Crawford, Wishnew & Lang PLLC
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Movants*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 19-34054-sgj-11 |
| | ) | |
| Highland Capital Management, L.P., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## APPENDIX TO JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY INVESTMENT TRUST, THE GET GOOD TRUST, and NEXPOINT REAL ESTATE PARTNERS, LLC, F/K/A HCRE PARTNERS, LLC, A DELAWARE LIMITED LIABILITY COMPANY'S MOTION FOR FINAL APPEALABLE ORDER AND SUPPLEMENT
## TO MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455 AND BRIEF IN SUPPORT

James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company (collectively, "Movants") file this Appendix in support of their *Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455* and *Brief in Support*:

| Exhibit No. | Description | Appendix Nos. |
|---|---|---|
| **31** | June 10, 2021 Hearing Transcript | APP'X. 2720-2810 |
| **32** | December 10, 2020 Hearing Transcript | APP'X. 2811-2815 |
| **33** | June 17, 2021 Order | APP'X. 2816-2828 |

| 34 | February 9, 2022 Memorandum Opinion and Order by Judge Kinkeade | APP'X. 2829-2842 |
|---|---|---|
| 35 | May 19, 2022 Letter | APP'X. 2843-2924 |
| 36 | November 3, 2021 Letter | APP'X. 2925-3013 |
| 37 | May 11, 2022 Letter | APP'X. 3014-3044 |
| 38 | January 14, 2021 Hearing Transcript | APP'X. 3045-3049 |
| 39 | May 20, 2021 Hearing Transcript | APP'X. 3050-3054 |
| 40 | May 10, 2021 Hearing Transcript | APP'X. 3055-3067 |
| 41 | June 25, 2021 Hearing Transcript | APP'X. 3068-3070 |
| 42 | March 1, 2022 Hearing Transcript | APP'X. 3071-3073 |

Dated: July 19, 2022

Respectfully submitted,

CRAWFORD, WISHNEW & LANG PLLC

By: */s/ Michael J. Lang*
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

**Counsel for Movants**

## CERTIFICATE OF SERVICE

The undersigned certifies that, on July 19, 2022, a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice by the Court's ECF system.

*/s/ Michael J. Lang*
Michael J. Lang

# EXHIBIT 31



```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION

                                    )    Case No. 19-34054-sgj-11
In Re:                              )    Chapter 11
                                    )
HIGHLAND CAPITAL                    )    Dallas, Texas
MANAGEMENT, L.P.,                   )    Thursday, June 10, 2021
                                    )    9:30 a.m. Docket
          Debtor.                   )
                                    )    MOTION TO COMPEL COMPLIANCE
                                    )    WITH BANKRUPTCY RULE 2015.3
                                    )    FILED BY GET GOOD TRUST AND
                                    )    THE DUGABOY INVESTMENT TRUST
                                    )    (2256)
_____)
                                    )
HIGHLAND CAPITAL                    )    Adversary Proceeding 21-3006-sgj
MANAGEMENT, L.P.,                   )
                                    )
          Plaintiff,                )    DEFENDANT'S MOTION FOR LEAVE
                                    )    TO FILE AMENDED ANSWER AND
v.                                  )    BRIEF IN SUPPORT [15]
                                    )
HIGHLAND CAPITAL                    )
MANAGEMENT SERVICES, INC.,          )
                                    )
          Defendant.                )
_____)
                                    )
HIGHLAND CAPITAL                    )    Adversary Proceeding 21-3007-sgj
MANAGEMENT, L.P.,                   )
                                    )
          Plaintiff,                )    DEFENDANT'S MOTION FOR LEAVE
                                    )    TO AMEND ANSWER TO PLAINTIFF'S
TO                                  )    COMPLAINT [16]
v.                                  )
                                    )
HCRE PARTNERS, LLC                  )
N/K/A NEXPOINT REAL                 )
ESTATE PARTNERS, LLC,               )
                                    )
          Defendant.                )
_____)

                   TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
               UNITED STATES BANKRUPTCY JUDGE.
```

```
 1   WEBEX APPEARANCES:

 2   For the Get Good Trust      Douglas S. Draper
     and Dugaboy Investment      HELLER, DRAPER & HORN, LLC
 3   Trust:                      650 Poydras Street, Suite 2500
                                 New Orleans, LA  70130
 4                               (504) 299-3300

 5   For the Debtor:             Jeffrey Nathan Pomerantz
                                 PACHULSKI STANG ZIEHL & JONES, LLP
 6                               10100 Santa Monica Blvd.,
                                   13th Floor
 7                               Los Angeles, CA  90067-4003
                                 (310) 277-6910
 8
     For the Debtor:             John A. Morris
 9                               PACHULSKI STANG ZIEHL & JONES, LLP
                                 780 Third Avenue, 34th Floor
10                               New York, NY  10017-2024
                                 (212) 561-7700
11
     For the Official Committee  Matthew A. Clemente
12   of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                                 One South Dearborn Street
13                               Chicago, IL  60603
                                 (312) 853-7539
14
     For James Dondero:          Clay M. Taylor
15                               BONDS ELLIS EPPICH SCHAFER
                                   JONES, LLP
16                               420 Throckmorton Street,
                                   Suite 1000
17                               Fort Worth, TX  76102
                                 (817) 405-6900
18
     For the NexPoint            Lauren K. Drawhorn
19   Parties:                    WICK PHILLIPS
                                 3131 McKinney Avenue, Suite 100
20                               Dallas, TX  75204
                                 (214) 692-6200
21
     Recorded by:                Michael F. Edmond, Sr.
22                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
23                               Dallas, TX  75242
                                 (214) 753-2062
24

25
```

3

```
1    Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX  76208
                                  (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
            Proceedings recorded by electronic sound recording;
24              transcript produced by transcription service.

25
```

**APP. 2722**

4

1              DALLAS, TEXAS - JUNE 10, 2021 - 9:44 A.M.

2              THE COURT:  All right.  Let me change my stacks here.

3    I will now hear what was Matter No. 1 on the docket, Highland

4    Capital, Case No. 19-34054.  We have a motion from the Dugaboy

5    and Get Good Trusts seeking compliance with Bankruptcy Rule

6    2015.3.

7         Who do we have appearing for the trusts this morning?

8              MR. DRAPER:  Douglas Draper, Your Honor.

9              THE COURT:  All right.  And for the Debtor this

10   morning?

11             MR. POMERANTZ:  Good morning, Your Honor.  Jeffrey

12   Pomerantz; Pachulski Stang Ziehl & Jones; on behalf of the

13   Debtor.

14             THE COURT:  All right.  Do we have any other parties

15   wishing to make an appearances?  These are the only parties

16   who filed pleadings, but I'll go ahead and ask if anyone wants

17   to appear for any reason.

18             MR. CLEMENTE:  Good morning, Your Honor.  It's Matt

19   Clemente at Sidley on behalf of the Committee.  I'm here.

20             THE COURT:  All right.  Thank you, Mr. Clemente.

21        All right.  Mr. Draper, how did you want to proceed?

22             MR. DRAPER:  I'd just -- I think the issue is

23   primarily a legal issue, Your Honor.

24             THE COURT:  Uh-huh.

25             MR. DRAPER:  So we've filed with the Court our

5

1   response to the Debtor's opposition, I have some comments I'd

2   I like to make, and just leave it at that.  I think -- as I

3   said, I believe the issue is purely a legal issue --

4               THE COURT:  Uh-huh.  Okay.

5               MR. DRAPER:  -- and can go from that.

6               THE COURT:  All right.

7               MR. DRAPER:  All right.  We are here -- thank you,

8   Your Honor.  Can I start?

9               THE COURT:  Yes, you may.

10              MR. DRAPER:  Thank you.  We're here before the Court

11  today on what should be a rather routine matter.  All I'm

12  asking the Court to do is to require the Debtor to do what it

13  should have done when the case was filed and is required

14  pursuant to Bankruptcy Rule 2015.3.

15     2015.3 uses the term "shall" and requires the Debtor to

16  file an official form -- and this is important, because I'm

17  going to come back to the official form -- with respect to the

18  value, operations, and profitability of each entity in which

19  the Debtor has a substantial or controlling interest.

20      The reports, the Rule says, shall be filed seven days

21  before the first meeting of creditors and every six months

22  thereafter.

23      Under 2015.3(d), I recognize a court may, after notice and

24  a hearing, modify the reporting requirement.  No request has

25  been made by counsel for the Debtor, who I will stipulate

6

1  knows the Rules, are experienced, and understand that the rule

2  existed the day they came into the case.  And quite frankly,

3  what we have now is, from what I can see, an intentional

4  decision not to file the report.

5      As the Court knows, this matter was brought before this

6  Court in February, when the confirmation hearing was held.

7  And if the Court will recall, Mr. Seery's comment was (a) it

8  slipped through the cracks; and (b) he implied that it would

9  be done.  That was February.  I had hoped, and I think

10  everybody had hoped, that Mr. Seery, Highland, and Debtor's

11  counsel would be so embarrassed by the fact that they didn't

12  file [sic] the rule that they would have either (a) filed

13  [sic] the rule; or (b) sought -- sought a waiver of the rule.

14  They did neither.

15      Now, let's -- let's go through the 2015.3(d).  There are

16  two items that are not exclusive, and so I recognize it.  The

17  first is that they can't do it, and second is with respect to

18  the information is publicly available.  If you look at the

19  cases that the Debtor has cited in support of their position

20  that courts have waived compliance with the rule, you'll note

21  that three of the four cases deal with first day motions when

22  in fact they ask for extensions of time to file their

23  schedule, Statement of Financial Affairs, and other things.

24  These are normal first day motions.  I understand the

25  extension in that case.  And quite frankly, those extensions

7

1  are -- fall into the "I can't do it."

2      The only excuse the Debtor has offered, other than their

3  response to date, was, oh, I forgot, or it slipped through the

4  cracks.  That is not a legitimate excuse.  It never has been

5  and never will be, and should not be countenanced by the

6  Court.

7      And so let's start with the after-the-fact excuses offered

8  by the Debtor.  The first is the bad guy defense -- *i.e.*,

9  Dugaboy is a Dondero entity; they're asking for this

10  information for nefarious purposes.  That has to -- that

11  should be completely disregarded by the Court.  This is a

12  systematic issue that neither you nor I nor the Debtor's

13  counsel put in the Code or put in the Rules.  It is a

14  requirement, it's systematic, and we, as counsel and people

15  acting on behalf of the estate and sort of people who oversee

16  the system, should insist that this be filed.  The bad guy

17  defense is not an excuse.  And quite frankly, this is

18  information that is required.

19      So what I'm asking for today is not gamesmanship.  I don't

20  think it is ever gamesmanship when you ask for the compliance

21  with a rule that says shall.  Again, it's systematic, and we

22  are here -- and I don't know why -- either the U.S. Trustee

23  was asleep at the switch or anybody else was asleep at the

24  switch -- that this matter hadn't been brought to the Court's

25  attention.

Case 19-34054-sgj11  Doc 3405-1  Filed 07/19/22    Entered 07/19/22 17:21:44    Page 10 of
356
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21    Page 10 of 106   PageID 9588

8

1       So the word "shall" is not strained in any fashion.  It's

2   not limited in any fashion.  The word "shall" is absolute.

3       So, again, had -- was there some secret deal between the

4   Trustee -- U.S. Trustee and the Debtor?  I don't know.  That

5   may have been.  But quite frankly, --

6           THE COURT:  A secret deal?

7           MR. DRAPER:  -- the Code, in 2015 --

8           THE COURT:  Did you just use the term "a secret

9   deal"?

10          MR. DRAPER:  Well, some --

11          THE COURT:  What --

12          MR. DRAPER:  I'm not using the term.  What I --

13          THE COURT:  That's highly charged, that --

14  =       MR. DRAPER:  No, --

15          THE COURT:  -- choice of words.

16          MR. DRAPER:  What I mean, what I really mean is

17  sometimes we go to the U.S. Trustee and say, look, can we have

18  an extension?  Can we have -- can we do this a little bit

19  later?  And the U.S. Trustee, in fairness to them, basically

20  says, okay, you can do this or that.  I don't know if that

21  occurred in this case.  But quite frankly, what we have are 20

22  months of noncompliance.  And so I don't know if they said,

23  look, --

24          THE COURT:  Okay.

25          MR. DRAPER:  -- you don't have to file it now.

9

1          THE COURT:  So you meant an informal deal, not secret

2    deal?

3          MR. DRAPER:  Yes.

4          THE COURT:  A secret deal, that sounds like something

5    nefarious.  Okay?  So, --

6          MR. DRAPER:  No, it is not intended in that -- it's

7    --

8          THE COURT:  Okay.

9          MR. DRAPER:  Judge, it's not intended in that

10   fashion.

11         THE COURT:  Okay.

12         MR. DRAPER:  This goes to my issue that it's

13   systematic.  It's a systematic compliance.

14       And let's also go the fact that the Bankruptcy Code

15   requires complete and open disclosure.  It does not matter who

16   or why compliance is requested.

17       The next objection is I waited too long.  And they offer

18   an excuse, Judge, we're going to go effective.  Let's look at

19   what the Code requires -- the rule requires.  It says it shall

20   be filed, it has to be filed at certain points, through the

21   effective date of a plan.  It doesn't say after the effective

22   date of a plan is filed or after the effective date of a -- of

23   a plan occurs, your compliance is not required.

24       And I'll point out something where you ruled against me,

25   and we've contrasted that in our motion -- in our opposition.

10

1    If you look at the examiner statute, which I know the Court

2    has looked at and completely disagreed with my reading of it,

3    it basically says after confirmation you don't have to do it.

4    This statute doesn't say that. This statute says you have to

5    file these through the effective date of a plan.

6        And so, you know, that "You waited too long" is really not

7    a legitimate excuse.

8        The next issue is -- and --

9            THE COURT: Well, on that point, --

10           MR. DRAPER: And let's look at the cases.

11           THE COURT: On that point, can I just ask, what is

12   the utility? I mean, let's say we're one -- okay. Let's say

13   we're one month away from the effective date. Let's say we're

14   three months away from the effective date. What is the

15   utility at this point? There's a confirmed plan. Now,

16   granted, it's on appeal. But, you know, what -- what would

17   you --

18           MR. DRAPER: Well, --

19           THE COURT: What would you do with this information

20   at this point? We have a confirmed plan.

21           MR. DRAPER: Well, there are two responses to that.

22   First of all, the rule says you have to file it through the

23   effective date of a plan. Somebody in rulemaking authority

24   made that determination. And so it's not for you or I to

25   question. That's the rule.

11

1        The second is the utility may be for further actions in

2    the case that occur after the effective date.  We just don't

3    know.

4        And so the rule is designed to require things to be filed

5    --

6                THE COURT:  Wait.  What did that last statement mean,

7    --

8                MR. DRAPER:  -- through the effective date.

9                THE COURT:  -- for actions that might occur after the

10   effective date?

11               MR. DRAPER:  It may be --

12               THE COURT:  What does that mean?

13               MR. DRAPER:  After the effective date of a plan.

14   There may be some -- some matter that comes up before the

15   Court.  And I'll give you the best example --

16               THE COURT:  Well, --

17               MR. DRAPER:  -- of all of them.

18               THE COURT:  Okay.

19               MR. DRAPER:  If you look -- if you look at the form,

20   all right, and what I'd ask the Court to look at is -- I think

21   it's Exhibit E that's required on the form.  And what Exhibit

22   E requires is disclosure of information where one of the

23   subsidiaries has either paid or has decided -- has incurred a

24   liability to somebody who would have an administrative expense

25   against the Debtor.

12

1      The utility of that post-effective date is important,

2   because post-effective date you'll be dealing with fee

3   applications and other things.  So the rule envisions

4   disclosure --

5           THE COURT:  Okay, I -- say that again for me slowly.

6   How --

7           MR. DRAPER:  Okay.

8           THE COURT:  How could there be an administrative

9   expense --

10          MR. DRAPER:  If you'll --

11          THE COURT:  -- claim against the estate in your

12  scenario, again?

13          MR. DRAPER:  Well, my scenario, if you look at

14  Exhibit E that's required in the form, --

15          THE COURT:  Do I have that, Nate?

16          MR. DRAPER:  -- it basically requires a disclosure.

17          THE COURT:  Okay.  I don't know if I have it in my

18  stack of paper.  I --

19          MR. DRAPER:  Well, let me read it to -- I can read it

20  to you, Your Honor.  It's easy.  Let me pull it up.

21      Exhibit E, "Describe any payment by the controlled

22  nondebtor entity of any claim, administrative expense, or

23  professional fee that have been paid or could be asserted

24  against the Debtor or the incurrence of any obligation to make

25  such payments, together with the reason for the entity's

13

1    payment thereof or the incurrence of any obligation with

2    respect thereof."

3        That is clearly a post-effective date issue that the Court

4    should be concerned about, all parties should be concerned

5    about, and so if that occurred, then everybody needs to know

6    about it.

7        So E envisions something that is absolutely after the

8    effective date that will be -- has a utility after the

9    effective date.

10       Let's look at B.  Again, something that may have something

11   to do with after the effective date.  That deals with tax-

12   sharing agreements and tax-sharing attributes.

13       So -- and then C, which also has something to do with

14   after the effective date and how things sort out through the

15   liquidation, is described claims between controlled debtor,

16   controlled nondebtor entity and any other controlled nondebtor

17   entity.

18       So there needs to be a disclosure of due-to's and due-

19   from's between the entities.  This is -- this is not secret

20   stuff.  This is stuff that transcends the effective date of a

21   plan.

22       And so when I focused on the rule, what I think the Court

23   really needs to look at for the utility of this is exactly

24   what the -- is required by a 2015.3 disclosure.

25       Does that answer the Court's question?

14

1          THE COURT:  Yes.

2          MR. DRAPER:  Now, my favorite excuse that's been

3   offered is really what I'll call the secret sauce dispute --

4   excuse, or the former lawyers for the Debtor.  Again, let's

5   break this down and let's look at the form.

6       What the form requires is there's nothing the Debtor's

7   former lawyers did or who were working for Mr. Dondero.  If

8   you look at Exhibit A that's required, is contains the most

9   readily-available balance sheet.  That's not a legal issue.

10  Statement of income or loss.  That's -- that's just an

11  accounting concept.  Statement of cash flows.  That's also an

12  accounting concept.  And statement of changes in shareholders

13  or partners equity for the period covered by the entire

14  report.

15      B again has nothing to do with the lawyers, is describe

16  the controlled nondebtor business entity's business

17  operations.

18      So the information that's here is purely accounting

19  information and it is not secret.

20      Let's, again, let's focus on A, which -- which I think

21  just deals with financial information.  The first one is

22  balance sheet.  All right.  They've argued that this tells

23  what the value -- what we think the value of an asset is.

24  That's not true.  A balance sheet may have a fair market

25  value.  A balance sheet may have a book value.  I don't know

15

1   what they have here.  But quite frankly, if you or I sell my

2   house, our house, we go to our agent and we say, hey, look,

3   agent, you know, this is my listing price.  That's my opinion

4   as to value.  It may not be somebody else's opinion as to

5   value.  And quite frankly, when somebody asks or wants to buy

6   an asset, what they come to, don't they ask, hey, what do you

7   want for it?

8       You know, book value does not equal value.  And I know the

9   Court has held -- has had before it many clients or many

10  debtors, and I've represented a lot of debtors, who think a

11  Bic pen that they have is not worth ten cents but is worth a

12  gazillion dollars.

13      So that issue doesn't go to any secret information.  The

14  statement of income doesn't go to secret information.

15  Statement of cash flows does not.  And changes in shareholders

16  does not.  There's no secret information.  The only person who

17  this may be kept away from, possibly, and that -- that, I

18  don't think applies, is a competitor who may want to look at

19  these.  And a court can fashion that relief and say, okay,

20  let's put this under seal.  If somebody signs a

21  confidentiality agreement, they can have access to this.

22      But this is purely accounting information.  It's nothing

23  more.

24      And the reference to trade secrets that the Debtor

25  attempts to make is just not true.  This is not a trade

16

1  secret.  There's no confidential research or development or

2  commercial information that's being disclosed.  And 9018 that

3  they cite is truly an evidentiary rule.  We're not -- this --

4  this requirement does not go to customers.  It does not go to

5  pricing.  It does not go to business processes.  It just goes

6  to financial information.

7       So the global argument that they're making is undercut

8  significantly by the -- by what is required under the rule.

9  I'm just asking for mere compliance with the rule, nothing

10  more.

11       And so, you know, what -- I still don't understand what

12  the issue is, why it hadn't been done.  And quite frankly,

13  again, this is systematic.  It has nothing to do with who is

14  requesting it, what is requesting it.  It should have been

15  done.  It should have been done probably by the U.S. Trustee.

16  You know, somebody -- you know, and quite frankly, I've been

17  in this case since December.  It was raised in February.  You

18  know, I don't understand why, from February to the time I

19  filed this motion, they didn't come in and either (a) file the

20  reports, which on their face appear to be benign; or (b) ask

21  for some reason other than, oops, I forgot.

22       And so I'd ask the Court to require compliance.  I don't

23  think the information here falls into any category of for

24  cause.  They can do it.  This -- and the cases -- any case

25  they cite does not support their proposition that it shouldn't

17

1  be done.

2       Does the Court have any questions for me?

3            THE COURT: Well, I do. My brain just constantly

4  goes to standing. And remind me again, the trusts you

5  represent have each filed proofs of claim, correct?

6            MR. DRAPER: Yes. And they're objected to, --

7            THE COURT: They are objected to.

8            MR. DRAPER: -- just so the Court's aware.

9            THE COURT: Okay. Remind me again what the substance

10 of the claim is about.

11           MR. DRAPER: The substance of the claim is I have a

12 -- I have a $17 million debt owed to me by Highland Select.

13 And it is our position that this Debtor is also liable for the

14 Highland Select debts through its general partner status,

15 through its comingling of things, and how these assets fit

16 together, between Highland Select, which is a hundred percent

17 owned by the -- ultimately owned by this Debtor. So I'd --

18 again, the standing issue --

19           THE COURT: And the debt is --

20           MR. DRAPER: And I am also an equity holder.

21           THE COURT: And the debt is pursuant to a note?

22           MR. DRAPER: It's pursuant to a loan agreement

23 between my client and Highland Select.

24           THE COURT: All right. And was an administrative

25 expense filed by your client?

**APP. 2736**

18

1          MR. DRAPER:  Not by my client.  No.  And I'm also an

2   equity holder in the Debtor that, when the plan goes

3   effective, I ultimately have, at best, a residual interest

4   when the Star Trek Enterprise returns.

5          THE COURT:  Okay.  And what is that residual

6   interest?  Remind me again.  Isn't it less than one percent --

7          MR. DRAPER:  After the --

8          THE COURT:  -- of a subordinated --

9          MR. DRAPER:  After all the class --

10         THE COURT:  Go ahead.

11         MR. DRAPER:  Right.  Well, after all the classes are

12  paid in full plus a hundred cents on the dollar -- get a

13  hundred cents on the dollar plus some interest factor, and the

14  -- there's another party who has an equity interest that's

15  ahead of me get paid, I get some -- some money.

16     Again, I have a residual interest.  It's very tangential.

17  And I'll be very frank to the Court and honest, I think

18  ultimately I will receive nothing under that residual

19  interest.

20     However, my -- the standing is not really an issue here.

21  Honestly, this is a systematic issue.  I've tried to make that

22  clear for the Court.  It's something that should be employed,

23  and who is asking for it is irrelevant.  The Code requires --

24  the Rules require it.  There is no excuse that they've given

25  that should absolve them of that.  And whatever excuse they've

19

1  given basically falls in -- falls in the face of what the rule

2  -- the official form requires.

3       I'm not asking for a variance of the official form.  I'm

4  asking that this Court not allow a "Oops, I forgot" or "It

5  slipped through the cracks" excuse.

6            THE COURT:  All right.  And who is the current

7  trustee of these trusts now?

8            MR. DRAPER:  My trusts?  Nancy Dondero is the trustee

9  of the Dugaboy Trust, and I think Grant Scott is the trustee

10 of the Get Good Trust.

11           THE COURT:  Okay.  I'm asking because we heard

12 earlier this week that Grant Scott has resigned from certain

13 roles.

14      All right.  Mr. Pomerantz, do you have evidence, --

15           MR. POMERANTZ:  Yes, Your Honor.

16           THE COURT:  -- or argument only?

17           MR. POMERANTZ:  Argument only, Your Honor.

18           THE COURT:  Okay.

19           MR. POMERANTZ:  As with -- as with many of the other

20 motions that have been filed with this -- in this case and has

21 burdened the Court's docket over the last several months, I

22 really can't help to wonder why we are here.

23      Eighteen months after the case was filed, after plan

24 confirmation, and with the effective date that's set to occur

25 soon, Dugaboy and Get Good, the family trusts, ask the Court

20

1    to compel the Debtor's compliance with 2015.3.  It reminds me

2    of the motion that Mr. Draper mentioned that he filed on the

3    eve of confirmation, the eve of confirmation, fourteen months

4    after the case had been filed, seeking an examiner.  And the

5    Court denied that motion without a hearing.

6         Now they're back again with, as Your Honor mentioned and

7    I'll get to in a little bit, with the same tangential

8    connection to the bankruptcy case and the same tenuous

9    standing that the Court has alluded to on several occasions,

10   including just a couple minutes ago.

11        It's clear that the motion, which is not supported by any

12   other creditor in the case and is actually opposed by the

13   Official Unsecured Creditors' Committee, is not about

14   financial transparency, as Mr. Draper would like Your Honor to

15   believe, but it's filed as a further litigation tactic to gain

16   access to information that Mr. Dondero would not be able to

17   obtain through discovery, who has tried to obtain through

18   other means, and that the Debtor believes will be used for

19   improper purposes.

20        One of the Movants, Dugaboy, is actually the holder of two

21   claims against the Debtor.  I guess Mr. Draper forgot about

22   his administrative claim, which really goes to the validity of

23   it.  One is the claim against the Select Fund, a subsidiary of

24   the Debtor, for which Mr. Draper says they should be liable,

25   including under an alter ego theory.

Case 19-34054-sgj11  Doc 3405-1  Filed 07/19/22    Entered 07/19/22 17:21:44    Page 23 of
356
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21    Page 23 of 106   PageID 9601

21

1      Yes, Your Honor heard me right.  Dugaboy is saying that

2 the Debtor is an alter ego with a nondebtor entity.  One would

3 think that, given the recent disclosures and commencement of

4 litigation -- and I'm talking about the UBS litigation -- that

5 Mr. Dondero would be the last one to raise alter ego.  In any

6 event, that claim is disputed.

7      The second claim is an administrative claim that Mr.

8 Draper filed on account of their 1.71 percent interest in

9 Multistrat, saying they were damaged by decisions Mr. Seery

10 made by selling certain life insurance policies in the spring

11 of 2020.

12      There is a theme here, Your Honor:  Claims that Mr. Seery

13 made decisions that harmed -- in this case -- Dugaboy's 1.71

14 percent interest.

15      The claim has no merit.  The Debtor will contest it.  But

16 even if it was allowed, the claim would be paid a hundred

17 cents on the dollar under the plan.  And accordingly, the

18 information under 2015.3 is not relevant.

19      Get Good filed a claim which alleges they may have a claim

20 from its limited partnership interest in the Debtor.  But for

21 the record, Get Good is not a limited partner of the Debtor.

22      So, how did we get here, Your Honor?  The Dondero entities

23 sandbagged the Debtor by raising the issue for the first time

24 during the confirmation trial.  Not in their briefs, not in

25 communications to the Debtor in advance of the confirmation,

Case 19-34054-sgj11  Doc 3405-1  Filed 07/19/22    Entered 07/19/22 17:21:44    Page 24 of
356
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21    Page 24 of 106   PageID 9602

22

1   but while the Debtor had its witness on the stand.

2        And why did they do it that way?  Because they wanted to

3   be able to argue, and they did argue to Your Honor, that the

4   Court couldn't confirm the plan because the Debtor did not

5   comply with Rule 2015.3, was in violation of 1129(a)(2), and

6   the Court could not confirm the plan.

7        Of course, the Court rejected that argument.  And when the

8   Debtor entity -- when the Dondero entities raised it as a

9   reason for Your Honor to enter a stay pending appeal, Your

10  Honor commented that that claim bordered on frivolous.  And of

11  course, that issue has been raised to the Fifth Circuit as one

12  of the reasons to overturn Your Honor's confirmation order.

13       And why are the Dondero entities persisting now in their

14  effort to obtain disclosure?  It's because they're desperate

15  to obtain financial information about the Debtor because they

16  want to become involved in the Debtor's future asset

17  dispositions at the nondebtor affiliates and they want to get

18  information.

19       As Your Honor will recall, Mr. Dondero filed a motion in

20  January asking for this Court to require the Debtor to bring

21  affiliated -- affiliated entity asset sales to the Court.  The

22  Debtor opposed the motion, and before the hearing it was

23  withdrawn.

24       Your Honor has heard testimony from Mr. Seery throughout

25  the case that Mr. Dondero previously interfered with the

23

 1    Debtor's asset sales and that -- and on that basis, the Debtor

 2    was not comfortable including Mr. Dondero in sale processes.

 3    And I'm not talking about the AVYA and the SKY stock from the

 4    CLO funds, but rather certain transactions regarding SSP and

 5    OmniMax which were subject to a motion made by, I believe, the

 6    Funds or the Advisors -- I get them confused sometimes --

 7    accusing the Debtor of mismanaging the CLOs.  And if Your

 8    Honor recalls, Your Honor denied that motion based upon a

 9    directed verdict.

10        So, having been rebuffed by the Debtor in its attempts to

11    obtain financial information that they're not entitled to, the

12    trusts have one last effort.  Press 2015.3 arguments, because,

13    of course, they're very interested in the integrity of the

14    process, in the institution, in the following of the

15    Bankruptcy Code.  That is exactly what their motivation is.

16        But there's yet another reason, Your Honor, the Debtor

17    believes Mr. Dondero, through the trusts, is pursuing this

18    motion.  As Your Honor is aware, the Debtor recently

19    discovered some extremely troubling information regarding a

20    massive fraud involving a previous --

21        (Audio cuts out.)

22            THE COURT:  Uh-oh.

23            THE CLERK:  He froze up.

24        (Pause.)

25            THE COURT:  All right.  Mr. Pomerantz, you're frozen.

24

1    Is everybody frozen, or is it just him?

2             MR. POMERANTZ:  There'll be some judicial estoppel.

3             THE COURT:  Okay.  Mr. Pomerantz?

4             MR. POMERANTZ:  Yes.

5             THE COURT:  You were frozen for about one minute.  So

6    I am sorry, --

7             MR. POMERANTZ:  Uh-huh.

8             THE COURT:  -- you're going to need to repeat the

9    past minute for me.

10            MR. POMERANTZ:  Just to check if you were listening,

11   Your Honor, what was the last thing you remember me saying?

12            THE COURT:  I was listening.

13            MR. POMERANTZ:  Okay.  So I will -- did you hear me

14   talk about Mr. Seery's testimony throughout the case?

15            THE COURT:  No.  No.

16            MR. POMERANTZ:  Okay.  I'll go back a paragraph

17   before.  Okay.  Okay.

18        And why are the Debtor -- why are the Dondero entities

19   persisting now in their effort to obtain disclosure?  It's

20   because the Dondero entities are desperate to try to obtain

21   financial information, information they would not otherwise be

22   entitled to under discovery rules, because they want to become

23   involved, he wants to become involved in the Debtor's asset

24   dispositions in the future regarding affiliated nondebtor

25   entities.

25

1    If Your Honor will recall, Mr. Dondero made a motion in

2  January seeking an order from this Court requiring the Debtor

3  to bring to this Court asset sales from nondebtor affiliates.

4  The Debtor opposed the motion, and before the hearing on the

5  motion it was withdrawn.

6    Your Honor has heard testimony from Mr. Seery throughout

7  the case that Mr. Dondero previously interfered or tried to

8  interfere with the Debtor's asset sales, and on that basis the

9  Debtor was not comfortable inviting Mr. Dondero into its asset

10  sale processes.

11    And I'm not talking about the AVYA and SKY stock from the

12  CLOs, but rather certain transactions regarding SSP and

13  OmniMax, which were closed for fair value, which were subject

14  of a motion that the Advisors or the Funds -- and I often get

15  them confused -- that they made, accusing the Debtor of

16  mismanaging the CLOs. And I'm sure Your Honor recalls. Your

17  Honor denied that motion on a directed verdict basis.

18    So, having been rebuffed in their attempts to try to get

19  the information that they weren't entitled to, they're now

20  proceeding under 2015.3. And, of course, Mr. Draper say he is

21  a protector of the process, the integrity of the system

22  demands it. It has nothing to do with Mr. Dondero's

23  interests, of course, because Mr. Draper is just there to make

24  sure everything runs on time and everything is done according

25  to the law, notwithstanding the fact that the U.S. Trustee

26

1    hasn't brought this motion, notwithstanding the fact that the

2    Unsecured Creditors' [Committee] supports our position, and

3    notwithstanding the fact that not one creditor, not one

4    unaffiliated creditor, has asked this Court for that

5    information and relief.

6        There's yet another reason, Your Honor, the Debtor

7    believes that the trusts are pursuing this motion.  As Your

8    Honor is aware, the Debtor recently discovered some extremely

9    troubling information regarding a massive fraud involving a

10   previously-unknown entity called Sentinel Reinsurance.  And

11   that information is the subject of an adversary proceeding

12   filed by UBS, which Your Honor heard substantial information

13   about both in connection with hearings on that motion practice

14   and also at the UBS 9019 motion.

15       The Debtor believes that the 2015.3 motion is a veiled or

16   pretty transparent effort of Dondero trying to find out what

17   the Debtor knows and what the Debtor doesn't know and trying

18   to get the Debtor to go on record with information that later

19   in litigation they will use as a judicial estoppel.

20       Your Honor, that's not an appropriate predicate for the

21   motion.  Mr. Draper will deny that that's the reason, of

22   course, but I leave it for Your Honor to look at the

23   circumstances and make your own conclusions.

24       As the Court has mentioned many times, context matters,

25   and the Court should take this context into account in looking

27

1    at the motion and the requested relief.

2        In our opposition, we argue that the Court should either

3    waive the 2015.3 compliance, given the anticipated effective

4    date, or continue the hearing to September 1 for a further

5    status conference if the effective date doesn't occur.

6        The burden on the estate if it was required to comply with

7    2015.3 is significant, and this goes to the issue Your Honor

8    mentioned, that, really, what's the point at this stage of the

9    case?  There are more than 150 entities that arguably meet the

10   definition of substantial or controlling interest for which

11   the Debtor would be required to file reports under 2015.3.  As

12   the Court knows, the Debtor is down to 12 staff, 13 if you

13   include Mr. Seery.  And if those employees working with the

14   Debtor's financial advisors were required to devote the

15   necessary time and effort to prepare the reports, the time and

16   the cost it would take would be substantial.  The Debtor just

17   doesn't have the bandwidth to comply.

18       More importantly, Your Honor, as we mention in our

19   opposition, Mr. Seery and the board are extremely concerned

20   with the quality of information it has received from the

21   Debtor's employees who have since been terminated by the

22   Debtor and now most of them are working for Mr. Dondero and

23   his related entities in one form or another.  It's not just

24   the lawyers, as Mr. Draper says.  It's the financial advisors,

25   who, in other contexts, and you'll hear a little later, are

28

1    coming up with new information, new defenses on notes, et

2    cetera.  The Debtor has no confidence that the information in

3    its records is accurate from a financial perspective or from a

4    legal perspective.

5        As I mentioned, the Court is aware of the Sentinel cover-

6    up.  And uncovering just the facts regarding Sentinel was a

7    very difficult process and required the Debtor to essentially

8    conduct discovery against itself.  It just couldn't rely on

9    its information.  So conducting the diligence that would be

10   required to provide accurate information for 150 entities,

11   intercompany claims, administrative claims, back and forth,

12   due-to's, due-from's, tax issues, all the stuff required by

13   the forms would be an extremely arduous task.  It would take

14   millions of dollars of forensic accounting.  And it wouldn't

15   -- and for what purpose?  There is no purpose.

16       In addition, Your Honor, to waiving filing the reports,

17   2015.3 also allows the Court to modify the reports requirement

18   for cause when the debtor is not able, in making a good faith

19   effort, to comply with the requirements.  Your Honor, in this

20   case, cause is clearly established under 2015.3.

21       Dugaboy spends a lot of time in their reply attacking the

22   cases that the Debtor cites in its opposition.  While the

23   facts in those cases are different from the case here, they

24   all share something in common which is the key point:  All of

25   the cases involve a waiver of the 2015.3 requirement for plans

29

1   that will be confirmed or will soon become effective.

2        Mr. Draper doesn't contest that this Court has the power

3   to waive.  He says, well, those requests were made in the

4   first 30 days of the case or in the initial part of the case.

5   But they all granted relief where the effective date -- where

6   either the confirmation date occurred and they were waiting

7   for the effective date, or the confirmation case was -- was

8   pending.

9        And Your Honor, we would ask the Court to treat the

10  Debtor's opposition as a motion to waive the requirement under

11  2015.3.  We could file a separate motion after this hearing.

12  It would be a waste of time.  But we would ask Your Honor,

13  treat our opposition as a motion.

14       Dugaboy spends the rest of its time, in the papers and its

15  argument that Mr. Draper made, challenging several arguments,

16  other arguments the Debtor makes in its opposition.  First,

17  they argue that there is no deadline for seeking compliance

18  and that the insinuation that we made that this is

19  gamesmanship is off base.  I'll acknowledge, Your Honor,

20  2015.3 does not contain a deadline for a party seeking

21  compliance.  But as I said before, context matters.  And given

22  how this motion has come to be before your court, I will leave

23  it for Your Honor to determine which party is the true one

24  playing games here.

25       Second, Dugaboy argues that there's nothing confidential

Case 19-34054-sgj11  Doc 3405-1  Filed 07/19/22    Entered 07/19/22 17:21:44    Page 32 of
356
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21    Page 32 of 106   PageID 9610

30

1    in any of the information required to be filed in the 2015.3

2    reports and that the disclosure of information will facilitate

3    interest in the assets and maximization of the Debtor's

4    assets.   Twenty months into this case, Your Honor, no party

5    other than Mr. Dondero or his related entities has complained

6    to the Court that the Debtor is not being transparent or

7    forthcoming.

8        And there's good reason for that.  Even during the early

9    stages of this case, when the Debtor and the Committee had

10   their differences, the Debtor was entirely forthcoming with

11   information about its assets, nondebtor affiliates, and

12   strategy for maximizing assets of the Debtor and its

13   affiliated entities.  That collaborative effort continues

14   today, and I suspect is one of the reasons that the Committee

15   has joined in the Debtor's opposition here.

16       Similarly, the Debtor's nondebtor affiliates have

17   transacted business with third parties postpetition.  The

18   Debtor has provided information to those parties as

19   appropriate, subject to nondisclosure agreement, and several

20   successful processes have been run that have maximized value.

21       And just to make clear, Your Honor, we do not believe that

22   Mr. Dondero or his related entities signed a nondisclosure

23   agreement that they would comply with the obligations.  So we

24   have no interest and no desire, unless ordered by the Court,

25   either in this context or another context, to provide Mr.

31

1  Dondero or his related entities with information that the

2  Debtor believes would prejudice its ability to monetize

3  assets.

4      The alleged transparency that Mr. Draper and the trusts

5  seek is not borne out of a desire to open the playing field

6  and make it level and put financial information in the public

7  domain for the good of the case.  It's about getting access to

8  information that the Debtor, in the exercise of its business

9  judgment -- should not be disclosed.

10      Lastly, Mr. Draper again, during oral argument, harped on

11  Mr. Seery's testimony that the reason the reports were not

12  filed is that they fell through the cracks.  It's misleading.

13  He also stated that Mr. Seery said they would file the

14  reports.  I've looked at the testimony.  That's not what he

15  said.  But he did say at confirmation that it slipped through

16  the cracks.  No doubt.  That's in the transcript.

17      And yes, the Debtor stands behind the fact that, in the

18  months leading to the confirmation hearing, neither Mr. Seery

19  nor the Debtor's professionals even thought about 2015.3.

20      But Your Honor, it's what has happened since that

21  justifies the Debtor's request for a waiver.  The plan is soon

22  to become effective.  As I said, the Debtor is down to 12

23  employees, who could not possibly prepare this information

24  without substantial time and effort.  Their effort and their

25  time should be focused on monetizing assets that will put

**APP. 2750**

32

1    money in creditors' pockets, hopefully sooner than later.

2        And on top of that, given the massive fraud that

3    management has uncovered, and continues to uncover information

4    to this day, Your Honor, on matters separate from the Sentinel

5    matter -- every week, we are finding out new information that

6    has not been made public that causes us real concern, and at

7    the appropriate time that information will be brought before

8    the Court -- the Debtors simply can't rely on that

9    information.  And to be required to go through the effort to

10   put that information out in the public record so Mr. Dondero

11   can later say that the Debtor was judicially estopped, or use

12   that information for an ulterior purpose or a litigation

13   strategy, just does not make sense.

14       Based upon the foregoing, Your Honor, we would ask that

15   the Court deny the motion and grant the Debtor a waiver of the

16   2015.3 requirements.

17       Does Your Honor have any questions?

18          THE COURT:  I do not think so.  Well, I just -- am I

19   correct in remembering the Debtor had somewhere around 75

20   employees at the beginning of this case?  And I didn't know it

21   was down to 12.  I knew it was down very low.  But that's what

22   we're talking about?

23          MR. POMERANTZ:  Yeah, that -- that sounds about

24   right, Your Honor.

25          THE COURT:  Okay.

33

1          MR. POMERANTZ:  And I should mention, you know, I was

2     there at the beginning.  I was there before the board.  The

3     first couple months of the case, it was extremely difficult to

4     get the Debtor's employees focused on trying to get the

5     information for the 2015.3.  They did not want that

6     information disclosed.  And it's sort of a -- sort of a little

7     ironic that now they're here asking for disclosure.

8        But, look, we're not going to walk away from the fact

9     that, yeah, it slipped through the cracks.  After the board

10    took over, Your Honor has heard many times what they did, the

11    efforts they went to.  If the U.S. Trustee had approached us,

12    if Mr. Dondero had approached us early on, we would have

13    figured out a way to address that and deal with that.  The

14    fact of the matter, it wasn't.  The fact of the matter, it was

15    brought up as a litigation tactic on confirmation, to defeat

16    confirmation of the plan.  And as I mentioned, for the

17    reasons, it's being used as a tactic now as well.

18          THE COURT:  All right.  Thank you.

19          MR. DRAPER:  Your Honor, I -- can I -- can I make a

20    few comments?

21          THE COURT:  No, not --

22          MR. DRAPER:  I'll be short.

23          THE COURT:  Not yet.  Mr. Clemente, --

24          MR. DRAPER:  Okay.

25          THE COURT:  -- I neglected to mention when I was

34

1  taking appearances, you filed a joinder on behalf of the

2  Committee with regard to --

3          MR. CLEMENTE:  That's correct, Your Honor.

4          THE COURT:  So I need to hear from you next, and then

5  I'll circle back to Mr. Draper.

6          MR. CLEMENTE:  That's correct, Your Honor.  And just

7  for the record, Matt Clemente from Sidley Austin.

8          THE COURT:  I should say, a joinder in the

9  opposition.  That was a confusing statement I just made.

10         MR. CLEMENTE:  Yeah, that's correct, Your Honor.

11         THE COURT:  Uh-huh.

12         MR. CLEMENTE:  And so I will be very brief, because

13  Mr. Pomerantz was obviously very thorough.  But just to echo

14  what he said, you know, the Committee is comfortable with the

15  information that it has received.  And as Your Honor knows, we

16  haven't been and won't be shy about coming to the Court if we

17  felt that that was not the case.

18      You know, we obviously had our issues early on in the

19  case, including with respect to getting information from the

20  Debtor.  But, again, the Committee, you know, has been

21  comfortable with the information that it's received from the

22  Debtor.

23      Therefore, at this point, Your Honor, from the Committee's

24  perspective, there doesn't seem to be any bona fide purpose to

25  making the Debtor go through the cost and the expensive effort

35

1    that Mr. Pomerantz said would be required to create the Rule

2    2015.3 reports.  And, again, I -- without casting aspersions,

3    it would suggest, based on previous activity, that there's

4    really only a nefarious purpose for what is being pressed

5    before Your Honor today.

6        So, Your Honor, again, we support the Debtor's position.

7    I absolutely agree with Mr. Pomerantz's arguments.  We would

8    request that Your Honor, you know, enter the relief that the

9    Debtor is requesting today.

10              THE COURT:  All right.  And Mr. Clemente, I just --

11              MR. CLEMENTE:  Yes?

12              THE COURT:  I just want to seal in my brain the

13   context that I think applies here.  The January 2020 corporate

14   governance settlement order.  In there, we all know there were

15   lots of protocols about lots of things, but one of them or a

16   set of the protocols dealt with transfers of assets in these

17   nondebtor subs or entities controlled by the Debtor.  And, of

18   course, Mr. Pomerantz alluded to this, but I'm just going to

19   make sure I'm crystal clear on what I remember.  You know, the

20   whole -- well, it was a protocol that the Committee would have

21   to be consulted on transfers of assets of those nondebtor

22   subs, those nondebtor controlled entities, and, you know,

23   there was a discussion that 363 doesn't apply, of course, to

24   nondebtor assets, and you could really argue all day, even if

25   it did apply, about whether these are ordinary course or non-

36

1 ordinary course because of the business Highland is in. But

2 the Debtor negotiated with you and your clients: We're going

3 to have full transparency to let you all get notice of

4 transfers of assets of these subs, and you could even object

5 and bring a motion. I mean, you can file some sort of

6 pleading, even though we were not so sure 363 under any

7 stretch might apply.

8 Am I correctly restating the context that -- you know, Mr.

9 Pomerantz alluded to it, but I just want to make sure I'm

10 clear and the record is clear.

11 MR. CLEMENTE: Your Honor, you are -- you are

12 absolutely correct. There's a very complex set of protocols

13 that we painstakingly negotiated with the Debtor that had

14 different categories depending upon the asset --

15 THE COURT: Uh-huh.

16 MR. CLEMENTE: -- and the Debtor's ownership and its

17 relationship with respect to the nondebtor entities or the

18 related parties. That required the Debtor to come to the

19 Committee in certain sets of circumstances and explain a

20 potential transaction and get the input from the Committee,

21 and either the Committee could consent to the transaction, or

22 if the Committee did not consent to the transaction, the

23 Debtor could seek relief from the Court.

24 Your Honor will remember that, in fact, one of the

25 hearings we had with respect to the monies that were placed in

37

1    the Court registry arose out of the protocols.  So the

2    protocols worked from that perspective in requiring the Debtor

3    to come to the Committee, allow the Committee to make an

4    evaluation, and then the Debtor would make a decision from the

5    perspective of how it wished to proceed.

6        So, Your Honor is absolutely correct.  That was all part

7    of the governance settlement that was negotiated back in

8    January.  And from the Committee's perspective, again, it

9    hasn't always been lemon water and rose petals, but we believe

10   that those protocols worked, and worked to provide the

11   Committee with information so it could appropriately evaluate

12   what the Debtor was doing.

13          THE COURT:  All right.  So I'm correct, you would

14   say, in thinking there was a lot of transparency built in?  It

15   didn't always work smoothly in the beginning, and as we know,

16   there were document production requests, many of them from the

17   Committee.  That all came to a head last July, with more

18   protocols put in place.  But lots of transparency was

19   negotiated by the Committee with regard to all of these

20   controlled entities and subs?

21          MR. CLEMENTE:  That was a critical, Your Honor, that

22   was a critical component of the governance settlement.

23          THE COURT:  Okay.

24          MR. CLEMENTE:  Because that was obviously the impetus

25   for us wanting that governance settlement, so we could get

38

1  that transparency.

2      So, to answer your question, Your Honor, yes, the

3  protocols served that function of providing the Committee with

4  information on transactions that the Debtor was proposing to

5  enter into.

6          THE COURT:  Okay.  And of course, there was a waiver

7  of the privilege -- I don't know if that's the word; I guess

8  that is the right word -- with regard to possible estate

9  causes of action.  Maybe I'm getting into something unrelated.

10 Maybe I'm not.  But that was part of the protocol, too, right,

11 the Debtor would waive its --

12         MR. CLEMENTE:  That's correct, Your Honor.

13         THE COURT:  -- privilege with regard to --

14         MR. MORRIS:  Your Honor, I apologize for

15 interrupting.  This is John Morris from Pachulski Stang.  I

16 just want to recharacterize that a bit.

17         THE COURT:  Okay.

18         MR. MORRIS:  It's not a waiver of the privilege.  We

19 agreed to share the privilege --

20         THE COURT:  Share the privilege.  Okay.

21         MR. MORRIS:  -- with the Debtor.  The Debtor --

22         MR. CLEMENTE:  I --

23         MR. MORRIS:  I'm sorry to -- sorry to correct you,

24 but it's a --

25         THE COURT:  Well, no, --

39

1          MR. MORRIS:  -- very important point.

2          THE COURT:  -- that's why I hesitated on that word.

3   I wasn't sure if that was the word, the concept.

4          MR. MORRIS:  There's no waiver.

5          THE COURT:  Okay.  Okay.  I'm not always --

6          MR. CLEMENTE:  That is -- and that is correct, Your

7   Honor.

8          THE COURT:  Okay.

9          MR. CLEMENTE:  Mr. Morris is correct.  As are you.

10          THE COURT:  Okay.  So I'm asking you, is all of this

11   protocol that was in place, I mean, is it reasonable for me to

12   think maybe that's the reason you all never pressed the 2015.3

13   issue, because you were getting a full look, as best you could

14   tell, and more?  You were getting more information, perhaps,

15   than these reports would have provided, even.  Is that fair

16   for me to think?

17          MR. CLEMENTE:  It is fair for you to think that, Your

18   Honor.  We viewed the protocols as our mechanism to get the

19   information that was necessary for the Committee to evaluate

20   the transactions that the Debtor wanted to engage in.  And so

21   we were looking to the protocols, and in fact, I think the

22   protocols were very broad in certain respects, and we were not

23   thinking about the Rule 2015 reports, nor would we have said

24   that that would have been a substitute for negotiating those

25   protocols and implementing them.

40

1          THE COURT:  Uh-huh.

2          MR. CLEMENTE:  So that's how the Committee was

3    looking at it, Your Honor.

4          THE COURT:  Okay.  All right.  Well, okay.  Mr.

5    Draper, I'm going to come back to you.  You get the last word

6    on that.

7          MR. DRAPER:  Thank you.  First of all, the answer is

8    yes, there are extensive protocols between the Debtor and the

9    Committee.  I one hundred percent agree with you.  And the

10   other point I'd make with that is this information is a

11   scaled-down version of what they're giving the Committee on a

12   regular basis.  So the argument that it would take hundreds of

13   man hours and millions of dollars to do that is absolutely not

14   true.  This information, in large measure, even vaster

15   portions of it have already been given to the Committee.

16   Number one.

17      Number two, we as lawyers are literalists --

18          THE COURT:  But I presume not in this format.  I

19   presume not in the format of filling out the form A through E

20   exhibits.  I mean, maybe it's an email.

21          MR. DRAPER:  Well, --

22          THE COURT:  Maybe it's a phone call.

23          MR. DRAPER:  -- it's not in a form -- no, there is --

24   there is -- they both have financial advisors who I'm sure

25   you're going to see whopping fee applications from who have

Case 19-34054-sgj11 Doc 3405-1 Filed 07/19/22   Entered 07/19/22 17:21:44   Page 43 of
356
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 43 of 106   PageID 9621

41

1    pored through all of this.  My bet, and I'd bet big dollars on

2    this, is that financial -- balance sheets are given to them on

3    a regular basis, statements of financial information for

4    subsidiaries and changes in cash flow are given to them.

5    Otherwise, there's no way the Creditors' Committee could

6    monitor what's going on and what's happening.

7        So, really, this is -- this is not a phone call thing.

8    There is real financial data that's being given that is

9    available and can be given on a scaled-down basis.

10       My real point of this is we as lawyers are literalists

11   until it suits our purposes not to be literalists.  There is

12   no exception in 2015.3 for information being given to a

13   creditors' committee.  In fact, when you look at 2015.3, it

14   basically figures there is information going to a creditors'

15   committee.  This is for the others who don't have access to

16   that information.

17       And the interesting part of that is, as the Court's aware,

18   the Bankruptcy Code was amended that if I had gone to the

19   Creditors' Committee and made a request as a creditor, I

20   probably have a right to get even more information than 2015.3

21   allows me to get.

22       Next, which is the giant smokescreen.  We're basically

23   dealing now with the gee, Mr. Dondero's a bad guy; gee, they

24   want this information because they want to uncover what we

25   know.  That's just not true with respect to these reports.  If

42

1  you look at what the reports do, the reports start from the

2  day that the case was filed and ask for changes in financial

3  condition from the day the case was filed going forward. It

4  is all postpetition in its effect. And to the extent they've

5  uncovered things that are incorrect in the Debtor's schedules,

6  the truth is the amendment of the schedules is warranted.

7  2015.3 does not deal with prepetition activity in any way,

8  shape, or form. They are balance sheets that ask for -- or

9  changes in financial condition that go from the filing of the

10  case, or seven days before, and require reports every six

11  months.

12      So this giant smokescreen that there's a massive fraud,

13  there's all this other stuff that's been uncovered, is just

14  not true. It is an attempt to cover up or give an excuse that

15  is unwarranted with respect to why they haven't done the

16  2015.3.

17      Next point. There is no secret stuff that's being done.

18  There's no valuation that we're asking for. 2015.3 asks for

19  balance sheet information. So, in fact, if they own ten

20  pieces of property, 2015.3 would bind them together in a

21  balance sheet and say, this is the total real estate that we

22  have. If an entity has 15 entities under its umbrella, it

23  would have a balance sheet entry. Assets and liabilities.

24  It's not broken down. The assets are probably at book value

25  or some sort of mark to market.

43

1       But honestly, this is -- there is no way that this

2  information gives anybody any benefit in terms of any bidding.

3       And the other point that's problematic is anybody who

4  wants to buy these assets would walk in and say, look, I want

5  a data room, let me look at this.  If what Mr. Pomerantz is

6  saying, which I don't understand, is that we're not going to

7  let a Dondero entity buy an asset, notwithstanding the fact

8  that they may pay more for the asset than somebody else would,

9  I think that's -- I have a huge problem with that.  We're here

10  for monetization of assets.  We're here to maximize the value.

11  And if, in fact, somebody walks in that may be a tangentially-

12  related Dondero entity and is willing to pay more, they should

13  be thrilled with that fact, not jettison it or disregard it.

14  That is -- their job is to maximize value, not minimize value

15  through a controlled sale process.

16       Again, I'm looking at the Code section.  I'm looking at

17  2015.3.  It basically says what it says.  It's designed to

18  give basic financial information.  It has nothing to do and

19  offers no disclosures of anything Mr. Pomerantz has thrown up

20  before the Court or that Mr. Dondero or any of his entities or

21  people are alleged to have done.

22       And the last is, if in fact there's financial information

23  that's incorrect in any of these entities, I question what the

24  Debtor's financial advisors have been doing for the last

25  months.  Honestly, they should be poring over these books.  If

44

1    they find a problem, they should correct 'em and address them.

2    And so there's no basis under the Code. We've -- what's been

3    given to you and what their argument is is an excuse for not

4    doing something they should have done. It can't be couched as

5    to who's asking. It is systematic in nature. And what's been

6    thrown up before the Court in Mr. Pomerantz's arguments are

7    just not true when you look at what the form requires.

8          THE COURT: You know, I can't remember ever being in

9    a contested matter involving this rule. And I was kind of

10   pondering before coming out here, I wonder why that is. And,

11   you know, I'm thinking the vast majority of our complex

12   Chapter 11s that involve many, many, many entities, they all

13   file. Okay? You know, they're kind of a different animal, if

14   you will, from Highland.

15       You know, we know how it normally works. You've got maybe

16   the mothership, holding company, and many, many subs, and

17   you've got asset-based lending, right, where, you know, maybe

18   the majority of the entities in the big corporate complex are

19   liable, so you just put them all in. Okay?

20       We don't have -- I have not experienced a lot of Chapter

21   11s where you have basically just the mothership and then you

22   keep subs and lots of affiliates out. Okay? So I'm thinking

23   that's one reason.

24       Another thing, I can't remember how old this rule is.

25   Does anyone -- can anyone educate me? How long has this rule

45

1    been around?

2            MR. DRAPER:  Your Honor, this is Douglas.  I think it

3    came in after Lehman Brothers.  And it came --

4            THE COURT:  Uh-huh.

5            MR. DRAPER:  It was put in to deal with off-balance

6    sheet items.

7            THE COURT:  Uh-huh.

8            MR. POMERANTZ:  2008, Your Honor.

9            THE COURT:  2008?

10           MR. DRAPER:  Which is exactly right.  It --

11           THE COURT:  Okay.

12           MR. DRAPER:  Yep.

13           THE COURT:  Okay.  So that, that's another reason.

14   Because I was thinking like *Enron* days.  You know, that's a

15   big giant, a gazillion entities, and, of course, a whole huge

16   slew of them were all put in.

17       So, there's not a lot of case law.  And you know, maybe

18   there are other situations where a judge ruled on this issue

19   but without issuing an opinion.  So, anyway, that's neither

20   here nor there.

21       Mr. Draper, you've urged me to focus on the literal

22   wording of the rule.  It's "shall" language.  You've talked

23   about essentially the integrity of the system as being the

24   reason for the rule.  You've told me not to accept the

25   Debtor's "bad guy" defense, you know, as an excuse.  This is

46

1   just Dondero, you know, wanting the information, and therefore

2   I should discount the motivations here.

3        But let me tell you something that is nagging very, very

4   much at me, and I'll hear whatever response you want to give

5   to this.  I just had an all-day hearing a couple of days ago,

6   and this involved the Charitable DAF entities and a contempt

7   motion the Debtor filed because those entities went into the

8   U.S. District Court upstairs in April and filed a lawsuit that

9   was all about Mr. Seery's alleged mismanagement with regard to

10  HarbourVest.

11       So what I'm really worried about is the idea that your

12  client wants this information to cobble together a new

13  adversary alleging mismanagement.  How can I not be worried

14  about that?

15            MR. DRAPER:  It's real simple.  Because the

16  information that's here doesn't go to management decisions.

17  The information that's requested here has balance sheet items.

18  It has to do with changes in cash flow.  It is not something

19  that you can cobble together a claim, because it doesn't deal

20  with discrete transactions.  It deals with only transactions

21  between affiliated entities.  It only deals with disclosure of

22  administrative expenses that are incurred by a subsidiary for

23  which the Debtor is liable.  It only deals with changes in

24  condition on a go-forward basis and a balance sheet.  It

25  doesn't say, gee, we have to disclose that, with respect to

47

1    HarbourVest or with respect to the MGM stock or whatever,

2    we're doing A, B, or C.  It doesn't go there.

3       That's why I asked the Court in my opening, look at the

4    form.  Because the form is what I'm asking for adherence to.

5    I'm not asking the form to be varied.  I'm just asking the

6    form to be approved -- to be addressed.  And the form

7    controls.  It is not something you can cobble together a

8    complaint with.

9             THE COURT:  Well, you left out when I asked, you

10   know, did your client have an administrative expense claim in

11   this case, and Mr. Pomerantz corrected the record on that.

12   Your client, while it's not a lawsuit in another court, has

13   filed an administrative expense that there was mismanagement

14   of a nondebtor sub or nondebtor controlled entity, --

15            MR. DRAPER:  That -- that's --

16            THE COURT:  -- Multistrat.

17            MR. DRAPER:  No, that's not -- if -- if I understand

18   the claim -- again, I didn't file it, and I forgot, that's an

19   oops on me as opposed to an oops on Mr. Seery for not filing,

20   and I apologize for the Court for that.  But if I understand

21   that claim, is when he acquired whatever he acquired, he

22   should have offered it to the other -- to the other members of

23   the -- that group.  Again, I'm not -- that's not -- I'm a

24   bankruptcy lawyer, as the Court's well aware.  This other

25   stuff is beyond me.

Case 19-34054-sgj11   Doc 3405-1   Filed 07/19/22   Entered 07/19/22 17:21:44   Page 50 of
356
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 50 of 106   PageID 9628

48

```
1        But the truth is, my understanding of the claim, it goes

2    to who should have benefited by the transaction and whether

3    the Debtor got CLO interests or got cash for it is irrelevant

4    and that it should have been offered.  That's what I

5    understand the claim.

6              THE COURT:  Okay.  So the same sort of theory --

7              MR. DRAPER:  So, the claim --

8              THE COURT:  -- as HarbourVest?  The same sort of

9    theory as HarbourVest?

10             MR. DRAPER:  No.  No.  Well, no, I'm just saying,

11   that's -- that's what -- again, you're asking me for something

12   that's outside my expertise.

13             THE COURT:  Okay.

14             MR. DRAPER:  Yes, we may have filed a claim.

15             THE COURT:  Who filed a proof of claim?

16             MR. DRAPER:  And the point I'm making --

17             THE COURT:  Who filed the proof of claim?

18             MR. DRAPER:  What?  I did not -- I have not filed the

19   proof of claims that were asserted by Dugaboy.

20             THE COURT:  I mean, --

21             MR. DRAPER:  I think that was --

22             THE COURT:  -- request for administrative expense.

23   Who filed this?  You say you don't -- you didn't file it.

24             MR. DRAPER:  I did -- I don't think I did.

25             MR. POMERANTZ:  Your Honor, to clarify, it was filed
```

49

1  as a proof of claim, but it related to postpetition actions.

2  And, again, I don't have it before me.  This has been raised

3  --

4         MR. DRAPER:  I --

5         MR. POMERANTZ:  -- several times in the confirmation

6  hearing when Mr. Draper was there, so I guess he must have

7  just forgotten about it.  But I don't know who actually filed

8  it.  But it is -- it is -- it is a proof of claim that is on

9  the record.

10        MR. DRAPER:  Mr. Pomerantz, God forbid that I should

11  forget something.  I'm sure you never have.

12        THE COURT:  Okay.  Well, here's what I'm going to do.

13  I'm not going to grant the relief being sought today, but I

14  will continue the hearing to a date in early September.  And

15  Mr. Draper, you can coordinate with my courtroom deputy, Traci

16  Ellison, with regard to a setting in early September.

17     I can assure you it's not going to be until after Labor

18  Day.  I think Labor Day falls on the 6th, maybe, and I plan to

19  be far away the first few days of September, far away from

20  this country.

21     But here are a few things I want to say.  First, I care

22  about transparency, and I tend to strictly construe a rule

23  like this.  I think, you know, it should be very clear for

24  anyone who's appeared before me that I really like -- I say

25  open kimono.  I probably shouldn't use that expression, but I

50

1    use that expression a lot.  You know, when you're in Chapter

2    11, the world changes and you have to be very transparent.

3        But while I generally feel that way, we have -- as I also

4    always say, facts matter, contexts matter -- and here we are

5    twenty months into a case and we're post-confirmation.  This

6    motion was filed post-confirmation.  So I acknowledge that the

7    Rule 2015.3(b) has the requirement of filing reports as to

8    these nondebtor controlled entities until the effective date

9    of a plan.  We're so -- we're presumably so very close to the

10   effective date that I think I should exercise my discretion

11   under Subsection (d) of this rule to, after notice and a

12   hearing, vary the reporting requirements for cause.  I think

13   there's cause, and that cause is I think we're oh so close to

14   the effective date.  That's number one.  Number two, we're

15   down to 12 staff members.  And I've heard that 150 entities

16   may be implicated, and I don't think that is a necessary and

17   reasonable use of staff members at this extremely late

18   juncture of the case.

19       And my third reason for cause under Subsection (d) of this

20   rule is we have had an active, a very active Creditors'

21   Committee in this case with sophisticated members and

22   sophisticated professionals who negotiated getting more

23   information, I think more useful information than this rule

24   even contemplates with the various form blanks.

25       Now, obviously, I'm continuing this to September because,

51

1   if we don't have an effective date by early September, well,

2   context matters, maybe that causes me to view this in a whole

3   different light.  But that is the ruling of the Court.

4       You know, I just want to say on behalf of the U.S.

5   Trustee, I don't know if anyone's listening in, but it was an

6   unfortunate use of words earlier, I think, saying, you know,

7   secret deal with them.  And I use unfortunate words all the

8   time.  I'm not being critical.  But I just want to defend

9   their honor here.  Oh my goodness, they --

10       (Phone ringing.)

11          THE COURT:  -- exercise integrity in every case I see

12   to the utmost degree, and I suspect they were satisfied that

13   the Committee was getting so much access to the Debtor, with

14   the sharing of the privilege and the protocols, that it just

15   didn't seem necessary in the facts and circumstances of this

16   case to require strict compliance with 2015.3.

17       So I'm going to ask Mr. Pomerantz to upload a form of

18   order reflective of my ruling.  And, again, if --

19       Whose phone is ringing?  Is there something going on with

20   our equipment?

21          THE CLERK:  No.

22          THE COURT:  I don't know where that phone ringing is

23   coming from.

24          THE CLERK:  I can hear it.

25          THE COURT:  Okay.  So, you'll get a day from Ms.

52

1   Ellison in -- after labor day, and we'll see where we are.

2   This will be a moot matter as far as I'm concerned if we've

3   had an effective date at that point.

4       (Continued phone ringing.)

5           MR. POMERANTZ:  Your Honor, one clarification I would

6   ask to have.  I don't think -- I think Your Honor intends that

7   to be a status conference, so to save the Debtor from, you

8   know, spending time in doing a pleading, and Mr. Draper as

9   well, and Your Honor from reading them, I would say that there

10  should be no pleadings filed in advance.  We will appear

11  before Your Honor with a status conference.  And to the extent

12  Your Honor determines there's further briefings or further

13  issues that need to be decided, you could decide at that

14  point.  But no further briefing.

15          THE COURT:  Okay.  I think that is a fair request.

16      (Ringing stops.)

17          THE COURT:  And so that -- that is the way we'll set

18  this up.  Status conference.  No further pleading.

19          MR. DRAPER:  Your Honor?

20          THE COURT:  All right?  Mr. Draper?

21          MR. DRAPER:  Can I make a request, Your Honor?  Can I

22  change -- can I make a comment about the Court's ruling?

23  Because I want to be transparent about this.  And I think the

24  Court's ruling, I would request that you shapeshift it a

25  little bit.

53

1     If, in fact, you're going to take the position that if the

2  plan goes effective, this issue -- this -- this motion is moot

3  and will be denied, I think, quite frankly, why don't we enter

4  that order now, rather than waiting.  Because that at least

5  gives me the ability to address the issue.

6     I don't think the rule has a waiver of it on the effective

7  date.  Let's -- let's get the issue before the -- before

8  everybody.  Because, again, as I said, if in fact your

9  position is that if it goes effective I'm going to deny the

10  relief and claim it's -- and assert it's moot in a ruling, I'm

11  fine, let's get the ruling now.  Because -- because my

12  position is that that waiver -- there is no basis for that

13  waiver due to time.  The rule requires being filed through a

14  point.

15     And, look, again, that way I'm not wasting the Court's

16  time.  We're not rearguing it.  If we're not having new

17  pleadings, let's get it over with.

18          MR. POMERANTZ:  Your Honor, I would reject that.

19  It's pretty transparent what Mr. Draper wants.  He wants

20  another appeal --

21          THE COURT:  Uh-huh.

22          MR. POMERANTZ:  -- because he wants to go to another

23  court, and he's unhappy that Your Honor has essentially given

24  an interlocutory order that he will be stuck with.

25     So we have, I think, close to a dozen appeals.  We're

**APP. 2772**

Case 19-34054-sgj11 Doc 3405-1 Filed 07/19/22    Entered 07/19/22 17:21:44    Page 56 of
356
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21    Page 56 of 106   PageID 9634

54

1    spending millions of dollars.  And I find -- I find Mr.

2    Draper's request, quite honestly, offensive, that it would

3    require us to -- a lot more time and money on an issue we

4    shouldn't.  So, I would ask Your Honor to reject Mr. Draper's

5    request.

6              THE COURT:  All right.  I do --

7              MR. DRAPER:  And again, my --

8              THE COURT:  -- reject it.  That's exactly where my

9    brain went, Mr. Draper.  This is an order continuing your

10   motion.  Okay?  And we'll have a status conference in early

11   September on your motion.

12       And you know, again, I'm just letting you know my view it

13   will be moot if the effective date has occurred, and then

14   we'll get some sort of order to that effect issued at that

15   time.  And then I guess you'll have your final order that you

16   can appeal if you want at that point.

17       The last thing I'm going to say is this.  Mr. Draper, as

18   I'm sure you remember, at some point many weeks back -- I

19   think it was in January, actually -- I ordered that Mr.

20   Dondero should be on the WebEx, or if we're live in the court

21   for a hearing, live in the court, any time there's a hearing

22   where he, his lawyers, have taken a position, filed an

23   objection or filed the motion himself.  If he and his lawyers

24   are requesting relief or --

25             MR. DONDERO:  I'm here.

55

1          THE COURT:  -- objecting to relief, that he has to be

2     in the courtroom.

3        I am now going to make the same requirement with regard to

4     the trusts.  Any time the trusts file a pleading seeking

5     relief, object to a pleading seeking relief, file any kind of

6     position paper, I'm going to require a trust representative to

7     be in court.

8        Now, I don't know if that's the trustee, Nancy Dondero.  I

9     don't know if that's Mr. Dondero's wife, a sister, who that

10    is.  But it'll either be her or whoever the trustee is or Mr.

11    Dondero as beneficiary.  But it has gotten to that point.

12    Okay?  And --

13          MR. DRAPER:  Your Honor?

14          THE COURT:  And it's not -- it's not personal.  I

15    have said this before.  I've done this in many cases.  If we

16    have a party who feels so invested in what's going on that

17    they're waging litigation, litigation, litigation, at some

18    point very often I will make this order.  Like, okay, we're

19    all spending a lot of time on what you want, so you need to

20    show you're invested in it and be here with the rest of us.

21    And, you know, potentially we're going to want testimony in

22    certain contexts.  Okay?

23        So I don't know who that human being is for the trusts,

24    but I'm now to the point where I'm making that same order that

25    I did with regard to Mr. Dondero personally.  All right?

56

1          MR. POMERANTZ:  Your Honor?

2          THE COURT:  Yes?

3          MR. POMERANTZ:  Your Honor, just to clarify, that's

4    Mr. Dondero and the trustee.

5       And I would also ask Your Honor, I know Mr. Dondero will

6    say that he was on, and that's what Mr. Taylor is going to

7    say, he was on audio.  I think, in order to have them actively

8    participating, they should be on the video the entire hearing.

9    Because if they're just on the phone on mute, Your Honor is

10   not able to really tell if they are really listening.  So I

11   would ask Your Honor to clarify to both Mr. Draper and Mr.

12   Taylor that, for both the trustee and Mr. Dondero, they should

13   be on video.

14          THE COURT:  All right.

15          MR. DRAPER:  Your Honor, Mr. Dondero is on.  You can

16   see him down in the lower screen.

17          THE COURT:  All right.  Just so you know, I mean, the

18   screen I'm looking at is not quite the same screen you're

19   looking at.  We have this Polycom.  And I show that there are,

20   you know, thirty-something people, but I only see the people

21   who have most recently talked.  Okay?  So, I see you, Mr.

22   Draper.  I see Mr. Pomerantz.  I see Mr. Clemente.  A few

23   minutes ago, I saw Mr. Morris.  But, you know, we've set it up

24   where I'm not overwhelmed with blocks; I'm just seeing the

25   people when they speak.

57

1          MR. POMERANTZ:  Your Honor, and those were the only

2    four people whose videos were on during the entire hearing.

3          THE COURT:  Oh, okay.

4          MR. POMERANTZ:  So I hope Mr. Draper is not going to

5    say that Mr. Dondero was on video, because he was not.

6          THE COURT:  Okay.

7          MR. DRAPER:  No, you can see -- Mr. Pomerantz, what I

8    said is you can see him on the screen here.  You can see that

9    he has dialed in.  I don't see him jumping up and down or his

10   person.

11         THE COURT:  Oh, okay.

12         MR. DRAPER:  But it is clear that somebody dialed in

13   on his behalf.

14         MR. POMERANTZ:  Well, --

15         MR. DRAPER:  Or he dialed in.  He is -- he is

16   present.

17         MR. POMERANTZ:  Exactly.  That's my point, Your

18   Honor, that someone may have dialed in on his behalf.  And I

19   think Mr. Dondero, for them to have active, meaningful

20   participation, because I think that's what Your Honor is

21   getting at, that they should be here, engaged.  And if we were

22   in court like we were the other day, Mr. Dondero would have

23   had to sit in Your Honor's courtroom.  And if he is going to

24   take up the time of Your Honor and all the parties, he and the

25   trustee should be really engaged, which you cannot be if

Case 19-34054-sgj11 Doc 3405-1 Filed 07/19/22 Entered 07/19/22 17:21:44 Page 60 of
356
Case 3:21-cv-00879-K Document 17 Filed 06/28/21 Page 60 of 106 PageID 9638

58

 1   you're only on the phone.

 2           THE COURT:  Okay.  All right.  Well, --

 3           MR. DRAPER:  Your Honor?

 4           THE COURT:  Go ahead, Mr. Draper.

 5           MR. DRAPER:  Mr. Dondero just talked a few moments

 6   ago, so Mr. Pomerantz heard him.  This is -- this is truly

 7   unwarranted.  He's appeared, he's here, and he's made a

 8   comment to the Court.  So, again, we are invested.  He was

 9   present at this hearing.  He heard the hearing.  And so, you

10   know, I just don't know where this is coming from.  I

11   understand he missed a hearing before, but he is here for this

12   one.

13           THE COURT:  Okay.  Well, I'm not going to get bogged

14   down in this issue.  I am going to issue an order, though,

15   that is going to be reflective of what I said, and we'll just

16   -- we'll make sure we have him check in or whoever the

17   representative is of the trusts in future hearings and turn

18   the video on and we'll make sure.

19       Again, this is -- I used the word frustrated the other

20   day.  I'm very frustrated.  This is just -- this is -- it's

21   out of control.  Okay?  I ordered mediation earlier in this

22   case.  I believed that an earnest effort was put in.  But if

23   we're not going to have settlement of issues, you know, I'll

24   address these issues, but everyone who files a pleading,

25   whether it's Mr. Dondero personally or the trusts, the family

59

```
 1    trusts, and, of course, we're going to get -- I'm going to go
 2    the same direction, actually, with all these other entities.
 3    You know, it's -- I've gotten to where I had my law clerk the
 4    other day prepare me basically what was like a program from a
 5    sports event, you know, who represents which entities, because
 6    it's gotten overwhelming.  And --
 7              MR. POMERANTZ:  Your --
 8              THE COURT:  And I mentioned the other day, I'm very
 9    close to requiring some sort of disclosures about the
10    ownership of each of these entities, because I -- you know,
11    the standing is just so tenuous, so tenuous with regard to
12    certain of these entities.  And I've erred on the side of
13    being conservative and, you know, okay, we maybe have
14    prudential standing, constitutional standing, even if it's
15    kind of hard finding statutory standing under the Bankruptcy
16    Code.  But it's gotten to the point where it's just costing
17    too much time and expense for me to not press some of these
18    issues and hold people accountable.
19        So, Mr. Pomerantz, were you about to say something?  I
20    know that we had talked at another hearing about the Court
21    maybe requiring some sort of disclosures for me to really
22    understand party in interest status maybe better than I do.
23              MR. POMERANTZ:  That, Your Honor, was where I was
24    going to go before Your Honor made the comment.  Your Honor
25    made that comment a few weeks ago.  I think, since then, quite
```

60

1  honestly, nothing really has changed.  And I think it would be

2  helpful -- it would be helpful for the Debtor, and more

3  importantly, I think it would be helpful to the Court to have

4  a list that you can refer to every time we are in a hearing of

5  every entity that has appeared that Mr. Dondero has a

6  relationship with, who the lawyers are, what the claims they

7  filed, what the status of the claims they filed, and maybe

8  even what litigation they are in pending with the Debtor.

9      We're happy with -- part of it we could prepare.  But I

10  would think Your Honor should order that from Mr. Dondero's

11  related entities, because it might cut through a lot of it,

12  and give Your Honor the information Your Honor needs and the

13  context and perspective as you're hearing a lot of these

14  motions.

15          THE COURT:  All right.  Well, is there anything else

16  before we move on to the other matter?  I'm about to close the

17  loop on this by saying I am --

18          MR. TAYLOR:  Your Honor?  Your Honor?

19          THE COURT:  Who is that speaking?

20          MR. TAYLOR:  This is Clay -- this is Clay Taylor,

21  Your Honor, --

22          THE COURT:  All right.

23          MR. TAYLOR:  -- representing Jim Dondero

24  individually.

25          THE COURT:  Okay.

61

1          MR. TAYLOR:  And I just wanted to be heard.  I've

2     just listened in, even though Mr. Dondero was not the movant,

3     because sometimes issues like this do come up where his name

4     is thrown about.

5          First of all, Jim Dondero was indeed, as Mr. Draper said,

6     was indeed present.  He did indeed try to speak.  I kind of

7     overrode him.  And because, you know, he needs to speak

8     through his lawyer most of the time and shouldn't address the

9     Court directly.  But I wanted to let you know that Mr. Dondero

10     was indeed on the line, was actively listening, and was

11     participating.

12          As far as additional disclosures, it would be, I would

13     just note, somewhat ironic if the Court denies the motion for

14     what appears to be mandatory disclosures under Rule 2015.3 but

15     then imposes additional disclosure requirements on somebody --

16     on another party, without any rule stating that there is such

17     disclosures.  It just -- it strikes me as ironic, and I would

18     like Your Honor to consider that, at least, as Your Honor

19     says, context matters.

20          You know, that's the context in which this arises.  And we

21     would just ask Your Honor to reflect upon that before she

22     imposes additional duties upon my client.

23          But there is -- and the Debtor has asked for the response

24     to be taken as a motion for leave to not comply with a rule,

25     but yet Mr. Seery is not here.  The UCC regularly

62

```
1  participates.  Its members are not here.  And so I just, to

2  the extent Your Honor is going to impose duties upon certain

3  parties, then what's good for the goose is good for the

4  gander, Your Honor.

5           THE COURT:  All right.

6           MR. POMERANTZ:  Your Honor, I would point out that

7  Mr. --

8           THE COURT:  I respect your argument.  I always

9  respect your arguments, Mr. Taylor.

10     By the way, you aren't wearing a jacket.  You know, next

11 time you need to wear a jacket.  And forgive me if I seem

12 nagging, but I'm letting you all know, if you all are soon

13 going to be having lots of litigation in the District Court, I

14 promise you the district judges are way more formal than me

15 and sticklers for every rule.  You'll also be doing everything

16 live in the courtroom, too.  I'm just letting you know that.

17     But while I respect your argument, apples and oranges.  I

18 mean, the 2015.3 rule, not only is it not -- not -- I wouldn't

19 say mandatory, since the Court has discretion for cause to

20 waive the requirement.  But it's a very onerous set of forms

21 that would have to be filled out for 150 entities by 12 staff

22 members.  I don't really consider that the same as the

23 disclosure that I'm now going to require.

24     But my law clerk and I will -- we'll craft a form of order

25 that will be specific as far as what I'm going to require.
```

63

1      And, again, I think it's way beyond the point of this

2  being necessary.  And just so -- again, I'm wanting to explain

3  this thoroughly.  You know, standing -- for the nonlawyers; I

4  don't know how many nonlawyers are on the phone, WebEx -- it's

5  a subject matter jurisdiction thing.  Okay?  And, you know, if

6  there's a dispute and someone involved in a dispute

7  technically doesn't have standing, that means the Court didn't

8  have subject matter jurisdiction to be adjudicating it.  Okay?

9  That's first year law school concept.

10      And it's been mentioned we have lots and lots of appeals,

11  and I can promise you, if you've never been through the

12  appellate process, that's the very first thing they'll look at

13  -- you know, District Court, Fifth Circuit, any Court of

14  Appeals -- because they have an overwhelming docket.  And if

15  there's a reason to push out this appeal before then because

16  of lack of subject matter jurisdiction, which would include

17  lack of standing, of course they are going to quickly get it

18  off their plates because they have other things to get to,

19  like criminal matters that are, you know, their top priority

20  because of the Constitution.

21      So this has been an evolving thing with me.  At some

22  point, I feel like the Courts of Appeals that are involved

23  with all of these appeals, they might be really, really

24  zeroing in on the standing of parties more than perhaps even I

25  have.  So I want to do my job and I want it clear on the

64

1   record, this is why this person has standing or doesn't have

2   standing.  Okay?  I just feel like we've gotten to that point.

3   And so we'll issue an order in that regard, and it will, I

4   promise you, be crystal clear.

5       Anything else?

6          MR. POMERANTZ:  Your Honor, one last point.  Mr.

7   Taylor insinuated that the board is not present here, which is

8   incorrect.  A member or two members or three members of the

9   board have been present at every hearing before Your Honor.

10  And that's without an order requiring them to do so, because

11  they are -- they are interested, they are engaged.  Mr. Dubel

12  is on the phone.  He has been on the phone.  I think this may

13  have been only the second hearing that Mr. Seery has missed,

14  felt it wasn't necessary to take him away from his running the

15  company.  So the Debtor has been, through its board members,

16  fully engaged, and I just wanted Your Honor to know that, that

17  we would never have a hearing before Your Honor without at

18  least one member of the independent board listening in and

19  participating as necessary.

20          THE COURT:  All right.  Thank you.

21      All right.  Well, let's move on to the other contested

22  matters, or adversary proceeding matters, I should say.  And

23  they're Adversary 21-3006 and 21-3007.  We have Motions for

24  Leave to Amend Answers.  And do we have Ms. Drawhorn appearing

25  for that motion or those motions?

65

1          MS. DRAWHORN:  Yes, Your Honor.  Lauren Drawhorn with

2    Wick Phillips on behalf of Highland Capital Management

3    Services, Inc. and NexPoint Real Estate Partners, LLP,

4    formerly known as HCRE Partners, LLC.

5          THE COURT:  All right.  And who will be making the

6    argument for the Debtor on this one?

7          MR. MORRIS:  John Morris, Your Honor; Pachulski Stang

8    Ziehl & Jones; for the Debtor.

9          THE COURT:  All right.  Are there any other

10   appearances on this?

11       Okay.  Ms. Drawhorn?

12         MS. DRAWHORN:  Yes, Your Honor.  We are -- so, my

13   clients are seeking leave to amend the answer to add two

14   affirmative defenses.  As you know, under Rule 15(a), there is

15   a bias towards granting leave, and leave should be freely

16   granted unless there's a substantial reason to deny it.

17       The main factors that are considered in determining

18   whether there is a substantial reason to deny a motion for

19   leave to amend are prejudice, bad faith, and futility.

20       Here, there is no prejudice to the Plaintiff.  Under the

21   case law, if the -- as long as a proposed amendment is not

22   presented on the eve of trial, continuing deadlines or

23   reopening discovery does not constitute sufficient prejudice

24   to deny leave.

25       Here, discovery does not close until July 5th for Highland

66

1   Capital Management Services, and it does not close until July

2   26th for NexPoint Real Estate Partners.

3       The Plaintiff has not -- neither party has taken any

4   depositions in this case.  And we are open and willing to

5   extend the discovery deadlines if necessary.  We think that

6   discovery can be extended as necessary without extending any

7   dispositive motion deadline or the docket call which are set

8   in August.  Dispositive motions are August 16th for Highland

9   Capital Management and September 6th for NexPoint Real Estate

10  Partners, with docket call in those cases being October and

11  November.

12      So there's significant time.  If the -- if the party just

13  wants to conduct additional written discovery, I think that

14  that -- they would be easily be able to do that.

15      We're also open to continuing all the deadlines in this

16  case, and practically speaking, those -- the deadlines may be

17  continued depending on what happens with the pending motion to

18  withdraw the reference and the motion to stay.

19      So we don't think -- we don't see any reason why our

20  amended additional affirmative defenses will result in any

21  prejudice to the Plaintiff, and don't see that as a reason --

22  a substantial reason to deny the motion for leave.

23      There is no bad faith here.  The motion for leave was

24  filed two months after our original answer.  Again, this is

25  not a situation where we're trying to add a new defense on the

67

1   eve of trial.  We're not even waiting until after discovery is

2   closed to try and add this new defense.  And it's not after

3   one of our prior defenses failed.  Instead, we've been

4   conducting additional investigations, preparing for written

5   discovery.  And as set forth in more detail in the Sauter

6   declaration that was filed yesterday, we discovered these

7   additional defenses through that additional investigation.

8       So there's certainly no bad faith here in adding these two

9   defenses.  We are just trying to make sure that we can prove

10  up our defenses and prove up our case on the merits, as we

11  need to.

12      And then the last factor, the new affirmative defenses

13  we're seeking to add, they're not futile.  I cited some cases

14  in the pleadings.  There are some judges in the Northern

15  District of Texas that refrain from even evaluating futility

16  at this stage, at a motion for leave to amend stage,

17  preferring to address those on a motion for summary judgment

18  situation.  But even when it is considered, futility looks

19  more at is there a statute of limitations that prevents the

20  claim from being successful, or does the court lack subject

21  matter on its face, based on this defense?  And that's not the

22  case here.

23      The Debtor -- the Plaintiff tries to argue on the merits

24  of our affirmative defenses, and a motion for leave to amend

25  is not a basis for that.  This isn't a motion for summary

**APP. 2786**

68

1   judgment.  This is just -- just a motion for leave to add

2   these defense, and they can certainly address the merits later

3   on in the case.

4       So we think we provided sufficient notice in our proposed

5   amendment.  I mean, our proposed amended answer.  To the

6   extent we need to add any specifics, we are certainly open to.

7   We've noted them in our reply.  The ambiguity is -- is to the

8   notes as a whole.  We noted the Highland Capital Management,

9   there's two notes that are signed by Frank Waterhouse without

10  indication of corporate capacity, which creates some

11  ambiguity.  The notes reference other related agreements,

12  which create some ambiguity.  So we think there's sufficient

13  pleading of these new defenses to support leave to amend and

14  address those on the merits.

15      And then the condition subsequent defenses, while we --

16  the schedules and the SOFAs, the notes related to that

17  reference that some loans between parties and related -- to

18  affiliates and related entities may not be enforceable, we

19  think that supports our position and this defense here, now

20  that we've furthered our investigation and heard about this

21  additional subsequent agreement that supports the condition

22  subsequent.

23      And the opposition, the Plaintiff's opposition notes that

24  there has been some discovery on this defense.  It's similar

25  to one that's asserted in a related note adversary.  And

69

1   while, again, they try to assert the merits and the

2   credibility of certain testimony, that's -- that's a decision,

3   credibility of a witness is a decision for a fact finder and

4   not for this stage of the proceedings and not for a motion for

5   leave to amend.

6       So we don't believe there's a substantial reason to deny

7   leave.  Again, under Rule 15, leave should be granted freely.

8   And so we would request that the Court grant our motion for

9   leave to amend so that we can have our amended answer and

10   affirmative defenses in this case.

11          THE COURT:  All right.  Well, Mr. Morris, you know,

12   the law is not too much in your favor on this one.  So what do

13   you have to say?

14          MR. MORRIS:  I have to say a few things first, Your

15   Honor.  The notes are one of the most significant assets of

16   the estate.  As the Court will recall at the confirmation

17   hearing, Mr. Dondero and all of his affiliated entities

18   objected to confirmation on the ground -- challenging, among

19   other things, both the liquidation analysis as well as the

20   projections on feasibility going forward.

21       One of the assumptions in those projections and in the

22   liquidation analysis was indeed the collection of these notes

23   in 2021.  They all sat on their hands, attacked the

24   projections, attacked the liquidation analysis, but never on

25   the grounds that the notes wouldn't be collectable in 2001

70

1    [sic], never informing the Court that there was some agreement

2    by which collection would be called into question, never ever

3    disclosing to anybody that the plan might not be feasible or

4    the liquidation analysis might not be accurate because these

5    notes were uncollectable.

6        So what happened after that, Your Honor?  We commenced

7    these actions.  Actually, before the hearing.  We actually

8    commenced these actions before the confirmation hearing, when

9    they sat silently on this.

10       And Mr. Dondero's first answer, because this is all very

11   important because they say that they're -- they're

12   piggybacking on Mr. Dondero.  Mr. Dondero's first answer to

13   the complaint said, I don't have to pay because there is an

14   agreement by which the Debtor said they would not collect.

15   It's in the record.  It's attached to my declaration.  And

16   that was it.  Full stop.  I don't have to pay because the

17   Debtor agreed that I would not have to collect.

18       So we served a request for admission.  Admit that you

19   didn't pay taxes.  He realized, okay, that defense doesn't

20   work, so he changes it completely and he amends his answer.

21   Now the amended answer says, I don't -- the Debtor agreed that

22   I wouldn't have to pay based on conditions subsequent.

23       And we said, what are those conditions subsequent?  Please

24   tell us in an interrogatory response.  And under oath, Mr.

25   Dondero said, I don't have to pay if the Debtor sells their

71

1  assets in the future.  At a favorable price, I think it says.

2  Again, this is in the record.  And we asked him under oath,

3  who made that agreement on behalf of the Debtor?  And he said,

4  I did.

5      And Your Honor will recall that we had a hearing on that

6  very defense, on the motion to compel, where they said Mr.

7  Seery has to come in and testify to the defense that Mr.

8  Dondero made this agreement with himself.  And then the

9  following week, on a Tuesday, we had the hearing on the motion

10  to withdraw the reference, and Your Honor said finish

11  discovery, because we told you discovery was going to be

12  concluded on Friday with Mr. Dondero's deposition.  You know

13  what they did, Your Honor?  The night before the hearing, they

14  amended Mr. Dondero's interrogatory.  Again, these are sworn

15  statements.  They amended it again to say he didn't enter the

16  agreement on behalf of the Debtor; Nancy Dondero, his sister,

17  did.

18      And then I took his deposition.  And we're going to get to

19  that in a moment, because I'm going to put it up on the screen

20  so you can see these answers, Your Honor.  And I say this by

21  way of background because it goes to both good faith -- or,

22  actually, bad faith -- as well as the lack of a bona fide

23  affirmative defense here.

24      This is -- there are five notes litigation.  One against

25  Mr. Dondero.  So that's package number one.  And they're

Case 19-34054-sgj11   Doc 3405-1   Filed 07/19/22    Entered 07/19/22 17:21:44    Page 74 of
356
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21    Page 74 of 106   PageID 9652

72

1    represented by the Stinson firm, who is signing all of these

2    things.  The Stinson firm is out there claiming that in good

3    faith each of these -- each of these amendments, each of these

4    amendments to the interrogatories, are in good faith.  They're

5    not in good faith, Your Honor.  They're just not.

6         And the Bonds firm.

7         Then bucket two is what we have here today.  That's HCRE

8    and Highland Capital Management Services.  They're represented

9    by Ms. Drawhorn.  I think the Stinson firm has now also

10   entered an appearance in those two adversary proceedings.

11        And the other two are against the two Advisors.  More

12   entities controlled by Dondero.  And Mr. Rukavina, I believe,

13   last night filed his motion to amend to add these same

14   defenses.

15        Okay?  Is this good faith?  I don't think this is good

16   faith.

17        Let's look at Mr. Dondero's testimony so that the Court

18   has an understanding of what we're talking about here.  I

19   think I have Ms. Canty on the phone, and I'd ask her to go to

20   Page 178.  3.  Just going to read (garbled) so you can see.

21   This was Mr. Dondero's testimony the day after telling me that

22   he amended his interrogatory -- sworn interrogatory answer to

23   say that he didn't enter the agreement on behalf of the Debtor

24   but Ms. -- but Ms. Dondero, his sister, did.

25        Question.  Are we -- 178, please.

73

1          MS. DRAWHORN:  Your Honor, I would --

2          MR. MORRIS:  Question.  Please --

3          MS. DRAWHORN:  This is not testimony in this

4   adversary and I was not -- my clients were not present at this

5   deposition that Mr. Morris is referring to, so I --

6          MR. MORRIS:  Your Honor, with all due respect, she's

7   interrupting me, and I would ask her to allow me to finish my

8   presentation and then she can make whatever comments she

9   wants.  Because -- because --

10         MS. DRAWHORN:  Well, I'm objecting to this testimony

11  --

12         THE COURT:  Okay.

13         MS. DRAWHORN:  -- coming into evidence.

14         THE COURT:  Okay.  So your objection is -- if you

15  could just articulate your objection for the record, please,

16  Ms. Drawhorn.

17         MS. DRAWHORN:  I would object to this -- this

18  deposition is not in this proceeding, this adversary

19  proceeding, either of these two the adversary proceedings, and

20  my client was not present at this deposition, so I would

21  object to it as hearsay.

22         THE COURT:  Response?

23         MR. MORRIS:  Your Honor, if I may, I think this --

24  this points to just one of the fundamental problems that we

25  have here.  As we pointed out in our objection, the Debtor, as

Case 19-34054-sgj11 Doc 3405-1 Filed 07/19/22    Entered 07/19/22 17:21:44    Page 76 of
356
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21    Page 76 of 106   PageID 9654

74

1   we sit here right now, still has no notice of the facts and

2   circumstances surrounding this alleged agreement.  We still

3   don't know who entered into the agreement on behalf of the

4   Debtor.  We don't know what the terms of the agreement were.

5   We don't know when the agreement was entered into.  We don't

6   -- right?

7       If they're going to assert that there's an agreement --

8   and they seem to be piggybacking on this conversation between

9   Mr. Dondero and his sister.  If there's a different one, they

10  need to say that right now.  They need to put their cards on

11  the table and they need to inform the Debtor who entered the

12  agreement on behalf of the Debtor pursuant to which the Debtor

13  agreed to waive millions and millions of dollars without

14  telling anybody.

15          THE COURT:  Okay.  I overrule the objection.  We can

16  go through the transcript.

17          MR. MORRIS:  So, I'm just going to use part of it,

18  Your Honor.  But on Lines 3 to 7:

19      "Q   Did  anybody  else  participate  --  did  anybody

20       participate in any of the conversations other than you

21       and your sister?

22      "A   I don't believe it was necessary.  It didn't

23       include anybody else."

24      Go down to Line 19, please.

25      "Q   Was the agreement subject to any negotiation?  Did

75

1    she make any kind of -- any counterproposal of any

2    kind?

3    "A   No."

4    Page 179, Line 2.

5    "Q   Do you know if she sought any independent advice

6    before entering into the agreement that you have

7    described?

8    "A   I don't know."

9    Line 23, please.

10    "Q   Do you know if there were any resolutions that

11    were adopted by Highland to reflect the agreement

12    that's referred to in the -- in the answer?

13    "A   Resolutions that -- no.  Not that I'm aware of."

14    Page 180, Line 5.

15    "Q   Did you give Nancy a copy of the promissory notes

16    that were a subject of the agreement?

17    "A   No."

18    Continue.

19    "Q   Did she ask to see any documents before entering

20    into the agreement that's referred to?

21    "A   I don't remember."

22    Page 181, Line 19.

23    "Q   Under the agreement that you reached with Nancy

24    that's referred to in Paragraph 40, was it your

25    understanding that Highland surrendered its right to

Case 19-34054-sgj11 Doc 3405-1 Filed 07/19/22    Entered 07/19/22 17:21:44    Page 78 of
356
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21    Page 78 of 106   PageID 9656

76

1       make  a  demand  for  payment  of  unpaid  principal  and

2       interest under the notes?

3       "A   Essentially, I think so."

4       Page 219.  I'll just summarize 219, Your Honor.  Mr.

5   Dondero has no recollection of telling Mr. Waterhouse, the

6   chief financial officer, or any other employee of Highland

7   that he'd entered into this agreement with his sister pursuant

8   to which the Debtor agreed to not collect almost $10 million

9   of principal and interest.

10      Now let's -- let's go -- I think it's really -- because it

11  took me an awfully long time to get there.  On Page 214 at

12  Lines 16 through 24.  This is what the agreement was, because

13  this is -- this is -- this is his third try to describe the

14  agreement.  Right?  The first time -- it's just his third try,

15  and this is what the agreement is, Your Honor.

16      "Q   Did you and Nancy agree in January or February

17      2019 that if Highland sold either MGM or Cornerstone or

18      Trussway for an amount that was equal to at least one

19      dollar more than cost, that Highland would forgive your

20      obligations under the three notes?

21      "A   I believe that is correct."

22      That's -- that's the agreement.  It took him three times

23  to get there, but look at -- look at that.  He and his sister

24  did that.

25      And I do want to point out, Your Honor, that in their

77

1   opposition that they filed last night, the Defendants claim

2   that Ms. Dondero was authorized because she was -- she was the

3   trustee of Dugaboy and Dugaboy holds the majority of the

4   limited partnership interests in the Debtor and therefore she

5   had the authority to enter into the agreement on behalf of the

6   Debtor.

7       There is that flippant -- there is just that unsupported

8   statement out there.  Section 4.2(b) of the limited

9   partnership agreement says, and I quote, "No limited partner

10  shall take part in the control of the partnership's business,

11  transact any business in the partnership's name, or have the

12  power to sign documents for or otherwise bind the partnership,

13  other than as specifically set forth in the agreement."

14      So I look forward to hearing what basis there was to

15  submit a document to this Court that Nancy Dondero had the

16  authority to bind the Debtor in an agreement with her brother

17  pursuant to which tens of millions of dollars was apparently

18  forgiven.

19      Can we go to Page 238?  This is the last piece, Your

20  Honor.  The Debtor's outside auditors were

21  PricewaterhouseCoopers.  There's management representation

22  letters signed by both Mr. Dondero and Mr. Waterhouse

23  attesting that they had given their auditors all of the

24  information necessary to conduct the audit.  We will get to

25  that in due course, but these are very important questions

78

1   right here.

2       What page are we on?  Is it 238?  Okay.  So, Line 16, I

3   believe.

4       "Q   You knew at the time -- you knew at the time the

5       audited financials were finalized that Highland was

6       carrying on its balance sheet notes and other amounts

7       due from affiliates?

8       "A   Yep."

9       And if we could just keep going, Your Honor, you will see:

10      "Q   Did   you   personally   tell   anybody   at

11      PricewaterhouseCoopers   in   connection   with   the

12      preparation of the audited financial statements for

13      2018 that you and your sister had entered into the

14      agreement with your sister Nancy in January or February

15      of 2019?

16      "A   Not that I recall."

17      There's a lot more here, Your Honor.  I'm really just

18  touching the surface.  I am going to take Nancy's deposition

19  later this month.  But there is -- this is wrong.  This is

20  just all so wrong.  For three different reasons.  At least.

21  This is not a viable defense and will never be a viable

22  defense.

23      The audited financial statements carry these loans as

24  assets on the books, without qualification, and they were

25  subject to Mr. Dondero and Mr. Waterhouse's representations.

79

1    There is partial performance.  These entities that we're

2    talking about today, they made payments on these notes.  How

3    do you make payments on the notes and then come to this Court

4    and say the notes are ambiguous?  How do you -- how do you

5    make payments on the notes and come to this Court and tell

6    this Court, I just learned that there was an agreement by

7    which I don't have to pay, subject to conditions precedent in

8    the future.

9    Mr. Sauter submits a declaration in support of this

10   motion.  He has no personal knowledge.  He states in Paragraph

11   14 that his review of the Defendants' books and records did

12   not reveal any background facts regarding the notes.  Mr.

13   Dondero is the maker on all of the notes except for two of

14   them.  Mr. Dondero owns and controls the Defendants.  Mr.

15   Dondero was not employed or otherwise affiliated with the

16   Debtor after these actions were commenced.  Mr. Sauter takes

17   Mr. Seery to task for telling the Debtor's employees not to

18   take actions that were adverse, and he uses that as his excuse

19   for not knowing these facts.  He is the general counsel.  He

20   was served with a complaint that alleged that his clients were

21   liable for millions and millions of dollars.  His boss is

22   James Dondero.  He had unfettered access to James Dondero.

23   Mr. Dondero is the one who signed the notes, except for two of

24   them.  There is absolutely no excuse for not doing the

25   diligence to find out from Mr. Dondero that this defense

80

1   existed.

2       And you know why it didn't happen?  Because the defense is

3   not real.  It is completely fabricated.  It continues to

4   change and evolve every single time I -- every single time I

5   talk about these note cases, it's a new defense, it's a

6   different defense, the contours change, somebody else is

7   involved.  This is an abuse of process, Your Honor.  It is bad

8   faith.  It just really is.  And somebody's got to start to

9   take responsibility and say, I won't do this.  I won't do

10  this.

11      Somebody's got to stand up and say that, because, I'm

12  telling you, it's not enough, Your Honor, that the Debtor is

13  going to collect all of its fees under the notes at the end of

14  this process.  It's not enough,  because we're now giving an

15  interest-free loan.  These are -- these are notes that are

16  part of the Debtor's plan that nobody objected to, that nobody

17  suggested were the subject of some condition subsequent.

18      This is not your normal, you know, gee, I'd like leave to

19  amend the complaint.  They're simply following what Mr.

20  Dondero did.  And I would really ask the Court to press the

21  Defendants to identify specifically who made the agreement on

22  behalf of the Debtors, when was the agreement made, is there

23  any document that they know of today that reflects this

24  agreement, and what were the terms of the agreement?  Is it

25  really that he would sell -- if he sells MGM for a dollar over

Case 19-34054-sgj11 Doc 3405-1 Filed 07/19/22   Entered 07/19/22 17:21:44   Page 83 of
356
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 83 of 106   PageID 9661

81

1   cost, $70 million of notes get forgiven?  How is that

2   possible?  How is that possible?  It doesn't pass the good

3   faith test.  The Court should deny the motion.

4      Thank you, Your Honor.

5         THE COURT:  Mr. Morris, in all of your listing of

6   allegedly problematic things, one trail my brain was going

7   down is this:  Is this adversary going to morph even further

8   to add fraudulent transfer allegations?  I mean, if notes --

9         MR. MORRIS:  Here's the --

10        THE COURT:  -- were forgiven or agreements were made

11  --

12        MR. MORRIS:  Yeah, I --

13        THE COURT:  -- that they would be forgiven if, you

14   know, assets are sold at a dollar more than cost, is the

15   Debtor going to say, well, okay, if this is an agreement,

16   there was a fraudulent transfer?

17        MR. MORRIS:  Your Honor, that is an excellent

18   question, one which I was discussing with my partners just

19   this morning.  You know, we have to -- we're balancing a

20   number of things on our side, including the delay that that

21   might entail; including, you know, what happens if we go down

22   that path.  You know, the benefit of suing under the notes, of

23   course, is that he's contractually obligated to pay all of our

24   fees.

25      And so we're balancing all of those things as these -- as

82

1   these defenses metastasize.  But it's something that we're

2   considering, and we reserve the right to do exactly that, as

3   these defenses continue to get -- and it would be fraudulent

4   transfer, it would be breach of fiduciary duty against Nancy

5   Dondero, it would be breach of fiduciary duty against Jim

6   Dondero.  I'm sure that there are other claims, Your Honor.

7   But if they want to -- if I'm forced to go down that path, I'm

8   certainly going to use every tool that I have available to

9   recover these amounts from the -- for the Debtor and their

10  creditors.  This is just an abuse of process.

11      How do you -- how does one enter into agreements of this

12  type without telling your CFO, without telling your auditors,

13  without putting it in writing?  And I asked Mr. Dondero, what

14  benefit did the Debtor get from all of this?  And you know

15  what his answer was, Your Honor?  Because it's really -- it's

16  appalling.  It was going to give him heightened focus on

17  getting the job done because of this agreement that he entered

18  into with his sister, Nancy, acting on behalf of the Debtor,

19  with no information, with no documents, with no notes, with no

20  advice, with no corporate resolutions.  The Debtor was going

21  to get Mr. Dondero's heightened focus to sell MGM, Trussway,

22  or Cornerstone for one dollar above cost.

23      I think the fraudulent transfer claim is probably a pretty

24  solid one.  But why do we have to do this?  Why do we have to

25  do this?

83

1          THE COURT:  Well, one of the reasons I'm asking is I

2    would not set the motion to withdraw the reference status

3    conference on an expedited basis, which I was asked to do a

4    few days ago in these two adversary proceedings, and I can't

5    remember when I've set it, but now I'm even worried, if I

6    grant this motion, is it going to be premature to have that

7    status conference in a month or so, whenever I've set it,

8    because if I grant this motion I'm wondering, am I going to

9    have your motion to amend to add fraudulent transfer claims?

10   It's -- you know, I want to give as complete a package to the

11   District Court as I can whenever I have that motion to

12   withdraw the reference.

13       All right.  Ms. Drawhorn, back to you.  As I said --

14          MS. DRAWHORN:  Yes.

15          THE COURT:  -- before inviting Mr. Morris to make his

16   argument, I know the law is very much on your clients' favor

17   as far as the law construing Rule 15(a).  But my goodness, I'm

18   wondering if your client needs -- your client needs to be

19   careful what they're asking for here, after what I've just

20   heard.

21       Anyway, what -- you get the last word on this.

22          MS. DRAWHORN:  Yes.  Thank you, Your Honor.  My

23   response is that Mr. Morris's argument was all on the merits

24   of the defenses, and certainly he is free to argue on the

25   merits, but that's not a determination for today and that's

84

1    not a determination for the motion for leave to amend.  That's

2    a determination for if he files a dispositive motion.

3        Like I said, we are still in the discovery phase.  Mr.

4    Morris mentioned at least three parties that will be -- likely

5    be deposed and potentially give us the additional information

6    that he's asking for to support this defense.  He mentioned

7    PricewaterhouseCoopers; Nancy Dondero, who he's already got

8    scheduled in a different adversary; Frank Waterhouse.

9        So it's too early, as you know, to look at the merits.

10   That's not -- that's not what's the focus of a motion for

11   leave to amend.

12       As to the -- the what amendment, what agreement, what are

13   the conditions subsequent, I believe we provided sufficient

14   information in our reply.  And if the Court would like us to

15   update our proposed amended answer, if the Court is inclined

16   to grant our motion, we can certainly do that.  But I think

17   the Plaintiff seems to be well aware of what the defenses are,

18   especially after his argument today on why he thinks it's not

19   a valid defense.

20       And then, on the due diligence, we did -- we did do due

21   diligence.  That's why we're seeking to amend the answer,

22   obviously, and add these claims.

23       If the Court -- if the Plaintiff wants to file a motion to

24   amend later, then we can address those amendments then.

25       But I think, on the Rule 15 standard, we have met our

Case 19-34054-sgj11   Doc 3405-1   Filed 07/19/22    Entered 07/19/22 17:21:44    Page 87 of
356
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21    Page 87 of 106   PageID 9665

85

1    burden and there's no substantial reason to deny the motion to

2    amend to add these defenses.

3            THE COURT:  All right.  By the way, have your

4    clients, have they filed proofs of claim?  And I'm asking for

5    a different reason than maybe I was asking earlier.  NexPoint

6    Real Estate Partners?

7            MS. DRAWHORN:  They're -- NexPoint Real Estate

8    Partners, LLC, formerly known as HCRE Partners, does have a

9    proof of claim on file.  It's unrelated to the notes.  And it

10   is subject to a contested matter that's pending -- that's a

11   separate matter that's before the Court being addressed.

12       And then HCMS initially filed a proof of claim that was

13   objected to in the Debtor's first omnibus objection and then

14   was disallowed.  There was no response to that omnibus

15   objection, so there's no longer a proof of claim for Highland

16   Capital Management Services.

17           THE COURT:  Okay.  Again, I'm just thinking ahead to

18   this report and recommendation I'm eventually going to have to

19   make on the motions to withdraw the reference.  And as I

20   alluded to, if this morphs to the point of including

21   fraudulent transfer claims, that certainly --

22           MS. DRAWHORN:  And Your Honor, one --

23           THE COURT:  It's going to affect the report and

24   recommendation.  And, you know, proofs of claim affect that,

25   too.  So, --

Case 19-34054-sgj11  Doc 3405-1  Filed 07/19/22    Entered 07/19/22 17:21:44    Page 88 of
356
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 88 of 106   PageID 9666

86

1           MS. DRAWHORN:  Uh-huh.  Yes.  And I understand that,

2     Your Honor.  And the issue, I think, with you -- we need to

3     have this motion resolved, because it -- unless the Court is

4     going to continue discovery or stay.  You know, one of the

5     reasons why we had initially requested the expedited hearing

6     was because of the discovery is continued -- continuing to --

7     discovery deadlines are continuing to move.  And obviously

8     whatever the Court decides on this motion for leave to amend

9     will determine what the scope of that discovery is.

10          Similarly, if the Debtor decides to amend, that could

11    change the scope of discovery as well.

12          So we are open to continuing deadlines, and I think, you

13    know, might end up filing a motion to continue.  I haven't

14    conferred with Mr. Morris yet.  I suspect he's opposed, based

15    on our prior conversations.  But that's something that might

16    be helpful, especially if the Court is concerned on how it

17    will affect the motion to withdraw the reference, to -- maybe

18    we continue some of these upcoming deadlines, and that might

19    appease, you know, solve some of your concerns.

20          THE COURT:  All right.  Well, Rule 15(a), of course,

21    is the governing rule here, and the case law is abundant that

22    courts "should freely give leave when justice so requires."

23    And the law is also abundantly clear that the rule "evinces a

24    bias in favor of granting leave to amend."  And again and

25    again, cases say that leave should be granted unless there's

Case 19-34054-sgj11   Doc 3405-1   Filed 07/19/22   Entered 07/19/22 17:21:44   Page 89 of
356
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 89 of 106   PageID 9667

87

1  substantial reason to deny leave, and courts may consider

2  factors such as delay or prejudice to the non-movant, bad

3  faith or dilatory motives on the part of the movant, repeated

4  failure to cure deficiencies, or futility of the amendment.

5      While the Debtor has presented arguments that there might

6  be bad faith here on the part of the Movants and there might

7  be futility in allowing the amendments because of various

8  strong arguments and defenses the Debtor believes it has to

9  this issue of agreements with regard to the notes that

10  allegedly provide affirmative defenses, the Court believes the

11  rule requires me to allow leave to amend the answer.

12      Now, a couple of things.  I am going to require, though,

13  that the amended answer be more specific than has been

14  suggested.  I am going to agree that if new affirmative

15  defenses are made that there was this agreement to forgive

16  when certain conditions happened, then there does need to be

17  identification of who the human beings were that were involved

18  in making the agreement, the date of any agreement or

19  agreements, and disclose what documents substantiate the

20  agreement or reflect the agreement.  All right?  So if that

21  could --

22          MR. MORRIS:  Your Honor?

23          THE COURT:  Yes?

24          MR. MORRIS:  John Morris.  I apologize for

25  interrupting, but just a fourth thing is what is the

Case 19-34054-sgj11  Doc 3405-1  Filed 07/19/22    Entered 07/19/22 17:21:44    Page 90 of
356
Case 3:21-cv-00879-K  Document 17   Filed 06/28/21    Page 90 of 106   PageID 9668

88

1  agreement?  I mean, what is the agreement?

2         THE COURT:  Well, okay.  That's fair enough.  What is

3  the agreement?  I guess --

4         MR. MORRIS:  And -- and --

5         THE COURT:  -- that needs to be spelled out.  I mean,

6  I guess I was assuming that that would be spelled out in --

7  but maybe it's not.  So we'll go ahead and add that.

8      As far as extension of the discovery, Ms. Drawhorn has

9  offered that.  I think it would be reasonable if the Debtor or

10 Plaintiff wants that.  Do you want an extension of discovery?

11        MR. MORRIS:  What I really want, Your Honor, is a

12 direction for them to serve this amended answer within 24 or

13 48 hours and grant leave to the Debtor to promptly file

14 written discovery.  We've got Nancy Dondero -- if it turns out

15 -- and maybe Ms. Drawhorn can just answer the question right

16 now.  Who entered the agreement on behalf of the Debtor?

17 Because I'm already taking Nancy Dondero's deposition on the

18 28th.  And it seems to me, if they would just answer the

19 question of whether Ms. Dondero is the person who did that, I

20 could just add a notice of deposition and take the deposition

21 on that date, too, and it would be, really, more efficient for

22 everybody.

23        THE COURT:  Ms. Drawhorn, who was the human being?

24        MS. DRAWHORN:  Yes.  It was -- yes, Nancy Dondero

25 entered into the -- the subsequent agreement.

89

1            MR. MORRIS:  Okay.  Super.

2            THE COURT:  All right.  You said you've already --

3            MR. MORRIS:  So, --

4            THE COURT:  -- got a depo scheduled of her?

5            MS. DRAWHORN:  Well, what's the date --

6            MR. MORRIS:  I do --

7            MS. DRAWHORN:  -- Mr. Morris?

8            MR. MORRIS:  I believe it's the 28th.  Your co-

9   counsel can confirm, but I think it's the 28th.

10       And I'll just get another deposition notice for that one,

11   and we'll figure out a time to take Mr. Sauter's deposition,

12   too.

13       But I don't think that there is a need, frankly, for --

14   having been told by Mr. Dondero that there's no documents

15   related to this, having the Court just ordered the Defendants

16   to disclose the identity of any documents that relate to this

17   agreement, I don't think we need to extend the discovery

18   deadline at all.  I can take Ms. Dondero's deposition, I can

19   take Mr. Dondero's deposition, and I can take Mr. Sauter's

20   deposition in due course over the next four weeks.

21            THE COURT:  All right.  Well, Ms. Drawhorn, we'll say

22   that this amended answer needs to be filed by midnight Friday

23   night, 11:59.  That gives you a day and a half to get it done.

24   All right.  If you could please --

25            MS. DRAWHORN:  Yes, Your Honor.

90

1    THE COURT: Please upload an order, Ms. Drawhorn,

2 granting your motion with these specific requirements that

3 I've orally worked in.

4    I think clients need to be careful what they ask for. I'm

5 very concerned. And I know it was just argument and I'll hear

6 evidence, but of all of the things that I guess -- well, I'm

7 concerned about a lot of things, but do we have audited

8 financial statements that didn't disclose these agreements

9 with regard to --

10    MR. MORRIS: Yes, Your Honor.

11    THE COURT: I mean, that's -- I'm just -- you know,

12 there's a lot to be concerned about on that point alone, I

13 would think. But, all right. If there's nothing further, we

14 are adjourned. Thank you.

15    THE CLERK: All rise.

16    (Proceedings concluded at 11:58 a.m.)

17                   --oOo--

18

19                 CERTIFICATE

20    I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
21 above-entitled matter.

22  **/s/ Kathy Rehling**                    **06/12/2021**

23 _____      _____
Kathy Rehling, CETD-444                       Date
24 Certified Electronic Court Transcriber

25

91

INDEX

PROCEEDINGS                                                                4

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

19-34054-sgj

Motion to Compel Compliance with Bankruptcy Rule 2015.3    49/54
filed by Get Good Trust, The Dugaboy Investment Trust
(2256)

21-3006-sgj

Motion for Leave to File Amended Answer and Brief in          86
Support filed by Defendant Highland Capital Management
Services, Inc. (15)

21-3007-sgj

Motion for Leave to Amend Answer to Plaintiff's              86
Complaint filed by Defendant HCRE Partners, LLC (n/k/a
NexPoint Real Estate Partners, LLC) (16)

END OF PROCEEDINGS                                            90

INDEX                                                        91

```
 1                   IN THE UNITED STATES BANKRUPTCY COURT
                    FOR THE NORTHERN DISTRICT OF TEXAS
 2                              DALLAS DIVISION

 3                                    )     Case No. 19-34054-sgj-11
             In Re:                   )     Chapter 11
 4                                    )
             HIGHLAND CAPITAL         )     Dallas, Texas
 5           MANAGEMENT, L.P.,        )     December 10, 2020
                                      )     9:30 a.m. Docket
 6                   Debtor.          )
             _____)
 7                                    )
             HIGHLAND CAPITAL         )     Adversary Proceeding 20-3190-sgj
 8           MANAGEMENT, L.P.,        )
                                      )
 9                   Plaintiff,       )     - MOTION FOR PRELIMINARY
                                      )       INJUNCTION
10           v.                       )     - MOTION FOR TEMPORARY
                                      )       RESTRAINING ORDER
11           JAMES D. DONDERO,        )
                                      )
12                   Defendant.       )
             _____)

13                       TRANSCRIPT OF PROCEEDINGS
                   BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14                     UNITED STATES BANKRUPTCY JUDGE.

15           WEBEX/TELEPHONIC APPEARANCES:

16           For the Plaintiff:        Jeffrey N. Pomerantz
                                       PACHULSKI STANG ZIEHL & JONES, LLP
17                                     10100 Santa Monica Blvd.,
                                        13th Floor
18                                     Los Angeles, CA  90067-4003
                                       (310) 277-6910
19
             For the Plaintiff:        John A. Morris
20                                     PACHULSKI STANG ZIEHL & JONES, LLP
                                       780 Third Avenue, 34th Floor
21                                     New York, NY  10017-2024
                                       (212) 561-7700
22
             For the Official Committee Matthew A. Clemente
23           of Unsecured Creditors:   SIDLEY AUSTIN, LLP
                                       One South Dearborn
24                                     Chicago, IL  60603
                                       (312) 853-7539
25
```

35

1    the protocols have been followed.

2        As Your Honor knows, when we've had an issue under the

3    protocols, I remember several months ago when we argued about

4    certain distributions being made, the Committee certainly was

5    not shy about bringing it to Your Honor's attention.

6        So we have been very vigilant and very diligent in holding

7    the Debtor accountable under the protocols.  And we believe

8    that -- although, again, when we've had an issue, we've come

9    to Your Honor.  We believe that the protocols have worked as

10   they were intended to and as they were designed, Your Honor.

11       So I can assure you that the Committee has been very

12   vigilant and the Committee will continue to be very vigilant.

13   These issues were all raised in the context of negotiating the

14   protocols.  That was before Your Honor.  Mr. Dondero was

15   involved with that.  It was very difficult negotiations, Your

16   Honor.

17       But this does seem like somebody now trying to renegotiate

18   what it was that the parties agreed to and Your Honor approved

19   early on in this case.

20       So, Your Honor, rest assured, the Committee has been very

21   vigilant and will continue to be very vigilant.

22           THE COURT:  All right.  And I guess the last thing

23   I'll say on that point is, while of course we always want

24   transparency --

25       (Interruption.)

36

1          THE COURT:  While we, of course, always want

2     transparency and notice and opportunity to object, I mean,

3     these are not your typical run-of-the-mill assets.  They're

4     not a parcel of real property or a building somewhere or

5     inventory somewhere or intellectual property.  I mean, these

6     are -- you know, again, we have a unique business here.  And I

7     think that was very much recognized in the process of

8     negotiating the protocols, that this is not the type of

9     business where you do a 363 motion on 21 days' notice any time

10    you feel like, oh, today's a great day to trade this or that

11    in whatever fund.

12         Well, we will go forward on this motion, because Mr.

13    Dondero is entitled to his day in court to make his argument,

14    put on his evidence, and try to convince me that this is not

15    just trying to renegotiate something Mr. Dondero agreed to 11

16    months ago on the eve of confirmation.  But I want to make

17    sure -- oh, we're getting --

18         (Echoing.)

19         (Clerk advises Court.)

20         THE COURT:  Okay.  You're on mute.  You're on mute,

21    Mr. Lynn.

22         MR. LYNN:  Your Honor, may I explain briefly?  This

23    is very distressing.  Mr. Morris says that it is the ordinary

24    course of this Debtor's business to sell a subsidiary.  This

25    is not the ordinary course of the Debtor's business.  There is

37

1  nothing in the protocols that says that the independent board

2  and just the creditors on the Creditors' Committee may make

3  decisions concerning major sales.  We will present evidence to

4  that effect when it occurs, and we believe strongly -- and I

5  want to state, Your Honor, I didn't participate in

6  negotiations of those protocols.  I wasn't involved.  And I've

7  looked at them.  There's nothing that says that this can occur

8  without going to a hearing.  And there is nothing in the

9  protocols that defines ordinary course of business to involve

10  this.

11      This motion was not filed because Mr. Dondero wanted to

12  get in the way.  It was filed because I thought it was the

13  right thing to do because I thought that this was contrary to

14  the way bankruptcy and Chapter 11 should work.  And it was

15  reasoned by me, with Mr. Dondero's consent.  And I very, very

16  much am upset to hear things people say that he's trying to

17  get in the way with this.  He is not.  He's asking for

18  something that is very, very, very reasonable.  If they have

19  nothing to hide, and I hope they don't and don't believe they

20  do, but if the Debtor has nothing to hide, what is wrong with

21  notice and a chance for hearing?

22          MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

23  If I briefly may be heard.

24          THE COURT:  Go ahead.

25          MR. POMERANTZ:  I actually did negotiate the

57

1   Court next Wednesday, he needs to testify.  And if NexPoint,

2   through whoever their decision-maker is, is wanting to urge a

3   position to the Court, they need a human being to testify.

4   And I'll hear Seery and I'll hear Dondero and I'll hear

5   whoever that person is, and that's what's going to matter, you

6   know, most to me.  Yeah, we have some legal issues, certainly,

7   but I like to hear business people explain things, no offense

8   to the lawyers.  But it's always very helpful to hear the

9   business people in addition to the lawyers.  All right.  So,

10  Mr. Morris, you're going to upload that TRO for me.

11          MR. MORRIS:  Yes, Your Honor.

12          THE COURT:  Mr. Wright, you can upload your order

13  setting your motion for hearing next Wednesday at 1:30.  And I

14  think we have our game plan for now.  Anything else?  All

15  right.  We're adjourned.

16          THE CLERK:  All rise.

17    (Proceedings concluded at 11:33 a.m.)

18                  --oOo--

19

20                  CERTIFICATE

21    I certify that the foregoing is a correct transcript to

     the best of my ability from the electronic sound recording of

22  the proceedings in the above-entitled matter.

23  **/s/ Kathy Rehling**                 **12/11/2020**

24  _____    _____

     Kathy Rehling, CETD-444               Date

25  Certified Electronic Court Transcriber

## EXHIBIT 33



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 17, 2021**

United States Bankruptcy Judge

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

---------------------------------------------------------------

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |

---------------------------------------------------------------

### <u>ORDER REQUIRING DISCLOSURES</u>

### I.    Introduction.

This Order is issued by the court *sua sponte* pursuant to Section 105 of the Bankruptcy Code and the court's inherent ability to efficiently monitor its docket and evaluate the standing of parties who ask for relief in the above-referenced case. More specifically, the Order is directed at clarifying the party-in-interest status or standing of numerous parties who are regularly filing pleadings in the above-referenced 20-month-old Chapter 11 bankruptcy case. The court has determined that there is

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

a need to: (a) fully understand whether such parties (defined below) have statutory or constitutional standing with regard to recurring matters on which they frequently file lengthy and contentious pleadings and, if so, (b) ascertain whether their interests are sufficiently aligned such that the parties might be required to file joint pleadings hence forth, rather than each file pleadings that are similar in content. The court has commented many times that certain active parties (*i.e.,* Mr. James Dondero and numerous non-debtor entities that he controls—hereinafter the "Non-Debtor Dondero-Related Entities") seem to have tenuous standing.   Mr. Dondero is, of course, the Debtor's co-founder, former President, Chief Executive Officer ("CEO"), and indirect beneficial equity owner.[2]   Since standing is a subject matter jurisdiction concern, the court has determined that it is in the interests of judicial economy to gain some clarity with regard to the standing of the various Non-Debtor Dondero-Related Entities.   It is also in the interests of judicial economy, the interests of other parties in this case, and in the interest of reducing administrative expenses of this estate that there be consolidation of pleadings, wherever possible, of the Non-Debtor Dondero-Related Entities.

---

[2] In addition to being the former CEO, Mr. Dondero represents that he is a "creditor, indirect equity security holder, and party in interest" in the Debtor's bankruptcy.   This court has stated on various occasions that this assertion is ostensibly true, but somewhat tenuous. Mr. Dondero filed five proofs of claim in the Debtor's bankruptcy case.  Two of those proofs of claim were withdrawn with prejudice on November 23, 2020 [DE # 1460].   The other three are unliquidated, contingent claims, each of which stated that Mr. Dondero would "update his claim in the next ninety days."   Ninety days has long-since passed since those proofs of claim were filed and Mr. Dondero has not updated those claims to this court's knowledge. With regard to Mr. Dondero's assertion that he is an "indirect equity security holder," the details have been represented to the court many times to be as follows (undisputed): Mr. Dondero holds no direct equity interest in the Debtor.  Mr. Dondero instead owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner. Strand, however, holds only 0.25% of the total limited partnership interests in the Debtor through its ownership of Class A limited partnership interests.  The Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests.  The Class A interests are also junior to all other claims filed against the Debtor.  Finally, Mr. Dondero's recovery on his indirect equity interest is junior to any claims against Strand itself.  Consequently, before Mr. Dondero can recover on his indirect equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be paid.

APP. 2817

Case 19-34054-sgj11 Doc 3405-1 Filed 07/19/22   Entered 07/19/22 17:21:44   Page 101 of
356
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 96 of 106   PageID 9674
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21   Entered 06/18/21 09:09:15   Page 3 of 13

## II. Background: The Chapter 11 Case.[3]

On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Highland is a registered investment advisor that is in the business of buying, selling, and managing assets on behalf of its managed investment vehicles. It manages billions of dollars of assets—to be clear, the assets are spread out in numerous, separate fund vehicles. While the Debtor has continued to operate and manage its business as a debtor-in-possession, the role of Mr. Dondero *vis-à-vis* the Debtor was significantly limited early in the bankruptcy case and ultimately terminated. The Debtor's current CEO is an individual selected by the creditors named James P. Seery.

Specifically, early in the case, the Official Unsecured Creditors Committee ("UCC") and the U.S. Trustee ("UST") desired to have a Chapter 11 Trustee appointed—absent some major change in corporate governance[4]—due to conflicts of interest and the alleged self-serving, improper acts of Mr. Dondero and possibly other officers (for example, allegedly engaging, for years, in fraudulent schemes to put Highland's assets out of the reach of creditors). Under this pressure, the Debtor negotiated a term sheet and settlement with the UCC (the "January 2020 Corporate Governance Settlement"), which was executed by Mr. Dondero and approved by a court order on January 9, 2020 (the "January 2020 Corporate Governance Order").[5] The settlement and term sheet contemplated a complete overhaul of the corporate governance structure of the Debtor. Mr. Dondero resigned from his role as an officer and director of the Debtor and of its general partner. Three new independent directors (the "Independent Board") were appointed to govern the Debtor's

---

[3] For a more detailed factual description of some of the disputed issues in this case, see the Memorandum of Opinion and Order Granting in Part Plaintiff's Motion to Hold James Dondero in Civil Contempt of Court for Alleged Violation of TRO, entered June 7, 2021, DE # 190, in AP # 20-3190.

[4] The UST was steadfast in wanting a Trustee.

[5] *See* DE ## 281 & 339.

APP. 2818

Case 19-34054-sgj11 Doc 3405-1 Filed 07/19/22   Entered 07/19/22 17:21:44   Page 102 of
356
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 97 of 106   PageID 9675
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21   Entered 06/18/21 09:09:15   Page 4 of 13

general partner Strand Advisors, Inc.—which, in turn, managed the Debtor. All of the new Independent Board members were selected by the UCC and are very experienced within either the industry in which the Debtor operates, restructuring, or both (Retired Bankruptcy Judge Russell Nelms, John Dubel, and James P. Seery). As noted above, one of the Independent Board members, James P. Seery ("Mr. Seery"), was ultimately appointed as the Debtor's new CEO and CRO.[6] As for Mr. Dondero, while not originally contemplated as part of the January 2020 Corporate Governance Settlement, the Debtor proposed at the hearing on the January 2020 Corporate Governance Settlement that Mr. Dondero remain on as an unpaid employee of the Debtor and also continue to serve as and retain the title of a portfolio manager for certain separate **non-Debtor** investment vehicles/entities whose funds are managed by the Debtor. The court approved this arrangement when the UCC ultimately did not oppose it. Mr. Dondero's authority with the Debtor was subject to oversight by the Independent Board, and Mr. Seery was given authority to oversee the day-to-day management of the Debtor, including the purchase and sale of assets held by the Debtor and its subsidiaries, as well as the purchase and sale of assets that the Debtor manages for various separate non-Debtor investment vehicles/entities. Significant to the court and the UCC was a provision in the order, at paragraph 9, stating that "Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor."

To be sure, this was a complex arrangement. Apparently, there were well-meaning professionals in the case that thought that having the founder and "face" behind the Highland brand still involved with the business might be value-enhancing for the Debtor and its creditors (even though Mr. Dondero was perceived as not being the type of fiduciary needed to steer the ship through bankruptcy). For sake of clarity, it should be understood that there are at least hundreds of

---

[6] "CRO" means Chief Restructuring Officer. *See* DE # 854, entered July 16, 2020.

entities—the lawyers have sometimes said 2,000 entities—within the Highland byzantine organizational structure (sometimes referred to as the "Highland complex"), most of which are ***not*** subsidiaries of the Debtor, nor otherwise owned by Highland.  And only Highland itself is in bankruptcy.  However, these entities are very much intertwined with Highland—in that they have shared services agreements, sub-advisory agreements, payroll reimbursement agreements, or perhaps, in some cases, less formal arrangements with Highland.  Through these agreements Highland (***through its own employees***) has historically provided resources such as fund managers, legal and accounting services, IT support, office space, and other overhead.  Many of these non-Debtor entities appear to be under the *de facto* control of Mr. Dondero—as he is the president and portfolio manager for many or most of them—although Mr. Dondero and certain of these entities stress that these entities have board members with independent decision making power and are not the mere "puppets" of Mr. Dondero.  This court has never been provided a complete organizational chart that shows ownership and affiliations of all 2,000 Non-Debtor Dondero-Related Entities, but the court has, on occasion, been shown information about some of them and is aware that a great many of them were formed in non-U.S. jurisdictions, such as the Cayman Islands.

Eventually, the Debtor's new Independent Board and management concluded that it was untenable for Mr. Dondero to continue to be employed by the Debtor in any capacity.  Various events occurred that led to the termination of his employment with the Debtor.  For one thing, Mr. Dondero prominently opposed certain actions taken by the Debtor through its CEO and Independent Board including:  (a) objecting to a significant settlement that the Debtor had reached in court-ordered mediation[7] with creditors Acis Capital Management and Josh and Jennifer Terry (the "Acis

---

[7] The court appointed Retired Bankruptcy Judge Allan Gropper, S.D.N.Y., and Attorney Sylvia Mayer, Houston, Texas (both with the American Arbitration Association), to be co-mediators over multiple disputes in the Bankruptcy Case, including the Acis dispute. The co-mediators, among other things, attempted to mediate disputes/issues with Mr. Dondero.

APP. 2820

Settlement")—which settlement helped pave the way toward a consensual Chapter 11 plan, and (b) pursuing, through one of his family trusts (the Dugaboy Investment Trust), a proof of claim alleging that the Debtor (including Mr. Seery) had mismanaged one of the Debtor's subsidiaries, Highland Multi Strategy Credit Fund, L.P. ("MSCF") with respect to the sale of certain of its assets during the bankruptcy case (in May of 2020).[8] The Debtor's Independent Board and management considered these two actions to create a conflict of interest— if Mr. Dondero was going to litigate significant issues against the Debtor in court, that was his right, but he could not continue to work for the Debtor (among other things, having access to its computers and office space) while litigating these issues with the Debtor in court.

But the termination of his employment was not the end of the friction between the Debtor and Mr. Dondero. In fact, literally a week after his termination, litigation posturing and disputes began erupting between Mr. Dondero and certain Non-Debtor Dondero-Related Entities, on the one hand, and the Debtor on the other.

At the present time, 11 adversary proceedings have been filed related to this bankruptcy case involving Non-Debtor Dondero-Related Entities. Additionally, Non-Debtor Dondero-Related entities have filed 11 appeals of bankruptcy court orders. Non-Debtor Dondero-Related entities have begun filing lawsuits relating to the bankruptcy case in other *fora* that are the subject of contempt motions.

III. **The Non-Debtor Dondero-Related Entities**.

The following are the Non-Debtor Dondero-Related Entities encompassed by this Order and their known counsel[9]:

---

[8] *See, e.g.,* Proof of Claim No. 177 and DE # 1154.
[9] There are three other entities that the court is not including in this Order at this time, since, although they have appeared in the past, they are no longer active in the case because of either resolving issues with the Debtor or other reasons: (a) Highland CLO Funding Ltd. (previously represented by the law firm of King and Spaulding); (b) Hunter

Case 19-34054-sgj11 Doc 3405-1 Filed 07/19/22    Entered 07/19/22 17:21:44    Page 105 of 356

Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 100 of 106   PageID 9678
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21   Entered 06/18/21 09:09:15    Page 7 of 13

A.  *James D. Dondero*

Mr. Dondero has had three law firms representing him in the bankruptcy proceedings:  Bonds Ellis Eppich Schafer Jones LLP; Stinson L.L.P.; and Crawford Wishnew Lang.

As earlier mentioned, Mr. Dondero has three pending proofs of claim that are unliquidated, contingent claims. Each of these claims state that Mr. Dondero would "update his claim in the next ninety days."  Ninety days has long-since passed since those proofs of claim were filed and Mr. Dondero has not updated those claims to this court's knowledge.  While this court is unclear what the alleged amount of Mr. Dondero's three unliquidated, contingent proofs of claim might be, the court takes judicial notice that the Debtor has filed an adversary proceeding (Adv. Proc. # 21-3003) alleging that Mr. Dondero is liable to three bankruptcy estate on three demand notes, on which the total amount due and owing is $9,004,013.07. Mr. Dondero has also been sued along with CLO Holdco, Grant Scott, Charitable DAF Holdco, Charitable DAF Fund, Highland Dallas Foundation, and the Get Good Trust for alleged fraudulent transfers in Adv. Proc. # 20-3195.

As far as equity interests in the Debtor, the Debtor is a Delaware limited partnership. The general partner is named Strand Advisors, Inc. ("Strand"). Mr. Dondero owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner, but gave up control of Strand pursuant to a court-approved corporate governance agreement reached in this case in January 2020, to which Mr. Dondero agreed. As of the Petition Date, the Debtor's limited partnership interests were held: (a) 99.5% by an entity called Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment Trust (Mr. Dondero's family trust—described below), (c) 0.0627% by the retired co-founder of the Debtor, Mark Okada, personally and through family trusts, and (d) 0.25% by Strand. These limited partnership interests were in three classes (Class A, Class B, and Class C).  The

---

Mountain Trust (previously represented by Sullivan Hazeltine Allinson and Rochelle McCullough); and (c) NexBank (previously represented by Alston & Bird).

APP. 2822

Case 19-34054-sgj11 Doc 3405-1 Filed 07/19/22 Entered 07/19/22 17:21:44 Page 106 of 356
Case 3:21-cv-00879-K Document 17 Filed 06/28/21 Page 101 of 106 PageID 9679
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21 Entered 06/18/21 09:09:15 Page 8 of 13

Class A interests were held by The Dugaboy Investment Trust, Mark Okada, and Strand. The Class B and C interests were held by Hunter Mountain Investment Trust and Hunter Mountain. The significance of this is that the Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests. The Class A interests are also junior to all other claims filed against the Debtor. And, of course, Mr. Dondero's recovery on his equity interest in Strand is junior to any claims against Strand itself. Consequently, before Mr. Dondero can recover on his indirect equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be paid.

B. _The Dugaboy Investment Trust ("Dugaboy") and Get Good Nonexempt Trust ("Get Good")_

The Dugaboy and Get Good Trusts are represented by the law firm Heller Draper & Horn.

Mr. Dondero is the beneficiary of Dugaboy and the settlor of Get Good (and family members are the beneficiaries). It has been represented in pleadings that Get Good is a trust established under the laws of the State of Texas. It has been represented in pleadings that Dugaboy is a trust established under the laws of the State of Delaware. At least as of the Petition Date, an individual named Grant Scott (a long-time friend of Mr. Dondero's, who is a patent lawyer and resides in Colorado) is the trustee of both. Mr. Dondero's sister may also be a trustee of Dugaboy.

As mentioned above, Dugaboy owns a 0.1866% of the Class A junior limited partnership interest in the Debtor.

Get Good has filed a proof of claim in this Bankruptcy Proceeding (submitted by Grant Scott). Dugaboy has filed several proofs of claim in this Bankruptcy Proceeding (all were submitted by Grant Scott). The court is not aware of the nature or amount of these claims, except the court has been apprised that: (a) one Dugaboy proof of claim alleges that Highland is obligated on a debt

<div align="center">8</div>

<div align="right">**APP. 2823**</div>

owed to Dugaboy by an entity known as Highland Select, allegedly because Highland is Highland Select's general partner and might also be its alter ego; and (b) another proof of claim asserts postpetition mismanagement by the Debtor of assets of one or more Debtor subsidiaries. While the court knows nothing about the Get Good proof of claim, it does know that the Get Good Trust (along with others, including Grant Scott) has been sued for alleged fraudulent transfers in an adversary proceeding in this case (Adv. Proc. # 20-3195)—which may affect the allowability of its proof of claim.

C. _Highland Capital Management Fund Advisors, L.P. ("HCMFA") and NexPoint Advisors, L.P. ("NPA") (sometimes collectively referred to as the "Advisors")_

These entities have been represented by the K&L Gates law firm at times and currently are represented by the law firm of Munsch Hardt Kopf & Harr. The entities are registered investment advisors that previously had shared services agreements with the Debtor.

It has been represented that Mr. Dondero directly or indirectly owns and/or effectively controls each of the Advisors. He is the President of each of them.

It is the court's understanding that both of these entities withdrew their original proofs of claim. However, the Advisors filed an application for an administrative expense claim on January 24, 2021, relating to services the Advisors allege the Debtor did not perform under a shared services agreement. The Debtor has since filed an objection to the claim and the matter is set for trial on September 28, 2021. Further, the Debtor has filed an adversary proceeding (Adv. Pro. # 21-3004) alleging that HCMFA owes the Debtor an aggregate of $7,687,653.07 pursuant to two promissory notes and the Debtor has filed an adversary proceeding (Adv. Pro. # 21-3005) alleging that NPA owes the Debtor $23,071,195.03 pursuant to a promissory note.

APP. 2824

Case 19-34054-sgj11 Doc 3405-1 Filed 07/19/22   Entered 07/19/22 17:21:44   Page 108 of 356

Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 103 of 106   PageID 9681
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21   Entered 06/18/21 09:09:15   Page 10 of 13

D. *Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, and NexPoint Real Estate Strategies Fund*

These entities are represented by the K&L Gates law firm. They are apparently each managed by the Advisors and these funds are specifically managed by Mr. Dondero as portfolio manager.

The court has no idea who owns these companies (assuming they should be regarded as separate companies). The court does not know which, if any of them, have filed proofs of claims.

E. *Charitable DAF Holdco, Ltd. ("DAF Holdco"), Charitable DAF Fund, LP ("DAF"), Highland Dallas Foundation, Inc., ("Highland Dallas Foundation")*

These entities are represented by the law firms of Kelly Hart Pitre and Sbaiti & Company PLCC.

It has been represented to the court that the DAF is managed by DAF Holdco, which is the managing member of the DAF.   It has further been represented to the court that DAF Holdco is owned by three different purported charitable foundations:  Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., and Highland Kansas City Foundation, Inc. (collectively, the "Highland Foundations").  DAF Holdco is an exempted company incorporated in the Cayman Islands.  Grant Scott has apparently, until recently, served as its managing member. The DAF is an exempted company incorporated in the Cayman Islands. Highland Dallas Foundation is a Delaware nonprofit, nonstock corporation.

Mr. Dondero is the president and one of the three directors of each of the Highland Foundations.  Apparently, Grant Scott was recently replaced by a former Highland employee named Mark Patrick (who is now an employee of Skyview Group, an entity created by former Highland employees). Although the Debtor is the non-discretionary investment advisor to the

**APP. 2825**

DAF, the Debtor does not have the right or ability to control or direct the DAF or CLO Holdco. Instead, the DAF takes and considers investment and payment advice from the Debtor, but ultimate decisions are in the control of Mr. Patrick, presumably at Mr. Dondero's direction.

The court is not aware whether these entities have filed proofs of claim. However, they, along with Messrs. Dondero and Scott, CLO Holdco and the Get Good have been sued for fraudulent transfers in Adv. Proc. # 20-3195.

F. *CLO Holdco, Ltd.*

This entity was previously represented by the law firm of Kane Russell Coleman & Logan and more recently is represented by the law firm of Sbaiti & Company PLLC.

CLO Holdco is a wholly owned and controlled subsidiary of the DAF. CLO Holdco is an exempted company incorporated in the Cayman Islands. CLO Holdco has filed two proofs of claim in this Bankruptcy Proceeding. Both proofs of claim were submitted by Grant Scott in his capacity as Director of CLO Holdco.

CLO Holdco, along with Messrs. Dondero and Scott, DAF Holdco, DAF Fund, Highland Dallas Foundation, and the Get Good have been sued for fraudulent transfers in Adv. Proc. # 20-3195.

G. *NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes, Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by any of the foregoing and any of their subsidiaries (sometimes collectively referred to as "NPRE")*

These entities are represented by the law firm of Wick Phillips Gould & Martin, LLP.

The entity known as HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) is alleged to owe the Debtor over $11 million pursuant to five promissory notes (as asserted in Adv.

**APP. 2826**

Pro. # 21-3007). The court understands this same entity has filed a proof of claim relating to its alleged interest in "SE Multifamily Holdings, LLC," which has been objected to and has not been resolved.

The court has no idea who owns or manages these companies or what exact function they play in the Highland complex of companies. The court does not know anything about the substance of the proof of claims.

### H. *Highland Capital Management Services, Inc.*

This entity appears to be represented by both Wick Phillips Gould & Martin, LLP (which also represents NPRE) and Stinson L.L.P. (which also sometimes represents Mr. Dondero personally).

This entity earlier filed two proofs of claim that were objected to and disallowed. Also, this entity is alleged to owe the Debtor approximately $7.7 million pursuant to five different promissory notes (as asserted in Adv. Pro. # 21-3006). The court has no idea who owns or manages this company or what exact function it plays in the Highland complex of companies.

### IV.    Disclosure Requirement

Accordingly, in furtherance of this court's desire to be more clear about the standing of various of these entities, and to assess whether their interests may be sufficiently aligned, in some circumstances, so as to require joint pleadings (rather than have a proliferation of similar pleadings) it is hereby **ORDERED** that:

Within 21 days of the entry of this Order, the Non-Debtor Dondero-Related Entities named in this Order shall file a Notice in this case disclosing thereon: (a) who owns the entity (showing percentages);[10] (b) whether Mr. Dondero or his family trusts have either a direct or indirect

---

[10] With regard to any minor children who may be beneficiaries of trusts, actual names should not be used (Child 1, Child 2, *etc.* would be sufficient).

APP. 2827

Case 19-34054-sgj11 Doc 3405-1 Filed 07/19/22   Entered 07/19/22 17:21:44   Page 111 of 356
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 106 of 106   PageID 9684
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21   Entered 06/18/21 09:09:15   Page 13 of 13

ownership interest in the entity and, if so, what percentage of ultimate ownership; (c) who are the officers, directors, managers and/or trustees of the Non-Debtor Dondero-Related Entity; and (d) whether the entity is a creditor of the Debtor (explaining in reasonable detail the amount and substance of its claims).

<p align="center">### **End of Order ###**</p>

APP. 2828

**EXHIBIT 34**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In Re: HIGHLAND CAPITAL | § | |
| MANAGEMENT, L.P., | § | |
| Debtor | § | |
| _____ | § | |
| | § | |
| JAMES DONDERO, *et al.*, | § | |
| | § | |
| Appellants, | § | |
| | § | |
| v. | § | Civil Action No. 3:21-CV-0879-K |
| | § | |
| HON. STACEY G. C. JERNIGAN, | § | |
| | § | |
| Appellee. | § | |

## MEMORANDUM OPINION AND ORDER

Appellants James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC. f/k/a HCRE Partners, LLC's (collectively "Appellants") appeal the Bankruptcy Court's Order Denying [Appellants'] Motion to Recuse Pursuant to 28 U.S.C. § 455 which was entered March 23, 2021. *See generally* Am. Notice of Appeal (Doc. No. 1-1); Appellants' Br. (Doc. No. 16). Because the Court lacks jurisdiction over this appeal, the Court hereby **dismisses** this appeal.

ORDER – PAGE 1

APP. 2829

### I.    Relevant Background

Appellants filed a Motion to Recuse under § 455 with the Bankruptcy Court, asking United States Bankruptcy Judge Stacey G. C. Jernigan (the "Bankruptcy Judge") to recuse herself from presiding over the bankruptcy proceeding of Debtor Highland Capital Management, L.P.  In an 11-page Order Denying Motion to Recuse Pursuant to 28 U.S.C. § 455 ("Recusal Order"), the Bankruptcy Judge denied the Motion while also reserving the right to supplement or amend the ruling.  *See* Am. Notice of Appeal (Doc. No. 1-1) at 5-15.  The Bankruptcy Court entered the Recusal Order on March 23, 2021.  *See id.*; Appellants' Br. (Doc. No. 16).  On April 18, 2021, the Clerk of the Bankruptcy Court transmitted the Notice of Appeal filed by Appellants on April 6, 2021.  *See generally* Doc. No. 1.  It is the Recusal Order that forms the basis of this appeal.  *See id.*  Appellants designated the Bankruptcy Judge as "Appellee".  *See id.*

Before appellate briefing began, Debtor Highland Capital Management, L.P. moved the Court for leave to intervene in this appeal.  *See* Mot. to Intervene (Doc. No. 2).  Debtor Highland Capital Management, L.P. argued that it is the real party-in-interest, not the Bankruptcy Judge.  Mot. to Intervene at 3.  After the Motion to Intervene was fully briefed and ripe, the Court granted the Motion and allowed Debtor Highland Capital Management, L.P. ("Debtor/Intervenor") to file a responsive brief as accorded to an appellee under the bankruptcy rules.  *See generally* Order (Doc. No. 10).

ORDER – PAGE 2

Appellants then filed their Appellants' Brief identifying and arguing two issues on appeal:  (1) whether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 as untimely; and (2) whether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 on the merits.   Appellants' Br. at 1. Intervenor/Debtor filed an Appellee's Brief in response (Doc. No. 20), and Appellants filed their Reply Brief (Doc. No. 23).  The Bankruptcy Record on Appeal does not reflect that a final judgment has been entered by the Bankruptcy Court in this matter.

Upon an initial review of the appellate briefing, the Court *sua sponte* questioned its jurisdiction over this appeal.  *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("[S]ubject-matter delineations must be policed by the courts on their own initiative even at the highest level.").  The Court issued an Order (Doc. No. 28) directing the parties to file briefs, respectively, addressing this Court's jurisdiction over an appeal of the Bankruptcy Judge's order denying a motion to recuse when final judgment has not yet been entered.  The parties timely filed their respective jurisdictional briefs, and the Court has carefully considered the arguments, the applicable and binding law, and relevant portions of the record.  The Court turns now to this threshold jurisdictional issue.

ORDER – PAGE 3

## II.    Applicable Law

Section 455 of Chapter 28 of the United States Code provides, in relevant part, that:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
> (b) He shall also disqualify himself in the following circumstances:
>   (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings.

28 U.S.C. § 455(a) & (b)(1).  Bankruptcy Rule 5004(a) provides that "A bankruptcy judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstances arises or, if appropriate, shall be disqualified from presiding over the case."  FED. R. BANKR. P. 5004(a).

District courts have jurisdiction over appeals from the following entered by a bankruptcy judge:

> (1) from final judgments, orders, and decrees;
> (2) from interlocutory orders and decrees under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and
> (3) with leave of the court , from other interlocutory orders and decrees.

28 U.S.C. § 158(a).

ORDER – PAGE 4

III.    Analysis

A.    Recusal Order is an Interlocutory Order and Not Immediately
Appealable as a Matter of Right

It is well-established law in the Fifth Circuit that a court's order denying a recusal

motion is not a final order, is not an appealable interlocutory order, and is not an

appealable collateral order, therefore it is reviewable on appeal only from final

judgment. *Willis v. Kroger*, 263 F.3d 163, 163 (5th Cir. 2001); *United States v. Henthorn*,

68 F.3d 465, 465 (5th Cir. 1995); *Chitimacha Tribe of La. v. Harry L. Laws Co., Inc.*, 690

F.2d 1157, 1164 n.3 (5th Cir. 1982); *In re Corrugated Container Antitrust Litig.*, 614 F.2d

958, 960 (5th Cir. 1980); *Martin v. Driskell*, 2021 WL 4784756, at *1 (5th Cir. July

12, 2021); *In re Gordon*, 2019 WL 11816606, at *1 (5th Cir. Apr. 10, 2019); *Stancu v.

Hyatt Corp./Hyatt Regency Dallas*, Civ. Action No. 3:18-CV-1737-E-BN, 2020 WL

853859, at *2 (N.D. Tex. Jan. 30, 2020), *adopted by* 2020 WL 833645 (Feb. 20,

2020)(Brown, J.); *Prather v. Dudley*, Civ. Action No. 9:06cv100, 2006 WL 3317124,

at *2 (E.D. Tex. Oct. 18, 2006); *Hardy v. Fed. Express Corp.*, No. Civ.A 97-1620, 1998

WL 104686, at *1 (E.D. La. Mar. 6, 1998).  Moreover, both the Fifth Circuit and

district courts in this Circuit have applied this very clear, decades-old law in appeals

taken from a bankruptcy court's order denying a motion to recuse.  *In re Dorsey*, 489 F.

App'x 763, 764 (5th Cir. 2012); *In re Schweitzer*, Civ. Action No. 07-4036, 2007 WL

2965045, at *1 (E.D. La. Oct. 9, 2007); *In re Moerbe*, No. 03-57260-LMC/04-5043-LMC/SA-04-CA-801-FB, 2005 WL 3337634, at *3 (W.D. Tex. Sept. 1, 2005).

In this case, the Bankruptcy Record on Appeal does not establish that a final judgment has been entered. The law in the Fifth Circuit specifies that a court's order on a motion to disqualify the judge "is not an appealable final order" and "a party 'must await final judgment to appeal [a] judge's refusal to recuse.'" *In re Dorsey*, 489 F. App'x at 764 (holding court was without jurisdiction to review bankruptcy court's decision on motion to recuse because, although final judgment had been entered, the appeal of it had not yet been resolved). Appellants attempt to get around this law by arguing that the courts have considered the "finality" of an order on a motion to recuse only under 28 U.S.C. § 1291 (which applies to jurisdiction of courts of appeals over appeals from final orders of district courts) and not § 158(a) (which applies to jurisdiction of district court over appeals from bankruptcy court orders). Appellants contend this is crucial because the bankruptcy appellate statute, § 158(a), applies here and that statute contemplates the more liberal and flexible "finality" standard accorded to bankruptcy courts, rather than the finality standard under § 1291 pertaining to district court orders. Resp. Br. (Doc. No. 31) at 2-7.

The Court rejects Appellants' suggestion that the Court should or even can construe this Recusal Order under a different "finality" standard mere because the

ORDER – PAGE 6

Bankruptcy Court entered it. There is nothing in the Court's own research, nor anything provided by Appellants, to suggest that the Court should ignore this binding precedent and apply a more liberal and flexible "finality" standard to this appeal of the Recusal Order merely because it is an order of the Bankruptcy Court. Indeed, courts in this Circuit have not hesitated in applying this well-settled law to an appeal of a bankruptcy court order on a motion to recuse. *See, e.g., In re Schweitzer*, 2007 WL 2965045, at *1 (court found jurisdiction lacking over appeal from bankruptcy court's order denying motion to recuse because "the law is quite clear that an order denying a motion to disqualify a judge is an interlocutory order from which no appeal lies prior to final judgment in the case."); *In re Moerbe*, 2005 WL 3337634, at *3 ("Because an order denying a motion to recuse or disqualify a judge is interlocutory, not final, and is not immediately appealable, it would seem to follow that the [the bankruptcy court's] order in this case granting recusal but denying its permanency is likewise interlocutory."). The Court finds no justification for straying from the well-settled law in the Fifth Circuit and finds that the Bankruptcy Court's Recusal Order is not a final appealable order.

The Court also finds that the Recusal Order is not subject to the collateral order doctrine and it is not an interlocutory order that is not immediately appealable. Appellants ask the Court to treat the Recusal Order as subject to the collateral order

ORDER – PAGE 7

doctrine. The Court rejects this request as there is no legal basis for doing so. Appellants again ignore very clear Fifth Circuit law that a court order denying a recusal motion is not an appealable collateral order. *Willis*, 263 F.3d at 163 (citing *Nobby Lobby*, 970 F.2d at 85-86 & n.3); *Henthorn*, 68 F.3d at 465; *Chitimacha Tribe of La.*, 690 F.2d at 1164 n.3; *In re Corrugated Container Antitrust Litig.*, 614 F.2d at 960; *In re Dorsey*, 489 F. App'x at 764; *Martin*, 2021 WL 4784756, at *1; *In re Gordon*, 2019 WL 11816606, at *1. There is no justification to stray from this well-settled law. Moreover, the Recusal Order is not an appealable interlocutory order under § 1292(a). *Nobby Lobby*, 970 F.2d at 85-86 & n.3; *In re Dorsey*, 489 F. App'x at 764.

For these reasons, the Court finds, as it must, that the Recusal Order is an interlocutory order from which no appeal lies prior to the Bankruptcy Court entering a final judgment. *See Willis*, 263 F.3d at 163; *Nobby Lobby*, 970 F.2d at 85-86 & n.3; *In re Corrugated Container Antitrust Litig.*, 614 F.2d at 960. Therefore, the Court lacks jurisdiction over this appeal.

## B.     Leave to Bring an Interlocutory Appeal

Appellants' last hope for their appeal is securing leave of this Court to bring an interlocutory appeal of the Recusal Order. 28 U.S.C. § 158(a)(3) (district courts may hear appeals "with leave of the court, from other interlocutory orders" of the bankruptcy court). Appellants were required to file a motion for leave to appeal

ORDER – PAGE 8

contemporaneously with their notice of appeal. Fed. R. Bankr. P. 8004(a). The motion for leave to appeal must also include certain contents. *Id.* 8004(b). Despite these unambiguous requirements of the Bankruptcy Rules, Appellants did not comply with them. Their failure, however, does not foreclose the appeal entirely because Bankruptcy Rule 8004(d) permits the Court to "treat the notice of appeal as a motion for leave and either grant it or deny it." Fed. R. Bankr. P. 8004(c). In their jurisdictional brief, Appellants ask the Court to treat their Notice of Appeal as a motion for leave to appeal should the Court find the Recusal Order is an interlocutory order. Appellants' Resp. (Doc. No. 29) at 8. The Court turns now to this analysis.

Section 158(a)(3) does not articulate the standard a district court must use in deciding whether to grant leave in its discretion, but "[c]ourts in the Fifth Circuit . . . have applied 28 U.S.C. § 1292(b), the standard governing interlocutory appeals generally." *In re Hallwood Energy, L.P.*, Civ. Action No. 3:12-CV-1902-G, 2013 WL 524418, at *2 (N.D. Tex. Feb. 11, 2013)(Fish, SJ) (citing *In re Ichinose*, 946 F.2d 1169, 1177 (5th Cir. 1991); *Panda Energy Int'l, Inc. v. Factory Mut. Ins.*, 2011 WL 610016, at *3 (N.D. Tex. Feb. 14, 2011)(Kinkeade, J.)); *accord Rivas v. Weisbart*, 2019 WL 5579726, at *2 (E.D. Tex. Oct. 28, 2019); *Celadon Trucking Servs., Inc. v. Moser*, 2019 WL 4226854, at *2 (E.D. Tex. Sept. 4, 2019). There are three elements of the § 1292(b) standard: "(1) a controlling issue of law must be involved; (2) the question

ORDER – PAGE 9

must be one where there is substantial ground for difference of opinion; and (3) an immediate appeal must materially advance the ultimate termination of the litigation." *In re Ichinose*, 946 F.2d at 1177. An appeal of an interlocutory order is appropriate only where all three elements are satisfied. *See In re Genter*, Civ. Action No. 3:19-CV-1951-E, 2020 WL 3129637, at *2 (N.D. Tex. June 12, 2020)(Brown, J.) (citing *Arparicio v. Swan Lake*, 643 F.2d 1109, 1110 n.2 (5th Cir. 1981)). "The Fifth Circuit disfavors interlocutory appeals and leave to appeal is sparingly granted." *Id.* (internal citations omitted); *In re Hallwood Energy*, 2013 WL 524418, at *2 ("[I]nterlocutory appeals are 'sparingly granted' and reserved for 'exceptional' cases.") (internal citations omitted). The decision whether to grant an interlocutory appeal is firmly within the district court's discretion. *Panda Energy Int'l*, 2011 WL 610016, at *3.

In this case, there is no controlling question of law with substantial grounds for disagreement for which resolution would materially advance the end of the bankruptcy litigation. It is well-settled that a recusal motion under § 455 is left to the sound discretion of the judge. *Chitimacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157, 1166 (5th Cir. 1982); *see In re Pendergraft*, 745 F. App'x 517, 520 (5th Cir. 2018) (citing *Trevino v. Johnson*, 168 F.3d 173, 178 (5th Cir. 1999)). "[C]ontrolling issue of law is one that has 'the potential for substantially accelerating the disposition of the litigation' and does not concern 'matters that are entrusted to the discretion of the bankruptcy

ORDER – PAGE 10

court.'" *In re Moerbe*, 2005 WL 3337634, at *4 (W.D. Tex. Sept. 1, 2005) (quoting *In re Aquatic Dev. Group, Inc.*, 196 B.R. 666, 669 (S.D.N.Y. 1996)). The Recusal Order was an exercise of the Bankruptcy Judge's discretion, so there is no controlling issue of law presented. *Cf. In re Tullius*, 2011 WL 5006673, at *3 (W.D. Tex. Oct. 20, 2011). Appellants also cannot satisfy the second factor because the Court cannot find there exists substantial ground for difference of opinion as to the Recusal Motion.

> [C]ourts have found substantial ground for difference of opinion where a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of the circuit has not yet spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented.

*Ryan v. Flowserve Corp.*, 444 F.Supp.2d 718, 723-24 (N.D. Tex. 2006)(Boyle, J.) (internal citation omitted). The Recusal Order does not fall within any of those categories. Simply because Appellants believe the Bankruptcy Court ruled incorrectly does not demonstrate substantial ground for disagreement. *Id.* at 724. Finally, the third element eludes Appellants as well. An interlocutory appeal of the Recusal Order will in no way materially advance the ultimate end to this bankruptcy matter.

The Fifth Circuit strongly disfavors interlocutory appeals and, accordingly, they are rarely granted and reserved for "exceptional cases". *See, e.g., In re Genter*, 2020 WL 3129637, at *2. Appellants failed to satisfy any of the three § 1292(b) criteria. *Id.*

ORDER – PAGE 11

Therefore, in its discretion, the Court **denies** Appellants leave to take an interlocutory appeal of the Bankruptcy Court's Recusal Order.

Finally, the Court turns to the remaining arguments Appellants assert. First, the Court declines to *sua sponte* withdraw the reference of Appellants' motion for the bankruptcy judge to recuse herself. The case Appellants cite in support of this suggestion is inapposite here. In the unpublished Fifth Circuit opinion, *Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958 (5th Cir. 2003), the appellant sought leave to appeal the dismissal of his 28 U.S.C. § 2254 petition. *See generally Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958. The magistrate judge recommended dismissal the § 2254 petition and the district judge adopted the recommendation and dismissed the petition. *See id.* at *1-2. The Fifth Circuit did not address the merits of the dismissal, but, instead, *sua sponte* vacated the district court's final judgment and remanded with instructions to assign the case to a different district judge. *Id.* at *2. The Fifth Circuit's reasoning—the district judge was the spouse of the magistrate judge and the *pro se* prisoner likely did not know nor could he have reasonably known this. *Id.* Unlike the unusual and exceptional facts in *Maddox*, the Court does not find this appeal to justify *sua sponte* withdrawing the reference of and ruling on Appellants' motion to recuse.

The Court also finds no justification for treating Appellants' notice of appeal as a petition for writ of mandamus, which Appellants also request. A question of recusal

ORDER – PAGE 12

is reviewable on a petition for writ of mandamus. *United States v. Gregory*, 656 F.2d 1132, 1136 (5th Cir. 1981); *In re Placid Oil Co.*, 802 F.2d 783, 786 (5th Cir. 1986); *In re Cameron Int'l Corp.*, 393 F. App'x 133, 134-35 (5th Cir. 2010). "However, the writ will not lie in the absence of exceptional circumstances, and the party seeking the writ has the burden of proving a clear and indisputable right to it." *In re Placid Oil Co.*, 802 F.2d at 786 (citing *Gregory*, 656 F.2d at 1136); *accord In re Cameron Int'l Corp.*, 393 F. App'x at 134-35. Appellants fail to make the required showing. The Court refuses to construe Appellants' appeal as a petition for writ of mandamus.

## C. Conclusion

The well-established precedent in the Fifth Circuit is that no jurisdiction lies over an appeal of a motion to recuse until final judgment has been entered. Appellants make arguments about potential inefficiency and wasted resources if they must wait to appeal the Recusal Order until the final judgment has been entered. But these arguments are not novel. The Court is certain those same arguments have been advanced in other courts considering this same issue and those courts have rejected them, as this Court does here. Appellants would have this Court carve out an exception to the well-settled law for them without any justifiable basis other than because they think the Bankruptcy Judge was wrong. Appellants must await final judgment, or other

ORDER – PAGE 13

final resolution, of their bankruptcy proceeding in order to appeal the Recusal Order. This Court has no jurisdiction to hear this appeal.

### IV.    Conclusion

The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292(a) and the Court is **without jurisdiction** over this appeal of the Bankruptcy Court's Recusal Order.  The Court further **denies** Appellants leave to appeal the Recusal Order under § 1292(b), **denies** Appellants' request to withdraw the reference of their motion to recuse, and **denies** Appellants' request to construe their appeal as a petition for writ of mandamus.  Accordingly, the Court **dismisses** this appeal for lack of jurisdiction.

**SO ORDERED.**

Signed February 9th, 2022.

ED KINKEADE
UNITED STATES DISTRICT JUDGE

ORDER – PAGE 14

**APP. 2842**

**EXHIBIT 35**

# HELLER, DRAPER & HORN, L.L.C.

*ATTORNEYS AT LAW*

650 POYDRAS STREET, SUITE 2500
NEW ORLEANS, LOUISIANA 70130-6103
TELEPHONE: (504) 299-3300  FAX: (504) 299-3399

Douglas S. Draper
Direct Dial: (504) 299-3333
E-mail: ddraper@hellerdraper.com

EDWARD M. HELLER
(1926-2013)

May 19, 2022

Mrs. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC 20530

> **Re:** *Highland Capital Management, L.P. – USBC Case No. 19-34054sgj11*

Dear Nan,

The purpose of this letter is to request that your office investigate the circumstances surrounding the sale of claims by members of the Official Committee of Unsecured Creditors ("Creditors' Committee") in the bankruptcy of Highland Capital Management, L.P. ("Highland" or "Debtor"). As described in detail below, there is sufficient evidence to warrant an immediate investigation into whether non-public inside information was furnished to claims purchasers. Further, there is reason to suspect that selling Creditors' Committee members may have violated their fiduciary duties to the estate by tying themselves to claims sales at a time when they should have been considering meaningful offers to resolve the bankruptcy. Indeed, three of four Committee members sold their claims without advance disclosure, in violation of applicable guidelines from the U.S. Trustee's Office. This letter contains a description of information and evidence we have been able to gather, and which we hope your office will take seriously.

By way of background, Highland, an SEC-registered investment adviser, filed for Chapter 11 bankruptcy protection in the United States Bankruptcy Court for the District of Delaware on October 16, 2019, listing over $550 million in assets and net $110 million in liabilities. The case eventually was transferred to the Northern District of Texas, to Judge Stacey G.C. Jernigan. Highland's decision to seek bankruptcy protection primarily was driven by an expected net $110 million arbitration award in favor of the "Redeemer Committee."[1] After nearly 30 years of successful operations, Highland and its co-founder, James Dondero, were advised by Debtor's counsel that a court-approved restructuring of the award in Delaware was in Highland's best interest.

---

[1] The "Redeemer Committee" was a group of investors in a Debtor-managed fund called the "Crusader Fund" that sought to redeem their interests during the global financial crisis. To avoid a run on the fund at low-watermark prices, the fund manager temporarily suspended redemptions, which resulted in a dispute between the investors and the fund manager. The ultimate resolution involved the formation of the "Redeemer Committee" and an orderly liquidation of the fund, which resulted in the investors receiving their investment plus a return versus the 20 cents on the dollar they would have received had the fund been liquidated when the redemption requests were made.

{00376610-1}

May 19, 2022
Page 2

I became involved in Highland's bankruptcy through my representation of The Dugaboy Investment Trust ("Dugaboy"), an irrevocable trust of which Mr. Dondero is the primary beneficiary. Although there were many issues raised by Dugaboy and others in the case where we disagreed with the Court's rulings, we will address those issues through the appeals process.

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace the existing management of the Debtor. To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero reached an agreement with the Creditors' Committee to resign as the sole director of the Debtor's general partner, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. The agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[2] It was expected that the new, independent management would not only preserve Highland's business but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero.

Judge Jernigan confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan"). We have appealed certain aspects of the Plan and will rely upon the Fifth Circuit Court of Appeals to determine whether our arguments have merit. I write instead to call to your attention the possible disclosure of non-public information by Committee members and other insiders and to seek review of actions by Committee members that may have breached their fiduciary duties—both serious abuses of process.

1.    **The Bankruptcy Proceedings Lacked The Required Transparency, Due In Part To the Debtor's Failure To File Rule 2015.3 Reports**

Congress, when it drafted the Bankruptcy Code and created the Office of the United States Trustee, intended to ensure that an impartial party oversaw the enforcement of all rules and guidelines in bankruptcy. Since that time, the Executive Office for United States Trustees (the "EOUST") has issued guidance and published rules designed to effectuate that purpose. To that end, EOUST recently published a final rule entitled *Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11*" (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906. The goal of the Periodic Reporting Requirements is to "assist the court and parties in interest in ascertaining, [among other things], the following: (1) Whether there is a substantial or continuing loss to or diminution of the bankruptcy estate; . . . (3) whether there exists gross mismanagement of the bankruptcy estate; . . . [and] (6) whether the debtor is engaging in the unauthorized disposition of assets through sales or otherwise . . . ." *Id.*

Transparency has long been an important feature of federal bankruptcy proceedings. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other

---

[2] *See* Appendix, pp. A-3 - A-14.

May 19, 2022
Page 3

information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[3] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. In fact, 11 U.S.C. § 1102(b)(3) requires a creditors' committee to share information it receives with those who "hold claims of the kind represented by the committee" but who are not appointed to the committee. In the case of the Highland bankruptcy, the transparency that the EOUST mandates and that creditors' committees are supposed to facilitate has been conspicuously absent. I have been involved in a number of bankruptcy cases representing publicly-traded debtors with affiliated non-debtor entities, much akin to Highland's structure here. In those cases, when asked by third parties (shareholders or potential claims purchasers) for information, I directed them to the schedules, monthly reports, and Rule 2015.3 reports. In this case, however, no Rule 2015.3 reports were filed, and financial information that might otherwise be gleaned from the Bankruptcy Court record is unavailable because a large number of documents were filed under seal or heavily redacted. As a result, the only means to make an informed decision as to whether to purchase creditor claims and what to pay for those claims had to be obtained from non-public sources.

It bears repeating that the Debtor and its related and affiliated entities failed to file *any* of the reports required under Bankruptcy Rule 2015.3. There should have been at least four such reports filed on behalf of the Debtor and its affiliates during the bankruptcy proceedings. The U.S. Trustee's Office in Dallas did nothing to compel compliance with the rule.

The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[4] This excuse makes no sense in light of the years of bankruptcy experience of the Debtor's counsel and financial advisors. Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-value determinations.[5] Rather than disclose financial information that was readily

---

[3] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).

[4] *See* Doc. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

[5] During a deposition, the Debtor's Chief Restructuring Officer, Mr. Seery, identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities

May 19, 2022
Page 4

available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency, and the U.S. Trustee's Office did nothing to rectify the problem.

By contrast, the Debtor provided the Creditors' Committee with robust weekly information regarding (i) transactions involving assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly owned subsidiaries, (ii) transactions involving entities managed by the Debtor and in which the Debtor holds a direct or indirect interest, (iii) transactions involving entities managed by the Debtor but in which the Debtor does not hold a direct or indirect interest, (iv) transactions involving entities not managed by the Debtor but in which the Debtor holds a direct or indirect interest, (v) transactions involving entities not managed by the Debtor and in which the Debtor does not hold a direct or indirect interest, (vi) transactions involving non-discretionary accounts, and (vii) weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee had real-time, actual information with respect to the financial affairs of non-debtor affiliates, and this is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3.

After the claims at issue were sold, I filed a Motion to Compel compliance with the reporting requirement. Judge Jernigan held a hearing on the motion on June 10, 2021. Astoundingly, the U.S. Trustee's Office took no position on the Motion and did not even bother to attend the hearing. Ultimately, on September 7, 2021, the Court denied the Motion as "moot" because the Plan had by then gone effective. I have appealed that ruling because, again, the Plan becoming effective does not alleviate the Debtor's burden of filing the requisite reports.

The U.S. Trustee's Office also failed to object to the Court's order confirming the Debtor's Plan, in which the Court appears to have released the Debtor from its obligation to file any reports after the effective date of the Plan that were due for any period prior to the effective date, an order that likewise defeats any effort to demand transparency from the Debtor. The U.S. Trustee's failure to object to this portion of the Court's order is directly at odds with the spirit and mandate of the Periodic Reporting Requirements, which recognize the U.S. Trustee's duty to ensure that debtors timely file all required reports.

## 2. There Was No Transparency Regarding The Financial Affairs Of Non-Debtor Affiliates Or Transactions Between The Debtor And Its Affiliates

The Debtor's failure to file Rule 2015.3 reports for affiliate entities created additional transparency problems for interested parties and creditors wishing to evaluate assets held in non-Debtor subsidiaries. In making an investment decision, it would be important to know if the assets of a subsidiary consisted of cash, marketable securities, other liquid assets, or operating businesses/other illiquid assets. The Debtor's failure to file Rule 2015.3 reports hid from public view the composition of the assets and the corresponding liabilities at the subsidiary level. During the course of proceedings, the Debtor sold $172 million in assets, which altered the asset mix and liabilities of the Debtor's affiliates and controlled entities. Although Judge Jernigan held that such sales did not require Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity. In the Appendix, I have included a schedule of such sales.

Of particular note, the Court authorized the Debtor to place assets that it acquired with "allowed claim dollars" from HarbourVest (a creditor with a contested claim against the estate) into a specially-created non-debtor entity ("SPE").[6]    The Debtor's motion to settle the

---

below the Debtor. *See* Appendix, p. A-19 (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

[6] Prior to Highland's bankruptcy, HarbourVest had invested $80 million into a Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF").  A dispute later arose between HarbourVest

May 19, 2022
Page 5

HarbourVest claim valued the asset acquired (HarbourVest's interest in HCLOF) at $22 million.
In reality, that asset had a value of $40 million, and had the asset been placed in the Debtor
entity, its true value would have been reflected in the Debtor's subsequent reporting. By instead
placing the asset into an SPE, the Debtor hid from public view the true value of the asset as well
as information relating to its disposition; all the public saw was the filed valuation of the asset.
The U.S. Trustee did not object to the Debtor's placement of the HarbourVest assets into an SPE
and apparently just deferred to the judgment of the Creditors' Committee about whether this was
appropriate.[7] Again, when the U.S. Trustee's Office does not require transparency, lack of
transparency significantly increases the need for non-public information. Because the
HarbourVest assets were placed in a non-reporting entity, no potential claims buyer without
insider information could possibly ascertain how the acquisition would impact the estate.

> ### 3. The Plan's Improper Releases And Exculpation Provisions Destroyed Third-Party Rights

In addition, the Debtor's Plan contains sweeping release, exculpation provisions, and a
channeling injunction requiring that any permitted causes of action to be vetted and resolved by
the Bankruptcy Court. On their face, these provisions violate *Pacific Lumber*, in with the United
States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses. The
U.S. Trustee's Office in Dallas has, in all cases but this one, vigorously protected the rights of
third parties against such exculpation clauses. In this case, the U.S. Trustee's Office objected to
the Plan, but it did not pursue that objection at the confirmation hearing (nor even bother to
attend the first day of the hearing),[8] nor did it appeal the order of the Bankruptcy Court
approving the Plan and its exculpation clauses.

As a result of this failure, third-party investors in entities managed by the Debtor are now
barred from asserting or channeled into the Bankruptcy Court to assert any claim against the
Debtor or its management for transactions that occurred at the non-debtor affiliate level. Those
investors' claims are barred notwithstanding that they were not notified of the releases and have
never been given any information with which to evaluate their potential claims, nor given the
opportunity to "opt out." Conversely, the releases insulate claims purchasers from the risk of
potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty,
diminution in value, or otherwise). These releases are directly at odds with investors'
expectations when they invest in managed funds—i.e., that fund managers will act in a fiduciary
capacity to maximize investors' returns and that investors will have recourse for any failure to do
so. While the agreements executed by investors may limit the exposure of fund managers,
typically those provisions require the fund manager to obtain a third-party fairness opinion where
there is a conflict between the manager's duty to the estate and his duty to fund investors.

As an example, the Court approved the settlement of UBS's claim against the Debtor and
two funds managed by the Debtor (collectively referred to as "MultiStrat"). Pursuant to that
settlement, MultiStrat agreed to pay UBS $18.5 million and represented that it was advised by
"independent legal counsel" in the negotiation of the settlement.[9] That representation is untrue;

---

and Highland, and HarbourVest filed claims in the Highland bankruptcy approximating $300 million in relation to
damages allegedly due to HarbourVest as a result of that dispute. Although the Debtor initially placed no value on
HarbourVest's claim (the Debtor's monthly operating report for December 2020 indicated that HarbourVest's
allowed claims would be $0), eventually the Debtor entered into a settlement with HarbourVest—approved by the
Bankruptcy Court—which entitled HarbourVest to $80 million in claims. In return, HarbourVest agreed to convey
its interest in HCLOF to the SPE designated by the Debtor and to vote in favor of the Debtor's Plan.
[7] Dugaboy has appealed the Bankruptcy Court's ruling approving the placement of the HarbourVest assets into a
non-reporting SPE.
[8] *See* Doc. 1894 (Feb. 2, 2021 Hr'g Tr. at 10:7-14).
[9] *See* Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch) at

May 19, 2022
Page 6

MultiStrat did not have separate legal counsel and instead was represented only by the Debtor's counsel.[10] If that representation and/or the terms of the UBS/MultiStrat settlement in some way unfairly impacted MultiStrat's investors, they now have no recourse against the Debtor. The release and exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse to third parties, even when they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to resolve conflicts of interest.

The U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharmaceuticals that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[11] It has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the Plan's language, what claims were extinguished, third-party releases are contrary to law.[12] This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release. Highland's Plan does not provide for consent by third parties (or an opt-out provision), nor does it require that released parties provide value for their releases. Under these circumstances, it is difficult to understand why the U.S. Trustee's Office in Dallas did not lodge an objection to the Plan's release and exculpation provisions. Several parties have appealed this issue to the Fifth Circuit.

### 4. The Lack Of Transparency Facilitated Potential Insider Trading

The biggest problem with the lack of transparency at every step is that it created a need for access to non-public confidential information. The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) were the only parties with access to critical information upon which any reasonable investor would rely. But the public did not.

In the context of this non-transparency, it is notable that three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup"). The four claims that were sold comprise the largest four claims in the Highland bankruptcy by a substantial margin,[13] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims[14]:

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,6969,610** | **$95,000,000** | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we have reason to believe that Jessup is owned and controlled by Stonehill Capital Management ("Stonehill"). As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon)

---

Ex. 1, §§ 1(b), 11; *see* Appendix, p. A-57.

[10] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent legal counsel.

[11] *See* Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.

[12] *See id.* at 22.

[13] *See* Appendix, p. A-25.

[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.

May 19, 2022
Page 7

and Jessup (Stonehill) will oversee the liquidation of the Reorganized Debtor and the payment over time to creditors who have not sold their claims.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims.[15] In particular, there are three primary reasons we believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

We believe the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|----------|---------|---------|-----------|----------------|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[16] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0[17] |

To elaborate on our reasons for suspicion, an analysis of publicly-available information would have revealed to any potential investor that:

- There was a $200 million dissipation in the estate's asset value, which started at a scheduled amount of $556 million on October 16, 2019, then plummeted to $328 million as of September 30, 2020, and then increased only slightly to $364 million as of January 31, 2021.[18]

---

[15] A timeline of relevant events can be found at Appendix, p. A-26.

[16] *See* Appendix, pp. A-70 – A-71. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

[17] Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean that Stonehill and Farallon paid $50 million for claims worth only $46.4 million. *See* Appendix, p. A-28. If, however, Stonehill and Farallon had access to information that only came to light later—i.e., that the estate was actually worth much, much more (between $472-600 million as opposed to $364 million)—then it makes sense that they would pay what they did to buy the UBS claim.

[18] *Compare* Jan. 31, 2021 Monthly Operating Report [Doc. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Doc. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which we believe was worth approximately $44.3 million as of January 31, 2021. *See* Appendix, p. A-25. It is also notable that the January 2021

{00376610-1}

May 19, 2022
Page 8

- The total amount of allowed claims against the estate increased by $236 million; indeed, just between the time the Debtor's disclosure statement was approved on November 24, 2020, and the time the Debtor's exhibits were introduced at the confirmation hearing, the amount of allowed claims increased by $100 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for creditors in bankruptcy went from 87.44% to 62.99% in just a matter of months.[19]

No prudent investor or hedge fund investing third-party money would purchase substantial claims out of the Highland estate based on this publicly-available information without conducting thorough due diligence to be satisfied that the assets of the estate would not continue to deteriorate or that the allowed claims against the estate would not continue to grow.

There are other good reasons to investigate whether Muck and Jessup (through Farallon and Stonehill) had access to material, non-public information that influenced their claims purchasing. In particular, there are close relationships between the claims purchasers, on the one hand, and the selling Creditors' Committee members and the Debtor's management, on the other hand. What follows is our understanding of those relationships:

- Farallon and Stonehill have long-standing, material, undisclosed relationships with the members of the Creditors' Committee and Mr. Seery.[20] Mr. Seery formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its collapse in 2009. While at Lehman, Mr. Seery did a substantial amount of business with Farallon. After the Lehman collapse, Mr. Seery joined Sidley & Austin as co-head of the corporate restructuring and bankruptcy group, where he worked with Matt Clemente, counsel to the Creditors' Committee in these bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Fund from the Redeemer Committee (which appointed Seery as its independent director) both played a substantial role on the Creditors' Committee and is a large investor in Farallon and Stonehill.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr. Seery represented Farallon in its acquisition of claims in the Lehman estate.

- Also while at Sidley, Mr. Seery represented the Steering Committee in the Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment Partner of River Birch Capital, a hedge fund founded by his former Lehman colleagues. He left River Birch in October 2017 just before the fund imploded. In 2017, River Birch and Stonehill Capital were two of the biggest note holders in the Toys R Us bankruptcy and were members of the Toys R Us creditors'

---

monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of $74 million in December 2020.

[19] *See* Appendix, pp. A-25, A-28.

[20] *See* Appendix, pp. A-2; A-62 – A-69.

May 19, 2022
Page 9

        committee.

It does not seem a coincidence that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The nature of the relationships and the absence of public data warrants an investigation into whether the claims purchasers may have had access to non-public information.

        Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

        The timing of the acquisitions of claims by Farallon and Stonehill also warrants investigation. In particular, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and prior to the effective date of the Plan, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. We know, for example, that Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to investigate whether selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. We believe an investigation will reveal whether negotiations of the sale and the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

        Likewise, correspondence from the fund adviser to the Crusader Fund indicates that the Crusader Fund and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[21] We also know that there was a written agreement among Stonehill, the Crusader Fund, and the Redeemer Committee that potentially dates back to the fourth quarter of 2020. Presumably such an agreement, if it existed, would impose affirmative and negative covenants upon the seller and grant the purchaser discretionary approval rights during the pendency of the sale. An investigation by your office is necessary to determine whether there were any such agreement, which would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

        The sale of the claims by the members of the Creditors' Committee also violates the guidelines provided to committee members that require a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim. The instructions provided by the U.S. Trustee's Office (in this instance the Delaware Office) state:

---

[21] *See* Appendix, pp. A-70 – A-71.

May 19, 2022
Page 10

> In the event you are appointed to an official committee of creditors, the United States Trustee may require periodic certifications of your claims while the bankruptcy case is pending. Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing a creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion. You are hereby notified that the United States Trustee may share this information with the Securities and Exchange Commission if deemed appropriate.

In this case, no Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline. The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors. For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not other creditors or parties-in-interest.

While claims trading itself is not necessarily prohibited, the circumstances surrounding claims trading often times prompt investigation due to the potential for abuse. This case warrants such an investigation due to the following:

a)   The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

b)   Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

c)   The sales allegedly occurred after the Plan was confirmed, and certain other matters immediately thereafter came to light, such as the Debtor's need for an exit loan (although the Debtor testified at the confirmation hearing that no loan was needed) and the inability of the Debtor to obtain Directors and Officer insurance;

d)   The Debtor settled a dispute with UBS and obligated itself (using estate assets) to pursue claims and transfers and to transfer certain recoveries to UBS, as opposed to distributing those recoveries to creditors, and the Debtor used third-party assets as consideration for the settlement[22];

e)   The projected recovery to creditors changed significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

f)   There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund that is publicly traded on the New York stock exchange. The Debtor's assets and the positions held by the closed-end fund are similar.

Further, there is reason to believe that insider claims-trading negatively impacted the estate's ultimate recovery. Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement. Mr. Dondero, through counsel, made numerous offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed Plan of Reorganization. The Creditors' Committee did not timely respond to these efforts. It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its

May 19, 2022
Page 11

members had a fiduciary duty to respond that a response was forthcoming. Mr. Dondero's proposed plan offered a greater recovery than what the Debtor had reported would be the expected Plan recovery. The Creditors' Committee's failure to timely respond to that offer suggests that some members may have been contractually constrained from doing so, which itself warrants investigation.

We encourage the EOUST to question and explore whether, at the time that Mr. Dondero's proposed plan was filed, the Creditors' Committee members already had committed to sell their claims and therefore were contractually restricted from accepting Mr. Dondero's materially better offer. If that were the case, the contractual tie-up would have been a violation of the Committee members' fiduciary duties. The reason for the U.S. Trustee's guideline concerning the sale of claims by Committee members was to allow a public hearing on whether Committee members were acting within the bounds of their fiduciary duties to the estate incident to the sale of any claim. The failure to enforce this guideline has left open questions about sale of Committee members' claims that should have been disclosed and vetted in open court.

In summary, the failure of the U.S. Trustee's Office to demand appropriate reporting and transparency created an environment where parties needed to obtain and use non-public information to facilitate claims trading and potential violations of the fiduciary duties owed by Creditors' Committee members. At the very least, there is enough credible evidence to warrant an investigation. It is up to the bankruptcy bar to alert your office to any perceived abuses to ensure that the system is fair and transparent. The Bankruptcy Code is not written for those who hold the largest claims but, rather, it is designed to protect all stakeholders. A second Neiman Marcus should not be allowed to occur.

We would appreciate a meeting with your office at your earliest possible convenience to discuss the contents of this letter and to provide additional information and color that we believe will be valuable in making a determination about whether and what to investigate. In the interim, if you need any additional information or copies of any particular pleading, we would be happy to provide those at your request.

Very truly yours,

/s/Douglas S. Draper

Douglas S. Draper

DSD:dh

{00376610-1}

# Appendix

## Table of Contents

Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers ........................................... 2

Debtor Protocols [Doc. 466-1] ........................................................................................................ 3

Seery Jan. 29, 2021 Testimony........................................................................................................ 15

Sale of Assets of Affiliates or Controlled Entities........................................................................... 24

20 Largest Unsecured Creditors ...................................................................................................... 25

Timeline of Relevant Events ........................................................................................................... 26

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1] ...................................................... 27

Updated Liquidation Analysis (Feb. 1, 2021)................................................................................... 28

Summary of Debtor's January 31, 2021 Monthly Operating Report................................................. 29

Value of HarbourVest Claim............................................................................................................ 30

Estate Value as of August 1, 2021 (in millions) .............................................................................. 31

HarbourVest Motion to Approve Settlement [Doc. 1625].................................................................. 32

UBS Settlement [Doc. 2200-1] ........................................................................................................ 45

Hellman & Friedman Seeded Farallon Capital Management ............................................................. 62

Hellman & Friedman Owned a Portion of Grosvenor until 2020 ...................................................... 63

Farallon was a Significant Borrower for Lehman .............................................................................. 65

Mr. Seery Represented Stonehill While at Sidley ............................................................................. 66

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates ............. 67

Investor Communication to Highland Crusader Funds Stakeholders.................................................. 70

## Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers



*Is there an affiliate relationship between Stonehill, Grosvenor, and Farallon? Has it been adequately disclosed to the Court and investors?

**Page A-2**

**APP. 2855**

Debtor Protocols [Doc. 466-1]

I.    **Definitions**

    A.   "<u>Court</u>" means the United States Bankruptcy Court for the Northern District of Texas.

    B.   "<u>NAV</u>" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

    C.   "<u>Non-Discretionary Account</u>" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

    D.   "<u>Related Entity</u>" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "<u>Related Entities Listing</u>"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

    E.   "<u>Stage 1</u>" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("<u>Term Sheet</u>") by all applicable parties until approval of the Term Sheet by the Court.

    F.   "<u>Stage 2</u>" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

    G.   "<u>Stage 3</u>" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

    H.   "<u>Transaction</u>" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I.  "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J.  "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K.  "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

II.  **Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A.  **Covered Entities**: N/A (See entities above).

B.  **Operating Requirements**

  1.  Ordinary Course Transactions do not require Court approval (All Stages).

      a)  Stage 1 and Stage 2:  ordinary course determined by the CRO.

      b)  Stage 3: ordinary course determined by the Debtor.

  2.  Related Entity Transactions

      a)  Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      b)  Stage 3:

          (1)  Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

   3.    Third Party Transactions (All Stages)

      a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

      c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**III.**    **Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.    **Operating Requirements**

   1.    Ordinary Course Transactions do not require Court approval (All Stages).

      a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

      b)    Stage 3: ordinary course determined by the Debtor.

   2.    Related Entity Transactions

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

    a)    <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)    <u>Stage 3</u>:

        (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages)

    a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

IV.  **Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

    A.    **Covered Entities**: See **<u>Schedule A</u>** hereto. **<u>Schedule A</u>** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

    B.    **Operating Requirements**

        1.    Ordinary Course Transactions do not require Court approval (All Stages).

            a)    <u>Stage 1 and Stage 2</u>: ordinary course determined by the CRO.

            b)    <u>Stage 3</u>: ordinary course determined by the Debtor.

        2.    Related Entity Transactions

            a)    <u>Stage 1 and Stage 2</u>: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

            b)    <u>Stage 3</u>:

                (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

                (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

        3.    Third Party Transactions (All Stages):

            a)    Except (x) as set forth in (b) and (c) below and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties. The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category. Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.

V. **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A. Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B. Ordinary Course Transactions (All Stages): N/A

C. Operating Requirements: N/A

D. Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**VI.** **Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.** **Transactions involving Non-Discretionary Accounts**

    A.    Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all non-discretionary accounts.[5]

    B.    Ordinary Course Transactions (All Stages): N/A

    C.    Operating Requirements: N/A

    D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VIII.** **Additional Reporting Requirements – All Stages (to the extent applicable)**

    A.    DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B.    The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.** **Shared Services**

    A.    The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B.    The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**X.   Representations and Warranties**

A.   The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B.   The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C.   The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

8. Highland Socially Responsible Equity Fund
9. Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest

1. The Dugaboy Investment Trust
2. NexPoint Capital LLC
3. NexPoint Capital, Inc.
4. Highland IBoxx Senior Loan ETF
5. Highland Long/Short Equity Fund
6. Highland Energy MLP Fund
7. Highland Fixed Income Fund
8. Highland Total Return Fund
9. NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

Transactions involving Non-Discretionary Accounts

1. NexBank SSB Account
2. Charitable DAF Fund LP

## Schedule B

**Related Entities Listing (other than natural persons)**

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

Page 1

```
 1   IN THE UNITED STATES BANKRUPTCY COURT

 2   FOR THE NORTHERN DISTRICT OF TEXAS

 3   DALLAS DIVISION

 4   ------------------------------)

 5   In Re:                  Chapter 11

 6   HIGHLAND CAPITAL         Case No.

 7   MANAGEMENT, LP,          19-34054-SGJ 11

 8

 9         Debtor

10   ------------------------------------

11

12

13    REMOTE DEPOSITION OF JAMES P. SEERY, JR.

14              January 29, 2021

15               10:11 a.m. EST

16

17

18

19

20

21

22

23
     Reported by:
24   Debra Stevens, RPR-CRR
     JOB NO. 189212
25
```

Page 2

```
1            January 29, 2021
2            9:00 a.m. EST
3
4       Remote Deposition of JAMES P.
5  SEERY, JR., held via Zoom
6  conference, before Debra Stevens,
7  RPR/CRR and a Notary Public of the
8  State of New York.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
1  REMOTE APPEARANCES:
2
3  Heller, Draper, Hayden, Patrick, & Horn
4  Attorneys for The Dugaboy Investment
5  Trust and The Get Good Trust
6       650 Poydras Street
7       New Orleans, Louisiana 70130
8
9
10 BY:    DOUGLAS DRAPER, ESQ
11
12
13 PACHULSKI STANG ZIEHL & JONES
14 For the Debtor and the Witness Herein
15      780 Third Avenue
16      New York, New York 10017
17 BY:    JOHN MORRIS, ESQ.
18        JEFFREY POMERANTZ, ESQ.
19        GREGORY DEMO, ESQ.
20        IRA KHARASCH, ESQ.
21
22
23
24            (Continued)
25
```

Page 4

```
1  REMOTE APPEARANCES:  (Continued)
2
3  LATHAM & WATKINS
4  Attorneys for UBS
5       885 Third Avenue
6       New York, New York 10022
7  BY:    SHANNON McLAUGHLIN, ESQ.
8
9  JENNER & BLOCK
10 Attorneys for Redeemer Committee of
11 Highland Crusader Fund
12      919 Third Avenue
13      New York, New York 10022
14 BY:    MARC B. HANKIN, ESQ.
15
16 SIDLEY AUSTIN
17 Attorneys for Creditors' Committee
18      2021 McKinney Avenue
19      Dallas, Texas 75201
20 BY:    PENNY REID, ESQ.
21        MATTHEW CLEMENTE, ESQ.
22        PAIGE MONTGOMERY, ESQ.
23
24            (Continued)
25
```

Page 5

```
1  REMOTE APPEARANCES:  (Continued)
2  KING & SPALDING
3  Attorneys for Highland CLO Funding, Ltd.
4       500 West 2nd Street
5       Austin, Texas 78701
6  BY:    REBECCA MATSUMURA, ESQ.
7
8  K&L GATES
9  Attorneys for Highland Capital Management
10 Fund Advisors, L.P., et al.:
11      4350 Lassiter at North Hills
12      Avenue
13      Raleigh, North Carolina 27609
14 BY:    EMILY MATHER, ESQ.
15
16 MUNSCH HARDT KOPF & HARR
17 Attorneys for Defendants Highland Capital
18 Management Fund Advisors, LP; NexPoint
19 Advisors, LP; Highland Income Fund;
20 NexPoint Strategic Opportunities Fund and
21 NexPoint Capital, Inc.:
22      500 N. Akard Street
23      Dallas, Texas 75201-6659
24   BY: DAVOR RUKAVINA, ESQ.
25                (Continued)
```

**Page 6**

1  REMOTE APPEARANCES (Continued)
2
3  BONDS ELLIS EPPICH SCHAFER JONES
4  Attorneys for James Dondero,
5  Party-in-Interest
6        420 Throckmorton Street
7
8        Fort Worth, Texas 76102
9  BY:    CLAY TAYLOR, ESQ.
10       JOHN BONDS, ESQ.
11       BRYAN ASSINK, ESQ.
12
13
14  BAKER McKENZIE
15  Attorneys for Senior Employees
16       1900 North Pearl Street
17
18       Dallas, Texas 75201
19  BY:   MICHELLE HARTMANN, ESQ.
20       DEBRA DANDEREAU, ESQ.
21
22
23
24            (Continued)
25

**Page 7**

1  REMOTE APPEARANCES: (Continued)
2
3  WICK PHILLIPS
4  Attorneys for NexPoint Real Estate
5  Partners, NexPoint Real Estate Entities
6  and NexBank
7        100 Throckmorton Street
8        Fort Worth, Texas 76102
9  BY:    LAUREN DRAWHORN, ESQ.
10
11  ROSS & SMITH
12  Attorneys for Senior Employees, Scott
13  Ellington, Isaac Leventon, Thomas Surgent,
14  Frank Waterhouse
15       700 N. Pearl Street
16       Dallas, Texas 75201
17  BY:   FRANCES SMITH, ESQ.
18
19
20
21
22
23
24
25

**Page 8**

1
2        E X A M I N A T I O N S
3  WITNESS                        PAGE
4  JAMES SEERY
5    By Mr. Draper                 9
6    By Mr. Taylor                75
7    By Mr. Rukavina             165
8    By Mr. Draper               217
9
          E X H I B I T S
10  SEERY DYD
    EXHIBIT    DESCRIPTION       PAGE
11
    Exhibit 1  January 2021 Material  11
12
    Exhibit 2  Disclosure Statement   14
13
    Exhibit 3  Notice of Deposition   74
14
15
    INFORMATION/PRODUCTION REQUESTS
16  DESCRIPTION                   PAGE
17  Subsidiary ledger showing note  22
    component versus hard asset
18  component
19  Amount of D&O coverage for     131
    trustees
20
    Line item for D&O insurance    133
21
22        MARKED FOR RULING
          PAGE   LINE
23         85    20
24
25

**Page 9**

1
2        COURT REPORTER:  My name is
3  Debra Stevens, court reporter for TSG
4  Reporting and notary public of the
5  State of New York.  Due to the
6  severity of the COVID-19 pandemic and
7  following the practice of social
8  distancing, I will not be in the same
9  room with the witness but will report
10  this deposition remotely and will
11  swear the witness in remotely.  If any
12  party has any objection, please so
13  state before we proceed.
14        Whereupon,
15        J A M E S   S E E R Y,
16  having been first duly sworn/affirmed,
17  was examined and testified as follows:
18  EXAMINATION BY
19  MR. DRAPER:
20    Q.   Mr. Seery, my name is Douglas
21  Draper, representing the Dugaboy Trust.  I
22  have series of questions today in
23  connection with the 30(b) Notice that we
24  filed.  The first question I have for you,
25  have you seen the Notice of Deposition

Page 14

J. SEERY

1 the screen, please?
2
3 A.    Page what?
4 Q.    I think it is page 174.
5 A.    Of the PDF or of the document?
6 Q.    Of the disclosure statement that
7 was filed.  It is up on the screen right
8 now.
9         COURT REPORTER:  Do you intend
10 this as another exhibit for today's
11 deposition?
12        MR. DRAPER:  We'll mark this
13 Exhibit 2.
14        (So marked for identification as
15 Seery Exhibit 2.)
16 Q.    If you look to the recovery to
17 Class 8 creditors in the November 2020
18 disclosure statement was a recovery of
19 87.44 percent?
20 A.    That actually says the percent
21 distribution to general unsecured
22 creditors was 87.44 percent.  Yes.
23 Q.    And in the new document that was
24 filed, given to us yesterday, the recovery
25 is 62.5 percent?

Page 15

J. SEERY

1
2 A.    It says the percent distribution
3 to general unsecured creditors is
4 62.14 percent.
5 Q.    Have you communicated the
6 reduced recovery to anybody prior to the
7 date -- to yesterday?
8         MR. MORRIS:  Objection to the
9 form of the question.
10 A.    I believe generally, yes.  I
11 don't know if we have a specific number,
12 but generally yes.
13 Q.    And would that be members of the
14 Creditors' Committee who you gave that
15 information to?
16 A.    Yes.
17 Q.    Did you give it to anybody other
18 than members of the Creditors' Committee?
19 A.    Yes.
20 Q.    Who?
21 A.    HarbourVest.
22 Q.    And when was that?
23 A.    Within the last two months.
24 Q.    You did not feel the need to
25 communicate the change in recovery to

Page 16

J. SEERY

1
2 anybody else?
3 A.    I said Mr. Doherty.
4 Q.    In looking at the two elements,
5 and what I have asked you to look at is
6 the claims pool.  If you look at the
7 November disclosure statement, if you look
8 down Class 8, unsecured claims?
9 A.    Yes.
10 Q.    You have 176,000 roughly?
11 A.    Million.
12 Q.    176 million.  I am sorry.  And
13 the number in the new document is 313
14 million?
15 A.    Correct.
16 Q.    What accounts for the
17 difference?
18 A.    An increase in claims.
19 Q.    When did those increases occur?
20 Were they yesterday?  A month ago?  Two
21 months ago?
22 A.    Over the last couple months.
23 Q.    So in fact over the last couple
24 months you knew in fact that the recovery
25 in the November disclosure statement was

Page 17

J. SEERY

1
2 not accurate?
3 A.    Yes.  We secretly disclosed it
4 to the Bankruptcy Court in open court
5 hearings.
6 Q.    But you never did bother to
7 calculate the reduced recovery; you just
8 increased --
9         (Reporter interruption.)
10 Q.    You just advised as to the
11 increased claims pool.  Correct?
12        MR. MORRIS:  Objection to the
13 form of the question.
14 A.    I don't understand your
15 question.
16 Q.    What I am trying to get at is,
17 as you increase the claims pool, the
18 recovery reduces.  Correct?
19 A.    No.  That is not how a fraction
20 works.
21 Q.    Well, if the denominator
22 increases, doesn't the recovery ultimately
23 decrease if --
24 A.    No.
25 Q.    -- if the numerator stays the

Page 26

```
 1              J. SEERY
 2    were amended without consideration a few
 3    years ago.  So, for our purposes we didn't
 4    make the assumption, which I am sure will
 5    happen, a fraudulent conveyance claim on
 6    those notes, that a fraudulent conveyance
 7    action would be brought.  We just assumed
 8    that we'd have to discount the notes
 9    heavily to sell them because nobody would
10    respect the ability of the counterparties
11    to fairly pay.
12        Q.    And the same discount was
13    applied in the liquidation analysis to
14    those notes?
15        A.    Yes.
16        Q.    Now --
17        A.    The difference -- there would be
18    a difference, though, because they would
19    pay for a while because they wouldn't want
20    to accelerate them.  So there would be
21    some collections on the notes for P and I.
22        Q.    But in fact as of January you
23    have accelerated those notes?
24        A.    Just one of them, I believe.
25        Q.    Which note was that?
```

Page 27

```
 1              J. SEERY
 2        A.    NexPoint, I said.  They
 3    defaulted on the note and we accelerated
 4    it.
 5        Q.    So there is no need to file a
 6    fraudulent conveyance suit with respect to
 7    that note.  Correct, Mr. Seery?
 8          MR. MORRIS:  Objection to the
 9       form of the question.
10        A.    Disagree.  Since it was likely
11    intentional fraud, there may be other
12    recoveries on it.  But to collect on the
13    note, no.
14        Q.    My question was with respect to
15    that note.  Since you have accelerated it,
16    you don't need to deal with the issue of
17    when it's due?
18          MR. MORRIS:  Objection to the
19       form of the question.
20        A.    That wasn't your question.  But
21    to that question, yes, I don't need to
22    deal with when it's due.
23        Q.    Let me go over certain assets.
24    I am not going to ask you for the
25    valuation of them but I am going to ask
```

Page 28

```
 1              J. SEERY
 2    you whether they are included in the asset
 3    portion of your $257 million number, all
 4    right?  Mr. Morris didn't want me to go
 5    into specific asset value, and I don't
 6    intend to do that.
 7          The first question I have for
 8    you is, the equity in Trustway Highland
 9    Holdings, is that included in the
10    $257 million number?
11        A.    There is no such entity.
12        Q.    Then I will do it in a different
13    way.  In connection with the sale of the
14    hard assets, what assets are included in
15    there specifically?
16        A.    Off the top of my head -- it is
17    all of the assets, but it includes
18    Trustway Holdings and all the value that
19    flows up from Trustway Holdings.  It
20    includes Targa and all the value that
21    flows up from Targa.  It includes CCS
22    Medical and all the value that would flow
23    to the Debtor from CCS Medical.  It
24    includes Cornerstone and all the value
25    that would flow from Cornerstone.  It
```

Page 29

```
 1              J. SEERY
 2    includes any other securities and all the
 3    value that would flow from Cornerstone.
 4    It includes HCLOF and all the value that
 5    would flow up from HCLOF.  It includes
 6    Korea and all the value that would flow up
 7    from Korea.
 8          There may be others off the top
 9    of my head.  I don't recall them.  I don't
10    have a list in front of me.
11        Q.    Now, with respect to those
12    assets, have you started the sale process
13    of those assets?
14        A.    No.  Well, each asset is
15    different.  So, the answer is, with
16    respect to any securities, we do seek to
17    sell those regularly and we do seek to
18    monetize those assets where we can
19    depending on whether there is a
20    restriction or not and whether there is
21    liquidity in the market.
22          With respect to the PE assets or
23    the companies I described -- Targa, CCS,
24    Cornerstone, JHT -- we have not --
25    Trustway.  We have not sought to sell
```

Page 38

J. SEERY

1
2    A.    I don't recall the specific
3  limitation on the trust.  But if there was
4  a reason to hold on to the asset, if there
5  is a limitation, we can seek an extension.
6    Q.    Let me ask a question.  With
7  respect to these businesses, the Debtor
8  merely owns an equity interest in them.
9  Correct?
10   A.    Which business?
11   Q.    The ones you have identified as
12 operating businesses earlier?
13   A.    It depends on the business.
14   Q.    Well, let me -- again, let's try
15 to be specific.  With respect to SSP, it
16 was your position that you did not need to
17 get court approval for the sale.  Correct?
18   A.    That's correct.
19   Q.    Which one of the operating
20 businesses that are here, that you have
21 identified, do you need court authority
22 for a sale?
23        MR. MORRIS:  Objection to the
24   form of the question.
25   A.    Each of the businesses will be a

Page 39

J. SEERY

1
2  different analysis that we'll undertake
3  with bankruptcy counsel to determine what
4  we would need depending on when it is
5  going to happen and what the restrictions
6  either under the code are or under the
7  plan.
8    Q.    Is there anything that would
9  stop you from selling these businesses if
10 the Chapter 11 went on for a year or two
11 years?
12        MR. MORRIS:  Objection to form
13   of the question.
14   A.    Is there anything that would
15 stop me?  We'd have to follow the
16 strictures of the code and the protocols,
17 but there would be no prohibition -- let
18 me finish, please.
19        There would be no prohibition
20 that I am aware of.
21   Q.    Now, in connection with your
22 differential between the liquidation of
23 what I will call the operating businesses
24 under the liquidation analysis and the
25 plan analysis, who arrived at the discount

Page 40

J. SEERY

1
2  or determined the discount that has been
3  placed between the two, plan analysis
4  versus liquidation analysis?
5        MR. MORRIS:  Objection to form
6   of the question.
7    A.    To which document are you
8  referring?
9    Q.    Both the June -- the January and
10 the November analysis has a different
11 estimated proceeds for monetization for
12 the plan analysis versus the liquidation
13 analysis.  Do you see that?
14   A.    Yes.
15   Q.    And there is a note under there.
16 "Assumes Chapter 7 trustee will not be
17 able to achieve the same sales proceeds as
18 Claimant trustee."
19   A.    I see that, yes.
20   Q.    Do you see that note?
21   A.    Yes.
22   Q.    Who arrived at that discount?
23   A.    I did.
24   Q.    What percentage did you use?
25   A.    Depended on the asset.  Each one

Page 41

J. SEERY

1
2  is different.
3    Q.    Is the discount a function of
4  capability of a trustee versus your
5  capability, or is the discount a function
6  of timing?
7        MR. MORRIS:  Objection to form.
8    A.    It could be a combination.
9    Q.    So, let's -- let me walk through
10 this.  Your plan analysis has an
11 assumption that everything is sold by
12 December 2022.  Correct?
13   A.    Correct.
14   Q.    And the valuations that you have
15 used here for the monetization assume a
16 sale between -- a sale prior to December
17 of 2022.  Correct?
18   A.    Sorry.  I don't quite understand
19 your question.
20   Q.    The 257 number, and then let's
21 take out the notes.  Let's use the 210
22 number.
23        MR. MORRIS:  Can we put the
24   document back on the screen, please?
25   Sorry, Douglas, to interrupt, but it

Page 42

```
1              J. SEERY
2       would be helpful.
3              MR. DRAPER:  That is fine, John.
4       (Pause.)
5              MR. MORRIS:  Thank you very
6       much.
7       Q.     Mr. Seery, do you see the 257?
8       A.     In the one from yesterday?
9       Q.     Yes.
10      A.     Second line, 257,941.  Yes.
11      Q.     That assumes a monetization of
12      all assets by December of 2022?
13      A.     Correct.
14      Q.     And so everything has been sold
15      by that time; correct?
16      A.     Yes.
17      Q.     So, what I am trying to get at
18      is, there is both the capability between
19      you and a trustee, and then the second
20      issue is timing.  So, what discount was
21      put on for timing, Mr. Seery, between when
22      a trustee would sell it versus when you
23      would sell it?
24             MR. MORRIS:  Objection.
25      Q.     What is the percentage you
```

Page 43

```
1              J. SEERY
2       applied?
3       A.     Each of the assets is different.
4       Q.     Is there a general discount that
5       you used?
6       A.     Not a general discount, no.  We
7       looked at each individual asset and went
8       through and made an assessment.
9       Q.     Did you apply a discount for
10      your capability versus the capability of a
11      trustee?
12      A.     No.
13      Q.     So a trustee would be as capable
14      as you are in monetizing these assets?
15             MR. MORRIS:  Objection to the
16      form of the question.
17      Q.     Excuse me?  The answer is?
18      A.     The answer is maybe.
19      Q.     Couldn't a trustee hire somebody
20      as capable as you are?
21             MR. MORRIS:  Objection to the
22      form of the question.
23      A.     Perhaps.
24      Q.     Sir, that is a yes or no
25      question.  Could the trustee hire somebody
```

Page 44

```
1              J. SEERY
2       as capable as you are?
3              MR. MORRIS:  Objection to the
4       form of the question.
5       A.     I don't know.
6       Q.     Is there anybody as capable as
7       you are?
8              MR. MORRIS:  Objection to the
9       form of the question.
10      A.     Certainly.
11      Q.     And they could be hired.
12      Correct?
13      A.     Perhaps.  I don't know.
14      Q.     And if you go back to the
15      November 2020 liquidation analysis versus
16      plan analysis, it is also the same note
17      about that a trustee would bring less, and
18      there is the same sort of discount between
19      the estimated proceeds under the plan and
20      under the liquidation analysis.
21             MR. MORRIS:  If that is a
22      question, I object.
23      Q.     Is that correct, Mr. Seery,
24      looking at the document?
25      A.     There are discounts, yes.
```

Page 45

```
1              J. SEERY
2       Q.     Again, the discounts are applied
3       for timing and capability?
4       A.     Yes.
5       Q.     Now, in looking at the November
6       plan analysis number of $190 million and
7       the January number of $257 million, what
8       accounts for the increase between the two
9       dates?  What assets specifically?
10      A.     There are a number of assets.
11      Firstly, the HCLOF assets are added.
12      Q.     How much are those?
13      A.     Approximately 22 and a half
14      million dollars.
15      Q.     Okay.
16      A.     Secondly, there is a significant
17      increase in the value of certain of the
18      assets over this time period.
19      Q.     Which assets, Mr. Seery?
20      A.     There are a number.  They
21      include MGM stock, they include Trustway,
22      they include Targa.
23      Q.     And what is the percentage
24      increase from November to January,
25      November of 2020 to January of 2021?
```

Page 46

J. SEERY

1   A.   Do you mean what is the
2
3   percentage increase from 190 to 257?
4   Q.   No.  You just identified three
5   assets.  MGM stock, we can go look at the
6   exchange and figure out what the price
7   increase is; correct?
8   A.   No.
9   Q.   Why not?  Is the MGM stock
10  publicly traded?
11  A.   Yes.  It doesn't trade on --
12  Q.   Excuse me?
13  A.   It doesn't trade on an exchange.
14  Q.   Is there a public market for the
15  MGM stock that we could calculate the
16  increase?
17  A.   There is a semipublic market;
18  yes.
19  Q.   So it is a number that is
20  readily available between the two dates?
21  A.   It's available.
22  Q.   Now, you identified Targa and
23  Trustway.  Correct?
24  A.   Yes.
25  Q.   Those are not readily available

Page 47

J. SEERY

1
2   markets; correct?
3   A.   No.
4   Q.   Those are operating businesses?
5   A.   Correct.
6   Q.   Who provided the valuation for
7   the November 2020 liquidation analysis?
8   A.   We use a combination of the
9   value that we get from Houlihan Lokey for
10  mark purposes and then we adjust it for
11  plan purposes.
12  Q.   And the adjustment was up or
13  down?
14  A.   When?
15  Q.   For both November and January.
16  You got a number from Houlihan Lokey.  You
17  adjusted it.  Did you adjust it up or did
18  you adjust it down?
19  MR. MORRIS:  Objection to form
20  of the question.
21  A.   I believe that for November we
22  adjusted it down, and for January we
23  adjusted it down.  I don't recall off the
24  top of my head but I believe both of them
25  were adjusted down.

Page 48

J. SEERY

1
2   Q.   And if I understand what you
3   just said, it is that the Houlihan Lokey
4   valuation for those two businesses showed
5   a significant increase between November of
6   2020 and January of 2021?
7   MR. MORRIS:  Objection to form
8   of the question.
9   A.   I didn't say that.
10  Q.   I am trying to account for the
11  increase between the two dates, and you
12  identified three assets.  You identified
13  MGM stock, which has, I can guess, as you
14  have said, a readily ascertainable value.
15  Then you identified two others that the
16  valuation is based upon something Houlihan
17  Lokey provided you.  Correct?
18  A.   I gave you three examples.  I
19  never said "readily."  That is your word,
20  not mine.  And I didn't say that Houlihan
21  had a significant change in their
22  valuation.
23  Q.   So let's now go back to the
24  question.  There is an increase in value
25  from November 24th of 2020 to January 28th

Page 49

J. SEERY

1
2   of 2021, the magnitude being roughly 60
3   some odd million dollars.  Correct?
4   A.   Correct.
5   Q.   We can account for $22 million
6   of it easily, right?
7   MR. MORRIS:  Objection to form.
8   A.   Correct.
9   Q.   That is the HarbourVest
10  settlement, so that leaves roughly
11  $40 million unaccounted for?
12  MR. MORRIS:  Objection to the
13  form of the question if that is a
14  question.  It is accounted for.
15  Q.   What makes up that difference,
16  Mr. Seery?
17  A.   A change in the plan value of
18  the assets.
19  Q.   Okay.  Which assets?  Let's sort
20  of go back to where we were.
21  A.   There are numerous assets in the
22  plan formulation.  I gave you three
23  examples of the operating businesses.  The
24  securities, I believe, have increased in
25  value since the plan, so those would go up

Page 50

J. SEERY

1
2  for one.  On the operating businesses, we
3  looked at each of them and made an
4  assessment based upon where the market is
5  and what we believe the values are, and we
6  have moved those valuations.
7     Q.    Let me look at some numbers
8  again.  In the liquidation analysis in
9  November of 2020, the liquidation value is
10 $149 million.  Correct?
11    A.    Yes.
12    Q.    And in the liquidation analysis
13 in January of 2021, you have $191 million?
14    A.    Yes.
15    Q.    You see that number.  So there
16 is $51 million there, right?
17    A.    No.
18    Q.    What is the difference between
19 191 and -- sorry.  My math may be a little
20 off.  What is the difference between the
21 two numbers, Mr. Seery?
22    A.    Your math is off.
23    Q.    Sorry.  It is 41 million?
24    A.    Correct.
25    Q.    $22 million of that is the

Page 51

J. SEERY

1
2  HarbourVest settlement, right?
3     A.    I believe that's correct.
4     Q.    Is that fair, Mr. Seery?
5     A.    I believe that is correct, yes.
6     Q.    And part of that differential
7  are publicly traded or ascertainable
8  securities.  Correct?
9     A.    Yes.
10    Q.    And basically you can get, or
11 under the plan analysis or trustee
12 analysis, if it is a marketable security
13 or where there is a market, the
14 liquidation number should be the same for
15 both.  Is that fair?
16    A.    No.
17    Q.    And why not?
18    A.    We might have a different price
19 target for a particular security than the
20 current trading value.
21    Q.    I understand that, but I mean
22 that is based upon the capability of the
23 person making the decision as to when to
24 sell.  Correct?
25        MR. MORRIS:  Objection to form

Page 52

J. SEERY

1
2     of the question.
3     Q.    Mr. Seery, yes or no?
4     A.    I said no.
5     Q.    What is that based on, then?
6     A.    The person's ability to assess
7  the market and timing.
8     Q.    Okay.  And again, couldn't a
9  trustee hire somebody as capable as you to
10 both, A, assess the market and, B, make a
11 determination as to when to sell?
12        MR. MORRIS:  Objection to form
13    of the question.
14    A.    I suppose a trustee could.
15    Q.    And there are better people or
16 people equally or better than you at
17 assessing a market.  Correct?
18    A.    Yes.
19        MR. MORRIS:  Objection to form
20    of the question.
21    Q.    So, again, let's go back to
22 that.  We have accounted for, out of
23 $41 million where the liquidation analysis
24 increases between the two dates,
25 $22 million of it.  That leaves

Page 53

J. SEERY

1
2  $18 million.  How much of that is publicly
3  traded or ascertainable assets versus
4  operating businesses?
5     A.    I don't know off the top of my
6  head the percentages.
7     Q.    All right.  The same question
8  for the plan analysis where you have the
9  differential between the November number
10 and the January number.  How much of it is
11 marketable securities versus an operating
12 business?
13    A.    I don't recall off the top of my
14 head.
15        MR. DRAPER:  Let me take a
16    few-minute break.  Can we take a
17    ten-minute break here?
18        THE WITNESS:  Sure.
19        (Recess.)
20 BY MR. DRAPER:
21    Q.    Mr. Seery, what I am going to
22 show you and what I would ask you to look
23 at is in the note E, in the statement of
24 assumptions for the November 2020
25 disclosure statement.  It discusses fixed

Page A-23

APP. 2876

## Sale of Assets of Affiliates or Controlled Entities

| Asset | Sales Price |
|---|---|
| Structural Steel Products | $50 million |
| Life Settlements | $35 million |
| OmniMax | $50 million |
| Targa | $37 million |

- These assets were sold over the contemporaneous objections of James Dondero, who was the Portfolio Manager and key-man on the funds.
- Mr. Seery admitted[1] that he must comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Protocols for the sale of major assets of the estate. We believe that a competitive bid process and court approval should have been required for the sale of each of these assets (as was done for the sale of the building at 2817 Maple Ave. [a $9 million asset] and the sale of the interest in PetroCap [a $3 million asset]).

---

[1] *See* Mr. Seery's Jan. 29, 2021 deposition testimony, Appendix p. A-20.

**Page A-24**

## 20 Largest Unsecured Creditors

| Name of Claimant | Allowed Class 8 | Allowed Class 9 |
|---|---|---|
| Redeemer Committee of the Highland Crusader Fund | $136,696,610.00 | |
| UBS AG, London Branch and UBS Securities LLC | $65,000,000.00 | $60,000,000 |
| HarbourVest entities | $45,000,000.00 | $35,000,000 |
| Acis Capital Management, L.P. and Acis Capital Management GP, LLC | $23,000,000.00 | |
| CLO Holdco Ltd | $11,340,751.26 | |
| Patrick Daugherty | $8,250,000.00 | $2,750,000 (+$750,000 cash payment on Effective Date of Plan) |
| Todd Travers (Claim based on unpaid bonus due for Feb 2009) | $2,618,480.48 | |
| McKool Smith PC | $2,163,976.00 | |
| Davis Deadman (Claim based on unpaid bonus due for Feb 2009) | $1,749,836.44 | |
| Jack Yang (Claim based on unpaid bonus due for Feb 2009) | $1,731,813.00 | |
| Paul Kauffman (Claim based on unpaid bonus due for Feb 2009) | $1,715,369.73 | |
| Kurtis Plumer (Claim based on unpaid bonus due for Feb 2009) | $1,470,219.80 | |
| Foley Gardere | $1,446,136.66 | |
| DLA Piper | $1,318,730.36 | |
| Brad Borud (Claim based on unpaid bonus due for Feb 2009) | $1,252,250.00 | |
| Stinson LLP (successor to Lackey Hershman LLP) | $895,714.90 | |
| Meta-E Discovery LLC | $779,969.87 | |
| Andrews Kurth LLP | $677,075.65 | |
| Markit WSO Corp | $572,874.53 | |
| Duff & Phelps, LLC | $449,285.00 | |
| Lynn Pinker Cox Hurst | $436,538.06 | |
| Joshua and Jennifer Terry | $425,000.00 | |
| Joshua Terry | $355,000.00 | |
| CPCM LLC (bought claims of certain former HCMLP employees) | Several million | |
| **TOTAL:** | **$309,345,631.74** | **$95,000,000** |

Timeline of Relevant Events

| Date | Description |
|---|---|
| 10/29/2019 | UCC appointed; members agree to fiduciary duties and not sell claims. |
| 9/23/2020 | Acis 9019 filed |
| 9/23/2020 | Redeemer 9019 filed |
| 10/28/2020 | Redeemer settlement approved |
| 10/28/2020 | Acis settlement approved |
| 12/24/2020 | HarbourVest 9019 filed |
| 1/14/2021 | Motion to appoint examiner filed |
| 1/21/2021 | HarbourVest settlement approved; transferred its interest in HCLOF to HCMLP assignee, valued at $22 million per Seery |
| 1/28/2021 | Debtor discloses that it has reached an agreement in principle with UBS |
| 2/3/2021 | Failure to comply with Rule 2015.3 raised |
| 2/24/2021 | Plan confirmed |
| 3/9/2021 | Farallon Cap. Mgmt. forms "Muck Holdings LLC" in Delaware |
| 3/15/2021 | Debtor files Jan. '21 monthly operating report indicating assets of $364 million, liabilities of $335 million (**inclusive of $267,607,000 in Class 8 claims, but exclusive of any Class 9 claims**), the last publicly filed summary of the Debtor's assets. The MOR states that no Class 9 distributions are anticipated at this time and Class 9 recoveries are not expected. |
| 3/31/2021 | UBS files friendly suit against HCMLP under seal |
| 4/8/2021 | Stonehill Cap. Mgmt. forms "Jessup Holdings LLC" in Delaware |
| 4/15/2021 | UBS 9019 filed |
| 4/16/2021 | Notice of Transfer of Claim - Acis to Muck (Farallon Capital) |
| 4/29/2021 | Motion to Compel Compliance with Rule 2015.3 Filed |
| 4/30/2021 | Notice of Transfer of Claim - Redeemer to Jessup (Stonehill Capital) |
| 4/30/2021 | Notice of Transfer of Claim - HarbourVest to Muck (Farallon Capital) |
| 4/30/2021 | Sale of Redeemer claim to Jessup (Stonehill Capital) "consummated" |
| 5/27/2021 | UBS settlement approved; included $18.5 million in cash from Multi-Strat |
| 6/14/2021 | UBS dismisses appeal of Redeemer award |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Jessup (Stonehill Capital) |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Muck (Farallon Capital) |

Critical unknown dates and information:

- The date on which Muck entered into agreements with HarbourVest and Acis to acquire their claims and what negative and affirmative covenants those agreements contained.
- The date on which Jessup entered into an agreement with the Redeemer Committee and the Crusader Fund to acquire their claim and what negative and affirmative covenants the agreement contained.
- The date on which the sales actually closed versus the date on which notice of the transfer was filed (i.e., did UCC members continue to serve on the committee after they had sold their claims).

**Page A-26**

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1]

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 12/31/2020 | $26,496 | $26,496 |
| Estimated proceeds from monetization of assets [1][2] | 198,662 | 154,618 |
| Estimated expenses through final distribution [1][3] | (29,864) | (33,804) |
| **Total estimated $ available for distribution** | **195,294** | **147,309** |
| | | |
| Less: Claims paid in full | | |
| Administrative claims [4] | (10,533) | (10,533) |
| Priority Tax/Settled Amount [10] | (1,237) | (1,237) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [5] | (5,560) | (5,560) |
| Class 3 – Priority non-tax claims [10] | (16) | (16) |
| Class 4 – Retained employee claims | - | - |
| Class 5 – Convenience claims [6][10] | (13,455) | - |
| Class 6 – Unpaid employee claims [7] | (2,955) | - |
| Subtotal | (33,756) | (17,346) |
| Estimated amount remaining for distribution to general unsecured claims | 161,538 | 129,962 |
| Class 5 – Convenience claims [8] | - | 17,940 |
| Class 6 – Unpaid employee claims | - | 3,940 |
| Class 7 – General unsecured claims [9] | 174,609 | 174,609 |
| Subtotal | 174,609 | 196,489 |
| % Distribution to general unsecured claims | 92.51% | 66.14% |
| Estimated amount remaining for distribution | - | - |
| Class 8 – Subordinated claims | *no distribution* | *no distribution* |
| Class 9 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 10 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Oct. 15, 2020 liquidation analysis include:

- Note [9]: General unsecured claims estimated using $0 allowed claims for HarbourVest and UBS. Ultimately, those two creditors were awarded $105 million of general unsecured claims and $95 million of subordinated claims.

Updated Liquidation Analysis (Feb. 1, 2021)[2]

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 [sic] | $24,290 | $24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution [1][3] | (59,573) | (41,488) |
| **Total estimated $ available for distribution** | **222,658** | **174,178** |
| | | |
| Less: Claims paid in full | | |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 – Other Secured Claims | (62) | (62) |
| Class 4 – Priority non-tax claims | (16) | (16) |
| Class 5 – Retained employee claims | - | - |
| Class 6 – PTO Claims [5] | - | - |
| Class 7 – Convenience claims [7][8] | (10,280) | - |
| **Subtotal** | **(27,793)** | **(17,514)** |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims including in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General unsecured claims [8] [10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 11 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Feb. 1, 2021 liquidation analysis include:

- claim amounts in Class 8 assume $0 for IFA and HM, $50.0 million for UBS and $45 million HV.
- Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

---

[2] Doc. 1895.

**Page A-28**

## Summary of Debtor's January 31, 2021 Monthly Operating Report[3]

|  | 10/15/2019 | 12/31/2020 | 1/31/2021 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | $2,529,000 | $12,651,000 | $10,651,000 |
| Investments, at fair value | $232,620,000 | $109,211,000 | $142,976,000 |
| Equity method investees | $161,819,000 | $103,174,000 | $105,293,000 |
| mgmt and incentive fee receivable | $2,579,000 | $2,461,000 | $2,857,000 |
| fixed assets, net | $3,754,000 | $2,594,000 | $2,518,000 |
| due from affiliates | $151,901,000 | $152,449,000 | $152,538,000 |
| reserve against notices receivable | | ($61,039,000) | ($61,167,000) |
| other assets | $11,311,000 | $8,258,000 | $8,651,000 |
| **Total Assets** | **$566,513,000** | **$329,759,000** | **$364,317,000** |
| | | | |
| **Liabilities and Partners' Capital** | | | |
| pre-petition accounts payable | $1,176,000 | $1,077,000 | $1,077,000 |
| post-petition accounts payable | | $900,000 | $3,010,000 |
| Secured debt | | | |
| Frontier | $5,195,000 | $5,195,000 | $5,195,000 |
| Jefferies | $30,328,000 | $0 | $0 |
| Accrued expenses and other liabilities | $59,203,000 | $60,446,000 | $49,445,000 |
| Accrued re-organization related fees | | $5,795,000 | $8,944,000 |
| Class 8 general unsecured claims | $73,997,000 | $73,997,000 | $267,607,000 |
| Partners' Capital | $396,614,000 | $182,347,000 | $29,039,000 |
| **Total liabilities and partners' capital** | **$566,513,000** | **$329,757,000** | **$364,317,000** |

Notable notations/disclosures in the Jan. 31, 2021 MOR include:

- Class 8 claims totaled $267 million, a jump from $74 million in the prior month's MOR
- The MOR stated that no Class 9 recovery was expected, which was based on the then existing $267 million in Class 8 Claims.
- Currently, there are roughly $310 million of Allowed Class 8 Claims.

---

[3] [Doc. 2030] Filed on March 15, 2021, the last publicly disclosed information regarding the value of assets in the estate.

Value of HarbourVest Claim





## Estate Value as of August 1, 2021 (in millions)[4]

| Asset | Low | High |
|---|---|---|
| Cash as of 6/30/2021 | $17.9 | $17.9 |
| Targa Sale | $37.0 | $37.0 |
| 8/1 CLO Flows | $10.0 | $10.0 |
| Uchi Bldg. Sale | $9.0 | $9.0 |
| Siepe Sale | $3.5 | $3.5 |
| PetroCap Sale | $3.2 | $3.2 |
| HarbourVest trapped cash | $25.0 | $25.0 |
| **Total Cash** | **$105.6** | **$105.6** |
| Trussway | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 |
| HarbourVest CLOs | $40.0 | $40.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 |
| MGM (direct ownership) | $32.0 | $32.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 |
| Korea Fund | $18.0 | $18.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 |
| Other | $2.0 | $10.0 |
| **TOTAL** | **$472.6** | **$598.6** |



---

[4] Values are based upon historical knowledge of the Debtor's assets (including cross-holdings) and publicly filed information.

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)
AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

Page A-32

Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Highland" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest").  In support of this Motion, the Debtor represents as follows:

## JURISDICTION

1.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2).  Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.     The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

## RELEVANT BACKGROUND

### A.    Procedural Background

        3.    On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

        4.    On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

        5.    On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

        6.    On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").  This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

        7.    In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

        8.    On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

        9.    The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

**B.**     **Overview of HarbourVest's Claims**

        10.    HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

        11.    In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor: (1) failed to disclose that it never intended to pay an arbitration award obtained by a former portfolio manager, (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager from collecting on his arbitration award and misrepresented the reasons changing the portfolio manager for HCLOF immediately prior to the Investment, (3) indicated that the dispute with the former portfolio manager would not impact investment activities, and (4) expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

        12.    HarbourVest seeks to rescind its Investment and claims damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

        13.    HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes of this Motion, and not for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

C.     **Summary of HarbourVest's Factual Allegations**

14.     At the time HarbourVest made its Investment, the Debtor was embroiled in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and limited partner of Acis Capital Management, L.P. ("Acis LP").  Through Acis LP, Mr. Terry managed Highland's CLO business, including CLO-related investments held by Acis Loan Funding, Ltd. ("Acis Funding").

15.     The litigation between Mr. Terry and the Debtor began in 2016, after the Debtor terminated Mr. Terry and commenced an action against him in Texas state court.  Mr. Terry asserted counterclaims for wrongful termination and for the wrongful taking of his ownership interest in Acis LP and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.

16.     HarbourVest alleges that the Debtor responded to the Arbitration Award by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of which were fraudulently concealed from HarbourVest.

17.     For example, according to HarbourVest, the Debtor changed the name of the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes").  The Debtor allegedly told HarbourVest that it made these changes because of the "reputational harm" to Acis LP resulting from the Arbitration Award.  The Debtor further told HarbourVest that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset them under the "Highland" CLO brand instead of the Acis CLO brand.

18.     In addition, HarbourVest also alleges that the Debtor had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

5

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

19. Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

20. After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof. The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

21. On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC. *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case"). The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee"). A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

6

APP. 2890

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "Preliminary Injunction").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

**D.    The Parties' Pleadings and Positions Concerning HarbourVest's Proofs of Claim**

22.    On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "Proofs of Claim").  Morris Dec. Exhibits 2-7.

23.    The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF."  *See, e.g.*, Morris Dec. Exhibit 2 ¶3.

24.    HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

agreements with the Debtor in connection with relating to" the Operative Documents "and any and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.*, Morris Dec. Exhibit 2 ¶4.

25. Highland subsequently objected to HarbourVest's Proofs of Claim on the grounds that they were no-liability claims. [Docket No. 906] (the "Claim Objection").

26. On September 11, 2020, HarbourVest filed its Response. The Response articulated specified claims under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "Fraud Claims"), U.S. State and Federal Securities Law Claims (the "Securities Claims"), violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "HarbourVest Claims").

27. On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion"). In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

E.    **Settlement Discussions**

28. In October, the parties discussed the possibility of resolving the Rule 3018 Motion.

29. In November, the parties broadened the discussions in an attempt to reach a global resolution of the HarbourVest Claims. In the pursuit thereof, the parties and their

8

APP. 2892

counsel participated in several conference calls where they engaged in a spirited exchange of perspectives concerning the facts and the law.

30. During follow up meetings, the parties' interests became more defined. Specifically, HarbourVest sought to maximize its recovery while fully extracting itself from the Investment, while the Debtor sought to minimize the HarbourVest Claims consistent with its perceptions of the facts and law.

31. After the parties' interests became more defined, the principals engaged in a series of direct, arm's-length, telephonic negotiations that ultimately lead to the settlement, whose terms are summarized below.

### F.   Summary of Settlement Terms

32. The Settlement Agreement contains the following material terms, among others:

- HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;[5]

- HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;

- HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;

- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;

- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and

- The parties shall exchange mutual releases.

---

[5] The NAV for HarbourVest's 49.98% interest in HCLOF was estimated to be approximately $22 million as of December 1, 2020.

9

*See generally* Morris Dec. Exhibit 1.

## BASIS FOR RELIEF REQUESTED

33.    Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement.  Notice shall be given to creditors, the
> United States trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

34.    Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).  Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long

as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See In re Age

Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, "approval of a compromise is within

the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO,

Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

35.    In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'" *Official Comm. of Unsecured Creditors v. Cajun Elec. Power

Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson

Brewing*, 624 F.2d at 602).  The Fifth Circuit has instructed courts to consider the following

factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

10

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.* Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations omitted).

36.     There is ample basis to approve the proposed Settlement Agreement based on the Rule 9019 factors set forth by the Fifth Circuit.

37.     First, although the Debtor believes that it has valid defenses to the HarbourVest Claims, there is no guarantee that the Debtor would succeed in its litigation with HarbourVest. Indeed, to establish its defenses, the Debtor would be required to rely, at least in part, on the credibility of witnesses whose veracity has already been called into question by this Court. Moreover, it will be difficult to dispute that the Transfers precipitated the Acis Bankruptcy, and, ultimately, the imposition of the Bankruptcy Court's TRO that restricted HCLOF's ability to reset or redeem the CLOs and that is at the core of the HarbourVest Claims.

38.     The second factor—the complexity, duration, and costs of litigation—also weighs heavily in favor of approving the Settlement Agreement. As this Court is aware, the events forming the basis of the HarbourVest Claims—including the Terry Litigation and Acis Bankruptcy—proceeded *for years* in this Court and in multiple other forums, and has already cost the Debtor's estate millions of dollars in legal fees. If the Settlement Agreement is not approved, then the parties will expend significant resources litigating a host of fact-intensive

11

issues including, among other things, the substance and materiality of the Debtor's alleged fraudulent statements and omissions and whether HarbourVest reasonably relied on those statements and omissions.

39.     Third, approval of the Settlement Agreement is justified by the paramount interest of creditors.  Specifically, the settlement will enable the Debtor to: (a) avoid incurring substantial litigation costs; (b) avoid the litigation risk associated with HarbourVest's $300 million claim; and (c) through the plan support provisions, increase the likelihood that the Debtor's pending plan of reorganization will be confirmed.

40.     Finally, the Settlement Agreement was unquestionably negotiated at arm's-length.  The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and their counsel and represent neither party's "best case scenario."  Indeed, the Settlement Agreement should be approved as a rational exercise of the Debtor's business judgment made after due deliberation of the facts and circumstances concerning HarbourVest's Claims.

## NO PRIOR REQUEST

41.     No previous request for the relief sought herein has been made to this, or any other, Court.

## NOTICE

42.     Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for HarbourVest; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; (d) the Debtor's principal secured parties; (e) counsel to the Committee; and (f) parties requesting notice pursuant to Bankruptcy Rule 2002.  The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

12

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as <u>Exhibit A</u>, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated:  December 23, 2020.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
        ikharasch@pszjlaw.com
        jmorris@pszjlaw.com
        gdemo@pszjlaw.com
        hwinograd@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

13

UBS Settlement [Doc. 2200-1]

# Exhibit 1
## Settlement Agreement

APP. 2898

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

### RECITALS

**WHEREAS**, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

**WHEREAS**, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

**WHEREAS**, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

**WHEREAS**, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

**WHEREAS**, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

**WHEREAS**, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

**WHEREAS**, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;

**WHEREAS**, the State Court bifurcated claims asserted in the State Court Action for purposes of trial, with the Phase I bench trial deciding UBS's breach of contract claims against the Funds and HCMLP's counterclaims against UBS;

**WHEREAS**, on August 7, 2017, the Funds, along with Highland CDO Opportunity Fund, Ltd., Highland CDO Holding Company, Highland Financial Corp., and HFP, purportedly sold assets with a purported collective fair market value of $105,647,679 (the "Transferred Assets") and purported face value of over $300,000,000 to Sentinel Reinsurance, Ltd. ("Sentinel") pursuant to a purported asset purchase agreement (the "Purchase Agreement");

**WHEREAS**, Sentinel treated the Transferred Assets as payment for a $25,000,000 premium on a document entitled "Legal Liability Insurance Policy" (the "Insurance Policy");

**WHEREAS**, the Insurance Policy purports to provide coverage to the Funds for up to $100,000,000 for any legal liability resulting from the State Court Action (the "Insurance Proceeds");

**WHEREAS**, one of the Transferred Assets CDO Fund transferred to Sentinel was CDO Fund's limited partnership interests in Multi-Strat (the "CDOF Interests");

**WHEREAS,** Sentinel had also received from HCMLP limited partnership interests in Multi-Strat for certain cash consideration (together with the CDOF Interests, the "MSCF Interests");

**WHEREAS**, the existence of the Purchase Agreement and Insurance Policy were unknown to Strand's independent directors and the Debtor's bankruptcy advisors prior to late January 2021;

**WHEREAS**, in early February 2021, the Debtor disclosed the existence of the Purchase Agreement and Insurance Policy to UBS;

**WHEREAS**, prior to such disclosure, the Purchase Agreement and Insurance Policy were unknown to UBS;

**WHEREAS**, on November 14, 2019, following the Phase I trial, the State Court issued its decision determining that the Funds breached the Knox Agreement on December 5, 2008 and dismissing HCMLP's counterclaims;

**WHEREAS**, Sentinel purportedly redeemed the MSCF Interests in November 2019 and the redeemed MSCF Interests are currently valued at approximately $32,823,423.50 (the "Sentinel Redemption");

**WHEREAS**, on February 10, 2020, the State Court entered a Phase I trial judgment against the Funds in the amount of $1,039,957,799.44 as of January 22, 2020 (the "Phase I Judgment");

**WHEREAS**, Phase II of the trial of the State Court Action, includes, *inter alia*, UBS's claim for breach of implied covenant of good faith and fair dealing against HCMLP, UBS's

2

EXECUTION VERSION

fraudulent transfer claims against HCMLP, HFP, and Multi-Strat, and UBS's general partner claim against Strand;

**WHEREAS**, on October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case"). The Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on December 4, 2019;

**WHEREAS**, Phase II of the trial of the State Court Action was automatically stayed as to HCMLP by HCMLP's bankruptcy filing;

**WHEREAS**, on May 11, 2020, UBS, Multi-Strat, Highland Credit Opportunities CDO, Ltd., and Highland Credit Opportunities CDO Asset Holdings, L.P. (collectively, the "May Settlement Parties"), entered into a Settlement Agreement (the "May Settlement") pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and restrictions on Multi-Strat's actions;

**WHEREAS**, on June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "UBS Claim"). The UBS Claim asserts a general unsecured claim against HCMLP for $1,039,957,799.40;

**WHEREAS**, on August 3, 2020, the Bankruptcy Court entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, UBS, and several other parties were directed to mediate their Bankruptcy Case disputes before two experienced third-party mediators, Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"). HCMLP and UBS formally met with the Mediators together and separately on numerous occasions, including on August 27, September 2, 3, and 4, and December 17, 2020, and had numerous other informal discussions outside of the presence of the Mediators, in an attempt to resolve the UBS Claim;

**WHEREAS**, on August 7, 2020, HCMLP filed an objection to the UBS Claim [Docket No. 928]. Also on August 7, 2020, the Redeemer Committee of the Highland Crusader Fund, and Crusader, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Redeemer Committee"), objected to the UBS Claim [Docket No. 933]. On September 25, 2020, UBS filed its response to these objections [Docket No. 1105];

**WHEREAS**, on October 16, 2020, HCMLP and the Redeemer Committee each moved for partial summary judgment on the UBS Claim [Docket Nos. 1180 and 1183, respectively], and on November 6, 2020, UBS opposed these motions [Docket No. 1337];

**WHEREAS**, by Order dated December 9, 2020, the Bankruptcy Court granted, as set forth therein, the motions for partial summary judgment filed by HCMLP and the Redeemer Committee and denied UBS's request for leave to file an amended proof of claim [Docket No. 1526];

3

**WHEREAS**, on November 6, 2020, UBS filed *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1338] (the "3018 Motion"), and on November 16, 2020, HCMLP and the Redeemer Committee each opposed the 3018 Motion [Docket Nos. 1404 and 1409, respectively];

**WHEREAS**, by Order dated December 8, 2020, the Bankruptcy Court granted the 3018 Motion and allowed the UBS Claim, on a temporary basis and for voting purposes only, in the amount of $94,761,076 [Docket No. 1518];

**WHEREAS**, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, and as may be further amended, supplemented, or otherwise modified, the "Plan");

**WHEREAS**, on March 29, 2021, the Debtor caused CDO Fund to make a claim on the Insurance Policy to collect the Insurance Proceeds pursuant to the Phase I Judgment;

**WHEREAS**, on March 29, 2021, UBS filed an adversary proceeding seeking injunctive relief and a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtor from allowing Multi-Strat to distribute the Sentinel Redemption to Sentinel or any transferee of Sentinel (the "Multi-Strat Proceeding"), which relief the Debtor, in its capacity as Multi-Strat's investment manager and general partner, does not oppose;

**WHEREAS**, the Parties wish to enter into this Agreement to settle all claims and disputes between and among them, to the extent and on the terms and conditions set forth herein, and to exchange the mutual releases set forth herein, without any admission of fault, liability, or wrongdoing on the part of any Party; and

**WHEREAS,** this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and section 363 of the Bankruptcy Code;

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

## A G R E E M E N T

1.    **Settlement of Claims.**  In full and complete satisfaction of the UBS Released Claims (as defined below):

(a)    The UBS Claim will be allowed as (i) a single, general unsecured claim in the amount of $65,000,000 against HCMLP, which shall be treated as a Class 8 General Unsecured Claim under the Plan;[1] and (ii) a single, subordinated unsecured claim in the amount of $60,000,000 against HCMLP, which shall be treated as a Class 9 Subordinated General Unsecured Claim under the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings attributed to them in the Plan.

(b)     Multi-Strat will pay UBS the sum of $18,500,000 (the "Multi-Strat Payment") as follows: (i) within two (2) business days after the Order Date, the May Settlement Parties will submit a Joint Release Instruction (as defined in the May Settlement) for the release of the amounts held in the Escrow Account (as defined in the May Settlement) to be paid to UBS in partial satisfaction of the Multi-Strat Payment on the date that is ten (10) business days following the Order Date; and (ii) Multi-Strat will pay UBS the remainder of the Multi-Strat Payment in immediately available funds on the date that is ten (10) business days following the Order Date, provided that, for the avoidance of doubt, the amounts held in the Escrow Account will not be paid to UBS until and unless the remainder of the Multi-Strat Payment is made.

(c)     Subject to applicable law, HCMLP will use reasonable efforts to (i) cause CDO Fund to pay the Insurance Proceeds in full to UBS as soon as practicable, but no later than within 5 business days of CDO Fund actually receiving the Insurance Proceeds from or on behalf of Sentinel; (ii) if Sentinel refuses to pay the Insurance Proceeds, take legal action reasonably designed to recover the Insurance Proceeds or the MSCF Interests or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment and in addition shall provide reasonable assistance to UBS in connection with any legal action UBS takes to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment or obtain rights to the MSCF interests, including but not limited to the redemption payments in connection with the MSCF Interests; (iii) cooperate with UBS and participate (as applicable) in the investigation or prosecution of claims or requests for injunctive relief against the Funds, Multi-Strat, Sentinel, James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, Transferred Assets, the transfer of the MSCF Interests, or any potentially fraudulent transfer of assets from the Funds to Sentinel, excluding the individuals listed on the schedule provided to UBS on March 25, 2021 (the "HCMLP Excluded Employees"); (iv) as soon as reasonably practicable, provide UBS with all business and trustee contacts at the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, if any, that are actually known by the Debtor after reasonable inquiry; (v) as soon as reasonably practicable, provide UBS with a copy of the governing documents, prospectuses, and indenture agreements for the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, as applicable, that are in the Debtor's actual possession, custody, or control, (vi) as soon as reasonably practicable, provide, to the extent possible, any CUSIP numbers of the securities of the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd., as applicable, including information regarding the location and amount of any cash related to those entities' holdings, in each case only to the extent actually known by the Debtor after reasonable inquiry; (vii) cooperate with UBS to assign or convey any such assets described in Section 1(c)(vi) or any other assets owned or controlled by the Funds and/or HFP, including for avoidance of doubt any additional assets currently unknown to the Debtor that the Debtor discovers in the future after the Agreement Effective Date; (viii) respond as promptly as reasonably possible to requests by UBS for access to relevant documents and approve as promptly as reasonably possible requests for access to relevant documents from third parties as needed with respect to the Transferred Assets, the Purchase Agreement, the Insurance Policy, the

5

MSCF Interests and any other assets currently or formerly held by the Funds or HFP, including without limitation the requests listed in **Appendix A** (provided, however, that the provision of any such documents or access will be subject to the common interest privilege and will not constitute a waiver of any attorney-client or other privilege in favor of HCMLP) that are in the Debtor's actual possession, custody, or control; (ix) preserve all documents in HCMLP's possession, custody, or control regarding or relating to the Purchase Agreement, the Insurance Policy, the MSCF Interests, or any transfer of assets from the Funds to Sentinel, including but not limited to the documents requested in Appendix A, from 2016 to present, and issue a litigation hold to all individuals deemed reasonably necessary regarding the same; and (x) otherwise use reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law ahead of all other creditors of the Funds and HFP; provided, however, that, from and after the date hereof, HCMLP shall not be required to incur any out-of-pocket fees or expenses, including, but not limited to, those fees and expenses for outside consultants and professionals (the "Reimbursable Expenses"), in connection with any provision of this Section 1(c) in excess of $3,000,000 (the "Expense Cap"), and provided further that, for every dollar UBS recovers from the Funds (other than the assets related to Greenbriar CLO Ltd. or Greenbriar CLO Corp.), Sentinel, Multi-Strat (other than the amounts set forth in Section 1(b) hereof), or any other person or entity described in Section 1(c)(iii) in connection with any claims UBS has that arise out of or relate to the Phase I Judgment, the Purchase Agreement, the Insurance Policy, the Transferred Assets, the MSCF Interests, or the Insurance Proceeds (the "UBS Recovery"), UBS will reimburse HCMLP ten percent of the UBS Recovery for the Reimbursable Expenses incurred by HCMLP, subject to: (1) the occurrence of the Agreement Effective Date and (2) UBS's receipt and review of invoices and time records (which may be redacted as reasonably necessary) for outside consultants and professionals in connection with such efforts described in this Section 1(c), up to but not exceeding the Expense Cap after any disputes regarding the Reimbursable Expenses have been resolved pursuant to procedures to be agreed upon, or absent an agreement, in a manner directed by the Bankruptcy Court; and provided further that in any proceeding over the reasonableness of the Reimbursable Expenses, the losing party shall be obligated to pay the reasonable fees and expenses of the prevailing party; and provided further that any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c) shall be conducted in consultation with UBS, including but not limited to the selection of necessary outside consultants and professionals to assist in such litigation; and provided further that UBS shall have the right to approve HCMLP's selection of outside consultants and professionals to assist in any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c).

      (d)    Redeemer Appeal.

          (i)     On the Agreement Effective Date, provided that neither the Redeemer Committee nor any entities acting on its behalf or with any assistance from or coordination with the Redeemer Committee have objected to this Agreement or the 9019 Motion (as defined below), UBS shall withdraw with prejudice its appeal of the *Order Approving Debtor's Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1273] (the "Redeemer Appeal"); and

6

(ii)     The Parties have stipulated to extend the deadline for the filing of any briefs in the Redeemer Appeal to June 30, 2021 and will agree to such further extensions as necessary to facilitate this Settlement Agreement.

(e)     As of the Agreement Effective Date, the restrictions and obligations set forth in the May Settlement, other than those in Section 7 thereof, shall be extinguished in their entirety and be of no further force or effect.

(f)     On the Agreement Effective Date, the Debtor shall instruct the claims agent in the Bankruptcy Case to adjust the claims register in accordance with this Agreement.

(g)     On the Agreement Effective Date, any claim the Debtor may have against Sentinel or any other party, and any recovery related thereto, with respect to the MSCF Interests shall be automatically transferred to UBS, without any further action required by the Debtor. For the avoidance of doubt, the Debtor shall retain any and all other claims it may have against Sentinel or any other party, and the recovery related thereto, unrelated to the MSCF Interests.

## 2.     Definitions.

(a)     "Agreement Effective Date" shall mean the date the full amount of the Multi-Strat Payment defined in Section 1(b) above, including without limitation the amounts held in the Escrow Account (as defined in the May Settlement), is actually paid to UBS.

(b)     "HCMLP Parties" shall mean (a) HCMLP, in its individual capacity; (b) HCMLP, as manager of Multi-Strat; and (c) Strand.

(c)     "Order Date" shall mean the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019 and section 363 of the Bankruptcy Code.

(d)     "UBS Parties" shall mean UBS Securities LLC and UBS AG London Branch.

## 3.     Releases.

(a)     **UBS Releases.**  Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the UBS Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue (A) the HCMLP Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, and (B) the MSCF Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

7

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "UBS Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to (1) the obligations of the HCMLP Parties and MSCF Parties under this Agreement, including without limitation the allowance of or distributions on account of the UBS Claim or the settlement terms described in Sections 1(a)-(g) above; (2) the Funds or HFP, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy, or such prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy by UBS; (3) James Dondero or Mark Okada, or any entities, including without limitation Hunter Mountain Investment Trust, Dugaboy Investment Trust, and NexBank, SSB, owned or controlled by either of them, other than the HCMLP Parties and MSCF Parties (but for the avoidance of doubt, such releases of the HCMLP Parties and MSCF Parties shall be solely with respect to such entities and shall not extend in any way to James Dondero or Mark Okada in their individual capacity or in any other capacity, including but not limited to as an investor, officer, trustee, or director in the HCMLP Parties or MSCF Parties); (4) Sentinel or its subsidiaries, parents, affiliates, successors, designees, assigns, employees, or directors, including James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, MSCF Interests, or Transferred Assets, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, the MSCF Interests, any potentially fraudulent transfer of assets from the Funds to Sentinel and/or Insurance Policy, excluding the HCMLP Excluded Employees; (5) the economic rights or interests of UBS in its capacity as an investor, directly or indirectly (including in its capacity as an investment manager and/or investment advisor), in any HCMLP-affiliated entity, including without limitation in the Redeemer Committee and Credit Strat, and/or in such entities' past, present or future subsidiaries and feeders funds (the "UBS Unrelated Investments"); and (6) any actions taken by UBS against any person or entity, including any HCMLP Party or MSCF Party, to enjoin a distribution on the Sentinel Redemption or the transfer of any assets currently held by or within the control of CDO Fund to Sentinel or a subsequent transferee or to seek to compel any action that only such person or entity has standing to pursue or authorize in order to permit UBS to recover the Insurance Proceeds, Transferred Assets, the Phase I Judgment or any recovery against HFP; provided, however, that, from and after the date hereof, any out-of-pocket fees or expenses incurred by HCMLP in connection with this Section 3(a)(6) will be considered Reimbursable Expenses and shall be subject to, and applied against, the Expense Cap as if they were incurred by HCMLP pursuant to Section 1(c) subject to the occurrence of the Agreement Effective Date and after any disputes regarding such Reimbursable Expenses have been resolved in the manner described in Section 1(c).

      (b)    **HCMLP Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the HCMLP Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of

8

their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "HCMLP Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement; and (b) the obligations of the UBS Parties in connection with the UBS Unrelated Investments.

(c)     **Multi-Strat Release.**   Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the MSCF Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "Multi-Strat Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement.

**4.      No Third Party Beneficiaries**.    Except for the parties released by this Agreement, no other person or entity shall be deemed a third-party beneficiary of this Agreement.

**5.      UBS Covenant Not to Sue.**   Subject to the occurrence of the Agreement Effective date, if UBS ever controls any HCMLP-affiliated defendant in the State Court Action by virtue of the prosecution, enforcement, or collection of the Phase I Judgment (collectively, the "Controlled State Court Defendants"), UBS covenants on behalf of itself and the Controlled State Court Defendants, if any, that neither UBS nor the Controlled State Court Defendants will assert or pursue any claims that any Controlled State Court Defendant has or may have against any of the HCMLP Parties; provided, however, that nothing shall prohibit UBS or a Controlled State Court Defendant from taking any of the actions set forth in Section 3(a)(1)-(6); provided further, however, if and to the extent UBS receives any distribution from any Controlled State Court Defendant that is derived from a claim by a Controlled State Court Defendant against the Debtor, subject to the exceptions set forth in Section 3(a), which distribution is directly

9

**EXECUTION VERSION**

attributable to any property the Controlled State Court Defendant receives from the Debtor and separate and distinct from property owned or controlled by CDO Fund, SOHC, or Multi-Strat, then such recovery shall be credited against all amounts due from the Debtor's estate on account of the UBS Claim allowed pursuant to Section 1(a) of this Agreement, or if such claim has been paid in full, shall be promptly turned over to the Debtor or its successors or assigns.

6. **Agreement Subject to Bankruptcy Court Approval.**

(a) The force and effect of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the releases herein by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order (the "9019 Motion") to be filed by the Debtor no later than five business days after execution of this Agreement by all Parties unless an extension is agreed to by both parties.

7. **Representations and Warranties**.

(a) Each UBS Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the UBS Released Claims and has not sold, transferred, or assigned any UBS Released Claim to any other person or entity, and (ii) no person or entity other than such UBS Party has been, is, or will be authorized to bring, pursue, or enforce any UBS Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such UBS Party.

(b) Each HCMLP Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HCMLP Released Claims and has not sold, transferred, or assigned any HCMLP Released Claim to any other person or entity, and (ii) no person or entity other than such HCMLP Party has been, is, or will be authorized to bring, pursue, or enforce any HCMLP Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such HCMLP Party.

(c) Each MSCF Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the Multi-Strat Released Claims and has not sold, transferred, or assigned any Multi-Strat Released Claim to any other person or entity, and (ii) no person or entity other than such MSCF Party has been, is, or will be authorized to bring, pursue, or enforce any Multi-Strat Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such MSCF Party.

10

**8.** **No Admission of Liability**. The Parties acknowledge that there is a bona fide dispute with respect to the UBS Claim. Nothing in this Agreement shall be construed, expressly or by implication, as an admission of liability, fault, or wrongdoing by HCMLP, the MSCF Parties, Strand, UBS, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the MSCF Parties, Strand, UBS, or any other person.

**9.** **Successors-in-Interest.** This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns.

**10.** **Notice**. Each notice and other communication hereunder shall be in writing and will, unless otherwise subsequently directed in writing, be delivered by email and overnight delivery, as set forth below, and will be deemed to have been given on the date following such mailing.

**HCMLP Parties or the MSCF Parties**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel
Telephone No.: 972-628-4100
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
E-mail: jpomerantz@pszjlaw.com

**UBS**

UBS Securities LLC
UBS AG London Branch
Attention: Elizabeth Kozlowski, Executive Director and Counsel
1285 Avenue of the Americas
New York, NY 10019
Telephone No.: 212-713-9007
E-mail: elizabeth.kozlowski@ubs.com

UBS Securities LLC
UBS AG London Branch
Attention: John Lantz, Executive Director
1285 Avenue of the Americas
New York, NY 10019

11

EXECUTION VERSION

Telephone No.: 212-713-1371
E-mail: john.lantz@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attention: Andrew Clubok
            Sarah Tomkowiak
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone No.: 202-637-3323
Email: andrew.clubok@lw.com
        sarah.tomkowiak@lw.com

**11.** **Advice of Counsel**. Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

**12.** **Entire Agreement**. This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter. Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation, or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement. The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement, and that any such reliance would be unreasonable. This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

**13.** **No Party Deemed Drafter**. The Parties acknowledge that the terms of this Agreement are contractual and are the result of arm's-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

**14.** **Future Cooperation**. The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

**15.** **Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement.

12

17

**EXECUTION VERSION**

Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

       **16.**    **Governing Law; Venue; Attorneys' Fees and Costs**.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, New York, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

13

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

Name: _____

Its: _____

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P. (f/k/a Highland Credit Opportunities CDO, L.P.)**

By: _____

Name: _____

Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO, Ltd.**

By: _____

Name: _____

Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, L.P.**

By: _____

Name: _____

Its: _____

**STRAND ADVISORS, INC.**

By: _____

Name: _____

Its: _____

Page A-59

17

**EXECUTION VERSION**

**UBS SECURITIES LLC**

By: _____

Name: John Lantz

Its:   Authorized Signatory

By: _____

Name: Elizabeth Kozlowski

Its:   Authorized Signatory

**UBS AG LONDON BRANCH**

By: _____

Name: William Chandler

Its:   Authorized Signatory

By: _____

Name: Elizabeth Kozlowski

Its:   Authorized Signatory

15

**Page A-60**

## APPENDIX A

- The search parameters (custodians, date ranges, search terms) used to locate the documents produced to UBS on February 27, 2021 (and any additional parameters used for the previous requests from UBS);

- Identity of counsel to, and trustees of, CDO Fund or SOHC;

- Current or last effective investment manager agreements for CDO Fund and SOHC, including any management fee schedule, and any documentation regarding the termination of those agreements;

- The tax returns for the CDO Fund and SOHC from 2017-present;

- Communications between any employees of Sentinel (or its affiliates) and any employees of the HCMLP Parties, CDO Fund, SOHC, or any of Dondero, Leventon, or Ellington from 2017-present;

- Documents or communications regarding or relating to the Purchase Agreement, Insurance Policy, or June 30, 2018 Memorandum entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" (the "Tax Memo"), including without limitation (i) amendments to these documents, (ii) transfer of assets pursuant to these documents, (iii) board minutes or resolutions regarding or relating to these documents, (iv) claims made on the Insurance Policy; (v) communications with the IRS regarding the asset transfer pursuant to these documents; and (vi) any similar asset purchase agreements, capital transfer agreements, or similar agreements;

- Documents or communications regarding or relating to the value of any assets transferred pursuant to the Insurance Policy or Purchase Agreement, including without limitation those assets listed in Schedule A to the Purchase Agreement, from 2017 to present, including documentation supporting the $105,647,679 value of those assets as listed in the Tax Memo;

- Documents showing the organizational structure of Sentinel and its affiliated entities, including information on Dondero's relationship to Sentinel;

- Any factual information provided by current or former employees of the HCMLP Parties, CDO Fund, SOHC, or Sentinel regarding or relating to the Purchase Agreement, Insurance Policy, Tax Memo, and/or transfer of assets pursuant to those documents;

- Debtor's settlement agreements with Ellington and Leventon;

- Copies of all prior and future Monthly Reports and Valuation Reports (as defined in the Indenture, dated as of December 20, 2007, among Greenbriar CLO Ltd., Greenbriar CLO Corp., and State Street Bank and Trust Company); and

- Identity of any creditors of CDO Fund, SOHC, or HFP and amount of debts owed to those creditors by CDO Fund, SOHC, or HFP, including without limitation any debts owed to the Debtor.

[Hellman & Friedman Seeded Farallon Capital Management](#)

OUR FOUNDER

RETURN TO ABOUT (/ABOUT/)

## Warren Hellman: One of the good guys

**Warren Hellman was a devoted family man,** highly successful businessman, active philanthropist, dedicated musician, arts patron, endurance athlete and all-around good guy. Born in New York City in 1934, he grew up in the Bay Area, graduating from the University of California at Berkeley. After serving in the U.S. Army and attending Harvard Business School, Warren began his finance career at Lehman Brothers, becoming the youngest partner in the firm's history at age 26 and subsequently serving as President. After a distinguished career on Wall Street, Warren moved back west and co-founded Hellman & Friedman, building it into one of the industry's leading private equity firms.

**Warren deeply believed in the power of people** to accomplish incredible things and used his success to improve and enrich the lives of countless people. Throughout his career, Warren helped found or seed many successful businesses including Matrix Partners, Jordan Management Company, Farallon Capital Management and Hall Capital Partners.

**Within the community,** Warren and his family were generous supporters of dozens of organizations and causes in the arts, public education, civic life, and public health, including creating and running the San Francisco Free Clinic. Later in life, Warren became an accomplished 5-string banjo player and found great joy in sharing the love of music with others. In true form, he made something larger of this avocation to benefit others by founding the Hardly Strictly Bluegrass Festival, an annual three-day, free music festival that draws hundreds of thousands of people together from around the Bay Area.

**An accomplished endurance athlete,** Warren regularly completed 100-mile runs, horseback rides and combinations of the two. He also was an avid skier and national caliber master ski racer and served as president of the U.S. Ski Team in the late 1970s, and is credited with helping revitalize the Sugar Bowl ski resort in the California Sierras.

**In short,** Warren Hellman embodied the ideal of living life to the fullest. He had an active mind and body, and a huge heart. We are lucky to call him our founder. **Read more about Warren. (https://hf.com/wp-content/uploads/2015/09/Warren-Hellman-News-Release.pdf)**


SFChronicle/SFGate/Liz Hafalia


Robert Holmgren


no caption

https://hf.com/warren-hellman/                                                                1/2

## Hellman & Friedman Owned a Portion of Grosvenor until 2020

# Grosvenor Capital Management



In 2007, H&F invested in Grosvenor, one of the world's largest and most diversified independent alternative asset management firms. The Company offers comprehensive public and private markets solutions and a broad suite of investment and advisory choices that span hedge funds, private equity, and various credit and specialty strategies. Grosvenor specializes in developing customized investment programs tailored to each client's specific investment goals.

**SECTOR**

Financial Services

**STATUS**

Past

**www.gcmlp.com (http://www.gcmlp.com)**

CONTACT (HTTPS://HF.COM/CONTACT/)     INFO@HF.COM (MAILTO:INFO@HF.COM)     LP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/CLIENT/HELLMAN)     BACK
GP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/DOCUMENT/2720045)     TERMS OF USE (HTTPS://HF.COM/TERMS-OF-USE/)
PRIVACY POLICY (HTTPS://HF.COM/PRIVACY-POLICY/)
KNOW YOUR CALIFORNIA RIGHTS (HTTPS://HF.COM/YOUR-CALIFORNIA-CONSUMER-PRIVACY-ACT-RIGHTS/)          (HTTPS://WWW.LINKEDIN.COM/COMPANY/HELLMAN-
                                                                                                  &-
                                                                                                  FRIEDMAN)
                                        ©2021 HELLMAN & FRIEDMAN LLC



Julie Segal

**CORNER OFFICE**

# GCM Grosvenor to Go Public

The $57 billion alternatives manager will become a public company after merging with a SPAC backed by Cantor Fitzgerald.

August 03, 2020



Chicago, IL (Tim Boyle/Bloomberg)

In a sign of the times, GCM Grosvenor will become a public company through a SPAC.

The Chicago-based alternative investments firm is planning to go public by merging with a special purpose acquisition company in a deal valued at $2 billion. The 50-year-old firm has $57 billion in assets in private equity, infrastructure, real estate, credit, and absolute return investments.

"We have long valued having external shareholders and we wanted to preserve the accountability and focus that comes with that," Michael Sacks, GCM Grosvenor's chairman and CEO, said in a statement.

GCM Grosvenor will combine with CF Finance Special Acquisition Corp, a SPAC backed by Cantor Fitzgerald, according to an announcement from both companies on Monday. After the company goes public, Sacks will continue to lead GCM Grosvenor, which is owned by management and Hellman & Friedman, a private equity firm. Hellman & Friedman, which has owned a minority stake of the Chicago asset manager since 2007, will sell its equity as

[Farallon was a Significant Borrower for Lehman](#)



# Case Study – Large Loan Origination

**Debt origination for an affiliate of Simon Property Group Inc. and Farallon Capital Management**

| | |
|---|---|
| Date | June 2007 |
| Asset Class | Retail |
| Asset Size | 1,808,506 Sq. Ft. |
| Sponsor | Simon Property Group Inc. / Farallon Capital Management |
| Transaction Type | Refinance |
| Total Debt Amount | Lehman Brothers: $121 million JP Morgan: $200 million |



### Transaction Overview

♦ In June 2007, Lehman Brothers co-originated a loan in the aggregate amount of $321 million (Lehman portion: $121 million) with JP Morgan to a special purpose affiliate of a joint venture between Simon Property Group Inc ("Simon") and Farallon Capital Management ("Farallon") secured by the shopping center known as Gurnee Mills Mall (the "Property") located in Gurnee, IL .

♦ The Property consists of a one-story, 200 store discount mega-mall comprised of 1,808,506 square feet anchored by Burlington Coat Factory, Marshalls, Bed Bath & Beyond and Kohls among other national retailers. Built in 1991, the Property underwent a $5 million interior renovation in addition to a $71 million redevelopment between 2004 and 2005. As of March 2007, the Property had a in-line occupancy of 99.5%.

### Lehman Brothers Role

♦ Simon and Farallon comprised the sponsorship which eventually merged with The Mills Corporation in early 2007 for $25.25 per common share in cash. The total value of the transaction was approximately $1.64 billion for all of the outstanding common stock, and approximately $7.9 billion including assumed debt and preferred equity.

♦ Lehman and JP Morgan subsequently co-originated $321 million loan at 79.2% LTV based on an appraisal completed in March by Cushman & Wakefield. The Loan was used to refinance the indebtedness secured by the Property.

### Sponsorship Overview

♦ The Mills Corporation, based in Chevy Chase MD is a developer owner and manager of a diversified portfolio of retail destinations including regional shopping malls and entertainment centers. They currently own 38 properties in the United States totaling 47 million square feet.

LEHMAN BROTHERS                    32

Mr. Seery Represented Stonehill While at Sidley

James P. Seery, Jr.
John G. Hutchinson
John J. Lavelle
Martin B. Jackson
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300 (tel)
(212) 839-5599 (fax)

*Attorneys for the Steering Group*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
------------------------------------------------------------ X
                                         :
In re:                                   :   Chapter 11
                                         :
BLOCKBUSTER INC., et al.,                :   Case No. 10-14997 (BRL)
                                         :
                        Debtors.         :   (Jointly Administered)
                                         :
------------------------------------------------------------ X
```

## THE BACKSTOP LENDERS' OBJECTION TO THE MOTION OF LYME REGIS TO ABANDON CERTAIN CAUSES OF ACTION OR, IN THE ALTERNATIVE, TO GRANT STANDING TO LYME REGIS TO PURSUE CLAIMS ON BEHALF OF THE ESTATE

1.      The Steering Group of Senior Secured Noteholders who are Backstop Lenders --

Icahn Capital LP, Monarch Alternative Capital LP, Owl Creek Asset Management, L.P.,

Stonehill Capital Management LLC, and Värde Partners, Inc. (collectively, the "Backstop

Lenders") -- hereby file this objection (the "Objection") to the Motion of Lyme Regis Partners,

LLC ("Lyme Regis") to Abandon Certain Causes of Action or, in the Alternative, to Grant

Standing to Lyme Regis to Pursue Claims on Behalf of the Estate (the "Motion") [Docket No.

593].

Page A-66

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates



Over 25 years earlier, here is a group at a party. From the left, Bob Zinn, Dave Lowenthal, Rory Little, Joe Nesler, Jon Polonsky (in front of Joe), John Motulsky and Mark Windfeld-Hansen (behind bottle!) Motulsky circulated this photo at the reunion. Thanks John!



Joseph H. Nesler (He/Him)
General Counsel

More    🔒 Message

Joseph H. Nesler (He/Him) ·    🛡️ Yale Law School
3rd
General Counsel
Winnetka, Illinois, United States ·
Contact info
500+ connections

🔒 Message    More

Open to work
Chief Compliance Officer and General Counsel roles
See all details

## About

I have over 38 years of experience representing participants in the investment management industry with respect to a wide range of legal and regulatory matters, including SEC, DOL, FINRA, and NFA regulations and examinations.    ... see more

## Activity

522 followers

Posts Joseph H. created, shared, or commented on in the last 90 days are displayed here.

https://www.linkedin.com/in/josephnesler/



Investor Communication to Highland Crusader Funds Stakeholders



**Alvarez & Marsal**
**Management, LLC** 2029 Cei
Park East Suite 206(
Angeles, CA 9

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal") in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management LLC ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

Page A-70

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million. Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021. Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.


Sincerely,


Alvarez & Marsal CRF Management, LLC


By: _____

Steven Varner
Managing Director

**EXHIBIT 36**



**MUNSCH HARDT**

DALLAS / HOUSTON / AUSTIN

Ross Tower
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main 214.855.7500
Fax 214.855.7584
munsch.com

Direct Dial 214.855.7587
Direct Fax 214.978.5359
drukavina@munsch.com

November 3, 2021

**Via E-Mail and Federal Express**
Ms. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC 20530
Nan.r.Eitel@usdoj.gov

    Re:    Highland Capital Management, L.P. Bankruptcy Case
            Case No. 19-34054 (SGJ) Bankr. N.D. Tex.

Dear Ms. Eitel:

I am a senior bankruptcy practitioner who has worked closely with Douglas Draper (representing separate, albeit aligned, clients) in the above-referenced Chapter 11 case. I have represented debtors-in-possession on multiple occasions, have served as an adjunct professor of law teaching advanced corporate restructuring, and consider myself not only a bankruptcy expert, but an expert on the practicalities and realities of how estates and cases are administered and, therefore, how they could be manipulated for personal interests. I write to follow up on the letter that Douglas sent to your offices on October 4, 2021, on account of additional information my clients have learned in this matter. So that you understand, my clients in the case are NexPoint Advisors, L.P. and Highland Capital Management Fund Advisors, L.P., both of whom are affiliated with and controlled by James Dondero, and I write this letter on their behalf and based on information they have obtained.

I share Douglas' view that serious abuses of the bankruptcy process occurred during the bankruptcy of Texas-headquartered Highland Capital Management, L.P. ("Highland" or the "Debtor") which, left uninvestigated and unaddressed, may represent a systemic issue that I believe would be of concern to your office and within your office's sphere of authority. Those abuses include potential insider trading and breaches of fiduciary duty by those charged with protecting creditors, understated estimations of estate value seemingly designed to benefit insiders and management, gross mistreatment of employees who were key to the bankruptcy process, and ultimately a plan aimed at liquidating an otherwise viable estate, to the detriment of third-party investors in Debtor-managed funds. To be clear, I recognize that the Bankruptcy Court has ruled the way that it has and I am not criticizing the Bankruptcy Court or seeking to attack any of its orders. Rather, as has been and will be shown, the Bankruptcy Court acted on misinformation presented to it, intentional lack of transparency, and manipulation of the facts and circumstances by the fiduciaries of the estate. I therefore wish to add my voice to Douglas' aforementioned letter, provide additional information, encourage your investigation, and offer whatever information or assistance I can.

The abuses here are akin to the type of systemic abuse of process that took place in the bankruptcy of Neiman Marcus (in which a core member of the creditors' committee admittedly attempted to perpetrate a massive fraud on creditors), and which is something that lawmakers should be concerned

Ms. Nan R. Eitel
November 3, 2021
Page 2

about, particularly to the extent that debtor management and creditors' committee members are using the federal bankruptcy process to shield themselves from liability for otherwise harmful, illegal, or fraudulent acts.

## BACKGROUND

### Highland Capital Management and its Founder, James Dondero

Highland Capital Management, L.P. is an SEC-registered investment advisor co-founded by James Dondero in 1993. A graduate of the University of Virginia with highest honors, Mr. Dondero has over thirty years of experience successfully overseeing investment and business activities across a range of investment platforms. Of note, Mr. Dondero is chiefly responsible for ensuring that Highland weathered the global financial crisis, evolving the firm's focus from high-yield credit to other areas, including real estate, private equity, and alternative investments. Prior to its bankruptcy, Highland served as advisor to a suite of registered funds, including open-end mutual funds, closed-end funds, and an exchange-traded fund.

In addition to managing Highland, Mr. Dondero is a dedicated philanthropist who has actively supported initiatives in education, veterans' affairs, and public policy. He currently serves as a member of the Executive Board of the Southern Methodist University Cox School of Business and sits on the Executive Advisory Council of the George W. Bush Presidential Center.

### Circumstances Precipitating Bankruptcy

Notwithstanding Highland's historical success with Mr. Dondero at the helm, Highland's funds— like many other investment platforms—suffered losses during the financial crisis, leading to myriad lawsuits by investors. One of the most contentious disputes involved a group of investors who had invested in Highland-managed funds collectively termed the "Crusader Funds." During the financial crisis, to avoid a run on the Crusader Funds at low-watermark prices, the funds' manager temporarily suspended redemptions, leading investors to sue. That dispute resolved with the formation of an investor committee self-named the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors' receiving a return of their investments plus a return, as opposed to the 20 cents on the dollar they would have received had their redemption requests been honored when made.

Despite this successful liquidation, the Redeemer Committee sued Highland again several years later, claiming that Highland had improperly delayed the liquidation and paid itself fees not authorized under the parties' earlier settlement agreement. The dispute went to arbitration, ultimately resulting in an arbitration award against Highland of $189 million (of which Highland expected to make a net payment of $110 million once the award was confirmed).

Believing that a restructuring of its judgment liabilities was in Highland's best interest, on October 16, 2019, Highland—a Delaware limited partnership—filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.[1]

On October 29, 2019, the Bankruptcy Court appointed the Official Committee of Unsecured Creditors ("Creditors' Committee"). The Creditors' Committee Members (and the contact individuals for those members) are: (1) The Redeemer Committee of the Highland Crusader Fund (Eric Felton), (2) Meta e-Discovery (Paul McVoy), (3) UBS Securities LLC and UBS AG London Branch (Elizabeth

---

[1] *In re Highland Capital Mgmt., L.P.*, Case No. 19-12239-CSS (Bankr. D. Del.) ("Del. Case"), Dkt. 1.

Ms. Nan R. Eitel
November 3, 2021
Page 3

Kozlowski), and (4) Acis Capital Management, L.P. and Acis Capital Management GP, LLP (Joshua Terry).[2] At the time of their appointment, creditors agreeing to serve on the Creditors' Committee were given an Instruction Sheet by the Office of the United States Trustee, instructing as follows:

> **Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing the creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.**

*See* Instruction Sheet, Ex. A (emphasis in original).

In response to a motion by the Creditors' Committee, on December 4, 2019, the Delaware Bankruptcy Court unexpectedly transferred the bankruptcy case to the Northern District of Texas, to Judge Stacey G.C. Jernigan's court.[3]

### SYSTEMIC PROBLEMS OCCURRING IN THE CONTEXT OF HIGHLAND'S COURT-ADMINISTERED BANKRUPTCY

#### Mr. Dondero Gets Pushed Out of Management and New Debtor Management Announces Plans to Liquidate the Estate

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace Mr. Dondero as the sole director of the Debtor's general partner, Strand Advisors, Inc. ("Strand"). To avoid a protracted dispute and to facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director, on the condition that he would be replaced by three independent directors who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. As Mr. Draper previously has explained, the agreement approved by the Bankruptcy Court allowed Mr. Dondero, UBS (which held one of the largest claims against the estate), and the Redeemer Committee each to choose one director, and also established protocols for operations going forward. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James Seery.[4]

In brokering the agreement, Mr. Dondero made clear his expectations that new, independent management would not only preserve Highland's business by expediting an exit from bankruptcy in three to six months, but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero. Unfortunately, those expectations did not materialize. Rather, it quickly became clear that Strand's and Highland's management was being dominated by one of the

---

[2] Del. Case, Dkt. 65.
[3] *See In re Highland Capital Mgmt., L.P.*, Case No. 19-34054 (Bankr. N.D. Tex.), Dkt. 186. All subsequent docket references are to the docket of the Bankruptcy Court for the Northern District of Texas.
[4] *See* Stipulation in Support of Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 338; Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 339.

Ms. Nan R. Eitel
November 3, 2021
Page 4

independent directors, Mr. Seery (as will be seen, for his self-gain). Shortly after his placement on the Board, on March 15, 2020, Mr. Seery became de facto Chief Executive Officer, after which he immediately took steps to freeze Mr. Dondero out of operations completely, to the detriment of Highland's business and its employees. The Bankruptcy Court formally approved Mr. Seery's appointment as CEO and Chief Restructuring Officer on July 14, 2020.[5] Although Mr. Seery publicly represented that his goal was to restructure the Debtor's business and enable it to emerge as a going concern, privately he was engineering a much different plan. Less than two months after Mr. Seery's appointment as CEO/CRO, the Debtor filed its initial plan of reorganization, disclosing for the first time its intention to terminate substantially all employees by the end of 2020 and to liquidate Highland's assets by 2022.[6]

Over objections by Mr. Dondero and numerous other stakeholders, the Bankruptcy Court confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan").[7] There are appeals of that Plan, as well as many of the other rulings made by the Bankruptcy Court, currently pending before the United States District Court and the Court of Appeals for the Fifth Circuit.

## Transparency Problems Pervade the Bankruptcy Proceedings

### *The Regulatory Framework*

As you are aware, one of the most important features of federal bankruptcy proceedings is transparency. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other information as the United States Trustee or the United States Bankruptcy Court requires." *See* http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[8] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. Particularly in large bankruptcies, creditors and investors alike should expect that debtors, their

---

[5] *See* Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854.

[6] *See* Plan of Reorganization of Highland Capital Management, L.P. dated August 12, 2020, Dkt. 944.

[7] *See* Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified); and (II) Granting Related Relief, Dkt. 1943.

[8] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).

Ms. Nan R. Eitel
November 3, 2021
Page 5

management, and representatives on creditors' committees abide by their reporting obligations and all other legal requirements. Bankruptcy is not meant to be a safe haven for lawlessness, nor is it designed to obfuscate the operations of the debtor. Instead, transparency is mandatory so that the debtor is accountable to stakeholders and so that stakeholders can ensure that all insiders are operating for the benefit of the estate.

### *In Highland's Bankruptcy, the Regulatory Framework Is Ignored*

Against this regulatory backdrop, and on the heels of high-profile bankruptcy abuses like those that occurred in the context of the Neiman Marcus bankruptcy, the Highland bankruptcy offered almost no transparency to stakeholders. Traditional reporting requirements were ignored. This opened the door to numerous abuses of process and potential violations of federal law, as detailed below.

As Mr. Draper already has highlighted, one significant problem in Highland's bankruptcy was the Debtor's failure to file *any* of the reports required under Bankruptcy Rule 2015.3, either on behalf of itself or its affiliated entities. Typically, such reports would include information like asset value, income from financial operations, profits, and losses for each non-publicly traded entity in which the estate has a substantial or controlling interest. This was very important here, where the Debtor held the bulk of its value—hundreds of millions of dollars—in non-debtor subsidiaries. The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[9] Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-value determinations.[10] Rather than disclose financial information that was readily available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency.

In stark contrast to its non-existent public disclosures, the Debtor provided the Creditors' Committee with robust weekly information regarding transactions involving assets held by the Debtor or its wholly-owned subsidiaries, transactions involving managed entities and non-managed entities in which the Debtor held an interest, transactions involving non-discretionary accounts, and weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee member had real-time financial information with respect to the affairs of non-debtor affiliates, which is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3. Yet, the fact that the Committee members alone had this information enabled some of them to trade on it, for their personal benefit.

The Debtor's management failed and refused to make other critical disclosures as well. As explained in detail below, during the bankruptcy proceedings, the Debtor sold off sizeable assets without any notice and without seeking Bankruptcy Court approval. The Debtor characterized these transactions as the "ordinary course of business" (allowing it to avoid the Bankruptcy Court approval process), but

---

[9] *See* Dkt. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

[10] During a deposition, Mr. Seery identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities below the Debtor. *See* Exh. A (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

Ms. Nan R. Eitel
November 3, 2021
Page 6

they were anything but ordinary. In addition, the Debtor settled the claims of at least one creditor—former Highland employee Patrick Daugherty—without seeking court approval of the settlement pursuant to Federal Rule of Bankruptcy Procedure 9019. We understand that the Debtor paid Mr. Daugherty $750,000 in cash as part of that settlement, done as a "settlement" to obtain Mr. Daugherty's withdrawal of his objection to the Debtor's plan.

Despite all of these transparency problems, the Debtor's confirmed Plan contains provisions that effectively release the Debtor from its obligation to file *any* of the reports due for *any* period prior to the effective date—thereby sanctioning the Debtor's failure and refusal to follow the rules. The U.S. Trustee also failed to object to this portion of the Court's order of confirmation, which is directly at odds with the spirit and mandate of the Periodic Reporting Requirements recently adopted by the EOUST and historical rules mandating transparency.[11]

As will become apparent, because neither the federal Bankruptcy Court nor the U.S. Trustee advocated or demanded compliance with the rules, the Debtor, its newly-appointed management, and the Creditors' Committee charged with protecting the interests of all creditors were able to manipulate the estate for the benefit of a handful of insiders, seemingly in contravention of law.

**Debtor And Debtor-Affiliate Assets Were Deliberately Hidden and Mischaracterized**

Largely because of the Debtor's failure to file Rule 2015.3 reports for affiliate entities, interested parties and creditors wishing to evaluate the worth and mix of assets held in non-Debtor affiliates could not do so. This is particularly problematic, because during proceedings, the Debtor sold $172 million in assets, which altered the mix of assets and liabilities of the Debtor's affiliates and controlled entities. In addition, the estate's asset value decreased by approximately $200 million in a matter of months. Absent financial reporting, it was impossible for stakeholders to determine whether the $200 impairment in asset value reflected actual realized losses or merely temporary mark-downs precipitated by problems experienced by certain assets during the pandemic (including labor shortages, supply-chain issues, travel interruptions, and the like). Although the Bankruptcy Court held that such sales did not require Court approval, a Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity—information that was critical in evaluating the worth of claims against the estate or future investments into it.

One transaction that was particularly problematic involved alleged creditor HarbourVest, a private equity fund with approximately $75 billion under management. Prior to Highland's bankruptcy, HarbourVest had invested $80 million into (and obtained 49.98% of the outstanding shares of) a Highland fund called Acis Loan Funding, later rebranded as Highland CLO Funding, Ltd. ("HCLOF"). A charitable fund called Charitable DAF Fund, L.P. ("DAF") held 49.02% member interests in HCLOF, and the remaining □2.00% was held by Highland and certain of its employees. Prior to Highland's bankruptcy proceedings, a dispute arose between HarbourVest and Highland, in which HarbourVest claimed it was duped into making the investment because Highland allegedly failed to disclose key facts relating to the investment (namely, that Highland was engaged in ongoing litigation with former employee, Josh Terry,

---

[11] See "*Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11*" (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906.

Ms. Nan R. Eitel
November 3, 2021
Page 7

which would result in HCLOF's incurring legal fees and costs). HarbourVest alleged that, as a result of the Terry lawsuit, HCLOF incurred approximately $15 million in legal fees and costs.[12]

In the context of Highland's bankruptcy, however, HarbourVest filed a proof of claim alleging that it was due over $300 million in damages in the dispute, a claim that bore no relationship to economic reality. As a result, Debtor management initially valued HarbourVest's claims at $0, a value consistently reflected in the Debtor's publicly-filed financial statements, up through and including its December 2020 Monthly Operating Report.[13] Eventually, however, the Debtor announced a settlement with HarbourVest which entitled HarbourVest to $45 million in Class 8 claims and $35 million in Class 9 claims.[14] At the time, the Debtor's public disclosures reflected that Class 8 creditors could expect to receive approximately 70% payout on their claims, and Class 9 creditors could expect 0.00%. In other words, HarbourVest's total $80 million in allowed claims would allow HarbourVest to realize a $31.5 million return.[15]

As consideration for this potential payout, HarbourVest agreed to convey its interest in HCLOF to a special-purpose entity ("SPE") designated by the Debtor (a transaction that involved a trade of securities) and to vote in favor of the Debtor's Plan. In its pleadings and testimony in support of the settlement, the Debtor represented that the value of HarbourVest's interest in HCLOF was $22.5 million. It later came to light, however, that the actual value of that asset was at least $44 million.

There are numerous problems with this transaction which may not have occurred with the requisite transparency. As a registered investment advisor, the Debtor had a fiduciary obligation to disclose the true value of HarbourVest's interest in HCLOF to investors in that fund. The Debtor also had a fiduciary obligation to offer the investment opportunity to the other investors prior to purchasing HarbourVest's interest for itself. Mr. Seery has acknowledged that his fiduciary duties to the Debtor's managed funds and investors supersedes any fiduciary duties owed to the Debtor and its creditors in bankruptcy. Nevertheless, the Debtor and its management appear to have misrepresented the value of the HarbourVest asset, brokered a purchase of the asset without disclosure to investors, and thereafter placed the HarbourVest interest into a non-reporting SPE.[16] This meant that no outside stakeholder had any ability to assess the value of that interest, nor could any outsider possibly ascertain how the acquisition of that interest impacted the bankruptcy estate. In the absence of Rule 2015.3 reports or listing of the HCLOF interest on the Debtor's balance sheet, it was impossible to determine at the time of the HarbourVest settlement (or thereafter) whether the Debtor properly accounted for the asset on its balance sheet.

Highland engaged in several other asset sales in bankruptcy without disclosing those sales in advance to outside stakeholders or investors, and without offering investors in funds impacted by the sales the opportunity to purchase the assets. For example:

---

[12] Assuming that HarbourVest were entitled to fraud damages as it claimed, the true amount of its damages was less than $7.5 million (because HarbourVest only would have borne 49.98% of the $15 million in legal fees).
[13] *See* Monthly Operating Report for Highland Capital Management for the Month Ending December 2020, Dkt. 1949.
[14] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.
[15] We have reason to believe that HarbourVest's Class 8 and Class 9 claims were contemporaneously sold to Farallon Capital Management—an SEC-registered investment advisor—for approximately $28 million.
[16] Even former Highland employee Patrick Daugherty recognized the problematic nature of asset dispositions like the one involving HarbourVest, commenting that such transactions "have left [Mr. Seery] and Highland vulnerable to a counter-attack under the [Investment] Advisors Act." *See* Ex. B.

Ms. Nan R. Eitel
November 3, 2021
Page 8

- The Debtor sold approximately $25 million of NexPoint Residential Trust shares that today are valued at over $70 million; the Debtor likewise sold $6 million of PTLA shares that were taken over less than 60 days later for $18 million.

- The Debtor divested interests worth $145 million held in certain life settlements (which paid on the death of the individuals covered, whose average age was 90) for $35 million rather than continuing to pay premiums on the policies, and did so without obtaining updated estimates of the life settlements' value, to the detriment of the fund and investors (today two of the covered individuals have a life expectancy of less than one year);

- The Debtor sold interests in OmniMax without informing the Bankruptcy Court, without engaging in a competitive bidding process, and without cooperating with other funds managed by Mr. Dondero, resulting in what we believe is substantially lesser value to investors;

- The Debtor sold interests in Structural Steel Products (worth $50 million) and Targa (worth $37 million), again without any process or notice to the Bankruptcy Court or outside stakeholders, resulting in what we believe is diminished value for the estate and investors.

Because the Bankruptcy Code does not define what constitutes a transaction in the "ordinary course of business," the Debtor's management was able to characterize these massive sales as ordinary course transactions when they were anything but ordinary, resulting in diminution in value to the estate and its creditors.

In summary, the consistent lack of transparency throughout bankruptcy proceedings facilitated sales and deal-making that failed to maximize value for the estate and precluded outside stakeholders from evaluating or participating in asset purchases or claims trading that might have benefitted the estate and outside investors in Debtor-managed funds.

**The Debtor Reneged on Its Promise to Pay Key Employees, Contrary to Sworn Testimony**

Highland's bankruptcy also diverges from the norm in its treatment of key employees, who usually can expect to be fairly compensated for pre-petition work and post-petition work done for the benefit of the estate. That did not happen here, despite the Debtor's representation to the Bankruptcy Court that it would.

By way of background, prior to its bankruptcy, Highland offered employees two bonus plans: an Annual Bonus Plan and a Deferred Bonus Plan. Under the Annual Bonus Plan, all of Highland's employees were eligible for a yearly bonus payable in up to four equal installments, at six-month intervals, on the last business day of each February and August. Under the Deferred Bonus Plan, Highland's employees were awarded shares of a designated publicly traded stock, the right to which vested 39 months later. Under both bonus plans, the only condition to payment was that the employee be employed by Highland at the time the award (or any portion of it) vested.

At the outset of the bankruptcy proceedings, the Debtor promised that pre-petition bonus plans would be honored. Specifically, in its Motion For Entry of an Order Authorizing the Debtor to Pay and Honor Ordinary Course Obligations Under Employee Bonus Plans and Granting Related Relief, the Debtor informed the Court that employee bonuses "continue[d] to be earned on a post-petition basis," and that "employee compensation under the Bonus Plans [was] critical to the Debtor's ongoing

Ms. Nan R. Eitel
November 3, 2021
Page 9

operations and that any threat of nonpayment under such plans *would have a potentially catastrophic impact on the Debtor's reorganization efforts.*"[17] Significantly, the Debtor explained to the Court that its operations were leanly staffed, such that all employees were critical to ongoing operations and such that it expected to compensate all employees. As a result of these representations, key employees continued to work for the Debtor, some of whom invested significant hours at work ensuring that the Debtor's new management had access to critical information for purposes of reorganizing the estate.

Having induced Highland's employees to continue their employment, the Debtor abruptly changed course, refusing to pay key employees awards earned pre-petition under the Annual Bonus Plan and bonuses earned pre-petition under the Deferred Bonus Plan that vested post-petition. In fact, Mr. Seery chose to terminate four key employees just before the vesting date in an effort to avoid payment, despite his repeated assurances to the employees that they would be "made whole." Worse still, notwithstanding the Debtor's failure and refusal to pay bonuses earned and promised to these terminated employees, in Monthly Operating Reports signed by Mr. Seery under penalty of perjury, the Debtor continued to treat the amounts owed to the employees as post-petition obligations, which the Debtor continued to accrue as post-petition liabilities even after termination of their employment.

The Debtor's misrepresentations to the Bankruptcy Court and to the employees themselves fly in the face of usual bankruptcy procedure. As the Fifth Circuit has explained, administrative expenses like key employee salaries are an "'actual and necessary cost" that provides a "benefit to the state and its creditors."[18] It is undisputed that these employees continued to work for the Debtor, providing an unquestionable benefit to the estate post-petition, but were not provided the promised compensation, for reasons known only to the Debtor.

Again, this is not business as usual in bankruptcy proceedings, and if we are to ensure the continued success of debtors in reorganization proceedings, it is important that key employees be paid in the ordinary course for their efforts in assisting debtors and that debtor management be made to live up to promises made under penalty of perjury to the bankruptcy courts.

**There Is Substantial Evidence that Insider Trading Occurred**

Perhaps one of the biggest problems with the lack of transparency at every step is that it facilitated potential insider trading. The Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) had access to critical information upon which any reasonable investor would rely. But because of the lack of reporting, the public did not.

Mr. Draper's October 4, 2021 letter sets forth in detail the reasons for suspecting that insider trading occurred, but his explanation bears repeating here.  In the context of a non-transparent bankruptcy proceeding, three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers, Muck Holdings LLC ("Muck") and Jessup Holdings LLC ("Jessup"). The four claims sold comprise the largest four claims in the Highland bankruptcy by a substantial margin,[19] collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims:

---

[17] *See* Dkt. 177, ¶ 25 (emphasis added).
[18] *Texas v. Lowe (In re H.L.S. Energy Co.)*, 151 F.3d 434, 437 (5th Cir. 1998) (quoting *Transamerican Natural Gas Corp.*, 978 F.2d 1409, 1416 (5th Cir. 1992)).
[19] *See* Ex. C.

Ms. Nan R. Eitel
November 3, 2021
Page 10

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| TOTAL: | $269,6969,610 | $95,000,000 | |

Muck is owned and controlled by Farallon Capital Management ("Farallon"), and we believe Jessup is owned and controlled by Stonehill Capital Management ("Stonehill"). As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon) and Jessup (Stonehill) will oversee the liquidation of the reorganized Debtor and the payment over time to creditors who have not sold their claims. These two hedge funds also will determine the performance bonus due to Mr. Seery for liquidating the estate. As set forth in the attached balance sheet dated August 31, 2021, we estimate that the estate today is worth nearly $600 million,[20] which could result in Mr. Seery's receipt of a performance bonus approximating $50 million.

This is concerning because there is substantial evidence that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims. We agree with Mr. Draper that there are three primary reasons to believe that non-public information was made available to facilitate these claims purchases:

- The scant publicly-available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that actually was publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims;

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

Credible information indicates that the claims purchases of Stonehill and Farallon can be summarized as follows:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[21] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |

---

[20] *See* Ex. D.
[21] *See* Ex. E. Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

Ms. Nan R. Eitel
November 3, 2021
Page 11

An analysis of publicly-available information would have revealed to any potential investor that:

- The estate's asset value had decreased by $200 million, from $556 million on October 16, 2019, to $328 million as of September 30, 2020 (increasing only slightly to $364 million as of January 31, 2021).[22]

- Allowed claims against the estate increased by a total amount of $236 million.

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for creditors in bankruptcy decreased from 87.44% to 62.99% in just a matter of months.[23]

No prudent investor or hedge fund investing third-party money would purchase substantial claims out of the Highland estate based on this publicly-available information absent robust due diligence demonstrating that the investment was sound.

As discussed by Mr. Draper, the very close relationships between the claims purchasers, on the one hand, and the selling Creditors' Committee members and the Debtor's management, on the other hand also raise red flags. In particular:

- Farallon and Stonehill have long-standing, material relationships with the members of the Creditors' Committee and Mr. Seery. Mr. Seery formerly was the Global Head of Fixed Income Loans at Lehman Bros. until its collapse in 2009. While Mr. Seery was Global Head, Lehman Bros. did substantial business with Farallon. After Lehman's collapse, Mr. Seery joined Sidley & Austin as co-head of the corporate restructuring and bankruptcy group, where he worked with Matt Clemente, counsel to the Creditors' Committee in Highland's bankruptcy proceedings.

- In addition, Grovesnor, one of the lead investors in the Crusader Funds from the Redeemer Committee (which appointed Seery as its independent director) both played a substantial role on the Creditors' Committee and is a large investor in Farallon and Stonehill. It is unclear whether Grovesnor, a registered investment advisor, notified minority investors in the Crusader Funds or Farallon and Stonehill of these facts.

- According to Farallon principals Raj Patel and Michael Linn, while at Sidley, Mr. Seery assisted Farallon in its acquisition of claims in the Lehman estate, and Farallon realized more than $100 million in claims on those trades.

---

[22] *Compare* Jan. 31, 2021 Monthly Operating Report [Dkt. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Dkt. 1473]. The increase in value between September 2020 and January 2021 is attributable to the Debtor's settlement with HarbourVest, which granted HarbourVest a Class 8 claim of $45 million and a Class 9 Claim of $35 million, and in exchange the Debtor received HarbourVest's interest in HCLOF, which in reality was worth approximately $44.3 million as of January 31, 2021. *See* Ex. C. It is also notable that the January 2021 monthly financial report values Class 8 claims at $267 million, an exponential increase over their estimated value of $74 million in December 2020.
[23] *See* Ex. F.

Ms. Nan R. Eitel
November 3, 2021
Page 12

- Also while at Sidley, Mr. Seery represented the Steering Committee in the Blockbuster Video bankruptcy; Stonehill (through its Managing Member, John Motulsky) was one of the five members of the Steering Committee.

- Mr. Seery left Sidley in 2013 to become the President and Senior Investment Partner of River Birch Capital, a hedge fund founded by his former Lehman colleagues. He left River Birch in October 2017 just before the fund imploded. In 2017, River Birch and Stonehill Capital were two of the biggest note holders in the Toys R Us bankruptcy and were members of the Toys R Us creditors' committee.

I strongly agree with Mr. Draper that it is suspicious that two firms with such significant ties to Mr. Seery have purchased $365 million in claims. The aggregate $150 million purchase price paid by Farallon and Stonehill is 56% of all Class 8 claims, virtually the full plan value expected to be realized after two years. We believe it is worth investigating whether these claims buyers had access to material, non-public information regarding the actual value of the estate.

Other transactions occurring during the Highland bankruptcy also reinforce the suspicion that insider trading occurred. In particular, it appears that one of the claims buyers, Stonehill, used non-public information obtained incident to the bankruptcy to purchase stock in NexPoint Strategic Opportunities Fund (NYSE: NHF), a publicly traded, closed-end '40 Act fund with many holdings in common with assets held in the Highland estate outlined above. Stonehill is a registered investment adviser with $3 billion under management that has historically owned very few equity interests, particularly equity interests in a closed-end fund. As disclosed in SEC filings, Stonehill acquired enough stock in NHF during the second quarter of 2021 to make it Stonehill's eighth largest equity position.

The timing of the acquisitions of claims by Farallon and Stonehill also raises suspicion. For example, although notices of the transfer of the claims were filed immediately after the confirmation of the Debtor's Plan and prior to the effective date of the Plan, it seems likely that negotiations began much earlier. Transactions of this magnitude do not take place overnight and typically require robust due diligence. Muck was formed on March 9, 2021, more than a month before it filed notice that it was purchasing the Acis claim. If the negotiation or execution of a definitive agreement for the purchase began before or contemporaneously with Muck's formation, then there is every reason to believe that selling Creditors' Committee members and/or Debtor management provided Farallon with critical non-public information well before the Creditors' Committee members sold their claims and withdrew from the Committee. Indeed, Mr. Patel and Mr. Linn have stated to others that they purchased the Acis and HarbourVest claims in late January or early February. This is strong evidence that negotiation and/or agreements relating to the purchase of claims from Creditors' Committee members preceded the confirmation of the Debtor's Plan and the resignation of those members from the Committee.

Likewise, correspondence from the fund adviser to the Crusader Funds indicates that the Crusader Funds and the Redeemer Committee had "consummated" the sale of the Redeemer Committee's claims and other assets on April 30, 2021, "for $78 million in cash, which was paid in full to the Crusader Funds at closing."[24] In addition, that there was a written agreement among Stonehill, the Crusader Funds, and the Redeemer Committee that sources indicate dates back to the fourth quarter of 2020. That agreement presumably imposed affirmative and negative covenants upon the seller and granted the purchaser discretionary approval rights during the pendency of the sale. Such an agreement would necessarily conflict with the Creditors' Committee members' fiduciary obligations.

---

[24] See Ex. E.

Ms. Nan R. Eitel
November 3, 2021
Page 13

The sale of the claims by the members of the Creditors' Committee also violates the instructions provided to committee members by the U.S. Trustee that required a selling committee member to obtain approval from the Bankruptcy Court prior to any sale of such member's claim. No such Court approval was ever sought or obtained, and the Dallas U.S. Trustee's Office took no action to enforce this guideline. The Creditors' Committee members were sophisticated entities, and they were privy to inside information that was not available to other unsecured creditors. For example, valuations of assets placed into a specially-created affiliated entities, such as the assets acquired in the HarbourVest settlement, and valuations of assets held by other entities owned or controlled by the Debtor, were available to the selling Creditors' Committee members, but not to other creditors or parties-in-interest.

While claims trading itself is not prohibited, there is reason to believe that the claims trading that occurred in the Highland bankruptcy violated federal law:

a)  The selling parties were *three* of the four Creditors' Committee members, and each one had access to information they received in a fiduciary capacity;

b)  Some of the information they received would have been available to other parties-in-interest if Rule 2015.3 had been enforced;

c)  The projected recovery to creditors decreased significantly between the approval of the Disclosure Statement and the confirmation of the Debtor's Plan; and

d)  There was a suspicious purchase of stock by Stonehill in NHF, a closed-end fund previously affiliated with Highland (and now managed by NexPoint Advisors, L.P.) that is publicly traded on the New York stock exchange. The Debtor's assets and the positions held by the closed-end fund are similar.

**Mr. Seery's Compensation Structure Encouraged Misrepresentations Regarding the Value of the Estate and Assets of the Estate**

An additional problem in Highland's bankruptcy is that Mr. Seery, as an Independent Director as well as the Debtor's CEO and CRO, received financial incentives that encouraged claims trading and dealing in insider information.

Mr. Seery received sizeable compensation for his heavy-handed role in Highland's bankruptcy. Upon his appointment as an Independent Director in January 2020, Mr. Seery received compensation from the Debtor of $60,000 per month for the first three months, $50,000 per month for the following three months, and $30,000 per month for remaining months, subject to adjustment by agreement with the Debtor.[25] When Mr. Seery subsequently was appointed the Debtor's CEO and CRO in July 2020, he received additional compensation, including base compensation of $150,000 per month retroactive to March 2020 and for so long as he served in those roles, as well as a "Restructuring Fee."[26] Mr. Seery's employment agreement contemplated that the Restructuring Fee could be calculated in one of two ways:

(1)  If Mr. Seery were able to resolve a material amount of outstanding claims against the estate, he would be entitled to $1 million on confirmation of what the Debtor termed a

---

[25] *See* Dkt. 339, ¶ 3.
[26] *See* Dkt. 854, Ex. 1.

Ms. Nan R. Eitel
November 3, 2021
Page 14

"Case Resolution Plan," $500,000 at the effective date of the Case Resolution Plan, and $750,000 upon completion of distributions to creditors under the plan.

(2)     If, by contrast, Mr. Seery were not able to resolve the estate and instead achieved a "Monetization Vehicle Plan," he would be entitled to $500,000 on confirmation of the Monetization Vehicle Plan, $250,000 at the effective date of that plan, and—most importantly—a to-be-determined "contingent restructuring fee" based on "performance under the plan after all material distributions" were made.[27]

The Restructuring Fee owed for a Case Resolution Plan was materially higher than that payable under the Monetization Vehicle Plan and provided a powerful economic incentive for Mr. Seery to resolve creditor claims in any way possible. Notably, at the time of Mr. Seery's formal appointment as CEO/CRO, he had already negotiated settlements in principle with Acis and the Redeemer Committee, leaving only the HarbourVest and UBS claims to resolve.

Further, after the Plan's effective date, as appointed Claimant Trustee, Mr. Seery was promised compensation of $150,000 per month (termed his "Base Salary"), subject to the negotiation of additional "go-forward" compensation, including a "success fee" and severance pay.[27] Mr. Seery's success fee presumably will be based on whether the Plan outperforms what was disclosed in the Plan Analysis. In other words, Mr. Seery had a financial incentive to grossly understate the value of the estate in public disclosures, not only to facilitate claims trading and resolution of the biggest claims in bankruptcy (for purposes of obtaining the larger Case Resolution Fee) but also to ensure that he eventually receives a large "success fee." Again, we estimate that, based on the estate's nearly $600 million value today, Mr. Seery's success fee could approximate $50 million.

One excellent example of the way in which Mr. Seery facilitated claims trading and thereby lined his own pockets is the sale of UBS's claim. Based on the publicly-available information at the time Stonehill and Farallon purchased the UBS claim, the purchase made no economic sense. At the time, the publicly-disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean believe is that, at the time of their claims purchase, the estate actually was worth much, much more (between $472-$600 million). If, prior to their claims purchases, Mr. Seery (or others in the Debtor's management) apprised Stonehill and Farallon of the true estate value (which was material, non-public information at the time), then the value they paid for the UBS claim made sense, because they would have known they were likely to recover close to 100% on Class 8 and Class 9 claims.

But perhaps the most important evidence of mismanagement of this bankruptcy proceeding and misalignment of financial incentives is the Debtor's repeated refusal to resolve the estate in full despite dozens of opportunities to do so. Immediately prior to the Plan confirmation hearing, Judge Jernigan suggested that the Creditors' Committee and Mr. Dondero attempt to reach a settlement. Mr. Dondero, through counsel, already had made 35 offers of settlement that would have maximized the estate's recovery, even going so far as to file a proposed plan of reorganization.  Some of these offers were valued between $150 and $232 million. And we now believe that as of August 1, 2020, the Debtor's estate had an actual value of at least $460 million, including $105 million in cash and a $50 million revolving credit facility. With Mr. Dondero's offer, the Debtor's cash and the credit facility could have resolved the estate, which would have enabled the Debtor to pay all proofs of claim, leave a residual estate intact for equity holders, and allow the company to continue to operate as a going concern.

---

[27] *See* Plan Supplement, Dkt. 1875, § 3.13(a)(i).

Ms. Nan R. Eitel
November 3, 2021
Page 15

Nonetheless, neither the Debtor nor the Creditors' Committee responded to Mr. Dondero's offers. It was not until The Honorable Former Judge D. Michael Lynn, counsel for Mr. Dondero, reminded the Creditors' Committee counsel that its members had a fiduciary duty to respond that a response was forthcoming. We believe Mr. Dondero's proposed plan offered a materially greater recovery than what the Debtor had reported would be the expected Plan recovery. The Creditors' Committee's failure to timely respond to that offer suggests that Debtor management, the Creditors' Committee, or both were financially disincentivized from accepting a case resolution offer and that some members of the Creditors' Committee were contractually constrained from doing so.

What happened instead was that the Debtor, its management, and the Creditors' Committee brokered deals that allowed grossly inflated claims and sales of those claims to a small group of investors with significant ties to Debtor management. In a transparent bankruptcy proceeding, we question whether any of this could have happened. What we do know is that the Debtor's non-transparent bankruptcy has ensured there will be nothing left for residual stakeholders, while enriching a handful of intimately connected individuals and investors.

**The Debtor's Management and Advisors Are Almost Totally Insulated From Liability**

Despite the mismanagement of bankruptcy proceedings, the Bankruptcy Court has issued a series of orders ensuring that the Debtor and its management cannot not be held liable for their actions in bankruptcy.

In particular, the Court issued a series of orders protecting Mr. Seery from potential liability for any act undertaken in the management of the Debtor or the disposition of its assets:

- In its order approving the settlement between the Creditors' Committee and Mr. Dondero, the Court barred any Debtor entity "from commenc[ing] or pursu[ing] a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director" unless the Court first (1) determined the claim was a "colorable" claim for willful misconduct or gross negligence, and (2) authorized an entity to bring the claim. The Court also retained "sole jurisdiction" over any such claim.[28]

- In its order approving the Debtor's retention of Mr. Seery as its Chief Executive Officer and Chief Restructuring Officer, the Court issued an identical injunction barring any claims against Mr. Seery in his capacity as CEO/CRO without prior court approval.[29] The same order authorized the Debtor to indemnify Mr. Seery for any claims or losses arising out of his engagement as CEO/CRO.[30]

Worse still, the Plan approved by the Bankruptcy Court contains sweeping release and exculpation provisions that make it virtually impossible for third parties, including investors in the Debtor's managed funds, to file claims against the Debtor, its related entities, or their management. The Plan's exculpation provisions contain also contain a requirement that any potential claims be vetted and approved by the Bankruptcy Court. As Mr. Draper already explained, these provisions violate the holding

---

[28] Dkt. 339, ¶ 10.
[29] Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Office, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854, ¶ 5.
[30] Dkt. 854, ¶ 4 & Exh. 1.

Ms. Nan R. Eitel
November 3, 2021
Page 16

of *In re Pacific Lumber Co.*, in which the United States Court of Appeals for the Fifth Circuit rejected similarly broad exculpation clauses.[31]

The fundamental problem with the Plan's broad exculpation and release provisions has been brought into sharp focus in recent days, with the filing of a lawsuit by the Litigation Trustee against Mr. Dondero, other individuals formerly affiliated with Highland, and several trusts and entities affiliated with Mr. Dondero.[32] Among other false accusations, that lawsuit alleges that the aggregate amount of allowed claims in bankruptcy was high because the Debtor and its management were forced to settle with various purported judgment creditors who had engaged in pre-petition litigation with Mr. Dondero and Highland. But it was Mr. Seery and Debtor's management, not Mr. Dondero and the other defendants, who negotiated those settlements with creditors in bankruptcy and who decided what value to assign to their claims. Ordinarily, Mr. Dondero and the other defendants could and would file compulsory counterclaims against the Debtor and its management for their role in brokering and settling claims in bankruptcy. But the Bankruptcy Court has effectively precluded such counterclaims (absent the defendants obtaining the Court's advance permission to assert them) by releasing the Debtor and its management from virtually all liability in relation to their roles in the bankruptcy case. That is a violation of due process.

Notably, the U.S. Trustee's Office recently has argued in the context of the bankruptcy of Purdue Pharma that release and exculpations clauses akin to those contained in Highland's Plan violate both the Bankruptcy Code and the Due Process Clause of the United States Constitution.[33] In addition, the U.S. Trustee explained that the bankruptcy courts lack constitutional authority to release state-law causes of action against debtor management and non-debtor entities.[34] Indeed, it has been the U.S. Trustee's position that where, as here, third parties whose claims are being released did not receive notice of the releases and had no way of knowing, based on the applicable plan's language, what claims were extinguished, third-party releases are contrary to law.[35] This position comports with Fifth Circuit case law, which makes clear that releases must be consensual, and that the released party must make a substantial contribution in exchange for any release.

As a result of the release and exculpation provisions of the Plan, employees and third-party investors in entities managed by the Debtor who are harmed by actions taken by the Debtor and its management in bankruptcy are barred from asserting their claims without prior Bankruptcy Court approval. Those third parties' claims are barred notwithstanding that they were not notified of the releases and have never been given any information with which to evaluate their potential claims (as mentioned, the Debtor has not disclosed several major assets sales, nor does the Plan require the Debtor to disclose post-confirmation asset sales). Conversely, the releases insulate claims purchasers from the risk of potential actions by investors in funds managed by the Debtor (for breach of fiduciary duty, diminution in value, or otherwise). These releases are directly at odds with investors' expectations and the written documents delivered to and approved by investors when they invest in managed funds—i.e., that fund managers will act in a fiduciary capacity to maximize investors' returns and that investors will have recourse for any failure to do so.

---

[31] 584 F.3d 229 (5th Cir. 2009).

[32] The Plan created a Litigation Sub-Trust to be managed by a Litigation Trustee, whose sole mandate is to file lawsuits in an effort to realize additional value for the estate.

[33] *See* Memorandum of Law in Support of United States Trustee's Expedited Motion for Stay of Confirmation Order, *In re Purdue Pharma, L.P.*, Case No. 19-23649 (RDD) (Bankr. S.D.N.Y.), Doc. 3778 at 17-25.

[34] *Id.* at 26-28.

[35] *See id.* at 22.

Ms. Nan R. Eitel
November 3, 2021
Page 17

As an example, the Court approved the settlement of UBS's claim against the Debtor and two funds managed by the Debtor (collectively referred to as "MultiStrat"). Pursuant to that settlement, MultiStrat agreed to pay UBS $18.5 million. But the settlement made no sense for several reasons. First, Highland owns approximately 48% of MultiStrat, so causing MultiStrat to make such a substantial payment to settle a claim in Highland's bankruptcy necessarily negatively impacted its other non-Debtor investors. Second, in its lawsuit, UBS alleged that MultiStrat wrongfully received a $6 million payment, but MultiStrat paid more than three times this amount to settle allegations against it—a deal that made little economic sense. Finally, as part of the settlement, MultiStrat represented that it was advised by "independent legal counsel" in the negotiation of the settlement, a representation that was patently untrue.[36] In reality, the only legal counsel advising MultiStrat was the Debtor's counsel, who had economic incentives to broker the deal in a manner that benefited the Debtor rather than MultiStrat and its investors.[37] If (as it seems) that representation and/or the terms of the UBS/MultiStrat settlement unfairly impacted MultiStrat's investors, they now have no recourse against the Debtor. The release and exculpation provisions in Highland's Plan do not afford third parties any meaningful recourse, even when they are negatively impacted by misrepresentations of the type contained in the UBS/MultiStrat settlement or when their interests are impaired by fund managers' failure to obtain fairness opinions to resolve conflicts of interest.

**Bankruptcy Proceedings Are Used As an End-Run Around Applicable Legal Duties**

The UBS deal is but one example of how Highland's bankruptcy proceedings, including the settlement of claims and claims trading that occurred, seemingly provided a safe harbor for violations of multiple state and federal laws. For example, the Investment Advisors Act of 1940 requires registered investment advisors like the Debtor to act as fiduciaries of the funds that they manage. Indeed, the Act imposes an "affirmative duty of 'utmost good faith' and full and fair disclosure of material facts" as part of advisors' duties of loyalty and care to investors. *See* 17 C.F.R. Part 275. Adherence to these duties means that investment advisors cannot buy securities for their account prior to buying them for a client, cannot make trades that may result in higher commissions for the advisor or their investment firm, and cannot trade using material, non-public information. In addition, investment advisors must ensure that they provide investors with full and accurate information regarding the assets managed.

State blue sky laws similarly prohibit firms holding themselves out as investment advisors from breaching these core fiduciary duties to investors. For example, the Texas Securities Act prohibits any registered investment advisor from trading on material, non-public information. The Act also conveys a private right of action to investors harmed by breaches of an investment advisor's fiduciary duties.

As explained above, Highland executed numerous transactions during its bankruptcy that may have violated the Investment Advisors Act and state blue sky laws. Among other things:

- Highland facilitated the purchase of HarbourVest's interest in HCLOF (placing that interest in an SPE designated by the Debtor) without disclosing the true value of the interest and without first offering it to other investors in the fund;

---

[36] *See* Doc. 2389 (Order Approving Debtor's Settlement With UBS Securities LLC and UBS AG London Branch) at Ex. 1, §§ 1(b), 11; *see* Appendix, p. A-57.
[37] The Court's order approving the UBS settlement is under appeal in part based on MultiStrat's lack of independent legal counsel.

Ms. Nan R. Eitel
November 3, 2021
Page 18

- Highland concealed the estate's true value from investors in its managed funds, making it impossible for those investors to fairly evaluate the estate or its assets during bankruptcy;

- Highland facilitated the settlement of UBS's claim by causing MultiStrat, a non-Debtor managed entity, to pay $18.5 million to the Debtor, to the detriment of MultiStrat's investors; and

- Highland and its CEO/CRO, Mr. Seery, brokered deals between three of four Creditors' Committee members and Farallon and Stonehill—deals that made no sense unless Farallon and Stonehill were supplied material, non-public information regarding the true value of the estate.

In short, Mr. Seery effectuated trades that seemingly lined his own pockets, in transactions that we believe detrimentally impacted investors in the Debtor's managed funds.

## CONCLUSION

The Highland bankruptcy is an example of the abuses that can occur if the Bankruptcy Code and Bankruptcy Rules are not enforced and are allowed to be manipulated, and if federal law enforcement and federal lawmakers abdicate their responsibilities. Bankruptcy should not be a safe haven for perjury, breaches of fiduciary duty, and insider trading, with a plan containing third-party releases and sweeping exculpation sweeping everything under the rug. Nor should it be an avenue for opportunistic venturers to prey upon companies, their investors, and their creditors to the detriment of third-party stakeholders and the bankruptcy estate. My clients and I join Mr. Draper in encouraging your office to investigate, fight, and ultimately eliminate this type of abuse, now and in the future.

Best regards,

MUNSCH HARDT KOPF & HARR, P.C.

By: _____
Davor Rukavina, Esq.

DR:pdm

# Appendix

## Table of Contents

Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers ........................................... 2

Debtor Protocols [Doc. 466-1] ......................................................................................................... 3

Seery Jan. 29, 2021 Testimony ........................................................................................................ 15

Sale of Assets of Affiliates or Controlled Entities ........................................................................... 24

20 Largest Unsecured Creditors ....................................................................................................... 25

Timeline of Relevant Events ........................................................................................................... 26

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1] ........................................................ 27

Updated Liquidation Analysis (Feb. 1, 2021) .................................................................................. 28

Summary of Debtor's January 31, 2021 Monthly Operating Report .................................................. 29

Value of HarbourVest Claim ............................................................................................................. 30

Estate Value as of August 1, 2021 (in millions) ............................................................................... 31

HarbourVest Motion to Approve Settlement [Doc. 1625] ................................................................. 32

UBS Settlement [Doc. 2200-1] ....................................................................................................... 45

Hellman & Friedman Seeded Farallon Capital Management ............................................................. 62

Hellman & Friedman Owned a Portion of Grosvenor until 2020 ....................................................... 63

Farallon was a Significant Borrower for Lehman .............................................................................. 65

Mr. Seery Represented Stonehill While at Sidley ............................................................................ 66

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates ............. 67

Investor Communication to Highland Crusader Funds Stakeholders .................................................. 70

## Relationships Among Debtor's CEO/CRO, the UCC, and Claims Purchasers



**Page A-2**

## Debtor Protocols [Doc. 466-1]

I.  **Definitions**

A.  "Court" means the United States Bankruptcy Court for the Northern District of Texas.

B.  "NAV" means (A) with respect to an entity that is not a CLO, the value of such entity's assets less the value of its liabilities calculated as of the month end prior to any Transaction; and (B) with respect to a CLO, the CLO's gross assets less expenses calculated as of the quarter end prior to any Transaction.

C.  "Non-Discretionary Account" means an account that is managed by the Debtor pursuant to the terms of an agreement providing, among other things, that the ultimate investment discretion does not rest with the Debtor but with the entity whose assets are being managed through the account.

D.  "Related Entity" means collectively (A)(i) any non-publicly traded third party in which Mr. Dondero, Mr. Okada, or Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor) has any direct or indirect economic or ownership interest, including as a beneficiary of a trust; (ii) any entity controlled directly or indirectly by Mr. Dondero, Mr. Okada, Mr. Grant Scott, or Mr. John Honis (with respect to Messrs. Okada, Scott and Honis, only to the extent known by the Debtor); (iii) MGM Holdings, Inc.; (iv) any publicly traded company with respect to which the Debtor or any Related Entity has filed a Form 13D or Form 13G; (v) any relative (as defined in Section 101 of the Bankruptcy Code) of Mr. Dondero or Mr. Okada each solely to the extent reasonably knowable by the Debtor; (vi) the Hunter Mountain Investment Trust and Dugaboy Investment Trust; (vii) any entity or person that is an insider of the Debtor under Section 101(31) the Bankruptcy Code, including any "non-statutory" insider; and (viii) to the extent not included in (A)(i)-(vii), any entity included in the listing of related entities in **Schedule B** hereto (the "Related Entities Listing"); and (B) the following Transactions, (x) any intercompany Transactions with certain affiliates referred to in paragraphs 16.a through 16.e of the Debtor's cash management motion [Del. Docket No. 7]; and (y) any Transactions with Charitable DAF Fund, L.P. (provided, however, that additional parties may be added to this subclause (y) with the mutual consent of the Debtor and the Committee, such consent not to be unreasonably withheld).

E.  "Stage 1" means the time period from the date of execution of a term sheet incorporating the protocols contained below the ("Term Sheet") by all applicable parties until approval of the Term Sheet by the Court.

F.  "Stage 2" means the date from the appointment of a Board of Independent Directors at Strand Advisors, Inc. until 45 days after such appointment, such appointment being effective upon Court approval.

G.  "Stage 3" means any date after Stage 2 while there is a Board of Independent Directors at Strand Advisors, Inc.

H.  "Transaction" means (i) any purchase, sale, or exchange of assets, (ii) any lending or borrowing of money, including the direct payment of any obligations of another entity, (iii) the satisfaction of any capital call or other contractual

**Page A-3**

requirement to pay money, including the satisfaction of any redemption requests, (iv) funding of affiliates and (v) the creation of any lien or encumbrance.

I. "Ordinary Course Transaction" means any transaction with any third party which is not a Related Entity and that would otherwise constitute an "ordinary course transaction" under section 363(c) of the Bankruptcy Code.

J. "Notice" means notification or communication in a written format and shall include supporting documents necessary to evaluate the propriety of the proposed transaction.

K. "Specified Entity" means any of the following entities: ACIS CLO 2017-7 Ltd., Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, PamCo Cayman Ltd., Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Bristol Bay Funding Ltd. Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

II. **Transactions involving the (i) assets held directly on the Debtor's balance sheet or the balance sheet of the Debtor's wholly-owned subsidiaries, including Jefferies Prime Account, and (ii) the Highland Select Equity Fund, L.P., Highland Multi Strategy Credit Fund, L.P., and Highland Restoration Capital Partners**

A. **Covered Entities**: N/A (See entities above).

B. **Operating Requirements**

1. Ordinary Course Transactions do not require Court approval (All Stages).

    a) Stage 1 and Stage 2: ordinary course determined by the CRO.

    b) Stage 3: ordinary course determined by the Debtor.

2. Related Entity Transactions

    a) Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b) Stage 3:

    (1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

        (2)     Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3.    Third Party Transactions (All Stages)

    a)    Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

    c)    The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

**III.    Transactions involving entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above)**

A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities the Debtor manages and in which the Debtor holds a direct or indirect interest (other than the entities discussed in Section I above).[1]

B.    **Operating Requirements**

1.    Ordinary Course Transactions do not require Court approval (All Stages).

    a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

    b)    Stage 3: ordinary course determined by the Debtor.

2.    Related Entity Transactions

---

[1] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

a) Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) Stage 3:

(1) Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(2) Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

3. Third Party Transactions (All Stages)

a) Except as set forth in (b) and (c) below, Transactions in excess of $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require three business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b) The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable. The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c) The Debtor may satisfy margin calls and short covers without providing the Committee advance notice if the exigencies do not allow advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.

C. **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.

IV. **Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest**

    A.    **Covered Entities**: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest.[2]

    B.    **Operating Requirements**

        1.    Ordinary Course Transactions do not require Court approval (All Stages).

            a)    Stage 1 and Stage 2: ordinary course determined by the CRO.

            b)    Stage 3: ordinary course determined by the Debtor.

        2.    Related Entity Transactions

            a)    Stage 1 and Stage 2: Transactions with Related Entities require prior approval of CRO and five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

            b)    Stage 3:

                (1)    Transactions with Related Entities greater than $1,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require five business days advance notice to the Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

                (2)    Transactions with Related Entities greater than $2,000,000 (either individually or in the aggregate basis on a rolling 30 day period) require Court approval, which the Committee agrees may be sought on an expedited basis.

        3.    Third Party Transactions (All Stages):

            a)    Except (x) as set forth in (b) and (c) below and (y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party, any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to

---

[2] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**Page A-7**

Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

b)    The Debtor may satisfy any redemption requests from entities that are not Related Entities without advance notice so long as the Debtor provides notice of such Transactions to the Committee as soon as reasonably practicable.   The Debtor will provide the Committee with five business days advance notice of any redemption requests made by and payable to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

c)    The Debtor may take such steps as may be reasonably necessary to winddown any managed entity and make distributions as may be required in connection with such winddown to any required parties.  The Debtor will provide the Committee with five business days advance notice of any distributions to be made to a Related Entity, and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

C.    **Weekly Reporting**: The Debtor will provide the Committee with weekly reports showing all Transactions under this category.   Such reports will include Transactions involving a Specified Entity unless the Debtor is prohibited from doing so under applicable law or regulation or any agreement governing the Debtor's relationship with such Specified Entity.

V.    **Transactions involving entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest**

A.    Covered Entities: See **Schedule A** hereto.  **Schedule A** includes or will include all entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest.[3]

B.    Ordinary Course Transactions (All Stages): N/A

C.    Operating Requirements: N/A

D.    Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

---

[3] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A.  The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**VI.** **Transactions involving entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest**

    A. Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest.[4]

    B. Ordinary Course Transactions (All Stages): N/A

    C. Operating Requirements: N/A

    D. Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VII.** **Transactions involving Non-Discretionary Accounts**

    A. Covered Entities: See **Schedule A** hereto. **Schedule A** includes or will include all non-discretionary accounts.[5]

    B. Ordinary Course Transactions (All Stages): N/A

    C. Operating Requirements: N/A

    D. Weekly Reporting: Debtor will provide weekly reports of all cross-held asset Transactions, i.e. Transactions in which the Debtor or a Related Entity also holds a direct or indirect interest.

**VIII.** **Additional Reporting Requirements – All Stages (to the extent applicable)**

    A. DSI will provide detailed lists and descriptions of internal financial and operational controls being applied on a daily basis for a full understanding by the Committee and its professional advisors three (3) business days in advance of the hearing on the approval of the Term Sheet and details of proposed amendments to said financial and operational controls no later than seven (7) days prior to their implementation.

    B. The Debtor will continue to provide weekly budget to actuals reports referencing their 13-week cash flow budget, such reports to be inclusive of all Transactions with Related Entities.

**IX.** **Shared Services**

    A. The Debtor shall not modify any shared services agreement without approval of the CRO and Independent Directors and seven business days' advance notice to counsel for the Committee.

    B. The Debtor may otherwise continue satisfying its obligations under the shared services agreements.

---

[4] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

[5] The Debtor is continuing to review the Related Entities List and to determine whether any additional parties or entities should be included on Schedule A. The Debtor will update Schedule A as soon as reasonably practicable to the extent necessary.

**Page A-9**

## X. Representations and Warranties

A. The Debtor represents that the Related Entities Listing included as **Schedule B** attached hereto lists all known persons and entities other than natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

B. The Debtor represents that the list included as **Schedule C** attached hereto lists all known natural persons included in the definitions of Related Entities covered by Section I.D parts A(i)-(vii) above at the time of the execution of the Term Sheet.

C. The Debtor represents that, if at any time the Debtor becomes aware of any person or entity, including natural persons, meeting the definition of Related Entities covered by Section I.D parts A(1)-(vii) above that is not included in the Related Entities Listing or Schedule C, the Debtor shall update the Related Entities Listing or Schedule C, as appropriate, to include such entity or person and shall give notice to the Committee thereof.

## Schedule A[6]

Entities the Debtor manages and in which the Debtor holds a direct or indirect interest

1. Highland CLO Funding, Ltd. (0.63% Ownership Interest)
2. Dynamic Income Fund (0.26% Ownership Interest)

Entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest

1. Highland Prometheus Master Fund L.P.
2. NexAnnuity Life Insurance Company
3. PensionDanmark
4. Highland Argentina Regional Opportunity Fund
5. Longhorn A
6. Longhorn B
7. Collateralized Loan Obligations
   a) Rockwall II CDO Ltd.
   b) Grayson CLO Ltd.
   c) Eastland CLO Ltd.
   d) Westchester CLO, Ltd.
   e) Brentwood CLO Ltd.
   f) Greenbriar CLO Ltd.
   g) Highland Park CDO Ltd.
   h) Liberty CLO Ltd.
   i) Gleneagles CLO Ltd.
   j) Stratford CLO Ltd.
   k) Jasper CLO Ltd.
   l) Rockwall DCO Ltd.
   m) Red River CLO Ltd.
   n) Hi V CLO Ltd.
   o) Valhalla CLO Ltd.
   p) Aberdeen CLO Ltd.
   q) South Fork CLO Ltd.
   r) Legacy CLO Ltd.
   s) Pam Capital
   t) Pamco Cayman

Entities that the Debtor does not manage but in which the Debtor holds a direct or indirect interest

1. Highland Opportunistic Credit Fund
2. Highland Healthcare Opportunities Fund f/k/a Highland Long/Short Healthcare Fund
3. NexPoint Real Estate Strategies Fund
4. Highland Merger Arbitrage Fund
5. NexPoint Strategic Opportunities Fund
6. Highland Small Cap Equity Fund
7. Highland Global Allocation Fund

---

[6] NTD: Schedule A is work in process and may be supplemented or amended.

**Page A-11**

8. Highland Socially Responsible Equity Fund
9. Highland Income Fund
10. Stonebridge-Highland Healthcare Private Equity Fund ("Korean Fund")

11. SE Multifamily, LLC

Entities that the Debtor does not manage and in which the Debtor does not hold a direct or indirect interest

1. The Dugaboy Investment Trust
2. NexPoint Capital LLC
3. NexPoint Capital, Inc.
4. Highland IBoxx Senior Loan ETF
5. Highland Long/Short Equity Fund
6. Highland Energy MLP Fund
7. Highland Fixed Income Fund
8. Highland Total Return Fund
9. NexPoint Advisors, L.P.
10. Highland Capital Management Services, Inc.
11. Highland Capital Management Fund Advisors L.P.
12. ACIS CLO Management LLC
13. Governance RE Ltd
14. PCMG Trading Partners XXIII LP
15. NexPoint Real Estate Partners, LLC f/k/a HCRE Partners LLC
16. NexPoint Real Estate Advisors II LP
17. NexPoint Healthcare Opportunities Fund
18. NexPoint Securities
19. Highland Diversified Credit Fund
20. BB Votorantim Highland Infrastructure LLC
21. ACIS CLO 2017 Ltd.

Transactions involving Non-Discretionary Accounts

1. NexBank SSB Account
2. Charitable DAF Fund LP

## Schedule B

**Related Entities Listing (other than natural persons)**

APP. 2955

## Schedule C

1. James Dondero
2. Mark Okada
3. Grant Scott
4. John Honis
5. Nancy Dondero
6. Pamela Okada
7. Thomas Surgent
8. Scott Ellington
9. Frank Waterhouse
10. Lee (Trey) Parker

Seery Jan. 29, 2021 Testimony

```
                                                      Page 1
 1    IN THE UNITED STATES BANKRUPTCY COURT

 2    FOR THE NORTHERN DISTRICT OF TEXAS

 3    DALLAS DIVISION

 4    ------------------------------)

 5    In Re:                Chapter 11

 6    HIGHLAND CAPITAL        Case No.

 7    MANAGEMENT, LP,        19-34054-SGJ 11

 8

 9         Debtor

10    ------------------------------------

11

12

13     REMOTE DEPOSITION OF JAMES P. SEERY, JR.

14              January 29, 2021

15               10:11 a.m. EST

16

17

18

19

20

21

22

23
      Reported by:
24    Debra Stevens, RPR-CRR
      JOB NO. 189212
25
```

Page 2

```
 1            January 29, 2021
 2            9:00 a.m. EST
 3
 4       Remote Deposition of JAMES P.
 5   SEERY, JR., held via Zoom
 6   conference, before Debra Stevens,
 7   RPR/CRR and a Notary Public of the
 8   State of New York.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1   REMOTE APPEARANCES:
 2
 3   Heller, Draper, Hayden, Patrick, & Horn
 4   Attorneys for The Dugaboy Investment
 5   Trust and The Get Good Trust
 6        650 Poydras Street
 7        New Orleans, Louisiana 70130
 8
 9
10   BY:   DOUGLAS DRAPER, ESQ
11
12
13   PACHULSKI STANG ZIEHL & JONES
14   For the Debtor and the Witness Herein
15        780 Third Avenue
16        New York, New York 10017
17   BY:   JOHN MORRIS, ESQ.
18        JEFFREY POMERANTZ, ESQ.
19        GREGORY DEMO, ESQ.
20        IRA KHARASCH, ESQ.
21
22
23
24              (Continued)
25
```

Page 4

```
 1   REMOTE APPEARANCES:  (Continued)
 2
 3   LATHAM & WATKINS
 4   Attorneys for UBS
 5        885 Third Avenue
 6        New York, New York 10022
 7   BY:   SHANNON McLAUGHLIN, ESQ.
 8
 9   JENNER & BLOCK
10   Attorneys for Redeemer Committee of
11   Highland Crusader Fund
12        919 Third Avenue
13        New York, New York 10022
14   BY:   MARC B. HANKIN, ESQ.
15
16   SIDLEY AUSTIN
17   Attorneys for Creditors' Committee
18        2021 McKinney Avenue
19        Dallas, Texas 75201
20   BY:   PENNY REID, ESQ.
21        MATTHEW CLEMENTE, ESQ.
22        PAIGE MONTGOMERY, ESQ.
23
24              (Continued)
25
```

Page 5

```
 1   REMOTE APPEARANCES:  (Continued)
 2   KING & SPALDING
 3   Attorneys for Highland CLO Funding, Ltd.
 4        500 West 2nd Street
 5        Austin, Texas 78701
 6   BY:   REBECCA MATSUMURA, ESQ.
 7
 8   K&L GATES
 9   Attorneys for Highland Capital Management
10   Fund Advisors, L.P., et al.:
11        4350 Lassiter at North Hills
12         Avenue
13        Raleigh, North Carolina 27609
14   BY:   EMILY MATHER, ESQ.
15
16   MUNSCH HARDT KOPF & HARR
17   Attorneys for Defendants Highland Capital
18   Management Fund Advisors, LP; NexPoint
19   Advisors, LP; Highland Income Fund;
20   NexPoint Strategic Opportunities Fund and
21   NexPoint Capital, Inc.:
22        500 N. Akard Street
23        Dallas, Texas 75201-6659
24   BY:   DAVOR RUKAVINA, ESQ.
25              (Continued)
```

Page 6

```
1    REMOTE APPEARANCES (Continued)
2
3    BONDS ELLIS EPPICH SCHAFER JONES
4    Attorneys for James Dondero,
5    Party-in-Interest
6            420 Throckmorton Street
7
8            Fort Worth, Texas 76102
9    BY:    CLAY TAYLOR, ESQ.
10           JOHN BONDS, ESQ.
11           BRYAN ASSINK, ESQ.
12
13
14   BAKER McKENZIE
15   Attorneys for Senior Employees
16           1900 North Pearl Street
17
18           Dallas, Texas 75201
19   BY:    MICHELLE HARTMANN, ESQ.
20           DEBRA DANDEREAU, ESQ.
21
22
23
24               (Continued)
25
```

Page 7

```
1    REMOTE APPEARANCES: (Continued)
2
3    WICK PHILLIPS
4    Attorneys for NexPoint Real Estate
5    Partners, NexPoint Real Estate Entities
6    and NexBank
7            100 Throckmorton Street
8            Fort Worth, Texas 76102
9    BY:    LAUREN DRAWHORN, ESQ.
10
11   ROSS & SMITH
12   Attorneys for Senior Employees, Scott
13   Ellington, Isaac Leventon, Thomas Surgent,
14   Frank Waterhouse
15           700 N. Pearl Street
16           Dallas, Texas 75201
17   BY:    FRANCES SMITH, ESQ.
18
19
20
21
22
23
24
25
```

Page 8

```
1
2        E X A M I N A T I O N S
3    WITNESS                         PAGE
4    JAMES SEERY
5      By Mr. Draper                  9
6      By Mr. Taylor                 75
7      By Mr. Rukavina              165
8      By Mr. Draper                217
9
         E X H I B I T S
10   SEERY DYD
     EXHIBIT     DESCRIPTION        PAGE
11
     Exhibit 1    January 2021 Material   11
12
     Exhibit 2    Disclosure Statement    14
13
     Exhibit 3    Notice of Deposition    74
14
15
     INFORMATION/PRODUCTION REQUESTS
16   DESCRIPTION                     PAGE
17   Subsidiary ledger showing note    22
     component versus hard asset
18   component
19   Amount of D&O coverage for       131
     trustees
20
     Line item for D&O insurance      133
21
22        MARKED FOR RULING
              PAGE    LINE
23             85      20
24
25
```

Page 9

```
1
2         COURT REPORTER:  My name is
3    Debra Stevens, court reporter for TSG
4    Reporting and notary public of the
5    State of New York.  Due to the
6    severity of the COVID-19 pandemic and
7    following the practice of social
8    distancing, I will not be in the same
9    room with the witness but will report
10   this deposition remotely and will
11   swear the witness in remotely.  If any
12   party has any objection, please so
13   state before we proceed.
14         Whereupon,
15         J A M E S   S E E R Y,
16   having been first duly sworn/affirmed,
17   was examined and testified as follows:
18   EXAMINATION BY
19   MR. DRAPER:
20   Q.    Mr. Seery, my name is Douglas
21   Draper, representing the Dugaboy Trust.  I
22   have series of questions today in
23   connection with the 30(b) Notice that we
24   filed.  The first question I have for you,
25   have you seen the Notice of Deposition
```

Page A-17

Page 14

```
 1                J. SEERY
 2    the screen, please?
 3    A.    Page what?
 4    Q.    I think it is page 174.
 5    A.    Of the PDF or of the document?
 6    Q.    Of the disclosure statement that
 7    was filed.  It is up on the screen right
 8    now.
 9           COURT REPORTER:  Do you intend
10    this as another exhibit for today's
11    deposition?
12           MR. DRAPER:  We'll mark this
13    Exhibit 2.
14           (So marked for identification as
15    Seery Exhibit 2.)
16    Q.    If you look to the recovery to
17    Class 8 creditors in the November 2020
18    disclosure statement was a recovery of
19    87.44 percent?
20    A.    That actually says the percent
21    distribution to general unsecured
22    creditors was 87.44 percent.  Yes.
23    Q.    And in the new document that was
24    filed, given to us yesterday, the recovery
25    is 62.5 percent?
```

Page 15

```
 1                J. SEERY
 2    A.    It says the percent distribution
 3    to general unsecured creditors is
 4    62.14 percent.
 5    Q.    Have you communicated the
 6    reduced recovery to anybody prior to the
 7    date -- to yesterday?
 8           MR. MORRIS:  Objection to the
 9    form of the question.
10    A.    I believe generally, yes.  I
11    don't know if we have a specific number,
12    but generally yes.
13    Q.    And would that be members of the
14    Creditors' Committee who you gave that
15    information to?
16    A.    Yes.
17    Q.    Did you give it to anybody other
18    than members of the Creditors' Committee?
19    A.    Yes.
20    Q.    Who?
21    A.    HarbourVest.
22    Q.    And when was that?
23    A.    Within the last two months.
24    Q.    You did not feel the need to
25    communicate the change in recovery to
```

Page 16

```
 1                J. SEERY
 2    anybody else?
 3    A.    I said Mr. Doherty.
 4    Q.    In looking at the two elements,
 5    and what I have asked you to look at is
 6    the claims pool.  If you look at the
 7    November disclosure statement, if you look
 8    down Class 8, unsecured claims?
 9    A.    Yes.
10    Q.    You have 176,000 roughly?
11    A.    Million.
12    Q.    176 million.  I am sorry.  And
13    the number in the new document is 313
14    million?
15    A.    Correct.
16    Q.    What accounts for the
17    difference?
18    A.    An increase in claims.
19    Q.    When did those increases occur?
20    Were they yesterday?  A month ago?  Two
21    months ago?
22    A.    Over the last couple months.
23    Q.    So in fact over the last couple
24    months you knew in fact that the recovery
25    in the November disclosure statement was
```

Page 17

```
 1                J. SEERY
 2    not accurate?
 3    A.    Yes.  We secretly disclosed it
 4    to the Bankruptcy Court in open court
 5    hearings.
 6    Q.    But you never did bother to
 7    calculate the reduced recovery; you just
 8    increased --
 9           (Reporter interruption.)
10    Q.    You just advised as to the
11    increased claims pool.  Correct?
12           MR. MORRIS:  Objection to the
13    form of the question.
14    A.    I don't understand your
15    question.
16    Q.    What I am trying to get at is,
17    as you increase the claims pool, the
18    recovery reduces.  Correct?
19    A.    No.  That is not how a fraction
20    works.
21    Q.    Well, if the denominator
22    increases, doesn't the recovery ultimately
23    decrease if --
24    A.    No.
25    Q.    -- if the numerator stays the
```

Page A-18

Page 26

J. SEERY

1
2  were amended without consideration a few
3  years ago. So, for our purposes we didn't
4  make the assumption, which I am sure will
5  happen, a fraudulent conveyance claim on
6  those notes, that a fraudulent conveyance
7  action would be brought. We just assumed
8  that we'd have to discount the notes
9  heavily to sell them because nobody would
10 respect the ability of the counterparties
11 to fairly pay.
12    Q.    And the same discount was
13 applied in the liquidation analysis to
14 those notes?
15    A.    Yes --
16    Q.    Now --
17    A.    The difference -- there would be
18 a difference, though, because they would
19 pay for a while because they wouldn't want
20 to accelerate them. So there would be
21 some collections on the notes for P and I.
22    Q.    But in fact as of January you
23 have accelerated those notes?
24    A.    Just one of them, I believe.
25    Q.    Which note was that?

Page 27

J. SEERY

1
2    A.    NexPoint, I said. They
3  defaulted on the note and we accelerated
4  it.
5    Q.    So there is no need to file a
6  fraudulent conveyance suit with respect to
7  that note. Correct, Mr. Seery?
8          MR. MORRIS:  Objection to the
9      form of the question.
10    A.    Disagree. Since it was likely
11 intentional fraud, there may be other
12 recoveries on it. But to collect on the
13 note, no.
14    Q.    My question was with respect to
15 that note. Since you have accelerated it,
16 you don't need to deal with the issue of
17 when it's due?
18          MR. MORRIS:  Objection to the
19      form of the question.
20    A.    That wasn't your question. But
21 to that question, yes, I don't need to
22 deal with when it's due.
23    Q.    Let me go over certain assets.
24 I am not going to ask you for the
25 valuation of them but I am going to ask

Page 28

J. SEERY

1
2  you whether they are included in the asset
3  portion of your $257 million number, all
4  right? Mr. Morris didn't want me to go
5  into specific asset value, and I don't
6  intend to do that.
7          The first question I have for
8  you is, the equity in Trustway Highland
9  Holdings, is that included in the
10 $257 million number?
11    A.    There is no such entity.
12    Q.    Then I will do it in a different
13 way. In connection with the sale of the
14 hard assets, what assets are included in
15 there specifically?
16    A.    Off the top of my head -- it is
17 all of the assets, but it includes
18 Trustway Holdings and all the value that
19 flows up from Trustway Holdings. It
20 includes Targa and all the value that
21 flows up from Targa. It includes CCS
22 Medical and all the value that would flow
23 to the Debtor from CCS Medical. It
24 includes Cornerstone and all the value
25 that would flow from Cornerstone. It

Page 29

J. SEERY

1
2  includes any other securities and all the
3  value that would flow from Cornerstone.
4  It includes HCLOF and all the value that
5  would flow up from HCLOF. It includes
6  Korea and all the value that would flow up
7  from Korea.
8          There may be others off the top
9  of my head. I don't recall them. I don't
10 have a list in front of me.
11    Q.    Now, with respect to those
12 assets, have you started the sale process
13 of those assets?
14    A.    No. Well, each asset is
15 different. So, the answer is, with
16 respect to any securities, we do seek to
17 sell those regularly and we do seek to
18 monetize those assets where we can
19 depending on whether there is a
20 restriction or not and whether there is
21 liquidity in the market.
22          With respect to the PE assets or
23 the companies I described -- Targa, CCS,
24 Cornerstone, JHT -- we have not --
25 Trustway. We have not sought to sell

Page 38

J. SEERY

1
2    A.    I don't recall the specific
3    limitation on the trust.  But if there was
4    a reason to hold on to the asset, if there
5    is a limitation, we can seek an extension.
6    Q.    Let me ask a question.  With
7    respect to these businesses, the Debtor
8    merely owns an equity interest in them.
9    Correct?
10    A.    Which business?
11    Q.    The ones you have identified as
12    operating businesses earlier?
13    A.    It depends on the business.
14    Q.    Well, let me -- again, let's try
15    to be specific.  With respect to SSP, it
16    was your position that you did not need to
17    get court approval for the sale.  Correct?
18    A.    That's correct.
19    Q.    Which one of the operating
20    businesses that are here, that you have
21    identified, do you need court authority
22    for a sale?
23         MR. MORRIS:  Objection to the
24    form of the question.
25    A.    Each of the businesses will be a

Page 39

J. SEERY

1
2    different analysis that we'll undertake
3    with bankruptcy counsel to determine what
4    we would need depending on when it is
5    going to happen and what the restrictions
6    either under the code are or under the
7    plan.
8    Q.    Is there anything that would
9    stop you from selling these businesses if
10    the Chapter 11 went on for a year or two
11    years?
12         MR. MORRIS:  Objection to form
13    of the question.
14    A.    Is there anything that would
15    stop me?  We'd have to follow the
16    strictures of the code and the protocols,
17    but there would be no prohibition -- let
18    me finish, please.
19         There would be no prohibition
20    that I am aware of.
21    Q.    Now, in connection with your
22    differential between the liquidation of
23    what I will call the operating businesses
24    under the liquidation analysis and the
25    plan analysis, who arrived at the discount

Page 40

J. SEERY

1
2    or determined the discount that has been
3    placed between the two, plan analysis
4    versus liquidation analysis?
5         MR. MORRIS:  Objection to form
6    of the question.
7    A.    To which document are you
8    referring?
9    Q.    Both the June -- the January and
10    the November analysis has a different
11    estimated proceeds for monetization for
12    the plan analysis versus the liquidation
13    analysis.  Do you see that?
14    A.    Yes.
15    Q.    And there is a note under there.
16    "Assumes Chapter 7 trustee will not be
17    able to achieve the same sales proceeds as
18    Claimant trustee."
19    A.    I see that, yes.
20    Q.    Do you see that note?
21    A.    Yes.
22    Q.    Who arrived at that discount?
23    A.    I did.
24    Q.    What percentage did you use?
25    A.    Depended on the asset.  Each one

Page 41

J. SEERY

1
2    is different.
3    Q.    Is the discount a function of
4    capability of a trustee versus your
5    capability, or is the discount a function
6    of timing?
7         MR. MORRIS:  Objection to form.
8    A.    It could be a combination.
9    Q.    So, let's -- let me walk through
10    this.  Your plan analysis has an
11    assumption that everything is sold by
12    December 2022.  Correct?
13    A.    Correct.
14    Q.    And the valuations that you have
15    used here for the monetization assume a
16    sale between -- a sale prior to December
17    of 2022.  Correct?
18    A.    Sorry.  I don't quite understand
19    your question.
20    Q.    The 257 number, and then let's
21    take out the notes.  Let's use the 210
22    number.
23         MR. MORRIS:  Can we put the
24    document back on the screen, please?
25    Sorry, Douglas, to interrupt, but it

Page 42

```
1              J. SEERY
2    would be helpful.
3         MR. DRAPER:  That is fine, John.
4    (Pause.)
5         MR. MORRIS:  Thank you very
6    much.
7    Q.    Mr. Seery, do you see the 257?
8    A.    In the one from yesterday?
9    Q.    Yes.
10   A.    Second line, 257,941.  Yes.
11   Q.    That assumes a monetization of
12   all assets by December of 2022?
13   A.    Correct.
14   Q.    And so everything has been sold
15   by that time; correct?
16   A.    Yes.
17   Q.    So, what I am trying to get at
18   is, there is both the capability between
19   you and a trustee, and then the second
20   issue is timing.  So, what discount was
21   put on for timing, Mr. Seery, between when
22   a trustee would sell it versus when you
23   would sell it?
24        MR. MORRIS:  Objection.
25   Q.    What is the percentage you
```

Page 43

```
1              J. SEERY
2    applied?
3    A.    Each of the assets is different.
4    Q.    Is there a general discount that
5    you used?
6    A.    Not a general discount, no.  We
7    looked at each individual asset and went
8    through and made an assessment.
9    Q.    Did you apply a discount for
10   your capability versus the capability of a
11   trustee?
12   A.    No.
13   Q.    So a trustee would be as capable
14   as you are in monetizing these assets?
15        MR. MORRIS:  Objection to the
16   form of the question.
17   Q.    Excuse me?  The answer is?
18   A.    The answer is maybe.
19   Q.    Couldn't a trustee hire somebody
20   as capable as you are?
21        MR. MORRIS:  Objection to the
22   form of the question.
23   A.    Perhaps.
24   Q.    Sir, that is a yes or no
25   question.  Could the trustee hire somebody
```

Page 44

```
1              J. SEERY
2    as capable as you are?
3         MR. MORRIS:  Objection to the
4    form of the question.
5    A.    I don't know.
6    Q.    Is there anybody as capable as
7    you are?
8         MR. MORRIS:  Objection to the
9    form of the question.
10   A.    Certainly.
11   Q.    And they could be hired.
12   Correct?
13   A.    Perhaps.  I don't know.
14   Q.    And if you go back to the
15   November 2020 liquidation analysis versus
16   plan analysis, it is also the same note
17   about that a trustee would bring less, and
18   there is the same sort of discount between
19   the estimated proceeds under the plan and
20   under the liquidation analysis.
21        MR. MORRIS:  If that is a
22   question, I object.
23   Q.    Is that correct, Mr. Seery,
24   looking at the document?
25   A.    There are discounts, yes.
```

Page 45

```
1              J. SEERY
2    Q.    Again, the discounts are applied
3    for timing and capability?
4    A.    Yes.
5    Q.    Now, in looking at the November
6    plan analysis number of $190 million and
7    the January number of $257 million, what
8    accounts for the increase between the two
9    dates?  What assets specifically?
10   A.    There are a number of assets.
11   Firstly, the HCLOF assets are added.
12   Q.    How much are those?
13   A.    Approximately 22 and a half
14   million dollars.
15   Q.    Okay.
16   A.    Secondly, there is a significant
17   increase in the value of certain of the
18   assets over this time period.
19   Q.    Which assets, Mr. Seery?
20   A.    There are a number.  They
21   include MGM stock, they include Trustway,
22   they include Targa.
23   Q.    And what is the percentage
24   increase from November to January,
25   November of 2020 to January of 2021?
```

Page A-21

Page 46

J. SEERY

```
 1                    J. SEERY
 2      A.     Do you mean what is the
 3  percentage increase from 190 to 257?
 4      Q.     No.  You just identified three
 5  assets.  MGM stock, we can go look at the
 6  exchange and figure out what the price
 7  increase is; correct?
 8      A.     No.
 9      Q.     Why not?  Is the MGM stock
10  publicly traded?
11      A.     Yes.  It doesn't trade on --
12      Q.     Excuse me?
13      A.     It doesn't trade on an exchange.
14      Q.     Is there a public market for the
15  MGM stock that we could calculate the
16  increase?
17      A.     There is a semipublic market;
18  yes.
19      Q.     So it is a number that is
20  readily available between the two dates?
21      A.     It's available.
22      Q.     Now, you identified Targa and
23  Trustway.  Correct?
24      A.     Yes.
25      Q.     Those are not readily available
```

Page 47

J. SEERY

```
 1                    J. SEERY
 2  markets; correct?
 3      A.     No.
 4      Q.     Those are operating businesses?
 5      A.     Correct.
 6      Q.     Who provided the valuation for
 7  the November 2020 liquidation analysis?
 8      A.     We use a combination of the
 9  value that we get from Houlihan Lokey for
10  mark purposes and then we adjust it for
11  plan purposes.
12      Q.     And the adjustment was up or
13  down?
14      A.     When?
15      Q.     For both November and January.
16  You got a number from Houlihan Lokey.  You
17  adjusted it.  Did you adjust it up or did
18  you adjust it down?
19           MR. MORRIS:  Objection to form
20      of the question.
21      A.     I believe that for November we
22  adjusted it down, and for January we
23  adjusted it down.  I don't recall off the
24  top of my head but I believe both of them
25  were adjusted down.
```

Page 48

J. SEERY

```
 1                    J. SEERY
 2      Q.     And if I understand what you
 3  just said, it is that the Houlihan Lokey
 4  valuation for those two businesses showed
 5  a significant increase between November of
 6  2020 and January of 2021?
 7           MR. MORRIS:  Objection to form
 8      of the question.
 9      A.     I didn't say that.
10      Q.     I am trying to account for the
11  increase between the two dates, and you
12  identified three assets.  You identified
13  MGM stock, which has, I can guess, as you
14  have said, a readily ascertainable value.
15  Then you identified two others that the
16  valuation is based upon something Houlihan
17  Lokey provided you.  Correct?
18      A.     I gave you three examples.  I
19  never said "readily."  That is your word,
20  not mine.  And I didn't say that Houlihan
21  had a significant change in their
22  valuation.
23      Q.     So let's now go back to the
24  question.  There is an increase in value
25  from November 24th of 2020 to January 28th
```

Page 49

J. SEERY

```
 1                    J. SEERY
 2  of 2021, the magnitude being roughly 60
 3  some odd million dollars.  Correct?
 4      A.     Correct.
 5      Q.     We can account for $22 million
 6  of it easily, right?
 7           MR. MORRIS:  Objection to form.
 8      A.     Correct.
 9      Q.     That is the HarbourVest
10  settlement, so that leaves roughly
11  $40 million unaccounted for?
12           MR. MORRIS:  Objection to the
13      form of the question if that is a
14      question.  It is accounted for.
15      Q.     What makes up that difference,
16  Mr. Seery?
17      A.     A change in the plan value of
18  the assets.
19      Q.     Okay.  Which assets?  Let's sort
20  of go back to where we were.
21      A.     There are numerous assets in the
22  plan formulation.  I gave you three
23  examples of the operating businesses.  The
24  securities, I believe, have increased in
25  value since the plan, so those would go up
```

Page 50

J. SEERY

1
2  for one.  On the operating businesses, we
3  looked at each of them and made an
4  assessment based upon where the market is
5  and what we believe the values are, and we
6  have moved those valuations.
7       Q.     Let me look at some numbers
8  again.  In the liquidation analysis in
9  November of 2020, the liquidation value is
10  $149 million.  Correct?
11      A.     Yes.
12      Q.     And in the liquidation analysis
13  in January of 2021, you have $191 million?
14      A.     Yes.
15      Q.     You see that number.  So there
16  is $51 million there, right?
17      A.     No.
18      Q.     What is the difference between
19  191 and -- sorry.  My math may be a little
20  off.  What is the difference between the
21  two numbers, Mr. Seery?
22      A.     Your math is off.
23      Q.     Sorry.  It is 41 million?
24      A.     Correct.
25      Q.     $22 million of that is the

Page 51

J. SEERY

1
2  HarbourVest settlement, right?
3       A.     I believe that's correct.
4       Q.     Is that fair, Mr. Seery?
5       A.     I believe that is correct, yes.
6       Q.     And part of that differential
7  are publicly traded or ascertainable
8  securities.  Correct?
9       A.     Yes.
10      Q.     And basically you can get, or
11  under the plan analysis or trustee
12  analysis, if it is a marketable security
13  or where there is a market, the
14  liquidation number should be the same for
15  both.  Is that fair?
16      A.     No.
17      Q.     And why not?
18      A.     We might have a different price
19  target for a particular security than the
20  current trading value.
21      Q.     I understand that, but I mean
22  that is based upon the capability of the
23  person making the decision as to when to
24  sell.  Correct?
25          MR. MORRIS:  Objection to form

Page 52

J. SEERY

1
2  of the question.
3       Q.     Mr. Seery, yes or no?
4       A.     I said no.
5       Q.     What is that based on, then?
6       A.     The person's ability to assess
7  the market and timing.
8       Q.     Okay.  And again, couldn't a
9  trustee hire somebody as capable as you to
10  both, A, assess the market and, B, make a
11  determination as to when to sell?
12          MR. MORRIS:  Objection to form
13      of the question.
14      A.     I suppose a trustee could.
15      Q.     And there are better people or
16  people equally or better than you at
17  assessing a market.  Correct?
18      A.     Yes.
19          MR. MORRIS:  Objection to form
20      of the question.
21      Q.     So, again, let's go back to
22  that.  We have accounted for, out of
23  $41 million where the liquidation analysis
24  increases between the two dates,
25  $22 million of it.  That leaves

Page 53

J. SEERY

1
2  $18 million.  How much of that is publicly
3  traded or ascertainable assets versus
4  operating businesses?
5       A.     I don't know off the top of my
6  head the percentages.
7       Q.     All right.  The same question
8  for the plan analysis where you have the
9  differential between the November number
10  and the January number.  How much of it is
11  marketable securities versus an operating
12  business?
13      A.     I don't recall off the top of my
14  head.
15          MR. DRAPER:  Let me take a
16      few-minute break.  Can we take a
17      ten-minute break here?
18          THE WITNESS:  Sure.
19          (Recess.)
20  BY MR. DRAPER:
21      Q.     Mr. Seery, what I am going to
22  show you and what I would ask you to look
23  at is in the note E, in the statement of
24  assumptions for the November 2020
25  disclosure statement.  It discusses fixed

Page A-23

## Sale of Assets of Affiliates or Controlled Entities

| Asset | Sales Price |
|---|---|
| Structural Steel Products | $50 million |
| Life Settlements | $35 million |
| OmniMax | $50 million |
| Targa | $37 million |

- These assets were sold over the contemporaneous objections of James Dondero, who was the Portfolio Manager and key-man on the funds.
- Mr. Seery admitted[1] that he must comply with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, and the Protocols for the sale of major assets of the estate. We believe that a competitive bid process and court approval should have been required for the sale of each of these assets (as was done for the sale of the building at 2817 Maple Ave. [a $9 million asset] and the sale of the interest in PetroCap [a $3 million asset]).

---

[1] *See* Mr. Seery's Jan. 29, 2021 deposition testimony, Appendix p. A-20.

**Page A-24**

## 20 Largest Unsecured Creditors

| Name of Claimant | Allowed Class 8 | Allowed Class 9 |
|---|---|---|
| Redeemer Committee of the Highland Crusader Fund | $136,696,610.00 | |
| UBS AG, London Branch and UBS Securities LLC | $65,000,000.00 | $60,000,000 |
| HarbourVest entities | $45,000,000.00 | $35,000,000 |
| Acis Capital Management, L.P. and Acis Capital Management GP, LLC | $23,000,000.00 | |
| CLO Holdco Ltd | $11,340,751.26 | |
| Patrick Daugherty | $8,250,000.00 | $2,750,000 (+$750,000 cash payment on Effective Date of Plan) |
| Todd Travers (Claim based on unpaid bonus due for Feb 2009) | $2,618,480.48 | |
| McKool Smith PC | $2,163,976.00 | |
| Davis Deadman (Claim based on unpaid bonus due for Feb 2009) | $1,749,836.44 | |
| Jack Yang (Claim based on unpaid bonus due for Feb 2009) | $1,731,813.00 | |
| Paul Kauffman (Claim based on unpaid bonus due for Feb 2009) | $1,715,369.73 | |
| Kurtis Plumer (Claim based on unpaid bonus due for Feb 2009) | $1,470,219.80 | |
| Foley Gardere | $1,446,136.66 | |
| DLA Piper | $1,318,730.36 | |
| Brad Borud (Claim based on unpaid bonus due for Feb 2009) | $1,252,250.00 | |
| Stinson LLP (successor to Lackey Hershman LLP) | $895,714.90 | |
| Meta-E Discovery LLC | $779,969.87 | |
| Andrews Kurth LLP | $677,075.65 | |
| Markit WSO Corp | $572,874.53 | |
| Duff & Phelps, LLC | $449,285.00 | |
| Lynn Pinker Cox Hurst | $436,538.06 | |
| Joshua and Jennifer Terry | $425,000.00 | |
| Joshua Terry | $355,000.00 | |
| CPCM LLC (bought claims of certain former HCMLP employees) | Several million | |
| **TOTAL:** | **$309,345,631.74** | **$95,000,000** |

## Timeline of Relevant Events

| Date | Description |
|------|-------------|
| 10/29/2019 | UCC appointed; members agree to fiduciary duties and not sell claims. |
| 9/23/2020 | Acis 9019 filed |
| 9/23/2020 | Redeemer 9019 filed |
| 10/28/2020 | Redeemer settlement approved |
| 10/28/2020 | Acis settlement approved |
| 12/24/2020 | HarbourVest 9019 filed |
| 1/14/2021 | Motion to appoint examiner filed |
| 1/21/2021 | HarbourVest settlement approved; transferred its interest in HCLOF to HCMLP assignee, valued at $22 million per Seery |
| 1/28/2021 | Debtor discloses that it has reached an agreement in principle with UBS |
| 2/3/2021 | Failure to comply with Rule 2015.3 raised |
| 2/24/2021 | Plan confirmed |
| 3/9/2021 | Farallon Cap. Mgmt. forms "Muck Holdings LLC" in Delaware |
| 3/15/2021 | Debtor files Jan. '21 monthly operating report indicating assets of $364 million, liabilities of $335 million (**inclusive of $267,607,000 in Class 8 claims, but exclusive of any Class 9 claims**), the last publicly filed summary of the Debtor's assets.  The MOR states that no Class 9 distributions are anticipated at this time and Class 9 recoveries are not expected. |
| 3/31/2021 | UBS files friendly suit against HCMLP under seal |
| 4/8/2021 | Stonehill Cap. Mgmt. forms "Jessup Holdings LLC" in Delaware |
| 4/15/2021 | UBS 9019 filed |
| 4/16/2021 | Notice of Transfer of Claim - Acis to Muck (Farallon Capital) |
| 4/29/2021 | Motion to Compel Compliance with Rule 2015.3 Filed |
| 4/30/2021 | Notice of Transfer of Claim - Redeemer to Jessup (Stonehill Capital) |
| 4/30/2021 | Notice of Transfer of Claim - HarbourVest to Muck (Farallon Capital) |
| 4/30/2021 | Sale of Redeemer claim to Jessup (Stonehill Capital) "consummated" |
| 5/27/2021 | UBS settlement approved; included $18.5 million in cash from Multi-Strat |
| 6/14/2021 | UBS dismisses appeal of Redeemer award |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Jessup (Stonehill Capital) |
| 8/9/2021 | Notice of Transfer of Claim - UBS to Muck (Farallon Capital) |

Critical unknown dates and information:

- The date on which Muck entered into agreements with HarbourVest and Acis to acquire their claims and what negative and affirmative covenants those agreements contained.
- The date on which Jessup entered into an agreement with the Redeemer Committee and the Crusader Fund to acquire their claim and what negative and affirmative covenants the agreement contained.
- The date on which the sales actually closed versus the date on which notice of the transfer was filed (i.e., did UCC members continue to serve on the committee after they had sold their claims).

Debtor's October 15, 2020 Liquidation Analysis [Doc. 1173-1]

| | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 12/31/2020 | $26,496 | $26,496 |
| Estimated proceeds from monetization of assets [1][2] | 198,662 | 154,618 |
| Estimated expenses through final distribution [1][3] | (29,864) | (33,804) |
| **Total estimated $ available for distribution** | **195,294** | **147,309** |
| | | |
| Less: Claims paid in full | | |
| Administrative claims [4] | (10,533) | (10,533) |
| Priority Tax/Settled Amount [10] | (1,237) | (1,237) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [5] | (5,560) | (5,560) |
| Class 3 – Priority non-tax claims [10] | (16) | (16) |
| Class 4 – Retained employee claims | - | - |
| Class 5 – Convenience claims [6][10] | (13,455) | - |
| Class 6 – Unpaid employee claims [7] | (2,955) | - |
| Subtotal | (33,756) | (17,346) |
| Estimated amount remaining for distribution to general unsecured claims | 161,538 | 129,962 |
| Class 5 – Convenience claims [8] | - | 17,940 |
| Class 6 – Unpaid employee claims | - | 3,940 |
| Class 7 – General unsecured claims [9] | 174,609 | 174,609 |
| Subtotal | 174,609 | 196,489 |
| % Distribution to general unsecured claims | 92.51% | 66.14% |
| Estimated amount remaining for distribution | - | - |
| Class 8 – Subordinated claims | *no distribution* | *no distribution* |
| Class 9 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 10 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Oct. 15, 2020 liquidation analysis include:

- Note [9]: General unsecured claims estimated using $0 allowed claims for HarbourVest and UBS. Ultimately, those two creditors were awarded $105 million of general unsecured claims and $95 million of subordinated claims.

## Updated Liquidation Analysis (Feb. 1, 2021)[2]

|  | Plan Analysis | Liquidation Analysis |
|---|---|---|
| Estimated cash on hand at 1/31/2020 [sic] | $24,290 | $24,290 |
| Estimated proceeds from monetization of assets [1][2] | 257,941 | 191,946 |
| Estimated expenses through final distribution [1][3] | (59,573) | (41,488) |
| **Total estimated $ available for distribution** | **222,658** | **174,178** |
|  |  |  |
| Less: Claims paid in full |  |  |
| Unclassified [4] | (1,080) | (1,080) |
| Administrative claims [5] | (10,574) | (10,574) |
| Class 1 – Jefferies Secured Claim | - | - |
| Class 2 – Frontier Secured Claim [6] | (5,781) | (5,781) |
| Class 3 – Other Secured Claims | (62) | (62) |
| Class 4 – Priority non-tax claims | (16) | (16) |
| Class 5 – Retained employee claims | - | - |
| Class 6 – PTO Claims [5] | - | - |
| Class 7 – Convenience claims [7][8] | (10,280) | - |
| **Subtotal** | **(27,793)** | **(17,514)** |
| Estimated amount remaining for distribution to general unsecured claims | 194,865 | 157,235 |
| % Distribution to Class 7 (Class 7 claims including in Class 8 in Liquidation scenario) | 85.00% | 0.00% |
| Class 8 – General unsecured claims [8] [10] | 273,219 | 286,100 |
| Subtotal | 273,219 | 286,100 |
| % Distribution to general unsecured claims | 71.32% | 54.96% |
| Estimated amount remaining for distribution | - | - |
| Class 9 – Subordinated claims | *no distribution* | *no distribution* |
| Class 10 – Class B/C limited partnership interests | *no distribution* | *no distribution* |
| Class 11 – Class A limited partnership interests | *no distribution* | *no distribution* |

Notable notations/disclosures in the Feb. 1, 2021 liquidation analysis include:

- claim amounts in Class 8 assume $0 for IFA and HM, $50.0 million for UBS and $45 million HV.
- Assumes RCP claims will offset against HCMLP's interest in fund and will not be paid from Debtor assets

---

[2] Doc. 1895.

**Page A-28**

## Summary of Debtor's January 31, 2021 Monthly Operating Report[3]

| | 10/15/2019 | 12/31/2020 | 1/31/2021 |
|---|---|---|---|
| **Assets** | | | |
| Cash and cash equivalents | $2,529,000 | $12,651,000 | $10,651,000 |
| Investments, at fair value | $232,620,000 | $109,211,000 | $142,976,000 |
| Equity method investees | $161,819,000 | $103,174,000 | $105,293,000 |
| mgmt and incentive fee receivable | $2,579,000 | $2,461,000 | $2,857,000 |
| fixed assets, net | $3,754,000 | $2,594,000 | $2,518,000 |
| due from affiliates | $151,901,000 | $152,449,000 | $152,538,000 |
| reserve against notices receivable | | ($61,039,000) | ($61,167,000) |
| other assets | $11,311,000 | $8,258,000 | $8,651,000 |
| **Total Assets** | **$566,513,000** | **$329,759,000** | **$364,317,000** |
| | | | |
| **Liabilities and Partners' Capital** | | | |
| pre-petition accounts payable | $1,176,000 | $1,077,000 | $1,077,000 |
| post-petition accounts payable | | $900,000 | $3,010,000 |
| Secured debt | | | |
| Frontier | $5,195,000 | $5,195,000 | $5,195,000 |
| Jefferies | $30,328,000 | $0 | $0 |
| Accrued expenses and other liabilities | $59,203,000 | $60,446,000 | $49,445,000 |
| Accrued re-organization related fees | | $5,795,000 | $8,944,000 |
| Class 8 general unsecured claims | $73,997,000 | $73,997,000 | $267,607,000 |
| Partners' Capital | $396,614,000 | $182,347,000 | $29,039,000 |
| **Total liabilities and partners' capital** | **$566,513,000** | **$329,757,000** | **$364,317,000** |

Notable notations/disclosures in the Jan. 31, 2021 MOR include:

- Class 8 claims totaled $267 million, a jump from $74 million in the prior month's MOR
- The MOR stated that no Class 9 recovery was expected, which was based on the then existing $267 million in Class 8 Claims.
- Currently, there are roughly $310 million of Allowed Class 8 Claims.

---

[3] [Doc. 2030] Filed on March 15, 2021, the last publicly disclosed information regarding the value of assets in the estate.

Value of HarbourVest Claim





## Estate Value as of August 1, 2021 (in millions)[4]

| Asset | Low | High |
|---|---|---|
| Cash as of 6/30/2021 | $17.9 | $17.9 |
| Targa Sale | $37.0 | $37.0 |
| 8/1 CLO Flows | $10.0 | $10.0 |
| Uchi Bldg. Sale | $9.0 | $9.0 |
| Siepe Sale | $3.5 | $3.5 |
| PetroCap Sale | $3.2 | $3.2 |
| HarbourVest trapped cash | $25.0 | $25.0 |
| **Total Cash** | **$105.6** | **$105.6** |
| Trussway | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 |
| HarbourVest CLOs | $40.0 | $40.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 |
| MGM (direct ownership) | $32.0 | $32.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 |
| Korea Fund | $18.0 | $18.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 |
| Other | $2.0 | $10.0 |
| **TOTAL** | **$472.6** | **$598.6** |



---

[4] Values are based upon historical knowledge of the Debtor's assets (including cross-holdings) and publicly filed information.

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 266326) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § § § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § | |

## DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
## SETTLEMENT WITH HARBOURVEST (CLAIM NOS. 143, 147, 149, 150, 153, 154)
## AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

TO THE HONORABLE STACEY G. C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE:

---

[1] The last four digits of the Debtor's taxpayer identification number are 6725. The headquarters and service address for the Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

**Page A-32**

Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Highland" or the "Debtor"), files this motion (the "Motion") for entry of an order, substantially in the form attached hereto as **Exhibit A**, pursuant to Rule 9019 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), approving a settlement agreement (the "Settlement Agreement"),[2] a copy of which is attached as Exhibit 1 to the *Declaration of John A. Morris in Support of the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith* being filed simultaneously with this Motion ("Morris Dec."), that, among other things, fully and finally resolves the proofs of claim filed by HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (collectively, "HarbourVest"). In support of this Motion, the Debtor represents as follows:

## JURISDICTION

1.      This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

2.      The statutory predicates for the relief sought herein are sections 105(a) and 363 of title 11 of the United States Code (the "Bankruptcy Code"), and Rule 9019 of the Bankruptcy Rules.

---

[2] All capitalized terms used but not defined herein shall have the meanings given to them in the Settlement Agreement.

## RELEVANT BACKGROUND

### A.    Procedural Background

3.    On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "Delaware Court").

4.    On October 29, 2019, the official committee of unsecured creditors (the "Committee") was appointed by the U.S. Trustee in the Delaware Court.

5.    On December 4, 2019, the Delaware Court entered an order transferring venue of the Debtor's case to this Court [Docket No. 186].[3]

6.    On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").  This Court approved the Settlement Motion on January 9, 2020 [Docket No. 339] (the "Settlement Order").

7.    In connection with the Settlement Order, an independent board of directors was constituted at the Debtor's general partner, Strand Advisors, Inc., and certain operating protocols were instituted.

8.    On July 16, 2020, this Court entered an order appointing James P. Seery, Jr., as the Debtor's chief executive officer and chief restructuring officer [Docket No. 854].

9.    The Debtor has continued in the possession of its property and has continued to operate and manage its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  No trustee or examiner has been appointed in this chapter 11 case.

---

[3] All docket numbers refer to the docket maintained by this Court.

3

**Page A-34**

## B.     Overview of HarbourVest's Claims

10.     HarbourVest's claims against the Debtor's estate arise from its $80 million investment in Highland CLO Funding, f/k/a Acis Loan Funding, Ltd. ("HCLOF"), pursuant to which HarbourVest obtained a 49 percent interest in HCLOF (the "Investment").

11.     In brief, HarbourVest contends that it was fraudulently induced into entering into the Investment based on the Debtor's misrepresentations and omissions concerning certain material facts, including that the Debtor: (1) failed to disclose that it never intended to pay an arbitration award obtained by a former portfolio manager, (2) failed to disclose that it engaged in a series of fraudulent transfers for the purpose of preventing the former portfolio manager from collecting on his arbitration award and misrepresented the reasons changing the portfolio manager for HCLOF immediately prior to the Investment, (3) indicated that the dispute with the former portfolio manager would not impact investment activities, and (4) expressed confidence in the ability of HCLOF to reset or redeem the collateralized loan obligations ("CLOs") under its control.

12.     HarbourVest seeks to rescind its Investment and claims damages in excess of $300 million based on theories of fraud, fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, negligent misrepresentation, and breach of fiduciary duty (under Guernsey law), and on alleged violations of state securities laws and the Racketeer Influenced Corrupt Organization Act ("RICO").

13.     HarbourVest's allegations are summarized below.[4]

---

[4] Solely for purposes of this Motion, and not for any other reason, the facts set forth herein are adopted largely from the *HarbourVest Response to Debtor's First Omnibus Objection to Certain (A) Duplicate Claims; (B) Overstated Claims; (C) Late-Filed Claims; (D) Satisfied Claims; (E) No-Liability Claims; and (F) Insufficient-Documentation Claims* [Docket No. 1057] (the "Response").

## C.    Summary of HarbourVest's Factual Allegations

14.    At the time HarbourVest made its Investment, the Debtor was embroiled in an arbitration against Joshua Terry ("Mr. Terry"), a former employee of the Debtor and limited partner of Acis Capital Management, L.P. ("Acis LP").  Through Acis LP, Mr. Terry managed Highland's CLO business, including CLO-related investments held by Acis Loan Funding, Ltd. ("Acis Funding").

15.    The litigation between Mr. Terry and the Debtor began in 2016, after the Debtor terminated Mr. Terry and commenced an action against him in Texas state court.  Mr. Terry asserted counterclaims for wrongful termination and for the wrongful taking of his ownership interest in Acis LP and subsequently had certain claims referred to arbitration where he obtained an award of approximately $8 million (the "Arbitration Award") on October 20, 2017.

16.    HarbourVest alleges that the Debtor responded to the Arbitration Award by engaging in a series of fraudulent transfers and corporate restructurings, the true purposes of which were fraudulently concealed from HarbourVest.

17.    For example, according to HarbourVest, the Debtor changed the name of the target fund from Acis Funding to "Highland CLO Funding, Ltd." ("HCLOF") and "swapped out" Acis LP for Highland HCF Advisor, Ltd. as portfolio manager (the "Structural Changes").  The Debtor allegedly told HarbourVest that it made these changes because of the "reputational harm" to Acis LP resulting from the Arbitration Award.  The Debtor further told HarbourVest that in lieu of redemptions, resetting the CLOs was necessary, and that it would be easier to reset them under the "Highland" CLO brand instead of the Acis CLO brand.

18.    In addition, HarbourVest also alleges that the Debtor had no intention of allowing Mr. Terry to collect on his Arbitration Award, and orchestrated a scheme to "denude"

5

Acis of assets by fraudulently transferring virtually all of its assets and attempting to transfer its profitable portfolio management contracts to non-Acis, Debtor-related entities.

19. Unaware of the fraudulent transfers or the true purposes of the Structural Changes, and in reliance on representations made by the Debtor, HarbourVest closed on its Investment in HCLOF on November 15, 2017.

20. After discovering the transfers that occurred between Highland and Acis between October and December 2017 following the Arbitration Award (the "Transfers"), on January 24, 2018, Terry moved for a temporary restraining order (the "TRO") from the Texas state court on the grounds that the Transfers were pursued for the purpose of rendering Acis LP judgment-proof. The state court granted the TRO, enjoining the Debtor from transferring any CLO management contracts or other assets away from Acis LP.

21. On January 30, 2018, Mr. Terry filed involuntary bankruptcy petitions against Acis LP and its general partner, Acis Capital Management GP, LLC. *See In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11 (Bankr. N.D. Tex. 2018) and *In re Acis Capital Management GP, LLC*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex. 2018) (collectively, the "Acis Bankruptcy Case"). The Bankruptcy Court overruled the Debtor's objection, granted the involuntary petitions, and appointed a chapter 11 trustee (the "Acis Trustee"). A long sequence of events subsequently transpired, all of which relate to HarbourVest's claims, including:

- On May 31, 2018, the Court issued a *sua sponte* TRO preventing any actions in furtherance of the optional redemptions or other liquidation of the Acis CLOs.

- On June 14, 2018, HCLOF withdrew optional redemption notices.

- The TRO expired on June 15, 2018, and HCLOF noticed the Acis Trustee that it was requesting an optional redemption.

6

- HCLOF's request was withdrawn on July 6, 2018, and on June 21, 2018, the Acis Trustee sought an injunction preventing Highland/HCLOF from seeking further redemptions (the "Preliminary Injunction").

- The Court granted the Preliminary Injunction on July 10, 2018, pending the Acis Trustee's attempts to confirm a plan or resolve the Acis Bankruptcy.

- On August 30, 2018, the Court denied confirmation of the First Amended Joint Plan for Acis, and held that the Preliminary Injunction must stay in place on the ground that the "evidence thus far has been compelling that numerous transfers after the Josh Terry judgment denuded Acis of value."

- After the Debtor made various statements implicating HarbourVest in the Transfers, the Acis Trustee investigated HarbourVest's involvement in such Transfers, including extensive discovery and taking a 30(b)(6) deposition of HarbourVest's managing director, Michael Pugatch, on November 17, 2018.

- On March 20, 2019, HCLOF sent a letter to Acis LP stating that it was not interested in pursuing, or able to pursue, a CLO reset transaction.

**D.    The Parties' Pleadings and Positions Concerning HarbourVest's Proofs of Claim**

22.    On April 8, 2020, HarbourVest filed proofs of claim against Highland that were subsequently denoted by the Debtor's claims agents as claim numbers 143, 147, 149, 150, 153, and 154, respectively (collectively, the "Proofs of Claim").  Morris Dec. Exhibits 2-7.

23.    The Proofs of Claim assert, among other things, that HarbourVest suffered significant harm due to conduct undertaken by the Debtor and the Debtor's employees, including "financial harm resulting from (i) court orders in the Acis Bankruptcy that prevented certain CLOs in which HCLOF was invested from being refinanced or reset and court orders that otherwise relegated the activity of HCLOF [*i.e.*, the Preliminary Injunction]; and (ii) significant fees and expenses related to the Acis Bankruptcy that were charged to HCLOF."  *See, e.g.*, Morris Dec. Exhibit 2 ¶3.

24.    HarbourVest also asserted "any and all of its right to payment, remedies, and other claims (including contingent or unliquidated claims) against the Debtor in connection with and relating to the forgoing harm, including for any amounts due or owed under the various

7

APP. 2980

agreements with the Debtor in connection with relating to" the Operative Documents "and any and all legal and equitable claims or causes of action relating to the forgoing harm." *See, e.g.*, Morris Dec. Exhibit 2 ¶4.

25.    Highland subsequently objected to HarbourVest's Proofs of Claim on the grounds that they were no-liability claims. [Docket No. 906] (the "Claim Objection").

26.    On September 11, 2020, HarbourVest filed its Response. The Response articulated specified claims under U.S. federal and state and Guernsey law, including claims for fraud, fraudulent concealment, fraudulent inducement, fraudulent misrepresentation, negligent misrepresentation (collectively, the "Fraud Claims"), U.S. State and Federal Securities Law Claims (the "Securities Claims"), violations of the Federal Racketeer Influenced and Corrupt Organizations Act ("RICO"), breach of fiduciary duty and misuse of fund assets, and an unfair prejudice claim under Guernsey law (collectively, with the Proofs of Claim, the "HarbourVest Claims").

27.    On October 18, 2020, HarbourVest filed its *Motion of HarbourVest Pursuant to Rule 3018 of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "3018 Motion"). In its 3018 Motion, HarbourVest sought for its Claims to be temporarily allowed for voting purposes in the amount of more than $300 million (based largely on a theory of treble damages).

**E.    Settlement Discussions**

28.    In October, the parties discussed the possibility of resolving the Rule 3018 Motion.

29.    In November, the parties broadened the discussions in an attempt to reach a global resolution of the HarbourVest Claims. In the pursuit thereof, the parties and their

8

counsel participated in several conference calls where they engaged in a spirited exchange of perspectives concerning the facts and the law.

30. During follow up meetings, the parties' interests became more defined. Specifically, HarbourVest sought to maximize its recovery while fully extracting itself from the Investment, while the Debtor sought to minimize the HarbourVest Claims consistent with its perceptions of the facts and law.

31. After the parties' interests became more defined, the principals engaged in a series of direct, arm's-length, telephonic negotiations that ultimately lead to the settlement, whose terms are summarized below.

## F.    Summary of Settlement Terms

32. The Settlement Agreement contains the following material terms, among others:

- HarbourVest shall transfer its entire interest in HCLOF to an entity to be designated by the Debtor;[5]

- HarbourVest shall receive an allowed, general unsecured, non-priority claim in the amount of $45 million and shall vote its Class 8 claim in that amount to support the Plan;

- HarbourVest shall receive a subordinated, allowed, general unsecured, non-priority claim in the amount of $35 million and shall vote its Class 9 claim in that amount to support the Plan;

- HarbourVest will support confirmation of the Debtor's Plan, including, but not limited to, voting its claims in support of the Plan;

- The HarbourVest Claims shall be allowed in the aggregate amount of $45 million for voting purposes;

- HarbourVest will support the Debtor's pursuit of its pending Plan of Reorganization; and

- The parties shall exchange mutual releases.

---

[5] The NAV for HarbourVest's 49.98% interest in HCLOF was estimated to be approximately $22 million as of December 1, 2020.

9

*See generally* Morris Dec. Exhibit 1.

## BASIS FOR RELIEF REQUESTED

33.     Bankruptcy Rule 9019 governs the procedural prerequisites to approval of

a settlement, providing that:

> On motion by the trustee and after notice and a hearing, the court may
> approve a compromise or settlement.  Notice shall be given to creditors, the
> United States trustee, the debtor, and indenture trustees as provided in Rule
> 2002 and to any other entity as the court may direct.

FED. R. BANKR. P. 9019(a).

34.     Settlements in bankruptcy are favored as a means of minimizing litigation,

expediting the administration of the bankruptcy estate, and providing for the efficient resolution

of bankruptcy cases. *See Myers v. Martin (In re Martin)*, 91 F.3d 389, 393 (3d Cir. 1996);

*Rivercity v. Herpel (In re Jackson Brewing Co.)*, 624 F.2d 599, 602 (5th Cir. 1980).  Pursuant to

Bankruptcy Rule 9019(a), a bankruptcy court may approve a compromise or settlement as long

as the proposed settlement is fair, reasonable, and in the best interest of the estate.  *See In re Age

Ref. Inc.*, 801 F.3d 530, 540 (5th Cir. 2015).  Ultimately, "approval of a compromise is within

the sound discretion of the bankruptcy court." *See United States v. AWECO, Inc. (In re AWECO,

Inc.)*, 725 F.2d 293, 297 (5th Cir. 1984); *Jackson Brewing*, 624 F.2d at 602–03.

35.     In making this determination, the United States Court of Appeals for the

Fifth Circuit applies a three-part test, "with a focus on comparing 'the terms of the compromise

with the rewards of litigation.'" *Official Comm. of Unsecured Creditors v. Cajun Elec. Power

Coop. (In re Cajun Elec. Power Coop.)*, 119 F.3d 349, 356 (5th Cir. 1997) (citing *Jackson

Brewing*, 624 F.2d at 602).  The Fifth Circuit has instructed courts to consider the following

factors: "(1) The probability of success in the litigation, with due consideration for the

uncertainty of law and fact, (2) The complexity and likely duration of the litigation and any

10

attendant expense, inconvenience and delay, and (3) All other factors bearing on the wisdom of the compromise." *Id.* Under the rubric of the third factor referenced above, the Fifth Circuit has specified two additional factors that bear on the decision to approve a proposed settlement. First, the court should consider "the paramount interest of creditors with proper deference to their reasonable views." *Id.*; *Conn. Gen. Life Ins. Co. v. United Cos. Fin. Corp. (In re Foster Mortgage Corp.)*, 68 F.3d 914, 917 (5th Cir. 1995). Second, the court should consider the "extent to which the settlement is truly the product of arms-length bargaining, and not of fraud or collusion." *Age Ref. Inc.*, 801 F.3d at 540; *Foster Mortgage Corp.*, 68 F.3d at 918 (citations omitted).

36. There is ample basis to approve the proposed Settlement Agreement based on the Rule 9019 factors set forth by the Fifth Circuit.

37. First, although the Debtor believes that it has valid defenses to the HarbourVest Claims, there is no guarantee that the Debtor would succeed in its litigation with HarbourVest. Indeed, to establish its defenses, the Debtor would be required to rely, at least in part, on the credibility of witnesses whose veracity has already been called into question by this Court. Moreover, it will be difficult to dispute that the Transfers precipitated the Acis Bankruptcy, and, ultimately, the imposition of the Bankruptcy Court's TRO that restricted HCLOF's ability to reset or redeem the CLOs and that is at the core of the HarbourVest Claims.

38. The second factor—the complexity, duration, and costs of litigation—also weighs heavily in favor of approving the Settlement Agreement. As this Court is aware, the events forming the basis of the HarbourVest Claims—including the Terry Litigation and Acis Bankruptcy—proceeded *for years* in this Court and in multiple other forums, and has already cost the Debtor's estate millions of dollars in legal fees. If the Settlement Agreement is not approved, then the parties will expend significant resources litigating a host of fact-intensive

11

issues including, among other things, the substance and materiality of the Debtor's alleged fraudulent statements and omissions and whether HarbourVest reasonably relied on those statements and omissions.

39. Third, approval of the Settlement Agreement is justified by the paramount interest of creditors. Specifically, the settlement will enable the Debtor to: (a) avoid incurring substantial litigation costs; (b) avoid the litigation risk associated with HarbourVest's $300 million claim; and (c) through the plan support provisions, increase the likelihood that the Debtor's pending plan of reorganization will be confirmed.

40. Finally, the Settlement Agreement was unquestionably negotiated at arm's-length. The terms of the settlement are the result of numerous, ongoing discussions and negotiations between the parties and their counsel and represent neither party's "best case scenario." Indeed, the Settlement Agreement should be approved as a rational exercise of the Debtor's business judgment made after due deliberation of the facts and circumstances concerning HarbourVest's Claims.

## NO PRIOR REQUEST

41. No previous request for the relief sought herein has been made to this, or any other, Court.

## NOTICE

42. Notice of this Motion shall be given to the following parties or, in lieu thereof, to their counsel, if known: (a) counsel for HarbourVest; (b) the Office of the United States Trustee; (c) the Office of the United States Attorney for the Northern District of Texas; (d) the Debtor's principal secured parties; (e) counsel to the Committee; and (f) parties requesting notice pursuant to Bankruptcy Rule 2002. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

12

WHEREFORE, the Debtor respectfully requests entry of an order, substantially in the form attached hereto as Exhibit A, (a) granting the relief requested herein, and (b) granting such other relief as is just and proper.

Dated:  December 23, 2020.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
         ikharasch@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

**HAYWARD & ASSOCIATES PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

13

**Page A-44**

UBS Settlement [Doc. 2200-1]

# **Exhibit 1**

## **Settlement Agreement**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "Agreement") is entered into as of March 30, 2021, by and among (i) Highland Capital Management, L.P. ("HCMLP" or the "Debtor"), (ii) Highland Credit Opportunities CDO, L.P. (n/k/a Highland Multi Strategy Credit Fund, L.P.) ("Multi-Strat," and together with its general partner and its direct and indirect wholly-owned subsidiaries, the "MSCF Parties"), (iii) Strand Advisors, Inc. ("Strand"), and (iv) UBS Securities LLC and UBS AG London Branch (collectively, "UBS").

Each of HCMLP, the MSCF Parties, Strand, and UBS are sometimes referred to herein collectively as the "Parties" and individually as a "Party."

## R E C I T A L S

**WHEREAS**, in 2007, UBS entered into certain contracts with HCMLP and two funds managed by HCMLP—Highland CDO Opportunity Master Fund, L.P. ("CDO Fund") and Highland Special Opportunities Holding Company ("SOHC," and together with CDO Fund, the "Funds") related to a securitization transaction (the "Knox Agreement");

**WHEREAS**, in 2008, the parties to the Knox Agreement restructured the Knox Agreement;

**WHEREAS**, UBS terminated the Knox Agreement and, on February 24, 2009, UBS filed a complaint in the Supreme Court of the State of New York, County of New York (the "State Court") against HCMLP and the Funds seeking to recover damages related to the Knox Agreement, in an action captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P., et al.*, Index No. 650097/2009 (N.Y. Sup. Ct.) (the "2009 Action");

**WHEREAS**, UBS's lone claim against HCMLP in the 2009 Action for indemnification was dismissed in early 2010, and thereafter UBS amended its complaint in the 2009 Action to add five new defendants, Highland Financial Partners, L.P. ("HFP"), Highland Credit Strategies Master Funds, L.P. ("Credit-Strat"), Highland Crusader Offshore Partners, L.P. ("Crusader"), Multi-Strat, and Strand, and to add new claims for fraudulent inducement, fraudulent conveyance, tortious interference with contract, alter ego, and general partner liability;

**WHEREAS**, UBS filed a new, separate action against HCMLP on June 28, 2010, for, *inter alia*, fraudulent conveyance and breach of the implied covenant of good faith and fair dealing, captioned *UBS Securities LLC, et al. v. Highland Capital Management, L.P.*, Index No. 650752/2010 (N.Y. Sup. Ct.) (the "2010 Action");

**WHEREAS**, in November 2010, the State Court consolidated the 2009 Action and the 2010 Action (hereafter referred to as the "State Court Action"), and on May 11, 2011, UBS filed a Second Amended Complaint in the 2009 Action;

**WHEREAS**, in 2015, UBS entered into settlement agreements with Crusader and Credit-Strat, and thereafter UBS filed notices with the State Court in the State Court Action dismissing its claims against Crusader and Credit-Strat;

**Page A-46**

**WHEREAS**, the State Court bifurcated claims asserted in the State Court Action for purposes of trial, with the Phase I bench trial deciding UBS's breach of contract claims against the Funds and HCMLP's counterclaims against UBS;

**WHEREAS**, on August 7, 2017, the Funds, along with Highland CDO Opportunity Fund, Ltd., Highland CDO Holding Company, Highland Financial Corp., and HFP, purportedly sold assets with a purported collective fair market value of $105,647,679 (the "Transferred Assets") and purported face value of over $300,000,000 to Sentinel Reinsurance, Ltd. ("Sentinel") pursuant to a purported asset purchase agreement (the "Purchase Agreement");

**WHEREAS**, Sentinel treated the Transferred Assets as payment for a $25,000,000 premium on a document entitled "Legal Liability Insurance Policy" (the "Insurance Policy");

**WHEREAS**, the Insurance Policy purports to provide coverage to the Funds for up to $100,000,000 for any legal liability resulting from the State Court Action (the "Insurance Proceeds");

**WHEREAS**, one of the Transferred Assets CDO Fund transferred to Sentinel was CDO Fund's limited partnership interests in Multi-Strat (the "CDOF Interests");

**WHEREAS,** Sentinel had also received from HCMLP limited partnership interests in Multi-Strat for certain cash consideration (together with the CDOF Interests, the "MSCF Interests");

**WHEREAS**, the existence of the Purchase Agreement and Insurance Policy were unknown to Strand's independent directors and the Debtor's bankruptcy advisors prior to late January 2021;

**WHEREAS**, in early February 2021, the Debtor disclosed the existence of the Purchase Agreement and Insurance Policy to UBS;

**WHEREAS**, prior to such disclosure, the Purchase Agreement and Insurance Policy were unknown to UBS;

**WHEREAS**, on November 14, 2019, following the Phase I trial, the State Court issued its decision determining that the Funds breached the Knox Agreement on December 5, 2008 and dismissing HCMLP's counterclaims;

**WHEREAS**, Sentinel purportedly redeemed the MSCF Interests in November 2019 and the redeemed MSCF Interests are currently valued at approximately $32,823,423.50 (the "Sentinel Redemption");

**WHEREAS**, on February 10, 2020, the State Court entered a Phase I trial judgment against the Funds in the amount of $1,039,957,799.44 as of January 22, 2020 (the "Phase I Judgment");

**WHEREAS**, Phase II of the trial of the State Court Action, includes, *inter alia*, UBS's claim for breach of implied covenant of good faith and fair dealing against HCMLP, UBS's

2

fraudulent transfer claims against HCMLP, HFP, and Multi-Strat, and UBS's general partner claim against Strand;

**WHEREAS**, on October 16, 2019, HCMLP filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Case"). The Bankruptcy Case was transferred to the United States Bankruptcy Court for the Northern District of Texas (the "Bankruptcy Court") on December 4, 2019;

**WHEREAS**, Phase II of the trial of the State Court Action was automatically stayed as to HCMLP by HCMLP's bankruptcy filing;

**WHEREAS**, on May 11, 2020, UBS, Multi-Strat, Highland Credit Opportunities CDO, Ltd., and Highland Credit Opportunities CDO Asset Holdings, L.P. (collectively, the "May Settlement Parties"), entered into a Settlement Agreement (the "May Settlement") pursuant to which the May Settlement Parties agreed to the allocation of the proceeds of certain sales of assets held by Multi-Strat, including escrowing a portion of such funds, and restrictions on Multi-Strat's actions;

**WHEREAS**, on June 26, 2020, UBS timely filed two substantively identical claims in the Bankruptcy Case: (i) Claim No. 190 filed by UBS Securities LLC; and (ii) Claim No. 191 filed by UBS AG London Branch (hereinafter collectively referred to as the "UBS Claim"). The UBS Claim asserts a general unsecured claim against HCMLP for $1,039,957,799.40;

**WHEREAS**, on August 3, 2020, the Bankruptcy Court entered an *Order Directing Mediation* [Docket No. 912] pursuant to which HCMLP, UBS, and several other parties were directed to mediate their Bankruptcy Case disputes before two experienced third-party mediators, Retired Judge Allan Gropper and Sylvia Mayer (together, the "Mediators"). HCMLP and UBS formally met with the Mediators together and separately on numerous occasions, including on August 27, September 2, 3, and 4, and December 17, 2020, and had numerous other informal discussions outside of the presence of the Mediators, in an attempt to resolve the UBS Claim;

**WHEREAS**, on August 7, 2020, HCMLP filed an objection to the UBS Claim [Docket No. 928]. Also on August 7, 2020, the Redeemer Committee of the Highland Crusader Fund, and Crusader, Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Redeemer Committee"), objected to the UBS Claim [Docket No. 933]. On September 25, 2020, UBS filed its response to these objections [Docket No. 1105];

**WHEREAS**, on October 16, 2020, HCMLP and the Redeemer Committee each moved for partial summary judgment on the UBS Claim [Docket Nos. 1180 and 1183, respectively], and on November 6, 2020, UBS opposed these motions [Docket No. 1337];

**WHEREAS**, by Order dated December 9, 2020, the Bankruptcy Court granted, as set forth therein, the motions for partial summary judgment filed by HCMLP and the Redeemer Committee and denied UBS's request for leave to file an amended proof of claim [Docket No. 1526];

3

EXECUTION VERSION

**WHEREAS**, on November 6, 2020, UBS filed *UBS's Motion for Temporary Allowance of Claims for Voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018* [Docket No. 1338] (the "3018 Motion"), and on November 16, 2020, HCMLP and the Redeemer Committee each opposed the 3018 Motion [Docket Nos. 1404 and 1409, respectively];

**WHEREAS**, by Order dated December 8, 2020, the Bankruptcy Court granted the 3018 Motion and allowed the UBS Claim, on a temporary basis and for voting purposes only, in the amount of $94,761,076 [Docket No. 1518];

**WHEREAS**, on January 22, 2021, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P. (As Modified)* [Docket No. 1808] (as amended, and as may be further amended, supplemented, or otherwise modified, the "Plan");

**WHEREAS**, on March 29, 2021, the Debtor caused CDO Fund to make a claim on the Insurance Policy to collect the Insurance Proceeds pursuant to the Phase I Judgment;

**WHEREAS**, on March 29, 2021, UBS filed an adversary proceeding seeking injunctive relief and a motion for a temporary restraining order and preliminary injunction to, among other things, enjoin the Debtor from allowing Multi-Strat to distribute the Sentinel Redemption to Sentinel or any transferee of Sentinel (the "Multi-Strat Proceeding"), which relief the Debtor, in its capacity as Multi-Strat's investment manager and general partner, does not oppose;

**WHEREAS**, the Parties wish to enter into this Agreement to settle all claims and disputes between and among them, to the extent and on the terms and conditions set forth herein, and to exchange the mutual releases set forth herein, without any admission of fault, liability, or wrongdoing on the part of any Party; and

**WHEREAS,** this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019") and section 363 of the Bankruptcy Code;

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

**A G R E E M E N T**

1.      **Settlement of Claims.**  In full and complete satisfaction of the UBS Released Claims (as defined below):

(a)      The UBS Claim will be allowed as (i) a single, general unsecured claim in the amount of $65,000,000 against HCMLP, which shall be treated as a Class 8 General Unsecured Claim under the Plan;[1] and (ii) a single, subordinated unsecured claim in the amount of $60,000,000 against HCMLP, which shall be treated as a Class 9 Subordinated General Unsecured Claim under the Plan.

---

[1] Capitalized terms used but not defined herein shall have the meanings attributed to them in the Plan.

**EXECUTION VERSION**

(b)　　　Multi-Strat will pay UBS the sum of \$18,500,000 (the "Multi-Strat Payment") as follows: (i) within two (2) business days after the Order Date, the May Settlement Parties will submit a Joint Release Instruction (as defined in the May Settlement) for the release of the amounts held in the Escrow Account (as defined in the May Settlement) to be paid to UBS in partial satisfaction of the Multi-Strat Payment on the date that is ten (10) business days following the Order Date; and (ii) Multi-Strat will pay UBS the remainder of the Multi-Strat Payment in immediately available funds on the date that is ten (10) business days following the Order Date, provided that, for the avoidance of doubt, the amounts held in the Escrow Account will not be paid to UBS until and unless the remainder of the Multi-Strat Payment is made.

(c)　　　Subject to applicable law, HCMLP will use reasonable efforts to (i) cause CDO Fund to pay the Insurance Proceeds in full to UBS as soon as practicable, but no later than within 5 business days of CDO Fund actually receiving the Insurance Proceeds from or on behalf of Sentinel; (ii) if Sentinel refuses to pay the Insurance Proceeds, take legal action reasonably designed to recover the Insurance Proceeds or the MSCF Interests or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment and in addition shall provide reasonable assistance to UBS in connection with any legal action UBS takes to recover the Insurance Proceeds or to return the Transferred Assets to the Funds to satisfy the Phase I Judgment or obtain rights to the MSCF interests, including but not limited to the redemption payments in connection with the MSCF Interests; (iii) cooperate with UBS and participate (as applicable) in the investigation or prosecution of claims or requests for injunctive relief against the Funds, Multi-Strat, Sentinel, James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, Transferred Assets, the transfer of the MSCF Interests, or any potentially fraudulent transfer of assets from the Funds to Sentinel, excluding the individuals listed on the schedule provided to UBS on March 25, 2021 (the "HCMLP Excluded Employees"); (iv) as soon as reasonably practicable, provide UBS with all business and trustee contacts at the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, if any, that are actually known by the Debtor after reasonable inquiry; (v) as soon as reasonably practicable, provide UBS with a copy of the governing documents, prospectuses, and indenture agreements for the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd, as applicable, that are in the Debtor's actual possession, custody, or control, (vi) as soon as reasonably practicable, provide, to the extent possible, any CUSIP numbers of the securities of the Funds, HFP, Greenbriar CLO Ltd., Greenbriar CLO Corp., Aberdeen Loan Funding Ltd, Eastland CLO Ltd, Grayson CLO Ltd, Valhalla CLO Ltd, and Governance Re Ltd., as applicable, including information regarding the location and amount of any cash related to those entities' holdings, in each case only to the extent actually known by the Debtor after reasonable inquiry; (vii) cooperate with UBS to assign or convey any such assets described in Section 1(c)(vi) or any other assets owned or controlled by the Funds and/or HFP, including for avoidance of doubt any additional assets currently unknown to the Debtor that the Debtor discovers in the future after the Agreement Effective Date; (viii) respond as promptly as reasonably possible to requests by UBS for access to relevant documents and approve as promptly as reasonably possible requests for access to relevant documents from third parties as needed with respect to the Transferred Assets, the Purchase Agreement, the Insurance Policy, the

5

**EXECUTION VERSION**

MSCF Interests and any other assets currently or formerly held by the Funds or HFP, including without limitation the requests listed in **Appendix A** (provided, however, that the provision of any such documents or access will be subject to the common interest privilege and will not constitute a waiver of any attorney-client or other privilege in favor of HCMLP) that are in the Debtor's actual possession, custody, or control; (ix) preserve all documents in HCMLP's possession, custody, or control regarding or relating to the Purchase Agreement, the Insurance Policy, the MSCF Interests, or any transfer of assets from the Funds to Sentinel, including but not limited to the documents requested in Appendix A, from 2016 to present, and issue a litigation hold to all individuals deemed reasonably necessary regarding the same; and (x) otherwise use reasonable efforts to assist UBS to collect its Phase I Judgment against the Funds and HFP and assets the Funds and/or HFP may own, or have a claim to under applicable law ahead of all other creditors of the Funds and HFP; provided, however, that, from and after the date hereof, HCMLP shall not be required to incur any out-of-pocket fees or expenses, including, but not limited to, those fees and expenses for outside consultants and professionals (the "Reimbursable Expenses"), in connection with any provision of this Section 1(c) in excess of $3,000,000 (the "Expense Cap"), and provided further that, for every dollar UBS recovers from the Funds (other than the assets related to Greenbriar CLO Ltd. or Greenbriar CLO Corp.), Sentinel, Multi-Strat (other than the amounts set forth in Section 1(b) hereof), or any other person or entity described in Section 1(c)(iii) in connection with any claims UBS has that arise out of or relate to the Phase I Judgment, the Purchase Agreement, the Insurance Policy, the Transferred Assets, the MSCF Interests, or the Insurance Proceeds (the "UBS Recovery"), UBS will reimburse HCMLP ten percent of the UBS Recovery for the Reimbursable Expenses incurred by HCMLP, subject to: (1) the occurrence of the Agreement Effective Date and (2) UBS's receipt and review of invoices and time records (which may be redacted as reasonably necessary) for outside consultants and professionals in connection with such efforts described in this Section 1(c), up to but not exceeding the Expense Cap after any disputes regarding the Reimbursable Expenses have been resolved pursuant to procedures to be agreed upon, or absent an agreement, in a manner directed by the Bankruptcy Court; and provided further that in any proceeding over the reasonableness of the Reimbursable Expenses, the losing party shall be obligated to pay the reasonable fees and expenses of the prevailing party; and provided further that any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c) shall be conducted in consultation with UBS, including but not limited to the selection of necessary outside consultants and professionals to assist in such litigation; and provided further that UBS shall have the right to approve HCMLP's selection of outside consultants and professionals to assist in any litigation in which HCMLP is a co-plaintiff with UBS or a plaintiff pursuing claims on behalf of or for UBS's benefit pursuant to this Section 1(c).

      (d)    Redeemer Appeal.

          (i)    On the Agreement Effective Date, provided that neither the Redeemer Committee nor any entities acting on its behalf or with any assistance from or coordination with the Redeemer Committee have objected to this Agreement or the 9019 Motion (as defined below), UBS shall withdraw with prejudice its appeal of the *Order Approving Debtor's Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72) and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* [Docket No. 1273] (the "Redeemer Appeal"); and

6

(ii)     The Parties have stipulated to extend the deadline for the filing of any briefs in the Redeemer Appeal to June 30, 2021 and will agree to such further extensions as necessary to facilitate this Settlement Agreement.

(e)     As of the Agreement Effective Date, the restrictions and obligations set forth in the May Settlement, other than those in Section 7 thereof, shall be extinguished in their entirety and be of no further force or effect.

(f)     On the Agreement Effective Date, the Debtor shall instruct the claims agent in the Bankruptcy Case to adjust the claims register in accordance with this Agreement.

(g)     On the Agreement Effective Date, any claim the Debtor may have against Sentinel or any other party, and any recovery related thereto, with respect to the MSCF Interests shall be automatically transferred to UBS, without any further action required by the Debtor. For the avoidance of doubt, the Debtor shall retain any and all other claims it may have against Sentinel or any other party, and the recovery related thereto, unrelated to the MSCF Interests.

## 2.     Definitions.

(a)     "Agreement Effective Date" shall mean the date the full amount of the Multi-Strat Payment defined in Section 1(b) above, including without limitation the amounts held in the Escrow Account (as defined in the May Settlement), is actually paid to UBS.

(b)     "HCMLP Parties" shall mean (a) HCMLP, in its individual capacity; (b) HCMLP, as manager of Multi-Strat; and (c) Strand.

(c)     "Order Date" shall mean the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019 and section 363 of the Bankruptcy Code.

(d)     "UBS Parties" shall mean UBS Securities LLC and UBS AG London Branch.

## 3.     Releases.

**(a)     UBS Releases.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the UBS Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue (A) the HCMLP Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, and (B) the MSCF Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), except as expressly set forth below, for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known

7

or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "UBS Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to (1) the obligations of the HCMLP Parties and MSCF Parties under this Agreement, including without limitation the allowance of or distributions on account of the UBS Claim or the settlement terms described in Sections 1(a)-(g) above; (2) the Funds or HFP, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy, or such prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, and/or Insurance Policy by UBS; (3) James Dondero or Mark Okada, or any entities, including without limitation Hunter Mountain Investment Trust, Dugaboy Investment Trust, and NexBank, SSB, owned or controlled by either of them, other than the HCMLP Parties and MSCF Parties (but for the avoidance of doubt, such releases of the HCMLP Parties and MSCF Parties shall be solely with respect to such entities and shall not extend in any way to James Dondero or Mark Okada in their individual capacity or in any other capacity, including but not limited to as an investor, officer, trustee, or director in the HCMLP Parties or MSCF Parties); (4) Sentinel or its subsidiaries, parents, affiliates, successors, designees, assigns, employees, or directors, including James Dondero, Isaac Leventon, Scott Ellington, Andrew Dean, Christopher Walter, Jean Paul Sevilla, Matthew DiOrio, Katie Irving, and/or any other current or former employee or director of the Funds or Sentinel and/or any other former employee or former director of any of the HCMLP Parties that is believed to be involved with the Purchase Agreement, Insurance Policy, MSCF Interests, or Transferred Assets, including for any liability with respect to the prosecution, enforcement, collection, or defense of the Phase I Judgment, Purchase Agreement, the MSCF Interests, any potentially fraudulent transfer of assets from the Funds to Sentinel and/or Insurance Policy, excluding the HCMLP Excluded Employees; (5) the economic rights or interests of UBS in its capacity as an investor, directly or indirectly (including in its capacity as an investment manager and/or investment advisor), in any HCMLP-affiliated entity, including without limitation in the Redeemer Committee and Credit Strat, and/or in such entities' past, present or future subsidiaries and feeders funds (the "UBS Unrelated Investments"); and (6) any actions taken by UBS against any person or entity, including any HCMLP Party or MSCF Party, to enjoin a distribution on the Sentinel Redemption or the transfer of any assets currently held by or within the control of CDO Fund to Sentinel or a subsequent transferee or to seek to compel any action that only such person or entity has standing to pursue or authorize in order to permit UBS to recover the Insurance Proceeds, Transferred Assets, the Phase I Judgment or any recovery against HFP; provided, however, that, from and after the date hereof, any out-of-pocket fees or expenses incurred by HCMLP in connection with this Section 3(a)(6) will be considered Reimbursable Expenses and shall be subject to, and applied against, the Expense Cap as if they were incurred by HCMLP pursuant to Section 1(c) subject to the occurrence of the Agreement Effective Date and after any disputes regarding such Reimbursable Expenses have been resolved in the manner described in Section 1(c).

(b)     **HCMLP Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the HCMLP Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of

8

—

**EXECUTION VERSION**

their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "HCMLP Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement; and (b) the obligations of the UBS Parties in connection with the UBS Unrelated Investments.

(c) **Multi-Strat Release.** Upon the occurrence of the Agreement Effective Date, and to the maximum extent permitted by law, each of the MSCF Parties hereby forever, finally, fully, unconditionally, irrevocably, and completely releases, relieves, acquits, remises, exonerates, forever discharges, and covenants never to sue any of the UBS Parties and each of their current and former advisors, attorneys, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (each in their capacities as such), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorneys' fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, or statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those that have been or could have been alleged or asserted in the State Court Action or the Bankruptcy Case (collectively, the "Multi-Strat Released Claims"), provided, however, that notwithstanding anything to the contrary herein, such releases shall not apply to the obligations of the UBS Parties under this Agreement or Section 7 of the May Settlement.

**4.     No Third Party Beneficiaries**.     Except for the parties released by this Agreement, no other person or entity shall be deemed a third-party beneficiary of this Agreement.

**5.     UBS Covenant Not to Sue.**     Subject to the occurrence of the Agreement Effective date, if UBS ever controls any HCMLP-affiliated defendant in the State Court Action by virtue of the prosecution, enforcement, or collection of the Phase I Judgment (collectively, the "Controlled State Court Defendants"), UBS covenants on behalf of itself and the Controlled State Court Defendants, if any, that neither UBS nor the Controlled State Court Defendants will assert or pursue any claims that any Controlled State Court Defendant has or may have against any of the HCMLP Parties; provided, however, that nothing shall prohibit UBS or a Controlled State Court Defendant from taking any of the actions set forth in Section 3(a)(1)-(6); provided further, however, if and to the extent UBS receives any distribution from any Controlled State Court Defendant that is derived from a claim by a Controlled State Court Defendant against the Debtor, subject to the exceptions set forth in Section 3(a), which distribution is directly

9

**Page A-54**

APP. 2996

ᵃ,

**EXECUTION VERSION**

attributable to any property the Controlled State Court Defendant receives from the Debtor and separate and distinct from property owned or controlled by CDO Fund, SOHC, or Multi-Strat, then such recovery shall be credited against all amounts due from the Debtor's estate on account of the UBS Claim allowed pursuant to Section 1(a) of this Agreement, or if such claim has been paid in full, shall be promptly turned over to the Debtor or its successors or assigns.

      **6.**     **Agreement Subject to Bankruptcy Court Approval.**

        (a)     The force and effect of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement and the releases herein by the Bankruptcy Court. The Parties agree to use reasonable efforts to have this Agreement expeditiously approved by the Bankruptcy Court by cooperating in the preparation and prosecution of a mutually agreeable motion and proposed order (the "9019 Motion") to be filed by the Debtor no later than five business days after execution of this Agreement by all Parties unless an extension is agreed to by both parties.

      **7.**     **Representations and Warranties**.

        (a)     Each UBS Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the UBS Released Claims and has not sold, transferred, or assigned any UBS Released Claim to any other person or entity, and (ii) no person or entity other than such UBS Party has been, is, or will be authorized to bring, pursue, or enforce any UBS Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such UBS Party.

        (b)     Each HCMLP Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HCMLP Released Claims and has not sold, transferred, or assigned any HCMLP Released Claim to any other person or entity, and (ii) no person or entity other than such HCMLP Party has been, is, or will be authorized to bring, pursue, or enforce any HCMLP Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such HCMLP Party.

        (c)     Each MSCF Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the Multi-Strat Released Claims and has not sold, transferred, or assigned any Multi-Strat Released Claim to any other person or entity, and (ii) no person or entity other than such MSCF Party has been, is, or will be authorized to bring, pursue, or enforce any Multi-Strat Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) such MSCF Party.

10

**8. No Admission of Liability**. The Parties acknowledge that there is a bona fide dispute with respect to the UBS Claim. Nothing in this Agreement shall be construed, expressly or by implication, as an admission of liability, fault, or wrongdoing by HCMLP, the MSCF Parties, Strand, UBS, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of HCMLP, the MSCF Parties, Strand, UBS, or any other person.

**9. Successors-in-Interest.** This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their representatives, successors, and assigns.

**10. Notice**. Each notice and other communication hereunder shall be in writing and will, unless otherwise subsequently directed in writing, be delivered by email and overnight delivery, as set forth below, and will be deemed to have been given on the date following such mailing.

**HCMLP Parties or the MSCF Parties**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: General Counsel
Telephone No.: 972-628-4100
E-mail: notices@HighlandCapital.com

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
E-mail: jpomerantz@pszjlaw.com

**UBS**

UBS Securities LLC
UBS AG London Branch
Attention: Elizabeth Kozlowski, Executive Director and Counsel
1285 Avenue of the Americas
New York, NY 10019
Telephone No.: 212-713-9007
E-mail: elizabeth.kozlowski@ubs.com

UBS Securities LLC
UBS AG London Branch
Attention: John Lantz, Executive Director
1285 Avenue of the Americas
New York, NY 10019

11

Page A-56

APP. 2998

EXECUTION VERSION

Telephone No.: 212-713-1371
E-mail: john.lantz@ubs.com

with a copy (which shall not constitute notice) to:

Latham & Watkins LLP
Attention: Andrew Clubok
          Sarah Tomkowiak
555 Eleventh Street, NW, Suite 1000
Washington, D.C. 20004-1304
Telephone No.: 202-637-3323
Email: andrew.clubok@lw.com
       sarah.tomkowiak@lw.com

     **11.**    **Advice of Counsel**. Each of the Parties represents that such Party has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

     **12.**    **Entire Agreement**. This Agreement contains the entire agreement and understanding concerning the subject matter of this Agreement, and supersedes and replaces all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter. Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation, or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement. The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation, or warranty not contained in this Agreement, and that any such reliance would be unreasonable. This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

     **13.**    **No Party Deemed Drafter**. The Parties acknowledge that the terms of this Agreement are contractual and are the result of arm's-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement. In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

     **14.**    **Future Cooperation**. The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

     **15.**    **Counterparts**. This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement.

12

17

**EXECUTION VERSION**

Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

      **16.**     **Governing Law; Venue; Attorneys' Fees and Costs**. The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of New York without regard to conflict-of-law principles. Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Borough of Manhattan, New York, with respect to any disputes arising from or out of this Agreement. In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

13

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: _____

Name: _____

Its: _____

**HIGHLAND MULTI STRATEGY CREDIT FUND, L.P. (f/k/a Highland Credit Opportunities CDO, L.P.)**

By: _____

Name: _____

Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO, Ltd.**

By: _____

Name: _____

Its: _____

**HIGHLAND CREDIT OPPORTUNITIES CDO ASSET HOLDINGS, L.P.**

By: _____

Name: _____

Its: _____

**STRAND ADVISORS, INC.**

By: _____

Name: _____

Its: _____

APP. 3001

**EXECUTION VERSION**

**UBS SECURITIES LLC**

By: _____
Name: John Lantz
Its: Authorized Signatory

By: _____
Name: Elizabeth Kozlowski
Its: Authorized Signatory

**UBS AG LONDON BRANCH**

By: _____
Name: William Chandler
Its: Authorized Signatory

By: _____
Name: Elizabeth Kozlowski
Its: Authorized Signatory

15

**Page A-60**

APP. 3002

## APPENDIX A

- The search parameters (custodians, date ranges, search terms) used to locate the documents produced to UBS on February 27, 2021 (and any additional parameters used for the previous requests from UBS);

- Identity of counsel to, and trustees of, CDO Fund or SOHC;

- Current or last effective investment manager agreements for CDO Fund and SOHC, including any management fee schedule, and any documentation regarding the termination of those agreements;

- The tax returns for the CDO Fund and SOHC from 2017-present;

- Communications between any employees of Sentinel (or its affiliates) and any employees of the HCMLP Parties, CDO Fund, SOHC, or any of Dondero, Leventon, or Ellington from 2017-present;

- Documents or communications regarding or relating to the Purchase Agreement, Insurance Policy, or June 30, 2018 Memorandum entitled "Tax Consequences of Sentinel Acquisition of HFP/CDO Opportunity Assets" (the "Tax Memo"), including without limitation (i) amendments to these documents, (ii) transfer of assets pursuant to these documents, (iii) board minutes or resolutions regarding or relating to these documents, (iv) claims made on the Insurance Policy; (v) communications with the IRS regarding the asset transfer pursuant to these documents; and (vi) any similar asset purchase agreements, capital transfer agreements, or similar agreements;

- Documents or communications regarding or relating to the value of any assets transferred pursuant to the Insurance Policy or Purchase Agreement, including without limitation those assets listed in Schedule A to the Purchase Agreement, from 2017 to present, including documentation supporting the $105,647,679 value of those assets as listed in the Tax Memo;

- Documents showing the organizational structure of Sentinel and its affiliated entities, including information on Dondero's relationship to Sentinel;

- Any factual information provided by current or former employees of the HCMLP Parties, CDO Fund, SOHC, or Sentinel regarding or relating to the Purchase Agreement, Insurance Policy, Tax Memo, and/or transfer of assets pursuant to those documents;

- Debtor's settlement agreements with Ellington and Leventon;

- Copies of all prior and future Monthly Reports and Valuation Reports (as defined in the Indenture, dated as of December 20, 2007, among Greenbriar CLO Ltd., Greenbriar CLO Corp., and State Street Bank and Trust Company); and

- Identity of any creditors of CDO Fund, SOHC, or HFP and amount of debts owed to those creditors by CDO Fund, SOHC, or HFP, including without limitation any debts owed to the Debtor.

Hellman & Friedman Seeded Farallon Capital Management

OUR FOUNDER

RETURN TO ABOUT (/ABOUT/)

## Warren Hellman: One of the good guys

**Warren Hellman was a devoted family man,** highly successful businessman, active philanthropist, dedicated musician, arts patron, endurance athlete and all-around good guy. Born in New York City in 1934, he grew up in the Bay Area, graduating from the University of California at Berkeley. After serving in the U.S. Army and attending Harvard Business School, Warren began his finance career at Lehman Brothers, becoming the youngest partner in the firm's history at age 26 and subsequently serving as President. After a distinguished career on Wall Street, Warren moved back west and co-founded Hellman & Friedman, building it into one of the industry's leading private equity firms.

**Warren deeply believed in the power of people** to accomplish incredible things and used his success to improve and enrich the lives of countless people. Throughout his career, Warren helped found or seed many successful businesses including Matrix Partners, Jordan Management Company, Farallon Capital Management and Hall Capital Partners.

**Within the community,** Warren and his family were generous supporters of dozens of organizations and causes in the arts, public education, civic life, and public health, including creating and running the San Francisco Free Clinic. Later in life, Warren became an accomplished 5-string banjo player and found great joy in sharing the love of music with others. In true form, he made something larger of this avocation to benefit others by founding the Hardly Strictly Bluegrass Festival, an annual three-day, free music festival that draws hundreds of thousands of people together from around the Bay Area.

**An accomplished endurance athlete,** Warren regularly completed 100-mile runs, horseback rides and combinations of the two. He also was an avid skier and national caliber master ski racer and served as president of the U.S. Ski Team in the late 1970s, and is credited with helping revitalize the Sugar Bowl ski resort in the California Sierras.

**In short,** Warren Hellman embodied the ideal of living life to the fullest. He had an active mind and body, and a huge heart. We are lucky to call him our founder. **Read more about Warren. (https://hf.com/wp-content/uploads/2015/09/Warren-Hellman-News-Release.pdf)**



SFChronicle/SFGate/Liz Hafalia



Robert Holmgren



no caption

https://hf.com/warren-hellman/

1/2

Hellman & Friedman Owned a Portion of Grosvenor until 2020

## Grosvenor Capital Management



In 2007, H&F invested in Grosvenor, one of the world's largest and most diversified independent alternative asset management firms. The Company offers comprehensive public and private markets solutions and a broad suite of investment and advisory choices that span hedge funds, private equity, and various credit and specialty strategies. Grosvenor specializes in developing customized investment programs tailored to each client's specific investment goals.

**SECTOR**

Financial Services

**STATUS**

Past

**www.gcmlp.com (http://www.gcmlp.com)**

CONTACT (HTTPS://HF.COM/CONTACT/)    INFO@HF.COM (MAILTO:INFO@HF.COM)    LP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/CLIENT/HELLMAN)    BACK
GP LOGIN (HTTPS://SERVICES.SUNGARDDX.COM/DOCUMENT/2720045)    TERMS OF USE (HTTPS://HF.COM/TERMS-OF-USE/)
PRIVACY POLICY (HTTPS://HF.COM/PRIVACY-POLICY/)
KNOW YOUR CALIFORNIA RIGHTS (HTTPS://HF.COM/YOUR-CALIFORNIA-CONSUMER-PRIVACY-ACT-RIGHTS/)
(HTTPS://WWW.LINKEDIN.COM/COMPANY/HELLMAN-&-FRIEDMAN)
©2021 HELLMAN & FRIEDMAN LLC



CORNER OFFICE

## GCM Grosvenor to Go Public

The $57 billion alternatives manager will become a public company after merging with a SPAC backed by Cantor Fitzgerald.

Julie Segal

August 03, 2020



Chicago, IL (Tim Boyle/Bloomberg)

In a sign of the times, GCM Grosvenor will become a public company through a SPAC.

The Chicago-based alternative investments firm is planning to go public by merging with a special purpose acquisition company in a deal valued at $2 billion. The 50-year-old firm has $57 billion in assets in private equity, infrastructure, real estate, credit, and absolute return investments.

"We have long valued having external shareholders and we wanted to preserve the accountability and focus that comes with that," Michael Sacks, GCM Grosvenor's chairman and CEO, said in a statement.

GCM Grosvenor will combine with CF Finance Special Acquisition Corp, a SPAC backed by Cantor Fitzgerald, according to an announcement from both companies on Monday. After the company goes public, Sacks will continue to lead GCM Grosvenor, which is owned by management and Hellman & Friedman, a private equity firm. Hellman & Friedman, which has owned a minority stake of the Chicago asset manager since 2007, will sell its equity as

Farallon was a Significant Borrower for Lehman

# Case Study – Large Loan Origination

**Debt origination for an affiliate of Simon Property Group Inc. and Farallon Capital Management**



| Date | June 2007 |
|---|---|
| Asset Class | Retail |
| Asset Size | 1,808,506 Sq. Ft. |
| Sponsor | Simon Property Group Inc. / Farallon Capital Management |
| Transaction Type | Refinance |
| Total Debt Amount | Lehman Brothers: $121 million JP Morgan: $200 million |

### Transaction Overview

◆ In June 2007, Lehman Brothers co-originated a loan in the aggregate amount of $321 million (Lehman portion: $121 million) with JP Morgan to a special purpose affiliate of a joint venture between Simon Property Group Inc ("Simon") and Farallon Capital Management ("Farallon") secured by the shopping center known as Gurnee Mills Mall (the "Property") located in Gurnee, IL .

◆ The Property consists of a one-story, 200 store discount mega-mall comprised of 1,808,506 square feet anchored by Burlington Coat Factory, Marshalls, Bed Bath & Beyond and Kohls among other national retailers. Built in 1991, the Property underwent a $5 million interior renovation in addition to a $71 million redevelopment between 2004 and 2005. As of March 2007, the Property had a in-line occupancy of 99.5%.

### Lehman Brothers Role

◆ Simon and Farallon comprised the sponsorship which eventually merged with The Mills Corporation in early 2007 for $25.25 per common share in cash. The total value of the transaction was approximately $1.64 billion for all of the outstanding common stock, and approximately $7.9 billion including assumed debt and preferred equity.

◆ Lehman and JP Morgan subsequently co-originated $321 million loan at 79.2% LTV based on an appraisal completed in March by Cushman & Wakefield. The Loan was used to refinance the indebtedness secured by the Property.

### Sponsorship Overview

◆ The Mills Corporation, based in Chevy Chase MD is a developer owner and manager of a diversified portfolio of retail destinations including regional shopping malls and entertainment centers. They currently own 38 properties in the United States totaling 47 million square feet.

LEHMAN BROTHERS       32

Page A-65

APP. 3007

Mr. Seery Represented Stonehill While at Sidley

James P. Seery, Jr.
John G. Hutchinson
John J. Lavelle
Martin B. Jackson
Sidley Austin LLP
787 Seventh Avenue
New York, New York 10019
(212) 839-5300 (tel)
(212) 839-5599 (fax)

*Attorneys for the Steering Group*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

```
----------------------------------------------------------- X
                                                             :
In re:                                                       :   Chapter 11
                                                             :
BLOCKBUSTER INC., et al.,                                    :   Case No. 10-14997 (BRL)
                                                             :
                                        Debtors.             :   (Jointly Administered)
                                                             :
----------------------------------------------------------- X
```

### THE BACKSTOP LENDERS' OBJECTION TO THE MOTION OF LYME REGIS TO ABANDON CERTAIN CAUSES OF ACTION OR, IN THE ALTERNATIVE, TO GRANT STANDING TO LYME REGIS TO PURSUE CLAIMS ON BEHALF OF THE ESTATE

1.    The Steering Group of Senior Secured Noteholders who are Backstop Lenders --

Icahn Capital LP, Monarch Alternative Capital LP, Owl Creek Asset Management, L.P.,

Stonehill Capital Management LLC, and Värde Partners, Inc. (collectively, the "Backstop

Lenders") -- hereby file this objection (the "Objection") to the Motion of Lyme Regis Partners,

LLC ("Lyme Regis") to Abandon Certain Causes of Action or, in the Alternative, to Grant

Standing to Lyme Regis to Pursue Claims on Behalf of the Estate (the "Motion") [Docket No.

593].

Stonehill Founder (Motulsky) and Grosvenor's G.C. (Nesler) Were Law School Classmates



Over 25 years earlier, here is a group at a party. From the left, Bob Zinn, Dave Lowenthal, Rory Little, Joe Nesler, Jon Polonsky (in front of Joe), John Motulsky and Mark Windfeld-Hansen (behind bottle!) Motulsky circulated this photo at the reunion. Thanks John!



**Joseph H. Nesler** (He/Him)
General Counsel

[ More ]  [ 🔒 Message ]

**Joseph H. Nesler** (He/Him) ·        Yale Law School

3rd
General Counsel
Winnetka, Illinois, United States ·
Contact info

500+ connections

[ 🔒 Message ]  [ More ]

**Open to work**
Chief Compliance Officer and General Counsel roles
See all details

## About

I have over 38 years of experience representing participants in the investment management industry with respect to a wide range of legal and regulatory matters, including SEC, DOL, FINRA, and NFA regulations and examinations.        ... see more

## Activity

522 followers

Posts Joseph H. created, shared, or commented on in the last 90 days are displayed here.

https://www.linkedin.com/in/josephnesler/



Investor Communication to Highland Crusader Funds Stakeholders



**Alvarez & Marsal**
**Management, LLC** 2029 Cei
Park East Suite 2060
Angeles, CA 9

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management LLC ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million. Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021. Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.

Sincerely,

Alvarez & Marsal CRF Management, LLC

By: _____

Steven Varner
Managing Director

EXHIBIT 37



MUNSCH
HARDT

DALLAS / HOUSTON / AUSTIN

**Ross Tower**
500 N. Akard Street, Suite 3800
Dallas, Texas 75201-6659
Main 214.855.7500
Fax 214.855.7584
munsch.com
Direct Dial 214.855.7587
Direct Fax 214.978.5359
drukavina@munsch.com

May 11, 2022

Ms. Nan R. Eitel
Office of the General Counsel
Executive Office for U.S. Trustees
20 Massachusetts Avenue, NW
8th Floor
Washington, DC 20530

Dear Ms. Eitel:

By way of follow-up to the letter Douglas Draper sent to your offices on October 4, 2021 and my letter dated November 3, 2021, I write to provide additional information regarding the systemic abuses of bankruptcy process occasioned during the bankruptcy of Texas-headquartered Highland Capital Management, L.P. ("Highland" or the "Debtor"). Those abuses, as detailed in our prior letters, include potential insider trading and breaches of fiduciary duty by those charged with protecting creditors, understated estimations of estate value seemingly designed to line the pockets of Debtor management, gross mistreatment of employees who were key to the bankruptcy process, and ultimately a plan aimed at liquidating an otherwise viable estate, to the detriment of stakeholders and third-party investors in Debtor-managed funds and in violation of investors' due process rights and various fiduciary duties and duties of candor to the Bankruptcy Court and all constituents. In particular, I write this letter to further detail:

1.      Actions and omissions by the Debtor that have but a single apparent purpose: to spend the assets of the Highland estate to enrich those currently managing the estate at the expense of the business owners (the equity). Currently, the Highland estate has more than enough assets to pay 100% of the allowed creditors' claims. But doing so would deprive the current steward, Jim Seery, as well as his professional cohorts, the opportunity to reap tens, if not hundreds of millions of dollars, in fees. This motivation explains the acts and omissions described below—all designed to prop up a façade that the post-confirmation bankruptcy machinations are necessary, and to avoid any scrutiny of that façade, and to foreclose any investigation into a contrary thesis.

2.      The Debtor's intentional understatement of the value of the estate for personal gain, the gain of professionals, and the gain of affiliated or related secondary claims-buyers.

3.      The failure to adhere to fiduciary duties to maximize the value of estate assets and failure to contest baseless proofs of claim to enable Highland to emerge from bankruptcy as a going concern and to preserve value for all stakeholders.

4.      The gross misuse of estate assets by the Debtor and Debtor professionals in pursuing baseless and stale claims against former insiders of the Debtor when the current value of the estate (over

Ms. Nan R. Eitel
May 11, 2022
Page 2

$650 million with the recent completion of the MGM sale, which includes over $200 million in cash) greatly exceeds the estate's general unsecured claims ($410 million).

     5.    The failure of the Debtor's CRO and CEO, Jim Seery, to adhere to his fiduciary duty to maximize the value of the estate. As evidenced by the chart below, all general unsecured claims could have been resolved using $163 million of debtor cash and other liquidity. Instead, proofs of claim were inflated and sold to Stonehill Capital Management ("Stonehill") and Farallon Capital Management ("Farallon"), which are both affiliates of Grosvenor (the largest investor in the Crusader Funds, which became the largest creditor in the bankruptcy). Mr. Seery has a long-standing relationship with Grosvenor and was appointed to the Independent Board (the board charged with managing the Debtor's estate) by the Redeemer Committee of the Crusader Funds, on which Grosvenor held five of nine seats.

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|----------|---------|---------|-----------|----------------|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0 ($65.0 net of other assets) |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | **$150.0 to $163.0** |

     As highlighted in the prior letters to your office and as further detailed herein, this is the type of systemic abuse of process that is something lawmakers and the Executive Office of the U.S. Trustee (the "EOUST") should be concerned about. Accordingly, we urge the EOUST to exercise its "broad administrative, regulatory, and litigation/enforcement authorities . . . to promote the integrity and efficiency of the bankruptcy system for the benefit of all stakeholders—debtors, creditors, and the public."[1] Specifically, we believe it would be appropriate for the EOUST to undertake an investigation to confirm the current value of the estate and to ensure that the claims currently being pursued by the Debtor are intended to benefit creditors of the estate, and not just to further enrich Debtor professionals and Debtor management.

## BACKGROUND

**The Players**

James Dondero – co-founder of Highland in 1993. Mr. Dondero is chiefly responsible for ensuring that Highland weathered the global financial crisis, evolving the firm's focus from high-yield credit to other areas, including real estate, private equity, and alternative investments. Mr. Dondero is a dedicated philanthropist who has actively supported initiatives in education, veterans' affairs, and public policy. He currently serves as a member of the Executive Board of the Southern Methodist University Cox School of Business and sits on the Executive Advisory Council of the George W. Bush Presidential Center.

---

[1] https://www.justice.gov/ust.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 3

Highland – Highland Capital Management, L.P., the Debtor. Highland is an SEC-registered investment advisor co-founded by James Dondero in 1993. Prior to its bankruptcy, Highland served as advisor to a suite of registered funds, including open-end mutual funds, closed-end funds, and an exchange-traded fund.

Strand – Strand Advisors, Inc., a Delaware corporation. The general partner of Highland.

The Independent Board – the managing board installed after Highland's bankruptcy filing. To avoid a protracted dispute, and to facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director of Strand, on the condition that he would be replaced by three independent directors of Strand, who would act as fiduciaries of the estate and work to restructure Highland's business so it could continue operating and emerge from bankruptcy as a going concern. Pursuant to an agreement with the Creditors' Committee that was approved by the Bankruptcy Court, Mr. Dondero, UBS, and the Redeemer Committee each were permitted to choose one director. Mr. Dondero chose The Honorable Former Judge Russell F. Nelms, UBS chose John Dubel, and the Redeemer Committee chose James P. Seery, Jr.[2]

Creditors' Committee – On October 29, 2019, the bankruptcy court appointed the Official Committee of Unsecured Creditors, which consisted of: (1) The Redeemer Committee of the Highland Crusader Fund (Eric Felton), (2) Meta e-Discovery (Paul McVoy), (3) UBS Securities LLC and UBS AG London Branch (Elizabeth Kozlowski), and (4) Acis Capital Management, L.P. and Acis Capital Management GP, LLP (Joshua Terry).

James P. Seery, Jr. – a member of the Independent Board, and the Chief Executive Officer, and Chief Restructuring Officer of the Debtor. Beginning in March 2020, Mr. Seery ran day-to-day operations and negotiations with the Creditors' Committee, investors, and employees in return for compensation of $150,000 per month and generous incentives and stands to earn millions more for administering the Debtor's post-confirmation liquidation. Judge Nelms and John Dubel remained on the Independent Board, receiving weekly updates and modest compensation.

Acis – Acis Capital Management, L.P., a former affiliate of Highland. Acis is currently owned and controlled by Josh Terry, a former employee of Highland. Acis (Joshua Terry) was a member of Highland's Creditors' Committee.

UBS – UBS Securities LLC and UBS AG London Branch, collectively. UBS asserted claims against Highland arising out of a default on a 2008 warehouse lending facility (to which Highland was neither a party nor a guarantor). Highland had paid UBS twice for full releases of claims UBS asserted against Highland – approximately $110 million in 2008 and an additional $70.5 million via settlement with Barclays, the Crusader Funds, and Credit Strategies in June 2015. UBS was a member of the Creditors' Committee and appointed John Dubel to the Independent Board.

---

[2] *See* Stipulation in Support of Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 338; Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course, Dkt. 339.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 4

HarbourVest – HarbourVest Partners, LLC. HarbourVest is a private equity fund of funds and one of the largest private equity investment managers globally. HarbourVest has approximately $75 billion in assets under management. HabourVest has deep ties with Grosvenor and has jointly with Grosvenor sponsored 59 LBO transactions in the last two years.

The Crusader Funds – a group of Highland-managed funds formed between 2000 and 2002. During the financial crisis, to avoid a run on the Crusader Funds at low-watermark prices, the funds' manager temporarily suspended redemptions, leading investors to sue. That dispute resolved with the formation of an investor committee self-named the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors' receiving a return of their full investment plus a return, as opposed to the 20 cents on the dollar they would have received had their redemption requests been paid when made. Subsequently, when disputes regarding management of the Crusader Funds' liquidation arose, the Redeemer Committee instituted an arbitration against Highland, resulting in an arbitration award against Highland of approximately $190 million. Nonetheless, due to offsets and double-counting, the Debtor initially estimated the value of the Redeemer arbitration award at $105 million to $110 million. In a 9019 settlement with the Debtor, the Crusader Funds ultimately received allowed claims of $137 million, plus $17 million of sundry claims and retention of an interest in Cornerstone Healthcare Group, Inc., an acute-health-care company, valued at over $50 million. Notably, UBS objected to the Crusader Funds' 9019 settlement, arguing that the Redeemer arbitration award was actually worth much less— between $74 and $128 million. The Crusader Funds sold their allowed claims to Stonehill, in which Grosvenor is the largest investor. This sale to an affiliated fund without approval of other investors in the fund is a violation of the Investment Advisers Act of 1940.

The Redeemer Committee – The Redeemer Committee of the Highland Crusader Funds was a group of investors in the Crusader Funds that oversaw the liquidation of the funds. The Redeemer Committee was comprised of nine members. Grosvenor held five seats. Concord held one seat.

Grosvenor – GCM Grosvenor is a global alternative asset management firm with over $59 billion in assets under management. Grosvenor has one of the largest operations in the Cayman Islands, with more than half of their assets under management originating through its Cayman operations. Unlike most firms operating in the Cayman Islands, Grosvenor has its own corporate and fiduciary services firm. This structure provides an additional layer of opacity to anonymous corporations from the British Virgin Islands (which includes significant Russian assets), Hong Kong (which includes significant Chinese assets), and Panama (which includes significant South American assets). As a registered investment adviser, Grosvenor must adhere to know-your-customer regulations, must report suspicious activities, and must not facilitate non-compliance or opacity. In 2020, Michael Saks and other insiders distributed all of Grosvenor's assets to shareholders and sold the firm to a SPAC originated by Cantor Fitzgerald.[3] In 2020, the equity market valued asset managers and financial-services firms at decade-high valuations. It makes little sense that Grosvenor would use the highly dilutive SPAC process (as opposed to engaging

---

[3] See https://www.wsj.com/articles/gcm-grosvenor-to-merge-with-cantor-fitzgerald-spac-11596456900. The Securities and Exchange Commission recently released a rule proposal that is focused on enhancing disclosure requirements around special purpose acquisition companies, including additional disclosures about SPAC sponsors, conflicts of interest and sources of dilution, business combination transactions between SPACs and private operating companies, and fairness of these transactions. See https://www.pionline.com/regulation/sec-proposes-enhanced-spac-disclosure-rule.

4862-7970-5887v.1 019717.00004

Case 19-34054-sgj11 Doc 3405-1 Filed 07/19/22   Entered 07/19/22 17:21:44   Page 301 of
356

Ms. Nan R. Eitel
May 11, 2022
Page 5

in a traditional IPO or other strategic-sale alternatives) unless such a structure was employed to avoid the diligence and management-liability tail inherent in more traditional processes.

Farallon – Farallon Capital Management, L.L.C. Farallon is a hedge fund that manages capital on behalf of institutions and individuals and was previously the largest hedge fund in the world. Farallon has approximately $27 billion in assets under management. Grosvenor is a significant investor in Farallon. Grosvenor and Farallon are further linked by Hellman & Friedman, LLC, an American private equity firm. Hellman & Friedman owned a stake in Grosvenor from 2007 until it went public in 2020 and seeded Farallon's initial capital.

Muck – Muck Holdings, LLC. Muck is owned and controlled by Farallon. Together with Jessup Holdings, LLC (described below)), Muck acquired 90.28% of the general unsecured claims (inclusive of Class 8 and Class 9) in the Highland bankruptcy.

Stonehill – Stonehill Capital Management, LLC. Stonehill provides portfolio management for pooled investment vehicles. It has approximately $3 billion in assets under management, which we have reason to believe includes approximately $1 billion from Grosvenor.

Jessup – Jessup Holdings, LLC. Jessup is owned and controlled by Stonehill. Together with Muck (Farallon), Stonehill acquired 90.28% of the general unsecured claims (inclusive of Class 8 and Class 9) in the Highland bankruptcy.

Marc Kirschner/Teneo - The Debtor retained Marc Kirschner to pursue over $1 billion in claims against former insiders and affiliates of the Debtor despite the significant solvency of the estate ($650 million in assets versus $410 million in claims). Kirschner's bankruptcy restructuring firm was purchased by Teneo (which also purchased the restructuring practice of KPMG). Teneo is sponsored by LetterOne, a London-based private equity firm owned by Mikhail Fridman, a Russian oligarch. Fridman is also the primary investor in Concord Management, LLC ("Concord"), which held a position on the Redeemer Committee. During the resolution of a 2018 arbitration involving a Debtor-managed fund, the Highland Credit Strategies Fund, evidence emerged demonstrating that Concord was operating as an unregistered investment adviser of Russian money from Alfa-Bank, Russia's largest privately held bank and a key part of Fridman's Alfa Group Consortium. –That money that was funneled into BVI-domiciled shell companies into the Cayman Islands, then into various hedge funds and private equity funds in the U.S. Evidence of these activities was presented by the Debtor to Grosvenor, and the Debtor asked to have Concord removed from the Redeemer Committee. Concord was never removed. Concord is a large investor in Grosvenor. Grosvenor, in turn, is a large investor in Stonehill and Farallon.

**Circumstances Precipitating Bankruptcy**

Notwithstanding Highland's historical success with Mr. Dondero at the helm, Highland's funds—like many other investment platforms—suffered losses during the financial crisis, leading to myriad lawsuits by investors. One of the most contentious disputes involved investors in the Crusader Funds. As explained above, a group of Crusader Funds investors sued after the funds' manager temporarily suspended redemptions during the financial crisis. That dispute resolved with the formation of the "Redeemer Committee" and the orderly liquidation of the Crusader Funds, which resulted in investors'

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 6

receiving a return of their investments plus a profit, as opposed to the 20 cents on the dollar they would have received had their redemption requests been honored when made.

Despite the successful liquidation of the Crusader Funds, the Redeemer Committee sued Highland again several years later, claiming that Highland had improperly delayed the liquidation and paid itself fees not authorized under the parties' earlier settlement agreement. The dispute went to arbitration, ultimately resulting in an arbitration award against Highland of $189 million (of which Highland expected to make a net payment of $110 million once the award was confirmed).

In view of the expected arbitration award and believing that a restructuring of its judgment liabilities was in Highland's best interest, on October 16, 2019, Highland—a Delaware limited partnership—filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court for the District of Delaware.[4]

On October 29, 2019, the Bankruptcy Court appointed the Creditors' Committee. At the time of their appointment, creditors agreeing to serve on the Creditors' Committee were given an Instruction Sheet by the Office of the United States Trustee, instructing as follows:

> **Creditors wishing to serve as fiduciaries on any official committee are advised that they may not purchase, sell or otherwise trade in or transfer claims against the Debtor while they are committee members absent an order of the Court. By submitting the enclosed Questionnaire and accepting membership on an official committee of creditors, you agree to this prohibition. The United States Trustee reserves the right to take appropriate action, including removing the creditor from any committee, if the information provided in the Questionnaire is inaccurate, if the foregoing prohibition is violated, or for any other reason the United States Trustee believes is proper in the exercise of her discretion.**

*See* Instruction Sheet, Ex. A (emphasis in original).

In response to a motion by the Creditors' Committee, on December 4, 2019, the Delaware Bankruptcy Court transferred the bankruptcy case to the Northern District of Texas, to Judge Stacey G.C. Jernigan's court.[5]

## SYSTEMIC PROBLEMS OCCURRING IN THE CONTEXT OF HIGHLAND'S COURT-ADMINISTERED BANKRUPTCY

### Mr. Dondero Gets Pushed Out of Management and New Debtor Management Announces Plans to Liquidate the Estate

From the outset of the case, the Creditors' Committee and the U.S. Trustee's Office in Dallas pushed to replace Mr. Dondero as the sole director of Strand. To avoid a protracted dispute and to

---

[4] *In re Highland Capital Mgmt., L.P.*, Case No. 19-12239-CSS (Bankr. D. Del.) ("Del. Case"), Dkt. 1.
[5] *See In re Highland Capital Mgmt., L.P.*, Case No. 19-34054 (Bankr. N.D. Tex.), Dkt. 186. All subsequent docket references are to the docket of the Bankruptcy Court for the Northern District of Texas.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 7

facilitate the restructuring, on January 9, 2020, Mr. Dondero agreed to resign as the sole director of Strand, on the condition that he would be replaced by the Independent Board.[6]

In brokering the agreement, Mr. Dondero made clear his expectations that new, independent management would not only preserve Highland's business by expediting an exit from bankruptcy in three to six months but would also preserve jobs and enable continued collaboration with charitable causes supported by Highland and Mr. Dondero. Unfortunately, those expectations did not materialize. Rather, it quickly became clear that Strand's and Highland's management was being dominated by one of the independent directors, Mr. Seery. Shortly after his placement on the Board, on March 15, 2020, Mr. Seery became de facto Chief Executive Officer, after which he immediately took steps to freeze Mr. Dondero out of operations completely, to the detriment of Highland's business and its employees. The Bankruptcy Court formally approved Mr. Seery's appointment as CEO and Chief Restructuring Officer on July 14, 2020.[7] Although Mr. Seery publicly represented that his goal was to restructure the Debtor's business and enable it to emerge as a going concern, privately he was engineering a much different plan. Less than two months after Mr. Seery's appointment as CEO/CRO, the Debtor filed its initial plan of reorganization, disclosing for the first time its intention to terminate substantially all employees by the end of 2020 and to liquidate Highland's assets by 2022.[8]

Over objections by Mr. Dondero and numerous other stakeholders, the Bankruptcy Court confirmed Highland's Fifth Amended Plan of Reorganization on February 22, 2021 (the "Plan").[9] There are appeals of that Plan, as well as many of the other rulings made by the Bankruptcy Court, currently pending before the United States District Court and the Court of Appeals for the Fifth Circuit.

**Transparency Problems Pervade the Bankruptcy Proceedings**

*The Regulatory Framework*

As you are aware, one of the most important features of federal bankruptcy proceedings is transparency. The EOUST instructs that "Debtors-in-possession and trustees must account for the receipt, administration, and disposition of all property; provide information concerning the estate and the estate's administration as parties in interest request; and file periodic reports and summaries of a debtor's business, including a statement of receipts and disbursements, and such other information as the United States Trustee or the United States Bankruptcy Court requires." See http://justice.gov/ust/chapter-11-information (citing 11 U.S.C. § 1106(a)(1), 1107(a)). And Federal Rule of Bankruptcy Procedure 2015.3(a) states that "the trustee or debtor in possession shall file periodic financial reports of the value, operations, and profitability of each entity that is not a publicly traded corporation or a debtor in a case under title 11, and in which the estate holds a substantial or controlling interest." This rule requires the trustee or a debtor in possession to file a report for each non-debtor affiliate prior to the first meeting of

---

[6] Frank Waterhouse and Scott Ellington, Highland employees, remained as officers of Strand, Chief Financial Officer and General Counsel, respectively.

[7] See Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr. as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020, Dkt. 854.

[8] See Plan of Reorganization of Highland Capital Management, L.P. dated August 12, 2020, Dkt. 944.

[9] See Order (I) Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (As Modified); and (II) Granting Related Relief, Dkt. 1943.

Ms. Nan R. Eitel
May 11, 2022
Page 8

creditors and every six months thereafter until the effective date of a plan of reorganization. Fed R. Bankr. P. 2015.3(b). Importantly, the rule does not absolve a debtor from filing reports due prior to the effective date merely because a plan has become effective.[10] Notably, the U.S. Trustee has the duty to ensure that debtors in possession properly and timely file all required reports. 28 U.S.C. § 1112(b)(4)(F), (H).

The entire purpose of these guidelines and rules is to ensure that external stakeholders can fairly evaluate the progress of bankruptcy proceedings, including compliance with legal requirements. Particularly in large bankruptcies, creditors and investors alike should expect that debtors, their management, and representatives on creditors' committees abide by their reporting obligations and all other legal requirements. Bankruptcy is not meant to be a safe haven for lawlessness, nor is it designed to obfuscate the operations of the debtor. Instead, transparency is mandatory so that the debtor is accountable to stakeholders and so that stakeholders can ensure that all insiders are operating for the benefit of the estate. This becomes all the more important when a debtor or an estate holds substantial assets through non-debtor subsidiaries or vehicles, as is the case here; hence, the purpose of Rule 2015.3.

### *In Highland's Bankruptcy, the Regulatory Framework Is Ignored*

Against this regulatory backdrop, the Highland bankruptcy offered almost no transparency to stakeholders. Traditional reporting requirements were ignored, and neither the Bankruptcy Court nor the U.S. Trustee's Office did anything to ensure compliance. This opened the door to numerous abuses of process and potential violations of federal law, as detailed below. Additionally, the lack of proper and accurate information and intentional hiding of material information led creditors to vote for the Debtor's plan and the Bankruptcy Court to confirm that plan which, we believe, would not have happened had the Debtor complied with its fiduciary and reporting duties.

As Mr. Draper and I have already highlighted, one significant problem in Highland's bankruptcy was the Debtor's failure to file *any* of the reports required under Bankruptcy Rule 2015.3, either on behalf of itself or its affiliated entities. Typically, such reports would include information like asset value, income from financial operations, profits, and losses for each non-publicly traded entity in which the estate has a substantial or controlling interest.

The Debtor's failure to file the required Rule 2015.3 reports was brought to the attention of the Debtor, the Bankruptcy Court, and the U.S. Trustee's Office. During the hearing on Plan confirmation, the Debtor was questioned about the failure to file the reports. The sole excuse offered by the Debtor's Chief Restructuring Officer and Chief Executive Officer, Mr. Seery, was that the task "fell through the cracks."[11] Nor did the Debtor or its counsel ever attempt to show "cause" to gain exemption from the reporting requirement. That is because there was no good reason for the Debtor's failure to file the required reports. In fact, although the Debtor and the Creditors' Committee often refer to the Debtor's structure as a "byzantine empire," the assets of the estate fall into a handful of discrete investments, most of which have audited financials and/or are required to make monthly or quarterly net-asset-value or fair-

---

[10] After notice and a hearing, the bankruptcy court may grant relief from the Rule 2015.3 disclosure requirement "for cause," including that "the trustee or debtor in possession is not able, after a good faith effort, to comply with th[e] reporting requirements, or that the information required by subdivision (a) is publicly available." Fed. R. Bankr. 2015.3(d).
[11] *See* Dkt. 1905 (Feb. 3, 2021 Hr'g Tr. at 49:5-21).

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 9

value determinations.[12] Rather than disclose financial information that was readily available, the Debtor appears to have taken deliberate and strategic steps to avoid transparency.

Despite these transparency problems, the Debtor's confirmed Plan contains provisions that effectively release the Debtor from its obligation to file *any* of the reports due for *any* period prior to the effective date—thereby sanctioning the Debtor's failure and refusal to follow the rules. The U.S. Trustee also failed to object to this portion of the Court's order of confirmation, which is directly at odds with the spirit and mandate of the Periodic Reporting Requirements adopted by the EOUST and historical rules mandating transparency.[13]

Because neither the federal Bankruptcy Court nor the U.S. Trustee advocated or demanded compliance with the rules, the Debtor, its newly appointed management, and the Creditors' Committee charged with protecting the interests of all creditors were able to manipulate the estate for the benefit of a handful of insiders, seemingly in contravention of law.

**The Lack of Transparency Permitted the Debtor to Quietly Sell Assets Without Observing Best Practices**

Highland engaged in several other asset sales in bankruptcy without disclosing those sales in advance to outside stakeholders or investors, and without offering investors in funds impacted by the sales the opportunity to purchase the assets. For example:

- The Debtor sold approximately $25 million of NexPoint Residential Trust shares that today are valued at over $70 million; the Debtor likewise sold $6 million of Portola Pharma shares that were taken over less than 60 days later for $18 million.

- The Debtor divested interests worth $145 million held in certain life settlements (which paid on the death of the individuals covered, whose average age was 90) for $35 million rather than continuing to pay premiums on the policies and did so without obtaining updated estimates of the life settlements' value, to the detriment of the fund and investors (today two of the covered individuals have a life expectancy of less than one year).

- The Debtor sold interests in OmniMax without informing the Bankruptcy Court, without engaging in a competitive bidding process, and without cooperating with other funds managed by Mr. Dondero, resulting in what we believe is substantially lesser value to the debtor (20% less than Mr. Dondero received in funds he managed).

- The Debtor sold interests in Structural Steel Products (worth $50 million) and Targa (worth $37 million), again without any process or notice to the Bankruptcy Court or

---

[12] During a deposition, Mr. Seery identified most of the Debtor's assets "[o]ff the top of [his] head" and acknowledged that he had a subsidiary ledger that detailed the assets held by entities below the Debtor. *See* Exh. A (Jan. 29, 2021 Dep. Tr. at 22:4-10; 23:1-29:10).

[13] *See "Procedures for Completing Uniform Periodic Reports in Non-Small Business Cases Filed Under Chapter 11 of Title 11"* (the "Periodic Reporting Requirements"). The Periodic Reporting Requirements reaffirmed the EOUST's commitment to maintaining "uniformity and transparency regarding a debtor's financial condition and business activities" and "to inform creditors and other interested parties of the debtor's financial affairs." 85 Fed. Reg. 82906.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 10

outside stakeholders, resulting in a loss to the estate of over $10 million versus cost and $20 million versus fair market value.

- The Debtor "sold" interests in certain investments commonly referred to as PetroCap without engaging in a public sale process and without exploring any other method of liquidating the asset.

Because the Bankruptcy Code does not define what constitutes a transaction in the "ordinary course of business," the Debtor's management was able to characterize these massive sales as ordinary course transactions when they were anything but ordinary, resulting in diminution in value to the estate and its creditors. Equally as troubling, for certain similar sale transactions the Debtor *did* seek Bankruptcy Court approval, thus acknowledging that such approval was necessary or, at a minimum, that disclosures regarding non-estate asset sales are required.

**The Lack of Transparency Permitted the "Inner Circle" to Manipulate the Estate for Personal Gain**

Largely because of the Debtor's failure to file Rule 2015.3 reports for affiliate entities, interested parties and creditors wishing to evaluate the worth and mix of assets held in non-Debtor affiliates could not do so. This is particularly problematic because the Debtor sold $172 million in assets, which altered the mix of assets and liabilities of the Debtor's affiliates and controlled entities. In addition, the estate's asset value decreased by approximately $200 million in a matter of months in the wake of the global pandemic. Absent financial reporting, it was impossible for stakeholders to determine whether the $200 million impairment in asset value reflected actual realized losses or merely temporary mark-downs precipitated by problems experienced by certain assets during the pandemic (including labor shortages, supply-chain issues, travel interruptions, and the like). A Rule 2015.3 report would have revealed the mix of assets and the corresponding reduction in liabilities of the affiliated or controlled entity—information that was critical in evaluating the worth of claims against the estate or future investments into it.

In stark contrast to its non-existent public disclosures, the Debtor provided the Creditors' Committee with robust weekly information regarding transactions involving assets held by the Debtor or its wholly owned subsidiaries, transactions involving managed entities and non-managed entities in which the Debtor held an interest, transactions involving non-discretionary accounts, and weekly budget-to-actuals reports referencing non-Debtor affiliates' 13-week cash flow budget. In other words, the Committee had real-time financial information with respect to the affairs of non-Debtor affiliates, which is precisely the type of information that should have been disclosed to the public pursuant to Rule 2015.3. The Debtor's "inner circle" -- the Debtor (as well as its advisors and professionals) and the Creditors' Committee (and its counsel) – had access to critical information upon which any reasonable investor would rely. But because of the lack of reporting, the public did not.

*Mr. Seery's Compensation Structure Encouraged Misrepresentations Regarding the Value of the Estate and Assets of the Estate*

Mr. Seery's compensation package encouraged, and the lack of transparency permitted, manipulation of the estate and settlement of creditors' claims at inflated amounts.

Ms. Nan R. Eitel
May 11, 2022
Page 11

Upon his initial appointment as an Independent Director in January 2020, Mr. Seery received compensation from the Debtor of $60,000 per month for the first three months, $50,000 per month for the following three months, and $30,000 per month for remaining months, subject to adjustment by agreement with the Debtor.[14]

When Mr. Seery subsequently was appointed the Debtor's CEO and CRO in July 2020, he his compensation package was handsomely improved. His base salary, which was on the verge of dropping to $30,000 per month, was increased *retroactively* back to March 15, 2020, to $150,000 per month. Additionally, his employment agreement contemplated a discretionary "Restructuring Fee"[15] that would be calculated in one of two ways:

(1)    If Mr. Seery were able to resolve a material amount of outstanding claims against the estate, he would be entitled to $1 million on confirmation of what the Debtor termed a "Case Resolution Plan," $500,000 at the effective date of the Case Resolution Plan, and $750,000 upon completion of distributions to creditors under the plan.

(2)    If, by contrast, Mr. Seery were not able to resolve the estate and instead achieved a "Monetization Vehicle Plan," he would be entitled to $500,000 on confirmation of the Monetization Vehicle Plan, $250,000 at the effective date of that plan, and—most importantly—a to-be-determined "contingent restructuring fee" based on "performance under the plan after all material distributions" were made.

The Restructuring Fee owed for a Case Resolution Plan was materially higher than that payable under the Monetization Vehicle Plan and was intended to provide a powerful economic incentive for Mr. Seery to steer Highland through the Chapter 11 case and emerge from bankruptcy as a going concern.

Despite the structure of his compensation package, Mr. Seery saw greater value in aligning himself with creditors and the Creditors' Committee. To that end, he publicly alienated and maligned Mr. Dondero, and he found willing allies in the Creditors' Committee. The posturing also paved the way for Mr. Seery to bestow upon the hold-out creditors exorbitant settlements at the expense of equity and earn his Restructuring Fee. In fact, at the time of Mr. Seery's formal appointment as CEO/CRO, he had already negotiated settlements in principle with Acis and the Redeemer Committee (both members of the Creditors' Committee),[16] leaving only the HarbourVest and UBS (also a member of the Creditors' Committee) claims to resolve. In other words, Mr. Seery had curried favor with two of the four members of the Creditors' Committee who would ultimately approve his Restructuring Fee and future compensation following plan consummation.

Ultimately, the confirmed Plan appointed Mr. Seery as the Claimant Trustee, which continued his compensation of $150,000 per month (termed his "Base Salary") and provided that the Oversight Board and Mr. Seery would negotiate additional "go-forward" compensation, including a "success fee" and severance pay.[17] Mr. Seery's success fee presumably is (or will be) based on whether his liquidation of

---

[14] *See* Dkt. 339, ¶ 3.
[15] *See* Dkt. 854, Ex. 1.
[16] *See* Dkt. 864, p. 8, l. 24 – p. 9, l. 8.
[17] *See* Plan Supplement, Dkt. 1875, § 3.13(a)(i).

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 12

the estate outperforms what was disclosed in the Plan Analysis. In other words, Mr. Seery had a financial incentive to grossly understate the value of the estate in public disclosures, not only to facilitate claims trading and resolution of the biggest claims in bankruptcy but also to ensure that he eventually receives a large "success fee" and severance payment. In fact, during a deposition taken on October 21, 2021, Mr. Seery testified that he expected to make "a few million dollars a year" for each year during the years that he will take to liquidate the Debtor, although we estimate that, based on the estate's nearly $650 million value today, Mr. Seery's success fee could approximate $50 million.

### *Mr. Seery Enters into Inflated Settlements*

Even before his appointment as CEO and CRO of the Debtor, Mr. Seery had effectively seized control of the Debtor as its *de facto* chief executive officer.[18] Thus, while he was in the process of negotiating his compensation agreement, he was simultaneously negotiating settlements with the remaining creditors to ensure he earned his Restructuring Fee, even if he did so at inflated amounts. One transaction that highlights this is the settlement with the Crusader Funds and the Redeemer Committee.

In connection with Mr. Seery's appointment as CEO and CRO, the Debtor announced that it had reached an agreement in principle with the Crusader Funds and the Redeemer Committee. Even **UBS**, one of the members of the Creditors' Committee, thought the settlement was inflated. In its objection to the Debtor's 9019 motion, UBS stated:[19]

> The Redeemer Claim is based on an Arbitration Award that required the Debtor, inter alia, to pay $118,929,666 (including prejudgment interest and attorneys' fees) in damages and to pay Redeemer $71,894,891 (including prejudgment interest) in exchange for all of Crusader's shares in Cornerstone. Pursuant to that same Arbitration Award, the Debtor also retained the right to receive $32,313,000 in Deferred Fees upon Crusader's liquidation. As shown below, after accounting for those reciprocal obligations to the Debtor and depending on the true value of the Cornerstone shares to be tendered (which is disputed), the actual value of the Arbitration Award to Redeemer is between $74,911,557 and $128,011,557.[3]

> Under the Proposed Settlement, however, Redeemer stands to gain far more because the Debtor has inexplicably agreed to release its rights to Crusader's Cornerstone shares and the Deferred Fees (with a combined value that could be as much as $115,913,000)—providing a substantial windfall to Redeemer. The Debtor has failed to provide sufficient information to permit this Court to meaningfully evaluate the true value of the Proposed Settlement, including the fair value of the Cornerstone shares, which it must do in order for this Court to have the information it needs to approve the Proposed Settlement. Depending on the valuation of the Cornerstone shares, the value of the Proposed Settlement to Redeemer may be as much as $253,609,610—which substantially exceeds the face amount of the Redeemer Claim.

---

[18] *See* Dkt. 864, p. 6, l. 18 – 22.
[19] *See* Dkt. 1190, p. 6 – 7.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 13

In the meantime, other general unsecured creditors of the Debtor will receive a much lower percentage recovery than they would if those assets were instead transferred to the Debtor's estate, as required by the Arbitration Award, and evenly distributed among the Debtor's creditors. The Proposed Settlement is only in the best interests of Redeemer and, as such, it should be rejected.

<center>******</center>

[3] The potential range of value attributable to the Cornerstone shares is significant because, according to the Debtor's liquidation analysis, the Debtor expects to have only $195 million total in value to distribute, and only $161 million to distribute to general unsecured creditors under its proposed plan. See Liquidation Analysis [Dkt. No. 1173-1]; First Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1079].

UBS was right. Mr. Seery agreed to a settlement that substantially overpaid the Redeemer Committee, and UBS only agreed to withdraw its objection and appeal of the Redeemer Committee's settlement when the Debtor bestowed upon UBS its own lavish settlement.[20]

It is worth noting that the Redeemer Committee ultimately sold its bankruptcy claim for $78 million in cash, but the sale excluded, and the Crusader Funds retained, its investment in Cornerstone Healthcare Group Holding Inc. and certain non-cash consideration.[21] At the end of the day, the Crusader Funds and the Redeemer Committee cashed out of their bankruptcy claims for total consideration at the very least of $135 million, meaning they received 105% of the highest estimate (according to UBS) of the net amount of their arbitration award.[22]

### *The Inner Circle Doesn't Object to Inflated Settlements*

Following the Bankruptcy Court's approval of settlements with Acis/Josh Terry and the Crusader Funds/the Redeemer Committee, Mr. Seery turned his attention to the two remaining critical holdouts: HarbourVest and UBS. HarbourVest, a private equity fund-of-funds with approximately $75 billion under management, had invested pre-bankruptcy $80 million into (and obtained 49.98% of the outstanding shares of) a Highland fund called Acis Loan Funding, later rebranded as Highland CLO

---

[20] *See* Dkt 2199. Under the terms of the UBS Settlement, UBS received a Class 8 claim in the amount of $65 million, a Class 9 claim in the amount of $60 million, a payment in cash of $18.5 million from a non-Debtor fund managed by the Debtor, and the Debtor's agreement to assist UBS in pursuing other claims against former Debtor affiliates related to a default on a credit facility during the Global Financial Crisis. Importantly, over the course of the preceding 11 years, UBS had already received payments totaling $180 million in connection with this dispute, and just prior to bankruptcy, UBS and the Debtor had reached a settlement in principle in which the Debtor would pay UBS just $7 million and $10 million in future business.
[21] *See* Exh. B.
[22] The estimation of a total recovery of $135 million includes attributing $48 million to the retained Cornerstone investment. The $48 million valuation equated to a ~45% interest in Cornerstone, which was valued pre-pandemic at approximately $107 million. Following COVID, Cornerstone's long-term acute care facilities flourished. Additionally, Cornerstone held a direct investment of over 800,000 shares in MGM, which was held on its books at approximately $72 per share. The per-share closing price on the sale of MGM to Amazon exceeded $164, which would have increased the company's valuation (irrespective of the post-COVID growth) by more than $70 million, bring Crusader Funds' windfall to more than $205 million.

Ms. Nan R. Eitel
May 11, 2022
Page 14

Funding, Ltd. ("HCLOF"). A charitable fund called the Charitable DAF Fund, L.P. ("DAF") held 49.02% member interests in HCLOF, and the remaining ~2.00% was held by Highland and certain of its employees.

Before Highland filed bankruptcy, a dispute arose between HarbourVest and Highland in which HarbourVest claimed it was duped into making the investment into HCLOF because Highland allegedly failed to disclose facts relating to the investment (namely, that Highland was engaged in ongoing litigation with former employee, Josh Terry, which would result in HCLOF's incurring legal fees and costs). HarbourVest alleged that, as a result of the Terry lawsuit, HCLOF incurred approximately $15 million in legal fees and costs. In Highland's bankruptcy, however, HarbourVest filed a proof of claim alleging that it was due over $300 million in damages in the dispute, a claim that the Debtor and Debtor's counsel initially argued was absurd. Indeed, Debtor management valued HarbourVest's claims at $0, which was consistently reflected in the Debtor's publicly-filed financial statements up through and including its December 2020 Monthly Operating Report.[23] Nevertheless, as one of the final creditor claims to be resolved, Mr. Seery ultimately agreed to give HabourVest a $45 million Class 8 claim and a $35 million Class 9 claim.[24] At that time, the Debtor's public disclosures reflected that Class 8 creditors could expect to receive 71.32% payout on their claims, and Class 9 creditors could expect 0.00%. Thus, HarbourVest's total $80 million in allowed claims would result in HarbourVest receiving $32 million in cash.[25] The cash consideration was offset by HarbourVest's agreement to convey its interest in HCLOF to the Debtor (or its designee) and to vote in favor of the Debtor's Plan. In its pleadings and testimony in support of the settlement, the Debtor represented that the value of HarbourVest's interest in HCLOF was $22.5 million. In other words, from the outside looking in, the Debtor agreed to pay $9.5 million for a spurious claim.

Oddly enough, no creditors (other than former insiders) objected. What the inner circle presumably knew was that the settlement was actually a windfall for the Debtor. As we have previously detailed, the $22.5 million valuation of HCLOF that the Debtor utilized in seeking approval of the settlement was based upon September 2020 figures when the economy was still reeling from the pandemic. The value of that investment rebounded rapidly, particularly because of the pending MGM sale to Amazon that was disclosed to the Debtor but not the public (i.e., material non-public information). We have subsequently learned that the actual value of the HCLOF at the time the Bankruptcy Court approved the HarbourVest settlement was at least $44 million—a value that Mr. Seery would have known but that was not disclosed to the Court or the public.

Likewise, there were no objections to the UBS settlement, which is puzzling. As detailed in the Debtor's 64-page objection to the UBS proof of claim and the Redeemer Committee's 431-page objection to the UBS proof of claim, UBS's claims against the Debtor were razor thin and largely foreclosed by res judicata and a settlement and release executed in connection with the June 2015 settlement. Moreover, the publicly available information indicated that:

- The estate's asset value had decreased by $200 million, from $556 million on October 16,

---

[23] *See* Monthly Operating Report for Highland Capital Management for the Month Ending December 2020, Dkt. 1949.

[24] Class 8 consists of general unsecured claims; Class 9 consists of subordinated claims.

[25] We have reason to believe that HarbourVest's Class 8 and Class 9 claims were contemporaneously sold to Farallon Capital Management—an SEC-registered investment advisor—for approximately $27 million.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 15

> 2019, to $328 million as of September 30, 2020 (increasing only slightly to $364 million as of January 31, 2021);[26]

- Allowed claims against the estate increased by $236 million from December 2020 to January 2021, with Class 8 claims ballooning $74 million in December to $267 million in January;

- Due to the decrease in the value of the Debtor's assets and the increase in the allowed claims amount, the ultimate projected recovery for Class 8 Claims decreased from 87.44% to 71.32% in just a matter of months.

The Liquidation Analysis estimated total assets remaining for distribution to general unsecured claims to be $195 million, with general unsecured claims totaling $273 million. By the time the UBS settlement was presented to the court for approval, the allowed Class 8 Claims had increased to $309,345,000, reducing the distribution to Class 8 creditors to 62.99%. Surely significant creditors like the Redeemer Committee—whose projected distribution dropped from $119,527,515 when it voted for the Plan to $86,105,194 with the HarbourVest and UBS claims included—should have taken notice.

**Mr. Seery Stacks the Oversight Board**

As previously disclosed, we believe Mr. Seery facilitated the sale of the four largest claims in the estate to Farallon and Stonehill. Based upon conversations with representatives of Farallon, Mr. Seery contacted them directly to encourage their acquisition of claims in the bankruptcy estate.[27] We believe Mr. Seery did so by disclosing the true value of the estate versus what was publicly disclosed in court filings, demonstrating that there was substantial upside to the claims as compared to what was included in the Plan Analysis. For example, publicly available information at the time Farallon and Stonehill acquired the UBS claim indicated the purchase would have made no economic sense: the publicly disclosed Plan Analysis estimated that there would be a 71.32% distribution to Class 8 creditors and a 0.00% distribution to Class 9 creditors, which would mean that Farallon and Stonehill would have lost money on the claim acquisition. We can only conclude Mr. Seery (or others in the Debtor's management) apprised Stonehill and Farallon of the true estate value (which was material, non-public information at the time), which based upon accurately disclosed financial statements would indicate they were likely to recover close to 100% on both Class 8 and Class 9 claims.

As set forth in the previous letters, three of the four members of the Creditors' Committee and one non-committee member sold their claims to two buyers Farallon, through Muck, and Stonehill, through Jessup. The four claims purchased by Farallon and Stonehill comprise the largest four claims in the Highland bankruptcy by a substantial margin, collectively totaling almost $270 million in Class 8 claims and $95 million in Class 9 claims:

---

[26] *Compare* Jan. 31, 2021 Monthly Operating Report [Dkt. 2030], *with* Disclosure Statement (approved on Nov. 24, 2020) [Dkt. 1473].
[27] We believe Mr. Seery made similar calls to representatives of Stonehill. We are informed and believe that Mr. Seery has long-standing relationships with both Farallon and Stonehill.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 16

| Claimant | Class 8 Claim | Class 9 Claims | Date Claim Settled |
|---|---|---|---|
| Redeemer Committee | $136,696,610 | N/A | October 28, 2020 |
| Acis Capital | $23,000,000 | N/A | October 28, 2020 |
| HarbourVest | $45,000,000 | $35,000,000 | January 21, 2021 |
| UBS | $65,000,000 | $60,000,000 | May 27, 2021 |
| **TOTAL:** | **$269,696,610** | **$95,000,000** | |

From the information we have been able to gather, it appears that Stonehill and Farallon purchased these claims for the following amounts:

| Creditor | Class 8 | Class 9 | Purchaser | Purchase Price |
|---|---|---|---|---|
| Redeemer | $137.0 | $0.0 | Stonehill | $78.0[28] |
| ACIS | $23.0 | $0.0 | Farallon | $8.0 |
| HarbourVest | $45.0 | $35.0 | Farallon | $27.0 |
| UBS | $65.0 | $60.0 | Stonehill and Farallon | $50.0 |
| **TOTAL** | **$270.0** | **$95.0** | | $150.0 - $165.0 |

As the purchasers of the four largest claims in the bankruptcy, Muck (Farallon) and Jessup (Stonehill) are overseeing the liquidation of the reorganized Debtor. These two hedge funds also will determine the performance bonus due to Mr. Seery for liquidating the estate. As set forth below, we estimate that the estate today is worth nearly $650 million and has approximately $200 million in cash, which could result in Mr. Seery's receipt of a performance bonus approximating $50 million. Thus, it is a warranted and logical deduction that Farallon and Stonehill may have been provided material, non-public information to induce their purchase of these claims. As set forth in previous letters, there are three primary reasons to believe this:

- The scant publicly available information regarding the Debtor's estate ordinarily would have dissuaded sizeable investment in purchases of creditors' claims;

- The information that was actually publicly available ordinarily would have compelled a prudent investor to conduct robust due diligence prior to purchasing the claims; and

- Yet these claims purchasers spent in excess of $100 million (and likely closer to $150 million) on claims, ostensibly without any idea of what they were purchasing.

For example, consider the sale of the Crusader Funds' claims, which we *know* was sold for $78 million. Based upon the publicly available information at the time of the acquisition, the expected distribution would have been $86 million. Surely a sophisticated hedge fund would not invest $78 million in a particularly contentious bankruptcy if it believed its maximum return was $86 million years later.

---

[28] Because the transaction included "the majority of the remaining investments held by the Crusader Funds," the net amount paid by Stonehill for the Claims was approximately $65 million.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 17

Ultimately, the Plan, Mr. Seery's compensation package, and the lack of transparency to everyone other than the Debtor, its management, and the Creditors' Committee permitted Debtor management and the Creditors' Committee to support grossly inflated claims (at the expense of residual stakeholders) in a grossly understated estate, which facilitated the sales of those claims to a small group of investors with significant ties to Debtor management. In doing so, Mr. Seery installed on the Reorganized Debtor's Oversight Board friendly faces who stand to make $370 million on ~$150 million investment. And Mr. Seery's plan has already worked. Notably, while the confirmed Plan was characterized by the Debtor as a monetization plan,[29] the newly installed Oversight Board supported, and the Court approved, paying Mr. Seery the much more lucrative Case Resolution Fee, netting Mr. Seery $1.5 million more than he was entitled to receive under his employment agreement.

In a transparent bankruptcy proceeding, we question whether any of this could have happened. What we do know is that the Debtor's non-transparent bankruptcy has ensured there will be nothing left for residual stakeholders, while enriching a handful of intimately connected individuals and investors.

| | Value as of Aug. 2021 | | March 2022 High Estimate updated for MGM closing |
|---|---|---|---|
| **Asset** | **Low** | **High** | |
| Cash as of 4/25/22 | $17.9 | $17.9 | |
| Targa Sale | $37.0 | $37.0 | |
| 8/1 CLO Flows | $10.0 | $10.0 | |
| Uchi Bldg. Sale | $9.0 | $9.0 | |
| Siepe Sale | $3.5 | $3.5 | |
| PetroCap Sale | $3.2 | $3.2 | |
| Park West Sale | $3.5 | $3.5 | |
| HCLOF trapped cash | $25.0 | $25.0 | |
| **Total Cash** | **$105.6** | **$105.6** | **$200** |
| Trussway | $180.0 | $180.0 | $180.0 |
| Cornerstone (125mm; 16%) | $18.0 | $18.0 | $25.0 |
| HCLOF | $40.0 | $40.0 | $20.0 |
| CCS Medical (in CLOs and Highland Restoration) | $20.0 | $20.0 | $30.0 |
| MGM (direct ownership) | $32.0 | $32.0 | $0.0 |
| Multi-Strat (45% of 100mm; MGM; CCS) | $45.0 | $45.0 | $30.0 |
| Korea Fund | $18.0 | $18.0 | $20.0 |
| Celtic (in Credit-Strat) | $12.0 | $40.0 | $40.0 |
| SE Multifamily | $0.0 | $20.0 | $20.0 |
| Affiliate Notes | $0.0 | $70.0 | $70.0 |
| Other | $2.0 | $10.0 | $10.0 |

---

[29] See Dkt. 194., p.5.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 18

| Highland Restoration Capital Partners | | | |
|---|---|---|---|
| **TOTAL** | **$472.6** | **$598.6** | **$645.0** |

**The Bankruptcy Professionals are Draining the Estate**

Yet another troubling aspect of the Highland bankruptcy has been the rate at which Debtor professionals have drained the Estate, largely through invented, unnecessary, and greatly overstaffed and overworked offensive litigation. The sums expended between case filing and the effective date of the Plan (the "Effective Date") are staggering:

| Professional | Fees | Expenses |
|---|---|---|
| Hunton Andrews Kurth | $1,147,059.42 | $2,747.84 |
| FTI Consulting, Inc. | $6,176,551.20 | $39,122.91 |
| Teneo Capital, LLC | $1,221,468.75 | $6,257.07 |
| Marc Kirschner | $137,096.77 | |
| Sidley Austin LLP | $13,134,805.20 | $211,841.25 |
| Pachulski Stang Ziehl & Jones | $23,978,627.25 | $334,232.95 |
| Mercer (US) Inc. | $202,317.65 | $2,449.37 |
| Deloitte Tax LLP | $553,412.60 | |
| Development Specialists, Inc. | $5,562,531.12 | $206,609.54 |
| James Seery[30] | $5,100,000.00 | |
| Quinn Emanuel Urquhart & Sullivan, LLP | | |
| Wilmer Cutler Pickering Hale & Dorr LLP | $2,645,729.72 | $5,207.53 |
| Kurtzman Carson Consultants LLC | $2,054,716.00 | |
| Foley & Lardner LLP | $629,088.00 | |
| Casey Olsen Cayman Limited | $280,264.00 | |
| ASW Law Limited | $4,976.00 | |
| Houlihan Lokey Financial Advisors, Inc. | $766,397.00 | |
| Berger Harris, LLP | | |
| Hayward PLLC | $825,629.50 | $46,482.92 |
| | **$64,420,670.18** | **$854,951.38** |
| | | |
| **Total Fees and Expenses** | | **$65,275,621.56** |

"The [bankruptcy] estate is not a cash cow to be milked to death by professionals seeking compensation for services rendered to the estate which have not produced a benefit commensurate with the fees sought." *In re Chas. A. Stevens & Co.*, 105 B.R. 866, 872 (Bankr. N.D. Ill. 1989).

---

[30] This amount includes Mr. Seery's success fee, which was paid a month following the Effective Date.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 19

The rate at which Debtor professionals have drained the estate is in stark contrast to the treatment of the employees who stayed with the Debtor (without a key employee retention plan or key employee incentive program) on the promise they would be made whole for prepetition deferred compensation that had not yet vested, only to be stiffed and summarily terminated. Even worse, some of these employees have been targeted by the litigation sub-trust for acts they took in the course and scope of their employment.

Following the Effective Date, siphoning of estate assets continues. Mr. Seery still receives base compensation of $150,000 per month, and he expects to receive compensation of at least "a few million dollars a year" according to his own deposition testimony. In addition, his retention was conditioned upon receiving a to-be-negotiated success fee and severance payment (notably, none of which is disclosed publicly).

Likewise, Teneo Capital, LLC was retained as the litigation adviser. For its services post-Effective Date, it is compensated $20,000 per month for Mr. Kirschner as trustee for the Litigation Subtrust, plus the regularly hourly fees of any additional Teneo personnel, plus a "Litigation Recovery Fee." The Litigation Recovery Fee is equal to 1.5% of Net Litigation Proceeds up to $100 million and 2.0% of Net Litigation Proceeds above. Interestingly, although "Net Litigation Proceeds" is defined as gross litigation proceeds less certain fees incurred in pursing the litigation, net proceeds are not reduced by Mr. Kirschner's monthly fee, contingency fees charged by any other professionals, or litigation funding financing. Moreover, Teneo is given credit for any litigation recoveries regardless of whether those recoveries stem from actions commenced by the litigation trustee. The Debtor has not disclosed, and is not required to disclose, the terms upon which any professionals have been engaged following the Effective Date, including Quinn Emanuel Urquhart & Sullivan, LLP, counsel for the Litigation Subtrust. Based upon pre-Effective Date monthly expenses, the number of lawyers that attend various matters on behalf of the Debtor,[31] and the addition of Quinn Emanuel Urquhart & Sullivan, LLP and Teneo, we believe the Debtor could be spending as much as $5-$7 million per month.

The Reorganized Debtor and the Highland Claimant Trust recently filed heavily redacted, quarterly post-confirmation reports.[32] Of note, the Reorganized Debtor disclosed that it has disbursed $81,983,611 since the Effective Date but disclosed that it has only paid $47,793 in priority claims and $6,918,473 in general unsecured claims, while still estimating a total recovery to general unsecured claims of $205,144,544. The Highland Claimant Trust disclosed that it has disbursed an additional $7,152,331 since the Effective Date.

## CONCLUSION

The Highland bankruptcy is an extreme example of the abuses that can occur if the federal bench, federal government appointees, and federal lawmakers do not police federal bankruptcy proceedings by

---

[31] In connection with a recent two-day trial on an administrative claim, the Debtor was represented by John Morris ($1,245.00 per hour), Greg Demo ($950 per hour), and Hayley Winograd ($695 per hour), and was assisted by paralegal La Asia Canty ($460 per hour). The Debtor's local counsel, Zachery Annable ($300 per hour), was also present, and Jeffrey Pomerantz ($1,295 per hour) observed the trial via WebEx. Despite the army of lawyers, Mr. Morris handled virtually the entire proceeding, with Ms. Winograd examining only two small witnesses. Messrs. Pomerantz, Demo, and Annable played no active role in the proceedings.

[32] Dkt 3325 and 3326.

4862-7970-5887v.1 019717.00004

Ms. Nan R. Eitel
May 11, 2022
Page 20

permitting debtors-in-possession to hide material information, violate duties of transparency and candor, and manipulate information and transactions to benefit disclosed and undisclosed insiders or "friends" of insiders. Bankruptcy should not be an avenue for opportunistic venturers to prey upon companies to the detriment of third-party stakeholders and the bankruptcy estate. We therefore encourage your office to investigate the problems inherent in the Highland bankruptcy. At a minimum, we ask that the EOUST seek orders from the Bankruptcy Court compelling the Debtor to undertake the following actions:

1. turn over all financial reports that should have been disclosed during the pendency of the bankruptcy, including 2015.3 reports;

2. provide a detailed disclosure of the assets Reorganized Debtor;

3. provide a copy of the executed Claimant Trust Agreement, which should already have been disclosed;

4. disclose all solvency analyses prepared by the Debtor; and

5. provide copies of all agreements for the engagement of Debtor professionals post-confirmation, including the terms of Mr. Seery's success fee and severance agreement, compensation agreements for personnel of the Reorganized Debtor, and the fee arrangement with Quinn Emanuel Urquhart & Sullivan, LLP.

Sincerely,

MUNSCH HARDT KOPF & HARR, P.C.

By:    _____
          Davor Rukavina, Esq.

DR:

1  IN THE UNITED STATES BANKRUPTCY COURT

2  FOR THE NORTHERN DISTRICT OF TEXAS

3  DALLAS DIVISION

4  -----------------------------)

5  In Re:                    Chapter 11

6  HIGHLAND CAPITAL          Case No.

7  MANAGEMENT, LP,           19-34054-SGJ 11

8

9       Debtor

10 ------------------------------------

11

12

13   REMOTE DEPOSITION OF JAMES P. SEERY, JR.

14              January 29, 2021

15              10:11 a.m. EST

16

17

18

19

20

21

22

23
    Reported by:
24  Debra Stevens, RPR-CRR
    JOB NO. 189212
25

Page 2

```
 1            January 29, 2021
 2            9:00 a.m. EST
 3
 4        Remote Deposition of JAMES P.
 5    SEERY, JR., held via Zoom
 6    conference, before Debra Stevens,
 7    RPR/CRR and a Notary Public of the
 8    State of New York.
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1    REMOTE APPEARANCES:
 2
 3    Heller, Draper, Hayden, Patrick, & Horn
 4    Attorneys for The Dugaboy Investment
 5    Trust and The Get Good Trust
 6            650 Poydras Street
 7            New Orleans, Louisiana 70130
 8
 9
10    BY:    DOUGLAS DRAPER, ESQ
11
12
13    PACHULSKI STANG ZIEHL & JONES
14    For the Debtor and the Witness Herein
15            780 Third Avenue
16            New York, New York 10017
17    BY:    JOHN MORRIS, ESQ.
18            JEFFREY POMERANTZ, ESQ.
19            GREGORY DEMO, ESQ.
20            IRA KHARASCH, ESQ.
21
22
23
24                (Continued)
25
```

Page 4

```
 1    REMOTE APPEARANCES:  (Continued)
 2
 3    LATHAM & WATKINS
 4    Attorneys for UBS
 5            885 Third Avenue
 6            New York, New York 10022
 7    BY:    SHANNON McLAUGHLIN, ESQ.
 8
 9    JENNER & BLOCK
10    Attorneys for Redeemer Committee of
11    Highland Crusader Fund
12            919 Third Avenue
13            New York, New York 10022
14    BY:    MARC B. HANKIN, ESQ.
15
16    SIDLEY AUSTIN
17    Attorneys for Creditors' Committee
18            2021 McKinney Avenue
19            Dallas, Texas 75201
20    BY:    PENNY REID, ESQ.
21            MATTHEW CLEMENTE, ESQ.
22            PAIGE MONTGOMERY, ESQ.
23
24                (Continued)
25
```

Page 5

```
 1    REMOTE APPEARANCES:  (Continued)
 2    KING & SPALDING
 3    Attorneys for Highland CLO Funding, Ltd.
 4            500 West 2nd Street
 5            Austin, Texas 78701
 6    BY:    REBECCA MATSUMURA, ESQ.
 7
 8    K&L GATES
 9    Attorneys for Highland Capital Management
10    Fund Advisors, L.P., et al.:
11            4350 Lassiter at North Hills
12            Avenue
13            Raleigh, North Carolina 27609
14    BY:    EMILY MATHER, ESQ.
15
16    MUNSCH HARDT KOPF & HARR
17    Attorneys for Defendants Highland Capital
18    Management Fund Advisors, LP; NexPoint
19    Advisors, LP; Highland Income Fund;
20    NexPoint Strategic Opportunities Fund and
21    NexPoint Capital, Inc.:
22            500 N. Akard Street
23            Dallas, Texas 75201-6659
24      BY:  DAVOR RUKAVINA, ESQ.
25                (Continued)
```

**APP. 3035**

Page 6

```
1   REMOTE APPEARANCES (Continued)
2
3   BONDS ELLIS EPPICH SCHAFER JONES
4   Attorneys for James Dondero,
5   Party-in-Interest
6          420 Throckmorton Street
7
8          Fort Worth, Texas 76102
9   BY:   CLAY TAYLOR, ESQ.
10         JOHN BONDS, ESQ.
11         BRYAN ASSINK, ESQ.
12
13
14  BAKER McKENZIE
15  Attorneys for Senior Employees
16         1900 North Pearl Street
17
18         Dallas, Texas 75201
19  BY:   MICHELLE HARTMANN, ESQ.
20        DEBRA DANDEREAU, ESQ.
21
22
23
24             (Continued)
25
```

Page 7

```
1   REMOTE APPEARANCES: (Continued)
2
3   WICK PHILLIPS
4   Attorneys for NexPoint Real Estate
5   Partners, NexPoint Real Estate Entities
6   and NexBank
7          100 Throckmorton Street
8           Fort Worth, Texas 76102
9   BY:    LAUREN DRAWHORN, ESQ.
10
11  ROSS & SMITH
12  Attorneys for Senior Employees, Scott
13  Ellington, Isaac Leventon, Thomas Surgent,
14  Frank Waterhouse
15         700 N. Pearl Street
16         Dallas, Texas 75201
17  BY:    FRANCES SMITH, ESQ.
18
19
20
21
22
23
24
25
```

Page 8

```
1
2        E X A M I N A T I O N S
3   WITNESS                          PAGE
4   JAMES SEERY
5     By Mr. Draper                  9
6     By Mr. Taylor                  75
7     By Mr. Rukavina                165
8     By Mr. Draper                  217
9
          E X H I B I T S
10  SEERY DYD
    EXHIBIT     DESCRIPTION          PAGE
11
    Exhibit 1   January 2021 Material   11
12
    Exhibit 2   Disclosure Statement    14
13
    Exhibit 3   Notice of Deposition    74
14
15
    INFORMATION/PRODUCTION REQUESTS
16  DESCRIPTION                      PAGE
17  Subsidiary ledger showing note   22
    component versus hard asset
18  component
19  Amount of D&O coverage for       131
    trustees
20
    Line item for D&O insurance      133
21
22        MARKED FOR RULING
             PAGE   LINE
23            85    20
24
25
```

Page 9

```
1
2        COURT REPORTER:  My name is
3   Debra Stevens, court reporter for TSG
4   Reporting and notary public of the
5   State of New York.  Due to the
6   severity of the COVID-19 pandemic and
7   following the practice of social
8   distancing, I will not be in the same
9   room with the witness but will report
10  this deposition remotely and will
11  swear the witness in remotely.  If any
12  party has any objection, please so
13  state before we proceed.
14        Whereupon,
15      J A M E S   S E E R Y,
16  having been first duly sworn/affirmed,
17  was examined and testified as follows:
18  EXAMINATION BY
19  MR. DRAPER:
20  Q.    Mr. Seery, my name is Douglas
21  Draper, representing the Dugaboy Trust.  I
22  have series of questions today in
23  connection with the 30(b) Notice that we
24  filed.  The first question I have for you,
25  have you seen the Notice of Deposition
```

Page 10

J. SEERY

1  that we sent out?
2
3    A.    Yes.
4    Q.    You are the person most
5  qualified to answer the areas of inquiry
6  identified in the 30(b) Deposition Notice?
7    A.    Yes.
8    Q.    And if in fact when we go
9  through this, if you are not the most
10  qualified person, I'd ask you to identify
11  who would be most qualified to provide the
12  answers.  Is that okay?
13    A.    I think I am the most qualified.
14  But if there is something I can't answer I
15  will endeavor to figure out who could.
16    Q.    Great.  Thank you very much.
17          Yesterday we were furnished by
18  Mr. Morris a new set of what I will call
19  plan analysis versus liquidation analysis.
20          MR. DRAPER:  Bryan, can you put
21    that document up?
22    Q.    Mr. Seery, can you get your
23  hands on that document?
24          THE WITNESS:  Is that in the
25    pieces you sent to me, John?

Page 11

J. SEERY

1
2          MR. MORRIS:  Yes.
3          THE WITNESS:  Do you recall
4    which one?  I will open them all.
5    It's not a big deal.
6    Q.    Bryan has put the document up
7  for you.
8          THE WITNESS:  John, I don't see
9    it in the ones you sent to me.  I can
10    see it on the screen.  I have the plan
11    of reorg, I have got the disclosure
12    statement, schedules.  I have
13    bankruptcy schedules from the filing.
14          MR. MORRIS:  Hold on one second.
15    See if it is among what I just sent
16    you.
17          (Reporter interruption.)
18          (So marked for identification as
19    Seery Exhibit 1.)
20          THE WITNESS:  Okay.  I am
21    looking at it.  It is easier to see on
22    my screen than yours.  We can do it
23    either way.
24  BY MR. DRAPER:
25    Q.    Did you prepare this document?

Page 12

J. SEERY

1
2    A.    It was prepared for me.
3    Q.    It was prepared under your
4  supervision.  Correct?
5    A.    Correct.
6    Q.    Who worked on the team?
7    A.    The team from DSI.
8    Q.    Who at DSI?
9    A.    The team working on the case.
10  It is Fred Caruso, Jack Donohue, James
11  Romey as well as counsel and myself.
12    Q.    If in fact there is a question
13  that I ask you about this document that
14  you don't know the answer, can you
15  identify for me the person --
16          (Reporter interruption.)
17    Q.    Mr. Seery, if in fact you don't
18  know an answer to a question about the
19  document, I would ask you to identify the
20  person at DSI who is most responsible for
21  the piece of information on the document.
22          MR. MORRIS:  Objection to the
23    form of the question.  He is here as
24    the 30(b)(6) witness.  We have offered
25    him as the person who is prepared to

Page 13

J. SEERY

1
2  answer the questions.  Just ask the
3  questions.  If he doesn't know
4  something, we'll decide whether or not
5  it warrants going elsewhere.  But
6  let's just move on.  It is like the
7  third time you asked him if he can
8  identify -- we don't even have
9  something that he doesn't know yet.
10    Q.    Mr. Seery, is the team that
11  prepared this document the same team that
12  prepared the November similar document
13  that is attached to the disclosure
14  statement in November?
15    A.    Largely.
16    Q.    This new document was prepared
17  to reflect information I gather that was
18  changed from November 20th of 2020 to
19  today's date?
20    A.    Yes.
21    Q.    In looking at the two
22  documents -- and I would ask you to go to
23  the disclosure statement of November 2020.
24  I think it is page 174.
25          MR. MORRIS:  Can you move it on

Page 14

J. SEERY

1  the screen, please?
2  A.   Page what?
3  Q.   I think it is page 174.
4  A.   Of the PDF or of the document?
5  Q.   Of the disclosure statement that
6  was filed.  It is up on the screen right
7  now.
8       COURT REPORTER:  Do you intend
9       this as another exhibit for today's
10      deposition?
11      MR. DRAPER:  We'll mark this
12      Exhibit 2.
13      (So marked for identification as
14      Seery Exhibit 2.)
15 Q.   If you look to the recovery to
16 Class 8 creditors in the November 2020
17 disclosure statement was a recovery of
18 87.44 percent?
19 A.   That actually says the percent
20 distribution to general unsecured
21 creditors was 87.44 percent.  Yes.
22 Q.   And in the new document that was
23 filed, given to us yesterday, the recovery
24 is 62.5 percent?

Page 15

J. SEERY

1  A.   It says the percent distribution
2  to general unsecured creditors is
3  62.14 percent.
4  Q.   Have you communicated the
5  reduced recovery to anybody prior to the
6  date -- to yesterday?
7       MR. MORRIS:  Objection to the
8       form of the question.
9  A.   I believe generally, yes.  I
10 don't know if we have a specific number,
11 but generally yes.
12 Q.   And would that be members of the
13 Creditors' Committee who you gave that
14 information to?
15 A.   Yes.
16 Q.   Did you give it to anybody other
17 than members of the Creditors' Committee?
18 A.   Yes.
19 Q.   Who?
20 A.   HarbourVest.
21 Q.   And when was that?
22 A.   Within the last two months.
23 Q.   You did not feel the need to
24 communicate the change in recovery to

Page 16

J. SEERY

1  anybody else?
2  A.   I said Mr. Doherty.
3  Q.   In looking at the two elements,
4  and what I have asked you to look at is
5  the claims pool.  If you look at the
6  November disclosure statement, if you look
7  down Class 8, unsecured claims?
8  A.   Yes.
9  Q.   You have 176,000 roughly?
10 A.   Million.
11 Q.   176 million.  I am sorry.  And
12 the number in the new document is 313
13 million?
14 A.   Correct.
15 Q.   What accounts for the
16 difference?
17 A.   An increase in claims.
18 Q.   When did those increases occur?
19 Were they yesterday?  A month ago?  Two
20 months ago?
21 A.   Over the last couple months.
22 Q.   So in fact over the last couple
23 months you knew in fact that the recovery
24 in the November disclosure statement was

Page 17

J. SEERY

1  not accurate?
2  A.   Yes.  We secretly disclosed it
3  to the Bankruptcy Court in open court
4  hearings.
5  Q.   But you never did bother to
6  calculate the reduced recovery; you just
7  increased --
8       (Reporter interruption.)
9  Q.   You just advised as to the
10 increased claims pool.  Correct?
11      MR. MORRIS:  Objection to the
12      form of the question.
13 A.   I don't understand your
14 question.
15 Q.   What I am trying to get at is,
16 as you increase the claims pool, the
17 recovery reduces.  Correct?
18 A.   No.  That is not how a fraction
19 works.
20 Q.   Well, if the denominator
21 increases, doesn't the recovery ultimately
22 decrease if --
23 A.   No.
24 Q.   -- if the numerator stays the

Page 18

J. SEERY

1 same?

2 A. Now your question is correctly
3 stated.

4 Q. Thank you.

5 Now, in connection with the
6 proceeds from the liquidation of the
7 assets in both the plan recovery and the
8 liquidation model -- and I will go back to
9 the January document that we just got.
10 Did you personally determine the estimated
11 proceeds, or that was done by the DSI
12 people?

13 A. Can you ask your question again?
14 I am looking at two different documents so
15 I don't know what you are asking me.

16 Q. Let's go to the January
17 document. If you will see, in line 2,
18 where you have plan versus liquidation?

19 A. Yes.

20 Q. You will see in line 2 it says
21 estimated proceeds 257, and then there is
22 191?

23 A. Yes.

24 Q. Do you see those numbers?

Page 19

J. SEERY

1 A. Yes.

2 Q. Is that your number? That is
3 the number you came up with?

4 A. Correct.

5 MR. MORRIS: Objection to the
6 form of the question. It is the
7 Debtor's number.

8 Q. Mr. Seery, what I have asked you
9 to look at is the statement of assumptions
10 in the January document, and look at
11 assumption P. Just so I can read it, it
12 says, "See below the Class 8 estimated
13 payout schedule" and then it lists a
14 September 30, 2021 date, a March 31, 2022
15 date, and a June 30, 2022 date. Do you
16 see that?

17 A. I do.

18 Q. Is that your assumption, or an
19 assumption made by DSI?

20 A. That is my assumption.

21 Q. That footnote P is the same note
22 that was in the November 2020 disclosure
23 statement. Correct?

24 A. I'd have to look.

Page 20

J. SEERY

1 Q. Do you want to take a look? Let
2 me tell you it is, but you can confirm
3 that.

4 A. It appears to be, yes.

5 Q. Now, going back to the 257,941
6 that is in the January statement?

7 A. The second line?

8 Q. Yes. What percentage of that
9 are notes -- collection from notes versus
10 collection from liquidation of assets?

11 A. The total percentage, I don't
12 recall the exact percentage off the top of
13 my head. It includes all the demand notes
14 and the demanded note from NexPoint
15 Advisors. So, it should be around
16 $40 million worth of value would come from
17 the notes. Somewhere in that
18 neighborhood.

19 Q. So roughly what we are talking
20 about when we break up the 257 is, doing
21 rough math, 210 being assets, 40 million
22 being note collection?

23 A. Roughly, I believe. I don't
24 have it off the top of my head but that is

Page 21

J. SEERY

1 rough numbers. We have made demand, I
2 think it is about 40 million, 24 million
3 on NexPoint and then 8 million on HCFMA,
4 roughly. And then somewhere around 8
5 million on Dondero, all for notes that
6 were either demanded because they were
7 able to be demanded or accelerated because
8 they were defaulted.

9 Q. And then in the liquidation
10 analysis you have $191 million. What
11 percentage of that is note collection
12 versus what percentage of that is
13 liquidation of assets?

14 A. The same amount for the demanded
15 notes, and the non-demand notes are a
16 reduced amount because they are assumed to
17 be sold.

18 Q. So that doesn't answer my
19 question. In the 257, you had a
20 $40 million figure. Correct?

21 A. Approximately.

22 Q. Do you have a $40 million figure
23 in the 191?

24 A. I believe it does.

Page 22

J. SEERY

2  Q.    Excuse me?
3  A.    I believe it does.
4  Q.    Is there a subsidiary ledger
5  that would tell me what is the note
6  component versus what is the hard asset
7  component?
8  A.    Yes.
9  Q.    Who has that?
10 A.    I do.
11     MR. DRAPER:  Mr. Morris, can I
12 get that document?
13     MR. MORRIS:  I will take it
14 under advisement.
15 Q.    There is also a Dugaboy note in
16 your notes that is to be sold.  Is that
17 Dugaboy note in the $40 million, or is it
18 in the hard asset monetization?
19 A.    I believe it is in the -- it is
20 to be sold, so it is not collected in
21 full.  If they default, then we would
22 accelerate that and collect that in full
23 as well.
24 Q.    That doesn't answer my question
25 unfortunately.  What I am asking you, is

Page 23

J. SEERY

2  it in the $40 million calculation, or in
3  the $200 million number?
4  A.    It doesn't answer your question
5  because you didn't listen to my prior
6  answer.  I said that the 40 million
7  calculation was for stuff that had been
8  demanded.  I think you represent -- do you
9  represent Dugaboy?  I don't think we
10 demanded --
11 Q.    I do.  Excuse me?
12 A.    So if it wasn't demanded, it is
13 not in the hard asset calculation; it's in
14 the discounted amount.
15 Q.    Let me try to understand your
16 answer.  What you are telling me, just so
17 we are both clear, is that that Dugaboy
18 note is not in the $40 million; it is in
19 the balance of the 257?  That is a yes or
20 no answer.
21 A.    I didn't take it as a question.
22 It sounded like a statement.  I agree with
23 your statement.
24 Q.    Thank you.  So the answer is
25 yes?

Page 24

J. SEERY

2  A.    It wasn't a question.  I agree
3  with your statement; yes.
4  Q.    Thank you.
5     Now, let's go to the
6  November 2020 schedule that we had.  If
7  you see in the line "Estimated proceeds
8  from monetization of assets," you had
9  $190 million under the plan analysis?
10 A.    Yes.
11 Q.    What percentage of that are
12 notes versus hard assets?
13 A.    The demand notes only were
14 included in the proceeds in terms of
15 recovery in full.  I don't quite
16 understand your distinction between hard
17 assets.  There is a lot of intangibles as
18 well as tangibles in the total.
19     But if we are distinguishing
20 between notes and other assets, the demand
21 notes are included in the 190.  The longer
22 dated notes are assumed to be sold.  So,
23 they are included but they are included at
24 a much lower amount.
25 Q.    Okay.  Now how much of the

Page 25

J. SEERY

2  demand notes in the 190, Mr. Seery?
3  A.    Off the top of my head I don't
4  recall.  It is the Dondero demand notes as
5  well as the HCFMA demand notes, so it
6  should be about 15 to $20 million.
7  Somewhere in that realm.  The same as the
8  other demand notes.
9  Q.    Were the other notes, the
10 $40 million of notes that you referenced
11 in the January document, were they carried
12 at face or at discounted amount in the
13 190?
14 A.    In the 190, the ones that were
15 demand were carried at face.  The ones
16 that were long dated, which really at that
17 point I believe -- the only difference is
18 the $24-and-change-million NexPoint
19 Advisors note was at a discounted amount.
20 The others were at face.
21 Q.    What was the discount that was
22 applied to that note?
23 A.    I don't recall off the top of my
24 head.  It is pretty significant because of
25 the long dated nature of the notes.  They

Page 26

J. SEERY

1  were amended without consideration a few
2  years ago.  So, for our purposes we didn't
3  make the assumption, which I am sure will
4  happen, a fraudulent conveyance claim on
5  those notes, that a fraudulent conveyance
6  action would be brought.  We just assumed
7  that we'd have to discount the notes
8  heavily to sell them because nobody would
9  respect the ability of the counterparties
10 to fairly pay.
11    Q.    And the same discount was
12 applied in the liquidation analysis to
13 those notes?
14    A.    Yes.
15    Q.    Now --
16    A.    The difference -- there would be
17 a difference, though, because they would
18 pay for a while because they wouldn't want
19 to accelerate them.  So there would be
20 some collections on the notes for P and I.
21    Q.    But in fact as of January you
22 have accelerated those notes?
23    A.    Just one of them, I believe.
24    Q.    Which note was that?

Page 27

J. SEERY

1    A.    NexPoint, I said.  They
2  defaulted on the note and we accelerated
3  it.
4    Q.    So there is no need to file a
5  fraudulent conveyance suit with respect to
6  that note.  Correct, Mr. Seery?
7          MR. MORRIS:  Objection to the
8      form of the question.
9    A.    Disagree.  Since it was likely
10 intentional fraud, there may be other
11 recoveries on it.  But to collect on the
12 note, no.
13    Q.    My question was with respect to
14 that note.  Since you have accelerated it,
15 you don't need to deal with the issue of
16 when it's due?
17          MR. MORRIS:  Objection to the
18     form of the question.
19    A.    That wasn't your question.  But
20 to that question, yes, I don't need to
21 deal with when it's due.
22    Q.    Let me go over certain assets.
23 I am not going to ask you for the
24 valuation of them but I am going to ask

Page 28

J. SEERY

1  you whether they are included in the asset
2  portion of your $257 million number, all
3  right?  Mr. Morris didn't want me to go
4  into specific asset value, and I don't
5  intend to do that.
6          The first question I have for
7  you is, the equity in Trustway Highland
8  Holdings, is that included in the
9  $257 million number?
10    A.    There is no such entity.
11    Q.    Then I will do it in a different
12 way.  In connection with the sale of the
13 hard assets, what assets are included in
14 there specifically?
15    A.    Off the top of my head -- it is
16 all of the assets, but it includes
17 Trustway Holdings and all the value that
18 flows up from Trustway Holdings.  It
19 includes Targa and all the value that
20 flows up from Targa.  It includes CCS
21 Medical and all the value that would flow
22 to the Debtor from CCS Medical.  It
23 includes Cornerstone and all the value
24 that would flow from Cornerstone.  It

Page 29

J. SEERY

1  includes any other securities and all the
2  value that would flow from Cornerstone.
3  It includes HCLOF and all the value that
4  would flow up from HCLOF.  It includes
5  Korea and all the value that would flow up
6  from Korea.
7          There may be others off the top
8  of my head.  I don't recall them.  I don't
9  have a list in front of me.
10    Q.    Now, with respect to those
11 assets, have you started the sale process
12 of those assets?
13    A.    No.  Well, each asset is
14 different.  So, the answer is, with
15 respect to any securities, we do seek to
16 sell those regularly and we do seek to
17 monetize those assets where we can
18 depending on whether there is a
19 restriction or not and whether there is
20 liquidity in the market.
21          With respect to the PE assets or
22 the companies I described -- Targa, CCS,
23 Cornerstone, JHT -- we have not --
24 Trustway.  We have not sought to sell



**Alvarez & Marsal CRF Management, LLC** 2029 Century Park East Suite 2060 Los Angeles, CA 90067

July 6, 2021

**Re: Update & Notice of Distribution**

Dear Highland Crusader Funds Stakeholder,

As you know, in October 2020, the Bankruptcy Court approved a settlement of the Redeemer Committee's and the Crusader Funds' claims against Highland Capital Management L.P. ("HCM"), as a result of which the Redeemer Committee was allowed a general unsecured claim of $137,696,610 against HCM and the Crusader Funds were allowed a general unsecured claim of $50,000 against HCM (collectively, the "Claims"). In addition, as part of the settlement, various interests in the Crusader Funds held by HCM and certain of its affiliates are to be extinguished (the "Extinguished Interests"), and the Redeemer Committee and the Crusader Funds received a general release from HCM and a waiver by HCM of any claim to distributions or fees that it might otherwise receive from the Crusader Funds (the "Released Claims" and, collectively with the Extinguished Interests, the "Retained Rights").

A timely appeal of the settlement was taken by UBS (the "UBS Appeal) in the United States District Court for the Northern District of Texas, Dallas Division. However, the Bankruptcy Court subsequently approved a settlement between HCM and UBS, resulting in dismissal of the UBS Appeal with prejudice on June 14, 2021.

On April 30, 2021, the Crusader Funds and the Redeemer Committee consummated the sale of the Claims against HCM and the majority of the remaining investments held by the Crusader Funds to Jessup Holdings LLC ("Jessup") for $78 million in cash, which was paid in full to the Crusader Funds at closing. The sale specifically excluded the Crusader Funds' investment in Cornerstone Healthcare Group Holding Inc. and excluded certain specified provisions of the settlement agreement with HCM (the "Settlement Agreement"), including, but not limited to, the Retained Rights. The sale of the Claims and investments was made with no holdbacks or escrows.

The sale to Jessup resulted from a solicitation of offers to purchase the Claims commenced by Alvarez & Marsal CRF Management LLC ("A&M CRF"), as Investment Manager of the Crusader Funds, in consultation with the Redeemer Committee. Ultimately, the Crusader Funds and the Redeemer Committee entered exclusive negotiations with Jessup, culminating in the sale to Jessup.

A&M CRF, pursuant to the Plan and Scheme and with the approval of House Hanover, the Redeemer Committee and the Board of the Master Fund, now intends to distribute the proceeds from the Jessup transaction ($78 million), net of any applicable tax withholdings and with no reserves for the Extinguished Claims or the Released Claims. In addition, the distribution will include approximately $9.4 million in proceeds that have been redistributed due to the cancellation

and extinguishment of the interests and shares in the Crusader Funds held by HCM, Charitable DAF and Eames in connection with the Settlement Agreement, resulting in a total gross distribution of $87.4 million. Distributions will be based on net asset value as of June 30, 2021.

Please note that A&M CRF intends to make the distributions by wire transfer no later than July 31, 2021. Please confirm your wire instructions on or before **July 20, 2021**. If there are any revisions to your wire information, please use the attached template to provide SEI and A&M CRF your updated information on investor letterhead. This information should be sent on or before **July 20, 2021** to Alvarez & Marsal CRF and SEI at CRFInvestor@alvarezandmarsal.com and AIFS-IS_Crusader@seic.com, respectively.

The wire payments will be made to the investor bank account on file with an effective and record date of July 1, 2021. Should you have any questions, please contact SEI or A&M CRF at the e-mail addresses listed above.

Sincerely,

Alvarez & Marsal CRF Management, LLC

By: _____
    Steven Varner
    Managing Director

**On investor letterhead, please use the template below to provide Alvarez & Marsal CRF Management, LLC and SEI your updated wire information.**

| Information Needed | Wire Information Input |
|---|---|
| Investor name (as it reads on monthly statements)<br><br>Fund(s) Invested<br><br>Contact Information (Phone No. and Email)<br><br>Updated Wire Information<br>• Beneficiary Bank<br>• Bank Address<br>• Beneficiary (Account) Name<br>• ABA/Routing #<br>• Account #<br>• SWIFT Code<br><br>International Wires<br>• Correspondent Bank<br>• ABA/Routing #<br>• SWIFT Code | |

Signed By: _____     Date: _____

**EXHIBIT 38**

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                    )    Case No. 19-34054-sgj-11
 3   In Re:                         )    Chapter 11
                                    )
 4   HIGHLAND CAPITAL               )    Dallas, Texas
     MANAGEMENT, L.P.,              )    Thursday, January 14, 2021
 5                                  )    9:30 a.m. Docket
                                    )
 6            Debtor.               )
                                    )    - MOTION TO PREPAY LOAN
 7                                  )      [1590]
                                    )    - MOTION TO COMPROMISE
 8                                  )      CONTROVERSY [1625]
                                    )    - MOTION TO ALLOW CLAIMS OF
 9   _____)      HARBOURVEST [1207]

10                     TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
11                  UNITED STATES BANKRUPTCY JUDGE.

12   WEBEX APPEARANCES:

13   For the Debtor:           Jeffrey Nathan Pomerantz
                               PACHULSKI STANG ZIEHL & JONES, LLP
14                             10100 Santa Monica Blvd.,
                                13th Floor
15                             Los Angeles, CA  90067-4003
                               (310) 277-6910
16
     For the Debtor:           John A. Morris
17                             Gregory V. Demo
                               PACHULSKI STANG ZIEHL & JONES, LLP
18                             780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
19                             (212) 561-7700

20   For the Official Committee Matthew A. Clemente
     of Unsecured Creditors:   SIDLEY AUSTIN, LLP
21                             One South Dearborn Street
                               Chicago, IL  60603
22                             (312) 853-7539

23   For CLO Holdco, Ltd.:     John J. Kane
                               KANE RUSSELL COLEMAN LOGAN, P.C.
24                             901 Main Street, Suite 5200
                               Dallas, TX  75202
25                             (214) 777-4261
```

22

1 purchase or sale of a security. And, again, I would ask the

2 Court to listen carefully to this because that's what it

3 appears to be and that's what the evidence is going to show to

4 the Court.

5     THE COURT: All right. Mr. Draper, let me clarify

6 something I'm not sure if I heard you say or not. Were you

7 saying that the Court still needs to drill down on the issue

8 of whether the Debtor can acquire HarbourVest's interest in

9 HCLOF?

10     MR. DRAPER: No.

11     THE COURT: Okay. I was confused whether you were

12 saying I needed to take an independent look at that, now that

13 the objection has been withdrawn of Holdco. You are not

14 pressing that issue?

15     MR. DRAPER: No, I am not. Basically, I think it's

16 the fairness of the settlement. I think the transferability

17 of the interest is separate and apart from the fairness of the

18 settlement itself. I think the fairness -- the

19 transferability was a contractual issue between two parties

20 that the Court does not have to drill down on.

21     THE COURT: All right. I have another question for

22 you. I want to clarify your client's standing. Tell me --

23 I'm looking through a chart I printed out a while back. I

24 guess Dugaboy Investment Trust filed a couple of proofs of

25 claim; is that right?

23

1        MR. DRAPER:  Yes.

2        THE COURT:  Okay.  What --

3        MR. DRAPER:  And objections are pending.

4        THE COURT:  Pardon?

5        MR. DRAPER:  Objections to those claims are pending

6   before the Court, Your Honor, --

7        THE COURT:  Okay.

8        MR. DRAPER:  -- and have not been litigated.

9        THE COURT:  And what about Get Good Trust?

10       MR. DRAPER:  Get Good Trust has a proof of claim also

11  that objections are pending to.  Pending.

12       THE COURT:  Okay.  I don't want to get too

13  sidetracked here, but I know standing was -- was mentioned as

14  a legal argument today.  What is the basis for those proofs of

15  claim?

16       MR. DRAPER:  The first one is, with respect to the

17  proof of claim for Dugaboy, there is an investment that

18  Dugaboy made that was then funneled, we believe, up to the

19  Debtor.  And the -- the loan that exists, we believe is a

20  Debtor loan, as opposed to a loan to the entity that we made

21  the loans to.

22     And, again, it's a matter that the Court is going to hear.

23  The claim may or may not be allowed.  It has not been

24  disallowed yet.

25     The second part to the Dugaboy ownership is we own an

24

1    interest in the Debtor.  And so we are, in fact, a party in
2    interest.
3              THE COURT:  Okay.
4              MR. DRAPER:  It may be a small interest, but it is an
5    interest.
6              THE COURT:  It has a limited partnership interest in
7    the Debtor?
8              MR. DRAPER:  Yes.
9              THE COURT:  Is that correct?
10             MR. DRAPER:  Yes.
11             THE COURT:  Okay.  Well, I'll move forward.  Thank
12   you.
13       Does that cover -- any other opening statements?  I think
14   that covered everyone who was -- who filed some sort of
15   pleading today.  No.
16             MR. WILSON:  Your Honor, John Wilson on behalf of --
17             THE COURT:  I'm sorry.  I'm sorry.
18             MR. WILSON:  -- Mr. Dondero.
19             THE COURT:  I missed Mr. Dondero's counsel.  I knew
20   we had visited at some point this morning.  I just got
21   confused there.  Go ahead, Mr. Wilson.
22             MR. WILSON:  No problem, Your Honor.  I was just
23   going to say that we will reserve our comments until after the
24   conclusion of the testimony.
25             THE COURT:  All right.  Very well.

171

1          MR. BONDS:  Thank you, Your Honor.

2       (Proceedings concluded at 2:04 p.m.)

3                          --oOo--

20                        CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23    **/s/ Kathy Rehling**                        **01/16/2021**

24  _____        _____

25  Kathy Rehling, CETD-444                          Date
    Certified Electronic Court Transcriber

**EXHIBIT 39**

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

| | |
|---|---|
| In Re: ) | Case No. 19-34054-sgj11 |
| ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., ) | |
| ) | |
| Debtor. ) | |
| ——————————————————— ) | |
| ) | |
| OFFICIAL COMMITTEE OF UNSECURED ) | Adv. Proc. No. 20-03195-sgj |
| CREDITORS, ) | |
| ) | PLAINTIFF'S MOTION for |
| Plaintiff, ) | CONTINUANCE |
| ) | |
| v. ) | |
| ) | |
| CLO HOLDCO, LTD., et al., ) | |
| ) | |
| Defendants. ) | |
| ——————————————————— ) | |
| ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., ) | Adv. Proc. No. 21-03003-sgj |
| ) | |
| Plaintiff, ) | |
| ) | DEFENDANT DONDERO'S MOTION |
| v. ) | to COMPEL DISCOVERY, the |
| ) | TESTIMONY of JAMES P. |
| JAMES DONDERO, ) | SEERY, JR. |
| ) | |
| Defendant. ) | May 20, 2021 |
| ——————————————————— ) | Dallas, Texas (Via WebEx) |

Appearances in 21-03003:

For Plaintiff Highland    John A. Morris
Capital Management,       Pachulski Stang Ziehl & Jones LLP
                          10100 Santa Monica Boulevard, 13th Floor
                          Los Angeles, California  90067

For Defendant-Movant      Michael P. Aigen
James Dondero:            Stinson, L.L.P.
                          3102 Oak Lawn Avenue, Suite 777
                          Dallas, Texas  75219

                          Bryan C. Assink
                          Bonds Ellis Eppich Schafer Jones LLP
                          420 Throckmorton Street, Suite 1000
                          Forth Worth, Texas  76102

        Appearances continued on next page.

1   it just maybe fell through the cracks, and I apologize, Your

2   Honor.

3           THE COURT:  All right.

4           MR. ASSINK:  You know, we — Your Honor, —

5           THE COURT:  Well, I'm going to say a couple of things.

6   You know this could have been raised Tuesday, when we were here

7   on the adversary proceeding, in which the preliminary injunction

8   was issued, okay, it would have been — it would have been wise,

9   it would have been very wise to raise the issue.

10          Second, it screams irony, if nothing else, that at a

11  time when I have under advisement a motion to hold Mr. Dondero

12  in contempt of Court that there would be a trip-up, the

13  second-recent trip-up, by the way, where he didn't appear at a

14  hearing.  There was a time a few weeks ago, two or three weeks

15  ago, can't remember what hearing it was then, but he wasn't

16  here.

17          Okay.  The —

18          MR. ASSINK:  Well, Your Honor, I just want to say —

19          THE COURT:  — the third thing I'm going to say — the

20  third thing I'm going to say is I guess I'll issue an order in

21  the main case now, you know, a one- or two-sentence order in the

22  main case saying repeating the sentence that was in the

23  preliminary injunction, that he's going to show up at every

24  hearing.  I never said only at substantive hearings.  The only

25  thing I hesitated on at all, because I've done this in other

1  cases, is sometimes I'll say any hearing at which, you know, the

2  person is taking a position, okay, an opposition, an objection,

3  you know, even if you file a pleading taking a neutral stand, if

4  he's going to file a pleading that requires the Court and all

5  the lawyers' attention to some extent, he's going to need to be

6  in court.  So that's something I thought about doing, but then I

7  was reminded, that I said, no, he's just going to be at all

8  hearings in the future.

9         And procedural, substantive, I never made that

10  distinction and I never would because — because it's taking up

11  time, it's taking up time of the Court, lawyers, parties.  And

12  if he is going to use the offices of this Court or, you know,

13  take up the time of any lawyers, then he needs to be a part of

14  it, okay?

15         MR. ASSINK:  Your Honor, yes, I —

16         THE COURT:  So I thought I made that very clear the

17  last time he didn't show up, but I think —

18         MR. ASSINK:  Your Honor, I apologize.  You know that's

19  certainly not our intention here.  We've been rushing around.  I

20  think this is more — this is more on — on me and just the fast

21  pace with everything.  We would intend that he would be here at

22  all hearings.  We're not trying to make any exception.  We're

23  not trying to say that the preliminary injunction got rid of his

24  obligation to be before, Your Honor.  You know, we weren't clear

25  exactly what the directive was for these kinds of hearings, or

1  based in.  And, again, no one would have better information

2  about his own compensation than Mr. Dondero himself.

3           I mean I want to stress that this comes against a

4  backdrop of — well, it seems like some antagonism, to say the

5  least, on the part of Mr. Dondero where Mr. Seery's concerned.

6  It seems like it's always a fight with Mr. Seery.  And you say,

7  well, we didn't handpick him as the 30(b)(6) witness, but, you

8  know, the motion to compel names him by name.  It just — it

9  feels like another antagonistic move.

10          You've got him for a deposition next Monday on 13 or

11  so different topics.  I think it is appropriate to draw the line

12  on these six or so topics that again just don't seem relevant or

13  proportional to the needs of the case.

14          All right.  So, Mr. Morris, would you please upload

15  just a simple order reflecting the Court's ruling?

16          MR. MORRIS:  I would be happy to, Your Honor.

17          THE COURT:  Okay.  Actually I'm going to ask Mr. Aigen

18  to do it.  I'm sorry.  I need to be thinking about attorney's

19  fees and who should bear the costs of what.

20          So, Mr. Aigen, would you please electronically submit

21  an order?

22          MR. AIGEN:  Yes.

23          THE COURT:  All right.  Thank you.

24          All right.  Well, if there's nothing else on this

25  particular adversary, let me just double check.  Any

State of California          )
                            )     SS.
County of San Joaquin       )

 

 

      I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of Texas, Office of the Clerk, of the proceedings taken on the date and time previously stated in the above matter.

      I further certify that I am not a party to nor in any way interested in the outcome of this matter.

      I am a Certified Electronic Reporter and Transcriber by the American Association of Electronic Reporters and Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.

Susan Palmer
Palmer Reporting Services

Dated May 22, 2021

# EXHIBIT 40

```
                    IN THE UNITED STATES BANKRUPTCY COURT
1                    FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION
2
                                      )   Case No. 19-34054-sgj-11
3    In Re:                           )   Chapter 11
                                      )
4    HIGHLAND CAPITAL                 )   Dallas, Texas
     MANAGEMENT, L.P.,                )   Monday, May 10, 2021
5                                     )   1:30 p.m. Docket
                                      )
            Debtor.                   )
6    _____)
                                      )
7    HIGHLAND CAPITAL                 )   Adversary Proceeding 20-3190-sgj
     MANAGEMENT, L.P.,                )
8                                     )
            Plaintiff,                )   - TRIAL DOCKET CALL
9                                     )   - DEFENDANT'S EMERGENCY MOTION
     v.                               )     TO STAY PROCEEDINGS PENDING
10                                    )     RESOLUTION OF DEFENDANT'S
     JAMES D. DONDERO,                )     PETITION FOR WRIT OF
11                                    )     MANDAMUS [154]
            Defendant.                )
12   _____)

13                     TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14                    UNITED STATES BANKRUPTCY JUDGE.

15   WEBEX APPEARANCES:

16   For the Plaintiff:         John A. Morris
                                PACHULSKI STANG ZIEHL & JONES, LLP
17                              780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
18                              (212) 561-7700

19   For the Plaintiff:         Jeffrey Nathan Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
20                              10100 Santa Monica Blvd.,
                                  13th Floor
21                              Los Angeles, CA  90067-4003
                                (310) 277-6910

22

23

24

25
```

44

1      Can everyone hear me okay?  I don't know if we're having

2    connectivity issues.  Can everyone hear me?

3              MR. MORRIS:  Yes, Your Honor.

4              THE COURT:  Can you hear me, Mr. Wilson?

5              MR. MORRIS:  Yes, Your Honor.

6              MR. WILSON:  Yes, Your Honor.

7              THE COURT:  Okay.  I have been pondering something

8    the past few days.  And I haven't figured out how I want to

9    address it, but maybe Mr. Dondero's counsel and counsel from

10   some of the Dondero-controlled entities, maybe they can listen

11   to what I'm about to say and figure out a solution.

12      As you all know, there are so many law firms, so many

13   lawyers involved now that are basically singing the same tune

14   at a lot of these hearings as far as objections, me too, me

15   too, me too.  And so just quickly eyeballing what we have, we

16   obviously have Mr. Dondero represented by Bonds Ellis.  There

17   is another firm that represents Mr. Dondero that filed a

18   motion asking that I recuse myself.  I can't remember the name

19   of that firm, but I think they appealed my denial of that

20   motion.  So, I can't remember who that was.  Then we have the

21   various affiliates.  We have -- well, I'll just start

22   chronologically.  Highland CLO Funding, Ltd. has historically

23   been represented by King & Spalding.  I don't know if that's

24   -- I know there were some changes there with the ownership of

25   that entity, so maybe they're gone.  But then we have NexPoint

45

1   Advisors and Highland Capital Management Fund Advisors.  We

2   call them the Advisors and then the Funds.  Originally, they

3   were all represented by K&L Gates, but now they've divvied it

4   up and Munsch Hardt is representing, I guess, the Advisors,

5   and the Funds are represented by K&L Gates.  CLO Holdco, Ltd.,

6   it was Kane Russell Coleman & Logan representing them, but I

7   now think I'm seeing Kane Russell is representing Grant Scott

8   and -- individually.  I'm not sure if Kane Russell is still

9   representing CLO Holdco.  We have Dugaboy and Get Good Trusts

10  represented by Doug Draper, Heller Draper.  We have now Louis

11  Phillips representing the Charitable DAFs, Highland Dallas

12  Foundation.  We have NexPoint Real Estate Partners represented

13  by Wick Phillips, although there's the motion to disqualify

14  them.  And then I guess I'll just throw in we've had Baker &

15  McKenzie and Ross & Smith representing certain groups of

16  employees, but now I guess those proofs of claim have been

17  bought by Dondero entities and so I'm not sure who's

18  representing who there.

19      I'm not even sure I got everyone just now, but here's what

20  I'm getting at.  You talk about judicial efficiency and

21  judicial economy and economy of the partners.  We can't go on

22  efficiently with 12 law firms or whatever I just named filing

23  the very same type of motion or objection.  You know, I almost

24  -- if we were in different circumstances, I'd say we need to

25  have an ad hoc committee of these Dondero-controlled

46

1   affiliates, something like that.

2       But I've been thinking about this for a few days because I

3   see, like in one adversary, I think we now have three motions

4   to withdraw the reference.  And I haven't studied them all,

5   but I'm pretty sure they're going to tell me the exact same

6   thing.  And again, I'm just doing some predictions that the

7   UBS settlement, I wouldn't be surprised if I get eight or ten

8   or twelve objections that say the very same thing.

9       We're going to have to work something out.  Okay?  This is

10  not efficient.  It's not useful.  I would think a person such

11  as Mr. Dondero would want to rein in legal fees, but maybe

12  not.

13      Do you all have any ideas, Mr. Taylor, Mr. Wilson?  How

14  can we rein this in?  There's got to be a better way --

15              MR. TAYLOR:  Your Honor?

16              THE COURT:  -- than twelve different law firms filing

17  almost identical pleadings.

18              MR. TAYLOR:  Your Honor, I understand what you're

19  saying, on the one hand.  On the other hand, each of these

20  entities do have -- are separate corporations.  They have

21  different duties to various stakeholders, and they are

22  controlled by different stakeholders.  And that is one of the

23  things that has been a consistent, at least from what I

24  understand from my limited understanding and length of time in

25  the case, that that is one thing that is very important to Mr.

47

1   Dondero and those related entities, is that those duties do

2   run to different parties.  So each party has to preserve its

3   individual rights.

4        Sure.  Could it be more efficient?  Of course.  But Mr.

5   Dondero has a different set of duties than do the Advisor,

6   than do the Funds, than do the Trusts that are controlled by a

7   separate trustee.  And while of course there's some

8   interrelated cooperation amongst them, amongst the joint

9   defense agreement, it is very important that they maintain

10  their separate corporate identities and act independently from

11  each other, because they truly do have to act independently

12  from each other in many different circumstances.  They don't

13  want to lose sight of that.

14       So that is my initial explanation.  Of course, I can talk

15  with my client about it further, about seeing what can be

16  done, because he does indeed want to make it more efficient.

17  Has been hammering on me and my firm every month to try to do

18  so, and I'm sure he has with the other professionals.

19       But we do hear Your Honor, but we do want to make sure

20  that that -- those different separate corporate identities of

21  these entities is both recognized and laid out in this case.

22  It is very important to us and just integral to a lot of the

23  things that we've done in this case.

24            THE COURT:  You know what would help me understand

25  that better?  Is if in every case I had this entity is owned

48

1  by, you know, 25 percent by this, this.  If I knew the owners,

2  if I knew the equitable owners.  But I don't.  That's just all

3  kind of glossed over.  And so that's how perceptions get

4  created that Dondero, Dondero, Dondero, Dondero.  You know

5  what I'm saying?

6        MR. DONDERO:  Your Honor?

7        THE COURT:  And I don't know if you want to share

8  that information or not, but that's why I can't just accept a

9  generalization that, oh, we have very different stakeholders

10 behind --

11       MR. TAYLOR:  Your Honor?  Wait, hold on a second.

12 Your Honor, --

13       THE COURT:  -- this entity versus this one versus

14 this one.

15       MR. TAYLOR:  Your Honor, if you would allow my

16 client, he would like to very briefly address the Court on

17 those points, if he may.

18       THE COURT:  Okay.

19       MR. DONDERO:  Your Honor, just a brief history from

20 my perspective, okay?  We filed with $450 million of assets

21 and $110 million of estimated, as presented by the independent

22 board and Pachulski to the Court, trying to do a quick

23 settlement the first three or four months into bankruptcy.

24 The claims, the awards, the Class 8, the Class 9 awards, the

25 people who didn't even have standing, have all of a sudden

49

1  ballooned to $300-some-odd million.  And the assets in the

2  estate, which we haven't had an examiner go through all these

3  no-process asset sales at a loss, when I would have bought

4  them for more, has driven the estate value down to less than

5  $250 million.

6      We made an offer to try and settle this thing a few months

7  ago at 20 percent more than the estimated value in the

8  recoveries.  But Seery and the UCC are emboldened because they

9  feel in this Court there's going to be no respect of third-

10  party investors, no respect of other Dondero entities, and

11  they've been told that they can get more than a hundred cent

12  recovery by going after me and all my other entities going

13  back ten or twelve years.

14      So there's no chance that this case ever settles.  And

15  what you're going to see is there's a half a dozen or more --

16          MR. POMERANTZ:  Your Honor, I have to -- I have to --

17          MR. DONDERO:  -- there's a half a dozen more law

18  firms coming --

19          THE COURT:  Just a moment.

20          MR. DONDERO:  -- and there's a half a dozen -- there

21  are a half a dozen more --

22          MR. POMERANTZ:  Your Honor, this --

23          THE COURT:  Mr. Morris?

24          MR. POMERANTZ:  This is Jeff Pomerantz.

25          THE COURT:  Mr. Morris?

50

1          MR. POMERANTZ:  This is Jeff Pomerantz, Your Honor.

2          THE COURT:  Oh, Mr. Pomerantz?

3          MR. POMERANTZ:  This is Jeff Pomerantz, Your Honor.

4          THE COURT:  Uh-huh.

5          MR. POMERANTZ:  You know, I think what Mr. Dondero is

6   doing is totally inappropriate.  We're not here to relitigate

7   the history of the case.  We're not here to relitigate or

8   determine why a settlement hasn't been reached.  Your Honor

9   raised some important questions, (garbled) gave an answer, you

10  pushed him, but what Mr. Dondero is doing is just

11  inappropriate, and we shouldn't -- don't think he should be

12  doing this in this manner.

13     If he wants to at some point be put on to testify, he

14  could be cross-examined.  But he's testifying about things

15  that actually just happen not to be true and it's totally

16  inappropriate for this context.

17          THE COURT:  Okay.  Well, I understand --

18          MR. DONDERO:  But Your Honor, there's going to a half

19  dozen --

20          THE COURT:  -- that -- I understand, you know, Mr.

21  Pomerantz is concerned because I asked a specific question

22  aimed at how do we rein in all the lawyers, and the answer

23  was, well, they all are separate entities with separate

24  interests and separate stakeholders.  And my question was,

25  well, could I maybe see a list, a breakdown on all of these

51

1   entities?  Because, you know, in so many cases, --

2           MR. DONDERO:  But Your Honor, --

3           THE COURT:  -- in almost every case I have, I get a

4   big giant what I call spaghetti chart at the beginning of the

5   case where I get a breakdown of debtor affiliates and who owns

6   what.  And this hasn't been clear to me with all of these

7   affiliates.

8       But I do very much have the impression, Mr. Dondero, that

9   all roads lead back to you.  So I let you speak to this, and

10  we've kind of gone down a different trail.  And I want you to

11  know, I know --

12          MR. DONDERO:  Right.

13          THE COURT:  I know where you stand on this because

14  you have told me before.  You have huge concern that Highland

15  had $x$ hundred million dollars of assets at the beginning of

16  the case and now it's a lot lower.  I know you have concerns

17  with liquidation at what you think were very inappropriate

18  times.  I know you have all kinds of beefs, beefs about the

19  settlement with Acis, and probably UBS and the Redeemer

20  Committee.  I understand that.  But what I'm talking about

21  right now is going forward.  Going forward, how do we rein

22  this in where we don't --

23          MR. DONDERO:  But going forward, there's going to be

24  more lawyers.  There's going to be more defense.  Because the

25  Debtor is just going to keep trying to broaden, because they

52

1   feel empowered and enabled to go after anything related to

2   Highland, me, et cetera.  But there's probably half a dozen

3   more attorneys coming into this case.  I don't know what to

4   tell you.  It's a circus.

5            THE COURT:  Okay.  Well, I'm going to let you all

6   think about this out of court.  Is there a way you can

7   streamline?  I mean, I know -- I almost chuckle at myself at

8   saying ad hoc committee of Dondero-controlled entities.  I

9   know that that sort of sounds, I don't know, unworkable,

10  maybe.  Maybe not.  I'm not going to read 14 different

11  objections to the UBS settlement that say the very same thing.

12  I'm not going to read a different motion to withdraw the

13  reference by every single defendant in every single adversary

14  that gets filed.  This is just not an efficient way to go

15  forward.

16      So I want you all to think about how you can make this

17  more efficient.  You know, it -- a perception could exist that

18  you're trying to carpet-bomb us all with paper, the Court

19  included.  I mean, it's my job.  I'm going to read everything

20  that's put before me.  That's what I do.  That's what I'm

21  supposed to do.  But it's out of control.  So you all think of

22  a way to get it in control or I might impose something.  The

23  wheels are turning.  What could I do?  You know, page limits.

24           MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

25  One suggestion might be, following up on what Your Honor made

53

1    some comments about, and Your Honor has used the word ad hoc

2    committees, and obviously it's sort of a different animal

3    here.  But as Your Honor knows, that every time an ad hoc

4    committee comes in, they have to file a 2019 statement.  So I

5    think it would at least provide Your Honor with information,

6    as it would provide all of us with information, to really

7    understand and know, when people are appearing, is it all

8    roads leading back to Dondero, or, as Mr. Taylor says, what

9    are the different constituents?  Who are the different people?

10        As Your Honor has heard from us, we lump them all together

11   because we believe the evidence has shown throughout this case

12   that it all leads -- the road leads back to Dondero.  But Your

13   Honor may consider asking them to file sort of the equivalent

14   of a 2019 statement to provide Your Honor with that

15   information under oath that Your Honor could then see, when

16   you get several objections to the same thing, whether you

17   really need to be dealing with them as seven different matters

18   or whether dealing with them as one.

19        THE COURT:  Okay.  All right.  Well, I'm giving this

20   thought.  And again, I'll let you all think about it and make

21   a proposal.  But I may or may not accept any proposal you

22   make.  And I am leaning towards requiring information to be

23   filed of who owns what, who are the stakeholders.  That'll

24   help me understand, is it necessary to have this entity filing

25   a separate objection or motion from this other entity or not?

54

1   Can we just have an hoc committee each time?

2       I don't even think I listed all the law firms.  I know a

3   new law firm filed a lawsuit in front of Judge Jane Boyle

4   recently.  We've got a hearing on that coming up in June.  I

5   mean, and now you're -- I'm hearing there are going to be

6   more.  Well, if you don't figure out a way to rein it in, then

7   I'm just going to have to get that list of who are the

8   stakeholders in these entities, under oath, because I don't

9   understand it.  I don't understand why we need these many

10  lawyers filing position papers.

11      So, all right.  Well, we're going to adjourn, and I guess

12  I'll see you next Monday, right?

13              MR. MORRIS:  Thank you, Your Honor.  Yes.

14              THE COURT:  Okay.  Thank you.

15              THE CLERK:  All rise.

16      (Proceedings concluded at 3:07 p.m.)

17                          --oOo--

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                        05/11/2021

24  _____        _____

25  Kathy Rehling, CETD-444                        Date
    Certified Electronic Court Transcriber

54

1   Can we just have an hoc committee each time?

2       I don't even think I listed all the law firms.  I know a

3   new law firm filed a lawsuit in front of Judge Jane Boyle

4   recently.  We've got a hearing on that coming up in June.  I

5   mean, and now you're -- I'm hearing there are going to be

6   more.  Well, if you don't figure out a way to rein it in, then

7   I'm just going to have to get that list of who are the

8   stakeholders in these entities, under oath, because I don't

9   understand it.  I don't understand why we need these many

10  lawyers filing position papers.

11      So, all right.  Well, we're going to adjourn, and I guess

12  I'll see you next Monday, right?

13              MR. MORRIS:  Thank you, Your Honor.  Yes.

14              THE COURT:  Okay.  Thank you.

15              THE CLERK:  All rise.

16      (Proceedings concluded at 3:07 p.m.)

17                          --oOo--

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                        05/11/2021

24  _____        _____

25  Kathy Rehling, CETD-444                      Date
    Certified Electronic Court Transcriber

# EXHIBIT 41

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| In Re: | ) **Case No. 19-34054-sgj-11** |
| | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL | ) Dallas, Texas |
| MANAGEMENT, L.P., | ) Friday, June 25, 2021 |
| | ) 9:30 a.m. Docket |
| Debtor. | ) |
| | ) EXCERPT: MOTION FOR |
| | ) MODIFICATION OF ORDER |
| | ) AUTHORIZING RETENTION OF JAMES |
| | ) P. SEERY, JR. DUE TO LACK OF |
| | ) SUBJECT MATTER JURISDICTION |
| | ) (2248) |
| _____ | ) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jeffrey Nathan Pomerantz |
| | PACHULSKI STANG ZIEHL & JONES, LLP |
| | 10100 Santa Monica Blvd., |
| | 13th Floor |
| | Los Angeles, CA  90067-4003 |
| | (310) 277-6910 |
| | |
| For the Debtor: | John A. Morris |
| | PACHULSKI STANG ZIEHL & JONES, LLP |
| | 780 Third Avenue, 34th Floor |
| | New York, NY  10017-2024 |
| | (212) 561-7700 |
| | |
| For CLO Holdco, Ltd. and | Jonathan E. Bridges |
| The Charitable DAF Fund, | Mazin Ahmad Sbaiti |
| LP: | SBAITI & COMPANY, PLLC |
| | JP Morgan Chase Tower |
| | 2200 Ross Avenue, Suite 4900 W |
| | Dallas, TX  75201 |
| | (214) 432-2899 |
| | |
| For Get Good Trust and | Douglas S. Draper |
| Dugaboy Investment Trust: | HELLER, DRAPER & HORN, LLC |
| | 650 Poydras Street, Suite 2500 |
| | New Orleans, LA  70130 |
| | (504) 299-3300 |

109

1    bring causes of action against persons, such as officers and

2    directors or other third parties, if they first come to the

3    Bankruptcy Court and show a colorable claim.  They have to

4    come to the Bankruptcy Court, show they have a colorable claim

5    and they're the ones that should be able to pursue them.  Not

6    exactly on point, but it's just one of many cases that one

7    could cite that certainly approve gatekeeper functions of

8    various sorts of Bankruptcy Courts.

9        It doesn't matter which court might ultimately adjudicate

10   the claims; the Bankruptcy Court can be the gatekeeper.

11       And the Court agrees with the many cases cited from

12   outside this circuit, such as the case in Alabama, in the

13   Eleventh Circuit, and there was another circuit-level case, at

14   least one other, that have held that the *Barton* doctrine

15   should be extended to other types of case fiduciaries, such as

16   debtor-in-possession management, among others.

17       Finally, as I pointed out in my confirmation ruling in

18   this case, gatekeeping provisions are commonplace for all

19   types of courts, not just Bankruptcy Courts, when vexatious

20   litigants are involved.  I have commented before that we seem

21   to have vexatious litigation behavior with regard to Mr.

22   Dondero and his many controlled entities.

23       Now, as far as the Movants' argument that there was not

24   just improper gatekeeping provisions but actually an improper

25   discharge in the Seery retention order of negligence claims or

**APP. 3069**

121

1   annoyance or anything like that.  I guess what I'm trying to

2   do is I don't want anyone to mistake the delay in ruling on

3   the contempt motion to mean I'm just not that -- you know, I'm

4   not prioritizing it, other things are more serious to me or

5   important to me, or I'm going to take two months to get to it.

6   It's literally been I've been in trial almost all day long

7   every day since you were here.  But trust me, I'm about as

8   upset as upset can be about what I heard on June 8th, and I'm

9   going to get to that ruling, and I know what I'm going to do.

10  And, well, like I said, it's just a matter of figuring out

11  dollars and whom, okay?  There's going to be contempt.  I just

12  haven't put it on paper because I've been in court all day and

13  I haven't come up with a dollar figure.  Okay?

14      So I hope -- I don't know if that matters very much, but

15  it should.

16      All right.  We stand adjourned.

17      (Proceedings concluded at 3:35 p.m.)

18                          --oOo--

19

20                        CERTIFICATE

21      I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                    **06/29/2021**

24  _____     _____

25  Kathy Rehling, CETD-444                    Date
    Certified Electronic Court Transcriber

# EXHIBIT 42

```
                     IN THE UNITED STATES BANKRUPTCY COURT
 1                  FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                )  Case No. 19-34054-sgj-11
 3    In Re:                    )  Chapter 11
                                )
 4    HIGHLAND CAPITAL          )  Dallas, Texas
      MANAGEMENT, L.P.,         )  March 1, 2022
 5                              )  1:30 p.m. Docket
             Reorganized Debtor.)
 6                              )  - REORGANIZED DEBTOR'S MOTION
                                )    FOR ENTRY OF AN ORDER
 7                              )    APPROVING SETTLEMENT WITH
                                )    PATRICK DAUGHERTY [3088]
 8                              )  - REORGANIZED DEBTOR'S MOTION
                                )    FOR ENTRY OF AN ORDER
 9                              )    FURTHER EXTENDING THE PERIOD
                                )    WITHIN WHICH IT MAY REMOVE
10                              )    ACTIONS [3199]
      _____)
11                              )
      ELLINGTON,                )  Adversary Proceeding 22-3003-sgj
12                              )
             Plaintiff,         )
13                              )  STATUS CONFERENCE
      v.                        )  (NOTICE OF REMOVAL)
14                              )
      DAUGHERTY,                )
15                              )
             Defendant.         )
16    _____)

17                    TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
18                  UNITED STATES BANKRUPTCY JUDGE.

19    APPEARANCES:

20    For the Debtor:          John A. Morris
                               PACHULSKI STANG ZIEHL & JONES, LLP
21                             780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
22                             (212) 561-7700

23    For Scott Ellington:     Debra A. Dandeneau
                               Laura R. Zimmerman
24                             BAKER & MCKENZIE, LLP
                               452 Fifth Avenue
25                             New York, NY  10018
                               (212) 626-4875
```

83

1          THE COURT:  Okay.  And you know that I tend to

2    sometimes share my views just to see if it will spur a fit of

3    reasonableness or encourage people to settle or walk away.

4    I'm pretty exasperated with that attempt in this case.  But

5    this litigation is -- I'm going to call it the stalking

6    lawsuit.  Okay?  Every time -- I don't know how much longer it

7    will be in my court, but as long as it's in my court I'm going

8    to call it what it is, a stalking lawsuit.  It is one grown

9    man accusing another grown man of stalking.  You know, it's

10   just embarrassing to me, and it should be embarrassing to

11   those involved.

12       Now, I have read the lawsuit and I have read that Mr.

13   Ellington accuses Mr. Daugherty of driving by his house,

14   driving by his father's house, driving by his sister's house,

15   driving by his office, 143 sightings, he's taking pictures.

16   And you know, if that's true, again, that's embarrassing.  If

17   -- I don't even know what to say except this is embarrassing.

18   One grown man accusing another grown man of stalking.  Okay?

19   A statute, by the way, that was designed to protect, you know,

20   ex-wives, girlfriends, battered women, from abusive men.  You

21   know, gender doesn't matter, but wow.  It's just -- I don't

22   know what to say except people should be embarrassed, and so

23   that's what I'm going to say.

24       I don't know if it's going to make a whit of difference in

25   anyone's litigation posture.  But we'll come back on March

84

1  29th and we'll do what we need to do on the motions before the

2  Court.

3       (Proceedings concluded at 3:41 p.m.)

4                              --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                          CERTIFICATE

20       I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
21  above-entitled matter.

22   **/s/ Kathy Rehling**                      **03/07/2022**

23  _____     _____
    Kathy Rehling, CETD-444                      Date
24  Certified Electronic Court Transcriber

25