PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX  75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

|  |  |  |
|---|---|---|
| In re: | ) ) ) | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) ) ) | Case No. 19-34054-sgj11 |
| Debtor. | ) ) ) |  |

**DECLARATION OF JOHN A. MORRIS
IN SUPPORT OF THE DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING
SETTLEMENTS WITH (A) THE REDEEMER COMMITTEE OF THE HIGHLAND
CRUSADER FUND (CLAIM NO. 72), AND (B) THE HIGHLAND CRUSADER FUNDS
(CLAIM NO. 81), AND AUTHORIZING ACTIONS CONSISTENT THEREWITH**

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054200923000000000004

I, John A. Morris, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declare as follows:

1.      I am a partner in the law firm Pachulski, Stang, Ziehl & Jones LLP, counsel to the above-referenced Debtor, and I submit this Declaration in support of the *Debtor's Motion for Entry of an Order Approving Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72), and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* being filed concurrently with this Declaration.  I submit this Declaration based on my personal knowledge and review of the documents listed below.

2.      Attached as **Exhibit 1** is a true and correct copy of a Stipulation entered between and among (i) Highland Capital Management, L.P. ("HCMLP"), (ii) Eames, Ltd., (iii) the Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee"), and (iv) Highland Crusader Offshore Partners, L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (together, the "Crusader Funds").

3.      Attached as **Exhibit 2** is a true and correct copy of a *Partial Final Award*, dated March 6, 2019, and rendered in the arbitration between the Redeemer Committee and HCMLP, Case No. 1-16-0002-6927 (the "Arbitration").

4.      Attached as **Exhibit 3** is a true and correct copy of a *Disposition of Application of Modification of Award*, dated March 14, 2019, and rendered in the Arbitration.

5.      Attached as **Exhibit 4** is a true and correct copy of a *Final Award*, dated as of April 29, 2019, and rendered in the Arbitration.

6.      Attached as **Exhibit 5** is a true and correct copy of a proof of claim filed by the Redeemer Committee on April 3, 2020 and denoted by the Debtor's claims agent as claim number 72.

7.      Attached as **Exhibit 6** is a true and correct copy of a proof of claim filed by the Crusader Funds on April 6, 2020 and denoted by the Debtor's claims agent as claim number 81.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: September 23, 2020.

*/s/ John A. Morris*
John A. Morris

# **EXHIBIT 1**

This stipulation (the "Stipulation") is made and entered into by and among (i) Highland Capital Management, L.P., as debtor and debtor-in-possession (the "Debtor"), (ii) Eames, Ltd., ("Eames"), (iii) the Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee"), (iv) Highland Crusader Offshore Partners, L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Crusader Funds" and together with the Debtor, Eames, and the Redeemer Committee, the "Parties"), (v) solely with respect to paragraphs 10 through 15 of this Stipulation, Hockney, Ltd., Strand Advisors, Inc., Highland Special Opportunities Holding Company ("SOHC"), Highland CDO Opportunity Master Fund, L.P., Highland Financial Partners, L.P. ("HFPLP" and together with SOHC, the "Contingent Parties"), Highland Credit Strategies Master Fund, L.P., and Highland Credit Opportunities CDO, L.P. (collectively, the "Highland Additional Release Parties"), and (vi) solely with respect to paragraphs 10 through 15 of this Stipulation, House Hanover, LLC, and Alvarez & Marsal CRF Management, LLC, (collectively, the "Crusader Additional Release Parties," and together with the Highland Additional Release Parties, the "Additional Release Parties"). This Stipulation provides for the allowance of general unsecured claims against the Debtor, for the Debtor and Eames to consent to the Redeemer Committee and the Crusader Funds implementing certain terms of the Arbitration Award (as defined below), and for the Debtor to take certain actions in connection with such implementation.

## RECITALS

WHEREAS, on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is managing and operating its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Debtor's chapter 11 case is pending in the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court");

WHEREAS, the Debtor served as the investment manager for the Crusader Funds until August 4, 2016, as of which date the Redeemer Committee, as set forth in a letter and notice dated July 5, 2016, terminated the Debtor;

WHEREAS, on July 5, 2016, the Redeemer Committee commenced an arbitration against the Debtor by filing a Notice of Claim with the American Arbitration Association in which it asserted various claims arising from the Debtor's service as the investment manager for the Crusader Funds (the "Arbitration");

WHEREAS, following an evidentiary hearing during the Arbitration, the panel of arbitrators issued (a) a *Partial Final Award,* dated March 6, 2019 (the "March Award"), (b) a *Disposition of Application for Modification of Award,* dated March 14, 2019 (the "Modification Award"); and (c) a *Final Award,* dated May 9, 2019 (the "Final Award," and together with the March Award and the Modification Award, the "Arbitration Award");

WHEREAS, as of the Petition Date, the aggregate amount of the damages awarded under the Arbitration Award, including the accrual of pre-judgment interest but before applying any offsets, was $190,824,557, which amount includes the Debtor's obligation to purchase the shares of Cornerstone Healthcare Group ("Cornerstone") that are held by the Crusader Funds in exchange for the sum of (a) $48,070,407 million in cash, and (b) accrued pre-judgment interest on such amount;

WHEREAS, in addition to awarding monetary damages, the Arbitration Award also provided for, among other things, (i) the cancellation of all limited partnership interests or shares in the Crusader Funds that are held by the Debtor, Eames, and Charitable DAF Fund, L.P.

("Charitable DAF"), respectively, and (ii) the Crusader Fund to disburse the funds held in the Deferred Fee Account[1] to the Consenting Compulsory Redeemers;

WHEREAS, on April 3, 2020, the Redeemer Committee filed a proof of claim in respect of the Arbitration Award, Proof of Claim number 72 ("Claim 72");

WHEREAS, on April 6, 2020, the Crusader Funds filed a proof of claim, Proof of Claim number 81 ("Claim 81") that asserted a claim in the alternative to the Redeemer Committee Proof of Claim for at least $23,483,446 in respect of certain fees that the Crusader Funds had paid to the Debtor prior to the Debtor being terminated (the "Crusader Funds Fee Claim");

WHEREAS, the Debtor has asserted that it is entitled to certain credits or offsets with respect to the damages provided in the Arbitration Award, and that it is has certain meritorious defenses with respect to the Crusader Funds Fee Claim;

WHEREAS, the Parties have agreed to settle and resolve all claims and disputes between and among them, including Claim 72 and Claim 81, and for the Redeemer Committee and the Crusader Funds to implement certain relief granted in the Arbitration Award on the terms and conditions set forth in this Stipulation, and the Parties and the Additional Release Parties have agreed to exchange the mutual releases set forth herein.

## AGREEMENT

**NOW, THEREFORE**, after good-faith, arms-length negotiations, in consideration of the foregoing, it is hereby stipulated and agreed that:

1. Claim 72 shall be allowed in the amount of $137,696,610 as a general unsecured claim.

---

[1] All capitalized terms not defined herein shall have the meanings given to such terms in (i) the Arbitration Award and (ii) the Joint Plan of Distribution of the Crusader Funds, and the Scheme of Arrangement between Highland Crusader Fund II, Ltd. and its Scheme Creditors (together, the "Crusader Plan").

2.      Claim 81 shall be allowed in the amount of $50,000 as a general unsecured claim.

3.      The Debtor and Eames each consent to the Crusader Funds, on or after the date an order of the Bankruptcy Court approving this Stipulation pursuant to Federal Rule of Bankruptcy Procedure 9019 and section 363 of the Bankruptcy Code becomes a final and non-appealable order (the "Stipulation Effective Date"), cancelling or extinguishing all of the limited partnership interests and shares in the Crusader Funds held by each of them respectively (collectively, the "Cancelled Highland and Eames Interests"), as provided for in the Arbitration Award.   Each of the Debtor and Eames represents solely for itself that (a) it has the authority to consent to the cancellation or extinguishment of the Cancelled Highland and Eames Interests that it holds, and (b) upon the occurrence of the Stipulation Effective Date, no other actions by or on behalf of it are necessary for such cancellation or extinguishment.  Each of the Debtor and Eames agrees that it will not object to the Crusader Funds, on or after the Stipulation Effective Date, cancelling or extinguishing the limited partnership interests or shares in the Crusader Funds held by Charitable DAF (the "Cancelled DAF Interests," and together with the Cancelled Highland and Eames Interests, the "Cancelled LP Interests").   Each of the Debtor and Eames acknowledges that the cancellation or extinguishment of the Cancelled LP Interests is intended to implement Sections F.a.v and F.a.x.2 of the Final Award.[2]

4.      The Parties acknowledge that the limited partnership interests or shares in the Crusader Funds held by the following entities and individuals shall not be extinguished pursuant to this Stipulation:  Highland Capital Management Multi-Strategy Insurance Dedicated Fund, L.P.; Highland Capital Management Services; Highland 401(k) Plan; Highland 401(k) Plan Retirement Plan and Trust; Highland 401(k) Plan Retirement Plan and Trust II; James Dondero;

---

[2] *See also* March Award §§ III(H)(25), VII(C)(2).

and Mark Okada (collectively, the "Retained LP Interests").

5.      Each of the Debtor and Eames acknowledges and agrees that (a) the Crusader Funds have reserved (i) distributions that, absent the Arbitration Award, would have been payable in respect of the Cancelled LP Interests, (ii) funds in respect of Deferred Fees and the Deferred Fee Account that, absent the Debtor's termination as investment manager for the Crusader Funds and the Arbitration Award, may have been payable to the Debtor in accordance with the Crusader Plan and (iii) certain other monies as to which the Debtor and Eames may have had an interest in the absence of this Stipulation (the reserved distributions and funds described in subparagraphs (i), (ii) and (iii), collectively, the "Reserved Distributions"); (b) the Crusader Funds, after the Stipulation Effective Date, intend to distribute in accordance with the Crusader Plan to the applicable holders of limited partnership interests or shares in the Crusader Funds the Reserved Distributions, and that the Debtor, Eames, and Charitable DAF shall not receive any part of such distribution; and (c) after giving effect to the cancellation or extinguishment of the Cancelled LP Interests, none of the Debtor, Eames, or Charitable DAF shall receive any further distributions, payments or fees from the Crusader Funds, including without limitation the Reserved Distributions, on account of any of the Cancelled LP Interests or any other role or position of the Debtor with respect to the Crusader Funds (including but not limited to its role as the investment manager for the Crusader Funds until August 4, 2016).  The Debtor acknowledges and agrees that, beginning as of the Stipulation Effective Date, it will not receive any payments from the Crusader Funds in respect of any Deferred Fees, Distribution Fees, or Management Fees. Without limiting the foregoing, the Parties acknowledge and agree that the funds described in the first sentence of this paragraph include monies held in reserve with respect to the Reserved Distributions, the Deferred Fee Account, any Deferred Fees currently accrued or that might have

accrued in the future, any Distribution Fees, and any Management Fees.

6. The Debtor represents that, to its actual knowledge and subject to paragraph 4 above, it does not control any fund, or hold any equity interest in any entity, that holds a claim against the Crusader Funds or the Redeemer Committee (including any claims in respect of the Cornerstone shares held by the Crusader Funds, but excluding, with respect to the Crusader Funds, the right to receive distributions with respect to the Retained LP Interests).

7. On the Stipulation Effective Date, the Amended and Restated Shareholders Agreement, substantially in the form attached as Exhibit A, which shall have been executed by all parties thereto, shall be jointly released by the Parties from escrow and become effective (as executed, the "Cornerstone Shareholders Agreement"). In the event that such fully executed agreement is not released from escrow on the Stipulation Effective Date for any reason other than the Redeemer Committee or the Crusader Funds not authorizing such agreement's release from escrow, then this Stipulation shall be of no force and effect, and this Stipulation (including the agreements and settlements incorporated herein) may not be used by any Party for any purpose.

8. Except as otherwise provided in a plan of reorganization proposed by the Debtor and or other entities and agreed to by the Redeemer Committee, the Debtor shall, in good faith, use commercially reasonable efforts to monetize all shares of capital stock of Cornerstone held by the Debtor, any funds that the Debtor manages, and the Crusader Funds (collectively, the "Cornerstone Shares"), in accordance with the schedule attached hereto as Exhibit B (the "Schedule"), in order to maximize, to the extent possible under the circumstances, the proceeds of such monetization to each such entity. ████████████████████████████

████████████████████████████████████████



9. The Debtor shall instruct the claims agent in the Debtor's chapter 11 case to adjust the claims register in accordance with this Stipulation.

10. On the Stipulation Effective Date, the following releases shall take effect:

A. To the maximum extent permitted by applicable law, the Debtor, and each Highland Additional Release Party, irrevocably releases, acquits, exonerates, and forever discharges (i) the Redeemer Committee, each of the Crusader Funds, and each of the Crusader Additional Release Parties, and (ii) with respect to each such person set forth in (i) above, such person's predecessors, successors, assigns and affiliates (whether by operation of law or otherwise), and each of their respective present and former members, officers, directors, employees, managers, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, employees, subsidiaries, divisions, management companies, and other representatives, in each case acting in such capacity, from all manner of actions, whether in law, in equity, or statutory, and whether presently known or unknown, matured or contingent, liquidated or unliquidated, including any claims, defenses, and affirmative defenses which were or could have been asserted

with respect to: (a) the Crusader Funds, including but not limited to any claims, defenses, and affirmative defenses which were or could have been brought, or which otherwise concern or are related to: (i) the Arbitration, (ii) the Debtor's service as investment manager or General Partner for the Crusader Funds, (iii) Alvarez & Marsal CRF Management, LLC's service as replacement manager of the Crusader Funds, (iv) House Hanover, LLC, as General Partner of the Crusader Funds, (v) the Cancelled LP Interests, and (vi) any distributions or payments with respect to the Deferred Fee Account, Deferred Fees, Management Fees, Distribution Fees, or Reserved Distributions, and (b) the alleged fraudulent transfers and all other claims asserted by UBS Securities LLC and UBS AG, London Branch (collectively, "UBS") in *UBS Securities LLC, et al v. Highland Capital Mgmt., L.P., et al*, No. 650097-2009 (N.Y. Sup. Ct.) or by UBS in the Debtor's chapter 11 case (collectively, the "UBS Claims"), including but not limited to claims that the Debtor or any Additional Highland Release Party could assert for contribution, indemnity or joint tortfeasor liability in connection with the UBS Claims; provided, however, that such release shall not apply with respect to the obligations of the Redeemer Committee, each of the Crusader Funds, or each of the Crusader Additional Release Parties pursuant to this Stipulation, including Exhibit B hereto, and the Cornerstone Shareholders Agreement.

B. To the maximum extent permitted by applicable law, the Redeemer Committee, each of the Crusader Funds, and each Crusader Additional Release Party irrevocably releases, acquits, exonerates, and forever discharges (i) the Debtor, Eames, and each Highland Additional Release Party, and (ii) with respect to each such person set forth in (i) above, such person's predecessors, successors, assigns and affiliates (whether by operation of law or otherwise), and each of their respective present and former members, officers, directors, employees, managers, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, employees, subsidiaries, divisions, management companies, and other representatives, in each case acting in such capacity, from all manner of actions, whether in law, in equity, or statutory, and whether presently known or unknown, matured or contingent, liquidated or unliquidated, including any claims, defenses, and affirmative defenses which were or could have been asserted with respect to: (a) the Crusader Funds, including but not limited to any claims, defenses, and affirmative defenses which were or could have been brought, or which otherwise concern or are related to: (i) the Arbitration, (ii) the Debtor's service as investment manager or General Partner for the Crusader Funds, (iii) the Cancelled LP Interests, and (iv) any distributions or payments with respect to the Deferred Fee Account, Deferred Fees, Management Fees, Distribution Fees, or Reserved Distributions, and (b) the alleged fraudulent transfers and all other claims

asserted by UBS Securities LLC and UBS AG, London Branch (collectively, "UBS") in *UBS Securities LLC, et al v. Highland Capital Mgmt., L.P., et al*, No. 650097-2009 (N.Y. Sup. Ct.) or by UBS in the Debtor's chapter 11 case (collectively, the "UBS Claims"), including but not limited to claims that the Redeemer Committee, the Crusader Funds, or any Additional Crusader Release Party could assert for contribution, indemnity or joint tortfeasor liability in connection with the UBS Claims; provided, however, that (I) such release shall not apply with respect to the obligations of the Debtor, Eames, or each of the Highland Additional Release Parties under this Stipulation, including Exhibit B hereto, the allowance of or distributions in respect of Claim 72 and Claim 81, and the Cornerstone Shareholders Agreement; (II) notwithstanding anything to the contrary herein, neither James Dondero nor Mark Okada, nor any entities owned or controlled by either of them, other than the Debtor, Eames, and any Highland Additional Release Party solely with respect to such entities and not as to any capacity in which James Dondero or Mark Okada had an interest in or served with respect to such entities, is released from any claims, including without limitation any claims arising from obligations owed to the Debtor; and provided further, and solely for the avoidance of doubt, that none of the releases set forth herein shall impair the right or ability of the applicable holders of Claim 72 or Claim 81 to receive distributions of any kind from the Debtor's estate in satisfaction of such respective claims in the amounts as and on such terms as are provided for herein; and (III) in the event any of the Highland Additional Release Parties fails to execute this Stipulation, this Release is null, void and of no legal effect as to that non-signing Highland Additional Release Party.

