# EXHIBIT 5

<u>SECOND AMENDED AND RESTATED</u>
<u>INVESTMENT ADVISORY AGREEMENT</u>

THIS SECOND AMENDED AND RESTATED INVESTMENT ADVISORY AGREEMENT (this "*Agreement*"), dated to be effective from January 1, 2017 (the "*Effective Date*") is entered into by and between **Charitable DAF Fund, L.P.**, a Cayman Islands exempted limited partnership (the "*Fund*"), **Charitable DAF GP, LLC**, a limited liability company organized under the laws of the State of Delaware (the "*General Partner*"), the general partner of the Fund, and **Highland Capital Management, L.P.**, a limited partnership organized under the laws of the State of Delaware (the "*Investment Advisor*"). Each of the signatories hereto is sometimes referred to herein individually as a "*Party*" and collectively as the "*Parties*."

RECITALS

WHEREAS, the Fund, the General Partner and the Investment Advisor entered into that certain Investment Advisory Agreement dated January 1, 2012 (the "*Original Agreement*");

WHEREAS, the Parties amended and restated the Original Agreement in its entirety on the terms set forth in that certain Amended and Restated Investment Advisory Agreement dated July 1, 2014 (the "*Existing Agreement*");

WHEREAS, the parties desire to amend and restate the Existing Agreement in its entirety with the terms as set forth in this Agreement effective as of the Effective Date;

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties hereby agree, and the Existing Agreement is hereby amended and restated in its entirety, as follows:

1. <u>Investment Advisory Services</u>. Subject to Section 7, the Investment Advisor shall act as investment advisor to the Fund, the General Partner with respect to the Fund and its subsidiaries and shall provide investment advice with respect to the investment and reinvestment of the cash, Financial Instruments and other properties comprising the assets and liabilities of the Fund and its subsidiaries.

2. <u>Custody</u>. The Financial Instruments shall be held in the custody of Jefferies & Company, Inc. or one or more banks selected by the General Partner (each such bank, a "Custodian"). The General Partner will notify the Investment Advisor promptly of the proposed selection of any other Custodians. The Custodian shall at all times be responsible for the physical custody of the Financial Instruments; for the collection of interest, dividends, and other income attributable to the Financial Instruments; and for the exercise of rights and tenders on the Financial Instruments after consultation with and as then directed by the General Partner. At no time shall the Investment Advisor have possession of or maintain custody over any of the Financial Instruments. The Investment Advisor shall not be responsible for any loss incurred by reason of any act or omission of the Custodian.

3.  Authority of the Investment Advisor.  Subject to Section 7 of this Agreement, the Investment Advisor shall advise the General Partner on behalf of the Fund and/or its subsidiaries with respect to:

(a)   investing, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (ii) swaps and contracts for difference, options, swaptions, rights, warrants, when-issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (iii) spot and forward currency transactions and (iv) agreements relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (each of such items, "***Financial Instruments***"), and the sale of Financial Instruments short and covering such sales.

(b)   engaging in such other lawful Financial Instruments transactions;

(c)   research and analysis;

(d)   purchasing Financial Instruments and holding them for investment;

(e)   entering into contracts for or in connection with investments in Financial Instruments;

(f)   investing in other pooled investment vehicles, which investments shall be subject in each case to the terms and conditions of the respective governing document for each such vehicle;

(g)     possessing, transferring, mortgaging, pledging or otherwise dealing in, and exercising all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments and other property and funds held or owned by the Fund and/or its subsidiaries;

(h)     lending, either with or without security, any Financial Instruments, funds or other properties of the Funds, including by entering into reverse repurchase agreements, and, from time to time, undertaking leverage on behalf of the Fund;

(i)     opening, maintaining and closing accounts, including margin and custodial accounts, with brokers and dealers, including brokers and dealers located outside the United States;

(j)     opening, maintaining and closing accounts, including custodial accounts, with banks, including banks located outside the United States, and drawing checks or other orders for the payment of monies;

(k)     combining purchase or sale orders on behalf of the Fund with orders for other accounts to which the Investment Advisor or any of its affiliates provides investment services ("***Other Accounts***") and allocating the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts;

(l)     entering into arrangements with brokers to open "average price" accounts wherein orders placed during a trading day are placed on behalf of the Fund and Other Accounts and are allocated among such accounts using an average price;

(m)     organizing one or more corporations and other entities formed to hold record title, as nominee for the Fund and/or its subsidiaries (whether alone or together with the Other Accounts), to Financial Instruments or funds of the Fund and/or its subsidiaries;

(n)     causing the Fund and/or its subsidiaries to engage in (i) agency, agency cross, related party principal transactions with affiliates of the Investment Manager and (ii) cross transactions with Other Accounts, in each case, to the extent permitted by applicable laws;

(o)     engaging personnel, whether part-time or full-time, and attorneys, independent accountants or such other persons (including, without limitation, finders, consultants and investment bankers); and

(p)     voting of Financial Instruments, participation in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters.

4.     <u>Policies of the Fund</u>.  The activities engaged in by the Investment Advisor on behalf of the Fund and/or its subsidiaries shall be subject to the policies and control of the General Partner.

The Investment Advisor shall submit such periodic reports to the General Partner regarding the Investment Advisor's activities hereunder as the General Partner may reasonably request and a representative of the Investment Advisor shall be available to meet with the General Partner and/or any other representative of the Fund or its subsidiaries as reasonably requested by the General Partner.

