# EXHIBIT 10

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD & ASSOCIATES PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX  75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

# DECLARATION OF JOHN A. MORRIS
## IN SUPPORT OF THE DEBTOR'S MOTION FOR ENTRY OF AN ORDER APPROVING SETTLEMENTS WITH (A) THE REDEEMER COMMITTEE OF THE HIGHLAND CRUSADER FUND (CLAIM NO. 72), AND (B) THE HIGHLAND CRUSADER FUNDS (CLAIM NO. 81), AND AUTHORIZING ACTIONS CONSISTENT THEREWITH

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054200923000000000004

I, John A. Morris, pursuant to 28 U.S.C. § 1746(a), under penalty of perjury, declare as follows:

1.      I am a partner in the law firm Pachulski, Stang, Ziehl & Jones LLP, counsel to the above-referenced Debtor, and I submit this Declaration in support of the *Debtor's Motion for Entry of an Order Approving Settlement with (A) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72), and (B) the Highland Crusader Funds (Claim No. 81), and Authorizing Actions Consistent Therewith* being filed concurrently with this Declaration.   I submit this Declaration based on my personal knowledge and review of the documents listed below.

2.      Attached as **Exhibit 1** is a true and correct copy of a Stipulation entered between and among (i) Highland Capital Management, L.P. ("HCMLP"), (ii) Eames, Ltd., (iii) the Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee"), and (iv) Highland Crusader Offshore Partners, L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (together, the "Crusader Funds").

3.      Attached as **Exhibit 2** is a true and correct copy of a *Partial Final Award*, dated March 6, 2019, and rendered in the arbitration between the Redeemer Committee and HCMLP, Case No. 1-16-0002-6927 (the "Arbitration").

4.      Attached as **Exhibit 3** is a true and correct copy of a *Disposition of Application of Modification of Award*, dated March 14, 2019, and rendered in the Arbitration.

5.      Attached as **Exhibit 4** is a true and correct copy of a *Final Award*, dated as of April 29, 2019, and rendered in the Arbitration.

6.      Attached as **Exhibit 5** is a true and correct copy of a proof of claim filed by the Redeemer Committee on April 3, 2020 and denoted by the Debtor's claims agent as claim number 72.

7.      Attached as **Exhibit 6** is a true and correct copy of a proof of claim filed by the Crusader Funds on April 6, 2020 and denoted by the Debtor's claims agent as claim number 81.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Dated: September 23, 2020.

*/s/ John A. Morris*
John A. Morris

# EXHIBIT 1

This stipulation (the "Stipulation") is made and entered into by and among (i) Highland Capital Management, L.P., as debtor and debtor-in-possession (the "Debtor"), (ii) Eames, Ltd., ("Eames"), (iii) the Redeemer Committee of the Highland Crusader Fund (the "Redeemer Committee"), (iv) Highland Crusader Offshore Partners, L.P., Highland Crusader Fund, L.P., Highland Crusader Fund, Ltd., and Highland Crusader Fund II, Ltd. (collectively, the "Crusader Funds" and together with the Debtor, Eames, and the Redeemer Committee, the "Parties"), (v) solely with respect to paragraphs 10 through 15 of this Stipulation, Hockney, Ltd., Strand Advisors, Inc., Highland Special Opportunities Holding Company ("SOHC"), Highland CDO Opportunity Master Fund, L.P., Highland Financial Partners, L.P. ("HFPLP" and together with SOHC, the "Contingent Parties"), Highland Credit Strategies Master Fund, L.P., and Highland Credit Opportunities CDO, L.P. (collectively, the "Highland Additional Release Parties"), and (vi) solely with respect to paragraphs 10 through 15 of this Stipulation, House Hanover, LLC, and Alvarez & Marsal CRF Management, LLC, (collectively, the "Crusader Additional Release Parties," and together with the Highland Additional Release Parties, the "Additional Release Parties"). This Stipulation provides for the allowance of general unsecured claims against the Debtor, for the Debtor and Eames to consent to the Redeemer Committee and the Crusader Funds implementing certain terms of the Arbitration Award (as defined below), and for the Debtor to take certain actions in connection with such implementation.

## RECITALS

WHEREAS, on October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under title 11 of the United States Code (the "Bankruptcy Code"). The Debtor is managing and operating its business as a debtor-in-possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code;

WHEREAS, the Debtor's chapter 11 case is pending in the Bankruptcy Court for the Northern District of Texas, Dallas Division (the "Bankruptcy Court");

WHEREAS, the Debtor served as the investment manager for the Crusader Funds until August 4, 2016, as of which date the Redeemer Committee, as set forth in a letter and notice dated July 5, 2016, terminated the Debtor;

WHEREAS, on July 5, 2016, the Redeemer Committee commenced an arbitration against the Debtor by filing a Notice of Claim with the American Arbitration Association in which it asserted various claims arising from the Debtor's service as the investment manager for the Crusader Funds (the "Arbitration");

WHEREAS, following an evidentiary hearing during the Arbitration, the panel of arbitrators issued (a) a *Partial Final Award,* dated March 6, 2019 (the "March Award"), (b) a *Disposition of Application for Modification of Award,* dated March 14, 2019 (the "Modification Award"); and (c) a *Final Award,* dated May 9, 2019 (the "Final Award," and together with the March Award and the Modification Award, the "Arbitration Award");

WHEREAS, as of the Petition Date, the aggregate amount of the damages awarded under the Arbitration Award, including the accrual of pre-judgment interest but before applying any offsets, was $190,824,557, which amount includes the Debtor's obligation to purchase the shares of Cornerstone Healthcare Group ("Cornerstone") that are held by the Crusader Funds in exchange for the sum of (a) $48,070,407 million in cash, and (b) accrued pre-judgment interest on such amount;

WHEREAS, in addition to awarding monetary damages, the Arbitration Award also provided for, among other things, (i) the cancellation of all limited partnership interests or shares in the Crusader Funds that are held by the Debtor, Eames, and Charitable DAF Fund, L.P.

("<u>Charitable DAF</u>"), respectively, and (ii) the Crusader Fund to disburse the funds held in the Deferred Fee Account[1] to the Consenting Compulsory Redeemers;

WHEREAS, on April 3, 2020, the Redeemer Committee filed a proof of claim in respect of the Arbitration Award, Proof of Claim number 72 ("<u>Claim 72</u>");

WHEREAS, on April 6, 2020, the Crusader Funds filed a proof of claim, Proof of Claim number 81 ("<u>Claim 81</u>") that asserted a claim in the alternative to the Redeemer Committee Proof of Claim for at least $23,483,446 in respect of certain fees that the Crusader Funds had paid to the Debtor prior to the Debtor being terminated (the "<u>Crusader Funds Fee Claim</u>");

WHEREAS, the Debtor has asserted that it is entitled to certain credits or offsets with respect to the damages provided in the Arbitration Award, and that it is has certain meritorious defenses with respect to the Crusader Funds Fee Claim;

WHEREAS, the Parties have agreed to settle and resolve all claims and disputes between and among them, including Claim 72 and Claim 81, and for the Redeemer Committee and the Crusader Funds to implement certain relief granted in the Arbitration Award on the terms and conditions set forth in this Stipulation, and the Parties and the Additional Release Parties have agreed to exchange the mutual releases set forth herein:

<u>AGREEMENT</u>

**NOW, THEREFORE**, after good-faith, arms-length negotiations, in consideration of the foregoing, it is hereby stipulated and agreed that:

1. Claim 72 shall be allowed in the amount of $137,696,610 as a general unsecured claim.

---

[1] All capitalized terms not defined herein shall have the meanings given to such terms in (i) the Arbitration Award and (ii) the Joint Plan of Distribution of the Crusader Funds, and the Scheme of Arrangement between Highland Crusader Fund II, Ltd. and its Scheme Creditors (together, the "<u>Crusader Plan</u>").

      2.      Claim 81 shall be allowed in the amount of $50,000 as a general unsecured claim.

      3.      The Debtor and Eames each consent to the Crusader Funds, on or after the date an order of the Bankruptcy Court approving this Stipulation pursuant to Federal Rule of Bankruptcy Procedure 9019 and section 363 of the Bankruptcy Code becomes a final and non-appealable order (the "Stipulation Effective Date"), cancelling or extinguishing all of the limited partnership interests and shares in the Crusader Funds held by each of them respectively (collectively, the "Cancelled Highland and Eames Interests"), as provided for in the Arbitration Award.   Each of the Debtor and Eames represents solely for itself that (a) it has the authority to consent to the cancellation or extinguishment of the Cancelled Highland and Eames Interests that it holds, and (b) upon the occurrence of the Stipulation Effective Date, no other actions by or on behalf of it are necessary for such cancellation or extinguishment.  Each of the Debtor and Eames agrees that it will not object to the Crusader Funds, on or after the Stipulation Effective Date, cancelling or extinguishing the limited partnership interests or shares in the Crusader Funds held by Charitable DAF (the "Cancelled DAF Interests," and together with the Cancelled Highland and Eames Interests, the "Cancelled LP Interests").  Each of the Debtor and Eames acknowledges that the cancellation or extinguishment of the Cancelled LP Interests is intended to implement Sections F.a.v and F.a.x.2 of the Final Award.[2]

      4.      The Parties acknowledge that the limited partnership interests or shares in the Crusader Funds held by the following entities and individuals shall not be extinguished pursuant to this Stipulation:  Highland Capital Management Multi-Strategy Insurance Dedicated Fund, L.P.; Highland Capital Management Services; Highland 401(k) Plan; Highland 401(k) Plan Retirement Plan and Trust; Highland 401(k) Plan Retirement Plan and Trust II; James Dondero;

---

[2] *See also* March Award §§ III(H)(25), VII(C)(2).

and Mark Okada (collectively, the "<u>Retained LP Interests</u>").

     5.     Each of the Debtor and Eames acknowledges and agrees that (a) the Crusader Funds have reserved (i) distributions that, absent the Arbitration Award, would have been payable in respect of the Cancelled LP Interests, (ii) funds in respect of Deferred Fees and the Deferred Fee Account that, absent the Debtor's termination as investment manager for the Crusader Funds and the Arbitration Award, may have been payable to the Debtor in accordance with the Crusader Plan and (iii) certain other monies as to which the Debtor and Eames may have had an interest in the absence of this Stipulation (the reserved distributions and funds described in subparagraphs (i), (ii) and (iii), collectively, the "<u>Reserved Distributions</u>"); (b) the Crusader Funds, after the Stipulation Effective Date, intend to distribute in accordance with the Crusader Plan to the applicable holders of limited partnership interests or shares in the Crusader Funds the Reserved Distributions, and that the Debtor, Eames, and Charitable DAF shall not receive any part of such distribution; and (c) after giving effect to the cancellation or extinguishment of the Cancelled LP Interests, none of the Debtor, Eames, or Charitable DAF shall receive any further distributions, payments or fees from the Crusader Funds, including without limitation the Reserved Distributions, on account of any of the Cancelled LP Interests or any other role or position of the Debtor with respect to the Crusader Funds (including but not limited to its role as the investment manager for the Crusader Funds until August 4, 2016). The Debtor acknowledges and agrees that, beginning as of the Stipulation Effective Date, it will not receive any payments from the Crusader Funds in respect of any Deferred Fees, Distribution Fees, or Management Fees. Without limiting the foregoing, the Parties acknowledge and agree that the funds described in the first sentence of this paragraph include monies held in reserve with respect to the Reserved Distributions, the Deferred Fee Account, any Deferred Fees currently accrued or that might have

accrued in the future, any Distribution Fees, and any Management Fees.

6.      The Debtor represents that, to its actual knowledge and subject to paragraph 4
above, it does not control any fund, or hold any equity interest in any entity, that holds a claim
against the Crusader Funds or the Redeemer Committee (including any claims in respect of the
Cornerstone shares held by the Crusader Funds, but excluding, with respect to the Crusader
Funds, the right to receive distributions with respect to the Retained LP Interests).

7.      On the Stipulation Effective Date, the Amended and Restated Shareholders
Agreement, substantially in the form attached as Exhibit A, which shall have been executed by
all parties thereto, shall be jointly released by the Parties from escrow and become effective (as
executed, the "Cornerstone Shareholders Agreement").   In the event that such fully executed
agreement is not released from escrow on the Stipulation Effective Date for any reason other
than the Redeemer Committee or the Crusader Funds not authorizing such agreement's release
from escrow, then this Stipulation shall be of no force and effect, and this Stipulation (including
the agreements and settlements incorporated herein) may not be used by any Party for any
purpose.

8.      Except as otherwise provided in a plan of reorganization proposed by the Debtor
and or other entities and agreed to by the Redeemer Committee, the Debtor shall, in good faith,
use commercially reasonable efforts to monetize all shares of capital stock of Cornerstone held
by the Debtor, any funds that the Debtor manages, and the Crusader Funds (collectively, the
"Cornerstone Shares"), in accordance with the schedule attached hereto as Exhibit B (the
"Schedule"), in order to maximize, to the extent possible under the circumstances, the proceeds
of such monetization to each such entity. ████████████████████████████

████████████████████████████████████████



9.      The Debtor shall instruct the claims agent in the Debtor's chapter 11 case to adjust the claims register in accordance with this Stipulation.

10.     On the Stipulation Effective Date, the following releases shall take effect:

A. To the maximum extent permitted by applicable law, the Debtor, and each Highland Additional Release Party, irrevocably releases, acquits, exonerates, and forever discharges (i) the Redeemer Committee, each of the Crusader Funds, and each of the Crusader Additional Release Parties, and (ii) with respect to each such person set forth in (i) above, such person's predecessors, successors, assigns and affiliates (whether by operation of law or otherwise), and each of their respective present and former members, officers, directors, employees, managers, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, employees, subsidiaries, divisions, management companies, and other representatives, in each case acting in such capacity, from all manner of actions, whether in law, in equity, or statutory, and whether presently known or unknown, matured or contingent, liquidated or unliquidated, including any claims, defenses, and affirmative defenses which were or could have been asserted

with respect to: (a) the Crusader Funds, including but not limited to any claims, defenses, and affirmative defenses which were or could have been brought, or which otherwise concern or are related to: (i) the Arbitration, (ii) the Debtor's service as investment manager or General Partner for the Crusader Funds, (iii) Alvarez & Marsal CRF Management, LLC's service as replacement manager of the Crusader Funds, (iv) House Hanover, LLC, as General Partner of the Crusader Funds, (v) the Cancelled LP Interests, and (vi) any distributions or payments with respect to the Deferred Fee Account, Deferred Fees, Management Fees, Distribution Fees, or Reserved Distributions, and (b) the alleged fraudulent transfers and all other claims asserted by UBS Securities LLC and UBS AG, London Branch (collectively, "UBS") in *UBS Securities LLC, et al v. Highland Capital Mgmt., L.P., et al*, No. 650097-2009 (N.Y. Sup. Ct.) or by UBS in the Debtor's chapter 11 case (collectively, the "UBS Claims"), including but not limited to claims that the Debtor or any Additional Highland Release Party could assert for contribution, indemnity or joint tortfeasor liability in connection with the UBS Claims; provided, however, that such release shall not apply with respect to the obligations of the Redeemer Committee, each of the Crusader Funds, or each of the Crusader Additional Release Parties pursuant to this Stipulation, including Exhibit B hereto, and the Cornerstone Shareholders Agreement.

B. To the maximum extent permitted by applicable law, the Redeemer Committee, each of the Crusader Funds, and each Crusader Additional Release Party irrevocably releases, acquits, exonerates, and forever discharges (i) the Debtor, Eames, and each Highland Additional Release Party, and (ii) with respect to each such person set forth in (i) above, such person's predecessors, successors, assigns and affiliates (whether by operation of law or otherwise), and each of their respective present and former members, officers, directors, employees, managers, financial advisors, attorneys, accountants, investment bankers, consultants, professionals, advisors, shareholders, principals, partners, employees, subsidiaries, divisions, management companies, and other representatives, in each case acting in such capacity, from all manner of actions, whether in law, in equity, or statutory, and whether presently known or unknown, matured or contingent, liquidated or unliquidated, including any claims, defenses, and affirmative defenses which were or could have been asserted with respect to: (a) the Crusader Funds, including but not limited to any claims, defenses, and affirmative defenses which were or could have been brought, or which otherwise concern or are related to: (i) the Arbitration, (ii) the Debtor's service as investment manager or General Partner for the Crusader Funds, (iii) the Cancelled LP Interests, and (iv) any distributions or payments with respect to the Deferred Fee Account, Deferred Fees, Management Fees, Distribution Fees, or Reserved Distributions, and (b) the alleged fraudulent transfers and all other claims

asserted by UBS Securities LLC and UBS AG, London Branch (collectively, "UBS") in *UBS Securities LLC, et al v. Highland Capital Mgmt., L.P., et al*, No. 650097-2009 (N.Y. Sup. Ct.) or by UBS in the Debtor's chapter 11 case (collectively, the "UBS Claims"), including but not limited to claims that the Redeemer Committee, the Crusader Funds, or any Additional Crusader Release Party could assert for contribution, indemnity or joint tortfeasor liability in connection with the UBS Claims; provided, however, that (I) such release shall not apply with respect to the obligations of the Debtor, Eames, or each of the Highland Additional Release Parties under this Stipulation, including Exhibit B hereto, the allowance of or distributions in respect of Claim 72 and Claim 81, and the Cornerstone Shareholders Agreement; (II) notwithstanding anything to the contrary herein, neither James Dondero nor Mark Okada, nor any entities owned or controlled by either of them, other than the Debtor, Eames, and any Highland Additional Release Party solely with respect to such entities and not as to any capacity in which James Dondero or Mark Okada had an interest in or served with respect to such entities, is released from any claims, including without limitation any claims arising from obligations owed to the Debtor; and provided further, and solely for the avoidance of doubt, that none of the releases set forth herein shall impair the right or ability of the applicable holders of Claim 72 or Claim 81 to receive distributions of any kind from the Debtor's estate in satisfaction of such respective claims in the amounts as are provided for herein; and (III) in the event any of the Highland Additional Release Parties fails to execute this Stipulation, this Release is null, void and of no legal effect as to that non-signing Highland Additional Release Party.

11.    At present, certain of the Parties are engaged in one or more of the following pending lawsuits and actions: (a) *Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P.*, Chancery Court, Delaware, C.A. No. 12533-VCG (the "Delaware Action"); (b) *Redeemer Committee of the Highland Crusader Fund and Highland Capital Management, L.P.*, Supreme Court of Bermuda, Civil Jurisdiction, Case No. 01-16-0002-6927 ("Bermuda Action No. 1"); (c) *Highland Capital Management, L.P. and Redeemer Committee of the Highland Crusader Fund*, Supreme Court of Bermuda, Civil Jurisdiction (Commercial Court), 2017: No. 308 ("Bermuda Action No. 2"); and (d) *Redeemer Committee of the Highland Crusader Fund and Highland Capital Management, L.P.*, Grand Court of Cayman

Islands, Financial Services Division, Cause No. 153 of 2019 (CRJ) (the "Grand Cayman Action" and together with the Delaware Action and Bermuda Action No. 1, the "Redeemer Actions"). The Parties agree that (1) as of the Stipulation Effective Date, the Redeemer Committee and each of the Crusader Funds covenants not to prosecute, and shall refrain from prosecuting, any of the Redeemer Actions against the Debtor, Eames, or any of the Highland Additional Release Parties, and (2) as soon as reasonably practicable after the Stipulation Effective Date, the Debtor shall cause Bermuda Action No. 2 to be dismissed with prejudice.

12.     This Stipulation, together with the Cornerstone Shareholders Agreement and the Schedule, contains the entire agreement between and among the Parties and the Additional Release Parties as to its subject matter and supersedes and replaces any and all prior agreements and undertakings between and among the Parties and the Additional Release Parties relating thereto.

13.     This Stipulation may not be modified other than by a signed writing executed by the Parties; provided, however, that paragraphs 10 through 15 may not be modified other than by a signed writing that is also executed by the Additional Release Parties.

14.     Each person who executes this Stipulation represents that he or she is duly authorized to do so on behalf of the respective Party or Additional Release Party and that each Party or Additional Release Party has full knowledge and has consented to this Stipulation, provided, however, that (a) the effectiveness of the Debtor's execution of this Stipulation shall be subject to entry of an order of the Bankruptcy Court approving this Stipulation and authorizing the Debtor's execution thereof, and (b) the Redeemer Committee represents and warrants to the Debtor, Eames, and each of the Highland Additional Release Parties that, in conformity with the Redeemer Committee's corporate governance documents, at least the minimum number of

members of the Redeemer Committee have executed this Stipulation to cause it to be legally binding on the Redeemer Committee.

15. The Debtor shall use commercially reasonable efforts to cause each of the Contingent Parties to execute this Stipulation not later than the date on which the Bankruptcy Court enters an order confirming a plan of reorganization or liquidation. Notwithstanding the foregoing, the Parties acknowledge and agree that the failure of either or both of the Contingent Parties to execute this Stipulation shall not affect (a) the rights, obligations, or duties of any of the Parties or (b) the enforceability of this Stipulation.

16. Not later than September 23, 2020, the Debtor shall file with the Bankruptcy Court a motion for an order approving this Stipulation, which motion shall be in form and substance satisfactory to the Crusader Funds and the Redeemer Committee, pursuant to Federal Rule of Bankruptcy Procedure 9019 and section 363 of the Bankruptcy Code.

17. This Stipulation may be executed in counterparts (including facsimile and electronic transmission counterparts), each of which will be deemed an original but all of which together constitute one and the same instrument, and shall be effective against a Party or Additional Release Party upon the Stipulation Effective Date.

18. This Stipulation will be exclusively governed by and construed and enforced in accordance with the laws of the State of New York, without regard to its conflicts of law principles, and all claims relating to or arising out of this Stipulation, or the breach thereof, whether sounding in contract, tort, or otherwise, will likewise be governed by the laws of the State of New York, excluding New York's conflicts of law principles. The Bankruptcy Court will retain exclusive jurisdiction over all disputes relating to this Stipulation.

[Remainder of page intentionally left blank]

       In witness whereof, the parties hereto, intending to be legally bound, have executed this Stipulation as of the day and year set forth below:

Dated:                   HIGHLAND CAPITAL MANAGEMENT, L.P.

                            By:

                            Name: James P. Seery NTL

                            Title: Authorized Signatory

                  REDEEMER COMMITTEE OF THE HIGHLAND CRUSADER FUND

Dated:                   Grosvenor Capital Management, L.P.

                  By: _____

                  Name: Eric Felton, designated Representative of Grosvenor Capital Management, L.P.

Dated:                   Grosvenor Capital Management, L.P.

                  By: _____

                  Name: Tom Rowland, designated Representative of Grosvenor Capital Management, L.P.

Dated:                   Grosvenor Capital Management, L.P.

                  By: _____

                  Name: Burke Montgomery, designated Representative of Grosvenor Capital Management, L.P.

Dated:                   Grosvenor Capital Management, L.P.

                  By: _____

                  Name: Brian Zambie, designated Representative of Grosvenor Capital Management, L.P.

**Execution Copy**

In witness whereof, the parties hereto, intending to be legally bound, have executed this Stipulation as of the day and year set forth below:


Dated:                          HIGHLAND CAPITAL MANAGEMENT, L.P.

                                By: _____
                                Name:
                                Title:


                                REDEEMER COMMITTEE OF THE HIGHLAND CRUSADER FUND

Dated:                          Grosvenor Capital Management, L.P.

                                By:    /s/ Eric Felton_____
                                Name:  Eric Felton, designated Representative of Grosvenor Capital
                                Management, L.P.


Dated:                          Grosvenor Capital Management, L.P.

                                By:    /s/ Tom Rowland_____
                                Name:  Tom Rowland, designated Representative of Grosvenor Capital
                                Management, L.P.


Dated:                          Grosvenor Capital Management, L.P.

                                By:    /s/ Burke Montgomery_____
                                Name:  Burke Montgomery, designated Representative of Grosvenor
                                Capital Management, L.P.


Dated:                          Grosvenor Capital Management, L.P.

                                By:    /s/ Brian Zambie_____
                                Name:  Brian Zambie, designated Representative of Grosvenor Capital
                                Management, L.P.

Dated:                                 Concord Management, LLC

                                          By:      /s/ Brant Behr
                                          Name:  Brant Behr, designated Representative of Concord Management, LLC

Dated:                                 Baylor University

                                          By:      /s/ David Morehead
                                          Name:  David Morehead, designated Representative of Baylor University

Dated:                                 Seattle Fund SPC

                                          By:      /s/ Stuart Robertson
                                          Name:  Stuart Robertson, designated Representative of Seattle Fund SPC

Dated:                                 Man Solutions Limited

                                          By:      /s/ Michael Buerer
                                          Name:  Michael Buerer, designated Representative of Man Solutions Limited

Dated:                                 Army and Air Force Exchange Service

                                          By:      /s/ James Jordan
                                          Name:  James Jordan, designated Representative of Army and Air Force Exchange Service

Dated:  HIGHLAND CRUSADER OFFSHORE PARTNERS, L.P.

By:  House Hanover, Its General Partner

By:  _/s/ Mark S. DiSalvo_____
Name:  Mark S. DiSalvo
Title:  Authorized Signatory


Dated:  HIGHLAND CRUSADER FUND, L.P.

By:  House Hanover, Its General Partner

By:  _/s/ Mark S. DiSalvo_____
Name:  Mark S. DiSalvo
Title:  Authorized Signatory


Dated:  HIGHLAND CRUSADER FUND, LTD.

By:  _/s/ Mark S. DiSalvo_____
Name:  Mark S. DiSalvo
Title:  Authorized Signatory


Dated:  HIGHLAND CRUSADER FUND II, LTD.

By:  _/s/ Mark S. DiSalvo_____
Name:  Mark S. DiSalvo
Title:  Authorized Signatory


Dated:  HOUSE HANOVER, LLC

By:  _/s/ Mark S. DiSalvo_____
Name:  Mark S. DiSalvo
Title:  Authorized Signatory


Dated:  ALVAREZ & MARSAL CRF MANAGEMENT, LLC

By:  _/s/ Steven Varner_____
Name:  Steven Varner
Title:  Managing Director

Dated:            EAMES, LTD.

By: _____
Name: Abali Hoilett
Title: Authorised Signatory of the Director MaplesFS Directors Limited

Dated:            HOCKNEY, LTD.

By: _____
Name: Abali Hoilett
Title: Authorised Signatory of the Director MaplesFS Directors Limited

Dated:            STRAND ADVISORS, INC.

By: _____
Name:
Title:

Dated:            HIGHLAND SPECIAL OPPORTUNITIES HOLDING COMPANY

By: _____
Name:
Title:

Dated:            HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P.

By: _____
Name:
Title:

Dated:            HIGHLAND FINANCIAL PARTNERS, L.P.

By: _____
Name:
Title:

Dated:            HIGHLAND CREDIT STRATEGIES MASTER FUND, L.P.

By: _____
Name:
Title:

Dated:                 EAMES, LTD.

                        By: _____
                        Name:
                        Title:

Dated:                 HOCKNEY, LTD.

                        By: _____
                        Name:
                        Title:

Dated:                 STRAND ADVISORS, INC.

                        By: _James P. Seery, Jr_
                        Name: _James P. Seery, Jr_
                        Title: _Authorized Signatory_

Dated:                 HIGHLAND SPECIAL OPPORTUNITIES HOLDING COMPANY

                        By: _____
                        Name:
                        Title:

Dated:                 HIGHLAND CDO OPPORTUNITY MASTER FUND, L.P.

                        By: _James P. Seery, Jr_
                        Name: _James P. Seery, Jr_
                        Title: _Authorized Signatory_

Dated:                 HIGHLAND FINANCIAL PARTNERS, L.P.

                        By: _____
                        Name:
                        Title:

Dated:                 HIGHLAND CREDIT STRATEGIES MASTER FUND, L.P.

                        By: _James P. Seery, Jr_
                        Name: _James P. Seery, Jr._
                        Title: _Authorized Signatory_

**Execution Copy**

Dated:               HIGHLAND CREDIT OPPORTUNITIES CDO, L.P.

By: _____

Name: James P. Seery, Jr.

Title: Authorized Signatory

# EXHIBIT A


**CORNERSTONE HEALTHCARE GROUP HOLDING, INC.**

**AMENDED & RESTATED STOCKHOLDERS' AGREEMENT**

**[●], 2020**

# TABLE OF CONTENTS

ARTICLE I TRANSFER RESTRICTIONS; RIGHT OF FIRST REFUSAL ............................. 1

    Section 1.1    Restrictions on Transfer ..................................................................... 1

    Section 1.2    Right of First Refusal .......................................................................... 2

    Section 1.3    Co-Sale Rights .................................................................................... 5

    Section 1.4    Market Stand-Off Agreement ............................................................. 7

ARTICLE II RIGHTS OF FIRST OFFER ......................................................................... 8

    Section 2.1    Grant of Right of First Offer .............................................................. 8

    Section 2.2    Procedure for Exercise ....................................................................... 8

    Section 2.3    Excluded Issuances ............................................................................ 9

    Section 2.4    Sale to Third Parties .......................................................................... 9

ARTICLE III REGISTRATION RIGHTS ......................................................................... 9

    Section 3.1    Definitions .......................................................................................... 9

    Section 3.2    Request for Registration .................................................................. 11

    Section 3.3    Company Registration ...................................................................... 12

    Section 3.4    Obligations of the Company ............................................................ 13

    Section 3.5    Furnish Information .......................................................................... 15

    Section 3.6    Expenses of Demand Registration ................................................... 15

    Section 3.7    Expenses of Company Registration .................................................. 15

    Section 3.8    Delay of Registration ....................................................................... 15

    Section 3.9    Indemnification ................................................................................ 15

    Section 3.10    Reports Under Securities Exchange Act .......................................... 17

    Section 3.11    Form S-3 Registrations .................................................................... 18

    Section 3.12    Expenses of Form 5-3 Registration ................................................. 20

    Section 3.13    Assignment of Registration Rights .................................................. 20

    Section 3.14    Limitations on Subsequent Registration Rights .............................. 20

ARTICLE IV VOTING AGREEMENT; BOARD OF DIRECTORS; REQUIRED VOTE ....... 21

    Section 4.1    Board of Directors ........................................................................... 21

    Section 4.2    Required Vote .................................................................................. 22

    Section 4.3    Grant of Proxy ................................................................................. 22

ARTICLE V COVENANTS OF THE COMPANY ........................................................... 23

    Section 5.1    Delivery of Financial Statements .................................................... 23

    Section 5.2    Inspection ......................................................................................... 24

    Section 5.3    Directors and Officers Insurance .................................................... 24

i

Section 5.4    Additional Stockholders ............................................................................ 25

ARTICLE VI MISCELLANEOUS ................................................................................... 25

Section 6.1    Term; Termination ................................................................................... 25

Section 6.2    Legend ...................................................................................................... 26

Section 6.3    Successors and Assigns ........................................................................... 26

Section 6.4    Governing Law ......................................................................................... 26

Section 6.5    Counterparts ............................................................................................. 27

Section 6.6    Titles and Subtitles ................................................................................... 27

Section 6.7    Notices ...................................................................................................... 27

Section 6.8    DGCL Electronic Notice .......................................................................... 28

Section 6.9    Dispute Resolution ................................................................................... 28

Section 6.10   Severability .............................................................................................. 29

Section 6.11   Amendments and Waivers ........................................................................ 29

Section 6.12   Aggregation of Stock ............................................................................... 30

Section 6.13   Entire Agreement ..................................................................................... 30

Section 6.14   Stock Splits, Stock Dividends, etc. .......................................................... 30

Section 6.15   Cumulative Remedies .............................................................................. 30

Section 6.16   Rights of Stockholders ............................................................................. 31

Section 6.17   Further Assurance .................................................................................... 31

Section 6.18   joint Product ............................................................................................ 31

ii

## AMENDED & RESTATED STOCKHOLDERS' AGREEMENT

**THIS AMENDED & RESTATED STOCKHOLDERS' AGREEMENT** (the "***Agreement***") is made as of the [●] day of [●], 2020 by and among (i) Cornerstone Healthcare Group Holding, Inc., a Delaware corporation (the "***Company***"), (ii) certain holders of the Company's common stock (the "***Common Stock***") (each of which is referred to herein as a "***Stockholder***" and collectively as the "***Stockholders***"), and (iii) Highland Capital Management, L.P., a Delaware limited partnership ("***HCMLP***"). HCMLP (if and to the extent it is or becomes a Stockholder) and the Stockholders that are affiliates of HCMLP, including any investment funds controlled by or under common control with, or managed directly or indirectly by, HCMLP are collectively referred to herein as "***Highland Capital***" and are set forth on Schedule A, as it may be updated from time to time. Individual Stockholders that are part of the Highland Capital group of Stockholders are sometimes referred to as a "***Highland Capital Stockholders***." Any Stockholders other than Highland Capital Stockholders are collectively referred to herein as the "***Remaining Stockholders***" and are set forth on Schedule B, as it may be updated from time to time.  All references in this Agreement to "***Crusader***" shall mean and include, as the case may be, (x) Highland Crusader Holding Corp., (y) any of its successors or assigns and (y) any purchaser or transferee of any Securities that at any time were held by Highland Crusader Holding Corp. (*i.e.,* any purchaser or transferee of Securities from Highland Crusader Holding Corp. and any subsequent purchasers or transferees of any such Securities).

## RECITALS:

**WHEREAS**, the Company, the Stockholders and HCMLP are parties to that certain Stockholders' Agreement of the Company, dated as of March 24, 2010 (as the same may have been amended, modified or supplemented in accordance with its terms, the "***First Stockholders' Agreement***").

**WHEREAS**, the Stockholders hold shares of Common Stock of the Company, and the Stockholders, the Company and HCMLP desire to enter into this Agreement to (i) provide certain rights to, and impose certain restrictions on, the Stockholders and HCMLP with respect to the Common Stock held by them and (ii) amend and modify certain provisions in the First Stockholders' Agreement.

## AGREEMENT:

**NOW**, **THEREFORE**, in consideration of the foregoing premises, the mutual promises and covenants set forth herein, and certain other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I

## TRANSFER RESTRICTIONS; RIGHT OF FIRST REFUSAL

### Section 1.1    Restrictions on Transfer.

(a)    Generally. During the term of this Agreement, all of the Common Stock and any other equity securities (collectively, "***Securities***") now owned or hereafter acquired by

1

2992816.2

any Stockholder shall be subject to the terms and conditions of this Agreement. No transfer, whether voluntary or involuntary, of the Securities shall be valid unless it is made pursuant to the terms and conditions of this Agreement; and, accordingly, any proposed transfer not made in compliance with the requirements of this Agreement shall be null and void ab initio, shall not be recorded on the books of the Company or its transfer agent, and shall not be recognized by the Company.

(b)     Permitted Transfers. Notwithstanding the foregoing, the first refusal rights and co-sale rights of the Company and Highland Capital, as set forth below in this Article I, shall not apply to (i) any transfer of Securities by a Stockholder to any such Stockholder's spouse, parents, siblings (by blood, marriage or adoption) or lineal descendants (by blood, marriage or adoption); (ii) any transfer of Securities by a Stockholder to a trust, partnership, corporation, limited liability company or other similar entity owned exclusively by such Stockholder and/or such Stockholder's spouse, parents, siblings (by blood, marriage or adoption) or lineal descendants (by blood, marriage or adoption) for the benefit of such Stockholder or such Stockholder's spouse, parents, siblings or lineal descendants; (iii) any transfer of Securities by a Stockholder, or upon a Stockholder's death to the executors, administrators, testamentary trustees, legatees or beneficiaries of such Stockholder; (iv) any transfer of Securities by a Stockholder to any person who controls, is controlled by or is under common control with such Stockholder (within the meaning of the Securities Act of 1933, as amended (the "*Securities Act*")); (v) any transfer of Securities by a Stockholder pursuant to a bona fide loan transaction which creates a mere security interest in the Securities; (vi) the Securities held Crusader; *provided*, *however*, that in each such case, each transferee, pledgee, donee, heir or distributee shall, as a condition precedent to such transfer, become a party to this Agreement by executing an Adoption Agreement substantially in the form attached as Annex A and shall have all of the rights and obligations set forth hereunder, and all interests in any trust, partnership, corporation, limited liability company or other similar entity to which any Securities are transferred shall themselves be deemed Securities and shall be subject to all of the provisions hereof. Such transferred Securities shall remain "*Securities*" hereunder, and such transferee shall be treated as a "*Stockholder*" for the purposes of this Agreement. Any purported transfers made in violation of this Section 1.1(b) shall be void.

(c)     Company Repurchase or Public Offering. The provisions of this Agreement shall not apply to the sale of any Securities (i) to the public pursuant to a registration statement filed with, and declared effective by, the Securities and Exchange Commission (the "*SEC*") under the Securities Act or (ii) to the Company.

(d)     Prohibited Transferees. Notwithstanding any other provision of this Agreement to the contrary, no Remaining Stockholder shall transfer any Target Shares to (a) any entity which, in the good faith and reasonable determination of the Company's Board of Directors, directly competes with the Company or (b) any customer, distributor or supplier of the Company, if the Company's Board of Directors should determine in good faith and reasonably that such transfer would result in such customer, distributor or supplier receiving information that would place the Company at a material competitive disadvantage with respect to such customer, distributor or supplier.

**Section 1.2     Right of First Refusal**.

2

   (a) <u>Grant of Right of First Refusal</u>. Subject to the terms hereof, the Company and, to the extent such right is waived by the Company, HCMLP, on behalf of itself and Highland Capital (and, as provided below, each ROFR Participant) are each hereby granted a right of first refusal with respect to any proposed disposition of any Securities held by any Remaining Stockholder (except for a permitted transfer of the Securities under <u>Section 1.1(b)</u> hereof), in the following order of priority:

   (i) The Company shall have the first right to purchase any Target Shares (as defined below). In the event the Company elects not to exercise first refusal rights with respect to all or any portion of such Target Shares, the Company agrees to waive such rights with respect to such portion of Target Shares in favor of Highland Capital's first refusal rights under this Agreement.

