# EXHIBIT 2

Docket #2061  Date Filed: 03/18/2021

CRAWFORD, WISHNEW & LANG PLLC
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Movants*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| In re: | Case No. 19-34054-sgj-11 |
| Highland Capital Management, L.P., | Chapter 11 |
| Debtor. | |

**JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY INVESTMENT TRUST, THE GET GOOD TRUST, and NEXPOINT REAL ESTATE PARTNERS, LLC, F/K/A HCRE PARTNERS, LLC, A DELAWARE LIMITED LIABILITY COMPANY'S BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455**

19340542103180000000000011

Appx. 00007

## TABLE OF CONTENTS

**TABLE OF CONTENTS** ............................................................................................... i

**TABLE OF AUTHORITIES** ........................................................................................ ii

**I.    INTRODUCTION** ................................................................................................... 1

**II.   BACKGROUND** .................................................................................................... 3

    **A.   The risk of prejudice to Mr. Dondero in this Court has been apparent since this Bankruptcy's inception in Delaware, including by Debtor itself.** ............................................. 3

    **B.   The Court has acknowledged that its opinions of Mr. Dondero from the *Acis* Bankruptcy have remained cemented in the mind of the Court in this proceeding.** ........... 5

    **C.   The Court's (and Debtor's) actions in this proceeding have demonstrated the Court has a perceptible bias against Mr. Dondero.** ............................................................. 7

        **1.   The February 19, 2020 Application to Employ Hearing** ............................................. 7

        **2.   The December 2020 Restriction Motion** ............................................................. 8

        **3.   The January 2021 Examiner Motion** ................................................................. 16

        **4.   The February 2021 Confirmation Hearing** ....................................................... 17

        **5.   Other Issues Demonstrating Bias** .................................................................... 23

    **D.   Recusal is necessary in light of the pending and future issues and proceedings.** ........ 26

**III.  ARGUMENTS & AUTHORITY** ........................................................................... 27

**IV.   PRAYER** ................................................................................................................ 32

**CERTIFICATE OF SERVICE** ..................................................................................... 33

i

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Andrade v. Chojnacki*,
  338 F.3d 448, 454 (5th Cir. 2003) ............................................................................. 27

*Bell v. Johnson*,
  404 F.3d 997, 1004 (6th Cir. 2005) ........................................................................... 28

*Bloom v. Illinois*,
  391 U.S. 194, 205 (1968) ........................................................................................... 31

*Burke v. Regalado*,
  935 F.3d 960, 1054 (10th Cir. 2019) (citations omitted) ........................................... 27

*Caperton v. A.T. Massey Coal Co*.,
  556 U.S. 868, 877 (2009) ........................................................................................... 31

*Highland Capital Mgmt. v. Highland Capital Management Fund Advisors, L.P., et al.*
  Adversary No. 21-03000-sgj ...................................................................................... 12

*In re Chevron U.S.A., Inc.*,
  121 F.3d 163, 165 (5th Cir. 1997) .............................................................................. 29

*In re Drexel Burnham Lambert Inc.*,
  861 F.2d 1307, 1313 (2d Cir. 1988) (quoting H.R.Rep. No. 1453,
  93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 6351, 6354–55) ..................... 28

*In re Kansas Pub. Employees Retirement Sys.*,
  85 F.3d 1353, 1358 (8th Cir.1996) ............................................................................. 28

*Johnson v. Mississippi*,
  403 U.S. 212, 216 (1971) (per curiam) ...................................................................... 31

*Liljeberg v. Health Servs. Acquisition Corp.*,
  486 U.S. 847, 805 (2001). ........................................................................................... 27

*Liteky v. United States*,
  510 U.S. 540, 550 (1994) ............................................................................. 28, 29, 32

*Miller v. Sam Houston State University*,
  986 F.3d 880, 893 (5th Cir. 2021) .............................................................................. 29

*Offutt v. United States*,
  348 U.S. 11, 14 (1954) ................................................................................................ 29

**Appx. 00009**

*United States v. Jordan*,
   49 F.3d 152, 155 (5th Cir. 1995) ............................................................................... 29

*Wilkerson v. Univ. of N. Texas By & Through Bd. of Regents*,
   878 F.3d 147, 161 (5th Cir. 2017) .............................................................................. 15

**STATUTES**

11 U.S.C. § 362(a) ........................................................................................................ 12

11 U.S.C. § 363(c)(1) .................................................................................................... 11

11 U.S.C. § 1104(c) ...................................................................................................... 17

11 U.S.C. §§105, 363, and 1107 .................................................................................. 10

11 U.S.C. § 1108 .......................................................................................................... 11

28 U.S.C. § 455 .............................................................................................................. 1

28 U.S.C. § 455 (a) ...................................................................................................... 27

28 U.S.C. § 455 (b)(1) ................................................................................................. 27

**OTHER AUTHORITIES**

H. Rep. No. 1453, 93d Cong., 2d Sess. 1 (1974), reprinted in 1974 U.S. Code Cong. & Admin.
   News 6351, 6355 ........................................................................................................ 28

Investment Advisers Act of 1940 ................................................................................... 8

**RULES**

FED. R. BANKR. P. 5004 ................................................................................................... 1

**Appx. 00010**

James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company (collectively, "Movants") file this Brief in Support of their Motion to Recuse (the "Motion") Pursuant to 28 U.S.C. § 455[1] and would, in support thereof, respectfully show the Court as follows:

## I.    INTRODUCTION

1.    Brought with reluctance, this Motion is the necessary result of the undeniable animus that the Presiding Judge (hereinafter, the "Court") has developed against James Dondero ("Mr. Dondero") and the resulting prejudicial effect of that animus on Mr. Dondero, The Dugaboy Trust, The Get Good Trust (collectively, the "Trusts") and any entity the Court deems connected to him or under his control (collectively, the "Affected Entities").[2] While the Court has presided over many issues in this bankruptcy, numerous adversary proceedings and contested matters involving Mr. Dondero and the Affected Entities remain, in which, for the reasons described herein, the Court's impartiality can be reasonably questioned.

2.    Importantly, the Court has essentially acknowledged the foundation of this Motion already—that: the Court formed negative opinions of Mr. Dondero in a prior bankruptcy; those opinions have carried into *this* bankruptcy; and, despite best efforts, the Court has been unable to extricate those opinions from its mind. Moreover, the record in this bankruptcy reflects that the Court's negative opinions of Mr. Dondero have resulted in, if not actual bias against Mr. Dondero

---

[1] 28 U.S.C. § 455 has been made applicable to bankruptcy judges under FED. R. BANKR. P. 5004.
[2] The definition of the Affected Entities includes the entities defined as "the Advisors" and "the Retail Funds" below.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                                                    **PAGE 1**

and the Affected Entities, the undeniable perception of bias against Mr. Dondero and the Affected

Entities that impair the ability of Mr. Dondero (and the Affected Entities) to preserve their legal

rights. Specifically, among other things, the record reflects that the Court has:

> (a) repeatedly made statements demonstrating the Court's unfavorable opinions about Mr. Dondero;
>
> (b) declared that Mr. Dondero (and, by implication, the Affected Entities and each of their licensed attorneys) are vexatious litigants based on actions taken by Mr. Dondero and the Affected Entities to: (i) defend lawsuits and motions filed against them; (ii) assert valid legal positions; and/or (iii) preserve legal rights, including on appeal;
>
> (c) concluded that any entity the Court deems connected to or controlled by Mr. Dondero (*i.e.*, the Affected Entities) is essentially no more than a tool of Mr. Dondero, without evidence being introduced that the corporate status of these entities should be disregarded or that they constitute a single business enterprise;[3]
>
> (d) summarily and/or preemptively disregarded the testimony of any witness who would testify in favor of Mr. Dondero or any of the Affected Entities, without evidentiary support, as "under [Mr. Dondero's] control" and, if the witness has any connection to Mr. Dondero, *per se* not credible.

3.      At the end of the day, even assuming, *arguendo*, that the Court's animus toward Mr.

Dondero were justified based upon the Court's experience in the *Acis* Bankruptcy, **this Motion**

**would be no less necessary** to safeguard the impartiality that Mr. Dondero and the Affected

Entities are entitled to receive as litigants in *these* bankruptcy and adversary proceedings—

regardless of Mr. Dondero's history with the Court.[4] Consequently, based on the facts stated herein

and the trajectory they suggest, the only way to ensure that this required impartiality (and, of equal

---

[3] Specifically, the evidentiary record does not reflect, *e.g.*, that: (a) the corporate formalities have been ignored for the entities; (b) their corporate property has not been kept separate and apart; or (c) Mr. Dondero uses the companies for personal purposes.
[4] Notably, the Affected Entities' investment base includes public investors beyond Mr. Dondero.

importance, the public perception of same) exists going forward is through recusal of this Court.