11.     At present, certain of the Parties are engaged in one or more of the following pending lawsuits and actions: (a) *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.*, Chancery Court, Delaware, C.A. No. 12533-VCG (the "Delaware Action"); (b) *Redeemer Committee of the Highland Crusader Fund and Highland Capital Management, L.P.*, Supreme Court of Bermuda, Civil Jurisdiction, Case No. 01-16-0002-6927 ("Bermuda Action No. 1"); (c) *Highland Capital Management, L.P. and Redeemer Committee of the Highland Crusader Fund*, Supreme Court of Bermuda, Civil Jurisdiction (Commercial Court), 2017: No. 308 ("Bermuda Action No. 2"); and (d) *Redeemer Committee of the Highland Crusader Fund and Highland Capital Management, L.P.*, Grand Court of Cayman

Islands, Financial Services Division, Cause No. 153 of 2019 (CRJ) (the "Grand Cayman Action" and together with the Delaware Action and Bermuda Action No. 1, the "Redeemer Actions"). The Parties agree that (1) as of the Stipulation Effective Date, the Redeemer Committee and each of the Crusader Funds covenants not to prosecute, and shall refrain from prosecuting, any of the Redeemer Actions against the Debtor, Eames, or any of the Highland Additional Release Parties, and (2) as soon as reasonably practicable after the Stipulation Effective Date, the Debtor shall cause Bermuda Action No. 2 to be dismissed with prejudice.

12. This Stipulation, together with the Cornerstone Shareholders Agreement and the Schedule, contains the entire agreement between and among the Parties and the Additional Release Parties as to its subject matter and supersedes and replaces any and all prior agreements and undertakings between and among the Parties and the Additional Release Parties relating thereto.

13. This Stipulation may not be modified other than by a signed writing executed by the Parties; provided, however, that paragraphs 10 through 15 may not be modified other than by a signed writing that is also executed by the Additional Release Parties.

14. Each person who executes this Stipulation represents that he or she is duly authorized to do so on behalf of the respective Party or Additional Release Party and that each Party or Additional Release Party has full knowledge and has consented to this Stipulation, provided, however, that (a) the effectiveness of the Debtor's execution of this Stipulation shall be subject to entry of an order of the Bankruptcy Court approving this Stipulation and authorizing the Debtor's execution thereof, and (b) the Redeemer Committee represents and warrants to the Debtor, Eames, and each of the Highland Additional Release Parties that, in conformity with the Redeemer Committee's corporate governance documents, at least the minimum number of

members of the Redeemer Committee have executed this Stipulation to cause it to be legally binding on the Redeemer Committee.

15.     The Debtor shall use commercially reasonable efforts to cause each of the Contingent Parties to execute this Stipulation not later than the date on which the Bankruptcy Court enters an order confirming a plan of reorganization or liquidation.  Notwithstanding the foregoing, the Parties acknowledge and agree that the failure of either or both of the Contingent Parties to execute this Stipulation shall not affect (a) the rights, obligations, or duties of any of the Parties or (b) the enforceability of this Stipulation.

16.     Not later than September 23, 2020, the Debtor shall file with the Bankruptcy Court a motion for an order approving this Stipulation, which motion shall be in form and substance satisfactory to the Crusader Funds and the Redeemer Committee, pursuant to Federal Rule of Bankruptcy Procedure 9019 and section 363 of the Bankruptcy Code.

17.     This Stipulation may be executed in counterparts (including facsimile and electronic transmission counterparts), each of which will be deemed an original but all of which together constitute one and the same instrument, and shall be effective against a Party or Additional Release Party upon the Stipulation Effective Date.

18.     This Stipulation will be exclusively governed by and construed and enforced in accordance with the laws of the State of New York, without regard to its conflicts of law principles, and all claims relating to or arising out of this Stipulation, or the breach thereof, whether sounding in contract, tort, or otherwise, will likewise be governed by the laws of the State of New York, excluding New York's conflicts of law principles. The Bankruptcy Court will retain exclusive jurisdiction over all disputes relating to this Stipulation.

[Remainder of page intentionally left blank]

       In witness whereof, the parties hereto, intending to be legally bound, have executed this Stipulation as of the day and year set forth below:

Dated:                 HIGHLAND CAPITAL MANAGEMENT, L.P.

                      By: _____
                      Name: James P. Seery Jr.
                      Title: Authorized Signatory

                REDEEMER COMMITTEE OF THE HIGHLAND CRUSADER FUND

Dated:                 Grosvenor Capital Management, L.P.

                      By: _____
                      Name: Eric Felton, designated Representative of Grosvenor Capital Management, L.P.

Dated:                 Grosvenor Capital Management, L.P.

                      By: _____
                      Name: Tom Rowland, designated Representative of Grosvenor Capital Management, L.P.

Dated:                 Grosvenor Capital Management, L.P.

                      By: _____
                      Name: Burke Montgomery, designated Representative of Grosvenor Capital Management, L.P.

Dated:                 Grosvenor Capital Management, L.P.

                      By: _____
                      Name: Brian Zambie, designated Representative of Grosvenor Capital Management, L.P.

In witness whereof, the parties hereto, intending to be legally bound, have executed this Stipulation as of the day and year set forth below:

Dated:                  HIGHLAND CAPITAL MANAGEMENT, L.P.

                            By: _____
Name:
Title:

                            REDEEMER COMMITTEE OF THE HIGHLAND CRUSADER FUND

Dated:                  Grosvenor Capital Management, L.P.

                            By: ___/s/ Eric Felton_____
Name: Eric Felton, designated Representative of Grosvenor Capital Management, L.P.

Dated:                  Grosvenor Capital Management, L.P.

                            By: ___/s/ Tom Rowland_____
Name: Tom Rowland, designated Representative of Grosvenor Capital Management, L.P.

Dated:                  Grosvenor Capital Management, L.P.

                            By: ___/s/ Burke Montgomery_____
Name: Burke Montgomery, designated Representative of Grosvenor Capital Management, L.P.

Dated:                  Grosvenor Capital Management, L.P.

                            By: ___/s/ Brian Zambie_____
Name: Brian Zambie, designated Representative of Grosvenor Capital Management, L.P.

Dated:      Concord Management, LLC

        By:  /s/ Brant Behr      
        Name:  Brant Behr, designated Representative of Concord Management, LLC


Dated:      Baylor University

        By:  /s/ David Morehead     
        Name:  David Morehead, designated Representative of Baylor University


Dated:      Seattle Fund SPC

        By:  /s/ Stuart Robertson     
        Name:  Stuart Robertson, designated Representative of Seattle Fund SPC


Dated:      Man Solutions Limited

        By:  /s/ Michael Buerer     
        Name:  Michael Buerer, designated Representative of Man Solutions Limited


Dated:      Army and Air Force Exchange Service

        By:  /s/ James Jordan     
        Name:  James Jordan, designated Representative of Army and Air Force Exchange Service

Dated:                  HIGHLAND CRUSADER OFFSHORE PARTNERS, L.P.

By: House Hanover, Its General Partner

By:     /s/ Mark S. DiSalvo
Name: Mark S. DiSalvo
Title:    Authorized Signatory


Dated:                  HIGHLAND CRUSADER FUND, L.P.

By: House Hanover, Its General Partner

By:     /s/ Mark S. DiSalvo
Name:  Mark S. DiSalvo
Title:    Authorized Signatory


Dated:                  HIGHLAND CRUSADER FUND, LTD.

By:     /s/ Mark S. DiSalvo
Name: Mark S. DiSalvo
Title:    Authorized Signatory


Dated:                  HIGHLAND CRUSADER FUND II, LTD.

By:     /s/ Mark S. DiSalvo
Name:  Mark S. DiSalvo
Title:    Authorized Signatory


Dated:                  HOUSE HANOVER, LLC

By:     /s/ Mark S. DiSalvo
Name: Mark S. DiSalvo
Title:    Authorized Signatory


Dated:                  ALVAREZ & MARSAL CRF MANAGEMENT, LLC

By:     /s/ Steven Varner
Name:  Steven Varner
Title:    Managing Director

Dated:          EAMES, LTD.

By: _____

Name: Abali Hoilett

Title: Authorised Signatory of the Director MaplesFS Directors Limited

Dated:          HOCKNEY, LTD.

By: _____

Name: Abali Hoilett

Title: Authorised Signatory of the Director MaplesFS Directors Limited

Dated:          STRAND ADVISORS, INC.

By: _____

Name:

Title:

Dated:          HIGHLAND SPECIAL OPPORTUNITIES HOLDING COMPANY

By: _____

Name:

Title:

Dated:          HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P.

By: _____

Name:

Title:

Dated:          HIGHLAND FINANCIAL PARTNERS, L.P.

By: _____

Name:

Title:

Dated:          HIGHLAND CREDIT STRATEGIES MASTER FUND, L.P.

By: _____

Name:

Title:

Dated:                       EAMES, LTD.

By: _____
Name:
Title:


Dated:                       HOCKNEY, LTD.

By: _____
Name:
Title:


Dated:                       STRAND ADVISORS, INC.

By: _____
Name:    James P. Seery, Jr
Title:    Authorized Signatory


Dated:                       HIGHLAND SPECIAL OPPORTUNITIES HOLDING COMPANY

By: _____
Name:
Title:


Dated:                       HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P.

By: _____
Name:    James P. Seery, Jr
Title:    Authorized Signatory


Dated:                       HIGHLAND FINANCIAL PARTNERS, L.P.

By: _____
Name:
Title:


Dated:                       HIGHLAND CREDIT STRATEGIES MASTER FUND, L.P.

By: _____
Name:    James P. Seery, Jr.
Title:    Authorized Signatory

Dated:                    HIGHLAND CREDIT OPPORTUNITIES CDO, L.P.

By:  _____

Name:  *James P. Seery, Jr.*

Title:  *Authorized Signatory*

# EXHIBIT A

**CORNERSTONE HEALTHCARE GROUP HOLDING, INC.**

**AMENDED & RESTATED STOCKHOLDERS' AGREEMENT**

**[●], 2020**

# TABLE OF CONTENTS

ARTICLE I TRANSFER RESTRICTIONS; RIGHT OF FIRST REFUSAL ............................. 1

Section 1.1    Restrictions on Transfer ............................................... 1

Section 1.2    Right of First Refusal .................................................. 2

Section 1.3    Co-Sale Rights .......................................................... 5

Section 1.4    Market Stand-Off Agreement ......................................... 7

ARTICLE II RIGHTS OF FIRST OFFER ........................................................ 8

Section 2.1    Grant of Right of First Offer ......................................... 8

Section 2.2    Procedure for Exercise ................................................ 8

Section 2.3    Excluded Issuances .................................................... 9

Section 2.4    Sale to Third Parties .................................................. 9

ARTICLE III REGISTRATION RIGHTS ......................................................... 9

Section 3.1    Definitions ............................................................. 9

Section 3.2    Request for Registration ............................................ 11

Section 3.3    Company Registration ................................................ 12

Section 3.4    Obligations of the Company ......................................... 13

Section 3.5    Furnish Information .................................................. 15

Section 3.6    Expenses of Demand Registration ................................. 15

Section 3.7    Expenses of Company Registration ................................ 15

Section 3.8    Delay of Registration ................................................ 15

Section 3.9    Indemnification ....................................................... 15

Section 3.10   Reports Under Securities Exchange Act ........................... 17

Section 3.11   Form S-3 Registrations .............................................. 18

Section 3.12   Expenses of Form 5-3 Registration ................................ 20

Section 3.13   Assignment of Registration Rights ................................ 20

Section 3.14   Limitations on Subsequent Registration Rights ................. 20

ARTICLE IV VOTING AGREEMENT; BOARD OF DIRECTORS; REQUIRED VOTE ....... 21

Section 4.1    Board of Directors ................................................... 21

Section 4.2    Required Vote ......................................................... 22

Section 4.3    Grant of Proxy ........................................................ 22

ARTICLE V COVENANTS OF THE COMPANY ............................................... 23

Section 5.1    Delivery of Financial Statements .................................. 23

Section 5.2    Inspection ............................................................. 24

Section 5.3    Directors and Officers Insurance .................................. 24

2992816.2

Section 5.4    Additional Stockholders ................................................................................. 25

ARTICLE VI MISCELLANEOUS ........................................................................................ 25

Section 6.1    Term; Termination........................................................................................ 25

Section 6.2    Legend ........................................................................................................ 26

Section 6.3    Successors and Assigns .............................................................................. 26

Section 6.4    Governing Law ........................................................................................... 26

Section 6.5    Counterparts................................................................................................ 27

Section 6.6    Titles and Subtitles .................................................................................... 27

Section 6.7    Notices ........................................................................................................ 27

Section 6.8    DGCL Electronic Notice ............................................................................ 28

Section 6.9    Dispute Resolution ..................................................................................... 28

Section 6.10   Severability................................................................................................. 29

Section 6.11   Amendments and Waivers .......................................................................... 29

Section 6.12   Aggregation of Stock ................................................................................. 30

Section 6.13   Entire Agreement ....................................................................................... 30

Section 6.14   Stock Splits, Stock Dividends, etc.............................................................. 30

Section 6.15   Cumulative Remedies ................................................................................. 30

Section 6.16   Rights of Stockholders................................................................................ 31

Section 6.17   Further Assurance ...................................................................................... 31

Section 6.18   joint Product ............................................................................................... 31

2992816.2

**AMENDED & RESTATED STOCKHOLDERS' AGREEMENT**

**THIS AMENDED & RESTATED STOCKHOLDERS' AGREEMENT** (the "***Agreement***") is made as of the [●] day of [●], 2020 by and among (i) Cornerstone Healthcare Group Holding, Inc., a Delaware corporation (the "***Company***"), (ii) certain holders of the Company's common stock (the "***Common Stock***") (each of which is referred to herein as a "***Stockholder***" and collectively as the "***Stockholders***"), and (iii) Highland Capital Management, L.P., a Delaware limited partnership ("***HCMLP***"). HCMLP (if and to the extent it is or becomes a Stockholder) and the Stockholders that are affiliates of HCMLP, including any investment funds controlled by or under common control with, or managed directly or indirectly by, HCMLP are collectively referred to herein as "***Highland Capital***" and are set forth on Schedule A, as it may be updated from time to time. Individual Stockholders that are part of the Highland Capital group of Stockholders are sometimes referred to as a "***Highland Capital Stockholders***." Any Stockholders other than Highland Capital Stockholders are collectively referred to herein as the "***Remaining Stockholders***" and are set forth on Schedule B, as it may be updated from time to time. All references in this Agreement to "***Crusader***" shall mean and include, as the case may be, (x) Highland Crusader Holding Corp., (y) any of its successors or assigns and (y) any purchaser or transferee of any Securities that at any time were held by Highland Crusader Holding Corp. (*i.e.,* any purchaser or transferee of Securities from Highland Crusader Holding Corp. and any subsequent purchasers or transferees of any such Securities).

**RECITALS:**

**WHEREAS**, the Company, the Stockholders and HCMLP are parties to that certain Stockholders' Agreement of the Company, dated as of March 24, 2010 (as the same may have been amended, modified or supplemented in accordance with its terms, the "***First Stockholders' Agreement***").

**WHEREAS**, the Stockholders hold shares of Common Stock of the Company, and the Stockholders, the Company and HCMLP desire to enter into this Agreement to (i) provide certain rights to, and impose certain restrictions on, the Stockholders and HCMLP with respect to the Common Stock held by them and (ii) amend and modify certain provisions in the First Stockholders' Agreement.

**AGREEMENT:**

**NOW**, **THEREFORE**, in consideration of the foregoing premises, the mutual promises and covenants set forth herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

**ARTICLE I**

**TRANSFER RESTRICTIONS; RIGHT OF FIRST REFUSAL**

**Section 1.1**     **Restrictions on Transfer**.

(a)     Generally. During the term of this Agreement, all of the Common Stock and any other equity securities (collectively, "***Securities***") now owned or hereafter acquired by

1

any Stockholder shall be subject to the terms and conditions of this Agreement. No transfer, whether voluntary or involuntary, of the Securities shall be valid unless it is made pursuant to the terms and conditions of this Agreement; and, accordingly, any proposed transfer not made in compliance with the requirements of this Agreement shall be null and void ab initio, shall not be recorded on the books of the Company or its transfer agent, and shall not be recognized by the Company.

(b)     Permitted Transfers. Notwithstanding the foregoing, the first refusal rights and co-sale rights of the Company and Highland Capital, as set forth below in this Article I, shall not apply to (i) any transfer of Securities by a Stockholder to any such Stockholder's spouse, parents, siblings (by blood, marriage or adoption) or lineal descendants (by blood, marriage or adoption); (ii) any transfer of Securities by a Stockholder to a trust, partnership, corporation, limited liability company or other similar entity owned exclusively by such Stockholder and/or such Stockholder's spouse, parents, siblings (by blood, marriage or adoption) or lineal descendants (by blood, marriage or adoption) for the benefit of such Stockholder or such Stockholder's spouse, parents, siblings or lineal descendants; (iii) any transfer of Securities by a Stockholder, or upon a Stockholder's death to the executors, administrators, testamentary trustees, legatees or beneficiaries of such Stockholder; (iv) any transfer of Securities by a Stockholder to any person who controls, is controlled by or is under common control with such Stockholder (within the meaning of the Securities Act of 1933, as amended (the "*Securities Act*")); (v) any transfer of Securities by a Stockholder pursuant to a bona fide loan transaction which creates a mere security interest in the Securities; (vi) the Securities held Crusader; *provided*, *however*, that in each such case, each transferee, pledgee, donee, heir or distributee shall, as a condition precedent to such transfer, become a party to this Agreement by executing an Adoption Agreement substantially in the form attached as Annex A and shall have all of the rights and obligations set forth hereunder, and all interests in any trust, partnership, corporation, limited liability company or other similar entity to which any Securities are transferred shall themselves be deemed Securities and shall be subject to all of the provisions hereof. Such transferred Securities shall remain "*Securities*" hereunder, and such transferee shall be treated as a "*Stockholder*" for the purposes of this Agreement. Any purported transfers made in violation of this Section 1.1(b) shall be void.