In furtherance of the foregoing, the General Partner hereby appoints the Investment Advisor as the Fund's attorney-in-fact, with full power of authority to act in the Fund's name and on its behalf with respect to the Fund, as follows:

(a)    to purchase or otherwise trade in Financial Instruments that have been approved by the General Partner;

(b)    to execute and combine purchase or sale orders on behalf of the Fund with orders for Other Accounts and allocate the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Investment Advisor in its sole discretion, among such accounts; *provided, however*, that such purchase or sale orders shall be market rates;

(c)    to direct the Custodian to deliver funds or the Financial Instruments, but only in the course of effecting trading and investment transactions for the Fund and subject to such restrictions as may be contained in the custody agreement between the Custodian and the Fund;

(d)    to enter into contracts, provide certifications or take any other actions necessary to effect any of the foregoing transactions; and

(e)    to select brokers on the basis of best execution and in consideration of relevant factors, including, but not limited to, price quotes; the size of the transaction; the nature of the market for the security; the timing of the transaction; the difficulty of execution; the broker-dealer's expertise in the relevant market or sector; the extent to which the broker-dealer makes market in the security or has an access to such market; the broker-dealer's skill in positioning the relevant market; the broker-dealer's facilities, reliability, promptness and financial stability; the broker-dealer's reputation for diligence and integrity (including in correcting errors); confidentiality considerations; the quality and usefulness of research services and investment ideas presented by the broker-dealer; and other factors deemed appropriate by the Investment Advisor.

5.    <u>Valuation of Financial Instruments</u>.  Financial Instruments will be valued in accordance with the then current valuation policy of the Investment Advisor, a copy of which will be provided to the General Partner upon request.

6.    <u>Status of the Investment Advisor</u>.  The Investment Advisor shall, for all purposes, be an independent contractor and not an employee of the General Partner or the Fund or its subsidiaries, nor shall anything herein be construed as making the Fund or its subsidiaries or the General Partner, a partner, member or co-venturer with the Investment Advisor or any of its affiliates or clients.  The Investment Advisor shall have no authority to act for, represent, bind or obligate the Fund or its subsidiaries or the General Partner except as specifically provided herein.

7.    _Investments_.    ALL ULTIMATE INVESTMENT DECISIONS WITH RESPECT TO THE FUND AND ITS SUBSIDIARIES SHALL AT ALL TIMES REST SOLELY WITH THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY, IT BEING EXPRESSLY UNDERSTOOD THAT THE GENERAL PARTNER AND/OR THE OFFICERS/DIRECTORS OF THE APPLICABLE SUBSIDIARY SHALL BE FREE TO ACCEPT AND OR REJECT ANY OF THE ADVICE RENDERED BY THE INVESTMENT MANAGER HEREUNDER FOR ANY REASON OR FOR NO REASON.

8.    _Reimbursement by the General Partner_.    The Investment Advisor may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the General Partner with respect to the Fund and/or its subsidiaries (any such appointee, a "***Sub-Advisor***"), including, but not limited to, any affiliate of the Investment Advisor, but payment for any such services shall be assumed by the Investment Advisor, and, therefore, neither the General Partner nor the Fund or any of its subsidiaries shall have any liability therefor; _provided, however_, that the Investment Advisor, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the General Partner with respect to the Fund and/or its subsidiaries hereunder, and the Fund shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom.

9.    _Expenses_.

(a)    The Fund shall pay or reimburse the Investment Advisor and its affiliates for all expenses related to the services hereunder, including, but not limited to, investment-related expenses, brokerage commissions and other transaction costs, expenses related to clearing and settlement charges, professional fees relating to legal, auditing or valuation services, any governmental, regulatory, licensing, filing or registration fees incurred in compliance with the rules of any self-regulatory organization or any federal, state or local laws, research-related expenses (including, without limitation, news and quotation equipment and services, investment and trading-related software, including, without limitation, trade order management software (i.e., software used to route trade orders)), accounting (including accounting software), tax preparation expenses, costs and expenses associated with reporting and providing information to the Fund, any taxes imposed upon the Fund (including, but not limited to, collateralized debt obligations managed by the Investment Advisor or its affiliates), fees relating to valuing the Financial Instruments, and extraordinary expenses.  In no event shall any of the foregoing costs or expenses include any salaries, occupational expense or general overhead of the Investment Advisor.  For the avoidance of doubt, (i) the cost of all third party expenses incurred in connection with this Agreement shall not exceed standard market rates (which may include standard soft dollar arrangements) and (ii) to the extent any of the foregoing expenses were incurred on behalf of, or benefit of a number of Investment Advisor's advised accounts, such expenses shall be allocated pro rata among such accounts.

(b)     To the extent that expenses to be borne by the Fund are paid by the Investment Advisor or by any Sub-Advisor, the Fund shall reimburse the Investment Advisor (or Sub-Advisors, as applicable) for such expenses so long as such expenses are at market rates.

10.     <u>Fees</u>.