   (ii) If the Company waives its first refusal rights pursuant to <u>Section 1.2(a)(i)</u>, Highland Capital shall have the next right to purchase any remaining Target Shares. HCMLP, in its sole discretion, shall have the right to assign and apportion the rights of first refusal hereby granted among itself and investment funds comprising Highland Capital, which need not be Stockholders or parties to this Agreement at that time, in any proportion it deems suitable (the actual participants, including any individuals or entities assigned such rights, each being a "**Highland ROFR Participant**" and, together with the Company, each a "**ROFR Participant**"); *provided* that each such Highland ROFR Participant is an "**accredited investor**" within the meaning of Rule 501 of Regulation D of the Securities Act; and provided further that any Highland ROFR Participant that is not then a party to this Agreement shall be required to become a party to this Agreement by executing an executing an Adoption Agreement in the form attached hereto as <u>Exhibit A</u>. In the event that HCMLP does not specify an allocation for ROFR Participants, then each Highland Capital Stockholder shall have the right to purchase up to that number of remaining Target Shares equal to the product of (A) the number of remaining Target Shares multiplied by (B) a fraction, (x) the numerator of which shall be the number of shares of Common Stock owned by such Highland Capital Stockholder (assuming full conversion and exercise of all convertible and exercisable securities into Common Stock held by such Highland Capital. Stockholder) and (y) the denominator of which shall be the number of shares of Common Stock owned by all of the Highland Capital Stockholders (assuming full conversion and exercise of all convertible and exercisable securities into Common Stock).

   (iii) In the event that HCMLP (or the Highland ROFR Participants as its designated assignee(s)) elects not to exercise first refusal rights with respect to all or any portion of such Target Shares, Highland Capital agrees to waive such rights with respect to such portion.

   (b) <u>Notice of Intended Disposition</u>. In the event a Remaining Stockholder desires to accept a written, bona fide third-party offer for the transfer of any or all of the Securities held by such Remaining Stockholder (in such capacity such Remaining Stockholder shall be referred to as a "**Selling Stockholder**" and the shares subject to such offer to be referred to as the "**Target Shares**"), the Selling Stockholder shall promptly deliver to the Company and HCMLP written notice of the intended disposition ("**Disposition Notice**") and the basic terms and conditions thereof, including the identity of the proposed purchaser.

3

(c) <u>Exercise of First Refusal Right</u>. The Company shall, for a period of thirty (30) days following receipt of the Disposition Notice, have the right to purchase all or any portion of the Target Shares:

(i) The Company's right shall be exercisable by written notice (the "***Exercise Notice***") delivered to the Selling Stockholder and HCMLP prior to the expiration of the thirty (30) day exercise period. If such right is exercised with respect to all the Target Shares specified in the Disposition Notice, then the Company shall effect the purchase of such Target Shares, including payment of the purchase price, not more than five (5) business days after the delivery of the Exercise Notice. At such time, the Selling Stockholder shall deliver to the Company the certificates representing the Target Shares to be purchased, each certificate to be properly endorsed for transfer.

(ii) Alternatively, if the Company exercises such rights with respect to only a portion of the Target Shares specified in the Disposition Notice, the Company shall notify HCMLP of its intent to purchase only a portion of the Target Shares within the thirty (30) day exercise period above defined. The Company's purchase of such Target Shares shall be consummated at the time of HCMLP's exercise of its purchase rights in accordance with <u>Section 1.2(e)</u> hereof, if such rights are exercised. In the event HCMLP does not elect to purchase any of the remaining Target Shares, the Company's purchase of that portion of the Target Shares that it desires to purchase shall be consummated not more than five (5) business days after the date of expiration of HCMLP's first refusal right. The purchasing party under this <u>Section 1.2</u> is referred to herein as the "***ROFR Purchaser***."

(iii) Should the purchase price specified in the Disposition Notice be payable in property other than cash or evidences of indebtedness, the ROFR Purchaser shall have the right to pay the purchase price in the form of cash equal in amount to the value of such property. It the Selling Stockholder and the ROFR Purchaser cannot agree on such cash value within fifteen (15) days after receipt of the Disposition Notice (or, in the event HCMLP is the ROFR Purchaser, within fifteen (15) days after the Company's waiver of its first refusal rights hereunder, the valuation shall be determined by the Company's Board of Directors (the "***Board***") in its good faith discretion. The closing shall then be held on the later of (A) the fifth business day following the delivery of the Exercise Notice, or (B) the fifth business day after such cash valuation shall have been made.

(d) <u>Non-Exercise of Right by the Company</u>. In the event the Exercise Notice is not given to the Selling Stockholder and HCMLP within thirty (30) days following the date of the Company's receipt of the Disposition Notice, the Company shall be deemed to have waived its right of first refusal with respect to such proposed disposition.

(e) <u>Exercise of Right by HCMLP</u>. Subject to the rights of the Company, for a period ending on the earlier of (a) sixty (60) days following receipt of the Disposition Notice or (b) thirty (30) days following receipt of written notice of the Company's election either to waive its right of first refusal or to purchase only a portion of the Target Shares, HCMLP (and/or its designee(s) as provided in <u>Section 1.2(a)(a)(ii)</u>) shall have the right to purchase all, or any portion of the remaining balance after the Company's purchase, of the Target Shares, upon the terms and conditions specified in the Disposition Notice. The Highland ROFR Participants shall

4

exercise this right of first refusal in the same manner and subject to the same rights and conditions as the Company, as more specifically set forth in <u>Section 1.2(c)</u> above.

(f)     <u>Non-Exercise of Right by HCMLP: Subsequent Sales, Void Transfers</u>. In the event an Exercise Notice with respect to all of the Target Shares is not given to the Selling Stockholder by the Company and/or HCMLP within sixty (60) days following the date of receipt of the Disposition Notice, the Selling Stockholder shall have a period of sixty (60) days thereafter in which to sell the portion of the Target Shares that the ROFR Participants have not elected to purchase upon terms and conditions (including the purchase price and the form of consideration therefor) no more favorable to the third-party transferee than those specified in the Disposition Notice; *provided*, *however*, that the Selling Stockholder must first offer the Target Shares for co-sale pursuant to <u>Section 1.3</u> hereof. Any transfer in violation of this <u>Section 1.2</u> shall be void. Such transferred Securities shall remain "***Securities***" hereunder, and such transferee shall be treated as a "***Stockholder***" for the purposes of this Agreement, in the capacity of Highland Capital or a Remaining Stockholder, as applicable. In the event the Selling Stockholder does not notify the Company or consummate the sale or disposition of the Target Shares within such sixty (60) day period, HCMLP's and the Company's first refusal rights shall continue to be applicable to any subsequent disposition of the Target Shares by the Selling Stockholder until such right lapses or terminates in accordance with <u>Section 6.1</u> hereof.

(g)     <u>Violation of First Refusal Right</u>. If any Selling Stockholder becomes obligated to sell any Target Shares to the Company or HCMLP (and/or its designee(s) as provided in <u>Section 1.2(a)(ii)</u>) under this Agreement and fails to deliver such Target Shares in accordance with the terms of this Agreement, the Company and/or HCMLP (and/or its designee(s) as provided in <u>Section 1.2(a)(ii)</u>) may, at its option, in addition to all other remedies it may have, send to such Selling Stockholder the purchase price for such Target Shares as is herein specified and transfer to the name of the Company or HCMLP (and/or its designee(s) as provided in <u>Section 1.2(a)(ii)</u>) (or request that the Company effect such transfer in the name of HCMLP (and/or its designee(s) as provided in <u>Section 1.2(a)(ii)</u>) on the Company's books the certificate or certificates representing the Target Shares to be sold. Such Selling Stockholder shall also reimburse HCMLP and each ROFR Participant for any and all reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred pursuant to the exercise or the attempted exercise of the ROFR Participants' rights under this <u>Section 1.3</u>.

(h)     <u>Application of Co-Sale Right</u>. Notwithstanding anything to the contrary in this <u>Section 1.2</u> Target Shares may be sold to a third party transferee (other than the Company or Highland Capital) <u>if and only if</u> the Selling Stockholder first complies with the co-sale procedures set forth in <u>Section 1.3</u>, and some or all of the Target Shares remain available for sale following the application of <u>Section 1.3</u>.

**Section 1.3     <u>Co-Sale Rights</u>**.

(a)     <u>Notice of Offer</u>. The provisions of <u>Section 1.2(b)</u> requiring the Selling Stockholder to give notice of any intended transfer of the Securities are incorporated in this <u>Section 1.3</u>.

(b)  Grant of Co-Sale Rights.

(i)  If (i) any such proposed disposition of Target Shares is being made by the Selling Stockholder and (ii) the rights of first refusal of the Company and HCMLP have been waived or have lapsed, in full or in part with respect to such proposed disposition, the Co-Sale Participant (as defined herein) shall have the right, exercisable upon written notice to the Selling Stockholder within thirty (30) days after receipt of the Disposition Notice, to participate in such sale of the Target Shares on the same terms and conditions as those set forth in the Disposition Notice. As used herein, "*Co-Sale Participant*" shall mean (x) in the event Highland Capital holds or otherwise controls a majority of the issued and outstanding shares of Common Stock of the Company, the Highland Capital entities designated by HCMLP as provided below, or (y) in the event Highland Capital does not hold or otherwise control a majority of the issued and outstanding shares of Common Stock of the Company, each non-Selling Stockholder. To the extent any Co-Sale Participant exercises such right of participation, the number of shares of Target Shares that the Selling Stockholder may sell in the transaction shall be correspondingly reduced. The right of participation of the Co-Sale Participants shall be subject to the terms and conditions set forth in this Section 1.3.

(ii)  Each Co-Sale Participant may sell all or any part of a number of shares of the capital stock of the Company held by such Co-Sale Participant equal to the product obtained by multiplying (i) the aggregate number of Target Shares covered by the Disposition Notice that neither the Company nor Highland Capital have elected to purchase pursuant to Section 1.2 by (ii) a fraction, the numerator of which is the number of shares of Common Stock of the Company at the time owned by such Co-Sale Participant (assuming for the purposes of this calculation that all shares held by Highland Capital are held by HCMLP) and the denominator of which is the combined number of shares of Common Stock of the Company at the time deemed owned by the Selling Stockholder and all of the Co-Sale Participants that desire to exercise their rights of co-sale. Notwithstanding the foregoing, HCMLP, in its sole discretion, shall have the right to assign and apportion the rights of first refusal hereby granted among itself and investment funds comprising Highland Capital, which need not be Stockholders or parties to this Agreement at that time, in any proportion it deems suitable; *provided* that each such Highland Capital Co-Sale Participant is an "*accredited investor*" within the meaning of Rule 501 of Regulation D of the Securities Act; and provided further that any Highland Capital Co-Sale Participant that is not then a party to this Agreement shall be required to become a party to this Agreement by executing an Adoption Agreement in the form attached hereto as Exhibit A.

(iii)  Each Co-Sale Participant may effect its participation in the sale by delivering to the Selling Stockholder for transfer to the purchase offeror one or more certificates, properly endorsed for transfer, which represent the number of shares of Common Stock that it elects to sell pursuant to this Section 1.3(h).

(c)  Payment of Proceeds. The stock certificates that the Co-Sale Participants deliver to the Selling Stockholder pursuant to Section 1.3(b) shall be transferred by the Selling Stockholder to the purchase offeror in consummation of the sale of the Common Stock pursuant to the terms and conditions specified in the notice to the Company and HCMLP (and, if applicable, the Remaining Stockholders) pursuant to Section 1.2(b), and the Selling Stockholder shall promptly thereafter remit to the Co-Sale Participants that portion of the sale proceeds to

6

which the Investors are entitled by reason of their participation in such sale. To the extent that any prospective purchaser or purchasers refuses to purchase shares or other securities from an Co-Sale Participant exercising its rights of co-sale hereunder, the Selling Stockholder shall not sell to such prospective purchaser or purchasers any Securities unless and until, simultaneously with such sale, the Selling Stockholder purchases such shares or other securities from such Co-Sale Participant for the same consideration and on the same terms and conditions as the proposed transfer described in the Disposition Notice.

(d)      Non-exercise. The exercise or non-exercise of the rights of the Co-Sale Participants hereunder to participate in one or more sales of Common Stock made by the Selling Stockholder shall not adversely affect their rights to participate in subsequent Common Stock sales by any Selling Stockholder.

(e)      Violation of Co-Sale Right. If any Selling Stockholder purports to sell any Target Shares in contravention of this Section 1.3 (a "**Prohibited Transfer**"), each Co-Sale Participant may, in addition to such remedies as may be available by law, in equity or hereunder, require Selling Stockholder to purchase from such Co-Sale Participant the type and number of Securities that such Co-Sale Participant would have been entitled to sell under Section 1.3(b)(ii) had the Prohibited Transfer been effected pursuant to and in compliance with the terms of Section 1.3. The sale will be made on the same terms and subject to the same conditions as would have applied had the Selling Stockholder not made the Prohibited Transfer, except that the sale (including, without limitation, the delivery of the purchase price) must be made within ninety (90) days after the Co-Sale Participant learns of the Prohibited Transfer. Such Selling Stockholder shall also reimburse HCMLP and each Co-Sale Participant for any and all reasonable and documented out-of-pocket fees and expenses, including reasonable legal fees and expenses, incurred pursuant to the exercise or the attempted exercise of the Co-Sale Participants' rights under this Section 1.3.

### Section 1.4      **Market Stand-Off Agreement**.

(a)      In connection with any underwritten public offering by the Company of its equity securities pursuant to an effective registration statement filed under the Securities Act, including the first bona fide firm commitment underwritten public offering of the Company's Common Stock registered under the Securities Act on Form S-1 or Form SB-2 (or any successor form designated by the SEC) (the "**Initial Public Offering**"), the Remaining Stockholders (each, an "**Owner**") shall not (i) lend, offer, pledge, sell, contract to sell, sell any option or contract to purchase, purchase any option or contract to sell, grant any option, right or warrant to purchase, or otherwise transfer or dispose of, directly or indirectly, any securities of the Company, including (without limitation) shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock (whether now owned or hereafter acquired) or (ii) enter into any swap or other arrangement that transfers to another, in whole or in part, any of the economic consequences of ownership of any securities of the Company, including (without limitation) shares of Common Stock or any securities convertible into or exercisable or exchangeable for Common Stock (whether now owned or hereafter acquired), whether any such transaction described in clause (i) or (ii) above is to be settled by delivery of securities, in cash or otherwise without the prior written consent of the Company or its underwriters; *provided* that all executive officers, directors and greater than 5% stockholders (including, if applicable, HCMLP

7

and Highland Capital) are subject to similar restrictions. Such restriction (the "***Market Stand-Off***") shall be in effect for such period of time from and after the effective date of the final prospectus for the offering as may be requested by the Company or such underwriters. In no event, however, shall such period exceed one hundred eighty (180) days (the "***Lock-Up Period***"), and the Market Stand-Off shall in no event be applicable to any underwritten public offering effected more than two (2) years after the effective date of the Company's initial public offering.

(b)  Any new, substituted or additional securities which are by reason of any recapitalization or reorganization distributed with respect to the Common Stock to be registered shall be immediately subject to the Market Stand-Off, to the same extent the Common Stock is at such time covered by such provisions.

(c)  In order to enforce the Market Stand-Off, the Company may impose stop-transfer instructions with respect to the Common Stock until the end of the applicable stand-off period.

## ARTICLE II

## RIGHTS OF FIRST OFFER

**Section 2.1** **Grant of Right of First Offer**. Each time the Company proposes to offer (i) any shares of, or securities convertible into or exercisable for any shares of, any class of its capital stock ("***equity securities***"), or (ii) any debt securities (collectively, the "***First Offer Securities***"), the Company shall first offer to Highland Capital the right and opportunity (but not the obligation) to purchase the First Offer Securities proposed to be issued in such offering in accordance with the provisions of this Article IV. HCMLP, in its sole discretion, shall have the right to assign and apportion the rights of first refusal hereby granted among itself and investment funds comprising Highland Capital, which need not be parties to this Agreement at that time (the actual participants, including any individuals or entities assigned such rights, each being a "***Purchaser***"); *provided* that each such Purchaser is an "***accredited investor***" within the meaning of Rule 501 of Regulation D of the Securities Act; and *provided further* that any such Purchaser that is not then a party to this Agreement shall be required to become a party to this Agreement by executing an Adoption Agreement in the form attached hereto as <u>Exhibit A</u>.

**Section 2.2** **Procedure for Exercise**. The Company shall deliver notice (the "***Offer Notice***") to HCMLP stating (a) the number and description of the First Offer Securities to be offered in the applicable offering and (b) the price and terms, if any, upon which it proposes to offer such First Offer Securities. Within 30 days after giving of the Offer Notice, the Purchasers may elect to purchase, at the price and on the terms specified in the Offer Notice, such First Offer Securities, in the amounts designated by HCMLP. The Purchasers shall exercise the rights under this section by paying the purchase price for the First Offer Securities elected to be purchased in cash or by wire transfer of immediately available funds. As promptly as practicable on or after the purchase date, the Company shall issue and deliver to the Purchasers a certificate or certificates for the number of full shares or amount, whichever is applicable, of First Offer Securities.

8

**Section 2.3** **Excluded Issuances**. The rights of first offer set forth in this section shall not be applicable to the following (collectively, the "***Excluded Issuances***"): (A) in the case of equity securities, (i) the issuance of shares of capital stock (or any cash-settled "phantom units" or similar equity-linked or equity-based incentive plans or agreement structures, the value of which is based on the Company's Common Stock (collectively, "***phantom units***")) of the Company issued or issuable solely for compensatory purposes, to directors, officers, employees or consultants of the Company, whether directly (as Common Stock, options or phantom units) or pursuant to an equity incentive plan or agreement or a restricted stock plan or agreement, in each case approved by the Board; (ii) the issuance of shares of capital stock of the Company in connection with stock splits, stock dividends, recapitalizations or the like; (iii) the issuance of shares of capital stock in connection with a bona fide business acquisition or license of technology of or by the Company, whether by license, merger, consolidation, sale of assets, sale or exchange of stock or otherwise that are not issued primarily for equity financing purposes, in each case as approved by the Board; (iv) the issuance of shares of capital stock of the Company in connection with corporate partnering transactions, business relationships and similar transactions that are not issued primarily for equity financing purposes, in each case as approved by the Board; or (v) the issuance of shares of capital stock to financial institutions in connection with bona fide Commercial Debt (as defined below) arrangements (including issuances, extensions, renewals, modifications and waivers), in each case approved by the Company's Board of Directors; and (B) in the case of debt securities, shall not be deemed to include debt issued to NexBank, SSB and other banks, commercial finance lenders, insurance companies, leasing or equipment financing institutions or other lending institutions regularly engaged in the business of lending money (excluding venture capital, private equity, investment banking or similar institutions which sometimes engage in lending activities but which are primarily engaged in investments in equity securities), which is for money borrowed, or purchase or leasing of equipment in the case of lease or other equipment financing, whether or not secured, and in any such instance is not primarily for equity financing purposes ("***Commercial Debt***"), in each such case approved by the Board of Directors of the Company,

**Section 2.4** **Sale to Third Parties**. The Company shall, after complying with its obligations under Section 2.1, be free at any time prior to 90 days after the date of the Offer Notice, to offer and sell to any third party or parties the remainder of such First Offer Securities proposed to be issued by the Company at a price and on payment terms no less favorable to the Company than those specified in the Offer Notice. However, if such third party sale or sales are not consummated within such 90-day period, or if the terms of any such proposed sale are modified in a manner more favorable to the proposed purchaser (whether with respect to price or any other term) than offered to HCMLP pursuant to Section 2.1, the Company shall not sell such First Offer Securities as shall not have been purchased within such period without again complying with Section 2.1 hereof.

**ARTICLE III**

**REGISTRATION RIGHTS**

**Section 3.1** **Definitions**. For purposes of this Article III.

9

(a)     "**Certificate of Incorporation**" shall mean the Company's Certificate of Incorporation as in effect as of the date hereof and as amended and restated from time to time.

(b)     "**Change in Control**" shall mean (A) the acquisition of the Company by means of any transaction or series of related transactions (including, without limitation, any stock purchase transaction, merger, consolidation or other form of reorganization in which outstanding shares of the Company are exchanged for securities or other consideration issued, or caused to be issued, by the acquiring entity or its subsidiary, but excluding (i) any transaction effected for the purpose of changing the Company's jurisdiction of incorporation and (ii) the sale by the Company of shares of its capital stock to investors in bona fide equity financing transactions), unless securities representing more than fifty percent (50%) of the total combined voting power of the voting securities of the surviving or acquiring entity or its direct or indirect parent entity are immediately thereafter beneficially owned, directly or indirectly and in substantially the same proportion, by the Company's stockholders of record as constituted immediately prior to such transaction or series of related transactions and (B) a sale of all or substantially all of the assets of the Company in a single transaction or series of related transactions. In no event shall any public offering of the Company's securities be deemed to constitute a Change in Control.

(c)     "**Exchange Act**" shall mean the Securities Exchange Act of 1934, as amended.

(d)     "**Form S-3**" shall mean such form under the Securities Act as in effect on the date hereof or any registration forms under the Securities Act subsequently adopted by the SEC that permit inclusion or incorporation of substantial information by reference to other documents filed by the Company with the SEC.

(e)     "**Holder**" shall mean any person owning or having the right to acquire Registrable Securities or any assignee thereof in accordance with <u>Section 3.13</u> hereof.

(f)     The terms "**register**," "**registered**" and "**registration**" refer to a registration effected by preparing and filing a registration statement or similar document in compliance with the Securities Act, and the declaration or ordering of effectiveness of such registration statement or document.

(g)     "**Registrable Securities**" shall mean, only with respect to equity securities held by Highland Capital, the Common Stock and any shares of Common Stock of the Company issued as (or issuable upon the conversion or exercise of any warrant, right or other security which is issued as) a dividend or other distribution with respect to, or in exchange for or in replacement of such shares; excluding in all cases, however, any Registrable Securities sold by a Holder in a transaction in which his rights under this <u>Article III</u> are not assigned.

(h)     The number of shares of "**Registrable Securities then outstanding**" shall be equal to the number of shares of Common Stock then issued and outstanding which are, and the number of shares of Common Stock then issuable pursuant to then exercisable or convertible securities which are, Registrable Securities.

10

        (i)      "***Rule 144***" means Rule 144 as promulgated by the SEC under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the SEC.

        (j)      "***Rule 145***" means Rule 145 as promulgated by the SEC under the Securities Act, as such Rule may be amended from time to time, or any similar successor rule that may be promulgated by the SEC.

**Section 3.2**    <u>**Request for Registration**</u>.

        (a)      At any time, HCMLP, on behalf of Highland Capital, may request that the Company effect a registration under the Securities Act of all or any part of the Registrable Securities held by Highland Capital (each, a "***Demand Registration***"), subject to the terms and conditions of this Agreement. Any request (a "***Registration Request***") for a Demand Registration shall specify (A) the approximate number of shares of Registrable Securities requested to be registered and (B) the intended method of distribution of such shares. Within twenty (20) days of the receipt of the Registration Request, the Company will use its best efforts to effect as soon as practicable (and in any event within ninety (90) days of the date such request is given) the registration under the Securities Act requested and will include in such registration all shares of Registrable Securities that holders of Registrable Securities request the Company to include in such registration by written notice given to the Company within twenty (20) days after the Company's sends such notice (subject to underwriter cut-backs as provided in this Agreement).

        (b)      Without the prior written consent of HCMLP, the Company will not include in any Demand Registration any securities other than (a) Registrable Securities, (b) shares of stock pursuant to <u>Section 3.3</u> hereof, and (c) securities to be registered for offering and sale on behalf of the Company. If the managing underwriter(s) advise the Company in writing that in their opinion the number of shares of Registrable Securities and, if permitted hereunder, other securities in such offering, exceeds the number of shares of Registrable Securities and other securities, if any, which can be sold in an orderly manner in such offering within a price range acceptable to the holders of a majority of the shares of Registrable Securities held by Holders initially requesting registration, the Company will include in such registration, prior to the inclusion of any securities which are not shares of Registrable Securities, the number of shares of Registrable Securities requested to be included that in the opinion of such underwriters can be sold in an orderly manner within the price range acceptable to the Holders of a majority of the shares of Registrable Securities initially requesting registration, subject to the following order of priority: (A) first, the securities requested to be included therein by the Holders, pro rata among the holders thereof on the basis of the number of shares of Registrable Securities such holders requested to be included in such registration or apportioned among them in any other manner in which HCMLP determines to be appropriate in its sole discretion; (B) second, the securities requested to be included therein by the Company; and (C) third, among persons not contractually entitled to registration rights under this Agreement.

        (c)      If HCMLP indicates that the Holders on whose behalf it is initiating the Registration Request hereunder (the "***Initiating Holders***") intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to <u>Section 3.2</u> and the Company shall include

11

such information in the written notice referred to in <u>Section 3.2</u>. The underwriter will be selected by HCMLP and shall be reasonably acceptable to the Board, which approval shall not be unreasonably withheld, conditioned or delayed. All Holders proposing to distribute their securities through such underwriting shall (together with the Company as provided in <u>Section 3.4(e)</u>) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting.

(d)     Notwithstanding the foregoing, if the Company shall furnish to HCMLP a certificate signed by the President of the Company stating that in the good faith judgment of the Board of Directors of the Company it would be seriously detrimental to the Company and its stockholders for such registration statement to be filed and it is, therefore, essential to defer the filing of such registration statement, the Company shall have the right to defer taking action with respect to such filing for a period of not more than one hundred twenty (120) days after receipt of the request of the Initiating Holders; *provided*, *however*, that the Company may not utilize this right more than once in any twelve (12) month period.

(e)     In addition, the Company shall not be obligated to effect, or to take any action to effect, any registration pursuant to this <u>Section 3.2</u>:

(i)     after the Company has effected three (3) Demand Registrations pursuant to this <u>Section 3.2</u> and such registrations have been declared or ordered effective;

(ii)     during the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of filing of, and ending on a date one hundred eighty (180) days after the effective date of, a registration subject to <u>Section 3.3</u> or <u>Section 3.11</u> hereof, provided that the Company is actively employing its commercially reasonable efforts to cause such registration statement to become effective; *provided*, *however*, that the Company may not utilize this right more than once in any twelve-month period;

(iii)     if the Initiating Holders propose to dispose of shares of Registrable Securities that may be immediately registered on Form S-3 pursuant to a request made pursuant to <u>Section 3.11</u> below; or

(iv)     in any particular jurisdiction in which the Company would be required to qualify to do business or to execute a general consent to service of process in effecting such registration, qualification or compliance unless the Company is already subject to service in such jurisdiction and except as may be required by the Securities Act.

### Section 3.3     <u>Company Registration</u>.

(a)     If, but without any obligation to do so, the Company proposes to register (including for this purpose a registration initiated by the Company for itself or for the Holders or stockholders other than the Holders) any of its stock or other securities under the Securities Act in connection with the public offering of such securities solely for cash (other than a registration relating solely to employee benefit plans, or a registration relating solely to a SEC Rule 145 transaction, or a registration on any registration form which does not permit secondary sales or does not include substantially the same information as would be required to be included in a registration statement covering the Registrable Securities) the Company shall, at such time,

12

promptly give each Holder written notice of such registration. Upon the written request of HCMLP given within fifteen (15) days after delivery of such notice by the Company, the Company shall cause to be registered under the Securities Act all of the Registrable Securities that HCMLP has requested to be registered on behalf of Highland Capital.

(b)     If a registration subject to <u>Section 3.3</u> relates to an underwritten public offering of equity securities and the managing underwriters advise the Company that in their opinion the number of securities requested to be included in such registration exceeds the number that can be sold in an orderly manner in such offering within a price range acceptable to the Holders initially requesting such registration, the Company will include in such registration (i) first, the Registrable Securities requested to be included in such registration by Highland Capital, allocated pro rata among the holders thereof on the basis of the total number of shares of Registrable Securities such Holder requested to be included in such registration or apportioned among them in any other manner in which HCMLP determines to be appropriate in its sole discretion; (ii) second, the securities requested to be included therein by the Company if the Company has initiated the registration; and (iii) third, among persons not contractually entitled to registration rights under this Agreement. Notwithstanding the foregoing, the amount of Registrable Securities of Highland Capital included in the offering shall not be reduced below thirty percent (30%) of the total amount of securities included in such offering. In connection with any offering involving an underwriting of shares of the Company's capital stock, the Company shall not be required to include any of the Holders' securities in such underwriting unless they accept the terms of the underwriting as agreed upon between the Company and the underwriters selected by it (or by other persons entitled to select the underwriters). All Holders proposing to distribute their securities through such underwriting shall (together with the Company as provided in <u>Section 3.4(e)</u>) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting.

**Section 3.4     Obligations of the Company**. Whenever required under this <u>Article III</u> to effect the registration of any Registrable Securities, the Company shall, as expeditiously as reasonably possible:

(a)     Prepare and file with the SEC a registration statement with respect to such Registrable Securities and use its commercially reasonable efforts to cause such registration statement to become effective within sixty (60) days of a request for registration pursuant to <u>Section 3.2</u> and <u>Section 3.11</u> and such registration statement shall remain effective until the earlier to occur of (i) one-hundred-eighty (180) days after the date such registration statement was declared effective or (ii) until the distribution contemplated in such registration statement has been completed; *provided*, *however*, that such one-hundred-eighty (180) day period shall be extended for a period of time equal to the period the Holder refrains from selling any securities included in such registration at the request of an underwriter of Common Stock (or other securities) of the Company.

(b)     Prepare and file with the SEC such amendments and supplements to such registration statement and the prospectus used in connection with such registration statement as may be necessary to comply with the provisions of the Securities Act with respect to the disposition of all securities covered by such registration statement.

13

(c)     Furnish to the Holders such numbers of copies of a prospectus, including a preliminary prospectus, in conformity with the requirements of the Securities Act, and such other documents as they may reasonably request in order to facilitate the disposition of Registrable Securities owned by them.

(d)     Use its best efforts to register and qualify the securities covered by such registration statement under such other securities or blue sky laws of such jurisdictions as shall be reasonably requested by the Holders; *provided* that the Company shall not be required in connection therewith or as a condition thereto to qualify to do business or to file a general consent to service of process in any such states or jurisdictions.

(e)     In the event of any underwritten public offering, enter into and perform its obligations under an underwriting agreement, in usual and customary form, with the managing underwriter of such offering. Each Holder participating in such underwriting shall also enter into and perform its obligations under such an agreement.

(f)     Notify each Holder of Registrable Securities covered by such registration statement at any time when a prospectus relating thereto is required to be delivered under the Securities Act of the happening of any event as a result of which the prospectus included in such registration statement, as then in effect, includes an untrue statement of a material fact or omits to state a material fact required to be stated therein or necessary to make the statements therein of misleading in the light of the circumstances then existing.

(g)     Cause all such Registrable Securities registered pursuant hereunder to be listed on each securities exchange or nationally recognized quotation system on which similar securities issued by the Company are then listed.

(h)     Provide a transfer agent and registrar for all Registrable Securities registered pursuant hereunder and a CUSIP number for all such Registrable Securities not later than the effective date of such registration.

(i)     Use its best efforts to cause to be furnished, at the request of at least a majority of the Holders participating in the registration, on the date that such Registrable Securities are delivered to the underwriters for sale, if such securities are being sold through underwriters, or, if such securities are not being sold through underwriters, on the date that the registration statement with respect to such securities becomes effective, (i) an opinion, dated such date, of the counsel representing the Company for purposes of such registration, in form and substance as is customarily given to underwriters in an underwritten public offering, addressed to the underwriters, if any, and (ii) a letter dated such date, from the independent certified public accountants of the Company, in form and substance as is customarily given by independent certified public accountants to underwriters in connection with an underwritten public offering, addressed to the underwriters, if any.

(j)     Make available for inspection by each Holder of Registrable Securities, any underwriter and any attorney, accountant, or other agent retained by such Holder or underwriter, all financial and other records, pertinent corporate documents and properties of the Company and cause the Company's officers, directors, and employees to supply all information

14

reasonably requested by such Holder, underwriter, attorney, accountant, or agent in connection with such registration statement.

**Section 3.5** **Furnish Information**. It shall be a condition precedent to the obligations of the Company to take any action pursuant to this Article III with respect to the Registrable Securities of any selling Holder that such Holder shall furnish to the Company such information regarding such Holder, the Registrable Securities held by such Holder, and the intended method of disposition of such securities as shall be required by the Company or the managing underwriters, if any, to effect the registration of such Holder's Registrable Securities.

**Section 3.6** **Expenses of Demand Registration**. All expenses, other than underwriting discounts and commissions, incurred in connection with registrations, filings or qualifications pursuant to Section 3.2(a), including (without limitation) all registration, filing and qualification fees, printers' and accounting fees, fees and disbursements of counsel for the Company and the reasonable fees and disbursements of counsel for the selling Holders shall be borne by the Company, including, without limitation, all such expenses incurred with respect to a registration request subsequently withdrawn by the Holders, regardless of whether such withdrawal was a result of a material adverse change in the condition (financial or otherwise), business or prospects of the Company from that known to the Holders at the time of the request or otherwise.

**Section 3.7** **Expenses of Company Registration**. All expenses, other than underwriting discounts and commissions relating to Registrable Securities, incurred in connection with registrations, filings or qualifications pursuant to Section 3.3 for each Holder, including (without limitation) all registration, filing and qualification fees, printers' and accounting fees, fees and disbursements of counsel for the Company and the reasonable fees and disbursements of counsel for the selling Holders shall be borne by the Company.

**Section 3.8** **Delay of Registration**. No Holder shall have any right to obtain or seek an injunction restraining or otherwise delaying any such registration as the result of any controversy that might arise with respect to the interpretation or implementation of this Article III.

**Section 3.9** **Indemnification**. In the event any Registrable Securities are included in a registration statement under this Article III:

(a)     To the extent permitted by law, the Company will indemnify and hold harmless each Holder, the partners, members, officers, and directors of each Holder (including HCMLP), any underwriter (as defined in the Securities Act) for such Holder and each person, if any, who controls such Holder or underwriter within the meaning of the Securities Act or the Exchange Act, against any losses, claims, damages, or liabilities (joint or several) to which they may become subject under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages, or liabilities (or actions in respect thereto) arise out of or are based upon any of the following statements, omissions or violations (each, a "***Violation***"): (i) any untrue statement or alleged untrue statement of a material fact contained in such registration statement, including any preliminary prospectus or final prospectus contained therein or any amendments or supplements thereto, (ii) the omission or alleged omission to state therein a material fact required to be stated therein, or necessary to make the statements therein not misleading, or (iii) any violation or alleged violation by the Company of the Securities Act, the

15

Exchange Act, any state securities law or any rule or regulation promulgated under the Securities Act, the Exchange Act or any state securities law; and the Company will pay to each such Holder, underwriter or controlling person, as incurred, any legal or other expenses reasonably incurred by them in connection with investigating or defending any such loss, claim, damage, liability, or action; *provided*, *however*, that the indemnity agreement contained in this <u>Section 3.9(a)</u> shall not apply to amounts paid in settlement of any such loss, claim, damage, liability, or action if such settlement is effected without the consent of the Company (which consent shall not be unreasonably withheld, conditioned or delayed), nor shall the Company be liable in any such case for any such loss, claim, damage, liability, or action to the extent that it arises out of or is based upon a Violation which occurs in reliance upon and in conformity with written information furnished by any such Holder, underwriter or controlling person expressly for use in connection with such registration.

(b)     To the extent permitted by law, each selling Holder will indemnify and hold harmless the Company, each of its directors, each of its officers who has signed the registration statement, each person, if any, who controls the Company within the meaning of the Securities Act, any underwriter, any other Holder selling securities in such registration statement and any controlling person of any such underwriter or other Holder, against any losses, claims, damages, or liabilities (joint or several) to which any of the foregoing persons may become subject, under the Securities Act, the Exchange Act or other federal or state law, insofar as such losses, claims, damages, or liabilities (or actions in respect thereto) arise out of or are based upon any Violation, in each case to the extent (and only to the extent) that such Violation occurs in reliance upon and in conformity with written information furnished by such Holder expressly for use in connection with such registration; and each such Holder will pay, as incurred, any legal or other expenses reasonably incurred by any person intended to be indemnified pursuant to this <u>Section 3.9(b)</u>, in connection with investigating or defending any such loss, claim, damage, liability, or action; *provided*, *however*, that the indemnity agreement contained in this <u>Section 3.9(b)</u>, shall not apply to amounts paid in settlement of any such loss, claim, damage, liability or action if such settlement is effected without the consent of the Holder (which consent shall not be unreasonably withheld, conditioned or delayed); *provided*, *however*, that in no event shall any indemnity under this <u>Section 3.9(b)</u> exceed the net proceeds from the offering received by such Holder.

(c)     Promptly after receipt by an indemnified party under this <u>Section 3.9</u> of notice of the commencement of any action (including any governmental action), such indemnified party will, if a claim in respect thereof is to be made against any indemnifying party under this <u>Section 3.9</u>, deliver to the indemnifying party a written notice of the commencement thereof and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume the defense thereof with counsel mutually satisfactory to the parties; *provided*, *however*, that an indemnified party (together with all other indemnified parties which may be represented without conflict by one counsel) shall have the right to retain separate counsel, with the fees and expenses to be paid by the indemnifying party, if representation of such indemnified party by the counsel retained by the indemnifying party would be inappropriate due to actual or potential differing interests between such indemnified party and any other party represented by such counsel in such proceeding. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action, if materially prejudicial to its ability

16

to defend such action, shall relieve such indemnifying party of any liability to the indemnified party under this <u>Section 3.9</u>, but the omission so to deliver written notice to the indemnifying party will not relieve it of any liability that it may have to any indemnified party otherwise than under this <u>Section 3.9</u>.

(d)     If the indemnification provided for in this <u>Section 3.9</u> is held by a court of competent jurisdiction to be unavailable to an indemnified party with respect to any loss, liability, claim, damage, or expense referred to therein, then the indemnifying party, in lieu of indemnifying such indemnified party hereunder, shall contribute to the amount paid or payable by such indemnified party as a result of such loss, liability, claim, damage, or expense in such proportion as is appropriate to reflect the relative fault of the indemnifying party on the one hand and of the indemnified party on the other hand in connection with the statements or omissions that resulted in such loss, liability, claim, damage, or expense as well as any other relevant equitable considerations; *provided, however*, that in no event shall any contribution under this <u>Section 3.9</u> exceed the net proceeds from the offering received by such Holder. The relative fault of the indemnifying party and of the indemnified party shall be determined by reference to, among other things, whether the untrue or alleged untrue statement of a material fact or the omission to state a material fact relates to information supplied by the indemnifying party or by the indemnified party and the parties' relative intent, knowledge, access to information, and opportunity to correct or prevent such statement or omission.