## II.    BACKGROUND

**A. The risk of prejudice to Mr. Dondero in this Court has been apparent since this Bankruptcy's inception in Delaware, including by Debtor itself.**

4.        On October 16, 2019, the Debtor in this proceeding, Highland Capital Management, L.P. ("Highland" or "Debtor"), filed bankruptcy in Delaware (the "Highland Bankruptcy"). Debtor's counsel, Jeff Pomerantz, admitted that the bankruptcy was filed in Delaware in order to give Debtor, including its management, a "fresh start."[5] Shortly thereafter, however, the unsecured creditor's committee (the "UCC") moved to transfer the matter to the Northern District of Texas (the "Motion to Transfer").

5.        During the December 2, 2019 hearing on the Motion to Transfer, while the UCC argued that transfer to this Court was appropriate because this Court was further along in the "learning curve" than the Delaware Bankruptcy Court due to this Courts prior presiding over the bankruptcy of *Acis Capital Management, L.P.* ("Acis") (the "*Acis* Bankruptcy"),[6] Mr. Pomerantz expressly acknowledged that the UCC's *actual* motive in seeking transfer to this Court was this Court's pre-existing negative views of Debtor's management, including Mr. Dondero:

> However -- Your Honor pointed to this at the beginning, in mentioning comments about forum-shopping -- the committee and Acis are really being disingenuous, and they have not told you the real reason that they want the case before Judge Jernigan.[7] … And it's not because she's familiar with this debtor's business, this

---

[5] December 3, 2019 Transcript - Motion to Transfer, at 78:21-23 [App. 0078], a true and correct copy of which is attached hereto as **Ex. 1 [APP. 0001]** and incorporated herein by reference. *See also* the Declaration of Michael J. Lang proving up exhibits 1-27 for this Motion, a true and correct copy of which is attached hereto as **Ex. 30 [APP. 2715]** and incorporated herein by reference.
[6] **Ex. 1** at 67:9-15 [App. 0067].
[7] *Id*. at 77:18-22 [App. 0077].

debtor's assets, or this debtor's liabilities, because she generally is not. ***It is because she formed negative views regarding certain members of the debtor's management that the committee and Acis hope will carry over to this case***.[8]

6.     At ***that*** time, Debtor effectively acknowledged the risk that this Court's prior opinions of Mr. Dondero would improperly impact this separate, new bankruptcy and the Court would be unable to set aside the negative views of Mr. Dondero it developed in the *Acis* Bankruptcy; thus, objectively questioning the Court's impartiality. In fact, Mr. Pomerantz specifically referred to the opinions the Court developed in the *Acis* Bankruptcy as "baggage":

> The debtor filed the case in this district because it wanted a judge to preside over this case that would look at what's going on with this debtor, with this debtor's management, this debtor's post-petition conduct, ***without the baggage of what happened in a previous case***, which contrary to what Acis and the committee says [*sic*], has very little to do with this debtor.[9]

7.     The Delaware Bankruptcy Court also acknowledged that it would be improper for this Court to substitute its prior knowledge, experience, or opinions from the *Acis* Bankruptcy for evidence (or, equally, as a basis to ignore contradictory evidence in the record) in this proceeding:

> Yeah, I was going to say that's kind of an interesting argument, because actually it assumes Judge Jernigan's going to ignore the rules of evidence in making factual findings, ***because you're limited to the record before you on a specific motion***. And what fact you may have learned with regard to something a person has done, maybe that goes into questions of credibility on cross-examination or direct testimony***, but to actually base your decision on a fact that's not in the record for the specific proceeding would be improper***.[10]

8.     Ultimately, the Delaware Bankruptcy Court granted the Motion to Transfer and, thus, this

---

[8] *Id.* at 78:3-8 (emphasis added) [App. 0078].
[9] *Id.* at 79:14-20 (emphasis added) [App. 0079].
[10] *Id.* at 90:15-24 (emphasis added) [App. 0090].

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                                    **PAGE 4**

bankruptcy was assigned to this Court.

**B. The Court has acknowledged that its opinions of Mr. Dondero from the *Acis* Bankruptcy have remained cemented in the mind of the Court in this proceeding.**

9.       Following the transfer, Debtor and the UCC entered into a compromise as to the management of Debtor (the "Compromise"), under which, among other things, Mr. Dondero, voluntarily surrendered all control of Debtor to an independent, three-person board appointed per the Compromise (the "Board").[11]

10.       During the January 9, 2020 hearing on the Compromise, the Court acknowledged that it: possessed opinions regarding Mr. Dondero from the *Acis* Bankruptcy; was unable to extract those opinions from its brain; and was relying on those opinions as bases for certain rulings (*e.g.*, requiring certain language be included in its order, shown below):

> Now, there is one specific thing I want to say about the role of Mr. Dondero. When Ms. Patel got up and talked about the newest language that has been added to the term sheet, she highlighted in particular the very last sentence on Page 2 of the term sheet, the sentence reading, 'Mr. Dondero shall not cause any related entity to terminate any agreements with the Debtor.' Her statement that that was important, it really resonated with me, because, you know, as I said earlier, ***I can't extract what I learned during the Acis case, it's in my brain, and we did have many moments during the Acis case where the Chapter 11 trustee came in and credibly testified that, whether it was Mr. Dondero personally or others at Highland, they were surreptitiously liquidating funds, they were changing agreements, assigning agreements to others. They were doing things behind the scenes that were impacting the value of the Debtor in a bad way. So not only do I think that language is very important, but I am going to require that language to be put in the order.***[12]

---

[11] January 9, 2020 Transcript at 14:4-11 [App. 0151], a true and correct copy of which is attached hereto as **Ex. 2 [APP. 0138]** and incorporated herein by reference. Mr. Dondero, however, remained a portfolio manager and an unpaid employee of Debtor. *Id. See also* **Ex. 30**.
[12] **Ex. 2** at 78:23-79:16 [App. 0215-0216] (emphasis added).

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE
PURSUANT TO 28 U.S.C. § 455**                                                                 **PAGE 5**

11.     Later, the Court also indicated that it relied on knowledge of purported actions taken by Mr. Dondero in the *Acis* Bankruptcy as "evidence" of a presumed propensity of Mr. Dondero to engage in actions (that were allegedly taken in the *Acis* Bankruptcy) to support the required language and threat of contempt:

> And ***I'm sure most of you can read my mind why***, but I want it crystal clear that if [Mr. Dondero] violates these terms, he's violated a federal court order, and contempt will be one of the tools available to the Court.[13]

12.     Notably, at this time, this bankruptcy had only been in front of this Court for approximately a month. Consequently, there was nothing in the record in front of Court to justify its specific rulings and comments related to Mr. Dondero. The Court sustained the United States Trustee's ("U.S. Trustee") attempt to use the *Acis* Bankruptcy as evidence to support the U.S. Trustee's objection to the Compromise:

> "***I have to look at what's presented***, and is this reflective of sound business judgment? Is this fair and equitable? Is it in the best interest? ***So, assuming there are tons of bad facts here reflected in the arbitration award, reflected in other evidence, bad facts that might justify a trustee***, a Chapter 11 trustee, is this nevertheless, ***what's proposed today***, a reasonable compromise of, you know, the trustee arguments from the Committee could make or, you know, is this a reasonable framework for going forward? … ***I can assume there are terrible facts out there that might justify a trustee, but I'm looking at what's proposed***."[14]

13.     Nonetheless, just a short time later, the Court confirmed that, based on its knowledge from the *Acis* Bankruptcy, it would require confirmed that it would require the above-referenced language directed at Mr. Dondero in its order based.

---

[13] *Id*. at 80:3-6 [App. 0217] (emphasis added).
[14] *Id*. at 52:10-25 [App. 0189] (emphasis added).

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455**                                                                 **PAGE 6**

**C. The Court's (and Debtor's) actions in this proceeding have demonstrated the Court has a perceptible bias against Mr. Dondero.**

**1.     The February 19, 2020 Application to Employ Hearing**

14.     The Court has demonstrated a predisposition against Mr. Dondero, including, for example, through its rulings discounting the testimony of demonstrably independent witnesses who testified in support of outcomes that could possibly benefit Mr. Dondero as testimony that is engineered by Mr. Dondero.