(c)     Company Repurchase or Public Offering. The provisions of this Agreement shall not apply to the sale of any Securities (i) to the public pursuant to a registration statement filed with, and declared effective by, the Securities and Exchange Commission (the "*SEC*") under the Securities Act or (ii) to the Company.

(d)     Prohibited Transferees. Notwithstanding any other provision of this Agreement to the contrary, no Remaining Stockholder shall transfer any Target Shares to (a) any entity which, in the good faith and reasonable determination of the Company's Board of Directors, directly competes with the Company or (b) any customer, distributor or supplier of the Company, if the Company's Board of Directors should determine in good faith and reasonably that such transfer would result in such customer, distributor or supplier receiving information that would place the Company at a material competitive disadvantage with respect to such customer, distributor or supplier.

**Section 1.2     Right of First Refusal**.

(a)    <u>Grant of Right of First Refusal</u>. Subject to the terms hereof, the Company and, to the extent such right is waived by the Company, HCMLP, on behalf of itself and Highland Capital (and, as provided below, each ROFR Participant) are each hereby granted a right of first refusal with respect to any proposed disposition of any Securities held by any Remaining Stockholder (except for a permitted transfer of the Securities under <u>Section 1.1(b)</u> hereof), in the following order of priority:

(i)    The Company shall have the first right to purchase any Target Shares (as defined below). In the event the Company elects not to exercise first refusal rights with respect to all or any portion of such Target Shares, the Company agrees to waive such rights with respect to such portion of Target Shares in favor of Highland Capital's first refusal rights under this Agreement.

(ii)    If the Company waives its first refusal rights pursuant to <u>Section 1.2(a)(i)</u>, Highland Capital shall have the next right to purchase any remaining Target Shares. HCMLP, in its sole discretion, shall have the right to assign and apportion the rights of first refusal hereby granted among itself and investment funds comprising Highland Capital, which need not be Stockholders or parties to this Agreement at that time, in any proportion it deems suitable (the actual participants, including any individuals or entities assigned such rights, each being a "***Highland ROFR Participant***" and, together with the Company, each a "***ROFR Participant***"); *provided* that each such Highland ROFR Participant is an "***accredited investor***" within the meaning of Rule 501 of Regulation D of the Securities Act; and provided further that any Highland ROFR Participant that is not then a party to this Agreement shall be required to become a party to this Agreement by executing an executing an Adoption Agreement in the form attached hereto as <u>Exhibit A</u>. In the event that HCMLP does not specify an allocation for ROFR Participants, then each Highland Capital Stockholder shall have the right to purchase up to that number of remaining Target Shares equal to the product of (A) the number of remaining Target Shares multiplied by (B) a fraction, (x) the numerator of which shall be the number of shares of Common Stock owned by such Highland Capital Stockholder (assuming full conversion and exercise of all convertible and exercisable securities into Common Stock held by such Highland Capital. Stockholder) and (y) the denominator of which shall be the number of shares of Common Stock owned by all of the Highland Capital Stockholders (assuming full conversion and exercise of all convertible and exercisable securities into Common Stock).

(iii)    In the event that HCMLP (or the Highland ROFR Participants as its designated assignee(s)) elects not to exercise first refusal rights with respect to all or any portion of such Target Shares, Highland Capital agrees to waive such rights with respect to such portion.

(b)    <u>Notice of Intended Disposition</u>. In the event a Remaining Stockholder desires to accept a written, bona fide third-party offer for the transfer of any or all of the Securities held by such Remaining Stockholder (in such capacity such Remaining Stockholder shall be referred to as a "***Selling Stockholder***" and the shares subject to such offer to be referred to as the "***Target Shares***"), the Selling Stockholder shall promptly deliver to the Company and HCMLP written notice of the intended disposition ("***Disposition Notice***") and the basic terms and conditions thereof, including the identity of the proposed purchaser.

3

(c)    Underline Exercise of First Refusal Right. The Company shall, for a period of thirty (30) days following receipt of the Disposition Notice, have the right to purchase all or any portion of the Target Shares:

(i)    The Company's right shall be exercisable by written notice (the "***Exercise Notice***") delivered to the Selling Stockholder and HCMLP prior to the expiration of the thirty (30) day exercise period. If such right is exercised with respect to all the Target Shares specified in the Disposition Notice, then the Company shall effect the purchase of such Target Shares, including payment of the purchase price, not more than five (5) business days after the delivery of the Exercise Notice. At such time, the Selling Stockholder shall deliver to the Company the certificates representing the Target Shares to be purchased, each certificate to be properly endorsed for transfer.

(ii)    Alternatively, if the Company exercises such rights with respect to only a portion of the Target Shares specified in the Disposition Notice, the Company shall notify HCMLP of its intent to purchase only a portion of the Target Shares within the thirty (30) day exercise period above defined. The Company's purchase of such Target Shares shall be consummated at the time of HCMLP's exercise of its purchase rights in accordance with Section 1.2(e) hereof, if such rights are exercised. In the event HCMLP does not elect to purchase any of the remaining Target Shares, the Company's purchase of that portion of the Target Shares that it desires to purchase shall be consummated not more than five (5) business days after the date of expiration of HCMLP's first refusal right. The purchasing party under this Section 1.2 is referred to herein as the "***ROFR Purchaser***."

(iii)    Should the purchase price specified in the Disposition Notice be payable in property other than cash or evidences of indebtedness, the ROFR Purchaser shall have the right to pay the purchase price in the form of cash equal in amount to the value of such property. It the Selling Stockholder and the ROFR Purchaser cannot agree on such cash value within fifteen (15) days after receipt of the Disposition Notice (or, in the event HCMLP is the ROFR Purchaser, within fifteen (15) days after the Company's waiver of its first refusal rights hereunder, the valuation shall be determined by the Company's Board of Directors (the "***Board***") in its good faith discretion. The closing shall then be held on the later of (A) the fifth business day following the delivery of the Exercise Notice, or (B) the fifth business day after such cash valuation shall have been made.

(d)    Underline Non-Exercise of Right by the Company. In the event the Exercise Notice is not given to the Selling Stockholder and HCMLP within thirty (30) days following the date of the Company's receipt of the Disposition Notice, the Company shall be deemed to have waived its right of first refusal with respect to such proposed disposition.

(e)    Underline Exercise of Right by HCMLP. Subject to the rights of the Company, for a period ending on the earlier of (a) sixty (60) days following receipt of the Disposition Notice or (b) thirty (30) days following receipt of written notice of the Company's election either to waive its right of first refusal or to purchase only a portion of the Target Shares, HCMLP (and/or its designee(s) as provided in Section 1.2(a)(a)(ii)) shall have the right to purchase all, or any portion of the remaining balance after the Company's purchase, of the Target Shares, upon the terms and conditions specified in the Disposition Notice. The Highland ROFR Participants shall

2992816.2

exercise this right of first refusal in the same manner and subject to the same rights and conditions as the Company, as more specifically set forth in Section 1.2(c) above.

(f)     Non-Exercise of Right by HCMLP: Subsequent Sales, Void Transfers. In the event an Exercise Notice with respect to all of the Target Shares is not given to the Selling Stockholder by the Company and/or HCMLP within sixty (60) days following the date of receipt of the Disposition Notice, the Selling Stockholder shall have a period of sixty (60) days thereafter in which to sell the portion of the Target Shares that the ROFR Participants have not elected to purchase upon terms and conditions (including the purchase price and the form of consideration therefor) no more favorable to the third-party transferee than those specified in the Disposition Notice; *provided*, *however*, that the Selling Stockholder must first offer the Target Shares for co-sale pursuant to Section 1.3 hereof. Any transfer in violation of this Section 1.2 shall be void. Such transferred Securities shall remain "*Securities*" hereunder, and such transferee shall be treated as a "*Stockholder*" for the purposes of this Agreement, in the capacity of Highland Capital or a Remaining Stockholder, as applicable. In the event the Selling Stockholder does not notify the Company or consummate the sale or disposition of the Target Shares within such sixty (60) day period, HCMLP's and the Company's first refusal rights shall continue to be applicable to any subsequent disposition of the Target Shares by the Selling Stockholder until such right lapses or terminates in accordance with Section 6.1 hereof.

(g)     Violation of First Refusal Right. If any Selling Stockholder becomes obligated to sell any Target Shares to the Company or HCMLP (and/or its designee(s) as provided in Section 1.2(a)(ii)) under this Agreement and fails to deliver such Target Shares in accordance with the terms of this Agreement, the Company and/or HCMLP (and/or its designee(s) as provided in Section 1.2(a)(ii)) may, at its option, in addition to all other remedies it may have, send to such Selling Stockholder the purchase price for such Target Shares as is herein specified and transfer to the name of the Company or HCMLP (and/or its designee(s) as provided in Section 1.2(a)(ii)) (or request that the Company effect such transfer in the name of HCMLP (and/or its designee(s) as provided in Section 1.2(a)(ii)) on the Company's books the certificate or certificates representing the Target Shares to be sold. Such Selling Stockholder shall also reimburse HCMLP and each ROFR Participant for any and all reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred pursuant to the exercise or the attempted exercise of the ROFR Participants' rights under this Section 1.3.

(h)     Application of Co-Sale Right. Notwithstanding anything to the contrary in this Section 1.2 Target Shares may be sold to a third party transferee (other than the Company or Highland Capital) if and only if the Selling Stockholder first complies with the co-sale procedures set forth in Section 1.3, and some or all of the Target Shares remain available for sale following the application of Section 1.3.

**Section 1.3     Co-Sale Rights**.

(a)     Notice of Offer. The provisions of Section 1.2(b) requiring the Selling Stockholder to give notice of any intended transfer of the Securities are incorporated in this Section 1.3.

(b)     Grant of Co-Sale Rights.

(i)     If (i) any such proposed disposition of Target Shares is being made by the Selling Stockholder and (ii) the rights of first refusal of the Company and HCMLP have been waived or have lapsed, in full or in part with respect to such proposed disposition, the Co-Sale Participant (as defined herein) shall have the right, exercisable upon written notice to the Selling Stockholder within thirty (30) days after receipt of the Disposition Notice, to participate in such sale of the Target Shares on the same terms and conditions as those set forth in the Disposition Notice. As used herein, "*Co-Sale Participant*" shall mean (x) in the event Highland Capital holds or otherwise controls a majority of the issued and outstanding shares of Common Stock of the Company, the Highland Capital entities designated by HCMLP as provided below, or (y) in the event Highland Capital does not hold or otherwise control a majority of the issued and outstanding shares of Common Stock of the Company, each non-Selling Stockholder. To the extent any Co-Sale Participant exercises such right of participation, the number of shares of Target Shares that the Selling Stockholder may sell in the transaction shall be correspondingly reduced. The right of participation of the Co-Sale Participants shall be subject to the terms and conditions set forth in this Section 1.3.

(ii)     Each Co-Sale Participant may sell all or any part of a number of shares of the capital stock of the Company held by such Co-Sale Participant equal to the product obtained by multiplying (i) the aggregate number of Target Shares covered by the Disposition Notice that neither the Company nor Highland Capital have elected to purchase pursuant to Section 1.2 by (ii) a fraction, the numerator of which is the number of shares of Common Stock of the Company at the time owned by such Co-Sale Participant (assuming for the purposes of this calculation that all shares held by Highland Capital are held by HCMLP) and the denominator of which is the combined number of shares of Common Stock of the Company at the time deemed owned by the Selling Stockholder and all of the Co-Sale Participants that desire to exercise their rights of co-sale. Notwithstanding the foregoing, HCMLP, in its sole discretion, shall have the right to assign and apportion the rights of first refusal hereby granted among itself and investment funds comprising Highland Capital, which need not be Stockholders or parties to this Agreement at that time, in any proportion it deems suitable; *provided* that each such Highland Capital Co-Sale Participant is an "*accredited investor*" within the meaning of Rule 501 of Regulation D of the Securities Act; and provided further that any Highland Capital Co-Sale Participant that is not then a party to this Agreement shall be required to become a party to this Agreement by executing an Adoption Agreement in the form attached hereto as Exhibit A.

(iii)     Each Co-Sale Participant may effect its participation in the sale by delivering to the Selling Stockholder for transfer to the purchase offeror one or more certificates, properly endorsed for transfer, which represent the number of shares of Common Stock that it elects to sell pursuant to this Section 1.3(h).

(c)     Payment of Proceeds. The stock certificates that the Co-Sale Participants deliver to the Selling Stockholder pursuant to Section 1.3(b) shall be transferred by the Selling Stockholder to the purchase offeror in consummation of the sale of the Common Stock pursuant to the terms and conditions specified in the notice to the Company and HCMLP (and, if applicable, the Remaining Stockholders) pursuant to Section 1.2(b), and the Selling Stockholder shall promptly thereafter remit to the Co-Sale Participants that portion of the sale proceeds to

6

which the Investors are entitled by reason of their participation in such sale. To the extent that any prospective purchaser or purchasers refuses to purchase shares or other securities from an Co-Sale Participant exercising its rights of co-sale hereunder, the Selling Stockholder shall not sell to such prospective purchaser or purchasers any Securities unless and until, simultaneously with such sale, the Selling Stockholder purchases such shares or other securities from such Co-Sale Participant for the same consideration and on the same terms and conditions as the proposed transfer described in the Disposition Notice.

(d)     Non-exercise. The exercise or non-exercise of the rights of the Co-Sale Participants hereunder to participate in one or more sales of Common Stock made by the Selling Stockholder shall not adversely affect their rights to participate in subsequent Common Stock sales by any Selling Stockholder.

(e)     Violation of Co-Sale Right. If any Selling Stockholder purports to sell any Target Shares in contravention of this Section 1.3 (a "**Prohibited Transfer**"), each Co-Sale Participant may, in addition to such remedies as may be available by law, in equity or hereunder, require Selling Stockholder to purchase from such Co-Sale Participant the type and number of Securities that such Co-Sale Participant would have been entitled to sell under Section 1.3(b)(ii) had the Prohibited Transfer been effected pursuant to and in compliance with the terms of Section 1.3. The sale will be made on the same terms and subject to the same conditions as would have applied had the Selling Stockholder not made the Prohibited Transfer, except that the sale (including, without limitation, the delivery of the purchase price) must be made within ninety (90) days after the Co-Sale Participant learns of the Prohibited Transfer. Such Selling Stockholder shall also reimburse HCMLP and each Co-Sale Participant for any and all reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred pursuant to the exercise or the attempted exercise of the Co-Sale Participants' rights under this Section 1.3.

### Section 1.4     **Market Stand-Off Agreement**.

(a)     In connection with any underwritten public offering by the Company of its equity securities pursuant to an effective registration statement filed under the Securities Act, including the first bona fide firm commitment underwritten public offering of the Company's Common Stock registered under the Securities Act on Form S-1 or Form SB-2 (or any successor form designated by the SEC) (the "*Initial Public Offering*"), the Remaining Stockholders (each, an "*Owner*") shall not (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any securities of the Company, including (without limitation) shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock (whether now owned or hereafter acquired) or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any securities of the Company, including (without limitation) shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock (whether now owned or hereafter acquired), whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of securities, in cash or otherwise without the prior written consent of the Company or its underwriters; *provided* that all executive officers, directors and greater than 5% stockholders (including, if applicable, HCMLP

7

and Highland Capital) are subject to similar restrictions. Such restriction (the "***Market Stand-Off***") shall be in effect for such period of time from and after the effective date of the final prospectus for the offering as may be requested by the Company or such underwriters. In no event, however, shall such period exceed one hundred eighty (180) days (the "***Lock-Up Period***"), and the Market Stand-Off shall in no event be applicable to any underwritten public offering effected more than two (2) years after the effective date of the Company's initial public offering.

(b)     Any new, substituted or additional securities which are by reason of any recapitalization or reorganization distributed with respect to the Common Stock to be registered shall be immediately subject to the Market Stand-Off, to the same extent the Common Stock is at such time covered by such provisions.

(c)     In order to enforce the Market Stand-Off, the Company may impose stop-transfer instructions with respect to the Common Stock until the end of the applicable stand-off period.

## ARTICLE II

## RIGHTS OF FIRST OFFER

**Section 2.1     Grant of Right of First Offer**. Each time the Company proposes to offer (i) any shares of, or securities convertible into or exercisable for any shares of, any class of its capital stock ("***equity securities***"), or (ii) any debt securities (collectively, the "***First Offer Securities***"), the Company shall first offer to Highland Capital the right and opportunity (but not the obligation) to purchase the First Offer Securities proposed to be issued in such offering in accordance with the provisions of this Article IV. HCMLP, in its sole discretion, shall have the right to assign and apportion the rights of first refusal hereby granted among itself and investment funds comprising Highland Capital, which need not be parties to this Agreement at that time (the actual participants, including any individuals or entities assigned such rights, each being a "***Purchaser***"); *provided* that each such Purchaser is an "***accredited investor***" within the meaning of Rule 501 of Regulation D of the Securities Act; and *provided further* that any such Purchaser that is not then a party to this Agreement shall be required to become a party to this Agreement by executing an Adoption Agreement in the form attached hereto as Exhibit A.