(a)     The Fund shall pay the Investment Advisor a quarterly fee (the "***Management Fee***") equal to 2.0% per annum (0.5% per quarter) of the Net Assets (as defined below) of the Fund, payable in advance at and calculated as of the first business day of each calendar quarter.  For purposes of calculating the Management Fee, the Net Assets of the Fund will be determined before giving effect to any of the following amounts payable by the Fund generally or in respect of any Investment which are effective as of the date on which such determination is made: (i) any fee payable to the Investment Advisor as of the date on which such determination is made; (ii) any capital withdrawals or distributions payable by the Fund which are effective as of the date on which such determination is made; and (iii) withholding or other taxes, expenses of processing withdrawals and other items payable, any increases or decreases in any reserves, holdback or other amounts specially allocated ending as of the date on which such determination is made.  The Management Fee shall be prorated for partial periods and any applicable excess fees should be returned to the Fund by the Investment Advisor.  Capital contributions made to the Fund after the commencement of a calendar quarter shall be subject to a prorated Management Fee based on the number of days remaining during such quarter.

(b)     Subject to clauses (c) and (d) below, at the end of each Calculation Period (as defined below), an amount equal to 20% of the net capital appreciation of the Fund's Investments (as defined below) after deducting the Management Fee shall be paid to the Investment Advisor (the "***Performance Fee***"); *provided*, *however*, that the net capital appreciation upon which the calculation of the Performance is based shall be reduced to the extent of any unrecovered balance remaining in the Loss Recovery Account (as defined below) maintained on the books and records of the Fund. The amount of the unrecovered balance remaining in the Loss Recovery Account at the time of calculating the Performance Fee shall be the amount existing immediately prior to its reduction pursuant to the second clause of the second sentence of clause (c) below.

(c)     There shall be established on the books of the Fund a memorandum account (the "***Loss Recovery Account***"), the opening balance of which shall be zero.  At the end of each Calculation Period, the balance in the Loss Recovery Account shall be adjusted as follows: first, if there has been, in the aggregate, net capital depreciation of the Fund's Investments (as adjusted pursuant to the last sentence of this paragraph) since the end of the immediately preceding Calculation Period (or with respect to the initial Calculation Period, since the Effective Date), an amount equal to such net capital depreciation shall be credited to the Loss Recovery Account, and, second, if there has been, in the aggregate, net capital appreciation of the Fund's investments (as adjusted pursuant to the last sentence of this paragraph) since the end of the immediately preceding Calculation Period, an amount equal to such net capital appreciation, before taking into account any Performance Fee to be paid to the Investment Advisor, shall be debited to and reduce any unrecovered balance in the Loss Recovery Account, but not below zero. Solely for purposes of this paragraph, in determining the Loss Recovery Account, net capital appreciation and net capital

depreciation for any applicable Calculation Period shall be calculated by taking into account the amount of the Management Fee paid for such period.

(d) In the event that all or a portion of the Fund's capital is distributed or withdrawn while there exists an unrecovered balance in the Loss Recovery Account, the unrecovered balance in the Loss Recovery Account shall be reduced as of the beginning of the next Calculation Period by an amount equal to the product obtained by multiplying the balance in such Loss Recovery Account by a fraction, the numerator of which is the amount distributed or withdrawn with respect to the immediately preceding distribution or withdrawal date, and the denominator of which is the total fair value of the Fund's Investment immediately prior to such distribution or withdrawal.

(e) For purposes of this Section 10, the net capital appreciation and net capital depreciation of the Fund's Investments for any given period will be calculation in accordance with the then current valuation policy of the Investment Advisor, a copy of which will be provided upon the General Partner's request. As soon as reasonably practicable following the end of a Calculation Period, the Investment Advisor shall deliver, or cause to be delivered, to the General Partner a statement showing the calculation of the Performance Fee, if any, with respect to such Calculation Period. The Performance Fee, if any, shall be payable within three (3) business days of the General Partner's receipt of such statement.

(f) Payments due to the Investment Advisor shall be made by wire transfer to:

| | |
|---|---|
| Bank Name: | Compass Bank |
| ABA#: | 113010547 |
| FBO: | Highland Capital Management, L.P. (Master Operating Account) |
| Acct#: | 0025876342 |

(g) For purposes of this Section 10, the following terms have the definitions set forth below:

"*Calculation Period*" means the period commencing on the Effective Date (in the case of the initial Calculation Period) and thereafter each period commencing as of the day following the last day of the preceding Calculation Period, and ending as of the close of business on the first to occur of the following: (i) the last day of a calendar year; (ii) the distribution or withdrawal of capital of the Fund (but only with respect to such distributed or withdrawn amount); (iii) the permitted transfer of all or any portion of a partner's interest in the Fund; and (iv) the final capital distribution of the Fund following its dissolution;

"*Investments*" means all investments, securities, cash, receivables, financial instruments, contracts and other assets, whether tangible or intangible, owned by the Fund;

"*Net Assets*" means, with respect to the Fund as of any date, the excess of the total fair value of all Investments over the total liabilities, debts and obligations of the Fund, in each case, calculated on an accrual basis in accordance with accounting principles generally accepted in the United States and the then current valuation policy of the Service Provider, a copy of which will be provided to the General Partner upon request; and

"*Services Agreement*" means that certain Second Amended and Restated Service Agreement, dated effective as of the Effective Date, by and among the Parties, as amended, restated, modified and supplemented from time to time.

11.    Exculpation; Indemnification.

(a)    Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Investment Advisor, its members or any of their respective affiliates and their respective partners, members, officers, directors, employees, shareholders and agents (including parties acting as agents for the execution of transactions) (each, a "*Covered Person*" and collectively, "*Covered Persons*") shall be subject to the provisions of this Section.