(e)     Notwithstanding the foregoing, to the extent that the provisions on indemnification and contribution contained in the underwriting agreement entered into in connection with the underwritten public offering are in conflict with the foregoing provisions, the provisions in the underwriting agreement shall control as to any Investor that is a party thereto.

(f)     The obligations of the Company and Holders under this <u>Section 3.9</u> shall survive the completion of any offering of Registrable Securities in a registration statement under this <u>Article III</u>, and otherwise. No indemnifying party, in the defense of any such claim or litigation, shall, except with the consent of each other indemnified party, consent to entry of any judgment or enter into any settlement that does not include as an unconditional term thereof the giving by the claimant or plaintiff to such indemnified party of a release from all liability in respect to such claim or litigation.

**Section 3.10     <u>Reports Under Securities Exchange Act</u>**. With a view to making available to the Holders the benefits of Rule 144 and any other rule or regulation of the SEC that may at any time permit a Holder to sell securities of the Company to the public without registration or pursuant to a registration on Form S-3, the Company agrees to:

(a)     make and keep public information available, as those terms are understood and defined in Rule 144, at all times after the effective date of the first registration statement filed by the Company for the offering of its securities to the general public;

(b)     take such action, including the voluntary registration of its Common Stock under Section 5.12 of the Exchange Act, as is necessary to enable the Holders to utilize Form S-3 for the sale of their Registrable Securities, such action to be taken as soon as practicable after the

17

end of the fiscal year in which the first registration statement filed by the Company for the offering of its securities to the general public is declared effective;

(c)     file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act; and

(d)     furnish to any Holder, so long as the Holder owns any Registrable Securities, forthwith upon request from such Holder (i) a written statement by the Company that it has complied with the reporting requirements of Rule 144 (at any time after 90 days after the effective date of the first registration statement filed by the Company), the Securities Act and the Exchange Act (at any time after it has become subject to such reporting requirements), or that it qualifies as a registrant whose securities may be resold pursuant to Form S-3 (at any time after it so qualifies), (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company, and (iii) such other information as may be reasonably requested in availing any Holder of any rule or regulation of the SEC which permits the selling of any such securities without registration or pursuant to Form S-3.

Section 3.11     **Form S-3 Registrations**. In the event that the Company shall receive from HCMLP on behalf of the Holders of at least 10% of the Registrable Securities then outstanding a written request that the Company effect a registration on Form S-3, and any related qualification or compliance with respect to all or a part of the Registrable Securities owned by such Holder or Holders, the Company will:

(a)     promptly give written notice of the proposed registration, and any related qualification or compliance, to all other Holders; and

(b)     use its commercially reasonable efforts to, as soon as practicable, effect such registration and all such qualifications and compliances as may be so requested and as would permit or facilitate the sale and distribution of all or such portion of such Holder's or Holders' Registrable Securities as are specified in such request, together with all or such portion of the Registrable Securities of any other Holder or Holders joining in such request as are specified in a written request given within fifteen (15) days after receipt of such written notice from the Company; *provided*, *however*, that the Company shall not be obligated to effect any such registration, qualification or compliance, pursuant to this Section 3.11:

(i)     if Form S-3 is not available for such offering by the Holders;

(ii)     if the Holders, together with the holders of any other securities of the Company entitled to inclusion in such Form S-3, propose to sell Registrable Securities at an aggregate price to the public (net of underwriting discounts and commissions) of less than $500,000;

(iii)     if the Company shall furnish to Holders requesting a registration statement pursuant to this Section 3.11 a certificate signed by the President of the Company stating that in the good faith judgment of the Board of Directors it would be seriously detrimental to the Company and its stockholders for such registration statement to be filed and it is, therefore, essential to defer the filing of such registration statement, the Company shall have the right to defer taking action with respect to such filing for a period of not more than one-hundred-

18

twenty (120) days after receipt of the request of the Initiating Holders; *provided*, *however*, that the Company may not utilize this right more than once in any twelve (12) month period;

        (iv)    in any particular jurisdiction in which the Company would be required to qualify to do business or to execute a general consent to service of process in effecting such registration, qualification or compliance;

        (v)    if the Company has, within the twelve (12) month period preceding the date of such request, already effected one (1) registration on Form S-3 for the Holders pursuant to this <u>Section 3.11</u>; or

        (vi)    during the period starting with the date sixty (60) days prior to the Company's good faith estimate of the date of filing of, and ending on a date one-hundred-eighty (180) days after the effective date of, any registration statement pertaining to a public offering of securities for the Company's account; *provided*, *however*, that the Company is actively employing its commercially reasonable efforts to cause such registration statement to be effective.

        (c)    Subject to the foregoing, the Company shall file a registration statement covering the Registrable Securities and other securities so requested to be registered as soon as practicable after receipt of the request or requests of the Holders. All expenses incurred in connection with a registration requested pursuant to this <u>Section 3.11</u>, including, without limitation, all registration, filing, qualification, printer's and accounting fees and the reasonable fees and disbursements of counsel for the selling Holder or Holders and counsel for the Company, shall be borne by the Company. Registrations effected pursuant to this <u>Section 3.11</u> shall not be counted as demands for registration or registrations effected pursuant to <u>Section 3.2</u> or <u>Section 3.3</u>, respectively.

        (d)    If the Holders initiating a registration pursuant to this <u>Section 3.11</u> intend to distribute the Registrable Securities covered by their request by means of an underwriting, they shall so advise the Company as a part of their request made pursuant to this <u>Section 3.11</u> and the Company shall include such information in the written notice referred to in <u>Section 3.11(a)</u>. The underwriter will be selected by HCMLP and shall be reasonably acceptable to the Company, which approval shall not be unreasonably withheld or delayed. In such event, the right of any Holder to include such Holder's Registrable Securities in such registration shall be conditioned upon such Holder's participation in such underwriting and the inclusion of such Holder's Registrable Securities in the underwriting (unless otherwise mutually agreed by a majority in interest of the Initiating Holders and such Holder) to the extent provided herein. All Holders proposing to distribute their securities through such underwriting shall (together with the Company as provided in <u>Section 3.4(e)</u>) enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such underwriting. Notwithstanding any other provision of this <u>Section 3.11</u>, if the underwriter advises the Initiating Holders in writing that marketing factors require a limitation of the number of shares to be underwritten, then the Company shall so advise all Holders of Registrable Securities which would otherwise be underwritten pursuant hereto, and the number of shares of Registrable Securities that may be included in the underwriting shall be allocated in the following order of priority: (A) first, the Registrable Securities requested to be included in such registration by the Holders, allocated pro

rata among the holders thereof on the basis of the total number of shares of Registrable Securities such Holder requested to be included in such registration or apportioned among them in any other manner in which HCMLP determines to be appropriate in its sole discretion; (B) second, the securities requested to be included therein by the Company; and (C) third, among persons not contractually entitled to registration rights under this Agreement.

Section 3.12 **Expenses of Form S-3 Registration**. All expenses, other than underwriting discounts and commissions, incurred in connection with registrations, filings or qualifications pursuant to Section 3.11, including (without limitation) all registration, filing and qualification fees, printers' and accounting fees, fees and disbursements of counsel for the Company and the reasonable fees and disbursements of counsel for the selling Holders shall be borne by the Company; including, without limitation, all such expenses incurred with respect to a registration request subsequently withdrawn by the Holders, regardless of whether such withdrawal was a result of a material adverse change in the condition (financial or otherwise), business or prospects of the Company from that known to the Holders at the time of the request or otherwise.

Section 3.13 **Assignment of Registration Rights**. Subject to the prior consent of HCMLP, the rights to cause the Company to register Registrable Securities pursuant to this Article III may be assigned (but only with all related obligations) by a Holder to a transferee or assignee of such securities that (i) is a subsidiary, parent, member, partner, limited partner, retired partner, grantor or shareholder of a Holder, and (ii) an affiliate of HCMLP, including any investment funds controlled by or under common control with, or managed directly or indirectly by, HCMLP, which will continue to qualify as Highland Capital after such transfer; *provided* that: (a) the Company is, within a reasonable time after such transfer, furnished with written notice of the name and address of such transferee or assignee and the securities with respect to which such registration rights are being assigned; (b) such transferee or assignee agrees in writing to be bound by and subject to the terms and conditions of this Agreement, including (without limitation) the provisions of Section 1.4 below, including the execution of an Adoption Agreement in the form attached hereto as Exhibit A; and (c) such assignment shall be effective only if immediately following such transfer the further disposition of such securities by the transferee or assignee is restricted under the Securities Act. For the purposes of determining the number of shares of Registrable Securities held by a transferee or assignee, the holdings of transferees and assignees of a partnership who are partners or retired partners of such partnership (including spouses and ancestors, lineal descendants and siblings of such partners or spouses who acquire Registrable Securities by gift, will or intestate succession) shall be aggregated together and with the partnership; *provided* that all assignees and transferees who would not qualify individually for assignment of registration rights shall have a single attorney-in-fact for the purpose of exercising any rights, receiving notices or taking any action under this Article III.

Section 3.14 **Limitations on Subsequent Registration Rights**. From and after the date of this Agreement, the Company shall not, without the prior written consent of HCMLP (which approval may be granted or withheld in its sole discretion), enter into any agreement with any holder or prospective holder of any securities of the Company (i) to include such securities in any registration filed under Section 3.2, unless under the terms of such agreement, such holder or prospective holder may include such securities in any such registration only to the extent that the inclusion of such holder's or prospective holder's securities will not reduce the amount of the

20

Registrable Securities of the Holders which is included or (ii) to make a demand registration that could result in such registration statement being declared effective prior to the dates set forth in Section 3.2 or within one-hundred-eighty (180) days of the effective date of any registration effected pursuant to Section 3.2.

# ARTICLE IV

## VOTING AGREEMENT; BOARD OF DIRECTORS; REQUIRED VOTE

**Section 4.1** **Board of Directors**.

(a) Composition of Board of Directors. For so long as Highland Capital owns any shares of the Company's capital stock, each Stockholder agrees that in any election of directors of the Company, each Stockholder shall vote all shares of the Company capital stock entitled to vote in the election of directors that are owned or controlled by such Stockholder (or shall consent pursuant to an action by written consent of the holders of capital stock of the Company), including all shares that each Stockholder is entitled to vote under any voting trust, voting agreement, proxy or other arrangement (collectively, "**Stock**"), to elect a Board of Directors consisting of the directors designated by HCMLP in its sole discretion. In the absence of any designation HCMLP, the director previously designated by HCMLP and then serving shall be re-elected if still eligible to serve as provided herein.  This Section 4.1(a) shall not apply to Crusader.

(b) Subsidiary Governing Bodies; Committees. Unless otherwise agreed to by HCMLP or the Board of Directors, the members of the Board of Directors, as the same shall be constituted from time to time, shall also constitute the board of directors or equivalent governing body of each subsidiary of the Company. HCMLP shall have the right but not the obligation to designate at least two members of the Board of Directors elected pursuant to this Section 4.1 to serve on any duly constituted committee of the boards of directors of the Company and any subsidiaries.

(c) Obligations of the Company. The Company shall use its best efforts and shall exercise all authority under applicable law to cause to be nominated for election and cause to be elected or appointed, as the case may be, as directors of the Company, a slate of directors consisting of individuals meeting the requirements of Section 4.1(a). The Company will not, by any voluntary action, avoid or seek to avoid the observance or performance of any of the terms to be performed hereunder by the Company, but will at all times in good faith assist in the carrying out of all of the provisions of this Agreement and in the taking of all such actions as may be necessary or appropriate in order to protect the rights of HCMLP hereunder against impairment. Each Stockholder hereby agrees to vote, cause to be voted or sign a written consent with respect to all of its shares in favor of a slate of directors consisting of individuals meeting the requirements of Section 4.1(a).

(d) Vacancies; Removal. In the event of any vacancy in the Board of Directors, each Stockholder agrees to vote all outstanding shares of Stock owned or controlled by such Stockholder and to use such Stockholder's best efforts to fill such vacancy so that the Board of Directors will be comprised of directors designated as provided in Section 4.1(a). Each

21

Stockholder agrees to vote all outstanding shares of Stock owned or controlled by such Stockholder for the removal of a director whenever (but only whenever) there shall be presented to the Board of Directors the written direction that such director be removed, signed by HCMLP. In such event, the Board of Directors shall solicit the vote of the Stockholders entitled to remove such director in order to effect such removal.  This Section 4.1(d) shall not apply to Crusader.

**Section 4.2  Required Vote**.

(a)  Notice of Disposition Transaction. In the event HCMLP has approved or rejected any (A) the acquisition of the Company by another entity by means of any transaction or series of related transactions (including, without limitation, any reorganization, merger or consolidation) unless the Company's stockholders of record as constituted immediately prior to such acquisition or sale will, immediately after such acquisition or sale (by virtue of securities issued as consideration for the Company's acquisition or sale or otherwise) hold at least 50% of the voting power of the surviving or acquiring entity; or (B) a sale of all or substantially all of the assets of the Company, including a sale of all or substantially all of the assets of the Company's subsidiaries, if such assets constitute substantially all of the assets of the Company and such subsidiaries taken as a whole (each, an "*Approved Sale*"), the Company shall give notice (the "*Sale Notice*") to the Stockholders stating that HCMLP has approved or rejected, as applicable, an Approved Sale. The Sale Notice also shall set forth the identity of the person or entity proposing to buy the Company, its assets or its capital stock (the "*Acquisition Offeror*") and shall summarize the basic terms of the proposed Approved Sale. Any Sale Notice may be rescinded by HCMLP by delivering written notice thereof to the Stockholders.

(b)  Obligations of Stockholders. As soon as practicable after receipt of the Sale Notice, the Stockholders shall take all lawful action reasonably necessary and requested by the Company (i) in the event the Approved Sale was approved by HCMLP, to complete the Approved Sale, including without limitation (A) the voting of all capital stock of the Company held by the Stockholders in favor of the Approved Sale, (B) if so requested, the surrender to the Acquisition Offeror of certificates representing all capital stock and all instruments representing convertible securities of the Company held by the Stockholders, properly endorsed for transfer to the Acquisition Offeror against payment of the sale price for such capital stock or such convertible securities in the Approved Sale, and (C) the execution of all sale, liquidation and other agreements in the form reasonably requested (containing, among other things, reasonable and customary representations and warranties relating to the valid title to such capital stock free and clear of any liens, claims, encumbrances and restrictions of any kind (other than those arising hereunder) and such Stockholder's power, authority, and right to enter into and consummate such purchase or merger agreement without violating any other agreement); or (ii) in the event the Approved Sale was rejected by HCMLP, to reject the Approved Sale, including, without limitation, the voting of all capital stock of the Company held by the Stockholders against the Approved Sale. The Stockholders hereby agree, after having received a Sale Notice, not to exercise any dissenter's rights or other rights granted to minority stockholders under state law in connection with an Approved Sale, or otherwise take actions designed to or that reasonably would be expected to complicate, delay, reject or terminate the Approved Sale.

**Section 4.3  Grant of Proxy**. To ensure the performance of each Stockholder with respect to the agreements set forth in this Article IV, each Stockholder hereby appoints the

2992816.2

Chairman of the Board of Directors and the principal executive officer of the Company, or either of them from time to time, or their designees, as his, her or its true and lawful proxy and attorney-in-fact, with full power of substitution and resubstitution, to vote all. Stock owned or held by such Stockholder and to execute all appropriate instruments consistent with this Agreement, subject to the provisions of this Agreement, upon any matter presented to the stockholders of the Company, if and only if such Stockholder fails to vote all of such Stockholder's Stock or execute such other instruments in accordance with the provisions of this Agreement within five (5) days of the Company's or any other party's written request for such Stockholder's written consent or signature. The proxies and powers granted by each Stockholder pursuant to this <u>Section 4.3</u> are coupled with an interest, are given to secure the performance of such Stockholder's commitments under this Agreement, and shall he irrevocable unless and until this Agreement terminates or expires pursuant to its terms. Such proxies shall survive the death, incompetence, disability, merger, reorganization, dissolution or winding up of such Stockholder. Each party hereto hereby revokes any and all previous proxies with respect to the Stock and shall not hereafter, unless and until this Agreement terminates or expires, purport to grant any other proxy or power of attorney with respect to any of the Stock, deposit any of the Stock into a voting trust or enter into any agreement (other than this Agreement), arrangement or understanding with any person, directly or indirectly, to vote, grant any proxy or give instructions with respect to the voting of any of the Stock, in each case, with respect to any of the matters set forth herein.

## ARTICLE V

## COVENANTS OF THE COMPANY

**Section 5.1** **Delivery of Financial Statements**. The Company shall deliver the following information to HCMLP, to each Highland Capital Stockholder and to Crusader:

(a)      as soon as reasonably practicable, but in any event within 90 days after the end of each fiscal year of the Company (which due date may be lengthened with respect to any fiscal year by approval of HCMLP), an audited consolidated income statement of the Company for such year, an audited consolidated balance sheet and statement of stockholders' equity of the Company as of the end of such fiscal year, and an audited consolidated statement of cash flows of the Company for such fiscal year, such audited year-end financial reports to be in reasonable detail, prepared in accordance with generally accepted accounting principles ("*GAAP*") consistently applied and setting forth in each case in comparative form the figures for the previous fiscal year, all in reasonable detail. Such audited financial statements shall be accompanied by a report and opinion thereon by independent public accountants of national standing selected by HCMLP.

(b)      as soon as reasonably practicable, but in any event within thirty (30) days after the end of each fiscal quarter of the Company, an unaudited consolidated income statement and consolidated statement of cash flows of the Company for such fiscal quarter and an unaudited consolidated balance sheet of the Company as of the end of such fiscal quarter, prepared in accordance with GAAP, which shall each show a comparison to plan figures for such period and to the comparable period in the prior year prepared in accordance with GAAP with the exception that no notes need be attached to such statements and year end audit adjustments

23

need not have been made, together with a report from the Company's chief executive officer, and/or chief financial officer, summarizing the Company's consolidated financial condition and consolidated results of operation during such quarter.

(c)     as soon as reasonably practicable, but in any event within twenty (20) days after the end of each calendar month, an unaudited consolidated income statement and consolidated statement of cash flows of the Company for such month and an unaudited consolidated balance sheet of the Company as of the end of such month and for the current fiscal year to date, including a comparison to plan figures for such period and to the comparable period in the prior year, prepared in accordance with GAAP consistently applied, with the exception that no notes need be attached to such statements and year end audit adjustments may not have been made, together with a report from the Company's chief executive officer, and/or chief financial officer, summarizing the Company's consolidated financial condition and consolidated results of operation during such month.

(d)     an annual budget and operating plans for the Company at least thirty (30) days prior to the beginning of each fiscal year and (promptly after they are available) any subsequent substantive revisions thereto; and

(e)     such relevant business and other information reasonably requested, including, without limitation, copies of relevant management reports, as HCMLP may request from time to time.

If, for any period, the Company has any subsidiary whose accounts are consolidated with those of the Company, then in respect of such period the financial statements delivered pursuant to the foregoing sections shall be the consolidated and consolidating financial statements of the Company and all such consolidated subsidiaries.

**Section 5.2**    **Inspection**. The Company will maintain true books and records of account in which full and correct entries will be made of all its business transactions pursuant to a system of accounting established and administered in accordance with GAAP consistently applied, and will set aside on its books all such proper accruals and reserves as shall be required under GAAP consistently applied. The Company shall permit HCMLP or its designee(s) to visit and inspect the Company's properties, to examine and audit its books of account and records and to discuss the Company's affairs, finances and accounts with its officers, all at such reasonable times and during normal business hours as may be requested by HCMLP.

**Section 5.3**    **Directors and Officers Insurance**.

(a)     The Company shall maintain, from financially sound and reputable insurers approved by HCMLP, directors' and officers' insurance with coverage decided in accordance with policies adopted by HCMLP.

(b)     The Company will indemnify the Board of Directors to the broadest extent permitted by applicable law. The Company shall enter into written indemnification agreements (in a form reasonably acceptable to HCMLP) with the directors and executive officers of the Company.

24

(c)     in the event of a Change in Control, proper provision shall be made so that the successors and assigns of the Company assume the obligations of the Company with respect to indemnification of members of the Board of Directors as in effect immediately prior to such transaction, whether in the Company's Bylaws, Certificate of Incorporation, or elsewhere, as the case may be, and, unless otherwise affirmatively determined by the Board of Directors, for the purchase of "*tail*" D&O insurance coverage.

**Section 5.4      Additional Stockholders**. As a condition to the Company's issuance of any shares of Common Stock, or options, warrants or rights to purchase or acquire Common Stock, to any person or entity, including the issuance of certificates representing shares of Common Stock upon a transfer following compliance with the terms of this Agreement, the Company shall, as a condition to such issuance, cause such person or entity to execute an Adoption Agreement in the form attached as Exhibit A hereto in the capacity of a Remaining Stockholder or a Highland Capital Stockholder, as appropriate, confirming that such person or entity is bound by, and subject to, all the terms and provisions of this Agreement applicable to a Remaining Stockholder or a Highland Capital Stockholder, whichever is applicable to such person or entity. The addition of Stockholders as parties to the Agreement in compliance with this provision shall not be deemed an amendment.

## ARTICLE VI

## MISCELLANEOUS

**Section 6.1      Term; Termination**. This Agreement shall terminate upon the earliest to occur of (a) such time as the Stockholders shall no longer be the owner of any shares of capital stock of the Company; or (b) the date specified by agreement of the Company and HCMLP. Notwithstanding the foregoing, the following rights under this Agreement shall terminate as set forth herein:

(a)     The rights of first refusal and co-sale set forth in Article I hereof shall terminate upon the earlier of (i) the closing of a bona fide firm commitment underwritten public offering of the Company's Common Stock registered under the Securities Act resulting in proceeds to the Company of at least $50 million (a "*Qualified IPO*"), and (ii) a Change in Control (including in the case of an asset sale or similar transaction in which Stockholders continue to hold the Company's shares, the final distribution of proceeds to the Stockholders);

(b)     The rights of first offer set forth in Article II hereof shall terminate upon the earlier of (i) a Qualified IPO, and (ii) a Change in Control (including in the case of an asset sale or similar transaction in which Stockholders continue to hold the Company's shares, the final distribution of proceeds to the Stockholders);

(c)     The registration rights set forth in Article III hereof shall terminate with respect to any Holder upon the earlier of (i) a Change in Control, and (ii) the date upon which all Registrable Securities held by such Holder can be sold without restriction under Rule 144(k) under the Securities Act;

25

(d)     The voting rights and obligations set forth in <u>Article IV</u> hereto shall terminate upon the earlier of (i) (A) in the case of <u>Section 4.1</u> the Initial Public Offering, and (B) in the case of <u>Section 4.2</u>, a Qualified IPO, and (ii) a Change in Control; and, *provided* that the provisions of <u>Section 4.2</u> will continue after the closing of any Approved Sale to the extent necessary to enforce the provisions of <u>Section 4.2</u> with respect to such Approved Sale;

(e)     The information and inspection rights set forth in <u>Section 5.1</u> and <u>Section 5.2</u> hereto shall terminate upon the earliest of (i) the Initial Public Offering, (ii) the date upon which the Company becomes subject to the periodic reporting requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, and (iii) a Change in Control (including in the case of an asset sale or similar transaction in which Stockholders continue to hold the Company's shares, the final distribution of proceeds to the Stockholders).

**Section 6.2     <u>Legend</u>**. Each certificate representing the Common Stock of the Company shall be endorsed with substantially the following legend, in addition to any other legend required by law, the Company's organizational documents or agreement to which the Stockholder is subject:

> "THE SECURITIES REPRESENTED BY THIS CERTIFICATE ARE SUBJECT TO THE TERMS AND CONDITIONS OF A CERTAIN STOCKHOLDERS' AGREEMENT, BY AND AMONG THE COMPANY AND CERTAIN HOLDERS OF THE COMMON STOCK OF THE COMPANY, INCLUDING SUBSTANTIAL RESTRICTIONS ON TRANSFER AND VOTING. A COPY OF SUCH AGREEMENT IS ON FILE AT THE PRINCIPAL OFFICE OF THE COMPANY. THE STOCKHOLDERS' AGREEMENT IS BINDING ON THE TRANSFEREES OF SUCH SHARES."

**Section 6.3     <u>Successors and Assigns</u>**. In addition to any restriction on transfer that may be imposed by any other agreement by which the parties hereto may be bound, this Agreement shall be binding upon the parties hereto and their respective permitted transferees, heirs, executors, administrators, successors and assigns; *provided*, *however*, that the Company shall not effect any transfer of Common Stock subject to this Agreement on its books or issue a new certificate for such Common Stock unless the transferee of such Common Stock has executed and delivered an Adoption Agreement in the form attached hereto as <u>Exhibit A</u>. Upon compliance with all transfer and other restrictions set forth herein and the execution and delivery of an Adoption Agreement by the transferee, such transferee shall be deemed to be a party hereto as if such transferee's signature appeared on the signature pages hereto, in the capacity of Highland Capital or a Remaining Stockholder, as the case may be, whereupon the schedules of Stockholders shall be updated accordingly. Nothing in this Agreement, express or implied, is intended to confer upon any party other than the parties hereto or their respective successors and assigns any rights, remedies, obligations or liabilities under or by reason of this Agreement, except as expressly provided in this Agreement.

**Section 6.4     <u>Governing Law</u>**. This Agreement shall be governed by and construed under the laws of the State of Texas, without giving effect to conflicts of laws principles.

Section 6.5 **Counterparts**. This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

Section 6.6 **Titles and Subtitles**. The titles and subtitles used in this Agreement are used for convenience only and are not to be considered in construing or interpreting this Agreement.

Section 6.7 **Notices**.

(a) All notices and other communications hereunder shall be in writing and shall be deemed given if delivered personally or by commercial delivery service, or mailed by registered or certified mail (return receipt requested) or sent via facsimile (with confirmation of receipt) to the parties at the address for each party set forth herein (or at such other address for a party as shall be specified by like notice):

(i) If to the Company:

Cornerstone Healthcare Group Holding, Inc.
13455 Noel Rd., Suite 1320
Dallas, TX 75240
Fax: [●]
Attn: [●]
Email: [●]

with a copy (which shall not constitute notice) to:

[●]
[●]
[●]
Fax: ([●]
Attn: [●]

(ii) If to HCMLP:

Highland Capital Management, L.P.
[●]
[●]
[●]
Fax: [●]
Attention: [●]
Email: [●]

(iii) If to a Highland Capital Stockholder, to the address set forth below such Highland Capital Stockholder's name on Schedule A hereto, with a copy (which shall not constitute notice) to HCMLP and the Company.

27

(iv)     If to a Remaining Stockholder, at the address set forth below such Stockholder's name on Schedule B hereto, with a copy (which shall not constitute notice) to HCMLP and the Company.

(b)     Notice given by personal delivery, courier service or mail shall be effective upon actual receipt. Notice given by facsimile shall be confirmed by appropriate answer back and shall be effective upon actual receipt if received during the recipient's normal business hours, or at the beginning of the recipient's next business day after receipt if not received during the recipient's normal business hours. All notices by facsimile shall be confirmed promptly after transmission in writing by certified mail or personal delivery. Any party may change any address to which notice is to be given to it by giving notice as provided above of such change of address.

(c)     An electronic communication ("*Electronic Notice*") shall be deemed written notice for purposes of this Section 6.7 if sent with return receipt requested to the electronic mail address specified by the receiving party in a signed writing in a nonelectronic form. Electronic Notice shall be deemed received at the time the party sending Electronic Notice receives verification of receipt by the receiving party. Any party receiving Electronic Notice may request and shall be entitled to receive the notice on paper, in a nonelectronic form ("*Nonelectronic Notice*") which shall be sent to the requesting party within five (5) days of receipt of the written request for Nonelectronic Notice.

**Section 6.8     DGCL Electronic Notice**. Each party hereto generally consents to the delivery of any stockholder notice pursuant to the Delaware General Corporation Law (the "*DGCL*"), as amended or superseded from time to time, by electronic transmission (a "*DGCL Electronic Notice*") pursuant to Section 232 of the DGCL at the electronic mail address or the facsimile number set forth below such party's name on the Schedules hereto, as updated from time to time by notice to the Company, or as the books of the Company. To the extent that any DGCL Electronic Notice is returned or undeliverable for any reason, the foregoing consent shall be deemed to have been revoked until a new or corrected electronic mail address has been provided, and such attempted DGCL Electronic Notice shall be ineffective and deemed to not have been given. Each party hereto hereby agrees to promptly notify the Company of any change in such holder's electronic mail address, but failure to do so shall not affect the foregoing.

**Section 6.9     Dispute Resolution**.

(a)     Arbitration. Notwithstanding anything contained in this Agreement to the contrary, and except for the equitable remedies provided in Section 6.9(b), in the event there is an unresolved legal dispute between the parties and/or any of their respective officers, directors, partners, employees, agents, affiliates or other representatives that involves legal rights or remedies arising from this Agreement, the parties agree to submit their dispute to binding arbitration under the authority of the Federal Arbitration Act; *provided*, *however*, that the Company or such applicable affiliate thereof may pursue a temporary restraining order and/or preliminary injunctive relief in connection with any confidentiality covenants or agreements binding on any of the parties, with related expedited discovery for the parties, in a court of law, and, thereafter, require arbitration of all issues of final relief. The Arbitration will be conducted by the American Arbitration Association, or another, mutually agreeable arbitration service. The arbitrator(s) shall be duly licensed to practice law in the State of Texas. The discovery process

28

shall be limited to the following: Each side shall be permitted no more than (i) two party depositions of six hours each. Each deposition is to be taken pursuant to the Texas Rules of Civil Procedure; (ii) one non-party deposition of six hours; (iii) twenty-five interrogatories; (iv) twenty-five requests for admission; (v) ten requests for production. In response, the producing party shall not be obligated to produce in excess of 5,000 total pages of documents. The total pages of documents shall include electronic documents; (vi) one request for disclosure pursuant to the Texas Rules of Civil Procedure. Any discovery not specifically provided for in this paragraph, whether to parties or non-parties, shall not be permitted. The arbitrator(s) shall be required to state in a written opinion all facts and conclusions of law relied upon to support any decision rendered. No arbitrator will have authority to render a decision that contains an outcome determinative error of state or federal law, or to fashion a cause of action or remedy not otherwise provided for under applicable state or federal law. Any dispute over whether the arbitrator(s) has failed to comply with the foregoing will be resolved by summary judgment in a court of law. In all other respects, the arbitration process will be conducted in accordance with the American Arbitration Association's dispute resolution rules or other mutually agreeable, arbitration service rules. The party initiating arbitration shall pay all arbitration costs and arbitrator's fees, subject to a final arbitration award on who should bear costs and fees. All proceedings shall be conducted in Dallas, Texas, or another mutually agreeable site. Each party shall bear its own attorneys fees, costs and expenses, including any costs of experts, witnesses and/or travel, subject to a final arbitration award on who should bear costs and fees. The duty to arbitrate described above shall survive the termination of this Agreement. Except as otherwise provided above, the parties hereby waive trial in a court of law or by jury. All other rights, remedies, statutes of limitation and defenses applicable to claims asserted in a court of law will apply in the arbitration.

(b)    Equitable Relief. Each party hereto acknowledges and agrees that any breach of this Agreement would result in substantial harm to the other parties hereto for which monetary damages alone could not adequately compensate. Therefore, the parties hereto unconditionally and irrevocable agree that nay non-breaching party hereto shall be entitled to seek protective orders, injunctive relief and other remedies available at law or in equity (including, without limitation, seeking specific performance or the rescission of purchases, sales and other transfers of Securities not made in strict compliance with this Agreement).

Section 6.10  **Severability**. If one or more provisions of this Agreement are held to be unenforceable under applicable law, such provision shall be excluded from this Agreement and the balance of the Agreement shall be interpreted as if such provision were so excluded and shall be enforceable in accordance with its terms.

Section 6.11  **Amendments and Waivers**. Subject to the last sentence of this Section 6.11, any term of this Agreement may be amended and the observance of any term of this Agreement may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of (i) the Company, (ii) HCMLP, (iii) the Highland Capital Stockholders holding a majority of the Shares of the Company's Capital Stock held by Highland Capital, and (iv) at any such time as Highland Capital does not hold a majority of the Shares of the Company's capital stock that are subject to this Agreement, the Stockholders holding a majority of the shares of the Company's capital stock (on an as-converted to Common Stock basis) then held by all Stockholders that are subject to this Agreement, *provided* that the

29

consent of the Remaining Stockholders shall not be required for any amendment or waiver if such amendment or waiver either (A) is not directly applicable to the rights of the Remaining Stockholders hereunder or (B) does not materially and adversely affect the rights of the Remaining Stockholders in a manner that is disproportionate to the effect on the rights of the other parties hereto. Notwithstanding the foregoing, any provision hereof may be waived by the waiving party on such party's own behalf, without the consent of any other party. Any amendment or waiver effected in accordance with this <u>Section 6.11</u> shall be binding upon each party to this Agreement and each future party to this Agreement. Notwithstanding the foregoing, neither (i) the addition of parties hereto as a condition to such person participating in a transaction described herein, nor (ii) the addition of a party hereto as a result of such party being or becoming a Highland Capital Stockholder, shall be deemed an amendment hereto, nor shall any update to the Schedules hereto from time to time to reflect the correct holdings of or other information with respect to the parties. No provision of this Agreement that is applicable expressly to Crusader, including Section 1.1(b)(vi), Section 1.1(b)(vii), Section 1.2(d), Section 4.1(a), Section 4.1(d), Section 5.1 and this Section 6.11, shall be amended in any respect that is applicable to Crusader without the prior written consent of Crusader.

Section 6.12 **Aggregation of Stock**. All shares of Common Stock or other Securities of the Company held or acquired by affiliated entities or persons (including, without limitation, the Common Stock or other Securities held by Highland Capital) may be aggregated together for the purpose of determining the availability of any rights under this Agreement. For the purposes of determining the availability of any rights under this Agreement, the holdings of transferees and assignees of an individual or a partnership who are spouses, ancestors, lineal descendants or siblings of such individual or partners or retired partners of such partnership or partnerships affiliated with such transferring or assigning partnership (including spouses and ancestors, lineal descendants and siblings of such partners or spouses who acquire Common Stock by gift, will or intestate succession) shall be aggregated together with the individual or partnership, as the case may be, for the purpose of exercising any rights or taking any action under this Agreement.

Section 6.13 **Entire Agreement**. This Agreement (including the Schedules hereto, if any) constitutes the full and entire understanding and agreement between the parties with regard to the subject matter hereof and thereof and supersedes any and all prior agreements relating to the subject matter hereof, including without limitation the First Stockholders' Agreement. The Company and each Stockholder acknowledges and agrees that neither the Company's Certificate of Incorporation or Bylaws shall be amended to include any transfer restrictions on the Company's Securities (it being understood that any and all applicable transfer restrictions, other than those arising under the securities laws generally, shall be as set forth herein).

Section 6.14 **Stock Splits, Stock Dividends, etc.** In the event of any stock split, stock dividend, capitalization, reorganization, or the like, any securities issued with respect to the shares of the Company's capital stock held by the Stockholders shall become subject to the terms of this Agreement.

Section 6.15 **Cumulative Remedies**. In addition to the rights and remedies stated in this Agreement, each party hereto shall have all those rights and remedies allowed by applicable laws. The rights and remedies of each party are cumulative and recourse to one or more right or remedy shall not constitute a waiver of the others.

30

**Section 6.16  Rights of Stockholders**. Each of HCMLP and each Stockholder, in its sole and absolute discretion, may exercise or refrain from exercising any rights or privileges that such Stockholder may have pursuant to this Agreement, the Company's Certificate of Incorporation or Bylaws, or at law or in equity; and neither HCMLP nor such Stockholder shall incur or be subject to any liability or obligation to the Company, any other party hereto, or any other person, by reason of exercising or refraining from exercising any such rights or privileges.

**Section 6.17  Further Assurance**. At any time or from time to time after the date hereof, the parties agree to cooperate with each other, and at the request of any other party, to execute and deliver any further instrument or documents and take all such further action as the other party may reasonably request in order to evidence or effectuate the consummation of the transactions contemplated hereby and to otherwise carry out the intent of the parties hereunder.

**Section 6.18  Joint Product**. This Agreement is the joint product of the Company and the other parties hereto and each provision hereof and thereof has been subject to the mutual consultation, negotiation and agreement of the Company and the other parties hereto and shall not be construed against any party hereto.

*[Signature Pages Follow]*

31

[Signature Page to Amended & Restated Stockholders' Agreement]

**IN WITNESS WHEREOF**, the undersigned party has executed this counterpart signature page to the Amended & Restated Stockholders' Agreement as of the date first above written.

<u>**COMPANY**</u>:

**CORNERSTONE HEALTHCARE GROUP HOLDING, INC.**

By: _____

Name: _____

Title: _____

<u>**HCMLP**</u>:

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By: Strand Advisors, Inc., its general partner

By: _____

Name: _____

Title: _____

[Signature Page to Amended & Restated Stockholders' Agreement]

## HIGHLAND CAPITAL STOCKHOLDERS:

**Highland Credit Opportunities Holding Corporation**

By: _____

Name: _____

Title: _____


**Highland Credit Strategies Holding Corporation**

By: _____

Name: _____

Title: _____


**Highland Capital Management, L.P.**

By: Strand Advisors, Inc., its general partner

By: _____

Name: _____

Title: _____

[Signature Page to Amended & Restated Stockholders' Agreement]

<u>**REMAINING STOCKHOLDERS**</u>**:**

**Highland Crusader Holding Corp.**

By: _____

Name: ___Mark S. DiSalvo_____

Title:___Authorized Signatory_____

[Signature Page to Amended & Restated Stockholders' Agreement]

**SCHEDULE A**

**Highland Capital Stockholders**
**(as of [●], 2020)**

| Name/Address | Number of Shares |
|---|---|
| Highland Credit Opportunities Holding Corporation<br>13455 Noel Road, Suite 800<br>Dallas, Texas 75240 | 4,029 |
| Highland Credit Strategies Holding Corporation<br>13455 Noel Road, Suite 800<br>Dallas, Texas 75240 | 8,119 |
| Highland Capital Management, L.P.<br>13455 Noel Road, Suite 800<br>Dallas, Texas 75240 | 1,022 |
| Highland Restoration Capital Partners Master, L.P.<br>13455 Noel Road, Suite 1300<br>Dallas, Texas 75240 | 6,655 |
| Highland Restoration Capital Partners, L.P.<br>13455 Noel Road, Suite 1300<br>Dallas, Texas 75240 | 5,445 |
| **Total** | **25,270** |

**SCHEDULE B**

**Remaining Stockholders**
**(as of [●], 2020)**

| Name/Address | Number of Shares |
|---|---|
| Highland Crusader Holding Corp.<br>800 Turnpike Street, Suite 300<br>North Andover, MA 01845 | 14,830 |
|  |  |
|  |  |
|  |  |
|  |  |

## EXHIBIT A

### Adoption Agreement

This Adoption Agreement ("***Adoption Agreement***") is executed by the undersigned (the "***Transferee***") pursuant to the terms of that certain Amended & Restated Stockholders' Agreement dated as of _____ (the **Stockholders' Agreement**") by and among Cornerstone Healthcare Group Holding, Inc. (the "***Company***"), Highland Capital Management, L.P. and certain holders of its Common Stock. Capitalized terms used but not defined herein shall have the respective meanings ascribed to such terms in the Stockholders' Agreement.