15.     For example, on February 19, 2020, the Court held a hearing on Debtor's application to retain the law firm Foley Gardere to pursue appeals of the *Acis* involuntary petition and the *Acis* confirmation order (the "<u>Application to Employ</u>") on behalf of Neutra Ltd. (which is a company owned by Mr. Dondero and which succeeded to the ownership of Acis). Importantly, during this hearing, former Bankruptcy Judge Russell Nelms, **one of the three independent directors appointed to Debtor's Board**, testified that, in the Board's business judgment, the Application to Employ was considered by the independent directors, and they concluded that it was in the Debtor's best interest.[15]

16.     Despite this testimony, the Court displayed a predisposition to contest positions that could possibly benefit Mr. Dondero on the pre-determined basis that any person sharing an opinion with Mr. Dondero (including, apparently, a member of the independent Board) was somehow being unduly influenced by him:

---

[15] *See* February 19, 2020 Transcript at 62:6-17 [App. 0290] (emphasis added), a true and correct copy of which is attached hereto as **Ex. 3 [APP. 0229]** and incorporated herein by reference; *see also* **Ex. 30**.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE
PURSUANT TO 28 U.S.C. § 455**                                                                    **PAGE 7**

… ***But I'm concerned that Dondero*** or certain in-house counsel has -- you know, they're smart, they're persuasive -- that -- what are the words I want to look for -- they have ***exercised their powers of persuasion*** or whatever to make the Board and the professionals think that there is some valid prospect of benefit to Highland with these appeals, ***when it's really all about Neutra, HCLOF, and Mr. Dondero. That's what I believe***.

I mean, this is awkward, right, because you want to defer to the debtor-in-possession, ***but I have this long history***, and I can think through the scenarios. …And I know, you know, there are multiple ways it might play out, but I cannot believe there is a chance in the world there is economic benefit to Highland if these things get reversed. Economic benefit to Neutra: Yeah, maybe. Economic benefit to HCLOF: Well, they'll get what they want. You know, whether it's an economic benefit, I don't know. But benefit to Highland? ***I just don't think the evidence has been there to convince me it's reasonable business judgment for Highland to pay the legal fees associated with the appeal***.[16]

17.    From here, unsurprisingly, Debtor began to leverage the Court's predisposition against Mr. Dondero (*i.e.*, what Debtor had previously described as the Court's "baggage") for Debtor's own benefit. This played out in a variety of ways.[17]

### 2.    The December 2020 Restriction Motion

18.    As the Court is aware, Debtor on the one hand, and Highland Capital Management Fund Advisors, L.P. and NexPoint Advisors, L.P. (the "Advisors"),[18] on the other hand, previously

---

[16] **Ex. 3** at 177:7-178:3 [App. 0405-0406].
[17] *See also* March 4, 2020 Transcript at 34:6-35:18 [App. 1544-1545]; 50:14-52:15 [APP. 1560-1562]; 58:17-23 [APP. 1568], a true and correct copy of which is attached hereto as **Ex. 15 [APP. 1511]** and incorporated herein by reference; *see also* **Ex. 30**.
[18] Each Advisor is registered with the U.S. Securities and Exchange Commission ("SEC") as an investment advisor under the Investment Advisers Act of 1940, as amended. Each of the Advisors advises several funds, including the Retail Funds. Each of the Retail Funds is a registered investment company or business development company under the Investment Company Act of 1940 (as amended, the "1940 Act"). Each Retail Fund is overseen by a majority independent board of trustees subject to 1940 Act requirements. Those respective boards reviewed and approved, among other things, major contracts including the advisory agreement with the applicable Advisor for the respective Retail Fund. The Retail Funds do not have employees and rely on their respective Advisors, acting pursuant to an advisory agreement, to provide the services necessary for their operations.

shared office space, and the Advisors each paid for resources and services, including in-house legal services, pursuant to shared services agreements that each of the Advisors separately entered into with Debtor.

19.     As the Court is also aware, Debtor manages more than $1 billion in assets owned by collateralized loan obligation investment vehicles ("CLOs") pursuant to certain Portfolio Management Agreements. Approximately $140 million of that amount is owned by Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (collectively, the "Retail Funds"). Although the Portfolio Management Agreements vary, they generally impose a duty on Debtor, when acting as portfolio manager, to maximize the value of the CLOs' assets for the benefit of the CLOs' noteholders and preference shareholders, such as the Retail Funds.

20.     For most of 2020, Debtor's plan with respect to the CLOs was to reject the Portfolio Management Agreements. However, in approximately October 2020, Debtor's plan changed, and Debtor wanted to assume the Portfolio Management Agreements (*i.e.*, continue managing the assets). However, Debtor's new plan also contemplated releasing all Debtor's employees and liquidating all of Debtor's assets over a two-year period. In the Advisors' and the Retail Funds' opinion, this was incompatible with the CLOs' needs (which required an investment staff) and the belief that the CLOs had more upside. Moreover, Debtor began to liquidate certain assets of the CLOs.

21.     Mr. Dondero, who, as stated above, continued to be a portfolio manager and unpaid employee of Debtor, and James Seery ("Mr. Seery"), one member Debtor's independent Board, disagreed on whether or not to liquidate the CLOs assets. Importantly, the CLOs were ***not assets of Debtor's estate*** but debt and preference equity is owned by third parties (*e.g.*, the Retail Funds,

which indirectly own $140 million of same).

22.     The Advisors (on behalf of the Retail Funds and pursuant to their obligations under their respective advisory agreements) and the Retail Funds believed that Debtor's decision to liquidate underlying assets held by the CLOs did not maximize the value of the investments for the investors to whom the Advisors and the Retail Funds owed a fiduciary duty. As a result, the Advisors and the Retail Funds raised these concerns with Mr. Seery (Debtor's interim CEO) and requested that Debtor not liquidate the CLOs until the Plan confirmation (which, at that time, was scheduled for early January 2021). Debtor, a/k/a portfolio manager, declined.

23.     Consequently, on December 8, 2020, pursuant to 11 U.S.C. §§105, 363, and 1107, the Advisors and the Retail Funds (not Mr. Dondero) raised these concerns in a motion that requested the Court exercise its equitable discretion to maintain the status quo and stop Debtor from liquidating the CLOs for 30 days  (the "Restriction Motion").[19]  The Restriction Motion was necessary to legally preserve the legal issue arising from the Advisors' and the Retail Funds' belief that this action by Debtor was contrary to the best interest of their investors.

24.     On December 16, 2020, the Court held a hearing on the Restriction Motion and denied same.[20] Rather than simply denying the motion, the Court chastised counsel for the Advisors and the Retail Funds for filing the Restriction Motion (*i.e.*, for advocating a position in good faith that their clients firmly believed in).

_____

[19] Dkt. 1522, a true and correct copy of which is attached hereto as **Ex. 4 [APP. 0417]** and incorporated herein by reference; *see also* **Ex. 30**.

[20] *See* the December 16, 2020 Transcript, a true and correct copy of which is attached hereto as **Ex. 5 [APP. 0443]** and incorporated herein by reference. *Id.* at 63:5-13 [App. 0505]. *See also* **Ex. 30**.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                              **PAGE 10**

25.     Going further, the Court stated that it was "dumbfounded" by the Restriction Motion and that it agreed with Debtor's accusation that Mr. Dondero was behind the Restriction Motion, despite the fact that the Restriction Motion was filed by separate and distinct legal entities. The Court focused on Mr. Dondero's role with the Advisors to conclude that the Restriction Motion was brought for an improper purpose, despite the fact that the only evidence before the court was that the decision was made by senior management in consultation with the board of trustees and counsel.[21] Thus, the Court implicitly concluded that the Retail Funds (some of which are publicly-traded, highly-regulated entities) cannot independently decide to pursue action they deem in their best interest.

26.     The Court further declared the Restriction Motion frivolous, "almost Rule 11 frivolous," and as having no statutory or contractual basis.[22] As stated above, these comments were made by the Court regarding a motion that: (a) was filed in good faith by fiduciaries seeking to protect the investments of investors; and (b) cited statutory authority which indisputably provided the Court with the discretion to grant the requested relief therein. While the Court had every right to deny the Restriction Motion, the Court additionally condemned Mr. Dondero, demonstrating that it could not set aside its animus towards Mr. Dondero to consider the separate entities involved and the actual issues being raised.

27.     In December of 2020, due to the Court's denial of the Restriction Motion, K&L Gates, as

---

[21] **Ex. 5** at 63:14-25 [App. 0505].