**Section 2.2     Procedure for Exercise**. The Company shall deliver notice (the "***Offer Notice***") to HCMLP stating (a) the number and description of the First Offer Securities to be offered in the applicable offering and (b) the price and terms, if any, upon which it proposes to offer such First Offer Securities. Within 30 days after giving of the Offer Notice, the Purchasers may elect to purchase, at the price and on the terms specified in the Offer Notice, such First Offer Securities, in the amounts designated by HCMLP. The Purchasers shall exercise the rights under this section by paying the purchase price for the First Offer Securities elected to be purchased in cash or by wire transfer of immediately available funds. As promptly as practicable on or after the purchase date, the Company shall issue and deliver to the Purchasers a certificate or certificates for the number of full shares or amount, whichever is applicable, of First Offer Securities.

**Section 2.3    Excluded Issuances**. The rights of first offer set forth in this section shall not be applicable to the following (collectively, the "*Excluded Issuances*"): (A) in the case of equity securities, (i) the issuance of shares of capital stock (or any cash-settled "phantom units" or similar equity-linked or equity-based incentive plans or agreement structures, the value of which is based on the Company's Common Stock (collectively, "*phantom units*")) of the Company issued or issuable solely for compensatory purposes, to directors, officers, employees or consultants of the Company, whether directly (as Common Stock, options or phantom units) or pursuant to an equity incentive plan or agreement or a restricted stock plan or agreement, in each case approved by the Board; (ii) the issuance of shares of capital stock of the Company in connection with stock splits, stock dividends, recapitalizations or the like; (iii) the issuance of shares of capital stock in connection with a bona fide business acquisition or license of technology of or by the Company, whether by license, merger, consolidation, sale of assets, sale or exchange of stock or otherwise that are not issued primarily for equity financing purposes, in each case as approved by the Board; (iv) the issuance of shares of capital stock of the Company in connection with corporate partnering transactions, business relationships and similar transactions that are not issued primarily for equity financing purposes, in each case as approved by the Board; or (v) the issuance of shares of capital stock to financial institutions in connection with bona fide Commercial Debt (as defined below) arrangements (including issuances, extensions, renewals, modifications and waivers), in each case approved by the Company's Board of Directors; and (B) in the case of debt securities, shall not be deemed to include debt issued to NexBank, SSB and other banks, commercial finance lenders, insurance companies, leasing or equipment financing institutions or other lending institutions regularly engaged in the business of lending money (excluding venture capital, private equity, investment banking or similar institutions which sometimes engage in lending activities but which are primarily engaged in investments in equity securities), which is for money borrowed, or purchase or leasing of equipment in the case of lease or other equipment financing, whether or not secured, and in any such instance is not primarily for equity financing purposes ("*Commercial Debt*"), in each such case approved by the Board of Directors of the Company,

**Section 2.4    Sale to Third Parties**. The Company shall, after complying with its obligations under Section 2.1, be free at any time prior to 90 days after the date of the Offer Notice, to offer and sell to any third party or parties the remainder of such First Offer Securities proposed to be issued by the Company at a price and on payment terms no less favorable to the Company than those specified in the Offer Notice. However, if such third party sale or sales are not consummated within such 90-day period, or if the terms of any such proposed sale are modified in a manner more favorable to the proposed purchaser (whether with respect to price or any other term) than offered to HCMLP pursuant to Section 2.1, the Company shall not sell such First Offer Securities as shall not have been purchased within such period without again complying with Section 2.1 hereof.

## ARTICLE III

## REGISTRATION RIGHTS

**Section 3.1    Definitions**. For purposes of this Article III.

(a)     "**Certificate of Incorporation**" shall mean the Company's Certificate of Incorporation as in effect as of the date hereof and as amended and restated from time to time.

(b)     "**Change in Control**" shall mean (A) the acquisition of the Company by means of any transaction or series of related transactions (including, without limitation, any stock purchase transaction, merger, consolidation or other form of reorganization in which outstanding shares of the Company are exchanged for securities or other consideration issued, or caused to be issued, by the acquiring entity or its subsidiary, but excluding (i) any transaction effected for the purpose of changing the Company's jurisdiction of incorporation and (ii) the sale by the Company of shares of its capital stock to investors in bona fide equity financing transactions), unless securities representing more than fifty percent (50%) of the total combined voting power of the voting securities of the surviving or acquiring entity or its direct or indirect parent entity are immediately thereafter beneficially owned, directly or indirectly and in substantially the same proportion, by the Company's stockholders of record as constituted immediately prior to such transaction or series of related transactions and (B) a sale of all or substantially all of the assets of the Company in a single transaction or series of related transactions. In no event shall any public offering of the Company's securities be deemed to constitute a Change in Control.

(c)     "**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

(d)     "**Form S-3**" shall mean such form under the Securities Act as in effect on the date hereof or any registration forms under the Securities Act subsequently adopted by the SEC that permit inclusion or incorporation of substantial information by reference to other documents filed by the Company with the SEC.

(e)     "**Holder**" shall mean any person owning or having the right to acquire Registrable Securities or any assignee thereof in accordance with <u>Section 3.13</u> hereof.

(f)     The terms "**register**," "**registered**" and "**registration**" refer to a registration effected by preparing and filing a registration statement or similar document in compliance with the Securities Act, and the declaration or ordering of effectiveness of such registration statement or document.

(g)     "**Registrable Securities**" shall mean, only with respect to equity securities held by Highland Capital, the Common Stock and any shares of Common Stock of the Company issued as (or issuable upon the conversion or exercise of any warrant, right or other security which is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of such shares; excluding in all cases, however, any Registrable Securities sold by a Holder in a transaction in which his rights under this <u>Article III</u> are not assigned.

(h)     The number of shares of "**Registrable Securities then outstanding**" shall be equal to the number of shares of Common Stock then issued and outstanding which are, and the number of shares of Common Stock then issuable pursuant to then exercisable or convertible securities which are, Registrable Securities.

        (i)      "***Rule 144***" means Rule 144 as promulgated by the SEC under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the SEC.

        (j)      "***Rule 145***" means Rule 145 as promulgated by the SEC under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the SEC.

### Section 3.2    <u>Request for Registration</u>.

        (a)      At any time, HCMLP, on behalf of Highland Capital, may request that the Company effect a registration under the Securities Act of all or any part of the Registrable Securities held by Highland Capital (each, a "***Demand Registration***"), subject to the terms and conditions of this Agreement. Any request (a "***Registration Request***") for a Demand Registration shall specify (A) the approximate number of shares of Registrable Securities requested to be registered and (B) the intended method of distribution of such shares. Within twenty (20) days of the receipt of the Registration Request, the Company will use its best efforts to effect as soon as practicable (and in any event within ninety (90) days of the date such request is given) the registration under the Securities Act requested and will include in such registration all shares of Registrable Securities that holders of Registrable Securities request the Company to include in such registration by written notice given to the Company within twenty (20) days after the Company's sends such notice (subject to underwriter cut-backs as provided in this Agreement).

        (b)      Without the prior written consent of HCMLP, the Company will not include in any Demand Registration any securities other than (a) Registrable Securities, (b) shares of stock pursuant to <u>Section 3.3</u> hereof, and (c) securities to be registered for offering and sale on behalf of the Company. If the managing underwriter(s) advise the Company in writing that in their opinion the number of shares of Registrable Securities and, if permitted hereunder, other securities in such offering, exceeds the number of shares of Registrable Securities and other securities, if any, which can be sold in an orderly manner in such offering within a price range acceptable to the holders of a majority of the shares of Registrable Securities held by Holders initially requesting registration, the Company will include in such registration, prior to the inclusion of any securities which are not shares of Registrable Securities, the number of shares of Registrable Securities requested to be included that in the opinion of such underwriters can be sold in an orderly manner within the price range acceptable to the Holders of a majority of the shares of Registrable Securities initially requesting registration, subject to the following order of priority: (A) first, the securities requested to be included therein by the Holders, pro rata among the holders thereof on the basis of the number of shares of Registrable Securities such holders requested to be included in such registration or apportioned among them in any other manner in which HCMLP determines to be appropriate in its sole discretion; (B) second, the securities requested to be included therein by the Company; and (C) third, among persons not contractually entitled to registration rights under this Agreement.

        (c)      If HCMLP indicates that the Holders on whose behalf it is initiating the Registration Request hereunder (the "***Initiating Holders***") intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to <u>Section 3.2</u> and the Company shall include

such information in the written notice referred to in <u>Section 3.2</u>. The underwriter will be selected by HCMLP and shall be reasonably acceptable to the Board, which approval shall not be unreasonably withheld, conditioned or delayed. All Holders proposing to distribute their securities through such underwriting shall (together with the Company as provided in <u>Section 3.4(e)</u>) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting.

(d)     Notwithstanding the foregoing, if the Company shall furnish to HCMLP a certificate signed by the President of the Company stating that in the good faith judgment of the Board of Directors of the Company it would be seriously detrimental to the Company and its stockholders for such registration statement to be filed and it is, therefore, essential to defer the filing of such registration statement, the Company shall have the right to defer taking action with respect to such filing for a period of not more than one hundred twenty (120) days after receipt of the request of the Initiating Holders; *provided*, *however*, that the Company may not utilize this right more than once in any twelve (12) month period.

(e)     In addition, the Company shall not be obligated to effect, or to take any action to effect, any registration pursuant to this <u>Section 3.2</u>:

(i)     after the Company has effected three (3) Demand Registrations pursuant to this <u>Section 3.2</u> and such registrations have been declared or ordered effective;

(ii)     during the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of filing of, and ending on a date one hundred eighty (180) days after the effective date of, a registration subject to <u>Section 3.3</u> or <u>Section 3.11</u> hereof, provided that the Company is actively employing its commercially reasonable efforts to cause such registration statement to become effective; *provided*, *however*, that the Company may not utilize this right more than once in any twelve-month period;

(iii)     if the Initiating Holders propose to dispose of shares of Registrable Securities that may be immediately registered on Form S-3 pursuant to a request made pursuant to <u>Section 3.11</u> below; or

(iv)     in any particular jurisdiction in which the Company would be required to qualify to do business or to execute a general consent to service of process in effecting such registration, qualification or compliance unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act.

### Section 3.3     <u>Company Registration</u>.

(a)     If, but without any obligation to do so, the Company proposes to register (including for this purpose a registration initiated by the Company for itself or for the Holders or stockholders other than the Holders) any of its stock or other securities under the Securities Act in connection with the public offering of such securities solely for cash (other than a registration relating solely to employee benefit plans, or a registration relating solely to a SEC Rule 145 transaction, or a registration on any registration form which does not permit secondary sales or does not include substantially the same information as would be required to be included in a registration statement covering the Registrable Securities) the Company shall, at such time,

12

promptly give each Holder written notice of such registration. Upon the written request of HCMLP given within fifteen (15) days after delivery of such notice by the Company, the Company shall cause to be registered under the Securities Act all of the Registrable Securities that HCMLP has requested to be registered on behalf of Highland Capital.

(b)     If a registration subject to <u>Section 3.3</u> relates to an underwritten public offering of equity securities and the managing underwriters advise the Company that in their opinion the number of securities requested to be included in such registration exceeds the number that can be sold in an orderly manner in such offering within a price range acceptable to the Holders initially requesting such registration, the Company will include in such registration (i) first, the Registrable Securities requested to be included in such registration by Highland Capital, allocated pro rata among the holders thereof on the basis of the total number of shares of Registrable Securities such Holder requested to be included in such registration or apportioned among them in any other manner in which HCMLP determines to be appropriate in its sole discretion; (ii) second, the securities requested to be included therein by the Company if the Company has initiated the registration; and (iii) third, among persons not contractually entitled to registration rights under this Agreement. Notwithstanding the foregoing, the amount of Registrable Securities of Highland Capital included in the offering shall not be reduced below thirty percent (30%) of the total amount of securities included in such offering. In connection with any offering involving an underwriting of shares of the Company's capital stock, the Company shall not be required to include any of the Holders' securities in such underwriting unless they accept the terms of the underwriting as agreed upon between the Company and the underwriters selected by it (or by other persons entitled to select the underwriters). All Holders proposing to distribute their securities through such underwriting shall (together with the Company as provided in <u>Section 3.4(e)</u>) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting.

**Section 3.4     <u>Obligations of the Company</u>**. Whenever required under this <u>Article III</u> to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a)     Prepare and file with the SEC a registration statement with respect to such Registrable Securities and use its commercially reasonable efforts to cause such registration statement to become effective within sixty (60) days of a request for registration pursuant to <u>Section 3.2</u> and <u>Section 3.11</u> and such registration statement shall remain effective until the earlier to occur of (i) one-hundred-eighty (180) days after the date such registration statement was declared effective or (ii) until the distribution contemplated in such registration statement has been completed; *provided*, *however*, that such one-hundred-eighty (180) day period shall be extended for a period of time equal to the period the Holder refrains from selling any securities included in such registration at the request of an underwriter of Common Stock (or other securities) of the Company.

(b)     Prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement.

13

(c)     Furnish to the Holders such numbers of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned by them.

(d)     Use its best efforts to register and qualify the securities covered by such registration statement under such other securities or blue sky laws of such jurisdictions as shall be reasonably requested by the Holders; *provided* that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

(e)     In the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriter of such offering. Each Holder participating in such underwriting shall also enter into and perform its obligations under such an agreement.

(f)     Notify each Holder of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein of misleading in the light of the circumstances then existing.

(g)     Cause all such Registrable Securities registered pursuant hereunder to be listed on each securities exchange or nationally recognized quotation system on which similar securities issued by the Company are then listed.

(h)     Provide a transfer agent and registrar for all Registrable Securities registered pursuant hereunder and a CUSIP number for all such Registrable Securities not later than the effective date of such registration.

(i)     Use its best efforts to cause to be furnished, at the request of at least a majority of the Holders participating in the registration, on the date that such Registrable Securities are delivered to the underwriters for sale, if such securities are being sold through underwriters, or, if such securities are not being sold through underwriters, on the date that the registration statement with respect to such securities becomes effective, (i) an opinion, dated such date, of the counsel representing the Company for purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering, addressed to the underwriters, if any, and (ii) a letter dated such date, from the independent certified public accountants of the Company, in form and substance as is customarily given by independent certified public accountants to underwriters in connection with an underwritten public offering, addressed to the underwriters, if any.

(j)     Make available for inspection by each Holder of Registrable Securities, any underwriter and any attorney, accountant, or other agent retained by such Holder or underwriter, all financial and other records, pertinent corporate documents and properties of the Company and cause the Company's officers, directors, and employees to supply all information

reasonably requested by such Holder, underwriter, attorney, accountant, or agent in connection with such registration statement.

**Section 3.5**     **Furnish Information**. It shall be a condition precedent to the obligations of the Company to take any action pursuant to this Article III with respect to the Registrable Securities of any selling Holder that such Holder shall furnish to the Company such information regarding such Holder, the Registrable Securities held by such Holder, and the intended method of disposition of such securities as shall be required by the Company or the managing underwriters, if any, to effect the registration of such Holder's Registrable Securities.

**Section 3.6**     **Expenses of Demand Registration**. All expenses, other than underwriting discounts and commissions, incurred in connection with registrations, filings or qualifications pursuant to Section 3.2(a), including (without limitation) all registration, filing and qualification fees, printers' and accounting fees, fees and disbursements of counsel for the Company and the reasonable fees and disbursements of counsel for the selling Holders shall be borne by the Company, including, without limitation, all such expenses incurred with respect to a registration request subsequently withdrawn by the Holders, regardless of whether such withdrawal was a result of a material adverse change in the condition (financial or otherwise), business or prospects of the Company from that known to the Holders at the time of the request or otherwise.

**Section 3.7**     **Expenses of Company Registration**. All expenses, other than underwriting discounts and commissions relating to Registrable Securities, incurred in connection with registrations, filings or qualifications pursuant to Section 3.3 for each Holder, including (without limitation) all registration, filing and qualification fees, printers' and accounting fees, fees and disbursements of counsel for the Company and the reasonable fees and disbursements of counsel for the selling Holders shall be borne by the Company.

**Section 3.8**     **Delay of Registration**. No Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Article III.

**Section 3.9**     **Indemnification**. In the event any Registrable Securities are included in a registration statement under this Article III:

(a)     To the extent permitted by law, the Company will indemnify and hold harmless each Holder, the partners, members, officers, and directors of each Holder (including HCMLP), any underwriter (as defined in the Securities Act) for such Holder and each person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or the Exchange Act, against any losses, claims, damages, or liabilities (joint or several) to which they may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages, or liabilities (or actions in respect thereto) arise out of or are based upon any of the following statements, omissions or violations (each, a "***Violation***"): (i) any untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, (ii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading, or (iii) any violation or alleged violation by the Company of the Securities Act, the

15

Exchange Act, any state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any state securities law; and the Company will pay to each such Holder, underwriter or controlling person, as incurred, any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability, or action; *provided*, *however*, that the indemnity agreement contained in this <u>Section 3.9(a)</u> shall not apply to amounts paid in settlement of any such loss, claim, damage, liability, or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld, conditioned or delayed), nor shall the Company be liable in any such case for any such loss, claim, damage, liability, or action to the extent that it arises out of or is based upon a Violation which occurs in reliance upon and in conformity with written information furnished by any such Holder, underwriter or controlling person expressly for use in connection with such registration.