(b)    To the fullest extent permitted by law, no Covered Person shall be liable to the General Partner or the Fund or any of its subsidiaries or anyone for any reason whatsoever (including but not limited to (i) any act or omission by any Covered Person in connection with the conduct of the business of the General Partner or the Fund, that is determined by such Covered Person in good faith to be in or not opposed to the best interests of the General Partner or the Fund, (ii) any act or omission by any Covered Person based on the suggestions of any professional advisor of the General Partner or the Fund or any of its subsidiaries whom such Covered Person believes is authorized to make such suggestions on behalf of the General Partner or the Fund or any of its subsidiaries, (iii) any act or omission by the General Partner or the Fund or any of its subsidiaries, or (iv) any mistake, negligence, misconduct or bad faith of any broker or other agent of the General Partner or the Fund or any of its subsidiaries selected by Covered Person with reasonable care), unless any act or omission by such Covered Person constitutes willful misconduct or gross negligence by such Covered Person (as determined by a non-appealable judgment of a court of competent jurisdiction).

(c)    Covered Persons may consult with legal counsel or accountants selected by such Covered Person and any act or omission by such Covered Person on behalf of the General Partner or the Fund or any of its subsidiaries or in furtherance of the business of the General Partner or the Fund or any of its subsidiaries in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Covered Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(d)    To the fullest extent permitted by law, the General Partner and the Fund and its subsidiaries shall indemnify and hold harmless Covered Persons (the "*Indemnified*

*Party*"), from and against any and all claims, liabilities, damages, losses, costs and expenses, including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnified Party and arise out of or in connection with the business of the General Partner or the Fund or any of its subsidiaries, any investment made under or in connection with this Agreement, or the performance by the Indemnified Party of Covered Person's responsibilities hereunder and against all taxes, charges, duties or levies incurred by such Covered Person or any Indemnified Party in connection with the General Partner or the Fund or any of its subsidiaries, provided that an Indemnified Party shall not be entitled to indemnification hereunder to the extent the Indemnified Party's conduct constitutes willful misconduct or gross negligence (as determined by a non-appealable judgment of a court of competent jurisdiction).   The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnified Party's conduct constituted willful misconduct or gross negligence.

(e)     Expenses incurred by an Indemnified Party in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the General Partner prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnified Party to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnified Party is not entitled to be indemnified hereunder.

(f)     The right of any Indemnified Party to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnified Party may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnified Party's successors, assigns and legal representatives.

(g)     The provisions of this Section are expressly intended to confer benefits upon Covered Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(h)     In no event shall any Covered Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits.

(i)     No Covered Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

(j)     Pursuant to the exculpation and indemnification provisions described above, the Investment Advisor and each Indemnified Party will generally not be liable to the General Partner or the Fund for any act or omission (or alleged act or omission), absent bad faith, willful misconduct, fraud or gross negligence, and the General Partner and the Fund will generally be required to indemnify such persons against any Losses they may incur by reason of any act or omission (or alleged act or omission) related to the General Partner, the Fund or its subsidiaries, absent bad faith, willful misconduct, fraud or gross negligence.  As a result of these provisions, the General Partner, the Fund and its subsidiaries, as applicable (not the Investment

Advisor or any other Indemnified Party) will be responsible for any Losses resulting from trading errors and similar human errors, absent bad faith, willful misconduct, fraud or gross negligence or the ability to waive or limit such Losses under applicable law. Trading errors might include, for example, keystroke errors that occur when entering trades into an electronic trading system or typographical or drafting errors related to derivatives contracts or similar agreements. Given the volume of transactions executed by the Investment Advisor and its affiliates on behalf of the Fund and/or its subsidiaries, the General Partner acknowledges that trading errors (and similar errors) will occur and that the General Partner will be responsible for any resulting Losses, even if such Losses result from the negligence (but not gross negligence) of the Investment Advisor or its affiliates.

          12.    <u>Activities of the Investment Advisor and Others</u>. The Investment Advisor, and its affiliates may engage, simultaneously with their investment management activities on behalf of the Fund, in other businesses, and may render services similar to those described in this Agreement to other individuals, companies, trusts or persons, and shall not by reason of such engaging in other businesses or rendering of services for others be deemed to be acting in conflict with the interests of the Fund. Notwithstanding the foregoing, the Investment Advisor and its affiliates shall devote as much time to provide advisory service to the General Partner with respect to the management of the Fund's assets as the Investment Advisor deems necessary and appropriate. In addition, the Investment Advisor or any of its affiliates, in their individual capacities, may engage in securities transactions which may be different than, and contrary to, the investment advice provided by the Investment Advisor to the General Partner with respect to the Fund. The Investment Advisor may give advice and recommend securities to, or buy securities for, accounts and other clients, which advice or securities may differ from advice given to, or securities recommended or bought for, the Fund, even though their investment objectives may be the same or similar. The Investment Advisor may recommend transactions in securities and other assets in which the Investment Advisor has an interest, including securities or other assets issued by affiliates of the Investment Manager. Each of the General Partner and the Fund acknowledges that it has received, reviewed and had an opportunity with respect to (a) a copy of Part 2 of the Investment Advisor's Form ADV, and (b) the supplemental disclosures attached hereto as <u>Exhibit A</u>, each of which further describes conflicts of interest relating to the Investment Advisor, its affiliates and their respective advised accounts.

          13.    <u>Term</u>. This Agreement shall remain in effect through an initial term concluding December 31, 2017 and shall be automatically extended for additional one-year terms thereafter, except that it may be terminated by the Investment Advisor, on the one hand, or by the General Partner and the Fund, on the other hand, upon at least 90 days' prior written notice to the General Partner or the Investment Advisor, as the case may be, prior to General Partner's fiscal year-end.