1.      <u>Acknowledgement</u>. Transferee acknowledges that Transferee is acquiring certain shares of the capital stock of the Company (the "***Stock***"), which shares are subject to the terms and conditions of the Stockholders' Agreement.

2.      <u>Agreement</u>. As partial consideration for such transfer, Transferee (i) agrees that the Stock acquired by Transferee shall be bound by and subject to the terms of the Stockholders' Agreement, to the same extent and with the same rights and obligations as the person(s) from which such Stock is received and (ii) hereby agrees to become a party to the Stockholders' Agreement with the same force and effect as if Transferee were originally a party thereto in the capacity of a [Highland Capital / Remaining] Stockholder.

3.      <u>Notice</u>. Any notice required or permitted by the Stockholders' Agreement shall be given to Transferee at the address listed beside Transferee's signature below.

4.      <u>Joinder</u>. The spouse of the undersigned Transferee, if applicable, executes this Adoption to acknowledge its fairness and that it is in such spouse's best interests, and to bind to the terms of the Stockholders' Agreement such spouse's community interest, if any, in the Stock.

EXECUTED AND DATED this _____ day of _____, _____.

**TRANSFEREE**:

_____

Title: _____
Address: _____
Fax: _____

Spouse: (if applicable):

_____

Name:

Acknowledged and accepted on _____, _____.

**CORNERSTONE HEALTHCARE GROUP HOLDING, INC.**

By:_____
Name: _____
Title: _____

# EXHIBIT B

**(To Be Filed under Seal)**

# EXHIBIT 2

*Partial Final Award* **dated March 6, 2019**

**(To Be Filed under Seal)**

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND,

Claimant,

v.                                              Case No. 01-16-0002-6927

HIGHLAND CAPITAL MANAGEMENT, L.P.,

Respondent.

**PARTIAL FINAL AWARD**

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with Section 9.03 of the Joint Plan of Distribution, and the Scheme of Arrangement, both entered into between the above-named parties and adopted in July 2011, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

I.       Introduction
    A.       The Parties
        1.       Claimant is a Committee of Redeemers in the Highland Crusader Fund (the "Committee"). Pursuant to the Joint Plan of Distribution of the Crusader Funds ("the Plan") and the Scheme of Arrangement between Highland Crusader Fund and its Scheme Creditors ("the Scheme")[1], HC300, the Committee was elected from among the investors in the Crusader Fund to oversee the management of the Crusader Fund by Highland Capital Management, L.P. (Highland Capital). The Plan and the Scheme are the governing documents which contain the arbitration agreements giving rise to this arbitration. The Committee is represented by Terri Mascherin, Andrew Vail, and Shaun Van Horn of Jenner & Block LLP.

        2.       Respondent, or Highland, is an investment manager and, until July 2016, served as such for the Highland Crusader Funds ("Crusader Funds" or the "Funds") that were formed between 2000 and 2002. The Funds consisted of one "Onshore Fund" and two "Offshore Funds," and the capital that was raised through these entities was pooled into a "Master

---

[1] The Plan was implemented with respect to Highland Crusader Offshore Funds by a "Scheme of Arrangement" ("Scheme") sanctioned by the Supreme Court of Bermuda. The Scheme incorporates the Plan and, unless otherwise noted, the Plan and Scheme contain effectively identical provisions. Unless the context requires otherwise, we will refer primarily to the Plan.

1

Fund." The capital was invested primarily in "undervalued senior secured loans and other securities of financially troubled firms" among other asset types. HC-17, at HC-117.0010[2]. Highland is represented by Gary Cruciani, Travis DeArmand, Michael Fritz of McKool Smith, LLP.

B.    The Arbitrators

1.    The three arbitrators, whose appointment was formalized by the International Center for Dispute Resolution ("ICDR"), a division of the American Arbitration Association ("AAA"), were David M. Brodsky, Chair, John S. Martin, Jr., and Michael D. Young.

II.    Background of the Dispute

A.    The 2008 Financial Crisis

1.    From 2000 until 2007, the Crusader Funds had double-digit annual returns, but in September and October 2008, as the financial markets in the United States began to fail, Highland Capital was flooded with redemption requests from Crusader Fund investors, as the Crusader Funds' assets lost significant value.

2.    On October 15, 2008, Highland Capital placed the Crusader Funds in wind-down, "compulsorily redeeming" Crusader Fund's limited partnership interests. Highland Capital also declared that it would liquidate the remaining assets and distribute the proceeds to investors. However, disputes over the appropriate distribution of the assets arose between those investors who had voluntarily redeemed their interests earlier in 2008 but had not yet been paid their redemption amount ("Prior Redeemers") and those who were compulsorily redeemed in October 2008 ("Compulsory Redeemers") (collectively, the "Redeemers").

B.    The Plan and Scheme

1.    At about the same time, an investor raised allegations of misconduct by Highland Capital and filed a wind-up petition in the Supreme Court of Bermuda. In 2011, after several years of negotiations among the Prior Redeemers, Compulsory Redeemers, and Highland, the Plan and Scheme were adopted and became effective in August 2011. The adoption of the Scheme and Plan was to "enable the orderly management, sale, and distribution of the assets" by Highland and the right of the Redeemers Committee to oversee Highland's services. HC-300 at 300.017.

---

[2] There are three sets of exhibits that will be referred to herein, Joint Exhibits (referred to as JX- —), Redeemer Committee Exhibits (RC- —), and Highland Capital Exhibits (HC- __).

2

2.　　　Central to the Scheme and Plan was the role of the Redeemer Committee, which was created so as to allow the investors in the Funds to have a greater level of influence over the affairs of Highland Capital than an ordinary creditors' committee would have in the liquidation of the Fund; that increased "level of influence" was particularly manifest in the Committee's ability to approve or disapprove of actions that Highland was contemplating taking, right of first refusal on other activities Highland wished to engage in, and the Committee's ability to terminate the services of Highland on 30 days' notice "with or without Cause." HC-300 at 300.016. Thus, the relationship between the Redeemer Committee and Highland, although grounded in contract, was designed to become one of mutual cooperation and confidence.

3.　　　Pursuant to §2.04 of the Plan, a ten-person committee of Crusader Fund investors, composed of five representatives of the Prior Redeemers and five representatives of the Compulsory Redeemers, was created. HC-300, § 2.04. As part of the Plan and Scheme, Highland Capital continued to serve as the investment manager for the Crusader Funds. As part of its duties as investment manager, Highland Capital was to liquidate fund assets and distribute the proceeds to the Crusader Fund investors pursuant to an agreed 43-month distribution schedule. In addition, as an incentive to Highland in its liquidation of assets, the Scheme and Plan provided that the Deferred Fees would be paid to Highland if it completed the full liquidation.

4.　　　It is not disputed that, between October 2011 and January 2013, Highland Capital distributed in excess of $1.2 billion to the Crusader Fund investors. It is also not disputed that the Crusader Funds were not completely liquidated when Highland paid itself the Deferred Fees in January and April 2016 and the Funds remain unliquidated as of the time of these hearings.

C.　　　The Arbitration Agreement

1.　　　Sections 2.09 and 9.03 set forth the terms and conditions by which these disputes are to be resolved in arbitration. Section 2.09 provides, in relevant part, that "in the event of a dispute between the Crusader Funds or the Redeemer Committee and HCMLP, ... the applicable representatives shall confer in god faith in an attempt to resolve the dispute...If the dispute cannot be resolved by mediation it will be referred to arbitration in accordance with Section 9.03."

2.　　　Section 9.03 provides, in relevant part, that "Any dispute referred to in Section 2.09...shall be subject to and decided by arbitration administered by the American Arbitration Association in accordance with its Commercial Arbitration Rules, and judgment upon the award rendered by the arbitrator(s) may be entered in any court having jurisdiction thereof pursuant to applicable law. Arbitration shall be conducted in New York, New York."

D.　　　Termination of Highland Capital and Ensuing Litigation

3

1.     For reasons set forth below, disputes began to arise between the Redeemer Committee and Highland Capital, culminating in the termination of Highland Capital as investment manager by letter and notice dated July 5, 2016, for cause and without cause, with termination being effective on August 4, 2016, RC-318. Highland Capital was replaced as investment manager by Alvarez & Marsal CRT Management, LLC ("A&M"). JX-31.

2.     On July 5, 2016, the Committee filed a Notice of Claim before the AAA, commencing an arbitration against Highland, RC-319, and also commenced litigation in Delaware Chancery Court, inter alia, to obtain a status quo order in aid of the arbitration. On July 8, 2016, a Vice Chancellor entered an oral status quo order in aid of this arbitration, pending the adjudication of the Committee's request for interim relief by an AAA arbitrator on an emergency basis pursuant to AAA Rule 38. On August 2, 2016, an Emergency Interim Order was entered by an Emergency Arbitrator appointed by the ICDR, which order replicated the oral status quo order entered in Delaware Chancery Court.

3.     On July 21, 2016, Highland filed its Answering Statement, denying the claims and asserting affirmative defenses.

E.     The Arbitration

1.     This Tribunal was established as of October 31, 2016. The parties consented to the appointment of the Tribunal.

2.     On October 14, 2016, Claimant filed an Amended Notice of Claim, seeking specific performance, injunctive relief, declaratory relief, money damages, and disgorgement arising out of the allegedly willful misconduct and violations of fiduciary and contractual duties by Highland Capital as investment manager of the Highland Crusader Fund. Claimant sought four species of relief: (a) an award requiring Highland Capital to provide to the Committee all information about the Fund and its assets as required by Section 2.05 of the Plan and Section 4.6 of the Scheme; (b) an award of money damages, including disgorgement, for Highland Capital's allegedly willful misconduct and breaches of its fiduciary and contractual duties, and for any unjust enrichment; (c) an injunction requiring Highland to return the so-called Deferred Fees and Distribution Fees to the Crusader Fund; and (d) declarations that the Consenting Compulsory Redeemers are entitled to payment of the Deferred Fee Account, and that Highland is not entitled to advancement of expenses and legal fees.

4

3.      On December 14, 2016, Respondent filed a motion for partial summary adjudication, seeking dismissal of those claims seeking monetary damages, seeking relief as both breaches of contract and of fiduciary duties, and seeking relief barred by the applicable Statute of Limitations; by Order of March 1, 2017, we denied such motions without prejudice to their being renewed upon the development of a fuller record.

4.      On February 16, 2017, Claimant filed a motion for partial summary adjudication, seeking an order compelling Highland to comply with its alleged contractual obligation under the Plan and Scheme to provide the Committee with the Crusader Fund's books, records and other information from 2011 to 2016. By Order, dated April 21, 2017, we entered a Partial Final Award, granting the relief sought by Claimant, and ordering Highland, inter alia, to produce non-privileged documents, as described in the Order.

5.      On April 11, 2017, Respondent moved for Summary Adjudication of its counterclaim for advancement to defend against the claims brought by the Claimant in the Arbitration and in the parallel Delaware action, Redeemer Committee of the Highland Crusader Fund v. Highland Capital Management, L.P., C.A. No. 12533-VCG (Del. Ch.) (the "Delaware Action"). Respondent sought a mandatory injunction requiring the Fund to escrow and segregate Crusader Fund assets to cover its indemnification and advancement rights. By Order and Partial Final Award in favor of Claimant, dated July 20, 2017, we denied Highland's motions for advancement in this Arbitration and in the parallel Delaware Action and for the mandatory injunction, on the ground that the "inter-party indemnification exception" applies.

6.      On December 8, 2017, Highland moved to amend its Counterclaims against the Redeemer Committee of the Highland Crusader Fund and for leave to file a third party demand for arbitration against Alvarez & Marsal CRF Management, LLC ("A&M CRF"), Alvarez & Marsal North America, LLC ("A&M NA"), and House Hanover, LLC ("House Hanover"). On January 11, 2018, following a pre-hearing conference call, Respondent filed a revised proposed amended Counterclaim against the Committee alone, raising counterclaims of breach of the covenant of good faith and fair dealing in the its performance and enforcement of the Plan, breach of its fiduciary duty, and aiding and abetting the breach of fiduciary duty by A&M CRF, A&M NA and House Hanover.

5

7.      By Order dated January 25, 2018, we granted the motion to amend Highland's counterclaims that raised direct claims of breach of fiduciary duty, breach of contract, and breach of the covenant of good faith and fair dealing arising out of the so-called Deferred Fees allegedly owed to Highland, and denied the balance of Highland's request for leave to file Counterclaims and Third Party Claims.

8.      On February 1, 2018, Respondent filed an Amended Answer and Counterclaims, seeking an order that the Committee account to Highland as an investor therein for all payments, gains, profits, and advantages obtained as a result of the Committee's alleged wrongful actions; that the Committee pay money damages, disgorge, and make restitution to Highland for damages arising from the Committee's alleged breaches of contract, breaches of the covenant of good faith and fair dealing, and breaches of fiduciary duty, including by awarding Highland the Deferred Fees allegedly improperly withheld, as well as an award of Highland's fees and expenses, including reasonable attorneys' fees incurred in this action; and such other relief as the Panel deems fair and equitable.

9.      On February 15, 2018, Claimant moved to strike portions of the Counterclaims on the grounds that certain of the new pleadings went beyond the limitations set by the Panel in the January 25 Order by including allegations that relate directly to claims the Panel had ordered not be included in the revised Counterclaim.  By Order dated April 1, 2018, we granted the motion of the Claimant to strike portions of the Counterclaim and directed Respondent to submit a revised Counterclaim to Claimant and the Panel.

10.     By Order dated March 19, 2018, we directed that "any party wishing to make a motion shall write a letter to the Panel, with copy to opposing counsel, seeking permission to make such motion..."

11.     By letter dated March 28, 2018, Highland requested permission to file a motion for partial summary adjudication with respect to the Committee's breach of fiduciary duty claims that accrued before July 5, 2013, which Highland contends are barred by the statute of limitations.  By Order dated April 5, 2018, relying upon AAA Commercial Arbitration Rule 33, we denied Highland's application to make a motion for partial summary adjudication, without prejudice to their doing so at the close of the Committee's main case at the hearing, if such factual and legal issues were briefed in the Pre-Hearing Briefs.

12.     On April 5, 2018, Respondent filed its revised Amended Counterclaims, seeking relief, as earlier, for alleged breaches of contract, of fiduciary duty, and of the covenant of good faith and fair dealing.

6

13.     On July 12, 2018, Highland moved to strike what it characterized as a new claim by the Committee. The Committee opposed the motion. By Order dated July 22, 2018, the motion to strike was denied.

14.     On August 19, 2018, after a series of discovery motions were decided, the Parties entered into a Joint Proposed Pre-Hearing Consent Order, which was So Ordered by the Panel.

F.     Hearing Dates and Witnesses

1.     An evidentiary hearing was held in New York, N. Y. on September 12-14, 17-18, 20-21, and 24-25, 2018.

2.     Claimant presented the oral testimony of Eric Felton, Burke Montgomery, David Morehead, and Brian Zambie, all Members of the Redeemer Committee; Steven Varner, Alvarez & Marsal ("A&M"); Robert Collins, PriceWaterhouseCoopers; and two experts, Scott Meadow, Analysis Group; and Basil Imburgia, FTI Consulting.

3.     Respondent presented the oral testimony of Isaac Leventon, Esq., Highland internal counsel; Brant Behr, Redeemer Committee Member; Matt Jameson, formerly employed by Highland Capital; Scott Ellington, General Counsel, Highland Capital; the deposition testimony of Thomas Sargent, the Compliance Officer of Highland; and two experts, James Finkel, Duff and Phelps, and Karl Snow, Bates and White.

G.     Post-Hearing

1.     On October 24, 2018, Claimant filed its Post-Hearing Memorandum on its Claims and Respondent filed its Post-Hearing Memorandum on its Counterclaim.

2.     On November 17, 2018, Claimant filed its Reply to Respondent's Post-Hearing Memorandum and Respondent filed its Reply to Claimant's Post-Hearing Memorandum.

3.     On November 30, 2018, the Panel heard closing arguments from counsel to the Parties.

4.     On December 10, 2018, the Parties filed Supplemental Post-Trial Memoranda, dealing with questions asked by the Panel during closing arguments.

5.     On December 12, 2018, the record was declared closed.

7

6.      On January 5, 2019, at the request of the Panel, the Parties consented to the adjournment of the timing of the award from January 11, 2019 to February 28, 2019. On February 25, at the request of the Panel, the Parties consented to the extension of the deadline to March 7, 2019.

H.      Issues to be Determined

1.      Claimant has pleaded four claims of breaches of fiduciary duty and of breaches of contract, arising out of similar fact patterns, as follows:

    a)      The taking of the Deferred Fees;
    b)      The payment of Distribution Fees;
    c)      The purchase of Plan claims without Redeemer Committee approval; and
    d)      The transfer of Barclays' Fund interests without Redeemer Committee approval.

2.      Separately, Claimant has pleaded claims of breach of fiduciary duty, as follows:

    a)      Engaging in related party transactions without Redeemer Committee approval
    b)      Refusing to settle claims brought by Credit Suisse;
    c)      Refusing to resolve the claims brought by UBS, which included a Temporary Restraining Order ("TRO"); and
    d)      Failing to make a good faith effort to sell the Cornerstone asset.

3.      In addition, Claimant seeks a declaratory judgment that there should be an immediate distribution of the Deferred Fee Account to the Consenting Compulsory Redeemers.

4.      Respondent has pleaded one counterclaim against the Redeemer Committee, alleging that the Committee breached its contractual and fiduciary duties by delaying liquidation of the Fund's assets after July 2016, and depriving Respondent of its right to receive the remaining funds in the Deferred Fees account payable upon complete liquidation of the Fund.

8

5.      Both Claimant and Respondent have also made claims for the recovery of their attorneys' fees and costs.

I.      Applicable Law

1.      At the outset, we address which law applies to which claims.  It is not in dispute that Claimant's breach of contract claims are governed by the law of New York State.  However, Claimant contends that the law of New York State also applies to the breach of fiduciary duty claims, as the breaches are claimed to arise from Highland's relationship with the Fund and its investors under the Plan, which provides for New York law. Respondent argues that any fiduciary duties owed by Highland arise under its services as investment manager of the Crusader Fund, and, thus, are governed by the law governing the Fund's Governing Documents, the state of Delaware.

2.      Although there are few, if any, significant differences between New York and Delaware regarding fiduciary duties of entities in the position of Highland vis-a-vis its investors and the Committee, we find that the governing law on the breach of fiduciary duty claims is most appropriately that of New York, the state whose law governs regarding the Plan and rights of the parties under the Plan.

III.    Discussion of The Issues

A.      We recognize and appreciate the exemplary efforts by counsel for each Party. The results set forth herein are not a reflection of any difference in the quality of those presentations, but of our review of the evidentiary record and of the relevant law.

B.      Taking of Deferred Fees

1.      When the Plan and Scheme were adopted, a prominent feature was the creation of a Deferred Fee Account which was designed to provide an incentive to Highland to liquidate expeditiously the Crusader Fund of its assets. Deferred Fees were annual performance fees payable to Highland but deferred until, as, and when there would be a "complete liquidation" of the Crusader Funds' assets," Scheme §1.5.2, Plan §2.02, HC-300.

9

2.     The evidence is uncontested that, as of the close of the hearing record in this matter, the Crusader Funds have not been completely liquidated. It is also uncontested that, on January 21 and April 6, 2016, Highland distributed to itself a total of $32,313,000 in Deferred Fees. JX-25 at 14; JX-26 at 13.  Highland's stated rationale, or "position," for making the payment without there first having been complete liquidation was set forth in the financial statements of the Funds for the year-end 2015, issued on April 22, 2016: the UBS TRO "prevented the full liquidation" and that Highland "would have received the Deferred Fees...but-for the impact of the restraining order still in place." Thus, Highland "believe[d] its right to receive the [Deferred Fees] crystalized as of the date the [TRO] was lifted," or January 21, 2016, JX-025.0010.

3.     The core of Highland's position was that, in January 2016, it sought, received, and relied on the advice of its outside counsel Akin Gump that the UBS TRO created an impossibility for it to have earned the Deferred Fees, thus allowing the self-payment. However, based upon the evidence heard, we do not find that Highland relied upon any such advice in executing its plan to take the Deferred Fees.

4.     We find that in January 2016, Highland's CEO James Dondero raised the possibility of taking the Deferred Fees before complete liquidation with Thomas Surgent, a Deputy General Counsel and Chief Compliance Officer at Highland, who then discussed the idea with Highland's General Counsel, Scott Ellington. Surgent Dep. 133:4-19.  Mr. Ellington testified that, in January 2016, he and others spoke on several occasions with lawyers from Akin Gump regarding the premature taking of the Deferred Fees, and that he received the advice that "the deferred fees could be taken under the circumstances," that it was a "calculated risk," and that, if successfully challenged, Highland would owe only "nominal interest." Tr. 10 167:14-168:25; 167:14-168:25.

5.     However, Mr. Ellington's testimony is not supported by the hourly billing records of Akin Gump, which do not show any time being billed in January 2016 for anything having to do with this or any other Highland-related issue. RC-523; Tr. 11 136:9-14. Furthermore, Highland's Assistant General Counsel, Isaac Leventon, testified that neither he, nor, he was certain, anyone else at Highland, consulted with outside counsel in January 2016 regarding taking the Deferred Fees.  Tr. 7 236:11-24.  When Highland executed on its "position" by paying itself the Deferred Fees in January and again in early April, Highland did not disclose the self-payment to its independent auditor or the Redeemer Committee.

10

6.      It was not until April 11, 2016, almost a week after it took the second tranche of
Deferred Fees that Highland belatedly informed its independent auditor, PriceWaterhouse
Coopers (PwC), of what it had done by sending it draft financial statements for the year
ending December 31, 2015, in which Highland disclosed, without explanation, a "change …
related to how [they were] … treating the deferred fee distribution." RC-288. On April 12, a
meeting was held between Highland and PwC, at which PwC sought an explanation from
Highland for the change in position and asked for a memorandum from Highland's counsel
and a "copy of the letter that was sent [to the Redeemers Committee] notifying them of the
position," JX-28.

7.      On April 12, Highland proceeded to have, apparently for the first time in 2016,
discussions with Akin Gump about a justification for its taking the Deferred Fees prior to
"complete liquidation." According to Akin Gump's billable time records, on April 12, there
was a telephone "call with Thomas Surgent regarding interpretation of distribution plan and
charging of fees during period of TRO." Following that call, on April 19, there was another
call with Mr. Surgent and Mr. Leventon "regarding audit disclosures with respect to legal
doctrine applicable to fee dispute…," following which an Akin Gump attorney started to
draft a memo on the "impossibility" issue. After further calls and discussions regarding the
drafting of the disclosure to the auditor, a memorandum was finalized and sent to PwC on
April 22, 2016, the day that the financials were issued. See RC-523; Tr. 11 136:9-14.)

8.      Although Mr. Ellington testified the Akin Gump memo was "entirely generated by
Akin Gump," without any participation by anyone from Highland, Tr. 10 189:14-21, there is
contrary and indisputable evidence that, in fact, someone at Highland drafted footnotes to
the financials that were then provided to Akin Gump and appear in the Akin Gump memo,
see Tr. 7 283:19-284:9; compare RC-289 with HC-277.  Further, Mr. Leventon exchanged
with Akin Gump and commented upon at least four separate drafts of the Akin Gump memo
before it was finalized. RC-291; RC-295; -RC300; RC-302; JX-29; Tr. 7 291:4-295:19.

9.      We find that Highland made a deliberate and calculated decision to make no
disclosure to the Committee of the actual taking of the Deferred Fees until the issuance of
the 2015 financial statements on April 22, 2016, but that, in the course of communicating
with PwC about its "position," Highland allowed PwC to conclude that it had informed the
Redeemer Committee of its position regarding the payment of the Deferred Fees, and did not
correct the misimpression. RC-441. It did so to induce PwC to provide the opinion Highland
needed to have clean financials.

11

10.     This was not the first time that Highland had sought to use the so-called "impossibility defense" as a basis for suspending its obligations under the Plan. In 2013, Highland had proposed to use the doctrine in an attempt to avoid making distributions pursuant to the Realization Schedule, attached to the Plan and Scheme. Highland's then-outside counsel, Christopher Panos, now a federal bankruptcy judge, was asked to provide an opinion to allow such action but he expressed strong reservations about the use of that doctrine in an affirmative context, RC-153.

11.     Thereafter, Highland tried to secure another opinion that would be more supportive of its position and received a PowerPoint presentation from Akin Gump in November 2014, HC-356, that provided some additional arguments but, ultimately, focused on the doctrine being able to be used only as a defense, see, e.g., HC-356 at 16.

12.     Finally, when in early 2015, Highland asserted to Committee counsel that, by reason of the UBS TRO, "all applicable distribution dates, distribution thresholds and fees payable" were tolled, by reason of the UBS TRO, JX-22, Committee counsel had strongly rejected such use of the TRO to attempt to justify Highland's failure to meet "either the Realisation Schedule or the distribution threshold for the Deferred Fee Account." RC-219.

13.     Notwithstanding two prior and unsuccessful attempts to use the doctrine to evade its obligations, Highland was not deterred and in late 2015 and early 2016, with the assistance of its inside counsel, but not on the advice of Akin Gump,planned for and then executed on the strategy to take the Deferred Fees.

14.     Under New York law, the doctrine of impossibility does not create an affirmative right to engage in any conduct; rather, under certain circumstances, it acts as a defense to claims of breach of contract. When an unforeseeable event, such as an injunction, occurs, and the actions of the non-performing contract party have not contributed to the occurrence, and the occurrence renders the performance of a contractual obligation objectively impossible, a party's contractual obligation can be excused. Kel Kim Corp. v. Cent. Mkts., Inc., 70 N.Y.2d 900, 902 (1987) ("While such defenses [as impossibility] have been recognized in the common law, they have been applied narrowly, due in part to judicial recognition that the purpose of contract law is to allocate the risks that might affect performance and that performance should be excused only in extreme circumstances"); JJ. Cassone Bakery, Inc. v. Consolidated Edison Co. of New York, Inc., 168 Misc.2d 272, 278, 638 N.Y.S.2d 898 (N.Y. Sup. 1996), rev'd in part on other grounds, 240 A.D.2d 634, 659 N.Y.S.2d 293 (2d Dept. 1997).  Absent such factors, the doctrine of impossibility is not available to excuse a party's performance and cannot be used to justify affirmative conduct.

12

15.    Highland attempts to squeeze itself into the four conditions, but its effort fails.  First, Highland argues that it is defending itself against accusations of breach of contract by invoking, defensively, the impossibility defense.  But it is Highland's illegitimate use of the impossibility defense to justify an affirmative act — the taking of the Deferred Fees — that is under attack, not its citation of the impossibility defense in 2018 as a defense to its breach of contract in 2016.

16.    Highland also argues that the TRO "rendered the complete liquidation of the Fund under the Plan's Realization Schedule objectively impossible." Closing Brief at 61. But Highland confuses the Realization Schedule which deals with timely distributions with the Deferred Fees which come into play only upon complete liquidation of the Fund with no deadline. Plan §2.02; Scheme §1.5.2.  In any case, when the UBS TRO was dissolved on January 21, 2016, there was nothing that prevented Highland from completing the liquidation.

13

17.     None of the factors allowing the doctrine of impossibility apply to the taking of the Deferred Fees.  Indeed, we find that Highland — and its inside counsel —knew none of the factors were applicable when Highland asserted the defense. First, the UBS TRO was not unforeseeable; in fact, as Mr. Panos had advised his client in 2013, "UBS had already filed suit and was threatening to get an injunction at the time of the approval of the Scheme."  Second, Highland's own acts gave rise to the UBS TRO, as it was UBS's accusation of Highland's fraudulent transfer of assets that gave rise to the TRO, as Mr. Panos again had advised Highland.  Third, as Mr. Leventon himself testified at the hearings, "the TRO did not do away with Highland's obligation to complete liquidation of the fund." Tr. 7 262:6-10. Finally, the doctrine of impossibility gives rise to no affirmative rights to take action in violation of a contract. Once again, Mr. Panos had given this critical advice to Highland in 2013.

18.     We have considered the other elements of Highland's defense to this claim and find them similarly wanting. We find that Highland's paying itself the Deferred Fees in 2016 constituted a breach of both the Scheme and Plan.  Given that finding, we need not reach the issue of whether the self-payment also constituted a breach of fiduciary duty by Highland to the Committee.

19.     As to remedy, under New York law, damages may be awarded for a breach of contract based upon the damages suffered by the claimant. Here, the damage suffered is the full amount of the Deferred Fees prematurely taken, plus prejudgment interest from the date of the taking.  "Prejudgment interest is generally granted 'in order to compensate the injured party for the loss, over a period of time, of the use of the property to which it was entitled.'" Panix Prods., Ltd v. Lewis, 2003 WL 21659370, at *2 (S.D.N.Y. 2003)(citing Lewis v. S.L. & E., Inc. 831 F.2d 37, 40 (2d Cir.1987)).  Although Respondent has raised good arguments as to why the interest rate should be nominal at best, we exercise our discretion to award statutory pre-judgment interest at 9% from the date of the taking, so as to measure as accurately as possible the totality of the damage that we perceive the Fund suffered by reason of the Deferred Fees being taken prematurely.

20.     Respondent also argues that the Tribunal lacks the authority to order a return of the moneys taken.  But measuring the damages suffered by the Fund by referencing the full amount of the Deferred Fees taken is not the same as literally ordering a return of the moneys. It is an appropriate measure of the damages because the Fees were to have stayed within the Fund until they were appropriately earned, and while in the Fund, they were to serve as a protection and cushion against creditors. In addition, very importantly, keeping the Deferred Fees was to have acted as an incentive to Highland to complete liquidation of the portfolio, an event that had not occurred when Highland was terminated and still has not occurred. Taking the Deferred Fees deprived the investors of all of those benefits. The Deferred Fees in the amount of $33,313,000 should be returned in full, and with full statutory interest of 9% from the dates of taking in January and April 2016 through the date of this Partial Final Award.

14

C.     Distribution Fees

1.     Under the Plan, Highland was to receive fees in the amount of 125 basis points based on "all amounts actually Distributed to Redeemers during each quarter following the

Effective Date . . . provided that assets equal to or in excess of the amount scheduled in the Realisation Schedule have been distributed to Redeemers during such quarter (with amounts distributed to Redeemers in excess of scheduled distributions for prior quarters being carried over.)" (Emphasis added) (Plan §2.01; Scheme §4.4.)

2.     Claimant alleges that Highland breached the provisions of the Plan by paying itself distribution fees totaling $14.5 million despite not having "actually" distributed to the Redeemers each quarter the minimum required to have been paid by the Realisation Schedule (Plan Appx. A). The Committee alleges that Highland paid itself distribution fees eight times, but that the only time Highland met or exceeded the goals set by the Realization Schedule was in the quarters ending January 31, 2013, and April 30, 2013. Other than those two quarters, Claimant contends that Highland missed the target in every other time period. Claimant also charged Highland with a breach of fiduciary duty, arising out of similar facts.

3.     The Committee alleges that six of the distribution fee payments were improper because Highland improperly calculated the amount paid to the Redeemers in one or more of the following ways: (1) in treating Deferred Fees as Distributions; (2) in withholding tax obligations from payments to Redeemers, but counted them for purposes of qualifying for its fee; (3) in improperly including amounts that it reserved to pay Barclays, amounts used to pay the Barclays settlement, and amounts paid to its affiliate Eames in its calculation of Distributions; and (4) in borrowing on margin and improperly treating such borrowings as "excess cash" under the Plan and, therefore, as Distributions.

4.     In addition, Claimant argues that if Highland missed any quarterly hurdle set in the Realisation Schedule, its deficiency would carry over to the next quarter, giving Highland an accordingly higher hurdle, or watermark, to meet in that next quarter. In other words, Claimant urges that the Realisation Schedule was intended to be cumulative.

5.     Cumulative Quarterly Hurdles

a)     Starting with the last issue first, the language in the Plan in question is as follows: "HCMLP will receive fees in cash ... (b) provided that assets equal to or in excess of the amount scheduled in the Realisation Schedule have been distributed to Redeemers during such quarter (with amounts distributed to Redeemers in excess of scheduled distributions for prior quarters being carried over)." HC-300 at 74 (emphasis added). Plan §2.01.

15

b) Claimant argues that, although the foregoing language is not explicit regarding both the positive and negative cumulative nature of the Realisation Schedule, there is evidence sufficient to establish that requirement from the text itself and from the testimony of those who negotiated the clause in the Plan, citing the testimony of Mr. Montgomery ("The Realisation Schedule was a cumulative concept. 100 million during one period, 100 million to the next, 200 million during the next. . . . it was designed to be cumulative. It was a stack.") Tr. 3 307:5-19. The Committee also points out that Highland kept internal accounting schedules that treated the Schedule as cumulative, including RC-364 at pp. 10, 23, 36, 49, 62, 75, 88, 101, 114, 127, 140; see also Tr. 4 196:17-197:19; Tr. 9 256:14-259.

c) Finally, the Committee urges that there would be "perverse incentives" if Highland were allowed to treat the Schedule as cumulative if it got ahead of the distribution schedule but not if it fell behind, because if Highland knew it could not make a quarterly target, it would have the incentive to skip that quarter and wait until the next quarter where it would meet the Realisation Schedule for only that quarter. This would have the undesirable effect of delaying liquidation but not adversely affecting Highland's receipt of incentive fees.

d) Highland strongly urges that the clause in question is unambiguous in requiring only a positive carry-forward, with no hint that a failure to meet a quarterly hurdle imposed an obligation to reach a high water mark that would meet both the prior hurdle and the present quarterly hurdle. In addition, Highland argues that, as Mr. Montgomery conceded on cross-examination, the Plan could have contained a cumulative shortfall provision, but that the inclusion of such language was never discussed with Highland, Tr. 3 at 308:7-13, and such could have been incorporated into the Plan had that been the Parties' intent.

e) Highland also criticizes the Committee's "perverse incentive" argument, arguing, first, that Highland was highly incentivized to liquidate as quickly as possible so it could receive Distribution Fees during the pendency of the 36-month Realisation Schedule (§2.02) and obtain the $10 million Deferred Fee by distributing $1.7 billion within 43 months of the Plan's Effective Date (§6.02); and, secondly, "if Highland fell too far behind," it would lose its incentive to continue expeditious liquidation of the Fund's assets. Respondent's Post-Hearing Brief at 57. See Tr. Day 12 at 169:3-18 (Snow).

16

f) In interpreting the section of the Plan, it is significant that the language regarding a positive carry-forward appears in a parenthetical phrase, not in the main operative text. Without considering the parenthetical, we read the main operative text as setting a test that Highland has to meet — each quarter, assets "equal to or in excess of the amount scheduled in the Realisation Schedule" must be distributed to Redeemers, or else Highland will not "receive fees in cash" that quarter. Thus, each separate quarter, Highland has to make a required distribution or will not be paid fees. But if each quarter there is a test that Highland has to meet, it would defeat the purpose of the quarterly test for Highland to be able to garner fees by just meeting the goal for one particular quarter without regard to how it had performed the prior quarter. Without a reward or a penalty each quarter dependent upon whether it met (or exceeded) the goal, Highland could undermine the objective of the clause. The supplemental parenthetical phrase simply makes explicit one benefit to Highland of overachieving such quarterly goal. We conclude that §2.01 requires both a positive and negative cumulative process.

g) To read it otherwise would create a perverse incentive of encouraging Highland to skip quarters. The contrary is not true: by having both a positive and negative cumulative obligation, Highland loses no incentive to continue to liquidate, perhaps at a faster pace than it in fact adopted, if it were to fall behind.

h) Though we reach our conclusion without need to rely on extrinsic evidence, we note that our interpretation is supported by Mr. Montgomery's testimony regarding Highland's request to include a parenthetical to make clear that it would not lose the benefit of an over-distribution and could carry it forward. See JA Apparel Corp. v. Abboud, 568 F.3d 390, 397 (2d Cir. 2009).

D. Deferred Fees as Distributions

1. With respect to Highland's treating Deferred Fees as Distributions, the Committee urges that Deferred Fees being reserved in an account for possible later distribution were not amounts "actually Distributed" or the kind of Distributions made to Redeemers as part of the return to them of their investment.

2. Highland defends on the basis that the Committee's position that Deferred Fees should not be included in calculating Distribution Fees is inconsistent with the parties' course of performance. From the outset, Highland argues that it included Deferred Fees in its calculation of Distribution Fees and gave written notice of its inclusion to the Committee on at least four occasions. HC-552; HC-591; HC-592; HC-593. However, Highland is not making the argument that the Plan was amended by what it says was its known conduct.

17

3.     Highland also argues that its successor, A&M, also included Deferred Fees in its calculation of Distribution Fees based upon the substantively identical language in the A&M investment management agreement, HC-56 at 6, and received a Distribution Fee based on that calculation in October 2016.

4.     We find that whether Highland's conduct was disclosed to the Committee or whatever A&M may have done are both irrelevant to the issue in this case, because, as we analyze the evidence adduced, the only relevant issue is whether including Deferred Fees in the calculation of Distribution Fees is authorized by the language of the Plan, and we find that it is not.

5.     The Plan sets forth a program of fees capable of being paid to Highland: if Highland met certain quarterly goals of distributions made to Redeemers, as set forth in the Realisation Schedule, it was entitled to receipt of certain Distribution Fees; if it distributed at least $1.7 billion to the Redeemers prior to the 43d month following the Effective Date, it was entitled to receive payment of the fees in the Deferred Fee Account in accordance with Section 2.02 of the Plan.