[22] *Id*. at 64:1-7 [App. 0506]. The statutory basis for the relief requested was section 363(c)(1) or 1108 of the Bankruptcy Code, which generally provides that a debtor-in-possession may engage in its ordinary course of business, "unless the court orders otherwise." That was all that was being asked.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                                           **PAGE 11**

counsel for the Advisors and the Retail Funds, exchanged correspondence with counsel for Debtor (the "K&L Gates Letters").[23] The K&L Gates Letters were sent for the following reasons: to reiterate the Advisors' and the Retail Funds' objection to the Debtor's handing of the Retail Funds' investments; to request, again, that Debtor not liquidate the CLOs; to reserve any rights that the Advisors and the Retail Funds might have against Debtor for failure to maximize the value of the investment as required under the Portfolio Management Agreements; and to notify Debtor that the Retail Funds, ***subject to applicable bankruptcy law*** (which would include the stay existing by reason of section 362(a) of the Bankruptcy Code and the Compromise) and the underlying agreements, intended to initiate the procedure to remove Debtor as fund manager of the CLOs.

28.     On January 6, 2021, Debtor filed a complaint for declaratory and injunctive relief against the Advisors and the Retail Funds,[24] claiming that: (a) the Advisors' purported refusal to book certain trades, which Debtor had, in actuality, already executed outside of the Advisors' process, interfered with Debtor's business and, thus, tortiously interfered with the prior sales; and (b) the K&L Gates Letters (*i.e.*, correspondence between counsel) violated the automatic stay.[25] Debtor's overall theme in the complaint was, because Mr. Dondero allegedly controlled the Retail Funds

---

[23] True and correct copies of the K&L Gates Letters are attached to the Declaration of James Seery [ECF 4] in the Adversary styled *Highland Capital Mgmt. v. Highland Capital Management Fund Advisors, L.P., et al*. Adversary No. 21-03000-sgj, courtesy copies of which are attached hereto as **Ex. 18 [APP. 1777]** and incorporated herein by reference. *See also* **Ex. 30**.

[24] *Highland Capital Mgmt. v. Highland Capital Management Fund Advisors, L.P., et al*. Adversary No. 21-03000-sgj, a true and correct copy of which is attached hereto as **Ex. 6 [APP. 0509]** and incorporated herein by reference. *See also* **Ex. 30**.

[25] *See*, Dkt. 6, a true and correct copy of which is attached hereto as **Ex. 17 [APP. 1759]** and incorporated herein by reference. *See also* **Ex. 30**. This is one of many instances where the Debtor asked for and received expedited consideration, relief not afforded to Mr. Dondero or the Affected Entities.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE
PURSUANT TO 28 U.S.C. § 455**                                                                    **PAGE 12**

(he does not), the Court should presume that Mr. Dondero (rather than the independent board and
its independent counsel for the Retail Funds) caused the acts complained of by Debtor (thus
enabling the Court to extend the prohibitions it imposed on Mr. Dondero to the Advisors and the
Retail Funds). As a result, Debtor sought to enjoin the Advisors and the Retail Funds from, among
other things, exercising any contractual rights that they may have had to remove Debtor as portfolio
manager (which Debtor was then seeking to assume, and ultimately did assume, under its plan) if
the injunction were not granted.

29.     On January 26, 2021, the Court commenced the preliminary injunction hearing on the
matter (the "Injunction Hearing").[26] The issue in the Injunction Hearing was whether the Advisors
and the Retail Funds tortiously interfered with the Portfolio Management Agreements by: (1)
hindering the Debtor's ability to sell certain CLO assets, (2) threatening to initiate the process for
removing the Debtor as the portfolio manager of the CLOs, and (3) otherwise attempting to
influence and interfere with the Debtor's decisions concerning the purchase or sale of any assets
on behalf of the CLOs.[27]

30.     To obtain such an injunction, Debtor was required to, among other things, prove a
substantial likelihood of success on the merits of its tortious interference claim and irreparable
harm. However, during the Injunction Hearing, it should have become abundantly clear that there
was no need or basis for an injunction, due, in large part, to the Debtor's concession that it did not

---

[26] A true and correct copy of the January 26, 2021 Transcript is attached hereto as **Ex. 7 [APP. 0528]** and incorporated
herein by reference; *see also* **Ex. 30**.
[27] *See* Dkt. 1 in Adversary Proceeding No. 21-03000-sgj at ¶ 58.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                                              **PAGE 13**

have a substantial likelihood of success on the merits via its acknowledgment that the alleged acts of interference did not actually interfere with any contract. In addition:

31.     **First**, Mr. Seery admitted that none of the alleged actions caused Debtor to breach any contract with a third party.[28] Moreover, Debtor could not assert a direct breach of contract claim because: (a) there is no claim for contemplating a prospective breach; and (b) the Advisors and the Retail Funds had no contractual obligation to settle the trade.

32.     **Second,** with respect to "hindering Debtor's ability to sell certain CLO assets," Mr. Seery admitted that every trade that he attempted to initiate in December closed.[29] In fact, the trades at issue were executed **before** Debtor even approached the Advisors, and the only thing that the Advisors did not do in connection with the trades was make a ledger entry booking the sale (which was due to the fact that Debtor had executed the trades outside of the historically-used system).[30] Moreover, Debtor itself had numerous authorized traders whose job was to settle Debtor's trades. Importantly, the Advisors had no obligation, contractual or otherwise, to perform any service for Debtor.

33.     **Third**, with respect to K&L Gates Letters' contemplation of future action "to initiate the process for removing the Debtor as portfolio manager:" (a) Debtor admitted that the K&L Gates Letters merely stated that the Advisors and the Retail Funds were "contemplating taking steps to terminate the CLO Agreements;"[31] (b) no steps would be taken without seeking relief from the

---

[28] See **Ex. 7** at 180:12-17 [App. 0707].
[29] *Id.* at 173:16-19 [App. 0700]; 174:1-3 [App. 0701]; 174:8-175:5 [App. 0701-0702].
[30] *Id* at 173:16-19 [App. 0700]; 175:1-5 [App. 0702]; 219:17-22 [App. 0746]; 220:9-17 [App. 0747].
[31] *Id.* at 103:21-23 [App. 0630].

stay;[32] (c) no action was taken to lift the stay;[33] and (d) no action was taken to remove Debtor as the portfolio manager.[34] Moreover, while the Debtor disputed whether the Advisors' and the Retail Funds' right to terminate Debtor had been triggered, it never undisputed that the Advisors and the Retail Funds, as preferred shareholders, were third party beneficiaries under the Portfolio Management Agreements that, in certain instances, expressly provided them with a right to terminate the Portfolio Manager.[35] Generally, one cannot tortiously interfere by exercising one's own contractual rights.[36]

34.     **Fourth**, while Debtor (no doubt in response to the Court's comments in the January 9, 2020 hearing regarding contempt) claimed that Mr. Dondero caused these issues, the Retail Funds have an independent board of trustees (Mr. Dondero is not a board member).[37] The evidence in the record showed that the decision to send the K&L Gates Letters was made by and in consultation with two national law firms, K&L Gates and Blank Rome.[38] Consequently, Debtor's motion was

---

[32] *Id.* at 180:8-11 [App. 0707].

[33] *Id.* 132:24-133:1 [App. 0659-0660]; 165:25-166:3 [App. 0692-0693].

[34] *Id.* 178:25-179:6 [App. 0705-0706]; 180:1-7 [App. 0707].

[35] *See* examples of Servicing Agreements at section 14 [APP. 2381-2382 and APP. 2416-2417 respectively], true and correct copies of which are attached hereto as **Exs. 24 and 25 [APP. 2366 and APP. 2402, respectively]** and incorporated herein by reference; *see also* the February 2, 2021 Transcript of Hearing at 54:6-56:12 [APP. 2124-2126] (authenticating Exs. 24 and 25), a true and correct copy of which is attached hereto as **Ex. 23 [APP. 2071]** and incorporated herein by reference; *see also* the chart of holdings of preference shares in CLOs (showing Movants are preferred shareholders), a true and correct copy of which is attached hereto as **Ex. 27 [APP. 2698]** and incorporated herein by reference; *see also* the February 3, 2021 Transcript of Hearing at 53:1-22 [APP. 2493] (authenticating Ex. 27), a true and correct copy of which is attached hereto as **Ex. 26 [APP. 2441 ]** and incorporated herein by reference. *See also* **Ex. 30**.

[36] *See, e.g., Wilkerson v. Univ. of N. Texas By & Through Bd. of Regents*, 878 F.3d 147, 161 (5th Cir. 2017) (To win, Wilkerson would have to prove that his employer interfered with his employment contract—a legal impossibility, as "one cannot tortiously interfere with one's own contract.").