(b)     To the extent permitted by law, each selling Holder will indemnify and hold harmless the Company, each of its directors, each of its officers who has signed the registration statement, each person, if any, who controls the Company within the meaning of the Securities Act, any underwriter, any other Holder selling securities in such registration statement and any controlling person of any such underwriter or other Holder, against any losses, claims, damages, or liabilities (joint or several) to which any of the foregoing persons may become subject, under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages, or liabilities (or actions in respect thereto) arise out of or are based upon any Violation, in each case to the extent (and only to the extent) that such Violation occurs in reliance upon and in conformity with written information furnished by such Holder expressly for use in connection with such registration; and each such Holder will pay, as incurred, any legal or other expenses reasonably incurred by any person intended to be indemnified pursuant to this <u>Section 3.9(b)</u>, in connection with investigating or defending any such loss, claim, damage, liability, or action; *provided*, *however*, that the indemnity agreement contained in this <u>Section 3.9(b)</u>, shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Holder (which consent shall not be unreasonably withheld, conditioned or delayed); *provided*, *however*, that in no event shall any indemnity under this <u>Section 3.9(b)</u> exceed the net proceeds from the offering received by such Holder.

(c)     Promptly after receipt by an indemnified party under this <u>Section 3.9</u> of notice of the commencement of any action (including any governmental action), such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this <u>Section 3.9</u>, deliver to the indemnifying party a written notice of the commencement thereof and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume the defense thereof with counsel mutually satisfactory to the parties; *provided*, *however*, that an indemnified party (together with all other indemnified parties which may be represented without conflict by one counsel) shall have the right to retain separate counsel, with the fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such proceeding. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action, if materially prejudicial to its ability

16

to defend such action, shall relieve such indemnifying party of any liability to the indemnified party under this <u>Section 3.9</u>, but the omission so to deliver written notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this <u>Section 3.9</u>.

(d)     If the indemnification provided for in this <u>Section 3.9</u> is held by a court of competent jurisdiction to be unavailable to an indemnified party with respect to any loss, liability, claim, damage, or expense referred to therein, then the indemnifying party, in lieu of indemnifying such indemnified party hereunder, shall contribute to the amount paid or payable by such indemnified party as a result of such loss, liability, claim, damage, or expense in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the indemnified party on the other hand in connection with the statements or omissions that resulted in such loss, liability, claim, damage, or expense as well as any other relevant equitable considerations; *provided*, *however*, that in no event shall any contribution under this <u>Section 3.9</u> exceed the net proceeds from the offering received by such Holder. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission.

(e)     Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control as to any Investor that is a party thereto.

(f)     The obligations of the Company and Holders under this <u>Section 3.9</u> shall survive the completion of any offering of Registrable Securities in a registration statement under this <u>Article III</u>, and otherwise. No indemnifying party, in the defense of any such claim or litigation, shall, except with the consent of each other indemnified party, consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

**Section 3.10   <u>Reports Under Securities Exchange Act</u>**. With a view to making available to the Holders the benefits of Rule 144 and any other rule or regulation of the SEC that may at any time permit a Holder to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3, the Company agrees to:

(a)     make and keep public information available, as those terms are understood and defined in Rule 144, at all times after the effective date of the first registration statement filed by the Company for the offering of its securities to the general public;

(b)     take such action, including the voluntary registration of its Common Stock under Section 5.12 of the Exchange Act, as is necessary to enable the Holders to utilize Form S-3 for the sale of their Registrable Securities, such action to be taken as soon as practicable after the

17

end of the fiscal year in which the first registration statement filed by the Company for the offering of its securities to the general public is declared effective;

(c)      file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act; and

(d)      furnish to any Holder, so long as the Holder owns any Registrable Securities, forthwith upon request from such Holder (i) a written statement by the Company that it has complied with the reporting requirements of Rule 144 (at any time after 90 days after the effective date of the first registration statement filed by the Company), the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after it so qualifies), (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company, and (iii) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the SEC which permits the selling of any such securities without registration or pursuant to Form S-3.

**Section 3.11**   <u>**Form S-3 Registrations**</u>. In the event that the Company shall receive from HCMLP on behalf of the Holders of at least 10% of the Registrable Securities then outstanding a written request that the Company effect a registration on Form S-3, and any related qualification or compliance with respect to all or a part of the Registrable Securities owned by such Holder or Holders, the Company will:

(a)      promptly give written notice of the proposed registration, and any related qualification or compliance, to all other Holders; and

(b)      use its commercially reasonable efforts to, as soon as practicable, effect such registration and all such qualifications and compliances as may be so requested and as would permit or facilitate the sale and distribution of all or such portion of such Holder's or Holders' Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any other Holder or Holders joining in such request as are specified in a written request given within fifteen (15) days after receipt of such written notice from the Company; *provided*, *however*, that the Company shall not be obligated to effect any such registration, qualification or compliance, pursuant to this <u>Section 3.11</u>:

(i)      if Form S-3 is not available for such offering by the Holders;

(ii)      if the Holders, together with the holders of any other securities of the Company entitled to inclusion in such Form S-3, propose to sell Registrable Securities at an aggregate price to the public (net of underwriting discounts and commissions) of less than $500,000;

(iii)      if the Company shall furnish to Holders requesting a registration statement pursuant to this <u>Section 3.11</u> a certificate signed by the President of the Company stating that in the good faith judgment of the Board of Directors it would be seriously detrimental to the Company and its stockholders for such registration statement to be filed and it is, therefore, essential to defer the filing of such registration statement, the Company shall have the right to defer taking action with respect to such filing for a period of not more than one-hundred-

18

twenty (120) days after receipt of the request of the Initiating Holders; *provided*, *however*, that the Company may not utilize this right more than once in any twelve (12) month period;

            (iv)    in any particular jurisdiction in which the Company would be required to qualify to do business or to execute a general consent to service of process in effecting such registration, qualification or compliance;

            (v)    if the Company has, within the twelve (12) month period preceding the date of such request, already effected one (1) registration on Form S-3 for the Holders pursuant to this Section 3.11; or

            (vi)    during the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of filing of, and ending on a date one-hundred-eighty (180) days after the effective date of, any registration statement pertaining to a public offering of securities for the Company's account; *provided*, *however*, that the Company is actively employing its commercially reasonable efforts to cause such registration statement to be effective.

            (c)    Subject to the foregoing, the Company shall file a registration statement covering the Registrable Securities and other securities so requested to be registered as soon as practicable after receipt of the request or requests of the Holders. All expenses incurred in connection with a registration requested pursuant to this Section 3.11, including, without limitation, all registration, filing, qualification, printer's and accounting fees and the reasonable fees and disbursements of counsel for the selling Holder or Holders and counsel for the Company, shall be borne by the Company. Registrations effected pursuant to this Section 3.11 shall not be counted as demands for registration or registrations effected pursuant to Section 3.2 or Section 3.3, respectively.

            (d)    If the Holders initiating a registration pursuant to this Section 3.11 intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to this Section 3.11 and the Company shall include such information in the written notice referred to in Section 3.11(a). The underwriter will be selected by HCMLP and shall be reasonably acceptable to the Company, which approval shall not be unreasonably withheld or delayed. In such event, the right of any Holder to include such Holder's Registrable Securities in such registration shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting (unless otherwise mutually agreed by a majority in interest of the Initiating Holders and such Holder) to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall (together with the Company as provided in Section 3.4(e)) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting. Notwithstanding any other provision of this Section 3.11, if the underwriter advises the Initiating Holders in writing that marketing factors require a limitation of the number of shares to be underwritten, then the Company shall so advise all Holders of Registrable Securities which would otherwise be underwritten pursuant hereto, and the number of shares of Registrable Securities that may be included in the underwriting shall be allocated in the following order of priority: (A) first, the Registrable Securities requested to be included in such registration by the Holders, allocated pro

rata among the holders thereof on the basis of the total number of shares of Registrable Securities such Holder requested to be included in such registration or apportioned among them in any other manner in which HCMLP determines to be appropriate in its sole discretion; (B) second, the securities requested to be included therein by the Company; and (C) third, among persons not contractually entitled to registration rights under this Agreement.

**Section 3.12    Expenses of Form 5-3 Registration**. All expenses, other than underwriting discounts and commissions, incurred in connection with registrations, filings or qualifications pursuant to Section 3.11, including (without limitation) all registration, filing and qualification fees, printers' and accounting fees, fees and disbursements of counsel for the Company and the reasonable fees and disbursements of counsel for the selling Holders shall be borne by the Company; including, without limitation, all such expenses incurred with respect to a registration request subsequently withdrawn by the Holders, regardless of whether such withdrawal was a result of a material adverse change in the condition (financial or otherwise), business or prospects of the Company from that known to the Holders at the time of the request or otherwise.

**Section 3.13    Assignment of Registration Rights**. Subject to the prior consent of HCMLP, the rights to cause the Company to register Registrable Securities pursuant to this Article III may be assigned (but only with all related obligations) by a Holder to a transferee or assignee of such securities that (i) is a subsidiary, parent, member, partner, limited partner, retired partner, grantor or shareholder of a Holder, and (ii) an affiliate of HCMLP, including any investment funds controlled by or under common control with, or managed directly or indirectly by, HCMLP, which will continue to qualify as Highland Capital after such transfer; *provided* that: (a) the Company is, within a reasonable time after such transfer, furnished with written notice of the name and address of such transferee or assignee and the securities with respect to which such registration rights are being assigned; (b) such transferee or assignee agrees in writing to be bound by and subject to the terms and conditions of this Agreement, including (without limitation) the provisions of Section 1.4 below, including the execution of an Adoption Agreement in the form attached hereto as Exhibit A; and (c) such assignment shall be effective only if immediately following such transfer the further disposition of such securities by the transferee or assignee is restricted under the Securities Act. For the purposes of determining the number of shares of Registrable Securities held by a transferee or assignee, the holdings of transferees and assignees of a partnership who are partners or retired partners of such partnership (including spouses and ancestors, lineal descendants and siblings of such partners or spouses who acquire Registrable Securities by gift, will or intestate succession) shall be aggregated together and with the partnership; *provided* that all assignees and transferees who would not qualify individually for assignment of registration rights shall have a single attorney-in-fact for the purpose of exercising any rights, receiving notices or taking any action under this Article III.

**Section 3.14    Limitations on Subsequent Registration Rights**. From and after the date of this Agreement, the Company shall not, without the prior written consent of HCMLP (which approval may be granted or withheld in its sole discretion), enter into any agreement with any holder or prospective holder of any securities of the Company (i) to include such securities in any registration filed under Section 3.2, unless under the terms of such agreement, such holder or prospective holder may include such securities in any such registration only to the extent that the inclusion of such holder's or prospective holder's securities will not reduce the amount of the

20

Registrable Securities of the Holders which is included or (ii) to make a demand registration that could result in such registration statement being declared effective prior to the dates set forth in Section 3.2 or within one-hundred-eighty (180) days of the effective date of any registration effected pursuant to Section 3.2.

## ARTICLE IV

## VOTING AGREEMENT; BOARD OF DIRECTORS; REQUIRED VOTE

**Section 4.1** **Board of Directors**.

(a) Composition of Board of Directors. For so long as Highland Capital owns any shares of the Company's capital stock, each Stockholder agrees that in any election of directors of the Company, each Stockholder shall vote all shares of the Company capital stock entitled to vote in the election of directors that are owned or controlled by such Stockholder (or shall consent pursuant to an action by written consent of the holders of capital stock of the Company), including all shares that each Stockholder is entitled to vote under any voting trust, voting agreement, proxy or other arrangement (collectively, "**Stock**"), to elect a Board of Directors consisting of the directors designated by HCMLP in its sole discretion. In the absence of any designation HCMLP, the director previously designated by HCMLP and then serving shall be re-elected if still eligible to serve as provided herein. This Section 4.1(a) shall not apply to Crusader.

(b) Subsidiary Governing Bodies; Committees. Unless otherwise agreed to by HCMLP or the Board of Directors, the members of the Board of Directors, as the same shall be constituted from time to time, shall also constitute the board of directors or equivalent governing body of each subsidiary of the Company. HCMLP shall have the right but not the obligation to designate at least two members of the Board of Directors elected pursuant to this Section 4.1 to serve on any duly constituted committee of the boards of directors of the Company and any subsidiaries.

(c) Obligations of the Company. The Company shall use its best efforts and shall exercise all authority under applicable law to cause to be nominated for election and cause to be elected or appointed, as the case may be, as directors of the Company, a slate of directors consisting of individuals meeting the requirements of Section 4.1(a). The Company will not, by any voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all of the provisions of this Agreement and in the taking of all such actions as may be necessary or appropriate in order to protect the rights of HCMLP hereunder against impairment. Each Stockholder hereby agrees to vote, cause to be voted or sign a written consent with respect to all of its shares in favor of a slate of directors consisting of individuals meeting the requirements of Section 4.1(a).

(d) Vacancies; Removal. In the event of any vacancy in the Board of Directors, each Stockholder agrees to vote all outstanding shares of Stock owned or controlled by such Stockholder and to use such Stockholder's best efforts to fill such vacancy so that the Board of Directors will be comprised of directors designated as provided in Section 4.1(a). Each

21

Stockholder agrees to vote all outstanding shares of Stock owned or controlled by such Stockholder for the removal of a director whenever (but only whenever) there shall be presented to the Board of Directors the written direction that such director be removed, signed by HCMLP. In such event, the Board of Directors shall solicit the vote of the Stockholders entitled to remove such director in order to effect such removal. This Section 4.1(d) shall not apply to Crusader.

### Section 4.2    Required Vote.

(a)    Notice of Disposition Transaction. In the event HCMLP has approved or rejected any (A) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation) unless the Company's stockholders of record as constituted immediately prior to such acquisition or sale will, immediately after such acquisition or sale (by virtue of securities issued as consideration for the Company's acquisition or sale or otherwise) hold at least 50% of the voting power of the surviving or acquiring entity; or (B) a sale of all or substantially all of the assets of the Company, including a sale of all or substantially all of the assets of the Company's subsidiaries, if such assets constitute substantially all of the assets of the Company and such subsidiaries taken as a whole (each, an "**Approved Sale**"), the Company shall give notice (the "**Sale Notice**") to the Stockholders stating that HCMLP has approved or rejected, as applicable, an Approved Sale. The Sale Notice also shall set forth the identity of the person or entity proposing to buy the Company, its assets or its capital stock (the "**Acquisition Offeror**") and shall summarize the basic terms of the proposed Approved Sale. Any Sale Notice may be rescinded by HCMLP by delivering written notice thereof to the Stockholders.

(b)    Obligations of Stockholders. As soon as practicable after receipt of the Sale Notice, the Stockholders shall take all lawful action reasonably necessary and requested by the Company (i) in the event the Approved Sale was approved by HCMLP, to complete the Approved Sale, including without limitation (A) the voting of all capital stock of the Company held by the Stockholders in favor of the Approved Sale, (B) if so requested, the surrender to the Acquisition Offeror of certificates representing all capital stock and all instruments representing convertible securities of the Company held by the Stockholders, properly endorsed for transfer to the Acquisition Offeror against payment of the sale price for such capital stock or such convertible securities in the Approved Sale, and (C) the execution of all sale, liquidation and other agreements in the form reasonably requested (containing, among other things, reasonable and customary representations and warranties relating to the valid title to such capital stock free and clear of any liens, claims, encumbrances and restrictions of any kind (other than those arising hereunder) and such Stockholder's power, authority, and right to enter into and consummate such purchase or merger agreement without violating any other agreement); or (ii) in the event the Approved Sale was rejected by HCMLP, to reject the Approved Sale, including, without limitation, the voting of all capital stock of the Company held by the Stockholders against the Approved Sale. The Stockholders hereby agree, after having received a Sale Notice, not to exercise any dissenter's rights or other rights granted to minority stockholders under state law in connection with an Approved Sale, or otherwise take actions designed to or that reasonably would be expected to complicate, delay, reject or terminate the Approved Sale.

### Section 4.3    Grant of Proxy. To ensure the performance of each Stockholder with respect to the agreements set forth in this Article IV, each Stockholder hereby appoints the

22

Chairman of the Board of Directors and the principal executive officer of the Company, or either of them from time to time, or their designees, as his, her or its true and lawful proxy and attorney-in-fact, with full power of substitution and resubstitution, to vote all. Stock owned or held by such Stockholder and to execute all appropriate instruments consistent with this Agreement, subject to the provisions of this Agreement, upon any matter presented to the stockholders of the Company, if and only if such Stockholder fails to vote all of such Stockholder's Stock or execute such other instruments in accordance with the provisions of this Agreement within five (5) days of the Company's or any other party's written request for such Stockholder's written consent or signature. The proxies and powers granted by each Stockholder pursuant to this Section 4.3 are coupled with an interest, are given to secure the performance of such Stockholder's commitments under this Agreement, and shall he irrevocable unless and until this Agreement terminates or expires pursuant to its terms. Such proxies shall survive the death, incompetence, disability, merger, reorganization, dissolution or winding up of such Stockholder. Each party hereto hereby revokes any and all previous proxies with respect to the Stock and shall not hereafter, unless and until this Agreement terminates or expires, purport to grant any other proxy or power of attorney with respect to any of the Stock, deposit any of the Stock into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Stock, in each case, with respect to any of the matters set forth herein.

## ARTICLE V

## COVENANTS OF THE COMPANY

**Section 5.1     Delivery of Financial Statements**. The Company shall deliver the following information to HCMLP, to each Highland Capital Stockholder and to Crusader:

(a)     as soon as reasonably practicable, but in any event within 90 days after the end of each fiscal year of the Company (which due date may be lengthened with respect to any fiscal year by approval of HCMLP), an audited consolidated income statement of the Company for such year, an audited consolidated balance sheet and statement of stockholders' equity of the Company as of the end of such fiscal year, and an audited consolidated statement of cash flows of the Company for such fiscal year, such audited year-end financial reports to be in reasonable detail, prepared in accordance with generally accepted accounting principles ("*GAAP*") consistently applied and setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail. Such audited financial statements shall be accompanied by a report and opinion thereon by independent public accountants of national standing selected by HCMLP.