          14.    <u>Miscellaneous</u>.

          (a)    <u>Notices</u>. Any notice, consent or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or facsimile or five days after mailed by certified mail, return receipt requested, as follows:

If to the Investment Advisor, to:

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Telephone Number: (972) 628-4100
Facsimile Number: (972) 628-4147

If to the General Partner or the Fund, to:

Charitable DAF GP, LLC
4140 Park Lake Avenue, Suite 600
Raleigh, North Carolina 27612
Attention: Grant Scott
Telephone Number: (919) 854-1407
Facsimile Number: (919) 854-1401

(b)     Entire Agreement. This Agreement contains all of the terms agreed upon or made by the parties relating to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

(c)     Amendments and Waivers. No provision of this Agreement may be amended, modified, waived or discharged except as agreed to in writing by the parties. No amendment to this Agreement may be made without first obtaining the required approval from the Fund. The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(d)     Binding Effect; Assignment. This Agreement shall be binding upon and inure to the benefit of the General Partner, the Fund, the Investment Advisor, each Indemnified Party and their respective successors and permitted assigns. Any person that is not a signatory to this Agreement but is nevertheless conferred any rights or benefits hereunder (*e.g.*, officers, partners and personnel of the Investment Advisor and others who are entitled to indemnification hereunder) shall be entitled to such rights and benefits as if such person were a signatory hereto, and the rights and benefits of such person hereunder may not be impaired without such person's express written consent. No party to this Agreement may assign (as such term is defined under the U.S. Investment Advisers Act of 1940, as amended) all or any portion of its rights, obligations or liabilities under this Agreement without the prior written consent of the other parties to this Agreement; provided; however, that the Investment Advisor may assign all or any portion of its rights, obligations and liabilities hereunder to any of its affiliates at its discretion.

(e)     Governing Law. Notwithstanding the place where this Agreement may be executed by any of the parties thereto, the parties expressly agree that all terms and provisions hereof shall be governed by and construed in accordance with the laws of the State of Texas applicable to agreements made and to be performed in that State.

(f) <u>Jurisdiction; Venue; Waiver of Jury Trial</u>. The Parties hereby agree that any action, claim, litigation, or proceeding of any kind whatsoever against any other Party in any way arising from or relating to this Agreement and all contemplated transactions, including claims sounding in contract, equity, tort, fraud and statute ("***Dispute***") shall be submitted exclusively to the U.S. District Court for the Northern District of Texas or, if such court does not have subject matter jurisdiction, the courts of the State of Texas sitting in Dallas County, and any appellate court thereof ("***Enforcement Court***"). Each Party irrevocably and unconditionally submits to the exclusive personal and subject matter jurisdiction of the Enforcement Court for any Dispute and agrees to bring any Dispute only in the Enforcement Court. Each Party further agrees it shall not commence any Dispute in any forum, including administrative, arbitration, or litigation, other than the Enforcement Court. Each Party agrees that a final judgment in any such action, litigation, or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS, SCHEDULES, AND APPENDICES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY. EACH PARTY CERTIFIES AND ACKNOWLEDGES THAT (A) NO REPRESENTATIVE OF THE OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT THE OTHER PARTY WOULD NOT SEEK TO ENFORCE THE FOREGOING WAIVER IN THE EVENT OF A LEGAL ACTION, (B) IT HAS CONSIDERED THE IMPLICATIONS OF THIS WAIVER, (C) IT MAKES THIS WAIVER KNOWINGLY AND VOLUNTARILY, AND (D) IT HAS BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Nothing in this Section 14(f) shall be construed to limit either party's right to obtain equitable or injunctive relief in a court of competent jurisdiction in appropriate circumstances.

(g) <u>Headings</u>. The headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the parties to this Agreement.

(h) <u>Counterparts</u>. This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.

(i) <u>Survival</u>. The provisions of Sections 8, 9, 10, 11 and 14 hereof shall survive the termination of this Agreement.

(j) <u>Pronouns.</u> All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons' firm or company may require in the context thereof.

(k)      <u>Arm's-Length Agreement</u>.  The General Partner and the Fund have
approved this Agreement and reviewed the activities described in Section 12 and in the Investment
Advisor's Form ADV and the risks related thereto.

*[Signature Page to Follow]*

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By: Strand Advisors, Inc., its general partner

By:_____

Name: James Dondero
Title: President
Date: 6/21/17


CHARITABLE DAF GP, LLC

By:_____

Name: Grant J. Scott
Title: Managing Member
Date:


CHARITABLE DAF FUND, L.P.

By: Charitable DAF GP, LLC, its general partner

By:_____

Name: Grant J. Scott
Title: Managing Member
Date:

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.

By:  Strand Advisors, Inc., its general partner


By:_____

Name:  James Dondero
Title:  President
Date:


CHARITABLE DAF GP, LLC

By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date:  6/21/2017


CHARITABLE DAF FUND, L.P.