6.     The Plan distinguished what Highland had to do to qualify to receive each category of Fees. With respect to Deferred Fees, the Plan provides that "Highland shall not be deemed to be a Redeemer in respect of the deferred fees." We read that sentence as making clear that Highland's setting aside of Deferred Fees into a account that it might eventually be able to draw upon should not be construed as a form of distribution such that, if it were a Redeemer, it could be construed as an "actual" distribution.  Because Highland is not "deemed to be a Redeemer," its payment to a fund is not equivalent to a Distribution to an investor.

7.     We find that this language is not ambiguous and does not allow for the practice used by Highland to beef up the amount of Distribution Fees it received.

18

E.      Withholding Taxes as Distributions

1.      The evidence at the hearing was that, as required in the Plan, HC-300 at 80, Highland took into account the amount of taxes that should be withheld and paid those amounts to the appropriate taxing authorities; however, Highland also included those withheld amounts in the calculation of amounts "actually" distributed to Redeemers.  The Committee contends that such withheld amounts were not "actually Distributed to Redeemers," and points out that, in fact, only a subset of Redeemers — the Offshore Fund investors —  were subject to tax withholding, RC-62; Tr. 9 275:5-23, while some investors were nonprofits that did not pay taxes at all,  Tr. 12 167:5-24.  The Committee also points out that, when first informed in 2012 that Highland had counted tax withholdings toward the May 1, 2012 Distribution, the Committee objected, demanding successfully that Highland make up that shortfall. RC-68; Tr. 3 301:6-12; Tr. 9 278:4-279:16.

2.      Highland makes two points in its defense: first, tax withholdings made on behalf of an employee are considered "compensation," so tax withholdings for Crusader investors should also be treated in a "common-sense manner" as "distributions" to those investors; and second, Highland disclosed its methodology in at least one monthly report in November 2013, HC-591 at 14 (Nov. 2013 Summary Report), to which the Committee never objected.

3.      We need not consider either of these defenses because we find the language of the Plan supports the treatment by Highland of these amounts. As stated above, "Distributions" is defined as "Amounts to be paid to Redeemers under the Plan, including amounts to be paid to Redeemers under the Scheme..."  §1.01. The operative language regarding withholding for taxes is as follows: "In connection with ... all Distributions to be made hereunder, the Crusader Funds shall, to the extent applicable, comply with all tax withholding and reporting requirements imposed by any ... taxing authority, and all Distributions hereunder shall be subject to any such withholding ... requirements. The Crusader Funds are hereby authorized to take any and all actions that may be necessary or appropriate to comply with any such requirements."

4.      Read together, we find that "the amounts paid to Redeemers" were "subject to ... withholding requirements" and thus, were appropriately included within the calculation of amounts distributed to Redeemers, even if, in fact, it was an indirect payment. We find for Highland on this branch of the Committee's claim.

19

F.    Payments to Barclays and Eames as Distributions

1.    In 2006 and 2007, Barclays and a Highland affiliate entered into two securities transactions — a prepaid forward transaction and an accreting strike option transaction. In connection with those two transactions, Barclays became an investor in the Highland Funds. JX-5. In late 2008, Barclays submitted redemptions for its full interests in the Highland Funds, which Highland did not honor. Litigation between Barclays and Highland entities ensued. When the Plan and Scheme were adopted, Barclays did not consent and became what it is referred to as a Non-Consenting Redeemer. HC-300, at HC-300.0075.

2.    Thereafter, when Fund assets were disposed of and amounts distributed to Redeemers, no amounts were actually paid to Barclays; instead, amounts equivalent to those that Barclays would have received if it was a Consenting Redeemer were paid into the Redeemer Trust Account. That Account was set up for the purpose of segregating the deposited funds so they could be "used to pay all costs of HCM-Related Parties and the Redeemer Committee to defend, respond to, settle and satisfy any Claims by Crusader Fund Redeemers excluding Plan Claims ("Redeemer Claims") and ... to defend, respond to, settle and satisfy any such Redeemer Claims in advance of any amounts otherwise properly available for such purposes out of the assets of the Crusader Funds." Plan 6.01.

3.    Notwithstanding such amounts remained in a designated account at a major financial institution, Highland treated such reserves as "actual" Distributions and paid itself fees based on the amounts reserved. The Committee argues that amounts reserved in the Redeemer Trust Account were not "actually Distributed" and that fees taken by Highland for such deposits were taken in breach of the Plan.

4.    We find that Highland's treatment of the reserves as Distributions violated the terms of the Plan.

5.    In July 2012, Highland, Barclays, and other entities entered into a settlement agreement, resolving all of the claims between and among them. JX-5. As part of the settlement, Barclays received both the cash reserved since August 2011 and several additional cash distributions expected between July and December 2012, essentially the exact distribution amounts that it was entitled to as a Consenting Redeemer. Tr. Day 9 at 146:12-19 (Palmer); HC-275; HC Demo 10 at 4.  Pursuant to the settlement, Barclays became a Consenting Redeemer, see JX-5 at 12 (§ 11.3). Highland treated such portion of the settlement payments as "Distributions" and paid itself the fees associated with that amount of Distributions. The Committee contends that any payments to Barclays were in settlement of various claims, in exchange for which there was a "relinquishment and/or abandonment" of all of Barclays' rights and interests in the Highland Funds, JX-5 at 3, and, thus, such payments were not Distributions.

20

6.      Finally, as part of the settlement, the two limited partner interests that Barclays had in the Funds were transferred to a newly-formed and wholly-owned affiliate of Highland, Eames; amounts equivalent to what Barclays would have received as an investor after the settlement were paid to Eames, totaling $35.1 million, and Highland treated such amounts as Distributions and paid itself the appropriate fees.  The Committee urges that the transfer of LP interests was in violation of Section 2.05(f) which gives that the Committee "the authority to approve or disapprove the assignment or transfer of interests in the Feeder Funds or Plan Claims," HC-300, and that the transfer was explicitly disapproved, RC-79 ("The Crusader Redeemer Committee does not believe that Highland has the right to take assignment of Barclays' interest in the Crusader Fund. The Committee believes its approval is required for any such assignment under the Plan/Scheme, and the Committee is not willing to approve that assignment."). Furthermore, the Barclays Settlement Agreement provided that the settlement was subject to Highland's receiving all necessary approvals under the Crusader Plan of Liquidation, which the Committee contends Highland did not receive. HC-330, §12.3.2, at HC-330.0014.

7.      Highland argues, first, that the Committee's right to approve or disapprove of the transfer of interests under Section 2.05(f) is not applicable because under Section 2.05(g)[3], the Barclays settlement did not give Barclays more than it would have received as a Consenting Compulsory Redeemer; that, in any case, 2.05(f) is subject to the "reasonableness" test under Section 2.07[4]; and, finally, that it was entitled to keep the LP interests because the LP interests were in the Redeemer Trust account, citing to HC-275. We find that Highland breached the Plan and Scheme by transferring the LP interests to a wholly-controlled affiliate after the Committee had specifically disapproved of the transfer. Its rejection was reasonable in that it was acting in the best interests of the other investors to have a smaller investment base that would have a greater portion of the asset distributions. The accounting ledger maintained by Highland, which created much confusion at the hearing, was not evidence that the LP interests were in the Redeemer Trust account; we agree with the Committee that the spreadsheet was an accounting convenience for Highland.

8.      We also find that Highland breached the Plan by taking fees in connection with amounts reserved in the Redeemer Trust Account; by no stretch of the imagination could one reasonably conclude — or argue — that an amount reserved in an account that was available to settle and pay costs in connection with all forms of Redeemer Claims could be considered as amounts "actually Distributed" to Redeemers. In any case, with respect to the amounts reserved, no Redeemer received any Distribution in the quarters when Highland claimed fees.

---

[3] "The Redeemer Committee will have, subject to the execution and delivery of customary and reasonable confidentiality agreements:… (g) the authority to approve or disapprove any settlement by the Crusader Funds with Barclays that would be in excess of what Barclays would receive as a Consenting Compulsory Redeemer…"

[4] "The approval of the Redeemer Committee with respect to any matter submitted for approval under Sections 2.05 or 2.06 shall not be unreasonably withheld."

9.      We also find that Highland breached the Plan by taking fees in connection with amounts reserved in the Redeemer Trust Account; by no stretch of the imagination could one reasonably conclude — or argue — that an amount reserved in an account that was available to settle and pay costs in connection with all forms of Redeemer Claims could be considered as amounts "actually Distributed" to Redeemers. In any case, with respect to the amounts reserved, no Redeemer received any Distribution in the quarters when Highland claimed fees.

10.     Finally, we find that when Barclays received the amounts, as part of the Settlement Agreement, that had been set aside in 2012 as if Barclays was then a Consenting Redeemer, it did not receive such amounts as Distributions "actually" paid to a Redeemer but rather as part of the Settlement amount. Although Barclays was "deemed" to have become a "Consenting Redeemer," it had that status only for the moment in time sufficient to transfer its LP interests to Eames. As the Settlement Agreement noted, "certain payments will be made by the Highland Entities to Barclays … in consideration of the settlement of the Claims hereunder and the assignment, relinquishment and/or abandonment by Barclays of all rights and interests it had in the Fund Interests…" HC-330 at HC-330.0003. Highland breached the Plan by treating the amounts paid to Barclays as if they had been received as a Consenting Compulsory Redeemer as Distributions.

11.     We conclude that it was improper for Highland to include in the calculation of the amounts distributed to the Redeemers:

      a)      The Distribution Fee attributable to the amounts reserved in the Redeemer Trust Account;

      b)      The Distribution Fee attributable to the amounts paid in settlement of the Barclays claims; and

      c)      The Distribution Fee attributable to the value of the LP interests and amounts transferred to Eames.

22

G.      Margin Borrowings as Distributions

1.      In January and April 2012, Highland caused the Fund to borrow $60 million from its
Jefferies brokerage account to distribute to Redeemers. The Committee contends that it did
so because Highland had not liquidated enough assets to meet the Realisation Schedule.
After learning about the loans in September 2012, the Committee protested and directed Mr.
Dondero at the September 2012 meeting to take no further margin loans without its consent.
Tr. 2 353:2-22; RC-85; JX-8. The Committee contends that Highland's taking such margin
loans to reach the Realisation Schedule and then paying itself Distribution Fees based on
having reached the quarterly goal with the assistance of the margin borrowing breached the
Plan because the margin borrowing did not constitute Excess Cash resulting from the
liquidation of assets from which Distributions must come. Plan §§1.01, 3.01; Scheme §§2.4.1,
2.4.2.

2.      Highland maintains that, as it was authorized under the Plan, to engage in margin
borrowing, and that amounts were actually distributed to the Redeemers, such payments to
the Redeemers were appropriately treated as Distributions qualifying it to receive
Distribution Fees.

3.      We find that such margin borrowings, which were authorized under the Plan, did not
qualify as the type of Distribution that would entitle Highland to receive a Distribution Fee.
The plain language of the Plan requires that any Distribution Fee be paid to Highland only
upon the appropriate amount of Excess Cash having been accumulated from the sale of
"assets equal to or in excess of the amount scheduled in the Realisation Schedule…" The
"assets" referred to are the "assets, respectively, of the Onshore Fund, Offshore Fund I and
Offshore Fund II…" §2.01. No such assets were sold and therefore no Excess Cash was
accumulated to be distributed to the Redeemers.

23

4.      The Committees expert, Mr. Imburgia, determined that the result of Highland's including the above improper items in the calculation of Distributions to Redeemers in calculating its entitlement to Distribution Fees, resulted in Highland paying itself Distribution Fees to which it was not entitled by an overpayment of $14,452,275 in Distribution Fees. The Committee is entitled to judgment in that amount plus interest at the rate of 9% from the date of each improper fee. RX 408, Schedule 2.1

H.      Purchase of Plan Claims[5]

1.      From December 2013 through January 2016, Highland purchased twenty-seven Plan Claims from Crusader investors for itself, without the approval of the Committee [ Tr. 5 50:5-8.] The Committee contends that such purchases breached the Plan, because if it had known that the Plan Claims were available for sale, it would have exercised its ROFR. Tr. 3 163:11-24; Tr. 4 389:3-390:23. The Committee urges that the UBS TRO, said by Highland to block any purchases by the Fund during its pendency, does not in fact bar such purchases; in any event, the Committee points out that it is conceded that the Fund had assets other than the allegedly restrained assets with which to make purchases outside of the restrained assets. The Committee seeks damages equivalent to the value of the Claims at the time they were sold, any profits or benefits realized by Highland, and pre-judgment interest at 9%, for a total of $8,897,899 plus interest.

2.      Highland raises a number of defenses. First, it argues that, during the period that the TRO was in effect, the Committee agreed with the advice given by the Fund's (and Highland's) counsel in the UBS case, Lackey Hershman, that the TRO, at minimum, prevented the Fund from spending cash to buy-out other investors before UBS's claims were resolved. See Tr. Day 7 at 319:17-332:3. Thus, Highland contends that the Committee cannot prove it would have purchased the Claims had they been offered to it.

---

[5] Plan §1.01: "Plan Claim. The claim of a Redeemer to payment of, or based upon, the Redemption Amount relating to the redemption of its shares or withdrawal of its capital account balance, as the case may be, in the Crusader Funds as detailed in Section 4.01."

3.      But the record doesn't support that interpretation. First, refuting the idea that the Committee agreed with the advice being relayed to them is the exchange of correspondence between counsel for the Committee counsel and Highland set forth in RC-360, in which Committee counsel rejected the advice said to have been received from outside counsel, and stated how the Plan Claims should be dealt with if Highland were to persist in asserting that the TRO so blocked the Committee's exercise of its ROFR: "the Committee does not agree with Highland's interpretation of the UBS TRO because the expenditure of money to redeem interests is not a "Distribution" and, in any event, if Highland feels strongly that it cannot use the Funds' assets in this way, any acquisition of the interests by Highland or an affiliate is subject to the Committee's exercising its rights under Section 5.04 when the TRO is lifted or when the interests can, in Highland's opinion, be acquired by the Fund consistent with the UBS TRO. Otherwise, the Committee did not approve of the transfer of the Scheme Claims." RC-360 at 87-88.

4.      Furthermore, before the TRO, when presented with the opportunity to purchase Plan Claims, the Committee exercised its right of first refusal (ROFR) on five occasions, see RC-358. During the pendency of the TRO, the Committee was informed about only five of twenty-eight Plan Claims purchases and disapproved each of the purchases by Highland, but the disapprovals were ignored. The Committee informed Highland that it disagreed about the scope of the TRO but that if Highland, as Fund Manager believed the TRO prevented the Fund from purchasing the Plan Claims, then it would be consistent with the Committee's ROFR for the right to be exercised when the TRO was lifted. HC-580.

5.      We find that the Committee would have exercised its ROFR if it had been given full information and had not Highland been preventing the exercise of the ROFR by invoking the TRO and misrepresenting to buyers that it had the ROFR.

25

6.      As a second defense, Highland contends that during the period that the UBS TRO was in effect, it relied on advice of counsel that the TRO prevented the Crusader Fund from acquiring any Plan Claims, thus opening the door for Highland to purchase the Plan Claims that would otherwise have been subject to the Committee's ROFR under §§2.05(f)[6] and 5.04[7] of the Plan.

7.      Mr. Leventon testified that the TRO was obtained by UBS in response to UBS's allegation that Crusader Funds had participated in a fraudulent transfer of assets from a UBS debtor; the TRO restricted transfer of assets but because those assets had been acquired about four years previously and disposed of in the ordinary course of business, "the UBS TRO was essentially designed to 'collateralize' UBS against the March 25, 2009 asset transfer. And if they couldn't be collateralized with those exact assets and the exact actual cash ... or cash equivalent, then it had to be collateralized with something else. And that something else was the assets of the fund." Day 7 at 328:12-20.  That testimony would suggest that from the moment that the TRO went into effect, the Fund was under constraints not to purchase any Plan Claims or other assets.

8.      But this explanation is not convincing.  Regarding the advice received from Lackey Hershman, Mr. Leventon testified that the majority of the advice received was orally and over time, and that the advice was "an evolving interpretation" that "crystallized...in the first quarter of 2014." Id. at 330:9-17.  The advice consisted of "a bunch of verbal conversations, but a lot of that advice is embodied in that memo [HC259] that Lackey wrote to the Crusader Fund. Because we wanted the Committee to understand our quandary."  Day 7 at 319:17-332:3 (Emphasis added).

---

[6] Plan §2.07(f): "The Redeemer Committee shall have ... the authority to approve or disapprove the assignment or transfer of interests in the Feeder Funds or Plan Claims; provided that such proposed assignment or transfer shall be deemed to be rejected if not affirmatively approved in writing within 30 days of submission to the Redeemer Committee..."

[7] Plan § 5.04: "No assignment or transfer of a Plan Claim after the Effective Date may be purchased by [Highland] or its affiliates without such Plan Claim first being offered to, and rejected by, the Crusader Funds."

26

9.      The Lackey Hershman memo, dated July 23, 2014, HC-259, deals only with the practical consequences of seeking an amendment to the UBS TRO while an appeal was pending, and does not provide any advice regarding the scope or interpretation of the UBS TRO.[8] Notably, there is no other document from Lackey Hershman presented at the hearing, even including emails, that supports Mr. Leventon's explanation.

10.      Perhaps in recognition of the thin basis for its claim that it relied on the advice of counsel, Highland requests that the Panel draw no inferences from the "relatively few written communications on this issue," because there was, Highland contends, "unrebutted testimony" of the "contemporaneous advice of counsel." Highland points to a letter from an internal counsel at Highland to the Committee that cites advice from outside counsel regarding the effect of the TRO on the Committee's ability to purchase Plan Claims, RC-360 ("outside counsel to HCMLP has advised that the temporary restraining order which has been imposed by the Court in UBS Securities LLC et al. v. Highland Capital Management, L.P. prohibits the Crusader Funds from purchasing the Scheme Claims using assets of the Crusader Funds").

11.      The statement by internal counsel is the type of hearsay that was received in evidence only because this was an arbitration but to which, under the circumstances, we accord little substantive weight. We find more persuasive the absence of any writing, even an e-mail, directly from the law firm regarding the scope of the TRO and restrictions against the Fund using its assets to purchase Plan Claims or similar items.

12.      Further, we find that, even before the TRO went into effect, and thus well before any advice from counsel would have been received, Highland was laying the groundwork for purchasing the Plan Claims for itself and bypassing the Committee's ROFR.

---

[8] On questioning by members of the Panel, Mr. Leventon referred to the Lackey Hershman memo in broad terms:

"As set forth in the Lackey memorandum, which we all have, Lackey reported that UBS said that, Crusader and Highland Credit Strategies could neither distribute cash to anybody, nor sell assets, nor make any payments outside of the normal course of business...ARBITRATOR BRODSKY: Is the Lackey Hershman memo you're referring to the one that is HC-259, dated July 23, 2014? THE WITNESS: I believe that's correct. ARBITRATOR BRODSKY: I don't see any reference to conversations relayed to you by counsel about what UBS said. I see a sentence on page RC-3208 at the top, it says, "UBS counsel stated that they're not willing to enter into such a stipulation unless Crusader provided detailed discovery of its cash and asset holdings," et cetera, et cetera. Is that what you were referring to? THE WITNESS: Yes. They were not willing to modify the TRO in order to permit the sale of assets unless Credit Strategies, Crusader and other defendants handed over detailed financial information that they would not otherwise be entitled to in discovery. And we were advised that that was a prohibitive risk."

Day 8 170:10-17, 173:4-174:7.

13.     On May 29, 2013, Highland caused the Board of the Master Fund, which it controlled, to adopt a resolution, as follows: "Whereas, ... (2) certain investors from time-to-time desire to sell their interests as redeemed, unpaid shareholders, in the Company ... (any such shares, 'Offered Shares'); (3) one or more principal accounts (the "Related Accounts') in which James Dondero ... and/or Highland ... have material, direct and indirect, financial and ownership interests, have enters a bid to purchase certain of Offered Shares; (4) the bid of the Related Account(s) is equal to or greater than the highest bid; ...Now Therefore Resolved That (1) the undersigned Directors hereby consent to the Proposed Transaction and any future transfers of Offered Shares to the Related Account(s)..." RC-276 at 5; Tr. 7 63:25-68:14.

14.     This pre-approval of transfers of interests in the Fund to Mr. Dondero, Highland, or its affiliates does not reference the Committee's ROFR, but it enabled Highland, falsely, to claim that it had a ROFR.  Using that Resolution, Mr. Leventon informed multiple investors interested in possible transfers of their interests, that Highland had a ROFR to purchase any Plan Claims, never mentioning the Committee's prior and superior ROFR. RC276[9]; RC280; RC434. This conduct alone constituted a breach of the Plan, because it deprived the Committee from having any insight into the transactions as to which the Plan gave them rights to purchase the underlying interests.

15.     Furthermore, by the time Highland received the Lackey Hershman memo in July 23, 2014, Highland had purchased fourteen Plan Claims, nine of which were not disclosed to the Committee. Thereafter, Highland purchased another thirteen Plan Claims without any disclosure to the Committee. Mr. Leventon testified that the only reason for Highland not to consult the Committee about the 27 purchases in 2013, 2014, and 2015 was its interpretation of the TRO. Day 7, 172:2-10.

16.     Additional actions by Highland further demonstrate that the reliance on the TRO was a facade, designed to enable Highland to attempt to purchase a majority interest in the Fund without the Committee's knowledge. In May 2014 and again in January 2016, Highland hired a broker to solicit all Fund investors, except those who were on the Committee, to buy their interests at half or approximately half of the NAV that Highland had itself set. RC417; Tr. 7 95:8-20, 96:8-23; RC425.

---

[9] "By way of Written Resolution, the Board of Directors of [the Fund] determined that if the Investment Manager or an affiliate offers to purchase the shares in the Fund, then that bid shall be accepted if it is the highest bid. See Written Resolution of the Directors of the Fund dated May 29, 2013. The Board may, in its absolute discretion, approve transfers. ... Accordingly, the Investment Manager, as authorized by the applicable documents, hereby bids 60.25 cents of NAV for purchase of 100% of Crown Alpha's capital balance as of the November 2015 NAV date"

17.     The broker, Wake2O, used talking points drafted by Highland that misrepresented on whose behalf Wake2O was acting, represented, without apparent foundation, that the offering price of 50% or 55% of NAV was "[t]he current best market bid" and that price would go down in the future, and, finally, that the TRO prevented the Fund from making distributions and that the Fund held many illiquid assets. RC420; Tr. 7 101:4-11 ("Q: And so one of the things that Highland wanted Wake to convey to investors was, hey, you might want to sell your interest in Crusader because right now there's this TRO and you're not going to be able to get any distributions, right?  A.· · That's probably a fair paraphrasing.").

18.     Throughout Wake2O's engagements, it was under pressure from Highland's CEO to pursue investors so that Highland could obtain a greater share of the Fund. See, e.g., RC-250 ("[K]eep pushing as much and many as quickly as possible....")(August 2015); and RC-426 ("Our CEO is keen on starting the process as soon as possible. Please let us know if we can start Monday.") (January 2016); Tr. 7 135:6-137:18.

19.     It was also in this period that Highland undertook a renewed effort to keep the Redeemers Committee in the dark about their purchasing activities. Mr. Leventon was significantly involved in providing direction, as well as drafting talking points, to Wake2O to "reach out to all non-committee members,"  (emphasis added); Tr. 7 146:16-149:7.  Highland offered Wake2O an incentive fee to acquire interests representing $200 million of NAV, but made clear to Wake2O that they should try to achieve that goal without contacting members of the Redeemer Committee. Tr. 7 157:13-161:2. The amount of $200 million was not an accidental target; it was just $4 million of NAV more than what the Redeemer Committee held, Tr. 7 155:15-23.  Wake2O's efforts resulted in the acquisition by Highland of a significant number of Plan Claims, amounting to just shy of $200 million, RC418; RC360; RC419; RC422; RC423; RC424.

29

20.     Finally, Highland continued misrepresenting to investors that it had a ROFR and never mentioned in its communications that the Committee was the entity actually possessing that right.  Mr. Leventon was the principal instrument through which this misrepresentation and omission were communicated, Tr. 55:19-25 ("Q.·Mr. Leventon, have you ever sent an e-mail to an investor telling the investor that Highland Capital has a right of first refusal in the event the investor wants to sell its interest in the fund? A. With respect to the Crusader Fund, I don't recall having done so."); but see RC-276; RC-280; RC434; Tr. 7 74:22-76:23.)[10]

21.     Based upon the testimony at the hearing, we have serious doubts about the scope of the advice given, if any.  In addition, as now conceded, there were adequate untainted funds under the control of the Crusader Funds to have enabled the Committee to exercise its ROFR as to the Plain Claims, had they been informed in a timely way, as mandated by the Plan. 10/24/18 Highland Ltr. to Panel at 2; RC-408 at 37.

22.     Further, from our examination of the language[11] in the TRO, we conclude that the restrained assets were narrowly circumscribed, and the broad position taken by Highland was not well-grounded. The TRO restrained the Crusader Fund only from transferring or disposing of property received, or its cash equivalent, in March 2009 "from Highland Financial Partners, L.P. in connection with the Termination, Settlement and Release Agreement, dated March 20, 2009." JX13; RC134. The TRO did not preclude the Fund's sale of unrestricted assets or use of a significant amount of cash in the Fund. JX13.

23.     We also find that Highland's reliance on the UBS TRO was pretextual to support Highland's true goal of benefiting itself over the interests of the Fund and the Committee. We find that Highland breached the Plan and Scheme by its actions and injured the Committee by its breach. We also found that Highland breached its fiduciary duty to the Committee by so acting.

---

[10] It appears that Mr. Leventon was also involved in a misrepresentation to the Committee about the purchase of a Plan Claim after the TRO had expired. In June 2016, he requested the Committee's approval for the purchase of a Plan Claim by an entity he described as a third party that was not affiliated with Highland. But in the course of soliciting the sale of the Plan Claim, Mr. Leventon represented that Highland was exercising a ROFR on behalf of itself or its affiliates. Tr. 7 87:6-89:11; RC-434. In fact, we find that the third party, Charitable DAF Fund, L.P. ("DAF"), was an affiliate of Highland. RC-435; Tr. 7 82:1384:21.  Based on what Mr. Leventon stated, the Committee approved the transfer. RC-316.

[11] "ORDERED, that pending the hearing on this motion, Defendants Highland Crusader Offshore Partners, L.P., and Highland Credit Strategies Master Fund, L.P., are temporarily restrained from transferring or otherwise disposing of property received (or if property has already been transferred or disposed to, the cash equivalent) in March 2009 from Highland Financial Partner,s L.P. in connection with the Termination, Settlement and Release Agreement, dated March 20, 2009."

24.     In the calculation of damages owed to the Redeemer Committee by Highland, we have assumed that any Plan or Scheme Claims purchased by Highland would have been purchased at the same discounted price as Highland did. However, the damages methodology used by the Committee's expert witness on damages makes the assumption that the fair market value of each of the Plan Claims was the NAV that Highland had established in each of the relevant months. We do not adopt this methodology because of the uncertainty as to whether a discount should be applied to the NAV in calculating the appropriate fair market value.

25.     Rather, we adopt the alternative approach suggested by the Committee, which is rescission.  We order Highland to transfer the 28 Plan or Scheme Claims to the Redeemer Committee, to pay to the Committee whatever financial benefits Highland received from the 28 transactions, less what Highland paid for the Plan Claims, plus interest at the rate of 9%, from the date of each purchase. We will leave the hearing open until the parties have worked out the exact financial details to comply with this order.

I.     Related Party Transactions

1.     The Committee contends that Highland breached its fiduciary duties by engaging in multiple related-party transactions without seeking or gaining the approval of the Committee  The Plan provision in questions requires the Committee's approval of "all transactions between the Crusader Funds and any other HCM-Related Party, while it serves as investment manager of the Crusader Funds, including any 'cross trade' between the Crusader Funds and any other account managed or advised by HCMLP," Plan §2.06; Scheme §4.7.1 (emphasis added).

2.     First, we must resolve the interpretation question left open by the Order of March 1, 2017, denying Respondent's motion for partial summary adjudication regarding these claims. We found that the language cited above was ambiguous because while Respondent argued that "Crusader Funds" is defined as meaning only four entities, the Master Fund, Onshore Fund, Offshore Fund I and Offshore Fund II, Id., § 1.01, and does not include Crusader Fund "portfolio companies" and other affiliated "entities," Claimant argued that if Crusader Fund meant only those four entities, there would be no meaning to the "including 'cross trades' language of §2.06, because none of the four entities directly owns assets and thus could not engage in cross trades with each other or with any other account managed by Highland. Thus, the language 'including "cross trades" must refer to entities broader than just the defined entities within Crusader Funds, or else that portion of §2.06(a) prohibiting cross trades would be read out of the Plan. Accordingly, we denied without prejudice the motion to dismiss the breach of contract and fiduciary duty claims based on the so-called affiliate transactions until after the record has been more fully developed.

31

3.      At the hearing, testimony was taken from two Redeemer Committee members, Messrs. Montgomery and Behr, regarding the drafting of the section in question. Mr. Montgomery testified that he negotiated the terms of the Plan with Michael Colvin, who was then Highland's General Counsel, telling him that the Committee "needed a related-party transaction prohibition, and he agreed to that. And the understanding was that it included everything on the Highland side and everything on the Crusader side… we thought there was agreement that it was including everything on the Highland side and everything on the Crusader side…" Tr. 2, 234:2-6, 235:2-5. Although in response to a question from a member of the Panel, Mr. Montgomery could not recall the specific language he and Mr. Colvin used to convey this understanding, and on cross-examination, he could not provide a reason for how the specific clause was drafted on this point, we credit Mr. Montgomery's testimony on this point.

4.      Although of limited evidentiary significance, Mr. Behr's testimony that before the adoption of the Plan and Scheme he had had discussions with someone at Highland, whom he recalled was Mr. Colvin, about concerns regarding Highland expensing board fees paid to its portfolio companies, Tr. 9 76:17-25, 77:2, supported Mr. Montgomery's testimony, cited above, that the subject of prohibiting certain related party transactions was part of the negotiations over the Plan. His recollection was supported in part by his contemporaneous notes of having raised that subject in the negotiations. HC508 at 142.

5.      In addition, the Committee makes the point that the occasional course of conduct between the parties before the relationship between the parties became a matter of some dispute reflected the belief that the Plan and Scheme required that Highland seek the Committee's approval before engaging in transactions that involved entities other than the four specific Crusader Fund entities in the definition. See, e.g., Tr. 4 213:6-9.12 Under the established law relating to contract interpretation, "How the parties perform a contract necessarily is manifested after execution of the contract, but their performance is highly probative of their state of mind at the time the contract was signed." Gulf Ins. Co. v. Transatlantic Reinsurance Co., 886 N.Y.S.2d 133, 143 (First Dept. 2009); "[T]he parties' course of performance under the contract is considered to be the 'most persuasive evidence of the agreed intention of the parties.' … 'Generally speaking, the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence.'" Federal Ins. Co. v. Americas Ins. Co., 691 N.Y.S.2d 508, 512 (First Dept. 1999).

6.      Based on the foregoing evidence, we resolve the ambiguity in favor of a broad definition of the term "Crusader Funds" to include not only the four specific entities named in §2.06 but also the Crusader Fund "portfolio companies" and other affiliated "entities. The Committee contends that Highland engaged in two types of transactions that required but did not receive its consent: (1) transactions between Highland affiliates and Fund portfolio companies, and (2) transactions directly between Highland affiliates and the Fund entities.

J.      Related Party Transactions with Portfolio Companies.

1.      The Committee contends that Highland breached §2.06 by causing Fund portfolio companies to pay board fees, advisory fees and D&O insurance premiums.

2.      Highland responds that transactions between Highland affiliates and Fund portfolio companies were expressly disclosed to the Fund's investors, see HC-230 at 34-36, and that the investors specifically agreed such transactions were permissible, see HC-118 at 7. Accordingly, Highland urges that there can be no fiduciary duty breaches.

3.      Furthermore, Highland urges that the claims arose in 2011 or 2012, and in any case were disclosed to Highland counsel by April 6, 2013, JX-12, and, thus, would be barred by the three-year statute of limitations. Highland characterizes the proof regarding such claims as failing to establish more than the occurrence of "isolated or sporadic acts."

---

[12] We note that one of Highland's outside counsel also occasionally used the term "Crusader Funds" or "Crusader" when describing transactions between portfolio companies and Highland affiliates, RC83 at 2-3; see JX12; JX10.

4.      The Committee claims that the statute of limitations should be tolled under the "continuing violation doctrine," which applies where "separate violations of the same type, or character, are repeated over time," and not where the claims are "based on a single decision that results in lasting negative effects." Moses v. Revlon, 2016 U.S. Dist. LEXIS 106431, *18 (S.D.N.Y. 2016). Under prevailing New York law, "The continuing violations doctrine 'will toll the limitations period to the date of the commission of the last wrongful act where there is a series of continuing wrongs.' Shelton v. Elite Model Mgt., 11 Misc.3d 345, 361 (Sup Ct, New York County 2005); 78/79 York Assoc. v. Rand, 175 Misc.2d 960, 966 (Civ Ct, New York County 1998) … However, 'it will only be predicated on continuing unlawful acts and not on the continuing effects of earlier unlawful conduct.' Selkirk v. State of New York, 249 A.D.2d 818, 819 (3d Dept 1998)." Pankin v. Perlongo, 2012 WL 7868667, at *2 (Sup. Ct. N.Y. Cnty. 2012).

5.      The evidence brought forth by the Committee failed to show that the payments made by Highland for insurance premiums or for advisory fees were parts of a series of continuing wrongs. Rather, there appear to have been a series of discrete payments made in no regular or consistent pattern and in no similar amounts.[13] Under the circumstances, we find in favor of Highland on these claims. We do not reach the issue of whether disclosure to investors would bar a claim for breach of fiduciary duty.

K.      Related Party Transactions with Highland Affiliates

1.      The Committee contends that in 2013 and 2014, without seeking its permission as required under §2.06, Highland sold shares in four CLO assets held by the Master Fund, known as Eastland CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., and Stratford CLO, Ltd. (the "CLOs"), in what it characterizes as "pre-approved" transactions to Highland affiliates, without seeking the Committee's approval, as required by §2.06(a), which, as noted above, prohibits "any 'cross-trades' between the Crusader Funds and any other account managed or advised by HCMLP."

2.      The proof at the hearing showed that, with no disclosure to the Committee, Highland sold CLOs to brokers it used for other securities transactions who, within a very short time of purchasing the CLOs, sold some or all of the CLOs to Highland affiliates.[14] The Committee urges that such sales were breaches of fiduciary duty as well as breaches of the Plan.

---

[13] Insurance premiums were paid on behalf of four entities (American Home Patient, Inc., Cornerstone Healthcare, Nex-Tech Aerospace, and Trussway Holdings) in 2011 and 2012; no payment to any of the entities was the same as to any other entity. RC355, Schedule 6.1. As to the portfolio company advisory fees, various fees were paid over varying years between 2011 and 2016 by six different portfolio entities to Barrier or NexBank as advisors; with the exception of two years for one of the entities, each payment of an advisory fee was of a different amount.

[14] As set forth in the Expert Report of Basil Imburgia, RC408, Highland engaged in the following transactions:
- It sold 32,500 shares of Grayson CLO at a settlement amounts of $560 and $570 per share, of which $25,500 were sold to NexPoint, with a reported value of $570 per share, Table 19;
- It sold 32,250 shares of Eastland CLO at settlement amounts of $611.40 and $613.90, of which 25,250 were sold to NexPoint, with a reported value of $730 and $670, Table 20;

34

3.      Highland contends that the sales in question were not cross trades but were rather "market-bearing transactions" between Highland and an independent financial institution, which then sold to a Highland affiliate. But this contention is belied by the fact that the transactions bore all of the hallmarks of pre-arranged trades, designed to avoid obtaining the consent of the Committee. See JX-30 at 3 ("Trading assets between two affiliated accounts through a broker may be considered a Cross Trade…"). Indeed, Mr. Dondero, the Chief Executive Officer, is heard on a tape made by then-Chief Portfolio Manager Joshua Terry, suggesting "run[ning a CLO trade] through some broker," RC-263A. By using a middleman between itself and its affiliate, Highland sought to avoid the description of a "cross trade," but the reality is that the transactions were effectively cross trades and we will treat them as such.

4.      That said, however, the substance of the transaction, arguably, benefitted the Committee, because assets of the Fund were liquidated, which was a principal goal of the Plan and Scheme.  Yet the problem with these transactions is that Highland had a perfectly clear path to effectuate these trades without any question being raised as to their bona fides – it could have sought the consent of the Committee under §2.06, which consent could not be unreasonably withheld under §2.07, HC-300. We find that Highland's failure to do so constitutes a breach of the Plan.

5.      We are left with the question of whether Highland's roundabout trading method caused any damage to the Fund.  It appears Highland sold the CLOs to a broker for one value and then the broker turned around and sold the CLOs to the Highland affiliate for a higher value. Thus, the Fund received less than it was entitled to receive had the transaction been done without the middleman, and the damage to the Fund is the difference in the two values. While the Committee's expert Basil Imburgia did not use that methodology to calculate the damages associated with these trades, the information on the price paid to the funds and the price paid to the broker is set forth in the expert report of Highland's expert, Mr. Snow, HC-526 at 41.  The Committee contends that the difference is approximately $450,000. The Committee is entitled to judgment for the amount of the difference with interest from the date of the sale from the funds, Since none of the experts did the appropriate calculation, as with other items, we leave it for the parties to confer and agree upon the total amount of damages including 9% interest and we will leave the record open to resolve that amount.

---

- It sold 31,000 shares of Greenbriar at settlement amounts of $713.60 and $665.00, of which all of the shares were sold to NexPoint at reported values of $730.00 and $670.00, Table 21; and
- It sold 31,500 shares of Stratford at settlement amounts of $661.70 and $660.00, of which 25,500 were sold to NexPoint at reported values of $724.49 and $665.00, Schedule 22.