[37] One fund is comprised of five individuals, four of whom satisfy the stringent independence requirements mandated by the SEC and the New York Stock Exchange. Two of the funds have four board members, three of which are independents.

[38] *See* **Ex. 7** at 208: 13-22 [App. 0735]; *see also* January 8, 2021 Transcript at 119:6-120:12 [App. 0903-0904];126:7-

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE
PURSUANT TO 28 U.S.C. § 455**                                                    **PAGE 15**

unnecessary and unwarranted.

35.     Nonetheless, during the Injunction Hearing, the Court again turned its focus to Mr.

Dondero (rather than the impropriety and groundlessness of Debtor's motion), warning him that

the January 9, 2020 order (described above) prohibited him from causing any related entity to

terminate an agreement with Debtor. Importantly, the Court made the implied finding that Mr.

Dondero caused the Retail Funds to send the K&L Gates Letters despite the fact that it had, in a

hearing just a week earlier, *sustained* Debtor's objections to Mr. Dondero being asked about why

the K&L Gates Letters were sent *on the grounds that: (a) Mr. Dondero lacked personal*

*knowledge;* (b) any answer would be hearsay; and (c) because the K&L Gates Letters (executed

by K&L Gates, not Mr. Dondero) speak for themselves.[39] **In other words, the Court had to "go**

**behind the letter" (which was sent by K&L Gates) in order to threaten Mr. Dondero with**

**sanctions after the Court's ruling sustaining the objection that the letters speak for**

**themselves**. Going further, the Court concluded that it was "leaning" toward finding *Mr. Dondero*

in contempt and shifting the "whole bundle of attorney's fees" to Mr. Dondero as a result of this

unwarranted motion filed by **Debtor**.[40]

### 3.     The January 2021 Examiner Motion

36.     Separately, on January 14, 2021, two trusts settled by Mr. Dondero, The Dugaboy

Investment Trust and The Get Good Trust (collectively, the "Trusts"), requested the Court exercise

---

16 [App. 0910], a true and correct copy of which is attached herein as **Ex. 8 [APP. 0785]** and incorporated herein by reference. *See also* **Ex. 30**.

[39] **Ex. 8** at 119:6-122:25 [App. 0903-0906]. Otherwise, Mr. Dondero should have been given the opportunity to answer the question, which the Court denied.

[40] **Ex. 7** at 251:24-252:5 [App. 0778-0779].

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                                      **PAGE 16**

its discretion to direct the appointment of a neutral third-party examiner pursuant to 11 U.S.C. § 1104(c) as a less costly means to resolve various issues that had arisen in this bankruptcy (the "Examiner Motion").[41] Notably, The Dugaboy Investment Trust also has significant holdings in the CLOs.

37.    The Examiner Motion was made in connection with the issues raised by the Advisors and the Retail Funds in the Restriction Motion, various objections to the proposed Plan raised by the Advisors and the Retail Funds and the U.S. Trustee (discussed below), and concerns expressed **by the Court** about costs and expenses. Moreover, when the Trusts made the Examiner Motion, they believed that the motion would cause delay or a continuance of the confirmation hearing on the Plan (defined below).[42] Notably, despite the Trusts' request, the Court elected not to set that motion for hearing on an "emergency" basis and, instead, set it for hearing long *after* the date for confirmation, rendering it moot.

### 4.    The February 2021 Confirmation Hearing

38.    On February 2 and 3, 2021, the Court held a hearing on *Debtor's Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (as Modified)* [docket no. 1808], as further modified (the "Plan").  At that hearing, the Advisors and the Retail Funds, pursuant to their rights under the Portfolio Management Agreements, objected to provisions in the Plan that would eliminate or alter their legal and contractual claims against Debtor (the "Objections").

---

[41] *See* the January 14, 2021 Motion to Appoint Examiner, a true and correct copy of which is attached hereto as **Ex. 22 [APP. 2057]** and incorporated herein by reference. *See also* **Ex. 30**.

[42] *See* ECF 1752.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455**                                                                **PAGE 17**

Additionally, Dondero, the Advisors, and the Retail Funds objected to, among other things, the Plan's significant release and exculpation provisions for the management of Debtor—including the Independent Directors, Debtor's professionals, the Committee, professionals retained by the Committee, *etc.*—and the Plan's "gatekeeper" provision that prohibited lawsuits against any exculpated party without prior permission from the Court.

39.     On February 8, 2021, the Court announced its oral ruling regarding the Plan,[43] in which the Court did not rely solely on evidence in the record in front of it but also referred extensively to proceedings in the **_Acis Bankruptcy_**.[44] In its ruling, the Court summarily rejected **_all_** of the Objections, decreeing them as bad faith: "[T]he Court questions the good faith of the [the Advisors and the Retail Funds]. In fact, the Court **_has good reason to believe_** that these parties are not objecting to protect economic interests they have in the Debtor, but to be disruptors."[45]

40.     The Court stated no basis for its "belief," but concluded that the other entities objecting to the Plan were "controlled by" Mr. Dondero:[46]

> To be clear, the Court has allowed all of these objectors to fully present arguments and evidence in opposition to confirmation, even though their economic interests in the Debtor appear to be extremely remote and the Court questions their good faith. Specifically on that latter point, the Court considers them all to be marching pursuant to the orders of Mr. Dondero.[47]

41.     To support its conclusion, the Court disregarded witness testimony on the grounds that the

---

[43] *See* the February 8, 2021 Transcript, a true and correct copy of which is attached hereto as **Ex. 9 [APP. 0990]** and incorporated herein by reference. *See also* **Ex. 30**.
[44] **Ex. 9** at 15:15-16:5 [App. 1004-1005].
[45] *Id.* at 20:17-20 [App. 1009] (emphasis added).
[46] *Id.* at 20:13-15 [App. 1009].
[47] *Id.* at 22:15-21 [App. 1011].

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE
PURSUANT TO 28 U.S.C. § 455**                                                    **PAGE 18**

witness had previously been engaged with Debtor:

> …While the evidence presented was that they have independent board members that run these companies, the Court was not convinced of their independence from Mr. Dondero.[48] None of the so-called independent board members of these entities have ever testified before the Court. Moreover, they have all been engaged with the Highland complex for many years.

> The witness who testified on these Objectors' behalves at confirmation, Mr. Jason Post, their chief compliance officer, resigned from Highland after more than twelve years in October 2020, at the same time that Mr. Dondero resigned or was terminated by Highland. And a prior witness recently for these entities whose testimony was made part of the record at the confirmation hearing essentially testified that Mr. Dondero controlled these entities. [49]

> Finally, various NexBank entities objected to the Plan. The Court does not believe they have liquidated claims. Mr. Dondero appears to be in control of these entities as well. [50]

42.    The Court then went on to question the good faith basis for the Objections based upon the perceived limited economic interest, despite the fact that each Objector had standing to object, irrespective of the size of their economic interest.[51] Indisputably, a Court must presume that anything filed by a licensed attorney, who is bound by ethical obligations, is filed in good faith unless proved otherwise. Therefore, insinuating a lack of good faith in light of this presumption suggests bias, especially when bad faith was not alleged by another party.

43.    Next, even though it had "not been asked to declare Mr. Dondero and his affiliated entities

---

[48] *Id.* at 21:22-24 [App. 1010].

[49] Notably, Jason Post resigned from Debtor and was hired by NPA because NPA and Debtor had to separate compliance programs, which was previously jointly administered.  This decision was discussed with and approved by Thomas Surgent and Mr. Seery.

[50] *Id.* at 22:12-14 [App. 1011].

[51] *Id.* [App. 1011]

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455**                                                    **PAGE 19**

as vexatious litigants *per se*,"[52] the Court summarily decreed that Mr. Dondero and other Affected Entities were "vexatious litigants"[53] in its ruling and held that objected to "gatekeeper provision "appears necessary and reasonable in light of the ***litigiousness of Mr. Dondero*** and his ***controlled entities*** that has been described at length herein."[54]

44.     In addition to **not** tied to evidence in the record from this bankruptcy, this finding of vexatious litigation does not meet the requirements set forth by the Court itself. To enjoin future filings due to vexatious litigation, the bankruptcy court must consider the circumstances of the case, including four factors: (a) the party's history of litigation; in particular, whether ***he has filed*** vexatious, harassing, or duplicative lawsuits; (b) whether the party had a good faith basis for ***pursuing the litigation***, or perhaps intended to harass; (c) the extent of the burden on the courts and other parties resulting from the party's filings; and (d) the adequacy of alternatives.[55] Here, the factors did not weigh in favor of a vexatious litigation finding, much less even being considered.