(b)     as soon as reasonably practicable, but in any event within thirty (30) days after the end of each fiscal quarter of the Company, an unaudited consolidated income statement and consolidated statement of cash flows of the Company for such fiscal quarter and an unaudited consolidated balance sheet of the Company as of the end of such fiscal quarter, prepared in accordance with GAAP, which shall each show a comparison to plan figures for such period and to the comparable period in the prior year prepared in accordance with GAAP with the exception that no notes need be attached to such statements and year end audit adjustments

23

need not have been made, together with a report from the Company's chief executive officer, and/or chief financial officer, summarizing the Company's consolidated financial condition and consolidated results of operation during such quarter.

(c)      as soon as reasonably practicable, but in any event within twenty (20) days after the end of each calendar month, an unaudited consolidated income statement and consolidated statement of cash flows of the Company for such month and an unaudited consolidated balance sheet of the Company as of the end of such month and for the current fiscal year to date, including a comparison to plan figures for such period and to the comparable period in the prior year, prepared in accordance with GAAP consistently applied, with the exception that no notes need be attached to such statements and year end audit adjustments may not have been made, together with a report from the Company's chief executive officer, and/or chief financial officer, summarizing the Company's consolidated financial condition and consolidated results of operation during such month.

(d)      an annual budget and operating plans for the Company at least thirty (30) days prior to the beginning of each fiscal year and (promptly after they are available) any subsequent substantive revisions thereto; and

(e)      such relevant business and other information reasonably requested, including, without limitation, copies of relevant management reports, as HCMLP may request from time to time.

If, for any period, the Company has any subsidiary whose accounts are consolidated with those of the Company, then in respect of such period the financial statements delivered pursuant to the foregoing sections shall be the consolidated and consolidating financial statements of the Company and all such consolidated subsidiaries.

**Section 5.2**    **Inspection**. The Company will maintain true books and records of account in which full and correct entries will be made of all its business transactions pursuant to a system of accounting established and administered in accordance with GAAP consistently applied, and will set aside on its books all such proper accruals and reserves as shall be required under GAAP consistently applied. The Company shall permit HCMLP or its designee(s) to visit and inspect the Company's properties, to examine and audit its books of account and records and to discuss the Company's affairs, finances and accounts with its officers, all at such reasonable times and during normal business hours as may be requested by HCMLP.

**Section 5.3**    **Directors and Officers Insurance**.

(a)      The Company shall maintain, from financially sound and reputable insurers approved by HCMLP, directors' and officers' insurance with coverage decided in accordance with policies adopted by HCMLP.

(b)      The Company will indemnify the Board of Directors to the broadest extent permitted by applicable law. The Company shall enter into written indemnification agreements (in a form reasonably acceptable to HCMLP) with the directors and executive officers of the Company.

24

(c)    in the event of a Change in Control, proper provision shall be made so that the successors and assigns of the Company assume the obligations of the Company with respect to indemnification of members of the Board of Directors as in effect immediately prior to such transaction, whether in the Company's Bylaws, Certificate of Incorporation, or elsewhere, as the case may be, and, unless otherwise affirmatively determined by the Board of Directors, for the purchase of "*tail*" D&O insurance coverage.

**Section 5.4    Additional Stockholders**. As a condition to the Company's issuance of any shares of Common Stock, or options, warrants or rights to purchase or acquire Common Stock, to any person or entity, including the issuance of certificates representing shares of Common Stock upon a transfer following compliance with the terms of this Agreement, the Company shall, as a condition to such issuance, cause such person or entity to execute an Adoption Agreement in the form attached as Exhibit A hereto in the capacity of a Remaining Stockholder or a Highland Capital Stockholder, as appropriate, confirming that such person or entity is bound by, and subject to, all the terms and provisions of this Agreement applicable to a Remaining Stockholder or a Highland Capital Stockholder, whichever is applicable to such person or entity. The addition of Stockholders as parties to the Agreement in compliance with this provision shall not be deemed an amendment.

## ARTICLE VI

## MISCELLANEOUS

**Section 6.1    Term; Termination**. This Agreement shall terminate upon the earliest to occur of (a) such time as the Stockholders shall no longer be the owner of any shares of capital stock of the Company; or (b) the date specified by agreement of the Company and HCMLP. Notwithstanding the foregoing, the following rights under this Agreement shall terminate as set forth herein:

(a)    The rights of first refusal and co-sale set forth in Article I hereof shall terminate upon the earlier of (i) the closing of a bona fide firm commitment underwritten public offering of the Company's Common Stock registered under the Securities Act resulting in proceeds to the Company of at least $50 million (a "*Qualified IPO*"), and (ii) a Change in Control (including in the case of an asset sale or similar transaction in which Stockholders continue to hold the Company's shares, the final distribution of proceeds to the Stockholders);

(b)    The rights of first offer set forth in Article II hereof shall terminate upon the earlier of (i) a Qualified IPO, and (ii) a Change in Control (including in the case of an asset sale or similar transaction in which Stockholders continue to hold the Company's shares, the final distribution of proceeds to the Stockholders);

(c)    The registration rights set forth in Article III hereof shall terminate with respect to any Holder upon the earlier of (i) a Change in Control, and (ii) the date upon which all Registrable Securities held by such Holder can be sold without restriction under Rule 144(k) under the Securities Act;

(d)     The voting rights and obligations set forth in <u>Article IV</u> hereto shall terminate upon the earlier of (i) (A) in the case of <u>Section 4.1</u> the Initial Public Offering, and (B) in the case of <u>Section 4.2</u>, a Qualified IPO, and (ii) a Change in Control; and, *provided* that the provisions of <u>Section 4.2</u> will continue after the closing of any Approved Sale to the extent necessary to enforce the provisions of <u>Section 4.2</u> with respect to such Approved Sale;

(e)     The information and inspection rights set forth in <u>Section 5.1</u> and <u>Section 5.2</u> hereto shall terminate upon the earliest of (i) the Initial Public Offering, (ii) the date upon which the Company becomes subject to the periodic reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, and (iii) a Change in Control (including in the case of an asset sale or similar transaction in which Stockholders continue to hold the Company's shares, the final distribution of proceeds to the Stockholders).

**Section 6.2     <u>Legend</u>**. Each certificate representing the Common Stock of the Company shall be endorsed with substantially the following legend, in addition to any other legend required by law, the Company's organizational documents or agreement to which the Stockholder is subject:

"THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN STOCKHOLDERS' AGREEMENT, BY AND AMONG THE COMPANY AND CERTAIN HOLDERS OF THE COMMON STOCK OF THE COMPANY, INCLUDING SUBSTANTIAL RESTRICTIONS ON TRANSFER AND VOTING. A COPY OF SUCH AGREEMENT IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY. THE STOCKHOLDERS' AGREEMENT IS BINDING ON THE TRANSFEREES OF SUCH SHARES."

**Section 6.3     <u>Successors and Assigns</u>**. In addition to any restriction on transfer that may be imposed by any other agreement by which the parties hereto may be bound, this Agreement shall be binding upon the parties hereto and their respective permitted transferees, heirs, executors, administrators, successors and assigns; *provided*, *however*, that the Company shall not effect any transfer of Common Stock subject to this Agreement on its books or issue a new certificate for such Common Stock unless the transferee of such Common Stock has executed and delivered an Adoption Agreement in the form attached hereto as <u>Exhibit A</u>. Upon compliance with all transfer and other restrictions set forth herein and the execution and delivery of an Adoption Agreement by the transferee, such transferee shall be deemed to be a party hereto as if such transferee's signature appeared on the signature pages hereto, in the capacity of Highland Capital or a Remaining Stockholder, as the case may be, whereupon the schedules of Stockholders shall be updated accordingly. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**Section 6.4     <u>Governing Law</u>**. This Agreement shall be governed by and construed under the laws of the State of Texas, without giving effect to conflicts of laws principles.

2992816.2

Section 6.5 **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 6.6 **Titles and Subtitles**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

Section 6.7 **Notices**.

(a) All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by commercial delivery service, or mailed by registered or certified mail (return receipt requested) or sent via facsimile (with confirmation of receipt) to the parties at the address for each party set forth herein (or at such other address for a party as shall be specified by like notice):

(i) If to the Company:

Cornerstone Healthcare Group Holding, Inc.
13455 Noel Rd., Suite 1320
Dallas, TX 75240
Fax: [●]
Attn: [●]
Email: [●]

with a copy (which shall not constitute notice) to:

[●]
[●]
[●]
Fax: ([●]
Attn: [●]

(ii) If to HCMLP:

Highland Capital Management, L.P.
[●]
[●]
[●]
Fax: [●]
Attention: [●]
Email: [●]

(iii) If to a Highland Capital Stockholder, to the address set forth below such Highland Capital Stockholder's name on Schedule A hereto, with a copy (which shall not constitute notice) to HCMLP and the Company.

27

(iv)     If to a Remaining Stockholder, at the address set forth below such Stockholder's name on Schedule B hereto, with a copy (which shall not constitute notice) to HCMLP and the Company.

(b)     Notice given by personal delivery, courier service or mail shall be effective upon actual receipt. Notice given by facsimile shall be confirmed by appropriate answer back and shall be effective upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next business day after receipt if not received during the recipient's normal business hours. All notices by facsimile shall be confirmed promptly after transmission in writing by certified mail or personal delivery. Any party may change any address to which notice is to be given to it by giving notice as provided above of such change of address.

(c)     An electronic communication ("*Electronic Notice*") shall be deemed written notice for purposes of this Section 6.7 if sent with return receipt requested to the electronic mail address specified by the receiving party in a signed writing in a nonelectronic form. Electronic Notice shall be deemed received at the time the party sending Electronic Notice receives verification of receipt by the receiving party. Any party receiving Electronic Notice may request and shall be entitled to receive the notice on paper, in a nonelectronic form ("*Nonelectronic Notice*") which shall be sent to the requesting party within five (5) days of receipt of the written request for Nonelectronic Notice.

**Section 6.8     DGCL Electronic Notice**. Each party hereto generally consents to the delivery of any stockholder notice pursuant to the Delaware General Corporation Law (the "*DGCL*"), as amended or superseded from time to time, by electronic transmission (a "*DGCL Electronic Notice*") pursuant to Section 232 of the DGCL at the electronic mail address or the facsimile number set forth below such party's name on the Schedules hereto, as updated from time to time by notice to the Company, or as the books of the Company. To the extent that any DGCL Electronic Notice is returned or undeliverable for any reason, the foregoing consent shall be deemed to have been revoked until a new or corrected electronic mail address has been provided, and such attempted DGCL Electronic Notice shall be ineffective and deemed to not have been given. Each party hereto hereby agrees to promptly notify the Company of any change in such holder's electronic mail address, but failure to do so shall not affect the foregoing.

**Section 6.9     Dispute Resolution**.

(a)     Arbitration. Notwithstanding anything contained in this Agreement to the contrary, and except for the equitable remedies provided in Section 6.9(b), in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; *provided*, *however*, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on any of the parties, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. The Arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service. The arbitrator(s) shall be duly licensed to practice law in the State of Texas. The discovery process

28

shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. No arbitrator will have authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable, arbitration service rules. The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

(b)     Equitable Relief. Each party hereto acknowledges and agrees that any breach of this Agreement would result in substantial harm to the other parties hereto for which monetary damages alone could not adequately compensate. Therefore, the parties hereto unconditionally and irrevocable agree that nay non-breaching party hereto shall be entitled to seek protective orders, injunctive relief and other remedies available at law or in equity (including, without limitation, seeking specific performance or the rescission of purchases, sales and other transfers of Securities not made in strict compliance with this Agreement).

Section 6.10  **Severability**. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

Section 6.11  **Amendments and Waivers**. Subject to the last sentence of this Section 6.11, any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of (i) the Company, (ii) HCMLP, (iii) the Highland Capital Stockholders holding a majority of the Shares of the Company's Capital Stock held by Highland Capital, and (iv) at any such time as Highland Capital does not hold a majority of the Shares of the Company's capital stock that are subject to this Agreement, the Stockholders holding a majority of the shares of the Company's capital stock (on an as-converted to Common Stock basis) then held by all Stockholders that are subject to this Agreement, *provided* that the

29

consent of the Remaining Stockholders shall not be required for any amendment or waiver if such amendment or waiver either (A) is not directly applicable to the rights of the Remaining Stockholders hereunder or (B) does not materially and adversely affect the rights of the Remaining Stockholders in a manner that is disproportionate to the effect on the rights of the other parties hereto. Notwithstanding the foregoing, any provision hereof may be waived by the waiving party on such party's own behalf, without the consent of any other party. Any amendment or waiver effected in accordance with this <u>Section 6.11</u> shall be binding upon each party to this Agreement and each future party to this Agreement. Notwithstanding the foregoing, neither (i) the addition of parties hereto as a condition to such person participating in a transaction described herein, nor (ii) the addition of a party hereto as a result of such party being or becoming a Highland Capital Stockholder, shall be deemed an amendment hereto, nor shall any update to the Schedules hereto from time to time to reflect the correct holdings of or other information with respect to the parties. No provision of this Agreement that is applicable expressly to Crusader, including Section 1.1(b)(vi), Section 1.1(b)(vii), Section 1.2(d), Section 4.1(a), Section 4.1(d), Section 5.1 and this Section 6.11, shall be amended in any respect that is applicable to Crusader without the prior written consent of Crusader.

Section 6.12    **Aggregation of Stock**. All shares of Common Stock or other Securities of the Company held or acquired by affiliated entities or persons (including, without limitation, the Common Stock or other Securities held by Highland Capital) may be aggregated together for the purpose of determining the availability of any rights under this Agreement. For the purposes of determining the availability of any rights under this Agreement, the holdings of transferees and assignees of an individual or a partnership who are spouses, ancestors, lineal descendants or siblings of such individual or partners or retired partners of such partnership or partnerships affiliated with such transferring or assigning partnership (including spouses and ancestors, lineal descendants and siblings of such partners or spouses who acquire Common Stock by gift, will or intestate succession) shall be aggregated together with the individual or partnership, as the case may be, for the purpose of exercising any rights or taking any action under this Agreement.

Section 6.13    **Entire Agreement**. This Agreement (including the Schedules hereto, if any) constitutes the full and entire understanding and agreement between the parties with regard to the subject matter hereof and thereof and supersedes any and all prior agreements relating to the subject matter hereof, including without limitation the First Stockholders' Agreement. The Company and each Stockholder acknowledges and agrees that neither the Company's Certificate of Incorporation or Bylaws shall be amended to include any transfer restrictions on the Company's Securities (it being understood that any and all applicable transfer restrictions, other than those arising under the securities laws generally, shall be as set forth herein).

Section 6.14    **Stock Splits, Stock Dividends, etc.** In the event of any stock split, stock dividend, capitalization, reorganization, or the like, any securities issued with respect to the shares of the Company's capital stock held by the Stockholders shall become subject to the terms of this Agreement.

Section 6.15    **Cumulative Remedies**. In addition to the rights and remedies stated in this Agreement, each party hereto shall have all those rights and remedies allowed by applicable laws. The rights and remedies of each party are cumulative and recourse to one or more right or remedy shall not constitute a waiver of the others.

Section 6.16   **Rights of Stockholders**. Each of HCMLP and each Stockholder, in its sole and absolute discretion, may exercise or refrain from exercising any rights or privileges that such Stockholder may have pursuant to this Agreement, the Company's Certificate of Incorporation or Bylaws, or at law or in equity; and neither HCMLP nor such Stockholder shall incur or be subject to any liability or obligation to the Company, any other party hereto, or any other person, by reason of exercising or refraining from exercising any such rights or privileges.

Section 6.17   **Further Assurance**. At any time or from time to time after the date hereof, the parties agree to cooperate with each other, and at the request of any other party, to execute and deliver any further instrument or documents and take all such further action as the other party may reasonably request in order to evidence or effectuate the consummation of the transactions contemplated hereby and to otherwise carry out the intent of the parties hereunder.

Section 6.18   **Joint Product**. This Agreement is the joint product of the Company and the other parties hereto and each provision hereof and thereof has been subject to the mutual consultation, negotiation and agreement of the Company and the other parties hereto and shall not be construed against any party hereto.

*[Signature Pages Follow]*

31

[Signature Page to Amended & Restated Stockholders' Agreement]

      **IN WITNESS WHEREOF**, the undersigned party has executed this counterpart signature page to the Amended & Restated Stockholders' Agreement as of the date first above written.