By:  Charitable DAF GP, LLC, its general
     partner


By:_____

Name:  Grant J. Scott
Title:  Managing Member
Date:  6/21/2017

## EXHIBIT A

## Supplemental Disclosures

**Potential Conflicts of Interest**

The scope of the activities of Highland Capital Management, L.P. (the "***Investment Adviser***"), its
affiliates, and the funds and clients managed or advised by the Investment Adviser or any of its
affiliates may give rise to conflicts of interest or other restrictions and/or limitations imposed on
Charitable DAF Fund, L.P. and its subsidiaries (collectively, the "***Fund***") in the future that cannot
be foreseen or mitigated at this time. The following briefly summarizes some of these conflicts,
but is not intended to be an exhaustive list of all such conflicts.  Additional conflicts are described
in the Investment Adviser's Form ADV.  You are urged to review the Investment Adviser's Form
ADV in its entirety prior to investing in the Fund.[1]

*Highland Group & Highland Accounts*.  None of the Investment Adviser, its affiliates and their
respective officers, directors, shareholders, members, partners, personnel and employees
(collectively, the "***Highland Group***") is precluded from engaging in or owning an interest in other
business ventures or investment activities of any kind, whether or not such ventures are
competitive with the Fund. The Investment Adviser is permitted to manage other client accounts,
and does manage other client accounts, some of which may have objectives similar or identical to
those of the Fund, including other collective investment vehicles that may be managed by the
Highland Group and in which the Investment Adviser or any of its affiliates may have an equity
interest.

The Fund will be subject to a number of actual and potential conflicts of interest involving the
Highland Group including, among other things, the fact that: (i) the Highland Group conducts
substantial investment activities for accounts, funds, collateralized debt obligations and
collateralized loan obligations that invest in leveraged loans (collectively, "***CDOs***") and other
vehicles managed by members of the Highland Group (collectively, "***Highland Accounts***") in
which the Fund has no interest; (ii) the Highland Group advises Highland Accounts, which utilize
the same, similar or different methodologies as the Fund and may have financial incentives
(including, without limitation, as it relates to the composition of investors in such funds and
accounts or to the Highland Group's compensation arrangements) to favor certain Highland
Accounts over the Fund; (iii) the Highland Group may use the strategy described herein in certain
Highland Accounts; (iv) the Investment Adviser may give advice and recommend securities to, or
buy or sell securities for, the Fund, which advice or securities may differ from advice given to, or
securities recommended or bought or sold for, Highland Accounts; (v) the Investment Adviser has
the discretion, to the extent permitted under applicable law, to use its affiliates as service providers
to the Fund and its portfolio investments; (vi) certain investors affiliated with the Highland Group
may choose to personally invest only in certain funds advised by the Highland Group and the
amounts invested by them in such funds is expected to vary significantly; (vii) the Highland Group
and Highland Accounts may actively engage in transactions in the same securities sought by the

---

[1]  The Investment Adviser's latest Form ADV filed and Part 2 Brochures can be accessed here:
https://adviserinfo.sec.gov/IAPD/IAPDFirmSummary.aspx?ORG_PK=110126

Fund and, therefore, may compete with the Fund for investment opportunities or may hold positions opposite to positions maintained by the Fund; (viii) the Fund may invest in CDOs and Highland Accounts managed by members of the Highland Group; and (ix) the Investment Adviser will devote to the Fund only as much time as the Investment Adviser deems necessary and appropriate to manage the Fund's business.

The Investment Adviser undertakes to resolve conflicts in a fair and equitable basis, which in some instances may mean a resolution that would not maximize the benefit to the Fund's investors.

*Allocation of Trading Opportunities*. It is the policy of the Investment Adviser to allocate investment opportunities fairly and equitably over time. This means that such opportunities will be allocated among those accounts for which participation in the respective opportunity is considered appropriate, taking into account, among other considerations: (i) fiduciary duties owed to the accounts; (ii) the primary mandate of the accounts; (iii) the capital available to the accounts; (iv) any restrictions on the accounts and the investment opportunity; (v) the sourcing of the investment, size of the investment and amount of follow-on available related to the investment; (vi) whether the risk-return profile of the proposed investment is consistent with the account's objectives and program, whether such objectives are considered in light of the specific investment under consideration or in the context of the portfolio's overall holdings; (vii) the potential for the proposed investment to create an imbalance in the account's portfolio (taking into account expected inflows and outflows of capital); (viii) liquidity requirements of the account; (ix) potentially adverse tax consequences; (x) regulatory and other restrictions that would or could limit an account's ability to participate in a proposed investment; and (xi) the need to re-size risk in the account's portfolio.

The Investment Adviser has the authority to allocate trades to multiple Highland Accounts on an average price basis or on another basis it deems fair and equitable. Similarly, if an order for any accounts cannot be fully allocated under prevailing market conditions, the Investment Adviser may allocate the trades among different accounts on a basis it considers fair and equitable over time. One or more of the foregoing considerations may (and are often expected to) result in allocations among the Fund and one or more Highland Accounts on other than a *pari passu* basis. The Investment Adviser will allocate investment opportunities across its accounts for which the opportunities are appropriate, consistent with (i) its internal conflict of interest and allocation policies and (ii) the requirements of the U.S. Investment Advisers Act of 1940, as amended. The Investment Adviser will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy. However, there is no assurance that such investment opportunities will be allocated to the Fund fairly or equitably in the short-term or over time and there can be no assurance that the Fund will be able to participate in all investment opportunities that are suitable for it.

The Investment Adviser and/or its affiliates may open "average price" accounts with brokers. In an "average price" account, purchase and sale orders placed during a trading day for the Fund, the Highland Accounts or affiliates of the Investment Adviser are combined, and securities bought and sold pursuant to such orders are allocated among such accounts on an average price basis.