35

L.        Failure to Settle Credit Suisse Trades/Litigation

1.        The Committee contends that Highland committed willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors, both by failing to settle two trades Highland made on behalf of the Fund in September 2008 with Credit Suisse (relating to the purchase from Credit Suisse of syndicated loans in the amount of $23.5/9 for properties known as Goldfield and Westgate) and by failing to settle the litigation initiated by Credit Suisse in July 2013 regarding the same trades. The Committee asserts that, despite clear legal authority requiring that Highland settle the trades and the subsequent litigation, Highland refused to do so because it sought to use its refusal to settle the trades and litigation as leverage against Credit Suisse with respect to other claims not involving the Fund that Highland had against Credit Suisse. Thus, the Committee contends Highland put its own interests ahead of the interests of the Fund. Consequently, the Committee further alleges, that by its delaying the settlement of the trades and then of the litigation, Highland caused the Fund to incur seven-plus years of statutory interest that could have been avoided but which the Fund had to pay in January 2016 when the trades and the litigation were ultimately settled.

2.        Highland poses multiple defenses to the Committee contentions. First, Highland argues that the Committee's claim first accrued in 2008 when it allegedly failed to settle the trades and therefore was released by Section 7.01 of the Plan,[15] releasing Highland from all claims, known or unknown, "from the beginning of the world to the Effective Date" of the Plan in August 2011. Second, Highland contends that even if this claim was resurrected after the effective date of the Plan and Scheme, said claim would have arisen in 2011 and was thus barred by the three years statute of limitations for breach of fiduciary duty claims. Third, Highland argues that it did not breach its fiduciary duty as it was only exercising its legitimate business judgment in not settling the trades or the litigation and that the Committee has otherwise failed to show that Highland committed willful misconduct in this regard. Finally, Highland asserts that if the Tribunal finds that it breached its fiduciary duty, any damages that might be owing should be at a reduced amount from what the Committee claims.

---

[15] Section 7.01 provides, as follows: "Section7.01. Upon the Effective Date, each of the Consenting Redeemers, for themselves and on behalf of any of their respective officers, directors, shareholders, partners, members, employees, affiliates, investors, agents and representatives and any other person or entity entitled to assert a Claim (defined below) by, through, under, or on behalf of any Consenting Redeemer, hereby releases each of the HCM-Related Parties and each of the other Consenting Redeemers, from any and all accounts, actions, agreements, causes of action, claims, contracts, covenants, controversies, damages, debts, demands, executions, expenses, judgments, liabilities, obligations, omissions, promises, representations, and fights to payment, and all other liabilities of every kind, nature and description whatsoever, liquidated and unliquidated, fixed and contingent, matured and unmatured, disputed and undisputed, legal and equitable, state and federal, secured and unsecured, accrued and unaccmed, known and unknown, choate and inchoate (each, a "Claim"), which each Consenting Redeemer has, may have or ever had against any or all of the HCM-Related Parties and the other Consenting Redeemers from the beginning of the world to the Effective Date related to each of the Crusader

36

Funds, including without limitation its administration and wind-down; provided, however, that such release shall not operate to release any claims arising from this Plan or based on larceny within the meaning of Section 155.05 of the New York Penal Code ("Larceny Claims"), provided that such exception shall not apply to Larceny Claims within the scope of knowledge of the releasing party as of the Effective Date. The benefit of the release in this Section 7.01, as it related to the HCM-Related Parties, is held in trust by the Crusader Funds for the HCM-Related Parties, and the Crusader Funds hereby assign the benefit of the release in this Section 7.01 in their favor."

37

3.      With respect to the issue of the release, the Tribunal concludes that Section 7.01 releases any claims that the Committee might have with respect to the failure by Highland to settle the Credit Suisse trades through the Effective Date of the Plan, but the Committee has not released any claims that arose after the Effective Date of the Plan. The Tribunal need not decide whether the continuous post-August 2011 failure to settle the trades automatically gives rise to new post-Effective Date claims; once Credit Suisse commenced litigation in July 2013 and the Committee renewed its demand that Highland settle the trades  and the litigation, and once Highland again failed to do so, a new claim arose, at least as of that point in time. This new claim would not be released under Section 7.01 since it arose after the Effective Date of the Plan. Accordingly, Tribunal views Highland's continuous failure to settle the trades and litigation after July 2013 (until January 2016, and subject to the temporary withdrawal by the Committee of its demand that Highland settle the trades and litigation in September of 2013, as discussed below) as the potentially actionable conduct that the Tribunal will analyze below.

4.      As to the statute of limitations issue, the Tribunal agrees with Highland that a three years statute of limitations applies to breach of fiduciary duty claims and therefore any conduct outside the three years limitations period is not actionable.  The Committee filed in this Arbitration its breach of fiduciary claim with respect to the unsettled Credit Suisse trades and litigation on July 5, 2016. Consequently, given the application of the statute of limitations, any claim for relief for any period prior to July 5, 2013 is barred by the statute of limitations and the Tribunal will not consider conduct prior to this date to be actionable nor will it consider any claim for damages for the period prior to July 5, 2013.

5.      The Tribunal finds that Highland committed willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors, by failing to settle the two subject trades with Credit Suisse. The Tribunal finds that, whatever strategy Highland intended or whatever judgment calls it made, or purported to make, with respect to the settlement of these trades, it was under a clear legal obligation to settle the trades but failed to do so.

6.       Highland's then General Counsel admitted to at least a general awareness of the legal obligation under the LSTA regime to settle trades promptly (and to litigate later if there is a dispute regarding same). Tr. 10 288:2-12, 290:13-22, 291:15-20; and there is other evidence to the same effect. See, e.g., JX-12 at RC00100770-771. Despite this clear legal obligation, and despite Committee requests that it do so, Highland refused to settle the trades in order to provide itself with leverage vis-a-vis Credit Suisse on another dispute. Even if, as argued by Highland, its prevailing on this other dispute would advantage the Fund, once the Committee demanded that Highland settle the trades, as it first did during the limitations period on August 7, 2013, Highland should have done so given both the acknowledged weakness in its defenses and that its purported goal in not doing so at least primarily advantaged itself and not the Fund (even if the Fund might have gained some marginal potential advantage if Highland prevailed in the other dispute). In light of the preceding, Highland's refusal to settle the trades constitutes willful misconduct, thereby breaching its fiduciary duty to the Fund and its investors.

7.       The Tribunal finds that the actionable willful misconduct by Highland for which damages will be due occurred during the period September 8, 2014 through January 14, 2016. The reason for the end date is clear and undisputed: on that date, Highland caused the Fund to pay for the trades and the interest due. As for the start date, the earliest possible start date, in light of the above analysis, is August 7, 2013 which is when the Committee first demanded during the limitations period that the trades be settled. But, in September 2013, counsel for the parties interacted and the Committee withdrew its demand that Highland settle the trades. HC-476a. The Committee argues that it was not apprised by Highland of relevant information at the time, and therefore the Fund should not be bound by its agent's withdrawal of the demand, but the Tribunal concludes that, notwithstanding Highland's failure to provide this information, the Committee's counsel independently analyzed the relevant issues and the Committee is responsible for the decisions flowing from that analysis. On or around September 8, 2014, after the trial court entered summary judgment in favor of Credit Suisse in the litigation, the Committee reinstated its demand that Highland settle the trades; since Highland did not do so until January 14, 2016, it is, under our analysis above, responsible for damages accruing during the period from September 8, 2014 through January 14, 2016.

39

8.      The Tribunal adopts the damages theory advanced by the Committee: the pre-judgment interest that the Fund had to pay during September 8, 2014 through January 14, 2016, minus the gain it achieved during the same period by virtue of having the use of the subject $23.5 million. However, neither party presented a damages analysis consistent with the preceding parameter. Accordingly, the Tribunal directs that the Parties jointly confer to calculate an amount of damages that takes into account the following parameters: (i) the damages period is between September 8, 2014 and January 14 , 2016; (ii) the 9% statutory interest (ordered by the New York State Supreme Court in September 2014) is to be applied on a simple basis to the total principal amount due ($23.5 million); (iii) the amount of the "off-set" is to be calculated using the factor utilized by Claimant's expert – the Treasury Yield Rates for the damages periods specified in (i); and (iv) 9% statutory, pre-judgment interest is to be applied on a simple basis to the result of the calculations in (i) – (iii) from January 14, 2016 to the date of this Partial Final Award.

M.      The Delay in Settling the UBS Litigation

1.      As noted above, Highland, Crusader and Credit Strategies were parties to an action commenced by UBS which alleged that certain securities had been fraudulently transferred by Highland to the funds. As a result, the funds were enjoined from transferring the subject assets during the course of the litigation.

2.      In May 2015, UBS, Highland, Crusader and Credit Strategies reached an agreement in principle to settle the litigation. Under the terms of that agreement Crusader was to pay UBS $25 million and Highland was to pay $35.75 million. A separate agreement between the Committee and Highland provided that, no sooner than December 30, 2016, Highland could recapture $33.75 million through incentive fees that could be generated through the liquidation of Crusader assets. RC-227.

3.      The settlement agreement was to be finalized on May 30, 2015, but Highland refused to go through with the settlement because Credit Strategies would not release claims against Highland. Tr. 3 21:10-22:3; Tr. 3 24:16-25:6; Tr. 10 316:20-317:23. Ultimately the Committee negotiated a its own settlement, pursuant to which Crusader paid UBS $25 million on July 1, 2015, and an additional amount of $30 million on December 29, 2015.

4.      The Committee argues that, had Highland not blown up the original settlement, it would not have had to pay the $30 million to UBS on December 29, 2015, and it would have retained those funds at least until December 30, 2016, when that amount might have been transferred to Highland if it had earned that amount in incentive fees. The Committee, therefore, seeks as damages 9% interest on the $30 million from December 29, 2015 to December 30, 2016, which its expert calculated to be $2,041,664.

40

5.      Highland denies that it has any liability and asserts that is protected by the business judgment rule. It also argues that 9% interest is not appropriate. Further, Highland urges that the Committee's expert did not otherwise account for the fact that Highland might have earned $33.75 million in incentive compensation and, therefore, there was a net benefit to the fund.

6.      There is no basis for Highland's claim that its conduct is protected by the business judgment rule. In deciding whether or not to settle the UBS litigation, Highland was acting as a fiduciary with respect to Crusader and had a fiduciary duty not to place its own interests above that of Crusader. As the New York Court of Appeals stated in Birnbaum v. Birnbaum, 73 N.Y. 461, 466 (1989):"It is elemental that a fiduciary owes a duty of undivided and undiluted loyalty to those whose interest the fiduciary is to protect . . . . This is a sensitive and ' inflexible' rule of fidelity, barring not only blatant self-dealing, but also requiring avoidance of situations in which a  fiduciary's personal interest possibly conflicts with the interest of those owed a fiduciary duty. (Citations omitted.)"

7.      Thus, Highland was not free to place its own interests above that of Crusader and had an obligation to settle UBS's claims against Crusader regardless of its concerns about possible claims against it by Credit Strategies.

8.      There can be no question that Highland's action in refusing to settle with UBS resulted in Crusader being deprived the use of $30 million in cash between July 1, 2015 and December 30, 2016, the first day on which Highland would have been entitled to receive any of the incentive fees. Here, as with the Deferred Fees, it is appropriate to award interest on that amount at the rate of 9% to compensate Crusader for that loss.

41

9.      The problem with Highland's claim that it might have earned an incentive fees of $33.75 million is that Highland offered no evidence that would suggest that its incentives fees would ever have reached even the $30 million amount that the Committee is willing to concede might have been reached. Since the original settlement agreement was negotiated at a time when there was no plan in place to terminate Highland as the fund manager, the incentive fee structure was based on events that would ultimately occur in periods after the Committee terminated Highland. Since neither party made any effort at the hearing to calculate incentive fees, it seems apparent that such a calculation was not possible. In these circumstances, the Committee's assumption that Highland would have earned $30 million in incentive fees by December 29, 2016 is generous and there is no basis for a finding that Highland would have earned more than that in incentive fees.

10.     We award Claimant as damages 9% interest on the $30 million from December 29, 2015 to December 30, 2016, which its expert calculated to be $2,041,664.

N.      Cornerstone

1.      Highland Cornerstone Healthcare Group ("Cornerstone") is a company that owns Long Term Acute Care (LTAC) hospitals in which the Fund owns a minority equity interest. At the time of the adoption of the Plan and Scheme, Highland owned or controlled 100% of the shares of Cornerstone. Two groups of funds, Crusader Funds and Highland Credit Strategies Fund ("Credit Strat"), owned more than 50% of the shares of Cornerstone. Between 2011 and 2013, Highland was secretly engaged in the process of valuing and, eventually, selling the interest held by Credit Strat in Cornerstone. In September 2013, after a process in which the Credit Strat Redeemer Committee was kept completely in the dark as to the sales process that was underway, and which was later found to be unfair to the investors in Credit Strat, see RC-306, Highland arranged for the purchase of Credit Strat's interest by Cornerstone itself at the price of $2,956.03 per share, see JX-16. This price was below the most recent mark set by Highland, and below the value of between $3,424 and $4,434 per share that Highland's investment bankers, Houlihan Lokey, found to be fair for the purchase of the minority interest, see HC-431.

42

2.      Following the purchase of the Credit Strat interest, the Crusader Funds owned 41.8% of Cornerstone, see RC-138 at 7. The Crusader Funds learned of the sale and made known their interest to Highland in having their interest in Cornerstone sold. But when Highland offered to buy their interest for the same price of $2,956.03 per share as the Credit Strat interest, the Committee engaged Ernst & Young ("E&Y") as its advisor to analyze the offer and prepare a response. E&Y prepared two analyses of the value of the Cornerstone asset. The first, HC-577, found that, as of the fall of 2013, "Cornerstone's offer to purchase Crusader's share for $43.8 mm is below Crusader's current carrying value and at the low end of the range of values developed in this Report" and that "based on information provided and reviewed to date it would appear that the lower end of the range is more reasonable to expect that (sic) the higher end of the range," Id. at 5.

3.      The Committee then requested that E&Y prepare a supplemental report, and, in January 2014, E&Y rendered a second report, finding that Cornerstone underperformed expectations for 2013 and that the changes occurring in the healthcare field were creating uncertainty in the industry in which Cornerstone operated. HC-577 at 19. E&Y reduced its range to $44 million to $63 million, by imposing a discount from its prior range as of year-end 2013 by 10% to 25%. In discussions with counsel to the Committee, E&Y suggested countering with a purchase price in the range of $50 million to $54 million "for negotiation purposes." Id.

4.      Thereafter, on March 28, 2014, after the Committee had considered its options, it made a counter-offer within the range suggested by E&Y at $52,342,188, or $3,529 per share, plus a 50% recapture provision in the event of a sale within three years. JX-18. The counter-offer was at the 2013 year-end market value, as calculated by Highland. Id. Highland never responded to this counter-offer despite repeated overtures to Highland by the Committee, and despite the desire of the Claimant Redeemer Committee and the mandate of the Scheme and Plan to liquidate all of the assets of the Crusader Fund, the interest in Cornerstone held by the Crusader Funds has not been sold.

5.      Claimant contends that the failure of Highland, during the period it was the investment manager of the Funds, to make any good faith effort to sell the Funds' shares in Cornerstone, constituted a breach of fiduciary duty.

6.      As part of its claim of breach of fiduciary duty, the Committee urges that Highland is collaterally estopped from denying the findings of the arbitration tribunal in the arbitration brought by the Redeemer Committee of Credit Strat arbitration tribunal regarding, inter alia, the Cornerstone transaction. RC-306 (4/6/16 Credit Strategies Fund Final Award).

43

7.     In particular, as it bears on this dispute, the Committee contends that Highland is estopped from denying the following findings: (1) Highland controlled Cornerstone; (2) the per share price at which Highland sold Credit Strat's interest was unfair; and (3) a price of $3,929 per share was a fair price, based upon the Houlihan Lokey valuation.

8.     Highland contends that the Credit Strat Tribunal's findings do not bind Highland in this proceeding, because the two arbitration proceedings deal with "fundamentally different" issues, such that collateral estoppel does not apply.

9.     First, Highland urges that the Credit Strat Tribunal was dealing with the ramifications of a consummated sale, where it found that Highland controlled both Cornerstone's offer and Credit Strat's acceptance. HC-220 at 8, 30, whereas in this proceeding, the evidence is that Cornerstone made an offer to the Committee, but Highland had no role in the Crusader Fund's evaluation of or counter to that offer and no sale occurred.

10.     Secondly, Highland points out that in Credit Strat, the retention of Houlihan Lokey and the entire process that Houlihan Lokey engaged in was a secret that the Credit Strat Committee was unaware of, whereas, in this proceeding, the Houlihan report as well as other financial information was made available to the Crusader Committee, HC-577 at 577.0002, Tr. Day 5 at 114:12-117:18 (Zambie).

11.     The doctrine of collateral estoppel requires that an issue being litigated in the second case be the same as was fully litigated by the same party in the first action. Fuchsberg & Fuchsberg v. Galizia, 300 F.3d 105, 109 (2d Cir. 2002) ("[C]ollateral estoppel prevents a party from relitigating an issue decided against that party in a prior adjudication. It may be invoked to preclude a party from raising an issue (1) identical to an issue already decided (2) in a previous proceeding in which that party had a full and fair opportunity to litigate.") (internal quotations and citations omitted).

12.     Although there are differences in the way in which the sale process took place, we do not find that such differences obscure the fact that some issues are substantially identical in both proceedings.

44

13.     The principal finding that we think is binding on Highland in this proceeding is that the price of $3,929 per share, based upon Houlihan Lokey's valuation, was a fair price. Claimant also argues that Respondent is bound by the finding that the offering price Highland made for the Credit Strat position, which was the same price as offered to the Redeemers Committee here, was unfair. But we think that finding would fly in the face of Claimant's own adviser, E&Y, who found that such a price was at the low end of a fair range. Accordingly, we do not think it appropriate to adopt such a finding as binding in this proceeding.

14.     Highland also contends that, with respect to the possible sale of the Cornerstone interest, it was not in a fiduciary relationship with the Committee, which was relying on EY for negotiating assistance, not on Highland, as Highland was sitting opposite to the Committee in the negotiation. Tr. Day 5 at 116:10-117:18 (Zambie).

15.     While the Committee was not relying on Highland for financial advice or guidance with respect to Cornerstone in the period between the Fall of 2013, when an offer of $2,956.03 per share was made, and the early Spring of 2014, when the counter-proposal were made, the Committee did rely on Highland, in its role as investment manager, both before and after those dates, to liquidate the Fund as rapidly as possible.

16.     But by Highland's choosing to have the Crusader Funds, along with several other entities controlled by Highland, invest in Cornerstone, Highland voluntarily placed itself in a conflict position: it owed fiduciary obligations to the Crusader Funds to maximize the liquidation process, while being the control person of Cornerstone whose own interests were to have any purchase price be as low as possible. As investment manager, Highland was obligated to be fully responsible to the Committee, but could not do so as long as it also continued to play an active role as controlling party of Cornerstone with respect to the Committee's desire to sell.

17.     The hearing record is that, other than making the offer in September 2013, Highland took no steps to market or sell the Fund's interest in Cornerstone. Tr. 1 347:16-349:2; 364:12-22. At meetings held with representatives of the Committee, the Committee asked about plans to sell assets and Highland never discussed, or appeared to have a plan by which it proposed to sell the Cornerstone asset. Tr. 1 349:4-22; 365:13-17; Tr. 4 55:14-20; RC-317 at 2("Mr. Jameson noted that for the remainder of the portfolio, formal strategies for disposition are not in place."). When Committee representatives met periodically with Jim Dondero, the CEO, he made it clear that he ran the sales operation completely and did not wish to be questioned or have the portfolio managers questioned as to the timing of any particular sale.

45

18.     We find that Highland had a fiduciary duty not to place its own interests above that of Crusader, Birnbaum v. Birnbaum, 73 N.Y. at 466 (1989), but rather to subordinate its own economic interests behind its fiduciary obligation to the Crusader Funds. Guth v. Loft, 5 A.2d 503, 510 (Del. 1939) ("The rule that requires an undivided and unselfish loyalty to the corporation demands that there shall be no conflict between duty and self-interest."); Weinberger v. UOP, Inc., 457 A.2d 701, 710 (Del.1983) ("There is no dilution of [fiduciary] obligation where one holds dual or multiple directorships."); see also Carsanaro v. Bloodhound Technologies, Inc., 65 A.3d 618 (Del. 2013).  Highland's failure to subordinate its own interests to those of the Committee led directly to its failure to engage in a fair negotiating process with the Committee. By failing to do so, Highland breached its fiduciary duty to the Fund.  Caruso v. Metex Corp., 1992 WL 237299, at *16 (E.D.N.Y. July 30, 1992), People ex rel. Spitzer v. Grasso, 50 A.D.3d 535, 546 (1st Dep't 2008). That breach of fiduciary duty was a continuing offense through the period of time that Highland was the investment manager of the Crusader Fund, as Highland never itself took, or authorized Cornerstone to take, any action in response to the counter-offer that was made in February 2014.

19.     Highland argues that the Committee must overcome the business judgment rule that "the defendant [fiduciaries] have acted on an informed basis and in the honest belief they acted in the best interest of the [client]," citing CVC Claims Litig. LLC v. Citicorp Venture Capital Ltd., No. 03 CIV. 7936 (DAB), 2007 WL 2915181, at *4 (S.D.N.Y. Oct. 4, 2007), in turn citing Aronson v. Lewis, 473 A.2d 805, 812 (Del.1984)("While each director must meet this obligation, a decision made by the board of directors will be presumed, under the business judgment rule, to have been made 'on an informed basis, in good faith, and in the honest belief that the action taken was in the best interest of the company,' unless the plaintiff shows that the presumption does not apply.").

20.     But here, we find that Highland's decisions regarding the purchase of the Cornerstone shares from the Crusader Funds — from the offer to purchase, the ignoring of the counteroffer, and the failure to engage in or authorize a negotiation process — were made with the willful intent to benefit itself and not the Crusader Funds investors. See JX-19; Tr. 1 379:17-380:8.  The Business Judgment Rule does not protect Highland or its officers from scrutiny for alleged breaches of fiduciary duty under these circumstances.

46

21.     The question then is what is the appropriate price at which the sale should take place. "[I]n determining whether a fiduciary has acted prudently, a court may examine a fiduciary's conduct throughout the entire period during which the investment at issue was held. The court may then determine, within that period, the 'reasonable time' within which divesture of the imprudently held investment should have occurred. What constitutes a reasonable time will vary from case to case and is not fixed or arbitrary. The test remains 'the diligence and prudence of prudent and intelligent [persons] in the management of their own affairs' (id., at 511 [citations omitted])." Matter of Estate of Janes, 90 N.Y.2d 4, 54 (1997); Public Service Co. of Colorado v. Chase Manhattan Bank, N.A., 577 F.Supp. 92, 107 (S.D.N.Y.1983) (Lumbard, CJ, sitting by designation)("where there is no sale, it is impossible to fix exactly the moment by which the loan should have been sold or the amount that could have been obtained; "[p]robably the only rule is that the court will use its common sense and determine what under all the circumstances it is fair to say that the trustee ought to have received if he had done his duty in selling the property within a reasonable time," (quoting Scott on Trusts)).

22.     To satisfy its obligation under the Plan to liquidate the Fund's assets as rapidly and as fairly as possible, Highland did not have "to cause Cornerstone to purchase the Fund's Cornerstone shares for a specific price and at the specific time demanded by the Committee…," Highland Post-Hearing Brief at 11, but it did have a duty to place the Funds' interest above its own and to obtain the best price possible for the Funds' Cornerstone interest. Thus, when it decided it wished to make an offer to purchase the Funds' Cornerstone shares, it was obligated to do so at the fair market value and not to attempt to take advantage of the fact that it had placed the funds in a position where it was the only available buyer.

23.     Highland argues that it makes no sense to assess damages based upon a hypothetical sale of the Cornerstone asset, because, first, since the shares have never been sold, there is no realized loss; and, second, "other than Cornerstone's $43.8 million offer, there is no evidence of any other willing buyer for Cornerstone's assets at any price."

24.     We reject the first argument because it ignores what we have found to be the breach of fiduciary duty —the obligation to pursue and consummate a sale at a fair and reasonable price. The Fund was damaged by reason of Highland's failure to fulfill that obligation.

47

25.     As to the second argument, Highland defeats its own argument by pointing out that, in the real world, there is only Cornerstone available as a buyer.  But, because of Highland's own financial objectives, there has been no indication since April 2014 when it failed to authorize a counteroffer that Highland was interested in directing Cornerstone, which it controlled, to make an offer to purchase the shares at anything other than a bargain basement and unfair price.

26.     Using our equitable powers, we believe that a fair price can be derived by using the fair market value of the shares of $3,929 per share, based upon Houlihan's valuation prepared on July 15, 2013, adjusted downward by 10-25% by the year-end discount caused by several factors cited by E&Y. The average of that discount results in a fair market valuation of $3,241.43, which amount is what we find should have been offered to pay for the Cornerstone shares.

27.     We order that Highland pay to the Committee $3,241.43 per share, or $48,070,407, and order that the Committee simultaneously cause the Crusader Fund to surrender its interest in Cornerstone to Highland.

28.     With respect to an award of pre-judgment interest, "[a]lthough an action for breach of fiduciary duty is generally considered of an equitable nature, '[e]ven on [such] a claim with equitable underpinnings ... prejudgment interest [is] mandatory where the only relief sought was compensatory damages.' Lewis v. S.L. & E., Inc. 831 F.2d 37, 39 (2d Cir.1987) (citing Spector v. Mermelstein, 485 F.2d 474, 481 (2d Cir.1973))(emphasis added).

29.     Regarding the rate of pre-judgment interest to be applied, Claimant argues for the application of New York's statutory rate of interest of 9% as most appropriate. Under CPLR §5001(a), "in an action of an equitable nature, interest and the rate and date from which it shall be computed shall be in the court's discretion." See  212 Inv. Corp. v. Kaplan, 16 Misc. 3d 1125(A), at *9 (Sup. Ct. N.Y. Cnty. 2007); Panix Prods., Ltd v. Lewis, id; Summa Corp. v. Trans World Airlines, 540 A.2d 403, 409 (Del. 1988).

30.     Under CPLR §5004, New York applies pre-judgment interest at 9%, simple annual interest. Under the circumstances here, where the breach of fiduciary duty deprived the investors of the Crusader Funds of a significant distribution and partial return of their equity, we exercise our "broad discretion, subject to principles of fairness, in fixing the rate to be applied," Summa Corp. v. Trans World Airlines, Inc., id., and we award interest at the statutory rate of 9%, simple annual interest, pursuant to New York law, from April 15, 2014, through the date of this Partial Final Award. We pick this date as it is the date by which we believe Highland and/or Cornerstone (as controlled by Highland) should have responded to the Committee offer.

IV.    The Return of the Deferred Fees

48

A.      Under §§2.02 and 6.02 of the Plan, if Highland distributed $1.7 billion within 43 months of the Plan's Effective Date, Highland could obtain $10 million in Deferred Fees that had been placed in the special account at the outset to incentivize Highland's rapid liquidation.  There is no question that Highland did not meet that goal by the 43rd month and, thus, in Count Three of its Amended Demand, the Committee seeks the immediate return to the Fund of those proceeds by a declaration that the Fund should distribute the right to receive payment in respect of the funds in the Deferred Fee Account to the Consenting Compulsory Redeemers.

B.      Highland objects on the ground that the UBS TRO eliminated the 47-month schedule applicable to the Deferred Fee Account, invoking the Impossibility Doctrine, discussed in detail above, and argues that, upon the eventual complete liquidation of the Fund, it will be entitled to the $10 million in the Deferred Fee Account.

C.      For reasons set forth earlier, we reject the argument that, under the Impossibility Doctrine, Highland was relieved of the requirement that it achieve complete liquidation of the Fund within 43 months, and, thus, is entitled to the $10 million in Deferred Fees upon complete liquidation. Highland had the opportunity to achieve the complete liquidation despite the duration of the UBS TRO, but chose, for its own reasons, not to do so. The Impossibility Doctrine does not provide a basis for granting Highland affirmative relief.

D.      We order the return to the Crusader Fund the $10 million in the Deferred Fee Account.

V.    Counterclaims

A.      Respondent has brought two principal counterclaims: first, it seeks to recover the remainder of Deferred Fees to which it says it is entitled now because Claimant should have completed the complete liquidation of the Fund's assets by December 31, 2017, at the latest; and, second, it seeks damages against the Committee for breach of the Plan and of its fiduciary duties to Highland by failing to oversee A&M's liquidation of Fund assets and for approving, without adequate, if any, scrutiny, A&M's fees, said to be exorbitant.

B.      As to the breach of fiduciary duty claim, the fiduciary duty relation is said to arise from Highland's status as an investor in the Crusader Funds.  Highland's Post-Hearing Brief at 3-5. However, we have previously stricken those portions of Highland's Amended Counterclaim that alleged it was suing as an investor. Panel Order, April 1, 2018, at 4. Furthermore, even assuming that, as an investor, Highland had standing to bring a claim for breach of fiduciary duty, as stated below, we find that no breach of duty has been proved with respect to any of the allegations in Respondent's Amended Counterclaim.

49

C.      Specifically, we have examined the record thoroughly and, aside from the testimony of Highland's expert, James Finkel, and its former portfolio manager, Mr. Jameson, there is insufficient evidence of a purposeful and wrongful delay in liquidation or a failure by the Committee to oversee and scrutinize A&M's performance, nor any activity of A&M that the Committee aided and abetted that was proved wrongful.

D.      Mr. Finkel had a distinguished thirty-plus year career in capital markets, investment banking, and investment advisory work, including as a liquidator of the assets of alternative investment funds. But his opinion that Highland or any reasonable manager or liquidator would have completed liquidation by the end of 2017, at the latest, was not based on anything more than his unverified judgment, and not on a close examination of the facts in this record. For example, he conceded that, in reaching his opinions, he didn't consider the amount of information A&M provided to investors, didn't review A&M's time records or evaluate the quality of the work performed by A&M, and didn't consider the consequences of the lack of cooperation of Highland with A&M, among other critical deficiencies. Tr.10 367:10-372:3. Similarly, his opinion that, because of what he regarded as a flawed compensation structure, A&M's primary focus was on the time it spent on projects, rather than on results achieved, was based on one assumption that time-based work is, inevitably, less likely to be focused, an assumption that we reject as a sound basis of criticism of A&M's contribution. We find that Mr. Finkel's opinions were not soundly based and we reject them.

E.      Mr. Jameson worked for Highland for almost seven years as co-head of Private Equity, responsible for sourcing and executing private equity investments and monetizing existing portfolio companies. He testified that he was aware of the UBS TRO and had been advised that he could not sell assets during its pendency. He was aware that Cornerstone did not comply with requests by A&M for information but did not think he had the power to direct Cornerstone to do so Tr 10 28:18-30:3. He also testified that, had Highland remained as its investment manager, it would have sold the Cornerstone asset by December 31, 2017, and that Highland Capital's purchase of Cornerstone from the Crusader Fund at a negotiated price around the mark set by Highland would have been logical. Tr. 10 30:4-35:23. He also testified, in response to questioning by the Tribunal, that little, if anything, would have changed in Highland's ability to negotiate a sale with the Committee when it was replaced by A&M as its investment manager, Tr. 10 119:8-121:23.  On balance, despite Mr. Jameson's on-the-ground role as portfolio manager, his testimony did not support the allegations of Highland in its counterclaims; if anything, his intimate understanding of the Cornerstone asset and how Highland controlled the process by which Cornerstone was or wasn't being marketed supported the Committee's contentions that Highland could have negotiated a fair disposition of the Cornerstone asset had it chosen to do so.

F.      As to an alleged delay in the liquidation of the Fund's assets, the weight of the credible evidence is that Highland, not A&M, was responsible for any delay in liquidating the balance of the assets in the Crusader Fund after Highland was discharged and A&M was retained.

   1.      We note that we have previously found that Highland, after refusing to respond to numerous requests by the Committee for books and records, should make a thorough search of its books and records and produce all non-privileged documents in its possession, custody, or control on certain relevant topics. Thus, we rejected several arguments put up by Highland to prevent the Committee and A&M from gaining access to critical books and records. Order and Partial Award, April 21, 2017.

51

2.      But, even when ordered to do so, Highland again refused to produce documents on at least two other occasions, requiring additional motions addressed to this Tribunal, Order, June 20, 2017; Order, October 21, 2017.

3.      In addition, there was unrebutted testimony that Highland produced "hundreds of thousands" of documents in single-page PDF format, requiring the better part of three or more months of A&M's time to correlate and organize. Tr. 6 25:4-19.

4.      By contrast, other than Mr. Finkel's testimony, there was little or no evidence of A&M's procrastinating or proceeding with deliberate slowness or that the Committee failed in its oversight of A&M.

5.      We have considered all of the other factual and legal arguments made by Highland in support of its counterclaims and conclude that Highland is not entitled to recover the remaining Deferred Fees being held in the Fund's cash account and that the Committee did not breach Sections 2.02 of the Plan and 1.5.2 of the Scheme, the covenant of good faith and fair dealing, or its fiduciary duties to Highland and other investors. We dismiss Highland's counterclaims in their entirety.

VI.      Attorneys' Fees and Other Costs

A.      Both parties have requested attorneys' fees relating to all claims asserted in the Amended Demand, Highland's Answer, Highland's Amended Counterclaims, and Claimant's Answer to the Counterclaims. Am. Dem. at 53-54; Highland Answer, October 16, 2016, at 21-22; Highland Am. Counterclaim, April 15, 2018; Committee Answer to Counterclaims. Under AAA Commercial Arbitration Rules, Rule 47(d)(ii), those mutual demands for attorneys' fees submitted the issue to arbitration and gave this Panel the authority to award attorneys' fees, in its discretion. AAA Rule 47(d)(ii). "[M]utual demands for counsel fees in an arbitration proceeding constitute, in effect, an agreement to submit the issue to arbitration, with the resultant award being valid and enforceable." R.F. Lafferty & Co., Inc. v. Winter, 161 A.D.3d 535, 536 (1st Dep't 2018) (internal quotation marks and citations omitted).

B.      The Committee urges that an award of attorneys' fees to it is justified by Highland's having "acted in bad faith, vexatiously, wantonly, or for oppressive reasons," InterChem 59 Asia 2000 Pte. Ltd. v. Oceana Petrochem. AG, 373 F. Supp. 2d 340, 355 (S.D.N.Y. 2005) (citation omitted), and that the record shows numerous examples of Highland acting in bad faith.

52

C.    Highland acknowledges the Tribunal's discretion to order an award of attorneys' fees but opposes an imposition of attorneys' fees here. First, Highland argues that denying the Committee's request for attorneys' fees would be consistent with Section 9.02 of the Plan which provides that "each of the Crusader Funds retains obligations it has to pay . . . legal fees." HC-300 at 86. But this section of the Plan does not deal with the issue of fee-shifting being ordered by an arbitral tribunal. Nor, given Rule 47(d)(ii), would an order of this Tribunal shifting the responsibility of fees from one party to another be contrary to the so-called American rule, as both parties have sought this relief which is authorized under the prevailing rules of this Tribunal.

D.    Second, Highland urges that the only basis upon which the Committee is seeking an award is that Highland allegedly engaged in bad faith and vexatious conduct, citing only InterChem Asia 2000 Pte. Ltd. v. Oceana Petrochem. AG, 373 F. Supp. 2d 340, 355 (S.D.N.Y. 2005).  Highland points out that the Court in InterChem Asia justified an arbitrator's imposition of an award of attorneys' fees because of one party's "bad faith" conduct during the arbitration, principally concerning discovery issues. Here, the Committee cites seven examples of alleged bad faith, but only one dealt with such conduct during the arbitration, "failing to provide the Committee with the books and records of the Fund, resulting in an extensive discovery process, producing records as single-paged TIFs, and resulting in a Panel ruling against them," citing the Tribunal's Panel Opinion and Final Partial Award, dated April 17, 2017.

E.    We are exercising our discretion to grant Claimant's request for attorneys' fees and costs and to deny Respondent's request for the same relief. We do not base our award on any concern of bad faith or oppressive conduct by Highland's able trial counsel, who acted professionally throughout these proceedings. However, with respect to each of the claims on which we have determined that the Committee is entitled to prevail, we have noted above the many occasions where, during the time it was investment manager and thereafter, Highland engaged in conduct that breached the Plan, breached fiduciary duties, involved secrecy, misrepresentations, and false statements by the most senior executives, and constituted willful misconduct. Furthermore, large portions of the defense set forth by Highland's witnesses were unworthy of belief and reflect the fact that Highland knew that it had no legitimate defense to many of the Committee's claims.  Accordingly, in our discretion, based on the foregoing, we award Claimant its legal fees and costs for the litigation of this arbitration.

VII.    CONCLUSION AND AWARD

A.    With respect to the claims below for which we find liability and direct the payment of damages and interest, if the Parties are not able to agree on the amount of damages or interest, we direct them to submit simultaneous briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award; there will be no reply briefs unless otherwise directed.

B.    We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on the breach of contract claims as follows:

53

1.      The taking of the Deferred Fees: We order that, within twenty (20) days of the date of this Partial Final Award, Respondent, Highland Capital Management, pay to the Claimant the Deferred Fees in the amount of $33,313,000, with statutory interest of 9%, calculated on a simple basis, from the dates of taking in January and April 2016 through the date of this Partial Final Award.

2.      The payment of Distribution Fees: As found above, with respect to each of the following categories, we find that the Respondent is liable for damages in the amount set forth in the Expert Report of Claimant's damages expert, Basil Imburgia, $14,452,275, plus 9% interest, calculated on a simple basis, from the respective dates such Fees were taken:

      a)      The Distribution Fees attributable to the payment of Deferred Fees;

      b)      The Distribution Fee attributable to the amounts reserved in the Redeemer Trust Account;

      c)      The Distribution Fee attributable to the amounts paid in settlement of the Barclays claims;

      d)      The Distribution Fee attributable to the value of the LP interests and amounts transferred to Eames;

      e)      The Distribution Fees attributable to the amount of margin borrowings; and

      f)      The Distribution Fees attributable to the cumulative nature of the calculation, as discussed above.