45.     ***First***, the "litigiousness" described in the Court's ruling were: (a) efforts taken by Mr. Dondero and other entities in the bankruptcy to defend against injunctions filed against them; (b) legitimate objections or responses to certain provisions in the Plan and other motions, made to preserve rights on appeal; and/or (c) lawsuits in which Mr. Dondero or other entities ***had been sued*** and were defending themselves (which, notably, Debtor—after Mr. Dondero relinquished

---

[52] *Id.* at 46:20-22 [App. 1035].
[53] *Id.* at 46:20-25 [App. 1035].
[54] *Id.* at 45-47 [App. 1034-1036] (emphasis added).
[55] *Id.* at 46:6-15 [App. 1035] (emphasis added).

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                                    **PAGE 20**

control of same—asserted were not frivolous or vexatious in various disclosures):

    (a)   *Acis Action*, in which Debtor filed a 65-page objection that it described as having "numerous basis" and in which USB filed an objection;[56]

    (b)   *UBS Action*, in which Debtor filed an objection to the claim and stated that it had, "meritorious defenses to most, if not all, of the UBS Claim …", [ECF 928] and in which the Redeemer Committee of the Crusader Funds also objected;[57]

    (c)   *Daugherty Action*, in which Debtor asserted that the Daugherty Claim lacked merit;[58] and

    (d)   *HarbourVest Action*, in which Debtor "vigorously defen[ded]" the HarbourVest Claims on numerous grounds.[59]

Notably, neither Mr. Dondero nor any of the Affected Entities were parties to these lawsuits.

46.     ***Second***, the record actually reflects little, if any, litigation and motion practice initiated by Mr. Dondero, individually, as referenced in the charts attached to this Motion as Exhibits 28 and 29.[60]

47.     ***Third***, the Objections were made in good faith.[61] In fact, the U.S. Trustee, whose "good faith basis" was not questioned and who was not labeled a "disruptor," asserted the some of the same objections to the exact same provisions. This demonstrates that, in fact, the record actually shows that the independent boards of the Advisors and the Retail Funds appropriately exercised their right to object to the Plan to preserve various contractual, due process, and appellate rights.

---

[56] *See* ECF 891.

[57] *See* ECF 895.

[58] *See* ECF 895.

[59] *See* Dkt. 1384.

[60] *See* Chart regarding this bankruptcy proceeding, a true and correct copy of which is attached hereto as **Ex. 28 [APP. 2700]** and incorporated herein by reference; *see also* Chart regarding the injunction proceeding, a true and correct copy of which is attached hereto as **Ex. 29 [APP. 2713]** and incorporated herein by reference; *see also* **Ex. 30**.

[61] **Ex. 9** at 23:8-11[App. 1012].

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**            **PAGE 21**

48. **Fourth**, the Court failed to address the fourth prong of the test to support a vexatious litigant finding and conducted no analysis or consideration of the burden on the Courts or any purported plaintiff or the adequacy of any alternative to the pre-suit injunction.

49. Consequently, nothing in this the record supports a finding that Mr. Dondero is a vexatious litigant or that any of the Advisors' or the Retail Funds' independent board members would disregard their fiduciary duties simply to benefit Mr. Dondero.

50. **Fifth**, as demonstrated herein, the record reflects that the parties are being judged by two different sets of rules that disadvantage Mr. Dondero and the Affected Entities while favoring others. While, for example, as stated above, the Court referred to the Restriction Motion as "almost Rule 11 frivolous," it has not applied the same level of scrutiny to the pleadings filed and positions taken by Debtor or other parties. This is illustrated by the mandatory injunction filed by Debtor in February 2021 seeking the limited relief of mandating the Advisors and the Retail Funds to express a transition plan after Debtor indisputably terminated the shared services agreements (indicating that it would not be providing services going forward).[62] Despite the fact that the Advisors and the Retails Funds did not contest the termination and had no obligation to share their transition plan with Debtor following its termination of the shared services agreement, and Debtor's termination of the shared services agreement posed no harm to Debtor. As a result, there was no need for the filing the mandatory injunction—much less a seven-hour evidentiary hearing on the issue.[63]

---

[62] *See* the Mandatory Injunction, a true and correct copy of which is attached hereto as **Ex. 19 [APP. 1792]** and incorporated herein by reference; *see also* **Ex. 30**.

[63] *See* the February 23, 2021 Transcript on Hearing for Mandatory Injunction, a true and correct copy of which is attached hereto as **Ex. 21 [APP. 1818]** and incorporated herein by reference; *see also* **Ex. 30**.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE
PURSUANT TO 28 U.S.C. § 455** **PAGE 22**

Nevertheless, the Court, who ruled Debtor's mandatory injunction moot, went beyond the pleadings and relief requested by Debtor **to issue findings of fact adverse to Mr. Dondero**[64] and, the again, specifically blamed Mr. Dondero.[65]

### 5. Other Issues Demonstrating Bias.

51. In addition to the examples above, the Court's inability to rule impartially as a result of its preconceived opinion of Mr. Dondero has manifested itself in other ways throughout this case.

52. *First*, the Court has admitted to relying upon extrajudicial information from an article that referenced "Mr. Dondero or Highland affiliates" receiving PPP loans as a basis for the Court to direct Debtor's counsel in this bankruptcy to investigate the loans and report back to it.[66] Neither Mr. Dondero nor the so-called "Highland affiliates" referred to in the article were the property of or governed by Debtor. In fact, the PPP loans had ***nothing*** to do with the Debtor.[67]

53. *Second*, the Court's bias against Mr. Dondero has prejudiced the legal rights of separate and distinct legal entities simply because such entities have a connection to Mr. Dondero. Specifically, with respect to the Retail Funds, regardless of whether Mr. Dondero purportedly

---

[64] *See* the order on the Mandatory Injunction, a true and correct copy of which is attached hereto as **Ex. 20 [App. 1813]** at pp. 3-5 [APP. 1815-1817] and incorporated herein by reference; *see also* **Ex. 30**.

[65] *See* **Ex. 21** at 232:3-234:19 [APP. 2049-2051].

[66] *See* July 8, 2020 Transcript at 42:10-24 [App. 1082] ("THE COURT: Okay. All right. Two more questions. And this one has been a bit of a tough one for me to decide whether I should broach this topic or not. You know, *I read the newspapers, the financial papers, just like everyone else, and I saw a headline that I wished almost I wouldn't have seen, and it was a headline about Dondero or Highland affiliates* getting three PPP loans. *And, you know, I'm only supposed to consider evidence I hear in the courtroom, right, or things I hear in the courtroom, but I've got this extrajudicial knowledge right now thanks to just keeping up on current events. I decided I needed to ask about this.* What can you tell me about this, Mr. Pomerantz? I mean, I assumed, from less-than-clear reporting, that it wasn't Highland Capital Management, LP, but I'd like to hear anything you can report about this."), a true and correct copy of which is attached hereto as **Ex. 10 [APP. 1041]** and incorporated herein by reference; *see also* **Ex. 30**.

[67] *See* July 14, 2020 Transcript at 53:17-59:3 [App. 1429-1435], a true and correct copy of which is attached hereto as **Ex. 14 [APP. 1377]** and incorporated herein by reference; *see also* **Ex. 30**.

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455** **PAGE 23**

controlled the entities at issue, the record does not reflect that any decision at issue was made other than by a vote of the independent board of trustees (which does not include Mr. Dondero).