**COMPANY:**

**CORNERSTONE HEALTHCARE GROUP HOLDING, INC.**


By: _____
Name: _____
Title: _____


**HCMLP:**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**


By: Strand Advisors, Inc., its general partner

By: _____
Name: _____
Title: _____

**<u>HIGHLAND CAPITAL STOCKHOLDERS</u>:**

**Highland Credit Opportunities Holding Corporation**

By:_____
Name: _____
Title: _____

**Highland Credit Strategies Holding Corporation**

By:_____
Name: _____
Title: _____

**Highland Capital Management, L.P.**

By: Strand Advisors, Inc., its general partner

By:_____
Name: _____
Title: _____

**REMAINING STOCKHOLDERS:**

**Highland Crusader Holding Corp.**

By: _____

Name: ____Mark S. DiSalvo_____

Title: ____Authorized Signatory_____

[Signature Page to Amended & Restated Stockholders' Agreement]

**SCHEDULE A**

**Highland Capital Stockholders**
**(as of [●], 2020)**

| Name/Address | Number of Shares |
|---|---|
| Highland Credit Opportunities Holding Corporation<br>13455 Noel Road, Suite 800<br>Dallas, Texas 75240 | 4,029 |
| Highland Credit Strategies Holding Corporation<br>13455 Noel Road, Suite 800<br>Dallas, Texas 75240 | 8,119 |
| Highland Capital Management, L.P.<br>13455 Noel Road, Suite 800<br>Dallas, Texas 75240 | 1,022 |
| Highland Restoration Capital Partners Master, L.P.<br>13455 Noel Road, Suite 1300<br>Dallas, Texas 75240 | 6,655 |
| Highland Restoration Capital Partners, L.P.<br>13455 Noel Road, Suite 1300<br>Dallas, Texas 75240 | 5,445 |
| **Total** | **25,270** |

**SCHEDULE B**

**Remaining Stockholders**
**(as of [●], 2020)**

| Name/Address | Number of Shares |
|---|---|
| Highland Crusader Holding Corp.<br>800 Turnpike Street, Suite 300<br>North Andover, MA 01845 | 14,830 |
|  |  |
|  |  |
|  |  |
|  |  |

# EXHIBIT A

## Adoption Agreement

This Adoption Agreement ("***Adoption Agreement***") is executed by the undersigned (the "***Transferee***") pursuant to the terms of that certain Amended & Restated Stockholders' Agreement dated as of _____ (the ***Stockholders' Agreement***") by and among Cornerstone Healthcare Group Holding, Inc. (the "***Company***"), Highland Capital Management, L.P. and certain holders of its Common Stock. Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Stockholders' Agreement.

1.  <u>Acknowledgement</u>. Transferee acknowledges that Transferee is acquiring certain shares of the capital stock of the Company (the "***Stock***"), which shares are subject to the terms and conditions of the Stockholders' Agreement.

2.  <u>Agreement</u>. As partial consideration for such transfer, Transferee (i) agrees that the Stock acquired by Transferee shall be bound by and subject to the terms of the Stockholders' Agreement, to the same extent and with the same rights and obligations as the person(s) from which such Stock is received and (ii) hereby agrees to become a party to the Stockholders' Agreement with the same force and effect as if Transferee were originally a party thereto in the capacity of a [Highland Capital / Remaining] Stockholder.

3.  <u>Notice</u>. Any notice required or permitted by the Stockholders' Agreement shall be given to Transferee at the address listed beside Transferee's signature below.

4.  <u>Joinder</u>. The spouse of the undersigned Transferee, if applicable, executes this Adoption to acknowledge its fairness and that it is in such spouse's best interests, and to bind to the terms of the Stockholders' Agreement such spouse's community interest, if any, in the Stock.

EXECUTED AND DATED this _____ day of _____, _____.

**TRANSFEREE**:

_____

Title: _____

Address: _____

Fax: _____

Spouse: (if applicable):

_____

Name:

Acknowledged and accepted on _____, _____.

**CORNERSTONE HEALTHCARE GROUP HOLDING, INC.**

By:_____

Name: _____

Title: _____

# **EXHIBIT B**

**(To Be Filed under Seal)**

# EXHIBIT 2

*Partial Final Award* **dated March 6, 2019**

**(To Be Filed under Seal)**

# EXHIBIT 3

*Disposition of Application of Modification of Award* **dated March 14, 2019**

**(To Be Filed under Seal)**

# <u>EXHIBIT 4</u>

*Final Award* **dated April 29, 2019**

**(To Be Filed under Seal)**

# EXHIBIT 5

Claim #72 Date Filed: 4/3/2020

**Fill in this information to identify the case:**

Debtor     Highland Capital Management, L.P.

United States Bankruptcy Court for the: Northern    District of Texas
                                                        (State)

Case number   19-34054

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

## Part 1:   Identify the Claim

| | | |
|---|---|---|
| 1. | **Who is the current creditor?** | Redeemer Committee Highland Crusader Fund <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor _____ |
| 2. | **Has this claim been acquired from someone else?** | ☑ No <br> ☐ Yes.   From whom? _____ |

| | | | |
|---|---|---|---|
| 3. | **Where should notices and payments to the creditor be sent?** <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> See summary page <br><br><br><br><br> Contact phone _____ <br> Contact email   TMascherin@jenner.com <br><br> Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br><br> __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | **Where should payments to the creditor be sent?** (if different) <br><br><br><br><br><br><br><br> Contact phone _____ <br> Contact email _____ |

| | | |
|---|---|---|
| 4. | **Does this claim amend one already filed?** | ☑ No <br> ☐ Yes.   Claim number on court claims registry (if known) _____    Filed on _____ <br>                                                            MM  /  DD  /  YYYY |
| 5. | **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No <br> ☐ Yes. Who made the earlier filing? _____ |

1934054200123040428003885

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

---

**7. How much is the claim?**

$ <u>See attached rider</u>. **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

<u>See attached rider</u>

---

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

---

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

---

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

1934054200123040428003885

| 12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☒ No | | Amount entitled to priority |
|---|---|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Yes. *Check all that apply:*

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.    $_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

| 13. **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☒ No |
|---|---|

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

## Part 3:    Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/03/2020
                    MM / DD / YYYY

/s/Terri L. Mascherin
Signature

Print the name of the person who is completing and signing this claim:

| Name | Terri L. Mascherin | | |
|---|---|---|---|
| | First name | Middle name | Last name |

Title    Partner

Company    Jenner and Block LLP
           Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone    _____    Email    _____

---

**Proof of Claim**

1934054200123040428003885

## KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| Redeemer Committee Highland Crusader Fund | Yes, supporting documentation successfully uploaded |
| c/o Terri Mascherin, Esq. | **Related Document Statement:** |
| Jenner and Block | |
| 353 N. Clark Street | **Has Related Claim:** |
| Chicago, IL, 60654-3456 | No |
| **Phone:** | **Related Claim Filed By:** |
| **Phone 2:** | **Filing Party:** |
| **Fax:** | Authorized agent |
| **Email:** | |
| TMascherin@jenner.com | |
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |
| **Basis of Claim:** | **Last 4 Digits:** / **Uniform Claim Identifier:** |
| See attached rider | No |
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| See attached rider | Yes |
| **Has Priority Claim:** | **Priority Under:** |
| No | |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | |
| No | **Annual Interest Rate:** |
| **Based on Lease:** | **Arrearage Amount:** |
| No | **Basis for Perfection:** |
| **Subject to Right of Setoff:** | **Amount Unsecured:** |
| No | |
| **Submitted By:** | |
| Terri L. Mascherin on 03-Apr-2020 1:51:56 p.m. Eastern Time | |
| **Title:** | |
| Partner | |
| **Company:** | |
| Jenner and Block LLP | |

VN: 4AC8D8C3992B6AD2D5B5C1D168C10819

Your claim can be filed electronically on KCC's website at https://epoc.kccllc.net/HCMLP

ID: 24788159          PIN: wZvUm7fb

| Fill in this information to identify the case: |
| --- |

Debtor    Highland Capital Management, L.P.

United States Bankruptcy Court for the Northern District of Texas, Dallas Division

Case number   19-34054-sgj11

# Official Form 410
# Proof of Claim
**04/19**

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Other than a claim under 11 U.S.C. § 503(b)(9), this form should not be used to make a claim for an administrative expense arising after the commencement of the case.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.**

| Part 1: | Identify the Claim | NameID: 13930498 |
| --- | --- | --- |

**1. Who is the current creditor?**

Redeemer Cmmttee Highland Crusader Fund
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

[X] No

[ ] Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Redeemer Cmmttee Highland Crusader Fund
c/o Terri Mascherin, Esq.
Jenner & Block
353 N. Clark Street
Chicago, IL 60654-3456

Address _____

Contact phone _____

Contact email _____

Where should payments to the creditor be sent? (if different)

Name _____

Number   Street _____

City    State    ZIP Code

Country _____

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one): _____

**4. Does this claim amend one already filed?**

[X] No

[ ] Yes.  Claim number on court claims registry (if known) _____  Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

[X] No

[ ] Yes. Who made the earlier filing? _____

Official Form 410      **Proof of Claim**
page 1

1934054200123040428003885

**Part 2:**     **Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☒ No<br><br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___ |

| | |
|---|---|
| 7. **How much is the claim?** | $ <u>See attached rider.</u>    . **Does this amount include interest or other charges?**<br><br>     ☐ No<br><br>     ☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.<br><br>Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as health care information.<br><br>     <u>See attached rider.</u> |

| | |
|---|---|
| 9. **Is all or part of the claim secured?** | ☒ No<br><br>☐ Yes.   The claim is secured by a lien on property.<br><br>     **Nature of property:**<br><br>     ☐ Real estate: If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.<br><br>     ☐ Motor vehicle<br><br>     ☐ Other. Describe: _____<br><br>     **Basis for perfection:** _____<br>     Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>     **Value of property:**    $_____<br>     **Amount of the claim that is secured:**    $_____<br>     **Amount of the claim that is unsecured:**    $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)<br><br>     **Amount necessary to cure any default as of the date of the petition:**    $_____<br><br>     **Annual Interest Rate** (when case was filed)_____%<br>     ☐ Fixed<br>     ☐ Variable |

| | |
|---|---|
| 10. **Is this claim based on a lease?** | ☒ No<br><br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.**    $_____ |

| | |
|---|---|
| 11. **Is this claim subject to a right of setoff?** | ☒ No<br><br>☐ Yes. Identify the property: _____ |

1934054200123040428003885

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☒ No

☐ Yes. Check all that apply:

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

13. **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?**

☒ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

**Part 3:  Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04 / 02 / 2020
                   MM / DD / YYYY

_Terri L. Mascherin_ (signature)
Signature

**Print the name of the person who is completing and signing this claim:**

Name        Terri          L.            Mascherin
            First name     Middle name   Last name

Title       Partner

Company     Jenner & Block LLP
            Identify the corporate servicer as the company if the authorized agent is a servicer.

Address     353 N. Clark Street
            Number    Street
            Chicago                IL          60654-3456      USA
            City                   State       ZIP Code        Country

Contact phone  (312) 222-9350          Email   tmascherin@jenner.com

---

Proof of Claim
page 3

## RIDER TO THE PROOFS OF CLAIM OF THE REDEEMER COMMITTEE OF THE HIGHLAND CRUSADER FUND

This Rider is part of the proof of claim (the "**Proof of Claim**") filed by the Redeemer Committee of the Highland Crusader Fund (the "**Redeemer Committee**") against Highland Capital Management, L.P. ("**HCM**" or the "**Debtor**").

On March 6, 2019, a panel of arbitrators issued a Partial Final Award (the "**March Award**") in favor of the Redeemer Committee against HCM. On April 29, 2019, the panel issued a Final Award (the "**Final Award**," and together with the March Award, the "**Arbitration Award**") in favor of the Redeemer Committee against HCM.[1] The Arbitration Award is subject to the Federal Arbitration Act and The Convention on the Recognition and Enforcement of Foreign Arbitral Awards. The Redeemer Committee timely moved to confirm the Award in the Delaware Chancery Court. HCM moved for partial vacatur of the Arbitration Award in June 2019. The time period to move to vacate the Arbitration Award expired prior to the Petition Date (as defined below). All capitalized terms that are not defined herein have the meanings given to such terms in the Arbitration Award.

The Redeemer Committee files this Proof of Claim out of an abundance of caution. The Arbitration Award is an executory contract under section 365 of the Bankruptcy Code. HCM has not yet moved to assume or reject the contract. Accordingly, the deadline to file a proof of claim remains undetermined. By filing the Proof of Claim, the Redeemer Committee does not concede that the amounts awarded under the Arbitration Award are prepetition claims or that it is required to file a proof of claim to be entitled to the amounts described herein. The Redeemer Committee reserves all rights to amend or modify this Proof of Claim in any respect, including to assert other or additional claims, or for the purpose of fixing or liquidating any contingent or unliquidated claims. This Proof of Claim is without prejudice to any other rights the Redeemer Committee may have against the Debtor, its officers, employees, successors, or assigns.

This Proof of Claim includes the following components, and each is based on the Arbitration Award (together, the "**Claim**"):

1.  **Damage Claim.** The Redeemer Committee asserts a liquidated claim for at least $190,824,557 plus interest that is accruing beginning as of October 16, 2019, the date that HCM filed its bankruptcy case (the "**Petition Date**"). As set forth in the Final Award, the separate components of the Damage Claim are as follows, and the amounts set forth below are as of the Petition Date, including prepetition interest awarded under the Arbitration Award accrued to the Petition Date:

    a.  Deferred Fee Claim: $43,105,395 (Final Award ¶ F.a.ii.1)

    b.  Distribution Fee Claim: $22,922,608 (Final Award ¶ F.a.ii.2)

---

[1] Copies of the Arbitral Award have previously been provided the Debtor, the Official Committee of Unsecured Creditors, and the Office of the United States Trustee. The Redeemer Committee reserves the right to file a copy of the Arbitral Award with the Bankruptcy Court.

    c.   Taking of Plan Claims: $3,277,991 (Final Award ¶ F.a.v)

    d.   CLO Trades Claim: $685,195 (Final Award ¶ F.a.vi)

    e.   Credit Suisse Claim: $3,660,130 (Final Award ¶ F.a.vii)

    f.   UBS Claim: $2,600,968 (Final Award ¶ F.a.viii)

    g.   Barclays Claim: $30,811,366 (Final Award ¶ F.a.ix)

    h.   Legal Fees, Costs, and Expenses: $11,351,850 (Final Award ¶ F.a.xi)

    i.   Administrative Fees: $514,164 (Final Award ¶ F.a.xii)

    j.   Cornerstone Award: $71,894,891 (Final Award ¶ F.a.ix)

The Redeemer Committee also asserts an unliquidated claim for post-petition interest, attorneys' fees, costs, and other expenses that continue to accrue in connection with the Damage Claim.

2.   **Cancellation of Limited Partnership Interests.**  The Final Award provides, in relevant part, for the cancellation of the limited partnership interests in the Crusader Fund that are (i) held by HCM and Charitable DAF Fund, L.P. that are identified in RC411, and (ii) held by Eames, Ltd. (Final Award ¶¶ F.a.v and F.a.x). The Final Award provides for HCM to transfer, or take all necessary steps to cause the transfer of, such interests to the Redeemer Committee for the benefit of the Crusader Fund. The Final Award also provides that the Redeemer Committee has the independent right to cause the Crusader Fund to cancel such limited partnership interests. The Redeemer Committee reserves the right, to the extent required under applicable law, to seek relief from the Bankruptcy Court in order to cancel such limited partnership interests in accordance with the Final Award. The Redeemer Committee asserts a claim in an unliquidated amount in the event all such limited partnership interests are not cancelled in accordance with the Final Award.

3.   **Deferred Fee Account.**  The Arbitration Award granted the Redeemer Committee's request for a declaratory judgment with respect to the immediate distribution of the Deferred Fee Account, which the Crusader Fund continues to hold, and ordered the payment of the funds in such account to the Redeemer Committee for disbursal to the Consenting Compulsory Redeemers (March Award ¶ VII.D; Final Award ¶ F.a). The Redeemer Committee reserves the right, to the extent required under applicable law, to seek relief from the Bankruptcy Court in order to cause the distribution of the funds held in the Deferred Fee Account in accordance with the Arbitration Award. The Redeemer Committee asserts a claim in an unliquidated amount in the event all such funds are not distributed in accordance with the Arbitration Award.

      The Redeemer Committee expressly reserves all of its procedural and substantive defenses and rights with respect to any claim that may be asserted against the Redeemer Committee by the Debtor, including any rights of setoff or recoupment.

136210.4

The filing of this Claim shall not constitute: (i) an admission of liability by the Redeemer Committee to any party; (ii) a waiver or release of the Redeemer Committee's rights against any person, entity, or property; (iii) a consent by the Redeemer Committee to the jurisdiction of the Bankruptcy Court with respect to the subject matter of this Claim, any objection or other proceeding commenced with respect thereto, or any other proceeding commenced in these cases or otherwise involving the Redeemer Committee; (iv) a waiver of the right to move to withdraw the reference to the subject matter of this Claim, any objection or other proceeding commenced with respect thereto, or any other proceeding commenced in these cases against or otherwise involving any claimant; (v) a waiver of the right to have final orders entered only after *de novo* review by a United States Judge; (vi) its right to trial by jury in any proceeding so triable in these cases or any case, controversy, or proceeding related to these cases; (vii) its right to arbitration under the Plan and Scheme; (viii) an election of remedies; or (ix) any other rights, claims, actions, defenses, setoffs, or recoupments to which it is or may be entitled under agreements, in law, in equity, or otherwise, all of which rights, claims, actions, defenses, setoffs, and recoupments are expressly reserved.