*Highland Group Trading.*  As part of their regular business, the members of the Highland Group hold, purchase, sell, trade or take other related actions both for their respective accounts and for the accounts of their respective clients, on a principal or agency basis, with respect to loans, securities and other investments and financial instruments of all types. The members of the Highland Group also provide investment advisory services, among other services, and engage in private equity, real estate and capital markets oriented investment activities. The members of the Highland Group will not be restricted in their performance of any such services or in the types of debt or equity investments which they may make. The members of the Highland Group may have economic interests in or other relationships with obligors or issuers in whose obligations or securities or credit exposures the Fund may invest. In particular, such persons may make and/or hold an investment in an obligor's or issuer's securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's securities made and/or held by the Fund or in which partners, security holders, members, officers, directors, agents, personnel or employees of such persons serve on boards of directors or otherwise have ongoing relationships. Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Fund and otherwise create conflicts of interest for the Fund. In such instances, the members of the Highland Group may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to the Fund's investments. In connection with any such activities described above, the members of the Highland Group may hold, purchase, sell, trade or take other related actions in securities or investments of a type that may be suitable to investments for the Fund. The members of the Highland Group will not be required to offer such securities or investments to the Fund or provide notice of such activities to the Fund. In addition, in managing the Fund's portfolio, the Investment Adviser may take into account its relationship or the relationships of its affiliates with obligors and their respective affiliates, which may create conflicts of interest. Furthermore, in connection with actions taken in the ordinary course of business of the Investment Adviser in accordance with its fiduciary duties to its other clients, the Investment Adviser may take, or be required to take, actions which adversely affect the interests of the Fund.

The Highland Group has invested and may continue to invest in investments that would also be appropriate for the Fund. Such investments may be different from those made by the Fund. The Highland Group does not have any duty, in making or maintaining such investments, to act in a way that is favorable to the Fund or to offer any such opportunity to the Fund, subject to the Investment Adviser's internal allocation policy. The investment policies, fee arrangements and other circumstances applicable to such other accounts and investments may vary from those applicable to the Fund and its investments. The Highland Group may also provide advisory or other services for a customary fee with respect to investments made or held by the Fund, and neither the Fund nor its investors shall have any right to such fees. The Highland Group may also have ongoing relationships with, render services to or engage in transactions with other clients who make investments of a similar nature to those of the Fund, and with companies whose securities or properties are acquired by the Fund.

As further described below, in connection with the foregoing activities the Highland Group may from time to time come into possession of material nonpublic information that limits the ability of the Investment Adviser to effect a transaction for the Fund, and the Fund's investments may be constrained as a consequence of the Investment Adviser's inability to use such information for

advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Fund.

Although the professional staff of the Investment Adviser will devote as much time to the Fund as the Investment Adviser deems appropriate to perform its duties in accordance with the Fund's advisory agreement and in accordance with reasonable commercial standards, the staff may have conflicts in allocating its time and services among the Fund and the Investment Adviser's other accounts.

*Various Activities of the Investment Adviser and its Affiliates*. The directors, officers, personnel, employees and agents of the Investment Adviser and its affiliates may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories or provide banking, agency, insurance and/or other services, and receive arm's length fees in connection with such services, for the Fund or its investments or other entities that operate in the same or a related line of business as the, for other clients managed by the Investment Adviser or its affiliates, or for any obligor or issuer in respect of the CDOs, and the Fund shall have no right to any such fees. In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Fund. The Fund may compete with other Highland Accounts for capital and investment opportunities.

There is no limitation or restriction on the Investment Adviser or any of its affiliates with regard to acting as investment adviser or collateral manager (or in a similar role) to other parties or persons. This and other future activities of the Investment Adviser and/or its affiliates may give rise to additional conflicts of interest. Such conflicts may relate to obligations that the Investment Adviser's investment committee, the Investment Adviser or its affiliates have to other clients.

The Investment Adviser and its affiliates may participate in creditors or other committees with respect to the bankruptcy, restructuring or workout of an investment of the Fund or another account. In such circumstances, the Investment Adviser or its affiliates may take positions on behalf of themselves or another account that are adverse to the interests of the Fund.

The Investment Adviser and/or its affiliates may act as an underwriter, arranger or placement agent, or otherwise participate in the origination, structuring, negotiation, syndication or offering of CDOs, Highland Accounts and other investments purchased by the Fund. Such transactions shall be subject to fees that are intended to be no greater than arm's-length fees, and the Fund shall have no right to any such fees. There is no expectation for preferential access to transactions involving CDOs and Highland Accounts that are underwritten, originated, arranged or placed by the Investment Adviser and/or its affiliates and the Fund shall not have any right to any such fees.

*Investments in Highland Accounts Managed by the Investment Manager or its Affiliates*. The Fund may invest a significant portion of its capital in Highland Accounts. The Investment Adviser or its affiliates will receive senior and subordinated management fees and, in some cases, a performance-based allocation or fee with respect to its role as general partner and/or manager of the Highland Accounts. If the Fund invests in Highland Accounts in secondary transactions, the Fund will indirectly pay the fees (senior and subordinated) of such Highland Accounts and any

carried interest. If the Fund provides all of the equity for a Highland Account, there may be no third party with whom the amount of such fees, expenses and carried interest can be negotiated on an arm's-length basis. The Investment Adviser or its affiliates will have conflicting division of loyalties and responsibilities regarding the Fund and a Highland Account, and certain other conflicts of interest would be inherent in the situation. There can be no assurance that the interests of the Fund would not be subordinated to those of a Highland Account or to other interests of the Investment Adviser.