C.      We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on the breach of fiduciary duty claims as follows:

1.      Engaging in related party transactions without Redeemer Committee approval:

2.      Purchase of Plan claims without Redeemer Committee approval: Within twenty (20) days of the date of this Partial Final Award, we order Respondent, Highland Capital Management, to transfer the 28 Plan or Scheme Claims to the Redeemer Committee, to pay to the Committee whatever financial benefits Highland received from the 28 transactions, less what Highland paid for the Plan Claims, plus interest at the rate of 9%, from the date of each purchase, calculated on a simple basis;

3.      Sale of CLO interests - The Committee is entitled to judgment for the amount of the difference between the sale and repurchase prices with interest from the date of the sale from the funds. We direct the Parties promptly to confer and agree upon the total amount of damages including 9% interest, calculated on a simple basis; if the Parties are not able to agree on the amount of damages, we direct the Parties to submit briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award;

4.      Failure to settle Credit Suisse claims: We find for Claimant, Redeemers Committee of the Highland Crusader Fund, on this claim and direct the Parties promptly to confer to calculate an amount of damages that takes into account the parameters set forth in the body of this Award; if the Parties are not able to agree on the amount of damages, we direct the Parties to submit briefs to the Panel on the issues within thirty (30) days of the date of this Partial Final Award;

5.      The UBS litigation: We find in favor of Claimant, Redeemers Committee of the Highland Crusader Fund, and award damages in the amount of 9% simple interest on $30 million from December 29, 2015 to December 30, 2016, which shall be paid to the Redeemer Committee by Highland Capital Management within twenty (20) days of the date of this Partial Final Award; and

6.      The Cornerstone Asset: We find in favor of Claimant and direct Highland Capital Management, within twenty (20) days of the date of this Partial Final Award, to pay the Redeemer Committee the amount of $48,070,407, plus interest at 9%, on simple basis, in return for which the Fund will transfer title to the shares to Highland.

D.      We grant Claimant's request for a declaratory judgment, seeking the immediate distribution of the Deferred Fee Account, and order the payment of the $10 million in the Account to the Committee for disbursal to the Consenting Compulsory Redeemers within twenty (20) days of the date of this Partial Final Award.

55

E.      We find against Respondent on its counterclaim and dismiss the counterclaim with prejudice.

F.      We grant Claimant's request for reasonable attorneys' fees and costs and deny Respondent's request for an award of attorneys' fees and costs. With respect to the amount of fees and expenses that Claimant seeks, the parties should promptly confer to determine whether they can agree on an amount. If the parties can not agree, Claimant shall file an affidavit or petition setting out its claim with appropriate documentation within fifteen (15) days of the date of this Award, unless counsel agree otherwise. Respondent shall respond within fifteen (15) days thereafter, unless counsel agree otherwise. There will be no reply opportunity absent leave of the Tribunal.

G.      We will leave the hearing open until all issues set forth above have been agreed upon by the Parties or decided by the Tribunal.

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6 2019

David M. Brodsky, Chair

John S. Martin, Jr.

Michael D. Young

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019

_____
David M. Brodsky, Chair

_____
John S. Martin, Jr.

_____
Michael D. Young

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Partial Final Award was made in New York, New York, USA.

Date: March 6, 2019


_____
David M. Brodsky, Chair



_____
John S. Martin, Jr.


_____
Michael D. Young

State of NEW YORK

ss:

County of NEW YORK

I, David M. Brodsky, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.

_____3/6/19_____

Date

_____

David M. Brodsky, Chairperson

State of NEW YORK

ss:

County of NEW YORK

On this ___6__ day of MARCH, 2019, before me personally came and appeared David M. Brodsky, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____

Notary Public

MEENA M. GULATI
Notary Public, State of New York
No. 01GU6349617
Qualified in New York County
Commission Expires March 2, 2021

State of FLORIDA

) ss.

County of LEE

I, JOHN S. MARTIN, JR., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is my Partial Final Award.

Date: March 5, 2019

_____
John S. Martin, Jr.

State of Florida

) ss.

County of Lee

On this 5th day of MARCH, 2019, before me personally came and appeared John S. Martin, Jr., to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

State of NEW YORK          )
                          ) ss:
County of NEW YORK         )

I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Partial Final Award.

_____          _____Michael Young_____
Date                                      Michael D. Young

State of NEW YORK          )
                          ) ss:
County of NEW YORK         )

On this \_\_ day of MARCH, 2019, before me personally came and appeared Michael D. Young, to me known and known to me to be the individual described in and who executed the foregoing instrument, and he acknowledged to me that he executed the same.

_____
Notary Public
CONNIE L. JOHNSTON

# EXHIBIT 3

*Disposition of Application of Modification of Award* **dated March 14, 2019**

**(To Be Filed under Seal)**

## INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND,

Claimant,

v.

Case No. 01-16-0002-6927

HIGHLAND CAPITAL MANAGEMENT, L.P.,

Respondent.

### DISPOSITION OF APPLICATION FOR
### MODIFICATION OF AWARD

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with Section 9.03 of the Joint Plan of Distribution, and the Scheme of Arrangement, both entered into between the above-named parties and adopted in July 2011, and having been duly sworn, and having duly heard the proofs and allegations of the parties, and having previously rendered a Partial Final Award, dated March 6, 2019, and on behalf of Claimant Redeemer Committee of the Highland Crusader Fund by email dated March 7, 2019, having made an Application for Modification of said Award pursuant to Section R-46 of the AAA's Commercial Arbitration Rules, and, not having received any objections thereto by Respondent Highland Capital Management, L.P., and having read and fully considered the contentions, do hereby determine, as follows:

The Application for Modification of Award is hereby granted and said Award is modified as follows:

Insert the following paragraph at page 54, immediately after VII.B.2.f:

"3. The transfer of Barclays Fund interests: By transferring, without the required Committee approval, Barclays' fund interests to itself through entities it controlled as part of the settlement, Highland breached the Plan and Scheme. We award the Committee damages measured by the benefits Highland received in excess of the amount it would have been entitled to receive from the Redeemer Trust Account because Barclays claim was settled for less than its value. In Table 11, Version 2, Claimant's damages expert, Basil Imburgia, calculated that such an amount totaled $34,661,749. RC-522. As with other amounts awarded, the Parties are to confer to determine the actual amount of damages including the 9% interest to date."

In all other respects, said Award dated March 6, 2019 is hereby reaffirmed.

1

This Disposition may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Disposition of Application for Modification of Award was made in New York, New York, United States of America.

3/17/19
_____                    _____
Date                                 David M. Brodsky, Chair


_____                    _____
Date                                 John S. Martin, Jr., Arbitrator


_____                    _____
Date                                 Michael D. Young, Arbitrator

2

This Disposition may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Disposition of Application for Modification of Award was made in New York, New York, United States of America.

_____        _____
. Date                          David M. Brodsky, Chair


*March 13, 2019*
_____        _____
Date                            John K. Martin, Jr., Arbitrator


_____        _____
Date                            Michael D. Young, Arbitrator


2

This Disposition may be executed in any number of counterparts, each of which shall be deemed an original, and all of which shall constitute together one and the same instrument.

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Disposition of Application for Modification of Award was made in New York, New York, United States of America.

_____                    _____
Date                                        David M. Brodsky, Chair


_____                    _____
Date                                        John S. Martin, Jr., Arbitrator


_____                    _____
Date                                        Michael D. Young, Arbitrator

2

State of New York      )
                             )   SS:
County of New York   )

I, David M. Brodsky, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Disposition of Application for Modification of Award.

3 /17/9
Date

David M. Brodsky, Chair

State of New York    )
                           )   SS:
County of New York )

On this 14 day of March, 2019, before me personally came and appeared David M. Brodsky, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

Notary Public

ISAIAS MATEO
NOTARY PUBLIC-STATE OF NEW YORK
No. 01MA6274151
Qualified in New York County
My Commission Expires 12-31-2020

3

State of _Florida_     )
                 )   SS:
County of _Lee_     )

I, John S. Martin, Jr., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Disposition of Application for Modification of Award.

_March 13, 2019_
Date                                       John S. Martin, Jr.

State of _Florida_     )
                 )   SS:
County of _Lee_     )

On this _13_ day of March, 2019, before me personally came and appeared John S. Martin, Jr., to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

Notary Public

CHRIS PAPPAS
Commission # GG 229231
Expires September 22, 2022
Bonded Thru Budget Notary Services

4

State of New York          )
                           )    SS:
County of New York         )


I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Disposition of Application for Modification of Award.


_3/14/19_                          _Michael Young_
Date                               Michael D. Young


State of New York          )
                           )    SS:
County of New York         )


On this 14 day of March, 2019, before me personally came and appeared Michael D. Young, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.


_Vicki Y. John_
Notary Public


5

# EXHIBIT 4

*Final Award* **dated April 29, 2019**

**(To Be Filed under Seal)**

INTERNATIONAL CENTRE FOR DISPUTE RESOLUTION
International Arbitration Tribunal

---

REDEEMER COMMITTEE OF THE
HIGHLAND CRUSADER FUND,

        Claimant,

v.                           Case No. 01-16-0002-6927

HIGHLAND CAPITAL MANAGEMENT, L.P.,

        Respondent.

---

## FINAL AWARD

WE, THE UNDERSIGNED ARBITRATORS, having been designated in accordance with Section 9.03 of the Joint Plan of Distribution, and the Scheme of Arrangement, both entered into between the above-named parties and adopted in July 2011, and having been duly sworn, and having duly heard the proofs and allegations of the parties, do hereby, AWARD, as follows:

A. On March 6, 2019, we issued a Partial Final Award, finding Respondent Highland Capital Management, L.P. ("Respondent") liable in a number of respects and awarding damages, interest, attorneys' fees, and costs to Claimant Redeemer Committee of the Highland Crusader Fund ("Claimant"), as described, in relevant part, below. We "le[ft] the hearing open until all issues set forth ... have been agreed upon by the Parties or decided by the Tribunal."

B. In response to an email from Claimant, dated March 7, 2019, seeking clarification on an apparent omission from the Partial Final Award, we issued a Disposition of Application for Modification of Award dated March 14, 2019 ("Modification of Award").[1]

C. This Final Award incorporates the Partial Final Award and the Modification of Award (together, the "Partial Award"). We re-adopt all prior findings and conclusions of the Partial Award, except as specifically modified hereinafter.

D. We have before us the following:

---

[1] The Modification of Award referred to Rule R-46 of the AAA Commercial Arbitration Rules, instead of Rule R-50, as the basis for the modification of a clerical error, relying upon the predecessor version of Rule R-50. The substantive text of old Rule R-46 and present Rule R-50 are the same.

a. Respondent's Memorandum, dated March 17, 2019, requesting that (1) the Panel withdraw its Modification of Award entered on March 16, 2019; (2) cease any further attempts to award additional damages, attorneys' fees, or costs that are not expressly set forth in the Partial Award; and (3) reconfirm that the hearing and all evidence is closed and the Panel is not empowered to take any further action beyond the issuance of its Partial Award ("Respondent's March 17 Memorandum").

b. Claimant's Submission Regarding Fees and Costs, dated March 21, 2019, made pursuant to Rules R-28, R-47, R-53, R-54, and R-55, AAA Commercial Arbitration Rules, seeking an award of $11,865,181.28 in attorneys' fees and costs, including Claimant's attorneys' fees, AAA administrative fees, arbitration expenses, fees incurred by A&M, expert fees, and Panel compensation paid by the Respondent Highland on behalf of the Committee in this arbitration ("Claimant's Fee Submission").

c. Claimant's Application, dated March 25, 2019, made pursuant to Rule 50, AAA Commercial Arbitration Rules, to modify the Partial Award, issued by this Panel on March 6, 2019 (Claimant's March 25 Application").

d. Claimant's and Respondent's Joint Submission on Damages dated April 5, 2019, in which the Parties agreed on the mathematical calculation of the amount of damages and interest contained in the Partial Award and Modification of Award, subject to Highland's objections to the inclusion of any damages awards that were not specified in the Partial Award and subject to objections on two specific issues: (1) whether the Eames residual LP interests would be extinguished; and (2) whether prejudgment interest awarded by the Panel will continue to run after March 6, 2019 until the earlier of the date the amount awarded is paid to the Committee for the benefit of the Fund, or the date on which a Final Judgment is issued on the Award ("Joint Submission").

e. Respondent's Memorandum dated April 5, 2019 opposing the motion to modify the Partial Award; and opposing any award for damages, attorneys' fees, or costs ("Respondent's April 5 Memorandum").

f. Claimant's Memorandum dated April 5, 2019 arguing that (1) the Panel should award further damages in connection with the Barclays claim measured by the Fund's loss of the residual value of the Eames LP interests, either by extinguishing the former Barclays LP interests, or alternatively, by awarding an appropriate amount of damages to compensate the Fund for loss of the value of those interests, which the Committee puts at $11,589,474; and (2) the Panel should award prejudgment interest through the date the Award is paid or final judgment is entered ("Claimant's April 5 Memorandum").

g. On April 10, 2019, Respondent sought leave, which we granted on consent, to file an additional Memorandum on two issues raised by Claimant in its April 5

Memorandum, namely, that Claimant adds a new and improper request that interest after March 6, 2019 be compound, and not simple, interest by applying an additional 9% statutory interest to both (a) the damages awarded and (b) the interest accrued through March 6, 2019; and that Claimant has provided a new and improper damages calculation relating to the extinguishment of the Eames LP interests.

h. Having reopened the record on March 6, 2019, for additional submissions, as described above, we deem the record closed as of April 10, 2019.

E.  Issues
   a.  Fees and costs
       1.  In the Partial Award, we evaluated the competing claims made by Claimant and Respondent regarding an award of fees, which both sides had sought in their pleadings. As we noted in the Partial Award, ¶VI.A, 52, AAA Commercial Arbitration Rule R-47 (d)(ii) authorizes the Arbitrator to award attorneys' fees if, as here, "all parties have requested such an award . . . " "[M]utual demands for counsel fees in an arbitration proceeding constitute, in effect, an agreement to submit the issue to arbitration, with the resultant award being valid and enforceable." *R.F. Lafferty & Co., Inc. v. Winter*, 161 A.D.3d 535, 536 (1st Dep't 2018) (internal quotation marks and citations omitted); *In re U.S. Offshore, Inc. and Seabulk Offshore Ltd.*, 753 F. Supp. 86, 92 (S.D.N.Y. 1990) ("If both parties sought attorney's fees, . . . then both parties agreed *pro tanto* to submit that issue to arbitration, and the arbitrators had jurisdiction to consider that issue and to award them.")."

       2.  During closing oral arguments, Respondent did not mention its own request for an award of fees, but "*acknowledge[d] the Tribunal's discretion* to order an award of attorneys' fees…" Indeed, Respondent made oral and written closing arguments that conceded that it was "*not disputing the discretion that the Panel has* [to award fees]." Tr. 13 444:2-3 (emphasis added). In its closing slides, Respondent also urged that "The Panel *should exercise its discretion in applying the American Rule*." Respondent Closing Slides at 261 (emphasis added).

       3.  Respondent also argued that denying the Claimant's request for attorneys' fees would be consistent with Section 9.02 of the Plan which provides that "each of the Crusader Funds retains obligations it has to pay . . . legal fees." Second, Respondent urged that the only basis upon which Claimant is seeking an award is that Respondent allegedly engaged in bad faith and vexatious conduct.

3

4. Respondent now chooses to oppose the grant of fees on grounds distinctly different from those set forth above. It belatedly argues an alleged lack of proof and the Panel's being *functus officio* to award fees.

    1. Respondent argues that the Panel "found that the evidence in the record was insufficient to determine many of the Committee's claims for damages, as well as its claims for costs and fees." Resp. April 5 Mem. 14.

    2. But that is incorrect; we did not find any insufficiency; instead, with no objection, we adopted a well-recognized method of dealing with attorneys' fees and costs by deciding entitlement before amount. See *Franco v. Dweck*, 87 N.Y.S.3d 5 (2018) ("Contrary to respondents' contention, the final award did not run afoul of the doctrine of *functus officio*, which precludes an arbitrator from altering in substance a prior award (see *Matter of Wolff & Munier [Diesel Constr. Co.]*, 41 A.D.2d 618, 340 N.Y.S.2d 455 [1st Dept. 1973] ). As the partial final award *expressly reserved* the issue of attorneys' fees, it cannot bar a *subsequent* award of those fees (see *Shimon v. Silberman*, 26 Misc.3d 910, 914–915, 891 N.Y.S.2d 891 [Sup. Ct., Kings County 2009] )."

5. Accordingly, we reject Respondent's new positions. From at least the time the pre-hearing briefs, witness lists, and list of exhibits were mutually filed, it was clear that whichever side that was going to seek attorneys' fees if it prevailed was reserving on the specific rates and amounts of legal fees, as well as costs and expenses, many of which had not yet been incurred. To do otherwise would be a waste of resources. Not once did Respondent ever raise the question of proof regarding attorneys' fees and costs; by its silence and conduct, Respondent consented to the process regarding proof of attorneys' fees that the Panel was following, see CCA Guide to Best Practices in Commercial Arbitration (3d edition), 246.

6. Second, we explicitly denominated the award of March 6 as a "Partial Final Award," making clear to the Parties that the arbitral proceeding was still ongoing. We also explicitly left the hearing open so that the Parties could meet and confer or make submissions, including providing additional evidence, "until *all issues* set forth ... have been agreed upon by the Parties or decided by the Tribunal." Under these circumstances, the doctrine of *functus officio* does not apply. *Kennecott Utah Copper Corp. V. Becker, 186 F.3d 1261, 1270-71 & n.4* (10th Cir. 1999) (*Functus*

*officio* provides that, "once an arbitrator has issued a *final* award and thus discharged his or her office, that arbitrator lacks any continuing power to revise the award or issue a new one.")(emphasis added).

i. Accordingly, we turn to an examination of the application for attorneys' fees and costs, sought by Claimant:

    a. Claimant seeks the following in fees and costs:
        i. Jenner & Block Fees - $9,278,248.99
            1. In support of its fee application, Claimant has provided detailed time records, billing records, and a declaration of Andrew Vail, a partner of Jenner & Block, that establishes that records were maintained on a contemporaneous basis, that time billed on duplicative, inefficient, or extraneous to the arbitral proceeding was excluded from the application, and that hourly rates, and a fixed-fee discount, where applicable, were discounted by 15%. Vail Declaration ¶¶13-18. The hourly rates are shown to be comparable to rates charged by other similar firms and consistent with prevailing market rates for attorneys of similar high levels of expertise and experience. We note that Respondent does not object to the amount sought, except on the bases previously discussed. We find the request for legal fees to be reasonable, especially given the complex factual and legal setting, and grant Claimant's application.

        ii. FTI Expert Fees - $1,274,853.26; and A&M Arbitration Fees - $655,160.00
            1. In support of the FTI fees, Claimant submitted a declaration, with supporting exhibits, of Mr. Vail, who affirmed that the fees reflected "services that were necessary for the Committee to prosecute its claims against [Respondent] and to defend against [Respondent's] counterclaims, and ... the amounts charged for such services were reasonable given the necessity of those services." Vail Declaration ¶26.

2. In support of the A&M Arbitration Fees, Claimant has provided the declaration of Steven Varner, a Managing Director of A&M, who affirms that A&M maintained billing records on a contemporaneous basis for its services throughout the course of this arbitration, but did not keep detailed descriptions of its billed time for specific matters within that engagement. He further affirmed that he and another managing director compiled a "conservative estimate of the time that A&M personnel spent on matters that were specifically required in connection with HCMLP's failure to timely provide A&M with books and records relating to the Fund." That work totaled approximately $655,160.00, after discounts were applied to their normal billing rates. Varner Declaration ¶¶6, 7, and 10.

3. Claimant is not seeking recovery for over $140,000 in attorneys' fees and costs for A&M's counsel to pursue information from Cornerstone pursuant to Del. Code Ann. tit. 8 § 220. Varner Declaration ¶8.

4. Respondent principally opposes the fees of FTI and A&M on the grounds that "while the AAA Rules permit the award of certain expenses (e.g. administrative costs and Panel compensation), they are much more restrictive when it comes to witness costs for the parties. In fact, Rule 54 expressly divides expenses into two categories: (i) witness expenses—which are to be borne by the party presenting the witness; and (ii) '[a]ll other expenses'—which may be apportioned by the arbitrator(s)."

5. While acknowledging some dispute among the courts as to whether Rule R-54 permits a prevailing party to recover its expert witness fees, Claimant urges that the weight of authority provides that both consulting and testifying witness fees are recoverable under the AAA's rules, citing *Dealer Comp.*

*Servs., Inc. v. Hammonasset Ford Lincoln-Mercury, Inc.*, 2008 WL 5378065, at *2, *4 (S.D. Tex. Dec. 22, 2008) (confirming final arbitration award that included expert witness fees); *In re Pos'tive Produc, Inc. v Thermal C/M Services, Inc.*, 2011 WL 13220365, at *4 (N.Y. Sup. Ct. Nov. 18, 2011) (confirming award that included "expert fees and costs"); and *Cardno Int'l Pty, Ltd. v. Merino*, 2017 WL 6034172 (S.D. Fla. Oct. 30, 2017).

6. Rule 47(a) gives the Tribunal the power to "grant any remedy or relief that the arbitrator deems *just and equitable* and within the scope of the agreement of the parties...", while Rule 47(c) provides that "In the final award, the arbitrator *shall* assess the fees, expenses, and compensation provided in Sections R-53, R-54, and R-55. The arbitrator *may apportion* such fees, expenses, and compensation among the parties in such amounts *as the arbitrator determines is appropriate*." (Emphasis added.) Parsing these sections in conjunction with R-54 leads us to conclude that we have the power to award the expenses of the arbitration, including expert fees, as we deem just, equitable, and appropriate. *White Springs Agric. Chemicals, Inc. v. Glawson Investments Corp.*, No. 3:07-CV-752-J-25JRK, 2010 WL 11507082, at *4 (M.D. Fla. Sept. 13, 2010) (confirming award where tribunal awarded prevailing party its expert fees), *aff'd*, 660 F.3d 1277 (11th Cir. 2011).

7. Under the complex circumstances presented here, we find that the experts were essential to the prosecution of the Claimant's case and that their services, and consequent fees, were a necessary obligation the Claimant was bound to its members to undertake in its pursuit of the claims against Respondent.

8. We note, specifically with respect to the A&M fees, that a large portion of the fees appear to relate to "time spent organizing the tens of thousands of individual page PDF files that HCMLP provided as books and records instead of complete documents." Varner Declaration ¶7.

9. From our observations at the hearing and our review of the reported rates and fees of FTI and A&M, we conclude that such fees were fair and reasonable and we find that it would be "just and equitable" and "appropriate" relief to award Claimant all of the expert fees it seeks, and we do so.

iii. Respondent does not object to the following categories of fees sought by Claimant:

1. AAA Administrative Costs - $64,750.00;
2. Court Reporter Hr'g Costs - $114,697.77;
3. Court Reporter Dep. Costs - $28,890.04; and
4. AAA Panel Compensation - $448,581.22 (to date).

b. Accordingly, in our discretion, we award Claimant the total sought in fees, costs, and expenses, as detailed and updated in section F. below.

b. Claimant's Motion for Modification of the Partial Final Award
   i. On March 25, 2019, Claimant moved, pursuant to AAA Rule 50, to modify the Partial Final Award in several respects.

1. First, with respect to the Partial Final Award regarding the finding of liability of Respondent with respect to the Barclays LP interests, Claimant moved to correct a clerical error that resulted in the omission of a Barclays damages paragraph from the Partial Final Award by modifying that Award to include the paragraph set forth in the Panel's March 14, 2019 Modification of Award.

2. Second, also pursuant to Rule 50, Claimant moved that the Panel modify the award to address other clerical, typographical, and computational errors in the Partial Final Award.

3. AAA Rule 50 provides in relevant part, as follows: "R-50. Modification of Award. Within 20 calendar days after the

8

transmittal of an award, any party, upon notice to the other parties, may request the arbitrator, through the AAA, to correct any clerical, typographical, or computational errors in the award. The arbitrator is not empowered to redetermine the merits of any claim already decided. The other parties shall be given 10 calendar days to respond to the request. The arbitrator shall dispose of the request within 20 calendar days after transmittal by the AAA to the arbitrator of the request and any response thereto."

4. With respect to the Barclays issues, Respondent contends both that Rule 50 does not apply and that the doctrine of *functus officio* divests the Panel of the power to modify the Partial Final Award, as the Panel would be adding an "additional award" that "represents an entirely new award of $34 million in damages not included in the [Partial Final Award] ... constitut[ing] a material revision of the award."(Respondent's April 5 Memorandum at 5).

5. First, we are not adding an "additional award," as it is clear from the structure of the Partial Final Award that a paragraph was missing from the damages portion; all other findings of liability were accompanied by a section delineating the applicable damages except for the finding of a breach of the Plan and Scheme by reason of the transfer of LP interests to Eames. In other words, we found liability in two respects but omitted a paragraph regarding the remedy for Respondent's breach of the Plan and Scheme that we had found with respect to the transfer, without the required Committee approval, of Barclays' fund interests to itself through entities it controlled as part of the settlement. That omission is a classic example of a clerical error.

6. Second, although the effect of the Modification was to add additional damages to the award against the Respondent, the Panel did not "materially revise" the Partial Final Award since liability had already been found.

7. In addition, as previously discussed, the doctrine of *functus officio* "provides that, *while an arbitrator may correct clerical, typographical, or computational errors in a final award, he has no power to revisit the merits of the award after it has issued...*" *Int'l Broth. Of Elec. Workers, Local Union 824 v. Verizon Florida, LLC*, 803 F.3d 1241, 1250 (11th Cir. 2015). However, we did not issue a final award; it was explicitly labeled a Partial Final Award and was explicitly subject to being supplemented by subsequent presentations of damages analyses by both Parties.

9

8. Finally, there is ample case law for the proposition that the Panel is not divested of power, even when issuing a final award, from correcting clerical, typographical, or computational errors. See *Rain CII Carbon, LLC v. ConocoPhillips Co.*, 674 F.3d 469, 472-73 (5th Cir. 2012); *E. Seaboard Const. Co., Inc. v. Gray Const., Inc.*, 553 F.3d 1, 5-6 (1st Cir. 2008).

9. Respondent also argues that the Panel is barred from correcting the Partial Final Award by AAA Rule 45, which provides that "The award shall be made ... no later than 30 calendar days from the date of closing the hearing..." Respondent urges that "the parties agreed that the final award would be made on or before March 7, 2019. Accordingly, any award made after that date is untimely and beyond the scope of the Panel's authority." (Resp. April 5 Mem. at 7). But, once again, this argument ignores the explicit nature of the March 6 Partial Final Award, which "le[ft] the hearing open until all issues set forth above have been agreed upon by the Parties or decided by the Tribunal."

10. Respondent also argues that we are "reopening" the record in violation of AAA Rule 40. That rule provides, in relevant part, as follows: "The hearing may be reopened on the arbitrator's initiative, or by the direction of the arbitrator upon application of a party, at any time before the award is made. If reopening the hearing would prevent the making of the award within the specific time agreed to by the parties in the arbitration agreement, the matter may not be reopened unless the parties agree to an extension of time. When no specific date is fixed by agreement of the parties, the arbitrator shall have 30 calendar days from the closing of the reopened hearing within which to make an award..."

11. We acknowledge that a communication from the AAA, dated December 12, 2018, stated that the "no additional evidence is to be submitted and that the hearings are declared closed as of December 12, 2018," but this statement was subsequently withdrawn by the previously-quoted language of the Partial Final Award where we explicitly left the record open "until all issues set forth ... have been agreed upon by the Parties or decided by the Tribunal."

12. That language is equivalent to the language that "we will reopen the hearing." *Int'l Bhd. of Teamsters Local 959 v. Horizon Lines of Alaska, LLC*, 22 F. Supp. 3d 1005, 1007–08 (D. Alaska 2014) ("Where an arbitrator specifically retains jurisdiction to resolve disputes regarding damages, that indicates that the arbitrator did not intend the award to be Final. Put simply, an arbitration award that postpones the determination of a remedy should not constitute

a final and binding award"); *Golden v. Lim*, 2016 WL 520302, at *3, *9 (E.D. Mich. Feb. 10, 2016)(holding that the arbitrator had the authority under the AAA Rules to reopen the hearing to accept further submissions on attorneys' fees).

13. Second, even if the relief sought required a reopening of the record, Rule 40 authorizes the Panel to do so "upon the application of a party," so long as doing so did not violate "the specific time agreed to by the parties in the arbitration agreement" for the making of the award. No such time period is set forth in the arbitration agreement. Finally, we interpret Rule 40 to be speaking to the instance of reopening the hearing after the final award is made, which is, again, not the situation we are in.

ii. We grant Claimant's application under AAA Rule 50[2] and formally correct the clerical error by re-adopting the additional paragraph, previously included in the Panel's March 16 Modification of Award, as follows:

    1. "Insert the following paragraph at page 54, immediately after VII.B.2.f: "3. The transfer of Barclays Fund interests: By transferring, without the required Committee approval, Barclays' fund interests to itself through entities it controlled as part of the settlement, Highland breached the Plan and Scheme. We award the Committee damages measured by the benefits Highland received in excess of the amount it would have been entitled to receive from the Redeemer Trust Account because Barclays claim was settled for less than its value. In Table 11, Version 2, Claimant's damages expert, Basil Imburgia, calculated that such an amount totaled $34,661,749. RC-522. As with other amounts awarded, the Parties are to confer to determine the actual amount of damages including the 9% interest to date."

iii. Claimant also moves under Rule 50 to correct four other clerical errors, set forth below, as to which Respondent does not object. The motion is granted; the clerical errors are set forth below and corrected as noted:

    1. The Partial Final Award reference to the amount of Deferred Fees improperly taken from the Fund by Highland as "$33,313,000" (Partial Final Award at 14, 54) is corrected to read "$32,313,000."

---

[2] We acknowledge Respondent's interesting linguistic analysis of the differences between ICDR Article 33 and AAA Rule 50, see Respondent April 5 Memorandum at 5-6, but we deny the underlying premise that what we are being asked to do is to make an "additional award as to claims, counterclaims, or setoffs presented but omitted from the award." We had found liability as to two claims involving the Barclays LP interests but omitted the damages component of one of the two liability findings. That does not constitute an award as to a claim argued by Claimant but omitted from the partial final award.

2. The Partial Final Award reference to the amount of improper Distribution Fees calculated by Mr. Imburgia as $14,452,275 (Partial Final Award at 24, 54) is corrected to read "$14,457,275."

3. The Partial Final Award reference to the amount of "$23.5/9" and "$23.5 million" (Partial Final Award at 36, 40) is corrected to read "$23,938,568."

4. The Partial Final Award reference to the incentive period as ending on "December 30, 2016" (Partial Final Award at 40, 41, 42, 55) is corrected to read "September 30, 2016."

iv. Eames

1. In the March 6 Partial Final Award, as modified herein, we found Respondent liable for having transferred the Barclays LP interests to an entity which it wholly controlled, Eames [LLC].[3] We awarded damages "measured by the benefits Highland received in excess of the amount it would have been entitled to receive from the Redeemer Trust Account because Barclays claim was settled for less than its value." We estimated — but did not find — that amount by referring to a damages calculation by Claimant's damages expert, Basil Imburgia, who "calculated that such an amount totaled $34,661,749. RC-522." "As with other amounts awarded," we directed "the Parties ... to confer to determine the actual amount of damages including the 9% interest to date."

2. The Parties have conferred and disagree as to the appropriate amount of damages for Respondent's breach of the Plan and Scheme. Claimant asserts that the appropriate amount of damages is $29,609,015, which is lower than the amount estimated by its expert and cited in the Partial Final Award, because "the value of the Barclays interests which [Respondent] now controls through Eames is expressly excluded, as it would be extinguished and that value would be spread amongst the remaining Fund investors." Claimant April 5 Memorandum, 5.

3. Thus, Claimant urges that "the Panel should either (1) award $29,609,015 and order the extinguishment of the Barclays LP interests owned and controlled by Highland, or (2) award $29,609,015 plus the current value of those LP interests, which its

---

[3] We found, and it is not disputed, that Highland controls Eames through an entity, Hockney, Ltd., that Highland wholly owns, and which, along with Eames, was created solely for the purpose of holding the Barclays LP interests for Highland's financial benefit. JX24; Tr. Day 8 83:21-86:13; Tr. Day 9 144:21-25, 220:18-25.)

damages expert estimates to be $11,589,474. Claimant April 5 Mem. at 10; Imburgia April 5 Declaration, ¶15.

4. Respondent urges that the "March 16 Modification contains specific language awarding the Committee a specific amount of monetary damages." However, as discussed above, that is not what the Panel did. We directed the Parties to confer on the exact amount to be awarded and to come to the Panel if they could not agree.

5. Respondent further argues that nowhere in the March 6 Partial Final Award or the March 16 Modification did the Panel award Claimant equitable relief concerning the Barclays Claim, and that had the Panel wanted to do so, it knew how to do so.

6. Respondent goes on to argue that Eames is not a party to this arbitration, and, therefore, the Panel lacks the authority to issue an award determining Eames' legal rights and obligations." Even if the Panel determines that the remaining equity interest should have been extinguished at the time of the 2012 settlement, "the fact remains that the equity interest was transferred to—and is still held by—Eames." Respondent April 5 Memorandum, 21-22.

7. Finally, in its April 10 submission, Respondent objects to the Claimant's calculation of interest on any award regarding Barclays or the other claims, to wit, Claimant's April 5 Request adds an improper request that interest after March 6, 2019 be compound, and not simple, interest by applying an additional 9% statutory interest to both (a) the damages awarded and (b) the interest accrued through March 6, 2019.

8. We disagree with Respondent's arguments except as relating to the compounding of interest sought by Claimant, which we discuss more fully below. First, when we found that "Highland breached the Plan and Scheme by transferring the LP interests to a wholly-controlled affiliate after the Committee had specifically disapproved of the transfer," we sought a remedy to deprive Respondent of the benefits that it had received illegitimately, or, in other words, to void the Eames transaction and put the parties back into the position they should have been in. Respondent may not benefit in the future by its breach of the Plan and Scheme, and the illegitimate transaction it engaged in, by forfeiting some, but receiving future, benefits through its absolute control of the entity it created, Eames.

9. Second, although Eames is not a party in this proceeding, that is irrelevant to the relief we grant. The operating party throughout all of the machinations that resulted in the transfer of Barclays' LP interests to an entity it created solely for the purpose of holding such interests was, and remains, Respondent. It is completely within its power to unwind the transfer and re-transfer those interests back to the Fund for the benefit of its investors, as we now order.

10. Regarding the appropriate amount upon which to award interest, for reasons set forth below, we reject Claimant's argument that $29,609,015 is the appropriate amount upon which to award interest, as to do so would be to violated well-settled law in New York regarding pre-judgment interest, CPLR §§5003-5004.

11. We award Claimant monetary damages against Respondent in the amount of $21,768,743, plus 9% simple prejudgment interest from the date of the breach until the earlier of either (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

12. We further order that Respondent take all necessary steps to cause the improperly taken Fund LP interests currently owned and controlled by Respondent through Eames, Ltd to be returned to Claimant within sixty (60) days from the date of transmittal of this Final Award to the Parties.

v. Interest

1. In the March 6 Partial Final Award, we awarded damages and interest through the date of that award, but then, as already referred to, directed the Parties to confer regarding all damages and interest issues. Claimant now urges that we award 9% prejudgment interest on the damage amounts awarded until the earlier of: (1) the date on which the amounts due are paid to the Committee for the benefit of the Fund; or (2) the date on which a court of competent jurisdiction enters a final judgment on the Final Award.

2. However, as Respondent points out, Claimant is, in effect, arguing for a compounding of interest upon interest. We agree. The effect of Claimant's interest calculations would violate New York law, as an award of 9% interest post-March 6 on an amount that already includes 9% interest from the breach through March 6, would amount to compound interest after March 6, 2019. "[T]he statutory

scheme [in New York] for awarding ..., where applicable, prejudgment interest, does not provide for compound interest." *520 East 81st Street Associates* v. *State of New York*, 19 AD3d 24 (2005).

3. Respondent also contends that the March 6 Partial Final Award contained specific language awarding interest "through the date of this Partial Final Award"— i.e., March 6, 2019, and that awarding interest through any other date would constitute an untimely modification of the Partial Final Award.

4. We disagree with Respondent that changing the termination date of prejudgment interest would constitute an untimely modification. Although the Partial Final Award did use the date of March 6 as a reference point for calculation of interest, that fact is not determinative of this issue. We also explicitly left open calculations of damages and interest until the Parties had fully conferred on the extremely complex financial calculations that had to be made. Among the calculations was a further calculation of interest. It is not an unlawful modification of the Partial Final Award to make, as we do here, a final award on all damages and interest issues based upon a final record.

5. Furthermore, failing to continue the running of interest through payment or entry of a final judgment could well, under the circumstances presented here, result in Fund investors with no compensation for their documented losses during that time, as well as provide an incentive to Respondent to prolong the confirmation process. We have already had occasion to comment on Respondent's tactics of putting forth witnesses who were "unworthy of belief" and an "[il]legitimate defense to many of the Committee's claims." Partial Award ¶VI(E). We will not adopt a result that would allow Respondent to impose more hardships on the Fund Investors.

6. We award Claimant 9% prejudgment simple interest on all sums awarded from the dates of each breach through the earlier of the date paid or the entry of a final judgment.

F. FINAL AWARD

a. We reaffirm the findings of fact, conclusions of law, and findings of liability as set forth in the March 6 Partial Award, and make the following awards with respect to such findings and conclusions:

i. Claimant's Application to modify the Partial Final Award is granted pursuant to the Disposition of Application for Modification dated March 14, 2019.

ii. Claimant's Motion to Correct Errors is granted, on consent; the clerical errors are set forth below and corrected as noted:

    1. The Partial Final Award reference to the amount of Deferred Fees improperly taken from the Fund by Highland as "$33,313,000" (Partial Final Award at 14, 54) is corrected to read "$32,313,000."

    2. The Partial Final Award reference to the amount of improper Distribution Fees calculated by Mr. Imburgia as $14,452,275 (Partial Final Award at 24, 54) is corrected to read "$14,457,275."

    3. The Partial Final Award reference to the amount of "$23.5/9" and "$23.5 million" (Partial Final Award at 36, 40) is corrected to read "$23,938,568."

    4. The Partial Final Award reference to the incentive period as ending on "December 30, 2016" (Partial Final Award at 40, 41, 42, 55) is corrected to read "September 30, 2016."