54.    Likewise, CLO Holdco, which is a wholly owned subsidiary of a charitable Doner Advised Fund ("DAF") established by Mr. Dondero, has an independent trustee who is a licensed attorney, Grant Scott. CLO Holdco moved to have $2.5 million in funds that indisputably belonged to CLO Holdco released from the registry of the Court.  There were no objections to the liquidation at issue. There were no objections that bona fide investors, like CLO Holdco, should not receive their portion of the funds received from the liquidation. The Court admitted that CLO Holdco's lawyer made "perfect arguments" regarding the potential legal issues and whether "holding the money in the registry of the Court that a non-debtor asserts is its property, is that tantamount to a prejudgment remedy?"[68] Despite these "perfect" arguments and the lack of objection, the Court, again concluded that Mr. Dondero was behind the CLO Holdco filing and, therefore, questioned the "good faith" basis,[69] even though the Court had, prior to that time, expressly stated that the parties reserved all rights to file motions requesting the funds be disbursed to them.[70]

55.    The Court gave the UCC 90 days to file a complaint asserting a legal basis to the funds,[71] but held that, it could not continue to withhold the funds from CLO Holdco unless the UCC proved an injunction was required to permit the Court to keep the funds (which would be unlikely because

---

[68] *See* June 30, 2020 Transcript at 85:17-22 [App. 1236], a true and correct copy of which is attached hereto as **Ex. 12 [APP. 1152]** and incorporated herein by reference; *see also* **Ex. 30**.
[69] **Ex. 12** at 82:3-11 [App. 1233]; 85:4-16 [App. 1236].
[70] *See* **Ex. 15** at 49:22-25[App. 1559].
[71] **Ex. 12** at 88:1-11 [App. 1239]; *see also* July 21, 2020 Transcript 97:13-23 [App. 1348], a true and correct copy of which is attached hereto as **Ex. 13 [APP. 1252]** and incorporated herein by reference; *see also* **Ex. 30**.

the UCC would be seeking quantifiable, monetary damages). After multiple extensions, the UCC ultimately filed an adversary, but never sought injunctive relief. Still, the Court has not released the funds to CLO Holdco and has relieved the UCC of its burden to establish the elements for injunctive relief.[72]

56.     ***Third***, and possibly most concerning, the Court has admitted to forming conclusions about Mr. Dondero prior to even seeing evidence. Specifically, in a September 2020 hearing in the *Acis* Bankruptcy, an issue arose regarding a lawsuit that certain DAFs and other entities filed against Acis (and other non-Acis or Debtor entities) concerning a post-confirmation dispute. That lawsuit was not pending in this Court or anywhere in the Northern District of Texas; nevertheless, **the Court, after admitting to having not seen the lawsuit, declared it vexatious**:

> It's just ridiculous, for lack of a better term, that Dondero and his entities would be doing some of the things it sounds like they're doing: Suing Moody's, for crying out loud, for not downgrading the Acis CLOs. ***If Mr. Dondero doesn't think that is so transparently vexatious litigation, yeah, I'm going out there and saying that. I haven't seen it, but, come on.***[73]

57.     It is the Court's admission that, "I haven't seen it," paired with the finding of the Court that the suit was "transparently vexatious litigation" that illustrates, perhaps most clearly, the increasing need for this Motion.[74]

---

[72] Needless to say, the Affected Entities and every entity that the Court believes has any affiliation with Mr. Dondero is gun-shy about filing any pleading out of fear of "sanctions" or accusations of "bad faith." Conversely, the UCC, which has not alleged any basis for the Court retaining the $2.5 million, has not been chastised or otherwise threatened.

[73] *See* September 23, 2020 Transcript at 51:10-16 [APP. 1149], a true and correct copy of which is attached hereto as **Ex. 11 [APP. 1099]** and incorporated herein by reference; *see also* **Ex. 30**.

[74] Notably, the claims against Moody's relating to its ratings concerning the CLOs were the same issues raised in various lawsuits against Moody's following the 2008 crash. The action asserting the claims was initiated by DAF, an independent charity originally funded by Highland Capital. As a primary investor in the ACIS Collateralized Loan Obligations (CLO), the DAF lost almost 80% of its investment in ACIS CLOs as Josh Terry and sub-advisor Bridge circumvented CLO indenture covenants and materially increased the risk in the portfolio. Recently, JP Morgan

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                    **PAGE 25**

**D. Recusal is necessary in light of the pending and future issues and proceedings.**

58.     Importantly, there are numerous adversary proceedings currently pending before this Court

that involve Mr. Dondero, individually, or one or more of the Affected Entities (collectively, the

"Adversary Proceedings").[75]

59.     The claims in the Adversary Proceedings include various tort and breach of contract claims,

claw-back claims, and *alter ego* claims seeking to hold Mr. Dondero and the Affected Entities

liable for any recovery ordered as to other entities. In addition, the UCC has indicated that there

are more suits to come, and Debtor specifically reserved claims against over five-hundred

"Dondero related-entities and current or former employees who will be branded with the "Dondero

disciple" moniker. Naturally, each of the Adversary Proceedings will require Mr. Dondero and the

Affected Entities to take legal positions and defend themselves—actions that this Court has

indicated that is predisposed to considering vexatious (and has already threatened large fee shifting

awards on preliminary injunction matters, even where a defendant has technically prevailed), even,

as stated above, in a situation where the Court had never seen the facts, the claims or the legal

---

highlighted ACIS 3-6 as the worst performing 1094 deals outstanding in 2019 through 2020. This action sought relief from the trustee (US Bank) for failing to properly administer the indenture and from Moody's for failing to update or suspend ratings given the breaches described above.

[75] The Adversary Proceedings include: *Highland Capital Management L.P. v. NexPoint Advisors, L.P. et. al.*, Adversary Proceeding No. 21-03000; *Highland Capital Management, L.P. v. Nexpoint Advisors, L.P.*, Adversary No. 21-03005,; *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors*, *L.P.*; Adversary No. 21-03004; *Highland Capital Management, L.P. v. Highland Capital Management Services, Inc.*; Adversary No. 21-03006, in the United States Bankruptcy Court for the Northern District of Texas; *Highland Capital Management, L.P. v. HCRE Partners, LLC (N/K/A Nexpoint Real Estate Partners, LLC*, Adversary No. 21-03007; *Highland Capital Management, L.P. v. HCRE Partners, LLC (N/K/A Nexpoint Real Estate Partners, LLC)*, Adversary No. 21-03007; *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., et al.*; Adversary No. 21-03010; *Highland Capital Management, L.P. v. James Dondero*; Adversary No. 21-03003;  and *Official Committee of Unsecured Creditors v. CLO HOLDCO, LTD, et al.*; Adversary No. 20-03195.

**Appx. 00036**

theories; or where the Court has not admonished another party for the same position or a similar assertion of its rights.

60.     For the reasons stated above, the Court has demonstrated what appears to be a high degree of antagonism toward Mr. Dondero and the Affected Entities that has grown to such a point that a reasonable question as to the Court's impartiality has arisen and must be resolved. As a result, Movants respectfully request the Court recuse itself from the Adversary Proceedings.

### III.     ARGUMENTS & AUTHORITY

61.     Section 28 U.S.C. § 455 requires a judge to be recused if the judge "has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding,"[76] and when the court's "impartiality might reasonably be questioned."[77] These provisions afford separate, though overlapping, grounds for recusal.[78]

62.     Under section 455(a), recusal is required whenever a judge's partiality might reasonably be questioned, *even if the judge does not have actual personal bias or prejudice*.[79] The test under § 455(a) is **_not_** whether the judge believes he or she is capable of impartiality[80] and **_not_** whether the judge actually has a bias (or actually knows of grounds requiring recusal).[81] Instead, the test is whether the "'average person on the street who knows all the relevant facts of a case'" might

---

[76] 28 U.S.C. § 455 (b)(1).
[77] 28 U.S.C. § 455 (a).
[78] *Andrade v. Chojnacki*, 338 F.3d 448, 454 (5th Cir. 2003).
[79] *Liljeberg v. Health Servs. Acquisition Corp.,* 486 U.S. 847, 860 n. 8 (1988); *Andrade v. Chojnacki*, 338 F.3d 448, 454 (5th Cir. 2003).
[80] *Burke v. Regalado*, 935 F.3d 960, 1054 (10th Cir. 2019) (citations omitted).
[81] *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 805 (2001)).

***reasonably question*** the judge's impartiality.[82] As Congress recognized when enacting section 455, litigants "ought not have to face a judge where there is a reasonable question of impartiality."[83] At its core, this statutory provision is "designed to promote public confidence in the impartiality of the judicial process."[84]

63.     The words "prejudice" and "bias" mean a favorable or unfavorable disposition or opinion that is somehow wrongful or inappropriate, either because: (a) it is undeserved; (b) it rests upon knowledge that the holder of the opinion ought not to possess; or (c) it is excessive in degree.[85]

64.     Despite holding that "judicial rulings alone *almost* never constitute a valid basis for a bias or partiality motion," the Supreme Court has also recognized that predispositions developed during the course of a trial will sometimes suffice.[86]

65.     Moreover, while the presence of an extrajudicial source is a factor in favor of finding either an appearance of partiality under section 455(a) or bias or prejudice under section 455(b)(1),[87] an extrajudicial source for a judge's opinion about a case or a party is not necessary for recusal.[88] In addition, while, ordinarily, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion," they "***may do so*** if they reveal an opinion that derives from an

---

[82] *In re Kansas Pub. Employees Retirement Sys.*, 85 F.3d 1353, 1358 (8th Cir.1996).
[83] H. Rep. No. 1453, 93d Cong., 2d Sess. 1 (1974), reprinted in 1974 U.S. Code Cong. & Admin. News 6351, 6355.
[84] *In re Drexel Burnham Lambert Inc.*, 861 F.2d 1307, 1313 (2d Cir. 1988) (quoting H.R.Rep. No. 1453, 93d Cong., 2d Sess., reprinted in 1974 U.S.C.C.A.N. 6351, 6354–55); *Liljeberg*, 486 U.S. at 859–60.
[85] *Liteky v. United States*, 510 U.S. 540, 550 (1994).
[86] *Liteky v. United States*, 510 U.S. 540, 554 (1994) (emphasis added).
[87] *Bell v. Johnson*, 404 F.3d 997, 1004 (6th Cir. 2005) (citations omitted).
[88] *Liteky v. United States*, 510 U.S. 540, 554-55 (1994).