136210.4

# **EXHIBIT 6**

**Fill in this information to identify the case:**

Debtor ___Highland Capital Management, L.P.___

United States Bankruptcy Court for the: ___Northern___    District of ___Texas___
(State)

Case number ___19-34054___

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.** That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

___See summary page___
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| See summary page | Alvarez and Marsal CRF Management, LLC<br>2029 Century Park East, Suite 2060<br>Los Angeles, CA 90067, United States |
| Contact phone  212-351-3969 | Contact phone  310-975-2600 |
| Contact email  mrosenthal@gibsondunn.com | Contact email  svarner@alvarezandmarsal.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No

☐ Yes.  Claim number on court claims registry (if known) _____    Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

1934054200406000000000005

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
| --- | --- |

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**   $ <u>see attached rider</u>. **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

<u>See attached rider</u>

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $_____

**Amount of the claim that is secured:**   $_____

**Amount of the claim that is unsecured:**   $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

**11. Is this claim subject to a right of setoff?**

☐ No

☑ Yes. Identify the property: <u>See attached rider</u>

Official Form 410

**Proof of Claim**

| 12. | **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | | |
|---|---|---|---|---|
| | | ☐ Yes. *Check all that apply:* | | **Amount entitled to priority** |
| | A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | | $_____ |
| | | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | | $_____ |
| | | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | | $_____ |
| | | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | | $_____ |
| | | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | | $_____ |
| | | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | | $_____ |
| | | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | | |

| 13. | **Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No | |
|---|---|---|---|
| | | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. | |
| | | $_____ | |

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date ___04/06/2020___
              MM / DD / YYYY

___/s/Michael A. Rosenthal___
Signature

Print the name of the person who is completing and signing this claim:

| Name | ___Michael A. Rosenthal___ | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | ___Counsel to Alvarez and Marsal CRF Management, LLC, as Investment Manager___ | | |
| Company | ___Gibson, Dunn and Crutcher LLP___ | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | | | |
| Contact phone | _____ | Email | _____ |

1934054200040600000000000005

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| Highland Crusader Offshore Partners, L.P., et al., see rider for all names of creditors | Yes, supporting documentation successfully uploaded |
| Michael A. Rosenthal, Gibson, Dunn and Crutcher LLP | **Related Document Statement:** |
| 200 Park Avenue | |
| New York, NY, 10166 | **Has Related Claim:** |
| United States | No |
| **Phone:** | **Related Claim Filed By:** |
| 212-351-3969 | |
| **Phone 2:** | **Filing Party:** |
| | Authorized agent |
| **Fax:** | |
| **Email:** | |
| mrosenthal@gibsondunn.com | |

| |
|---|
| **Disbursement/Notice Parties:** |
| Alvarez and Marsal CRF Management, LLC |
| 2029 Century Park East, Suite 2060 |
| Los Angeles, CA, 90067 |
| United States |
| **Phone:** |
| 310-975-2600 |
| **Phone 2:** |
| **Fax:** |
| **E-mail:** |
| svarner@alvarezandmarsal.com |
| **DISBURSEMENT ADDRESS** |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |
| **Basis of Claim:** | **Last 4 Digits:** | **Uniform Claim Identifier:** |
| See attached rider | No | |
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| see attached rider | Yes |
| **Has Priority Claim:** | **Priority Under:** |
| No | |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** |
| No | |
| **Based on Lease:** | **Arrearage Amount:** |
| No | **Basis for Perfection:** |
| **Subject to Right of Setoff:** | |
| Yes, See attached rider | **Amount Unsecured:** |

| |
|---|
| **Submitted By:** |
| Michael A. Rosenthal on 06-Apr-2020 4:27:48 p.m. Eastern Time |
| **Title:** |
| Counsel to Alvarez and Marsal CRF Management, LLC, as Investment Manager |
| **Company:** |
| Gibson, Dunn and Crutcher LLP |

<table>
<tr><td colspan="2"><strong>Fill in this information to identify the case:</strong></td></tr>
<tr><td>Debtor 1</td><td>Highland Capital Management, L.P.</td></tr>
<tr><td>Debtor 2<br>(Spouse, if filing)</td><td></td></tr>
<tr><td>United States Bankruptcy Court for the:</td><td>Northern District of Texas</td></tr>
<tr><td>Case number</td><td>19-34054-sgj11</td></tr>
</table>

## Official Form 410

# Proof of Claim

04/19

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309)** that you received.

## Part 1:  Identify the Claim

| | |
|---|---|
| 1. **Who is the current creditor?** | Highland Crusader Offshore Partners, L.P., et al. (see rider for all names of creditors)<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. **Has this claim been acquired from someone else?** | ☑ No<br>☐ Yes.  From whom? _____ |
| 3. **Where should notices and payments to the creditor be sent?**<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>Michael A. Rosenthal, Gibson, Dunn & Crutcher<br>Name<br>200 Park Avenue<br>Number          Street<br>New York               NY            10166<br>City                     State          ZIP Code<br><br>Contact phone (212) 351-3969<br><br>Contact email mrosenthal@gibsondunn.com | **Where should payments to the creditor be sent?** (if different)<br><br>Alvarez & Marsal CRF Management, LLC<br>Name<br>2029 Century Park East, Suite 2060<br>Number          Street<br>Los Angeles            CA            90067<br>City                     State          ZIP Code<br><br>Contact phone 310-975-2600<br><br>Contact email SVarner@alvarezandmarsal.com |
| | Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br>__ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __ |
| 4. **Does this claim amend one already filed?** | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____     Filed on _____<br>                                                                                                              MM / DD / YYYY |
| 5. **Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No<br>☐ Yes.  Who made the earlier filing? _____ |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6.** **Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ____ ____ ____ ____

**7.** **How much is the claim?** $ _See attached rider_ . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8.** **What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached rider

**9.** **Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10.** **Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11.** **Is this claim subject to a right of setoff?**

☐ No

☑ Yes. Identify the property: See attached rider _____

12. **Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

| | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3:  Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04/06/2020
                   MM / DD / YYYY

Signature

**Print the name of the person who is completing and signing this claim:**

Name
Michael A. Rosenthal
First name          Middle name          Last name

Title
Counsel to Alvarez & Marsal CRF Management, LLC, as Investment Manager

Company
Gibson, Dunn & Crutcher LLP
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address
200 Park Avenue
Number          Street

New York                          NY          10166
City                              State        ZIP Code

Contact phone  (212) 351-3969          Email  mrosenthal@gibsondunn.com

**RIDER TO THE PROOF OF CLAIM OF THE CRUSADER FUNDS**
**Dated: April 6, 2020**

This Rider is part of the proof of claim (the "**Proof of Claim**") filed by Highland Crusader Offshore Partners, L.P. ("**Master Fund**"), Highland Crusader Fund, L.P. ("**Onshore Fund**"), Highland Crusader Fund, Ltd. ("**Offshore Fund I**"), and Highland Crusader Fund II, Ltd. ("**Offshore Fund II**" and together with the Master Fund, Onshore Fund, and Offshore Fund I, the "**Crusader Funds**"), by and through their authorized investment manager, Alvarez & Marsal CRF Management, LLC, against Highland Capital Management, L.P. ("**HCM**" or the "**Debtor**").

The Crusader Funds' claim against HCM contains two components (which partially overlap) and a number of sub-components, described below.

## I.    FORFEITURE OF COMPENSATION

At all relevant times prior to August 4, 2016, HCM served as the investment manager for each of the Crusader Funds, pursuant to the terms of (a) the Joint Plan of Distribution of the Crusader Funds (the "**Plan**"); (b) the Scheme of Arrangement (the "**Scheme**"); (c) the Amended and Restated Investment Management Agreement between the Master Fund and HCM, dated as of June 1, 2006 (the "**Master Fund IMA**"); (d) the Amended and Restated Investment Management Agreement between Onshore Fund and HCM, dated as of June 1, 2006 (the "**Onshore IMA**"); (e) the Amended and Restated Investment Management Agreement between Offshore Fund I and HCM, dated as of September 1, 2006 (the "**Offshore I IMA**"); and (f) the Third Amended and Restated Investment Management Agreement between Offshore Fund II and HCM, dated as of September 1, 2006 (the "**Offshore II IMA**" and together with the Master Fund IMA, the Onshore IMA, and the Offshore I IMA, the "**IMAs**"). The Plan, the Scheme, and the IMAs are collectively referred to as the "**Fund Documents**."

Pursuant to the Fund Documents, HCM received compensation from the Crusader Funds in the form of Management Fees, Distribution Fees, and rights to Deferred Fees (each as defined in the Plan, the Scheme, or the IMAs). However, by no later than January 2012, HCM willfully and deliberately breached its obligations under the Fund Documents and breached its duty of loyalty to the Crusader Funds. At that time, HCM caused the Crusader Funds to borrow on margin from a trading account at Jefferies, and used the borrowings to inflate the amount of distributions being made, so as to inflate the amount of HCM's Distribution Fee. Following that date, HCM committed other acts of disloyalty and further breached its obligations to the Crusader Funds, as described in the Arbitration Award (as defined below) and as shown by the evidence presented at the arbitration hearing that led to the Arbitration Award.

As a result, pursuant to the "faithless servant" doctrine, HCM forfeited any right it had to compensation for its services from the Crusader Funds, from the date of HCM's first disloyal act onward. *See, e.g.*, *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 188 (2d Cir. 2003) ("We hold that New York's faithless servant doctrine requires Phansalkar to forfeit all compensation received after his first disloyal act."). As a "faithless servant," HCM is obligated to disgorge all compensation received from the Crusader Funds from the date of HCM's first disloyal act, and has no right to any further compensation from the Crusader Funds. The Crusader Funds thus assert a claim in the following amounts:

136210.4

1. Management Fees: $8,233,337

2. Distribution Fees: $15,250,109

3. Deferred Fees: $32,313,000[1]

4. Other Fees: In the amount of any other compensation, fees or distributions which may now or in the future otherwise be owing to HCM

The Crusader Funds also assert an unliquidated claim for pre- and post-petition interest, attorneys' fees, costs, and other expenses in connection with recovering such amounts. The Crusader Funds also assert a claim in an unliquidated amount for any Deferred Fees to which HCM might otherwise become entitled in the future under the Fund Documents.

The Crusader Funds currently hold, and may in the future hold, amounts that HCM may claim are, either now or in the future, due to it as a result of services provided by HCM to the Crusader Funds (the "Withheld Amounts"). As a result of the claims detailed in the Arbitration Award and this Proof of Claim (including without limitation, the faithless servant claim), the Crusader Funds dispute that any such amounts are due. However, to the extent that HCM prevails on an entitlement to a claim against the Crusader Funds, the Crusader Funds have a right of setoff against any such claim to the extent of its claims against HCM and such right of setoff is further secured by the Withheld Amounts.

## II.    ARBITRATION AWARD

This component of the claim is asserted in the alternative to the claim asserted by the Redeemer Committee of the Crusader Funds (the "**Redeemer Committee**"). The Crusader Funds would withdraw this portion of their claim if and to the extent that the Redeemer Committee's claim is allowed.

On March 6, 2019, a panel of arbitrators issued a Partial Final Award (the "**March Award**") in favor of the Redeemer Committee against HCM. On April 29, 2019, the panel issued a Final Award (the "**Final Award**," and together with the March Award, the "**Arbitration Award**") in favor of the Redeemer Committee against HCM.[2] Substantially all of the relief awarded by the panel was expressly noted to be "for the benefit of the Fund." Final Award ¶¶ F.a.iii-x. The Arbitration Award is subject to the Federal Arbitration Act and The Convention on the Recognition and Enforcement of Foreign Arbitral Awards. The Redeemer Committee timely moved to confirm the Award in the Delaware Chancery Court. HCM moved for partial vacatur of the Arbitration Award in June 2019. The time period to move to vacate the Arbitration Award expired prior to the Petition Date (as defined below). All capitalized terms that are not defined below have the meanings given to such terms in the Arbitration Award.

---

[1] This element of the claim for forfeiture of compensation overlaps in part with a component of the Arbitration Award claim, described in Section II below.

[2] Copies of the Arbitral Award have previously been provided the Debtor, the Official Committee of Unsecured Creditors, and the Office of the United States Trustee. The Crusader Funds reserve the right to file a copy of the Arbitral Award with the Bankruptcy Court.

2

The Arbitration Award component of the Crusader Funds' claim includes the following sub-components, and each is based on the Arbitration Award:

1. **Damage Claim.** The Crusader Funds assert a liquidated claim for at least $190,824,557 plus interest that is accruing beginning as of October 16, 2019, the date that HCM filed its bankruptcy case (the (the "**Petition Date**"). As set forth in the Final Award, the separate components of the Damage Claim are as follows, and the amounts set forth below are as of the Petition Date, including prepetition interest awarded under the Arbitration Award accrued to the Petition Date:

   a. Deferred Fee Claim: $43,105,395 (Final Award ¶ F.a.ii.1)

   b. Distribution Fee Claim: $22,922,608 (Final Award ¶ F.a.ii.2)

   c. Taking of Plan Claims: $3,277,991 (Final Award ¶ F.a.v)

   d. CLO Trades Claim: $685,195 (Final Award ¶ F.a.vi)

   e. Credit Suisse Claim: $3,660,130 (Final Award ¶ F.a.vii)

   f. UBS Claim: $2,600,968 (Final Award ¶ F.a.viii)

   g. Barclays Claim: $30,811,366 (Final Award ¶ F.a.ix)

   h. Legal Fees, Costs, and Expenses: $11,351,850 (Final Award ¶ F.a.xi)

   i. Administrative Fees: $514,164 (Final Award ¶ F.a.xii)

   j. Cornerstone Award: $71,894,891 (Final Award ¶ F.a.ix)

The Crusader Funds also assert an unliquidated claim for post-petition interest, attorneys' fees, costs, and other expenses that continue to accrue in connection with the Damage Claim.

2. **Cancellation of Limited Partnership Interests.** The Final Award provides, in relevant part, for the cancellation of the limited partnership interests in the Crusader Funds that are (i) held by HCM and Charitable DAF Fund, L.P. that are identified in RC411, and (ii) held by Eames, Ltd. (Final Award ¶¶ F.a.v and F.a.x). The Final Award provides for HCM to transfer, or take all necessary steps to cause the transfer of, such interests to the Redeemer Committee for the benefit of the Crusader Funds. The Final Award also provides that the Redeemer Committee has the independent right to cause the Crusader Funds to cancel such limited partnership interests. The Crusader Funds reserve the right, to the extent required under applicable law, to seek relief from the Bankruptcy Court in order to cancel such limited partnership interests in accordance with the Final Award. The Crusader Funds assert a claim in an unliquidated amount in the event all such limited partnership interests are not cancelled in accordance with the Final Award.

3. **Deferred Fee Account.** The Arbitration Award granted the Redeemer Committee's request for a declaratory judgment with respect to the immediate distribution of the

Deferred Fee Account, which the Crusader Funds continue to hold, and ordered the payment of the funds in such account to the Redeemer Committee for disbursal to the Consenting Compulsory Redeemers (March Award ¶ VII.D; Final Award ¶ F.a). The Crusader Funds reserve the right, to the extent required under applicable law, to seek relief from the Bankruptcy Court in order to cause the distribution of the funds held in the Deferred Fee Account in accordance with the Arbitration Award. The Crusader Funds assert a claim in an unliquidated amount in the event all such funds are not distributed in accordance with the Arbitration Award.

The Crusader Funds file this portion of the Proof of Claim out of an abundance of caution and in the event that the Arbitration Award is determined not to be an executory contract. However, the Arbitration Award may be an executory contract under section 365 of the Bankruptcy Code. HCM has not yet moved to assume or reject such contract. The Crusader Funds reserve the right to dispute whether the Arbitration Award is an executory contract and, if so, HCM's decision to reject such contract. If the Arbitration Award is determined to be an executory contract and is allowed to be rejected by the Bankruptcy Court, the Crusader Funds reserve the right to file an amended proof of claim by the bar date for the filing of rejection damages claims; if no such amended proof of claim is filed, then, this claim shall serve as the Crusader Funds' rejection damages claim. By filing this Proof of Claim, the Crusader Funds do not concede that the Arbitration Award is an executory contract, that amounts awarded under the Arbitration Award are prepetition claims or that they are now required to file a proof of claim to be entitled to the amounts described in the Arbitration Award.

* * *

The Crusader Funds reserve all rights to amend or modify this Proof of Claim in any respect, including, without limitation, to assert other or additional claims, or for the purpose of fixing or liquidating any contingent or unliquidated claims. This Proof of Claim is without prejudice to any other rights the Crusader Funds may have against the Debtor, its officers, employees, successors, or assigns.

The Crusader Funds expressly reserve all of their procedural and substantive defenses and rights with respect to any claim that may be asserted against the Crusader Funds by the Debtor, including, without limitation, any rights of setoff or recoupment.

The filing of this Proof of Claim shall not constitute: (i) an admission of liability by the Crusader Funds to any party; (ii) a waiver or release of the Crusader Funds' rights against any person, entity, or property; (iii) a consent by the Crusader Funds to the jurisdiction of the Bankruptcy Court with respect to the subject matter of this Proof of Claim, any objection or other proceeding commenced with respect thereto, or any other proceeding commenced in these cases or otherwise involving the Crusader Funds; (iv) a waiver or release of the right to move to withdraw the reference to the subject matter of this Proof of Claim Claim, any objection or other proceeding commenced with respect thereto, or any other proceeding commenced in these cases against or otherwise involving any claimant; (v) a waiver or release of the right to seek to have the Bankruptcy Court abstain with respect to the subject matter of this Proof of Claim, any objection or other proceeding commenced with respect thereto, or any other proceeding commenced in these cases against or otherwise involving any claimant, (vi) a waiver or release of the right to have final

4

orders entered only after *de novo* review by a United States District Judge; (vii) a waiver or release of their right to trial by jury in any proceeding so triable in these cases or any case, controversy, or proceeding related to these cases; (viii) a consent to a jury trial in any proceeding so triable in these cases or any case, controversy or proceeding related to these cases, (ix) a waiver or release of their right to arbitration under the Plan and Scheme; (x) an election of remedies or limitation of rights or remedies; or (xi) a waiver or release of any other rights, claims, actions, defenses, setoffs, or recoupments to which they are or may be entitled under agreements, in law, in equity, or otherwise, all of which rights, claims, actions, defenses, setoffs, and recoupments are expressly reserved.

5