*Multiple Levels of Fees*. The Investment Adviser and the Highland Accounts are expected to impose management fees, other administrative fees, carried interest and other performance allocations on realized and unrealized appreciation in the value of the assets managed and other income. This may result in greater expense than if investors in the Fund were able to invest directly in the Highland Accounts or their respective underlying investments. Investors in the Fund should take into account that the return on their investment will be reduced to the extent of both levels of fees. The general partner or manager of a Highland Account may receive the economic benefit of certain fees from its portfolio companies for services and in connection with unconsummated transactions (*e.g.*, break-up, placement, monitoring, directors', organizational and set-up fees and financial advisory fees).

*Cross Transactions and Principal Transactions.* The Investment Adviser may effect client cross-transactions where the Investment Adviser causes a transaction to be effected between the Fund and another client advised by it or any of its affiliates. The Investment Adviser may engage in a client cross-transaction involving the Fund any time that the Investment Adviser believes such transaction to be fair to the Fund and such other client.

The Investment Adviser may effect principal transactions where the Fund acquires securities from or sells securities to the Investment Adviser and/or its affiliates, in each case in accordance with applicable law, which will include the Investment Adviser obtaining independent consent on behalf of the Fund prior to engaging in any such principal transaction between the Fund and the Investment Adviser or its affiliates.

The Investment Adviser may advise the Fund to acquire or dispose of securities in cross trades between the Fund and other clients of the Investment Adviser or its affiliates in accordance with applicable legal and regulatory requirements. In addition, the Fund may invest in securities of obligors or issuers in which the Investment Adviser and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Fund may enhance the profitability of the Investment Adviser's own investments in such companies. Moreover, the Fund may invest in assets originated by the Investment Adviser or its affiliates. In each such case, the Investment Adviser and such affiliates may have a potentially conflicting division of loyalties and responsibilities regarding the Fund and the other parties to such trade. Under certain circumstances, the Investment Adviser and its affiliates may determine that it is appropriate to avoid such conflicts by selling a security at a fair value that has been calculated pursuant to the Investment Adviser's valuation procedures to another client managed or advised by the Investment Adviser or such affiliates. In addition, the Investment Adviser may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Fund and for the other party to the transaction, to the extent permitted under applicable law. The Investment Adviser may obtain independent consent

in writing on behalf of the Fund, which consent may be provided by the managing member of the General Partner or any other independent party on behalf of the Fund, if any such transaction requires the consent of the Fund under Section 206(3) of the U.S. Investment Advisers Act of 1940, as amended.

*Material Non-Public Information*. There are generally no ethical screens or information barriers among the Investment Adviser and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions. If the Investment Adviser, any of its personnel or its affiliates were to receive material non-public information about a particular obligor or issuer, or have an interest in causing the Fund to acquire a particular security, the Investment Adviser may be prevented from advising the Fund to purchase or sell such asset due to internal restrictions imposed on the Investment Adviser. Notwithstanding the maintenance of certain internal controls relating to the management of material nonpublic information, it is possible that such controls could fail and result in the Investment Adviser, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information. Inadvertent trading on material nonpublic information could have adverse effects on the Investment Adviser's reputation, result in the imposition of regulatory or financial sanctions, and as a consequence, negatively impact the Investment Adviser's ability to perform its portfolio management services to the Fund. In addition, while the Investment Adviser and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers. In such event, the Investment Adviser's ability to operate as an integrated platform could also be impaired, which would limit the Investment Adviser's access to personnel of its affiliates and potentially impair its ability to manage the Fund's investments.

*Conflicts Relating to Equity and Debt Ownership by the Fund and Affiliates.* In certain circumstances, the Fund and other client accounts may invest in securities or other instruments of the same issuer (or affiliated group of issuers) having a different seniority in the issuer's capital structure. If the issuer becomes insolvent, restructures or suffers financial distress, there may be a conflict between the interests in the Fund and those other accounts insofar as the issuer may be unable (or in the case of a restructuring prior to bankruptcy may be expected to be unable) to satisfy the claims of all classes of its creditors and security holders and the Fund and such other accounts may have competing claims for the remaining assets of such issuers. Under these circumstances it may not be feasible for the Investment Adviser to reconcile the conflicting interests in the Fund and such other accounts in a way that protects the Fund's interests. Additionally, the Investment Adviser or its nominees may in the future hold board or creditors' committee memberships which may require them to vote or take other actions in such capacities that might be conflicting with respect to certain funds managed by the Investment Adviser in that such votes or actions may favor the interests of one account over another account. Furthermore, the Investment Adviser's fiduciary responsibilities in these capacities might conflict with the best interests of the investors.

*Other Fees*. The Investment Adviser and its affiliates are permitted to receive consulting fees, investment banking fees, advisory fees, breakup fees, director's fees, closing fees, transaction fees and similar fees in connection with actual or contemplated investments. Such fees will not reduce

or offset the Management Fee.  Conflicts of interest may also arise due to the allocation of such fees to or among co-investors.

*Soft Dollars*.  The Investment Adviser's authority to use "soft dollar" credits generated by the Fund's securities transactions to pay for expenses that might otherwise have been borne by the Investment Adviser may give the Investment Adviser an incentive to select brokers or dealers for transactions, or to negotiate commission rates or other execution terms, in a manner that takes into account the soft dollar benefits received by the Investment Adviser rather than giving exclusive consideration to the interests of the Fund.