    5. In all other respects, the Partial Final Award dated March 6, 2019 and the Disposition of Application for Modification dated March 14, 2019 are reaffirmed and incorporated by reference.

iii. For the Deferred Fee Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the Deferred Fees in the amount of $32,313,000 as directed in the Partial Final Award, plus prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the dates of the breaches and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

iv. For the Distribution Fee Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $14,457,275, plus prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the dates of breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

v. For the Taking of Plan Claims, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21,

Case 19-34054-sgj11 Doc 3428-10 Filed 08/03/22 Entered 08/03/22 13:26:05 Page 157 of 187

2019, the amount of $3,106,414. The Panel further orders that LP interests identified in RC411 be transferred to Claimant for the benefit of the Crusader Fund or that Claimant cause the Fund to extinguish those claims. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to $3,106,414 beginning on March 7, 2019 and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

vi. For the CLO Trades Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $449,375.00. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple, from the dates of the breaches and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

vii. For the Credit Suisse Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $2,735,411. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple on that sum, from the date of the breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

viii. For the UBS Claim, the Panel awards the following relief: the Panel orders Respondent to pay to the Claimant, on or before May 21, 2019, the amount of $2,041,664. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the date of breach until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

ix. For the Cornerstone Claim, the Panel awards the following relief: the Panel orders Respondent to pay to Claimant, on or before May 21, 2019, the amount of $48,070,407 for the sale of the Crusader Fund's shares in Cornerstone. The Panel also awards pre-prejudgment interest at the New York statutory rate of 9% simple on that sum from the date of breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award. When the amount awarded for the Cornerstone claim is paid by Respondent, Claimant shall cause the Crusader Fund to tender its Cornerstone shares to Respondent.

17

    x.  For the Barclays Claim, the Panel awards the following relief:

        1.  The Panel orders Respondent to pay to Claimant, on or before May 21, 2019, the amount of $21,768,743. The Panel also awards prejudgment interest at the New York statutory rate of 9% simple applied to that sum from the date of the breach and continuing until the earlier of: (1) the date the amount awarded is paid to Claimant for the benefit of the Fund, or (2) the date on which a court of competent jurisdiction enters a final judgment upon this Award.

        2.  Further to the Barclays Claim, the Panel orders that Respondent take all necessary steps to cause the improperly taken Fund LP interests currently owned and controlled by Respondent through Eames, Ltd to be transferred to Claimant for the benefit of the Crusader Fund within sixty (60) days from the date of transmittal of this Final Award to the Parties, or, alternatively, that Claimant cause the Fund to extinguish those interests.

    xi.  For Claimant's Application for Legal Fees, Costs, and Expenses, we award Claimant $11,351,850.06 in fees, costs, and expenses as per the following:

        1.  Jenner & Block Fees - $9,278,248.99;
        2.  FTI Expert Fees - $1,274,853.26;
        3.  A&M Arbitration Fees - $655,160.00;
        4.  Court Reporter Hr'g Costs - $114,697.77;
        5.  Court Reporter Dep. Costs - $28,890.04

    xii.  The administrative fees and expenses of the International Centre for Dispute Resolution (ICDR) totaling US$94,693.88 and the compensation and expenses of the Tribunal totaling US$887,427.89 shall be borne by Respondent. Therefore, Respondent shall reimburse Claimant the additional sum of US$514,163.97, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Claimant.

G.  We have carefully considered, although not discussed in their entirety herein, all arguments made by Claimant and Respondent. Any other claims or requests for relief, made by either Party, are denied.

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

Date: April 29, 2019

_____
David M. Brodsky, Chair

_____
John S. Martin, Jr.

_____
Michael D. Young

We hereby certify that, for the purposes of Article I of the New York Convention of 1958, on the Recognition and Enforcement of Foreign Arbitral Awards, this Final Award was made in New York, New York, USA.

Date: April 29, 2019


David M. Brodsky, Chair


John S. Martin, Jr.


Michael D. Young

State of New York          )
                           )  SS
County of New York         )


I, David M. Brodsky, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our Final Award

_____5/9/19_____                    _____
Date                                     David M. Brodsky, Chairperson


State of New York          )
                           )  SS:
County of New York         )


On this ___ day of May, 2019, before me personally came and appeared David M. Brodsky, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

ISAIAS MATEO
ARY PUBLIC-STATE OF NEW YORK
No 01MA6274151
Qualified in New York County
Commission Expires 12-31-2020

State of Florida    )
                  )   SS:
County of Lee    )

I, John S. Martin, Jr., do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our        Final Award.

_Date April 29,2019

John S. Martin, Jr., Arbitrator


State of Florida    )
                  )   SS:
County of Lee    )

On this 29th day of April, 2019, before me personally came and appeared John S. Martin, Jr., to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

Notary Public

ROBIN A. YEOMANS
MY COMMISSION # GG 121122
EXPIRES: November 3, 2021
Bonded Thru Notary Public Underwriters

21

State of New York      )
                       )   SS:
County of New York     )

I, Michael D. Young, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument, which is our      Final Award.

_____4/29/19_____                    _____
Date                                         Michael D. Young, Arbitrator

State of New York      )
                       )   SS:
County of New York     )

On this ___ day of April, 2019, before me personally came and appeared Michael D. Young, to me known and known to me to be the individual described in and who executed the foregoing instrument and he acknowledged to me that he executed the same.

_____
Notary Public

VICKIE L. JOHNSTON
Notary Public - State of New York
No. 01JO6113098
Qualified in Queens County
My Commission Expires July 19, 20 20

# EXHIBIT 5

**Fill in this information to identify the case:**

| | |
|---|---|
| Debtor | Highland Capital Management, L.P. |
| United States Bankruptcy Court for the: | Northern District of Texas (State) |
| Case number | 19-34054 |

# Official Form 410
# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

---

**Part 1:  Identify the Claim**

| | | |
|---|---|---|
| 1. | Who is the current creditor? | Redeemer Committee Highland Crusader Fund<br>Name of the current creditor (the person or entity to be paid for this claim)<br><br>Other names the creditor used with the debtor _____ |
| 2. | Has this claim been acquired from someone else? | ☑ No<br>☐ Yes.  From whom? _____ |
| 3. | Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>See summary page<br><br><br><br><br>Contact phone _____<br>Contact email  TMascherin@jenner.com<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br><br>__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ | **Where should payments to the creditor be sent?** (if different)<br><br><br><br><br><br>Contact phone _____<br>Contact email _____ |
| 4. | Does this claim amend one already filed? | ☑ No<br>☐ Yes.  Claim number on court claims registry (if known) _____  Filed on _____<br>MM / DD / YYYY |
| 5. | Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

---

1934054200123040428003885

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**

$ <u>See attached rider</u> . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

<u>See attached rider</u>

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

1934054200123040428003885

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No | | | |
|---|---|---|---|---|---|
| | | ☐ Yes. *Check all that apply:* | | **Amount entitled to priority** | |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $_____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $_____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $_____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $_____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $_____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies.  $_____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

| 13. | Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)? | ☑ No |
|---|---|---|

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$_____

---

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  04/03/2020
                  MM / DD / YYYY

    /s/Terri L. Mascherin
         Signature

Print the name of the person who is completing and signing this claim:

| Name | Terri L. Mascherin | | |
|---|---|---|---|
| | First name | Middle name | Last name |
| Title | Partner | | |
| Company | Jenner and Block LLP | | |
| | Identify the corporate servicer as the company if the authorized agent is a servicer. | | |
| Address | | | |
| Contact phone | | Email | |

---

1934054200123040428003885

# KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| Redeemer Committee Highland Crusader Fund | Yes, supporting documentation successfully uploaded |
| c/o Terri Mascherin, Esq. | **Related Document Statement:** |
| Jenner and Block | |
| 353 N. Clark Street | **Has Related Claim:** |
| Chicago, IL, 60654-3456 | No |
| **Phone:** | **Related Claim Filed By:** |
| **Phone 2:** | |
| **Fax:** | **Filing Party:** |
| **Email:** | Authorized agent |
| TMascherin@jenner.com | |
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |
| **Basis of Claim:** | **Last 4 Digits:** / **Uniform Claim Identifier:** |
| See attached rider | No |
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| See attached rider | Yes |
| **Has Priority Claim:** | **Priority Under:** |
| No | |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | **Annual Interest Rate:** |
| No | |
| **Based on Lease:** | **Arrearage Amount:** |
| No | **Basis for Perfection:** |
| **Subject to Right of Setoff:** | **Amount Unsecured:** |
| No | |
| **Submitted By:** | |
| Terri L. Mascherin on 03-Apr-2020 1:51:56 p.m. Eastern Time | |
| **Title:** | |
| Partner | |
| **Company:** | |
| Jenner and Block LLP | |

VN: 4AC8D8C3992B6AD2D5B5C1D168C10819

Your claim can be filed electronically on KCC's website at https://epoc.kccllc.net/HCMLP

ID: 24788159          PIN: wZvUm7fb

---

| Fill in this information to identify the case: |
| --- |
| Debtor    Highland Capital Management, L.P. |
| United States Bankruptcy Court for the Northern District of Texas, Dallas Division |
| Case number   19-34054-sgj11 |

## Official Form 410
# Proof of Claim
**04/19**

**Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Other than a claim under 11 U.S.C. § 503(b)(9), this form should not be used to make a claim for an administrative expense arising after the commencement of the case.**

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed.**

---

### Part 1:  Identify the Claim

NameID: 13930498

**1. Who is the current creditor?**

Redeemer Cmmttee Highland Crusader Fund
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

[X] No

[ ] Yes.   From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

Redeemer Cmmttee Highland Crusader Fund
c/o Terri Mascherin, Esq.
Jenner & Block
353 N. Clark Street
Chicago, IL 60654-3456

Address _____

Contact phone _____

Contact email _____

Where should payments to the creditor be sent? (if different)

Name _____

Number    Street _____

City          State    ZIP Code

Country _____

Contact phone _____

Contact email _____

Uniform claim identifier for electronic payments in chapter 13 (if you use one): _____

**4. Does this claim amend one already filed?**

[X] No

[ ] Yes.   Claim number on court claims registry (if known) _____      Filed on _____
                                                  MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

[X] No

[ ] Yes. Who made the earlier filing? _____

---

1934054200123040428003885

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---------|---|

**6. Do you have any number you use to identify the debtor?**

☒ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**

$ ___See attached rider.___ . **Does this amount include interest or other charges?**

☐ No

☒ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

___See attached rider.___

**9. Is all or part of the claim secured?**

☒ No

☐ Yes. The claim is secured by a lien on property.

    **Nature of property:**

    ☐ Real estate: If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

    ☐ Motor vehicle

    ☐ Other. Describe: _____

    **Basis for perfection:** _____

    Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

    **Value of property:** $_____

    **Amount of the claim that is secured:** $_____

    **Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

    **Amount necessary to cure any default as of the date of the petition:** $_____

    **Annual Interest Rate** (when case was filed) _____%

    ☐ Fixed

    ☐ Variable

**10. Is this claim based on a lease?**

☒ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☒ No

☐ Yes. Identify the property: _____

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☒ No

☐ Yes. *Check all that apply:*

Amount entitled to priority

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). $ _____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). $ _____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. $ _____

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

**13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?**

☒ No

☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim.

$ _____

---

**Part 3:  Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Check the appropriate box:

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  04 / 02 / 2020
                  MM / DD / YYYY

*Signature*

Print the name of the person who is completing and signing this claim:

Name: Terri / L. / Mascherin
      First name / Middle name / Last name

Title: Partner

Company: Jenner & Block LLP
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address: 353 N. Clark Street
         Number  Street
Chicago   IL   60654-3456   USA
City      State   ZIP Code   Country

Contact phone (312) 222-9350   Email tmascherin@jenner.com

1934054200123040428003885

### RIDER TO THE PROOFS OF CLAIM OF THE REDEEMER COMMITTEE OF THE HIGHLAND CRUSADER FUND

This Rider is part of the proof of claim (the "**Proof of Claim**") filed by the Redeemer Committee of the Highland Crusader Fund (the "**Redeemer Committee**") against Highland Capital Management, L.P. ("**HCM**" or the "**Debtor**").

On March 6, 2019, a panel of arbitrators issued a Partial Final Award (the "**March Award**") in favor of the Redeemer Committee against HCM. On April 29, 2019, the panel issued a Final Award (the "**Final Award**," and together with the March Award, the "**Arbitration Award**") in favor of the Redeemer Committee against HCM.[1] The Arbitration Award is subject to the Federal Arbitration Act and The Convention on the Recognition and Enforcement of Foreign Arbitral Awards. The Redeemer Committee timely moved to confirm the Award in the Delaware Chancery Court. HCM moved for partial vacatur of the Arbitration Award in June 2019. The time period to move to vacate the Arbitration Award expired prior to the Petition Date (as defined below). All capitalized terms that are not defined herein have the meanings given to such terms in the Arbitration Award.

The Redeemer Committee files this Proof of Claim out of an abundance of caution. The Arbitration Award is an executory contract under section 365 of the Bankruptcy Code. HCM has not yet moved to assume or reject the contract. Accordingly, the deadline to file a proof of claim remains undetermined. By filing the Proof of Claim, the Redeemer Committee does not concede that the amounts awarded under the Arbitration Award are prepetition claims or that it is required to file a proof of claim to be entitled to the amounts described herein. The Redeemer Committee reserves all rights to amend or modify this Proof of Claim in any respect, including to assert other or additional claims, or for the purpose of fixing or liquidating any contingent or unliquidated claims. This Proof of Claim is without prejudice to any other rights the Redeemer Committee may have against the Debtor, its officers, employees, successors, or assigns.

This Proof of Claim includes the following components, and each is based on the Arbitration Award (together, the "**Claim**"):

1.  **Damage Claim.** The Redeemer Committee asserts a liquidated claim for at least $190,824,557 plus interest that is accruing beginning as of October 16, 2019, the date that HCM filed its bankruptcy case (the "**Petition Date**"). As set forth in the Final Award, the separate components of the Damage Claim are as follows, and the amounts set forth below are as of the Petition Date, including prepetition interest awarded under the Arbitration Award accrued to the Petition Date:

    a.  Deferred Fee Claim: $43,105,395 (Final Award ¶ F.a.ii.1)

    b.  Distribution Fee Claim: $22,922,608 (Final Award ¶ F.a.ii.2)

---

[1] Copies of the Arbitral Award have previously been provided the Debtor, the Official Committee of Unsecured Creditors, and the Office of the United States Trustee. The Redeemer Committee reserves the right to file a copy of the Arbitral Award with the Bankruptcy Court.

    c.   Taking of Plan Claims: $3,277,991 (Final Award ¶ F.a.v)

    d.   CLO Trades Claim: $685,195 (Final Award ¶ F.a.vi)

    e.   Credit Suisse Claim: $3,660,130 (Final Award ¶ F.a.vii)

    f.   UBS Claim: $2,600,968 (Final Award ¶ F.a.viii)

    g.   Barclays Claim: $30,811,366 (Final Award ¶ F.a.ix)

    h.   Legal Fees, Costs, and Expenses: $11,351,850 (Final Award ¶ F.a.xi)

    i.   Administrative Fees: $514,164 (Final Award ¶ F.a.xii)

    j.   Cornerstone Award:  $71,894,891   (Final Award ¶ F.a.ix)

The Redeemer Committee also asserts an unliquidated claim for post-petition interest, attorneys' fees, costs, and other expenses that continue to accrue in connection with the Damage Claim.

2.    **Cancellation of Limited Partnership Interests.**  The Final Award provides, in relevant part, for the cancellation of the limited partnership interests in the Crusader Fund that are (i) held by HCM and Charitable DAF Fund, L.P. that are identified in RC411, and (ii) held by Eames, Ltd. (Final Award ¶¶ F.a.v and F.a.x).  The Final Award provides for HCM to transfer, or take all necessary steps to cause the transfer of, such interests to the Redeemer Committee for the benefit of the Crusader Fund.  The Final Award also provides that the Redeemer Committee has the independent right to cause the Crusader Fund to cancel such limited partnership interests.  The Redeemer Committee reserves the right, to the extent required under applicable law, to seek relief from the Bankruptcy Court in order to cancel such limited partnership interests in accordance with the Final Award. The Redeemer Committee asserts a claim in an unliquidated amount in the event all such limited partnership interests are not cancelled in accordance with the Final Award.

3.    **Deferred Fee Account.**  The Arbitration Award granted the Redeemer Committee's request for a declaratory judgment with respect to the immediate distribution of the Deferred Fee Account, which the Crusader Fund continues to hold, and ordered the payment of the funds in such account to the Redeemer Committee for disbursal to the Consenting Compulsory Redeemers (March Award ¶ VII.D; Final Award ¶ F.a).  The Redeemer Committee reserves the right, to the extent required under applicable law, to seek relief from the Bankruptcy Court in order to cause the distribution of the funds held in the Deferred Fee Account in accordance with the Arbitration Award. The Redeemer Committee asserts a claim in an unliquidated amount in the event all such funds are not distributed in accordance with the Arbitration Award.

       The Redeemer Committee expressly reserves all of its procedural and substantive defenses and rights with respect to any claim that may be asserted against the Redeemer Committee by the Debtor, including any rights of setoff or recoupment.

136210.4

The filing of this Claim shall not constitute: (i) an admission of liability by the Redeemer Committee to any party; (ii) a waiver or release of the Redeemer Committee's rights against any person, entity, or property; (iii) a consent by the Redeemer Committee to the jurisdiction of the Bankruptcy Court with respect to the subject matter of this Claim, any objection or other proceeding commenced with respect thereto, or any other proceeding commenced in these cases or otherwise involving the Redeemer Committee; (iv) a waiver of the right to move to withdraw the reference to the subject matter of this Claim, any objection or other proceeding commenced with respect thereto, or any other proceeding commenced in these cases against or otherwise involving any claimant; (v) a waiver of the right to have final orders entered only after *de novo* review by a United States Judge; (vi) its right to trial by jury in any proceeding so triable in these cases or any case, controversy, or proceeding related to these cases; (vii) its right to arbitration under the Plan and Scheme; (viii) an election of remedies; or (ix) any other rights, claims, actions, defenses, setoffs, or recoupments to which it is or may be entitled under agreements, in law, in equity, or otherwise, all of which rights, claims, actions, defenses, setoffs, and recoupments are expressly reserved.

3

# **EXHIBIT 6**

**Fill in this information to identify the case:**

Debtor ___Highland Capital Management, L.P.___

United States Bankruptcy Court for the: ___Northern___  District of ___Texas___
(State)

Case number ___19-34054___

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies or any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

See summary page

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor _____

**2. Has this claim been acquired from someone else?**

☑ No

☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| See summary page | Alvarez and Marsal CRF Management, LLC<br>2029 Century Park East, Suite 2060<br>Los Angeles, CA 90067, United States |
| Contact phone  212-351-3969 | Contact phone  310-975-2600 |
| Contact email  mrosenthal@gibsondunn.com | Contact email  svarner@alvarezandmarsal.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ — __ __ __ __ — __ __ __ __ — __ __ __ __

**4. Does this claim amend one already filed?**

☑ No

☐ Yes.  Claim number on court claims registry (if known) _____  Filed on _____
MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No

☐ Yes. Who made the earlier filing? _____

Official Form 410                    Proof of Claim

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: ___ ___ ___ ___

**7. How much is the claim?**   $ _see attached rider_ . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

_See attached rider_

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature or property:**

☐ Real estate: If the claim is secured by the debtor's principle residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim*.

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:**   $_____

**Amount of the claim that is secured:**   $_____

**Amount of the claim that is unsecured:**   $_____ (The sum of the secured and unsecured amount should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:**   $_____

**Annual Interest Rate** (when case was filed)_____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.**   $_____

**11. Is this claim subject to a right of setoff?**

☐ No

☑ Yes. Identify the property: _See attached rider_ _____

1934054200040600000000000005

| | | |
|---|---|---|
| **12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?** | ☑ No | |
| | ☐ Yes. *Check all that apply:* | **Amount entitled to priority** |
| A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority. | ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $_____ |
| | ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $_____ |
| | ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $_____ |
| | ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $_____ |
| | ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $_____ |
| | ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $_____ |
| | * Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment. | |
| **13. Is all or part of the claim pursuant to 11 U.S.C. § 503(b)(9)?** | ☑ No | |
| | ☐ Yes. Indicate the amount of your claim arising from the value of any goods received by the debtor within 20 days before the date of commencement of the above case, in which the goods have been sold to the Debtor in the ordinary course of such Debtor's business. Attach documentation supporting such claim. | |
| | $_____ | |

| **Part 3:** | **Sign Below** |
|---|---|

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgement that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04/06/2020
                   MM / DD / YYYY

/s/Michael A. Rosenthal
Signature

Print the name of the person who is completing and signing this claim:

Name    Michael A. Rosenthal
        First name          Middle name          Last name

Title   Counsel to Alvarez and Marsal CRF Management, LLC, as Investment Manager

Company Gibson, Dunn and Crutcher LLP
        Identify the corporate servicer as the company if the authorized agent is a servicer.

Address

Contact phone  _____        Email  _____

1934054200040600000000000005

## KCC ePOC Electronic Claim Filing Summary

For phone assistance: Domestic (877) 573-3984 | International (310) 751-1829

| | |
|---|---|
| **Debtor:** | |
| 19-34054 - Highland Capital Management, L.P. | |
| **District:** | |
| Northern District of Texas, Dallas Division | |

| | |
|---|---|
| **Creditor:** | **Has Supporting Documentation:** |
| Highland Crusader Offshore Partners, L.P., et al., see rider for all names of creditors | Yes, supporting documentation successfully uploaded |
| Michael A. Rosenthal, Gibson, Dunn and Crutcher LLP | **Related Document Statement:** |
| 200 Park Avenue | |
| New York, NY, 10166 | **Has Related Claim:** |
| United States | No |
| **Phone:** | **Related Claim Filed By:** |
| 212-351-3969 | |
| **Phone 2:** | **Filing Party:** |
| | Authorized agent |
| **Fax:** | |
| **Email:** | |
| mrosenthal@gibsondunn.com | |

| |
|---|
| **Disbursement/Notice Parties:** |
| Alvarez and Marsal CRF Management, LLC |
| 2029 Century Park East, Suite 2060 |
| Los Angeles, CA, 90067 |
| United States |
| **Phone:** |
| 310-975-2600 |
| **Phone 2:** |
| **Fax:** |
| **E-mail:** |
| svarner@alvarezandmarsal.com |
| DISBURSEMENT ADDRESS |

| | |
|---|---|
| **Other Names Used with Debtor:** | **Amends Claim:** |
| | No |
| | **Acquired Claim:** |
| | No |
| **Basis of Claim:** | **Last 4 Digits:** **Uniform Claim Identifier:** |
| See attached rider | No |
| **Total Amount of Claim:** | **Includes Interest or Charges:** |
| see attached rider | Yes |
| **Has Priority Claim:** | **Priority Under:** |
| No | |
| **Has Secured Claim:** | **Nature of Secured Amount:** |
| No | **Value of Property:** |
| **Amount of 503(b)(9):** | |
| No | **Annual Interest Rate:** |
| **Based on Lease:** | **Arrearage Amount:** |
| No | |
| **Subject to Right of Setoff:** | **Basis for Perfection:** |
| Yes, See attached rider | **Amount Unsecured:** |

| |
|---|
| **Submitted By:** |
| Michael A. Rosenthal on 06-Apr-2020 4:27:48 p.m. Eastern Time |
| **Title:** |
| Counsel to Alvarez and Marsal CRF Management, LLC, as Investment Manager |
| **Company:** |
| Gibson, Dunn and Crutcher LLP |

VN: 7A78DE4EB71152089D81101C07CBE433

Fill in this information to identify the case:

Debtor 1    Highland Capital Management, L.P.

Debtor 2
(Spouse, if filing)    _____

United States Bankruptcy Court for the:  Northern District of Texas

Case number    19-34054-sgj11

Official Form 410

# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. **Do not use this form to make a request for payment of an administrative expense.** Make such a request according to 11 U.S.C. § 503.

**Filers must leave out or redact** information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

**Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.**

| Part 1: | Identify the Claim |
|---|---|

**1. Who is the current creditor?**

Highland Crusader Offshore Partners, L.P., et al. (see rider for all names of creditors)
Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor  _____

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes.  From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

| Where should notices to the creditor be sent? | Where should payments to the creditor be sent? (if different) |
|---|---|
| Michael A. Rosenthal, Gibson, Dunn & Crutcher<br>Name | Alvarez & Marsal CRF Management, LLC<br>Name |
| 200 Park Avenue<br>Number      Street | 2029 Century Park East, Suite 2060<br>Number      Street |
| New York          NY          10166<br>City          State          ZIP Code | Los Angeles          CA          90067<br>City          State          ZIP Code |
| Contact phone  (212) 351-3969 | Contact phone  310-975-2600 |
| Contact email  mrosenthal@gibsondunn.com | Contact email  SVarner@alvarezandmarsal.com |

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

__ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __ __

**4. Does this claim amend one already filed?**

☑ No
☐ Yes.  Claim number on court claims registry (if known) _____       Filed on _____
                                                                                              MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes.  Who made the earlier filing? _____

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor:  ____  ____  ____  ____

**7. How much is the claim?**

$ ___See attached rider___ . **Does this amount include interest or other charges?**

☐ No

☑ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.

Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as health care information.

See attached rider

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate. If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410-A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $_____

**Amount of the claim that is secured:** $_____

**Amount of the claim that is unsecured:** $_____ (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $_____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed

☐ Variable

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $_____

**11. Is this claim subject to a right of setoff?**

☐ No

☑ Yes. Identify the property: __See attached rider__

Official Form 410          **Proof of Claim**          page 2

**12. Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)?**

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☑ No

☐ Yes. *Check one:*

|  | Amount entitled to priority |
|---|---|
| ☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B). | $ _____ |
| ☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7). | $ _____ |
| ☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4). | $ _____ |
| ☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8). | $ _____ |
| ☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5). | $ _____ |
| ☐ Other. Specify subsection of 11 U.S.C. § 507(a)(___) that applies. | $ _____ |

\* Amounts are subject to adjustment on 4/01/22 and every 3 years after that for cases begun on or after the date of adjustment.

---

**Part 3:  Sign Below**

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.**

*Check the appropriate box:*

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this *Proof of Claim* serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this *Proof of Claim* and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   04/06/2020
                   MM / DD / YYYY

Signature

Print the name of the person who is completing and signing this claim:

| Name | Michael A. Rosenthal |
|---|---|
|  | First name     Middle name     Last name |
| Title | Counsel to Alvarez & Marsal CRF Management, LLC, as Investment Manager |
| Company | Gibson, Dunn & Crutcher LLP |
|  | Identify the corporate servicer as the company if the authorized agent is a servicer. |
| Address | 200 Park Avenue |
|  | Number     Street |
|  | New York                         NY          10166 |
|  | City                              State      ZIP Code |
| Contact phone | (212) 351-3969            Email  mrosenthal@gibsondunn.com |

---

Official Form 410 | **Proof of Claim** | page 3

## RIDER TO THE PROOF OF CLAIM OF THE CRUSADER FUNDS
### Dated: April 6, 2020

This Rider is part of the proof of claim (the "**Proof of Claim**") filed by Highland Crusader Offshore Partners, L.P. ("**Master Fund**"), Highland Crusader Fund, L.P. ("**Onshore Fund**"), Highland Crusader Fund, Ltd. ("**Offshore Fund I**"), and Highland Crusader Fund II, Ltd. ("**Offshore Fund II**" and together with the Master Fund, Onshore Fund, and Offshore Fund I, the "**Crusader Funds**"), by and through their authorized investment manager, Alvarez & Marsal CRF Management, LLC, against Highland Capital Management, L.P. ("**HCM**" or the "**Debtor**").

The Crusader Funds' claim against HCM contains two components (which partially overlap) and a number of sub-components, described below.

## I.   FORFEITURE OF COMPENSATION

At all relevant times prior to August 4, 2016, HCM served as the investment manager for each of the Crusader Funds, pursuant to the terms of (a) the Joint Plan of Distribution of the Crusader Funds (the "**Plan**"); (b) the Scheme of Arrangement (the "**Scheme**"); (c) the Amended and Restated Investment Management Agreement between the Master Fund and HCM, dated as of June 1, 2006 (the "**Master Fund IMA**"); (d) the Amended and Restated Investment Management Agreement between Onshore Fund and HCM, dated as of June 1, 2006 (the "**Onshore IMA**"); (e) the Amended and Restated Investment Management Agreement between Offshore Fund I and HCM, dated as of September 1, 2006 (the "**Offshore I IMA**"); and (f) the Third Amended and Restated Investment Management Agreement between Offshore Fund II and HCM, dated as of September 1, 2006 (the "**Offshore II IMA**" and together with the Master Fund IMA, the Onshore IMA, and the Offshore I IMA, the "**IMAs**"). The Plan, the Scheme, and the IMAs are collectively referred to as the "**Fund Documents**."

Pursuant to the Fund Documents, HCM received compensation from the Crusader Funds in the form of Management Fees, Distribution Fees, and rights to Deferred Fees (each as defined in the Plan, the Scheme, or the IMAs). However, by no later than January 2012, HCM willfully and deliberately breached its obligations under the Fund Documents and breached its duty of loyalty to the Crusader Funds. At that time, HCM caused the Crusader Funds to borrow on margin from a trading account at Jefferies, and used the borrowings to inflate the amount of distributions being made, so as to inflate the amount of HCM's Distribution Fee. Following that date, HCM committed other acts of disloyalty and further breached its obligations to the Crusader Funds, as described in the Arbitration Award (as defined below) and as shown by the evidence presented at the arbitration hearing that led to the Arbitration Award.

As a result, pursuant to the "faithless servant" doctrine, HCM forfeited any right it had to compensation for its services from the Crusader Funds, from the date of HCM's first disloyal act onward. *See, e.g.*, *Phansalkar v. Andersen Weinroth & Co., L.P.*, 344 F.3d 184, 188 (2d Cir. 2003) ("We hold that New York's faithless servant doctrine requires Phansalkar to forfeit all compensation received after his first disloyal act."). As a "faithless servant," HCM is obligated to disgorge all compensation received from the Crusader Funds from the date of HCM's first disloyal act, and has no right to any further compensation from the Crusader Funds. The Crusader Funds thus assert a claim in the following amounts:

1.  Management Fees:  $8,233,337

2.  Distribution Fees:  $15,250,109

3.  Deferred Fees:  $32,313,000[1]

4.  Other Fees:  In the amount of any other compensation, fees or distributions which may now or in the future otherwise be owing to HCM

The Crusader Funds also assert an unliquidated claim for pre- and post-petition interest, attorneys' fees, costs, and other expenses in connection with recovering such amounts.  The Crusader Funds also assert a claim in an unliquidated amount for any Deferred Fees to which HCM might otherwise become entitled in the future under the Fund Documents.

The Crusader Funds currently hold, and may in the future hold, amounts that HCM may claim are, either now or in the future, due to it as a result of services provided by HCM to the Crusader Funds (the "Withheld Amounts").  As a result of the claims detailed in the Arbitration Award and this Proof of Claim (including without limitation, the faithless servant claim), the Crusader Funds dispute that any such amounts are due.  However, to the extent that HCM prevails on an entitlement to a claim against the Crusader Funds, the Crusader Funds have a right of setoff against any such claim to the extent of its claims against HCM and such right of setoff is further secured by the Withheld Amounts.

## II.   ARBITRATION AWARD

This component of the claim is asserted in the alternative to the claim asserted by the Redeemer Committee of the Crusader Funds (the "**Redeemer Committee**").  The Crusader Funds would withdraw this portion of their claim if and to the extent that the Redeemer Committee's claim is allowed.

On March 6, 2019, a panel of arbitrators issued a Partial Final Award (the "**March Award**") in favor of the Redeemer Committee against HCM.  On April 29, 2019, the panel issued a Final Award (the "**Final Award**," and together with the March Award, the "**Arbitration Award**") in favor of the Redeemer Committee against HCM.[2]  Substantially all of the relief awarded by the panel was expressly noted to be "for the benefit of the Fund."  Final Award ¶¶ F.a.iii-x.  The Arbitration Award is subject to the Federal Arbitration Act and The Convention on the Recognition and Enforcement of Foreign Arbitral Awards.  The Redeemer Committee timely moved to confirm the Award in the Delaware Chancery Court.  HCM moved for partial vacatur of the Arbitration Award in June 2019.  The time period to move to vacate the Arbitration Award expired prior to the Petition Date (as defined below).  All capitalized terms that are not defined below have the meanings given to such terms in the Arbitration Award.

---

[1] This element of the claim for forfeiture of compensation overlaps in part with a component of the Arbitration Award claim, described in Section II below.

[2] Copies of the Arbitral Award have previously been provided the Debtor, the Official Committee of Unsecured Creditors, and the Office of the United States Trustee.  The Crusader Funds reserve the right to file a copy of the Arbitral Award with the Bankruptcy Court.

2

136210.4

The Arbitration Award component of the Crusader Funds' claim includes the following sub-components, and each is based on the Arbitration Award:

1. **Damage Claim.** The Crusader Funds assert a liquidated claim for at least $190,824,557 plus interest that is accruing beginning as of October 16, 2019, the date that HCM filed its bankruptcy case (the (the "**Petition Date**"). As set forth in the Final Award, the separate components of the Damage Claim are as follows, and the amounts set forth below are as of the Petition Date, including prepetition interest awarded under the Arbitration Award accrued to the Petition Date:

    a. Deferred Fee Claim: $43,105,395 (Final Award ¶ F.a.ii.1)

    b. Distribution Fee Claim: $22,922,608 (Final Award ¶ F.a.ii.2)

    c. Taking of Plan Claims: $3,277,991 (Final Award ¶ F.a.v)

    d. CLO Trades Claim: $685,195 (Final Award ¶ F.a.vi)

    e. Credit Suisse Claim: $3,660,130 (Final Award ¶ F.a.vii)

    f. UBS Claim: $2,600,968 (Final Award ¶ F.a.viii)

    g. Barclays Claim: $30,811,366 (Final Award ¶ F.a.ix)

    h. Legal Fees, Costs, and Expenses: $11,351,850 (Final Award ¶ F.a.xi)

    i. Administrative Fees: $514,164 (Final Award ¶ F.a.xii)

    j. Cornerstone Award: $71,894,891 (Final Award ¶ F.a.ix)

The Crusader Funds also assert an unliquidated claim for post-petition interest, attorneys' fees, costs, and other expenses that continue to accrue in connection with the Damage Claim.

2. **Cancellation of Limited Partnership Interests.** The Final Award provides, in relevant part, for the cancellation of the limited partnership interests in the Crusader Funds that are (i) held by HCM and Charitable DAF Fund, L.P. that are identified in RC411, and (ii) held by Eames, Ltd. (Final Award ¶¶ F.a.v and F.a.x). The Final Award provides for HCM to transfer, or take all necessary steps to cause the transfer of, such interests to the Redeemer Committee for the benefit of the Crusader Funds. The Final Award also provides that the Redeemer Committee has the independent right to cause the Crusader Funds to cancel such limited partnership interests. The Crusader Funds reserve the right, to the extent required under applicable law, to seek relief from the Bankruptcy Court in order to cancel such limited partnership interests in accordance with the Final Award. The Crusader Funds assert a claim in an unliquidated amount in the event all such limited partnership interests are not cancelled in accordance with the Final Award.

3. **Deferred Fee Account.** The Arbitration Award granted the Redeemer Committee's request for a declaratory judgment with respect to the immediate distribution of the

3

Deferred Fee Account, which the Crusader Funds continue to hold, and ordered the payment of the funds in such account to the Redeemer Committee for disbursal to the Consenting Compulsory Redeemers (March Award ¶ VII.D; Final Award ¶ F.a). The Crusader Funds reserve the right, to the extent required under applicable law, to seek relief from the Bankruptcy Court in order to cause the distribution of the funds held in the Deferred Fee Account in accordance with the Arbitration Award. The Crusader Funds assert a claim in an unliquidated amount in the event all such funds are not distributed in accordance with the Arbitration Award.

The Crusader Funds file this portion of the Proof of Claim out of an abundance of caution and in the event that the Arbitration Award is determined not to be an executory contract. However, the Arbitration Award may be an executory contract under section 365 of the Bankruptcy Code. HCM has not yet moved to assume or reject such contract. The Crusader Funds reserve the right to dispute whether the Arbitration Award is an executory contract and, if so, HCM's decision to reject such contract. If the Arbitration Award is determined to be an executory contract and is allowed to be rejected by the Bankruptcy Court, the Crusader Funds reserve the right to file an amended proof of claim by the bar date for the filing of rejection damages claims; if no such amended proof of claim is filed, then, this claim shall serve as the Crusader Funds' rejection damages claim. By filing this Proof of Claim, the Crusader Funds do not concede that the Arbitration Award is an executory contract, that amounts awarded under the Arbitration Award are prepetition claims or that they are now required to file a proof of claim to be entitled to the amounts described in the Arbitration Award.

* * *

The Crusader Funds reserve all rights to amend or modify this Proof of Claim in any respect, including, without limitation, to assert other or additional claims, or for the purpose of fixing or liquidating any contingent or unliquidated claims. This Proof of Claim is without prejudice to any other rights the Crusader Funds may have against the Debtor, its officers, employees, successors, or assigns.

The Crusader Funds expressly reserve all of their procedural and substantive defenses and rights with respect to any claim that may be asserted against the Crusader Funds by the Debtor, including, without limitation, any rights of setoff or recoupment.

The filing of this Proof of Claim shall not constitute: (i) an admission of liability by the Crusader Funds to any party; (ii) a waiver or release of the Crusader Funds' rights against any person, entity, or property; (iii) a consent by the Crusader Funds to the jurisdiction of the Bankruptcy Court with respect to the subject matter of this Proof of Claim, any objection or other proceeding commenced with respect thereto, or any other proceeding commenced in these cases or otherwise involving the Crusader Funds; (iv) a waiver or release of the right to move to withdraw the reference to the subject matter of this Proof of Claim Claim, any objection or other proceeding commenced with respect thereto, or any other proceeding commenced in these cases against or otherwise involving any claimant; (v) a waiver or release of the right to seek to have the Bankruptcy Court abstain with respect to the subject matter of this Proof of Claim, any objection or other proceeding commenced with respect thereto, or any other proceeding commenced in these cases against or otherwise involving any claimant, (vi) a waiver or release of the right to have final

4

orders entered only after *de novo* review by a United States District Judge; (vii) a waiver or release of their right to trial by jury in any proceeding so triable in these cases or any case, controversy, or proceeding related to these cases; (viii) a consent to a jury trial in any proceeding so triable in these cases or any case, controversy or proceeding related to these cases, (ix) a waiver or release of their right to arbitration under the Plan and Scheme; (x) an election of remedies or limitation of rights or remedies; or (xi) a waiver or release of any other rights, claims, actions, defenses, setoffs, or recoupments to which they are or may be entitled under agreements, in law, in equity, or otherwise, all of which rights, claims, actions, defenses, setoffs, and recoupments are expressly reserved.

136210.4