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455**                                                            **PAGE 28**

extrajudicial source; and ***they will do so if they reveal such a high degree of favoritism or antagonism as to make fair judgment impossible***."[89]

66.    Mr. Dondero and all other non-debtors, like every litigant, are entitled to a full and fair opportunity to make their case in an impartial forum—regardless of their history with that forum.[90] Beyond that, "fundamental to the judiciary is the public's confidence in the impartiality of our judges and the proceedings over which they preside."[91] "[J]ustice must satisfy the appearance of justice."[92] Notably, the Fifth Circuit has held that "***[i]f the question of whether § 455(a) requires disqualification is a close one, the balance tips in favor of recusal.***"[93]

67.    Here, the facts detailed above, and incorporated herein, including but not limited to specifically paragraphs 1-60, show that the Court's conduct in this bankruptcy would lead an objective observer to reasonably question the Court's impartiality. By way of summary, the Court has:

(a)    admitted that the negative opinions about Mr. Dondero formed during the *Acis* case cannot be excised from the Court's mind;

(b)    made repeated reference to proceedings in the *Acis* case to justify findings made in this case that are not otherwise supported by *this* record and repeated negative statements about Mr. Dondero in connection with the Court's rulings;

(c)    repeatedly threatened sanctions on and questioned the good-faith basis Mr. Dondero and the Affected Entities, for (i) defending lawsuits and motions; (ii) asserting valid legal positions; and/or (iii) preserving their rights, including in the exact same manner in which others are permitted to do so (e.g., the U.S. Trustee's objections to the Plan),

---

[89] *Liteky v. United States*, 510 U.S. 540, 555 (1994) (citation omitted) (emphasis added).
[90] *Miller v. Sam Houston State University,* 986 F.3d 880, 893 (5th Cir. 2021) (citing *United States v. Jordan*, 49 F.3d 152, 155 (5th Cir. 1995)).
[91] *Id.*
[92] *Id.* (quoting *Offutt v. United States*, 348 U.S. 11, 14 (1954)).
[93] *In re Chevron U.S.A., Inc.*, 121 F.3d 163, 165 (5th Cir. 1997) (emphasis added).

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                          **PAGE 29**

even declaring Mr. Dondero and the Affected Entities as behind "vexatious" litigation the Court admits it has not actually seen; and

(d) Disregarded the presumption that related corporations of separation have institutional independence and concluded, without supporting evidence from this proceeding, that any entity the Court deems connected to or controlled by Mr. Dondero (i.e., including the highly regulated Affected Entities, which are governed by independent boards) is essentially *no more than* a tool of Mr. Dondero and that Mr. Dondero is the ultimate decision-maker behind all the motions they file and actions they take in this proceeding; [94] and

(e) disregarded the testimony of any witness with a connection to Mr. Dondero as per se less credible, which includes attorneys and persons who owe fiduciary duties and ethical obligations.[95]

68. This Motion is not being filed because of prior adverse rulings; or because of any predispositions formed by the Court based upon *facts or evidence* introduced in the course of the current proceeding; or because of ordinary admonishments from a court to a litigant. Instead, this Motion is being filed because the facts and circumstances, including the non-exhaustive examples described above, reveal a deep-seeded antagonism toward Mr. Dondero and the Affected Entities that goes enough beyond "normal" admonishment as to render fair judgment and impartiality toward Mr. Dondero (and the required perception of same) impossible.

69. Importantly, this Court will sit as both judge and jury in the various Adversary Proceedings

---

[94] **Ex. 7** at 254:4-25 [App. 0781].

[95] *See, e.g.*, ECF 1943 at p. 19 ("At the Confirmation Hearing, Mr. Post testified on behalf of the Highland Advisors and Funds that the Funds have independent board members that run the Funds, but the Bankruptcy Court was not convinced of their independence from Mr. Dondero because none of the so-called independent board members have ever testified before the Bankruptcy Court and all have been engaged with the Highland complex for many years. Notably, the Court questions Mr. Post's credibility because, after more than 12 years of service, he abruptly resigned from the Debtor in October 2020 at the exact same time that Mr. Dondero resigned at the Board of Directors' request, and he is currently employed by Mr. Dondero."); *see also*, **Ex. 8**, The January 8, 2021 Transcript, at 175:8-176:25 [App. 0959-0960].

(and any additional ones that are filed) and contested matters in the future, and the Court has demonstrated a willingness to retain jurisdiction whenever possible.[96] In doing so, the Court must, but appears unable to despite best efforts, set aside any prejudice or bias against Mr. Dondero in those proceedings. As demonstrated above, the Court is predisposed against Mr. Dondero (on issues that have not yet been tried and evidence that has never been entered in any proceeding in this bankruptcy) and has already disregarded the corporate separateness between Mr. Dondero and entities—which Mr. Dondero does not control—that are defendants in the Adversary Proceedings.

70.     Practically and importantly, the Court's predisposition against Mr. Dondero (and the Affected Entities), including its prior declarations of vexatiousness (and threats of sanctions) and its questioning of counsels' good faith in taking legally-supported positions, indisputably threaten the ability of counsel for Mr. Dondero (and the Affected Entities or any entity or person that is perceived to be associated or aligned with Mr. Dondero) to put forward any claim or defense or seek certain relief. In effect, counsel is now forced to choose between: (a) raising an issue to preserve it for appeal and risk sanctions; (b) waiving raising a valid issue to avoid sanctions and, thereby, committing malpractice; or (c) withdrawing from its representation.

71.     "It is axiomatic that a fair trial in a fair tribunal is a basic requirement of due process."[97] As described herein, the cumulative weight of both prejudicial comments and peremptory rulings by the Court demonstrate that the Court appears to have developed a personal bias or prejudice

---

[96] *See, e.g.,* **Ex. 11** at 50:4-52:7 [App. 1148-1150].

[97] *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 877 (2009) (internal quotation marks and citation omitted); *see also Johnson v. Mississippi*, 403 U.S. 212, 216 (1971) (per curiam) ("Trial before 'an unbiased judge' is essential to due process.") (quoting *Bloom v. Illinois*, 391 U.S. 194, 205 (1968)).

concerning Mr. Dondero (and various entities that the Court has deemed "under his control") that now render the Court unable to be impartial and render fair judgment related to Mr. Dondero. At a minimum, that is the perception that has been created.[98]

72.    As a result, the Court should recuse itself from the Adversary Proceedings, any contested matter involving Mr. Dondero or any of the Affected Entities from acting as the "gatekeeper" in determining whether any future claim by Mr. Dondero (or any of the Affected Entities) is valid.

## IV.    PRAYER

FOR THE FOREGOING REASONS, Movants respectfully request that the Court recuse itself from the Adversary Proceedings and any future contested matters involving Movants or any entity connected to Mr. Dondero; and grant Movants all other further relief, at law or equity, to which they are justly entitled.

---

[98] *Liteky v. United States*, 510 U.S. 540, 551 (1994).

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                                    **PAGE 32**

Dated: March 18, 2021

Respectfully submitted,

CRAWFORD, WISHNEW & LANG PLLC

By: */s/ Michael J. Lang*
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500
*Counsel for Movants*

## CERTIFICATE OF SERVICE

The undersigned certifies that on March 18, 2021, a true and correct copy of the above and foregoing document was served on all parties of record via the Court's e-filing system.

*/s/ Michael J. Lang*
Michael J. Lang

---

**MOVANTS' BRIEF IN SUPPORT OF THEIR MOTION TO RECUSE**
**PURSUANT TO 28 U.S.C. § 455**                                    **PAGE 33**

**Appx. 00043**