# EXHIBIT 3

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 2 of
2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 1 of 2722

Docket #2062  Date Filed: 03/18/2021

CRAWFORD, WISHNEW & LANG PLLC
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Movants*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 19-34054-sgj-11 |
| | ) | |
| Highland Capital Management, L.P., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**APPENDIX TO JAMES DONDERO, HIGHLAND CAPITAL MANAGEMENT
FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., THE DUGABOY INVESTMENT
TRUST, THE GET GOOD TRUST, and NEXPOINT REAL ESTATE PARTNERS, LLC,
F/K/A HCRE PARTNERS, LLC, A DELAWARE LIMITED LIABILITY COMPANY'S
<u>MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455</u>**

James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors,

L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners,

LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company (collectively, "<u>Movants</u>")

file this Appendix in support of their Motion to Recuse Pursuant to 28 U.S.C. § 455 and Brief in

Support of same:

| Exhibit No. | Description | Appendix Page Nos. |
|---|---|---|
| 1 | December 2, 2019 Transcript - Motion to Transfer | APP. 0001-APP. 0137 |
| 2 | January 9, 2020 Transcript - Debtor's Motion to Compromise Controversy with Official Committee of Unsecured Creditors | APP. 0138-APP. 0228 |
| 3 | February 19, 2020 Transcript | APP. 0229-APP. 0416 |

| 4 | December 12, 2020 Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles | APP. 0417-APP. 0442 |
|---|---|---|
| 5 | December 16, 2020 Transcript - Motion for Order Imposing Temporary Restrictions | APP. 0443-APP. 0508 |
| 6 | January 6, 2021 Plaintiff Highland Capital Management, L.P.'S Verified Original Complaint for Declaratory and Injunctive Relief | APP. 0509-APP. 0527 |
| 7 | January 26, 2021 Transcript - Motion for Entry of Order Authorizing Debtor to Implement Key Employee Plan | APP. 0528-APP. 0784 |
| 8 | January 8, 2021 Transcript - Preliminary Injunction Hearing | APP. 0785-APP. 0989 |
| 9 | February 8, 2021 Transcript - Bench Ruling on Confirmation Hearing and Agreed Motion to Assume | APP. 0990-APP. 1040 |
| 10 | July 8, 2020 Transcript - Motion to Extend Exclusivity Period and Motion to Extend Time to Remove Actions | APP. 1041-APP. 1098 |
| 11 | September 23, 2020 Transcript – Debtors' Motion to File Redacted Quarterly Reports | APP. 1099-APP. 1151 |
| 12 | June 30, 2020 Transcript - Motion for Remittance of Funds Held in Registry of Court filed by CLO Holdco, Ltd. | APP. 1152-APP. 1251 |
| 13 | July 21, 2020 Transcript - Official Committee of Unsecured Creditors Emergency Motion to Compel Production by the Debtor | APP. 1252-APP. 1376 |
| 14 | July 14, 2020 Transcript - Applications to Employ James P. Seery and Development Specialists, Inc. | APP. 1377-APP. 1510 |
| 15 | March 4, 2020 Transcript - Hearing on Motion of The Debtor for Entry of an Order Authorizing, but not Directing, the Debtor to Cause Distributions to Certain "Related Entities" | APP. 1511-APP. 1631 |
| 16 | June 15, 2020 Transcript - UBS's Motion for Relief from the Automatic Stay to Proceed with State Court Action | APP. 1632-APP. 1758 |
| 17 | January 6, 2021 Debtor's Memorandum of Law in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero | APP. 1759-APP. 1776 |
| 18 | K&L Gates Letters | APP. 1777-APP. 1791 |
| 19 | February 17, 2021 Debtor's Memorandum of Law in Support of its Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021 | APP. 1792-APP. 1812 |
| 20 | February 24, 2021 Order on Mandatory Injunction | APP. 1813-APP. 1817 |
| 21 | February 23, 2021 Mandatory Injunction Hearing Transcript | APP. 1818-APP. 2056 |
| 22 | January 14, 2021 Motion to Appoint Examiner | APP. 2057-APP. 2070 |
| 23 | February 2, 2021 Transcript of Proceedings | APP. 2071-APP. 2365 |

| 24 | Servicing Agreement – Exhibit N from February 2, 2021 Hearing | APP. 2366-APP. 2401 |
| 25 | Servicing Agreement – Exhibit J from February 2, 2021 Hearing | APP. 2402-APP. 2440 |
| 26 | February 3, 2021 Transcript of Proceedings | APP. 2441-APP. 2697 |
| 27 | Chart of Holdings of Preference Shares in CLOs – Exhibit 2 from February 3, 2021 Hearing | APP. 2698-APP. 2699 |
| 28 | Demonstrative #1 Showing Motions in this Bankruptcy Proceeding No.19-34054-sgj-11 | APP. 2700-APP. 2712 |
| 29 | Demonstrative #1 Showing Motions in Injunction Proceeding No. 20-03190-sgj | APP. 2713-APP. 2714 |
| 30 | Declaration of Michael J. Lang | APP. 2715-APP. 2719 |

Dated: March 18, 2021

Respectfully submitted,

CRAWFORD, WISHNEW & LANG PLLC

By: /s/ Michael J. Lang
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Movants*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on March 18, 2021, a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice by the Court's ECF system.

/s/ Michael J. Lang
Michael J. Lang

# EXHIBIT 1

1

1

2  UNITED STATES BANKRUPTCY COURT

3  DISTRICT OF DELAWARE

4  - - - - - - - - - - - - - - - - - - - - -x

5  In the Matter of:

6  HIGHLAND CAPITAL MANAGEMENT, L.P.,      Case No.

7          Debtor.                   19-12239(CSS)

8  - - - - - - - - - - - - - - - - - - - - -x

9

10

11              United States Bankruptcy Court

12              824 North Market Street

13              Wilmington, Delaware

14

15              December 2, 2019

16              10:07 AM

17

18

19  B E F O R E :

20  HON. CHRISTOPHER S. SONTCHI

21  CHIEF U.S. BANKRUPTCY JUDGE

22

23  ECR OPERATOR:  LESLIE MURIN

24

25

2

1

2 Motion for Entry of an Order (I) Authorizing Bradley D. Sharp

3 to Act as Foreign Representative Pursuant to 11 U.S.C. Section

4 1505 and (II) Granting Related Relief (Docket No. 68).

5

6 Motion of the Official Committee of Unsecured Creditors for

7 Entry of an Order Authorizing Filing Under Seal of the Omnibus

8 Objection of the Official Committee of Unsecured Creditors to

9 the Debtor's (1) Motion for Final Order Authorizing Continuance

10 of the Existing Cash Management System, (II) Motion to Employ

11 and Retain Development Specialists, Inc. to Provide a Chief

12 Restructuring Officer, and (III) Precautionary Motion for

13 Approval of Protocols for "Ordinary Course" Transactions

14 (Docket No. 123).

15

16 Motion of Debtor for Entry of Interim and Final Orders

17 Authorizing Debtor to File Under Seal Portions of Its Creditor

18 Matrix Containing Employee Address Information (Docket No. 8).

19

20 Debtor's Application for an Order Authorizing the Retention and

21 Employment of Foley Gardere, Foley & Lardner LLP as Special

22 Texas Counsel, Nunc Pro Tunc to the Petition Date (Docket No.

23 69).

24

25

APP. 0002
Appx. 00049

3

1

2  Debtor's Application for an Order Authorizing the Retention and

3  Employment of Lynn Pinker Cox & Hurst LLP as Special Texas

4  Litigation Counsel, Nunc Pro Tunc to the Petition Date (Docket

5  No. 70).

6

7  Motion of Debtor for Entry of Interim and Final Orders

8  Authorizing (A) Continuance of Existing Cash Management System

9  and Brokerage Relationships, (B) Continued Use of the Prime

10  Account, (C) Limited Waiver of Section 345(b) Deposit and

11  Investment Requirements, and (D) Granting Related Relief

12  (Docket No. 5).

13

14  Motion Pursuant to 11 U.S.C. Sections 105(a) and 363(b) to

15  Employ and Retain Development Specialists, Inc. to Provide a

16  Chief Restructuring Officer, Additional Personnel, and

17  Financial Advisory and Restructuring-Related Services, Nunc Pro

18  Tunc as of the Petition Date (Docket No. 75).

19

20  Precautionary Motion of the Debtor for Order Approving

21  Protocols for the Debtor to Implement Certain Transactions in

22  the Ordinary Course of Business (Docket No. 77).

23

24

25

4

1

2 Motion of the Official Committee of Unsecured Creditors for an

3 Order Transferring Venue of This Case to the United States

4 Bankruptcy Court for the Northern District of Texas (Docket No.

5 86).

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25 Transcribed by: Clara Rubin

5

1

2  A P P E A R A N C E S :

3  PACHULSKI STANG ZIEHL & JONES LLP

4       Attorneys for Debtor

5  BY:   JAMES E. O'NEILL, ESQ.

6       GREGORY DEMO, ESQ.

7       IRA D. KHARASCH, ESQ.

8       MAXIM LITVAK, ESQ.

9       JOHN A. MORRIS, ESQ.

10       JEFFREY N. POMERANTZ, ESQ.

11

12

13  UNITED STATES DEPARTMENT OF JUSTICE

14       Office of the United States Trustee

15  BY:   JANE LEAMY, ESQ.

16

17

18  SIDLEY AUSTIN LLP

19       Proposed Counsel for Official Committee of Unsecured

20       Creditors

21  BY:   MATTHEW A. CLEMENTE, ESQ.

22       PENNY P. REID, ESQ.

23       DENNIS M. TWOMEY, ESQ.

24

25

APP. 0005
Appx. 00052

6

1

2  YOUNG CONAWAY STARGATT & TAYLOR, LLP

3         Attorneys for Official Committee of Unsecured Creditors

4  BY:   SEAN M. BEACH, ESQ.

5         KEVIN A. GUERKE, ESQ.

6         MICHAEL R. NESTOR, ESQ.

7

8

9  ASHBY & GEDDES, P.A.

10        Attorneys for Jefferies, LLC

11  BY:   WILLIAM P. BOWDEN, ESQ.

12

13

14  BLANK ROME LLP

15        Attorneys for Acis Capital Management GP, et al.

16  BY:   JOHN E. LUCIAN, ESQ.

17        JOSE F. BIBILONI, ESQ.

18

19

20  DENTONS US, LLP

21        Attorneys for Jefferies

22  BY:   LAUREN MACKSOUD, ESQ. (TELEPHONICALLY)

23        PATRICK C. MAXCY, ESQ. (TELEPHONICALLY)

24

25

7

1

2　GIBSON, DUNN & CRUTCHER LLP

3　　　　Attorneys for Alvarez & Marsal

4　BY:　MICHAEL A. ROSENTHAL, ESQ.

5

6

7　JENNER & BLOCK

8　　　　Attorneys for Redeemer Committee of Crusader Fund

9　BY:　MARC B. HANKIN, ESQ.

10　　　　TERRI L. MASCHERIN, ESQ.

11

12

13　LATHAM & WATKINS, LLP

14　　　　Attorneys for UBS Securities LLC and UBS London Bank

15　BY:　ASIF ATTARWALA, ESQ. (TELEPHONICALLY)

16　　　　JEFF BJORK, ESQ. (TELEPHONICALLY)

17　　　　ANDREW B. CLUBOK, ESQ. (TELEPHONICALLY)

18　　　　KUAN HUANG, ESQ. (TELEPHONICALLY)

19　　　　KIMBERLY A. POSIN, ESQ. (TELEPHONICALLY)

20

21

22　MORRIS, NICHOLS, ARSHT & TUNNELL LLP

23　　　　Attorneys for Redeemer Committee of Crusader Fund

24　BY:　CURTIS S. MILLER, ESQ.

25

8

```
 1
 2   POTTER ANDERSON & CORROON LLP
 3        Attorneys for Alvarez & Marsal
 4   BY:   JEREMY W. RYAN, ESQ.
 5
 6
 7   ROGGE DUNN GROUP, PC.
 8        Attorneys for Acis Capital Management GP, et al.
 9   BY:   BRIAN P. SHAW, ESQ.
10
11
12   SCHULTE ROTH & ZABEL LLP
13        Attorneys for CLO Entities, Intertrust Entities
14   BY:   JAMES T. BENTLEY, ESQ. (TELEPHONICALLY)
15
16
17   WINSTEAD, P.C.
18        Attorneys for Acis Capital Management GP, et al.
19   BY:   RAKHEE V. PATEL, ESQ.
20
21
22
23
24
25
```

APP. 0008
Appx. 00055

9

1

2   ALSO PRESENT:

3         ISAAC D. LEVENTON, ESQ., Asst. General Counsel, Highland

4         Capital Management

5         FRANK WATERHOUSE, Partner and CFO, Highland Capital

6         Management

7         BRADLEY SHARP, Pres. and CEO, Development Specialists,

8         Inc.

9         FRED CARUSO, COO, Development Specialists, Inc.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APP. 0009
Appx. 00056

HIGHLAND CAPITAL MANAGEMENT, L.P.                    10

1                    P R O C E E D I N G S

2          THE CLERK:  All rise.

3          THE COURT:  Please be seated.

4          MR. O'NEILL:  Good morning, Your Honor.

5          THE COURT:  Good morning.

6          MR. O'NEILL:  James O'Neill, Pachulski Stang Ziehl &

7   Jones, here today on behalf of the debtor, Highland Capital

8   Management.  With me, Your Honor, at counsel table is Jeff

9   Pomerantz, Ira Kharasch, John Morris, Greg Demo, and Max

10  Litvak, representing the debtor.  Also in the courtroom with

11  us, from our client, Isaac Leventon and Frank Waterhouse and,

12  from DSI, Brad Sharp and Fred Caruso.

13          THE COURT:  Welcome.

14          MR. O'NEILL:  Your Honor, we have a number of matters

15  on the agenda today, but we are going to proceed with item

16  number 12 on the agenda, which is the committee's venue motion.

17  So I will yield the podium to them.

18          THE COURT:  Okay.

19          MR. CLEMENTE:  Good morning, Your Honor.

20          THE COURT:  Good morning.

21          MR. CLEMENTE:  Matthew Clemente from Sidley Austin,

22  proposed counsel to the official committee of unsecured

23  creditors.  With me here today, my colleagues Dennis Twomey and

24  Penny Reid, along with our co-counsel from Young Conaway, Mike

25  Nestor and Sean Beach.

HIGHLAND CAPITAL MANAGEMENT, L.P.                    11

1      Your Honor, we have filed our venue motion.  We

2  believe that venue -- it's appropriate to transfer venue to the

3  bankruptcy court in the District of Texas for the reasons that

4  we laid out in the motion.  Based on Your Honor's --

5  discussions with Your Honor this morning, we understand that we

6  would proceed with what I believe would be a short proffer from

7  the debtor, we would have an opportunity to cross, and then we

8  would proceed to argument from there.  If that's acceptable to

9  Your Honor, that's --

10      THE COURT:  That's fine.  Thank you.

11      MR. CLEMENTE:  -- that's the way we'd proceed.

12      THE COURT:  Yes.

13      MR. CLEMENTE:  Thank you, Your Honor.

14      MR. POMERANTZ:  Good morning, Your Honor.  Jeff

15  Pomerantz, Pachulski Stang Ziehl & Jones, on behalf of the

16  debtor.  We'd also like at this time, Your Honor, to move into

17  evidence Exhibits A through U, except for Exhibit G.  Exhibit G

18  is one of those documents that we refer to in chambers as would

19  be subject to seal.  We don't need to refer to it in connection

20  with the venue motion.  But if Your Honor would like, I can

21  approach with a binder containing the --

22      THE COURT:  Yeah, I don't have those.

23      MR. POMERANTZ:  -- exhibits.  There have been no

24  objections to them.

25      MR. POMERANTZ:  Your Honor, if Mr. Sharp were called

HIGHLAND CAPITAL MANAGEMENT, L.P.                    12

1  to testify, he would testify --

2          THE COURT:  Hang --

3          MR. POMERANTZ:  Oh, sorry.

4          THE COURT:  Hang on.  Okay.

5          MR. POMERANTZ:  Okay.

6          THE COURT:  Look at the documents.  It's the first

7  I've seen them.

8      (Pause)

9          THE COURT:  So you're moving A through U, except for

10  G?

11          MR. POMERANTZ:  Correct, Your Honor.

12          THE COURT:  Any objection?

13          MR. CLEMENTE:  Sorry, Your Honor, one --

14          THE COURT:  No; yeah, that's fine.

15          MR. CLEMENTE:  No objection, Your Honor.

16          THE COURT:  All right, they're admitted without

17  objection, other than G.  G is not admitted at this time.

18      (Debtors' Exhibits A through U, except for Exhibit G, were

19  hereby received into evidence, as of this date.)

20          THE COURT:  All right, you may proceed with the

21  proffer.

22          MR. POMERANTZ:  Thank you, Your Honor.

23          If Mr. Sharp were called to testify, he would testify

24  that he is the proposed chief restructuring officer of the

25  debtor; he's also the president of Development Specialists,

HIGHLAND CAPITAL MANAGEMENT, L.P. 13

1   Inc., a financial advisory firm. He would testify that he's
2   been a restructuring professional with over twenty-five years
3   of experience as a trustee, a chief restructuring officer, and
4   a financial advisor, in a myriad of industries. He would
5   testify that he has been appointed as chief restructuring
6   officer in four cases in Delaware, including In re Variant
7   before Judge Shannon, In re Woodbridge before Judge Carey, In
8   re WL Homes before Judge Shannon, and In re Beverly Hills
9   Bancorp before Judge Carey.

10          He would testify that he has a national practice, he's
11  physically headquartered in Los Angeles, and it would be as
12  convenient for him to travel to this court in Delaware than it
13  would be for him to travel to Dallas. He would testify that
14  the debtor's counsel, Pachulski Stang Ziehl & Jones, has
15  offices in Delaware and, if the case were transferred, the
16  debtor would need to retain local counsel in Dallas.

17          He would testify that he was initially engaged by the
18  debtor on October 7, 2019 and that, prior to his engagement as
19  a CRO, he had no prior involvement with Highland or any of its
20  senior management employees or principals. He would testify
21  that he was introduced to Highland by Pachulski Stang Ziehl &
22  Jones.

23          He would testify that, since his engagement, he and
24  his colleague, Fred Caruso, who functions as an extension of
25  him in his role as chief restructuring officer, and other

HIGHLAND CAPITAL MANAGEMENT, L.P.     14

1   employees of DSI have devoted themselves to learning about the

2   debtor's business and financial affairs, knowledge that only

3   increases as the days go by.  He would testify that he and

4   others from DSI have spent hundreds of hours meeting with

5   various employees of the debtor and reviewing and accessing the

6   debtor's books and records.  He would testify that he's been

7   given complete access to a wealth of information by the debtor,

8   and nothing he or his team have requested from the debtor have

9   been withheld by them.

10        He would testify that the debtor's a limited

11   partnership organized under the laws of Delaware and that the

12   debtor's general partner, Strand Advisors, is a corporation

13   organized under Delaware law as well, and Strand is the manager

14   of the debtor.  He would testify that over ninety-nine percent

15   of the debtor's limited partnerships are held by Delaware

16   entities.

17        He would testify that the debtor owns and manages a

18   sophisticated financial-advisory-services and money-management

19   business that has assets and interests all over the world; that

20   the debtor's assets under management, including its own

21   proprietary assets and those of its clients, through various

22   related parties, exist in the United States, Asia, South

23   America, and Europe.

24        He would testify that the debtor has over two-and-a-

25   half billion dollars of assets under management and receives

APP. 0014
Appx. 00061

HIGHLAND CAPITAL MANAGEMENT, L.P.                    15

1  management and advisory fees from a multitude of sources around

2  the world.  He would also testify that the debtor provides

3  shared services for approximately 7.5 billion of assets managed

4  by a variety of affiliated and unaffiliated entities, including

5  other affiliated registered investment advisors.

6          He would testify that although the debtor is based in

7  Dallas, the debtor's affiliates and related parties maintain

8  offices or have personnel in many international locales,

9  including Buenos Aires, Rio de Janeiro, Singapore, and Seoul.

10 He would testify that the debtor owns and manages targeted

11 funds in Korea, South America, and Singapore.

12         He would testify that the debtor's filed the motion

13 that's pending today to appoint him as foreign representative

14 in order to manage certain foreign interests, including those

15 proceedings pending in Bermuda and Cayman.  He would testify

16 that the principal assets in the United States consist of

17 custodial and noncustodial interests and investments located

18 all over the country, and that the debtor's prime brokerage

19 account that holds the bulk of the debtor's liquid assets is

20 located in New York City with Jefferies.

21         He would testify the debtor owes approximately 30

22 million dollars to Jefferies on account of margin obligations

23 that are secured by the securities in the prime account, and

24 that the debtor's other principal secured creditor, Frontier

25 State Bank, is based in Oklahoma City and is owed approximately

HIGHLAND CAPITAL MANAGEMENT, L.P.                    16

1   5.2 million dollars as of the petition date.

2          He would testify that one aspect of the debtor's

3   business is management advisory services in connection with

4   various investments and collateralized loan obligations, or

5   "CLOs", and that the debtor previously provided submanager,

6   subadvisory, and shared services to Acis CLOs pursuant to

7   certain contractual agreements that were terminated during the

8   course of Acis' bankruptcy in or around August 2018.  He would

9   testify that he's informed and believes that the compensation

10  structure for subadvisory and shared-service agreements is

11  different for CLOs than with other types of private equity or

12  hedge funds that the debtor manages.

13         He will testify that a focus of DSI's efforts in this

14  case will be to evaluate the appropriateness and the economics

15  of the shared-service agreements and subadvisory agreements

16  that the debtor's a party to with both affiliated and

17  unaffiliated third parties, and he would determine what

18  modifications are appropriate given the facts and

19  circumstances.

20         He would testify that, since the petition date and, he

21  believes, since August 2018, the debtor has not had any direct

22  business dealings with respect to Acis or the CLO assets for

23  which Acis serves as CLO manager, and that the debtor no longer

24  advises or subadvises any active CLOs; the debtor only has CLOs

25  that are in liquidation and in the process of monetizing their

APP. 0016
Appx. 00063

HIGHLAND CAPITAL MANAGEMENT, L.P.                    17

1  underlying assets and paying off their remaining investors'

2  revenues that will decrease over time; and that the CLO portion

3  of the debtor's business provides just ten percent of the

4  debtor's revenue, which, again, will shrink over time.

5          He would testify that the debtor derives ninety

6  percent of its other revenue from managing asset classes that

7  have nothing to do with Acis, including private equity, hedge

8  fund, mutual funds, open-ended retail funds, and real-estate

9  funds.

10          He would testify that the debtors and Acis assert

11  various substantial disputed and unliquidated claims against

12  each other, and the debtor has outstanding claims against Acis

13  that total no less than eight million dollars for services

14  rendered.  He would testify that the debtor and Acis have been,

15  and continue to be, involved in highly contentious litigation,

16  including matters that are subject to multiple appeals from the

17  bankruptcy court and pending fraudulent-transfer claims brought

18  by Acis against the debtor, in Texas.  He would testify the

19  debtor is currently supporting two pending appeals of orders of

20  the Texas bankruptcy court, granting the involuntary petition

21  against Acis and confirming Acis' Chapter 11 plan that put Mr.

22  Terry in charge of Acis.

23          He would testify that, although he serves subject to

24  the debtor's ability to terminate him, he has full

25  responsibility with respect to analyzing and pursing insider

APP. 0017
Appx. 00064

HIGHLAND CAPITAL MANAGEMENT, L.P. 18

1 transactions and is in charge of the debtor's restructuring

2 efforts, and that he has no prior relationship with either Acis

3 or the Texas bankruptcy court with respect to this matter. He

4 would testify that his goal in this case is to maximize the

5 value of the debtor's estate for the benefit of all

6 constituents, and he intends to evaluate all available

7 strategic options for accomplishing the goal, and hopes to work

8 constructively with the committee in that regard.

9 He believes that the outcome of this case will not

10 turn on the day-to-day management of the debtor's assets but

11 instead will be driven by the debtor's ability to restructure

12 its balance sheet and maximize the value of its assets, many of

13 which are liquid. He would testify that either he or Fred

14 Caruso would provide substantially all the testimony that would

15 be provided for the debtor in this case.

16 Lastly, he would testify that he's been on the job for

17 over a month-and-a-half, that the debtor has been following the

18 protocols set out in the motion for which approval is being

19 sought today. He would testify the debtor's being transparent

20 with the creditors' committee, has met with and communicated

21 with FTI on many occasions, and shared a lot of information.

22 And he would testify that there have been no allegations made

23 by the committee or any other party, regarding any post-

24 petition impropriety by the debtor.

25 That concludes my proffer of Mr. Sharp's testimony.

HIGHLAND CAPITAL MANAGEMENT, L.P.                    19

1          THE COURT:  All right, thank you very much.

2          Does anyone wish to cross-examine the witness?

3          UNIDENTIFIED SPEAKER:  Yes, Your Honor.

4          THE COURT:  Yes?

5          UNIDENTIFIED SPEAKER:  Yeah.

6          THE COURT:  Okay.

7          MS. REID:  Yes, Your Honor.

8          THE COURT:  Mr. Sharp, would you please take the

9   stand?  And remain standing for your affirmation.

10         THE CLERK:  Would you step up to the stand, please?

11  Raise your right hand.

12      (Witness affirmed)

13         THE CLERK:  Please state and spell your name for the

14  record.

15         THE WITNESS:  Bradley Sharp, B-R-A-D-L-E-Y; last name,

16  S-H-A-R-P.

17         THE CLERK:  Thank you.

18         THE COURT:  Very good.

19         MS. REID:  Good morning, Your Honor.  Penny Reid on

20  behalf of the creditors' committee.

21         THE COURT:  Good morning.

22         Mr. Sharp, just -- you look like a veteran, but if you

23  could stay close to the microphone, I'd appreciate it.

24         THE WITNESS:  Yes, sir.

25         THE COURT:  Thank you.

eScribers, LLC  |  (973) 406-2250
operations@escribers.net  |  www.escribers.net

HIGHLAND CAPITAL MANAGEMENT, L.P.                    20

1  CROSS-EXAMINATION

2  BY MS. REID:

3  Q.  Mr. Sharp, you've only met Mr. Dondero once; correct?

4  A.  That is correct.

5  Q.  And that was in Dallas; correct?

6  A.  That is correct.

7  Q.  And your team has been at the debtor's offices; correct?

8  A.  Yes.

9  Q.  And worked over a hundred hours at the debtor's offices;

10  correct?

11  A.  Yes.

12  Q.  And that's all been in Dallas; correct?

13  A.  Yes.

14  Q.  Your team has not been to a New York office; has it?

15  A.  No.

16  Q.  Has your team -- your team has not been to Korea; has it?

17  A.  No.

18  Q.  Your team has not been to Singapore; has it?

19  A.  With respect to this engagement, no.

20  Q.  Okay.  And you haven't met any employees in the Singapore

21  office; have you?

22  A.  No.

23  Q.  And under this proposed engagement, you're going to report

24  to Mr. Dondero; correct?

25  A.  Yes.

HIGHLAND CAPITAL MANAGEMENT, L.P.                    21

1          MS. REID:  We will reserve our rights to further

2     question him on the other issues, non-venue issues.

3          THE COURT:  Of course.

4          MR. SHAW:  Good morning, Your Honor.  Brian Shaw on

5     behalf of Acis Capital Management, a creditor.

6          THE COURT:  Yes, Mr. Shaw, you may proceed.

7     CROSS-EXAMINATION

8     BY MR. SHAW:

9     Q.  Mr. Sharp, you were hired nine days before the bankruptcy

10    petition was filed in this case; correct?

11    A.  Correct.

12    Q.  Other than the retention of DSI, are there any other new

13    managers at the debtor, that didn't exist prior to the

14    bankruptcy filing?

15          MR. MORRIS:  Objection.  Beyond the scope, Your Honor.

16    This should be a traditional cross.

17          THE COURT:  You're going to need to find a microphone

18    or talk into one that's in front of you.

19          MR. MORRIS:  John Morris, Pachulski Stang Ziehl &

20    Jones, for the debtor.

21          This line of questioning is beyond the scope.  This

22    should be a traditional cross.  The moving parties have called

23    no witnesses, as Your Honor is aware.

24          THE COURT:  Well, they reserved the right to call

25    witnesses based on what you did in your direct.  So I'm not

APP. 0021
Appx. 00068

HIGHLAND CAPITAL MANAGEMENT, L.P.                    22

1  going to hold them to technicalities.

2          You may proceed.

3          MR. SHAW:  Thank you, Judge.

4          THE COURT:  Do you remember the question, Mr. Shaw?

5          THE WITNESS:  I do.

6  A.  Not that I'm aware of.

7  Q.  Okay.  So other than -- so DSI is the only difference pre-

8  petition and post-petition; is that right?

9  A.  With respect to management.  Obviously, the company's now

10 operating in bankruptcy, which is significantly different.

11 Q.  You testified, in your proffer, regarding the provision of

12 shared services and subadvisory to Acis; do you remember that

13 proffer your counsel commented about?

14 A.  I do.

15 Q.  And one of the core parts of the debtor's business is the

16 provision of shared services and subadvisory services to

17 affiliates and nonaffiliates; right?

18 A.  Yes.

19 Q.  Okay.  And so that was true for Acis and it's true for

20 current affiliates of the debtor; right?

21 A.  Yes, except for, you know, Acis was primarily CLOs, which

22 is a reducing part of the debtor's business.

23 Q.  Do you have any reason to believe that the Northern

24 District of Texas cannot hear this case expeditiously and

25 fairly?

HIGHLAND CAPITAL MANAGEMENT, L.P. 23

1  A.  No.

2          MR. SHAW:  Pass the witness.

3          THE COURT:  Any other cross-examination?

4          Hearing none, any -- redirect; that's what it's

5  called.  There we go.

6          MR. MORRIS:  No, thank you, Your Honor.

7          THE COURT:  All right.  Thank you, sir.  You may step

8  down.

9          THE WITNESS:  Thank you.

10          THE COURT:  Any further evidence by any party, in

11  connection with the venue motion only?

12          MR. CLEMENTE:  Your Honor, I believe we would like to

13  call Mr. Waterhouse to the stand to testify in connection with

14  the venue motion briefly.

15          THE COURT:  All right.  Mr. Waterhouse.  I thought

16  we -- there we go.  If you could please take the stand as well,

17  sir, and remain standing.

18          MR. GUERKE:  May it please the Court.  Good morning,

19  Your Honor.  Kevin Guerke on behalf of the creditors'

20  committee.

21          THE CLERK:  Please raise your right hand.

22      (Witness affirmed)

23          THE CLERK:  Please state and spell your name for the

24  record.

25          THE WITNESS:  Yes; it's Frank Waterhouse, F-R-A-N-K,

HIGHLAND CAPITAL MANAGEMENT, L.P. 24

1  W-A-T-E-R-H-O-U-S-E.

2        THE CLERK:  Thank you.

3        THE COURT:  Thank you.  Please be seated and try to

4  remain close to the microphone, if you would, please.  It's a

5  little awkward here.

6        You may proceed.

7  DIRECT EXAMINATION

8  BY MR. GUERKE:

9  Q.  Mr. Waterhouse, you've worked for the debtor, Highland

10 Capital Management, L.P., since 2006; correct?

11 A.  Yes.

12 Q.  You started there as a senior accountant; right?

13 A.  That is correct.

14 Q.  You were promoted to chief financial officer at the end of

15 2011; correct?

16 A.  Yes.

17 Q.  That's the title that you hold today; right?

18 A.  Yes.

19 Q.  You also currently hold the title of partner; right?

20 A.  Yes.

21 Q.  You were made partner three or four years ago; correct?

22 A.  Yes.  I mean, I don't remember the exact time but, yeah,

23 approximately three or four years ago.

24 Q.  You are an officer in Highland Affiliates; correct?

25 A.  Yes.

HIGHLAND CAPITAL MANAGEMENT, L.P.                    25

1  Q.  James Dondero is the president of Highland Capital

2  Management, L.P.; right?

3  A.  Yes.

4  Q.  Mr. Dondero owns and controls Highland's general partner,

5  Strand Advisors, Inc.; right?

6          MR. MORRIS:  Your Honor, I'm just going to object for

7  the record.  This is supposed to be a rebuttal witness.  This

8  isn't rebutting anything; it's just new facts --

9          THE COURT:  He's laying

10         MR. MORRIS:  -- that they're seeking --

11         THE COURT:  I'm sure he's laying foundation.

12         MR. GUERKE:  I am, Your Honor.  It's background, it's

13  foundation.  It has to go (sic) with the organizational

14  structure.

15         THE COURT:  That's fine.  Objection overruled.

16  Q.  Mr. Waterhouse, Mr. Dondero owns and control Highland's

17  general partner, Strand Advisors, Inc.; correct?

18  A.  I don't remember his exact title but, yes, he is

19  president.

20  Q.  He owns a hundred percent of the equity in Strand; right?

21  A.  Yes.

22  Q.  He also has a limited-partnership interest in Highland;

23  correct?

24  A.  That is correct.

25  Q.  Mr. Dondero's the portfolio manager of all Highland funds;

APP. 0025
Appx. 00072

HIGHLAND CAPITAL MANAGEMENT, L.P.                    26

1  right?

2           MR. MORRIS:  Objection to the form of the question.

3           THE COURT:  Overruled.

4           You can answer.

5  A.  Yes, he -- he is the portfolio manager or the -- or a co-

6  portfolio manager.  We have several funds.  I -- I -- I can't

7  recall if he is the sole portfolio manager on every single fund

8  or -- but he -- he -- but yes, he is -- he is a portfolio

9  manager.

10 Q.  As the president of Highland, Mr. Dondero promoted you to

11 CFO back in 2011; right?

12 A.  Yes.  My -- my promotion was recommended by the -- the

13 former CFO and, as president, Mr. Dondero had to, you know,

14 obviously, approve that taking.

15 Q.  You report to Mr. Dondero; right?

16 A.  Yes.

17 Q.  He's your boss; correct?

18 A.  Yes.

19 Q.  And after the transition period from the old CFO to you,

20 you've reported only to Mr. Dondero; right?

21 A.  That is correct.

22 Q.  After the bankruptcy was filed, you still report to Mr.

23 Dondero; right?

24 A.  Yes.

25 Q.  And Mr. Dondero doesn't report to anyone; correct?

HIGHLAND CAPITAL MANAGEMENT, L.P.                    27

1   A.  Yeah, not -- not to my knowledge.  Yeah, it's correct.

2   Q.  Mr. Dondero has the ability to terminate you; right?

3   A.  Again, I -- I assume so.  Again, I think I -- I testified

4   earlier last week, I -- I -- I -- you know, again, I don't know

5   through this process -- again, I'm not -- bankruptcy is not

6   something that I -- I am, you know, a specialist.  I'm not a

7   bankruptcy attorney.  But maybe the CRO can, or Jim, or

8   something in -- in conjunction.  But I think, theoretically,

9   yes.

10  Q.  Post-bankruptcy, you don't report to Bradley Sharp; right?

11          MR. MORRIS:  Objection, Your Honor.  Same objection:

12  beyond the scope.

13          THE COURT:  Overruled.

14  A.  I do not.

15  Q.  Post-bankruptcy, you don't report to Fred Caruso; correct?

16  A.  I do not.

17  Q.  Mr. Sharp doesn't have the power to terminate your

18  employment; right?

19  A.  Again, I'll --

20          THE COURT:  Actually, he already answered that

21  question; said he wasn't sure.

22  Q.  Mr. Waterhouse, there are six groups below Mr. Dondero in

23  Highland's organizational chart; correct?

24  A.  Give or -- give or take.

25  Q.  The heads of those groups are the executive-level

APP. 0027
Appx. 00074

HIGHLAND CAPITAL MANAGEMENT, L.P.                    28

1   management employees that you describe in your declaration that

2   was submitted in association with the first-day motions; right?

3   A.   Yes.

4   Q.   You manage one of those teams; correct?

5   A.   Yes.

6   Q.   Your team is made up of the corporate accounting folks,

7   Funding Accounting, the tax group, Valuation, Operations,

8   Retail Fund Operations, Human Resources, and IT; right?

9   A.   That -- that is correct.

10  Q.   The other Highland teams are the legal-compliance team --

11  correct?

12  A.   Yes.

13  Q.   The credit-research team; right?

14  A.   Yes.

15  Q.   Public-relations team; correct?

16  A.   Yes.

17  Q.   Private-equity team; right?

18  A.   Yes.

19  Q.   And the trading team; true?

20  A.   Yes.

21  Q.   The heads of each one of those groups report up to Mr.

22  Dondero; isn't that true?

23  A.   Yes, and we -- we -- well, and we also -- and -- but we

24  have a risk-management team as well, at Highland.  That -- that

25  risk-management team reports up through the trading team.

APP. 0028
Appx. 00075

HIGHLAND CAPITAL MANAGEMENT, L.P. 29

1  Q.  As the CFO, your office is in Dallas, Texas; right?

2  A.  Yes.  My -- yes, we office in -- or my office is in

3  Dallas, Texas.

4  Q.  That's been the location of your office since you joined

5  Highland; correct?

6  A.  My current location in Dallas, Texas, is not the same as

7  it was when I joined Highland Capital in October of 2006.

8  Q.  You started in 2006 and your office was in Dallas; right?

9  A.  Well, my offices were in Dallas but it was not at the same

10  location as we are currently.

11  Q.  Your current offices are also in Dallas; right?

12  A.  Yes, their address is in Dallas, Texas.

13  Q.  Over seventy Highland employees work out of Highland's

14  Dallas office; right?

15  A.  Yes.

16  Q.  Dallas is the only location where Debtor Highland

17  employees work; correct?

18  A.  Yes.

19  Q.  Mr. Dondero's office is in Dallas; true?

20  A.  Yes.

21  Q.  Members of the legal team have offices in Dallas; right?

22  A.  Yes.

23  Q.  You meet with Mr. Dondero at a minimum of once a week;

24  correct?

25  A.  Yes, give or take.

HIGHLAND CAPITAL MANAGEMENT, L.P.                    30

1  Q.  Usually those meetings are in his office in Dallas; right?

2  A.  Yes.

3  Q.  All the group heads that we just discussed all have

4  offices in Dallas; right?

5  A.  Yes.  We used to -- our -- our risk-management team used

6  to be officed in New York.  But yes, we -- we -- yes.

7  Q.  You mentioned New York.  There's a location in New York

8  that we discussed at your deposition; do you remember that?

9  A.  Yes.

10  Q.  That office in New York is not in Highland -- the debtor's

11  name; true?

12  A.  That is correct.

13  Q.  It's in another nondebtor-entity name; correct?

14  A.  Yes.

15  Q.  There are no Highland employees in that New York location;

16  correct?

17  A.  That is correct.

18  Q.  In the proffer that you just heard, and at your

19  deposition, there was some discussion about offices outside of

20  the United States.  Do you recall that?

21  A.  Yes.

22  Q.  The people who work in those locations are not employees

23  of the debtor, Highland Capital Management, L.P.; right?

24  A.  That's right.

25  Q.  The offices outside the U.S. are subsidiary offices with

APP. 0030
Appx. 00077

HIGHLAND CAPITAL MANAGEMENT, L.P.                    31

1  subsidiary employees; correct?

2  A.  That is correct.

3  Q.  You've never been to those offices; right?

4  A.  I have not.

5  Q.  You have members of team who include David Klos, Clifford

6  Stoops, and some other folks; right?

7  A.  Yes.

8  Q.  You have standing weekly meetings with those folks --

9          THE COURT:  All right --

10  Q.  -- right?

11          THE COURT:  -- I'm going to reprimand -- this is well

12  beyond -- I was giving you some leeway but, if this is what you

13  wanted to put on -- it's your motion, sir.  I mean, this is --

14  you're laying your foundation in your case-in-chief.  Why

15  didn't you put this on to begin with?

16          MR. GUERKE:  Your Honor, it's rebuttal to the proffer

17  that Mr. Sharp just offered.

18          THE COURT:  In what way?

19          MR. GUERKE:  Related to the organizational structure

20  and how decisions are made currently at the debtor.

21          MR. MORRIS:  Your Honor, if I may.  I don't believe

22  any aspect of the proffer went to the location of decision-

23  making.

24          THE COURT:  Would you like to reply to that?

25          MR. GUERKE:  Yes.  The proffer was made that decisions

APP. 0031
Appx. 00078

HIGHLAND CAPITAL MANAGEMENT, L.P. 32

1 are made in California and around the country, and around the

2 world I believe. And this evidence rebuts that; that the

3 organizational structure and the day-to-day operations are

4 still run in Dallas, Texas, as they were before bankruptcy.

5          And, Your Honor, I have three questions, then I'll sit

6 down.

7          THE COURT: Okay. All right, I'll allow it.

8 Q. When you meet with people on your team that we just

9 identified, you meet with them in Dallas; correct?

10 A. That's correct.

11          MR. GUERKE: Those are my only questions. Thank you,

12 Mr. Waterhouse.

13          THE COURT: All right.

14          THE WITNESS: Thank you.

15          THE COURT: That was direct. Any further direct?

16          Yes, sir.

17          MR. SHAW: Real briefly, Your Honor.

18 DIRECT EXAMINATION

19 BY MR. SHAW:

20 Q. Mr. Waterhouse, as the CFO of the debtor, were you aware

21 that the debtor intended to file bankruptcy prior to the

22 filing?

23          MR. MORRIS: Objection. Beyond the scope.

24          MR. SHAW: Judge, we designated any witness that they

25 designated, so I don't know that we necessarily have called --

HIGHLAND CAPITAL MANAGEMENT, L.P. 33

1        THE COURT:  Well, yeah, but it's your motion --

2        MR. SHAW:  Correct.

3        THE COURT:  -- and you declined to put any evidence on

4   in support of your motion.  They then put on evidence in

5   opposition to your motion.  So you're limited, sir, to

6   rebutting the evidence they put on.  You had your chance to

7   make your case-in-chief; you decided not to do it.  It's not my

8   fault.

9        MR. SHAW:  My understanding was that we were -- that,

10  depending upon what the proffer was, which we -- we're not

11  aware of what the proffer was before today, that we reserved

12  the right to call Mr. Waterhouse, which I understood from our

13  chambers conference is what we exercised that right to do.  If

14  I misunderstood how procedurally we were going about it,

15  then --

16       THE COURT:  Well, I don't understand how -- that

17  doesn't make any sense to me.  You get a free shot to hear

18  their case first, and then you get to make your direct case?

19  Why would I allow that?  It's your motion.

20       MR. SHAW:  Understood.

21       THE COURT:  All right, so let's stick to rebutting

22  what they put on.

23       MR. SHAW:  Okay.

24       THE COURT:  I gave a lot of leeway to your colleague;

25  I'll give you leeway.  But I don't really want to sit through

HIGHLAND CAPITAL MANAGEMENT, L.P.                    34

1  forty-five minutes of direct that you could have done in the

2  first place.

3          MR. SHAW:  And I promise you, I have a very few

4  limited questions.

5          THE COURT:  All right.

6  BY MR. SHAW:

7  Q.  With regard -- where is Mr. Dondero today?

8  A.  I don't know.

9  Q.  For the shared services and subadvisory services that the

10 debtor previously provided Acis -- are you aware of those?

11 A.  I'm aware of them generally.

12 Q.  All right.  Have you ever reviewed the shared-services and

13 subadvisory agreements between Acis and Highland?

14 A.  I'm sure I reviewed them at -- at some point, but I

15 honestly can't recall.

16 Q.  How are those agreements different than the shared-

17 services and subadvisory agreements currently between the

18 debtor and various affiliates?

19         MR. MORRIS:  Objection.  No foundation.

20         MR. SHAW:  It's directly relevant to -- the foundation

21 being he said he's aware of them.  I --

22         MR. MORRIS:  The witness just testified that he's not

23 familiar with them as he sits here --

24         THE COURT:  I can't hear you.

25         MR. MORRIS:  The witness just testified that he's not

HIGHLAND CAPITAL MANAGEMENT, L.P.                    35

 1 | familiar with them as he sits here today.  He may have seen

 2 | them in some -- at some point in the past.

 3 |          THE COURT:  Well, he can qualify the answer further.

 4 | Overruled.

 5 |          You can answer.

 6 | A.  You know, again, I -- I don't -- I don't know.  I don't

 7 | have the documents in front of me.  I -- I -- like I said, I'm

 8 | generally aware of -- of the Acis agreements.  You know, I

 9 | don't have these agreements memorized to any certain degree, so

10 | I -- I -- I -- I don't know specifically.

11 | Q.  As -- you're familiar with the -- as the CFO, with the

12 | shared-services and subadvisory agreements that govern the

13 | seven billion dollars in assets under management that the

14 | debtor provides for affiliates and nonaffiliates; right?

15 | A.  Yes, I'm generally aware of those agreements.

16 | Q.  And are those agreements typical in form?  Do they differ

17 | widely in their content?

18 | A.  Again, I don't know -- I mean, they -- they can.  Again,

19 | it -- it depends on the nature of the services.  And -- you

20 | know, it -- there isn't a standard template, I would say, for

21 | shared services.  Yes, they can differ.  As I said, I don't

22 | have those agreements memorized, so I can't speak as to how

23 | they are similar or how they are not.

24 |          MR. SHAW:  Pass the witness.

25 |          THE COURT:  Thank you.

HIGHLAND CAPITAL MANAGEMENT, L.P.                     36

1              I guess it'll be cross of your own witness.  Any

2    cross?

3              MR. MORRIS:  No, thank you, Your Honor.

4              THE COURT:  All right, sir, thank you.  Mr.

5    Waterhouse, you may step down.

6              THE WITNESS:  Thank you.

7              THE COURT:  You're welcome.

8              Any further evidence?

9              MS. PATEL:  Your Honor, as I referenced, we just have

10   some exhibits; I believe these to be the unobjected-to pieces

11   of it.  We -- Acis provided a witness-and-exhibit list.  These

12   are the unobjected-to exhibits, and we would just move them in.

13   And --

14             THE COURT:  Is this the ones I already have?

15             MS. PATEL:  No, Your Honor.  I believe you only have

16   the debtor's.

17             THE COURT:  Yeah.

18             MS. PATEL:  And I will apologize, Your Honor; we've

19   given debtors a copy of the exhibits.  Our -- there was

20   miscommunication.  They are not bound.

21             THE COURT:  That's fine.

22             MS. PATEL:  But they are numbered.

23             THE COURT:  All right.

24             MS. PATEL:  If I may approach?

25             THE COURT:  Yes.  Please don't hurt yourself.  It's a

HIGHLAND CAPITAL MANAGEMENT, L.P.                    37

1  bit of a mess there.

2          MS. PATEL:  There's a little trash back here.

3          THE COURT:  These are all not objected to; is that

4  correct?

5          MS. PATEL:  (Indiscernible), Your Honor, but I go

6  through them.

7          THE COURT:  Are they -- okay.

8          MS. PATEL:  What I've handed the Court and to opposing

9  counsel are Exhibits 1 -- Acis Exhibits 1 through 18, with the

10 exclusion of Exhibit 3 and Exhibit 9, which were objected to;

11 and then also Exhibit Numbers 24 and 25, which were not

12 objected to.  We do have one additional exhibit, Your Honor,

13 that was objected to, that I would like to move in.

14         THE COURT:  All right.  Is there any objection to the

15 admission of the documents that counsel has represented there's

16 no objection to?

17         MR. MORRIS:  No, Your Honor.

18         THE COURT:  Okay.  They are admitted without

19 objection.

20      (Acis' Exhibits 1 through 18, with the exception of Nos. 3

21 and 9; and Exhibits 24 and 25, were hereby received into

22 evidence, as of this date.)

23         MS. PATEL:  If I may approach, Your Honor?

24         THE COURT:  Yes.

25         Thank you.

APP. 0037
Appx. 00084

HIGHLAND CAPITAL MANAGEMENT, L.P.                38

1          MS. PATEL:  And, Your Honor, my co-counsel will handle

2    that -- will handle it since we -- this was a late objection

3    and he prepared with respect to this; I prepared with respect

4    to argument.

5          THE COURT:  Okay.

6          Yes, sir.

7          MR. CLEMENTE:  I believe there's a hearsay objection

8    regarding this.

9          MR. MORRIS:  Relevance and hearsay, Your Honor.

10          THE COURT:  Okay.

11          MR. CLEMENTE:  Your Honor, I'll address hearsay first.

12    Federal Rule of Evidence 807 is a residual exception to the

13    hearsay rule; provides that a hearsay statement is admissible

14    if the statement is supported by sufficient guarantees of

15    trustworthiness, after considering the totality of the

16    circumstances under which it was made and evidence, if any,

17    corroborating the statement, and (2) it is more probative on

18    the point for which it is offered, than any other evidence that

19    the proponent can obtain through reasonable efforts.

20          This is an email exchange between counsel for Acis and

21    the courtroom deputy for Judge Jernigan, just requesting and

22    ask -- inquiring about the court's availability.  Everything

23    about that email supports the fact that it is -- that it is

24    authentic and that there's no question about whether or not it

25    is -- it's trustworthy.  How would we put on evidence of

HIGHLAND CAPITAL MANAGEMENT, L.P. 39

1 whether or not Judge Jernigan in the Northern District of Texas

2 has sufficient time to hear these numerous motions that are

3 set, other than by providing something like this? I mean, we

4 can't call or depose the courtroom deputy or the judge. So

5 based upon that, also -- there also is an exception, under the

6 hearsay rule, to a public record. I think this also falls

7 within that exception to the rule. So for that reason, we

8 don't believe the hearsay objection is proper.

9        As far as relevance, it goes to the argument about

10 transfer and whether or not the transferee court can

11 expeditiously hear the matter. And that's one of the elements

12 and one of the core questions about judicial efficiency.

13        So for those reasons, we believe that the objections

14 are not well-founded and we offer this exhibit. And it's

15 Exhibit 26.

16        THE COURT: Reply?

17        MR. MORRIS: Briefly, Your Honor.

18        THE COURT: Yes.

19        MR. MORRIS: I'm not aware of any case where a court

20 has ever considered, let alone decided, a venue motion on the

21 availability of another court's time. So I don't think it's

22 relevant at all. I do think it's an out-of-court statement

23 being offered for the truth of the matter asserted, and I do

24 believe it's hearsay.

25        MR. CLEMENTE: It most certainly is hearsay, Judge;

APP. 0039
Appx. 00086

HIGHLAND CAPITAL MANAGEMENT, L.P.                    40

1  just to respond.  But the question is not whether it's hearsay

2  but whether it's admissible.  And of course the Court is well

3  aware that hearsay can be admissible, and one of the exceptions

4  is the exception that I outlined.

5          THE COURT:  All right, I'll overrule the objection and

6  admit the document.  It is hearsay but it clearly meets the

7  reliability aspects for the exception to hearsay.  With regard

8  to the relevance, I think its relevance is very -- well, let me

9  put it this way; I think it's tangentially relevant.  I mean,

10 it certainly is relevant whether the Northern District of Texas

11 has the ability to handle the case were it transferred there.

12 To me that's -- I don't even think that's disputed, I mean,

13 it's obvious, it's a fantastic bankruptcy court.  They're more

14 than capable of handling it.  So I -- it's probably

15 duplicative, if nothing else.

16          Also, it's very carefully written so that you don't

17 actually identify what case you're talking about.  So whether

18 the courtroom deputy realized what you were saying or not

19 saying with regard to this specific motion is obviously

20 unclear.  But I will allow it for very limited purposes.

21     (Email exchange between Acis' counsel and Hon. Jernigan's

22 courtroom deputy was hereby received into evidence as Acis'

23 Exhibit 26, for the stated limited purposes, as of this date.)

24          MR. CLEMENTE:  Thank you, Your Honor.

25          THE COURT:  Any other evidence?

HIGHLAND CAPITAL MANAGEMENT, L.P.                    41

1        I'm going to -- all right, last chance.  I'm going to
2  close the evidentiary record.

3        All right, the evidentiary record's closed.  Let's
4  take a short recess; then I'll hear argument.  We will start
5  with the movants and their supporters, and then we'll turn it
6  over to the debtor.  Okay?  We'll take a short recess.

7        UNIDENTIFIED SPEAKER:  Thank you, Your Honor.

8     (Recess at 10:48 a.m. until 11:05 a.m.)

9        THE COURT:  Be seated.  Sorry about the delay.  We had
10 some computer difficulties.  But they're all ironed out.

11       You may proceed.

12       MR. CLEMENTE:  Thank you, Your Honor.  Again, Matthew
13 Clements from Sidley Austin, on behalf of the committee.

14       Your Honor, to begin, everything we rely on in our
15 venue argument is uncontested and uncontroverted and is in the
16 record that either the debtor's exhibits or the Asic's (sic)
17 exhibits or the record of this case, or published opinions of
18 the Dallas bankruptcy court, and which Your Honor can take
19 judicial notice of -- we believe that that record more than
20 amply carries our evidentiary burden with respect to the venue
21 motion.

22       With respect to the Sharp proffer, Your Honor, it
23 attempted to create the appearance of a debtor with operations
24 in far-flung jurisdictions, employees at nondebtor entities
25 that may be located in places other than Dallas, offices that

HIGHLAND CAPITAL MANAGEMENT, L.P.                    42

1  may be in New York that aren't actually debtor offices.  And
2  the testimony of Mr. Waterhouse rebutted that and made clear
3  that the debtor has no employees other than in Dallas and that
4  Mr. Dondero makes all of the decisions, and he is in Dallas.
5  The nerve center of this debtor is in Dallas.  And we wanted to
6  make that clear, Your Honor, after the proffer, the rebuttal,
7  and the evidentiary record.  We believe that the evidentiary
8  record is largely uncontroverted with respect to the arguments
9  that we're going to be made (sic) in our venue motion, and that
10 Mr. Sharp's testimony has been effectively rebutted.

11         With that, Your Honor, we believe that this case is
12 atypical and presents a set of unique facts which we believe
13 are uncontroverted, that warrant transfer of venue to the
14 Dallas bankruptcy court.  And frankly, Your Honor, it does beg
15 the question as to why the debtor chose not to file in Dallas,
16 what we believe the most logical venue is, in the first
17 instance.  Let's talk about some of these unique facts here;
18 then we'll move into some of the arguments we made in our
19 motion, and then we'll talk about some of the things that the
20 debtor made (sic) in its reply.

21         First and perhaps most importantly, which is obvious
22 from the nature of this proceeding, not a single creditor or
23 party-in-interest has filed papers supporting the debtor's
24 venue in Delaware, other than, obviously, the debtor.  The
25 official committee has unanimously supported venue transfer to

APP. 0042
Appx. 00089

HIGHLAND CAPITAL MANAGEMENT, L.P. 43

1 Dallas, Texas. Acis, in its own capacity as creditor, has

2 joined the transfer request. It's not surprising to us, Your

3 Honor, that no creditor has affirmatively come out in favor of

4 venue in Delaware, because the debtor is in Dallas and, in

5 fact, that is where its nerve center is.

6　　　　　Your Honor, we do believe that it's particularly

7 significant because in this case, although schedules and

8 statements have not yet been filed, the creditors' committee

9 makes up the vast majority of creditors in this case, in terms

10 of absolute dollar amounts. There may be multiple creditors in

11 number, but the vast majority of dollar amount of creditors are

12 represented by the official committee of unsecured creditor

13 (sic).

14　　　　　There was reference to Jefferies. They're owed thirty

15 million dollars. There was reference to Frontier Bank.

16 They're owed five million dollars. A single claim of one

17 committee member dwarfs that by multiples, Your Honor. So we

18 believe the fact that no other creditor supports venue in

19 Delaware is a very significant fact, Your Honor, and is not

20 controverted.

21　　　　　Second, Your Honor, until a few months ago, the Acis

22 case, which is pending in the Dallas bankruptcy court, was an

23 affiliated case. And again, this can be gleaned from the

24 published decisions and the record that's been put into

25 evidence. Had this case been filed prior to confirmation of

HIGHLAND CAPITAL MANAGEMENT, L.P.                    44

1   the Acis plan, under Rule 1014 the Dallas bankruptcy court

2   would be the appropriate court to determine venue.  And

3   although I would never suppose to predetermine how a judge

4   would rule, I think there would have been a high probability

5   that the Dallas court would have taken venue over the debtor's

6   case.

7          This is important, Your Honor, because the third point

8   I'd like to make is that Highland and the debtor, and as we

9   have described in our papers and related attachments, and as

10  Mr. Sharp referred to in his proper -- in his proffer, has

11  itself filed an appeal, seeking to overturn the confirmed Acis

12  plan of reorganization and return the equity that was

13  distributed to Mr. Terry under that confirmed plan, to an

14  entity called Nutro (ph.).

15         Second on Nutro, Your Honor.  Nutro's wholly owned by

16  Mr. Dondero and, therefore, if Acis were returned underneath

17  Nutro, it would become an affiliate of this debtor, and Acis

18  would once again be subject to, as an initial matter, a

19  venue -- excuse me, this debtor would be subject to, as an

20  initial matter, a venue determination by the Dallas bankruptcy

21  court.  If we have a successful appeal, we would have

22  affiliated cases with dueling jurisdictions, Your Honor, and

23  the Dallas bankruptcy court, as I mentioned, would determine

24  venue.

25         On that, Your Honor, the debtor must believe -- it's

APP. 0044
Appx. 00091

HIGHLAND CAPITAL MANAGEMENT, L.P.                    45

1   not just me speculating.  The debtor must believe that there is

2   a material possibility of this occurrence, as it has been

3   seeking to employ counsel -- and you'll hear about that

4   shortly -- and expend estate resources on behalf of Nutro, a

5   nondebtor affiliate, in an attempt to have the Acis

6   confirmation order overturned, with, again, the result being

7   Acis would, again, be a debtor affiliate.  Therefore, the

8   debtor cannot argue that such possibility does not materially

9   impact the venue decision or is remote, in particular where

10  they're trying to convince the committee and this Court to use

11  estate resources to achieve that very outcome.  The debtor's

12  effectively arguing for a ruling on appeal, but the debtor is

13  an affiliate of Acis, in which case the current Chapter 11

14  proceeding should be in Dallas, Texas.

15          Fourth, Your Honor --

16          THE COURT:  Well --

17          MR. CLEMENTE:  Yes, Your Honor.

18          THE COURT:  -- let me interrupt you for a moment,

19  because that hasn't happened.  As we sit here today --

20          MR. CLEMENTE:  That's correct, Your Honor.

21          THE COURT:  -- they're not affiliates.  There seems to

22  be an assumption that, were this case to be transferred to the

23  Northern District of Texas, it would be assigned to -- sorry,

24  I'm losing my notes --

25          MR. CLEMENTE:  Judge Jernigan, Your Honor.

HIGHLAND CAPITAL MANAGEMENT, L.P.                46

1          THE COURT: Jernigan, yes. Thank you. Sorry. I know
2   Judge Jernigan fairly well.

3          But if they're not affiliates, isn't the case subject
4   to random assignment under the normal procedures in the
5   Northern District of Texas? And if it's not assigned to Judge
6   Jernigan, don't your arguments about judicial knowledge and
7   experience in connection with this case fall away because
8   nobody other than Judge Jernigan has that special knowledge in
9   Texas? And all -- what other colleagues would be able to do
10  there is simply walk down the hall and talk to her. And of
11  course, I can pick up the phone and talk to her any time, as
12  well.

13         So I'm just teasing out this assumption that
14  definitely feels to be behind everybody's arguments, that she's
15  going to get this case. Is there anything in the record that
16  would support that? Is there some sort of rule I'm not aware
17  of in Texas or that I'm -- am I assuming something that's not
18  consistent with practice down there, which is that this case
19  would be randomly assigned?

20         MR. CLEMENTE: Your Honor, I believe you are correct
21  in the sense that the case would be randomly assigned, but I
22  believe Your Honor could look at -- as I understand, there are
23  three judges located in the Dallas court district; one is
24  obviously Judge Houser. I could be getting the name wrong.
25  But she's overseeing the Puerto Rican proceeding --

HIGHLAND CAPITAL MANAGEMENT, L.P.                    47

1        THE COURT:  Um-hum.

2        MR. CLEMENTE:  -- so her docket is clearly beyond --

3        THE COURT:  She's also --

4        MR. CLEMENTE:  -- full.

5        THE COURT:  -- about to retire, so I don't even know

6   if she's taking new cases.

7        MR. CLEMENTE:  Correct.  So that leaves two judges,

8   Your Honor.  And we understand -- perhaps Acis' counsel would

9   be able to expand on that, given their familiarity with the

10  Dallas bankruptcy court, but that judge is not being assigned

11  new cases, given a circumstance with that particular judge.

12        But to answer your direct question, Your Honor, I

13  believe you are correct; it would be a random assignment.  But

14  we do believe that there is a high probability it would wind up

15  with Judge Jernigan.

16        THE COURT:  But it might be a pool of one; right?

17        MR. CLEMENTE:  That is correct, Your Honor.  And even

18  if it wasn't, I think, clearly, for all the reasons we'll

19  discuss, we would have a very strong case to make that it

20  should be transferred to Judge Jernigan, even if it initially

21  got somebody else on the --

22        THE COURT:  Well, you know, I mean, if a judge were a

23  lawyer, a judge couldn't have both these cases.  A judge (sic)

24  couldn't have a case with two warring former affiliates,

25  because it would create a conflict of interest.  Now, those

HIGHLAND CAPITAL MANAGEMENT, L.P.                    48

1  rules don't apply to judges.  We're assumed to be above all

2  that.  But -- since we don't have clients.  But it does -- it

3  might inform someone's decision about do I really feel

4  comfortable having Acis and Highland, given the situation -- I

5  mean, they wouldn't be jointly administered, certainly, of

6  course.  They're --

7          MR. CLEMENTE:  That's correct, Your Honor.

8          THE COURT:  Again, they're not affiliates, at least as

9  we stand here today; although the debtors are trying to change

10  that, purportedly.  It might create a situation where a judge

11  might take that into consideration in deciding whether to have

12  the case or not.  And I --

13          Now, we deal all the time with jointly administered

14  affiliated cases, right, because there's always intercompany

15  debt --

16          MR. CLEMENTE:  That's correct.

17          THE COURT:  -- and we all just assume it away (ph.).

18          MR. CLEMENTE:  That's correct, Your Honor.

19          THE COURT:  But this is a little different in that

20  they're not affiliates.

21          MR. CLEMENTE:  I do think, Your --

22          THE COURT:  Again, she would -- the judge wouldn't be

23  required -- Judge Jernigan wouldn't be required -- it's not a

24  recusal issue.  It's not a disqualification issue.  It's just

25  a -- sort of something to think about in making the decision.

HIGHLAND CAPITAL MANAGEMENT, L.P. 49

1    MR. CLEMENTE:  I don't disagree, Your Honor.  I do

2  think Your Honor hit on it, though.  Bankruptcy judges are

3  unique in that perspective that they're put in situations all

4  the time where a decision may impact one particular entity to

5  the detriment of another entity that's also before Your Honor

6  in connection with a particular bankruptcy proceeding.

7    THE COURT:  Yeah.

8    MR. CLEMENTE:  With that, Your Honor, I'll continue to

9  move forward.

10    THE COURT:  Yeah, please.

11    MR. CLEMENTE:  Fourth, and this gets back to the point

12  we were just discussing with Your Honor, we do not believe

13  there's any credible dispute that the Dallas court has already

14  upped the learning curve relative to this Court.  Again, not

15  that Your Honor wouldn't be able to come up to speed and that

16  Your Honor has tremendous capacity to do that, but the record

17  is clear, from our perspective, that the Dallas bankruptcy

18  court has already had to wrestle with issues involving the

19  debtor.  There has been extensive proceeding (sic) in the

20  Dallas bankruptcy court, not just the bankruptcy court but also

21  the district court, with respect to the Acis case.

22    There are several written opinions, again, that Your

23  Honor can take judicial notice of and which are also in the

24  record, that provide, after an extensive and developed factual

25  record, that Acis only operated through Debtor Highland -- the

APP. 0049
Appx. 00096

HIGHLAND CAPITAL MANAGEMENT, L.P.                    50

1    debtor, Highland.  It is clear that the Dallas court had to

2    develop an understanding of how the debtor's complex business

3    worked.  It is the same business as the debtor engages in here,

4    albeit a subset.

5         That's consistent with Mr. Sharp's testimony.  Mr.

6    Sharp didn't say that they no longer are in the CLO business.

7    He characterized it in a certain fashion, but the debtor

8    clearly still manages and advises CLOs.  That is a part of the

9    debtor's business.  That is what was at issue in the Acis

10   proceeding. And also, as Mr. Waterhouse testified to quite

11   clearly in the rebuttal, and as Mr. Sharp testified to in the

12   cross, it's the same principal actors:  Mr. Dondero and others

13   on his management team.

14        Your Honor, this case, although the idea is to get a

15   fresh start, we believe will necessary require a backward-

16   looking review of the facts.  And the Dallas court has upped

17   the learning curve from that perspective.  The committee

18   recognizes that the Dallas court would take time and determine

19   issues as presented to it.  And depending on the issue, the

20   past experience of the court will have varying degrees of

21   relevance.  But that experience is nonetheless important to the

22   committee to ensure maximum efficiency, with an entity that has

23   demonstrated itself to be highly litigious, Your Honor.  One

24   needs only to review the top-twenty list of creditors, made up

25   largely of law firms and other professionals, to make the

HIGHLAND CAPITAL MANAGEMENT, L.P. 51

1   determination that the debtor is highly litigious, as well as

2   the record in this proceeding.

3        So Your Honor, those four facts, we believe, are

4   unique, and we believe that they strike in favor of

5   transferring venue to Dallas. I do want to walk through some

6   of the arguments we made in our papers, as well, but I wanted

7   to highlight what we believe are truly distinguishing features

8   of this particular situation.

9        Your Honor, as we more fully lay out in our papers, we

10   do believe the convenience of the parties supports transfer of

11   venue. The debtor's nerve center is in Dallas; Mr. Waterhouse

12   was clear on that. Mr. Dondero is the portfolio manager for

13   all of the Highland funds, and he is the one-hundred-percent

14   owner of Strand. Strand's the general partner of this debtor.

15   All decisions run through Mr. Dondero. And it's clear that Mr.

16   Dondero and all of the other key personnel are located in

17   Dallas.

18        Your Honor, a large number of creditors are located in

19   Dallas; you need not look past the list of twenty largest

20   unsecured creditors to determine that. There are almost a

21   majority of those creditors that are located in Texas. While

22   the committee agrees that the overall organization with several

23   thousand affiliates is complex -- and you'll hear about that as

24   we go on this afternoon -- there's 2,000 affiliated entities

25   with Highland -- the debtor is only Highland. And so the idea

APP. 0051
Appx. 00098

HIGHLAND CAPITAL MANAGEMENT, L.P.                     52

1  that there may be offices in far-flung jurisdictions, those are
2  not debtor offices.

3         Your Honor, the interests of justice also support the
4  transfer of venue.  The Dallas bankruptcy court has clearly
5  invested time and resources that are applicable to this debtor.
6  In this context, the learning curve that is referred to in the
7  cases clearly favors transfer of venue to Dallas.  Although
8  this case has been pending for a while, Your Honor, there's
9  only been a first-day hearing with very limited relief granted,
10 and one brief status conference.

11        There are also economic efficiencies in Dallas.
12 Dallas is convenient for all debtor employees.  Yes, people can
13 get on planes, but it's hard to argue that being a mile-and-a-
14 half away from the courthouse isn't more convenient.

15        THE COURT:  I don't know.  Parking's tough.

16        MR. CLEMENTE:  And perhaps an overnight trip is
17 helpful for the family life, Your Honor.  It depends.

18        Dallas is convenient for the professionals.  It's easy
19 to fly in and out of Dallas, as we point out in our papers,
20 Your Honor.  There's no real, I believe, disagreement that
21 Dallas would not be convenient.

22        Additionally, Your Honor, and we think that this is a
23 unique factor as well, if the long history of Highland's
24 litigious nature is any indicator here, there will be discovery
25 disputes.  And under Rule 45, contested nonparty discovery

HIGHLAND CAPITAL MANAGEMENT, L.P.                        53

1 | would likely occur in the Northern District in Texas, in

2 | Dallas.  Given the massive number of nondebtor affiliates --

3 | again, we only have 1 box here; there's, like, 2,000 others.

4 | It is highly likely that nonparty discovery will become an

5 | issue.

6 |          The fact that -- I heard Mr. Sharp testify in his

7 | proffer that he believes he and Mr. Caruso will provide all of

8 | the testimony.  That's great and good and well for him to think

9 | that.  I think the committee's going to take a different view

10 | of that, Your Honor.

11 |          Our own limited history in this case shows the

12 | relevance of Dallas.  Two of the three depositions occurred in

13 | Dallas.  I believe we informed Your Honor of that on the status

14 | call that we had.  And the third didn't, only because we

15 | believe Mr. Sharp was not able to travel to Dallas.

16 |          The justice that the debtor seeks in the Acis case,

17 | Your Honor, yields a result that this places -- excuse me, Your

18 | Honor.  The justice that we talked about in the appeal with

19 | respect to the Acis confirmation order yields a result that

20 | places this debtor in the Dallas bankruptcy court, which is

21 | also in the interest of justice.

22 |          So, Your Honor, we believe there are several unique

23 | factors.  We believe that the traditional factors, as we lay

24 | out in our papers, support the transfer of venue.  And I wanted

25 | to just briefly touch on some of the objections that the debtor

HIGHLAND CAPITAL MANAGEMENT, L.P.                    54

1    raised to our venue motion.  First, the debtor thinks too

2    little of the Dallas court, in asserting that we're trying to

3    gain some type -- the committee is trying to gain some type of

4    litigation advantage.  We have no doubt, as Your Honor has

5    tremendous respect for the Dallas court, that the Dallas court

6    will take each issue as it comes to it, without prejudice or

7    predetermination.  History and experience doesn't mean

8    prejudice or predetermination; it just means familiarity, Your

9    Honor.  That's all it means.

10          Our point is simply that the Dallas court clearly had

11   to spend time wrestling with the debtor, how it operated, and

12   its opaque structure.  And let me spend a second on how.  As we

13   point out in our reply and, again, as the record is clear based

14   on the published opinions, Acis had no employees; it was a box.

15   And it subcontracted its management services to the debtor.

16   The Dallas court examined that contract, that subadvisory

17   agreement that Mr. Sharp and, I believe, Mr. Waterhouse

18   referred to, and had to become familiar with it.  That's clear

19   from the published opinions.  And the debtor has numerous other

20   similar contracts.

21          The Dallas court also made determinations -- and

22   these, again, are in published opinions -- whether certain of

23   the debtor's contracts with Acis were personal-services

24   contracts.  Again, they may differ, Your Honor, in terms of the

25   specifics, but these are clear examples of where the Dallas

HIGHLAND CAPITAL MANAGEMENT, L.P.                    55

1 | bankruptcy court had to wrestle with contracts of Highland, the
2 | way Highland operated, and the way that it was managed.

3 |         Additionally, Your Honor, on the point of litigation
4 | advantage, as I thought about this, I think the debtor's, sort
5 | of, arguments regarding a litigation advantage, frankly, worked
6 | the other way.  If I may, here, for a second, Your Honor.  Mr.
7 | Dondero is the sole controlling party, as the testimonies made
8 | clear.  He's based in Dallas.  As we demonstrated in our
9 | papers, Dallas is clearly the most efficient and convenient
10 | forum for the creditors.  And the creditors have sent this
11 | message loud and clear through this motion to transfer and the
12 | lack of any party affirmatively supporting the debtor and venue
13 | in Delaware.

14 |         Mr. Dondero, in our view, as he has shown in the past,
15 | consistently makes decisions that are in his best interest,
16 | potentially fleeing from a jurisdiction and not his creditors.
17 | And we believe that fleeing from the Dallas court, that is,
18 | steps away from his office -- and that is convenient for his
19 | creditors and, frankly, seems to be the most logical choice of
20 | venue -- again, understanding -- we don't dispute that the
21 | debtor is a Delaware limited partnership.  We're not disputing
22 | that.  But we're talking about what's logical.  That's the
23 | point that I would like to make here, Your Honor.

24 |         Again, back to --

25 |         THE COURT:  Well, I mean --

HIGHLAND CAPITAL MANAGEMENT, L.P.                    56

1          MR. CLEMENTE:  Yes, Your Honor.

2          THE COURT:  -- I mean, a cynic -- and after almost

3    fourteen years, maybe I'm becoming one; I don't know.  But a

4    cynic would say -- and not necessarily badly (ph.), that both

5    sides want -- are interested in forum-shopping; the debtor

6    fleeing, obviously, adverse rulings in Texas, and the creditors

7    fleeing Delaware to go back to the home of adverse rulings

8    against the debtor in Texas.  And it's six one, half dozen the

9    other.  However, at least the cases -- or some of the cases say

10   that the debtor is entitled to some deference in its forum-

11   shopping, as opposed to the creditor, in their opposition, in

12   their forum-shopping.  I'm not sure I buy that.  And as a

13   matter of fact, I've ruled previously that there is no

14   deference --

15         MR. CLEMENTE:  Correct.

16         THE COURT:  -- that should be afforded to the debtor,

17   in the EFH case.  But --

18         MR. CLEMENTE:  That's correct, Your Honor.

19         THE COURT:  -- I just throw that out there.

20         MR. CLEMENTE:  And I believe Your Honor also made a

21   point, in the EFH ruling, regarding the support of the various

22   parties for the venue.  And so I believe that is actually a

23   very strong factor that weighs in favor of transfer to --

24         THE COURT:  Well, and -- yeah, I mean --

25         MR. CLEMENTE:  -- Dallas.

HIGHLAND CAPITAL MANAGEMENT, L.P. 57

1          THE COURT: -- and that case had -- the government of

2 Texas or the committee, or both, supported venue. That case

3 probably, thankfully, would have been sent to Texas, freed up

4 five years of my life, and twenty appeals and --

5          MR. CLEMENTE: You're stronger for it, though --

6          THE COURT: -- everything else.

7          MR. CLEMENTE: -- Your Honor.

8          THE COURT: Yeah -- I don't know about that. I'm

9 heavier, that's for sure.

10          MR. CLEMENTE: I wish I could blame that for my

11 weight, Your Honor, but I can't.

12          Your Honor, back -- very briefly, because we did touch

13 on it already. We do believe that the Dallas court experience

14 is highly relevant, contrary to what the debtor remarks in

15 their objection. The debtor again tries to cast the Acis

16 bankruptcy as being narrow and only involving CLOs. Again, the

17 testimony, I believe, showed, in -- shows, in point of fact,

18 the debtor does manage a significant number of CLOs. Even if

19 they are in liquidation, there are still decisions that are

20 being made. And therefore, exposure to how the debtor operated

21 with respect to CLOs is highly relevant.

22          Your Honor, I already mentioned, so I won't repeat

23 myself, that Acis was a box and it had no employees, and

24 therefore, obviously, the court had to look through to what was

25 going on at Highland in terms of how the debtor was managed.

APP. 0057
Appx. 00104

HIGHLAND CAPITAL MANAGEMENT, L.P.                    58

1          Your Honor, the CRO, unfortunately, I believe, for the

2     debtor, does not cleanse the venue choice.  The CRO was not

3     around.  The CRO didn't decide venue.  And as clear from the

4     testimony, the CRO reports to Mr. Dondero.  Nothing has

5     changed.  There has been no management changes.  I believe that

6     was also consistent with the testimony.  And everybody still

7     reports to Mr. Dondero, and he's located in Dallas, and Dallas

8     is the nerve center.

9          Additionally, as I mentioned, the cases will be very

10    much about the past, unfortunately, Your Honor, a time when the

11    CRO was not involved, and about transactions and conduct

12    engaged in by the debtor and Mr. Dondero in the run-up to this

13    bankruptcy.

14          In short, I believe the CRO issue is a red herring,

15    Your Honor; it doesn't erase the history the Dallas bankruptcy

16    court has with the debtor through the Acis proceeding, and it

17    doesn't erase the history of the decision-making process that

18    the debtor engaged in, in the past and currently engages in

19    today.

20          With that, Your Honor -- we already had a colloquy

21    about how we do not believe the Dallas bankruptcy court is

22    conflicted, so I won't spend any further time on that.  But I

23    would like to sum up.  Your Honor, let me be very clear.  We

24    have the utmost respect for you and for this Court, so I want

25    to make sure that Your Honor is very clear on that.  However,

HIGHLAND CAPITAL MANAGEMENT, L.P. 59

1  the committee respectfully believes that this case presents the

2  unique combination of facts which dictate that the transfer of

3  venue to the Dallas bankruptcy court is appropriate.

4          THE COURT:  You don't need to worry.  My ego assumes

5  you have respect for me.

6      (Laughter)

7          MR. CLEMENTE:  Thank you for that, Your Honor.  Unless

8  Your Honor has any questions, I'll sit.

9          THE COURT:  I do not.  There may be others in support

10  who want to be heard.

11          Mr. Pomerantz (sic).

12          MR. LUCIAN:  Your Honor, for the record, John Lucian

13  of Blank Rome, local counsel for Acis.

14          Just during the break, we had a binder made for Your

15  Honor so that the exhibits that Ms. Patel had handed up that

16  were admitted -- I know Mr. Morris has no objection to us

17  handing that up, Your Honor.  It's the -- 1 through 26, with

18  the ones that were not admitted.  This will save you from --

19          THE COURT:  Is that these?

20          MR. LUCIAN:  Yeah.  That's the -- you got them in the

21  binder now.

22          THE COURT:  Okay.  Is this in there --

23          MR. LUCIAN:  Yeah.

24          THE COURT:  -- the email?

25          MR. LUCIAN:  Yes; 26, yes.  If you want to switch to

APP. 0059
Appx. 00106

HIGHLAND CAPITAL MANAGEMENT, L.P.     60

1  that.  Perfect.

2          MS. PATEL:  Thank you, Your Honor.  For the record,

3  Rakhee Patel on behalf of Acis Capital Management, L.P., who

4  joined in the committee's motion.  And I will make reference to

5  those -- certain of those documents.  I'm generally loathe to

6  hand up big binders or big stacks of documents without telling

7  the Court of what's been handed up.  So, very briefly, Your

8  Honor, I will say, Exhibits 1 and 2 (sic) in the binder are the

9  involun -- the issue -- I'm sorry, the opinion issued by the

10 Dallas bankruptcy court, in connection with the involuntary

11 trial, and Exhibit number 2 is the opinion that was issued in

12 connection with confirmation of Acis' plan.  I would also point

13 the Court to Exhibit Number 17, which is the actual

14 confirmation order in Acis Capital Management.  And I'll make

15 reference to one other exhibit as I go through my presen -- or

16 a number of other exhibits, but -- one additional ruling by the

17 court, as I go through my presentation.

18         THE COURT:  What was the date of -- oh, okay.  Never

19 mind.  So the confirmation was late January?

20         MS. PATEL:  Yes, Your Honor.  January 31st, 2019.  And

21 the plan went effective on February 15th of 2019.

22         THE COURT:  Okay.

23         MS. PATEL:  And the Highland bankruptcy, I believe,

24 was just a little bit over eight months later.

25         And, Your Honor, I'll try not to duplicate necessarily

HIGHLAND CAPITAL MANAGEMENT, L.P.                 61

1  what the committee did, and I will promise to keep this as

2  brief as I can.  I'm happy to answer any questions, because

3  standing here before you is the counsel -- at least the

4  bankruptcy counsel that lived and breathed the Acis case from

5  the date that they were filed on January 30th of 2018, through

6  today.

7          Now, Your Honor -- and along with my co-counsel, Mr.

8  Shaw, who has been living and breathing, frankly, the issues

9  longer than I have, even.

10          Your Honor, I will repeat something that was in our

11  moving papers.  And I know Your Honor and Your Honor's team has

12  probably read all the moving papers. but I think this bears

13  repeating, and that is that this case is unique.  It is, in my

14  mind, exceptionally unique.  These facts are so unique, Your

15  Honor, that I would venture to say I don't think that this is

16  necessarily a case that would even possibly or remotely or even

17  tangentially open any floodgates, because these facts are so

18  different from the typical motion to transfer venue.

19          Your Honor, touching quickly on the burden-of-proof

20  issue that Your Honor referenced in your colloquy with Mr.

21  Clemente.  Your Honor, Acis concedes, obviously, the burden of

22  proof is clear that it's the preponderance of the evidence.

23  And I won't go through ad nauseum all of the factors.  I know

24  the Court is exceptionally familiar with all the factors on

25  both the convenience-of-the-parties and interest-of-justice

HIGHLAND CAPITAL MANAGEMENT, L.P.                    62

 1  side.  But I would just note that, at least in the Court's

 2  prior rulings, you've said that the factors are not really a

 3  scorecard, that we're not counting three factors versus three

 4  factors, or four versus two.

 5          And I would just --

 6          THE COURT:  Well, that follows with my fundamental

 7  tenet, which is that any legal test with more than three

 8  factors is useless.  It's just a -- it's just a question of

 9  discussion.

10          MS. PATEL:  I think -- and I think this Court has wide

11  discretion with whether to transfer this case or not.

12          Your Honor, one final quick point that I'll call

13  the -- kind of the four corners or setting the table, for

14  purposes of go-forward, is back to the reference to the -- that

15  there's no real deference, necessarily, to the debtor's choice

16  of venue.  That's sort of subsumed in the burden of proof.  The

17  movant bears a burden of proof and, if they meet the

18  preponderance of the evidence, then the burden shifts.  And

19  that's really kind of where the debtor's choice of forum weighs

20  in.

21          Now, Your Honor, one other quick point is that there's

22  been a lot of discussion in the objections and the responses

23  and the replies, indicating that this whole issue is about Acis

24  as a creditor.  And what I'm here to say, Your Honor, is that

25  this, actually, the issue, the motion to transfer venue, is not

HIGHLAND CAPITAL MANAGEMENT, L.P. 63

1 really about Acis as a creditor. And I'm here representing

2 Acis as a creditor. This has been painted as there's one

3 creditor that's driving this, and that's Acis. That's just

4 simply not the case, Your Honor.

5 The reality is that you've got hundreds of millions of

6 dollars or claims represented by the committee, as a fiduciary

7 to those claims, that have made this motion. This is not Acis'

8 motion. Yes, we did join with respect to it. And really, it

9 has -- that has more to do with the fact that we're the Texas

10 folks, we're the Texas creditor. And we -- again, I and Mr.

11 Shaw lived and breathed the Texas cases. And I'm here to stand

12 before the Court and answer any questions you may have with

13 respect to what happened, what transpired, but, more

14 importantly, what could happen on a go-forward basis.

15 Your Honor, it's important -- and I -- again, harking

16 back to this concept of this is unique. As Your Honor noted in

17 EFH, had the committee signed on, had the Texas comptroller

18 signed on, perhaps that outcome would have been a little bit

19 different. But here, Your Honor, we've got the committee

20 moving for transfer of venue. And I think that's really

21 significant. And I'll go through in a little bit sort of the

22 debt stack that we're dealing with here, and you'll see that,

23 hands down, the committee is the fulcrum debt here. It is the

24 fulcrum debt, Your Honor.

25 Your Honor, one final quick note on forum-shopping.

HIGHLAND CAPITAL MANAGEMENT, L.P.                    64

1  And there's been conversation with respect to the committee's

2  forum-shopping, the debtor's relationship.  Look, I've read

3  Your Honor's prior opinions and I really do think the issue

4  boils down to -- I think it's probably neutral with respect to

5  both sides.  As Your Honor pointed out, the debtor has the

6  ability to choose the state of its incorporation as its venue

7  for filing of bankruptcy.  And also, the committee has the

8  ability to move, to transfer, pursuant to 1412, to a place that

9  is the interest of justice and the convenience of the parties.

10 I really view that as being the -- there should be no negatives

11 cast on, frankly, either side, with respect to forum-shopping,

12 because it's kind of invited by the structure of the statute.

13         So if the case isn't about Acis as a creditor, what is

14 this case about?  Well, I -- or what is this motion about?

15 Here I really do think that -- at its heart, that this

16 particular motion to transfer, and probably motions to transfer

17 in general, boil down to the bankruptcy case itself.  So here

18 that would be -- this is all about Highland's bankruptcy and

19 where it should be administered, what makes sense.

20         And, Your Honor, I want to go through a couple of

21 different subtopics on this.  First I want to talk about the

22 business lines that the debtor engages in.  What does it do?

23 And this is all from the -- what I'm going to refer the Court

24 to is all included in the first-day declaration of Mr.

25 Waterhouse, which is Debtor's Exhibit O.

HIGHLAND CAPITAL MANAGEMENT, L.P.                    65

1            And, Your Honor, in Mr. Waterhouse's declaration, he

2    goes through the three kind of general lines of the debtor's

3    business.  First is proprietary trading.  And that involves

4    sort of trading with the debtor's money or leveraged money in

5    certain brokerage accounts.  And I really think that

6    proprietary trading is probably that line of business -- when

7    we're thinking about which court is best suited to oversee that

8    line of business and what's going to happen with respect to it,

9    I think that's really neutral.  I think both Delaware and

10   Dallas could adequately handle that issue.

11           The issue really becomes a lot more focused, though,

12   when we look at the other two lines of business.  The next line

13   of business is investment management services.  And this is --

14   and a big piece of that is the debtor's operation of its CLOs

15   or collateralized loan obligations.

16           If the 2018 financials -- again, I believe they're

17   contained in debtor's exhibits -- if you take a look at those

18   you'll see that as a part of investment management fee revenue,

19   a lot of the revenue that was generated is related to the

20   debtor's operation of eighteen CLOs along with some managed

21   separate accounts, et cetera.

22           Your Honor, the CLO piece and the separate accounts

23   are issues that the Dallas court was faced with through Acis'

24   bankruptcy and Highland's management of it.  And I'll borrow

25   from Mr. Clemente his phrase:  Acis was effectively a box.  It

APP. 0065
Appx. 00112

HIGHLAND CAPITAL MANAGEMENT, L.P. 66

1  had no employees of its own.  It only had two officers, Mr.

2  Dondero and Mr. Waterhouse, who was the treasurer of Acis,

3  until their resignation shortly after the appointment of --

4  shortly after the involuntary filings and the appointment of a

5  trustee.

6       Now, Your Honor, the other -- the last piece that's

7  also involved is shared services.  So we've got investment

8  management, and there's subpieces of it.  And I won't represent

9  to the Court that is Judge Jernigan familiar with every aspect

10 of Highland's investment management services?  No, likely not.

11 But neither is this Court.  This Court is still, very much so,

12 on the learning curve with respect to that.

13      And I would submit, Your Honor, that Judge Jernigan is

14 frankly just further along that learning curve with respect to

15 the investment management services.

16      On shared services, Your Honor, as Mr. Clemente

17 referenced, the opinions are very clear -- again, Exhibits 1

18 and 2 -- with respect to there is -- it's clear that Judge

19 Jernigan had to evaluate shared services.  And I'll kind of

20 summarize what the structure of what Judge Jernigan had to

21 evaluate was.  Again, Acis is a box.  It was provided its

22 services by Highland, pursuant to two key agreements:  a

23 subadvisory agreement and a shared-services agreement.  And

24 that shared-services agreement is relatively generic.  And all

25 that is is the subadvisory -- I like to think of it as that's

HIGHLAND CAPITAL MANAGEMENT, L.P. 67

1  the thinking brain stuff.  That's the investment advisory.

2  Does this comply with SEC guidelines?  Should these trades be

3  made?  What does the marketplace look like?

4          Shared services, on the other hand, Your Honor, are

5  all that middle- and back-office typical type stuff.  There's

6  no real rocket science with respect to it.  It's just providing

7  infrastructure:  accounting, legal, bookkeeping functions, all

8  those things that any sort of generic business would provide.

9          And again, that is something that Judge Jernigan is

10 just more familiar with.  She is familiar with Highland's

11 business modus operandi.

12          And, Your Honor, if you look sort of across the

13 Highland structure, you will see that Acis really was just a

14 little microcosm.  It's a little template, because it gets

15 repeated throughout the Highland empire.

16          And one of the exhibits -- and forgive me; I didn't

17 bring up the other exhibit list, but multiple parties have

18 designated it, and it's the entities list.  And there's 2,000

19 entities, approximately.  I didn't count them all up.  But

20 that's a number that's been thrown around:  2,000 entities

21 under this.  And they are all each little microcosms.

22 Certainly, Judge Jernigan is further along with respect to the

23 Acis microcosm, but also with respect to the template as well.

24          Your Honor, with respect to then, therefore, economy

25 or -- judicial economy or efficiency, again, Judge Jernigan,

HIGHLAND CAPITAL MANAGEMENT, L.P. 68

1  further along the learning curve.

2  Your Honor, now turning then to the debt stack, as I

3  had referenced earlier -- again, this is all set forth in the

4  declaration of Mr. Waterhouse -- you've got two secured

5  lenders, Jefferies and Frontier.  And no one's heard with

6  respect to -- from them with respect to their position.  Your

7  Honor, these are two creditors that are vastly oversecured, and

8  so really they -- I'll put them as sort of neutral with respect

9  to what's going to happen in this bankruptcy case.

10  Then the next item in the debt stack that Mr.

11  Waterhouse identifies is Highland CLO Management.  Well, Your

12  Honor, it's a note that was transferred -- Highland is the

13  obligor on the note.  It's about nine-and-a-half million

14  dollars.  And it was a note that was previously held by Acis

15  and that was transferred to an entity by the name of Highland

16  CLO Management, by Mr. Dondero.

17  Highland CLO Management, in turn -- Mr. Waterhouse

18  references that there's sort of -- Highland doesn't have a

19  beneficial interest with respect to it.  But if you look at the

20  retention applications that are set for hearing a little bit

21  later today, you'll see that actually the debtors (sic) are

22  claiming there is an interest in this, that the debtor has an

23  interest in making sure that Highland CLO Management has a

24  defense when it comes to the issue of was that transfer from

25  Acis to Highland CLO Management a fraudulent transfer.

APP. 0068
Appx. 00115

HIGHLAND CAPITAL MANAGEMENT, L.P.                    69

1        And again, these are issues that Judge Jernigan has

2    had to grapple with all throughout the bankruptcy case.  There

3    have been no -- there has been no adjudication that it was a

4    fraudulent transfer; but certainly she's had to evaluate it in

5    connection with four injunctions that were issued in connection

6    with the Acis case.

7        First there was a -- excuse me -- a sua sponte

8    injunction.  Second there came an ex parte injunction.  Third

9    there was a preliminary injunction.  And then fourth there was

10   a plan injunction.  And that plan injunction, Your Honor, is

11   embodied in Exhibit Number 17.  And again, all of these

12   transfers and transactions -- part of the debt stack of

13   Highland has been evaluated by Judge Jernigan.

14       Last in the debt stack, but certainly not least, Your

15   Honor, we have the general unsecureds.  And Mr. Waterhouse, in

16   his deposition that was held in Dallas, estimated that perhaps

17   the general unsecureds could be upwards of two billion dollars,

18   all told.

19       Now, just looking at the twenty largest, we're still

20   in the hundreds of millions, and we don't have the benefit of

21   schedules yet.  But this is -- this is the big dog.  This is

22   the big layer of debt.  This is who is really the fulcrum here.

23       And keep in mind, Your Honor, this is a free-fall

24   bankruptcy.  No one knows where this is going to go.  At the

25   first-day hearings, debtor's Counsel referenced that there

HIGHLAND CAPITAL MANAGEMENT, L.P.                    70

1   could be sales of assets and divestiture of certain things,

2   operational restructuring.  There's really no idea where this

3   case is headed.  And I think that's significant, Your Honor,

4   because this is an operational restructure or perhaps a

5   liquidation.

6          I hope not.  I hope that this is an operational

7   restructure and that all creditors can be paid either in full

8   or close to in full, but that's significant.  And the reason

9   why it's significant here is because, Your Honor, you've got

10  the fiduciary for that fulcrum debt voting with their feet with

11  what could happen -- what should happen on a plan.

12         And they're saying we think this case should be

13  administered in Texas.  And I think, again, going back to what

14  makes this case so unique, I think that's what makes it so

15  unique is that there are -- just from a dollar perspective and

16  volume perspective, the significant creditors and the committee

17  with respect to who's a fiduciary telling you, Judge, we think

18  this case should be administered in Texas.  And those votes are

19  going to be important with respect to any exit that happens

20  here.

21         Your Honor, I'll hit sort of on another factor, the

22  sort of forum's interest or a local interest in the

23  controversy.  And I concede, clearly -- and I think Your Honor

24  has referenced in the past -- Delaware, when it -- when an

25  entity is organized under Delaware law, that the forum state

HIGHLAND CAPITAL MANAGEMENT, L.P. 71

1  has an interest in protecting its entities. However, I will

2  say, I think what's different here is --

3           THE COURT: Say that again?

4           MS. PATEL: I'm sorry, Your Honor. I probably

5  misstated that. That the state of incorporation has an

6  interest in entities that are --

7           THE COURT: Yeah, but --

8           MS. PATEL: -- formed under its state's law.

9           THE COURT: -- you're in the wrong court for that.

10 That's state court. This is --

11          MS. PATEL: I'm sorry?

12          THE COURT: -- the --

13          MS. PATEL: Oh, yeah.

14          THE COURT: You're in the wrong court for that. I

15 don't care about that. This is --

16          MS. PATEL: All right.

17          THE COURT: -- this is federal court.

18          MS. PATEL: Fair enough. I'll take that one, then.

19          THE COURT: This is federal court. That's for the

20 chancery and the governor.

21          MS. PATEL: Well, Your Honor, and going back just to

22 the issue of the unique factors here, usually, Your Honor, in a

23 motion to transfer venue, you have what I'll call relatively

24 similarly situated courts, certainly if you've got a transfer-

25 of-venue motion that was filed as early as the one that was

1    filed in this case, within the first few weeks of the case, and

2    within, I believe, two days of the committee's formation.

3            That's just not the scenario here, Your Honor. You

4    have a bankruptcy court in Texas who is familiar with various

5    aspects of the debtor's business. Is it familiar with every

6    aspect of the debtor's business? No. But that certainly can't

7    be said as to the Delaware Court either, that you are familiar

8    with every aspect of the debtor's business.

9            Your Honor, in Texas there's not only a bankruptcy

10   court, there's a district court who is familiar with all of

11   the -- with aspects of the debtor's business, and that is the

12   Honorable Judge Fitzwater.

13           And what I will say -- Your Honor was asking questions

14   with respect to the judge -- the bankruptcy judge that it would

15   be assigned to. I'm happy to address those from my

16   perspective. But what I will note is that every appeal that

17   stemmed out of the Acis bankruptcy case -- and there were in

18   excess of ten -- every single one was transferred ultimately to

19   Judge Fitzwater for adjudication.

20           So even if -- even if we look just one layer up from

21   the bankruptcy court to the district court, Judge Fitzwater is

22   intimately familiar. And now we've got three -- in connection

23   with the Acis cases -- three appeals that are pending before

24   the Fifth Circuit, two of which involve Highland or a Highland-

25   related entity.

HIGHLAND CAPITAL MANAGEMENT, L.P.                    73

1          Your Honor, I want to quickly touch on the --

2          THE COURT:  Is it the practice in the -- it's the

3   practice in our district court that once a district judge is

4   assigned an appeal in connection with a bankruptcy, any further

5   appeals in that bankruptcy go to that district judge.  Is that

6   the practice in Texas?

7          MS. PATEL:  It's the practice, Your Honor.  I don't

8   believe that there's a specific local rule that says that that

9   will happen, but that's functionally what happens.  And

10  sometimes you have to make a motion to transfer between two

11  courts, but invariably, it usually goes to sort of either the

12  first-filed court or kind of the first court to really get into

13  a substantive issue.

14         THE COURT:  Okay.

15         MS. PATEL:  Your Honor, I'll touch on a couple more

16  quick points.  It is offensive to me when I read through the

17  debtor's pleadings and that there is an implication that the

18  Dallas court is somehow biased.  I think of Judge Jernigan and

19  I think of this Court and I think of virtually every bankruptcy

20  court that I've ever had the privilege of appearing before as

21  being fair and impartial.  And this concept of bias, that's

22  only grounded in the fact that the debtors have -- or I'm

23  sorry -- the debtor has lost a few.

24         And I will say, just to kind of forestall that easy

25  conclusion based on the opinions, I would note, in Acis'

HIGHLAND CAPITAL MANAGEMENT, L.P.                     74

1    exhibits, if you look at Exhibit Number 12, that is -- it's an

2    email that the court sent in connection with Acis' first

3    confirmation hearing.  And that was a confirmation hearing that

4    occurred in August of 2018.  And the court ultimately denied

5    confirmation of the first sort of plan.  And there were kind of

6    three sub-plans.  But the court denied it.

7            And so again, I'm offended that there would be even an

8    implication that the court is somehow biased, because this

9    isn't a scenario where there have been only adverse rulings to

10   Highland in connection with the Acis bankruptcy case.  Judge

11   Jernigan has called the balls and strikes as she sees them,

12   Your Honor.

13           Your Honor, I'll conclude with the following, which is

14   that I would venture to guess that if this Court were in sort

15   of -- if we reversed the scenario and this Court had expended

16   hundreds of hours, hundreds of pages of opinions, untold hours

17   of its courtroom staff's time, going through and poring through

18   an exceptionally voluminous record, over 100,000 pages, and

19   having expended over forty days of courtroom time, with that

20   significant of an interest in the case and that expenditure of

21   time, I would venture to guess that this Court would want this

22   case transferred back to Delaware, if it had been filed

23   anywhere else.

24           And so I would submit to Your Honor that this Court

25   should -- this case should be transferred to Dallas for all of

APP. 0074
Appx. 00121

HIGHLAND CAPITAL MANAGEMENT, L.P.                    75

1  the reasons proffered by the committee and as joined by Acis.

2  Thank you, Your Honor.

3              THE COURT:  You're welcome.

4              Anyone else in favor of the motion?

5              All right.  This time it will be short.  We're going

6  to take a very short recess, and then I'll hear from the

7  debtor.

8       (Recess at 11:50 a.m. until 12:00 p.m.)

9              THE CLERK:  All rise.

10             THE COURT:  Please be seated.  I apologize.  I know

11 it's getting warmer and warmer in here.  And we're trying to

12 contact -- we're trying to find someone in Maintenance who's

13 working today.

14             MR. POMERANTZ:  It's usually motivation to get the

15 hearings done quickly, in my experience.

16             THE COURT:  Yeah, it's -- if I take off my robe, don't

17 be offended.  I do have clothes on underneath.

18             MR. BOWDEN:  Thank you.

19             THE COURT:  I heard you, Mr. Bowden.

20             All right, go ahead.

21             MR. POMERANTZ:  Good afternoon, again, Your Honor.

22 Jeff Pomerantz, Pachulski Stang Ziehl & Jones, on behalf of the

23 debtors-in-possession (sic).  Before I go on to my prepared

24 remarks, I just want to address a couple of the points that

25 were raised by Mr. Clemente and Acis' Counsel.

HIGHLAND CAPITAL MANAGEMENT, L.P.                    76

1          First, we are not aware of any formal statement that

2     Judge Hale, in the Northern District of Texas, is not taking

3     cases.  So I think Your Honor's point was a good one.  There's

4     no definite -- there's no requirement, and it may or may not be

5     that this case gets transferred, if Your Honor were to transfer

6     it.

7          Second, Your Honor, Highland has -- there have been

8     appeals made not only from confirmation of the plan but also

9     from the involuntary itself.  If the involuntary appeal

10    succeeded, there wouldn't even be a bankruptcy case to be

11    related to.  And in any event, the case law says that events

12    that may or may not happen in the future are not really

13    relevant to the venue analysis.

14         Lastly, Your Honor, Mr. Clemente started by saying he

15    thinks the facts are largely in dispute, and you heard Counsel

16    then go through in detail, as did Acis' Counsel, about how

17    there's no dispute that Judge Jernigan has a learning curve.

18         Of course they need to say that because that is the

19    focus and the crux of their venue-transfer argument.  As I will

20    demonstrate in my comments and as the evidence is before the

21    Court, other than the opinions that were written and other than

22    the amount of time the court has spent, there is no real nexus

23    between what happened in that case and what happened in this

24    case.

25         We have no doubt that Judge Jernigan learned all about

APP. 0076
Appx. 00123

HIGHLAND CAPITAL MANAGEMENT, L.P.                    77

1  Acis, learned all about Acis' relationship to Highland.  But

2  the real issue before Your Honor is what does that have to do

3  with this debtor, this debtor's assets and liabilities, and

4  this debtor's operations.  And as my comments will show, we

5  think that's a significantly overblown argument.

6       Your Honor, during their presentation, Counsel really

7  strayed a little bit from what the motion and the joinders sort

8  of said.  There they went through a painstaking analysis of the

9  various factors supporting venue.  I know Your Honor said that

10 over three factors, you don't find that helpful, but the courts

11 have relied on a series of factors.

12      And I think the reason why they have strayed away from

13 that and focused on the committee being the one to support the

14 transfer-of-venue motion and the facts of the Acis case is

15 because when you pare it down, the actual factors demonstrate

16 that there is no way the committee can carry its burden to

17 demonstrate that venue should be transferred.

18      However -- Your Honor pointed to this at the

19 beginning, in mentioning comments about forum-shopping -- the

20 committee and Acis are really being disingenuous, and they have

21 not told you the real reason that they want the case before

22 Judge Jernigan.

23      At the first-day hearing, Your Honor, Acis said they

24 intended to file a motion for an appointed trustee.  The

25 committee has told the debtor it intends to file a motion to

HIGHLAND CAPITAL MANAGEMENT, L.P.                    78

1  appoint a trustee after this hearing.  The motion has not yet
2  been filed, Your Honor, because they want Judge Jernigan to
3  rule on that motion.  And it's not because she's familiar with
4  this debtor's business, this debtor's assets, or this debtor's
5  liabilities, because she generally is not.  It is because she
6  formed negative views regarding certain members of the debtor's
7  management that the committee and Acis hope will carry over to
8  this case.

9          The convenience of the parties and the interests of
10  justice and how this case is so unique are just a pretext.
11  They want a trustee to run the debtor, and they want Judge
12  Jernigan and not Your Honor to rule on that motion.  That, Your
13  Honor, is not a proper reason to transfer venue, but rather a
14  transparent litigation ploy.

15          Similarly, Acis also wants the case to proceed in its
16  home court where it has enjoyed success in litigating against
17  the debtor.  Your Honor mentioned the conflicts-of-interest
18  theories.  They're not just conflicts of interest between two
19  jointly administered debtors.  These go to the crux of what the
20  Acis case is about and significant claims against the debtor.

21          The Court may ask, appropriately -- and the Court
22  did -- why would the debtor file the case in Delaware?  Chapter
23  11 is all about a fresh start.  The debtor recognized concerns
24  that the creditors had with certain aspects of its pre-petition
25  conduct, and proactively appointed Brad Sharp as chief

1  restructuring officer with expanded powers, to oversee the

2  debtor's operations.

3         Mr. Sharp worked with the debtor and Counsel to craft

4  a protocol for transactions that would be subject to increased

5  transparency.  The debtor didn't have to do that.  As Your

6  Honor mentioned at the first-day hearing, the debtor operates

7  its business in the ordinary course.  But given the

8  circumstances surrounding this case, given the history, we

9  felt, and the CRO, importantly, felt it was important to get on

10  the table what the debtor, through the CRO, believed was

11  ordinary and what was not, so we could have a transparent

12  discussion, discussion that, while we've made headway with the

13  committee, we have not yet been able to come to an agreement.

14         The debtor filed the case in this district because it

15  wanted a judge to preside over this case that would look at

16  what's going on with this debtor, with this debtor's

17  management, this debtor's post-petition conduct, without the

18  baggage of what happened in a previous case, which contrary to

19  what Acis and the committee says, has very little to do with

20  this debtor.

21         These form insufficient grounds, Your Honor, to

22  overturn the debtor's choice of venue, and the motion should be

23  denied.

24         I would like to now walk through the statutory

25  analysis, something that Counsel avoided, because again, I

HIGHLAND CAPITAL MANAGEMENT, L.P.                    80

 1   think it highlights the weakness of their argument.

 2        It is clear that the Delaware venue is proper, and

 3   1408 says the places where a Chapter 11 debtor can file the

 4   case.  As the vast majority of debtors who file cases in this

 5   district, the debtor filed here because it was domiciled in

 6   Delaware.  It is a Delaware LP.  But it goes further than that.

 7   99.94 percent of its LP interests are owned by Delaware

 8   entities.  And the general partner, Strand Advisors, is a

 9   Delaware general partner.

10        While many cases, Your Honor, before this court, rely

11   on the domicile of one affiliate to bring other non-Delaware

12   related affiliates before the court, that's not the case here.

13   All you have, virtually, are Delaware entities, through the

14   ownership structure.

15        As I will also discuss in a few moments, Your Honor,

16   domicile is not the only connection that this debtor has to

17   this district, as significant litigation matters involving the

18   debtor, including those commenced by committee members, that

19   was the catalyst to the filing, are pending in Delaware.

20   Accordingly, the committee acknowledges, as they must, that

21   Delaware is, of course, a proper venue.

22        However, they rely on 1412 which sets forth the

23   standard -- test that the movant has to meet in order to

24   transfer venue, either for the convenience of the parties or

25   the interest of the justice.

HIGHLAND CAPITAL MANAGEMENT, L.P.                                81

1          And courts, including the written opinions in this
2     district by your colleagues, most often cite to the six factors
3     in the CORCO decision in the Fifth Circuit in 1979.  And as
4     Judge Gross, in his 2016 opinion in Restaurants Acquisition
5     makes clear, the movant bears the burden of demonstrating that
6     the factors strongly weigh in favor of a transfer.
7          Similarly, Judge Gross stated in that case -- and I
8     know Your Honor may not fully subscribe -- that courts
9     generally grant substantial deference to the debtor's choice of
10    forum.
11         And in the case here, where not only do you have the
12    debtor is a Delaware entity, but virtually all of its holdings
13    are well -- are Delaware entities as well, it is even more
14    appropriate to defer to the debtor's choice of forum.  As Judge
15    Walsh said in his 1998 opinion at PWS Holding, it is a
16    fundamental legal tenet that every citizen of a state is
17    entitled to take advantage of the state and federal judicial
18    process in that state.
19         So the question before Your Honor is whether the facts
20    in this case strongly weigh in favor of a venue transfer such
21    that the Court will disregard the debtor's reasoned business
22    judgment to commence the case in this district?
23         We submit, Your Honor, that the committee and Acis
24    have not come close to meeting that standard, and the CORCO
25    factors do not support a transfer.

HIGHLAND CAPITAL MANAGEMENT, L.P.                    82

1       The first one is the proximity of creditors.  And the

2   committee is focused on the fact that the committee -- the

3   representative fiduciary of the estate -- has determined that

4   venue is appropriate.  But the factor not only looks at the

5   number of creditors, it looks at the dollar amount of the

6   creditors.  And if you analyze -- an analysis of either

7   demonstrates that convenience of the parties does not support a

8   transfer of venue in this case.

9       The debtor has two secured creditors.  Jefferies is

10  headquartered in New York City.  Frontier Bank is headquartered

11  in Oklahoma.  There was reference by Acis' Counsel to HCLOF.

12  Their secured claim is unrelated to the note that was at issue

13  in Acis, and there's nothing in the record to say that that

14  secured instrument has anything to do with the Acis case.

15  Neither of those creditors has weighed in on the motion to

16  transfer venue.

17      So let's look at the unsecured creditors.  Of the

18  twenty that were listed in the debtor's petition, seven have

19  Texas addresses.  Five of those are debtor's either current or

20  former law firms.  Two of them are in the courtroom today.  And

21  as Your Honor I'm sure appreciates, debtor professionals --

22  former debtor professionals are not usually active in

23  bankruptcy cases.  Indeed, none of them filed a notice of

24  appearance in this case.

25      The other two that have Texas addresses are the claims

HIGHLAND CAPITAL MANAGEMENT, L.P. 83

1 related to Acis: the Acis claim and the Josh Terry claim.

2 There are no other unsophisticated creditors that the Court

3 needs to worry about that would not be able to travel to

4 Delaware, as needed.

5      The two largest unsecured creditors in the top twenty

6 are the Redeemer Committee and Patrick Daugherty, each of whom

7 had pre-petition litigation pending against the debtor that

8 they each commenced in the Delaware Chancery Court. And the

9 arbitration proceeding that preceded the Redeemer chancery

10 court litigation was pending in New York City.

11      UBS, a member of the committee, listed as number

12 nineteen with a disputed and unliquidated claim, will likely

13 claim it is the largest creditor of the estate. It is based in

14 New York. It has litigation pending against the debtor in New

15 York, and used Latham & Watkins' DC office for that litigation.

16      And lastly, the fifth largest creditor, Your Honor,

17 Meta-e Discovery, is also on the committee. Where is their

18 address? Stamford, Connecticut.

19      As Judge Gross reasoned in Restaurants Acquisition, in

20 order to overcome the strong presumption in favor of the venue

21 transfer, a transfer must substantially improve the

22 administrative feasibility with respect to the creditor body as

23 a whole. So the committee sits out there and Acis sits out

24 there saying that it's convenient for the creditors, it's much

25 more convenient in Dallas. Their actions belie their

HIGHLAND CAPITAL MANAGEMENT, L.P.                    84

1    statements. All this litigation was focused on either Delaware

2    or the Northeast. It is just simply disingenuous for them to

3    argue otherwise.

4           The next factor, Your Honor, is the proximity of the

5    debtor. And in applying this factor, the courts focus

6    primarily on the parties who appear in court. The debtor

7    retained Brad Sharp, and he has demonstrated its intention --

8    and the debtor has demonstrated its intention of having Mr.

9    Sharp be the face of the reorganization efforts before the

10   Court.

11          Indeed, in cases where a CRO is reported, Your Honor,

12   the CRO is more apt to testify in court than any other debtor

13   representative. And I believe Mr. Sharp's testimony, which was

14   uncontroverted, was that he expects that he and Mr. Caruso will

15   provide the bulk of the testimony required from debtor

16   representatives during this bankruptcy case; and that's because

17   the debtor has given Mr. Sharp broad authority to evaluate the

18   propriety of post-petition transactions and to pursue and

19   analyze insider claims.

20          And at today's hearing the debtor will offer the

21   testimony of Mr. Sharp and his colleague, Mr. Caruso, to

22   support the relief requested. They have developed a

23   substantial amount of knowledge regarding the debtor's assets,

24   liabilities, and operations, in the six weeks they've been on

25   the job; and that knowledge will continue to grow.

HIGHLAND CAPITAL MANAGEMENT, L.P. 85

1      And Mr. Sharp has significant experience, as he

2  testified to, being a CRO in cases in this district; and he

3  could travel just as easily to Delaware as he can to Texas.

4      While the debtor acknowledges that other debtor

5  employees like Frank Waterhouse may be called to testify, as he

6  was today, the involvement of the debtor's personnel in this

7  court is likely to be immaterial.  And he was the only Texas

8  person called to testify in this case.  And if the committee

9  and Acis felt it was so important that representatives of the

10 debtor be -- it would be easier for them to travel to court,

11 they didn't call any witnesses in today, which is the most

12 important hearing in the case.

13      Also, Your Honor, our offices, as you know, are in

14 Delaware.  And while it's true that we practice all around the

15 country, we would need separate counsel if we were to -- if the

16 case was to be -- to move.

17      And similarly, the committee retained Young Conaway,

18 which took a significantly active role in the litigation

19 leading up to today.  That information and knowledge and

20 expertise would be lost if the case was transferred.

21      Next, Your Honor, related, is the proximity of

22 witnesses.  And a I said, the committee can't demonstrate that

23 witnesses in this case would find Texas a substantially more

24 convenient forum than this court.  And you would have expected

25 them to have subpoenaed Texas witnesses if that were so

HIGHLAND CAPITAL MANAGEMENT, L.P.                    86

1    important.

2           Location of assets, Your Honor, is one of the CORCO

3    factors.  And the committee makes a big point that all the

4    decision-making is in Texas and all the people are in Texas and

5    the office is in Texas.  The courts that look at location of

6    assets as being critical typically involve cases that are

7    single-asset real-estate cases, or cases that are small local

8    businesses that have significant regional connections.

9           But if you look at the debtor's assets here, it's not

10   the case.  Their assets generally include financial instruments

11   and investments in a wide variety of public stock; advisory

12   contracts; shared services; and interests in nonpublic hedge

13   funds and private equity funds.

14          The assets are located throughout the United States

15   and in Latin America, Korea, and Singapore.  And the majority

16   of the debtor's liquid assets are in New York.  We were not --

17   we don't dispute the point that there aren't significant people

18   in Dallas and that the offices are in Dallas and all the

19   employees.  We don't dispute that.  But the assets are far-

20   flung around the country, and the cases, again, that focus on

21   the assets, focus on local expertise that the court will bring

22   to bear, particularly in real-estate cases with respect to

23   valuation.  You have nothing of that here.

24          The debtor intends to use its Chapter 11 to provide

25   breathing room and to evaluate, hopefully in a constructive way

HIGHLAND CAPITAL MANAGEMENT, L.P.                    87

1  with the committee, how best to maximize value for the debtor's

2  assets through a consensual restructuring; and there's no

3  reason to believe why Texas rather than this court, would be a

4  more appropriate forum for this restructuring.

5          The last factor, Your Honor, is the economic

6  administration of the estate, which the courts generally point

7  to as the most important factor.  And the committee points to

8  five reasons, which is essentially retreads of its previous

9  arguments.

10         Again, they argue a higher concentration of creditors

11 in Texas and Midwest.  That's not the case, as I mentioned.

12 They argue that there's a higher concentration of professionals

13 in Texas and Midwest.  And if you look at all the

14 professionals, they're all from national firms; they're all

15 metropolitan areas that practice routinely before this Court.

16 And the concept that the flights being different and the

17 mileage being different is in any way -- is in any way

18 important, is just not -- is just not the case.

19         People practice in a global, national world, these

20 days.  And if that argument succeeded, most of the -- your

21 brethren and yourself would not have much to do, because that

22 argument could support transfers in most cases.

23         THE COURT:  Well, I think really goes to why -- I

24 mean, I know this is the standards that are generally applied,

25 but it's a case from 1979.  It's really behind the times.  I

APP. 0087
Appx. 00134

HIGHLAND CAPITAL MANAGEMENT, L.P.                    88

1    don't think the factors reflect corporate practice of

2    bankruptcy reality of 2019.

3              MR. POMERANTZ:  And that's exactly what Judge Gross

4    said in the Caesar's opinion --

5              THE COURT:  Right.

6              MR. POMERANTZ:  -- which is cited in the material,

7    that this argument, given technology, given frequency of air --

8    ease of air travel, it's just not a relevant factor anymore.

9              And the two pages that the movants spent in the brief

10   talking to you about how many direct flights there are from LA

11   to Delaware as opposed to LA to Dallas, that, Your Honor, I

12   think is just silly.

13             The committee also argues that most creditors would

14   need to retain local counsel if they were here.  Well, if you

15   look, the case has been pending a month-and-a-half, and other

16   than notices of appearance filed by committee members, there

17   have only been two notices of appearance that have been filed

18   that are unrelated to debtor entities.  And one of those is

19   Daugherty, who commenced litigation in chancery court.  So the

20   argument that is made typically in cases where they're filed in

21   jurisdictions far off from where the debtor's operating is, is

22   that it'll be burdensome on the mom-and-pop creditor, Your

23   Honor, we don't have mom-and-pop creditors here.  And there's

24   nobody out there with material claims against the estate that

25   will not have the ability and have trouble and demonstrated the

HIGHLAND CAPITAL MANAGEMENT, L.P.                    89

1   willingness to hire Delaware Counsel.

2          The last argument --

3          THE COURT: Even when you do have mom and -- again, to

4   comment on reality, even when you do have mom-and-pop creditors

5   in businesses that are very locally focused, general practice

6   today is to make their claims irrelevant, in that to the extent

7   they have avoidance claims, they're paid on the first day.

8   Their real concern is whether the business will continue or

9   not.

10         Now, it's certainly true that pension claims are

11  important, and proofs of claim are important. But we have

12  many -- all courts have many procedures in place to ensure that

13  those types of creditors can participate without having to go

14  to the courthouse.

15         MR. POMERANTZ: Yes. So, Your Honor, Judge Gross also

16  mentioned that in the Restaurants Acquisition case, which was a

17  Texas-based --

18         THE COURT: He's a smart guy.

19         MR. POMERANTZ: We'll be sorry to see him go, Your

20  Honor.

21         THE COURT: Yeah, absolutely.

22         MR. POMERANTZ: Which was a Texas-based restaurant

23  chain that had more of a local flair. But he made the comments

24  Your Honor made.

25         The last argument the committee makes is that Texas is

HIGHLAND CAPITAL MANAGEMENT, L.P.     90

1   more convenient.  And this is really the crux, which I'll spend

2   some time over the next few minutes.

3        Texas is more convenient -- convenient -- because the

4   Texas bankruptcy court, where Acis is pending has, in their

5   words, already expended great time and effort familiarizing

6   itself with the debtor and its operations.  You've heard

7   statements like "learning curve".  You heard statements about

8   everything that the debtor -- that Judge Jernigan has found out

9   about this debtor, and how important and how helpful it is, and

10   how Your Honor will be behind the learning curve.  We just

11   don't buy that, Your Honor.

12        And aside from that argument, the arguments that the

13   committee makes for transfer are arguments that could be made

14   in any case before Your Honor.

15        THE COURT:  Yeah, I was going to say that's kind of an

16   interesting argument, because actually it assumes Judge

17   Jernigan's going to ignore the rules of evidence in making

18   factual findings, because you're limited to the record before

19   you on a specific motion.  And what fact you may have learned

20   with regard to something a person has done, maybe that goes

21   into questions of credibility on cross-examination or direct

22   testimony, but to actually base your decision on a fact that's

23   not in the record for the specific proceeding would be

24   improper.

25        MR. POMERANTZ:  Look, I agree, Your Honor.  And the

HIGHLAND CAPITAL MANAGEMENT, L.P.                    91

1  familiarity with the type of business -- if I wasn't speaking

2  to Your Honor or your brethren or many other judges around the

3  country, I'd say well, maybe there are certain judges who

4  haven't dealt with large financial services company, may not

5  know what a CLO, may not know what a hedge fund is or private

6  equity fund is.  I'm very confident that Your Honor has had

7  many cases with sophisticated financial instruments, likely CLO

8  obligations, so that Your Honor not only has a good base of

9  knowledge that would give you the same base of knowledge that

10  Judge Jernigan has, but as we've also found, you are a fairly

11  quick study and that I have no doubt that you could come up-to-

12  speed without very little effort.

13         So their argument is a grossly overstated

14  interpretation of what the Acis case was about and that what

15  was learned in that case has any relevance.  As a part -- as a

16  result of the Acis plan confirmation, Acis is no longer part of

17  the debtor's organizational structure.  The debtor owns no

18  equity in Acis.  And the debtor no longer provides any advisory

19  services to Acis.

20         We admit that Judge Jernigan conducted many hearings,

21  and she issued several lengthy opinions, and she heard from a

22  variety of witnesses.  And I'm sure Your Honor -- if Your Honor

23  has not -- Your Honor might read the opinions that she wrote

24  that are attached to the exhibits, the plan confirmation

25  opinion, the arbitration opinion, the involuntary opinion; and

HIGHLAND CAPITAL MANAGEMENT, L.P. 92

1 you will conclude, I believe, as I have concluded, that ninety-

2 five percent of that stuff has nothing to do with this debtor.

3 It focused on the CLO obligations -- CLO business, the

4 relationship, the transfers of certain assets away from Acis

5 that basically Acis is claiming were fraudulent conveyances,

6 and that was the real focus; not on any of the debtor's

7 business operations.

8 Acis was the advisory arm through which the debtor

9 structured its collateral loan portfolio. The fees -- the

10 uncontroverted evidence is the fees generated from the CLO

11 business represent approximately ten percent of the debtor's

12 revenue and that that will reduce over time, because since the

13 market crash in 2009 the debtor has not created any new CLO

14 funds. So there's no active management and advisory services

15 going on for the CLOs. They're just being liquidated in the

16 normal course. Their importance will continue to decrease.

17 And even right now, it's only ten percent.

18 The debtor generates its revenues from trading public

19 securities; its equity positions in a variety of nonpublic,

20 private-equity, and hedge funds; and advisory and back-office

21 service provided to third parties. It is the monetization of

22 those assets that will provide the basis for the restructuring

23 of this debtor. And Judge Jernigan's prior experience with the

24 small sliver of what the debtor's business currently is, will

25 be only marginally relevant, at all.

HIGHLAND CAPITAL MANAGEMENT, L.P.                93

1          Acis didn't have any other balance-sheet assets.  They
2    were basically an advisor of CLOs.

3          For example, Judge Jernigan has no experience or
4    knowledge surrounding the debtor's multi-strat. fund; its
5    Korean, Latin American, or Singapore private-equity
6    investments; its investments in the PetroCap funds; or the
7    other myriad of assets that are on the debtor's balance sheet
8    which Your Honor will likely will hear about in connection with
9    the hearings that will go on later.

10          The committee and Acis make a big point of arguing
11   that Judge Jernigan is familiar with the shared-service and
12   management agreements between Acis and the debtor.  However,
13   there was a lot of testimony from the podium on that.  The only
14   testimony before Your Honor is that the contracts are
15   different.  Mr. Waterhouse wasn't even familiar with the
16   contracts, couldn't provide any testimony.  But Mr. Sharp
17   testified that the type of shared-service and advisory
18   agreements for CLOs are markedly different than the type of
19   services and advisory agreements for non-CLO entities.  While
20   Acis' Counsel stood up there and said there's a template and
21   they're pretty much the same, that was purely argument.  There
22   was no evidence in the record to reflect that.

23          And in fact, the only two agreements that involved
24   Highland in the Acis case were these two agreements.  But
25   again, they're like apples and oranges.

HIGHLAND CAPITAL MANAGEMENT, L.P. 94

1       In any event, Your Honor, one of the matters that Mr.

2   Sharp is focusing on will be the appropriate economic

3   arrangement between the debtor and its affiliates and

4   nonaffiliates, through its shared-services and advisory

5   agreements.  That has been a focus of DSI's analysis.  The

6   committee has indicated that's something that they want to

7   focus on.  And Mr. Sharp will come up with a recommendation as

8   to what those should be, and it'll be that recommendation

9   that'll be based on the market rate for these contracts in

10   these particular businesses that will be relevant for Your

11   Honor to consider, at some point.

12       They attached a post-confirmation opinion that Judge

13   Jernigan issued with respect to denial of a motion to seek

14   arbitration regarding provisions of those agreements.  But if

15   you read that opinion carefully, you will see that the primary

16   issues in that case were whether an arbitration provision

17   actually survived, given that the last version of the agreement

18   did not have them -- there were five different iterations in

19   each of the agreements.  And after concluding that the

20   arbitration provision did survive, she ultimately ruled that

21   that notwithstanding, she would not enforce arbitration because

22   the claims were too related to the other claims that were being

23   asserted.  Again, nothing to do with the debtor's business.

24       In fact, Your Honor, after today, I have no doubt that

25   Your Honor will be a lot more familiar -- if Your Honor is not

HIGHLAND CAPITAL MANAGEMENT, L.P.                          95

1  already -- with what the debtor does.  So Your Honor will hear

2  testimony from Mr. Caruso; Your Honor will hear testimony from

3  Mr. Sharp, about various aspects of the debtor's business, what

4  it's doing, its management structure, how that structure is

5  working.  All that you will hear, which will put you in an

6  advanced state, compared to Judge Jernigan, as opposed to being

7  behind.

8          And there are other aspects of this case that are on

9  the way that have nothing to do with Acis.  For example, we

10 just filed a motion to approve ordinary-course bonuses to

11 employees.  And we may also seek approval of a KERP and a KEIP.

12 Acis had their own employees, and Judge Jernigan had no special

13 knowledge of the debtor that would put her in a better position

14 to give her an advantage over this Court in determining an

15 appropriate compensation structure.

16         It isn't that difficult.  Your Honor hears it all the

17 time:  KEIPs, KERPs.  Judge Jernigan hears it all the time.  My

18 point is, Your Honor, there's nothing that would help her, from

19 her knowledge of Acis, that would justify a transfer of venue.

20         They also stress that -- in their papers, that Judge

21 Jernigan heard a lot of testimony from debtor's management.

22 But they really don't discuss what the content of that

23 testimony is or how it's, in any event, relevant to this case.

24 They just really want to rely on the sheer volume of

25 information that they have foisted on Your Honor, citing to the

HIGHLAND CAPITAL MANAGEMENT, L.P.                    96

1   entire record, by saying there's so much; there's been hundreds

2   of pages, dozens of hearings, and then that means Judge

3   Jernigan is in a much better position.

4        If they wanted to point to specific things in the

5   record where the judge had specific knowledge, they could have.

6   They shouldn't (sic) have.  And they're trying to do this on a

7   big holistic view, but when Your Honor looks at the record, I

8   think Your Honor will conclude otherwise.

9        In any event, it's not really -- they don't explain

10  why familiarity with the debtor's management is at all

11  relevant.  Look, they clearly want a trustee in this case and

12  believe that because Judge Jernigan found debtor's management

13  to not be credible, she'll be more apt to appoint a trustee

14  than this Court.  But that argument doesn't withstand scrutiny.

15       This case is different.  This case is being managed by

16  a CRO.  This case had the debtor file a motion it didn't have

17  to file for ordinary-course protocols.  This case has -- thus

18  far, you haven't heard anything about any discovery disputes,

19  you haven't heard anything -- although you heard a couple weeks

20  ago there might be issues with cooperation, we provided a

21  substantial amount of documents, produced witnesses, in a

22  significantly accelerated time frame.  You have heard nothing

23  about that.

24       So any un-cooperation or difficulty of any -- that

25  they may have encountered in the Acis case, there's no evidence

APP. 0096
Appx. 00143

HIGHLAND CAPITAL MANAGEMENT, L.P. 97

1 that that's occurring here, for good reason; because Mr. Sharp

2 is in charge. And although he is still reporting to Mr.

3 Dondero, as his corporate structure, Mr. Dondero can terminate

4 him, and if he terminates him, he has to give notice. That's

5 appropriate. That's one of the issues we address in connection

6 with the U.S. Trustee's concerns with the CRO motion. In order

7 to file a corporate governance, he has to report. But there

8 are certain things, as you'll hear later, that he has been

9 given primary responsibility for.

10 Your Honor, Chapter 11 is about giving a debtor a

11 fresh start, and this court is no -- this case is no exception.

12 This Court is fully capable of evaluating the veracity of the

13 debtor's witnesses; and transferring the case to Judge

14 Jernigan, when the real motivation is because of how she has

15 dealt with the prior case -- which they may not say it, but

16 that's clearly what's happening here -- would be unduly

17 prejudicial to the debtor.

18 We have nothing against Judge Jernigan. She is a fine

19 jurist. But in this case I think it's a challenge and there's

20 a reason why we decided to have the case filed here.

21 And then I'll also point to Your Honor the significant

22 adversity between the two estates. Your Honor mentioned that.

23 Counsel said, well, it happens in all cases. True. We've been

24 involved in many, many cases with multi debtors, that they have

25 issues in intercompany claims. That's a fact of modern

HIGHLAND CAPITAL MANAGEMENT, L.P. 98

1  corporate life.

2        But this is different.  The whole -- one of the -- the

3  most significant asset of Acis are their claims against this

4  debtor.  How those claims are prosecuted and when they succeed,

5  may make or break the Acis case as to whether unsecured

6  creditors get paid or not.

7        In a case like this, this factor does not support a

8  transfer of venue; we argue that it supports keeping the case

9  before Your Honor so that it can maintain the separateness of

10  the estates.

11        In conclusion, Your Honor, we don't believe the

12  committee has come close to satisfying its burden that a change

13  of venue is appropriate under 1412.  And as I mentioned at the

14  beginning of my presentation, the committee's motive in

15  bringing the motion and Acis' motive in joining the motion is

16  clear.  Even though the debtor has installed a CRO with

17  expanded powers, with impeccable credentials to address

18  creditor concerns, the committee and Acis are focused on the

19  appointment of a Chapter 11 trustee and believe the transfer of

20  the case to Texas is the most likely to get that goal

21  accomplished.

22        But rather than filing the case -- or filing a trustee

23  motion here, they took their shot on a venue motion and hope

24  that Your Honor will give them a shot to do it in Texas.

25        Your Honor, for those reasons, we respectfully request

HIGHLAND CAPITAL MANAGEMENT, L.P. 99

1  that Your Honor deny the motion.

2          THE COURT:  Thank you.

3          MR. POMERANTZ:  Does Your Honor have any more

4  questions?

5          THE COURT:  No.

6          MR. POMERANTZ:  Thank you, Your Honor.

7          THE COURT:  Reply?

8          MR. CLEMENTE:  Briefly, Your Honor.  I will be brief.

9  It will be a little less organized, because I'll just run

10  through some points very quickly.

11          THE COURT:  Okay.

12          MR. CLEMENTE:  First of all, on Restaurant

13  Acquisitions, I believe in that opinion, Your Honor, there were

14  creditors that supported venue in Delaware.  We do not have a

15  single creditor on the record supporting Delaware -- excuse

16  me -- supporting venue in Delaware.

17          Regarding the litigation in New York and Delaware,

18  that's a red herring, Your Honor.  They're forced creditors.

19  They were forced to bring lawsuits to achieve their view of

20  justice.  It's not relevant to whether -- the location of

21  that -- those lawsuits being in Delaware and New York.  They

22  were forced to bring those lawsuits in order to get paid by Mr.

23  Dondero and the debtor.

24          Your Honor, we didn't call witnesses this morning,

25  because we believe -- as I mentioned in my argument -- that the

HIGHLAND CAPITAL MANAGEMENT, L.P. 100

1  uncontroverted facts support our venue-transfer motion. The

2  other motions are their burden, Your Honor. And so I wanted to

3  remind Your Honor of that.

4  Regarding Young Conaway, obviously, we shouldn't -- it

5  shouldn't be held against us that we decided that the smart and

6  prudent thing to do is to have able Co-Counsel advise us as we

7  proceed in front of Your Honor. So I believe that that's

8  something that simply is of no moment.

9  The location of the assets, Your Honor, these are

10  financial instruments. They're interests in limited

11  partnerships. They're documents. They're things that are

12  created by documents. And again, it's not controverted.

13  That's all located in Dallas, Your Honor.

14  So this idea of far-flung assets throughout the

15  country just simply isn't true. These are documents. They're

16  interests. They're things that exist on paper.

17  Your Honor, we have not made this about the mom-and-

18  pop creditors. We take Your Honor's comments to heart on that.

19  As Counsel for Acis suggested, this is about the large body of

20  unsecured creditors that are sitting at the bottom of this cap

21  structure with oversecured creditors on top of it. And this

22  large body of unsecured creditors has said we believe that

23  venue is appropriate in Dallas.

24  Regarding the rules of evidence, of course Judge

25  Jernigan is not going to ignore the rules of evidence. But

HIGHLAND CAPITAL MANAGEMENT, L.P. 101

1 we're talking about judicial efficiency.

2 For example, when I need to look at an indenture, I

3 know in article 2 it's going to have payment terms. That's the

4 type of thing that we're talking about, Your Honor; not that

5 she's going to pre-judge or ignore the rules of evidence as she

6 makes her determinations.

7 Finally, Your Honor, two things that I would -- that I

8 would like to say. The testimony you may hear this afternoon,

9 obviously that should not factor into what you're up the

10 learning curve today, right now, in terms of considering the

11 venue motion. That would put the cart before the horse, I

12 think.

13 And, Your Honor, I'd be remiss if I didn't talk about

14 this ordinary-course motion that we keep hearing about. If

15 they didn't need it, they shouldn't have filed it. But

16 instead, what they're trying to do is create some type of

17 transparency and legitimacy around transactions that I think

18 we'll make clear, are not in the ordinary course.

19 And the final point that I would make there, Your

20 Honor; it's interesting Mr. Pomerantz referred to the multi-

21 strategy transaction. That one is -- Your Honor, I will

22 call -- a doozy. And you will hear more about it this

23 afternoon, to the extent Your Honor decides not (sic) to keep

24 venue.

25 With that, unless you have questions for me, I'll sit

HIGHLAND CAPITAL MANAGEMENT, L.P.                102

1   down.

2          THE COURT:  No questions.

3          MR. CLEMENTE:  Thank you.

4          THE COURT:  Thank you.

5          MS. PATEL:  Your Honor, I'll be brief, and I won't

6   repeat anything that Mr. Clemente, on behalf of the committee,

7   said.  But I did want to just address kind of the first point

8   Mr. Pomerantz made with respect to Judge Hale, and he's not

9   aware of any formal statement that Judge Hale is not taking

10  cases.  Your Honor, that's accurate.  I'm not aware of any

11  formal statement that Judge Hale is not taking cases either.

12         So to answer Your Honor's question, in terms of random

13  assignment, in the Northern District of Texas, where I have

14  practiced my entire career, and primarily practice before the

15  courts that are there -- and I'm a former law clerk to Judge

16  Hale also -- I will say that although there may be a random

17  assignment, it is not -- absolutely not unheard of that when

18  you've got the matter -- for example, if a case were assigned

19  to Judge Hale, but Judge Houser were to hear first-day matters

20  and other significant matters, that Judge Hale would then

21  transfer that case for judicial efficiency and economy within

22  the district, to Judge Houser for further proceedings.

23         In other words, the Northern District of Texas always

24  finds the easiest way in which to handle matters.  And I am

25  confident, Your Honor, that if this matter were transferred to

HIGHLAND CAPITAL MANAGEMENT, L.P.          103

1  the Northern District of Texas, that despite whoever it would

2  be assigned to, that everyone is well aware of the time that

3  Judge Jernigan has spent becoming familiar with Highland, these

4  issues, and the amount of court resources that have been

5  expended, such that this case would be transferred to Judge

6  Jernigan.

7          But perhaps that's just a question for Judge Jernigan

8  and her courtroom staff or the Northern District of Texas and

9  the courtroom -- I'm sorry -- the court clerk or the staff

10  that's there.

11          Your Honor, one last very quick point.  The comment

12  was made that -- with respect to CLOs that Highland hasn't had

13  a new CLO since 2009.  That, Your Honor, is because every new

14  CLO that was issued from 2009 going forward to 2017, every one

15  of those was issued in Acis.  Acis was the structured-credit

16  arm of Highland.  It is how it issued new CLOs.

17          Indeed, it issued seven CLOs under Acis, with over two

18  billion dollars in assets under management.  The fact that

19  there have been no new CLOs since then, simply means that they

20  haven't been able to get one off the ground.

21          But make no mistake, Your Honor, the CLO business is

22  valuable enough that it is now the subject of significant

23  litigation because of all of the attempts to transfer those CLO

24  assets away.  So in terms of the court's familiarity, I would

25  submit, again, that the bankruptcy court is clearly more

HIGHLAND CAPITAL MANAGEMENT, L.P.                    104

1  familiar with a significant piece of Highland's business.

2          One last thing, Your Honor, and somewhat similar to

3  that, that Judge Jernigan was not familiar with the Korean

4  entities, the Singapore entities, or the multi-strat.  I submit

5  to Your Honor that this Court hasn't been exposed to those

6  things as well, other than conclusory statements that well,

7  we've got some Korean assets; oh, we've got some Singapore

8  assets; and we've got multi-strat; and other than Mr.

9  Waterhouse's, like, five-minute testimony at the first-day

10 hearing where I was questioning him with respect to the assets

11 which he didn't really quite know about what's inside a

12 multi-strat.

13         Other than that, this Court hasn't been exposed either

14 to those assets, so when we're looking at the broad playing

15 field rather than looking at specific assets, there is a

16 learning curve.  Judge Jernigan is further along it with

17 respect to certain things.  Otherwise both courts are similarly

18 situated or neutral to each other.  But it's those assets that

19 she is familiar with, the business model of Highland, and that

20 further along the learning curve that she is, that's what's

21 significant here, Your Honor.

22         And that will play into, clearly, what will ultimately

23 be how Highland is going to restructure.  Again, the creditors

24 here have voted with their feet in filing this transfer motion.

25 And these are the very same creditors, Your Honor, that will be

HIGHLAND CAPITAL MANAGEMENT, L.P.                    105

1  necessary in order for this -- if it's going to be a successful

2  restructure, they're the ones that are necessary to make it a

3  successful restructure.  Thank you.

4          THE COURT:  You're welcome.

5          All right, let's break for lunch until 1:45.  And when

6  I come back at 1:45 -- when we come back at 1:45, I am going to

7  issue an oral decision on this motion.  All right.

8      (Recess at 12:39 p.m. until 1:47 p.m.)

9          THE CLERK:  All rise.

10          THE COURT:  Please be seated.

11          Okay, good afternoon.  Thank you for coming back.  I'm

12  now prepared to rule on the motion to transfer venue, which I'm

13  going to grant.

14          So I think, as I hinted at during argument, that the

15  case law that we're kind of clinging to on motions to transfer

16  venue, really do not reflect the modern reality of Chapter 11

17  practice in the U.S. and internationally.  And I think a lot of

18  the parts of the test really don't reflect what's going on

19  generally in Chapter 11 cases.

20          The thing I take greatest umbrage -- no, "umbrage"

21  isn't the right word -- but disagree with the most is the idea

22  that there's somehow a strong presumption of the debtor's

23  choice of forum.

24          Look, every debtor that files bankruptcy -- certainly

25  every sophisticated Chapter 11 debtor that files bankruptcy --

HIGHLAND CAPITAL MANAGEMENT, L.P.                    106

1  is engaged in forum-shopping.  There is an element to that.

2  Where you file will depend on a lot of things that are unique

3  to the forum.

4           I don't think you need to be ashamed of that.  I don't

5  think that's bad.  As long as the venue you're choosing is

6  appropriate under the law, certainly you're going to make

7  decisions based on what the law is in that particular district,

8  perhaps even a preference to individual judges or judge in that

9  district.

10          To compound that with a strong presumption in favor of

11 the debtor is to really give a boost to the debtor's choice of

12 forum, which is made -- included in the decision-making process

13 is an element of forum-shopping, to a level that makes it very

14 difficult to overcome that presumption.

15          Of course, the creditors that file a motion to

16 transfer venue are engaged in forum-shopping themselves.

17 Otherwise, why would they be switching forums and going for a

18 different location.  Again, I don't think that the word "forum-

19 shopping" should have the negative connotation that it has come

20 to have in the law.  It is the reality of bankruptcy practice.

21          Now, if that's involved -- if that goes a step further

22 and somehow involves chicanery or something inappropriate just

23 from an ethical standpoint, of course that's problematic.  But

24 there's absolutely no indication here whatsoever that anyone,

25 on behalf of the debtor or the creditors or the Dallas court or

HIGHLAND CAPITAL MANAGEMENT, L.P.                    107

1    the Delaware court, is doing anything other than acting

2    appropriately.

3         The question about a motion to transfer venue is

4    whether the motion should be granted by a preponderance of the

5    evidence. If you add a strong presumption, you're turning it

6    into a harder motion to be granted; and I don't think that's

7    appropriate.

8         However, I find the laundry list of factors that are

9    generally discussed to be irrelevant or almost irrelevant to

10    the actual issues that are going on, particularly in a case

11    like this. And I'll get to that in a second.

12         So six of the debtors are located in Texas; UBS is

13    located in New York. UBS is located everywhere. Wells Fargo

14    is located everywhere. Certainly companies have executive

15    suites. But whether or not that should be the decision about

16    where a case should file, to me, isn't particularly clear. It

17    depends on the facts of the case.

18         I think a more general approach that would involve

19    looking at the facts and circumstances of a case and seeing

20    whether it points to a specific jurisdiction might be a more

21    helpful way of proceeding. And that's what this case is really

22    about.

23         This is a unique case, I think. It is a different

24    case than those that we usually run into. And although maybe

25    not completely different from every case, but in any event,

HIGHLAND CAPITAL MANAGEMENT, L.P. 108

1　this case is very focused on responding to existing litigation.

2　And that existing litigation of a former affiliate, as of a few

3　months ago, and a pending appeal that could make it a current

4　affiliate, is located in the Northern District of Texas.

5　　　　　The judge in the Northern District of Texas has done a

6　tremendous amount of work and has done -- issued a number of

7　opinions, had a number of trials.  That work creates a

8　familiarity with the facts, issues, and players in a case

9　which, while it may not affect the actual decision based on

10　evidence on a motion-by-motion basis, certainly could color a

11　judge's approach to a case.

12　　　　　Judges are human.  Judges make judgments over time as

13　to the parties, as to the lawyers.  That's not inappropriate,

14　as long as you stick by the rules of evidence.  But it

15　certainly can color what credibility you might give to a

16　witness or to counsel.

17　　　　　I think here we have a situation where the real

18　gravitas of this case is in Dallas.  The two facts that really

19　come out to me are, in this case, the fact that the executive

20　suite is very focused and very Dallas-oriented.  It's a global

21　empire, but it's clearly focused in Dallas.  And the existing

22　litigation in the Acis bankruptcy that's been going on for some

23　time; those are the two predominant factors.

24　　　　　Everything else kind of falls away.  The creditors are

25　scattered.  The assets are scattered.  The economic

APP. 0108
Appx. 00155

**HIGHLAND CAPITAL MANAGEMENT, L.P.**                 109

1   administration isn't being affected one way or the other.  I

2   mean, people can get on planes and you can go to Philly or you

3   can go to Dallas.  Either way, you're stuck on American

4   Airlines.  But so be it.

5          It can be done.  And as a result, I think that the

6   best solution here, to give the debtors a fair shot at

7   reorganization, but to balance the creditors' rights and the

8   creditors' desires, is to move the case to Texas.

9          And on that latter point, just to finish up.  As I

10  said with my previous decision in EFH, it was striking in that

11  case that only one creditor moved to transfer venue and that

12  none of the other creditors either actively opposed or simply

13  stayed silent with regard to that motion, including significant

14  creditors, like the official committee.

15         In this case, we have the opposite.  We have the

16  debtor defending its venue choice, of course.  But there's a

17  lot of silence, because there's no one else on that side.  I

18  thought it highly significant that Jefferies and -- is it

19  Fortress?

20         UNIDENTIFIED SPEAKER:  Frontier.

21         THE COURT:  Frontier, thank you.  That Jefferies and

22  Frontier did not take a position.  And no other creditors

23  opposed the committee's motion.  And the committee consists of

24  a series of very large creditors.

25         So I think that given these facts and circumstances,

HIGHLAND CAPITAL MANAGEMENT, L.P. 110

1 particularly the unique nature of the ongoing litigation and

2 the existing tie to Dallas, the executive suite and management,

3 principal place of business, if you will, being focused in

4 Dallas, and creditors -- as Counsel said -- voting with their

5 feet to move the case to Dallas, and applying just a good old

6 fashioned preponderance of the evidence standard, that the

7 Court should grant the motion, which I will do.

8 Now, I need an order. And we will get the machinery

9 in place, as soon as I get the order signed, to transfer the

10 file as quickly as possible.

11 I did call Judge Jernigan prior -- right before I came

12 out -- well, right before I went and got lunch and then came

13 out -- to inform her what I was going to do, so the Dallas

14 court is aware that this is -- that this is an issue that's

15 coming their way.

16 Is there anything -- I'm not going to create a lot of

17 law of the case for Judge Jernigan on matters that don't need

18 to be decided today. Is there anything the parties actually

19 agree on that needs to go forward today or can go forward

20 today? If not, I'd rather just save everything for Judge

21 Jernigan to have a fresh look at. I know that she did mention

22 that she has availability on her calendar over the next several

23 weeks. So you should be able to get on it rather quickly, once

24 the case gets transferred.

25 We used to send big boxes in the mail to do this, but

HIGHLAND CAPITAL MANAGEMENT, L.P.                111

1  now it's just hitting a couple buttons on a computer to take

2  care of that.

3        So is there anything we could -- we need to decide?

4        Okay.  Just a question.  Obviously there are estate

5  professionals -- Pachulski not really a problem, since you'll

6  stay in the case, but I'm thinking of Young Conaway -- and I

7  don't know if there are any other firms that are Delaware firms

8  that might fall out of the case that would be subject to the

9  Court.  But I'll leave that for Judge Jernigan to decide

10 whether to retain them for a limited period of time or to pay

11 them or not pay them.  Hopefully, of course, they've earned

12 their money; they should be paid.

13       Yes, sir.

14       MR. KHARASCH:  Your Honor, Ira Kharasch of Pachulski.

15 I think Your Honor, there is one vital matter that you should

16 hear today and rule on.  I would think it would be generally an

17 easy motion.  It is the application to employ the CRO.  That is

18 within the debtor's business judgment, given -- as we described

19 the reasons for that, considering the concerns raised by

20 creditors.

21       I think it's critical that the CRO be formally

22 engaged.  They've done a tremendous amount of work in the past

23 six weeks.  They've been at the company full time, for a team,

24 for a month.  They have done a lot of good stuff in this case.

25 They have a lot more things to do.

HIGHLAND CAPITAL MANAGEMENT, L.P. 112

1        The CRO has been tasked under the modified -- under

2   the protocols, with broadened authority to take all kinds of

3   and accept all kinds of decision-making over key decisions of

4   this case, involving insider transactions, ordinary-course

5   transactions.  We've done a lot of work modifying the protocols

6   that relate to that.

7        This company is operating every day.  I think the CRO

8   and his team deserve some comfort that they should get employed

9   as of today, Your Honor.  I -- you know --

10        THE COURT:  Let me hear from the committee.

11        MR. CLEMENTE:  Thank you, Your Honor.  Matthew

12   Clemente on behalf of the committee.

13        Your Honor, we don't agree with that.  Again, it's not

14   about DSI being paid or not being paid.  As Your Honor

15   mentioned with Young Conaway, that isn't the issue.  But to the

16   extent Your Honor has any familiarity with the motions, they're

17   all intertwined.  The CRO is all part of the protocols that

18   they're advancing in the ordinary-course motion.

19        So this isn't about simply retaining a professional to

20   ensure that that professional gets paid.  It really is about

21   setting what I like to call concrete pillars in the ground in

22   terms of how the debtor views the case should be managed going

23   forward.  And I think based on Your Honor's ruling, that's

24   something that Judge Jernigan should be given the opportunity

25   to weigh in on.

HIGHLAND CAPITAL MANAGEMENT, L.P.                113

1       So again, it's not about Mr. Sharp and his firm

2   getting paid.  I don't believe that that is the issue.  They

3   can continue doing what they've been doing, up to this point,

4   just like we have, for example, at Sidley, and the rest of the

5   professionals that haven't been retained.  And I don't see why

6   that should cause a problem.

7       But we do believe that that is integrated with the

8   other suite of motions that would be before Your Honor; and we

9   think it's appropriate for Judge Jernigan to make those

10  decisions.

11      THE COURT:  All right.  Well, I don't view a retention

12  application to be an emergent basis to hear a motion anyway.

13  But I'm certainly not going to agree to sign it over objection

14  of the committee, given how I just ruled.  So --

15      MR. CLEMENTE:  Thank you, Your Honor.

16      THE COURT:  -- I'd also say.  So I'd ask the committee

17  Counsel to circulate a form of order and submit it under

18  certification of counsel.  I think the simpler the better; just

19  for the reasons set forth on the record, and it's transferred.

20  Don't put a lot of findings in there.  That'll just cause

21  trouble.  That's my belief.  But you can negotiate what you

22  want to negotiate, and as soon as that's ready, upload it,

23  inform chambers, we'll get it signed, and we'll start the

24  machinery in place.

25      MR. CLEMENTE:  Great.  Thank you very much, Your

HIGHLAND CAPITAL MANAGEMENT, L.P.                    114

1  Honor.  We appreciate it.

2          THE COURT:  All right.  We're adjourned.

3      (Whereupon these proceedings were concluded at 2:02 PM)

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

APP. 0114
Appx. 00161

115

1                          I N D E X

2     WITNESS                 EXAMINATION BY        PAGE

3     Bradley Sharp           Ms. Reid             20

4     Bradley Sharp           Mr. Shaw             21

5     Frank Waterhouse        Mr. Guekre           24

6     Frank Waterhouse        Mr. Shaw             32

7

8                       E X H I B I T S

9     DEBTOR'S         DESCRIPTION            PAGE

10    --               A thru U, except for G      12

11    ACIS'            DESCRIPTION            PAGE

12    --               Exhibits 1 through 18, with    37

13                     the exception of Nos. 3 and

14                     9; and Exhibits 24 and 25

15    26               Email exchange between Acis'    40

16                     counsel and Hon. Jernigan's

17                     courtroom deputy

18

19                        RULINGS

20                                     Page    Line

21    Motion of the Official Committee of      105      13

22    Unsecured Creditors for an Order

23    Transferring Venue of this Case to the

24    United States Bankruptcy Court for the

25    Northern District of Texas, granted.

APP. 0115
Appx. 00162

116

1

2                    C E R T I F I C A T I O N

3

4  I, Clara Rubin, certify that the foregoing transcript is a true

5  and accurate record of the proceedings.

6

7

8

9

10 _____        December 3, 2019

11 _____        _____

12 CLARA RUBIN                        DATE

13

14 eScribers, LLC

15 352 Seventh Avenue, Suite #604

16 New York, NY 10001

17 (973) 406-2250

18 operations@escribers.net

19

20

21

22

23

24

25

APP. 0116
Appx. 00163

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

**A**

**ability (7)**
17:24;18:11;27:2;
40:11;64:6,8;88:25
**able (9)**
46:9;47:9;49:15;
53:15;79:13;83:3;
100:6;103:20;
110:23
**above (1)**
48:1
**absolute (1)**
43:10
**absolutely (3)**
89:21;102:17;
106:24
**accelerated (1)**
96:22
**accept (1)**
112:3
**acceptable (1)**
11:8
**access (1)**
14:7
**accessing (1)**
14:5
**accomplished (1)**
98:21
**accomplishing (1)**
18:7
**Accordingly (1)**
80:20
**account (3)**
15:19,22,23
**accountant (1)**
24:12
**accounting (3)**
28:6,7;67:7
**accounts (3)**
65:5,21,22
**accurate (1)**
102:10
**achieve (2)**
45:11;99:19
**Acis (106)**
6:15;8:8,18;16:6,
22,23;17:7,10,12,14,
18,21,22;18:2,21:5;
22:12,19,21;34:10,
13;35:8;36:11;37:9;
38:20;43:1,21;44:1,
11,16,17;45:5,7,13;
48:4;49:21,25;50:9;
53:16,19;54:14,23;
57:15,23;58:16;
59:13;60:3,14;61:4,
21;62:23;63:1,2,3;
64:13;65:25;66:2,
21;67:13,23;68:14,
25;69:6;72:17,23;
74:10;75:1;77:1,14,

20,23;78:7,15,20;
79:19;81:23;82:13,
14;83:1,1,23;85:9;
90:4;91:14,16,16,18,
19;92:4,5,8;93:1,10,
12,24;95:9,12,19;
96:25;98:3,5,18;
100:19;103:15,15,
17;108:22
**Acis' (17)**
16:8;17:21;37:20;
40:21,22;47:8;
60:12;63:7;65:23;
73:25;74:2;75:25;
76:16;77:1;82:11;
93:20;98:15
**acknowledges (2)**
80:20;85:4
**Acquisition (3)**
81:4;83:19;89:16
**Acquisitions (1)**
99:13
**across (1)**
67:12
**acting (1)**
107:1
**actions (1)**
83:25
**active (4)**
16:24;82:22;
85:18;92:14
**actively (1)**
109:12
**actors (1)**
50:12
**actual (4)**
60:13;77:15;
107:10;108:9
**Actually (10)**
27:20;40:17;42:1;
56:22;62:25;68:21;
90:16,22;94:17;
110:18
**ad (1)**
61:23
**add (1)**
107:5
**additional (2)**
37:12;60:16
**Additionally (3)**
52:22;55:3;58:9
**address (8)**
29:12;38:11;
72:15;75:24;83:18;
97:5;98:17;102:7
**addresses (2)**
82:19,25
**adequately (1)**
65:10
**adjourned (1)**
114:2
**adjudication (2)**
69:3;72:19

**administered (6)**
48:5,13;64:19;
70:13,18;78:19
**administration (2)**
87:6;109:1
**administrative (1)**
83:22
**admissible (3)**
38:13;40:2,3
**admission (1)**
37:15
**admit (2)**
40:6;91:20
**admitted (5)**
12:16,17;37:18;
59:16,18
**advanced (1)**
95:6
**advancing (1)**
112:18
**advantage (5)**
54:4;55:4,5;81:17;
95:14
**adverse (3)**
56:6,7;74:9
**adversity (1)**
97:22
**advise (1)**
100:6
**advises (2)**
16:24;50:8
**advisor (2)**
13:4;93:2
**Advisors (5)**
14:12;15:5;25:5,
17;80:8
**advisory (12)**
13:1;15:1;16:3;
67:1;86:11;91:18;
92:8,14,20;93:17,19;
94:4
**affairs (1)**
14:2
**affect (1)**
108:9
**affected (1)**
109:1
**affiliate (7)**
44:17;45:5,7,13;
80:11;108:2,4
**affiliated (7)**
15:4,5;16:16;
43:23;44:22;48:14;
51:24
**affiliates (15)**
15:7;22:17,20;
24:24;34:18;35:14;
45:21;46:3;47:24;
48:8,20;51:23;53:2;
80:12;94:3
**affirmation (1)**
19:9
**affirmatively (2)**

**43:3;55:12**
**affirmed (2)**
19:12;23:22
**afforded (1)**
56:16
**afternoon (5)**
51:24;75:21;
101:8,23;105:11
**again (52)**
17:4;27:3,3,4,5,19;
35:6,18,18;41:12;
43:23;44:18;45:6,7;
48:8,22;49:14,22;
53:3;54:13,22,24;
55:20,24;57:15,16;
63:10,15;65:16;
66:17,21;67:9,25;
68:3;69:1,11;70:13;
71:3;74:7;75:21;
79:25;86:20;87:10;
89:3;93:25;94:23;
100:12;103:25;
104:23;106:18;
112:13;113:1
**against (13)**
17:11,12,18,21;
56:8;78:16,20;83:7,
14;88:24;97:18;
98:3;100:5
**agenda (2)**
10:15,16
**ago (5)**
24:21,23;43:21;
96:20;108:3
**agree (4)**
90:25;110:19;
112:13;113:13
**agreement (6)**
54:17;66:23,23,
24;79:13;94:17
**agreements (22)**
16:7,10,15,15;
34:13,16,17;35:8,9,
12,15,16,22;66:22;
93:12,18,19,23,24;
94:5,14,19
**agrees (1)**
51:22
**ahead (1)**
75:20
**air (2)**
88:7,8
**Aires (1)**
15:9
**Airlines (1)**
109:4
**al (3)**
6:15;8:8,18
**albeit (1)**
50:4
**allegations (1)**
18:22
**allow (3)**

**43:3;55:12**
**almost (3)**
51:20;56:2;107:9
**alone (1)**
39:20
**along (8)**
10:24;61:7;65:20;
66:14;67:22;68:1;
104:16,20
**although (11)**
15:6;17:23;43:7;
44:3;48:9;50:14;
52:7;96:19;97:2;
102:16;107:24
**Alvarez (2)**
7:3;8:3
**always (2)**
48:14;102:23
**America (3)**
14:23;15:11;86:15
**American (2)**
93:5;109:3
**amount (8)**
43:11;76:22;82:5;
84:23;96:21;103:4;
108:6;111:22
**amounts (1)**
43:10
**amply (1)**
41:20
**analysis (5)**
76:13;77:8;79:25;
82:6;94:5
**analyze (2)**
82:6;84:19
**analyzing (1)**
17:25
**ANDERSON (1)**
8:2
**ANDREW (1)**
7:17
**Angeles (1)**
13:11
**answered (1)**
27:20
**anymore (1)**
88:8
**apologize (2)**
36:18;75:10
**appeal (8)**
44:11,21;45:12;
53:18;72:16;73:4;
76:9;108:3
**appeals (6)**
17:16,19;57:4;
72:23;73:5;76:8
**appear (2)**
84:6
**appearance (4)**
41:23;82:24;
88:16,17
**appearing (1)**
73:20

APP. 0117

Appx. 00164

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                December 2, 2019

**apples (1)**
93:25
**applicable (1)**
52:5
**application (2)**
111:17;113:12
**applications (1)**
68:20
**applied (1)**
87:24
**apply (1)**
48:1
**applying (2)**
84:5;110:5
**appoint (3)**
15:13;78:1;96:13
**appointed (2)**
13:5;77:24;78:25
**appointment (3)**
66:3,4;98:19
**appreciate (2)**
19:23;114:1
**appreciates (1)**
82:21
**approach (5)**
11:21;36:24;
37:23;107:18;
108:11
**appropriate (15)**
11:2;16:18;44:2;
59:3;81:14;82:4;
87:4;94:2;95:15;
97:5;98:13;100:23;
106:6;107:7;113:9
**appropriately (2)**
78:21;107:2
**appropriateness (1)**
16:14
**approval (2)**
18:18;95:11
**approve (2)**
26:14;95:10
**approximately (6)**
15:3,21,25;24:23;
67:19;92:11
**apt (2)**
84:12;96:13
**arbitration (6)**
83:9;91:25;94:14,
16,20,21
**areas (1)**
87:15
**argue (6)**
45:8;52:13;84:3;
87:10,12;98:8
**argues (1)**
88:13
**arguing (2)**
45:12;93:10
**argument (21)**
11:8;38:4;39:9;
41:4,15;76:19;77:5;
80:1;87:20,22;88:7,

20;89:2,25;90:12,16;
91:13;93:21;96:14;
99:25;105:14
**arguments (9)**
42:8,18;46:6,14;
51:6;55:5;87:9;
90:12,13
**arm (2)**
92:8;103:16
**around (10)**
15:1;16:8;32:1,1;
58:3;67:20;85:14;
86:20;91:2;101:17
**arrangement (1)**
94:3
**ARSHT (1)**
7:22
**article (1)**
101:3
**ashamed (1)**
106:4
**ASHBY (1)**
6:9
**Asia (1)**
14:22
**Asic's (1)**
41:16
**aside (1)**
90:12
**ASIF (1)**
7:15
**aspect (5)**
16:2;31:22;66:9;
72:6,8
**aspects (6)**
40:7;72:5,11;
78:24;95:3,8
**assert (1)**
17:10
**asserted (2)**
39:23;94:23
**asserting (1)**
54:2
**asset (2)**
17:6;98:3
**assets (40)**
14:19,20,21,25;
15:3,16,19;16:22;
17:1;18:10,12;
35:13;70:1;77:3;
78:4;84:23;86:2,6,9,
10,14,16,19,21;87:2;
92:4,22;93:1,7;
100:9,14;103:18,24;
104:7,8,10,14,15,18;
108:25
**assigned (9)**
45:23;46:5,19,21;
47:10;72:15;73:4;
102:18;103:2
**assignment (4)**
46:4;47:13;
102:13,17

**association (1)**
28:2
**Asst (1)**
9:3
**assume (2)**
27:3;48:17
**assumed (1)**
48:1
**assumes (2)**
59:4;90:16
**assuming (1)**
46:17
**assumption (2)**
45:22;46:13
**attached (2)**
91:24;94:12
**attachments (1)**
44:9
**ATTARWALA (1)**
7:15
**attempt (1)**
45:5
**attempted (1)**
41:23
**attempts (1)**
103:23
**attorney (1)**
27:7
**Attorneys (12)**
6:3,10,15,21;7:3,8,
14,23;8:3,8,13,18
**atypical (1)**
42:12
**August (3)**
16:8,21;74:4
**Austin (2)**
10:21;41:13
**authentic (1)**
38:24
**authority (2)**
84:17;112:2
**availability (3)**
38:22;39:21;
110:22
**available (1)**
18:6
**avoidance (1)**
89:7
**avoided (1)**
79:25
**aware (17)**
21:23;22:6;32:20;
33:11;34:10,11,21;
35:8,15;39:19;40:3;
46:16;76:1;102:9,
10;103:2;110:14
**away (8)**
46:7;48:17;52:14;
55:18;77:12;92:4;
103:24;108:24
**awkward (1)**
24:5

**B**

**back (14)**
26:11;37:2;49:11;
55:24;56:7;57:12;
62:14;63:16;70:13;
71:21;74:22;105:6,6,
11
**background (1)**
25:12
**back-office (2)**
67:5;92:20
**backward- (1)**
50:15
**bad (1)**
106:5
**badly (1)**
56:4
**baggage (1)**
79:18
**balance (3)**
18:12;93:7;109:7
**balance-sheet (1)**
93:1
**balls (1)**
74:11
**Bancorp (1)**
13:9
**Bank (4)**
7:14;15:25;43:15;
82:10
**bankruptcy (63)**
11:3;16:8;17:17,
20;18:3;21:9,14;
22:10;26:22;27:5,7;
32:4,21;40:13;
41:18;42:14;43:22;
44:1,20,23;47:10;
49:2,6,17,20,20;
52:4;53:20;55:1;
57:16;58:13,15,21;
59:3;60:10,23;61:4;
64:7,17,18;65:24;
68:9;69:2,24;72:4,9,
14,17,21;73:4,5,19;
74:10;76:10;82:23;
84:16;88:2;90:4;
103:25;105:24,25;
106:20;108:22
**base (3)**
90:22;91:8,9
**Based (13)**
11:4;15:6,25;
21:25;39:5;54:13;
55:8;73:25;83:13;
94:9;106:7;108:9;
112:23
**basically (2)**
92:5;93:2
**basis (4)**
63:14;92:22;
108:10;113:12

**BEACH (2)**
6:4;10:25
**bear (1)**
86:22
**bears (3)**
61:12;62:17;81:5
**become (3)**
44:17;53:4;54:18
**becomes (1)**
65:11
**becoming (2)**
56:3;103:3
**beg (1)**
42:14
**begin (2)**
31:15;41:14
**beginning (2)**
77:19;98:14
**behalf (12)**
10:7;11:15;19:20;
21:5;23:19;41:13;
45:4;60:3;75:22;
102:6;106:25;
112:12
**behind (4)**
46:14;87:25;
90:10;95:7
**belie (1)**
83:25
**belief (1)**
113:21
**believes (5)**
16:9,21;18:9;53:7;
59:1
**below (1)**
27:22
**beneficial (1)**
68:19
**benefit (2)**
18:5;69:20
**BENTLEY (1)**
8:14
**Bermuda (1)**
15:15
**best (4)**
55:15;65:7;87:1;
109:6
**better (3)**
95:13;96:3;113:18
**Beverly (1)**
13:8
**Beyond (6)**
21:15,21;27:12;
31:12;32:23;47:2
**bias (1)**
73:21
**biased (2)**
73:18;74:8
**BIBILONI (1)**
6:17
**big (9)**
60:6,6;65:14;
69:21,22;86:3;

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(2) apples - big

APP. 0118
Appx. 00165

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                December 2, 2019

93:10;96:7;110:25
**billion (5)**
　14:25;15:3;35:13;
　69:17;103:18
**binder (4)**
　11:21;59:14,21;
　60:8
**binders (1)**
　60:6
**bit (6)**
　37:1;60:24;63:18,
　21;68:20;77:7
**BJORK (1)**
　7:16
**blame (1)**
　57:10
**BLANK (2)**
　6:14;59:13
**BLOCK (1)**
　7:7
**body (3)**
　83:22;100:19,22
**boil (1)**
　64:17
**boils (1)**
　64:4
**bonuses (1)**
　95:10
**bookkeeping (1)**
　67:7
**books (1)**
　14:6
**boost (1)**
　106:11
**borrow (1)**
　65:24
**boss (1)**
　26:17
**both (8)**
　16:16;47:23;56:4;
　57:2;61:25;64:5;
　65:9;104:17
**bottom (1)**
　100:20
**bound (1)**
　36:20
**BOWDEN (3)**
　6:11;75:18,19
**box (5)**
　53:3;54:14;57:23;
　65:25;66:21
**boxes (1)**
　110:25
**Brad (3)**
　10:12;78:25;84:7
**BRADLEY (3)**
　9:7;19:15;27:10
**B-R-A-D-L-E-Y (1)**
　19:15
**brain (1)**
　67:1
**break (3)**
　59:14;98:5;105:5

**breathed (2)**
　61:4;63:11
**breathing (2)**
　61:8;86:25
**brethren (2)**
　87:21;91:2
**BRIAN (2)**
　8:9;21:4
**brief (5)**
　52:10;61:2;88:9;
　99:8;102:5
**briefly (7)**
　23:14;32:17;
　39:17;53:25;57:12;
　60:7;99:8
**bring (5)**
　67:17;80:11;
　86:21;99:19,22
**bringing (1)**
　98:15
**broad (2)**
　84:17;104:14
**broadened (1)**
　112:2
**brokerage (2)**
　15:18;65:5
**brought (1)**
　17:17
**Buenos (1)**
　15:9
**bulk (2)**
　15:19;84:15
**burden (9)**
　41:20;61:21;
　62:16,17,18;77:16;
　81:5;98:12;100:2
**burden-of-proof (1)**
　61:19
**burdensome (1)**
　88:22
**business (39)**
　14:2,19;16:3,22;
　17:3;22:15,22;50:2,
　3,6,9;64:22;65:3,6,8,
　12,13;67:8,11;72:5,
　6,8,11;78:4;79:7;
　81:21;89:8;91:1;
　92:3,7,11,24;94:23;
　95:3;103:21;104:1,
　19;110:3;111:18
**businesses (3)**
　86:8;89:5;94:10
**buttons (1)**
　111:1
**buy (2)**
　56:12;90:11

**C**

**Caesar's (1)**
　88:4
**calendar (1)**
　110:22

**California (1)**
　32:1
**call (12)**
　21:24;23:13;
　33:12;39:4;53:14;
　62:12;71:23;85:11;
　99:24;101:22;
　110:11;112:21
**called (9)**
　11:25;12:23;
　21:22;23:5;32:25;
　44:14;74:11;85:5,8
**came (3)**
　69:8;110:11,12
**can (31)**
　11:20;26:4;27:7;
　35:3,5,18,21;38:19;
　39:10;40:3;41:18;
　43:23;46:11;49:23;
　52:12;61:2;70:7;
　77:16;80:3;85:3;
　89:13;97:3;98:9;
　108:15;109:2,2,3,5;
　110:19;113:3,21
**cap (1)**
　100:20
**capable (2)**
　40:14;97:12
**capacity (2)**
　43:1;49:16
**Capital (13)**
　6:15;8:8,18;9:4,5;
　10:7;21:5;24:10;
　25:1;29:7;30:23;
　60:3,14
**care (2)**
　71:15;111:2
**career (1)**
　102:14
**carefully (2)**
　40:16;94:15
**Carey (2)**
　13:7,9
**carries (1)**
　41:20
**carry (2)**
　77:16;78:7
**cart (1)**
　101:11
**CARUSO (9)**
　9:9;10:12;13:24;
　18:14;27:15;53:7;
　84:14,21;95:2
**case (149)**
　13:15;16:14;18:4,
　9,15;21:10;22:24;
　33:18,18;39:19;
　40:11,17;41:17;
　42:11;43:7,9,22,23,
　25;44:6;45:13,22;
　46:3,7,15,18,21;
　47:19,24;48:12;
　49:21;50:14;52:8;

53:11,16;56:17;57:1,
　2;59:1;61:4,13,16;
　62:11;63:4;64:13,14,
　17;68:9;69:2,6;70:3,
　12,14,18;72:1,1,17;
　74:10,20,22,25;76:5,
　10,11,23,24;77:14,
　21;78:8,10,15,20,22;
　79:8,14,15,18;80:4,
　12;81:7,11,20,22;
　82:8,14,24;84:16;
　85:8,12,16,20,23;
　86:10;87:11,18,25;
　88:15;89:16;90:14;
　91:14,15;93:24;
　94:16;95:8,23;96:11,
　15,15,16,17,25;
　97:11,13,15,19,20;
　98:5,7,8,20,22;
　102:18,21;103:5;
　105:15;107:10,16,
　17,19,21,23,24,25;
　108:1,8,11,18,19;
　109:8,11,15;110:5,
　17,24;111:6,8,24;
　112:4,22
**case-in-chief (2)**
　31:14;33:7
**cases (31)**
　13:6;44:22;47:6,
　11,23;48:14;52:7;
　56:9,9;58:9;63:11;
　72:23;76:3;80:4,10;
　82:23;84:11;85:2;
　86:6,7,7,20,22;
　87:22;88:20;91:7;
　97:23,24;102:10,11;
　105:19
**cast (2)**
　57:15;64:11
**catalyst (1)**
　80:19
**cause (2)**
　113:6,20
**Cayman (1)**
　15:15
**center (4)**
　42:5;43:5;51:11;
　58:8
**CEO (1)**
　9:7
**certain (14)**
　15:14;16:7;35:9;
　50:7;54:22;60:5;
　65:5;70:1;78:6,24;
　91:3;92:4;97:8;
　104:17
**certainly (15)**
　39:25;40:10;48:5;
　67:22;69:4,14;
　71:24;72:6;89:10;
　105:24;106:6;
　107:14;108:10,15;

113:13
**certification (1)**
　113:18
**cetera (1)**
　65:21
**CFO (7)**
　9:5;26:11,13,19;
　29:1;32:20;35:11
**chain (1)**
　89:23
**challenge (1)**
　97:19
**chambers (3)**
　11:18;33:13;
　113:23
**chance (2)**
　33:6;41:1
**chancery (4)**
　71:20;83:8,9;
　88:19
**change (2)**
　48:9;98:12
**changed (1)**
　58:5
**changes (1)**
　58:5
**Chapter (10)**
　17:21;45:13;
　78:22;80:3;86:24;
　97:10;98:19;105:16,
　19,25
**characterized (1)**
　50:7
**charge (3)**
　17:22;18:1;97:2
**chart (1)**
　27:23
**chicanery (1)**
　106:22
**chief (6)**
　12:24;13:3,5,25;
　24:14;78:25
**choice (10)**
　55:19;58:2;62:15,
　19;79:22;81:9,14;
　105:23;106:11;
　109:16
**choose (1)**
　64:6
**choosing (1)**
　106:5
**chose (1)**
　42:15
**Circuit (2)**
　72:24;81:3
**circulate (1)**
　113:17
**circumstance (1)**
　47:11
**circumstances (5)**
　16:19;38:16;79:8;
　107:19;109:25
**cite (1)**

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                                    December 2, 2019

**81:2**

**cited (1)**
88:6

**citing (1)**
95:25

**citizen (1)**
81:16

**City (4)**
15:20,25;82:10;
83:10

**claim (7)**
43:16;82:12;83:1,
1,12,13;89:11

**claiming (2)**
68:22;92:5

**claims (17)**
17:11,12,17;63:6,
7;78:20;82:25;
84:19;88:24;89:6,7,
10;94:22,22;97:25;
98:3,4

**classes (1)**
17:6

**cleanse (1)**
58:2

**clear (22)**
42:2,6;49:17;50:1;
51:12,15;54:13,18,
25;55:8,11;58:3,23,
25;61:22;66:17,18;
80:2;81:5;98:16;
101:18;107:16

**clearly (15)**
40:6;47:2,18;50:8,
11;52:4,7;54:10;
55:9;70:23;96:11;
97:16;103:25;
104:22;108:21

**CLEMENTE (51)**
10:19,21,21;11:11,
13;12:13,15;23:12;
38:7,11;39:25;
40:24;41:12;45:17,
20,25;46:20;47:2,4,
7,17;48:7,16,18,21;
49:1,8,11;52:16;
56:1,15,18,20,25;
57:5,7,10;59:7;
61:21;65:25;66:16;
75:25;76:14;99:8,
12;102:3,6;112:11,
12;113:15,25

**Clements (1)**
41:13

**CLERK (11)**
10:2;19:10,13,17;
23:21,23;24:2;75:9;
102:15;103:9;105:9

**client (1)**
10:11

**clients (2)**
14:21;48:2

**Clifford (1)**

**31:5**

**clinging (1)**
105:15

**CLO (21)**
8:13;16:22,23;
17:2;50:6;65:22;
68:11,16,17,23,25;
91:5,7;92:3,3,10,13;
103:13,14,21,23

**CLOs (19)**
16:5,6,11,24,24;
22:21;50:8;57:16,18,
21;65:14,20;92:15;
93:2,18;103:12,16,
17,19

**close (6)**
19:23;24:4;41:2;
70:8;81:24;98:12

**closed (1)**
41:3

**clothes (1)**
75:17

**CLUBOK (1)**
7:17

**co- (1)**
26:5

**co-counsel (4)**
10:24;38:1;61:7;
100:6

**collateral (1)**
92:9

**collateralized (2)**
16:4;65:15

**colleague (3)**
13:24;33:24;84:21

**colleagues (3)**
10:23;46:9;81:2

**colloquy (2)**
58:20;61:20

**color (2)**
108:10,15

**combination (1)**
59:2

**comfort (1)**
112:8

**comfortable (1)**
48:4

**coming (2)**
105:11;110:15

**commence (1)**
81:22

**commenced (3)**
80:18;83:8;88:19

**comment (2)**
89:4;103:11

**commented (1)**
22:13

**comments (5)**
76:20;77:4,19;
89:23;100:18

**Committee (66)**
6:3;7:8,23;10:22;
18:8,20,23;19:20;

**23:20;41:13;42:25;**
43:8,12,17;45:10;
50:17,22;51:22;
54:3;57:2;59:1;61:1;
63:6,17,19,23;64:7;
70:16;75:1;77:13,16,
20,25;78:7;79:13,19;
80:18,20;81:23;82:2,
2;83:6,11,17,23;
85:8,17,22;86:3;
87:1,7;88:13,16;
89:25;90:13;93:10;
94:6;98:12,18;
102:6;109:14,23;
112:10,12;113:14,16

**committee's (7)**
10:16;53:9;60:4;
64:1;72:2;98:14;
109:23

**communicated (1)**
18:20

**companies (1)**
107:14

**company (3)**
91:4;111:23;112:7

**company's (1)**
22:9

**compared (1)**
95:6

**compensation (2)**
16:9;95:15

**complete (1)**
14:7

**completely (1)**
107:25

**complex (2)**
50:2;51:23

**comply (1)**
67:2

**compound (1)**
106:10

**comptroller (1)**
63:17

**computer (1)**
41:10;111:1

**CONAWAY (6)**
6:2;10:24;85:17;
100:4;111:6;112:15

**concede (1)**
70:23

**concedes (1)**
61:21

**concentration (2)**
87:10,12

**concept (3)**
63:16;73:21;87:16

**concern (1)**
89:8

**concerns (4)**
78:23;97:6;98:18;
111:19

**conclude (3)**
74:13;92:1;96:8

**concluded (2)**
92:1;114:3

**concludes (1)**
18:25

**concluding (1)**
94:19

**conclusion (2)**
73:25;98:11

**conclusory (1)**
104:6

**concrete (1)**
112:21

**conduct (3)**
58:11;78:25;79:17

**conducted (1)**
91:20

**conference (2)**
33:13;52:10

**confident (2)**
91:6;102:25

**confirmation (12)**
43:25;45:6;53:19;
60:12,14,19;74:3,3,
5;76:8;91:16,24

**confirmed (2)**
44:11,13

**confirming (1)**
17:21

**conflict (1)**
47:25

**conflicted (1)**
58:22

**conflicts (1)**
78:18

**conflicts-of-interest (1)**
78:17

**conjunction (1)**
27:8

**Connecticut (1)**
83:18

**connection (17)**
11:19;16:3;23:11,
13;46:7;49:6;60:10,
12;69:5,5;72:22;
73:4;74:2,10;80:16;
93:8;97:5

**connections (1)**
86:8

**connotation (1)**
106:19

**consensual (1)**
87:2

**consider (1)**
94:11

**consideration (1)**
48:11

**considered (1)**
39:20

**considering (3)**
38:15;101:10;
111:19

**consist (1)**
15:16

**consistent (3)**
46:18;50:5;58:6

**consistently (1)**
55:15

**consists (1)**
109:23

**constituents (1)**
18:6

**constructive (1)**
86:25

**constructively (1)**
18:8

**contact (1)**
75:12

**contained (1)**
65:17

**containing (1)**
11:21

**content (2)**
35:17;95:22

**contentious (1)**
17:15

**contested (1)**
52:25

**context (1)**
52:6

**continue (6)**
17:15;49:8;84:25;
89:8;92:16;113:3

**contract (1)**
54:16

**contracts (8)**
54:20,23,24;55:1;
86:12;93:14,16;94:9

**contractual (1)**
16:7

**contrary (2)**
57:14;79:18

**control (1)**
25:16

**controlling (1)**
55:7

**controls (1)**
25:4

**controversy (1)**
70:23

**controverted (2)**
43:20;100:12

**convenience (5)**
51:10;64:9;78:9;
80:24;82:7

**convenience-of-the-parties (1)**
61:25

**convenient (13)**
13:12;52:12,14,18,
21;55:9,18;83:24,25;
85:24;90:1,3,3

**conversation (1)**
64:1

**conveyances (1)**
92:5

**convince (1)**
45:10

APP. 0120
Appx. 00167

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

**COO (1)**
9:9
**cooperation (1)**
96:20
**copy (1)**
36:19
**CORCO (3)**
81:3,24;86:2
**core (2)**
22:15;39:12
**corners (1)**
62:13
**corporate (5)**
28:6;88:1;97:3,7;
98:1
**corporation (1)**
14:12
**corroborating (1)**
38:17
**CORROON (1)**
8:2
**Counsel (33)**
9:3;10:8,22;13:14,
16;22:13;37:9,15;
38:20;40:21;45:3;
47:8;59:13;61:3,4;
69:25;75:25;76:15,
16;77:6;79:3,25;
82:11;85:15;88:14;
89:1;93:20;97:23;
100:19;108:16;
110:4;113:17,18
**count (1)**
67:19
**counting (1)**
62:3
**country (6)**
15:18;32:1;85:15;
86:20;91:3;100:15
**couple (5)**
64:20;73:15;
75:24;96:19;111:1
**course (15)**
16:8;21:3;40:2;
46:11;48:6;76:18;
79:7;80:21;92:16;
100:24;101:18;
106:15,23;109:16;
111:11
**COURT (260)**
10:3,5,13,18,20;
11:3,10,12,22;12:2,
4,6,9,12,14,16,20;
13:12;17:17,20;
18:3;19:1,4,6,8,18,
21,25;21:3,6,17,24;
22:4;23:3,7,10,15,
18;24:3;25:9,11,15;
26:3;27:13,20;31:9,
11,18,24;32:7,13,15;
33:1,3,16,21,24;
34:5,24;35:3,25;
36:4,7,14,17,21,23,

25;37:3,7,8,14,18,
24;38:5,10;39:10,16,
18,19;40:2,5,13,25;
41:9,18;42:14;
43:22;44:1,2,5,21,
23;45:10,16,18,21;
46:1,23;47:1,3,5,10,
16,22;48:8,17,19,22;
49:7,10,13,14,18,20,
20,21;50:1,16,18,20;
52:4,15;53:20;54:2,
5,5,10,16,21;55:1,17,
25;56:2,16,19,24;
57:1,6,8,13,24;
58:16,21,24;59:3,4,
9,19,22,24;60:7,10,
13,17,18,22;61:24;
62:6,10;63:12;
64:23;65:7,23;66:9,
11,11;71:3,7,9,9,10,
12,14,14,17,17,19,
19;72:4,7,10,10,21,
21;73:2,3,12,12,14,
18,19,20;74:2,4,6,8,
14,15,21,24;75:3,10,
16,19;76:21,22;
78:16,21,21;80:10,
12;81:21;83:2,8,10;
84:6,10,12;85:7,10,
24;86:21;87:3,15,23;
88:5,19;89:3,18,21;
90:4,15;95:14;
96:14;97:11,12;99:2,
5,7,11;102:2,4;
103:4,9,25;104:5,13;
105:4,10;106:25;
107:1;109:21;110:7,
14;111:9;112:10;
113:11,16;114:2
**courthouse (2)**
52:14;89:14
**courtroom (10)**
10:10;38:21;39:4;
40:18,22;74:17,19;
82:20;103:8,9
**courts (11)**
71:24;73:11;
77:10;81:1,8;84:5;
86:5;87:6;89:12;
102:15;104:17
**court's (4)**
38:22;39:21;62:1;
103:24
**craft (1)**
79:3
**crash (1)**
92:13
**create (6)**
41:23;47:25;
48:10;101:16;
110:16
**created (2)**
92:13;100:12

**creates (1)**
108:7
**credentials (1)**
98:17
**credibility (2)**
90:21;108:15
**credible (2)**
49:13;96:13
**creditor (21)**
15:24;21:5;42:22;
43:1,3,12,18;56:11;
62:24;63:1,2,3,10;
64:13;83:13,16,22;
88:22;98:18;99:15;
109:11
**Creditors (50)**
6:3;10:23;43:9,10,
11;50:24;51:18,20,
21;55:10,10,16,19;
56:6;68:7;70:7,16;
78:24;82:1,5,6,9,15,
17;83:2,5,24;87:10;
88:13,23;89:4,13;
98:6;99:14,18;
100:18,20,21,22;
104:23,25;106:15,
25;108:24;109:12,
14,22,24;110:4;
111:20
**creditors' (6)**
18:20;19:20;
23:19;43:8;109:7,8
**credit-research (1)**
28:13
**critical (2)**
86:6;111:21
**CRO (21)**
13:19;27:7;58:1,2,
3,4,11,14;79:9,10;
84:11,12;85:2;
96:16;97:6;98:16;
111:17,21;112:1,7,
17
**cross (6)**
11:7;21:16,22;
36:1,2;50:12
CROSS-EXAMINATION (4)
20:1;21:7;23:3;
90:21
**cross-examine (1)**
19:2
**Crusader (2)**
7:8,23
**CRUTCHER (1)**
7:2
**crux (3)**
76:19;78:19;90:1
**current (6)**
22:20;29:6,11;
45:13;82:19;108:3
**currently (7)**
17:19;24:19;
29:10;31:20;34:17;

58:18;92:24
**CURTIS (1)**
7:24
**curve (12)**
49:14;50:17;52:6;
66:12,14;68:1;
76:17;90:7,10;
101:10;104:16,20
**custodial (1)**
15:17
**cynic (2)**
56:2,4

**D**

**Dallas (96)**
13:13,16;15:7;
20:5,12;29:1,3,6,8,9,
11,12,14,16,19,21;
30:1,4;32:4,9;41:18,
25;42:3,4,5,14,15;
43:1,4,22;44:1,5,20,
23;45:14;46:23;
47:10;49:13,17,20;
50:1,16,18;51:5,11,
17,19;52:4,7,11,12;
18,19,21;53:2,12,13,
15,20;54:2,5,5,10,16,
21,25;55:8,9,17;
56:25;57:13;58:7,7,
15,21;59:3;60:10;
65:10,23;69:16;
73:18;74:25;83:25;
86:18,18;88:11;
100:13,23;106:25;
108:18,21;109:3;
110:2,4,5,13
**Dallas-oriented (1)**
108:20
**date (7)**
12:19;16:1,20;
37:22;40:23;60:18;
61:5
**Daugherty (2)**
83:6;88:19
**David (1)**
31:5
**day (2)**
89:7;112:7
**days (5)**
14:3;21:9;72:2;
74:19;87:20
**day-to-day (2)**
18:10;32:3
**DC (1)**
83:15
**de (1)**
15:9
**deal (1)**
48:13
**dealing (1)**
63:22
**dealings (1)**

16:22
**dealt (2)**
91:4;97:15
**debt (10)**
48:15;63:22,23,
24;68:2,10;69:12,14,
22;70:10
**debtor (159)**
10:7,10;11:7,16;
12:25;13:16,18;14:5,
7,8,14,17,24;15:2,6,
10,21;16:5,12,21,23,
24;17:5,12,14,18,19;
18:15,17,24;21:13,
20;22:20;24:9;
29:16;30:23;31:20;
32:20,21;34:10,18;
35:14;41:6,23;42:1,
3,5,15,20,24;43:4;
44:8,17,19,25;45:1,
7,8,12;49:19,25;
50:1,3,7;51:1,14,25;
52:2,5,12;53:16,20,
25;54:1,11,15,19;
55:12,21;56:5,8,10,
16;57:14,15,18,20,
25;58:2,12,16,18;
64:5,22;68:22;
73:23;75:7;77:3,25;
78:11,17,20,24;
79:3,5,6,10,14,16,20;
80:3,5,16,18;81:12;
82:9,21,22;83:7,14;
84:5,6,8,12,15,17,20;
85:4,4,10;86:24;
88:18;90:6,8,9;
91:17,18;92:2,8,13,
18,23;93:12;94:3;
95:1,13;96:16;97:10,
17;98:4,16;99:23;
105:24,25;106:11,
25;109:16;112:22
**debtors (10)**
17:10;36:19;48:9;
68:21;73:22;78:19;
80:4;97:24;107:12;
109:6
**Debtors' (1)**
12:18
**debtor's (88)**
13:14;14:2,6,10,
12,15,20;15:7,12,18,
19,24;16:2,16;17:3,
4,24;18:1,5,10,11,
19;20:7,9;22:15,22;
30:10;36:16;41:16;
42:23;44:5;45:11;
50:2,9;51:11;54:23;
55:4;62:15,19;64:2,
25;65:2,4,14,17,20;
69:25;72:5,6,8,11;
73:17;77:3,4;78:4,4,
4,6;79:2,16,17,22;

APP. 0121
Appx. 00168

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

81:9,14,21;82:18,19;
84:23;85:6;86:9,16;
87:1;88:21;91:17;
92:6,11,24;93:4,7;
94:23;95:3,21;96:10,
12;97:13;105:22;
106:11;111:18
**debtors-in-possession (1)**
75:23
**decide (3)**
58:3;111:3,9
**decided (5)**
33:7;39:20;97:20;
100:5;110:18
**decides (1)**
101:23
**deciding (1)**
48:11
**decision (10)**
45:9;48:3,25;49:4;
81:3;90:22;105:7;
107:15;108:9;
109:10
**decision- (1)**
31:22
**decision-making (4)**
58:17;86:4;
106:12;112:3
**decisions (10)**
31:20,25;42:4;
43:24;51:15;55:15;
57:19;106:7;112:3;
113:10
**declaration (4)**
28:1;64:24;65:1;
68:4
**declined (1)**
33:3
**decrease (2)**
17:2;92:16
**defending (1)**
109:16
**defense (1)**
68:24
**defer (1)**
81:14
**deference (4)**
56:10,14;62:15;
81:9
**definite (1)**
76:4
**definitely (1)**
46:14
**degree (1)**
35:9
**degrees (1)**
50:20
**Delaware (42)**
13:6,12,15;14:11,
13,15;42:24;43:4,19;
55:13,21;56:7;65:9;
70:24,25;72:7;
74:22;78:22;80:2,6,

6,7,9,13,19,21;81:12,
13;83:4,8;84:1;85:3,
14;88:11;89:1;
99:14,15,16,17,21;
107:1;111:7
**delay (1)**
41:9
**Demo (1)**
10:9
**demonstrate (4)**
76:20;77:15,17;
85:22
**demonstrated (5)**
50:23;55:8;84:7,8;
88:25
**demonstrates (1)**
82:7
**demonstrating (1)**
81:5
**denial (1)**
94:13
**denied (3)**
74:4,6;79:23
**Dennis (1)**
10:23
**DENTONS (1)**
6:20
**deny (1)**
99:1
**depend (1)**
106:2
**depending (2)**
33:10;50:19
**depends (3)**
35:19;52:17;
107:17
**depose (1)**
39:4
**deposition (3)**
30:8,19;69:16
**depositions (1)**
53:12
**deputy (4)**
38:21;39:4;40:18,
22
**derives (1)**
17:5
**describe (1)**
28:1
**described (2)**
44:9;111:18
**deserve (1)**
112:8
**designated (3)**
32:24,25;67:18
**desires (1)**
109:8
**despite (1)**
103:1
**detail (1)**
76:16
**determination (2)**
44:20;51:1

**determinations (2)**
54:21;101:6
**determine (5)**
16:17;44:2,23;
50:18;51:20
**determined (1)**
82:3
**determining (1)**
95:14
**detriment (1)**
49:5
**develop (1)**
50:2
**developed (2)**
49:24;84:22
**Development (3)**
9:7,9;12:25
**devoted (1)**
14:1
**dictate (1)**
59:2
**differ (3)**
35:16,21;54:24
**difference (1)**
22:7
**different (19)**
16:11;22:10;
34:16;48:19;53:9;
61:18;63:19;64:21;
71:2;87:16,17;93:15,
18;94:18;96:15;
98:2;106:18;107:23,
25
**difficult (2)**
95:16;106:14
**difficulties (1)**
41:10
**difficulty (1)**
96:24
**direct (11)**
16:21;21:25;24:7;
32:15,15,18;33:18;
34:1;47:12;88:10;
90:21
**directly (1)**
34:20
**disagree (2)**
49:1;105:21
**disagreement (1)**
52:20
**discovery (5)**
52:24,25;53:4;
83:17;96:18
**discretion (1)**
62:11
**discuss (3)**
47:19;80:15;95:22
**discussed (3)**
30:3,8;107:9
**discussing (1)**
49:12
**discussion (5)**
30:19;62:9,22;

79:12,12
**discussions (1)**
11:5
**disingenuous (2)**
77:20;84:2
**dispute (6)**
49:13;55:20;
76:15,17;86:17,19
**disputed (3)**
17:11;40:12;83:12
**disputes (2)**
52:25;96:18
**disputing (1)**
55:21
**disqualification (1)**
48:24
**disregard (1)**
81:21
**distinguishing (1)**
51:7
**distributed (1)**
44:13
**District (30)**
11:3;22:24;39:1;
40:10;45:23;46:5,
23;49:21;53:1;
72:10,21;73:3,3,5;
76:2;79:14;80:5,17;
81:2,22;85:2;102:13,
22,23;103:1,8;106:7,
9;108:4,5
**divestiture (1)**
70:1
**docket (1)**
47:2
**document (1)**
40:6
**documents (10)**
11:18;12:6;35:7;
37:15;60:5,6;96:21;
100:11,12,15
**dog (1)**
69:21
**dollar (4)**
43:10,11;70:15;
82:5
**dollars (11)**
14:25;15:22;16:1;
17:13;35:13;43:15,
16;63:6;68:14;
69:17;103:18
**domicile (2)**
80:11,16
**domiciled (1)**
80:5
**Dondero (32)**
20:3,24;25:1,4,16;
26:10,13,15,20,23,
25;27:2,22;28:22;
29:23;34:7;42:4;
44:16;50:12;51:12,
15,16;55:7,14;58:4,
7,12;66:2;68:16;

97:3,3;99:23
**Dondero's (2)**
25:25;29:19
**done (9)**
34:1;75:15;90:20;
108:5,6;109:5;
111:22,24;112:5
**doozy (1)**
101:22
**doubt (4)**
54:4;76:25;91:11;
94:24
**down (10)**
23:8;32:6;36:5;
46:10,18;63:23;64:4,
17;77:15;102:1
**dozen (1)**
56:8
**dozens (1)**
96:2
**driven (1)**
18:11
**driving (1)**
63:3
**DSI (6)**
10:12;14:1,4;
21:12;22:7;112:14
**DSI's (2)**
16:13;94:5
**dueling (1)**
44:22
**DUNN (1)**
7:2;8:7
**duplicate (1)**
60:25
**duplicative (1)**
40:15
**during (5)**
16:7;59:14;77:6;
84:16;105:14
**dwarfs (1)**
43:17

**E**

**earlier (2)**
27:4;68:3
**early (1)**
71:25
**earned (1)**
111:11
**ease (1)**
88:8
**easier (1)**
85:10
**easiest (1)**
102:24
**easily (1)**
85:3
**easy (3)**
52:18;73:24;
111:17
**economic (4)**

APP. 0122
Appx. 00169

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                                December 2, 2019

52:11;87:5;94:2;
108:25
economics (1)
  16:14
economy (3)
  67:24,25;102:21
effective (1)
  60:21
effectively (3)
  42:10;45:12;65:25
efficiencies (1)
  52:11
efficiency (5)
  39:12;50:22;
  67:25;101:1;102:21
efficient (1)
  55:9
effort (2)
  90:5;91:12
efforts (4)
  16:13;18:2;38:19;
  84:9
EFH (4)
  56:17,21;63:17;
  109:10
ego (1)
  59:4
eight (2)
  17:13;60:24
eighteen (1)
  65:20
either (15)
  18:2,13;41:16;
  64:11;70:7;72:7;
  73:11;80:24;82:6,
  19;84:1;102:11;
  104:13;109:3,12
element (2)
  106:1,13
elements (1)
  39:11
else (7)
  40:15;47:21;57:6;
  74:23;75:4;108:24;
  109:17
email (5)
  38:20,23;40:21;
  59:24;74:2
embodied (1)
  69:11
emergent (1)
  113:12
empire (2)
  67:15;108:21
employ (2)
  45:3;111:17
employed (1)
  112:8
employees (20)
  13:20;14:1,5;
  20:20;28:1;29:13,
  17;30:15,22;31:1;
  41:24;42:3;52:12;

54:14;57:23;66:1;
85:5;86:19;95:11,12
employment (1)
  27:18
encountered (1)
  96:25
end (1)
  24:14
enforce (1)
  94:21
engaged (6)
  13:17;58:12,18;
  106:1,16;111:22
engagement (4)
  13:18,23;20:19,23
engages (3)
  50:3;58:18;64:22
enjoyed (1)
  78:16
enough (2)
  71:18;103:22
ensure (3)
  50:22;89:12;
  112:20
entire (2)
  96:1;102:14
Entities (18)
  8:13,13;14:16;
  15:4;41:24;51:24;
  67:18,19,20;71:1,6;
  80:8,13;81:13;
  88:18;93:19;104:4,4
entitled (2)
  56:10;81:17
entity (8)
  44:14;49:4,5;
  50:22;68:15;70:25;
  72:25;81:12
equity (8)
  16:11;17:7;25:20;
  44:12;86:13;91:6,
  18;92:19
erase (2)
  58:15,17
ESQ (22)
  6:4,5,6,11,16,17,
  22,23;7:4,9,10,15,16,
  17,18,19,24;8:4,9,14,
  19;9:3
essentially (1)
  87:8
estate (8)
  18:5;45:4,11;82:3;
  83:13;87:6;88:24;
  111:4
estates (2)
  97:22;98:10
estimated (1)
  69:16
et (4)
  6:15;8:8,18;65:21
ethical (1)
  106:23

Europe (1)
  14:23
evaluate (7)
  16:14;18:6;66:19,
  21;69:4;84:17;86:25
evaluated (1)
  69:13
evaluating (1)
  97:12
even (19)
  40:12;47:5,17,20;
  57:18;61:9,16,16;
  72:20,20;74:7;
  76:10;81:13;89:3,4;
  92:17;93:15;98:16;
  106:8
event (5)
  76:11;94:1;95:23;
  96:9;107:25
events (1)
  76:11
everybody (1)
  58:6
everybody's (1)
  46:14
everyone (1)
  103:2
everywhere (2)
  107:13,14
evidence (30)
  11:17;12:19;
  23:10;32:2;33:3,4,6;
  36:8;37:22;38:12,16,
  18,25;40:22,25;
  43:25;61:22;62:18;
  76:20;90:17;92:10;
  93:22;96:25;100:24,
  25;101:5;107:5;
  108:10,14;110:6
evidentiary (5)
  41:2,3,20;42:7,7
ex (1)
  69:8
exact (2)
  24:22;25:18
exactly (1)
  88:3
EXAMINATION (2)
  24:7;32:18
examined (1)
  54:16
example (5)
  93:3;95:9;101:2;
  102:18;113:4
examples (1)
  54:25
except (4)
  11:17;12:9,18;
  22:21
exception (7)
  37:20;38:12;39:5,
  7;40:4,7;97:11
exceptionally (3)

61:14,24;74:18
exceptions (1)
  40:3
excess (1)
  72:18
exchange (2)
  38:20;40:21
exclusion (1)
  37:10
excuse (4)
  44:19;53:17;69:7;
  99:15
executive (3)
  107:14;108:19;
  110:2
executive-level (1)
  27:25
exercised (1)
  33:13
Exhibit (17)
  11:17,17;12:18;
  37:10,10,11,12;
  39:14,15;40:23;
  60:11,13,15;64:25;
  67:17;69:11;74:1
Exhibits (20)
  11:17,23;12:18;
  36:10,12,19;37:9,9,
  20,21;41:16,17;
  59:15;60:8,16;
  65:17;66:17;67:16;
  74:1;91:24
exist (3)
  14:22;21:13;
  100:16
existing (4)
  108:1,2,21;110:2
exit (1)
  70:19
expand (1)
  47:9
expanded (2)
  79:1;98:17
expected (1)
  85:24
expects (1)
  84:14
expeditiously (2)
  22:24;39:11
expend (1)
  45:4
expended (4)
  74:15,19;90:5;
  103:5
expenditure (1)
  74:20
experience (10)
  13:3;46:7;50:20,
  21;54:7;57:13;
  75:15;85:1;92:23;
  93:3
expertise (2)
  85:20;86:21

explain (1)
  96:9
exposed (2)
  104:5,13
exposure (1)
  57:20
extension (1)
  13:24
extensive (2)
  49:19,24
extent (3)
  89:6;101:23;
  112:16

F

face (1)
  84:9
faced (1)
  65:23
fact (17)
  38:23;43:5,18,19;
  53:6;56:13;57:17;
  63:9;73:22;82:2;
  90:19,22;93:23;
  94:24;97:25;103:18;
  108:19
factor (11)
  52:23;56:23;
  70:21;82:4;84:4,5;
  87:5,7;88:8;98:7;
  101:9
factors (20)
  53:23,23;61:23,
  24;62:2,3,4,8;71:22;
  77:9,10,11,15;81:2,
  6,25;86:3;88:1;
  107:8;108:23
facts (18)
  16:18;25:8;42:12,
  17;50:16;51:3;59:2;
  61:14,17;76:15;
  77:14;81:19;100:1;
  107:17,19;108:8,18;
  109:25
factual (2)
  49:24;90:18
Fair (3)
  71:18;73:21;109:6
fairly (3)
  22:25;46:2;91:10
fall (2)
  46:7;111:8
falls (2)
  39:6;108:24
familiar (21)
  34:23;35:1,11;
  54:18;61:24;66:9;
  67:10,10;72:4,5,7,
  10,22;78:3;93:11,15;
  94:25;103:3;104:1,3,
  19
familiarity (7)

APP. 0123
Appx. 00170

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)          December 2, 2019

47:9;54:8;91:1;
96:10;103:24;108:8;
112:16
**familiarizing (1)**
90:5
**family (1)**
52:17
**fantastic (1)**
40:13
**far (3)**
39:9;88:21;96:18
**far- (1)**
86:19
**far-flung (3)**
41:24;52:1;100:14
**Fargo (1)**
107:13
**fashion (1)**
50:7
**fashioned (1)**
110:6
**fault (1)**
33:8
**favor (8)**
43:3;51:4;56:23;
75:4;81:6,20;83:20;
106:10
**favors (1)**
52:7
**feasibility (1)**
83:22
**features (1)**
51:7
**February (1)**
60:21
**Federal (4)**
38:12;71:17,19;
81:17
**fee (1)**
65:18
**feel (1)**
48:3
**feels (1)**
46:14
**fees (3)**
15:1;92:9,10
**feet (3)**
70:10;104:24;
110:5
**felt (3)**
79:9,9;85:9
**few (7)**
34:3;43:21;72:1;
73:23;80:15;90:2;
108:2
**fiduciary (4)**
63:6;70:10,17;
82:3
**field (1)**
104:15
**Fifth (3)**
72:24;81:3;83:16
**file (14)**

32:21;42:15;
77:24,25;78:22;80:3,
4;96:16,17;97:7;
106:2,15;107:16;
110:10
**filed (22)**
11:1;15:12;21:10;
26:22;42:23;43:8,
25;44:11;61:5;
71:25;72:1;74:22;
78:2;79:14;80:5;
82:23;88:16,17,20;
95:10;97:20;101:15
**files (2)**
105:24,25
**filing (7)**
21:14;32:22;64:7;
80:19;98:22,22;
104:24
**filings (1)**
66:4
**final (3)**
62:12;63:25;
101:19
**Finally (1)**
101:7
**financial (8)**
13:1,4;14:2;24:14;
86:10;91:4,7;100:10
**financial-advisory-services (1)**
14:18
**financials (1)**
65:16
**find (5)**
21:17;75:12;
77:10;85:23;107:8
**findings (2)**
90:18;113:20
**finds (1)**
102:24
**fine (5)**
11:10;12:14;
25:15;36:21;97:18
**finish (1)**
109:9
**firm (2)**
13:1;113:1
**firms (5)**
50:25;82:20;
87:14;111:7,7
**first (19)**
12:6;33:18;34:2;
38:11;42:16,21;
54:1;64:21;65:3;
69:7;72:1;73:12;
74:2,5;76:1;82:1;
89:7;99:12;102:7
**first-day (8)**
28:2;52:9;64:24;
69:25;77:23;79:6;
102:19;104:9
**first-filed (1)**
73:12

**Fitzwater (3)**
72:12,19,21
**five (6)**
43:16;57:4;82:19;
87:8;92:2;94:18
**five-minute (1)**
104:9
**flair (1)**
89:23
**fleeing (4)**
55:16,17;56:6,7
**flights (2)**
87:16;88:10
**floodgates (1)**
61:17
**flung (1)**
86:20
**fly (1)**
52:19
**focus (8)**
16:13;76:19;84:5;
86:20,21;92:6;94:5,7
**focused (11)**
65:11;77:13;82:2;
84:1;89:5;92:3;
98:18;108:1,20,21;
110:3
**focusing (1)**
94:2
**foisted (1)**
95:25
**folks (4)**
28:6;31:6,8;63:10
**following (2)**
18:17;74:13
**follows (1)**
62:6
**forced (3)**
99:18,19,22
**foreign (2)**
15:13,14
**forestall (1)**
73:24
**forgive (1)**
67:16
**form (4)**
26:2;35:16;79:21;
113:17
**formal (3)**
76:1;102:9,11
**formally (1)**
111:21
**formation (1)**
72:2
**formed (2)**
71:8;78:6
**former (6)**
26:13;47:24;
82:20,22;102:15;
108:2
**forth (3)**
68:3;80:22;113:19
**Fortress (1)**

109:19
**forty (1)**
74:19
**forty-five (1)**
34:1
**forum (10)**
55:10;62:19;
70:25;81:10,14;
85:24;87:4;105:23;
106:3,12
**forum- (2)**
56:10;106:18
**forums (1)**
106:17
**forum's (1)**
70:22
**forum-shopping (9)**
56:5,12;63:25;
64:2,11;77:19;106:1,
13,16
**forward (5)**
49:9;103:14;
110:19,19;112:23
**found (3)**
90:8;91:10;96:12
**foundation (5)**
25:11,13;31:14;
34:19,20
**four (7)**
13:6;24:21,23;
51:3;62:4,13;69:5
**fourteen (1)**
56:3
**Fourth (3)**
45:15;49:11;69:9
**frame (1)**
96:22
**FRANK (4)**
9:5;10:11;23:25;
85:5
**F-R-A-N-K (1)**
23:25
**frankly (6)**
42:14;55:5,19;
61:8;64:11;66:14
**fraudulent (3)**
68:25;69:4;92:5
**fraudulent-transfer (1)**
17:17
**FRED (5)**
9:9;10:12;13:24;
18:13;27:15
**free (1)**
33:17
**freed (1)**
57:3
**free-fall (1)**
69:23
**frequency (1)**
88:7
**fresh (4)**
50:15;78:23;
97:11;110:21

**front (3)**
21:18;35:7;100:7
**Frontier (7)**
15:24;43:15;68:5;
82:10;109:20,21,22
**FTI (1)**
18:21
**fulcrum (4)**
63:23,24;69:22;
70:10
**full (5)**
17:24;47:4;70:7,8;
111:23
**fully (3)**
51:9;81:8;97:12
**functionally (1)**
73:9
**functions (2)**
13:24;67:7
**Fund (8)**
7:8,23;17:8;26:7;
28:8;91:5,6;93:4
**fundamental (2)**
62:6;81:16
**Funding (1)**
28:7
**funds (13)**
15:11;16:12;17:8,
8,9;25:25;26:6;
51:13;86:13,13;
92:14,20;93:6
**further (15)**
21:1;23:10;32:15;
35:3;36:8;58:22;
66:14;67:22;68:1;
73:4;80:6;102:22;
104:16,20;106:21
**future (1)**
76:12

---

**G**

**gain (2)**
54:3,3
**gave (1)**
33:24
**GEDDES (1)**
6:9
**General (13)**
9:3;14:12;25:4,17;
51:14;64:17;65:2;
69:15,17;80:8,9;
89:5;107:18
**generally (12)**
34:11;35:8,15;
60:5;78:5;81:9;
86:10;87:6,24;
105:19;107:9;
111:16
**generated (2)**
65:19;92:10
**generates (1)**
92:18

**APP. 0124**

**Appx. 00171**

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

**generic (2)**
66:24;67:8
**gets (5)**
49:11;67:14;76:5;
110:24;112:20
**GIBSON (1)**
7:2
**given (18)**
14:7;16:18;36:19;
47:9,11;48:4;53:2;
79:7,8;84:17;88:7,7;
94:17;97:9;109:25;
111:18;112:24;
113:14
**giving (2)**
31:12;97:10
**gleaned (1)**
43:23
**global (2)**
87:19;108:20
**goal (3)**
18:4,7;98:20
**goes (7)**
39:9;65:2;73:11;
80:6;87:23;90:20;
106:21
**go-forward (2)**
62:14;63:14
**Good (18)**
10:4,5,19,20;
11:14;19:18,19,21;
21:4;23:18;53:8;
75:21;76:3;91:8;
97:1;105:11;110:5;
111:24
**govern (1)**
35:12
**governance (1)**
97:7
**government (1)**
57:1
**governor (1)**
71:20
**GP (3)**
6:15;8:8,18
**grant (3)**
81:9;105:13;110:7
**granted (3)**
52:9;107:4,6
**granting (1)**
17:20
**grapple (1)**
69:2
**gravitas (1)**
108:18
**great (3)**
53:8;90:5;113:25
**greatest (1)**
105:20
**Greg (1)**
10:9
**Gross (5)**
81:4,7;83:19;88:3;

89:15
**grossly (1)**
91:13
**ground (2)**
103:20;112:21
**grounded (1)**
73:22
**grounds (1)**
79:21
**GROUP (3)**
8:7;28:7;30:3
**groups (3)**
27:22,25;28:21
**grow (1)**
84:25
**guarantees (1)**
38:14
**GUERKE (9)**
6:5;23:18,19;24:8;
25:12;31:16,19,25;
32:11
**guess (3)**
36:1;74:14,21
**guidelines (1)**
67:2
**guy (1)**
89:18

---

**H**

**Hale (7)**
76:2;102:8,9,11,
16,19,20
**half (3)**
14:25;52:14;56:8
**hall (1)**
46:10
**hand (4)**
19:11;23:21;60:6;
67:4
**handed (3)**
37:8;59:15;60:7
**handing (1)**
59:17
**handle (5)**
38:1,2;40:11;
65:10;102:24
**handling (1)**
40:14
**hands (1)**
63:23
**Hang (2)**
12:2,4
**HANKIN (1)**
7:9
**happen (7)**
63:14;65:8;68:9;
70:11;111:7;3:9;76:12
**happened (5)**
45:19;63:13;
76:23,23;79:18
**happening (1)**
97:16

**happens (3)**
70:19;73:9;97:23
**happy (2)**
61:2;72:15
**hard (1)**
52:13
**harder (1)**
107:6
**harking (1)**
63:15
**HCLOF (1)**
82:11
**headed (1)**
70:3
**headquartered (1)**
13:11;82:10,10
**heads (3)**
27:25;28:21;30:3
**headway (1)**
79:12
**hear (20)**
22:24;33:17;
34:24;39:2,11;41:4;
45:3;51:23;75:6;
93:8;95:1,2,5;97:8;
101:8,22;102:19;
111:16;112:10;
113:12
**heard (14)**
30:18;53:6;59:10;
68:5;75:19;76:15;
90:6,7;91:21;95:21;
96:18,19,19,22
**Hearing (12)**
23:4;52:9;68:20;
74:3,3;77:23;78:1;
79:6;84:20;85:12;
101:14;104:10
**hearings (5)**
69:25;75:15;
91:20;93:9;96:2
**hears (2)**
95:16,17
**hearsay (13)**
38:7,9,11,13,13;
39:6,8,24,25;40:1,3,
6,7
**heart (2)**
64:15;100:18
**heavier (1)**
57:9
**hedge (5)**
16:12;17:7;86:12;
91:5;92:20
**held (4)**
14:15;68:14;
69:16;100:5
**help (1)**
95:18
**helpful (4)**
52:17;77:10;90:9;
107:21
**hereby (3)**

12:19;37:21;40:22
**herring (2)**
58:14;99:18
**high (2)**
44:4;47:14
**higher (2)**
87:10,12
**Highland (53)**
9:3,5;10:7;13:19,
21;24:9,24;25:1,22,
25;26:10;28:10,24;
29:5,7,13,16;30:10,
15,23;34:13;44:8;
48:4;49:25;50:1;
51:13,25,25;55:1,2;
57:25;60:23;66:22;
67:13,15;68:11,12,
15,17,18,23,25;
69:13;72:24;74:10;
76:7;77:1;93:24;
103:3,12,16;104:19,
23
**Highland- (1)**
72:24
**Highland's (10)**
25:4,16;27:23;
29:13;52:23;64:18;
65:24;66:10;67:10;
104:1
**highlight (1)**
51:7
**highlights (1)**
80:1
**highly (7)**
17:15;50:23;51:1;
53:4;57:14,21;
109:18
**Hills (1)**
13:8
**hinted (1)**
105:14
**hire (1)**
89:1
**hired (1)**
21:9
**history (6)**
52:23;53:11;54:7;
58:15,17;79:8
**hit (2)**
49:2;70:21
**hitting (1)**
111:1
**hold (3)**
22:1;24:17,19
**Holding (1)**
81:15
**holdings (1)**
81:12
**holds (1)**
15:19
**holistic (1)**
96:7
**home (2)**

56:7;78:16
**Homes (1)**
13:8
**Hon (1)**
40:21
**honestly (1)**
34:15
**Honor (276)**
10:4,8,14,19;11:1,
5,9,13,14,16,20,25;
12:11,13,15,22;19:3,
7,19;21:4,15,23;
23:6,12,19;25:6,12;
27:11;31:16,21;32:5,
17;36:3,9,15,18;
37:5,12,17,23;38:1,
9,11;39:17;40:24;
41:7,12,14,18,22;
42:6,11,14;43:3,6,
17,19,21;44:7,15,22,
25;45:15,17,20,25;
46:20,22;47:8,12,17;
48:7,18;49:1,2,5,8,
12,15,16,23;50:14,
23;51:3,9,18;52:3,8,
17,20,22;53:10,13,
17,18,22;54:4,9,24;
55:3,6,23;56:1,18,
20;57:7,11,12,22;
58:1,10,15,20,23,25;
59:7,8,12,15,17;
60:2,8,20,25;61:7,
10,11,15,19,20,21;
62:12,21,24;63:4,15,
16,19,24,25;64:5,20;
65:1,22;66:6,13,16;
67:4,12,24;68:2,7,
12;69:10,15,23;70:3,
9,21,23;71:4,21,22;
72:3,9,13;73:1,7,15;
74:12,13,24;75:2,21;
76:5,7,14;77:2,6,9,
18,23;78:2,12,13,17;
79:6,21;80:10,15;
81:8,19,23;82:21;
83:16;84:4,11;85:13,
21;86:2;87:5;88:11,
23;89:15,20,24;
90:10,11,14,25;91:2,
6,8,22,22,23;93:8,
14;94:1,11,24,25,25;
95:1,2,16,18,25;
96:7,8;97:10,21,22;
98:9,11,24,25;99:1,
3,6,8,13,18,24;100:2,
3,7,9,13,17;101:4,7,
13,20,21,23;102:5,
10,25;103:11,13,21;
104:2,5,21,25;
111:14,15;112:9,11,
13,14,16;113:8,15;
114:1
**Honorable (1)**

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(9) generic - Honorable

APP. 0125
Appx. 00172

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

72:12
**Honor's (7)**
11:4;61:11;64:3;
76:3;100:18;102:12;
112:23
**hope (4)**
70:6,6;78:7;98:23
**hopefully (2)**
86:25;111:11
**hopes (1)**
18:7
**horse (1)**
101:11
**hours (4)**
14:4;20:9;74:16,
16
**Houser (3)**
46:24;102:19,22
**HUANG (1)**
7:18
**Human (2)**
28:8;108:12
**hundred (2)**
20:9;25:20
**hundreds (6)**
14:4;63:5;69:20;
74:16,16;96:1
**hurt (1)**
36:25

**I**

**idea (5)**
50:14;51:25;70:2;
100:14;105:21
**identified (1)**
32:9
**identifies (1)**
68:11
**identify (1)**
40:17
**ignore (3)**
90:17;100:25;
101:5
**immaterial (1)**
85:7
**impact (2)**
45:9;49:4
**impartial (1)**
73:21
**impeccable (1)**
98:17
**implication (2)**
73:17;74:8
**importance (1)**
92:16
**important (13)**
44:7;50:21;63:15;
70:19;79:9;85:9,12;
86:1;87:7,18;89:11,
11;90:9
**importantly (3)**
42:21;63:14;79:9

**improper (1)**
90:24
**impropriety (1)**
18:24
**improve (1)**
83:21
**inappropriate (2)**
106:22;108:13
**Inc (5)**
9:8,9;13:1;25:5,17
**include (2)**
31:5;86:10
**included (2)**
64:24;106:12
**including (10)**
13:6;14:20;15:4,9,
14;17:7,16;80:18;
81:1;109:13
**incorporation (2)**
64:6;71:5
**increased (1)**
79:4
**increases (1)**
14:3
**Indeed (3)**
82:23;84:11;
103:17
**indenture (1)**
101:2
**indicated (1)**
94:6
**indicating (1)**
62:23
**indication (1)**
106:24
**indicator (1)**
52:24
**Indiscernible (1)**
37:5
**individual (1)**
106:8
**industries (1)**
13:4
**inform (3)**
48:3;110:13;
113:23
**information (4)**
14:7;18:21;85:19;
95:25
**informed (2)**
16:9;53:13
**infrastructure (1)**
67:7
**initial (2)**
44:18,20
**initially (2)**
13:17;47:20
**injunction (5)**
69:8,8,9,10,10
**injunctions (1)**
69:5
**inquiring (1)**
38:22

**inside (1)**
104:11
**insider (3)**
17:25;84:19;112:4
**installed (1)**
98:16
**instance (1)**
42:17
**instead (2)**
18:11;101:16
**instrument (1)**
82:14
**instruments (3)**
86:10;91:7;100:10
**insufficient (1)**
79:21
**integrated (1)**
113:7
**intended (2)**
32:21;77:24
**intends (3)**
18:6;77:25;86:24
**intention (2)**
84:7,8
**intercompany (2)**
48:14;97:25
**interest (15)**
25:22;47:25;
53:21;55:15;64:9;
68:19,22,23;70:22,
22;71:1,6;74:20;
78:18;80:25
**interested (1)**
56:5
**interesting (2)**
90:16;101:20
**interest-of-justice (1)**
61:25
**interests (9)**
14:19;15:14,17;
52:3;78:9;80:7;
86:12;100:10,16
**international (1)**
15:8
**internationally (1)**
105:17
**interpretation (1)**
91:14
**interrupt (1)**
45:18
**Intertrust (1)**
8:13
**intertwined (1)**
112:17
**intimately (1)**
72:22
**into (14)**
11:16;12:19;
21:18;37:21;40:22;
42:18;43:24;48:11;
73:12;90:21;101:9;
104:22;107:6,24
**introduced (1)**

13:21
**invariably (1)**
73:11
**invested (1)**
52:5
**investment (7)**
15:5;65:13,18;
66:7,10,15;67:1
**investments (5)**
15:17;16:4;86:11;
93:6,6
**investors' (1)**
17:1
**invited (1)**
64:12
**involun (1)**
60:9
**involuntary (6)**
17:20;60:10;66:4;
76:9,9;91:25
**involve (3)**
72:24;86:6;107:18
**involved (6)**
17:15;58:11;66:7;
93:23;97:24;106:21
**involvement (2)**
13:19;85:6
**involves (2)**
65:3;106:22
**involving (4)**
49:18;57:16;
80:17;112:4
**Ira (2)**
10:9;111:14
**ironed (1)**
41:10
**irrelevant (3)**
89:6;107:9,9
**ISAAC (2)**
9:3;10:11
**issue (23)**
48:24,24;50:9,19;
53:5;54:6;58:14;
60:9;61:20;62:23,
25;64:3;65:10,11;
68:24;71:22;73:13;
77:2;82:12;105:7;
110:14;112:15;
113:2
**issued (10)**
60:9;11;69:5;
91:21;94:13;103:14,
15,16,17;108:6
**issues (14)**
21:2,2;49:18;
50:19;61:8;65:23;
69:1;94:16;96:20;
97:5,25;103:4;
107:10;108:8
**item (2)**
10:15;68:10
**iterations (1)**
94:18

**J**

**JAMES (3)**
8:14;10:6;25:1
**Janeiro (1)**
15:9
**January (3)**
60:19,20;61:5
**JEFF (4)**
7:16;10:8;11:14;
75:22
**Jefferies (9)**
6:10,21;15:20,22;
43:14;68:5;82:9;
109:18,21
**JENNER (1)**
7:7
**JEREMY (1)**
8:4
**Jernigan (52)**
38:21;39:1;45:25;
46:1,2,6,8;47:15,20;
48:23;66:9,13,19,20;
67:9,22,25;69:1,13;
73:18;74:11;76:17,
25;77:22;78:2,12;
90:8;91:10,20;93:3,
11;94:13;95:6,12,17,
21;96:3,12;97:14,18;
100:25;103:3,6,7;
104:3,16;110:11,17,
21;111:9;112:24;
113:9
**Jernigan's (3)**
40:21;90:17;92:23
**Jim (1)**
27:7
**job (2)**
18:16;84:25
**JOHN (4)**
6:16;10:9;21:19;
59:12
**join (1)**
63:8
**joinders (1)**
77:7
**joined (5)**
29:4,7;43:2;60:4;
75:1
**joining (1)**
98:15
**jointly (3)**
48:5,13;78:19
**Jones (6)**
10:7;11:15;13:14,
22;21:20;75:22
**JOSE (1)**
6:17
**Josh (1)**
83:1
**Judge (97)**
13:7,7,8,9;22:3;

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(10) Honor's - Judge

APP. 0126
Appx. 00173

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                December 2, 2019

32:24;38:21;39:1,4,
25;44:3;45:25;46:2,
5,8,24;47:10,11,15,
20,22,23,23;48:10,
22,23;66:9,13,18,20;
67:9,22,25;69:1,13;
70:17;72:12,14,14,
19,21;73:3,5,18;
74:10;76:2,17,25;
77:22;78:2,11;
79:15;81:4,7,14;
83:19;88:3;89:15;
90:8,16;91:10,20;
92:23;93:3,11;
94:12;95:6,12,17,20;
96:2,5,12;97:13,18;
100:24;102:8,9,11,
15,19,19,20,22;
103:3,5,7;104:3,16;
106:8;108:5;110:11,
17,20;111:9;112:24;
113:9
**judges (9)**
46:23;47:7;48:1;
49:2;91:2,3;106:8;
108:12,12
**judge's (1)**
108:11
**judgment (2)**
81:22;111:18
**judgments (1)**
108:12
**judicial (8)**
39:12;41:19;46:6;
49:23;67:25;81:17;
101:1;102:21
**jurisdiction (2)**
55:16;107:20
**jurisdictions (4)**
41:24;44:22;52:1;
88:21
**jurist (1)**
97:19
**justice (8)**
52:3;53:16,18,21;
64:9;78:10;80:25;
99:20
**justify (1)**
95:19

**K**

**keep (4)**
61:1;69:23;
101:14,23
**keeping (1)**
98:8
**KEIP (1)**
95:11
**KEIPs (1)**
95:17
**KERP (1)**
95:11

**KERPs (1)**
95:17
**KEVIN (2)**
6:5;23:19
**key (3)**
51:16;66:22;112:3
**Kharasch (3)**
10:9;111:14,14
**KIMBERLY (1)**
7:19
**kind (12)**
62:13,19;64:12;
65:2;66:19;73:12,
24;74:5;90:15;
102:7;105:15;
108:24
**kinds (2)**
112:2,3
**Klos (1)**
31:5
**knowledge (13)**
14:2;27:1;46:6,8;
84:23,25;85:19;91:9,
9;93:4;95:13,19;
96:5
**knows (1)**
69:24
**Korea (3)**
15:11;20:16;86:15
**Korean (3)**
93:5;104:3,7
**KUAN (1)**
7:18

**L**

**LA (2)**
88:10,11
**lack (1)**
55:12
**laid (1)**
11:4
**large (5)**
51:18;91:4;
100:19,22;109:24
**largely (3)**
42:8;50:25;76:15
**largest (5)**
51:19;69:19;83:5,
13,16
**last (11)**
19:15;27:4;41:1;
66:6;69:14;87:5;
89:2,25;94:17;
103:11;104:2
**Lastly (3)**
18:16;76:14;83:16
**late (2)**
38:2;60:19
**later (4)**
60:24;68:21;93:9;
97:8
**LATHAM (2)**

7:13;83:15
**Latin (4)**
86:15;93:5
**latter (1)**
109:9
**Laughter (1)**
59:6
**laundry (1)**
107:8
**LAUREN (1)**
6:22
**law (12)**
14:13;50:25;
70:25;71:8;76:11;
82:20;102:15;
105:15;106:6,7,20;
110:17
**laws (1)**
14:11
**lawsuits (3)**
99:19,21,22
**lawyer (1)**
47:23
**lawyers (1)**
108:13
**lay (2)**
51:9;53:23
**layer (2)**
69:22;72:20
**laying (3)**
25:9,11;31:14
**leading (1)**
85:19
**learned (4)**
76:25;77:1;90:19;
91:15
**learning (3)**
14:1;49:14;50:17;
52:6;66:12,14;68:1;
76:17;90:7,10;
101:10;104:16,20
**least (5)**
48:8;56:9;61:3;
62:1;69:14
**leave (1)**
111:9
**leaves (1)**
47:7
**leeway (3)**
31:12;33:24,25
**legal (4)**
29:21;62:7;67:7;
81:16
**legal-compliance (1)**
28:10
**legitimacy (1)**
101:17
**lenders (1)**
68:5
**lengthy (1)**
91:21
**less (2)**
17:13;99:9

**level (1)**
106:13
**LEVENTON (2)**
9:3;10:11
**leveraged (1)**
65:4
**liabilities (3)**
77:3;78:5;84:24
**life (3)**
52:17;57:4;98:1
**likely (8)**
53:1,4;66:10;
83:12;85:7;91:7;
93:8;98:20
**limited (12)**
14:10,15;33:5;
34:4;40:20,23;52:9;
53:11;55:21;90:18;
100:10;111:10
**limited-partnership (1)**
25:22
**line (4)**
21:21;65:6,8,12
**lines (3)**
64:22;65:2,12
**liquid (3)**
15:19;18:13;86:16
**liquidated (1)**
92:15
**liquidation (3)**
16:25;57:19;70:5
**list (6)**
36:11;50:24;
51:19;67:17,18;
107:8
**listed (2)**
82:18;83:11
**litigating (1)**
78:16
**litigation (19)**
17:15;54:4;55:3,5;
78:14;80:17;83:7,10,
14,15;84:1;85:18;
88:19;99:17;103:23;
108:1,2,22;110:1
**litigious (3)**
50:23;51:1;52:24
**little (5)**
24:5;37:2;48:19;
54:2;60:24;63:18,
21;67:14,14,21;
68:20;77:7;79:19;
91:12;99:9
**Litvak (1)**
10:10
**lived (2)**
61:4;63:11
**living (1)**
61:8
**LLC (2)**
6:10;7:14
**LLP (8)**
6:2,14,20;7:2,13,

22;8:2,12
**loan (2)**
16:4;65:15;92:9
**loathe (1)**
60:5
**local (8)**
13:16;59:13;
70:22;73:8;86:7,21;
88:14;89:23
**locales (1)**
15:8
**locally (1)**
89:5
**located (15)**
15:17,20;41:25;
46:23;51:16,18,21;
58:7;86:14;100:13;
107:12,13,13,14;
108:4
**location (12)**
29:4,6,10,16;30:7,
15;31:22;86:2,5;
99:20;100:9;106:18
**locations (1)**
30:22
**logical (3)**
42:16;55:19,22
**London (1)**
7:14
**long (3)**
52:23;106:5;
108:14
**longer (5)**
16:23;50:6;61:9;
91:16,18
**Look (24)**
12:6;19:22;46:22;
51:19;57:24;64:2;
65:12,17;67:3,12;
68:19;72:20;74:1;
79:15;82:17;86:5,9;
87:13;88:15;90:25;
96:11;101:2;105:24;
110:21
**looking (5)**
50:16;69:19;
104:14,15;107:19
**looks (3)**
82:4,5;96:7
**Los (1)**
13:11
**losing (1)**
45:24
**lost (2)**
73:23;85:20
**lot (16)**
18:21;33:24;
62:22;65:11,19;
93:13;94:25;95:21;
105:17;106:2;
109:17;110:16;
111:24,25;112:5;
113:20

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)

December 2, 2019

**loud (1)**
55:11
**LP (6)**
24:10;25:2;30:23;
60:3;80:6,7
**LUCIAN (6)**
6:16;59:12,12,20,
23,25
**lunch (2)**
105:5;110:12

**M**

**machinery (2)**
110:8;113:24
**MACKSOUD (1)**
6:22
**mail (1)**
110:25
**maintain (2)**
15:7;98:9
**Maintenance (1)**
75:12
**majority (5)**
43:9,11;51:21;
80:4;86:15
**makes (12)**
42:4;43:9;55:15;
64:19;70:14,14;
81:5;86:3;89:25;
90:13;101:6;106:13
**making (4)**
31:23;48:25;
68:23;90:17
**manage (3)**
15:14;28:4;57:18
**managed (6)**
15:3;55:2;57:25;
65:20;96:15;112:22
**Management (45)**
6:15;8:8,18;9:4,6;
10:8;13:20;14:20,
25;15:1;16:3;18:10;
21:5;22:9;24:10;
25:2;28:1;30:23;
35:13;50:13;54:15;
58:5;60:3,14;65:13,
18,24;66:8,10,15;
68:11,16,17,23,25;
78:7;79:17;92:14;
93:12;95:4,21;96:10,
12;103:18;110:2
**manager (8)**
14:13;16:23;
25:25;26:5,6,7,9;
51:12
**managers (1)**
21:13
**manages (4)**
14:17;15:10;
16:12;50:8
**managing (1)**
17:6

**many (12)**
15:8;18:12,21;
80:10;88:10;89:12,
12;91:2,7,20;97:24,
24
**MARC (1)**
7:9
**margin (1)**
15:22
**marginally (1)**
92:25
**markedly (1)**
93:18
**market (2)**
92:13;94:9
**marketplace (1)**
67:3
**Marsal (2)**
7:3;8:3
**MASCHERIN (1)**
7:10
**massive (1)**
53:2
**material (2)**
45:2;88:6,24
**materially (1)**
45:8
**matter (9)**
18:3;39:11,23;
44:18,20;56:13;
102:18,25;111:15
**matters (8)**
10:14;17:16;
80:17;94:1;102:19,
20,24;110:17
**Matthew (3)**
10:21;41:12;
112:11
**Max (1)**
10:9
**MAXCY (1)**
6:23
**maximize (3)**
18:4,12;87:1
**maximum (1)**
50:22
**may (38)**
12:20;21:6;22:2;
23:7,18;24:6;31:21;
35:1;36:5,24;37:23;
41:11,25;42:1;
43:10;49:4;52:1;
54:24;55:6;59:9;
63:12;76:4,4,12,12;
78:21;81:8;85:5;
90:19;91:4,5;95:11;
96:25;97:15;98:5;
101:8;102:16;108:9
**maybe (5)**
27:7;56:3;90:20;
91:3;107:24
**mean (14)**
24:22;31:13;

35:18;39:3;40:9,12;
47:22;48:5;54:7;
55:25;56:2,24;
87:24;109:2
**means (4)**
54:8,9;96:2;
103:19
**meet (5)**
29:23;32:8,9;
62:17;80:23
**meeting (1)**
14:4;81:24
**meetings (2)**
30:1;31:8
**meets (1)**
40:6
**member (2)**
43:17;83:11
**Members (5)**
29:21;31:5;78:6;
80:18;88:16
**memorized (2)**
35:9,22
**mention (1)**
110:21
**mentioned (12)**
30:7;44:23;57:22;
58:9;78:17;79:6;
87:11;89:16;97:22;
98:13;99:25;112:15
**mentioning (1)**
77:19
**mess (1)**
37:1
**message (1)**
55:11
**met (3)**
18:20;20:3,20
**Meta-e (1)**
83:17
**metropolitan (1)**
87:15
**MICHAEL (2)**
6:6;7:4
**microcosm (2)**
67:14,23
**microcosms (1)**
67:21
**microphone (3)**
19:23;21:17;24:4
**middle- (1)**
67:5
**Midwest (2)**
87:11,13
**might (9)**
47:16;48:3,10,11;
91:23;96:20;107:20;
108:15;111:8
**Mike (1)**
10:24
**mileage (1)**
87:17
**mile-and-a- (1)**

52:13
**MILLER (1)**
7:24
**million (6)**
15:22;16:1;17:13;
43:15,16;68:13
**millions (2)**
63:5;69:20
**mind (3)**
60:19;61:14;69:23
**minimum (1)**
29:23
**minutes (2)**
34:1;90:2
**miscommunication (1)**
36:20
**misstated (1)**
71:5
**mistake (1)**
103:21
**misunderstood (1)**
33:14
**model (1)**
104:19
**modern (2)**
97:25;105:16
**modifications (1)**
16:18
**modified (1)**
112:1
**modifying (1)**
112:5
**modus (1)**
67:11
**mom (1)**
89:3
**mom-and- (1)**
100:17
**mom-and-pop (3)**
88:22,23;89:4
**moment (2)**
45:18;100:8
**moments (1)**
80:15
**monetization (1)**
92:21
**monetizing (1)**
16:25
**money (3)**
65:4,4;111:12
**money-management (1)**
14:18
**month (1)**
111:24
**month-and-a-half (2)**
18:17;88:15
**months (3)**
43:21;60:24;108:3
**more (27)**
38:17;40:13;
41:19;51:9;52:14;
62:7;63:9,13;65:11;
67:10;73:15;81:13;

83:25;84:12;85:23;
87:4;89:23;90:1,3;
94:25;96:13;99:3;
101:22;103:25;
107:18,20;111:25
**morning (11)**
10:4,5,19,20;11:5,
14;19:19,21;21:4;
23:18;99:24
**MORRIS (21)**
7:22;10:9;21:15,
19,19;23:6;25:6,10;
26:2;27:11;31:21;
32:23;34:19,22,25;
36:3;37:17;38:9;
39:17,19;59:16
**most (14)**
39:25;42:16,21;
55:9,19;81:2;85:11;
87:7,20,22;88:13;
98:3,20;105:21
**motion (66)**
10:16;11:1,4,20;
15:12;18:18;23:11,
14;31:13;33:1,4,5,
19;39:20;40:19;
41:21;42:9,19;54:1;
55:11;60:4;61:18;
62:25;63:7,8;64:14,
16;71:23,25;73:10;
75:4;77:7,14,24,25;
78:1,3,12;79:22;
82:15;90:19;94:13;
95:10;96:16;97:6;
98:15,15,23,23;99:1;
100:1;101:11,14;
104:24;105:7,12;
106:15;107:3,4,6;
109:13,23;110:7;
111:17;112:18;
113:12
**motion-by-motion (1)**
108:10
**motions (7)**
28:2;39:2;64:16;
100:2;105:15;
112:16;113:8
**motivation (2)**
75:14;97:14
**motive (2)**
98:14,15
**movant (3)**
62:17;80:23;81:5
**movants (2)**
41:5;88:9
**move (9)**
11:16;36:12;
37:13;42:18;49:9;
64:8;85:16;109:8;
110:5
**moved (1)**
109:11
**moving (5)**

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(12) loud - moving

APP. 0128
Appx. 00175

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                                December 2, 2019

12:9;21:22;61:11,
12;63:20
**much (9)**
19:1;58:10;66:11;
83:24;87:21;93:21;
96:1,3;113:25
**multi (1)**
97:24
**multi- (1)**
101:20
**multiple (3)**
17:16;43:10;67:17
**multiples (1)**
43:17
**multi-strat (4)**
93:4;104:4,8,12
**multitude (1)**
15:1
**must (4)**
44:25;45:1;80:20;
83:21
**mutual (1)**
17:8
**myriad (2)**
13:4;93:7
**myself (1)**
57:23

**N**

**name (7)**
19:13,15;23:23;
30:11,13;46:24;
68:15
**narrow (1)**
57:16
**national (3)**
13:10;87:14,19
**nature (4)**
35:19;42:22;
52:24;110:1
**nauseum (1)**
61:23
**necessarily (5)**
32:25;56:4;60:25;
61:16;62:15
**necessary (3)**
50:15;105:1,2
**need (14)**
11:19;13:16;
21:17;51:19;59:4;
76:18;85:15;88:14;
101:2,15;106:4;
110:8,17;111:3
**needed (1)**
83:4
**needs (3)**
50:24;83:3;110:19
**negative (2)**
78:6;106:19
**negatives (1)**
64:10
**negotiate (2)**

113:21,22
**neither (2)**
66:11;82:15
**nerve (4)**
42:5;43:5;51:11;
58:8
**NESTOR (2)**
6:6;10:25
**neutral (4)**
64:4;65:9;68:8;
104:18
**New (25)**
15:20;20:14;
21:12;25:8;30:6,7,7,
10,15;42:1;47:6,11;
82:10;83:10,14,14;
86:16;92:13;99:17,
21;103:13,13,16,19;
107:13
**next (6)**
65:12;68:10;84:4;
85:21;90:2;110:22
**nexus (1)**
76:22
**NICHOLS (1)**
7:22
**nine (1)**
21:9
**nine-and-a-half (1)**
68:13
**nineteen (1)**
83:12
**ninety (1)**
17:5
**ninety- (1)**
92:1
**ninety-nine (1)**
14:14
**nobody (2)**
46:8;88:24
**nonaffiliates (3)**
22:17;35:14;94:4
**non-CLO (1)**
93:19
**noncustodial (1)**
15:17
**nondebtor (3)**
41:24;45:5;53:2
**nondebtor-entity (1)**
30:13
**non-Delaware (1)**
80:11
**none (3)**
23:4;82:23;109:12
**nonetheless (1)**
50:21
**nonparty (2)**
52:25;53:4
**nonpublic (2)**
86:12;92:19
**non-venue (1)**
21:2
**normal (2)**

46:4;92:16
**Northeast (1)**
84:2
**Northern (13)**
22:23;39:1;40:10;
45:23;46:5;53:1;
76:2;102:13,23;
103:1,8;108:4,5
**Nos (1)**
37:20
**note (8)**
62:1;63:25;68:12,
13,14;72:16;73:25;
82:12
**noted (1)**
63:16
**notes (1)**
45:24
**notice (4)**
41:19;49:23;
82:23;97:4
**notices (2)**
88:16,17
**notwithstanding (1)**
94:21
**number (16)**
10:14,16;43:11;
51:18;53:2;57:18;
60:11,13,16;67:20;
69:11;74:1;82:5;
83:11;108:6,7
**numbered (1)**
36:22
**Numbers (1)**
37:11
**numerous (2)**
39:2;54:19
**Nutro (4)**
44:14,15,17;45:4
**Nutro's (1)**
44:15

**O**

**object (1)**
25:6
**objected (4)**
37:3,10,12,13
**objection (20)**
12:12,15,17;
21:15;25:15;26:2;
27:11,11;32:23;
34:19;37:14,16,19;
38:2,7;39:8;40:5;
57:15;59:16;113:13
**objections (4)**
11:24;39:13;
53:25;62:22
**obligations (5)**
15:22;16:4;65:15;
91:8;92:3
**obligor (1)**
68:13

**obtain (1)**
38:19
**obvious (2)**
40:13;42:21
**Obviously (11)**
22:9;26:14;40:19;
42:24;46:24;56:6;
57:24;61:21;100:4;
101:9;111:4
**occasions (1)**
18:21
**occur (1)**
53:1
**occurred (2)**
53:12;74:4
**occurrence (1)**
45:2
**occurring (1)**
97:1
**October (2)**
13:18;29:7
**off (4)**
17:1;75:16;88:21;
103:20
**offended (2)**
74:7;75:17
**offensive (1)**
73:16
**offer (2)**
39:14;84:20
**offered (3)**
31:17;38:18;39:23
**office (14)**
20:14,21;29:1,2,2,
4,8,14,19;30:1,10;
55:18;83:15;86:5
**officed (1)**
30:6
**officer (7)**
12:24;13:3,6,25;
24:14,24;79:1
**officers (1)**
66:1
**offices (18)**
13:15;15:8;20:7,9;
29:9,11,21;30:4,19,
25,25;31:3;41:25;
42:1;52:1,2;85:13;
86:18
**Official (5)**
6:3;10:22;42:25;
43:12;109:14
**often (1)**
81:2
**of-venue (1)**
71:25
**Oklahoma (2)**
15:25;82:11
**old (2)**
26:19;110:5
**once (5)**
20:3;29:23;44:18;
73:3;110:23

**one (49)**
11:18;12:13;16:2;
21:18;22:15;28:4,
21;37:12;39:11,12;
40:3;43:16;46:23;
47:16;49:4;50:23;
52:10;56:3,8;60:15,
16;62:12,21;63:2,25;
67:16;69:24;71:18,
25;72:18,20;76:3;
77:13;80:11;82:1;
86:2;88:18;94:1;
97:5;98:2;101:21;
103:11,14,20;104:2;
109:1,11,17;111:15
**one-hundred-percent (1)**
51:13
**O'NEILL (4)**
10:4,6,6,14
**ones (3)**
36:14;59:18;105:2
**one's (1)**
68:5
**ongoing (1)**
110:1
**only (32)**
14:2;16:24;20:3;
22:7;23:11;26:20;
29:16;32:11;36:15;
49:25;50:24;51:25;
52:9;53:3,14;57:16;
66:1;72:9;73:22;
74:9;76:8;80:16;
81:11;82:4;85:7;
88:17;91:8;92:17,
25;93:13,23;109:11
**opaque (1)**
54:12
**open (1)**
61:17
**open-ended (1)**
17:8
**operandi (1)**
67:11
**operated (4)**
49:25;54:11;55:2;
57:20
**operates (1)**
79:6
**operating (3)**
22:10;88:21;112:7
**operation (2)**
65:14,20
**operational (3)**
70:2,4,6
**Operations (9)**
28:7,8;32:3;41:23;
77:4;79:2;84:24;
90:6;92:7
**opinion (11)**
60:9,11;81:4,15;
88:4;91:25,25,25;
94:12,15;99:13

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                              December 2, 2019

**opinions (14)**
41:17;49:22;
54:14,19,22;64:3;
66:17;73:25;74:16;
76:21;81:1;91:21,
23;108:7
**opportunity (2)**
11:7;112:24
**opposed (5)**
56:11;88:11;95:6;
109:12,23
**opposing (1)**
37:8
**opposite (1)**
109:15
**opposition (2)**
33:5;56:11
**options (1)**
18:7
**oral (1)**
105:7
**oranges (1)**
93:25
**order (12)**
15:14;45:6;53:19;
60:14;80:23;83:20;
97:6;99:22;105:1;
110:8,9;113:17
**orders (1)**
17:19
**ordinary (3)**
79:7,11;101:18
**ordinary-course (5)**
95:10;96:17;
101:14;112:4,18
**organization (1)**
51:22
**organizational (5)**
25:13;27:23;
31:19;32:3;91:17
**organized (4)**
14:11,13;70:25;
99:9
**others (4)**
14:4;50:12;53:3;
59:9
**otherwise (4)**
84:3;96:8;104:17;
106:17
**out (22)**
11:4;18:18;29:13;
41:10;43:3;46:13;
51:9;52:19,19;
53:24;54:13;56:19;
64:5;72:17;83:23,
23;88:24;90:8;
108:19;110:12,13;
111:8
**outcome (3)**
18:9;45:11;63:18
**outlined (1)**
40:4
**out-of-court (1)**

39:22
**outside (2)**
30:19,25
**outstanding (1)**
17:12
**over (26)**
13:2;14:14,19,24;
15:18;17:2,4;18:17;
20:9;29:13;41:6;
44:5;60:24;74:18,
19;77:10;78:7;
79:15;90:2;92:12;
95:14;103:17;
108:12;110:22;
112:3;113:13
**overall (1)**
51:22
**overblown (1)**
77:5
**overcome (2)**
83:20;106:14
**overnight (1)**
52:16
**overrule (1)**
40:5
**overruled (4)**
25:15;26:3;27:13;
35:4
**oversecured (2)**
68:7;100:21
**oversee (2)**
65:7;79:1
**overseeing (1)**
46:25
**overstated (1)**
91:13
**overturn (2)**
44:11;79:22
**overturned (1)**
45:6
**owed (3)**
15:25;43:14,16
**owes (1)**
15:21
**own (6)**
14:20;36:1;43:1;
53:11;66:1;95:12
**owned (2)**
44:15;80:7
**owner (1)**
51:14
**ownership (1)**
80:14
**owns (6)**
14:17;15:10;25:4,
16,20;91:17

**P**

**PA (1)**
6:9
**Pachulski (8)**
10:6;11:15;13:14,

21;21:19;75:22;
111:5,14
**pages (4)**
74:16,18;88:9;
96:2
**paid (9)**
70:7;89:7;98:6;
99:22;111:12;
112:14,14,20;113:2
**painstaking (1)**
77:8
**painted (1)**
63:2
**paper (1)**
100:16
**papers (10)**
42:23;44:9;51:6,9;
52:19;53:24;55:9;
61:11,12;95:20
**pare (1)**
77:15
**Parking's (1)**
52:15
**part (7)**
22:22;50:8;65:18;
69:12;91:15,16;
112:17
**parte (1)**
69:8
**participate (1)**
89:13
**particular (8)**
45:9;47:11;49:4,6;
51:8;64:16;94:10;
106:7
**particularly (5)**
43:6;86:22;
107:10,16;110:1
**parties (15)**
14:22;15:7;16:17;
21:22;51:10;56:22;
64:9;67:17;78:9;
80:24;82:7;84:6;
92:21;108:13;
110:18
**Partner (9)**
9:5;14:12;24:19,
21;25:4,17;51:14;
80:8,9
**partnership (2)**
14:11;55:21
**partnerships (2)**
14:15;100:11
**parts (2)**
22:15;105:18
**party (5)**
16:16;18:23;
23:10;55:7,12
**party-in-interest (1)**
42:23
**Pass (2)**
23:2;35:24
**past (8)**

35:2;50:20;51:19;
55:14;58:10,18;
70:24;111:22
**PATEL (27)**
8:19;36:9,15,18,
22,24;37:2,5,8,23;
38:1;59:15;60:2,3,
20,23;62:10;71:4,8,
11,13,16,18,21;73:7,
15;102:5
**PATRICK (2)**
6:23;83:6
**Pause (1)**
12:8
**pay (2)**
111:10,11
**paying (1)**
17:1
**payment (1)**
101:3
**PC (2)**
8:7,17
**pending (14)**
15:13,15;17:17,
19;43:22;52:8;
72:23;80:19;83:7,10,
14;88:15;90:4;108:3
**Penny (2)**
10:24;19:19
**pension (1)**
89:10
**people (7)**
30:22;32:8;52:12;
86:4,17;87:19;109:2
**percent (8)**
14:14;17:3,6;
25:20;80:7;92:2,11,
17
**Perfect (1)**
60:1
**perhaps (8)**
42:21;47:8;52:16;
63:18;69:16;70:4;
103:7;106:8
**period (2)**
26:19;111:10
**person (2)**
85:8;90:20
**personal-services (1)**
54:23
**personnel (3)**
15:8;51:16;85:6
**perspective (6)**
49:3,17;50:17;
70:15,16;72:16
**petition (7)**
16:1,20;17:20;
18:24;21:10;22:8;
82:18
**PetroCap (1)**
93:6
**ph (3)**
44:14;48:17;56:4

**Philly (1)**
109:2
**phone (1)**
46:11
**phrase (1)**
65:25
**physically (1)**
13:11
**pick (1)**
46:11
**piece (4)**
65:14,22;66:6;
104:1
**pieces (1)**
36:10
**pillars (1)**
112:21
**place (6)**
34:2;64:8;89:12;
110:3,9;113:24
**places (4)**
41:25;53:17,20;
80:3
**plan (13)**
17:21;44:1,12,13;
60:12,21;69:10,10;
70:11;74:5;76:8;
91:16,24
**planes (2)**
52:13;109:2
**play (1)**
104:22
**players (1)**
108:8
**playing (1)**
104:14
**pleadings (1)**
73:17
**Please (14)**
10:3;19:8,10,13;
23:16,18,21,23;24:3,
4;36:25;49:10;
75:10;105:10
**ploy (1)**
78:14
**pm (4)**
75:8;105:8,8;
114:3
**podium (2)**
10:17;93:13
**point (29)**
34:14;35:2;38:18;
44:7;49:11;52:19;
54:10,13;55:3,23;
56:21;57:17;60:12;
62:12,21;76:3;86:3,
17;87:6;93:10;
94:11;95:18;96:4;
97:21;101:19;102:7;
103:11;109:9;113:3
**pointed (2)**
64:5;77:18
**points (5)**

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                      December 2, 2019

73:16;75:24;87:7;
99:10;107:20
**Pomerantz (23)**
10:9;11:14,15,23,
25;12:3,5,11,22;
59:11;75:14,21,22;
88:3,6;89:15,19,22;
90:25;99:3,6;
101:20;102:8
**pool (1)**
47:16
**pop (1)**
100:18
**poring (1)**
74:17
**portfolio (7)**
25:25;26:5,6,7,8;
51:12;92:9
**portion (1)**
17:2
**POSIN (1)**
7:19
**position (4)**
68:6;95:13;96:3;
109:22
**positions (1)**
92:19
**possibility (2)**
45:2,8
**possible (1)**
110:10
**possibly (1)**
61:16
**post- (1)**
18:23
**Post-bankruptcy (2)**
27:10,15
**post-confirmation (1)**
94:12
**post-petition (3)**
22:8;79:17;84:18
**potentially (1)**
55:16
**POTTER (1)**
8:2
**power (1)**
27:17
**powers (2)**
79:1;98:17
**practice (14)**
13:10;46:18;73:2,
3,6,7;85:14;87:15,
19;88:1;89:5;
102:14;105:17;
106:20
**practiced (1)**
102:14
**pre- (1)**
22:7
**preceded (1)**
83:9
**predetermination (2)**
54:7,8

**predetermine (1)**
44:3
**predominant (1)**
108:23
**preference (1)**
106:8
**pre-judge (1)**
101:5
**prejudice (2)**
54:6,8
**prejudicial (1)**
97:17
**preliminary (1)**
69:9
**prepared (4)**
38:3,3;75:23;
105:12
**pre-petition (2)**
78:24;83:7
**preponderance (4)**
61:22;62:18;
107:4;110:6
**Pres (1)**
9:7
**presen (1)**
60:15
**PRESENT (1)**
9:2
**presentation (3)**
60:17;77:6;98:14
**presented (1)**
50:19
**presents (2)**
42:12;59:1
**preside (1)**
79:15
**president (5)**
12:25;25:1,19;
26:10,13
**presumption (5)**
83:20;105:22;
106:10,14;107:5
**pretext (1)**
78:10
**pretty (1)**
93:21
**previous (3)**
79:18;87:8;109:10
**previously (4)**
16:5;34:10;56:13;
68:14
**primarily (3)**
22:21;84:6;102:14
**primary (2)**
94:15;97:9
**prime (2)**
15:18,23
**principal (4)**
15:16,24;50:12;
110:3
**principals (1)**
13:20
**prior (11)**

13:18,19;18:2;
21:13;33:21;43:25;
62:2;64:3;92:23;
97:15;110:11
**private (4)**
16:11;17:7;86:13;
91:5
**Private-equity (3)**
28:17;92:20;93:5
**privilege (1)**
73:20
**proactively (1)**
78:25
**probability (2)**
44:4;47:14
**probably (7)**
40:14;57:3;61:12;
64:4,16;65:6;71:4
**probative (1)**
38:17
**problem (2)**
111:5;113:6
**problematic (1)**
106:23
**procedurally (1)**
33:14
**procedures (2)**
46:4;89:12
**proceed (11)**
10:15;11:6,8,11;
12:20;21:6;22:2;
24:6;41:11;78:15;
100:7
**proceeding (11)**
42:22;45:14;
46:25;49:6,19;
50:10;51:2;58:16;
83:9;90:23;107:21
**proceedings (3)**
15:15;102:22;
114:3
**process (5)**
16:25;27:5;58:17;
81:18;106:12
**produced (1)**
96:21
**professional (3)**
13:2;112:19,20
**professionals (8)**
50:25;52:18;
82:21,22;87:12,14;
111:5;113:5
**proffer (15)**
11:6;12:21;18:25;
22:11,13;30:18;
31:16,22,25;33:10,
11;41:22;42:6;
44:10;53:7
**proffered (1)**
75:1
**promise (2)**
34:3;61:1
**promoted (2)**

24:14;26:10
**promotion (1)**
26:12
**proof (3)**
61:22;62:16,17
**proofs (1)**
89:11
**proper (5)**
39:8;44:10;78:13;
80:2,21
**proponent (1)**
38:19
**proposed (3)**
10:22;12:24;20:23
**proprietary (3)**
14:21;65:3,6
**propriety (1)**
84:18
**prosecuted (1)**
98:4
**protecting (1)**
71:1
**protocol (1)**
79:4
**protocols (5)**
18:18;96:17;
112:2,5,17
**provide (8)**
18:14;49:24;53:7;
67:8;84:15;86:24;
92:22;93:16
**provided (7)**
16:5;18:15;34:10;
36:11;66:21;92:21;
96:20
**provides (5)**
15:2;17:3;35:14;
38:13;91:18
**providing (2)**
39:3;67:6
**provision (4)**
22:11,16;94:16,20
**provisions (1)**
94:14
**proximity (3)**
82:1;84:4;85:21
**prudent (1)**
100:6
**public (3)**
39:6;86:11;92:18
**Public-relations (1)**
28:15
**published (5)**
41:17;43:24;
54:14,19,22
**Puerto (1)**
46:25
**purely (1)**
93:21
**purportedly (1)**
48:10
**purposes (3)**
40:20,23;62:14

**pursing (1)**
17:25
**pursuant (3)**
16:6;64:8;66:22
**pursue (1)**
84:18
**put (16)**
17:21;31:13,15;
33:3,4,6,22;38:25;
40:9;43:24;49:3;
68:8;95:5,13;
101:11;113:20
**PWS (1)**
81:15

**Q**

**qualify (1)**
35:3
**quick (6)**
62:12,21;63:25;
73:16;91:11;103:11
**quickly (6)**
61:19;73:1;75:15;
99:10;110:10,23
**quite (2)**
50:10;104:11

**R**

**Raise (2)**
19:11;23:21
**raised (3)**
54:1;75:25;111:19
**RAKHEE (2)**
8:19;60:3
**random (4)**
46:4;47:13;
102:12,16
**randomly (2)**
46:19,21
**rate (1)**
94:9
**rather (6)**
78:13;87:3;98:22;
104:15;110:20,23
**re (4)**
13:6,7,8,8
**read (5)**
61:12;64:2;73:16;
91:23;94:15
**ready (1)**
113:22
**Real (11)**
32:17;52:20;
62:15;67:6;76:22;
77:2,21;89:8;92:6;
97:14;108:17
**real-estate (3)**
17:8;86:7,22
**reality (5)**
63:5;88:2;89:4;
105:16;106:20

**APP. 0131**
**Appx. 00178**

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)
December 2, 2019

**realized (1)**
40:18
**really (35)**
33:25;48:3;62:2,
19;63:1,8,20;64:3,
10,15;65:5,9,11;
67:13;68:8;69:22;
70:2;73:12;76:12;
77:6,20;87:23,25;
90:1;95:22,24;96:9;
104:11;105:16,18;
106:11;107:21;
108:18;111:5;
112:20
**reason (9)**
22:23;39:7;70:8;
77:12,21;78:13;
87:3;97:1,20
**reasonable (1)**
38:19
**reasoned (2)**
81:21;83:19
**reasons (8)**
11:3;39:13;47:18;
75:1;87:8;98:25;
111:19;113:19
**rebuts (1)**
32:2
**rebuttal (4)**
25:7;31:16;42:6;
50:11
**rebutted (2)**
42:2,10
**rebutting (3)**
25:8;33:6,21
**recall (3)**
26:7;30:20;34:15
**received (3)**
12:19;37:21;40:22
**receives (1)**
14:25
**recess (6)**
41:4,6,8;75:6,8;
105:8
**recognized (1)**
78:23
**recognizes (1)**
50:18
**recommendation (2)**
94:7,8
**recommended (1)**
26:12
**record (29)**
19:14;23:24;25:7;
39:6;41:2,16,17,19;
42:7,8;43:24;46:15;
49:16,24,25;51:2;
54:13;59:12;60:2;
74:18;82:13;90:18,
23;93:22;96:1,5,7;
99:15;113:19
**records (1)**
14:6

**record's (1)**
41:3
**recusal (1)**
48:24
**red (2)**
58:14;99:18
**Redeemer (4)**
7:8,23;83:6,9
**redirect (1)**
23:4
**reduce (1)**
92:12
**reducing (1)**
22:22
**refer (3)**
11:18,19;64:23
**reference (6)**
43:14,15;60:4,15;
62:14;82:11
**referenced (6)**
36:9;61:20;66:17;
68:3;69:25;70:24
**references (1)**
68:18
**referred (4)**
44:10;52:6;54:18;
101:20
**reflect (4)**
88:1;93:22;
105:16,18
**regard (6)**
18:8;34:7;40:7,19;
90:20;109:13
**regarding (11)**
18:23;22:11;38:8;
55:5;56:21;78:6;
84:23;94:14;99:17;
100:4,24
**regional (1)**
86:8
**registered (1)**
15:5
**Reid (6)**
10:24;19:7,19,19;
20:2;21:1
**relate (1)**
112:6
**related (11)**
14:22;15:7;31:19;
44:9;65:19;72:25;
76:11;80:12;83:1;
85:21;94:22
**relationship (4)**
18:2;64:2;77:1;
92:4
**relative (1)**
49:14
**relatively (2)**
66:24;71:23
**Relevance (7)**
38:9;39:9;40:8,8;
50:21;53:12;91:15
**relevant (13)**

**34:20;39:22;40:9,**
10;57:14,21;76:13;
88:8;92:25;94:10;
95:23;96:11;99:20
**reliability (1)**
40:7
**relied (1)**
77:11
**relief (2)**
52:9;84:22
**rely (4)**
41:14;80:10,22;
95:24
**remain (3)**
19:9;23:17;24:4
**remaining (1)**
17:1
**remarks (2)**
57:14;75:24
**remember (5)**
22:4,12;24:22;
25:18;30:8
**remind (1)**
100:3
**remiss (1)**
101:13
**remote (1)**
45:9
**remotely (1)**
61:16
**rendered (1)**
17:14
**reorganization (3)**
44:12;84:9;109:7
**repeat (3)**
57:22;61:10;102:6
**repeated (1)**
67:15
**repeating (1)**
61:13
**replies (1)**
62:23
**reply (5)**
31:24;39:16;
42:20;54:13;99:7
**report (8)**
20:23;26:15,22,
25;27:10,15;28:21;
97:7
**reported (2)**
26:20;84:11
**reporting (1)**
97:2
**reports (3)**
28:25;58:4,7
**represent (2)**
66:8;92:11
**representative (3)**
15:13;82:3;84:13
**representatives (2)**
84:16;85:9
**represented (3)**
37:15;43:12;63:6

**representing (2)**
10:10;63:1
**reprimand (1)**
31:11
**request (2)**
43:2;98:25
**requested (2)**
14:8;84:22
**requesting (1)**
38:21
**require (1)**
50:15
**required (3)**
48:23,23;84:15
**requirement (1)**
76:4
**reserve (1)**
21:1
**reserved (2)**
21:24;33:11
**residual (1)**
38:12
**resignation (1)**
66:3
**Resources (5)**
28:8;45:4,11;52:5;
103:4
**respect (43)**
16:22;17:25;18:3;
20:19;22:9;38:3,3;
41:20,22;42:8;
49:21;53:19;54:5;
57:21;58:24;59:5;
63:8,13;64:1,4,11;
65:8;66:12,14,18;
67:6,22,23,24;68:6,
6,8,19;70:17,19;
72:14;83:22;86:22;
94:13;102:8;103:12;
104:10,17
**respectfully (2)**
59:1;98:25
**respond (1)**
40:1
**responding (1)**
108:1
**responses (1)**
62:22
**responsibility (2)**
17:25;97:9
**rest (1)**
113:4
**restaurant (2)**
89:22;99:12
**Restaurants (3)**
81:4;83:19;89:16
**restructure (6)**
18:11;70:4,7;
104:23;105:2,3
**restructuring (11)**
12:24;13:2,3,5,25;
18:1;70:2;79:1;87:2,
4;92:22

**result (5)**
45:6;53:17;19;
91:16;109:5
**retail (2)**
17:8;28:8
**retain (3)**
13:16;88:14;
111:10
**retained (3)**
84:7;85:17;113:5
**retaining (1)**
112:19
**retention (3)**
21:12;68:20;
113:11
**retire (1)**
47:5
**retreads (1)**
87:8
**return (1)**
44:12
**returned (1)**
44:16
**revenue (5)**
17:4,6;65:18,19;
92:12
**revenues (2)**
17:2;92:18
**reversed (2)**
74:15
**review (2)**
50:16,24
**reviewed (2)**
34:12,14
**reviewing (1)**
14:5
**Rican (1)**
46:25
**right (71)**
12:16,20;19:1,11;
21:24;22:8,17,20;
23:7,15,21;24:12,17,
19;25:2,5,20;26:1,
11,15,20,23;27:2,10,
18;28:2,8,13,17;
29:1,8,11,14,21;
30:1,4,23,24;31:3,6,
9,10;32:7,13;33:12,
13,21;34:5,12;35:14;
36:4,23;37:14;40:5;
41:1,3;47:16;48:14;
71:16;75:5,20;88:5;
92:17;101:10;105:5,
7,21;110:11,12;
113:11;114:2
**rights (2)**
21:1;109:7
**Rio (1)**
15:9
**rise (3)**
10:2;75:9;105:9
**risk-management (3)**
28:24,25;30:5

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
(16) realized - risk-management

APP. 0132
Appx. 00179

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                                December 2, 2019

robe (1)
75:16
rocket (1)
67:6
ROGGE (1)
8:7
role (2)
13:25;85:18
ROME (2)
6:14;59:13
room (1)
86:25
ROSENTHAL (1)
7:4
ROTH (1)
8:12
routinely (1)
87:15
Rule (13)
38:12,13;39:6,7;
44:1,4;46:16;52:25;
73:8;78:3,12;
105:12;111:16
ruled (3)
56:13;94:20;
113:14
rules (6)
48:1;90:17;
100:24,25;101:5;
108:14
ruling (4)
45:12;56:21;
60:16;112:23
rulings (4)
56:6,7;62:2;74:9
run (5)
32:4;51:15;78:11;
99:9;107:24
run-up (1)
58:12
RYAN (1)
8:4

S

sales (1)
70:1
Same (8)
27:11;29:6,9;50:3,
12;91:9;93:21;
104:25
satisfying (1)
98:12
save (2)
59:18;110:20
saying (6)
40:18,19;70:12;
76:14;83:24;96:1
scattered (2)
108:25,25
scenario (3)
72:3;74:9,15
schedules (2)

43:7;69:21
SCHULTE (1)
8:12
science (1)
67:6
scope (4)
21:15,21;27:12;
32:23
scorecard (1)
62:3
scrutiny (1)
96:14
seal (1)
11:19
SEAN (2)
6:4;10:25
seated (5)
10:3;24:3;41:9;
75:10;105:10
SEC (1)
67:2
Second (7)
43:21;44:15;
54:12;55:6;69:8;
76:7;107:11
secured (6)
15:23,24;68:4;
82:9,12,14
Securities (3)
7:14;15:23;92:19
seeing (1)
107:19
seek (2)
94:13;95:11
seeking (3)
25:10;44:11;45:3
seeks (1)
53:16
seems (2)
45:21;55:19
sees (1)
74:11
send (1)
110:25
senior (2)
13:20;24:12
sense (3)
33:17;46:21;64:19
sent (3)
55:10;57:3;74:2
Seoul (1)
15:9
separate (3)
65:21,22;85:15
separateness (1)
98:9
series (2)
77:11;109:24
serves (2)
16:23;17:23
service (1)
92:21
services (26)

15:3;16:3,6;17:13;
22:12,16,16;34:9,9,
17;35:19,21;54:15;
65:13;66:7,10,15,16,
19,22;67:4;86:12;
91:4,19;92:14;93:19
set (6)
18:18;39:3;42:12;
68:3,20;113:19
sets (1)
80:22
setting (2)
62:13;112:21
seven (3)
35:13;82:18;
103:17
seventy (1)
29:13
several (6)
26:6;49:22;51:22;
53:22;91:21;110:22
Shannon (2)
13:7,8
shared (12)
15:3;16:6;18:21;
22:12,16;34:9;
35:21;66:7,16,19;
67:4;86:12
shared- (1)
34:16
shared-service (4)
16:10,15;93:11,17
shared-services (5)
34:12;35:12;
66:23,24;94:4
SHARP (32)
9:7;10:12;11:25;
12:23;19:8,15,22;
20:3;21:9;27:10,17;
31:17;41:22;44:10;
50:6,11;53:6,15;
54:17;78:25;79:3;
84:7,9,17,21;85:1;
93:16;94:2,7;95:3;
97:1;113:1
S-H-A-R-P (1)
19:16
Sharp's (4)
18:25;42:10;50:5;
84:13
SHAW (21)
8:9;21:4,4,6,8;
22:3,4;23:2;32:17,
19,24;33:2,9,20,23;
34:3,6,20;35:24;
61:8;63:11
sheer (1)
95:24
sheet (2)
18:12;93:7
shifts (1)
62:18
shopping (2)

56:11;106:19
short (6)
11:6;41:4,6;58:14;
75:5,6
shortly (3)
45:4;66:3,4
shot (4)
33:17;98:23,24;
109:6
show (1)
77:4
showed (1)
57:17
shown (1)
55:14
shows (2)
53:11;57:17
shrink (1)
17:4
sic (13)
25:13;41:16;42:9,
20;43:13;47:23;
49:19;59:11;60:8;
68:21;75:23;96:6;
101:23
side (3)
62:1;64:11;109:17
sides (2)
56:5;64:5
Sidley (3)
10:21;41:13;113:4
sign (1)
113:13
signed (4)
63:17,18;110:9;
113:23
significant (22)
43:7,19;57:18;
63:21;70:3,8,9,16;
74:20;78:20;80:17;
85:1;86:8,17;97:21;
98:3;102:20;103:22;
104:1,21;109:13,18
significantly (4)
22:10;77:5;85:18;
96:22
silence (1)
109:17
silent (1)
109:13
silly (1)
88:12
similar (3)
35:23;54:20;104:2
similarly (5)
71:24;78:15;81:7;
85:17;104:17
simpler (1)
113:18
simply (9)
46:10;54:10;63:4;
84:2;100:8,15;
103:19;109:12;

112:19
Singapore (8)
15:9,11;20:18,20;
86:15;93:5;104:4,7
single (5)
26:7;42:22;43:16;
72:18;99:15
single-asset (1)
86:7
sit (5)
32:5;33:25;45:19;
59:8;101:25
sits (4)
34:23;35:1;83:23,
23
sitting (1)
100:20
situated (2)
71:24;104:18
situation (4)
48:4,10;51:8;
108:17
situations (1)
49:3
six (6)
27:22;56:8;81:2;
84:24;107:12;
111:23
sliver (1)
92:24
small (2)
86:7;92:24
smart (2)
89:18;100:5
sole (2)
26:7;55:7
solution (1)
109:6
somebody (1)
47:21
somehow (4)
73:18;74:8;
105:22;106:22
someone (1)
75:12
someone's (1)
48:3
sometimes (1)
73:10
somewhat (1)
104:2
soon (2)
110:9;113:22
sophisticated (3)
14:18;91:7;105:25
sorry (11)
12:3,13;41:9;
45:23;46:1;60:9;
71:4,11;73:23;
89:19;103:9
sort (16)
46:16;48:25;55:4;
62:16;63:21;65:4;

Min-U-Script®

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

(17) robe - sort

APP. 0133
Appx. 00180

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                                                       December 2, 2019

67:8,12;68:8,18;
70:21,22;73:11;74:5,
14;77:7
**sought (1)**
18:19
**sources (1)**
15:1
**South (2)**
14:22;15:11
**speak (1)**
35:22
**SPEAKER (4)**
19:3,5;41:7;
109:20
**speaking (1)**
91:1
**special (2)**
46:8;95:12
**specialist (1)**
27:6
**Specialists (3)**
9:7,9;12:25
**specific (8)**
40:19;73:8;90:19,
23;96:4,5;104:15;
107:20
**specifically (1)**
35:10
**specifics (1)**
54:25
**speculating (1)**
45:1
**speed (2)**
49:15;91:12
**spell (2)**
19:13;23:23
**spend (4)**
54:11,12;58:22;
90:1
**spent (4)**
14:4;76:22;88:9;
103:3
**sponte (1)**
69:7
**stack (5)**
63:22;68:2,10;
69:12,14
**stacks (1)**
60:6
**staff (2)**
103:8,9
**staff's (1)**
74:17
**Stamford (1)**
83:18
**stand (6)**
19:9,10;23:13,16;
48:9;63:11
**standard (4)**
35:20;80:23;
81:24;110:6
**standards (1)**
87:24

**standing (4)**
19:9;23:17;31:8;
61:3
**standpoint (1)**
106:23
**Stang (6)**
10:6;11:15;13:14,
21;21:19;75:22
**STARGATT (1)**
6:2
**start (5)**
41:4;50:15;78:23;
97:11;113:23
**started (3)**
24:12;29:8;76:14
**State (11)**
15:25;19:13;
23:23;64:6;70:25;
71:5,10;81:16,17,18;
95:6
**stated (2)**
40:23;81:7
**statement (7)**
38:13,14,17;
39:22;76:1;102:9,11
**statements (5)**
43:8;84:1;90:7,7;
104:6
**States (4)**
14:22;15:16;
30:20;86:14
**state's (1)**
71:8
**status (2)**
52:10;53:13
**statute (1)**
64:12
**statutory (1)**
79:24
**stay (2)**
19:23;111:6
**stayed (1)**
109:13
**stemmed (1)**
72:17
**step (4)**
19:10;23:7;36:5;
106:21
**steps (1)**
55:18
**stick (2)**
33:21;108:14
**still (8)**
26:22;32:4;50:8;
57:19;58:6;66:11;
69:19;97:2
**stock (1)**
86:11
**stood (1)**
93:20
**Stoops (1)**
31:6
**Strand (7)**

14:12,13;25:5,17,
20;51:14;80:8
**Strand's (1)**
51:14
**strategic (1)**
18:7
**strategy (1)**
101:21
**strayed (2)**
77:7,12
**stress (1)**
95:20
**strike (1)**
51:4
**strikes (1)**
74:11
**striking (1)**
109:10
**strong (6)**
47:19;56:23;
83:20;105:22;
106:10;107:5
**stronger (1)**
57:5
**strongly (2)**
81:6,20
**structure (15)**
16:10;25:14;
31:19;32:3;54:12;
64:12;66:20;67:13;
80:14;91:17;95:4,4,
15;97:3;100:21
**structured (1)**
92:9
**structured-credit (1)**
103:15
**stuck (1)**
109:3
**study (1)**
91:11
**stuff (4)**
67:1,5;92:2;
111:24
**sua (1)**
69:7
**subadvises (1)**
16:24
**subadvisory (12)**
16:6,10,15;22:12,
16;34:9,13,17;35:12;
54:16;66:23,25
**subcontracted (1)**
54:15
**subject (9)**
11:19;17:16,23;
44:18,19;46:3;79:4;
103:22;111:8
**submanager (1)**
16:5
**submit (6)**
66:13;74:24;
81:23;103:25;104:4;
113:17

**submitted (1)**
28:2
**subpieces (1)**
66:8
**sub-plans (1)**
74:6
**subpoenaed (1)**
85:25
**subscribe (1)**
81:8
**subset (1)**
50:4
**subsidiary (2)**
30:25;31:1
**substantial (4)**
17:11;81:9;84:23;
96:21
**substantially (3)**
18:14;83:21;85:23
**substantive (1)**
73:13
**subsumed (1)**
62:16
**subtopics (1)**
64:21
**succeed (1)**
98:4
**succeeded (2)**
76:10;87:20
**success (1)**
78:16
**successful (3)**
44:21;105:1,3
**sufficient (2)**
38:14;39:2
**suggested (1)**
100:19
**suite (3)**
108:20;110:2;
113:8
**suited (1)**
65:7
**suites (1)**
107:15
**sum (1)**
58:23
**summarize (1)**
66:20
**support (13)**
33:4;46:16;52:3;
53:24;56:21;59:9;
77:13;81:25;82:7;
84:22;87:22;98:7;
100:1
**supported (4)**
38:14;42:25;57:2;
99:14
**supporters (1)**
41:5
**supporting (6)**
17:19;42:23;
55:12;77:9;99:15,16
**supports (4)**

38:23;43:18;
51:10;98:8
**suppose (1)**
44:3
**supposed (1)**
25:7
**sure (9)**
25:11;27:21;
34:14;56:12;57:9;
58:25;68:23;82:21;
91:22
**surprising (1)**
43:2
**surrounding (2)**
79:8;93:4
**survive (1)**
94:20
**survived (1)**
94:17
**switch (1)**
59:25
**switching (1)**
106:17

---

**T**

---

**table (3)**
10:8;62:13;79:10
**talk (7)**
21:18;42:17,19;
46:10,11;64:21;
101:13
**talked (1)**
53:18
**talking (5)**
40:17;55:22;
88:10;101:1,4
**tangentially (2)**
40:9;61:17
**targeted (1)**
15:10
**tasked (1)**
112:1
**tax (1)**
28:7
**TAYLOR (1)**
6:2
**team (23)**
14:8;20:7,14,16,
16,18;28:6,10,13,15,
17,19,24,25,25;
29:21;30:5;31:5;
32:8;50:13;61:11;
111:23;112:8
**teams (2)**
28:4,10
**teasing (1)**
46:13
**technicalities (1)**
22:1
**technology (1)**
88:7
**TELEPHONICALLY (8)**

APP. 0134
Appx. 00181

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                        December 2, 2019

6:22,23;7:15,16,
17,18,19;8:14
**telling (2)**
60:6;70:17
**template (4)**
35:20;67:14,23;
93:20
**ten (4)**
17:3;72:18;92:11,
17
**tenet (2)**
62:7;81:16
**terminate (4)**
17:24;27:2,17;
97:3
**terminated (1)**
16:7
**terminates (1)**
97:4
**terms (8)**
43:9;54:24;57:25;
101:3,10;102:12;
103:24;112:22
**TERRI (1)**
7:10
**Terry (3)**
17:22;44:13;83:1
**test (3)**
62:7;80:23;105:18
**testified (8)**
22:11;27:3;34:22,
25;50:10,11;85:2;
93:17
**testify (42)**
12:1,1,23,23;13:1,
5,10,13,17,20,23;
14:3,6,10,14,17,24;
15:2,6,10,12,15,21;
16:2,9,13,20;17:5,
10,14,18,23;18:4,13,
16,19,22,23:13;53:6;
84:12;85:5,8
**testimonies (1)**
55:7
**testimony (22)**
18:14,25;42:2,10;
50:5;53:8;57:17;
58:4,6;84:13,15,21;
90:22;93:13,14,16;
95:2,2,21,23;101:8;
104:9
**Texas (59)**
11:3;17:18,20;
18:3;22:24;29:1,3,6,
12;32:4;39:1;40:10;
43:1;45:14,23;46:5,
9,17;51:21;53:1;
56:6,8;57:2,3;63:9,
10,11,17;70:13,18;
72:4,9;73:6;76:2;
82:19,25;85:3,7,23,
25;86:4,4,5;87:3,11,
13;89:25;90:3,4;

98:20,24;102:13,23;
103:1,8;107:12;
108:4,5;109:8
**Texas-based (2)**
89:17,22
**thankfully (1)**
57:3
**that'll (2)**
94:9;113:20
**theoretically (1)**
27:8
**theories (1)**
78:18
**therefore (5)**
44:16;45:7;57:20,
24;67:24
**thinking (3)**
65:7;67:1;111:6
**third (5)**
16:17;44:7;53:14;
69:8;92:21
**thirty (1)**
43:14
**though (4)**
49:2;57:5;65:11;
98:16
**thought (3)**
23:15;55:4;109:18
**thousand (1)**
51:23
**three (13)**
24:21,23;32:5;
46:23;53:12;62:3,3,
7;65:2;72:22,23;
74:6;77:10
**throughout (4)**
67:15;69:2;86:14;
100:14
**throw (1)**
56:19
**thrown (1)**
67:20
**thus (1)**
96:17
**tie (1)**
110:2
**times (1)**
87:25
**title (3)**
24:17,19;25:18
**today (27)**
10:7,15,23;15:13;
18:19;24:17;33:11;
34:7;35:1;45:19;
48:9;58:19;61:6;
68:21;75:13;82:20;
85:6,11,19;89:6;
94:24;101:10;
110:18,19,20;
111:16;112:9
**today's (1)**
84:20
**told (3)**

69:18;77:21,25
**took (2)**
85:18;98:23
**top (2)**
83:5;100:21
**top-twenty (1)**
50:24
**total (1)**
17:13
**totality (1)**
38:15
**touch (4)**
53:25;57:12;73:1,
15
**touching (1)**
61:19
**tough (1)**
52:15
**trades (1)**
67:2
**trading (6)**
28:19,25;65:3,4,6;
92:18
**traditional (3)**
21:16,22;53:23
**transaction (1)**
101:21
**transactions (8)**
18:1;58:11;69:12;
79:4;84:18;101:17;
112:4,5
**transfer (47)**
11:2;39:10;42:13,
25;43:2;51:10;52:4,
7;53:24;55:11;
56:23;59:2;61:18;
62:11,25;63:20;64:8,
16,16;68:24,25;69:4;
71:23;73:10;76:5;
78:13;80:24;81:6,20,
25;82:8,16;83:21,21;
90:13;95:19;98:8,
19;102:21;103:23;
104:24;105:12,15;
106:16;107:3;
109:11;110:9
**transfer- (1)**
71:24
**transferee (1)**
39:10
**transfer-of-venue (1)**
77:14
**transferred (16)**
13:15;40:11;
45:22;47:20;68:12,
15;72:18;74:22,25;
76:5;77:17;85:20;
102:25;103:5;
110:24;113:19
**transferring (2)**
51:5;97:13
**transfers (3)**
69:12;87:22;92:4

**transition (1)**
26:19
**transparency (2)**
79:5;101:17
**transparent (3)**
18:19;78:14;79:11
**transpired (1)**
63:13
**trash (1)**
37:2
**travel (7)**
13:12,13;53:15;
83:3;85:3,10;88:8
**treasurer (1)**
66:2
**tremendous (4)**
49:16;54:5;108:6;
111:22
**trial (1)**
60:11
**trials (1)**
108:7
**tries (1)**
57:15
**trip (1)**
52:16
**trouble (2)**
88:25;113:21
**true (10)**
22:19,19;28:19,
22;29:19;30:11;
85:14;89:10;97:23;
100:15
**truly (1)**
51:7
**trustee (9)**
13:3;66:5;77:24;
78:1,11;96:11,13;
98:19,22
**Trustee's (1)**
97:6
**trustworthiness (1)**
38:15
**trustworthy (1)**
38:25
**truth (1)**
39:23
**try (2)**
24:3;60:25
**trying (8)**
45:10;48:9;54:2,3;
75:11,12;96:6;
101:16
**TUNNELL (1)**
7:22
**turn (3)**
18:10;41:5;68:17
**turning (2)**
68:2;107:5
**twenty (5)**
51:19;57:4;69:19;
82:18;83:5
**twenty-five (1)**

13:2
**two (28)**
17:19;47:7,24;
53:12;62:4;65:12;
66:1,22;68:4,7;
69:17;72:2,24;
73:10;78:18;82:9,20,
25;83:5;88:9,17;
93:23,24;97:22;
101:7;103:17;
108:18,23
**two-and-a- (1)**
14:24
**Twomey (1)**
10:23
**type (8)**
54:3,3;67:5;91:1;
93:17,18;101:4,16
**types (2)**
16:11;89:13
**typical (3)**
35:16;61:18;67:5
**typically (2)**
86:6;88:20

**U**

**UBS (5)**
7:14,14;83:11;
107:12,13
**ultimately (4)**
72:18;74:4;94:20;
104:22
**umbrage (2)**
105:20,20
**Um-hum (1)**
47:1
**unaffiliated (2)**
15:4;16:17
**unanimously (1)**
42:25
**unclear (1)**
40:20
**uncontested (1)**
41:15
**uncontroverted (6)**
41:15;42:8,13;
84:14;92:10;100:1
**un-cooperation (1)**
96:24
**under (22)**
14:11,13,20,25;
20:23;35:13;38:16;
39:5;44:1,13;46:4;
52:25;67:21;70:25;
71:8;98:13;103:17,
18;106:6;112:1,1;
113:17
**underlying (1)**
17:1
**underneath (2)**
44:16;75:17
**understood (2)**

APP. 0135
Appx. 00182

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                December 2, 2019

33:12,20
unduly (1)
97:16
unfortunately (2)
58:1,10
unheard (1)
102:17
UNIDENTIFIED (4)
19:3,5;41:7;
109:20
unique (18)
42:12,17;49:3;
51:4;52:23;53:22;
59:2;61:13,14,14;
63:16;70:14,15;
71:22;78:10;106:2;
107:23;110:1
United (4)
14:22;15:16;
30:20;86:14
Unless (2)
59:7;101:25
unliquidated (2)
17:11;83:12
unobjected-to (2)
36:10,12
unrelated (2)
82:12;88:18
Unsecured (9)
6:3;10:22;43:12;
51:20;82:17;83:5;
98:5;100:20,22
unsecureds (2)
69:15,17
unsophisticated (1)
83:2
untold (1)
74:16
up (24)
19:10;28:6,21,25;
43:9;46:11;47:14;
49:15;50:24;57:3;
58:23;59:15,17;60:6,
7;67:17,19;72:20;
85:19;93:20;94:7;
101:9;109:9;113:3
upload (1)
113:22
upon (2)
33:10;39:5
upped (2)
49:14;50:16
up-to- (1)
91:11
upwards (1)
69:17
use (2)
45:10;86:24
used (4)
30:5,5;83:15;
110:25
useless (1)
62:8

Usually (6)
30:1;71:22;73:11;
75:14;82:22;107:24
utmost (1)
58:24

V

valuable (1)
103:22
Valuation (2)
28:7;86:23
value (3)
18:5,12;87:1
Variant (1)
13:6
variety (4)
15:4;86:11;91:22;
92:19
various (9)
14:5,21;16:4;
17:11;34:18;56:21;
72:4;77:9;95:3
varying (1)
50:20
vast (3)
43:9,11;80:4
vastly (1)
68:7
venture (3)
61:15;74:14,21
venue (71)
10:16;11:1,2,2,20;
23:11,14;39:20;
41:15,20;42:9,13,16,
24,25;43:4,18;44:2,
5,19,20,24;45:9;
51:5,11;52:4,7;
53:24;54:1;55:12,
20;56:22;57:2;58:2,
3;59:3;61:18;62:16,
25;63:20;64:6;
71:23;76:13;77:9,
17;78:13;79:22;
80:2,21,24;81:20;
82:4,8,16;83:20;
95:19;98:8,13,23;
99:14,16;100:23;
101:11,24;105:12,
16;106:5,16;107:3;
109:11,16
venue-transfer (2)
76:19;100:1
veracity (1)
97:12
version (1)
94:17
versus (2)
62:3,4
veteran (1)
19:22
view (6)
53:9;55:14;64:10;

96:7;99:19;113:11
views (2)
78:6;112:22
virtually (3)
73:19;80:13;81:12
vital (1)
111:15
volume (2)
70:16;95:24
voluminous (1)
74:18
voted (1)
104:24
votes (1)
70:18
voting (2)
70:10;110:4

W

walk (3)
46:10;51:5;79:24
Walsh (1)
81:15
wants (1)
78:15
warmer (2)
75:11,11
warrant (1)
42:13
warring (1)
47:24
WATERHOUSE (24)
9:5;10:11;23:13,
15,25;24:9;25:16;
27:22;32:12,20;
33:12;36:5;42:2;
50:10;51:11;54:17;
64:25;66:2;68:4,11,
17;69:15;85:5;93:15
W-A-T-E-R-H-O-U-S-E (1)
24:1
Waterhouse's (2)
65:1;104:9
WATKINS (1)
7:13
Watkins' (1)
83:15
way (16)
11:11;31:18;40:9;
55:2,2,6;77:16;
86:25;87:17,17;
95:9;102:24;107:21;
109:1,3;110:15
weakness (1)
80:1
wealth (1)
14:7
week (2)
27:4;29:23
weekly (1)
31:8
weeks (5)

72:1;84:24;96:19;
110:23;111:23
weigh (3)
81:6,20;112:25
weighed (1)
82:15
weighs (2)
56:23;62:19
weight (1)
57:11
Welcome (4)
10:13;36:7;75:3;
105:4
well-founded (1)
39:14
Wells (1)
107:13
what's (10)
55:22;60:7;65:8;
68:9;71:2;79:16;
97:16;104:11,20;
105:18
whatsoever (1)
106:24
Whereupon (1)
114:3
whole (3)
62:23;83:23;98:2
wholly (1)
44:15
who's (2)
70:17;75:12
wide (2)
62:10;86:11
widely (1)
35:17
WILLIAM (1)
6:11
willingness (1)
89:1
wind (1)
47:14
WINSTEAD (1)
8:17
wish (2)
19:2;57:10
withheld (1)
14:9
within (5)
39:7;72:1,2;
102:21;111:18
without (7)
12:16;37:18;54:6;
60:6;79:17;89:13;
91:12
withstand (1)
96:14
witness (18)
19:2,12,15,24;
22:5;23:2,9,22,25;
25:7;32:14,24;34:22,
25;35:24;36:1,6;
108:16

witness-and-exhibit (1)
36:11
witnesses (10)
21:23,25;85:11,22,
23,25;91:22;96:21;
97:13;99:24
WL (1)
13:8
Woodbridge (1)
13:7
word (2)
105:21;106:18
words (2)
90:5;102:23
work (8)
18:7;29:13,17;
30:22;108:6,7;
111:22;112:5
worked (5)
20:9;24:9;50:3;
55:5;79:3
working (2)
75:13;95:5
world (4)
14:19;15:2;32:2;
87:19
worry (2)
59:4;83:3
wrestle (2)
49:18;55:1
wrestling (1)
54:11
written (4)
40:16;49:22;
76:21;81:1
wrong (3)
46:24;71:9,14
wrote (1)
91:23

Y

years (5)
13:2;24:21,23;
56:3;57:4
yield (1)
10:17
yields (2)
53:17,19
York (16)
15:20;20:14;30:6,
7,7,10,15;42:1;
82:10;83:10,14,15;
86:16;99:17,21;
107:13
YOUNG (6)
6:2;10:24;85:17;
100:4;111:6;112:15

Z

ZABEL (1)
8:12

APP. 0136
Appx. 00183

HIGHLAND CAPITAL MANAGEMENT, L.P.
Case No. 19-12239(CSS)                                                      December 2, 2019

**Ziehl (6)**
10:6;11:15;13:14,
21;21:19;75:22

---

**1**

**1 (7)**
37:9,9,20;53:3;
59:17;60:8;66:17
**1:45 (3)**
105:5,6,6
**1:47 (1)**
105:8
**10:48 (1)**
41:8
**100,000 (1)**
74:18
**1014 (1)**
44:1
**11 (10)**
17:21;45:13;
78:23;80:3;86:24;
97:10;98:19;105:16,
19,25
**11:05 (1)**
41:8
**11:50 (1)**
75:8
**12 (2)**
10:16;74:1
**12:00 (1)**
75:8
**12:39 (1)**
105:8
**1408 (1)**
80:3
**1412 (3)**
64:8;80:22;98:13
**15th (1)**
60:21
**17 (2)**
60:13;69:11
**18 (2)**
37:9,20
**1979 (2)**
81:3;87:25
**1998 (1)**
81:15

---

**2**

**2 (5)**
38:17;60:8,11;
66:18;101:3
**2,000 (4)**
51:24;53:3;67:18,
20
**2:02 (1)**
114:3
**2006 (3)**
24:10;29:7,8
**2009 (3)**
92:13;103:13,14

**2011 (2)**
24:15;26:11
**2016 (1)**
81:4
**2017 (1)**
103:14
**2018 (5)**
16:8,21;61:5;
65:16;74:4
**2019 (4)**
13:18;60:20,21;
88:2
**24 (2)**
37:11,21
**25 (2)**
37:11,21
**26 (4)**
39:15;40:23;
59:17,25

---

**3**

**3 (2)**
37:10,20
**30 (1)**
15:21
**30th (1)**
61:5
**31st (1)**
60:20

---

**4**

**45 (1)**
52:25

---

**5**

**5.2 (1)**
16:1

---

**7**

**7 (1)**
13:18
**7.5 (1)**
15:3

---

**8**

**807 (1)**
38:12

---

**9**

**9 (2)**
37:10,21
**99.94 (1)**
80:7

APP. 0137
Appx. 00184

# EXHIBIT 2

```
                  IN THE UNITED STATES BANKRUPTCY COURT
1                    FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
2
                                     )    Case No. 19-34054-sgj-11
3    In Re:                          )    Chapter 11
                                     )
4    HIGHLAND CAPITAL                )    Dallas, Texas
     MANAGEMENT, L.P.,               )    January 9, 2020
5                                    )    9:30 a.m. Docket
                                     )
6         Debtor.                    )
                                     )    DEBTOR'S MOTION TO COMPROMISE
7                                    )    CONTROVERSY WITH OFFICIAL
                                     )    COMMITTEE OF UNSECURED
8    _____)    CREDITORS [281]

9                       TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                  UNITED STATES BANKRUPTCY JUDGE.

11   APPEARANCES:

12   For the Debtor:              Jeffrey N. Pomerantz
                                  PACHULSKI STANG ZIEHL & JONES, LLP
13                                10100 Santa Monica Blvd.,
                                    13th Floor
14                                Los Angeles, CA  90067-4003
                                  (310) 277-6910
15
     For the Debtors:             Ira D. Kharasch
16                                PACHULSKI STANG ZIEHL & JONES, LLP
                                  10100 Santa Monica Blvd.,
17                                  13th Floor
                                  Los Angeles, CA  90067-4003
18                                (310) 277-6910

19   For the Debtor:              John A. Morris
                                  PACHULSKI STANG ZIEHL & JONES, LLP
20                                780 Third Avenue, 34th Floor
                                  New York, NY  10017-2024
21                                (212) 561-7700

22   For the Debtors:             Melissa S. Hayward
                                  Zachery Z. Annable
23                                HAYWARD & ASSOCIATES, PLLC
                                  10501 N. Central Expressway,
24                                  Suite 106
                                  Dallas, TX  75231
25                                (972) 755-7104
```

2

```
 1   APPEARANCES, cont'd.

 2   For the Official Committee   Matthew A. Clemente
     of Unsecured Creditors:      Dennis M. Twomey
 3                                SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
 4                                Chicago, IL  60603
                                  (312) 853-7539
 5
     For the Official Committee   Penny P. Reid
 6   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  2021 McKinney Avenue, Suite 2000
 7                                Dallas, TX  75201
                                  (214) 981-3413
 8
     For the Issuer Group:        James T. Bentley
 9   (Telephonic)                 SCHULTE ROTH & ZABEL, LLP
                                  919 Third Avenue
10                                New York, NY  10022
                                  (212) 756-2000
11
     For the Issuer Group:        James E. Bain
12   (Telephonic)                 JONES WALKER, LLP
                                  811 Main Street, Suite 2900
13                                Houston, TX  77002
                                  (713) 437-1820
14
     For Acis Capital            Rakhee V. Patel
15   Management GP, LLC:          Annmarie Antoinette Chiarello
                                  WINSTEAD, P.C.
16                                2728 N. Harwood Street, Suite 500
                                  Dallas, TX  75201
17                                (214) 745-5250

18   For Redeemer Committee of    Terri L. Mascherin
     the Highland Crusader        JENNER& BLOCK, LLP
19   Fund:                        353 N. Clark Street
     (Telephonic)                 Chicago, IL  60654-3456
20                                (312) 923-2799

21   For Redeemer Committee of    Mark B. Hankin
     the Highland Crusader        JENNER & BLOCK, LLP
22   Fund:                        919 Third Avenue
     (Telephonic)                 New York, NY  10022-3098
23                                (212) 891-1600

24

25
```

3

1 APPEARANCES, cont'd.:

2 For the U.S. Trustee:          Lisa L. Lambert
                                Meredyth A. Kippes
3                               OFFICE OF THE UNITED STATES
                                   TRUSTEE
4                               1100 Commerce Street, Room 976
                                Dallas, TX  75242
5                               (214) 767-8967

6 For Jefferies, LLC:           Patrick C. Maxcy
  (Telephonic)                  DENTONS US, LLP
7                               233 South Wacker Drive, Suite 5900
                                Chicago, IL  60606-6361
8                               (312) 876-8000

9 For Patrick Daugherty,        Patrick Daugherty
  Pro Se:
10

   Recorded by:                 Hawaii S. Jeng
11                              UNITED STATES BANKRUPTCY COURT
                                1100 Commerce Street, 12th Floor
12                              Dallas, TX  75242
                                (214) 753-2006
13

   Transcribed by:              Kathy Rehling
14                              311 Paradise Cove
                                Shady Shores, TX  76208
15                              (972) 786-3063

16

17

18

19

20

21

22

23

24

25        Proceedings recorded by electronic sound recording;
             transcript produced by transcription service.

APP. 0140
Appx. 00187

4

1        <u>DALLAS, TEXAS - JANUARY 9, 2020 - 9:56 A.M.</u>

2              THE COURT:  All right.  Let's roll to Highland now.

3    Let's get appearances from lawyers in the courtroom, please.

4              MR. POMERANTZ:  Good morning, Your Honor.  Jeff

5    Pomerantz; Pachulski Stang Ziehl & Jones.  Happy New Year,

6    Your Honor.

7              THE COURT:  Happy New Year.

8              MR. POMERANTZ:  Here on behalf of the Debtor.

9              THE COURT:  Okay.  Thank you.

10             MS. HAYWARD:  Good morning, Your Honor.  Melissa

11   Hayward and Zachery Annable on behalf of the Debtor.

12             THE COURT:  Good morning.

13             MS. LAMBERT:  Lisa Lambert, and I think Ms. Kippes

14   will be joining me, representing William Neary, the United

15   States Trustee.

16             THE COURT:  Thank you.

17             MS. CHIARELLO:  Good morning, Your Honor.  Annmarie

18   Chiarello and Rakhee Patel here on behalf of Acis Capital

19   Management, LP and Acis Capital Management GP, LLC.

20             THE COURT:  Thank you.

21             MR. CLEMENTE:  Good morning, Your Honor.  Matthew

22   Clemente from Sidley Austin on behalf of the Official

23   Committee of Unsecured Creditors.  With me today are my

24   partners Dennis Twomey and Penny Reid.

25             THE COURT:  Okay.  Good morning.  All right.  Is that

5

1   all of the courtroom appearances?

2       All right.  We have several people on the phone.  I think

3   most of them are just listening in.  If you're on the phone,

4   though, and you wish to appear, you may do so at this time.

5           MR. BENTLEY:  Good morning, Your Honor.  This is

6   James Bentley of Schulte Roth & Zabel.  Also on the line is my

7   co-counsel, Joseph Bain of Jones Walker.  We represent the

8   Issuers.

9           THE COURT:  Okay.  Good morning.

10          MS. MASCHERIN:  Good morning, Your Honor.  This is --

11          MR. MAXCY:  Good morning.  Patrick --

12          MS. MASCHERIN:  Good morning, Your Honor.  This is

13  Terri Mascherin of Jenner & Block.  Also on the line with me

14  is my partner, Mark Hankin.  We represent the Redeemer

15  Committee of the Highland Crusader Fund, which is one of the

16  members of the Unsecured Creditors' Committee.

17          THE COURT:  Okay.  Good morning.

18          MR. MAXCY:  Good morning, Your Honor.  This is

19  Patrick Maxcy from Dentons US, LLP on behalf of Jefferies,

20  LLC.

21          THE COURT:  Okay.  Thank you.  All right.  Well, I

22  guess that is it for the phone appearances.

23      Mr. Pomerantz, we're -- we have just one matter on the

24  calendar, the motion to compromise with the Committee.  I saw

25  two limited objections, and then a U.S. Trustee's broader

6

1    objection.  I'll start with, Do you have any of these

2    objections worked out?

3             MR. POMERANTZ:  Yes, we do.

4             THE COURT:  Okay.

5             MR. POMERANTZ:  We believe we have the Jefferies

6    objection worked out, as well as the objection of the Issuers.

7    And I'll, during the course of my presentation, alert Your

8    Honor to how that's worked out.

9             THE COURT:  Okay.

10            MR. POMERANTZ:  And then we'll have a revised order

11   that basically addresses each of their concerns, or at least

12   Jefferies' concerns, but the statements on the record for the

13   Issuers' concerns.

14            THE COURT:  Okay.  Very good.

15            MR. POMERANTZ:  Good morning again, Your Honor.  Jeff

16   Pomerantz; Pachulski, Stang, Ziehl & Jones.  I'm joined in the

17   courtroom by Ira Kharasch, Greg Demo, and John Morris from my

18   office.  I would also like to introduce the Court to the

19   proposed new members of the board of directors of Strand

20   Advisors, which is the Debtor's general partner.  They're all

21   sitting in the first row behind counsel's well.  And that's

22   Mr. James Seery, --

23            THE COURT:  Good morning.

24            MR. POMERANTZ:  -- Mr. John Dubel, --

25            THE COURT:  Good morning.

7

1          MR. POMERANTZ:  -- and the Honorable Russell Nelms.

2          THE COURT:  Yes.  I've met him before.

3          MR. POMERANTZ:  As have we.  We thought you would

4    remember him.

5       The resumes of Mr. Seery and Mr. Dubel were attached to

6    the motion filed on December 27th, and those two resumes and

7    the resume of the Honorable Judge Nelms were attached to the

8    reply that was filed last evening.  And while Mr. Seery and

9    Mr. Dubel may be new names to Your Honor, we know that you are

10   familiar with Judge Nelms, who sat with you in this district.

11         THE COURT:  Uh-huh.

12         MR. POMERANTZ:  Also in the courtroom, Your Honor, is

13   Brad Sharp, the Debtor's chief restructuring officer from DSI,

14   --

15         THE COURT:  Good morning.

16         MR. POMERANTZ:  -- and his colleague, Fred Caruso,

17   who spends most of his working hours at the Debtor's Dallas

18   headquarters.

19         THE COURT:  Good morning.

20         MR. POMERANTZ:  We have the declaration of Mr. Sharp

21   that we would move into evidence at this point in time.

22         THE COURT:  All right.  I've got a stack of paper.

23   If you have an extra copy for me to use, --

24         MS. HAYWARD:  Your Honor, may I approach with the --

25         THE COURT:  You may.

8

1          MS. HAYWARD:  Your Honor, it was filed, the

2   declaration was filed.  I'm not sure that we have a copy of --

3          MR. POMERANTZ:  Your Honor, we will also at the

4   appropriate time during my presentation, I'll bring up to Your

5   -- ask to bring up to Your Honor revisions to the term sheet

6   that was attached to the motion.

7          THE COURT:  Okay.

8          MR. POMERANTZ:  Copies have been given to Ms. Lambert

9   as well as the Committee.

10          THE COURT:  Okay.  Very good.  All right.  Well, what

11   was handed to me was the preliminary term sheet as well as the

12   CVs for the proposed new board members.  I don't see the

13   declaration --

14          MR. POMERANTZ:  Your Honor, if I may approach, I have

15   a copy.

16          THE COURT:  You may.  All right.  Very good.

17          MR. POMERANTZ:  So we would move that declaration

18   into evidence.

19          THE COURT:  All right.  The Court will admit this.

20   It was filed on the docket at 327, but I will additionally

21   admit it as Exhibit 1 today.

22      (Debtor's Exhibit 1 is received into evidence.)

23          THE COURT:  At some point in time, I want to give

24   parties the opportunity to cross-examine Mr. Sharp.  Do you

25   want to do that now, or shall we hear an opening statement?

9

1          MR. POMERANTZ:  However Your Honor prefers.  I mean,

2    maybe it's helpful to hear argument first, and then, before

3    the Trustee --

4          THE COURT:  I think I'd like to hear opening

5    statements and then we'll --

6          MR. POMERANTZ:  Thank you.

7          THE COURT:  -- make the opportunity available.  Okay.

8             OPENING STATEMENT ON BEHALF OF THE DEBTOR

9          MR. POMERANTZ:  Your Honor, by way of background, we

10   appeared before Your Honor on December 6th and December 19th.

11   And during each of those hearings, we described for the Court

12   negotiations that were underway between the Committee and the

13   Debtor which, if successful, would have -- would eliminate the

14   need for contested and uncertain and costly litigation

15   regarding the appointment of a Chapter 11 trustee and really

16   put this case in a position where the Debtor and the Committee

17   would be able to work together constructively towards

18   negotiation of a plan.

19       As a result of our hearing on December 19th, Your Honor

20   entered a scheduling order that set deadlines for either the

21   filing of a motion to approve a settlement, or alternatively,

22   the filing of one or more motions for the appointment of a

23   trustee.

24       As set forth and required by the scheduling order, we

25   filed our motion on December 27th, and in that motion we

10

1    sought approval of a term sheet and ancillary documents

2    between the Debtor and the Committee, which I'll describe

3    shortly.

4        While a couple of items had not yet been agreed to at the

5    time the motion was filed, I'm pleased to report that over the

6    last couple of days we've been able to reach closure with the

7    Committee with respect to those items, and there would also be

8    some modifications to the term sheet, which I'll go through in

9    a few moments.

10       The motion, Your Honor, seeks approval of the term sheet,

11   which accomplishes a variety of things that, again, will allow

12   the Debtor and the Committee to put the acrimony that has

13   existed in this case for the first three months behind us and

14   allow us to focus on productive matters.  In the last 24

15   hours, as I mentioned, there have been a few changes to the

16   term sheet that I will describe.  And I would like to hand up

17   Your Honor a redline and a clean copy of the revised term

18   sheet and exhibits.  May I approach?

19            THE COURT:  All right.  You may.  Do you have an

20   extra for the law clerk?  Okay.  Thank you.

21       (Pause.)

22            MR. POMERANTZ:  Your Honor, the term sheet does a

23   number of things.  Would you like me to give Your Honor some

24   time to look through the redlines?

25            THE COURT:  No.  You may proceed.

11

1        MR. POMERANTZ:  Okay.  The term sheet does a number

2   of things.  The first thing the term sheet does is appointment

3   of an independent board at Strand Advisors.  Strand Advisors

4   is the GP of the Debtor.  The Debtor is an LP.  The Debtor

5   previously had filed a motion to approve the retention of Brad

6   Sharp as the chief restructuring officer, and that initial

7   agreement and motion contain details regarding the scope of

8   Mr. Sharp's authority and the scope of what the Debtor could

9   do without Mr. Sharp's prior consent.

10       The Committee raised concerns that the structure was not

11  sufficient to ensure that decisions were being made for the

12  Debtor only in their best interests and without any

13  inappropriate influence from Mr. Dondero.

14       To address the Committee's concerns, a focal point of the

15  settlement was the Debtor's agreement to appoint an

16  independent board of directors at Strand who would be

17  responsible for managing the operations of the Debtor.

18       Over the last few weeks, a principal aspect of the

19  negotiations between the Committee and the Debtor have been

20  discussing who should the independent directors be.

21  Conceptually, the Debtor and the Committee both agreed that

22  the board should include, first, a person with significant

23  industry experience in which the Debtor operates -- hedge

24  funds, money management; second, a person with deep

25  restructuring experience from the financial advisor side; and

12

1   third, a person with some sort of judicial or governmental

2   experience.

3       The Debtor originally provided the Committee with three

4   proposed candidates.  The Committee considered the Debtor's

5   request, but instead presented the Debtor with four different

6   candidates and asked the Debtor to choose from those four.

7   The Debtors interviewed each of those people and ultimately

8   agreed on Messrs. Dubel and Seery, who were each on the

9   original list.

10      As of the deadline to file the motion on December 27th,

11  the Committee and the Debtor had still not agreed on the

12  identity of the third board member, but the parties were

13  hopeful that an agreement could ultimately be reached and we

14  decided to go ahead and file the motion.  As I'm sure Your

15  Honor saw in the motion, it was contingent upon everyone

16  agreeing on the third board member.

17      Ultimately, the Debtor and the Committee both agreed that

18  Mr. Dubel and Mr. Seery could identify the third board member

19  out of a pool of four people:  Two of the people originally

20  requested by the Committee and two people identified by the

21  Debtor.  This week and over the weekend, Mr. Seery and Mr.

22  Dubel interviewed each of the four candidates, and ultimately

23  decided on the appointment of Judge Nelms as the third

24  independent board member.

25      The board, as it will be constituted going forward, in the

13

1    Debtor's opinion, consists of three exceptional individuals

2    who are independent of the Debtor, have a sterling reputation

3    in the community, and bring to the Debtor a variety of the

4    skills that we believe, and believe the Committee agrees,

5    gives the Debtor the best opportunity to achieve a consensual

6    restructuring and otherwise manage the affairs of the Debtor

7    in the best interests of the stakeholders.

8        It is contemplated that the Debtor will continue to retain

9    the services of DSI as the chief restructuring officer, and

10   ultimately the board will determine if it's important to

11   retain a CEO going forward.

12       The second thing that the term sheet does, Your Honor, was

13   the removal of Mr. Dondero as an officer and director of

14   Strand and eliminate all of his control over decision-making

15   of the Debtor.  The Debtor recognized early on in this case

16   that Mr. Dondero's continuing role with the Debtor in a

17   position of authority made the Committee extremely uneasy.

18   Accordingly, the term sheet provides for him removing himself

19   as an officer and director of Strand and that he would no

20   longer be in a position of control at the Debtor.

21       However, since the filing of the motion, over the last

22   several days, concerns have been raised about whether removing

23   Mr. Dondero from the business entirely would have unintended

24   consequences.  I believe I may have mentioned at prior

25   hearings that, because of his involvement as a portfolio

14

1   manager under various contracts with third parties, that there

2   could be adverse economic consequences to the Debtor if he

3   didn't stay in some role.

4       As a result of discussions over the last 24 hours, the

5   Committee has agreed and the Debtor agreed to modify the term

6   sheet to allow the new board to decide whether to retain Mr.

7   Dondero in his capacity as a portfolio manager, provided,

8   however, that he will not receive any compensation and he will

9   agree to resign if requested by the board.

10      In any event, he will have no decision-making control at

11  all and he will report to the independent board.

12      The corporate governance documents that create the new

13  independent board of Strand also provide that Mr. Dondero, as

14  the owner of the equity in Strand, may not replace the board

15  without the Committee consent or court order.

16      The third major aspect of the term sheet, Your Honor, was

17  the agreement on operating protocols, and it really relates to

18  the ground rules for the Debtor's operations going forward and

19  when notice to the Committee is required of certain

20  transactions that would otherwise be in the ordinary course of

21  business.

22      Importantly, Your Honor, we are not trying to modify the

23  Bankruptcy Code in any way.  Any transactions out of the

24  ordinary course of business would still be subject to Your

25  Honor's approval.

15

 1     However, in this case, as we indicated in the initial

 2   motion we filed when the case was in Delaware, whether or not

 3   something is ordinary is not straightforward in a case such as

 4   the Debtor's, given the nature of the Debtor's operations.  So

 5   we thought it was important to establish ground rules up

 6   front, and establishing those ground rules was one of the

 7   things we did initially in the case.  We had opposition from

 8   the Committee, and we've worked through the opposition and

 9   ultimately arrived at the operating protocols that are

10   attached to the term sheet.

11     They have been slightly modified in nonmaterial ways in

12   the documents I handed up to Your Honor.

13     They were subject to substantial negotiations between the

14   Debtor and the Committee, and we also expect them to be the

15   subject of future discussions with the Committee and the

16   independent board after the independent board takes -- takes

17   place.  Takes over.

18     Two parties in interest, Your Honor, Jefferies and a group

19   of Issuers, the CLOs, have filed comments to the term sheet,

20   which I'll describe in a few moments.

21         THE COURT:  Okay.

22         MR. POMERANTZ:  The next aspect, Your Honor, of the

23   term sheet was the provision of standing to the Creditors'

24   Committee to pursue certain insider claims.

25     During the negotiations, the Committee requested immediate

16

1   standing to investigate and potentially prosecute claims

2   against insiders to the extent those insiders were not

3   employed by the Debtor.  Granting standing at this stage of

4   the case was a difficult give by the Debtor.  However, the

5   Committee impressed upon the Debtor the importance of them

6   being able to control the filing of any actions against the

7   insiders, and the Debtor decided to accede to the Committee's

8   request.

9       It still remains the Debtor's hope that, with the creation

10  of the independent board, that the Debtor, the Committee, and

11  any insiders who might be subject to any such claims will be

12  able to come together and negotiate a consensual resolution of

13  this case.  While all parties, I'm sure, can and know how to

14  litigate, hopefully they will agree that a negotiated outcome

15  is better than a litigated outcome.

16      The next aspect of the term sheet, Your Honor, was the

17  document preservation protocols, and it provides for certain

18  procedures to be put in place to address the Committee's

19  concerns about document preservation.  They are contained in

20  an exhibit to the term sheet.  Again, slight nonmaterial

21  modifications were made in what I handed up to Your Honor.

22  And essentially they provide also for the Committee's access

23  to privileged documents to aid in their investigation and

24  prosecution of claims to which they are granted standing, and

25  also sets forth a procedure to be followed to address concerns

17

1   if the information is subject to shared privileges by several

2   entities.

3       As I mentioned, Your Honor, three parties have filed

4   responses to the motion.  The first is Jefferies.  Jefferies

5   is a secured creditor of the Debtor with respect to its margin

6   account held at Jefferies, and also has a similar account held

7   by a non-debtor affiliate.  They have asked for clarification

8   that, one, nothing in the protocols or the motion affects its

9   rights under the underlying agreements or the safe harbor

10  provisions of the Bankruptcy Code entitling them to enforce

11  their remedies; and two, that the Debtors will not trade in

12  the prime account without Jefferies' consent, and if that

13  consent is sought and not obtained, only subject to court

14  order.

15      The Debtor has agreed to include language in the order to

16  address Jefferies' concern, and at the conclusion of my

17  presentation I'll submit to Your Honor an order and a redline

18  containing that language.

19          THE COURT:  Okay.

20          MR. POMERANTZ:  The second objection -- or not

21  objection, Your Honor -- the second statement was filed by a

22  group of Issuers of CLO obligations.

23          THE COURT:  Uh-huh.

24          MR. POMERANTZ:  And they were concerned that certain

25  aspects of the operating protocols which require notice to the

18

1  Committee prior to the Debtor being able to take certain

2  actions could conflict with the provisions of the underlying

3  agreements which might require the Debtor to take action on a

4  more expedited basis.

5      Neither the Issuers or the Debtor are aware of any

6  potential transactions that will arise prior to the next

7  hearing before Your Honor on January 21st.  We understand --

8  we were not party to these discussions between the Committee

9  and the Issuers yesterday, but we understand the way it's been

10 resolved is that the Issuers will withdraw their objection as

11 it relates to going forward today, subject to being able to

12 come back to the Court on the 21st and revisit the issue if

13 additional changes are not made acceptable to them to resolve

14 their issues and concerns.

15          THE COURT:  Okay.

16          MR. POMERANTZ:  But I think all parties acknowledge

17 that over the next 12 days this is a theoretical issue rather

18 than a practical issue.

19          THE COURT:  Okay.

20          MR. POMERANTZ:  This brings us, Your Honor, to the

21 United States Trustee's opposition, which is really the only

22 true objection to the motion that has been filed.  No creditor

23 has filed an objection, no investor has filed an objection,

24 and no governmental agency -- which the U.S. Trustee in its

25 objection purports to be pursuing their interests -- has filed

19

1  an objection, either.

2      As Your Honor probably recalls, at the December 19th

3  hearing the Trustee indicated its intent to oppose any

4  agreement between the Debtor and the Committee that would

5  involve corporate governance and to file its own motion for

6  the appointment of the trustee.  That motion is currently

7  scheduled for hearing on January 21st.  We had asked the U.S.

8  Trustee to reserve judgment on the Committee's and Debtor's

9  agreement until after we had come to an agreement and after we

10  had presented it to the Trustee, in hopes that it would

11  address their concerns.  However, as the Court told us -- as

12  the U.S. Trustee told us and Your Honor at the December 19th

13  hearing, there was nothing short of appointment of a trustee

14  that would satisfy the Trustee.

15      The comments really didn't make sense to us, and I believe

16  it perplexed Your Honor, but here we are.

17      At its core, Your Honor, the U.S. Trustee's objection is

18  really a request that the Court substitute its business

19  judgment for that of the Debtor and the Committee, the

20  Committee who represents the substantial majority of all

21  claims in this case, when both of them have decided that

22  agreeing to certain changes in corporate governance, among

23  other things, is preferable to the uncertain, costly, and

24  time-consuming litigation over a trustee, and also the

25  uncertainty, even if a trustee was appointed, on how the case

20

1    would be administered.

2        To the contrary, under the corporate governance proposal,

3    we have three highly-qualified individuals who are poised to

4    take over management of the Debtor, and each bring with them

5    various skills that one trustee would not have.

6        The Trustee has filed its motion for appointment of a

7    trustee, and I'm sure on the 21st will argue that the Code

8    requires it.  However, that's not the issue before Your Honor

9    today.  It's not whether a trustee is appropriate.  It's

10   whether the motion and the term sheet is a sound exercise of

11   the Debtor's business judgment under Section 363, and,

12   importantly, a reasonable compromise of the pending disputes

13   between the Debtor and the Committee.

14       The Trustee's objection raises three general points, none

15   of which have any merit.  First, the Trustee argues that there

16   is a lack of disclosure of significant matters.  The first

17   aspect that the Trustee raises to, or points to, is the

18   absence of identification of the third board member and the

19   absence of disclosure of the compensation that the board

20   members will receive, which will be backstopped by the Debtor.

21       As I described before, Your Honor, the identity of the

22   third member of the board was a fluid process which was only

23   resolved earlier this week, and the Debtor did not believe

24   that it was appropriate to reach agreement on director

25   compensation until all board members could provide input.

21

 1  Last night, we filed a reply to the Trustee's objection in

 2  which we disclosed the identity of the third board member, and

 3  we'll also disclose the proposed compensation to be provided

 4  to them, which essentially is as follows.  Each member of the

 5  board will receive $60,000 a month for the first three months

 6  of the case, $50,000 a month for the next three months of the

 7  case, and the presumption thereafter would be $30,000 a month.

 8  However, people recognize that this case will look a lot

 9  differently six months from now, and while the presumption is

10  $30,000, the Debtor, the independent board members, and the

11  Committee will sit down, see how the case looks, and decide

12  whether any modifications are appropriate.

13      The amount of compensation, which at first blush may seem

14  significant, really reflects the significant amount of work

15  that the Debtor, the Committee, and the independent directors

16  anticipate will be required from them not only to get up to

17  speed about the case, but to effectively manage this complex

18  Debtor's business operations.  The directors have heard from

19  the Debtor and the Committee of all the issues, of all the

20  concerns, and this is not an enviable task that they are

21  undertaking.  The compensation they are being provided thus

22  far we believe is appropriate under the circumstances and

23  commensurate with the work that they are going to be expected

24  to complete.

25      If they are successful and they are able to achieve a

22

1   consensual restructuring here, the million and a half or so

2   that will be spent on them will be best million and a half

3   dollars I think spent in this case.

4       Your Honor, we also have updated corporate governance

5   documents which --

6       (Pause.)

7           MR. POMERANTZ:  Your Honor, may I approach with the

8   updated corporate governance documents?

9           THE COURT:  You may.  Okay.

10          MR. POMERANTZ:  As I will discuss in a moment, Your

11  Honor, there is really no need for the Court to approve the

12  corporate governance documents, as they have been executed by

13  Strand, which is not a debtor before this Court.  However,

14  there are a couple of matters in those documents that I want

15  to bring to the Court's attention that do impact on the

16  Debtor.

17          THE COURT:  Okay.

18          MR. POMERANTZ:  First, as is typical for board

19  members, Strand has agreed to indemnify the independent

20  directors to the full extent permitted by law.  The

21  independent directors have requested that the Debtors backstop

22  Strand's agreement, and the Debtor and the Committee agree,

23  and the documents so provide.

24      Strand has also committed to obtain directors and officers

25  coverage for the independent directors.  It has been located,

23

1    it's in the process of being finalized and bound, and the

2    Debtor will pay the cost of that coverage.

3        The independent directors have also asked for language in

4    the order approving the settlement that requires a party

5    seeking to assert a claim against the independent directors

6    relating to their role as an independent director to

7    demonstrate to this Court that a claim is colorable before

8    filing the claim and providing the Court with jurisdiction

9    over any such claim.  This is language that's similar in other

10   similar types of cases.

11            THE COURT:  Uh-huh.

12            MR. POMERANTZ:  That will be reflected in the order.

13       Next, the Trustee objects to the failure of the Debtor to

14   identify who the potential chief executive officer of the

15   Debtor will be.  And essentially, she's arguing that you have

16   to identify that CEO now; it has to be subject to court

17   approval.  However, there's no requirement that any company

18   retain a CEO.  It's not a corporate law requirement.  And the

19   fact that the board reserves the right to retain a CEO in the

20   future is consistent with corporate law and is not a basis to

21   deny the motion.  And in any event, normally, the retention of

22   a CEO is not a subject that is brought to the Court's

23   attention for Court approval.

24       So the lack of any clarity over the identity of the CEO is

25   a reflection of the fact that this independent board does not

24

1 know if a CEO is required. They will come in, they are going

2 to interview all the employees, they're going to sit down with

3 the CRO, they're going to sit down with counsel, they're going

4 to sit down with the Committee, and ultimately they will

5 decide if a CEO is to be retained. And if a CEO is to be

6 retained, they will go through the process of identifying who

7 that CEO is. But again, it's not a reason to deny the motion.

8     The Trustee has also argued that because the Committee is

9 not granted standing to pursue claims against current

10 employees, as opposed to former employees, that there might be

11 some statute of limitations concerns with respect to claims

12 against those employees. The argument doesn't really make

13 sense to us. In the standard case, the Debtor retains causes

14 of action. And the Committee can investigate causes of

15 action. And at some point during the case, a Committee could

16 come in and could demand that the Debtor prosecute them, and

17 if the Debtor unreasonably refuses, could seek standing before

18 the Court.

19     In this case, the Debtors agreed up front that the

20 Committee has the standing to prosecute certain claims against

21 insiders that are not employees of the Debtor, which obviates

22 the need for standing. So we've gone one step more. But the

23 Trustee is arguing that that leaves a void for the claims that

24 are not subject to the agreement on standing.

25     However, the term sheet provides that the board is going

25

1    to make determinations on what employees should remain, what

2    employees should not remain.  To the extent the board

3    terminates any employees and there are claims against them,

4    then basically the Committee will have the ability to bring

5    those claims.

6        To the extent that those people aren't terminated, we have

7    no doubt that the Committee, in the course of its

8    investigation, will determine whether claims should be brought

9    against those people, and at some point in time may ask the

10   Debtor to prosecute those claims or ultimately seek standing.

11       In any event, these things are not being swept under the

12   rug.  There's no real legitimate concern that there's any

13   statute of limitations issue that will prevent those claims

14   from being prosecuted.

15       I am very much aware and have no doubt that the Committee

16   is going to be laser-focused on claims, and any concern that

17   statute of limitations is going to lapse I think is not well-

18   taken.

19       The Trustee next argues that the Court does not have the

20   jurisdiction to implement the corporate governance matters,

21   and for that reason the motion should be denied.  They -- she

22   argues that because Strand is not a debtor, that the Court has

23   no authority to appoint --

24            MS. LAMBERT:  Your Honor, I object.  The United

25   States Trustee is a he.  I am not the United States Trustee,

26

1    and the attacks *ad hominem* are inappropriate.

2            THE COURT:  All right.  Well, clarification, the U.S.

3    Trustee is the guy in Washington.  But anyway, you may

4    proceed.

5            MR. POMERANTZ:  I apologize to Ms. Lambert.

6            MS. LAMBERT:  Actually, he's downstairs right now.

7    Bill Neary.

8            MR. POMERANTZ:  I apologize to --

9            THE COURT:  Oh, well, I thought you meant the big guy

10   in Washington.  But anyway, you may proceed.

11           MR. POMERANTZ:  I apologize to Ms. Lambert and no

12   offense was meant.

13           THE COURT:  Okay.

14           MR. POMERANTZ:  So, the U.S. Trustee argues that

15   because Strand is not a debtor that the Court has no authority

16   to appointment the independent directors and limit Mr.

17   Dondero's right to remove the independent directors.  The

18   Debtor is not really seeking authority to appoint -- to have

19   court authority for the appointment of the directors at

20   Strand.  Again, as I mentioned before, that authority exists

21   outside of bankruptcy.  Strand is not a debtor.  Strand could

22   appoint anyone it wants to carry out its responsibility as the

23   general partner of the Debtor, and it's exercising its

24   corporate authority to do so by installing a board at Strand.

25       Nor is the Debtor seeking court authority for Strand to

27

1   enter into the corporate governance documents.  Other than the

2   couple of items I mentioned before, Your Honor, Strand can

3   enter into these documents without authority from this Court.

4   The only court authority that was required:  Debtor to

5   backstop the indemnification obligations, Debtor to pay

6   compensation to the board members, and Debtor to pay for the

7   D&O policy.

8        With respect to the Court's right to limit Mr. Dondero's

9   ability to terminate the independent directors, the term sheet

10  contemplates the Court approving a stipulation which limits

11  Mr. Dondero's ability to terminate the independent directors,

12  and if he does in fact seek to terminate the appointment of

13  the independent directors, he would be in violation of court

14  order.  But even more importantly, Your Honor, if he decided

15  to terminate the independent directors without the Committee's

16  consent and without the Debtor's consent, I wouldn't imagine

17  it would take anyone very long to come back before Your Honor

18  and ask Your Honor to very quickly appoint a trustee.

19       Accordingly, Your Honor, I think the argument of lack of

20  jurisdiction over Strand is a red herring and should be

21  denied.

22       Lastly, Your Honor, the Trustee makes a curious argument

23  that a trustee is needed to protect all investors and

24  governmental authorities.  The Trustee argues that this case

25  demands transparency which can only be accomplished by a

28

1   Chapter 11 trustee.

2       One thing I think the Debtor and the Committee and the

3   U.S. Trustee will agree on, this case does demand

4   transparency.  And we believe we've installed a corporate

5   governance structure, an operating protocol structure, a

6   document preservation structure, that does just that, provides

7   transparency that this Debtor has not been subject to and

8   which is quite different from the case that was before Your

9   Honor before.

10      So we believe that what the Debtor and the Committee have

11  done is not only in the interests of the Debtor, the

12  creditors, but investors and all governmental entities.

13      And no investor or governmental entity has had any

14  concerns or any problems with what is being done.  They

15  haven't filed any objection.  The U.S. Trustee apparently is

16  proceeding by proxy asserting those interests.

17      Second, nothing in the term sheet or any of the documents

18  limits the rights of investors or of governmental entities to

19  seek a trustee, to seek documents, or to do anything they

20  would -- that they would be entitled to do under the

21  Bankruptcy Code.

22      In any event, Your Honor, the fact that the Trustee

23  believes that a trustee is more appropriate, again, is an

24  argument that they can make at the January 21st hearing.  It's

25  not a basis for denial of this motion.

29

1    In conclusion, Your Honor, the only economic stakeholders

2 in this case believe that proceeding with the transactions

3 contemplated by the term sheet is in the best interest of the

4 estate, will maximize their ability to achieve a consensual

5 restructuring, and move this case through the system as

6 quickly and efficiently as possible. The term sheet is a

7 valid exercise of the Debtor's business judgment under 363 and

8 an appropriate compromise of controversy, and the Trustee's

9 objections are really nothing more than a rehash of its

10 request for an appointment of a trustee.

11    For all these reasons, Your Honor, we request that the

12 Court overrule the U.S. Trustee's objection and approve the

13 motion.

14        THE COURT: All right. Well, before I hear from our

15 objectors, is there any friendly commentary? Mr. Clemente, I

16 figured you might want to address this.

17        MR. CLEMENTE: I do, Your Honor. And good morning.

18        THE COURT: Good morning.

19    OPENING STATEMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF

20                    UNSECURED CREDITORS

21        MR. CLEMENTE: For the record, Matthew Clemente from

22 Sidley Austin on behalf of the Official committee of Unsecured

23 Creditors. I do have some comments that I would like to make,

24 Your Honor, some, so please bear with me. I will try and be

25 brief.

30

1          THE COURT:  Okay.

2          MR. CLEMENTE:  I think as late as 1:00 o'clock in the

3   morning I wasn't sure that I would be in front of you with

4   this settlement fully in place in a manner that was

5   satisfactory to my Committee.  As I mentioned to you in my

6   prior appearances in front of you, every provision was

7   important to the Committee, and they all work together.  As

8   Your Honor can imagine, there was a lot of negotiation that

9   took place, including late in the day and early morning, to

10  come to that conclusion.

11     Some comments on our perspective as a committee, Your

12  Honor.  As an initial matter, we were absolutely not okay with

13  the governance structure that was in place when the petition

14  was filed.  As we detailed in our objections to the CRO motion

15  and the protocol motion back when the case was in Delaware,

16  the Committee has very real and identifiable concerns about

17  the Debtor's ability to dispatch its fiduciary duty.  And the

18  Committee very seriously contemplated moving for a Chapter 11

19  trustee daily.  That conversation is something that the

20  Committee continues to -- continued to engage in, Your Honor.

21  So it's something that they considered very, very carefully.

22     That was the lens through which the Committee was

23  approaching negotiations over the settlement agreement and the

24  independent director structure.  That's how they viewed it.

25  That's the backdrop against which they came to it.

31

1    The Committee had two primary goals that it had sought to

2  achieve with the settlement agreement.  The first was to

3  ensure that Mr. Dondero does not remain in a position of

4  management authority or control in any fashion with the

5  Debtor.  Goal number two was to ensure that the value of the

6  Debtor's estate is preserved and maximized.  Those two goals

7  needed to work together.

8    The Committee  believes that the carefully-crafted

9  settlement agreement achieves these objectives in a manner

10  that is more beneficial to the estate than a potential Chapter

11  11 trustee and a related fight over its appointment at this

12  time.

13    The lynchpin of the settlement, Your Honor, is the

14  appointment of the three independent directors.  And as Mr.

15  Pomerantz outlined for you, that was the subject of intense

16  discussion, negotiation, debate among the Committee and with

17  the Debtor.  But we believe that Mr. Seery, Mr. Dubel, and

18  Judge Nelms are fully independent, highly qualified, and bring

19  relevant and complementary skillsets to this board.  Mr.

20  Pomerantz referred to that, but we believe that the three

21  directors all bring unique talents and attributes that will

22  allow them to function effectively as a board and provide the

23  appropriate oversight and direction that we believe is

24  necessary here.

25    However, regardless of how independent or highly skilled

32

1  they may be, they would be of no use if they weren't bestowed

2  with the appropriate power.  So that was another point that

3  was very important to the Committee, and we believe that the

4  settlement does this.  The settlement makes clear that the

5  independent directors are granted exclusive control over the

6  Debtor, including over all employees.  That's absolutely

7  critical to the Committee.

8       The settlement also provides that the CRO and the Debtor's

9  professionals shall report and serve at the direction of the

10  independent directors.  That is also very important.

11      And let me be clear, Your Honor, because I think you may

12  have raised this at a prior hearing:  This is not a board that

13  we expect to work at 50,000 feet, as demonstrated by the

14  compensation structure that Mr. Pomerantz outlined for you.

15  This will be a board that's hands-on, members of which will be

16  on the ground, at the Debtor, with a strong presence and a

17  clear message of who is in charge.  That is critical for this

18  Committee.

19      Additionally, as Mr. Pomerantz mentioned, the new board,

20  in consultation with the Committee, is empowered to determine

21  whether a CEO should be retained.  It's possible that one of

22  the independent directors could be that CEO, Your Honor.  But

23  we wanted to make clear that that was an important part of the

24  structure, should the board determine that that was the way it

25  wanted to go.

33

1    So, in sum, Your Honor, we believe that the independent

2  board has the clear authority and the skillset that's

3  necessary to take control and will be actively and

4  aggressively doing so.

5    But let me be clear, rest assured, Your Honor, this is not

6  going to be a board that answers to the Committee in that

7  sense.  I think that we will all be moving together

8  directionally, but it's very possible that I will be in front

9  of Your Honor arguing against a decision that this independent

10  board made.  So I want to assure Your Honor that although the

11  Committee was very active and in fact picked Mr. Seery and Mr.

12  Dubel, and then Mr. Pomerantz detailed how the third director

13  was picked, we understand who their duty -- what their duty is

14  and we also understand that they're not a rubberstamp for the

15  Committee, Your Honor.  And so I wanted to make that point to

16  you to assure Your Honor that that's not the structure that's

17  being set up here, nor are they the type of individuals that

18  would allow that to happen.

19    Additionally, Your Honor, the settlement grants the

20  Committee standing to pursue estate causes of action against

21  the related parties.  That was very important to us, Your

22  Honor.

23    And in addition to that, the settlement provides the

24  Committee access to privileged documents and sets forth a

25  discovery protocol that will assist the Committee in its

34

1 investigation.

2 　　The Committee strongly believes that Mr. Dondero's

3 repeated past behavior, that there are many questionable

4 transactions that will need to be thoroughly investigated and

5 pursued.  And so having those causes of action with the

6 economic party in interest related to those causes of action,

7 the Committee and its constituencies, we thought was very

8 important and very critical.

9 　　Granting standing, Your Honor, as I mentioned, avoids any

10 issues regarding who will be controlling those claims.

11 　　I'll touch on this in a moment, but Mr. Pomerantz talked

12 about Mr. Dondero remaining in name as an employee.  Let me

13 assure Your Honor that that is not a backdoor around the

14 Committee's ability to investigate and immediately pursue

15 claims against him should that be the course that we choose to

16 take.  So he's not part of that carve-out for current

17 employees.  That's not at all happening.  That would never be

18 something that my Committee would be comfortable with.  So I

19 wanted to make clear to Your Honor that that's not something

20 that's happening with sort of this late edition of Mr.

21 Dondero's continuing on in name as an employee.

22 　　Your Honor, the settlement also lays out a very detailed

23 set of operating protocols which we do believe are appropriate

24 and provides the Committee with transparency, which I've been

25 expressing to Your Honor we've needed since this case has

35

1 started.

2 Finally, as we point out in our reply and as would always

3 be the case, should new facts develop or the situation demand

4 it, the Committee reserves the right to seek a Chapter 11

5 trustee, as does any other party in interest, to the extent it

6 may be appropriate at that time.

7 In short, Your Honor, the Committee very carefully and

8 diligently weighed the independent director option versus the

9 Chapter 11 trustee option. The Committee had very clear goals

10 in mind, as I expressed to you, and determined that those

11 goals could be achieved in a value-maximizing manner through

12 the independent director structure.

13 The negotiations were very intense, and it was only after

14 the Committee determined that each piece of the settlement was

15 to its satisfaction did it ultimately conclude that the

16 settlement maximizes value for all stakeholders while at the

17 same time protecting those stakeholders from exposure to

18 continuing insider dealing, breaches of duty, and

19 mismanagement.

20 Therefore, the Committee believes approving the settlement

21 is in the best interest of the estate, and therefore it

22 believes it should be approved.

23 I do want to offer a word about Mr. Dondero continuing as

24 an employee. As Your Honor was aware, the term sheet as

25 originally filed provided that Mr. Dondero would, among other

36

1   things, resign as an employee of the Debtor.  Mid to late

2   afternoon yesterday, Mr. Ellington called me and said that the

3   Debtor was now of the view that Mr. Dondero should remain on

4   as an employee in that capacity for the benefit of the estate.

5   The Committee was, very appropriately, very skeptical of this,

6   as well as the sort of last-minute offer, last-minute, you

7   know, addition, however you want to view it -- some might

8   argue retrade -- that Mr. Dondero was to leave the Debtor,

9   period.  That was our view.  That was the way that the term

10  sheet was initially structured.  And under no circumstances

11  was the Committee going to allow Mr. Dondero to have any

12  control over this Debtor.

13      Your Honor, the Committee doesn't know what, if any, the

14  consequences are of removing Mr. Dondero as an employee.  And

15  we're not conceding at all that there are any value lost by

16  removing Mr. Dondero as an employee.  Instead, what we're

17  doing is we're staying true to our structure with the

18  independent directors and we're empowering them to decide.

19  And so it's consistent with, you know, our goals of having the

20  independent director structure in place.  And under the

21  settlement as now constructed, even with this late addition or

22  adjustment, Mr. Dondero would remain as an employee in name

23  only, subject in all respects to the direction, oversight, and

24  removal by the independent board.  And importantly, should

25  they decide to do that, Mr. Dondero shall resign.  And he

37

1 shall receive no compensation.

2 So he will not be in control of this Debtor. The

3 independent directors are. And he's not going to be empowered

4 to make decisions on behalf of the Debtor. Instead, we're

5 empowering our independent directors to make those decisions

6 and determinations on behalf of the Debtor.

7 I wanted -- I thought it was important that I provide that

8 perspective to Your Honor, as this is something that came in

9 at a very, very late hour.

10 Overall, Your Honor, for the reasons I have stated and the

11 reasons in our reply, the Committee, as a fiduciary of all

12 creditors in this case, believes that the settlement is in the

13 best interests of the creditors and should be approved. And

14 at this time, it's the better alternative than the cost,

15 delay, and uncertainty resulting from a Chapter 11 trustee

16 fight and the potential appointment of a Chapter 11 trustee.

17 It is time to put the governance issues behind us, Your

18 Honor, and to move forward to determine how to maximize value

19 for the creditors and how to get them paid.

20 Your Honor, just regarding the specific resolutions of

21 objections that Mr. Pomerantz put on the record, I agree with

22 how Mr. Pomerantz characterized those, and the Committee is

23 supportive of those resolutions as well.

24 Those are all my remarks, Your Honor, but I am happy to

25 answer any questions or address any concerns Your Honor may

38

1   have.

2          THE COURT:  Okay.  Two follow-up questions.  First, I

3   know I asked you this at a previous hearing and you told me,

4   but your Committee, as I recall, is very well constituted.

5   Just remind me of the members.

6          MR. CLEMENTE:  Yes.

7          THE COURT:  You have a representative from the

8   Redeemer Committee, --

9          MR. CLEMENTE:  Yes, Your Honor.

10         THE COURT:  -- which is a $140 million or so

11  arbitration award?

12         MR. CLEMENTE:  Yes, Your Honor.

13         THE COURT:  Okay.  And who else is on the Committee?

14  Is an Acis representative?

15         MR. CLEMENTE:  Acis is on the Committee, Your Honor.

16         THE COURT:  Uh-huh.

17         MR. CLEMENTE:  Meta-e Discovery, who is a trade

18  vendor of the Debtor, is on the Committee.  And UBS

19  Securities, who is also --

20         THE COURT:  Okay.

21         MR. CLEMENTE:  -- a litigation claimant, is on the

22  Committee.

23     It was the U.S. Trustee in Delaware's parting gift to me

24  to name a four-member committee, Your Honor.

25     (Laughter.)

39

1          THE COURT:  Okay.  Makes it awkward at times.  And

2     then back to the Dondero subject.

3          MR. CLEMENTE:  Yes, Your Honor.

4          THE COURT:  I mean, again, both Mr. Pomerantz and you

5     clarified that the proposal now is the new board will decide

6     if he stays on, Mr. Pomerantz said as a portfolio manager.

7          MR. CLEMENTE:  That is correct, Your Honor.

8          THE COURT:  Am I -- I mean, I'm hearing that

9     correctly?

10         MR. CLEMENTE:  That is correct, Your Honor.

11         THE COURT:  So, right now, whatever officer positions

12    he has, he's technically not resigning?  Or --

13         MR. CLEMENTE:  He is resigning as an officer of the

14    company, Your Honor.

15         THE COURT:  Okay.  He's resigning?  So the board will

16    just decide, is he going to be a portfolio manager or some --

17    whatever the employee title is?

18         MR. CLEMENTE:  Or they could decide that he's not

19    necessary.

20         THE COURT:  Or not necessary?  In any event, no

21    compensation?

22         MR. CLEMENTE:  That is correct, Your Honor.

23         THE COURT:  Okay.

24         MR. CLEMENTE:  And as you can see, the term sheet

25    provides that Mr. Dondero shall not cause any related entity

40

1    to terminate any agreements with the Debtor as well.  That was

2    language that was added last night as well.

3          THE COURT:  All right.  So they're going to make the

4    decision, does he help preserve value by staying in some

5    capacity or not?

6          MR. CLEMENTE:  That is correct, Your Honor.

7          THE COURT:  Okay.

8          MR. CLEMENTE:  That, cutting through it, that is the

9    way that ultimately the Committee views it.

10          THE COURT:  Okay.

11          MR. CLEMENTE:  And if there's an opportunity -- and

12    I'm not conceding that there is.  I'm not conceding that he

13    preserves any value.

14          THE COURT:  Uh-huh.

15          MR. CLEMENTE:  But we wanted to give the option to

16    our independent directors to make that determination.  Because

17    if there's an opportunity to preserve value, that's what we're

18    trying to achieve.

19          THE COURT:  Okay.  And I don't even know if you've

20    thought through this.  Would there be some sort of notice

21    filed on record in the case if --

22          MR. CLEMENTE:  If --

23          THE COURT:  -- if the decision is made to --

24          MR. CLEMENTE:  To -- to --

25          THE COURT:  -- hire him or keep him as a portfolio

41

1  manager?

2         MR. CLEMENTE:  So, I think the default under the term

3  sheet, as revised, is he stays in that capacity in terms of

4  name.  The independent directors will -- they're subject to

5  his control and direction, and they could decide to remove

6  him.

7         THE COURT:  Uh-huh.

8         MR. CLEMENTE:  Perhaps if Your Honor --

9         THE COURT:  Okay.

10         MR. CLEMENTE:  We could provide notice if they make

11  the determination to remove him, but I think the default is

12  that, you know, he's in that -- he's remaining as that

13  employee name currently.  So that's the current default.

14         THE COURT:  Okay.  All right.  Thank you.

15         MR. CLEMENTE:  Thank you very much, Your Honor.

16         THE COURT:  Well, Ms. Patel, you're getting up so

17  I'll hear -- I don't know who all has been in the loop over

18  this overnight development.

19     OPENING STATEMENT ON BEHALF OF ACIS CAPITAL MANAGEMENT

20         MS. PATEL:  Your Honor, Acis has been in the loop as

21  a member of the Committee.  And I will be very brief with

22  respect to Acis's individual comments.  And I just want to be

23  clear:  Obviously, I'm here as counsel for Acis, and so this

24  is Acis's individual position.  Mr. Clemente aptly and very

25  ably handled the Committee's overall position with respect to

42

1   this.

2        But Your Honor, I just want to, on behalf of Acis, make

3   sure that, because of these developments, that's really -- I

4   really had hoped to have zero role today, but I want to make

5   sure that we're -- Acis is on record with respect to our

6   position.  And obviously, given Your Honor's knowledge and

7   oversight of the long history of Acis's bankruptcy case and

8   seeing some of the events that transpired there, I'm sure that

9   this will all, against that backdrop, make an awful lot of

10  sense.

11       But, you know, it's this continued role for Mr. Dondero

12  that is of concern.  You know, this issue even being raised

13  within like the last 48 hours by Mr. Ellington, the timing of

14  it just creates an issue.  I mean, did this -- how could this

15  possibly have come out of left field when this is such a huge

16  part of what the Debtor does in its ordinary course of

17  business, is serve as a portfolio manager, and these are

18  contracts that have been negotiated, generally speaking,

19  internally by Highland.  So the fact that if Mr. Dondero were

20  to exit the structure and there would be some potential

21  ramifications to that, I've got to wonder how much of a

22  surprise could that really have been to Highland folks.

23       But I just wanted to highlight, in connection with the

24  term sheet -- this is the preliminary term sheet that was

25  handed up Your Honor, and I believe Your Honor has a redline

43

1   version of it as well --

2           THE COURT: Uh-huh.

3           MS. PATEL: -- on Page 2, with respect to the role of

4   Mr. James Dondero, there's various provisions in there. And I

5   guess I would be remiss, Your Honor, if I didn't say, at least

6   out of the gate, Acis obviously supports the implementation of

7   this independent board of directors. We believe all the

8   candidates are very capable and are -- we put our reliance

9   upon them.

10      Obviously, we don't concede any issues. We'll see what

11  we're going to do. But certainly, for the time being, we do

12  support the entry of this agreement of the settlement -- or,

13  I'm sorry, approval of the settlement agreement by the Court

14  that lets the independent board be put into place.

15      But what I'll focus the Court on, on Page 2 under the role

16  of Mr. James Dondero, it goes through various provisions as to

17  what he'll resign to -- positions he'll resign from and that

18  he will remain as an employee of the Debtor, including

19  maintaining his title as portfolio manager for all funds and

20  investment vehicles for which he currently holds that title.

21  And then it goes on to provide as to who he'll report to and

22  how he will be governed, which includes by the independent

23  board, he will receive no compensation, and that he will be

24  subject to at all times the supervision, direction, and

25  authority of the independent directors.

44

1    Again, we have faith that the independent directors will

2  oversee this and will govern his role accordingly.  However,

3  given Acis's history with how transactions have transpired at

4  Highland, we remain highly cautious with respect to what

5  happens next.

6    And to that end, Your Honor, the very last sentence there

7  on Page 2, "Mr. Dondero shall not cause any related entity to

8  terminate any agreements with the Debtor," is a key provision

9  of this that keeps Acis, as a Committee member, on board with

10  this agreement.  I wanted to highlight that and note that, in

11  the last less than 48 hours, in the last 12 hours, or maybe a

12  little bit more than that, call it 18 to be safe, that's where

13  -- that's a provision that's been -- that's where we've ended

14  up.  It's all of these issues have been going at lightning

15  speed, but I did want to just, for the record and so everybody

16  is clear, that is an important piece of this agreement to --

17  for Acis.

18    And as Your Honor knows, this Debtor, Highland, is wont to

19  try to terminate agreements and to try -- in an attempt to try

20  and transfer valuable contracts away and valuable revenue

21  stream away from an entity to an alternate entity.  And that's

22  really the heart of our concern, Your Honor.

23    So, with that, I just wanted to be clear and be on record

24  as to Acis's position.  Thank you.

25          THE COURT:  Thank you.  All right.

45

1        MR. POMERANTZ:  Your Honor, if I briefly may respond

2   to the issues with Mr. Dondero while they are fresh in Your

3   Honor's mind?

4        THE COURT:  Okay.  Okay.

5        MR. POMERANTZ:  Your Honor, look, we appreciate the

6   timing of this coming to the attention of the Committee as

7   being less than optimal.  As Your Honor can appreciate, this

8   case that's been filed three months ago, a lot of people are

9   looking very carefully at what's happening to the Debtor.

10  Investors are looking.  There was a transfer of venue.  There

11  have been a lot of reports about potential trustee motions.

12  And we believe a lot of parties are waiting to see the outcome

13  of this hearing and the trustee hearing to determine whether

14  they will determine to continue to do business with the

15  Debtor.

16      It's not only an issue of contractual rights.  It's also

17  an issue of whether investors feel comfortable on who is

18  managing, who is managing their investments.

19      This issue of Mr. Dondero's continuing role has been

20  something that at the Debtor we've continued to grapple with

21  over the last several weeks.  It's always been our thought

22  that we should do nothing that would unduly harm the company

23  from an economic standpoint.  I think the Committee shares

24  that.  That if it's determined by an independent board -- and

25  don't take current Debtor professionals, don't take current

46

1   Debtor employees' word for it -- but if they determine that

2   there's an economic benefit by keeping him on to preserve

3   material revenue stream, they should be able to make that

4   determination.  I think that's really at the core here.  And I

5   think the Committee got ultimately comfortable with it because

6   it will be an independent board, the majority of the members

7   identified and chosen by them and accepted by the Debtor.

8       So, again, we apologize to the parties and the Court for

9   bringing this on late.  It wasn't my intent to come here and

10  present modified versions of the term sheet that hadn't been

11  filed.  But that's where we are, and that's why it has come

12  up, and that's why it's an extremely important issue, because

13  preserving whatever revenue we can for the Debtor is

14  important.

15      Now, at the end of the day, the board may either decide

16  that he doesn't preserve the revenue, or the negatives from

17  keeping him involved with the company outweigh any benefits.

18  And that's a decision they will have to make, and it'll be

19  their province to make.  So I just wanted to give Your Honor

20  that perspective.

21          THE COURT:  Okay.

22          MR. DAUGHERTY:  Your Honor, may I approach?

23          THE COURT:  Mr. Daugherty?  You may.

24      OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

25          MR. DAUGHERTY:  I apologize.  I was not planning to

47

1 address the Court at all today. I would have had my attorney

2 here for it. But I just ask a little bit of indulgence to

3 represent myself *pro se* for this issue.

4    This is the first I've heard that Mr. Dondero would stay

5 with the company. I think it's an awful idea. There's a

6 litany of reasons for that.

7    By the way, I'm completely in support of this -- of this

8 board that's been chosen. I have every confidence that

9 they'll be able to make good decisions eventually. But

10 they're stepping into this thing new. Obviously, I've been

11 through this in your court with *Acis* and other matters, and I

12 have deep, deep concerns about Mr. Dondero continuing in that

13 role, simply because of the influence it has on the rest of

14 the organization and the message that it sends, both

15 internally and externally, of where the company goes from

16 here.

17    So I just wanted to let you know my thoughts. I wasn't

18 planning to make them. I haven't filed anything. But that's

19 where I stand.

20        THE COURT: All right. Thank you, Mr. Daugherty.

21    All right. Before we hear from the U.S. Trustee, who I

22 know is going to have a lot to say, let me just circle back

23 briefly to Jefferies counsel and the CLO Issuers' counsel.

24 You heard the representations of Mr. Pomerantz earlier about,

25 well, first, in the case of Jefferies, that the Debtor has

48

1    agreed to language to address your concerns. Do you want to

2    weigh in on that and confirm that you're content that you're

3    going to have language to work out your concerns?

4              OPENING STATEMENT ON BEHALF OF JEFFERIES, LLC

5              MR. MAXCY: Thank you, Your Honor. Patrick Maxcy for

6    Jefferies.

7         No, I don't have anything additional to add to what Mr.

8    Pomerantz said. The language that we have worked out will

9    speak for itself and will be included in the order.

10             THE COURT: All right. Thank you.

11        And counsel for the CLO and CDO Issuers, do you confirm

12   that you would be in agreement to basically withdraw your

13   objections for now, but perhaps come back and make argument on

14   the 21st if you have not worked out language with the

15   Committee that you think works?

16             OPENING STATEMENT ON BEHALF OF THE ISSUER GROUP

17             MR. BENTLEY: James Bentley from Schulte Roth for the

18   Issuers, Your Honor.

19        I believe the deal that Mr. Pomerantz and Mr. Clemente

20   and I have discussed was adjourning our objection to the 21st,

21   --

22             THE COURT: Okay.

23             MR. BENTLEY: -- rather than withdrawing it.

24             THE COURT: Okay.

25             MR. BENTLEY: We're -- we believe we will be able to

49

1    come up with language acceptable to the Issuers, but we would

2    like to reserve the right to come back to the Court on our

3    limited objection if we cannot, given that our issue is really

4    -- really only relates to the 25 Issuers we represent.

5         THE COURT:  Okay.  Thank you very much.

6      All right.  Ms. Lambert?

7    OPENING STATEMENT ON BEHALF OF THE UNITED STATES TRUSTEE

8         MS. LAMBERT:  May it please the Court.  As the Debtor

9    acknowledges, the motion that they are settling, the issues

10   that they are settling, are the issues that the U.S. Trustee

11   has raised in his motion to appoint a Chapter 11 trustee.  As

12   a matter of statutory construction, Section 1104 does not

13   contemplate settlement of these issues.  1112, in contrast,

14   has a provision that if the Court finds and determines that

15   there is cause to convert a case, there are unusual

16   circumstances and the Court can find a reasonable

17   justification for the wrongdoing or the error that occurred

18   that led to cause -- for example, administrative defects in

19   1112, not filing monthly operating reports -- and that can be

20   cured.  The Court has to make a finding that those -- these

21   defects can be cured within a reasonable period of time.

22   Section 1104 contains no analog to his.

23     If the Court finds cause to direct the appointment of a

24   Chapter 11 trustee, then the Court is supposed to appoint a

25   Chapter 11 trustee.  And *Trailer Ferry* and *AWECO* both stand

50

1   for the proposition that, on today's day, we're supposed to

2   have evidence about what the management issues are that led to

3   this agreement. There's been no evidence. There's been no

4   allegations in the motion for settlement. And so the U.S.

5   Trustee is prepared to put that evidence on.

6       And Your Honor, one aspect of this is that the arbitration

7   agreement has been sealed. And there are people on the phone.

8   I don't know who's on the phone. The U.S. Trustee has opposed

9   the sealing of the arbitration -- not arbitration agreement,

10  the arbitration judgment -- has opposed the sealing of that.

11  And then they referenced a confidentiality order as the basis

12  to seal it. The U.S. Trustee also opposed that

13  confidentiality motion, which was filed subsequently to the

14  motion to seal.

15      There is no confidentiality order. An interim order was

16  entered sealing the arbitration award, but -- and the U.S.

17  Trustee has honored that by redacting all of the pleadings

18  that we filed relating to that, but it's important today for

19  the U.S. Trustee to be able to discuss it in argument, and it

20  is here -- and we have it prepared to be admitted into an

21  exhibit.

22      So, to proceed with my argument, Your Honor, I need some

23  clarification about what I can say.

24          THE COURT: You want clarification from me on what

25  you can say?

51

1          MS. LAMBERT:  Well, I mean, either that or we need to

2    clear the room.

3          THE COURT:  I've read the arbitration award.

4          MS. LAMBERT:  Right.

5          THE COURT:  It's in my brain.

6          MS. LAMBERT:  Right.  Okay.

7          THE COURT:  Uh-huh.

8          MS. LAMBERT:  And so one of the arguments here today

9    is that the U.S. Trustee is representing the SEC and

10   representing other Government agencies and things.  No.

11   Obviously, that is not the U.S. Trustee --

12         THE COURT:  I didn't hear that.

13         MS. LAMBERT:  Okay.  The -- one of the positions has

14   been, in the papers, is, well, that we don't have standing to

15   raise their issues.  And that's true.

16         THE COURT:  Okay.

17         MS. LAMBERT:  But the problem is that the U.S.

18   Trustee has been constrained from discussing those issues with

19   the SEC.  The arbitration award is very relevant to the SEC's

20   oversight.  I anticipate the evidence today will be that the

21   SEC, after the financial crisis of 2008, imposed restrictions

22   on this Debtor on breach of fiduciary duty issues.  I

23   anticipate that the arbitration findings would be very

24   relevant to whether those issues are ongoing or not.

25         THE COURT:  Okay.  Let me weigh in.  I view the legal

52

1  standard that this Court has to weigh today as being: Is the

2  Debtor proposing something that is reflective of sound

3  business judgment, reasonable business judgment? And to the

4  extent this is a compromise of controversies with the

5  Committee, is this fair and equitable and in the best interest

6  of the estate?

7      And as Mr. Pomerantz has said, you know, a lot of this

8  maybe doesn't even need Court approval. But to the extent

9  there are aspects of this that are appropriate to seek Court

10  approval on, you know, this is my task. I have to look at

11  what's presented, and is this reflective of sound business

12  judgment? Is this fair and equitable? Is it in the best

13  interest?

14      So, assuming there are tons of bad facts here reflected in

15  the arbitration award, reflected in other evidence, bad facts

16  that might justify a trustee, a Chapter 11 trustee, is this

17  nevertheless, what's proposed today, a reasonable compromise

18  of, you know, the trustee arguments the Committee could make

19  or, you know, is this a reasonable framework for going

20  forward? Okay?

21      So I guess what I'm saying is I'm confused about, you

22  know, do I need to look at the arbitration award? Do we need

23  to have evidence of all of that? I can assume that there are

24  terrible facts out there that might justify a trustee, but I'm

25  looking at what's proposed. Is this a fair and equitable way

53

1    to resolve the disputes?  Is it sound business judgment?

2    Frankly, is it a pragmatic solution here to preserve value?

3    So that's the legal standard I have in my mind here.

4              MS. LAMBERT:  Yes, Your Honor.

5              THE COURT:  Okay.

6              MS. LAMBERT:  The standard is whether it is fair and

7    equitable to resolve the issues in the Chapter 11 trustee

8    motion, and it is the U.S. Trustee's position that they are

9    not resolved by this.  And how are they not resolved?  Number

10   one, they're not resolved because the problems that led to the

11   breach of fiduciary duty issues and findings are more

12   pervasive, both based on this Court' finding in the *Acis* case

13   and in the arbitration court's finding in Mr. Dondero.  Other

14   officers are implicated.

15             THE COURT:  But how --

16             MS. LAMBERT:  Other employees are implicated.

17             THE COURT:  Okay.  I feel like maybe we're talking at

18   each other, not getting each other.  I've got a proposed

19   solution here to totally change the playing field, if you

20   will.  Bring in incredibly qualified people to --

21             MS. LAMBERT:  Those people --

22             THE COURT:  -- to change out the, you know, the

23   person that you say breached fiduciary duties, the, you know,

24   mismanagement, whatever bad labels we have here, but bring in

25   a clean slate.

54

1          MS. LAMBERT:  No, Your Honor, because employees

2    remain at the Debtor who are problematic.  The board that is

3    appointed owes a fiduciary duty to whom?  Strand.  Dondero.

4    He's still the board -- he is the sole stockholder.  Yes.  In

5    addition, --

6          THE COURT:  And they won't be taking directions from

7    him.

8          MS. LAMBERT:  In addition, --

9          THE COURT:  The term sheet is they won't be taking

10   directions from him.

11         MS. LAMBERT:  Your Honor, there is no evidence before

12   the Court today that Mr. Dondero has entered a stipulation.

13   This is part of the problem.  This continues --

14         THE COURT:  Well, if he doesn't, in five minutes the

15   Committee is going to be filing their trustee motion, right?

16         MS. LAMBERT:  Well, then we haven't saved any time or

17   any money.  This is the whole issue.  They have to put on

18   evidence that this is a resolution of issues.  We're going to

19   have the motion to appoint a Chapter 11 trustee either way.

20         THE COURT:  All right.  Well, we did have the

21   evidence of Mr. Sharp.  Would you like to cross-examine him at

22   this point?

23         MS. LAMBERT:  Your Honor, I would like to put the

24   U.S. Trustee's exhibits into evidence and then cross-examine

25   him.

55

1          THE COURT: All right. Your exhibits?

2          MR. POMERANTZ: Your Honor, we would object to any

3     exhibits. The Trustee has not filed an exhibit list.

4          MS. LAMBERT: Your Honor, this matter was set on an

5     expedited basis and the Court does not require exhibit and

6     witnesses lists when a matter is filed on an expedited basis.

7     It's impossible, when a response is filed at 5:00 o'clock the

8     evening before and supplements are made in the morning of the

9     hearing, for the U.S. Trustee to put on a witness and exhibit

10    list.

11         MR. POMERANTZ: Your Honor, we were here on the 19th.

12    We set out a briefing schedule. And maybe it was a couple

13    days short of normal notice. Ms. Lambert agreed to issue

14    discovery by a certain date, and she at no point said that

15    because there was 13 days' notice as opposed to longer period

16    that she couldn't comply and provide a witness list.

17       We provided with a witness list. We provided an exhibit

18    list. The Trustee's effort and attempt to now submit exhibits

19    and rely on maybe there were some changes this morning, that

20    just doesn't cut it, and that's not fair and that's not due

21    process.

22         THE COURT: Okay. I sustain the objection. The

23    exhibits won't be admitted since there was no exhibit list.

24         MS. LAMBERT: Your Honor, I do not have an exhibit

25    list from them. And they --

56

1        THE COURT:  Well, they haven't offered any.

2        MS. LAMBERT:  They put on new exhibits this morning.

3   The exhibits that the U.S. Trustee has are all things that

4   they are familiar with.

5        THE COURT:  Let me back up.  They didn't introduce

6   any exhibits.  They --

7        MS. LAMBERT:  But they introduced the declaration,

8   they introduced the supplements to the agreement that were

9   drafted this morning, they've introduced the new corporate

10  resolutions, all of which they handed me this morning.

11        THE COURT:  All right.  Well, the declaration of Mr.

12  Sharp, it's two pages long.  It is, I don't think, any kind of

13  surprise information.

14        MS. LAMBERT:  Your Honor, --

15        THE COURT:  I'll allow you to cross-examine him.

16        MS. LAMBERT:  -- the U.S. Trustee's exhibits are no

17  surprise, either.  The *Acis* opinion is no surprise to anybody

18  in this courtroom.

19        THE COURT:  Okay.  Well, what are your exhibits?

20        MS. LAMBERT:  The --

21        THE COURT:  I probably should have asked.

22        MS. LAMBERT:  The exhibits are the *Acis* opinion, the

23  arbitration awards or the determinations, both the partial and

24  the final, and the SEC's original judgment.  There are four

25  exhibits.

57

1          THE COURT:  All right.  Well, Mr. Pomerantz, what

2     would you like to say?  One of them I have obviously seen,

3     since I wrote it.

4          MR. POMERANTZ:  Yes, you've written it.  You wrote

5     it.

6        (Laughter.)

7          MR. POMERANTZ:  Your Honor, I think this is a tempest

8     in a teapot.  The Committee's brief that it filed in

9     opposition to the CRO retention, the ordinary course

10    protocols, and the cash management motion had a litany of

11    description of the Redeemer litigation, of the SEC litigation.

12    There are plenty of bad facts out here.  Okay?  We have an

13    interim order to seal.  There was no hearing set today for our

14    final hearing.

15        The Trustee has objected to that order, and I suspect that

16    will be heard on the 21st.  We don't think it's appropriate to

17    introduce the Redeemer award.  However, we have read the

18    redacted provisions or portion of the U.S. Trustee's brief,

19    and we have no problem if the U.S. Trustee limits its argument

20    to the redacted portion in presenting that to the Court.

21        In other words, we don't believe that the few sentences

22    that were redacted need to be redacted.

23        However, to the extent they intend to submit the

24    arbitration award, we don't think it's appropriate, we don't

25    think it's necessary, we think Your Honor hit it right, that

58

1  the issues today are not whether there's mismanagement at the

2  Debtor. Okay?

3      The U.S. Trustee's position is, notwithstanding this new

4  structure, it doesn't work. She has a trustee motion on. She

5  can argue on the 21st that it doesn't work. Nobody is

6  prejudicing her right to do so.

7      We think it's prejudicial, it's unfair, it's procedurally

8  improper to submit the Redeemer arbitration award and to allow

9  the Trustee to do anything other than describe exactly what

10  she has in her pleading.

11          THE COURT: Okay. I sustain the objection to those

12  exhibits. Again, I've read them. They're in my brain. I

13  wrote one of them. But I will allow you to cross-examine Mr.

14  Sharp. So, Mr. Sharp, would you please come to the witness

15  stand? Please raise your right hand.

16              BRADLEY SHARP, DEBTOR'S WITNESS, SWORN

17          THE COURT: All right. Please be seated.

18          MS. LAMBERT: To clarify, Your Honor, has the Court

19  considered the *Acis* opinion and the arbitration opinions based

20  on judicial notice?

21          THE COURT: And we're doing a lot of hair-splitting

22  here. I'm just letting you know I -- the facts are in my

23  brain. You can't extract them from my brain. Okay?

24          MS. LAMBERT: Okay.

25          THE COURT: I know there have been a lot of bad

Sharp - Cross                          59

1   things, arguably bad things.  But to me, the real issue here

2   today is whether this framework that has been heavily

3   negotiated with the Committee reflects reasonable business

4   judgment on the part of the Debtor, is a fair and equitable

5   resolution of the Committee's, you know, arguments in favor of

6   a trustee, and whether this makes, you know, sense going

7   forward to allow this Debtor to go forward without a trustee.

8   Okay?

9       So I really think that the evidence you want is not

10  terribly relevant.  We technically aren't here on a trustee

11  motion today.  We're here on whether a new board and the

12  terms, the protocols suggested, reflect reasonable business

13  judgment and reflect a fair compromise of arguments the

14  Committee has raised.  All right?  So I don't know how much

15  more clear I can make that.  I guess the technical answer is

16  I'm not taking judicial notice of those things for purposes of

17  today.

18      All right.  You may proceed.

19                      CROSS-EXAMINATION

20  BY MS. LAMBERT:

21  Q   Mr. Strand, can you state your name for --

22  A   Sorry.  Bradley Sharp, S-H-A-R-P.

23  Q   Sharp.  Mr. -- oh, sorry.

24  A   No relation to Strand.

25  Q   All right.  Strand is the general partner of the Debtor,

```
                        Sharp - Cross                      60
```

1   right?

2   A    That is correct.

3   Q    And there has been no change in the board of the Debtor

4   except Mr. Dondero's resignation; is that right?

5   A    Well, it's a little different, because the -- Strand is

6   the general partner of the Debtor.

7   Q    Yes.

8   A    So the new board will be acting and in control of the

9   Debtor.

10  Q    Yes.  And there is -- Strand is a non-debtor, correct?

11  A    That is correct.

12  Q    And the stock of the non-debtor, Strand, is owned by

13  Dondero?

14  A    Mr. Dondero owns Strand Advisors.

15  Q    In its entirety?

16  A    That is correct.

17  Q    So the board will owe a fiduciary duty to Mr. -- to Mr.

18  Dondero?

19  A    The board will have a fiduciary duty to the Debtor and to

20  Strand Advisors.

21  Q    All right.

22  A    Their duty is to the entity.

23  Q    The -- Strand, as the general partner, as an entity, owes

24  a fiduciary duty to the Debtor, right?

25            MR. MORRIS:  Objection to the extent it calls for a

Sharp - Cross                          61

1  legal conclusion.

2          THE COURT:  Sustained.

3  BY MS. LAMBERT:

4  Q    Do you know?

5  A    As a lay person.  I'm not an attorney.

6  Q    Okay.  So you don't know what the fiduciary roles of the

7  board will be; is that right?

8  A    Well, the fiduciary board will be acting -- you know,

9  looking at it from my perspective as the chief restructuring

10 officer, the new board will be acting as the Debtor-in-

11 Possession.  And, you know, they will be directing the Debtor-

12 in-Possession.  You know, the Debtor-in-Possession has duties

13 to all parties in interest, and they will be directing the

14 Debtor.  They will be directing me as CRO.

15 Q    And, in addition, there may be a CEO, right?

16 A    That is contemplated, correct.

17 Q    It is contemplated?  It --

18 A    It is -- it is an option that the board has if they think

19 a CEO is necessary.

20 Q    But you don't know whether a CEO is going to be appointed

21 or not?

22 A    That's up to the board.

23 Q    And you don't know what the compensation for that

24 individual might be, right?

25 A    Again, that's up to the board.

                        Sharp - Cross                    62

1   Q   Mr. Dondero is going to be an employee of the Debtor,

2   right?

3   A   That's correct.

4   Q   And Mr. Dondero started the Debtor, correct?

5   A   I believe so.

6   Q   And he also started Strand, right?

7   A   I believe that's correct.

8   Q   And he is also in control of a number of entities that the

9   Debtor does business with; is that right?

10  A   That is correct.

11  Q   Mr. Ellington is going to remain on with the Debtor?

12  A   That -- Mr. Ellington is an employee.  All employees are

13  now subject to the board.

14  Q   Okay.  And Mr. Ellington's role with the Debtor is what?

15  A   He is general counsel with the Debtor.

16  Q   And there are other in-house attorneys with the Debtor,

17  right?

18  A   That's correct.

19  Q   And who else is there currently?

20  A   I don't have the list in front of me, you know, the

21  employee list.  As of now, because obviously this is still --

22  hasn't been effected, so the board has not made any decisions

23  with respect to any employees going forward.

24  Q   And the CFO remains the same?

25  A   Yeah, that is, again, as of now.  I don't know what the

Sharp - Cross                          63

1  board is going to do, if anything.

2  Q   Do you have any anticipation of what you would recommend

3  to the board regarding the CFO?

4  A   You know, I have many recommendations I have not made to

5  the board yet.  I just met them this morning.

6  Q   Are you aware that historically this Court has found that

7  the lawyers provided bad advice to the Debtor?

8         MR. MORRIS:  Objection to the form of the question.

9         THE COURT:  Sustained.

10 BY MS. LAMBERT:

11 Q   Do you have any knowledge about whether there have been

12 findings that the law firm gave erroneous advice to the

13 Debtor?  Or, I mean, the in-house counsel gave erroneous

14 advice.

15        MR. MORRIS:  Objection to the form of the question.

16        THE COURT:  Sustained.

17        MS. LAMBERT:  Your Honor, I'm asking for the

18 foundation.

19        THE COURT:  Rephrase.

20 BY MS. LAMBERT:

21 Q   Do you -- are you aware of any concerns about the in-house

22 counsel?

23 A   Yes.

24 Q   What is your knowledge?

25 A   I have read the rulings from this Court.

Sharp - Cross                    64

1  Q    And what is your understanding of those rulings?

2  A    I don't recall specifically.  I read that early on when I

3  was first employed.  But there have been concerns with respect

4  to, you know, management of the Debtor.

5  Q    As the CRO, have you made any recommendations to change

6  employees to date?

7  A    As of now, I don't have a -- the board.  You know, the

8  board has just been employed.  We have not made

9  recommendations up to this point.  We are still -- obviously,

10 have been evaluating our position and what needs to happen.  I

11 think it's important for the Debtor at this time, a little

12 stability would be a good thing for -- until we develop the

13 direction going forward.

14 Q    Are you familiar with the compensation terms for the

15 directors?

16 A    Yes.

17 Q    And the directors are employees of Strand but paid by the

18 Debtor; is that right?

19 A    Oh, I'm not sure they're employees of Strand, but they are

20 paid by the Debtor, their compensation.  That's correct.

21 Q    And yet the compensation is technically through Strand,

22 right?

23 A    They -- they are.  They have to act through the general

24 partner of the Debtor because of the corporate structure.

25 Q    One of the portions of the agreement is that the Committee

Sharp - Cross                          65

1   acquires litigation claims.  Are you familiar with that?

2   A    I am.

3   Q    Have you parsed out which litigation claims those might be

4   at this point?

5   A    I think the agreement says they have litigation claims

6   against insiders and related parties.  So I don't know what

7   those individual claims are.  I don't know what exists.

8   Q    Are you aware that the Committee obtains the attorney-

9   client privilege and work product privilege?

10  A    Yeah.  Subject to the terms of those agreements, correct.

11  Q    Have you gone through the documents and determined which

12  ones would fall on -- which attorney files would fall on which

13  side?

14  A    Not as of yet.

15  Q    Have you been taking direction from Mr. Dondero?

16  A    We've had -- I've had limited interaction with Mr. Dondero

17  since my retention.  You know, we have been complying with the

18  protocols that we had been negotiating with the Committee and

19  providing information to the Committee.  We have been, as a

20  result of those protocols, instructing management of the

21  company on compliance with those protocols.  So they have

22  brought to us transactions that they would like to do.  We

23  have reviewed those transactions and compared it to the

24  proposed protocols and have been enforcing those.  So if

25  management has asked to do a transaction that does not meet

Sharp - Cross                          66

1   within those protocols, we have been declining the

2   transaction.  And that -- you know, the company has agreed

3   with that decision and accepted that decision.

4   Q    When you say management, who are you -- to whom are you

5   referring?

6   A    You know, the whole management team at the company.  In-

7   house counsel.  The CFO.  You know, I've had limited

8   interaction with Mr. Dondero.  One interaction was he did

9   question one of my decisions that I made.  We discussed it and

10  he accepted my conclusion.

11  Q    You're at the Debtor every day?

12  A    My team is.

13  Q    You are not?

14  A    I have had some travel restrictions due to a medical

15  issue, but I have three of my team there every day.

16  Q    Is Mr. Dondero there every day?

17  A    I don't know.  I don't think so.  In the few days I'm

18  there, I've not seen him.

19  Q    Is Mr. Ellington there every day?

20  A    No.

21  Q    Who on the management team is there every day?

22  A    You know, our primary interaction is with Isaac Leventon,

23  Frank Waterhouse, the CFO.  You know, primary interaction, you

24  know, with David Klos, who is the controller, in dealing with

25  the financial issues.

Sharp - Cross                    67

1    Obviously, we spend a lot -- my team spends a lot of time

2  with the head of compliance.

3  Q   Were you surprised by this addition that Mr. Dondero would

4  remain as an employee?

5  A   I can't say I was surprised.  It is an issue that we

6  struggle with, given the nature of this company's business.

7  You know, I see the change in the language and, you know, as

8  CRO, I am comfortable with it.

9  Q   So, as CRO, if Mr. Dondero is necessary now, you recognize

10 that he was necessary three weeks ago?

11 A   I'm not saying that he's necessary.  I'm saying that it is

12 important for the board to be able to make that decision.

13 Q   And it wasn't important when the settlement was filed?

14 A   It was the -- it was a struggle at the time.  I was

15 concerned at the time it was filed the unintended consequences

16 of Mr. Dondero resigning completely and disappearing, because

17 there are a significant number of funds that the Debtor deals

18 with related parties that are controlled by Mr. Dondero, and I

19 was worried about the financial impact with it.  I knew this

20 issue was important to the Committee.  And if that's something

21 that the Debtor agreed to and the Committee agreed to, so be

22 it.

23     You know, I think the last-minute compromise is acceptable

24 and appropriate.  I think the language as negotiated is going

25 to be very helpful to the Debtor.  And I think, then, it's up

Sharp - Cross                           68

1   to the board to make the decision, with full knowledge on

2   what's the best avenue forward.

3   Q   And the language as negotiated was added because, in the

4   past, there have been problems with Mr. Dondero changing or

5   terminating agreements with related entities, right?

6   A   There was that -- I've seen that -- issues raised in the

7   *Acis* case.

8           MS. LAMBERT:  No further questions.

9           THE COURT:  All right.  Any redirect?

10          MR. POMERANTZ:  Not from the Debtor.

11          THE COURT:  Anyone have examination?  No?  All right.

12  Thank you, Mr. Sharp.  You're excused.

13          THE WITNESS:  Thank you.

14      (The witness steps down.)

15          THE COURT:  All right.  Are we going to have any

16  other, I guess, witnesses, evidence?

17          CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

18          MR. POMERANTZ:  No, Your Honor.  I just had a couple

19  points.  One, Ms. Lambert mentioned that she hadn't seen a

20  copy of the stipulation referred to, which was prohibiting Mr.

21  Dondero from terminating the board.  There's a good reason for

22  her not having seen it.  I hadn't provided it to her.  It just

23  came this morning, right before the hearing.  I have one

24  signed copy.  I have other copies that I could represent, even

25  though they're unsigned, are the same, so I would like to

69

```
 1   provide Your Honor.  I'll keep the signed copy but provide you

 2   with an unsigned copy, but it's the same, and also give one to

 3   the U.S. Trustee.

 4           THE COURT:  But you've got a signature of Mr. Dondero

 5   on that?

 6           MR. POMERANTZ:  Yes, I do.

 7           THE COURT:  Okay.

 8           MR. POMERANTZ:  May I approach?

 9           THE COURT:  You may.  Thank you.

10           MR. POMERANTZ:  Your Honor, maybe for the record it

11   would be appropriate for me to show Your Honor the signature,

12   so you could say that you've seen it?

13           THE COURT:  Yes.  Yes.

14           MR. POMERANTZ:  May I approach again?

15           THE COURT:  You may.  (Pause.)  Okay.  Thank you.

16   The record will reflect I've seen Mr. Dondero's signature.

17           MR. POMERANTZ:  Your Honor, one of the threads that

18   Ms. Lambert said to Your Honor is that there were employees

19   still remaining at the Debtor and that those employees may

20   have been involved in some wrongdoing.

21      I submit, Your Honor, if Your Honor appointed a Chapter 11

22   trustee today, what would a Chapter 11 trustee do?  A Chapter

23   11 trustee wouldn't terminate every employee at the Debtor.  A

24   Chapter 11 trustee, if he or she was doing what they should

25   do, would go down to the company, would interview members of
```

70

1   the company, senior management, and decide who should stay on

2   and who should not stay on.

3       That, I submit, Your Honor, is exactly what this board

4   will do.  So the concept of there being something different

5   done, if you have a board here or not, I don't think makes

6   sense.

7       And lastly, Your Honor, Ms. Lambert expressed the issue as

8   whether it's fair and equitable to resolve the U.S. Trustee

9   issues in this way.  I don't think that's the standard.  The

10  only fair and equitable I understand is in plan confirmation.

11  I think Your Honor said it straight, which is:  Is this a

12  valid exercise of the Debtor's business judgment and is it an

13  appropriate compromise of controversy?  That is the standard.

14  And, again, we have always acknowledged that, notwithstanding

15  how Your Honor rules today, the Trustee reserves the right to

16  come back to court and argue a trustee is appropriate on the

17  21st.

18      We believe, Your Honor, that many of the cases, in this

19  circuit and elsewhere, look to the continuing management of

20  the company and whether management issues have been addressed

21  as a significant factor in determining whether a trustee is

22  appointed.  And it'll come as no surprise, of course, if Your

23  Honor grants our motion today, this will be a lynchpin of our

24  opposition to the trustee motion.

25      But, again, those issues are for another day, and we

71

1  believe that we have satisfied our standard, and we request

2  that Your Honor approve the motion.

3         THE COURT:  All right.  Other closing arguments?

4     CLOSING ARGUMENT ON BEHALF OF THE UNITED STATES TRUSTEE

5         MS. LAMBERT:  Yes, Your Honor.  As the Debtor

6  acknowledges, the Court has no jurisdiction over Strand.  This

7  is a complicated structure.  A trustee avoids all of the

8  complications involved in the Court exercising jurisdiction

9  over an entity that it doesn't have jurisdiction over.

10     To enter a stock stipulation related to a non-debtor is

11  highly irregular, and Mr. Dondero is the person behind that.

12  It has happened in cases where people have been in these kinds

13  of structures, like that FSLIC used to put in these kinds of

14  structures -- there's published opinion, the *Gaubert* case --

15  where the person continued to exercise control even though

16  they had a stock trust.

17     The Court needs a person beholden to the Court.  The

18  evidence is that, historically, this Debtor has entered into

19  things that breached its fiduciary duty and resulted in self-

20  dealing and liability for the Debtor.  The evidence is that

21  these go beyond Mr. Dondero and the Court does not have

22  jurisdiction over his stock.  The Court does not have

23  jurisdiction over Strand.  The board members of Strand are not

24  employees of the Court, they're employees of Strand, a non-

25  debtor.  These members have a fiduciary duty to Strand.

72

1    Yes, Strand is the general partner of this Debtor and has

2  a fiduciary duty, but all these fiduciary duties intermix in

3  ways that result in conflicts for this case. These conflicts

4  are unnecessary. The Court could just appoint a trustee who

5  only owes a fiduciary duty to the members and creditors of

6  this case, as well as the next (inaudible).

7    There is no evidence that this is cheaper. There is no

8  evidence that this is a total resolution, because issues are

9  left open, such as whether or not a CEO is going to be

10  appointed, how much that person is going to cost.

11    Finally, Your Honor, the sealing has constrained the

12  ability of some of the parties to understand what's going on

13  in this case. And that is material to the argument about who

14  is here, because we don't know who -- that all the people who

15  would have participated in this discussion had an opportunity

16  to participate in it.

17    Yes, the creditors have a fiduciary duty, and I believe

18  that they represented to the best of their ability, but they

19  are not charged with the issues that others are charged with,

20  such as the SEC.

21    There is no evidence that the officers are disinterested.

22  Rather, the new officers are going to be conflicted by the

23  nature of their position. There's no evidence that it's

24  cheaper. And a trustee, if appointed, could be appointed on

25  an hourly basis. This is a Chapter 11 trustee.

73

1     They argue that the trustee would not have the knowledge,

2  and yet they've been able to find three candidates to serve

3  for the board who are qualified.  So there's no evidence that

4  it would not be better to have a trustee for that reason as

5  well.

6     The evidence is that, historically, the Redeemer Committee

7  was set up to prevent these kinds of transactions and have

8  oversight.  Historically, the evidence is it did not work.

9  For this reason, the statute provides a solution, and the

10  Court should impose it.  The Court should deny this motion as

11  not being in the interest of the estate, as not being a sound

12  exercise of discretion, because it's really the discretion of

13  Strand, not the Debtor, and it will remain the discretion of

14  Strand, not the Debtor.

15     Thank you.

16          THE COURT:  All right.  Anyone else have comments?

17          MR. POMERANTZ:  Your Honor, just a couple of minor

18  points.

19          THE COURT:  Okay.

20           CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

21          MR. POMERANTZ:  Ms. Lambert started by saying the

22  Court doesn't have jurisdiction over Strand.  I know I just

23  handed her the stipulation, but the last paragraph of the

24  stipulation specifically says that the parties stipulate and

25  agree that the Court shall have exclusive jurisdiction over

74

1    all matters arising from or related to the interpretation and

2    implementation of this stipulation and the adjudication of any

3    parties breaching the stipulation.

4        So the Court does have jurisdiction now that the

5    stipulation has been signed, assuming that the Court enters

6    it, so I think that addresses that issue.

7        Your Honor, the evidence of the disinterestedness of the

8    members of the board, we've provided their *curriculum vitaes*.

9    We've made representations that they have no connections with

10   the Debtor or any of the parties in interest.  We don't think

11   that, just because they become appointed and become a director

12   of Strand, that that renders them disinterested [sic], and we

13   think that the Trustee's arguments that being at a different

14   level creates different duties is just not -- is not accurate.

15   I don't think that the Committee would have had any appetite

16   for this type of structure had they believed that each of

17   these board members wouldn't feel that their fiduciary duty

18   was to the Debtor's estate.  And they all are seasoned

19   restructuring people from different aspects, all understand

20   their fiduciary duties well, and all are prepared to carry

21   them out.

22       Lastly, the Trustee points to the historic issues, and

23   specifically mentioned the Redeemer Committee and that

24   structure didn't work.  Well, I think it speaks volumes, Your

25   Honor, that not only the Redeemer Committee, are they on the

75

1  Committee and the Committee has supported this motion, but the

2  Redeemer Committee hasn't come to Your Honor and said that,

3  notwithstanding that structure that may or may not have been

4  effective, this structure is ineffective.

5      And at the end, Your Honor, the Trustee is trying to

6  replace the business judgment of the Debtor.  The Debtor is

7  entitled to deference of the judgment, again, focusing on the

8  correct standard.  And, again, the Trustee will have her day

9  in -- his day in court in connection with the ultimate trustee

10  motion on the 21st.

11      Thank you, Your Honor.

12          THE COURT:  Anyone else?

13      All right.  Well, the Court is going to note a few things

14  as part of its ruling, obviously.  The new proposed

15  independent board members for Strand, Strand obviously being

16  the general partner of the Debtor, Highland -- Mr. James

17  Seery, Mr. John Dubel, and retired Judge Russ Nelms -- are

18  highly-qualified individuals with respect to the industry.

19  Some of them with respect to restructuring.  Certainly, in the

20  case of retired Judge Nelms, with regard to fiduciary duties

21  and the Bankruptcy Code requirements.

22      These three individuals were chosen by the Creditors'

23  Committee, whose constituency is broad, whose constituency is

24  owed well over $100 million.  And they were chosen by the

25  Committee after literally months of negotiation.  Obviously,

76

1    this bankruptcy was filed in October, and it appears to this

2    Court, from the representations of counsel, that from the very

3    beginning of the case -- the Committee was, I guess, appointed

4    a week or two after the case was filed in October -- there's

5    been haggling over corporate governance of this Debtor.

6        So we have highly-qualified individuals. We have

7    individuals who were chosen by the well-constituted Creditors'

8    Committee. And what has been proposed to the Court is that it

9    is these independent directors that would have sole and

10   exclusive management and control of the Debtor.

11       An interesting jurisdictional argument has been made, and

12   it's one of those arguments that, frankly, you know, sounds

13   good when you first hear it, but when you really drill down

14   about the governance structure here, I mean, obviously, this

15   Debtor is a limited partnership and it acts through a general

16   partner. It's the general partner that controls the Debtor

17   entity. And while Strand Advisors, Inc., the general partner,

18   may not technically be in bankruptcy, it's the structure of

19   these entities such that it controls the Debtor. So the

20   jurisdictional argument, when you drill down, feels a little

21   off.

22       Moreover, we have language in the stipulation where Strand

23   is stipulating and consenting, if you will, to this Court's

24   exercise of jurisdiction over it.

25       There are many things about the compromise here that have

77

1  very compelling appeal.  Among them, certainly, the Committee

2  that's negotiated this term sheet retains the right at any

3  time to move for a Chapter 11 trustee if it believes there are

4  grounds.  The Committee is granted standing to pursue estate

5  claims, certain estate claims right off the bat, without

6  having to come back and ask the Court, without having to rely

7  on the Debtor to pursue that.  There are document production

8  provisions, document preservation provisions, a shared

9  privilege negotiated, that are very powerful tools for the

10  Committee, and certainly operating protocols that have been

11  negotiated regarding the Debtor's operations that are very

12  powerful tools for the Committee.

13      I said many times during the *Acis* case -- those who were

14  here will remember -- that the company, *Acis*, was not a great

15  fit for Chapter 11.  Lots of companies aren't great fits for

16  Chapter 11, I suppose, but the kind of business it was was

17  kind of tough to maneuver in Chapter 11.  Human beings and

18  their expertise create value.  And while we had a Chapter 11

19  trustee, a stranger come in and take control over Acis, you

20  know, there's great uncertainty whether that stranger is going

21  to be able to preserve value and have the smooth transition

22  into Chapter 11 that's really going to be the best fit.

23      Here, as I've said earlier, the legal standard I view as

24  controlling here is 363 and whether what has been proposed

25  reflects reasonable business judgment.  Is there a sound

78

1   business justification for proposing the independent slate of

2   directors at the GP level for the Debtor, the protocols, the

3   negotiation with the Committee, the document sharing, the

4   standing given to them? Does all of this reflect reasonable

5   business judgment? And I find, quite clearly, it does. I

6   find it to be a pragmatic solution to the Committee's concerns

7   about existing management and control.

8       And I think I used the words "fair and equitable," not

9   just Ms. Lambert, because it is also presented to the Court as

10  a 9019 compromise of disputes with the Committee, and we

11  traditionally use a fair and equitable and best interest of

12  the estate analysis in this context. So, to the extent that

13  applies, I do find this a fair and equitable way of resolving

14  the disputes with the Committee, and I find this to be in the

15  best interest of the estate. So I do approve this.

16      And by approving this motion, I'm approving the term sheet

17  as it's been presented, the various terms therein, the

18  exhibits thereto. I'm specifically approving the new

19  independent directors, the document management and

20  preservation process, the standing to the Committee over

21  certain of the estate claims, the reporting requirements, the

22  operating protocols, the whole bundle of provisions.

23      Now, there is one specific thing I want to say about the

24  role of Mr. Dondero. When Ms. Patel got up and talked about

25  the newest language that has been added to the term sheet, she

79

1 highlighted in particular the very last sentence on Page 2 of

2 the term sheet, the sentence reading, "Mr. Dondero shall not

3 cause any related entity to terminate any agreements with the

4 Debtor."  Her statement that that was important, it really

5 resonated with me, because, you know, as I said earlier, I

6 can't extract what I learned during the *Acis* case, it's in my

7 brain, and we did have many moments during the *Acis* case where

8 the Chapter 11 trustee came in and credibly testified that,

9 whether it was Mr. Dondero personally or others at Highland,

10 they were surreptitiously liquidating funds, they were

11 changing agreements, assigning agreements to others.  They

12 were doing things behind the scenes that were impacting the

13 value of the Debtor in a bad way.

14     So not only do I think that language is very important,

15 but I am going to require that language to be put in the

16 order.  Okay?  So we're not just going to have an order

17 approving the term sheet that has that language.  I want

18 language specifically in the order.  You know, you can figure

19 out where the appropriate place to stick it in the order is,

20 but I want specific language in here regarding Mr. Dondero's

21 role.  I also -- the language in there that his role as an

22 employee of the Debtor will be subject at all times to the

23 supervision, direction, and authority of the Debtors, I want

24 that language in there as well.  Let's go ahead and put the

25 language in there that at any time, in any event, the

80

1   independent directors can determine he's no longer going to be

2   retained. I want that in the order.

3      And I'm sure most of you can read my mind why, but I want

4   it crystal clear that if he violates these terms, he's

5   violated a federal court order, and contempt will be one of

6   the tools available to the Court. He needs to understand

7   that. Mr. Ellington needs to understand that. You know, if

8   there are any games behind the scene, not only do I expect the

9   Committee is going to come in and highlight that to the Court

10  and file a motion for a trustee or whatever, but we're going

11  to have a contempt of court issue.

12     So, anybody want to respond to that?

13        MR. POMERANTZ: Your Honor, Jeff Pomerantz; Pachulski

14  Stang Ziehl & Jones.

15    We hear Your Honor. What I thought I'd do now is I have a

16  clean redline of the order, of course not including the

17  provision you just requested, --

18        THE COURT: Uh-huh.

19        MR. POMERANTZ: -- which we will go back and upload

20  and hope to get an order signed by Your Honor today, if you're

21  around. But to go over the other changes, the changes to

22  Jefferies, the other language changes I discussed before. I

23  gave a copy to Ms. Lambert and to the Committee. May I

24  approach with a --

25        THE COURT: You may.

81

1              MR. POMERANTZ:  Thank you.

2              THE COURT:  Okay.  All right.  (Pause.)  All right.

3     The form of order looks fine to me.  Obviously, you'll add the

4     Dondero-related language, and we may have further wording

5     tweaks negotiated with the CLO Issuers.  But, again, I approve

6     all of this.  I didn't say on the record the compensation, but

7     certainly I am approving that as reasonable.  I expect these

8     three directors are going to be working very, very hard.  And

9     so, as you said, not 50,000-foot level monitoring, actually

10    rolling up sleeves on-site, so I think the compensation is

11    reasonable.

12             MR. POMERANTZ:  Thank you, Your Honor.  We will

13    submit an order shortly that includes Your Honor's language

14    requested.

15             THE COURT:  Okay.

16             MR. POMERANTZ:  Are you around this afternoon?

17             THE COURT:  I am around, --

18             MR. POMERANTZ:  Okay.

19             THE COURT:  -- so just pick up the phone or send an

20    email to Traci, my courtroom deputy, --

21             MR. POMERANTZ:  Yes.

22             THE COURT:  -- so she can tell me, "It's in your

23    queue to sign."

24             MR. POMERANTZ:  She has been extremely helpful and

25    responsive.

82

1        THE COURT: Good. I'm glad to hear that.

2        MR. POMERANTZ: Yes.

3        THE COURT: Now, as far as future scheduling, I did

4   have her sitting by, listening, in case we needed to discuss

5   anything. Obviously, we're going to have a kind of a

6   carryover placeholder on the 21st as part of the trustee

7   motion hearing for any remaining issues with the CLO Issuer.

8   And, you know, that's just a placeholder if necessary to hear

9   language controversies.

10       My courtroom deputy was concerned, because you have a lot

11  of pending motions that have just sort of sat there pending

12  because this was the big issue, right? She wants to make sure

13  she sets anything you need a setting on. And I don't know if

14  you want to discuss that today or go back as a group and --

15       MR. POMERANTZ: We're happy to -- I think, you know,

16  I think that's appropriate to do. We had the motion to

17  appoint the CRO.

18       THE COURT: Uh-huh.

19       MR. POMERANTZ: That was pending. That gets resolved

20  by this motion. We will submit an order --

21       THE COURT: Okay.

22       MR. POMERANTZ: -- with the new agreement that was

23  attached to the term sheet.

24       We had the cash management order which Judge Sontchi had

25  issued an interim order. We will have a final order with

83

1  respect to that.

2          THE COURT:  Okay.

3          MR. POMERANTZ:  We will be withdrawing the motion to

4  approve ordinary course protocols which was originally on for

5  hearing.

6          THE COURT:  Uh-huh.

7          MR. POMERANTZ:  I think on the 21st we have currently

8  set a motion to approve the retention or Mercer, which is the

9  Debtor's compensation consultant, --

10          THE COURT:  Uh-huh.

11          MR. POMERANTZ:  -- and an analog motion that was

12  originally set for today with respect to insiders, non-

13  insiders, but is on for non-insiders and insiders on the 21st,

14  --

15          THE COURT:  Uh-huh.

16          MR. POMERANTZ:  -- which is the motion to approve

17  bonuses.

18          THE COURT:  Uh-huh.

19          MR. POMERANTZ:  Of course, the Debtor's new board is

20  going to be wanting to very carefully review that.  And we are

21  going back and today having our first new board meeting with

22  the board to start bringing them up to speed.  But we

23  presently intend, subject to, obviously, their direction, to

24  go forward on the 21st.

25      We also have the retention of Lynn Pinker and Foley

84

1 Gardere, which had been filed and was brought on for hearing

2 previously. It had been delayed, again, for the board to look

3 at the issues. We expect to have that on for the 21st. And I

4 believe, I believe that would be it.

5     MS. LAMBERT: No, Your Honor, the --

6     MR. POMERANTZ: No?

7     MS. LAMBERT: -- U.S. Trustee has objected to the

8 motion to seal, which was the second item on the Wilmington

9 Court's docket that got -- and it got transferred here. The

10 U.S. Trustee has also objected to the motion for protective

11 order. The issues overlap. We request that they be set as

12 quickly as possible.

13     MR. POMERANTZ: We're happy to set both of those for

14 the 21st as well.

15     THE COURT: All right. So I think what I'm going to

16 ask you to do is just get on the phone, one of you, with Traci

17 and just make sure she's clear on everything you need set on

18 the 21st, and then you can do a big notice of hearing, just

19 kind of listing all of these matters.

20     MR. POMERANTZ: Your Honor, with respect to the CRO

21 motion -- order and the cash management order, I was wondering

22 if it would be helpful for my colleague Mr. Demo to go over

23 the amendments to those orders -- we would like those to be

24 entered today -- to see if Your Honor has any questions.

25     THE COURT: All right. That would be good. Mr.

85

1    Clemente, did you have something first?

2            MR. CLEMENTE:  Just very quickly, Your Honor.  We had

3    filed our retention applications for the Committee

4    professionals and filed CNOs, and your office had indicated

5    you wanted to get through today, which I totally understand,

6    but I just wanted to make sure that Your Honor didn't lose

7    sight of those.  I don't believe there were any objections to

8    those, but I think your intent was probably to deal with them

9    after today, but I just wanted to --

10           THE COURT:  All right.  Yes, it was to get through

11   today.

12           MR. CLEMENTE:  Yes.

13           THE COURT:  So, since you've had plenty of time run

14   on those, you can submit orders and I'll get them signed in

15   chambers.

16           MR. CLEMENTE:  Thank you very much, Your Honor.

17   Appreciate it.

18           THE COURT:  Okay.  Thank you.  Counsel?

19           MR. DEMO:  Good afternoon, Your Honor.  Greg Demo,

20   Pachulski Stang, on behalf of the Debtor.  I'm happy to keep

21   this as brief as possible, but I think walking through the

22   cash management motion has the most changes.

23           THE COURT:  Okay.

24           MR. DEMO:  The biggest change there, and we had

25   discussed this with the United Stated Trustee in Delaware, is

86

1    that in our initial motion we disclosed that the Debtor had

2    bank accounts at BBVA and then also at NexBank.  Those

3    accounts have been moved to East West Bank, --

4            THE COURT:  Okay.

5            MR. DEMO:  -- which is a party to a depository

6    agreement with the United Stated Trustee.

7            THE COURT:  Okay.

8            MR. DEMO:  The only exception to that is a

9    certificate of deposit that is at NexBank.  It's a relatively

10   small amount of money.  It's $135,000.  But it also is pledged

11   as collateral on a lease.  So that has been -- proven

12   problematic to move.  The Trustee for Delaware did say that

13   was okay.  I would hope that the Trustee for Texas would agree

14   with that.  We did disclose it in the initial debtor

15   interview.

16      But those are the bank accounts.  The bank accounts at

17   BBVA and NexBank, with the exception of that CD, were all

18   closed as of yesterday.

19           THE COURT:  Okay.

20           MR. DEMO:  So now we are going to be using East West

21   Bank for all operating accounts, all cash, going forward.

22      The other two accounts are the account at Jefferies, which

23   is the prime brokerage account.

24           THE COURT:  Uh-huh.

25           MR. DEMO:  That account, we are keeping open.

87

1   Obviously, there have been conversations with Jefferies that

2   are going to be reflected in the proposed order on the

3   settlement, but we do propose to keep the Jefferies prime

4   brokerage account open as well.

5       And then we filed a supplement for another prime brokerage

6   account that we have at a prime broker called Maxim Group.

7   That account has $30 million in securities in it, give or

8   take, and then literally like $100 in cash.  The Debtor

9   considers that account more an investment than actual

10  operating account, but we would like to keep that account open

11  as well, just so it can continue holding those securities.

12      Jefferies and Maxim, neither of them are on the depository

13  list, so we are requesting a waiver of 345(b) for those two

14  accounts, and then also requesting a waiver of 345(b) with

15  respect to the certificate of deposit at NexBank.

16          THE COURT:  Okay.

17          MR. DEMO:  That's where we're at at cash management.

18  And I guess, sorry, one more thing.  In the original cash

19  management motion, we had a series of intercompany

20  transactions that we disclosed, and we had gotten interim

21  relief from the Delaware court to make those payments up to a

22  hundred -- or, $1.7 million.  We are below that account, and

23  on a go-forward basis, all of those intercompany transactions

24  are getting subsumed into the settlement motion and the

25  operating protocols and all of that.  But we are asking for

88

1    final relief on the intercompany transactions that we made

2    under the interim order.

3          THE COURT: Okay. All right. Who wishes to be heard

4    on this? I don't know how much discussion we've had outside

5    the courtroom on this.

6          MS. LAMBERT: We haven't -- normally, a bond would be

7    appropriate for the Jefferies and the other small account.

8    The estate is at risk on the CD, but it's not that much money.

9    It's not worth bonding. It'll be more expensive to bond it.

10        NexBank, as you know, Your Honor, is a bank where Mr.

11    Dondero is the CEO. So that was part of the reason that

12    NexBank was carved out. But the -- so I would like them to

13    bid bonds on the Jefferies and the other account. And if we

14    -- let's carry it on those issues so that we can see how

15    expensive bonding it would be, and if it's cost-prohibitive,

16    maybe we reconsider. But in the past, the bonds haven't been

17    very expensive, relatively.

18          MR. DEMO: We're happy to discuss that with the U.S.

19    Trustee. I mean, just for the record, the Jefferies account,

20    you know, does support a margin loan. It's $80 million in

21    securities. It's $30 million at Maxim. They're SIPC. I

22    mean, it's Jefferies and, you know, another large prime

23    broker. Again, we're happy to discuss it with the Trustee. I

24    don't know that it's necessary, but we will discuss it.

25          THE COURT: Okay. Well, you all can discuss it, and

89

1   if you have an unopposed order, an agreed order, --

2          MR. DEMO:  Uh-huh.

3          THE COURT:  -- you can upload it and I'll sign it.

4   Otherwise, if you need hearing time on the 21st, --

5          MR. DEMO:  Okay.

6          THE COURT:  -- we'll get it all figured out then and

7   --

8          MR. DEMO:  Okay.  All right.

9          THE COURT:  -- resolve it then.

10         MR. DEMO:  Thank you, Your Honor.  And then I guess

11  the other motion is the CRO retention.  This one should

12  hopefully be pretty brief.  We are just filing a new proposed

13  order that attaches the engagement letter, as has been

14  modified by all of the settlement discussions.  I believe the

15  Committee is on board with that, and it's consistent.  It was

16  one of the attachments that you approved this morning in

17  connection with the settlement.

18         THE COURT:  All right.  Comments on that?

19         A VOICE:  None, Your Honor.

20         THE COURT:  Committee,  you're good?

21         MS. LAMBERT:  The U.S. Trustee had also objected to

22  the CRO motion, but it's some of the same issues that the

23  Committee raised.  And the CRO, my understanding, is now not

24  an employee of the board but totally overseen by the board,

25  and with that, we can withdraw our objection.

90

1          THE COURT:  All right.  Very good.  I'll sign your

2     order on the CRO, then.

3          MR. DEMO:  Okay.  Thank you, Your Honor.

4          THE COURT:  All right.  Well, if there's nothing

5     else, I'll be on the lookout for your orders.  And, again, if

6     you could coordinate with Traci to make sure she's clear on

7     everything you need set on the 21st.

8          MR. POMERANTZ:  Thank you very much, Your Honor.

9          THE COURT:  All right.

10          MR. CLEMENTE:  Thank you, Your Honor.

11          MR. DEMO:  Thank you, Your Honor.

12          THE CLERK:  All rise.

13       (Proceedings concluded at 11:54 a.m.)

14                         --oOo--

15

16

17

18

19

20                        CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22     above-entitled matter.

23      **/s/ Kathy Rehling**                          12/10/2020

24     _____      _____
     Kathy Rehling, CETD-444                        Date
25     Certified Electronic Court Transcriber

91

INDEX

PROCEEDINGS                                                    4

OPENING STATEMENTS

By Mr. Pomerantz                                              9
By Mr. Clemente                                             29
By Ms. Patel                                                41
By Mr. Pomerantz                                            45
By Mr. Daugherty                                            46
By Mr. Maxcy                                                48
By Mr. Bentley                                              48
By Ms. Lambert                                              49

WITNESSES

Debtor's Witnesses

Bradley Sharp
- Direct Testimony by Declaration                            8
- Cross-Examination by Ms. Lambert                          59

EXHIBITS

Debtor's Exhibits                            Identified Received

1    Bradley Sharp Declaration                    8      8

CLOSING ARGUMENTS

By Mr. Pomerantz                                            68
By Mr. Clemente                                            71
By Mr. Pomerantz                                            73

RULINGS                                                     75

END OF PROCEEDINGS                                          90

INDEX                                                       91

# EXHIBIT 3

```
            IN THE UNITED STATES BANKRUPTCY COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
                        DALLAS DIVISION

                          )    Case No. 19-34054-sgj-11
In Re:                    )
                          )
HIGHLAND CAPITAL          )    Dallas, Texas
MANAGEMENT, L.P.,         )    February 19, 2020
                          )    9:30 a.m.
        Debtor.           )
                          )    MOTIONS
                          )
_____

                  TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                UNITED STATES BANKRUPTCY JUDGE.

APPEARANCES:

For the Debtor:          Greg Demo
                         John A. Morris
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         780 Third Avenue, 34th Floor
                         New York, NY  10017-2024
                         (212) 561-7700

For the Debtor:          Jeffrey N. Pomerantz
                         PACHULSKI STANG ZIEHL & JONES, LLP
                         10100 Santa Monica Blvd., 13th
                          Floor
                         Los Angeles, CA  90067
                         (310) 277-6910

For the Debtor:          Melissa S. Hayward
                         Zachery Z. Annable
                         HAYWARD & ASSOCIATES, PLLC
                         10501 N. Central Expressway,
                          Suite 106
                         Dallas, TX  75231
                         (972) 755-7104

For the Official Committee  Matthew A. Clemente
of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                            One South Dearborn Street
                            Chicago, IL  60603
                            (312) 853-7539
```

2

```
 1    APPEARANCES, cont'd.:

 2    For the Official Committee  Juliana Hoffman
      of Unsecured Creditors:     SIDLEY AUSTIN, LLP
 3                                2021 McKinney Avenue, Suite 2000
                                  Dallas, TX  75201
 4                                (214) 981-3413

 5    For Acis Capital           Rakhee V. Patel
      Management GP, LLC,        Annmarie Antoinette Chiarello
 6    et al.:                    Phillip L. Lamberson
                                 WINSTEAD, P.C.
 7                               2728 N. Harwood Street, Suite 500
                                 Dallas, TX  75201
 8                               (214) 745-5250

 9    For Acis Capital           Brian Patrick Shaw
      Management GP, LLC,        ROGGE DUNN GROUP, P.C.
10    et al.:                    500 N. Akard Street, Suite 1900
                                 Dallas, TX  75201
11                               (214) 239-2707

12    For the Issuer Group:      Amy K. Anderson
                                 JONES WALKER, LLP
13                               811 Main Street, Suite 2900
                                 Houston, TX  77002
14                               (713) 437-1866

15    For the Issuer Group:      James T. Bentley
      (Telephonic)               SCHULTE ROTH & ZABEL, LLP
16                               919 Third Avenue
                                 New York, NY  10022
17                               (212) 756-2000

18    For Redeemer Committee of  Mark A. Platt
      the Highland Crusader      FROST BROWN TODD, LLC
19    Fund:                      100 Crescent Court, Suite 350
                                 Dallas, TX  75201
20                               (214) 580-5852

21    For Redeemer Committee of  Marc B. Hankin
      the Highland Crusader      JENNER & BLOCK, LLP
22    Fund:                      919 Third Avenue
      (Telephonic)               New York, NY  10022-3098
23                               (212) 891-1600

24

25
```

3

1    APPEARANCES, cont'd.:

2    For the U.S. Trustee:        Lisa L. Lambert
                                  OFFICE OF THE UNITED STATES
3                                   TRUSTEE
                                  1100 Commerce Street, Room 976
4                                 Dallas, TX  75242
                                  (214) 767-8967 Ext. 1080
5
     Recorded by:                 Michael F. Edmond
6                                 UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
7                                 Dallas, TX  75242
                                  (214) 753-2062
8
     Transcribed by:              Kathy Rehling
9                                 311 Paradise Cove
                                  Shady Shores, TX  76208
10                                (972) 786-3063

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25         Proceedings recorded by electronic sound recording;
             transcript produced by transcription service.

APP. 0231
Appx. 00278

4

1                DALLAS, TEXAS - FEBRUARY 19, 2020 - 9:43 A.M.

2            THE COURT:  All right.  Well, we have Highland

3    matters.  Let's get lawyer appearances, in the courtroom

4    first.

5            MR. DEMO:  Good morning, Your Honor.  Greg Demo;

6    Pachulski Stang Ziehl & Jones, on behalf of the Debtor.  With

7    me are Jeff Pomerantz and John Morris.

8            THE COURT:  Okay.  Good morning.

9            MR. POMERANTZ:  Good morning.

10           MR. CLEMENTE:  Good morning, Your Honor.  Matthew

11   Clemente and Juliana Hoffman from Sidley Austin on behalf of

12   the Official Committee of Unsecured Creditors.

13           THE COURT:  Good morning.

14           MS. HAYWARD:  Good morning, Your Honor.  Melissa

15   Hayward and Zachery Annable also on behalf of the Debtor.

16           THE COURT:  Good morning.

17           MS. LAMBERT:  Lisa Lambert with the U.S. Department

18   of Justice on behalf of the U.S. Trustee, William Neary.

19           THE COURT:  Good morning.

20           MS. PATEL:  Good morning, Your Honor.  Rakhee Patel,

21   Phil Lamberson, and Annemarie Chiarello of Winstead, P.C., and

22   also Brian Shaw of Rogge Dunn Group, on behalf of Acis Capital

23   Management, LP and Acis Capital Management, GP, LLC.

24           THE COURT:  Thank you.

25           MR. PLATT:  Good morning, Your Honor.  Mark Platt

APP. 0232
Appx. 00279

5

1  from Frost Brown Todd on behalf of the Redeemer Committee of

2  the Highland Crusader Fund.  I believe that at least Marc

3  Hankin from Jenner & Block is on the line as well.

4          THE COURT:  Okay.  Thank you.

5          MS. ANDERSON:  Good morning, Your Honor.  Amy

6  Anderson with Jones Walker on behalf of the Issuers.  And I

7  believe Mr. James Bentley with Schulte Roth is also on the

8  phone.

9      And I apologize for interrupting the flow.  I would ask if

10  Mr. Bentley and I could be excused after the uncontested

11  matters are taken up this morning, just to avoid  --

12          THE COURT:  Okay.

13          MS. ANDERSON:  -- having us -- I don't want to re-

14  interrupt later, if that is all right with Your Honor.

15          THE COURT:  Okay.  That's fine.  Thank you.

16          MS. ANDERSON:  Okay.

17          THE COURT:  All right.  That looks like all the

18  courtroom appearances.  On the phone, we heard that James

19  Bentley is there.  Do you want to appear, Mr. Bentley?

20          MR. BENTLEY:  Yes, that's correct, Your Honor.  Good

21  morning.

22          THE COURT:  All right.

23          MR. BENTLEY:  Good morning, Your Honor.  James

24  Bentley; Schulte Roth & Zabel; for the Cayman Issuers.

25          THE COURT:  All right.  And someone else was there

6

1  for the Redeemer Fund.  I can't remember.  Was it Mr. Clubok

2  you said, or anyone else on the phone?

3         MR. HANKIN:  Marc Hankin from Jenner & Block, --

4         THE COURT:  Oh, okay.

5         MR. HANKIN:  -- Your Honor.

6         THE COURT:  All right.  Mr. Hankin.  Anyone else on

7  the phone who wants to appear may go ahead.

8     All right.  I guess we're good to go.  Well, I'll turn now

9  -- Mr. Demo, are you going to start us off today?

10        MR. DEMO:  Yes, Your Honor.

11        THE COURT:  Someone delivered a wonderful notebook

12  and an easy-to-follow agenda.  I appreciate whosoever hard work

13  was behind that.  It really helps us get prepared back in

14  chambers.  So, thank you.

15        MR. DEMO:  And we're happy to do it, Your Honor,

16  because, honestly, it helps us, I think, as much as it helps

17  you.

18        THE COURT:  Okay.

19        MR. DEMO:  And we do have extra copies if anybody

20  needs a copy of the agenda.

21        THE COURT:  Okay.

22        MR. DEMO:  Generally speaking, we'd kind of like to

23  go in the order of the agenda, I think, with two exceptions.

24  I know that Ms. Adams and Mr. Bentley have to move, so I

25  thought maybe we could do their objection to the settlement

7

1    motion first.

2            THE COURT:  Okay.  So that's the carryover matter.

3            MR. DEMO:  Correct, Your Honor.

4            THE COURT:  We obviously have an order in place, but

5    we kept it open to accommodate their issues.

6            MR. DEMO:  Correct.

7            THE COURT:  Okay.

8            MR. DEMO:  And that's Item 7 on Page 7.

9            THE COURT:  All right.

10            MR. DEMO:  And I think this one -- and anybody can

11    correct if I'm wrong -- will go pretty easily.  We've come to

12    an agreement with the Objecting Parties.

13            THE COURT:  All right.

14            MR. DEMO:  We are planning on submitting, under a

15    notice, a revised copy of the operating protocols that were

16    approved by this Court in connection with the settlement that

17    addresses those Objectors' concerns.  And then once that is

18    filed, the Objecting Parties will withdraw their objection.

19            THE COURT:  All right.  Anyone wish to speak up on

20    this matter?

21        All right.  Well, as I recall, the concern had been that

22    they didn't want the agreed-upon operating protocols with the

23    Committee to somehow change contractual rights of the parties,

24    and so --

25            MR. DEMO:  That is correct, Your Honor.  And we took

8

1    their language and we carved out a small universe of CLO

2    Issuers, --

3            THE COURT: Okay.

4            MR. DEMO:  -- exactly as they asked for.

5            THE COURT:  All right.  Well, again, I'll ask:  Does

6    anyone have any comment about this revised process?

7       All right.  Well, that sounds perfectly fine to me, so

8    we'll look for the revised copy of the operational procedures.

9            MR. DEMO:  Okay.  Great, Your Honor.

10      And then I guess the only other exception to the order of

11   the agenda --

12      (Garbled phone noises.)

13           THE COURT:  Is someone on the phone wishing to speak

14   up?  (no response)  All right.  I guess not.

15           MR. DEMO:  Yeah.  I guess the only other exception to

16   the order in the agenda is the Foley Gardere retention

17   application.

18           THE COURT:  Okay.

19           MR. DEMO:  We would like to do that last.  It is a

20   contested hearing and I think we are going to have some

21   evidence on that.

22           THE COURT:  All right. All right.  Sounds fine.

23           MR. DEMO:  Then, I guess, just going through the

24   agenda in the order that it's written, the first one is the

25   Lynn Pinker retention application.  We had originally filed

9

1   that retention application back in October.  We recently

2   withdrew it.  We're not going to go forward on it.

3           THE COURT:  All right.

4           MR. DEMO:  The second matter, and I guess the second

5   two matters, hopefully, we can take at the same time.  These

6   are two uncontested matters.  Certificates of no objection

7   have been filed for both of them.  The first is the foreign

8   representative motion.

9           THE COURT:  Yeah, and I will tell you, I don't know

10  if it's shown up on PACER yet, --

11          MR. DEMO:  Okay.

12          THE COURT:  -- but I actually already signed an order

13  on that, --

14          MR. DEMO:  Okay.

15          THE COURT:  -- as well as exclusivity.

16          MR. DEMO:  Perfect.

17          THE COURT:  But, you know, I saw the certificates of

18  no objection, but perhaps we need to talk about it in case

19  anyone wants to comment in any way.

20          MR. DEMO:  If anybody does, I mean, if you've already

21  entered them -- I know PACER was down, so I don't think we've

22  seen it yet.

23          THE COURT:  Okay.

24          MR. DEMO:  But we're fine moving on if --

25          THE COURT:  Well, yeah.  The foreign representative

10

1  motion looked like a no-brainer, if you will.

2      MR. DEMO:  Uh-huh.

3      THE COURT:  It was filed way back in October, right?

4      MR. DEMO:  Correct.  Right.

5      THE COURT:  And no one had ever objected.  It's just

6  that there are some foreign proceedings out there; --

7      MR. DEMO:  Right.  Right.

8      THE COURT:  -- you wanted to make sure that there was

9  a human being who had authority to act in those?

10     MR. DEMO:  Correct.

11     THE COURT:  All right.  So, if no one has any

12 comment, I did go ahead and sign the order approving that.

13     MR. DEMO:  Okay.

14     THE COURT:  Similarly, exclusivity.  I signed an

15 order on that yesterday.  In probably nine out of ten cases, I

16 would have had a hearing with evidence.

17     MR. DEMO:  Uh-huh.

18     THE COURT:  But, again, that one seemed like a no-

19 brainer.  We had no objections, and obviously you've been in

20 court a lot, with a lot of things happening.

21     MR. DEMO:  Yes.

22     THE COURT:  So it seemed like a no-brainer to give

23 more time on that.  So, does anyone have anything they wanted

24 to say about that?  (no response)  All right.

25     MR. DEMO:  Okay.

11

1          THE COURT:  So that is granted.  I can't remember,

2    off the top of my brain, what the extended time frame was.  Do

3    you want to say that on the record?  Because I've just blanked

4    out at the moment.

5        (Counsel confer.)

6          MR. DEMO:  It's -- we extended it for four months,

7    Your Honor.

8          THE COURT:  Okay.  All right.  So that was June, June

9    12th as the deadline for filing a plan, and then the

10   solicitation period would expire on August 11th, 2020.  That's

11   what I've approved.

12         MR. DEMO:  Yes.

13         THE COURT:  All right.

14         MR. DEMO:  Okay.  The next matter is the bar date

15   motion.  There was an automatic bar date set for April 8th --

16         THE COURT:  Uh-huh.

17         MR. DEMO:  -- in connection with the 341 notice.  We

18   just wanted to have procedures for filing claims approved by

19   this Court.

20         THE COURT:  Okay.

21         MR. DEMO:  You know, we filed the motion.  There are

22   no objections.  We did have some comments from the United

23   States Trustee, which we've incorporated into a redlined

24   order.

25      Something came up last night where, the way that it works

12

1  because we have a lot of investors, is that a lot of people

2  get notice through their custodians and through the different

3  administrators.

4          THE COURT:  Uh-huh.

5          MR. DEMO:  And so we worked that into the motion.

6  The United States Trustee has asked for an extension of 45

7  days for those folks to file their claim.  We're okay with

8  that.  We're going to work with her afterwards, and we will

9  submit a revised form of order.

10         THE COURT:  Okay.  So, just to be clear, the proposed

11  deadlines, as revised, would be what?

12         MR. DEMO:  It depends on when the notice is actually

13  able to be sent out.

14         THE COURT:  Okay.

15         MR. DEMO:  We need to work through some technical

16  issues on that.

17         THE COURT:  Okay.  Ms. Lambert?

18         MS. LAMBERT:  So, Judge Jernigan, I think the Court

19  is familiar with this from when we solicit Equity Committees.

20  It's the same issue here.  You go to TD Ameritrade and then

21  they send the notice to the direct holders, but also asked

22  that they include correspondence to the TD Ameritrade or

23  Merrill Lynch equivalents saying -- instructing them to send

24  the notice of the bar date to their direct holders.

25      So we're going to agree on the phrasing of the letter.

13

1 I'm hopeful that we can attach that to the order so the Court

2 can see what it looks like.

3          THE COURT: All right.

4          MR. DEMO: Okay. And we'll work through those

5 issues, Your Honor, and have something to you as soon as

6 possible.

7          THE COURT: All right. And you're also asking for

8 bar dates, really, bar date for 503(b)(9) claims as well?

9          MR. DEMO: Yeah. We don't think we're going to have

10 any.

11          THE COURT: Okay.

12          MR. DEMO: So it's really just out of an abundance of

13 caution.

14          THE COURT: Okay. All right. Well, I'll look for

15 that form of order --

16          MR. DEMO: Okay.

17          THE COURT: -- and be happy to sign it as you all

18 have negotiated it.

19          MR. DEMO: Okay. And then skipping over Foley

20 Gardere, there is one still outstanding objection on that, so

21 we will hear that in due course.

22          THE COURT: Okay.

23          MR. DEMO: The next one is Item 6 on Page 6, and

24 that's the PensionDanmark motion to lift the stay. We have an

25 agreement in principle with PensionDanmark that the Committee

14

1   has signed off on.  We're just going through and working

2   through the paperwork.  And so we would like to just push this

3   to the next hearing date, with the expectation that we would

4   get the paperwork filed in between then and we wouldn't have

5   to have it set.

6         THE COURT:  All right.  So we will carry this to our

7   next omnibus hearing date.  I don't know if we have one

8   automatically set at this point or --

9         MR DEMO:  It's March 13th.

10        THE COURT:  March--?

11        MR. DEMO:  12th.

12        MS. HAYWARD:  11th.

13        MR. DEMO:  11th.  I'm sorry.  I was in the ballpark.

14        THE COURT:  Okay.  So, carried to March 11th, as

15  necessary.

16        MR. DEMO:  Uh-huh.

17        THE COURT:  All right.

18        MR. DEMO:  And then I guess the next thing, skipping

19  over the CLO Issuers' objection, which we already addressed,

20  --

21        THE COURT:  Uh-huh.

22        MR. DEMO:  -- is the sealing conference motion.

23        THE COURT:  Okay.

24        MR. DEMO:  And I would turn this over to my

25  colleague, John Morris.

15

1          THE COURT:  All right.

2          MR. MORRIS:  Good morning, Your Honor.  John Morris,

3   Pachulski Stang Ziehl & Jones.

4          THE COURT:  Good morning.

5          MR. MORRIS:  I hope that this doesn't take too much

6   time.  But following the last hearing that we had, the Court

7   had rendered a ruling with respect to the Committee's sealing

8   motion.  And regrettably, the Debtor and the U.S. Trustee's

9   Office were unable to agree on a form of order.  And that led

10  to kind of a back-and-forth about the scope of the protective

11  order that had been entered.

12     So, because we couldn't come to an agreement, and because

13  the Debtor had concerns about the interpretation and the

14  position, frankly, that the U.S. Trustee was taking with

15  respect to the protective order, we filed our motion for the

16  entry of an order concerning the sealing motion and for a

17  conference.  And that was filed at Docket 397.

18     The Court subsequently entered the Debtor's proposed order

19  on the sealing motion, on the Committee's sealing motion.  So

20  that's moot.

21     The only issue, to the extent there is an issue, and I'm

22  not sure that there is, but to the extent that there is an

23  issue, it was just the Debtor's desire to make clear on the

24  record that the words of the protective order are clear and

25  unambiguous and that they apply to any party who receives

16

1 documents in this bankruptcy case, whether it's in connection

2 with a contested matter or an adversary proceeding, and that

3 order applies both to documents previously received and to

4 documents that will be received in the future.

5     We had asked the U.S. Trustee's Office to make -- just to

6 agree that they would abide by the protective order. And I'm

7 not casting aspersions, I'm not saying, you know, they're bad

8 people or anything, but we never got the crystal-clear

9 response that we needed and expected, frankly, that the order

10 says what the order says and the U.S. Trustee's Office would,

11 you know, would abide by it.

12         THE COURT: Okay. So, --

13         MR. MORRIS: So that's why we asked for this status

14 conference.

15         THE COURT: So this is more than just the issue of

16 the Redeemer Committee arbitration award --

17         MR. MORRIS: Correct.

18         THE COURT: -- that was the attachment to the --

19         MS. LAMBERT: No, Your Honor.

20         THE COURT: Wait. Oh, okay. Well, what I was about

21 to say is I was understanding from your presentation that you

22 thought this was about more than just the arbitration award,

23 the Redeemer Committee arbitration award that had been

24 attached to that Committee objection and that was subject to

25 the motion to seal.

17

1    You think it is also about items marked Confidential that

2  the U.S. Trustee received before the entry of the protective

3  order?

4         MR. MORRIS:  As it explicitly provides for.  And I'll

5  just say that the concerns arise from the written

6  communications that we received, where the U.S. Trustee's

7  Office specifically said that they would file matters

8  unredacted and without seal.  And we asked them to simply

9  retract that statement, because the order says what the order

10  says.  And I think it's a fair concern that the Debtor has in

11  this regard, and it was really a very simple request.  Please,

12  please, I mean, you can't file documents unredacted and

13  without seal because there's a protective order in place.

14         THE COURT:  Okay.  Now, Ms. Lambert, you say -- what

15  were you about to say?

16         MS. LAMBERT:  First, Your Honor, I want to be clear

17  that the U.S. Trustee -- everyone in the U.S. Trustee's Office

18  intends to honor the Court's orders.  There are many things

19  that we debate hotly and that we feel animated about in terms

20  of legal advocacy, but we intend to honor both the office and

21  the individual that holds that office when the Court has made

22  a ruling.

23    The issue that is presented to the Court is what is the

24  effect of dismissing a motion to seal on the basis that it is

25  moot?  There's black-letter law that sealing should be for

18

1   limited time periods and things should be unsealed --

2          THE COURT:  Okay.  Can I stop you?  Are you saying

3   that you think the sole issue here is just the arbitration

4   award?

5          MS. LAMBERT:  Yes, Your Honor.

6          THE COURT:  Okay.  So, so --

7          MS. LAMBERT:  And this is how it springs back to the

8   protective order.

9          THE COURT:  Okay.  Let me --

10          MS. LAMBERT:  The U.S. --

11          THE COURT:  Let me stop you, because what about other

12   documents besides the arbitration award that the U.S. Trustee

13   might have received prior to the Court signing the protective

14   order?

15          MS. LAMBERT:  The U.S. Trustee did not receive any

16   other items that --

17          THE COURT:  Okay.  So we are just talking about the

18   arbitration?

19          MS. LAMBERT:  We have not to this date received any

20   other items than those items --

21          THE COURT:  Okay.

22          MS. LAMBERT:  -- that were subject to the motion to

23   seal.

24          THE COURT:  Okay.

25          MS. LAMBERT:  And this is the U.S. Trustee's

19

1   position.  The Court --

2          THE COURT:  I will say that one of the Debtor's

3   lawyers is shaking his head.  I want to see if there's a

4   disagreement about, did the U.S. Trustee receive more items?

5   Was that --

6          MR. MORRIS:  I would say, Your Honor, I don't know

7   exactly what was delivered, because I'm, --

8          THE COURT:  Okay.

9          MR. MORRIS:  -- right, I'm part of a team.  But I do

10  know that we gave, for example, information about bonus --

11  about, you know, personnel bonus motions that is confidential.

12          MS. LAMBERT:  But the issue about what was going to

13  be filed unsealed was related to the items in the motion to

14  seal and the U.S. Trustee's attendant motion for the

15  appointment of a Chapter 11 Trustee, which had been redacted.

16          THE COURT:  Okay.  Let me -- I'm going to take a shot

17  at making this go quicker.  What I meant when I ruled that,

18  well, the objection of the Committee is moot now because it

19  was resolved by other orders; therefore, I think the motion to

20  file under seal the arbitration award is moot because it was

21  connected to the Committee's objection; you know, that was a

22  quick, off-the-cuff comment.  What I was trying to say is I

23  didn't think this needed any more court time.  There was no

24  case in controversy anymore.  I didn't know why I needed to

25  resolve an objection to the motion to file under seal.

20

1   What I meant is it's going to be like it never even

2   happened, right?  And what I probably should have done is

3   said, Committee, you want to make an oral motion to withdraw

4   your objection and withdraw your motion to seal, you know,

5   orally, I'll grant it orally and just remove it from the

6   record, so to speak.

7   And I thought we were passing off to another day whether

8   that arbitration award, if someone wanted to file it and file

9   it publicly or disclose it, they could then file a motion

10  later.

11          MR. MORRIS:  Your Honor?

12          MS. LAMBERT:  Here's the -- here's the --

13          MR. MORRIS:  Your Honor, if I may?

14          THE COURT:  Uh-huh.

15          MR. MORRIS:  You've done exactly what you've said.

16          THE COURT:  Okay.

17          MR. MORRIS:  I don't think there is an issue now.

18          THE COURT:  Okay.

19          MR. MORRIS:  I've heard from the U.S. Trustee's

20  Office what I asked for probably three times in writing, that

21  they are going to abide by the terms of the protective order.

22  With respect to the sealing order, Your Honor has entered an

23  order.  It declared the Committee's motion to seal moot, and

24  it specifically provided that anybody who's received the

25  awards has to treat them in accordance with the protective

21

1    order.

2         THE COURT:  Yeah.

3         MR. MORRIS:  Nobody's appealed that order.

4         THE COURT:  Okay.

5         MR. MORRIS:  It's now the -- it's -- whatever the

6    U.S. Trustee's interpretation is of the law is kind of

7    irrelevant at this point because the order has been entered

8    and it hasn't been appealed.

9         THE COURT:  Okay.

10        MS. LAMBERT:  Here's the thing, Your Honor.  The case

11   law, *Omni Video*, similar things.  There are two issues.

12   Number one is whether the mootness of the underlying issue

13   means that the pleadings should be unredacted, which is black

14   letter that at some point pleadings should be unredacted and

15   made available to the public.  And the Court's ruling is that

16   by replacing the management the Court has mooted anything that

17   might be scandalous about that or that might be problematic

18   about it, and therefore --

19        THE COURT:  What is the it?  I'm not following.

20        MS. LAMBERT:  -- the arbitration award and the

21   pleadings attendant were redacted, but the --

22        THE COURT:  I haven't said anything about -- I mean,

23   I denied a Chapter 11 trustee motion because I thought the new

24   management was a correct way to go forward in this case.

25        MS. LAMBERT:  Correct.

22

1          THE COURT:  The arbitration award, what I meant was

2    it's like it never happened now.  And if I --

3          MS. LAMBERT:  Right.

4          THE COURT:  -- need to do an amended order saying the

5    Committee has permission to withdraw the objection and

6    withdraw the motion to seal, I'll --

7          MS. LAMBERT:  That's --

8          THE COURT:  -- I'll do that, --

9          MS. LAMBERT:  But --

10         THE COURT:  -- so there's nothing on the record to

11   make public.

12         MS. LAMBERT:  But withdrawing the motion, objection,

13   does not delete it from the record, Your Honor.

14         THE COURT:  Well, I'm going to make it so.  I'm going

15   to make it so.  And then if, one day, you or someone else --

16         MS. LAMBERT:  Your Honor, currently, --

17         THE COURT:  -- wants to be relieved from the

18   protective order and asks that it be publicly filed, I'll

19   consider --

20         MS. LAMBERT:  Your Honor?

21         THE COURT:  -- the merits of that.

22         MS. LAMBERT:  Your Honor, the thing is that the

23   Committee, when it filed its original objection, did not

24   redact.  So this information has been in the public domain for

25   months now.  And the arbitration --

23

1    THE COURT: Wait. Okay. This all happened in

2  Delaware, so I don't know their procedure. Are you saying it

3  was on the public PACER?

4    MS. LAMBERT: They didn't redact.

5    MR. MORRIS: No. Your Honor, the Redeemer Award

6  (inaudible). The order says what the order says. It's been

7  entered. I mean, this is the concern, is that we have this

8  never-ending debate. I've heard -- the Debtor has heard what

9  it needed to hear, and that is the U.S. Trustee's Office will

10  abide by the terms of the protective order.

11    With respect to the Committee's motion to seal, we're done

12  with that.

13    MS. LAMBERT: There is no --

14    MR. MORRIS: An order has been entered.

15    MS. LAMBERT: There is no motion to seal. The normal

16  effect of -- the dismissal of a motion to seal on the basis

17  that it is moot is that everything attendant to that becomes

18  unredacted and unsealed.

19    In addition, there's a separate issue that the Debtor gets

20  to talk about what the amounts in the Redeemer awards were

21  unilaterally, without -- and the Committee gets to talk about

22  it unilaterally. They've mentioned what the findings were in

23  four different spots in their objection that are not redacted.

24  And the U.S. Trustee is the only one that's held to the motion

25  to seal, which we have honored, but the --

24

 1          THE COURT:  I don't understand why we're having this

 2  discussion.  For now, I've made it a moot issue, a dead issue.

 3  The objection to which the arbitration award was attached as

 4  an exhibit became moot.  Maybe I'm not using the best legal

 5  description, but it was resolved.  And I didn't feel the need

 6  for us to have a dispute about whether that motion to seal,

 7  which related to the objection --

 8          MS. LAMBERT:  The motion to seal --

 9          THE COURT:  -- was meritorious or not.  If -- again,

10  --

11          MS. LAMBERT:  But the motion to --

12          THE COURT:  -- to me, there's an easy fix.  If you're

13  -- if you think it's necessary, I'll grant the --

14          MR. MORRIS:  Your Honor?

15          THE COURT:  This seems like wasted energy, --

16          MS. LAMBERT:  But --

17          THE COURT:  -- granting the Committee authority to

18  withdraw their objection and their motion to seal --

19          MS. LAMBERT:  But, Your Honor, --

20          THE COURT:  -- so that it's off the record.

21          MS. LAMBERT:  -- the interim sealing order didn't

22  impact just their objection.  It impacted the U.S. Trustee's

23  motion to dismiss.  It impacted the evidence.  The finding

24  that these issues are moot because they're resolved means that

25  the Court should unredact them because it's no longer

25

1   confidential.  It's no longer a problem.  If the evidence is

2   --

3        THE COURT:  Why are we having this discussion?  Why

4   is this important in this Chapter 11 case?  The arbitration

5   award may get in one day, and someone may ask me, and I may

6   say yes, I may say no.  It depends on what the legal arguments

7   are.

8        MS. LAMBERT:  It's --

9        THE COURT:  Why is this relevant right now?

10       MS. LAMBERT:  It's important to the public's

11  perception, and the U.S. Trustee is charged with making the

12  information about a case available to the public.

13       MR. MORRIS:  Your Honor, there is no motion --

14       MS. LAMBERT:  This -- these -- these arbitration --

15       MR. MORRIS:  There's no relief that's been sought.

16       MS. LAMBERT:  The arbitration awards have been

17  discussed in the press, Your Honor.  And the press --

18       THE COURT:  Well, let me just say this.  Okay?  This

19  was obviously -- there was an arbitration award.  It was never

20  confirmed with a judgment by a court.  And I am presuming -- I

21  don't need to decide today -- but I'm presuming that there is

22  some legal argument that someone feels can be made about why

23  that arbitration award is confidential.  You know, it

24  obviously --

25       MR. MORRIS:  The Committee made that argument in

26

1   their motion.

2          THE COURT:  Obviously, if there had been a judgment,

3   it all would have been out in the world.  And I will say I

4   cannot remember ever being in a situation where someone wanted

5   to keep an arbitration award confidential in a bankruptcy

6   case.  Maybe it happens.  I'm just -- I've never seen it.  So

7   if there is a day where someone wants me to find this

8   arbitration award can be made public, I may very well do it.

9   I don't know.  I'll hear the legal arguments.  But I am just

10  asking, why are we arguing about this today?

11         MS. LAMBERT:  We're arguing about it today because it

12  remains a point of interest and a point of information sharing

13  to government creditors and other creditors that are involved

14  in the case, as well as the public.

15         THE COURT:  They're not in here, the SEC or whoever

16  you're --

17         MS. LAMBERT:  Well, how would they know to be in

18  here?

19         THE COURT:  Because maybe they've seen the press that

20  you're talking about.  All right.  I don't know --

21         MR. MORRIS:  Your Honor, we -- the Debtor's heard

22  what --

23         THE COURT:  The protective order governs.  And my

24  prior order with regard to the sealing motion I think made

25  clear, but if it didn't, I'm going to say right now:  As far

27

1  as I'm concerned, the arbitration award, nothing gets unsealed

2  on the Court's docket, and no one will file it or disclose it

3  without bringing a motion, and we'll have a legal argument and

4  evidence or whatever we need and I'll rule on the issue.

5         MS. LAMBERT:  So, Your Honor, my understanding is

6  that the Court is striking the objection to the CRO that the

7  Committee filed and striking the U.S. Trustee's motion to

8  dismiss, which was redacted, and striking the evidence, and

9  those will not be on the docket available to the public at

10 all.

11        THE COURT:  That's not what I'm doing.  I don't -- I

12 don't even know -- I don't understand why you're saying that.

13        MS. LAMBERT:  Well, you can't just withdraw the

14 objection.  The objection had the exhibits attached to it.

15 The issue that the U.S. Trustee -- I'm sorry, but I'm always

16 charged with this issue -- is trying to unseal documents and

17 trying to determine the proper date for unsealing them.  They

18 attached to the arbitration award, like a motion for summary

19 judgment.  That's the practice in Delaware.  And so the issue

20 is, at what point will that become unsealed?  It's a higher

21 standard --

22        THE COURT:  The answer is no, without an order from

23 this Court.

24        MS. LAMBERT:  It is a higher standard than for

25 confidentiality.  And in addition, --

28

1      THE COURT:  All right.  If you want to file a motion

2  and we set it for hearing and we have briefing, we'll do that.

3  But, for now, there's -- there are two orders that I will tell

4  you on the record what they mean is, right now, the

5  arbitration award is not to be publicly disclosed.  Not by the

6  Court on the docket system.  Not by any person.

7      If someone wants to publicly disclose it, they can file a

8  motion and we'll talk about whether it's protected or not.

9      MR. MORRIS:  Thank you.

10      THE COURT:  Whether there are grounds, legal grounds,

11  to protect it.

12      MR. MORRIS:  Thank you, Your Honor.

13      THE COURT:  I've told you I'm skeptical.  I'm

14  skeptical.  But, you know, we'll see.  Okay?

15      MS. LAMBERT:  Okay.  Your Honor, the FJC publication

16  is very clear that the Court should be trying, when issues are

17  moot, to unseal items.  And this is why our advocacy is this

18  way.  And I will move to unseal it.

19      THE COURT:  All right.

20      MR. DEMO:  For the record, Your Honor, again, Greg

21  Demo; Pachulski Stang Ziehl & Jones; for the Debtor.

22      Before we move on to the Foley retention, two quick

23  housekeeping matters.

24      THE COURT:  Uh-huh.

25      MR. DEMO:  We would like to set the next omnibus

29

1   hearing date on April 22nd.  At that date, we would do the

2   quarterly fee applications and whatever else comes up onto the

3   docket.

4           THE COURT:  All right.  Have you run that by Traci

5   Ellison yet?

6           MR. DEMO:  We have not.

7           THE COURT:  Okay.

8           MR. DEMO:  We've talked to the Committee about it,

9   though.

10          THE COURT:  So I will call her right now.

11          MR. DEMO:  And then, I guess, Your Honor, before you

12  do that, we are actually asking for a hearing date on March

13  4th at 1:30 as well.  We're going to have an expedited motion

14  that we'll be filing, I think, this week.  So if you're going

15  to check with her, I guess it might make sense to check on

16  both of those dates.

17          THE COURT:  Okay.

18      (Court confers with Clerk telephonically.)

19          THE COURT:  Okay.  We can give you April 22nd, as you

20  requested, at 9:30.

21          MR. DEMO:  Okay.  Thank you.

22          THE COURT:  Okay.  So that's going to be an omnibus.

23      (Court confers with Clerk telephonically.)

24          THE COURT:  All right.  We can give you March 4th at

25  1:30.

30

1      How about a preview of what we're going to -- what are we

2  going to be seeing?

3              MR. DEMO:  And, Your Honor, I guess we had also

4  reserved March 2nd, and we can release that date.

5              THE COURT:  What?  I'm sorry.

6              MR. DEMO:  We had previously reserved March 2nd at

7  9:30 for the expedited motion, which I'll describe briefly in

8  a second.  We don't need the March 2nd date.

9              THE COURT:  So, okay.

10             MR. DEMO:  Yeah.

11             THE COURT:  All right.  So I'll tell Traci that one

12 --

13             MR. DEMO:  Yeah.  Okay.  Perfect.  Thank you.

14             THE COURT:  -- is off.  Okay.  What is this going to

15 be?

16             MR. DEMO:  The expedited motion, we obviously run a

17 series of investment funds.  From time to time, those funds,

18 either through liquidation or just through normal proceeds

19 generation, make distributions out to their investors.

20     Under the protocols, distributions out to what are

21 related, called related entities under the protocols, which

22 include Mr. Dondero, entities owned by Mr. Dondero, and

23 numerous other categories, those entities cannot receive their

24 distributions from those investment vehicles if the Committee

25 objects to those distributions unless we come to the Court and

31

1    we get Your Honor's approval.

2        That issue has come up.  We are hoping to make those

3    distributions to these related entities.  The Committee has

4    said that they will object, but they've also agreed to the

5    motion to expedite.

6            THE COURT:  All right.

7            MR. DEMO:  So that's the issue that's going to be in

8    front of Your Honor on March 4th.

9            THE COURT:  All right.  When are you going to file

10   the motion?

11           MR. DEMO:  We are hoping to file it, I think, by

12   Friday.

13           THE COURT:  Okay.  So that would be -- what are we at

14   now, the 19th?

15           MR. DEMO:  Yeah.

16           THE COURT:  Okay.  So that'd be --

17           MR. DEMO:  Yeah.  And obviously, --

18           THE COURT:  -- a couple weeks.

19           MR. DEMO:  -- yeah, we'll endeavor to get it filed as

20   soon as possible.

21           THE COURT:  Okay.

22           MR. DEMO:  And then I guess the last item, Your

23   Honor, is the Foley Gardere retention application.

24           THE COURT:  Okay.

25           MR. DEMO:  And, you know, this should be a relatively

32

1  simple retention application. You know, we'll get into it a

2  little bit more. There are two objections that were

3  originally filed, one by the Committee and one by Acis.

4  Yesterday morning, the Committee withdrew their objection, so

5  the only objection to the Foley Gardere retention application

6  is by Acis.

7      In the courtroom with me are Holland O'Neil with Foley

8  Gardere -- she's the partner in charge of that representation

9  -- and then also The Honorable Russell Nelms, who's a member

10  of the Independent Board of Directors of Strand Advisors, the

11  party that manages the Debtor. And I should be remiss if I

12  didn't mention that the two other independent directors, James

13  Seery and John Dubel, are also in the courtroom, --

14          THE COURT: Okay.

15          MR. DEMO: -- as is the Debtor's chief restructuring

16  officer.

17      And as I said, Your Honor, really, the only thing, the

18  only substantive thing we're here this morning on is this

19  retention application. The retention application is under

20  Section 327 of the Bankruptcy Code, and it's to represent the

21  Debtor in three matters related to the Acis bankruptcy and the

22  resulting litigation.

23      Judge Nelms is going to be testifying in support of the

24  Foley retention this afternoon.

25          THE COURT: Okay.

33

1    MR. DEMO:  We filed the retention application on

2  October 29th, along with the retention application of Lynn

3  Pinker.  As I mentioned earlier, the Lynn Pinker retention

4  application was withdrawn.  Two objections were filed to the

5  Foley retention:  One by the Committee, one by Acis.

6    The Committee -- or, sorry, the Debtor addressed those two

7  objections in an omnibus reply that we filed on November 21st.

8  The primary response to those objections was providing

9  additional disclosure to this Court concerning the parties

10  being represented by Foley, the proceedings in which Foley was

11  going to represent those parties, and the allocation of fees,

12  of Foley's fees, across those parties.

13    The reply disclosed, and Judge Nelms will also testify,

14  that the Debtor had originally intended to engage Foley on

15  four matters, not three.  The first matters is general matters

16  just relating to the Acis bankruptcy, status conferences,

17  proof of claim issues.  The second matter is the appeal to the

18  Fifth Circuit of the confirmation order.  The third matter was

19  the appeal, again to the Fifth Circuit, of the entry of the

20  involuntary petition.  And then the fourth matter was the

21  appeal of Winstead's retention as counsel to both Mr. Terry,

22  who is a pre-petition creditor of Acis, and Robert [sic]

23  Phelan as the Chapter 11 trustee.

24    The two appeals, the appeal of the confirmation order and

25  the appeal of the involuntary petition, have been fully

34

1   briefed to the Fifth Circuit, and some of that briefing was

2   done, by necessity, post-petition, because of the drag in time

3   between when we filed the retention and now.  And the Fifth

4   Circuit has actually set both of those appeals for oral

5   argument.  They've been consolidated for purposes of oral

6   argument, and both of the appeals are set for March 30th, so

7   about six weeks away.

8       Now, it's an understatement to say a lot has happened in

9   this case since we filed the reply on November 21st.  One of

10  the most major things in this case, as the Court knows, is the

11  appointment of the Board of Directors.  The Board of Directors

12  was appointed on January 9th and it oversees the management of

13  the Debtor.  Judge Nelms is in this courtroom and will be

14  testifying as to what the Board did to familiarize itself with

15  the Acis litigation and with Foley's retention.  And you'll

16  hear from Judge Nelms that the Board had extensive

17  conversation with the Debtor's employees, including the

18  Debtor's internal legal team, Ms. O'Neil with Foley Gardere,

19  attorneys from Pachulski regarding the status of the Acis

20  litigation and the bankruptcy and Foley's retention.

21      You'll also hear that Judge Nelms reached out directly to

22  Josh Terry, the major party in the Acis litigation, and that

23  Judge Nelms met with both Josh Terry and Ms. Patel to discuss

24  the status of the Acis litigation.

25      And then finally you'll hear, as part of that diligence,

35

1 that the Board analyzed the economic benefit of proceeding

2 with Foley's retention in all three of those matters that I

3 mentioned and also conducted their own diligence on the claims

4 that are being raised in those matters.

5     As a result of that diligence, and I'll discuss the

6 explicit reasons later, the Board determined that it is in the

7 best interest of the Debtor and its estate to proceed with

8 Foley's retention with respect to the three matters I

9 mentioned earlier:  the Acis general bankruptcy, the appeal of

10 the confirmation order, and the appeal of the involuntary

11 petition.

12     The Debtor has also asked for Foley's assistance on

13 certain ancillary matters, like including about disclosures of

14 the Acis litigation, including what needs to go on the

15 schedules and things like that.

16     As a result of this diligence, however, the Board decided

17 to drop the Winstead appeal.  So Acis -- I'm sorry, Foley is

18 not going to be retained to challenge Winstead's retention in

19 that proceeding.  And assuming that Foley is retained, Foley

20 will prepare the papers to withdraw that objection as soon as

21 possible.

22     As a quick aside, though, you know, Foley was directed by

23 the Debtor to continue with the Winstead matter post-petition.

24 Incurred about $25,000 of fees.  And we believe that Foley was

25 working in good faith on that.  So although we're not going to

36

1 proceed with the Winstead matter, we would still ask that

2 Foley be entitled to file a fee application for those fees.

3 The Committee has agreed with this, and we have a form of

4 proposed order with the Committee that contemplates Foley's

5 payment or Foley's receiving payment for the Winstead fees of

6 $25,000.

7        THE COURT: Wait. You're talking about, if I approve

8 their retention, rolling that into the retention order?

9        MR. DEMO: We are, Your Honor.

10        THE COURT: Okay.

11        MR. DEMO: No?

12        THE COURT: That's a no-go, I'll tell you right now.

13        MR. DEMO: Okay.

14        THE COURT: I mean, --

15        MR. DEMO: And we can, we can deal with that.

16        THE COURT: Yeah.

17        MR. DEMO: But I --

18        THE COURT: I'm not going to say yes or no to any

19 fees I haven't seen.

20        MR. DEMO: Okay. And -- well, I'm sorry. What's

21 going to be rolled into the order is their ability to file for

22 those fees. Everybody would still have the right to object to

23 those fees. You would have the right to say yes or no on

24 those fees. The only thing that we would be asking for is

25 that they would be able to apply for those fees and that the

37

1 fact that they weren't retained on that matter specifically

2 would not be a basis for an objection to those fees. So it's

3 a little bit different.

4         THE COURT: Okay.

5         MR. DEMO: We're not trying to cut off anybody's

6 right to object to those fees.

7         THE COURT: Okay. But I don't want to put some

8 imprimatur on their ability to ask for them.

9         MR. DEMO: Okay.

10         THE COURT: Okay? So, you know, it's just another

11 day.

12         MR. DEMO: Yeah.

13         THE COURT: If they ask for that in a fee app -- if I

14 approve their retention and they ask for it in a fee app,

15 we'll --

16         MR. DEMO: Okay. Understood, Your Honor.

17         THE COURT: -- decide whether it's meritorious or

18 not.

19         MR. DEMO: Okay.

20         THE COURT: Okay.

21         MR. DEMO: And then I guess, just moving on, you

22 know, as you'll hear from Judge Nelms, all of the elements of

23 227(e), you know, have been met. You know, first, Foley is

24 being retained for a special purpose. Nobody has objected on

25 that basis.

38

1      Second, Foley is not being retained to conduct the

2  Debtor's bankruptcy case.  That's my firm, Pachulski Stang.

3  Again, nobody has objected on that basis.

4      Third, Foley represented the Debtor prior to the petition

5  date on these matters.  Again, nobody has objected on that

6  basis.

7      And, fourth, you know, as Judge Nelms will testify, the

8  retention of Foley and Foley's continued prosecution of the

9  Acis matters is in the best interest of the Debtor's estate.

10      And then fifth and finally, Foley has no adverse interest

11  with respect to the matters on which it is being retained.

12      Now, as I mentioned, there were two omnibus objections

13  that were filed.  There was the Committee's objection and then

14  there was Acis's objection.  Both of these objections really

15  had one common theme, which was that there was insufficient

16  disclosure as to how the fees were going to be allocated, and,

17  honestly, whether or not Mr. James Dondero would benefit from

18  Foley's retention without paying his share of those fees.

19      Now, we had a meeting with the Committee on Friday and we

20  walked through this issue.  And as a result of that, the

21  Committee withdrew its objection.

22      What we told to the Committee is that, prior to the Acis

23  bankruptcy -- and this goes primarily to the retention -- or,

24  the prosecution of the involuntary petition appeal.  In that

25  appeal, Foley is representing just Neutra.  Foley is not

39

1   representing the Debtor. Now, the economic benefit to the

2   estate, though, in that appeal accrues almost solely to the

3   Debtor. It does not accrue to Neutra or to Neutra's economic

4   interest owners, which, full disclosure, are Mr. James Dondero

5   and Mr. Mark Okada.

6       The reason why the Debtor -- and you'll hear, again, hear

7   this from Judge Nelms -- believes that it's in the economic

8   best interest of its estate to pay for Neutra's fees in that

9   appeal is that, if Neutra is successful in that appeal, the

10  involuntary petition obviously will be struck, the involuntary

11  will be unwound, and the economic interest and the economic

12  ownership of Acis will revert to Neutra.

13      Upon that reversion, Highland Capital Management will be

14  reinstated as the advisor to Neutra.

15      Now, if Neutra -- I'm sorry, if Acis then generates fees,

16  those fees are going to be paid about 85 percent to satisfy

17  the contractual obligations under that advisory agreement.

18      So, on a go-forward basis, again, if Neutra is successful,

19  85 percent of the revenue generated by Acis will go to Neutra.

20  That remaining 15 percent will be used to satisfy the claim

21  that Acis -- I'm sorry, that Highland Capital Management has

22  against Acis for the pre-, post-petition, and gap period

23  services that it provided to Acis under the advisory

24  agreements. That claim is about $8 million.

25      So, 85 percent of the revenue on a go-forward basis is

40

1  going to be used to satisfy the obligations under the

2  management agreement.  The balance of that is going to be used

3  to satisfy that $8 million claim.

4      That means that, you know, if our math is right -- and

5  obviously, the numbers are not static -- that there's not

6  going to be any contributions or any distributions to the

7  upstream equity, to Mr. Dondero or Mr. Okada, for about four

8  years.  After that four years, 85 percent of the revenue is

9  still going to go to Highland Capital Management, the Debtor,

10  under those advisory agreements.

11      So for that reason, we do believe, and Judge Nelms will

12  testify, that the true economic beneficiary of the Neutra

13  appeal of the involuntary petition is actually Highland

14  Capital Management.

15           THE COURT:  I don't want to jump ahead too much, but

16  are we going to talk today about mootness as a potential issue

17  with both of these appeals?  I mean, you know, I have to say

18  it's very compelling to me that you tell me all the briefing

19  has been done --

20           MR. DEMO:  Uh-huh.

21           THE COURT:  -- and oral argument is set in March, so

22  -- but is mootness a --

23           MR. DEMO:  We don't --

24           THE COURT:  Was there ever a motion to dismiss for

25  mootness or --

41

1           MR. DEMO:  Not that I'm aware of, Your Honor.

2           THE COURT:  Okay.

3           MR. DEMO:  And all the briefing has been done.

4           THE COURT:  Okay.

5           MR. DEMO:  Again, oral argument is set.  And as far

6    as I know, nobody has raised that issue.

7           THE COURT:  Okay.

8           MR. DEMO:  So I think that we're still proceeding as

9    to whether --

10          THE COURT:  And, again, I'm leaping ahead, but I'm

11   just -- you know, you went through the scenario --

12          MR. DEMO:  Uh-huh.

13          THE COURT:  -- to show that, you know, Dondero and --

14   if the involuntary was reversed, you know, no money would ever

15   get there.  But you're painting a picture, to me, that, again,

16   it feels a little farfetched.  But the evidence will either,

17   you know, bear it out or not.

18          MR. DEMO:  Again, the evidence, you know, I think,

19   will bear it out.

20      And I think what's important also is, when you're thinking

21   about this, is to think of the actual universe of post-

22   petition fees that Foley is going to incur for those services,

23   for the briefing of the two appeals and then for the

24   bankruptcy services, versus the actual economic gain that the

25   Debtor could and hopefully will get if those appeals are

42

1   successful.

2           THE COURT: Okay.

3           MR. DEMO: So, Foley --

4           THE COURT: And hopefully the evidence will really go

5   to this.

6           MR. DEMO: Yes.

7           THE COURT: I'm trying to think of -- I'm trying to

8   decide what life looks like --

9           MR. DEMO: Right.

10          THE COURT: -- if there is a successful reversal.

11          MR. DEMO: Right.

12          THE COURT: And I'm not at all clear. So the

13  evidence and argument will hopefully make me clear.

14          MR. DEMO: Yes. And, honestly, Your Honor knows the

15  facts and circumstances --

16          THE COURT: Right.

17          MR. DEMO: -- better than me and probably better than

18  anyone.

19          THE COURT: Uh-huh.

20          MR. DEMO: But I think what's --

21          THE COURT: I mean, we've had -- we had terminated

22  contracts --

23          MR. DEMO: Right.

24          THE COURT: -- with Highland. We have a Reorganized

25  Debtor now, which, you know, --

43

1          MR. DEMO:  Right.

2          THE COURT:  -- has new contractual arrangements.

3          MR. DEMO:  Right.

4          THE COURT:  I just, I'm not sure how that all goes

5    away if there's a reversal.  So I'm --

6          MR. DEMO:  Right.

7          THE COURT:  I'm really wanting to drill down on the

8    benefit --

9          MR. DEMO:  Okay.  And --

10         THE COURT:  -- to Highland.

11         MR. DEMO:  And we can do that.  But I think --

12         THE COURT:  Okay.

13         MR. DEMO:  -- it's helpful to talk about --

14         THE COURT:  Uh-huh.

15         MR. DEMO:  -- the universe of fees first and then

16   talk about the related benefit for that.

17      Foley Gardere has helpfully filed two post-petition fee

18   applications.  Those fee applications disclose that, on all

19   three of these matters, Foley has billed about $330,000.  We

20   believe that Foley was probably going to bill, up through the

21   end of oral argument, about $500,000.

22      And then, you know, again -- and not getting too deep into

23   it, because I do think this is something that's better for

24   testimony because I think it goes to, you know, what the Board

25   believes is the economic benefit to the estate -- but if the

44

1  Neutra appeal is successful, if the confirmation order appeal

2  is successful, then the post-petition fees that are going to

3  accrue or we believe are going to accrue to Highland Capital

4  Management under those contracts are tens of millions of

5  dollars a year.

6      The post-petition and gap period and pre-petition fees

7  that we believe that Acis owes to Highland are $8 million a

8  year.  And then there's the go-forward fees.

9      So we believe that, for spending $500,000, the benefits to

10 the estate are actually going to be in the tens of millions of

11 dollars.  So, you know, even though, you know, reasonable

12 minds can differ as to the merits -- and, again, we'll put on

13 some testimony about that, although there's obviously

14 privilege issues and things like that -- the actual economic

15 benefit to the estate is $500,000 versus the possible benefit

16 of $50 million, possibly more dollars, plus the removal of a

17 substantial portion of Acis's proof of claim, which is -- I

18 think it says not less than $75 million.  So you're looking

19 at, if we're successful, fees into the estate --

20          THE COURT:  Well, that's a different issue, though.

21 Isn't that --

22          MR. DEMO:  It is, but it --

23          THE COURT:  Isn't that the Acis adversary proceeding

24 component?

25          MR. DEMO:  Yes.

45

1          THE COURT:  So, --

2          MR. DEMO:  But if the -- if the -- and, again, I

3    don't want to get too far into this --

4          THE COURT:  Uh-huh.

5          MR. DEMO:  -- because I don't want to get into, you

6    know, legal arguments that are going to be on appeal.

7          THE COURT:  Uh-huh.

8          MR. DEMO:  But what we believe is that, and what

9    Judge Nelms will testify to and what you'll hear, is that if

10   the confirmation order and the involuntary petition are

11   erased, especially the involuntary petition, and we go back to

12   status quo ante, the benefit to the estate is going to be in

13   the tens of millions of dollars, at a minimum, plus the

14   possible diminution, to a large extent, of a proof of claim

15   that is not less than $75 million, and we've heard numbers of

16   up to $300 million.

17      So you're looking to spend $500,000 on these two matters

18   for a benefit to the estate that's going to be astronomically

19   more than that.  So the benefit to the estate versus the money

20   that is going out of the estate, especially since everything

21   has been briefed and set for oral argument, I guess,

22   personally, I find it difficult to not see that benefit and

23   not to see that spending that half a million dollars to

24   possibly get back $50-plus million, I just don't see how

25   that's not a benefit to the estate and how that does not

46

1    warrant the retention of Foley Gardere in the limited matters

2    that we're honestly asking them to be retained for.

3              THE COURT:  All right.

4              MR. DEMO:  Okay.

5              THE COURT:  I'll hear other opening statements on

6    this.

7              MR. LAMBERSON:  Good morning, Your Honor.  Phillip

8    Lamberson on behalf of Acis Capital Management.

9        First of all, let me start off with outlining exactly what

10   our limited objection relates to.  We are not objecting to the

11   Debtor retaining Foley Gardere to handle the litigation

12   matters for the Debtor.  So, for example, the Acis litigation,

13   anything related to the Acis bankruptcy, that's fine.  We

14   don't have any objection to that.

15             THE COURT:  So the mega-adversary proceeding against

16   Highland and affiliates that is stayed, --

17             MR. LAMBERSON:  Uh-huh.

18             THE COURT:  -- I have a giant Report and

19   Recommendation on my desk that was ready to go about the time

20   the Highland bankruptcy was filed -- but it's stayed:  You

21   would have no objection to Gardere defending Highland --

22             MR. LAMBERSON:  Correct.

23             THE COURT:  -- in that if ever a motion to lift stay

24   is filed and that goes forward?

25             MR. LAMBERSON:  Correct.

47

1          THE COURT:  Okay.

2          MR. LAMBERSON:  And, for example, I believe counsel

3    mentioned this:  To the extent that there's a status

4    conference in the Acis case or something like that, we don't

5    have any issue with Foley representing the Debtor as it

6    relates to that.

7      We don't have any objection to the representation of the

8    Debtor as it relates to the Debtor's appeal of the

9    confirmation order.  We don't have any objection to Neutra's

10   retention of Foley at all.  In fact, we don't have any basis

11   to object to Neutra's retention of Foley Gardere.  Neutra is

12   not a debtor.

13     We fully expect and anticipate that we'll be opposite

14   Foley Gardere in the appeal which is going to be argued at the

15   end of next month, as well as any matters in front of this

16   Court.

17     What we do object to is the Debtor agreeing -- frankly,

18   pre-agreeing -- to pay Foley Gardere for litigation costs

19   incurred by non-debtors, and, specifically, Neutra.  And as

20   counsel outlined, and the reply filed by the Debtors is very

21   clear on this point, Neutra is not a subsidiary of the Debtor.

22   Neutra is ultimately owned one hundred percent by Mr. Dondero

23   and Mr. Okada.

24     So why, why are we objecting?  There's a couple of

25   reasons.  Number one, this is obviously an extremely unusual

48

1  request.  It's not really a --

2         THE COURT:  Okay.  Let me just make sure I heard you

3  correct.  The only thing that Acis is objecting to is the

4  Debtor paying fees for Gardere -- Foley Gardere's

5  representation of Neutra?

6         MR. LAMBERSON:  Correct.

7         THE COURT:  Okay.  So, --

8         MR. LAMBERSON:  Right.  And let me --

9         THE COURT:  -- you don't have a problem with Foley

10 representing the Debtor in these appeal -- well, the Debtor

11 isn't an appellant in the involuntary appeal, right?  Or no?

12        MR. LAMBERSON:  It is -- no.  So, the Debtor is an

13 appellant in the --

14        THE COURT:  The confirmation order.

15        MR. LAMBERSON:  -- confirmation order appeal.

16        THE COURT:  Uh-huh.

17        MR. LAMBERSON:  It's one of two appellants.

18        THE COURT:  Uh-huh.

19        MR. LAMBERSON:  The other one is Neutra.

20        THE COURT:  Uh-huh.

21        MR. LAMBERSON:  Neutra is the only appellant in the

22 confirmation order -- I'm sorry, in the order for relief

23 appeal.

24        THE COURT:  Okay.  So you don't have any problem with

25 Foley's retention; it's just you don't want the Debtor to pay

49

1  Neutra's legal fees?

2          MR. LAMBERSON:  Correct.

3          THE COURT:  And there needs to be some allocation in

4  the confirmation appeal between Neutra and the Debtor, and it

5  needs to all be paid by Neutra, --

6          MR. LAMBERSON:  Correct.

7          THE COURT:  -- not the Debtor?  Okay.

8          MR. LAMBERSON:  Yeah.  That's exactly correct, Your

9  Honor.

10          THE COURT:  Okay.  Just --

11          MR. LAMBERSON:  So I wanted to be clear on that, --

12          THE COURT:  Okay.

13          MR. LAMBERSON:  -- that we're not -- we understand

14  that they're --

15          THE COURT:  Okay.

16          MR. LAMBERSON:  -- going to be our opponents going

17  forward, and we're fine with that.

18          THE COURT:  Uh-huh.

19          MR. LAMBERSON:  I actually like Mrs. O'Neil.

20      So, why are we objecting?  So, there's a couple of

21  reasons.  One is procedural and one is really more

22  substantive.  So, this is obviously a strange request under

23  Section 327.  327 is to approve counsel for the Debtor, for

24  the estate.  And this request doesn't really fit.

25      So, for example, you engage Foley Gardere.  You agree that

50

1   the Debtor is going to pay fees under 330.  Okay.  Well, how

2   do we apply 330 in this situation, right?  What constitutes

3   reasonable and necessary as it relates to the Debtor when the

4   work wasn't done for the Debtor?  What constitutes a

5   determination of whether it was beneficial to the Debtor when,

6   again, the work wasn't done for the Debtor?

7       There's other issues, obviously.  Who controls Neutra?

8   It's not controlled by the Debtor.  The Debtor doesn't own any

9   of Neutra.  Who is making litigation decisions for Neutra?

10  All we know is that the Debtor is paying the freight for

11  whatever Neutra decides to do going forward.

12      The other issue, Your Honor, and this is probably the

13  broader issue, is this decision evidences a continuation of a

14  failed litigation strategy that precipitated this bankruptcy

15  in the first place.  Right?  So, we all heard that the reason

16  Highland Capital Management had to file bankruptcy is because

17  they couldn't pay the Crusader judgment.  Right?  They had a

18  $190 million judgment, or about to be judgment against them,

19  and they couldn't pay it.

20      So let's look at the Committee.  Right?  We have a

21  Committee with four members on it.  Three of them are

22  litigants.  Three of them are in active litigation against the

23  Debtor.

24      If you look at the Top 20 List in this case, of the Top

25  10, only one of them is not a litigation creditor, and that's

51

1   -- I'm trying to -- is an insider creditor.  The rest of the

2   Top 10 are either litigation adversaries or they're law firms

3   that were paid to fight the litigation adversaries.

4       So why is the Debtor continuing its strategy of fighting

5   every last issue, and using various instrumentalities to do

6   it, and then paying the freight for all of it?  That's exactly

7   how we got to where we are today in this case.

8       So, let me address also the benefit from the Neutra

9   appeal.  And, Your Honor, I think that's definitely an area

10  that we need to probe.  Because, like you, I don't get it.  I

11  think what they're outlining is sort of a fantasyland where

12  money is going to rain from the sky when they win this appeal,

13  or if they win this appeal.  And obviously, their reply goes

14  on for pages about the benefit to the Debtor.

15      So, just using basic odds of winning -- and I'm not going

16  to go to the substance of this appeal, which I think is

17  probably worse than the basic odds -- there's a 90 percent

18  chance that the Fifth Circuit just affirms the -- Judge

19  Fitzwater's ruling.  Right?  I mean, there's a 90 percent

20  chance that what the Debtor gets out of this is an affirmance

21  that says, "You lose."  Right?

22      But even if it's reversed, --

23          THE COURT:  What are you basing that on?  Because

24  Fitzwater affirmed 90 percent of the time?

25          MR. LAMBERSON:  Well, so, actually, Judge -- and Ms.

52

1   Chiarello can probably address this more specifically -- Judge

2   Fitzwater actually gets affirmed, I think, more than 90

3   percent of the time, --

4        THE COURT: Probably, yes.

5        MR. LAMBERSON: -- but the general reversal rate at

6   the Fifth Circuit is about ten percent. So, and that

7   obviously includes things like 1983 appeals and things like

8   that.

9        But even if it is reversed, which I think we'd all agree

10  is fairly unlikely, again, money isn't just going to start

11  raining down on Highland Capital. So what's most likely going

12  to happen if the Fifth Circuit decides to reverse -- and let

13  me, let me point out one issue, Your Honor. The only issue on

14  appeal, I should say the only -- there are various issues on

15  appeal, and I'll just click through them. So, one of them is

16  whether Neutra has standing to appeal. Right? Whether they

17  qualify under the person aggrieved standard that the Fifth

18  Circuit uses. That's obviously a gating issue. And, by the

19  way, that's the basis of Judge Fitzwater's ruling affirming

20  this Court's ruling, which was basically Neutra doesn't have

21  standing to appeal the order for relief. They're not the

22  Debtor.

23       So the first issue is whether Neutra is a person

24  aggrieved. Okay?

25       The second issue, and this is the substantive bankruptcy

53

1  issue, the only substantive bankruptcy issue, is whether the

2  order for relief should have been arbitrated.  Right?  So

3  that's the next issue.  That would be, frankly, the issue that

4  the Fifth Circuit would have to reverse on, is that well, yes,

5  this should have been arbitrated.  Right?  The order for

6  relief should have been arbitrated.

7      And then the final issue that we raised on appeal is

8  whether, even if Neutra has standing and even if there was

9  some right to arbitration, whether Neutra, via the putative

10  debtor, waived its right to arbitration by waiting until

11  literally, and you'll remember this, literally the day before

12  the order for relief file started, to raise its request for

13  arbitration.  Right?

14      So, assuming that they get some reversal, what's really

15  likely to happen is that the Court, the Fifth Circuit is going

16  to send it back to you on a remand and say, This is the

17  standard you should have applied, you need to make this

18  finding, or something like that, right?  It's very unlikely

19  the Fifth Circuit is going to say, We're going to reverse and

20  we're just going to render, right, and this thing just goes

21  away forever, particularly considering that the only live

22  substantive issue is whether the order for relief should have

23  been arbitrated, right?

24      But even if Neutra wins and its relief is wholly granted,

25  well, what does that mean?  That doesn't mean that the

54

 1  involuntary goes away.  It doesn't mean the order for relief

 2  permanently goes away.  It means that we go arbitrate it.

 3  Right?  That's what they asked for, is that we go arbitrate

 4  it.  So now we go arbitrate it.  Right?

 5      So, basically, if you break it down, if, in the unlikely

 6  event Neutra wins on appeal, it doesn't mean the bankruptcy

 7  permanently goes away.  What it means is we have more

 8  litigation.  Right?  And that's what normally happens when

 9  there's a reversal on appeal, right?  You relitigate the

10  issues that were litigated in the first place.

11      So this concept -- you're exactly right, Your Honor.  This

12  sounds like fantasyland.  This concept that money is just

13  going to fall out of the sky and onto Highland because Neutra

14  got a reversal is just not going to happen.

15      There's some other problems here, obviously.  Counsel just

16  spent a lot of time talking about how all of Acis's funds are

17  going to get paid to Highland.  Well, that completely misses

18  the point that Josh Terry has an eight, probably somewhere in

19  the neighborhood of maybe $12 million judgment now against

20  Acis.  They're just going to ignore that?  They're just going

21  to ignore the fact that their largest creditor has a judgment

22  against them and is just hanging out there?  That's going to

23  have some impact on what happens to all that cash flow.

24      And then, finally -- and we'll talk about this in more

25  substance when we get to the testimony -- as you recall, this

55

1 was the entire basis of the Acis case: Mr. Dondero and

2 Highland Capital were aggressively trying to liquidate Acis

3 when we showed up in your Court asking for relief. So what

4 makes anybody think that that isn't going to continue

5 happening if there's not a bankruptcy anymore? Right?

6 And Your Honor will recall that you had to twice enjoin

7 Dondero affiliates, HCLOF, from liquidating the PMAs and

8 Acis's assets during the bankruptcy. Right? So the concept

9 that if they win on appeal and there is no bankruptcy,

10 everything just goes away and we're not in this Court at all,

11 that Acis is going to have all of these valuable PMAs and cash

12 flow and it's all going to go to the benefit of Highland, is

13 completely contrary to what happened during the Acis case and

14 what precipitated the Acis case.

15 One other issue that we raised in the objection and in the

16 Debtor's omnibus reply is what we call the DAF litigation,

17 which is litigation filed in the Southern District of New

18 York. And Your Honor, I think you probably remember that from

19 the pleadings. I do want to point out that -- so this, this

20 is a serious issue for Acis. And the reason is because,

21 contrary to what was stated in the reply -- admittedly, this

22 happened after the reply -- but contrary to what happened --

23 was stated in the reply, that litigation has now been expanded

24 to include Acis and Mr. Terry and Brigade, and with basically

25 the same allegations of CLO mismanagement that were raised in

56

1  this Court during the confirmation hearing.

2      So this is a very significant matter to us.  We are very

3  concerned that this Debtor is involved in that and is

4  promoting it in some way.  And we want Your Honor to be aware

5  of that litigation and the actions that are taken challenging

6  your rulings in a court that's miles and miles away from here.

7      Thank you, Your Honor.

8          THE COURT:  All right.  Mr. Morris, are you ready to

9  call your witness?

10         MR. MORRIS:  Yes, I am, Your Honor.  The Debtor calls

11  Russell Nelms.

12         THE COURT:  All right.

13         MR. MORRIS:  Your Honor, I have some exhibit binders.

14  May I hand up?

15         THE COURT:  You may.  All right.  Well, odd as it is,

16  I suppose I in this context need to swear you in.

17             RUSSELL NELMS, DEBTOR'S WITNESS, SWORN

18         THE COURT:  All right.  Please be seated.

19         MR. MORRIS:  John Morris for Pachulski Stang Ziehl &

20  Jones on behalf of the Debtor, Your Honor.

21      Before we get to the testimony, the Debtor has put on its

22  exhibit list nine specific documents that are in the binder

23  before you, and the Debtor moves for the introduction of those

24  documents into evidence.

25         THE COURT:  All right.  Any objection?

Nelms - Direct                          57

1        MR. LAMBERSON:  No objections, Your Honor.

2        THE COURT:  Exhibits 1 through 9 are admitted.

3    (Debtor's Exhibits 1 through 9 are received into

4 evidence.)

5        MR. MORRIS:  Thank you, Your Honor.

6                      DIRECT EXAMINATION

7 BY MR. MORRIS:

8 Q   Mr. Nelms, do you currently have a relationship to the

9 Debtor?

10 A   I do.

11 Q   And what is that relationship?

12 A   I am one of three independent directors of the Debtor.

13 Q   And when were you appointed?

14 A   January the 9th of this year.

15 Q   Did you just listen to the opening statement on behalf of

16 Acis?

17 A   I did.

18 Q   And did you hear the reference to the DAF litigation?

19 A   I did.

20 Q   And did you hear the allegation that the Debtor somehow

21 was involved in the prosecution of the DAF litigation?

22 A   I heard that, yes.

23 Q   Okay.  Did there come a time last week that the Board

24 learned of the possibility of a filing with respect to the DAF

25 litigation?

Nelms - Direct                                    58

1  A    We learned about the filing of the DAF litigation sometime
2  within the last two weeks.
3  Q    And what did the Board do in response to learning that
4  information?
5  A    Well, first of all, I -- we met with Ms. Patel and her
6  client, Josh Terry.  They expressed their concerns about the
7  DAF litigation.  And so the Board used its influence to
8  encourage the trustee of the DAF, Grant Scott, to dismiss that
9  litigation, and we have gotten Mr. Scott's commitment to
10 dismiss the litigation.
11     There's a little bit of an issue there concerning about
12 whether some of the claims can -- they may need to be
13 dismissed without -- the preference is, of course, to dismiss
14 them without prejudice, but there are some issues about that.
15 But I'm told by Mr. Scott that he's going to dismiss the
16 litigation.
17 Q    Let's go back in time before this was filed.  Did the
18 Board express its view as to whether there should be a filing
19 at all?
20 A    It was really a very brief thing.  This was probably a
21 couple weeks or so ago, kind of late in the day at the end of
22 a long, long day, one of those long days we've been having.
23 Someone brought into a board meeting I guess a copy of this
24 new DAF complaint.  It had not been filed at that time.  They
25 showed it to Mr. Dubel.  He looked at it and just kind of

Nelms - Direct                              59

1  asked what it was.  There was a brief explanation of what it

2  was.  And Mr. Dubel said, Tell them not to file this.  He

3  goes, This is only going to cause us problems.  And that's the

4  last we heard of it before it was filed.

5  Q    And what law firm filed that complaint?

6  A    That was filed by the Lynn Pinker firm.

7  Q    And after the Board learned that Lynn Pinker filed this,

8  in spite of the Board's instructions, did the Board take any

9  steps with respect to Lynn Pinker?

10 A    Well, of course, we -- one of the matters that previously

11 was before the Court was the Lynn Pinker application to be

12 retained in this case.  And I'll just say that it was -- it

13 was a factor that went into our deliberations concerning our

14 decision not to go forward with the Lynn Pinker litigation.

15 Q    So, I just want to make sure I have this right.  So the

16 Board, upon learning of a possible filing, gave instructions

17 not to do so; is that right?

18 A    It did.

19 Q    And upon learning that it was filed, it became one of the

20 factors that the Board relied upon in determining not to

21 pursue the Lynn Pinker retention; is that right?

22 A    That's correct.

23 Q    And you personally reached out to Mr. Terry and Ms. Patel

24 to discuss the issue; is that right?

25 A    Mr. Seery and I did, the two of us.

Nelms - Direct                          60

1  Q    And you used whatever influence you had to try to reach an

2  agreement for the withdrawal of that complaint without

3  prejudice; is that right?

4  A    That's correct.

5  Q    Okay.  Now, let's get back to the issues that are relevant

6  to the actual motion.  Are you aware that the Debtor has

7  sought the Court's approval to retain Foley Gardere as special

8  counsel?

9  A    I am.

10  Q    And have you reviewed the court filings with respect to

11  that motion?

12  A    Yes, I have.

13  Q    Okay.  Can you describe for the Court generally the

14  matters for which the Debtor seeks to retain Foley Gardere?

15  A    There are three matters, essentially.  One is an appeal in

16  the Fifth Circuit which concerns the entry of the order for

17  relief in the involuntary petition itself.  The second is an

18  appeal in the Fifth Circuit that concerns the confirmation of

19  the Acis plan.  And the third matter is the assertion of,

20  prosecution of a proof of claim that Highland Capital

21  Management would have in the Acis bankruptcy.

22  Q    Okay.  And are these the special purposes for which the

23  Debtor seeks to retain Foley?

24  A    Yes.

25  Q    Do you know whether there are matters that were part of

Nelms - Direct                      61

1  the original motion but which the Debtor no longer seeks to

2  pursue?

3  A    One of the matters that was pending when we took office

4  was an appeal, and I believe it was still in the District

5  Court, and that related to an alleged conflict of interest by

6  the Winstead firm.  And so there was an objection to their

7  fees and an appeal concerning payment of Winstead fees.  And

8  the Board has decided not to go forward with that appeal.

9  Q    Okay.  So the Board -- did you hear the opening from

10  Acis's counsel that charged that the Debtor was just doing

11  more scorched-earth litigation tactics?  Did you hear that

12  charge?

13  A    I heard that, yes.

14  Q    Okay.  But yet the Board has instructed Foley not to

15  pursue the Winstead matter; is that right?

16  A    That's correct.

17  Q    And just again, for the record, why did the Board make

18  that decision?

19  A    The Board made that decision because we just thought it

20  was in the best interest of the Debtor and this estate not to

21  do that.

22  Q    And did the Debtor see any benefit to pursuing that

23  particular litigation?

24  A    You know, there -- a benefit could be articulated, but we

25  decided not to pursue it.

Nelms - Direct                                    62

1    Q    Okay.  So, that, plus the Neutra appeal, are two -- I

2    mean, I apologize, withdrawn.  That, plus the DAF matter, are

3    two examples where the Board exercised its judgment not to

4    pursue pending litigation; is that fair?

5    A    That's correct.

6    Q    Okay.  Is the Board supportive of the Debtor's application

7    to retain Foley for the three matters you have described?

8    A    It is.

9    Q    And without revealing privileged communications, can you

10   describe generally the diligence that the Board conducted to

11   reach that decision?

12   A    Well, we met with some of the people that work at

13   Highland.  We met with the Debtor's attorneys, the Pachulski

14   firm.  We did have a couple of meetings with Ms. Patel and Mr.

15   Terry.  Some of us have reviewed the pleadings, some more than

16   others.  And, well, we may have done other things, but those

17   are the ones that come to mind right now.

18   Q    I don't know if you mentioned it, but did you confer with

19   Ms. O'Neil?

20   A    Oh, yes, we did.  We talked with Ms. O'Neil about it.

21   Q    Okay.  And what was the purpose of the diligence that you

22   just described for the Court?

23   A    Well, ultimately, what we as a board were trying to do was

24   to conduct kind of a cost-benefit analysis to the estate:  How

25   much will this potentially cost us?  What's the potential

Nelms - Direct                              63

1  upside of pursuing it?  And based upon that cost-benefit

2  analysis, we thought that this was the best thing to do.

3  Q   Okay.  Let's just focus on a couple of very narrow 327(e)

4  issues.   Is the Debtor seeking to retain Foley to act as

5  general bankruptcy counsel?

6  A   No.

7  Q   And which firm serves as general bankruptcy counsel?

8  A   That would be the Pachulski firm.

9  Q   Okay.  And do you know whether Foley Gardere represented

10  the Debtor's interest in each of the three matters that you've

11  described?

12  A   It has been representing the Debtor previously.

13  Q   Okay.  So let's talk about those three matters.  The first

14  one I believe you said was with respect to the representation

15  of the Debtor in connection with an $8 million claim that it

16  has against Acis; is that right?

17  A   That's correct.

18  Q   And is that the claim -- is that the subject of a formal

19  proof of claim?

20  A   Yes.

21  Q   Okay.

22  A   It is a claim filed in the Acis case.

23  Q   I've placed before you an exhibit binder, and I would ask

24  you to turn first to Exhibit 4.

25  A   Okay.

Nelms - Direct                          64

1  Q   And is that one of the proofs of claim that the Debtor has

2  filed against Acis?

3  A   It is.

4  Q   And you'll see that attached to the proof of claim a few

5  pages in there's a document called the Third Amended and

6  Restated Sub-Advisory Agreement.  Do you see that?

7  A   Yes.

8  Q   Do you know what that document is?  Generally?

9  A   Well, generally, I know what this document is.

10 Q   All right.  And what's your general understanding of the

11 document?

12 A   This is an advisory agreement that -- the only thing that

13 I know, I can tell you, really, about this agreement is it

14 gives rise to and generates fees that would inure to the

15 benefit of the Debtor.

16 Q   Okay.  And a few pages past that, you'll see something

17 called a Fourth Amended and Restated Shared Services

18 Agreement.  Do you see that?

19 A   Yes.

20 Q   Is it your understanding that that was another source of

21 revenue that the Debtor generated when it had this agreement

22 in place with Acis?

23 A   Yes.

24 Q   Okay.  Do you have an understanding as to, you know,

25 ballpark, what the annual fees were that the Debtor received

Nelms - Direct                              65

1    pursuant to these agreements prior to the Acis bankruptcy?

2    A    Well, I think, prior to the bankruptcy, it was more, and

3    perhaps significantly more, than it is today.  It may have

4    been in the $12 million range per annum.  I think it's less

5    than that today.

6    Q    Okay.  And can you turn to Exhibit 5, please?  Is that

7    another proof of claim that was filed in the bankruptcy case,

8    the Acis bankruptcy case?

9    A    Yes.  This is a little bit different.  This is an

10   application for an administrative expense claim.  The prior

11   proof of claim that we looked at related to a pre-petition

12   claim that the Debtor had, then a gap period claim that the

13   Debtor had, and this is post-petition.  So this is an

14   administrative claim.  It's basically for the same services,

15   but just different time periods.

16   Q    Okay.  And who was responsible for preparing Exhibits 4,

17   5, and 6?

18   A    Ms. O'Neil and the Foley firm.

19   Q    Okay.  And has the Board reached a conclusion that it's in

20   the Debtor's best interest to retain Foley on a post-petition

21   basis to prosecute these claims?

22   A    It has.

23   Q    And why -- what's the justification for that?  Why did the

24   Board reach that decision?

25   A    Well, we believe it's in the best interest of the Debtor.

Nelms - Direct                              66

1  Obviously, a couple of things there. I realize we may have a

2  very long road ahead of us with respect to these things. But

3  the overall aspirational goal is to have an income stream

4  that's associated with these agreements. The goal is to have

5  an amount of money out there that's available to pay our pre-

6  petition claims, the gap claims, the administrative claims,

7  while at the same time acknowledging that this company has the

8  obligation to satisfy and fulfill Mr. Terry's claim as well.

9  Q    All right. Let's just focus for the moment on the three

10 proofs of claim. The aggregate amount is approximately $8

11 million. Do I have that right?

12 A    Yes, that's right.

13 Q    And from the Board's perspective, is the -- are those

14 claims an asset of the estate?

15 A    They are.

16 Q    And does the Board want to retain Foley for the purpose of

17 trying to recover that asset?

18 A    It does.

19 Q    And has the Board concluded that Foley is familiar with

20 these particular claims?

21 A    Foley is familiar with these claims, yes.

22 Q    And -- okay. Let's move on, then, to the second task for

23 which the Debtor seeks approval to retain Foley, and that is

24 with respect to the confirmation order. That's one of the

25 tasks, right?

```
                          Nelms - Direct                    67
```

1  A    It is.

2  Q    Okay.  And this is one of the Fifth Circuit arguments

3  that's scheduled for six weeks from now; is that right?

4  A    That's correct.

5  Q    Okay.  And has Foley represented the Debtor throughout the

6  proceedings that are leading up to this oral argument?

7  A    It has.

8  Q    And did Foley prepare all of the briefing in connection

9  with the arguments?

10  A    It did prepare the briefing.  It did that, in some

11  respects, along with Lynn Pinker.

12  Q    Okay.  Did you personally review the Debtor's briefs that

13  were filed in connection with the appeal?

14  A    I have reviewed those.

15  Q    Okay.  Have you reviewed every single piece of the record

16  on appeal?

17  A    I would doubt that I have.

18  Q    Okay.  Do you have a general understanding of the nature

19  of the appeal?  Of -- and this would --

20  A    Are we talking now about the confirmation appeal?

21  Q    Yes.  Just the confirmation.  Yeah.

22  Q    Well, the appeal has basically two broad elements, and the

23  first is an argument that the plan was not brought in good

24  faith.  Section 1129(a)(3).  And that goes back to the

25  arbitration issue.  Generally speaking, that because -- the

Nelms - Direct                              68

 1  allegation is that because Mr. Terry refused to arbitrate,

 2  then the plan was tainted by that lack of good faith.  And the

 3  second issue, broad issue that's involved in that appeal has

 4  to do with, oh, the injunction, the breadth and scope of the

 5  injunction, which the Debtor contends is -- was improper.

 6  Q    And if the Fifth Circuit reverses the underlying decision,

 7  has the Board made a determination of the possible benefits

 8  that the Debtor may receive?

 9  A    Well, there's two aspects of that appeal.  One would be a

10  narrower decision.  I suppose, if it's just related to the

11  injunction, it's -- it's hard to quantify exactly what that

12  would mean.

13  Q    Okay.

14  A    The bigger issue, of course, has to do with the

15  arbitration.  And if the -- theoretically, at least, the

16  arbitration, if the Fifth Circuit agreed on the issue of

17  arbitration, then the argument would be that we would -- that

18  in the arbitra... well, it is true to say that -- well, I

19  think I'm kind of getting ahead of myself here.

20  Q    You are, just a bit.  Let's just focus on the confirmation

21  appeal.  That's been consolidated for oral argument purposes

22  --

23  A    It has.

24  Q    -- with the appeal of the involuntary; is that right?

25  A    That's correct.

Nelms - Direct                           69

1  Q    Okay.  And just to sum up this piece of it, did Foley

2  represent the Debtor with respect to all of the underlying

3  proceedings?

4  A    It did.

5  Q    And why does the Board believe it's in the Debtor's best

6  interest to retain Foley to conduct the oral argument and to

7  finish up this proceeding?

8  A    Well, first of all, I think the Court would agree with me

9  that Foley is a very competent law firm.  It's competent to do

10  the work that they've been charged to do.

11      Second, pretty much all the work on the appeal is already

12  in the can.  The only thing that's left to be done at this

13  point in time is to make the oral argument.  Obviously, if we

14  didn't go forward with the Foley firm, we'd have to find

15  somebody who could make the argument.  So, we would -- but we

16  would lose the benefit of Foley's experience that they have in

17  the case so far.

18      I think there will be a cost element that would be

19  associated with bringing somebody new up to speed with respect

20  to this.

21      So, those, generally speaking, are the benefits that we

22  see.

23  Q    Okay.  Let's turn then, finally, to the Neutra appeal.  Do

24  you have a general understanding of that matter for which the

25  Debtor seeks to retain Foley?

Nelms - Direct                    70

1  A    Yeah.  The Neutra appeal, what happened in Neutra is that

2  Neutra, to my understanding, moved to intervene in the

3  involuntary proceeding.  I think that intervention was denied.

4  And so that appeal has to do with the fact that Neutra

5  contends that it should have been permitted to intervene, that

6  the matter of collections should have been arbitrated.

7      I think that one of the issues in there is this -- in that

8  appeal is who decides on the issue of arbitrability.  Is it

9  this Court, or is it the arbitrators themselves?

10     So, those are the issues that are present in the Neutra

11 appeal.

12 Q    Okay.  Is the Debtor named a party to the appeal?

13 A    The Debtor is not a named party in the Neutra appeal.

14 Q    But the Board nevertheless wants to retain Foley on a

15 post-petition basis to prosecute that appeal; is that right?

16 A    That's correct.

17 Q    And why is that?

18 A    Well, I think both -- we recognize and I think the Fifth

19 Circuit recognizes as well that these two things, that these

20 two appeals kind of go hand-in-glove.  The 1129(a)(3) argument

21 basically is dependent upon the arbitration issue, which is

22 fleshed out in the Neutra appeal.

23     And so, at the end of the day, the way that the Board sees

24 this is that the Debtor is the most immediate beneficiary of

25 the economic benefit of the Neutra appeal.  We see the

Nelms - Direct                    71

1  possibility of an income stream there.  We see the possibility

2  of the ability to pay our claims in the Acis case.  And I

3  think -- one of the things I think that is of particular focus

4  when it comes to all of this litigation is the fact that, as I

5  understand it, Mr. Terry started out with an $8 million claim,

6  and I think he bid $1 million of that claim for the interest

7  that he got in Acis, which reduced it, say, to $7 million.

8  And I think Mr. Terry's interest now over time I believe it's

9  been reduced to somewhere between $4 to $6 million.  So

10 that's, that's a claim.

11     But in this case, Mr. Terry has filed a proof of claim for

12 $70 million.  And my understanding from our visit with Mr.

13 Terry and his counsel is that that claim could get up to $300

14 million.  And so, as a board, we look at that and what we're

15 concerned about is the migration, the alleged migration of a

16 tremendous amount of value from Highland down to Acis.  So, at

17 the end of the day, it doesn't really matter who you regard as

18 the ultimate equity owner of Acis, whether it's Mr. Terry or

19 whether it's Mr. Dondero:  The migration of that value

20 downstream to Acis is of no real benefit to Highland Capital

21 at all.

22 Q   Is this one of the issues that the Board discussed with

23 the Committee last week in connection with this motion?

24 A   Yes.  It is.

25 Q   Okay.  And let's just go back to the income stream for a

                          Nelms - Direct                    72

1    second.  The income stream that the Board is hoping it will

2    get if the decision is reversed, is that income stream derived

3    from the two agreements that we just looked at?

4    A    It is.

5    Q    So those are the two very agreements that the Board would

6    look to have reinstated if it were to succeed on the appeal;

7    is that right?

8    A    Yes.

9    Q    Now, does the Board know exactly the form of relief the

10   Fifth Circuit is going to grant?

11   A    I have no earthly idea.

12   Q    Right?  But has the Board made a determination that the

13   outcome of Neutra obtaining control of Acis is one

14   possibility?

15   A    It's certainly a possibility.

16   Q    And is that the potential benefit that the Board focused

17   on in deciding to pursue this motion?

18   A    Yes.  I mean, I'm glad to adopt the percentages that Mr.

19   Terry's counsel has mentioned today.  I guess if the cost-

20   benefit analysis is that we're going to pay a couple hundred

21   thousand dollars here to get to the end of the road, and the

22   benefit is millions of dollars, well, even if our chances are

23   only ten percent, I think that's a shot worth taking.

24   Q    Thank you very much.  If the Fifth Circuit reversed,

25   because this is a point that was also made in the Acis

Nelms - Direct                    73

1  opening, what would happen to Mr. Terry's claim?  Or what's

2  your understanding or what's the Board's view as to whether or

3  not it would intend to satisfy Mr. Terry's claim?

4  A    I know, speaking on my behalf, that I'd -- the claim that

5  Mr. Terry got through arbitration I regard as a valid claim.

6  I think it's one that would have to be addressed no matter who

7  is in charge of paying the obligations of Neutra.

8  Q    Has the Board concluded that it's in the Debtor's best

9  interest to retain Foley for the purpose of prosecuting the

10 Neutra appeal, or at least in issuing the oral argument?

11 A    Yes.

12 Q    Okay.  And when is the argument scheduled for?

13 A    March the 30th.

14 Q    And is the fact that that's all that's left with respect

15 to this aspect of the engagement a factor that the Board took

16 into account in its decision?

17 A    Yes.

18 Q    Has the Board reached a decision as to who the real

19 economic party in interest is with respect to the Neutra

20 appeal?

21 A    Yes.  We believe ultimately that our Debtor would bear the

22 most economic interest in the outcome.  And, really, because

23 of the amount of the obligations that are owed, both to Mr.

24 Terry, to Highland Capital, by the time that you have this

25 kind of runoff of all the revenue streams, I'm not really sure

Nelms - Direct                    74

1   that there would be anything left for either Mr. Dondero or

2   Mr. Okada.

3   Q    So, --

4   A    That's -- that's a view from 50,000 feet, not even 30,000

5   feet.

6   Q    Okay.  Well, let's talk about the specific benefits,

7   potential benefits, if it's reversed on appeal.  Does the

8   Board believe it's possible that the two contracts get

9   reinstated?

10  A    It is possible.

11  Q    And is that a motivating factor in supporting this motion?

12  A    It is.

13  Q    What would happen to the $8 million claim that the Debtor

14  has against Acis right now in the Acis bankruptcy?  Does the

15  Board have a view as to what would happen to that?

16  A    It would be our aspiration to collect that claim on behalf

17  of our client, which is Highland Capital Management.

18  Q    And would -- is it the Board's expectation that if it was

19  in that position it would get paid hundred-cent dollars,

20  rather than at least a portion of it as a general unsecured

21  claim?

22  A    Again, that would be our aspiration.

23  Q    Uh-huh.  What would happen to the adversary proceeding?

24  Do you have an understanding as to what would happen in the

25  adversary proceeding with respect to Mr. Terry if the Fifth

Nelms - Direct                                75

1  Circuit reverses and Neutra regains control of Acis?

2  A    Well, I'm assuming -- I'm assuming that that adversary

3  proceeding would go away.

4  Q    Okay.  And would that -- is that a potential benefit to

5  the estate?

6  A    That would be a benefit to the estate if it did.

7  Q    And do all of the factors that we just discussed go into

8  the cost-benefit analysis that the Board did in deciding to

9  pursue only these three very limited aspects of the

10  engagement?

11  A    Yes.

12  Q    Okay.  Has the Board considered the potential harm to the

13  Debtor if the motion is denied?

14  A    We have.

15  Q    And have -- can you share with the Court the issues that

16  the Board has identified as potentially being adverse if the

17  motion is denied?

18  A    It's really just the other -- the flip side of the coin of

19  benefit, which is added expense, loss of the experience that

20  the Foley firm has, perhaps delay of time in finding somebody

21  else, bringing them up to speed, not just with respect to the

22  two appeals but with respect to the proof of claim.  And there

23  may be others that I'm not thinking of right now.

24  Q    Did the Board consider the potential loss of the

25  institutional knowledge that Foley has and the potential

Nelms - Direct                          76

1  adverse impact it would have on the quality of the oral

2  argument?

3  A    It did.

4  Q    Okay.  So, two of the three matters that the Debtor seeks

5  to retain Foley for are appeals to the Fifth Circuit; is that

6  right?

7  A    Yes.

8  Q    And did those matters originate in this courtroom?

9  A    They did.

10  Q    And you were colleagues with Judge Jernigan at one time,

11  weren't you?

12  A    Yes.  We were bench colleagues for twelve years.

13  Q    And do you believe Judge Jernigan is a good judge?

14  A    I do.

15  Q    Do you believe she's a fair judge?

16  A    I do.

17  Q    Do you believe she tries to get it right every single

18  time?

19  A    I know she tries to get it right every time.

20  Q    So then why is the Board seeking to prosecute these

21  appeals of Judge Jernigan's decision?

22  A    Well, it's in the best interest of our client to do that.

23  And I have not -- I have to say there's always a little bit of

24  discomfort that comes with something like this, but I do know

25  this from my time on the bench, and that is that when you take

Nelms - Direct                          77

1   the job that Judge Jernigan has, you take it with full

2   understanding of how the system works.  And in the system,

3   half the people lose at any one given time.  And when you

4   lose, you tend to be disappointed in the result, and the

5   result of that is that you get the right to go to the next

6   court and have someone say that the judge got it wrong.

7       So those of us that take the bench understand that that's

8   the system, and I don't think -- for the most part, we're not

9   threatened by that.  And so I, you know, as uncomfortable as

10  this may -- this may put -- a position it may put me in from

11  time to time, I think that -- I think Judge Jernigan

12  understands the roles that we all play in this system.  And so

13  --

14  Q   Just, okay, just to summarize:  If the motion is granted,

15  what's the absolute worst-case scenario here for the Debtor?

16  A   I'm sorry.  Would you say that again?

17  Q   If the motion is granted and the Debtor is allowed to

18  retain Foley for the three tasks which you have described, do

19  you have an understanding as to what -- what's the worst that

20  could happen?  They'd have to pay Foley's fees, right?

21  A   We'd have to pay -- well, subject to Judge Jernigan's

22  approval, --

23  Q   Right.

24  A   -- those fees would be paid.

25  Q   And subject to everybody's opportunity to object, right?

Nelms - Direct                          78

1   A    Right.

2   Q    But if the fees were paid at a hundred percent, nobody

3   objected and Judge Jernigan approved of them, what's the

4   maximum exposure that the Debtor has from this?

5   A    I think Foley has about $311,000, I believe, right now in

6   time.  And I think they would probably have about maybe

7   another $100,000 more.  And I know -- I hate to scoff at the

8   notion that $400,000 is a lot of -- is not a lot of money.

9   But, you know, in the grand scheme of things in this case,

10  it's -- I won't say it's a rounding error, but it's not a lot

11  of money.

12  Q    And forget about, I mean, not forget about, but in

13  addition to its relative size to the overall case, how does

14  that compare to the relative economic benefit that the Debtor

15  believes it will recover if the appeal is successful?

16  A    Well, I think the cost is -- the cost is less than half a

17  million, and the potential benefits are in the millions.

18          MR. MORRIS:  Okay.  Just one moment, Your Honor, if I

19  may?

20          THE COURT:  Okay.

21      (Pause.)

22          MR. MORRIS:  All right.  Just a few more questions,

23  Your Honor.

24          THE COURT:  Okay.

25  BY MR. MORRIS:

Nelms - Direct                              79

1   Q   Mr. Nelms, did Neutra pay a portion of the fees, Foley's

2   fees prior to the petition date in connection with an April

3   litigation?  Do you know?

4   A   If they did, I'm not aware of it.

5   Q   Okay.  Do you know what would happen to the appeal if

6   there was no funding for the appeal?

7   A   Well, I think I know what the result of the appellant not

8   showing up for an appellant argument would be.

9   Q   And what would that be?

10  A   Well, I think that would be a pretty quick resolution.

11  Q   Do you think the case would be dismissed, the appeal would

12  be dismissed?

13  A   I think so.

14  Q   And would that be the loss of a potential material benefit

15  and asset of the Debtor's estate?

16  A   It would be.

17  Q   Can you think of any way to ensure the appeal is

18  prosecuted today other than making sure the Debtor funds it?

19  A   I'll put it this way.  I think the most certainty can be

20  added to this case by having the Debtor fund this matter

21  through the end of March.

22  Q   And from --

23  A   I think that's -- that's -- for the time being, that's the

24  easiest, most simple path.

25  Q   And you say for the time being.  Has the Board reached an

```
                          Nelms - Direct                    80

1    agreement to never request, from Neutra or anybody else,

2    contributions for the funding of this case?

3    A    No.  Ultimately, there is going to be at some point in

4    this case a settling of accounts between the Debtor and Mr.

5    Dondero, just as there are -- will be a settling of accounts

6    between the Debtor and other parties in interest.  We, as the

7    Board, have just chosen not to have that fight today.

8    Q    And why did the Board reach that decision?

9    A    Because we just thought it was in the best interest of the

10   Debtor to proceed that way.

11   Q    And is that because you need this appeal argued on March

12   30th?

13   A    It is.

14   Q    And that's because of all of the potential benefits that

15   you've identified; is that right?

16   A    Right.

17   Q    Okay.

18            MR. MORRIS:  I have no further questions, Your Honor.

19            THE COURT:  Okay.  Cross?

20            MR. LAMBERSON:  Yes, Your Honor.

21                       CROSS-EXAMINATION

22   BY MR. LAMBERSON:

23   Q    Good morning, Mr. Nelms.

24   A    Good morning.

25   Q    How's it to be on that side of the bench?
```

                    Nelms - Cross                    81

1  A    Not so fun.

2  Q    It's not great, right?

3           MR. LAMBERSON:  And Your Honor, we have an exhibit

4  notebook, which we're not -- we're not going to use all these

5  exhibits.  We actually -- you'll notice that there are some

6  empty tabs in here.  We downsized the exhibits from the

7  exhibit list, and I'm not going to use all these.  So I'll

8  just introduce them as I get to them.

9           THE COURT:  Okay.

10 BY MR. LAMBERSON:

11 Q    Let me pick up on your last point.

12          MS. CHIARELLO:  Your Honor, may we approach?  We have

13 binders.

14          THE COURT:  You may.

15 BY MR. LAMBERSON:

16 Q    So, let me pick up on your last point, Mr. Nelms.  So, who

17 -- who owns Neutra?

18 A    Well, if you follow the stream all the way up, it is owned

19 75 percent by Mr. Dondero and 25 percent by Mr. Okada.

20 Q    Okay.  And Mr. Dondero is one of the richest men in

21 Dallas.  Correct?

22 A    I don't know.

23 Q    Presumably?  Mr. Okada is also one of the richest men in

24 Dallas?

25 A    I don't know.  I haven't lived in Dallas in 17 years.

Nelms - Cross                          82

1  Q   Okay.  Fair enough.  But they can't -- they can't pay the

2  litigation costs for their own entity?

3  A   Well, I don't know that they -- whether they can or

4  whether they can't.

5  Q   Right.  So, are you familiar with an entity called

6  Highland CLO Funding?

7  A   Vaguely, yeah.

8  Q   Okay.  And Highland CLO Funding is one of the appellants

9  in the appeal of the confirmation order, correct?

10  A   That's correct.

11  Q   Okay.  And one of the issues on appeal is actually the

12  plan injunction that's embedded in the confirmed plan,

13  correct?

14  A   That's correct.

15  Q   Right.  And is your understanding that that's really

16  Highland CLO Funding's main appeal issue?

17  A   I think it probably would be, yes.

18  Q   Okay.  And is there any reason that Highland CLO Funding

19  can't pay Neutra's legal fees to have -- have another

20  appellant in the Fifth Circuit?

21  A   I don't know the answer to that question.

22  Q   Okay.  So, let me -- let me -- I'm going to try to keep

23  this coordinated, but my notes are a little bit over the

24  place, so I apologize in advance if I move around a little

25  bit.

Nelms - Cross                          83

1      So, you had testified earlier that -- and I'm just trying

2  to synopsize your testimony -- that you -- that the Board

3  believes the primary benefit of paying Neutra's legal expenses

4  related to the order for relief appeal and the confirmation

5  appeal is the income stream that would be evidenced by the

6  sub-advisory agreement, right?

7  A    Yes.

8  Q    Okay.  And I'm -- when I say sub-advisory agreement, I'm

9  talking about this is the attachment to the Debtor's Exhibit

10  4, which is the proof of claim.

11  A    Right.

12  Q    Right?  And so it's your understanding that the way that

13  works is Acis Capital Management, my client, is the portfolio

14  manager for a bundle of CLOs, right?

15  A    That's my understanding.

16  Q    And that before the Acis bankruptcy, the sub-advisory

17  agreement allowed Highland Capital Management to sub-advise

18  those CLOs for a fee, correct?

19  A    That's correct.

20  Q    Okay.  So, I'm going to focus on the confirmation appeal.

21  So, you understand that the plan injunction prevents the

22  liquidation of the CLOs and the Acis portfolio management

23  agreement?

24  A    That is my understanding.

25  Q    Okay.  And the reason that, frankly, we had to get the

Nelms - Cross                              84

1   plan injunction is because HCLOF three times tried to

2   liquidate, redeem the CLOs, including twice in the bankruptcy

3   case?

4   A    I understand that was an issue.  But -- I have a general

5   understanding as to what you're saying, but not a specific

6   understanding.  But I'm not disagreeing with you.

7   Q    Yeah.  Okay.  And so if the plan goes away, the plan

8   injunction goes away, then is there any reason to think that

9   HCLOF isn't going to liquidate the CLOs?

10  A    I would not know.

11  Q    And in that case, there's not going to be any cash flow

12  under the portfolio management agreements or the sub-advisory

13  agreements, right?

14  A    If you're asking me if that's a possibility, I'd say it's

15  certainly within the realm of possibilities.

16  Q    Okay.  So, staying on the confirmation appeal, so let's --

17  let's assume that, for whatever reason, the Fifth Circuit

18  decides that the confirmation order needs to be reversed and

19  they send it back down to Judge Jernigan and say, "Try again."

20  Would you agree that that would effectively reactivate the

21  Acis case?

22  A    Well, I don't know, because, you know, one of the issues

23  in the appeal is who gets to make the decision with respect to

24  arbitrability.  Because I know that it's the Appellants'

25  position that the decision as to whether or not it should be

Nelms - Cross                                  85

1    arbitrated, something such as collections, should they go to

2    be decided by the arbitrator, --

3    Q    Let me stop you, just to be clear.  I'm talking about the

4    confirmation appeal, the appeal of the confirmation order.

5    A    Uh-huh.

6    Q    Right?  Okay.  I'm not talking about the order for relief

7    appeal.

8    A    I may be conflating the two, so I'm sorry.

9    Q    Yeah, yeah, and I -- and it's -- yeah, it's -- but it is

10   confusing.  But I'm talking about the confirmation appeal.  So

11   the appeal of the Court's confirmation order confirming the --

12   I think was the third amended plan.  Okay?  So, I'm focusing

13   on that appeal only.  If the Fifth Circuit says, "Nope.  Try

14   again," then you would agree with me that that effectively

15   reactivates the Acis Chapter 11 case?

16   A    Well, I think it depends.  If you -- would you like me to

17   explain why I think it depends?

18   Q    Yeah.  Go ahead.  I don't -- because, I mean, honestly,

19   I'm not exactly sure what happened, so I would actually -- I

20   would like your opinion.

21   A    Well, given that the first issue in the confirmation

22   appeal is the issue of good faith, and the foundation of that

23   pretty much is the whole arbitration issue, if the Fifth

24   Circuit were to reverse on that basis, then I don't

25   necessarily know that it would go back to the Bankruptcy

Nelms - Cross                    86

1  Court.

2      If it was reversed just on the narrower issue with respect

3  to the injunction, and maybe whether the injunction was too

4  broad or something like that, --

5  Q    Uh-huh.

6  A    -- and that was the only basis for reversal, I would agree

7  with you it would go back to Bankruptcy Court.

8  Q    Okay.  So there's some possibility that a result of the

9  confirmation appeal is that the Acis Chapter 11 case is

10  reactivated and we're back in front of Judge Jernigan on that

11  case, too?

12  A    That would be a possibility.

13  Q    Okay.  And then you'd get to talk with Mr. Phelan, right?

14  That would be fun.

15  A    Right.

16  Q    So, so how much money did Highland Capital spend in the

17  Acis bankruptcy case?

18  A    I don't know.

19  Q    Was it -- it was millions and millions, right?

20  A    I don't know, but I'm -- I'm assuming it exceeded a

21  million.

22  Q    Okay.  Well, aren't there -- aren't there claims of unpaid

23  fees just in the Top 20 list, which we'll point to here in a

24  minute, in the millions of dollars that relate to the

25  attorneys that represented Highland in the bankruptcy -- in

Nelms - Cross                                    87

1    the Acis bankruptcy case?

2    A    I don't know.

3    Q    Okay.  So, why, you know, assuming that a result of the

4    confirmation appeal is that the Acis bankruptcy case is

5    reactivated, how is that in Highland's best interest?  And I'm

6    not talking about Neutra, and I'm not talking about HCLOF.

7    I'm talking about Highland.

8    A    Well, the -- what would be in our best interest would be

9    to once again control the sub-advisory agreement and to

10   generate revenues for the benefit of this estate.  Use those

11   -- that revenue stream both to address any claims that

12   Highland might have, as well as Mr. Terry.  That would be the

13   benefit as we see it.

14   Q    Right.  But by the time of the confirmation order, --

15   A    But if your question is, oh, but you're going to be

16   involved in a lot of other litigation and so how does that

17   benefit, then I guess my answer to that is it's a -- my answer

18   is a "Yes, but," and but may exceed the scope of your

19   question, so I won't --

20   Q    Okay.

21   A    -- I won't give you the but answer unless you want me to

22   do it.

23   Q    That's fine.  I just -- if we go back, if we go back to

24   where we were before confirmation, I mean, I'm not talking

25   about the order for relief, I'm talking about confirmation,

Nelms - Cross                                        88

 1   the sub-advisory agreement had been terminated.  Highland had

 2   been fired and Brigade was managing everything.

 3   A    Right.

 4   Q    So, there wouldn't be any cash flow going to Highland

 5   based on the -- just the reversal of the confirmation order.

 6   A    Well, what would have to happen, of course, is that Neutra

 7   would have to -- would have to appoint us as -- would have to

 8   allow us to come in under the sub-advisory agreement to

 9   perform those services.

10   Q    Right.  Except that there's a trustee, right?  Robin

11   Phelan was in charge of everything.

12   A    Well, you're assuming there's still a bankruptcy.

13   Q    Right.  Yeah.  Well, I am.  I mean, again -- and maybe I'm

14   being simplistic about this, but if the confirmation order is

15   reversed, --

16          THE COURT:  Counsel is standing.  Do you have an

17   objection?

18          MR. MORRIS:  Yeah.  I do, Your Honor, to this whole

19   line of hypothetical questions.  We do understand, I think

20   everybody understands, that we don't know if the appeal will

21   be granted.  I think we do all understand that we don't know

22   what the form of relief, the exact form of relief will be.

23   But the testimony here is that the Board has decided that one

24   possible form of relief is that -- is that Neutra will regain

25   control of Acis and get these contracts reinstated, get the

Nelms - Cross                    89

1  adversary proceeding dismissed, and get paid on its $8 million

2  claim.

3      If there's questions about that, I think it's relevant,

4  but I don't know why we're spending a lot of time on

5  hypotheticals with a fact witness.

6          THE COURT:  But the --

7          MR. MORRIS:  Not an expert witness.

8          THE COURT:  The business judgment of the Board of the

9  Debtor is at issue here, correct?

10         MR. MORRIS:  Correct.  Absolutely.

11         THE COURT:  Don't these hypotheticals go to, is

12  reasonable business judgment being exercised here?

13         MR. MORRIS:  I think he has to lay a foundation and

14  say, Is this -- is this a hypothetical you considered?  Is

15  this a hypothetical that you considered?  Because we're just

16  -- this is like expert testimony almost.  There is no evidence

17  that any of these factors were considered.  And at the end of

18  the day, there is no dispute that the scenario that the Board

19  is saying is worth the investment, basically, is also a

20  possibility.

21         THE COURT:  Okay.  I overrule the objection.

22         MR. LAMBERSON:  Okay.

23         THE COURT:  You can proceed.

24         MR. LAMBERSON:  And Your Honor, I'm just about done.

25         THE COURT:  Okay.

Nelms - Cross                                    90

1  BY MR. LAMBERSON:

2  Q   So, okay.  So, we -- but we can agree that -- okay.  Let

3  me -- let me hopefully do this.  Okay.  So, I mean, I think

4  that's fine for the confirmation appeal, so now I want to talk

5  about the order for relief appeal.  Right?  So this is the

6  appeal of the order for relief or the -- and I stated this

7  earlier to the Court, but the sole substantive issue in that

8  appeal is whether this Court should have compelled the order

9  for relief to arbitration.  Is that right?

10 A   The sole substantive issue?  I think, if you paint with a

11 broad brush, yeah.  I would agree with you, yes.

12 Q   Okay.  Well, and again, I'm not trying to --

13 A   I know.  So, --

14 Q   I'm not trying to trap anybody.  The three issues --

15 A   And I'm not trying to be evasive, either.

16 Q   Yeah.

17 A   Yeah.

18 Q   Are the standing issue, which, in my mind, isn't really a

19 substantive issue.  And then there's the issue about the

20 arbitration of the order for relief.  And then, finally, as I

21 mentioned, we've raised a waiver argument that basically, if

22 they had a right to arbitrate, which we think they don't, they

23 waited too long to raise it.  Right?  Those are the three

24 issues.  Correct?

25 A   That's correct.

Nelms - Cross                                    91

1    Q   Okay.  So, let me ask you.  And I'm not going to -- I'm

2    not going to hold this against you at the Fifth Circuit level,

3    but, I mean, do you -- do you think an order for relief is

4    subject to arbitration?

5              MR. MORRIS:  Objection, Your Honor.  Calls for a

6    legal conclusion.

7              THE COURT:  Overruled.

8              MR. LAMBERSON:  Sure it does.

9              THE COURT:  Overruled.

10             THE WITNESS:  I think the -- I think it's a -- I

11   think there's a colorable argument.

12   BY MR. LAMBERSON:

13   Q   Uh-huh.

14             MR. MORRIS:  Objection withdrawn.

15   BY MR. LAMBERSON:

16   Q   So you don't think *National Gypsum* and *Gandy* would apply

17   to an involuntary petition and order for relief?

18   A   Well, I'll put it this way.  I guess they'll apply if the

19   Fifth Circuit tells us they do.

20   Q   Right.

21   A   That's as much as I can tell you.

22   Q   Okay.  So, so if that ruling is reversed, right, as I

23   mentioned earlier -- and let me ask you, actually, another

24   thing.  So, how often, when you were a judge, how often were

25   -- I shouldn't say how often -- how many times were your

Nelms - Cross                                         92

1   rulings reversed?  Just roughly?

2   A    Was I reversed?

3   Q    Yeah.

4   A    I think six.

5   Q    Not very many claims, right?

6   A    No.

7   Q    So how many times was there a reverse and a render?

8   A    I'm sorry.  Say again?

9   Q    How many times was there a reverse and a render, where

10  nothing came back to you, that basically the higher court just

11  said, It's done?

12  A    Well, it was rendered every time except on one occasion,

13  and that --

14  Q    Uh-huh.

15  A    -- *Stern v. Marshall* had just been decided, and so --

16  gosh, I can't remember the district judge.

17  Q    Okay.

18  A    One of the judges reversed but sent it back to me to

19  reconsider it under the light of the ruling in *Stern v.*

20  *Marshall*, a jurisdictional issue.  So, in all those instances,

21  it was rendered.

22  Q    Okay.  So there was nothing -- there was no issue that

23  came back to you?  The case was just resolved?

24  A    No.  No issue came back to me.

25  Q    Okay.

Nelms - Cross                                    93

1   A    No, you know what, there was a second one.  I think the

2   second one was *In re Mirant*.  *Commerzbank versus -- MCAR v.*

3   *Commerzbank*.  That came back as well.

4   Q    Right.  Okay.  So, again, but focusing on the order for

5   relief appeal, one possibility is that the Fifth Circuit says,

6   okay, this may be subject to arbitration, and sends it back to

7   Judge Jernigan to make additional findings, apply a different

8   standard, right?  That's possible, right?

9   A    That's possible.

10  Q    Okay.  So, in that case, nothing necessarily came out of

11  the appeal, right?  Like you're just basically back in front

12  of her on the same issues?

13  A    Well, I -- that may very well be the case, but --

14  Q    Okay.  Well, let's assume that the Fifth Circuit does

15  reverse and render.  Wouldn't -- isn't what they would render

16  would be a -- compelling this case to arbitration?  Right?

17  Not that the bankruptcy goes away, disappears.  It would

18  basically be, "Should have been arbitrated.  Go arbitrate."

19  A    It's a good question, what the effect of reversing it

20  would be and sending it back, remanding it.  They -- I mean,

21  one of the things that they might decide is to say that the

22  whole issue of arbitration should be decided by an arbitrator.

23  Q    Uh-huh.

24  A    That's a possibility.

25  Q    Right.  But in that situation, the bankruptcy doesn't go

Nelms - Cross                          94

1   away.  It just moves to a different forum, right?

2   A    No, I mean, you're probably right.  That, in and of

3   itself, would not eviscerate the bankruptcy filing.

4   Q    Uh-huh.

5   A    That's true.

6   Q    And so, in that situation, the result is -- and this is --

7   that's, frankly, the best situation, is --

8   A    But, of course, I mean -- can I go back to that?  Just,

9   I'm not sure about that.  Because, after all, this was an

10  involuntary petition.

11  Q    Uh-huh.

12  A    If it was a voluntary petition, then I would certainly

13  agree with you wholeheartedly.  Inasmuch as it was an

14  involuntary petition, I'm not sure about the answer to that

15  question.

16  Q    Uh-huh.  Okay.

17  A    That's a good question.

18  Q    But you would agree with me that a possible result of even

19  a reversal of the order for relief appeal would just be more

20  litigation?

21  A    Yes.  That's certainly a possibility.

22  Q    Right.  In this Court?  Maybe in front of an arbitrator?

23  Maybe both?

24  A    Yes.  That's possible.

25  Q    Okay.  All right.  So, still focusing on the order for

Nelms - Cross                          95

1    relief appeal, but I want to go to this idea that, again,

2    there's this cash flow stream that is going to be reinstated

3    for the benefit of Highland Capital under the sub-advisory

4    agreement.  Okay?

5    A    Right.

6    Q    All right.  So, before the Acis bankruptcy was filed,

7    Dondero, and at that time, in control of Highland, were

8    actually in the process of liquidating Acis, weren't they?

9    A    Were they in the process of liquidating Acis?

10   Q    Uh-huh.

11   A    And I take it these are the transfers that were --

12   concerning your client that prompted the filing of the

13   involuntary petition itself?

14   Q    Correct.

15   A    Is that what you're referring to as the --

16   Q    Yes.

17   A    -- liquidation?

18   Q    Yes.

19   A    Well, I certainly know that -- I understand those

20   transfers were taking place.  Now, whether you'd call that a

21   liquidation or not, I don't know, but I know what you're

22   referring to --

23   Q    Okay.

24   A    -- and I think the answer to your --

25   Q    So, --

Nelms - Cross                                96

1  A    Yeah.

2  Q    Yeah.  So there were a variety of transfers of assets away

3  from Acis before --

4  A    Right.

5  Q    -- the Acis bankruptcy filing, right?  And, actually, are

6  you aware that there was actually an agreement between

7  Highland CLO Management and Acis to transfer those PMAs to

8  HCLOF Management?

9  A    No, I'm not aware of that.

10  Q    Okay.  And as we talked about earlier, HCLOF repeatedly

11  attempted to redeem the CLOs, even during the Acis bankruptcy,

12  right?

13  A    I read about that in Judge Jernigan's opinion, so I'm

14  assuming that's the case.

15  Q    Right.  Okay.  And then -- and, in fact, if HCLOF was

16  successful, that would liquidate the CLOs and it would

17  effectively terminate the Acis portfolio management

18  agreements, right?

19  A    I don't know.

20  Q    Okay.  But if that was the case, if the portfolio

21  management agreements went away or no longer had assets to

22  manage, then the sub-advisory agreement would have no income,

23  right?

24  A    If you're asking me if that's something within the realm

25  of possibilities, I suppose so.

Nelms - Cross                              97

1   Q    Okay.  So, if, because of the appeal, the Acis bankruptcy

2   -- because of the order for relief appeal, if the bankruptcy

3   -- if the Acis bankruptcy just went entire away, just

4   disappeared, right, so Mr. Dondero would be in control of

5   Acis, not you, right?

6   A    He would be in control.  That's correct.

7   Q    Okay.  And so if he wanted to terminate the PMAs and enter

8   new PMAs with Dondero Capital Management, you couldn't keep

9   him from doing that, could you?

10  A    Well, I -- no, I could not keep him from doing that.

11  Q    Okay.  Or if he wanted to terminate the sub-advisory

12  agreement and enter into a different agreement, I mean, you

13  couldn't keep him from doing that, either, could you?

14  A    No, I couldn't.

15  Q    Right.  So what makes you think that Highland Capital

16  Management, a debtor that he lost control of, just like Acis,

17  would benefit from Acis's PMAs, when he was actively trying to

18  take Acis's PMAs away from Acis?

19  A    Well, I have -- I spoke to Mr. Dondero about this, and he

20  -- I asked him the question, and he said that he would

21  reinstate Highland under the sub-advisory agreement and the

22  shared services agreement.

23  Q    Okay.  So, on that point, you did mention earlier that, as

24  part of your -- as part of the Board's diligence, you talked

25  with Mrs. O'Neil and you talked to Pachulski.  Obviously,

Nelms - Cross                                98

1  you've analyzed the issues.  I can tell you're familiar with

2  all these, all of the pleadings.  But you also talked with

3  different Highland Capital employees about the litigation and

4  the appeals, correct?

5  A    I did.

6  Q    Okay.  Who did you talk with?

7  A    Well, I have to say that the interaction with Highland

8  employees was actually fairly abbreviated.

9  Q    Uh-huh.

10 A    We spoke very, very briefly about this with Isaac Leventon

11 on the day that we were appointed.  I don't know if the Court

12 is aware of this or not, but we spoke about it very briefly,

13 and then he was injured later that night and he really hasn't

14 been back at the office since then.  So, --

15 Q    Oh.

16 A    -- I would say, for the most part, I have relied mainly on

17 Pachulski.

18 Q    Okay.  But you did indicate you talked to Mr. Dondero as

19 well?

20 A    I talked to him about this issue about reinstatement, yes.

21            MR. LAMBERSON:  So, Your Honor, I'd like to turn to

22 --

23            THE WITNESS:  Oh, you don't have to call me Your

24 Honor.

25            THE COURT:  There are two Your Honors.

APP. 0326
Appx. 00373

Nelms - Cross                                    99

1           MR. LAMBERSON:  Your Honors.  How about that?

2           THE COURT:  Okay.

3           THE WITNESS:  Yeah, there's only one judge in the

4    court today.

5    BY MR. LAMBERSON:

6    Q    Could you turn to Exhibit 16, please?  This is Acis's

7    Exhibit 16.  I'm sorry.  Do you have that, Mr. Nelms?

8    A    I do.

9    Q    And could you identify Acis Exhibit 16?

10   A    Yes.  This is Official Form 204 in the current case, the

11   one we're here for today.

12   Q    Right.  So it's the Top 20 List of Creditors for Highland

13   Capital Management?

14   A    Yes, that's correct.

15   Q    Okay.  And have you seen Exhibit 16 before?

16   A    Pardon me?

17   Q    Have you seen Exhibit 16 before, the Top 20 List?

18   A    No, I have not seen it before.

19   Q    Okay.

20           MR. LAMBERSON:  Your Honor, we'd ask for the

21   admission of Exhibit 16.

22           THE COURT:  Any objection?

23           MR. MORRIS:  Just on relevance grounds.  Can we at

24   least establish a foundation as to which element of 327(e)

25   this goes to?

Nelms - Cross                              100

1          THE COURT:  Response?

2          MR. LAMBERSON:  Well, Your Honor, what I'm going to

3   point out is that the top ten creditors, other than an insider

4   creditor, are all litigation-based, and that the, as I pointed

5   out in my opening, the origin of this case was a bad

6   litigation strategy.

7          MR. MORRIS:  No objection to the introduction of this

8   exhibit for that limited purpose.

9          THE COURT:  All right.  It's admitted.

10      (Acis Capital Management GP, LLC's Exhibit 16 is received

11   into evidence.)

12  BY MR. LAMBERSON:

13  Q    All right.  So, Mr. Nelms, you said you hadn't seen this

14  before, but I think you'll probably be familiar with the

15  information on it generally.  So let's walk through this

16  quickly.  So, this is the Top 20 List of Creditors.  The first

17  creditor is Redeemer Committee, listed as litigation, do you

18  see that, for about $190 million?

19  A    Yes.

20  Q    And that's the arbitration award that precipitated this

21  filing, correct?

22  A    It is.

23  Q    Okay.  So the next claim is Pat Daugherty, litigation

24  claim.  It's $11.7 million.  Do you see that?

25  A    Yes.

Nelms - Cross                              101

1   Q    So, do you know what is Mr. Daugherty's history with

2   Highland Capital?  And try to keep it under five minutes.

3   A    Yeah.  Mr. Daugherty is a former employee.  And I know he

4   has some contractual disputes with the company based upon his

5   separation.

6   Q    Right.  And he's a long-time litigant with Highland

7   Capital, correct?

8   A    He is, yes.

9   Q    Yes.  So the next one is CLO HoldCo.  This is about $11.5

10  million.  CLO HoldCo is an insider of the Debtor, correct?  If

11  you know.

12  A    Is -- is it an insider?  I don't know.

13  Q    Okay.  Well, Grant Scott, the party here, is Mr. Dondero's

14  college roommate.  Do you know that?

15  A    That's my understanding, yes.

16  Q    Okay.  So, Creditor #4, McKool Smith, for two point --

17  roughly $2.1 million.  Do you see this?  This is for

18  attorneys' fees incurred by Highland Capital, correct?

19          MR. MORRIS:  Objection, Your Honor.  I still fail to

20  see how this is at all connected to any of the elements of

21  327(e) or the retention of Foley.

22          THE COURT:  Okay.  I overrule.

23  BY MR. LAMBERSON:

24  Q    So, this is -- this -- these are fees incurred by Highland

25  Capital, you know, a variety of venues, right, including this

Nelms - Cross                                    102

1  one, state court fights against Mr. Terry, right?

2  A   I thought -- McKool Smith, I thought they were involved in

3  the Redeemer litigation, but they may be involved in other

4  litigation as well.

5  Q   Okay.  Fair enough.  And do you know, this claim is

6  disputed by the Debtor, correct?

7  A   Yes.

8  Q   Okay.  And do you know, obviously subject to the stay, but

9  do you know if this claim is being arbitrated or has been sent

10 to arbitration?

11 A   No, I don't know any -- no, I don't know.

12 Q   Okay.  That's fair enough.  So, then #5 -- I'll move it

13 along here.  Meta Discovery, Meta-e Discovery, they're a

14 litigation vendor, right?

15 A   I'm sorry, would you ask your question again?

16 Q   Meta-e Discovery, the next creditor.  They're a litigation

17 vendor and they provide litigation support services?

18 A   I don't know what they do.

19 Q   Okay.  Fair enough.  Foley Gardere.  Obviously, that's the

20 law firm you all are seeking to have engaged.  DLA Piper.

21 This relates to fees incurred in connection with the Terry

22 arbitration award, correct?

23 A   I think so.

24 Q   Okay.  Reid Collins.  These are fees related to the UBS

25 lawsuit, correct?

Nelms - Cross                                103

1   A    I don't know.

2   Q    Okay.  Josh and -- Joshua and Jennifer Terry.  This is a

3   litigation claim, right?  This is -- this is an IRA claim,

4   right?

5   A    It is.

6   Q    NWCC.  This is also a litigation claim?  In other words, a

7   litigant fighting with Highland?

8   A    I can only intuit that just because of the fact that it's

9   a law firm.

10  Q    Okay.  Fair enough.  So, out of the Top 20 -- or, out of

11  the Top 10 Creditors, basically, they're all litigants or

12  attorneys paid to fight litigants, with the exception of

13  Dondero's college roommate.  Right?

14  A    With the exception of what?

15  Q    Mr. Dondero's college roommate that has a claim based on

16  some entity.

17  A    Yes.  They're -- they all have some nexus to litigation.

18  Q    Okay.  And let me just ask you:  If you were able to

19  completely set aside all of Highland Capital's litigation

20  issues, right, just like -- just like the concept of the order

21  for relief appeal makes the Acis bankruptcy go away forever,

22  if you could snap your fingers and make all of Highland's

23  litigation go away forever, would Highland have any financial

24  problems at all?

25  A    Well, I don't know that I know the answer to that, but I

Nelms - Cross                          104

1   -- but it's certainly to say that litigation up to this point

2   has been the driving force behind its bankruptcy filing.

3   Q   Okay.  Fair enough.  Okay.  So, Mr. Nelms, would you turn

4   -- could you turn to Acis Exhibit 27?

5   A   Okay.

6   Q   Do you have that?

7   A   I do.

8   Q   Okay.  And can you identify Exhibit 27?

9   A   Yes.  My understanding is that this was the lawsuit that

10  was filed by the DAF and CLO HoldCo in the Southern District

11  of New York.

12  Q   Okay.  And so I had mentioned this in my opening, and I

13  believe counsel had asked you about what we call the DAF

14  litigation.  Is this the complaint that's the basis of the DAF

15  litigation?

16  A   Yeah, that's my understanding.  It is.

17  Q   Okay.  And I think you had testified earlier that the

18  board was actually shown a copy of this complaint, was before

19  it was filed, and --

20  A   I wouldn't call it -- I'm sorry, go ahead, ask your

21  question.

22  Q   No, no, I -- that's fine.

23  A   I wouldn't call it a board presentation.  I just remember

24  it being handed to Mr. Dubel and Mr. Dubel looking at it,

25  asking what it was, and saying, Tell them not to do this.

Nelms - Cross                           105

1   Q   Okay.  Thank you.  And -- but it's your understanding that

2   the complaint was filed anyway?

3   A   It is my understanding it was filed later.

4   Q   Okay.  And in fact, this has a file-stamp at the top,

5   which I'm sure you're very familiar with.  Correct?  Has a

6   PACER file-stamp at the top.

7   A   Right.

8   Q   Right.

9          MR. LAMBERSON:  So, Your Honor, we'd ask for the

10  admission of Exhibit 27.

11         THE COURT:  Any objection?

12         MR. MORRIS:  No objection.

13         THE COURT:  Admitted.

14     (Acis Capital Management GP, LLC's Exhibit 27 is received

15  into evidence.)

16         MR. LAMBERSON:  And I'll be relatively quick.

17  BY MR. LAMBERSON:

18  Q   I had mentioned in my opening that we -- I should say Acis

19  was concerned that Highland Capital Management had some

20  participation in this, and I probably should have been clearer

21  in saying that Highland Capital Management employees had some

22  participation in Exhibit 27.  Has the Board done any

23  investigation as to whether any Highland Capital employees

24  were involved in the preparation of Exhibit 27 or the filing

25  of Exhibit 27?

Nelms - Cross                              106

1    A    No, we have not.  At least, let me speak for myself.  I

2    haven't done that investigation.

3    Q    Uh-huh.  And your counsel had mentioned that -- I believe

4    this is correct -- your counsel had mentioned that you all had

5    reached out -- the Board, I should say -- reached out to Grant

6    Scott, who's the -- who's in control of the DAF as well as CLO

7    HoldCo, and, you know, had sort of convinced them that it

8    probably -- to dismiss this lawsuit.  Correct?

9    A    Yes.

10   Q    Okay.  And but do you -- as far as you know, it hasn't

11   been dismissed yet?

12   A    It hasn't been dismissed.  There's some kind of technical

13   things there, and I don't know if you want to go into them or

14   not, but it hasn't been dismissed, but I have a high degree of

15   certainty that this is going to get dismissed.

16   Q    Okay.  Fair enough.  And are you aware that there was

17   already a press release issued related to this lawsuit that

18   was picked up by various CLO publications?

19   A    When you say "already," are you talking about a specific

20   time?

21   Q    Well, that -- I guess what's I'm getting at is are you

22   aware that the filing of this lawsuit has already resulted in

23   various articles in CLO journals, periodicals?

24   A    I'm aware of it having appeared in one publication.

25   Q    Okay.  And so is it fair to say that the damage is already

Nelms - Cross                        107

1    done and that, you know, dismissal of these claims probably

2    isn't really all that -- isn't really all that significant

3    when they've already, you know, put it in the press?

4    A    I don't know if the damage has already been done or not.

5    Q    Okay.

6          MR. LAMBERSON:  Give me just a second, Your Honor.

7          THE COURT:  Okay.

8       (Pause.)

9    BY MR. LAMBERSON:

10   Q    So, there is actually one other -- there is one point.

11   And I told you in advance that I was afraid I might be jumping

12   around a little bit, so I'm going to jump around a little bit.

13   Let me go back to the order for relief appeal.  So, this is

14   the appeal of the Court's order for relief that started the

15   Acis bankruptcy.

16       One of the things you testified about related -- on your

17   direct testimony is one of the benefits, one of the potential

18   benefits, understanding we don't know what's going to happen,

19   of the order for relief appeal is that if the -- if that

20   ruling was reversed and the Acis bankruptcy went away, then

21   the adversary would go away, the adversary between Acis

22   Capital Management and Highland Capital Management.  Correct?

23   A    Well, yes.  In my opinion, the adversary opinion -- excuse

24   me, the adversary proceeding would go away.  Would a lawsuit

25   under TUFTA be avoided altogether by Mr. Terry?

Nelms - Cross                                    108

1  Q    Right.

2  A    I don't know that it would take that away.

3  Q    Okay.  And that's -- you actually anticipated my question,

4  --

5  A    Uh-huh.

6  Q    -- which was:  It's fair to say that, even if the

7  adversary went away between Acis and Highland Capital

8  Management, that the -- certain of the claims in the adversary

9  -- for example, the fraudulent transfer claims or derivative

10 claims -- would not necessarily go away because they could be

11 asserted by Mr. Terry as a judgment creditor, correct?

12 A    They could, but the consequences of asserting that claim

13 outside of bankruptcy are vastly different than asserting them

14 inside of a bankruptcy case.

15 Q    Uh-huh.  Right.

16 A    At least potentially.

17 Q    And just to close the thought here, are you aware that one

18 of Acis's main arguments during the order for relief trial was

19 that we didn't need an involuntary, that Mr. Terry could just

20 go litigate all that stuff in state court?

21 A    Yeah, I think so.  I think I am aware of that.  Yes.

22 Q    Okay.  So you'd agree with me that, even on your possible

23 day on the order for relief appeal, that doesn't make the --

24 what I'll call the Terry litigation, right, the judgment

25 litigation, go away?

                          Nelms - Redirect                    109

 1  A    No.  No.  The reversal on appeal would not necessarily

 2  make the Terry litigation go away.

 3  Q    Okay.  Thank you.

 4            MR. LAMBERSON:  That's all I have, Your Honor.

 5            THE COURT:  All right.  Redirect?

 6            MR. MORRIS:  I just have a few questions, Your Honor.

 7            THE COURT:  Okay.

 8                      REDIRECT EXAMINATION

 9  BY MR. MORRIS:

10  Q    Can you turn to Exhibit 16 in your binder, sir?

11  A    Which one?

12  Q    I guess it's the Acis exhibits.

13  A    The Acis?  Okay.

14  Q    Yeah.  The List of Top 20 Creditors.

15  A    Okay.

16  Q    You were taken through each and every one of those to make

17  the point that they're largely litigation claims.  Is that

18  fair?

19  A    Say again, please?

20  Q    You were taken through many of those creditors to

21  establish that --

22  A    I was.

23  Q    -- that the Debtor was involved in a lot of litigation; is

24  that right?

25  A    It was.

                              Nelms - Redirect                    110

1   Q   Okay.  And the Board was appointed on January 9th; is that

2   right?

3   A   Yes.

4   Q   Did the Board have anything to do with any of the claims

5   that are set forth in Exhibit 16?

6   A   No.

7   Q   Did the Board authorize the filing of any suits that are

8   related to any of the claims that are set forth in Exhibit 16?

9   A   No.

10  Q   Did the Board direct the defense of any suits that were

11  commenced against Highland with respect to Exhibit 16?

12  A   No.

13  Q   Okay.  Has the Board been trying to diminish and eliminate

14  litigation where it thought it was in the Debtor's best

15  interests?

16  A   It has.

17  Q   And is that, for example, why the Board decided not to

18  pursue the Winstead matter?

19  A   It is.

20  Q   Is that why the Board has used its efforts to try to

21  thwart the DAF litigation?

22  A   Yes.

23  Q   Does the Debtor control DAF?

24  A   The Debtor does not control the DAF.

25  Q   Okay.  Did the Debtor authorize -- withdrawn.  Did the

Nelms - Redirect                                111

1  Board authorize the filing of the DAF complaint?

2  A    It did not.

3  Q    Did the Board know the DAF complaint was going to be

4  filed?

5  A    Well, I mean, I know Mr. Dubel was presented with a copy

6  of the complaint.  We had noticed that that document existed.

7  But it came as somewhat of a surprise to us when it got filed.

8  Q    It came as a surprise to you?

9  A    It did.

10  Q    Because that's not what was expected after Mr. Dubel said,

11  Don't file it.  Right?

12  A    Right.

13  Q    Okay.  You were asked a bunch of questions on cross about

14  different possibilities and results and potential orders from

15  the Fifth Circuit on the assumption that the appeal was

16  granted.  Do you remember that?

17  A    Yes.

18  Q    And some of them were purported to be better or worse for

19  the Debtor.  Do you remember that?

20  A    Yes.

21  Q    If the appeal is not prosecuted, is there any chance that

22  the contracts that the Board has focused on will be

23  reinstated?

24  A    No.

25  Q    Is it fair to say that if the appeal is not prosecuted the

Nelms - Redirect                                      112

1   chances of the Debtor recovering the tens of millions of

2   dollars of revenue will be exactly zero?

3   A    Well, I don't know that it's exactly zero, but severely

4   diminished.

5   Q    Yeah.  How about getting paid a hundred-cent dollars on

6   the $8 million claim that's in the Acis litigation?  If the

7   appeal is not prosecuted, is there any chance that the Debtor

8   is likely to recover hundred-cent dollars?

9   A    Again, that possibility is severely diminished.

10  Q    Uh-huh.  How about with respect to terminating the

11  adversary proceeding in the Acis litigation?  If the appeal is

12  not prosecuted, is there any possibility of that adversary

13  proceeding just going away and being left with the arbitration

14  that you've described?

15  A    Again, a severely diminished possibility.

16  Q    You mentioned that the $8 million fraudulent transfer as

17  part of an arbitration would be very different outside of a

18  bankruptcy case.  Do you remember saying that?

19  A    I do.

20  Q    Can you explain to the Court why you believe it would be

21  different outside of a bankruptcy case?

22  A    Well, it actually goes to a case that started in my court.

23  This was the *MCAR v. Commerzbank* case in *In re Mirant*, and the

24  issue in that case, Mirant, when it filed its petition in

25  bankruptcy, was insolvent, but by the time that its bankruptcy

Nelms - Redirect                                    113

1    concluded, Mirant was a solvent entity.  And so all of its

2    creditors were paid in full, but the trust that was

3    established in the *Mirant* case brought some fraudulent

4    transfer claims that were predicated on solvency, where these

5    were constructively fraudulent as opposed to actual.

6        And so the question was, if all the creditors had been

7    paid in full, is there standing to bring fraudulent transfer

8    claims that would basically not benefit creditors but would go

9    to equity?

10       I originally -- I ruled that there was no such -- that you

11   couldn't bring such a cause of action, that the satisfaction

12   of claims in full extinguished those claims.  And I do recall

13   that one of the interesting things about that case is that a

14   lady named Elizabeth Warren wrote -- or proposed -- she

15   submitted -- they submitted an expert opinion on her behalf,

16   which I wouldn't let them file because I took the position

17   that I was an expert, the expert in the Court.

18       And in any event, it turns out I wasn't the expert.  I was

19   reversed by Judge Means on that, who said that it's not

20   limited.  It went up to the Fifth Circuit, and the Fifth

21   Circuit ruled the same thing.

22       So my takeaway from all of this is that, in a bankruptcy

23   setting, as opposed to just a state court setting, that the

24   potential recovery on account of fraudulent transfers is much

25   broader, much more unlimited than it would be in the context

Nelms - Redirect                    114

1    of a state court lawsuit.

2        So, now, there may be things that would distinguish that,

3    but that's something to be -- that's something to be troubled

4    about if you're a director of this company.

5    Q    And are these the types of things that, without, you know,

6    just divulging privileged communications, are these the type

7    of experiences and perspectives that you've shared with the

8    other board members in the context of considering the various

9    motions, the various matters for which Foley's retention is

10   sought?

11   A    Yes.

12   Q    Okay.

13           MR. MORRIS:  Just one second, Your Honor.

14           THE COURT:  Okay.

15       (Pause.)

16           MR. MORRIS:  Nothing further, Your Honor.

17           THE COURT:  All right.  Any recross on that redirect?

18           MR. LAMBERSON:  No, Your Honor.

19           THE COURT:  All right.  Thank you, Mr. Nelms.

20       (The witness steps down.)

21           THE COURT:  Any other evidence from Highland?

22           MR. MORRIS:  Your Honor, we have had admitted our

23   exhibits.  Among those exhibits are two declarations from Ms.

24   O'Neil, and so she's available in the courtroom today if

25   anybody wants to cross-examine on those issues.

O'Neil - Cross                          115

1              THE COURT:  All right.  Well, I will accept those

2    declarations as direct evidence.  Any desire to cross-examine

3    Ms. O'Neil?

4              MS. PATEL:  Yes, Your Honor.

5              THE COURT:  All right.  Ms. O'Neil, we'll go ahead

6    and swear you in on this today.

7              HOLLAND O'NEIL, DEBTOR'S WITNESS, SWORN

8              THE COURT:  All right.  Please be seated.

9                       CROSS-EXAMINATION

10   BY MS. PATEL:

11   Q   Good afternoon, Ms. O'Neil.

12   A   Good afternoon.

13   Q   Ms. O'Neil, do you concurrently represent both Highland

14   Capital Management and Neutra, which is a Cayman entity,

15   correct?

16   A   Yes.

17   Q   Okay.  There are other entities that you either represent

18   or have represented that are kind of affiliated or within the

19   Highland umbrella; is that correct?

20   A   Yes.

21   Q   Okay.  And that includes, for example, CLO HoldCo was one

22   such representation.  Isn't that right?

23   A   Previous.  Previously.

24   Q   Okay.

25   A   Not currently.

O'Neil - Cross                          116

1  Q   Okay.  So, and I believe you say that in your declaration,

2  right, that you didn't -- that you no longer represent CLO

3  HoldCo?

4  A   Correct.

5  Q   Okay.  And when did that representation cease?

6  A   It was -- it was very brief.  I came into the case after

7  the involuntary -- after the orders for relief were entered.

8  And at that time, there had been the motion to intervene that

9  included that entity, and it was determined to proceed with an

10 appeal on that motion to intervene, or the denial of the

11 motion to intervene, as well as the orders for relief.

12 Actually, there was a compendium of orders that were appealed

13 all at the same time.

14     And so, because that entity had also filed a motion to

15 intervene, we had included that in the appeal.  And at that

16 time I was retained, but then by the time we kind of analyzed

17 the issues, determined it was not necessary to proceed with

18 that appeal, then I no longer represented that entity and

19 disengaged.

20 Q   Okay.  But CLO -- to be clear, CLO HoldCo was actually an

21 appellant for the order for relief appeal that we've been

22 talking about today, correct?

23 A   Initially, yes.

24 Q   Okay.  And it still remains an appellant; it just didn't

25 file a brief in the involuntary appeal.  Isn't that right?

O'Neil - Cross                    117

1   A    It has not filed any brief.  And I would have to look at

2   the record if it even filed a notice to the Fifth Circuit.  It

3   did -- was included in the notice to the District Court.  I

4   just honestly can't recall if it was included in the -- in any

5   notice to the Fifth Circuit.

6   Q    Okay.  And did you ever withdraw from your representation

7   of CLO HoldCo in the District Court appeal?

8   A    What do you mean, withdraw?

9   Q    Well, I mean, you entered an appearance.

10  A    You mean file a notice with the -- with the Court?

11  Q    Right.

12  A    I can't recall.

13  Q    Okay.  Ms. O'Neil, with respect to Neutra, you understand

14  and you've heard testimony, and I believe it's in the

15  declarations in support of the retention papers for Foley, and

16  if you need to look at that I can direct you to the exhibit

17  book, but it's -- is it your understanding that ultimately

18  Neutra is owned 75 percent by Mr. Dondero and 25 percent by

19  Mr. Okada?

20  A    Yes.

21  Q    Okay.  And Ms. O'Neil, in connection with your

22  representation of Neutra, who are the human beings that you

23  interact with?  Who directs your services?

24  A    At -- currently?  Are you --

25  Q    Just on behalf of Neutra.

O'Neil - Cross                              118

1  A    Predominantly, I get direction from Highland's in-house

2  counsel.

3  Q    Okay.  And who would that be?  Who are the people?

4  A    The people are Mr. J.P. Sevilla, Mr. Isaac Leventon, Ms.

5  Stephanie Vitiello.  Those are the primary individuals that

6  direct vis-à-vis Neutra.

7  Q    Okay.  Have you ever spoke with Mr. Dondero regarding your

8  representation of Neutra?

9  A    Yes.

10  Q    Okay.  And when was that?  When was the last time?

11  A    It has -- it's been a while.  Certainly, it hasn't been

12  since this bankruptcy was commenced.  I think the last time I

13  recall discussing that specifically is when we were together

14  at the mediation during the course of the bankruptcy.  And I'd

15  have to look at my calendar.  I can't recall exactly when that

16  was.

17  Q    Okay.  And what about Mr. Okada?  Have you -- when was the

18  last time you spoke with Mr. Okada?

19  A    I have never spoken with Mr. Okada.

20  Q    During the course of your entire representation of Neutra,

21  you've never spoken with Mr. Okada?

22  A    That is correct.

23  Q    Okay.  And under -- do you have an understanding of under

24  what authority Mr. Sevilla or Mr. Leventon or Ms. Vitiello

25  would have to direct your legal services on behalf of Neutra?

O'Neil - Cross                          119

1   A    Generally, yes, through the direction from the owners of

2   Neutra.

3   Q    Okay.  That would be Mr. Dondero and Mr. Okada?

4   A    Correct.

5   Q    Okay.  And it's your understanding, then, that Mr. Dondero

6   and Mr. Okada have directed Highland's legal department to

7   direct your services?

8   A    Yes.  Previously, yes.

9   Q    Okay.  Do you have -- is there a contract between Neutra

10  and Highland, or --

11  A    I don't know.

12  Q    Okay.  Did you ever ask if there was one?

13  A    No, I did not.

14  Q    Okay.  In connection with your representation of Neutra,

15  do you bill separately for the Neutra representation?

16  A    Since the bankruptcy was -- since the Highland bankruptcy

17  was commenced, we set up a separate task code to track the

18  fees being incurred on the Neutra appeal.  Prior to the

19  bankruptcy, we did not have a reason to do that.

20  Q    Okay.  So let's talk about prior to the bankruptcy.  I

21  believe in your declaration it was disclosed that there were

22  approximately $2.1 million in billings relating to your

23  representation of Highland, Neutra, and certain of the

24  Highland Cayman entities:  Highland CLO Management, Highland

25  CLO Holdings, and HCF Advisor, amongst others.  Right?

O'Neil - Cross                          120

1   A    That sounds about right.  I might want to look at the

2   declaration just to confirm on the number, but that sounds

3   about right.

4   Q    Okay.  Well, your declaration can be found under Tab 10.

5   A    Okay.  (Pause.)  And are you referring to Paragraph 16?

6   Q    Well, if you look at Page -- at the bottom, you'll see

7   that there's page numbers, and it says Page 15 of 48.  And

8   this would be your declaration.

9   A    Oh, thank you.  I was looking at the --

10  Q    Uh-huh.  Paragraph 3.

11  A    -- at the application, that's all.  Correct.  Yes.  Thank

12  you.

13  Q    Firm-earned fees of two point -- roughly $2.15 million,

14  almost, correct?

15  A    Yes.

16  Q    Okay.  And there's about $1.4 million of that that was

17  unpaid from the pre-petition period, correct?

18  A    Correct.

19  Q    Okay.  And is it your testimony that, of the $2.15 million

20  in fees, that there was no apportionment between Highland,

21  Neutra, and the Cayman defendants?

22  A    Correct.

23  Q    Okay.  So, --

24  A    Not -- not in my account -- not through my accounting

25  processes.  Obviously, the time entries, you could parse them

O'Neil - Cross                         121

1  out, if need be.

2  Q   Okay.  But you didn't keep your time necessarily that way,

3  where they were already apportioned and parsed?

4  A    Not under separate task codes, --

5  Q   Okay.

6  A   -- as we have done post-bankruptcy.

7  Q   So, in connection with the billings that would have

8  represented that $2.15 million, were those bills submitted to

9  Highland, to Neutra, to the Cayman defendants?

10 A   They are submitted through an e-billing process that it

11 goes through a Highland portal and -- in the aggregate.  So

12 they're submitted through that portal.

13 Q   Okay.  But the portal goes to Highland, correct?

14 A   I do not know.  I honestly -- our e-billing department

15 handles it and I just know it goes through e-billing, an e-

16 billing portal, and I don't know exactly.  I'm assuming

17 obviously it goes to Highland.  They certainly get copies of

18 it.

19 Q   Okay.  Did you or Foley ever submit a bill to Neutra?

20 A   I mean, my understanding is that, going through the

21 portal, we would go to the various parties that are affiliated

22 with Highland.

23 Q   Okay.  But you've never directly sent a bill to Neutra for

24 your representation of Neutra?

25 A   As I said, it goes through e-billing, so that could be

O'Neil - Cross                              122

1  interpreted to go directly to them if it goes through an e-

2  billing process.

3  Q   Okay.  But I'm asking, have you ever --

4  A   I'm -- maybe I'm being hyper-technical, but I'm just --

5  Q   Right.

6  A   It's being submitted through --

7  Q   I understand, but I just -- here's where I want to just

8  direct us, is:  Have you ever addressed a bill to Neutra, Ltd.

9  care of either Mr. Dondero, Mr. Okada, or its formal business

10 address?

11 A   As I indicated, post-petition, we have been segregating

12 them under a different task code and indicating it's Neutra.

13 Pre-petition, it was all under the same invoice.

14 Q   That was submitted to Highland only?

15 A   Submitted through the e-billing process.

16 Q   To Highland only, right?

17         MR. LAMBERSON:  Objection to the form of the

18 question.  This has been asked about four times.  The witness

19 is very clear.

20         THE COURT:  Overruled.  I think she's trying to get

21 an exact answer to her question, and she feels like she's not

22 getting it.  So, overruled.

23         THE WITNESS:  Okay.  Then I apologize, Your Honor.

24 I'm not -- I just don't know technically, once it goes through

25 the e-billing, how it's distributed on the other side.  I

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 355 of
2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 354 of
2722

```
                        O'Neil - Cross                        123
```

1   just, I honestly --

2           THE COURT:  I think the question is, to whom was the

3   invoice directed?

4           THE WITNESS:  In terms of the -- not where it was

5   sent, but who it's directed to?

6   BY MS. PATEL:

7   Q    Yes.

8   A    It would have -- I believe it has the entities on it.  It

9   definitely has Highland on it for sure.

10  Q    Okay.  Does it have Neutra on it?

11  A    Neutra is subject to the engagement letter, so it would be

12  applicable to -- if our accounting department didn't

13  technically put Neutra on it, that is not necessarily at any

14  moment being -- as the engagement letter is -- was with all

15  those parties.  So I would have to look at the invoice, if it

16  has all of the clients listed on there.  I honestly -- I just

17  can't remember right now.

18  Q    Okay.  Well, --

19  A    We do have some post-petition invoices, and you'll see

20  where they're segregated with Neutra.

21  Q    You raise an interesting point.  If Highland and Neutra

22  and the other entities are all part of the engagement letter,

23  is Neutra also liable for all of Highland's legal fees?

24  A    I don't know the answer to that.

25  Q    Okay.  Is it your position that because Highland, Neutra,

O'Neil - Cross                        124

1   and the Cayman defendants are all part of the engagement

2   letter, that Highland is responsible for Neutra's legal fees?

3   A    From my firm's standpoint?

4   Q    Yes.

5   A    I think the, you know, our perspective is that they were

6   -- we were primarily working for Highland, so the beneficial

7   work, and as I think the Court knows, most of the work here

8   was on behalf of Highland Capital Management.  And it's in our

9   engagement letter to that effect, effectively.

10  Q    Sitting here today, Ms. O'Neil, post-petition, who's

11  calling the legal shots for purposes of Neutra?

12  A    The -- well, where we have been is the process with the

13  Fifth Circuit.  The Fifth Circuit schedule was already set

14  pre-petition, and we have just been complying with the pre-

15  petition -- or, rather, that schedule, which has rolled post-

16  petition.  And so our direction pre-petition has just

17  continued in terms of proceeding with the briefing.  And so,

18  again, going back to who it was pre-petition, it's the same

19  legal team giving instructions on behalf of Neutra.

20  Q    Okay.  And if the question were to be posed, for example,

21  whether the Neutra involuntary or the order for relief appeal

22  should be dismissed, for example, who would call the legal

23  shots on that?  Who would make the decision on that?

24  A    To dismiss the appeal?

25  Q    Yeah.

O'Neil - Cross                        125

1   A    Not proceed with it up to this point?  Despite where we

2   are at this point, to just -- to just drop it?

3   Q    Yes.

4   A    It would be the owners of Neutra.

5   Q    So that would be Mr. Dondero and Mr. Okada, right?

6   A    Yes.

7   Q    Okay.  You -- Ms. O'Neil, were you in the courtroom when

8   Mr. Demo or -- and Mr. Nelms -- when Mr. Demo made the opening

9   statement and then when Mr. Nelms was testifying?

10  A    Yes.

11  Q    Okay.  And you heard, again, the opening statement and

12  then the testimony regarding the benefit to Highland of

13  Highland paying for Neutra's legal fees in connection with the

14  appeals, correct?

15  A    I did hear that, yes.

16  Q    Okay.  All right.  And can you, in your words, then,

17  articulate, from your perspective as legal counsel to both

18  entities, what the benefit is to Highland in this bankruptcy

19  for Foley's representation of Neutra and Highland paying the

20  bill for it?

21  A    I just want to make sure I'm not, you know, getting onto

22  attorney-client privileged discussions in terms of the

23  benefit.  I think I would agree with what has been stated in

24  court today.

25  Q    Okay.  So, so, and just to kind of recap that, if I

O'Neil - Cross                    126

1    understand it, it's that if Neutra is successful in its appeal

2    of the involuntary orders for relief and also its appeal of

3    the confirmation order, then everything goes back and Highland

4    gets this revenue stream, correct, of about $12 million, plus

5    it gets paid on an $8 million, approximately, purported claim.

6    Right?

7    A    That the -- the agreements would be reinstated, which

8    would then yield approximately that type of revenue stream as

9    -- pursuant to the sub-advisor and sub-management agreements

10   that were in place.

11   Q    Okay.  And one of the entities -- and I know that the

12   retention application doesn't actually go to, anymore, Foley's

13   representation of the Cayman entities, but -- that's kind of

14   been put to the side.  But you do -- and you do represent

15   Highland CLO Management, correct, which is a Cayman entity?

16   A    Correct.

17   Q    All right.  And it's one of the defendants in the Acis

18   adversary proceeding, right?

19   A    And that is the only engagement that we have for that

20   party, is in conjunction with that adversary proceeding, which

21   is stayed.  So nothing is going on with that right now.

22   Q    Well, I understand that, but you --

23   A    Okay.

24   Q    My question was, you represent Highland CLO Management,

25   correct?

O'Neil - Cross                          127

1   A    In that adversary proceeding.

2   Q    Okay.  So -- but you also represent it in connection with

3   -- in -- generally with the bankruptcy as well, Acis's

4   bankruptcy?

5   A    There was no involvement until the adversary proceeding,

6   until they were sued in the adversary proceeding.

7   Q    Okay.  And in the adversary proceeding, Highland CLO

8   Management was sued for a few things, correct?

9   A    In the adversary proceeding?

10  Q    Yes.

11  A    Yes.

12  Q    Okay.  Highland CLO Management, for example, received a

13  $9.5 million note that Acis was previously the holder of and

14  that was transferred after Mr. Terry's judgment, correct?

15  A    Are you asking if that was an allegation in the adversary

16  proceeding?

17  Q    Sure.

18  A    I --

19  Q    Right.

20  A    That sounds right.  That's been stayed, and I would have

21  to defer to the -- obviously, the second amended complaint and

22  the allegations therein.  So, --

23  Q    Okay.  And are you aware that your client, Highland CLO

24  Management, was also sued because it was to receive the

25  portfolio management agreements under which Acis represents --

O'Neil - Cross                                    128

1    or, I'm sorry, manages the Acis CLOs?

2    A    That was -- that sounds like one of the allegations from

3    that point in time.

4    Q    Okay.  So I guess let me -- let me ask you a slightly

5    different way.  Are you aware that there was a pre-petition

6    agreement that was entered into and signed by Mr. Dondero that

7    transferred the PMAs from Acis to Highland CLO Management?

8    A    I cannot recall the -- all the evidence at the -- in

9    conjunction with that at this time, but if that's one of your

10   representations.  I wasn't representing any of the parties at

11   that time, but I do recall that there may have been some

12   evidence presented in that regard.  But I would have to look.

13   It's been a long time.  And that record is hundreds of

14   thousands of pages.  I would need to check back on that.

15   Q    Okay.  But if there were such an agreement, for example,

16   that transferred the portfolio management agreements from Acis

17   to another entity, a Cayman entity, can you agree with me,

18   then, that Mr. Dondero's ownership interest in Neutra would

19   really be of no import anymore because there wouldn't be a $12

20   million revenue stream anymore, would there, if Acis wasn't

21   the portfolio manager of the Acis CLOs?

22   A    I don't agree with the premi... at the end, when you said,

23   if Acis isn't the CLO manager, then there would be no revenue

24   stream from the CLOs if it's not reinstated as the -- as the

25   manager.

```
                          O'Neil - Cross                    129
```

1   Q    Okay.  So you agree that if Acis isn't the portfolio

2   manager of the Acis CLOs, there's no $12 million revenue

3   stream potential to Highland by virtue of Highland coming back

4   in as the sub-advisor and shared services provider, right?

5   A    Okay.  Now, the -- no, I don't know that that's

6   necessarily the case.

7   Q    Well, why not?

8   A    It could be appointed to be the sub-advisor, sub-manager

9   for -- through a different entity.

10  Q    Okay.  So it would basically be -- but, again, going back,

11  it would be through a different entity.  Again, Mr. Dondero's

12  ownership of Neutra would be of no import then, right?

13  A    Perhaps I'm not understanding your question.

14  Q    Well, --

15  A    I -- it's a hypothetical, and I --

16  Q    If Acis -- if Acis didn't have these portfolio management

17  agreements, it doesn't matter if Mr. Dondero wins the Neutra

18  appeal or not, right?  Because he wouldn't have control of the

19  Acis entity within which to redirect, through Acis, the sub-

20  advisory and the shared services agreements, correct?

21  A    He could direct it through another entity, as I think it's

22  been well-discussed that Highland had -- Highland had the

23  personnel to manage the CLOs.  In fact, Mr. Terry was a

24  Highland employee when he managed the CLOs.  So he could

25  certainly direct that management through another entity, even

```
                    O'Neil - Cross                     130
```

 1  if it wasn't Acis.  But vis-à-vis Neutra, Neutra would be --

 2  well, before the confirmation of the plan, Neutra owned Acis.

 3  So, vis-à-vis through Neutra, I believe your statement would

 4  be correct.

 5  Q   Okay.  Ms. O'Neil, also as sort of a participant during

 6  the Acis bankruptcy cases --

 7        MS. PATEL:  And Your Honor, I know you're intimately

 8  familiar with all of these.

 9  BY MS. PATEL:

10  Q   But Ms. O'Neil, do you recall the multiple attempts during

11  the bankruptcy case to effectuate what was called an optional

12  redemption, which sought to liquidate the Acis CLOs?

13  A   By HCLOF, I believe there were two instances, yes.

14  Q   Okay.  HCLOF executed those optional redemptions, correct?

15  Mr. Bill Scott, one of the independent directors?  Is that

16  right?

17  A   I believe the evidence was presented before the Court --

18  Q   Okay.

19  A   -- in that regard.

20  Q   And during the course of the -- all of those proceedings

21  with the optional redemptions, Highland was the ultimate

22  advisor to HCLOF, was it not?

23  A   I'm not sure I understand what you mean by the ultimate

24  advisor.

25  Q   Well, the technical contractual advisor was an entity by

O'Neil - Cross                                131

1    the name of Highland HCF Advisor, right?  Is the portfolio

2    manager for Highland CLO Funding?

3    A    It has been a while since I looked at that org chart or

4    those issues, so I do not recall off the top of my head.

5    Q    Okay.  Well, you said that you interacted, for example,

6    with Neutra -- on your Neutra issues with JP Sevilla, Mr.

7    Leventon, and Stephanie Vitiello, correct?

8    A    Yes.

9    Q    Okay.  Wasn't it really, from a legal perspective, at

10   least, Mr. Sevilla, Mr. Leventon, who were all advising

11   Highland CLO Funding as well?

12   A    I don't know the answer.  You'd have to inquire of them.

13   Q    So, is it your testimony, then, that Highland had nothing

14   to do with the optional redemption notices that were issued

15   during the course of the Acis bankruptcy cases?

16   A    I'm not sure that I understand the relevance of that as to

17   whether Highland had any -- had nothing to do with it.  I

18   think they were certainly involved and were aware.  But they

19   weren't the -- independently making those determinations.

20   Q    Okay.

21   A    As you know, Ms. Patel, there were directors that were

22   involved.  They testified before this Court.  There -- HCLOF

23   was represented by counsel as well.  King & Spalding.  So

24   there were multiple parties involved.

25   Q    Okay.  So is it, again, your testimony that Highland had

O'Neil - Cross                            132

1  nothing to do with the optional redemption notices that were

2  issued during the Acis bankruptcy case?

3          MR. MORRIS:  Objection, Your Honor.  It may be me,

4  but I don't understand what this has to do with the Foley

5  retention application.

6          THE COURT:  Okay.  We do seem like we're getting a

7  little far afield.  What's your response to that?

8          MS. PATEL:  Your Honor, the contention has been made

9  that if these bankruptcy appeals are somehow granted or in the

10 District Court and this Court are reversed, --

11         THE COURT:  Uh-huh.

12         MS. PATEL:  -- that these cases are going to come

13 back and that suddenly, magically, there's going to be a $12

14 million revenue stream flowing out of Acis back into Highland,

15 and they're going to be able to collect on an $8 million

16 objected-to claim.

17    I'm just trying to get to how likely is that really to

18 happen.  I mean, given the course -- and again, I know Your

19 Honor was a viewer of all of this -- of the multiple attempts

20 to try to liquidate these assets, --

21         THE COURT:  Okay.  I'll allow the question, but it'll

22 be the end of the line of questioning.  Okay?

23         MS. PATEL:  Understood.  And Your Honor, just

24 additionally, it's -- that's part of the appeal that Foley is

25 handling on the confirmation appeal.  As Mr. Nelms said, it's

```
                        O'Neil - Cross                        133
```

1  also based on the plan injunction.

2          THE COURT:  All right.  She can answer the question,

3  but then we move on to another area.

4          MS. PATEL:  Okay.

5  BY MS. PATEL:

6  Q   So is it your testimony, Ms. O'Neil, that Highland had

7  absolutely nothing to do with the optional redemptions --

8  A   I did not --

9  Q   -- during the bankruptcy case?

10 A   That is not what I said.

11 Q   Okay.  So, -- and I get it.  Highland CLO Funding is a

12 different entity, and the Bankruptcy Court made findings with

13 respect to the fact that it is controlled in every way by

14 Highland.  Do you recall that finding?

15 A   Preliminary findings in conjunction with determining

16 whether there was a likelihood of success on the merits.  I do

17 recall that --

18 Q   Okay.

19 A   -- those conclusions by the Court.

20 Q   As a part of the bench memorandum in support of the

21 confirmation order, correct?

22 A   Yes.

23 Q   Okay.

24 A   Actually, I will -- I will -- I'll correct that.  I'll let

25 that -- the Court's order speak for itself.  You may have said

O'Neil - Cross                          134

1  a few things that were more or less than what the Court's

2  order said, so I'd just defer to what the Court's order said.

3  Q   Okay.  Well, part of the representation for Foley here is

4  to represent Highland and Neutra in connection with the

5  confirmation appeal, correct?

6  A   Yes.

7  Q   And part of that confirmation appeal is also -- one of the

8  grounds there is that you're appealing the plan injunction,

9  which the plan injunction is what stops the CLOs from being

10  redeemed, correct?

11  A   Correct.

12  Q   Okay.  So, how is Highland damaged by the plan injunction?

13  A   I think it's fairly obvi... again, I want to not tread too

14  much on attorney-client privilege.  But, obviously, I have yet

15  to have a client over my 30-plus years of practicing law that

16  likes to be subject to any kind of injunction.  It limits --

17  that injunction is more than just on the -- it's a very broad

18  injunction.  So I'd like -- if I had the injunction in front

19  of me, there's -- there's lots of restrictions under that

20  injunction, and that is prejudicial to Highland to be able to

21  act freely.

22  Q   Able to act freely to liquidate CLOs?

23  A   Among other things, as it may do in the ordinary course of

24  business, in its opinion, that may be beneficial to his

25  clients.

O'Neil - Cross                                135

1  Q    Okay.  Now, Ms. O'Neil, --

2  A    If I may, may I add one more thing?

3           THE COURT:  You may.

4           THE WITNESS:  Okay.  Highland, at least in that role,

5  could not liquidate CLOs.  So I think that was an improper

6  statement.  Or suggestion.

7  BY MS. PATEL:

8  Q    Okay.  Well, then, what specific actions that Highland

9  would like to take is it being damaged by the injunction?

10 A    I would need to look at the -- the injunction is very,

11 very broad.  So, anything that it can't do freely that is

12 covered by the injunction is obviously a detriment to

13 Highland.

14 Q    Okay.  Now, Ms. O'Neil, if you would turn to Tab 31 in the

15 book, --

16 A    All right.

17 Q    -- please.  And I will ask you, this is the declaration of

18 Bradley Sharp that was in support of the order authorizing the

19 retention of Foley Gardere.  Have you had an opportunity to

20 review this?

21 A    Yes.

22 Q    Any dispute with any of the statements in here?

23 A    I don't recall having a -- I don't -- I think it was

24 accurate, but --

25 Q    Okay.  Well, when you read it, did you have any disputes

O'Neil - Cross                           136

1  with the statements that were in here?

2  A    I did not see it before it was filed, so -- but having

3  read it after it was filed, I don't recall having any disputes

4  with anything that was in it.

5  Q    Okay.  And I'll turn you specifically to Paragraph 13,

6  which is found on Page 4 of 5.

7  A    Okay.

8  Q    And I'll -- well, let's look at this together.  (reading)

9  Prior to the petition date, the majority of Foley's and Lynn

10  Pinker's fees and expenses were paid by a non-debtor entity,

11  Highland CLO Funding Limited.

12       Do you see that?

13  A    Yes.

14  Q    Okay.  And were Foley's bills sent to Highland CLO

15  Funding?

16  A    Yes.

17  Q    Okay.  And is -- were those bills separate and apart from

18  the $2.15 million that we talked about earlier that were

19  remitted through the Highland e-billing system?

20  A    Separate, yes.

21  Q    Okay.  About how much in fees has Highland CLO Funding

22  paid to Foley to date?

23  A    Nothing post-petition.  Prior -- I mean, during -- from

24  the inception of the representation of Highland, probably

25  approximately -- over a million dollars, for sure.

```
                        O'Neil - Cross                    137
```

1   Q   Over $2 million?

2   A   I do not believe it is over $2 million.  It's somewhere

3 between $1 and $2 million.

4   Q   Okay.  And those separate matters that were billed to

5 Highland CLO Funding, how did those differ from what was

6 billed to Highland or to Neutra or to the Cayman defendants?

7   A   If it was a matter that was clearly of some benefit to

8 HCLOF, it was billed directly.  Otherwise, there was an

9 allocation billing for just the general work.  And that was

10 primarily through an indemnity agreement, as I understood it,

11 between Highland and HCLOF.

12   Q   Okay.  And who did the allocation between Highland and

13 Highland CLO Funding?

14   A   I was instructed as to what the allocation should be or

15 asked what I thought the allocation should be on any given

16 time, and I believe it was the -- it was discussed with the

17 board of HCLOF as to the allocation.

18   Q   Okay.  And who were you directed as to the categories of

19 allocation by that you just referenced?

20   A   You mean in terms of a person?

21   Q   Yes.

22   A   I most frequently discussed this with Mr. Sevilla, but

23 also had conversations with Mr. Maloney, with King & Spalding,

24 who was representing HCLOF, and occasionally would have direct

25 conversations with Mr. Maloney and Mr. Scott and Ms. Bestwick,

```
                        O'Neil - Cross                    138
```

1  who were the two independent directors of HCLOF.

2  Q   Okay.  And what types of work generally either were

3  allocated or apportioned or billed in full to Highland CLO

4  Funding.  What was the benefit there?

5  A   The work was -- the work that was going on in the

6  bankruptcy case.

7  Q   Okay.  But I -- I understand that it was work in the

8  bankruptcy case because that's where Foley represented

9  Highland and various other entities, but I'm asking you

10  specifically:  What types of categories, and I don't -- you

11  don't have to go task by task -- but categories of work that

12  you performed for Highland or Neutra or for the Highland

13  Cayman defendants that benefited and were billed to Highland

14  CLO Funding?

15       MR. MORRIS:  Your Honor, I'm going to again assert a

16  relevance objection to any of this post-petition stuff.  This

17  is an application to retain Foley on a post-petition basis

18  for the benefits to this estate, not with respect to what

19  happened on a pre-petition basis.

20       THE COURT:  Your response?

21       MS. PATEL:  Your Honor, there's been much discussion

22  about what -- whether Neutra should have to pay this bill or

23  whether it should not have to pay its own way here.  This is

24  -- this is, in my mind, a bit of an extraordinary application

25  in that we're asking a debtor entity to pay for non-debtor

O'Neil - Cross                            139

1   representation.

2       I want to inquire as to sort of this jumbled mix of work

3   that's been performed. There's -- clearly, Ms. O'Neil said

4   she hasn't been paid by HCLOF post-petition, but I think we

5   need to separate out all of these representations, who's

6   controlling what, and how -- how these bills really should be

7   paid.

8           THE COURT: How the allocation has worked --

9           MS. PATEL: Yes.

10          THE COURT: -- thus far?

11          MS. PATEL: Yes, Your Honor.

12          THE COURT: I overrule the relevance objection, but

13  let me tell you a pickle we're getting into timewise. I have

14  a confirmation hearing starting at 1:30. And we've gone three

15  hours on this without a bathroom break. How much longer do

16  you think you're going to need? Because we might have to stop

17  and come back at 2:30 if you're going to need much longer.

18          MS. PATEL: Your Honor, I would say give me ten

19  minutes and I can wrap it up.

20          THE COURT: Okay. Ten minutes.

21          MS. PATEL: Okay.

22          THE WITNESS: I'm sorry. What was the question? I

23  apologize.

24  BY MS. PATEL:

25  Q   I'm trying to remember it myself, Ms. O'Neil. The

O'Neil - Cross                    140

1    question was, what specifically -- what -- and I don't -- you

2    don't have to go task by task.  But categorically, what was

3    the work that was performed that you would have billed

4    directly to HCLOF?

5    A    Prior to King & Spalding's involvement, you may recall

6    that we were representing HCLOF as well.  So there was direct

7    bill for the work during the bankruptcy by Foley Gardere for

8    specific work for HCLOF.

9        The -- the -- pursuant to the indemnification, as I

10   understood it, although I never read the indemnification

11   personally, that there would be an allocation between Highland

12   to HCLOF for that, for work that they performed that was of

13   benefit to HCLOF or its equity interest in the CLOs.

14       And so I was more directed as to what that allocation

15   should be vis-à-vis the work that was going on.  I think,

16   generally speaking, because the CLOs were being impacted, as

17   was well-discussed during the course of the Acis bankruptcy,

18   by the issues in the bankruptcy, by the temporary injunction

19   that were in place vis-à-vis their inability to seek an

20   optional redemption during the course of the bankruptcy, that

21   they were being significantly impacted by the actions in the

22   bankruptcy, even though they were not specifically a creditor

23   in the bankruptcy.

24   Q    So you performed services on behalf of your client,

25   Highland, that you then billed to Highland CLO Funding because

```
                          O'Neil - Cross                    141
```

 1  Highland CLO Funding couldn't effectuate an optional

 2  redemption?

 3  A    It was -- it was in conjunction with the overall

 4  activities that were going on in the bankruptcy.

 5  Q    Okay.

 6  A    Not that specifically, no.

 7  Q    All right, Ms. O'Neil.  I've only got a few minutes left.

 8  So let me ask you:  Towards the end of January, did there come

 9  a time where you sent me an email regarding Acis's quarterly

10  operating reports?

11  A    Yes.

12  Q    Okay.  And you copied Mr. Hurst on that email as well,

13  correct?

14  A    Correct.

15  Q    Okay.  And your email was to say, hey, can we set up a

16  time to talk because I've got -- Highland's got some questions

17  about the quarterly operating report.  Do you recall that?

18  A    Yes.

19  Q    Okay.  And again, just so we're clear, this is around end

20  of January 2020, right, after the appointment of the Board?

21  A    Yes.  You --

22  Q    Okay.

23  A    I think there's an exhibit.  One of your exhibits is that.

24  Q    There is.  If you turn to --

25  A    Or it's a portion of that email communication.

```
                        O'Neil - Cross                      142

 1   Q    It is.  It's -- if you turn to Tab 28, this is sort of

 2   your initial email to me, correct?

 3   A    Yeah.  This is not the entire email dialogue, because --

 4   Q    There were other emails afterward.

 5   A    -- I did not get a response and sent a couple of emails

 6   later, several days later, asking for a response.

 7   Q    Right.  And I actually did respond to you after that,

 8   correct?

 9   A    Approximately a week later, yeah.

10   Q    Okay.  Because I was out sick, actually.

11   A    Yeah.  That's what you said.

12   Q    Right.  So, --

13   A    You didn't say sick, but you were out, so it's okay.

14   Q    Yeah.  I was out.  And so -- and I will tell you, I was

15   sick.  So I responded, albeit a little bit late, but I did

16   respond to you and say, Ms. O'Neil, could you tell me what

17   your questions are so that I can be prepared?

18        Does that sound about right?

19   A    Yeah.

20   Q    Okay.

21   A    Yes.

22   Q    And I never -- I never got a response to that.  You never

23   told me what your questions were with respect to the quarterly

24   operating report, right?

25   A    Yes.  And I --
```

```
                            O'Neil - Cross                     143
```

1   Q    Okay.

2   A    I can explain that.  Because Mr. -- I believe Mr.

3   Pomerantz said that there was a meeting that was -- and they

4   would discuss it then, so --

5   Q    Okay.

6   A    Or Mr. Demo.  I'm sorry.  Somebody from Pachulski told me

7   that that would be addressed.  Also, the status conference --

8   I mean, the questions we had were because there was a February

9   3rd status conference coming, and I wanted to see if we could

10  get some clarity so that when we appeared before the status

11  conference we could limit what we were going to be discussing

12  with the Court, if anything.

13  Q    Okay.  Well, what were -- what were the nature of your

14  questions?  Because there was a conversation between Mr. Terry

15  and myself and the Board and -- well, certain members of the

16  Board.  But what were your questions pertaining to?

17  A    Oh, okay.  Happy to discuss that.  It's kind of awkward to

18  have it in -- on this, in this --

19  Q    On Q and A.

20  A    -- forum, but --

21  Q    I hear you.

22  A    We sent -- as the Court will recall, the confirmation

23  injunction can be lifted if all the claims are paid.  So,

24  since the plan, the Acis plan was confirmed, we have been

25  tracking -- and the only way to track it is through the QORs

O'Neil - Cross                              144

1   -- what the revenues were coming in and what has been paid.

2   And so -- in terms of expenses and then claims.  And so we

3   have been -- my paralegal has been tracking this.

4        As the Court may know from looking at the record, almost

5   all of -- any other claims that were in the case were either

6   disallowed or withdrawn.  And so, really, the only claim,

7   other than Highland's, was Mr. Terry's that was really left to

8   be paid, other than administrative claims.  And I believe the

9   administrative claimants had agreed to deferral on some of

10  their payments after the effective date.

11       So we had been tracking the payments, which you can track

12  through the QORs, and it appeared that all of -- including Oak

13  Tree's most recently allowed administrative claim -- that all

14  of the administrative claims had been paid, and it appeared at

15  least approximately a half of Mr. Terry's claim had been paid.

16       When you look at the QORs, it doesn't specifically say,

17  "Here's who got what payment," but it shows the claims being

18  paid down, in addition to just general expenses of the post-

19  confirmation Debtor.  And I'm -- this is taking a little bit,

20  but in the disclosure statement to the plan, there had also

21  been plan projections that set forth the revenues that were

22  anticipated post-confirmation to pay the claims.  And so

23  likewise -- as well as the expenses, including to Brigade or

24  just general operating expenses for Acis.

25       So, likewise, through the QORs, we had been comparing

O'Neil - Cross                          145

1   those against what was in the plan projection.  And there were

2   some things that weren't matching and we simply were having

3   questions about the expenses seemed to be much higher.

4   However, the claims were being paid down, so it looked like

5   Mr. Terry was the only claimant left and was probably owed, by

6   our calculation, around $4-1/2 million, and that was the only

7   thing left to be paid.  And, but the revenues per the QOR was

8   showing cash available of over five and -- $5.3 million.

9       So, one of the things we wanted to discuss was the

10  application of using the cash to go ahead and pay down what

11  was left of Mr. Terry's claim so that the injunction could be

12  lifted.  But wanted to discuss that with you.  That was the

13  purpose of that.

14  Q   Okay.  And I guess let me back up.  One, let me kind of

15  correct you on a technical point, which is Mr. Terry's claim

16  isn't the only claim that's left outstanding.  There were also

17  law firm claims that were lodged as against Acis, correct?

18  A   I believe there were two --

19          MR. MORRIS:  Objection, Your Honor.  Just relevance.

20  I don't get it.

21          THE COURT:  Okay.  Sustained.  You've gone seven

22  minutes.  So, three more minutes and we need to wrap it up.

23          MS. PATEL:  Okay.

24  BY MS. PATEL:

25  Q   Well, I guess, Ms. O'Neil, kind of in line with the email,

O'Neil - Cross                          146

1  the email came in shortly before Acis was sued by your co-

2  counsel, Lynn Pinker, on behalf of the Charitable DAF and CLO

3  HoldCo.  Are you aware of this lawsuit?

4  A    After it was filed.  I was not aware of it before it was

5  filed.  The second one.  I had seen the first one after it was

6  filed.  I had not seen the second one until after it was

7  filed.  We have a conflict with one of the defendants in that,

8  so --

9  Q    Okay.  So, and when you say "the first one," are you

10 talking about when it was originally the Charitable DAF versus

11 U.S. Bank National Association and Moody's Investors Service?

12 A    Yes.

13 Q    Okay.  And that all involved claims by the DAF brought

14 against U.S. Bank and Moody's at the time relating to the Acis

15 bankruptcy, right?  It's claims that U.S. Bank didn't manage

16 --

17 A    Ms. --

18 Q    -- as a trustee correctly, correct?

19 A    Ms. --

20        MR. MORRIS:  Objection, Your Honor.  She's got no

21 foundation.  She said she has a conflict and wasn't involved

22 with this case.

23        THE COURT:  Sustained.

24        THE WITNESS:  That's correct.

25 BY MS. PATEL:

```
                    O'Neil - Cross                    147
```

1  Q   Okay.  I guess, Ms. O'Neil, let me just ask you:  Did you

2  have any involvement with -- if you look at Tab 27, that's a

3  copy of the lawsuit, so that we're all clear exactly which one

4  I'm asking you about.  This is the lawsuit between the

5  Charitable DAF and CLO HoldCo, your former client, versus U.S.

6  Bank National Association, Moody's Investors Service, Acis

7  Capital Management, Brigade, and Josh Terry.  Did Foley have

8  any involvement in the drafting or formulation of this

9  lawsuit?

10  A   None.

11  Q   Okay.

12          MS. PATEL:  No further questions, Your Honor.

13          THE COURT:  All right.  Any redirect?

14          MR. MORRIS:  Very briefly.

15          THE COURT:  Okay.

16                      REDIRECT EXAMINATION

17  BY MR. MORRIS:

18  Q   Ms. O'Neil, you've been representing a number of different

19  entities associated with Highland since 2018, right?

20  A   Correct.

21  Q   And are those entities identified in Plaintiff's Exhibit

22  #2 in the engagement letter?

23  A   Plaintiff's 2 or -- sorry.

24  Q   The Debtor's.

25  A   The Debtor's 2.  Okay.  Let me switch.  They are.

O'Neil - Redirect                    148

1  Q   Okay.  And since the Board has been appointed, have you

2  met with board members to discuss the status of the matters

3  that your firm has been handling?

4  A   Yes.

5  Q   And without disclosing attorney-client communications, did

6  that involve providing a history of the work that you'd done?

7  A   Yes.

8  Q   Did that involve providing a history of the work that you

9  expected to do in the future?

10 A   Yes.

11 Q   Did the Board have an opportunity to ask questions of you?

12 A   Yes.

13 Q   And did you, in fact, answer the Board's questions?

14 A   I endeavored to do so to the best of my ability, yes.

15 Q   Okay.

16 A   Or I followed up if -- with information via email if I

17 needed to get additional information.

18 Q   And is it your understanding that the Board supports your

19 retention for the purposes that were described earlier by Mr.

20 Nelms?

21 A   Yes.

22 Q   Okay.

23         MR. MORRIS:  I have nothing further, Your Honor.

24         THE COURT:  Any recross on that redirect?

25         MS. PATEL:  No, Your Honor.

O'Neil - Redirect                      149

1              THE COURT:  All right.  Ms. O'Neil, you're excused.

2              THE WITNESS:  Thank you.

3        (The witness steps down.)

4              THE COURT:  All right.  Highland, any more evidence?

5              MR. MORRIS:  No, Your Honor.  We rest.

6              THE COURT:  All right.  Is there any evidence from

7    Acis?

8              MR. LAMBERSON:  No, ma'am.

9              THE COURT:  All right.  Let's take a five-minute --

10   please, five-minute break -- and then we'll hear your closing

11   arguments.

12             THE CLERK:  All rise.

13        (A recess ensued from 12:47 p.m. until 12:56 p.m.)

14             THE CLERK:  All rise.

15             THE COURT:  All right.  Please be seated.  We're

16   going back on the record in Highland.  I'll hear closing

17   arguments.

18        I'm going to ask a question.  I need clarification --

19             MR. DEMO:  Of course.

20             THE COURT:  -- on this.  First off, in the Acis

21   adversary that's stayed in the Acis bankruptcy case, Foley,

22   it's proposed, would represent Highland.  But is Foley also

23   representing co-defendants in that adversary?  You know, I

24   think King & Spalding is representing all the co-defendants,

25   or someone else is, but am I wrong or right about that?

150

1        MR. DEMO:  Yes and no, Your Honor.  I think there's

2    been some miscommunication on that.  The adversary, as we

3    understand it, is stayed, and because of that we are not

4    seeking to represent -- or retain Foley in that adversary,

5    although we will if that comes up again.  So, in the

6    adversary, pre-petition, Foley did represent the Debtor and

7    then a handful of other creditors who were brought into that

8    adversary, as we understand it, as defendants.  On a go-

9    forward basis, though, we are proposing to retain Foley on

10   three things:  General matters in the bankruptcy proceeding;

11   the appellate --

12       THE COURT:  General matters in the Acis bankruptcy

13   proceeding?

14       MR. DEMO:  Correct, Your Honor.  The appeal involving

15   the confirmation order.  And the appeal involving the Neutra

16   litigation.  And --

17       THE COURT:  Okay.  On the appeal of the involuntary,

18   --

19       MR. DEMO:  Yes, ma'am.

20       THE COURT:  -- only Neutra --

21       MR. DEMO:  That is correct.

22       THE COURT:  -- is an appellant.  Okay.  So what

23   you're asking is for authority for Highland to pay the legal

24   fees of Neutra on that?

25       MR. DEMO:  Yes, Your Honor.

151

1          THE COURT: Okay.

2          MR. DEMO: We are. And we, again, to the --

3          THE COURT: And let me -- let me -- and then the

4   appeal of the confirmation order, are the appellants Highland

5   and Neutra only, or is HCLOF an appellant?

6          MR. DEMO: In terms of Foley's representation, it's -

7   -

8          THE COURT: No, no, no. Just answer the question.

9   Who are the appellants in the confirmation order?

10         MR. DEMO: Highland, Neutra, and HCLOF.

11         THE COURT: Okay. Who is representing HCLOF?

12         MR. DEMO: King & Spalding.

13         THE COURT: Okay. And Foley has thus far been

14   representing Neutra and Highland?

15         MR. DEMO: Correct, Your Honor.

16         THE COURT: Okay. Well, okay. You may proceed.

17         MR. DEMO: And I will be brief. And I think

18   ultimately this, this is a relatively simple thing, and I

19   think you've nailed it.

20      What are the benefits to the estate of -- because nobody

21   has objected, again, to Foley representing the Debtor. What

22   are the benefits to the estate for Foley representing Neutra

23   and being paid for that by the Debtor? And to answer that

24   question, I think you have to look to all the testimony that

25   we've heard today, and you also have to look at who's

152

1  objecting, Your Honor. The Committee is not objecting. There

2  is no other committee member objecting besides Acis. The only

3  party objecting to Neutra -- or, I'm sorry, to Highland paying

4  Neutra's fees in the appeal, which, again, are a portion of

5  the $500,000 that we think is going to be incurred post-

6  petition on this, excluding today, because today has obviously

7  gone a little bit long -- the only party objecting to paying a

8  portion of that $500,000 to have Foley represent Neutra in an

9  appeal that is happening less than six weeks from now is Acis.

10    Acis is the party opponent in that. Acis is the party

11  that stands to benefit, not just because the involuntary

12  petition will not be overturned, but because there will be a

13  lack of leverage and a lack of ability to contest their $75

14  million, which is where it started, but it keeps growing.

15  It's at $300 million now. The only party who's objected to

16  that is Acis. None of the other creditors have objected.

17        THE COURT: Well, until the past 24 hours, the

18  Committee was objecting.

19        MR. DEMO: Correct, Your Honor. And we had a --

20  finally had a chance, with the new Board in place, to discuss

21  it with the Committee. And the new Board explained to the

22  Committee that, in their business judgment, spending this

23  money, this $500,000 -- which, again, is going to be allocated

24  across these three matters; not all of it's going to be

25  allocated to Neutra; a portion of it is going to be allocated

153

1  to Neutra -- $500,000 for the possibility of a recovery to the

2  estate, the possibility of the ability to challenge a $300

3  million proof of claim that impacts not just the estate but

4  the other creditors in the estate, substantially, because

5  there's only so much money here. So, --

6          THE COURT: Okay. Let me ask you to recap what the

7  evidence was on benefit to Highland --

8          MR. DEMO: On benefit --

9          THE COURT: -- from the overturning of the order for

10 relief in Acis.

11         MR. DEMO: In terms of the overturning of the order

12 for relief in Acis, there were -- there was testimony on the

13 possibility -- and again, it's a possibility, and we're not

14 disputing that. Acis's attorneys said it was 10 percent.

15 That's fine. Maybe it's 10 percent. There was evidence

16 presented by Mr. Nelms on the possibility that if the Acis

17 involuntary is overturned, that the contracts at issue, the

18 advisory and the sub-management agreements, --

19         THE COURT: Well, let's take it sequentially, because

20 you've got to, you know, look at benefit of the estate --

21         MR. DEMO: Understood.

22         THE COURT: -- versus time and cost, to some degree,

23 right?

24         MR. DEMO: Right.

25         THE COURT: So, Neutra wins.

154

1          MR. DEMO:  Okay.

2          THE COURT:  Okay?  That means, according to Mr.

3  Lamberson's argument, which I think is the correct argument,

4  that we send to arbitration whether it's appropriate for Acis

5  to be in a bankruptcy.

6          MR. DEMO:  Correct, Your Honor.

7          THE COURT:  Okay.

8          MR. DEMO:  Well, may be correct.

9          THE COURT:  So, --

10         MR. DEMO:  I think we did hear there's a different

11 possibility from Mr. Nelms.

12         THE COURT:  Well, what is the other possibility?

13         MR. DEMO:  Well, okay.  Understood, Your Honor.

14 Okay.

15         THE COURT:  Okay.

16         MR. DEMO:  So, say we -- assuming we send it to

17 arbitration, --

18         THE COURT:  So that means an arbitration panel is

19 convened, and at some point, many months from now, an

20 arbitration panel will either say yes or no, involuntary, you

21 know, should have gone forward.

22         MR. DEMO:  Okay.

23         THE COURT:  Okay?  Let's say the arbitration panel

24 says no, should not have gone forward.  Then what does the

25 world look like for Highland?

155

1        MR. DEMO:  I guess, taking it a step back, Your

2   Honor, assuming that this does go to arbitration, it also

3   means that the involuntary petition was not entered.  If the

4   involuntary petition was not entered, which means that the

5   Acis equity did not go to Mr. Terry, it stayed under Neutra,

6   at that point --

7        THE COURT:  Wait, wait, wait.

8        MR. DEMO:  -- you also go into arbitration.

9        THE COURT:  Wait, wait.  Wait, wait.  So you're

10  saying that everything is wiped out in the involuntary, the

11  Acis bankruptcy case?

12       MR. DEMO:  Your Honor, and I do want to be really,

13  honestly, very, very clear about this.  I am -- I am not

14  saying anything.  I'm not -- trying very hard not to draw a

15  legal conclusion.  What I'm saying is that the Board has

16  analyzed this, the Board has applied business --

17       THE COURT:  But I'm trying to understand --

18       MR. DEMO:  -- judgment to this, and that there is a -

19  - there is a possibility.  Now, --

20       THE COURT:  I'm trying --

21       MR. DEMO:  -- obviously, reasonable minds can --

22       THE COURT:  Okay.  Here's where I'm coming from.  And

23  you can tell me if I'm analyzing this incorrectly, in your

24  view.  Okay.  We used to have this terrible Fifth Circuit case

25  -- you know, God help me if this transcript gets sent -- but

156

1  called *Pro-Snax*. Okay?

2        MR. DEMO: Okay.

3        THE COURT: I think the Fifth Circuit has decided

4  itself that it was terrible, so it's not going to come back to

5  haunt me, saying that. So, *Pro-Snax* said basically the

6  Bankruptcy Court is a Monday-morning quarterback in looking at

7  the reasonableness of fees. You know, did it provide a

8  benefit to the estate?

9        MR. DEMO: Uh-huh.

10        THE COURT: And then that got reversed a few years

11  ago. I think it was the *Woerner* case -- *Baron & Newburger*

12  *(Woerner)* -- where the Court said, no, you don't do a

13  hindsight look. You look at, at the time fees were expensed,

14  --

15        MR. DEMO: Uh-huh.

16        THE COURT: -- was there something like a reasonable

17  possibility they would benefit the estate?

18        MR. DEMO: Yes.

19        THE COURT: Okay? So I'm looking through it in that

20  lens, so to speak, and I'm like, what benefit to the Highland

21  estate could there be if the confirmation -- well, if the

22  order for relief is unwound or the confirmation order is

23  unwound? And I'm not there. I'm not there understanding any

24  benefit for Highland.

25      I can understand a benefit, maybe, for Neutra, although I

157

1  am even hard-pressed to see that, because it looks like years

2  of more litigation.

3          MR. DEMO:  And Your Honor, I mean, I do think that

4  there was -- and again, I'm not going to challenge your legal

5  conclusions -- I do think that there was evidence that in the

6  Board's business judgment they did analyze this and they see

7  it, I think, a little bit differently.

8          THE COURT:  And I should defer heavily to a Board's

9  reasonable exercise of business judgment.  I've got trouble.

10  So I'm just trying to --

11          MR. DEMO:  Understood.  And I think, when you look at

12  that business judgment, --

13          THE COURT:  Uh-huh.

14          MR. DEMO:  -- you know, obviously, I don't disagree.

15  I do think that when you have a three-person independent board

16  of this caliber who's come into a difficult situation, has

17  reviewed all of the evidence, talked to all the applicable

18  people, when things happened with the DAF litigation that they

19  didn't like, they took action to stop that.  When they looked

20  at the Winstead appeal and they said, you know, there's not a

21  benefit to the estate here, let's drop they, they dropped it.

22          THE COURT:  But again, work with --

23          MR. DEMO:  When they --

24          THE COURT:  Work with me.  Fifth Circuit reverses the

25  order for relief.  I don't think you have disagreed with

158

1  Lamberson's argument that best-case scenario in that reversal

2  scenario is that an arbitration panel now looks at, should

3  this Acis -- you know, should it have gone forward in a

4  bankruptcy?

5          MR. DEMO:  Well, I guess, Your Honor, then maybe I --

6          THE COURT:  So, in that many --

7          MR. DEMO:  -- I'm not being clear.

8          THE COURT:  -- months, let's say eight months that an

9  arbitration panel takes to decide, what happens during that

10  eight months?

11          MR. DEMO:  Well, then I guess, Your Honor, I need to

12  step back, because I have not -- absolutely not been clear.

13  If it goes to an arbitration panel, our view -- and I think

14  Ms. O'Neil's briefs to the Fifth Circuit are clear on this --

15  the arbitration panel is going to arbiter or arbitrate whether

16  or not there was a fraudulent conveyance.  It's going to

17  arbitrate how to resolve the claims.  It's not going to

18  arbitrate whether or not the involuntary petition should ever

19  have been entered.

20          THE COURT:  Wait, wait.  What does that mean?  Of

21  course.  That's the starting point of it all, right?  The

22  appeal is the Bankruptcy Court wrongly held a trial on the

23  involuntary petition and ordered for relief.  It should have

24  deferred to an arbitration panel to do that.  Isn't that

25  appeal number one that we're talking about?

159

1          MR. DEMO:  Yes, but --

2          THE COURT:  Neutra's appeal?

3          MR. DEMO:  Yes, it is.

4          THE COURT:  Okay.

5          MR. DEMO:  But I do think there's a nuance.  And I do

6   want to defer to the pleadings that were filed with the Fifth

7   Circuit, because I don't want here to get myself out in front

8   of that Fifth Circuit appeal, because obviously I do very much

9   want that appeal to go forward.  And maybe we lose and maybe

10  we win, but if we win, I think the --

11         THE COURT:  If Neutra wins.

12         MR. DEMO:  If Neutra wins, one of the outcomes -- and

13  again, I understand that, you know, reasonable minds can

14  differ that there --

15         THE COURT:  Okay.

16         MR. DEMO:  -- of the outcomes.

17         THE COURT:  But one of the outcomes.

18         MR. DEMO:  One of the outcomes is that the

19  involuntary petition is unwound, withdrawn, and the parties go

20  to arbitration on the claims.  If that were to happen, --

21         THE COURT:  Wait.  It's unwound and they go to

22  arbitration on what claims?  The claims in the adversary

23  proceeding that's been filed in Acis?

24         MR. DEMO:  Again, Your Honor, I'm not the appellate

25  lawyer here.  I mean, this is why we are here.

160

1      THE COURT:  But how do you skip over the arbitration

2  of the order for relief?  Because if Joshua Terry, who

3  commenced it, you know, he has the right now to argue to an

4  arbitration panel that this should have been in bankruptcy,

5  right?  He doesn't have to just agree that the adversary

6  proceeding is now arbitrated.  Right?

7      MR. DEMO:  Well, again, Your Honor, I don't want to

8  substitute my judgment for the judgment of the Board.  I think

9  the judgment of the Board is that there is a scenario and that

10  it's worth exploring and that it's worth the -- what we

11  honestly think is a limited amount of money to explore.

12  Because I think, if we explore that, we explore the

13  possibility, quite honestly, of taking it out of bankruptcy,

14  then, yes, in that scenario, and which we do it think is

15  possible, in that scenario, and call it whatever probability

16  you want, but if you're going to spend half a million dollars

17  to get to a scenario that could reap you -- and I don't want

18  to put a number on it -- but millions of dollars in future

19  revenue, millions of dollars in terms of --

20      THE COURT:  You're melding.  You're collapsing.  And

21  we all know as lawyers that's not how it works.  Things happen

22  sequentially, okay?

23      MR. DEMO:  Okay.  Then I guess, going --

24      THE COURT:  There's a setting aside -- well, there's

25  a reversal of the Bankruptcy Court's issuance of an order for

161

1  relief.

2          MR. DEMO:  Okay.

3          THE COURT:  And that means you should have deferred

4  to an arbitration panel, Judge Jernigan.  And so they remand

5  so that I can, consistent with that appellate ruling, say,

6  We're staying the bankruptcy and it's going to arbitration to

7  decide whether an order for relief.  Is there really any

8  realistic scenario where we skip that step?

9          MR. DEMO:  We think that there's a scenario that is

10  worth exploring.

11          THE COURT:  I feel like your colleagues are really

12  dying to chime in because they think they've got the answer to

13  my question, no offense to you.

14          MR. MORRIS:  I really -- I don't, Your Honor, but if

15  I may.

16          THE COURT:  Uh-huh.

17          MR. MORRIS:  I think Ms. O'Neil is the appellate

18  lawyer.  Maybe she should speak on this very precise point, --

19          THE COURT:  Okay.  Because --

20          MR. MORRIS:  -- if that's okay with the Court.

21          THE COURT:  Because I see many miles --

22          MR. MORRIS:  Yeah.

23          THE COURT:  -- to go before we sleep if there's a

24  reversal, and I'm trying to figure -- well, you know, we all

25  know that, right?

162

1    MS. O'NEIL: Your Honor, if I may.

2    THE COURT: Uh-huh.

3    MS. O'NEIL: And I did not want to interrupt Mr.

4  Demo, and he's done a great job, but obviously we've been

5  involved with the appeal.

6    THE COURT: Right.

7    MS. O'NEIL: We've prepared the briefs.

8    THE COURT: So how does it play out if there's a

9  reversal in favor of Neutra --

10    MS. O'NEIL: If I may, Your Honor.

11    THE COURT: -- of the order for relief?

12    MS. O'NEIL: The issue on the appeal is not to send

13  the concept to arbitration of the involuntary petitions.

14    THE COURT: Okay.

15    MS. O'NEIL: It is that Mr. Terry was not a qualified

16  petitioner because he was bound by an arbitration, a binding

17  arbitration agreement, and that the issue that he -- by

18  proceeding with these involuntary petitions, he commenced a

19  suit, a proceeding that was, at its core, about fraudulent

20  transfers, and that that should have gone to arbitration. And

21  to proceed and try to engage this Court's jurisdiction on

22  something that he had contractually agreed to go to

23  arbitration on was improper.

24    So, if Neutra wins on that argument, and I would encourage

25  the Court, we -- I think the briefs are in one of the

163

1 exhibits, but certainly I would provide them to the Court

2 before the Court makes a determination if it would help. If

3 there -- if Neutra wins on that appeal, then our position

4 would be that yes, the bankruptcy is effectively void *ab*

5 *initio*, and that's what we believe the case law supports.

6      Where that would put the parties, potentially -- and

7 again, we're speculating what the Fifth Circuit may or may not

8 due to instruct this Court to do -- could reverse and render,

9 as it were, as Mr. Nelms testified happened to him previously,

10 but could instruct this Court to abstain, which I think was --

11 and that is one of the various motions and the orders that the

12 Court had denied. All of these are wrapped up in the appeal,

13 Your Honor. And in doing so, instruct the petitioner, Mr.

14 Terry, and Acis to go arbitrate the issue of the fraudulent

15 transfers. That would reinstate Acis. Acis could reinstate

16 Highland as the manager of the CLOs.

17      THE COURT: So every single order in the Acis case

18 would be null and void?

19      MS. O'NEIL: We believe that the case law is that it

20 would be void *ab initio*. And now, Your Honor, practically

21 speaking, --

22      THE COURT: Void *ab initio*? Okay. That could only

23 -- is that hinged to a subject matter jurisdiction, lack of

24 subject matter jurisdiction --

25      MS. O'NEIL: Partially, that's part of the argument.

164

1          THE COURT:  -- theory?

2          MS. O'NEIL:  That's part of the argument.  Yes, Your

3     Honor.

4          THE COURT:  Okay.

5          MS. O'NEIL:  Practically speaking, it is our belief,

6     although it is not clear, is what I've tried to kind of convey

7     to the Court, and in conjunction with this conversation I was

8     trying to have with Mr. Terry's counsel/Acis's counsel, is

9     that we believe Mr. Terry has been paid down.  Practically

10    speaking, if that happens and he's only left with a claim or

11    currently has a claim of $4 million, $4-1/2 million, which is

12    what we think it is, or it's somewhere in that neighborhood,

13    that -- and there's sufficient cash in Acis to pay that claim

14    off -- it is a claim Judge -- Mr. Nelms testified to the fact

15    that it would need to be paid -- then there may not even need

16    to be a fraudulent transfer lawsuit because the claim would --

17    what's left of the claim would just be paid off.  And then

18    Acis -- Neutra would be back in ownership of Acis, Acis would

19    engage Highland to come back in and do what it was doing

20    before, Mr. Terry got his claim paid off, and there we are.

21         THE COURT:  Okay.

22         MR. DEMO:  That's honestly pretty much it, Your

23    Honor.  And we think that -- and the Board thinks that the

24    benefit of pursuing that is worth it, quite honestly.  And

25    they think, in their business judgment, that it's worth paying

165

1   those Neutra fees -- which again, are a portion of the

2   $500,000, only a portion -- because that benefit accrues to

3   the estate, or could accrue to the estate in a situation

4   where, in their business judgment, it's worth going forward on

5   this.

6          THE COURT:  Okay.  The appeal -- okay.  Let me make

7   sure I heard this correctly.  The appeal of the confirmation

8   order, whereas we have Neutra only on the appeal --

9          MR. DEMO:  Correct.

10         THE COURT:  -- of the order for relief, the appeal of

11  the confirmation order is Highland, Neutra, and HCLOF.

12         MR. DEMO:  Correct.

13         THE COURT:  And King & Spalding still represents

14  HCLOF in connection with that appeal.

15         MR. DEMO:  Correct.  And they're the only law firm

16  representing HCLOF in that appeal.

17         THE COURT:  So here's what I'm struggling with.  You

18  know, what initially seemed like kind of a compelling argument

19  -- all the briefing has been done, oral argument is set in

20  March -- it feels like to me the main beneficiaries of a

21  reversal of that confirmation order are HCLOF and Neutra.

22  Foley can represent Neutra.  Neutra can pay.  King & Spalding

23  can represent HCLOF.  HCLOF can pay.  And that seems like the

24  reasonable scenario to me.

25         MR. DEMO:  And I hear that.  But I think -- and I

166

1  think Mr. Nelms --

2          THE COURT:  Because let's --

3          MR. DEMO:  -- testified to it, but --

4          THE COURT:  Work with me.  Let's say they don't

5  reverse the order for relief --

6          MR. DEMO:  Okay.

7          THE COURT:  -- but they do reverse the confirmation

8  order.

9          MR. DEMO:  Okay.

10          THE COURT:  So, Chapter 11 Trustee is in place

11  representing Highland, and he can -- I'm sorry -- he is the

12  spokesperson for the Acis, the controller of the Acis estate.

13  He might go forward with plan number four, five, whatever it

14  would be.

15          MR. DEMO:  Okay.

16          THE COURT:  Or say, I think it's time to convert this

17  to 7.  I mean I'm just trying to figure out --

18          MR. DEMO:  And I guess I do want to go back to one

19  thing, --

20          THE COURT:  Uh-huh.

21          MR. DEMO:  -- because I do not think there is another

22  economic beneficiary that would pay Neutra's fees.  I think if

23  the Debtor is not allowed to pay Neutra's fees, nobody will

24  pay Neutra's fees, and that portion of the appellate argument

25  will fall by the wayside.  Because --

167

1        THE COURT:  So Neutra loses, but I don't see how

2   Highland loses.  You have not painted a scenario where it's

3   clear to me there's any economic benefit to the estate.

4        MR. DEMO:  I would, I would, with all --

5        THE COURT:  And you're telling me, Defer to the

6   Board's business judgment.  But I'm --

7        MR. DEMO:  Well, I --

8        THE COURT:  I'm concerned that the evidence hasn't

9   shown me --

10       MR. DEMO:  I would also ask, Your Honor, --

11       THE COURT:  -- all of the --

12       MR. DEMO:  -- in all --

13       THE COURT:  -- scenarios that lead to their

14   reasonable business judgment on this.

15       MR. DEMO:  As Ms. O'Neil just said, I mean, this is

16   above the Fifth -- to the Fifth Circuit.  The Fifth Circuit is

17   set to hear this in six weeks.  And if the Fifth Circuit rules

18   the way that Ms. O'Neil just said, I do think, and I think the

19   Board thinks -- actually, I know the Board thinks -- that

20   there is a tangible benefit to the estate here.  And so I know

21   that I'm asking you to defer to their judgment, --

22       THE COURT:  All I heard was --

23       MR. DEMO:  -- but I'm also asking just for --

24       THE COURT:  -- that they'd reinstate the sub-advisory

25   and shared services agreements.

168

1          MR. DEMO:  Which are --

2          THE COURT:  Which, by the way, Highland moved to

3    terminate, moved to compel rejection at one point during the

4    case, and then, when that didn't work, HCLOF started calling

5    for redemption.

6          MR. DEMO:  And it's not the --

7          THE COURT:  This is nuts for me --

8          MR. DEMO:  It's not -- it's not the -- Your Honor,

9    it's --

10         THE COURT:  Tell me why it's not nuts for me to think

11   --

12         MR. DEMO:  Because it's not the same Highland.

13         THE COURT:  -- that Highland would be thrilled to

14   have Acis back managing the CLOs and subcontracting with

15   Highland.  I mean, that --

16         MR. DEMO:  It's not, it's not the same Highland.  The

17   stuff that happened prior to the institution of the Board was

18   the stuff that happened prior to the institution of the Board.

19   There is new management of Highland.  That new management is

20   working very hard.  As you've seen, Your Honor, that new

21   management is willing to push back.  That new management, with

22   the DAF, which you've heard testimony of, that new management

23   is working to get that motion withdrawn.  That new management

24   is not going forward with Lynn Pinker because of actions that

25   it took that it thought subverted their control and their

169

1  management of the Debtor.  The new management decided to drop

2  an appeal that they did not think had any merit.

3      It's not the same Debtor, Your Honor.  It is a board

4  consisting of three highly-qualified people who are exercising

5  their own judgment.  So all of that stuff that happened prior

6  to January 9th, I don't want to say hey, it's a clear line in

7  the sand, but it is.  Mr. Dondero is not in control of

8  Highland Capital Management.

9          THE COURT:  But he is in control of Neutra.

10          MR. DEMO:  He is the economic beneficiary of Neutra.

11  That is correct.  But Mr. Dondero did tell Mr. Nelms, as Mr.

12  Nelms testified, that he would reinstate those contracts.  And

13  I understand that.  But again, as you've seen, Mr. Nelms and

14  the Board have been able to push back, have been able to exert

15  control, to exert influence, and to exert management over an

16  institution that is very difficult to manage.

17      And I do think that deference to that is something that

18  should very much be considered, because it's very easy to

19  think of this as Old Highland, but this is New Highland, who

20  has done an independent, objective review of these claims, who

21  has sat with Ms. O'Neil, who has sat with Pachulski, who has

22  sat with Mr. Terry and Ms. Patel and talked about this stuff,

23  and still thinks that there is a benefit here to the estate,

24  and that spending the $500,000 to pursue that benefit, which

25  is not just a benefit to Highland but it's a benefit to

170

1  Highland other -- to Highland's other creditors, I guess, Your

2  Honor, quite honestly, I would ask that you to defer to that

3  new management, because it is not -- it is not Old Highland.

4      All that stuff that people have talked about -- I mean,

5  you've seen today in court, you've heard testimony about very

6  qualified people working to stop that and working to put this

7  estate into a position where it can reorganize, where it can

8  come to agreements with its creditors, where it can work

9  through this process, where it can come out the other side.

10      But if we take away that Board's ability to manage

11  litigation with one of their biggest creditors, whose

12  litigation claim keeps growing, all you're doing is

13  benefitting that one creditor, not to the detriment of Mr.

14  Dondero but to the detriment of the other creditors in this

15  case.

16      UBS has a claim. Redeemer has a claim. Meta-e has a

17  claim. McKool's has a claim. You can run through that whole

18  list. And if you take away the Board's right to direct

19  litigation that is going directly to the Board's ability to

20  control runaway claims, to negotiate with creditors, and to

21  come up with an idea of how to split the pie, then, with all

22  respect, Your Honor, you are infringing on that Board's

23  business judgment and that Board's ability to reorganize this

24  case.

25      This case isn't just about --

171

1          THE COURT:  It wouldn't be taking away.  And here is

2     a nuance that -- I think it is perfectly reasonable, in case

3     you don't know where I'm heading on this, for Foley to

4     represent Highland in the Acis case, in that adversary

5     proceeding, if it goes forward, because heck yeah, Highland

6     has been sued for huge amounts of money.

7          MR. DEMO:  Understood.

8          THE COURT:  Their claim, that is many millions, has

9     been objected to.  So, heck yeah, this estate needs good

10    representation of Highland in that case, where there are many

11    unresolved issues still in the Acis case.

12        But on the appeal, I am just still lost as to how there is

13    any chance in the world Highland benefits in those appeals.

14    Neutra, heck yeah.  Maybe they get their Acis back and can

15    instruct it to, you know, stop suing Highland or whatever.

16    Dondero controlling Neutra can do that.  Okay?  And HCLOF, it

17    doesn't want Acis to have anything to do anymore with managing

18    its equity piece of those CLOs.  Sure.  But how -- I mean,

19    you're telling me that there could be a scenario -- here's

20    what I'm hearing.  That there is a benefit in having all those

21    fraudulent transfer claims arbitrated, I guess, not litigated

22    in the Bankruptcy or District Court, and there's a benefit in

23    having all of the management agreements, portfolio management

24    agreements reinstated.  And I just, I don't see how that

25    happens anytime soon based on how I perceive a reversal of

172

1  orders on appeal happening.

2  MR. DEMO: And I guess I don't know what else to say

3  on that point. We do think there's a $12 million tangible

4  benefit to reinstating those contracts. We think there's a

5  tangible benefit to allowing Neutra to go forward with its

6  appeal. And again, there is nobody else who I think would pay

7  that freight besides the Debtor, because that benefit, we

8  believe, goes to the Debtor.

9  THE COURT: How many years of life are there left on

10  the CLOs that Acis manages?

11  MR. DEMO: I would have to check, Your Honor. I

12  don't know off the top of my head. I can ask. But --

13  THE COURT: I mean, you're saying $12 million. I

14  mean, I don't --

15  MR. DEMO: I, you know, --

16  THE COURT: There's not a -- I'm just not sure where

17  that number is coming from. I never heard direct evidence of

18  that.

19  MR. DEMO: Okay. Well, I guess, Your Honor, I mean,

20  again, I would just ask that you defer to the business

21  judgment of the Board and allow them to position this

22  litigation in a way that best enables them to deal with every

23  creditor's claim, and not just the claims of one creditor.

24  And if they cannot fight the claims of the creditor, then they

25  can't negotiate how that pot is going to be split in a fashion

173

1   that benefits everybody.

2       So I guess, Your Honor, I mean, I don't know what else to

3   say about the benefits of the Neutra appeal except that the

4   testimony, I think, speaks for itself.  But, you know, I --

5   and in terms of --

6           THE COURT:  Again, fight the claim of a creditor.

7   Foley can represent Highland in the adversary proceeding,

8   wherever that goes forward.

9           MR. DEMO:  Yeah.

10          THE COURT:  Probably District Court, not this Court.

11  At least some of it, if not all of it.  But anyway, I'm

12  digressing.  They can object to Acis's proof of claim.  They

13  can object to Terry's proof of claim.  I mean, --

14          MR. DEMO:  And conversely, Your Honor, if -- if --

15          THE COURT:  -- this has nothing to do with -- I mean,

16  I don't get the appeal.  I mean, I --

17          MR. DEMO:  Right.

18          THE COURT:  Neutra can appeal, HCLOF can appeal, but

19  I'm not seeing the benefit to Highland.

20          MR. DEMO:  And I guess the only thing I would say,

21  Your Honor, is if there is an improper benefit, we are not

22  saying that the fee applications are sacrosanct.  People can

23  challenge the improper benefit there.

24      And again, the settlement gave broad discretion to the

25  Committee to pursue insider claims.  So if an insider is

174

1   receiving a benefit from this, the Committee has standing to

2   pursue that.

3       So it's not a null set, Your Honor, whereas cutting off

4   the appeal now does take away that possibility.

5           THE COURT:  How would I be cutting off the appeal?

6   I'm not cutting off the appeal.  King & Spalding can go in

7   there and fight hard.  Foley can go in there and fight hard

8   for Neutra.  So, --

9           MR. DEMO:  One second, Your Honor.

10      (Counsel confer.)

11          MR. DEMO:  And I guess, you know, Your Honor, and I

12  do want to reiterate that there is no other party with an

13  economic incentive to fight the Neutra appeal the way that the

14  Debtor has an economic incentive.

15          THE COURT:  That makes no sense to me.  HCLOF is the

16  one who hated this injunction.

17          MR. DEMO:  That's not the Neutra appeal, Your Honor.

18  That's the confirmation order.

19          THE COURT:  Well, okay.  Neutra gets its company back

20  if they win.

21          MR. DEMO:  And we would get our contracts back.

22          THE COURT:  And arguably, it can control Acis, maybe,

23  okay, and it can assign management contracts to whoever it

24  wants.  That just -- and it says it'll assign them to

25  Highland.  If you can trust Jim Dondero, then Highland's going

175

1    to benefit if Neutra wins that appeal.  Right?

2          MR. DEMO:  Yes.  Yes, Your Honor.

3          THE COURT:  Okay.  So that --

4          MR. DEMO:  Highland would benefit greatly --

5          THE COURT:  Okay.

6          MR. DEMO:  -- if Neutra were to win that appeal.

7          THE COURT:  Okay.  Okay.  Well, but first Neutra

8    benefits, right?  And then --

9          MR. DEMO:  No.

10         THE COURT:  -- Highland only secondarily benefits --

11         MR. DEMO:  I -- I --

12         THE COURT:  -- if Jim Dondero keeps his word and

13   gives the management contracts back to Highland.

14         MR. DEMO:  Jim Dondero would also have to repay the

15   $8 million in claim, even if he didn't reinstate those

16   contracts.  And that $8 million would be hundred-cent dollars.

17         THE COURT:  Okay.

18         MR. DEMO:  So, worst case, --

19         THE COURT:  It would have been nice to have him

20   testify as to all of this.

21         MR. DEMO:  Worst --

22         THE COURT:  It would be more compelling if I had him.

23         MR. DEMO:  Well, --

24         THE COURT:  Okay?  But I don't think --

25         MR. DEMO:  -- I can only do so much, Your Honor.

176

1          THE COURT:  -- that's going to happen anytime soon.

2          MR. DEMO:  But I guess worst-case scenario is that

3     it's $8 million in hundred-cent dollars.

4          THE COURT:  Okay.

5          MR. DEMO:  And that's not nothing for $500,000.  And

6     only a portion of that $500,000.

7          THE COURT:  Okay.

8          MR. DEMO:  Thank you, Your Honor.

9          THE COURT:  Okay.  Mr. Lamberson?

10         MR. LAMBERSON:  Your Honor, do you want a closing

11    from me?  Or no?

12         THE COURT:  I don't really need it.  Thank you.

13         MR. LAMBERSON:  Okay.

14         THE COURT:  Okay.

15         MR. LAMBERSON:  Because I know your hearing starts in

16    about two minutes.

17         THE COURT:  All right.  So, I just hate it that we

18    spent so much time on this.  I hate it that we spent so much

19    time, but, I mean, I understand.  I understand.  You know, I

20    think the employment application was filed pretty early in the

21    case, right, and -- October 29th.  And it was continued,

22    continued, continued, because we were getting objections from

23    the Committee, or they wanted time to look at it, I guess.

24    And now you're kind of up against the wire, right, because

25    oral arguments are set at the Fifth Circuit next month.  So I,

177

1  you know, I hate it that we were here, but I understand it.

2      But I'm concerned. I'm concerned -- well, here's the

3  deal. We have a great board, and I totally get that

4  Bankruptcy Courts should defer heavily to the reasonable

5  exercise of business judgment by a board. And we've got great

6  professionals. And we've got this case, I think, on a good

7  track as a general matter now. But I'm concerned that Dondero

8  or certain in-house counsel has -- you know, they're smart,

9  they're persuasive -- that -- what are the words I want to

10  look for -- they have exercised their powers of persuasion or

11  whatever to make the Board and the professionals think that

12  there is some valid prospect of benefit to Highland with these

13  appeals, when it's really all about Neutra, HCLOF, and Mr.

14  Dondero. That's what I believe.

15      I mean, this is awkward, right, because you want to defer

16  to the debtor-in-possession, but I have this long history, and

17  I can think through the scenarios. If this is reversed, here

18  is how it will play out. If this is reversed, here is how it

19  might play out. And I know, you know, there are multiple ways

20  it might play out, but I cannot believe there is a chance in

21  the world there is economic benefit to Highland if these

22  things get reversed. Economic benefit to Neutra: Yeah,

23  maybe. Economic benefit to HCLOF: Well, they'll get what

24  they want. You know, whether it's an economic benefit, I

25  don't know. But benefit to Highland? I just don't think the

178

1  evidence has been there to convince me it's reasonable

2  business judgment for Highland to pay the legal fees

3  associated with the appeal.

4      And even more concerning to me is a valid point was made

5  that Highland is in bankruptcy because of litigation,

6  litigation, litigation. The past officers and directors and

7  controls' propensity to fight about everything. This isn't a

8  balance sheet restructuring, okay? It's not a Chapter 11

9  caused by operational problems or revenue disruption or who

10 knows what kind of disruption. It's about years of litigation

11 finally coming home to roost. And this just appears to be

12 more of the same, potentially.

13     Okay. Parties have a right to appeal. I respect that.

14 Neutra, go for it. HCLOF, go for it. But this estate and its

15 creditors should not bear the burden of having Highland pay

16 for that, when, again, I don't think there's any evidence to

17 suggest they could benefit at the end of the day.

18     So what I'm going to do is I'm going to approve the

19 retention of Foley to represent Highland in the Acis case. We

20 all know the adversary is stayed right now. It may or may not

21 ever be un-stayed, depending on what strategies people want to

22 pursue. But Highland, I think a meritorious case has been

23 presented, and under 327(e) I will approve Foley representing

24 Highland in all Acis matters. Okay? The Acis bankruptcy

25 case. The adversary proceeding, if it goes forward. And so

179

1   that's my ruling.

2       I will additionally rule, for the avoidance of doubt, that

3   if Foley wants to represent Neutra in the appeals and get paid

4   by Neutra, I don't have any problem with that. In other

5   words, I'm not going to find something like there's a conflict

6   with the estate, you know, because of its simultaneous

7   representation of Neutra. That's fine. But I'm not going to

8   approve Highland paying anything in connection with either of

9   those appeals. So that is the ruling of the Court.

10      Have I left any gaps here?

11          MR. DEMO: Your Honor, just one clarification.

12          THE COURT: Uh-huh.

13          MR. DEMO: Foley is representing Highland Capital

14  Management in the appeal of the confirmation order to the

15  Fifth Circuit. I just want to clarify that your ruling that

16  Highland can represent -- I'm sorry -- Foley can represent

17  Highland in all Acis matters extends to their representation

18  of Highland Capital Management in the appeal of the

19  confirmation order that's set for March 30th.

20          THE COURT: Okay. Let me think through that.

21          MR. DEMO: And again, Your Honor, there's been no

22  objection to that.

23          THE COURT: King & Spalding is in there representing

24  HCLOF. Foley would be representing both Neutra and Highland

25  in connection with the confirmation order?

180

1    MR. DEMO:  Technically, but Neutra really has

2  nothing.  It's a coattail party in that case.  Highland

3  Capital Management, to the extent that they could bifurcate

4  Neutra, it would still be doing the exact same work.  So if

5  there is an issue there with the representation of Neutra,

6  we'd still ask that Foley be allowed to represent Highland

7  Capital Management in that appeal.

8    THE COURT:  Okay.  So you're telling me Neutra

9  doesn't really benefit from that appeal, so you want Highland

10  to pay all of the fees of Foley in connection with the

11  confirmation order appeal?

12    MR. DEMO:  All I'm asking, Your Honor, is that Foley

13  can represent Highland Capital Management in that appeal.  And

14  again, there's been no objection to that.  What happens with

15  Neutra, I, you know, I understand your position.  I am simply

16  asking for a clarification that Foley can continue

17  representing the Debtor in the Debtor's appeal of the

18  confirmation order.

19    THE COURT:  All right.  I will say yes to that, but

20  they need to be prepared to have their fees split.  I'm not

21  saying 50/50, I don't know what the percentage is, but they

22  are going to be allocated between Neutra and Highland, and

23  they should not expect to get a hundred percent of those

24  covered by Highland at the end of the day.  Okay?  There's

25  going to be a deep dive into looking at how that allocation

181

1  should work, okay?

2       MR. DEMO:  And they will be filing fee apps,

3  obviously, on all of the matters that they are --

4       THE COURT:  Okay.  Anything else?

5       MR. POMERANTZ:  One moment, Your Honor.

6       THE COURT:  Okay.

7    (Pause.)

8       MR. DEMO:  Yeah.  And Your Honor, I do just want to

9  clarify that when we talk about the involuntary petition

10 appeal, that when we talk about its effect on the fraudulent

11 conveyance action, to the extent that -- and I would like to

12 clarify your position on this, Your Honor.  Is your position

13 that the appeal of the involuntary, if successful, would have

14 no impact on the fraudulent conveyance actions in the Acis

15 litigation?

16    Because I do think that it is clear that --

17       THE COURT:  I think we don't know.  We would have to

18 see --

19       MR. DEMO:  And I guess that's -- that's --

20       THE COURT:  -- what the Fifth Circuit states.

21       MR. DEMO:  And my --

22       THE COURT:  And it may be:  Bankruptcy Court, stay

23 the proceedings and defer, send it to arbitration.  "It" being

24 re-litigation of --

25       MR. DEMO:  Understood.

182

1          THE COURT:  -- the involuntary.

2          MR. DEMO:  And --

3          THE COURT:  That may be, to me, a likely scenario,

4   but maybe not.

5          MR. DEMO:  And -- and --

6          THE COURT:  Maybe they'll say something else.

7          MR. DEMO:  Understood.  And I think we're honestly on

8   the same page with that.

9          THE COURT:  Uh-huh.

10         MR. DEMO:  Because to the extent that it does put it

11  into arbitration, to the extent that there is that

12  possibility, that it changes the color of those fraudulent

13  conveyance claims, changes the color of Acis's $300 million

14  proof of claim, which goes to settlement strategy, which goes

15  to the benefits to other creditors, which goes to a whole

16  panoply of other things that tie into a benefit to the estate.

17  And I don't want to re-argue what we've already argued, but I

18  think, as Your Honor said, that chance that there is going to

19  be a change to the fraudulent conveyance, either because it

20  throws them into an arbitration or because it somehow

21  otherwise colors it, is, in and of itself, a substantial

22  benefit to the estate -- leaving aside the dollars from the

23  contracts, leaving aside the $8 million proof of claim --

24  because that benefit goes to, again, that $300 million proof

25  of claim that Acis has filed, which impacts the estate, which

183

1  impacts other creditors, and which impacts the settlement

2  mechanics in this case.

3      So to the extent that there is a chance that the

4  involuntary changes that and recolors it, there is a

5  substantial benefit to the estate in that, because it allows

6  the estate to work with creditors --

7          THE COURT:  I mean, --

8          MR. DEMO:  -- to figure out a way to settle claims in

9  a way that are --

10         THE COURT:  I get what you're saying, but guess what?

11  You can object to that $300 million proof of claim.  And we

12  might have a very interesting conversation about --

13         MR. DEMO:  What --

14         THE COURT:  Well, it's the same judge either way, but

15  -- well, I guess I don't get what you're saying.  You have the

16  ability to object to the proof of claim whether there's

17  affirmance or --

18         MR. DEMO:  Yeah.  But --

19         THE COURT:  -- reversal, right?  I'm just --

20         MR. DEMO:  We don't have a -- you know, we may not

21  have to get -- I'm sorry, Your Honor, and I'll stop it -- but

22  we may not have to get there.  Objecting to the proof of claim

23  is quali... it is quantitatively and qualitatively different

24  than a Fifth Circuit order saying that there are changes to

25  the fraudulent conveyance, there are changes to the

184

1  distribution of equity under the plan. Maybe there is no plan

2  -- or maybe there is no bankruptcy at all.

3     Those things fundamentally change the dynamics of this

4  case in a way that's good for the estate. And those things

5  can only happen if there's an order from the Fifth Circuit

6  entering that. We can object all down the pipe, and we are

7  going to object, Your Honor, and I assume other people will

8  object as well. But our objecting does not have the same

9  benefit to the estate as a Fifth Circuit opinion saying,

10  Fraudulent conveyance claims go to arbitration; saying, There

11  is no involuntary petition.

12     Now, I understand that there are questions as to the

13  probability of those things, but the fact that there is a

14  probability of those things happening and the cost to the

15  estate is a hundred thousand dollars, I understand what Your

16  Honor has said and I don't want to overstay my welcome, but I

17  do think we are -- at least maybe I am presenting it wrong --

18  but that Fifth Circuit order either way is going to calcify

19  and solidify this in ways that are beneficial to the estate

20  and beneficial to how this bankruptcy is going to progress.

21        THE COURT: Okay. I understand you feel passionately

22  about that, but just so you know, for future purposes or not,

23  I'm not there because, you know, among other things, we -- you

24  know, life has changed. You know, if the Fifth Circuit says

25  reversal, not a darn thing should happen in a bankruptcy case

185

1  of Acis, you know, it can all go to arbitration, well, that's

2  the Acis litigation, right?  But Acis has filed a proof of

3  claim now.  And are you going to tell me the Fifth Circuit is

4  going to say the arbitration that should have happened in the

5  earlier Acis case trumps, if you will, adjudication of a proof

6  of claim now in a new case?

7           MR. DEMO:  And the claims are --

8           THE COURT:  I mean, I'm just -- someone mentioned

9  *Gandy* and *National Gypsum*, and there's even a more recent

10 Fifth Circuit case dealing with arbitration which --

11          MR. DEMO:  The claims, Your Honor, are state law

12 claims if there's no bankruptcy, and I think --

13          THE COURT:  But there is a bankruptcy.  There's a

14 Highland bankruptcy now.  And there's a proof of claim --

15          MR. DEMO:  Not if the Fifth Circuit --

16          THE COURT:  -- in the Highland case.

17          MR. DEMO:  -- overturns the involuntary petition.

18          THE COURT:  Yeah.  I just -- okay.  We're just, we're

19 having academic conversations, and I'm probably guilty for

20 going down this trail.  So, anyway, is there anything further,

21 then?

22          MR. LAMBERSON:  No, Your Honor.

23          THE COURT:  I need a few orders.

24          MR. LAMBERSON:  If they want to prepare an order and

25 send it to us, we're happy to look --

186

1          THE COURT:  Okay.  Thank you all.

2      (Proceedings concluded at 1:44 p.m.)

3                      --oOo--

20                    CERTIFICATE

21     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22 above-entitled matter.

23   **/s/ Kathy Rehling**                    **02/20/2020**

24 _____      _____
   Kathy Rehling, CETD-444                    Date
25 Certified Electronic Court Transcriber

187

INDEX

PROCEEDINGS                                                          4

WITNESSES

Debtors' Witnesses

Russell F. Nelms
- Direct Examination by Mr. Morris                                 57
- Cross-Examination by Mr. Lamberson                              80
- Redirect Examination by Mr. Morris                             109

Holland O'Neil
- Direct Testimony via Declaration                               115
- Cross-Examination by Ms. Patel                                 115
- Redirect Examination by Mr. Morris                             147

EXHIBITS

Debtor's Exhibits                                    Identified Received

1 through 9                                              57       57

Acis Capital Management GP's Exhibits        Identified Received

16   Top 20 List of Creditors                           99      100
27   DAF Lawsuit                                        104      105

RULINGS

Motion to Compromise Controversy with Official Committee      8
of Unsecured Creditors filed by Debtor Highland Capital
Management, L.P. (carryover issues) (281) - *Revised
Operating Protocols to be Submitted*

Lynn Pinker Retention Application - *Withdrawn*               8

Foreign Representative Motion - *Order Signed*              10

Motion to Extend Exclusivity Period filed by Debtor        11
Highland Capital Management, L.P. (395)- *Order Signed*

Debtor's Motion for an Order (i) Establishing Bar Dates     13
for Filing Claims, Including 503(b)(9) Claims; and (ii)
Approving the Form and Manner of Notice Thereof (421) -
*Agreed Order to be Uploaded*

188

```
 1                                  INDEX
                                   Page 2
 2
      RULINGS, cont'd.
 3
```

Motion for Relief from Stay by Creditor PensionDanmark    14
(218) - *Continued to March 11, 2020*

Status Conference Re: Motion of the Debtor for the Entry    28
of an Order Concerning the "Sealing Motion" and for a
Conference Concerning the Substance, Scope, and Intent
of Certain Recent Rulings (397)

Motion to Employ/Retain Foley Gardere, Foley & Lardner    176
LLP as Special Texas Counsel filed by Highland Capital
Management, L.P. (68)

END OF PROCEEDINGS    186

INDEX    187-188

```
 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Docket #1522 Date Filed: 12/08/2020

# EXHIBIT 4

K&L GATES LLP
Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

Stephen G. Topetzes (*pro hac vice*)
1601 K Street, NW
Washington, DC 20006-1600
Tel: (202) 778-9328
stephen.topetzes@klgates.com

James A. Wright III (*pro hac vice*)
1 Lincoln Street
Boston, MA 02110
Tel: (617) 261-3193
james.wright@klgates.com

*Counsel for Highland Capital Management Fund Advisors, L.P.,
NexPoint Advisors, L.P., Highland Income Fund, NexPoint
Strategic Opportunities Fund, and NexPoint Capital, Inc.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |

**MOTION FOR ORDER IMPOSING TEMPORARY
RESTRICTIONS ON DEBTOR'S ABILITY, AS PORTFOLIO
MANAGER, TO INITIATE SALES BY NON-DEBTOR CLO VEHICLES**

Highland Capital Management Fund Advisors, L.P. ("**HCMFA**") and NexPoint

Advisors, L.P. ("**NexPoint**", and together with HCMFA, the "**Advisors**"), and Highland

Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the

"**Funds**"), by and through their undersigned counsel, hereby submit this motion for an order of the Court under Bankruptcy Code §§ 105(a), 363, and 1107 imposing temporary restrictions on Highland Capital Management, L.P.'s (the "**Debtor**") ability to initiate sales as portfolio manager (or other similar capacity) for certain non-debtor investment vehicles (the "**CLOs**"). In support of the Motion, the Funds and Advisors submit the Declaration of Dustin Norris (the "**Declaration**") attached hereto and state as follows:

## BACKGROUND

### A.  *General Background on the Advisors and their Advised Funds*

1.      Each Advisor is registered with the U.S. Securities and Exchange Commission ("**SEC**") as an investment advisor under the Investment Advisers Act of 1940, as amended (the "**Advisers Act**").

2.      Each of the Advisors advises several funds, including the Funds. Each of the Funds is a registered investment company or business development company under the Investment Company Act of 1940 (as amended, the "**1940 Act**").

3.      As an investment company or business development company, each Fund is overseen by a majority independent board of trustees subject to 1940 Act requirements. That board reviews and approves contracts with one of the Advisors for the respective Fund. The Funds do not have employees. Instead, each Fund relies on its respective Advisor, acting pursuant to advisory agreements, to provide the services necessary to the Fund's operations.

### B.  *The CLOs*

4.      The CLOs are Aberdeen Loan Funding, Ltd., Brentwood CLO, Ltd., Eastland CLO, Ltd., Gleneagles CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., Jasper CLO, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Rockwall CDO, Ltd., Rockwall CDO II Ltd.,

300324533.13

Southfork CLO, Ltd., Stratford CLO Ltd., Loan Funding VII, LLC, and Westchester CLO, Ltd.

5.     The CLOs are securitization vehicles formed to acquire and hold pools of debt obligations. They also issued various tranches of notes and preference shares, which are intended to be repaid from proceeds of the subject CLO's pool of debt obligations. The notes issued by the CLOs are paid according to a contractual waterfall, with the value remaining in the CLO after the notes are fully paid flowing to the holders of the preference shares.

6.     The CLOs were created many years ago. Most of the CLOs are, at this point, past their reinvestment period and have paid off all the tranches of notes or, in a few instances, all but the last and most junior tranche. Accordingly, most of the economic value remaining in the CLOs, and all of the upside, belongs to the holders of the preference shares. The repayment status of the notes in the CLOs as of November 2020 is shown on Exhibit A to the Declaration, and the Funds' collective ownership of the preference shares is shown on Exhibit B to the Declaration. As shown on Exhibit B, the Funds hold a majority of the preference shares in three of the CLOs, Grayson CLO, Ltd., Greenbriar CLO, Ltd., and Stratford CLO Ltd., and material interests in most of the other CLOs.

7.     The CLOs have each separately contracted for the Debtor to serve as the CLO's portfolio manager.[1] In this capacity, the Debtor is responsible, among other things, for making decisions to sell the CLOs' assets. Although the portfolio management agreements vary, the agreements generally impose a duty on the Debtor when acting as portfolio manager to maximize the value of the CLO's assets for the benefit of the CLO's noteholders and preference

---

[1] The title given to the Debtor by the CLOs varies from CLO to CLO based on the relevant agreements, but the Debtor has the same general rights and obligations for each CLO. In this Motion, the Funds and Advisors have used the term "portfolio manager" when referring to the Debtor's role for each CLO regardless of the precise title in the underlying documents.

308324633.8 13

APP. 0419
Appx. 00466

shareholders.

        **C.**     **_The Operating Protocols_**

8.     As part of the resolution of certain disputes between the Debtor and the Official Committee of Unsecured Creditors (the "**Committee**"), the Debtor is operating under the restrictions and provisions of certain operating protocols (the "**Operating Protocols**") approved by the Court. See Notice of Debtor's Amended Operating Protocols (Docket No. 466). Among other things, the Operating Protocols include provisions regulating the Debtor's actions on behalf of other entities. With respect to the CLOs, however, the Operating Protocols generally exempt the Debtor from the regular approval process involving the Committee where the Debtor acts as portfolio manager for the CLOs. See, e.g., Operating Protocols at § IV(B)(3)(a).

        **C.**     **_Recent Asset Sales and the Advisors' Requests for a Temporary Pause in Sales_**

9.     The Court recently approved the Debtor's Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (Docket No. 1473) (the "Disclosure Statement").

10.     The Disclosure Statement discusses the Debtor's role as portfolio manager for the CLOs (which the Disclosure Statement defines as "Issuers") in Article II(U) (pg. 32). After explaining the Debtor's role and noting some proofs of claim filed by the CLOs, the Disclosure Statement states as follows:

> The Issuers have taken the position that the rejection of the Portfolio Management Agreements (including any ancillary documents) would result in material rejection damages and have encouraged the Debtor to assume such agreements. Nonetheless, the Issuers and the Debtor are working in good faith to address any outstanding issues regarding such assumption. The Portfolio Management Agreements may be assumed either pursuant to the Plan or by separate motion filed with the Bankruptcy Court.

DOCS_NY:41533.313

The Debtor is still assessing its options with respect to the Portfolio Management Agreements, including whether to assume the Portfolio Management Agreements.

11.    The Financial Projections attached as Exhibit C to the Disclosure Statement make clear that, assuming confirmation of the Debtor's chapter 11 plan in its current form, the Debtor intends to liquidate its remaining assets over the next two years, concluding in December 2022.

12.    The Funds and Advisors do not agree with recent sales executed by the Debtor in certain CLOs, including sales during the historically light Thanksgiving trading week, because the Funds and Advisors view those assets as having greater value if held as long-term investments. When the Advisors became aware the Debtor was considering these transactions, NexPoint requested that the Debtor not consummate the sales.

13.    NexPoint has requested in two letters that the Debtor refrain from causing the CLOs to sell further assets without prior notice and consent of NexPoint. Counsel to the Funds and Advisors has also requested by email that the Debtor agree consensually to temporarily suspend further sales of the CLOs' assets and/or confirm that the Debtor is not presently planning further sales in the immediate future. The Debtor has refused these requests.

### D.    *HCMLP Decisions Illustrating Its Short-Term Approach*

14.    Consistent with its proposal to liquidate all of its assets by the end of 2022 per the Disclosure Statement, HCMLP has engaged in transactions taking a short-term approach to value.

15.    In addition to the sales noted above during Thanksgiving week, during the chapter 11 case, the Debtor has directed the disposition of other assets in a manner that suggests a focus on quick monetization at the expense of maximizing returns for investors and/or the

5

APP. 0421

Appx. 00468

estate. For example, Debtor-controlled entities sold a collective majority interest in an unsecured term loan to OmniMax International, Inc. Other non-Debtor controlled entities, advised by the Advisors, were able to secure a substantially better price for their stake in the same asset by being willing to hold it and transacting at a later date. Given the Debtor-controlled entities large ownership in the unsecured loan, the Advisors believe the Debtor was well-positioned to realize a higher price.

16. Also, upon information and belief, the Debtor, through its wholly owned subsidiary Trussway Holdings, LLC ("**Trussway**"), consummated a sale transaction where Trussway sold a division, SSP Holdings, LLC, in which Trussway had a majority interest. Upon information and belief, the sale was conducted without a formal competitive bidding process and resulted in a loss of $10 million, despite certain metrics of SSP Holdings, LLC having improved materially since it was acquired in 2014.

<u>**REQUEST FOR RELIEF**</u>

17. The Funds and Advisors request that the Court, under Bankruptcy Code sections 105(a), 363, and 1107(a) impose a temporary restriction on the Debtor's ability, as portfolio manager, to cause the CLOs to sell assets. The Funds and Advisors request that the Court prohibit the Debtor from authorizing any such sales for a period of 30 days, absent further order of the Court.

18. Bankruptcy Code section 363 governs the Debtor's use of estate property. 11 U.S.C. § 363. Section 363 authorizes the Debtor to use that property outside of the ordinary course of business "after notice and a hearing," and in the ordinary course of business without notice and a hearing "unless the court orders otherwise . . . ." 11 U.S.C. § 363(b-c). Bankruptcy Code section 1107(a) grants the Debtor, as debtor-in-possession, the powers of a chapter 11 trustee, subject to "such limitations or conditions as the court prescribes . . . ." 11 U.S.C.

6

APP. 0422
Appx. 00469

§ 1107(a). And Bankruptcy Code section 105(a) empowers the Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions" of the Bankruptcy Code. 11 U.S.C. § 105(a).

19.      Consistent with these powers, the Court implemented the Operating Protocols earlier in this case regarding the Debtor's actions on behalf of other non-debtor entities. Unlike where the Debtor directs sales of assets for other entities, however, the Operating Protocols generally do not restrict the Debtor's actions as portfolio manager for the CLOs. See Operating Protocols at IV(B)(3)(a).[2] The Funds and Advisors submit that the relief requested does not conflict with the Operating Protocols, but to the extent necessary, the Funds and Advisors request that the Court modify the Operating Protocols in the limited and temporary way requested in this Motion.

20.      The Funds and Advisors seek this relief to preserve the status quo at the CLOs while the Funds and Advisors explore replacing the Debtor as portfolio manager either

---

[2] Section IV(B)(3)(a) (Transactions involving entities that the Debtor manages but in which the Debtor does not hold a direct or indirect interest)(Operating Requirements)(Third Party Transactions: All Stages) provides in full:

> **Except** (x) as set forth in (b) and (c) below and **(y) for any Transaction involving a Specified Entity and the sale or purchase by such Specified Entity of an asset that is not an obligation or security issued or guaranteed by any of the Debtor, a Related Entity or a fund, account, portfolio company owned, controlled or managed by the Debtor or a Related Entity, where such Transaction is effected in compliance with the collateral management agreement to which such Specified Entity is party,** any Transaction that decreases the NAV of an entity managed by the Debtor in excess of the greater of (i) 10% of NAV or (ii) $3,000,000 requires five business days advance notice to Committee and if the Committee objects, the burden is on the Debtor to seek Court approval, which the Committee agrees may be sought on an expedited basis.

(emphasis added). "Specified Entity" is defined in section I(K) of the Operating Protocols to include the CLOs referenced in this Motion.

APP. 0423
Appx. 00470

consensually or through the contractual processes laid out in the relevant underlying agreements.

21. In the Disclosure Statement, the Debtor states that it has not determined if it wants to continue to serve as portfolio manager for the CLOs. The Debtor also has not sought input from the Funds and Advisers, even though the Funds are among the largest stakeholders indirectly and significantly affected by the Debtor's actions with respect to the CLOs.

22. The Advisers Act places a fiduciary duty on investment advisers comprising a duty of care and duty of loyalty. See, e.g., SEC Release No. IA-3248, "Commission Interpretation Regarding Standard of Conduct for Investment Advisers," (July 12, 2019). This means an adviser, like the Debtor, must, at all times, serve the best interest of its client and not subordinate its client's interest to its own. See id. This combination of care and loyalty obligations has been characterized as requiring the investment adviser to act in the "best interest" of its client at all times. See SEC v. Tambone, 550 F.3d 106, 146 (1st Cir. 2008) ("Section 206 imposes a fiduciary duty on investment advisers to act at all times in the best interest of the fund . . . ."); SEC v. Moran, 944 F. Supp. 286, 297 (S.D.N.Y. 1996) ("Investment advisers are entrusted with the responsibility and duty to act in the best interest of their clients.").

23. Although the Debtor's nominal "clients" are the CLOs themselves, the true parties in interest are the holders of beneficial interests in the CLOs, such as the Funds. Most or all of the other layers of CLO interests have been paid out, and the Funds hold either the majority or a substantial portion of most of the remaining CLO interests. In these circumstances, the Funds and the other preference shareholders are the parties who are economically affected by the Debtor's actions as portfolio manager.

APP. 0424
Appx. 00471

24.     The Funds and Advisors believe replacing the Debtor as portfolio manager is appropriate in light of the reduced staffing the Debtor anticipates having once the Debtor's chapter 11 plan goes effective. The Funds and Advisors also believe it is appropriate in light of the Debtor's reduced investment time horizon under the chapter 11 plan. As noted above, the Debtor intends to liquidate its investments in the next two years. The Funds, on the other hand, have a much longer investment time horizon and, as a result, have very different financial incentives with respect to their investments. The Funds and Advisors accordingly believe that the Funds and the other preference shareholders would be best served by a portfolio manager with a similar long-term perspective.

25.     Upon information and belief, none of the CLOs needs liquidity at the current time, as the next quarterly waterfall payments are not due until February 2021. The Funds and Advisors accordingly submit that none of the CLOs, the other holders of preference shares and notes issued by the CLOs, or the Debtor will be harmed by the temporary restriction proposed by this Motion. Notably, the Funds and Advisors are not seeking to restrict the Debtor from performing any of its other functions for the CLOs or to modify the Debtor's compensation from the CLOs in any way.

*[Remainder of Page Intentionally Left Blank]*

308324533.813

## <u>CONCLUSION</u>

26.     For the reasons set forth above, the Funds and Advisors respectfully request that

the Court grant the relief requested in the Motion and such other and further relief as the Court

deems just and proper.

Dated:     December 8, 2020

K&L GATES LLP

*/s/ Artoush Varshosaz*
Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

Stephen G. Topetzes (*pro hac vice*)
1601 K Street, NW
Washington, DC 20006-1600
Tel: (202) 778-9328
stephen.topetzes@klgates.com

James A. Wright III (*pro hac vice*)
1 Lincoln Street
Boston, MA 02110
Tel: (617) 261-3193
james.wright@klgates.com

*Counsel for Highland Capital Management Fund
Advisors, L.P., NexPoint Advisors, L.P.,
Highland Income Fund, NexPoint Strategic
Opportunities Fund, and NexPoint Capital, Inc.*

308324533.813

APP. 0426
Appx. 00473

## CERTIFICATE OF SERVICE

I hereby certify that on December 8, 2020, I caused the foregoing document to be served via first class United States mail, postage prepaid and/or electronic email through the Court's CM/ECF system to the parties that consented to such service, as each are listed in the debtor's service list filed at docket entry 1442, Exhibits A and B.

This the 8th day of December, 2020

*/s/ Artoush Varshosaz*
Artoush Varshosaz


## CERTIFICATE OF CONFERENCE

I hereby certify that on December 7, 2020, I conferred with Mr. Greg Demo, counsel for the Debtors, regarding the relief requested in the motion.  Mr. Demo informed me that the Debtors do not consent to the relief sought in the motion.

This the 8th day of December, 2020

*/s/ James A. Wright III*
James A. Wright III

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtors. | ) | (Jointly Administered) |
| | ) | |
| | ) | |

## DECLARATION OF DUSTIN NORRIS

I, Dustin Norris, hereby declare pursuant to 28 U.S.C. § 1746, that the following is true and correct.

1. I am the Executive Vice President of NexPoint Advisors, L.P. ("**NexPoint**").

2. I submit this Declaration based on my personal knowledge and information supplied to me by other members of NexPoint's management. I submit this Declaration in support of the Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles (the "Motion") by NexPoint, Highland Capital Management Fund Advisors, L.P. ("**HCMFA**", and together with NexPoint, the "**Advisors**"), Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "**Funds**").

3. The Motion concerns the following non-debtor investment vehicles: Aberdeen Loan Funding, Ltd., Brentwood CLO, Ltd., Eastland CLO, Ltd., Gleneagles CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., Jasper CLO, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Rockwall CDO, Ltd., Rockwall CDO II Ltd., Southfork CLO, Ltd., Stratford CLO Ltd., Loan Funding VII, LLC, and Westchester CLO, Ltd. (collectively, the "**CLOs**").

308354413 v10

4.      The Funds each hold interests in the CLOs.

5.      The CLOs are securitization vehicles formed to acquire and hold pools of debt obligations. They also issued various tranches of notes and preference shares, which are intended to be repaid from proceeds of the subject CLO's pool of debt obligations. The notes issued by the CLOs are paid according to a contractual waterfall, with the value remaining in the CLO after the notes are fully paid flowing to the holders of the preference shares.

6.      The CLOs were created many years ago. Most of the CLOs are, at this point, past their reinvestment period and have paid off all the tranches of notes or, in a few instances, all but the last and most junior tranche. Accordingly, most of the economic value remaining in the CLOs, and all of the upside, belongs to the holders of the preference shares. The repayment status of the notes in the CLOs as of November 2020 is shown on Exhibit A hereto, and the Funds' collective ownership of the preference shares is shown on Exhibit B hereto.

7.      The CLOs have each separately contracted for Highland Capital Management, L.P. (the "**Debtor**") to serve as the CLO's portfolio manager. The title given to the Debtor by the CLOs varies from CLO to CLO based on the relevant agreements, but the Debtor has the same general rights and obligations for each CLO. In this capacity, the Debtor is responsible, among other things, for making decisions to sell the CLOs assets. Although the portfolio management agreements vary, the agreements generally impose a duty on the Debtor when acting as portfolio manager to maximize the value of the CLO's assets for the benefit of the CLO's noteholders and preference shareholders.

8.      During the chapter 11 case, the Debtor has directed the disposition of other assets in a manner that suggests a focus on quick monetization at the expense of maximizing returns for investors and/or the estate. For example, Debtor-controlled entities sold a collective majority

APP. 0429
Appx. 00476

interest in an unsecured term loan to OmniMax International, Inc. Other non-Debtor controlled entities, advised by the Advisors, were able to secure a substantially better price for their stake in the same asset by being willing to hold it and transacting at a later date. Given the Debtor-controlled entities large ownership in the unsecured loan, the Advisors believe the Debtor was well-positioned to realize a higher price.

9.      Also, upon information and belief, the Debtor, through its wholly owned subsidiary Trussway Holdings, LLC ("**Trussway**"), consummated a sale transaction where Trussway sold a division, SSP Holdings, LLC, in which Trussway had a majority interest. Upon information and belief, the sale was conducted without a formal competitive bidding process and resulted in a loss of $10 million, despite certain metrics of SSP Holdings, LLC having improved materially since it was acquired in 2014.

10.      The Advisors did not agree with the Debtor's decision to execute recent sales for certain of the CLOs, because the Advisors viewed those assets as having greater value if held as long-term investments. When the Advisors became aware the Debtor was considering these transactions, NexPoint requested that the Debtor not consummate the sales.

11.      Upon information and belief, none of the CLOs need liquidity at the current time, as the next quarterly waterfall payments are not due until February 2021.

I declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 8th day of December, 2020, in Allen, Texas,

By:      _____
          Dustin Norris

308354413 v10

**EXHIBIT A**

308354413 v10

**CLO Note Repayment Status[1]**

Aberdeen Loan Funding, Ltd.

| Security | CUSIP | Remaining Balance |
|----------|-------|-------------------|
| Class A Notes | 00306LAA2 | $0 |
| Class B Notes | 00306LAB0 | $0 |
| Class C Notes | 00306LAC8 | $0 |
| Class D Notes | 00306LAD6 | $0 |
| Class E Notes | 00306MAA0 | $0 |
| Class I Preference Shares | 00306M201 | $12,000,000.00 |
| Class II Preference Shares | 00306M300 | $36,000,000.00 |

Brentwood CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|----------|-------|-------------------|
| Class A-1A Notes | 107265AA8 | $0 |
| Class A-1B Notes | 107265AM2 | $0 |
| Class A-2 Notes | 107265AC4 | $0 |
| Class B Notes | 107265AE0 | $0 |
| Class C Notes | 107265AG5 | $0 |
| Class D Notes | 107265AK5 | $10,279,258.35 |
| Class I Preference Shares | 107264202 | $34,400,000.00 |
| Class II Preference Shares | 107264400 | $37,000,000.00 |

Eastland CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|----------|-------|-------------------|
| Class A-1 Notes | 277345AA2 | $0 |
| Class A-2a Notes | 277345AC8 | $0 |
| Class A-2b Notes | 277345AE4 | $0 |
| Class A-3 Notes | 277345AG9 | $0 |
| Class B Notes | 277345AJ3 | $0 |
| Class C Notes | 277345AL8 | $0 |
| Class D Notes | 27734AAA1 | $3,251,287.27 |
| Class I Preference Shares | 27734A202 | $85,000,000.00 |
| Class II Preference Shares | 27734A400 | $38,500,000.00 |

---

[1] As of December 1, 2020.

308354413 v10

Gleneagles CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1 Notes | | $0 |
| Class A-2 Notes | | $0 |
| Class B Notes | | $0 |
| Class C Notes | | $0 |
| Class D Notes | | $0 |
| Class 1 Combination Notes | | $0 |
| Class 2 Combination Notes | | $0 |
| Preference Shares | 37866PAB5 & G39165AA6 | $91,000,000.00 |

Grayson CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1a Notes | 389669AA0 | $0 |
| Class A-1b Notes | 389669AB8 | $0 |
| Class A-2 Notes | 389669AC6 | $0 |
| Class B Notes | 389669AD4 | $0 |
| Class C | 389669AE2 | $0 |
| Class D | 389668AA2 | $9,011,534.74 |
| Class I Preference Shares | 389669203 | $52,500,000.00 |
| Class II Preference Shares | 389669302 | $75,000,000.00 |

Greenbriar CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A Notes | 393647AA0 | $0 |
| Class B Notes | 393647AB8 | $0 |
| Class C Notes | 393647AC6 | $0 |
| Class D Notes | 393647AD4 | $0 |
| Class E Notes | 39364PAA0 | $0 |
| Class I Preference Shares | 39364P201 | $20,000,000.00 |
| Class II Preference Shares | 39364P300 | $60,000,000.00 |

Jasper CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A Notes | | $0 |
| Class B Notes | | $0 |
| Class C Notes | | $0 |
| Class D-1 Notes | | $0 |
| Class D-2 Notes | | $0 |
| Preference Shares | 471315200 | $70,000,000.00 |

308354413 v10

APP. 0433
Appx. 00480

Liberty CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1a Notes | | $0 |
| Class A-1b Notes | | $0 |
| Class A-1c Notes | | $0 |
| Class A-2 Notes | | $0 |
| Class A-3 Notes | | $0 |
| Class A-4 Notes | | $0 |
| Class B Notes | | $0 |
| Class C Notes | | $0 |
| Class Q-1 Notes | | $0 |
| Class P-1 Notes | | $0 |
| Class E Certificates | EP0175232 & 530360205 | $94,000,000.00 |

Red River CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A Notes | 75686VAA2 | $0 |
| Class B Notes | 75686VAB0 | $0 |
| Class C Notes | 75686VAC8 | $0 |
| Class D Notes | 75686VAD2 | $0 |
| Class E Notes | 75686XAA8 | $0 |
| Class I Preference Shares | 75686X209 | $36,000,000.00 |
| Class II Preference Shares | 75686X308 | $45,000,000.00 |

Rockwall CDO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1LA Notes | 774262AA7 | $0 |
| Class A-1LB Notes | 774262AB5 | $0 |
| Class A-2L Notes | 774262AC3 | $0 |
| Class A-3L Notes | 774262AD1 | $0 |
| Class A-4L Notes | 774262AE9 | $0 |
| Class B-1L Notes | 774262AF6 | $0 |
| Class X Notes | 774262AG4 | $0 |
| Class I Preference Shares | 774272207 | $33,200,000.00 |
| Class II Preference Shares | 774261127 | $45,000,000.00 |

308354413 v10

APP. 0434
Appx. 00481

Rockwall CDO II Ltd.

| Security | CUSIP | Remaining Balance |
|----------|-------|-------------------|
| Class A-1LA Notes | 77426NAA1 | $0 |
| Class A-1LB Notes | 77426NAB9 | $0 |
| Class A-2L Notes | 77426NAC7 | $0 |
| Class A-3L Notes | 77426NAD5 | $0 |
| Class B-1L Notes | 77426NAE3 | $0 |
| Class B-2L Notes | 77426RAA2 | $9,838,508.11 |
| Class I Preference Shares | 77426R203 | $42,200,000.00 |
| Class II Preference Shares | 77426R401 | $44,000,000.00 |

Southfork CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|----------|-------|-------------------|
| Class A-1a Notes | | $0 |
| Class A-1b Notes | | $0 |
| Class A-1g Notes | | $0 |
| Class A-2 Notes | | $0 |
| Class A-3a Notes | | $0 |
| Class B Notes | | $0 |
| Class C Notes | | $0 |
| Preference Shares | 84427P202 | $80,200,000.00 |
| Class I Composite Note | | $2,000,000.00 |

Stratford CLO Ltd.

| Security | CUSIP | Remaining Balance |
|----------|-------|-------------------|
| Class A-1 Notes | 86280AAA5 | $0 |
| Class A-2 Notes | 86280AAC1 | $0 |
| Class B Notes | 86280AAD9 | $0 |
| Class C Notes | 86280AAE7 | $0 |
| Class D Notes | 86280AAF4 | $0 |
| Class E Notes | 86280AAG2 | $0 |
| Class I Preference Shares | 86280A202 | $17,500,000.00 |
| Class II Preference Shares | 86280A301 | $45,500,000.00 |

308354413 v10

APP. 0435
Appx. 00482

Loan Funding VII, LLC (aka Valhalla)

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1-A Notes | | |
| Class A-2 Notes | | |
| Class B Notes | | |
| Class C-1 Notes | | |
| Class C-2 Notes | | |
| Class I Preference Shares | 91914QAA4 | $82,000,000.00 |

Westchester CLO, Ltd.

| Security | CUSIP | Remaining Balance |
|---|---|---|
| Class A-1-A Notes | 95736XAA6 | $0 |
| Class A-1-B Notes | 95736XAB4 | $0 |
| Class B Notes | 95736XAD0 | $0 |
| Class C Notes | 95736XAE8 | $0 |
| Class D Notes | 95736XAF5 | $0 |
| Class E Notes | 95736XAG3 | $9,141,575.05 |
| Class I Preference Shares | 95736T206 | $80,000,000.00 |

308354413 v10

APP. 0436
Appx. 00483

**EXHIBIT B**

308354413 v10

APP. 0437
Appx. 00484

### Holdings of Preference Shares[1] in CLOs

| CLO | HIF | NSOF | NC | Total |
|---|---|---|---|---|
| Aberdeen | 0% | 30.21% | 0% | **30.21%** |
| Brentwood | 0% | 40.06% | 0% | **40.06%** |
| Eastland | 31.16% | 10.53% | 0% | **41.69%** |
| Gleneagles | 9.74% | 8.52% | 0% | **18.26%** |
| Grayson | 49.10% | 10.75% | 0.63% | **60.48%** |
| Greenbriar | 0% | 53.44% | 0% | **53.44%** |
| Jasper | 0% | 17.86% | 0% | **17.86%** |
| Liberty | 0% | 10.64% | 0% | **10.64%** |
| Red River | 0% | 10.49% | 0% | **10.49%** |
| Rockwall | 6.14% | 19.57% | 0% | **25.71%** |
| Rockwall II | 14.56% | 5.65% | 0% | **20.21%** |
| Southfork | 0% | 7.30% | 0% | **7.30%** |
| Stratford | 0% | 69.05% | 0% | **69.05%** |
| Loan Funding VII (aka Valhalla) | 0% | 1.83% | 0% | **1.83%** |
| Westchester | 0% | 44.38% | 0% | **44.38%** |

---

[1] Class E Certificates for Liberty CLO, Ltd.

308354413 v10

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

|  |  |
|---|---|
| In re: | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | Case No. 19-34054 (SGJ11) |
| Debtors. | (Jointly Administered) |

## ORDER GRANTING MOTION FOR ORDER IMPOSING TEMPORARY RESTRICTIONS ON DEBTOR'S ABILITY, AS PORTFOLIO MANAGER, TO INITIATE SALES BY NON-DEBTOR CLO VEHICLES

Upon the Motion (the "**Motion**"),[1] filed by Highland Capital Management Fund Advisors, L.P. ("**HCMFA**") and NexPoint Advisors, L.P. ("**NexPoint**," and together with HCMFA, the "**Advisors**"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "**Funds**"), seeking an order, pursuant to sections 105(a), 363, and 1107 of the Bankruptcy Code, imposing temporary restrictions on the Debtor's

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings set forth in the Motion.

**APP. 0439**
**Appx. 00486**

ability to initiate sales as portfolio manager (or other similar capacity) for certain non-debtor

investment

2

APP. 0440
Appx. 00487

vehicles (the "**CLOs**"); and upon the Declaration of Dustin Norris (the "**Declaration**"); and the Court, having reviewed the Motion and the Declaration; and due and sufficient notice of the Motion having been given; and it appearing that no other or further notice need be provided; and upon the record before the Court; and a hearing having been held on the Motion; and it appearing to the Court that good cause exists to grant the relief requested by the Motion;

IT IS HEREBY ORDERED THAT:

1.      The Motion is GRANTED as set forth herein.

2.      For a period of thirty days, commencing on the date hereof, the Debtor, in its capacity as portfolio manager or such other similar role with respect to the CLOs, is hereby prohibited from causing the CLOs to engage in any asset sales until January ___, 2021.

3.      The Court shall retain jurisdiction over all matters involving the enforcement, implementation and interpretation of this Order.

# # # END OF ORDER # # #

Submitted by:

K&L Gates LLP
*/s/ Artoush Varshosaz*
Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

Stephen G. Topetzes (*pro hac vice*)
1601 K Street, NW
Washington, DC 20006-1600
Tel: (202) 778-9328
stephen.topetzes@klgates.com

James A. Wright III (*pro hac vice*)
1 Lincoln Street
Boston, MA 02110
Tel: (617) 261-3193
james.wright@klgates.com

308355009 v2

**APP. 0441**
**Appx. 00488**

*Counsel for Highland Capital Management Fund Advisors, L.P.,*
*NexPoint Advisors, L.P., Highland Income Fund, NexPoint*
*Strategic Opportunities Fund, and NexPoint Capital, Inc.*

308355009 v2

4

# EXHIBIT 5

```
              IN THE UNITED STATES BANKRUPTCY COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
                         DALLAS DIVISION

                              )    Case No. 19-34054-sgj-11
In Re:                        )    Chapter 11
                              )
HIGHLAND CAPITAL              )    Dallas, Texas
MANAGEMENT, L.P.,             )    Wednesday, December 16, 2020
                              )    1:30 p.m. Docket
         Debtor.              )
                              )    - MOTION FOR ORDER IMPOSING
                              )    TEMPORARY RESTRICTIONS [1528]
                              )    - DEBTOR'S EMERGENCY MOTION TO
                              )    QUASH SUBPOENA AND FOR ENTRY
                              )    OF PROTECTIVE ORDER [1564,
                              )    1565]
                              )    - JAMES DONDERO'S MOTION FOR
                              )    ENTRY OF ORDER REQUIRING
                              )    NOTICE AND HEARING [1439]
                              )
_____
                  TRANSCRIPT OF PROCEEDINGS
         BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
               UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:              Jeffrey N. Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
                              13th Floor
                             Los Angeles, CA  90067-4003
                             (310) 277-6910

For the Debtor:              John A. Morris
                             Gregory V. Demo
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

For the Official Committee   Matthew A. Clemente
of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                             One South Dearborn Street
                             Chicago, IL  60603
                             (312) 853-7539
```

2

```
1   APPEARANCES, cont'd.:

2   For James Dondero:          D. Michael Lynn
                                Bryan C. Assink
3                               BONDS ELLIS EPPICH SCHAFER
                                  JONES, LLP
4                               420 Throckmorton Street,
                                  Suite 1000
5                               Fort Worth, TX  76102
                                (817) 405-6900
6
    For the Issuer Group:       James E. Bain
7                               JONES WALKER, LLP
                                811 Main Street, Suite 2900
8                               Houston, TX  77002
                                (713) 437-1820
9
    For the NexPoint Parties:   James A. Wright, III
10                              K&L GATES
                                State Street Financial Center
11                              One Lincoln Street
                                Boston, MA  02111
12                              (617) 261-3193

13  For Highland CLO Funding,   Rebecca Matsumura
    Ltd.:                       KING & SPALDING, LLP
14                              500 West 2nd Street, Suite 1800
                                Austin, TX  78701
15                              (512) 457-2024

16  Recorded by:               Michael F. Edmond, Sr.
                                UNITED STATES BANKRUPTCY COURT
17                              1100 Commerce Street, 12th Floor
                                Dallas, TX  75242
18                              (214) 753-2062

19  Transcribed by:             Kathy Rehling
                                311 Paradise Cove
20                              Shady Shores, TX  76208
                                (972) 786-3063
21

22

23

24
           Proceedings recorded by electronic sound recording;
25             transcript produced by transcription service.
```

3

1          DALLAS, TEXAS - DECEMBER 16, 2020 - 1:35 P.M.

2               THE COURT: All right. This is Judge Jernigan. We

3     have settings in Highland. We have -- I guess the very first

4     thing that we had set today was a motion of Dondero, Mr.

5     Dondero wanting some sort of revised procedures for "future

6     estate transactions occurring outside the ordinary course of

7     business." Then, related to that, we received the other day

8     -- I'm not showing it on the calendar, I'm not sure if that

9     means it's moot now or not, but we had a motion for protective

10    order and a motion to quash with regard to certain depositions

11    that Mr. Dondero wanted in connection with his motion. The

12    Debtor filed that motion to quash. It was to quash a

13    deposition of Mr. Dubel, Mr. Nelms, Mr. Sevilla, and Mr.

14    Caruso. And then we have the CLO Motion, what I'm calling the

15    CLO Motion, of --

16        (Interruption.)

17               THE COURT: Okay. Let's --

18               MR. POMERANTZ: Your Honor, this is Jeff Pomerantz.

19    The first two motions have been resolved. And after Your

20    Honor takes appearances, I'm happy to inform the Court of the

21    proposed resolution, and there's an agreed order that we would

22    upload after the hearing.

23               THE COURT: Okay. Well, that is certainly music to

24    my ears. All right. So I was just trying to lay out the

25    program for what I thought was set, potentially three motions,

4

1   one of which was a deposition dispute.

2       All right. So let's go ahead and get appearances. Mr.

3   Pomerantz, you're obviously appearing for the Debtor team.

4           MR. POMERANTZ: Yes. Good morning, Your Honor. Or

5   good afternoon, Your Honor. Jeff Pomerantz; Pachulski Stang

6   Ziehl & Jones. Also on the video with me today are John

7   Morris and Greg Demo. They will be handling the CLO Motion,

8   and I will be reporting to the Court on the resolution of Mr.

9   Dondero's motion and our corollary discovery motions.

10          THE COURT: Okay. All right. Well, why don't I take

11  an appearance from Mr. Dondero next. Mr. Lynn, I see you

12  there.

13          MR. LYNN: Yes, Your Honor. I am here with Bryan

14  Assink, who will replace me after the preliminaries when our

15  business is done. Other than concurring with Mr. Pomerantz, I

16  wanted to advise Your Honor that in the last 30 minutes we

17  filed an additional motion where we're seeking a clarification

18  with respect to the temporary restraining order that the Court

19  entered last week.

20          THE COURT: All right. Well, I did see an email from

21  my courtroom deputy right before walking in about that motion,

22  and so that's why I was a little surprised and said "Music to

23  my ears" that there was an agreed order on the Dondero

24  motions. But I'll get the details --

25          MR. LYNN: Well, we're --

5

1    THE COURT: I'll get the details about that in a

2  minute. Let me go ahead and get the other appearances.

3      For the Movants on what I've called the CLO Motion, who do

4  we have appearing?

5      MR. WRIGHT: Good afternoon, Your Honor. It's James

6  Wright of K&L Gates for the -- I guess I'll call them the

7  Movant for this motion.

8      THE COURT: Yes. Sometimes you're referred to as the

9  Advisors and the Funds and -- but Movants on Docket Entry

10  1528.

11    All right. For the Committee, I know you have weighed in

12  on a couple of these motions. Who do we have?

13      MR. CLEMENTE: Good afternoon, Your Honor. Matt

14  Clemente with Sidley Austin on behalf of the Committee.

15      THE COURT: All right. Well, we have a lot of folks

16  on the phone. I think I've covered everybody who filed a

17  pleading for today. Is there anyone else who would like to

18  appear? I'd really like to restrict it only to those who have

19  filed pleadings today.

20      MS. MATSUMURA: This is Rebecca Matsumura from King &

21  Spalding representing Highland CLO Funding, Ltd. I don't

22  expect I'll be weighing in today, but there are a couple

23  issues that I may say a sentence on, so I want to go ahead and

24  make my appearance now.

25      THE COURT: All right. Thank you. Anyone else?

6

1        MR. BAIN:  Yes, Your Honor.  Joseph Bain; Jones

2   Walker; on behalf of the CLO Issuers.

3        THE COURT:  All right.

4        MR. BAIN:  And Your Honor, if we may make certain

5   comments at the requisite time, we'd appreciate it.

6        THE COURT:  All right.  Thank you.  Anyone else?

7      All right.  Well, Mr. Pomerantz, let's hear about the

8   agreements you have on the Dondero-related motions.

9        MR. POMERANTZ:  Happy to, Your Honor.  And yes, Mr.

10  Lynn is correct, we saw also an emergency motion that came

11  through that I'll have a couple of comments at the end of my

12  presentation.

13     So, as I mentioned before, Your Honor, I'm pleased to

14  report that with respect to the two motions that Your Honor

15  scheduled for today's hearing, we have an agreement with Mr.

16  Dondero.  One was the motion of Mr. Dondero requiring

17  transactions out of the ordinary course to be brought before

18  this Court.  The second was the Debtor's motion to quash a

19  series of subpoenas that had been issued in the last two days,

20  requiring board members and others to testify.

21     As part of the agreement, we have agreed with Mr. Dondero

22  that his motion, which is presently set for today, shall be

23  continued to January 4th, which is the same date set as the

24  continued hearing on the preliminary injunction relating to

25  the TRO that Your Honor had entered last week.

7

1      As part of that agreement, the Debtor has agreed that it

2   will provide Mr. Dondero with three business days' notice

3   before selling any non-security assets from any managed funds

4   accounts through and including January 13th, which is the date

5   set for confirmation.

6      While, as the Court is aware, the Debtor doesn't believe

7   that any notice, opportunity for hearing, or an order from the

8   Court is required in connection with such transactions, as the

9   Debtor does not have any current plans to sell non-security

10   assets from managed funds before confirmation, it was willing

11   to agree to the notice requirement as essentially a way of

12   resolving the motion before Your Honor today and continuing

13   until the 4th.

14      As part of the agreement as well, Your Honor, the parties

15   have agreed that there will be no further discovery in

16   connection with the motion that is set.  That'll be no

17   additional discovery by Mr. Dondero, so he is withdrawing the

18   subpoenas as it relates to this motion, and there will be no

19   further discovery as -- by the Debtor.  As Your Honor, I

20   think, is aware, there were depositions conducted of both Mr.

21   Seery and Mr. Dondero on Monday in connection with this

22   motion, but the discovery will not happen over the next couple

23   of weeks.

24      Mr. Dondero wanted to make sure, and the Debtor didn't

25   have any opposition, that that agreement with respect to no

8

1   discovery only relates to the pending motion before the Court.

2   And in connection with any other matters relating to this

3   bankruptcy case, Mr. Dondero would reserve the right to pursue

4   discovery, and of course the Debtors would reserve the right

5   to challenge discovery if we believed it was inappropriate or

6   unduly burdensome.

7       With respect to the motion that was just filed, Your

8   Honor, we had a chance to briefly review it.  We haven't had a

9   chance to discuss it with the board.  In any event, we don't

10  think there's an emergency.  Mr. Dondero wants the opportunity

11  to approach and communicate with the board.  I've told Mr.

12  Lynn that communications regarding the plan are to go through

13  Mr. Seery.  Mr. Seery is the Debtor's chief executive officer.

14  He's the chief restructuring officer.  And at this point, the

15  board doesn't see a reason or have a desire to meet with Mr.

16  Dondero to talk about his plan, but, again, would be happy to

17  receive any written communications that Mr. Dondero has.

18      Mr. Dondero has sought to modify the TRO to allow him to

19  speak to the board.  Again, if the board agreed to speak with

20  Mr. Dondero, that wouldn't violate the TRO, provided that

21  counsel would be present.  But at this point, the board has

22  decided that it would be inappropriate and not a good use of

23  anyone's time to have that communication and that Mr. Dondero

24  should continue to communicate through Mr. Seery, the Debtor's

25  chief executive officer.

9

1    If Your Honor, after reading the motion and hearing my

2    comments, and I'm sure Judge Lynn's comments that he will make

3    to Your Honor, Your Honor wants to set it for hearing, we

4    would submit, Your Honor, there's no emergency and that a

5    hearing could be set next week, but we would think Your Honor

6    might be able to dispose of the motion just on the papers and

7    the limited argument that would go on today.

8         THE COURT:  All right.

9         MR. POMERANTZ:  Thank you, Your Honor.

10        THE COURT:  All right.  Mr. Lynn, first, could you

11   confirm the terms of the agreed order that Mr. Pomerantz just

12   announced are consistent with what you and your client

13   believed was negotiated?

14        THE CLERK:  He's on mute.

15        THE COURT:  You're on mute, sir.

16        MR. LYNN:  Mr. Pomerantz has correctly stated the

17   agreement of the parties.  I am pleased to advise Your Honor

18   that I expect that we will withdraw the motion that is

19   presently pending to be heard on January 4th, since all we

20   were asking for was notice until confirmation date.  If those

21   sales are going to take place before then, we don't have a

22   problem any longer with the pre-confirmation activity of Mr.

23   Seery.

24    With regard to the motion that we filed requesting that

25   the temporary restraining order be modified, we would point

10

1  out, respectfully, that the independent board is the board of

2  directors of Strand Advisors.  Strand Advisors belongs to Mr.

3  Dondero.  It is not unreasonable for the sole stockholder of

4  Strand Advisors to ask the board questions or present thoughts

5  to the board or ask its advice.  Mr. Seery, on the other hand,

6  while being a member of the board of Strand, is the chief

7  executive officer and the chief restructuring officer of

8  Highland, which is not the same as Strand.

9      Furthermore, Your Honor, Mr. Dondero has been attempting

10 for several months to negotiate an arrangement by which the

11 Debtor can continue as a going concern.  It is his desire to

12 discuss further with the board as a whole what he can do in

13 that regard.  I think the Court, by directing him originally

14 to participate in the mediation that took place in September,

15 expected him to do so.  He has attempted to do so.  And while

16 he has not gotten a response from the Creditors' Committee

17 that is definitive, he has at least caught the interest of Mr.

18 Seery, though that interest may have died for a variety of

19 reasons in recent weeks.

20     And by the way, next week is fine with us.  We're not in a

21 hurry beyond that if the Court feels further discussion would

22 be useful.

23         MR. POMERANTZ:  Your Honor, just a couple of points

24 in response.

25     Mr. Dondero has the right to request an audience with the

11

1    board. He has requested the audience with the board. The

2    board has considered it and decided not to communicate in that

3    fashion with Mr. Dondero at this time. There is nothing that

4    Your Honor can do in the TRO that would change that, other

5    than ordering the board to speak with Mr. Dondero, which I

6    highly doubt Your Honor would do.

7        Having said that, this board in general and Mr. Seery in

8    particular have been very supportive of an overall resolution

9    to this case, not only with the creditors, but with Mr.

10   Dondero. Mr. Seery has spent tens if not hundreds of hours

11   over the last several months working with Mr. Dondero to try

12   to get him in a position to present something that would have

13   traction with the Unsecured Creditors. Unfortunately, that

14   hasn't occurred. We understand there have been communications

15   between Mr. Lynn and Mr. Clemente. And if there is any hope

16   of a plan and any traction with the creditors, this Debtor in

17   general and Mr. Seery in particular stands ready, willing, and

18   able to do anything within the Debtor's power to help that

19   out.

20       So, it's not really the Debtor standing in the way. It's

21   an economic agreement ultimately that needs to be reached with

22   Mr. Clemente and his constituents and Mr. Lynn. And if that

23   can be reached, we will be the first to jump on that bandwagon

24   and do everything humanly possible to have that occur.

25       Thank you, Your Honor.

12

1        THE COURT: All right. Well, again, I've not read

2  the motion. I've just seen an email that I have this motion.

3  I'm a little bit confused. I don't want to spend too long on

4  this because we have another motion to get to. But I'm a

5  little bit confused on how Dondero wants the TRO to be

6  modified. If he has the right already to request an audience

7  of the board, what is it that is problematic about the TRO

8  that he wants modified?

9        THE CLERK: He's on mute.

10       THE COURT: You're on mute.

11       MR. LYNN: Sorry, Your Honor. As I told you before,

12  you must forgive me, my command of technology is not great.

13    In response, I would say that I question whether it is

14  appropriate, in advance of a meeting with the board of his

15  company, that what he wants to talk about should be screened.

16  And that is what has occurred in our effort to meet by

17  telephone with the board.

18    Any such meeting would, of course, be subject to the

19  restraints that are included in the temporary restraining

20  order, in that both Mr. Pomerantz or his designee and I would

21  participate in any such discussion. I respectfully submit

22  Strand is his. Nobody may like that, but it is his, and he

23  ought to be able to talk to his own board.

24       THE COURT: Is this about having a conversation

25  without the Committee's involvement? I just don't -- hmm. I

13

1  just need to see the motion.

2      Mr. Clemente, anything you want to add at this juncture?

3  Have you even reviewed the motion yet?

4          MR. CLEMENTE:  Your Honor, I apologize.  I haven't

5  actually even seen the motion.  And so I have no comment on

6  it, Your Honor.  I apologize for not having been able to look

7  at it.

8          THE COURT:  Okay.  Well, what about the agreed order

9  that's been announced?  Any comment on that?

10          MR. CLEMENTE:  Your Honor, we support the resolution

11  that Mr. Pomerantz announced on the record.

12          THE COURT:  Okay.  All right.  Well, I assume there's

13  nothing further, then, on the Dondero motions that were

14  scheduled today?

15      All right.  So I will happily accept the agreed order that

16  has been announced.  For now, we will continue the Dondero

17  motion that was Docket Entry No. 1439 to January 4th, when the

18  preliminary injunction hearing is set.  And we -- I understand

19  there are going to be no more discovery requests in connection

20  with these matters that were set today.

21      And I will review the motion that Mr. Dondero has filed

22  shortly before today's hearing in chambers later, and I will

23  have my courtroom deputy communicate to the lawyers whether I

24  see fit to set it for an emergency hearing next week or rule

25  on the pleadings or set it for January 4th.  Those are, I

14

1    guess, the three possibilities I can think of that I might

2    decide upon.

3        So, again, I'm not making any ruling at all on a motion I

4    haven't read yet.  So I'll -- the courtroom deputy will let

5    you all know, if not later today, tomorrow.  Probably

6    tomorrow, because I have a confirmation hearing set later

7    today in another case.

8        All right.  So, thank you all for working these issues

9    out.  And Mr. Pomerantz, Mr. Dondero -- or, excuse me, Mr.

10   Lynn, anything further on the Dondero disputes?

11           MR. POMERANTZ:  Nothing from the Debtor, Your Honor.

12           MR. LYNN:  Your Honor, nothing from Mr. Dondero.  May

13   I be excused?

14           THE COURT:  Is anyone anticipating needing Mr.

15   Dondero's counsel for the other matter?  All right.  If not,

16   then I certainly have no problem with you dropping off the

17   line, Mr. Lynn.  Thank you.

18           MR. LYNN:  Thank you, Your Honor.

19           THE COURT:  Okay.  All right.  So let's turn next to

20   the CLO Motion.  I take it there are no agreements on this

21   one?

22           MR. POMERANTZ:  There are not, Your Honor.

23           MR. WRIGHT:  There are not, Your Honor.  I can

24   confirm that.

25           THE COURT:  All right.  Mr. Wright, do you have

15

1    anything you want to say as far as an opening statement before

2    we go to the evidence?

3         MR. WRIGHT:  I don't, Your Honor.  My intention, if

4    it's okay with you, you asked me to bring a witness, so I do

5    have Mr. Norris from my client, and I was going to just remind

6    the Court who I am and state the name of all of my Movants,

7    and then I was going to move directly to put him on the stand

8    and go through a brief direct.

9         THE COURT:  All right.  I think I heard Mr. Morris is

10   going to handle this phase of the hearing.

11        MR. DEMO:  And Your Honor, this is Greg Demo from

12   Pachulski on behalf of the Debtor.

13        THE COURT:  Oh, okay.

14        MR. DEMO:  We would like to make a brief opening

15   statement before we have witnesses, if that's all right with

16   Your Honor.

17        THE COURT:  All right.  I'm fine with that.  So, --

18        MR. DEMO:  All right.

19        THE COURT:  -- go ahead.

20        MR. DEMO:  All right.  Well, thank you, Your Honor.

21   Again, Greg Demo; Pachulski Stang; on behalf of the Debtor.

22     We are here today on what really amounts to the third of

23   three motions that deal with Mr. Dondero's attempts, either

24   directly or through a proxy, to transfer control away from the

25   Debtor and back to Mr. Dondero.

16

1     The current motion is filed by NexPoint Capital and

2  Highland Capital Management Fund Advisors and three of their

3  managed funds:  Highland Income Fund, NexPoint Capital, and

4  NexPoint Strategic Opportunities Funds.

5     Mr. Dondero owns and controls NexPoint Capital and

6  Highland Capital Management Fund Advisors.  While both

7  NexPoint Capital and Highland Capital Management Fund Advisors

8  are governed by boards, the boards have no investment

9  authority with respect to the funds they manage, nor was the

10 boards' approval necessary to file the motion, or obtained.

11    Mr. Dondero is the sole portfolio manager for NexPoint

12 Strategic Opportunities Fund and Highland Income Fund.  Mr.

13 Dondero is one of three portfolio managers for NexPoint

14 Capital.  Mr. Dondero's decisions are not subject to

15 oversight.

16    The Movants disclosed these facts in their recent SEC

17 filings, and there can be no dispute that Mr. Dondero is the

18 controlling figure behind the Movants in the relief being

19 sought in the motion which seeks to impede the Debtor's

20 efforts to exercise its rights as a CLO manager.

21    The fact that this motion was even filed is quite

22 surprising, since on December 7th the Debtor filed a complaint

23 and TRO based upon Mr. Dondero's unlawful efforts to frustrate

24 the Debtor's efforts to sell assets from the very CLOs that

25 are the subject of this motion.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 463 of
2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 462 of
2722

17

1        The Court granted the TRO on December 10th.  Mr. Dondero

2   also filed a motion seeking similar relief in November, which

3   has now been adjourned to January 4th.

4        The Movants are essentially now seeking an order from this

5   Court enjoining the Debtor from exercising its rights as a CLO

6   manager and requiring the Debtor to seek the Movants' and Mr.

7   Dondero's permission to fulfill its obligations as a manager

8   for the CLOs.

9        The Movants, however, do not come right out and say this,

10  and instead couch the motion as seeking to simply pause the

11  CLOs' asset sales while the Movants and the Debtor engage in

12  discussions regarding the future of the CLOs' management.

13       In the motion, the Movants also argue the Debtor has made

14  decisions detrimental to the interests of the preference

15  shareholders because the Debtor is trying to monetize its

16  assets in a manner inconsistent with the preference shares'

17  objectives.

18       The Movants simply mischaracterize the facts, the parties'

19  respective rights under contracts, and the law.

20       First, to the extent the Movants hold interests, they hold

21  only preference shares in the CLOs and are minority investors

22  in the preference shares of 12 of the 15 CLOs at issue.  In

23  one third of the CLOs, the Movants' interests sit behind

24  senior debt which must be paid first.

25       Notably, Your Honor, no other investors in the CLOs are

18

1   here or have expressed support for the Movants' position.

2        Second, the Movants simply have no right under the

3   contracts governing the CLOs to the relief they are

4   requesting.  The CLOs are governed by a series of agreements

5   which were agreed to long ago and dictate the rights of all

6   investors of the CLOs.  The enforceability of those agreements

7   is relied on by all investors, not just the Movants.

8        Under these agreements, investment discretion is given to

9   the CLOs' manager -- in this case, the Debtor -- and no

10  investor has the right to direct the CLO manager.  The manager

11  was chosen to manage the CLOs' assets.  No individual investor

12  was chosen to manage the CLOs' assets.

13       Simply said, there will be no evidence that the Movants

14  have the right to do what they're trying to do, and there will

15  be no evidence that the Movants' preferences with respect to

16  the CLOs' assets is in line with that of the other investors

17  in the CLOs.

18       Under the relevant agreements, if an investor is not happy

19  with a manager's performance, the investor's rights are

20  generally limited to replacing the manager.  The investors

21  here -- excuse me, the Movants here -- have not done that and

22  cannot do that.  Under the agreements, replacement requires at

23  least the majority of the preference shares that are not

24  affiliates of the managers.  In 12 of the 15 CLOs, the Movants

25  hold a substantial minority interest position.  They are not

19

1  the majority.  In the three CLOs in which they are the

2  majority, the Movants still cannot replace the Debtor as the

3  investment manager because they are the Debtor's affiliates.

4      It is indisputable that, prior to January 9th, when Mr.

5  Dondero was removed from control of the Debtor, that the

6  Debtor, NexPoint Advisors, Highland Capital Management Fund

7  Advisors, and the three funds were the Debtor's affiliates

8  because of Mr. Dondero's common control.

9      After January 9th, where the Court removed Mr. Dondero

10  from control of the Debtor, the Debtor is arguably, under the

11  documents, not an affiliate.  However, Your Honor, the Movants

12  have disclosed in their recent proxy statements filed in 2020

13  that they still consider themselves the Debtor's affiliate,

14  and they should be bound by that statement.  The Movants, by

15  virtue of Mr. Dondero's being removed from control of the

16  Debtor, should not be able to use that removal to reassert

17  control over the CLOs that were taken away from Mr. Dondero

18  when he was removed in January 2020.

19      The Debtor believes that additional briefing may be needed

20  on this issue, and that a ruling specifically on this issue

21  and the parties' relative rights under the CLO management

22  agreements may be needed.  The Debtor reserves its right to

23  brief this issue and to bring it before this Court, either as

24  a declaratory judgment or any other procedurally-appropriate

25  motion.

20

1    Because the Debtor -- excuse me.  The Movants have no

2    right to the relief requested.  They argue that the relief is

3    justified because of the mismatch between the investors'

4    timelines and the Movants'.  This is not true.  The Movants

5    cite to three transactions to justify their statement in the

6    motion:  SSP, OmniMax, and certain recent transactions.

7    The recent transactions were the attempted sales of two

8    public equities immediately before Thanksgiving that Mr.

9    Dondero interfered with.  You'll hear testimony from Mr. Seery

10   about each of these transactions and how each was in the best

11   interest of the CLOs.

12   First, SSP.  SSP is a steel business that was suffering

13   for a number of reasons.  The Debtor's investment team

14   believed SSP should be sold since 2019.  The Debtor received

15   multiple offers for SSP, the Debtor evaluated these offers,

16   and the Debtor choose the one that was the best.  The SSP sale

17   closed in early November.

18   Notably, Your Honor, none of the CLOs held an equity

19   interest in SSP, its parent, or in Trussway.  Instead, they

20   held debt, and they got exactly what they bargained for,

21   repayment of their debt obligations in full.

22   OmniMax, Your Honor, is the second one.  It is a

23   fabricator of building materials.  The CLOs and the Movants

24   held an interest in OmniMax debt which they have been trying

25   to refinance or equitize since 2019.  That deal was intended

21

1  to include the Movants, but instead of working with the

2  Debtor, Mr. Dondero held out and used the threat of litigation

3  against OmniMax to secure a higher price for the Movants, to

4  the detriment of the CLOs.

5      As Mr. Seery will testify, these two transactions were all

6  about maximizing value and have nothing to do with investment

7  timelines.

8      Finally, Your Honor, the Movants reference the

9  Thanksgiving transactions.  These transactions were discussed

10 in the context of Mr. Dondero's TRO.  Mr. Seery directed

11 Debtor personnel, on the advice of his investment team, to

12 sell these securities.  Mr. Dondero blocked those trades.  Now

13 the Movants argue that the reason those trades were blocked

14 was because of a mismatch between the Movants' and the

15 Debtor's investment timelines.  That is not the case.  Mr.

16 Seery will testify as to these trades.  The Debtor is an

17 investment manager and appreciates that its decisions with

18 respect to how it manages its assets are -- is a judgment

19 call.  The evidence, however, will show that the Debtor at all

20 times exercised that judgment in good faith based on all

21 available information.

22     The Movants may disagree with the Debtor's judgment, Your

23 Honor, but that is irrelevant.  The Movants have no right to

24 interfere with the Debtor's management of the CLOs.  There is

25 simply no statutory or contractual basis for this, not under

22

1   Section 363 and not under the CLO agreements.

2        Finally, Your Honor, -- I guess not finally.  There's one

3   more point I want to make.  But Your Honor, this -- what we're

4   here on today is notably similar to the Acis bankruptcy that

5   Your Honor noted last time we were here last week.  In that

6   bankruptcy, HCLOF tried to direct the collateral manager to

7   take certain actions that HCLOF thought were in the best

8   interest of the CLOs.  In this case, the Movants, through Mr.

9   Dondero, are trying to file an action that functionally seeks

10  to direct the Debtor to take interests that the Movants

11  believe are in their best interest.  There is substantial

12  overlap between the litigation in Acis and the litigation

13  here.

14       Finally, Your Honor, the Debtor has been in discussions

15  with the CLOs' counsel on this issue.  And the Debtor has been

16  informed that the CLOs' position is that the Debtor's ability

17  to operate under the management agreements should not be

18  interfered with, not by the Movants or not by any other party.

19       Thank you, Your Honor.  With that, I will turn it over to

20  Mr. Norris.  Or, I'm sorry, Mr. Wright.

21            THE COURT:  All right.  Mr. Wright, you may call your

22  witness.

23            MR. WRIGHT:  All right, Your Honor.  Dustin Norris

24  should be -- should be dialed in and should be available on

25  screens.

Norris - Direct                              23

1           THE COURT:  Okay.  I'm going to --

2           MR. WRIGHT:  I'll pause and have him confirm that.

3           THE COURT:  I'm going to ask you, Mr. Wright, to

4    speak up or closer to your device.  I didn't hear the name of

5    your witness.

6           MR. WRIGHT:  Sure.  Sorry.  It's Dustin Norris.  I --

7    last time, you were having trouble hearing me, and so I'm

8    trying a different device this time.  I actually followed the

9    instructions that I found very helpful, so I'm trying my phone

10   in hopes that it will work better.

11          THE COURT:  All right.

12          MR. WRIGHT:  But, yeah, it's Dustin Norris.  D-U-S-T-

13   I-N, N-O-R-R -- N-O-R-R-I-S.

14          THE COURT:  All right.  Mr. Norris, can you say

15   "Testing one two" so we pick up your video?

16          MR. NORRIS:  Testing one two.

17          THE COURT:  All right.

18          MR. NORRIS:  Testing one two.

19          THE COURT:  All right.  Please raise your right hand.

20            DUSTIN NORRIS, MOVANTS' WITNESS, SWORN

21          THE COURT:  All right.  Mr. Wright, you may proceed.

22          MR. WRIGHT:  Thank you, Your Honor.

23                       DIRECT EXAMINATION

24   BY MR. WRIGHT:

25   Q   Mr. Norris, you're employed by NexPoint Advisors?

Norris - Direct                    24

1  A    I am.  That's correct.

2  Q    And what is your title and role there?

3  A    Yeah.  I am the executive vice president of NexPoint

4  Advisors.  In that role, I oversee business development,

5  marketing, sales, investor relations.  And as far as the funds

6  advised by the advisor, I'm the liaison with the independent

7  board on the business side.

8  Q    Thank you.  Do you also have a role for Highland Capital

9  Management Fund Advisors?

10 A    I do.  I'm also the same executive vice president and

11 fulfill that same role as it pertains to business development,

12 sales, investor relations.  And in both, I'm also working on

13 product development.  So, launching, developing new products

14 and investment funds.

15 Q    Do you also have a role for Highland Income Fund, NexPoint

16 Strategic Opportunities Fund, and NexPoint Capital, Inc.?

17 A    I do.  I'm also executive vice president for each of those

18 funds.

19 Q    Thank you.  Have you ever served on the boards of these

20 three funds?

21 A    I have.  I've served as the interested trustee, sole

22 interested trustee for each of these funds.  I'm no longer the

23 board member or interested trustee, but still serve as an

24 officer, executive vice president, for each fund.

25 Q    At times, I'm going to refer to NexPoint Advisors, LP and

Norris - Direct                    25

1  Highland Capital Management Fund Advisors, LP simply as the

2  Advisors, to avoid having to keep saying their long names.

3  And similarly with the three funds that are part of the

4  motion, I may just call them the Funds.

5     Can you explain the relationship between the Advisors and

6  the Funds, briefly?

7  A    Yeah.  So, each of these are investment companies that are

8  registered under the Investment Company Act of 1940.  So, with

9  that comes a unique relationship between an investment advisor

10 and the funds themselves.  The Funds don't have employees.

11 They rely on the investment advisor and investment advisor

12 employees.  And between the Funds and the Advisors is an

13 investment advisory agreement.  And the Funds themselves are

14 also overseen by an independent board, and that's by statute

15 by the 1940 Act.

16 Q    Okay.  And just to be clear, when you said that these are

17 -- entities are investment companies, you meant that the three

18 Funds are investment companies?

19 A    Correct.  Correct.  The three Funds are investment

20 companies.  The investment advisors are not investment

21 companies.

22 Q    Thank you.  Can you explain the role of the board for the

23 Funds?

24 A    Yeah.  So, as prescribed by the Investment Company Act of

25 1940, there are certain obligations related to an investment

Norris - Direct                    26

1  company, and one of those is they must be overseen by an

2  independent board.  And the independent board has a

3  responsibility to oversee the -- certain material agreements,

4  including the advisory agreement.  And we meet regularly with

5  the boards.  They overseas certain processes and, again, all

6  material contracts.  And the board is, by Section 15(c) of the

7  1940 Act, required by law to annually review the capabilities

8  of the Advisor and to either approve or reject the advisory

9  contracts.  So, each year, those contracts are renewed by the

10  independent board.

11     There are certain obligations of the Fund and operations

12  that are delegated responsibility to the investment advisors.

13  That includes portfolio management and investment decisions.

14  But all those are overseen by the board.

15  Q   Okay.  And are the boards involved in the day-to-day

16  operations of the Funds?

17  A   They're not.

18  Q   Okay.  And do you know who the members of the boards of

19  these three Funds are?

20  A   I do.

21  Q   Could you share that with us?

22  A   Yeah.  So, the -- there is one interested trustee of each

23  board, and that's John Honis.  And then for the Highland

24  Income Fund and the NexPoint Strategic Opportunities Fund --

25  sorry, for NexPoint -- for Highland Income Fund and NexPoint

Norris - Direct                          27

1   Capital, we have the same three disinterested or independent

2   trustees, and that's Bryan Ward, Dr. Bob Froehlich, and Ethan

3   Powell.  And for NexPoint Strategic Opportunities Fund, we

4   have the same four trustees, one interested, three

5   independent, but there's another fourth interested trustee,

6   Ed Constantino.

7   Q    And when you refer to independent trustees, do you mean

8   independent for purposes of the Investment Company Act of

9   1940, as amended?

10  A    That's correct.  They, by statute, they are independent

11  trustees.  They also have an independent legal counsel.  Stacy

12  Louizos represents them from Blank Rome.  And also two of

13  these Funds are listed on the New York Stock Exchange, and the

14  New York Stock Exchange has various independence requirements

15  that each independent director has met.

16  Q    Thank you.  And which are the two Funds that are listed on

17  NYSE?

18  A    The Highland Income Fund and the NexPoint Strategic

19  Opportunities Fund are both NYSE-listed.

20  Q    And I know you probably haven't memorized everybody who

21  invests in the Funds, but can you give us a general idea of

22  who invests in these Funds?

23  A    Certainly.  I definitely have not memorized them.  There

24  are thousands of individual investors in each of these Funds.

25  Part of my role overseeing investor relations and sales, I do

Norris - Direct                    28

1   talk to a lot of those investors.  But the majority of the

2   investors in each of these Funds are individual investors.

3       As '40 Act Funds, almost anybody with a brokerage account

4   can buy them.  They have tickers, particularly the Funds that

5   are listed.  Closed-end funds.  And so, with that, it is mom-

6   and-pop investors.  It's retail investors, including myself.

7   I've allocated my 401(k) to these funds, the majority of my

8   401(k) to these funds.  But there are also institutional

9   investors.  There's hedge funds.  There's ETFs.  There are

10  large high-net-worth individuals.  But the majority of it is

11  individual investors that have invested through their

12  brokerage firms, be it Wells Fargo, Morgan Stanley, or Cetera.

13  These are -- these are -- these are the individual investors.

14  Q   Thank you.  Does Mr. Dondero have investments in the

15  Funds?  Do you know?

16  A   He does.  He's invested in each of the Funds.

17  Q   Does he have a majority investment in any of the Funds?

18  A   He does not have a majority investment in any of the

19  Funds.

20  Q   Thank you.  Does Mr. Dondero have a control relationship

21  with the two Advisors?

22  A   Yes.  He does.  With the Advisors.

23  Q   And does he have a control relationship with the Funds?

24  A   As it pertains to portfolio management, he is a portfolio

25  manager of each Fund.  But as discussed, as I mentioned, the

Norris - Direct                    29

1   independent board on an annual basis has the ability to

2   terminate or renew our advisory contracts, and that -- that

3   dynamic removes the control, overall control, of the Funds in

4   that regard.

5   Q   Are you familiar with the motion that the Court I think

6   has accurately referred to as the CLO Motion that was filed by

7   the two Advisors and the three Funds?

8   A   Yes.  I am familiar with it.

9   Q   And I'm going to ask you a question now that I think is of

10  interest to the Court, based on the last time I was in front

11  of Judge Jernigan.  Were any employees of the Debtor involved

12  in deciding to bring this motion or in preparing the motion?

13  A   No.  None of the HCMLP employees, to my knowledge, were

14  involved in preparing or deciding to bring the motion.

15  Q   Okay.  And you investigated who was involved in preparing

16  the motion, so your knowledge is pretty good on this point?

17  A   Correct.  I have.  And none were involved, based on that

18  investigation.

19  Q   (garbled) involved in deciding to bring a motion,

20  preparing it, other than outside counsel and my firm?

21  A   Yeah.  So, the initial cause for concern was raised by Mr.

22  Dondero himself to our legal -- internal legal team and

23  compliance team.  And working together with them, myself, and

24  outside counsel, and senior management of Highland Capital

25  Management Fund Advisors, including Joe Sowin, we prepared the

Norris - Direct                          30

1  order.  Or, sorry, not the order, the motion.

2  Q   All right.  Thank you.  Were the boards of the three Funds

3  involved at all with bringing the motion?

4  A   They were not involved in the preparation of the motion

5  itself.  They were aware and supportive, but they did not

6  prepare the motion.

7  Q   You provided a (audio gap), correct?

8  A   Sorry.  You did cut out there.  I didn't hear the

9  question.

10 Q   I'll try again.  You provided a declaration (garbled)

11 motion, correct?

12 A   I did, yes.

13 Q   And there are two exhibits to your declaration.  There's

14 an Exhibit A and an Exhibit B.

15 A   Correct.

16 Q   Exhibit A, does this reflect the current repayment status

17 of the various CLOs as we -- as you understand it to be as of

18 December 1st?

19 A   Yes, it does.

20 Q   And does Exhibit (garbled) of the three Funds --

21        THE COURT:  Okay.  Mr. --

22 BY MR. WRIGHT:

23 Q   -- and the various CLOs, --

24        THE COURT:  Mr. Wright?

25 BY MR. WRIGHT:

Norris - Direct                              31

1  Q   -- as you understand it?

2           THE COURT:  Mr. Wright, time out.  Two things.

3  First, I don't know what you can do to improve --

4           MR. WRIGHT:  Sure.

5           THE COURT:  -- your connection, but you're

6  occasionally breaking up a little.

7       But second, can we be clear for myself, the record,

8  everyone else, what you're referring to right now?  We have an

9  Advis... your witness and exhibit list is at Docket 1573.  Is

10 that what I should be looking at first?

11          MR. WRIGHT:  Yes, Your Honor.  The declaration of Mr.

12 Norris.  It's Docket 1522-1.  And it's on our exhibit list.

13 It may be the only exhibit on our exhibit list, frankly.

14          THE COURT:  Okay.  So you're talking about his

15 declaration now, not the witness and exhibit list with the

16 attachments to it?  Actually, it is attached here.  Exhibit A.

17 Okay.  I'm there.  I went to Exhibit A in your attachments to

18 your exhibit list at 1573.

19      All right.  Let's try again with your question you just

20 asked.

21          MR. WRIGHT:  Sure.

22 BY MR. WRIGHT:

23 Q   So, Mr. Norris, Exhibit A, this reflects the current

24 repayment status of the CLOs that are the subject of the

25 motion as of December 1.  Correct?

Norris - Direct                     32

1  A    Correct.

2  Q    And then --

3            MR. WRIGHT:  Your Honor, if you turn to Exhibit B,

4  which is just a couple pages forward.

5            MR. MORRIS:  Your Honor, I would ask that this be put

6  up on the screen, if possible.

7            THE COURT:  Yes.  Can you do that, please?

8            MR. WRIGHT:  I'm sorry.  I couldn't hear that, John.

9            THE COURT:  He asked if you could --

10            MR. MORRIS:  I would --

11            THE COURT:  -- share your screen.  Can you share your

12  screen as to what you're looking at?

13            MR. WRIGHT:  Can I share my screen?  Last time I was

14  using a computer and you were having trouble hearing me, so

15  this time I'm doing it on my phone.  So my phone, no, I don't

16  have this on my phone to share my screen that way.  It's

17  Docket 1522-1, and it's the only exhibit that was on our

18  exhibit list.

19            MR. MORRIS:  No objection, Your Honor.

20            MR. WRIGHT:  All it shows is the holdings in Funds in

21  the CLOs.  That's all it is.

22            MR. MORRIS:  No objection, Your Honor.

23            THE COURT:  Okay.

24            MR. NORRIS:  I'm sorry, John.  I didn't hear.

25            THE COURT:  Give me a minute, because I was at 1573,

                              Norris - Direct                    33

 1  your witness and exhibit list.

 2       (Pause.)

 3            THE COURT:  Okay.  That's not the correct docket

 4  number.

 5            MR. MORRIS:  Your Honor?

 6            THE COURT:  Yes?

 7            MR. MORRIS:  If I may, it's John -- it's John Morris.

 8  It's Docket No. 1528.  And the declaration can be found at

 9  Page 12 of 26.

10            MR. WRIGHT:  Thank you.

11            THE COURT:  1528?

12            MR. WRIGHT:  That's bizarre, because I have a

13  printout of it and it says Docket 1522-1.

14            THE COURT:  Okay.  1528 is the -- the actual motion

15  we've set for hearing.

16            MR. MORRIS:  And it's attached to that, yes.  If you

17  -- if you go to PDF Page 12, it's the first page of the

18  declaration.

19            THE COURT:  Okay.  I'm there now.  Okay.  So we're on

20  that declaration.  And then you were having the witness look

21  first at Exhibit A to that declaration.  And then where are

22  you having him look next?  Exhibit B, which is entitled

23  "Holdings of Preferred Shares in CLOs"?

24            MR. WRIGHT:  Exhibit B, Your Honor.

25            THE COURT:  Okay.  Continue.

Norris - Direct                    34

1         MR. WRIGHT:  (garbled) I think some of the exhibits

2    that I have had the wrong docket number printed on the top,

3    and I --

4    BY MR. WRIGHT:

5    Q    Exhibit B.  So, Mr. Norris, Exhibit B to your declaration

6    shows the holdings of the preference shares of the Funds in

7    the various CLOs that are the subject of the motion, correct?

8    A    That's correct.  One clarification.  It shows the

9    percentage ownership of each of those preference share

10   tranches that each Fund owns.

11   Q    Thank you.  Mr. Norris, do the three Funds have a date by

12   which they have to liquidate their investments?

13   A    Sorry, you did skip out there.  If you could you repeat

14   the question.  I apologize.

15   Q    It's frustrating.  Do the three Funds have a date by which

16   they must liquidate their investments?

17   A    No.  They do not.

18   Q    Okay.  Can you briefly explain why the Advisors and the

19   Funds brought this motion?

20   A    Yeah.  The Advisors and the Funds were concerned with

21   certain transactions, as described in the motion.  As

22   preference share owners, we own the majority or a substantial

23   portion of the economics of most of these CLOs, and in three

24   instances the majority of the economic benefit.  And there was

25   concern with the way that the sales were executed.  And so,

Norris - Cross                          35

1    with that, we're simply asking for a temporary relief in order

2    to benefit and to maximize the recovery for our preference

3    shares that we own.

4    Q    Thank you.

5            MR. WRIGHT:  All right, Your Honor.  I have no

6    further questions for Mr. Norris, although I guess I reserve

7    the right to redirect.

8            THE COURT:  All right.  Cross-examination?

9            MR. MORRIS:  Thank you, Your Honor.

10                         CROSS-EXAMINATION

11   BY MR. MORRIS:

12   Q    Good afternoon, Mr. Norris.  Can you hear me?

13   A    I can.  Thank you, Mr. Morris.

14   Q    All right.  I'm going to go into a little bit more detail

15   about some of the topics that you discussed.  To be clear

16   here, there are five moving parties; is that right?

17   A    That's correct.  The two Advisors and the three Funds.

18   Q    And one of the advisory firms is Highland Capital

19   Management Fund Advisors, LP; is that right?

20   A    That's correct.

21   Q    And I'll refer to that as Fund Advisors; is that okay?

22   A    That's great.

23   Q    James Dondero and Mark Okada are the beneficial owners of

24   Fund Advisors, correct?

25   A    That is my understanding, yes.

```
                      Norris - Cross                    36
```

1  Q    And your understanding is that Mr. Dondero controls Fund

2  Advisors, correct?

3  A    That's correct.

4  Q    And the other advisory firm that brought the motion is

5  NexPoint Advisors, LP; is that right?

6  A    That is correct.

7  Q    And Mr. Dondero is the beneficial owner of NexPoint; is

8  that right?

9  A    A family trust where Jim is the sole beneficiary, I

10 believe, controls or owns NexPoint Advisors.

11 Q    Okay.  And Mr. Dondero --

12 A    Or 99.9 percent of NexPoint Advisors.

13 Q    Thank you for the clarification.  Mr. Dondero controls

14 NexPoint; is that right?

15 A    Correct.

16 Q    All right.  And I'm going to refer to Fund Advisors and

17 NexPoint as the Advisors going forward; is that fair?

18 A    That's fair.

19 Q    Each of the Advisors manages certain funds; is that right?

20 A    That is correct.

21 Q    And three of those funds that are managed by the Advisors

22 are the Movants on this motion, correct?

23 A    Correct.

24 Q    All right.  The Advisors caused these three Funds to

25 invest in CLOs that are managed by the Debtor; is that right?

Norris - Cross                    37

1  A    The portfolio managers working for the Advisors did.

2  That's correct.

3  Q    And Mr. Dondero is the portfolio manager of the Highland

4  Income Fund; is that right?

5  A    He is one of the portfolio managers for that Fund.

6  Q    And he's also --

7  A    I believe there are two.

8  Q    And he's also a portfolio manager of NexPoint Capital,

9  Inc., one of the Movants here, right?

10  A    That is correct.

11  Q    And he's also the portfolio manager of NexPoint Strategic

12  Opportunities Fund, another Movant; is that right?

13  A    Yes.  That is correct.

14  Q    Okay.  And I think you testified earlier that each of

15  these Funds has a board.  Is that right?

16  A    That is correct.

17  Q    But the boards don't make investment decisions for the

18  Funds, do they?

19  A    They do not.  They have delegated that authority.

20  Q    And that authority to make investment decisions is

21  delegated to the Advisors; is that right?

22  A    Yes.

23  Q    Okay.  And none of the boards of the Funds who are Movants

24  here adopted any resolution authorizing the Funds to file this

25  motion; is that right?

Norris - Cross                              38

1    A    To my knowledge, that is correct.

2    Q    And in fact, the boards were not required to approve the

3    filing of this motion, correct?

4    A    I'm not -- I believe that's a legal question, but to my

5    knowledge, there was not a requirement of the board to -- or,

6    to adopt a resolution for that.

7    Q    Okay.  Let's talk a little bit about your background.  I

8    think you testified that you're the executive vice president

9    at NexPoint Advisors, one of the Movants.  Is that right?

10   A    That's right.

11   Q    Who's the president of NexPoint Advisors, LP?

12   A    Mr. Dondero.

13   Q    And you report directly to him; is that right?

14   A    I do.

15   Q    You're also the executive vice president of Fund Advisors,

16   another Movant; is that right?

17   A    Correct.

18   Q    And Mr. Dondero is the president of Fund Advisors; is that

19   right?

20   A    He is not.  There is no president of Fund Advisors.  But

21   he -- yeah.

22   Q    You're the president of another entity called NexPoint

23   Securities; is that right?

24   A    That's correct.

25   Q    And you're also the executive vice president of the 11 or

Norris - Cross                                   39

1  12 funds that are managed by the Advisors here, right?

2  A    Yes.   That is correct.

3  Q    Okay.   You've been working for Highland Capital Management

4  or other Highland-related entities for a little more than a

5  decade; is that right?

6  A    That's correct.   Since June 2010.

7  Q    Okay.   Now, you don't personally make any investment

8  decisions for -- for the Funds.   Is that right?

9  A    That's correct.

10  Q    And you don't hold yourself out as an investment manager,

11  do you?

12  A    I do not.

13  Q    And you've never worked for a CLO, have you?

14  A    Never worked for a -- for a C -- employed by a CLO.

15  Worked on accounting, various other aspects, but never worked

16  for a CLO.

17  Q    Okay.   You referred earlier to the declaration that you've

18  submitted in support of the motion.   Do you remember that?

19  A    I do.

20  Q    I've got an assistant on the line here.

21        MR. MORRIS:   Ms. Cantey, can we put up onto the

22  screen Debtor's Exhibit C, which I believe was Mr. Norris's

23  declaration?   And if we could go to Page 12 of 26.   Oh, all

24  right.

25  BY MR. MORRIS:

Norris - Cross                    40

1    Q    And, again, Mr. Norris, as we did in the deposition

2    yesterday, I'll remind you of the difficulty of doing a

3    virtual examination.  And if at any time I ask you a question

4    about your declaration that prompts you to think you need to

5    see another portion of the declaration, will you let me know

6    that?

7    A    Yes, I will.

8    Q    Okay.  Because I'm not here to test your memory.  I'm just

9    here to ask you certain questions.  So please let me know if

10   you need to see something that's not on the screen itself.

11        You didn't write any portion of this declaration; is that

12   right?

13   A    I did not.

14   Q    And you didn't provide any substantive comments to the

15   declaration as drafted because you agreed with -- with the

16   declaration as written by others; is that fair?

17   A    Correct.

18   Q    And all of the key information in your declaration was

19   supplied by NexPoint's management; isn't that right?

20   A    Correct.

21   Q    The individuals who provided the information that's in

22   your declaration include D.C. Sauter, Jason Post, Mr. Dondero,

23   and outside counsel at K&L Gates; is that right?

24   A    Correct.

25   Q    And Mr. Sauter is in-house counsel at the Advisors; is

Norris - Cross                          41

1  that right?

2  A    That is right.

3  Q    And Mr. Post is the chief compliance officer at NexPoint;

4  is that right?

5  A    That's correct.

6  Q    The whole idea for this motion initiated with Mr. Dondero;

7  isn't that right?

8  A    The concern, yes, the concern originated, and his concern

9  was voiced to our legal and compliance team.

10 Q    Okay.

11      MR. MORRIS:  Can we take the declaration down for --

12 oh, actually, no, I'm sorry, leave it there, and let's talk

13 about Exhibit B.  Now we can all see it.  If you can scroll

14 down to Exhibit B, please.  Okay.

15 BY MR. MORRIS:

16 Q    This page is attached to your declaration, right?

17 A    That's correct.

18 Q    And this page is intended to show the percentage of

19 preferred shares owned by each of the Movant Funds and the 15

20 different CLOs, right?

21 A    That's right.

22 Q    And the Debtor is the portfolio manager for each of these

23 CLOs; is that right?

24 A    Yes.

25 Q    And it's your understanding that the Debtor's management

                    Norris - Cross                    42

1  of the CLOs on this page is governed by written agreements

2  between the Debtor and each of the CLOs, right?

3  A   Yes.

4  Q   None of the Movants are parties to the agreements between

5  the Debtor and each of the CLOs pursuant to which the Debtor

6  serves as portfolio manager; is that correct?

7  A   I believe that is correct.  One, I think, important --

8  even though they're not subject to the agreement, they are the

9  -- they have the economic ownership of each of these CLOs.

10 Q   But they're not party to the agreement; is that right?

11 A   Not that I'm aware of.

12 Q   Okay.  And in preparing for this motion and preparing for

13 your testimony, you didn't personally review any of the

14 agreements between the Debtor and any of the CLOs listed on

15 this page, right?

16 A   No.  I relied on legal counsel for that review.

17 Q   Okay.  And, but even though you didn't review the

18 agreements, it's your understanding that among the

19 responsibilities that the Debtor has as the portfolio manager

20 is buying and selling assets on behalf of the CLOs; is that

21 right?

22 A   Yes.  And I believe I specifically stated in my statement,

23 if you want to turn to it, what I (audio gap) to regarding the

24 CLOs' duties under the agreements.

25 Q   Okay.  It's your understanding, in fact, that nobody other

Norris - Cross                          43

1   than the Debtor has the right or the authority to buy and sell

2   assets on behalf of the CLOs listed on Exhibit B, correct?

3   A    That's my understanding.

4   Q    Okay.  And it's also your understanding, your specific

5   understanding, that holders of preferred shares do not make

6   investment decisions on behalf of the CLO; is that right?

7   A    Correct.

8   Q    And that's something that the Advisors knew when they

9   decided to invest in the CLOs on behalf of the Movant Funds;

10  is that fair?

11  A    That's right.  And at that time, the knowledge in the

12  purchase was with Highland Capital Management, LP and the

13  portfolio management team at that time.

14  Q    And it's still with Highland Capital Management, LP; isn't

15  that right?

16  A    That's correct.  I'm not sure that the portfolio

17  management team looks the same, but it was HCMLP.

18  Q    Okay.  Let's just look at this document for a second.  The

19  first column has the list of the CLOs in which the Movant

20  Funds have invested; is that right?

21  A    Correct.

22  Q    And the second column, HIF, that stands for Highland

23  Income Fund; is that right?

24  A    Yes, sir.

25  Q    And Highland Income Fund is one of the Funds who are the

Norris - Cross                    44

1   Movants here, right?

2   A    That is correct.

3   Q    And the percentages below that show the percentage of the

4   preference shares of each of the CLOs that that particular

5   fund holds; is that right?

6   A    That's right.

7   Q    And then the third column relates to NexPoint Strategic

8   Opportunities Fund, one of the Movants here; is that right?

9   A    That's correct.

10  Q    And the next column, the fourth column, relates to

11  NexPoint Capital, Inc.'s holding of preference shares in the

12  15 CLOs, right?

13  A    That's right.

14  Q    So, NexPoint Capital doesn't hold any preference shares in

15  any of the CLOs except for a less-than-one-percent interest in

16  Grayson; am I reading that correctly?

17  A    Yes, that's correct.

18  Q    Okay.  And then the last column is intended to show the

19  aggregate portion or percentage of preference shares that the

20  three moving Funds have in each of the 15 CLOs; is that right?

21  A    Yes, that's right.

22  Q    Okay.  Am I reading this correctly that, for 12 of the 15

23  Funds, the moving Funds own less than a majority of the

24  outstanding preferred shares?

25  A    Yes, that's correct.

Norris - Cross                              45

1  Q    And is it also -- am I also reading this correctly to

2  conclude that the moving Funds owned less than 70 percent of

3  every one of these CLOs; is that right?

4  A    That's correct.

5  Q    You don't know who owns the preferred shares in the CLOs

6  that are not owned by the Movant Funds, do you?

7  A    I don't know any -- any specific owners.

8  Q    And some of these CLOs still have notes that are

9  outstanding; is that right?

10  A    Yes.  Very small amounts as a percentage of the overall

11  CLO original capital structure, but yes, some still have small

12  --

13  Q    So, --

14  A    -- notes.  Small amounts of notes.

15  Q    Okay.  I'm sorry to interrupt.  If we looked at Exhibit A,

16  if we took the time to look at Exhibit A, Exhibit A would

17  show, for each of the 15 CLOs, which of those CLOs still had

18  notes outstanding and the amount of out -- the dollar value of

19  those notes.  Is that right?

20  A    That's correct.

21  Q    Okay.  And your understanding is that -- your

22  understanding -- withdrawn.  The payment -- the distributions

23  from the CLOs are made pursuant to a waterfall; is that right?

24  A    Yes, that's correct.

25  Q    And your understanding of the waterfall process is that

Norris - Cross                            46

1    the notes that are still outstanding at any CLO must be paid

2    -- must be paid in full before the preferred shares receive

3    any recovery; is that right?

4    A    So, I would say that my understanding is slightly

5    different.  It's going to be dependent on each indenture.

6    But, in general, interest payments are made to the debt

7    holders, and anything extra is then allocated to the equity.

8    But ultimate recovery, to your point, would be once those --

9    once the debt is paid off.  And that's the critical thing

10   here, where the preference shares here now with most of these

11   CLOs almost all the way wound down, with the exception of a

12   small piece of debt.  The equity owns the lion's share of the

13   economic interest of every one of these CLOs.  And I think

14   that's important.

15   Q    Okay.  Some of the CLOs still have outstanding notes.  Is

16   that right?

17   A    Yes.  As we discussed on -- Exhibit A will have the notes

18   that are -- that are remaining on those.

19   Q    And you don't know who holds the notes in the other CLOs,

20   right?

21   A    I don't.

22   Q    The only holders of preferred shares that are pursuing

23   this motion are the three Funds managed by the Advisors,

24   right?

25   A    In this motion, yes.

                            Norris - Cross                    47

1   Q    You're not aware of any holder of preferred shares

2   pursuing this motion other than the three Funds managed by the

3   Advisors, correct?

4   A    No, I'm not aware of any others.

5   Q    You didn't personally inform any holder of preferred

6   shares, other than the Funds that are the Movants, that this

7   motion would be filed, did you?

8   A    No, I did not.

9   Q    You're not aware of any steps taken by either of the

10  Advisors to provide notice to holders of preferred shares that

11  this motion was going to be filed, are you?

12  A    I'm not, no.

13  Q    And you're not aware of any attempt that was made to

14  obtain the consent of all of the holders of the preferred

15  shares to seek the relief sought in this motion, correct?

16  A    That's correct.

17  Q    You don't have any personal knowledge, personal knowledge,

18  as to whether any holder of preferred shares other than the

19  Funds managed by the Advisors wants the relief sought in the

20  motion, correct?

21  A    Correct.

22  Q    You don't have any personal knowledge as to whether any of

23  the CLOs that are subject to the contracts that you described

24  want the relief that's being requested in this motion, right?

25  A    That's correct.  I have not spoken or been involved at all

Norris - Cross                              48

1   directly with the CLOs.  I'm representing the Funds.

2   Q   Okay.  Now, two of the Funds, two of the three Movant

3   Funds, I believe you testified are publicly traded; is that

4   right?

5   A   That's correct.

6   Q   And that's the Highland Income Fund and the NexPoint

7   Strategic Opportunities Fund; is that right?

8   A   That's right.  That's right.

9   Q   And because they are publicly-traded, the shareholders in

10  those two funds can sell their shares any time the market is

11  open; is that right?

12  A   If they're willing to take the price that the market is

13  willing to give, yes.

14  Q   Yes.

15  A   Between market hours.

16  Q   And if they -- if they don't like the way the assets that

17  are -- that the Funds have been invested, one of the things

18  they could do is simply sell their shares, right?

19  A   Yes.

20  Q   And the third fund, the shareholders in the third fund

21  have the right to sell out not on a public market but on a

22  quarterly basis; is that right?

23  A   Correct.

24  Q   That third Movant Fund is NexPoint Capital; do I have that

25  right?

Norris - Cross                    49

1   A    Correct.

2   Q    So they also have the ability to exit if they don't like

3   management on a quarterly basis; is that right?

4   A    Correct.

5   Q    All right.  Can we turn to Paragraph -- Paragraphs 8 and 9

6   of your declaration?  Okay.  Paragraph 8 describes a

7   transaction that's been referred to as OmniMax; is that right?

8   A    Yes.

9   Q    And Paragraph 9 refers to a transaction involving SSP

10  Holdings, LLC; do I have that right?

11  A    That's correct.

12  Q    Do you know what SSP stands for?

13  A    See if we say it in there.  SSP Holdings, LLC.

14  Q    Right.  Do you know what SSP stands for?

15  A    I don't.  Something Steel Products.  I --

16  Q    Okay.  You don't need to guess.  These are the only two

17  transactions that the Movants question; is that right?

18  A    These transactions, as well as certain transactions around

19  Thanksgiving time.

20  Q    Okay.  We'll talk about those.  But those transactions

21  about -- around Thanksgiving time aren't in your declaration,

22  are they?

23  A    Not specifically mentioned by name.

24  Q    Okay.  Let's talk about the two that are mentioned by

25  name, Trussway and SSP.  The Movants do not contend that

APP. 0491
Appx. 00538

Norris - Cross                    50

1  either transaction was the product of fraudulent conduct, do

2  they?

3  A    No.

4  Q    The Movants do not contend that the Debtor breached any

5  agreement by effectuating these transactions, do they?

6  A    I don't believe so.

7  Q    In fact, the Movants do not contend that the Debtor

8  violated any agreement at any time in the management of the

9  CLOs listed on Exhibit B; is that right?

10 A    That's right.

11 Q    The Movants don't even question the Debtor's business

12 judgment, only the results of the trans -- of these two

13 transactions.  Is that right?

14 A    That's right.  And results is the key here and the

15 approach.

16 Q    I see.  And the reason the Movants do not question the

17 Debtor's business judgment is because you don't know what

18 factor or factors the Debtor considered in executing these

19 transactions, right?

20 A    That's right.  I can't look into the mind or know the

21 business judgment and the inputs that went into this.  We do

22 know the outcomes.  And to us, that's troubling, right, as the

23 owners of the lion's share or the majority or even significant

24 amounts of the economic ownership of the CLOs.  And having

25 insight into those transactions, as mentioned in my statement,

Norris - Cross                              51

1    really just trying to maximize recoveries for our Funds.

2            MR. MORRIS:  Your Honor, I move to strike the portion

3    of his answer following that which was responsive to the

4    question.

5            THE COURT:  All right.  I grant that motion.

6            MR. MORRIS:  Okay.

7    BY MR. MORRIS:

8    Q   Sir, you never asked the Debtor what factors it considered

9    in making these trades, right?

10   A   I did not.

11   Q   And you have no reason to believe that anyone on behalf of

12   the Movants ever asked the Debtor why it executed these

13   trades, right?

14   A   I don't have any knowledge.  There could have been

15   somebody from -- from the Movants.  But I did not.

16   Q   Okay.  On OmniMax, the Movants disagree with the price at

17   which the Debtor effectuated the trade, right?

18   A   Correct.

19   Q   And I believe there was a meeting of the boards of the

20   Funds back in August at which Mr. Seery appeared.  Do I have

21   that right?

22   A   I believe it was August, but he did appear.

23   Q   And the purpose of the appearance was so that Mr. Seery

24   could give an update on the bankruptcy; is that right?

25   A   That's correct, and on the services provided by Highland

Norris - Cross                              52

1  Capital Management, LP to our Advisor.  Advisors.  They

2  provide various shared services.

3  Q   And it was during that meeting that Mr. Seery forthrightly

4  told the boards the price at which he was planning to execute

5  the OmniMax transaction, correct?

6  A   Correct.

7  Q   The transaction hadn't yet occurred, right?

8  A   I'm not sure if it had been finalized.  He had a price,

9  and these -- these things are negotiated.  This was, I

10 believe, a company in restructuring.  So I don't know whether

11 it had been transacted or not.

12 Q   Okay.  The board didn't ask Mr. Seery not to execute the

13 transaction, did it?

14 A   Not to my knowledge.  The board wouldn't -- I don't think

15 the board would have that authority, either.

16 Q   Okay.  But it's here asking the Court to cause the Debtor

17 to pause in the execution of any trades in the CLOs; is that

18 right?

19 A   I think the order speaks in that regard.

20 Q   Yeah.  Okay.  Let's talk about the SSP transaction for a

21 moment.  It's your understanding that Trussway Holdings, LLC

22 owned a majority interest in SSP Holdings, LLC, right?  That's

23 in Paragraph 9.

24 A   Yes.  The statement in Paragraph 9 is what I believe is

25 correct.

Norris - Cross                    53

1    Q    Okay.  And it's also your understanding that Trussway is a

2    wholly-owned subsi... I'm sorry, that SSP Holdings is a

3    wholly-owned subsidiary -- withdrawn.  It's also your

4    understanding that Trussway is a wholly-owned subsidiary of

5    the Debtor, right?

6    A    Yes.

7    Q    But Trussway is not a debtor in bankruptcy, right?

8    A    I'm not sure.

9    Q    Okay.  You have no reason to believe that; is that fair?

10   A    That it's not a debtor in bankruptcy?  That Trussway is

11   not in bankruptcy itself?

12   Q    Correct.

13   A    Yeah.  I have no knowledge of Trussway's situation.

14   Q    Okay.  But you -- but according to your declaration that

15   was prepared by the Advisors' management team, Trussway and

16   not the Debtor owned SSP Holdings, LLC.  Is that right?

17   A    I'm looking here at the statement just to make sure.

18   Q    Sure.

19        (Pause.)

20   A    I -- again, I -- the statement is correct, and I believe

21   speaks for itself regarding entity ownership.

22   Q    The only things you know about the SSP transaction are,

23   one, that you believe it was made without a formal bidding

24   process; and two, that it resulted in a $10 million loss.  Is

25   that right?

Norris - Cross                           54

1   A    Correct.

2   Q    Okay.  But, again, neither you, or to the best of your

3   knowledge, anybody at Advisors, ever spoke with anybody at the

4   Debtor about the circumstances concerning either of the

5   transactions, right?

6   A    I don't know the conversations that were had at anyone

7   else from our Advisors, but this is the knowledge that -- that

8   I have.

9   Q    Okay.  And it's the only knowledge you have, right?  You

10  don't know anything about the SSP transaction other than those

11  two facts, right?

12  A    Correct.

13  Q    In fact, I think you testified yesterday that you've been

14  very remote from the SSP transaction, right?

15  A    That's correct.

16  Q    And that it's not a transaction that you have much

17  knowledge on.  Fair?

18  A    Fair.

19  Q    Let's just talk briefly about the transactions that

20  occurred (garbled) Thanksgiving.  They're not specifically

21  referred to in your declaration; is that right?

22  A    That's correct.

23  Q    And you have no knowledge about any transaction that Mr.

24  Seery wanted to execute around Thanksgiving; is that right?

25  A    I know there were transactions and there were concerns

Norris - Cross                       55

1   from our management team, but I'm not aware of what the

2   transactions were.

3   Q    In fact, you can't even identify the assets that Mr. Seery

4   wanted to sell around Thanksgiving, or at least you couldn't

5   at the time of your deposition yesterday.  Is that right?

6   A    That's correct.

7   Q    And you have no knowledge as to why Mr. Seery wanted to

8   make those particular trades at around Thanksgiving?

9   A    No, I don't.

10  Q    And in fact, you don't even know if the transactions that

11  Mr. Seery wanted to close around Thanksgiving ever in fact

12  closed.  Is that fair?

13  A    Correct.

14  Q    Okay.  Let's just -- let's just finish up with a few

15  questions about the boards.

16          MR. MORRIS:  Ms. Cantey, can we put up Debtor's

17  Exhibit EEEE?  Four E's, Your Honor.  Thank you.

18  BY MR. MORRIS:

19  Q    This particular page identifies the directors for each of

20  the three Movant Funds; is that right?

21  A    Let me take a look and confirm.  (Pause.)  Yes.  That

22  looks correct.

23  Q    Okay.  And this was prepared by the Movants; is that

24  right?

25  A    I'm not sure who prepared it.

Norris - Cross                                56

1   Q    Okay.  To the best of your knowledge, does this document

2   accurately reflect the composition of the boards of each of

3   the three Movant Funds?

4   A    Yes, it does.

5   Q    Okay.  John Honis, I think you mentioned him earlier.

6   He's on all three boards.  Is that right?

7   A    That's correct.  And the reason being we have a unitary

8   board structure, so -- which is very common in '40 Act Fund

9   land, where the board sits, for efficiency purposes, on

10  multiple fund boards, and there's a lot of economies of scale

11  from an operating standpoint.  So, yes, they sit on multiple

12  boards.

13  Q    Okay.  And for purposes of the '40 Act, Mr. Honis has been

14  deemed to be an interested trustee.  Is that right?

15  A    That's correct.

16  Q    Okay.  But you don't specifically know what facts caused

17  that designation; you only know that the designation exists.

18  Right?

19  A    That's right.  And I know they are disclosed in the proxy

20  -- or, in the -- the relative filings related to those Funds.

21  Q    Okay.  Three other people are common to all three of the

22  Movant Funds.  I think you've got Dr. Froehlich, Ethan Powell,

23  --

24  A    Froehlich.

25  Q    Froehlich.  Ethan Powell and Bryan Ward.  Right?

Norris - Cross                              57

1  A    That is correct.

2  Q    Okay.  All three of those individuals actually serve on

3  the 11 or 12 boards that you mentioned earlier that are

4  managed by the Advisors, right?

5  A    Yes, that is correct.

6  Q    And they're the same Funds for which you serve as an

7  executive vice president, right?

8  A    Yes.  That's correct.

9  Q    So, for all of the Funds that are managed by the Advisors,

10  you serve as executive vice president and all four of these

11  directors -- trustees serve as trustees on the boards, right?

12  A    Yes, that's correct.

13  Q    Okay.  In exchange for serving on all of these boards, the

14  three individuals -- Dr. Froehlich, Mr. Ward, and Mr. Powell

15  -- each receive $150,000 a year for services across the

16  Highland complex; is that right?

17  A    That's correct.

18  Q    Dr. Froehlich has been serving as a board member across

19  the Highland complex for seven or eight years now; is that

20  right?

21  A    That's correct.

22  Q    Mr. --

23  A    I believe it's about seven or eight years.

24  Q    And Mr. Powell, he actually was employed by Highland or

25  related entities from about 2007 or 2008 until 2015, right?

Norris - Cross                          58

1   A    That's correct.

2   Q    And Mr. Ward, the third of the independent trustees, he's

3   been serving as a board member on various Highland-related

4   funds on a continuous basis since about 2004.  Do I have that

5   right?

6   A    Yeah, I believe that's correct.

7   Q    Okay.  Just a couple of final questions.  You would agree,

8   would you not, sir, that portfolio managers have an obligation

9   to effectuate transactions concerning the assets that they

10  manage based on their business judgment?

11  A    Yes.  And in accordance with whatever governing documents

12  govern the fund structure.

13  Q    And you would personally expect a portfolio manager to

14  execute a transaction that he or she reasonably believes in

15  good faith and in their business judgment would maximize value

16  for the CLO, even if the CLO did not need cash at that

17  particular time.  Is that right?

18  A    I think it would come down to the governing documents.

19  And I think what you're getting at here is, in this instance,

20  these sales and the intent of the portfolio manager.  And our

21  view, again, is -- and the request for the motion is simply

22  there is a lot at play here.  Several negotiations.  And in

23  order to maximize returns, simply asking for a pause on

24  transactions.

25  Q    All right.  Let me -- let me ask the question again, and I

Norris - Cross                                    59

1   would ask that you please listen carefully to the question.

2   You would expect a portfolio manager would execute a

3   transaction that he or she believes maximizes value, even if

4   the CLO didn't need cash at that particular moment in time.

5   Correct?

6   A    Yeah.  As long as that is maximizing value for the

7   stakeholders, and in the instance of a CLO, the economic

8   interest is owned by the equity holders.  So, to their

9   benefit, yes, that -- that would be the idea.

10           MR. MORRIS:  Your Honor, I have no further questions.

11           THE COURT:  Any redirect, Mr. Wright?

12           MR. WRIGHT:  Only briefly, Your Honor.

13                       REDIRECT EXAMINATION

14  BY MR. WRIGHT:

15  Q    Mr. Norris, I think you were asked at one point about how

16  long you'd been working for Highland Capital Management, which

17  there's -- there's Highland Capital Management Fund Advisors

18  and then there's Highland Capital Management, LP, Debtor.  And

19  I wanted to give you an opportunity to just explain when and

20  what years you worked for HCMLP and then when and what years

21  you worked for NexPoint Advisors or Highland Capital

22  Management Fund Advisors.

23  A    Yes.  From June 2010, I was employed by Highland Capital

24  Management, LP, until July or August of 2012, at which time I

25  was then hired by Highland Capital Management Fund Advisors,

Norris - Redirect                    60

1   not HCML -- no longer employed by HCMLP, and have worked since

2   that time for HCMFA and NexPoint Advisors and not for the

3   Debtor, HCMLP.

4   Q   Okay.  So -- and I'm sorry if I missed a year, but it's

5   been about ten years since you had worked for HCMLP or been an

6   employee of HCMLP, correct?

7   A   Yeah.  It's been over eight years since I have left

8   employment by HCMLP.  Ten and a half years ago, I started

9   working for HCMLP, and then two years after that transitioned

10  away and started working for the Advisors that are part of

11  this motion.

12  Q   Thank you for clarifying.

13          MR. WRIGHT:  Your Honor, I hope -- you directed us to

14  have a witness here today, and so we do.  And I know that you

15  had asked me at the last hearing some questions about the

16  involvement of people at HCMLP, which I tried to address with

17  Mr. Norris in my direct.  But I, you know, I do want to make

18  sure that we've answered any questions that you have.

19          THE COURT:  All right.  Yes, that's fine.  Are you

20  -- does that conclude your redirect?

21          MR. WRIGHT:  It does, Your Honor.

22          THE COURT:  Any recross, Mr. Morris, on that

23  redirect?

24          MR. MORRIS:  No, thank you, Your Honor.

25          THE COURT:  All right, then.  That concludes the

61

1   testimony of Mr. Norris.

2       Any other evidence, Mr. Wright?

3           MR. WRIGHT:  I do not, Your Honor, although I guess I

4   would offer the Exhibit A and Exhibit B to Mr. Norris's

5   declaration --

6           THE COURT:  Any objection to that?

7           MR. WRIGHT:  -- into evidence.

8           MR. MORRIS:  No, Your Honor.

9           THE COURT:  All right.  Those are admitted.

10      (Movants' Exhibits A and B are received into evidence.)

11          THE COURT:  All right.  Well, Mr. Morris, did you

12  want to put on any evidence?

13          MR. MORRIS:  Does the -- do the Movants rest, Your

14  Honor?

15          THE COURT:  I understood that they rest.  Correct,

16  Mr. Wright?

17          MR. WRIGHT:  That's correct, Your Honor.

18          MR. MORRIS:  Your Honor, I would move, effectively,

19  for a directed verdict here.  The Movants have the burden of

20  establishing a *prima facie* case to entitlement to the relief

21  that's been requested, and they have failed to meet that

22  burden.  The Debtor has -- we -- the undisputed facts are the

23  Debtor has the contractual right, and indeed, the obligation,

24  to serve as the portfolio manager of the CLOs pursuant to

25  written agreements.

62

1    The Movants are not parties to those agreements. The

2  testimony is undisputed that there are many holders of

3  preferred shares and notes that have had no notice of this

4  proceeding that will undoubtedly be impacted by the tying of

5  the hands of the portfolio manager. The chart that was

6  attached as Exhibit B expressly shows just what a large

7  portion of interested parties and people who would be affected

8  by this motion are not -- they didn't get notice. There was

9  no attempt to get notice. There was no attempt to get their

10 consent. All of that testimony is now in the record, and I

11 think due process alone would prevent the entry or even the

12 consideration of an order of this type.

13   There is nothing improper that's been alleged. There is

14 no -- there is no allegation of fraud. There is no allegation

15 of breach of contract of any kind. There's not even a

16 question of business judgment. The Movants didn't even do

17 their diligence to ask the Debtor why they made these

18 transactions. There is nothing in the record that shows that

19 the Debtor, as the portfolio manager of the CLOs, did anything

20 improper.

21   The only thing that the Movants care about is that they

22 don't like the results in two particular trades. I don't

23 think that that meets their burden of persuasion that the

24 Court should enter an order of this type, and I would like to

25 relieve Mr. Seery of the burden, frankly, and the Court, of

63

1  having to put on testimony to justify transactions that really

2  aren't even being questioned, Your Honor.

3     So the Debtor would respectfully move for the denial of

4  the motion and the relief sought therein.

5        THE COURT: All right. Your request for a directed

6  verdict, something equivalent to a directed verdict here, is

7  granted. I agree that the Movant has wholly failed to meet

8  its burden of proof here today to show the Court, persuade the

9  Court that, as Mr. Morris said, I should essentially tie the

10 hands of the Debtor as a portfolio manager here, as stated.

11 Nothing improper has been alleged. There has been no showing

12 of a statutory right here, or a contractual right here, on the

13 part of the Movants.

14    I am -- I'm utterly dumbfounded, really. I agree with the

15 -- I was going to say innuendo; not really innuendo -- I agree

16 with part of the theme, I think, asserted by the Debtor here

17 today that this is Mr. Dondero, through different entities,

18 through a different motion. I feel like he sidestepped the

19 requirement that I stated last week that if we had a contested

20 hearing on his motion, Dondero's motion, that I was going to

21 require Mr. Dondero to testify. He apparently worked out an

22 eleventh hour agreement with the Debtor on his motion to avoid

23 that. But, again, these so-called CLO Motions very clearly,

24 very clearly, in this Court's view, were pursued at his sole

25 direction here.

64

1      This is almost Rule 11 frivolous to me. You know, we're

2  -- we didn't have a Rule 11 motion filed, and, you know, I

3  guess, frankly, I'm glad that a week before the holidays begin

4  we don't have that, but that's how bad I think it was, Mr.

5  Wright and Mr. Norris. This is a very, very frivolous motion.

6  Again, no statutory basis for it. No contractual basis. You

7  know, you didn't even walk me through the provisions of the

8  contracts. I guess that would have been fruitless. But you

9  haven't even shown something equitable, some lack of

10 reasonable business judgment.

11     Bluntly, don't waste my time with this kind of thing

12 again. You wasted my time. We have 70 people on the video.

13 Utter waste of time.

14     All right. So, motion is denied. Mr. Morris, please

15 upload an order.

16          MR. MORRIS: Thank you, Your Honor.

17          THE COURT: All right. Do we have any other business

18 to accomplish today?

19          MR. POMERANTZ: I don't think so, Your Honor. I know

20 we will see you tomorrow in connection with Mr. Daugherty's

21 relief from stay motion.

22          THE COURT: Well, yeah, we do have that. Okay. We

23 will see you tomorrow. We stand adjourned.

24          MR. CLEMENTE: Thank you, Your Honor.

25          MR. MORRIS: Thank you, Your Honor.

65

1          THE CLERK:  All rise.

2          (Proceedings concluded at 3:05 p.m.)

3                         --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                     CERTIFICATE

20     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
21 above-entitled matter.

22   **/s/ Kathy Rehling**                    **12/17/2020**

23 _____     _____
   Kathy Rehling, CETD-444                         Date
24 Certified Electronic Court Transcriber

25

66

INDEX

1

PROCEEDINGS                                               3

2

WITNESSES

3

Movants' Witnesses

4

Dustin Norris

5

- Direct Examination by Mr. Wright                       23

6

- Cross-Examination by Mr. Morris                        35

- Redirect Examination by Mr. Wright                     59

7

EXHIBITS

8

Movants' Exhibits A and B                       Received 61

9

RULINGS

10

Debtor's Emergency Motion to Quash Subpoena and for      13

11

Entry of a Protective Order or, in the Alternative,
for an Adjournment (1564, 1565) - *Agreed Order*

12

James Dondero's Motion for Entry of an Order Requiring   13

13

Notice and Hearing for Future Estate Transactions
Occurring Outside the Ordinary Course of Business (1439)

14

- *Continued to 01/04/2021*

15

Motion for Directed Verdict - *Granted*                  63

16

Motion for Order Imposing Temporary Restrictions on      63

17

Debtor's Ability, as Portfolio Manager, to Initiate Sales
by Non-Debtor CLO Vehicles Highland Capital Management Fund

18

Advisors, L.P., Highland Fixed Income Fund, NexPoint
Advisors, L.P., NexPoint Capital, Inc., NexPoint Strategic
Opportunities Fund (1528) - *Denied*

19

END OF PROCEEDINGS                                       65

20

INDEX                                                    66

21

22

23

24

25

# EXHIBIT 6

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | _____ |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND | § | |
| ADVISORS, L.P., NEXPOINT ADVISORS, L.P., | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

| HIGHLAND INCOME FUND, NEXPOINT | § |
| STRATEGIC OPPORTUNITIES FUND, | § |
| NEXPOINT CAPITAL, INC., AND CLO | § |
| HOLDCO, LTD., | § |
| Defendants. | |

## PLAINTIFF HIGHLAND CAPITAL MANAGEMENT, L.P.'S VERIFIED ORIGINAL COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiff Highland Capital Management, L.P., the above-captioned debtor and debtor-in-possession ("Plaintiff" or the "Debtor"), by its undersigned counsel, files this *Original Complaint for Declaratory and Injunctive Relief* (the "Complaint") against defendants Highland Capital Management Fund Advisors, L.P. ("HCMFA"), NexPoint Advisors, L.P. ("NPA," and together with HCMFA, the "Advisors"), Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc. (collectively, the "Funds"), and CLO Holdco, Ltd. ("CLO Holdco" and together with the Advisors and the Funds, the "Defendants") seeking declaratory and injunctive relief pursuant to sections 105(a) and 362 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 7001(7) and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules").  In support of its Complaint, the Debtor alleges upon knowledge of its own actions and upon information and belief as to other matters as follows:

## PRELIMINARY STATEMENT

1.    Mr. James Dondero ("Mr. Dondero") directly or indirectly owns and/or controls each of the Defendants.  The Defendants have interfered with, and impeded, the Debtor's business, and they have threatened to initiate a process aimed at removing the Debtor as the portfolio manager of certain collateralized loan obligation vehicles ("CLOs") – although they have refused to actually bring a motion to lift the automatic stay for that purpose, thereby

2

contributing to the necessity of these proceedings.  The Funds invested in certain of the CLOs at the direction of the Advisors.  CLO Holdco also invested in the CLOs.

2.      As alleged below, the Defendants have damaged the Debtor and threaten to upset the status quo by interfering with the Debtor's contractual rights.

3.      Thus, the Debtor seeks damages, declaratory relief, and an order preliminarily and permanently enjoining the Defendants from: (a) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's (i) management of the CLOs, (ii) decisions concerning the purchase or sale of any assets on behalf of the CLOs, or (iii) contractual right to serve as the portfolio manager (or other similar title) of the CLOs; (b) otherwise violating section 362(a) of the Bankruptcy Code; (c) seeking to terminate the portfolio management agreements and/or servicing agreements between the Debtor and the CLOs ((a)-(c), the "Prohibited Conduct"), (d) conspiring, colluding, or collaborating with (x) Mr. Dondero, (y) any entity owned and/or controlled by Mr. Dondero, and/or (z) any person or entity acting on behalf of Mr. Dondero or any entity owned and/or controlled by him, to, directly or indirectly, engage in any Prohibited Conduct, and (e) engaging in any Prohibited Conduct with respect to any of the Successor Parties (as that term is defined below).

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and § 1334(b).  This adversary proceeding is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(A) and (O).

5.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1409.

APP. 0511
Appx. 00558

6.  This adversary proceeding is commenced pursuant to Bankruptcy Rules 7001 and 7065, Bankruptcy Code sections 105(a) and 362, 28 U.S.C. §§ 2201 and 2202, and applicable Delaware law.

## THE PARTIES

7.  Plaintiff is a limited liability partnership formed under the laws of Delaware with a business address at 300 Crescent Court, Suite 700, Dallas, Texas 75201.

8.  Upon information and belief, HCMFA is a limited partnership with offices located in Dallas, Texas.

9.  Upon information and belief, NPA is a limited partnership with offices located in Dallas, Texas.

10.  Upon information and belief, Highland Income Fund is an investment fund managed by HCMFA in Dallas, Texas.

11.  Upon information and belief, NexPoint Strategic Opportunities Fund is an investment fund managed by NPA in Dallas, Texas.

12.  Upon information and belief, NexPoint Capital, Inc. is an investment fund managed by NPA in Dallas, Texas

13.  Upon information and belief, CLO Holdco is a holding company that is directly or indirectly owned and/or managed by Mr. Dondero and others acting on his behalf in Dallas, Texas.

## CASE BACKGROUND

14.  On October 16, 2019 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code in the United States Bankruptcy Court for the

APP. 0512
Appx. 00559

District of Delaware (the "Delaware Court"), Case No. 19-12239 (CSS) (the "Highland Bankruptcy Case").

15.     On October 29, 2019, the U.S. Trustee in the Delaware Court appointed an Official Committee of Unsecured Creditors (the "Committee") with the following members:  (a) Redeemer Committee of Highland Crusader Fund, (b) Meta-e Discovery, (c) UBS Securities LLC and UBS AG London Branch (collectively, "UBS"), and (d) Acis Capital Management, L.P. and Acis Capital Management GP LLC (collectively, "Acis").

16.     On December 4, 2019, the Delaware Court entered an order transferring venue of the Highland Bankruptcy Case to this Court [Docket No. 186].[2]

17.     The Debtor has continued to operate and manage its business as a debtor-in-possession pursuant to Bankruptcy Code sections 1107(a) and 1108.  No trustee or examiner has been appointed in this chapter 11 case.

18.     On November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1472] (the "Plan").  The Court has scheduled a confirmation hearing on the Plan for January 13, 2021.  If confirmed, the Debtor will be succeeded by the Reorganized Debtor and Plan will create a Claimant Trust and a Litigation Sub-Trust (as those terms are defined in the Plan) (the Reorganized Debtor, the Claimant Trust, and the Litigation Sub-Trust are collectively referred to herein as the "Successor Entities," and together with the Successor Entities' directors, officers, employees, professionals, and agents, including but not limited to the Claimant Trustee and the Litigation Trustee (as those terms are defined in the Plan), and any professionals engaged by the Claimant Trustee and Litigation Trustee, the "Successor Parties").

---

[2] All docket numbers refer to the main docket for the Highland Bankruptcy Case maintained by this Court.

DOCS_NY:41851.8 36027/002

APP. 0513
Appx. 00560

**STATEMENT OF FACTS**

**A.**     **Mr. James Dondero Owns and/or Controls Each of the Defendants**

19.     Mr. Dondero directly or indirectly owns and/or effectively controls each of the Defendants.

***The Advisors and the Funds***

20.     On December 16, 2020, Mr. Dustin Norris ("Mr. Norris") testified under oath in support of the *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [Docket No. 1528] that was brought by the Advisors and Funds (the "Restriction Motion").

21.     Mr. Norris is the Executive Vice President of each the Advisors and each of the Funds.

22.     During the hearing on the Restriction Motion (the "Hearing"), Mr. Norris testified that Mr. Dondero (a) directly or indirectly owns and controls each of the Advisors, and (b) is the portfolio manager of each of the Funds, each of which is advised by one of the Advisors.

23.     Mr. Norris's testimony is corroborated by, among other things, (a) the Funds' public filings with the Securities and Exchange Commission in which each of the Funds disclosed that the Advisors were owned and controlled by Mr. Dondero, and that Mr. Dondero was the portfolio manager for each of the Funds, and (b) the assertion in a letter dated December 31, 2020, sent on behalf of the Advisors and the Funds, that "Mr. Dondero is the lead (and in some cases the sole) portfolio manager for certain of the Funds.  He is intimately involved in the day-to-day operations and investment decisions regarding those Funds and the operations of the Advisors."

***CLO Holdco***

DOCS_NY:41851.8 36027/002

APP. 0514
Appx. 00561

24.     CLO Holdco is a wholly-owned and controlled subsidiary of the DAF.   On information and belief, the DAF is managed by the Charitable DAF Holdco, Ltd. ("DAF Holdco"), which is the managing member of the DAF.

25.     On information and belief, DAF Holdco is owned by three different charitable foundations:  Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., and Highland Kansas City Foundation, Inc. (collectively, the "Highland Foundations").  On information and belief, Mr. Dondero is the president and one of the three directors of each of the Highland Foundations.  On information and belief, Mr. Grant Scott ("Mr. Scott"), is an intellectual property lawyer based in Raleigh, North Carolina, Mr. Dondero's college roommate, is also an officer and director of each of the Highland Foundations.

26.     Although the Debtor is the non-discretionary investment advisor to the DAF, the Debtor does not have the right or ability to control or direct the DAF or CLO Holdco.  Instead, on information and belief, the DAF takes and considers investment and payment advice from the Debtor, but ultimate decisions are in the control of Mr. Scott who acts substantially at Mr. Dondero's direction.

**B.     This Court has Entered Two Orders that are Implicated by the Defendants' Actions and Threatened Actions**

27.     This Court has entered two Orders that are relevant to the injunctive relief sought by the Debtor.

28.     On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").  On January 9, 2019, this Court entered an Order granting the Settlement Motion [Docket No. 339] (the "Settlement Order").

7

APP. 0515
Appx. 00562

29.     As part of the Settlement Order, this Court also approved a term sheet (the "Term Sheet") [Docket No. 354-1] between the Debtor and the Official Committee of Unsecured Creditors (the "Committee") pursuant to which Mr. John S. Dubel, Mr. Russell Nelms, and Mr. Seery were appointed to the Board.

30.     As required by the Term Sheet, on January 9, 2020, Mr. James Dondero resigned from his roles as an officer and director of Strand and as the Debtor's President and Chief Executive Officer.

31.     Among other things, the Settlement Order directed Mr. Dondero not to "cause any Related Entity to terminate any agreements with the Debtor."

32.     Each of the Defendants is a "Related Entity" as defined in the Term Sheet because each of the Defendants is directly or indirectly owned and/or controlled by Mr. Dondero and/or Mr. Scott.

33.     Defendants' actions and threatened actions also implicate the *Order Granting Debtor's Motion for a Temporary Restraining Order Against James Dondero* [Adv. Pro. No. 20-03190-sgj, Docket No. 10], entered on December 10, 2020 (the "TRO" and together with the Settlement Order, the "Orders").

34.     Pursuant to the TRO, the Court temporarily enjoined and restrained Mr. Dondero from, among other things, "interfering with or otherwise impeding, directly or indirectly, the Debtor's business" and from "causing, encouraging, or conspiring with (a) any entity owned or controlled by [Mr. Dondero], and/or (b) any person or entity acting on his behalf, from, directly or indirectly, engaging in any Prohibited Conduct [as defined in the TRO]," including interfering or impeding the Debtor's business.

DOCS_NY:41851.8 36027/002

APP. 0516
Appx. 00563

C.    **Defendants Interfere with and Impede the Debtor's Business and
Threaten to Terminate the Debtor's Management Contracts**

35.    In addition to filing the Restriction Motion, on at least four separate occasions the Defendants have either interfered with and impeded the Debtor's business or have threatened to do so by initiating the process for removing the Debtor as the portfolio manager of the CLOs. Such conduct violates the Orders and flouts the Court's decision on the Restriction Motion and the Court's observations made at the Hearing.

36.    *First*, on December 22, 2020, employees of NPA and HCMFA interfered with and impeded the Debtor's business by refusing to settle the CLOs' sale of AVYA and SKY securities that Mr. Seery had personally authorized.  The Advisors engaged in this conduct notwithstanding (a) the denial of the Restriction Motion and the Court's pointed comments during that Hearing on the Restriction Motion, and (b) Mr. Norris's sworn acknowledgments on behalf of the Advisors and Funds during the Hearing that (i) the Debtor's management of the CLOs is governed by written contracts as to which none of the Advisors or Funds are parties; (ii) the Debtor has the exclusive duty and responsibility to buy and sell assets on behalf of the CLOs; and (iii) as the Advisors knew when they invested in the CLOs on behalf of the Funds, that holders of preference shares (such as the Funds) have no right to make investment decisions on behalf of the CLOs.

37.    Notably, the Advisors' interference with trades that Mr. Seery authorized on behalf of the CLOs is the same type of conduct that led the Court to impose the TRO against Mr. Dondero. *See Declaration of Mr. James P. Seery, Jr. in Support of Debtor's Motion for a Temporary Restraining Order Against Mr. James Dondero* [Adv. Pro. No. Docket No. 4] ¶¶21-23, Ex. 8.

DOCS_NY:41851.8 36027/002

APP. 0517
Appx. 00564

38. *Second*, also on December 22, 2020, the Defendants wrote to the Debtor and renewed their "request" that the Debtor refrain from selling any assets on behalf of the CLOs until the confirmation hearing (the "December 22 Letter"). In support of their "request," the Debtor re-asserted almost verbatim the arguments advanced in connection with the Restriction Motion – all of which were soundly rejected by the Court.

39. The Debtor responded on December 24, 2020, demanding that Defendants withdraw their December 22 Letter and confirm that neither the Defendants nor anyone acting on their behalf will take any further steps to interfere with the Debtor's directions as the CLOs' portfolio manager by the close of business on December 28, 2020. The Defendants failed to comply with the Debtor's demands.

40. *Third*, the Defendants threatened to seek to remove the Debtor as the portfolio manager of the CLOs. Specifically, in a letter dated December 23, 2020 (the "December 23 Letter"), the Defendants informed the Debtor that one or more of them "intend to notify the relevant trustee and/or issuers that the process of removing the Debtor as fund manager should be initiated, subject to and with due deference for the applicable provisions of the United State Bankruptcy Code, including the automatic stay of Section 362."

41. The Debtor responded to the December 23 Letter the next day and advised the Defendants that the Settlement Order prohibited the termination of the Debtor's management agreements with the CLOs, and that there was no factual, legal, or contractual basis to remove the Debtor as the CLOs' portfolio manager in any event. The Debtor demanded that the Defendants withdraw their December 23 Letter and commit not to take any actions, directly or indirectly, to terminate the CLO management agreements, by the close of business on December 28, 2020. The Defendants failed to comply with the Debtor's demands.

10

**APP. 0518**
**Appx. 00565**

42.     Because Mr. Dondero owns and/or effectively controls the Defendants, the Debtor forwarded the correspondence between the Debtor and the Defendants, including the Defendant's Letters, to Mr. Dondero's counsel.  In response, Mr. Dondero's counsel contended that "[w]hile there are relationships between my client and some of the movants, I believe they are separate entities and should be treated as such."

43.     On December 30, 2020, the Debtor specifically requested that the Defendants promptly bring the matters to the Court for resolution by bringing a motion to terminate the CLO management agreements and for related relief, or the Debtors would be forced to commence an action for declaratory relief and bring this Motion in order to bring clarity to the Debtor's contractual rights.  In response, Defendants' counsel would not commit to bring any motion, only that they would file an objection to Debtor's plan of reorganization.  The Debtor believes that its disputes with the Defendants can and must be promptly resolved.

44.     *Finally,* because Mr. Dondero continues to interfere with the Debtor's business and engage in disruptive behavior, the Debtor gave notice to Mr. Dondero on December 23, 2020, that the Debtor would evict him and terminate all services provided to him, as of December 30, 2020.  On December 31, 2020, counsel to the Advisors and the Funds sent a letter to Debtor's counsel (the "December 31 Letter" and together with the December 22 Letter and December 23 Letter, the "Defendants' Letters") contending that the Debtor's decision to remove Mr. Dondero from the Debtor's offices and services was damaging the Advisors and the Funds and implied that the Debtor would be economically responsible for such damage.

45.     On January 4, 2021, the Debtor responded to the December 31 Letter by noting that (a) Mr. Dondero did not seek judicial relief, make any of the contentions the advanced in the December 31 Letter, or even complain to the Debtor, (b) no action was taken against Entities,

DOCS_NY:41851.8 36027/002

only against Mr. Dondero, (c) Mr. Dondero was given reasonable notice of his eviction and the termination of the Debtor's services to him, such that he could have and should have made alternative arrangements to avoid any disruption, and (d) nothing prevents Mr. Dondero from continuing to work on behalf of the Entities.  The Debtor also noted that it will take all steps to protect its interests against any further frivolous claims and threats made by the Defendants.

46.    Upon information and belief, Mr. Dondero has taken no steps to cause the Defendants – entities that he owns and/or effectively controls and that are each a "Related Entity" under the Term Sheet – to comply with the Debtor's demands made in response to the Defendants' Letters.

## FIRST CLAIM FOR RELIEF

### (For Declaratory Relief: -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7001)

47.    The Debtor repeats and realleges each of the allegations in each of the foregoing paragraphs as though fully set forth herein.

48.    A bona fide, actual, present dispute exists between the Plaintiff and the Defendants concerning their respective rights and obligations concerning the CLOs.

49.    A judgment declaring the parties' respective rights and obligations will resolve their disputes.

50.    Pursuant to Bankruptcy Rule 7001, the Debtor specifically seeks declarations that:

- Each of the Defendants is directly or indirectly controlled by Mr. Dondero;

- Each of the Defendants is an "affiliate" of the Debtor for purposes of the CLO Management Agreements;

- The Plaintiff has the exclusive contractual right to manage the CLOs;

- The Plaintiff has the exclusive duty and responsibility to buy and sell assets on behalf of the CLOs;

DOCS_NY:41851.8 36027/002

APP. 0520
Appx. 00567

- Holders of preference shares have no right to make investment decisions on behalf of the CLOs;

- The Debtor's decision to evict Mr. Dondero from the Debtor's offices, and to terminate the provision of services to him, did not violate any contract with, or duty owed to, any of the Defendants; and

- The demands and requests set forth in Defendants' Letters constitute interference with the Plaintiff's business and management of the CLOs.

.

## SECOND CLAIM FOR RELIEF

### (Violation of the automatic stay under section § 362(a) of the Bankruptcy Code)

51.    The Debtor repeats and realleges each of the allegations in each of the foregoing paragraphs as though fully set forth herein.

52.    The Defendants' interference with the Plaintiff's contractual rights and course of dealing violates the automatic stay pursuant to § 362(a) of the Bankruptcy Code.

53.    To the extent Defendants engaged in such conduct after the entry of the Court's Order on the Restriction Motion, such conduct was willful.

54.    The Plaintiff is entitled to damages in an amount to be determined at trial arising from, and related to, the Defendants' violation of the automatic stay.

## THIRD CLAIM FOR RELIEF

### (Tortious Interference with Contract)

55.    The Debtor repeats and realleges each of the allegations in each of the foregoing paragraphs as though fully set forth herein.

56.    Since November 2020, Defendants have tortuously interfered with the Debtor's CLO management contracts.

DOCS_NY:41851.8 36027/002

APP. 0521
Appx. 00568

57. The Debtors' CLO management contracts constitute are valid contracts, and, upon information and belief, the Debtor knows of the terms and conditions of such contracts because they were prepared and executed at Mr. Dondero's direction.

58. The Defendants have willfully and intentionally impeded the Debtor's ability to fulfill its contractual duties and obligations pursuant to its CLO management contracts, by, among other things, (1) hindering the Debtor's ability to sell certain CLO assets, (2) threatening to initiate the process for removing the Debtor as the portfolio manager of the CLOs, and (3) otherwise attempting to influence and interfere with the Debtor's decisions concerning the purchase or sale of any assets on behalf of the CLOs.

59. Defendants' conduct has proximately caused, and will continue to cause, damage and loss to the Debtor's estate.

60. The Plaintiff is entitled to damages in an amount to be determined at trial arising from, and related to, the Defendants' tortious interference with its CLO management contracts.

## FOURTH CLAIM FOR RELIEF

**(For Injunctive Relief -- 11 U.S.C. § 105(a) and Fed. R. Bankr. P. 7065)**

61. The Debtor repeats and realleges the allegations in each of the foregoing paragraphs as though fully set forth herein.

62. Pursuant to Bankruptcy Code section 105(a) and Bankruptcy Rule 7065, the Debtor seeks a preliminary and permanent injunction enjoining Defendants from (1) engaging in any Prohibited Conduct, and (2) conspiring, colluding, or collaborating with (a) Mr. Dondero, (b) any entity owned and/or controlled by Mr. Dondero, and/or (c) any person or entity acting on behalf of Mr. Dondero or any entity owned and/or controlled by him, to, directly or indirectly, engage in any Prohibited Conduct.

DOCS_NY:41851.8 36027/002

63.     Bankruptcy Code section 105(a) authorizes the Court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." 11 U.S.C. §105(a).

64.     Bankruptcy Rule 7065 incorporates by reference rule 65 of the Federal Rules of Civil Procedure and authorizes the Court to issue injunctive relief in adversary proceedings.

65.     The interference and threats described herein are embodied in written communications and are without any justification, and constitute willful and intentional interferences with the Debtor's management contracts that, if not prohibited, will cause the Debtor irreparable damages; the Debtor is therefore likely to prevail on its underlying claim for tortious interference with contract.

66.     In the absence of injunctive relief, the Debtor will be irreparably harmed because Defendants are likely to engage in some or all of the Prohibited Conduct, thereby interfering with the Debtor's operations, management of assets, and contractual obligations, all to the detriment of the Debtor, its estate, its creditors and the creditors and stakeholders of the Successor Entities.

67.     In light of, among other things, (a) the Debtor's status as a debtor in bankruptcy subject to the jurisdiction of this Court, (b) the Settlement Order and Term Sheet, (c) Mr. Dondero's resignations as the Debtor's President and CEO and later as portfolio manager and an employee, (d) the authority vested in the Board and Mr. Seery, as CEO and CRO, (e) the TRO, (f) Mr. Norris's testimony during the Hearing, and (g) the Court's denial of the Restriction Motion, there is no legal or equitable basis for Defendants to engage in any of the Prohibited Conduct, and the balance of the equities strongly favors the Debtor in the request to enjoin Defendants from engaging in any Prohibited Conduct.

DOCS_NY:41851.8 36027/002

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 528 of
2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 527 of
2722
Case 21-03000-sgj Doc 1 Filed 01/06/21    Entered 01/06/21 16:43:34    Page 16 of 19

68.     Injunctive relief would serve the public interest by re-enforcing the implicit mandate in the Bankruptcy Code that debtors and their successors are to be managed and controlled only by court-authorized representatives, free from threats and coercion.

69.     Based on the foregoing, the Debtor requests that the Court preliminarily and permanently enjoin Defendants from engaging in any Prohibited Conduct or from causing, encouraging, or conspiring with Mr. Dondero, or any entity controlled by Mr. Dondero or agent acting on Mr. Dondero' s behalf, from engaging in any Prohibited Conduct.

DOCS_NY:41851.8 36027/002

APP. 0524
Appx. 00571

## **PRAYER**

WHEREFORE, the Debtor prays for judgment as follows:

(a) On the First Cause of Action, a judgment declaring that: (i) each of the Defendants is directly or indirectly controlled by Mr. Dondero, (ii) each of the Defendants is an "affiliate" of the Debtor for purposes of the CLO Management Agreements; (iii) the Plaintiff has the exclusive contractual right to manage the CLOs; (iv) the Plaintiff has the exclusive duty and responsibility to buy and sell assets on behalf of the CLOs; (v) holders of preference shares have no right to make investment decisions on behalf of the CLOs; (vi) the Debtor's decision to evict Mr. Dondero from the Debtor's offices, and to terminate the provision of services to him, did not violate any contract with, or duty owed to, any of the Defendants; and (vii) the demands and requests set forth in Defendants' Letters constitute interference with the Plaintiff's business and management of the CLOs;

(b) On the Second Cause of Action, damages in an amount to be determined at trial arising from Defendants' violation of the automatic stay;

(c) On the Third Cause of Action, damages in an amount to be determined at trial arising from the Defendants' tortious interference with the Plaintiff's CLO management contracts;

(d) On the Fourth Cause of Action, a preliminary and permanent injunction enjoining Defendants from conspiring, colluding, or collaborating with (a) Mr. Dondero, (b) any entity owned and/or controlled by Mr. Dondero, and/or (c) any person or entity acting on behalf of Mr. Dondero or any entity owned and/or controlled by him, to, directly or indirectly, engage in any Prohibited Conduct;

(h) For such other and further relief as this Court deems just and proper.

DOCS_NY:41851.8 36027/002

APP. 0525
Appx. 00572

Dated: January 6, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Plaintiff Highland Capital Management, L.P.*

DOCS_NY:41851.8 36027/002

**APP. 0526**
**Appx. 00573**

**<u>VERIFICATION</u>**

I have read the foregoing <u>VERIFIED COMPLAINT FOR INJUNCTIVE RELIEF</u> and know its contents.

..     I am a party to this action.  The matters stated in it are true of my own knowledge except as to those matters which are stated on information and belief, and as to those matters I believe them to be true.

☒     I am the Chief Executive Officer and Chief Restructuring Officer of Highland Capital Management, L.P., the Plaintiff in this action, and am authorized to make this verification for and on behalf of the Plaintiff, and I make this verification for that reason.  I have read the foregoing document(s).  I am informed and believe and on that ground allege that the matters stated in it are true.

..     I am one of the attorneys of record for _____, a party to this action.  Such party is absent from the county in which I have my office, and I make this verification for and on behalf of that party for that reason.  I have read the foregoing document(s).  I am informed and believe and on that ground allege that the matters stated in it are true.

I certify and declare under penalty of perjury under the laws of the United States that the foregoing is true and correct as of this 6th day of January 2021.

_/s/ James P. Seery, Jr._
James P. Seery, Jr.

# EXHIBIT 7

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In Re: | ) | **Case No. 19-34054-sgj-11** |
| | ) | Chapter 11 |
| HIGHLAND CAPITAL | ) | Dallas, Texas |
| MANAGEMENT, L.P., | ) | Tuesday, January 26, 2021 |
| | ) | 9:30 a.m. Docket |
| Debtor. | ) | |
| | ) | MOTION FOR ENTRY OF ORDER |
| | ) | AUTHORIZING DEBTOR TO |
| | ) | IMPLEMENT KEY EMPLOYEE |
| | ) | PLAN [1777] |
| _____ | ) | |
| | ) | |
| HIGHLAND CAPITAL | ) | **Adversary Proceeding 21-3000-sjg** |
| MANAGEMENT, L.P., | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | PLAINTIFF'S MOTION FOR A |
| | ) | PRELIMINARY INJUNCTION AGAINST |
| HIGHLAND CAPITAL | ) | CERTAIN ENTITIES OWNED AND/OR |
| MANAGEMENT FUND ADVISORS, | ) | CONTROLLED BY MR. JAMES |
| L.P., et al. | ) | DONDERO [5] |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:            Jeffrey Nathan Pomerantz
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           10100 Santa Monica Blvd.,
                             13th Floor
                           Los Angeles, CA  90067-4003
                           (310) 277-6910

For the Debtor:            John A. Morris
                           PACHULSKI STANG ZIEHL & JONES, LLP
                           780 Third Avenue, 34th Floor
                           New York, NY  10017-2024
                           (212) 561-7700

2

```
 1   APPEARANCES, cont'd.:

 2   For the Official Committee  Matthew A. Clemente
     of Unsecured Creditors:     SIDLEY AUSTIN, LLP
 3                               One South Dearborn Street
                                 Chicago, IL  60603
 4                               (312) 853-7539

 5   For CLO Holdco, Ltd.:       John J. Kane
                                 KANE RUSSELL COLEMAN LOGAN, P.C.
 6                               901 Main Street, Suite 5200
                                 Dallas, TX  75202
 7                               (214) 777-4261

 8   For Certain Defendants:     Davor Rukavina
                                 Julian Vasek
 9                               MUNSCH, HARDT, KOPF & HARR
                                 500 N. Akard Street, Suite 3800
10                               Dallas, TX  75201-6659
                                 (214) 855-7587
11
     For Certain Defendants:     A. Lee Hogewood, III
12                               Emily Mather
                                 K&L GATES, LLP
13                               4350 Lassiter at North Hills
                                   Avenue, Suite 300
14                               Raleigh, NC  27609
                                 (919) 743-7306
15
     For James D. Dondero:       John T. Wilson
16                               BONDS ELLIS EPPICH SCHAFER
                                   JONES, LLP
17                               420 Throckmorton Street,
                                   Suite 1000
18                               Fort Worth, TX  76102
                                 (817) 405-6900
19
     For the U.S. Trustee:       Lisa L. Lambert
20                               OFFICE OF THE UNITED STATES
                                   TRUSTEE
21                               1100 Commerce Street, Room 976
                                 Dallas, TX  75242
22                               (214) 767-8967

23   Recorded by:                Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
24                               1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
25                               (214) 753-2062
```

3

1    Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX  76208
                                  (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25         Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.

4

1      DALLAS, TEXAS - JANUARY 26, 2021 - 9:40 A.M.

2          THE COURT:  All right.  We have Highland settings

3  this morning:  a Motion for Approval of a KERP, which I didn't

4  see objections to, and then a Preliminary Injunction hearing.

5  Let me get appearances from the parties who have filed

6  pleadings.

7       For the Debtor team, I see Mr. Morris.  Who do we have

8  appearing?

9          MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

10  Pomerantz and John Morris appearing on behalf of the Debtor.

11  I will handle the KERP motion, which we'll propose goes first

12  and quickly, and then Mr. Morris will handle the adversary

13  proceeding.

14          THE COURT:  All right.  Very good.

15       All right.  Let me get appearances from the Defendants in

16  the preliminary injunction matter.  Do we have Mr. Kane or

17  someone for CLO Holdco?

18          MR. KANE:  Yes, Your Honor.  John Kane for CLO

19  Holdco, Ltd.

20          THE COURT:  All right.  What about for the Funds and

21  Advisors?  I guess we have a couple of law firms involved.

22  Who do we have appearing for the K&L Gates firm?

23          MR. HOGEWOOD:  Good morning, Your Honor.  This is Lee

24  Hogewood with K&L Gates, and also with our firm appearing

25  today is Emily Mather.

5

1          THE COURT:  Okay.  I didn't get Emily's last name.

2     Could you repeat that?

3          MR. HOGEWOOD:  I'm sorry, Your Honor.  Emily Mather,

4     M-A-T-H-E-R.

5          THE COURT:  Thank you.

6       All right.  For the Munsch Hardt team, do we have Mr.

7     Rukavina or someone else appearing?

8          MR. RUKAVINA:  Your Honor, good morning.  This is

9     Davor Rukavina.  I represent all of the Defendants in the

10    adversary except CLO Holdco.

11       Pursuant to the Court's instructions, Mr. Dondero is also

12    present here in my conference room, so he is here.  He is not

13    on the camera, but he is here.

14         THE COURT:  Okay.  All right.  And does Mr. Dondero

15    have counsel, his individual counsel appearing today?

16         MR. WILSON:  Your Honor, John Wilson for Jim Dondero.

17         THE COURT:  Okay.  Thank you.  Do we have Creditors'

18    Committee lawyers on the phone today?

19         MR. CLEMENTE:  Yes, Your Honor.  Good morning.

20    Matthew Clemente; Sidley Austin; on behalf of the Official

21    Committee of Unsecured Creditors.

22         THE COURT:  All right.  Thank you.

23       All right.  Well, obviously, if any other lawyer is dying

24    to chime in at some point today, I will consider letting that

25    happen.  But, again, I think we've got the parties who have

6

1 filed pleadings having appeared at this point. So, let's turn

2 to the KERP motion. Mr. Pomerantz?

3       MR. POMERANTZ: Yes, Your Honor. Good morning again.

4 On January 19th, the Debtor filed its motion for approval of a

5 Key Employee Retention Program which would substitute out its

6 annual bonus plan.

7     We have not received any opposition to the motion,

8 although the United States Trustee did ask some questions

9 which we are prepared to address in connection with the

10 proposed proffer of Mr. Seery's testimony. I'm happy to make

11 a full presentation of the motion to Your Honor, if you would

12 like, or I could just present Mr. Seery's proffer, which I

13 should -- which I believe will establish the factual predicate

14 and the evidence to support the motion.

15       THE COURT: All right. Let's just go straight to the

16 proffer, please.

17       MR. POMERANTZ: Okay. Thank you, Your Honor.

18        PROFFER OF TESTIMONY OF JAMES P. SEERY

19       MR. POMERANTZ: Mr. Seery is on the video today, and

20 if he was called to testify he would testify that his name is

21 James P. Seery, Jr. and that he is the chief executive officer

22 and chief restructuring officer of Highland Capital

23 Management.

24     He would also testify that he was one of the independent

25 directors appointed to the Court on January 9th, 2020.

7

1 Because of his role with the Debtor, he is familiar with the

2 company's day-to-day operations, including its -- the

3 company's employee and wage benefit and bonus plans relating

4 to the employees.

5      He would testify that he has been involved in the

6 negotiation and drafting of the company's plan of

7 reorganization, and is familiar with the expected operation of

8 the Claimant Trust and Reorganized Debtor post-confirmation in

9 connection with the plan.

10      He would testify that the plan generally provides for the

11 monetization of the company's assets for the benefit of

12 creditors and stakeholders, and he would testify that, as part

13 of the plan process, he worked closely with DSI, the company's

14 financial advisor, to assess both the costs of the Debtor's

15 current employee base and the projected cost of operations in

16 connection with the Reorganized Debtor and Claimant Trust

17 following the effective date.

18      He would testify that, to ensure the continued smooth

19 operation of the company in connection with the continuation

20 and consummation of the plan for the benefit of all

21 stakeholders, that he worked with DSI to determine the

22 appropriate staffing needs necessary for the company's

23 remaining operations.

24      He would testify that he analyzed the current employees to

25 determine which, if any, would need to be continued to be

8

1 retained by the Debtor and operate during the Reorganized

2 Debtor and Claimant Trust period following the effective date

3 of the plan.

4      He would testify as part of that analysis he reviewed the

5 roles and functions of the non-insider employees with respect

6 to the services that they needed, and he reviewed the wages,

7 benefits, and bonuses for those remaining non-insider

8 employees necessary for those functions.

9      He would testify, that based upon his review, the company

10 determined that it was in the best interests of the estate to

11 terminate the existing annual bonus plan, as it was no longer

12 necessary to effectively incentivize the remaining non-insider

13 employees who would be terminated prior to being entitled to

14 any further payments under the annual bonus plan.

15      He would testify that, instead, the company developed a

16 new retention plan that was designed to incentivize the non-

17 insider employees to remain with the company for as long as

18 they are needed to assist in the effectuation of the plan.

19      He would testify that Mr. Waterhouse and Surgent, arguably

20 two insiders of the Debtor, are not eligible for the retention

21 plan, and that's not because there is any concern regarding

22 their loyalty, but the Debtor is looking at ways to

23 appropriately incentivize and compensate those people as

24 appropriate in the future.

25      He would testify that there are a few persons on the list

9

1  of people who are part of the retention plan with a title that

2  includes director or manager; however, he would testify that

3  none of those individuals are corporate officers or directors

4  of the Debtors -- the Debtor, and that the titles are for

5  convenience only. He would testify that the individuals who

6  are employed in these roles do not have any authority

7  whatsoever to make any decisions on behalf of the Debtor.

8      He would testify that in connection with the new retention

9  plan, the non-insider employees may be offered the opportunity

10 to enter into a termination agreement with the company that

11 will provide specified benefits and payments in return for the

12 non-insider employee remaining as an employee in good standing

13 with the company through the separation date.

14     He would testify that a key component of the retention

15 plan is that non-insider employees will be entitled to the

16 specific bonus payments provided that they do not voluntarily

17 terminate their employment with the Debtor prior to the

18 separation date and are not terminated for cause.

19     He would testify that that is in contrast to the existing

20 or the prior annual bonus plan, which provided that non-

21 insider employees would not receive their bonus payments if

22 they were not employed by the Debtor on the vesting date for

23 any reason except on account of disability, including

24 termination without cause.

25     Mr. Seery would further testify that the retention plan is

10

1  being offered to approximately 53 employees, and the projected

2  aggregate amount of payments under the retention plan is

3  approximately $1,481,000, which is $32,000 approximately less

4  than the amount that would have been paid to such employees

5  under the annual bonus plan.

6     He would testify that the retention plan includes 20

7  employees who are not entitled to benefits under the annual

8  bonus plan.  Fourteen employees are entitled to receive more

9  under the retention plan than they would have received under

10 the annual bonus plan.

11    With respect to the 20 employees I've previously mentioned

12 who are not otherwise entitled to receive anything under the

13 annual bonus plan, the vast majority of those -- 18 -- will be

14 entitled to payments of $2,500 each, and the other two

15 entitled to payments of $10,000 and $7,500, respectively.

16    Mr. Seery would testify that he believes that these

17 additional payments are reasonable in light of the current

18 status of the company and the value to be added to the estate

19 through the retention of these employees, and that this plan

20 is more accurately and narrowly-tailored to achieve the

21 company's reorganization goals.

22    On this basis, Your Honor, Mr. Seery would testify that he

23 presented the proposed retention plan to the independent

24 directors and they agreed with Mr. Seery's assessment that

25 entry into the retention plan was in the best interests of the

11

1  estate and its creditors.

2      He would also testify that he had negotiations with the

3  Creditors' Committee and its advisors regarding the retention

4  plan and that the Committee is supportive of the retention

5  plan.

6      And that would conclude my proffer of testimony from Mr.

7  Seery, Your Honor.

8          THE COURT:  All right.  Mr. Seery, if you could say

9  "Testing, one, two" so we can catch your audio and video,

10 please?

11         MR. SEERY:  Testing, one, two, Your Honor.

12         THE COURT:  All right.  There you are.  Please raise

13 your right hand.

14          JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

15         THE COURT:  All right.  Thank you.  Is there anyone

16 who has questions at this time for Mr. Seery?

17     (No response.0

18         THE COURT:  All right.  Well, I'll just double-check

19 with the Committee.  It's been represented that you all are in

20 support of this.  Mr. Clemente, if you could confirm that on

21 the record?

22         MR. CLEMENTE:  That's correct, Your Honor.  The

23 Committee has no objection to the motion, so Mr. Pomerantz's

24 statements are accurate.

25         THE COURT:  All right.  Anyone else?

12

1 MS. LAMBERT:  This is Lisa Lambert for the United

2 States Trustee.  The U.S. Trustee has reviewed the actual data

3 about the comparatives, and the U.S. Trustee, based on the

4 stipulations, has no objection.

5 THE COURT:  All right.  Thank you.  Anyone else?

6 All right.  Well, the Court will approve this motion.

7 First, while the notice was expedited, the Court finds that it

8 was sufficient under the circumstances.  We are many months

9 into the case, it's been vetted by the Committee, and the

10 Court is satisfied with the level of notice here.

11 The Court finds that this is a KERP that is justified by

12 all the facts and circumstance of this case, to use the

13 wording of Section 503(c)(3) of the Bankruptcy Code.  There

14 also appears to be a very sound business purpose justifying

15 the proposed KERP.  It appears to be reasonable in all ways,

16 and fair under the circumstances, so I do approve it.

17 All right.  So if you all will get the order uploaded

18 electronically, I will promise to sign it promptly.

19 MR. POMERANTZ:  We will do so, Your Honor.  Thank

20 you.

21 THE COURT:  All right.  So, the preliminary

22 injunction.  Mr. Morris, I heard you were going to be taking

23 the lead on that, so go ahead.

24 MR. MORRIS:  Indeed.  Good morning, Your Honor.  John

25 Morris; Pachulski, Stang, Ziehl & Jones; for the Debtor.

13

1          THE COURT:  Good morning.

2          MR. MORRIS:  A few items before I give what I hope

3   will be an informative opening statement.  I trust that Your

4   Honor has not had the opportunity, because it was just filed a

5   moment ago, to see that the Debtor filed on the docket notice

6   of a settlement with CLO Holdco, Ltd., one of the Defendants

7   here today.

8          THE COURT:  I have not seen that.  Okay.

9          MR. MORRIS:  Right.  So you'll find that at Docket

10  1838.

11         THE COURT:  Okay.

12         MR. MORRIS:  It really is a very simple settlement,

13  Your Honor.  In exchange for the withdrawal of CLO Holdco's

14  objection to the Debtor's plan of reorganization, the Debtor

15  is dismissing CLO Holdco from this adversary proceeding with

16  prejudice.  There are, you know, some other bells and whistles

17  there, the most important of which to the Debtor is simply

18  that, under the CLO management agreements, most of them but

19  not all of them require that a level of cause be established

20  before the contracts can be terminated, and CLO Holdco has

21  agreed that, before it seeks to terminate a contract for

22  cause, there will be a gating provision or a gatekeeping

23  provision that requires them to come to this Court to simply

24  establish whether or not there is a colorable claim -- not for

25  a determination on the merits, but simply to protect the

14

1   Debtor from frivolous lawsuits.

2       So that's really the sum and substance of it.  Mr. Kane is

3   on the line now, and if I've either inaccurately or

4   incompletely characterized the settlement, I'm sure he'll take

5   the opportunity to supplement the record.  But we don't see

6   any need, really, to go through a full 9019 motion here.

7   There's no releases.  There's no exchange of money.  It's the

8   withdrawal of a plan objection in consideration for the

9   dismissal of an injunctive proceeding.

10      So we did want to alert you to that.  And as a result,

11  there was one witness that we intended to call today, Grant

12  Scott.  Mr. Scott is the director of CLO Holdco.  And with the

13  resolution of the issues between the Debtor and CLO Holdco, we

14  have no intention of calling Mr. Scott today.  But I'd like to

15  give Mr. Kane an opportunity to be heard just in case he's got

16  anything to add.

17          THE COURT:  All right.  Mr. Kane, can you confirm?

18  Do you have anything to change about what you heard?

19          MR. KANE:  Your Honor, I do not.  The settlement

20  agreement speaks for itself.  We did reach an agreement with

21  Debtor's counsel and the Debtor yesterday evening, fairly late

22  in the evening.  Mr. Morris's synopsis of the proposed

23  settlement is accurate.  The Debtor has agreed to dismiss CLO

24  Holdco from the preliminary injunction adversary proceeding

25  with prejudice.

15

1        THE COURT:  All right.  Well, thank you.  I've pulled

2    it up on my screen.  It's very short and to the point.  And I

3    agree with the comment of Mr. Morris that I don't think a

4    formal 9019 motion is required here, given no consideration is

5    going back and forth, or releases.  It's just exactly as you

6    described orally.  So, I appreciate that.  It simplifies a

7    little bit what we have set today.  And we will accept this

8    settlement as being in place as we roll forward.  All right?

9    Thank you.

10        MR. MORRIS:  Thank you, Your Honor.

11      So, before I get to the substance of the argument, I would

12    like to take care of some housekeeping items relative to

13    today's proceedings.

14        THE COURT:  Okay.

15        MR. MORRIS:  You know, this has been a bit of a

16    challenge for me personally, and it's going to be a little bit

17    of a challenge today for Ms. Canty, my assistant, in part

18    because it's almost like Groundhog's Day.  This is, I think,

19    the third time that we're covering some of the same issues.

20    We had covered them the first time on December 16th in

21    connection with what I'll now just simply refer to as the

22    Defendants, the Defendants' motion to try to limit the Debtor

23    from trading the CLO assets.  We heard a lot of what we're

24    going to hear today again on January 8th in connection with

25    the preliminary injunction motion against Mr. Dondero.  And so

16

1   there's already a ton of evidence in the record. We do

2   believe that we need to present our evidence today, but one of

3   the challenges that we'll face, and I think we'll be able to

4   do it efficiently, Your Honor, is there may just be some back

5   and forth between various documents. But everything's gone

6   pretty smoothly, and I'm optimistic we'll get through that

7   part of it today.

8       So I want to deal with the exhibits themselves, Your

9   Honor. As you may have seen, there have been a number of

10  different filings relating to the Debtor's exhibits for this

11  particular motion, and I just want to go through the exhibits

12  and make sure that we're all on the same page here. I want to

13  tell the Court exactly what happened and why and where we are

14  today.

15      The Debtor timely filed its original witness and exhibit

16  list on January 22nd. They filed that witness and exhibit

17  list at Docket 39 in this Adversary Proceeding 21-3000. The

18  exhibit list referenced Exhibits A through I'll just say

19  AAAAA. It was a lot of exhibits, and somebody had the wise

20  idea to convert them to numbers, but it wasn't me, so I can't

21  take credit. But we're left with letters, and they go from A

22  through AAAAA.

23      After filing that initial exhibit list, we realized that

24  --

25      (Interruption.)

17

1        THE COURT:  All right.  Does someone have their

2   device unmuted?  Okay.  It went away.  Go ahead, Mr. Morris.

3        MR. MORRIS:  Thank you.  So, shortly after filing

4   that initial exhibit list, we realized that we forgot to file

5   among the exhibits AAAAA.  So at Docket #40 in the adversary

6   proceeding, the Court can find Debtor's Exhibit AAAAA.

7        And then we're going to -- I'm going to refer in a few

8   minutes -- I'm going to use in a few minutes some

9   demonstrative exhibits, and I'm going to use them again with

10  Mr. Seery.  And these exhibits concern trading in AVYA and SKY

11  securities that you've heard about previously.

12       But I'm pointing that out now because I'm kind of old

13  school, Your Honor, and I won't use a demonstrative exhibit if

14  it doesn't have the evidence in the record.  And what we

15  realized, Your Honor, is we made two additional mistakes on

16  Friday with all the papers that we filed.  The backup for

17  these demonstratives was mistakenly included on the exhibit

18  list for the confirmation hearing as opposed to the

19  preliminary injunction hearing.  That was error number one.

20  And error number two, we hadn't redacted the information to

21  show only the SKY and AVYA.

22       And that's why, Your Honor, at Docket #48, you will find

23  our amended exhibit list that includes what we have identified

24  as Exhibits BBBBB as in boy through SSSSS as in Sam.  And

25  those exhibits, Your Honor, are the backup to the

18

1  demonstrative exhibits.  I don't expect to use them at all,

2  but I do believe strongly that one should not use a

3  demonstrative exhibit unless the evidence is in the record to

4  support it, and now it is.

5      So that's why, Your Honor, I do appreciate your court

6  staff.  I do appreciate Your Honor.  I think you either had

7  before you and you may have signed an order on redacting.

8  This is what it was all about.  It was just to make sure we

9  had the proper evidence in the record, so I appreciate that.

10     At this time, Your Honor, I think, just because I'll be

11  referring to it in the opening, the Debtor would move for the

12  admission into evidence of Exhibits A through SSSSS.

13         THE COURT:  All right.  Is there any objection?

14         MR. RUKAVINA:  Your Honor, there is.  Your Honor, I

15  object to UUUU.  I'll object to VVVV as in Victor.  I object

16  to AAAAA.  That's it, Your Honor.

17     I will note that there are several exhibits in here of

18  relevance to CLO Holdco that may not be relevant to my

19  clients, but those are my limited objections for now.

20         THE COURT:  All right.  Before we ask the nature of

21  your objection, let me ask Mr. Morris:  Shall we just --

22         MR. MORRIS:  Yeah.

23         THE COURT:  -- carve these out for now, and then if

24  you want to offer them the old-fashioned way, we'll hear the

25  objection then?

19

1          MR. MORRIS:  Yes, although I can make it very clear

2    that UUUU should not be in there precisely because it's

3    demonstrative.  We had talked that yesterday and I agreed; I

4    just forgot that.  UUUU should not be part of the record.

5          THE COURT:  Okay.  And so you'll just decide later do

6    you want to offer VVVV and AAAAA the old-fashioned way?

7          MR. MORRIS:  Correct.

8          THE COURT:  All right.  So, for the record, I am

9    admitting by stipulation -- with three exceptions I'll note --

10   all of the exhibits of the Debtor that appear at Exhibits 39

11   and, well, and 48.  And we're carving out of that admission

12   UUUU, VVVV, and AAAAA, which actually appears at Exhibit --

13   Docket Entry 40.  Those are not admitted at this time.

14      (Debtor's Exhibits A through SSSSS, exclusive of Exhibits

15   UUUU, VVVV, and AAAAA, are received into evidence.)

16         THE COURT:  All right.  Go ahead, Mr. Morris.

17         MR. MORRIS:  Yes.

18         MR. RUKAVINA:  Well, Your Honor, while we're talking

19   about housekeeping -- Mr. Morris, I apologize.  Is there more

20   housekeeping?

21         MR. MORRIS:  I'd like to continue.  I was going to

22   describe the witnesses.

23           OPENING STATEMENT ON BEHALF OF THE DEBTOR

24         MR. MORRIS:  So, Your Honor, the Debtor is going to

25   call three witnesses today.  The first witness will be Mr.

20

1  Dondero, the second will be Jason Post, and then the third

2  will be Mr. Seery.

3      Obviously, Mr. Dondero and Mr. Seery are very familiar to

4  the Court and they will cover much but not all of the same

5  ground that you've heard previously.

6      Mr. Post, I believe, is a new witness appearing in this

7  court for the first time.  I understand that he is the chief

8  compliance officer of each of the Debtors [sic].  He had

9  worked at Highland Capital Management, the Debtor, for more

10  than a decade, I believe, but moved over to NexPoint to work

11  with Mr. Dondero shortly after Mr. Dondero resigned from

12  Highland Capital on or about October 10th last year.

13      So those are the three witnesses that we plan to present

14  today, and I'd like to describe briefly kind of what we think

15  the evidence will show.

16      The theme from our perspective here, Your Honor, is that

17  this is a case that is about power and not rights.  The Debtor

18  brings this motion for preliminary injunction in order to

19  protect itself from the interference of Mr. Dondero and the

20  Defendants, entities that there will be no dispute he owns and

21  controls.

22      You may have read in the papers, and I suspect you will

23  hear today from the Defendants, the clarion call for

24  contractual rights and the need for this Court to protect

25  their contractual rights.  This is a red herring, Your Honor.

21

1   There are no contractual rights at issue here.  What Mr.

2   Dondero and the Defendants really want is to maintain control,

3   or at least to deny Mr. Seery from exercising the Debtor's

4   valuable contractual rights.  If there are any contractual

5   rights at issue here, it is the Debtor's.  The Debtor is the

6   party to the CLO management agreements, and it's those very

7   rights that are being infringed upon.

8       This was supposed to have been resolved 53 or 54 weeks ago

9   now, Your Honor, when Mr. Dondero agreed and this Court

10  ordered that Mr. Dondero could not use related entities to

11  terminate any of the Debtor's agreements.  There is no dispute

12  that each of the Defendants is a related entity for purposes

13  of the January 9th order, since Mr. Dondero and Mr. Norris

14  have already testified that the Defendants are owned and/or

15  controlled by Mr. Dondero.

16      Notwithstanding the plain language of the January 9th

17  order, which Mr. Dondero not only agreed to, but it may be one

18  of the very few orders in this case that he hasn't appealed,

19  notwithstanding the plain language, Your Honor, he persists,

20  and that is why we are here.

21      How do we know that this is about power and not rights?

22  How do we know that everything that's going to be described

23  for you, what the evidence is going to show that this is about

24  power and not rights, is very simple.  Mr. Dondero and Mr.

25  Post will testify -- I'm just going to give four, five, six

22

1    examples here -- are going to testify that Mr. Seery's AVYA

2    trades were not in the Funds' best interests.  It's an

3    irrelevant point, Your Honor.  There is no contractual right

4    that gives them the ability to terminate because they don't

5    like trades that are being made.  They can sell.  If they

6    don't like it, they can sell.  That's what's really funny

7    about this.

8        But what's -- what makes it even more clear that this is

9    about power and not rights is the evidence is going to show

10   that Mr. Dondero sold AVYA shares throughout 2020.  He sold

11   those shares right up until the day he resigned.  And yet six

12   days after resigning, NexPoint sends a letter saying, Don't

13   sell any assets.

14       Ms. Canty, can we put up Exhibit number -- Demonstrative

15   Exhibit 1, please?

16       Okay, Your Honor.  We have redacted this to shield from

17   public disclosure the name of each fund that's trading, but

18   the backup, as I alluded to earlier, in Exhibits BBBBB through

19   SSSSS, some portion of those documents, that's where these

20   demonstrative figures come from.

21       And as you can see, beginning on January 29, 2000,

22   continuing through the bottom of the page, October 9th, 2020,

23   when Mr. Dondero left Highland Capital, he traded millions and

24   millions and millions of dollars in AVYA stock.

25       Can we go to Demonstrative Exhibit #2, please?

23

1    This chart is really -- no, I apologize if I -- the other

2 one.  The AVYA trading activity chart.  Yeah.

3    This one is really interesting, Your Honor, because it

4 shows the trading throughout the year of AVYA stock, and you

5 can see the brown bars there represent Mr. Dondero's trades.

6 And you can see just how many trades there are.  There are

7 over a million shares, I think, if you added it up.  They're

8 represented by the brown bars.  You can see him selling AVYA

9 stock throughout the period, sometimes at a price really near

10 its bottom.

11    And then Mr. Seery tries and actually does sell some stock

12 toward the end of the year.  That's the green bars on the

13 right.  A very, very tiny amount compared to Mr. Dondero.  And

14 he sells it at a substantially greater price than Mr. Dondero

15 sold the AVYA stock.  And yet they're here telling you, Your

16 Honor, that somehow Mr. Seery is mismanaging the CLOs and they

17 disagree with what he's doing and he's not acting in the best

18 interests of the investors.  That's what they want -- but this

19 is what the evidence shows, Your Honor.

20    With respect to SKY, if we could go to the next slide,

21 please.

22    So this is SKY.  Now, Mr. Dondero did not trade any SKY

23 securities, but Mr. Seery did.  And this was another security

24 -- and we'll get to the evidence in a moment -- that Mr.

25 Dondero interfered with and tried to stop.  So Mr. Seery

24

1  succeeded sometimes and he was stopped sometimes, but the

2  point is, Your Honor, look at the price that Mr. Seery sold.

3      And remember, you heard this before and you're going to

4  hear it again.  Nobody from the Defendants ever asked Mr.

5  Seery, Why do you want to trade this?  Not that they even had

6  to.  Not that Mr. Seery needs to defend himself, frankly.

7  He's got the authority under the management contracts to act

8  in the way that he thinks is in the best interest.  But look

9  at this chart.  He made these sales, Your Honor, at more than

10  twice the price of the bottom.

11      How can they have any credibility?  How can Mr. Dondero

12  and Mr. Post come into this courtroom and assert that Mr.

13  Seery is doing anything other than a fabulous job?  He is

14  selling at the top of the market.  Because they think that

15  some high -- in the future, it's going to go higher?  It's

16  prudent, Your Honor.

17      Mr. Seery is going to tell you the work that he did.  He

18  is going to give you the rationale for his decisions.  And the

19  only conclusion that I hope and believe the Court will be able

20  to reach is that these were not only rational decisions but

21  they were prudent, taking some money off the table when the

22  stock was near its high.

23      That's how we know, this is more evidence how we know this

24  is about power.  It's not about rights.  It's not about

25  justice.  It's not about anything having to do with anything

25

1    other than Mr. Dondero wanting to maintain control.

2        How else do we know?  What other evidence is there that

3    this is about power and not rights?  Again, the timing.  The

4    calendar here is going to be very, very important.  The first

5    demand from NexPoint from the Defendants that Mr. Seery stop

6    trading came on October 16th.  It was less than a week after

7    Mr. Dondero -- like, where does this come from?  There's no

8    right to demand stopping of trading.  You don't get to do it.

9    And they're going to minimize it.  They're going to spend the

10   whole day, Your Honor, either -- either focusing on the law or

11   trying to minimize.  And they'll say, well, it was just a

12   request, Your Honor.  And if it was a third-party request, I

13   bet Mr. Seery -- Mr. Seery is going to tell you, if it was a

14   third party, he wouldn't care.  But when you put all of this

15   together, it is oppressive.  It is an exertion -- it's an

16   attempt at exertion of control.  That's how it's perceived and

17   that's actually what happened.

18       Do you need more evidence?  Again, they'll talk about

19   termination for cause and how they have the right and the

20   Court -- you, Your Honor, don't have the power to infringe

21   upon their contractual rights.  But there will be no evidence.

22   Absolutely none.  Mr. Post is going to tell you, in fact, that

23   he has no evidence of any breach, of any default, of any

24   reason whatsoever that cause might exist for the termination

25   of these contracts.  That's how you know this is about power

26

1  and not rights.

2      Last point on the issue of power versus rights:  Who were

3  the counterparties to the CLO agreements?  Did the CLO Issuers

4  -- where are they?  They're not here.  They're not here to

5  tell the Court that Mr. Seery is breaching his duty.  They're

6  not here to tell the Court that the Debtor is in default.  In

7  fact, what Mr. Seery is going to tell you, and it won't be

8  rebutted, is that the CLO Issuers are close to finalizing a

9  deal that will permit the Debtor to assume the CLO management

10  contracts.

11      Mr. Post or Mr. Dondero might get up on the stand today

12  and say, oh, because people have left the firm, that somehow

13  they don't have the ability to service the contracts anymore.

14  You know who doesn't believe that?  The contractual

15  counterparty, the Issuers.  It's about power, Your Honor.

16  It's not about rights.

17      There is substantial evidence that warrants the imposition

18  of a preliminary injunction, substantial evidence, much of

19  which you've heard already.

20      The October and November letters demanding or requesting

21  that the Debtor halt trades.  There's no right to that.

22      Mr. Dondero's interference with the support of Joe Sowin,

23  the Advisors' trader, around Thanksgiving, when they actively

24  moved in.  And it's in the emails.  It's in the record.  We'll

25  put in the record again.

27

1    And then he made the threat to Thomas Surgent -- Mr.

2    Dondero made the threat to Thomas Surgent about potential

3    personal liability.

4    The ridiculous -- remember the ridiculous motion that was

5    heard on December 16th, a motion so devoid of factual or legal

6    basis that the Court granted the Debtor a directed verdict and

7    dismissed the motion as frivolous?  Notably, neither Mr.

8    Dondero nor Mr. Post testified at that hearing.  Yet, within a

9    week, Your Honor -- the hearing was on a Wednesday.  The

10    hearing was on Wednesday, December 16th.  The Court entered

11    the order on Friday, December 18th.  On Monday, December 21st,

12    the next business day, Mr. Dondero and Mr. Post and the

13    lawyers for the Defendants held conference calls to figure out

14    what to do next.

15    And the very next day, the evidence is going to show --

16    it's already in the record -- Mr. Dondero again actively

17    stopped Mr. Seery's trades from being effectuated.  They sent

18    their first letter.  This is less than a week after that

19    hearing, Your Honor.  They sent another letter asking the

20    Debtor -- again, they requested -- minimize -- this is what

21    you're going to hear:  Well, we just sent a letter requesting

22    no more trading.

23    What happened the next day, December 23rd?  They send

24    another letter and they say, We're thinking about terminating

25    the contracts.  Now we think we're going to terminate the

28

1  contracts.  And we just want to let you know we're thinking

2  about terminating the contracts.

3      And we call them -- and Mr. Seery is going to testify to

4  this -- we say, What are you doing?  Every time we just said,

5  Please withdraw your letter.  There's no basis for doing this.

6  Leave us alone and let us do our job.  They wouldn't -- they

7  refused to withdraw the letter.

8      And finally -- again, Mr. Seery will testify to this -- we

9  told them, If you think you really have a basis for

10  terminating the contract, make your motion to lift the stay.

11  And if you don't, the Debtor will file the motion that brings

12  us here today.

13      And that's how we got here, because they continued to

14  interfere with the trading.  They continued to send these

15  specious letters that are implicit threats.  Mr. Seery is

16  going to tell you that every one of these, he -- is an

17  implicit threat.  We asked them, Just withdraw the letters and

18  stop it.  We asked them to make their own motion if you think

19  so strongly of it.  They wouldn't do that, either.  They just

20  want it hanging out there.  They just want it all hanging out

21  there over Mr. Seery's head so that he knows somebody's --

22  somebody's watching and somebody's planning, you know, to take

23  action.

24      It's not right, Your Honor.  They have no right to any of

25  this.  There's nothing in the contract that allows them to

29

1   make even a good-faith -- to make any claim that they have

2   cause to terminate the contract.  They have no right under any

3   circumstances to stop Mr. Seery from trading.

4        What they are going to tell you is there's no agreement

5   between the Advisors and the Debtor that requires the Advisors

6   to execute the trades.  And they're right about that.  They're

7   actually right about that.  But here's the thing, Your Honor.

8   What Mr. Seery is going to tell you is that Advisors has the

9   trading desk.  For more than a decade, they executed the

10  trades.  Through the entirety of this bankruptcy case, until

11  Mr. Dondero left Highland, they executed the trades.  Even

12  after Mr. Dondero left Highland in October, they continued to

13  execute the trades.  And on December 22nd, they fold their

14  hands and they say, Nope, I don't care about the course of

15  dealing, I don't care what impact it has, you can't make me do

16  it.  So Mr. Seery has tried end-arounds, and that'll be in the

17  record, too, and that's when the threats to Surgent come.

18  That's when the threat to Surgent come, when we try to do the

19  workaround.  Cannot do it.

20       This is just not right, Your Honor.  It's just not right.

21  There's order -- there's the January 9th order.  There was the

22  TRO that was in effect that we're going to hear about again,

23  because that TRO not only applied to Mr. Dondero, it prevented

24  him from conspiring with or even encouraging a related entity

25  from engaging in prohibited conduct.  And that prohibited

30

1   conduct, as Your Honor knows, because it's your order, is

2   plain and as unambiguous as can possibly be:  Don't interfere

3   with the Debtor's business.  It's all we're asking for.  It's

4   the only reason we're here today.

5        Interestingly, Your Honor, probably the best piece of

6   evidence that I'll put in front of you today are going to be

7   the words out of Mr. Post's mouth, because basically what he's

8   going to tell you is that, as chief compliance officer, he has

9   never once in the history of his employment told Mr. Dondero

10  to stop.  In fact, what he's going to tell you is that he

11  defers to the investment professionals, and that but for the

12  TRO that is consensually in place today, it would depend on

13  the facts and circumstances as to whether or not he actually

14  does anything as chief compliance officer to stop this

15  conduct.  Depends on the -- maybe he can explain to Your Honor

16  what facts and circumstances he thinks, as chief compliance

17  officer, would allow the Advisors to interfere with the

18  Debtor's business.  It'll be interesting to hear him answer

19  that question.

20       That's all I have, Your Honor.  I look forward to

21  presenting the evidence today.  I'd like this done once and

22  for all.  It's time to move on.  And the Debtor -- the Debtor

23  is in bankruptcy.  Your Honor, I think, has every power, every

24  right, and frankly, you know -- I feel very strongly about

25  this, obviously, Your Honor -- the Debtor needs the breathing

31

1   space and to be left alone so it can do its job.  And we'll

2   respectfully request at the end of this that the Court enter

3   an order allowing it to do so.

4       Thank you, Your Honor.

5           THE COURT:  All right.  We were hearing some

6   distortion there, I'm not sure where it was coming from, but

7   we'll try to keep it reined in.

8       Mr. Rukavina, your opening statement.

9           MR. RUKAVINA:  Your Honor, thank you.  Can the Court

10  hear me?

11          THE COURT:  Yes.

12      OPENING STATEMENT ON BEHALF OF CERTAIN DEFENDANTS

13          MR. RUKAVINA:  Your Honor, I think it's important

14  first to note a few obvious things.  One, what we're talking

15  about today is enjoining future rights, future rights under a

16  contract.  Hearing Mr. Morris's opening, it sounds like we're

17  trying a breach of contract case.  There is no declaratory

18  relief sought for whether there is grounds for a breach of

19  contract case.  And prior to assumption and prior to

20  confirmation, the automatic stay applies.

21      So let me be clear that what they're asking the Court to

22  do today is to excise from these contracts our rights in the

23  future, effectively for all time, as I'll explain.

24      The second thing that merits real consideration is that it

25  is the Funds, Your Honor, not the Advisors, it is the Funds

32

1    that have the right to remove the Debtor as manager.

2         Those Funds, as you will hear, have independent boards.

3    Mr. Dondero doesn't own those Funds.  He's not on those

4    boards.  He doesn't control them.

5         When Mr. Morris talks about Mr. Norris's prior testimony,

6    that testimony was limited to the Advisors.  And yes, Mr.

7    Dondero does own the Advisors, and Mr. Dondero, while I won't

8    say controls the Advisors, certainly has a lot of input.  That

9    is not the case for the Funds, which are the ones with the

10   contractual powers here to remove the Debtor.

11        You will hear that those -- that that board or those

12   boards meet frequently, they have independent counsel, and

13   they take separate actions, including very recently where they

14   did not do something that was advised and acted independently.

15        And the third thing that makes this case different and

16   that all of us should bear in mind is that we're talking today

17   about other people's money.  There's more than one billion

18   dollars of investment funds, retirement funds, pension funds,

19   firefighter funds, school funds, wealthy individuals, having

20   nothing in the world to do with Mr. Dondero or anyone in this

21   case.

22        So what we're talking about here today, Your Honor, is

23   that if my retirement manager files bankruptcy, that I for all

24   time would be effectively enjoined from removing him, no

25   matter what he may do in the future, just because he needs

33

1  that revenue.

2      That is an absolutely inappropriate use of a preliminary

3  injunction.  It is the modification of a contract that the

4  Debtor seeks to assume, and there is going to be no evidence

5  on the underlying elements that the Court must consider.

6      I say that, Your Honor, because I'm new to -- I'm late to

7  this case but I have studied in detail what Your Honor did in

8  the *Acis* case.  And I think that we have to qualitatively

9  differentiate today from *Acis*.  In *Acis*, there were

10  allegations of fraudulent transfer.  When Your Honor enjoined

11  future actions, I believe in part it was because the

12  legitimate owner of those rights might not have been having

13  those rights.

14      So that was a very important difference.  Here, there's no

15  question that we have more than billion dollars of other

16  people's funds at issue.

17      Also in *Acis*, as confirmed by the District Court, there

18  was the exercise of an optional redemption right, which could

19  have very well been used as a weapon to strip the manager of

20  its rights.  That's not the case here today.  We are talking

21  about removing the Debtor in the future -- not today, not

22  prior to assumption, in the future -- for such things as if

23  the Debtor commits fraud, if Mr. Seery is indicted for

24  felonies, if the Debtor absconds with our funds.  We are

25  talking about potential hypothetical actions in the future

34

1   that are not even ripe based on the Debtor's potential

2   wrongful actions, not based anything on our motivations or our

3   intentions.

4        So this is a different case than Your Honor has heard so

5   far in these cases.  And what it boils down to, Your Honor, is

6   will the Court give judicial immunity to the post-assumption,

7   post-confirmation Debtor over the next two or three years as

8   it manages and liquidates more than a billion dollars of other

9   people's funds?  It is their money at issue.

10       So, in order to do this, the Debtor first has to tell Your

11   Honor that it has a likelihood of merits on the success [sic]

12   of some claim.  The Debtor cannot just come to you -- because

13   the Debtor knows Your Honor's opinion on 105(a) and the

14   Supreme Court law -- and the Debtor cannot just say, Judge,

15   please give us an injunction because it's convenient or

16   because we don't want to comply with our obligations.  So they

17   concoct a tortious interference claim.  They argue that there

18   is an automatic stay violation, which, as Your Honor knows,

19   all of us bankruptcy lawyers take most seriously.  And they

20   argue that, well, whatever Mr. Dondero has been enjoined from

21   doing, somehow we *a priori* are also enjoined.  Basically, an

22   alter ego with no facts, law, trial, or due process.

23       On the tortious interference, Your Honor will hear

24   absolute evidence that cannot be refuted that all that we did,

25   all that we did was we refused, our employees refused to make

35

1  a ministerial entry into a computer program of two trades that

2  Mr. Seery authorized.  Those trades closed exactly as Mr.

3  Seery wanted.  Those trades closed, were executed, before Mr.

4  Seery asked our employees to do his bidding.  And the reason

5  why our employees were instructed not to do what Mr. Seery

6  wanted was because our chief compliance officer looked at it,

7  those employees looked at it, and they all said, What is this?

8  Our internal protocols were not followed.  We don't know

9  anything about these trades.  We have fiduciary duties, we

10  have SEC obligations, and Mr. Seery has his own employees whom

11  he can instruct to enter these two trades into the computer

12  and our employees aren't going to do it.  It's as simple as

13  that.

14      Mr. Dondero did not command that decision.  Mr. Dondero

15  did not instruct that decision.

16      Our employees not doing what Mr. Seery requested of them

17  is not tortious interference.  It is not interference as a

18  matter of law.  There was no breach of contract as a result.

19      So the two elements -- two of the elements required for

20  tortious interference, there will be zero evidence on.  But in

21  the bigger picture, what they're talking about again is

22  restraining our rights in the future.  And whether -- whether

23  we are party to these contracts or a third-party beneficiary,

24  it doesn't matter, because we are not a stranger to these

25  contracts.  These contracts expressly give us rights.  And a

36

1  party exercising their right under a contract, it could be

2  breaching that contract, but it cannot be tortious

3  interference as a matter of law.

4      And if Your Honor is concerned about us tortiously

5  interfering in the future, then the Court should enjoin us

6  from tortious interference in the future, not excise from the

7  contract the remedies that the Debtor must accept if it wants

8  to assume these contracts.

9      Moving to the automatic stay issue, the sole and exclusive

10 argument for why we violated the stay is because our counsel,

11 a seasoned, gentlemanly bankruptcy lawyer of many years'

12 experience, sent two letters to seasoned veteran bankruptcy

13 lawyers for the Debtor. Communications. Communications

14 amongst counsel.

15     The first, the December 22nd letter, is a request: Okay,

16 we lost in front of Judge Jernigan, Judge Jernigan called our

17 motion frivolous, we get that, but we ask you to please stop

18 trading until the plan is confirmed. A request which the

19 Debtor ignored. Or that's not true, didn't ignore: refused

20 to comply with.

21     The second letter, a day later, after various

22 communications, was: Okay, we are going to initiate the

23 process of terminating you as the servicer.

24     Mr. Dondero had nothing in the world to do with these

25 letters. Mr. Dondero did not direct these letters. This was

37

1  professional advice from outside counsel and the independent

2  boards of the Advisors believing that their fiduciary duty

3  compelled that.

4      And guess what, that letter even said:  subject to the

5  automatic stay.  You heard from Mr. Morris that they basically

6  said, File your stay motion.

7      Our follow-up letter clarified anything that we might do

8  is subject to the automatic stay.  We never said we're going

9  to act in a way that the stay doesn't permit.  We said we're

10  going to come to this Court first.

11      But even all that, all those communications, while it may

12  be interesting, are irrelevant, because we never took any

13  action.  You will hear that we never communicated with the

14  CLOs, the Trustees, or the Issuers, anything like we went over

15  with the Debtor, anything like, Please start the process of

16  removing the Debtor.  We have done nothing of the sort, we

17  will do nothing of the sort, precisely because of the

18  automatic stay.

19      So I equate this, Your Honor, to your average home lender

20  whose lawyer sends a letter to the borrower saying, You don't

21  have insurance; we're going to start the process of

22  foreclosure.  You're past due on your post-petition adequate

23  protection payments; we're going to start the foreclosure

24  process; we're going to go seek a list of stay.  That is not

25  actionable.  It is not a stay violation.  Those are

38

1  communications, not actions.  And that is precisely what

2  seasoned professional counsel should be doing.

3     And now, Your Honor, we move to the Mr. Dondero issue.

4  The argument is, well, on January the 9th, Mr. Dondero,

5  apparently for all time, in perpetuity, agreed that he will

6  not cause the related entities to terminate these agreements.

7  And then the argument is, well, the Court entered a TRO

8  against Mr. Dondero and the Court entered a preliminary

9  injunction against Mr. Dondero.  Okay?

10    I don't see where the problem is.  Mr. Dondero is

11  prohibited from causing us to terminate these agreements.

12  There are many ways, with independent boards, that Mr. Dondero

13  has nothing to do with that.  And he will have nothing to do

14  with that in the future.  So if the concern is enjoining us

15  because of an injunction against Mr. Dondero, enjoin Mr.

16  Dondero.  Just like if the concern is that we're going to

17  tortiously interfere, you enjoin us from tortious

18  interference.  Or if we're going to violate the stay, enjoin

19  us from violating the stay.  But do not for all time assume

20  that any right that we may exercise in the future will

21  necessarily be tainted and the corrupt product of Mr.

22  Dondero's instructions.  You will see today on the evidence

23  that that has not happened and it will not happen.

24    And whatever Mr. Dondero may have agreed to, we are

25  separate entities.  Again, the Funds have -- are not

39

1  controlled or owned, and Mr. Dondero is not on the board.  So

2  whatever he may have agreed to is between the Court and the

3  Debtor and him, but he never agreed to that on behalf of the

4  Funds.  He never agreed to that on behalf of the Advisors, who

5  have their own independent fiduciary duties and duties under

6  the law.

7      So, Your Honor, there will be no substantial likelihood of

8  success on the merits.  There will be no likelihood of success

9  on the merits.  And I'm talking about the post-assumption,

10 post-confirmation time frame.  The issue is fundamentally

11 different pre-assumption and pre-confirmation.  But post-

12 assumption and post-confirmation, the Debtor will not show a

13 likelihood of success on the merits.  The Debtor will not show

14 any irreparable injury.  None.

15     Mr. Seery will testify that managing these agreements for

16 the coming couple or three years will have some value to the

17 Debtor.  He doesn't know what the profitability of that is to

18 the Debtor.  You will hear that, in fact, managing these

19 contracts for the next two years does not bring any

20 profitability to the Debtor.  The Debtor will lose money

21 managing of them.  But whatever damages there are are monetary

22 damages, and monetary damages are not an irreparable injury as

23 a matter of law.

24     Now, the Debtor says, well, the Court can enter an

25 injunction in the aid of restructuring, but this injunction

40

1    will happen after restructuring.

2        On the balance of harm and public interest, Your Honor, I

3    think we're dealing with more than a billion dollars of clean,

4    innocent third-party funds.  The balance of harm here weighs

5    against granting this injunction.  If we try to do anything in

6    the post-confirmation world, the Debtor has all of its rights

7    and remedies to contest what we do.  If we do it wrong, we're

8    liable in contract or in tort, there's monetary damages, and

9    the Debtor has already successfully organized.

10       But if the Debtor does something wrong in the future and

11   we cannot take action to stop a gross mismanagement or a

12   denution [sic] of the Debtor or an abscondence with funds,

13   then think about the harm to the innocent investors here.

14   Because if we even go to court, your Court, any court, we will

15   be in violation of a federal court injunction.

16       Your Honor, this is not the appropriate purpose of an

17   injunction for the preservation of the status quo.  The status

18   quo, by definition, cannot extend post-assumption or post-

19   confirmation.  This is not a proper exercise of equity.  We

20   have done nothing wrong, we have threatened to do nothing

21   wrong, and we will do nothing wrong to justify forever being

22   prejudiced and enjoined from exercising our contractual and

23   statutory rights.

24       Your Honor, this TRO extends through February the 15th.

25   We asked the Debtor to continue this hearing.  We asked the

41

1   Debtor to go to our independent boards and seek approval of

2   the same settlement that the Debtor has with CLO Holdco, which

3   we learned about last night.  We simply haven't had the time

4   to get those boards aligned up and present a settlement to

5   them.  We're trying to put together a competing plan.

6       Your Honor, there is no reason to go forward today except,

7   like Mr. Morris said, power.  Power.  Mr. Seery's power, Your

8   Honor.  Not ours.  Mr. Seery's power in perpetuity or for

9   judicial immunity, get out of jail free card.  Thank you.

10          THE COURT:  All right.  Mr. Morris, you may call your

11  witness.

12          MR. MORRIS:  Yeah.  I just want to make a motion to

13  strike the notion of a get out of jail free card.  I

14  appreciated everything counsel had to say, but I think that's

15  a little -- a little over the top.

16      We call Mr. James Dondero, please.

17          THE COURT:  Mr. Dondero, --

18          MR. RUKAVINA:  Your Honor, bear with me.

19          THE COURT:  Okay.

20          MR. RUKAVINA:  Your Honor, bear with me.  I'm going

21  to get out of this chair.  Mr. Dondero will get in this chair.

22  And so that there's no reverberation, I will be sitting next

23  to Mr. Dondero in case I have to make any objections.

24          THE COURT:  Okay.  All right.  Good morning, Mr.

25  Dondero.

Dondero - Direct                         42

1          MR. DONDERO:  Good morning.

2          THE COURT:  Please raise your right hand.

3              JAMES DONDERO, DEBTOR'S WITNESS, SWORN

4          THE COURT:  Thank you.  Mr. Morris, go ahead.

5          MR. MORRIS:  May I proceed, Your Honor?

6          THE COURT:  Yes.

7                     DIRECT EXAMINATION

8   BY MR. MORRIS:

9   Q    Good morning, Mr. Dondero.  Okay.  John Morris; Pachulski,

10  Stang, Ziehl & Jones; for the Debtor.  Can you hear me okay,

11  sir?

12  A    Yes.

13  Q    There are no board members here on behalf of any of the

14  Funds to testify or offer any evidence; isn't that right?

15  A    Not that I'm aware of.

16  Q    Okay.  And you knew the hearing was going to be today on

17  the preliminary injunction, right?

18  A    Yes.

19  Q    And you had an opportunity to confer with the boards of

20  the Funds in advance of this hearing, right?

21  A    No.

22  Q    There's no -- there's no -- no board member is expected to

23  testify, fair?

24  A    Correct.

25  Q    So the Court isn't going to hear any evidence as to the

```
                       Dondero - Direct                    43

 1  board's perception of what's happening here, right?

 2  A    Not that I'm aware of.

 3  Q    Okay.  Until January 9th, 2020, you controlled the debtor

 4  Highland Capital Management, LP; isn't that right?

 5  A    I don't remember exactly when these -- when the

 6  independent board was put in place, but up until around that

 7  time, I believe.

 8  Q    Okay.  So, January 2020?

 9  A    Yes.

10  Q    And during that month, you completed an agreement with the

11  Creditors' Committee where you ceded control of the Debtor

12  pursuant to a court order, right?

13  A    Pursuant to a court ...?  I thought it was pursuant to a

14  negotiation where they would have fiduciary responsibility to

15  the estate in my absence.  That's -- that's what I think the

16  (garbled).

17  Q    Okay.  You're aware -- so you entered into an agreement

18  with the Creditors' Committee pursuant to which you ceded

19  control of the Debtor, right?

20          MR. RUKAVINA:  Your Honor, I'll object.  That

21  agreement speaks for itself.  And if Mr. Morris wants to

22  present it to Mr. Dondero, he can.

23          THE COURT:  Um, --

24          MR. MORRIS:  Sure.  Ms. Canty, can we please put up

25  --
```

Dondero - Direct                         44

1          THE COURT:  All right.  Well, I --

2          MR. MORRIS:  I'm happy to put it up, Your Honor.

3          THE COURT:  I overrule that objection.  You can ask.

4   And then if he's not sure, you can present the agreement.  All

5   right?  Go ahead.

6          MR. MORRIS:  Okay.

7   BY MR. MORRIS:

8   Q    Mr. Dondero, is there any doubt in your mind that in

9   January of 2020 you gave up control of Highland in favor of an

10  independent board at the Strand Advisors level?

11  A    No.  I -- yes, I agree with that.

12  Q    Okay.  And do you recall that, in connection with that

13  agreement, the Court entered an order?

14  A    Several orders.  Which one?

15  Q    Okay.

16         MR. MORRIS:  Can we please put up Docket No. 339?

17         MS. CANTY:  Sure, just one second.

18         MR. RUKAVINA:  And you have it here.

19     John, I have the order if just want Mr. Dondero to review

20  it.

21         MR. MORRIS:  I think -- I think everybody should have

22  the benefit of seeing it.  But thank you very much.

23     Your Honor, while we take this moment, can you just remind

24  me of when the Court needs to take a break today, so that I'm

25  mindful of that and respectful of your time?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 576 of
2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 575 of
2722

Dondero - Direct                           45

1          THE COURT:  11:30.

2          MR. MORRIS:  Okay.  And what time will we reconvene?

3          THE COURT:  Well, I have said 1:00.  I hope it can be

4     a little sooner, but let's just plan on 1:00, okay, so there's

5     no confusion.

6          MR. MORRIS:  Okay.  All right.  All right.  So, on

7     the screen here, we have Exhibit OOOO, which is in the record.

8     BY MR. MORRIS:

9     Q    This is an order that was entered by the Court on January

10    9th, 2020.  Do you see that, sir?

11    A    Yes.

12         MR. MORRIS:  Can we scroll down to Paragraph 9,

13    please?  (Pause.)  Are you having problems, Ms. Canty?

14         MS. CANTY:  It's on the screen.  You can't see it?

15         MR. MORRIS:  Yeah.  Can you scroll down to Paragraph

16    9?

17         MS. CANTY:  It's on Paragraph --

18         MR. MORRIS:  That's on Page 2, I believe.

19         MS. CANTY:  Yeah, I have it up.  I'm not sure what

20    the disconnect is, because I can see it on my screen.  I'm

21    going to stop it and reshare it.

22         MR. MORRIS:  Thank you very much.

23       (Pause.)

24         MS. CANTY:  Do you see it now?

25         MR. MORRIS:  Okay.  Beautiful.

Dondero - Direct                          46

1   BY MR. MORRIS:

2   Q   Mr. Dondero, if you'd just read Paragraph 9 out loud.

3   A   (reading)  Mr. Dondero shall not cause any related entity

4   to terminate any agreements with the Debtor.

5   Q   Okay.  So you understood, as part of the corporate

6   governance settlement pursuant to which you avoided the

7   imposition of a trustee, that you agreed that you wouldn't

8   cause any related entity to terminate any agreements with the

9   Debtor, right?

10  A   Uh, --

11  Q   Is that correct?  You understood that paragraph?

12  A   Yes.

13  Q   Okay.  And you didn't appeal this particular order, did

14  you, sir?

15  A   I -- I believe I've refuted -- I've adhered to that order

16  entirely.

17  Q   Okay.  NexPoint Advisors LP, is one of the defendants in

18  this matter, right?

19  A   Yes.

20      (Pause.)

21  Q   Can you hear me, sir?

22  A   Yes.  Yes, I said, "Yes."

23          MR. NICHOLSON:  Well, John, did you -- did you ask a

24  question?  Because you went offline for a few seconds there.

25          MR. MORRIS:  I asked whether NexPoint Advisors, LP

                          Dondero - Direct                    47

1    was an advisory firm.

2            THE WITNESS:  Yes.

3    BY MR. MORRIS:

4    Q    And you have a direct or indirect ownership interest in

5    NexPoint Advisors, LP, correct?

6    A    Yes.

7    Q    And you understand that, based on that direct or indirect

8    ownership interest, NexPoint Advisors, LP is a related entity

9    under Paragraph 9 of this order, right?

10   A    Yes.

11   Q    Okay.  Highland Capital Management Fund Advisors, LP is

12   one of the other defendants in this case, right?

13   A    Yes.

14   Q    And we'll refer to that entity as Fund Advisors; is that

15   fair?

16   A    Yes.

17   Q    And we'll refer to Fund Advisors together with NexPoint

18   Advisors, LP as the Advisors; is that fair?

19   A    Yes.

20   Q    Okay.  Fund Advisors is also an advisory firm; is that

21   (audio gap)?

22   A    I missed that last question.

23           MR. RUKAVINA:  John, you're freezing up on us.  Is it

24   on our end, Your Honor, or is it on Mr. Morris's end?

25           MR. MORRIS:  Just let me know -- just let me know

Dondero - Direct                     48

1    when it happens.

2           THE COURT:  Yes.  I'm hearing him.  But go ahead, Mr.

3    Morris.  Let's try again.

4           MR. MORRIS:  Okay.

5    BY MR. MORRIS:

6    Q    You have a direct or indirect ownership interest in Fund

7    Advisors, correct, sir?

8    A    Yes.

9    Q    (audio garbled)  And based on that direct or indirect

10   interest, you would agree that Fund Advisors is a related

11   entity for purposes of this order, correct?

12   A    Yes.

13   Q    In addition to your ownership interest, you're also the

14   president of Fund Advisors; is that (audio gap)?

15          THE COURT:  All right.  Now --

16          THE WITNESS:  I believe so.

17          THE COURT:  Yes.  Now I'm starting to have some

18   trouble, Mr. Morris.  Every once in a while, you're freezing

19   towards the end of a sentence.  So I don't know what can be

20   done, but it's --

21          MR. MORRIS:  All right.  Let me know if that

22   continues.

23          THE COURT:  Okay.

24   BY MR. MORRIS:

25   Q    To use your words -- to use your words, Mr. Dondero, it's

Dondero - Direct                          49

1    fair to say that you generally control Fund Advisors, right?

2    A    Yes.

3    Q    And based on that, you acknowledge that Fund Advisors is a

4    related entity under the Court's order, correct?

5    A    Yes.

6    Q    And together, the Advisors that you own and control manage

7    certain investment funds, correct?

8    A    Yes.

9    Q    And three of those funds are defendants in this case,

10   correct?

11   A    Yes.

12   Q    And you are the portfolio manager of each of those funds;

13   is that right?

14   A    I believe so.

15   Q    Okay.  Let's talk about the events that led to this

16   matter.  CLO stands for Collateralized Loan Obligations,

17   correct?

18   A    I'm sorry.  Repeat that, please?

19   Q    Sure.  CLO stands for Collateralized Loan Obligations,

20   correct?

21   A    Yes.

22   Q    Years ago, the Advisors that you own and control caused

23   the investment funds that they manage to buy the interests in

24   CLOs that are managed by the Debtor, correct?

25   A    Yes.  Yes.

Dondero - Direct                    50

1    Q   Okay.  And those Funds still hold an equity interest

2    today, correct?

3    A   Yes.

4    Q   And K&L Gates is one of the law firms that represents the

5    Advisors and the Funds that are managed by the Advisors,

6    correct?

7    A   Yes.

8    Q   You would agree that the Debtor is party to certain

9    contracts that give it the right and the responsibility to

10   manage certain CLO assets, right?

11   A   Yes.

12   Q   And you recall that --

13          MR. RUKAVINA:  Your Honor, Mr. Morris is frozen on

14   our end.

15          THE COURT:  Yes.  Mr. Morris, you just froze.

16          MR. RUKAVINA:  We heard nothing, Mr. Morris.

17          THE COURT:  Yes.

18          MR. MORRIS:  Okay.

19   BY MR. MORRIS:

20   Q   Sir, do you recall that you resigned from the Debtor on or

21   around October 10th, 2020?

22   A   Yes.

23   Q   Okay.  And shortly thereafter, K&L Gates sent a couple of

24   letters to the Debtor on behalf of the Advisors and the Funds,

25   correct?

```
                    Dondero - Direct                    51
```

1  A   Yes.

2  Q   Okay.

3       MR. MORRIS:  Can we take a look at these?  These are

4  documents that were admitted into evidence in a different

5  matter, but they're actually referred to in his prior

6  testimony, which is in evidence in this case.  So I would just

7  ask Ms. Canty to go to Trial Exhibit B, which was filed in the

8  Adversary Proceeding 20-3190 at Docket 46.  And for the

9  record, it's PDF Page #184 out of 270.  I just want to take a

10 look at these two letters.

11 BY MR. MORRIS:

12 Q   Okay.  Do you see this letter, sir?

13 A   Yes.

14 Q   And NexPoint is one of the defendants here; is that right?

15 A   Yes.

16 Q   And that's one of the Advisors that you own and generally

17 control, correct?

18 A   Yes.

19 Q   And so this letter is sent less than a week after you've

20 left Highland Capital Management, right?

21 A   Yes.

22 Q   Do you recall this particular letter?

23 A   No.

24 Q   Can -- you're familiar with the substance of this letter

25 and the other one that was sent in November, correct?

Dondero - Direct                            52

1  A    Could you pull it a little higher and let me read it?

2  Q    Yes.  Sure.

3        MR. RUKAVINA:  If this is an exhibit, I can show it

4  to him as an exhibit, Mr. Morris.

5        MR. MORRIS:  I don't know that this is one of the

6  marked exhibits.  It's one of the exhibits that's used within

7  his prior testimony.  So, but I want to give Mr. Dondero a

8  chance to review it.  And please let us know if you need to

9  scroll further down.

10     (Pause.)

11        MR. RUKAVINA:  You're going to have to scroll down.

12        THE WITNESS:  Scroll down a little further, please.

13     (Pause.)

14        MR. RUKAVINA:  Mr. Morris, can you please scroll

15  down?  Neither Mr. Dondero nor I can read the balance.

16  BY MR. MORRIS:

17  Q    There you go.  (Pause.)  So, you see at the top of the

18  page there there is a reference to the sale of assets and a,

19  quote, "a rush to sell these assets at fire sale prices."  Is

20  that what you think -- did you think that Mr. Seery was

21  selling (audio garbled) CLO assets at fire sale prices in

22  October 2020, --

23        MR. RUKAVINA:  Your Honor, --

24        MR. MORRIS:  -- less than a week after --

25        MR. RUKAVINA:  Your Honor, I'll object.  We did not

Dondero - Direct                              53

1    hear Mr. Morris's question.

2            THE COURT:  All right.  Could you repeat the

3    question?

4            MR. MORRIS:  Okay.  Yes, Your Honor.

5    BY MR. MORRIS:

6    Q   Mr. Dondero, on or about October 16th, did you personally

7    believe that Mr. Seery was in a rush to sell CLO assets at

8    fire sale prices?

9    A   I believe he had no business purpose to sell any of the

10   assets, which I believe he stated that to Joe Sowin, our

11   trader.  I -- I -- there was no business purpose stated or

12   ever given or obvious from the sales.  And --

13   Q   Okay.

14   A   -- I (indecipherable) draft this letter.

15   Q   Okay.

16           MR. MORRIS:  I move to strike, Your Honor.  It's a

17   very simple question --

18           THE COURT:  Sustained.

19           MR. MORRIS:  -- and it has to do solely with Mr.

20   Dondero's state of mind.

21   BY MR. MORRIS:

22   Q   Mr. Dondero, on or about October 16th, did you personally

23   believe that Mr. Seery was in a rush to sell CLO assets at

24   fire sale prices?

25   A   He was in a rush to sell them for some reason with no

Dondero - Direct                          54

1   business purpose.  I don't know the reason.

2          THE COURT:  All right.  Can you --

3   BY MR. MORRIS:

4   Q   Okay.  And you never asked him, right?

5          THE COURT:  Yes.  Yes or no answer, Mr. Dondero.

6          THE WITNESS:  Never asked him.

7          MR. MORRIS:  Okay.  Can we turn to the next exhibit,

8   which is Exhibit C on that same docket?

9       (Pause.)

10  BY MR. MORRIS:

11  Q   While we're waiting, can you just read the last sentence

12  of the paragraph that ends at the top of the page, Mr.

13  Dondero, beginning, "Accordingly"?

14  A   (reading)  Accordingly, we hereby request that no CLO

15  assets be sold without prior notice and prior consent from the

16  Advisors.

17  Q   Are you aware of any contractual provision pursuant to

18  which the Funds or the Advisors can -- can expect that the

19  Debtor will refrain from any -- selling any assets without

20  giving prior notice and obtaining prior consent from those

21  entities?

22  A   I think the documents have an overall good-faith/fair-

23  dealing clause which would cover something like this, I

24  believe.

25  Q   Your -- is it your testimony, sir, that the duty of good

Dondero - Direct                        55

1    faith and fair dealing requires the Debtor to give notice to

2    the Advisors and to obtain the Advisors' prior consent before

3    they can sell any CLO assets?

4    A    Well, I think -- yes, I do.  I think --

5    Q    All right.

6    A    Yes.  Yeah.

7    Q    Okay.  And then the next month, another letter was sent by

8    NexPoint to Mr. Seery.  Do you recall that?

9    A    Not specifically.  If you bring it up, we can talk about

10   it.

11           MR. MORRIS:  Can we scroll down a little bit?

12       (Pause.)

13           MS. CANTY:  John, are you talking to me?  I was

14   frozen out.  I just got back on.  I apologize.

15           MR. MORRIS:  That's okay.  Can we just scroll down so

16   Mr. Dondero can see more of this particular letter?

17           MS. CANTY:  Okay.

18           MR. MORRIS:  Okay.

19   BY MR. MORRIS:

20   Q    Can you just read out loud, Mr. Dondero, out loud the last

21   two sentences, please, beginning with, "We understand"?

22   A    (reading)  We understand that Charitable DAF Holdco, Ltd.

23   has made a similar request.  Accordingly, we hereby re-urge

24   our request that no CLO assets be sold without prior notice to

25   and prior consent from the Advisors.

Dondero - Direct                                56

1  Q    What's the Charitable DAF Holdco, Ltd.?

2  A    I think that's who you settled with yesterday.

3  Q    Do you have an interest in that entity?

4  A    No.  It's a bona fide charity.  It was one of the largest

5  in Dallas before it got cut in half by Acis.

6  Q    Does -- are you familiar with the Get Good and the Dugaboy

7  Investment Trusts?

8        MR. RUKAVINA:  Your Honor, at this time I would

9  object to relevance.  I don't see what this has to do with

10 tortious interference and stay violation on December 22nd and

11 December 23rd, 2020.

12       THE COURT:  Response?

13       MR. MORRIS:  Your Honor, I'm trying to establish that

14 Charitable DAF Holdco, Ltd. is another entity in which Mr.

15 Dondero holds a beneficial interest.

16       THE COURT:  Okay.  Overrule the objection.

17       MR. RUKAVINA:  John, you're not only frozen, now

18 you're off.

19       MR. MORRIS:  Yeah, I can see myself.  You can't hear

20 me?

21       MR. RUKAVINA:  We can now, but Your Honor, we lost

22 Mr. Morris for a bit there.

23       THE COURT:  All right.  I think we were --

24       MR. MORRIS:  Okay.

25       THE COURT:  -- waiting on an answer from Mr. Dondero,

Dondero - Direct                    57

1   actually.

2           THE WITNESS:  We didn't hear the question at --

3   BY MR. MORRIS:

4   Q    Sure.  Are you familiar with the Get Good and Dugaboy

5   Investment Trusts?

6   A    Yes.

7   Q    Are you the beneficiary of those trusts?

8           MR. RUKAVINA:  Your Honor, again, objection to

9   relevance.  These are non-parties, and what his personal

10  interests are has no relevance to this.

11          THE COURT:  Overruled.

12          THE WITNESS:  The Get Good Trust, Get -- I believe

13  those are defective grantor trusts.  I don't believe I have

14  any interest whatsoever in those.  Dugaboy is a perpetual

15  Delaware trust.  I don't know how that's set up, but I believe

16  I do have an interest there until I pass.

17  BY MR. MORRIS:

18  Q    In fact, you're -- you're the sole beneficiary of the

19  Dugaboy Investment Trust, right?

20  A    Until I pass.  It's a -- it's a estate planning trust.

21  Q    I appreciate that.  And the Dugaboy and the Get Good

22  Trusts are the owners of the Charitable DAF Holdco Ltd.,

23  correct?

24  A    No.  Not as far as I know.

25  Q    Okay.

Dondero - Direct                           58

1  A    (garbled) time at all.

2  Q    All right.  So we just looked at these two letters, sir.

3  And you were familiar with the substance of the letters before

4  they were sent, right?

5  A    Uh, just --

6          MR. MORRIS:  You can take it down, Ms. Canty.

7          THE WITNESS:  Just generally.  Again, I wasn't

8  involved directly with the letters.

9  BY MR. MORRIS:

10  Q    You were aware of the letters before they were sent,

11  right?

12  A    Yes.

13  Q    And you discussed the substance of the letters with

14  NexPoint, correct?

15  A    Not the substance of the letters, just the substance of

16  the issue.

17  Q    You actually discussed the substance of the letters with

18  NexPoint, correct?

19  A    I -- Again, I remember it being the substance of the

20  issue.  Generally, at most, the substance of the letters.

21  Q    And you discussed the substance of the letters with the

22  Advisors' internal counsel, too, right?

23  A    The sub -- generally, the substance, yes, but more the

24  issue than the letter.

25  Q    Okay.  If I pull up your transcript from the TRO hearing,

Dondero - Direct                                      59

1   would that refresh your recollection that you discussed the

2   substance of these letters with NexPoint and with the

3   Advisors' internal counsel?

4   A    I'd like to clarify with the testimony I just gave.

5   Q    Okay.  Would you -- do you have any reason to believe that

6   you did not previously testify that you discussed the

7   substance of the letters with NexPoint and with NexPoint

8   Advisors' internal counsel?

9   A    I repeat the same testimony.  Generally.  Like, those

10  letters that you put on the screen, I have no recollection of

11  those specifically.

12          MR. MORRIS:  Ms. Canty, can we please call up on the

13  screen Exhibit NNNN, which was the transcript from the January

14  8th, 2021 preliminary injunction hearing?

15          MR. RUKAVINA:  Mr. Morris, just one sec.  I'm trying

16  to find it on paper.

17          MR. MORRIS:  Yeah.  It's four Ns.

18          MR. RUKAVINA:  One, two, three, four.  (inaudible)

19  put that on the screen.

20          MS. CANTY:  John, I'm not sure what's going on, but

21  it won't come up on the screen.  I've tried three times.  I'm

22  going to keep trying.

23          MR. MORRIS:  All right.  I have it in front of me.

24  Do you have it, too?

25          MR. RUKAVINA:  Yes, the witness has it --

Dondero - Direct                    60

1          MR. MORRIS:  Okay.

2          MR. RUKAVINA:  -- in front of him.  This is NNNN,

3   just to confirm?

4          MR. MORRIS:  Yes.  And it is the January 8th

5   transcript.

6   BY MR. MORRIS:

7   Q   Mr. Dondero, were you asked these questions and did you

8   give these answers?  Question:  Are you familiar with --

9          MR. RUKAVINA:  Where are you, John?  Where are you?

10  Where are you?  We -- we -- we --

11         MR. MORRIS:  I apologize.  Page 40.  I'm going to

12  read Page 40, Lines 1 through 14.

13         MR. RUKAVINA:  Okay.  He has it in front of him, if

14  you just want him to read it.

15  BY MR. MORRIS:

16  Q   Did you give these answers at Page 40, beginning Line 1:

17      "Q   And were you -- and you were familiar, you were

18      aware of these letters before they were sent; is that

19      correct?

20      "A   Yes.

21      "Q   And you generally discussed the substance of these

22      letters with NexPoint; is that right?

23      "A   Generally, yes.

24      "Q   You discussed the letters with the internal

25      counsel; is that right?

Dondero - Direct                    61

1          "A    Yes.

2          "Q    That's D.C. Sauter?

3          "A    Yes.

4          "Q    And you have been on some calls with K&L Gates

5          about these letters, right?

6          "A    I believe so.

7          "Q    And you knew these letters were being sent,

8          correct?

9          "A    Yeah.  They're -- they're reported.

10    Q    Did you give those answers to those questions at the prior

11    hearing?

12    A    I -- I believe it's what I -- it's almost exactly what I

13    just said, but yes.

14    Q    And you supported the sending of the letters; isn't that

15    right?

16    A    Absolutely.

17    Q    And you encouraged the sending of the letters, right?

18    A    Absolutely.

19    Q    Around Thanksgiving, you learned that Mr. Seery had given

20    a direction to sell certain securities owned by CLOs managed

21    by the Debtor, correct?

22    A    Yes.

23    Q    And when you learned that, you personally intervened to

24    stop the trades, correct?

25    A    Yes.

Dondero - Direct                         62

1  Q   Let's -- I want to look at that email string that we

2  looked at once before.  It can be found at Trial Exhibit D

3  found on Docket No. 46 in the adversary proceeding. It's PDF

4  Number -- it's PDF Page 189 of two (garbled).

5             MR. RUKAVINA:  Did you catch that?

6             THE COURT:  Which -- which exhibit number -- letter

7  is it?

8             MR. MORRIS:  It's on the docket in the Adversary

9  Proceeding 20-3190.  And in that adversary proceeding, at

10 Docket No. 46, you've got the Debtor's exhibit list.  And

11 Exhibit D, which can be found at PDF Page 189 of 270, is the

12 email string I'm looking for.

13     I apologize, Your Honor.  It wasn't until I was reading

14 the transcript yesterday that I realized I needed these

15 documents.  But they are in the record.  Obviously, they're

16 referred to in the transcript that is in the record.

17             THE COURT:  Okay.

18             MR. RUKAVINA:  Your Honor, I would like to interject

19 for the record here that this is the first time my clients

20 have been sued.  They have a right to be confronted with the

21 witnesses and testimony and evidence against them.  So if Mr.

22 Morris wants to introduce this as an exhibit here today,

23 that's one thing, but I object to any notion that there's a

24 prior record that is going to tie my clients' hands.  It might

25 tie Mr. Dondero's hands, but not my clients' hands.

Dondero - Direct                         63

1         MR. MORRIS:  I'd move for the introduction into

2    evidence of this document that has emails not only from Mr.

3    Dondero, but from Joe Sowin, the head trader of the

4    Defendants.

5         MR. RUKAVINA:  And Your Honor, I have no problem with

6    that admission.  I just want to make it clear that we're not

7    conceding that whatever happened in this case previous to this

8    is a part of today's record.  That's all.  So I do not have a

9    problem with the admission of this.  I would, however, ask

10   you, Mr. Morris, to have someone email it to us so that I can

11   use it today if I need to.

12        THE COURT:  All right.

13        MR. MORRIS:  Okay.  Will do.

14        THE COURT:  So, I'll --

15        MR. MORRIS:  We'll do that at the --

16        THE COURT:  I'll admit it into evidence.  You'll need

17   to not only email it Mr. Rukavina, but you'll need to file a

18   supplement to your exhibit and witness list after the hearing

19   showing the admission of --

20        MR. RUKAVINA:  And Mr. Morris, if you could email it

21   to Mr. -- if you could email it to Mr. Vasek as well, because

22   obviously I can't get to it now.  Thank you.

23        MR. MORRIS:  Sure.

24        THE COURT:  All right.  So this --

25        MR. MORRIS:  Okay.  So, --

Dondero - Direct                    64

1      THE COURT:  For the record, let's just be clear what

2  the record is -- this is going to be called on the record.  I

3  think you are up to SSSSS, so this would be TTTTT when you

4  file it on the record.  All right?  Go ahead.

5      MR. MORRIS:  Thank you very much, Your Honor.

6    (Debtor's Exhibit TTTTT is received into evidence.)

7  BY MR. MORRIS:

8  Q   Mr. Dondero, you recall looking at this email string at

9  the last hearing, right?

10  A   Yes.

11  Q   Let's start at the bottom, please, with Mr. Covitz's

12  email.

13      (Pause.)

14      MR. RUKAVINA:  Hey, John, real quick, now we've lost

15  you.  We've lost you and we're not seeing anything from your

16  assistant.  Do you have the email, Mr. Vasek?

17      MR. MORRIS:  I'm here.  Can you hear me?

18      MS. CANTY:  I'm here.  (garbled) on the screen.

19      MR. MORRIS:  Yeah.  Can we scroll down to the bottom?

20      MS. CANTY: I did.  I don't know why it's not showing

21  on you guys' screen.

22      MR. MORRIS:  Hopefully this gets fixed.  Yeah.  We've

23  never had this problem before, Your Honor.  I'm not sure what

24  the issue is, but I do apologize.

25      THE COURT:  All right.  Well, I can hear you, but we

Dondero - Direct                    65

1   don't see movement of the exhibit.

2           MR. MORRIS:  Yeah.  When I began earlier today by

3   suggesting that this was going to be challenging, this was not

4   one of the challenges I anticipated.

5           THE COURT:  Okay.  All right.

6           MR. RUKAVINA:  Do you have the email yet?

7           MS. CANTY: I'm sorry.  I don't know what's happening

8   on this end.  I have three streams of Internet going, and I

9   don't think it's the Internet.  I don't know what's going on.

10          MR. MORRIS:  Hmm.

11          MR. RUKAVINA:  Yeah, John, what I'm suggesting is

12  that you have an associate email it to Mr. Vasek immediately

13  and then we can present it to Mr. Dondero.

14          MR. MORRIS:  I'll tell you what.  While that -- one

15  more try.

16          MR. CANTY:  Can you see it now?

17          MR. MORRIS:  Okay.  Yes.

18  BY MR. MORRIS:

19  Q   All right.  Mr. Dondero, Hunter Covitz is an employee of

20  the Debtor, right?

21          MR. RUKAVINA:  Hold on a sec.  Hold on a sec.

22      Your Honor, I believe that I have the right to see the

23  full email here.  I believe that Mr. Dondero does.  And we've

24  just seen the first little bit and now some middle piece.

25          THE COURT:  All right.  So are you saying --

Dondero - Direct                      66

1          MR. MORRIS:  And in the order that --

2          THE COURT:  -- you want to see the whole string?

3          MR. RUKAVINA:  Well, I think -- Mr. Dondero, do you

4    need to see the whole string?  I don't know what this is, but

5    maybe you do.

6          MR. DONDERO:  It depends on what the question is.  I

7    can answer some questions off of this email.

8          THE COURT:  Okay, let's go.

9          MR. MORRIS:  Yeah.

10   BY MR. MORRIS:

11   Q    All right.  So, for the moment, Mr. Covitz is an employee

12   of the Debtor, correct?

13   A    Yes.

14   Q    And he's the author of this email in front of us, correct?

15   A    Yes.

16   Q    And Mr. Covitz helps to manage the CLO assets on behalf of

17   the Debtor, correct?

18   A    Yes.

19   Q    Mr. Covitz is giving directions to Matt Pearson and Joe

20   Sowin to sell certain securities held by the CLOs, correct?

21   A    Yes.

22   Q    And if we can scroll up, I think we can see that you

23   received a copy of this email?

24        (Pause, 11:15 a.m.)

25          MR. MORRIS:  What I would like to do instead, we'll

```
                    Dondero - Direct                    67
```

1    take a break in about 15 or 20 (audio gap). When we

2    disconnect, we'll get a better connection after the break.

3    And in the interim, I've got testimony that I would like

4    that's already been admitted into the record but there's

5    portions of which I would like to read into the record from

6    Dustin Norris, who is the executive vice president for each of

7    the Defendants. And maybe it would be easiest for me to do

8    that.

9            THE COURT: Okay.

10           MR. MORRIS: All right. On Docket No. 39.

11           MR. RUKAVINA: Your Honor, I apologize. Your Honor,

12   I apologize. We did not hear --

13           MR. MORRIS: I'm going to read into the record a

14   portion of Mr. Norris' testimony from the December 16th

15   hearing.

16           MR. RUKAVINA: Your Honor, I do not see that

17   transcript in the exhibits. If Mr. Morris could give me an

18   exhibit.

19           MR. MORRIS: Exhibit B as in boy.

20           MR. RUKAVINA: Thank you.

21           MR. MORRIS: All right. Instead of putting it on the

22   screen, if we could take the exhibit down, Ms. Canty. He can

23   just follow along. Beginning at Page 38, Line 7 through -- 7

24   through 17.

25       Are you there, Mr. Rukavina?

Dondero - Direct                    68

1        MR. RUKAVINA:  I am.  Thank you.  I have it in front

2   of Mr. Dondero.

3        MR. MORRIS:  Okay.  Page 38, Lines 7 through 17:

4    "Q   I  think  you  testified  that  you're  one  of  the

5    executive vice presidents at NexPoint Advisors, one of

6    the Movants.  Is that right?

7    "A   That's right.

8    "Q   Who is the president of NexPoint Advisors, LP?

9    "A   Mr. Dondero.

10   "Q   And you report directly to him; is that right?

11   "A   I do.

12   "Q   You're  also  the  executive  vice  president  of  Fund

13   Advisors, another Movant; is that right?

14   "A   Correct."

15        MR. MORRIS:  Beginning on Page 38, Line 25:

16   "Q   You're  also  the  executive  vice  president  (audio

17   gap) that are managed by the Advisors here, right?

18   "A   Yes.  That is correct."

19        MR. MORRIS:  Then going back to Page 35, beginning at

20   Line 15:

21   "Q   To be clear here, there are five moving parties;

22   is that right?

23   "A   That's correct.  The two Advisors and the three

24   Funds.

25   "Q   And one of the advisory firms is Highland Capital

Dondero - Direct                    69

1    Management Fund Advisors, LP; is that right?

2    "A    That's correct.

3    "Q    And I'll refer to that as Fund Advisors; is that

4    okay?

5    "A    That's great.

6    "Q    James Dondero and Mark Okada are the beneficial

7    owners of Fund Advisors, correct?

8    "A    That is my understanding.

9    "Q    And your understanding is that Mr. Dondero

10   controls Fund Advisors, correct?

11   "A    That's correct.

12   "Q    And the other advisory firm that brought the

13   motion is NexPoint Advisors, LP; is that right?

14   "A    That is correct.

15   "Q    And Mr. Dondero is the beneficial owner of

16   NexPoint; is that right?

17   "A    A family trust where Jim is the sole beneficiary,

18   I believe, controls or owns NexPoint Advisors.

19   "Q    Okay. And Mr. Dondero --

20   "A    Or 99 percent of NexPoint Advisors.

21   "Q    Mr. Dondero controls NexPoint; is that right?

22   "A    Correct."

23       MR. MORRIS:  Continuing at Line 16 on Page 36:

24   "Q    All right. And I'm going to refer to Fund

25   Advisors and NexPoint as the Advisors going forward; is

                      Dondero - Direct                    70

 1     that fair?

 2     "A    That's fair.

 3     "Q    Each  of  the  Advisors  manages  certain  funds;  is

 4     that right?

 5     "A    That is correct.

 6     "Q    And three of those funds that are managed by the

 7     Advisors are Movants on this motion, correct?

 8     "A    Correct.

 9     "Q    All right.  The Advisors caused these three Funds

10     to invest in CLOs that are managed by the Debtor; is

11     that right?"

12     "A    --"

13          MR. RUKAVINA:  Your Honor, I object.  Is there a

14     question at the end of this?  I mean, Mr. Dondero can't

15     possibly remember all this and then be asked a question.

16          MR. MORRIS:  He doesn't have to answer any questions.

17     I'm just reading the evidence into the record.

18          THE COURT:  Okay.

19          MR. RUKAVINA:  Your Honor?

20          MR. MORRIS:  Since we're having difficulty --

21          MR. RUKAVINA:  Your Honor, that's a matter for

22     summation.  That's -- this is a question and answer, I submit.

23          THE COURT:  Well, I overrule.

24          MR. MORRIS:  Your Honor, here's -- here's --

25          THE COURT:  This has been admitted into --

Dondero - Direct                    71

1         MR. MORRIS:  Yeah.

2         THE COURT:  -- evidence.  And if he wants to

3    highlight to the Court portions of the evidence, he can.

4       Go ahead.

5         MR. MORRIS:  Thank you, Your Honor.

6       "A   The portfolio managers working for the Advisors

7       did.  That's correct.

8       "Q   And Mr. Dondero is the portfolio manager of the

9       Highland Income Fund; is that right?

10      "A   He is one of the portfolio managers for that Fund.

11      "Q   And he's also --

12      "A   I believe there are two.

13      "Q   And he's also a portfolio manager of NexPoint

14      Capital, Inc., one of the Movants here, right?

15      "A   That is correct.

16      "Q   And he's also the portfolio manager of NexPoint

17      Strategic Opportunities Fund, another Movant; is that

18      right?

19      "A   Yes.  That is correct."

20        MR. MORRIS:  Going to Line -- Page 41, Lines 6

21    through 9:

22      "Q   The whole idea for this motion initiated with Mr.

23      Dondero; isn't that right?

24      "A   The concern, yes, the concern originated, and his

25      concern was voiced to our legal and compliance team."

Dondero - Direct                    72

1          MR. MORRIS:  Page 42, Lines 4 through 11:

2     "Q   None of the Movants are parties to the agreements

3     between the Debtor and each of the Debtors pursuant --

4     each of the CLOs pursuant to which the Debtor serves as

5     portfolio manager; is that correct?

6     "A   I believe that is correct.   One, I think,

7     important -- even though they're not (audio gap), they

8     are the -- they have the economic ownership of each of

9     these CLOs.

10    "Q   But they're not party to the agreement; is that

11    right?

12    "A   Not that I am aware of."

13         MR. MORRIS:  Page 42, Line 25:

14    "Q   Okay.   It's your understanding, in fact, that

15    nobody other than the Debtor has the right or the

16    authority to buy and sell assets on behalf of the CLOs

17    listed on Exhibit B, correct?

18    "A   That is my understanding.

19    "Q   Okay.   And it's also your understanding, your

20    specific understanding, that holders of preferred

21    shares do not make investment decisions on behalf of

22    the CLO; is that right?

23    "A   (audio gap)

24    "Q   And that's something the Advisors knew when they

25    decided to invest in the CLOs on behalf of the Movant

Dondero - Direct                          73

1    Funds; is that fair?

2    "A   That's right.  And at that time, the knowledge in

3    the purchase was with Highland Capital Management, LP

4    and the portfolio management team at the time.

5    "Q   And it's still with Highland Capital Management,

6    LP; isn't that right?

7    "A   That's correct.  I'm not sure that the portfolio

8    management team looks the same, but it was HCMLP."

9        MR. MORRIS:  Moving on to Page 46, Line 22:

10   "Q   The only holders of preferred shares that are

11   pursuing this motion are the three Funds managed by the

12   Advisors, right?

13   "A   In this motion, yes.

14   "Q   You're not aware of any holder of preferred shares

15   pursuing this motion other than the three Funds managed

16   by the Advisors, correct?

17   "A   No, I'm not aware of any others.

18   "Q   You didn't personally inform any holder of

19   preferred shares, other than the Funds that are the

20   Movants, that this motion would be filed, did you?

21   "A   No, I did not.

22   "Q   You're not aware of any steps taken by either of

23   the Advisors to provide notice to holders of preferred

24   shares that this motion was going to be filed, are you?

25   "A   I'm not, no.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 605 of
2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 604 of
2722

Dondero - Direct                    74

1       "Q   And you're not aware of any attempt that was made

2       to obtain the consent of all of the noteholder -- of

3       all the holders of the preferred shares to seek the

4       relief that is sought in this motion, correct?

5       "A   That's correct.

6       "Q   You don't have any personal knowledge, personal

7       knowledge, as to whether any holder of preferred shares

8       other than the Funds managed by the Advisors wants the

9       relief sought in this motion, correct?

10      "A   Correct.

11      "Q   You don't have any personal knowledge as to

12      whether any of the CLOs that are subject to the

13      contracts that you described want the relief that's

14      being requested in this motion, right?

15      "A   That's correct.   I have not spoken or been

16      involved at all directly with the CLOs.   I'm

17      representing the Funds."

18           MR. MORRIS:  Moving to Page 49.  I just have a bit

19  more, Your Honor.  Page 49, Line 9.  And this is the reference

20  to his declaration.

21      "Q   And Paragraph 9 refers to a transaction involving

22      SSP Holdings, LLC; do I have that right?

23      "A   That's correct.

24      "Q   Do you know what SSP stands for?

25      "A   See if we say it in there.  SSP Holdings, LLC.

Dondero - Direct                    75

1    "Q   Right.  Do you know what SSP stands for?

2    "A   I don't.  Something Steel Products.  I --

3    "Q   Okay.  You don't need to guess.  These are the

4    only two transactions that the Movants question; is

5    that right?

6    "A   These transactions, as well as certain

7    transactions around Thanksgiving time.

8    "Q   Okay.  We'll talk about those.  But those

9    transactions about -- around Thanksgiving time aren't

10   in your (audio gap)?

11   "A   Not specifically mentioned by name.

12   "Q   Okay.  Let's talk about the two that are mentioned

13   by name, Trussway and SSP.  The Movants do not contend

14   that either transaction was the product of fraudulent

15   conduct, do they?

16   "A   No.

17   "Q   The Movants do not contend that the Debtor

18   breached any agreement by effectuating these

19   transactions, do they?

20   "A   I don't believe so.

21   "Q   In fact, the Movants do not contend that the

22   Debtor violated any agreement at any time in the

23   management of the CLOs listed on Exhibit B; is that

24   right?

25   "A   That's right.

Dondero - Direct                    76

1      "Q   The Movants don't even question the Debtor's

2      business judgment, only the results of the trans -- of

3      these two transactions.  Is that right?

4      "A   That's right.  And the results is the key here,

5      and the approach."

6          MR. MORRIS:  Moving on to Page 51, Line 8:

7      "Q   Sir, you never asked the Debtor what factors it

8      considered in making these trades, right?

9      "A   I did not.

10     "Q   And you have no reason to believe that anyone on

11     behalf of the Movants ever asked the Debtor why it

12     executed these (audio gap), right?

13     "A   I don't have any knowledge.  There could have been

14     somebody from (audio gap) Movants.  But I do not."

15         MR. MORRIS:  Page 54, Line 19:

16     "Q   Let's just talk briefly about the transactions

17     that occurred (garbled) Thanksgiving.  They're not

18     specifically referred to in your declaration; is that

19     right?

20     "A   That's correct.

21     "Q   And you have no knowledge about any transaction

22     that Mr. Seery wanted to execute around Thanksgiving;

23     is that right?

24     "A   I know there were transactions and there were

25     concerns from our management team, but I'm not aware of

Dondero - Direct                    77

1    what those transactions were.

2    "Q   In fact, you can't even identify the assets that

3    Mr. Seery wanted to sell around Thanksgiving, or at

4    least you couldn't at the time of your deposition

5    yesterday.  Is that right?

6    "A   That's correct.

7    "Q   And you have no knowledge as to why Mr. Seery

8    wanted to make particular trades around Thanksgiving?

9    "A   No, I don't.

10   "Q   And in fact, you don't even know if the

11   transactions that Mr. Seery wanted to close around

12   Thanksgiving ever in fact closed.  Is that fair?

13   "A   Correct."

14       MR. MORRIS:  Last one.  Page 56, Line 1:

15   "Q   Okay.  To the best of your knowledge, does this

16   document accurately reflect the composition of the

17   boards of each of the three Movant Funds?

18   "A   Yes, it does.

19   "Q   Okay.  John Honis, I think you mentioned him

20   earlier.  He's on all three boards.  Is that right?

21   "A   Yeah, that's correct.  And the reason we're --

22   we're being -- we have a unitary board structure, so --

23   which is very common in '40 Act Fund land, where the

24   board sits, for efficiency purposes, on multiple fund

25   boards, and there's a lot of economies of scale from an

Dondero - Direct                    78

1    operating standpoint.  So, yes, they sit on multiple

2    boards.

3    "Q   Okay.  And for purposes of the '40 Act, Mr. Honis

4    has been deemed to be an interested trustee.  Is that

5    right?

6    "A   That's correct.

7    "Q   Okay.  But you don't specifically know what (audio

8    gap) caused that designation; you only know that the

9    designation exists.  Right?

10   "A   That's right.  And I know they are disclosed in

11   the proxy -- or, in the -- the relative filings related

12   to those Funds.

13   "Q   Okay.  Three other people are common to all three

14   Movant Funds.  I think you've got Dr. Froehlich, Ethan

15   Powell, --

16       MR. MORRIS:  I think he -- pronunciation.

17   "A   Froehlich.

18   "Q   Ethan Powell and Bryan Ward.  Right?

19   "A   That is correct.

20   "Q   Okay.  All three of those individuals actually

21   serve on the 11 or 12 boards that you mentioned earlier

22   that are managed by the Advisors, right?

23   "A   That is correct.

24   "Q   And they're the same Funds for which you serve as

25   the executive vice president, right?

Dondero - Direct                    79

1    "A    This is correct -- yes.  That's correct.

2    "Q    So, for all of the Funds that are managed by the

3    Advisors, you serve as executive vice president and all

4    four of these directors -- trustees serve as trustees

5    on the boards, right?

6    "A    Yes, that's correct.

7    "Q    Okay.  In exchange for serving on all of these

8    boards, the three individuals -- Dr. Froehlich, Mr.

9    Ward, and Mr. Powell  -- each receive $150,000 a year

10   for services across the Highland complex; is that

11   right?

12   "A    That's correct.

13   "Q    Dr. Froehlich has been serving as a board member

14   across the Highland complex for seven or eight years

15   now; is that right?

16   "A    That's correct.

17   "Q    Mr. --

18   "A    I believe it's about seven or eight years.

19   "Q    Mr. Powell, he actually was employed by Highland

20   related -- Highland or related entities from about 2007

21   or 2008 until 2015, right?

22   "A    That's correct.

23   "Q    And Mr. Ward, the third of the independent

24   trustees, he's been serving on a board or various of --

25   on various Highland-related funds on a continuous basis

Dondero - Direct                    80

1      since about 2004.  Do I have that right?

2      "A   Yeah, I believe that's correct."

3           MR. MORRIS:  Your Honor, that concludes the reading

4    of the portions of Mr. Norris's testimony that I wanted to

5    present to the Court.

6      I know it's 11:30 now, and I would respectfully request

7    that we simply adjourn and let Your Honor tend to your

8    business.

9           THE COURT:  Okay.

10          MR. MORRIS:  And hopefully when we come back at 1:00

11   o'clock, we'll have a better connection.

12          THE COURT:  All right.  So, we are going to go into

13   recess until 1:00 o'clock Central.  Mike, can people just stay

14   connected, or should they --

15          THE CLERK:  Yes.  They can stay.  Yes.

16          THE COURT:  You can stay or reconnect, whichever you

17   want.  But we'll see you at 1:00.

18          MR. MORRIS:  Thank you, Your Honor.

19          THE CLERK:  All rise.

20     (A luncheon recess ensued from 11:33 a.m. until 1:37 p.m.)

21          THE CLERK:  All rise.  The United States Bankruptcy

22   Court for the Northern District of Texas, Dallas Division, is

23   now in session, the Honorable Stacey Jernigan presiding.

24          THE COURT:  Good afternoon.  Please be seated.

25   Apologies.  I was a little ambitious in my time estimate.  So,

Dondero - Direct                     81

1   anyway, I didn't have any control over getting in and out of

2   Parkland Hospital, so I'm just grateful to be here.

3       All right.  We were in the middle of direct examination of

4   Mr. Dondero.  Mr. Morris, are you ready to proceed?

5           MR. MORRIS:  I am, Your Honor, and I'm hopeful that

6   the computer issues have resolved themselves.  It remains to

7   be seen once we try.  If problems arise again, I plan on just

8   putting this on mute and dialing in through the telephone,

9   kind of the other alternative.

10          THE COURT:  All right.

11          MR. MORRIS:  So (garbled) and I apologize to Mr.

12  Dondero, too.  I know I'm testing his patience.  But it's not

13  for any reason other than technological.

14          THE COURT:  All right.

15          MR. MORRIS:  And Your Honor, you don't have to

16  apologize for keeping us waiting.  That's okay.

17          THE COURT:  Okay.

18          MR. MORRIS:  But thank you.

19          THE COURT:  All right.  Mr. Dondero, --

20          MR. MORRIS:  All right.  So, --

21          THE WITNESS:  Yeah.

22          THE COURT:  I was just going to remind you, I have to

23  remind you you're still under oath.

24      Are you ready, Mr. Morris?

25          MR. MORRIS:  I am, Your Honor.

APP. 0608
Appx. 00655

Dondero - Direct                    82

1          THE COURT:  All right.  You may proceed.

2          MR. MORRIS:  And we're going to begin with the

3    document that we had difficulty scrolling through earlier,

4    which we have now sent to counsel, and that would be what was

5    marked as Exhibit D on Docket No. 46.

6          THE COURT:  All right.

7          MR. MORRIS:  That's the email string that we had seen

8    earlier that I think Your Honor admitted into evidence.  Do I

9    have that right?

10         THE COURT:  Yes.

11         MR. MORRIS:  Okay.

12              DIRECT EXAMINATION, RESUMED

13   BY MR. MORRIS:

14   Q   So, let's just start at the bottom and see if we can do

15   this more easily, Mr. Dondero.  And again, I apologize for

16   keeping you waiting before.  Starting at the bottom, that's an

17   email from Hunter Covitz.  Do you see that?

18   A   Yeah, I see it.

19   Q   And he's an employee of the Debtor, right?

20   A   Yes.

21   Q   And your understanding is that Mr. Covitz actually helps

22   the Debtor manage the CLO assets, right?

23   A   Yes.

24   Q   And in this email, Mr. Covitz is giving directions to Matt

25   Pearson and Joe Sowin regarding certain securities held by the

Dondero - Direct                    83

1  CLOs, right?

2  A    Yes.

3  Q    And if we could scroll up, hopefully, we can see that you

4  received a copy of this email.

5        MR. MORRIS:  Yeah.  Right there.

6  BY MR. MORRIS:

7  Q    Do you see that?

8  A    Yes.

9  Q    And then -- and then you instructed the recipients of Mr.

10 Covitz's email not to sell the SKY securities as had been

11 instructed by Mr. Seery, correct?

12 A    Yes.

13 Q    And you understood when you gave that instruction that the

14 people on the email were trying to execute trades that Mr.

15 Seery had authorized, correct?

16 A    Incorrect.

17 Q    You didn't know that, sir?

18 A    What I knew was that Seery had not authorized the trade,

19 he had orchestrated the trade.  Hunter is not an analyst with

20 any particular knowledge.  I called Hunter, why would he sell

21 those?  And he said Seery told him to sell those.  So it

22 wasn't that Seery authorized Hunter trading it.  It was Seery

23 told Hunter to trade it, which is -- which is a material

24 difference in my mind.

25 Q    Okay.  So I'll ask you again.  At the time you gave the

Dondero - Direct                        84

1  instruction, "No, do not," you knew that you were stopping

2  trades that had been authorized and directed by Mr. Seery,

3  correct?

4  A    Yes.

5  Q    You didn't speak with Mr. Seery before sending this email,

6  did you?

7  A    No.

8  Q    And you took no steps to seek the Debtor's consent before

9  instructing the recipients of this email to stop executing the

10 SKY transactions.  Is that right?

11 A    I'm sorry.  I missed the first part of that question.

12 Q    Okay.  You took no steps to seek the Debtor's consent

13 before instructing the recipients of this email to stop

14 executing the SKY transactions that were authorized by Mr.

15 Seery, correct?

16 A    I don't -- I'm not sure I was permitted to talk to Seery

17 at this point, but I don't recall specifically, no.

18 Q    You didn't seek consent, did you, before stopping these

19 trades?

20 A    No.

21 Q    Okay.  In response to your instruction --

22         MR. MORRIS:  If we could scroll up to the next

23 response.

24 BY MR. MORRIS:

25 Q    You see the response from Mr. Pearson?

                        Dondero - Direct                    85

1  A    Yes.

2  Q    And in response to your instructions, Mr. Pearson canceled

3  all of the SKY and AVYA sales that the Debtor had directed but

4  which had not yet been executed, right?

5  A    Yes.

6  Q    Okay.

7          MR. MORRIS:  Can we scroll up to the next email,

8  please?

9  BY MR. MORRIS:

10 Q    And you responded again, right?  That's your response?

11 A    Yes.

12 Q    Can you read your response out loud, please?

13 A    (reading) HFAM and DAF have instructed Highland in writing

14 not to sell any CLO underlying assets.  There is potential

15 liability.  Don't do it again, please.

16 Q    And the writings that you refer to there are the two

17 letters that we looked at earlier, the October 16 and the

18 November 24 letter, right?

19 A    I believe so.  If not, if there's a third or fourth

20 letter, all the letters in aggregate.

21 Q    All right.  And you, you interpreted those letters not as

22 requests but, as you tell the recipients of your email here,

23 that they were actually instructions, right?

24 A    That was -- that was my choice of words.  I don't know if

25 I thought about it that clearly.

Dondero - Direct                          86

1   Q   Okay.  But the reci... you have no reason to believe that

2   the recipient of this email wouldn't understand that you

3   believed that Highland had been instructed not to do these

4   trades, right?

5   A   I'm sorry.  Can you ask that again?  I had no reason to

6   believe what?

7   Q   That's okay.  I'll move on.  At this juncture, the

8   reference to potential liability was intended for Mr. Pearson,

9   right?

10  A   Frankly, when you violate the Advisers Act, the CFO has

11  liability.  I mean, I'm sorry, the chief compliance officer

12  has liability, and anybody who has an awareness that it

13  violates the Advisers Act has potential liability also.

14  Q   And is it -- is it your testimony and your position that

15  Mr. Pearson had potential liability under the Advisers Act for

16  carrying out Mr. Seery's trade requests?

17  A   Yes, once he was informed that the underlying investors

18  didn't want assets sold and Seery had stated he had no

19  business purpose in selling those assets.

20          MR. MORRIS:  I move to strike the latter part of the

21  answer, Your Honor.  Mr. Dondero has testified repeatedly

22  multiple times that he has never communicated with Mr. Seery

23  about why he wanted to make these transactions.

24          THE COURT:  I grant that.

25  BY MR. MORRIS:

Dondero - Direct                              87

1   Q    Mr. Sowin responded and indicated that he would follow

2   your instructions, right, if we scroll to the next email?

3   A    I'm sorry.  What part are you saying, or what part are you

4   referring to?

5   Q    Mr. Sowin.  Who is Mr. Sowin?

6   A    He's Matt Pearson's boss.  He's the head trader.

7   Q    And he works for the Advisors, right?

8   A    Yes.

9   Q    He's one of your employees, right?

10  A    Yes.

11  Q    Mr. Sowin followed your instructions as set forth in this

12  email, right?

13  A    He did a bunch of things, but, yes, I believe -- yes,

14  that's a fair way to characterize.

15  Q    And the only information that you know of that he's

16  relying upon to state that Compliance should never have

17  approved this order was your email that preceded it, right?

18  A    No.

19  Q    No?  There's nothing else on this email other than your

20  email that preceded it, correct?

21  A    Correct.

22  Q    Okay.  A few days later, you learned that Mr. Seery was

23  trying a workaround to effectuate the trades anyway, right?

24  A    I believe so.

25          MR. MORRIS:  Can we scroll up to the next email?

Dondero - Direct                          88

1    BY MR. MORRIS:

2    Q    This is your response to Mr. Surgent, right?

3    A    Yes.

4    Q    Now, Mr. Surgent hasn't written anything.  He is not part

5    of this conversation, is he?

6    A    No.

7    Q    But you bring him into the conversation, right?

8    A    Because he's the chief compliance officer at Highland,

9    yes.

10   Q    He's not -- he's not the chief compliance officer for the

11   Advisors.  He's the chief compliance officer for a company

12   that you no longer work for, right?

13   A    Correct, but he has personal liability for violations of

14   the Advisers Act.

15   Q    Okay.  And you thought it was your responsibility to

16   remind him of that, right?

17   A    It was my view of the situation, and at least he could

18   evaluate it himself if I reminded him of it, yes.

19   Q    Uh-huh.  What does it mean to do a workaround?  What did

20   you mean by that?

21   A    There's a concept in compliance called you can't do

22   something indirectly that you can't do directly, and that's

23   what I was referring to there.

24   Q    Does that mean that he was trying to effectuate the trade

25   without the assistance of the Advisors?

Dondero - Direct                              89

1   A    I believed he was trying to do it without compliance and

2   without proper regard for investors, so that's why I described

3   it as a workaround.

4              MR. MORRIS:  I move to strike.

5              THE COURT:  Sustained.

6   BY MR. MORRIS:

7   Q    I'm asking you a very specific question.

8              MR. MORRIS:  Can I have a ruling, Your Honor?  Thank

9   you.

10             THE COURT:  Yes.

11  BY MR. MORRIS:

12  Q    Did you, when you used the phrase workaround, did you mean

13  that he was trying to effectuate the trade without relying on

14  the Advisors' employees?

15  A    No.

16  Q    Okay.  But you found out about the trade and you thought

17  it was a good idea to send Mr. Surgent this email, right?

18  A    Yes.

19  Q    Can you read the last line of your email?

20  A    (reading)  You might want to remind him and yourself that

21  the chief compliance officer has personal liability.

22  Q    Personal liability for effectuating a trade that Mr. Seery

23  had authorized, correct?

24  A    For violating the Advisers Act, is what I meant.

25  Q    Uh-huh.  Did you report anybody to the SEC?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 621 of
2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 620 of
2722

Dondero - Direct                      90

1   A    I would be happy to if it's permitted by the Court.

2   Q    But you didn't -- you never asked the Court to do that,

3   right?

4   A    No.

5   Q    It didn't seem important enough for you to take that step,

6   right?  But you wanted -- you had to make sure that you told

7   Mr. Surgent that he might be personally liable, right?  That

8   was what you needed to do?

9   A    Could you repeat that question, please?

10  Q    You needed to make sure that Mr. Surgent knew that you

11  were threatening him with personal liability if he followed

12  Mr. Seery's instructions, right?

13  A    No.

14  Q    As a factual matter, you never asked Mr. Seery why he

15  wanted to make these trades, right?

16  A    I asked Joe Sowin to ask him.

17  Q    As a factual matter, you never asked Mr. Seery why he

18  wanted to make these trades, correct?

19  A    I believe I wasn't permitted to talk to him.

20  Q    In November 2020?  What would have prevented that?

21  A    I believe Scott Ellington was the go-between at that

22  point in time.

23  Q    Is it your testimony that you never spoke with Jim Seery

24  in November 2020?

25  A    I believe in an unauthorized fashion, the day after

```
                        Dondero - Direct                    91
```

1    Thanksgiving I talked to him, but that's the only day I can

2    remember.

3    Q    Should we call up the email where you threatened him not

4    to do it again?

5    A    That was an email.

6    Q    Ah.  So you could communicate by email?  Did you ever send

7    Mr. Seery an email and say, Why do you want to do these

8    trades?

9    A    No.

10   Q    But somehow you thought you couldn't even speak to him?

11   You couldn't speak to him but you can send him emails?  That's

12   the world that you live in, right?  That's what you think?

13   A    I have no comment on that.

14   Q    All right.  So, after this exchange, --

15           MR. MORRIS:  And this is what I read out-of-order

16   before, Your Honor.  We moved to the December 16th hearing.

17   BY MR. MORRIS:

18   Q    And you remember, Mr. Dondero, that the Defendants made

19   that motion that asked the Court to stop the Debtor from

20   trading in the CLO assets?  Do you remember that?

21   A    I'm sorry.  You're asking me do I remember letters were

22   sent?  Yes.

23   Q    No.  Do you remember that there was a hearing in mid-

24   December?

25   A    Yes.

Dondero - Direct                          92

1    Q    Okay.

2            MR. MORRIS:  And Your Honor, for the record, Exhibit

3    A is the Debtor -- is the Defendants' motion.  Exhibit B is

4    the transcript that we had looked at earlier or that I had

5    read portions of earlier.

6            THE COURT:  Okay.

7            MR. MORRIS:  And Exhibit C is the order that the

8    Court entered denying the Defendants' motion.

9        Can we call up Exhibit C, please?

10   BY MR. MORRIS:

11   Q    All right.  Do you see --

12           MR. MORRIS:  If we could scroll to the very top,

13   please.  All right.

14   BY MR. MORRIS:

15   Q    Do you see this document is dated December 18th, sir?

16   A    Yes.

17   Q    And if we scroll down, this is the order denying the

18   motion of the Advisors and the Funds for an order trying to

19   temporarily restrict the Debtor's ability as portfolio manager

20   from initiating sales.  Do you see that?

21   A    Yes.

22   Q    Okay.  So, this is December 18th.  And if you'll recall,

23   the TRO was issued against you on December 10th.  Do you

24   remember that?

25   A    I don't believe it was the 10th.

Dondero - Direct                          93

1  Q   Okay.  It was in December, and it was just before this.

2  Is that fair?

3  A   I believe there was an intent, and then the actual filing

4  I think was much later.  I don't have -- I don't have the

5  knowledge.  I don't have the knowledge of when the TRO was put

6  in place.

7  Q   Okay.  (Pause.)  Okay.  We talked earlier about how you

8  interfered with Mr. Seery's trading activities around

9  Thanksgiving.  Do you remember that?

10 A   Yes, I do.  I do remember the trading then, also.

11 Q   Okay.  And do you remember that just before Christmas you

12 interfered with Mr. Seery's tradings again?

13 A   Yes.

14 Q   Okay.

15         MR. MORRIS:  If we can call up Exhibit K from Docket

16 No. 46, which I have shared with counsel?

17         THE WITNESS:  You know what?

18 BY MR. MORRIS:

19 Q   Yeah.

20 A   Let's handle these each incident one at a time.  And I

21 don't want to use the word "interfering" or accept the word

22 "interfering" as an answer because I think my participation in

23 each situation was very different.

24         MR. MORRIS:  All right.  Can we scroll down?

25 BY MR. MORRIS:

Dondero - Direct                              94

1  Q   This is a letter that my firm wrote to Mr. Lynn.  Mr. Lynn

2  is your lawyer.  Is that right?

3  A   Yes.

4          MR. MORRIS:  And if we could start down at the first

5  page.  We've seen these letter before.  A little further.

6  BY MR. MORRIS:

7  Q   Do you see there is a reference there to the Debtor's

8  management of CLOs?

9  A   Yes.

10 Q   And there is a recitation of the history that we talked

11 about a bit earlier.  If we -- if we look further in that

12 paragraph to around Thanksgiving, when you intervened to block

13 the trades.

14 A   Yes, I see that sentence.

15 Q   Okay.

16         MR. MORRIS:  And then if we can go to the next page,

17 the next paragraph.  Yeah, that's where.

18 BY MR. MORRIS:

19 Q   Then we referred to the December 16th hearing, right?  And

20 then the next paragraph says, "On December 22, 2020" --

21         MR. MORRIS:  Can you scroll down just a little bit?

22 Nope, the other way.  Yeah, right there.

23 BY MR. MORRIS:

24 Q   "On December 22, 2020, employees of NPA and HCMFA" --

25 those are the Advisors, right?

Dondero - Direct                    95

1   A    Yes.

2   Q    -- "notified the Debtor that they would not settle the

3   CLO's sale of the AVYA and SKY security."  Have I read that

4   correctly?

5   A    Yes.

6   Q    All right.  On or about December 22nd, you personally

7   instructed employees of the Advisors not to trade the SKY and

8   AVYA securities that Mr. Seery had authorized.  Is that right?

9   A    No.

10  Q    You personally instructed, on or about December 22, 2020,

11  employees of those Advisors to stop doing the trades that Mr.

12  Seery had authorized with respect to SKY and AVYA, right?

13  A    No.  You know, we need to look at source documents.  My

14  recollection is I encouraged Compliance to look at those

15  trades.  But I'm willing to be -- I'm willing to be -- get

16  source documents again, if you'd like.

17  Q    All right.  My source document is your prior testimony.

18           MR. MORRIS:  Can we please call up Exhibit NNNN at

19  Page 73?  Beginning at Line 2?  Okay.

20  BY MR. MORRIS:

21  Q    Page 73, beginning at Line 2, did you give the following

22  answer to my question?

23      "Q   And  you  personally  instructed,  on  or  about

24      December 22nd, 2020, employees of those Advisors to

25      stop doing the trades that Mr. Seery had authorized

```
                        Dondero - Direct                    96
```

 1      with respect to SKY and AVYA, right?

 2      "A  Yeah.   Maybe we're splitting hairs here, but I

 3      instructed them not to trade them.   I never gave

 4      instructions not to settle the trades that occurred,

 5      but that's a different ball of wax."

 6   Q   Did you give that answer, sir?

 7   A   I believe I confused dates or misspoke there, but I did

 8  give that answer.

 9   Q   Okay.  Thank you.  Stated a different way, you personally

10  instructed the Advisors' employees not to execute the trades

11  that Mr. Seery had authorized but which had not yet been made,

12  right?

13   A   No.  Not -- not on December 22nd.  That was in November.

14  November 22nd, I did not do that.

15   Q   Okay.

16      MR. MORRIS:  Can we go to Page 76, please?  Line 15.

17  BY MR. MORRIS:

18   Q   Did you give this answer to my question?

19      "Q   And you would agree with me, would you not, that

20      you instructed the employees of the Advisors not to

21      execute the very trades that Mr. Seery identifies in

22      this email, correct?

23      "A   Yes."

24   Q   Did you give that answer, sir?

25   A   Well, like I said, I -- I confused the Thanksgiving

Dondero - Direct                      97

1   trades, the week of Thanksgiving, with my more nuanced

2   responses to later trades.

3           MR. MORRIS:  I move to strike, Your Honor.  It's a

4   very simple question.

5           THE COURT:  Granted.

6   BY MR. MORRIS:

7   Q   Did you give that answer to my question, sir?

8   A   I -- yes, I did.

9   Q   Thank you.  Now, all of this is just a week after that

10  December 16th hearing, right?

11  A   Yes.

12  Q   And right after that hearing, the K&L Gates firm sent, on

13  behalf of the Defendants, more letters to the Debtors, right?

14  A   Yes.

15          MR. MORRIS:  Can we please pull up the first letter?

16  It's Exhibit DDDD.  And if we can go not to our response but

17  to the original letter that was sent that's attached to this.

18  I think it is Exhibit A.  Right there.

19  BY MR. MORRIS:

20  Q   That's the first of the letters, December 22, 2020.  Do

21  you see that?

22  A   Yes.

23          MR. MORRIS:  And can we scroll down to the end of the

24  letter to see what the request is here?  Right there.

25  BY MR. MORRIS:

Dondero - Direct                                    98

1  Q    Can you read the end of that letter right there, sir?

2  A    (reading)  Sincerely, A. Lee Hogewood, III.

3  Q    Nice.  I meant the actual substance.

4  A    (reading)  For the foregoing and other reasons, we request

5  that no further CLO transactions occur, at least until the

6  issues raised by and addressed in the Debtor's plan are

7  resolved at the confirmation hearing.

8  Q    Okay.  And that's similar in substance to the letter that

9  was sent on behalf of the Defendants on October 16th that you

10 saw and approved, right?

11 A    I did not see and approve.

12 Q    All right.  The record will speak for itself.  And it's

13 similar in substance to the letter that was sent on November

14 24th by the K&L Gates clients on behalf of the Defendants,

15 right?

16 A    I don't know.

17 Q    We looked at it before.  Should we get it again?

18 A    It's a -- all the letters, as far as I understand, were

19 similar in requesting that the -- the beneficial owners of the

20 CLOs were requesting that no wholesale liquidation of their

21 assets occur.  That's how I understand it.

22 Q    And that's --

23 A    You asked my understanding.  That's my understanding.

24 Q    Okay.  And notwithstanding the request in this letter,

25 when you were -- when you were talking to the traders at your

Dondero - Direct                    99

1   shop, you actually told them that the Debtor was instructed

2   not to do these trades, right?

3   A   Are you parsing "instructed" versus "requested"?  I don't

4   understand the question.

5   Q   I am, in fact.  You used a very different phrase when

6   speaking to your employees than you did -- then your lawyers

7   did when they wrote to the Debtor, right?

8   A   It seems to be a difference, yes.

9   Q   Okay.  So, this is on December 22nd.  Now, the night

10  before, you participated in a meeting with Grant Scott and

11  with the lawyers for the Defendants, right, to talk about what

12  you guys were going to do with respect to the Debtor's

13  management of the CLOs.  Isn't that right?

14  A   I don't remember specifically.

15  Q   Okay.  But is it fair to say it's true, is it not, that

16  during the week leading up to Christmas you participated in

17  several phone calls with the K&L Gates firm and with other

18  members of the Defendants' -- the Advisors, Mr. Sowin or Mr.

19  Post or Mr. Sauter, and the lawyers, right?  You were all

20  together talking about these issues during the week before

21  Christmas, right?

22          MR. RUKAVINA:  Your Honor, I'm going to object.  If

23  counsel is asking what was discussed with counsel present for

24  the purpose of legal advice, that is an inappropriate

25  question.

Dondero - Direct                    100

1          THE COURT:  Okay.

2          MR. MORRIS:  I'm certainly not.  I'm asking if the

3    conversations took place.

4          MR. RUKAVINA:  And the conversations -- the question

5    was, did they discuss what to do with respect to the CLOs?

6    That would be privileged, Your Honor.  If they discussed

7    football, that's not privileged, but what to do with the CLO

8    management agreements is privileged.

9          THE COURT:  Okay.  I sustain.

10          MR. MORRIS:  Can we please call up Exhibit TT?  I'm

11    sorry, TTT.  Nope, TTTT.  TTTT.  Can you scroll down a bit?

12    Right there.

13    BY MR. MORRIS:

14    Q    Do you see -- this is an email from Grant Scott to Scott

15    Ellington; do you see that?

16    A    Yes.

17    Q    And at this point, Mr. Ellington is still working for the

18    Debtor, right?

19    A    Yes.  I believe he was settlement counsel.

20    Q    Uh-huh.  And do you see that this is an email that refers

21    to your availability for a 9:00 a.m. call?

22    A    Yes.

23    Q    And do you see that there's a question as to whether the

24    K&L people can make it?

25    A    Yes.

Dondero - Direct                    101

1   Q    And you understand that refers to K&L Gates, right?

2   A    I -- I guess so.

3   Q    And so does this refresh your recollection that at or

4   around Christmas, or in the days leading up to Christmas, you

5   participated in calls with Mr. Scott, with Scott Ellington,

6   and with the K&L Gates folks?

7   A    I -- I don't know.  I don't know if -- if I actually did

8   or not.  But I was highly concerned with inappropriate

9   behavior.

10  Q    And you were available -- and did you tell somebody that

11  you were available for this call on the morning of the 23rd?

12  A    I don't know.

13  Q    This is the day after you stopped the trades, right?

14  A    Again, I didn't stop the trades on the 23rd.

15  Q    You stopped them on the 22nd, right?

16  A    No, I stopped them on the week of Thanksgiving.

17          MR. MORRIS:  Can we go back to Exhibit NNNN, the

18  transcript?  Page 73?

19  BY MR. MORRIS:

20  Q    Let me see if I can refresh your recollection.  Tab 2.

21  Did you give this answer to this question:

22      "Q    And  you  personally  instructed,  on  or  about

23      December 22, 2020, employees of those Advisors to stop

24      doing  the  trades  that  Mr.  Seery  had  authorized  with

25      respect to SKY and AVYA, right?

Dondero - Direct                          102

1      "A   Yeah.   Maybe we're splitting hairs here, but I

2      instructed them not to trade them."

3  Q   Did you give that answer to the question?

4  A   Yes.

5  Q   Okay.

6  A   But we -- we corrected.

7  Q   All right.  You didn't correct it at the preliminary

8  injunction hearing, did you?

9  A   No, I did not.

10 Q   Okay.  So as far as the Court knows as of this moment,

11 that's the only testimony that you've ever given on the topic,

12 right?

13 A   I'm trying to give some now.

14 Q   Okay.  And on December 22nd, that's the date that the

15 first letter was also sent, right, we just looked at?

16 A   All right.  Okay.

17 Q   You agree with that, right?

18 A   I don't remember the date on the letter.  If you want to

19 pull it up, I'll say it is the 22nd or the 23rd, whatever it

20 says.  I don't know.

21 Q   Sure.

22         MR. MORRIS:  Let's go back to DDDD, please.  And if

23 we can just go to the top of the letter.  Thank you.

24 BY MR. MORRIS:

25 Q   K&L Gates.  December 22nd.  That's the letter, right?

Dondero - Direct                    103

1  A    Yes.

2  Q    And according to the testimony that you gave at the

3  preliminary injunction hearing on January 8th, that's the day

4  that you also stopped AVYA and SKY trades, right?

5  A    I'm not agreeing to that testimony.  I am changing the

6  testimony.

7  Q    Okay.  And then we just saw that other exhibit where they

8  were trying to arrange a phone call with you, the K&L Gates

9  lawyers, and Mr. Ellington and Grant Scott for the 23rd.  Do

10 you remember that one we just looked at?

11 A    Yes.

12 Q    And then later on the day on the 23rd, K&L Gates sends

13 another letter, right?

14         MR. MORRIS:  Can we call up EEEE?  And can we scroll

15 to the Exhibit A, to our response?  Right there.

16 BY MR. MORRIS:

17 Q    That's the 23rd.  Do you see that letter?

18 A    Yes.

19 Q    Again, this is one week after the hearing, right?

20 A    Yes.

21 Q    Okay.  And this is a letter where K&L Gates states on

22 behalf of the Defendants that they are contemplating taking

23 steps to terminate the CLO management agreements, right?

24 A    I don't know.  Can you scroll down, if you want to ask me

25 --

Dondero - Direct                         104

1  Q    Sure.

2         MR. MORRIS:  Can we flip to the next page, please?

3  Keep going.  Right there.

4  BY MR. MORRIS:

5  Q    Can you read the first sentence of the paragraph

6  beginning, "Consequently"?

7  A    (reading)  Consequently, in addition to our request of

8  yesterday, where appropriate and consistent with the

9  underlying contractual provisions, one or more of the entities

10 above intend to notify the relevant Trustees and/or Issuers

11 that the process of removing the Debtor as fund manager should

12 be initiated, subject to and with due deference to the

13 applicable provisions of the United States Bankruptcy Code,

14 including the automatic stay of Section 362.

15 Q    Okay.  So, on December 23rd, the Defendants told the

16 Debtor that they intended to notify the relevant Trustees

17 and/or the Issuers that the process of removing the Debtor as

18 the fund manager should be initiated, right?

19 A    That's what it says.

20 Q    And then the K&L Gates firm sent yet another letter to the

21 Debtor, right?  Do you remember that?

22 A    No.

23        MR. MORRIS:  Can we get up FFFF, please?

24 BY MR. MORRIS:

25 Q    This is dated December 31st.  Do you see that?

```
                        Dondero - Direct                    105
```

1   A    Yes.

2         MR. MORRIS:  Can we scroll down a bit?

3   BY MR. MORRIS:

4   Q    Do you recall this is the letter where they claim that

5   they've been damaged by the Debtor's eviction of you from the

6   Highland offices?

7   A    I don't remember specifically, but that's true.

8   Q    Okay.  So we just saw these three letters, in addition to

9   your -- the -- at least the testimony you gave regarding your

10  conduct on the 22nd of December.  You were aware that all of

11  these letters were being sent by K&L Gates, correct?

12  A    Yes, generally.

13  Q    And you were supportive of the sending of these letters,

14  right?

15  A    Absolutely.  They were appropriate.

16  Q    And you pushed and encouraged the chief compliance officer

17  and the general counsel to send these letters, right?

18  A    I'd like to think that they believed and they acted

19  largely on their own judgment, but I strongly believed it was

20  a violation of the Advisers Act, and stated that numerous

21  times.

22  Q    Sir, you pushed and encouraged the chief compliance

23  officer and the general counsel to send these letters,

24  correct?

25  A    No, I wouldn't use those words.

Dondero - Direct                    106

1  Q   Do you understand that the Debtor demanded that the K&L

2  Gates clients or the Defendants withdraw these letters?

3  A   I believe they requested it.  I didn't -- I didn't know

4  the former, what you mean by demand, but --

5  Q   Well, it's fair to say you never instructed the K&L Gates

6  clients or the Defendants to withdraw these letters, right?

7  A    No.  I still believe they are appropriate and accurate.  I

8  wouldn't withdraw them today.

9  Q   Okay.  Sir, throughout 2020, when you were still the

10  portfolio manager at Highland Capital Management, it's true

11  that you sold AVYA shares on numerous occasions on behalf of

12  both the CLOs and on behalf of the Funds outside of the

13  holdings of the CLOs?

14  A   Always with a business purpose, yes.  That is still a

15  small percentage of our total AVYA holdings, and we still

16  liked AVYA.

17  Q   Sir, I'm going to ask you just one more time.  In 2020,

18  you sold AVYA stock many times on behalf of the CLOs and on

19  behalf of the Funds?

20  A   Yes.

21  Q   Thank you.

22          MR. MORRIS:  No further questions, Your Honor.

23          THE COURT:  All right.  Mr. Rukavina?

24          MR. RUKAVINA:  Your Honor, I will reserve my

25  questions to my case in chief, and I would request a very

Dondero - Direct                    107

1   short restroom break.

2           THE COURT:  All right.  Mr. Dondero, we're --

3           MR. RUKAVINA:  And I do mean short.  I will --

4           THE COURT:  I'm sorry.  What?

5           MR. RUKAVINA:  And I do mean short, Your Honor.  I

6   just need to run and be back -- I can be back in three

7   minutes.

8           MR. MORRIS:  No problem, Your Honor.

9           THE COURT:  Okay.  You're finished for now, Mr.

10  Dondero, but you're going to be recalled, so hang tight.

11      Your next witness, Mr. Morris?

12          MR. MORRIS:  The Debtor calls Jason Post.

13          MR. RUKAVINA:  Your Honor, may I be excused to run to

14  the restroom and Mr. Vasek take over for a few minutes?

15          THE COURT:  Oh.  Okay.  I'm sorry.  If you made that

16  request, I didn't hear you.  So that's fine.

17      All right.  Mr. Post, --

18          MR. MORRIS:  Your Honor, can we just -- I apologize

19  for interrupting.  Can we just direct Mr. Dondero not to speak

20  with anybody about anything at any time?  Not by phone, not by

21  text, not by email, not by meeting, not by anything?  Because

22  he's still on the stand.

23          MR. RUKAVINA:  Well, Your Honor, anything at any

24  time.  I think I know that Mr. Morris is being facetious, but

25  if he's trying to get the rule invoked, that's different.

Post - Direct                              108

1          MR. MORRIS:  Okay.  I'm trying to get the rule

2    invoked.

3          THE COURT:  Okay.  All right.  I'm not going to make

4    that instruction.  All right.  So, --

5          MR. RUKAVINA:  I've got to run to the restroom.  I'll

6    be -- listen for the instructions.

7          THE COURT:  Jason Post, you've been called to the

8    witness stand.  Could you say, "Testing, one, two"?

9          MR. POST:  (Indiscernible.)

10          THE COURT:  All right.  Please raise --

11          MR. POST:  Testing, one, two.

12          THE COURT:  Thank you.  Please raise your right hand.

13              JASON POST, DEBTOR'S WITNESS, SWORN

14          THE COURT:  All right.  Mr. Morris, go ahead.

15                        DIRECT EXAMINATION

16    BY MR. MORRIS:

17    Q    Good afternoon, Mr. Post.  We met the other day.  Do you

18    remember that?

19    A    I do.

20    Q    Okay.  So, again, just to remind you, my name is John

21    Morris.  I'm an attorney at Pachulski, Stang, Ziehl & Jones.

22    We represent the Debtor here.  You're the chief compliance

23    officer for each of the Defendants; is that right?

24    A    I am.

25    Q    And in your role as the chief compliance officer, your job

Post - Direct                    109

1   is to act as a liaison between regulatory bodies and internal

2   working groups with respect to the rules and regulations for

3   the funds advised by the Advisors; is that correct?

4   A    Correct, that's -- that's the (inaudible).  Correct.

5   Q    All right.  And internally, you report to Mr. Dondero.

6   Isn't that right?

7   A    Correct.

8   Q    And you've been working with Mr. Dondero since 2008 when

9   you joined Highland Capital Management, correct?

10  A    I worked at Mr. Dondero's firm since 2008, but I reported

11  to other direct reports during that time outside of Mr.

12  Dondero.  I started to report to him directly in October of

13  2020.

14  Q    Okay.

15  A    (overspoken)

16  Q    But you've -- you've worked at Highland -- you worked at

17  Highland since 2008, fair?

18  A    Yes.

19  Q    Okay.  And you were employed by Highland up until October

20  2020, correct?

21  A    Yes.

22  Q    Okay.  And at that time, Mr. Dondero left and he went to

23  NexPoint and you went to NexPoint.  Is that right?

24  A    Shortly after Mr. Dondero left Highland, I transitioned

25  over to NexPoint.

Post - Direct                           110

1  Q    And that's where Mr. Dondero is, right?

2  A    Correct.

3  Q    Okay.  You joined Highland in 2008, and in around 2011 you

4  joined Highland's internal legal and compliance team, correct?

5  A    That's correct.

6  Q    And in 2015, while still employed by Highland, Mr. Dondero

7  appointed you as the chief compliance officer of the Advisors

8  and the Funds, right?

9  A    Technically, the retail board appointed me the CCO of the

10  Funds, and then I was appointed internally.  I believe Mr.

11  Dondero was part of that decision for the Advisors.

12  Q    Had you ever worked with the retail boards before that?

13  A    There was about -- I worked with them for about a year

14  prior to that.

15  Q    Okay.  And you've served as the CCO, the chief compliance

16  officer, of each of the Advisors and each of the Funds since

17  September 2015 on a continuous basis, right?

18  A    That is correct.

19  Q    You know Thomas Surgent; is that right?

20  A    I do.

21  Q    Mr. Surgent has been the Debtor's chief compliance officer

22  since around 2013 or 2014; is that right?

23  A    I believe -- uh -- I -- I think that's correct.  It may be

24  a year or two off.  He took the role after the former CO

25  resigned, which I don't know if that was 2011 or 2012.  I

Post - Direct                          111

1  can't recall specifically.

2  Q   Okay.  But he's been -- he's been in that position for a

3  long time, right?  Fair enough?

4  A   Yes, that's fair.

5  Q   And during the whole time that you were employed by

6  Highland and serving as the chief compliance officer for the

7  Funds and the Advisors, you reported to Mr. Surgent?

8  A   Internally.  Yes, that's correct.

9  Q   Yeah.  And you respect Mr. Surgent; isn't that right?

10  A   During the time I reported to him, yes.

11  Q   Yeah.  And you believed that he did his job well, right?

12  A   As far as I could see, yes.

13  Q   You viewed it as -- you viewed him as a mentor, did you

14  not?

15  A   Yes.  I mean, when I joined the legal compliance team, you

16  know, he was there.  He was a senior member on the team.  And

17  he, you know, helped educate me, along with other, you know,

18  external sources, et cetera, on the compliance function.

19  Q   Uh-huh.  He trained you for the work you're doing now,

20  right?

21  A   With respect to the on-the-job training, yes.

22  Q   Uh-huh.  Despite all of that, throughout all the

23  proceedings, the court hearings, all of the issues that we're

24  talking about in this case, you never, ever stopped to discuss

25  any of these issues with your former mentor, Mr. Surgent; is

Post - Direct                                    112

1  that right?

2  A    The -- with respect to, for example, the trade (garbled)

3  that you were talking about earlier?

4  Q    Let's do it this way.  From the time that you left

5  Highland until today, you've never discussed with Mr. Surgent

6  Mr. Seery's trades; is that right?

7  A    I believe there was a discussion after -- I can't recall

8  exactly the context.  There was a discussion after the trades

9  in the November time frame.  And then I believe there was a --

10 I responded to an email exchange in the December time frame

11 regarding booking of the trades.

12 Q    Sir, you -- you've never spoken with Mr. Surgent about any

13 issue concerning the Debtor's management of the CLOs, correct?

14 A    I don't recall directly, no.

15 Q    In fact, you're not aware of anyone acting on behalf of

16 the Advisors or the Funds who has reached out to Mr. Surgent

17 to get his views on any of the issues related to this motion.

18 Isn't that right?

19 A    I believe previously there's correspondence that Mr.

20 Dondero had with Surgent.  But aside from that, I'm not aware

21 of any.

22 Q    Is that the email where he reminded him of his personal

23 liability?  Is that the one you're thinking of?

24 A    Correct.

25 Q    Yeah.  Do you know of any other communication -- do you

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 643 of 2722

Post - Direct                                   113

1    know of any other communication that any of the Defendants had

2    with Mr. Surgent concerning the Debtor's management of the

3    CLOs?

4    A    With Mr. Surgent directly, I don't -- I don't -- I don't

5    believe so.

6    Q    Yeah.  You graduated from Baylor; is that right?

7    A    Correct.

8    Q    But you don't have any certifications or licenses

9    applicable to your work, correct?

10   A    Correct.

11   Q    You don't have any specialized training or education

12   that's relevant to your work as a chief compliance officer,

13   correct?

14   A    Correct.

15   Q    Your job -- your training is limited to on-the-job

16   training; isn't that right?

17   A    That is correct.

18   Q    You've never spoken at any conferences on compliance

19   matters, have you?

20   A    Spoken, no.  Attended, yes.

21   Q    You don't recall presenting any papers at any compliance-

22   related conferences, do you?

23   A    That is correct.

24   Q    You've never published anything in connection with your

25   work as a compliance officer; isn't that right?

Post - Direct                                    114

1   A    Not that I can recall.

2   Q    Let's talk about the CLO management agreements briefly.

3   You're aware that the Debtor is party to certain management

4   agreements pursuant to which it serves as the portfolio

5   manager for certain CLOs, correct?

6   A    Correct.

7   Q    And until your lawyers recently asked you to review them,

8   you last had reason to review a CLO management agreement about

9   five or six years ago; isn't that right?

10  A    I believe that's correct.

11  Q    And the request from your lawyers to look at the CLO

12  management agreements, that request came in late November/

13  early December; isn't that right?

14  A    I believe that's around the right time frame.

15  Q    And the portions of the management agreements that you

16  read were the portions that your counsel asked you to read;

17  isn't that right?

18  A    Correct.

19  Q    And other than the general recollection of having read

20  something about the rights of preference shareholders, you

21  don't recall much about the agreements at all; isn't that

22  right?

23  A    I mean, the agreements are very lengthy in nature.  You

24  know, I think it was probably rights that the preference

25  shareholders had, and, you know, possibly indemnification

Post - Direct                    115

1    provisions.  But aside from that, I don't recall anything else

2    specifically right now.

3    Q    As the chief compliance officer of the Advisors and the

4    Funds, you don't know whether any of them are party to the CLO

5    management agreements between the Debtors and -- between the

6    Debtor and the Issuers, correct?

7            MR. RUKAVINA:  And Your Honor, I would just object to

8    the extent that that calls for a legal conclusion.  This

9    witness is not a lawyer.

10           THE COURT:  Overruled.

11           THE WITNESS:  I'm sorry.  Can you repeat the

12   question, please?

13   BY MR. MORRIS:

14   Q    Sure.  As the chief compliance officer for each of the

15   Defendants, you don't know whether any of them are party to

16   the CLO management agreements between the Debtor and the

17   Issuers, correct?

18   A    They're not the named collateral manager, but they're a

19   security holder of the CLOs, so they should be entitled to,

20   you know, the rights that those security holders are afforded

21   under those agreements.

22           MR. MORRIS:  I move to strike, Your Honor.

23           THE COURT:  Granted.

24   BY MR. MORRIS:

25   Q    All right.  So, now, Mr. Post, I know this is difficult,

Post - Direct                                116

1   and I do appreciate that it's difficult just to focus on the

2   question.  Your counsel will have the opportunity to ask you

3   whatever he wants.  But I would respectfully request that you

4   listen to my question and only answer my question.  It really

5   is very likely to require just a yes or no answer.

6        So, let me try again.  As the chief compliance officer of

7   the Advisors and the Funds, you don't know whether any of them

8   are a party to the CLO management agreements between the

9   Debtor and the Issuers, correct?

10  A    I don't believe they are, correct.

11  Q    Okay.  Let's talk about that prior hearing.  Now, by the

12  way, Mr. Post, did you listen in to Mr. Dondero's testimony

13  earlier?

14          MR. RUKAVINA:  Mr. Post was here with me --

15          MR. MORRIS:  Yeah.

16          MR. RUKAVINA:  -- as my representative..

17          MR. MORRIS:  Okay.  I -- there's no problem.  I just

18  -- I just -- that way there's some background and he has some

19  context.  That's the only reason I asked.

20  BY MR. MORRIS:

21  Q    You're aware that the Funds and the Advisors previously

22  filed a motion in the Bankruptcy Court asking the Court to

23  institute a pause in the Debtor's ability to sell CLO assets,

24  correct?

25  A    Correct.

Post - Direct                    117

1  Q    And you recall that that happened in mid-December, around

2  December 16th; is that right?

3  A    That sounds correct.

4  Q    And in connection with that motion, you provided

5  information to counsel that they requested from you, right?

6  A    Yes.  I was part of the working -- internal working group,

7  with internal and external counsel.

8  Q    Other than providing that information, you generally

9  agreed with the position being taken that it wasn't in the

10  best interest of the Funds involved for Highland to make any

11  trades; isn't that right?

12  A    Yes.  And that was based off of discussions with the

13  investment professionals.

14  Q    And the investment professionals are Mr. Sowin and Mr.

15  Dondero, correct?

16  A    Correct.

17  Q    Okay.  So you're the chief compliance officer, and they

18  made a motion that was based on the idea that the fund

19  manager, Highland Capital Management, shouldn't trade any

20  assets in the CLOs.  Do I have that right?

21  A    I believe that's what the motion contained.

22  Q    But you don't even remember who authorized the filing of

23  the motion; isn't that right?

24  A    I believe it was pursuant to discussions internally and

25  with external counsel, and I believe Mr. Norris signed the

Post - Direct                                118

1    filing, if I -- if I recall correctly.

2    Q    Sir, you don't remember who authorized the filing of the

3    motion, correct?

4    A    It -- it was pursuant to a discussion with the investment

5    professionals and counsel, and it was in the best interest of

6    the Funds to make the filing.  So I think it was a

7    collaborative determination.

8              MR. MORRIS:  I move to strike, Your Honor.

9              THE COURT:  Granted.

10             MR. MORRIS:  Ms. Canty, can we please pull up Mr.

11   Post's deposition transcript?  And let's go to Page 35.  Line

12   21.  Okay.

13   BY MR. MORRIS:

14   Q    Do you remember giving the following answer to the

15   following question:

16       "Q    Who authorized the filing of this motion?

17       "A    I can't recall specifically who authorized it."

18   Q    Did you give that answer to my question just the other

19   day?

20   A    That's -- that's what it says there, yes.

21   Q    And it says that because that's, in fact, what you

22   testified to under oath the other day, right?

23   A    Correct.

24   Q    Okay.  And the one thing that you know for certain is that

25   you didn't authorize the filing of the motion; isn't that

Post - Direct                                              119

1    right?

2    A    I didn't sign anything in connection with the filing.

3    Q    All right.  Listen carefully to my question.  The one

4    thing that you're certain of is that you did not authorize the

5    filing of the motion as the chief compliance officer of the

6    Debtors, correct?

7    A    Correct.

8    Q    Okay.  But you did participate in conversations with Mr.

9    Dondero and counsel concerning the motion; is that fair?

10   A    There were conversations with Mr. Dondero initially, and

11   then the conversations were then more so with internal and

12   external counsel in terms of the filing.

13   Q    Okay.  So they started just with Mr. Dondero, and then

14   they moved on to counsel.  Is that what you're saying?

15   A    I can't recall specifically.  It may have been part of a

16   discussion internally with internal counsel and Mr. Dondero.

17   I just -- I can't recall the specifics.

18   Q    Okay.  But Mr. Dondero certainly supported the filing of

19   the motion, right?

20   A    Yes.  From an investment perspective, it was in the best

21   interest of the Funds in terms of the sales that were

22   occurring.

23   Q    Okay.

24          MR. MORRIS:  I move to strike.

25          THE COURT:  Granted.

Post - Direct                          120

1  BY MR. MORRIS:

2  Q    It's a very simple question.  Mr. Dondero supported the

3  filing of the motion; is that correct?

4  A    Yes.

5  Q    You did not file a declaration in support of the motion;

6  is that correct?

7  A    Me personally, no.

8  Q    Okay.  So you're the chief compliance officer of the

9  Defendants; is that right?

10 A    Correct.

11 Q    But instead of you filing a declaration, Mr. Norris filed

12 the declaration.  Do I have that right?

13 A    Correct.  My understanding is one person needs to sign the

14 declaration.

15 Q    And remind me, what is Mr. Norris's position?  He's the

16 executive vice president, right?

17 A    Correct.

18 Q    What responsibilities does he have?  Does he have trading

19 responsibility?

20 A    He does not.

21 Q    Does he have compliance responsibility?

22 A    Not directly, no.

23 Q    Does he have investment responsibility?

24 A    He's familiar with the composition of the portfolios in

25 his role as a product strategy team member.

Post - Direct                               121

1   Q    Does he have investment responsibility, sir?

2   A    He is not making direct investments for the -- for the

3   Funds.

4   Q    Okay.  So he doesn't -- and he's not a compliance person,

5   right?

6   A    Correct.

7   Q    And he's not a lawyer, right?

8   A    Correct.

9   Q    But nevertheless, as the chief compliance officer, you

10  believed that Mr. Norris's declaration contained all of the

11  information that was relevant to support the motion, right?

12  A    It was a determin... or a collaborative determination in

13  conjunction with counsel.  But I, you know, I don't -- yeah,

14  it was -- it was a collaborative determination.  There were

15  multiple elements that went into that -- the letter.

16  Q    Okay.  You believed that the motion and Mr. Norris's

17  declaration contained all the relevant facts that supported

18  the Advisors and the Funds' requests to the Court, correct?

19  A    Yes.

20  Q    In fact, you believed that Mr. Norris was the most

21  knowledgeable person to testify on behalf of the Movants;

22  isn't that right?

23  A    I think it was -- he was identified pursuant to

24  discussions with counsel to be the most knowledgeable.

25  Q    I'm going to ask you just about you and not counsel.  You

APP. 0648
Appx. 00695

Post - Direct                          122

1   believed at the time that Mr. Norris was the most

2   knowledgeable witness to testify on behalf of the Movants;

3   isn't that right?

4   A    Yes.

5   Q    And you didn't testify -- not only didn't you submit a

6   declaration, but you didn't testify at the hearing, did you?

7   A    Correct on both.

8   Q    Okay.  And you listened to parts of the hearing, but not

9   all of it, because you were busy doing other stuff, right?

10  A    Correct.

11  Q    You didn't listen to Mr. Norris's testimony at all, right?

12  A    I don't believe I did.

13  Q    You didn't listen to the Court when the Court rendered its

14  decision, did you?

15  A    I don't -- I don't believe I did.

16  Q    And you didn't read the transcript from the hearing, did

17  you?

18  A    I don't -- correct.  I did not.

19  Q    Okay.  So in your capacity as the chief compliance

20  officer, you didn't believe that you should take the time to

21  review the transcript, did you?

22  A    Correct.  I mean, just it was filed based off of the

23  belief that the -- that the trades weren't in the best

24  interest, and I -- and no, I didn't read it personally.

25  Q    And you didn't believe, in -- that in your capacity as the

Post - Direct                                  123

1   CCO, the chief compliance officer, that it was in the scope of

2   your responsibility to listen to the hearing, correct?

3   A    I was -- I wasn't asked to listen, and quite frankly, I

4   don't -- I don't recall if I remember the timing, but I did

5   not listen.

6   Q    Okay.  And in your capacity as the chief compliance

7   officer, you didn't believe that it was in the scope of your

8   responsibilities to listen to the hearing; isn't that right?

9   A    Correct.

10  Q    And because you didn't listen to the hearing or review the

11  transcript, you were unaware of what the Court said or how

12  Judge Jernigan described the motion or the people involved in

13  presenting the case on behalf of the Defendants, right?

14  A    Correct, but I -- I believe I probably would have received

15  some guidance from counsel who attended or listened to the

16  hearing.

17  Q    Well, after the hearing was over, you did speak to Mr.

18  Norris, right?

19  A    Very briefly.

20  Q    In fact, --

21  A    Very --

22  Q    In fact, the only thing you can remember about your

23  conversation with Mr. Norris following the hearing was

24  discussing with him how long the hearing took.  Isn't that

25  right?

Post - Direct                        124

1   A    Correct, because I -- I believe I heard it was a short

2   hearing.

3   Q    And that's -- that's all -- that's all you asked Mr.

4   Norris about, about the hearing, right?  That's all you

5   remember talking to him about?

6   A    I believe so, correct.

7   Q    You don't recall discussing with Mr. Norris any other

8   aspect of the hearing other than the length of time it took to

9   conduct, correct?

10  A    I don't recall specifically.

11  Q    And you have no recollection of ever discussing with Mr.

12  Dondero what happened at the hearing, right?

13  A    I don't think I talked with Jim, Jim Dondero about that.

14  Q    Nor did you talk to Mr. Dondero about the Court's ruling;

15  isn't that right?

16  A    Correct.

17  Q    Okay.  Let's talk about the events that occurred after the

18  hearing, in the two weeks following the hearing.  The

19  Defendants for which you serve as the chief compliance officer

20  sent three separate letters to the Defendant [sic], correct?

21  A    If you could bring them up, I can confirm.

22  Q    Sure.

23         MR. MORRIS:  Let's start with DDDD, please.  Okay.

24  Okay.  Can we scroll to the attachment, please?

25  BY MR. MORRIS:

Post - Direct                    125

1  Q   All right.  So this is the first letter, Mr. Post.  Do you

2  recall, on or about December 22nd, the K&L Gates firm sent, on

3  behalf of the Advisors and Funds for which you serve as the

4  chief compliance officer, a letter to the Debtors?

5  A   Yes.

6  Q   Okay.

7            MR. MORRIS:  And can we call the next exhibit?  I

8  guess it's EEEE.

9        And I don't mean to be quick about these.  If there's any

10 reason that you want to read them, I wasn't planning on asking

11 any questions about the substance of the letters of this

12 witness.

13 BY MR. MORRIS:

14 Q   But Mr. Post, I don't mean to be quick here.  So if you

15 think there's a benefit to you to reading the letters, please

16 let me know.

17       Do you see, December 23rd, the next day, another letter

18 was sent by K&L Gates?

19 A   Yes.

20 Q   Okay.  And do you recall generally that the Advisors and

21 Funds for which you serve as chief compliance officer told the

22 -- told the Debtor that they were going to begin the process

23 of seeking to terminate the CLO management agreements?

24 A   I believe -- I believe that was contained in the letter,

25 so long as it was done in compliance with the Court.

Post - Direct                126

1  Q   Uh-huh.  And do you remember there was a third letter that

2  was sent?

3  A   If you wouldn't mind pulling it up.

4  Q   Yeah, not at all.

5      MR. MORRIS:  Can we get the December 31st letter?  I

6  think it might be -- yeah.

7  BY MR. MORRIS:

8  Q   Now, here's the December 31st letter.  Do you remember the

9  December 31st letter was the one where K&L Gates suggested

10 that the Advisors and the Funds had suffered damages because

11 the Debtor evicted Mr. Dondero from the Highland suite of

12 offices?

13 A   I -- I had heard of that letter being drafted, but I don't

14 recall -- I obviously don't recall a specific date.  But if it

15 says December 31st, --

16 Q   Okay.  Mr. Dondero was one of the main voices in the

17 decision to send these letters, correct?

18 A   He was part of the preliminary conversation and expressed

19 his opinion, and then myself and others internally, and with

20 external counsel, then worked to draft the letters.

21     THE COURT:  All right.  Mr. Post, I am going to

22 interject.  I have heard Mr. Morris give you this instruction

23 many times.  Maybe it's time for me to.  Maybe it's past time

24 for me to.

25   Most of his questions simply require a yes or no answer.

Post - Direct                          127

1    If you feel like there are other things that you want to

2    supplement your testimony with, Mr. Rukavina is going to have

3    a chance to question you, and that would be the situation

4    where maybe you could give more fulsome answers.  But please

5    listen to the question.  If it's a yes or no answer, that's

6    all we want you to give right now.  Okay?  Got it?

7            THE WITNESS:  Understood.

8            THE COURT:  Okay.

9            MR. MORRIS:  Thank you, Your Honor.

10   BY MR. MORRIS:

11   Q   Mr. Post, Mr. Dondero was one of the main voices in the

12   decision to send the letters; isn't that correct?

13   A   He was a voice.

14           THE COURT:  That was not a yes --

15   BY MR. MORRIS:

16   A   And he was -- he --

17           THE COURT:  Okay.

18           THE WITNESS:  I'm --

19           THE COURT:  Please, just a yes or no answer, okay?

20           THE WITNESS:  No.

21           MR. MORRIS:  Okay.  Can we go to Mr. Post's

22   transcript, please, Page 47?  Line 22?

23       And Your Honor, when we pull it up on the screen, there is

24   an objection, and I would respectfully request that the Court

25   rule on the objection before I read the question and the

Post - Direct                          128

1   answer.

2           THE COURT:  All right.

3           MR. MORRIS:  So if we could just call up Page 47

4   beginning at Line 22.

5           MR. RUKAVINA:  Page 47, Line 22.

6           THE COURT:  Okay.

7           MR. MORRIS:  One moment.  Give her a moment.  She's

8   not there.

9           MR. RUKAVINA:  Do you remember what exhibit this is?

10          MR. MORRIS:  Yeah.  There it is.  Beginning at Line

11  22, "Do you know?"  And there is Mr. Rukavina's objection.

12          MR. RUKAVINA:  Your Honor, it's very simple.  He

13  can't go into Mr. Dondero's head.  But he -- but if Mr.

14  Dondero told him something, that's different.  So I think

15  counsel can rephrase the question and it's perfectly fine, but

16  he can't go into Mr. Dondero's state of mind.

17          MR. MORRIS:  Your Honor, I'm not asking for Mr.

18  Dondero's state of mind.  I'm asking for Mr. Post's knowledge.

19  "Do you know?"

20          THE COURT:  Okay.  I'll overrule the objection.  He

21  can answer.

22  BY MR. MORRIS:

23  Q   All right.  So, Mr. Post, do you remember giving this

24  answer to the following question:

25      "Q   Do you know whether Mr. Dondero supported the

Post - Direct                    129

1      sending of each of these three letters?

2      "A   I don't -- I don't recall specifically.  I think

3      he had his views on certain of the transactions that

4      were occurring, and he wasn't in agreement with those

5      transactions, as one of the main voices."

6    Q   Do you see that?

7    A   I do.

8    Q   Does that refresh your recollection that Mr. -- that you

9    testified that Mr. Dondero was one of the main voices?

10   A   Yes.

11   Q   Okay.  Mr. Dondero --

12        MR. MORRIS:  You can take that down now for the

13   moment, please.

14   BY MR. MORRIS:

15   Q   Mr. Dondero had his views on certain of the transactions

16   that were occurring, and he wasn't in agreement with those

17   transactions.  Isn't that right?

18   A   Yes.

19   Q   All right.  Going back to the letters that we just looked

20   at quickly, you recall the Debtor responded to each of those

21   letters, but as the chief compliance officer, you couldn't

22   really recall what the Debtor said in response.  Is that fair?

23   A   I'm -- I believe they -- I'm sorry.  I can't recall

24   specifically without seeing the letters.

25   Q   Okay.  So you don't recall that, in response, the Debtor

Post - Direct                    130

1  requested that the Advisors and the Funds withdraw the

2  letters, right?

3  A    I believe that was requested in the letters.

4  Q    Okay.  But the Funds and the Advisors didn't comply with

5  that request, right?

6  A    To my knowledge, they have not withdrawn the letters.

7  Q    You do recall that the Debtor specifically asked the

8  Defendants to file their lift stay motion so that they could

9  finally resolve the issue of whether or not the Advisors and

10  the Funds could actually terminate the agreement, right?

11  A    I -- I'm sorry.  Can you repeat that question, please?

12  Q    Do you recall that the Funds and the Advisors informed the

13  Debtor that they were going to initiate steps to terminate the

14  CLO management agreements, including moving to lift the stay?

15  A    I think they indicated that they were going to take steps,

16  but it would be pursuant to what was permitted in the court.

17  Q    And do you remember that the Debtor specifically asked the

18  Defendants to do exactly that, to bring this matter to a

19  conclusion, to file the motion so that the Court could resolve

20  the issue of whether or not they had a right to terminate the

21  agreement?  You remember that, right?

22          MR. RUKAVINA:  Objection, compound, Your Honor.

23          THE WITNESS:  I can't --

24          THE COURT:  I'm sorry.

25          MR. MORRIS:  I can't recall.

Post - Direct                    131

1      THE COURT:  Was there an objection?

2      MR. RUKAVINA:  Yes, Your Honor.  That's four

3  questions in one.  That's compound.

4      MR. MORRIS:  I'll rephrase, Your Honor.

5      THE COURT:  Okay.  And let me interject a minute.

6  Mr. Post, you have this habit of not looking squarely at the

7  camera but looking over to your right.  And in a normal

8  courtroom setting, that might be fine, but I have no way of

9  knowing if some lawyer or some other person is -- you're

10  looking at them and they're somehow instructing you.  I would

11  certainly hope that's not what's going on, but it just kind of

12  leaves room for me to wonder when you're not looking squarely

13  at the camera.  So can you start looking squarely at the

14  camera, please?

15      MR. RUKAVINA:  Your Honor, I can explain that, and

16  certainly there's no funny business going on.  There are two

17  cameras on Mr. Post.  One is on a laptop.  We're looking at

18  the Court on the big camera.  I'm sitting behind Mr. Post.  So

19  if the Court would prefer that Mr. Post look directly into the

20  laptop, then that's what he'll do, or if the Court would

21  prefer that he look into the big camera.

22      THE COURT:  Okay.  Well, I prefer he look into the

23  big camera just because it --

24      MR. RUKAVINA:  So keep looking there?  Yeah.

25      THE COURT:  No, no, no, no.  Okay.  I don't know what

Post - Direct                                        132

1   -- I thought -- okay. Do you see what I'm seeing? I don't

2   know if you can see what I'm seeing.

3            MR. MORRIS: Yes.

4            THE COURT: I'm seeing the left side of his face.

5            THE WITNESS: I'm sorry. I'll just look at the

6   laptop. Sorry. I was -- I was looking at who was speaking to

7   me.

8            THE COURT: Okay. Well, I don't --

9            MR. MORRIS: Okay.

10            THE COURT: I don't know the setup, so it was

11   confusing to me.

12       All right. This is better. Thank you.

13            THE WITNESS: Yeah. I apologize.

14            MR. RUKAVINA: We'll focus on the laptop, Judge.

15   BY MR. MORRIS:

16   Q   All right. So the question, Mr. Post, is: You do recall

17   that the Debtor specifically asked the Defendants to file

18   their motion to lift the stay so that the issue could finally

19   be resolved; isn't that right?

20   A   I can't recall that specifically.

21   Q   You believe that may be one of the options that the Debtor

22   specifically proposed, right?

23   A   It -- yes.

24   Q   Okay. But the Defendants never filed their lift stay

25   motion to terminate the agreements; isn't that right?

Post - Direct                         133

 1  A    I don't believe so.

 2  Q    Right.  So the Debtor filed its complaint and its request

 3  for the injunction, right?

 4  A    Correct.

 5  Q    As the CO -- as the CCO, you may have reviewed the

 6  Debtor's complaint and motion, but you can't recall, given all

 7  the documentation that's involved, right?

 8  A    Correct.

 9  Q    You can't recall any facts that the Debtor asserted in

10  support of its motion; isn't that right?

11  A    I can't recall specifically.  Correct.

12  Q    But the one thing you do know is that the Debtor's motion

13  is based on its entitlement to transact business pursuant to

14  their arrangement with the CLOs as collateral manager,

15  correct?

16  A    Yes.

17  Q    Now, you heard that there was supposed to be an initial

18  hearing on the Debtor's motion for a temporary restraining

19  order against the Defendants, right?

20  A    Correct.

21  Q    But you don't believe the motion for the TRO got heard,

22  and you presume it got resolved, right?

23  A    I don't believe it was heard.

24  Q    Okay.  And you understand that there is a TRO in place

25  now, pursuant to which the Advisors and the Funds are

Post - Direct                    134

1  prevented from interfering with the Debtor's execution of its

2  rights under the CLO management agreements, right?

3  A    Correct.

4  Q    Before the TRO was resolved, you weren't personally

5  involved in the process of deciding what witnesses would be

6  called and what exhibits would be offered into evidence; is

7  that right?

8  A    No.

9         MR. MORRIS:  During the deposition, Your Honor,

10  subject to correction from Mr. Rukavina, I believe that the

11  Defendants and the Debtor reached the following two

12  stipulations.

13     First, the Defendants and the Debtor stipulate that Mr.

14  Post was not going to be called as a witness at the TRO

15  hearing.

16         MR. RUKAVINA:  That is correct.

17         MR. MORRIS:  And second, the Defendants and the

18  Debtor stipulate that the Defendants were not going to offer

19  into evidence any exhibits other than those specifically

20  listed on their witness and exhibit list.

21         MR. RUKAVINA:  That being the witness and exhibit

22  list filed before the TRO.  That is correct.

23         MR. MORRIS:  Okay.

24  BY MR. MORRIS:

25  Q    Let's talk about Mr. Seery for a minute.  You know who Mr.

Post - Direct                    135

1   Seery is, correct?

2   A   Correct.

3   Q   You understand he's an independent director and the CEO of

4   the Debtor, right?

5   A   Correct.

6   Q   And you also understand that his -- in his capacity as the

7   Debtor's CEO, Mr. Seery is authorized to sell certain

8   securities and assets that are owned by the CLOs, correct?

9   A   Correct.

10  Q   In your opinion as the CCO, the chief compliance officer

11  of the Advisors and the Funds, Mr. Seery has the knowledge and

12  experience to trade securities on behalf of the CLOs, correct?

13  A   Correct.

14  Q   But you don't believe that it's in the Funds' best

15  interest for Mr. Seery to sell SKY and AVYA securities, right?

16  A   Correct.

17  Q   But even though you reached that decision about Mr. Seery,

18  you have no knowledge as to whether Mr. Dondero ever traded

19  either of those securities before he resigned from Highland;

20  isn't that right?

21  A   I saw some trades that were shown on the screen earlier.

22  I don't think I recalled at the time I was asked on Friday.

23  Q   As of the time -- as of Friday, you had no knowledge as to

24  whether Mr. Dondero had traded in AVYA securities prior to his

25  departure from Highland, correct?

Post - Direct                     136

1    A    Correct.

2    Q    And before, before forming your view as the chief

3    compliance officer that Mr. Seery's trading of AVYA was not in

4    the best interest of the Funds, you made no effort to see if

5    Mr. Dondero had sold the exact same securities Mr. Seery was

6    selling, correct?

7    A    Correct.

8    Q    And the sole source of information that you relied upon to

9    reach your opinion that the trades weren't in the best

10   interest of the Funds is Jim Dondero and Joe Sowin, correct?

11   A    I'm sorry.  Can you repeat that?  You kind of cut out at

12   the beginning.

13   Q    Sure.  And please, any time that happens, let me know.  We

14   had some problems this morning.

15       The sole source of information that you relied upon to

16   reach your opinion that the trades weren't in the best

17   interest of the funds is Jim Dondero and Joe Sowin; isn't that

18   correct?

19   A    Correct.  They're the investment professionals, yes.

20   Q    And you have no understanding as to why Mr. Seery wanted

21   to sell the AVYA and SKY securities, do you?

22   A    I was told that -- I don't know why he wanted to sell them

23   personally, correct.

24   Q    Okay.  In fact, before reaching your conclusion as the CCO

25   that Mr. Seery's trades were not in the best interest of the

Post - Direct                                    137

1   Fund, you did not undertake any investigation of any kind to

2   try to determine why Mr. Seery wanted to sell AVYA or SKY

3   stock, correct?

4   A    Correct.  I didn't reach out to Mr. Seery.

5   Q    All right.  You believe that Mr. Dondero and Mr. Sowin's

6   opinion that Mr. Seery's trades aren't in the Funds' best

7   interest should be heard pursuant to the Advisers Act, right?

8   A    Correct.

9   Q    Specifically, Section 2000 -- 206 of the Advisers Act,

10  right?

11  A    Correct.

12  Q    Have you ever read Section 206 of the Advisers Act?

13  A    Yes.

14  Q    Okay.

15        MR. MORRIS:  Ms. Canty, can you please put up the

16  demonstrative for Section 206 of the Advisers Act?

17        MR. RUKAVINA:  Your Honor, the witness just asked me

18  for water.  Nothing more.

19        THE COURT:  Okay.

20        MR. MORRIS:  Yeah.  No problem.

21  BY MR. MORRIS:

22  Q    I've put on the screen Section 206 of the Advisers Act,

23  Mr. Post.  Can you please tell the Court what provision of 206

24  you believe Mr. Seery allegedly breached when he sought to

25  sell AVYA and SKY securities?

Post - Direct                              138

1  A    It would be Number 4.

2  Q    Do you believe that Mr. Seery engaged in fraudulent,

3  deceptive, or manipulative practices by trying to trade AVYA

4  and SKY securities?

5  A    The -- as collateral manager for the CLOs, they're

6  supposed to maximize returns for the preference shares, which

7  we didn't believe the sales reflected that, and so they

8  weren't acting, --

9            THE COURT:  Okay.

10           THE WITNESS:  -- you know, pursuant to their duties

11  --

12           THE COURT:  Here I -- here I go --

13           THE WITNESS:  -- under the collateral management --

14           THE COURT:  Here I go again.  Here you go again.

15           THE WITNESS:  I'm sorry.

16           THE COURT:  It really was a yes or no question.  All

17  right?

18  BY MR. MORRIS:

19  Q    You're the -- you're the chief compliance officer, right?

20  A    Yes.

21  Q    And this is the provision in Section 4 that you cite to as

22  the provision that Mr. Seery violated when he attempted to

23  sell SKY and AVYA securities, correct?

24  A    Yes.

25  Q    Did Mr. Seery engage in an act, practice, or course of

Post - Direct                                    139

1   business which was fraudulent when he looked to sell those

2   securities?

3   A    No.

4   Q    Do you believe that Mr. Seery engaged in an act, a

5   practice, or a course of business which was deceptive when he

6   went to sell the SKY and the AVYA securities?

7   A    Yes.

8   Q    Who did he deceive?

9   A    The investors of the CLOs, --

10  Q    How?

11  A    -- the preference shareholders.

12  Q    How?

13  A    By selling securities that the preference shareholder

14  investors believed had further upside to them.

15  Q    Did he lie to them?

16  A    I don't believe he talked to the investors.

17  Q    But you're putting your reputation on the line here and

18  you're swearing under oath that Mr. Seery deceptively tried to

19  sell SKY and AVYA securities?

20  A    I believe that based off of a review and discussion with

21  counsel.

22  Q    Do you think he was manipulative?

23  A    No.

24  Q    Did you -- did you check in with the SEC to tell them that

25  you had a bad actor here?

Post - Direct                    140

1   A    No.

2   Q    You first formed your view that the Debtor violated

3   Section 206 of the Advisers Act after the sales started to

4   occur in the CLOs, correct?

5   A    Correct.

6   Q    But you don't know when the sales actually started, right?

7   A    I believe there were sales --

8   Q    And I assume, since you were the chief compliance officer

9   since 2015, you don't believe that Mr. Dondero's sale of AVYA

10  stock was deceptive, right?

11  A    You would have to ask Mr. Dondero that, but I believe he

12  was selling for cash, cash needs for other funds.

13          MR. MORRIS:  Okay.  I move to strike.  I'm asking him

14  not --

15          THE COURT:  Sustained.

16  BY MR. MORRIS:

17  Q    I'm asking about you.  I'm asking about you.  You're the

18  chief compliance officer, right?

19  A    Yes.

20  Q    And you don't believe that when Mr. Dondero sold AVYA

21  stock that he was engaged in deceptive practices, do you?

22  A    No.

23  Q    And that's because you don't even know whether he sold

24  AVYA stock; isn't that right?

25  A    On Friday, I -- that is correct.

Post - Direct                    141

1  Q    In fact, the only reason you learned that Mr. Seery wanted

2  to sell AVYA and SKY stock is because Mr. Dondero told you;

3  isn't that right?

4  A    I believe I was forwarded the email after -- after there

5  was communications on the sales.

6  Q    And that's the email where Mr. Dondero told Mr. Surgent

7  that he had personal liability, correct?

8  A    I -- I believe it was an email prior to that about were

9  trades being requested and Mr. Dondero responding.

10  Q    You're familiar with the email where Mr. Dondero

11  interfered with Mr. Seery's trades?

12  A    Yes.

13  Q    Okay.  And you're aware that Mr. Dondero told Mr. Surgent

14  that he faced potential liability if he continued to follow

15  Mr. Seery's instructions, correct?

16  A    Correct.  Based off of Mr. Dondero's view.

17  Q    Notwithstanding all of that, in your capacity as the chief

18  compliance officer, you don't believe it's ever appropriate

19  for an investor to step in and impede transactions that have

20  been authorized by the portfolio manager unless the contract

21  permits the investor to step in; isn't that right?

22  A    I believe -- I'm sorry, can you repeat that, please?

23  There was a lot of question.

24  Q    Sure.  Sure.  In your capacity as the chief compliance

25  officer, you don't believe it's ever appropriate for an

Post - Direct                               142

1   investor to step in and impede transactions that were

2   authorized by the portfolio manager unless the contract

3   permits the investor to do so; isn't that correct?  Isn't that

4   correct?

5   A    Yes.

6   Q    Okay.  I know you're not a lawyer, but you are the chief

7   compliance officer of the Funds; isn't that right?

8   A    Correct.

9   Q    And you can't point to anything in any contract that gives

10  Mr. Dondero the right to step in and impede transactions that

11  have been authorized by Mr. Seery; isn't that correct?

12  A    He's entitled rights as preference shareholders for the --

13  for the Funds that hold those preference shareholders.  So,

14  indirectly, he should be afforded those rights as portfolio

15  manager for those Funds.

16  Q    Sir, you can't point to anything in any contract that

17  gives Mr. Dondero the right to step in and impede transactions

18  that have been authorized by Mr. Seery; isn't that correct?

19  A    Correct.

20  Q    Okay.  But yet you have never told Mr. Dondero that he

21  should not interfere with Mr. Seery's trades; isn't that a

22  fact?

23  A    Correct.

24  Q    In fact, you never personally took any steps at any time

25  to make sure that there would be no further interference with

Post - Direct                    143

1  the Debtor's trading activities; isn't that correct?

2  A    Correct.

3  Q    And that's because you believe, as the chief compliance

4  officer of the Funds, that Mr. Dondero should have the leeway

5  to make the determination as to whether or not the

6  transactions are appropriate; isn't that correct?

7  A    He should be able to be heard in the transactions that are

8  being made, correct.

9  Q    Sir, not to be heard, but to make the determination.  Let

10 me ask the question again.  You believe, as the CO -- CCO of

11 the Funds, that Mr. Dondero should have the leeway to make the

12 determination as to whether or not the transactions are

13 appropriate; isn't that correct?

14 A    Yes.

15 Q    Okay.  And you completely deferred to Mr. Dondero; isn't

16 that right?

17 A    For the investment determination, yes.

18 Q    And based on that deference, you never took any steps at

19 any time to make sure no one on behalf of the Advisors or the

20 Funds impeded or stopped transactions authorized by Mr. Seery,

21 correct?

22 A    Correct.

23 Q    You understand there's a TRO in place today that prevents

24 Mr. Dondero and the Advisors and the Funds from interfering

25 with Mr. Seery's trading activities; isn't that right?

Post - Direct                    144

1          MR. RUKAVINA:  I'm going to object to that, Your

2   Honor, to the extent that calls for a legal conclusion.  And I

3   do think it mischaracterizes the testimony.  I'm sorry.  The

4   TRO.

5          THE COURT:  Overruled.

6   BY MR. MORRIS:

7   Q   You can answer, sir.  Would you like me to repeat the

8   question?

9   A   Yes, please.

10  Q   You understand that there is a TRO in place -- TRO in

11  place today that prevents Mr. Dondero, the Advisors, and the

12  Funds from interfering with Mr. Seery's trading activities on

13  behalf of the CLOs, correct?

14  A   Correct.

15  Q   But in the absence of the TRO, in your view, whether you

16  tell Mr. Dondero not to interfere with Mr. Seery's trades

17  depends on the facts and circumstances that exist at the time,

18  right?

19  A   Correct.  From a -- yes.

20  Q   Okay.  And up until this point, there have been no facts

21  and circumstances that have caused you to tell Mr. Dondero not

22  to interfere with Mr. Seery's trades on behalf of the CLOs,

23  correct?

24  A   He can't because of the TRO.

25  Q   Correct.  But if the TRO wasn't in place, it's possible

Post - Direct                                    145

1    that you wouldn't take any steps to stop Mr. Dondero from

2    impeding Mr. Seery's trades; isn't that right?

3    A    I mean, if Mr. Dondero or other investment professionals

4    have a view, that they should be -- they should have a right

5    to be heard as preference shareholders of the CLOs.

6    Q    Okay.  But if the TRO wasn't in place, you wouldn't act to

7    stop Mr. Dondero from interfering or impeding the Debtor's

8    trades on behalf of the CLO; isn't that right?

9    A    He would -- if he would be permitted to talk to Mr. Seery.

10   Q    Okay.  Prior to the imposition of the TRO, you took no

11   steps to stop Mr. Dondero from interfering with Mr. Seery's

12   trades, correct?

13   A    Correct.

14   Q    And if the TRO wasn't in place, it's possible you wouldn't

15   take any steps to stop Mr. Dondero from impeding -- impeding

16   Mr. Seery's trades again; isn't that right?

17   A    If there's an investment rationale as to why they feel the

18   trades shouldn't be done, I -- again, I feel like Mr. Dondero

19   or the other investment professionals should be able to raise

20   those points with Mr. Seery.

21   Q    Do you think they should be able to stop the trades?

22   A    I -- I -- I think they should be able to question the

23   trades.  But flat-out stop them, I'd probably say no.

24   Q    Then why didn't you do anything before the TRO was

25   entered?

Post - Direct                    146

1  A    Um, I'm sorry, can you repeat the -- do anything in -- in

2  what manner?

3  Q    Why didn't you take any steps before the TRO was entered

4  to stop Mr. Dondero from interfering and stopping and impeding

5  the Debtor's trades?

6  A    I think, as I recall, there was only one -- one set of

7  trades in question that he stepped in on.

8  Q    So, one is okay?  How about two?

9  A    Or, sorry.  There were two trades on one day that -- that,

10 you know, he questioned.  Or stepped in on.  I don't -- I

11 don't recall him stopping any other trades thereafter.

12 Q    That's all you know about, right?

13 A    Correct.

14 Q    And with that knowledge, it never occurred to you to tell

15 Mr. Dondero to knock it off, did it?

16 A    He believed the trades weren't in the best interest for

17 the investors, so I did not.

18 Q    And that's what you mean by deferring to him; isn't that

19 right?

20 A    From the investment perspective, yes.

21 Q    Thank you for your -- thank you for your honesty.  As the

22 CCO, you have never communicated with the Issuers about the

23 Debtor's performance under the CLO management agreements;

24 isn't that right?

25 A    Correct.

Post - Direct                                  147

1  Q    And that's because you didn't believe it was in your

2  responsibility as the CCO to check with the Issuers to see if

3  the Issuers believed that the Debtor was in compliance with

4  the CLO management agreements, correct?

5  A    That communication would have involved counsel and that

6  communication didn't occur.  I wouldn't have reached out to

7  them directly.

8  Q    Yeah.  You didn't believe it was within your

9  responsibility as the chief compliance officer to communicate

10 with the Issuers to see if they had any views as to Mr.

11 Seery's performance as portfolio manager, correct?

12 A    Correct, because it would have involved me working with

13 counsel and there was never direction to do that.

14 Q    As the chief compliance officer of the Defendants, you

15 have no idea if anyone on behalf of the Advisors or the Funds

16 ever asked the Issuers whether they believed the Debtor was in

17 default under the CLO management agreements, correct?

18 A    Correct.

19 Q    As the CCO, you have no idea if anyone on behalf of the

20 Advisors or the Funds ever asked the Issuers whether they

21 believed was in breach under the CLO management agreements,

22 correct?

23 A    Correct.  I believe there was a call that I wasn't a part

24 of, that it was just involving lawyers, that I don't know what

25 was discussed on the call.  So, correct.

Post - Direct                    148

1  Q   As the CCO, you have no idea if anyone on behalf of the

2  Advisors or Funds ever asked the Issuers whether they believed

3  it was appropriate to try to take steps to terminate the CLO

4  management agreements; isn't that right?

5  A   Correct.

6  Q   None of the Issuers joined any of the letters that were

7  sent on behalf of the Funds and the Advisors, right?

8  A   I didn't -- I don't recall seeing their names listed.

9  Q   As the CCO, you don't have any understanding as to what

10 the standard is for terminating the CLO management agreements

11 unless you get legal advice; isn't that right?

12 A   Yes.  It was -- it would be a discussion with counsel,

13 given the complexity of the agreements.

14 Q   But as a factual matter, you're not aware of any facts

15 that would support the termination of the CLO management

16 agreements except that there were trades that Mr. Dondero

17 didn't think were in the best interests of the Funds; isn't

18 that right?

19 A   Yes.  And because the belief was those trades weren't

20 maximizing value for the preference shareholders.

21         MR. MORRIS:  I move to strike everything after the

22 word yes, Your Honor.

23         THE COURT:  Granted.

24         MR. MORRIS:  I have no further questions.

25         THE COURT:  All right.  Mr. Rukavina?

Post - Direct                    149

1         MR. RUKAVINA:  Your Honor, I'll reserve my questions

2    for my case in chief.

3         THE COURT:  All right.  Mr. Post, that concludes your

4    testimony for now.  Stick around.

5       Mr. Morris?

6         MR. MORRIS:  Your Honor, last witness, and I hope

7    it's rather brief, actually.  The Debtor calls James Seery.

8         MR. RUKAVINA:  Your Honor, may we have a brief

9    restroom break, all of us in this room, before we start the

10   next witness?

11        THE COURT:  All right.  We'll take a five-minute

12   restroom break.  I know part of the long day is because of my

13   commitment at the lunch hour, but you all did estimate three

14   or four hours for this hearing, right?  That's what I recall.

15        MR. MORRIS:  We did.

16        MR. RUKAVINA:  Your Honor, I was never consulted on a

17   time estimate.  I had no idea that someone said three to four

18   hours.

19        THE COURT:  All right.

20        MR. MORRIS:  And part -- part of that is my fault and

21   the technological problems we had this morning, so I take

22   responsibility for that, Your Honor, and I sincerely

23   apologize.

24        THE COURT:  Okay.  Well, just so you know, we cannot

25   come back tomorrow.  I've got two -- too booked today tomorrow

150

1 to come back, so --

2       MR. MORRIS: I don't expect Mr. Seery to be more than

3 about 15 minutes.

4       THE COURT: Okay. We'll take a five-minute break.

5       THE CLERK: All rise.

6    (A recess ensued from 3:22 p.m. until 3:32 p.m.)

7       THE CLERK: All rise.

8       THE COURT: All right. Please be seated. I wanted

9 to clarify one thing I said, just so no one is confused. I

10 know that originally you had today, Wednesday, and Thursday,

11 26th, 27th, and 28th, for confirmation. So if anyone thought,

12 oh, we're coming back tomorrow on this if we don't finish,

13 because originally you had all three of those days, you know,

14 as soon as we continued the confirmation hearing, we started

15 filling in Wednesday. So we have three different Chapter 11

16 case matters set tomorrow. And so it was, you know, you give

17 up time and we have people usually wanting to get that time,

18 so that's what happened.

19    But anyway, people, we'll talk fast and we'll get it done

20 today, right?

21       MR. RUKAVINA: Your Honor, my -- Your Honor? Oh,

22 wait. I need to --

23       THE COURT: Ooh, it sounds like you're in a cave.

24 Let's get those headphones on.

25       MR. MORRIS: I promise to be as quick as I can, Your

151

1    Honor.

2            THE COURT:  Okay.  Mr. Rukavina, were you trying to

3    say something?

4            MR. RUKAVINA:  I was, Your Honor.  Can you hear me?

5            THE COURT:  Yes.

6            MR. RUKAVINA:  This darn video.  Too many -- Your

7    Honor, we have an agreed TRO that goes through February the

8    15th.  And I'm certainly not suggesting taking any more of the

9    Court's time than is necessary, but I cannot commit to

10   finishing today, especially because Mr. Morris has taken so

11   much time.  So I think we will do our best, but I just want

12   the Court to know that there's no urgency to this, and if we

13   have to come back at some point after Tuesday or Wednesday,

14   there's no possible harm to the Debtor.

15           MR. MORRIS:  Your Honor, it's my hope that we can get

16   this done, and I think the sooner we begin the better.

17           THE COURT:  Okay.  Well, we're going to try to get it

18   done.  All right, Mr. Seery.  You've called Mr. Seery to the

19   stand now?

20           MR. MORRIS:  Yes, Your Honor.  The Debtor calls James

21   Seery.

22           THE COURT:  All right.  Mr. Seery, please raise your

23   right hand.

24              JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

25           THE COURT:  All right.  Thank you.

```
                         Seery - Direct                    152

 1            MR. MORRIS:  May I proceed?

 2            THE COURT:  You may.

 3            MR. MORRIS:  Thank you, Your Honor.

 4                         DIRECT EXAMINATION

 5   BY MR. MORRIS:

 6   Q    Good afternoon, Mr. Seery.  Can you hear me okay?

 7   A    I can, yes.

 8   Q    Okay.  Let's just cut to the chase here.  You're the CEO

 9   of the Debtor; is that right?

10   A    That's correct.

11   Q    And in that capacity, do you understand that the Debtor is

12   party to contracts pursuant to which it manages certain CLO

13   assets?

14   A    Yes.

15   Q    And are you personally involved in the management of those

16   assets?

17   A    Yes.

18   Q    Do you have any prior experience managing other people's

19   money or other people's assets?

20   A    Yes.

21   Q    Can you please explain to the Court your experience and

22   your knowledge as to investing other people's money?

23   A    Yes.  I was a finance lawyer -- I'll go quickly, if it's

24   okay.  I can fill in later, if you like.  I was a finance and

25   bankruptcy lawyer for ten years before I went to Lehman on the
```

Seery - Direct                    153

1  business side in 1999.

2      In that role, I started immediately in distressed

3  investing.  I worked as part of a team of analysts and traders

4  to build distressed positions in prop (phonetic) business,

5  trading Lehman Brothers balance sheet at the time.  This was

6  in 1999 and 2000.  We were one of the most significant

7  investors on the Street, and I was part of that team, and a

8  leading part of the team, putting on significant investments

9  of our balance sheet, which was Lehman's money, into different

10 kinds of stressed, distressed, high yield investments.  That

11 included bonds, that included loans, unsecured, subordinated.

12 Sometimes equity.  Typically, we stayed in credit, but a lot

13 of this was very distressed credit, which often ended up as

14 reorg equity.

15     After that, I began running different teams for making

16 distressed loans to companies that no one else would lend

17 money to.  These investments were significant, anywhere from

18 fifty to a billion dollars.  Some of the largest transactions

19 in the world at the time were transactions I ran, like a

20 rescue loan to PG&E for a billion dollars.  That was in 2000.

21     After that, I continued to grow my career there, running

22 distressed investments.  In 2005, I took over the loan

23 business at Lehman.  That included all high-grade loans, high-

24 yield loans, trading and sales of those loans; managing that

25 portfolio, which was in excess of $10 or $20 billion,

Seery - Direct                     154

1    depending on the time; exposure both in committed transactions

2    as well as funded loans; the hedging of that portfolio;

3    traders and salespeople working for me.  In addition, I had

4    significant responsibility for the distressed book, as well as

5    all restructuring business at Lehman.

6        After Lehman, I -- and I was one of the people who sold

7    Lehman -- I became a senior investing partner at RiverBirch

8    Capital.  We were about a billion and a half dollar long/short

9    investor, mostly stressed and distressed, but a lot of high-

10   grade trades as well, particularly in preferred stocks.  That

11   was a global business, but primarily U.S., Europe, some Asian

12   investments as well.

13       Since then, I've gotten to Highland.  I've been

14   responsible for Highland's investments.  After the first

15   quarter, when the performance managed by Mr. Dondero was

16   absolutely disastrous -- we lost about $80 million in equity

17   securities, positions that he managed, about $50 million in

18   the Select Equity Fund, and about $30 million in the -- in the

19   Highland internal account.  After Jefferies seized the Select

20   account, I took over the --

21           A VOICE:  I think Mr. Seery has sort of gone beyond

22   the question of his background.

23           THE WITNESS:  He's asked me if I was experienced in

24   investing other people's money.  I was giving that background.

25   But we -- I can stop or I can keep going, if you like.

```
                        Seery - Direct                    155

1            THE COURT:  Okay.  If that was an objection, --

2            MR. MORRIS:  Let's --

3            THE COURT:  -- I overrule it.  Go ahead.

4            THE WITNESS:  I've been managing that portfolio.  In

5    addition, after Mr. Dondero left, but I actually started

6    looking at it before that, started taking over the CLO

7    portfolio, or taking a look at it, frankly.  We have a -- we

8    have an experienced professional sitting on top of it, Hunter

9    Covitz, who manages the day-to-day exposure.  But those

10   portfolios -- we call them CLOs, Your Honor, but I think

11   you've heard testimony before, they're not really.  Acis 7 is

12   a CLO.  The 1.0 CLOs are very old investment vehicles that are

13   primarily structured as, right now, closed-end investment

14   funds.  They don't have the typical diverse portfolio of loans

15   that a CLO has.  They have mostly reorg equity or positions in

16   real estate and in MGM.  So the -- the securities we've been

17   talking about in these trades are publicly-traded liquid

18   securities that Highland took as post-reorganization equity.

19   Q    Thank you, Mr. Seery.  Let's cut to the chase on the AVYA

20   and the SKY.  Nobody seems to have asked you this question,

21   but did you -- have you looked to sell AVYA and SKY securities

22   since the time that Mr. Dondero left in October?

23   A    I have, yes.

24   Q    Can you please explain to the Court your investment

25   rationale, the reason why you wanted to sell -- let's just
```

Seery - Direct                    156

1    take them one at a time.  Let's start with AVYA.  In the last

2    couple of months, why have you wanted to sell AVYA?

3    A    Well, the original impetus to sell AVYA came from Mr.

4    Covitz when it started moving up as a post-reorg security in

5    the communications space that had -- had really performed

6    extremely poorly post its Chapter 11.  Mr. Covitz over the

7    summer felt we should start lightening up on that position.  I

8    agreed.  He did that.  And Mr. Dondero eventually cut him off.

9         As it got to the fall, what I did was I got Mr. Covitz, as

10   well as then the analyst -- the analyst on that is Kunal

11   Sachdev.  That's the Highland analyst on the position -- as

12   well as Joe Sowin and Matthew Gray, who's another senior

13   analyst.  And I looked at all of the equity positions in the

14   CLOs and wondered why we had them.  What was the view?  Were

15   they worth keeping?

16        Primarily, the ones we looked at were four of the post-

17   reorg equities that were liquid.  A company called Vistra, a

18   company called Arch Coal.  Vistra is the old TXU, a well-known

19   bankruptcy.  Arch Coal, another well-known bankruptcy.  Avaya,

20   a bankruptcy; and Sky Champion, a less -- less-known

21   bankruptcy but came out of there.

22        Mr. Gray is the analyst on Vistra and Arch.  We

23   determined, based upon his recommendations, not to sell those.

24   Mr. Sachdev was the analyst on Avaya, and he believed that it

25   had reached its peak, and even though it could continue to go

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 688 of
2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 687 of
2722

Seery - Direct                        157

1    up or down -- stocks often do that -- he did not think that

2    the value was there.  His recommendation was to sell.

3        Mr. Sowin was in those meetings.  Prior testimony to the

4    contrary or any statements that were said before are

5    completely false, they're completely made up, so I know it's

6    frustrating and I apologize for -- for being frustrated.

7        So we decided that we would sell the Sky Champion.  A

8    pretty simple answer.  Highland didn't have an analyst.

9    Literally didn't have an analyst.  Nobody had a view as to

10   what the stock was.  It just sat in there, in two CLOs,

11   without anybody paying any attention to it.

12       I had Matthew Gray take a look.  He felt that it was at

13   fair value.  I did my own work on it, felt it was at fair

14   value, notwithstanding some good tailwinds in -- secular

15   tailwinds in the home building space, and determined that that

16   CLO should sell those securities.

17   Q   Thank you, sir.  Prior to his departure at Highland, did

18   Mr. Dondero have responsibility over the management of any of

19   the CLO assets?

20   A   He did, yes.

21   Q   And do you understand, do you know whether Mr. Dondero

22   sold AVYA securities on behalf of the CLOs and on behalf of

23   the Funds during the time that he was employed as the

24   portfolio manager from January until October 2020?

25   A   I do.  And he did sell those securities.  The chart you

Seery - Direct                              158

1  put up, based upon our business record, is accurate, and he

2  engaged in significant sales of those securities throughout

3  the year.

4  Q    Okay.

5       MR. MORRIS:  Can we please put upon Demonstrative #1?

6  BY MR. MORRIS:

7  Q    Okay.  And can you just explain to the Court what this

8  document is?

9  A    It's a trade report, one of Highland's -- this shows the

10 whole platform, so it's the aggregate sales.  The name of the

11 email -- I apologize, I forgot the system; it just left my

12 mind.  But the email you saw before is anybody on the platform

13 used for various trades if they're part of a trading group.

14 And that's to make sure that, across the portfolio, in its

15 corporate platform, you aren't running into either compliance

16 problems or allocation problems that could lead to a

17 compliance problem.

18 Q    So this shows sales of Avaya on these particular dates.

19 The trade is -- the trade symbol is AVYA.  This is a liquid

20 security.  Trades in, you know, liquid equity markets.  I

21 believe its average trading volume is somewhere about a

22 million and a half a day, approximately.  So you have a trade

23 date.  You have the type of transaction.  It could be a buy or

24 a sell.  These are all sales.  The quantity.  And then the

25 price.  And then it would have the Fund, and then the

Seery - Direct                          159

1  aggregate dollars, which is simply multiplying the price times

2  the quantity.

3  Q   And if we just scroll down to the end of the document,

4  October 9th, is that around the time that Mr. Dondero left

5  Highland?

6  A   Right around that time.  This was coming into a number of

7  hearings that we thought it was most important to have Mr.

8  Dondero depart, particularly in light of some of the positions

9  that he and his companies were taking vis-à-vis the Debtor.

10         MR. MORRIS:  Can we put up Demonstrative Exhibit #2,

11  please?

12  BY MR. MORRIS:

13  Q   Can you explain to the Court what this is?

14  A   Uh, --

15         MR. MORRIS:  And again, just for -- just for the

16  record -- sorry to interrupt, Mr. Seery -- the backup for this

17  information can be found at Debtor's Exhibits BBBBB to SSSSS

18  BY MR. MORRIS:

19  Q   Go ahead, sir.  Could you explain to the Court what this

20  is?

21  A   Yeah.  This is just a pretty straightforward chart showing

22  the bars being sales and the lines being the -- the closing

23  sale price of a buy on that day.  And so you can see, you

24  know, with the market fallout in the early part of the year,

25  AVYA hit a low, but like most of the securities in the market,

Seery - Direct                    160

1   it has come back very strongly.  And you see Mr. Dondero's

2   trades earlier in the year, the rest of it during the middle

3   part of the year, sales in the third quarter, and then, when

4   he's gone, I began selling in November and December.

5   Q   Now, so is it fair to say that Mr. Dondero and the

6   Defendants didn't completely impede and stop the Debtor from

7   selling AVYA shares?

8   A   That's fair.  What -- there's a little bit of confusion.

9   The way the trading desk worked previously is that you have

10  these separate companies but they're not really separate

11  companies.  HCFMA is populated by about seven employees.  Many

12  of them have functions across a number of different companies.

13  HCFMA exists solely because Highland funds it.  They haven't

14  paid fees of about three million bucks this year.  They owe

15  $10 million related to a disastrous bailout of what was an

16  open-end fund called Global Al a couple years ago where the

17  SEC, you know, came in and took significant action, almost

18  shut significant parts of Highland down.  And these traders do

19  the trading of all the equities across the platform.

20      So I typically would call them, and this is how we worked

21  in the spring when I took over the internal account after the

22  seizure by Jefferies of Mr. Dondero's management of the Select

23  Equity account.  I would work with Joe Sowin as the trader,

24  make decisions on what we wanted to do for the day, he would

25  execute those trades by going out in the market with a broker,

Seery - Direct                              161

1   selling them to -- to the dealer on the other side, run it

2   through our automated system, and then the trades get closed

3   with the back office.

4       So there's the trade, which is your agreement to buy or

5   sell at a particular dollar price.  That gets inputted into

6   the OMS system, and then from there it's the back office takes

7   over, and then ultimately securities are delivered versus

8   payment to the counterparty.

9   Q   Okay.  And can you just describe, you know, in one or two

10  sentences, your interpretation of this chart and how your

11  sales and the green bars compare to Mr. Dondero's sales and

12  the brown bars?

13  A   Well, the two simple obvious answers are, one, they're

14  smaller, and two, they're at higher prices.

15  Q   Okay.  You also traded, since Mr. Dondero's departure,

16  securities known as SKY; is that right?

17  A   That's correct.  It's Sky Champion Corp.  The ticker is

18  SKY.

19  Q   And did Mr. -- to the best of your knowledge, Dr. Mr.

20  Dondero trade in SKY securities prior to his departure?

21  A   I don't believe so.  As I said earlier, we didn't appear

22  to have an analyst on that for some time.  I don't even know

23  how far back it goes.  It was a bit of an orphan security

24  sitting in the portfolio.  It's only -- it was only in two of

25  the CLOs.

Seery - Direct                         162

1  Q   Okay.

2          MR. MORRIS:  Can we please put up Demonstrative #3,

3  please?  Okay.

4  BY MR. MORRIS:

5  Q   And can you just explain to the judge what's depicted on

6  this page?

7  A   Again, similar to the last chart, you have the dollar

8  price of the security at the close each day, throughout the

9  year, and then the green bar showing where we began to sell

10 securities for those CLOs.

11 Q   And so, again, is it fair to say that Mr. Dondero and the

12 Defendants haven't completely stopped the Debtor from engaging

13 in SKY transactions?

14 A   That's correct.  What we did was the so-called workaround

15 previously mentioned, was that we decided that I would have to

16 do the trading directly.  So I'd literally look at the stock

17 each day, talk to the broker at Jefferies, determine what

18 level to sell at, communicate with him throughout the day,

19 work through transactions.  Then he reports in whether he's

20 been able to sell and execute on our behalf.  When he's done

21 that, then we have the back office manually enter the trades,

22 as opposed to doing it from the automated trading desk, and

23 then have those trades close.  So, so far, knock on wood, we

24 haven't failed on any trades.

25 Q   Okay.

Seery - Direct                              163

1          MR. MORRIS:  We can the demonstrative down, please.

2   BY MR. MORRIS:

3   Q    Just two more topics here, sir.  Can we talk briefly about

4   what efforts, if any, the Debtors have made to avoid this

5   litigation?  I'll just ask them one at a time.  Has the Debtor

6   made any attempt to transfer the CLO management agreements to

7   the Defendants or to others?

8   A    Well, our original construct of our plan was to do that.

9   We've since determined, when we tried to do that, we got

10  virtually no response from the Dondero interests.  The

11  structure of the original thought of the plan was if we didn't

12  get a grand bargain we would effectively transition a

13  significant part of the business to Dondero entities, they

14  would assume employee responsibilities and the operations, and

15  then assure that the third-party funds were not impacted.

16        As I think I testified on the -- I can't recall if it was

17  the deposition or my prior testimony in court -- Mr. Dondero,

18  true to his word, told me that would be very difficult, he

19  would not agree, and he has made that very difficult.

20        So we examined it.  We've determined that we're going to

21  maintain the CLOs and assume them.  But we originally tried to

22  contemplate a way to assign those management agreements.

23  We've had --

24  Q    All right.

25  A    -- significant discussions with the CLO Issuers, and

Seery - Direct                              164

1  they're supportive of us retaining them.

2  Q    Okay.  You were on the -- you've been participating or

3  listening in to the hearing throughout the day; is that right?

4  A    I have, yes.  I apologize.  I didn't leave the screen on

5  because I didn't want to suck up bandwidth.

6  Q    Are you familiar with all of the K&L Gates letters that

7  that were reviewed today?

8  A    I am, yes.

9  Q    Did the Debtor request that the Defendants withdraw those

10  letters?

11  A    Yes, we did.

12  Q    Had the Defendants withdrawn those letters, might that

13  have avoided this whole litigation?

14  A    I think it would have.  What we wanted to have here is a

15  withdrawal of the letters and an agreement by the clients for

16  the -- the K&L Gates clients that they wouldn't interfere with

17  the operations of the Debtor and our drive towards a plan.

18  They could take their legal positions and object to the plan,

19  if they like, but interfering on a day-to-day basis was

20  unacceptable to us in terms of trying to operate this business

21  in the most efficient manner.

22      We specifically requested that they do that.  This is, I

23  don't think, lost on anybody, certainly not on me in my

24  experience here for years:  These entities are all dominated

25  and controlled by Mr. Dondero, and each of these attacks is

Seery - Direct                                        165

1   specifically coordinated for the purpose of diverting the

2   Debtor, causing confusion, and forcing us to spend estate

3   resources.

4   Q   Do you know if the Debtor also asked the Defendants to

5   avoid this whole injunction proceeding by simply filing their

6   motion to lift the stay and see if they could actually win a

7   motion to terminate the contract?

8   A   Well, what we did was we contemplated the best, most

9   efficient way out, and it was either withdrawing the

10  agreement; if they didn't agree, then we'd said you should

11  file your stay motion immediately and let's have this

12  determined.  We told them, short of that, if they weren't

13  willing to do that, then we would have to put this in front of

14  the Court to try to make sure that we could operate the

15  business.

16  Q   All right.  So, just to summarize, you attempted to sell

17  the CLO management agreements, but were unable to do so; is

18  that right?

19  A   I would say assign.  We would have looked for a payment,

20  there is a cure payment that we have to make, but we didn't

21  we didn't conduct an auction for the CLO assets.

22  Q   And to the best of your knowledge, the Defendants never

23  withdrew the letters; is that right?

24  A   They did not.

25  Q   And to the best of your knowledge, the Debtors -- the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 697 of
2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 696 of
2722

Seery - Direct                        166

1   Defendants never brought their contemplated lift stay motion,

2   right?

3   A    They have not, no.

4   Q    And so why did the Debtor bring this action?

5   A    Well, quite clearly, to try to prevent the managers and

6   Mr. Dondero and the Funds from interfering with the way that

7   we operate the business.  We intend to continue to manage the

8   CLOs, we intend to assume those contracts, we intend to manage

9   them post-confirmation, after exit from bankruptcy.  And

10  causing confusion among the employees, preventing the Debtor

11  from consummating trades in the ordinary course, deferring

12  those transactions, we thought put the estate at significant

13  risk, in addition to the cost.

14  Q    Did you hear Mr. Rukavina in the opening suggest that

15  these might, in fact, be money-losing contracts?

16  A    I did, yes.

17  Q    Why would the Debtor want to assume money-losing

18  contracts?

19  A    They're not money losing contracts.

20  Q    And why, why do you say that?

21  A    They generate fee income.  So the fees on each of these

22  CLOs get paid to the Debtor.  Now, not all of these CLOs, as I

23  mentioned earlier, are -- none of them are ordinary CLOs,

24  other than Acis 7.  But not all -- because they don't all have

25  liquid assets that are able to pay their fees each quarter,

Seery - Direct                          167

1   some are deferred.  There are some CLOs that will probably

2   never pay any deferred fee because they are underwater.  Those

3   are not CLOs that Mr. Dondero or the Funds own any of.  That's

4   not really a surprise.  But we will continue to manage those

5   and look for ways to exit for those investors who are

6   noteholders who are underwater in those CLOs.

7   Q   Okay.  Can you describe for the Court the Debtor's

8   contentions as to how the conduct that has been adduced

9   through today's evidence, how is the Debtor harmed by Mr.

10  Dondero's interference in the trades and the sending of these

11  letters?

12  A   I think it's clear in terms of operational risk.  Being

13  forced to construct a workaround to consummate trades that we

14  think are in the best interest of the Funds.

15      It's telling not only that neither Mr. Dondero nor Mr.

16  Sowin nor -- Mr. Sowin was on the calls and agreed to the

17  analyst view, by the way -- nor anybody from MHF ever asked me

18  a question, their lawyers in the deposition never asked me why

19  we were selling these securities.  They simply want to get in

20  the way, cause additional risk to the estate, and cause

21  additional exposure with respect to legal fees, divert our

22  attention from trying to consummate the case.  I think that's,

23  in my opinion, that's pretty clear.

24  Q   Is there any concern on the part of the Debtor that

25  that Mr. Dondero's emails and conduct is creating uncertainty

Seery - Direct                          168

1    among the staff as to who's in charge?

2    A    I think they did initially, and if they continued, they

3    would.  Right now, the workaround is working pretty well.  We

4    still do keep Mr. Sowin on the emails to make sure that, you

5    know, from a compliance perspective, that our sales, he knows

6    about; that we're not stepping on each other's markets, if you

7    will; that we're not getting in the way that -- in the way if

8    he wants to sell assets from a different MHF other managed

9    asset holding, but we do have a workaround that works right

10   now.

11       I think the biggest risk is, because it's much more

12   manual, you have risk of so-called fat-finger trades, where

13   you think you're selling a thousand and you sell 10,000, you

14   think you're executing a sale and you're executing a buy, you

15   think you're executing from an account that has the securities

16   and end up selling short from an account that doesn't.  So

17   we've got to be very careful of that, but the team is doing

18   that now.  There certainly was confusion at the start.

19   Q    And can you just explain to the Court your view as to how

20   the Debtor is able to -- how the Debtor will be able to

21   service the contract on a go-forward basis?

22   A    The CLO contracts?

23   Q    Yes.

24   A    We'll have a team of folks able to manage these assets

25   with professionals that are experienced credit analysts,

Seery - Direct                              169

1  equity analysts.  I think we'll be able to manage this --

2  these assets in a pretty straightforward manner.  It's not

3  going to be very difficult.

4  Q    Has the Debtor been harmed through the diversion of your

5  personal attention as CEO in responding to all of this?

6  A    I like to think that I can juggle a lot of different

7  things.  I would prefer not to have to be looking at the

8  securities levels each day and feeding out securities that we

9  determine to sell through the broker at Jefferies, who,

10 notwithstanding, is doing a great job.  It's the job of the

11 trader to actually do that and day-to-day -- throughout the

12 day monitor the markets and look for the best place to sell.

13      So do I think I'm getting the best execution?  I think the

14 trader at Jefferies is excellent.  Do I think if a trader on

15 the Highland side was involved every step of the way, I think

16 it would be better.

17 Q    Have the Debtor's professionals' attention and resources

18 been diverted to deal with all of this stuff?

19 A    That -- I think that's -- that's quite clear as well.

20 It's a significant expense.

21 Q    Okay.

22      MR. MORRIS:  Your Honor, I have no further questions

23 of this witness.

24      THE COURT:  All right.  Mr. Rukavina?

25      MR. HOGEWOOD:  Your Honor, if you please, Lee

Seery - Cross                                    170

1    Hogewood from North Carolina.  You've admitted me *pro hac*

2    *vice.*  If I may do cross-examination, I would appreciate it.

3             THE COURT:  All right.  Go ahead.

4             MR. HOGEWOOD:  Thank you, Your Honor.

5                        CROSS-EXAMINATION

6    BY MR. HOGEWOOD:

7    Q    Mr. Seery, let me ask you about the letters that came from

8    our firm, and especially from me, beginning on December 22nd.

9    I think you spoke about those generally.  If you need them to

10   be called up, I think my questions will be crisp as to the

11   letters generally, but we could certainly look at them

12   specifically, if need be.

13       There was initially a letter dated December 22nd, 2020,

14   that's Debtor's Exhibit DDDD, at Docket 39.  I take it you've

15   read that letter?

16   A    I have, yes.

17   Q    And it's fair to say that was a request you had seen

18   before?

19   A    I don't think that's fair to say, no.

20   Q    You had not seen a request to discontinue trades until the

21   confirmation hearing?

22   A    I don't believe so, no.

23   Q    Okay.  So that, that was the first time a request had been

24   made not to trade in the CLO securities prior to confirmation?

25             MR. MORRIS:  Objection to the form of the question.

```
                        Seery - Cross                    171
```

1           THE COURT:  Overruled.

2           THE WITNESS:  I --

3           THE COURT:  Go ahead.  You can answer.

4           THE WITNESS:  I don't recall you sending me a letter

5     before that, but I -- if you have, then I apologize.  I

6     thought I was pretty familiar with them, but I don't recall

7     you sending me that request previously.

8     BY MR. HOGEWOOD:

9     Q    Okay.  I'm sorry.  That was the first request you had

10    received from me, is that -- that's correct?

11    A    Yes.

12    Q    But there had been prior requests of a similar nature?

13    A    Not to my recollection.  Is there a letter?

14    Q    All right.  Well, let me -- let me move on.  You

15    weren't intimidated by my letter, were you?

16    A    Was I intimidated by your letter?  No, I was not

17    intimidated.

18    Q    And it didn't cause -- the letter itself did not cause you

19    or the Debtor to alter your investment strategy?

20    A    It did not, no.

21    Q    And it did not cause you or the Debtor to refrain from

22    operating the company in the manner that you perceived to be

23    in its best interest?

24    A    It did not.

25    Q    It did not cause you to change any of your trading

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 703 of
2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 702 of
2722

                              Seery - Cross                    172

1   decisions?

2   A    No.

3   Q    You and your counsel responded -- or, your counsel

4   responded to the letter a couple of days later; isn't that

5   correct?

6   A    Yes.

7   Q    And the response rejected the request that had been made

8   and demanded that the letter be withdrawn; is that right?

9   A    Yes.

10  Q    So the range of communication is a set of lawyers

11  representing adverse parties asserting their respective

12  positions?  Is that a fair characterization of that set of

13  communications?

14  A    No.

15  Q    Okay.  Would you characterize it differently?

16  A    Yes.

17  Q    All right.  How so?

18  A    I believe you sent a letter with no good-faith basis,

19  knowing what the contracts say as an experienced lawyer,

20  knowing there was not cause, yet still making the same

21  threats, basically couching them as a request.  But I don't

22  think there was any good-faith exchange of ideas.  No one even

23  asked me why I was making the trades.  I think you were aware

24  of that.

25  Q    You -- but you testified that, nonetheless, the letter did

Seery - Cross                              173

1   not cause you to conduct yourself in any other manner than you

2   would have conducted had you not received the letter; isn't

3   that right?

4   A   That's correct.

5   Q   So I think there's some confusion, then, and I just want

6   to clear this up. There was earlier testimony, both at your

7   deposition, that -- that my clients actually interfered with

8   and caused trades not to occur on or around December 22nd and

9   23rd of 2020. And that's not correct.

10         MR. MORRIS: Objection. Your Honor, the evidence is

11   in the record.

12         MR. HOGEWOOD: Okay. Well, let me --

13         THE COURT: All right. You're going to have to

14   rephrase.

15   BY MR. HOGEWOOD:

16   Q   Yeah. Let me -- let me say it differently. Focusing

17   solely on December of 2020, every trade that you initiated

18   closed; isn't that correct?

19   A   Every trade. Yes. We did not fail one trade.

20   Q   Okay. And so the issue that you have raised in your

21   pleading is that there were -- there was an expectation that

22   employees of my clients would book trades, which is

23   essentially a backroom operation, after the trade has closed.

24   Isn't that right?

25   A   That's incorrect.

Seery - Cross                              174

1  Q    Okay.  So, once again, let me just get -- there were no

2  trades that you initiated that failed to close; is that right?

3  A    That's correct.

4  Q    And nothing that was done by the Defendants resulted in a

5  trade that you wished to make in December of 2020 to fail to

6  occur or fail to close; isn't that right?

7  A    That incorrect.

8  Q    So you initiated a trade that did not close?

9  A    Yes.

10 Q    In December of 2020?  And when was that?

11 A    I believe that's the case, yes.

12 Q    And specifically what trade did not close that you

13 initiated?

14 A    I'd have to check the notes, but the specific trades were

15 my attempt to initiate the trade with the desk.  Then the

16 trading desk goes into the market and makes the sale.  Once

17 it's inputted into the order management system, referred to as

18 an OMS, then it gets processed for closing.  In November and

19 in December, Mr. Dondero instructed those employees not to

20 initiate those trades.  So there was never an agreement.  When

21 I initiated a trade, which was the workaround you saw referred

22 to, I quite simply called Jefferies directly and I had the

23 back-office folks manually input it instead of the trading

24 desk.

25      Sorry.  I just wanted to make sure we cleared that up.

                          Seery - Cross                    175

1  Q   No, just -- that -- that's helpful to understand.  But I

2  think, focusing again solely on December, every trade you

3  initiated closed?

4  A   Every trade that I actually went and made in the market

5  closed.

6  Q   And indeed, if --

7         MR. HOGEWOOD:  I observed your demonstrative

8  exhibits, and if I could ask that the one related to the Avaya

9  trades be called up, Mr. Morris.  is that possible?

10        MR. MORRIS:  Yeah, sure.  Is that the first one with

11 Mr. Dondero's trades, or do you want the chart?

12        MR. HOGEWOOD:  The -- the -- I think it was your

13 Demonstrative #2 that showed the timeline of the trades.

14        MR. MORRIS:  Yeah.  You bet.

15    (Pause.)

16        MR. HOGEWOOD:  Thank you.  Thank you very much.

17 BY MR. HOGEWOOD:

18 Q   So, just so I understand this document, the bottom axis is

19 the passage of time, and when we get into the period between

20 November of 2020 and the end of 2020, 12/31/2020, there are --

21 there's a green bar that has the numbers 50,000 at the top of

22 it.  That reflects what, Mr. Seery?  The number of shares or

23 the dollar amount of the trades?

24 A   Number of shares.

25 Q   And while this is not date-specific, do you know when

Seery - Cross                              176

1  those sets of $50,000 trades happened?  Or --

2  A    I don't --

3  Q    -- 50,000 shares trades happened?

4  A    I don't know the specific dates off the top of my head,

5  no.

6  Q    But looking at it just in comparison to the calendar, that

7  -- that's awfully close to December 22nd and 23rd, is it not?

8  A    It appears to be, yes.

9          MR. HOGEWOOD:  And Mr. Morris, if the I guess it's

10 the SKY document could be pulled up as well?  I just want to

11 be clear --

12         MR. MORRIS:  Demonstrative #3, please.

13         MR. HOGEWOOD:  Yes.  Thank you.

14 BY MR. HOGEWOOD:

15 Q    The  timeline on this demonstrative is similar, is it not?

16 A    Yes, it is.

17 Q    It's showing trades by day throughout the course of the

18 year?

19 A    That's correct.

20 Q    And again, there are a significant number of trades in SKY

21 on what looks awfully close to the few days before Christmas

22 of 2020; is that right?

23 A    That's correct.

24 Q    Okay.  And this is the period of time that we're talking

25 about there being interference by the Defendants' employees;

Seery - Cross                           177

1   is that right?

2   A    Yes.

3   Q    Okay.  I'll move on.  So, the next letter in question was

4   one that came the day after, on December 23rd.  Again, that

5   was a letter from me to your counsel.  Do you recall that

6   letter?

7   A    Yes.

8   Q    And the letter of the 23rd, if we need to look at it, is

9   the EEEE, Docket 39.  You read that letter as well?

10  A    Yes.

11  Q    And you disagreed with the position taken in the letter?

12  A    I'm trying to remember the specific position in that one.

13  Was that the one threatening to try to terminate the CLOs

14  without having checked whether there's cause?  I just don't

15  recall.

16  Q    Why don't we call it up, if we can?

17          MR. HOGEWOOD:  Mr. Morris, if you could help us,

18  because it's one of your exhibits, that would be great.  But

19  Ms. Mather has got it up, so that's great.

20  BY MR. HOGEWOOD:

21  Q    Mr. Seery, can you see the December 23rd letter?

22  A    I can, yes.

23  Q    And I think you referred to it as a threat to terminate

24  the portfolio management contracts?

25  A    I wasn't sure.  That's why I was just asking if this was

Seery - Cross                              178

1   that one.  I don't -- I don't recall.

2   Q    Right.  And if you review the first page and the second

3   page, does that confirm your recollection that that is the one

4   related to portfolio management contracts?

5   A    I can't see the second page.  I believe it is.  I'm not

6   trying to --

7   Q    Yeah, no, --

8   A    If you represent, I'll accept it.

9   Q    Take your time.

10  A    (Pause.)  Yes.

11  Q    Okay.  And I think you already said this:  You strenuously

12  disagreed with the positions stated in the letter?

13  A    Yes.

14  Q    But again, you were not intimidated by the letter?

15  A    Intimidated?  No.

16  Q    The letter didn't cause you to change your investment

17  strategy?

18  A    No.

19  Q    It didn't cause you to trade or not trade in a particular

20  manner?

21  A    No.

22  Q    You continued to function the Debtor's operations as you

23  deemed appropriate?

24  A    Yes.

25  Q    To your knowledge, no CLO or Issuer has taken any steps to

Seery - Cross                          179

1    remove the Debtor as the portfolio manager?

2    A    The CLO or the Issuers?

3    Q    Yeah.  No one's -- no one's taken a position that you

4    should -- that the Debtor should be removed as a portfolio

5    manager?

6    A    Not -- not from the Issuers, no.

7    Q    And -- or, I'm sorry.  And so when you -- when you brought

8    a distinction between the Issuer and the CLO, are you -- are

9    you referring to CLO Holdco?

10   A    No.

11   Q    Okay.  Has a CLO taken steps to remove the Debtor as a

12   portfolio manager?

13   A    The CLO is the Issuer.

14   Q    Okay.

15   A    So the answer is no.

16   Q    Okay.  So no one has -- no one has acted to take any -- to

17   do anything as it relates to the removal of the Debtor as the

18   portfolio manager?

19          MR. MORRIS:  Objection to the form of the question.

20          THE COURT:  Overruled.

21          THE WITNESS:  I'm quite sure the CLO Issuers haven't,

22   as they agreed and we've been working with them on an

23   assumption.  With respect to what your clients have done, I

24   don't know.

25   BY MR. HOGEWOOD:

Seery - Cross                          180

1    Q    But you don't have any evidence that my clients have taken

2    any action in violation of the automatic stay to -- to move or

3    encourage the removal of the Debtor as the portfolio manager,

4    do you?

5    A    Other than the letter?  No.

6    Q    Other than the letter between me and your counsel?

7    A    Correct.

8    Q    All right.  So, and that letter expressly states that any

9    of those actions that would be taken are subject to the

10   automatic stay and the Bankruptcy Code; is that right?

11   A    That's correct.

12   Q    And as we sit here today, the Debtor is not in breach of

13   any contract with any of the Issuers; is that right?

14   A    That's correct.

15   Q    And the letter didn't cause the Debtor to breach any

16   contract with any Issuer, did it?

17   A    Did not.

18   Q    And I think you've already testified today and you also

19   testified in deposition that you anticipate that the -- all of

20   the CLOs will consent to the assumption of the portfolio

21   management agreements in the context of confirmation; is that

22   right?

23   A    Yes.

24   Q    And the plan supplement that you recently filed, you

25   provide a mechanism by which the issue of for-cause

Seery - Cross                    181

1  termination is to be resolved, do you not?

2  A   I don't recall if there's a specific provision in the plan

3  supplement.  We certainly have, either in the plan or in the

4  plan supplement, a provision related to the gatekeeper

5  function.

6  Q   And that's similar to the settlement that you entered into

7  with CLO Holdco in terms of resolving both their objection to

8  confirmation and the lawsuit against them today; is that

9  right?

10 A   I believe it's similar.

11 Q   Okay.  And the gatekeeper is the Bankruptcy Court to

12 determine, short of a full-blown trial, that if cause exists,

13 isn't that correct, under the plan?

14 A   Among other functions, yes.

15 Q   So if the Court confirms the plan, then the concerns that

16 you have are resolved by the gatekeeper function that is the

17 subject of this motion; is that right?

18 A   I think it depends on the contents of the confirmation

19 order.

20 Q   And if the Court denies confirmation, then the stay

21 remains in effect and the letter related to the removal of the

22 portfolio manager was expressly subject to the stay; isn't

23 that right?

24 A   If the letter says it's subject to the stay?  It does say

25 that, but it says other false things as well, so I'm not sure

Seery - Cross                          182

1  -- I don't know exactly what you're asking me there.

2  Q   All right.  It wasn't a very good question, frankly.

3      Your counsel responded to the December 23rd letter as well

4  and demanded a retraction; isn't that right?

5  A   Yes.

6  Q   And that was sort of a separate (audio gap) with counsel?

7  A   I'm sorry.  You broke up for a second there, sir.  I'm

8  sorry.

9  Q   I'm sorry.  That -- that' -- let's just skip that.  You

10 had testified that neither letter was withdrawn?

11 A   I believe that's correct, yes.

12 Q   Are you familiar -- and -- are you familiar with the fact

13 that, in the response letters, your counsel insisted that

14 there be a response and withdrawal by not later than, I

15 believe, 5:00 on December 28th?  Do you recall that?

16 A   I don't recall that specifically, but I accept your

17 representation.

18 Q   And do you know whether or not there was a response dated

19 December 28th?

20 A   I don't believe there was a written response.  I don't --

21 I don't recall.

22 Q   All right.

23      MR. HOGEWOOD:  Ms. Mather, can you call up

24 Defendant's Exhibit 84, which is at Docket 45, please?  Thank

25 you.

Seery - Cross                        183

1  BY MR. HOGEWOOD:

2  Q   So, Mr. Seery, have you ever seen this letter dated

3  December 28?

4  A   I believe I have, yes.

5  Q   And this letter was not attached to the complaint nor your

6  declaration nor the request for a TRO or preliminary

7  injunction, was it?

8  A   If you say it wasn't.  I don't recall specifically.

9  Q   Okay.  So, you, by seeing this, you realize now there was

10 a response by the 28th.  Is that right?

11 A   Yes.

12 Q   And in the -- let me just direct your attention to the

13 final sentence of the first paragraph.  It says -- it makes

14 once again clear that the -- any efforts to remove the Debtor

15 as manager would be subject to applicable orders of the

16 pending bankruptcy case, provisions of the Bankruptcy Code,

17 and specifically, the automatic stay.  Do you see that?

18 A   I apologize.  I don't see it.  Which paragraph?

19 Q   I'm at the very last sentence of the first paragraph.

20 There's a sentence that --

21 A   (reading)  Subject to applicable orders in the pending

22 bankruptcy case, provisions of the Bankruptcy Code,

23 specifically, the automatic stay.

24     I read that, yes.

25 Q   Yes.  Okay.  There was some testimony about the letter

Seery - Cross                                        184

1  related to Mr. Dondero's eviction.  I don't intend to belabor

2  that.  But once again, that was a letter between counsel, was

3  it not?

4  A   I believe it -- I believe it was.  I don't recall

5  specifically now.  I assume -- I assume all of these were

6  directed to counsel.

7  Q   Right.  And again, the fact that counsel wrote a letter

8  requesting that the eviction not occur did not change your

9  process and you proceeded with the eviction, did you not?

10  A   I think the letter came after Mr. Dondero was no longer

11  permitted.  Eviction is an odd word.  He was no longer an

12  employee, so employee not being able to come into the office

13  and hang around and disrupt business isn't exactly an

14  eviction.  So I disagree with your characterization there.

15  Q   Okay.  Well, so I'll just leave that.  I mean, the --

16  since this exchange of letters, are you aware -- I mean, there

17  was some testimony about the Debtors presenting the Defendants

18  with the choice of either filing a motion for relief from stay

19  or this injunction proceeding would be brought.  Isn't that

20  right?

21  A   Yes.

22  Q   And no motion for relief from stay was filed, and

23  therefore this injection proceeding was brought.  Is that

24  correct?

25  A   Yes.

Seery - Cross                              185

1   Q    So the other thing that you know was filed by the

2   Defendants was an objection to confirmation, which was due on

3   January 5th of 2020, correct?

4   A    I'm sorry, Mr. Hogewood.  You broke up.  Did you say the

5   other paper or pleading that was filed?

6   Q    The pleading that was filed by the -- these who are

7   Defendants as well as other parties to this case was an

8   objection to confirmation, the deadline for which was January

9   5, 2020.  Are you familiar that an objection to confirmation

10  was filed?

11  A    I'm familiar that one was filed, yes.

12  Q    And so the objection to confirmation raised many of these

13  same issues regarding the circumstances under which the

14  various CLO agreements could be assumed; isn't that right?

15  A    I'm not aware of the specifics of the objection.

16  Q    Okay.  But nonetheless, my client was under no obligation

17  to initiate yet another motion or lawsuit or pleading against

18  the Debtor beyond objecting to confirmation, was it?

19  A    An obligation?  No.

20  Q    And since the objection to confirmation has been filed,

21  there have been a number of pleadings filed in the case.  We

22  obviously were required to respond to the motion for

23  preliminary injunction, and it says there's been an objection

24  filed to that.  Are you aware of that?

25  A    That -- that you objected to the preliminary injunction?

```
                        Seery - Cross                    186

 1    Q    Yes.

 2    A    Yes, yes, I'm aware of that.

 3    Q    And --

 4    A    I'm very aware.

 5    Q    And you're aware that there was a proposed settlement with

 6    HarbourVest; is that correct?

 7    A    We have an approved settlement with HarbourVest.

 8    Q    Right.  And there were objections filed to that particular

 9    -- or, to that particular settlement agreement, were there

10    not?

11    A    Yes.

12    Q    But none of my clients participated in that objection, did

13    they?

14    A    I don't recall the specifics of your clients versus the

15    other Dondero entities, but I'm certain Mr. Dondero

16    participated.

17    Q    But the De... the parties that we represent did not object

18    to the settlement?

19    A    I don't recall specifically.

20    Q    Okay.  And another motion that was filed was for an

21    examiner.  Isn't that correct?

22    A    I believe that's the case, yes.

23    Q    Yeah.  And my clients didn't join that motion, either?

24    A    No.  It's a bit of whack-a-mole, but they did not -- they

25    did not -- I don't -- I don't know.  To be honest, I don't
```

Seery - Cross                              187

1   know if they did or not.

2   Q    All right.  Toward the end of your testimony, you were

3   giving some information about the value of these management

4   contracts in terms of income over the course of the coming

5   year or two.  What is the projected revenue with respect to

6   these management contracts?

7   A    Do you mean the CLO 1.0 management contracts?

8   Q    Yes.

9   A    They generate about four-and-a-half to five million

10  dollars a year, depending on the asset base in total, but

11  that's accrual, as I mentioned earlier.  It doesn't all come

12  in in cash.  It depends on the waterfall.  Expect about two-

13  and-a-half to 2.7 million to come in per year during the

14  course of the projected time period.

15       (Echoing.)

16  Q    Have you done any sort of profitability analysis on the

17  management contracts?

18  A    Not specifically on those contracts, no.  We look at the

19  --

20  Q    Okay.

21  A    -- aggregate of the Debtor's receipts versus its costs.

22  Q    Can you -- so, --

23       MR. HOGEWOOD:  Ms. Mather, can you call up the

24  disclosure statement?  This is Docket 1473.  And in

25  particular, Page 176.

Seery - Cross                          188

1  BY MR. HOGEWOOD:

2  Q   So, I'm, Mr. Seery, I'm trying to square the 779 for the

3  month ended -- month period ended in March '21 and no further

4  revenue coming in on management fees with what you just said.

5  A   I'm not -- I'm not sure why.  This should -- certainly

6  should have the management fees according to the CLOs if this

7  was included in the assumption of those.  We have revenue,

8  they do generate revenue, they currently generate and they

9  will continue to generate.

10  Q   But this is the disclosure statement approved by the

11  Court, right?

12  A   Yes.  I'll have to come back and check why that for the

13  year doesn't have it, unless we were assuming that we wouldn't

14  receive any into the -- into this vehicle.  I just, I don't

15  know the answer.

16         MR. HOGEWOOD:  Your Honor, that's all the questions I

17  have.  Thank you very much.

18         THE COURT:  All right.  Redirect?

19         MR. MORRIS:  Can we just leave this up on the screen

20  for a second, very quickly, for Mr. Seery?  Can we put the

21  document back?

22                  REDIRECT EXAMINATION

23  BY MR. MORRIS:

24  Q   Mr. Seery, do you recall that the disclosure statement was

25  approved back in November?

Seery - Redirect                    189

1   A    Yes.

2          THE COURT:  Could you repeat the question?  I

3   couldn't hear it.

4          MR. MORRIS:  Yeah.  That is -- I don't know if

5   somebody's phone is not on mute.

6          THE COURT:  Yes.  Please put your device on mute if

7   you're not the one talking.  Okay.  Someone did.  Go ahead.

8          MR. MORRIS:  Thank you.

9   BY MR. MORRIS:

10  Q    Mr. Seery, do you recall that this disclosure statement

11  was approved back in November?

12  A    Yeah.  What I'd said earlier was that I'm not sure if the

13  -- this plan projection conforms with our decision to maintain

14  the CLO management contracts, and so there certainly should be

15  revenue, while it comes in quarterly on the management fee,

16  the base management fee.  And it's not always -- each CLO is

17  not always able to pay it in cash.  It will depend on our

18  ability to monetize assets, because they don't -- a lot of the

19  assets are not cash-generative.  Some are.  For example, the

20  Trussway loan is cash generative.  The CCS loan is not.

21       But I'm just not sure why this doesn't show the management

22  fees at all.  At least for the whole year, we certainly will

23  have them, unless this is prior to the determination to assume

24  those agreements.

25  Q    Okay.  So if the assumption in November was that the

Seery - Redirect                    190

1  agreements would be assigned, there would be no revenue shown.

2  Is that fair?

3  A    That would have been the assumption prior to us

4  determining that we wanted to assume them, yes.

5  Q    Okay.  And do you recall whether the Debtor became more

6  convinced that it would assume the contracts rather than

7  assign them before or after the disclosure statement was

8  approved?

9  A    I don't recall the specific timing, but a number of things

10 happened around this time.  First, the Dondero entities were

11 unwilling to even engage on assignment because they were on a

12 much more aggressive, quote, blow up the place strategy.

13 That's Mr. Dondero's quote.

14     Number two, we settled with HarbourVest, and that

15 significantly increased the value of maintaining the CLO

16 management.  The HarbourVest --  or the HCLOF entities own

17 significant preferred shares in the 1.0 CLO structures, and

18 having management of those and being able to monetize those in

19 accordance with the agreement, maximizing value for the

20 benefit of HCLOF, would be far, far better for the estate than

21 letting these assets just sit.  We're not trying to drive the

22 price down, because we wouldn't be in the business of trying

23 to buy back those securities on the cheap.  We're in the

24 business of trying to maximize value.

25 Q    All right.

Seery - Examination by the Court          191

1          MR. MORRIS:  I have nothing further, Your Honor.

2          THE COURT:  Any recross on that redirect?

3          MR. HOGEWOOD:  No, thank you, Your Honor.  Appreciate

4     the opportunity to appear before you.

5          THE COURT:  All right.  Thank you.

6       Mr. Seery, before we let you go, I have a couple of

7     follow-up questions.

8                     EXAMINATION BY THE COURT

9          THE COURT:  These CLOs, I mean, you've said a couple

10    of times they're not really traditional CLOs, except for the

11    Acis 7 one.  But I have this question.  I've learned back in

12    the Acis case most of what I know about CLOs, I suppose.  And

13    what the witnesses told me there were they typically had a 12-

14    year life, and then, yeah, there was some period, you know,

15    the first five years, seven years, something like that, where

16    it was in a reinvestment/refinancing phase, but then after

17    that, you know, we couldn't do that anymore and it was kind of

18    heading towards wind-down.

19       Anyway, my long-winded question is:  Do these CLOs work

20    generally like that or not?  Because you said they're

21    atypical.

22          THE WITNESS:  They -- they --

23          THE COURT:  Go ahead.

24          THE WITNESS:  They used to.

25          THE COURT:  Okay.

Seery - Examination by the Court                192

1      THE WITNESS:  So these are extremely old.  These go

2   back to 2006, '07, '08.  These are very old CLOs.  So they're

3   far beyond their investment periods.  Some of them are coming

4   up on their maturities on their debt.  Many of them don't have

5   any debt at all.

6      So you'll recall, Your Honor, that a CLO is a vehicle

7   where you take x-hundred million -- we'll use 400 for fun --

8   million dollars.  You ramp up $400 million of assets.  You

9   sell off, for our purposes, $350 million of securities.  You

10   have the AAA securities, the AAs, all the way down.  And then

11   you have these preference shares.

12      During a period of time, as cash is generated in the CLO,

13   the CLO is entitled to reinvest it.  And that keeps it going.

14   And then it gets beyond its reinvestment period and it's in

15   what folks usually refer to as its harvest period.  That's

16   when oftentimes, depending on where rates are, depending on

17   asset value, the rates for the debt obligations or the rate

18   you can receive on your assets, you may see refinancings or

19   resets.  Otherwise, the CLOs begin to wind down.  They have --

20   they don't have a life, like a partnership with a final date,

21   but there's maturities on the debt and then there's an

22   expectation that they would wind down.

23      These CLOs -- which typically CLOs only invest in

24   performing loans, and oftentimes, particularly Highland -- and

25   I could regale you with stories how Highland would take

Seery - Examination by the Court                    193

1    virtually non-interest-bearing, seventh lien debt -- that's a

2    bit of an exaggeration -- but just to keep the fees going, and

3    not actually convert to equity.  A lot of these, that wasn't

4    an option, so they've converted to equity.  So I just have one

5    that I happen to have on my screen, Your Honor, Gleneagles.

6    The assets in Gleneagles (echoing) are 16 -- MGMs.

7          THE COURT:  Okay.  Someone needs to put their phone

8    on mute.  All right.  I'm sorry.

9          THE WITNESS:  So it has -- it has -- the specifics

10   aren't particularly important, but its assets are -- just this

11   one I just pulled up; they're all a little different, and --

12   but mostly the same -- MGM stock.  This is MGM Studios, which

13   you read about with James Bond, a very valuable asset.  Across

14   the Highland platform, there's roughly $500 million worth of

15   stock.  It doesn't pay off any income.  So if it had debt --

16   and I'm not sure if Gleneagles still has any; I'd have to

17   switch screens; I don't believe it does; if it does, it's

18   small -- it wouldn't get any income-generating -- that's not

19   income generating asset.

20      Vistra, which is the TXU stock I talked about before, is

21   the next biggest asset.  Skyline Corporation, which was the

22   one we were selling.  That's no longer in there.  TCI

23   portfolio, which is a Dondero real estate asset it has, it's

24   an old Las Vegas and Phoenix, Arizona real estate

25   developments.  Not income-generating.  Not that they don't

Seery - Examination by the Court                194

1  have value, but this is much more like what would be referred

2  to as a closed-end fund.  It's not going to go out and buy

3  anything.  It can't.  It can only generate cash by selling

4  assets, give that cash to the trustee, and then the trustee

5  pays it through the waterfall.  And that's the way all of

6  these CLOs work.

7      Now, some of them do have debt.  And some of them have a

8  lot of debt, and the preferred shares will never be worth any

9  money, so we refer to those as being underwater.  No surprise,

10  the Dondero-related entities don't own any of those junior

11  securities.

12      The -- some do have debt.  A lot of that debt is going to

13  get paid off in the first half of the year because there'll be

14  refinancings at Trussway and a refinancing at Cornerstone.

15  They own debt, and that'll generate cash.  It'll go to the

16  CLOs, go to the trustee.  First it goes to pay the obligations

17  for the outstanding debt of the CLO, and then the asset

18  dollars, they get put through the waterfall to pay the more

19  junior securities.

20          THE COURT:  Okay.  And --

21          THE WITNESS:  And I --

22          THE COURT:  The --

23          THE WITNESS:  I was going to give you -- I contrast

24  that to a more typical CLO, which is whether it's beyond its

25  investment period or not, will have something like 150 to 250,

Seery - Examination by the Court                195

1  sometimes more, loans in it. 150 would be on the loan side.

2  It'll own -- own those in smaller amounts. It has

3  requirements as to what its concentrations are in different

4  buckets of types of assets. It has to return -- it has to

5  have an income-generating ability to satisfy certain covenants

6  in its debt obligations and in the indenture. And then it

7  will, once it gets past its investment period, it will start

8  to harvest those assets.

9      There are different ways for the CLO manager to swap

10  assets, to stay in compliance, to extend out the tenure, but

11  usually markets start to move and there's some reason for the

12  CLO manager to do something like a reset or a refinancing or

13  to call the CLO.

14      So you'll see a number -- there was one this week, and

15  there'll be a number because of the conditions in the market

16  -- of CLOs called by the, effectively, the equity, saying,

17  Great time to sell, I don't need the short income, call the

18  CLO, do a BWIC or some other way to get dollars for all of the

19  assets, pay off all of my debt, and give me the balance of the

20  proceeds.

21          THE COURT: Okay. All right. And the plan

22  contemplates that these will all be wound down over a two-year

23  period, correct?

24          THE WITNESS: It's not a hard -- it's not a hard

25  period.

Seery - Examination by the Court                196

1          THE COURT:  Okay.

2          THE WITNESS:  So it's not a two-year period.  We're

3    going to -- we're going to manage these assets, as any asset

4    manager would, and we've had direct discussions with some of

5    the underlying holders, including one of the biggest investors

6    in the world who's an investor in the CLO but also has a

7    couple separate accounts which they want us to manage, and

8    we'll look for opportunities, depending on the market.  We're

9    not going to -- we're not going to just sell.  It's not a

10   liquidation.  We're going to find opportunities where, if we

11   believe it's the right value, we'll sell.  That doesn't mean

12   we'll sell it all in a big chunk.  We may manage pieces.  We

13   may hold on to some.

14      Some of them may perform -- some of the assets may

15   actually do things differently than others.  For example,

16   Cornerstone, for unknown reasons, has $60 million of MGM

17   stock, not an asset that you'd think you'd stuff into a

18   healthcare business, but this is Highland.  That may be sold

19   before, for example, Gleneagles sells its MGM.  It'll just

20   depend on, you know, market and the need of the specific

21   investor.

22          THE COURT:  All right.  Thank you.  That's all the

23   questions I have.

24          THE WITNESS:  Thank you, Your Honor.

25          THE COURT:  All right.  So, Mr. Seery, I think we're

Seery - Examination by the Court          197

1   done with you, but we hope you'll stick around for however

2   longer this goes.

3          THE WITNESS:  I will indeed.

4          THE COURT:  Okay.

5          THE WITNESS:  Thank you.

6          THE COURT:  Does the Debtor rest, Mr. Morris?

7          MR. MORRIS:  Yes, Your Honor.  There were those

8   couple of documents that we had used from the different docket

9   that we'll certainly put on the docket with the supplement

10  witness and exhibit list.  I just wanted to point that out.

11  And I, you know, I don't recall, frankly, if I moved into

12  evidence each of those extras, and I'm happy to go through it,

13  but it's very important to me that those documents be part of

14  the record.  So --

15         THE COURT:  Okay.  I think what you added was TTTTT,

16  and I think I admitted it.  You moved to admit it, and I said

17  yes, but you're going to have to file it on the docket --

18         MR. MORRIS:  Yeah.

19         THE COURT:  -- as a supplemental exhibit.

20         MR. MORRIS:  Right.  And then there were the couple

21  from the other -- let me see if I can get them.

22         THE COURT:  I admitted everything else that you filed

23  on the docket except UUUU, VVVV, and AAAAA.

24         MR. HOGEWOOD:  Yeah.  And that's fine.

25      Can we, Ms. Canty, going from Docket No. 46, can we just

198

1  call up Exhibit K to make sure that that's in evidence?

2  Docket 46 from the Dondero adversary proceeding.

3      Okay.  So this was the letter, Your Honor, that I used

4  earlier today with Mr. Dondero.  If you scroll down, where I

5  examined him on the trading.  This is what led into the

6  December 22nd trading, if you go to the next page.  So if it's

7  not in evidence, I would respectfully request that this

8  document be admitted into evidence, Your Honor.

9          MR. RUKAVINA:  Your Honor, I object.  This document

10  is hearsay of Mr. Pomerantz.

11          THE COURT:  Okay.

12          MR. MORRIS:  Mr. Dondero has already -- I'm sorry,

13  Your Honor.

14          THE COURT:  Okay.  So this is -- I wholesale-admitted

15  all of your exhibits with those three carved out that I

16  mentioned.  So you're saying I've not admitted this one yet?

17          MR. MORRIS:  I just don't recall, because this wasn't

18  on the exhibit list. I will point out that we had no objection

19  to the entry into the evidence of all of K&L Gates letters,

20  and I'm really a little surprised, having heard the testimony

21  from Mr. Dondero on this particular letter, that there would

22  be an objection.  But I would respectfully request that it be

23  admitted as an exception to the hearsay rule.

24          THE COURT:  All right.  Well, I'm going to overrule

25  the objection.  I'll admit it.

199

1     So, again, it has to be supplemented on the docket.

2     (Debtor's Exhibit K is received into evidence)

3          MR. MORRIS:  Yes.  And there's just one other

4     document, Your Honor, from that same docket.  It's Exhibit D,

5     Ms. Canty.  I just want to make sure that's in the record as

6     well.  And I do apologize again, Your Honor.

7          THE COURT:  Okay.

8          MR. MORRIS:  I didn't realize until I was reading --

9          THE COURT:  We're getting terrible distortion.  I

10    don't know where it's coming from, but --

11         MR. MORRIS:  Okay.  And this is, this is the email

12    that I -- it's Mr. Dondero's own statement, so it's not even

13    hearsay, but I just want to make sure this is part of the

14    evidentiary record, Your Honor.  So I move for the admission

15    of this document as well to our exhibit list.

16         MR. RUKAVINA:  I believe this document has been

17    admitted.  I believe -- I believe --

18    (Echoing.)

19         MR. RUKAVINA:  Is that us?  Testing.

20         THE COURT:  All right.  Mike, where is that coming

21    from?

22    (Clerk advises.)

23         THE COURT:  Okay.  Mike thinks it's Mr. Morris, but

24    -- so put yourself on mute.

25    Mr. Rukavina, go ahead.

200

1          MR. RUKAVINA:  Your Honor, I think this exhibit is in

2    already.  If it's not, no objection.

3          THE COURT:  All right.  So it will be admitted, and

4    again, you need to file it as a supplement, Mr. Morris.

5        (Debtor's Exhibit D is received into evidence)

6          MR. MORRIS:  Yeah.  Thank you, Your Honor.  The

7    Debtor rests.

8          THE COURT:  All right.  Mr. Rukavina, I want to go a

9    while longer, so let's at least -- do you have Mr. Dondero as

10   well as Mr. Post?

11         MR. RUKAVINA:  I do, Your Honor.  I have both.

12         THE COURT:  Okay.  Well, let's go.  You may call your

13   witness.

14         MR. RUKAVINA:  Your Honor, we'll call Jason Post.

15         THE COURT:  All right.  Mr. Post, I swore you in

16   earlier and I consider you still under oath.  Do you

17   understand that?

18         MR. POST:  I do.

19         THE COURT:  All right.  Go ahead.

20      JASON POST, DEFENDANTS' WITNESS, PREVIOUSLY SWORN

21         MR. RUKAVINA:  Oh, turn on the video.  Can you see

22   how to do that?  Is Jason on the video?  Okay.  All right.

23   Mr. Post?  Hold on a second.  I'm hearing myself.

24         THE WITNESS:  I'm hearing the same.

25         MR. RUKAVINA:  Let me turn down my volume.  Testing.

Post - Direct                                    201

1   Okay.  Mr. Post, can you hear me?

2          THE WITNESS:  Yes.

3          MR. RUKAVINA:  Okay.

4                    DIRECT EXAMINATION

5   BY MR. RUKAVINA:

6   Q   You were asked about some of your background and

7   qualifications.  Just so that the record is clear, you are the

8   chief compliance officer for both two Advisors and each of the

9   Funds, correct?

10  A   Correct.

11  Q   And I think we refer to these three defendant funds as

12  retail funds; is that correct?

13  A   Correct.

14  Q   Describe what we mean or what you mean by a retail fund.

15  A   I look at it two ways.  There's private funds, which are

16  institutional in nature, and retail funds, which are comprised

17  of open-end funds, closed-end funds, BDCs, ETFs, and that

18  constitutes the suite of funds that are advised by Highland

19  Capital Management Fund Advisors and NexPoint Advisors.  And

20  they generally have a broad swath of investors, including

21  institutional investors, but also, you know, just regular mom-

22  and-pop investors.

23  Q   Okay.  So, for the Highland -- I'm sorry, for the three

24  retail funds, how much in ballpark investments do they have in

25  the CLOs that are at issue today?  Ballpark.

Post - Direct                                    202

1  A   Maybe call it a hundred million, ballpark.  Or a hundred

2  million, give or take.

3  Q   Okay.  And for all of the CLOs that Highland manages that

4  the Advisors and other Funds have an interest in, do you have

5  an estimate of how much it manages of CLO assets?

6  A   I believe it's approximately a billion, a little over a

7  billion that HCMLP manages for its CLO assets.

8  Q   Do you have an estimate of how many individual investors

9  there are in the three retail funds?

10  A   I -- thousands.  I don't have an exact number.

11  Q   Okay.  And I think you mentioned some of the types.  Do

12  you have any names of the types of investors that Her Honor

13  might know or have heard of before?

14  A   Off the top of my head, I do not, just -- but they're

15  generally constituted or characterized of the investor types

16  that I mentioned earlier.

17  Q   Okay.  Now, these three retail funds, do they own voting

18  preference shares in any of the CLOs that the Debtor manages?

19  A   Yes.

20  Q   Okay.  Do they own a majority in any of those CLOs' voting

21  preference shares?

22  A   In aggregate, across the three, they would.

23  Q   Okay.

24  A   With other CLOs.

25  Q   What are those three CLOs, sir?

Post - Direct                                      203

1  A    I believe it's Greenbrier, Graceland, and Stratford, if I

2  recall correctly.

3          MR. RUKAVINA:  Your Honor, have you received a

4  couriered binder of our exhibits?

5          THE COURT:  I have.  I've got them right here.

6          MR. RUKAVINA:  Now I can't hear the judge.  What's

7  she saying?

8          THE COURT:  Yes.  I've got them.

9          MR. RUKAVINA:  I think you're on mute, Judge.

10         MR. VASEK:  No, you turned your volume down.

11         MR. RUKAVINA:  Oh.  I apologize, Your Honor.

12     So, Mr. Vasek, if you'll please put Exhibit 2 up.

13  BY MR. RUKAVINA:

14  Q    Mr. Post, are you the custodian of records for the Funds

15  and Advisors?

16  A    Yes.  We're required to keep records of ownership and

17  trades for the Funds involved.

18  Q    And you are an actual officer of these Funds and Advisors,

19  correct?

20  A    Correct.

21  Q    Okay.  Are you familiar with this Exhibit 2?

22  A    I am.

23  Q    Did you participate in pulling together the underlying

24  information with others to prepare Exhibit 2?

25  A    I did.

Post - Direct                                    204

1  Q    Does Exhibit 2 accurately reflect the current ownership of

2  the various CLOs by the three retail funds that are --

3  A    At the time it was put together, I believe it did.

4  Q    And approximately when was that?

5  A    I believe it was in the November time frame, middle of

6  November, end of November.

7  Q    Do you have reason to believe that the numbers we're

8  referring to would be materially different today?

9  A    I don't believe they would be materially different.

10           MR. RUKAVINA:  Your Honor, I move for the admission

11 of Exhibit 2 as a summary of underlying data.

12           THE COURT:  All right.  Any objection?

13           MR. MORRIS:  Yes, Your Honor.  It's hearsay.  I

14 understand that the witness has testified to it, but just as I

15 put in the backup for my demonstrative, where's the backup?

16 We're just supposed to take his word for it?  There's no

17 ability to check this.  This is not evidence.  It's a

18 demonstrative.

19           THE COURT:  All right.  Mr. Rukavina, do you have

20 backup?

21           MR. RUKAVINA:  Let me ask the witness a couple more

22 questions.

23 BY MR. RUKAVINA:

24 Q    What would be the backup for this Exhibit 2?

25 A    We'd have to pull the holdings from the intranet and that

Post - Direct                                205

1  would identify the quantity that's held by each of the

2  respective funds and then an aggregate that, over the

3  preference shares outstanding, would give you the percentages

4  that are outlined in this exhibit.

5  Q    Okay.  And is that a database that you have personal

6  access and authority over?

7  A    I have personal access to it.  Yes.

8  Q    Okay.

9         MR. MORRIS:  Your Honor, *voir dire*?

10 BY MR. RUKAVINA:

11 Q   Can you easily take that data from a computer and show it

12 to the Court here today?

13 A    Yes.  It would just require the CUSIPs for each of the

14 preference shares and then plug it into the intranet and then

15 that would provide a screenshot of the ownership of the CLOs.

16 Q    And is this what that is, basically?

17 A    This is an aggregation -- or, this is a percentage of the

18 shares outstanding, the preference shares.  So what would be

19 shown on the intranet would be the quantity and then you'd

20 have to tie that back to the shares outstanding and that would

21 give you the percentages that are shown on this exhibit.

22         MR. MORRIS:  *Voir dire*, Your Honor?

23         THE COURT:  I'm sorry?

24         MR. MORRIS:  May I inquire before this --

25         THE COURT:  Mr. Morris, is that you?  Okay.  You want

Post - Voir Dire                              206

1    to take him on *voir dire*?

2              MR. MORRIS:  Yes.

3              THE COURT:  Go ahead.  Uh-huh.

4                   VOIR DIRE EXAMINATION

5    BY MR. MORRIS:

6    Q    Yes.  Mr. Post, did you prepare this document?

7    A    I provided information and the document was ultimately

8    prepared by counsel.

9    Q    So you didn't personally prepare this, right?

10   A    I didn't personally put this chart together.

11   Q    And you didn't personally make the calculations on this

12   chart, right?

13   A    I would have supplied or assisted in supplying the

14   holdings with reference to the shares outstanding and then

15   they would have done the math to place the percentages.

16   Q    I'm asking a very specific question.  You didn't do the

17   calculations necessary to come up with the percentages on this

18   chart, right?

19   A    Me personally, no, I did not.

20   Q    And you can't verify that this chart is accurate, can you?

21   A    I provided, provided the information.  Then it's a

22   mathematical calculation.

23   Q    Okay.  You didn't take any steps to determine the accuracy

24   of this chart, right?  You relied on others?

25   A    There's a -- I would have cross -- you know, maybe cross-

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 738 of
2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 737 of
2722

Post - Voir Dire                              207

1    referenced some of the percentages against another spreadsheet

2    that was -- that we had internally.

3    Q   Sir, I didn't want to know what you would have done.  You

4    didn't do anything to confirm the accuracy of all of the

5    numbers on this page, correct?

6    A   I believe I may have spot-checked a couple of them.  I

7    can't recall specifically.

8          MR. MORRIS:  Your Honor, not only don't we have the

9    backup, but this witness isn't even competent to testify to

10   the accuracy of the chart.  I renew my objection.

11         THE COURT:  All right.  I sustain the objection.

12         MR. RUKAVINA:  Your Honor, I'll --

13         THE COURT:  It's not allowed.

14         MR. RUKAVINA:  Going back to the -- take that down.

15         THE COURT:  All right.  Mr. Rukavina, we're -- our

16   connection to your office is suddenly not very good.  Both you

17   and Mr. Post are very hard to hear.  So let's see what we can

18   to improve.

19         MR. RUKAVINA:  Is it a question of loudness or

20   quality?

21         THE COURT:  Quality.  And I heard you fine just then,

22   but -- so let's try again.

23                    DIRECT EXAMINATION, RESUMED

24   BY MR. RUKAVINA:

25   Q   Mr. Post, let's go back to those retail funds.  How are

Post - Direct                                      208

1    those funds managed at the top level?

2    A    They're overseen by a board of trustees.

3    Q    Okay.  Do you interact with that board of trustees

4    periodically?

5    A    I do.

6    Q    Okay.  Approximately how often?

7    A    At least quarterly, and generally intervening periods.

8    I'd probably say anywhere from every five to six weeks, if not

9    more frequent.

10   Q    Have you been communicating with them more frequently

11   recently?

12   A    Yes.

13   Q    As the CCO of the funds, who do you ultimately report to?

14   A    The board.

15   Q    Is Mr. Dondero on any of those boards?

16   A    He is not.

17   Q    Okay.  Are those boards capable, to your experience, of

18   making independent decisions?

19          MR. MORRIS:  Objection to the form of the question.

20          THE COURT:  Overruled.

21          THE WITNESS:  I think the question, is are they

22   capable of making independent determinations?  Yes.

23   BY MR. RUKAVINA:

24   Q    Okay.  Explain the interaction between the Fund Advisors

25   and the retail funds.  What -- what does the one do for the

Post - Direct                    209

1    other, if you will?

2    A    I'm sorry.  Can you repeat that?  I didn't -- I didn't

3    hear the question.

4    Q    So, we have the three retail funds.

5    A    Yes.

6    Q    What relationship, if any, is there between the two

7    Advisor defendants and any retail fund defendants?

8    A    So, there's an investment advisory agreement that the

9    Funds have entered into with the investment advisor, and the

10   investment advisor performs investment functions on behalf of

11   those Funds, along with other noninvestment functions.

12   Q    Okay.  So is it fair to conclude that, for investment

13   purposes, the Advisors make pretty much all, if not all,

14   decisions for the three Funds?

15   A    Yes.

16   Q    Okay.  What about other matters that the board might

17   consider?  Do the Funds make -- I'm sorry.  Do the Advisors

18   make other decisions for the Funds, or is it an advisory role?

19   A    The Advisors may make other decisions or recommendations,

20   which they then set forth to the board for their approval, if

21   needed.

22   Q    Okay.  Does the board have independent counsel?

23   A    They do.

24   Q    Okay.  Have you interacted before?

25   A    I have.

                              Post - Direct                    210

1   Q    And is it fair to conclude that the board not only is

2   capable of making independent decisions but has made

3   independent decisions recently?

4              MR. MORRIS:  Objection.  Leading.

5              THE COURT:  Sustained.

6              THE WITNESS:  They have.

7              MR. RUKAVINA:  Okay.

8              THE COURT:  That was --

9              MR. RUKAVINA:  And we'll get --

10             THE COURT:  You don't answer.

11             MR. RUKAVINA:  Go into that in another bit.

12             THE WITNESS:  Oh.  Sorry.

13             MR. RUKAVINA:  Okay.

14  BY MR. RUKAVINA:

15  Q    Explain to the Court what your role as the chief

16  compliance officer for the Advisors and the Funds is.

17  A    I think, as you mentioned earlier, it's interaction with

18  the board.  Also with regulatory bodies to the extent

19  examinations occur.  It could be to ensure oversight and

20  compliance with a fund's prospectus and SAI limitations, and

21  then it's establishing policies and procedures and ensuring

22  that those policies and procedures are adequate to detect any

23  sort of violations that could occur by the Funds.

24  Q    And are you an attorney?

25  A    I am not.

Post - Direct                               211

1   Q   Do you frequently work with attorneys?

2   A   I do.

3   Q   Both in-house and external?

4   A   Yes.

5   Q   Good.  And do you frequently rely on the advice of

6   counsel?

7   A   I do.  At times will present, you know, if there is a

8   question or an issue, present the background to either

9   internal or external counsel and then request their advice on

10  certain matters.

11  Q   So when counsel was asking about why you wouldn't appear

12  at a hearing or listen to a hearing or read a transcript of a

13  hearing, are those the kinds of things that you would rely on

14  counsel?

15  A   Yes.  If counsel were to tell me to, you know, attend the

16  hearing, I would have attended the hearing.

17  Q   Okay.  Does -- do the Funds and Advisors also have in-

18  house counsel?

19  A   Yes.

20  Q   I think we established that's D.C. Sauter?

21  A   He's been the primary point of in-house counsel more

22  recently, I'd say, within the past three to four months.

23  Q   Okay.  And would you expect that perhaps he would be

24  attending hearings and reading transcripts instead of you for

25  some of these litigated matters?

Post - Direct                          212

1         MR. MORRIS:  Objection to the form of the question.

2         THE COURT:  Overruled.

3         MR. MORRIS:  Leading.

4         THE COURT:  Overruled.

5         THE WITNESS:  I believe he would be.

6   BY MR. RUKAVINA:

7   Q   Okay.  Well, the implication was made, Mr. Post, that

8   somehow you were negligent as CCO by not following the

9   December 16th hearing.  I'd like to know, --

10        THE COURT:  Okay.  Could you -- could you repeat --

11  BY MR. RUKAVINA:

12  Q   -- Did you have counsel at the hearing and did you hear

13  from --

14        THE COURT:  Mr. Rukavina, start over with your

15  question.  It was a little hard to hear.

16        MR. RUKAVINA:  Okay.

17  BY MR. RUKAVINA:

18  Q   Mr. Post, the implication had been made that, because you

19  weren't at the December 16th hearing and because you had not

20  read the transcript, that you were somehow deficient as a CCO.

21  I'd like to know, Did you have the benefit of outside

22  counsel's views both before and after that hearing as to that

23  hearing and what happened?

24  A   Yes.

25  Q   It's not that you put your head in the sand and ignored

Post - Direct                          213

1  what's happening, is it?

2  A    That is correct.

3  Q    Okay.  And is it fair to say that when you deal with

4  compliance, you deal with complicated statutes and

5  regulations?

6  A    That is correct.

7  Q    Okay.

8         MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

9  (garbled).

10      (Pause.)

11  BY MR. RUKAVINA:

12  Q    Okay.  Taking you back to Mr. Morris's questions, do you

13  recall Mr. Morris asking you whether you believe that any of

14  the trades that were being discussed were deceptive?

15         MR. MORRIS:  Hold on one second, Your Honor.  What

16  exhibit is this?

17         THE COURT:  I don't know.  What is it?

18         MR. RUKAVINA:  Can you hear me, Mr. Post?

19         THE WITNESS:  They're asking a question as to what

20  exhibit this is.

21         MR. RUKAVINA:  Your Honor, this is not an exhibit.

22  This is a Commission Interpreting Regarding Standard of

23  Conduct for Investment Advisors, an SEC regulation in

24  conjunction with 17 CFR 276.

25         THE COURT:  Okay.  How are we --

Post - Direct                          214

1          MR. RUKAVINA:  So, Your Honor, these are the actual

2     regulations.

3          THE COURT:  I mean, it's -- okay.  The answer to the

4     question is it's not an exhibit.  You have pulled up 17 CFR

5     part 276.  Is that what the answer is?

6          MR. RUKAVINA:  Yes, Your Honor.  And I haven't

7     offered this as an exhibit.

8          THE COURT:  All right.

9          MR. MORRIS:  You have -- Your Honor, I don't know why

10    this is being put up on the screen now.  It's not an exhibit.

11    It's not in the record like a couple of those that I had.  I

12    used the statute that he relied on to cross-examine him with

13    the 206.  I don't know what this is.  I don't know if it's

14    accurate.  I don't know anything about it.

15         MR. RUKAVINA:  Your Honor, this is a rule and

16    regulation.  This is not an exhibit.  If it is an exhibit, I

17    haven't moved to admit it yet.  I'm going to use this to

18    refresh his memory and explain why he believed that the

19    actions were deceptive, a door opened solely by Mr. Morris.

20         MR. MORRIS:  His recollection hasn't -- there's no

21    need to refresh it yet.  He hasn't even answered a question

22    where he says, "I don't remember."

23         THE COURT:  Okay.  I sustain the objection here.  I

24    mean, you can ask him a question, but, again, it's kind of

25    hard for us to tell what this is, actually.  I mean,

Post - Direct                              215

1  Commission Interpretation Regarding Standard of Conduct for

2  Investment Advisors.  I mean, is this actually a -- I mean,

3  it's not a statute.  I'm not even sure it's a reg.  It's --

4           MR. MORRIS:  Okay.

5           THE COURT:  I don't know what it is.  So, --

6           MR. RUKAVINA:  Your Honor, we'll lay a predicate

7  later.  First, let me ask some other questions.

8  BY MR. RUKAVINA:

9  Q   Again, you recall that you were asked whether, pursuant to

10 Section 206 of the Advisers Act, you believed the trades that

11 have been discussed were deceptive.  Do you recall?

12 A   Yes.

13 Q   Okay.  And you answered that you believed that they were

14 deceptive?

15 A   Correct.  I did.

16 Q   As the CCO, do you have an understanding of what role, if

17 any, conflicts of interest play in an advisor's duties under

18 the Advisers Act?

19 A   Yes.

20 Q   Okay.  What is your understanding?

21 A   All -- all known material conflicts of interests need to

22 be disclosed -- need to be disclosed by the advisor to the

23 underlying investors.

24 Q   Okay.  And why, why do those conflicts of interests have

25 to be disclosed?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 747 of
2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 746 of
2722

Post - Direct                                216

1  A    Because an advisor could have a view that may deviate from

2  the underlying investors' view of how the portfolio could be

3  managed and in contradiction to it.

4  Q    And do you have an understanding as to whether, pursuant

5  to your experience as the CEO [sic], the Advisers Act and the

6  SEC regulations (garbled) it require an advisor to adopt the

7  principal's goals as opposed to his or her own goals?

8            MR. MORRIS:  Objection to the form of the question.

9  Your Honor, he has not been offered as an expert.  He

10  shouldn't be permitted to provide -- this is -- this would be,

11  at best, expert testimony.  I asked him 30 different questions

12  about his background.  He's got no training.  He's got no

13  licenses.  He's taken no special courses.  He doesn't have

14  anything except on-the-job training.  This is not right.

15            MR. RUKAVINA:  Your Honor, Mr. Morris got to ask yes-

16  and-no questions all day, leading questions, and the witness

17  was told that he could explain his answers.  The Court told

18  him that.  And I am trying to explain his answer as to why he

19  believed that these transactions were deceptive, especially

20  because the allegation is that we willfully and intentionally

21  violated the stay by sending letters that this witness

22  authorized.  So understanding his understanding is very

23  important to Your Honor's determination of the actual --

24            THE COURT:  Well, I sustain the objection.

25            MR. RUKAVINA:  And Mr. Morris opened this door.

Post - Direct                           217

1          THE COURT:  You can ask him why he thought the

2    actions were deceptive, but he's starting to go into what may

3    or may not be CFRs and conflicts of interest.  No.  This is

4    going well beyond asking him, Why do you think it was

5    deceptive?  And I agree:  It's straying into expert testimony.

6    BY MR. RUKAVINA:

7    Q    Mr. Post, you are familiar with the December 22nd AVYA

8    and SKY sales and transactions which you were asked about by

9    Mr. Morris and that you previously have testified about,

10   correct?

11   A    Correct.

12   Q    Okay.  How are you familiar with those sales and

13   transactions as they were occurring?  How did you learn about

14   them?

15   A    There was some internal email correspondence.  If I recall

16   from memory, at the bottom it provided fill information that

17   Jefferies provided to, I believe, Mr. Seery and others on the

18   email.  And then it kind of worked its way up to get the

19   trades that had been executed administratively booked into the

20   OMS.

21   Q    Why did you get involved with those transactions?

22   A    They were requesting that employees of HCMFA book those --

23   I'm sorry, Highland Capital Management Fund Advisors -- book

24   those into the system.  And those employees were not a party

25   to the trade.  I don't believe --

Post - Direct                                    218

1  Q    Well, let me pause you.  Let me pause you.  Those two

2  employees, who were they?

3  A    Joe Sowin and Matt Pearson.

4  Q    Were they at that time employees of the Debtor?

5  A    They were not.

6  Q    Okay.  So, how did you come to learn about this ask that

7  those two employees book -- book it?

8  A    I believe there was an email that was sent to me, or I was

9  on it.  I can't recall specifically.

10 Q    Okay.  And did you undertake any review as to whether

11 those two employees should or should not do what was being

12 asked of them?

13 A    Once it was brought to my attention, I discussed with -- I

14 looked at it.  It looked like, pursuant to prior

15 correspondence with -- that Joe Sowin made, he wasn't aware of

16 the trades.

17      You know, I also had a discussion with K&L based off of --

18 our legal counsel based off of a prior letter that was sent,

19 and just it didn't -- it didn't look right that they would be

20 booking trades on behalf of the two Advisors that are named in

21 the letters when they had nothing to do with it and weren't --

22 weren't a part of any of the pre-trade compliance checks, et

23 cetera.

24 Q    What is a pre-trade compliance check?

25 A    Well, there's an electronic system, a -- or a management

Post - Direct                                      219

1  system we have, the OMS, which is called Verda (phonetic).

2  And generally, trades are entered into the system by the

3  portfolio manager, and they then go through pre-trade

4  compliance checks.  And once those compliance checks are

5  passed, they're then routed to the trading desk for direction

6  or execution, where the executing brokers and the trading desk

7  will then monitor that execution over the course of the day.

8  And at the conclusion of the trading day, those trades, if

9  they weren't already allocated, would be allocated, and then a

10  trade would be sent to custodian prime brokers to identify the

11  trades that occurred in the respective Funds for those -- or,

12  on that day, and then they would then be dropped into the

13  database and our -- the settlement team would kind of work to

14  settle those trades or ensure that those trades were settled

15  based off of the stipulated time frame for settlement on the

16  trades.

17  Q   So, in all that course of a transaction, what exactly was

18  it that those two employees of the Advisors were being asked

19  to do on behalf of the Debtor?  What exactly were they being

20  asked to do?

21  A   To just book them in the system because they are trades

22  that already have been executed.

23  Q   Did you stop that?

24  A   I believe I responded and said, you know, it -- they're

25  employees of, if I recall, employees of one of the named

Post - Direct                    220

1    Advisors, and believe those trades are in the best interest of

2    those Advisors, and separately, you know, the Debtor has

3    designated operators/traders that should be able to enter

4    those trades as well, aside from Mr. Sowin and Matt Pearson.

5    Q    So can you think of any reason why Mr. Seery would ask

6    your employees, as with his own employees, to book these

7    trades?

8    A    I believe based off of past practice.

9    Q    Okay.  But nevertheless, those two trades did not comply

10   with internal compliance?

11   A    They weren't run through the OMS.  We try and route trades

12   through the order management system because there's pre-trade

13   compliance checks that can be performed, and it reduces any

14   sort of back-end reallocation or trade errors that may occur

15   as a result of, you know, trades being entered after the fact,

16   because quantities could be, you know, referenced incorrectly

17   or funds could be identified incorrectly.

18   Q    Based on prior practices, have these internal policies

19   been followed when perhaps employees of the Debtor asked

20   employees of the Advisors to take a particular action in the

21   course of a transaction?

22   A    Yes.

23   Q    When internal practices are not followed, what is your

24   job?  What are you supposed to do?

25   A    When internal practices are followed, --

Post - Direct                221

1  Q    Are not followed.

2  A    Oh.  Not followed?  To the extent that they're not

3  followed, we would question, you know, number one, why weren't

4  they followed?  You know, we -- we try and have all trades

5  booked in the OMS so that the necessary checks could be

6  performed, and as I mentioned earlier, to avoid any

7  reallocation or trade errors.  So I would then question, you

8  know, why was this done outside of the system?

9  Q    And if you did not get an appropriate response back to

10 your question, what are you supposed to do?

11 A    If I didn't get an appropriate response, would, you know,

12 research it further and elevate it to senior management and/or

13 any of the board if it was ultimately an issue.

14 Q    Are you supposed to stop trades or stop the process if you

15 see something that you believe is not compliant with your

16 obligations and the fiduciary obligations of the Advisors?

17 A    Yes.

18 Q    Have you done that in the past?

19 A    Yes.

20 Q    Have you done that frequently, or infrequently?

21 A    I would say it's -- it's infrequent, but they do occur.

22 For example, if a fund is trading in a security that it's not

23 permitted to invest in based off of a prospectus limitation,

24 it would get flagged in the OMS and we would then not permit

25 the trade to go forward because it could cause the breach to

Post - Direct                                    222

1  go further offsides or it could cause it to go offsides.

2  Q   Okay.  And these December 22nd trades, were they the type

3  of, in your past experience, problematic trades like you have

4  interfered or stopped or intervened to stop in other

5  situations in the past?  Do you understand my question?  That

6  was an inartful question.  Do you understand it?

7  A   If the question is because they were done outside of the

8  system?

9  Q   Yes.

10  A   And repeatedly?

11  Q   Yes.

12  A   I would have raised the question with the trading desk or

13  the portfolio manager as to why that's being done, because it

14  was not in -- not consistent with how we instruct trades be

15  booked.

16  Q   Did Mr. Dondero, for these December 22nd transactions,

17  tell these two employees not to book the trades?

18         THE COURT:  Okay.  Please repeat the question.  It

19  was garbled.

20         MR. RUKAVINA:  Thank you, Your Honor.

21  BY MR. RUKAVINA:

22  Q   For these December 22nd trades, did Mr. Dondero tell those

23  two employees not to book the trades?

24         MR. MORRIS:  I object, Your Honor.  No foundation.

25  This witness has no personal knowledge to testify to this --

Post - Direct                                    223

1  to answer this question.

2           THE COURT:  Overruled.  If he knows.

3           THE WITNESS:  I do not know.

4  BY MR. RUKAVINA:

5  Q    Okay.  Do you have a reason to believe that he did?

6  A    I don't know.  I just saw the email traffic and Mr. Sowin,

7  I believe, was questioning the trades, you know, more in the

8  sense that he wasn't aware of them.  So, I don't -- I don't

9  know what kind of conversations, what happened in the

10 background, just that he -- he didn't recognized that rates.

11 Q    Let me try it this way.  You determined that these trade

12 would have violated the Advisors' policies and procedures,

13 correct?

14 A    Yes, because they were done outside of the OMS.

15 Q    Did Mr. Dondero tell you to come to that conclusion?

16 A    He did not.

17 Q    Did Mr. Dondero pressure you to come to that conclusion?

18 A    He did not.  He had indicated that there -- there are

19 these trades, and you should take a look at it from a legal

20 compliance perspective, which I did.

21 Q    And you talked to K&L Gates?

22 A    Correct.

23 Q    And when Mr. Dondero told you to look at these trades, did

24 he suggest to you in any way, shape, or form what you should

25 conclude or decide to do, if anything, with respect to these

Post - Direct                                      224

1  trades?

2  A    I don't believe so.

3  Q    Okay.  Let's go back to that question about your view that

4  some of what Mr. Seery was doing was deceptive under the 1940

5  Investors Act.  When did you form that view?

6  A    I believe it was after it was identified that there was

7  not (inaudible) on certain of the trades that were entered

8  into at the end of the November time frame, the SKY and AVYA

9  trades.

10 Q    And why did you form the opinion that those trades that

11 Mr. Seery was attempting to do or had done were deceptive

12 under the statute that Mr. Morris asked you about?

13 A    It was pursuant to reviewing them and supplemental

14 discussion.  A review with the portfolio managers and then

15 supplemental discussion with K&L be it from a (inaudible)

16 perspective, through, you know, perform in the best interest

17 of your clients, it was expressed that, at least with respect

18 to preference shareholders, they were supposed to maximize

19 value, and those sales, they're not really maximizing value.

20     And it was also identified that the Debtor was planning to

21 liquidate the CLOs based off of a filing within the Court

22 within a few-year period.  And the investors -- or, the Funds

23 that invested and the preference shareholders, or preference

24 shares, had a longer-time view in those assets.

25     So the sales, coupled with the short duration, or the

Post - Direct                    225

1   anticipated, you know, two-year duration, didn't line up with

2   the investment objective that they were seeking to maximize

3   returns.

4   Q    To your understanding and your experience, does the

5   servicer of the CLOs owe fiduciary duties to anyone?

6          THE COURT:  Okay.  I cannot -- someone is flipping

7   paper.  Please stop flipping paper.  Okay.  Repeat your

8   question, Mr. Rukavina.

9          MR. RUKAVINA:  Thank you, Your Honor.

10  BY MR. RUKAVINA:

11  Q    In your experience and in your knowledge, does the

12  servicer of the CLOs owe fiduciary duties to anyone?

13  A    They should, yeah, the underlying investors in the CLO,

14  whether it be the Debtor or the equity holders.

15  Q    Do the Advisors owe fiduciary duties to anyone?

16          MR. MORRIS:  Your Honor, I'm sorry, I apologize.  I

17  really do move to strike.  He's not a lawyer.  There is no

18  foundation.  He's not here as an expert.  There's no basis for

19  this witness to be talking about who owes who fiduciary

20  duties.  I don't even think that's the law, what's just been

21  stated.

22          THE COURT:  Okay.  I sustain.

23          MR. RUKAVINA:  Okay.

24  BY MR. RUKAVINA:

25  Q    Well, let me make it very easy, then.  Do you have an

Post - Direct                226

1  understanding as to whether Advisors subject to the 1940 Act

2  owe a fiduciary duty?

3  A    Yes.

4  Q    Do you have an understanding of how a conflict of interest

5  plays into a fiduciary duty?

6  A    Yes.

7  Q    What is your understanding?

8  A    If there's a material conflict of interest, it should be

9  disclosed.

10  Q    And what did you conclude with respect to Mr. Seery and

11  the Debtor once the Debtor stated that it will liquidate

12  within two years?

13  A    That's not the investment horizon that the underlying

14  preference shareholders have, especially with respect to the

15  underlying assets held in those CLOs.  More or less, you're --

16  they're now put on a clock, and those preference shareholders

17  may have a longer-term view on the underlying assets of those

18  CLOs.

19  Q    Let's move on to those December 22nd and December twenty

20  -- well, let me strike that.  You heard Mr. Seery testify that

21  those December 22nd trades closed, correct?

22  A    I did.

23  Q    And did you independently look at whether that's true?

24  A    I did.

25  Q    And what did you conclude?

Post - Direct                              227

1  A    They showed a sale in the -- on the intranet.

2  Q    Okay.  Let's move on to the December 22nd and December

3  23rd letters.  Are you familiar with those letters from K&L

4  Gates to counsel for the Debtor?

5  A    I am.

6  Q    And did you participate in preparing those letters?

7  A    I did.

8  Q    Okay.  And I think Mr. Morris asked you and I think you

9  testified you supported or agreed with the sending of those

10 letters.  Is that generally accurate?

11 A    Yes.

12 Q    Why?  Why did you support sending those letters?

13 A    It wasn't in the best interest of the Funds pursuant to

14 discussions with the portfolio managers and the investment

15 objectives that they were looking to seek any of those

16 investment in the preference -- preference securities and

17 CLOs.

18 Q    Was that a purpose that you were trying to achieve by

19 sending those?

20        THE COURT:  Repeat the question.

21        THE WITNESS:  Ah, --

22        THE COURT:  Repeat the question.

23 BY MR. RUKAVINA:

24 Q    Was that a purpose that you were trying to achieve by

25 sending those letters?

Post - Direct                                      228

1   A    Yes.  I believe there was something towards the end of one

2   or both letters that said, to the extent, you know,

3   transactions occur, if, for lack of better words, a courtesy

4   heads up could be given to the Funds and the Advisor.

5   Q    Did you intend in any way to intimidate the Debtor by

6   authorizing or supporting the sending of those letters?

7   A    No.

8   Q    Did you intend in any way to violate the automatic stay by

9   sending those letters?

10  A    No.

11  Q    Were you trying to engage the Debtor in a dialogue at that

12  time as to what to do with these CLO management agreements?

13  A    Yes.  I believe that was stated at one -- at the end of

14  one or both of the letters.

15  Q    And I think Mr. Morris discussed with you that the Debtor

16  sent back letters asking you to withdraw these two letters.

17  Do you recall that discussion?

18  A    Yes.

19  Q    And do you recall saying that we never withdrew these

20  letters, right?

21  A    Correct.

22  Q    Why did we not withdraw these letters?

23  A    Because we don't believe that the trades that are being

24  entered into are in the best interest of the shareholders --

25  *i.e.*, the Funds.

Post - Direct                                    229

1   Q    To your knowledge, did we ever, or did you ever,

2   communicate to the Trustees or Issuers anything in the nature

3   of instructing them to terminate the CLO management agreements

4   with the Debtor?

5   A    I did not.

6   Q    To your knowledge, did anyone, for the Funds or Advisors?

7   A    I don't believe so.

8   Q    Did you or anyone to your knowledge communicate to the

9   Issuers or Trustees that the process of removing the Debtor as

10  manager should commence?

11  A    I don't believe so.

12  Q    Okay.  To your knowledge, have any of the Issuers or

13  Trustees undertaken any steps to remove the Debtor or

14  terminate these contracts?

15          MR. MORRIS:  Objection to the extent it calls for the

16  conduct or knowledge of the Issuers.

17          THE COURT:  Overruled.  He can answer if he knows.

18          THE WITNESS:  I don't believe so.

19  BY MR. RUKAVINA:

20  Q    Had they, is that something that you would have expected

21  them to inform the Funds of?

22  A    Yes.  The Funds would have received some type of

23  notification if there was a new Advisor on the CLOs.

24  Q    So, other than these two letters -- let me stop there.

25  Did any discussion of trying to terminate these contracts

Post - Direct                                    230

1   basically cease with the sending of these two letters and the

2   Debtor's responsive letters?

3   A    That's my understanding, yes.

4   Q    Okay.  And we never did file a motion for lift stay.  Can

5   you explain to the judge why we didn't file a motion for

6   relief from the stay?

7   A    It's my understanding that the intent was that the

8   management of the CLOs was going to be heard in conjunction

9   with the confirmation hearing.

10  Q    And do you recall when that confirmation hearing was

11  originally set for?

12  A    I believe it was supposed to start today.  Or tomorrow.

13  Q    Well, wasn't it earlier in January?  Around January 11th?

14  A    Uh, I -- I don't recall specifically.

15        MR. RUKAVINA:  Mr. Vasek, if we could pull up the

16  Form CLO agreement.  What exhibit is that?

17      (Pause.  Counsel confer.)

18        MR. RUKAVINA:  No, that's not.

19        THE COURT:  Can I ask what we're about to start

20  doing?

21        MR. RUKAVINA:  Eight.

22        THE COURT:  Can I ask what we are about to start

23  doing?

24        MR. RUKAVINA:  Your Honor, I apologize.  I'm trying

25  to find one of the CLO portfolio management agreements.  I'm

Post - Direct                              231

1   trying to pull it up for you.

2          THE COURT:  Okay.

3          MR. RUKAVINA:  It should be in your binder.

4          THE COURT:  All right.  Well, --

5          MR. RUKAVINA:  Where is it, Julian?

6          MR. VASEK:  It should be 8.

7          MR. RUKAVINA:  I'm sorry?

8          MR. VASEK:  8.

9          MR. RUKAVINA:  Your Honor, it's Exhibit 8 in your

10  binder.

11         THE COURT:  Exhibit --

12  BY MR. RUKAVINA:

13  Q   And Mr. Post, you have that in front of you, right?

14         MR. RUKAVINA:  Mr. Vasek, if you'll go to Page 14,

15  please.  Section 14.  Termination by the Issuer for Cause.

16         MR. VASEK:  Okay.

17         MR. RUKAVINA:  Your Honor, the contract speaks for

18  itself, and I'm not about to read the contract to the Court.

19  The Court can read.  I want to ask him certain questions about

20  this.  And you'll note that the contract gives the requisite

21  holders of voting preference shares certain rights.

22         MR. MORRIS:  Your Honor, respectfully, the witness

23  has testified that he hadn't seen any of these contracts for

24  five or six years, until the lawyers asked him to look at it,

25  and they told him which specific provisions to look at.

Post - Direct                                    232

1    The document does speak for itself.  Counsel should just

2  make it part of his closing argument.  There's no evidence

3  that there's a quote/unquote Form CLO Management Agreement.

4  And I would just respectfully suggest that this is better

5  saved for closing argument.

6         THE COURT:  Yes.  What are we going to do here?  He

7  did not seem like he was an expert on these CLOs in his

8  earlier testimony.  He hadn't read much of them until

9  recently.  So where are we going with this?

10        MR. RUKAVINA:  Well, Your Honor, the question, again,

11  is -- can you hear me?  The question again is, Are we going to

12  be enjoined from exercising any rights in the future, so I

13  would like to take the witness through the importance from a

14  regulatory perspective and a fiduciary perspective of some of

15  these rights.  If Your Honor thinks that that's for closing

16  argument, that's fine.  But I will note that that Your Honor

17  allowed Mr. Morris for some forty minutes to read prior

18  testimony into the record.

19        MR. MORRIS:  I'm happy to respond if Your Honor needs

20  me to.

21        THE COURT:  Go ahead.

22        MR. MORRIS:  There is a complete difference, Your

23  Honor.  To read statements against interest, to read defense's

24  own sworn statements that they made at a prior proceeding, as

25  opposed to trying to get a witness who has admitted that he's

Post - Direct                                233

1   not familiar with these documents, to try to convince the

2   Court that they said something that the witness doesn't have

3   any personal knowledge or expertise about.  It's completely

4   different.

5          THE COURT:  All right.  I sustain the objection.  You

6   can make whatever argument you want in the closing arguments

7   about whatever provisions of whichever CLO agreements justify

8   actions.  I guess that's where we're going.

9          MR. RUKAVINA:  Then, if you could pull up Exhibit 78,

10  and if Your Honor could turn to Exhibit 78.

11         THE COURT:  All right.

12         MR. RUKAVINA:  Is this a confidential -- Julian, what

13  does it mean, it's confidential?  78.  Is this confidential?

14         MR. VASEK:  It says confidential on the --

15         MR. RUKAVINA:  Your Honor, apparently this is a

16  confidential document, so how does the Court want to proceed

17  on this WebEx?

18         THE COURT:  All right.  We're stopping.  We're

19  stopping.  We have protocols in place in this case, and people

20  usually file motions to present things under seal or

21  redactions.  My patience is shot, so we're going to stop.

22  Let's talk about where we go from here.

23         MR. MORRIS:  If I may, Your Honor?

24         THE COURT:  Yes.

25         MR. MORRIS:  John Morris from Pachulski Stang --

234

1          THE COURT: Uh-huh.

2          MR. MORRIS: -- for the Debtor.

3          MR. RUKAVINA: We filed this under seal, right?

4          MR. MORRIS: We were --

5          MR. RUKAVINA: Oh, I thought we had.

6          MR. MORRIS: -- hoping that we would get this

7    finished today, Your Honor, and the Debtor was really hoping

8    to get a ruling before confirmation. But given all that's in

9    front of us, including the contempt hearing next Friday, just

10   a couple of days after the confirmation hearing, I think the

11   Debtor at this point is prepared to agree, if it's okay with

12   the Defendants' counsel, to push this to the following week,

13   since the -- you know, with the understanding that everybody

14   stipulate on the record that the TRO stays in place. And if

15   we could have this particular motion heard, I guess, somewhere

16   -- it's the week of February 8th, the Debtor would consent to

17   that.

18          THE COURT: All right. Do we already have a --

19          MR. RUKAVINA: Your Honor, can the Court --

20          THE COURT: -- setting that week? Because I know we

21   have confirmation, what, are we set for the 2nd, 3rd, and 4th?

22   Three days next week.

23          MR. MORRIS: I believe -- yeah. I think it's just

24   two, Your Honor. I think --

25          THE COURT: Okay.

235

1      MR. MORRIS:  -- confirmation is the 2nd and the 3rd,

2  and then I think the 5th is the contempt hearing.  I'm not

3  aware, but I don't -- I don't profess to know the entirety of

4  the calendar.  I'm not aware of anything that's on for the

5  following week.

6      THE COURT:  Does it make sense to continue this to

7  the 5th?  Because the issues are so overlapping here.  I feel

8  like it's been a contempt hearing half of today, actually.

9      MR. MORRIS:  Yeah.

10      THE COURT:  So, shall we just set it for -- is it

11  Friday, the 5th?

12      MR. MORRIS:  It is.

13      THE COURT:  At 9:30?

14      MR. MORRIS:  And I think that's a great idea, yeah.

15  Yeah.

16      THE COURT:  What do you want to say about that, Mr.

17  Rukavina?

18      MR. RUKAVINA:  Thank you, Your Honor.  We're fine

19  with that.

20    Let me just point out, so that if the Court is impatient

21  or frustrated, we did move Exhibit 78 to be filed under seal.

22  The Court did enter an order allowing it to be filed under

23  seal.  So that the Court doesn't think that somehow we were

24  negligent in that.

25    But February the 5th works for us.

236

1          THE COURT:  Okay.  All right.  So I have an

2    unredacted clean copy up here, which, if and when I admit it,

3    we will put it under seal in our exhibit room, or I guess our

4    electronic exhibit room.

5      So, we'll come back on the 5th at 9:30.  But I am not -- I

6    am not done.  Yes, I am frustrated.  Yes, I'm impatient.  I

7    have asked myself "Why are we here?" so many times today.  Why

8    are we here?  I mean, I've had this conversation before.  I

9    mean, we had a, as you know, a very lengthy hearing on the

10   motion for a TRO or preliminary injunction against Mr. Dondero

11   personally.  And I think it was Mr. Morris who said, it's a

12   little bit like Groundhog Day.  You know, that was actually a

13   more flattering way of describing it than I might have.  I

14   might have said this is reminding me of Albert Einstein's

15   definition of insanity.  You all know what I'm talking about?

16   When you're doing the same thing over and over again and

17   expecting a different result.

18      And, you know, no offense, Mr. Dondero, if you're still

19   there listening, but that's what it feels like to me.  I mean,

20   it is -- it's the same thing over and over again.  And we've

21   spent very, very, very little time talking about the January

22   9th, 2020 corporate governance settlement agreement.  Of

23   course, it was mentioned extensively in the pleadings, at

24   least by the Debtor.  But, you know, I've heard all of this

25   evidence today, and I'm going to hear more evidence,

237

1  apparently, on the 5th.  But Paragraph -- was it 9? --

2  Paragraph 9 of the January 9th, 2020 settlement agreement.

3  The order directed Mr. Dondero not to "cause any related

4  entity to terminate any agreements with the Debtor."

5      And, you know, I thought to myself as I was reading,

6  preparing for this hearing, that, you know, I seem to remember

7  those words meant so, so much to me.  And then this reply

8  brief was filed by the Debtor at 6:00 or 7:00 o'clock last

9  night, and it gave an excerpt of the transcript, the hearing

10  where I approved this corporate governance settlement

11  agreement, and I said, that language is so important to me

12  because of my history in the *Acis* case, I want it in the

13  order.  I don't even -- I don't want it merely in the term

14  sheet, and then, of course, the order cross-references,

15  approves the term sheet.  I want that in the order.  Because,

16  you know, I knew, even with this highly-qualified independent

17  board of directors, and even with this very sophisticated

18  Creditors' Committee with very sophisticated professionals

19  monitoring everything that happened, and having not just the

20  monitoring rights but the standing to pursue things, I knew,

21  even with this great system that had been negotiated in the

22  January term sheet, there was the possibility of things

23  happening through Dondero-controlled entities indirectly.  And

24  so that's why we had that Paragraph 9.  So, --

25      (Interruption.)

238

1      THE COURT:  I don't know what that was I just heard,

2  but someone needs to put me on mute.

3    So, I mean, we've heard a lot.  We've heard a lot, but --

4      MR. DONDERO:  Hello?  Your Honor?  Your Honor?

5      THE COURT:  Okay.  I --

6      MR. DONDERO:  Hi.  Jim Dondero.

7      THE COURT:  Oh, okay.  I'm still talking.  I'm still

8  talking.  But I --

9      MR. DONDERO:  Okay.

10      THE COURT:  But I said --

11      MR. DONDERO:  I'm sorry.

12      THE COURT:  I said at the hearing on the preliminary

13  injunction as to Mr. Dondero personally, do you remember what

14  I said, I said life changed when you put your company in

15  Chapter 11.  And, you know, even if you had stayed on as

16  president of the Debtor, life changed.  Okay?  Because you're

17  a debtor-in-possession.  You have to say, "Mother, may I?" to

18  the Court.  Creditors get to object to things.  So things

19  changed.

20    But things really, really, really changed, you know, they

21  changed in October 2019, and then they changed dramatically in

22  January 2020, when independent board members were put in place

23  and you were taken out of management.

24    So, the reason I'm coming back to that concept is this:

25  I've heard a lot about the preferred shareholders didn't like

239

1  the trades Mr. Seery was implementing, the sale of AVYA, the

2  sale of SKY. They didn't like it. Well, I mean, I hate to

3  say something flippant like tough luck, but really: Tough

4  luck. Okay? We all know that with a company like this, with

5  a company like Acis, it's complicated, right? Because you've

6  got a fiduciary duty to your creditors to maximize value of

7  the estate so creditors get paid in Chapter 11, right? But

8  meanwhile, you know, you've got to have fiduciary duties, I

9  don't know if it's directly to preferred shareholders or just

10  to the CLOs. But whatever it is, you know, there may be

11  differing views that individual preferred shareholders have.

12  But Mr. Seery is in charge. The Debtor is in charge. You

13  don't like it, I'm sorry, but he's in charge.

14     So, you know, I thought, am I going to come in here today

15  and see all kinds of specific contractual references, where, I

16  don't know, somehow you have an argument that you can control

17  buys and sells? Of course, in this case, it would just be

18  sells at this point. You know, no. I knew I wasn't going to

19  see that. And I haven't.

20     So I don't know what I'm going to hear more on the 5th

21  that is going to tilt me a different way, but right now, if I

22  had to rule right now, this would be a total no-brainer to

23  issue this preliminary injunction. Okay? I feel like it's

24  been teed up almost like find Dondero in contempt, find these

25  entities in contempt. What I'm here on today is whether I

240

1  should issue a preliminary injunction, and the December

2  letters, the emails, the communications, they lead me to

3  believe that this preliminary injunction is needed because

4  someone doesn't understand that Mr. Seery is in charge and the

5  preferred shareholders, the Funds, the Advisors, they don't

6  have the ability to interfere with what he's doing in running

7  the company.

8      And the threats of we're going to, you know, direct -- we

9  may direct the CLO Issuer to terminate the Debtor:  I mean,

10 it's just -- there's no sound business justification for that.

11 Okay?  I don't know what we're doing, where we're going.

12     Mr. Dondero, I said to you in December, you know, I really

13 wanted to encourage good-faith negotiations on your possible

14 pot plan because I thought you wanted to save your baby.  But

15 the more I hear, the more I feel you're just trying to burn

16 the house down.  Okay?  Maybe it's an either/or proposition

17 with you:  I'll either get my company back or I'll burn the

18 house down.  That's what it feels like.  And I have no choice

19 but to enter preliminary injunctions with this kind of

20 behavior.

21     So, I'm very frustrated.  I'm very frustrated.  I don't

22 know if anyone wants to say anything or we just end it on this

23 frustrating note.

24     Mr. Rukavina, did you want to let your client speak, or

25 no?

241

1          MR. RUKAVINA: Your Honor?

2          THE COURT: Not your client.

3          MR. RUKAVINA: No, but --

4          THE COURT: The client representative.

5          MR. RUKAVINA: Your Honor, I take issue with what the

6    Court has said, but we did file a motion yesterday to file a

7    plan under seal. It is -- Mr. Dondero, can you mute your

8    phone? The Court should have seen that by now. It is a pot

9    plan with much more cash consideration. We have discussed it

10   with the Debtor and the Committee. We are in earnest

11   negotiations. I have no reason to believe or disbelieve that

12   we're close to a settlement.

13       But recall what I said at the beginning. We asked the

14   Debtor to continue this hearing. We said, You have a TRO that

15   ends February the 15th. Why are you doing this? Well, the

16   Debtor did it to smear Mr. Dondero on a very carefully crafted

17   record, without telling you the other half of it. And when I

18   tried to have Mr. Post explain it, opposing counsel won't let

19   me even tell you our views. So there is a competing plan. We

20   want to try --

21         THE COURT: You tried to get him to testify about

22   comments to CFRs when he has shown no expertise whatsoever --

23         MR. RUKAVINA: That's fine.

24         THE COURT: -- to permit that.

25         MR. RUKAVINA: And I understand, Your Honor. I don't

242

1  want -- Your Honor has made her evidentiary rulings.  I'm not

2  here to second-guess them.

3      I'm telling you that Mr. Dondero -- and more importantly,

4  the other companies, *i.e.*, NexPoint -- we heard you loud and

5  clear.  We did not just send forward some cocktail-napkin term

6  sheet.  I spent the weekend and Friday preparing a

7  comprehensive plan and disclosure statement.  I hope that the

8  Court will allow it to be filed under seal.  Exclusivity has

9  expired.  I am asking to file it under seal only.

10         THE COURT:  Tell me what utility that has.  What

11  utility does that have if you don't have one plan supporter?

12  I mean, where are we going with this?  I have invited, I have

13  encouraged, I have directed good-faith negotiations with the

14  Committee.  If you don't have the Committee on board, what

15  utility is there in allowing you to file a plan under seal?

16         MR. RUKAVINA:  Well, if it's filed under seal, Your

17  Honor, then, really, no one is going to be prejudiced or hurt.

18  But we have not been told --

19         THE COURT:  Then why --

20         MR. RUKAVINA:  -- from the Committee --

21         THE COURT:  Then why are we doing it?  Help me to

22  understand the strategy.  Maybe I'm just naïve.

23         MR. RUKAVINA:  Your Honor, there is no strategy and

24  the Court is not naïve.  Pursuant to an agreement of the

25  Committee and the Debtor, I sent that draft plan to them over

243

1   the weekend, and they agree it's not solicitation. It has not

2   gone to the creditors. No one has seen it.

3       The reason why we sent it to the Committee and the Debtor

4   was to foster ongoing negotiations. We had negotiations last

5   night. The Committee and the Debtor had negotiations last

6   night. We've been promised a response in the next couple of

7   days, and we have a follow-up meeting scheduled for Thursday.

8       The reason why I wanted the plan filed under seal is so

9   that there is a record of what is being discussed so the U.S.

10  Trustee can see it, if she wants to, and so that other key

11  constituents, if they want to or have a reason to, can see it.

12      But I agree with you: That plan ain't going nowhere if we

13  don't have some material creditor support. We won't know that

14  for a couple more days.

15      So my only point in saying this to Your Honor is that we

16  are working earnestly, we are increasing our consideration, we

17  have heard you loud and clear, and all the parties are

18  negotiating.

19      Again, we did not want this hearing to happen today

20  because it's a step backwards from negotiations, not a step

21  forward. Thank you.

22          MR. POMERANTZ: Your Honor, may I be heard?

23          THE COURT: Go ahead, Mr. Pomerantz. Go ahead.

24          MR. POMERANTZ: Mr. Rukavina sent us over the plan,

25  and we had no problem with it being sent to the Committee. He

244

1    then sent us over the motion.  Now, aside from the fact that

2    the motion contains some statements which the Debtor strongly

3    disagrees with, with respect to the ability of administrative

4    claims or other claims to be assumed, but putting that aside,

5    we were concerned that the filing of a plan on the docket,

6    unsealed, would be a distraction.

7        Having said that, we also saw utility in the plan being

8    put in the hands of the largest creditors so that they can

9    evaluate what was being proposed.

10       We told Mr. Rukavina we have no problem if the plan was

11   filed under seal, stayed under seal until after confirmation,

12   and then, in exchange, we would agree to something that we

13   don't think we had to agree:  That he could send the plan to

14   UBS, to Acis, to Redeemer, to Meta-e, to HarbourVest, and

15   Daugherty.  Essentially, all the players in the case.  Mr.

16   Rukavina said he would consider that, and then just filed his

17   motion.

18       We don't have any problem with him doing that still,

19   sending it to the six creditors so they can look at it.  We

20   don't think it should be unsealed on the docket.

21       And the discussion of status of negotiations, Your Honor,

22   as we've told you many times before, we would love there to be

23   a plan.  We would love there to be support of a plan.  Mr.

24   Dondero asked to approach the board and speak to the board

25   yesterday.  We heard him out.  The plan essentially is the

245

1 same document and the same term sheet, I think, that has been

2 floating around for several weeks.

3      Having said that, we said, We are not going to stand in

4 the way of Mr. Dondero and the Creditors' Committee.  And if

5 the Creditors' Committee and Mr. Dondero have a meeting of the

6 minds, if there's any desire of them to have more time, we

7 would be supportive of it.  I'll let Mr. Clemente respond as

8 to whether there's any negotiation -- (echoing.)  But when Mr.

9 Rukavina said that last night there were negotiations between

10 the Debtor and Mr. Dondero, that's just not accurate.  We, we

11 look at ourselves as the honest broker.  But at the end of the

12 day, as Your Honor has remarked many times throughout this

13 case and just remarked a few moments ago, unless the

14 Creditors' Committee supports this plan, it is DOA.  And we

15 have communicated that several times to Mr. Dondero and his

16 team.

17      So, I just wanted to speak to correct the record.  We're,

18 again, supportive of a plan if there can be one.  But at this

19 point, we haven't seen anything, the parties coming any closer

20 or any more negotiations, and we just have to get confirmed

21 sooner rather than later (echoing), prepared to go forward.

22           MR. CLEMENTE:  Your Honor, it's Matt Clemente at

23 Sidley.  I'm happy to make some comments to Your Honor, --

24           THE COURT:  Okay.

25           MR. CLEMENTE:  -- if you -- if you wish.

246

1          THE COURT:  Please do.

2          MR. CLEMENTE:  I think it's fair to say that the

3    Committee believes the plan needs to go forward next week,

4    Your Honor.  We have, of course, taken your direction very

5    seriously, and we very seriously consider all of the

6    communications we get from Mr. Dondero.  There exists still a

7    material value gap in what is being offered under Mr.

8    Dondero's plan, as well as a quality of the value.

9        So, Your Honor, while we continue to consider the plan and

10   what we receive from Mr. Dondero, I do not want to leave Your

11   Honor with the impression that the Committee feels like we are

12   close to an agreement, and we anticipate going forward with

13   the plan next week.

14       That being said, we of course will respond to Mr. Dondero

15   as we review the plan, but as I sit here today, I don't

16   believe that we are close.  But, again, the Committee will

17   continue to review it, and we should anticipate going forward

18   with confirmation next week.

19          THE COURT:  All right.  So, you don't have any

20   problem with the plan being filed under seal?

21          MR. CLEMENTE:  Your Honor, we -- the Committee does

22   have the plan, and I guess I'm not sure I'd see the point of

23   having it filed it under seal.  I think it serves to confuse

24   issues.  But, you know, hearing what Your Honor said earlier,

25   I don't think we need to continue to bring different fights in

247

1  front of Your Honor, so I'm not sure that I see necessarily

2  the harm in a plan being filed under seal, again, with the

3  idea that, you know, why bring -- continue to bring fights to

4  Your Honor if we don't need to?

5          THE COURT:  All right.

6          MR. CLEMENTE:  But what I do think is clear, Your

7  Honor, that I do want to express to you is that the

8  representations in that motion the Committee do not believe

9  are accurate.  We do not believe that there's been a

10  significant value increase.  We do not believe that we are

11  close.  That would be the point that I would make in

12  connection with a response to that motion.  So, but in terms

13  of filing it under seal, I'm not sure the Committee has a

14  strong feeling that that should not happen.

15          THE COURT:  Yes.

16          MR. RUKAVINA:  And Your Honor, very quickly, --

17          THE COURT:  The words --

18          MR. RUKAVINA:  -- I never represented that we're

19  close.

20          THE COURT:  The words I remember in the motion were

21  significant value increase, something to that effect.  But

22  also more recovery than the plan that's on file.

23      (Echoing.)

24          THE COURT:  So I was kind of darn curious to see it

25  just for that.

248

1      MR. RUKAVINA:  And Your Honor, obviously, because

2  there's many people on this call, I don't want to run afoul of

3  any kind of procedures.  I'd be happy to walk Your Honor

4  through, but I can't, not with 90 people on the call.

5      THE COURT:  Right.

6      MR. RUKAVINA:  I did not represent that we're close

7  to a settlement in that motion, and I did not send the plan to

8  those people that Mr. Pomerantz mentioned.

9    So, right now, the Committee, the Debtor, and the

10 employees, because they requested it after Mr. Pomerantz

11 approved it, have what I would like to file under seal.  I'm

12 not suggesting here today that it go any farther than being

13 filed under seal, but at least it be there for some record.

14      THE COURT:  Well, didn't you -- did I dream this? --

15 didn't you say that there would be something like 48 hours for

16 people to object or then it would be filed not under seal?

17 Did I dream that?

18      MR. RUKAVINA:  Your Honor, that was my proposal, and

19 Your Honor can certainly reject that.  Mr. Pomerantz asked

20 that the plan should never be unsealed pending confirmation of

21 the Debtor's plan.  I have a different proposal.  Your Honor

22 will rule and we'll comply with Your Honor's ruling.

23      MR. DONDERO:  Jim Dondero here.  Can I have two --

24 two quick minutes and just say two quick things?

25      THE COURT:  Well, only if your counsel permits it.  I

249

1  don't want to get in --

2        MR. RUKAVINA:  I just don't -- yeah.  Mr. Dondero, if

3  you would please just not describe the substance, the economic

4  substance of our proposed plan, not with so many people on the

5  line.

6        MR. DONDERO:  Sure.  I just want to make two quick

7  points.  I couldn't apologize more for taking the Court's time

8  today.  It wasn't our 'druthers.  You heard, I think, at least

9  five or six hours from the Debtor.  You never once heard them

10  say that their activities didn't violate the Advisers Act.

11  And they never once said that violating the Advisers Act

12  wasn't a big deal.  You know, they never said that.

13      What they tried to say, oh, we have these other contracts.

14  Let's try and turn this into an injunction against Dondero

15  interfering.  But they never -- they never denied that Dondero

16  and the NexPoint team was trying to do what was in the best

17  interest of investors and that they had violated the Advisers

18  Act.

19      I think, in normal course, each side would have had an

20  expert and you could have opined on whether it was a violation

21  of the Advisers Act, but they know they did something wrong so

22  they're trying to make it an injunction against me.  Okay.

23  That's all I have to say about that point.

24      As far as the alternative plan, Your Honor, we heard you

25  loud and clear.  And the economics that we put forward, I

250

1  can't talk them about specifically, but they're at least 20

2  percent better than what the Debtor has put forward as far as

3  a plan.  And what we put forward is elegant, it's simpler, it

4  treats the employees fairly, it gives the business continuity,

5  it gives investors continuity, and it's not just a harsh,

6  punitive liquidation that's going to end up in a myriad of

7  litigation.

8      We're paying a premium, it's a capitulation price, to try

9  and get to some kind of settlement.  And I encourage you to

10  look at it.  It's elegant.  It's straightforward.  It's

11  simple.  And now that you've encouraged and gotten us up to a

12  number that's well in excess of the Debtor, maybe a little

13  pressure on other people to treat employees fairly, maybe not

14  liquidate a business that's important in Dallas, that has been

15  a big business for a number of years, doing enormous good

16  things for a lot of people.

17      You know, we went into bankruptcy with $450 million of

18  assets and almost no debt.  And we've been driven into the

19  ground by the process.  And then the plan is to just harshly

20  liquidate going forward.  I -- I -- it's crazy.  I don't know

21  what else to do to stop the train other than what we've

22  offered.

23          THE COURT:  All right.  Well, I hear what you're

24  saying, and I do, just because -- I don't know if you left the

25  room or not, but we did have discussion of Section 206 of the

251

1    Investment Advisers Act today.  It was put on the screen.  Mr.

2    Post was asked what was unlawful as far as what had happened

3    here, what was going on here, what was fraudulent, deceptive,

4    or manipulative, in parsing through the words of the statute.

5    And he said Mr. Seery engaged in deceptive acts because he

6    wasn't trying to maximize value.  Okay?  I'm not an expert on

7    the Investment Advisers Act, but I know that that was not a

8    deceptive act.

9        And so I'll allow the plan to be filed under seal, but

10   it's not going to be unsealed absent an order of the Court.

11   Okay?  So we'll just leave it at that for now.  And while I

12   still encourage good-faith negotiations here, I've said it

13   umpteen times, where you're tired of the cliché, probably:

14   The train is leaving the station.  And if you want the Court

15   to have patience in the process and if you want the parties to

16   cooperate in good faith, it might help if we didn't have

17   things like Dugaboy and Get Good Trust filing a motion for an

18   examiner 15 months into the case.

19       I mean, it feels to me, Mr. Dondero, whether I'm right or

20   wrong, that it's like you've got a twofold approach here:  I

21   either get the company back or I burn the house down.  And I'm

22   telling you right now, if we don't have agreements, --

23           MR. DONDERO:  That's not true.

24           THE COURT:  -- if we don't have agreements and we

25   come back on the 5th for a continuation of this hearing and a

252

1  motion to hold you in contempt, you know, I'm leaning right

2  now, based on what I've heard so far, and I know I haven't

3  heard everything, but I'm leaning right now towards finding

4  contempt and shifting a whole bundle of attorneys' fees.

5  That, to me, seems like the likely place we're heading.

6      I mean, I commented at the December hearing on the

7  preliminary injunction against you personally that it had been

8  like a $250,000 hearing, I figured, okay, just guesstimating

9  everybody's billable rate times the hours we spent. Well,

10  here we were again, and I know we've got all this time outside

11  the courtroom preparing, taking depositions. I mean, what

12  else is a judge to think except, by God, let's drive up

13  administrative expenses as much as we can; if we can't win,

14  we're going to go down fighting? That's what this looks like.

15  Okay? So if it's not really what's going on, then you've got

16  to work hard to change my perceptions at this point.

17          MR. RUKAVINA: Your Honor, I hear everything what

18  you're saying, and I'm going to discuss it very bluntly with

19  my clients. But we're being asked not to exercise contract

20  rights in the future. This is not a contempt hearing. And

21  Your Honor, we did ask and offered the estate a million

22  dollars, found money, plus to waive almost all our plan

23  objections, if they would just put this case on pause for 30

24  days.

25      So we are trying. We are trying creative solutions here.

253

1   We know that the train is leaving. We've put our money where

2   our mouth is. We will continue trying. But Your Honor, this

3   is not a contempt proceeding, and my clients are not Mr.

4   Dondero. You've heard they're independent boards.

5          MR. POMERANTZ: I can't leave that last comment

6   without a response. Yes, there was an offer of a million

7   dollars, by an entity that owes the estate multiples of that.

8   So they are offering to pay us something that they already owe

9   us. So Mr. Rukavina continues try to do this. We will not

10  stand for it.

11         MR. RUKAVINA: That is not a fair statement, sir. I

12  misrepresented nothing. We were offering you a million

13  dollars, with no conditions, earned upon receipt, with no

14  credit, no deduction for any of our liability. So you're free

15  to say no, sir, but you're not going to tell the judge that I

16  misrepresented something.

17         THE COURT: All right.

18         MR. POMERANTZ: Should tell the Court --

19         THE COURT: You know what?

20         MR. POMERANTZ: -- that that entity owed the Debtor.

21         THE COURT: You know what? You know what? I am more

22  focused on, Mr. Rukavina, your comment that this Court can't

23  enjoin your clients from exercising contractual rights when,

24  again, in January of 2020, the representation was made and it

25  was ordered, "Mr. Dondero shall not cause any related entity

254

1  to terminate any agreements with the Debtor."  Okay?  That was

2  -- go back and look at the transcript.  That was so meaningful

3  to me.

4       We were facing a possible trustee.  And that's what I did

5  in the *Acis* case.  Okay?  I had a Chapter 11 trustee.  And it

6  was not a perfect fit, to be sure.  But it is where we were

7  heading in this case, had the lawyers and parties not

8  negotiated what they did.  That was a very important

9  provision, convincing me that, you know what, I think the

10  structure they've got will be better than a trustee.  And it

11  has, for the most part.  But the fees have gone out the roof,

12  and I lay that at the feet of Mr. Dondero, for the most part.

13  Okay?  We have a bomb thrown every five minutes by either him

14  personally or the Dugaboy or the Get Good Trust or the Funds

15  or the Advisors or I don't know who else.  Okay?

16       So the train is leaving the station, unless you all come

17  to me and say, okay, we've maybe got a -- Mr. Pomerantz's word

18  -- grand solution here.  Okay?  If you get there in the next

19  few days, wonderful.  Okay?  But I don't know what else to say

20  except I'm tired of the carpet-bombing, and if I had to rule

21  this minute, there would be a huge amount of fee-shifting for

22  what we went through today, for what we went through in

23  December, for the restriction motion that, after I called it

24  frivolous, the lawyers were sending letters pretty much

25  regurgitating the same arguments.  All right.  So, not a happy

255

1   camper.

2      But upload your order on the motion to seal the plan.

3   And, again, it's not going to be unsealed absent a further

4   order of the Court.  And if you all come to me next week and

5   say, hey, we've got something in the works here, okay, I'll

6   consider unsealing it and letting you go down a different

7   path.  But I'm not naïve.  I feel like this is just more

8   burning the house down, maybe.  I don't know.  I hope I'm

9   wrong.  I hope I'm wrong.  But all right.  So I guess we'll

10  see you next week.

11          MR. POMERANTZ:  Thank you, Your Honor.

12          MR. MORRIS:  Thank you, Your Honor.

13          THE COURT:  All right.  We're adjourned.

14          MR. RUKAVINA:  Thank you, Your Honor.

15          THE CLERK:  All rise.

16      (Proceedings concluded at 6:08 p.m.)

17                      --oOo--

18

19

20                  CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                      **01/28/2021**

24  _____    _____
    Kathy Rehling, CETD-444                          Date
25  Certified Electronic Court Transcriber

256

INDEX

PROCEEDINGS                                                    4

OPENING STATEMENTS

- By Mr. Morris                                              19
- By Mr. Rukavina                                            31

WITNESSES

Debtor's Witnesses

James P. Seery
- Proffer of Direct Testimony by Mr. Pomerantz               6

James D. Dondero
- Direct Examination by Mr. Morris                          42

Jason Post
- Direct Examination by Mr. Morris                         108

James P. Seery, Recalled
- Direct Examination by Mr. Morris                         152
- Cross-Examination by Mr. Hogewood                        170
- Redirect Examination by Mr. Morris                       188
- Examination by the Court                                 191

Defendants' Witnesses

Jason Post
- Direct Examination by Mr. Rukavina                       201
  *Voir Dire* Examination by Mr. Morris                    206
  Direct Examination, Resumed, by Mr. Rukavina             207

EXHIBITS

Debtor's Exhibits A through SSSSS *(exclusive of*   Received  19
  *Exhibits UUUU, VVVV, and AAAAA)*
Debtor's Exhibit D (Email)                         Received 200
Debtor's Exhibit K (Letter)                        Received 198
Debtor's Exhibit TTTTT                             Received  64

**APP. 0783**
**Appx. 00830**

257

INDEX
Page 2

RULINGS

<u>19-34054-sgj11 - Highland Capital Management, L.P.</u>

    Motion of the Debtor for Entry of an Order         12
    Authorizing the Debtor to Implement a Key Employee
    Retention Plan with Non-Insider Employees and
    Granting Related Relief filed by Debtor Highland
    Capital Management, L.P. (1777) - *Granted*

21-03000-sgj - Highland Capital Management, L.P. v.
<u>Highland Capital Management Fund Advisors, L.P. et al.</u>

    Agreed Settlement with CLO Holdco, Ltd.         15

    Plaintiff's Motion for a Preliminary Injunction     233
    against Certain Entities Owned and/or Controlled
    by Mr. James Dondero (5) - *Continued*

END OF PROCEEDINGS         255

INDEX         256-257

# EXHIBIT 8

```
              IN THE UNITED STATES BANKRUPTCY COURT
               FOR THE NORTHERN DISTRICT OF TEXAS
                         DALLAS DIVISION

                             )    Case No. 19-34054-sgj-11
In Re:                       )    Chapter 11
                             )
HIGHLAND CAPITAL             )    Dallas, Texas
MANAGEMENT, L.P.,            )    Friday, January 8, 2021
                             )    9:30 a.m. Docket
          Debtor.            )
                             )
_____)
                             )
HIGHLAND CAPITAL             )    Adversary Proceeding 20-3190-sgj
MANAGEMENT, L.P.,            )
                             )
          Plaintiff,         )    PRELIMINARY INJUNCTION
                             )    HEARING [#2]
v.                           )
                             )
JAMES D. DONDERO,            )
                             )
          Defendant.         )
_____)

                    TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                UNITED STATES BANKRUPTCY JUDGE.

WEBEX/TELEPHONIC APPEARANCES:

For the Debtor/Plaintiff:    Jeffrey N. Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
                              13th Floor
                             Los Angeles, CA  90067-4003
                             (310) 277-6910

For the Debtor/Plaintiff:    John A. Morris
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700
```

2

```
 1    APPEARANCES, cont'd.:

 2    For James Dondero,          D. Michael Lynn
      Defendant:                  John Y. Bonds, III
 3                                Bryan C. Assink
                                  BONDS ELLIS EPPICH SCHAFER
 4                                  JONES, LLP
                                  420 Throckmorton Street,
 5                                  Suite 1000
                                  Fort Worth, TX  76102
 6                                (817) 405-6900

 7    For the Official Committee  Matthew A. Clemente
      of Unsecured Creditors:     SIDLEY AUSTIN, LLP
 8                                One South Dearborn Street
                                  Chicago, IL  60603
 9                                (312) 853-7539

10    For the Funds and           Davor Rukavina
      Advisors:                   MUNSCH HARDT KOPF & HARR, P.C.
11                                500 N. Akard Street, Suite 3800
                                  Dallas, TX  75201-6659
12                                (214) 855-7554

13    For Certain Employees:      Frances A. Smith
                                  ROSS & SMITH, P.C.
14                                Plaza of the Americas
                                  700 N. Pearl Street, Suite 1610
15                                Dallas, TX  75201
                                  (214) 593-4976
16
      Recorded by:                Michael F. Edmond, Sr.
17                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
18                                Dallas, TX  75242
                                  (214) 753-2062
19
      Transcribed by:             Kathy Rehling
20                                311 Paradise Cove
                                  Shady Shores, TX  76208
21                                (972) 786-3063

22

23

24
             Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

3

1          DALLAS, TEXAS - JANUARY 8, 2021 - 9:41 A.M.

2          THE COURT:  All right.  We are here for Highland

3   Capital Management, L.P. versus James Dondero, a preliminary

4   injunction hearing.  This is Adversary 20-3190.

5      All right.  Let's start out by getting appearances from

6   counsel.  First, for the Plaintiff/Debtor, who do we have

7   appearing?

8          MR. MORRIS:  Your Honor, John Morris; Pachulski Stang

9   Ziehl & Jones.  I'm here with my partner, Jeff Pomerantz, and

10  others.

11         THE COURT:  All right.  Good morning.  All right.

12  For Mr. Dondero, who do we have appearing?

13         MR. LYNN:  Michael Lynn, together with John Bonds,

14  for Mr. Dondero.

15         THE COURT:  Good morning.

16     All right.  I know we have a lot of parties in interest

17  represented on the video or phone today.  I'm not going to go

18  through a roll call, other than I'll see if we have the

19  Committee, the Unsecured Creditors' Committee counsel on the

20  line.  Do we have anyone appearing for them?

21         MR. CLEMENTE:  Yes, good morning, Your Honor.

22  Matthew Clemente from Sidley Austin on behalf of the

23  Committee.

24         THE COURT:  Okay.  Thank you.  All right.

25         MR. CLEMENTE:  Thank you, Your Honor.

4

1          THE COURT:  Well, as I said, I'm not going to do a

2    roll call.  I don't think we had any specific parties in

3    interest, you know, file a pleading, or any other parties

4    other than the Debtor and Mr. Dondero in this adversary.  So

5    I'll just let the others kind of listen in without appearing.

6       All right.  Mr. Morris, are you going to start us off this

7    morning with, I don't know, an opening statement or any

8    housekeeping matters?

9          MR. MORRIS:  I have both an opening statement and

10   housekeeping matters.  I just wanted to see if Mr. Pomerantz

11   has anything he wants to convey to the Court before I begin.

12          MR. POMERANTZ:  (garbled)

13          THE COURT:  Mr. Pomerantz, if you could take your

14   device off mute, please.

15          THE CLERK:  He's off mute.  I don't know what --

16          THE COURT:  Okay.  Well, we're showing you're not on

17   mute, but we can't hear you.  What now?

18          THE CLERK:  He's not on mute now.  He's --

19          THE COURT:  Okay.  Go ahead, Mr. Pomerantz.

20       (Pause.)

21          THE CLERK:  He's not coming through.

22          THE COURT:  We're -- you're not coming through, and

23   we're not sure what the problem is.  We're not showing you on

24   mute.

25       (Pause.)

5

1    THE COURT:  All right.  Should we have him call back

2  in on his phone?  All right.  If you could, if you have a

3  phone, maybe you can try calling in on your phone and speak

4  through your phone, not your computer.

5    MR. MORRIS:  You know what, Your Honor?  I'm going to

6  proceed, and Mr. Pomerantz will address the Court at the

7  conclusion of the hearing on the motion.

8    THE COURT:  Okay.  Very good.  We usually hear him

9  loud and clear, so I don't know what's going on this morning.

10  Go ahead, Mr. Morris.

11    OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

12    MR. MORRIS:  Yes.  Thank you very much, Your Honor.

13  John Morris; Pachulski Stang; for the Debtor.

14    We are here this morning, Your Honor, on the Debtor's

15  motion for preliminary injunction against Mr. Dondero.  We

16  filed last night also an emergency motion for an order to show

17  cause as to why this Court should not hold Mr. Dondero in

18  contempt of court --

19    THE COURT:  All right.

20    MR. MORRIS:  -- for violating a previously-issued

21  TRO.

22    THE COURT:  Yes.  Let me just interject, in case

23  there's any confusion by anyone.  I am not going to hear the

24  motion for show cause order this morning.  While I understand

25  you think there might be some efficiency and overlap in

6

1    evidence, it's not enough notice.  So we'll talk about

2    scheduling that at the end of the presentations this morning.

3    All right?

4            MR. MORRIS:  Thank you for addressing that, Your

5    Honor.

6            THE COURT:  Okay.

7            MR. MORRIS:  Your Honor, then let's just proceed

8    right to the preliminary injunction motion.  There is ample

9    evidence to support the Debtor's motion for a preliminary

10   injunction.  There would have been substantial evidence to

11   support it based on the conduct that occurred prior to the

12   issuance of the TRO, but the conduct that did occur following

13   the TRO only emphasizes the urgent need for an injunction in

14   this case.

15       I want to begin by just telling Your Honor what evidence

16   we intend to introduce here today.  We filed at Docket 46 in

17   the adversary proceeding our witness and exhibit list.  The

18   exhibit list contains Exhibits A through Y.  And at the

19   appropriate time, I will move for the admission into evidence

20   of those exhibits.

21       The exhibit list and the witness list also identifies

22   three witnesses for today.  Mr. Dondero.  Mr. Dondero is here

23   today.  Notwithstanding Your Honor's comments on December 10th

24   and on December 16th, when I deposed him on Tuesday he was

25   unsure whether he was going to come here today to testify.

7

1   And he will inform Your Honor of that on cross-examination.

2   And so the Debtor was forced to prepare and serve a subpoena

3   to make sure that he was here today. But Mr. Dondero is here

4   today.

5       Following the conclusion of Mr. Dondero's deposition on

6   Tuesday, and based in part on the evidence adduced during that

7   deposition, the Debtor terminated for cause Scott Ellington

8   and Isaac Leventon. We had asked counsel for those former

9   employees to accept service of a trial subpoena so that they

10  would appear today. We were told that they would do so if we

11  gave them a copy of the transcript of Mr. Dondero's

12  deposition.

13      We thought that was inappropriate and we declined to do

14  so, and they declined to accept service of the subpoenas. We

15  have spent two days with a professional process server

16  attempting to effectuate service of the trial subpoenas for

17  Mr. Ellington and Mr. Leventon, but we were unsuccessful in

18  doing that. So we'll only have one witness today, unless we

19  have cause to call anybody on rebuttal, and that witness will

20  be Mr. Dondero.

21      I want to talk for a few moments as to what Mr. Dondero

22  will testify to and what the evidence will show. Mr. Dondero

23  will testify that he never read the TRO, Your Honor. He will

24  testify that he didn't participate in the motion on the

25  hearing for the TRO, that he never read Mr. Seery's

8

1  declaration in support of the Debtor's motion for the TRO,

2  that he never bothered to read the transcript of the

3  proceedings on December 10th so that he could understand the

4  evidence that was being used against him.  He had no knowledge

5  of the terms of the TRO when he was deposed on Tuesday.

6      And that's the backdrop of what we're doing here today,

7  because he didn't know what he was enjoined from doing, other

8  than speaking to employees.  He actually did testify and he

9  will testify that he knew he wasn't supposed to speak with the

10 Debtor's employees, but he spoke with the Debtor's employees

11 in all kinds of ways, as the evidence will show.

12     The evidence will also show that Mr. Dondero violated the

13 TRO by throwing away the cell phone that the company bought

14 and paid for after the TRO was entered into.  He's going to be

15 unable to tell you who threw it away.  He's going to be unable

16 to tell you who gave the order to throw it away.  He's going

17 to be unable to tell you when after the TRO was entered the

18 phone was thrown away.

19     But we do have as one fact and as I believe one violation

20 of the TRO --

21         MR. POMERANTZ:  So, I'm on a WebEx.

22         MR. MORRIS:  Jeff, --

23         THE COURT:  Mr. Pomerantz, we heard you.  We heard

24 you say something.  So, apparently, you got your audio

25 working.

9

1      All right.  Mr. Morris, continue.

2           MR. MORRIS:  Yeah.  And what Mr. Dondero may tell

3  you, Your Honor, is that it's really Mr. Seery's fault that

4  the phone got thrown away, because Mr. Seery announced that

5  all of the employees were going to be terminated at the end of

6  January, and because Mr. Seery did that, he and I believe Mr.

7  Ellington thought it was appropriate to just throw their

8  phones away, without getting the Debtor's consent, without

9  informing the Debtor, and switching the phone numbers that

10 were in the Debtor's account to their own personal names.  So

11 that's Item No. 1.

12     Item No. 2 -- and this is in no particular order, Your

13 Honor.  I don't want you to think that I'm bringing these

14 things up in terms of priority.  But they're just the order in

15 which they came up in the deposition, and so I'm just

16 following it as well.

17     Item No. 2 is trespass.  On December 22nd, you will hear

18 evidence that Mr. Dondero personally intervened to yet again

19 stop trades that Mr. Seery was trying to effectuate in his

20 capacity as portfolio managers of the CLOs.  He did that just

21 six days after Your Honor dismissed as frivolous a motion

22 brought by the very Advisors and Funds that he owns and

23 controls.

24     Therefore, the very next day, the Debtor sent him a

25 letter, sent through counsel a letter, evicting him from the

10

1  premises, demanding the return of the phone, and telling him

2  that he had to be out by December 30th.

3       I was stunned, Your Honor, stunned, when I took his

4  deposition on Tuesday and he was sitting in Highland's

5  offices.  He hadn't asked for permission to be there.  He

6  hadn't obtained consent to be there.  But he just doesn't care

7  what the Debtor has to say here.  He just doesn't.

8       I don't know when he got there or when he left.  I don't

9  know if he spoke to anybody while he was there.  But he just

10  took it upon himself to show up in the Debtor's office,

11  notwithstanding the very explicit eviction notice that he got

12  on December 23rd.

13       Mr. Dondero, as I mentioned, clearly violated the TRO by

14  knowingly and intentionally and purposely interfering with the

15  Debtor's trading as the portfolio manager of the CLOs.  This

16  has just gone on too long.  There have been multiple hearings

17  on this matter, but he doesn't care.  So he gave the order to

18  stop trades that Mr. Seery had effectuated.  That's a clear

19  violation of the TRO, and it certainly supports the imposition

20  of a preliminary injunction.

21       Mr. Seery -- Mr. Dondero is going to testify that multiple

22  letters -- that I'm going to refer to them, Your Honor, as the

23  K&L Gates Parties, and those are the two Advisors and the

24  three investment funds and CLO Holdco that are all owned and/

25  or controlled by Mr. Dondero -- after that hearing on the

11

1  16th, K&L Gates, the K&L Gates Parties sent not one, not two,

2  but three separate letters. They said they may take steps to

3  terminate the CLO management agreements. After we evicted Mr.

4  Dondero, sent a letter suggesting that we would be held liable

5  for damages because we were interfering with their business.

6      And Mr. Dondero is going to tell you, Your Honor, that he

7  encouraged the sending of those letters, that he approved of

8  those letters, that he thought those letters were the right

9  things to send to the Debtor, even after -- even with the

10 knowledge of what happened on December 16th.

11     He's going to tell you he knew about that hearing and he

12 still, he still approves of those letters, and never bothered

13 to exercise his control to have those letters withdrawn upon

14 the Debtor's request. We asked them to withdraw it, and when

15 they wouldn't do it, Your Honor, that's what prompted the

16 filing of yet another adversary proceeding. And we're going

17 to have another TRO hearing next Wednesday because they won't

18 stop.

19     Next, a preliminary injunction should issue because Mr.

20 Dondero violated the TRO by communicating with the Debtor's

21 employees to coordinate their legal strategy against the

22 Debtor. The evidence will show, in documents and in

23 testimony, that on December 12th, while he was prohibited from

24 speaking to any employee except in the context of shared

25 services, you're going to see the documents and you're going

12

1    to hear the evidence that on December 12th Scott Ellington was

2    actively involved in identifying a witness to support Mr.

3    Dondero's interests at the December 16th hearing.

4         You will receive evidence that on December 15th Mr.

5    Ellington and Mr. Leventon collaborated with Mr. Dondero's

6    lawyers to prepare a common interest agreement.

7         You will hear evidence that on the next day, December

8    16th, the day of that hearing, that Mr. Dondero solicited Mr.

9    Ellington's help to coordinate all of the lawyers representing

10   Mr. Dondero's interests, telling Mr. Ellington that he needed

11   to show leadership, and Mr. Ellington readily agreed to do

12   just that.

13        You will hear evidence that on December 23rd Mr. Ellington

14   and Grant Scott communicated in connection with calls that

15   were being scheduled with Mr. Dondero and with K&L Gates, the

16   very K&L Gates Clients who filed the frivolous motion that was

17   heard on December 16th and that persisted in sending multiple

18   letters threatening the Debtor thereafter.

19        You will hear evidence that late in December Mr. Dondero

20   sought contact information for Mr. Ellington and Mr.

21   Leventon's lawyer, and he will tell you that he did it for the

22   explicit purpose of advancing their mutual shared interest

23   agreement, while they were employed by the Debtor.  While they

24   were employed by the Debtor.

25        Finally, you will hear evidence, and it will not be

13

1    disputed, you will see the evidence, it's on the documents,

2    that Mr. Dondero personally intervened to stop the Debtor from

3    producing the financial statements of Get Good and Dugaboy,

4    two entities that he controls, that the U.C.C. had been asking

5    for for some time, that the Debtor had been asking of its

6    employees for some time to produce.  And it was only when we

7    got, frankly, the discovery from Mr. Dondero when there's a

8    text message that says, Not without a subpoena.

9        The documents are on the Debtor's system.  We just don't

10   know where they are because they're hidden someplace.  But Mr.

11   Dondero knows where they are.  He can certainly force -- he

12   can certainly get them produced.  And one of the things we'll

13   be asking for when we seek the contempt motion is the

14   production of those very documents.

15       So, Your Honor, that's what the evidence is going to show.

16   I don't think there's going to be any question that a

17   preliminary injunction ought to issue.  But I do want to spend

18   just a few minutes rebutting some of the assertions made in

19   the filing by Mr. Dondero last night.

20       Of course, they offer no evidence.  There is no

21   declaration.  There is no document.  There is merely argument.

22   It's been that way throughout this case.  For a year, Mr.

23   Dondero has never stood before Your Honor to tell you why

24   something was wrong being done to him, why -- he hasn't

25   offered to be here at all, and he's here today, again, only

14

1 because he got a subpoena. That's the only reason we know

2 he's here today.

3      So let's just spend a few minutes talking about the

4 assertions made in the document last night. Mr. Dondero

5 complains about the scope of the injunction, and I say to

6 myself, in all seriousness, Are you kidding me? You didn't

7 even read the TRO and you're going to be concerned about what

8 the scope of the injunction is? You didn't even have enough

9 respect for the Court to read the TRO and we're going to worry

10 about the scope of some future injunction? Doesn't make any

11 sense to me.

12      But let's talk about the specific arguments that they

13 make.

14      Third parties. They're concerned that somehow third

15 parties don't have notice of the injunction. Your Honor,

16 third parties are not impacted by the injunction. The only

17 third parties that are impacted by the injunction are those

18 that are owned and/or controlled by Mr. Dondero. If he

19 doesn't tell them, that's his breach of duty. He created the

20 Byzantine empire of over 2,000 entities, and he wants the

21 Debtor to have the burden of notifying all of them so that

22 they can all come in here and make 2,000 arguments as to why

23 they shouldn't be enjoined?

24      He owns and controls them. They are the only third

25 parties who are impacted by this proposed preliminary

15

1  injunction, and he has the responsibility, he has the duty to

2  inform them, because he owns and controls them.

3      We know of the K&L Gates Parties. We know Get Good and

4  Dugaboy are in this courtroom. We know CLO Holdco. So many

5  of these parties have been so -- they're on the phone now.

6  They don't have notice? It is insulting, frankly, to suggest

7  that the Debtor somehow has some obligation to figure out who

8  Mr. Dondero owns and controls. He should know that. That's

9  number one.

10     Number two, there is a statement in there about employees

11  and how he should be able to speak with them about personal

12  and routine matters. As to that, Your Honor, he has forfeited

13  that opportunity. He cannot be trusted. There cannot be any

14  communication because nobody can police it. And so we think a

15  complete bar to any discussion with any employee, except as it

16  relates to shared services -- because we do have a contractual

17  obligation; that's what was in it -- ought to be barred.

18  That's number one.

19     Number two, there's a reference in the objection to Mr.

20  Dondero's personal assistant. I'd like to know who that is,

21  Your Honor. I wasn't aware that he still was using a personal

22  assistant at the Debtor. I want to know specifically who that

23  is. I don't know that they -- you know, I just -- we need to

24  cut that off. And he should not be communicating with any

25  employee. The Debtor should not be paying for his personal

16

1 assistant.

2     It's offensive to think that he's still doing that,

3 particularly after he was terminated or his resignation was

4 requested back in October precisely because his interests were

5 adverse to the Debtor.

6     Number three, he's concerned that the Debtor is somehow

7 preventing him from speaking to former employees.  We now

8 know, Your Honor, that that's a, I'm sure, a very specific

9 reference to Mr. Ellington and Mr. Leventon.  Right?  He wants

10 a green light to be able to do that.  And you know, I'll leave

11 it to Your Honor as to whether that's appropriate.  I'll leave

12 it to their counsel as to whether, going forward, colluding

13 together against the Debtor at this point in time is in

14 anybody's best interest.  But I will -- what I will demand in

15 the preliminary injunction is a very explicit statement that

16 Mr. Ellington and Mr. Leventon are not to share any

17 confidential or privileged information that they received in

18 their capacity as general counsel and assistant general

19 counsel of the Debtor.

20     The pot plan.  He's afraid somehow the order is going to

21 prevent him from pursuing the pot plan.  He's had over a year

22 to pursue this pot plan, Your Honor.  Frankly, I don't, you

23 know, I don't know what to say.  He has never made a proposal

24 that has gotten any traction with the only people who matter.

25 And it's not the Debtor.  It's the creditors.  It's the

17

1   Creditors' Committee.

2       If you want to put in an exception that he can call Matt

3   Clemente, I don't mean to put this on Mr. Clemente, he can

4   decide whether or not that's appropriate, but the creditors

5   are the only ones who matter here.  Your Honor, it's not the

6   Debtor.

7       And I'll let Mr. Dondero's counsel explain to Your Honor

8   why he thinks he still needs to pursue a pot plan, and Your

9   Honor can decide.  I trust Your Honor to decide what

10  boundaries and what guardrails might be appropriate for him to

11  continue to pursue his pot plan.

12      That's all I have, Your Honor.  Not much.

13          THE COURT:  All right.

14          MR. MORRIS:  But I think there's going to be --

15  there's going to be an awful lot of evidence.  This is going

16  to be a lengthy examination.  I ask the Court for your

17  patience.

18          THE COURT:  I've got --

19          MR. MORRIS:  But that's all I have.

20          THE COURT:  I've got all day, if we need it.

21          MR. MORRIS:  Okay.

22          THE COURT:  I hope we don't, but I've got all day if

23  we need it.  All right.

24          MR. MORRIS:  That's what I have, Your Honor.

25          THE COURT:  All right.  Mr. Dondero's counsel, your

18

1    opening statement?

2          MR. BONDS:  Your Honor, I would reserve my opening

3    statement to the end of the hearing.

4       I would also point out that anything that Mr. Morris just

5    said was not evidence, and we think that the evidence will

6    show completely differently than argued or articulated by Mr.

7    Morris.

8          THE COURT:  All right.

9          MR. BONDS:  That's all.

10          THE COURT:  Thank you, Mr. Bonds.

11       Mr. Morris, you may call your witness.

12          MR. MORRIS:  The Debtor calls James Dondero.

13          THE COURT:  All right.  Mr. Dondero, this is Judge

14    Jernigan.  I would ask you to say, "Testing, one, two," so we

15    pick up your video so I can swear you in.

16       All right.  Mr. Dondero, if you're speaking up, we're not

17    hearing you, so please make sure you're unmuted and have your

18    video --

19       (Echoing.)

20          MR. DONDERO:  Hello.  One, two.

21          THE COURT:  Okay.  We got you.

22          MR. DONDERO:  One, two three.

23          THE COURT:  We got you now.

24          JAMES D. DONDERO, PLAINTIFF'S WITNESS, SWORN

25          THE COURT:  All right.  Thank you.

                         Dondero - Direct                    19

1       Mr. Morris, go ahead.

2            MR. MORRIS:  Thank you, Your Honor.

3        (Echoing.)

4            THE COURT:  I'm going to ask everyone except Mr.

5   Dondero and Mr. Morris to put your device on mute.  We're

6   getting a little distortion.

7        All right.  Go ahead.

8                        DIRECT EXAMINATION

9   BY MR. MORRIS:

10  Q    Good morning, Mr. Dondero.  Can you hear me?

11  A    Yes.

12       (Echoing.)

13           THE COURT:  Ooh.  Okay.  We're having a little echo

14  when you speak, Mr. Dondero.  Do you have -- well, first, you

15  have headphones.  That always helps.

16       (Echoing.)

17           THE COURT:  Okay.  That may help as well.

18       (Pause.)

19           THE COURT:  Okay.  Let's try again.  If you could

20  say, "Testing, one, two."

21           THE WITNESS:  Is that better?

22           THE COURT:  That is better, yes.

23       All right.  Go ahead.

24           THE WITNESS:  Okay.  Great.

25           MR. MORRIS:  Thank you.

```
                          Dondero - Direct                    20
```

 1  BY MR. MORRIS:

 2  Q   Can you hear me, Mr. Dondero?

 3  A   You're a bit faint.  Give me one second.  Okay.  Got you.

 4  Q   Okay.  Thank you.  Who is in the room with you right now?

 5  A   Bonds, Lynn, and a tech.

 6          A VOICE:  Bryan Assink.

 7          THE WITNESS:  Oh, is Assink here?  Oh, okay, I'm

 8  sorry.  All right.  I'm sorry.  Bonds, Lynn, and Bryan Assink.

 9  BY MR. MORRIS:

10  Q   Okay.  You're testifying today pursuant to a subpoena,

11  correct?

12  A   Yes.

13  Q   Okay.

14          MR. MORRIS:  And Your Honor, that subpoena can be

15  found at Docket No. 44 in the adversary proceeding.

16          THE COURT:  All right.

17  BY MR. MORRIS:

18  Q   In the absence of a subpoena, in the absence of a

19  subpoena, you didn't know if you would show up to testify at

20  this hearing; is that right?

21  A   I -- I do what my counsel directs me to do, and I didn't

22  know at that time whether they would direct me to come or not.

23  Q   Okay.  And when I -- when I deposed you earlier this week,

24  you agreed that you may or may not testify; is that right?

25  A   It depends on what counsel instructs me to do, correct.  I

Dondero - Direct                     21

1   didn't know at the time.

2   Q   Okay.  And you didn't mention anything about counsel when

3   I asked you the questions earlier this week, correct?

4   A   That was the undertone in almost all my answers, that I

5   relied on counsel.

6        MR. MORRIS:  Your Honor, I move to strike.  I'm

7   asking very specific questions.  And if I need to go to the

8   deposition transcript, I'm happy to do that.

9        THE COURT:  All --

10       MR. MORRIS:  Just going forward, Your Honor, this is

11  cross-examination.  It's really yes or no at this point.

12  That's what I would request, anyway.

13       THE COURT:  All right.  Mr. Dondero, do you

14  understand --

15      (Echoing.)

16       THE COURT:  Do you understand what Mr. Morris was

17  raising there?  We really need you to give specific answers --

18  and usually they're going to be yes or no answers -- to Mr.

19  Morris's questioning.  Okay?  So let's try again.  Mr. Morris,

20  go ahead.

21       THE WITNESS:  Yeah.

22  BY MR. MORRIS:

23  Q   Mr. Dondero, you're aware that Judge Jernigan granted the

24  Debtor's request for a TRO against you on December 10th,

25  correct?

Dondero - Direct                    22

1   A   Yes.

2   Q   But you never reviewed the declaration that Mr. Seery

3   filed in support of the Debtor's motion for a TRO, correct?

4   A   I relied on counsel.

5   Q   Sir, you never reviewed the declaration that Mr. Seery

6   filed in support of the Debtor's motion for a TRO, correct?

7   A   Correct.

8   Q   You didn't even know the substance of what Mr. Seery

9   alleged in his declaration at the time that I deposed you on

10  Tuesday, correct?

11  A   Correct.

12  Q   And that's because you didn't even think about the fact

13  that the Debtor was seeking a TRO against you; isn't that

14  right?

15  A   No.

16  Q   That's not right?

17  A   No.

18  Q   All right.

19       MR. MORRIS:  Your Honor, could I ask my assistant,

20  Ms. Canty, to put up on the screen what had been designated as

21  the Debtor's Exhibit Z in connection with the motion for

22  contempt?  Exhibit Z is the transcript from Tuesday's hearing.

23       THE COURT:  All right.

24       MR. MORRIS:  And I would like to -- I'd like to

25  cross-examine Mr. Dondero on his testimony on Tuesday.

Dondero - Direct                    23

1          THE COURT:  All right.  You may.

2          MR. MORRIS:  Can we put up Page 15, please?  And go

3   to Lines 15 through 17.

4   BY MR. MORRIS:

5   Q   Sir, you recall being deposed on Tuesday by my -- by me,

6   correct?

7   A   Yes.

8   Q   Okay.  Did you hear this question and did you hear this

9   answer?

10      "Q   Did you care that the Debtor was seeking a TRO

11      against you?

12      "A   I didn't think about it."

13  Q   Is that -- is that your testimony from the other day?

14  A   Yes.

15  Q   You didn't dial in to the hearing when the Court

16  considered the Debtor's motion for a TRO against you, did you?

17  A   I -- I don't recall.  I don't think so.

18  Q   You never read the transcript in order to understand what

19  took place in this courtroom when Judge Jernigan decided to

20  enter a TRO against you; isn't that right?

21  A   I relied on counsel, which has been my testimony all

22  along.

23          MR. MORRIS:  Can we go to Page 13 of the transcript,

24  please?  Beginning at Line 24.

25  BY MR. MORRIS:

Dondero - Direct                    24

1    Q    (reading)

2         "Q    Did you read a transcript of the hearing?

3         "A    No."

4    Q    Did you testify on Tuesday that you did not read a

5    transcript of the hearing?

6    A    Yes.

7    Q    In fact, as of at least last Tuesday, you hadn't even

8    bothered to read the TRO that this Court entered against you.

9    Isn't that right?

10         MR. BONDS:  Your Honor, I'm going to object.

11    (Echoing.)

12         THE COURT:  Okay.  We're getting that echo from you

13    now, Mr. Bonds.  So maybe you need to turn your volume down a

14    little.  But what is the basis for your objection?

15    (Echoing.)

16         MR. BONDS:  Leading and rhetorical.

17         MR. MORRIS:  I think it's because they're in the same

18    room.

19         THE COURT:  Okay.  Do you have -- I don't know what

20    you're doing.  I guess you're moving to a different room?

21         MR. BONDS:  I am, Your Honor.

22         THE COURT:  Okay.

23    (Echoing.)

24         THE COURT:  Okay.  I'm waiting for the objection

25    basis.

Dondero - Direct                    25

1        MR. BONDS:  The basis of the objection, Your Honor,

2   is that --

3        (Echoing.)

4        THE COURT:  Okay.  We're going to have to do

5   something different here.  We can't have this issue for the

6   entire hearing.  Do you need to get a tech person in there, or

7   maybe call in on your phone?  I don't know.

8        MR. BONDS:  Your Honor, I'm going into the conference

9   room.

10       (Pause.)

11       THE COURT:  Okay.  Are we going to try again here?

12       MR. BONDS:  Yes.  Is this working?

13       THE COURT:  Yes.

14       MR. BONDS:  Perfect.  Your Honor, my objection is

15   that Mr. Dondero has already testified that he relied on his

16   lawyers.  I don't know where Mr. Morris is going with this,

17   but it's pretty clear that Mr. Dondero simply relies on his

18   lawyers to tell him what happened.  I don't know that that's

19   that different than any other layperson.

20       MR. MORRIS:  Your Honor, if this is --

21       THE COURT:  Well, --

22       MR. MORRIS:  If I may?

23       THE COURT:  Yes.

24       MR. MORRIS:  I believe it's terribly relevant to know

25   how seriously Mr. Dondero takes this Court and this Court's

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 814 of
2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 813 of
2722

Dondero - Direct                          26

1   proceedings and this Court's orders.  If the Court decides

2   that it doesn't matter whether or not he read the transcript,

3   you're the fact-finder and you'll make that decision.  But I

4   believe it's at least relevant.

5          THE COURT:  Okay.  I agree and I overrule the

6   objection.

7      Go ahead.

8   BY MR. MORRIS:

9   Q   Mr. Dondero, as of at least Tuesday, you never bothered to

10  read the TRO that was entered against you, correct?

11  A   I'm sorry.  We're dealing with some tech stuff here for a

12  second.  Can you repeat the question?

13  Q   Yes.

14     (Echoing.)

15  Q   As of Tuesday, you had not bothered to read the TRO that

16  was entered against you?

17     (Echoing.)

18         MR. MORRIS:  Your Honor, can we take a break?  I

19  can't do this.  I just --

20         THE COURT:  Okay.  I agree.  Okay.  Mr. Bonds, what

21  do we need to do to fix these technical problems?  Do I need

22  to get my IT guy in here and help you?  This is terrible.

23  This connection is terrible.  And I understand people have

24  technical problems sometimes, but we've been doing these video

25  hearings since March, so --

Dondero - Direct                    27

1          MR. BONDS:  Your Honor, I have simply gone to another

2    conference room.  The Debtor (garbled) I think that Mr.

3    Dondero should be fine.

4          THE COURT:  Okay.  I don't know what you said except

5    that you think Mr. Dondero should be fine.  I --

6          MR. MORRIS:  Is there anybody in that room with a

7    cell phone on, Mr. Dondero?

8          THE WITNESS:  No.

9          MR. BONDS:  And I'm completely over in --

10         THE COURT:  Okay.

11         MR. MORRIS:  Can I try and proceed?

12         THE COURT:  Try to proceed.

13         MR. MORRIS:  Okay.

14      (Echoing.)

15   BY MR. MORRIS:

16   Q   Mr. Dondero, as of Tuesday you only had a general view of

17   what this Court restrained you from doing; is that correct?

18      (Echoing.)

19         MR. MORRIS:  I'd still -- I -- there's too much

20   noise, Your Honor.  I can't do it.

21         THE COURT:  Okay.  We're going to take a five-minute

22   break.  Mr. Bonds, can you get a technical person there to

23   work through these problems?

24      And Mike, let's get Bruce up here to --

25         THE CLERK:  It's because they're in the same room.

```
                      Dondero - Direct                    28
```

 1  That's the problem.

 2          THE COURT:  They're -- they're --

 3          THE CLERK:  Judge Jernigan, this is Traci.  Bruce is

 4  on his way up there.

 5          THE COURT:  Thank you.

 6      Mike, explain it to me, because I don't understand.

 7  You're saying if they have two devices on in the same room?

 8          THE CLERK:  The same -- that's the problem.  They're

 9  so close.  And they're trying to use the same device, give it

10  back to you.

11          A VOICE:  He has a phone on in the room.

12          MR. MORRIS:  I asked that question.

13          THE COURT:  Okay.

14          MR. MORRIS:  Please instruct the witness to exclude

15  everybody from the room, to turn off all electronic devices

16  except the device that's being used for this (garbled).  At

17  least have --

18          THE COURT:  All right.  So, the consensus of more

19  technical people than me is you've got two devices on in the

20  same room and that's what's causing the distortion and echo.

21  So I don't know if it's somebody's phone that needs to be

22  turned off or if you have two iPads or laptops.

23      (Court confers with Clerk.)

24      (Pause.)

25          MR. BONDS:  I think I'm unmuted.  Can people hear me?

Dondero - Direct                    29

1           THE WITNESS:  Yes.

2       (Pause.)

3           THE COURT:  Okay.  Bruce, can you walk their office

4   through?  They have, I think, two devices in the same room.

5   It's a horrible echo.  So, Mr. Bonds or some --

6           MR. BONDS:  Yes, Your Honor.

7           THE COURT:  We have a lawyer and the lawyer's client

8   who is testifying right now in the same room.

9           I.T. STAFF:  Uh-huh.

10          THE COURT:  And --

11          I.T. STAFF:  Yeah.  Yeah.  Because -- is one a call-

12  in user on a telephone?

13          THE COURT:  I don't know.  I don't --

14          I.T. STAFF:  Yeah.  Whatever's coming -- the audio is

15  feeding back in.  They need to separate if they're both on.

16  Or just use one and the attorney can slide over and the client

17  can --

18          THE COURT:  Okay.

19          I.T. STAFF:  -- go in his place.  Just use one --

20          THE COURT:  Our IT person is confirming what everyone

21  else has been saying, that you really can only have one device

22  in the same room.  It's just unavoidable, the echoing.

23          I.T. STAFF:  Unless everybody has --

24          THE COURT:  Unless everyone has headphones on.

25          I.T. STAFF:  Right.

Dondero - Direct                              30

1          THE COURT:  So we either need everyone to have

2    headphones on, or one device in the room.  And you all,

3    awkward as it is, just have to share.  Or I guess you could

4    have two laptops, but one person has to --

5          I.T. STAFF:  Has to have a headset.

6          THE COURT:  Has to --

7          I.T. STAFF:  Because the other one, the audio is

8    going to be feeing into the microphone of the other one.

9          THE COURT:  Okay.  So, Mr. Bonds, I don't know if

10   you've heard any of that, but --

11         THE CLERK:  He needs to unmute himself.

12         THE COURT:  You're on mute, Mr. Bonds.

13         MR. BONDS:  I'm sorry, Your Honor.  I'm going to sit

14   next to Mr. Dondero and answer any questions that may come up.

15         THE COURT:  Okay.

16         MR. BONDS:  If any objections --

17         THE COURT:  Okay.  So we're going to have one device?

18         MR. BONDS:  Yes.

19         THE COURT:  Okay.  Let's try again.

20      Okay.  Go ahead, Mr. Morris.

21   BY MR. MORRIS:

22   Q   Mr. Dondero, is Mr. Ellington listening to this hearing?

23         THE COURT:  I didn't hear you, Mr. Morris.  What?

24   BY MR. MORRIS:

25   Q   Mr. Dondero, is Mr. Ellington listening to this hearing?

Dondero - Direct                          31

1   A    I have no idea.

2   Q    Is Mr. Leventon listening to this hearing?

3   A    I have no idea.  I haven't spoken with him.

4   Q    Okay.  So let's try again.  At least as of today, you

5   never bothered to read the TRO that was entered against you,

6   correct?

7   A    Correct.

8   Q    As of Tuesday, you only had a general understanding of

9   what the Court restrained you from doing, correct?

10       (Echoing.)

11  A    I had an adequate understanding.

12  Q    You had a what?

13  A    Adequate understanding.

14  Q    Your understanding --

15           A VOICE:  Your Honor?

16  BY MR. MORRIS:

17  Q    -- was that you were prohibited from speaking to the

18  Debtor's board without counsel and from speaking to the

19  Debtor's employees; is that right?

20  A    No.

21  Q    Okay.

22           MR. MORRIS:  Can we go to Page 13, Line 8, please?

23  BY MR. MORRIS:

24  Q    Were you asked this question and did you give this answer?

25       "Q    Tell me your understanding of what the temporary

Dondero - Direct                           32

1    restraining order restrains you from doing.

2        "A   To talk to Independent Board directly or talking

3        directly with employees.

4        "Q   Is there any other aspect of the temporary

5        restraining order that you're aware of that would

6        otherwise constrain or restrain your conduct?

7        "A   Those are the points I (garbled)."

8    Q   Did you give those answers to the questions that I asked?

9    A   Yes.

10   Q   And even with that general understanding, you went ahead

11   and communicated directly (garbled) employees many, many, many

12   times after the TRO was entered?

13   A   Only with regard to shared services, pot plan, and

14   Ellington, the settlement counsel.

15   Q   Does the restraining order permit you to speak with

16   Debtor's employees about the pot plan?

17       (Echoing.)

18           THE COURT:  Mr. Morris, let me stop.

19           MR. MORRIS:  Yeah.  I appreciate that, Your Honor.

20           THE COURT:  Even --

21           MR. MORRIS:  It's not working.

22           THE COURT:  Even your sound is not coming through

23   clearly.  And I think it's the echo coming out of their

24   speakers, Mr. Dondero and Mr. Bonds' speakers.  But before we

25   conclude that, would you turn off your video and ask your

Dondero - Direct                      33

1  question again and see if it's any better, just to confirm

2  it's not a bandwidth issue on your end?  I doubt it is, but --

3  okay.  So, try asking your question again, and I'm going to

4  see if it's still distorted.

5  BY MR. MORRIS:

6  Q    There's nothing in the TRO that permitted you to speak

7  with Debtor employees about the pot plan, correct?

8          THE COURT:  Okay.  Mr. Morris, it's not at your end.

9  It's -- it's their end.  Okay.  So you can turn your video

10 back on.

11     Mr. Bonds?

12         MR. BONDS:  Yes, ma'am.

13         THE COURT:  You all are going to have to use earbuds,

14 apparently.  We're getting -- we're getting a feedback loop,

15 okay?  Whenever Mr. Morris talks or I talk, we're hearing

16 ourselves echo through your speakers.

17         MR. BONDS:  Can you check right now to see if it's

18 true, if we're experiencing the same problem?

19         THE WITNESS:  In other words, is this better?  We

20 unplugged the cord here.

21         THE COURT:  Well, when you all speak, it's -- it's

22 better now.  But when --

23         MR. MORRIS:  It is better.

24         THE COURT:  But when Mr. Morris asks a question, it's

25 echoing through your speakers.  But I don't hear myself

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 822 of
2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 821 of
2722

                         Dondero - Direct                    34

1   echoing through your speakers.

2           I.T. STAFF:  Can Mr. Morris say something, please?

3           THE COURT:  Mr. Morris, say something.

4           MR. MORRIS:  They may have solved the problem.  They

5   may have solved the problem.  How's that?

6           THE COURT:  Okay.  I think the problem is solved,

7   whatever you did, so let's try once again.

8       Go ahead, Mr. Morris.  Repeat your last question.  I

9   didn't hear it.

10  BY MR. MORRIS:

11  Q   Mr. Dondero, the temporary restraining order doesn't

12  permit you to speak with the Debtor's employees about a pot

13  plan; isn't that right?

14  A   There was a presentation on the pot plan given to the

15  Independent Board after the restraining order was put in

16  place.  What are you implying, that that wasn't proper?

17          MR. MORRIS:  Your Honor, I move to strike.  It's a

18  very simple question.

19          THE COURT:  Okay.  Sustained.  If you could just

20  answer the specific question, Mr. Dondero.

21          THE WITNESS:  I don't know.

22  BY MR. MORRIS:

23  Q   Fair enough.  Sir, let's talk about some of the events

24  that led up to the imposition of the TRO.  I appreciate the

25  fact that you hadn't read Mr. Seery's declaration or any of

Dondero - Direct                          35

1  the evidence that was submitted in connection with the TRO, so

2  let's spend some time talking about that now.  CLO stands for

3  Collateralized Loan Obligation, correct?

4  A    Yes.

5  Q    And the Debtor is party to certain contracts that give it

6  the exclusive right and responsibility to manage certain CLOs,

7  correct?

8  A    Yes.

9  Q    NexPoint Advisors, LP is an advisory firm.  Do I have that

10 right?

11 A    Yes.

12 Q    And we can refer to that, that firm, as NexPoint; is that

13 fair?

14 A    Yes.

15 Q    You have a direct or indirect ownership interest in

16 NexPoint, correct?

17 A    Yes.

18 Q    You're the president of NexPoint; isn't that right?

19 A    Yes.

20 Q    And as the president of NexPoint, it's fair to say that

21 you control that entity, correct?

22 A    To a certain extent.

23 Q    Sir, as the president of NexPoint, it's fair to say that

24 you control that entity, correct?

25 A    To a certain extent.

Dondero - Direct                    36

1        MR. MORRIS:  Can we go to Page 18 of the transcript,

2    please?  Lines 19 and 21.

3    BY MR. MORRIS:

4    Q    Were you asked this question and did you give this answer?

5        "Q   As the president of NexPoint, it's fair to say

6        that you control that entity?

7        "A   Generally."

8    Q    Is that the right answer that you gave the other day?

9    A    I think it's similar to what I just said, yeah, yeah.

10   Q    Sir, you're familiar with Highland Capital Management Fund

11   Advisors, LP; is that right?

12   A    Yes.

13   Q    And we'll call that Fund Advisors; is that fair?

14   A    Yes.

15   Q    And we'll refer to Fund Advisors and NexPoint together as

16   the Advisors; is that okay?

17   A    Yes.

18   Q    Fund Advisors is also an advisory firm, correct?

19   A    Yes.

20   Q    You have a direct or indirect ownership interest in Fund

21   Advisors, correct?

22   A    Yes.

23   Q    You're the president of Fund Advisors, correct?

24   A    Yes.

25   Q    And you also have an ownership interest in the general

Dondero - Direct                     37

1  partner of Fund Advisors; isn't that right?

2  A    I believe so.

3  Q    It's fair to say that you control Fund Advisors, correct?

4  A    Generally.

5  Q    NexPoint and Fund Advisors manage certain investments

6  funds; is that right?

7  A    Yes.

8  Q    Among the funds that they manage are High Point Income

9  Fund; is that right?

10  A    I don't think that's a name that we manage.

11  Q    Let's put it this way.  There are three funds that are

12  represented by K&L Gates that are managed by the Advisors,

13  correct?

14  A    I don't know.

15  Q    Okay.  You're the portfolio manager of the investment

16  funds advised by NexPoint and Fund Advisors, correct?

17  A    Largely.

18  Q    And NexPoint and Fund Advisors caused the investment funds

19  that they manage to invest in CLOs that are managed by the

20  Debtors, correct?

21  A    Years ago, they bought the equity interests, if that -- if

22  that's what you're asking me, in various CLOs.

23  Q    The two Advisors that you own and control caused the

24  investment funds to purchase interests in CLOs that are

25  managed by the Debtor, correct?

                          Dondero - Direct                    38

1   A   Not recently.  Not recently.  Years ago.  Yes.

2   Q   And they still hold those interests today, correct?

3   A   Yes.

4   Q   And K&L Gates represents all of those entities, correct?

5   A   Yes.

6   Q   And we'll call those the K&L Gates Clients; is that fair?

7   A   Yes.

8   Q   Before the TRO was entered, the K&L Gates Clients sent two

9   letters to the Debtor concerning the Debtor's management of

10  certain CLOs, right?

11  A   Yes.

12  Q   Okay.

13          MR. MORRIS:  Your Honor, I just want to take a moment

14  now, because we're going to start to look at some documents.

15  The Debtor would respectfully move into evidence Exhibits A

16  through Y that are on their exhibit list.

17          THE COURT:  All right.

18          MR. BONDS:  Your Honor, we have no objection.

19          THE COURT:  A through Y are admitted.  And for the

20  record, these appear at Docket No. 46 in this adversary.

21      (Plaintiff's Exhibits A through Y are received into

22  evidence.)

23          MR. MORRIS:  Okay.  Can we please put up Exhibit B as

24  in boy?  (Pause.)  Ms. Canty?  If you need a moment, just let

25  us know.

Dondero - Direct                              39

1        MS. CANTY:  Yeah.  I'm pulling it up right now.

2        MR. MORRIS:  Thank you.  (Pause.)  Can you scroll

3   down just a bit?

4   BY MR. MORRIS:

5   Q   All right.  Can you see this letter was sent on October

6   16th?

7   A   Yes.

8   Q   And we see the entities that are reflected on this letter.

9   We've got Highland Capital Management, LP.  That's the

10  question that they're asking.  And the questions and the

11  statements are being asserted on behalf of NexPoint Advisors,

12  LP.  Do you see that?

13  A   Yes.

14  Q   And Highland Capital Management Fund Advisors, LP.  Those

15  are the two Advisors that you own and control, correct?

16  A   Control to a large extent.

17  Q   Okay.

18        MR. MORRIS:  And can we put up Exhibit C, please?

19  BY MR. MORRIS:

20  Q   This is a second letter sent by NexPoint on November 24th.

21  Do you see that?

22  A   Yes.

23  Q   Okay.  And you're familiar with the substance of these

24  letters, correct?

25  A   Yes.

Dondero - Direct                    40

1  Q    And you were familiar -- you were aware of these letters

2  before they were sent.  Is that correct?

3  A    Yes.

4  Q    And you generally discussed the substance of these letters

5  with NexPoint; is that right?

6  A    Generally, yes.

7  Q    And you discussed the substance of the letters with the

8  Advisors' internal counsel; is that right?

9  A    Yes.

10 Q    That's D.C. Sauter?

11 A    Yes.

12 Q    And you have been on some calls with K&L Gates about these

13 letters, right?

14 A    I believe so.

15 Q    And you knew these letters were being sent, correct?

16 A    Yeah, they're -- they're reported.

17 Q    You knew these letters for being sent; isn't that right,

18 sir?

19 A    Yes.

20 Q    And you didn't object to the sending of these letters,

21 correct?

22 A    No.

23 Q    In fact, you supported the sending of these letters.  Is

24 that right?

25 A    Yes.

Dondero - Direct                    41

1  Q   And you have never directed NexPoint to withdraw these

2  letters, correct?

3  A   No.

4  Q   Around Thanksgiving, you learned that Mr. Seery had given

5  a direction to sell certain securities owned by the CLOs

6  managed by the Debtors, correct?

7  A   Yes.

8  Q   And when you learned that, you personally intervened to

9  stop the trades, correct?

10  A   Yes.  I believe they were inappropriate.

11       MR. MORRIS:  I move to strike the latter part of the

12  answer, Your Honor.

13       THE COURT:  It's stricken.

14       MR. MORRIS:  Can we put up Exhibit D, please?

15  BY MR. MORRIS:

16  Q   We looked at this email string the other day.  Do you

17  recall that?

18  A   Yes.

19       MR. MORRIS:  Can we start at the bottom, please?

20  BY MR. MORRIS:

21  Q   There's an email from Hunter Covitz.  Do you see that?

22  A   Yes.

23  Q   Now, this is November 24th.  It's before the TRO.  Is that

24  fair?

25  A   Yes.

```
                        Dondero - Direct                    42
```

1  Q   Mr. Covitz is an employee of the Debtor, right?

2  A   I believe so.

3  Q   And Mr. Covitz helps manage the CLOs on behalf of the

4  Debtor.  Is that your understanding?

5  A   Yes.

6  Q   And Mr. Covitz in this email is giving directions to Matt

7  Pearson and Joe Sowin to sell certain securities held by the

8  CLOs.  Is that correct?

9  A   No.  He's giving Jim Seery's direction.

10        MR. BONDS:  And Your Honor, I'm going to object.

11 This is all before the TRO was ever entered.  It doesn't have

12 anything to do with today's hearing.

13        THE COURT:  Overruled.

14        MR. MORRIS:  May I respond, Your Honor?

15        THE COURT:  I --

16        MR. MORRIS:  Okay.  Thank you.

17        THE COURT:  I think it's relevant.  Go ahead.

18        MR. MORRIS:  Thank you.  Okay.

19 BY MR. MORRIS:

20 Q   Mr. Seery is the CEO of the Debtor; is that right?

21 A   Yes.

22 Q   And the Debtor is the contractual party with the CLOs

23 charged with the exclusive responsibility of managing the

24 CLOs, correct?

25 A   I don't believe so.  The Debtor is in default of the

```
                         Dondero - Direct                    43

 1    agreements.

 2              MR. MORRIS:  I move to strike, Your Honor.

 3              THE COURT:  Sustained.

 4    BY MR. MORRIS:

 5    Q    Sir, the Debtor has the exclusive contractual right and

 6    obligation to manage the CLOs, correct?

 7    A    I don't agree with that.

 8    Q    Okay.

 9              MR. MORRIS:  Can we scroll up to the -- just --

10    BY MR. MORRIS:

11    Q    Do you see that Mr. Pearson acknowledges receipt of Mr.

12    Covitz's email?

13    A    Yes.

14    Q    And you received a copy of Mr. Covitz's email, did you --

15    did you not?

16    A    Yes.

17              MR. MORRIS:  Can you scroll up a little bit, please?

18    BY MR. MORRIS:

19    Q    And can you just read for Judge Jernigan your response

20    that you provided to Mr. Pearson, Mr. Covitz, and Mr. Sowin on

21    November 24th?

22    A    (reading)  No, do not.

23    Q    You instructed the recipients of Mr. Covitz's email not to

24    sell the SKY securities as had been specifically instructed by

25    Mr. Seery, correct?
```

Dondero - Direct                    44

1    A    Yes.

2    Q    And you understood when you gave that instruction that the

3    people on the email were trying to execute trades that Mr.

4    Seery had authorized, correct?

5    A    No.  I -- no, that isn't how I would describe it.

6           MR. MORRIS:  A second, Your Honor?

7           THE COURT:  Okay.

8        (Pause.)

9    BY MR. MORRIS:

10   Q    Sir, when you gave the instruction reflected in this

11   email, you knew that you were stopping trades that were

12   authorized and directed by Mr. Seery, correct?

13   A    I don't think -- I -- I wasn't -- I wasn't sure at the

14   moment I did that.  I didn't find out until later that it was

15   Seery who directed it.

16          MR. MORRIS:  Can we please go back to the deposition

17   transcript, Debtor's Exhibit Z, at Page 42?  Line 12.

18   BY MR. MORRIS:

19   Q    Were you asked this question and did you give this answer?

20       "Q   At the time that you gave the instruction, "No, do

21       not," you knew that you were stopping trades that had

22       been authorized and directed by Mr. Seery, correct?

23       "A   Yes."

24   Q    Did you give that answer to my question on Tuesday?

25   A    I'd like to clarify it, but yes, I did give that answer.

Dondero - Direct                    45

1  Q    Okay.  You didn't speak with Mr. Seery before sending your

2  instructions interfering with his trade, the trades that he

3  had authorized, correct?

4  A    No, I did not.

5  Q    And you took no steps to seek the Debtor's consent before

6  instructing the recipients of your email to stop executing the

7  SKY transactions that had been authorized by Mr. Seery,

8  correct?

9  A    I'm sorry.  Can you repeat the question?

10  Q    You took no steps to seek the Debtor's consent before

11  stepping in to stop the trades that Mr. Seery had authorized,

12  correct?

13  A    I took other actions instead.

14  Q    Okay.  But you didn't seek the Debtor's consent?  That's

15  not one of the actions you took, right?

16  A    No, I educated the traders as to why it was inappropriate.

17            MR. MORRIS:  I move to strike, Your Honor.

18            THE COURT:  Sustained.

19  BY MR. MORRIS:

20  Q    Sir, did you seek the Debtor's consent before stepping in

21  to stop the trades that Mr. Seery had authorized?

22  A    No, I did not seek consent.

23  Q    In response to your instruction, Mr. Pearson canceled all

24  of the trades that Mr. Seery had authorized, correct?

25  A    Yes.

Dondero - Direct                          46

1          MR. MORRIS:  Can we go back to the exhibit, please?

2   And if we could just scroll -- stop right there.

3   BY MR. MORRIS:

4   Q   That's -- that's Mr. Pearson's response to your email,

5   confirming that he had canceled both the SKY and the AVAYA

6   trades that had not yet been executed, correct?

7   A   Yes.

8          MR. MORRIS:  Can we scroll to the response to that?

9   BY MR. MORRIS:

10  Q   Is this your response?

11  A   Yes.

12  Q   Can you read that aloud, please?

13  A   (reading)  HFAM and DAF have instructed Highland in

14  writing not to sell any CLO underlying assets.  There is

15  potential liability.  Don't do it again, please.

16  Q   The writings that you're referring to are the two letters

17  from NexPoint, Exhibits B and C that we just looked at,

18  correct?

19  A   Yeah.  There might have been a third letter.  I don't

20  know.  But, yes, generally, those letters.

21  Q   Okay.  And at this juncture, the reference to potential

22  liability was a statement intended for Mr. Pearson.  Is that

23  correct?

24  A   Um, I -- no.  Pearson wouldn't have had any personal

25  liability.  It was -- it was meant for the -- there was

Dondero - Direct                    47

1   potential liability to the Debtor or to the compliance

2   officers at the Debtor.

3           MR. MORRIS:  Can we go to Page 45 of the deposition

4   transcript, please?  Line -- beginning at Line 11, through 18.

5   BY MR. MORRIS:

6   Q   Did I ask these questions and did you give these answers?

7       "Q   Do you see the reference there in the latter

8       portion of your email, 'There is potential liability.

9       Don't do it again'?

10      "A   Yes.

11      "Q   Who was the intended recipient of that message?

12      "A   At this juncture, it's Matt Pearson, I believe."

13  Q   Did you give those answers to my questions on Tuesday?

14  A   Yeah.  That's not inconsistent.

15          MR. MORRIS:  Let's go back to the email, please.

16  BY MR. MORRIS:

17  Q   Mr. Sowin responded to your email; is that right?

18          MR. MORRIS:  Can we scroll up?

19  BY MR. MORRIS:

20  Q   Okay.  Who's Mr. Sowin?

21  A   He's the head trader.

22  Q   Who's he employed by?

23  A   I believe he's employed by HFAM but not the Debtor.

24  Q   Okay.  So he's -- he's somebody who's employed by one of

25  the Advisors; is that right?

Dondero - Direct                    48

1   A    I believe so.

2   Q    And Mr. Sowin responded to your email and he indicated

3   that he would follow your instructions.  Is that right?

4   A    Yeah.  He understands that it's inappropriate.  That's

5   what he's reflecting.  Yes.

6        MR. MORRIS:  I move to strike, Your Honor.

7        THE COURT:  Sustained.

8   BY MR. MORRIS:

9   Q    Sir, Mr. Sowin responded and indicated that he would

10  follow your instructions, correct?

11  A    (no audible response)

12  Q    Did you answer?  I'm sorry.

13  A    No, I didn't answer.  It's -- I don't know if you could

14  expressly say that from that email.  Maybe we should read the

15  email.

16       MR. MORRIS:  Let's just move on, Your Honor.

17       THE COURT:  Okay.

18  BY MR. MORRIS:

19  Q    A few days later, you learned -- you learned that Mr.

20  Seery was trying a workaround to effectuate the trades anyway,

21  correct?

22  A    I believe so.

23  Q    Uh-huh.  And when you learned that, you wrote to Thomas

24  Surgent; is that right?

25  A    I -- I believe so.

Dondero - Direct                    49

1  Q   I don't -- I don't mean to -- this is not a test here.

2           MR. MORRIS:  Can we just scroll up to the next email,

3  please?  Okay.  Stop right there.

4  BY MR. MORRIS:

5  Q   When you -- when you learned that Mr. Seery was trying a

6  workaround, you wrote to Mr. Surgent when you learned that,

7  right?

8  A   Yes.

9  Q   And Mr. Surgent is an employee of the Debtor; is that

10  correct?

11  A   I believe he's still the chief compliance officer of the

12  Debtor.

13  Q   Okay.  Now, as a factual matter, you never asked Mr. Seery

14  why he wanted to make these trades; isn't that right?

15  A   I -- I did not.

16  Q   Okay.  And before the TRO was entered, there was nothing

17  that prevented you from picking up the phone and asking Mr.

18  Seery why he wanted to make these trades, correct?

19  A   That's not true.

20           MR. MORRIS:  One second, please, Your Honor.

21           THE COURT:  Okay.

22       (Pause.)

23           MR. MORRIS:  Can we go to Page 60 of the transcript?

24  Mr. Bonds says -- beginning at Line 14.  There is an objection

25  there, Your Honor, and I would ask that the Court rule on the

```
                        Dondero - Direct                    50

 1    objection before I read from the transcript.

 2           THE COURT:  Okay.

 3           MR. MORRIS:  There you go.

 4           THE COURT:  (sotto voce)  (reading)  Is there

 5    anything that you're aware of that prevented you from picking

 6    up the phone and asking Mr. Seery for his business

 7    justification for these trades prior to December 10.

 8    Objection, form.

 9       I overrule the objection to the form of that question.

10           MR. MORRIS:  Okay.

11    BY MR. MORRIS:

12    Q   Mr. Dondero, were you asked this question and did you give

13    this answer?

14       "Q   Is  there  anything  that  you're  aware  of  that

15       prevented you from picking up the phone and asking Mr.

16       Seery  for  his  business  justification  for  these  trades

17       prior to December 10, 2010?

18       "A   No.  I expressed my disapproval via email."

19    Q   Is that right?

20    A   I'd like to adjust that answer to the answer I just gave.

21    Q   Okay.

22           MR. MORRIS:  And I move to strike.

23    BY MR. MORRIS:

24    Q   I'm just asking you if that's the answer you gave on

25    Tuesday.
```

Dondero - Direct                      51

1           THE COURT:  Sustained.

2           THE WITNESS:  Yes.

3    BY MR. MORRIS:

4    Q   Thank you.  Now, you wrote to Mr. Surgent because you

5    wanted to remind him of his personal liability for regulatory

6    breaches and for doing things that aren't in the best interest

7    of investors, correct?

8    A   Yes.

9    Q   And you actually thought about this and you -- because you

10   didn't believe that Mr. Surgent had extra insurance and

11   indemnities like Mr. Seery, right?

12   A   No.

13   Q   Didn't you testify to that the other day?

14   A   I don't remember, but that isn't the only reason.

15   Q   I didn't ask you if it was the only reason.  Listen

16   carefully to my question.  Did you send this email because you

17   -- because you wanted to remind him of his personal liability

18   for regulatory breaches and for doing things that aren't in

19   the -- I apologize.  Withdrawn.

20       You did not believe at the time that you sent this email

21   that he, Mr. Surgent, had insurance and indemnities like Mr.

22   Seery, correct?

23   A   Yes.

24   Q   Okay.

25           MR. MORRIS:  Can we go back to the email, please?

Dondero - Direct                    52

1  BY MR. MORRIS:

2  Q   Can you just read the entirety of your email to Mr.

3  Surgent out loud?

4  A   (reading)  I understand Seery is working on a workaround

5  to trade these securities anyway, trades that contradict

6  investor desires and have no business purpose or investment

7  rationale.  You might want to remind him and yourself that the

8  chief compliance officer has personal liability.

9  Q   Okay.  That's -- that's the message you wanted to convey

10 to Mr. Surgent, right?

11 A   Yes.

12 Q   And, again, you never bothered to ask Mr. Seery what his

13 businessperson -- purpose or investment rationale was,

14 correct?

15 A   I -- I didn't believe I could talk to him directly.

16 Q   This is before the --

17 A   That's why I never picked up the phone.

18 Q   Okay.  You intended to convey the message to Mr. Surgent

19 that, by following Mr. Seery's orders to execute the trades,

20 that Mr. Surgent faced personal liability, correct?

21 A   Yes, he does.

22 Q   And that's the message you wanted to send to him, right?

23 A   It's a true and accurate message, yes.

24 Q   Okay.  Just a few days earlier, you also threatened Mr.

25 Seery, right?

                    Dondero - Direct                    53

1  A    I wouldn't use the word "threatened."

2  Q    Okay.  Let's let -- let's let it speak for itself.

3          MR. MORRIS:  Can we go to Exhibit E, please?  Keep

4  scrolling down just a bit.

5  BY MR. MORRIS:

6  Q    This is an email that you sent to Mr. Seery on November

7  24th.  And as always, Mr. Dondero -- this is the third time

8  we're meeting -- if there's something in the document that you

9  need to see, please just let me know, because I don't -- I

10 don't mean to test your memory if the document can help

11 refresh your recollection.

12         MR. MORRIS:  Can we just scroll up a little bit

13 further to the top to see the date?

14 BY MR. MORRIS:

15 Q    Okay.  So, Jim, there, JD, who is that?

16 A    That's me.

17 Q    Okay.  And can you tell by the substance of the email, of

18 the text messages, this is communications between you and Mr.

19 Seery, right?

20 A    Yes.

21 Q    Okay.  And you see that it's dated November 24th there?

22 A    Yes.  Right after we were discussing the pipeline.  Or

23 right when we were working on the pipeline.

24 Q    Okay.

25         MR. MORRIS:  Can you scroll down a little bit,

Dondero - Direct                            54

1    please?

2    BY MR. MORRIS:

3    Q    At 5:26 p.m., you sent Mr. Seery a text, correct?

4    A    Yes.

5    Q    Can you read that, please?

6    A    (reading)  Be careful what you do.  Last warning.

7    Q    Okay.  This was a warning telling Mr. Seery to stop

8    selling assets out of the CLOs or the beneficial owners would

9    take more significant action against him, correct?

10   A    It was a general statement that what he was doing was

11   regulatorily inappropriate and ethically inappropriate and he

12   was in breach of the contracts he was operating.

13   Q    Neither you nor any entity owned or controlled by you are

14   parties to the contracts you just referred to; isn't that

15   correct?

16   A    I believe they're indirectly parties to those contracts,

17   especially when they're in default.

18   Q    Neither you nor any entity owned or controlled by you is a

19   signatory to any CLO management contract pursuant to which the

20   Debtor is a party, correct?

21   A    I -- I don't know and I don't want to make legal

22   conclusions on that.

23   Q    Okay.  At the deposition the other day, some of the things

24   that you suggested the beneficial owners of the CLO interests

25   might do against Mr. Seery and the Debtor are class action

Dondero - Direct                                    55

1    lawsuits.  Is that right?

2    A    I -- I did not suggest the entities I control would do

3    that.  If anybody on this call were to call a class action

4    lawsuit -- a class action law firm and tell them what's been

5    going on with the CLOs, I think a class action law firm would

6    file it on their own regard, not on the behalf of my entities.

7             MR. MORRIS:  I move to strike, Your Honor.

8             THE COURT:  Sustained.

9    BY MR. MORRIS:

10   Q    Let's talk about that cell phone.  Okay?  Until at least

11   December 10th, the day the TRO was entered, you had a cell

12   phone that was bought and paid by the Debtor, right?

13   A    Yes.

14   Q    But sometime after December 10th, your phone was disposed

15   of or thrown in the garbage; is that right?

16   A    Yes.

17   Q    And you don't know when after December 10th the cell phone

18   that was the Debtor's property was disposed of, right?

19   A    I don't believe at that point it was the Debtor's

20   property.  I think I paid it off in full and the Debtor had

21   announced that they were canceling everybody's cell phones so

22   it was appropriate for me to get another one.

23            MR. MORRIS:  I move to strike, Your Honor.

24            THE COURT:  Sustained.

25            MR. BONDS:  Your Honor, at some point, I mean, Mr.

Dondero - Direct                    56

1   Morris just ought to go on and testify.

2         MR. MORRIS:  No, this is Mr. Dondero's testimony,

3   Your Honor.  He gave it the other day.  I'm just asking him to

4   confirm it, basically.

5         THE COURT:  Okay.  I overrule the objection, if any

6   there was, on the part of Mr. Bonds.

7   BY MR. MORRIS:

8   Q    Sometime after December 10th, the cell phone that prior to

9   that time had been owned and paid for by the Debtor was thrown

10  in the garbage or otherwise disposed of, correct?

11  A    Yes.

12  Q    And you don't know when after December 10th that was --

13  the phone was disposed of, correct?

14  A    It was on or about that date, I'm sure.

15  Q    Well, we know it was after December 10th, right?

16  A    Okay.  Or about that date.

17  Q    You testified the other day that you just don't know who

18  made the decision to throw your phone away, right?

19  A    I could find out, but I don't know.  I would have to talk

20  to employees.

21  Q    Did you make any request of the Debtor since your

22  deposition to try to find out the answer as to who made the

23  decision to throw your phone away?

24  A    No.

25  Q    How did you learn that your phone was thrown away?

Dondero - Direct                          57

1  A   As I testified, it's standard operating procedures every

2  time a senior executive gets a new phone.

3  Q   Hmm.  You don't know exactly who threw the phone away; is

4  that right?

5  A   No, but I can find out.

6  Q   Okay.  I'm just asking -- I'm not asking you to find out.

7  I'm just asking you if you know.  Do you know who threw your

8  phone away?

9  A   No.

10  Q   Do you know who made the decision to throw your phone

11  away?

12  A   It -- there wasn't a decision.  It was standard operating

13  procedure.

14        MR. MORRIS:  I move to strike.

15        THE COURT:  Sustained.

16  BY MR. MORRIS:

17  Q   You and Mr. Ellington disposed of your phones at the same

18  time, correct?

19  A   I don't have specific awareness regarding what Mr.

20  Ellington did with his phone.

21  Q   It never occurred to you to get the Debtor's consent

22  before throwing the phone that they had purchased away, right?

23  A   I'm not permitted to talk to the Debtor.

24  Q   Sir, it never occurred to you to get the Debtor's consent

25  before throwing the phone away, correct?

Dondero - Direct                    58

1  A   I'm going to stick with the answer I just gave.

2          MR. MORRIS:  Can we go to Page 75 of the transcript?

3  Lines 12 through 15.  There is an objection there, Your Honor.

4  I would respectfully request that the Court rule on the

5  objection before I read the testimony.

6          THE COURT:  Okay.  Starting at Line 12?

7          MR. MORRIS:  12.

8          THE COURT:  (sotto voce)  (reading)  Did it ever

9  occur to you to get the Debtor's consent before doing this?

10 Objection, form.

11     That objection is overruled.

12 BY MR. MORRIS:

13 Q   All right.  Mr. Dondero, did you give this answer to my

14 question on Tuesday?

15     "Q  Did it ever occur to you to get the Debtor's

16     consent before doing this?

17     "A   No."

18 A   Yes, I gave that testimony.

19 Q   Okay.  And you also had the phone number changed from the

20 Debtor's account to your own personal account; is that right?

21 A   The phone number changed?  The phone number stayed the

22 same.

23 Q   But you had the number changed from the Debtor's account

24 to your own personal account, correct?

25 A   The Debtor said they wouldn't pay for it anymore.  Who

Dondero - Direct                          59

1    else could I change it to?

2          MR. MORRIS:  Your Honor, I move to strike.  It's a

3    very simple question.

4          THE COURT:  Sustained.

5    BY MR. MORRIS:

6    Q   I'll ask it one more time, Mr. Dondero.  You had the phone

7    number changed from the Debtor's account to your personal

8    account, correct?

9    A   I didn't change the number.  I had the billing changed to

10   my personal account versus the company account.

11   Q   And you never asked the Debtor for permission to do that,

12   correct?

13   A   No.

14   Q   And you never told Debtor you were doing that, correct?

15   A   No.

16   Q   And nobody ever told Mr. Seery or anybody at my firm that

17   the phone was being thrown in the garbage, correct?

18   A   Well, --

19          MR. BONDS:  To the extent he knows.

20          THE WITNESS:  Yeah.  I have no idea.  But I didn't.

21   BY MR. MORRIS:

22   Q   You didn't believe it was necessary to give the Debtor

23   notice that you were taking the phone number for your own

24   personal account and throwing the phone in the garbage,

25   correct?

Dondero - Direct                    60

1   A    Correct.

2   Q    The phone --

3            MR. BONDS:  Your Honor, I'm going to object.  He --

4   Mr. Dondero did not testify he personally threw the phone in

5   the garbage.

6            MR. MORRIS:  Withdrawn.

7            THE COURT:  Okay.

8   BY MR. MORRIS:

9   Q    Mr. Dondero, the phone was in Highland's offices on

10  December 10th, the date the TRO was in effect, correct?

11  A    I -- I don't -- I -- I -- I don't know.  You know, I don't

12  know.  It's -- I remember going over to -- well, anyway, I --

13  I don't know.  We'll leave it at that.

14           MR. MORRIS:  Can we go to Exhibit G, please?

15  BY MR. MORRIS:

16  Q    Who's Jason Rothstein, while we wait?

17  A    Jason, Jason is our -- is the Highland head of technology.

18  Q    Okay.  And did you text with him from time to time?  On or

19  about December 10th?

20  A    Yes.

21  Q    Okay.

22           MR. MORRIS:  Can we just scroll up a little bit?

23  BY MR. MORRIS:

24  Q    Is that Mr. Rothstein there?

25  A    Yes.  Yeah.

```
                      Dondero - Direct                    61
```

1    Q    Okay.  And do you see that there's a text message that you

2    sent to him on December 10th, right at the top?  Can you read

3    -- can you read the text message Mr. Rothstein --

4    A    He sent that to me.  At the top.

5    Q    I apologize.  Thank you for the correction.  Can you read

6    what Mr. Rothstein told you on December 10th?

7    A    That my old phone is in the top drawer of Tara's desk.

8    Q    And who's Tara?

9    A    My assistant.

10   Q    Is she still your assistant today?

11   A    Yes.

12   Q    And has she been serving as your assistant since the TRO

13   was entered into on December 10th?

14   A    Yes.

15   Q    Okay.  Is it fair to say that you were informed on

16   December 10th that the phone was not thrown in the garbage,

17   had not been disposed of, but was instead sitting in Tara's

18   desk?

19   A    As of that moment, yes.

20   Q    Okay.  And it's also fair to say that, as of December

21   10th, Mr. Rothstein didn't take it upon himself to throw your

22   old phone in the garbage, right?

23   A    Not as of that moment.  But like I said, I can find out

24   how it was disposed of.

25   Q    If you were curious to do that, would you have done that

Dondero - Direct                    62

1    before today?

2    A    I haven't been curious.

3    Q    Thank you very much.  Someone you can't identify made the

4    decision after December 10th to throw the phone in the garbage

5    without asking the Debtor for permission or seeking the

6    Debtor's consent, correct?

7         MR. BONDS:  I'm going to object, Your Honor.  To the

8    extent that the witness knows, he can answer.

9         THE COURT:  I -- I didn't hear --

10        THE WITNESS:  I don't know.

11        THE COURT:  I didn't hear what your objection was,

12   Mr. Bonds.  Repeat.

13        MR. BONDS:  Your Honor, my objection was along the

14   lines of to the extent that the witness knows, he could

15   testify, but if he doesn't know, he doesn't need to speculate.

16        THE COURT:  All right.  Well, I don't hear an

17   objection there, but go ahead, Mr. Dondero, if you have

18   knowledge and can answer the question.

19        THE WITNESS:  I don't know.

20   BY MR. MORRIS:

21   Q    Do you recall that the Debtor subsequently gave notice to

22   you to vacate its offices and to return its cell phone?

23   A    I don't know.

24   Q    Did you ever --

25   A    I know I -- I know I was told to vacate the offices.  I

Dondero - Direct                    63

1  didn't see the specific --

2  Q    Uh-huh.  Your lawyer -- your lawyers never told that

3  Debtor that the cell phone had been disposed of or thrown in

4  the garbage, consistent with company practice, right?

5  A    I don't know.

6         MR. MORRIS:  Can we put up Exhibit K, please?

7  BY MR. MORRIS:

8  Q    This is the letter that my firm sent to your lawyer on

9  December 23rd.  Do you see that?

10  A    Yeah, I see it.

11  Q    Okay.

12         MR. MORRIS:  Can we scroll down a little bit?  Keep

13  going.  Okay.  Stop right there.

14  BY MR. MORRIS:

15  Q    Do you see that it says that, as a result of the conduct

16  described above, that the Debtor "has concluded that Mr.

17  Dondero's presence at the HCMLP office suite and his access to

18  all telephonic and information services provided by HCMLP are

19  too disruptive"?

20  A    Yeah, I see it.

21  Q    And this is the letter that gave you notice that you had

22  to vacate the premises by December 30th, correct?

23  A    I believe so.

24         MR. MORRIS:  Can we scroll down a little bit?

25  BY MR. MORRIS:

Dondero - Direct                     64

1  Q   You see at the bottom there's a reference to a defined

2  term of "cell phones"?

3  A   Yes.

4  Q   And it says that the Debtor "will also terminate Mr.

5  Dondero's cell phone plan and those cell phone plans

6  associated with parties providing personal services to Mr.

7  Dondero."  Do you see that?

8  A   Yes.  Yeah.

9  Q   Have I read that accurately?

10 A   Yes.

11 Q   And then my colleagues went on to write, "HCMLP demands

12 that Mr. Dondero immediately turn over the cell phones to

13 HCMLP by delivering them to you, Mr. Lynn."  Do you see that?

14 A   Yes.

15 Q   Have I read that accurately?

16 A   Yes.

17 Q   The last sentence on the page begins, "The cell phones

18 and."

19        MR. MORRIS:  And let's scroll down further.

20 BY MR. MORRIS:

21 Q   "The cell phones and the accounts are property of HCMLP.

22 HCMLP further demands that Mr. Dondero refrain from deleting

23 or wiping any information or messages on the cell phone.

24 HCMLP, as the owner of the account and cell phones, intends to

25 recover all information related to the cell phones and

Dondero - Direct                    65

1  accounts, and reserves the right to use the business-related

2  information."  Have I read that accurately?

3  A   Yes.

4  Q   Okay.  We were a couple of weeks too late, huh?

5  A   It sounds like it.

6  Q   Yeah.  Because the phones were already in the garbage,

7  right?

8  A   Yes.

9  Q   Uh-huh.  But that's not what Mr. Lynn told the Debtor on

10 your behalf, right?

11 A   I don't know.

12 Q   Mr. Lynn -- all right.  Let's -- let's see what Mr. Lynn

13 said.

14         MR. MORRIS:  Can we go to Exhibit U, please?

15 BY MR. MORRIS:

16 Q   It took Mr. Lynn six days to write a one-paragraph letter

17 in response, right?  December 29th, he responded?

18         MR. MORRIS:  Can we scroll down a bit?

19 BY MR. MORRIS:

20 Q   Let me read beginning with the second sentence of the

21 first substantive paragraph.  "We are at present not sure of

22 the location of the cell phone issued to Mr. Dondero by the

23 Debtor, but we are not prepared to turn it over without

24 ensuring the privacy of the attorney-client communications."

25 And then he goes on.

Dondero - Direct                          66

1      Have I read that correctly?

2   A   Yes.

3   Q   Okay.  So Mr. Lynn didn't say anything about the phone

4   being thrown in the garbage, right?

5   A   No.

6   Q   He didn't say that it was disposed of, did he?

7   A   No.

8   Q   He didn't refer to any company practice or policy, right?

9   A   No.

10  Q   Mr. Lynn's not a liar, is he?

11  A   No, he's not.

12  Q   He's a decent and honest professional.  Wouldn't you agree

13  with that?

14  A   Yes.

15  Q   And is it fair to say that he conveyed only the

16  information that he had at the time?

17  A   I don't know.

18  Q   Do you have any reason to believe that Mr. Lynn would

19  withhold from the Debtor the information that the cell phone

20  had been thrown in the garbage, consistent with company

21  practice?

22  A   No, I don't believe he would withhold whatever he knew.

23  Q   All right.  Let's talk about -- let's talk about other

24  matters.  You do know, sir, do you not, that the Debtor is

25  subject to the Bankruptcy Court's jurisdiction?

```
                    Dondero - Direct                    67

 1   A    Yes.

 2   Q    Okay.  And we just saw in the December 23rd letter that

 3   the Debtor demanded that you vacate their offices a week

 4   later, right?

 5   A    Yes.

 6   Q    And you knew that at or around the time the letter was

 7   sent on December 23rd, correct?

 8   A    I -- I don't remember when I knew.

 9   Q    Well, in fact, in fact, you or through counsel asked for

10   an accommodation and asked for an extension of time to

11   December 31st; isn't that right?

12   A    I had to pack up 30 years of stuff in three days.  I -- I

13   know we asked for some forbearance.  I don't think we got any.

14   I don't remember the details.  I don't understand why it's

15   important.

16   Q    Okay.  It was actually -- withdrawn.  The Debtor actually

17   gave you seven days' notice, right?  They sent the letter on

18   December 23rd and asked you to vacate on December 30th,

19   correct?

20   A    I don't -- I don't remember.  But, again, I think the

21   initial response was it was inconsistent with shared services

22   agreement.  No Highland employees are coming into the office

23   anyway.  So kicking me out of my office was -- seemed

24   vindictive and overreaching.  And we tried to get some, you

25   know, forbearance.
```

Dondero - Direct                    68

1   Q   Okay.

2           MR. MORRIS:  I move to strike, Your Honor.

3           THE COURT:  Sustained.

4   BY MR. MORRIS:

5   Q   Mr. Dondero, you were given seven days' notice before --

6   before you were going to be barred from the Debtor's office,

7   correct?

8   A   I don't know.

9   Q   Okay.

10          MR. MORRIS:  Can we go back to Exhibit K, please?

11  Oh, actually, it's okay.

12  BY MR. MORRIS:

13  Q   We just read, actually, the piece from the Debtor's letter

14  of December 23rd barring you from the Debtor's office.  Do you

15  remember that?  And we can go back and look at it if you want.

16  A   Yes.

17  Q   Was there anything ambiguous that you recall about the

18  Debtor's demand that you not enter their offices after

19  December 30th?

20  A   Ambiguous?  I can tell you what my understanding was or I

21  can tell you what the letter says.  What would you like to

22  know?

23  Q   I'd just like to know if, as you sit here right now, you

24  believe there was anything ambiguous about the Debtor's demand

25  that you vacate the offices as of December 30th?

Dondero - Direct                          69

1  A    I mean, I did vacate the offices as of December 30th.

2  Q    Correct.  And you knew that -- and you were complying with

3  the Debtor's demand you do that, right?

4  A    Well, with the Court's demand, I guess.

5  Q    Okay.  And it's your understanding that you would not be

6  permitted in the Debtor's offices after that time, correct?

7  A    Um, (pause), uh, I don't know how to answer that question.

8  I knew I wouldn't be residing in the offices anymore.  But for

9  legitimate business purposes, to visit the people at NexPoint

10 who were in the office, since there are no Highland people in

11 the office, or to handle a deposition, you know, there was

12 nothing I thought inappropriate about that.

13 Q    Did the Debtor tell you that they would allow you to enter

14 the offices any time you just believed that it would be

15 appropriate to do that?

16 A    I used my business judgment.

17         MR. MORRIS:  I move to strike.

18 BY MR. MORRIS:

19 Q    I'm asking you a very --

20         THE COURT:  Sustained.

21 BY MR. MORRIS:

22 Q    -- specific question, sir.  Did the Debtor ever tell you

23 that they -- that you would be permitted to enter their

24 offices after December 30th if you, in your own personal

25 discretion, believed it to be appropriate?

Dondero - Direct                    70

1   A    No.

2   Q    Did the Debtor provide you any exception to their demand

3   that you vacate the offices, without access, by and after

4   December 30th?

5   A    I always do what I think is appropriate and in the best

6   interests.  I don't know.  I didn't know the specifics of the

7   Debtor's -- okay, yeah, what the specifics of the Debtor was.

8   Q    Despite the unambiguous nature of the Debtor's demands

9   letter, on Tuesday you just walked right into the Debtor's

10  office and sat for the deposition, correct?

11  A    I believe that was reasonable, yes.

12  Q    Okay.  But you didn't -- you didn't have the Debtor's

13  approval to do that, correct?

14  A    We didn't have technology to do it anywhere else, so if

15  the deposition was going to occur, it had to occur there.

16  Q    Sir, --

17            MR. MORRIS:  Move to strike.

18            THE COURT:  Sustained.

19  BY MR. MORRIS:

20  Q    And I ask you to just listen very carefully.  And if it's

21  not clear to you, please let me know.  You did not have the

22  Debtor's approval to enter their offices on Tuesday to give

23  your deposition, correct?

24  A    No.

25  Q    And you did not even bother to ask the Debtor for

Dondero - Direct                          71

1   permission, correct?

2   A    I'm prohibited from contacting them, so no, I did not.

3   Q    Okay.  Let's talk about other events that occurred after

4   the entry of the TRO.  We talked earlier about how you

5   interfered with Mr. Seery's trading activities on behalf of

6   the CLOs around Thanksgiving.  Do you remember that?

7   A    Yes.

8   Q    But after the TRO was entered, the K&L Gates Clients also

9   interfered with the Debtor's trading activities, correct?

10  A    No.

11       MR. MORRIS:  Can we go to Exhibit K, please?  Can we

12  start at the first page?  And scroll down just a bit.

13  BY MR. MORRIS:

14  Q    Do you see there's an explanation there about the Debtor's

15  management of CLOs?

16  A    Yes.

17  Q    And there's a recitation of the history that we talked

18  about earlier, where around Thanksgiving you intervened to

19  block those trades?

20  A    Yes.

21  Q    And then the next paragraph refers to the prior motion

22  that was brought by the CLO entities?  I mean, the K&L Gates

23  entities, right?

24  A    Yes.

25  Q    And you were aware of that motion at the time it was made,

Dondero - Direct                          72

1  right?

2  A    Yes.

3  Q    And you were supportive of the making of that motion,

4  right?

5  A    Supportive?  Yes.

6         MR. MORRIS:  And scroll down to the next paragraph,

7  please.

8  BY MR. MORRIS:

9  Q    Okay.  So, my colleague wrote that, "On December 22nd,

10  2020, employees of NPA and HCMFA notified the Debtor that they

11  would not settle the CLO sale of the AVAYA and SKY

12  securities."  Have I read that right?

13  A    Yes.

14  Q    And that took place six days after the motion that the

15  Court characterized as frivolous was denied on December 16th?

16  A    Yes.  I wasn't aware of that, for what that's worth.

17  Q    Okay.  You personally instructed the employees --

18  withdrawn.  NPA -- that refers to NexPoint, correct?

19  A    Yes.

20  Q    That's an entity you own and control, right?

21  A    I -- largely.

22  Q    And that's one of the Advisors we defined earlier, right?

23  A    Yes.

24  Q    And HCMFA, that's Fund Advisors, another advisory firm

25  that you own and control, correct?

Dondero - Direct                    73

1  A    Yes.

2  Q    And you personally instructed, on or about December 22nd,

3  2020, employees of those Advisors to stop doing the trades

4  that Mr. Seery had authorized with respect SKY and AVAYA,

5  right?

6  A    Yeah.  Maybe we're splitting hairs here, but I instructed

7  them not to trade them.  I never gave instructions not to

8  settle trades that occurred.  But that's a different ball of

9  wax.

10 Q    Okay.  But you did instruct them not to execute trades

11 that had not been made yet, right?

12 A    Yeah.  Trades that I thought were inappropriate, for no

13 business purpose, I -- I told them not to execute.

14 Q    Okay.  You actually learned that Mr. Seery wanted to

15 effectuate these trades the Friday before, right?

16 A    I don't know, but what did I do?  When did I know it?

17 What did I do?  When I knew things are inappropriate, I

18 reacted immediately.  I don't -- I don't -- whenever --

19 whenever I found out about inappropriate things, I reacted to

20 the best of my ability.

21 Q    Okay.

22        MR. MORRIS:  I move to strike, Your Honor.

23        THE COURT:  Sustained.

24    Mr. Dondero, I'm going to -- I'm going to interject some

25 instructions once again here.  Remember we talked about early

Dondero - Direct                          74

1  on, and I know you've testified before, but I'll repeat it:

2  You need to just give direct yes or no answers.

3      And let me just say that we see witnesses all the time do

4  what you're doing here, and that is they feel they need to say

5  more than yes or no.  They feel the need to clarify or

6  supplement the yes or no answer they give.  And just to remind

7  you how this works, your lawyer, Mr. Bonds, is going to be

8  given the opportunity when Mr. Morris is through to ask you

9  all the questions he wants, and that will be your chance to

10  clarify yes and no answers to the extent he asks you to

11  revisit certain of these questions and answers.  Okay?

12      So I'm going to remind you once again:  yes or no or

13  direct -- you know, other appropriate direct answers.  Mr.

14  Bonds can let you clarify later.  All right?

15      Mr. Morris, continue.

16          MR. MORRIS:  Okay.  Thank you, Your Honor.

17      Can we please put up on the screen Exhibit L?  And at the,

18  I guess, the bottom of Page 1.

19  BY MR. MORRIS:

20  Q   This is an email string.  And --

21          MR. MORRIS:  Go to the email below that, please.

22  Yeah.  Okay.  Right there.

23  BY MR. MORRIS:

24  Q   This is an email from Mr. Seery dated December 18th at

25  (garbled) :30 p.m.  Do you see that?

Dondero - Direct                    75

1   A    Yes.

2   Q    And in the substantive portion of his email, continuing on

3   to the next page, he's giving instructions to sell certain SKY

4   and AVAYA securities that are held by CLOs, correct?

5   A    Yes.

6   Q    And Mr. Sowin forwarded this email to you, right?

7   A    Yes.

8         MR. MORRIS:  If we can scroll up.

9   BY MR. MORRIS:

10  Q    And you forwarded it to Mr. Ellington, right?  I'm sorry.

11  Let's just give Ms. Canty a chance.

12        MR. MORRIS:  Keep scrolling up.

13  BY MR. MORRIS:

14  Q    So, Mr. Sowin forwarded it to you at 3:34 p.m.  Do you see

15  that?

16  A    Yes.

17  Q    And if we scroll up, you turn around and give it to Mr.

18  Ellington a few minutes later, right?

19  A    Yes.

20  Q    So that you and Mr. Ellington and Mr. Sowin are all aware

21  that Mr. Seery wants to sell AVAYA and SKY securities on

22  behalf of the CLOs, right?

23  A    Yes.

24  Q    Why did you decide to forward this email to Mr. Ellington?

25  A    Ellington's role has been of settlement counsel that

Dondero - Direct                    76

1   supposedly everybody is able to talk to to try and bridge some

2   kind of settlement.  Ellington, I thought, should be aware of

3   things that would make settlement more difficult or create

4   liabilities for the Debtor.  And so I thought it was

5   appropriate for him to know.

6   Q   Okay.  This is the email that caused you to put a stop to

7   the trades that Mr. Seery wanted to effectuate, correct?

8   A   This is the -- I'm sorry.  Ask the question again.  This

9   is the email that what?

10  Q   This is -- this is how you learned that Mr. Seery wanted

11  to effectuate rates in AVAYA and SKY securities, right?

12  A   I -- I learned about it pretty early on of him trading it.

13  I don't know if it was this email or -- or one of the others.

14  But yes, it was from -- it was from Joe Sowin.

15  Q   And you would agree with me, would you not, that you

16  personally instructed the employees of the Advisors not to

17  execute the very trades that Mr. Seery identifies in this

18  email, correct?

19  A   Yes.

20  Q   At no time after December 10th, when the TRO was entered

21  into, did you instruct the employees of the Funds that you own

22  and control not to interfere or impede the Debtor's management

23  of the CLOs, correct?

24          MR. BONDS:  Can you repeat the question?  I'm sorry.

25  BY MR. MORRIS:

                         Dondero - Direct                    77

1  Q    At no time after December 10th, when the TRO was entered,

2  did Mr. Dondero instruct any employee of either of the

3  Advisors that he owns and controls not to interfere or impede

4  with the Debtor's business and management of the CLOs,

5  correct?

6  A    I did not.

7  Q    Okay.  Neither you nor anybody that you know of ever

8  provided a copy of the TRO to the employees of the Advisors

9  that you own and control, correct?

10 A    I don't know.

11 Q    Okay.  After the TRO was entered, the K -- after the TRO

12 was entered, and after the hearing on December 16th, the K&L

13 Gates Clients sent three more letters to the Debtor, right?

14 A    Yes.

15 Q    Okay.

16         MR. MORRIS:  Your Honor, those are Exhibits M as in

17 Mary, N as in Nancy, and X as in x-ray.

18         THE COURT:  Okay.

19         MR. MORRIS:  Unless the witness thinks there is a

20 need to look at them specifically -- oh, let me just ask a

21 couple of questions.

22 BY MR. MORRIS:

23 Q    Mr. Dondero, in those letters, it's your understanding

24 that the K&L Gates Clients again requested that the Debtor not

25 trade any securities on behalf of the CLOs, right?

Dondero - Direct                               78

1   A    Yes.

2   Q    And it's your understanding that in those letters the K&L

3   Gates Clients suggested that they might seek to terminate the

4   CLO management agreements to which the Debtor was a party,

5   correct?

6   A    I don't know specifically, but that wouldn't surprise me.

7   Q    Okay.

8   A    So, --

9   Q    Is it your understanding that the K&L Gates Clients also

10  sent the letter a Debtor -- the Debtor a letter in which they

11  asserted that your eviction from the offices might cause them

12  damages and harm?

13  A    I know there was objections to me -- I assume so.  I don't

14  know specifically.

15  Q    And you were aware of these letters at the time that they

16  were being sent, right?

17  A    I'm sorry, what?

18  Q    You were aware of these letters at the time they were

19  being sent by the K&L Gates Clients, right?

20  A    Generally, yes.

21  Q    And you were generally supportive of the sending of those

22  letters, right?

23  A    I'm always supportive of doing what we believe is the

24  right thing, yes.

25  Q    And in this case, you were supportive of the sending of

Dondero - Direct                          79

1  these three letters, correct?

2  A    I -- yes.

3  Q    In fact, you pushed and encouraged the chief compliance

4  officer and the general counsel to send these letters, right?

5  A    I push them to do the right thing.  I didn't push them

6  specifically.

7  Q    Okay.  At the time the letters were sent, you were aware

8  that the K&L Gates Clients had filed that motion that was

9  heard on the 16th of December, correct?

10 A    Yes.

11 Q    And you were aware that they advanced the very same --

12 withdrawn.  You're aware that in the letters they advance some

13 of the very same arguments that Judge Jernigan had dismissed

14 as frivolous just six days earlier, right?

15 A    I wasn't at the hearing.  I don't know if it was the same

16 arguments or similar arguments.  I -- I can't -- I can't

17 corroborate the similarity or contrast the differences between

18 the two.

19 Q    All right.  So it's fair to say, then, that you were

20 supportive of the sending of these letters, you were aware of

21 the December 16 argument, but you didn't take the time to see

22 whether or not any of the arguments being advanced in the

23 letters were consistent or any different from the arguments

24 that were made at the December 16th hearing, correct?

25 A    Correct.  I wasn't directly involved, but still believed

APP. 0863
Appx. 00910

Dondero - Direct                    80

1   that fundamentally Seery's behavior was wrong.

2   Q   You never instructed the K&L Gates Clients to withdraw the

3   three letters that were sent after December 10th, correct?

4   A   No.

5   Q   And you're aware that the Debtor had demanded that those

6   letters be withdrawn or it would seek a temporary restraining

7   order against the K&L Gates Clients, correct?

8   A   I'm not aware of the back and forth.

9   Q   Okay.  Let's talk about your communications with Mr.

10  Ellington and Mr. Leventon.  You communicated with them on

11  numerous occasions after December 16th, correct?

12  A   No.

13  Q   No, you didn't communicate with them many times after

14  December 10th?

15  A   You're lumping in Ellington and Isaac, and numerous times

16  is a bad clarifier, so the answer is no.

17  Q   I appreciate that.  You communicated many times with Mr.

18  Ellington after December 10th, right?

19  A   Not -- not outside shared services, pot plan, and him

20  being the go-between between me and Seery.  I would say

21  virtually none.

22  Q   Okay.  On Saturday, December 12th, two days after the

23  temporary restraining order was entered against you, Mr.

24  Ellington was involved in discussions with your personal

25  counsel about who would serve as a witness at the upcoming

Dondero - Direct                         81

1  December 16th hearing, correct?

2  A    I don't -- I don't remember.

3  Q    Let's see if we can refresh your recollection.

4           MR. MORRIS:  Can we please put up Exhibit P?  Can we

5  scroll down?  Okay.

6  BY MR. MORRIS:

7  Q    Do you see where Mr. Lynn writes you an email on Saturday,

8  December 12th, and he says, among other things, it looks like

9  trial?

10  A    Yes.

11  Q    And then if we scroll up a little bit, he wrote further,

12  "That said, we must have a witness now."  Have I read that

13  accurately?

14  A    Yes.

15  Q    Okay.

16           MR. MORRIS:  Can we scroll back up?

17  BY MR. MORRIS:

18  Q    And this is Mr. Ellington's response, right?

19  A    Yes.

20  Q    Can you read Mr. Ellington's response for Judge Jernigan?

21  A    (reading)  It will be J.P. Sevilla.  I'll tell him that he

22  needs to contact you first thing in the morning.

23  Q    Is it your testimony that this email relates to --

24  withdrawn.  Mr. Ellington is not your personal lawyer, right?

25  A    No.  Mr. Ellington has been functioning as settlement

```
                         Dondero - Direct                    82
```

1  counsel, trying to bridge settlement, --

2  Q   Okay.

3  A   -- which is what this email looks like to me.

4  Q   Okay.  I'll let -- I'll let the judge --

5        MR. MORRIS:  I move to strike, Your Honor.

6        THE COURT:  Sustained.

7  BY MR. MORRIS:

8  Q   So, after the TRO was entered, you and Mr. Ellington not

9  only communicated but Mr. Ellington was actively involved in

10 identifying witnesses to testify on behalf of your interests

11 at the December 16th hearing, correct?

12 A   I -- I don't know what the witness was for, but I believe

13 Ellington was doing his job as settlement counsel, trying to

14 facilitate settlement.  I don't -- I have no reason to think

15 this was anything more nefarious.

16 Q   Okay.  You looked to Mr. Ellington for leadership in

17 coordinating with all of the lawyers who were working for you

18 and your personal interests, right?

19 A   I'm not agreeing with that.

20 Q   No?  All right.

21        MR. MORRIS:  Let's look at the next exhibit.  I think

22 it's Exhibit Q.  And if we could stop right there.

23 BY MR. MORRIS:

24 Q   There's an email from Douglas Draper, do you see that, on

25 December 16th?

```
                        Dondero - Direct                    83
```

1    A    Yes.

2    Q    So this is after the TRO was entered into, right?

3    A    I believe so.

4    Q    And Mr. Draper represents Get Good and Dugaboy; is that

5    right?

6    A    I believe so.

7    Q    And he was new to the case at that moment in time, right?

8    A    On or about, I believe so.

9    Q    And he was looking to -- he was looking for a joint

10   meeting among all of the lawyers representing your personal

11   interests, right?

12   A    No.  I think he was trying to coordinate -- coordinate or

13   understand whatever.  But not everybody -- he doesn't just

14   talk to lawyers around my interests.  I mean, and he hasn't

15   sought agreements with just lawyers reflecting my interests.

16   Q    You forwarded Mr. Draper's email to Mr. Ellington, right?

17   A    Yes.

18   Q    But you can't remember why you did that, right, or at

19   least -- withdrawn.  You couldn't remember as of Tuesday's

20   deposition why you forwarded this email to Mr. Ellington,

21   right?

22   A    Not specifically.  But, again, Ellington is settlement

23   counsel.

24          MR. MORRIS:  I move to strike, Your Honor, after the

25   initial phrase "Not specifically."

                        Dondero - Direct                    84

1            THE COURT:  Sustained.

2            MR. MORRIS:  Can we scroll up a little bit, please?

3   BY MR. MORRIS:

4   Q   Mr. Lynn responded initially with a reference to the

5   assumption that a particular lawyer was with K&L Gates, right?

6   A   Yes.

7            MR. MORRIS:  And if we could scroll up a little bit.

8   BY MR. MORRIS:

9   Q   That's where you forward this email to Mr. Ellington,

10  right?

11  A   Yes.

12  Q   And can you read to Judge Jernigan what you wrote at 1:33

13  p.m.?

14  A   (reading)  I'm going to need you to provide leadership

15  here.

16  Q   But at least as of Tuesday's deposition, you couldn't

17  remember why you needed Mr. Ellington to provide leadership,

18  right?

19  A   Correct.  Nor if he did.

20           MR. MORRIS:  I move to strike the latter portion of

21  the answer, Your Honor.

22           THE COURT:  Sustained.

23  BY MR. MORRIS:

24  Q   So you have no --

25           (Echoing.)

Dondero - Direct                              85

1          MR. MORRIS:  We're getting --

2          THE WITNESS:  Can I -- can I hold -- can I hold on

3     for one second here?  Can I just put you guys on mute, please?

4          MR. MORRIS:  Sure.

5        (Pause.)

6          THE COURT:  All right.

7          THE CLERK:  John, there's some feedback again.  I'm

8     sorry.

9          MR. MORRIS:  That's okay.

10          THE COURT:  Mr. Bonds, --

11          MR. MORRIS:  We lost Mr. --

12          THE COURT:  Mr. Bonds, what's going on?

13          MR. MORRIS:  We've lost -- the screen --

14          THE COURT:  You know you can't counsel your client in

15     the middle of court testimony.  I thought maybe Mr. Dondero

16     had some non-legal thing going on in the background.  Mr.

17     Bonds?

18          MR. BONDS:  Your Honor, I -- I did not in any way

19     counsel Mr. Dondero.

20          THE COURT:  Okay.  Well, I'll take your

21     representation on that.  Are we ready to go forward?

22          MR. MORRIS:  I'll readily accept Mr. Bonds'

23     representation as well, Your Honor.

24          THE COURT:  Okay.

25          MR. MORRIS:  But I'd ask that it not happen again.

Dondero - Direct                                86

1          THE COURT:  Well, fair enough.  I think Mr. Bonds

2     understands.

3     BY MR. MORRIS:

4     Q   Mr. Dondero, you have no recollection of why you forwarded

5     this email to Mr. Ellington and why you told him you needed

6     him to provide leadership, correct?

7     A   Correct.

8          MR. MORRIS:  And if we can scroll up, can we just see

9     how Mr. Ellington responded?

10    BY MR. MORRIS:

11    Q   All right.  And can you just read for Judge Jernigan what

12    Mr. Ellington said on December 16th in response to your

13    statement that you're going to need him to provide leadership

14    here?

15    A   (reading)  On it.

16    Q   Thank you.  In your deposition, you testified without

17    qualification that Scott Ellington and Isaac Leventon did not

18    participate in the drafting of a joint interest or mutual

19    defense agreement.  Do you recall that testimony?

20    A   Yes, as far as I knew.

21    Q   And you also testified that you never discussed with

22    either of them the topic of a joint defense or mutual defense

23    agreement; is that right?

24    A   Correct.  That was Draper.

25    Q   Okay.

Dondero - Direct                    87

1          MR. MORRIS:  Can we put up Exhibit 11, please?  I

2     apologize.  It's Exhibit W.  Okay.  Can we stop right there?

3     BY MR. MORRIS:

4     Q    This is an email between some of your counsel and Mr.

5     Ellington.  Do you see that?

6     A    Yes.

7     Q    And a common interest agreement is attached to the

8     communication.  Is that a fair reading of the portion of the

9     exhibit that's on the screen?

10    A    Yes.

11         MR. MORRIS:  And can we scroll to the top of the

12    exhibit, please?

13    BY MR. MORRIS:

14    Q    And do you see that there is an email exchange between Mr.

15    Ellington and Mr. Leventon concerning the common interest

16    agreement?

17    A    Yes.

18    Q    Okay.  So it's your testimony that this email may exist

19    but you had no idea that Mr. Ellington and Mr. Leventon were

20    working with your lawyers to draft a common interest

21    agreement?  Is that your testimony?

22    A    I wasn't part of this.  It looks to me like they were just

23    included in a -- a final draft.  And, again, Ellington is

24    settlement counsel.  I -- but I don't want to speculate why or

25    what they were doing.

                    Dondero - Direct                    88

1   Q   Do you remember that I asked you a few questions the other

2   day about Multi-Strat financial statements and whether or not

3   you'd ever given -- you'd ever received any of those documents

4   from Mr. Ellington and Mr. Leventon?

5   A   Yes.

6   Q   Okay.  And you testified under oath that you never got any

7   financial information, including balance sheets, concerning

8   Multi-Strat from either of those lawyers, correct?

9   A   I -- hmm.  I -- I don't remember.  Yeah, I don't remember.

10  I may have to clarify that, but I don't remember.

11  Q   You testified under oath the other day that you wouldn't

12  even think to ask them for financial information relating to

13  Multi-Strat because it's not natural for them to have it,

14  right?

15  A   I -- I'm sorry.

16          THE WITNESS:  Your Honor, do I just have to answer

17  these questions yes or no, or is that the -- can I clarify at

18  all, or can I --

19          THE COURT:  Well, I mean, if the question simply

20  directs a yes or no answer, that's correct, you just answer

21  yes or no.  And I think this one did.

22      Again, your lawyer is going to have the chance to do

23  follow-up examination later.

24  BY MR. MORRIS:

25  Q   So let me try again.  During your deposition, you

Dondero - Direct                    89

1   testified under oath without qualification that you never got

2   any financial information, including balance sheets,

3   concerning Multi-Strat from Scott Ellington or Isaac Leventon,

4   correct?

5   A    I believe I might have misspoken there.

6   Q    Okay.  But that was your testimony the other day, right?

7   A    Yes.

8   Q    And today, you believe you might have gotten that

9   information from them, right?

10  A    Only because Ellington was supposed to be the go-between

11  and I couldn't go directly to somebody.  But he wouldn't

12  normally have that information, which is what I was saying.

13          MR. MORRIS:  Your Honor, I have an exhibit that's not

14  on the Debtor's exhibit list, and I was going to use it for

15  impeachment purposes to establish the fact that Mr. Ellington

16  and Mr. Leventon in fact gave to Mr. Dondero, after December

17  10th, financial information concerning Multi-Strat, which Mr.

18  Dondero had previously denied receiving.  May I -- may I use

19  that document to impeach Mr. Dondero?

20          THE COURT:  You may.

21          MR. BONDS:  Your Honor, I'm going to object.  This is

22  pretty clearly something that should have been disclosed and

23  it wasn't.

24          THE COURT:  Well, he says it's purely to impeach the

25  testimony that Mr. Dondero just now gave.  So we'll -- we'll

Dondero - Direct                    90

1    see the document and, you know, I'll either agree with that

2    being impeachment or not.  So, he may proceed.

3            MR. BONDS:  Your Honor, I think that the testimony

4    -- Your Honor, I'm sorry.  I think that the testimony that was

5    (inaudible) given was that he thought that he may have talked

6    to Scott or Isaac, not that he did not.

7            MR. MORRIS:  Your Honor, if I may, the testimony the

8    other day was unequivocal and unambiguous that not only didn't

9    he get this information from the two lawyers, but that he had

10   no reason to believe he would ever get the information from

11   those two lawyers.

12      I appreciate the fact that Mr. Dondero today is suggesting

13   that he may have, but I -- I would still like to use this

14   document to refresh his recollection and to impeach even the

15   possibility that he's giving this qualified testimony that he

16   may have.

17           THE COURT:  All right.

18           MR. MORRIS:  There's no doubt that he did.

19           THE COURT:  I overrule the objection.  You can go

20   forward.

21           MR. MORRIS:  Can we please put up on the screen -- I

22   believe it's Debtor's Exhibit AA.  And if we can scroll down,

23   please.  And just stop, yeah, towards the top.  All right.

24   Stop right there.

25   BY MR. MORRIS:

                        Dondero - Direct                    91

1    Q    Do you see in the first email Mr. Klos -- he's an employee

2    of the Debtor, right?

3    A    Yes.

4    Q    And he provides Multi-Strat balance sheet and financial

5    information to Mr. Leventon, Mr. Ellington, and Mr.

6    Waterhouse.  Do you see that?

7    A    Yes.  He's the person I would normally go to.

8    Q    Okay.  And they're all Debtor employees, right?

9    A    Yes.

10   Q    Okay.  And then Mr. Leventon sends it to you and Mr.

11   Ellington on February 4th, 2020; is that correct?

12   A    Yes.

13   Q    And this is confidential information; is that fair?

14   A    No.

15   Q    Okay.  Let's -- let's talk about the next --

16   A    No, it's not -- wait, wait, hold on a second.  Judge, I

17   need to clarify this.  I -- it's not confidential information.

18   It's available to every investor, of which I was one of them.

19   Okay?  So, let's -- let's not mischaracterize this as some

20   corporate secret.

21   Q    Okay.  You interfered with the Debtor's production of

22   documents; isn't that right?

23   A    No.

24   Q    Several times in the last year, various entities have

25   requested that Dugaboy produce its financial statements,

Dondero - Direct                     92

1  correct?

2  A   Dugaboy is my personal trust.  It's not an entity of the

3  Debtor in any form or fashion.

4  Q   Sir, you're aware that several times in the last year

5  various entities requested that the Debtor produce Dugaboy

6  financial information, correct?

7  A   The Debtor is not in a position to do it.  I -- I don't

8  know if it's been several times or whatever, but it's not

9  appropriate.

10         MR. MORRIS:  I move to strike, Your Honor.

11         THE COURT:  Sustained.

12  BY MR. MORRIS:

13  Q   I'll try one more time.  If we need to go to the

14  transcript, we can.  It's a very simple question.  You knew

15  and you know that several times in the last year various

16  entities have requested that the Debtor produce Dugaboy

17  financial statements, correct?

18  A   Yes.

19  Q   Do you recall at the deposition the other day I asked you

20  whether you had ever discussed with Mr. Ellington and Mr.

21  Leventon whether or not the Dugaboy financial statements

22  needed to be produced, and you were directed not to answer the

23  question by counsel and you followed those directions?

24  A   Yes.

25  Q   But you communicated with at least one employee concerning

Dondero - Direct                          93

1  the production of the Dugaboy financial statements, correct?

2  A    Yes.

3  Q    And that's Melissa Schroth; is that right?

4  A    Yes.

5  Q    She's an executive accountant employed by the Debtor,

6  right?

7  A    Yes.

8  Q    And on December 16th, after the TRO was entered into, you

9  instructed Ms. Schroth not to produce the Dugaboy financials

10 without a subpoena, correct?

11 A    That was the advice I had gotten from counsel, yes.

12 Q    Okay.  The Dugaboy and Get Good financial statements are

13 on the Debtor's platform, correct?

14 A    I do not know.

15 Q    There is no shared services agreement between Dugaboy or

16 Get Good and the Debtor, correct?

17 A    I don't know.

18 Q    You're not aware of any; is that fair?

19 A    Yes.

20 Q    Okay.

21       MR. MORRIS:  Can we put on the screen Exhibit R?  And

22 can you scroll down a bit?

23 BY MR. MORRIS:

24 Q    Okay.  That's Melissa Schroth at the top there; is that

25 right?

Dondero - Direct                    94

1  A    Yes.

2  Q    And these are texts that you exchanged with her after the

3  TRO was entered into, correct?

4  A    Yes.

5        MR. MORRIS:  Can we scroll down a little bit?

6  BY MR. MORRIS:

7  Q    And do you see on December 16th you sent Ms. Schroth an

8  email -- I apologize -- a text that says, "No Dugaboy details

9  without subpoena"?

10  A    Yeah.

11  Q    But you can't remember why you sent this text, correct?

12  At least you couldn't as of Tuesday?

13  A    I believe it was on advice of counsel.

14  Q    But that's not what you said on Tuesday, correct?

15  A    I don't remember.

16  Q    You sent this text even though you knew that various

17  entities had requested the Dugaboy financials, but you have no

18  recollection of ever talking to anyone at any time about the

19  production of those documents, right?

20  A    Can you repeat the question?

21  Q    I'll move on.  Let me just -- last topic, and then I'm

22  going to respectfully request that we just take a short break.

23  You're familiar with the law firm of Baker & McKenzie; is that

24  right?

25      (Echoing.)

Dondero - Direct                          95

1   A   I'm sorry.  You broke up on us there.

2   Q   No problem.  You're familiar with the law firm Baker &

3   McKenzie, correct?

4   A   Yes.

5   Q   That firm has never -- never represented you or any entity

6   in which you have an ownership interest, correct?

7   A   Correct.

8   Q   But in December, the Employee Group, of which Mr. Leventon

9   and Mr. Ellington was a part, was considering changing counsel

10  from Winston & Strawn to Baker & McKenzie, right?

11  A   I believe so.

12  Q   And you asked -- and because of that, you specifically

13  asked Mr. Leventon for the contact information for the lawyers

14  at Baker & McKenzie, right?

15  A   I believe so.

16  Q   Okay.

17          MR. MORRIS:  Can we put up Exhibit S, please?

18  BY MR. MORRIS:

19  Q   And who is that email sent from?  I apologize.  Withdrawn.

20  Who is that text message exchange with?

21  A   Isaac Leventon.

22  Q   Okay.  And Mr. Leventon was an employee of the Debtor

23  after December 10th, correct?

24  A   Yes.

25          MR. MORRIS:  Can we scroll down a little bit?

Dondero - Direct                              96

1   BY MR. MORRIS:

2   Q    And on December 22nd, you asked Mr. Leventon for the

3   contact information at Baker & McKenzie, correct?

4   A    Yes.

5   Q    And the reason you asked Mr. Leventon for the contact

6   information, that was in connection with the shared defense or

7   mutual defense agreement, right?

8   A    I -- I don't remember why.  It might have just been for my

9   records.  I don't know.

10  Q    The only reason that you could think of for asking for

11  this information was for the shared defense or mutual defense

12  agreement, correct?

13  A    I -- no, it -- I don't know and I don't want to speculate.

14  I don't want to -- I don't want to speculate.  I -- did -- I

15  don't think I ever got -- I don't know what your point is.

16       MR. MORRIS:  May we please go back to the transcript

17  at Page 136?  At the bottom, Line 23.

18  BY MR. MORRIS:

19  Q    Were you asked this question and did you give this answer?

20       "Q    Do you recall asking Isaac Leventon for the

21       contact information for the -- for the lawyers at

22       Bakers & McKenzie?

23       "A    I -- I don't -- I don't -- it might have been for

24       part of the shared defense, mutual defense whatever

25       agreement, but that's -- that's the only reason I would

Dondero - Direct                    97

1    have asked for it."

2    Q   Did you give that answer to my question?

3    A   Yeah.  I shouldn't have speculated.

4    Q   Okay.  But that's the answer you gave the other day; is

5    that right?

6    A   I shouldn't have speculated.  That's my answer today.

7    Q   And today -- withdrawn.  In fact, you wanted the Baker

8    contact information in order to help Mr. Draper coordinate the

9    mutual defense agreement, correct?

10   A   I don't want to speculate.

11          MR. MORRIS:  Can we go to Page 139, please?  Lines 2

12   to 5.

13   BY MR. MORRIS:

14   Q   Did you -- did you hear this question and did you give

15   this answer on Tuesday?

16      "Q   Why did you want the Baker & McKenzie contact

17      information?

18      "A   I was trying to help Draper coordinate the mutual

19      shared defense agreement, period."

20   Q   Did you give that answer to my question on Tuesday?

21   A   Yes.

22          MR. MORRIS:  Your Honor, I'd respectfully request a

23   short break to see if I've got anything more.

24          THE COURT:  All right.  Well, I was going to ask you

25   how much more do you think you have.  We've been going almost

Dondero - Direct                    98

1   two hours.

2        So we'll take a break.  Let's make it a ten-minute break.

3   And then, depending on how much more you have and how much Mr.

4   Bonds is going to have, we'll figure out are we going to need

5   a lunch break in just a bit.

6        All right.  So it's 12:00 noon Central.  We'll come back

7   at 12:10.  Ten minutes.

8             MR. MORRIS:  Your Honor, may I have an instruction of

9   the witness not to check his phone for any purposes, not to

10  make -- not to communicate with anybody until -- until his

11  testimony is completed?

12            THE COURT:  All right.  Any -- any --

13            MR. BONDS:  Your Honor, he's going to speak with me.

14            THE COURT:  Pardon?

15            MR. BONDS:  I assumed he will speak to me about just

16  general events.  I mean, I don't want to be in breach of some

17  order.

18            MR. MORRIS:  Yeah.  I would -- I would -- I would ask

19  for -- you know, it's not -- he's on the stand.  He's still on

20  the stand.

21            THE COURT:  Yeah.  He --

22            MR. MORRIS:  He shouldn't be conferring with counsel,

23  either.  No disrespect to Mr. Bonds at all.

24            THE COURT:  Exactly.  I mean, you all can talk about,

25  you know, the national champion football game or whatever, but

Dondero - Direct                    99

1  it would be counseling your client in the middle of testimony

2  if you -- if you talk about this case at the moment.  So, you

3  know, --

4           MR. BONDS:  I understand, Your Honor.

5           THE COURT:  All right.

6           MR. BONDS:  I just didn't want to be --

7           THE COURT:  All right.  So now we'll come back at

8  12:11.

9           THE CLERK:  All rise.

10          MR. MORRIS:  Thank you, Your Honor.

11     (A recess ensued from 12:01 p.m. until 12:12 p.m.

12          THE CLERK:  All rise.

13          THE COURT:  Please be seated.  This is Judge

14  Jernigan.  We're going back on the record in Highland Capital

15  versus Dondero.  We have taken an 11-minute break.  It looks

16  like we have Mr. Dondero and counsel back.  And Mr. Morris,

17  are you out there, ready to proceed?

18          MR. MORRIS:  I am, Your Honor.  And I do have just a

19  few more questions.

20          THE COURT:  Okay.  I'm sorry.  Mr. Lynn, I see you're

21  there in the room with Mr. Dondero.  Now, did you want to --

22          MR. LYNN:  Here's Mr. Bonds.  I apologize.  He was in

23  the restroom.

24          THE COURT:  Okay.  All right.  Everyone ready to

25  proceed?

Dondero - Direct                         100

1        MR. MORRIS:  Yes, Your Honor.

2        THE COURT:  Okay.  Mr. Morris, go ahead.

3        MR. MORRIS:  Thank you, Your Honor.

4              DIRECT EXAMINATION, RESUMED

5   BY MR. MORRIS:

6   Q    Can you hear me, Mr. Dondero?

7   A    Yes.

8   Q    Did you ever discuss the request of any party to produce

9   the financial statements of Get Good and Dugaboy with Scott

10  Ellington?

11  A    Not that I recall.

12  Q    Did you ever communicate with Mr. Leventon on the subject

13  matter of whether or not the financial statements for Get Good

14  and Dugaboy needed to be produced by the Debtor?

15  A    No.

16  Q    Those are the two questions that you were directed not to

17  answer the other day, right?

18  A    I don't remember.

19  Q    Okay.  You mentioned that Mr. Ellington serves in some

20  capacity as settlement counsel.  Do I have that right?

21  A    Yes.

22  Q    Do you know if there's any exception in the TRO that

23  permits you to communicate directly with Mr. Ellington in his

24  so-called capacity as settlement counsel?

25  A    There was no change in his status in the TRO.  It's -- and

Dondero - Direct                         101

 1  I think he was still used by both the Debtor and by me in that

 2  function.

 3  Q    You said that -- you testified earlier that you understood

 4  that you were prohibited from speaking with the Debtor's

 5  employees, correct?

 6  A    Except for -- except for with regard to the pot plan,

 7  shared services, and Ellington as settlement counsel.  But I

 8  continued to talk to employees about the pot plan as recently

 9  as the end of the year, and I continued to talk to employees

10  about shared services based on the shared services proposal

11  that was sent to Ellington and forwarded to me as recently as

12  two days ago.

13  Q    You never -- you never read the TRO, right?

14  A    No.

15       MR. MORRIS:  Can we have it put up on the screen?  I

16  don't know the exhibit number, Ms. Canty, but hopefully it's

17  clear on the exhibit list.

18       MS. CANTY:  I'm sorry, John.  Can you repeat what

19  you're looking for?

20       MR. MORRIS:  The TRO.  (Pause.)  Can we scroll down

21  to Paragraph 2, please?  Okay.

22  BY MR. MORRIS:

23  Q    I appreciate the fact that you've never seen this before,

24  Mr. Dondero, but let me know if I'm reading Section 2(c)

25  correctly.  "James Dondero is temporarily enjoined and

                        Dondero - Direct                    102

1    refrained from" -- subparagraph (c) -- "communicating with any

2    of the Debtor's employees, except for specifically -- except

3    as it specifically relates to shared services currently

4    provided to affiliates owned or controlled by Mr. Dondero."

5        Have I read that correctly?

6    A    Yes.

7    Q    Does that provide for any exceptions concerning the pot

8    plan?

9    A    The Independent Board requested a meeting on the pot plan.

10   Q    Okay.  But does it -- I appreciate that, and we'll talk

11   about that in a moment, but my question is very specifically

12   looking at the order.  And I, again, appreciate that you've

13   never seen it before.  But looking at the order now, is there

14   any exception for you to communicate with the Debtor's

15   employees concerning the pot plan?

16   A    I would think the pot plan would fall under that, since

17   some of the pot plan value is coming from affiliated entities

18   that are subject to the shared services agreement.  I would

19   think that would be reasonable, again, plus the -- well, it

20   was the subject of a meeting with the Independent Board at the

21   end of the month.

22   Q    Okay.

23   A    I still think it's the best alternative for this estate.

24   Q    Okay.  Did you -- did you ever -- did you ever ask

25   anybody, on your behalf, have asked the Debtors whether they

Dondero - Direct                    103

1   agreed with what you believed was a reasonable interpretation

2   of the restraining order?

3   A    I did not.

4   Q    Okay.  And let's just deal with the notion of settlement

5   counsel.  Do you see anywhere in this TRO -- and if you want

6   to read anything more, please let me know -- do you see

7   anything in this TRO that would permit you to speak with Mr.

8   Ellington in his so-called role as settlement counsel?

9   A    Well, I would say, more importantly, I don't see anything

10  that takes away his role as settlement counsel, which was

11  formally done six months ago.

12  Q    Okay.  I did read Section 2(c) correctly, right?

13  A    Yes.

14  Q    And the only exception that's in Judge Jernigan's

15  restraining order that she entered against you relates to

16  shared services.  Have I read that correctly?

17  A    Yes.

18  Q    Okay.  Let's talk about the pot plan for a moment.  After

19  the TRO was entered, you were interested in continuing to

20  pursue the pot plan; is that right?

21  A    I still believe it's the best possible result for this

22  estate.

23  Q    And you sought a forum with the Debtor's board, correct?

24  A    Yes.

25  Q    And you knew that you couldn't speak directly with any

Dondero - Direct                        104

1   member of the Debtor's board unless your counsel and the

2   Debtor's counsel was -- was present at the same time.

3   Correct?

4   A    Yeah.  As a matter of fact, I didn't go.  I just had

5   counsel go.

6   Q    And the Debtor's board gave Mr. Lynn a forum for him to

7   present your pot plan after the TRO was entered.  Isn't that

8   right?

9   A    I believe so.

10  Q    And are you aware that the Debtor's board spent more than

11  an hour and a half with Mr. Lynn talking about your pot plan

12  after the TRO was entered?

13  A    Yes.

14  Q    And is it fair to say that, notwithstanding Mr. Lynn's

15  goodwill and Mr. Lynn's efforts to try to get to a successful

16  resolution here, the terms on which the pot plan were offered

17  were unacceptable to the Debtor?

18  A    I wasn't there.  I -- I don't know.

19  Q    The Debtor never made a counteroffer, did it?

20  A    Not that I heard.

21  Q    You'll admit, will you not, that over the last year you or

22  others acting on behalf -- on your behalf have made various

23  pot plan proposals to the Official Committee of Unsecured

24  Creditors?

25  A    Quite generous pot plans that I think will exceed any

Dondero - Direct                        105

1   other recoveries.

2   Q   Okay.  So you're aware that your pot plan was delivered

3   either by you or on your behalf to the U.C.C., correct?

4   A   I -- some were.  Some, I don't know.

5   Q   Okay.  Has the U.C.C. ever made a counterproposal to you?

6   A   Nope.

7           MR. MORRIS:  I have no further questions, Your Honor.

8           THE COURT:  All right.  Pass the witness.

9       Mr. Bonds, do you have any time estimate for me,

10  guesstimate?

11          MR. BONDS:  My guess is, Your Honor, it'll be about

12  an hour.  I would hope that we could take some type of a

13  break, just because I'm a diabetic and need to have some --

14          THE COURT:  All right.  Well, --

15          MR. MORRIS:  I have no objection, Your Honor.

16  Whatever suits the Court.  I'm willing to accommodate Mr.

17  Bonds always.

18          THE COURT:  Okay.  Let's take a 45-minute break.

19  Forty-five minutes.  So, it's 12:22.  We'll come back at seven

20  minutes after 1:00 Central time.

21      All right.  We're in recess.

22          THE CLERK:  All rise.

23      (A luncheon recess ensued from 12:23 p.m. to 1:15 p.m.)

24          THE CLERK:  All rise.

25          THE COURT:  Please be seated.  This is Judge

Dondero - Cross                          106

1    Jernigan.  We are going back on the record in Highland Capital

2    Management versus Dondero.  We took a lunch break.  And when

3    we broke, Mr. Bonds was going to have the chance to examine

4    Mr. Dondero.

5        Let me just make sure we have, first, Mr. Dondero and Mr.

6    Bonds.  Are you there?

7            MR. BONDS:  Yes, we are.

8            THE COURT:  All right.  Very good.  I don't see your

9    video yet, but -- there you are.  All right.  Mr. Morris, are

10   you there?

11           MR. MORRIS:  I am here.  Can you hear me, Your Honor?

12           THE COURT:  I can.  All right.

13           MR. MORRIS:  Thank you.

14           THE COURT:  Well, we've got lots of other people, but

15   that's all I'll make sure we have at this moment.  All right.

16   Mr. Bonds, you may proceed.

17       And, Mr. Dondero, I know you know this, but I'm required

18   to remind you you're still under oath.

19       Okay, go ahead.

20                       CROSS-EXAMINATION

21   BY MR. BONDS:

22   Q    Before you resigned as portfolio manager, how long had you

23   had with Highland Capital Management?

24   A    Since inception in 1994.

25   Q    Okay.  And how long have your offices been at the

Dondero - Cross                                      107

1    Crescent?

2    A    Eight years.

3    Q    Okay.  Before you resigned as portfolio manager, did you

4    spend a lot of time in the office?

5    A    Yes.  I spent every business day this -- or 2020,

6    including COVID, in the office.

7    Q    Okay.  And this is the first time that you are not in the

8    office, is that right, in decades?

9    A    Yes.

10   Q    Can you tell us about the shared services agreement that

11   exists between the Debtor and the other entities in which you

12   have an interest?

13   A    NexPoint, NexBank, the DAF, HFAM, primarily.  I don't know

14   what other entities paid.  Shared services, which is typical

15   in finance, for centralized tax, accounting, RICO function, so

16   that we don't have to have redundant, multiple high-paid

17   people in different entities.  We'd have them centralized and

18   with collective experience and collective functionality.  And

19   so, historically and recently, they pay Highland for those --

20   fees for those services.  And I, as a non-paid employee, or a

21   non-employee of Highland but a paid employee of NexBank -- of

22   NexPoint, was -- and my occupancy and support were part of

23   those shared services agreement.

24   Q    What do those agreements allow those entities to do?

25   A    Would it allow those entities to do?  Well, to access the

                          Dondero - Cross                      108

1   Highland functionality as appropriate, because most of those

2   entities, as is typical in finance, did not have their own

3   functionality, legal, tax, and -- legal, tax, and accounting,

4   but although they've been -- they've been building it lately

5   in anticipation of the pot plan not going through at Highland.

6   Q   Okay.  Do those agreements allow you to share office space

7   with --

8           MR. MORRIS:  Objection --

9           THE WITNESS:  Yes.

10          MR. MORRIS:  -- to the form of the question, Your

11  Honor.  I think the exhibits and the agreements themselves

12  would be the best evidence.  They're not in evidence.  They

13  haven't been offered in evidence.  I have no way to challenge

14  the witness on anything he's saying.  And on that basis, I'd

15  -- it's not fair to the Plaintiff.

16          THE COURT:  All right.  Mr. Bonds, can I ask you to

17  repeat your question?  It was muffled and I was about to ask

18  you to repeat it before I got the objection.  So, repeat the

19  question so I can --

20          MR. BONDS:  Okay.  I'm going to repeat it and amend

21  it.

22          THE COURT:  Okay.

23  BY MR. BONDS:

24  Q   Is it your understanding that those agreements allow you

25  to share office space with the Debtor?

Dondero - Cross                              109

1    A    Yes.  Virtually all of NexPoint's employees share the

2    Highland office space as part of a shared services agreement.

3    Q    Do those agreements allow you to share -- I'm sorry,

4    excuse me.  Strike that.  What else do they allow?

5    A    Typically is used in coordination of systems, servers,

6    software, cloud software, Internet software, office software,

7    tax, accounting, and legal functionality are all part of the

8    shared services agreement, although, you know, much of -- much

9    of that was stripped, you know, four or five months ago,

10   especially legal functionality and the accounting

11   functionality, without the concurrent adjustment in the

12   building.

13   Q    Okay.  And you previously testified that you generally

14   control NexPoint; is that correct?

15   A    Generally.  And the distinction I was trying to make is,

16   you know, following the financial crisis in '08, compliance

17   and the chief compliance officer has personal liability. along

18   with the rest of the C Suite, and operates independently, with

19   primary loyalty to the regulatory bodies.  And they're --

20   they're not controlled, bamboozled, or segued away from their

21   responsibility.  And at all times, they're supposed to be

22   doing what they believe is right, regulatorily-compliant, and

23   in the best interest of investors.

24        So that was the distinction I was drawing between, A, what

25   I was trying to remind Thomas of, that he should be

Dondero - Cross                          110

1  independent of Seery, in terms of following what he believes

2  is correct and regulatory-compliant.  And I don't have to push

3  the NexPoint compliance people and general counsel to do

4  anything specific, nor could I.  They are supposed to do what

5  is right from a regulatory investor standpoint, and I believe

6  that's what they've done.

7  Q    All right.  And what do you mean by the term or the usage

8  of the word "generally"?

9  A    Well, that's the distinction I was just drawing.  I mean,

10  generally, on regular business strategy, you know, major

11  investments, you know, other business items, I'm in control of

12  those entities.  But in terms of the content and allegations,

13  regulatory opinions that come from compliance and the general

14  counsel, that is their best views on their own, knowing they

15  have compliance obligations and personal liability.

16  Q    Do you believe that NexPoint and its other owners and

17  interest holders have rights independent from your own in this

18  case?

19  A    Right, yes, and obligations, and responsibilities to

20  investors.  I believe the attempt by the Debtor or Seery to

21  hide behind contracts that the Debtor has with the CLOs are --

22  are a spurious, incomplete argument.  You know, they're not in

23  compliance with those contracts.  Bankruptcy alone is an event

24  of default.  Not having the key man -- the key men, the

25  required requisite professionals that they're obligated to

Dondero - Cross                          111

1   contractually have working at the Debtor is a clear breach, in

2   violation of those CLO contracts. Not having adequate staff

3   or investment professionals to analyze, evaluate, or follow

4   the investments in the portfolio is a clear violation. And

5   specifically telling investors in the marketplace that you

6   plan to terminate all employees, a date certain January 24th,

7   is a proclamation that you're not going to be in any form able

8   to be a qualified registered investment advisor or qualified

9   in any which way to manage the portfolio or be in compliance

10  with the CLO contracts.

11      I would -- I would further add that the selling of the

12  securities, and the SKY securities, represent incomplete

13  intentional incurring of loss against the investors. You have

14  securities that are less liquid with, you know, restructured

15  securities that have been owned for ten years, and they were

16  sold during the most illiquid weeks of the year, the couple

17  days before and after Thanksgiving, couple days before and

18  after Christmas, where the investors could have gotten 10 or

19  15 percent more on their monies if they were just sold in a

20  normal week. It's -- it's preposterous to me. It's

21  consistent with Seery not being an investment (garbled).

22      But it's preposterous to me that -- that this treatment of

23  investors is allowed or being camouflaged as some kind of

24  contractual obligation, when the investors have said these

25  funds are clearly in transition and the manager clearly is

Dondero - Cross                                      112

1  incapable of managing them.  You know, please don't transact

2  until the transition is complete.  But Jim Seery has traded

3  every day, including -- I don't know about today, but every

4  day this week, selling securities for no investment rationale

5  and no business purpose.

6  Q    Are you also portfolio manager for NexPoint?

7  A    Yeah, I'm a portfolio manager for the closed-end retail

8  funds, which do have a higher fiduciary obligation than

9  anything on the institutional side.  I'm a portfolio manager

10 for those '40 Act funds that are the primary owners of the

11 CLOs that Seery is selling securities in for some unknown

12 reason.

13 Q    And what shared service agreements exist between NexPoint

14 and the Debtor?

15 A    Those are the shared service agreements I spoke of.  I

16 don't want to repeat myself.

17 Q    And I'm going to call Highland Capital Management Fund

18 Advisors, LP just Fund Advisors.  Is that okay with you?

19 A    Yes.

20 Q    Okay.  And you testified generally -- that you generally

21 control Fund Advisors; is that correct?

22 A    Yes.

23 Q    Do you believe that Fund Advisors and its owners and

24 interest holders have rights independent from your own in this

25 case?

Dondero - Cross                          113

1   A    Yes.

2   Q    Are you the portfolio manager for Fund Advisors?

3   A    Yes.

4   Q    What shared services agreements exist between Fund

5   Advisors and the Debtor?

6         MR. MORRIS:  Objection, Your Honor.  The agreements

7   themselves are the best evidence of the existence in terms of

8   any agreement between the Debtor and these entities.

9         MR. BONDS:  Your Honor, I can fix that.

10        THE COURT:  Okay.

11  BY MR. BONDS:

12  Q    I'm just asking:  What is your understanding, Mr. Dondero,

13  of the shared service agreements between the Debtor and Fund

14  Advisors?

15  A    It's similar to the agreement I mentioned earlier.  It

16  covers a broad range of centralized services historically

17  provided by Highland, but now those, while still paying

18  smaller than historic fees, those entities now have been

19  required to incur the expenses of duplicating those functions.

20  Q    Okay.  Do you recall the email string dated November 24th

21  regarding SKY equity that the Debtor talked about?

22  A    Yes.

23  Q    What did you mean when you sent that email about the

24  trade?  What did you mean, I'm sorry?

25  A    I was trying to inform the traders, and once they knew --

Dondero - Cross                              114

1   they weren't willing to do the trades anymore once they knew

2   that the underlying investors had requested that their

3   accounts not being traded until the transition be -- until the

4   transition of the CLOs was effectuated.

5        It's -- it's standard by, you know, statute or

6   understanding, in the money and management business, when

7   you're moving accounts from one asset manager to another, and

8   someone requests that you don't do anything to their account,

9   you don't trade it whimsically.  And so I was -- I was making

10  sure the traders knew that the underlying investors had

11  requested that no trades occur in their accounts.

12       And then I believed it was a clear violation of the

13  Registered Investment Adviser's Act.  I believe that people

14  involved at a senior level or at a compliance level could have

15  material liability, and could create material liability for

16  the Debtor.  And I think if, as I said before, I think if

17  anybody on this call were to call the SEC, they would start on

18  audit on this.

19            MR. MORRIS:  Your Honor, I move to strike the first

20  portion of the answer prior to when he started to describe

21  what he believes and what he thinks.  The first portion of the

22  answer was devoted to testifying about what is in the

23  knowledge of the people who he was communicating with.

24  There's no evidence.  Mr. Dondero, of course, was free to call

25  any witness he wanted.  He could have called the chief

Dondero - Cross                          115

1  compliance officer.  He could have called the general counsel.

2  He could have called all the people he's now testifying on

3  behalf of, and he did not.

4     So I move to strike anything in the record that purports

5  to reflect or suggest the knowledge on behalf of any party

6  other than Mr. Dondero.

7           THE COURT:  Okay.  I'm --

8           MR. BONDS:  Let me rephrase -- Your Honor, I'm going

9  to rephrase the question.

10          THE COURT:  Okay.  Very well.

11          MR. BONDS:  I'm sorry.

12          THE COURT:  So the motion to strike is granted.  If

13  you're going to rephrase, go ahead.

14          MR. BONDS:  Okay.

15  BY MR. BONDS:

16  Q   Mr. Dondero, what did you mean when you said -- that the

17  emails about the trade?

18  A   Okay.  I'll give my intention by sending emails to stop

19  the trade and my basis for those emails.  My intentions were

20  to inform the traders and to inform the compliance people that

21  I believe there was a trade that wasn't in the best interest

22  of the employees that had no business purpose for its

23  occurring.  And the people involved weren't aware that the

24  investors had sent over requests not to trade their accounts

25  while they were in transition.

Dondero - Cross                    116

1    So I made the traders aware of that.  I made compliance

2 aware of that also.  And it's my belief, based on 30 years'

3 experience in the industry, that it is entirely inappropriate

4 to trade the accounts of investors that are in transition, and

5 especially when you're not -- you're not contractually -- you

6 are contractually in default with that client, to trade their

7 account whimsically, for no business purpose.  And I thought

8 it was a clear breach of both regulatory, ethical, and

9 fairness with regard to the investors.

10    So I -- what did you know, when did you know it, what did

11 you do?  I did what I felt was the right thing, which I try

12 and do every day, and made all the relevant parties aware of

13 what was going on.

14 Q    Mr. Dondero, do you recall the text message you sent to

15 Mr. Seery in which you said, "Be careful what you do"?

16 A    Yes.

17 Q    What did you mean by that message?

18 A    It's -- I even said, Last warning.  I mean, I -- he's

19 doing things against the interests of investors.  He's

20 purposely incurring losses by trading in days and weeks and

21 time of the year, the day before and after Thanksgiving, where

22 any novice knows the markets are illiquid and anybody who can

23 read a computer screen can see you get ten percent less --

24 five or ten percent less than you would the week before or the

25 week after.  And with as much professional umbrage as

Dondero - Cross                    117

1    possible, I was recommending that he stop.

2    Q   Did you intend to personally threaten Mr. Seery in any

3    way?

4    A    No.  It was bad -- bad intentional professional acts

5    against the interests of investors that flow through to '40

6    Act retail mom-and-pop investors.  I was trying to prevent

7    those losses and those bad acts from occurring.  And I believe

8    everybody who's -- everybody around that issue should be

9    ashamed of themselves, in my opinion.

10   Q   Do you now regret sending the text?

11   A    No.  No, I mean, I could have worded it differently.  I

12   was angry on behalf of the investors.

13   Q   And Mr. Dondero, you have management ownership interest in

14   that entity; is that right?

15   A    Yes.

16   Q   Do you believe the interests or other entities in which

17   you are involved are independent from your personal rights in

18   this case?

19   A    Yes.

20   Q   And do you believe you caused anyone to violate the TRO?

21   A    No.  I've been -- I've been very conscious to just try and

22   champion the thing that -- things that I think are important

23   and the things that I've been tasked to do, like an attractive

24   pot plan to help resolve this case.  I spend time on that.

25   But every once in a while, do I have to access, let's say,

Dondero - Cross                        118

1  David Klos, who is the person who put the model together, who

2  has been working on it for six or nine months, and no one else

3  S has a copy of?  Yes.  Yeah, I have to -- I have to access

4  him.  I don't believe that's the -- inappropriate or in any

5  way violating the spirit of the TRO.

6      I believe settlement in this case is only going to happen

7  with somebody fostering communication.  And Ellington's role,

8  which I thought was a good one and I thought he was performing

9  well as settlement counsel, was an important role.  And I used

10 him for things like -- and Seery also used him for things.  As

11 recently as two days before Ellington was fired, Seery gave

12 him a shared services proposal to negotiate with me.

13 Ellington has always been the go-between from a settlement and

14 a legal standpoint.  I think his role there was -- it was

15 valued.  To try to honor the TRO was things like Multi-Strat,

16 that I didn't remember correctly.  Ninety percent of the time

17 or for the last 20 years I would have gone directly to

18 Accounting and Dave Klos for it, but I purposely went to

19 settlement counsel in terms of Ellington in order to get the

20 Multi-Strat information which we needed in order to put the

21 pot plan together that we went to the Independent Board with

22 at the end of December.

23 Q   (faintly)  And do you recall the questions that Debtor's

24 counsel had regarding the letters sent by K&L Gates to clients

25 of the Debtor?

Dondero - Cross                               119

1          MR. MORRIS:  I'm sorry, Your Honor.  I had trouble

2    hearing that question.

3          THE COURT:  Please repeat.

4          MR. BONDS:  Sure.

5    BY MR. BONDS:

6    Q    Do you recall the questions Debtor's counsel had regarding

7    the letters sent by K&L Gates to the clients of the Debtor --

8    to the Debtor?

9    A    Yes.

10   Q    You testified on direct that the letters were sent to do

11   the right thing; is that correct?

12   A    Yes.

13   Q    What did you mean by that?

14   A    I don't want to repeat too much of what I just said, but

15   the Debtor has a contract to manage the CLOs, which in no way

16   is it not in default of.  It doesn't have the staff.  It

17   doesn't have the expertise.  Seery has no historic knowledge

18   on the investments.  The investment staff of Highland has been

19   gutted, with me being gone, with Mark Okada being gone, with

20   Trey Parker being gone, with John Poglitsch being gone.

21        And there's -- there's a couple analysts that are a year

22   or two out of school.  The overall portfolio is in no way

23   being understood, managed, or monitored.  And for it to be

24   amateur hour, incurring losses for no business purpose, when

25   the investors have requested numerous times for their account

Dondero - Cross                    120

1   not to be traded, is crazy to me.  Where the investors say, We

2   just want our account left alone.  We just want to keep the

3   exposure.  And Jim Seery decides no, there's -- I'm going to

4   turn it into cash for no reason.  I'm just going to sell your

5   assets and turn them to cash and incur losses by doing it the

6   week of Thanksgiving and the week of Christmas.  I think it's

7   -- it's shameful.  I'm glad the compliance people and the

8   general counsel at HFAM and NexPoint saw it the same way.  I

9   didn't edit their letters, proof their letters, tell them how

10  to craft their letters.  They did that themselves, with

11  regulatory counsel and personal liability.  They put forward

12  those letters.

13          MR. MORRIS:  Your Honor (garbled) the testimony that

14  Mr. Dondero just gave about these people saw it.  They're not

15  here to testify how they saw it.  We know that Mr. Dondero

16  personally saw and approved the letters before they went out.

17  He can testify what he thinks, what he believes.  I have no

18  problem with that.  But there should be no evidence in the

19  record of what the compliance people thought, believed,

20  understood, anything like that.  It's not right.

21          THE COURT:  All right.  That's essentially a --

22          MR. BONDS:  Your Honor?

23          THE COURT:  -- a hearsay objection, I would say, or

24  lack of personal knowledge, perhaps.  Mr. Bonds, what is your

25  response?

Dondero - Cross                          121

1          MR. BONDS:  Your Honor, my response would be that

2    there are several exhibits the Debtor introduced today that

3    stand for the proposition that the compliance officers were

4    concerned.  So I think there is ample evidence of that in the

5    record.

6          THE COURT:  I didn't --

7          MR. MORRIS:  Your Honor, the letter --

8          THE COURT:  I did not understand what you said is in

9    the record.  Say again.

10         MR. BONDS:  Your Honor, I'm sorry.  The -- there are

11   -- there are references that are replete in the record that

12   have to do with the compliance officers' understanding of the

13   transactions.

14         THE COURT:  I don't know what you're referring to.

15         THE WITNESS:  Your Honor?

16         THE COURT:  I've got a lot of exhibits.  You're going

17   to have to point out what you think --

18         THE WITNESS:  Can I -- can I -- can I -- can I answer

19   for -- that for a second?  The letters that were signed by the

20   compliance people or by the businesspeople at NexPoint and

21   HFAM objecting to the transactions, those letters were their

22   beliefs, their researched beliefs.  They weren't --

23         THE COURT:  Okay.

24         THE WITNESS:  -- micromanaged by me.  You know, they

25   weren't -- I agree with them, but those weren't my beliefs

Dondero - Cross                    122

1   that they've stated.  Those were their own beliefs and their

2   own research, --

3            THE COURT:  All right.

4            THE WITNESS:  -- and the record should reflect --

5            THE COURT:  This is clearly hearsay.  I mean, it's

6   one thing to have a letter, but to go behind the letter and

7   say, you know, what the beliefs inherent in the words were is

8   inadmissible.  All right?  So I strike that.

9            THE WITNESS:  Maybe ask your question again.

10  BY MR. BONDS:

11  Q   Yeah.  What is your understanding of the rights that these

12  parties had and what do you believe that was intended to be

13  conveyed by the compliance officers?

14           MR. MORRIS:  Objection.  Calls -- calls for Mr.

15  Dondero to divine the intent of third parties.  Hearsay.

16           THE COURT:  I sustain.

17           MR. BONDS:  Your Honor, --

18           MR. MORRIS:  No foundation.

19           MR. BONDS:  -- I don't agree.  I think that this is

20  asking Mr. Dondero what he thinks.

21           MR. MORRIS:  The letters speak for themselves, Your

22  Honor.

23           THE COURT:  Okay.  I sustain --

24           MR. MORRIS:  And Mr. --

25           THE COURT:  I sustain the objection.

Dondero - Cross                    123

1              MR. MORRIS:  All right.  Thank you.

2              THE WITNESS:  Ask me what I know.  Or ask me what my

3    concerns --

4    BY MR. BONDS:

5    Q    Let me ask you this.  What were your concerns relating to

6    the compliance officers' exhibit?

7    A    My concerns regarding the transaction, the transactions,

8    which may repeat what I've said before, but I do want to make

9    sure it gets in the record.  So if we have to make a -- these

10   were my concerns, whether or not they were the compliance

11   people's concerns.  I believe they were, and I believe they

12   were similar, but I'm just going to say these are -- these

13   were my concerns.

14       The Debtor, with its contractual -- with its contract with

15   the CLOs, were in no way -- was in no way compliant with that

16   contract or not in default of that contract.  Bankruptcy is a

17   reason for default.  Not having the key men specified in the

18   contract currently employed by the Advisor is a violation.

19   Not having adequate investment staff to manage the portfolio

20   is a violation of that contract.  Announcing that you're

21   laying off everybody and will no longer be a registered

22   investment advisor is proclaiming that you, if you even have

23   any -- any -- pretend that you're qualified or in compliance

24   with the contract now, you're broadcasting that you won't be

25   in three weeks, are -- are all mean that you're not in good

Dondero - Cross                                124

1  standing.  Okay?  Number one.

2      Number two, when the investors know that it's in

3  transition, you're not in compliance as a manager, you're not

4  going to be an RIA in three weeks, the accounts are going to

5  have to transition to somebody else in three weeks, and the

6  investors ask you, Please don't trade my accounts between now

7  and then, that is -- that is a -- if it's not a *per se*, it's

8  an ethical and a spirit violation of any relationship between

9  an investor and an asset manager.

10     To then sell assets -- not replace assets, just sell

11  assets for cash -- and purposely do it on the least liquid

12  days of the year -- the day before Thanksgiving, the day after

13  Thanksgiving, the week of Christmas, this past week, whatever

14  -- to purposely incur losses so that the investors suffer ten

15  or fifteen percent losses that other -- on each of those sales

16  that they wouldn't otherwise have to incur, and for no stated

17  business purpose, for no investment rationale, with no staff

18  to even say whether the investment is potentially going up or

19  down, is -- is -- is -- I've never seen anything else like it.

20     And I will stand up and say it every day:  I'm glad the

21  letters went out from HFAM and from NexPoint.  I would never

22  recommend they get retracted.  And I believe everybody who

23  signed those letters meant everything in those letters.  And I

24  believe the letters are correct.  And I believe the whole

25  selling of CLO assets is a travesty.

Dondero - Cross                          125

1      My personal opinion, we need an examiner or somebody here

2   to look at this junk and look at some of the junk that

3   occurred earlier this year.  This -- this stuff is

4   unbelievable to me.

5   Q    Generally, who holds interests in the CLOs?

6   A    A vast majority of the CLOs that we're speaking of that

7   Seery has been selling the assets of are owned by the two

8   mutual funds, the two '40 Act -- the two '40 Act mutual funds

9   and the DAF.  Between them, I think out of -- eleven out of

10  the sixteen CLOs, they own a vast majority, and then I think,

11  whatever, two or three they own a hundred percent, and I think

12  two or three they own a significant minority.

13     And just because they don't own a hundred percent doesn't

14  somehow allow a registered investment advisor to take

15  advantage of an investor.  And I -- I've never understood that

16  defense.  I wouldn't be able -- in my role of 30 years, I

17  wouldn't be able to tell that to an investor, that, hey, you

18  had a contract with us, we did something that wasn't in your

19  best interest, but we got away with it because you didn't own

20  a hundred percent, you only owned eighty percent.

21         MR. MORRIS:  Your Honor, I move to strike.  There's

22  no contract between the Debtor and Mr. Dondero's -- and the

23  entities that he owns and controls for purposes of the CLO.

24  The only contract is between the Debtor and the CLOs

25  themselves.

Dondero - Cross                    126

1    THE COURT: All right. Well, I overrule whatever

2    objection that is. Again, if you want to bring something out

3    on cross-examination or through Mr. Seery, you know, you're

4    entitled to do that.

5        All right. Please continue.

6    BY MR. BONDS:

7    Q   Do you believe these letters were sent by the Funds to the

8    Advisors because they are trying to protect the independent

9    entities?

10   A   They're trying to protect their investors. They were

11   trying to protect their regulatory liability for activities

12   they see that are not in the best interests of investors.

13       MR. MORRIS: Objection, Your Honor. I move to

14   strike. He's again testifying as to the intent of the people

15   who sent the letters who are not here to testify today.

16       THE COURT: Sustained.

17   BY MR. BONDS:

18   Q   Mr. Dondero, what is your belief as to the letters that

19   were sent by the Funds and Advisor? Is -- are they trying to

20   protect their independent interests?

21       MR. MORRIS: Objection, Your Honor. Asked and

22   answered.

23       THE COURT: Sustained.

24       THE WITNESS: Ask me --

25   BY MR. BONDS:

Dondero - Cross                    127

1   Q    What is your understanding of why the letters were sent?

2            MR. MORRIS:  Objection, Your Honor.  Asked and

3   answered.

4            THE COURT:  Sustained.

5   BY MR. BONDS:

6   Q    Mr. Dondero, would you have sent the letters?

7   A    I would have sent the letters exactly or very similar or

8   probably even more strongly than the letters were stated, for

9   the purposes of protecting investors, to protecting mom-and-

10  pop mutual fund investors from incurring unnecessary losses by

11  an entity that was no longer in compliance with their -- with

12  their asset management contract and because the investors had

13  requested that their account just be frozen until it was

14  transitioned.

15       That's why I would have sent the letter.  That's why I

16  believe the letter should be sent.  That's why I'm happy they

17  were sent.  That's why we've never retracted.

18  Q    Mr. Dondero, who is Jason Rothstein?

19           THE COURT:  I did not hear the question.

20           THE WITNESS:  Jason -- Jason --

21           MR. BONDS:  Who --

22           THE COURT:  Please repeat.

23           MR. BONDS:  Yes.  I asked Mr. Dondero who Jason

24  Rothstein was.

25           THE WITNESS:  Jason Rothstein heads up our systems

Dondero - Cross                    128

1  department at Highland Capital.

2  BY MR. BONDS:

3  Q   Can you explain what your text message to Mr. Rothstein

4  was about?

5  A   Which text message?  The one where it was in the drawer?

6  Q   Yeah.

7  A   Uh, --

8  Q   And that was actually from him, not you.

9  A   Yeah.  That was from him.  I think he transferred icons or

10  set up personal stuff to the new phone, and he was just saying

11  that the old phone was in Tara's drawer.

12  Q   And you don't know whether -- what's happened to the

13  phones, do you?

14  A   No.  Like I said, I believe they've been destroyed, but I

15  -- I can find out.  I mean, I can query and find out who

16  destroyed it, if that's important.

17  Q   And you understood that you were not supposed to talk to

18  the Debtor's employees; is that correct?

19  A   Like I said, except for my roles regarding shared

20  services, the pot plan, and trying to reach some type of

21  settlement, I've had painfully few conversations with the

22  Debtor's employees.

23  Q   When you talked to certain employees, did you think it was

24  an -- under an exception to the TRO, like shared services,

25  related to the pot plan, or settlement communications?

Dondero - Cross                              129

1    A    Yes.

2          MR. MORRIS:  Your Honor, I move to strike.  Mr.

3    Dondero never read the TRO.  He's got no basis to say what the

4    TRO required and didn't require.

5          MR. BONDS:  That wasn't the -- that wasn't the

6    question.

7          THE COURT:  Okay.

8          MR. BONDS:  I'm sorry.

9          THE COURT:  Okay.  Rephrase the question, please.

10         MR. BONDS:  Okay.  I'm sorry.

11   BY MR. BONDS:

12   Q    When you talked to these -- to certain employees, did you

13   think it was under an exception to the TRO, like shared

14   services, relating to the pot plan, or settlement

15   communications?

16   A    Yes.  Absolutely.

17         MR. MORRIS:  I object.  No foundation.

18         THE COURT:  Sustained.

19   BY MR. BONDS:

20   Q    Mr. Dondero, do you understand -- did your lawyers explain

21   to you the TRO?

22   A    Yes.

23   Q    And who was the lawyer that explained the TRO to you?

24         MR. MORRIS:  Your Honor, I don't know if we're

25   getting into a waiver of privilege, but I just want to tell

Dondero - Cross                    130

1   you that my antenna are up very high.

2          THE COURT:  Okay.  Mine are as well, Mr. Bonds.  Are

3   you about to waive the privilege?

4          MR. BONDS:  No, Your Honor, I am not.

5          THE COURT:  Okay.  Well, it sounded like perhaps we

6   were about to have the witness testify about conversations he

7   had with lawyers.

8          MR. BONDS:  I'm sorry, Your Honor.  That was not my

9   intention.  Again, I'm asking Mr. Dondero to explain for us

10  his contact with -- or, his impression of the TRO.

11  BY MR. BONDS:

12  Q    What did the TRO mean to you?

13  A    The TRO meant to me that I was precluded from talking to

14  Highland employees -- which, again, very few, if any, were

15  coming into the office.  I was not talking to Highland

16  employees with any regularity anyway.  But there was an

17  exception with regard to Scott Ellington regard -- Scott

18  Ellington in terms of him functioning as settlement attorney

19  to try and bridge the U.C.C., the Independent Board, Jim

20  Seery, other people, and things that impacted me or other

21  entities.

22      I also viewed that there was an exception for the pot

23  plan, which had been presented and gone over as recently as

24  December 18th and 20th.  And -- or December 18th, I think, was

25  the date.

Dondero - Cross                           131

1    And you know what, I want to clarify a characterization of

2    the pot plan.  I still believe it's the best and most likely

3    alternative for this estate in the long run.  I think what

4    we've proposed numerous times is more generous than what

5    anyone will receive in a liquidation and in a more timely

6    fashion.

7    And the last time we presented it to the Independent

8    Board, the Independent Board thought it was attractive and

9    thought we should go forward with it to the U.C.C. and other

10   parties.

11           MR. MORRIS:  Your Honor, I move to strike the last

12   portion of the answer that purports to describe what the

13   Independent Board thought.

14           THE COURT:  Well, --

15           MR. MORRIS:  No foundation.  Hearsay.

16           THE COURT:  What is your response to the hearsay

17   objection, Mr. Bonds?

18           MR. BONDS:  Your Honor, I don't have one.

19           THE COURT:  Okay.  I sustain.

20   BY MR. BONDS:

21   Q   What exceptions did you believe there were for

22   communications with employees?

23   A   Okay.  Thank you.  Yeah.  Like I said, I covered Scott

24   Ellington and settlement counsel.  I covered the pot plan.

25   Q   Okay.

Dondero - Cross                                    132

1   A    My -- my view of the pot plan as -- my view of the pot

2   plan was that it was very attractive, and I had received

3   encouragement to go forward with it as something that should

4   be workable.  That's my testimony on that.

5        And then -- and we talk about negotiating shared services.

6   So, there's shared services in terms of overlap in

7   functionality, but there's also, in terms of negotiating the

8   shared services agreement, which, as I said, was something

9   that Ellington was put in charge of three or four days ago by

10  Jim Seery to negotiate with us.  And he reached out to me to

11  negotiate it.  And I think the Pachulski deadline on it was

12  three days later.  That whole process was something that I

13  viewed as separate from the TRO, especially since it was

14  initiated by Jim Seery, DSI, et cetera, and consistent with

15  what Scott Ellington's role had been for the last six, nine

16  months.

17  Q    As to the Debtor's request that you vacate the office

18  space, did you comply with this request?

19  A    Yes.

20  Q    What did you think that vacating meant?

21  A    I moved out all my -- my personal items to a new office at

22  NexBank.

23  Q    (faintly)  And, in fact, did you work on the last day over

24  to 3:00 a.m.?

25  A    Yes.  4:00.

Dondero - Cross                           133

1        THE COURT:  Mr. Bonds, I didn't hear your question.

2   I didn't hear your question.

3        MR. BONDS:  Okay.  I'm sorry.

4   BY MR. BONDS:

5   Q   Did -- isn't it true that you worked through the night, to

6   3:00 or 4:00 a.m., to vacate the premises?

7   A   Yes.  Until 4:00 a.m. on the last day, to organize and

8   pack up all my stuff, yes.

9   Q   Did you think your presence in the office, with no other

10  employees there, violated the spirit of the TRO?

11  A   No.  I thought it was over the top and meant to tweak me,

12  but, yeah, there's no -- there's not Debtor employees coming

13  in since COVID.

14  Q   (faintly)  Okay.  And you thought you could talk to Mr.

15  Ellington and -- as settlement counsel; is that correct?

16       MR. MORRIS:  I'm having trouble hearing it, Your

17  Honor.

18       THE WITNESS:  Yes.

19       THE COURT:  Yeah.  We're -- Mr. Bonds, please make

20  sure you speak into the device.

21       MR. BONDS:  I'm sorry.  I'll try to get closer.

22  Okay.  I asked the Debtor -- or I, excuse me, I asked Mr.

23  Dondero if he thought he could talk to Ellington as a go-

24  between or settlement counsel.  And I asked him if that was

25  correct.

Dondero - Cross                    134

1           THE WITNESS:  Yes.  For settlement, shared services,

2   the pot plan.  Nothing that interrupts or affects the Debtor,

3   but for those purposes, as has consistently occurred for the

4   last six months.

5   BY MR. BONDS:

6   Q    Okay.  And you saw the texts and emails presented by the

7   Debtor between you and Mr. Leventon; is that correct?

8   A    The one regarding Multi-Strat?

9   Q    Yes.

10  A    Yes.

11  Q    In your understanding, did you believe those

12  communications were allowed under the TRO?

13  A    Well, yes.  And, again, to clarify my -- my contrasting

14  testimony, I would never typically have gone to them for that

15  kind of information, but to be compliant with the TRO, for

16  Multi-Strat information, which I needed in order to put

17  together the pot plan that the Independent Board audienced on

18  December 18, I needed the information on Multi-Strat, and I

19  requested it as appropriate through settlement counsel

20  Ellington.  And I think Ellington requested it from Isaac, who

21  requested it from David Klos.

22       The whole purpose, I believe -- my belief is the whole

23  purpose of this TRO is to make it impossible for us to get

24  information to come up with alternatives other than a -- the

25  plan proposed by Jim Seery.  It's our -- if -- if -- without

Dondero - Cross                          135

1  Ellington in the go-between, which he's now no longer an

2  employee, I assume the only way we get any information,

3  balance sheet or anything from Highland Capital, is with a

4  subpoena.

5      And as much as I've tried to engage or make an attractive

6  pot plan for everybody, each one of them has been a complete

7  shot in the dark, without even knowing the assets and

8  liabilities of Highland, but just estimating where they were

9  or were likely to be.

10 Q   Do you believe your text message with Leventon caused any

11 harm to the Debtor's business?

12 A   No.  It potentially fostered a pot plan, because, you have

13 to know, the pot plan needed -- one of the aspects of the pot

14 plan was the --

15 Q   Do you still want to advocate for your pot plan?

16 A   I think that's eventually where we ultimately end up.  Or

17 -- or should end up.  Otherwise, I fear it's going to be an

18 extended, drawn-out process.

19 Q   And how much did you initially propose to pay creditors in

20 this case?

21 A   The most recent -- the most recent pot plan?

22 Q   No.  The -- initially.

23 A   The initial pot plan, I believe, was $160 million.

24 Q   And what about the notes?

25 A   There was $90 [million] of cash and I believe $70

Dondero - Cross                          136

1   [million] of notes.

2   Q    And what is Multi-Strat?

3   A    Multi-Strat is a fund that's managed by Highland.  They

4   used to have $40 or $50 million in value.  It used to contain

5   a lot of life settlement policies.  And I believe now has $5

6   or $6 million of value, after assets have been sold.

7   Q    Do you recall the email Debtor's counsel presented

8   regarding the balance sheet today?

9   A    The balance sheet of Multi-Strat?

10  Q    Correct.

11  A    Yes.

12  Q    Do you believe you were entitled to see that document?

13  A    Yes.  It's just -- again, for the pot plan, I needed it.

14  But also I'm an investor in that fund and I'm entitled to it.

15  It's -- there was nothing in there that was improper or

16  untoward or in any way damaged the Debtor.

17  Q    And you recall the request for documents sent by the

18  Debtor; is that correct?

19  A    On my -- my personal estate plan?

20  Q    No, on Multi-Strat.

21  A    The Debtor's request on -- I'm sorry.  What was that?

22  Q    The Debtor sent you a request for Multi-Strat.  For Duga

23  -- I'm sorry.

24  A    For Dugaboy?  Okay.

25  Q    Dugaboy.

Dondero - Cross                          137

1   A    Yeah.  There's -- there's personal estate planning trusts.

2   Some are active.  Some are inactive.  Some have been around

3   for 15 years.  But they're -- they're not assets or anything

4   that's related to the estate.  And that was -- that was my

5   text to Melissa that said, you know, Not without a subpoena.

6   Q    Mr. Dondero, if you remember back on Exhibit K, there was

7   some request that you terminate your offices at the Crescent,

8   and I think you were given seven days' notice to do that.  Do

9   you know if Christmas occurred during that time?

10  A    I believe it did.

11  Q    So, if Christmas and Christmas Eve are both holidays, how

12  many days, business days, did they give you to terminate or to

13  get out of the space?

14  A    There would have been three business days.  It was Monday

15  through Wednesday that I moved out.

16          MR. BONDS:  Your Honor, I'll pass the witness.

17          THE COURT:  All right.  Mr. Morris?

18          THE WITNESS:  Take a break.  I hope.

19          MR. BONDS:  Your Honor, I'm sorry, can I take a ten-

20  minute break?  I think that I'm going to be through, but I

21  don't know.

22          THE COURT:  All right.  I'll give you a ten-minute

23  break.

24          MR. BONDS:  All right.  Thank you, Your Honor.

25          THE COURT:  We're coming back at 2:15.

Dondero - Cross                              138

1          THE CLERK:  All rise.

2      (A recess ensued from 2:06 p.m. until 2:16 p.m.)

3          THE CLERK:  All rise.

4          THE COURT:  All right.  Please be seated.  We're back

5   on the record in Highland versus Dondero.  Mr. Bonds, do you

6   have more examination?

7          MR. BONDS:  Your Honor, I have one question.

8          THE COURT:  Okay.

9          MR. BONDS:  And that's --

10         MR. LYNN:  And one more witness.

11         MR. BONDS:  And one more witness.

12                  CROSS-EXAMINATION, RESUMED

13  BY MR. BONDS:

14  Q   Do you think that Scott Ellington and Isaac Leventon were

15  treated appropriately by the Debtor?

16  A   No, I do not.  I don't think they've been treated fairly,

17  nor do I think other senior employees have been treated

18  fairly.  I've never seen a bankruptcy like this where, during

19  complex unwinding of 20 years of various different entities

20  and structures, relying on the staff, working them hard,

21  working overtime, a lot of investment professionals like

22  lawyers and DSI just putting their name on the work of stuff

23  that was done by internal employees, getting to the end of the

24  year, trying to pay people zero bonuses and retract prior

25  years' bonuses, and try and come up with legal charges against

Dondero - Cross                    139

1   those people is unusual to this case and my experience, in the

2   bankruptcies we've been involved in, where typically

3   management teams get paid multiples of current salary to stay

4   on and be the experts.

5       I also think they were put in difficult spots from the

6   very beginning.  It was Jim Seery that made Scott Ellington

7   the settlement counsel six, seven months ago.  It was a

8   broadly-defined role that was never retracted, never adjusted,

9   never modified, yet somehow he and Isaac violated it.  I don't

10  know.  I haven't spoken to them since they've been terminated.

11  They aren't allowed to speak to me, from what I hear.  But I

12  wish them luck in their claims.

13          THE COURT:  Okay.  You pass the witness?

14          MR. BONDS:  Yes, Your Honor.

15          THE COURT:  All right.  Mr. Morris, do you have

16  further examination?

17          MR. MORRIS:  Just a few questions.

18                  REDIRECT EXAMINATION

19  BY MR. BONDS:

20  Q   Mr. Dondero, you knew about this hearing for some time,

21  right?

22  A   No.

23  Q   When did you first learn this hearing was going to take

24  place?

25  A   Two days ago.

Dondero - Redirect                    140

1   Q    Two days ago?

2   A    When was the depo, three days ago?  Whatever.

3   Q    And you didn't know prior to the deposition that we would

4   be having a hearing today on the Debtor's motion for a

5   preliminary injunction?

6   A    No.  I thought it was going to be postponed or canceled.

7   I was waiting for the text last night.

8   Q    You had an opportunity to call any witness in the world

9   you wanted to today, right?

10  A    I guess.

11  Q    You could have called -- you could have called the chief

12  compliance officer at the Advisors if you thought the Court

13  should hear from him as to the compliance issues that you've

14  testified to, right?

15  A    I think their letters stand on their own.

16  Q    Okay.  So you didn't think that it was important for the

17  Court to hear from Mr. Sowin directly, correct?

18  A    Sowin is a trader.

19  Q    I'm sorry.  Who's the chief compliance officer of the

20  Advisors?

21  A    Jason Post, as far as NexPoint is concerned.  He's the one

22  that would have been behind the K&L -- K&L letters.

23  Q    And he is not here today to testify, right?

24  A    I think his letters stand on their own and I think

25  everybody should read them, make sure they read them.

Dondero - Redirect                    141

1  Q   Okay.  But Mr. Post is not here to answer any questions;

2  is that right?

3  A   I don't know if there are any questions beyond what's

4  obviously stated in the letters.  You should read the letters

5  carefully.  They're -- they're -- they talk about clear

6  violations.

7        MR. MORRIS:  Your Honor, I move to strike.  It's a

8  very simple question.

9        THE COURT:  Sustained.  That was another yes or no

10  answer, Mr. Dondero.  Go ahead.

11        THE WITNESS:  I'm sorry.

12  BY MR. MORRIS:

13  Q   Mr. Dondero, Mr. Post is not here to testify in order to

14  explain to the Court what he thinks the regulatory issues are,

15  correct?

16  A   He's not here today.

17  Q   And you could have called him as a witness, correct?

18  A   Yes.

19  Q   And you thought Mr. Ellington and Mr. Leventon were

20  treated unfairly, right?

21  A   Yes.

22  Q   And there's no reason why they couldn't have come today to

23  testify, correct?

24  A   I guess they could have.

25  Q   And there's no reason why anybody on behalf of the K&L

Dondero - Redirect                          142

1  Gates clients couldn't have been here to testify, correct?

2  A    I didn't deem it necessary, I guess.

3  Q    Okay.  You could have offered into evidence, at least

4  offered into evidence, any document you wanted, right?

5  A    Yes.

6  Q    And you could have offered the judge, for example, the

7  shared services agreement, the shared services agreements for

8  which you gave the Court your understanding, right?

9  A    Which shared services, the one that Seery gave Ellington

10 three days ago or the original one from years ago?

11 Q    Any of the ones -- any of the ones that you have referred

12 to today.  You could have given any of them to the judge,

13 right?

14 A    Correct.

15 Q    And you didn't, right?

16 A    I did not.

17 Q    In fact, there's not a single piece of evidence in the

18 record that corroborates anything you say; isn't that right?

19 A    I -- I believe all those documents are in the record.

20 They're just not in the record of this TRO.  But they're all

21 --

22 Q    Oh.

23 A    They're all in the record.

24 Q    Do you remember that there was a hearing on December 16th?

25 I think you -- you testified that you're fully aware of that

                        Dondero - Redirect                    143

1   hearing that was brought by the K&L Gates Clients.  Do you

2   remember that?

3   A    Yes.

4   Q    Who testified at that hearing on behalf of the K&L Gates

5   Clients?  Dustin Norris?

6   A    I believe -- I believe Dustin Norris testified.

7   Q    Uh-huh.  And what's Mr. Norris's role at the Advisors?

8   A    He's one of the senior managers.

9   Q    Is he a compliance officer?

10  A    No.

11  Q    Is he a trader?

12  A    No.  But he's one of the senior managers.

13  Q    Okay.  They could have called anybody they wanted, to the

14  best of your understanding, right?

15  A    I don't think they got a chance to.  Wasn't it an

16  abbreviated hearing?

17  Q    They offered Mr. Norris as a witness.  Do you understand

18  that?

19  A    I -- all I -- I wasn't there.  I didn't attend virtually.

20  I -- but I did know that Norris testified.  But I don't know

21  who else was called, wasn't called, was going to be called,

22  was on the witness list.  I have no awareness.

23  Q    Okay.  You were pretty critical of the trades that Mr.

24  Seery wanted to make that you interfered to stop, right?

25  A    I think he's subsequently done most of those trades.

Dondero - Redirect                    144

1   Q    And you called them preposterous because he wanted to do

2   it around Thanksgiving or around Christmas, at least based on

3   your testimony, correct?

4   A    That's when it did occur.

5   Q    And is it your testimony -- is it your testimony that

6   every single person in the world who trades securities near a

7   holiday is making a preposterous trade?

8   A    I think it's amateur and not what an investment

9   professional would do.

10  Q    So you never trade on holidays; is that your testimony?

11  You've never done it once in your life?

12  A    Very rarely, unless there's another overriding reason.

13  And there was no overriding reasons, period.

14  Q    How would you know that when you didn't even ask Mr. Seery

15  why he wanted to make the trades?

16  A    I asked Joe Sowin, who asked Jim Seery.  And Joe Sowin

17  said that Jim Seery just said for risk reduction.

18          MR. MORRIS:  I move to strike on the grounds that

19  it's hearsay, Your Honor.

20          THE COURT:  Sustained.

21  BY MR. MORRIS:

22  Q    You never asked Mr. Seery why he wanted to make the

23  trades, correct?

24  A    I'm not allowed to talk to Mr. Seery.

25  Q    You certainly were around Thanksgiving; isn't that right?

Dondero - Redirect                     145

1   A    I don't know.

2   Q    There was no TRO in place at that time, correct?

3   A    That's true.

4   Q    You're pretty critical of Mr. Seery and his capabilities;

5   is that right?

6   A    He's a lawyer.  He's not an investment professional.

7   Q    Did you object to his appointment as the CEO of the

8   Debtor?

9   A    No.

10  Q    Have you made any motion to the Court to have him removed

11  as unqualified?

12  A    Not yet.

13  Q    Okay.  But with all the knowledge of all the preposterous

14  things that he's been doing for months now, you haven't done

15  it, right?

16  A    No.

17  Q    When you -- when -- before you threw the phone in the

18  garbage, did you back it up?

19  A    No.

20  Q    Did it occur to you that maybe you should save the data?

21  A    No.

22  Q    You said that the only way you think you might be able to

23  get information going forward is through a subpoena.  Do I

24  have that right?

25  A    I mean, that's how it seems.  I mean, it seems at every

                        Dondero - Redirect                146

1  turn -- and now with Scott Ellington being gone and Isaac

2  being gone -- I have no idea how the Debtor is ever going to

3  defend against UBS.

4           THE COURT:  I did not --

5           THE WITNESS:  I have no idea how --

6           THE COURT:  I didn't hear the answer after with

7  Ellington and Leventon being gone.  I didn't hear the rest of

8  the answer.  Could you repeat?

9           THE WITNESS:  I said I have no idea how the Debtor is

10 ever going to defend itself against UBS.  But I also have no

11 idea how we're ever going to get any information or ever push

12 forward any kind of settlement without having any access to

13 information or anybody to talk to.

14 BY MR. MORRIS:

15 Q    Do you trust Judge Lynn?

16      (Echoing.)

17 A    Yes.

18 Q    Is he a good advocate?

19 A    Yes.  If anybody returns his phone calls.

20 Q    Do you recall that on October 24th Judge Lynn specifically

21 asked my law firm to provide information on your behalf in

22 connection with the Debtor's financial information, their

23 assets and their liabilities?

24 A    Yes.

25 Q    Do you recall that the Debtor simply asked that you

Dondero - Redirect                               147

1  acknowledge in an email between and among counsel that you

2  would abide by the confidentiality agreement that was entered

3  by the Court?

4  A    I wasn't involved in those details.

5  Q    Didn't you send an email in which you agreed to receive

6  the financial information subject to the protective order that

7  this Court entered?

8  A    I'm sure I would.  I just don't remember.

9  Q    That was a condition that the Debtors made.  That doesn't

10 refresh your recollection?

11 A    I'm not denying it.  I just don't remember, and --

12 Q    Okay.  And --

13 A    (overspoken)

14 Q    I'm sorry, I don't mean to cut you off.  And in fact, on

15 December 30th, the day you were supposed to vacate the office,

16 the Debtor voluntarily provided to Judge Lynn all of the

17 information that had been requested on your behalf without the

18 need for a subpoena, right?

19 A    Yeah.  It took a week.  It's 40,000 pages of mixed

20 gobbledygook that we're -- we're going through.  But it should

21 provide enough information for us to negotiate a pot plan if

22 anybody so chose.

23 Q    So you didn't need to (echoing) the 40,000 pages of

24 financial information from the Debtor; all you needed was an

25 agreement that you would abide by the protective order.

Dondero - Redirect                    148

1   Correct?

2   A    I think that was the first thing that was ever produced on

3   request that I can remember.  But yes.

4   Q    And it was just a week ago, right?

5   A    Yes.

6           MR. MORRIS:  I have no further questions, Your Honor.

7           THE COURT:  All right.  Mr. Bonds, do you have

8   anything else?

9           MR. BONDS:  I do not, Your Honor, as to this witness.

10  I have one other witness.

11          THE COURT:  All right.

12          MR. MORRIS:  Your Honor, I don't know who they plan

13  on calling, but he's not on the witness list.

14          THE COURT:  All right.  Well, --

15          MR. BONDS:  Your Honor, this other witness --

16          THE COURT:  Just a moment.  This concludes, for the

17  record, Mr. Dondero's testimony.  But, obviously, stick

18  around, because we're going to have a lot to talk about when

19  this is finished as far as the evidence.

20      All right.  Now, who are you wanting to call that you did

21  not identify?

22          MR. BONDS:  I'd like to call Mike Lynn for the

23  purpose -- or, to -- as a rebuttal witness.

24          THE COURT:  Lawyer as witness?

25          MR. MORRIS:  Your Honor?

149

1          THE COURT:  Well, you know, first off, rebuttal of

2    what?  Rebuttal --

3          MR. MORRIS:  Exactly.  He's going to rebut his own

4    client, Your Honor?  He's going to rebut his own client?

5    There's only been one witness to testify here.  He was on

6    their exhibit list.  How do they call a witness to rebut their

7    own client?

8          THE COURT:  Yes.  What -- I don't --

9          MR. BONDS:  Your Honor?

10          THE COURT:  Go ahead.

11          MR. BONDS:  Mr. Morris testified or attempted to

12    testify that the pot plan didn't gain any traction.  We will

13    submit Mike Lynn on that issue.

14          THE COURT:  No.

15          MR. MORRIS:  Your Honor?

16          THE COURT:  I'm not going to allow a lawyer to

17    testify to rebut lawyer argument.  That's very inappropriate,

18    in my view.  So, not going to happen.

19          MR. LYNN:  (garbled)

20          MR. BONDS:  Your Honor, he would be a fact witness to

21    discussions with the other side.

22          MR. MORRIS:  Your Honor, I strenuously object.

23    They're -- he's only rebutting -- my questions are not

24    evidence.  The only evidence in the record is Mr. Dondero's

25    testimony.  Mr. Dondero is their client.  Mr. Dondero was on

150

1 their witness list. They should not be permitted to call any

2 witness, with all due respect to Mr. Lynn, to rebut their own

3 witness.

4        THE COURT: All right.

5        MR. BONDS: Your Honor, we're not rebutting our

6 witness. We are rebutting the testimony that Mr. Morris gave.

7        THE COURT: Mr. Morris is a lawyer. He makes

8 argument. He asks questions. He was not a witness today.

9 Okay?

10     So if you want to say whatever you want to say as lawyers

11 in closing arguments, then obviously you can do that. But I'm

12 not going to allow a lawyer to be a witness to rebut something

13 another lawyer said in argument or in a question. I -- it's

14 -- so, I disallow that.

15     Anything else, then?

16        MR. BONDS: No.

17        THE COURT: Okay. And while we're talking about

18 procedure, actually, Mr. Morris, it's the Debtor's motion, and

19 I'm not even sure that's all of your evidence. So, do you

20 have any more evidence as Movant?

21        MR. MORRIS: No, Your Honor. The Plaintiff and the

22 Debtor rest.

23        THE COURT: All right. So, at the risk of repeating,

24 now that the Movant has rested, it would be Mr. Dondero's

25 chance to put on supplemental evidence. But what I'm hearing

151

 1    from Mr. Morris is there were no witnesses identified on your

 2    witness list?

 3            MR. BONDS:  Other than Mr. Dondero, Your Honor.

 4            THE COURT:  Okay.  All right.  Well, was there any

 5    stipulated documentary evidence that -- that you had --

 6            MR. BONDS:  No, Your Honor.

 7            THE COURT:  All right.  Well, I guess we're done with

 8    evidence.

 9        Mr. Morris, your closing argument?

10            MR. MORRIS:  All right.  Before I get to that, Your

11    Honor, I just want to make a very brief statement.  When the

12    Debtor objected to Mr. Dondero's emergency motion for a

13    protective order, the Debtor stated that it sought discovery

14    from Mr. Dondero to determine whether Mr. Dondero may have

15    violated the TRO by interfering and impeding the Debtor's

16    business, including by potentially colluding with UBS.  After

17    that motion was decided, both Mr. Dondero and UBS produced

18    documents to the Debtor.

19        Based on the review of that information, the Debtor found

20    no evidence that Mr. Dondero and UBS colluded to purchase

21    redeemed limited partnership interests of Multi-Strat, nor any

22    inappropriate conduct by UBS or its counsel.

23        The Debtor appreciates the opportunity to clear that part

24    of the record.

25            THE COURT:  All right.

152

1        CLOSING ARGUMENT ON BEHALF OF THE PLAINTIFF

2        MR. MORRIS:  Now, with respect to the motion at hand

3    today, Your Honor, I want to take you back just about a month

4    ago to December 10th, 2020.  At that time, we had a hearing on

5    the Debtor's motion for a TRO.  The motion had been filed in

6    advance.  Mr. Dondero had filed an objection.  He had concerns

7    about the scope and the language of the terms of the proposed

8    TRO.

9        And at that hearing, Your Honor, if you'll recall, you

10   listened carefully to the arguments that were made on behalf

11   of Mr. Dondero.  You heard carefully -- you listened carefully

12   to the proposed changes that he sought to make.  And you went

13   through that proposed TRO word by word, Paragraph 2 and 3, and

14   you read them out loud, and you made decisions at that time as

15   to whether the Court believed any portion of that was

16   ambiguous or whether it was clear.  You made determinations at

17   that time whether or not the provisions were reasonable.

18       Mr. Dondero wasn't there.  He didn't read the transcript.

19   He has no idea what you said.  But his lawyers were there, and

20   they had an opportunity to object and they had an opportunity

21   to make comments, and the order is what the order is.  And for

22   whatever reason, Mr. Dondero chose not to read it, or,

23   frankly, even understand it, based on his testimony.

24       The fact is, Your Honor, the one thing that the evidence

25   shows very clearly here is that Mr. Dondero thinks that he is

153

1   the judge. He believes that he is the decider. He believes

2   that he decides what the TRO means, even though he never read

3   it. He believes that he decides what exceptions exist in the

4   TRO, even though he never read it.

5      He believes that he decides that it's okay to ditch the

6   Debtor's cell phone without even seeking, let alone obtaining,

7   the Debtor's consent. I guess he decides that he can ditch

8   the phone and trash it without seeking to back it up or

9   informing the Debtor.

10      Mr. Dondero believes that he gets to decide that it's okay

11   to take a deposition from the Debtor's office, even when the

12   Debtor specifically says you're evicted and you're not allowed

13   to have access.

14      Mr. Dondero believes that he gets to decide that Mr. Seery

15   has no justification for making trades, even though he

16   couldn't take the time to pick up the phone or otherwise

17   inquire as to why Mr. Seery wanted to do that.

18      Mr. Seery -- Mr. Dondero believes that he is the arbiter

19   and the decision-maker and gets to decide to stop trades,

20   notwithstanding the TRO, notwithstanding the CLO agreements

21   that he is not a party to, that his entities are not a party

22   to.

23      Mr. Dondero thinks that he gets to decide that the Debtor

24   has breached the agreements with the CLOs. He gets to decide

25   that the Debtor is in default under those agreements. He gets

154

1  to decide that it's perfectly fine for Ellington and Leventon

2  to support his interests while they have obvious duties of

3  loyalty to the Debtor.

4      It is not right, Your Honor.  It is not right.  I stood

5  here, I sat here, about four hours ago, five hours ago, and

6  told the Court what the evidence was going to show, and it

7  showed every single thing that I expected it to show and

8  everything I just described for the Court about Mr. Dondero's

9  belief that he's the decider.

10     He's not the decider, Your Honor.  You are.  And you made

11  a decision on June -- on December 10th that he ignored.

12     There is ample evidence in the record to support the

13  imposition of a preliminary injunction.  And Your Honor, I'm

14  putting everybody on notice now that we're amending our

15  complaint momentarily to add all of the post-petition parties,

16  because this has to stop.  The threats have to stop.  The

17  interference has to stop.  Mr. Dondero can always make a

18  proposal if he thinks that there's something that will capture

19  the imagination and the approval -- more importantly, the

20  approval -- of the Debtor's creditors.  We have no interest in

21  stopping him from doing that.  He's got very able and

22  honorable counsel, and he can go to them and through them any

23  time he wants.

24     But the record is crystal clear here that, notwithstanding

25  Your Honor's order, one entered after serious deliberation, is

155

1  of no meaning to him.  And we'll be back at the Court's

2  convenience on the Debtor's motion to hold him in contempt.

3  It'll just be a repeat of what we've heard today, because,

4  frankly, the evidence is exactly the same.

5      With that, Your Honor, unless you have any questions, the

6  Debtor rests.

7          THE COURT:  All right.  I do not.

8      Mr. Bonds?

9          MR. BONDS:  Your Honor, we would like to divide our

10  time between Mike Lynn and myself.  Is that a problem?

11          THE COURT:  That's fine.  Go ahead.

12          MR. LYNN:  Are we on mute?

13          MR. BONDS:  No.

14          CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

15          MR. LYNN:  Your Honor, I'm taking a leaf out of Mr.

16  Phelan's book.  I happened to read the confirmation hearing in

17  the *Acis* case regarding what was referred to as Clients A, B,

18  and C.  And Mr. Phelan, who testified, really gave an oral

19  argument to the Court which was very persuasive and very

20  thorough.  So I'm going to sort of do the reverse, because I

21  hope that the Court would find useful some information

22  regarding the pot plan about which you've heard many words

23  spoken but very little to do with what that plan was or how it

24  came about.

25      The pot plan was proposed by Mr. Dondero for the first

156

1  time in September of 2020, shortly after the conclusion of the

2  first round of mediations. Though there had been versions of

3  it before, and lesser versions, the pot plan was finally in

4  the form that would more or less survive it in September.

5  Under the pot plan, Mr. Dondero proposed to come up with $90

6  million of cash and $70 million in promissory notes, and that

7  was to form a pot which creditors would share in.

8      The proposal was provided to the Debtor and then shared

9  with the Committee. Mr. Seery responded with a degree, a

10 degree only, of enthusiasm to the pot plan, and indeed

11 provided a counter-term sheet to the pot plan. He also, so he

12 said, and I believe him, approached the Committee and said

13 this is a proposal to be taken seriously.

14     He proposed some improvements in his view to the pot plan.

15 No response was received from the Creditors' Committee at that

16 time.

17     After going back and forth with the Debtor -- and Mr.

18 Seery, not unreasonably, was unwilling to propose the pot plan

19 without some support on the Creditors' Committee -- I

20 contacted Matt Clemente. We had a nice conversation. And at

21 that time, Mr. Clemente raised two particular concerns. The

22 $160 million, which creditors did not think was enough, was

23 not enough, in part, because that included no consideration

24 for the acquisition of promissory notes executed some by Mr.

25 Dondero and some by entities controlled by Mr. Dondero, which

157

1  notes total approximately $90 million.

2      The second concern was that Mr. Dondero would get a

3  release under the plan.  During that call, I said the issue of

4  the notes is subject to negotiation and might well result in a

5  transfer of those notes, possibly with some amendments, to the

6  pot, and that Mr. Dondero was prepared, in all likelihood, to

7  forego a release.

8      Mr. Clemente agreed to get back to me.  He did.  And he

9  said to me, I have talked to the Committee about this and they

10  would like you to go to or they want you to go first to Mr.

11  Seery, work off of his revised timesheet -- or term sheet,

12  sorry -- and after you have reached an agreement with him,

13  come to us, come to the Committee, and we'll negotiate with

14  you.

15      Now, I might have agreed that that was a reasonable

16  approach if there were a possibility that Mr. Seery would

17  propose a plan without the agreement of creditors.  But the

18  way I took it was that the Committee was saying go make a deal

19  with Seery and then we'll start negotiating, and we know,

20  correctly, that Mr. Seery will not propose a plan that does

21  not have our support.

22      So, effectively, we get to go through two rounds of

23  negotiations, even though effectively everything that is in

24  the estate, everything -- causes of action against Mr.

25  Dondero, promissory notes from Mr. Dondero -- everything that

158

1    they would get under a plan or under a liquidation, they would

2    get under the pot plan.

3        Now, I wanted you to know that, Your Honor, not because

4    I'm now trying to get you or anyone else to sell the pot plan.

5    But I think it's important that Your Honor know that Mr.

6    Dondero's approach in this case has not been a hostile

7    approach.

8        I know the Court had what it found to be an unsatisfactory

9    experience with Mr. Dondero in the *Acis* case.  But from the

10   time I became involved in this case and Mr. Bonds became

11   involved, we have been quiet, we have said nothing, and we've

12   done virtually nothing in the case, up until the time after

13   the mediation, when negotiations regarding a pot plan broke

14   down.

15       Since that time, regrettably, there has been a good deal

16   of hostility, and it's spreading.  I would like to see it stop

17   spreading.  I will do what I can to make it stop spreading.

18   But I need others to help me on that.  And it's my hope that I

19   can count on the Pachulski law firm, the Sidley law firm, and

20   the firms representing the major creditors to help make that

21   happen.

22       I do not think, and I would submit that it is not to the

23   benefit of the estate, it is not to the likely workout of this

24   case, that it would be best served by entering a preliminary

25   injunction, which it appears to me prevents Mr. Dondero from

159

1  saying good morning to one of the employees of the Debtor that

2  he knows.

3      It seems to me, Your Honor, that the injunction, by its

4  terms, as Mr. Morris would have it, is an injunction that

5  would prevent Mr. Dondero from discussing politics with Mr.

6  Ellington.  And it seems to me that an injunction that broad,

7  that extensive, and one which lasts, as far as I can tell,

8  until infinity, that such an injunction is not the right thing

9  to do, given, if nothing else, the First Amendment to the

10 United States Constitution.

11     That will conclude my presentation, and I will turn it

12 over to the wiser and better-spoken colleague, John Bonds.

13 Thank you, Your Honor.

14         THE COURT:  Thank you.  Mr. Bonds, what else do you

15 have to say?

16         CLOSING ARGUMENT ON BEHALF OF THE DEFENDANT

17         MR. BONDS:  Your Honor, has the Debtor met the

18 requirements for the issuance of a preliminary injunction?  We

19 submit that they have not.  And the Fifth Circuit's rules are

20 fairly clear as to the awarding of a preliminary injunction.

21     First, let's look at the type of preliminary injunction

22 that the Debtor would like you to enter today.  It provides

23 that Mr. Dondero cannot talk to any employee, regardless of

24 what is being communicated.  Mr. Dondero can pass an employee

25 on the street, but he can't acknowledge the employee, with

160

1 whom he may have worked for years. Nor can he talk to his

2 personal assistants, again, which he has worked with for

3 years. Does that violate the First Amendment of the

4 Constitution?

5 What about the shared services agreement? What about the

6 pot plan which he is advocating as a means of reorganizing the

7 Debtor? Not the liquidation proposed by the Debtor. Can Mr.

8 Dondero communicate with creditors about the pot plan and the

9 other proposals without violating the TRO or the preliminary

10 injunction which deals with interfering with the Debtor's

11 business?

12 Your Honor, I think it's important to note that a

13 preliminary injunction is an extraordinary remedy that may

14 only be awarded upon a clear showing that the Plaintiff is

15 entitled to such relief. Plaintiffs are entitled to a

16 preliminary injunction if they show, one, a substantial

17 likelihood that they will prevail on the merits of their

18 claims; two, a substantial threat that they will suffer an

19 irreparable injury if the injunction is not granted; three,

20 their threatened injury outweighs the harm to the estate or

21 the other party; and four, the public interest will not be

22 disserved, misserved, if the preliminary injunction is

23 granted.

24 The party seeking the preliminary injunction bears the

25 burden of persuasion on all four requirements. We believe

161

1  that the Debtor today has failed to carry its burden of

2  persuasion of proof with regard to the second element, which

3  I'm going to refer to as the irreparable injury requirement.

4  In order to show irreparable harm to the Court, the Plaintiff

5  must prove that if the District Court denied the grant of a

6  preliminary injunction, irreparable harm would be the result.

7  Injuries are irreparable only when they cannot be undone

8  through monetary remedies.  There is no evidence before the

9  Court today that Mr. Dondero cannot respond to any judgment

10 that is rendered against him by this Court.

11     Your Honor, this preliminary injunction does not involve

12 real property.  Unlike the *Saldana* case, this request for the

13 issuance of a preliminary injunction involves personal

14 property only.  The request that Mr. Dondero cease and desist

15 all contact with employees is just wrong and may violate the

16 First Amendment of the Constitution, as I previously stated.

17     We have other concerns regarding the issuance of a

18 preliminary injunction.  We feel that the preliminary

19 injunction is too broad.  It lacks a beginning and an end.

20 When does the preliminary injunction terminate?  What about

21 the former employees?  Once they are terminated, can Mr.

22 Dondero speak to them?  What about the pot plan?  Is it gone

23 forever?  Can Mr. Dondero talk with the mediators about the

24 pot plan?  Can Mr. Dondero speak with the members of the

25 U.C.C.?

162

1    It is easy to criticize Mr. Dondero.  Did he violate the

2    TRO?  We submit that he didn't and the Debtor says that he

3    did.  What matters going forward is the lack of evidence of

4    irreparable harm.

5    Mr. Seery sure wants to keep Mr. Dondero from talking to

6    anyone in this case.  Why is that?  Does Mr. Seery believe

7    that the only way to get his liquidation plan confirmed is to

8    keep Mr. Dondero from talking to anyone?  How will the

9    preliminary injunction help the Debtor's creditors?  Does

10   keeping Mr. Dondero from talking with anyone mean that there

11   will be a greater return to the creditor body?  Does

12   precluding Mr. Dondero from talking about his pot plan mean

13   that the creditors will take home more money on their claims,

14   or does it eliminate the possibility that they may take home

15   more money on their claims?

16   Your Honor, what we are seeing here today is an attempt by

17   a group to destroy what Mr. Dondero has built over the last

18   few years.  That isn't the way Chapter 11 should work.

19   Just one last thing to keep in mind, Your Honor.  Mr.

20   Seery's plan is a liquidation of the Debtor.  Mr. Dondero's

21   pot plan is a reorganization of the Debtor.

22   Thank you, Your Honor.

23       THE COURT:  All right.  Mr. Morris, you get the last

24   word.  Anything in rebuttal?

25       MR. MORRIS:  I would just point out, Your Honor, that

163

1  nobody here has objected to the Debtor's motion for the entry

2  of a preliminary injunction except Mr. Dondero.  While I

3  appreciate that this is an adversary proceeding, anybody who

4  felt strongly about the matter certainly could have moved to

5  intervene.  The Creditors' Committee could have moved to

6  intervene.  Mr. Clemente could have stood at the podium and

7  begged Your Honor not to impose the injunction because he

8  thought it was in the best interest of creditors to allow Mr.

9  Dondero to interfere with the Debtor's business and to speak

10  with their employees.  Nobody has done that, Your Honor.

11  Nobody's here speaking on behalf of Mr. Dondero.  Nobody's

12  here to testify on his behalf.  Nobody's -- there's no

13  evidence in the record that supports or corroborates anything

14  that he said at all, Your Honor.

15      Unless Your Honor has any specific questions, the Debtor

16  is prepared to rest.

17          THE COURT:  All right.  I do not have any follow-up

18  questions.

19      All right.  I have a lot to say.  I'm sorry, I apologize

20  in advance, but I've got a heck of a lot to say right now.

21  I'm going to give you a ruling on the motion before me, but

22  I've got a lot to add onto that, so I hope all the key parties

23  in interest are listening carefully.  Mr. Bonds, in the video,

24  I can only see you.  I hope Mr. Dondero is just right there

25  out of the video camera view.  Okay, there you are.  I wanted

164

1  to make sure you didn't wander off to take a bathroom break or

2  anything.  So, again, I have a whole lot to say here today.

3      First, I'm going to rule on the motion.  The Court does

4  find there is sufficient compelling evidence to grant a

5  preliminary injunction that is completely consistent with the

6  prior TRO.  Okay?  So, specifically, the Court today is going

7  to continue to prevent Mr. Dondero from (a) communicating in

8  any way, directly or indirectly, with any of the Debtor's

9  board members -- I think that's really Strand board members --

10 unless Mr. Dondero's counsel and counsel for the Debtor are

11 included.  Okay.  I'm saying those words slowly and carefully.

12 There is no bar on Mr. Dondero talking to the board about a

13 pot plan or anything else in the universe Mr. Dondero wants to

14 talk to them about.  There's just a preclusion from him doing

15 it without his counsel and the Debtor's counsel present.

16 Okay?

17     I did that before and I'm doing it now because I've seen

18 concerning evidence that some communications to Mr. Seery and

19 others had an intimidating tone, a threatening tone one or two

20 times, an interfering tone.  So, guess what, we're just going

21 to have lawyers involved if any more conversations happen.

22 Okay.

23     So (b) the preliminary injunction, just as the TRO did, is

24 going to prevent Mr. Dondero from making any threats of any

25 nature against the Debtor or any of its directors, officers,

165

1    employees, professionals, or agents.  Okay.  It's almost

2    embarrassing having to say that or order that with regard to

3    such an accomplished and sophisticated person, but, you know,

4    I saw the evidence.  I've got to do what I've got to do.  You

5    know, words in a text like, Don't do it, this is your last

6    warning, and some of the other things, that has a threatening

7    tone, so I'm going to order this.

8        Third, the preliminary injunction will prevent Mr. Dondero

9    from communicating with any of the Debtor's employees except

10   as it specifically relates to shared services provided to

11   affiliates owned or controlled by Mr. Dondero.

12       Now, I'm going to elaborate in a couple of ways here.  I

13   think in closing argument there was a suggestion that he can't

14   even talk to his friend, Mr. Ellington, about anything.  Well,

15   I heard today that Mr. Ellington and Mr. Leventon are no

16   longer employees of the Debtor, so actually that's not an

17   issue.  But while this is very restrictive, while this

18   prevents Mr. Dondero from engaging in small talk with Debtor

19   employees about the weather or the football game or whatever,

20   it's regrettable, but I feel like I'm forced to order this

21   now, because, again, the communications that were put in the

22   record.  Okay?  We just can't take any chances, as far as I'm

23   concerned, with regard to there being potential interference

24   with the Debtor's operations that might be harmful or contrary

25   to creditors' interests.

166

1    Fourth, the preliminary injunction, just like the TRO,

2    will prevent Mr. Dondero from interfering with or otherwise

3    impeding the Debtor's business, including but not limited to

4    the Debtor's decisions concerning its operations, management,

5    treatment of claims, disposition of assets owned or controlled

6    by the Debtor, and pursuit of any plan or alternative to the

7    plan.

8        Now, I understand the argument that this is pretty broad

9    and might be, I don't know, subject to some disputes regarding

10   was it interference, did it impede the Debtor's business or

11   not? You know what, if you follow the other prongs of the

12   preliminary injunction, that you don't talk to the board

13   without your counsel, Mr. Dondero, and the Debtor's counsel,

14   and you don't talk to Debtor's employees except with regard to

15   matters pertaining to the shared services agreement, and,

16   bottom line, if you just run everything by your attorneys,

17   you'll be okay. We won't have this ambiguous, vague,

18   problematic territory.

19       Fifth, I will go ahead and, for good measure, belts and

20   suspenders, whatever you want to call it, prevent Mr. Dondero

21   from otherwise violating Section 362(a) of the Bankruptcy

22   Code.

23       Now, I read the response filed at 9:30 last night by Mr.

24   Dondero's counsel. It's a good response. It makes legal

25   arguments about that being, you know, it just being too vague.

167

1   Well, to the contrary, it just restates what's already in the

2   Bankruptcy Code, right?  Persons are prohibited from violating

3   Section 362(a) of the Bankruptcy Code.  If anything, it's the

4   sky is blue, right, just stating what is true.  But I

5   understand Debtor wanting some clarity in an order, because we

6   want you to take this seriously, Mr. Dondero, and not just do

7   something and then say, well, you didn't know what was in the

8   Code.  You know, you need to consult with your lawyer.  That's

9   going to be in there.

10     Bottom line, I want that language in there because, Mr.

11   Dondero, I want you to see an order that this Court expects

12   you to comply with the Bankruptcy Code.  And again, if you

13   don't understand, if you're unsure whether you can take action

14   $x$ or $y$, consult with your very capable lawyers.

15     I note that if you listened carefully to these words,

16   there was nothing in here that stopped Mr. Dondero from

17   talking to the Creditors' Committee about a pot plan.  Nothing

18   in this injunction, nothing in the previous TRO, ever

19   prohibited that.

20     Last, with regard to the ruling -- and again, I've got a

21   lot more to say when I'm done -- I am going to further enjoin

22   Mr. Dondero from what we said in the TRO:  causing,

23   encouraging, or conspiring with any entity controlled by him

24   and/or any person or entity acting on his behalf from directly

25   or indirectly engaging in any of the aforementioned items.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 956 of
2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 955 of
2722

168

1    This is not an injunction as to nonparties to the adversary

2    proceeding.  It is an injunction as to Mr. Dondero from doing

3    the various enjoined acts that I previously listed under the

4    guise of another entity or a person that he controls.

5        Again, if you're dealing with and through your attorneys,

6    Mr. Dondero, I don't think this will be hard to maneuver.

7        I guess I'm actually not through with my ruling yet.  I do

8    want to add that the Court rules that the injunction shall

9    last through the time of confirmation of a plan in this case

10    unless otherwise ordered by this Court.

11        And as to the legal standards, I want to be clear for the

12    record that the Court believes this injunction is necessary to

13    avoid immediate and irreparable harm to the Debtor's estate

14    and to its reorganization prospects.  I believe that there's a

15    strong likelihood the Debtor will succeed in a trial on the

16    merits of this adversary proceeding.  I believe the public

17    interest strongly favors this injunction.  And I believe the

18    balance of harms weighs in favor of the Debtor on all of these

19    various issues.

20        Again, I want to reiterate, the intimidation and

21    interference that came through in some of these email and text

22    communications was concerning to the Court and is a motivation

23    for this preliminary injunction.

24        Now, I'm going to add on a couple of things today.  The

25    first thing I'm going to add on -- and I want this, Mr.

169

1    Morris, in the order you submit.  You didn't ask me for this,

2    but I'm going to do it.  I'm going to order you, Mr. Dondero,

3    to attend all future hearings in this bankruptcy case unless

4    and until this Court orders otherwise.  And I'm doing this --

5    it's not really that unusual a thing for me to do.  I

6    sometimes order this in cases when I'm concerned about, you

7    know, is the businessperson paying attention to what's going

8    on in the case and is he engaged, is he invested, is he

9    available when we need him?

10        In this case in particular, the evidence was that you

11   didn't read the TRO.  You were not aware of its basic terms

12   and you didn't read it.  Okay?  So that was what sent me over

13   the edge as far as requiring this new element that you're

14   going to attend every hearing.  Obviously, we're doing video

15   court, so that's not that much of a burden or imposition.  You

16   can pretty much be anywhere in the world and patch in by

17   video, since we're in the pandemic and not doing live court.

18   But I think it's necessary so I know you hear what I rule and

19   what goes on in this case.

20        I will tell you that I was having a real hard time during

21   your testimony deciding if I believe you didn't read the TRO

22   or know about the different things that were prohibited.  You

23   know, I was thinking maybe you're not being candid to help

24   yourself in a future contempt hearing, or actually maybe

25   you're being a hundred percent honest and candid but you're

170

1    kind of hiding behind your lawyers so that you can argue the

2    old plausible deniability when it suits you.

3        But no more.  No more.  I'm not going to risk this

4    situation again of you not knowing what's in an order that

5    affects you.  So you must be in court by video until I order

6    otherwise.

7        Second, and I regret having to do this, but I want it

8    explicit in the preliminary injunction that Mr. Dondero shall

9    not enter Highland Capital Management's offices, regardless of

10   whether there are subleases or agreements of Highland

11   affiliates or Dondero-controlled entities to occupy the

12   office, unless Mr. Dondero has explicit written permission

13   that comes from Highland's bankruptcy counsel to Dondero's

14   bankruptcy counsel.  Okay?  If he does, it will be regarded as

15   trespassing.

16       And, I don't know, are there security guards on the

17   premises?  I mean, gosh, I hate to be getting into this

18   minutia, but -- well, I just want it explicit in the order

19   that Mr. Dondero, I'm sorry, but you can't go to these offices

20   without written permission.  And again, that can only be given

21   from Debtor's counsel to Mr. Dondero's counsel.  Okay?  So

22   it's going to be trespassing.  You know, someone can call the

23   Dallas Police Department and have you escorted out.  Again, I

24   hate having to do that.  It's just, it's embarrassing for me.

25   I think it's embarrassing for everyone.  But I'm backed up in

171

1   that corner.

2       Next, I am going to ask that it be clear that Mr. Dondero

3   can deal with the Unsecured Creditors' Committee and its

4   professionals with regard to talking about a pot plan.

5       And next, I'm going to add -- and I think, Mr. Morris, you

6   requested this at some point today in oral argument -- Mr.

7   Ellington and Mr. Leventon shall not share any confidential

8   information that they received as general counsel, assistant

9   general counsel for the Debtor, without Debtor's counsel's

10  explicit written permission.  Okay?  So we've got that in

11  writing.

12      And, you know, that's a little awkward because they're not

13  here, they weren't parties to the injunction, but they were

14  Debtor employees until recently.  If they want to risk

15  violating that and come back to the Court and argue about

16  whether they got notice and whatnot of that, they can argue

17  that, but I want it in the order regardless.

18      So that is the ruling.  And now I want to kind of talk

19  about a few other things.  And before we're done here, Mr.

20  Morris, I'll ask do you have questions, does Mr. Bonds have

21  questions, does anyone have questions about the ruling.  But I

22  want to talk about a couple of things.  And again, I hope that

23  I'm coming through loud and clear, Mr. Bonds, in your office

24  for Mr. Dondero to hear this.  It's really, really important

25  that he heard what I'm about to say.  I'm going to say some

172

1   kind of unpleasant things and then I'm going to say some

2   hopeful things, okay?

3       Mr. Dondero? Okay. Mr. Dondero, I'm going to -- Mr.

4   Morris, you've got your hands on your head. Did I miss

5   something?

6           MR. MORRIS: No. I was just surprised to see Mr.

7   Dondero on his phone. I apologize, Your Honor.

8           THE COURT: Oh, my goodness. Were you on your phone,

9   Mr. Dondero?

10          MR. DONDERO: No, I was not.

11          THE COURT: Okay. I want you to listen to this

12  really closely, and then I promise I'm going to have something

13  hopeful to say after this very unpleasant stuff. You know, I

14  keep a whiteboard up at my bench. I don't know if you can

15  read it. But sometimes I hear something in a hearing and I

16  think, okay, this is one of my major takeaways from what I

17  heard today. And I've got two, I've got two big takeaways

18  here. Number one on my whiteboard is Dondero's spoliated

19  evidence. Game-changer for all future litigation. Okay.

20          MR. DONDERO: I'm sorry. I didn't hear that. I

21  didn't hear that. Could you repeat that, please?

22          THE COURT: Mr. Dondero, spoliated evidence, game-

23  changer in future litigation.

24      Okay. Let me tell you, the throwing away of the phone,

25  that was the worst thing I heard all day. That was far and

173

1    away the worst thing I heard all today. I don't know what I'm

2    going to hear down the road to fix this, but if it's really

3    gone, let me tell you how bad this is. We have all sorts of

4    Federal Rules of Civil Procedure that talk about this being a

5    bad thing, but I wrote an opinion a couple years ago dealing

6    with spoliation of electronic evidence, and I think it might

7    be helpful for everyone to read. It was called *In re Correra*,

8    C-O-R-R-E-R-A. I have no idea what the cite on it is. But in

9    this case, *Correra*, we had a debtor who had a laptop, and he

10   gave the laptop to his personal assistant, who took it away to

11   another state. And at some point during the case, parties

12   discovered, oh, there's a laptop that may have a treasure

13   trove of information. Who knows? Maybe it does; maybe it

14   doesn't. But there's a laptop that we just now learned about

15   that the personal assistant has.

16        And so I issued an order that she turn it over, and there

17   were subpoenas and depositions, blah, blah, blah. Long story

18   short, the evidence ended up being that she deleted everything

19   on the laptop, and then -- this would almost be funny if it

20   wasn't so serious -- she downloaded thousands of pictures of

21   cats onto the laptop. I kid you not, cats. Meow, meow, cats.

22   And she downloaded a hundred-something full-length movies.

23   And we had two days of forensic experts come in and take the

24   witness stand and tell me about how, okay, this is like an

25   amateurish -- you've talked about amateur hour today -- this

174

 1   is kind of an amateurish way of deleting data, right.  You

 2   first delete all the files on the laptop and then you cover

 3   over all the space to make sure the information is not

 4   retrievable.  You know, this genius ended up retrieving some

 5   of the information.

 6       But the long story short is I sanctioned the debtor and

 7   his assistant jointly and severally.  You'll have to go back

 8   and look at the opinion.  I'm pretty sure it was over a

 9   million dollars.  And I can't remember if that was attorneys'

10   fee-shifting only, or monetary, like penalty on top of the

11   attorneys' fees-shifting.  I just can't remember.  But maybe

12   poor Tara needs to be advised of that opinion, too.  I mean,

13   --

14       But the other reason I put game-changer in future

15   litigation is, in my *Correra* case, it wasn't just the monetary

16   million-dollar sanction or whatever it was; it was a game-

17   changer in future litigation because the adverse party to the

18   debtor ended up arguing -- and it was the state of New Mexico,

19   by the way -- they ended up saying, in all future litigation,

20   we want you -- some adversaries, we want you to make an

21   adverse inference.  In other words, for all of these elements

22   that we're trying to prove in our fraudulent transfer

23   litigation and whatever else was going on, we want you to make

24   an adverse inference that there would have been evidence there

25   on that laptop that would have supported some of our causes of

175

1  action and it was destroyed to keep us from having that

2  evidence.

3      And they brought forth all kinds of case law.  It's a hard

4  area.  It's a really, really hard area.  But I ended up --

5  again, it's not in the main opinion.  It was in subsequent

6  orders.  I ended up saying, yeah, I think you've met the

7  standard here to draw adverse inferences.

8      So, again, this is a very unpleasant message for me to

9  deliver today.  But the destruction of the phone is my biggest

10  takeaway of concern today, how that might have ramifications.

11  You know, there are other bad things, too, about that.  I'm

12  not even going to go there right now.  But the, you know,

13  Title 18, you can ask your lawyer what that means, but okay.

14      My second big takeaway before we get to the hopeful stuff

15  is -- and this is kind of harsh, what I'm about to say -- but

16  Ellington and Leventon maybe care more about you, Mr. Dondero,

17  than their law license.  You know, I guess it's great to have

18  people in your life who are very, very loyal to you.  I mean,

19  loyalty is a wonderful thing.  But I am just so worried about

20  things I've heard.  Again, the phone and in-house lawyers.

21  The biggest concerns in my brains right now.  I have worried

22  about them for a while.

23      You all will -- well, Mr. Dondero, you might not know

24  this.  But we had a hearing a few months ago, maybe September,

25  October, where the Creditors' Committee was trying to get

176

1  discovery of documents.  And we had some sort of hearing,

2  maybe a motion to compel production.  And we had many, many

3  entities that you control file objections:  NexPoint, NexBank.

4  I can't even remember.  We just had a whole slew.  CLO Holdco.

5  Many, many of these entities objected.  And I was trying to

6  figure out that day who was instructing them.  And oh my

7  goodness, I hope the in-house layers are not involved in this

8  document discovery dispute, because, you know, they have

9  fiduciary duties.  And are -- you know, is it -- it feels like

10  it's breaching a duty to the bankruptcy estate when it's in

11  the bankruptcy estate's best interest to get these documents

12  if you're meanwhile hiring lawyers for these other entities,

13  Holdco, et cetera, and saying, Fight this.

14      I never really pressed it very hard back then, but I

15  raised the issue and I said, I'm really, really concerned

16  about this.  And I continue to be concerned about it.  I had

17  experiences with Mr. Ellington in the *Acis* case where he

18  testified on the witness stand, and later it looked a heck of

19  a lot like he might have committed perjury.  I hate to use

20  such blunt terms.  But I let it go.  I'm just like, you know,

21  I'm not going to -- you know, I'm going to just hope for the

22  best that he misspoke.

23      But I'm getting a really bad taste in my mouth about

24  Ellington and Leventon, and I hope that they will be careful

25  and you will be careful, Mr. Dondero, in future actions.

177

1    Is Mr. -- I can't see Mr. Dondero.  I want to make sure

2    he's not on the phone.  Okay.  Okay.  Thank you.

3    So where was I going to head next?  I guess I want to say

4    a couple of things now that I would describe as a little bit

5    more hopeful, and that is pertaining to this whole pot plan

6    thing.

7    You know, I tend to think, without knowing what's being

8    said outside the courtroom, that a pot plan would be the best

9    of all worlds, okay, because the plan that we have set for

10   confirmation next week, I understand we have a lot of

11   objections, and if I approve it, if I confirm the plan, we're

12   going to have a lot of appeals and motions for stay pending

13   appeal, and no matter how that turns out, we're going to have

14   a lot of litigation.  Okay?  You know, we're going to have

15   adversaries.  And we have a not-very-workable situation here

16   where we have these Dondero-controlled affiliates questioning

17   Mr. Seery's every move.

18   I would love to have a pot plan that would involve, Mr.

19   Dondero, you getting to keep your baby, okay?  I acknowledge,

20   everyone here acknowledges, you are the founder of this

21   company.  This is your baby.  You created a multi-billion-

22   dollar empire, okay?  I would be shocked if you didn't want to

23   keep your baby.  Okay?  If there was a reasonable pot plan, I

24   would love it.

25   But I'm telling you, the numbers I heard didn't impress me

178

1   a heck of a lot.  I'm not an economic stakeholder.  It's not

2   my claim that would be getting paid.  But I can see where

3   these Creditor Committee members, they're not going to think

4   $160 million -- $90 million in cash, $70 million in notes, or

5   vive-versa -- is nearly enough.  Okay?

6       So I am going -- what just happened?  What just happened?

7   I lost Mr. Dondero.  Okay.  This is getting kind of humorous,

8   almost.

9       Okay.  I am going to order that between now and the end of

10  the day Tuesday there be good-faith, and I'll say face-to-face

11  -- Zoom, WebEx, whatever -- negotiations between Mr. Dondero

12  and his counsel and at least the Committee and its

13  professionals regarding this pot plan.

14      Now, the train is leaving the station next Wednesday,

15  okay?  If we don't have Creditors' Committee and Debtor and

16  Dondero rushing in here saying, Please continue the

17  confirmation hearing next Wednesday, if we don't have like

18  unanimous sentiment to do that, you know, this is a 15-month-

19  old case, I'm going to go forward with the plan that's on

20  file.

21      And it's been a long, expensive case.  I had great

22  mediators try to give it their best shot to get a grand

23  compromise.  I just, I'm not going to drag this out unless you

24  all tell me Wednesday morning, We want you to continue this a

25  week or two.

179

1      And let me tell you -- this may be the stars lining up, or

2   it may not be -- I was supposed to have a seven-day trial

3   starting the week after next, and then I was supposed to have

4   a four- or five-day day trial starting immediately after that.

5   And all of those lawyers came in and asked for a continuance

6   because of COVID.  They wanted a face-to-face trial, and so

7   I've put them off until April.

8      So if you wanted to postpone the confirmation hearing to

9   the following week or even the following week, I have the gift

10  of time to give you.  But I'm not going to do it lightly.

11  I'm, again, I'm just going to order face-to-face meetings.

12  And I said Dondero and his counsel and the Committee and its

13  professionals.  You know, if -- I'm not slighting the Debtor

14  here or Mr. Seery, but I'm kind of taking a cue from what Mr.

15  Morris, I think I heard you say, that at this point it's the

16  Committee, it's the Committee's money, and I think that's the

17  starting place.  And if they want to join the Debtor in at the

18  beginning or midway through, you know, wonderful, but I think

19  it needs --

20      MR. POMERANTZ:  Your Honor, this is Jeff -- this is

21  Jeff Pomerantz.  I hate to interrupt, and I never do that to a

22  judge, but I did have something to say in my comments about a

23  continuance that we've talked about with the Committee and

24  some other developments in the case.

25      THE COURT:  Oh.

180

1    MR. POMERANTZ:  I'm happy to wait.  But it has -- it

2  has nothing to do with the comments you said, although, as I

3  think you've heard from me before, the Debtor has been a

4  supporter, a supporter of a pot plan.  Mr. Seery has done a

5  tremendous amount of work working with Mr. Dondero, working

6  with Mr. Lynn, to try to make that happen.  And if the

7  Committee is willing to engage in a pot plan, we would

8  definitely support that.  Because we do agree with Your Honor

9  that, absent a pot plan, we are looking at a lot of

10  litigation.

11    Some of the issues you're going to have to deal with at

12  the confirmation hearing if we do not have a peace-in-the-

13  valley settlement is exculpations, releases, moratoriums on

14  litigation, extensions of your January 9th order --

15    THE COURT:  Uh-huh.

16    MR. POMERANTZ:  -- with respect to pursuing certain

17  people.

18    So, we get it, and we've gotten it from the beginning.

19  And Mr. Seery, sometimes even at a fault, has been

20  singlehandedly focused on trying to get that done.  It's just

21  unfortunate where we are here.

22    But having said that, I wanted to first apprise the Court

23  of a recent major development in the case.  I'm pleased to

24  report that the Debtor and UBS have reached a settlement in

25  principle which will resolve all of UBS's claims against the

181

1  estate, all of UBS's claims against Multi-Strat. The parties

2  are working on documentation. The settlement is subject to

3  internal approvals from UBS, but we've been led to believe

4  those approvals will occur, and we would hope to file a Rule

5  9019 motion in the near future.

6      I'm sure Your Honor is quite pleased to hear that. The

7  UBS matters have taken a substantial amount of time. And with

8  the settlement of UBS's claims, the only material unresolved

9  claim, unrelated to Mr. Dondero or the employees, are Mr.

10 Daugherty. And Mr. Seery will continue to work with Mr.

11 Daugherty to try to settle that.

12         THE COURT: Okay.

13         MR. POMERANTZ: With respect to the scheduling, with

14 respect to the scheduling, Your Honor, there are three

15 significant matters on for hearing on the 13th. The first is

16 the Debtor's motion to approve a settlement with HarbourVest,

17 which Mr. Dondero is contesting. Depositions are being

18 conducted on Monday, and we anticipate an evidentiary hearing

19 in connection therewith.

20     The Debtors, as Mr. Morris indicated earlier on in the

21 hearing, have also filed a complaint and a motion for a

22 temporary restraining order against certain of the Advisors

23 and Funds owned and controlled by Mr. Dondero which relate to

24 the CLO management agreements for which Your Honor has heard a

25 lot of testimony today. We also expect that TRO to be

182

1  contested and for the Court to have an evidentiary hearing.

2      And as Your Honor mentioned, the confirmation of the plan

3  was scheduled for Wednesday, and there were 15 objections. I

4  would point out, Your Honor, all but four of which were Mr.

5  Dondero, his related entities that he owns or controls, and

6  employees or former employees.

7      The Court previously gave us time on the 13th and the

8  14th, I think anticipating that we would have a lot and it may

9  be necessary to go into two days. However, Your Honor, those

10  two days are not going to be enough to deal with all the

11  issues that we have before Your Honor.

12      So what we suggest, and we've spoken to the Committee and

13  the Committee is supportive, that we continue confirmation to

14  a day around January 27th. This will enable the Debtor to not

15  only -- and the Committee -- not only to take Your Honor up on

16  what you'd like to see accomplished in the next few days. I'm

17  sure the Debtor is supportive and will be supportive, and we

18  hope the Committee will engage in good-faith negotiations, and

19  if there's a way to do a pot plan, we are all for it. It'll

20  give time for that to happen.

21      But at the same time, and I think what you'll hear from

22  Mr. Clemente, that we're willing to give a continuance, we all

23  know that if there is not a settlement to be had, if there is

24  not a pot plan to be had, this case has to confirm, it has to

25  exit bankruptcy, and at least from the Debtor's perspective, a

183

1　lot of protections will have to be in place that basically

2　this has not just been a pit stop in Bankruptcy Court and we

3　return to the litigation ways that Highland is involved in.

4　　So, Your Honor, we believe that the two evidentiary

5　hearings on for next week probably will fill up both days.  We

6　would suggest that the first day be the complaint and the TRO

7　against the Advisors and the Funds for the 13th, and the 14th

8　be the HarbourVest.

9　　We also recognized as we were preparing for today, Your

10　Honor, looking ahead, that we thought it was not fair for us,

11　although we know Your Honor works tirelessly and as hard as

12　anyone on this hearing and that Your Honor would be prepared

13　for confirmation and would be prepared for each of those

14　trials, given the gravity of these issues, the extensive

15　pleadings, pleadings that you would get in confirmation on

16　Monday from the Debtor, that it made sense to continue the

17　hearing.

18　　So, again, fully supportive of Your Honor's mandate to try

19　to see if we could work things out, fully supportive of a

20　continuance until the 27th, if that date works for Your Honor,

21　but we believe we do need to go ahead with the two matters

22　that are on for calendar next week.

23　　　MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

24　May I be heard briefly?

25　　　THE COURT:  Oh my goodness.  Who do you represent,

184

1 | Mr. Rukavina?

2 |         MR. RUKAVINA:  And I apologize -- Your Honor, I am

3 | the new counsel who will be representing the Funds and

4 | Advisors.  I will probably be taking the laboring oar at

5 | confirmation.

6 |     I apologize I'm not wearing a suit and tie.  I did not

7 | anticipate speaking right now.

8 |     I support -- to the extent that that's an oral motion for

9 | continuance by Mr. Pomerantz, I certainly support that.  I

10 | would suggest that the Court give us an understanding of that

11 | today, because we do have depositions and discovery lined up

12 | which we can then push if the hearing on confirmation is

13 | pushed to the 27th.  And we have no problem going forward on

14 | the other matters on the 13th.

15 |     So, I am co-counsel to K&L Gates, Your Honor, so whoever

16 | the K&L Clients are, they're now my clients as well.  I just

17 | wanted to be heard briefly that we support the recommendation

18 | by Mr. Pomerantz and just urge that the Court give us finality

19 | on that issue today so that we're not burning the midnight

20 | oil, many sets of lawyers preparing for confirmation on the

21 | 13th.

22 |     Thank you for hearing me, Your Honor.

23 |         THE COURT:  All right.  So, just to be clear, the

24 | proposal is that we go forward next Wednesday on the newest

25 | request for a TRO with regard to -- is -- the CLO Funds and

185

1  the Advisors.  I'm forgetting the exact names.  And then that

2  would take likely the whole day, but whether it does or does

3  not, we would roll over to Wednesday of next week -- that'd be

4  the 14th -- to do the HarbourVest.  It's a compromise motion,

5  right?  Is there anything else?

6        MR. POMERANTZ:  No, correct, it's the compromise

7  motion, Your Honor.  There are two pending objections on this

8  and discovery scheduled for Monday.

9        THE COURT:  All right.  Well, as far as --

10       MR. CLEMENTE:  Your Honor?

11       THE COURT:  Yes, who is that?

12       MR. CLEMENTE:  Oh, Your Honor, it's Matt Clemente at

13  Sidley on behalf of the Committee.  I'm here, and I thought

14  maybe I'd offer just a couple of comments at this point, but

15  I'm happy to hold them.

16       THE COURT:  Well, --

17       MS. SMITH:  And Your Honor, this is Frances Smith.  I

18  would also like to be heard before you wrap up.

19       THE COURT:  Okay.  Well, I guess generally I want to

20  know, does anyone have any objection -- I can't imagine they

21  would -- but any objection to pushing confirmation out to

22  around the 27th?  I'm going to say that because I have an

23  issue middle of the day the 28th.  If we do it the 27th, I

24  could only go a day and a half, okay?  I have to go out of

25  town the evening of the 28th, and I would be out the 29th as

186

1  well.  That's Thursday and Friday.  So we'll talk about that.

2  But anyone, Mr. Clemente or anyone else, want to say anything

3  about continuing the confirmation?

4            MR. CLEMENTE:  Your Honor, it's Matt Clemente at

5  Sidley.  No, Your Honor, we're supportive of that schedule.

6      And Your Honor, just briefly, I heard my name discussed

7  quite a bit at this hearing as well as the Committee.  I'm not

8  going to get into it unless Your Honor would like me to, but

9  let me be very clear:  The committee has taken very seriously

10 the pot plan proposals that Mr. Dondero has presented, and

11 there's much more to the discussion other than what Mr. Lynn

12 suggested in his remarks.

13     So I'm not going to get into all that unless Your Honor

14 thinks it's necessary.  I think it's of no moment here.  But I

15 did want Your Honor to know that we have carefully considered

16 the pot plan proposals and have communicated a variety of

17 issues about that to Mr. Lynn and will continue to take the

18 direction of Your Honor and engage on a pot plan, Your Honor.

19 But I did not want there to be any suggestion that we did not

20 take it seriously and that there was much, much more

21 consideration and discussion about it than what was suggested.

22            THE COURT:  Uh-huh.

23            MR. CLEMENTE:  Thank you, Your Honor.

24            THE COURT:  All right.

25            MS. SMITH:  Your Honor, this is Frances Smith.

187

1      THE COURT: Who do you represent, Ms. Smith?

2      MS. SMITH: Your Honor, we were recently retained by

3  the four senior employees: Tom Surgent, Frank Waterhouse,

4  Scott Ellington, Isaac Leventon, along with Baker & McKenzie,

5  and I believe we have the Baker & McKenzie lawyers Deb

6  Dandeneau and Michelle Hartmann on the line.

7      Your Honor, we have listened to the whole hearing. And I

8  was not going to make an appearance. I was following your

9  instructions and listening carefully. But Your Honor, I --

10  first of all, we hate to be before you for the first time in a

11  discovery dispute. We did file a very limited objection to

12  the plan because of the disparate treatment of our clients,

13  which we are not arguing today, of course. We received -- it

14  is our usual practice, Your Honor -- you've known me for a

15  long time -- to cooperate on having witnesses appear. We got

16  -- we were notified very late Tuesday that the Debtor's

17  counsel would like two of our clients to appear. We made what

18  we thought was a reasonable request for a copy of the

19  transcript from the deposition. We were invited to the

20  deposition and then told we could not attend, or our clients

21  could not attend. When we offered to make it lawyers-only,

22  they said no. So we did not produce our clients without a

23  subpoena.

24      Our clients have not been evading service. As far as we

25  know, they were each attempted service one time, late

188

1    Wednesday, when they were -- around dinnertime.  Mr. Leventon

2    was home all day today.  Didn't go any -- or yesterday.

3    Didn't go anywhere.  Was not served.  Wasn't served this

4    morning.  The same, as far as we know, with Mr. Ellenton.

5        Your Honor, on the order that you just entered, I am a

6    little unclear of where your findings of fact stopped.  First

7    of all, I do not think that you can enjoin Mr. Ellenton and

8    Mr. Leventon.  They are not parties to the adversary

9    proceeding.

10       You know, we did some very quick research.  There's a

11   Seventh Circuit case, a district court may not enjoin

12   nonparties who are not either acting in concert with an

13   enjoined party nor in the capacity of agents, employees,

14   officers of the enjoined party.  Mr. Ellington and Mr.

15   Leventon are not agents, employees, officers of Mr. Dondero.

16   So I think that, Your Honor, you cannot make that ruling.

17       Of course, you can rule that Mr. Dondero cannot talk to

18   Mr. Leventon and Mr. Ellington.  That might be a way to fix

19   that one part.  But as nonparties, I don't believe that you

20   can enjoin them.

21       Also, Your Honor, there was just no evidence against them

22   to support that.  Out of more than two dozen exhibits, there

23   was one mention of Mr. Leventon, where all he did was give Mr.

24   Dondero Matt Clemente's phone number.  And you yourself ruled,

25   Your Honor, that Mr. Dondero could speak with the Committee,

APP. 0972
Appx. 01019

189

1    so that wouldn't even have been a violation of your orders.

2    There's three related to Mr. Ellington, but no evidence of

3    confidential information.

4        And, Your Honor, I'm very concerned about the comments

5    that you made about Mr. Ellington and perjury.  I just want to

6    make sure that it's clear on the record that those were not

7    findings of fact.  That did not -- there was no evidence about

8    that today.  And I understand Your Honor's frustration.  I was

9    -- but I just want to be very clear on the record that those

10   were not findings of fact that you were making during that

11   part of your comments.  I was a little unclear about where the

12   ruling exactly stopped when you said you wanted to add onto

13   the order and then you were going to make a few more comments.

14        So that's all I have, Your Honor.

15            THE COURT:  Okay.

16            MS. SMITH:  Thank you for listening and --

17            THE COURT:  Thank you.  Fair comments, one and all.

18   I'm first going to tweak.  I was concerned.  You heard me

19   express concern about, you know, Ellington and Leventon aren't

20   parties to this adversary.  Not here.  So here's -- Mr.

21   Morris, I assume you're the scrivener.  Let's change what I

22   said earlier and have the injunction read that Mr. Dondero

23   shall not request that Mr. Ellington or Mr. Leventon share any

24   confidential information they received as general counsel or

25   assistant general counsel for the Debtor without Debtor's

190

1 counsel's explicit written permission, nor accept any

2 confidential information that the two of them may have

3 received as general counsel or assistant general counsel for

4 the Debtor. Okay? So the injunction is --

5            MR. MORRIS: Your Honor, if I may, --

6            THE COURT: Who?

7            MR. MORRIS: Your Honor, if I may, that is not

8 sufficient for us, because that means that they can actually

9 share it with him as long as he doesn't request it. I'm a

10 little surprised --

11           THE COURT: No. You didn't hear the accept -- the

12 last part.

13           MR. MORRIS: Okay.

14           THE COURT: I added on at the end, nor shall Mr.

15 Dondero accept any confidential information. They -- he shall

16 not request that they share it, nor shall he accept it. Okay?

17 I --

18           MR. MORRIS: So, but that -- my concern is that that

19 makes Mr. Dondero the arbiter of what's confidential and

20 what's privileged. And I think that's improper. I think it's

21 really reasonable, and I'm surprised -- you know, we're all

22 advocates here, so I take no issue with counsel, but the order

23 was going to be pretty simple: Don't disclose privileged or

24 confidential information. If they don't like that, that's

25 fine. Just bar Mr. Dondero from speaking to either one of

191

1  them, period, full stop.  Because we should not be in a

2  position where he doesn't request it but somehow they send it

3  to him.  It is confidential.

4      I mean, who's deciding what's confidential here?  Mr.

5  Ellington?  Mr. Leventon?  Mr. Dondero?  Just stop their

6  communication.  Mr. Dondero is subject to the Court's order.

7  He's the one who's subject to this motion.  Bar him from

8  speaking to either one of them.  It's a very -- very simple

9  solution.

10        MR. BONDS:  Your Honor, I agree that it's a simple

11  solution.  It's, I mean, not correct to assume that Mr.

12  Dondero is in any way going to breach his obligations to the

13  Court or to Mr. Ellington and Mr. Leventon.  I don't see where

14  -- what we're talking about.

15        MS. SMITH:  Also, Your Honor, I have to object to him

16  disparaging my clients that way.  There's been no evidence

17  that they improperly shared any information.  They are

18  licensed lawyers and they know the Rules of Professional --

19  they know the rules of professionalism, so --

20        THE COURT:  Okay.  I, you know, I didn't make a

21  finding earlier when I held out my two giant takeaways, to get

22  to your later question, no findings.  But I really hope you

23  share with them everything I said, the concerns I expressed.

24  Maybe get the transcript.

25        MS. SMITH:  Absolutely, Your Honor.

192

1      THE COURT: Because I have huge concerns about

2   conflicts of interest here. Okay? Huge, huge concerns. I

3   had them back when we had the discovery fight, Committee

4   wanting documents, and, you know, and I still have them. You

5   know, did Ellington know about the TRO?

6      MS. SMITH: Understood, Your Honor.

7      THE COURT: Okay. So let me backtrack. We already

8   had a TRO that prevented Mr. Dondero from talking to any

9   employees of the Debtor unless it was about shared services

10  agreement.

11    So, Mr. Bonds, I'm going to flip it back to you on this

12  one. Why shouldn't I at this point just say, okay, guess

13  what, no talking to Mr. Leventon or Ellington for the time

14  being? Why --

15     MR. BONDS: First of all, --

16     MS. SMITH: Your Honor, that's acceptable to us.

17     THE COURT: Okay. What's wrong with that, Mr. Bonds?

18     MR. BONDS: Your Honor, we don't believe that Mr.

19  Dondero has violated the TRO.

20    And secondly and more importantly, we don't believe that

21  there's any way that you can enter an order that singles out

22  two former employees. I mean, that's bizarre.

23     THE COURT: If I'm concerned that it's thwarting the

24  reorganization efforts and there are conflicts of interest

25  here, why can't I?

193

1    You know, this is -- I hate to say it, but I feel like

2  I've been in the role of a divorce judge today. We have very

3  much a corporate divorce that has been in the works, unless we

4  get this pot plan on track, okay, and I'm a judge having to

5  enter interim orders keeping one spouse away from the other,

6  keeping one spouse out of the house, keeping one spouse away

7  from the kids. It's not pleasant at all. But I don't -- the

8  more I think about it, the more I have authority to do it just

9  to protect, to protect the nest egg here.

10    MS. SMITH: Your Honor, we are perfectly fine with

11  you enjoining Mr. Dondero from speaking to our clients, and we

12  will convey that to our clients.

13    THE COURT: Okay. Mr. Bonds, I can't hear you.

14    MR. BONDS: I'm sorry, Your Honor. What evidence is

15  there of irreparable harm as to Mr. Dondero talking with

16  either Mr. Leventon or Mr. Ellington?

17    THE COURT: Okay. Do I need to parse through the

18  communications I saw? Do I need to parse-

19    MR. BONDS: Yeah, I think so. I mean, I don't

20  understand.

21    THE COURT: Okay. I never authorized Mr. Ellington

22  to be the settlement lawyer or whatever, okay? I never would

23  have, okay? And maybe Mr. Seery, you know, said something to

24  -- early on in the case to make him think he had that

25  authority, but no, we're done. Okay? And I feel like it's

194

1   causing more harm than good right now.  Okay?

2       I don't know who instructed all of these Dondero-

3   controlled entities to hire lawyers.  I don't know if

4   Ellington and Leventon have been giving instructions to these

5   entities.  But we've got conflicts everywhere now.  Okay?

6   We've got -- and by the way, I'm just going to list them now.

7   We have, of course, Bonds Ellis representing Dondero.  We have

8   Doug Draper, Heller Draper, now representing these trusts, Get

9   Good Trust, Dugaboy Investment Trust.  We have K&L Gates and

10  now Munsch Hardt also representing the Advisors, NexPoint and

11  the various CLO or other Funds.  We have CLO Holdco

12  represented by Kane Russell Coleman Logan.  We have NexPoint

13  Real Estate represented by Wick Phillips.  Who have I left --

14  and, of course, the employees, Baker & McKenzie and Ms. Smith.

15  We have Spencer Fane in there for other current or former

16  employees.  We have Loewinsohn Flegle in there for certain

17  former or current employees.

18      I mean, the proliferation of lawyers.  And again, I don't

19  know if Mr. Ellington and Mr. Leventon have had a role in

20  hiring counsel, wearing their hat for these other entities or

21  not.  Can anyone tell me?  Maybe I'm worried about something I

22  shouldn't be worried about.

23          MR. DONDERO:  You're worried about something you

24  shouldn't worry about, Your Honor.

25          THE COURT:  Okay.  So Ellington --

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 982 of 2722

195

1        MR. MORRIS:  Your Honor, I would just point to the

2   evidence that's in the record, Your Honor.  You have Mr.

3   Dondero asking Mr. Ellington to show leadership in

4   coordinating all of the lawyers you just mentioned.  It's in

5   the record.

6        THE COURT:  Yes.  I'm just going to, until otherwise

7   ordered, no conversations between Dondero and Ellington and

8   Leventon, and that's just going to be my ruling until further

9   order.  That's what I feel best about.

10      Now, let me ask you, knowing that I could only give you a

11  half a day on the 28th of January, if we start the

12  confirmation hearing on whatever the plan looks like on

13  January 27th, I mean, do people want to go with that, --

14       MR. POMERANTZ:  Your --

15       THE COURT:  -- even knowing we might not finish that

16  day, or no?

17       MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

18  Maybe if we could start on the 26th, have the 26th, 27th, and

19  then maybe half of the 28th.  I would think two and a half

20  days should be enough, notwithstanding the volume of

21  objections, because I think you'll find that, while there may

22  be some evidence, I think the majority of the objections are

23  really legal in nature.

24       THE COURT:  All right.  Traci, are you out there in

25  video-land?

196

1            THE CLERK:  Yes, I'm here.

2            THE COURT:  Okay.  Have I overcommitted the 26th?  If

3    we start the 26th at 9:30 in the morning, can we do that?  Or

4    --

5            MR. BONDS:  Your Honor?

6            THE CLERK:  That'd be fine.

7            THE COURT:  Okay.

8            THE CLERK:  Just remember that you have an

9    appointment at lunchtime that day at noon on the 26th.

10           THE COURT:  Okay.  I --

11           THE CLERK:  You don't have any court hearings.

12           THE COURT:  Okay.

13           MR. BONDS:  Your Honor, I'm sorry.

14           THE COURT:  Go ahead.

15           MR. BONDS:  Your Honor, I'm sorry.  This is John

16   Bonds.  I have a hearing on the 26th that I can't miss.

17           THE COURT:  Well, can someone else --

18           MR. POMERANTZ:  Your Honor, we would request, right,

19   that Mr. Lynn lead the confirmation hearing.  There's a lot of

20   lawyers.  If we try to look at everyone's calendar, we're

21   never going to be able --

22           THE COURT:  Yes.

23           MR. POMERANTZ:  -- to get something that's good for

24   everyone.

25           THE COURT:  Okay.  Yes.  Well, Mr. Lynn or Mr. Assink

197

1  can handle it, Mr. Bonds.

2      So we're going to start the 26th at 9:30. We'll go all

3  day, except I have something at lunchtime, apparently. And

4  then we'll go all day on the 27th, and then I can give you

5  half a day on the 28th.

6      So you'll upload immediately a notice to that effect, Mr.

7  Pomerantz.

8          MR. POMERANTZ: Yes, we would.

9      Your Honor, in terms of our documents in support of

10  confirmation, we want to make it convenient with the Court.

11  We know your Court would at least need one business day, so we

12  would prefer to file, say, by 2:00 Central on the 24th, on a

13  Sunday. Everyone will have it, and have one business day. I

14  mean, the old order only had one business day in advance as

15  well. So that's what we would propose for our confirmation

16  documents to be filed.

17          MR. RUKAVINA: Your Honor, this is Davor Rukavina.

18  An important issue here is how the creditors have voted, and I

19  have no idea how they have voted. The voting deadline has

20  expired. So I have no problem with what Mr. Pomerantz

21  suggests, but I do think that the Debtor should file its

22  tabulation of votes sooner rather than later so we all know

23  one of the central elements for the hearing that we'll have.

24          THE COURT: Okay.

25          MR. POMERANTZ: That's fair, Your Honor. We're

198

1  prepared to file the summary of voting and tabulation by the

2  15th of January.

3           THE COURT:  Okay.  Very good.

4      So, backing up, Mr. Pomerantz, you asked that I approve

5  you filing any plan modifications by noon on Sunday, the 24th?

6  Is that what you said?

7           MR. POMERANTZ:  Yeah.  So, there's a couple of

8  things.  There's our confirmation brief.

9           THE COURT:  Uh-huh.

10           MR. POMERANTZ:  There is our -- any evidence we would

11  submit, although I suspect we are likely to provide live

12  testimony, as opposed to a declaration.  There was our summary

13  of ballots, which we will now do on the 15th.  And to the

14  extent we have any modifications, we would provide them on

15  Sunday by 12:00 noon Central time as well.  Yes.

16           THE COURT:  All right.

17           MR. RUKAVINA:  Well, Your Honor, this is Davor

18  Rukavina.  Does that mean the witness and exhibit lists also

19  will not be due until Sunday at noon?  Because I would request

20  that we have the normal period of time to exchange exhibits

21  and witnesses.

22           MR. BONDS:  Your Honor, I think that the normal time

23  period is also important in this case.

24           THE COURT:  Okay.  I'm going to --

25           MR. POMERANTZ:  Your Honor, we could -- if everyone

199

1  agrees on witness lists, we could do those by 5:00 p.m.

2  Central on the 22nd.

3          THE COURT:  Okay.  Let's do that.  Okay.

4          MR. POMERANTZ:  But that -- but that needs to be for

5  everybody.

6          THE COURT:  Oh, it will be for everyone.

7          MR. RUKAVINA:  Your Honor, no problem.

8          THE COURT:  Okay.  Let's --

9          MR. POMERANTZ:  5:00 p.m. Central Standard Time.

10          THE COURT:  No more discussions.  That'll be the

11  ruling, okay?  Everything is going to be due by 5:00 p.m.

12  Central time on Friday, the 22nd.  All right.

13          MR. POMERANTZ:  Your Honor, is that our brief as

14  well, or --

15          THE COURT:  Yes.

16          MR. POMERANTZ:  -- was that just the witness list?

17          THE COURT:  Everything.  Brief, witness list, and --

18          MR. POMERANTZ:  Okay.

19          THE COURT:  -- plan mods.

20      Let me look through my notes and see if there's anything

21  else I want to say.  You know, let me do some quick math here.

22  I know there was one other thing I wanted to say that involves

23  math.  Okay.  I think my math is right here.  Okay.  You know,

24  I mentioned the proliferation of lawyers.  And let me just say

25  this.  We had -- we've had about 90 people on the -- showing

200

1    up on the video screen today -- 89, 90, 91, 92.  A few, a

2    little over 90.  Okay?  So let's say 90.  It's been up to 95

3    earlier.  But let's pretend that 60 of those are lawyers

4    billing by the hour.  That's very conservative.  Probably many

5    more than 60.  And let's assume conservatively that the

6    average billing rate is $700 an hour.  That's probably very

7    low, right?  We probably don't have many baby lawyers on the

8    phone.  So that's a very low average.  So, 60 lawyers times

9    $700 an hour, $42,000 an hour this hearing has cost.  And then

10   we've been going over seven hours.  So let's say seven,

11   conservatively, times $42,000.  This hearing has cost $294,000

12   today.  A preliminary injunction hearing.  I mean, no one

13   thinks that's chump change.  I don't know, maybe some people

14   do.  This just seems like a ridiculous way to spend resources.

15   No offense to all the wonderful lawyers, but this is just --

16   it's crazy-town, right?  It is crazy-town.  So I implore you,

17   okay, how about I use that word, I implore you to have these

18   good-faith discussions on a pot plan.

19       Please, Mr. Dondero, I mean, don't waste people's time.

20   $160 million, I know that's not going to cut it.  Okay?  So

21   it's going to have to be more meaningful.  I just know that in

22   my gut.

23       But having said that, I mean, I honestly mean I think a

24   pot plan -- I think you getting your baby back is the best

25   thing for everyone.  Okay?  I think it's the best thing for

201

1  everyone.  So I want you all to --

2       MR. DONDERO:  Judge, I -- Judge, I just need to

3  interject for a second, because no one follows the big

4  picture.  We filed for bankruptcy with $450 million of assets.

5  $360 million of third-party net assets, $90 million of

6  affiliated notes.  The third-party assets are down to $130

7  million and falling fast.

8       MR. POMERANTZ:  Your Honor, I hate to interrupt Mr.

9  Dondero, but that is not the purpose of this hearing.

10      THE COURT:  Well, --

11      MR. POMERANTZ:  Mr. Dondero's statement of the assets

12 and value is just not something that the Debtors would agree

13 and support.  I'm sure it's not something the creditors -- I

14 think we understand what Your Honor is saying.  I think the

15 Committee understands.  And Your Honor knows that the Debtor

16 and the Committee are close to the asset values.  And Mr.

17 Dondero should be making his argument to the Debtor and the

18 Committee, not Your Honor, in this open forum.

19      THE COURT:  Okay.

20      MR. POMERANTZ:  It's just not appropriate.

21      THE COURT:  And I understand where you're both coming

22 from.  And he's saying that because I made the comment I made

23 about $160 million not being enough.

24     I've seen the evidence.  I've heard the evidence at prior

25 hearings, Mr. Dondero.  We've had a lot of hearings.  And I

202

1    remember writing that down.  Wow, why did that happen?  Seeing

2    the dissipation of value.  I couldn't remember the exact

3    numbers, but I thought it was like $500 million something and

4    then $300 million or whatever.  And I remember Multi-Strat,

5    that being sold, and blah, blah, blah, blah.

6        But having said that, there are a lot of causes of action

7    that have been hinted at by the Creditors' Committee and

8    others.  So, causes of action is one of the things they are

9    looking at when they start thinking about what's appropriate

10   value.

11       So I just, I get where everyone is coming from.  I get

12   where everyone is coming from.  But, again, let's take one

13   more stab at this, please.  Okay?

14            MR. POMERANTZ:  Yeah.  And Your Honor, my last

15   comment.  We're commercial people.  The creditors are

16   commercial people.  I think we've done a tremendous job in

17   being able to resolve most every one of the significant

18   claims.  I think the Court should trust the process.  Mr.

19   Dondero should trust the process.

20       And again, if there's a commercial deal to be worked out,

21   I don't think there's anyone more than of course the Debtor

22   and the people on the Committee, who have been litigating in

23   many cases with Mr. Dondero and Highland for ten years, I

24   don't think it's anyone's desire.  So if there's a reasonable,

25   rational proposal that the creditors can get behind and want

203

1   to engage, then there'll be a discussion.  If they don't

2   believe it's a reasonable, rational proposal, they won't.

3           THE COURT:  Yes.  All right.  Well, I do feel very

4   good about what I've heard about the UBS issues being worked

5   out.  I mean, we have come a long way in 15 months, even

6   though it's frustrating to me and others.  But, again, I know

7   you all are going to do what you need to do.  And I'll look

8   for the form of order.  I'm going to see you all, Mr. Dondero,

9   including you, next Wednesday.  And if there's nothing else,

10  we stand adjourned.

11          MS. SMITH:  Your Honor, I'd like to review the form

12  of order as it regards my clients before it's submitted.

13          THE COURT:  Okay.

14          MS. SMITH:  If I could have a courtesy copy, please.

15          THE COURT:  Yes.  Well, yes.  I'm not going to

16  require 90 lawyers to get the order, but I will ask Mr.

17  Pomerantz, Mr. Morris, make sure Ms. Smith gets it and

18  obviously Mr. Dondero's counsel gets it.  And I probably won't

19  get it until Monday, it sounds like, but --

20          MR. POMERANTZ:  That's likely.

21          THE COURT:  But I'll be on the lookout for it.  Okay.

22  Thank you.  We stand adjourned.

23          MS. SMITH:  Thank you, Your Honor.

24          THE CLERK:  All rise.

25          MR. MORRIS:  Thank you, Your Honor.

204

1          MR. BONDS:  Thank you, Your Honor.

2      (Proceedings concluded at 4:09 p.m.)

3                        --oOo--

18                      CERTIFICATE

19      I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
20    above-entitled matter.

21    **/s/ Kathy Rehling**                          **01/11/2021**

22    _____    _____

23    Kathy Rehling, CETD-444                          Date
Certified Electronic Court Transcriber

205

INDEX

PROCEEDINGS                                              3

OPENING STATEMENTS

- By Mr. Morris                                          5

WITNESSES

Plaintiff's Witnesses

James D. Dondero
- Direct Examination by Mr. Morris                      19
- Cross-Examination by Mr. Bonds                       106
- Redirect Examination by Mr. Morris                   139

EXHIBITS

Plaintiff's Exhibits A through Y            Received 38

CLOSING ARGUMENTS

- By Mr. Morris                                        152
- By Mr. Lynn                                          155
- By Mr. Bonds                                         159

RULINGS                                           163/189

END OF PROCEEDINGS                                     204

INDEX                                                  205

APP. 0989
Appx. 01036

# EXHIBIT 9

```
                IN THE UNITED STATES BANKRUPTCY COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION

                                    )    Case No. 19-34054-sgj-11
In Re:                              )    Chapter 11
                                    )
HIGHLAND CAPITAL                    )    Dallas, Texas
MANAGEMENT, L.P.,                   )    Monday, February 8, 2021
                                    )    9:00 a.m. Docket
                                    )
        Debtor.                     )
                                    )    BENCH RULING ON CONFIRMATION
                                    )    HEARING [1808] AND AGREED
                                    )    MOTION TO ASSUME [1624]
_____)

                      TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:              Jeffrey Nathan Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
                               13th Floor
                             Los Angeles, CA  90067-4003
                             (310) 277-6910

For the Official Committee   Matthew A. Clemente
of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                             One South Dearborn Street
                             Chicago, IL  60603
                             (312) 853-7539

For James Dondero:           D. Michael Lynn
                             John Y. Bonds, III
                             Bryan C. Assink
                             BONDS ELLIS EPPICH SCHAFER
                               JONES, LLP
                             420 Throckmorton Street,
                               Suite 1000
                             Fort Worth, TX  76102
                             (817) 405-6900

For Get Good Trust and       Douglas S. Draper
Dugaboy Investment Trust:    HELLER, DRAPER & HORN, LLC
                             650 Poydras Street, Suite 2500
                             New Orleans, LA  70130
                             (504) 299-3300
```

2

1  APPEARANCES, cont'd.:

2  For Certain Funds and          Davor Rukavina
   Advisors:                      MUNSCH, HARDT, KOPF & HARR
3                                 500 N. Akard Street, Suite 3800
                                  Dallas, TX  75201-6659
4                                 (214) 855-7587

5  For Certain Funds and          A. Lee Hogewood, III
   Advisors:                      K&L GATES, LLP
6                                 4350 Lassiter at North Hills
                                    Avenue, Suite 300
7                                 Raleigh, NC  27609
                                  (919) 743-7306
8
   Recorded by:                   Michael F. Edmond, Sr.
9                                 UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
10                                Dallas, TX  75242
                                  (214) 753-2062
11
   Transcribed by:                Kathy Rehling
12                                311 Paradise Cove
                                  Shady Shores, TX  76208
13                                (972) 786-3063

14

15

16

17

18

19

20

21

22

23

24
        Proceedings recorded by electronic sound recording;
25          transcript produced by transcription service.

APP. 0991
Appx. 01038

3

1          <u>DALLAS, TEXAS - FEBRUARY 8, 2021 - 9:08 A.M.</u>

2          THE COURT:  Please be seated.

3      (Beeping.)

4          THE COURT:  Someone needs to turn off their whatever.

5      All right.  Good morning.  This is Judge Jernigan, and we

6  have scheduled today a bench ruling regarding the Debtor's

7  plan that we had a confirmation trial on last week.  This is

8  Highland Capital Management, LP, Case No. 19-34054.

9      Let me first make sure we've got Debtor's counsel on the

10 line.  Do we have --

11          MR. POMERANTZ:  Yes.

12          THE COURT:  -- Mr. Pomerantz?

13          MR. POMERANTZ:  Yes, Your Honor.  Good morning, Your

14 Honor.  Jeff Pomerantz; Pachulski Stang Ziehl & Jones; on

15 behalf of the Debtor.

16          THE COURT:  Okay.  Good morning.  Do we have the

17 Creditors' Committee on the phone?

18          MR. CLEMENTE:  Good morning, Your Honor.  Matthew

19 Clemente of Sidley Austin on behalf of the Creditors'

20 Committee.

21          THE COURT:  Good morning.  All right.  We had various

22 Objectors.  Do we have Mr. Dondero's counsel on the phone?

23          MR. LYNN:  Yes, Your Honor.  Michael Lynn, together

24 with John Bonds and Bryan Assink, for Jim Dondero.

25          THE COURT:  Good morning.  For the Trusts, the

4

1   Dugaboy and Get Good Trusts, do we have Mr. Draper?

2           MR. DRAPER:  Yes.  Douglas Draper is on the line,

3   Your Honor.

4           THE COURT:  Good morning.  Now, for what I'll call

5   the Funds and Advisor Objectors, do we have Mr. Rukavina and

6   your crew on the line?

7           MR. RUKAVINA:  Davor Rukavina.  And Lee Hogewood is

8   also on the line.

9           THE COURT:  All right.  Good morning to you.  All

10  right.  And we had objections pending from the U.S. Trustee as

11  well.  Do we have the U.S. Trustee on the line?

12      (No response.)

13          THE COURT:  All right.  If you're appearing, you're

14  on mute.  We're not hearing you.

15      All right.  Well, we have lots of other folks.  I don't

16  mean to be neglectful of them, but we're going to get on with

17  the ruling this morning.  This is going to take a while.  This

18  is a complex matter, so it should take a while.

19      All right.  Before the Court, of course, for consideration

20  is the Debtor's Fifth Amended Plan, first filed on November

21  24, 2020, as later modified on or around January 22, 2021,

22  with more amendments filed on or around February 1, 2021.  The

23  Court will hereinafter refer to this as the "Plan."

24      The parties refer to the Plan as a monetization plan

25  because it involves the gradual wind-down of the Debtor's

5

1   assets and certain of its funds over time, with the

2   Reorganized Debtor continuing to manage certain other funds

3   for a while, under strict governance and monitoring, and a

4   Claimants Trust will receive the proceeds of that process,

5   with the creditors receiving an interest in that trust.  There

6   is also anticipated to be Litigation Sub-Trust established for

7   the purpose of pursuing certain avoidance or other causes of

8   action for the benefit of creditors.

9       The recovery for general unsecured creditors is estimated

10  now at 71 percent.

11      The Plan was accepted by 99.8 percent of the dollar amount

12  of voting creditors in Class 8, the general unsecured class,

13  but as to numerosity, a majority of the class of general

14  unsecured creditors did not vote in favor of the plan.

15  Specifically, 27 claimants voted no and 17 claimants voted

16  yes.  All but one of the rejecting ballots were cast by

17  employees who, according to the Debtor, are unlikely to have

18  allowed claims because they are asserted for bonuses or other

19  compensation that will not become due.

20      Meanwhile, in a convenience class, Class 7, of general

21  unsecured claims under one million dollars, one hundred

22  percent of the 16 claimants who chose to vote in that class

23  chose to accept the Plan.

24      Because of the rejecting votes in Class 8, and because of

25  certain objections to the Plan, the Court heard two full days

6

1   of evidence, considering testimony from five witnesses and

2   thousands of pages of documentary evidence, in considering

3   whether to confirm the Plan pursuant to Sections 1129(a) and

4   (b) of the Bankruptcy Code.

5        The Court finds and concludes that the Plan meets all of

6   the relevant requirements of Sections 1123, 1124, and 1129 of

7   the Code, and other applicable provisions of the Bankruptcy

8   Code, but is issuing this detailed ruling to address certain

9   pending objections to the Plan, including but not limited to

10  objections regarding certain Exculpations, Releases, Plan

11  Injunctions, and Gatekeeping Provisions of the Plan.

12       The Court reserves the right to amend or supplement this

13  oral ruling in more detailed findings of fact, conclusions of

14  law, and an Order.

15       First, by way of introduction, this case is not your

16  garden-variety Chapter 11 case.  Highland Capital Management,

17  LP is a multibillion dollar global investment advisor,

18  registered with the SEC pursuant to the Investment Advisers

19  Act of 1940.  It was founded in 1993 by James Dondero and Mark

20  Okada.  Mr. Okada resigned from his role with Highland prior

21  to the bankruptcy case being filed.  Mr. Dondero was in

22  control of the Debtor as of the day it filed bankruptcy, but

23  agreed to relinquish control of it on or about January 9,

24  2020, pursuant to an agreement reached with the Official

25  Unsecured Creditors' Committee, which will be described later.

7

1    Although Mr. Dondero remained on as an unpaid employee and

2    portfolio manager with the Debtor after January 9, 2020, his

3    employment with the Debtor terminated on October 9, 2020.  Mr.

4    Dondero continues to work for and essentially control numerous

5    nondebtor companies in the Highland complex of companies.

6        The Debtor is headquartered in Dallas, Texas.  As of the

7    October 2019 petition date, the Debtor employed approximately

8    76 employees.

9        Pursuant to various contractual arrangements, the Debtor

10   provides money management and advisory services for billions

11   of dollars of assets, including CLOs and other investments.

12   Some of these assets are managed pursuant to shared services

13   agreements with a variety of affiliated entities, including

14   other affiliated registered investment advisors.  In fact,

15   there are approximately 2,000 entities in the Byzantine

16   complex of companies under the Highland umbrella.

17       None of these affiliates of Highland filed for Chapter 11

18   protection.  Most, but not all, of these entities are not

19   subsidiaries, direct or indirect, of Highland.  And certain

20   parties in the case preferred not to use the term "affiliates"

21   when referring to them.  Thus, the Court will frequently refer

22   loosely to the so-called, in air quotes, "Highland complex of

23   companies" when referring to the Highland enterprise.  That's

24   a term many of the lawyers in the case use.

25       Many of the companies are offshore entities, organized in

8

1  such faraway jurisdictions as the Cayman Islands and Guernsey.

2      The Debtor is privately owned 99.5 percent by an entity

3  called Hunter Mountain Investment Trust; 0.1866 percent by the

4  Dugaboy Investment Trust, a trust created to manage the assets

5  of Mr. Dondero and his family; 0.0627 percent by Mark Okada,

6  personally and through family trusts; and 0.25 percent by

7  Strand Advisors, Inc., the general partner.

8      The Debtor's primary means of generating revenue has

9  historically been from fees collected for the management and

10 advisory services provided to funds that it manages, plus fees

11 generated for services provided to its affiliates.

12     For additional liquidity, the Debtor, prior to the

13 petition date, would sell liquid securities in the ordinary

14 course, primarily through a brokerage account at Jefferies,

15 LLC.  The Debtor would also, from time to time, sell assets at

16 nondebtor subsidiaries and distribute those proceeds to the

17 Debtor in the ordinary course of business.

18     The Debtor's current CEO, James Seery, credibly testified

19 that the Debtor was "run at a deficient for a long time and

20 then would sell assets or defer employee compensation to cover

21 its deficits."  This Court cannot help but wonder if that was

22 necessitated because of enormous litigation fees and expenses

23 that Highland was constantly incurring due to its culture of

24 litigation, as further addressed hereafter.

25     Highland and this case are not garden-variety for so many

9

1   reasons.  One is the creditor constituency.  Highland did not

2   file bankruptcy because of some of the typical reasons a large

3   company files Chapter 11.  For example, it did not have a

4   large asset-based secured lender with whom it was in default.

5   It only had relatively insignificant secured indebtedness

6   owing to Jefferies, with whom it had a brokerage account, and

7   one other entity called Frontier State Bank.

8       Highland did not have problems with trade vendors or

9   landlords.  It did not suffer any type of catastrophic

10  business calamity.  In fact, it filed Chapter 11 six months

11  before the COVID-19 pandemic was declared.  The Debtor filed

12  Chapter 11 due to a myriad of massive unrelated business

13  litigation claims that it was facing, many of which had

14  finally become liquidated or were about to become liquidated

15  after a decade or more of contentious litigation in multiple

16  fora all over the world.

17      The Unsecured Creditors' Committee in this case has

18  referred to the Debtor under its former chief executive, Mr.

19  Dondero, as a serial litigator.  This Court agrees with that

20  description.  By way of example, the members of the Creditors'

21  Committee and their history of litigation with the Debtor and

22  others in the Highland complex are as follows:

23      First, the Redeemer Committee of the Highland Crusader

24  Fund, which I'll call the Redeemer Committee.  This Creditors'

25  Committee member obtained an arbitration award against the

APP. 0998
Appx. 01045

10

1  Debtor of more than $190 million, inclusive of interest,

2  approximately five months before the petition date from a

3  panel of the American Arbitration Association.  It was on the

4  verge of having that award confirmed by the Delaware Chancery

5  Court immediately prior to the petition date, after years of

6  disputes that started in late 2008 and included legal

7  proceedings in Bermuda.  This creditor's claim was settled

8  during the bankruptcy case in the amount of approximately

9  $137.7 million.  The Court is omitting various details and

10  aspects of that settlement.

11      The second Creditors' Committee member, Acis Capital

12  Management, LP, which was formerly in the Highland complex of

13  companies but was not affiliated with Highland as of the

14  petition date.  This UCC member and its now-owner, Josh Terry,

15  were involved in litigation with Highland dating back to 2016.

16  Acis was forced into an involuntary bankruptcy in the

17  Bankruptcy Court for the Northern District of Texas, Dallas

18  Division, by Josh Terry, who was a former Highland portfolio

19  manager, in 2018 after Josh Terry obtained an approximately $8

20  million arbitration award and judgment against Acis that was

21  issued by a state court in Dallas County, Texas.  Josh Terry

22  was ultimately awarded the equity ownership of Acis by the

23  Dallas Bankruptcy Court in the Acis bankruptcy case.

24      Acis subsequently asserted a multimillion dollar claim

25  against Highland in the Dallas Bankruptcy Court for Highland's

11

alleged denuding of Acis in fraud of its creditors, primarily

Josh Terry.

The litigation involving Acis and Mr. Terry dates back to

mid-2016, and has continued on, with numerous appeals of

bankruptcy court orders, including one appeal still pending at

the United States Court of Appeals for the Fifth Circuit.

There was also litigation involving Josh Terry and Acis in

the Royal Court of the Island of Guernsey and in a court in

New York.

The Acis claim was settled during this bankruptcy case in

court-ordered mediation for approximately $23 million. Other

aspects and details of this settlement are being omitted.

Now, the third Creditors' Committee member, UBS

Securities. It's a creditor who filed a proof of claim in the

amount of $1,039,000,000 in the Highland case. Yes, over one

billion dollars. The UBS claim was based on the amount of a

judgment that UBS received from a New York state court in 2020

after a multi-week bench trial which had occurred many months

earlier on a breach of contract claim against other entities

in the Highland complex. UBS alleged that the Debtor should

be liable for the judgment. The UBS litigation related to

activities that occurred in 2008. The litigation involving

UBS and Highland and its affiliates was pending for more than

a decade, there having been numerous interlocutory appeals

during its history.

12

1    The Debtor and UBS recently announced a settlement of the

2    UBS claim, which came a few months after court-ordered

3    mediation.  The settlement is in the amount of $50 million as

4    a general unsecured claim, $25 million as a subordinated

5    claim, and $18 million of cash coming from a nondebtor entity

6    in the Highland complex known as Multistrat.  Other aspects of

7    this settlement are being omitted.

8    The fourth and last Creditors' Committee member is Meta-e

9    Discovery.  It is a vendor who happened to supply litigation

10   and discovery-related services to the Debtor over the years.

11   It had unpaid invoices on the petition date of more than

12   $779,000.

13   It is fair to say that the members of the Creditors'

14   Committee in this case all have wills of steel.  They fought

15   hard before and during the bankruptcy case.  The members of

16   the Creditors' Committee are highly sophisticated and have had

17   highly sophisticated professionals representing them.  They

18   have represented their constituency in this case as

19   fiduciaries extremely well.

20   In addition to these Creditors Committee members, who were

21   all embroiled in years of litigation with Highland and its

22   affiliates in various ways, the Debtor has been in litigation

23   with Patrick Daugherty, a former limited partner and employee

24   of Highland, for many years in both Delaware and Texas state

25   courts.  Patrick Daugherty filed a proof of claim for "at

13

1    least $37.4 million" relating to alleged breached employment-

2    related agreements and for the tort of defamation arising from

3    a 2017 press release posted by the Debtor.

4        The Debtor and Patrick Daugherty recently announced a

5    settlement of the Patrick Daugherty claim in the amount of

6    $750,000 cash on the effective date, an $8.25 million general

7    unsecured claim, and a $2.75 million subordinated claim.

8    Other aspects and details of this settlement are being

9    omitted.

10       Additionally, an entity known as HarbourVest, who invested

11   more than $70 million with an entity in the Highland complex,

12   asserted a $300 million proof of claim against Highland,

13   alleging, among other things, fraud and RICO violations.  The

14   HarbourVest claim was settled during the bankruptcy case for a

15   $45 million general unsecured claim and a $35 million junior

16   claim.

17       Other than these claims just described, most of the other

18   claims in this case are claims asserted against the Debtor by

19   other entities in the Highland complex, most of which entities

20   the Court finds to be controlled by Mr. Dondero; claims of

21   employees who believe that they are entitled to large bonuses

22   or other types of deferred compensation; and claims of

23   numerous law firms that did work for Highland and were unpaid

24   for amounts due to them on the petition date.

25       Yet another reason this is not your garden-variety Chapter

14

1  11 case is its postpetition corporate governance structure.

2  Highland filed bankruptcy October 16, 2019.  Contentiousness

3  with the Creditors' Committee began immediately, with first

4  the Committee's request for a change of venue from Delaware to

5  Dallas, and then a desire by the Committee and the U.S.

6  Trustee for a Chapter 11 or 7 trustee to be appointed due to

7  concerns over and distrust of Mr. Dondero and his numerous

8  conflicts of interest and alleged mismanagement or worse.

9      After many weeks of the threat of a trustee lingering, the

10  Debtor and the Creditors' Committee negotiated and the Court

11  approved a corporate governance settlement on January 9, 2020

12  that resulted in Mr. Dondero no longer being an officer or

13  director of the Debtor or of its general partner, Strand.

14      As part of the court-approved settlement, three eminently-

15  qualified Independent Directors were chosen by the Creditors'

16  Committee and engaged to lead Highland through its Chapter 11

17  case.  They were James Seery, John Dubel, and Retired

18  Bankruptcy Judge Russell Nelms.  They were technically the

19  Independent Directors of Strand, the general partner of the

20  Debtor.  Mr. Dondero had previously been the sole director of

21  Strand, and thus the sole person in ultimate control of the

22  Debtor.

23      The three independent board members' resumes are in

24  evidence.  James Seery eventually was named CEO of the Debtor.

25  Suffice it to say that this changed the entire trajectory of

15

1   the case.  This saved the Debtor from a trustee.  The Court

2   trusted the new directors.  The Creditors' Committee trusted

3   them.  They were the right solution at the right time.

4       Because of the unique character of the Debtor's business,

5   the Court believed this solution was far better than a

6   conventional Chapter 7 or 11 trustee.  Mr. Seery, in

7   particular, knew and had vast experience at prominent firms

8   with high-yield and distressed investing similar to the

9   Debtor's business.  Mr. Dubel had 40 years of experience

10  restructuring large, complex businesses and serving on their

11  boards of directors in this context.  And Retired Judge Nelms

12  had not only vast bankruptcy experience but seemed

13  particularly well-suited to help the Debtor maneuver through

14  conflicts and ethical quandaries.

15      By way of comparison, in the Chapter 11 case of Acis, the

16  former affiliate of Highland that this Court presided over two

17  or three years ago, which company was much smaller in size and

18  scope than Highland, managing only five or six CLOs, a Chapter

19  11 trustee was elected by the creditors that was not on the

20  normal rotation panel for trustees in this district, but

21  rather was a nationally-known bankruptcy attorney with more

22  than 45 years of large Chapter 11 case experience.  This

23  Chapter 11 trustee performed valiantly, but was sued by

24  entities in the Highland complex shortly after he was

25  appointed, which this Court had to address.  The Acis trustee

16

1  could not get Highland and its affiliates to agree to any

2  actions taken in the case, and he finally obtained

3  confirmation of a plan over Highland and its affiliates'

4  objections in his fourth attempted plan, which confirmation

5  then was promptly appealed by Highland and its affiliates.

6      Suffice it to say it was not easy to get such highly-

7  qualified persons to serve as independent board members and

8  CEO of this Debtor.  They were stepping into a morass of

9  problems.  Naturally, they were worried about getting sued, no

10 matter how defensible their efforts might be, given the

11 litigation culture that enveloped Highland historically.  It

12 seemed as though everything always ended in litigation at

13 Highland.

14     The Court heard credible testimony that none of them would

15 have taken on the role of Independent Director without a good

16 D&O insurance policy protecting them, without indemnification

17 from Strand, guaranteed by the Debtor; without exculpation for

18 mere negligence claims; and without a gatekeeper provision,

19 such that the Independent Directors could not be sued without

20 the bankruptcy court, as a gatekeeper, giving a potential

21 plaintiff permission to sue.

22     With regard to the gatekeeper provision, this was

23 precisely analogous to what bankruptcy trustees have pursuant

24 to the so-called "Barton Doctrine," which was first

25 articulated in an old U.S. Supreme Court case.

17

1      The Bankruptcy Court approved all of these protections in

2   a January 9, 2020 order.  No one appealed that order.  And Mr.

3   Dondero signed the settlement agreement that was approved by

4   that order.

5      An interesting fact about the D&O policy came out in

6   credible testimony at the confirmation hearing.  Mr. Dubel and

7   an insurance broker from Aon, named Marc Tauber, both credibly

8   testified that the gatekeeper provision was needed because of

9   the so-called, and I quote, "Dondero Exclusion" in the

10  insurance marketplace.

11     Specifically, the D&O insurers in the marketplace did not

12  want to cover litigation claims that might be brought against

13  the Independent Directors by Mr. Dondero because the

14  marketplace of D&O insurers are aware of Mr. Dondero's

15  litigiousness.  The insurers would not have issued a D&O

16  policy to the Independent Directors without either the

17  gatekeeping provision or a "Dondero Exclusion" being in the

18  policy.

19     Thus, the gatekeeper provision was part of the January 9,

20  2020 settlement.  There was a sound business justification for

21  it.  It was reasonable and necessary.  It was consistent with

22  the Barton Doctrine in an extremely analogous situation --

23  *i.e.*, the independent board members were analogous to a three-

24  headed trustee in this case, if you will.  Mr. Dondero signed

25  off on it.  And, again, no one ever appealed the order

18

1  approving it.

2      The Court finds that, like the Creditors' Committee, the

3  independent board members here have been resilient and

4  unwavering in their efforts to get the enormous problems in

5  this case solved.  They seem to have at all times negotiated

6  hard and with good faith.  As noted previously, they changed

7  the entire trajectory of this case.

8      Still another reason why this was not your garden-variety

9  case was the mediation effort.  In summer of 2020, roughly

10  nine months into the Chapter 11 case, this Court ordered

11  mediation among the Debtor, Acis, UBS, the Redeemer Committee,

12  and Mr. Dondero.  The Court selected co-mediators, since this

13  seemed like such a Herculean task, especially during COVID-19,

14  where people could not all be in the same room.  Those co-

15  mediators were Retired Bankruptcy Judge Allan Gropper from the

16  Southern District of New York, who had a distinguished career

17  presiding over complex Chapter 11 cases, and Ms. Sylvia Mayer,

18  who likewise has had a distinguished career, first as a

19  partner in a preeminent law firm working on complex Chapter 11

20  cases, and subsequently as a mediator and arbitrator in

21  Houston, Texas.

22      As noted earlier, the Acis claim was settled during the

23  mediation, which seemed nothing short of a miracle to this

24  Court, and the UBS claim was settled many months later, and

25  this Court believes the groundwork for that ultimate

19

1   settlement was laid, or at least helped, through the

2   mediation.  And as earlier noted, other enormous claims have

3   been settled during this case, including that of the Redeemer

4   Committee, who, again, had asserted approximately or close to

5   a $200 million claim; HarbourVest, who asserted a $300 million

6   claim; and Patrick Daugherty, who asserted close to a $40

7   million claim.

8       This Court cannot stress strongly enough that the

9   resolution of these enormous claims and the acceptance of all

10  of these creditors of the Plan that is now before the Court

11  seems nothing short of a miracle.  It was more than a year in

12  the making.

13      Finally, a word about the current remaining Objectors to

14  the Plan before the Court.  Once again, the Court will use the

15  phrase "not garden-variety."  Originally, there were over one

16  dozen objections filed to this Plan.  The Debtor has made

17  various amendments or modifications to the Plan to address

18  some of these objections.  The Court finds that none of these

19  modifications require further solicitation, pursuant to

20  Sections 1125, 1126, 1127 of the Code, or Bankruptcy Rule

21  3019, because, among other things, they do not materially

22  adversely change the treatment of the claims of any creditor

23  or interest holder who has not accepted in writing the

24  modifications.

25      Among other things, there were changes to the projections

20

1   that the Debtor filed shortly before the confirmation hearing

2   that, among other things, show the estimated distribution to

3   creditors and compare plan treatment to a likely disbursement

4   in a Chapter 7.

5       These do not constitute a materially adverse change to the

6   treatment of any creditors or interest holders.  They merely

7   update likely distributions based on claims that have now been

8   settled, and they've otherwise incorporated more recent

9   financial data.  This happens often before confirmation

10  hearings.  The Court finds that it did not mislead or

11  prejudice any creditors or interest holders, and certainly

12  there was no need to resolicit the Plan.

13      The only Objectors to the Plan left at this time were Mr.

14  Dondero and entities that the Court finds are controlled by

15  him.  The standing of these entities to object to the Plan

16  exists, but the remoteness of their economic interest is

17  noteworthy, and the Court questions the good faith of the

18  Objectors.  In fact, the Court has good reason to believe that

19  these parties are not objecting to protect economic interests

20  they have in the Debtor, but to be disruptors.

21      Mr. Dondero wants his company back.  This is

22  understandable.  But it's not a good faith basis to lob

23  objections to the Plan.  The Court has slowed down

24  confirmation multiple times on the current Plan and urged the

25  parties to talk to Mr. Dondero.  The parties represent that

21

1   they have, and the Court believes that they have.

2       Now, to be specific about the remoteness of the objectors'

3   interests, the Court will address them each separately.

4   First, Mr. Dondero has a pending objection.  Mr. Dondero's

5   only economic interest with regard to the Debtor at this point

6   is an unliquidated indemnification claim.  And based on

7   everything this Court has heard, his indemnification claim

8   will be highly questionable at this juncture.

9       Second, a joint objection has been filed by the Dugaboy

10  Trust and the Get Good Trust.  As for the Dugaboy Trust, it

11  was created to manage the assets of Mr. Dondero and his

12  family, and it owns a 0.1866 percent limited partnership

13  interest in the Debtor.  The Court is not clear what economic

14  interest the Get Good Trust has, but it likewise seems to be

15  related to Mr. Dondero, and it has been represented to the

16  Court numerous times that the trustee is Mr. Dondero's college

17  roommate.

18      Another group of Objectors that has joined together in one

19  objection is what the Court will refer to as the Highland and

20  NexPoint Advisors and Funds.  The Court understands they

21  assert disputed administrative expense claims against the

22  estate.  While the evidence presented was that they have

23  independent board members that run these companies, the Court

24  was not convinced of their independence from Mr. Dondero.

25  None of the so-called independent board members of these

22

1  entities have ever testified before the Court.  Moreover, they

2  have all been engaged with the Highland complex for many

3  years.

4      The witness who testified on these Objectors' behalves at

5  confirmation, Mr. Jason Post, their chief compliance officer,

6  resigned from Highland after more than twelve years in October

7  2020, at the same time that Mr. Dondero resigned or was

8  terminated by Highland.  And a prior witness recently for

9  these entities whose testimony was made part of the record at

10  the confirmation hearing essentially testified that Mr.

11  Dondero controlled these entities.

12      Finally, various NexBank entities objected to the Plan.

13  The Court does not believe they have liquidated claims.  Mr.

14  Dondero appears to be in control of these entities as well.

15      To be clear, the Court has allowed all of these objectors

16  to fully present arguments and evidence in opposition to

17  confirmation, even though their economic interests in the

18  Debtor appear to be extremely remote and the Court questions

19  their good faith.  Specifically on that latter point, the

20  Court considers them all to be marching pursuant to the orders

21  of Mr. Dondero.

22      In the recent past, Mr. Dondero has been subject to a TRO

23  and preliminary injunction by the Bankruptcy Court for

24  interfering with the current CEO's management of the Debtor in

25  specific ways that were supported by evidence.  Around the

23

1    time that this all came to light and the Court began setting

2    hearings on the alleged interference, Mr. Dondero's company

3    phone supplied to him by Highland, which he had been asked to

4    turn in, mysteriously went missing.  The Court merely mentions

5    this in this context as one of many reasons that the Court has

6    to question the good faith of Mr. Dondero and his affiliated

7    objectors.

8         The only other pending objection besides these objections

9    of the Dondero and Dondero-controlled entities is an objection

10   of the United States Trustee pertaining to the release,

11   exculpation, and injunction provisions in the Plan.

12        In juxtaposition to these pending objections, the Court

13   notes that the Debtor has resolved earlier-filed objections to

14   the Plan filed by the IRS, Patrick Daugherty, CLO Holdco,

15   Ltd., numerous local taxing authorities, and certain current

16   and former senior-level employees of the Debtor.

17        With that rather detailed factual background addressed,

18   because certainly context matters here, the Court now

19   addresses what it considers the only serious objections raised

20   in connection with confirmation.  Specifically, the Plan

21   contain certain releases, exculpation, plan injunctions, and a

22   gatekeeper provision which are obviously not fully consensual,

23   since there are objections.  Certainly, these provisions are

24   mostly consensual when you consider that parties with hundreds

25   of millions of dollars' worth of legitimate claims have not

24

1    objected to them.

2        First, a word about plan releases generally, since the

3    Objectors at times seem to gloss over, in this Court's view,

4    relevant distinctions, and seem to refer to the plan releases

5    in this Plan and the exculpations and the plan injunctions all

6    as impermissible third-party releases, when, in fact, they are

7    not, *per se*.

8        It has, without a doubt, become quite commonplace in

9    complex Chapter 11 bankruptcy cases to have three categories

10   of releases in plans.  These three types are as follows.

11       First, Debtor Releases.  A debtor release involves a

12   release by the debtor and its bankruptcy estate of claims

13   against nondebtor third-parties.  For example, a release may

14   be granted in favor of creditors, directors, officers,

15   employees, professionals who participated in the bankruptcy

16   process.  This is the least-controversial type of release

17   because the debtor is extinguishing its own claims, which are

18   property of the estate, that a debtor has authority to utilize

19   or not, pursuant to Sections 541 and 363 of the Bankruptcy

20   Code.

21       Authority for a debtor release pursuant to a plan arises

22   out of Section 1123(b)(3)(A), which indicates that a plan may

23   provide for "the settlement or adjustment of any claim or

24   interest belonging to the debtor or to the estate."

25       In this context, it would appear that the only analysis

25

1  required is to determine whether the release or settlement of

2  the claim is an exercise of reasonable business judgment on

3  that part of the debtor, is it fair and equitable, is it in

4  the best interest of the estate, given all the relevant facts

5  and circumstances?  Also relevant is whether there's

6  consideration given of some sort by the releasees.

7      Now, the second type of very commonplace Chapter 11 plan

8  release is an exculpation.  Chapter 11 plans also very often

9  have these exculpation provisions, and they're something much

10 narrower in scope and time than a full-fledged release.  An

11 exculpation provision is more like a shield for a certain

12 subset of key actors in the case for their acts during and in

13 connection with the case, which acts may have been merely

14 negligent.

15     Specifically, a plan may absolve certain actors -- usually

16 estate fiduciaries -- such as an Official Unsecured Creditors'

17 Committee and its members, Committee professionals, sometimes

18 Debtor professionals, senior management, officers and

19 directors of the Debtor, from any liability for postpetition

20 negligent conduct -- *i.e.*, conduct which occurred during the

21 administration of the Chapter 11 case and in the negotiation,

22 drafting, and implementation of a plan.  An exculpation

23 provision typically excludes gross negligence and willful

24 misconduct.  It is usually worded in a passive voice, so it

25 may seem a little unclear as to whether it is actually a

26

1 release and by whom.

2     In any event, the rationale is that parties who actively

3 participate in a court-approved process -- often, court-

4 approved transactions by court order -- should receive

5 protection for their work. Otherwise, who would want to work

6 in such a messy, contentious situation, only to be sued for

7 alleged negligence for less-than-perfect end results?

8     Chapter 11 end results are not always pretty. One could

9 argue that these exculpation provisions, though, are much ado

10 about nothing. Why? For one thing, again, the shield is only

11 as to negligent conduct. There is no shield for other

12 problematic conduct, such as gross negligence or willful

13 misconduct.

14     Second, in many situations, any claims or causes of action

15 that might arise will belong to the Debtor or its estate.

16 Thus, they would already be released pursuant to a debtor

17 release.

18     Additionally, there is case law stating that, where a

19 claim is brought against an estate professional whose fees

20 have already been approved in a final fee application, any

21 claims are barred by *res judicata*. Thus, exculpated

22 professionals would only have potential exposure for a very

23 short window of time, until final fee applications.

24     Additionally, certain case law in Texas makes clear that

25 an attorney generally does not owe any duties to persons other

27

1   than his own client.

2       All of this suggests that the shield of a typical

3   exculpation provision may rarely become useful or needed.

4       Moving now to the third type of release, a true third-

5   party release, Chapter 11 plans also sometimes contain third-

6   party releases.  A true third-party release involves the

7   release of claims held by nondebtor third parties against

8   other nondebtor third parties, and there is often no

9   limitation on the scope and time of the claims released.

10      This is the most heavily scrutinized of the three types of

11  plan releases.  Much of the case authority focuses on whether

12  a third-party release is consensual or not in analyzing their

13  propriety and/or enforceability.

14      In Highland, there are no third-party releases.  Rather,

15  there are debtor releases and exculpations.  There also happen

16  to be plan injunctions and gatekeeper provisions that have

17  been challenged.  The Objectors argue that these provisions

18  violate the Fifth Circuit's opinion in *Pacific Lumber* or are

19  otherwise beyond the jurisdiction or authority of the

20  bankruptcy court.  These arguments are now addressed.

21      First, the debtor release is found at Article IX.D of the

22  Plan.  The language, in pertinent part, reads as follows.  "On

23  and after the effective date, each Released Party is deemed to

24  be hereby conclusively, absolutely, unconditionally,

25  irrevocably, and forever released and discharged by the Debtor

28

1    and the Estate, in each case on behalf of themselves and their

2    respective successors, assigns, and representatives, including

3    but not limited to the Claimant Trust and the Litigation Sub-

4    Trust, from any and all causes of action, including any

5    derivative claims, asserted on behalf of the Debtor, whether

6    known or unknown, foreseen or unforeseen, matured or

7    unmatured, existing or hereafter arising, in law, equity,

8    contract, tort, or otherwise, that the Debtor or the Estate

9    would have been legally entitled to assert in their own right,

10   whether individually or collectively, or on behalf of the

11   holder of any claim against, or interest in, a debtor or other

12   person."

13       There are certain exceptions discussed, and then Released

14   Parties are defined at Definition 113 of the Plan collectively

15   as:  the Independent Directors; Strand, solely from the date

16   of the appointment of the Independent Directors through the

17   effective date; the CEO/CRO; the Committee, the members of the

18   Committee, in their official capacities; the professionals

19   retained by the Debtor and the Committee in the Chapter 11

20   case; and the employees.  This is a defined term in the Plan

21   Supplement and does not include certain employees.

22       To be clear, these are not third-party releases such as

23   addressed in the *Pacific Lumber* case.  These are the Debtor's

24   and/or the bankruptcy estate's causes of action that are

25   proposed to be released.  Releases by a debtor are

29

1   discretionary and can be provided by a debtor to persons who

2   have provided consideration to the debtor and the estate.

3   Section 1123(b)(3)(A) of the Bankruptcy Code permits this.

4        The evidence here supported the notion that these releases

5   are a *quid pro quo* for the Released Parties' significant

6   contributions to a highly complex and contentious

7   restructuring.  The Debtor is releasing its own claims.  Some

8   of the Released Parties would have indemnification rights

9   against the Debtor.  And the Debtor's CEO, James Seery,

10  credibly testified that he does not believe any claims exist

11  as to the Released Parties.  The Court approves the Debtor

12  releases and overrules the objections to them.

13       Next, the exculpations appear at Article IX.C of the Plan

14  and provide as follows:  Subject in all respects to Article

15  XII.D of the Plan, to the maximum extent permitted by

16  applicable law, no Exculpated Party will have or incur, and

17  each Exculpated Party is hereby exculpated from, any claim,

18  obligation, suit, judgment, damage, demand, debt, right, cause

19  of action, remedy, loss, and liability for conduct occurring

20  on or after the petition date in connection with or arising

21  out of the filing and administration of the Chapter 11 case,

22  the negotiation and pursuit of a disclosure statement, the

23  Plan, or the solicitation of votes for or confirmation of the

24  Plan, the funding or consummation of the Plan, or any related

25  agreements, instruments, et cetera, et cetera, whether or not

30

1  such Plan distributions occur following the effective date,

2  the implementation of the Plan, and any negotiation,

3  transactions, and documentation in connection with the

4  foregoing clauses, provided, however, the foregoing will not

5  apply to any acts or omissions of any Exculpated Party arising

6  out of or related to acts or omissions that constitute bad

7  faith, fraud, gross negligence, criminal misconduct, or

8  willful misconduct; or Strand or any employee other than with

9  respect to actions taken by such entities from the date of

10  appointment of the Independent Directors through the effective

11  date.

12      Exculpated Parties are later defined at Section -- or,

13  earlier defined at Section 62 of the Plan, Definition No. 62

14  of the Plan, as later limited by the Debtor, as announced in

15  the confirmation hearing. And so these are the Exculpated

16  Parties: the Debtor and its successors and assigns; the

17  employees, certain employees, as defined; Strand; the

18  Independent Directors; the Committee, the members of the

19  Committee, in their official capacities; the professionals

20  retained by the Debtor and the Committee in the Chapter 11

21  case; the CEO and CRO; and the related persons as to each of

22  these parties listed in Part (iv) through (viii) above;

23  provided, for the avoidance of doubt, and it goes on to say

24  Dondero, Mark Okada, and various others aren't Exculpated

25  Parties.

31

1    Now, as earlier mentioned, the Objectors argue that

2  *Pacific Lumber*, 584 F.3d 229, a Fifth Circuit case from 2009,

3  categorically rejects the permissibility of nonconsensual

4  exculpations as well as third-party releases in a Chapter 11

5  plan.  So the Court is going to take a deep dive into that

6  assertion.

7    In *Pacific Lumber*, the Fifth Circuit reviewed on appeal

8  numerous challenges to a confirmed plan of affiliated debtors

9  known as Palco and Scopac and four subsidiaries.  The debtor

10 Palco owned and operated the sawmill, a power plant, and even

11 a town called Scotia, California.  The debtor Scopac owned

12 timberlands.  A creditor, a secured creditor called Marathon

13 had a claim against Palco's assets.  Marathon estimated

14 Palco's assets were worth $110 million.  Its claim was $160

15 million.  Meanwhile, other parties had large secured claims

16 against the other debtor, Scopac.

17    The plan that the bankruptcy court confirmed, which was on

18 appeal to the Fifth Circuit, was filed by both the secured

19 creditor Marathon and a joint plan proponent called MRC.  MRC

20 was a competitor of the debtor Palco.  The Marathon/MRC plan

21 proposed to dissolve all the debtors, cancel intercompany

22 debts, and create two new entities, Townco and Newco.  Almost

23 all of the debtor Palco's assets, including the town of

24 Scotia, California, would be transferred to Townco.  The

25 timberlands and other assets, including the sawmill, would be

32

1   placed in Newco.

2       Marathon and MRC proposed to contribute $580 million to

3   Newco to pay claims against Scopac.  And Marathon would

4   convert its secured claim against Palco's assets into equity,

5   giving it full ownership of Townco, a 15 percent stake in

6   Newco, and a new note for the sawmill's working capital.  MRC

7   would own the other 80 percent of Newco and would manage and

8   run the company.

9       An indenture trustee for the secured indebtedness against

10  Scopac -- which, by the way, had also been a plan proponent of

11  a competing plan -- appealed the confirmation order, raising

12  eight distinct issues on appeal.  One of the eight issues

13  pertained to what the Fifth Circuit referred to as a

14  "nondebtor exculpation and release clause."  This issue is

15  discussed on the last two pages of a very lengthy opinion.

16      While the complained-of provision is not quoted verbatim

17  in the *Pacific Lumber* opinion, it appears to have been a

18  typical exculpation clause.  Not a third-party release; a

19  typical exculpation clause.  The Fifth Circuit stated, "The

20  plan releases MRC, Marathon, Newco, Townco, and the Unsecured

21  Creditors' Committee, and their personnel, from liability,

22  other than for willful and gross negligence related to

23  proposing, implementing, and administering the plan" at Page

24  251.

25      The Fifth Circuit held that "the nondebtor releases must

33

1  be struck except with respect to the Creditors' Committee and

2  its members."

3      Footnote 26 of the opinion also states that the appellants

4  had "not briefed why Newco and Townco or their officers and

5  directors should not be released," and so "we do not analyze

6  their position."  Rather, the Fifth Circuit merely analyzed

7  why the exculpation provision was not permissible as to the

8  two plan proponents, MRC and Marathon.

9      Thus, the Court views *Pacific Lumber* as being a holding

10 that squarely addressed the propriety of two plan proponents,

11 a secured lender and a third-party competitor purchaser of the

12 Debtors, obtaining nonconsensual exculpation in the plan.

13 However, its reasoning certainly cannot be ignored, strongly

14 suggesting it would not be inclined to approve an exculpation

15 for any party other than a Creditors' Committee or its

16 members.

17     As far as the Fifth Circuit's reasoning, it relied on

18 Bankruptcy Code Section 524(e) for striking down the

19 exculpations, stating, "The law states, however, that

20 discharge of a debt of the debtor does not affect the

21 liability of any other entity on such debt."  Page 251.  The

22 opinion suggests that MRC and Marathon may have tried to argue

23 that 524(e) did not apply to their exculpations because MRC

24 and Marathon were not liable as co-obligors in any way on any

25 of the debtor's debt.

34

1     The Fifth Circuit seemed dismissive of this argument,

2 stating as follows, "MRC/Marathon insist the release clause is

3 part of their bargain because, without the clause, neither

4 company would have been willing to provide the plan's

5 financing. Nothing in the records suggests that MRC/Marathon,

6 the Committee, or the Debtor's officers and directors were co-

7 liable for the Debtor's prepetition debts. Instead, the

8 bargain the proponents claim to have purchased is exculpation

9 from any negligence that occurred during the course of the

10 case. Any costs the released parties might incur defending

11 against suits alleging such negligence are unlikely to swamp

12 either of these parties or the consummated reorganization. We

13 see little equitable about protecting the released nondebtors

14 from negligence suits arising out of the reorganization."

15     The Court goes on to note that, in a variety of cases,

16 that releases have been approved, but these cases "seem

17 broadly to foreclose nonconsensual nondebtor releases and

18 permanent injunctions."

19     The Court then adds at Footnote 27 that the Fifth Circuit

20 in the past did not set aside challenged plan releases that

21 were in final nonappealable orders and were the subject of

22 collateral attack much later, citing its famous *Republic*

23 *Supply v. Shoaf* case, where the Fifth Circuit ruled that *res*

24 *judicata* barred a debtor from bringing a claim that was

25 specifically and expressly released by a confirmed

35

1 reorganization plan because the debtor -- the objector failed

2 to object to the release at confirmation.

3     The Fifth Circuit in *Pacific Lumber* also noted that the

4 Bankruptcy Code permits bankruptcy courts to enjoin third-

5 party asbestos claims under certain circumstances, 524(g),

6 which the Court said suggests nondebtor releases are most

7 appropriate as a method to channel mass tort claims towards a

8 specific pool of assets, citing numerous cases, including

9 *Johns-Manville*.

10     In reach its holding, the Fifth Circuit saw no reason to

11 uphold exculpation to the plan proponents MRC and Marathon,

12 seeming to find it inconsistent with 524(e) under the facts at

13 bar, but the Court did uphold exculpation for the Creditors'

14 Committee and its members, stating, "We agree, however, with

15 courts that have held that 1103(c) under the Code, which lists

16 the Creditors' Committee's powers, implies Committee members

17 have qualified immunity for actions within the scope of their

18 duties." Numerous cites. "The Creditors' Committee and its

19 members are the only disinterested volunteers among the

20 parties sought to be released here. The scope of protection,

21 which does not insulate them from willful and gross

22 negligence, is adequate."

23     Thus, the Court held that the exculpation provisions in

24 *Pacific Lumber* must be struck except with regard to the

25 Creditors' Committee and its members.

36

1     Now, after all of that, this Court believes the following

2    can be gleaned from *Pacific Lumber*. First, the Fifth Circuit

3    hinted that consensual exculpations and/or consensual

4    nondebtor third-party releases are permissible. The Court

5    was, of course, dealing with nonconsensual exculpations in

6    *Pacific Lumber*. In this regard, I note Page 252, where the

7    Court cited various prior Fifth Circuit authority and then

8    stated, "These cases seem broadly to foreclose nonconsensual

9    nondebtor releases and permanent injunctions."

10    The second thing that can be gleaned from *Pacific Lumber*:

11    The Fifth Circuit hinted that nondebtor releases may be

12    permissible in cases involving global settlements of mass

13    claims against the debtors and co-liable parties. The Court,

14    of course, referred to 524(g), but various other cases which

15    approved nondebtor releases where mass claims were channeled

16    to a specific pool of assets.

17    Third, the Fifth Circuit outright held that exculpations

18    from negligence for a Creditors' Committee and its members are

19    permissible because the concept is both consistent with

20    1103(c), "which implies Committee members have qualified

21    immunity for actions within the scope of their duties," and a

22    good policy result, since "if members of the Committee can be

23    sued by persons unhappy with the outcome of the case, it will

24    be extremely difficult to find members to serve on an official

25    committee."

37

1     Fourth, the Fifth Circuit recognized in *Pacific Lumber*

2  that *res judicata* may bar complaints regarding an

3  impermissible plan release, citing to its earlier *Republic*

4  *Supply v. Shoaf* opinion.

5     Now, being ever-mindful of the Fifth Circuit's words in

6  *Pacific Lumber*, this Court cannot help but wonder about at

7  least three things.

8     First, did the Fifth Circuit leave open the door that

9  facts/equities might sometimes justify approval of an

10  exculpation for a person other than a Creditors' Committee and

11  its members?  For example, the Fifth Circuit stated, in

12  referring to the plan proponents Marathon and MRC, that "Any

13  costs the released parties might incur defending against suits

14  alleging such negligence are unlikely to swamp either of these

15  parties or the consummated reorganization."  Here, this Court

16  can easily expect the proposed exculpated parties to incur

17  costs that could swamp them and the reorganization based on

18  the past litigious conduct of Mr. Dondero and his controlled

19  entities.  Do these words of the Fifth Circuit hint that

20  equities/economics might sometimes justify an exculpation?

21     Second, did the Fifth Circuit's rationale for permitted

22  exculpations to Creditors' Committee and their members, which

23  was clearly policy-based, based on their implied qualified

24  immunity flowing from their duties in Section 1103 and their

25  disinterestedness, and the importance of their role in a

38

1   Chapter 11 case, did this rationale leave open the door to

2   sometimes permitting exculpations to other parties in a

3   particular Chapter 11 case besides Creditors' Committees and

4   their members?  For example, in a situation such as the

5   Highland case, in which Independent Directors, brought in to

6   avoid a trustee, are more like a Creditors' Committee than an

7   incumbent board of directors.

8       Third, the Fifth Circuit's sole statutory basis was

9   Section 524(e).  This Court would humbly submit that this is a

10  statute dealing with prepetition liability in which some

11  nondebtor is liable with the Debtor.  Exculpation is a concept

12  dealing with postpetition liability.

13      The Ninth Circuit recently, in a case called *Blixseth v.*

14  *Credit Suisse*, 961 F.3d 1074 (9th Cir. 2020), approved the

15  validity of an exculpation clause incorporated into a

16  confirmed Chapter 11 plan that purported to absolve certain

17  nondebtor parties that were "closely involved" in drafting the

18  plan.  They were the largest secured creditor, a purchaser,

19  and an individual who was an indirect owner of certain of the

20  debtor companies.  The exculpation was from any negligence,

21  liability, for "any act or omission in connection with,

22  related to, or arising out of the Chapter 11 cases."

23      By the time the appeal was before the Ninth Circuit, the

24  only issue was the propriety of the exculpation clause as to

25  the large secured creditor, which was also a plan proponent,

39

1  since all the other exculpated parties had settled with the

2  appellant.

3      The Court, in determining that the exculpation clause was

4  permissible as to the secured lender, concluded that Section

5  524(e) "does not bar a narrow exculpation clause of the kind

6  here at issue -- that is, one focused on actions of various

7  participants in the plan approval process and relating only to

8  that process," Page 1082.  Why?  Because "Section 524(e)

9  establishes that discharge of a debt of the debtor does not

10  affect the liability of any other entity on such debt."  In

11  other words, the discharge in no way affects the liability of

12  any other entity for the discharged debt.  By its terms,

13  524(e) prevents a bankruptcy court from extinguishing claims

14  of creditors against nondebtors over the very discharged debt

15  through the bankruptcy proceedings.

16      The Court went on to explicitly disagree with *Pacific*

17  *Lumber* in its analysis of 524(e), reiterating that an

18  exculpation clause covers only liabilities arising from the

19  bankruptcy proceedings and not of any of the debtor's

20  discharged debt.  Footnote 7, Page 1085.

21      Ultimately, the Court held that under Section 105(a),

22  which empowers a bankruptcy court to issue any order, process,

23  or judgment that is necessary or appropriate to carry out the

24  provisions of Chapter 11 and Section 1123, which establishes

25  the appropriate content of the bankruptcy plan, under these

40

1 sections, the bankruptcy court had authority to approve an

2 exculpation clause intended to trim subsequent litigation over

3 acts taken during the bankruptcy proceedings and so render the

4 plan viable.

5    This Court concludes that, just as the Fifth Circuit left

6 open the door for consensual exculpations and releases in

7 *Pacific Lumber*, just as it left open the door for consensual

8 exculpations and releases in *Pacific Lumber*, its dicta

9 suggests that an exculpation might be permissible if there is

10 a showing that "costs that the released parties might incur

11 defending against suits alleging such negligence are likely to

12 swamp either the Exculpated Parties or the reorganization."

13 Again, that was a quote from the Fifth Circuit.

14    If ever there were a risk of that happening in a Chapter

15 11 reorganization, it is this one.  The Debtor's current CEO

16 credibly testified that Mr. Dondero has said outside the

17 courtroom that if Mr. Dondero's own pot plan does not get

18 approved, that he will "burn the place down."  Here, this

19 Court can easily expect the proposed exculpated parties might

20 expect to incur costs that could swamp them and the

21 reorganization process based on the past litigious conduct of

22 Mr. Dondero and his controlled entities.

23    Additionally, this Court concludes that the Fifth

24 Circuit's rationale in *Pacific Lumber* for permitted

25 exculpations to Creditors' Committees and their members, which

41

1   was clearly policy-based based on their implied qualified

2   immunity flowing from Section 1103 and their importance in a

3   Chapter 11 case, leaves the door open to sometimes permitting

4   exculpations to other parties in a particular Chapter 11 case

5   besides a UCC and its members.

6       Again, if there was ever such a case, the Court believes

7   it is this one, in which Independent Directors were brought in

8   to avoid a trustee and are much more like a Creditors'

9   Committee than an incumbent board of directors.  While,

10  admittedly, there are a few exculpated parties here proposed

11  beyond the independent board, such as certain employees, it

12  would appear that no one is invulnerable to a lawsuit here if

13  past is prologue in this Highland saga.

14      The Creditors' Committee was initially not keen on

15  exculpations for certain employees.  However, Mr. Seery

16  credibly testified that there was a contentious arm's-length

17  negotiation over this and that he needs these employees to

18  preserve value implementing the Plan.  Mr. Dondero has shown

19  no hesitancy to litigate with former employees in the past, to

20  the *nth* degree, and there is every reason to believe he would

21  again in the future, if able.

22      Finally, in this situation, in the case at bar, we would

23  appear to have a *Shoaf* reason to approve the exculpations.

24  The January 9, 2020 order of this Court, Docket Entry 339,

25  which approved the independent board and an ongoing corporate

42

1    governance structure for this case, and which is incorporated

2    into the Plan at Article IX.H, provided as follows:  "No

3    entity may commence or pursue a claim or cause of action of

4    any kind against any Independent Director, any Independent

5    Director's agents, or any Independent Director's advisors

6    relating in any way to the Independent Director's role as an

7    Independent Director of Strand without the Court (1) first

8    determining, after notice, that such claim or cause of action

9    represents a colorable claim of willful misconduct or gross

10   negligence against Independent Director, any Independent

11   Director's agents, or any Independent Director's advisors; and

12   (2) specifically authorizing such entity to bring such a

13   claim.  The Court will have sole jurisdiction to adjudicate

14   any claim for which approval of the Court to commence or

15   pursue has been granted."

16       This was both an exculpation from negligence as to the

17   Independent Directors and their agents and advisors, as well

18   as a gatekeeping provision.  This Court believes that this

19   provision basically approved an exculpation for the

20   Independent Directors way back on January 9, 2020 for their

21   postpetition conduct that might be negligent.  And this is the

22   law of the case and has *res judicata* preclusive effect now.

23       Thus, as to the three Independent Directors, as well as

24   the other named parties in the January 9, 2020 order, their

25   agents, their advisors, we have a situation that fits within

43

1   *Republic Supply v. Shoaf*, and we fit within the exception

2   articulated in *Pacific Lumber*.

3      The Court reserves the right to supplement these findings

4   and conclusions as to the exculpations, but based on the

5   foregoing, they are approved and the objections are overruled.

6      Now, turning to the Plan objection, it appears at Article

7   IX.F of the Plan and provides, in pertinent part, as follows:

8   Upon entry of the confirmation order, all enjoined parties are

9   and shall be permanently enjoined on and after the effective

10   date from taking any action to interfere with the

11   implementation or consummation of the Plan. Except as

12   expressly provided in the Plan, the confirmation order, or a

13   separate order of the Bankruptcy Court, all Enjoined Parties

14   are and shall be permanently enjoined on and after the

15   effective date, with respect to any claims and interests, from

16   directly or indirectly -- and then commencing, conducting,

17   continuing any suit, action, proceeding of any kind, and

18   numerous other acts of that vein.

19      The injunction set forth herein shall extend to and apply

20   to any act of the type set forth in any of the causes above

21   against any successors to the Debtor, including but not

22   limited to the Reorganized Debtor, the Litigation Sub-Trust,

23   and the Claimant Trust, and their respective property and

24   interests in property.

25      Plan injunctions like this are commonplace and

44

1   appropriate.  They are entirely consistent with and

2   permissible under Bankruptcy Code Sections 1123(a)(5),

3   1123(a)(6), 1141(a) and (c), and 1142, as well as Bankruptcy

4   Rule 3016(c), which articulates the form that a plan

5   injunction must be set forth in a plan.

6       The Court finds the objections to the Plan Injunctions to

7   be unfounded, and they are thus overruled without much

8   discussion here.

9       Now, lastly, the Gatekeeper Provision.  It appears at

10  Paragraph 4 of Article IX.F of the Plan and provides, in

11  pertinent part, "Subject in all respects to Article XII.D, no

12  Enjoined Party may commence or pursue a claim or cause of

13  action of any kind against any Protected Party that arose or

14  arises from or is related to the Chapter 11 case, the

15  negotiation of the Plan, the administration of the Plan, or

16  property to be distributed under the Plan, the wind-down of

17  the business of the Debtor or Reorganized Debtor, the

18  administration of the Claimant Trust or the Litigation Sub-

19  Trust, or the transactions in furtherance of the foregoing,

20  without the Bankruptcy Court (1) first determining, after

21  notice and a hearing, that such claim or cause of action

22  represents a colorable claim of any kind, including but not

23  limited to negligence, bad faith, criminal misconduct and

24  willful misconduct, fraud, or gross negligence against a

25  Protected Party; and (2) specifically authorizing such

45

 1  Enjoined Party to bring such claim or cause of action against

 2  such Protected Party, provided, however, that the foregoing

 3  will not apply to a claim or cause of action against Strand or

 4  against any employee other than with respect to actions taken,

 5  respectively, by Strand or any such employee from the date of

 6  appointment of the Independent Directors through the effective

 7  date.  The Bankruptcy Court will have sole and exclusive

 8  jurisdiction to determine whether a claim or cause of action

 9  is colorable and, only to the extent legally permissible and

10  as provided for in Article XI, shall have jurisdiction to

11  adjudicate the underlying colorable claim or cause of action."

12      This gatekeeper provision appears necessary and reasonable

13  in light of the litigiousness of Mr. Dondero and his

14  controlled entities that has been described at length herein.

15  Provisions similar to this have been approved in this district

16  in the *Pilgrim's Pride* case and the *CHC Helicopter* case.  The

17  provision is within the spirit of the Supreme Court's Barton

18  Doctrine.  And it appears consistent with the notion of a pre-

19  filing injunction to deter vexatious litigants that has been

20  approved by the Fifth Circuit in such cases as *Baum v. Blue*

21  *Moon Ventures*, 513 F.3d 181, and in the *In re Carroll* case,

22  850 F.3d 811, which arose out of a bankruptcy pre-filing

23  injunction.

24      The Fifth Circuit, in fact, noted in the *Carroll* case that

25  federal courts have authority to enjoin vexatious litigants

46

1   under the All Writs Act, 28 U.S.C. § 1651.  And additionally,

2   under the Bankruptcy Code, a bankruptcy court can issue any

3   order, including a civil contempt order, necessary or

4   appropriate to carry out the provisions of the Code, citing,

5   of course, 105 of the Bankruptcy Code.

6       The Fifth Circuit stated that, when considering whether to

7   enjoin future filings against a vexatious litigant, a

8   bankruptcy court must consider the circumstances of the case,

9   including four factors:  (1)  the party's history of

10  litigation; in particular, whether he has filed vexatious,

11  harassing, or duplicative lawsuits; (2) whether the party had

12  a good faith basis for pursuing the litigation, or perhaps

13  intended to harass; (3) the extent of the burden on the courts

14  and other parties resulting from the party's filings; and (4)

15  the adequacy of alternatives.

16      In the *Baum* case, the Fifth Circuit stated that the

17  traditional standards for injunctive relief -- *i.e.*,

18  irreparable harm and inadequate remedy at law -- do not apply

19  to the issuance of an injunction against a vexatious litigant.

20      Here, although I have not been asked to declare Mr.

21  Dondero and his affiliated entities as vexatious litigants *per*

22  *se*, it is certainly not beyond the pale to find that his long

23  history with regard to the major creditors in this case has

24  strayed into that possible realm, and thus this Court is

25  justified in approving this provision.

47

1        One of the Objectors' lawyers stated very eloquently in

2    closing argument, in opposing the plan injunction and

3    gatekeeping provisions, that "Even a serial killer has

4    constitutional rights," suggesting that these provisions would

5    deprive Mr. Dondero and his controlled entities of fundamental

6    rights or due process somehow.  But to paraphrase the district

7    court in the *Carroll* case, no one, rich or poor, is entitled

8    to abuse the judicial process.  There exists no constitutional

9    right of access to the courts to prosecute actions that are

10   frivolous or malicious.  The Plan injunction and gatekeeper

11   provisions in Highland's plan simply set forth a way for this

12   Court to use its tools, its inherent powers, to avoid abuse of

13   the court system, protect the implementation of the Plan, and

14   preempt the use of judicial time that properly could be used

15   to consider the meritorious claims of other litigants.

16       Accordingly, the Objectors' objections to this provision

17   are overruled.

18       As earlier stated, this Court reserves the right to alter

19   or supplement this ruling in a written order.  In this regard,

20   the Court directs Debtor's counsel -- I hope you are still

21   awake; it's been a long time -- the Court directs Debtor's

22   counsel to submit a form of order.  And specifically, I assume

23   that you've already prepared or have been in the process of

24   preparing a set of findings of fact, conclusions of law, and

25   confirmation order that tracks the confirmation evidence and

48

1  recites conclusions of law that the Plan complies with all the

2  various provisions of Section 1123, 1129, and other applicable

3  Code provisions.

4      What I want you to do is take this bench ruling and add it

5  to what you've prepared.  And what I mean is, as you can tell,

6  I've been reading:  I will have my courtroom deputy email to

7  you all a copy of what I just read.  I'll have her obviously

8  copy the Debtor's counsel, Creditors' Committee, Dondero and

9  the other Objectors, copy them on this written document she's

10  going to send out.  And, again, I want you to kind of meld it

11  into what you've already been preparing.

12      Obviously, I did not address in this oral ruling every

13  provision of 1129(a) and (b).  I did not address every 1123

14  objection.  I did not even address every single objection of

15  the Objectors.  But, again, any objection I've not

16  specifically addressed today is overruled.

17      The briefing, I should say, that the Debtor submitted,

18  there was a Memorandum of Law in Support of Confirmation filed

19  on January 22nd.  There was also a reply brief, a hundred

20  pages or so, separately filed, replying to all the objections.

21  I don't disagree with anything that was in that.  So, again,

22  to the extent you want to send me conclusions of law that are

23  along the lines of that briefing, I would consider that.

24      And so what I thought is you'll send me the melded

25  document and I will edit it if I see fit.  I recognize this

49

1   may take a few days, so I don't give you a strict timetable,

2   just hopefully it won't take too many days.

3      All right.  Is there anyone out there -- Mr. Pomerantz,

4   you had to go to jury duty, except I can't believe --

5            MR. POMERANTZ:  No, I --

6            THE COURT:  I can't believe you were called, but are

7   you there?

8            MR. POMERANTZ:  Your Honor, I am here.  I was luckily

9   excused, because I probably wouldn't have made it.

10     Your Honor, one just comment I'd make.  You referred to

11  the January 9th order.  You didn't refer to the CEO order,

12  which is your order July 16th, which had the same gatekeeper

13  provision.  I assume that was the same analysis?

14           THE COURT:  That was an oversight.  Same analysis.

15  And that's exactly why I said I reserve the right to

16  supplement or amend, because I know there had to be places

17  like that where I omitted to mention something important.

18           MR. POMERANTZ:  But thank you, Your Honor, for your

19  thoughtful ruling, and we will certainly incorporate your

20  materials into the order that we're working on and get it to

21  you when we can.  But we appreciate it on behalf of the

22  Debtor.  We know this took a lot of time and a lot of effort.

23  Hopefully, you got a chance to still watch the Super Bowl

24  yesterday.

25           THE COURT:  Well, when I saw that Tom Brady was going

50

1   to win, I turned it off.

2       I'm sorry.  That's terrible.  You know, my law clerk, my

3   law clerk that you can't see, Nate, he is from Ann Arbor,

4   Michigan, University of Michigan, and he almost cried when I

5   said I didn't like Tom Brady the other day.  So, I apologize.

6           MR. POMERANTZ:  Your Honor, one other comment.  We

7   had our motion to assume our nonresidential real property

8   lease that was also on.  It got missed in all the fanfare, but

9   it was -- it has been unopposed and essentially done pursuant

10  to stipulation.  So we'd like to submit an order on that as

11  well.

12          THE COURT:  Okay.  I have seen that, and I approve it

13  under 365.  You may submit the order.  Okay.  Thank you.

14          MR. POMERANTZ:  Thank you, Your Honor.

15          THE CLERK:  All rise.

16      (Proceedings concluded at 10:35 a.m.)

17                          --oOo--

18

19

20                          CERTIFICATE

21      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    02/09/2021

24  _____    _____
    Kathy Rehling, CETD-444                        Date
25  Certified Electronic Court Transcriber

51

INDEX

PROCEEDINGS                                                    3

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

Confirmation Hearing [1808]                                    3

Agreed Motion to (1) Assume Non-Residential Real Property     50
Lease with Crescent TC Investors, LP upon Confirmation of
Plan and (II) Extend Assumption Deadline [1624]

END OF PROCEEDINGS                                            50

INDEX                                                         51

# EXHIBIT 10

```
                IN THE UNITED STATES BANKRUPTCY COURT
 1                FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
 2
                               )   Case No. 19-34054-sgj11
 3   In Re:                    )
                               )
 4   HIGHLAND CAPITAL          )   Dallas, Texas
     MANAGEMENT, L.P.,         )   July 8, 2020
 5                             )   1:30 p.m. Docket
          Debtor.             )
 6                             )   - MOTION TO EXTEND EXCLUSIVITY
                               )     PERIOD (737)
 7                             )   - MOTION TO EXTEND TIME TO
                               )     REMOVE ACTIONS (747)
 8   _____)
```

```
 9                  TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                UNITED STATES BANKRUPTCY JUDGE.

11   WEBEX/TELEPHONIC APPEARANCES:

12   For the Debtor:           Jeffrey N. Pomerantz
                               PACHULSKI STANG ZIEHL & JONES, LLP
13                             10100 Santa Monica Blvd.,
                                13th Floor
14                             Los Angeles, CA  90067
                               (310) 277-6910
15
     For the Official Committee Matthew A. Clemente
16   of Unsecured Creditors:   SIDLEY AUSTIN, LLP
                               One South Dearborn Street
17                             Chicago, IL  60603
                               (312) 853-7539
18
     For the Debtor:           Zachery Z. Annable
19                             Melissa S. Hayward
                               HAYWARD & ASSOCIATES, PLLC
20                             10501 N. Central Expressway,
                                Suite 106
21                             Dallas, TX  75231
                               (972) 755-7104
22
     For Acis Capital          Rakhee V. Patel
23   Management GP, LLC:       Annmarie Antoinette Chiarello
                               WINSTEAD, P.C.
24                             2728 N. Harwood Street, Suite 500
                               Dallas, TX  75201
25                             (214) 745-5250
```

2

```
 1  APPEARANCES, cont'd.:

 2  For Acis Capital           Brian Patrick Shaw
    Management GP, LLC:         ROGGE DUNN GROUP, P.C.
 3                             500 N. Akard Street, Suite 1900
                               Dallas, TX  75201
 4                             (214) 239-2707

 5  For Redeemer Committee of  Mark A. Platt
    the Highland Crusader      FROST BROWN TODD, LLC
 6  Fund:                      100 Crescent Court, Suite 350
                               Dallas, TX  75201
 7                             (214) 580-5852

 8  For Redeemer Committee of  Terri L. Mascherin
    the Highland Crusader      JENNER & BLOCK, LLP
 9  Fund:                      353 N. Clark Street
                               Chicago, IL  60654-3456
10                             (312) 923-2799

11  For Redeemer Committee of  Marc B. Hankin
    the Highland Crusader      JENNER & BLOCK, LLP
12  Fund:                      919 Third Avenue
                               New York, NY  10022-3098
13                             (212) 891-1600

14  For Jim Dondero:           D. Michael Lynn
                               John Y. Bonds, III
15                             BONDS ELLIS EPPICH SCHAFER JONES,
                                 LLP
16                             420 Throckmorton Street,
                                 Suite 1000
17                             Fort Worth, TX  76102-5304
                               (817) 405-6903
18
    For UBS Securities, LLC:   Jeffrey E. Bjork
19                             LATHAM & WATKINS, LLP
                               355 South Grand Avenue, Suite 100
20                             Los Angeles, CA  90071
                               (213) 485-1234
21
    Recorded by:               Michael F. Edmond, Sr.
22                             UNITED STATES BANKRUPTCY COURT
                               1100 Commerce Street, 12th Floor
23                             Dallas, TX  75242
                               (214) 753-2062
24

25
```

3

```
 1    Transcribed by:              Kathy Rehling
                                   311 Paradise Cove
 2                                 Shady Shores, TX  76208
                                   (972) 786-3063
 3

 4

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24
            Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

4

1          DALLAS, TEXAS - JULY 8, 2020 - 1:37 P.M.

2          THE COURT: All right. Hello. This is Judge

3     Jernigan. Hopefully you can all hear me. We're ready to

4     start the Highland hearings we have today, Case No. 19-34054.

5     Let's start off by getting appearances from those lawyers who

6     want to appear formally today. First, for the Debtor, do we

7     have Mr. Pomerantz or a team from Pachulski Stang?

8          MR. POMERANTZ: Yes. Good morning, Your Honor. Jeff

9     Pomerantz; Pachulski Stang Ziehl & Jones; counsel for the

10    Debtors.

11         THE COURT: All right. Good afternoon. Anyone else

12    for the Debtors that wants to appear?

13         MR. ANNABLE: Yes, Your Honor. Yes, Your Honor.

14    Zachery Annable and Melissa Hayward, local counsel for the

15    Debtors.

16         THE COURT: All right. Thank you. All right. For

17    the Unsecured Creditors' Committee, I think I see Mr. Clemente

18    there on the screen.

19         MR. CLEMENTE: Good afternoon, Your Honor. Matthew

20    Clemente; Sidley Austin; on behalf of the Creditors'

21    Committee.

22         THE COURT: All right. Very good. I know we have

23    lots of other folks on the line. I'm not sure who else might

24    want to formally appear. I'll check on some of the usuals.

25    For Acis, do we have Ms. Patel or Ms. Chiarello?

5

1          MS. PATEL:  Good afternoon, Your Honor.  Rakhee Patel

2 and Annmarie Chiarello of the Winstead firm on behalf of Acis

3 Capital Management, LP.  Also on the phone is Brian Shaw of

4 the Rogge Dunn Group.

5          THE COURT:  All right.  Thank you.  For the Redeemer

6 Committee, do we have anyone appearing for them?

7          MS. MASCHERIN:  Good morning, Your Honor.

8          MR. PLATT:  Your Honor, --

9          MS. MASCHERIN:  Go ahead, Mark.

10          MR. PLATT:  Sorry.  Mark Platt, Your Honor, on behalf

11 of the Redeemer Committee of the Highland Crusader Fund.  And,

12 obviously, Ms. Mascherin is on the screen as well.

13          THE COURT:  Okay.

14          MS. MASCHERIN:  Good afternoon, Your Honor.

15          THE COURT:  Good afternoon.  Let's see.

16          MR. PLATT:  And Mr. Hankin is on the phone as well,

17 --

18          THE COURT:  Okay.

19          MR. PLATT:  -- Your Honor.

20          THE COURT:  All right.  Very good.  All right.  Any

21 other -- UBS, by chance?

22     (No response.)

23          THE COURT:  Okay.  Anyone for the CLO Issuers?

24     (No response.)

25          THE COURT:  All right.  Anyone I missed?  U.S.

6

1    Trustee, perhaps?

2        (No response.)

3            THE COURT:  All right.  Well, --

4            MR. LYNN:  Your Honor, --

5            THE COURT:  Okay.

6            MR. LYNN:  -- good afternoon.  Michael Lynn and John

7    Bonds for Jim Dondero.

8            THE COURT:  Oh, okay.  Hello.  How are you?

9            MR. LYNN:  Well, thank you.

10           THE COURT:  All right.  Anyone else wishing to appear

11   at this time?

12       (No response.)

13           THE COURT:  All right.  We have a couple of matters

14   set on our calendar.  A motion to extend the deadline for

15   removal of actions, to which I saw no written responses, and

16   then a third motion to extend exclusivity, and I saw a

17   Committee response to that.

18       I don't have on my hard calendar anything about a status

19   conference regarding mediation, but I found in our notes from

20   our hearing, I believe it was the UBS hearing in middle of

21   June, that I said, you know, we might want to talk about that

22   if we don't hear some rosy news or some developing positive

23   news today at the July 8th hearing.  So we'll kind of put that

24   on the back burner and see if there's a need to talk about

25   that today.

7

1    All right.  So, Mr. Pomerantz, are you going to start us

2  off?

3        MR. POMERANTZ:  Yes, Your Honor.  And actually, I had

4  some comments that sort of touched on a few of the issues you

5  talked about and I think it's apropos to talk about it in the

6  context of the motion to extend exclusivity, which I do note,

7  Your Honor, is not objected to.

8    We had asked in the motion for a 30-day extension and an

9  additional extension beyond that in increments of 30 days, up

10  to a maximum of 90 days, with the Creditors' Committee's

11  consent.  We have read their response.  We understand they are

12  accepting a 30-day extension, but wanted to put the Debtor and

13  I'm sure the Court on notice that, at the end of 30 days, they

14  don't anticipate any further extensions, which I think, based

15  upon the course of actions, will be just fine, because I

16  think, as I will report to Your Honor, we expect to be able to

17  file a plan by then.

18    But I thought I would take this time, Your Honor, and sort

19  of (audio gap) little context, and that is the (inaudible) to

20  give Your Honor just a brief update of the status of the case,

21  the status on the filing of the Debtor's plan, and as Your

22  Honor alluded to, the Debtor's thoughts regarding mediation,

23  because we have spent a lot of time since Your Honor first

24  raised the issue in the middle of June talking about it, and

25  we think we have a structure that has significant support from

8

1   the main parties in this case.

2      So, as I mentioned, Your Honor, at the hearing on June

3   30th, after stabilizing operations, the Board began to focus

4   on resolving the significant litigation claims that have been

5   filed against the estate.  And the first step in that process,

6   Your Honor, is the Board wanted to commission an independent

7   analysis of those claims, not burdened by what had come before

8   it in connection with the analysis.  So we spent a lot of

9   time, our firm did, providing detailed analysis on the major

10  claims against the estate, including the Acis claim, the UBS

11  claim, and the Redeemer claim.

12     Then the pandemic hit, and a lot of the Board's attention

13  was spent on dealing with the disruption to the Debtor's

14  business that was caused by the pandemic.  However, during the

15  last couple of months, Your Honor, the Board has began to

16  focus on engaging with UBS, Redeemer, and the Acis groups in

17  order to assess the ability to be able to resolve the claims

18  short of contested and time-consuming litigation.  Because as

19  I mentioned to Your Honor on several occasions, the Board

20  intended, when it came in on January 9th, and I think has done

21  a good job, is changing the culture that had existed before,

22  the culture of litigation, to potentially a culture of

23  settlement and mediation.

24     And in that regard, Your Honor, I'm pleased to report that

25  the Debtor has reached an agreement in principle with the

9

1    Redeemer Committee regarding the allowance of the Redeemer

2    Committee's claim.  The agreement is subject to resolution of

3    a few minor drafting issues, and the Debtor anticipates

4    seeking Court approval of a settlement in the near future.

5        With respect to Acis, Acis's claims, two weeks ago the

6    Independent Board made an offer to resolve the Acis claims.

7    At this point, has not heard back.  Hopes to hear back from

8    Acis.

9        In the interim, the Debtor has also filed an objection to

10   the Acis claim, which it would intend to prosecute if it

11   cannot be resolved consensually, either before or in

12   connection with the mediation process that I will lay out that

13   we would propose to the Court in a few moments.

14       With respect to the UBS claim, Your Honor, the Board

15   believes that the Court's ruling on UBS's relief from stay

16   motion was a necessary first step before settlement

17   discussions could get off the ground, and the hope is that the

18   claim could be resolved through mediation, if not sooner, and

19   the parties discussing potentially different counterproposals.

20   None have been made yet, but it is the intention of the Board

21   to engage with UBS.

22       With respect to the mediation process, Your Honor, the

23   Board agrees with the comments that the Court made that

24   mediation could be a very useful tool and a catalyst to a

25   settlement.  That would resolve the litigation that has

10

1    burdened this estate for many years.

2        Since the last hearing, Your Honor, I've had discussions

3    with both Committee counsel, Mr. Clemente, and counsel for

4    each of the Committee members regarding a mediation process

5    that I think, subject to Your Honor's concurrence, has broad

6    support among the major parties, just proving to Your Honor

7    that the parties can come together and agree on something in

8    this case.

9        There is consensus that the Court should order a mediation

10   that would encompass essentially two general areas.  First,

11   the mediation would seek to resolve the claims of Acis and

12   UBS, to the extent the parties cannot reach agreement on their

13   own prior to the commencement of the mediation.

14       However, resolving claims against the estate is really

15   only one part of the equation.  A true global resolution would

16   also (audio gap) the Debtor's estate may have against Jim

17   Dondero and related entities, claims that I'm sure Your Honor

18   recalls the Committee bargained for the ability to prosecute

19   in connection with the global settlement approved by Your

20   Honor in January.

21       I've spoken with Mr. Lynn, Mr. Dondero's counsel.  I know

22   he's participating in the hearing.  And he has indicated that

23   Mr. Dondero is willing to participate in a plan mediation

24   process to see if a global resolution can be reached.

25       The Debtor and the Committee have also discussed the names

11

1  of potential mediators, and subject, of course, to Your

2  Honor's approval, the Debtor and the Committee have reached

3  out to Judge Jones' clerk for the Southern District of Texas

4  and he has told us that he has the time and the willingness to

5  mediate.

6      We also believe that, if available, since there is a lot

7  in terms of mediation in this case, that it may be helpful to

8  have two mediators.  And if Judge Isgur -- we haven't reached

9  out to him -- is also available, we believe that both of those

10  judges possess the qualities that this case would need to

11  resolve -- to give the best chance of resolving the claims and

12  the plan process in an efficient and a timely manner.

13      We would contemplate that the parties would submit fees to

14  the mediator by July 31st, and the mediation would occur

15  sometime in the second half of August.

16      Notwithstanding the mediation process, however, Your

17  Honor, the Debtor is moving forward towards expeditiously

18  filing a plan, which will not need to wait for mediation to

19  conclude.  And in that regard, Your Honor, the Debtor and the

20  Committee have worked cooperatively over the last several

21  weeks to draft a plan that would allow the Debtor to emerge

22  from Chapter 11 as quickly as possible -- you know, 120 days

23  or so after it would be filed.

24      The Debtor and the Committee and its members recognize

25  that the administrative fees attending to the continued

12

1    administration of this case in bankruptcy is material, and

2    that one way to reduce them is to emerge from bankruptcy as

3    quickly as possible.

4        To that end, Your Honor, the Debtor is optimistic that it

5    will be able to file a plan by the end of the current

6    exclusivity period, which, if Your Honor grants the pending

7    motion, would be August 12th.  And, at present, the plan

8    contemplates the creation of an asset monetization vehicle

9    that will seek to monetize the assets in an appropriate

10   manner.

11       The Debtor believes that the current plan is confirmable,

12   whether or not the Debtor is successful in resolving the large

13   claims against the estate, either consensually or in

14   mediation.  Worst case, the claims litigation process can

15   proceed post-confirmation.

16       At the same time, however, Your Honor, the Independent

17   Board -- led by Mr. James Seery, who has testified before Your

18   Honor and who has been appointed as the Debtor's chief

19   executive officer, subject to Court approval, and that hearing

20   is scheduled for July 14th -- has also had positive

21   discussions with Jim Dondero regarding a plan structure that

22   would not only allow for the prompt exit from Chapter 11 but

23   could also inject some liquidity into the case that would

24   allow actual distributions to be made to creditors much more

25   expedited than perhaps waiting for the monetization of the

13

1   assets.  And Mr. Seery continues to have those discussions

2   with Mr. Dondero, and he and the Board are cautiously

3   optimistic that they will bear fruit.

4        However, Your Honor, just to be clear, the Debtor intends

5   to file a plan by the expiration of exclusivity whether or not

6   Mr. Dondero is part of that plan, and his involvement will not

7   distract the Debtor from emerging from Chapter 11 as quickly

8   as possible.

9        So we feel we have presented some rosy news today in terms

10  of resolution of some of the claims and a path forward, that

11  we think this case is on a different trajectory than it was

12  quite some time ago, and we look forward to continuing a

13  dialogue with the parties before mediation and in mediation,

14  if Your Honor orders it, and hopefully can have a quick and

15  (inaudible) resolution of the case.

16          THE COURT:  All right.  I have a few questions, but

17  I'll turn to other lawyers to see what they have to say, and

18  their comments may answer some questions I have.  Mr.

19  Clemente, go ahead.

20          MR. CLEMENTE:  Yes, Your Honor.  Thank you.  Matthew

21  Clemente from Sidley on behalf of the Committee.

22       Mr. Pomerantz is correct with respect to exclusivity.  As

23  we laid out in our papers, the Committee has no objection to

24  the additional 30 days of exclusivity through August 12th, and

25  the Committee sees no reason why a plan cannot be filed within

14

1  that time frame.

2      As we laid out in our papers, we at this time don't see

3  any reason for exclusivity to extend beyond August 12th. But

4  I do think that is consistent with the relief that the Debtor

5  is asking for.

6      To be sure, Your Honor, given the position of the

7  Committee and its constituency, we do not see any plan here

8  that gets done without our consent, frankly, and approval.

9  And we've made that point consistently to the Debtor, and we

10 continue to make that point. Filing a plan with which the

11 Debtor knows this constituency does not agree, frankly, we

12 think would be a waste of time and resources and will create

13 needless litigation, to which Your Honor expressed a strong

14 distaste for at the last hearing.

15     So, Your Honor, we will continue to work with the Debtor

16 in moving forward with a plan, and we are hopeful that the

17 Debtor will continue to understand the importance of working

18 cooperatively with the Committee to propose a plan the

19 Committee can support, as opposed to one it knows the

20 Committee will take issue with.

21     So, with that, Your Honor, again, we don't have any issue

22 or objection to the entry of the exclusivity order, but I did

23 want to make Your Honor aware of the Committee's views.

24     Second, Your Honor, with respect to mediation, the

25 Committee is supportive of the mediation proposal Mr.

15

1   Pomerantz laid out.  Mr. Pomerantz touched on it, and the

2   Committee has been consistently clear, however, that the

3   mediation should not distract from the task of moving forward

4   with a plan, a plan, as Mr. Pomerantz told you, will be

5   designed to be confirmable even without claim resolution or

6   Mr. Dondero's involvement.

7       The Committee believes that it is important that the

8   claims be addressed first in the mediation, the claim

9   resolution issues, as they believe that that is the

10  appropriate sequencing.  It can all happen as part of the same

11  mediation, but the Committee feels very strongly that the

12  claims should be addressed first in the context of that

13  mediation.

14      And with respect to Mr. Dondero's involvement, the

15  Committee is not opposed to having his involvement and the

16  Committee will negotiate in good faith during the mediation

17  and will be looking to the mediator to help determine the most

18  effective way to involve Mr. Dondero in the process -- again,

19  with the very strong view that the claims should be addressed

20  first in the context of that mediation.

21      That is all I have, Your Honor, but I'm happy, obviously,

22  to answer any questions you have.

23          THE COURT:  Okay.  Let's hear from anyone else.  Any

24  other lawyers want to weigh in?

25          MS. PATEL:  Good afternoon, Your Honor.  Rakhee Patel

16

 1  on behalf of Acis.  And I will endeavor to not tread the same

 2  ground that Mr. Pomerantz and Mr. Clemente have.  But just to

 3  kind of -- probably more so for the benefit of others that are

 4  participating in the hearing, because I know Your Honor,

 5  you're familiar with our matter, I hit on the two pieces of

 6  litigation that I think, you know, bear discussing in the

 7  context of mediation.  And by the way, just to be clear, I

 8  have -- I have no position different than Mr. Clemente with

 9  respect to exclusivity.

10      But as Your Honor is aware, there is a lawsuit involving

11  Acis and Highland Capital Management.  It's an adversary.

12  It's been through various permutations, the first of which

13  started roughly two years ago.  I think we just passed the

14  two-year anniversary of the first adversary that all ended up

15  being consolidated down and added to over time.  And

16  immediately prior to Highland's bankruptcy, that adversary was

17  effectively abated by virtue of the withdrawal of the

18  reference motion that was filed and argued and the Court was

19  writing what I understand to be a lengthy Report and

20  Recommendation in connection with.  And that was then

21  ultimately stayed by Highland's bankruptcy case in October of

22  2019.

23      As Mr. Pomerantz indicated, Highland has now objected to

24  Acis's proof of claim.  That just came roughly about two weeks

25  ago.  And keeping in mind, Your Honor, that Acis's proof of

17

1   claim is its complaint in that adversary that I just

2   referenced.

3       At present, Acis's response is due somewhere around July

4   23rd, I believe, and there is a hearing scheduled on that

5   claim objection on August the 6th.  So a hearing has been set

6   imminently.

7       Mr. Pomerantz and Mr. Couch were very kind to put in a

8   peremptory call immediately prior to the filing, and they

9   advised that they were going to be filing that claim objection

10  and that they were going to be setting it for hearing on

11  August the 6th, and I advised them that I had planned on being

12  on vacation that week, which is all a very long way of saying,

13  Your Honor, I think we're going to have to, in light of

14  mediation, work up an alternate schedule.

15      And I'm confident that we'll be able to reach that

16  alternate schedule, but we'll be keeping the mediation and its

17  scheduling and the parties with schedules in mind.  Because it

18  doesn't seem to make an awful lot of sense to me to be

19  litigating the claim objection before we get to mediation.

20      On the -- on other fronts, and, again, you know, I know

21  Your Honor presided over the Acis case, obviously, for the

22  last two and half years, commencing with the involuntary

23  bankruptcy that touched off that case.  But on the -- on the

24  related front, is, as I advised the Court at the status

25  conference during the Acis status conference, there was a suit

18

1   that was filed by Acis against Mr. Dondero, certain of

2   Highland Capital Management's employees, the former treasurer,

3   Mr. Waterhouse, as well as CLO Holdco, Grant Scott, and

4   certain of the Independent Directors of Highland CLO Funding.

5       And, you know, as Your Honor may recall, that suit was

6   filed to get ahead of the 546 or -- and/or Section 108 time

7   period cutoff.  But that suit is now pending.  In connection

8   with that litigation, Your Honor, there has been -- there are

9   a couple of answers that were filed and there's -- there have

10  been a panoply of motions to dismiss filed as well on various

11  grounds:  Personal jurisdiction -- ranging from personal

12  jurisdiction, subject matter jurisdiction, 12(b)(6) grounds.

13  Kind of a smattering of a whole lot of things.  And all of

14  that bundles together, Your Honor, into a whole lot more

15  litigation.

16      So, in thinking about that piece of litigation and its

17  overall impact on where the parties are, I endeavored to reach

18  out to all of the counsel, the various counsel for the

19  constituent groups therein to talk about what we were going to

20  do with that piece of litigation, certainly now that we are

21  discussing mediation.  And I've had various positive at least

22  preliminary discussions with Mr. Bonds, counsel for Mr.

23  Dondero, and then also Mr. Kane, who is counsel for CLO Holdco

24  and Grant Scott, and they were generally receptive to the

25  concept of an abatement, pending mediation, just, again, so we

19

1  can put a pin in the litigation, see where we can get to in

2  the context of mediation, if some sort of resolution can be

3  reached that advances the collective ball and hopefully helps

4  to, if not resolve the litigation, perhaps reduce or certainly

5  streamline it.

6      I've reached out to, by email, to counsel for certain of

7  the other employees who are, at present, evaluating that --

8  the request for an agreed abatement, and I've also reached out

9  via email and phone to counsel for the Independent -- the two

10  Independent Directors for Highland CLO Funding.  That's Mr.

11  Maloney and Ms. Matsumora.  And I've not heard from them as

12  yet.

13      So, in connection with that, Your Honor, likely, at least

14  as of right now, my thought is that we would basically be

15  filing a motion tomorrow seeking to abate that piece of

16  litigation in connection with the mediation that we're

17  discussing today, and, of course, depending upon the outcome

18  of today.  And we may seek to expedite that motion to abate if

19  the parties don't agree to extend at least present responsive

20  deadlines, et cetera.  Because, again, it doesn't seem to make

21  an awful lot of sense to be continuing with litigation while

22  everyone is trying to get into resolution mode.

23      So, Your Honor, as you know, Acis has tried to remain

24  consistently in resolution mode, but we hear Your Honor loud

25  and clear and we will endeavor and try and streamline and at

20

 1 | least give the best-faith effort at trying to get things

 2 | resolved as expeditiously as possible as we can.

 3 |         THE COURT:  Well, if that is the case, why haven't --

 4 | why hasn't the Debtor heard back from you on the offer they

 5 | made two weeks ago?

 6 |         MS. PATEL:  Your Honor, the offer was made after --

 7 | shortly after the claim objection was filed.  The claim

 8 | objection itself, Your Honor, is a two-page claim objection.

 9 | And, frankly, if I turn my camera around, you'd see that I am

10 | surrounded by paper.  We are analyzing the claim objection as

11 | filed.

12 |     Your Honor, in terms of talking about Acis's claim, Acis,

13 | as you know, has been -- has been attempting to discuss its

14 | claim, and even during Acis's bankruptcy case, we engaged in

15 | two different mediations to try and resolve the overarching --

16 | a lot of the facts that -- and circumstances that underlie the

17 | complaint, and those were unsuccessful.

18 |     Shortly after the Board was appointed -- and by shortly, I

19 | mean I think the hearing was in the morning; we ended up -- I

20 | and Mr. Terry ended up having lunch with the Board and the

21 | Board's counsel to again being fostering a relationship and to

22 | begin discussing Acis's claim in earnest.  And we had a

23 | lengthy meeting at my offices -- if my memory serves, it was

24 | in early February -- with Mr. Nelms and with Mr. Seery.  And

25 | then, frankly, didn't hear a whole heck of a lot with respect

21

1  to our claim or any type of negotiation.  So the first thing

2  that we heard back with respect to it was just a couple of

3  weeks ago, and Your Honor, we --

4       (Audio interruptions.)

5            THE COURT:  Okay.

6            MS. PATEL:  We will --

7            THE COURT:  Someone needs to put their phone on mute.

8  Okay.  Thank you.

9            MS. PATEL:  Thank you, Your Honor.  We have

10  endeavored -- we have rolled up our sleeves and we are

11  analyzing the claim objection and trying to narrow the issues.

12  And we will be providing a substantive response back to the

13  Debtor as quickly as we can.

14      The settlement proposal, frankly, Your Honor, came in

15  while Mr. Terry was on vacation, so we did have a little bit

16  of time lapse on that.

17            THE COURT:  Okay.  Where are people going on vacation

18  these days?  I can't get anywhere.

19            MS. PATEL:  Your --

20            THE COURT:  I've had to cancel a couple of vacations.

21  I don't know where people are going.

22      But okay.  Well, I'm very disappointed, nevertheless, to

23  hear that there's been zero response in two weeks.

24      Anyone else wish to make a comment before I get to some

25  questions I have?

22

1        MR. LYNN:  Your Honor, Michael Lynn for Jim Dondero.

2      This is just a comment.  The Acis v. Dondero, et al. suit

3   parallels in many respects the objection to the claim filed by

4   the Debtor with respect to the Acis claim.  We would probably

5   seek to join in the objection, if for no other reason than to

6   preserve our ability to address factual issues that the two

7   matters have in common, to ensure against a future preclusive

8   effect.

9        THE COURT:  Okay.  Anyone else?

10       MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz

11   again.  I have a couple of comments with respect to Ms.

12   Patel's.  Would you like me to address them now?

13       THE COURT:  Go ahead.  Uh-huh.

14       MR. POMERANTZ:  Okay.  Your Honor, I think it's

15   helpful to the Court to understand sort of the big picture in

16   terms of our discussions with Acis.  Prior to making  a

17   settlement proposal, which, incidentally, occurred before the

18   claim objection was filed, a week or so ago -- well, actually,

19   a few week before that, we had offered to sit down and meet

20   with Acis with respect to their claim.

21      The initial response we received back was that, unless the

22   Guernsey lawsuit was dismissed, they were not interested in

23   sitting down and meeting with us.  We were disappointed in

24   that because, as we have consistently maintained since the

25   Board has taken over, the Board does not control that Guernsey

23

1    lawsuit.  But in any event, that was what Acis's position was.

2        Subsequently, a few weeks after that, we were told that

3    Acis would be willing to sit down and have a discussion with

4    us about their claim, similar to the discussions we had with

5    Redeemer and similar to the discussions we had with UBS.

6        To make that discussion most productive, two and a half

7    days into that -- I certainly realize two and a half days is

8    not a lot of time -- we provided Ms. Patel and Mr. Shaw with a

9    draft of the objection, which was mostly identical to the one

10   that got filed.  There was a couple of minor changes.  We then

11   had a discussion with them.  I'm not going to, of course,

12   reveal the substance of the discussion, but the purpose was to

13   go over our thoughts before it was filed.  And we were told,

14   as Ms. Patel said, that Mr. Terry was on vacation, and we

15   didn't expect, after putting, as Ms. Patel said, a roughly 60-

16   page objection, that they would be able to turn it around.

17   Several days later, we called up Ms. Patel and Mr. Shaw,

18   communicated orally a settlement proposal, told them that a

19   settlement -- told them that an objection would be filed and

20   offered to, at their convenience, to sit down and talk about

21   the claims.

22       We are still hopeful, Your Honor, in light of Ms. Patel's

23   comments that we will receive a response, that we will receive

24   a response.  And to the extent we can narrow the issues down

25   and -- before mediation, I think those ought to be helpful.

24

1     We also spoke to Ms. Patel.  She had indicated she had a

2   vacation scheduled.  At the time, I think we were starting to

3   talk about mediation.  And the Debtor has no intention of

4   mediating while litigating.  We don't believe that's an

5   effective use of people's time.  So while it is on for August

6   6th, to the extent Your Honor does order us to mediation and

7   mediation occurs at the end of August, we would anticipate

8   that the hearing on the claim objection would be set for some

9   time in September.  But we are encouraged.

10     We also, after the additional litigations were filed by

11   Ms. Patel against Mr. Dondero and certain of the Debtor's

12   employees, who are still current employees, we had suggested

13   that it might make sense to have an abatement and a stay of

14   those proceedings, given the interrelatedness of those

15   proceedings and the matters in Acis's claim objection.  They

16   initially rejected that, but I'm very happy to hear that their

17   view now is that it does make more sense to try to see if we

18   can coalesce around a mediation process without satellite

19   litigation occurring.

20     So we are -- we are, to the -- we're not a party to that

21   litigation.  We weren't asked.  The first time we had been

22   told that that litigation would be stayed was I heard it just

23   a few minutes ago.  But we are very much in support of that

24   and hope that the parties can coalesce around a mediated

25   resolution as opposed to a litigated resolution.

25

1      THE COURT:  Okay.  Remind me again the amount of

2  Acis's proof of claim.

3      MR. POMERANTZ:  I will let Ms. Patel answer that

4  because it's a little unclear and there are some -- been

5  disputes in terms of who said what about it.  So I would ask

6  Ms. Patel to remind the Court of what they're claiming.

7      MS. PATEL:  Your Honor, on the face of our -- of the

8  filed proof of claim, it states that the claim is in excess of

9  $75 million.

10      THE COURT:  Okay.  All right.  Anyone else wish to

11  make a statement today?

12    (No response.)

13      THE COURT:  All right.  Well, as I said, I have a few

14  questions, some I came in here with and some sort of popped up

15  in my brain as I heard the presentations today.

16    Mr. Pomerantz, I mean, I feel in many ways I have sort of

17  only a 30,000-foot level understanding of certain things going

18  on outside of the courtroom.  And here's what I mean by that.

19  You made a comment that the Board, you know, had to deal with

20  the destruction of the Debtor's business caused by the

21  pandemic.  I think those were your exact words.  I would like

22  to understand that better, because there was indeed a theme in

23  your motion to extend exclusivity of, you know, one of the

24  reasons we're not where we would like to be at this juncture

25  is, among other things, you know, we had the pandemic hit.

26

1    I don't have a full appreciation of how that has slowed

2   things down.  I mean, I know there was one specific comment

3   that Jefferies issued margin calls and so that caused

4   liquidity issues.  But other than that, I'm not -- I mean,

5   yes, the capital markets fell off a cliff in March, but my

6   impression, naïve as it may be, is that things have kind of

7   bounced back after March.  So, tell me how the pandemic has

8   had an effect in trying to get to resolution of issues and a

9   plan.

10          MR. POMERANTZ:  Absolutely, Your Honor.  So, as I

11  think Your Honor knows in the calls, the Debtor's primary

12  assets consist of two things.  One, public stock that it

13  trades through a proprietary account in its select account,

14  and other stocks, public stocks, which, as Your Honor

15  mentioned, the pandemic roiled the stock market, and for the

16  period of time in March and early April, given the fact that

17  the Debtor had margin accounts, a substantial amount of the

18  time spent primarily by Mr. Seery, who effectively started

19  becoming a CEO at that time -- we'll deal with his motion next

20  week -- if it wasn't for his efforts, his expertise and

21  acumen, the result could have been a lot worse.

22    So he's been spending a lot of time in dealing with

23  Jefferies, because, as Your Honor is aware, with margin

24  accounts, there is really limited protections that are

25  available under the Bankruptcy Code, and the automatic stay

27

1   and other protections don't necessarily apply, and Jefferies

2   could have turned around and sold all the stock.  So the value

3   that was preserved took a lot of time and effort.  That was

4   one area.

5       The second area, Your Honor, is the Debtor's assets also

6   include interests in private equity investments.  A lot of the

7   Debtor's funds that it manages and which the Debtor has

8   significant interest in have a variety of different companies.

9   Each of those companies were dealing with the pandemic in

10  their own different ways, whether it was addressing issues of

11  applying for PPP loans, whether it was addressing employees,

12  there's capital structure issues, each of them are potentially

13  a Chapter 11 making all of their own.

14      So, again, the type of effort and time that it took --

15  again, principally, Mr. Seery, acting as CEO, but also, you

16  know, the other Board members -- was a lot, to stabilize those

17  investments and to make sure that they were not lost through

18  actions by lenders or whatnot.

19      And the third aspect is the Debtor manages funds, still

20  manages funds and actively manages funds.  And managing funds

21  that have principally financial-type assets in this

22  environment has been extremely challenging.

23      As Your Honor accurately mentions, over the last couple

24  months the stock market has come to a little more stability.

25  Whether that will remain is anyone's guess.  And during that

28

1  time, that's when a lot of the efforts that I've mentioned in

2  terms of the claims work has been put back on.  But there was

3  a month or two period during the pandemic, the early stages,

4  that really impacted the Debtor's ability, and it was all-

5  hands-on-deck to address those issues.

6      At the same time, though, Your Honor, our firm was working

7  on the extensive analysis that was required to, for example,

8  address all the legal issues in connection with what I think I

9  recall is a 34-count complaint by Acis; for our firm to get up

10 to speed with respect to the UBS claim, which, as Your Honor

11 heard a few weeks ago, spanned 11 years of litigation; and

12 also to address the issues with Redeemer and be in a position

13 that, as I mentioned before, we have reached a settlement.

14     So, there were a lot of things going on.  We had hoped to

15 be where we are now a couple of months ago.  But I think the

16 Board, under the strong leadership of the Board and the strong

17 leadership of Mr. Seery, has effectively stabilized the

18 operations, and we have now been able to, the last couple of

19 months, really turn to how do we get out of this case, as

20 evidenced by the comments I made with the substantial effort

21 that's been made in the plan and the substantial progress I

22 think has been made on putting the Board in a position to sit

23 down and have meaningful discussions with creditors

24 (inaudible).

25            THE COURT:  Okay.  I mean, again, I don't -- I don't

29

1  have a witness here, but, well, remind me, what do we have set

2  July 14th?

3          MR. POMERANTZ:  So, July 14th, Your Honor, we have

4  two motions.  One is a motion to appoint Jim Seery as the

5  chief executive officer.  Again, I will talk more about it in

6  connection with that hearing.  If Your Honor recalls, as part

7  of the term sheet in January, there was a recognition by the

8  Committee and by the Debtor that instilling the Board was

9  obviously critical.  It was critical to avoid this case going

10  into a different direction.  And I think there was a

11  recognition that it would be important that somebody stepped

12  up and become the CEO.

13      It was too early to tell whether that somebody would come

14  from the Debtor's board, the newly-installed board, or someone

15  else, but there was a contemplated process.  And while the

16  first couple of months of the case were spent, again, on

17  stabilizing operations, I think starting in mid-March and as

18  we went on it was pretty clear that, of the three people on

19  the Board, while all of them are providing invaluable services

20  in leading the Debtor to where it is now, Mr. Seery was

21  stepping up primarily because of his significant operational

22  background in connection with these types of assets.  And he

23  has essentially been working a couple hundred hours a month or

24  thereabouts over the last few months doing the things I just

25  alluded to, and the Debtor has determined to seek his

30

1    retention as a CEO.  Has had discussion with the Committee on

2    terms.  They're not all finalized or resolved yet, but that

3    hopefully will be uncontested by the 14th.

4          Mr. Seery will also undertake the role of chief

5    restructuring officer, which, as Your Honor recalls, we

6    already have Brad Sharp as -- from DSI as chief restructuring

7    officer.  They will essentially become financial advisor.  DSI

8    has provided a valuable role to the Board and to counsel in

9    this case.  But given that Mr. Seery will, if the Court

10   approves the motion, become the CEO, it would make sense that

11   he be the CRO as well, so it's a separate motion to

12   essentially transmute the DSI representation from a CRO

13   representation to a financial advisor representation.  So the

14   two matters are on, Your Honor, but I've --

15              THE COURT:  Okay.

16              MR. POMERANTZ:  -- given Your Honor a preview.

17              THE COURT:  Well, I'd like to hear testimony from

18   both of them on the 14th, Mr. Seery and Mr. Sharp.

19         Again, I -- I mean, ideally, we would have evidence at a

20   hearing on a motion to extend exclusivity.  And I understand

21   you didn't have any objections, you worked out essentially an

22   agreement with the Committee.  So, I mean, I understand you

23   didn't necessarily think that evidence would be needed.

24         But I, again, you know, my understanding is 30,000-foot

25   level.  I'm just trying to understand, you know, with three

31

1   wonderful independent board members and with a CRO and all

2   these fantastic professionals, it just feels like we -- you

3   know, multiple things could be going on at once, and I kind of

4   feel like, you know, January 9th, six months ago, we had the

5   independent board installed.  We had the protocol order with

6   the Committee worked out, you know, which we call it a

7   settlement, but it was mostly a mechanism to allow the

8   Committee to have oversight and monitoring.  And it just feels

9   like, January 9th, okay, then we were in a position to really

10  start focusing on these big claims.  We knew it was Acis and

11  we knew it was UBS, even though the bar date hadn't hit.  And

12  it feels like to me we've -- I shouldn't say bought a lot of

13  time, but a lot of time has gone by for not as many results as

14  I would like.

15      Tell me why I'm being unfair.  And, again, I go back to,

16  okay, if it's the pandemic, help me to understand what it was

17  about.  You know, I kind of got scared by that phrase you

18  used, destruction to the Debtor's business caused by the

19  pandemic.  I mean, I guess part of what I'm getting at here

20  is, Has there been a massive loss of value by the Debtor

21  caused by the pandemic, and that has been sort of a halting

22  event to being able to talk about a plan?

23          MR. POMERANTZ:  Well, Your Honor, I believe, and I

24  actually went back to my notes, and I think I said disruption.

25  I didn't say destruction.

32

1          THE COURT:  Oh.

2          MR. POMERANTZ:  And if Your Honor heard destruction,

3   --

4          THE COURT:  I heard destruction.  Maybe I --

5          MR. POMERANTZ:  -- or if I misspoke, I apologize.

6    But there wasn't any implication of a destruction in the

7    Debtor's business.  Again, financial assets did take a hit.

8    There were some concerns in how, you know, to monetize those

9    assets, the stock assets, and working through the Jefferies

10   issues as well as the private equity issues.

11       And look, Your Honor:  When the Board took over on January

12   9th, I think they recognized soon after their appointment that

13   there was a lot of stuff to do.  There was -- it was a really

14   steep learning curve.  Highland, as people have described it

15   in the hearings in this case, is an extremely complicated

16   structure of companies.

17       So, yes, perhaps things could have moved a little quicker.

18   Your Honor does recall the early stages of the case, we dealt

19   with motions for the appointment of a trustee by the United

20   States Trustee.  There was other litigation over retention of

21   professionals and others, which, you know, Your Honor has

22   commented about in the past, and I think we're past that and

23   beyond that.  But there has been a lot of work.

24       And, again, on the claims work, the Board, to be

25   independent, did not want to rely on the employees of the

33

1  Debtor in evaluating the various claims.  So that took a lot

2  of time and effort.

3     So, you know, look, I think you could look at it two ways.

4  One way you could look at it, that it's been pending six

5  months and we don't have a plan yet, we don't have the claims

6  resolution.  I would -- and I tend to be a glass-is-half-full

7  type of person -- I think the message that we are hearing

8  today is that the plan process is on track.   We have resolved

9  one of the three major litigation claims.  We have coalesced

10 around a mediation process that people can get behind and

11 hopefully have concluded at the end of August.  That the

12 process is going to include not only the inbound claims

13 against the company but potentially the claims by the company

14 against some of the targets.

15    I think there is reason for optimism at this point in the

16 case.  And while, you know, I wish it was May and we were

17 having this discussion, not July, I still think there has been

18 a lot of groundwork that was prepared to get to the place

19 we're here.  And, you know, the Board is laser-focused on

20 getting results, and getting results quick.

21         THE COURT:  Okay.  Let me follow on about the

22 agreement in principle on the Redeemer claim.  They had an

23 arbitration award.  So that doesn't sound like a major

24 milestone to me, to be honest.  Tell me why I'm wrong about

25 that.  They had an arbitration award.

34

1          MR. POMERANTZ:  Sure.  Your Honor, they do have an

2   arbitration award, but there are several aspects of the

3   arbitration award that needed negotiation and resolution.  A

4   significant part of the arbitration award was the Debtor's

5   obligation to repurchase some Cornerstone shares that Redeemer

6   had for a certain dollar amount.  Well, obviously, the Debtor

7   in bankruptcy doesn't have the ability to write a check to

8   repurchase it.

9       There was issues on the Debtor's ability to ultimately

10  recoup different fees that the arbitrator had determined had

11  been taken inappropriately that had to be repaid, and to what

12  extent the Debtor would be entitled to a credit.

13      So, by no means am I telling Your Honor that the Redeemer

14  claims and issues were as difficult as the Acis and UBS claims

15  and issues.  But there were a variety of issues, there were a

16  variety of matters that had to be discussed.  You know, we

17  worked cooperatively with Redeemer and with Jenner & Block.

18  And we, again, have reached a resolution that is going to

19  provide a face amount of a claim which is materially less than

20  the claim that was on file.

21      But Your Honor, by no means am I trying to convince Your

22  Honor that this was the same type of work that needed to go

23  into -- resolve the others.  But having said that, getting

24  that claim resolved, which the Debtor believes is the largest

25  legitimate claim against this estate, I think is an important

35

1  step forward that will lead towards hopefully the confirmation

2  of a plan and hopefully spur on efforts from all the parties

3  -- Acis, UBS, and the Debtor -- to try to make the same type

4  of progress in their claims.

5       THE COURT:  Okay.  All right.  My next question is, I

6  mean, you've talked about -- I think it was the previous

7  hearing I heard you say a term sheet had been provided to the

8  Committee or going back and forth.  I mean, help me to

9  understand what you're envisioning the plan is going to look

10 like in this case.  I mean, I know there's a wide swing

11 between UBS being owed a billion dollars and being owed

12 nothing, and Acis being owed $70 million versus, you know,

13 nothing or wherever you think the number should be, or the

14 Debtor's board thinks the number should be.  I know, you know,

15 these are giant questions.  But can you answer for me what

16 you're envisioning?

17     I mean, again, one of the pleadings said, you know, the

18 plan should provide for orderly monetization of assets,

19 provide for a process for resolution of claims, and pursue

20 causes of action.  I mean, again, that's kind of 30,000-foot

21 stuff.  Tell me what you're envisioning.

22       MR. POMERANTZ:  Sure.  So, Your Honor, just to take a

23 step back, we -- this case was filed not necessarily for the

24 traditional reason that cases are filed.  There weren't operational

25 fixes that needed to be done at the business.

36

1          THE COURT:  Right.

2          MR. POMERANTZ:  There wasn't a capital structure that

3    needed to be revised.

4          THE COURT:  Right.

5          MR. POMERANTZ:  Right?  So, as everyone knows, the case

6    was filed because the Redeemer Committee got its arbitration award,

7    to prevent execution on that.  Okay?

8       We also had a very complicated business.  There are not many, I

9    think, examples of asset managers around the country of the type of

10   Highland Capital that actually go through a Chapter 11.  And it

11   caused a tremendous amount of upheaval, of issues.  Your Honor,

12   we've been dealing with the protocols on a daily basis with the

13   Committee.  Your Honor has seen some of that.

14      So while the hope was, from the beginning of the case, to end

15   this case in a nice, tidy bow, get a resolution that would not only

16   resolve everyone's claims but also try to resolve the claims that

17   the estate had against third parties, as time was going by the

18   parties realized that there was nothing more bankruptcy could

19   provide this company.  This company right now has litigation issues

20   to deal with that can be resolved with the help of the Bankruptcy

21   Court, as appropriate, in connection with the claims process.  And

22   the Board -- and the Committee, for that matter -- were looking at

23   the substantial amount of fees that were being incurred by the

24   Debtor professionals and the Committee professionals which were

25   draining liquidity from the company and started to think, How can we

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1080 of 2722

37

1  exit this case?  Even if we can't get what has been referred to by

2  people as a grand bargain, how can we exit this case quickly and

3  efficiently?

4       So what really has to be done in terms of exiting the case?

5  Coming up with a way to monetize the assets, a structure in which

6  those assets can be monetized; not doing anything in the context of

7  a plan process that would in any way interfere with the

8  estate's obligations under the Advisers Act with the SEC or

9  otherwise; and coming up with a governance structure of who's

10  going to govern that.

11       So the plan that is currently contemplated -- and it's

12  more than a term sheet, Your Honor.  We have had numerous

13  versions of the plan go back and forth.  We are right now

14  waiting.  The pen is in the hand of the Committee.  We think

15  we are very close to having a form of a plan and a form of a

16  disclosure statement that would essentially contemplate some

17  type of trust vehicle that would monetize the assets.  And the

18  structure of how that trust would work, whether it's one

19  trust, whether it's two, whether it's one trustee, whether

20  it's two, how that trust would be governed, who would be on

21  the governing board:  Those are all issues that are currently

22  being worked out.

23       At the same time, the company is doing a thorough analysis

24  of every contract and every asset, to make sure that

25  assignment provisions and contract provisions and regulatory

38

1    issues, that we don't somehow trip up in connection with the

2    plan process.

3         So, essentially, at its core and at its minimum, it will

4    be transferring the assets into a monetization vehicle, some

5    type of trust vehicle, which, again, the corporate and

6    regulatory lawyers are working with us, with the bankruptcy

7    lawyers, to figure out the appropriate way, given the nature

8    of the Debtor's business, having an oversight board that has,

9    you know, creditor support.  And if you ask Mr. Clemente,

10   it'll be total creditor identification of the people, which we

11   are in discussions of what the Board looks like after.  And

12   monetization over time, and a way to resolve the claims over

13   time.

14        So that is essentially the concept.  Again, to the extent

15   we can resolve the claims soon, to the extent we can work on a

16   negotiation with Mr. Dondero to bring in liquidity so that

17   creditors will not have to wait for the monetization of the

18   assets, which a lot of these assets are not assets that are

19   easily monetizable and it will take some time.  But it is --

20   the Debtor feels strongly and I think the Committee feels

21   equally as strongly that emerging from Chapter 11 with some

22   type of vehicle to monetize the assets, governance and

23   control, and a way to resolve remaining claims, that is the

24   minimum that can and should be accomplished and that the

25   Debtor is committed to accomplishing in short order.

39

1     If something else comes out of it where we get more,

2   again, where the claims are resolved or where we have a grand

3   bargain with Mr. Dondero, that's something we're going to

4   strive for.  But at a minimum, it needs to be an asset

5   monetization vehicle, governance, and a way to -- a structure

6   to resolve claims.

7          THE COURT:  Okay.  Asset monetization vehicle.  You

8   know, subject to regulatory lawyers and corporate lawyers

9   figuring out the exact mechanics, you're saying essentially

10  put the business of Highland into a trust or trusts, and then,

11  I guess, from cash flow of the business over time, the

12  creditors would be paid?  Or are you saying something more

13  than that?

14         MR. POMERANTZ:  Well, again, I think it's on an

15  asset-by-asset basis.  And, you know, Mr. Seery, you know, is

16  -- has become very familiar with all the assets, now has a --

17  ideas in mind which he's shared with the Board on how to best

18  monetize the assets.  Some assets, there may be a quick sale.

19  Some assets, it may be over time.  So it's a combination.

20    This is not going to be a fire sale of the Debtor's

21  assets.  It's not in the best interest of the Debtor, we

22  believe.  It's not in the best interest of the creditors.  We

23  don't think anyone is in favor of that.  It's dealing with

24  each of the assets in an appropriate manner and figuring out

25  how to monetize them, recognizing that given -- even though

40

1 the stock market has bounced back, the market for privately-

2 owned businesses may not have bounced back as much.

3     So it's figuring out with the appropriate people,

4 appropriate governance structure, how best to monetize those

5 assets, recognizing that creditors want to be paid and they're

6 -- they don't want to be in the business of long-term holds.

7 So, the Debtor gets that. But it's really being a thoughtful

8 approach on how to get the best value from those assets.

9     THE COURT: Okay. There's nothing, though, being

10 discussed as far as a big chunk of cash distribution up front,

11 unless Dondero comes up with it?

12     MR. POMERANTZ: Well, potentially. I mean,

13 potentially, Mr. Dondero is a potential source of liquidity.

14 There are some significant assets that may be able to be

15 liquidated sooner rather than later. So it's something that's

16 in discussion.

17     But the lion's share of the value for creditors is likely

18 going to come over time, unless there is someone who, like Mr.

19 Dondero, who is essentially willing to buy back the company.

20 And that is something that's being explored.

21     So, look, we've had a lot of transparency with the

22 Committee. We have weekly meetings, the Board and the

23 Committee. We just started a few weeks ago. I think the

24 professionals are working together. They understand what the

25 assets are in the estate. So, to that end, I think we have

41

1   been working very cooperatively with our creditors over the

2   last few months and we're just seeking to do it the best way.

3       So nothing I've said today, nothing, you know, should come

4   as and will come as a surprise to the Committee, but we're

5   working better, recognizing that ultimately the creditors want

6   to be paid, and doing that in an appropriate manner and a

7   thoughtful manner is what the Debtor is committed to do with

8   its partner, the Committee, in this process.

9           THE COURT:  Okay.  Sort of jumping back, I forgot to

10  ask earlier when we were talking about Acis:  Has the Fifth

11  Circuit rescheduled oral argument on the appeal of the Acis

12  confirmation order and order for relief?

13          MR. POMERANTZ:  I believe -- Your Honor, maybe Ms.

14  Patel would know off the top of her head.

15          THE COURT:  Ms. Patel?

16          MS. PATEL:  Your Honor, it was -- it was briefly -- I

17  -- and I say briefly, it was briefly we had -- we got a notice

18  at some point, I believe in early June, that the Fifth Circuit

19  had reset oral argument.  And then approximately, I can't

20  remember exactly, but it was like, I don't know, a week or

21  maybe ten days later, we got a notice that it was cancelled

22  again.  We have not received notice that it is rescheduled, so

23  it is still pending.  But it has not been taken off oral -- it

24  has not been taken off oral argument at some juncture.

25          THE COURT:  Okay.  Well, I acknowledge that that is a

42

1    pandemic disruption for sure.  It would have been nice to have

2    that resolved one way or another by now.

3            MS. PATEL:  Agreed, Your Honor.  We were trying to

4    figure out, frankly, in the week to ten days that it took from

5    the scheduling to how it was cancelled, exactly how our team

6    was going to get down to New Orleans.  And the -- I think the

7    leading contender was to rent an RV and drive down so we could

8    safely get there.  So it certainly has been a casualty of the

9    pandemic.

10           THE COURT:  Okay.  All right.  Two more questions.

11   And this one has been a bit of a tough one for me to decide

12   whether I should broach this topic or not.  You know, I read

13   the newspapers, the financial papers, just like everyone else,

14   and I saw a headline that I wished almost I wouldn't have

15   seen, and it was a headline about Dondero or Highland

16   affiliates getting three PPP loans.  And, you know, I'm only

17   supposed to consider evidence I hear in the courtroom, right,

18   or things I hear in the courtroom, but I've got this

19   extrajudicial knowledge right now thanks to just keeping up on

20   current events.  I decided I needed to ask about this.

21       What can you tell me about this, Mr. Pomerantz?  I mean, I

22   assumed, from less-than-clear reporting, that it wasn't

23   Highland Capital Management, LP, but I'd like to hear anything

24   you can report about this.

25           MR. POMERANTZ:  So, look, Your Honor, the first I

43

1  could say is that, to my knowledge, Highland Capital, the

2  Debtor, has not obtained a PPP loan.  I know there have been

3  discussions with certain funds that basically have certain

4  assets, private operating companies, about obtaining PPP

5  loans.  I don't have the specifics for Your Honor.  I'm happy

6  to provide that.

7      Of course, to the extent Mr. Dondero, on any of his

8  affiliated funds that are under the control of the Debtor, I

9  would have no way of answering that, but I'm happy to follow

10  up with that with the Board and report back to Your Honor in

11  whatever appropriate manner you felt to obtain that

12  information.

13          THE COURT:  Okay.  Well, let's have a report on that

14  on the 14th when we come in.  You know, maybe Mr. Seery or Mr.

15  Sharp or some other person.  But you can probably imagine the

16  different things going through my brain.  You know, well,

17  first, let's see if it was -- you know, I don't -- again, I'm

18  not expecting it to be Highland Capital Management, LP.  I

19  would be beyond shocked if, you know, that somehow happened

20  when they're in bankruptcy.  And, you know, I think it would

21  require a 364 motion, just like any other borrowing, although

22  I know it's kind of a forgivable loan.  Strange bird.

23      But then if it's some affiliate of Highland, I still feel

24  like we need some transparency and disclosure on that.  I

25  mean, I -- and who were the human beings behind it.  It just

44

1   raises a lot of questions in my brain.  Anything else?

2          MR. POMERANTZ:  Your Honor, would you mind saying

3   what newspaper you found it in?  Because not everything one

4   reads in the newspaper is accurate, but we will definitely --

5          THE COURT:  Oh, yeah.  I know --

6          MR. POMERANTZ:  -- follow up on it and --

7          THE COURT:  Fake news really is a thing.

8          MR. POMERANTZ:  I didn't say fake news.

9          THE COURT:  Oh, I know, I know.  It's not really a

10  good term.  But *Business Insider*?  Is that reputable?  Or no?

11  I thought I saw it in one of the local papers, too.  I mean,

12  someone tell me if that's, --

13         MR. POMERANTZ:  We -- we --

14         THE COURT:  -- you know, something unreliable.

15         MR. POMERANTZ:  We will investigate it, Your Honor.

16  I don't know what confidentiality restrictions would be on

17  whether if any of those entities -- but we will get the

18  information.  If there's any concern on confidentiality,

19  perhaps we could have an *in-camera* on that.  But before we get

20  ahead of ourselves, let me broach the issue with the Board and

21  Mr. Sharp and then be in a position to act and respond more

22  intelligently.

23         THE COURT:  Okay.  My last topic is to come back to

24  mediation.  I was surprised that Judge Jones' or Judge Isgur's

25  staff expressed that they had availability.  They are the

45

1 busiest judges in the country right now. I'm wondering when

2 were they contacted. Was it really recently, or a week or two

3 ago? Because they've probably gotten ten new mega-cases in

4 the past two weeks.

5 MR. POMERANTZ: So, Your Honor, the last -- the last

6 two weeks, again, probably since June 15th, we had been

7 discussing the structure of a mediation. We, the Debtor,

8 proposed perhaps a combination of Judge Isgur and Jones. We

9 initially had that conversation with Mr. Clemente, and then we

10 socialized it with the rest of the Committee members. As of

11 last Thursday, I believe it was, we had consensus that Judge

12 Jones, and if available, also Judge Isgur, would make sense.

13 I sent an email to Judge Jones' clerk, indicating that we

14 had a hearing today, that it would be helpful if we got a

15 response, and this morning, two hours before the hearing,

16 Judge Jones' clerk responded and told Mr. Clemente and I that

17 he is available and ready and suggested that we have a

18 conference with -- again, I'm not sure if it'll be him or his

19 clerk, to talk about availability. Of course, we didn't want

20 to go ahead and have that discussion until, you know, we got

21 Your Honor's input on it.

22 THE COURT: Okay. I mean, a couple of things come to

23 mind. One is I am just flabbergasted that they would have any

24 availability. I know they're -- I'm aware of Judge Jones

25 doing hearings on weekends.

46

1    But second, I'm also concerned what is their idea of

2   availability.  Because in order for a mediator to meaningfully

3   help you on this, I mean, it's going to take not just hours

4   but days of time, unless you want the mediator to just have a

5   30,000-foot view.  And I mean, I just cannot imagine, --

6           MR. POMERANTZ:  So, --

7           THE COURT:  -- once again, that they would have days

8   and days to come up to speed with, you know, 11 years of

9   litigation or however long it was, not that long, with UBS,

10  you know the years with Acis, you know, the various alleged

11  claims and causes of action, and, you know, the Byzantine

12  structure here.  I mean, you know, not that they have to be,

13  you know, as educated as a judge presiding over litigated

14  matters, but I just cannot imagine they could meaningfully

15  spend time on this.

16    So what are you all envisioning?  Because I know what I'm

17  envisioning, and maybe we're not seeing it the same way.  I

18  mean, what are you thinking?  That you'll go in and spend a

19  day with, you know, maybe just each of you doing a 25-page

20  white paper, and you'll either settle it by the end of the day

21  or not, or what?

22          MR. POMERANTZ:  So, let me start by saying that when

23  everyone raised the issue of Judge Jones and Isgur, everyone

24  had the same potential concern that Your Honor has mentioned.

25  You know, my firm and me personally, I'm involved in a couple

47

1  of cases before Judge Jones now, significant cases.  So there

2  was a concern.

3      I think people also generally thought that if they

4  accepted and they knew what they were getting into, they would

5  want to do a good job and they'd have the time.

6      We have not had the ability to have an extensive

7  discussion.  That discussion could either occur with Mr.

8  Clemente and myself speaking to the clerk or the judge, or if

9  Your Honor -- nothing stops Your Honor from picking up the

10  phone, speaking to Judge Jones and asking him as well.

11     But I expect it to be a very intensive mediation process.

12  I do understand that Judge Jones only does mediations in

13  person, so this would require people getting to Houston,

14  which, in my experience, while I have participated in

15  mediations virtually on the phone, it's a lot more effective

16  to be in person.  We would anticipate detailed mediation

17  briefs.  We would envision each of the parties speaking to

18  Judge Jones to give him their perspective.  But it would be --

19  it would be a significant assignment.

20     Again, whether we would conclude at the end of August, I

21  don't know, but I would contemplate a good two, three days of

22  in-person mediation at the end of August, and then probably,

23  if necessary, to set up for something else, which, again,

24  there are several different things.  And I mentioned in my

25  opening remarks why I think people like Judge Jones -- and

48

1 this is also why we thought about Judge Isgur as well -- it's

2 not often you have two mediators, but two mediators,

3 especially judges who work together and who are pretty adept

4 at mediation, I mean, you know, having a bankruptcy judge be a

5 mediator is fine, but Judge Jones and Isgur, they have done a

6 lot of that, and I understand have continued to do that,

7 notwithstanding themselves getting busy.

8      So I can't answer Your Honor's question of whether they

9 know what they are getting themselves into.  I would hope that

10 by, again, a combination, or Mr. Clemente and I speaking to

11 them or Your Honor speaking to them, they would understand.

12 And if they are willing to do it -- obviously, Highland is a

13 high-profile case; I know judges, sitting judges, often like

14 to help out their brethren who are sitting on the bench.  So

15 if they are ready and able to do it, we'd think we'll have

16 lucked out, and we think they would be great to aid the

17 process.

18      If for some reason they don't really appreciate or if

19 Judge Jones doesn't appreciate what it is, then we can go back

20 to square one, and, you know, I'm sure find other people as

21 well.  But we'd like to sort of give it a shot.

22          THE COURT:  Okay.

23          MR. BJORK:  Your Honor?

24          THE COURT:  Yes?

25          MR. BJORK:  May I be heard?  This is Jeff Bjork with

49

1    Latham, hi, on behalf of UBS.  I apologize.  I just wanted to

2    say that, from our perspective, we have concern, we raised

3    this concern about Judge Jones or Isgur having the time to

4    really evaluate the claims.  I mean, as you noted, our claim

5    is complex, to say the least.  So is Acis's.  There's a lot of

6    history behind it.

7         And so while we appreciate the fact that there is a

8    mediation process that will be moving forward, we have raised

9    the prospect of having a separate mediator like Dan Weinstein

10   or someone of that ilk to serve as a mediator with respect to

11   our claim dispute, with the goal of trying to advance that in

12   advance of August.

13        So we have put that out to the Debtors.  We raised that

14   today in advance of this hearing.  We're happy to progress

15   that discussion.  But I wanted you to understand, from our

16   perspective, we share your concern.

17             THE COURT:  Okay.  Anyone else?

18             MR. POMERANTZ:  So, just on that, Your Honor, --

19             THE COURT:  Uh-huh.

20             MR. POMERANTZ:  -- you know, we understood UBS's

21   view.  We believe each of the other Committee members and the

22   Committee believe Judge Jones would be the appropriate person.

23   And, again, I think we're all I think somewhat in the dark

24   here, and I think the next step is to really find out the time

25   that they have available to devote to it.  And, again, if they

50

1   have the time to devote to it, I don't think Mr. Bjork could

2   challenge that Judge Jones would be an excellent mediator and

3   excellent to resolve a complicated issue like the UBS claim.

4           THE COURT:  Uh-huh.  But you all cannot go down to

5   Houston live anytime in the near future.  I don't know if

6   you're reading.  Houston is pretty much like New York was two

7   months ago.  It's -- well, the death rate is not as terrible

8   because it's younger people getting it, but it's the hotspot

9   for coronavirus right now.  And --

10          MR. POMERANTZ:  And we understand that, Your Honor.

11          THE COURT:  Uh-huh.

12          MR. POMERANTZ:  And, again, you know, we're sitting

13  here on July 8th.  A lot could change by August 25th.  A lot

14  couldn't change.  I'm not, you know, I'm not sure there are

15  other places in the country people like to travel to more.  I

16  mean, you know, --

17          THE COURT:  Uh-huh.

18          MR. POMERANTZ:  -- there are several places that are

19  hotspots.  It may be challenging to do an in-person mediation.

20  I know on the Debtor's side we are committed to make it

21  happen.  I might just ask Ms. Patel if she has the number of

22  the RV company she was going to -- because maybe that's an

23  appropriate way to get there.

24          THE COURT:  All right.  So, well, let's see.  I was

25  going to say you'd be quarantined 14 days after, but you're in

51

1  California, not New York.  New York, you know, has quarantined

2  --

3          MR. POMERANTZ:  Yes.

4          THE COURT:  -- people traveling from Texas.  Well,

5  and remind me:  August 25th.  That was just sort of an

6  internal target date you all had created?

7          MR. POMERANTZ:  Yeah.  It was around, you know,

8  again, the end of August, you know, that we'd, you know, do

9  around that time.

10         THE COURT:  Uh-huh.  All right.  You know, I'm --

11 I've been talking to lawyers in different cases, where the

12 topic of mediation is being discussed, about more and more

13 mediators, and this is private mediators, are becoming very

14 adept with Zoom mediation.  And what I thought was noteworthy

15 -- I hadn't thought through this, you know.  I thought, well,

16 you can do mediation like this.  You know, if you can do court

17 by video, why can't you do mediation by video, what's the big

18 deal?  But there are private mediators who apparently have

19 become every adept very fast at having these separate caucus

20 rooms, okay?  So when you have mediation involving, you know,

21 12 different constituencies, you know, the mediator will close

22 out all the other conference rooms and go to these three

23 people, and then close that out and go to these eight people

24 in this other room.  And it just really hadn't occurred to me

25 that, oh, if you're not live and in person, how do you that,

52

1   you know, the going back and forth from room to room?  And

2   they've got some tricks worked out where some of them are

3   doing that.  And I just don't know that any sitting judges are

4   going to have that all worked out.

5       I have a couple of names in mind.  And I have not talked

6   to either of these folks, but I had thought of these people.

7   You know, they're going to cost you money.  They're not going

8   to be free mediators like Judge Jones and Judge Isgur.  But

9   two people.  One, I had thought of retired Judge Jim Peck.  I

10  don't know if he has availability, or, you know, a conflict or

11  anything like that, but he's someone I happened to have gone

12  to baby judge school with back in 2006, and, you know, have

13  somewhat of a friendship with him.  And I thought of him

14  because not only does he have a personality that I think might

15  fit this situation, but, as you know if you ever had a case

16  with him, I mean, he's just so very smart.  You know, he dealt

17  -- handled the *Lehman* case.  You know, he's not going to be --

18  he'll be a very quick study, is what I'm thinking, as far as

19  whatever factual background he would need to assemble to get

20  up to speed.

21      And, again, I just worry -- and I'm going to get on the

22  phone and talk to Judge Jones and Judge Isgur -- but I'm just

23  really worried if they will devote the amount of time for this

24  to have a meaningful shot at settling.

25      Another name I thought of is a lawyer in Houston who was

53

1 at Weil Gotshal many years, Sylvia Mayer. I don't know if any

2 of you know her, but she pretty much does mediation and

3 arbitration full-time now, and she is one of the people I am

4 aware has mastered this Zoom separate conference rooms. So,

5 once again, you know, a very quick study, I think, my

6 impression from past dealings with her.

7      There may be many other names we could add to that list,

8 but you might want to all kind of talk offline about those as

9 well.

10     But here's what I want to do.

11     (Audio interruption.)

12          THE COURT: Was someone wanting to speak up?

13     Okay. I am going to think on this more between now and

14 the 14th. And, again, I'm going to be reaching out to Isgur

15 and Jones, and might reach out to Jim Peck and Sylvia Mayer as

16 well, just to have a lot of options out there. And then we'll

17 talk on the 14th about what my research has revealed in

18 talking to these folks.

19     So, everyone, just let's continue to think on this

20 mediation thing. But, again, I want this to be meaningful.

21 I'm very worried that, you know, if all you get is one day,

22 even a long day, with these folks, that it's just not at all

23 realistic that there would be a chance at settling. So I've

24 really got to think on this.

25     As far as the motions before the Court, I'm going to grant

54

1    the motion to extend exclusivity for 30 days.  Okay?  So,

2    August 12th.  And no potential add-ons for two 30-day

3    additional extensions, which, you know, the mechanism, I think

4    you were hoping not to have to come back to the Court, that if

5    the Committee agreed, you know, you could just automatically

6    get up to 90 days.  I'm not quite clear.  But the point is I'm

7    just extending to August 12th, and for now that's all I'm

8    going to do.  Okay?

9              MR. POMERANTZ:  Understood, Your Honor.

10             THE COURT:  And we didn't talk about the other

11   motion.  That was sort of a no-brainer, I think, as far as

12   everyone was probably concerned, the motion to extend the

13   period to remove actions.  The current deadline is July 14th.

14   You're wanting to extend that out to January 14th, 2021,

15   correct?

16             MR. POMERANTZ:  Correct, Your Honor.

17             THE COURT:  All right.  Is there anyone who wanted to

18   say anything about that one?

19        (No response.)

20             THE COURT:  All right.  So that -- I think there's

21   good cause to grant that motion as well.

22        The only other thing --

23             MR. POMERANTZ:  Your Honor, one --

24             THE COURT:  Okay.

25             MR. POMERANTZ:  One comment on what Your Honor said

55

1  about mediation.  Again, I had a dialog with Albert, Judge

2  Jones' clerk.  We may want to get him on the phone, Mr.

3  Clemente and I.  Of course, we won't do it if Your Honor

4  doesn't think it's helpful.  But it might be helpful.  And,

5  again, I didn't know if that was going to be with Judge Jones

6  or if it was going to be with just his clerk, to talk about

7  days or whatnot.

8      But we'd be happy to get on the phone in order to give him

9  the parties' perspective, which, look, we all agree this has

10  to be a meaningful mediation.  And perhaps hearing it also

11  from us in terms of what we expect and what we contemplate and

12  what we think the issues might be and whatnot could be

13  helpful.

14      If Your Honor doesn't want us to do that, that's fine.

15  But since I suspect his clerk will get back to me and say "Are

16  you available?" to Mr. Clemente and I, I just didn't want to

17  step on any toes and I wanted to check with Your Honor whether

18  you want us to take that call or not.

19          THE COURT:  Okay.  I got a little confused.  You're

20  asking for a blessing to kind of continue the dialogue you've

21  already started with their offices?

22          MR. POMERANTZ:  Well, I'm just asking.  Again, I

23  don't want to be presumptuous.

24          THE COURT:  Uh-huh.

25          MR. POMERANTZ:  The fact that Your Honor is calling

56

1    Judge Jones is important.  But I expect Judge Jones' clerk to

2    get back to us and say, "Are you available to have a

3    conversation?"  And I just want to know what Your Honor's

4    pleasure is in terms of whether we should have it or not.  I

5    think it might be helpful, but if Your Honor says, okay,

6    you've brought it here, you want to take it over from here, I

7    would obviously respect that.  But just, just wanted to come

8    out of this hearing clear on what your expectations are in

9    terms of that communication.

10        THE COURT:  Okay.  I'll take it from here.  And if

11   they call back, just say, you know, I understand Judge

12   Jernigan is going to be calling Judge Jones directly.  And so

13   -- but I'll get on the phone this afternoon, so hopefully

14   there won't be any awkwardness on that.

15        MR. POMERANTZ:  Thank you, Your Honor.

16        THE COURT:  All right.  Anything else?

17      The only other thing I was going to tie back to is I fully

18   expect that there would be across-the-board agreement to abate

19   the Acis newly-filed adversary, so I hope I would -- I don't

20   even remember who all the defendants are, but please make that

21   a priority, talking about that in the next few days, and

22   report to me on that on the 14th.  Okay?  Ms. Patel?

23        MS. PATEL:  From Acis's perspective, yes, Your Honor,

24   will do.  I'm on -- I'm all over it.

25        THE COURT:  Okay.  All right.  Well, if there's

57

1  nothing else, we'll go ahead and adjourn for today.  And I'll

2  keep -- if there's anything worthwhile to report on the

3  mediation front before we have our hearing on the 14th, I'll

4  have my courtroom deputy reach out to all counsel by email and

5  let you know.  Okay?  All right.

6          MR. POMERANTZ:  Thank you very much, Your Honor.

7          MS. PATEL:  Thank you, Your Honor.

8          THE COURT:  Thank you.  We stand adjourned.

9          THE CLERK:  All rise.

10     (Proceedings concluded at 3:00 p.m.)

11                      --oOo--

12

13

14

15

16

17

18

19                      CERTIFICATE

20
        I certify that the foregoing is a correct transcript to
21  the best of my ability from the electronic sound recording of
    the proceedings in the above-entitled matter.
22
     **/s/ Kathy Rehling**                        07/09/2020
23
    _____    _____
24  Kathy Rehling, CETD-444                      Date
    Certified Electronic Court Transcriber
25

58

INDEX

PROCEEDINGS                                                                    4

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

Mediation                                                                     53

Motion to Extend or Limit the Exclusivity Period (737) -      53
*Granted*

Debtor's Motion for Entry of an Order Further Extending       54
the Period Within Which It May Remove Actions Pursuant
to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of
Bankruptcy Procedure (747) - *Granted*

END OF PROCEEDINGS                                                            57

INDEX                                                                         58

# EXHIBIT 11

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

In Re:                                ) Case No. 18-30264-SGJ-11
                                      ) Case No. 18-30265-SGJ-11
                                      ) (Jointly administered under
ACIS CAPITAL MANAGEMENT, L.P.         )  Case No. 18-30264-SGJ-11)
and ACIS CAPITAL MANAGEMENT GP,       )
LLC,                                  ) DEBTORS' MOTION to FILE
                                      ) REDACTED QUARTERLY REPORTS
                   Debtors.           )
                                      ) September 23, 2020
_____    ) Dallas, Texas

 Appearances via video and/or telephone:

 For the Reorganized      Annemarie Chiarello
 Debtors:                 Rahkee V. Patel
                          Winstead PC
                          500 Winstead Building
                          2728 North Harwood Street
                          Dallas, Texas  75201

 For James Dondero:       D. Michael Lynn, of Counsel
                          Bonds Ellis Eppich Schafer Jones LLP
                          420 Throckmorton Street, Suite 1000
                          Forth Worth, Texas  76102

 For William T. Neary,    Lisa L. Lambert, Assistant U.S. Trustee
 United States Trustee:   Office of the U.S. Trustee, Region 6
                          1100 Commerce Street, Room 976
                          Dallas, Texas  75242-1496

 Digital Court            United States Bankruptcy Court
 Reporter:                Northern District of Texas
                          Michael F. Edmond, Judicial
                           Support Specialist
                          Earle Cabell Building, U.S. Courthouse
                          1100 Commerce Street, Room 1254
                          Dallas, Texas  75242
                          (214) 753-2062, direct; 753-2072, fax

 Certified Electronic     Palmer Reporting Services
 Transcriber:             1948 Diamond Oak Way
                          Manteca, California  95336-9124

          Proceedings recorded by digital recording;
  transcript produced by federally-approved transcription service.

APP. 1099
Appx. 01146

2

<u>I N D E X</u>

Witnesses:

|  | Direct | Cross | Redirect | Recross |
|---|---|---|---|---|
| Joshua Terry | | | | |
| By Ms. Chiarello: | 27 | | 40 | |
| By Ms. Lambert: | | 36 | | |

Exhibits Received in Evidence:

Debtors'/Movants' A through W
(C through K and Q through T
   received for notice purposes only):      page 18

Arguments:

Opening on behalf of the Debtors/Movants:    page  5
Opening on behalf of the U.S. Trustee:       page 11
Opening on behalf of James Dondero:          page 16

Closing on behalf of the Debtors/Movants:    page 45
Closing on behalf of the U.S. Trustee:       page 46

The Ruling of the Court:                     page 48

*Debtors' Motion to File Redacted Quarterly Reports*                    3

1   Wednesday, September 23, 2020                    11:02 o'clock a.m.

2                        P R O C E E D I N G S

3          THE COURT:  Last on our 10:30 docket is an Acis

4   Capital matter.  It's a motion of Acis to file redacted

5   quarterly operating reports.  This is in Case Number 18-30264.

6          Ms. Chiarello, I see you there for the reorganized

7   debtor, correct?

8          MS. CHIARELLO:  Yes.  Good morning, Your Honor.

9   Annemarie Chiarello here on behalf of Acis Capital Management,

10  L.P. and Acis Capital Management, GP, LLC, the reorganized

11  debtors.

12          We also have with us on the phone and video, Joshua

13  Terry.  Mr. Terry is a principal of the reorganized debtors.

14  And I believe Ms. Patel is also on the video.

15          THE COURT:  All right.  Thank you very much.

16          For the U.S. Trustee, I believe I see Ms. Lambert

17  there.  Correct?

18          MS. LAMBERT:  Yes, Your Honor.

19          THE COURT:  All right.  Good morning to you.

20          Do we have —

21          MS. LAMBERT:  Good morning.

22          THE COURT:  — anyone else wishing to appear this

23  morning on this matter?

24      (No audible response.)

25          THE COURT:  All right.  So we have, it looks like,

*Debtors' Motion to File Redacted Quarterly Reports*                                4

1   several people on the phone.  They may just want to observe, but

2   I always want to double check that someone may be on mute and

3   think they're appearing but they're not.

4           So, Mike, can you — can you make sure everyone's off

5   mute for a minute?  Are you able to do that?

6           THE REPORTER:  Yes, ma'am.

7           THE COURT:  Okay.  So everyone's off mute now.  If you

8   wish to appear and you haven't, go ahead.

9           MR. LYNN:  Your Honor, are you able to hear me?

10          THE COURT:  I can now.

11          MR. LYNN:  I fear I can barely hear you.  I'm going to

12  dial in a second time and see if I get better reception.

13          THE COURT:  All right.  Well, that's Mr. Lynn for Mr.

14  Dondero.

15          I can recognize your voice.  So we heard you.  And it

16  sounds like you were going to try to change your device to get

17  better audio.

18          All right.  Anyone else wishing to appear?

19          All right.  Well, Ms. Chiarello, are you making the

20  argument this morning?

21          MS. CHIARELLO:  Yes, Your Honor.

22       (Noise.)

23          MS. CHIARELLO:  May I begin?

24          THE COURT:  You may.  And I just realized I left my

25  exhibit notebook back in chambers.

*Opening Statement on behalf of the Debtors/Movants*                    5

1          So, May, can you go grab that?

2          Okay, the law clerk's going to grab that.  Thank you.

3          OPENING STATEMENT ON BEHALF OF THE DEBTORS/MOVANTS

4          MS. CHIARELLO:  Thank you, Your Honor.

5          Good morning again.  Annemarie Chiarello here on

6    behalf of Acis Capital Management, L.P. and Acis Capital

7    Management, GP, the reorganized debtors.  We're here on Acis'

8    motion to file its quarterly operating report under redaction.

9    That motion was filed at Docket Number 1161.  The two objecting

10   parties that we have today are the United States Trustee's

11   Office and we believe Mr. Dondero filed a comment rather than

12   formal objection.

13          And, before we get any further, this Court has heard

14   days, weeks, months of testimony in this case.  Undoubtedly

15   you're aware that Mr. Dondero is not a creditor or an equity

16   holder in the debtor, at least not the named equity holder,

17   former or otherwise, in the debtor.  So we'd just like to

18   reserve our right to object to Mr. Dondero's standing to be

19   heard today.  I'm happy to go into that further.  I thought it

20   may make sense to present to you our opening argument and then

21   address the standing as the last issue, but I'm happy to address

22   it whichever way you'd like.

23          THE COURT:  Let's defer that for now, so you may go

24   ahead with your opening, your other issues.

25          MS. CHIARELLO:  Your Honor, we're here on a 107(b)

APP. 1103
Appx. 01150

*Opening Statement on behalf of the Debtors/Movants*                    6

1   motion, a motion to really file our quarterly operating reports

2   with limited information available to — on the public docket.

3   We don't believe there's any dispute as to the standard that's

4   applicable.  And the United States Trustee, who has filed a

5   substantive objection, we agree on the standard.  We don't

6   believe Mr. Dondero disagrees with the applicability of the

7   standard here, but again it's under 107, at the request of a

8   party-in-interest the Bankruptcy Court shall protect information

9   that is confidential or commercial information.

10          And, as a threshold matter, we're — we're sorry for

11  wasting — or using the Court's time for this.  I know Acis has

12  taken up a lot of your time in the last few years.  And we tried

13  to reach a practical solution with respect to this issue.  If

14  Your Honor had looked through our exhibits or the docket, you

15  will see that initially Highland Capital Management filed a

16  lengthy objection to this — to this motion and ultimately they

17  withdrew their objection after coming — after we worked on a

18  stipulation that was agreeable to each party.  It's in your

19  exhibit notebook at Exhibit A.  And I really think that's

20  demonstrative of what we're trying to do here.

21          So as Your Honor is aware, Acis had limited creditors

22  during its bankruptcy case and few remaining creditors that need

23  to be paid through the plan of reorganization.  There are really

24  only four remaining creditors, three of which are disputed and

25  subject to claim objection.  Those are Hunton Andrews Kurth,

*Opening Statement on behalf of the Debtors/Movants*                    7

1    Stinson Leonard, Highland Capital Management, and then the

2    remaining nonobjected-to creditor is Mr. Terry's claim.  So

3    today we have no creditors who are objecting to the relief that

4    we're requesting, but I do think the presence of Mr. Dondero,

5    whether or not this Court decides to grant him — or decides to

6    hear him on his — on his comment, is really illustrative of our

7    problem.

8            Mr. Dondero's objection highlights that noncreditors

9    may misuse the information in Acis' quarterly operating reports.

10   We know Mr. Dondero doesn't want this information in order to

11   see if the plan is being complied with as an essential creditor

12   or a party-in-interest.  We don't know why Mr. Dondero is

13   objecting, but we don't believe his actions are benevolent.

14           As a reminder, this case is postconfirmation and we

15   only have four remaining creditors.  And our motion does not

16   request that the Court permit Acis to redact information on the

17   QORs related to payments to creditors.  We're asking the Court

18   to permit Acis to redact information related to its business

19   operation.  We are concerned that Dondero-controlled entities

20   are going to misuse this information.

21           We are concerned that the Donor Advised Fund; the

22   Charitable DAF Devised Fund, L.P., which we've referred to as

23   the DAF; and CLO HoldCo, again has been referred to as part of

24   the DAF structure; and entities controlled by Grant Scott, Jim

25   Dondero's college roommate, are going to use information in the

APP. 1105
Appx. 01152

*Opening Statement on behalf of the Debtors/Movants*  8

1  Acis unredacted QORs to sue parties related to the Acis CLOs,

2  including U.S. Bank, Brigade, and Moody's. And this concern has

3  come to fruition as multiple times in the last year U.S. Bank;

4  Moody's; Acis Capital Management, L.P.; Brigade; and even Mr.

5  Terry individually have been sued by the DAF, CLO HoldCo, or

6  both.

7       We understand the United States Trustee's concern

8  about setting precedent for sealing QORs, but we do think here

9  the facts matter. And we'd like to highlight again that there

10  are no objecting creditors. The creditors remaining are two law

11  firms who are capable of filing objections; Highland Capital

12  Management, who we have agreed to provide this information in a

13  form that we believe protects the confidentiality of the

14  information.

15       And, Your Honor, if you take a look at the

16  stipulation, you will see that, generally speaking, we provide

17  the — the — and that's at Exhibit A, we're providing that — the

18  Acis QOR information to: The Highland Capital Board; and

19  Pachulski, debtors' counsel for Highland Capital Management; and

20  their restructuring advisor, Development Specialists, Inc., but

21  we have prevented that information from living on the Highland

22  Capital Management server because we have — as Your Honor is

23  aware in this Highland Capital Management case there have been

24  some issues about what lived on the Highland Capital Management

25  server, who has access to it, and which of the Highland entities

*Opening Statement on behalf of the Debtors/Movants*               9

1  gets to control that information. And ultimately we want to

2  make sure that this information can't be misused by Mr.

3  Dondero's entities.

4         Again we're not trying to limit this information from

5  other courts or actual creditors. Our goal is to reduce

6  frivolous and expensive litigation that is bad for the Acis CLOs

7  and has aided Acis' ability to reorganize. We are not

8  attempting to limit legitimate discovery in another court or we

9  are not trying to limit the United States Trustee's access to

10 this information. If you take a look at our proposed order, it

11 provides that it should be given to the United States Trustee's

12 Office.

13        And with that, Your Honor, unless you have any

14 questions, I'd like to move to Mr. Dondero's standing or lack

15 thereof.

16        THE COURT: All right. Go ahead.

17        MS. CHIARELLO: So as Your Honor's aware, under

18 Section 1109(b), there is a very broad party-in-interest

19 standard with respect to being heard in a bankruptcy matter.

20 And there are — there are enumerated parties including

21 creditors, obviously the United States Trustee under a different

22 statute, the debtor, certain parties-in-interest. But Mr.

23 Dondero is not a creditor and he is not an equity holder in the

24 debtor, nor is he former equity in the debtor. At this point he

25 is merely a litigation counterparty.

*Opening Statement on behalf of the Debtors/Movants*                    10

1          And if you take a look at our Exhibits C through V,

2     those are the debtors' schedules and — schedules and claims

3     registry which show that Mr. Dondero is not a creditor or — and

4     is not looked at as an equity holder, and has not filed a proof

5     of claim against the debtor.

6          Judge Bohm, faced with a similar situation in 2016,

7     found that a litigation counterparty was not a party-in-interest

8     has standing to be heard in a postconfirmation matter.  So that

9     case is *In re Odin Demolition* and it's at 544 B.R. 615.  In that

10    case Judge Bohm, was faced with a motion to reopen a bankruptcy

11    case after litigation had been brought pursuant to a plan.  The

12    party that moved to reopen the bankruptcy case was actually the

13    defendant in the matter, really seeking to make sure that they

14    were to have an order clarifying whether certain claims and

15    causes of action had been reserved properly under the plan.  And

16    in that case Judge Bohm denied the litigation counterparty's

17    motion to reopen for, among other reasons, that they didn't have

18    standing as a noncreditor to reopen the bankruptcy case and as a

19    party — as an entity that was not a party-in-interest.  And we

20    believe that Mr. Dondero is in the same category.

21          At the very — at the very least, I think Mr. Dondero's

22    arguments should be — should be faced with some suspicion.  And

23    we'd like to highlight that although it was quite some time ago,

24    we don't see Mr. Dondero on the video or the phone, and we do

25    have a standing order in this case with respect to presenting

*Opening Statement on behalf of the U.S. Trustee*                11

1  argument.  As you have — you at one point required under — under

2  Order 36- — Docket Number 36 — 336, you required party

3  representatives to be at every hearing if the parties were going

4  to take a position.

5        So for all of those reasons we don't believe Mr.

6  Dondero's comments should be heard.  But to the extent that Your

7  Honor does intend to indulge Judge Lynn and Mr. Dondero, we — we

8  object and we dispute the contentions that Acis had or may

9  misuse its role on the Highland Capital Management Committee to

10 do anything nefarious.  I don't think there — there's no

11 evidence that that's occurred and it's, frankly, particularly in

12 light of concurrent events, it's rather insulting to insinuate

13 that there's been any — anything nefarious going on there.

14        THE COURT:  All right.  Thank you, Ms. Chiarello.

15        I'll hear next from the U.S. Trustee, Ms. Lambert.

16        OPENING STATEMENT ON BEHALF OF THE U.S. TRUSTEE

17        MS. LAMBERT:  Judge Jernigan, —

18        THE COURT:  Okay.

19        MS. LAMBERT:  — as Acis has stated, the parties are in

20 agreement about what the legal standards are and really about

21 most of the facts, but not about what the legal conclusion here

22 is or what the appropriate remedy is for the problem.

23        Acis contends that none of the creditors are here.

24 First, the United States Trustee contends that this is a public

25 document that the public is entitled to have access to; that

*Opening Statement on behalf of the U.S. Trustee*     12

1   professors, government agencies, Congress use to evaluate

2   whether plans are being complied with and whether the Bankruptcy

3   Code is being performed successfully as applied.

4       Secondly, two of the creditors that are subject to

5   objection are law firms, so they're in an awkward position to

6   object to their former clients' position, number one. And,

7   number two, because the information has been redacted, they

8   don't really have the ability to assess what the information is

9   or speak as to whether they need it. And in the context of

10   objected-to proofs of claim, where the plan contemplates

11   payment, they are entitled to know whether there is a reserve

12   for them or not. This they cannot access and evaluate from the

13   information that's been provided.

14       This information is typically disclosed in bankruptcy

15   cases, in large forfeit cases; confidential information is often

16   disclosed in individual cases. That information may lead to

17   litigation. The parties to contracts are entitled to know

18   whether their contracts are being complied with. Undoubtedly,

19   the DAF litigation has been a series of annoying and costly —

20   costly litigation events. We don't question that, but the

21   proper remedy for that is to seek some relief in this Court by

22   asking that the Court enforce the interpretation of its order

23   and its prior interpretation of the DAF agreement — the DAF

24   litigation issues and seek to have any complaint in another

25   forum enjoined or require that the litigation be filed here in

*Opening Statement on behalf of the U.S. Trustee*                    13

1   the Acis bankruptcy case, not that the public be denied access

2   to the information, because that does not comply with the

3   standards that the Constitution requires for public access to

4   the court as discussed in the *Nixon* case and as interpreted in

5   the statutory context of 107 and 9018 and in the cases that

6   discuss how those should be applied in a constitutional context

7   such as a line — (brief garbled audio).

8         Alternatively, if the Court is inclined to do this,

9   and this started as a motion to seal, which was withdrawn, and

10  then Acis filed a motion to redact, and we hoped that the

11  redactions would be more limited, but the redactions go to the

12  substantive information in the case.  You cannot evaluate

13  compliance with the plan under the redactions that — that are

14  set forth in the proposed orderly operating reports.  You cannot

15  tell from quarter to quarter where the money is or what's been

16  paid or what has happened.  And that's where we get to.

17        This is not information that can be tailored for this

18  case.  And, therefore, it's not really a redaction.  It's really

19  a motion to seal.  The fact — the information that they provide

20  is about the claims that have not been paid, but let's — that

21  information is accessible otherwise in the bankruptcy reports,

22  in the claims register, and in the objections to claims.  The

23  information that's not available to creditors and to the public

24  is the information that's been redacted about the finances in

25  the case.

*Opening Statement on behalf of the U.S. Trustee*          14

1     So often fraudulent transfers, whether prepetition or

2  postpetition, are disclosed in operating reports.  The

3  bankruptcy processes is not designed to cover up litigation

4  issues.  Here, the allegation is that the litigation issues are

5  frivolous, and that may be true, but the remedy for that is

6  different than sealing the quarterly operating reports.

7     And for these reasons we would ask that the motion be

8  denied or, alternatively, if the Court is inclined to do this,

9  that the Court define a period of time for unsealing the

10  quarterly operating reports, because, as set forth in the case

11  law and in the Federal Judicial Center Guide, generally, orders

12  to seal should define a period for unsealing them; and — and

13  also that the Court allow the United States Trustee to comply

14  with its ethical and statutory obligations, in that the Court

15  include the standard language that it would include in sealing

16  orders for that purpose.

17     However, we still contend that the evidence will

18  reflect that the sealing should not occur and that this is bad

19  precedent for bankruptcy cases and especially large corporate

20  cases.  I'm available if the Court wants more.  Thank you.

21     THE COURT:  All right.  Ms. Lambert, I'm going to ask

22  you a follow-up question.  You just said it would be bad

23  precedent.  Have you ever seen either redaction of or sealing of

24  either monthly operating reports or quarterly operating reports

25  in a Chapter 11?  I've never, that I can remember, had anyone

*Opening Statement on behalf of the U.S. Trustee*                    15

1   ask me to do this, so I've never looked into it.  Is this

2   something that is occasionally happening and I'm just not

3   experiencing it till now, or do you know?

4          MS. LAMBERT:  No, Your Honor.  In fact, Mr. Neary,

5   when I discussed this motion with him, said that he had never

6   seen this before either.  We are aware of some circumstances

7   where particular line items in quarterly operating reports have

8   been redacted, but never something substantive or that caused an

9   inability to access, to evaluate, or determine what had happened

10  in accordance with the plan.

11          Similarly, the Court asked about monthly operating

12  reports, no, we have not seen that before.  As is pointed out in

13  other pleadings that were filed, the SEC also requires

14  disclosure of this type of information in large corporate cases.

15          I can, however, Your Honor, think of two Chapter 7

16  cases where large settlements were sealed and the final reports

17  were sealed.  Both of those resulted in discussions with the

18  U.S. Trustee about this should not have occurred and we request

19  that it not occur again.  And there were provisions for

20  unsealing them at a subsequent date.  That is the only

21  circumstance which I feel ethically I'm bound to disclose to the

22  Court that I can think is analogous to this.

23          THE COURT:  All right.  Well, I ask and I'll just tell

24  you all what's dancing in my head.  I mean bankruptcy judges,

25  we've been talking for a couple of decades now about, you know,

APP. 1113
Appx. 01160

*Opening Statement on behalf of James Dondero*                    16

1  these motions to seal or motions to heavily redact.  They seem

2  to be coming with more and more frequency in the large Chapter

3  11 complex cases.

4          And, you know, I'm about to hear from Mr. Lynn, but in

5  the Highland case of course I had a motion to seal the plan and

6  disclosure statement because of pending mediation.  And I

7  approved that under the very unique situation that I thought it

8  was, but I've never sealed a plan and disclosure statement

9  before.

10         And, again, it's a subject that causes I think all of

11 us bankruptcy judges angst because we do have this general

12 notion, not just a notion, a statute, 107, that presumes

13 everything is publicly available, again unless commercial

14 information, scandalous, confidential.  So there's kind of a

15 perception that more and more and more people are wanting to

16 avail themselves of 107 and say something's commercial, say

17 something's sensitive, confidential.  But, you know, sometimes

18 it's very questionable.

19         All right.  So with that, Mr. Lynn, are you there?

20 Your client's standing has been challenged, first and foremost.

21 Why don't you start there and then we'll see where we go from

22 there.

23         MR. LYNN:  Your Honor, can you hear me?

24         THE COURT:  I can, yes.

25         OPENING STATEMENT ON BEHALF OF JAMES DONDERO

APP. 1114
Appx. 01161

*Debtors' Motion to File Redacted Quarterly Reports* 17

1      MR. LYNN: Okay, good. Well, I had hoped to break in

2  earlier because I could have, I think, solved some of this

3  problem. Let me begin by saying Mr. Dondero is the portfolio

4  manager for certain funds that have an interest in CLOs that

5  Acis manages. So indirectly he has an interest in there.

6  However, he does not have a direct interest in this. And we

7  filed the four comments rather than a response or an objection.

8      We agreed with the United States Trustee, although we

9  do not agree with some of her comments regarding DAF litigation

10  that occurred after the confirmation of the Acis plan, which we

11  think is probably beyond the jurisdiction of the Bankruptcy

12  Court.

13      We also don't agree with the rude characterizations of

14  Mr. Dondero and the angelic characterizations of Mr. Terry that

15  counsel for Acis mentioned. However, we don't have any

16  particular interest in whether or not this motion is granted

17  other than on a precedential level.

18      THE COURT: All right. Well, Ms. Chiarello, I'm going

19  to ask you: Do you — do you intend to put on any evidence

20  today? And you know you have a notebook full of exhibits, but

21  is your client perhaps going to testify on this?

22      All right. We're — I guess you were muted. If you

23  could unmute — go ahead.

24      MS. CHIARELLO: Oh, yeah. Yes, Your Honor, we intend.

25  As a threshold matter, we would move to admit Exhibits A through

*Debtors' Motion to File Redacted Quarterly Reports* 18

1  W, which are in your binder and with the caveat being I believe

2  Ms. Lambert wanted to make clear that Exhibits C through K are

3  not admitted for the truth of the matter asserted therein but

4  merely to show that they have been sent and the contents. But

5  obviously, particularly with respect to the DAF complaint, we

6  obviously would contest the truthfulness of the matters asserted

7  in those. And the same caveat for Exhibits Q through T. And,

8  with that, we would move to admit Exhibits A through W.

9      THE COURT: All right. Are there any objections, Ms.

10  Lambert? If you could unmute yourself.

11      MS. LAMBERT: The agreement is as stated by Ms.

12  Chiarello so that the exhibits that she carved out are admitted

13  for notice purposes but not for the truth of the matter

14  asserted. That includes the proof of claim register. And the

15  other items are admitted for all purposes.

16      THE COURT: All right. So to be clear for the record,

17  I'm admitting A through W, but C through K and Q through T are

18  being admitted for notice purposes only, not for the truth of

19  the matter asserted.

20      (Debtors'/Movants' Exhibits A through W received in

21  evidence, as noted above by the Court.)

22      THE COURT: Ms. Chiarello, could you tell me, do we —

23  were these filed on the docket so I can cross-reference that or

24  do I just have the hard copies?

25      MS. CHIARELLO: Your Honor, they are filed with the

*Debtors' Motion to File Redacted Quarterly Reports*                    19

1  docket.  And I believe your hard copies, although it's hard to

2  tell for the first few because there are things that were filed,

3  the filings on filings, they should have the file mark copies as

4  well on the top.  So, for example, if you go to Exhibit T, it

5  should have the 1180-21.  So I believe then that these were all

6  filed at Docket Number 1180.

7            THE COURT:  Okay.

8            MS. CHIARELLO:  So if it's 1180 —

9            THE COURT:  All right, I gotcha.

10            MS. CHIARELLO:  — 1180-1 through 26.

11            THE COURT:  You know that I need to give the court

12  reporter hard copies of all this, and the answer is no.  These

13  are all found at Docket Entry Number 1180 on the Acis docket.

14            All right, with that, —

15            MS. CHIARELLO:  Yes, Your Honor.

16            THE COURT:  — call your witness.

17            MS. CHIARELLO:  Yes, Your Honor.

18            Your Honor, if it would — I believe Ms. Lambert has —

19  doesn't have any objection to — or objection to the

20  admissibility of our exhibits.  If you would be amenable to it,

21  we'd like to walk through some of what those exhibits are to

22  limit the amount of testimony from Mr. Terry.  But if you'd like

23  to hear from Mr. Terry first, we can offer you that.

24            THE COURT:  No, that's fine.  You can walk through the

25  exhibits first.

*Debtors' Motion to File Redacted Quarterly Reports*                    20

1      MS. CHIARELLO:  Okay.  Do you mind if I share my

2  screen?

3      THE COURT:  Go ahead.

4      MS. CHIARELLO:  Okay.  Can you see it?

5      THE COURT:  Um-hum.

6      MS. CHIARELLO:  Okay.  So we've moved in as Exhibit A

7  the stipulation between Acis and Highland Capital Management,

8  refers us to the Acis QOR.  As I mentioned earlier, you will see

9  in paragraph 3 that the parties that have the — or who the

10  information is being made available on a confidential basis are

11  Pachulski Stang Ziehl and Jones; Mr. Seery; Mr. Nelms; Mr.

12  Dubel; and Highland's bankruptcy advisor, Development

13  Specialists, Inc.; Mr. Dondero; the Charitable Donor Advised

14  Fund; and CLO HoldCo are parties that the Viewing Parties are

15  prohibited from disclosing this information to.

16      Next, — next we'll move to Exhibit B, which is the

17  Acis — and I'll put up in one moment — which is the proposed

18  redacted exhibit — I'm sorry — redacted quarterly operating

19  report with respect — showing the information that we are and

20  are not redacting.  So, again, this is postconfirmation, so

21  these operating reports are somewhat limited.  But we'd be

22  redacting information related to Acis' cash receipts, but for

23  cash disbursements, creditors can see the payments made under a

24  plan.  And — and then the remaining information would be

25  redacted as it — again, this is the backup for, again, the cash

*Debtors' Motion to File Redacted Quarterly Reports*                21

1  disbursement.

2          So I'm going to move through Exhibit C through E and G

3  all at once.  First, for purposes of today, I'll pull this up,

4  but I know Your Honor has a — I'll pull up G, but you have all

5  of them in front of you.  So these are the DAF lawsuits that we

6  have been discussing.  There are a number of iterations of them,

7  the most recent which is Exhibit G.

8          So you take a look at these and the plaintiffs are

9  either CLO HoldCo or the Donor Charitable Advised Fund.  It

10  sounds from Judge Lynn's comments that Mr. Dondero may serve in

11  some capacity with respect to these entities, but you — you have

12  heard these mentioned as the DAF.  They assert that they are

13  interest — or they hold an interest in the Acis CLOs either

14  directly or indirectly.  And, generally speaking, this

15  litigation alleges misconduct related to the Acis CLOs and

16  misconduct related to the Acis bankruptcy case.

17          With respect to the mismanagement, it will sound

18  familiar to Your Honor as it's quite similar to the

19  mismanagement alleged by Highland Capital Management during

20  Acis' bankruptcy case, an objection that this Court overruled

21  when it confirmed Acis' plan of reorganization.

22          So the parties to these lawsuits, which admittedly

23  have changed, this is probably the most fulsome one, include

24  U.S. Bank; Moody's; Acis Capital Management, which is of course

25  our debtor, our reorganized debtor; Brigade Capital Management,

*Debtors' Motion to File Redacted Quarterly Reports*                    22

1   L.P., which is the debtors' subadvisor; and Mr. Terry

2   individually.

3          I think what's most notable — or maybe most

4   interesting, maybe not most notable, just how — how interesting

5   this litigation has become.  So one of the causes of action that

6   is present here is actually a defamation claim against Moody's.

7   And the defamation claim is quite surprising, particularly in

8   light of who is bringing this cause of action.  So the Acis, the

9   DAF, and CLO HoldCo, who allege that they are noteholders in the

10  Acis CLOs, are actually suing Moody's for not downgrading their

11  investment.  So that's at page 26 of Exhibit G.

12         And, again, this is — this is more — I mean it's

13  really just litigation for whatever value it is.  At some point

14  this litigation was dismissed.  If you look at Exhibit H and F,

15  those are dismissal orders.  I will note they were dismissed

16  without prejudice in February of 2020.  However, the — if you

17  take a look at Exhibit J, you will see — now I have to

18  understand how to switch between these exhibits — so Exhibit J

19  is actually dated April 20 — 21, and it's a letter from Mr.

20  Hurst, counsel for the DAF entities, to U.S. Bank, basically

21  raising the same concerns related to the mismanagement of the

22  Acis CLOs.  So this letter was sent after the litigation was

23  dismissed, so I don't think we — we don't see the dismissal as

24  anything other than a strategy, if you will.

25         Again we have another letter now on this Exhibit K,

*Debtors' Motion to File Redacted Quarterly Reports*                              23

1    which is a letter from Grant Scott on behalf of the Donor

2    Advised Fund, L.P.  So this is a letter from Mr. Scott to Seward

3    and Kissel, who were counsel for U.S. Bank in this — actually in

4    this bankruptcy case.  I believe they're on the telephone.

5            And Mr. Scott is a patent lawyer.  You can tell from

6    his letterhead.  And he is Mr. Dondero's college roommate.  And

7    he is, again, alleging these same sort of issues related to the

8    Acis CLOs and Acis' performance.  If you take a look at the

9    third paragraph you can see his concerns.  And — and all of

10   these letters request an accounting from the Acis CLOs.  We

11   don't necessarily know why.  We obviously have suspicions, but

12   we think they're — they're asking for certain information.

13           And if you take a look at — this is — Exhibit L, you

14   will see Mr. Kotwick's response to Mr. Scott with respect to the

15   requested information.  Effectively Mr. Kotwick responds that

16   under the documents, the DAF and CLO HoldCo aren't entitled to

17   this information.  So we really see this as an end-run for Mr.

18   Dondero and his entities to get information that they would not

19   otherwise be entitled to under their documents.  And,

20   unfortunately, we believe that this is also bolstered by

21   requests we have received previously from counsel to Highland

22   Capital Management prior to the entry of the stipulation, and

23   those are Exhibits I and M, again requesting really detailed

24   financial information from Acis, which we believe is unrelated

25   to plan performance.  And we can talk about plan compliance in a

*Debtors' Motion to File Redacted Quarterly Reports*                          24

1    moment.

2              And, finally, Your Honor, I think it's worth noting

3    that there are two transcripts at Exhibits N and O.  Both are

4    transcripts actually from the Highland Capital Management

5    bankruptcy case.  And Exhibit N is a transcript from the

6    February hearing on the motion to employ Lynn Pinker — I'm sorry

7    — Foley Lardner, and it was originally intended to be a hearing

8    on a motion to employ Lynn Pinker Cox and Hurst.  And so at page

9    59, Judge Nelms testifies that the Highland Capital Management

10   Board was not aware of this DAF litigation.  So we don't take a

11   lot of comfort in knowing that the Board — it's not that the

12   Board can control this litigation, at least that hasn't — and

13   that's not what has been demonstrated.  We hope — we hope that

14   they can exert their influence here, but we don't know that that

15   necessarily is within their purview.

16             And this is further illustrated by actually a comment

17   from last week.  Now I'm in Exhibit O.  And so if you look at

18   page 42, although I'm sure Your Honor remembers, we heard from

19   counsel for Mr. — from Judge Lynn's firm, Mr. Assink makes

20   statements on the record to this Court that Mr. Dondero was

21   still working with entities that he controlled to file proofs of

22   claim in the Highland bankruptcy case.  And I know that

23   definitely was surprising to us, but really illustrates the fact

24   that Mr. Dondero is still around, still has the same intentions,

25   and we don't believe that the letter-writing campaign or

*Debtors' Motion to File Redacted Quarterly Reports*                25

1   litigation has stopped.

2          And, finally, Your Honor, we want to move to Exhibit

3   W.  This is something I'm not sure the Court is aware of.

4   Sorry.  This is the final judgment from the Guernsey Court with

5   respect to Mr. Terry.  If you recall, Your Honor, Mr. Terry was

6   sued on the Island of Guernsey, effectively contemporaneous with

7   Acis' first confirmation hearing.  So Highland CLO Funding

8   Limited, which we have called things like ALF, HCLO, CLOF, they

9   sued Mr. Terry in Guernsey effectively for filing the Acis

10  involuntary petition.  And ultimately that case was dismissed,

11  and I'm probably to butcher the Guernsey term, but it does seem

12  for lack of jurisdiction.

13         And in connection with that case, the Guernsey Court

14  found that testimony submitted by Mr. Sevilla, an Island —

15  Exhibit W on page 8, so his information, particularly this

16  confidential information was related to whether Mr. Terry's

17  payment of his involuntary fees and expenses were — should be

18  characterized as a bribe rather than an allowed administrative

19  claim under the Bankruptcy Code, Mr. Sevilla's testimony was

20  found to be inaccurate with respect to that and a number of

21  other items with respect to jurisdiction over Mr. Terry, but I

22  don't know that that's necessarily relevant.

23         So with that, Your Honor, unless you have any

24  questions, we'd move — we'd call Mr. Terry to the stand.

25         THE COURT:  Let me ask one question before we do that.

*Debtors' Motion to File Redacted Quarterly Reports*      26

1   So what pending satellite litigation remains at this point? If

2   the DAF lawsuits were dismissed, granted without prejudice, and

3   this Guernsey lawsuit is now resolved, what — what is left of

4   what I'll call the satellite litigation?

5      MS. CHIARELLO: Your Honor, Mr. — I believe there is

6   still pending litigation in state court and actually Mr. Terry

7   can answer that question better than I can. But with respect to

8   litigation that is not in front of Your Honor, I believe that

9   there remains — Acis has state court litigation, but between

10   Acis, on one hand, and the Highland-related entity on the other,

11   I believe there is something still pending in state court, but I

12   think Mr. Terry should speak to that.

13      THE COURT: Okay. Because I'm understanding the heart

14   of the argument here with your motion is that Dondero, Dondero-

15   controlled entities have misused information in connection with

16   lawsuits filed against —

17      MS. CHIARELLO: Um-hum.

18      THE COURT: — Mr. Terry and U.S. Bank, Brigade,

19   Moody's, and so that's what I'm getting at: Are there pending

20   lawsuits where that is still a concern?

21      MS. CHIARELLO: So I think that the answer to your

22   question is the most recent DAF litigation has been dismissed.

23   However, after that dismissal there have been letters —

24      THE COURT: Right.

25      MS. CHIARELLO: — from Mr. Scott asserting the same

*Terry - Direct/Chiarello*                                                27

1  causes of action.  And we don't — we have no reason to believe

2  that that is over.  It just may not be occurring today.  And we

3  are concerned that providing this information emboldens that

4  type of litigation.

5          THE COURT:  Okay, got it.

6          All right.  Well, Mr. Terry, I'll need to swear you

7  in.  So if you could make sure you allow your video to capture

8  you.  Do we have you, Mr. Terry?  Let's make sure you're not on

9  mute and your video is activated.  I saw you earlier today.

10         MR. TERRY:  Yes.  Can you see me, Your Honor, and can

11 you hear me?

12         THE COURT:  I can now.  Thank you.

13    JOSHUA TERRY, DEBTORS'/MOVANTS' WITNESS, SWORN/AFFIRMED

14         THE WITNESS:  I do.

15         THE COURT:  All right.  Thank you.

16         Ms. Chiarello.

17                    DIRECT EXAMINATION

18 BY MS. CHIARELLO:

19 Q.  Good afternoon — I'm sorry.  Good morning, Mr. Terry.  We've

20 got 13 minutes.  I know you testified a number of times before

21 the Court, but would you introduce yourself?

22 A.  I'm the president of Acis Capital Management, L.P. and also

23 the ultimate owner of Acis Capital Management, L.P.

24 Q.  And, Mr. Terry, I believe you had a copy of the exhibits

25 electronically available to you, but to the extent if possible

*Terry - Direct/Chiarello*                                                           28

1    I'm going to put them in front of the screen that form the share

2    screen.  But as a threshold matter, I think it's probably

3    important to address a few things that have been raised today.

4            So with respect to how the plan works, can you explain

5    how — what's required under the plan with respect to a reserve

6    creditor, unsecured creditors, or disputed claims, and explain

7    if there is a balance or how much is in that reserve?

8    A.  Yes.  There is — under the plan, I believe, and I'm going

9    off memory, but as I recall there is a requirement that the

10   debtor or the reorganized debtor in this case keep an adequate

11   reserve for potential future claims, and we have since we've

12   emerged.

13           MS. CHIARELLO:  And, Your Honor, there is a pending

14   settlement with Highland Capital Management.

15   BY MS. CHIARELLO:

16   Q.  So I think it's prudent to take that into account, so

17   accounting for that Highland Capital Management claim, do you

18   believe that there are sufficient reserves to pay the remaining

19   unsecured creditors to the extent that they would be allowed

20   pursuant to the plan?

21   A.  Yes.

22   Q.  Okay.  And then you heard Judge Jernigan ask a question with

23   respect to satellite litigation.  Can you — can you speak to

24   what remaining litigation there is between Acis, on one hand, or

25   you, on one hand, and Highland, on the other, or Dondero-related

*Terry - Direct/Chiarello*                                    29

1    entities, on the other?

2    A.   Yeah.  As I understand it, in state court in the 162nd

3    District there is still an open case between, on one hand,

4    Highland Capital Management, L.P., which obviously this

5    bankruptcy case stayed that party in that litigation, but James

6    Dondero and Thomas Surgent as well, and then my wife and I as

7    the plaintiffs.  And this relates to the stolen retirement money

8    as well as some related other claims that we had.  That

9    litigation, originally Highland had filed claims against me

10   individually, which were already rejected by the arbitrators.

11   They sued me again for the same thing.

12           In state court, we won a summary judgment hearing in

13   March of 2019, which dismissed Highland's claims against me and

14   left my wife and I as the plaintiffs regarding the retirement

15   money.  That case, we did settle that on October 2nd, 2019,

16   which was a few weeks prior to trial.  And so that settlement

17   was between Highland, Dondero and Surgent, and then my wife and

18   I, on the other hand.  And so we had a rule and an agreement in

19   place, which I think has been an exhibit in this Court before,

20   but that case still remains open technically, I believe.

21           Then Acis, on the other hand, does have a state court

22   action against former attorneys of Acis.  And that one is in the

23   162nd district as well.  And then there are the pending

24   adversaries which are in this Court.

25           And I believe after the Guernsey judgment, I believe

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1132 of 2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 1131 of 2722
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20    Entered 09/28/20 00:18:35    Page 30 of 53

*Terry - Direct/Chiarello*                                      30

1    that matter is closed pending a — there is still an assessment

2    of cost or fees that can be awarded, given I was individually

3    the prevailing party.

4    Q.   Thank you, Mr. Terry.  So I am going to pull up what is

5    Exhibit B, which is a — it's been filed with the docket, but it

6    is the — it's Acis' quarterly operating reports, which have been

7    filed with appeal — I'm sorry — filed with redactions.  Can you

8    explain kind of the narrow redactions that we have and what we

9    are — or what Acis is not intending to redact?

10   A.   Correct.  The — the items that we're not redacting are

11   payments to creditors and essentially the U.S. Trustee fees on —

12   on the QORs.  The other information is redacted.

13   Q.   And how many remaining creditors does Acis have?

14   A.   In terms of allowed claims, it's just me individually.  In

15   terms of disputed claims, it's Lackey Hershman, which while I

16   believe it's now called Stinson Leonard, and then Andrews Kurth,

17   and then Highland are the three remaining disputed claims.

18   Q.   And are any of them objecting today?

19   A.   No, not to my knowledge.

20   Q.   And with respect to the cash receipts and cash disbursements

21   and the information that's being redacted here, can you explain

22   why that information is confidential or commercial information?

23   A.   So certain — as I believe former Judge Lynn mentioned, Mr.

24   Dondero has access as portfolio manager to certain CLO indenture

25   trustee reports of the Acis CLOs and is able to get information

APP. 1128
Appx. 01175

*Terry - Direct/Chiarello*                                          31

1  from those that the average creditor would not get.  And it's my

2  belief that Mr. Dondero or Grant Scott or other Dondero-related

3  individuals or entities, believe they can discern information

4  between our QORs and this other information that they have that

5  might help them perpetuate this litigation that seems to be

6  their agenda, unfortunately; that, you know, we don't believe

7  necessarily they can discern what they think they can discern,

8  but unfortunately that hasn't stopped them in the past from

9  mischaracterizing information, such as the Guernsey lawsuit.

10  And, you know, we're concerned that, you know, this information

11  will then allow them a basis to continue to file lawsuits to the

12  detriment of our CLOs, to the detriment of the service providers

13  to our CLOs, and to the detriment of our business and our

14  reorganization.

15  Q.  Thank you.  So, Mr. Terry, can you explain to the Court who

16  is the DAF or what we're referring to when we say the DAF?

17  A.  Yeah.  There's a series of entities that are generally

18  referred to as the DAF.  I think the two plaintiffs are the

19  Charitable Donor Advised Fund, L.P., and then CLO HoldCo

20  Limited, which as I understand it it's a subsidiary of the

21  former entity.  Grant Scott serves as director of both of those

22  entities.  Ultimately, these entities are owned by Highland

23  Foundations, of which, as I understand, Mr. Dondero serves as

24  president and Grant Scott serves as treasurer of the ultimate

25  shareholders of these entities.

*Terry - Direct/Chiarello*                                                    32

1  Q.  And, Mr. Terry, who is Grant Scott?

2  A.  Grant Scott is Mr. Dondero's college roommate.  He's a

3  patent attorney in North Carolina with an electrical engineering

4  degree that focuses on semiconductor and microelectronic

5  patents.

6  Q.  Okay.  So how has the DAF litigation and then the threatened

7  continuation of the DAF litigation affected the Acis CLOs?

8  A.  So in a number of ways, unfortunately.  You know, I think

9  the first — the first way is it really prevents resets or

10  inhibits the ability to reset these CLOs, which we've tried to

11  do since emerging.  We've requested that of HCLOF.  We were

12  hopeful when this independent board was put in place that we

13  would be able to work with them to get the CLOs reset finally.

14  And, you know, coincidentally or not, about a week after the

15  conversation started with the new independent board back in

16  February was when the lawsuit was amended to add Acis, me

17  individually, and Brigade up in New York.  So unfortunately it's

18  kept resets from happening.

19          I think additionally these — when everybody has to

20  lawyer up, there's various indemnification provisions in place

21  in these CLO documents.  And it's expensive to the CLOs.  It

22  becomes an administrative expense essentially of the CLOs.  And

23  the definition of administrative expense allows, within the

24  indenturers, allows for the U.S. Bank, as indenture trustee,

25  their counsel is paid — U.S. Bank's expenses are paid first

*Terry - Direct/Chiarello* 33

1  before any other vendors are paid in the CLO.

2          So naturally when U.S. Bank is sued as indenture

3  trustee, it leads to a big expense burden of the CLOs.  And then

4  when Acis, Brigade, myself, others are sued, it leads to

5  indemnification issues of the CLOs, which ultimately are, you

6  know, a burden on the CLO that we had hoped to try to minimize

7  as much as we can.  So those are the two main ways.  It's the

8  resets and the expenses.

9  Q.  All right.  So does the mere threat of litigation in — I

10  think what I'd characterize as — a letter-writing campaign, does

11  that — does that affect the Acis CLOs somewhat similarly to an

12  actual filing of the complaint?

13  A.  It does.  It's similar in a way on the expenses, on the

14  expense front.  And it also will continue to be a cloud on a

15  reset transaction.

16  Q.  So what has been the effect of what I call the DAF

17  litigation and the letter-writing campaign on Acis'

18  reorganization?

19  A.  Unfortunately, it — this litigation in general has been an

20  impediment since we emerged.  I mean just broadly speaking, the

21  effective date was February 15th, 2019.  There were affidavits

22  submitted in Guernsey on the 15th and 18th from Mr. Sevilla;

23  from Bill Scott, the former chairman of Highland CLO Funding;

24  Heather Bestwick, the other director of Highland CLO Funding,

25  submitting this Court's ruling to the Guernsey Court saying,

*Terry - Direct/Chiarello*                                    34

1    'This is an offense, we can't get a fair trial in the United

2    States.'

3            The — after that we had a May 2019 hearing in

4    Guernsey.  These letters started, the demand letters started in

5    August of 2019 to U.S. Bank, Moody's, and S&P.  The lawsuit

6    occurred in October of 2019 and then was amended in November and

7    amended in January and amended in February.  And then we had a

8    letter in April and another letter in May of 2020.  And so it's

9    just been a constant — obviously it's a distraction, but when

10   all the service providers to Acis CLOs — or not all, but a lot

11   are being sued, it's a cloud over other third parties'

12   willingness to want to engage with Acis on their business.  And,

13   unfortunately, it's understandable.  So that — that's been an

14   impediment.

15           And then there have also been concerns raised and due

16   diligence meetings, and whatnot, that, well, what if you did a

17   CLO, and Mr. Dondero did acquire — and the secondary market

18   acquired a position in that CLO just to sue all the service

19   providers to that CLO initially, even if he wasn't involved in

20   the initial transaction, just because, you know, he seems to

21   have it out for me, and so that's just unfortunately constantly

22   this cloud over trying to go out and get new business.  It's

23   just this unending, you know, litigation against Acis.

24   Q.  All right.  So I think there was kind of — let me go back to

25   my question.  So effectively you — you fought and — and won the

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1137 of 2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 1136 of 2722
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20    Entered 09/28/20 00:18:35    Page 35 of 53

*Terry - Direct/Chiarello*                                            35

1   Guernsey litigation; is that — is that a correct assessment?

2   A.  Yes.

3   Q.  And ultimately it was dismissed after — how long had it been

4   pending when it was dismissed for lack of jurisdiction?

5   A.  Two — two years since the date it was filed, roughly.

6   Almost two years.

7   Q.  So even if you succeed in this litigation that's there, this

8   type of litigation, it injures Acis; is that correct?

9   A.  Yes.

10          MS. LAMBERT:  Objection, leading.

11          THE COURT:  Sustained.

12          MS. LAMBERT:  Yeah, and I — I ask that the answer be

13  stricken.

14          THE COURT:  It will be stricken.

15          MS. LAMBERT:  I'm sorry.  I had trouble unmuting.

16          THE COURT:  All right.  It is so ordered.

17          Continue.

18  BY MS. CHIARELLO:

19  Q.  Mr. Terry, what are the effects of the litigation on Acis?

20  A.  Well, I mean it's problematic.  It continues to be a cloud.

21  You know, as mentioned before, it continues to be a cloud over —

22  over our business.

23          MS. CHIARELLO:  Your Honor, I have nothing further.  I

24  prefer to redirect if there is a cross.

25          THE COURT:  All right.  Any cross, Ms. Lambert?

*Terry - Cross/Lambert*                                           36

1            Ms. Lambert?

2            MS. LAMBERT:  Yes.  Yes, Your Honor, —

3            THE COURT:  Go ahead.

4            MS. LAMBERT:  — there is a cross.

5                     <u>CROSS-EXAMINATION</u>

6    BY MS. LAMBERT:

7    Q.  Mr. Dondero, you and I have met before —

8            THE COURT:  You called him Mr. — you called him Mr.

9    Dondero.  That is —

10           MS. LAMBERT:  Mr. — I have questions about Mr.

11   Dondero.

12   BY MS. LAMBERT:

13   Q.  Mr. Terry, you and I met before.  And sometimes we've been

14   aligned, the U.S. Trustee and your individual interest, and

15   sometimes we've been opposed; is that right?

16   A.  Yes, I believe so.

17   Q.  First I want to ask you about the reserve amount.  The

18   reserve amount is redacted in the two quarterly operating

19   reports that are in evidence, right?

20   A.  Well, technically I don't think the reserve — a reserve

21   amount is one of the items on the operating report.  The reserve

22   amount, so I don't know how to exactly answer that question.

23   Q.  You didn't disclose the reserved amount today, did you?

24           You didn't —

25   A.  That's — well, I don't know if that's correct either.  If I

APP. 1134
Appx. 01181

*Terry - Cross/Lambert* 37

1   could, the outstanding claims, there's a Highland claim that

2   might total eight million pending this settlement agreement that

3   obviously has been reached.  I think that's what they have

4   alleged their prepetition gap period and admin claim to be in

5   total.  And then the other objected-to claims are about $400,000

6   in terms of Lackey Hershman/Stinson Leonard, whatever, I forget

7   how that's styled, and then Hunton Andrews Kurth.  And then —

8   and then there's my claim as well.  But the — which there is

9   between 8- and 900,000 outstanding on that.  So, in general,

10  when I think of the reserved amount I think of those claims and

11  how am I going to pay them over time with not just existing

12  cashflow but future cashflow.

13  Q.  You would agree with me that you have not disclosed today

14  the amount that has been set aside from reserve, correct?

15          MS. CHIARELLO:  Objection, asked and answered.

16          THE COURT:  Overruled.

17          THE WITNESS:  I don't think that is — I don't know how

18  to answer your question because the reserved amount isn't an

19  amount on the operating report, it's an amount that I need to

20  reserve for both in cash and in future cashflow, as I understand

21  it.

22  BY MS. LAMBERT:

23  Q.  Your counsel asked you if there was a reserve.  You have not

24  provided the dollar amount of the reserve to the Court today,

25  have you?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22  Entered 08/15/22 16:45:41  Page 1140 of 2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21  Entered 03/18/21 20:59:39  Page 1139 of 2722
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20  Entered 09/28/20 00:18:35  Page 38 of 53

*Terry - Cross/Lambert*                                      38

1  A.  Well, the dollar amount of the reserve is all of these

2  factors that we're talking about that can help take care of

3  these claims that I just mentioned.  So the dollar amount of the

4  reserve would be $8 million plus $400,000 plus somewhere between

5  8- and $900,000 total, but then, for example, there's a Highland

6  settlement that will take care of some of that, hopefully, there

7  is cash onhand and then there's future cashflows that will take

8  care of that amount that needs to be reserved for.

9  Q.  You would agree with me that on today's date, Acis and the

10 Stinson law firm do not currently agree on the amount owed to

11 Stinson, right?

12 A.  I believe that's correct.

13 Q.  You would agree with me that on today's date Acis and

14 Hunton, which you refer to as Andrews Kurth, do not agree on the

15 amount owed to Hunton, right?

16 A.  That's correct, I believe so.

17 Q.  And if the reserve amount is redacted or the underlying

18 information is not provided and the quart- — is redacted in the

19 quarterly reports, they can't complain about whether there is a

20 reserve or not, can they?

21 A.  Respectfully, the question was based on a reserve amount

22 that's in the QOR, and I don't think there is an item in the QOR

23 that's a reserve amount.

24 Q.  They can't evaluate the cashflow to determine whether they

25 should ask for a reserve, can they?

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1141 of 2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 1140 of 2722
Case 18-30264-sgj11 Doc 1186 Filed 09/28/20    Entered 09/28/20 00:18:35    Page 39 of 53

*Terry - Cross/Lambert* 39

1  A.  I feel like there's two parts to that question.  The reserve

2  is inherent in the plan, that I have to keep a reserve, I

3  believe.  They can't — they could always ask for information.

4  Q.  I'm going to shift from the reserve to Acis' compliance with

5  the agreements.  You would agree with me that in or out of

6  bankruptcy Acis has to comply with its management contractual

7  obligations, wouldn't you?

8  A.  Generally, yes.

9  Q.  And — and the parties to your contractual obligations are

10  entitled to compliance, right?

11         MS. CHIARELLO:  Objection, Your Honor.  I think this

12  is outside the scope of direct.

13         THE COURT:  Well, she could always recall him, I

14  guess, as her own witness, so I'm going to go ahead and allow

15  it.  So overruled.

16         THE WITNESS:  I'm sorry.  Can you repeat the question,

17  Ms. Lambert?

18  BY MS. LAMBERT:

19  Q.  Complying with your contractual obligations is something

20  that the parties to the contracts are entitled to evaluate,

21  correct?

22  A.  I believe so.

23         MS. LAMBERT:  I have no further questions.

24         THE COURT:  All right.  Any redirect, Ms. Chiarello?

25         MS. CHIARELLO:  Just briefly.

*Terry - Redirect/Chiarello*                                                  40

### REDIRECT EXAMINATION

BY MS. CHIARELLO:

Q.  Mr. Terry, does the plan require — or did the plan have a bucket of money to pay unsecured creditors upon confirmation? Was there a set dollar amount of funds?

A.  No.  There — there wasn't a set dollar amount of funds just to pay unsecured creditors upon confirmation.

Q.  So how does the plan contemplate paying unsecured creditors?

A.  I think in part from cash that was available upon confirmation and then in part from ongoing business operations.

Q.  So to the extent that there were not funds available on the date that Acis emerged, creditors would be paid from Acis' future cashflows; is that correct?

A.  Yes.

Q.  Okay.  And have Hunton — Hunton Andrews Kurth asked you or requested any information from Acis regarding plan compliance?

A.  No, not to my knowledge.

Q.  Has Stinson Leonard requested any information from Acis related to plan compliance?

A.  Not to my knowledge.

Q.  Okay.  And to the extent that that information was requested from Hunton or Stinson Leonard or, I guess, Mr. Terry as an individual, would you be amenable to providing that information to them under some — the same or similar terms that you have provided that information to Highland Capital Management?

*Debtors' Motion to File Redacted Quarterly Reports*                41

1    A.  Yes.

2            MS. CHIARELLO:  I have no further questions, Your

3    Honor.

4            THE COURT:  Any recross, Ms. Lambert?

5            Okay, I think that was a no.  Okay.

6            MS. LAMBERT:  No, Your Honor.

7            THE COURT:  I'm trying to figure out do I have a

8    question for Mr. Terry or maybe it's a question for you, Ms.

9    Chiarello.  As I was trying to keep track of what litigation was

10   pending versus what is not, there was a reference to adversary

11   proceedings in the Bankruptcy Court.  Since I haven't had those

12   before me yet I have not studied them.

13           So could someone tell me — I mean I know about the

14   biggie, if you will, the 34-count adversary proceeding involving

15   Highland and Highland's claims in the alleged fraudulent

16   transfers and whatnot, but are there others?  If so, I haven't

17   had reason to study those, so I'd like to know what those

18   involve.

19           MS. CHIARELLO:  Yes, Your Honor.  There are a few

20   other adversary proceedings that are pending in front of Your

21   Honor.  And you haven't — you're not familiar with them because

22   they have largely been stayed or delayed given kind of the

23   posture of the Highland Capital Management bankruptcy case.

24   Those were filed on the eve of the 108 deadline, just to

25   preserve causes of action.  So the first of which is what we

*Debtors' Motion to File Redacted Quarterly Reports*                    42

1   have been referring to as the officer adversary.  I don't have

2   the case number in front of me, but I can get it for you.  And

3   that is asserting similar — a similar factual scenario that's at

4   issue in the big Highland — or the big adversary case that Your

5   Honor is familiar with, but the causes of action are against

6   Acis' former officers and directors, so Mr. Dondero, Mr.

7   Waterhouse, an individual — it's really individuals including

8   some Highland Capital employees.  We hope that that is in the

9   midst of being resolved or — to some degree.  And I think you —

10  there hasn't been a 9019 filed by Highland Capital Management,

11  so I'm — and I'm not sure where that stands, but I think some of

12  that will be addressed or I'm hopeful some of it will be

13  addressed, and when you are able to see that.

14          And then there is one other adversary pending related

15  to a preference in a fraudulent-transfer claim against Mr.

16  Stinik.  Mr. Stinik was a Highland Capital — he had the Highland

17  Capital Management email address but contends that he was a

18  contractor for Acis.  The basis of the lawsuit is effectively

19  there is — there was no contract between Mr. Stinik and Acis.

20  And it's a relatively small dollar fraudulent-transfer and

21  preference action, I think it was about $380,000 total.  I may

22  be — that may be a little high.  But, again, I think — I think

23  that — it's not — it's not before Your Honor today and it's

24  certainly — I believe we're working to move that trial — to a

25  trial date out, but it's really in the discovery phase.

*Debtors' Motion to File Redacted Quarterly Reports*                    43

1        THE COURT:  All right.  Well, when you were describing

2    the officer adversary proceeding against — or officer and

3    director adversary proceeding against Dondero, Waterhouse, and

4    some Highland employees, I was a little confused.  Do you think

5    that has been entirely settled or — because you mentioned the

6    9019 motion.  I know that Acis and Highland have resolved your

7    issues, but has this been resolved as well?

8        MS. CHIARELLO:  Your Honor, if I may —

9        Ms. PATEL:  Your Honor, —

10       THE COURT:  Oh, Ms. — Ms. Patel is speaking up.  She

11   may be the point person on that.

12       MS. PATEL:  Yes.

13       THE COURT:  Go ahead.

14       MS. PATEL:  Yes, Your Honor.  If I — if I can chime

15   in.  With respect to the settlement.  The settlement involves

16   certain of the defendants in the Dondero, et al. adversary, so

17   the nonHighland adversary, but not all of them.  There are

18   certain employees who are contemplated to be included as a part

19   of the resolution.  Now there are still developments that could

20   happen and that will become a little bit more clear I think when

21   the 9019 is filed.  It's anticipated that that 9019 — at least

22   everyone's targeting that to be filed, frankly, today.  That

23   might get pushed out.  And, just as a full disclosure, it might

24   get pushed out a couple of days, but the parties are working

25   hard to get that 9019 on file.  But — so it's a little bit of a

*Debtors' Motion to File Redacted Quarterly Reports* 44

1  hybrid answer as to what's going to happen with respect to it,

2  but the resolution does not contemplate a full global resolution

3  of the Dondero, et al. lawsuit, it's just a few — a few of the

4  defendants, namely, certain Highland employees.

5           THE COURT: Okay. Thank you.

6           All right. Well, that — that's really all I had as

7  far as follow-up questions.

8           So thank you, Mr. Terry, we appreciate your testimony

9  today.

10      (Witness excused.)

11          THE COURT: Is there anything else, Ms. Chiarello?

12          MS. CHIARELLO: Just by briefly, Your Honor.

13          I think it's important to highlight that we are here

14  truthfully near — past confirmation, and there is no absolute

15  right for creditors —

16          MS. LAMBERT: Your Honor, I'm trying to determine have

17  we closed the evidence, so we're submitting closing arguments?

18          THE COURT: Well, I'm trying to determine that as

19  well.

20          Ms. Chiarello, are you having — are you going to have

21  any more evidence?

22          MS. CHIARELLO: No, Your Honor. We rest on the

23  evidence submitted.

24          THE COURT: Okay. So I need to ask Ms. Lambert: Do

25  you have evidence at this time?

*Closing Argument on behalf of the Debtors/Movants*                    45

1          MS. LAMBERT:  The U.S. Trustee's evidence has been

2    admitted in the redacted quarterly reports that were admitted in

3    the case in chief of Acis.  The U.S. Trustee has no additional

4    evidence.  Thank you.

5          THE COURT:  All right.  Thank you.

6          All right, Ms. Chiarello, you may resume.

7          <u>CLOSING ARGUMENT ON BEHALF OF THE DEBTORS/MOVANTS</u>

8          MS. CHIARELLO:  I apologize, Your Honor.  Again

9    Annemarie Chiarello on behalf of Acis, L.P.

10         I think it's important to note here that we are post

11   confirmation.  We are really almost nearly two years post

12   confirmation.  And in a situation where a case has been closed

13   pursuant to a final decree, creditors would not have access to

14   this issue — this information.  This is not an absolute right of

15   creditor to get this information.  Even though that is — that is

16   the case, Acis is absolutely amenable to providing this

17   information to creditors.

18         Our concern is really having it available to

19   litigation counterparties and parties who not only previously

20   sued Acis but have — who have threatened to sue Acis, Brigade,

21   U.S. Bank, and even Moody's, the rating agency.  We believe we

22   have met our burden with respect to 107(b).  And given that we

23   have demonstrated that the information is confidential, under

24   107(b) the Court does not have discretion to permit this

25   information to be publicized on the docket.

*Closing Argument on behalf of the U.S. Trustee* 46

1     Like I have said, we have been amenable to Ms. Lambert
2  in providing this information to her in whichever — including
3  whatever revision she would like in the order with respect to
4  her and the United States Trustee having access to this
5  information, our concern is really related to litigation
6  counterparties. And I know that this is very unorthodox and
7  it's not typical for operating reports to be redacted, however
8  this is a very highly specific factual scenario that we don't
9  expect to be the case in other — in other bankruptcies.
10  Typically bankruptcies doesn't result in this type of satellite
11  litigation, and we're well aware of that. And we hope that
12  we're moving forward, where that isn't going to continue to be
13  the case. But given what's already occurred to — for Acis and
14  even though — even though Acis has the ability to defeat some of
15  these frivolous claims or suits filed in Guernsey, this doesn't
16  — we don't want to embolden litigation counterparties with
17  information that they should be able — if they think they're
18  entitled to, they can get a legitimate discovery.
19     So with that, Your Honor, we ask the Court to grant
20  our motion for redact — to redact Acis' quarterly operating
21  reports in a manner consistent with what you have seen of
22  Exhibit B.
23     THE COURT: All right. Thank you.
24     Ms. Lambert, closing argument.
25     CLOSING ARGUMENT ON BEHALF OF THE U.S. TRUSTEE

*Closing Argument on behalf of the U.S. Trustee* 47

1      MS. LAMBERT:  Yes, Your Honor.

2          On balance, the Court has two components here.  One

3  component is the public's access to information, information

4  that is used to evaluate compliance with the Code and the rules

5  and the plan.  And both the creditors and the public are

6  entitled to that information.

7          On this side, the debtor, Acis, or the

8  postconfirmation debtor contends that Stinson and Hunton should

9  not knock at their door and ask for information if they need it.

10 Over here we have the component of the contention that the

11 litigation against the debtor or the postconfirmation debtor

12 regarding compliance with the management agreement, compliance

13 with its fiduciary duties and similar, and the side effects for

14 Moody's and for — for other entities is a reason to protect

15 information that normally would be public in the bankruptcy

16 case.

17         The people over here should not have to knock on the

18 door because there is an issue about compliance.  Compliance is

19 a requirement of the Bankruptcy Code and rules.  And I know that

20 the Court and I have experienced cases both personally and in

21 observe where unfortunately people have gotten involved in

22 ongoing years of litigation.

23         Historically, Mr. Terry and Mr. Dondero and their

24 related entities had a business marriage.  Historically, that

25 business marriage has come to an end, but they still have a

*The Ruling of the Court*                                                48

1  child together, which is Acis.  And the reporting about that

2  child and the financial information about that child does not

3  change the obligation to comply with the legal requirements and

4  to comply with the contractual requirements.  If there is

5  litigation that is being filed, it is frivolous.  Federal rules

6  and the common law provide remedies for that, including remedies

7  that are sufficient to compensate for that.

8          In addition, even with the third-party litigation, to

9  the extent that it impacts the ability of Acis to do new

10 contracts, there are also mitigation remedies for that.  It's

11 unfortunate, but that is the factual situation that we have.

12 That factual situation is nonsufficient to limit the information

13 that is normally publicly required in this context.

14 Alternatively, the United States Trustee requests that the

15 motion be denied in its entirety or, alternatively, that it be

16 tailored in accordance with the prayer and the U.S. Trustee's

17 objection.

18                  THE RULING OF THE COURT

19          THE COURT:  All right.  Thank you.

20          Well, we're going — we're going to stop it right here.

21 I think that Mr. Dondero technically did not have standing here

22 today, that I think — I think Mr. Lynn weighed in and explained,

23 you know, that he felt compelled to weigh in on a potentially

24 precedential matter and so he's weighed in, and so we're going

25 to cut it off there.

APP. 1146
Appx. 01193

*The Ruling of the Court* 49

1     I have found this to be a somewhat tough call, tough

2  decision here today because, on the one hand, it sort of feels

3  like in this context, at this very late juncture of Acis'

4  Chapter 11, there's sort of a no-harm/no-foul situation.  We are

5  not only well past, more than a year and a half past

6  confirmation and the effective date, but we only have a couple

7  of creditors left at this point other than Highland and — who

8  gets the information pursuant to an agreement, or at least its

9  professionals and independent board members do and Mr. Terry

10  himself.  So it sort of feels a little bit like, eh, if I would

11  grant this motion, there are really likely only a couple of

12  parties-in-interest who are impacted, and they have gotten

13  notice, they haven't weighed in.  That is Hunton Andrews Kurth

14  and Stinson.  But 107 governs this motion.  And, as has been

15  noted, it talks in terms of everything being public record and

16  open to examination to the public without any charge.  And the

17  Court can deviate from this public access only on motion of a

18  party to protect a trade secret, or confidential research,

19  development, or commercial information, or to protect a person

20  with respect to scandalous or a defamatory matter contained in a

21  paper filed.  So that's the governing statute.

22     So looking at the evidence today, would these

23  quarterly operating reports and the numbers they reflect for

24  receipts and disbursements and whatnot, is this in the nature of

25  any of those elements of 107(b), I don't think it is.  The only

*The Ruling of the Court*                                                    50

1   thing that it might be is commercial information, but I really

2   don't think there's been a showing that it is of the nature that

3   107(b) is intended to address.

4         Now don't get me wrong, I am very troubled by some of

5   what I've heard today. I doubt Mr. Dondero is listening in

6   personally, but I'm going to say, and maybe it will get back to

7   him, maybe it won't, but that I'm very troubled by hearing that

8   Dondero-controlled entities, and I believe the DAF, based on

9   what I've heard in the past, is Dondero controlled, I'm very

10  troubled that Dondero-controlled entities are suing Acis and

11  parties that have dealt with Acis, U.S. Bank, Brigade, and the

12  Moody's one is really mind-boggling, but I'm very troubled that

13  this could be hampering Acis' ability to do a reset and it's

14  driving up expenses.

15        And if these lawsuits were brought before me through a

16  removal or any other mechanism, you know, first, I would have to

17  look at subject matter jurisdiction of the Bankruptcy Court.

18  Yes, we're way past the effective date of Acis' plan, but the

19  Fifth Circuit case authority provides that if there is a dispute

20  postconfirmation that bears on the interpretation,

21  implementation, or execution of a confirmed plan, then the

22  Bankruptcy Court has subject matter jurisdiction in that

23  context. And it sure sounds like, hearing Mr. Terry's version

24  of things today, which sounded very credible, that this is

25  potentially impinging on the reorganization and plan of Acis.

*The Ruling of the Court*                                             51

1          So it's very troubling to me that — well, I've said it

2    before in Highland hearings, that these battles just continue

3    on, but if it's impairing with a plan I confirmed, it's

4    impairing a plan I confirmed, it's impairing the ability to

5    perform under that plan, then that is a problem for the

6    plaintiffs.

7          Now I've heard there is no pending litigation in that

8    regard, but I'm troubled by the April 2020 letter I saw that is

9    essentially a suggestion we may start this up again, the

10   litigation that we dismissed.  It's just ridiculous, for lack of

11   a better term, that Dondero and his entities would be doing some

12   of the things it sounds like they're doing:  Suing Moody's, for

13   crying out loud, for not downgrading the Acis CLOs.  If Mr.

14   Dondero doesn't think that is so transparently vexatious

15   litigation, yeah, I'm going out there and saying that.  I

16   haven't seen it, but, come on.

17         So, bottom line, I don't find the 107 standard here is

18   met today, so I am denying entirely the motion.  I haven't been

19   convinced that this is commercial information that 107(b)

20   justifies redacting or sealing.  But, again, I am most troubled

21   by what I've heard today.

22         I have found Mr. Terry to be a very credible witness

23   today on these points.  He's testified in this Court many times

24   and I continue to find him a very credible witness.

25         And so to the extent Mr. Dondero is listening or gets

*The Ruling of the Court* 52

1    a transcript, I hope it's loud and clear to him that to the

2    extent you are engaging in efforts surreptitious or overt to

3    derail Acis in its reorganization, there is going to be a price

4    to pay for that. So I hope that message gets to him.

5           Very troubled, very troubled by what I've heard today.

6           All right. Well, I think that concludes our business

7    here today. Is there anything else anyone wants to raise?

8           MS. LAMBERT: Judge Jernigan, Ms. Lambert for the U.S.

9    Trustee. Would you like me to prepare an order just as for the

10   reasons stated?

11          THE COURT: I would like you to do that. Thank you

12   very much. All right.

13          MS. LAMBERT: And I think I will order the — I think I

14   will order the transcript and have it sent to Mr. Lynn.

15          THE COURT: All right. Thank you.

16       (The hearing was adjourned at 5:21 o'clock p.m.)

17                              —o0o—

18

19

20

21

22

23

24

25

State of California          )
                            )      SS.
County of San Joaquin        )


        I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of Texas, Office of the Clerk, of the proceedings taken on the date and time previously stated in the above matter.

        I further certify that I am not a party to nor in any way interested in the outcome of this matter.

        I am a Certified Electronic Reporter and Transcriber by the American Association of Electronic Reporters and Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.

                            Susan Palmer
                            Palmer Reporting Services

                            Dated September 26, 2020

# EXHIBIT 12

```
                   IN THE UNITED STATES BANKRUPTCY COURT
 1                    FOR THE NORTHERN DISTRICT OF TEXAS
                               DALLAS DIVISION
 2
                                    )   Case No. 19-34054-sgj11
 3   In Re:                         )
                                    )
 4   HIGHLAND CAPITAL               )   Dallas, Texas
     MANAGEMENT, L.P.,              )   June 30, 2020
 5                                  )   9:30 a.m. Docket
                                    )
 6          Debtor.                 )
                                    )   MOTION FOR REMITTANCE OF FUNDS
 7                                  )   HELD IN REGISTRY OF COURT
                                    )   FILED BY CLO HOLDCO, LTD.
 8   _____)   (590)

 9                        TRANSCRIPT OF PROCEEDINGS
               BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
10                  UNITED STATES BANKRUPTCY JUDGE.

11   WEBEX/TELEPHONIC APPEARANCES:

12   For the Debtor:             Jeffrey N. Pomerantz
                                 PACHULSKI STANG ZIEHL & JONES, LLP
13                               10100 Santa Monica Blvd.,
                                   13th Floor
14                               Los Angeles, CA  90067
                                 (310) 277-6910
15
     For the Debtor:             John A. Morris
16                               Greg Demo
                                 PACHULSKI STANG ZIEHL & JONES, LLP
17                               780 Third Avenue, 34th Floor
                                 New York, NY  10017-2024
18                               (212) 561-7700

19   For CLO Holdco, Ltd.,       John J. Kane
     Movant:                     Brian W. Clark
20                               KANE RUSSELL COLEMAN LOGAN, P.C.
                                 901 Main Street, Suite 5200
21                               Dallas, TX  75202
                                 (214) 777-4261
22
     For the Official Committee  Matthew A. Clemente
23   of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                                 One South Dearborn Street
24                               Chicago, IL  60603
                                 (312) 853-7539
25
```

                                                                         2

 1   APPEARANCES, cont'd.:

 2   For the Debtor:            Zachery Z. Annable
                                HAYWARD & ASSOCIATES, PLLC
 3                              10501 N. Central Expressway,
                                  Suite 106
 4                              Dallas, TX  75231
                                (972) 755-7104
 5
     For the Issuer Group:      Amy K. Anderson
 6                              JONES WALKER, LLP
                                811 Main Street, Suite 2900
 7                              Houston, TX  77002
                                (713) 437-1866
 8
     For the Issuer Group:      James T. Bentley
 9                              SCHULTE ROTH & ZABEL, LLP
                                919 Third Avenue
10                              New York, NY  10022
                                (212) 756-2000
11
     For Acis Capital           Rakhee V. Patel
12   Management GP, LLC:        WINSTEAD, P.C.
                                2728 N. Harwood Street, Suite 500
13                              Dallas, TX  75201
                                (214) 745-5250
14
     For Redeemer Committee of  Mark A. Platt
15   the Highland Crusader      FROST BROWN TODD, LLC
     Fund:                      100 Crescent Court, Suite 350
16                              Dallas, TX  75201
                                (214) 580-5852
17
     For Redeemer Committee of  Marc B. Hankin
18   the Highland Crusader      JENNER & BLOCK, LLP
     Fund:                      919 Third Avenue
19                              New York, NY  10022-3098
                                (212) 891-1600
20
     Recorded by:               Michael F. Edmond, Sr.
21                              UNITED STATES BANKRUPTCY COURT
                                1100 Commerce Street, 12th Floor
22                              Dallas, TX  75242
                                (214) 753-2062
23

24

25

3

1   Transcribed by:                Kathy Rehling
                                   311 Paradise Cove
2                                  Shady Shores, TX   76208
                                   (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
             transcript produced by transcription service.

4

```
 1              DALLAS, TEXAS - JUNE 30, 2020 - 9:37 A.M.

 2              THE CLERK:  All rise.

 3              THE COURT:  Good morning.  Please be seated.  This is

 4    Judge Jernigan, and I am ready to start our Highland setting.

 5    Let me start by getting appearances.  I see Mr. Kane there on

 6    the video for our Movant this morning on for CLO Holdco.  Is

 7    that correct?

 8              MR. KANE:  Yes, Your Honor.  Thank you.

 9              THE COURT:  Good morning.  All right.  Who do we have

10    for the Debtor?  Do we have Mr. Pomerantz or others from the

11    Pachulski firm?

12              MR. POMERANTZ:  Yes.  Good morning, Your Honor.  It's

13    Jeff Pomerantz and John Morris, and also on the phone is Greg

14    Demo, on behalf of the Debtors.

15              THE COURT:  Okay.  Thank you.

16              MR. MORRIS:  Good morning, Your Honor.

17              THE COURT:  Good morning to all of you.  All right.

18    What about for the Unsecured Creditors' Committee?  Do we have

19    Mr. Clemente or Ms. Reid or others?

20              MR. CLEMENTE:  Yes.  Good morning, Your Honor.

21    Matthew Clemente from Sidley Austin on behalf of the

22    Creditors' Committee.

23              THE COURT:  Okay.  Good morning.

24              MR. CLEMENTE:  Good morning.

25              THE COURT:  All right.  I'll just say, do we have
```

5

```
 1    some of our other usual participants, maybe someone from Acis,

 2    Ms. Patel or Ms. Chiarello?  No?

 3              MR. ANNABLE:  Your Honor, --

 4              THE COURT:  Oh.

 5              MR. ANNABLE:  -- this is Zachery Annable --

 6              THE COURT:  Oh.

 7              MR. ANNABLE:  Your Honor, --

 8              THE COURT:  Good morning.

 9              MR. ANNABLE:  -- this is Zachery Annable.

10              THE COURT:  All right.  Good morning, Mr. Annable,

11    also for the Debtor.  Any other --

12              MS. ANDERSON:  Oh, sorry.

13              THE COURT:  Oh.  Go ahead?

14              MS. ANDERSON:  Yes.  Sorry, Your Honor.  I

15    (inaudible).

16              MS. PATEL:  Good morning, Your Honor.  Rakhee Patel

17    on the phone.  I'm not planning on participating.  We're just

18    listening in today.

19              THE COURT:  All right.  Any other counsel wishing to

20    appear this morning?

21              MS. ANDERSON:  Good morning, Your Honor.  Oh.

22              THE COURT:  Go ahead.

23         (No response.)

24              THE COURT:  Do we have -- is that maybe Ms. Anderson?

25              MS. ANDERSON:  That was, Your Honor.  I apologize.
```

6

1    This is Amy Anderson with Jones Walker on behalf of the

2    Issuers.  And Mr. James Bentley with Schulte Roth & Zabel is

3    also on the phone this morning.

4          THE COURT:  All right.  Good morning to you both.

5    Any other people wishing to appear?

6          MR. PLATT:  Your Honor, Mark Platt for the Redeemer

7    Committee of the Highland Crusader Fund.  And Marc Hankin from

8    Jenner & Block is on the phone as well.

9          THE COURT:  Okay.  Good morning to you both.

10          MR. HANKIN:  Good morning.

11          THE COURT:  Anyone else?

12          MR. CLARK:  Your Honor, this is Brian Clark from Kane

13    Russell.  I'm here with Mr. Kane on behalf of CLO Holdco.

14          THE COURT:  Okay.  Good morning.

15          MR. CLARK:  Good morning.

16          THE COURT:  All right.  Anyone else?

17       All right.  Well, I'll start by asking:  Do we have any

18    stipulations or agreements with regard to evidence or how

19    we're going to proceed this morning?

20          MR. KANE:  Yes, Your Honor.  This is John Kane for

21    CLO Holdco.  We do.

22          THE COURT:  All right.

23          MR. KANE:  I would like to note on that question that

24    we've actually worked very well together.  CLO Holdco has had

25    a pretty open discourse with Committee's counsel and got on

7

 1  the phone yesterday to go through any final evidentiary

 2  issues, and then had some follow-up late last night.  And so

 3  what we'd like to announce to the Court is that there's a

 4  stipulation to the admissibility of all of the exhibits in

 5  both parties' witness and exhibit list.

 6          THE COURT:  All right.

 7          MR. KANE:  And on top of that, there are a number of

 8  factual stipulations.  And I can walk through that on our kind

 9  of case-in-chief presentation, or we can walk through that

10  now, either way, whichever is most convenient for the Court.

11      The actual stipulations are largely related to what is and

12  isn't a dispute in this hearing.

13      So, the Committee has stipulated that, for the purposes of

14  this hearing, there is no contest about the amount in

15  controversy.  CLO Holdco is claiming that it is entitled to

16  the full amount of the funds in the registry, and there's

17  really no dispute about the amount that CLO Holdco is

18  asserting its interest in.  There's no accounting concerns

19  here.

20          THE COURT:  Okay.

21          MR. KANE:  There is also a stipulation for the

22  purposes of this hearing that I do believe bears reading into

23  the record, and I'd like to do that on the case-in-chief, just

24  to make sure that everything is clear, we're not overstating

25  or understating any party's position.

8

```
 1              THE COURT:  Okay.

 2              MR. KANE:  But, in summary of that, there's really no

 3    dispute that, upon CLO's obtaining the interests in the

 4    Dynamic and AROF Funds, it did not, after obtaining them,

 5    later transfer that interest to any other party.

 6              THE COURT:  Okay.

 7              MR. KANE:  And then, finally, Your Honor, this was

 8    reached late last night:  There is a stipulation between the

 9    parties for the purposes of this hearing to a statement made

10    by the Debtor in a footnote that essentially states that there

11    was a transfer of a note from the Dugaboy Trust, it's a note

12    payable owed by the Dugaboy Trust, to the Get Good Trust, that

13    that $24 million note was transferred to the Debtor, and that

14    the principal paid down on that note has reduced the

15    obligation from about $24 million to about $17.5 million in

16    principal obligations, and that the Dugaboy Investment Trust

17    has been paying amounts due and owing under that note to the

18    Debtor.  We'll go into a little bit more detail about why

19    that's relevant in our case-in-chief and in our closing

20    argument.

21              THE COURT:  All right.

22              MR. KANE:  I think the way we'd like to proceed, Your

23    Honor, is each side provide an opening statement, and then

24    we'll transition to showing our case-in-chief and kind of a

25    walk-through of the evidence, and then a closing argument to
```

1    kind of draw things to a conclusion, Your Honor.

2      I will say that, given the stipulation reached last night

3    on the payments on the Dugaboy Trust, we do not believe that

4    the testimony of Mr. David Klos is going to be necessary any

5    longer.

6          THE COURT:  All right.  Let me recap a couple of

7    things.  First, there was the stipulation as to the

8    admissibility of each other's exhibits.  The Movant's

9    exhibits, your exhibits, Mr. Kane, were filed at Docket Entry

10   No. 782, so that's where I'm going to look today as exhibits

11   are referenced.

12     Now, I know there were some sealed documents in the list

13   of exhibits.  I show Exhibits 11, 12, 13, 14, 15, and 16 are

14   actually under seal.  All right.

15         MR. KANE:  Yes, Your Honor.

16         THE COURT:  So, then turning to the Creditors'

17   Committee, their exhibits are at Docket Entry No. 789 on

18   PACER.  They have three exhibits.

19     So those are the exhibits for the record that we're

20   talking about, correct?

21         MR. KANE:  Yes, Your Honor.

22         MR. CLEMENTE:  That's correct, Your Honor.

23         THE COURT:  Okay.  Thank you.

24     And then the last thing I wanted to clarify is your

25   comment about there's no contest about the amount in

10

1   controversy.  So, dollars and cents, are we talking about

2   $1,516,354.38 related to the Dynamic Fund and then $898,075.53

3   regarding the Argentina Fund?

4           MR. KANE:  Yes, Your Honor.

5           THE COURT:  Okay.  Very good.

6           MR. KANE:  John Kane for CLO.  Yes, Your Honor.

7           THE COURT:  Okay.  Thank you.  All right.  Well, you

8   may make your opening statement.

9           MR. KANE:  Thank you, Your Honor.

10          OPENING STATEMENT ON BEHALF OF CLO HOLDCO, LTD.

11          MR. KANE:  So, I would like to begin with just making

12  sure that we have -- we've set the stage for this dispute as

13  well as I can here.  I want to look at, Your Honor, the

14  requests for relief that are before this Court.

15      So, CLO has requested that this Court remit funds from its

16  registry.  And there is no other (inaudible) request for leave

17  by any other party.

18      There is no adversary proceeding against CLO Holdco filed

19  by the Committee.  There are no claims or causes of action of

20  any kind asserted by the Committee.  There is no objection to

21  CLO Holdco's proof of claim on file.  There is no motion for a

22  prejudgment writ of attachment, and there is no motion by the

23  Committee for an injunction.  And we'd argue that that would

24  be procedurally improper anyway.

25      The only thing that the Committee has done is objected to

11

1    this Court's release of funds from the registry to CLO Holdco.

2        Your Honor, this is a -- this is a registry dispute.    This

3    is a dispute under Title 28 of the United States Code, Section

4    2042.    And under that statute,   CLO Holdco has the burden of

5    proof here to show by a preponderance of evidence that it has

6    a valid legal claim to the funds in the registry of the Court.

7        So, how does it prove by a preponderance of the evidence

8    that it has that claim?    Courts looking at this issue show

9    that CLO Holdco has to show that it has title to the funds, it

10   has to provide evidence of ownership, and it has to show proof

11   that that claim is current.    In other words, it's not an

12   unliquidated claim, it's not a claim that's been transferred

13   to somebody else or that's possessed by some other party.

14       So, Your Honor, what is the evidence going to show in this

15   case?  And as we walk you through our case-in-chief, we think

16   it's going to be very clear that the evidence will show that

17   CLO Holdco obtained an interest in what we are going to refer

18   to as the Dynamic and the AROF Funds.    Those interests are

19   evidenced by executed subscription agreements.    Once they were

20   in CLO Holdco's possession, those interests weren't

21   transferred to any other party.

22       The Dynamic and the AROF Funds were liquidated.    The

23   Debtor accounted for CLO Holdco's interests in those funds.

24   The Debtor sought to distribute those funds to CLO Holdco.

25   There is no dispute over the amount of CLO Holdco's liquidated

1   interests in those funds.  And now CLO Holdco is seeking a

2   request for the remittance of those funds from the registry of

3   the Court.

4        Your Honor, our evidence will completely establish that

5   CLO Holdco has a claim, a valid, legal claim well beyond the

6   preponderance of the evidence standard.

7        Your Honor, those, the facts, the evidence that proves up

8   each of those elements are not subject to any objection and

9   are not refuted.

10       Based on that evidence, Your Honor, the bigger question to

11  CLO Holdco is why are fighting in this contested matter?  We

12  have to look to the Committee's objection here.  What are they

13  really arguing?

14       The Committee's argument is essentially a guilt-by-

15  association argument.  There's a suggestion in the Committee's

16  objections that James Dondero did bad things.  CLO Holdco is

17  this related entity, and so it must have done bad things, too.

18  The Committee needs time to investigate potential claims and

19  causes of action, and because CLO Holdco is a Cayman entity,

20  any judgment that it might hypothetically obtain in the future

21  will be uncollectable unless these funds are seized and held

22  in the registry of the Court and used as a surety against that

23  later hypothetical judgment.

24       So, Your Honor, this is an evidentiary hearing, and what

25  we would ask the Court to do is scrutinize the evidence.

13

 1      So, what is the Committee's evidence likely to show?

 2    Well, there are only three exhibits submitted by the

 3    Committee.  One of them is the Acis opinion that you issued on

 4    the involuntary file.  The second is the Acis opinion you

 5    issued confirming the plan of reorganization in that case.

 6    And those two opinions combine for a grand total of two total

 7    references to CLO Holdco.  And the third exhibit proposed by

 8    the Committee is a transcript of the March hearing on the

 9    distribution motion, in which there really were no evidentiary

10    issues addressed associated with CLO Holdco at all.

11      So the better question becomes, Your Honor, what elements

12    is missing?  And as we go through our case-in-chief, we'd ask

13    you to consider the following.  The Committee will provide no

14    evidence that it pursued any discovery from CLO Holdco in the

15    ten weeks since CLO Holdco filed its motion for remittance of

16    funds from the registry.  There were no follow-up questions

17    asserted by the Committee in response to CLO Holdco's

18    deposition by written questions and David Klos' responses to

19    those questions.  The Committee did not subpoena any witness

20    to testify at this hearing, and they've presented no evidence

21    of wrongdoing by CLO Holdco. And finally, the Committee will

22    show that there is no evidence whatsoever regarding CLO's

23    ability to satisfy a money judgment, should the Committee

24    obtain that judgment in the future.

25      So, if we look at the scope of the evidence that's

1    presented by the parties in this case, we have CLO Holdco

2    presenting overwhelming evidence of a present valid legal

3    claim to the funds in the registry of the Court, and no

4    evidence submitted by the Committee to refute that fact, and

5    no claim for affirmative relief by the Committee or any

6    evidence that would be necessary to prove up any claim for

7    relief.

8         So, Your Honor, based on the evidence that you will hear

9    today, we ask that this Court deny the Committee's objection

10   and grant CLO Holdco's motion.

11        You will see that there is no evidence supporting any kind

12   of injunction or prejudgment writ of attachment, and that the

13   -- that CLO Holdco has satisfied its burden of proof by a

14   preponderance of the evidence to show ownership of the funds

15   in the registry that this Court holds as a statutory trustee

16   for its benefit.

17        Thank you.

18             THE COURT:  All right.  I am going to interject

19   something here.  I'm glad that the March 4, 2020 transcript is

20   part of the evidence here, because I have to say -- I had

21   wanted to go back and look at that, and had not done it, and

22   this is why -- your words, Mr. Kane, were, Why are we fighting

23   this contested matter?  I have to say, I had the same reaction

24   myself, but with a slightly different spin on it.  I thought

25   this was a pragmatic solution that everyone agreed to on March

15

```
1   4th.  I don't think CLO Holdco, Ltd., your client, made a
2   formal appearance at the hearing on March 4th, but I take it
3   you all got notice of the hearing.
4       Tell me why so quickly we're revisiting this issue.
5   That's the way I look at it.  Maybe my perspective is not
6   accurate and you're going to tell me it's not accurate.  But
7   it feels like to me we just were here on this issue with the
8   Debtor's own motion filed February 24, wanting a court order
9   blessing these disbursements to affiliated or potentially
10  insider parties who were due to receive these funds, and then
11  things just sort of evolved at the March 4th hearing where
12  everyone would agree that the money -- I guess at least the
13  money that was owed to your client, as well as Highland
14  Capital Management Services, Inc. -- would be kept in the
15  registry of the Court, just as a placeholder.  Okay?  So
16  that's the perspective I come in with.  That is my memory of
17  what happened.  Tell me why I'm not seeing it the way you're
18  seeing it.
19          MR. KANE:  Yes, Your Honor.  For the record, John
20  Kane for CLO Holdco.  I'd be happy to address the Court's
21  question.
22      That motion was filed seeking relief on essentially an
23  expedited basis.
24      I'm sorry.  I don't know if I cut out there.  I had a
25  little glitch on my screen.
```

16

1        But that hearing sought relief, in essence, on an

2    expedited basis, and drew a vehement objection from both the

3    Committee and also the Acis parties, Mr. Terry and the like.

4        When we looked at that issue, we determined that there was

5    likely a reasonable solution.  CLO Holdco's representative,

6    Grant Scott, had conversations with Judge Nelms, one of the

7    Independent Directors for the Debtor, discussing the

8    resolution of a -- of a proposal that would resolve some of

9    what we understood to be the Debtor's concerns about its

10   duties to distribute those funds.

11       It would not be a permanent solution.  At least, that was

12   our understanding.  Putting funds into the registry of the

13   Court would preserve the issue of CLO Holdco showing this

14   Court that it had a legal entitlement to those funds, as

15   opposed to proceeding with some dispute over the technical

16   merits of the Debtor's right or need legally to distribute

17   those funds to the parties.

18       So we felt like it was a reasonable remedy to satisfy the

19   Debtor's concerns and also to satisfy the Committee's

20   concerns.  The Committee would have an opportunity to continue

21   discovery and to take discovery following the filing of that

22   motion, as we sought to prove to this Court that we have a

23   right to the funds, to dispel any concerns that the Court

24   might have.

25       And frankly, Your Honor, I think that there is some case

17

 1  law out there that would suggest that you had a right to

 2  deposit the funds in the registry of the Court.  So we didn't

 3  think that there was any issue whatsoever with depositing the

 4  funds in the registry, understanding that that would allow us

 5  an opportunity to prove to you at a later date that we had a

 6  right to remove those funds from the registry.

 7      And Your Honor, I'm happy to try and dig through it real

 8  quick, but there's language in the transcript that talks about

 9  the preservation of the rights of the parties whose funds

10  would be pled into the registry to then go seek the funds out

11  of the registry as part of that agreement.  So that's exactly

12  what we're doing.  The issue here for us, Your Honor, is that

13  we can establish our burden of proof that we have a right to

14  these funds.

15      I understand that the Committee had concerns.  Right?  I

16  mean, they're a little bit in the same position as the Debtor.

17  I understand, as a practitioner, why the Committee had reason

18  to want to scrutinize the transactions involving CLO Holdco as

19  a related entity.  That doesn't mean that they have a

20  (inaudible) right to preclude those distributions, and that's

21  why we're here.

22      So we've now had ten weeks for the Committee to perform

23  discovery, to heavily scrutinize the nature of the

24  transactions involving CLO Holdco.  Leading up to this

25  presentation to the Court of our evidence that we have a legal

1  and factual right to have these funds back out of the registry

2  under Title 28 of the U.S. Code, the Committee didn't do any

3  discovery at all on these issues.  At least, not to CLO

4  Holdco.

5      So we believe that we're here trying to show the Court,

6  okay, we want to dispel the Court's concerns.  The Committee

7  has had an opportunity to scrutinize these transactions.  But

8  we'd like our money.  There are operational needs and the

9  like.  We would like to have our funds.  And we believe that,

10  unequivocally, the funds that are in the registry of the Court

11  are CLO Holdco's.  They're not subject to a claim of any other

12  party.

13      So that, Your Honor, is why we've submitted our motion

14  seeking a recovery of the funds from the registry.

15          THE COURT:  All right.  So, I think what I hear you

16  saying is that on March 4th you all were agreeable to this

17  money being put into the registry of the Court, but everyone

18  understood that you were, pretty promptly after March 4th,

19  going to file a motion to get an adjudication on why you

20  should get these funds.  Is that what you're saying?

21          MR. KANE:  What I'm saying, Your Honor, is, at the

22  time, we didn't have any problem with the funds being pled

23  into the registry of the Court, understanding that we had

24  reserved our right to later seek the funds from the registry.

25          THE COURT:  Well, --

19

```
 1              MR. KANE:  I'm not sure --

 2              THE COURT:  -- again, I --

 3              MR. KANE:  I'm not sure what the commitment says.

 4              THE COURT:  Maybe I'm splitting hairs, but we were

 5    here in March, and then April 15th you file the motion.  And,

 6    you know, I'm -- it just -- I guess I'm trying to understand.

 7    You know, we were here to litigate this in March, and then

 8    this, you know, kind of status quo agreement was reached.  And

 9    then a month later, about a month later, you're filing the

10    motion to tee up the issue all over again.

11        It's just -- it's not what I anticipated.  Yes, I knew

12    everyone was reserving their rights, but it wasn't what I was

13    anticipating.  You know, if I had known a month later that one

14    of the parties who was agreeing to this was going to be filing

15    a motion, I would have just said, you know, why don't we do

16    this today.

17        So, again, I'm asking:  Am I just misremembering this?

18    Did everyone but me have a clear idea that, pretty promptly

19    after March 4th, you all were going to ask to come back on,

20    you know, a non-expedited basis for the Court to adjudicate

21    what was already teed up that day to be adjudicated?

22              MR. CLEMENTE:  Your Honor, the --

23              MR. KANE:  Your Honor, I can't speak to the other

24    parties' understanding.

25              THE COURT:  Okay.  Mr. Clemente was kind of raising
```

20

 1   his hand to speak up.

 2           MR. CLEMENTE:  Yes.

 3           THE COURT:  Am I going down a trail here that I'm the

 4   only --

 5           MR. CLEMENTE:  No.

 6           THE COURT:  -- I'm the only one --

 7           MR. CLEMENTE:  No, you're not.

 8           THE COURT:  Okay.  Mr. Clemente?

 9           MR. CLEMENTE:  No.  No, you're not, Your Honor.  I

10   have a couple comments, and I have much more to say,

11   obviously.  But just direct on what Your Honor said:  Nothing

12   has changed since March 4th.  I think that is fair to say.

13   And interestingly, in the initial motion, you know, this idea

14   of the 28 U.S. 2042 governing and it becoming a simple issue

15   of taking the time regarding amounts or ownership of the money

16   in the registry was not raised in the motion.  So I found that

17   kind of interesting.

18       But I was before you, Your Honor.  And you'll recall on

19   March 4th that -- that's absolutely not.  I thought what we

20   were doing was merely preserving the status quo for some

21   period of time, which is what I believe Your Honor is

22   suggesting that she recalls as well.

23       It would have been, I think, a little counterintuitive for

24   us to have all been there, ready to do that litigation, and

25   then decide to put something in the registry, and then have

```
1   the argument that you can't look at the Bankruptcy Code to
2   determine whether the money should come out of the registry or
3   not, and then be back in front of you, you know, three or four
4   weeks later to relitigate any of those issues.
5       So that was absolutely my recollection and understanding,
6   Your Honor, and I think from your comments I intuit that it
7   was your understanding as well, that this was not something
8   that we were going to deal with again very quickly, but was
9   something to preserve the status quo, a reasonable solution,
10  an equitable solution under Section 105.  And I believe that's
11  what Your Honor ordered.
12          THE COURT:  All right.  Well, I'll let you go ahead
13  and make your opening statement.  I think Mr. Kane was
14  finished before I started asking my questions.
15          MR. CLEMENTE:  Okay.
16          THE COURT:  Mr. Clemente, you may proceed.
17          MR. CLEMENTE:  Thank you, Your Honor.  I appreciate
18  that.  So, and I'll try and be brief on the opening.
19    OPENING STATEMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF
20                      UNSECURED CREDITORS
21          MR. CLEMENTE:  Your Honor, like it or not, CLO Holdco
22  is not an independent, unrelated, third-party investor merely
23  seeking distributions on account of its own arm's-length
24  independent investments.  Instead, CLO is a related party in
25  literally every sense of the word.  That's not in dispute.
```

22

1  That is part of the Jim Dondero or Mr. Dondero web of

2  entities.

3      CLO Holdco is effectively controlled by Mr. Dondero.  It

4  was seeded and received assets transferred from the Debtor,

5  including the assets giving rise to the distribution that's in

6  the registry.  None of that is in dispute.  All of this at a

7  time when Mr. Dondero controlled the Debtor as well as the

8  parties through the various intermediate transactions that

9  ultimately resulted in the assets arriving in CLO Holdco.

10 That is not in dispute.

11     Mr. Dondero's past fraudulent conduct, including

12 fraudulent transfers, is also not in dispute.  He was on all

13 sides of this transaction.  And therefore this transaction,

14 along with many of the others, must be viewed with skepticism

15 and scrutinized very closely by the Committee and by this

16 Court.

17     The Committee has only just begun such work, Your Honor.

18 And given the Byzantine empire created by Mr. Dondero, it will

19 take time and significant resources to fully and properly

20 conduct an investigation.

21     And Mr. Kane referred to, did we do discovery?  We did

22 not.  Our reaction to this motion was the same as Your Honor.

23 And as you can see by the stipulations that we have agreed to

24 for purposes of this hearing, we didn't want this to be a

25 situation where the estate would spend a tremendous amount of

 1   resources to deal with something that we thought that was

 2   dealt with on March 4th.

 3        But aside from that, given the web that's been created

 4   here, we can't just isolate one piece of it.  We can't just be

 5   like, I'm going to look at the CLO Holdco documents and be

 6   able to develop a full theory.  This is a tapestry of

 7   interrelated entities that is opaque and vague and purposely

 8   so.  So you can't just focus on one piece and then try and

 9   say, well, I know what this piece is, because that piece has

10   many interrelated complex ramifications and relationships

11   where, frankly, you can't just say, okay, let's focus on this

12   one issue, because you're going to miss the entire tapestry.

13        We still need to examine, as I mentioned, the whole thing,

14   and this takes time and it takes an investment.  So while I

15   understand CLO Holdco wants to receive its distribution, I

16   also understand that my constituency wants to be paid, some of

17   whom have been waiting for over a decade.

18        To be clear, Your Honor, my constituency didn't choose to

19   be here in the bankruptcy.  But CLO Holdco chose to associate

20   itself with Mr. Dondero and to take assets from Highland in

21   convoluted related-party transactions and reap the benefits of

22   those transactions.  CLO Holdco can't now step away from that

23   and try and suggest to Your Honor that this is about taking

24   time under 28 U.S.C. 2042.  That was never what it was about

25   on March 4th, and it's not what it's about today.

24

 1     Instead, it's about the overall situation and why we find

 2   ourselves here.

 3     And Your Honor, I'm here to tell you, I think, and I

 4   believe Your Honor would agree, that the Bankruptcy Code and

 5   Section 105 and all the other provisions of the Code are alive

 6   and well in this courtroom, despite the distribution being put

 7   into the registry on March 4th.

 8     You clearly found you had the authority under Section 105

 9   to hold the funds, nothing has changed in the intervening

10   time, and therefore the funds should remain in the registry.

11     This is not a dispute under, you know, 28 U.S.C 2042 about

12   ownership, again, or where somebody pleads an amount in the

13   registry to let other people argue that they actually owned

14   the money.  This was always about preserving the estate and

15   maintaining the status quo.

16     Such a result might be unfair if it was a different party,

17   but CLO is a related party controlled by Mr. Dondero.  It's

18   not an unaffiliated party.

19     So, from our perspective, the motion should be denied,

20   Your Honor.

21        THE COURT:  All right.  Thank you.

22     I assume no one else has an opening statement because

23   there were no other pleadings filed regarding this motion.

24     All right.  Mr. Kane, let's turn to your evidence.

25        MR. KANE:  Thank you, Your Honor.  I'll tell you

25

1  what.  Just to make sure that we're hitting on the issue that

2  was out in front of this Court a moment ago, I'd like to start

3  by just directing the Court's attention to the Committee's

4  Exhibit 3 or Exhibit C, which is a transcript of that hearing

5  from March.

6         THE COURT:  Okay.

7         MR. KANE:  And Your Honor, Page 119, Lines 4 through

8  11, are your statements about what you were doing entering the

9  order.  And you know, when the funds are being pled into the

10 registry of the Court, but I do think the Court has broad

11 equitable powers to remedy, to fashion remedies that preserve

12 the status quo.  And I think it is appropriate here to order

13 that most of this money, that most of the $8.6 million that

14 would go to related investors in these three Funds -- this is

15 the important part -- be put into the registry of the Court

16 pending further motions, orders, adversary proceedings anyone

17 wants to file to make a claim to that money.

18     So, Your Honor, that's what we did.  We -- the rights were

19 reserved.  CLO Holdco made a motion, filed its essentially

20 claim to the money that's in the registry of the Court.

21     So, Your Honor, I'd like now to just briefly walk through

22 the exhibits, because I think it's important to understand

23 exactly what CLO Holdco's claim to the funds really is.

24     So, Your Honor, first, I'd like to move for the admission

25 of CLO Holdco's Exhibits 1 through 16 and all subparts.

26

1          THE COURT:  All right.  Well, I understood earlier

2    there is a stipulation to the admissibility of these.  So, for

3    the record, I am admitting CLO Exhibits 1 through 16 in their

4    entirety, and they appear at Docket Entry 782.  All right?

5          MR. KANE:  Thank you, Your Honor.

6      (CLO Holdco's Exhibits 1 through 16 are received into

7    evidence.)

8          MR. KANE:  Your Honor, Exhibit 1A is the Highland

9    Capital Loan Fund, LP subscription agreement.  Now, this

10   subscription agreement is in the amount of $2,032,183.24 and

11   is dated December 28, 2016.

12     You'll notice that CLO Holdco obtains an interest in the

13   Highland Capital I Fund through a transfer in kind.  Schedule

14   1 to Exhibit 1A shows the progression of this interest,

15   admittedly, from the Debtor to the Get Good Trust down through

16   a series of charitable entities, through the Charitable DAF,

17   to CLO Holdco.

18     Your Honor, Exhibit 1B, we've included just make sure

19   everybody's on the same page.  The Highland Capital Loan Fund,

20   LP, in which H -- CLO had the subscription interest, had a

21   name change to essentially what we were referring to as the

22   Dynamic Fund.  It was changed to Highland Dynamic Income Fund,

23   LP.  So when there are references to the Highland Capital Loan

24   Fund subscription, it's really a reference to the subscription

25   in the Dynamic Fund.

```
1      Exhibit 1C is Highland Argentina Regional Opportunity Fund
2   Limited subscription documents.  This is a $2.5 million
3   subscription dated June 6, 2018, showing that CLO Holdco
4   obtained its $2-1/2 million subscription in the AROF Fund by
5   payment.
6      Exhibit 1D is a NAV statement dated November 11, 2019
7   showing CLO Holdco's interest in the Dynamic Fund totaled
8   $1.689 million and change.
9      Exhibit 1E is the NAV statement from December 31, 2019
10  from the AROF Fund showing that CLO Holdco's interests in that
11  fund were valued at $918,905.82.
12     Exhibits 1F and 1G are the investment management
13  agreements for Dynamic and AROF.  And then Exhibits 1H and 1I
14  are the Dynamic LP agreement and the AROF LP agreement.
15     We can skim over Exhibits -- well, actually, I'd like to
16  point to Exhibit 2 and note that there are no (inaudible)
17  related to any CLO Holdco wrongdoing in the Committee's (audio
18  gap) to the -- CLO Holdco's motion for remittance of funds
19  held in the registry of the Court.
20     Also, on Paragraph 10, the Committee acknowledges that, in
21  exchange for the transfer of the Dynamic interests, the Get
22  Good Trust transferred the Dugaboy Trust note of about $24
23  million.
24     And in Paragraphs 17 and 18, the Committee acknowledges
25  that it had been pursuing discovery on CLO Holdco obtaining
```

1    interests in the Dynamic Fund since early February.

2         Your Honor, Exhibit 3 is CLO Holdco's reply to the

3    Committee.  Exhibit 4 is the notice of hearing.  Exhibit 5 is

4    the Debtor's February 4th -- or, 24th distribution motion.

5    And Your Honor, we have a stipulation between the Committee

6    and CLO Holdco for the sake of this hearing to the facts

7    included in Footnote 7.

8         So, in Footnote 7, the Debtor states, I'll read it into

9    the record for the Court:

10        The limited partnership interests in Dynamic held by

11        CLOH, CLO Holdco, were originally held by the Debtor.

12        The  Debtor  transferred  those  interests  to  the  Get

13        Good   Nonexempt   Trust,   defined   as   Get   Good,   on

14        December 28, 2016, in exchange for 97.6835 percent of

15        Get  Good's  interest  in  a  promissory  note  in  the

16        original   principal   amount   of   approximately   $24

17        million issued by the Dugaboy Investment Trust.  Get

18        Good   subsequently   transferred   its   interests   in

19        Dynamic   to   Highland   Dallas   Foundation,   which

20        transferred  those  interests  to  CLO  Holdco.   The

21        Dugaboy Investment Trust has been paying amounts due

22        and owing under the $24 million note, and the current

23        principal amount is approximately $17.5 million.

24        Your Honor, that's an important fact, and I'll get to that

25    in just a moment.  But one of the reasons why that's an

 1  important fact is the Dugaboy Investment Trust note is

 2  actually (audio gap) note with a balloon payment due at

 3  maturity.  So, paydown of the principal means that the Dugaboy

 4  Trust is actually paying Highland Dallas Foundation principal

 5  payments on that note, despite not having a strict contractual

 6  obligation to do so until the maturity date, which expires in

 7  another 16 years.  So it's been paying principal that it

 8  doesn't have to pay, and interest on the note, which was

 9  exchanged for the Dynamic and other interests transferred to

10  the Get Good Trust.

11      Your Honor, the next exhibit is Exhibit 6.  This is the

12  Committee objection to the distribution motion.  We'd also

13  note that there is no reference to any bad acts by the

14  Committee alleged against CLO Holdco other than simply having

15  a relationship with James Dondero and the fact that its

16  investments were managed by Highland.  And that's included in

17  Paragraph 11 of that pleading.

18      7 is the Debtor's reply to the Committee's objection.

19      8 is the Debtor's responses to CLO Holdco's deposition by

20  written question.  Your Honor, this has been stipulated as

21  admissible in full by the Committee.  And we think that this

22  is important because, starting on Page 7 of this exhibit,

23  David Klos, the chief accountant -- or, the chief accounting

24  officer of Highland Capital Management, LP, the Debtor, walks

25  through the Debtor's means for determining ownership, the

30

1  accounting for interests, the liquidation of Funds, and

2  determining amounts due from the proceeds of those Funds to

3  CLO Holdco for both the Dynamic and the AROF Funds.

4      So, again, Your Honor, the Committee is not stipulating

5  that the Debtor has appropriately performed this function and

6  that the amounts that are purportedly due from the Debtor's

7  liquidation of these Funds to the Committee is accurate.

8      Number 9, Your Honor, is a stipulation regarding CLO

9  Holdco's lack of a transfer of any interests in Dynamic and

10  the AROF Funds.

11      I noted for Your Honor at the beginning of my open that

12  this was a stipulation I really did want to read into the

13  record.  I want to be fair to the Committee, and there are

14  some limitations on this stipulation.  So what I'd like to do

15  is read this, then.  This is an email statement from Allison

16  Stromberg of Sidley on behalf of the Committee.  And Mr.

17  Clemente is cc'd on this email dated June 22, 2020:  "With a

18  few edits, we can agree to the stipulation for the purposes of

19  the June 30 hearing."  And this is the edited version that Ms.

20  Stromberg proposed:

21          "The Committee and CLO stipulate  to  the  following,

22          solely for the purposes of this hearing.  Grant Scott

23          represented  to  the  Committee  that  CLO  Holdco,  Ltd.

24          did  not,  after  obtaining  the  disputed  interests  in

25          the  entities  commonly  referred  to  as  the  Dynamic  and

1          the AROF Funds, transfer those interests to any other

2          party.   The Committee, solely for the purposes of

3          this hearing, does not contest that assertion and

4          stipulates to that fact.  This stipulation shall not

5          be binding on the Committee in any future proceedings

6          and shall not have any preclusive effect against the

7          Committee in any future disputes, contested matters,

8          adversary proceedings, or other legal matters between

9          the Committee and CLO or any other party.  Further,

10         this stipulation shall not in any way preclude or

11         limit the Committee from asserting claims or causes

12         of action against CLO in the future, including but

13         not limited to claims challenging the validity of

14         CLO's disputed interest and/or transactions through

15         which CLO Holdco obtained such disputed interests or

16         claims to avoid and recover such disputed interests

17         in the Dynamic and AROF Funds or their proceeds."

18    Your Honor, for the sake of this hearing, no dispute that

19 when CLO obtained those interests, it didn't transfer them to

20 any other party.

21    Exhibit 10 includes another stipulation between

22 Committee's counsel and CLO Holdco's counsel.  And this

23 relates to some of the exhibits that are already in the

24 record.  And for that, Your Honor, we can skim over this.

25    When the motion was initially filed, we had a signature

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1187 of 2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 1186 of 2722
Case 19-34054-sgj11 Doc 802 Filed 07/02/20    Entered 07/02/20 18:59:24    Page 32 of 100

32

1    page issue on one of the exhibits and a metadata strip on

2    another exhibit that we corrected.  We provided the corrected

3    exhibits to the Committee.  The corrected exhibits were

4    included with this motion.  And it's noted in our witness and

5    exhibit list which corrected exhibits those are.  They'll be

6    1A and 1C.

7        Exhibit 11, Your Honor, is an important exhibit for us.

8    And we would direct the Court's attention to Page 3 of this

9    exhibit.  So, on Page 3, there is a list of debits and credits

10   associated with the Highland Argentina Regional Opportunity

11   Fund statement of accounts -- essentially, a bank statement

12   from June 6, 2018 to June 30, 2018.

13       You'll note, Your Honor, that there is an incoming source,

14   an incoming wire transfer from CLO Holdco, Ltd., which

15   credited the AROF account by $2.5 million.  That's the date of

16   this subscription agreement, Your Honor, and it's consistent

17   with the subscription agreement statement that shows that CLO

18   Holdco obtained a subscription in the AROF Fund by a wire

19   transfer.  So it's not a transfer from Highland of the

20   interests like it was with the Dynamic Fund.

21       Exhibit 12, Your Honor, is a purchase and sale agreement.

22   Now, this is an exchange between the Get Good Trust and the

23   Debtor.  It's dated December 28, 2016.  And I'll talk about

24   this a little bit in our closing argument, but I did want to

25   just have a brief walk through this.  Under this purchase and

33

1   sale agreement, there is an exchange.  This is not a one-sided

2   agreement that denudes the Debtor of assets without anything

3   in return.  This exhibits shows that the Debtor receives the

4   Get Good interests in the Dugaboy note, which was

5   approximately a $24 million note.  In exchange, Get Good

6   received about $23 million worth of various interests.  It

7   received a $2.032 million interest in the Highland Loan Fund.

8   And Your Honor, if you'll recall, that's the Dynamic Fund.  It

9   received certain American Airlines call options that had a

10  fair market value at the time of about $8.7 million.  And then

11  it received various participation interests in Highland's

12  interests in the Crusader Funds, which had a fair market value

13  at the time of about $12.6 million.

14       Now, Exhibit A, which is internally attached to Exhibit

15  12, is a copy of the Dugaboy note.  And that, Your Honor,

16  shows that this was an interest-only note, about $2.75 percent

17  interest, with the principal due on a 20-year term.  So,

18  annual interest payments, principal due at a later date, and

19  there was no prepayment penalty on principal.  So, Your Honor,

20  you've seen that the principal was paid down at least about

21  $6-1/2 million, in addition to other interest payments made

22  under the terms of that note.  So the Debtor did receive

23  consideration in exchange.

24       Exhibit 13 is an amendment to that purchase and sale

25  agreement.  And we included this as what we call a full

34

 1  disclosure agreement.  There is an adjustment to the deal

 2  terms in which the call options are revoked, and instead of

 3  the Get Good Trust receiving the call options in the American

 4  Airlines stock, it received participation interests.  There's

 5  no adjustment to the Dugaboy note, and there's no adjustment

 6  to the Crusader interests that were transferred.

 7      Your Honor, Exhibit 14, this is also just a full

 8  disclosure exhibit.  This shows that the Get Good Trust was

 9  identifying as a trust beneficiary the Highland Dallas

10  Foundation, to make, in essence, the charitable donation that

11  would then be pushed down to the Charitable DAF and then

12  invested by CLO Holdco.

13      Exhibit 15 is the Dynamic Fund side letter exhibit dated

14  January 10, 2017.  And this really is included to show, in the

15  last "Whereas," Your Honor, the series of transfers from the

16  Debtor to the Get Good Trust down to CLO Holdco and how CLO

17  Holdco came to acquire the interests in the Dynamic Fund.

18      And finally, Your Honor, is Exhibit 16.  We think this is

19  an important exhibit for a number of reasons.  First, the

20  Debtor disclosed in correspondence with CLO Holdco and the

21  Committee that this exhibit was produced in November of 2019

22  by the Debtor to the Committee.  I notice that the Bates stamp

23  was a significantly lower number than the rest of the exhibits

24  we received in our discovery request.

25      But this document shows a number of important facts.  If

```
 1   you look at Page 2, Your Honor, this shows that the

 2   consolidated balance sheet for Highland Capital Management, LP

 3   showed a net -- a positive net worth at the time of about $418

 4   million.  And if you look at it on a cash flow basis, the

 5   consolidated income statement for year-end dated December 31,

 6   2016 shows about $39,356,000 of net income in 2016

 7   attributable to Highland Capital Management, LP.

 8        And then if you turn the Page 33, Your Honor, there is a

 9   heading called Investment Liability.  And the bottom paragraph

10   on -- over on Page 33 of Exhibit 16 shows that, in this

11   audited financial statement, PricewaterhouseCoopers had

12   analyzed this transfer transaction.  It states:

13        "On December 28, 2016, the Partnership" -- that's

14        Highland Capital Management, LP, the Debtor --

15        "entered into a purchase and sale agreement with the

16        Get Good Nonexempt Trust.  In consideration for a

17        note receivable from an affiliate, the Partnership

18        sold or participated in certain investments that it

19        already held, with the participated investments

20        carrying an aggregate market value of $21.3 million

21        as of the date of the transaction.  The fair value of

22        the agreement will fluctuate with the fair value of

23        the securities throughout the term.  As of December

24        31, 2016" -- that was three days later -- "the

25        participated investment value had reduced from $21.83
```

1        to $18.7 million."

2      Again, Your Honor, this is in exchange for a $24 million

3   note that it's been paying.

4      So, Your Honor, given the stipulation of the Debtor, we no

5   longer need to call David Klos, so what we would propose to do

6   at this time is close our case-in-chief and allow Mr. Clemente

7   to go forward with (audio gap).

8           THE COURT:  All right.  Mr. Clemente, you may proceed

9   with your evidence.

10          MR. CLEMENTE:  Thank you, Your Honor.  Just a couple

11  of things to note (indecipherable) into argument, though I

12  would point Your Honor to the Committee's -- so, first of all,

13  I'd move for the formal admission of the Committee's exhibits

14  for purposes of this hearing, Exhibits 1 through 3, which are

15  the two Acis opinions and the transcript from the March 4th

16  hearing.  Again, it's subject to the stipulation Mr. Kane

17  referenced earlier.

18          THE COURT:  All right.  Committee Exhibits 1 through

19  3 are admitted by stipulation, and they appear on the docket

20  at Docket Entry No. 789.

21      (Unsecured Creditors' Committee's Exhibits 1 through 3 are

22  received into evidence.)

23          MR. CLEMENTE:  Thank you, Your Honor.  And I'd like

24  to point Your Honor to Page 43 of Exhibit 3, which is the

25  transcript from the March 4th hearing, and read into the

37

```
 1   record a statement by Mr. Lynn which says, "We'd like to

 2   suggest the following, should the Court determine" --

 3             THE COURT:  Okay.  Tell me --

 4             MR. CLEMENTE:  Yes?

 5             THE COURT:  I didn't hear what page again?

 6             MR. CLEMENTE:  Oh, I'm sorry, Your Honor.  It's Page

 7   43, starting at Line 14.

 8             THE COURT:  Okay.

 9             MR. CLEMENTE:  And Mr. Lynn states, "We'd like to

10   suggest the following, should the Court determine that the

11   motion be denied, and that is that instead of the Debtor

12   retaining the funds, that the Debtor distribute the funds into

13   the registry of the Court.  That way, they" -- meaning the

14   Debtor, Your Honor -- "lose control over the funds and they

15   can say they distributed them in accordance with their

16   agreements and applicable law."

17      So, the point, again, Your Honor, from the hearing was to

18   simply preserve the status quo yet ensure that the funds would

19   be safeguarded by depositing them within the registry of the

20   Court.

21      Additionally, Your Honor -- and Your Honor may be

22   scratching her head as to why the Committee stipulated to all

23   of this.  It's not about taking in kind and filing three

24   documents.  That was never the issue at the March 4th hearing.

25   Frankly, that's not the issue today.  The March 4th hearing
```

38

1   wasn't about ownership of the Funds, which is what the

2   exhibits Mr. Kane just walked through purports to show.  The

3   March 4th hearing was about the web and the circumstances

4   surrounding the case and the circumstances surrounding CLO

5   Holdco.

6       What Mr. Kane's exhibits don't refute is the fact that all

7   of the interests that CLO Holdco has on which it's here today

8   and funds were deposited into the registry on account of came

9   from the Debtor.  What Mr. Kane's factual record does not

10  dispute is that, at that time, the Debtor was controlled by

11  Mr. Dondero.  And the Dugaboy Trust and the Get Good Trust

12  were at various times controlled by Mr. Dondero, Mr. Scott,

13  and Nancy Dondero, Mr. Dondero's sister.

14      So, again, Your Honor, it isn't about walking through

15  account statements.  It's about the context in totality.

16      Finally, Your Honor, and I believe the exhibits Mr. Kane

17  referred to, including Exhibit 12, they make clear, and I

18  think Mr. Kane admits that, that these interests did come from

19  the Debtor.

20      Finally, Your Honor, the other factual point I would like

21  to make refers to Mr. Kane's Exhibit 16, which he finished up

22  with.  These are the consolidated financial statements of

23  Highland Capital Management.  I find it all very interesting

24  what the book values of assets and liabilities are, but I do

25  not believe that there's any reference in these financial

1    statements to contingent liabilities or litigation claims,

2    including claims with respect to Redeemer or potential claims

3    with respect to UBS.

4        So, Your Honor, I would just suggest that this exhibit,

5    although for purposes of the stipulation we agree with what

6    the numbers, you know, that the numbers say what they are,

7    it's entirely replete -- and I think Your Honor would know, of

8    course, that any analysis of fraudulent transfer would have to

9    take into a reasonable estimate of contingent liabilities.

10       So that's the only other point I would like to make from

11   the factual background, Your Honor.  Unless you have any

12   questions for me, I'll just reserve the rest for argument.

13           THE COURT:  All right.  I have no other questions at

14   this time for you.

15       All right.  Shall we go to closing arguments, then?

16           MR. KANE:  Yes, Your Honor.  This is John Kane for

17   CLO Holdco.  I did want to make one important clarification,

18   because it was about a characterization of the exhibits that

19   were presented by CLO Holdco.

20       Mr. Clemente stated that we had no -- or, that the

21   evidence that I've presented indisputably showed that all of

22   the interests have been liquidated, so the funds that we're

23   seeking here today came from the Debtor.  And what our Exhibit

24   11 shows is that CLO Holdco used its cash that it wired to the

25   AROF Fund to obtain its interests in AROF.

40

1  That was not a transfer by the Debtor.  There is no

2 evidence suggesting whatsoever that that flowed down from a

3 Highland interest to CLO Holdco.  That was a cash acquisition

4 by CLO Holdco to AROF for its subscription interest in the

5 Argentina Fund.

6    THE COURT:  All right.  Well, Mr. Clemente, let me

7 follow up on that.  Are you going back to 2011, and is that

8 what you were referring to, that all of CLO Holdco's original

9 seed money -- I guess it was a couple of levels up from CLO

10 Holdco -- originated from Highland?

11    MR. CLEMENTE:  That's correct, Your Honor.  And

12 that's what Your Honor writes in the Acis opinions, --

13    THE COURT:  Uh-huh.

14    MR. CLEMENTE:  -- that ultimately the DAF and the CLO

15 Holdco were seeded by the Debtor.  That's our position, that

16 all of the assets that ultimately were used to seed the DAF

17 came from the Debtor, and then obviously Mr. Kane's exhibits

18 demonstrate that the particular interests with respect to

19 Dynamic came from the Debtor.

20    THE COURT:  All right.  Mr. Kane, any comment about

21 that?

22    MR. KANE:  Yes, Your Honor.  And this is -- we're

23 back in an evidentiary hearing.  So whether or not there were

24 seed funds that were contributed by Dondero or related trusts,

25 that I think this Court has found that was the case in the

41

 1   past, but that does not mean that there were not other viable

 2   investments, personal funding by Dondero individually,

 3   deposits by Mark Okada individually or other third parties

 4   through Dallas Foundation, that there were not legitimate

 5   funds, legitimate means of generating revenue by CLO Holdco

 6   that allowed it to reinvest money.

 7        And this is -- there's an inference made, Your Honor, by

 8   the Committee that because there was an initial seed of this

 9   CLO Holdco entity by Jim Dondero and various trusts, whether

10   through Highland or other entities, that all of the funds that

11   it forever uses are somehow inherently tied to Highland.

12   We're talking about 2011, transitioning to 2018 for a cash

13   investment made.  I think that is a huge stretch.

14        I think it's important to know that there is zero evidence

15   presented by the Committee to substantiate the statement that

16   this $2.5 million somehow arose from Highland Capital

17   Management, LP.

18             THE COURT:  Okay.  All right.  Well, proceed with

19   your closing argument, please.

20             MR. KANE:  Yes, thank you, Your Honor.

21          CLOSING STATEMENT ON BEHALF OF CLO HOLDCO, LTD.

22             MR. KANE:  So, I do want to go back a little bit to

23   what you had previously stated about the March hearing.  So,

24   we acknowledge that the Court has a right to submit funds into

25   the registry of the Court in a contested matter under rare

42

 1  circumstances under Rule 67 and *In re Kim*.  But it is our

 2  position that once funds are pled into the registry of the

 3  Court, there is a material shift in how those funds are

 4  treated and what the Court can really do to adjudicate matters

 5  involving those funds.

 6     So, there are zero Bankruptcy Code references that relate

 7  to a Chapter 11 dispute and Bankruptcy Code statutes that

 8  address the registry of the Court.  The only Bankruptcy Code

 9  statute in the entirety of the Bankruptcy Code that references

10  the registry of the Court or proceeding under 28 U.S.C. 2041

11  and 2042 is Section 347(a) of the Bankruptcy Code, which

12  applies to unclaimed funds only in Chapter 7, 12, and 13

13  cases.

14     So, Your Honor, we're looking at a situation here where

15  funds are in the registry of the Court.  And once funds are in

16  the registry of the Court, under 28 U.S.C. 2041, the Court

17  holds money as a statutory trustee for the rightful owners.

18     That's an issue that's been addressed by most circuits,

19  Your Honor.  And as noted by the First Circuit, the funds that

20  are deposited in the registry of the Court are not at the

21  disposal of the judge but held in trust for the rightful

22  owner.  That's the *Alstom Caribe* case from the First Circuit

23  in 2007.

24     The Fifth Circuit has addressed this issue on a number of

25  occasions, and noted that once funds are deposited into the

43

1  Court's registry, the Court should determine ownership and

2  make disbursements. It's not suggesting a long hold. That's

3  from *Craig's Stores*, a Fifth Circuit decision in 2005.

4      Your Honor, CLO Holdco acknowledges that the Fifth

5  Circuit's decision in *U.S. v. Cochran* and 28 U.S.C. 2042 place

6  the burden of proof of ownership squarely on the party seeking

7  funds from the registry of the Court. And so here, as shown

8  in *Craig's Stores* and *U.S. v. Beach*, which is an Eleventh

9  Circuit decision, CLO Holdco has to prove ownership by a

10 preponderance of the evidence. On that showing, the Fifth

11 Circuit noted in *Cochran* that a court needs to remit the funds

12 to the party that satisfied its burden of proof.

13     So, how do I satisfy my burden of proof? I have to show

14 that -- I have to show that I have title to those funds or

15 that CLO Holdco has title to those funds.

16     Your Honor, a lot of courts have addressed what title

17 means in a 28 U.S.C. 2042 dispute. And proving title means

18 demonstrating a present right to the funds. A present right

19 is a right that is not hypothetical, it's not unliquidated,

20 and it isn't presently possessed by some other party.

21     So, applying the evidence here, there is overwhelming

22 evidence that CLO Holdco has a present right to these funds.

23 The Dynamic subscription proves that CLO Holdco had an

24 interest in the Dynamic Fund. The AROF subscription proved

25 that CLO Holdco had an interest in the AROF Fund. We provided

44

1   proof to the Court of either how those interests were

2   transferred to CLO Holdco or how they were acquired by cash

3   payment by CLO Holdco. The Committee has stipulated that,

4   once obtained, CLO Holdco did not transfer those interests to

5   any other party. So, Your Honor, that hits the no other party

6   presently possessing title.

7       We can show Your Honor through Mr. Klos' testimony and

8   testimony previously presented to the Court that the Debtor

9   liquidated all of the parties that had an interest in the

10  Dynamic and AROF Funds interests. Those Funds are done.

11      Mr. Klos' testimony and his deposition by written

12  questions shows that the Debtor calculated the pro rata

13  interest due to CLO Holdco, and the Committee has stipulated

14  to those amounts. They're not in dispute.

15      So, Your Honor, frankly, I'm not entirely sure what else

16  CLO Holdco would need to show to concretely establish that it

17  has a present valid legal claim to the interests in the

18  registry of the Court. It's satisfied every element of its

19  claim to the funds.

20      And right there, under a 28 U.S.C. 2402 dispute, that

21  should end the discussion about whether we're entitled to

22  remittance of the funds from the registry amount. We have a

23  proven, current, valid legal title hold. And that's all

24  that's required for relief under Fifth Circuit case law,

25  Fourth Circuit case law, Eleventh Circuit case law addressing

1   these registry motions.

2       Your Honor, we understand that the Committee is arguing

3   that the funds should just sit in the registry of the Court.

4   We'd like to reiterate, we think it's very important that the

5   Committee has not asserted any form of affirmative relief in

6   this Court.  There is no adversary proceeding.  There is no

7   motion for some kind of prejudgment writ of attachment or

8   anything like that.  This is a defensive play by the

9   Committee.  It is an -- it is solely an objection to CLO

10  Holdco's position.  That objection wants to maintain the

11  status quo.  That's it.

12      So, what is maintaining the status quo?  Well, if we're

13  going to address the Committee's objection, we need to look at

14  *Rosen v. Cascade*, which is an Eleventh Circuit case that says,

15  when a party issues this type of objection, or even a motion

16  for (audio gap) relief, you need to look at the actual nature

17  of the relief sought by the party, not necessarily just the

18  description of the relief sought.

19      Well, what is the nature of the relief?  The Committee has

20  noted in its pleadings that it wants this Court to leave CLO

21  Holdco's funds in the registry so that it can use those funds

22  as security against a potential hypothetical future judgment

23  because it believes that collection against CLO Holdco, a

24  Cayman entity, may otherwise be difficult.

25      Okay.  So the Committee wants this Court to keep CLO

46

1    Holdco's funds, after it's proven title to those funds, to

2    serve as surety against a potential future judgment.  As we

3    noted in our pleadings, Your Honor, *Black's Law* defines

4    attachment as seizing of a person's property to secure a

5    judgment.  We believe that that's exactly what's happening

6    here.  The Committee wants the Court to hold CLO Holdco's

7    property pending a potential future judgment.

8        Your Honor, a prejudgment remedy like attachment invokes

9    Bankruptcy Rule 7064, and at least here the Committee is

10   willing to -- or, CLO Holdco is willing to acknowledge that

11   7064 is applicable in a contested matter like the one before

12   the Court.  But to obtain relief under 7064, the party would

13   have to satisfy Texas law and the requirements for a

14   prejudgment writ of attachment.

15       Your Honor, that falls under Section 61 of the Texas Civil

16   Practice and Remedies Code.  But importantly, Judge Houser has

17   addressed that specific issue in the *Atlas Financial Mortgage*

18   case.  And she hits the nail on the head.  She notes that, To

19   prove a claim for a right to a writ of attachment, prejudgment

20   writ of attachment, the party seeking that relief must have

21   made, and this is a quote, "a certain and liquidated demand or

22   a demand whose amount is reasonably certain."  And she cites

23   the Fifth Circuit case *In re Fredeman Litigation* .

24       There is no demand by the Committee, and there is

25   certainly no demand for an amount certain.  There is no claim.

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1202 of 2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1201 of 2722
Case 19-34054-sgj11 Doc 802 Filed 07/02/20   Entered 07/02/20 18:59:24   Page 47 of 100

47

1   There is no cause of action asserted by the Committee against

2   CLO Holdco.

3       Judge Houser went on to state that, If the amount of

4   damages can only be ascertained by the fact-finder, a writ of

5   attachment is inappropriate.

6       Your Honor, again, we have no idea what is asserted.

7   Presumably, any damage model that the Committee asserts that

8   it has would have to be thoroughly litigated and the damage

9   modelled by the Court.

10      Also, prejudgment writ of attachments are only available

11  in liquidated claims that arise out of contract.  That doesn't

12  exist in this case.

13      So the Committee is just flat out ineligible for any kind

14  of prejudgment writ of attachment.

15      So, next, Your Honor, that flows to, well, is an

16  injunction available?  Arguably, the Committee is defensively,

17  not affirmatively, but defensively asking this Court to enjoin

18  CLO Holdco from removing its funds from the registry of the

19  Court or otherwise using those funds.  Well, that was what

20  happened in *Atlas Financial Mortgage*.  Judge Houser said,

21  well, you're not eligible for a prejudgment writ of

22  attachment, but you actually are eligible for a preliminary

23  injunction.  But she went into a very detailed analysis of

24  when a preliminary injunction would be obtainable.

25      And Your Honor, I think before I get to Judge Houser's

48

 1   kind of final analysis on that issue, I'd like to look at what

 2   do the Bankruptcy Rules say?  Bankruptcy Rule 7001, Subsection

 3   7, notes that an adversary proceeding is a proceeding to

 4   obtain an injunction or other equitable relief other than when

 5   that relief is in the plan.  So, plan injunction, totally

 6   different animal.  And CLO Holdco readily admits that.  But an

 7   injunction against the assets of another party requires an

 8   adversary proceeding.

 9       Bankruptcy Rule 7065 incorporates Federal Rule of Civil

10   Procedure 65, which is -- which addresses the means of

11   obtaining a preliminary injunction.  Importantly, Bankruptcy

12   Rule 9014 excludes 7065 in Bankruptcy Rules applicable in a

13   contested matter.

14       So, again, Your Honor, the Bankruptcy Rules essentially

15   trickle down on this idea that if the Committee wants some

16   form of injunctive relief, it must file an adversary

17   proceeding to obtain that relief against CLO Holdco.

18       And Judge Houser's analysis in the *Atlas Financial*

19   *Mortgage* case is very consistent with that position.  The

20   party seeking the injunction, she said, must assert a

21   cognizable claim to specific assets or must seek an equitable

22   remedy involving those assets in its adversary proceeding and

23   complaint.

24       There is no adversary proceeding here.  There is no

25   complaint.  The Committee has not asserted any claim or cause

1 of action against any specific assets owned by CLO Holdco.

2 And the Committee has not asserted any equitable remedy

3 against any specific asset in an adversary proceeding against

4 CLO Holdco.

5     Your Honor, as Judge Houser noted, Federal Rule of Civil

6 Procedure 65, as incorporated by 7065, enables a court to

7 issue preliminary injunctions -- and I stress this -- pending

8 trial.  It is a prejudgment, post-commencement of adversary

9 proceeding remedy.

10     And before Judge Houser is willing to issue -- and,

11 really, any court under the Fifth Circuit -- is willing to

12 issue a preliminary injunction, those courts consider four key

13 factors that must be proven by the movant before the

14 injunction can enter.  And that is:  A substantial likelihood

15 of success on the merits; (2) a substantial threat of

16 irreparable injury if the injunction does not issue; (3) that

17 the threatened injury if the injunction is denied outweighs

18 any harm that will result if the injunction is granted; and

19 (4) that the grant of injunction will not disserve the public

20 interest.

21     That's from *Janvey v. Alguire*, which is a Fifth Circuit

22 decision in 2011 and is incorporated into Judge Houser's *Atlas*

23 *Financial Mortgage* decision.

24     So, let's look at those elements, Your Honor, even

25 assuming that the Committee is somehow asserting a claim for

50

1  injunctive relief.

2      The Committee has the burden of proving that there is a

3  likelihood of success on the merits of its claims against CLO

4  Holdco.  The Committee has not asserted any claims against CLO

5  Holdco.  Moreover, CLO Holdco is unable to identify any

6  potential claim that the Committee could assert based on the

7  facts that are in evidence.

8      There is evidence of a $2.5 million cash payment by CLO

9  Holdco to obtain a subscription in AROF.  There is evidence of

10  an exchange of reasonably equivalent value between Highland

11  and Get Good for the initial transfer of the Dynamic

12  interests.  Your Honor, the Dugaboy Trust note has been paying

13  down.  There is no evidence of insolvency at the time of the

14  transfer as a result of the Dynamic transfer.  In fact,

15  Exhibit 16 shows the Debtor had a very large equity value and

16  made actually a million dollars.  And there's no evidence of

17  any fraudulent intent at any time related to the Dynamic

18  transfer.  There is simply no evidence whatsoever, and no

19  attempt by CLO -- or, by the Committee to obtain any evidence

20  from CLO Holdco.

21      So, Your Honor, there is no substantial likelihood of

22  success on the merits.  As Judge Houser noted in *Atlas*

23  *Financial*, the Committee would have to prove the estate's

24  entitlement -- or doesn't -- the Committee wouldn't have to

25  prove the estate's entitlement to summary judgment on its

1   claim, but it would have present a prima facie case in support

2   of its claim. And in stating that, Judge Houser cited to

3   *Janvey's* Fifth Circuit decision.

4      So, Your Honor, is there a prima facie case presented by

5   the Committee? The answer is a resounding no. It cannot

6   satisfy the first element of the factor test required to issue

7   an injunction against CLO Holdco.

8      How about a substantial threat of irreparable injury if an

9   injunction is not issued? Your Honor, this goes back to the

10   Committee performing no discovery against CLO Holdco. If the

11   Committee wanted to prove up this point, presumably it would

12   have to present evidence to the Court that CLO Holdco was

13   either financially unable to satisfy a judgment or wouldn't

14   satisfy a judgment for some other reason. The simple fact

15   that CLO Holdco is a Cayman entity does not mean that it is

16   incapable of satisfying a judgment. CLO Holdco, through its

17   counsel, has had conversations with the Committee about the

18   assets in CLO Holdco. And, in fact, there's not a whole lot

19   of dispute that CLO Holdco does possess a significant value of

20   assets.

21      It is not, inherently, Your Honor, some judgment-proof

22   entity.

23      But, again, CLO Holdco does not have the burden of proof

24   on disproving this potential issue. It would be the

25   Committee's burden of proof. The Committee can't satisfy

52

1　either of the first and most important elements of a test for

2　an injunction.  Your Honor, that injunction simply cannot

3　issue.

4　　　Now, the Committee will say, well, the Court should be

5　able to issue a naked injunction under Section 105(a) of the

6　Bankruptcy Code because the Court has these broad, equitable

7　powers.  And in its pleas, it cites to a number of decisions

8　that it alleges support that position.

9　　　It cites to *King Louie Mining*.  Well, *King Louie Mining*

10　granted an injunction and cited to Section 105(a), but the

11　injunction was granted against property that was subject to a

12　pending adversary proceeding.  Again, injunction issued under

13　7065.

14　　　The Committee cites to *In re Momentum Manufacturing*.

15　Well, in that case, 105(a) was used to grant equitable

16　estoppel, not a preliminary injunction.

17　　　The Committee cites to *Caesar's Entertainment* repeatedly

18　for this proposition this Section 105(a) can be used by the

19　Court to grant this naked injunction, but the injunction

20　granted in *Caesar's* was granted against a third party where

21　there was a pending adversary proceeding to claw back the

22　assets of that third party.

23　　　The Committee also cites to the *DeLorean* decision.  Well,

24　in that case, there was a 105(a) statement by the Court when

25　it entered an injunction in an adversary proceeding filed

53

1  seeking the injunction.  The Court went through the 7065

2  factors before it issued the injunction.

3      And then the Committee cites to *Sire Plan*.  Well, there

4  was 105(a) relief granted, but it was also granted in an

5  adversary proceeding, and the relief was consistent with the

6  language of the Bankruptcy Act, albeit the Court even admitted

7  that it was a liberal interpretation, again.

8      So, what case law or actions have been cited by the

9  Committee in support of this Court's ability to grant a 105(a)

10  injunction outside of the parameters of a plan?  Well, it

11  cited to the *Lewis v. Celotex* decision, which is a Fifth

12  Circuit case.  I think it's worth discussing, Your Honor,

13  because we readily acknowledge that, in that case, there was a

14  preliminary injunction that was incredibly broad in that it

15  addressed five parties who were seeking to recover on

16  supersedeas bonds after the case was commenced, after the

17  *Celotex* bankruptcy case was commenced.

18      And I want to note that there's a Supreme Court decision

19  on a separate dispute called *Edwards v. Celotex*.  Now, in the

20  *Edwards v. Celotex* dispute, the Fifth Circuit disagreed with

21  the lower court's decision and its ability to enter the

22  injunction.  It did so -- officially made its ruling on

23  jurisdictional grounds.  But the U.S. Supreme Court reviewed

24  the Fifth Circuit's decision and overturned it.  But when it

25  overturned it, the Supreme Court did two things.  One, it

54

1    refused to address whether a court could actually enter the

2    injunction under 105(a).  It addressed (audio gap)

3    jurisdictional argument.

4        But the Supreme Court also noted that while the Fifth

5    Circuit allegedly ruled on a jurisdictional basis, it

6    certainly appeared that the Fifth Circuit was partially ruling

7    because it found the 105(a) injunction inappropriate at that

8    position of the case.

9        So there is at least some dicta from the Supreme Court and

10   the Fifth Circuit that that 105(a) injunction issued in the

11   *Celotex* case was inappropriate.

12       Also, Your Honor, the Third Circuit notes in a footnote in

13   its decision in *Lewis v. Celotex* that while it would uphold

14   the injunction, it noted that the injunction was narrow in

15   scope as far as what it actually did.  And once the bankruptcy

16   judge reviewed the judgments against the debtor, the

17   avoidability, if the judgments were voidable for one reason or

18   another, the Court would have to lift the stay to allow the

19   party in that case to proceed against the assets.

20       And Your Honor, that's basically where we are in this

21   case.  The Court used its equitable rights under 105(a) to

22   deposit funds in the registry of the Court, and now the Court

23   has an opportunity to review CLO Holdco's evidence to see if

24   it can meet its preponderance standard to prove that it has a

25   right to the funds in the registry of the Court.  And once it

55

1    does, it should release those funds to CLO Holdco.  That

2    analysis is really pretty consistent with the *Lewis v. Celotex*

3    decision, which is the only case that's cited by the Committee

4    that includes an injunction outside of the scope of an

5    adversary proceeding.

6        So, Your Honor, there really is nothing here supporting

7    the Committee's position.  The Committee hasn't proved up any

8    right to a writ of attachment.  It hasn't satisfied any of the

9    elements, procedurally or factually, to be able to obtain an

10   injunction against CLO Holdco's assets.

11       So, Your Honor, based on the evidence presented, we

12   request this Court grant CLO Holdco's motion and allow us to

13   withdraw funds from the registry of the Court.

14           THE COURT:  Thank you, Mr. Kane.  All right.  Mr.

15   Clemente, I hope that you will focus in your closing argument,

16   I suspect you will, but the arguments, the primary arguments

17   of Mr. Kane that this is -- this holding of money in the

18   registry of the Court in this context is tantamount to a

19   prejudgment remedy, there is no adversary there in order to

20   have a preliminary injunction under 105, you really need an

21   adversary under 7001:  I hope you'll address those arguments,

22   among others.  All right.  Mr. Clemente?

23           MR. CLEMENTE:  Yes.  Thank you, Your Honor.  Matt

24   Clemente from Sidley on behalf of the Official Committee of

25   Unsecured Creditors.

56

1       CLOSING ARGUMENT ON BEHALF OF THE OFFICIAL COMMITTEE OF

2                UNSECURED CREDITORS

3        MR. CLEMENTE:  Well, Your Honor, I think Mr. Kane's

4   arguments overall generally miss the point, and the issue is

5   really about context.

6     Mr. Kane referred to the monies being pled into the

7   registry.  That is not the case at all.  Your Honor ordered

8   them placed into the registry at the March 4 hearing.  That,

9   in my view, distinguishes it almost entirely from all the

10  cases that CLO Holdco cites in their papers.

11    This is not a dispute about ownership.  This is not an

12  interpleader.  This is not some party saying, I don't know

13  what to do with these monies and so I'm pleading them into the

14  Court and please, Court, give me direction.  That is

15  absolutely not the circumstance or context in which the monies

16  were ordered by this Court under Section 105 to be put into

17  the registry.

18    So, from my perspective, I think that, Your Honor,

19  effectively distinguishes the current situation from the

20  situations that Mr. Kane cites.

21    Belatedly, Your Honor, and I'll touch on this in a moment,

22  none of this about 28 U.S.C. was ever raised in the actual

23  motion, which I found to be fairly interesting.

24    So I wanted to start with those comments, but then I want

25  to take a step back, because I do believe that the context and

1  background of this bankruptcy case is critical to this

2  dispute.

3      CLO Holdco would have the Court view it as an independent

4  third-party investor merely requesting the release of proceeds

5  of its investment that Mr. Kane referred to in his argument as

6  another party.  It's not just another party.  I would do that

7  as well and I would try and distance myself from Mr. Dondero,

8  but the fact of the matter is CLO Holdco cannot.

9      The Committee, as Your Honor knows, never objected to

10  distributions to independent third parties, including in

11  connection with the initial distribution motion, and the

12  Committee is not doing that now.

13      And recall just a bit of context around the March 4th

14  motion, Your Honor.  Under the protocol that the Committee

15  negotiated, the Debtor -- related-party transactions needed

16  the consent of the Committee if they exceeded a certain

17  threshold.  The Debtor came to us with respect to these

18  distributions, and the Committee said, no, because of the

19  related party involvement and given the web that Mr. Dondero

20  has created.  And so the Debtor then filed a motion in front

21  of Your Honor seeking Your Honor's authority to make the

22  distribution.

23      Again, this is entirely unlike the cases that Mr. Kane

24  talks about.  This is about the context in which that

25  distribution -- and these were funds that the Debtor

58

 1    controlled -- I agree, weren't funds that the Debtor owned,

 2    but the Debtor controlled them, and I believe that is an

 3    important factor that I'll touch on later, Your Honor, in

 4    distinguishing it from the prejudgment cases and other things

 5    that Mr. Kane talks about.

 6        Importantly, Your Honor, CLO Holdco is not an independent

 7    third-party investor, and CLO Holdco and other related parties

 8    hold a special place in this case in the hearts and the minds

 9    of the Committee, and I think also of Your Honor.

10        Again, and just a little bit of a background here, because

11    I do need to sort of create the picture here.  Mr. Dondero has

12    created a web of over 2,000 related entities, which includes a

13    sub-web involving CLO Holdco.  At the outset of the cases,

14    Your Honor, the Debtor's advisors could not even identify all

15    the Debtor's affiliates.

16        As we laid out in our papers, CLO Holdco, through its

17    parent entity, and this is not disputed, and it's proven up --

18    out by the documents that Mr. Kane walked through, controlled

19    by a patent attorney, not an investment professional but a

20    patent attorney that was a college roommate of Mr. Dondero, it

21    has at all times, including when the transfers were made, been

22    advised by the Debtor, which, when these transfers were made,

23    then it was controlled by Mr. Dondero.

24        Mr. Dondero credited and directed each of the beneficial

25    owners, which are the foundations, and the assets and

59

1   interests gave rise to the distribution that CLO Holdco is

2   seeking now that were Debtor assets that were either

3   transferred through a series of conduit and intermediate

4   transfers, which is what Mr. Kane's papers, you know, bear

5   out, and which -- with which we agree with, into the hands of

6   CLO Holdco, again, at a time when Mr. Dondero was in control

7   of the Debtor and in control of the intermediate parties and

8   in control of CLO Holdco.  So he therefore was on all sides of

9   the transfer.

10       Your Honor, to be specific -- and, again, there's no

11  dispute over this; we lay this out in our papers -- the Debtor

12  transferred its interest in what was ultimately renamed as the

13  Dynamic Fund, along with other interests and assets, to

14  something called the Get Good Nonexempt Trust, in exchange for

15  not a hundred percent, but 97.6 percent of a $24 million note

16  issued by something called the Dugaboy Investment Trust.  That

17  note itself, Your Honor, from Exhibit 12, if you read the

18  introduction to the note, was a substitute for a previous note

19  issued by Dugaboy to the Get Good Trust.  And at least on the

20  (audio gap) note, (audio gap) unsecured note bearing interest

21  at 2.75 percent.  We don't know whether that note in and of

22  itself had been exchanged for a different note.  We just don't

23  know.

24       We do know that there was a note with Get Good and

25  Dynamic, or Get Good and Dugaboy, and that note was replaced

60

1  in a series of transactions, however, documented together,

2  Your Honor.  The Get Good Trust then transferred the interests

3  to the Highland Dallas Foundation, and then ultimately through

4  the DAF entities into CLO Holdco.

5      And, again, this is not in dispute, and it's bore out by

6  the documents.  Both the Get Good Trust and the Dugaboy Trust

7  are Dondero family trusts for which Nancy Dondero, the sister

8  of Mr. Dondero, and/or Grant Scott are trustees, and for which

9  it appears Mr. Dondero was at some point also a trustee.

10  That's evidenced on Committee Exhibit 12, where it talks about

11  that prior note.  It was issued or made by a Mr. Dondero as

12  Trustee, I believe, for the Get Good Trust.

13      And I just would note, these transactions also support the

14  basis or form the basis for CLO Holdco's purported $11 million

15  claim that they filed against the estate.

16      Your Honor, from my perspective, this is all very

17  confusing and it raises many questions, not the least of which

18  is why was this done, what is the Dugaboy Trust, what did the

19  Debtor actually receive relative to what transferred, and,

20  frankly, what was the purpose of all this?  And did the

21  Dugaboy Trust ultimately pay on the note?  And I'll address

22  Mr. Kane's discussion about payments that were made on the

23  note in a moment.

24      Your Honor, I don't believe any of this is in dispute.

25  And indeed, this Court previously found that CLO Holdco's

61

1   parent was seeded by the Debtor, managed by the Debtor, and

2   CLO Holdco's quote/unquote independent trustee was a longtime

3   friend of Mr. Dondero.  That's in the record.  That's where he

4   makes his case.

5        The key point of all this, Your Honor, is that CLO Holdco

6   is anything but an independent third-party investor merely

7   seeking the return of its invested funds, and its argument

8   should not be viewed through that lens and instead should be

9   viewed through the lens of Mr. Dondero being on all sides of

10  the transactions and transfers and pulling the strings and

11  controlling it all.  And this lens is clearly tainted by the

12  previous documented conduct of Mr. Dondero.

13       As the Court is well aware, (inaudible) as controlled by

14  Mr. Dondero, has a history of engaging in misconduct, breaches

15  of fiduciary duty, and fraudulent transactions in multiple

16  settings, with its principal, Mr. Dondero, taking a central

17  role.  And Your Honor, as you know, this bankruptcy case is

18  the result of arbitration proceedings, awards, judgments, and

19  other litigation against the Debtor arising from this

20  misconduct.

21       Therefore, the Committee and the Court must approach and

22  consider each of the related-party Dondero-controlled

23  transactions with skepticism, including the transactions with

24  CLO Holdco.

25       Now, Your Honor, CLO Holdco provided voluminous documents

62

```
1   and other information which Mr. Kane meticulously walked

2   through, none of which, for purposes of this proceeding only,

3   the Committee takes issue with.

4       But Your Honor, as I've mentioned before, this discussion

5   isn't about taking in kind, columns of numbers, and signatures

6   on documents.  What it is about is the context in which CLO

7   Holdco's interests arose and the relationship that it has with

8   this Debtor prepetition.  And despite the documents and

9   admissions, what CLO Holdco doesn't do and cannot do is refute

10  any of that, including the fact that CLO Holdco was seeded by

11  the Debtor, and the very interests which gave rise to the

12  distributions came from the Debtor at a time when it was

13  controlled by the Debtor.

14      This is not new money third-party investment or anything

15  close to it.  Instead, again, and as the Court found in the

16  Acis case, CLO Holdco was seeded by the Debtor, and as its own

17  exhibits demonstrate, the interests were transferred from the

18  Debtor.

19      Your Honor, I don't think I'm painting with too broad of a

20  brush, then, to state that transactions with Dondero on both

21  sides, as we have here, must be subject to scrutiny by the

22  Committee and the creditors -- and, frankly, the Court -- to

23  determine their legitimacy.

24      And yes, Your Honor, the distributions are not property of

25  the Debtor's estate.  We've never argued that they are.
```

63

1    However, allowing it to be distributed to this entity, through

2    the holding company, a Cayman Island entity, controlled by Mr.

3    Dondero, would have the effect of prejudicing the estates and

4    rewarding Dondero for potentially fraudulent conduct, which is

5    something we cited in the *Sire Plan* case, where a party should

6    not be allowed to benefit from its fraudulent scheme.

7        All the Committee is asking to do -- and, frankly, what

8    the Court did at the March 4th hearing -- is something the

9    Debtor should have done, and that is let's keep the status quo

10   to allow the investigation to proceed to determine the

11   legitimacy of the transfers to CLO Holdco.  This best balances

12   the interests of all parties.  CLO Holdco's money is

13   safeguarded.  As Mr. Dondero's attorney claimed, stated on the

14   record at March 4th, the registry is, Your Honor, not

15   surprisingly, a place that is safe.

16       And Your Honor, the burden of keeping those distributions

17   with the Court isn't that onerous at all on CLO Holdco, in

18   particular relative to the burden that is on the creditors,

19   some of whom have been seeking recompense for almost a decade.

20   To be clear, Your Honor, the Committee and its constituencies

21   did not ask to be in bankruptcy.  It was thrust upon them by

22   the actions of Mr. Dondero and his team.  Now that they are in

23   bankruptcy, the creditors are forced to deal with the

24   consequences of that decision by Mr. Dondero.

25       Similarly, CLO Holdco must deal with the consequences that

64

 1   flow from being controlled by Mr. Dondero and having been

 2   seeded at the direction of Mr. Dondero and taking transfers of

 3   assets from the Debtor at the direction of Mr. Dondero, which

 4   I submit here should be having the distributions continue to

 5   be maintained in the Court registry.

 6       Your Honor, I will turn to some of the arguments raised by

 7   Mr. Kane.  First, the Bankruptcy Code and Section 105 continue

 8   to apply to these issues.  As I mentioned before, I was a bit

 9   surprised and, frankly, taken aback, Your Honor, when I saw

10   CLO Holdco's response to our objection.  Their motion is

11   completely silent on this argument that somehow the Bankruptcy

12   Code doesn't apply and instead the only issue this Court would

13   have to determine would be dictated by a non-bankruptcy

14   statute, 28 U.S.C. 2042.

15       Putting aside any discussion of whether this should have

16   been in the motion to begin with, as I mentioned at the

17   outset, Your Honor, I was before you pre-COVID when we

18   addressed these issues, and I certainly did not view placement

19   of the funds into the registry as some mechanism which would

20   divest the Bankruptcy Code from continuing to be applied.

21       Again, it's all about the context of that March 4th

22   hearing.  This wasn't a dispute about ownership of the funds.

23   This was about the Debtor coming in and doing something that

24   the Committee took issue with under the protocols that it had

25   negotiated.  That's entirely different and distinct from just

 1   placing money into a registry and then allowing all parties to

 2   come in with their document to show that, based on my account

 3   statement, my book balance, this is my funds, these are my

 4   funds.  Which I agree with Mr. Kane on that.  It's not -- I

 5   mean, Your Honor has no stake in that fight from that

 6   perspective.

 7       But this is different.  Your Honor does have a stake in

 8   this fight because it was to preserve and protect the estate

 9   and maintain the status quo.

10       As I mentioned earlier, I don't presume to speak for Your

11   Honor, but I would suspect that Your Honor didn't think that

12   she was divesting herself of discussion under Section 105 by

13   placing the funds into the registry.  Instead, it was simply a

14   mechanism to deal with them and maintain the status quo.  They

15   could have been held -- they could have been held in

16   (inaudible) account, for example, but they weren't.  This

17   seemed like a logical, practical solution to the issue that

18   was presented to the Court.

19       Had we understood that, Your Honor, had I understood that

20   -- and, again, I was before you -- I wouldn't have agreed to

21   that.  And, frankly, I wouldn't have -- wouldn't have

22   understood -- if I understood that we'd be here today

23   belatedly arguing about that, I would not have agreed to it,

24   either.

25       Additionally, Your Honor, the cases cited by CLO Holdco

66

1   are just not applicable on their facts.  Unlike the cases

2   cited by CLO Holdco, this has never been a dispute about the

3   ownership or pleading -- interpleader-type action regarding

4   the funds.  This is all about preserving the estate and the

5   status quo.  This is why the monies were placed into the

6   registry, not as a mechanism to determine ownership.

7        Therefore, the Bankruptcy Code and Section 105 clearly

8   continue to -- continue to apply.  And Your Honor found on

9   March 4th that you already had the authority under Section 104

10  to do this, and nothing has changed in the interim, aside from

11  Mr. Kane has come in with documents showing -- which we don't

12  dispute -- that if you tick and tie everything, it adds up to

13  the money that he asserts that CLO Holdco should be given,

14  should be distributed.

15       Your Honor, regarding the 105 issue, there is clearly an

16  issue as to whether the seeding of CLO Holdco and transfers of

17  Debtor assets to it involved transfers that are fraudulent or

18  otherwise avoidable.  And I'll touch on the payment on the

19  note in a moment.

20       Those actions, of course, are assets of the estate for the

21  benefit of the creditors, and in fact, under the governing

22  protocol, the Committee negotiated to have standing to pursue

23  those claims.  And CLO Holdco is just that, a holdco.  And a

24  Cayman entity, to boot.  And despite Mr. Kane's references to

25  conversations that may have been had about what it is CLO

67

 1    Holdco has or doesn't have, we have no idea.  And it's

 2    controlled, ultimately, let us not lose sight of the fact, by

 3    Mr. Dondero.

 4        So, allowing CLO Holdco to take distributions will place

 5    them with an offshore entity, potentially outside the

 6    jurisdiction of this Court, or at the very least, placed in

 7    five or six entities removed or who knows where, including

 8    potentially other foreign entities.

 9        Therefore, exercising authority under Section 105 is

10    consistent with preserving, protecting, and maximizing the

11    value of the Debtor's estate, which estate includes claims,

12    causes of action, and avoidance actions.

13        As you know, 105 is the means and -- circumstances (audio

14    gap) preserve and protect the estate.

15        And to be sure, this is not inconsistent with any other

16    provision of the Bankruptcy Code, and it's, in fact, from our

17    perspective, in furtherance of the goals of the Code.

18        Your Honor, regarding the payments that Mr. Kane (audio

19    gap), the fact that a few payments were made on the note

20    doesn't change the fact that Section 105 applies and the Court

21    should deny the motion.

22        As with all that is Highland, nothing is simple or easy.

23    First, CLO Holdco received millions more in assets and

24    transfers, aside from the interests giving rise to the

25    distributions at issue.  So the fact that there were payments

68

1   on the notes really speak nothing to the fact of whether the

2   overall transaction was for reasonably equivalent value or

3   otherwise problematic, especially when there is nothing in the

4   record regarding the Dugaboy Trust, its wherewithal to pay, or

5   the fairness of the terms of the note, or any of that.  Or why

6   the note was structured this way or, you know, what the Get

7   Good Trust and the Dugaboy Trust do, how they interact, who

8   makes decision on what gets paid and doesn't get paid.

9       The few payments, while interesting, Your Honor, again, do

10  not establish reasonably equivalent value or the propriety, in

11  our view, of the transfers.

12      Finally, as this Court knows, reasonably equivalent value

13  is not determinative of whether the transfer was intentionally

14  fraudulent or otherwise potentially avoidable or problematic.

15  So, while deeds are interesting, Your Honor, I would submit

16  that they don't move the needle in changing the fact that the

17  motion should be denied.

18      Now, Your Honor, to the point that you raised with me

19  before I started my remarks here.  Much has been made about

20  inappropriate prejudgment remedy or attachment or similar

21  arguments.  I submit this case is moot, Your Honor.  Again, at

22  the risk of repeating myself, I will emphasize that CLO Holdco

23  is not an independent third party.  Like it or not, it is tied

24  up in a ruinous web with Mr. Dondero, and that in and of

25  itself makes this case unique and distinguishes it from the

69

1    other cases cited by CLO Holdco.

2        Additionally, Your Honor, the current circumstances are

3    distinguishable because the Debtor had control over these

4    funds.  That's why we were in front of you on March 4th.  I

5    agree, and I'm not arguing, that the Debtor did not own these

6    funds.  But it clearly had control over them at the time that

7    it sought to make the distributions on March 4th.  So, in my

8    humble opinion, Your Honor, that means the Court had control

9    over that.

10       Having them held in a registry while an investigation

11   occurs is not akin to slapping a lien on someone's house or

12   taking possession of an automobile, like the cases cited by

13   Mr. Kane where they require there's some -- an adversary

14   proceeding or some type of complaint.

15       The situation here, again, Your Honor, matters.  The

16   Debtor was before you seeking your authority to make this

17   distribution.  That is entirely different than if I were to

18   walk in here and say my colleague, Mr. Twomey, I think that,

19   you know what, I don't like him and so I have a claim against

20   him, and I want Your Honor to enjoin him from being able to

21   sell his automobile.  That is entirely different, and in my

22   view completely distinguishes it from any of the cases that

23   Mr. Kane cited, including, of course, I have much respect for

24   Judge Houser, but including the case authored by Judge Houser.

25       So, Your Honor, again, having them held in the registry is

70

1  not akin to the type of situation -- to the situation that Mr.

2  Kane discussed in his cases.

3      In fact, Your Honor, although the Board chose not to do

4  so, a decision with which Your Honor knows I vehemently

5  disagreed, I think the Debtor could have not and frankly

6  should not have sought to make the distributions to CLO Holdco

7  in the first place, and instead have come to this Court, and

8  this Court clearly had the authority to provide them with the

9  protection in doing so. Because, again, the Debtor had

10  control of the funds.

11      And I understand there's contractual arrangements, and Mr.

12  Kane walked through some of those. But at the end of the day,

13  if the Debtor has control over it, that means Your Honor has

14  control over it. And Your Honor clearly could have ordered --

15  and, in fact, did, under Section 105 -- the authority to tell

16  the Debtor, don't make the distribution.

17      That is not the same as the Committee walking in and

18  trying to argue it's entitled to some prejudgment remedy or

19  something on a stranger to the case, where there was already

20  the relationship and the establishment and the nexus that

21  existed in this case was already there. I'd submit those

22  other cases that Mr. Kane cites are designed to protect

23  against, and reasonably so: This is not that situation, Your

24  Honor.

25      As a result, Your Honor, of what the Debtor did, the

71

1   Committee finds itself placed behind the proverbial eight

2   ball.  Its constituencies have waited -- literally decades, in

3   some cases -- for recompense from an entity with a documented

4   history of fraudulent conduct.  And it's forced to deal with a

5   bankruptcy it did not choose.  It must spend literally

6   millions of dollars from the estate that could be part of its

7   recovery investigating an intentional take and obfuscating

8   whatever transaction with literally thousands of entities,

9   while on the other hand the Cayman Island holding company that

10  is controlled by Mr. Dondero, the funds over which the Debtor

11  had control and came to this Court seeking authority to make

12  the distribution, and seeded by the Debtor when Mr. Dondero

13  controlled it, takes distributions on account of interests

14  which were previously the Debtor's and the transfer of which

15  may very well be avoidable.

16      Your Honor, I'd submit this is precisely an appropriate

17  use of Section 105.  And talk around prejudgment remedies and

18  attachment, frankly, is simply not on point, Your Honor,

19  because I think this situation is distinguishable.

20      And to be clear, Your Honor, Rule 7064, which is cited by

21  CLO Holdco, as I read it, does not preclude the use of Section

22  105 to achieve this outcome.  To the contrary, Rule 7064 might

23  even expand the tools available to the Court to include those

24  available under state law.  It does not restrict them, in my

25  view.

72

```
 1       And there was a reference to Rule 7067, which does not

 2   apply, because the Court ordered the funds placed into the

 3   registry.  They weren't pled into the registry.  The Debtor

 4   didn't want them put in the registry.  The Debtor wanted to

 5   distribute them, which is why it came to the Court in the

 6   first place.

 7       So, Your Honor, I'm at the end of my remarks, and I would

 8   like to say that I think -- not that I think; I know -- what

 9   we are seeking is an equitable result which is clearly within

10   this Court's authority and discretion under the Bankruptcy

11   Code, including Section 105.

12       CLO Holdco's motion cannot be viewed in a vacuum.  The

13   circumstances surrounding, the reason why the distribution

14   motion was brought in the first place, including the Debtor's

15   control over those funds, the circumstances surrounding CLO

16   Holdco, Mr. Dondero's involvement, how it was seeded, how it

17   obtained the interests giving rise to the distribution, all

18   matter, Your Honor, as does the documented history of

19   fraudulent transfers and inappropriate conduct of Mr. Dondero.

20   Viewed appropriately in this context and the balancing of the

21   harms resulting from keeping the distribution in the registry,

22   I submit there is more than ample justification for this Court

23   to deny the motion and order the continued holding of the

24   distributions in the registry.

25       With that, Your Honor, I've concluded my remarks.  Am
```

1  happy to address any questions you may have.

2          THE COURT: Just one. Could you remind me of the

3  relevant provisions of what I'll call the protocol order that

4  was negotiated with the Committee? Because as you pointed

5  out in your argument, the Debtor filed the motion to make

6  these disbursements from the Dynamic Fund and the Argentina

7  Fund because of concerns about the do's and don'ts of that

8  protocol order. So if there's relevant language in there you

9  think I should be reminded of, could you --

10          MR. CLEMENTE: Yeah, that --

11          THE COURT: -- read it?

12          MR. CLEMENTE: Your Honor, that's exactly right.

13  That's exactly correct. I don't -- I'm pretty sure I have it

14  somewhere, but I don't have it right in front of me. But the

15  point there was, Your Honor, when the Committee came to the

16  case and it began to understand all of the related parties,

17  the Committee clearly was concerned that value that either

18  rightfully belonged to the Debtor or had been inappropriately

19  transferred or siphoned away from the Debtor would be

20  distributed to related parties, and then the Committee would

21  be in the position of having to chase after that money.

22      So we negotiated a series of very complicated protocols

23  that Your Honor ultimately approved, and the protocol at issue

24  here was, if distributions, I believe, from any fund where the

25  Debtor managed it and maintained an entity in excess of $2

1    million was to be made, that the Debtor would come to the

2    Committee and the Committee would have five days, I believe,

3    to say, We think you -- you know, we agree with it or we

4    don't.  And if the Committee didn't agree with it, that then

5    the Debtor would go to Court before Your Honor to seek the

6    authority to do it.

7         And so, again, back to an argument I made earlier, that's

8    how we found ourselves here on March 4th.  The Debtor had

9    control over those funds in the sense of he was the party

10   making distributions and doing other things.  They had to come

11   to Your Honor to actually get Your Honor to rule one way or

12   the other to make those distributions.  That, to me,

13   distinguishes it from the cases Mr. Kane cites regarding

14   prejudgment remedies and attachments and things of that

15   nature.

16        THE COURT:  Thank you.  All right.  Mr. Kane, the

17   Movant always get the last word.  And in making whatever quick

18   rebuttal you have, I'll just ask you to please address Mr.

19   Clemente's argument that context matters.

20        This is not as though someone requested an injunction

21   without an adversary proceeding against CLO Holdco.  This

22   order of the Court that money go into the registry of the

23   Court resulted from a Debtor motion, several responses

24   thereto, and then a suggestion that was made by Mr. Dondero's

25   counsel that others embraced:  Let's just stick the disputed

75

1    money into the registry of the Court for now and we'll sort

2    this out in due time.

3        You know, you've made some very compelling legal

4    arguments, I have to say, Mr. Kane, but we have this

5    overarching issue of the context.  So, your response, please.

6            MR. KANE:  Yes, Your Honor.  I'm happy to start with

7    that.  I do think the context is important.  I think that Mr.

8    Clemente and I would disagree about what elements of the

9    context are most important.

10       I would note that the portion of your order that I

11   previously cited during this hearing, whether the -- that

12   funds are to be pled into the registry of the Court and that

13   that would allow parties seeking those funds to file whatever

14   motions or to seek whatever orders were necessary to obtain

15   those funds.  And so what we're looking at here is, right,

16   there is a related-party entity.  But let's talk about

17   generally what the context of this dispute is about.

18       Mr. Clemente noted repeatedly in his closing argument that

19   this is not a dispute about Debtor assets.  Okay?  And I think

20   that's really important.  This is a dispute about funds that

21   are not owned by the Debtor.  The Committee readily admits

22   that.  The Debtor readily admits that.  And so what we're

23   talking about here is tying up assets that are not assets of

24   the Debtor's estate.

25       And so an indefinite freeze on assets that are not assets

 1   of the Debtor's estate is disturbing from a procedural

 2   perspective.

 3        So, I get the Committee's concerns about, hey, this is a

 4   related entity.  Right?  This is CLO Holdco.  There are ties

 5   to Jim Dondero.  We're not trying to hide that fact.  We're

 6   not trying to say, no, that's not really true.  But what I

 7   would also say is that there is no evidence that the seeding

 8   of CLO Holdco from Highland assets was necessarily a

 9   fraudulent transfer or effectuated by seedings of fraudulent

10   conveyances.  Okay?

11        Mr. Clemente even noted, as he was giving his

12   presentation, that there is no factual investigation into the

13   Dugaboy Trust by the Committee or anything like that.  These

14   are baseless allegations, or at least allegations that

15   entirely lack evidence.  So we're at a spot right now,

16   contextually, Your Honor, where the Court has CLO Holdco's

17   funds in its registry.  No other party is laying claim to

18   those funds.  The Committee wants those funds to stick in the

19   registry for an indefinite period of time, even though they're

20   not assets of the Debtor's bankruptcy estate.  And the only

21   reason it wants to do that is for the funds to serve as

22   security against a potential future judgment or claim.

23        And so, contextually for us, well, if there aren't -- if

24   there's no competing claim for the assets and they're stuck in

25   the Court's registry, you know, contrary to Mr. Clemente's

77

1  argument, a vacuous argument on the balancing of harms, we're

2  deprived of the use of $2.4 million and change of assets that

3  could go to additional investments or to satisfy operating

4  costs.

5      So there is real harm on a going forward basis from CLO

6  Holdco's perspective.

7      So that, Your Honor, is the context as we see this.  This

8  is about non-debtor assets frozen to serve as potential

9  security of a hypothetical judgment on claims that have never

10 been ascertained, asserted, identified.

11      So let me address a couple of issues on rebuttal, and I'll

12 be pretty quick about this.

13          THE COURT:  Please.

14          MR. KANE:  Mr. Clemente was making hay about the fact

15 that I said pled into the registry of the Court and that --

16 because, Your Honor, pled into the registry of the Court, this

17 isn't an interpleader action, that this was an order entered

18 by the Court.  That's a distinction without difference.  And

19 the reason that's the case is, if you look at 7067, which is

20 the only Bankruptcy Rule that addresses pleading funds into

21 the registry of the Court, 7067(b) notes, Money paid -- not

22 pled, not ordered -- money paid into the registry of the Court

23 is treated under 28 U.S.C. 2041 and withdrawn pursuant to 28

24 U.S.C. 2042.

25      So, you know, regardless of whether Mr. Clemente

78

```
 1   appreciated how I had described the transition of funds from

 2   the Debtor's control into the Court's registry, the reality is

 3   that 28 U.S.C. 2042 does create the legal thresholds that are

 4   required to withdraw funds from the registry of the Court.

 5        Mr. Clemente argues that, well, cases where a car is

 6   repossessed or a lien is placed on a party's assets under a

 7   prejudgment writ of attachment or injunction are dissimilar

 8   from this case, is really legally -- it's inaccurate.  Those

 9   are erroneous statements.  There is no difference.  If this

10   Court retains CLO Holdco's assets, it's the exact same thing

11   as another -- a third party's assets being held in a blocked

12   account or a third party's assets being retained by a court or

13   third party pending a future judgment.  We're in the exact

14   same procedural position there.

15        Mr. Clemente got into a balance of harm's analysis when he

16   was discussing this Court's application of an injunction under

17   Section 105(a), arguing that an adversary proceeding is

18   unnecessary or that injunctive relief could be issued under

19   7064.  Your Honor, 7064 and 7065 are there.  And there is a

20   distinction from the courts between a prejudgment writ of

21   attachment that would be applicable under 7064 and an

22   injunction that would be issued under 7065.  Injunctive relief

23   is addressed under 7001(7) and 7065.

24        So you can't just say, well, no, you can do it as a -- as

25   -- on a motion like you would a prejudgment writ of
```

79

1   attachment.  Bankruptcy Rules aren't structured like that.

2       But importantly, Mr. Clemente presented no facts to

3   support his balancing of harms argument and presented no facts

4   to establish that he has any viable claims against CLO Holdco.

5   Arguments that James Dondero participated in frauds does not

6   mean that there's a claim or cause of action that the

7   Committee can assert against CLO Holdco, which is what would

8   be required to obtain an injunction.

9       This is a big if.  If the Committee is seeking to obtain

10  an injunction, it must satisfy its burden of proving under

11  7065 and the four-factor test established by *Janvey v. Alguire*

12  in the Fifth Circuit in 2011 and the many cases before that.

13  And it just can't do it.

14      So I want to leave the Court with one case citation,

15  because if the Court is considering some means of entering a

16  preliminary injunction outside of an adversary proceeding, I

17  was able to find a grand total of one case that address that

18  in the Fifth Circuit.  And that is the 1995 decision of *In re*

19  *Zale* in which the Fifth Circuit noted that the only way a

20  105(a) preliminary injunction could be issued, after a finding

21  of these unusual circumstances and the like, was if all of the

22  protections of an adversary proceeding had been afforded to

23  the non-movant and if the party that was requesting the

24  injunction satisfied the four-factor test that's found in

25  7065.

80

1    There are no extraordinary circumstances or unusual

2  circumstances here.  And if this Court believes that the

3  context of this case warrants that, then the Committee would

4  still have to satisfy that four-factor test for a preliminary

5  injunction.  And it has the burden of proof on those four

6  factors.  It hasn't presented any evidence whatsoever to

7  support that it can meet the first, let alone the second,

8  third, and fourth factors of that test.

9    So, Your Honor, with that, I'll close our case, unless you

10  have additional questions, and request that the Court grant

11  CLO Holdco's motion.

12    THE COURT:  A couple of follow-up questions.  I have

13  certain facts in my brain, and I can't remember if they're in

14  evidence or stipulated to or I read them in a pleading.  So, I

15  just want to ask:  Somewhere I remember seeing that CLO

16  Holdco, or, you know, maybe it's its parent, I think -- Mr.

17  Clemente said we have a Byzantine structure here and we have a

18  sub-web within a bigger web with regard to CLO Holdco.  But,

19  anyway, CLO Holdco or its parent has assets of approximately

20  $225 million?  Is that evidence or undisputed?

21    MR. KANE:  Your Honor, that was contained in one of

22  the pleadings asserted, I believe, by the Committee, and that

23  was the Charitable DAF entities, not necessarily CLO Holdco.

24  There hasn't been any evidence presented by the Committee of

25  the assets held by CLO Holdco other than what we have before

81

```
 1   the Court.
 2          THE COURT:  Okay.  So it's not something you would
 3   stipulate or offer one way or another?
 4          MR. KANE:  No, Your Honor, I think that's factually
 5   incorrect and I don't stipulate to that.
 6          THE COURT:  Okay.  I think my notes show that that
 7   was the alleged amount of assets as of September 30, 2019.
 8   But, again, that may have just been a pleading, not anything
 9   in evidence.
10      All right.  And are Mr. Scott or Mr. Dondero on the phone
11   today or on the video?  I'm just curious.
12          MR. KANE:  Your Honor, I lost you on the video a
13   little bit, but assuming you can hear me, though, Mr. Scott is
14   not.  We had conversations with the Committee about various
15   exhibits and whether or not Mr. Scott would be here to testify
16   to prove up exhibits.  Once the exhibits were all stipulated
17   as admissible, then there was no need for Mr. Scott to
18   participate.
19          THE COURT:  Okay.  I was not going to ask him
20   anything.  I just was curious if he was listening in.  Or Mr.
21   Dondero, for that matter.  I guess Mr. Dondero is not on the
22   line, correct?  (Pause.)  All right.  I'll --
23          MR. KANE:  Your Honor, I -- I think -- I'm sorry.
24   I've had no conversations with Mr. Dondero.  I have no idea
25   whether he's on the line.
```

82

```
 1          THE COURT:  Okay.  I'll take silence to mean he's
 2   probably not, but --
 3       All right.  I asked that question for, I guess, a couple
 4   of reasons.  But the main reason I asked is -- and I'm going
 5   to say this as kindly as I can.  They're not here to hear it
 6   anyway.  But I feel like perhaps they are a little tone deaf,
 7   for lack of a better term, on how this all looks to the Court
 8   today.  And what I mean by that is, obviously, I assume it was
 9   their decision to bring this motion, at least Mr. Scott's, and
10   likely Mr. Dondero as well had some involvement in that
11   decision.  And the reason I say that it feels like they're a
12   little tone deaf about how this looks is that we just had an
13   extensive hearing and some very thorough pleadings, a lot of
14   evidence uploaded, on a $2.5 million issue.  And I don't --
15   you know, I appreciate that that is a significant sum of
16   money, but we've used the word context a lot this morning:  In
17   the context of this reorganization, it seems like a very big
18   deal was raised here, at the choice of Mr. Scott and Mr.
19   Dondero, over a $2.5 million issue, in the context of a
20   reorganization that involves at least hundreds of millions of
21   dollars of debt, if not over a billion.  UBS says they're owed
22   a billion.
23       And I just asked my question a minute ago about the value
24   of assets that the DAF or CLO Holdco or that sub-structure has
25   managed, because while no one will commit, is it $225 million
```

83

1    or not, you know, I take it that the Committee had a good

2    faith basis for saying that, and if it's not that, it's

3    probably a quite sizable number.

4        Again, so I'm kind of thinking out loud about the

5    proportionality of this issue.  $2.5 million, not anything to

6    sneeze at, but we're talking about a Charitable DAF that

7    probably has many, many, many more times that of assets.  And

8    so there was certainly no equitable argument of hardship or,

9    you know, significant detriment that's befalling CLO Holdco by

10   the tying up of this money in the registry of the Court for

11   this relatively short time period.  So, again, it feels a

12   little tone deaf to be bringing this argument, occupying so

13   much time from the parties, the lawyers, the Court, over this

14   issue.

15       And just to further elaborate on that, it matters to me,

16   and I say this about the tone-deafness, partly because I

17   thought -- I said this at the beginning of the hearing, and I

18   still say it -- we already put this issue to rest, albeit

19   temporarily, in March.  And in April, we get this new motion.

20   Again, I recognize the language of the March order reserved

21   everyone's rights to come back and argue about this, but,

22   again, the buzzwords for this hearing are going to be context

23   matters, I guess.  Mr. Clemente, you get credit for that buzz

24   phrase, those buzzwords.

25       Again, I issued the order with regard to putting these

84

1    monies in the registry of the Court at the suggestion of Mr.

2    Dondero's very wonderful lawyer, retired Judge Lynn.  And,

3    again, the context was we had a protocol order early in this

4    case that the Committee negotiated heavily with regard to

5    monies being disbursed out under the control of the Debtor,

6    and heavily negotiated.  I remember the CLO Issuers, I think,

7    had some pause and concerns and got their language into that

8    order.

9        So we had this protocol order.  Debtor was worried about

10   violating the protocol order, so Debtor files the motion

11   February 24th, wanting the blessing of a court order before it

12   transferred these monies to CLO Holdco and some other

13   Highland-affiliated entities.  There were vehement objections,

14   and the Court issued the order saying, Let's put these monies

15   into the registry of the Court, at the suggestion of very able

16   counsel as to how we could resolve that contested matter we

17   were there on on March 4th.

18       So, you know, a month later, April, we have this new

19   motion of CLO Holdco reviving the dispute, the $2.5 million

20   dispute that we had just put to rest temporarily in March at

21   the suggestion of lawyers.  I didn't issue a 105 injunction

22   outside the context of an adversary proceeding just on my own,

23   *sua sponte*.  It was suggested to me that this was a good

24   solution.  People embraced it.  That's what we did.  And I

25   sure didn't have in my brain that a month later we'd have a

85

 1   brand new motion regarding whether these monies should be

 2   disbursed to CLO Holdco all over again, when that was the

 3   issue that was already before the Court in March.

 4       I, again, fully recognize that everybody reserved their

 5   rights, but I focus on this context because, again, I wish Mr.

 6   Dondero and Mr. Scott were on the call to hear this:  This

 7   almost feels like a good faith issue to me.  You know, maybe I

 8   would feel slightly different if there had been a broad

 9   emphasis, heavy emphasis, CLO Holdco standing up through a

10   lawyer that day saying, We're just letting you know, we're

11   going to get together a motion in very short order and tee

12   this up again.  Because I would have probably said no.  You

13   know, if -- let's just hear it right now today, if this is

14   only a three-week mandate or whatever.  So, good faith is

15   something that I can't help but scratch my head and be

16   troubled by.

17       So, I want to emphasize that CLO Holdco's lawyer has made

18   perfect arguments regarding the potential legal issues here.

19   There are some valid arguments here about is this tantamount,

20   holding the money in the registry of the Court that a non-

21   debtor asserts is its property, is that tantamount to a

22   prejudgment remedy?  You know, did it require an adversary

23   proceeding?  Did it require the traditional four-prong prove-

24   up for a preliminary injunction?  And did the Court just give

25   short shrift to those legal technicalities?

86

 1     Again, these are compelling arguments, but I'm overruling

 2   the arguments because, again, I believe it ignores the context

 3   that CLO Holdco essentially consented, acquiesced, in this

 4   placeholder keep-the-status-quo solution.  And I question its

 5   good faith in, so quickly after consenting, bringing this

 6   motion.

 7     But moreover, I do find that in the unique context of the

 8   disputes before the Court on March 4th, I did have authority

 9   to issue a 105 injunction.  105, as we all know, at Subsection

10   (a) gives a bankruptcy court authority to issue orders

11   necessary or appropriate to carry out provisions of Title 11,

12   and the last sentence even provides a mechanism for the Court

13   to *sua sponte* take action to, among other things, prevent an

14   abuse of process or just do what's necessary or appropriate to

15   implement court orders or rules.

16     So I think, again, in the context before the Court, it was

17   not only a consensual thing, but the Court had authority.  And

18   the backdrop of this, again, cannot be overstated.  Again, to

19   use Mr. Clemente's word, we have this Byzantine structure

20   here.  It's a lot for the Committee to get its arms around.

21   And even the CLO Holdco structure -- again, I'm looking at my

22   notes, my fancy chart -- we have CLO Holdco, a Cayman Island

23   entity.  Its parent is Charitable DAF Fund, LP, another Cayman

24   Island entity.  It, in turn, is owned by Charitable DAF

25   Holdco, Ltd., yet another Cayman Island entity.  Its general

1  partner happens to be a Delaware entity, Charitable DAF GP,

2  LLC, but the beneficial owners of it are the three Highland

3  Foundations, of which Dondero is president and director, and

4  Mr. Scott the treasurer and director.

5      So, I'm not saying the Byzantine structure is in and of

6  itself problematic, although one might wonder why a charitable

7  organization needs to have three offshore entities as part of

8  its structure.  I digress.  But we all know a Byzantine

9  structure and ties to Dondero do not mean something is

10  attackable in and of itself, but we have had issues raised

11  about the Dynamic Fund and the various transfers with regard

12  to Dugaboy, the Dondero Family Trust, and Get Good Trust and

13  the note.  All of that is worthy of examination, and the

14  Committee has not had all that long in this case to

15  investigate it.

16      So, I'm going to say a couple of more things.  First, the

17  motion is denied, but I'm going to put more strings on it than

18  that.  I'm denying the motion, but as part of this ruling I'm

19  going to order that the Committee has 90 days, unless the

20  Court happens to extend that on motion or agreement of the

21  parties, to file an adversary proceeding against CLO Holdco or

22  the money shall be released.  Okay?

23      So, again, I intended it, as I think everybody did, to be

24  a placeholder, to keep the status quo little bit.  Again, Mr.

25  Kane has raised good arguments that maybe an adversary

88

1  conceivably was necessary or might become necessary.  So here

2  we have a requirement of an adversary within 90 days or the

3  money shall be released to Holdco -- again, unless someone

4  moves to extend that or I get an agreement to extend that and

5  I happen to decide to issue an order extending that.

6      I presume that if an adversary is filed, then if the

7  Committee wants that money to continue to be held in the

8  registry of the Court, then they would have to file an

9  application for injunctive relief, essentially, to keep the

10 money in the registry of the Court pending the resolution of

11 the adversary proceeding.

12     So that is the ruling of the Court.  Mr. Clemente, I'll

13 ask you to draft up the order.  And I reserve the right to

14 supplement this oral ruling in that form of order.  And please

15 run it by Mr. Kane before electronically submitting it to the

16 Court.

17     Now, I'm going to say a couple of other things, and then

18 I'll, before closing, I'll ask if there are questions or other

19 announcements.  I have told the parties and the lawyers to

20 focus on a plan and problem-solving how we're going to pay

21 creditors.  And I think I expressed my strong hope that people

22 would stop litigating everything.  I think I'm remembering

23 saying this most recently at the UBS hearing a few weeks ago

24 on a motion to lift stay.  Once again, we had a very lengthy

25 hearing that day.  I denied the motion.  And here we are

89

1   again.

2       You know, I want certain people to understand that it's

3   time to stop fighting everything.  The Debtor is in bankruptcy

4   because of years and years and years and years and years of

5   litigating everything to the nth degree.  I'm fed up with it,

6   and I tend to believe that behind the scenes -- I have no

7   doubt that behind the scenes there are people working hard

8   towards crafting a plan, and I think we're coming up on an

9   exclusivity deadline in late July, maybe.  What do I have to

10  say to make it clear:  People need to stop litigating and

11  start focusing on a plan to get creditors paid.  I don't want

12  to do something drastic like appoint a global mediator, but it

13  is definitely dancing around in my brain if we keep having,

14  again, sideshows.  Okay?

15      So, Mr. Pomerantz, what do you want to tell me about

16  what's going on behind the scenes?  Again, I am certainly not

17  probing into settlement discussions, but do we have progress

18  being made, or is everyone just threatening to file new

19  litigation?

20          MR. POMERANTZ:  Yes, Your Honor.  For the record,

21  it's Jeff Pomerantz; Pachulski Stang Ziehl & Jones; on behalf

22  of the Debtors.

23      Your Honor, the Debtor took to heart the comments that

24  Your Honor made at the conclusion of the UBS hearing.  It's

25  been the Board's desire to move this case forward, both in the

90

 1   plan process and in terms of a claims resolution process.  And

 2   I think I mentioned to Your Honor that at least with respect

 3   to the UBS hearing, I think that we needed to get by that

 4   hearing before until I think we can make any progress with

 5   them.

 6        Since that time, and in anticipation of the hearing that

 7   is going to occur on July 8th, when I indicated to Your Honor

 8   that we would hopefully present a structure and a mechanism to

 9   do exactly what Your Honor said, there has been a lot of work

10   and a lot of effort, both at the Board level to come up with a

11   concept, a structure, and a timing for the mediation process,

12   and I personally have spoken to not only Mr. Clemente but

13   counsel for every member of the Committee, to hopefully

14   coalesce around a concept, identification of mediators, what

15   would be mediated, and how that would take -- process.

16        We understand the Committee is meeting today to discuss

17   that.  Right after this hearing, we have a weekly meeting

18   between the Board and the Committee.  We will discuss that

19   further.  But your message was taken by the Debtor, and I

20   believe by the other parties, loud and clear, that Your Honor

21   would (audio gap).

22        At the same time, we recognize that that might be

23   impossible.  Since the last hearing, we filed our objection to

24   the Acis claims.  UBS filed its claim on Friday, the 26th.  As

25   Your Honor is aware, we're preparing an objection to that

1   claim as well, as well as others.

2       We do not want to litigate while we mediate.  However,

3   this case has progressed for a while, and I think it's going

4   to be important for all parties to understand that if the

5   mediation is not successful, they and I will be called on to

6   make some difficult decisions on the claims that are asserted

7   against the estate to go forward.

8       At the same time, and separate and apart from the

9   mediation process, the Debtor has been working on a plan with

10  the Creditors' Committee.  It is in its advanced stages.  And

11  while it's not ready to be imminently filed, we think in short

12  order we will be able to file a plan.  What the plan says and

13  whether it's just essentially putting assets in a monetization

14  vehicle and resolving the claims after confirmation, or

15  whether something can be done more globally, what has been

16  referred to with the parties as a grand bargain, is still

17  something that we are trying to flesh out.

18      But make no mistake, Your Honor:  The Board has wanted to

19  move this case forward.  Your comments, I think, have been

20  extremely helpful in telegraphing what your thoughts are.  I

21  think the Committee understands that, the Creditors' Committee

22  understand that, that it's just not sustainable on a number of

23  levels to keep on fighting and litigating and have these types

24  of hearings.

25      So we will present, hopefully, on July 8th, as -- a game

92

1    plan.  Hopefully, we'll have everyone's approval.  But even if

2    we don't have every -- anyone -- everyone's approval, it'd be

3    the Debtor's thoughts to present to Your Honor how the Debtor

4    believes we should proceed.

5         THE COURT:  All right.  Well, thank you.  I had

6    forgotten we were coming back so soon.  July 8th.  Next week.

7    I had in my brain late July.  But that -- is it a status

8    conference or an actual motion that's set?

9         MR. POMERANTZ:  Your Honor, we have a couple of

10   hearings on calendar for that day.

11        THE COURT:  Okay.

12        MR. POMERANTZ:  I believe one is exclusivity, --

13        THE COURT:  Okay.

14        MR. POMERANTZ:  -- which I do not think is going to

15   be contested, based upon my conversations with Mr. Clemente,

16   although I understand he'll want to explain to the Court what

17   the Committee's position on any further extensions would be.

18        There is also a motion to extend the removal deadline.

19        So, thus far, there is nothing contested, but we intend to

20   be able to use that, Your Honor, to present an approach that

21   hopefully will resolve this.

22        Your Honor, I have one other comment that I wanted to make

23   in connection with the motion Your Honor just heard.

24        THE COURT:  Okay.

25        MR. POMERANTZ:  As Your Honor recalls and as we

93

1    mentioned today, there were distributions from a variety of

2    different Funds to a variety of related parties.  In June,

3    distributions were set to be made to those same parties.  And

4    with the consent of CLO Holdco and with the consent of HCM

5    Services, those monies were not distributed to them, but are

6    in the process of being submitted to the Court's registry.

7              THE COURT:  Okay.

8              MR. POMERANTZ:  The expectation would be that they

9    were going to be treated the same way as the old funds, based

10   upon Your Honor's ruling.

11       We understand from the Court that we, Your Honor, that we

12   probably need a separate order with respect to that, and

13   that's with respect to the CLO and HCM Services.  So we would

14   prepare that order.

15       Whether both those distributions would be made to Mark

16   Okada -- and if Your Honor recalls, at the last hearing, Your

17   Honor only withheld the amount necessary to pay Mr. Okada's

18   note, which was ultimately paid, and the remaining amounts

19   were distributed to him.  And in light of that, we advised the

20   Committee that we would distribute additional monies to Mr.

21   Okada, and there was no objection.

22       (Echoing.)

23             MR. POMERANTZ:  So, in sum, Your Honor, we would

24   submit to Your Honor a further order to Your Honor for the

25   additional funds, otherwise payable from those funds to CLO

94

1    Holdco and to HCM Services, to be put in the Court's registry.

2          THE COURT:  All right.  Someone needs to be put on

3    mute.  I don't know who that is, but we're getting some

4    background.  Okay.

5          MR. CLEMENTE:  Again, Your Honor.  Your Honor, Matt

6    Clemente, very, very quickly, Your Honor.

7          THE COURT:  Okay.

8          MR. CLEMENTE:  Again, the Committee obviously took to

9    heart your comments at the last hearing and very much

10   appreciate the comments you just gave in terms of where you're

11   at and how you're viewing and feeling about things.  And so I

12   will obviously discuss those very, very carefully with the

13   Committee.

14       Just to point out to Your Honor, Mr. Pomerantz talked

15   about the distribution to Mr. Okada.  And, again, you talk

16   about context and optics and understanding where we are.  I

17   read and understood -- I was in front of you -- regarding the

18   ruling from the last time.  Remember, we objected to the

19   distribution to Mr. Okada last time.  We did not do that this

20   time, Your Honor.

21       So the Committee does very much understand Your Honor's

22   desire for this to not continue to be a litigation issue.  We

23   could have easily tried to object to Mr. Okada's distribution

24   again, and we did not, Your Honor.

25       So I want Your Honor to understand that the Committee very

95

```
 1   much understands where Your Honor is thinking and how she's
 2   viewing things, and I suspect that the Committee will be very
 3   responsive and respectful of your comments, Your Honor.
 4           THE COURT:  Thank you.  All right.  Well, then, Mr.
 5   Pomerantz, I'll be on the lookout for your order that the
 6   Clerk's Office needs for more money to be deposited in the
 7   registry of the Court.  And, again, I understand that it is
 8   the newest disbursement that would otherwise be due to
 9   Highland Capital Management Services, Inc. and to CLO Holdco,
10   Ltd., and that would certainly be my intention after today's
11   ruling, that the newest distribution for those entities go
12   into the registry of the Court.
13       So, we'll be on the lookout for that.  And I guess I will
14   see you on July 8th for other case matters, and we'll see
15   where we are next week.
16       All right.
17           MR. CLEMENTE:  Thank you, Your Honor.
18           MR. KANE:  Your Honor?
19           THE COURT:  Thank you.
20           MR. KANE:  Your Honor, this is John Kane.
21           THE COURT:  Okay.
22           MR. KANE:  Sorry.  I have mainly just a brief
23   statement.  And I have no intention of trying to persuade you
24   a different way from your ruling.  I understand that ruling is
25   already there.
```

 1    But I was -- I was on the phone representing CLO Holdco on

 2  the last Acis plan status conference and listened to your

 3  directives to the parties about the litigious nature that's

 4  been taking place in this case.  And I've had lengthy

 5  conversations with my client, Grant Scott, about those same

 6  concerns.

 7    So I did want to disclose to Your Honor, first, that

 8  nothing in our motion was trying to contradict the Court's

 9  ability to initiate plead funds into the registry of the Court

10  or order that.  We weren't trying to relitigate the same

11  proceeding a second time.

12    But, importantly, at the outset of this, I had

13  conversations with the Committee about our efforts to try and

14  locate a feasible bond to put up as collateral to remove the

15  funds from the registry so that we could satisfy both the

16  Committee's concerns but also CLO Holdco's concerns about

17  liquidity issues at the CLO Holdco level.

18    Unfortunately, we were not able, after discussing with two

19  different bond brokers, to locate a bond that we thought was

20  going to be economically feasible, given the potential time

21  period that the funds could be in the registry, given that

22  there was no temporal limitation on how long the Committee

23  would be investigating these claims, or, really, how long

24  litigation could take, depending on the complexity of the

25  claims and the number of parties included on that complaint.

1      We were looking at a potential even, you know, two percent

2   cash bond on an annual basis was going to be hundreds of

3   thousands of dollars, potentially.  And that's something that

4   we decided really wasn't feasible.

5      And I also want to make abundantly clear that I would not

6   have attempted to relitigate any issue whatsoever.  I

7   personally viewed that this is a separate and distinct legal

8   issue.  I was not present at that March hearing.  So I

9   apologize if this came across as some kind of litigation

10  tactic.

11     But the reason that our motion was filed is because of

12  liquidity concerns at the CLO Holdco level relayed to me by

13  Grant Scott.  There was no evidence presented of that because,

14  Your Honor, we did not believe that we had the burden of

15  proving any kind of harm issue because we were not the party

16  seeking that injunction, and that wasn't an issue that had

17  been subject to any kind of discovery whatsoever.

18     So, I just -- I always get very uncomfortable when there

19  are allegations of good faith, bad faith, the like.  I want

20  this Court to understand that CLO Holdco's counsel is advising

21  CLO Holdco regarding your views on the litigious nature of

22  proceedings in this case, this bankruptcy case, that that is

23  something that is very real, that I have taken to heart, that

24  I am using to influence my client's decision-making, and that

25  this was not an attempt by CLO Holdco to unnecessarily address

98

1    or relitigate an issue for some small balance.

2        CLO Holdco, most of its assets are either encumbered or

3    are illiquid.  There is a large portion of illiquid assets

4    that are not encumbered.  So we are able to pay any kind of

5    judgment.  Let me restate that.  That we would -- we would

6    likely have to liquidate considerable assets to do that, which

7    is where the settlement gives a potential opportunity cost and

8    appreciation of asset value, which is why we proceeded with

9    this motion.

10       I'm not intending any of those statements to be admitted

11   into evidence or to persuade you to either rule differently

12   for some reason or another, but I did think that, given your

13   concerns, that it was important to provide the Court with

14   context for why we took the tactic that we did to try and

15   obtain funds from the registry of the Court.

16       This, on the CLO Holdco level, was not a bad faith effort.

17   We weren't trying to relitigate an issue that was already

18   there, and certainly we weren't trying to litigate unless

19   litigation we felt was necessary from a financial cost-benefit

20   analysis.  And that was a real analysis that we discussed

21   between me and my client.

22       I just wanted to share that with the Court.  I've shared

23   with the Committee counsel that we understand that there are

24   major concerns about Jim Dondero, about his control over

25   various entities, about transfers.  I'm trying to work as hard

99

1   as I can to distance CLO Holdco from that taint, because

2   understanding that it's in what has been alleged as a

3   Byzantine web, we think it's important to separate CLO Holdco

4   and its operations to ensure that things are done in an

5   appropriate fashion with square corners.

6       That's all I have, Your Honor.  We have no objection to

7   the additional funds being pled into the registry of the

8   Court.  We can agree those funds would be adjudicated as part

9   of this dispute.  We understand that we did not prevail, and

10  we appreciate your Court hearing our argument.

11      (Proceedings concluded at 12:06 p.m.)

12                          --oOo--

13

14

15

16

17

18

19                      CERTIFICATE

20      I certify that the foregoing is a correct transcript to
    the best of my ability from the electronic sound recording of
21  the proceedings in the above-entitled matter.

22   **/s/ Kathy Rehling**                        07/02/2020

23  _____    _____
    Kathy Rehling, CETD-444                     Date
24  Certified Electronic Court Transcriber

25

100

INDEX

PROCEEDINGS                                                    4

OPENING STATEMENTS

- By Mr. Kane                                                 10
- By Mr. Clemente                                            21

WITNESSES

-none-

EXHIBITS

CLO Holdco, Ltd.'s Exhibits 1 through 16        Received 26
Unsecured Creditors' Committee's Exhibits       Received 36
  1 through 3

CLOSING ARGUMENTS

- By Mr. Kane                                                41
- By Mr. Clemente                                           56

RULINGS                                                      81

END OF PROCEEDINGS                                           99

INDEX                                                       100

APP. 1251
Appx. 01298

# EXHIBIT 13

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

```
IN RE:                        ) Case No. 19-34054-sgj11
                              ) Chapter 11
                              )
HIGHLAND CAPITAL              ) Courtroom 1
MANAGEMENT, L.P.,             ) 1100 Commerce Street
                              ) Dallas, Texas 75242-1496
                              )
                              ) July 21, 2020
                              ) 1:38 p.m.
```

```
     TRANSCRIPT OF OFFICIAL COMMITTEE OF UNSECURED CREDITORS
          EMERGENCY MOTION TO COMPEL PRODUCTION BY THE
     DEBTOR (808); DEBTORS MOTION FOR ENTRY OF (I) A PROTECTIVE
      ORDER, OR, IN THE ALTERNATIVE, (II) AN ORDER DIRECTING THE
   DEBTOR TO COMPLY WITH CERTAIN DISCOVERY DEMANDS TENDERED BY THE
   OFFICIAL COMMITTEE OF UNSECURED CREDITORS, PURSUANT TO FEDERAL
         RULES OF BANKRUPTCY PROCEDURE 7026 AND 7034 (810)
           BEFORE HONORABLE JUDGE STACEY G. JERNIGAN
              UNITED STATES BANKRUPTCY JUDGE
```

```
APPEARANCES VIA WEBEX:

For the Debtor:          Pachulski Stang Ziehl & Jones LLPL
                         By:  IRA D. KHARASCH, ESQ.
                         10100 Santa Monica Boulevard
                         13th Floor
                         Los Angeles, California 90067

                         Pachulski Stang Ziehl & Jones, LLP
                         By:  JOHN A. MORRIS, ESQ.
                         780 Third Avenue, 34th Floor
                         New York, New York 10017-2024


ECRO:                    Michael Edmond
```

**TRANSCRIPTION SERVICE:**   **TRANSCRIPTS PLUS, INC.**
**435 Riverview Circle**
**New Hope, Pennsylvania 18938**
**Telephone:  215-862-1115**
email CourtTranscripts@aol.com

```
 Proceedings recorded by electronic sound recording, transcript
            produced by transcription service.
```

2

```
APPEARANCES VIA WEBEX:
(Continued)


For the Debtor:              Hayward & Associates PLLC
                            By:  MELISSA S. HAYWARD, ESQ.
                                 ZACHERY Z. ANNABLE, ESQ.
                            10501 N. Central Expressway
                            Suite 106
                            Dallas, Texas 75231

For the Unsecured           Sidley Austin LLP
Creditors' Committee:       By:  MATTHEW A. CLEMENTE, ESQ.
                            One South Dearborn
                            Chicago, Illinois 60603

                            Sidley Austin LLP
                            By:  PAIGE HOLDEN MONTGOMERY, ESQ.
                            2021 McKinney Avenue, Suite 2000
                            Dallas, Texas 75201

For James Dondero:          Bonds Ellis Eppich Schafer Jones LLP
                            By:  JOHN BONDS, ESQ.
                                 MICHAEL LYNN, ESQ.
                            420 Throckmorton Street, Suite 1000
                            Fort Worth, Texas 76102

For Atlas IDF, GP,          Rochelle McCullough, LLP
et al.:                     By:  E. P. KEIFFER, ESQ.
                            325 North St. Paul Street
                            Suite 4500
                            Dallas, Texas 75201

For H.C. and Fund           K&L Gates LLP
Advisors:                   By:  JAMES WRIGHT, ESQ.
                                 STEPHEN TOPETZES, ESQ.
                            1601 King Street, N.W.
                            Washington, DC  20006

For CCS Medical:            Jones Day
                            By:  TRACY K. STRATFORD, ESQ.
                            North Point, 901 Lakeside Avenue
                            Cleveland, Ohio 44114-1163
```

3

APPEARANCES VIA WEBEX:
(Continued)


For CLO Holdco, Ltd:        Kane Russell Coleman Logan PC
                            By:  JOHN J. KANE, ESQ.
                            901 Main Street
                            Suite 5200
                            Dallas, Texas 75202

For NexPoint:               Wick Phillips
                            By:  LAUREN DRAWHORN, ESQ.
                            100 Throckmorton Street, Suite 1500
                            Fort Worth, Texas 76102

For HCLOF:                  King & Spalding
                            By:  REBECCA T. MATSUMURA, ESQ.
                            500 W. 2nd Street, Suite 1800
                            Austin, Texas 78701

                            King & Spalding
                            By:  MARK M. MALONEY, ESQ.
                            1925 Monroe Drive NE
                            Atlanta, Georgia 30324

For Redeemer Committee      Jenner & Block LLP
of the Highland             By:  TERRI L. MASCHERIN, ESQ.
Crusader Fund:              353 N. Clark Street
                            Chicago, Illinois 60654-3456

                            Jenner & Block LLP
                            By:  MARC B. HANKIN, ESQ.
                            919 Third Avenue
                            New York, New York 10022-3098

For NexBank Capital:        Alston & Bird
                            By:  JARED M. SLADE, ESQ.
                                 JONATHAN T. EDWARDS, ESQ.
                            Chase Tower
                            2200 Ross Avenue
                            Suite 2300
                            Dallas, Texas 75201

4

```
APPEARANCES VIA WEBEX:
(Continued)


For UBS Securities:        Latham & Watkins LLP
                           By:  ANDREW CLUBOK, ESQ.
                           555 Eleventh Street, N.W.
                           Suite 1000
                           Washington, DC 20004

                           Latham & Watkins LLP
                           By:  KIMBERLY A. POSIN, ESQ.
                           355 South Grand Avenue
                           Los Angeles, California 90071-1560

For Acis Capital          Winstead PC
Management L.P.:          By:  RAKHEE V. PATEL, ESQ.
                               ANNMARIE CHIARELLO, ESQ.
                          2728 N. Harwood Street
                          Suite 500
                          Dallas, Texas 75201

For Ellington, et al.:    Winston & Strawn LLP
                          By:  KATHERINE PRESTON, ESQ.
                          800 Capitol Street, Suite 2400
                          Houston, Texas 77002

                               * * *
```

5

1    **(IN INSTANCES WHERE CONNECTION IS FADING IN AND OUT, AN**

2  **INAUDIBLE RESULTED DUE TO THE LACK OF AUDIBILITY.   IN INSTANCES**

3    **OF MUFFLED VOICES OR REVERBERATION OF THE TELEPHONIC**

4    **PARTICIPANTS ON CHANNEL 2, AN INDISCERNIBLE RESULTED)**

5         THE COURT:  This is Judge Jernigan, and we are ready

6  to start a hearing today in Highland.  Before I take

7  appearances, let me just kind of say where I think we are.

8         We have a document production dispute on the calendar

9  today, primarily between the Unsecured Creditors' Committee and

10  the debtor.  Basically it's an ESI protocol dispute, as I

11  understand it.

12        We have had eight other parties in interest weigh in

13  on the dispute with pleadings.  So I'll do a roll call.

14   (The Court engaged in off-the-record unrelated colloquy)

15        THE COURT:  I'm a little hamstrung here because I

16  don't have my glasses, but my law clerk is working on that.  I

17  guess I do have a magnifying glass here.

18        All right, well, why don't we do a roll call while

19  he's getting my glasses, of the different parties in interest.

20  I'm going to call parties one-by-one to avoid talking overlap.

21        For the Committee, it looks like we have Mr.

22  Clemente, is that correct?

23                    (No audible response heard)

24        THE COURT:  Oh, you're on mute.

25        MR. CLEMENTE:  My apologies, Your Honor.  Matt

6

1  Clemente from Sidley on behalf of the Committee. My partner,

2  Paige Montgomery, is also here with me, and she will be

3  addressing the Court today, as well.

4          THE COURT: Okay. Very good. For the debtor, who do

5  we have participating today?

6          MR. KHARASCH: Good morning, Your Honor. It's Ira

7  Kharasch of Pachulski Stang, and we also have John Morris from

8  Pachulski Stang, as well.

9          THE COURT: Okay; good afternoon.

10         All right. Mr. Dondero's counsel weighed in. Who do

11 we have appearing for Mr. Dondero this afternoon?

12         MR. LYNN: Yes, Your Honor. Michael Lynn and John

13 Bonds for Jim Dondero.

14         THE COURT: Okay, very good.

15         Now I'm going to go through the seven other parties

16 that have weighed in. For the party Atlas, do we have Paul

17 Keiffer or some other lawyer participating?

18         MR. KEIFFER: Yes, Your Honor, Paul Keiffer here.

19         THE COURT: All right; good afternoon.

20         For H.C. and Fund Advisors, who do we have appearing?

21         MR. WRIGHT: Good afternoon, Your Honor. You have

22 James Wright and Steve Topetzes at K&L Gates.

23         THE COURT: Okay; very good.

24         All right, CCS Medical, who do we have appearing?

25         MS. STRATFORD: Your Honor, it's Tracy Stratford from

7

1   Jones Day.

2           THE COURT:  Okay; thank you.

3           MS. STRATFORD:  Thank you.

4           THE COURT:  CLO Holding, who do we have?

5           MR. KANE:  Your Honor, John Kane for CLO Holdco,

6   Limited.

7           THE COURT:  Okay, Holdco, excuse me; thank you.

8           What about NexPoint?

9                   (No audible response heard)

10          THE COURT:  Anyone appearing for NexPoint?  Jason

11   Rudd, Lauren Drawhorn perhaps?

12                  (No audible response heard)

13          MR. WRIGHT:  Your Honor, this is James Wright again

14   at K&L Gates.  We represent one of the NexPoint entities,

15   NexPoint Advisors.  But I understand there are some other

16   NexPoint entities that we don't represent, and they may have a

17   separate objection, just to be clear.

18          THE COURT:  Okay.  Yes, there was a separate

19   objection.  The same firm, Wick Phillips, filed an objection by

20   MGM.

21          So, again, I'll ask, is there anyone on the phone for

22   those clients?

23                  (No audible response heard)

24          THE COURT:  All right, well, we may -- oh, I see

25   Lauren Drawhorn on the video; are you muted, Ms. Drawhorn?  Ms.

8

1 Drawhorn, we can see you but we can't hear you. Cannot hear

2 you. We definitely see you.

3       If we can't -- yes, if you could call on your cell

4 phone, we can hear you that way, and you can keep your visual

5 on, as well.

6       Okay, I'll go on. What about HCLOF, do we have

7 someone from King & Spalding?

8           (No audible response heard)

9       THE COURT: Okay. I'm not hearing anyone from King &

10 Spalding.

11       MR. MALONE: Your Honor, this is Mark Malone. I'm

12 not sure if you can hear me, I'm only dialed in on my phone.

13       THE COURT: Okay, I --

14       MR. MALONE: Can you hear me?

15       THE COURT: I do hear you, Mr. Malone; thank you.

16       MR. MALONE: Yes, and Rebecca Matsumura is trying --

17 I suspect feverishly, I don't have the video. I know she's

18 plugged in on the video. She'll be handling any argument,

19 assuming we can get her on. If not, I'm happy to handle it.

20 But we are here, Your Honor; thank you.

21       THE COURT: All right, thank you.

22       MS. MATSUMURA: Can y'all hear me now?

23       THE COURT: Yes. Who is that?

24       MS. MATSUMURA: This is --

25       THE COURT: Was that Ms. Matsumura?

9

1          MS. MATSUMURA:  This is Rebecca Matsumura; sorry

2   about that.

3          THE COURT:  Okay, we hear you and we see you; very

4   good.

5          All right.  I'll go back to Ms. Drawhorn, do we have

6   you on the phone yet?

7                    (No audible response heard)

8          THE COURT:  All right.  Well, hopefully -- hopefully

9   we can get whatever technical difficulties there worked out.

10          I'll ask, for the record, are there any other parties

11   in interest wishing to make an appearance?  And I'm going to

12   forewarn you that I'm not going to be inclined to let any other

13   party make an argument today unless you give me a reason I

14   should that absolutely knocks my socks off.  So I assume we

15   might have people wanting to appear, but who are not going to

16   make an argument.  If so, go ahead.

17          MR. ANNABLE:  Your Honor, this is Zachary Annable and

18   Melissa Hayward of Hayward & Associates, local counsel for the

19   debtor.  We just wanted to let you know we're here, too.

20          THE COURT:  All right; thank you.

21          Anyone else?

22          MS. MASCHERIN:  Yes, Your Honor.  Terri Mascherin and

23   Marc Hankin from Jenner & Block on behalf of the Redeemer

24   Committee of the Highland Crusader Fund.

25          THE COURT:  All right; thank you, Ms. Mascherin.

10

1          MR. SLADE:  Your Honor, it's Jared Slade and Jonathan

2   Edwards of Alston & Bird.  We're here on behalf of NexBank.

3   And I'm not sure if it's going to knock your socks off, but we

4   were engaged just this week by NexBank as a party in interest,

5   the issue about the ESI disclosures.  We have been negotiating

6   with the Creditors' Committee about the issues, and we hope to

7   have an opportunity to present a minute or two at the end about

8   why we were differently situated than some of the other

9   objectors, if the Court entertains it.

10          THE COURT:  Okay.

11          MR. SLADE:  Thank you.

12          THE COURT:  Thank you.

13          MR. CLUBOK:  And, Your Honor, Andrew Clubok and

14   Kimberly Posin for UBS.

15          THE COURT:  Okay; thank you.

16          MS. PATEL:  Good afternoon, Your Honor.  Rakhee Patel

17   and Annmarie Chiarello on behalf of Acis Capital Management,

18   but we don't intend on making any presentation, Your Honor,

19   unless anyone specifically asks to address things.  Our matters

20   are after this.

21          THE COURT:  Okay, correct.

22          Anyone else?

23               (No audible response heard)

24          THE COURT:  All right.  Well, let's talk --

25          MS. DRAWHORN:  Your Honor?

11

1          THE COURT:  Oh, go ahead.

2          MS. DRAWHORN:  This is Lauren Drawhorn, I got my --

3  I'm sorry, I got the audio -- the speaking to work.

4          THE COURT:  Okay.

5          MS. DRAWHORN:  I'm appearing on behalf of the

6  NexPoint Real Estate entities, there's 15 of them.  I can go

7  through them, if you want, or -- they're listed on Docket 847.

8          And then I'm also appearing on behalf of MGM

9  Holdings, Inc.

10          THE COURT:  Okay, thank you, Ms. Drawhorn.  We've got

11  you loud and clear now.

12          All right, well, I want to talk for a moment about

13  how we are going to proceed here today, and I'm hoping we don't

14  go late, late, late with ten or so parties wanting to weigh in

15  on document production because we do have the Acis status

16  conference regarding the September 10th setting on the

17  objection to Acis's proof of claim, I want to make sure we get

18  to that today.

19          And then I do want to talk a little bit about where

20  we stand on getting the mediation going.

21          So for everyone's benefit, I'm just going to let you

22  know that I think I have a handle on the primary disputes

23  between the Committee and the debtor.  There's a lot of finger-

24  pointing that is going on in the papers.

25          The UCC is suggesting that the debtor has been

12

1  dragging its heels; and the debtor saying no, it hasn't.

2          I really don't want to get bogged down by that today.

3  I really just want to focus on the handful of things that seem

4  to be in dispute between the Committee and the debtor, and so

5  we're going to obviously start with the Committee and the

6  debtor.  I want to hear about are we going to have evidence

7  today.  I know there were a couple of declarations filed.

8          And then I'm inclined to, thereafter, just give these

9  eight or nine other parties five or ten minutes each to present

10 any arguments that they think I need to hear.

11         But I'll tell you, I closely read the Committee's

12 pleadings, I closely read the debtor's pleadings, Mr. Dondero's

13 pleading.

14         And then, frankly, I skimmed very rapidly the other

15 seven or so pleadings because of being pressed for time, but I

16 do think I get the gist of them.  And I think a lot of them

17 kind of have the same theme.

18         But before turning to the debtor and the Committee,

19 let me just tell you what my understanding is that we're going

20 to primarily focus on:

21         We're obviously talking about emails of nine

22 different custodians of the debtor, three of which I understand

23 to be in-house lawyers.  And whether it's the Committee's

24 protocol that should be ordered here, or the debtor's protocol,

25 and the way I see the two protocols differing is the debtor

13

 1 | wants independent contract -- or contract attorneys for the

 2 | debtor to do a relevance review.  UCC says no, that's going to

 3 | be time-consuming, and strangers can't meaningfully do that.

 4 |         It looks like there's a dispute about the search term

 5 | request.  Committee thinks what debtor is wanting is too

 6 | stringent.

 7 |         And then, of course, we have some competing views

 8 | about how the privilege review process would work, and the

 9 | debtor has obviously this overriding concern about

10 | confidentiality obligations it has, either contractually and/or

11 | shared services agreements, or through other law.

12 |         So now I will, at long last, turn -- I'm going to, I

13 | guess, start with the Committee because it is first in time

14 | with its pleading the motion to compel.  And then, of course,

15 | the debtor came quickly behind that pleading with its own

16 | motion for protective order.

17 |         And so -- I don't know, Mr. Montgomery, or Mr.

18 | Clemente, let me hear from you on how you --

19 |         MR. MORRIS:  Your Honor?

20 |         THE COURT:  -- want to go forward today.

21 |         MR. MORRIS:  Your Honor, this is John Morris from

22 | Pachulski.  I greatly apologize for interrupting, but I have a

23 | slightly different suggestion.

24 |         We had made a proposal to try to resolve our disputes

25 | with the Committee a few days ago.  The Committee responded

14

1 with its own proposal about an hour before this hearing, and

2 we'd like an opportunity to confer with them. But under --

3 even under the -- even if we were to reach an agreement, I

4 think the Court needs to rule on the other objections.

5      So my suggestion, subject to the Committee's

6 acceptance and Your Honor's acceptance, of course, is that we

7 allow the Committee to proceed and let the --

8      (Technical interference)

9      THE COURT: Okay.

10      MR. MORRIS: Let the other objectors be heard.

11      And then after the conclusion, and the resolution of

12 those objections, some of which I understand may have been

13 resolved already, we take a short break, and allow me to confer

14 with Ms. Montgomery to see if we can resolve the balance of the

15 issues, that's my suggestion.

16      THE COURT: Okay. So start with the Committee, hear

17 their argument, and then any objectors who haven't otherwise

18 been taken care of through agreements, hear from them, all

19 right. Well, I am perfectly happy to go forward this way,

20 especially if it means that we'll save some time in court, and

21 the debtor and Committee can get on the same page without the

22 Court ordering something.

23      So will it be Ms. Montgomery or Mr. Clemente? Which

24 one of you wants to start us off?

25      MR. CLEMENTE: Your Honor, it's Matt Clemente. My

15

```
 1  colleague, Ms. Montgomery, will be handling it.  So I'll turn

 2  it over to her, please.

 3              THE COURT:  All right.  Ms. Montgomery?

 4                       (Pause)

 5              MS. MONTGOMERY:  ... the objection that the debtor

 6  has filed --

 7              THE COURT:  All right.  Ms. Montgomery, I'm going to

 8  ask you to start from the beginning, we missed the first few

 9  seconds, okay?

10              MS. MONTGOMERY:  Sure.  Can you hear me now?

11              THE COURT:  Yes.

12              MS. MONTGOMERY:  So consistent with the proposal that

13  Mr. Morris laid out, I plan to reserve any arguments with

14  regard to the dispute between the Committee and the debtors for

15  now in the hopes that we can get those resolved at the

16  conclusion, and we'll just focus on the objections, if that

17  works for the Court.

18              THE COURT:  Okay, that's fine.

19              MS. MONTGOMERY:  We've been working diligently with

20  all of the objectors that Your Honor is aware of, as well as a

21  few that did not file objections over the last week or so in an

22  attempt to resolve as many of their concerns as possible before

23  today's hearing.

24              And we're happy to tell the Court that we have

25  resolved some of those objections.  We were able to negotiate
```

16

1  an out-of-court resolution with regard to an entity called

2  Omnimax International, Inc. without them filing an objection.

3          And we have resolved the objection of Highland CLO

4  Funding Ltd.  And pursuant to that agreement with Highland CLO

5  Funding, Highland CLO Funding has requested that the Court

6  order, at the end of today's argument, include a statement that

7  any documents that they produce pursuant to joint privilege

8  aren't subject to a privilege waiver by virtue of their

9  production to the Committee.

10          THE COURT:  Okay.

11          MS. MONTGOMERY:  And if I missed anything there, I'm

12  sure that counsel for Highland CLO will correct me at the end.

13          THE COURT:  Okay.

14          MS. MONTGOMERY:  We also have an agreement in

15  principle with Highland Capital Management Fund Advisors, LP

16  and the remaining entities that submitted their objections at

17  Docket 841.

18          Pursuant to that agreement in principle, we have no

19  objection to those entities being treated as parties to a

20  protective order or to having certain data being isolated from

21  review as a preliminary matter subject to reservation of

22  rights.

23          What we don't have an agreement on, Your Honor, is

24  how those documents will be isolated.  And we intend to

25  continue working with Highland Capital Management Fund Advisors

17

 1 and K&L Gates to try to knock out the details of that in the

 2 coming days.  We preliminarily don't believe that it's

 3 necessary for you to hear the details of that objection for

 4 today.

 5          THE COURT:  Okay.

 6          MS. MONTGOMERY:  So with regard to the remaining

 7 objections -- my apologies, Your Honor.

 8          There are essentially three categories of documents

 9 that make up the assorted objections -- the issues that are set

10 forth in the objections.  There are some documents that are

11 allegedly confidential, and I think that Your Honor has

12 probably read quite a bit about that in the pleadings that have

13 been submitted to the Court.

14          It's our position, Your Honor, that there's a very

15 strong protective order in place in this case.  And that the

16 protective order should be sufficient to handle any

17 confidentiality concerns that have arisen pursuant to the

18 objections.

19          We also believe, Your Honor, that a number of the

20 documents at issue are subject to a joint privilege, and we've

21 briefed this, and it sounds like Your Honor is very familiar

22 with the materials that we've submitted to the Court.  And as a

23 result of that joint privilege, we believe that many of the

24 documents that are included in the ESI that we've requested

25 should be made available to the Committee.

18

1          As you know, Your Honor, there are thousands of

2    companies that have been identified as affiliates of the

3    debtor.  Many of those affiliates have shared service

4    agreements with the debtor, in which the debtor provided

5    business functions for these purportedly separate entities.

6          And if you look at my briefing, there isn't any

7    segregation of employees of the debtor that represent each of

8    these affiliates.  And instead, the debtor maintains a

9    centralized pool, and whoever can perform the service for the

10   affiliate does so.

11         The basis for most of the remaining objections that

12   we're talking about here today is that these shared service

13   agreements include provision of legal services.  And in some

14   instances, for shared IT -- like shared service servers for

15   emails and other documents.

16         Under those shared service agreements, the debtor's

17   in-house legal department provides legal advice to these

18   thousands of entities on as-needed basis.  And you're going to

19   hear from the objectors in a moment some of those separate

20   companies are objecting to production of their documents by the

21   debtor, even though those documents are on the debtor's

22   servers, in the debtor's employees' files, and generally

23   available to debtor personnel.

24         We wanted to begin, Your Honor, with the objections

25   to NexPoint Real Estate Advisors.  We previously -- we

19

1 previously discussed NexPoint Advisors and its affiliates,

2 represented by K&L Gates, but obviously there's also a separate

3 objection for NexPoint Real Estate Advisors and affiliated

4 entities.

5 NexPoint Real Estate Advisors argues that it would be

6 unduly burdened if the debtor were to produce documents related

7 to it to the Committee. It's unclear, however, how NexPoint

8 would be burdened by the debtor producing documents, nor is it

9 clear what expense NexPoint would incur as a result of that

10 production.

11 In fact, it appears that NexPoint is attempting to

12 raise defenses that belong to the debtor instead. This may be

13 because NexPoint shares many things with the debtor under the

14 shared services agreement:

15 First, they have shared employees who are employed

16 both by the debtor and NexPoint Real Estate. Although pursuant

17 to the shared service agreement, only the debtor pays the

18 salaries of those shared employees. It shares back- and

19 middle-office services, it shares administrative services,

20 including cohabitating in the same office space on information

21 and belief, and it also shares IT services, possibly including

22 servers, and in-house counsel that provide assistance with

23 advice with respect to legal issues.

24 Despite all of the shared services, NexPoint is

25 arguing that it should be given a separate and independent

20

1 opportunity to review all documents possibly related to it, and

2 to decide what it relevant, responsive, and privileged.

3         Your Honor, it's the Committee's position that

4 NexPoint chose to commingle its data with that of the debtor;

5 to share in-house counsel with the debtor; to co-office with

6 the debtor; to share employees with the debtor; and to

7 generally allow the debtor to provide many of its services.

8 But now it believes it has a separate ability to review

9 documents in the debtor's possession before they're produced to

10 the Committee.  And this is the sort of gamesmanship that we've

11 been trying to avoid through the motion to compel.

12         NexPoint may very well be the subject of estate

13 claims, it's impossible for us to know at this point because we

14 don't have access to the data that's necessary for us to

15 determine what estate claims might exist.  And we don't believe

16 that NexPoint should also have the ability to dictate to the

17 estate which documents the estate -- that the estate already

18 possesses and needs to investigate those claims.

19         With regard to the various Rand entities and Atlas, I

20 believe Your Honor referenced Atlas when we began.  Essentially

21 the same argument appears to apply with Rand, although to a

22 somewhat lesser extent.

23         The objection for Rand is slightly different in that

24 it focuses on the shared IT infrastructure with the debtor, and

25 not necessarily the custodial data for nine individuals that

1 were the subject of the motion to compel.

2        Unlike with NexPoint, it doesn't appear that Rand has

3 legal services provided by the debtor.

4        And their objection primarily focuses on the

5 potential that there is Rand data on servers that are

6 accessible by the debtor which, in itself is an indication that

7 the data may not have been maintained separately as to Rand

8 and, therefore, confidentially.  And as such, any privilege

9 related to data contained on that server as to Rand would be

10 waived.

11        That said, we are amenable to their request to be

12 made party to the protective order.  And that all data related

13 to them be produced as highly confidential as a preliminary

14 matter, subject, of course, to our ability to request a de-

15 designation of that data where the default designation appears

16 to be improper.

17        The next objection is CLO Holdco.  CLO Holdco also

18 argues that there may be data among that of the nine

19 custodians, all of whom are employees of the debtor, that

20 relate to a privilege held exclusively by CLO Holdco.  We don't

21 believe that that position is tenable.

22        The briefing on this particular objection, Your

23 Honor, includes some back and forth with regard to Teleglobe,

24 and related cases.

25        Teleglobe is one of the foundational cases on the

22

1   issue of privilege with regard to business affiliates. And it

2   provides that communications between affiliates can maintain

3   privilege because the members of a corporate family are joint

4   clients, and this reflects both the separateness of the entity

5   and the reality that they are all represented by the same in-

6   house counsel.

7        We don't believe that <u>Teleglobe</u> stands for the

8   position that there can be completely separate privileges held

9   by affiliates with the in-house counsel that is employed by the

10  parent company, or any other member of an affiliate family.

11       As a result, either the communications are subject to

12  a joint privilege, and the debtor having access to the

13  communications isn't a waiver of confidentiality requirements

14  of privilege, or there is no common interest. There is no

15  joint client interest, and the debtor having access to the

16  documents is a waiver. But either way, the Committee should be

17  provided with the documents under the terms of the final term

18  sheet because the Committee is standing in the debtor's shoes

19  with regard to those estate claims, and the debtor has

20  conceded, and the Court has, you know, ordered that those

21  documents should be -- that the privilege isn't waived. The

22  privilege should be shared with the Committee, it's not

23  waived.

24       Separately, CLO Holdco has argued that it should be

25  able to conduct an independent review of the documents. As you

23

1 know, and I think we referenced in our hearing last week, the

2 impetus for the motion to compel is specifically the need for

3 expedited access to documents related to CLO Holdco so that we

4 can comply with the Court's 90-day deadline.

5 CLO Holdco entered into the shared service agreement,

6 it agreed to allow the debtor have access to this material, the

7 debtor has that data. And we don't think they can now seek to

8 claw back access to the ESI that's in the debtor's possession.

9 The remaining objectors, Your Honor, stand in a

10 slightly different position. CCS Medical and MGM, in

11 particular, are bringing objections, not based on the shared

12 service agreement, but based upon the facts that there are

13 employees of the debtor that have served in board positions for

14 each of those entities.

15 But, you know, based on the information that we have

16 to date, we understand that that -- that those board positions

17 were obtained pursuant to investments or other relationships

18 with the debtor, and that the debtor has or had relationship

19 with those entities outside of the board position. And those

20 additional relationships that are separate from board

21 membership make it very difficult to craft searches that would

22 exclude only outside information related to board service.

23 And so while the Committee doesn't necessarily have

24 an objection to attempts to isolate the communications that are

25 truly related to board service, we've had difficulty

24

1 negotiating the terms of what that would look like with MGM, at

2 least.  We haven't had an opportunity to speak with CCS Medical

3 because -- because of its overlap, Your Honor.

4        We also think -- and this is set forth in our

5 documents -- that it's possible that the documents that were

6 shared with the debtor are -- have been waived, to the extent

7 that there was any privilege associated with it because of the

8 way that the debtor maintains its email servers.

9        And then I believe finally, the last objection that

10 has been filed with the Court for today is from Mr. Dondero.

11 And he argues that any data related to information that's being

12 produced under the protocols should not be made available to

13 Josh Terry, Acis Capital Management GP LLC, or Acis Capital

14 Management LP.

15        But there's nowhere in Dondero's briefing that sets

16 forth a basis of law for a categorical restriction of that

17 nature.  And as you know, Mr. Dondero and his affiliated

18 entities are at the center of the Committee's investigation of

19 the estate claims.  And we believe imposing a categorical

20 confidentiality ban against one member of a Committee would

21 considerably complicate and impede that investigation.

22        We understand a desire to have any documents that are

23 created in connection with pending litigation between Acis and

24 the debtor, Dondero, and other Dondero-related parties, that

25 that information be marked as attorneys' eyes only, highly

25

1  confidential so that only outside counsel has access to it, but

2  that's not really the basis for Mr. Dondero's objection, and as

3  a result, we don't believe that objection has value.

4         And then, Your Honor, I don't know to the extent you

5  intend to hear from NexBank Capital and its affiliates, and so

6  if -- I would like to reserve any sort of response to them --

7         THE COURT:  Okay.

8         MS. MONTGOMERY:  -- to the extent that you allow them

9  to speak.

10        But, you know, in concluding, Your Honor, the debtor

11 and its affiliates have interwoven so much of their operations,

12 their legal services, and even their data storage, that it's

13 incredibly difficult to try to pick apart the data, with the

14 exception of MGM and CCS, the objectors here today agreed to

15 those shared services, and now they want to argue that what was

16 shared was actually separate.

17        The Committee has been tasked with investigating the

18 estate's claims against the very affiliates that now seek to

19 unwind their information and said that unnecessary burdens to

20 production.  And as a result, we request that those objections

21 be overturned, that the motion be granted, and that the ESI

22 subject to the motion to compel be produced to the Committee.

23        THE COURT:  All right.  Well, let me -- I'm just

24 going to go down the list of objectors.

25        Let me start with the two that Ms. Montgomery

26

1 announced have been resolved: Highland CLO Funding Limited.

2 Matsumura, were you going to be the one to weigh in on

3 confirming that?

4         MS. MATSUMURA: Yes, Your Honor. I can confirm we've

5 reached an agreement with the Committee that the documents that

6 are -- contain confidential and privileged information of HCLOF

7 will be produced on a highly confidential designation under the

8 protective order, so that will be only the Committee's

9 professionals.

10         And that as Ms. Montgomery stated, any of the

11 documents produced by the debtor pursuant to this agreement

12 will not be construed as a waiver of any privilege that the

13 funds share of those documents.

14         THE COURT: Okay; thank you.

15         All right, what about HMC Fund Advisors? I

16 understand that your issues have been resolved, you're still

17 working out a couple of things, but who wants to weigh in on

18 that to confirm that?

19         MR. WRIGHT: Good afternoon, Your Honor. It's James

20 Wright at K&L Gates for -- actually a number of entities that

21 are all at Docket 841. There was an objection at 841 that's

22 HMC Fund Advisors, NexPoint Advisors, and then a number of

23 individual funds, and I will not burden the record with listing

24 each of them out.

25         THE COURT: Thank you.

27

1          MR. WRIGHT:  I agree with the Committee's summary,

2  that we have made a lot of progress.

3          There are some technical things that we're still

4  working out, but I think that we're -- you know, we've been --

5  we've made a lot of progress, we've been working in good faith,

6  and -- get there -- but we just need a minute to -- we were on

7  the phone with them, frankly, ten minutes before this hearing

8  started, I think we just need a little bit more time.

9          THE COURT:  Okay; thank you.

10         All right.  Well, why don't we start with Mr.

11 Dondero, and your objection which I understand deals mostly

12 with Acis and Josh Terry.

13         Go ahead.

14         MR. LYNN:  Thank you, Your Honor.

15         As you've gathered, our concerns are somewhat

16 different from the other parties who are objecting.  Mr.

17 Dondero agreed to the arrangement involving shared privilege in

18 allowing the Committee the kind of discovery that they're

19 seeking here.

20         And accordingly, we would (indiscernible) object to

21 what they're doing.

22         But as I understand the Committee's response to the

23 Dondero response to the motion to compel, (indiscernible)

24 because, first, there is no basis in law (indiscernible) Acis

25 and Mr. Terry (indiscernible) and participate (indiscernible)

28

1   in consideration of the estate claims.

2           And second, (indiscernible) and I quote,

3   "considerably complicate and impede the Committee's

4   investigation."

5           Even assuming for a minute that Acis and Mr. Terry

6   are so central to the investigation that their absence from it

7   could not be tolerated by a Committee, just as there may be

8   nothing in the statute that permits the Court specifically to

9   restrict Mr. Terry and Acis's access to information so, too,

10  there's nothing in the Bankruptcy Code or the Bankruptcy Rules

11  that prevents the Court from doing so.

12          There is (indiscernible) the authority for the

13  Bankruptcy Court to grant what Mr. Dondero asks, which is that

14  Acis and Mr. Terry be excluded from the information gained by

15  the Committee during the course of its investigation.  Section

16  105, as this Court is acutely aware, is the problem-solving

17  section of the Bankruptcy Code that allows the Court to fashion

18  results that may be necessary to fill in gaps that the Code

19  leaves open.

20          There was nothing in the law that authorized it, even

21  before the passage of Section (indiscernible) of the Code, it

22  was common for (indiscernible) representatives are

23  (indiscernible).  And, indeed, (indiscernible) representatives

24  are also (indiscernible) in other (indiscernible).

25          Similarly, I know of nothing in the Code or the Rules

29

1 that provides for the retention of a Chief Restructuring

2 Officer. Yet, Section 105 has allowed for that necessary post,

3 as is true (indiscernible) which are also not provided for in

4 the law.

5 In this case, (indiscernible) Section 105 has been

6 used to justify an independent board, and to justify the very

7 same privilege that is at the root of the disputes. Section

8 105 (indiscernible) to justify the removal by a court of a

9 member of the Creditors' Committee. That's in the <u>First</u>

10 <u>Republic Bank Corporation</u> case, Judge Felsenthal determined

11 that he had the authority to remove, and he chose to remove, a

12 member of the Creditors' Committee. A similar result was

13 reached in the <u>MAP International</u> case out of the Eastern

14 District of Pennsylvania, and a similar result (indiscernible)

15 following Judge Felsenthal was reached by the Bankruptcy Court

16 for the District of Arizona in <u>In Re America West Airlines.</u>

17 If the Bankruptcy Court has authority pursuant to

18 Section 105 to remove a Committee member, clearly Section 105

19 gives authority to the Court to eliminate a member's access to

20 and involvement in an investigation that will give that

21 Committee member a leg-up in discovery in another case.

22 In the litigation commenced by Acis is, indeed, in

23 another case, not in this case, and the litigation is intended

24 to provide a benefit -- a windfall to Mr. Terry, not to provide

25 (indiscernible) who he is supposed to be representing as a

30

1   member of the Creditors' Committee.

2           As pointed out in an article in The Review of Banking

3   and Financial Services in October of 2016, "Members of a

4   Creditors' Committee may not use their positions as Committee

5   members to advance their individual interests."  And I'm

6   quoting there the <u>MAP International</u> case.  Similarly, that

7   fight has been made by Collier in Paragraph 1102.05[3] of the

8   Collier treatise.

9           Indeed, the Acis litigation may not only drain assets

10  from Highland, it may reduce the (indiscernible) Dondero and

11  other potential defendants in the same causes of action as to

12  their ability to (indiscernible) any judgment that defendants

13  may manage to obtain.

14          Under those circumstances, unsecured creditors

15  represented by Acis and Mr. Terry will have their recovery

16  reduced by virtue of those judgments.

17          It is clear that the Bankruptcy Court may restrict a

18  committee member's access to information, as Collier points

19  out, where a member of a committee is a competitor of the

20  debtor, as, indeed, Acis is, the member may be restricted as to

21  the information that the member gets so it does not obtain

22  competitive advantage.

23          I recognize that the same claims may be, indeed, a

24  central concern of the Committee, (indiscernible) with Acis and

25  Mr. Terry creates serious problems, perhaps Mr. Terry should

31

1  resign from the Committee or be removed.

2          In fact, in this case, when UBS filed the motion for

3  relief from stay in order to pursue litigation in New York,

4  very properly, UBS excluded itself -- recused itself from

5  discussion of the motion for relief from stay. And Mr. Terry,

6  I respectfully submit, should do the same here.

7          Further, as far as complicating and repeating the

8  Committee's investigation, and the Committee did not elucidate

9  how that would happen, whatever trouble or cost (indiscernible)

10 Acis and Mr. Terry may cost is nothing compared to the trouble

11 and cost to the debtor of complying with a request for millions

12 and millions of communications.

13         In conclusion, Your Honor, in litigation such as that

14 being pursued by Acis in the Acis case, as courts have said,

15 the Federal Rules were designed to create, quote, "a level

16 playing field," end quote.

17         A couple of those cases, the Hillsborough Holding

18 decision of the Bankruptcy Court out of the Middle District of

19 Florida; Allstate Insurance versus Electrolux out of the

20 Northern District of Illinois; and Passlogix, Inc. versus 2FA

21 Tech out of the Southern District of New York.

22         Yet the motion to compel is brought without

23 protection from (indiscernible) that Acis seeks, there clearly

24 will be no level playing field in that litigation. And the

25 commitment of this Court (indiscernible) in general to

32

1  (indiscernible) litigation processes will be undermined.

2          Your Honor, if anybody wants cites to any of these

3  authorities that I provided to the Court, I'll be happy to

4  provide them.

5          THE COURT: All right. Thank you, I appreciate

6  that.

7          I'm going to go next to --

8          MR. LYNN: Your Honor, I didn't hear you.

9          THE COURT: Pardon? I thanked you for your argument,

10 and I do not need those case cites.

11         I'm going to go next to CLO Holdco. Mr. Kane, will

12 you be making the argument there?

13         MR. KANE: Yes, Your Honor, I will; thank you for the

14 time. This is John Kane for CLO Holdco, for the record.

15         And first, I want to start by kind of acknowledging

16 that we really did take to heart what you said previously in

17 attempts to avoid unnecessary litigation. I've been working

18 with Ms. Montgomery for over a week now in an effort to try and

19 resolve some of our concerns about the discovery requests, at

20 the same time trying to be mindful of what I believe to be my

21 client's privileges and our right (indiscernible) the party

22 that reviews documents and produces them.

23         We are -- CLO Holdco is subject to a request for

24 production of documents from the Committee. We are working to

25 prepare a review, to obtain all of the requisite documents to

33

1 have a fulsome production to the Committee.  And Ms. Montgomery

2 and I have had conversations about how that production will

3 take place.  While we acknowledge that there are obviously some

4 timing concerns here given the 90 days relating to that

5 registry order that was relatively recently entered.

6          So we've mindful of all of those issues, and our

7 dispute here is about whether we're giving up privileged

8 documents or whether we aren't.

9          It's our position that since that request for

10 production of documents to CLO Holdco, CLO Holdco has a right

11 to review those documents, and to produce documents in

12 accordance with the Federal Rules.  And that the request by the

13 Committee to have all ESI produced by these various custodians

14 basically provides an end around to the request for production

15 of documents delivered to CLO Holdco.  And it does look through

16 the guise of this joint client privilege exception to the

17 general privilege rules.

18          But we've got a fundamental misunderstanding of the

19 law by the Committee as the exception applies to the general

20 rule of privilege.  And it basically breaks down to a simple

21 analogy, one we can apply to the case of law.  The analogy

22 would be like if our firm, Kane Russell Coleman and Logan,

23 represented Texas Capital Bank and Wells Fargo on a bunch of

24 separate matters, and then because we had a great relationship

25 with both, we are going to represent Texas Capital Bank in a

34

1 | merger with Wells Fargo, and we are going to be retained as

2 | kind of a mutual third party counsel by both sides to help

3 | manage this merger.

4 |        Now if that merger representation turned into a later

5 | dispute between the parties, the correspondence between Wells

6 | Fargo and Kane Russell Coleman and Logan, and the

7 | correspondence between Texas Capital Bank and Kane Russell

8 | Coleman and Logan would not be precluded from production to

9 | either party as long as it were (indiscernible) representation.

10 | They have the same counsel for the same representation.  So

11 | that this idea of privilege doesn't really apply the same way.

12 | Those documents pass back and forth, I have a duty to both of

13 | those clients equally.

14 |        But what they wouldn't be able to obtain is, let's

15 | say, Texas Capital Bank's request for production of documents

16 | to me, counsel, seeking all correspondence that I have ever had

17 | with Wells Fargo on any other matter, regardless of whether it

18 | was -- it was related to or unrelated to a joint

19 | representation.  And really, that's what the Committee is

20 | trying to do here, they want all ESI, there are no parameters.

21 | So it doesn't matter if there's a joint representation on a

22 | specific matter between CLO Holdco and the debtor, what the

23 | Committee is asserting is because they use the same counsel,

24 | that all matters or all correspondence between counsel for the

25 | debtor, all internal counsel, and counsel for CLO Holdco, since

35

1 it was essentially the same person, the same people, all of

2 that is subject to production.

3     So here's an example of how this plays out, Your

4 Honor. At our last hearing, you heard a bunch of testimony

5 about a transfer of Highland, the debtor's interest in the

6 Dynamic fund, and how on December 28, 2016, with one document,

7 we can trace -- I'm sorry -- we can trace this trail of

8 transfers from Highland to CLO Holdco, and we know that

9 Highland's internal counsel was representing both sides of the

10 deal. They were representing the debtor, they were also

11 representing CLO Holdco as the creation of those documents was

12 done for both parties by the same entity and the same

13 transaction, that's critical.

14     So do I have an assertion of privilege for CLO Holdco

15 in that situation? No, I don't believe that I do. I think

16 that joint client exception that's addressed in <u>Teleglobe</u>, and

17 <u>Nguyen</u>, and in the <u>Nester</u> decision that's cited by the

18 Committee in their pleadings precludes me from stopping the --

19 or the disclosure of documents that were between internal

20 counsel and CLO Holdco as they're related to that dynamic

21 transaction because internal counsel at Highland represented

22 both sides of the deal.

23     But there are other representations taken up by

24 internal counsel for Highland under the shared services

25 agreement between CLO Holdco and Highland that really don't

1  have anything to do with Highland.  So much (indiscernible)

2  litigation, we'll say, between CLO Holdco and some other party

3  like U.S. Bank that does not have Highland Capital Management

4  as a party to that litigation, and could not have Highland

5  Capital Management as a party to that litigation.

6          (Indiscernible) under this joint client privilege

7  exception that the Committee is asserting should control this

8  entire deal.  So in a situation like that, I would still be

9  able to review and withhold documents that were privileged,

10 attorney-client communications, or work product communications

11 without having to disclose those to the Committee even though

12 the Committee stands in the debtor's shoes.  Because there is

13 this isolation, Highland is not a party that is jointly

14 represented in that transaction.

15         So all of the documents that have been exchanged

16 between CLO Holdco and the debtor in representations where the

17 debtor is not an active participant as a party in a joint

18 representation, all of that documentation is the sole property

19 of CLO Holdco.  It shouldn't be subject to disclosure simply

20 because one of these custodians engaged in correspondence with

21 CLO Holdco.

22         So, for instance, the Argentina Bank, let's say, if

23 Highland is not being represented in a transaction with CLO

24 Holdco related to the Argentina Bank, and Grant Scott, as

25 trustee of CLO Holdco, inquires internally about a -- let's say

37

1  a NAV statement related to its interest, that's not necessarily

2  a document that would have to be produced to the Committee

3  because it is a potentially privileged communication if it was

4  with one of the attorneys in-house.

5        Now that doesn't mean that everything is going to be

6  privilege, or that there aren't going to be a significant

7  number of these joint client privilege exceptions where we have

8  to disclose attorney-client communications because Highland was

9  on the other side of the transaction, but that's something that

10 I should be reviewing as CLO Holdco's attorney, and identifying

11 documents for a privilege log, and then having a conversation

12 with the Committee's counsel about whether these are subject to

13 the joint client privilege exception, or whether they are truly

14 privileged documents or not.

15        So we've already got a request for production out

16 there.  I mean presumably, Your Honor, this is already -- you

17 know, this is already underway.  What we just want to do is try

18 and protect the documents that are actually privileged

19 communications or work product communications from disclosure

20 to the Committee.

21        THE COURT:  All right; thank you, Mr. Kane.

22        Let me hear next from NexPoint Real Estate Financial.

23              (No audible response heard)

24        THE COURT:  All right.  I can't hear you.  Is this

25 Ms. Drawhorn who will be addressing this one?

38

1          MS. DRAWHORN:  Can you hear me -- can you --

2          THE COURT:  Yes.

3          MS. DRAWHORN:  Can you hear me now?

4          THE COURT:  I can.

5          MS. DRAWHORN:  Okay.  I had to unmute both my phone

6   and the -- and the computer, okay.

7          Lauren Drawhorn on behalf of NexPoint Real Estate

8   Finance and the 15 related entities and -- that are listed on

9   Docket 847, I won't go through them all.

10         So our -- one of the -- we've got a couple issues

11  with the motion to compel relative to our shared services

12  agreement with the debtor, and largely because of the breadth

13  of the request wanting ESI from all nine of these custodians.

14  And we have concerns that because there are no limits on that

15  request, that we've got our confidentiality and privilege

16  issues that are concerned about.

17         The real estate entities are -- NexPoint Real

18  Estate entities are typically traded, and there are some

19  regulatory constraints that we have on the dissemination of

20  information and it being public.  And so obviously we need to

21  protect those interests and try and prohibit the disclosure of

22  information.

23         While there -- while the NexPoint Real Estate

24  entities do -- did have a shared services agreement, it is the

25  businesses unrelated to and separate from Highland, except for

39

1 the occasional times when they co-invested.

2 So generally speaking, they were separate businesses.

3 Any use of services from Highland employees under the shared

4 services would be for separate deals. And so because they're

5 separate, we believe that it's unlikely that they would be

6 relevant to the estate claims.

7 In other words, the request should be narrowed to

8 limit the amount of information that's not related to the

9 Committee's estate claims, (indiscernible) related to NexPoint

10 Real Estate entities' deals and confidential information and

11 business information.

12 The other issue we have in connection with

13 confidentiality is in connection with NexPoint Real Estate's

14 entities business operations. They continue to receive

15 information electronically from third parties that have been

16 the subject -- that information was provided subject to

17 confidentiality agreements there. So under those agreements

18 with other parties, there are requirements and obligations for

19 NexPoint Real Estate entities to notify those parties and

20 provide them an opportunity to object.

21 So we are wanting the additional protections and

22 limits on the discovery to protect this confidential

23 information and our obligations to other parties, and to

24 regulatory entities.

25 We also have concerns on the privilege -- any

40

1   privilege information, again, since these custodians were

2   counsel, and provided -- occasionally provided legal advice in

3   connection with NexPoint Real Estate entities' deals that,

4   again, were unrelated to Highland and separate from the debtor.

5   That information will be -- would be privileged and

6   (indiscernible) NexPoint Real Estate entities' privilege

7   (indiscernible) position you just heard, and the Committee's

8   response is that that was waived or part of this joint client,

9   and we disagree with that.  Where the legal advice was given on

10  a separate matter, there would be no joint privilege between

11  the NexPoint Real Estate entities and the debtor.  We think

12  that that privilege should be protected, and the privileged

13  documents should be withheld from the production.

14        The Committee responded by their -- that we -- that

15  NexPoint Real Estate entities are not burden.  We did argue in

16  our objection that this request, under 26(b) (indiscernible)

17  because it was also an undue burden because it's so broad -- so

18  broad.  And that burden (indiscernible), as you know, isn't

19  required to be the physical burden of us going through and

20  producing documents.  An undue burden encompasses the invasion

21  of confidential information and privilege concerns.  So we

22  think that there is a good basis to limit the information that

23  is being produced to protect NexPoint Real Estate entities'

24  confidential information and business information.

25        So what we're requesting we suggested in our

41

1  objection was to allow NexPoint -- the NexPoint Real Estate

2  entities to have input on the search terms that would narrow

3  the production and potentially exclude the NexPoint Real Estate

4  entities' confidential information, information that would be

5  unrelated to the Committee's estate claims.

6        We also requested that NexPoint be given an

7  opportunity to review the documents -- the NexPoint documents

8  before produced -- and this is similar to what is my

9  understanding the debtor would -- for all of the -- the

10  previous production that was provided.  So it is my

11  understanding that before the debtor produced any document that

12  instituted the shared services agreement, confidentiality

13  privileges, they contacted that party and said "Here's this

14  document that we're going to produce, are you okay with it?

15  Are you okay with it, is there any objection?"

16        And so that's all we're requesting is an opportunity

17  that the NexPoint documents that -- that are potentially giving

18  -- to make sure that they're designated correctly under the

19  protective order, so as highly confidential versus

20  confidential, again, because of those confidentiality concerns

21  that I mentioned earlier.  And then also to confirm the

22  privilege designation and to make sure anything privileged is

23  not being produced.

24        And then the last request we have is just to make

25  NexPoint a party to the protective order so that we are able to

42

 1 | obtain those protections as the highly confidential and

 2 | confidential designations.

 3 |         THE COURT:  All right; thank you, Ms. Drawhorn.

 4 |         All right, let's see.  How about we hear from Atlas

 5 | IDF GP next.

 6 |         MR. KEIFFER:  Thank you, Your Honor.  Paul Keiffer

 7 | for the Atlas IDF entities and parties located at -- or I

 8 | should say named at Docket Number 837, I won't burden the

 9 | Court, as others have not done, as well, with the full list of

10 | parties.

11 |         And also taking in mind -- or keeping in mind what

12 | the Committee has done as far as discussing issues, I want to -

13 | - I have just a few points:

14 |         First off is that my clients don't have a specific

15 | concern with the ESI request.  The shared privileges and the

16 | joint privilege is supposed to hold, we want that to hold as it

17 | has been requested for everybody else, and I think that was the

18 | intent of the Committee in regard to that point.

19 |         It's also, as the Committee indicated, between the

20 | debtor and the -- I'm sorry -- between the Committee and the

21 | Rand Advisors' related entities that they want to be expressly

22 | involved or brought into the agreed protective order.  Lots of

23 | documents are being requested, not so much through the

24 | electronic -- the ESI, but through the fourth production of

25 | documents request that we got that -- which we received on the

43

1 9th of July that gave us six days to respond to, and that's why

2 we started talking and having discussions with the Committee

3 about this.

4      But there -- there there's all these document

5 requests, and we have our own fiduciary duties, we -- either

6 contractually, statutorily, or regulatorily. And as the

7 Committee noted, they'd be perfectly fine with having us being

8 brought into (indiscernible) -- whatever you want to call the

9 right under the coverage of agreed protective order. We're not

10 expressly under it because we're -- we're not a specific party

11 to it, but we need to be -- we feel it's the most appropriate

12 for us, too, in this context, and they've acknowledged that

13 it's a reasonable step to be added to the agreed protective

14 order, so we're happy with that.

15      As far as the documents being produced, the only --

16 the principal attached -- the principal issue for Rand Advisors

17 there is that it's principally its email server issue. Rand

18 Advisors, and the others, have their on documents on its own

19 servers, as best as I understand. And so it's really more

20 documents that would be appended to emails and discussions

21 between the parties, either in the context of (indiscernible)

22 some of the nine individuals that are custodians, that they're

23 described as custodians or otherwise.

24      But the UCC has agreed to let whatever documents are

25 produced in that context, both through the ESI and through the

44

1  request for production that's outlined there, that we're having

2  to respond to under the shared services agreement with the

3  debtor.  But those would also be subject to highly confidential

4  status, subject to the Committee seeking to downgrade to

5  confidential, or not confidential at all.

6          Now the other issue is the attorney-client privilege

7  where Rand Advisors and the others were generally using

8  RandAdvisors.com suffix, would have negotiations and

9  discussions with its own private counsels.  And the question

10 here, we don't -- I'm not sure whether or not the shared -- I

11 mean the servers are or are not sufficiently silo'd or

12 otherwise.

13         But we really don't have that hard of an issue here -

14 - that difficult of an issue here as we only -- there's only

15 three defined suffixes that are out there that would be of

16 concern to the Rand Advisor entities, and those are suffixes

17 such as romclaw.com, our law firm, we didn't realize that that

18 was the case.  Also, there would be maybe Sadis -- Sadis or --

19 another law firm, maybe three or five suffixes we need to have

20 set aside for attorney-client privilege review.  And if we have

21 those, I think that the Rand Advisor group has gotten what they

22 -- what they think is reasonably appropriate under the

23 circumstances.

24         And we're not asking the Court to, you know -- well,

25 we don't see this as truly a request for production, it's kind

45

1  of a hybrid kind of a (indiscernible). But under the shared

2  services and the final term sheet, and that allows access, lets

3  the Committee be the debtor and get to many things, but yet

4  they use request for productions as a methodology to say what

5  they're looking for, but they're not really requests for

6  production, per se, because it's -- I've already got it now,

7  this is (indiscernible) debtor, it's what we can look at.

8         And so we're wanting to make sure that we have under

9  our side of this relationship under the shared service

10 agreement some modicum of protection for its specific attorney-

11 client issues that it has. We recognize the joint privilege

12 issue, that's going to (indiscernible). But there are three to

13 five very simple suffixes as we can give to the Committee for

14 doing its search (indiscernible) romclaw.com, that's my law

15 firm, it would know not to go -- you know, set those aside.

16 There's one or two other law firms that they deal with

17 specifically, and if they go through the next step, and it

18 turns out that there's three or four other people on the email

19 that aren't part of Rand Advisor that's something with the

20 debtor or some third party altogether, then sure, there's no

21 privilege there.

22        But if it's the discussions between Rand Advisor

23 entities and its counsels specifically, then it should be

24 something that's set aside and reviewed in a different manner.

25 And I don't think it's really even close to burdensome in the

46

1  context of how much is going on in this case, and how many

2  documents are going to be reviewed.

3         That's principally our concern.  We are -- that's

4  another suggested solution to deal with the two elements that

5  we raised in our response on Pages 6 and 8 to a likely

6  solution, which is to basically deal with attorney-client

7  privileges, subpart C, is just to have these exclusion --

8  exclusionary suffixes to address that, very simple.

9         The rest of this, as far as having a log to keep

10 produced items in its context, to be able to (indiscernible)

11 what documents were produced, well, that's probably a bridge

12 too far.  We don't need to have that, we don't think that's

13 (indiscernible) concern for us.

14         So keeping up with the few things, the agreed

15 protective order being made expressly applicable to us so that

16 for our purposes, when we have to deal with issues of

17 confidentiality regarding our clients contractually,

18 statutorily, or regulatorily, that's the (indiscernible) I

19 think there's always a legal process (indiscernible).

20         Two, that everything gets a highly confidential

21 status initially, and subject to being downgraded, obviously

22 with notice and opportunity to object.

23         And then lastly, just that the three suffixes be

24 added to the review standard so that -- three to five suffixes,

25 and I'll have those easily enough in the next few days to give

47

1 to the Committee to allow me to preserve its attorney-client

2 privilege without having to go into the issue of whether or not

3 this is a means by which Rule 34, or the other appropriate

4 discovery rules, are really being invoked or not in this

5 context, or whether this is just "I'm standing in the debtor's

6 shoes, and I should be able to do these things."  It's --

7 that's an odd -- we can bypass that oddity by dealing with

8 those requested suffixes being set aside.

9          THE COURT:  Okay; thank you.

10          All right, let's hear from CCS, please.

11          MS. STRATFORD:  Good afternoon, Your Honor.  This is

12 Tracy Stratford from Jones Day on behalf of CCS Medical.

13          THE COURT:  Okay.

14          MS. STRATFORD:  Our concern is relatively narrow and

15 unique.  CCS is one of the country's leading providers of home

16 delivery medical services.  And so they deliver things like

17 insulin pumps and orthotics to people in their homes.

18          Two of Highland's employees, Mr. Parker and Mr.

19 Dondero, were directors of CCS Medical.  And so CCS Medical

20 sent information to them, sensitive business information about

21 the strategic direction of the business, about pricing, about

22 what the business would be doing or wouldn't be doing, about

23 decision-making that would happen within CCS Medical.  That

24 sensitive information was sent to the director, including these

25 two individuals who were employed by Highland at their Highland

48

 1  email addresses.

 2          All we're asking is for the ability to look through

 3  these emails first so that we can identify anything that is

 4  competitively sensitive, so that we can identify anything that

 5  is privileged, and talk to the Committee about it separately.

 6          We don't know, frankly, what the claims are that the

 7  Committee is looking to press, so I can't say that none of it

 8  is relevant, although it doesn't seem to be particularly

 9  relevant to what's being discussed today.

10          But to the extent that some of those documents might

11  be relevant, the non-privileged ones, but commercially

12  sensitive ones, we want to have that discussion.  We would like

13  the ability to look at those documents first, and that would be

14  at our cost, so there's no cost to the estate.  We don't think

15  it would take particularly long.

16          And we would have offered the solution directly to

17  the Committee, but they wouldn't return our phone calls.  So

18  we've sent emails, we've called them, and heard nothing back.

19  We would have loved to have negotiated this, but that didn't

20  happen.

21          The only argument that the Committee makes in

22  response to our suggestion, which were laid out pretty clearly

23  in our very short objection, is that there's a privilege waiver

24  here, or a waiver of confidentiality because we sent this

25  information to these two board members who were employed by

1   Highland.  (Inaudible) as a matter of law.  And the very case

2   that they cite in their papers explains that.

3          If you take a look at the In Re Royce Homes case that

4   they cite in their response to the objection, what they say is

5   that once you send confidential information to another

6   corporation, the privilege is automatically waived.  That's not

7   the case.

8          In fact, if you look at that case, it's very lengthy

9   because the Court looks at a number of factors.  And amongst

10  those factors is the expectation that the sender has that the

11  recipient will be able to maintain the information as

12  confidential or protected.

13         Here we have two executives at Highland who were

14  receiving information as members of the board of directors,

15  they controlled the company, they had the ability to control

16  who reviewed their email, and CCS Medical had every reason to

17  believe that those two directors would preserve their duty of

18  loyalty to the company and maintain their individual emails as

19  confidential.  There's no waiver under that circumstance.

20         But to the extent that this issue is one that needs

21  to be decided, it can't be decided on these papers because none

22  of those facts are before the Court.  None of the factors that

23  are discussed in the In Re Royce Homes case are -- have been

24  briefed.

25         And so to the extent that we're going to discuss a

50

1 waiver, we would like the opportunity to do that. We don't

2 think the Court ever needs to reach this issue because we think

3 that we can, in a very efficient and effective way, screen the

4 emails by just having the vendor search for particular domains,

5 review them ourselves, identify what's privileged. And what's

6 not privileged, we can turn over.

7           To the extent there's any dispute later on, we can

8 bring it before the Court at that time, but we think this is an

9 easy problem to solve, Your Honor.

10          THE COURT:  Thank you.

11          MS. STRATFORD:  Thank you.

12          THE COURT:  All right.

13          Well, let's see who I missed.  Ms. Drawhorn, did you

14 have a separate argument for MGM?

15          MS. DRAWHORN:  Yes, Your Honor.

16          THE COURT:  Okay, go ahead.

17          MS. DRAWHORN:  I do.

18          THE COURT:  All right.

19          MS. DRAWHORN:  And so MGM is in a similar situation

20 to the party you just heard.  And the only reason that MGM is

21 being pulled into the discovery dispute is because Mr. Dondero

22 served as a director on the -- on the board of directors for

23 MGM.

24          So we also believe -- and we have been in discussions

25 with the Committee about potentially pulling out or excluding

51

1 certain MGM information just by providing a list of the emails,

2 the dot-com of the other executives, or executive assistants,

3 or other board of directors members who would be sending

4 confidential information that was circulated just because --

5 for purposes of the board of directors of MGM and for MGM

6 business matters.

7        So we -- we agree and -- or disagree with the

8 Committee, and agree with the position you just heard. The

9 Committee's response to our -- to MGM's objection is that we

10 waived by sending confidential MGM information to Mr. Dondero's

11 account at Highland, that waived conference or privilege, and

12 we disagree with that. We -- we just heard that sending to an

13 employer's email account in and of itself is not sufficient to

14 waive privilege or confidentiality. There are a multitude of

15 factors that need to be considered, including the expectation

16 of privacy in considering the fiduciary duties of board of

17 directors under California law, which is where MGM operates.

18 That that confidentiality is one of the fiduciary duties.

19        We would expect that sending information to our

20 directors would remain confidential. And just the mere fact

21 that he utilized his -- Mr. Dondero utilized his Highland email

22 account would not be sufficient to waive any confidentiality or

23 any privilege.

24        And then I -- I -- it is hard to believe that

25 anything MGM-related would be extremely relevant to the

52

1    Committee's claims, but regardless, I think there's an easy way

2    to pull that information and make sure that nothing is being

3    disclosed, which would be by providing these specific email

4    addresses of outside counsel to MGM's board of directors.

5    We've got, you know, two -- two counsels that would not have

6    provided any services to the debtor, that we can say anything

7    at those email addresses should get excluded from production.

8              Same with the outside advisors to the MGM board, we

9    can easily provide that email address and have that information

10   excluded.

11             And then as to the other confidential MGM

12   information, we have a list of the executives and their

13   assistants, we would have provided -- and other board members,

14   we would have provided that.  I just think it should be fairly

15   easy to give those email addresses and exclude them from the

16   production, and make sure that that confidentiality and

17   privilege is maintained and protected.

18             THE COURT:  All right; thank you, Ms. Drawhorn.

19             Okay, NexBank's counsel, you were going to try to

20   knock my socks off with a reason why I should hear your

21   argument today when you didn't file an objection.  So, Counsel,

22   now's your chance.

23             MR. SLADE:  I appreciate it, Your Honor; thank you

24   very much.  Jared Slade of Alston & Bird for NexBank.

25             NexBank advances the same arguments about concern of

53

1 counterparty confidential information, as well as attorney-

2 client privilege concerns.  And to that end, it's requested

3 some preview time to be able to review the documents and

4 provide the appropriate search terms.

5      I think there are three things which will happen in

6 the next 50 seconds that make us differently situated:

7      The first is unlike the other objectors, our shared

8 services agreement provides expressly that debtor shall take

9 all options, legal or otherwise, that are necessary to prevent

10 the disclosure of confidential information by the receiving

11 party or any of its representatives.  So we have a different

12 legal basis that was addressed in part in the debtor's motion

13 originally on this issue.

14      The reason we have that is because we're a bank, and

15 we have two other categories of information that are

16 particularly sensitive and we're concerned about being

17 disclosed:

18      The first are bank examination materials.  Privilege

19 is a part of those, and we are very concerned about an issue or

20 problem with our regulators in connection with the fact that we

21 have, in fact, taken appropriate steps to try to protect those

22 and treat those as privileged and confidential information.

23      The other category of information is consumer

24 information.  We're talking about things protected by

25 (indiscernible) and other consumer information which are

54

1  protected in the statutes.

2         Again, we're willing to go through the effort and

3  expense to be given an opportunity to be able to review that

4  because (indiscernible) that any of that is going to be

5  relevant to what the Creditors' Committee is looking at, that

6  we understand where we are.  And provided that we are able to

7  do that, and are also afforded an opportunity by the Court to

8  be a party to the protective orders so we can take advantage of

9  the designations and not be prohibited from the (indiscernible)

10 third party beneficiary provision, we should be able to meet

11 our obligation.

12         Thank you, Your Honor.

13         THE COURT:  All right; thank you.

14         All right, Ms. Montgomery, I'm going to turn back to

15 you.  And let me make sure I understand entirely your position

16 on all of these objectors.

17         You have said -- correct me if I'm wrong -- the

18 Committee has no problem with making all of these objectors

19 subject to the protective order that was negotiated with the

20 debtor way back when in January, or did I overspeak -- overstep

21 on that one?

22         (No audible response heard)

23         THE COURT:  Ms. Montgomery, I can't hear you.

24         (No audible response heard)

25         THE COURT:  Ms. Montgomery, you must be on mute.

55

```
 1              Michael, is she still on there?

 2              ECRO:  (Inaudible).

 3              THE COURT:  Okay.  Ms. Montgomery, we're showing

 4   you're on mute.  There you are, okay.

 5              MS. MONTGOMERY:  Can you -- can you understand me

 6   now?

 7              THE COURT:  Yes.

 8              MS. MONTGOMERY:  Okay.  I don't know what happened, I

 9   didn't touch anything.

10              THE COURT:  That's okay.

11              MS. MONTGOMERY:  Technology.

12              No, Your Honor, you're accurate -- that is accurate.

13   We don't have any problem with any of the objectors being made

14   parties to the protective order for purposes of, you know, for

15   their clients to be subject to the same -- the same

16   protections.

17              THE COURT:  All right.  And then my next thing I

18   wanted to confirm is that protective order, is it already

19   worded that it's UCC professionals' eyes only or no?

20              MS. MONTGOMERY:  So the current -- the current

21   protective order has two tiers.

22              THE COURT:  Okay.

23              MS. MONTGOMERY  And the highly confidential tier has

24   a very -- a much more limited disclosure group, it includes the

25   Court, it includes the outside professionals, so I guess it
```

56

 1 would be also FTI, etc.

 2         And then, you know, other parties that would be, you

 3 know, fundamentally necessary for us to use those -- that data,

 4 like court reporters.  It does not include the members of the

 5 Committee.

 6         THE COURT:  All right, so you said it's two tiers.

 7 You mean like there's highly confidential, that's professionals

 8 and those people you named only; and then there's a second

 9 tier, confidential, then the Committee members, the actual

10 businesspeople could see it?

11         MS. MONTGOMERY:  That's absolutely right, but the

12 confidential data would still be subject to protection.  So we

13 think it's a strong protective order, and should meet the needs

14 of all of the objectors.

15         THE COURT:  Okay.  Let me -- I'm giving you the last

16 word.  You can respond in any way you want to all of these

17 eight or so separate arguments, but I would like you to start

18 first with CCS Medical and MGM.  I think you acknowledged at

19 the beginning they're in a little bit different category, but

20 now that you've heard their lawyers articulate how they are

21 different, do you think that at least with these two, their

22 ability to first review anything you produce, or the debtor is

23 going to produce, relating to CCS Medical and MGM might be

24 reasonable?

25         MS. MONTGOMERY:  Yes, Your Honor.

57

1          I'd even go a step further.  I mean we were working

2 to negotiate with MGM, and my apologies to Ms. Stratford

3 because I must have missed her communications, it was not

4 intentional; we would have happily negotiated the same with

5 regard to her.  That those documents might even just be

6 excluded from the review subject to some specific, you know,

7 protections so that we can make sure that things aren't being

8 overly included.

9          So I think that the UCC would be open to a limited

10 review.  The devil's in the details with all ESI, Your Honor,

11 so it would really just be determining to make that as targeted

12 as possible so it's not -- you know, it's not including

13 documents that don't have anything to do with the board's

14 service.

15          THE COURT:  Okay.  It's -- let me ponder what you

16 just said.

17          It would exclude anything not having to do with their

18 board service, Dondero or Trey Parker's board service.

19          MS. MONTGOMERY:  Yes.  So we believe that because the

20 debtor has separate relationships potentially with these other

21 entities, we understand the concern with regard to the data

22 that's related to their role as a director.

23          But, for example, if there is communications between

24 Mr. Dondero and someone else at the debtor that just says like,

25 you know, "MGM stock is trending up," I don't know that that's

58

1  necessarily related to his status as a director as I don't know

2  that it's related to an estate claim. It's perhaps a bad

3  example, but the concept remains, Your Honor, we think that

4  there has to be a way to slice that so that all the parties are

5  getting the protection that they need for their confidential

6  board communications without overly dipping into the data

7  that's otherwise in the debtor's position.

8          THE COURT: All right.

9          Well, let me -- let me go to Mr. Keiffer's client.

10  I'd like to hear your specific rebuttal to his idea that maybe

11  you can come up with three or five categories, suffix as he

12  called them, to just, at the outset, carve them out from the

13  possibility of Committee review.

14          MS. MONTGOMERY: So I'm not entirely certain that I

15  completely understood the proposal, Your Honor, and my

16  apologies for that. But I don't know that Mr. Keiffer is

17  suggesting that those categories be excluded from these nine

18  custodians that are the subject to the motion to compel, or if

19  he was requesting that there be some sort of exclusion that

20  applies to data that's otherwise produced related to his client

21  by the debtor, so maybe it's not in the nine custodians' data.

22          In any case, Your Honor, we're open to discussions to

23  try to resolve any of these objections. I don't know that

24  we've specifically discussed that with Mr. Keiffer, but we're

25  happy to do so. If it's limited in nature, and it's not going

59

1  to unnecessarily slow down production, you know, we're open to

2  talking about it.

3          THE COURT:  Okay.  Well, let me -- let me make sure I

4  understand -- and I know this is subject to discussion with the

5  debtor when we break, but the UCC's proposed protocol here was

6  -- let me go through a couple of mechanics.

7          All the files of the nine custodians would be

8  provided to this E discovery vendor to put in a repository.

9  And then hopefully the debtor and the Creditors' Committee

10 would come up with a set of mutually agreeable privilege terms

11 to hopefully identify what would -- you agree be attorney-

12 client privilege or work product privilege so that the search

13 terms don't get to that privileged information.

14         If you have disputes, you're going to have a third

15 party neutral, you've discussed, to resolve the disputes about

16 those search terms.

17         And then all documents, not including those agreed

18 privilege terms, would get produced to the Committee, obviously

19 subject to the earlier agreed upon protective order, and then

20 the debtors contract attorneys would review the held back files

21 to see if they're really privileged, or not.  And if not,

22 they'd be produced.  And if they are, they would -- if they

23 think they are, a privilege log would be produced, and then any

24 disputes could be resolved by this neutral third party.

25         I don't know if that's still your protocol on the

60

1  table, but that's how I understood it to work from your papers.

2          I guess what I'm getting at is -- I'm pondering Mr.

3  Keiffer's argument, and really a few others.  I mean if this is

4  what you're still holding fast to, I mean there's a lot of

5  opportunities along the way to protect attorney-client

6  privilege information of these affiliated entities, right?

7  You're going to first try to craft appropriate search terms so

8  as not to get at privileged information.  If you can't get

9  agreements on those, you'll have the third party neutral weigh

10 in.

11         And then the documents that are turned up ultimately

12 through the search, the debtor's going to get a chance to

13 review for privilege and hold back.

14         I guess -- I guess the thought is the debtor's only

15 going to be looking towards its own privileged information,

16 not necessarily NexPoint, or Highland, CLO Funding, and the

17 others.

18         So -- I mean if you could address -- first off, is

19 that the protocol that's still on the table?  Did I correctly

20 described the Creditors' Committee's proposed protocol?

21         MS. MONTGOMERY:  Sorry.  Yes, Your Honor, that's

22 what's set forth in our motion.  We've been working with the

23 debtors to try to make that more functional; we haven't reached

24 an agreement yet.  Perhaps we'll be able to do that when we

25 take a break in just a moment.

61

1    But, you know, we've been trying to figure out, Your

2  Honor, if there are ways that we can further limit the

3  production based on search terms in some way so that we can

4  limit the privilege logging and review that has to occur.  But

5  like I said, that's -- that's outstanding at the moment, and I

6  don't know that the parties have an agreement or would be able

7  to reach an agreement.  We're hopeful, but I'm not entirely

8  certain.

9    But otherwise, yes, Your Honor, I think you've pretty

10  well explained the protocol, with one exception, which is that

11  the privilege review that was proposed, that review would be to

12  determine whether or not the documents that were being produced

13  -- that were, you know, presumptively privileged were related

14  to estate claims.  And if they were related to estate claims,

15  then those would be produced to the Committee under the terms

16  of the final term sheet.

17    If they are attorney-client privileged, and not

18  related to estate claims, then those would be withheld and

19  logged.

20    THE COURT:  All right.

21    Well, let's go back to Mr. Keiffer's suggestion.  I

22  mean if he -- okay.  I was confused; I think Ms. Montgomery was

23  confused, too.

24    Mr. Keiffer, you had talked about these three or four

25  suffixes, and one of them would be your law firm if -- I think

62

1 what I was understanding, communications that went between

2 Atlas and your law firm; communications that went between Atlas

3 and one or two other outside counsel. Is that encapsulating

4 what you think could be crafted in here --

5          MR. KEIFFER: Yes, Your Honor.

6          THE COURT: -- and excluded?

7          MR. KEIFFER: Yes, Your Honor, that's exactly what

8 we're talking about.

9          The reason I used "suffixes" just as a term because

10 after the act. So it's ROMCLAW.com is the suffix. And so if

11 you look for that -- if that is the part of the search terms

12 and, you know, you see that, and that means set aside, you see

13 my law firm's suffix on the email somewhere in that, then you

14 know that that's something you need to set aside, as well as

15 another law firm that they had would be SGLawyers.com, those

16 are the -- that's what was referencing, it's just an easy way.

17          We don't have a lot in our specific circumstance --

18 and I think it was also some of the more attenuating parties

19 that come in and -- complaining have been -- would be looking

20 for something like that, so if they had a -- maybe that's the

21 same thing that they're kind of looking for. But for us, it is

22 very simple terms, it's what the law firm email addresses are.

23 And when they show up, that's the search term that pushes them

24 aside.

25          THE COURT: All right.

63

1          MR. KEIFFER:  Because that would okay, it's probably

2    something -- because before we even knew what was going on, we

3    were working on putting that proof of claim together that we

4    filed, we would have emails out there concerning circumstances

5    between myself and my client.  And those would -- those

6    ostensibly would be available under the -- under the -- if it

7    were (indiscernible) litigated, and the Committee won that

8    issue, those would be available.

9          But we think the easier thing to do is just set them

10   side, let's not go down that road.

11         The other -- we think there's very few of those, and

12   we'll be happy to give them -- the suffixes in a few days.

13   I'll make sure Mr. Honis -- that my client representative gives

14   me all of those.

15         THE COURT:  All right.

16         Well, Ms. Montgomery, again, I'm just looking through

17   my notes of your early comments.  I mean you had put Mr.

18   Keiffer's client in a little bit of a separate category, right?

19   Saying it didn't appear that Atlas or Rand entities -- they're

20   one in the same, right?  Or -- well, same group of clients or

21   same group of entities:  Rand, Atlas --

22         MR. KEIFFER:  They are, Your Honor, that's all --

23   they're all in my group.

24         THE COURT:  Okay.  So you had made the comment, Ms.

25   Montgomery, that they did not appear to share legal counsel.

64

1              MS. MONTGOMERY:  I did.

2              THE COURT:  In other words, the three in-house

3     lawyers that are custodians, right?

4              MS. MONTGOMERY:  That's right, Your Honor.  And I

5     think that our position would be because they don't share legal

6     counsel, if there were communications essentially from these

7     three law -- like law firm email addresses that are in these

8     nine custodial data, then those documents might not be

9     privileged.

10             If what Mr. Keiffer's concerned about is

11    communications not to these nine custodians that involve those

12    three or four addresses where there isn't sort of a debtor

13    representative involved, then I think that's a separate

14    situation, and we'd be more than willing to reach an agreement

15    regarding how those documents should be treated, whether it's

16    by review by Mr. Keiffer in logging or just exclusion from

17    review.

18             MR. KEIFFER:  Your Honor, may I ask for one quick

19    clarification.  We still want to maintain that to the extent I

20    don't know for sure whether -- what extent legal services were

21    or were not provided.

22             And to the extent that their joint privileges waived,

23    a way around those things, that's the better way of doing it

24    than to say that they've been waived and things.  So let's just

25    let the joint client privilege point, which we previously

65

1 discussed, be the main means by which those go through. There

2 might be (indiscernible) discussions with one of the nine folks

3 that -- when Highland was involved in the transaction. There

4 may be a common interest privilege, etc. I think it has to

5 stay at that highly confidential level just because it's

6 (indiscernible) had it lowered in its tier -- I mean a tier --

7 or possible references, whether it's confidential, highly

8 confidential, confidential or not confidential at all.

9          THE COURT: Okay. I just --

10          MR. KEIFFER: That's the only --

11          THE COURT: I just got very confused. I think we

12 were discussing if -- if there are --

13          MR. KEIFFER: May I, Your Honor?

14          THE COURT: Yeah, I -- I -- well, if there are

15 communications from folks at Highland to these three or so law

16 firms that Atlas uses, then there could be an agreement those

17 are cut out -- carved out.

18          But if there is -- if there are communications from

19 the six other custodians who are not lawyers to Rand entity --

20 or -- or these law firms --

21          MR. KEIFFER: No, Your Honor --

22          THE COURT: I -- I --

23          MR. KEIFFER: Pardon me, Your Honor. The law firms

24 aren't really the issue here. Only the issue with regard to

25 seeking things through what is the shared server circumstance

66

1  in the email server.

2          An example may be that when there's an email that

3  comes in from Isaac to my client saying "You've got some

4  production requirements," and I'm on that email, I would

5  initially show up on that email, but that wouldn't be one that

6  would be as part of a shared services type of potential legal

7  discussions about current circumstances and telling me, "Oh, by

8  the way, we've been requested for this information under a

9  shared services agreement, you have X days to produce."

10          If, on the other hand, it's -- some years ago, back

11  when things were happening, not current, but years ago when

12  things were going on, that there was -- that there was an email

13  between my client's counsel and the debtor's counsel, there

14  would be the shared privilege or the joint privilege element

15  that would keep it at a different level, even though there may

16  be some other issues in regard to the shared services related

17  to privilege.

18          What we mentioned earlier -- and I think the

19  Committee's okay with this -- with the joint client privilege

20  is not affected by the process.  And so that -- the only thing

21  that's really, really out here that adds to the circumstance is

22  where emails show the three to five dot-com addresses.  That

23  they get set aside to go through a different -- go through a

24  process of review, you know, to see if they're attorney client

25  between myself and my client, or between previous counsels and

67

1  my clients, just as between them.

2          THE COURT:  All right.

3          MR. KEIFFER:  That's all we're really looking for in

4  that.

5          THE COURT:  Okay.

6          Ms. Montgomery, again, I'm giving you the last word

7  in rebuttal to any of this you want to say at this point.  But

8  I do hope you'll address one more thing as part of that, and

9  that is Mr. Dondero's arguments about Acis.  I just want to

10 clarify I understand where you stand on that.

11         MS. MONTGOMERY:  Yes, Your Honor.  With regard to Mr.

12 Dondero's arguments regarding Acis, we have no qualms with the

13 position that communications that are related to the Acis

14 litigation should be treated as outside counsel or highly

15 confidential -- at the highly confidential level, right?  That

16 makes sense, Your Honor, and we're not trying to bypass

17 discovery on behalf of any of the members of the Committee, or

18 anything of that nature.

19         Our concern with the objection was that's not what's

20 being asked for.  If Mr. Dondero had asked that communications

21 or documents that relate to the underlying litigation be not

22 provided to the members of the Committee, and held at only the

23 lawyers' eyes only, we wouldn't have had a problem with that.

24         Instead, what he's asking is that all documents not

25 be shared with one of the members of the Committee, and we

68

 1 | think that's overly broad. And, frankly, I'm unclear as to why
 2 | that would be necessary.
 3 |         THE COURT: Okay; all right. Anything else you want
 4 | to say?
 5 |         MS. MONTGOMERY: Only to the extent that you have
 6 | questions about any of the arguments that they made, Your
 7 | Honor. We don't want to take up more of your time than
 8 | necessary.
 9 |         THE COURT: All right. Well, I'm going to carve out
10 | three specific areas, and then I'll just give you the more
11 | broad ruling.
12 |         With regard to CCS Medical and MGM, I think they have
13 | shown themselves to be in a more unique -- a unique situation
14 | in contrast to the others since we certainly don't have any
15 | issues of shared in-house lawyers, shared IT, and whatnot. We
16 | just have the board connection to Mr. Dondero and Trey Parker
17 | on CCS Medical, and with regard to Mr. Dondero and MGM.
18 |         So I do think these objectors should have the
19 | independent ability to review before disclosure to the
20 | Creditors' Committee, at their own cost, any information
21 | pertaining to those two entities to make sure there's not any
22 | privileged information they want to argue should be held back
23 | or commercially sensitive information.
24 |         So, again, hopefully you all can amicably work out
25 | the wording of that, but that is the concept of the ruling of

69

1  the Court.

2           Second, with regard to the Atlas/Rand parties, I

3  think that they should be entitled to a separate review of any

4  items that involve those dot-com law firm names to weigh in on

5  whether those are privileged.

6           And, of course, these are all subject to further

7  Court review and litigation before the Court if people cannot

8  agree on that.  I say that, or the third party neutral, I guess

9  that would hopefully be the first step before any of this comes

10 to the Court.

11          So that is the special category as to Atlas/Rand.

12          As far as the Dondero argument, I do like the

13 suggestion, Ms. Montgomery, that you made that if there is any

14 documentation relating to Acis litigation that is produced to

15 the Committee, that it should be considered in that first

16 category that it's highly confidential, so it's for

17 professional eyes only; Mr. Terry or Acis businesspeople cannot

18 see that.  But that it -- that's just a special category of

19 documents, any ESI that pertains to the Acis litigation,

20 wherever that litigation is pending, this Court, Guernsey,

21 State Court, wherever.

22          So all other objections are overruled except --

23 obviously I do think it's important to do, Ms. Montgomery, what

24 you said you would do, and make all of these objectors

25 expressly parties who are subject to the original agreed

70

1  protective order.  Okay, so I think that gives them some level

2  of protection.  But I have been strongly persuaded in

3  everything I've heard today that there is a very strong chance

4  with regard to most of these entities that share legal counsel

5  with Highland, and share IT, and servers that we have had a

6  waiver of privilege, we have common interest privilege, joint

7  privilege, something of that regard to have impaired their

8  privilege arguments.  So I'm just throwing that out there for

9  the benefit of everyone as far as future disputes that there

10 might be.

11         All right, Ms. Montgomery, do you have any questions

12 about that ruling?

13         MS. MONTGOMERY:  (No audible response heard).

14         THE COURT:  No?  All right.

15         MS. MATSUMURA:  Your Honor, may I make one brief

16 comment?  This is Rebecca Matsumura for Highland CLO Funding.

17         THE COURT:  Yes.

18         MS. MATSUMURA:  I just wanted to clarify, we didn't

19 make it as an explicit part of our deal with the Committee that

20 we also be made party to the protective order.  But we'd also

21 ask for that relief, as well as, you know, such being given to

22 all of the objectors.

23         THE COURT:  Okay, the Court grants that request.

24         All right, Ms. Montgomery, anything else?

25         MS. MONTGOMERY:  (No audible response heard).

71

1          THE COURT:  Shall we break now to let the Committee

2    counsel and debtor counsel talk about their remaining

3    unresolved issues?  How long of a break, Ms. Montgomery, do you

4    think you will need?

5          MS. MONTGOMERY:  (No audible response heard).

6          THE COURT:  Okay.  I think you're on mute.

7          MR. MORRIS:  Your Honor, this is John Morris from

8    Pachulski on behalf of the debtor.

9          THE COURT:  Oh, okay.

10          MR. MORRIS:  I just -- yeah, I just need to put some

11   -- a couple of bells and whistles, it will probably take me two

12   minutes to finish-up an email from Ms. Montgomery.  And then if

13   we could just -- I would suggest give us until -- 45 -- until I

14   guess 3:45 --

15          THE COURT:  All right.

16          MR. MORRIS:  -- local time.

17          THE COURT:  All right.  Well --

18          MR. MORRIS:  And then see -- hopefully we'll know --

19   at least narrow the issues, if not reached a complete

20   agreement, by that time.

21          THE COURT:  Okay.  I'll come back at 3:45.

22          UNIDENTIFIED ATTORNEY:  Thank you, Your Honor.

23          (Recess 3:23 p.m./Reconvene 3:46 p.m.)

24          THE COURT:  All right.  This is Judge Jernigan again.

25   I'm going back on the record in Highland Capital.  Do we have

 1  at least Mr. Morris and Ms. Montgomery available from their

 2  session?

 3              MS. MONTGOMERY:  Can you guys -- can you hear me,

 4  Your Honor?

 5              THE COURT:  I can hear you now; thank you.

 6              MS. MONTGOMERY:  Okay, I have no idea why it keeps

 7  muting, so my apologies for that.

 8              We just briefly met.  We need just a few more

 9  minutes, Your Honor, to run one issue past our client, but we

10  do believe we're going to have at least one matter outstanding

11  for the Court to consider hopefully, but we've managed to

12  resolve everything else.

13              THE COURT:  Okay.  So do you literally mean one

14  minute, or were you being general?  Do we need five minutes

15  or --

16              MS. MONTGOMERY:  I think five would be sufficient,

17  Your Honor.

18              THE COURT:  All right.  Well, I'll take another

19  break.  I'll be back in five minutes.

20              MS. MONTGOMERY:  My apologies.

21              THE COURT:  Okay; no problem.

22              (Recess 3:47 p.m./Reconvene 3:59 p.m.)

23              THE COURT:  All right.  This is Judge Jernigan, we're

24  back on the record in Highland after a break.

25              Mr. Morris, I see you there.  And do we have positive

1  news to report?

2         MR. MORRIS:  I think we do.  We haven't completely

3  resolved every single issue, there is still one remaining one

4  that we'd like to present to the Court.

5         THE COURT:  Okay.

6         MR. MORRIS:  But we have otherwise, I think, reached

7  an agreement with respect to all other matters.

8         Ms. Montgomery, I don't know if you want to share

9  with the Court or -- I don't even know if Your Honor wants us

10  to present the agreement to her or we'll just submit it in a

11  proposed order later.

12         THE COURT:  Well, if you could just hit the

13  highlights so we have it on the record that we have an

14  agreement, and the pertinent points.

15         MR. MORRIS:  Okay.  So I'll just -- I'm just reading

16  from the email.

17         The Requested ESI will be securely delivered to

18  Meta-e.  Meta-e is a third-party service provider,

19  (indiscernible) the Committee.  So the requested ESI for the

20  nine custodians will be delivered to Meta-e.

21         Number two, the debtor will proceed with the

22  production of the 800,000 e-mails previously identified by use

23  of agreed search terms, subject to the Court's prior rulings

24  with respect to the third party objections, and subject further

25  to a privilege review using terms agreed by the parties, with

74

1  the resolution of any disputes on those privileged terms

2  resolved on an expedited basis in accordance with the

3  Committee's proposal in their motion to compel.  And that

4  really is just longhand, I guess, for a special master.

5          If and when the UCC wants to conduct further searches

6  on the requested e-mails, it will give the debtor with three

7  business days to consent to the search terms, with such consent

8  not to be unreasonably withheld.  In the absence of any

9  objection, the e-mails will be produced subject to the Court's

10  rulings on the third-party objections, as well as privilege

11  review previously described.  Search terms need not necessarily

12  be tied to formal requests for production, and may be provided

13  to the debtor on a rolling basis.

14          If debtor does not consent to search terms, it must

15  lodge an objection with the Committee.  The parties shall

16  confer in good faith and if no resolution is reached within two

17  business days, the debtor may seek judicial review on an

18  expedited basis.  It will be debtor's burden to establish that

19  the search terms are not reasonably designed to identify data

20  relevant to Estate Claims.  Initial caps because the "Estate

21  Claims" is from the governance settlement back in January.

22          All ESI containing search terms not subject to

23  objection will be produced to the Committee pending

24  determinations on those terms, if any, as to which there is

25  disagreement.

1          Next, Your Honor, taking into account the speed with

2     which the parties intend to proceed and the volume of

3     documents, all ESI produced that is not subject to the

4     privilege term search shall be produced on a "highly

5     confidential" basis under the protective order, and the debtor

6     shall respond within two business days to any designation

7     challenge by the UCC.  Documents that have been reviewed for

8     privilege will be categorized by debtor in the first instance

9     as either highly confidential, confidential, or not subject to

10    confidentiality.

11         Next, all persons or entities who objected to the

12    UCC's motion to compel or who are otherwise identified in the

13    debtor's motion for a protective order shall be deemed to be

14    parties to the court-ordered protective order that was entered

15    in January.

16         All documents from any custodian -- any of the non-

17    custodians that are related to or otherwise concern the pending

18    Acis litigation shall be marked "highly confidential" and not

19    subject to privilege challenge.

20         And finally, any disputes regarding the privilege

21    review process will be resolved by the special master and both

22    parties expressly reserve their rights thereto.

23         So there's one last issue --

24         THE COURT:  Can I -- before we --

25         MR. MORRIS:  Of course.

76

1        THE COURT:  -- go on and I forget, can we call this

2   human being a third party neutral instead of a special master?

3   And I'm -- I'm splitting hairs on that because there is a rule

4   somewhere -- is it -- is it in 105 or is it a rule that says a

5   bankruptcy judge can't appoint a special master?

6        MR. MORRIS:  I don't know, but let's just call him or

7   her a third party neutral.

8        THE COURT:  Yeah, I'm not crazy, isn't that -- I

9   think it's in one of the 9000 rules.

10       MR. MORRIS:  I'm sure you're right.,

11       THE COURT:  I'm not sure how different this third

12  party neutral is in substance from a special master, but it

13  will just make me feel better.

14       MR. MORRIS:  Yeah, it's just somebody who can --

15       THE COURT:  If the Fifth Circuit ever looks at it --

16       MR. MORRIS:  Yeah, it's just somebody who can help us

17  resolve either issues of creating these privilege terms or

18  resolving any other disputes so that we don't have to burden

19  the Court with such issues.

20       THE COURT:  Okay; very good.

21       Well, let's hear the unresolved issue then.

22       MR. MORRIS:  Okay.  So the last issue, Your Honor, is

23  as Your Honor knows -- Your Honor, I need to, if I may, just

24  provide some perspective here because these issues are very,

25  very important to the debtor.  I take personal responsibility

77

1  for all discovery matters in this case.  I've had the support

2  of the independent board, and of all of Highland's employees

3  who have worked very hard to get these documents in this case.

4       We produced -- really we were substantially complete

5  with all (indiscernible), and we did it with the following

6  principles in mind:  We wanted to, of course, eliminate or at

7  least limit any potential liability exposure to the debtor, and

8  that's what prompted us to make the motion to compel.  And as

9  Your Honor saw, there were eight separate objections brought by

10 40 or 50 different parties, and it's exactly for that reason

11 that we were seeking the ability to do the review initially

12 because we have -- you know, we may have wound up disagreeing

13 with some third parties as to the scope of their obligations,

14 but we knew there were obligations that existed and the board

15 was very specific in instructing me to make sure that we

16 (indiscernible) liability (indiscernible).  So I'm really

17 pleased that the objecting party stepped up, and that the Court

18 issued its rulings.  But that was really one of our

19 (indiscernible) principles.

20      Another one is to make sure that we protect the

21 privilege to non-estate claims.  We negotiated very

22 (indiscernible) term sheet with the Committee.  We gave the

23 Committee standing to pursue estate claims.  We gave the

24 Committee a shared privilege to all privileged communications

25 of estate claims.

78

1          But what we did not do, what we did not agree to was

2    to waive the privilege with respect to non-estate claims.  So

3    that's the second principle that we've been trying to protect

4    because the board and (indiscernible) we have an obligation to

5    the estate and to the Committee, so we're trying to protect the

6    estate's privilege for non-estate claims.

7          And the third thing is just to make sure this process

8    runs as efficiently as it could.  You know, I don't know that

9    going from 800,000 emails to eight million is -- can be

10   categorized as a success, but that's what the Committee's

11   wanted to do, and the board has been very specific not to be

12   obstructionist here, but just to be guided by the principles

13   that I've articulated.  And that's kind of how we got here.

14         And so the last issue here, Your Honor, touches on

15   the principles that I just described, and that is the nine

16   custodians at issue, three of them are lawyers:  Scott

17   Ellington, Isaac Leventon, and Mr. Surgent.  They're all

18   lawyers, they're all licensed to practice law, they all give

19   legal advice, they give legal advice to the board, they give

20   legal advice on countless issues that are completely unrelated

21   to estate claims for which the Committee does not have standing

22   to pursue, and for which the Committee does not have a shared

23   privilege.

24         So the third issue, Your Honor, is just to say that

25   for those three out of nine custodians, we actually do a real

79

1  privilege review on a document-by-document basis.

2          Now I'll just leave it at that, that's what the issue

3  is.  And the Committee, I think -- I'll let them speak for

4  itself.

5          THE COURT:  Okay.  I -- I didn't know there was any

6  disagreement about debtor lawyers or debtor contract lawyers

7  doing a privilege review.  I thought it was just a -- you know,

8  the two-tier, first a relevance review and then a privilege

9  review.

10         MR. MORRIS:  It's in our objection, Your Honor.

11         THE COURT:  Pardon?

12         MR. MORRIS:  We did raise it -- we did raise the

13  issue in our objection.

14         THE COURT:  Oh.

15         MR. MORRIS:  This isn't the first time I --

16         THE COURT:  Well, no, no, no, no, I thought --

17         MR. MORRIS:  Maybe I'm mistaken.

18         THE COURT:  I thought it was already part of the

19  UCC's proposed protocol that there be a privilege review by

20  debtor's lawyers.

21         MR. MORRIS:  That's right, and that's just using kind

22  of garden variety search terms.  What I'm saying is that when

23  it comes to -- and that's fine to take the six non-lawyers,

24  that's fine for Mr. Dondero, that's fine, you know, for Mr.

25  Waterhouse, and for the other non-lawyers.  But for a lawyer,

80

1 Your Honor, I think -- I think -- I mean this is of such vital

2 importance, and is -- almost everything they do is -- not

3 everything; I overstated. Sometimes they're engaged in

4 business advice. But for the most part, they're practicing

5 lawyers.

6 And I think we just need a heightened standard of

7 protection for those individuals, and it's just the three of

8 the nine. I mean it's for three of the nine who are licensed

9 lawyers, and we're asking for a wholesale privilege review for

10 those three people, not just searching to see if their email

11 says they privilege or work product, you know, there are other

12 search terms that may come up.

13 THE COURT: Okay. Ms. Montgomery, elaborate on where

14 the difference is on your proposed procedure versus the

15 debtor's, all right?

16 MS. MONTGOMERY: Yes, Your Honor.

17 The proposal that is before the Court, you're

18 correct, does provide for a privilege review. We've never

19 argued that there shouldn't be a privilege review. We

20 understand that the creditors stand only in the shoes of the

21 debtor with regard to the estate claims, and not more broadly.

22 The dispute really here, Your Honor, is on the nature

23 of the search when it comes down to these three custodians that

24 are attorneys. And Mr. Morris is suggesting that all of the

25 documents -- every document that has a custodial file, is in

81

1  their custodian file should be touched by the debtor so that

2  they could look at it and determine whether or not it is

3  privileged.  And if it is privileged, whether or not it's

4  related to an estate claim.

5        And our position, Your Honor, is that that's

6  unnecessary, and that it's going to cost a lot of money, and

7  also slow down the review process.

8        And the basis, Your Honor, for our position is that

9  this sort of assumption stands on the ground that every

10 document a lawyer touches can be -- you know, is automatically

11 privileged.  And as a general rule, we all know that that's not

12 the case.  Not every document a lawyer touches is protectable.

13 And that's particularly true with regard to in-house counsel.

14 Their roles by their nature involve providing both legal advice

15 and business advice, and only the legal advice is protectable.

16       Several courts have held that the presumption might -

17 - regarding privilege that might exist for law firm counsel is

18 not the same presumption that should be held with regard to in-

19 house counsel.  In fact, the presumption should be that the

20 advice is business advice, unless it's establishing legal

21 advice.

22       And of the three custodians that the debtor

23 discussed, two of them -- they're all, in fact, licensed

24 attorneys.  But one of them is not in the legal department, he

25 is acting as the head of compliance.  And as you know, the case

82

1  law on compliance is fairly well-settled that there isn't a

2  presumption of privilege with regard to the compliance issues.

3          And so as a result, we think it's most appropriate to

4  use robust privilege terms.  You know, think of things like

5  privilege, lawyer, attorney-client, work product, etc., and

6  we've proposed a list of those terms to the debtor, and we're

7  willing to continue to work that out with this third party

8  neutral.

9          But we don't believe that it's appropriate for every

10  single document that is related to these three custodians be

11  reviewed for privilege purposes, that's just excessive and

12  expensive.

13          MR. MORRIS:  Your Honor, if I may?

14          THE COURT:  You may.

15          MR. MORRIS:  I dare say that not ten percent of what

16  I write has the word "privilege," "attorney-client," "work

17  product" in my emails.  That is -- you will never be able to

18  create a list that's sufficient to protect a lawyer from

19  producing privileged communications.

20          There's no dispute here that the Committee's rights

21  extend no further than estate claims.  And I might feel

22  differently here, Your Honor, and maybe there's some wiggle

23  room here, but they can create six terms that are actually

24  designed to elicit information relating to estate claims,

25  right?  And we've asked them to do that for many months.  And

83

1  if they're -- if I thought that they were actually looking for

2  information that related to estate claims for which the debtor

3  has agreed the Committee would share the privilege, my concerns

4  would be much more modest in scope.

5         But here, you have individuals who have been acting

6  as lawyers for five years.  To expect them to write the word

7  "lawyer," or "privilege," or "work product" in every email, or

8  to suggest that if they haven't done that, then it's fair game.

9  Even if you have no idea if it relates to an estate claim is

10 just -- it's just (indiscernible).  It's just -- it's not

11 right.

12        They're getting the emails of six custodians.

13 They're getting the emails using the search terms with the six

14 custodians.  It is costly, it will slow it down for three of

15 the nine people, but that's because they haven't given us --

16 they haven't given us search terms that are designed to elicit

17 estate claims.  They're just -- they're asking for everything.

18 And I've never ever seen anybody -- any court allow, you know,

19 the unfettered access subject to only search terms that may or

20 may not be sufficient.  I just -- we feel very, very strongly

21 about this.  They're getting six out of nine custodians, and

22 we're not even saying that they won't get the lawyers in these

23 three custodians' emails.  We'll give them whatever relates to

24 estate claims.

25        MS. MONTGOMERY:  Very briefly.  I think what Mr.

84

1 Morris has raised is dealt with by virtue of the agreement that

2 we just told you about, which is that we're going to be using

3 search terms that are aimed at identifying estate claims. And

4 that the review and the production process to us would be only

5 of the documents that contained that search term, and the

6 privilege would be for the subset of documents that contain

7 that search term and also contain a privilege term.

8         And it's not limited to just privilege, Your Honor.

9 There are things in there like "lawsuit," or "litigation," or

10 "claim," or -- and we're open to continue to discuss those.

11         Like I said, we only object to a wholesale review of

12 every document, we don't really think that that's necessary.

13         MR. MORRIS: We're -- we're -- and I just want to

14 clarify, we're not talking about reviewing every document.

15 We're only talking about the documents that would come up using

16 whatever search terms the Committee devises.

17         So by our count, there's between one point five and

18 two million emails from the three lawyers. We're not

19 suggesting that we would look at every one of them, there would

20 be no need to do that.

21         But what we would do is review the emails that are

22 the subject of search terms to make sure there (indiscernible).

23         THE COURT: Okay. Let me -- at the risk of repeating

24 myself -- go through the explicit protocol the UCC had in its

25 pleading:

85

1       Number one, all files of the nine custodians,

2 including those three lawyers, would be provided over to the E-

3 discovery vendor to put in a repository.

4       Then you come up with this robust list of privilege

5 terms to ferret out what might be privileged. You try to agree

6 on that robust set of privilege terms. If you can't, you get

7 the third party neutral to work out your disagreement,

8 hopefully.

9       So you get that resolved, and the search protocol is

10 executed, and all documents, not including one of those

11 robustly created privilege terms, get produced to the Committee

12 subject to that agreed protective order from January, 2020

13 where there's carve out and, you know, ability to pull back,

14 right, if there's inadvertent production of privilege, right?

15 That's an essential term, right? If something accidentally

16 gets produced that shouldn't, then there's always a mechanism

17 to pull it back.

18       And then the debtor's contract attorneys would review

19 all of the held back documents, the documents held back, you

20 know, because the privilege terms were triggered, and they were

21 held back, to determine if they are really privileged. If not,

22 then they get produced.

23       But if you decide they are, in fact, privilege, then

24 you create a privilege log, and that gets shared with the

25 Committee. And if there are disputes about that, then you go

86

1  to the third party neutral to resolve those.

2         Okay, is there anything I misstated about what the

3  Committee has proposed?

4                    (No audible response heard)

5         THE COURT:  Is there anything I've misstated?  Ms.

6  Montgomery's shaking her head no.

7         MS. MONTGOMERY:  No, Your Honor, I don't believe so.

8         MR. MORRIS:  So --

9         THE COURT:  So I really am -- if that's the case, I'm

10 not getting, Mr. Morris, why --

11        MR. MORRIS:  Let me try one more time, because --

12        THE COURT:  You're going to get your chance to review

13 stuff that's --

14        MR. MORRIS:  No, but -- but we're not, and here's --

15 here's the gap in what you have just described.  Everything you

16 have just described is perfectly fine for the six non-lawyers.

17        Our concern is if you don't have -- if -- there's no

18 question that the lawyers have engaged in the provision of

19 legal services, there's no question that the provision of legal

20 services extended beyond estate claims.

21        And the concern is no matter how hard you devise

22 search terms, and this is just a matter of practice in my

23 experience, you're always going to get documents that don't get

24 captured by the search terms.

25        And so what you've described works very well if the

1  document -- if the search terms actually work.

2          What our concern is for lawyers only, that that's not

3  sufficient.  That we will lose too many documents that will not

4  be captured using the search terms for which, you know,

5  clawback -- clawback issues are just -- we're talking about

6  millions of documents that are going to be reviewed and

7  produced.  Under these circumstances, more than any other, Your

8  Honor, these lawyers privileged communications that do not

9  relate to estate claims should be subject to protection.  They

10 should be subject to more protection than non-lawyers are

11 getting.

12          THE COURT:  The clawback --

13          MR. MORRIS:  And given --

14          THE COURT:  The clawback isn't enough.  The clawback

15 isn't enough.

16          MR. MORRIS:  It's not enough.  You can't unring the

17 bell, Your Honor.

18          And given the massive amount of information that the

19 Committee is seeking that we are willing to provide, frankly, I

20 don't think it's unreasonable to say, yeah, no, we're going to

21 treat lawyers like lawyers.

22          THE COURT:  So balance is you think, you know, those

23 lawyer eyes that can't unsee what they see, okay, if they get

24 it, yeah, you can claw it back, but they can't unsee it.  And

25 so somehow, it's going to, you know, be harmful.

88

1          But the flip side of that is -- well --

2          MR. MORRIS:  I did try to create a little more --

3          THE COURT:  A great delay and expense, right, for you

4  all to first go through the gazillion documents, and then, you

5  know, there's a privilege log that might be --

6          MR. MORRIS:  I --

7          THE COURT:  -- much larger than --

8          MR. MORRIS:  I did --

9          THE COURT:  Go ahead.

10          MR. MORRIS:  I did try to create a little space for

11  Your Honor, a little comfort zone, and that is that the

12  Committee actually use search terms that was designed to get

13  communications related to estate claims, right?  Because these

14  lawyers have countless emails, for example, relating to the

15  board's deliberations on settlement with UBS, or with the

16  Redeemer Committee, or with Acis, these things have been going

17  on for months.  That shouldn't be subject to clawback, they

18  should never be produced.

19          And so if there's -- you know, if the Committee were

20  to devise actual search terms that were intended to get estate

21  claim information, like I said before, that may make more --

22  that might provide a little bit more comfort.  But to allow

23  them to just use, you know, regular search terms on those

24  emails when you have non-estate claim information, and they

25  have -- I'm telling Your Honor, just countless emails over the

89

 1  last six months with the board, responding to board inquiries,

 2  responding to claims dispute resolutions, responding to all

 3  kinds of things.

 4        You know, at a minimum, I would want -- I would want

 5  it to stop as of the petition date.  But I think -- but I think

 6  even beyond that, they're lawyers, they're licensed

 7  practitioners who are rendering legal advice, and they're doing

 8  so in the kind of context that have nothing to do with estate

 9  claims.  And you have six other custodians, six, with whom the

10  Committee's proposal is completely acceptable.

11        THE COURT:  Well, this is a hard one.  This is a very

12  hard one, Ms. Montgomery.  What -- I mean what do you have to

13  offer me other than delay/expense?  And that's -- you know,

14  those are not small considerations, but that's really what it

15  boils down to, right?

16        MS. MONTGOMERY:  Well, there's delay, there's

17  expense, and then there's the protections that are already put

18  forth in the protective order, Your Honor, which we think are,

19  as we've said already today, robust.

20        We understand their concern with regard to clawback.

21  They have an attorneys' eyes only highly confidential

22  designation that they can use, and that will be used under the

23  agreement we've reached with regard to any document that they

24  haven't looked at.  So those will only be going to outside

25  counsel and the Committee's professionals.

90

1          And I just don't know -- you know, I think the

2   protections are there, and that the cost, you know, when

3   balanced against what we're really asking them to do and the

4   protections that are in place for them, just -- they don't --

5   they don't balance out, Your Honor.

6          MR. MORRIS:  Your Honor, with all due respect, it's a

7   little -- it's a little difficult for me to listen to cost

8   being a concern when you have a Committee who's asked for the

9   emails of nine custodians over a five-year period.  Actually

10  they've asked for ESI, the eight million number is just emails.

11  So it's not -- it's emails and attachments.

12         So the notion that cost is now an impediment while

13  we've gone from 800,000 emails to eight million doesn't

14  (indiscernible) with me.

15         THE COURT:  All right.  Well, again, I don't find

16  this to be at all easy.  But I am going to sustain the debtor's

17  objection on this, if that's the right way to say it.  I'm

18  going to accept the position, and order that these three

19  custodians, Scott Ellington, Isaac Leventon, and Tom Surgent,

20  that before any production, those three individuals' files can

21  go through, will go through separate review by the debtor.  So

22  they're carved out of the rest of these protocols, and

23  presumably as promptly as possible, there will be rolling

24  production.  Debtor will produce non-privileged files and will

25  create a privilege log.

91

1          And if there are disputes about that privilege log,

2    either the third party neutral will work them out or I guess

3    I'm the ultimate arbiter, if need be.  I don't know exactly how

4    you have those mechanics.  Maybe you don't have the judge

5    involved; I don't know.

6          Why don't you tell me so I can know whether to be

7    expecting a request to weigh in.  Do you have it set up where

8    the third party neutral's the final say on things like whether

9    something belongs on a privilege log or if it's really

10   privileged?

11         MR. MORRIS:  I don't think we've addressed that, Your

12   Honor.

13         THE COURT:  Okay.

14         MR. MORRIS:  But I'm sure we can --

15         MS. MONTGOMERY:  I think it may be already be covered

16   in the protective order, Your Honor; I'm just checking to see.

17         THE COURT:  Okay.  And I just want to say that I

18   understand very well from my months working on the Acis

19   bankruptcy that these in-house lawyers -- I'm inclined to say

20   they wear many hats.  I don't know if that's the right way -- I

21   had Mr. Ellington on the witness stand once; I had Mr. Leventon

22   on the witness stand many times.  And I will tell you the

23   Court's impression is that they are both businesspeople, as

24   well as lawyers.  And I never had Surgent, the compliance

25   fellow, in here.

92

1        But I'm just letting you know I hope there aren't,

2   you know, umpteen disputes about things held back as privilege.

3   The way I view it, there may be things that are privileged, and

4   things that absolutely were not -- are not.  I know we've got

5   privilege related to estate causes of action versus attorney-

6   client privilege or work product that doesn't relate to causes

7   of action.  And I'm already bracing myself for how hard is that

8   going to be to ferret out is it related to an estate cause of

9   action or not.

10       I'm really -- while I feel good that we've worked out

11  a lot today, I am really bracing myself because I don't think

12  this is the last discovery dispute I'm going to see.  I just

13  don't.  We have a lot of things that kind of sound good when

14  you say them fast, but just -- you know my view.  Well, you

15  know my views.  I've seen two of these in-house lawyers on the

16  witness stand before.  And, again, part businessperson, part

17  lawyer, and I know what the case law says.  If it's really a

18  communication that is about rendering legal advice, that's one

19  thing.

20       But if it has nothing to do with that, or little to

21  do with that, it's mainly in their role as a business

22  consultant, or other capacities, there might not be a

23  privilege.

24            MR. PATEL:  Your Honor, this is --

25            THE COURT:  Go ahead.

93

 1          MS. PATEL:  Your Honor, this is Rakhee Patel.  If I

 2    can briefly be heard on a point of clarification on the

 3    agreement.

 4          THE COURT:  Well, okay, what are you talking about on

 5    the agreement?

 6          MS. PATEL:  Well, Your Honor, what I heard as part of

 7    the agreement reached between the Committee and the debtor is

 8    that all Acis information will be designated as highly

 9    confidential determination, and certainly --

10          THE COURT:  Okay.  Acis litigation.  If it's related

11    to Acis litigation.  If they misspoke, that's what I ordered

12    earlier.  You didn't misspeak, right?

13          MR. MORRIS:  I don't believe so, Your Honor.  I think

14    that's --

15          THE COURT:  Okay.

16          MR. MORRIS:   That's what was --

17          THE COURT:  Okay.

18          MR. MORRIS:  I think it was relating to or concerning

19    the Acis litigation matters.

20          THE COURT:  Is that --

21          MS. PATEL:  Understood, Your Honor.  Yeah, and I just

22    wanted to clarify because what I heard, and apologies if I

23    caught a bit of it, but is that Acis litigation will be

24    designated as highly confidential, and that it is not subject

25    to further review.  And I wrote that down because I wanted to

94

1  just, again, clarify what "not subject to further review"

2  means.

3          My concerns, Your Honor, are kind of twofold:

4          Number one is that certain documentation, as Your

5  Honor just referenced, and you'll recall Mr. Ellington and Mr.

6  Leventon testify during the Acis bankruptcy case that during

7  the involuntary and then during the case in chief, were

8  generally testifying as fact witnesses.  And my concern is is

9  that there are other things, for example, in Acis's bankruptcy

10  case, the original schedules were signed by Mr. Leventon.

11          THE COURT:  Right.

12          MS. PATEL:  Well, some of these are Acis's documents

13  or Acis's information, and Acis is the holder of the privilege

14  on those.

15          So to say that they're highly confidential and

16  they're privileged, that they're -- it's our privilege, I

17  should be allowed to assert my own privilege with respect to

18  those documents, and waive my own privilege -- my client's

19  privilege with respect to that even though --

20          THE COURT:  Okay.  Can I cut this off?  I -- I --

21  what I believe is the deal, someone correct me if I'm wrong, is

22  that with regard to documents produced, ESI produced to the

23  Committee, if it pertains to Acis litigation matters, okay,

24  litigation between Acis and any Highland -- Highland or

25  Highland affiliate or Highland insiders, that is going to be

95

 1  designated as highly confidential, meaning only professionals

 2  for the Committee get to see it, not Committee

 3  members/businesspeople.  That's the whole agreement with regard

 4  to Acis, right?

 5          MR. MORRIS:  Yes.

 6          MS. PATEL:  And that was going to be my only point,

 7  Your Honor, was that we can -- Acis is obviously going to be

 8  able to go get it if necessary.  In other words, we -- this

 9  isn't about prejudice to Acis's rights to even get it because

10  it is our privileged information anyway; or, number two, we can

11  get it in the ordinary discovery process.

12          Obviously we've got a claim objection that may go to

13  trial, and we may need to seek these documents separately.

14          THE COURT:  Right.  That -- this doesn't mean -- this

15  does not mean Acis never gets to see it.

16          MS. PATEL:  Okay.

17          THE COURT:  If Acis requests something in discovery

18  with regard to the claim objection or other litigation, then

19  that's subject to a whole different agreement or order, right,

20  Mr. Morris?

21          MR. MORRIS:  Yes.  Yes, Your Honor.

22          THE COURT:  Okay.

23          MS. PATEL:  Thank you, Your Honor.

24          THE COURT:  All right.  Well, I -- I kind of lost my

25  train of thought, but I guess I'm trying to signal, for

96

```
 1  whatever it's worth, that if there are disputes down the road

 2  regarding files from these three individuals -- Ellington,

 3  Leventon, Surgent -- and the debtor is saying they're

 4  privileged, you know, and not related to estate causes of

 5  action, and the Committee is disagreeing, be prepared to make

 6  your best argument.  Because I am expecting that some

 7  communications, even if they're unrelated to estate causes of

 8  action, may very well be in the nature of business type

 9  communications because I've seen with my two eyes that they

10  fulfill different roles in that organization.

11          So I hope we don't get bogged down because of my

12  ruling on this today.

13          The other thing I wanted you to kind of keep dangling

14  in your mind is as I was reading the pleadings, preparing for

15  this afternoon, I was very much fixated on -- we had this

16  protocol and a compromise worked out with the Committee way

17  back, at the end of last year, finalized in January and, you

18  know, the agreement was that the Committee would have standing

19  to pursue the estate causes of action, and would get privileged

20  documents related -- you know, communications related to these

21  estate causes of action.  And that was to avoid a Chapter 11

22  trustee, which we all know under case law, Weintraub would

23  inherit all privileges, all attorney-client privilege

24  information.

25          So I guess what I'm getting at is I thought -- I
```

1 thought we had an agreement last January, and that we were

2 going to be smoothly going down this road of document

3 production.  And here we are in mid-July, and we're having this

4 fight.  That doesn't make me very happy because I was happy not

5 to appoint a Chapter 11 trustee last January because I thought,

6 okay, we have this major compromise with the Committee, they're

7 going to go forward, and evaluate estate causes of action,

8 they're going to get documents that are subject to attorney-

9 client privilege.  And, you know, it just -- again, I said

10 earlier I didn't want to get into the he said and she said, but

11 the facts speak for themselves that were in July, and just now

12 finalizing this protocol.

13          And I guess the one more thing I will say on that is

14 I know I gave a 90-day deadline for the Committee to either

15 bring causes of action against CLO Holdco -- and I forget the

16 other entity -- or the money in the registry of the Court would

17 be released.

18          I didn't know we still had so far to go with document

19 production when I ruled that.  So if someone asks for an

20 extension after today, I think I'd probably be inclined to give

21 an extension.  Not a huge, huge, huge extension, but I was a

22 little bit -- not appreciating where the Committee was with

23 regard to getting documents when I said that that day.

24          All right.  So I'll be looking for your form of

25 order, hopefully in the next day or two on this.

98

1          Is there anything further on this topic?  Or shall we

2    go to the Acis status conference?

3          MR. MORRIS:  Your Honor, just a couple of things.

4          THE COURT:  Yes?

5          MR. MORRIS:  Number one, I do want to give the Court

6    some comfort of knowing that while Mr. Surgent is the Chief

7    Compliance Officer, he's also the Deputy General Counsel at

8    Highland, so he is -- he is (indiscernible).

9          Number two, as you may have seen from our papers, the

10   board considered three outside vendors to do the document

11   review, and ultimately selected one, and we had prepared a

12   stipulation.  The Court should expect to see, hopefully in the

13   next day or two, a stipulation pursuant to which the debtor

14   seeks its authority to retain a third party vendor named Robert

15   Hass (phonetic) to assist with the document review.  This has

16   all been discussed with the Committee, the Committee has

17   consented to the theory of the retention, but I would ask them

18   to go back perhaps and look at the stipulation so we can get

19   that signed up and get people to work as quickly as possible.

20         THE COURT:  Okay, very good.

21         Now what about the third party neutral, do you have

22   that person identified?

23         MR. MORRIS:  No, we haven't talked about that.  I'm

24   sure we can get that resolved as we're discussing the form of

25   order.

99

1           THE COURT:  Okay, very good.

2           All right, well, if there's nothing further, again,

3    let's roll to Acis.

4           And I guess actually -- maybe we should briefly talk

5    about mediation, where things stand, in case there are people

6    on the call who don't want to stick around for the Acis

7    discussion.  I don't know, maybe everyone wants to hear the

8    whole hearing today.

9           So let me just tell you where things stand:  We have

10   -- my courtroom deputy reached out to you all late last week,

11   and let you all know that both Sylvia Mayer from Houston, as

12   well as retired Bankruptcy Judge Allan Gropper, are interested

13   in being co-mediators on this, and that was subject to doing

14   their conflicts review.

15          And then the next thing after that, they were going

16   to reach out to the lawyer contacts, and give their, quote,

17   "initial disclosures."

18          I emailed about 9:30 last night with Sylvia Mayer,

19   and she was making sure she had all the right contact people.

20   I gave her lawyers for the debtor, for the Committee, for Acis,

21   for UBS, for Dondero, and the Redeemer Committee -- Crusader

22   Redeemer Committee.

23          Right now, it's my view that that is the universe of

24   parties to participate, although I can see the co-mediators

25   rolling in more people.  Like someone suggested Mark Okada, and

100

1  -- I think probably it would be premature in the beginning, but

2  maybe he'll be rolled in.  You know, if the UBS proof of claim

3  is resolved in mediation, and the Acis -- and/or the Acis proof

4  of claim are resolved in mediation, and then -- you know, I

5  think those are kind of the highest priorities here of the

6  mediation, then certainly he might be brought in, but right

7  now, I'm not going to order that.

8         So about 9:30 last night, I sent Sylvia Mayer the

9  lawyer people to email, the co-mediators' disclosures.  And she

10  was going to be in a mediation all day today, but I would

11  suspect probably tonight, if y'all haven't gotten anything yet

12  -- I haven't looked at my email during this hearing, but I

13  would suspect maybe tonight or tomorrow you're probably going

14  to get that communication from Sylvia Mayer with whatever their

15  disclosures are for the parties to consider.  And, you know,

16  assuming everyone gets comfortable with that, then the

17  administrative people at the triple A, the American Arbitration

18  Association, we're going to get going with, you know, the

19  administrative side of this, and you all would talk about

20  scheduling.

21         So all this to say I hope here in the next few days

22  there is an active effort to get things scheduled and get the

23  dialogue going with those co-mediators.

24         The only other thing I would add is I don't

25  necessarily anticipate that Sylvia Mayer would mediate the,

101

1  say, Acis proof of claim, and Judge Gropper would mediate, say,

2  the UBS proof of claim.  I think -- I don't think it

3  necessarily breaks down that way.  I think you would probably

4  just have co-mediators doing the whole ball of wax here

5  because, among other things, the plan treatment discussion is

6  probably going to roll into proof of claim allowance

7  discussions.

8          So that is, I think, what this would shape up to be.

9  That you would have co-mediators working on all of this.

10         So any questions at this point?

11                 (No audible response heard)

12         THE COURT:  Again, I know -- if you haven't gotten an

13  email by the end of today, it's surely going to be in the next

14  day or two that you'll get their email reaching out about their

15  disclosures.  Okay?

16         UNIDENTIFIED ATTORNEY:  Yes, Your Honor.

17         MR. CLUBOK:  Your Honor --

18         MS. MASCHERIN:  Your Honor, this is Terri Mascherin

19  on behalf of the Redeemer Committee.

20         Just a quick question:  Did I hear correctly that you

21  have given the mediators our contact information?  Because we

22  have not been copied on the email -- the emails that have gone

23  around.

24         In fact, we haven't been copied on any of the emails

25  that have gone around about the mediation.

102

1        THE COURT:  Okay; thank you, Ms. Mascherin.

2        Let me make sure you're completely in the loop.  So I

3   did have my courtroom deputy reach out to debtor, Committee,

4   Dondero, UBS, and Acis last week, their counsel, regarding the

5   interest of both Sylvia Mayer and former Judge Gropper.

6        And at the time she did that, I was thinking since

7   the Redeemer Committee had an agreement with the debtor, you

8   all have announced at the last hearing or two you had an

9   agreement that perhaps you all would not be participating.

10       And I actually did have some lawyers respond to my

11  courtroom deputy that, no, we think they very much need to be

12  involved.

13       So that was just a missed step, I would say, on my

14  part, not having that email go out to you originally.  So I

15  will make sure when we get out of this hearing that my

16  courtroom deputy forwards to you the little bit of email

17  traffic there was.  There were not a lot of emails, but maybe

18  her email and three or four responses of other lawyers.

19       So the co-mediators have been given your name.  If

20  others, besides you, want to be on her contact list, you know,

21  certainly Mr. Hankin or Mr. Platt, you can let her know when

22  you get the initial -- her, Sylvia Mayer, know when you get the

23  initial email from her.  But you're on the list now, and I --

24  again, it was just a mistaken belief on my part that maybe you

25  wouldn't be part of the mediation since your claim had been

1 agreed to with the debtor, so --

2      MS. MASCHERIN:  Okay.  I appreciate it, and thank you

3 for clarifying, Your Honor.

4      THE COURT:  Okay; thank you.

5      MR. CLUBOK:  Your Honor --

6      THE COURT:  All right --

7      MR. CLUBOK:  Your Honor, this is -- Your Honor, may I

8 speak briefly?

9      THE COURT:  Certainly.

10      MR. CLUBOK:  Thank you, Your Honor.  This is Andrew

11 Clubok on behalf of UBS.

12      And I apologize if you did not see the email that we

13 sent to Ms. Ellison this morning.  But we -- our position is we

14 very much are fine with Crusader, or frankly any other major

15 creditor, involving the overall mediation.

16      But the issue of reaching an overall plan, the so

17 call grand bargain that Mr. (indiscernible) talked about.  What

18 we don't -- and we just want to be sure that no one takes it

19 that you're ordering this or thinks it's appropriate, because

20 in the first instance to have a productive discussion on our

21 specific claim with the debtor, it's not going to be helpful

22 and productive -- in fact, it would be counterproductive -- to

23 have other creditors in our class sitting in listening to that,

24 weighing in.  You know, obviously their position will all be

25 make it as low as possible.  It's not helpful to have a whole

104

1 nother set of lawyers doing that, and I just want to make sure

2 people don't come away thinking that you've ordered -- I hope

3 you have not ordered that, and if you have, I would like to

4 speak to that.

5          But just like we wouldn't be sitting in -- we were

6 not permitted to sit in when the debtor spoke with Crusader

7 about setting their claim, we're not -- we have not been part

8 of the discussion with Acis and if the debtors have discussions

9 -- with Acis.  The other parties, we were actually told before

10 they would not be involved in (indiscernible) first instance.

11          There is a time -- an appropriate time for a creditor

12 to object, but we don't even know what the settlement is with

13 Redeemer.  Once we hear it, we may have an objection; hopefully

14 not.  Hopefully it will be perfectly fine.

15          And we understand that once we reach an agreement

16 with the debtor, that's subject to an objection process, and

17 everyone is going to have a chance to weigh in.  It's just not,

18 we think, going to be effective, and I set this out in an email

19 that I sent earlier but -- just today.  And so I just want to

20 make sure that, you know, people aren't taking from what you

21 said that Crusader is just going to be able to sit in our

22 (indiscernible), Acis does or does not (indiscernible)

23 specifically their claim, etc.

24          THE COURT:  All right.  Well, let me tell you how I

25 usually do this, and how I expect to do it here.

105

1      Once everything is nailed down with the mediators,

2  and I say that because they're going to send you their

3  disclosures, and hopefully everybody's going to be fine with

4  everything.  When I get the green light that, yes, we're going

5  to go forward, I have a standard form of mediation order.  And

6  it pretty much gives discretion to the mediators to run this

7  the way they want to.  And, for example, if they want

8  participants to submit a white paper, you know, no more than 25

9  pages in length, or whatever, you know, the mediators can

10 instruct that.

11      And it has all of the usual bells and whistles about

12 confidentiality that nobody can subpoena the mediators, or

13 compel them to testify.  And I'm not going to talk to them

14 about the substance.

15      I just want a report, either things settled or not.

16 People negotiated in good faith or not.

17      And so I don't think there will be any ambiguity

18 about the rules of the road, it's just what I think is a fairly

19 normal mediation order.

20      And, therefore, you know, I think the confidentiality

21 that you're concerned about will be built into that order, and

22 will be kind of the usual -- what I think is the usual

23 protocol.  That if you want the mediator to keep something

24 confidential, and not share it with another party, then it's --

25 that's the way it's going to be.

106

1           MR. CLUBOK:  Okay.  I believe -- we certainly agree
2   the mediators will different roles.  We just -- I just -- and
3   the mediator may have different sessions, different breakout
4   sessions.  But we just believe that if our claim, or any
5   creditor's claim, with the debtor in the first instance, to
6   have a productive mediation, settlement should be done the way
7   the (indiscernible) claim is (indiscernible), which is directly
8   with the debtor.  And that we'd have a chance to see if that --
9   if that gets somewhere and results in something.  We're --
10  we're -- that's our input about about meeting our specific
11  claim to maximize the chance of avoiding litigation and
12  resolving it.

13          THE COURT:  Well, again, I fully suspect they're
14  going to reach out to all of you all and get all of your ideas
15  about the sequence of the mediation, you know, whether it's all
16  together with people in separate rooms on day one, or hey,
17  let's start with UBS, let's start with Acis.  I mean it would
18  be expected that the co-mediators will reach out to you all
19  from day one with everybody's ideas about what would be the
20  most productive format.  So I hope that answers your question.

21          You know, to a large extent, this is to be
22  determined.  But, you know, the ground rules I'm giving them is
23  let's try to get this UBS proof of claim resolved.  Let's try
24  to get the Acis proof of claim resolved.  Let's try to get to a
25  grand bargain on what a plan looks like, and the treatment of

107

1  all the unsecured creditors.

2          So I think these are extremely experienced people who

3  will be pretty skilled at how to proceed.

4          MR. CLUBOK:  That does answer our question; thank

5  you, Your Honor.

6          THE COURT:  Okay.

7          MR. CLUBOK:  That's all I wanted to clarify.  That

8  you weren't directing them to do anything in terms of how they

9  proceed, and we'll pick it up with them.

10          THE COURT:  Okay; very good.

11          MR. CLUBOK:  Thank you.

12          THE COURT:  Anyone else want to say anything about

13  this?

14              (No audible response heard)

15          THE COURT:  All right.  Well, let's turn then to the

16  status conference that both the debtor and Acis wanted to have

17  today.  Back on the 14th, I guess it was, Mr. Pomerantz, I

18  think, raised the issue that the Acis proof of claim, which at

19  that point the debtor had objected to, and now Mr. Dondero has

20  objected to, was set for hearing, I think, August 6th.  But

21  there had been a discussion about continuing that hearing to

22  September 10th to hopefully focus primarily on mediation.

23          But then we wanted to have a status conference today

24  to kind of talk about what the September 10th hearing would

25  look like.  We don't want it to just be a status conference.

108

1       And, Mr. Pomerantz, I don't know if you're on the

2  line, but you said there were legal issues as well as factual

3  issues.  And so my brain was kind of going down the trail of

4  are you suggesting motions for summary judgment might be a

5  first step on September 10th?  I have no idea what you had in

6  mind.

7       So who -- is it going to be Mr. Morris taking the

8  lead on this --

9       MR. KHARASCH:  Your Honor --

10       THE COURT:  -- or Mr. Pomerantz?

11       MR. KHARASCH:  Your Honor, it's Mr. Kharasch.

12       THE COURT:  Oh.

13       MR. KHARASCH:  It's Ira Kharasch.

14       THE COURT:  Oh, Mr. Kharasch.

15       MR. KHARASCH:  Yeah.

16       THE COURT:  Okay, there you are.

17       MR. KHARASCH:  I --

18       THE COURT:  You appeared earlier.

19       MR. KHARASCH:  I did.  I did.  So two things, Your

20  Honor:

21       First, Mr. Pomerantz wanted me to express to Your

22  Honor that he would have loved to have been here today, as he's

23  been here in the past, however, he is in the hospital with a

24  medical condition, we think things will work out just fine,

25  but --

109

```
 1              THE COURT:  I'm sorry to hear that.

 2              MR. KHARASCH:  Thank you, Your Honor.

 3              THE COURT:  Please express my best wishes.

 4              MR. KHARASCH:  Absolutely.  But he just wanted to let

 5   you know why he's not here.

 6              So, number two, I think, Your Honor, at the last

 7   week, I think we mentioned that the continued hearing on the

 8   claim objection would be September 17.  There's a little

 9   confusion about that versus September 10.  I don't know if Ms.

10   Patel is in agreement about that.  I think we're both in

11   agreement that it was September 17th, but I'm not completely

12   sure of the different dates.

13              THE COURT:  Okay.  I did not run that date by my

14   courtroom deputy.  I just -- I looked at the transcript from

15   the hearing.  Y'all said September 10th, but maybe someone

16   misspoke.

17              What do you think, Ms. Patel?

18              MS. PATEL:  Your Honor, I think the confusion might

19   be -- I believe the original hearing was August the 10th, and

20   that's what's getting moved off.  And so September 17th is --

21   I've seen a September 19th date, as well, but I think that's a

22   Sunday or --

23              MR. KHARASCH:  It's a Saturday.  I think it's a

24   Saturday.

25              MS. PATEL:  Saturday.  So I think September 17th is
```

110

1 the day that Acis is amenable to -- to -- the process we're

2 about to discuss with the date being the 17th of September.

3          THE COURT:  Okay; very good.

4          MR. KHARASCH:  Thank you, Your Honor.

5          THE COURT:  Okay.

6          MR. KHARASCH:  And --

7          THE COURT:  So 17th, okay.

8          MR. KHARASCH:  Yeah.  And, Your Honor, I think the

9 good news here is the debtor and Acis's counsels are in

10 agreement subject to your blessing of that agreement as to how

11 we want to approach things.

12          Again, we did continue the hearing to today and the

13 purpose, Your Honor, is to give us a chance to discuss with the

14 Acis team how we both thought -- how to proceed in a manageable

15 way to make this September 17th hearing date a productive

16 hearing, and manageable, and easily understandable, and easy

17 for the Court to deal with, because we're dealing with a

18 massive claim, and a very big claim objection.

19          So what we come up with is the following way that we

20 think should be a productive way to handle it.  We would like

21 to have another status conference on or about August 14, which

22 is, I think, just after Ms. Patel's vacation.  If it has to be

23 a few days later, that's fine.

24          And during that time, we'll also be seeing a draft

25 response to our claim objection.  But the purpose is before

1  that status conference on the 14th, Your Honor, we would

2  propose the following:

3         That a few days before, we file a joint statement

4  that would propose the following to the Court:  We would come

5  up come up with respect to the September 17 hearing date, that

6  we would come up with a list of issues for summary adjudication

7  that both parties would like to deal with by summary

8  adjudication on the September 17 hearing date.  We would set

9  those forth in the joint statement for the Court to review.

10        We'd also set out a list of issues that are not

11 subject -- we don't believe are not subject to summary

12 adjudication.  That would be dealt with later, if not through a

13 trial or otherwise, if not dealt with by the summary

14 adjudication proceeding, depending on how that goes.

15        We would also propose for that status conference,

16 that joint statement, Your Honor, a proposed discovery and

17 pretrial schedule that would occur after the September 17

18 summary adjudication, and a proposed trial date.

19        Just for the record, both parties do want to move as

20 quickly as possible after the September 17th hearing date in

21 terms of discovery, and get to a trial as quickly as possible,

22 maybe even before plan confirmation.  But this would be part of

23 the greater discussion, then we'd starting pinning down

24 proposed dates for Your Honor to talk about at the next status

25 conference here, Your Honor, on or about August 14th.

112

1      We'd also address the Acis request that the debtor

2  file an answer to the Acis second amended complaint in the Acis

3  case.  We had talked about that, that was a new topic of

4  discussion.

5      And that's really the -- that's what we would propose

6  to get before the Court.  We'd file it -- it's August 14, we'd

7  file it two days before the hearing because that's soon after

8  Ms. Patel's vacation.  If it's a few days later, we'd give the

9  Court -- we would file it a few days earlier to give the Court

10 more time to look at the joint statement.

11     To the extent we can't agree on all of these issues

12 that I just enumerated in the joint statement, the joint

13 statement would address those issues that we haven't agreed on,

14 and the unilateral position of the parties to be discussed

15 before the Court at the continued status conference.

16     So we think in that way, Your Honor, we can make

17 everyone's life easier to go forward and get something done at

18 the September 17 claim objection date.

19     THE COURT:  All right.  Well, Ms. Patel, do you agree

20 with everything you just heard?

21     MS. PATEL:  Yes, generally speaking, Your Honor.

22 Just a couple of things.

23     THE COURT:  All right.  Mr. Bonds, I'm going to ask

24 you to put your phone on mute.  I think we're getting some

25 disruption from your end.

113

1          MR. BONDS:  It is on mute; I'm sorry.

2          THE COURT:  Okay.  Well, Mike, I don't know where

3   that's coming from.

4          ECRO:  I think it's Mr. Ira's phone.  He's on mute

5   now.

6          THE COURT:  Okay.

7          ECRO:  That's where it's coming from.

8          THE COURT:  Ms. Patel, go ahead.

9          MS. PATEL:  Thank you, Your Honor.

10          Just a couple of things, again, so the Court -- just

11   so I can set the Court's expectations a little bit on where

12   we're going to head, and these were discussions we had with Mr.

13   Kharasch over the (indiscernible) yesterday.  But I wanted to,

14   again, reiterate the parties' expectation is that if we're

15   going to go down this path -- a double (indiscernible) path

16   while we're doing things by summary adjudication at the

17   September 17th hearing which issues -- you know, we'll decide

18   which buckets of issues are appropriate for September 17th,

19   that nevertheless, that there would be an expeditious trial

20   setting, and that's what I think the parties are anticipating

21   coming back to the Court and asking for in August.

22          And that that trial setting would be at some

23   juncture, preferably before plan confirmation.  But if it has

24   to go to trial, that's certainly no (inaudible), so make that

25   simultaneous with the plan confirmation.

APP. 1364
Appx. 01411

114

1    But just -- that's just a little bit of

2 foreshadowing, I suppose, Your Honor, more than anything else.

3    We also requested that basically we would just go

4 through one -- what we'll call summary adjudication process.

5 And Your Honor hit on a great question of is this a motion for

6 summary judgment?  I'm not sure that we really necessarily

7 defined it as a motion for summary judgment, as much as this is

8 intended to be a "there's not going to be anymore motions to

9 dismiss or motions for (indiscernible) pleading, etc."  The

10 September 17th hearing is intended to be the full shot of

11 "let's go through all the issues that can be determined on

12 September 17th by agreement, and then that's it, other than

13 that, we're going to be talking about trial."

14    The other point that I would just raise again just to

15 enlighten the Court, this isn't -- the summary adjudication

16 would not just be issues that Highland has raised in its

17 objection to Acis's claim, but it could also be summary

18 adjudication with respect to Acis's affirmative claims as

19 against the estate.  So it's a two-way street with respect to

20 that.

21    And then finally, Your Honor, Acis just requested

22 that we at least have a discussion with respect to the Highland

23 Capital Management filing an answer with respect to Acis's

24 complaint.  And as Your Honor recalls, the proof of claim that

25 Acis filed is -- attaches the second amended complaint that's

115

1  pending in the adversary.  That complaint has never had an

2  answer filed with respect to it, so we need an answer really as

3  kind of a responsive pleading.  And the hope was that that

4  would help streamline the issues so -- and, frankly, I think it

5  would be helpful from my perspective to decide what are the

6  appropriate issues for the summary adjudication basket to be

7  heard on September 17th, and what are the appropriate -- what's

8  the appropriate basket that is going to have to go trial.

9          And that was -- that was my thinking with respect to

10  that.  But we'll continue to have those discussions, and foster

11  that.

12          But beyond that, that's just some things that I

13  wanted to sort of foreshadow, I guess, for the Court, just to

14  (indiscernible) the Court's expectations as to what's going to

15  happen at the August hearing, and where things are headed.

16          THE COURT:  All right.  Well, just a couple of things

17  I'll throw in.

18          Before we get off, I'll make sure September 17th is

19  available.

20          (The Court engaged in off-the-record colloquy)

21          THE COURT:  So we'll circle back and make sure that's

22  good.

23          As far as this process, I like everything I heard.

24          As far as getting the summary adjudication on certain

25  issues, I kind of like the idea of not cross-motions for

116

1  summary judgment, no, please.  Maybe instead, you just come up

2  with a set of stipulated facts, and then based on these

3  stipulated facts, we think you can rule as a matter of law on

4  A, B, and C, and then the other side disagrees that you can

5  based on A, B, and C.

6          But on the other hand, you think we can -- you can

7  rule in front of us because of D, E, F.  And then the other

8  side -- so I guess what I'm saying is -- hmmm, I'm trying to

9  avoid the whole cumbersome summary judgment process, but -- can

10  we --

11          MR. KHARASCH:  Your Honor, can --

12          THE COURT:  Mr. Kharasch, do you have an idea?

13          MR. KHARASCH:  Yes.  We've been thinking about that

14  very point, Your Honor, and that's something I'm going to talk

15  to Ms. Patel about, you know, prior to that status conference

16  hearing.

17          We agree with you, we don't want to recreate the

18  wheel on a bunch of paper that's already before the Court.  We

19  might come up with a proposal, Your Honor, where we just submit

20  a short statement of why we think -- you know, before the

21  September hearing date, here's what's going to be argued on

22  summary adjudication, we'll cross-reference what's already in

23  front of the Court in terms of our claim objection, point you

24  to different parts of it, rather than me filing things.

25  Hopefully stipulate to certain facts to make your life easier,

1  and to, you know, just make sure everything's easily directed.

2          But that's the kind of thing we'd like -- I think

3  we're going to be talking about to make things easier and more

4  streamlined.

5          THE COURT: Okay. Ms. Patel, you agree that's a goal

6  to shoot for? Rather than cross motions for summary judgment,

7  and responses, and replies, and giant appendixes, just have

8  something like a set of stipulated facts, and here are the

9  contested issues of law?

10          MS. PATEL: Yes, Your Honor. I think that would be

11  sort of the general goal.

12          THE COURT: Okay, all right. Well, that -- that

13  sounds like a good game plan.

14          So I like this overall idea, we'll kind of check in

15  on August 14th. A few days before that, you'll file the joint

16  statement of what you think the list of issues of law are that

17  would be argued on the 17th.

18          And then as far as the answer to the Acis adversary

19  proceeding, that adversary proceeding is technically subject to

20  the automatic stay, and there are other parties in the

21  litigation. So as I've mentioned before, we have drafted back

22  in chambers a giant report and recommendation on a motion to

23  withdraw the reference that was filed way long ago by -- I

24  think it was jointly by Highland and HCLOF. But I may be

25  wrong, it may have only been HCLOF, it's been so long since

1 I've looked at it.

2        But my point is it's stayed. So I mean as a

3 technical matter, if you want to agree that Highland will file

4 an answer, I mean I guess you'll have to do an agreed order

5 lifting the stay, maybe just for the limited purpose of

6 allowing Highland to do an answer with you all agreeing it's

7 not going to go any further than that at this juncture. Or --

8 I mean I'm just asking, frankly, because we've got other

9 parties involved who want to know the answer to that question

10 maybe.

11        And then I've got a report and recommendation that

12 I've got to dust off, and finalize, and send in to the District

13 Court if we're lifting the stay for all purposes.

14        I assume you just want to do a limited lifting the

15 stay to let them file an answer, but everything else is still

16 on hold?

17        MS. PATEL: Your Honor, I think that would be the

18 general concept. And to be fair, it's a concept that I was,

19 you know, late in the day yesterday with Mr. Kharasch, and so

20 we haven't really quite formulated exactly how we Proceed

21 forward with it. So I don't -- I'm not trying to ambush him on

22 the issue.

23        But I think we can either craft something that to the

24 extent that it is an answer, a very traditional answer, you

25 know, concept in the adversary proceeding, then, yes, I agree

119

1  that I think it would be appropriate to do a very limited

2  agreed order lifting the stay for the limited purpose of filing

3  the answer, and that's it.  Again, just so we have the

4  pleading.

5         Or if we -- that perhaps maybe Mr. Kharasch and I can

6  come and put our creative brains together and see if we can

7  come up with something that acts an awful lot like an answer,

8  but is here and filed in the Highland bankruptcy case that kind

9  of functions similarly.

10        THE COURT:  Okay.

11        MR. KHARASCH:  Yeah, just to be clear, Your Honor, we

12 haven't agreed to anything; we heard about this concept

13 yesterday.  I have not really had a chance to think it through.

14 I'm not -- I'm not saying absolutely no, we have to discuss it

15 with our client.  (Indiscernible) but we have an open mind, and

16 will continue our discussions.

17        One thing, Your Honor, do we definitely have the

18 August 14 date as a status conference?  And if so, at what

19 time?

20        THE COURT:  It is available.  Let's do it at 9:30,

21 and I'm not going to give you a ton of time that day because I

22 have a bear of a trial that next week that I'm going to need to

23 be in mostly hibernation preparing for.  So let's say 9:30 on

24 Friday, August 14th.

25        MR. KHARASCH:  That's fine, Your Honor; thank you

120

1  very much.

2          THE COURT:  And then I -- on September 17th at 9:30,

3  I also have available.

4          MR. KHARASCH:  That's great.

5          THE COURT:  The morning only, I've got a full

6  afternoon.

7          All right, so I was going to ask you to do sort of

8  like a mini scheduling order, reflective of what we discussed

9  today.  And it sounds like you'll have a few things to iron out

10 after we get off the phone, but I think we've got enough here

11 to kind of have a partial scheduling order, or something to

12 that effect, dealing with objections to Acis's proof of claim.

13         Mr. Bonds, you're on there, I see now, for Mr.

14 Dondero.  I think you've joined in the -- I don't know if you

15 call it a joint, or you filed your separate objection to the

16 Acis proof of claim, correct?

17         MR. BONDS:  (No verbal response).

18         THE COURT:  Okay.  You're on mute, if you could

19 unmute yourself.

20         MR. BONDS:  Your Honor --

21         THE COURT:  We're getting some echo, but is there

22 anything you want to add to this discussion?

23         MR. BONDS:  Your Honor, there is.  We believe that we

24 are entitled to participate in the Acis claim of because it's

25 so intertwined with the underlying lawsuit -- Your Honor, I'm

121

1  sorry.

2          THE COURT: All right. Well, I understand you filed

3  an objection. Is there any -- is there any -- well, is there

4  any objection to the Dondero -- I don't know if he's going to

5  say anything separate from the debtor, but Dondero being

6  involved as an objecting party.

7          MR. BONDS: (Indiscernible). I'm sorry.

8          THE COURT: Okay. We're having real terrible --

9          (The Court engaged in off-the-record colloquy)

10          THE COURT: Okay. We have two feeds that say D.

11  Michael Lynn, and that's causing a feedback loop, according to

12  the younger smarter people here behind me. Like maybe you have

13  a phone and a computer? All right, well, I've actually turned

14  to Mr. Kharasch and Ms. Patel, do you all have any problem with

15  Dondero kind of joining in, and -- I haven't reviewed his

16  objection to see how it differs from the debtor's.

17          MR. KHARASCH: Yeah, frankly, Your Honor -- Ira

18  Kharasch. We have not spent time reviewing that objection, as

19  well, so we haven't really thought about it.

20          I mean it's out there, I'm not sure I see the problem

21  with it. But we would like some time to see how -- what it

22  looks like, and how it plays into it. I'm not -- I'd be

23  surprised if -- well, I'm not even going to say anything as to

24  what's in it because I just haven't read it.

25          THE COURT: Okay, all right. Ms. Patel?

122

1          MS. PATEL:  Your Honor, from Acis's perspective,

2  same.  I, frankly, have not given it enough consideration.  And

3  just out of the gate, I think one of the issues is going to be

4  Mr. Dondero's standing to kind of join in on the claim

5  objection, but it's something that, frankly, I just truly

6  haven't spent enough time thinking that issue through, or

7  whether there's going to be an issue.  So I'm just not sure.

8          THE COURT:  All right.  Well, I'll try one more time.

9  Mr. Bonds, do you have a good connection now?

10          MR. BONDS:  (No audible response heard).

11          THE COURT:  All right.  I'm just going to direct you

12  all to visit with Mr. Bonds or Mr. Lynn, and see if you can

13  come up with any agreements.  And if you can't, then maybe Mr.

14  Dondero's counsel can request a status conference.  I'm not

15  inclined to want to do another one before August 14, but maybe

16  we can just hear what they have to say on August 14th about the

17  process.

18          MR. KHARASCH:  I think that makes sense, Your Honor.

19  And we'll -- and we'll talk to them.

20          THE COURT:  Okay.

21          MR. KHARASCH:  We'll talk to them beforehand.

22          THE COURT:  Okay, all right.

23          MS. PRESTON:  Your Honor, may I briefly be heard?

24          THE COURT:  Who is this?

25          MS. PRESTON:  This is Katherine Preston from Winston

123

```
 1  & Strawn, I represent Mr. Ellington, Mr. Leventon, and some of
 2  the other Highland employees.
 3          THE COURT:  Okay.
 4          MS. PRESTON:  And I apologize, I tried to appear
 5  earlier and had some technical difficulties.
 6          THE COURT:  Okay.
 7          MS. PRESTON:  We just wanted to ask regarding
 8  mediation.  We've discussed with some of the parties to that
 9  mediation dissipating, and so we just wanted to be included, as
10  well, in any of those discussions and communications.
11          THE COURT:  All right.  And I guess the party in
12  interest status would be that you've been sued by Acis, is
13  that -- is there any --
14          MS. PRESTON:  That's correct.
15          THE COURT:  Okay.  Well, I think what I'm going to do
16  is think about that one a bit.
17          I almost put that one in the same category as Mark
18  Okada.  I'm just trying to be as productive as possible in the
19  way this goes forward where the primary issues are the UBS
20  proof of claim and the Acis proof of claim.  And granted,
21  there's a lot of satellite litigation out there, and -- and
22  that might be a factor as far as -- let me think about that
23  one, okay?
24          Your request is duly noted, and I'm going to think
25  about that, and I'll let you all know through my courtroom
```

124

1  deputy what I decide on that.  But I'm leaning towards that

2  might be a second stage of mediation if we have wonderful

3  breakthroughs on the Acis and UBS proof of claim sides, so

4  that's my answer on that.

5          MS. PRESTON:  Thank you.

6          THE COURT:  Uh-huh.  Anything else?

7          MS. PRESTON:  Thank you, Your Honor.

8          THE COURT:  All right.  Well, it's a little bit late,

9  it's 5:19 central time, and if there's nothing further, we're

10 adjourned, and we'll look for all the orders to be

11 electronically submitted.

12         Thank you.

13         MULTIPLE SPEAKERS:  Thank you.

14     (Whereupon, at 5:20 p.m., the hearing was adjourned.)

15

16

17

18

19

20

21

22

23

24

25

TRANSCRIPTS PLUS, INC.
215-862-1115 ● CourtTranscripts@aol.com

125

1

2

3                    CERTIFICATE OF TRANSCRIBER

4     I, KAREN HARTMANN, a certified Electronic Court

5 Transcriber, certify that the foregoing is a correct transcript

6 from the electronic sound recording of the proceedings in the

7 above-entitled matter.

8

9     *Karen Hartmann*

10

11 Karen Hartmann, AAERT CET**D0475    Date: July 24, 2020

12 Transcripts Plus, Inc.

13

14

15

16

17

18

19

20

21

22

23

24

25

**TRANSCRIPTS PLUS, INC.**
**215-862-1115 ● CourtTranscripts@aol.com**

# EXHIBIT 14

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                    FOR THE NORTHERN DISTRICT OF TEXAS
                                DALLAS DIVISION
 2
                                     )   Case No. 19-34054-sgj11
 3    In Re:                         )
                                     )
 4    HIGHLAND CAPITAL               )   Dallas, Texas
      MANAGEMENT, L.P.,              )   July 14, 2020
 5                                   )   1:30 p.m. Docket
              Debtor.               )
 6                                   )   APPLICATIONS TO EMPLOY JAMES
                                     )   P. SEERY AND DEVELOPMENT
 7                                   )   SPECIALISTS, INC. (774, 775)
      _____)
 8
                          TRANSCRIPT OF PROCEEDINGS
 9            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                    UNITED STATES BANKRUPTCY JUDGE.
10
      WEBEX/TELEPHONIC APPEARANCES:
11
      For the Debtors:          Jeffrey N. Pomerantz
12                              PACHULSKI STANG ZIEHL & JONES, LLP
                                10100 Santa Monica Blvd.,
13                                13th Floor
                                Los Angeles, CA  90067
14                              (310) 277-6910

15    For the Debtors:          John A. Morris
                                Greg Demo
16                              PACHULSKI STANG ZIEHL & JONES, LLP
                                780 Third Avenue, 34th Floor
17                              New York, NY  10017-2024
                                (212) 561-7700
18
      For the Debtors:          Ira D. Kharasch
19                              PACHULSKI STANG ZIEHL & JONES, LLP
                                10100 Santa Monica Blvd.,
20                                13th Floor
                                Los Angeles, CA  90067-4003
21                              (310) 277-6910

22    For the Debtors:          Zachery Z. Annable
                                Melissa S. Hayward
23                              HAYWARD & ASSOCIATES, PLLC
                                10501 N. Central Expressway,
24                                Suite 106
                                Dallas, TX  75231
25                              (972) 755-7104
```

2

```
 1   APPEARANCES, cont'd.:

 2   For the Official Committee  Matthew A. Clemente
     of Unsecured Creditors:     SIDLEY AUSTIN, LLP
 3                               One South Dearborn Street
                                 Chicago, IL  60603
 4                               (312) 853-7539

 5   For the Official Committee: Paige Holden Montgomery
     of Unsecured Creditors:     SIDLEY AUSTIN, LLP
 6                               2021 McKinney Avenue, Suite 2000
                                 Dallas, TX  75201
 7                               (214) 969-3500

 8   For Acis Capital            Rakhee V. Patel
     Management GP, LLC:         WINSTEAD, P.C.
 9                               2728 N. Harwood Street, Suite 500
                                 Dallas, TX  75201
10                               (214) 745-5250

11   For Acis Capital            Brian Patrick Shaw
     Management GP, LLC:         ROGGE DUNN GROUP, P.C.
12                               500 N. Akard Street, Suite 1900
                                 Dallas, TX  75201
13                               (214) 239-2707

14   For Redeemer Committee of   Mark A. Platt
     the Highland Crusader       FROST BROWN TODD, LLC
15   Fund:                       100 Crescent Court, Suite 350
                                 Dallas, TX  75201
16                               (214) 580-5852

17   For Redeemer Committee of   Terri L. Mascherin
     the Highland Crusader       JENNER & BLOCK, LLP
18   Fund:                       353 N. Clark Street
                                 Chicago, IL  60654-3456
19                               (312) 923-2799

20   For Redeemer Committee of   Marc B. Hankin
     the Highland Crusader       JENNER & BLOCK, LLP
21   Fund:                       919 Third Avenue
                                 New York, NY  10022-3098
22                               (212) 891-1600

23

24

25
```

3

```
 1   APPEARANCES, cont'd.:

 2   For UBS Securities, LLC:    Andrew Clubok
                                 Latham & Watkins, LLP
 3                               555 Eleventh Street, NW,
                                   Suite 1000
 4                               Washington, DC  20004
                                 (202) 637-2200
 5
     For UBS Securities:         Kimberly A. Posin
 6                               LATHAM & WATKINS, LLP
                                 355 South Grand Avenue, Suite 100
 7                               Los Angeles, CA  90071-1560
                                 (213) 891-7322
 8
     For Certain Employees:      David Neier
 9                               WINSTON & STRAWN, LLP
                                 200 Park Avenue
10                               New York, NY  10166
                                 (212) 294-6700
11
     Recorded by:                Michael F. Edmond, Sr.
12                               UNITED STATES BANKRUPTCY COURT
                                 1100 Commerce Street, 12th Floor
13                               Dallas, TX  75242
                                 (214) 753-2062
14
     Transcribed by:             Kathy Rehling
15                               311 Paradise Cove
                                 Shady Shores, TX  76208
16                               (972) 786-3063

17

18

19

20

21

22

23

24
              Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

4

1           DALLAS, TEXAS - JULY 14, 2020 - 1:34 P.M.

2           THE COURT:  ... to get lawyer appearances.  First,

3    for the Debtor, do we have some Pachulski lawyers on the

4    phone?  Please make your appearance.

5           MR. POMERANTZ:  Good morning, Your Honor.  It's

6    Jeffrey Pomerantz; Pachulski Stang Ziehl & Jones.  Also with

7    me are John Morris, and then listening in are Greg Demo and

8    Ira Kharasch.

9           THE COURT:  All right.  Thank you all.  And do we

10   have any Hayward lawyers on the phone?

11          MR. ANNABLE:  Yes, Your Honor.

12          THE COURT:  I presume that was Mr. Annable.

13          MR. ANNABLE:  Yes, Your Honor.  Sorry.  My mic's not

14   picking up.  It's Zachery Annable and Melissa Hayward --

15          THE COURT:  All right.

16          MR. ANNABLE:  -- as local counsel for the Debtor.

17          THE COURT:  Okay.  Thank you.  For the Unsecured

18   Creditors' Committee, who do we have from Sidley Austin?

19          MR. CLEMENTE:  Good afternoon, Your Honor.  Matthew

20   Clemente from Sidley Austin, and Paige Montgomery is also on

21   the phone.

22          THE COURT:  All right.  Thank you.  All right.  I'll

23   go to some of our usual appearances.  Do we have lawyers for

24   the Redeemer Committee this afternoon?  (No response.)  All

25   right.

5

1          MS. MASCHERIN:  Yes.  Excuse me, Your Honor.

2          THE COURT:  Yes?

3          MS. MASCHERIN:  This is Terri Mascherin.  I wasn't

4   sure whether I had the microphone on mute or not.

5          THE COURT:  Okay.

6          MS. MASCHERIN:  I apologize.  Terri Mascherin, Jenner

7   & Block.  My colleague, Marc Hankin, is on the phone.  And I

8   believe that Mark Platt is also on the line.

9          THE COURT:  All right.  Thank you.  What about UBS?

10  Anyone wanting to appear for UBS?

11         MR. CLUBOK:  Yes.  Good afternoon, Your Honor.  This

12  is Andrew Clubok from Latham & Watkins, LLP.  And my partner,

13  Kimberly Posin, is on as well.

14         THE COURT:  Okay.  Thank you.  What about for Acis?

15  Any lawyers appearing for Acis?

16         MS. PATEL:  Yes.  Good afternoon, Your Honor.  Rakhee

17  Patel of the Winstead firm and Brian Shaw of the Rogge Dunn

18  Group appearing on behalf of Acis.

19         THE COURT:  All right.  Do we have Mr. Lynn or Mr.

20  Bonds for James Dondero?  (No response.)  Maybe not.  All

21  right.  Is there anyone else who wishes to appear for today's

22  hearings?

23         MR. NEIER:  Good afternoon, Your Honor.  David Neier

24  of Winston & Strawn making a reappearance, but this time for

25  several employees of Highland:  Mr. Leventon, Mr. Sevilla, Mr.

6

```
 1   Ellington, several others.
 2          THE COURT:  Oh, okay.  Thank you.  Any other
 3   appearances today?
 4      (No response.)
 5          THE COURT:  All right.  I'll assume everyone else is
 6   just going to observe.
 7      Well, we have two employment applications.  Mr. Pomerantz,
 8   how did you want to proceed on those?
 9          MR. POMERANTZ:  So, Your Honor, we have the two
10   motions to present, Your Honor.  I'm happy to say that neither
11   of them are opposed.
12      Before I present the motions to Your Honor, I wanted to
13   ask if Your Honor would like to address the mediation issues
14   at the conclusion of the hearing or prior to the presentation
15   of the motions.
16          THE COURT:  At the conclusion.  Thank you.
17          MR. POMERANTZ:  Thank you, Your Honor.
18      Your Honor, the first motion on the docket today is a
19   Motion to Appoint James Seery as the Debtors' chief executive
20   officer and chief restructuring officer, effective as of March
21   15th, which is about the time that Mr. Seery began performing
22   the services as the chief executive officer.
23      While there's a good argument that the retention of a
24   chief executive officer is in the ordinary course of business
25   and does not require court approval, the Debtor, out of an
```

7

 1   abundance of caution, filed the motion, and the motion seeks

 2   approval of the agreement which is attached to the motion.

 3       The second motion, Your Honor, is a Motion to Approve the

 4   Retention of DSI as the Debtors' Financial Advisor.  And as

 5   the Court is aware, Mr. Sharp, a managing director of DSI, was

 6   approved as the Debtors' Chief Restructuring Officer pursuant

 7   to this Court's January 10th order.

 8       Although Mr. Seery is proposed to replace Mr. Sharp as the

 9   Debtors' Chief Restructuring Officer, Mr. Seery still requires

10   the financial assistance and advisory support that DSI has

11   been providing to him, the Board, and the Debtor for several

12   months.

13       While each of these motions, as I mentioned, Your Honor,

14   are unopposed, we plan to put on the testimony of James Seery,

15   John Dubel, and Brad Sharp to provide the Court with the

16   evidentiary basis to support the relief that is requested.

17   And with the testimony, Your Honor, we intend to accomplish

18   several things.

19       First, Your Honor, in light of our exchange at the hearing

20   on July 8th, we thought it'd be appropriate for Mr. Seery to

21   provide a more fulsome response to Your Honor regarding the

22   nature and extent of the Debtors' operations and assets and

23   the variety of significant activities that the Board in

24   general and Mr. Seery as the chief executive officer has been

25   performing over the last several months.

8

1     We think this is very important, Your Honor, given that

2  the Debtor has substantial and multiple complex business

3  operations that it oversees that are in -- that are in

4  subsidiaries outside of Chapter 11 or are in entities managed

5  by the Debtor and also not in Chapter 11.  And the Court, we

6  appreciate, especially in light of Your Honor's comments, does

7  not have the benefit of seeing what is really going on.  So

8  we're hoping, by Mr. Seery's testimony, it will provide Your

9  Honor with a much clear picture, and, quite frankly, a better

10  job doing it than I was able to do last week.

11     Mr. Seery's testimony will support the need for the

12  retention of the chief executive officer and why his

13  particular background and qualifications made him the

14  appropriate choice for the role.

15     Second, Mr. Dubel, as the chairman of the compensation

16  committee of the Board, will testify regarding the process

17  undertaken by the compensation committee that led to the

18  conclusion to ask Mr. Seery to become the chief executive

19  officer and the agreement -- under the terms and conditions

20  set forth in the agreement.

21     Lastly, Mr. Sharp will testify regarding the activities he

22  and DSI have been performing since the commencement of the

23  case, the assistance they have been providing to Mr. Seery

24  over the last few months, and how the nature and extent of the

25  services they are providing will essentially remain the same

9

1  if Your Honor approves the motion to employ Mr. Seery.

2      Before I turn the virtual podium over to my partner, John

3  Morris, to present the testimony, Your Honor, I thought I

4  would provide the Court with a brief summary of the events

5  leading to the Debtors' filing of the motion.

6          THE COURT:  Okay.

7          MR. POMERANTZ:  As Your Honor will recall, the Court

8  entered an order on January 9th approving a settlement between

9  the Debtor and the Committee, and a significant part of that

10  settlement involved modifications to the Debtors' corporate

11  governance that resulted in the installation of the

12  Independent Board.

13      The term sheet that was attached in the settlement motion

14  specifically contemplated that the Independent Board, in

15  consultation with the Committee, would determine whether it

16  was appropriate to retain a chief executive officer, and

17  further went on to say that the chief executive officer could

18  be a member of the Board.

19      And the retention of a chief executive officer was on

20  everyone's minds from the beginning, because since Mr.

21  Dondero's authority as the CEO of the Debtor was being

22  terminated in connection with the settlement, the Debtor and

23  the Committee contemplated that, in order to manage a dynamic

24  and widespread asset management platform like Highland's, that

25  the retention of a chief executive officer may very well be

10

1  necessary.

2      I will leave it to Mr. Seery and Mr. Dubel to explain to

3  the Court what transpired during the early stages of the case

4  and the decision-making process that led to Mr. Seery starting

5  to act as the Debtors' chief executive officer.  And I would

6  also leave it to Mr. Dubel to discuss the sequence of events

7  which led from the appointment of him as the chief executive

8  officer through the filing of the motion that brings us here

9  today, which events will include the establishment of a

10 compensation committee; the commissioning of a report from the

11 Debtors' compensation expert, Mercer; the procurement of the

12 Debtors' [sic] and officers insurance coverage to cover Mr.

13 Seery and Mr. Dubel; the negotiations over the (inaudible) of

14 Mr. Seery; and lastly, the negotiations with the Committee

15 which has resulted in the motion being fully consensual.

16     I'll also leave it to Mr. Seery to explain his personal --

17 professional background and why he was qualified to fill that

18 role.

19     The agreement, Your Honor, between Mr. Seery and the

20 Debtor includes the following material provisions.

21     First, there would be base compensation at the rate of

22 $150,000 a month, retroactive to March 15th.  And while Mr.

23 Seery will remain on the Board as part of his role as the

24 chief executive officer, the $150,000 per month would cover

25 his services not only as a CEO but also a member of the Board.

11

1  In other words, the Board fees that were agreed to back in

2  January of $60,000 a month, $50,000 a month, and $30,000 a

3  month would be replaced by the $150,000 a month commencing on

4  March 15th.

5      While the compensation committee and Mr. Seery reached

6  agreement on the structure of potential bonus compensation,

7  the Committee has not agreed to that proposed structure. As a

8  result, the compensation committee and Mr. Seery decided that

9  approval sought in this motion would only be the monthly

10  compensation and the other non-economic terms, but would not

11  include the bonus compensation. Any bonus compensation sought

12  to be paid to Mr. Seery would be pursuant to a separate motion

13  filed, if at all, a lot later in the case.

14      The Committee was also uncomfortable with the open-ended

15  nature of the agreement and wanted some control in being able

16  to seek to terminate it. To accommodate the Committee, Mr.

17  Seery and the Debtor agreed to the following: After 90 days

18  from the date the Court enters an order approving this

19  agreement, if the Court is inclined to do so, the Committee

20  may provide the Debtor with notice that it does not want the

21  agreement to continue. The Debtor would then have two weeks

22  to file a motion on normal notice seeking to extend the date

23  of the agreement, and Mr. Seery would be entitled to his base

24  compensation until the Court ruled on the motion.

25      Also, the Committee asked us that be made clear in the

12

1    order, which we've done, that Mr. Seery's retention would

2    terminate on the effective date on the plan, subject, of

3    course, of his right to seek bonus compensation pursuant to a

4    separate motion.  The agreement also contains standard

5    reimbursement and indemnification provisions.

6        Your Honor, those conclude my initial remarks.  I'm happy

7    to take questions.  And then, at the appropriate time, I

8    return it over to Mr. Morris, who will put on the testimony of

9    Mr. Seery, Mr. Dubel, and Mr. Sharp.

10           THE COURT:  All right.  I'd like to pretty quickly

11   get to the evidence.  So, I'll ask:  Does anyone have a

12   burning desire to make an opening statement?  If so, please

13   let's keep it brief.

14       (No response.)

15           THE COURT:  All right.  I assume everyone is content

16   to wait until the end and speak up in any way they want to

17   speak up.

18       Mr. Morris, are you ready to call your witness?

19           MR. MORRIS:  I am, Your Honor.  Can you hear me right

20   now?

21           THE COURT:  I can.  Thank you.

22           MR. MORRIS:  Okay.  Your Honor, this is John Morris

23   from Pachulski Stang Ziehl & Jones for the Debtor.  As the

24   Debtors' first witness, we call James Seery.

25           THE COURT:  All right.  Mr. Seery, I need to swear

                              Seery - Direct                        13

 1   you in by video.  So could you take your phone off mute and

 2   please raise your right hand.  Can you say Testing 1, 2, so I

 3   know you're there?

 4            MR. SEERY:  Testing 1, 2.

 5            THE COURT:  All right.

 6             JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

 7            THE COURT:  All right.  Thank you.  Mr. Morris?

 8            MR. MORRIS:  Thank you, Your Honor.  Before I begin

 9   my questioning of Mr. Seery, the Debtor had filed its witness

10   list and its exhibit list.  We provided copies of the exhibits

11   to the Court and to the Committee, and I would like to just

12   move into evidence Debtors' Exhibits 1 through 7 at this time.

13            THE COURT:  All right.  So I have in front of me

14   Docket Entry No. 822 with Exhibits 1 through 7.  Any

15   objection?  (No response.)  All right.  1 through 7 are

16   admitted.

17       (Debtors' Exhibits 1 through 7 are received into

18   evidence.)

19            MR. MORRIS:  Thank you, Your Honor.  And just as an

20   overview, so you have a sense of where we're going with Mr.

21   Seery's testimony, I am going to begin with some very brief

22   background questionings and then have Mr. Seery answer some

23   questions concerning the overview of the company and the

24   corporate structure of the company.  You may have heard some

25   of this before, but I think in the context of a motion such as

Seery - Direct                                    14

1   the appointment of a CEO, I think it would be helpful to hear

2   it all.

3       When I finish with that, we're going to move into the area

4   of the Board and the work that the Board has done and Mr.

5   Seery's work as a member of the Board.

6       And then we'll transition into really the meat of the

7   discussion here, and that is what has he done in his capacity

8   as CEO.  And to be clear, he's not the CEO, he doesn't call

9   himself the CEO, but he's functioned as the CEO, and I think

10  that's the point that we want to present to the Court.  And we

11  want to present to the Court the fact that he functioned as a

12  CEO really from day one of the process.  And we're not going

13  to get into, you know, every single thing he's done, because

14  we'd be here for an awfully long time, but we do intend to

15  highlight a couple of the transactions that he worked on and

16  give you a sense of his role in trying to develop a plan and

17  resolving claims.

18      And I think, with that, you'll have a better understanding

19  of Mr. Seery, his role, and why we believe it's a proper

20  exercise of the Debtors' business judgment to appoint him as

21  CEO.

22          THE COURT:  All right.  Sounds good.

23          MR. MORRIS:  All right.

24                  DIRECT EXAMINATION

25  BY MR. MORRIS:

```
                           Seery - Direct                    15
```

```
 1   Q    Mr. Seery, can you hear me?

 2   A    I can.  Can you hear me?

 3   Q    Yes, I can.

 4           MR. MORRIS:  Your Honor, just one other point.  I

 5   have a legal assistant on the phone here.  She's participating

 6   in the WebEx.  Her name is La Asia Canty.  La Asia is going to

 7   handle the exhibits when and if we need to put them up on the

 8   screen.  So we've tried to practice that, and hopefully it

 9   will go smoothly, but I may turn to Ms. Canty from time to

10   time with some help with the exhibits.

11           THE COURT:  All right.  Fine.

12   BY MR. MORRIS:

13   Q    Okay.  Mr. -- what is your current relationship to the

14   Debtor?

15   A    I'm an Independent Director of Strand, which is the

16   general partner of the Debtor.

17   Q    All right.  And when did you become the Independent

18   Director of Strand?

19   A    On January 9th, along with John Dubel and Russ Nelms.

20   Q    The Court has previously heard about your background, but

21   from a high level, can you just hit the highlights for the

22   Court as to your experience, et cetera?

23   A    To go swiftly -- and if Your Honor wants me to go further,

24   I certainly can -- I was a restructuring and finance lawyer

25   for 10 years, handling virtually every type of restructuring
```

Seery - Direct                                16

1  matter as well as financing in distressed matters during that

2  time.

3       In 1999, I went to the business side and I began to manage

4  distressed assets at Lehman Brothers as well as a leverage

5  finance business.  That grew into my running the risky finance

6  business as well as the loan business at Lehman globally,

7  which included high-grade loans, high-yield loans, trading and

8  sales of those products, a big part of distressed, all of

9  restructuring, all of asset management, and all of the hedging

10 of the portfolio that we had.

11      From there, I left Lehman with a small group and sold it

12 to Barclay's.  I moved on and ran a hedge fund with two former

13 partners of mine who are the founding partners called River

14 Birch Capital.  It was a long-short credit fund; mostly

15 credit, though we did structured finance as well, and we also

16 handled some equities.

17 Q   Okay.  Let's spend a few minutes, as a preview, talking

18 about the Debtor and its business.  And let's start with the

19 basics.  Is there a way you can summarize the business of the

20 Debtor?

21 A   I think, from a high level, the best way to think about

22 the Debtor is that it's a registered investment advisor.  As a

23 registered investment advisor, which is really any advisor of

24 third-party money over $25 million, it has to register with

25 the SEC, and it manages funds in many different ways.

```
                        Seery - Direct                    17
```

1    The Debtor manages approximately $200 million current

2    values -- it was more than that at the start of the case -- of

3    its own assets.  It doesn't have to be a registered investment

4    advisor for those assets, but it does manage its own assets,

5    which include directly-owned securities; loans from mostly

6    related entities, but not all; and investments in certain

7    funds which it also manages.

8        In addition, the Debtor manages about roughly $2 billion

9    in -- $2 billion in total managed assets, around $2 billion in

10   CLO assets, and then other entities, which are hedge funds or

11   PE style.

12       In addition, the Debtor provides shared services for

13   approximately $6 billion of assets.  Those are assets that are

14   owned by related entities but not owned by Debtor-owned or

15   managed entities.  And those are a combination of back office

16   services, which include timely reporting, asset management,

17   legal and compliance support, trading and research support,

18   but not the actual management of the assets.

19       The Debtors run -- and I think the way to think about it

20   is on a functional basis; at least, that's the way I think

21   about it -- and there's really six areas.  There's corporate

22   management; finance, accounting and tax; trading and research;

23   private equity and fund investing; compliance and legal; and

24   then structured equity, which really includes all of the CLO

25   businesses.

Seery - Direct                                18

1      The goals of the Debtor generally are what you'd expect

2  out of an asset manager.  A little bit different than most

3  because the Debtor does own assets, which is a little

4  different than when money asset managers typically hold assets

5  away from the asset manager.  But number one, discharge

6  Highland's, which I'll call Highland (inaudible), LP, duties

7  to investors in the funds.  Those are fiduciary duties under

8  the Investment Advisors Act.  Each day, you've got to make

9  sure that you do that first and foremost.

10      Number two, create positive MPD in each of the funds that

11  we manage, either through sales, purchases, or hedging.

12      Next, make sure that we report timely finances of our own

13  assets, including in the funds, but also, to the third-party

14  investors.  Maximize the value of HCMLP's owned assets.  And

15  then operate as efficiently as possible for the lowest cost.

16      That's essentially how the Debtor -- how we think about

17  the Debtor from a functional perspective.  It's got about 70

18  employees laid out in those areas that I mentioned, and each

19  of those employees every day usually think about those goals

20  and try to discharge their duties by focusing on those goals.

21  Q   Thank you, Mr. Seery.  And can you describe for the Court

22  how those 70 or so employees are organized?  Is there an

23  internal corporate structure that you're working with?

24  A   Yeah.  The way -- the way -- I apologize.  The way we

25  think about it is, as I said, corporate management, which is

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1399 of 2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 1398 of 2722
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 19 of 134

Seery - Direct                               19

1   really HR and overseeing the function that it's filling every

2   day, that's been really -- because Mr. Dondero was removed

3   from management.  It used to all roll up to him.  That's been

4   effectively rolling up to me since February.

5        Finance, accounting, and tax.  Each of these businesses

6   every day require certain amounts of liquidity.  Each of them

7   have requirements that they have to pay out to investors.

8   Each of them have expenses.  And all of them have different

9   kinds of tax either obligations or reporting.  Those are

10  managed by Frank Waterhouse as the CFO.  (inaudible), sorry.

11       Trading and research.  With respect to the assets, they're

12  not -- they're not static assets.  Many of them do get traded

13  on a regular basis.  A gentleman, Joe Sowin, heads up the

14  trading of the liquid assets.  John Povish (phonetic) heads up

15  the research and the trading of the more illiquid assets, but

16  not PE.  In addition, we have PE assets that require some

17  management every day, including Board seats.  That's a

18  gentleman by the name of Cameron Baynard, and also he will

19  fund investments in that area.  J.P. Sevilla is responsible

20  for working with Cameron on those investments and leading that

21  team.

22       Importantly, because of the nature of what the Debtor

23  does, the fiduciary obligations, as well as the

24  responsibilities to each investor and the legal overlay, we

25  have a robust compliance and legal department.  That's headed

Seery - Direct                    20

```
 1  by Thomas Surgent and Scott Ellington.  Scott:  more focused
 2  on transactional issues with respect to legal.  He is actually
 3  general counsel.  Everything that has do with compliance, the
 4  interrelatedness of the funds, trading between funds or
 5  positions that are shared across funds, which are many, runs
 6  through Thomas Surgent and his team.
 7      And finally, structured equity.  Sitting on top of the
 8  structured finance business that we have, understanding those
 9  assets, particularly of two billion-ish assets in CLOs, that's
10  headed by Hunter Covitz.
11  Q    Can you describe for the Court your interaction with each
12  of the department heads that you just identified?
13  A    Well, depending on the nature of the issue each day, I
14  have at least -- I'd say generally at least weekly contact
15  with most, often daily contact with most.  So, for example,
16  when there are trading issues, particularly as the market was
17  extremely volatile with respect to unliquid securities, Joe
18  Sowin and I were on the phone several times a day.
19      Relating to the COVID issues, Brian Collins, who heads the
20  HR group, and I were on the phone several times a day.
21      Relating to structured equity, depending on what's
22  happening with a particular fund or what's happening in loan
23  prices, I speak to Hunter Covitz.  And it goes down the line.
24      So it really depends on each of the areas and what's going
25  on in the business, but I try to touch base with each of those
```

Seery - Direct                    21

1   department heads on a regular basis.

2       Frank Waterhouse, of course, is at least weekly.  We have

3   a standing call every week to make sure that we're focused on

4   liquidity, which is always a concern in a Chapter 11, and

5   Frank and his team are on that call and prepare weekly

6   materials for us.

7   Q   Okay.

8           MR. MORRIS:  Your Honor, before I move to the next

9   area of questions, the work of the Board, I just wanted to see

10  if the Court had any questions on the corporate organizational

11  structure, the internal structure of the business, or any of

12  the matters that Mr. Seery touched on?

13          THE COURT:  I do not.  And I do have in front of me a

14  demonstrative aid that Mr. Annable sent over ahead of time, so

15  I appreciate that as well.

16          MR. MORRIS:  Okay.  Your Honor, I think Mr. Seery

17  covered much of what's on that document, but if you'd like him

18  to go through that, we're happy to do it.

19          THE COURT:  No, that's fine.

20          MR. MORRIS:  Okay.

21  BY MR. MORRIS:

22  Q   Then let's shift gears a little bit and start talking

23  about the work of the Independent Board itself.  The

24  Independent Board was appointed in mid-January; is that right?

25  A   Yeah.  It was the first -- January 9th, the first week of

Seery - Direct                              22

1  January, and we started working that afternoon.

2  Q    Okay.  Can you describe for the Court what the -- the

3  Board's initial focus?  What were you focused on?

4  A    Well, if you think about the areas that I just mentioned

5  previously, the Board initially, for lack of a better term,

6  gang-tackled everything.  So we tried to make sure that we had

7  a broad base of understanding among the three of us with

8  respect to the business.

9      I, because of my background, had a lot more familiarity

10  with asset management, these type of asset security

11  businesses.  But we wanted to make sure that each of us was at

12  least facile with the main areas that we had to understand.

13  First was operations.  How does the company run each day?

14  Particularly, how was it going to run without Mr. Dondero?

15  And I went through some of those functional areas and how we

16  thought about those and who head each of those.

17      Next in the -- I don't mean to say it's second, because

18  it's always first, but liquidity.  What did the Debtors'

19  liquidity look like?  How are we going to manage that

20  liquidity, not just for the near-term, but also for the

21  medium-term, and then even into the slightly longer-term?  We

22  had to think about what assets are there, what money those

23  assets might need that we would have to invest in them, and

24  whether there was liquidity in those assets that we can create

25  liquidity in order to fund the Debtors' business.

Seery - Direct                            23

1    Personnel, we needed a good opportunity to understand who

2    did what, not just in the senior managers that I mentioned,

3    but deeper into the staff, because we're going to rely on

4    those folks.  Particularly worked through with DSI.

5        As I mentioned, the Debtor, unlike a lot of other asset

6    managers, owns a lot of assets.  It's a disparate group of

7    assets, but getting a feel and understanding for what those

8    assets were, what the critical issues surrounding those assets

9    are, who managed them day-to-day:  We wanted to make sure that

10   each of the directors had a good (inaudible) and understanding

11   of those issues that might arise with respect to those assets,

12   and a good sense of how quickly those issues could, you know,

13   further arise.

14       We also had to get a very good understanding of each of

15   the funds that we manage.  As I said, the Investment Advisors

16   Act puts a fiduciary duty on Highland Capital to discharge its

17   duty to the investors.  So while we have duties to the estate,

18   we also have duties, as I mentioned in my last testimony, to

19   each of the investors in the funds.

20       Now, some of them are related parties, and those are a

21   little bit easier.  Some of them are owned by Highland.  But

22   there are third-party investors in these funds who have no

23   relation whatsoever to Highland, and we owe them a fiduciary

24   duty both to manage their assets prudently but also to seek to

25   maximize value.  And we wanted to make sure we had a good

Seery - Direct           24

1   understanding of that.

2     Finally, with respect to the shared service arrangements,

3   we needed to get an understanding of that $6 billion in assets

4   and how our business, HCMLP, worked with those -- those shared

5   service counterparties and exactly who did what for whom.

6   It's very complicated because it had been run much more on a

7   functional basis than on a line basis from each contract. So

8   it's not as if your employees are allocated to NexBank. It's

9   the whole panoply of businesses that we enter into, and

10   providing those services to NexBank, not through a central

11   point but through whatever requests come in from the counter-

12   parties. So we needed a good understanding of what those

13   contracts looked and what those obligations were.

14         A VOICE: John, you're on mute.

15         MR. MORRIS: Thank you.

16   BY MR. MORRIS:

17   Q   All of that work was going on in the first weeks of the

18   appointment of the Board?

19   A   Yeah, it would not be fair to say we could do that in a

20   couple weeks. So it took far longer than that. But that

21   didn't mean that issues didn't start to arise immediately in

22   February. And so, while we were learning, we were also

23   starting to get a feel for different things that could happen

24   in the company.

25     As in many companies, immediately, one of the first things

Seery - Direct                           25

1   you have to deal with is, particularly at the beginning of the

2   year, what does compensation look like; who are the -- what do

3   promotions look like; are you going to be able to hold this

4   team together to service these assets?  And yeah, we had that,

5   with an additional wrinkle that Highland's payment structure

6   defers a significant amount of compensation to its employees,

7   and it vests over time, and it has the very typical provision

8   that if you are not there when it vests -- when it is going to

9   be paid, actually, not when it vests.  Even if you're vested,

10  if you're not there when it gets paid, you're not entitled to

11  it.  And so understanding who was owed what; how the vesting

12  worked; what the compensation structure looked like compared

13  to third parties, was one of the first things we had to do.

14  And Highland has an extremely robust review process.  Brian

15  Collins manages it.  It's first-rate.  It goes through both

16  360 in terms of what other employees think of each other as

17  well as bottoms up, in terms of performance.  And then it has

18  a top-down component, which ultimately ran through Mr.

19  Dondero.  Since he was effectively removed from that role, the

20  Board had to jump in and get a full understanding with Brian

21  about what the process looked like; how it was going to work;

22  how it compared to other firms; and whether we could go

23  forward with it.  And that was one of the motions that was

24  brought early to the Court.

25  A    Let's talk a minute about the transactional work that the

Seery - Direct                          26

1   Board was called to focus on initially.  Are you familiar with

2   the transactional protocols that the Debtor agreed to with the

3   Committee?

4   Q    I am.

5   A    Can you describe for the Court the impact those protocols

6   had on the Board's work?

7   Q    Well, they make it extremely difficult.  And I understand

8   the purposes behind the protocols.  Was not involved in

9   negotiating them.  However, because of the limitations they

10  put on the Debtor, they make it very difficult to manage

11  certain of the assets.  So, if an asset needs money to invest

12  in it, depending on the size, it may need Committee approval.

13  If the -- if there are expenses that need to be paid from --

14  in related entities, and the related entity does not have the

15  capital to make the expense payment, the Debtor needs to put

16  the money in.  Can the Debtor put that money in without the

17  Committee's approval, and if the Committee doesn't approve,

18  would we have to go to Court?

19       So, the functioning on a day-to-day basis for how to deal

20  with those assets became very difficult.  And that came up

21  really early, as the market started to get a lot more

22  volatility by mid-February.  We saw with respect to the

23  internal accounts trades that we would have liked to put on,

24  for example, short position, where we just weren't able to put

25  the trades on.

Seery - Direct                           27

1    Now, we could go to the Committee, and we did, but

2  understanding why we wanted to put it on; explaining it;

3  presenting that opportunity to the Committee; and then having

4  them go to the full Committee with it:  It's very cumbersome.

5  And the trading markets don't wait for a week to determine

6  whether that offering that you want to -- that you want to

7  access is available.

8    So, early on, we got a sense of how difficult it would be

9  to manage the business with the protocols.

10    One of the areas I think that was significant and that we

11 talked about significantly with the Committee was an entity

12 called Multi-Strat.  Multi-Strat is a fund that is owned by

13 the Debtor.  It's, in essence, a PUNY-style (phonetic) fund.

14 It's an older fund.  And it's about 60 percent owned by the

15 Debtor and roughly 30 percent owned by Dondero-related

16 entities.

17    However, there are 90 million, roughly 89 million,

18 approximately, third-party redeemers who had redeemed in that

19 fund but have yet to be paid, so they're treated like equity

20 claims but they're a fixed dollar amount because they are set

21 at the date that they redeemed based on the NAV at that time,

22 the net asset claim.

23    So, we were -- we were stuck with looking at that fund and

24 trying to determine how do we best manage the fund to get up-

25 side for the Debtor as well as the related entities that owned

Seery - Direct                          28

1   the equity, making sure that we treated the redeemed entities

2   as fiduciaries, so which we acted as their fiduciaries, but

3   then also assuring that we managed the assets that that fund

4   owns in a prudent way.

5       One of the large assets in that fund were 13 life

6   policies.  And these are, in essence, life insurance policies

7   that the Debtor bought from third parties.  And there's a

8   market that trades life policies, and they owned these

9   policies on (inaudible).  The value at the time was marked

10  around $32 million when -- when we took control.

11      The problem with the policies and some of the other

12  expenses at Multi-Strat is that they didn't -- Multi-Strat

13  didn't have the funds to continue to pay premiums.  So, if the

14  premiums weren't paid, that $32 million was at risk of going

15  to zero.  Why?  Because if the premiums aren't paid, the

16  policies lapse.  And once they lapse, the insurance company

17  will pay you zero for them.  They don't them buy them back

18  anywhere.  That's the market.  But we looked at those assets

19  and began to consider how we would fund, from a liquidity

20  perspective, monies going into Multi-Strat.

21      The amounts required would require CC's approval under the

22  protocols, and the Debtor prepetition had advanced monies to

23  Multi-Strat to make premium payments and other expenses at

24  Multi-Strat.  We went to the Committee and were able to get

25  approval to put a couple million dollars in early on to keep

Seery - Direct                              29

1  the policies alive while we analyzed the best opportunity for

2  maximizing value with respect to those policies.

3      But thereafter, we needed additional money to try to

4  consider how to continue to maximize value, and the Committee

5  balked.  So we went to Dondero-related entities, and they

6  actually put equity into the Multi-Strats.  So we -- the

7  Debtor had made a postpetition, in essence -- it wasn't a

8  postpetition advance because it was going outside of the

9  Debtor, but postpetition, the Debtor made a loan to Multi-

10 Strat to service the policies, and then Dondero-related

11 entities made an equity investment into Multi-Strat to

12 continue to service the policies.

13     Well, we understood as a Board but that wasn't going to

14 work and that the protocols were going to continue to hinder

15 us, so we entered into a sale process with respect to those

16 policies.

17 Q   And the work that you're describing with respect to Multi-

18 Strat, is that -- just to transition to your work as

19 functionary CEO, would it fall into that bucket as opposed to

20 the Board work that we were talking about earlier?

21 A   Yeah, absolutely.  I think the -- the initial assessment,

22 as I said, we made as a group.  And we looked at what the

23 opportunity set was, and determined that, because of the

24 costs, we weren't going to be able to continue to fund money

25 into Multi-Strat to make those payments.

Seery - Direct                          30

1       So the Board asked me to take on trying to work out a

2    process to sell those policies.  So, working with Fred Caruso

3    of DSI, we hired a broker, after interviewing a couple

4    different brokers.  We considered the views of the internal

5    Highland team with respect to value and how to maximize that

6    value.  We entered into a sale process for those policies, and

7    we ended up with a number of bidders and broke it down to two

8    bidders for the 13 policies, breaking up the policies to

9    maximize the value.  They're only on eight lives, so it's not

10   fair to call it a portfolio.  And so there's significant

11   amounts of premiums that have to be paid on a monthly basis

12   and going forward, and realizations on those policies are very

13   uncertain because it's hard to take them over an actuarial

14   methodology because there's only eight lives.

15       We tried to consider other ways to finance those policies,

16   but seven turned out to be, in our view, far and away the best

17   net present value for the investors in the fund.

18       The challenge that we had, as I mentioned, is the

19   complexity of Multi-Strat was also layered with a loan from

20   NexBank that was secured by four of the policies.  That $32

21   million loan was also secured by the MGM stock owned by Multi-

22   Strat.

23       And then, as we got towards closing, we learned that one

24   of the buyers wanted a more detailed title rep, and as we

25   peeled through, we found a long-dormant UBS fraudulent

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 1411 of 2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 1410 of 2722
Case 19-34054-sgj11 Doc 864 Filed 07/17/20   Entered 07/17/20 10:53:51   Page 31 of 134

Seery - Direct                          31

1   conveyance suit that had been brought against Multi-Strat.

2   There was no lien on the policies, but it made it impossible

3   for us to give the clean rep that the buyer wanted.

4       And at this point, I was running that with Fred Caruso, at

5   the request of the Board, and it became almost a full-time job

6   except for the five other things that we have to do during

7   April.  And we negotiated a variety of different -- well,

8   considered a variety of different opportunities to try to

9   complete the sale.

10      First, I negotiated directly with UBS to see if they would

11  agree to a release, and then when the funds, other than

12  certain escrows which had to be paid out to NexBank as well as

13  repayment of the Debtors' fund, (inaudible), that didn't -- it

14  was very unfruitful in terms of those negotiations.

15      I then moved towards a potential bankruptcy of Multi-

16  Strat, where we would file Multi-Strat, have to do a 363 sale,

17  have a DIP loan to service the NexBank monthly payments.  That

18  seemed very expensive.

19      We also thought about doing it as not selling them, so

20  perhaps we would a 360 -- a filing without a sale and try to

21  maximize the value by holding onto the policies but have to

22  get financing.

23      Ultimately, we came up with a structure which was we

24  escrowed funds for UBS, $10 million of funds, but they're not

25  actually for UBS.  We preserved all of our rights to defend

Seery - Direct                          32

 1   the claims and we had paid down NexBank.  We allocated funds

 2   to make sure that we can pay NexBank for the next year before

 3   their loan comes due.  We allocated for all the expenses in

 4   Multi-Strat.  And then when we went back to the sellers, lo

 5   and behold, one of the two sellers balked.  Didn't -- or

 6   buyers, I'm sorry.  Balked.  Didn't want to complete the sale.

 7   And fortunately, our broker (inaudible) and Fred Caruso had

 8   had another buyer in the wings, kept them warm, and were able

 9   to complete the sale for $37 million.

10       So that goes to:  How does this business function, what's

11   the complexity of it, and what have I and the rest of the

12   Board been doing?  That was virtually a month's worth of work.

13   Q    And when did the Board ask you, if you recall, to

14   undertake this project?  When did it begin and when did it

15   end?

16   A    Well, the initial project, around -- around Multi-Strat,

17   we started analyzing it as a group in January, the first week

18   we were there.  I started probably taking control of it

19   sometime in mid-February, with Fred Caruso.  So, DSI was

20   already on it.  We were looking to work with the Debtors' team

21   as well as hire a broker.  We, as a group, as a Board, made

22   the decision to sell the policies.  Ultimately, we sold them

23   for about $37 million, which was -- which was more, a few

24   million dollars more than the mark on the policies when we

25   took them.

Seery - Direct                                  33

1   Q    Can you give the Judge a sense of your role, as distinct

2   from the Board's role, how you went about completing or

3   attempting to complete all of the tasks that you've described

4   and the interaction with the Board and what the Board's role

5   was in assessing all of that?

6   A    With respect to the Multi-Strat policies?

7   Q    Uh-huh.

8   A    I think, you know, initially, it was a understand, for the

9   three of us, understand the policies; understand the premium

10  obligations; understand what the benefits, the potential up-

11  sides to those policies were; and understand what the risks

12  were if we were to fail to make a premium payment; what did

13  the lapse period look like.  And we did that collectively.

14  From there, all of the individual work around -- we came up

15  with a strategy to sell the policies, and then the tactical

16  work with Fred Caruso about how to execute sale of the

17  policies and completing that sale through the issues NexBank,

18  through the issues with UBS, resolving those issues, that

19  became really my job.

20  Q    Now, I do want to take a step back, because we kind of

21  transitioned from the Board to the work that you were doing,

22  and I wanted to ask:  You're seeking -- the Debtor is seeking

23  to have you appointed as the CEO, right?

24  A    Yes.

25  Q    Can you just describe for Judge Jernigan your

Seery - Direct                           34

1  understanding of the duties and responsibilities of the CEO

2  position that we're seeking your appointment for?

3  A    Sure.  From a high level, it's -- I apologize.  From a

4  high level, it's what I said earlier, which is the Board sets

5  the strategy, the CEO implements the strategy.  And so I work

6  with the Highland team and the managers that I described

7  earlier, whose function that is, to try to execute on that

8  strategy.  So that's, that's the basic overlay of what we do.

9  But that includes everything from, as I mentioned, personnel

10  issues to COVID-19 protocol to determining whether we're going

11  to sell certain assets and then how we're going to sell them,

12  determining how we'll resolve issues like Multi-Strat.

13      Another good example was the trading accounts that the

14  Debtor had.  So, on the second or third week of January, or

15  perhaps the third or fourth week, we determined as we were

16  going through the asset review that the Debtor had two primary

17  liquid or semi-liquid securities accounts, and those were in

18  the Select account, which was a separate fund that had

19  previously third-party investors but was effectively a hundred

20  percent, 99 and change percent, owned by Highland at this

21  point.  And an internal account, which was basically just

22  HCMLP-owned and denominated securities.  These were generally

23  at Jefferies.  Both of them employed significant margin.

24          THE WITNESS:  If this is too pedantic, Your Honor,

25  please tell me if I'm going too deep.

Seery - Direct                                    35

1      But margin is, in essence, a way for a security purchaser
2  to borrow money to facilitate the purchase and holding of the
3  securities.  In essence, the lender, which in this case was
4  Jefferies, a large, well-known, reputable financier and New
5  York investment bank, was the Debtors' account holder.  The
6  Debtor would select securities.  Jefferies would establish a
7  haircut.  The haircut is really the -- how the lender
8  determines how much they want to lend against the assets.  So
9  if there's a -- if there's a haircut of a hundred percent in
10  use there, there would be no margin against that asset.  A
11  haircut of 50 percent means the debtor will give you -- or,
12  the lender will give you 50 percent of the funds you need to
13  own and hold that asset and you put up 50 percent of the
14  funds.
15      And in a margin loan, the way that the lender protects
16  itself is, each day, it assesses the value of the asset; it
17  looks at the volatility of the asset; and then it asks for
18  more margin if the asset value went down in the trading
19  markets; and then you have a day or two or three, depending on
20  the structure, to post the new margin.
21      If you don't post the new margin, and this the way every
22  margin loan works, the lender has the ability to seize the
23  asset, sell it, and pay off its loan.  It will then give you
24  the proceeds above the loan, if any.
25      The debtor -- the lender does that by looking at both the

Seery - Direct                          36

1  daily prices, to make sure that it can manage its exposure,

2  but also it considers the volatility.  And what it does when

3  it's looking at the volatility, and volatility is really a

4  measure, the way -- the way that securities analysts look at

5  it, is a forward year of the movement, potential movement of a

6  security.  And that's how you set your haircut.  Because if

7  the -- if the asset is very, very stable -- for example, your

8  home -- if your home was a margin loan and your mortgage, say,

9  is a margin loan, there wouldn't be much calling of margin

10 every day, because if the lender loaned 80 percent of the

11 value of your home, there may be house sales that go higher or

12 lower, but they don't necessary move that much really quickly,

13 particularly if these loans set what's called a threshold

14 amount that allow a little bit of movement each way.

15     The margin loans, though, are on securities that can move

16 tremendously.  And what happened in February and then in early

17 March, volatility spiked up, prices moved significantly,

18 prices moved against the Highland positions.  So Jefferies did

19 two things.  One is it called margin, because it was -- its

20 equity cushion, in essence, was getting trimmed, and it wanted

21 more protection.  Number two, it increased the haircuts, which

22 it was entitled to do because it looked forward and said, The

23 volatility in this market is worse than we thought.  It will

24 be a higher volatility and there's more risk to us that the

25 asset could be worth less than the loan.

Seery - Direct                    37

1     I started working with Joe Sowin, who's a head trader, a

2   very accomplished trader at Highland.  He actually reports

3   into the -- not on the Debtors' payroll but another payroll

4   that we don't manage.  But he spends a ton of time working on

5   Highland assets and trading those assets.  And Joe and I

6   started working together to try to manage the Jefferies

7   exposure.

8     At one point, Jefferies actually seized the Select

9   account.  Again, Select wasn't in bankruptcy, but Jefferies

10  had safe harbor provisions or protections anyway and they

11  could have done it.  We felt they were about to seize the

12  internal account, and so we sent them a note that said that

13  perhaps their safe harbors weren't as good as they thought.

14  But, more importantly, here's our sale program.  Jim Seery's

15  going to take over the account, working with Joe, and we're

16  going to manage it down.

17    In the Select account, Jefferies took it over -- and this

18  is not really a blame to Jefferies; it's part of the market --

19  they sold out of that account pretty quickly.  They did work

20  with us, but they were the selling position and covering their

21  loan, and we lost virtually all of the value in that account.

22    In the internal account, we effectively kept Jefferies

23  from seizing it, gave them a sale program, and then day-to-day

24  managed the sale of the more significant assets, as well as

25  the hedges, which mean we traded pretty aggressively

Seery - Direct                                    38

1    throughout the day.  This was a full-day job, trading that

2    account, with Joe as the trader and then me acting as the PM,

3    effectively.

4        We took that account, which if Jefferies had taken it over

5    and done -- it had virtually the same securities, it had just

6    a small number of securities, as well as some hedges which had

7    significant basis risk related to the securities -- we took

8    that account over.  If we'd gotten the same program as

9    Jefferies, we would have lost $11 million.  We made about $23

10   million.  So that swing, that swing was pretty significant.

11   I'm sorry, we made about $11-1/2 million, about a $23 million

12   swing than if Jefferies had taken it over.

13       So that was another example of what I've been doing that

14   the Board designated me to do to help run this business.

15   Working with Joe, as well as research, as well as discussing

16   these positions on a regular basis with Jefferies, weekly

17   calls and daily e-mails, we were able to preserve that value

18   in that account.

19   Q    And so, just for context, this is happening in late

20   February or early March, as COVID is hitting and the markets

21   are volatile; is that fair?

22   A    That's when we started taking it over.  The real -- the

23   real -- the lay in the markets was about March 22nd or 23rd.

24   Q    Uh-huh.

25   A    And that's when it became a daily grind on those positions

Seery - Direct                              39

1  for a solid month to make sure that we got it in a decent

2  place.

3       And remind you that we were trading those accounts within

4  the strictures of the protocols.  So we didn't have the

5  ability to -- the securities were -- rather less liquid.  We

6  didn't have the ability to just dump them, because we would

7  have destroyed the market and taken significant losses.

8       In addition, because of the protocols, we didn't have the

9  ability to go out and buy hedges, even though we had a

10 negative bias as to where the market was, particularly in

11 those less-traded securities.

12      And it's -- it was public that Highland (inaudible) and

13 Highland (inaudible) was in bankruptcy, so you can be certain

14 that the traders were leaning on those -- those securities

15 from short decisions.  So it was a very difficult, time-

16 consuming effort, and a great job by Joe.

17 Q    When you talk about a time-consuming effort, how would

18 you -- how would you characterize the amount of time you spent

19 on this project in the month of March?  Was it a full-time

20 job?

21 A    Yeah.  Yeah.  I mean, full-time is relative, right, but it

22 was -- it was a lot of time.  So we would start out, you know,

23 like everybody else who is in those markets and do it the same

24 way, it's pretty tried and true:  By 6:30 in the morning,

25 you're starting to look at what the EOP, what Asia did, where

Seery - Direct                                    40

1   European markets were opened up, what the futures were looking

2   like, looking at your own securities, checking all of the

3   mail, talking to your research folks.  To the extent that you

4   know that there's other investors in those investments, we

5   reached out to those -- I have a number of contacts in the

6   market who are in these kinds of assets -- to see what they're

7   thinking and how they're looking at value.  And then set up a

8   trading strategy with Joe, and then execute on it every day.

9   And that trading strategy, again, was not static.  So during

10  the day, a dynamic trading strategy has to be adjusted

11  depending on what the market is doing, and Joe was excellent

12  at it.

13  Q   I think you mentioned the protocols earlier.  Can you just

14  talk a little bit more about how you and the Debtor

15  communicated with the Committee through this process of

16  addressing the Jefferies mortgage -- mortgage defaults?

17  A   Well, every day, we sent a report to -- to the Debtor -- I

18  mean, to the Committee, I apologize -- with our positions in

19  each of the accounts and tell them exactly what we're doing,

20  what the plan is, what we're set up to do, where we think it's

21  going, and what assistance we might need through the

22  protocols.

23      I think it became really difficult for the Debtors'

24  professionals -- the Committee's professionals to deal with

25  these issues, because it's just not what they were used to

Seery - Direct                          41

1  doing every day.  So we would report to them.  The Committee

2  met weekly.  We can -- provided direct information to

3  Committee members when they -- you know, there's members on

4  the Committee who are very versed in these types of assets.

5  We would talk to them directly, I would talk to them directly,

6  and tell them exactly what we're doing and why and get their

7  input, because there was no magic special sauce as to exactly

8  what to do.

9  Q   And would you characterize the process as transparent and

10 open between you and the Committee and its members?

11 A   Oh, oh, absolutely.  You know, we were -- they were

12 constructive.  I wouldn't say that the Committee wasn't

13 constructive.  I think the difficulty the Committee had, which

14 is what, you know, any third party would have, is that:  Why

15 are we going to put more money into these accounts when the

16 value is going down, and what's -- what's your -- what are

17 your price targets?  How do you think about those assets;

18 who's the analyst who's working on it; how do they compare to

19 other assets?  So it wasn't an easy process for the Committee

20 to get their arms around, either.

21 Q   Okay.

22         MR. MORRIS:  Your Honor, we have other transactions

23 that we could talk about if you think that would be useful, or

24 we could continue to push this forward.

25         THE COURT:  You can continue to push it forward.

Seery - Direct                                    42

1   Thank you.

2          MR. MORRIS:  Okay.

3   BY MR. MORRIS:

4   Q    Then let's transition for a moment just about your

5   recollection as to kind of when and how, you know, the

6   discussions with the Board and the Committee evolved with

7   respect to your taking over as CEO.  Did there come a point in

8   time that you can recall when the Board asked you to consider

9   that?

10  A    Yeah.  The Board asked me to consider it I would say

11  probably late January or early February.  And the initial

12  discussions, even before, you know, before we were selected.

13  So, as John Dubel and I had been selected by the Debtor and

14  the Committee, we talked about the need for one central point

15  of management for this company.  That it's 70 employees and

16  diverse assets, diverse business practices.  How are we going

17  to mold that as a Committee?  It really needed somebody to

18  execute the strategic plan that the Board put in place.

19       And so John had asked me about that even before we were

20  selected.  Committee counsel asked me about it.  So there was

21  -- there was some, at least away from me, there was some view

22  that perhaps I was going to be the person that was most

23  likely, if it was needed.

24       My view in early February was that, you know, we were

25  effectively, as the phrase goes, drinking from a fire hose,

Seery - Direct                              43

1    and I wanted to get a better sense of who the folks were at

2    Highland; what their responsibilities are; how they performed;

3    what I thought of them as performers; how -- I had -- or,

4    having some idea what the claims are and how that process

5    would work; and could we make this a success?

6        So, early on, in January and in February, as we started

7    having these discussions, I was in the Highland offices at

8    least three, usually four days a week.  And I was there from

9    7:30 in the morning until 6:00 or 7:00 at night every day.

10   And that gave me just a different feel for exactly how the

11   organization was running and the issues that were coming up

12   every day.

13       That evolved into March where, after I took over the

14   securities accounts in early March and then took over the

15   Multi-Strat issues, that John and Russ Nelms pushed me to

16   really consider stepping up fully to the CEO role.  So, by

17   early April, I think it's the first week of April, we actually

18   -- we put it forth and go to the Committee.  So we started

19   negotiating what potential terms were, how it would work.

20       You know, one of the concerns that I had, you know, we had

21   no idea, and I suppose we still don't, how the COVID-19 issues

22   will play out and how that would both -- because at the time

23   they were really affecting New York, where I'm based and I

24   live, and less so in Dallas.  But by mid-March, it was pretty

25   clear that the whole country was being affected.  And now,

Seery - Direct                           44

1   obviously, it's hitting all over.

2       And hopefully that will settle, but what we did learn, and

3   I think a lot of businesses learned, is that particularly

4   these types of service businesses that function electronically

5   in lot of respects, even when they are in an office, because

6   you're in front of your screen, that we are very lucky to have

7   these types of roles where we can really perform the job, if

8   not equally well, pretty darn close to how you perform it when

9   you're at the office.  And so that issue subsided a little bit

10  in terms of how I would interrelate -- not the issue going

11  away, obviously -- but how I could interrelate and work with

12  the team to drive the business, even if I was doing it from

13  New York.

14  Q    And have you continued to play a leadership role from the

15  time you spoke with your fellow Board members in early March

16  until the present?

17  A    I have.  And I think one of the things that the Committee,

18  you know, recognized was that John and Russ, experienced

19  professionals, were willing to step back and let me take the

20  day-to-day working with the Committee or presenting to the

21  Committee.  So we do have weekly Board meetings and we do have

22  almost daily Board calls, and then, without an official

23  meeting, we meet on the phone virtually every Saturday or

24  Sunday, sometimes both, with the three of us, to go through

25  what's happened every -- each week, how the plan has evolved

Seery - Direct                              45

1    and where we're pushing it.

2         But in terms of the presentations to the Committee, I took

3    the lead on those in both designing and working with the Board

4    then and then implementing them and laying them out for the

5    Committee, as well as the individual negotiations.

6         So, early on, we determined that we had to try to figure

7    out a way to push this case forward, notwithstanding that we

8    weren't getting -- we didn't see a lot of movement from any of

9    the parties, frankly, on trying to figure out a way to

10   coalesce around a direction.  So we designed a program that we

11   laid out for the Committee in which we considered three main

12   areas to consider for a plan.  And I took the lead on doing

13   that.

14   Q   So, let's talk a little bit about the claims resolution

15   process and the formulation of a plan.  Have you played any

16   role in the claims resolution process?

17   A   Well, we haven't actually resolved any claims completely

18   yet, but we're very close on one, and I've taken the lead on

19   doing that.

20        On the other two, I've been involved heavily with the --

21   both counsel and with DSI in analyzing the claims.  As well as

22   with the rest of the Board, frankly.  The -- you know, we've

23   got a significant amount of expertise between John Dubel and

24   Russ Nelms with respect to how to think about these issues in

25   the context both of a bankruptcy, obviously, with Russ, and in

Seery - Direct                           46

1  the context of both a restructuring and in the business with

2  respect to John.

3      So we've gang-tackled those, again, effectively, all

4  analyzing the various issues with respect to these claims.

5  But in terms of having the direct negotiations, particularly

6  on two of them, I've taken -- I've taken more of the lead

7  about where we could go.  And if you -- particularly with my

8  background in restructuring, and having wrestled with

9  substantive consolidation, alter ego, piercing the veil since

10 1988 or '89, you know, some of the issues that have arisen in

11 this case are very, very familiar to me.  I've spent a

12 significant part of my career dealing with those.  So I've

13 taken the lead on those types of issues.

14     I think that where I was going was in terms of structuring

15 potential outcomes for plans.  And we are -- you know, we've

16 been slowed down, as I think Jeff Pomerantz mentioned last

17 week, to a fair degree by COVID, in that the business impacts,

18 we can go into, and Jeff touched on some of those, but the

19 social impacts with respect to negotiating are hard to -- are

20 hard to understate.  The -- you can run a business like this

21 through your screen.  It's very difficult to simply negotiate

22 by phone or by video.  The face-to-face, at least in my

23 experience, makes a big difference in moving parties, and we

24 haven't had as much of that.

25     What we've tried to do recently, starting in May, is we've

Seery - Direct                              47

 1   put together a program for the Committee, and we'll walk them

 2   through what I think are the -- what we determine as a Board

 3   and then we laid out the specifics -- I didn't; DSI -- of what

 4   the options are in this case.

 5       And I think number one was the status quo.  Do we maintain

 6   this case status quo, continue to run the business, and then

 7   try to negotiate, resolve, mediate, or litigate, first through

 8   dispositive motions, then through something more significant

 9   if we can't do it through dispositive motions, these claims?

10       The Debtor right now on an operating basis does burn cash.

11   I can go into the specifics, but the Committee knows them, and

12   I'd prefer to do those *in camera* if we -- if the Judge would

13   like that.  We do burn cash on an operating basis, but not

14   that much.  The Debtor has about $30 million (inaudible) and

15   the business does run, and generally each year the operating

16   burn, if you will, which is, in compensation, is filled by

17   selling some assets that have appreciated in value.  And the

18   Debtor runs real -- with those accretions, run roughly

19   breakeven.

20       The problem in this case is that we are burning a

21   significant amount of bankruptcy professional fees.  And it's

22   the lament of creditors and business operators and the

23   bankruptcy bar.  I think, certainly, the judges that I see for

24   a long time.  And the percentage -- the cost of the cases

25   keeps going up and the percentage of the assets keeps going,

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1428 of 2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 1427 of 2722
Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 48 of 134

Seery - Direct                                    48

1    but particularly if the asset values are going down.

2        So the status quo didn't make a lot of sense unless we

3    were going to get very swift movement from the parties, and I

4    mean all sides, to try to resolve the case.

5        The other type of outcome we thought about in terms of a

6    plan was a downsiding model.  Downsizing model, excuse me.  In

7    that model, we would try to significantly cut headcount, try

8    to significantly cut expenses.  Run the business as leanly as

9    possible.  And then try to go through those steps with respect

10   to resolving the claims.

11       Again, the problem, the problem with that is resolution of

12   those claims was uncertain and could take a long time, unless

13   we had significant movement from either side.  But, moreover,

14   in terms of operating the business, we determined that with

15   respect to both the managed accounts and shared service

16   agreements, we really couldn't effectively do the job that the

17   Debtor does with a smaller staff.  Truth is, even at 70

18   people, the HCMLP staff is pretty lean.  It's a really good

19   team and they are very efficient and they've really proved it

20   through working offsite, you know, through the pandemic.

21       But we really thought that if we -- and analyzed it.  If

22   we were to try to cut that team and provide the services, we

23   would fall down.  So we would breach the duties or potentially

24   incur liabilities under those various contracts.

25       The third area that we took a look at, which was what we

Seery - Direct                          49

```
 1   called the subservicing model.  In this model, we would try to

 2   separate the business of the Debtor, which has a small

 3   operating loss, but it's still material money, from the asset

 4   management.  That way, you could hold onto the assets for the

 5   benefit of the creditors or the Debtor, depending on where the

 6   claims comes out, still provide the services to those third

 7   parties under the subservicing agreements or the management

 8   agreements.  You wouldn't make money on that, but you'd get

 9   rid of the operating burn.

10       And that model had a number of issues, but we've sort of

11   evolved that model to what I think has been referred to in

12   court as the debtor-creditor monetization vehicle.  So a

13   little bit of a cumbersome name, but the idea would be to try

14   to separate the assets, which potentially are the ways to pay

15   the creditors, depending on where claims come out, and then --

16   and the operations, and make sure you can continue the

17   operations without a heavy burn.

18       That model also permits us to cut, we believe, bankruptcy

19   operating expenses significantly.  So, right now, because of

20   the nature of the case, we have two professionals doing every

21   job:  Committee professionals and Debtor professionals.  We

22   would be able to reduce that cost by putting those into one

23   entity that'll be a trust-like structure to service the

24   business, resolve the claims, monetize the assets.

25       And, finally, something I started working on -- I'd say on
```

Seery - Direct                              50

1   my own, but that wouldn't be true -- with the DSI team,

2   particularly the two -- we have two excellent analysts on the

3   case.  A very detailed model of what I think has been referred

4   to maybe even in court as a potential grand bargain plan.  And

5   that plan looks at monetizing the assets over what period we

6   believe that we could get that done.  (inaudible) we're

7   looking at the values that we could achieve as well as setting

8   out what we think are reasonable numbers for the claim

9   distributions and then how they would be made.

10      Now, on the asset side of the ledger, we have a pretty

11  good understanding.  We obviously know where the assets are

12  bought, and we have a pretty good sense of what the current

13  market looks like for those assets.  We're not a forced

14  seller, but we have -- we have been involved in processes

15  around a number of the assets and have a good sense of where

16  values are and how long it would take to achieve those values.

17      You don't have to sell an asset as well to get money from

18  it.  There might be ways to finance those assets.  Although,

19  to be sure, in this environment, financing particularly these

20  types of assets has become very, very difficult.

21      The other side of the equation of the claims, and we're

22  using our best estimate of where we think those claims come

23  out in terms of payment, the creditors often have a different

24  view as to what they would like those claims to come out with.

25  So we're trying to figure out, through negotiation and

Seery - Direct                              51

1    discussion, how we get those two sides closer together.  And

2    that, that would be the grand bargain plan.

3        And I think where we're really focused now is that status

4    quo doesn't make sense.  We've gone that way too long.

5    Downsizing doesn't work because of the complexity of these

6    operations and the contractual obligations that the Debtor

7    has.  And it's really a grand bargain plan or a Debtor

8    monetization, a debtor-creditor monetization vehicle, which

9    would be structured like a trust and still be able to service

10   the business while resolving the claims.

11   Q    Taking into account the uncertainty because there are

12   still some options being considered, in your leadership role,

13   have you -- do you have a sense of timing?  Is there a

14   timeline by which certain milestones are at least

15   aspirational, if not achievable?

16   A    Well, I don't think I'm telling anyone what they don't

17   know, that deadlines get people to act and make decisions.

18   Sometimes they're good decisions, sometimes they're not, but

19   we're going to push forward on both of these plan

20   opportunities now.  So we intend to file a debtor-creditor

21   monetization vehicle plan, and we'll keep pushing the parties

22   towards settlements.

23       You know, as we say on the Multi-Strat negotiations, until

24   it was clear that we were either going to default, because we

25   didn't have the money to pay those premiums, or we're going to

Seery - Direct                                  52

1  file Multi-Strat as a bankruptcy, it was hard to get folks to

2  really come to the table and think about how to settle that

3  issue.

4     These issues in regard to the total case are much more

5  complicated.  We're going to file a plan.  We believe that

6  will set a bit of a crucible to folks to think about how to

7  move forward with their claims.  We are, as Jeff Pomerantz

8  mentioned last time, agreed in principle, but we have some

9  issues to work through with Redeemer that we hope to be able

10 to resolve by this week.  And so that's my internal goal, but

11 I expect to be able to do it.

12    The reason that's complex is not that it's simply a -- the

13 arbitration award is not simply a money award; it actually

14 requires certain offsets, it requires certain assets be sold

15 and paid for.  And we're trying to carve our way around some

16 of those, because they (inaudible) agreement, because they're

17 -- they're more difficult than simply exchanging cash for

18 assets, because we don't have the ability to do that right

19 now.  We don't have the cash, and we're in bankruptcy.

20    So I do believe that we can get these done.  And then if

21 mediation is something that would work, great.  We're going to

22 try to do it without mediation as well.  Going to try to do it

23 before we get to mediation and resolve claims.  And if we're

24 unable to do that, hopefully mediation will push it forward or

25 we have to have a fallback, which will be dispositive motions

Seery - Direct                                    53

1    with respect to certain of the claims.

2        But we expect to have and I think we have a number of

3    claims objections that have (inaudible).  We've resolved

4    those.  We're really down to three claims.  And one of them is

5    almost done.

6    Q   All right.  At the last hearing, --

7            MR. MORRIS:  Your Honor, that really does finish the

8    substance of the testimony with respect to this motion, but at

9    the last hearing Your Honor raised some questions about PPP

10   loans.

11           THE COURT:  Yes.

12           MR. MORRIS:  Would you like me to just take a moment

13   with Mr. Seery to address that?

14           THE COURT:  Yes, please.

15           MR. MORRIS:  Okay.

16   BY MR. MORRIS:

17   Q   Mr. Seery, you're aware that the Judge raised some

18   questions about whether and to what extent the Debtor may have

19   been involved in any of the PPP loans?

20   A   Yes.

21   Q   And have you done any work to try to figure out the

22   answers to the questions the Judge posed?

23   A   Well, work in response to the question, but also work

24   previously.  So, just a -- quickly, as I think we all know,

25   the PPP program was put forth to try to give companies cash

Seery - Direct                           54

 1   that they had to use for employee payments, to continue to

 2   keep payroll supported and to continue to have folks hold

 3   their jobs.

 4       We have -- and I think the *Business Insider* article, which

 5   I'm not familiar, I know the publication is not something I

 6   seen much, but I'm not familiar with the specifics of that

 7   article, and -- but any PPP, away from the assets that HCMLP

 8   actually owns or controls.  And we've got -- we've got three

 9   -- and I think there's some substance to the article.  But

10   we've got three businesses.  And these are -- this is public,

11   but I'll go into the -- sort of the obvious reasons without

12   going into the specifics of the business around the ones that

13   I know of well.

14       Carey Limousine is a business that transports folks in

15   high-quality cars from airports or from events or between

16   businesses.  It was hit severely by the COVID-19 pandemic.,

17   particularly with respect to the air transportation, which was

18   really one of its biggest areas.  The business,

19   notwithstanding Uber and the other type of shared ride

20   services, had actually done quite well, and Highland was an

21   owner of a significant portion of that business related to

22   some loans that it held in various funds.

23       That business's management, with its own outside counsel,

24   sought a PPP loan.  Then our director came to us and discussed

25   with the Board the propriety of that loan.  We engaged outside

Seery - Direct                                55

1   counsel, not bankruptcy counsel but counsel that had

2   particularized expertise in PPP, and spent a ton of time

3   really understanding both the law as well as the specific

4   regs.  Carey did get a PPP loan.  It is potentially

5   forgivable, depending on how it's used.

6       The second entity that was similar but didn't come to the

7   Board, we have a business called SSP, which is an excellent

8   highway business that provides equip -- materials for a lot of

9   different road construction, but primarily highway road

10  construction.  Very well run business.  That entity got a PPP

11  loan as well, primarily worried about whether the construction

12  on the highways would shut down.

13      So it's been -- I don't believe that's really happened in

14  Texas, which is where most of their business is, but they

15  qualified for that loan.  They did not come to the Board.  A

16  very specific carve-out, because one of the interest holders

17  that we share that position with is a Small Business

18  Administration fund and, so it was very clear that it was

19  entitled to that loan.

20      Then there's a third entity called Roma that got a very

21  small PPP loan.  We don't control the entity and we were not

22  involved in its acquisition of that loan.  Again, it would

23  have to be used as required.

24      One of the things I want to make sure that is in the

25  record and for Your Honor with respect to Carey, we spent a

Seery - Direct                              56

1   lot of time as a Board focused on, one, whether it was legal

2   to get that loan, first.  We're doing everything right, by the

3   book.  We're not going to play in the gray.  There is no gray.

4   There's black and white in these areas.

5       Number two, was it ethical, was it appropriate that we

6   went and got this loan or that Carey went and got this loan?

7   Management, with the outside counsel, was sure that we could

8   do it, but we didn't want to take their word for it, so we

9   went out and got our own counsel, third-party counsel for the

10  Board to make sure that this was appropriate.

11      Three, the requirements around these loans are significant

12  and the penalties for violating them are severe.  So if you

13  get a loan by mistake, are you really required to pay it back?

14  And if you're mistaken, that will be expensive, but it won't

15  be a real penalty.  But if you get a loan that's really

16  inappropriate, that you shouldn't have gotten, that was a

17  material misstatement of any of the facts around it, the

18  penalties are significant.  And not only in terms of the

19  opprobrium that you'd suffer in the press, because that's

20  coming, but in terms of how you use the funds.

21      So they can only be used in very specific ways, and we

22  were exceptionally careful around this program.

23      The basis of the program is to keep people employed.  And

24  with a business like Carey Limousine in particular, where

25  there's a significant amount of debt, where the business is

Seery - Examination by the Court          57

1   shut down by COVID, where we didn't have the funds to put into

2   Carey, nor even if we wanted to, we might not have been able

3   to do it without the Committee's approval because of the

4   protocol, a PPP loan was not only legal but it was

5   appropriate.  And it's being used in that fashion, meaning to

6   keep employees employed.

7   Q    Thank you very much, Mr. Seery.

8           MR. MORRIS:  Your Honor, I have no further questions

9   of Mr. Seery.  Does the Court have any questions?

10          THE COURT:  I actually have a follow-up question

11  regarding the PPP, just to kind of put a bow on this.

12                  EXAMINATION BY THE COURT

13          THE COURT:  I'm looking at the demonstrative aide.  I

14  don't know if you, Mr. Seery, have it there handy.

15          THE WITNESS:  I do, Your Honor.

16          THE COURT:  Okay.  So I'm turning to Page 6, the

17  chart, the subchart, Investments and Subsidiaries.  The third

18  column, Privately-Held Equity, Various Companies.  I mean,

19  that would be the type of investment entity we're talking

20  about here that got the PPP loan:  Carey Limousine, SSP, Roma?

21  Nothing that was -- well, I'm going to say Highland affiliate.

22  Affiliate, that's a dicey term, but that's the type of entity

23  in the organizational structure we're talking about, correct?

24          THE WITNESS:  Those are the ones -- I want to be very

25  careful, because I know what I know and I know I won't

Seery - Examination by the Court                58

1   represent anything that I don't know.

2       So, with respect to the entities that HCMLP, the Debtor,

3   controls, that's absolutely the case.  I don't know, and I can

4   try to find out, but they are not HCMLP-controlled entities.

5   Whether other entities in the related-party complex received

6   loans -- so, obviously, HCMLP did not receive a loan.  And the

7   only entities that we were involved with is the ones I

8   mentioned to you.

9       And I should mention, there are other entities in the

10  privately-held equity that got other government money, in the

11  medical space, that they didn't even ask for.  HHS pushed

12  forward payments to folks in the business, medical healthcare-

13  providing businesses, to assure that they had liquidity to

14  provide.  And so -- and this has been described to me exactly

15  this way, that they woke up in the morning and found money in

16  their account.  And with one of the companies, they actually

17  returned a bunch of the money because it was from a dormant

18  provider number and they didn't believe it was appropriate to

19  keep that money.  So that was one of the entities that we

20  control with other investors.

21      But with respect to our HCMLP entities, these are the only

22  ones I know.  With respect to other related entities that

23  might be in the family of businesses, for lack of a better

24  term, that were alluded to in the *Business Insider* article, I

25  don't know that answer.  So, I -- if I -- I can try to find

Seery - Examination by the Court                    59

1   out.  I just don't know the answer, Your Honor.

2          THE COURT:  All right.  Thank you.  Well, this has

3   been extremely helpful.

4      I should ask does anyone have any questions of Mr. Seery?

5   The Committee counsel, perhaps?  Anyone else?

6          MR. CLUBOK:  Your Honor, this is Andrew Clubok.  In

7   light of the testimony, I do have some questions on behalf of

8   UBS.

9          THE COURT:  All right.  Briefly.  Go ahead.

10          MR. CLUBOK:  Okay.

11          MR. MORRIS:  Your Honor?  Your Honor, I'm sorry to

12   interrupt, but there's no objection lodged here.  If Your

13   Honor wants to permit it, that's obviously the Court's

14   prerogative.  But as just a point of order, having not lodged

15   an objection, I don't know what right anybody has to cross-

16   examine the witness.

17          THE COURT:  All right.  Well, that's why I said

18   briefly.  I think that Mr. Morris makes a good point, Mr.

19   Clubok.  You could have filed a written objection, response,

20   comment, or something.  So, you're a party in interest.  I'll

21   give you a little bit of leeway here.  But please keep it

22   brief.

23          MR. CLUBOK:  Yeah.  Thank you, Your Honor.  It's just

24   some of the things that Mr. Seery said which we didn't expect

25   to hear that has raised a few questions that I just very

Seery - Cross                                60

1   briefly will try to address.

2                        CROSS-EXAMINATION

3   BY MR. CLUBOK:

4   Q   Mr. Seery, good afternoon.  I'm Andrew Clubok, Latham &

5   Watkins, on behalf of UBS.

6       Mr. Seery, you talked about the fiduciary duties you've

7   understood yourself to have with respect to certain parties,

8   and my question to you is:  Have you understood, since the

9   beginning of your service as an Independent Director of

10  Strand, that you had fiduciary duties to the unsecured

11  creditors of the Debtor?

12  A   It's a -- it's a -- the answer is I understand the

13  fiduciary duties very well.  I think we have fiduciary duties

14  to the estate.  So Highland -- what I tried to explain is that

15  Highland, as an asset manager, has very specific fiduciary

16  duties that are set forth in (inaudible) in the cases and the

17  rules that have interpreted it.  We, as directors of Strand,

18  have a duty to the estate.

19      I don't think it's -- I don't think it's fair, and I'd

20  have to subject myself to some education from counsel, I don't

21  think it's fair to say we had a specific fiduciary duty to a

22  particular creditor.

23      So, for example, if I had a fiduciary duty to UBS, it

24  would be very difficult for me to object to UBS's claim.  It

25  would be -- I don't know how I could do that as a fiduciary.

Seery - Cross                                        61

1    When the claim is crystalized in the estate, I believe that we

2    have fiduciary duties to each and every interest holder in the

3    estate.

4    Q    My question is a little simpler, and I just -- well, I'm

5    actually not asking legally whether you do or not.  I'm asking

6    what your understanding has been since your role.  Have you

7    conducted yourself in a way in which you have treated your

8    obligations as though you have a fiduciary obligation to the

9    unsecured creditors?

10          MR. MORRIS:  Objection to the form of the question.

11          THE COURT:  Sustained.

12          MR. CLUBOK:  Okay.

13   BY MR. CLUBOK:

14   Q    You said that you believe that you have, with respect to

15   Multi-Strat, which is an entity that you manage, you said that

16   you understood yourself to have fiduciary duties to the

17   redeemers of Multi-Strat.  Do you recall that?

18   A    Yes.

19   Q    Yeah.  And Multi-Strat is outside of the estate, but HCM,

20   the Debtor manages Multi-Strat.  And you said because of, you

21   know, your role, you personally feel as if you have a

22   fiduciary duty to the redeemers in Multi-Strat, correct?

23   A    I --

24          MR. MORRIS:  Objection to the form of the question.

25   Mischaracterizes the testimony.

Seery - Cross                                          62

1              THE COURT:  Sustained.

2              MR. CLUBOK:  Your Honor, I believe that the

3     transcript -- I believe Mr. Seery said in direct that he

4     considered himself to have fiduciary duties with respect to

5     the redeemers of Multi-Strat.  The transcript will show it.  I

6     don't know what the objection is.  Maybe I misstated when I

7     asked my question, but I'm just starting --

8              THE COURT:  Okay.

9              MR. CLUBOK:  I'm just trying to understand --

10             THE COURT:  All right.  I'll let you rephrase the

11    question, but this -- I've probably -- I may have made a

12    mistake in letting you ask questions, because this is about

13    the propriety of him being CEO and the reasonableness of

14    compensation.  This isn't a discovery opportunity.  So I'm a

15    little confused the relevance of what you're asking.  Could

16    you address that for me?

17             MR. CLUBOK:  Sure.  Your Honor, Mr. Seery on direct

18    described what he understood his fiduciary duties to be.  I

19    think we -- it made me wonder, he didn't mention the unsecured

20    creditors or what he believes his fiduciary relationship is,

21    if any, with the creditors, unsecured creditors.  I would -- I

22    think it's a fair question to ask what his understanding is,

23    because now he's going to take on a new role as CEO, and I

24    think it's appropriate for everyone to understand, so we know

25    when we're dealing with Mr. Seery --

Seery - Cross                                    63

1           THE COURT:  Okay.

2           MR. CLUBOK:  -- what his --

3           THE COURT:  I think -- I think he --

4           MR. CLUBOK:  -- he understands -- what he understands

5    his fiduciary duties to be.

6           THE COURT:  I think he answered the question, and

7    frankly, I think he answered it correctly.  His fiduciary

8    duties go to the estate, right?  And the creditors are the

9    beneficiaries of his actions in that regard, right?  So I

10   think he correctly answered the question already.  All right?

11   Next question.

12          MR. CLUBOK:  Okay.  He says that there's three

13   aspects of the business he's been managing: $300 million,

14   roughly, of Highland's own assets; the fact that they manage

15   $3 billion in other assets, I think in managed assets; and

16   then they have shared services for $6 billion in assets owned

17   by related entities, mostly.

18   BY MR. CLUBOK:

19   Q    For those three separate businesses, I just want to

20   briefly understand:  With respect to the first one, for

21   example, there's $300 million, you said, roughly, of

22   (inaudible) assets.  Roughly what were the value of the assets

23   when you started your role in January of 2020?

24   A    It's hard to compare apples to apples on this because

25   there are certain assets that we've taken out that didn't

Seery - Cross                                        64

1   change in value.  So I would say they were carried on the

2   balance sheet at different levels.  I think a good rough

3   number would be in the $500 to $600 million area.

4   Q    Okay.

5   A    And the biggest -- the biggest movants in asset values

6   have been on securities, both ones that we continue to own and

7   the accounts that Jefferies -- that were levered, and those

8   were shown as unlevered marks on the balance sheet and the

9   losses that were incurred there.  And then with respect to

10  certain of the PE assets and then a major movement on a

11  related-party loan, where the Board, through analysis that we

12  did with DSI and others, believes that loan is likely to be

13  worthless.  Likewise, the claim of that entity we believe is

14  likely to be worthless.

15  Q    And then to the extent the assets, you say, have a rough

16  value of $300 million, you alluded to significant professional

17  fees, bankruptcy costs, administrative fees, the Debtor is

18  burning cash.  My question is, If it's $300 million today

19  roughly of total value of assets, what's your current best

20  estimate of the total amount that will be available to be

21  distributed to the creditors net of those -- that burning of

22  cash and the admin fees and the other issue that you

23  mentioned?  What is your current expectation of the total

24  amount that will be able to be distributed to the creditors?

25          MR. MORRIS:  Your Honor, just -- I just object to

Seery - Cross                        65

 1  this line of inquiry.  It's like free discovery, as Your Honor

 2  suggested earlier.  I don't know what it has to do with Mr.

 3  Seery's work, his qualifications, the compensation

 4  arrangements.  And I think it's inappropriate.

 5        THE COURT:  Okay.  I'll overrule and allow this one

 6  remaining question, but that's going to be it, unless your

 7  next questions pertain to the employment or compensation

 8  structure.

 9        THE WITNESS:  Yeah, I don't have a crystal ball as to

10  what the assets are going to be worth.  I think that they are

11  fairly marked right now, and we have significant discovery

12  that we've had with respect to a number of the assets and

13  marked at views as to their value.  So I think that we're at a

14  pretty good base value, assuming that we don't rush into

15  forced sales of assets.

16     So, as I know the Court is aware and I hope you're aware,

17  when you look at asset values, and you look at them on a

18  liquidation basis, the numbers are normally much lower than

19  when you look at them as selling them on a more controlled

20  basis.  If you have liquid securities, that's not the case.

21  So if I have $500 million of Apple at $363 today, it's

22  probably a good chance that it'll be worth something different

23  in a month, something different in two months.  But if I need

24  to move my position, I can do that.

25     These assets are much more difficult to move.  And the act

Seery - Cross                         66

1   of selling them often changes the value, which is why we

2   engage professional bankers to help move, first, those assets.

3        So I just don't have a good crystal ball.  I think the

4   valuations that we have now are pretty good.  I think they've

5   been scrubbed well.  But that doesn't mean that certain of

6   these assets will maintain the exact value they have.  So, I

7   gave a good example of Carey Limousine, which is a very small

8   asset but it's an easy one to understand because everybody can

9   relate to a car service company that does, you know, a little

10  bit more high-end and is focused on the airport travel and how

11  that's been impacted.

12       That asset value has gone down precipitously, even though

13  it was small, because of that.  So I don't -- I don't really

14  have a great crystal ball as to what's going to happen.  If

15  we're very successful in the fourth quarter and the economy

16  stabilizes and the COVID vaccines are out in record time and

17  move forward, then I think we've got potential for upside.

18  But right now, in the current environment, I think we're

19  marked fairly.

20  BY MR. CLUBOK:

21  Q   Yeah.  But my question really wasn't about the value of

22  the assets.  I realize those could go up or down.  And you

23  think they're fairly marked.  My question was, What's the

24  total amount of setoff from those assets to the extent the

25  bankruptcy fees you alluded to, the burning of cash on the

Seery - Cross                          67

1    other businesses, you know, how much, you know, net -- what's

2    the amount that will come off of those assets or that should

3    be -- that we should assume will be deducted from those assets

4    because of the professional fees that have been incurred or

5    you predict will be incurred through the end of the year and

6    the burn of cash that you mentioned, et cetera?

7        I'm trying to understand how you supervised -- because

8    you've managed those expenses as well as the assets, right?

9    And so I just think it's important for us to understand, at

10   the end of six months, and then how things are set for the

11   rest of the year, what's the total amount of, you know, call

12   it liabilities or costs associated with running the business,

13   running the business and at a cash burn rate, bankruptcy fees,

14   et cetera, that we --

15            THE COURT:  Okay.  I'm going to cut it off.  I'm

16   going to cut it off.  That, in my view, is going a little too

17   far afield.  That's a discussion outside the courtroom.  So,

18   thank you, and we're going to see:  Does the Committee have

19   anything they want to ask?

20            MR. CLEMENTE:  Your Honor, Matt Clemente on behalf of

21   the Committee.

22       I certainly do not have any questions to ask.  I do have a

23   couple of statements that I want to make, but I don't know if

24   now is the appropriate time or if there's going to be further

25   testimony.

Seery - Examination by the Court                68

1          THE COURT:  Okay.  I think there might be another

2     witness or two, but we'll let you make your comments at the

3     appropriate time.

4                    EXAMINATION BY THE COURT

5          THE COURT:  Mr. Seery, I meant to ask, I forgot to

6     ask:  You've mentioned a couple of times the Debtor, Highland,

7     has 70-ish employees.  Has the number gone down since the case

8     was filed, is Highland losing employees, or is it staying

9     stable?

10         THE WITNESS:  We lost -- we lost seven employees.

11    There were some that were severed for performance reasons.

12    That happens every year.  There were some that just moved on

13    because they decided to move on.  And that some -- and then we

14    had some that, because of the bankruptcy, we lost.  We added,

15    I think, one or two employees that we're pretty excited about

16    in the fund valuation area, which is a pretty critical area

17    for the shared services.  Unfortunately, they haven't been

18    able to go to the office, but fortunately, they've been able

19    to work.

20       So we're down, Your Honor, probably eight total, and so

21    we're more of the low to mid-60 area right now.

22              THE COURT:  Okay.  And --

23              MR. SEERY:  And we were a little bit north of 70 when

24    we took the case.

25              THE COURT:  Okay.  And the COVID situation, I mean,

Seery - Examination by the Court          69

1  if you walked into the office, would there be people around in

2  masks, or are people still working at home?

3          MR. SEERY:  People -- so, in -- yeah.  So, in March,

4  very early on, as things started to shut down, Brian Collins,

5  who's the director of human resources and an accomplished

6  professional, came to the Board and basically said, you know,

7  yeah, Texas is better, but it's not immune.  We need to come

8  up with a program.

9      And with Russ Nelms and John Dubel and I, we developed a

10  program, with Brian -- with Brian driving it, to figure out

11  exactly how to approach going into the office; how we would

12  maintain the office; and then, if something were to happen,

13  what we would do.

14      We had an employee who, with her family, got COVID in --

15  we believe in New York, came back.  And as soon as we found

16  out that person wasn't feeling good in the office, it was the

17  first day they were back, a protocol with thermometers and --

18  at that time, thermometers were thought to be valuable -- we

19  immediately sent that employee home.  We then brought in a

20  cleaning crew to clean up the office with EPA and FDA-approved

21  materials, and then had several days off and brought folks

22  back the following week.

23      We found that to be, frankly, unwieldy as COVID started to

24  continue to creep a bit through March and into April.  At that

25  point, we did have other employees, not who came into the

Seery - Examination by the Court          70

1    office, but who had contracted COVID, so we shut down HCMLP.

2    When we cleaned the office, we shut it down completely.

3    Nobody could go in.

4         When -- since then, we have set the office up where we had

5    initial (inaudible) when things were pretty good, so we

6    divided the move into -- into basically 20 percent could be in

7    the office at any one time.  And then, since that time, as

8    things have gotten worse, we found that we were, one, working

9    extremely well offsite; and two, that it was just a better

10   environment for the employees.  So we've been working

11   continually offsite.

12        If folks need to go in, because either they need more

13   advanced systems that they can't go to plug-and-play at home,

14   or because there's just materials that they want to get,

15   they're able to do in.  We have tons of disinfectant

16   everywhere.  We have masks available.  We put in dividers,

17   Plexiglas dividers between the work stations to assure that if

18   someone was at a station for a long time, it didn't -- it was

19   less likely that you could have transmission.

20        I will tell Your Honor that HCMLP is not reporting to the

21   office.  Some of the affiliated businesses, and I don't know

22   the percentage, have been.  So those businesses, which we

23   don't control, are going in.

24        From my perspective, as long as the numbers are where they

25   are in Texas, from both a business perspective in terms of

Seery - Examination by the Court                71

1    making sure that the employee base doesn't contract COVID in

2    material amounts -- first, any amount -- but in material

3    amounts that would impact our ability to run the business.

4    And then with respect to the civic part of it, which is we

5    don't want to be a part of forcing the spread or causing the

6    spread of this disease, we know we can work from home.  We're

7    going to continue to do that until we believe it's very safe

8    to go back.

9        Notwithstanding that we have the ability and have been

10   doing it with extensive cleaning, extensive disinfectant, and

11   with dividers, until we are very comfortable that we can go

12   back and protect our employees and that it's the right civic

13   thing to do, we're not going to go back, particularly since it

14   doesn't impact our ability to perform.

15           THE COURT:  Okay.  I really want to, you know, get to

16   the rest of our hearing soon, but I heard something that made

17   me have a question.  You said there are other entities we

18   don't control whose employees are going in.  Could you tell me

19   exactly what you meant by that?

20           THE WITNESS:  There's -- away from HCMLP, there's

21   approximately another 75 to 80 -- it may be slightly more --

22   employees at the other entities that are NexPoint, NexBank,

23   NexPoint Advisors.  They are under different protocols that

24   neither I nor Russ nor John control.  The office --

25           THE COURT:  Let me just stop you.

Seery - Examination by the Court                72

1          THE WITNESS:  Please.

2          THE COURT:  So it's just Nex -- well, NexPoint-

3   related companies?

4          THE WITNESS:  Uh-huh.

5          THE COURT:  NexPoint and --

6          THE WITNESS:  Yes.

7          THE COURT:  -- affiliates of NexPoint?

8          THE WITNESS:  Correct, Your Honor.  The office, the

9   HCMLP offices are huge.  And when we were there pre-COVID,

10  with the full complement of folks, it felt like they were

11  relatively empty.  I shouldn't say -- they felt like there was

12  plenty of space.

13      What we found, with both sets, our employees and then the

14  NexPoint-related employees, when 140 or 150 people were in

15  that office, which pre-COVID felt comfortable, post-COVID

16  didn't feel so comfortable.  So our employees, we started, as

17  I mentioned, with the shift-working.  And then we decided to

18  go completely mobile unless somebody feels they have to be in

19  the office, and we want to make sure that they follow the

20  protocols when they do.

21      With respect to the non-HCMLP related entities, those

22  entities, some percent of those employees are still going into

23  the office.

24      Now, when they're there, to be frank, what I said was a

25  pretty comfortable place with 140 people is a pretty empty

Seery - Examination by the Court                73

1    place if there's only 50.  But our employees, we felt it was

2    important, since we were able to execute from home, we didn't

3    need, on most parts, the extra systems to be able to execute

4    in the office, that we could largely perform from home to make

5    sure that we weren't taking any risks with the business but

6    also taking -- one, taking risks for the employees; two,

7    taking any risks for the business; and three, as I mentioned,

8    the civil perspective.

9         THE COURT:  Okay.  We're going to have to take a

10   five-minute break here in just a second, but let me kind of

11   elaborate on why I was drilling down on that question about

12   NexPoint.  I mean, isn't it Highland employees who service

13   NexPoint?  Or am I wrong about that?

14        THE WITNESS:  Highland employees service a lot of

15   NexPoint.  But NexPoint, NexBank, the various funds, NXRT,

16   there's a number of businesses:  They have their own employees

17   as well.

18        THE COURT:  Okay.

19        THE WITNESS:  So the whole complex is about 150

20   employees.

21        THE COURT:  Okay.

22        THE WITNESS:  Highland Management is about 70.

23        THE COURT:  Okay.  All right.  Well, are we finished

24   with Mr. Seery's testimony, Mr. Morris?

25        MR. MORRIS:  Yes, Your Honor.  Our next witness after

Seery - Examination by the Court              74

1    the break will be John Dubel.

2              THE COURT:  Okay.  Very good.

3              MR. MORRIS:  And we --

4              THE COURT:  Mr. Seery, again, this has been extremely

5    helpful for me, and I hope for others.  I hope you'll stick

6    around, because when we circle back to the mediation

7    discussion at the end of today, I really would like you to be

8    involved in that discussion.  I may want your input on one or

9    two things.  So can you stick around?

10             THE WITNESS:  Absolutely, Your Honor.  Other than

11   getting some water and maybe turning the air conditioning back

12   on in this room, I'll stay.

13             THE COURT:  You must not be in Texas if you don't

14   have your air conditioning on.  I assume you're in New York.

15   All right.  Five-minute break.  We'll be back.

16             THE WITNESS:  It's hot, but not Texas hot.

17             THE COURT:  Okay.  Thank you.

18             THE WITNESS:  Thank you, Your Honor.

19             THE CLERK:  All rise.

20        (A recess ensued from 3:16 p.m. until 3:22 p.m.)

21             THE CLERK:  All rise.

22             THE COURT:  All right.  Please be seated.  We're back

23   on the record in Highland.

24        Mr. Morris, you were going to call Mr. Dubel next?

25             MR. MORRIS:  Yes, the Debtor calls John Dubel.

Dubel - Direct                        75

1              THE COURT:  Dubel?

2              MR. DUBEL:  Your Honor, may I have just one minute to

3    -- my air conditioner.

4              THE COURT:  All right.  Mr. Dubel, I said your name

5    wrong.  Could you say Testing 1, 2?

6              MR. DUBEL:  I can do that, Your Honor.  Testing 1, 2.

7              THE COURT:  Okay.  Very good.  Please raise your

8    right hand.

9                   JOHN DUBEL, DEBTORS' WITNESS, SWORN

10             THE COURT:  All right.  Thank you.  Mr. Morris, you

11   may proceed.

12             MR. MORRIS:  Thank you, Your Honor.  As Mr. Pomerantz

13   previewed, Mr. Dubel's testimony is going to largely cover the

14   corporate governance-type issues concerning the evolution of

15   the motion, the discussions or the, you know, beginning of the

16   discussions, and how the proposal itself evolved.

17       If I may, Your Honor, just to perhaps move this along, I

18   might lead the witness a little bit.  If it's a problem,

19   you'll let me know, okay?

20             THE COURT:  Okay.  I will let you know if it's a

21   problem.

22             MR. MORRIS:  Okay.

23                        DIRECT EXAMINATION

24   BY MR. MORRIS:

25   Q    Good afternoon, Mr. Dubel.  You're a member of the Board

Dubel - Direct                    76

```
 1   of Strand today; is that right?

 2   A    I am.

 3   Q    And you've held that position since mid-January; is that

 4   right?

 5   A    Since January 9th, yes.

 6   Q    Okay.  And you understand that we're here today on the

 7   Debtors' motion to appoint Mr. Seery as the Debtors' CEO, CRO,

 8   and the Foreign Representative?

 9   A    I do understand that, yes, sir.

10   Q    Does the Board unanimously support the motion?

11   A    I think the Board does, and specifically the compensation

12   committee, because of obviously the conflict that Mr. Seery

13   might have, you know, but the Board fully supports it, and the

14   compensation committee is comprised of Mr. -- Judge -- Judge

15   Nelms and myself.

16   Q    Okay.  And do you believe that -- withdrawn.  Does the

17   Board believe that it's in the Debtors' best interests to

18   retain Mr. Seery on the terms proposed?

19   A    We do.

20   Q    And why does the Board believe that?

21   A    Well, as the Court has heard from the testimony of Mr.

22   Seery today, he has a tremendous amount of skills and

23   experience in the area of asset management.  He's effectively

24   been serving as the CEO since -- well, in a lot of ways, since

25   January 9th, when we asked him to step up and take on some
```

Dubel - Direct                                      77

1   additional responsibilities, but very clearly since the middle

2   of February, and specifically, the middle of March.

3        And as the Court noted, he is -- knows these assets very

4   well.  He knows the operations.  He's done an exemplary job of

5   handling all of the issues.  He has spent a tremendous amount

6   of time working with the Committee members, trying to develop

7   good lines of communications.

8        And, you know, Russ -- having, you know, served in a C

9   Suite position for 25 years of my 30-plus years of

10  restructuring experience, and 15 years as a CEO, we need a

11  good leader, an operational leader to run the organization.

12  So we can support him because you need to have someone in

13  there who can make decisions; work quickly; obviously,

14  communicate well with the Board, which he has been doing for

15  quite some time.  So, all the -- all of the reasons why we are

16  very pleased to have him take on this role.

17  Q    Okay.  Let's talk a little bit about what led to this

18  particular motion.  Do you recall when the idea of appointing

19  a CEO first arose?

20  A    I would say it was back in December, before the

21  Independent Board was put together, when we first started

22  intervening with the creditors and with the Debtor.  It was

23  raised to me in my interview, would I be, you know, willing to

24  step in as a CEO if asked to?  And I'm assuming it was also

25  asked of Mr. Seery.  I didn't ask him that.  And it was all

Dubel - Direct                          78

```
 1   obviously coming, you know, out of the protocols that were

 2   being developed where Mr. Dondero would step down as the CEO

 3   and the Independent Board would basically be responsible for

 4   the operations of the company.  But we had the opportunity to

 5   go out and seek either one of the three Independent Board

 6   Members as the CEO or go outside to the marketplace and try

 7   and find an independent or a third-party CEO.

 8   Q    And to the best of your recollection, was that flexibility

 9   built into the term sheet that was part of the corporate

10   governance settlement?

11   A    It was.

12   Q    All right.

13          MR. MORRIS:  Your Honor, this is where we're going to

14   test our technological capabilities.  I'm going to ask Ms.

15   Canty to put up and to share Exhibit 1, and let's see if we're

16   able to do that.

17          THE COURT:  Okay.  But if anything goes wrong, I

18   actually do have the docket up on my screen.  I can pull them

19   up.  But, oh, even better.  Even better.  Okay.

20          MR. MORRIS:  All right.  It looks like it worked.

21   Ms. Canty, if you could turn to Page 2, please.  I think

22   that's Page 1.

23      (Pause.)

24          MR. MORRIS:  I think it's stuck.

25          THE COURT:  Hmm.
```

Dubel - Direct                                    79

```
 1          THE WITNESS:  If need be, I have a teenager who could
 2   probably figure this out, because I sure can't.
 3          MR. MORRIS:  I'm impressed that La Asia got to this
 4   point already.  Okay.  Good.  Just the one on the right.  Is
 5   there a way to focus in on the top paragraph on the right?
 6          THE WITNESS:  I'll put my glasses on and I'll be able
 7   to read it.
 8          MR. MORRIS:  Okay.  Right there.  Perfect.
 9   BY MR. MORRIS:
10   Q    Is -- are you familiar with the provisions generally in
11   the term sheet relating to the opening of CEO?
12   A    I am.
13   Q    And is this the provision that you were referring to
14   earlier?
15   A    It is.
16   Q    And does this provision, to the best of your
17   understanding, provide the Board with the flexibility, in
18   consultation with the UCC, to exercise its business judgment
19   and appoint a CEO if it determined that to be in the Debtors'
20   best interest?
21   A    It does.  It's consistent with the discussions had -- that
22   were had prior to our appointment, and it obviously was
23   incorporated in the term sheet that was approved by the Court
24   on January 9th.
25   Q    And this also reflects the understanding that you
```

Dubel - Direct                          80

 1  described earlier, where one of the Independent Directors

 2  could, in fact, be selected as the CEO; is that right?

 3  A    That is correct.

 4        MR. MORRIS:  All right.  Let's just take that down,

 5  please, Ms. Canty.

 6  BY MR. MORRIS:

 7  Q   Mr. Dubel, has Mr. Seery, in fact, taken on day-to-day

 8  operational responsibilities for the Debtor?

 9  A    Yeah.  Yes, he has.  And I think early on the Board

10  realized that, between the three Board members, we would try

11  and divvy up the responsibilities, as Mr. Seery referred to

12  earlier, and it was definitely like drinking from a fire hose

13  in the early stages of the case, where the new Board was put

14  in place.  And we tried to divvy up our responsibilities,

15  taking into consideration each of the Board Members'

16  expertise.

17     But it was pretty clear that the main business operations

18  required somebody with the skill set that Mr. Seery had, and

19  it would be much more efficient, as we progressed forward, to

20  coalesce around one individual as a CEO.

21        MR. MORRIS:  Ms. Canty, can you pull up Exhibit 2?

22  BY MR. MORRIS:

23  Q   And while we're doing that, Mr. Dubel, do you recall early

24  on that the Board asked Mr. Seery to become involved in the

25  trading of the prime accounts?

                              Dubel - Direct                    81

1   A    I do, yes.

2   Q    Okay.

3           MR. MORRIS:  La Asia, I don't know if you can scroll

4   down just to --

5       Your Honor, these are minutes from the Board's very first

6   meeting.  And if we go to the next page, right here, you'll

7   see there's a discussion in the second paragraph.

8   BY MR. MORRIS:

9   Q    Mr. Dubel, does that reflect the Board's deliberation and

10  decision, really, on the first day, to give Mr. Seery, you

11  know, the responsibility for dealing and overseeing the prime

12  accounts?

13  A    It does.  And what I was saying is, prior to the

14  appointment, in doing all of our diligence prior to joining

15  the Board, we realized there were all these issues that needed

16  to be dealt with.  And so we came in on the very first day,

17  ready to recognize that there were certain things that needed

18  sort of expertise.  And they were presented to us by DSI and

19  the management of HCMLP as areas that needed some additional

20  handling and oversight.  And so we asked Mr. Seery to step

21  into that role on the very first day, which he -- which he

22  agreed to and the Board approved it.

23  Q    Okay.  Let's get to the meat and potatoes here.  Did there

24  come a time when the Board and Mr. Seery actually began

25  discussing the possibility of his serving as the CEO?

Dubel - Direct                              82

1  A     Yes, there did.

2  Q     And can you share with the Court your recollection of how

3  that began?

4  A     So, there were informal discussions, I would say, through

5  the month of February, as we started to realize that there

6  were -- the decision-making was going to be cumbersome,

7  having, you know, three parties involved.  As I said earlier,

8  having spent 15 years or so my career as a chief executive

9  officer, I understand where you really want to have one person

10  be responsible for these issues.

11      And so we were conversing with Mr. Seery to see if he

12  would take on that role.  And, obviously, we had felt very

13  comfortable, Mr. Nelms and I felt very comfortable with the

14  communications that he was having with us on things that we

15  had asked him to do.  There was a very free and open

16  discussion with the Board members.  So we continued, you know,

17  to look at opportunities where it might make sense.

18      And then, you know, towards the beginning of March, it was

19  pretty obvious that we were going to want to coalesce around

20  the motion.  We thought about whether or not that would be

21  some third party.  But having, again, experience of having to

22  go out in the marketplace to find CEOs when I'd been either,

23  you know, a director or involved in companies, we realized

24  that can be very time-consuming, would take us months to find

25  somebody.

Dubel - Direct                              83

1      And so we continued to discuss it with Mr. Seery.  And

2    around the middle of March or so, right around the time that

3    we had a Creditors' Committee meeting in New York, we asked

4    Mr. Seery if he would take that role on, and he agreed to, to

5    take that role.

6    Q    And that's -- and is that why the Debtor is seeking

7    authority to retain Mr. Seery nunc pro tunc back to March

8    15th?

9    A    We are.  I mean, effectively, he really started the role

10   in the February time frame.  But we officially asked him about

11   this in -- right after that meeting on March -- I think it was

12   March 11th or so.

13   Q    So, is it fair to say that's when the Board had a meeting

14   of the minds with respect to not necessarily the terms but at

15   least the engagement of Mr. Seery as CEO?

16   A    Yes, that is fair to say.

17   Q    Okay.

18   A    And that's when he really did step up and take on all of

19   those responsibilities, you know, with the acknowledgement and

20   understanding that we would work out the appropriate terms for

21   his engagement.

22   Q    Okay.  And a couple of weeks later, do you recall that Mr.

23   Seery made a written proposal to you and Mr. Nelms?

24   A    He did make a written proposal after, you know, having

25   discussions with us orally about various issues and roles and

                              Dubel - Direct                    84

  1    responsibilities.  I think it was around April 4th or so that

  2    he presented us with a written proposal.

  3           MR. MORRIS:  All right.  Ms. Canty, can you call up

  4    Exhibit 3, please?  (Pause.)  Okay.  If you'll scroll down.

  5    BY MR. MORRIS:

  6    Q   Mr. Dubel, is this the April, the early April e-mail that

  7    you were referring to in which Mr. Seery made a proposal for

  8    the terms of his engagement as CEO?

  9    A   Yes.  This document refreshes my recollection.  It wasn't

 10    April 4th.  It was April (audio gap).  But yes, that's the

 11    document I was referring to.

 12    Q   Okay.  What happened next, after -- after the -- after

 13    this was presented to you and Mr. Nelms?  What did you guys

 14    do?

 15    A   So, what we wanted to do is understand what was our

 16    responsibility as a board.  So we reached out to counsel to

 17    figure out how the process should work.  We set up a

 18    compensation committee.  It's called a comp committee; it's

 19    more I would call it a nomination committee or a governance

 20    committee also, because it was all about retaining Mr. Seery

 21    in that role.

 22       We got advice from counsel on what the process should be.

 23    We reached out to our compensation consultant at Mercer, who

 24    had been providing us assistance in other areas of the

 25    company's compensation program, to talk to them about what the

Dubel - Direct                              85

1   various market comps, you know, compensation programs were and

2   what would be an appropriate market comp for Mr. Seery's

3   compensation, and, you know, moved forward that way.

4              MR. MORRIS:  Ms. Canty, can you pull up Exhibit 4,

5   please?

6   BY MR. MORRIS:

7   Q    Do you know what this document is, Mr. Dubel?

8   A    Yes.  This looks like the minutes from the meeting of our

9   first compensation committee on April 8th, compensation

10  committee of Strand Advisors.

11  Q    And this was a meeting between you and Mr. Nelms, with

12  counsel; is that right?

13  A    That is correct.

14  Q    And this was precipitated by Mr. Seery's written proposal

15  that was made a few days before that; is that fair?

16  A    Well, I would say it was precipitated by the advice we had

17  gotten through counsel that we should set up a compensation

18  committee and consider what would be the appropriate way of

19  retaining Mr. Seery, you know, as a chief executive officer.

20  His proposal came in a couple of days earlier than that, and

21  so this was our first official time to get together as a

22  committee and review it and discuss the issue.

23  Q    And was this a contemporaneous record of the steps that

24  the compensation committee took to do its due diligence with

25  respect to the proposal?

Dubel - Direct                           86

```
 1   A    It is.

 2   Q    Okay.  Did the compensation committee --

 3          MR. MORRIS:  You can take that down, Ms. Canty.

 4   BY MR. MORRIS:

 5   Q    Did the compensation committee communicate with the

 6   Creditors' Committee with respect to these matters?

 7   A    We did.

 8   Q    Can you --

 9   A    As a part of the protocols, one of the things I -- and I'd

10   go back and re-read the protocol language, but one of the

11   things it said was work with the UCC to determine who would be

12   an appropriate CEO.  And so we realized we would do that, and

13   we started to reach out to the various members of the

14   Creditors' Committee to discuss that.

15   Q    Okay.  And do you recall whether the compensation

16   committee or the Debtor generally shared Mr. Seery's proposal

17   with the Committee?

18   A    We did.  I don't recall the exact date, but we did share

19   it with the UCC through the UCC counsel.

20   Q    Do you recall if the report that was commissioned by the

21   Debtor with respect to Mercer, the Mercer Report, was that

22   shared with the Committee?

23   A    It was.

24   Q    Can you describe for Judge Jernigan your recollection as

25   to, you know, the Committee's reaction and, you know, position
```

Dubel - Direct                            87

1  with respect to the proposed retention of Mr. Seery as CEO?

2  A    We shared the report from Mercer with the Committee in --

3  I think it was early May.  And we spent time with them in the

4  April time frame talking about the fact that we were going to

5  be seeking Mr. Seery's appointment as CEO and telling them

6  that we were going to be commissioning a report to make sure

7  we had what we thought was market compensation.

8      The Committee was generally very supportive.  They had

9  been obviously experiencing Mr. Seery taking on that role of

10 effectively the CEO for a period of time, so they understood

11 where, you know, where he was coming from and what -- how he

12 was going to operate the business.

13     They understood, to my knowledge and in my discussions,

14 they understood the benefits of having a single person as the

15 CEO rather than trying to manage the business by committee.

16 We discussed with them why it made sense.

17     And so, you know, they were supportive of it.  Obviously,

18 we had to negotiate the terms of the compensation.

19 Q    And did that take some time, to negotiate the compensation

20 terms?

21 A    It did.  Initially, it was being done through myself and

22 Mr. Nelms, working directly with the Committee.  But, again,

23 having been in that position of having to negotiate with the,

24 you know, the committee on terms of my own personal

25 compensation -- not this committee, but in other cases -- we

```
                              Dubel - Direct                      88
```

1  recognized that it was probably more efficient for Mr. Seery

2  to speak directly with the Committee, Committee members.  And

3  so we asked him to pick up that, you know, responsibility

4  also.  And he did.  He kept us informed every step of the way.

5  And I, as the de facto chairman of the compensation committee,

6  also spoke directly with the various members of the Committee

7  during this time frame, where there was (echoing)

8  communication about compensation.

9  Q   Mr. Pomerantz mentioned it in his opening remarks, but do

10 you recall kind of what the bigger issues were with respect to

11 the proposed compensation terms with the Committee?

12 A   Sure.  The Committee -- well, there was always negotiation

13 going on, obviously.  The Committee, at the end of it, they

14 had no problems with the monthly compensation, recognizing

15 that whatever his board compensation would be would

16 effectively be wrapped into the monthly compensation.

17     What the issues really came down to for them revolved

18 around the restructuring fee that was being proposed, success

19 fee, you know, what have you.  And there was a lot of

20 different views, as you can imagine, between the four members

21 of the Committee as to how that should be set up.

22     Mr. Nelms and I were very cognizant that we did not want

23 to have Mr. Seery (echoing) -- I'm sorry.  I'm getting a lot

24 of background noise here.

25          THE COURT:  Yes.  I'm not sure who needs to mute

Dubel - Direct                    89

1    their phone, but someone needs to mute their phone.  Okay.

2            THE WITNESS:  Thank you.

3            THE COURT:  Uh-huh.

4        (Echoing subsides.)

5            THE WITNESS:  So we were very concerned that

6    structures not be put in place that could cause the potential,

7    the appearance of a conflict between the role that Mr. Seery

8    was playing and his compensation.

9        It's always a, you know, a challenging issue here, to make

10   sure that, you know, a CEO of any company is looking out for

11   the best interests of the estate and not looking out

12   specifically for any particular creditor, equity, or group of

13   creditors, just because that's the way the compensation was

14   designed.  And so that was a challenge.

15       At the end of the day, we wanted to have what we felt was

16   fair compensation for the success fee and restructuring fee

17   for Mr. Seery, because we wanted him incented to get the job

18   done, as he has alluded to in his prior testimony as to what

19   he's trying to do here.  And so there did come a point where

20   we could not get to a meeting of the minds and so we chose to

21   move forward on the compensation with just the monthly agreed

22   to.  Mr. Seery was good enough to agree to that for just the

23   monthly, and that we would put forward the restructuring fee

24   at a later date.

25   BY MR. MORRIS:

Dubel - Direct                                    90

1  Q    Okay.  Thank you.  In addition to the CEO title, the

2  Debtor is asking for the Court to appoint Mr. Seery as the CRO

3  and the Foreign Representative; is that right?

4  A    That is correct.

5  Q    And why is the Debtor seeking that relief?

6  A    Well, initially, the CRO was brought in, I believe it was

7  the middle of October, when the case was filed and before the

8  Independent Board was put in place.  And there were reasons

9  why, you know, the Committee had asked for the CRO to have

10 certain responsibilities.  Those carried through in the

11 protocols.

12      And obviously, you know, we had no issues with those, but

13 what we also felt, Mr. Nelms and I, and in consultation with

14 Mr. Seery, was that it would be more appropriate to have one

15 person be responsible for all of the issues within the

16 company.  And since there was an Independent Board, and since

17 one of those Independent Board Members was becoming the CEO,

18 the need for another individual to be the CRO might send

19 conflicting signals inside the organization.  And so we

20 decided that it would be appropriate to put those

21 responsibilities into Mr. Seery's lap.  And we spoke with Mr.

22 Sharp from DSI, and he agreed.  And so that's the reason why

23 we moved it forward that way.

24 Q    Okay.  I understood you to say that the meeting of the

25 minds, at least conceptually, was somewhere around March 12th

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1471
of 2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 1470 of
2722

Case 19-34054-sgj11 Doc 864 Filed 07/17/20    Entered 07/17/20 10:53:51    Page 91 of 134

 1 │ in New York, or March 11th.  I think the Judge may have asked

 2 │ the question or at least implied that she wanted to know kind

 3 │ of why it took so long to get the motion on file.  I think

 4 │ you've discussed some of the issues, but just kind of in a

 5 │ bullet-point way, can you give the Judge an explanation as to,

 6 │ you know, why it took several months to get this motion in

 7 │ front of the Court if a meeting of the minds occurred back in

 8 │ March?

 9 │ A    Sure.  I believe the motion was filed on the -- I think it

10 │ was the 22nd or so of June.

11 │ Q    Okay.

12 │ A    And so we -- we asked Mr. Seery.  He accepted the

13 │ responsibility in the middle of March.  Right at that point in

14 │ time was when the whole pandemic issue was, you know, really

15 │ coming hot and heavy at the company.  As Mr. Seery testified

16 │ earlier, he had -- he was spending a tremendous amount of time

17 │ just focusing on the operations of the business, focusing on

18 │ the assets, dealing with the prime accounts, the select

19 │ accounts, working with Jeff Reeves, working with the other

20 │ individual investments that we had, to make sure that those

21 │ were under control.

22 │     I would say I applaud him for putting the business first

23 │ in front of him, and then I think probably at 1:00 o'clock in

24 │ the morning he was able to finally sit down and put together

25 │ his own compensation request.

Dubel - Direct                                92

1     We did need time to go through with the Mercer folks and

2  get, you know, the market information, and that took a lot of,

3  you know, a lot of time.

4     And then, more importantly, we wanted to make sure we

5  could get something in front of the Court that was agreed to

6  by the Committee.  So we did share the information with the

7  Committee.  We spent a lot of time in negotiations with the

8  Committee, trying to get to a resolution.  As I said earlier,

9  we asked Mr. Seery to step in and there be, you know, one-on-

10  one discussions to maybe shortcut some of that.

11     And finally, at the point in time where we realized we

12  could not get a full, you know, fully-agreed compensation

13  program, we asked him to just break it down into the monthly,

14  and then come back for a restructuring bonus at the end of the

15  case.

16     And so all of that, while trying to manage the business in

17  the COVID era, is what took such a long period of time.

18  Q   Did it also take some time to obtain appropriate D&O

19  insurance for Mr. Seery as the CEO?

20  A   It did.  We had to, as the Board of Strand, we had to set

21  up a D&O program for the Board members when we first got

22  involved back in January.  That took a tremendous amount of

23  time.  It was very difficult to obtain in the marketplace, for

24  any number of reasons, but mainly because the insurance market

25  understood what Highland was all about and the various

Dubel - Direct                          93

1    players, and they were very reticent to insure Highland.

2        So, because we were Strand, because there were other

3    protections that were afforded to the Independent Directors,

4    we were able to obtain it.

5        When we asked the various carriers to add Mr. Seery on as

6    the CEO for HCMLP, it was very challenging to put folks on.

7    We were eventually able to get our first layer to sign on, the

8    first-layer insurer.  The second layer would not do it, and we

9    had to go find a third carrier who would do it.  And we

10   actually got that done at some time in the latter part of

11   June, right after we had filed the motion.

12   Q    Okay.

13        MR. MORRIS:  Your Honor, I've got just a few more

14   questions, but they're going to be devoted to the DSI motion.

15   I don't know if you wanted to ask -- if you had any questions

16   on the motion with respect to Mr. Seery or I should just

17   continue on.

18        THE COURT:  I do not have questions.  You can

19   continue.

20        MR. MORRIS:  Okay.

21   BY MR. MORRIS:

22   Q    Okay.  So, let's just finish up, Mr. Dubel.  There is a

23   second motion in front of the Court, and this one is for the

24   appointment of DSI as financial advisor.  Are you familiar

25   with that motion?

Dubel - Direct                               94

```
 1   A    I am.

 2   Q    Does the Board unanimously support that motion?

 3   A    We do.

 4   Q    Has the Board concluded, in an exercise of its independent

 5   business judgment, that the engagement of DSI as financial

 6   advisor is in the Debtors' best interests?

 7   A    We have.  Yes.

 8   Q    Can you explain to the Court why the Board reached that

 9   conclusion?

10   A    Well, we do need the services of a financial advisor.

11   It's very important in this case to have an independent, you

12   know, restructuring, you know, financial advisor to assist us.

13   As Mr. Seery testified earlier, they have been very

14   instrumental in helping him prepare the financial analysis

15   that has been part of what he's been using to start

16   negotiating and working forward on the -- putting together a

17   plan of reorganization.

18        They've also spent a tremendous amount of time acting as a

19   bridge to FTI, the Committee's financial advisors, which is

20   very common in these types of cases.  And so that's been

21   extremely helpful.  And that role needs to continue.

22        They also are handling all of -- all the administrative

23   bankruptcy issues, the SOFAs, the MORs.  They're doing a lot

24   of work for us, not necessarily specifically on the large

25   claims, but on helping us analyze and review all of the other
```

Dubel - Examination by the Court                    95

1    myriad of -- I think it's two hundred something claims that

2    have been filed in the case.

3        So they've been here since -- I guess they came in pre-

4    filing.  They have a lot of history and knowledge, and we want

5    to continue to utilize that knowledge as we continue to move

6    forward.  So that's why.  And the Board is very comfortable

7    with the job they've been doing, and so we felt it was

8    appropriate to continue to use them as the financial advisor,

9    just in a slightly different role.

10            MR. MORRIS:  Your Honor, I have no more questions of

11   Mr. Dubel.

12            THE COURT:  All right.  Well, I'm going to just jump

13   in and ask my own questions, and then I will -- I'll, you

14   know, offer him up for cross if people will promise to

15   restrict it to employment terms.

16                    EXAMINATION BY THE COURT

17            THE COURT:  So, what -- my question is about Mr.

18   Sharp.  As I recall, the compensation is not going to change

19   at all, even though the role is changing.  He won't be CRO

20   anymore, Mr. Sharp.  He won't be the Foreign Representative

21   anymore.  But obviously, he and his firm will remain very

22   engaged as financial advisor.

23       What I'm getting at is there was a $100,000 per month flat

24   fee for Mr. Sharp, and then other professionals at DSI will

25   bill by the hour.  Tell me why the Board thinks that's still

Dubel - Examination by the Court          96

 1  the appropriate compensation package with the modified role of

 2  Mr. Sharp.  I'm getting at, $100,000 a month, is that still

 3  the right thing, or hourly compensation, did you discuss that,

 4  and why is --

 5          THE WITNESS:  We did, Your Honor.  And I'll be

 6  (inaudible) with you.  I don't know who negotiated that

 7  originally for -- with, you know, with DSI, but I find it to

 8  be a very fair-to-the-Debtor compensation package of $100,000

 9  for Mr. Sharp, but it also includes Mr. Caruso, who Mr. Seery

10  has referenced earlier.  I think it was a very good

11  negotiation that was had by the Debtor.

12     So when we looked at it, we said, if we switch to a

13  straight hourly, based upon the amount of time and effort

14  that's being put in by the two of those individuals, it might

15  cost us a little bit more.  So we chose to continue it at that

16  level.

17     And I know Mr. Seery will continue to lean on those two

18  folks and get his money's worth.  I'm confident of that.

19          THE COURT:  Okay.  You just reminded me of something

20  that I did not remember, I guess.  Mr. -- we're getting two

21  for the price of one, is basically the -- Mr. Caruso does not

22  bill by the hour?

23          THE WITNESS:  They -- they work together.  It's their

24  compensation.  I would imagine they keep hours internally,

25  just to keep track of it, but what they bill us for the two

Dubel - Examination by the Court                    97

1    individuals, Mr. Caruso and Mr. Sharp, is a flat fee of

2    $100,000 for the two of them.

3           THE COURT:  Okay.  All right.  And do you remember,

4    by comparison, the financial advisor to the Committee -- is it

5    FDI?  Whoever it is.

6           THE WITNESS:  It -- it --

7           THE COURT:  How are they getting compensated?  Is it

8    strictly on an hourly basis, or is there also a combo flat fee

9    and hourly?

10          THE WITNESS:  (echoing) on an hourly basis, and I

11   have one of their most recent charts.  It was the May fee

12   application that they just filed, and they -- they bill in a

13   range from $1,245 an hour for, you know, senior managing

14   directors, to $875 an hour for managing directors, down to,

15   you know, $690 an hour for directors.  Yeah.  A very fair and

16   appropriate marketplace compensation, but I think what we are

17   incurring under the structure that we have for DSI is below

18   that.

19          THE COURT:  If those two guys were billing normal

20   market hourly fees, you think it would be busting $100,000 a

21   month, perhaps?

22          THE WITNESS:  I think it -- I think it would be well

23   in excess of $100,000, --

24          THE COURT:  Okay.

25          THE WITNESS:  -- based upon the hours that we have

Dubel - Examination by the Court                    98

1  seen to date from them, Your Honor.

2          THE COURT:  Okay.  Now, does anyone else have

3  questions for Mr. Dubel related to these employment

4  arrangements proposed?

5      (No response.)

6          THE COURT:  I guess not.  I actually have one more

7  question.  I think it will be for my benefit, but maybe for

8  benefit of parties in interest, I hope.  You made a comment

9  about getting insurance for Mr. Seery, and you said it was a

10 bit of a challenge because insurers in the marketplace kind of

11 knew what Highland was about.  I think those were your words.

12         THE WITNESS:  Yes, Your Honor.

13         THE COURT:  Here is my question.  As far as knowing

14 what Highland is about, other persons, not me, have used the

15 words that people were Mr. Dondero's puppet master, or he was

16 the puppet master, had his hands all over this, here and

17 there.  And we obviously endeavored to change that with the

18 new Board in place.  What would you say if people out there

19 think Dondero still might be a puppet master?  What -- I mean,

20 is there any concern there that you could address?

21         THE WITNESS:  Sure.  And let me, let me take it in

22 two parts, because I think it's important for you to

23 understand from a third-party insurer's point of view.  The

24 D&O marketplace has seen a lot of litigation surrounding the

25 Highland Capital name.  And because of that, that obviously

Dubel - Examination by the Court              99

1  causes them concern.  Their business is to write insurance and

2  never pay a dime.  I ran an insurance company for six years,

3  and you never want to pay a dime out, you just want to collect

4  premiums.

5        THE COURT:  Yes.  And I probably prefaced this in a

6  confusing way.  I'm really not going back to the insurance.  I

7  just said that comment, when you were talking about insurance,

8  made me want to ask, for my benefit and for other parties'

9  benefit:  How much control, if any, does Dondero have?  In

10  theory, he was not supposed to have any control over the

11  Debtor anymore, but can you say something to make us all feel

12  comfortable that, if he ever was a puppet master, he's not a

13  puppet master anymore?

14        THE WITNESS:  Well, I won't use that terminology.

15  What I will say is, since January 9th --

16        THE COURT:  Yes.  It was someone else's term, not

17  mine.  I'm just repeating it.

18        THE WITNESS:  That's okay.  Since January 9th, when

19  the Independent Board was put in place, the Independent Board

20  has had the responsibility, is responsible for the operations

21  of this business.  Mr. Dondero, as Mr. Seery alluded to

22  earlier in talking about the number of people in the

23  organization, has other businesses that he's involved with

24  that operate out of the offices through shared services.  But

25  it's very clear to all the employees that the Independent

Dubel - Examination by the Court                 100

1    Board is responsible for HCMLP and that since, really, you

2    know, the early March time frame, that Mr. Seery is the CEO.

3        So there is no concern on my part that Mr. Dondero is

4    having undue influence.  He is still our portfolio manager,

5    but Mr. Seery is working with him as appropriate, and I have

6    no concern that Mr. Seery is not getting the job done and

7    getting any undue influence from Mr. Dondero.

8            THE COURT:  All right.  Thank you.

9        Mr. Morris, do you have any redirect?

10           MR. MORRIS:  I do not, Your Honor.  I appreciate the

11   question, and I think Mr. Dubel answered it appropriately.

12           THE COURT:  All right.  Thank you, Mr. Dubel.  I do

13   appreciate your testimony today.  It was helpful.

14       All right.  Mr. Morris, --

15           THE WITNESS:  Thank you, ma'am.

16           THE COURT:  -- what else do you have?  You have Mr.

17   Sharp on your witness list.  Did you want to --

18           MR. SHARP:  I'm here, Your Honor.

19           THE COURT:  -- put him on?

20           MR. MORRIS:  I'm intending to do that.  If Your Honor

21   thinks it's not necessary, I don't need to ask more questions.

22   It's a relatively brief examination that will just focus on

23   the slight change in his role.

24           THE COURT:  All right.  Well, if you feel the need to

25   make a record, you may.  I just have one question I want to

Sharp - Examination by the Court                     101

1     ask him, to shore up the record.

2           MR. MORRIS:  So perhaps, Your Honor, could we swear

3     him in, you ask your question, and then I'll see if there's

4     (echoing)?

5           THE COURT:  All right.  Mr. Sharp, I see you there.

6     Please raise your right hand.

7        (Echoing.)

8           BRADLEY SHARP, DEBTORS' WITNESS, SWORN

9           THE COURT:  Thank you.  We were getting some

10    distortion there.  So, again, if you're not Mr. Sharp, please

11    put your phone on mute.

12               EXAMINATION BY THE COURT

13          THE COURT:  All right.  Mr. Sharp, I just wanted to

14    hear from you how many hours a month do you think that you and

15    Mr. Caruso are working on the Highland matter?

16          THE WITNESS:  I don't have the hours in front of me,

17    Your Honor, but I think Mr. Dubel unfortunately alluded to

18    poor negotiating on DSI's part.  That'd be my responsibility,

19    because I'm the one that did that.

20       From October through May, if you look at the time for Mr.

21    Caruso and myself, DSI has provided about a $730,000 discount.

22    So if we were actually being paid on our hourly rate, our fees

23    would be $730,000 more than the $100,000 a month.  We

24    typically run -- my rate is $720 an hour.  I think Mr.

25    Caruso's is about the same.  The time for the two of us each

Sharp - Direct                          102

1   month runs about $200,000, which we then write down to

2   $100,000.

3          THE COURT:  All right.

4          THE WITNESS:  (echoing) a month.

5          THE COURT:  Okay.  That answers my question.  Mr.

6   Morris, is there anything you wanted to put on the record?

7                  DIRECT EXAMINATION

8   BY MR. MORRIS:

9   Q    Mr. Sharp, are you the person who was (echoing) with the

10  (echoing) CRO (echoing) Seery (echoing)?

11  A    Yes, I am.  I think it's much more efficient, frankly.

12  We've worked very well with Mr. Seery since the beginning,

13  since January 9th.  That's going to continue.  I think it

14  takes away some confusion, both internally and externally, in

15  that, you know, Mr. Seery is the CEO, the CRO, and everyone

16  knows that we are providing the analytical and support for him

17  with whatever he needs.

18  Q    And I want to focus just for a second on DSI's (echoing).

19  Is DSI's responsibilities in the case changing at all?

20  A    No.  No.  We have been working for the Board and

21  responding directly to Mr. Seery.  You know, as Mr. Seery

22  testified, he works directly with myself and directly with my

23  team, and that's not going to change.

24          MR. MORRIS:  I have no further questions, Your Honor.

25          THE COURT:  All right.  Anyone have any questions

Sharp - Direct                               103

1   regarding the employment terms?

2        (No response.)

3            THE COURT:  All right.  Well, I thank you, Mr. Sharp.

4   We appreciate it.

5        All right.  Mr. --

6            MR. MORRIS:  The Debtor rests, Your Honor.

7            THE COURT:  Okay.  Well, I presume no one else had a

8   witness to call.  Again, we didn't have any responsive

9   pleadings on this.

10       So, with that, I am going to turn to the Committee counsel

11  at this point.  Mr. Clemente, I know you said early on that

12  you wanted to make some comments, so this is your opportunity.

13           MR. CLEMENTE:  Well, thank you, Your Honor.  Matt

14  Clemente from Sidley on behalf of the Committee.

15       And just very briefly, Your Honor, as you know, we did not

16  file an objection.  It sounds from what we heard today that

17  Mr. Seery and the Board are working hard, which is, frankly,

18  what I think you expect and what we expect of them.

19       We don't have an objection to the retention of Mr. Seery

20  as CEO at $150,000 a month, which is inclusive of director

21  fees.  And as Mr. Pomerantz said, the Committee does not agree

22  -- in fact, that was the source of quite a bit of the

23  negotiation of the last couple of months -- with the bonus

24  proposal.  But, again, we understand that that will be

25  addressed by a separate motion.

104

1    Your Honor, we appreciate Mr. Seery's testimony to advise

2  you and to create the record for purposes of today's

3  uncontested matter.  And obviously, the Committee -- there's

4  no live objection.  And while the Committee may have different

5  views of what Mr. Seery said -- for example, the working of

6  the protocols, the sophistication of the advisors to the

7  Committee -- again, for purposes of the matter before the

8  Court today, we're not going to take any issue with any of

9  those statements, Your Honor, but reserve the right to do so

10  again in future if it becomes necessary.

11    So, with that, Your Honor, I have no further comments, but

12  I did want to make those couple comments for the record, to

13  make sure Your Honor understood where the Committee is coming

14  from.

15    THE COURT:  Okay.  Thank you.  Does anyone else wish

16  to make comments about the applications before the Court?

17    (No response.)

18    THE COURT:  All right.  Mr. Morris, I'll turn it back

19  to you.

20    I found in my notes one question that I had.  Looking at

21  your Exhibit 3 is what made me decide I have this question.

22  The Exhibit 3 was the e-mail exchange of Sunday, April 5th

23  amongst the Board members.  Let me ask you this.  There was

24  something in there regarding Mr. Seery, this would be a full-

25  time position, but he would be permitted to serve on outside

1   boards of directors.  Is that a term that survived, or no?

2   And if it did, I want to ask how many outside board

3   memberships does he have?  Again, I expect, like I think

4   everyone, that it's going to be very full-time, so I don't

5   want to hear that he's on 12 other boards.  How did that --

6        MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

7   Since I was the one who actually was involved in negotiations

8   more than Mr. Morris, --

9        THE COURT:  Okay.

10        MR. POMERANTZ:  -- maybe I can answer.  I believe it

11   was something that survived.  I am not aware of any other

12   boards that Mr. Seery is on.  And if he has actually been able

13   to do anything meaningful while performing what is I think

14   probably 200 hours a month and being available 24/7, I take my

15   hat off to him.  But I would ask him to confirm if he has any

16   other material role, but I have not seen anything.

17        THE COURT:  All right.  What about that, Mr. Seery?

18        MR. SEERY:  I -- currently, I'm not on any other

19   outside boards except two charities.

20        THE COURT:  Okay.

21        MR. SEERY:  One is a foundation called the

22   (inaudible) Foundation, which is a charity for (inaudible)

23   individuals, disabled folks, and -- most of whom are abused.

24   And I'm also involved with a charity, I'm not on the board but

25   on a funding committee for Team Rubicon, which is a reference

106

1   -- reference service, assistance in disasters.  So they don't

2   take time like this, and so I'm not going to be involved in

3   any --

4         THE COURT:  Okay.  Thank you.  That's what I would

5   hope to hear.  I didn't want to hear that you were on, you

6   know, 12 other for-profit boards.

7      So, all right.  So, Mr. Morris, Mr. Pomerantz, do you have

8   anything to say before we wrap up this topic?

9         MR. POMERANTZ:  Your Honor, I'm happy to give Your

10  Honor a closing statement if you think it's necessary.  I

11  think you know what I would say, to summarize.  But I think

12  we've been at this a while, so (inaudible).

13     So unless Your Honor has any questions for me, I would

14  just say that the evidentiary record, I believe, supports the

15  entry of an order approving both the Motion to Employ Mr.

16  Seery as the Chief Executive Officer, CRO, and Foreign

17  Representative, and the Motion to Appoint DSI as the Financial

18  Advisor.

19        THE COURT:  All right.  Well, I am going to grant

20  both of these motions.  Again, as for Mr. Seery, it's as

21  modified per the agreements with the Committee, that

22  modification being that, as for any bonuses, we're just

23  deferring to another day whether Mr. Seery is going to get any

24  bonuses related to a plan, what kind of plan it might be, a

25  case resolution plan or a monetization vehicle plan.

107

```
 1      You know, I really hope, frankly, Mr. Seery is before me
 2   seeking a bonus in the very near future and we're all happy
 3   about the prospect of paying him a bonus because a plan has
 4   been achieved, hopefully a case resolution plan.  I will just
 5   tell you right now, I will have a big smile on my face and
 6   will warmly consider that if we get a great result here.
 7      But it's deferred to another day.  So I do find it's --
 8   the evidence amply shows a sound business justification and
 9   reasonable business judgment on the part of the Debtor in
10   proposing that Mr. Seery be CEO and CRO, essentially, and a
11   foreign representative, where necessary, at the base pay of
12   $150,000 per month, again, with bonuses to be considered at
13   appropriate times down the road if we feel that that is a good
14   thing for Mr. Seery to be paid.
15      And I likewise find that, under 327, 328, 363, the amended
16   application with regard to DSI Specialists and Mr. Sharp and
17   Mr. Caruso should be granted, it appearing to be reasonable
18   business judgment and in the best interests of the estate and
19   appropriate in all ways under those Code sections.
20      All right.  So we are going to look for orders on those
21   two matters.
22      Now, unless you have other housekeeping matters you want
23   to talk about, I want to circle back to the mediation topic.
24   Mr. Pomerantz, Mr. Morris, anything you wanted to raise?
25           MR. POMERANTZ:  There is actually one other
```

108

1  housekeeping matter that Ms. Patel and I have been speaking

2  about and we said we would raise before Your Honor.

3      As Your Honor heard at the last hearing, we had filed an

4  objection to the Acis claim.  We initially set the objection

5  for August 6th.  Ms. Patel reached out to us, I understand, I

6  remember at the last hearing indicated that August 6th was

7  difficult for her.  And especially since we were having the

8  mediation, we had talked to her about a rescheduling.  So we

9  are intending put the matter on the September 10th calendar.

10  We have also granted Acis an extension to file a response to

11  July 31st.

12      What I think we would like the Court's input on, and not

13  now, but we would suggest having it done at the next hearing,

14  which is July 21st, as I'm sure Your Honor has not yet read

15  our objection, but it's a quite lengthy objection, I think 55,

16  60 pages.  There's a lot of issues there.  There are some

17  factual issues, some -- there are some legal issues.  There

18  are some combination of factual and legal issues.

19      We think it would be helpful to the process to set up a

20  status conference with Your Honor -- again, to be held perhaps

21  on July 21st, because discovery motions are pending -- where

22  we could walk through with Your Honor what exactly everyone

23  would intend to accomplish on September 10th.  We don't

24  believe it should just be a status conference.  We searched

25  other dates.  On the other hand, I think both parties will

109

1  have different views on what exactly will be at issue.  But I

2  think it would be helpful, from both sides, to hear Your

3  Honor's expectations and to get some ground rules so we can

4  make a hearing, if necessary, on September 10th as productive

5  as possible.

6          THE COURT:  All right.  So, in writing down dates,

7  did you tell me what -- a deadline you have given Acis, or

8  what is the deadline that would apply under the Rules versus

9  what you have agreed to?  Is there something different you've

10 agreed to?

11         MR. POMERANTZ:  Sure.  I believe, for a hearing on

12 August 6th, based upon when we filed it, I believe their

13 objection would have been due July 23rd or thereabouts.  They

14 have asked us for July 31st, and I don't want to be as

15 presumptuous, Your Honor, to say that I have given them the

16 extension.  I know that's up to you, Your Honor, to do so.

17 The Debtor does not have any opposition to an extension in

18 that respect, especially given the fact that we're not going

19 to have a hearing until September, although it's obviously

20 going to be important to be able to move forward with

21 negotiations to understand what their specific position is,

22 and, of course, for a mediator to look at both as well.

23      So, again, it's July 31st, September 10th, and then

24 setting up something with Your Honor, whether it be July 21st

25 or some other date, to walk through Your Honor what that

110

1    hearing will look like so it could be most efficient.

2          THE COURT: All right. Well, I am agreeable to that

3    set of dates and deadlines. Ms. Patel, did you want to say

4    anything about it?

5          MS. PATEL: No, Your Honor. Mr. Pomerantz hit the

6    salient terms. Yes, July 31st is the agreed response date.

7    And that allows, frankly, parties to -- an opportunity --

8    allows Acis the opportunity to meaningfully brief the issues,

9    as Mr. Pomerantz indicated.

10     It's a 60-page objection. It's very weighty. There's a

11   lot of issues that require due consideration. So we have

12   agreed on that extended date. It's in sufficient time to

13   allow the parties time to read a response and analyze it ahead

14   of a mediation in August.

15     And as Mr. Pomerantz indicated, yes, the parties would

16   like -- effectively, I think he -- he might have referred to

17   it as a status conference. Apologies, my WebEx is cutting in

18   and out a little bit this afternoon. But I think it's

19   probably a status conference/scheduling conference so we can

20   talk about what the trial of the claim objection is going to

21   look like and how it should be structured. And I think, as

22   Mr. Pomerantz alluded to, parties may have very different

23   contexts with respect to that, but we want to just run it by

24   Your Honor, and ultimately it is going to be up to Your Honor

25   with respect to how the trial goes forward.

111

```
1          THE COURT:  All right.  Well, I hope that you all are
2   going to have lots of specific thoughts to share on what the
3   hearing on September 10th would look like, because, holy cow,
4   a $70 million proof of claim that -- I haven't looked at your
5   proof of claim, but it is presumably based on the 34 counts in
6   the adversary proceeding filed in the Acis case, and maybe
7   then some.
8       So, you know, I don't know how in the world, if we had to
9   have a contested hearing on September 10th, we could get that
10  all done in one day.
11          MR. POMERANTZ:  Your Honor, Jeff Pomerantz again.
12  Without getting ahead of ourselves, at least the Debtors' view
13  is there are some threshold legal issues --
14          THE COURT:  Okay.
15          MR. POMERANTZ:  -- that are raised in the objection.
16  And then there are, of course, a series of issues that are
17  factual-intensive.
18      So what we intend to present is how we think we can
19  efficiently deal with it.  Again, it's not our expectation to
20  have a lengthy trial on the entire claim objection.  But,
21  again, Ms. Patel and I agreed that what we weren't going to do
22  is turn this into a status conference.
23          THE COURT:  Okay.
24          MR. POMERANTZ:  To the effect that neither party was
25  ready.  I would just leave it at that --
```

112

1              THE COURT:  Okay.

2              MR. POMERANTZ:  -- and say we'd be prepared to talk

3      with you on the 21st.

4              THE COURT:  Okay.  Well, we -- we'll use that setting

5      partly as a status conference to talk about the September 10th

6      hearing.  And, again, I hope you both will have some specific

7      ideas to give me.

8         So, July 21st, we have -- remind me what we have.  We are

9      so busy, I haven't looked one week ahead to --

10             MR. POMERANTZ:  I believe, and Mr. Morris could

11     correct me if I get ahead of ourselves.  I know there's been

12     discussions between us and the Committee on two very -- two,

13     in some sense, the opposite sides of the coin -- discovery

14     motions that are pending before Your Honor.  I thought July

15     21st may have been pre-obtained.  Again, I could be ahead of

16     my partner there.

17             THE COURT:  Okay.  That sounds like something that

18     I've set on an expedited basis in the past few days.  Mr.

19     Morris, Mr. Clemente -- Mr. Clemente filed a motion, or

20     someone from their shop filed a motion --

21             MR. CLEMENTE:  Your Honor?  Your Honor?

22             THE COURT:  -- during the middle of our last hearing,

23     as I recall.  And I was kind of surprised to get out of court

24     and learn about it.  But you're saying you haven't gotten

25     information you've been asking for for months, and we also

113

 1   have a motion for a protective order.

 2        So, just give me a short -- I'm trying to figure out how

 3   much time we're going to be in court next week on the 21st.

 4   It's a discovery dispute.

 5             MR. POMERANTZ:  And I'll --

 6             THE COURT:  So, Mr. Pomerantz?  Go ahead.

 7             MR. POMERANTZ:  Your Honor, if my colleague, Paige

 8   Montgomery, is on, she's in a better position to address that.

 9   I don't know if Ms. Montgomery is on.

10             MS. MONTGOMERY:  I'm here.  I don't -- my WebEx has

11   been cutting in and out, but I think (inaudible) hear me.

12             THE COURT:  We can hear you, but we can't --

13             MR. POMERANTZ:  Yes, we can.

14             THE COURT:  Oh, there you are.  We can now see you as

15   well.  So, --

16             MS. MONTGOMERY:  Yes, Your Honor.  I think the amount

17   of time that might be required for the discovery motions is

18   going to be dependent on the number of third-party objections

19   that may or may not be filed tomorrow.   We've been in

20   communication with a number of different parties over the last

21   couple of days, trying to resolve those.

22        But I think, if it were just the two motions and the two

23   parties that filed those, John, I don't know if you disagree,

24   but I'd say that's probably an hour.  I just don't know how

25   many other people -- I don't know how many other people will

114

1    want to participate, Your Honor.

2             THE COURT:  Okay.  Well, it's going to be whatever

3    it's going to be, but we're going to have -- the main event on

4    the 21st is going to be this document discovery contest, and I

5    guess there's a related motion for protective order.  But I

6    don't know how much it's going to be about resisting producing

7    documents versus we'll produce documents if we have a

8    protective order.

9        Mr. Morris, can you, in, you know, a few seconds, answer

10   that?

11            MR. MORRIS:  Sure.  As the Debtor, we're trying to --

12   we've got certain interests to protect.  We thought we were in

13   a different place in the middle of June, and, you know, this

14   proposal that the Committee made for the first time on July --

15   on June 26th is really what, from my perspective, prompted us

16   to be here.

17       But we've made a proposal to the Committee.  We haven't

18   received a response to that.  We're trying to address these

19   issues.  But it's not, you know, it's not contentious.  I

20   think our interests are legitimate.  I think the motion that

21   we made is either for a protective order or for an order

22   directing us to produce the documents.  Because as the motion

23   itself sets forth, Your Honor, the Debtor has certain

24   contractual and other obligations to some third parties.  We

25   have given notice to those third parties of our -- of our

115

1   intent to make this motion, because we are kind of between a

2   rock and a hard place.  We can't produce the documents

3   without, you know, potentially violating obligations to third

4   parties.

5       And so we'd just ask the Court to be the referee here, to

6   make the decision as to how it gets resolved.  And we've given

7   notice to these third parties so that they fairly have an

8   opportunity to be heard, too.  And I've been in communication

9   with some of them as well, and I've encouraged them to speak

10  with the Debtor, because ultimately, you know, if the Debtor

11  and the third parties can come to an agreement on the

12  production of the documents, you know, that will resolve, you

13  know, a substantial piece of the issue.

14          MR. POMERANTZ:  You mentioned the -- you meant the

15  Committee, John, not the Debtor.

16          MR. MORRIS:  I apologize.  Yes.  Thank you.

17          MR. POMERANTZ:  Thank you, John.

18          THE COURT:  Okay.  Well, I hope you have this largely

19  worked out.  Obviously, I hope that.  You know, I just

20  remember doing a very quick pass through the Committee's

21  motion, but I do remember them saying they've been trying to

22  get these documents for a very long time, and I think I recall

23  there's pressure building now because I gave you a 90-day

24  deadline to either file a lawsuit regarding the CLO Holdco

25  issues that we had a hearing on a few weeks ago, a couple of

116

 1    weeks ago, or I'm probably going to release the money in the

 2    registry of the Court.  And so that's part of why you're

 3    trying to get these documents as soon as possible, right, Ms.

 4    Montgomery?

 5              MS. MONTGOMERY:  Yes, Your Honor.

 6              THE COURT:  Okay.  All right.  You all try to work

 7    this out.  Okay?

 8              MR. CLEMENTE:  Thank you.

 9              THE COURT:  Well, I was partly pressing the issue of

10    what's July 21st going to look like because I think we may

11    carry over the discussion about mediation.  We're going to

12    start it right now, but I think we may have to carry it over

13    to the 21st, and I hope finally kind of get a game plan

14    together on that day.

15        So, I wanted Mr. Seery to be available.  Mr. Seery is --

16    if you're still there somewhere.  You're very important, in my

17    view, to mediation potentially being successful here -- and

18    the whole Board is, for that matter -- because -- well, let me

19    digress a minute.

20        Mediation is going to be very tough here.  We all know

21    that mediation tends to be more likely to succeed if we've got

22    face-to-face, in-person participation.  And as I said last

23    week, I just don't know how I can order people to be in face-

24    to-face mediation right now.  I just -- we've got people

25    spread out, and I think it would be very, very bad to order

117

1   face-to-face mediation right now.

2       But on the topic of mediation, you know, I've heard some

3   things that, you know, we all know, but I've heard some things

4   from Mr. Seery that are important to stress today.  This isn't

5   the type of case that needs to be in bankruptcy for months and

6   months and months and months.  Okay?  We have the issue of the

7   professional fees accruing, of course, like every case.  But

8   we have a company where -- it's a strange fit for bankruptcy,

9   right, this kind of company.  And it's so dependent on people

10  to provide value.  And people can bolt.  You know, people can

11  get weary of the bankruptcy and want to be somewhere else

12  where that taint is not there in the marketplace.

13      The issue of the UCC protocols was brought up by Mr.

14  Seery, and I know that is something that is going to be

15  cumbersome, you know, for this company to be in bankruptcy

16  long-term.

17      So, I want to go to Mr. Seery, and it may be unusual for

18  me to reach out to you and ask this, but I want to hear from

19  you:  Do you think mediation is a waste-of-time pipe dream,

20  for lack of a better term?  I really want mediation to happen,

21  because I don't know how we quickly get a confirmed plan if we

22  have, well, the voting issue, for one, right?  We have to, at

23  a minimum, figure out what is UBS's voting claim.  What's its

24  claim for voting purposes?  What is Acis's claim for voting

25  purposes?  A looming, huge issue in my mind.  So I feel like

118

1  we've got to have mediation.  We've got to get a strong shot

2  at getting these two claims liquidated, at least for voting

3  purposes, if not overall.

4       So, is this a pipe dream, Mr. Seery, in your view, that

5  mediation might get to resolution on these two claims?  What

6  do you think about it?

7            MR. SEERY:  The quick answer, Your Honor, is I don't

8  think it's a pipe dream.  I think there's a legitimate shot to

9  move parties together.

10      Let me just say one thing that -- reflecting on what Mr.

11  Clemente said.  I want to make clear for the record that, to

12  the extent I misspoke, and it would have been misspeaking, I

13  have no negative implication regarding the sophistication,

14  professionalism, or focus of Sidley --

15            THE COURT:  Uh-huh.

16            MR. SEERY:  -- or FTI or any of the professionals.  I

17  know these folks.  They're really good.  They're very

18  sophisticated.  I have the highest professional and personal

19  respect for them.  So, to the extent that I misspoke, I

20  apologize.

21            THE COURT:  I don't think you did, and that's not how

22  I heard it --

23            MR. SEERY:  Okay.

24            THE COURT:  -- and that's certainly not how I meant

25  it.  It's just a fact of bankruptcy that it's expensive.

1   Okay?  So, --

2          MR. SEERY:  Yeah.

3          THE COURT:  Right.

4          MR. SEERY:  I just wanted that to be clear.

5      I think, particularly with respect, Your Honor, to the

6   Acis and UBS claims, our professionals have done a lot of work

7   on them.  Obviously, the professionals for Acis and UBS have

8   done a lot of work on them.  There may be things that we know,

9   the perspectives that we have, and perspectives that the other

10  side has, that may not be as well-founded as each side thinks.

11  It could be very valuable to have a third-party objective

12  observer, cajoler, somebody who's strong, to help move the

13  parties off of certain positions.

14      We would like to think, as a Board, Independent Board, and

15  I'd like to think as an Independent Director and now as a CEO,

16  I didn't really have a -- the proverbial dog in that fight for

17  either of those claims.  I wasn't -- I'm not a Highland

18  employee.  I don't have any animus towards any of the sides.

19  I don't have any history with any of the sides.

20      But I'm realistic that I take a perspective around certain

21  claims and how they're brought, the factual and legal basis

22  for them.  And I get a lot of that information from Highland

23  employees, and we use that information to then perform the

24  analysis with our professionals.

25      Likewise, these parties have been involved in, on the

120

1  other side, very entrenched disputes with Highland and

2  Highland employees.  And they've dug in on their positions.

3      Having a third party hear each side and start to move

4  could give us the chance to break it open.  I think there's --

5  and there's two really important aspects.  One is the claim

6  amount, and then, obviously, the distributions on the claims:

7  How to make those, how much are they, when are they made?  We

8  can work on both of those, and I think we need some help

9  moving us both on the claim amounts and on how to make the

10  distributions.

11      We've made progress with Redeemer because even though they

12  had -- they had an arbitration award, so we knew what the

13  outside would be.  Now, Redeemer and their attorneys are very

14  good and very creative.  They could stretch the outside in

15  those discussions.  I won't get into what they are.  But we

16  were able to more easily fashion around the particulars of

17  that claim because there was that judgment from the

18  arbitrators that, while it hasn't been entered, gave us much

19  more guidelines as to where we could look.  The other claims

20  are much more amorphous, at least at this stage, and having a

21  third party help us develop perhaps closer goal lines would be

22  useful, in my opinion.

23      But, again, I think it's very important that we do it

24  quickly.  I think we -- you know, somebody who is focused,

25  strong.  I'm sure they'll be highly intelligent and versed in

121

1   the field, but somebody who's got the opportunity and time to

2   do it.  And then, if it's unsuccessful, then, as Mr. Pomerantz

3   and Ms. Patel alluded to, then perhaps we may need some

4   judicial help to move those goal lines a little bit.

5       But I do think that mediation -- and I apologize for the

6   length of my answer -- could be a very helpful way to do it,

7   provided we get there quickly.

8           THE COURT:  All right.  I guess my other question I

9   wanted your view on is structure.  You know, when someone --

10  Mr. Pomerantz, I think -- told me that he or others had

11  reached out to our judges in Houston, Judge Jones and Judge

12  Isgur, my initial reaction -- and, frankly, my continued

13  thought on that -- is they just don't have meaningful time,

14  because I don't think one day of cajoling is going to be

15  enough to get -- you know, you're a billion dollars apart on

16  UBS, right?  The Debtor, I guess, thinks zero is the amount of

17  their claim, and UBS thinks it's a billion, and it's been

18  litigated for 11 years.  And then I personally know, you know,

19  how Acis feels about its positions.

20      So, anyway, what I'm getting at is structure.  I in some

21  ways think what we need here is sort of a master statesman-

22  type person who would spend meaningful time, not just a day or

23  two, but days or even weeks trying to reach a grand

24  compromise.

25      On the other hand, in my experience -- I've never done

122

1    that in a case as judge.  But as a lawyer, I felt like that

2    kind of person can hijack a case, and we don't need that here.

3    We have wonderful professionals, a wonderful Board, a

4    wonderful CEO.  We don't need that kind of help, I worry.

5        So, I guess where I'm evolving, you know, we've got the

6    two-sitting-judge option that would be free mediators that

7    could give you a day or two.  Maybe.  And then we have kind of

8    the master statesman who might be in there for weeks, trying

9    to help you reach a grand compromise.

10       Another option, I think, is one or two mediators who just

11   zero in, you know, on the UBS claim versus -- and the Acis

12   claim.  And I have a couple of private mediators in mind that

13   have very good video capabilities to have a sophisticated

14   video mediation.

15       So, all of this rambling to say, Do you think we need to

16   just zero in on Acis and UBS and maybe have one or two people

17   to do formal video mediation with those two parties, or do we

18   need sort of more of a grand pooh-bah, grand compromise-type

19   person?

20            MR. SEERY:  My view, Your Honor, is that we should

21   focus on the claims, but they're not just going to be two-

22   party, because we do have other active constituents.  I think

23   Redeemer, with their party in interest status, is going to

24   want to be part of it.

25       I think if we can focus on those, we have the

123

1  professionals to help drive the grander bargain that I've

2  alluded to in some of those discussions we've been having.  So

3  they haven't progressed as far as I would like, but they have

4  progressed.  We do need the bottom line number for where

5  claims are going to come out.  But also that will help frame a

6  little bit as to what parties expect in terms of distributions

7  on their claims.

8      And I think the reason that we had some impetus behind a

9  sitting judge -- frankly, I didn't know that sitting judges

10 couldn't be paid.  I think that's -- there should be a

11 standard rate, because we shouldn't take people's time for

12 free in these cases, and I know judges work extremely hard and

13 if they're going to put in extra time, then they should maybe

14 be compensated, but that's a whole different issue.

15     I don't think we should get too hung up on the cost.  We

16 are -- the costs of this case are extremely high, and we are,

17 with best intents, sometimes getting ourselves wrapped up in

18 things that should be, I think, more swiftly and economically

19 dealt with and dispatched.

20     So, if we can get a good mediator, and I think the reason

21 folks think about a judge is -- a sitting judge, it's not just

22 the vast experience that folks -- judges like yourself have,

23 Your Honor, and in particular with these issues, but also the

24 requirement that all the participants, notwithstanding the

25 professionals and -- that you see here, the requirement that

124

1  all the participants know that they're dealing with a sitting

2  judge, there's a certain decorum that's required.  But that, I

3  think we get anyway.  But there's also a -- there's less

4  willingness to go to the furthest reaches of your argument

5  when you have someone who's on the bench who sees those types

6  of positions taken frequently and can dispatch with them more

7  readily.

8      So, I think there are a number of individuals that I've

9  dealt with in the past who would have the ability, the

10  gravitas, for lack of a better term, to be able to help push

11  the parties in the right direction.  And I think it's a matter

12  of finding somebody, as you said, with both the capabilities,

13  which we'll find, but also the capacity in terms of the time

14  to do it.  And then, in the video age, maybe some facility in

15  being able to make that happen both rapidly and effectively on

16  screen.

17          THE COURT:  Okay.

18          MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

19  And I'd just make a couple of comments.

20          THE COURT:  Okay.

21          MR. POMERANTZ:  You know, as Mr. Seery said, we were

22  predisposed towards a sitting judge.  And while we did share

23  the same concerns about the timing of Judge Jones and Isgur,

24  we understand you've probably been in communication with them,

25  and if that's not going to work, we appreciate it.  We want

125

1  this mediation to be effective and we want someone to spend

2  the time with it. And if you didn't feel that they, you know,

3  could commit to that, we totally appreciate that.

4      We thought long and hard about the people that you

5  identified at the last hearing, former Judge Peck and Sylvia

6  Mayer. We've done our diligence. The Debtor would be willing

7  to mediate before Sylvia Mayer. We think that, based upon our

8  diligence, the people we've spoken to, that she, if she

9  otherwise had the time and the abil... the time to devote to

10  it, that being a former big-firm lawyer in permanent practice

11  now as a mediator, that the Debtor would find her acceptable.

12         THE COURT: All right. Does anyone else wish to

13  comment? Because I have a very positive view of Sylvia Mayer,

14  and certainly her video capabilities, I think, are far and

15  away better than a few other people I've chatted with.

16         MS. PATEL: Your Honor?

17         MR. CLEMENTS: Your Honor? Oh, I'm sorry.

18         MS. PATEL: Go ahead.

19         MR. CLEMENTE: Your Honor, --

20         THE COURT: Not that I would ever, you know, put that

21  ahead of, you know, overall abilities, but it just is an added

22  plus, a huge plus right now during COVID.

23      Go ahead.

24         MR. CLEMENTE: Your Honor, Matt Clemente on behalf of

25  the Committee. Just a couple observations, building a little

126

1   bit on what Mr. Seery said.

2       We had consensus among the Committee around Judge Isgur

3   and Judge Jones.  I think the view, the consensus view -- and,

4   again, I use the word consensus and not unanimity because I

5   want Your Honor to understand that -- is that having a sitting

6   judge, ideally, given the personalities as you've expressed

7   and I think as Mr. Seery has expressed, provides the best

8   possibility for a successful mediation.  It may not be that

9   overlord that spends three weeks, but, you know, it is a

10  strong personality that -- not that any of the names that have

11  been raised aren't tremendously to be respected, but that

12  would be respected by all of the parties simply by the fact

13  that they're a sitting judge.

14      With that said, Your Honor, and, again, the speed.  Again,

15  I don't have unanimity from the Committee, but there is

16  consensus to see if Sitting Judge Green from the Southern

17  District of New York would have the time and the capability to

18  spend.  And I know Your Honor has concerns about the time.  I

19  think Judge Isgur and Judge Jones occupy a special place in

20  terms of how busy they are, but at least among the Committee

21  members, there's been discussion that that may be a suitable

22  approach in terms of identifying a mediator and accomplishing

23  the objectives of having a very strong mediation, mediator, on

24  a timely basis, that has the best possibility of success.

25      That being said, Your Honor, based on what Mr. Pomerantz

127

1  said, if Mr. Green is not acceptable or if Your Honor doesn't

2  wish for us to go in that direction, I do have consensus among

3  the Committee members to move forward with Ms. Mayer as

4  mediator.

5      So, a little -- maybe a little convoluted in my comments

6  there, Your Honor, but the main thrust is I think there is

7  consensus among the Committee to consider a sitting judge, and

8  Judge Green would be someone who would be satisfactory.  And

9  if he's not acceptable, or I should say acceptable but not

10 able to do it, Ms. Mayer would be acceptable to the Committee.

11         THE COURT:  All right.  Well, let me put this out

12 there.  I talked on a no-names basis with Ms. Mayer last

13 Friday.  And it was actually more in the nature of making

14 inquiries about how an organization she's connected with, the

15 AAA -- you've heard of the American Arbitration Association;

16 they, of course, do mediation -- what their experience and

17 capabilities were with many, many parties and video mediation.

18 And as you might guess, they have a lot of experience already

19 -- you know, a number well in excess of a hundred; I can't

20 remember -- of doing video mediations with many parties and

21 having the different constituencies in this caucus room and

22 that caucus room.  And, very importantly, having lots of IT

23 staff to give instructions, to give help, to, you know, tackle

24 technology problems.

25     But in that discussion, I learned that there is a panel

128

 1   that AAA has put together of 12 mediators that have bankruptcy

 2   expertise.  And, of course, Sylvia Mayer is one of those

 3   people.  But Retired Bankruptcy Judge Gropper -- is it Groper

 4   or Gropper from the Southern District of New York?  I always

 5   forget which way he pronounces his name.  Anyway, he is on

 6   that.  He is on that panel of 12.

 7      Mr. Seery, you're grinning like you want to say something

 8   about this.

 9         MR. SEERY:  No.  Only on the Gropper/Groper, because

10   there's a professional that I know that is similarly named,

11   and I believe -- and I believe Judge Groper -- I may have it

12   wrong, but I think it's -- it's Judge Groper and Dan Gropper.

13   But that's the best I --

14         MR. NEIER:  It's Dan Groper and Judge Gropper.  I

15   actually had a mediation with the two of them when they argued

16   about the pronunciation of their name.

17         THE COURT:  Okay.  Well, Gropper.  So we -- it's

18   Gropper.  Okay.

19         A VOICE:  Yes.

20         THE COURT:  My point was, without -- I've not talked

21   to him at all.  And by the way, I haven't personally reached

22   out to Jim Peck, but we'll stop that discussion about him.

23   But after getting off the call with Sylvia Mayer and a couple

24   of other people at the AAA Friday, I put together in my brain,

25   maybe we could have a Sylvia Mayer/Allan Gropper tag team, two

1   mediators.  Okay?  I don't know how that would affect the

2   cost, but that might be the way to go in such a complex case.

3   You know, maybe they could divvy up among themselves.  One

4   would be the primary mediator on Acis, one would be the

5   primary mediator on UBS, but they would both work together.

6       If you all want to think on that, digest that a little,

7   and we, you know, decide definitely next week on the 21st, we

8   could do that.  Or we could just all say, yeah, that's a good

9   game plan, and I can get on the phone after this.  Or it

10  actually may be tomorrow, because I have a terrible hearing

11  that I've got to prepare for at 9:30 in the morning tomorrow.

12  It may be tomorrow.

13      But do people want to let that soak in a little bit, or

14  shall -- I mean, --

15          MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

16          THE COURT:  -- frankly, I can order it either way.  I

17  can order it.  But I just really want to be conciliatory to

18  the parties who are owed the money and have to pay the money,

19  if you want to think on it some.

20          MR. POMERANTZ:  Your Honor, it's Jeff Pomerantz.

21  Having my newly-minted CEO on the phone, Mr. Seery, I would

22  ask him, and if he says that it would be okay, then it would

23  be okay with me.

24          MR. SEERY:  Be fine with me.

25          THE COURT:  Okay.

130

1        MR. SEERY:  Yeah, I think the key is moving forward.

2   I know it's much harder with a Committee, and I respect, you

3   know, Matt Clemente's job there of having to get consensus.

4   But from our perspective, if we were to push it off, you know,

5   on the 21st, Your Honor, we -- we would request you to order

6   something, because I don't want this to delay.

7        THE COURT:  Okay.

8        MR. CLUBOK:  Your Honor, if I may, speaking for UBS,

9   it's Andrew Clubok.  You'll be happy to know I think that

10   we're in agreement with Mr. Seery, and I guess, derivatively,

11   Mr. Pomerantz.  We think the most important thing is to move

12   it along quickly, and we trust -- you know, we're familiar

13   with Judge -- or, with Mayer, and whether it's Groper or

14   Gropper, I lost track, but I'm sure he is also going to be

15   equally capable.  We do kind of think that two is probably

16   necessary, given, you know, the sort of multi-layer

17   (inaudible).

18     But, really, our position has simply been we'll happily

19   mediate with any, you know, effective mediator as quickly as

20   possible, because we do think the sooner we do that, the

21   sooner we might have a chance to get to yes.  So, I'm -- we're

22   prepared to just say yes to the idea.

23        THE COURT:  All right.  Does anyone else want to

24   comment?

25        MS. PATEL:  Your Honor?  And can you hear me?  I'm

```
 1   sorry.  It's --

 2           THE COURT:  Yes.

 3           MS. PATEL:  Again, I'm still having WebEx problems.

 4           THE COURT:  Yes.

 5           MS. PATEL:  Your Honor, again, for the record, Rakhee

 6   Patel.

 7       Acis is fine with the proposal, Your Honor.  We've been

 8   amenable to virtually every proposal, and have been trying to

 9   hopefully be helpful with respect to getting this moved to

10   mediation as quickly as possible.  We equally think that we

11   should get to mediation as quickly as we can.

12       And, you know, the only -- the only -- and I appreciate

13   Your Honor's contemplativeness on this.  As you know, at least

14   in connection with the Acis case, you know, we've been through

15   two unsuccessful mediations so far.  So we're really hoping

16   that the third time will go much better than the prior two.

17       So, anyway, this is my very long way of saying we're fine

18   with the proposal and are happy to kind of sign off on it.  We

19   don't need until July 21st to respond on that.

20           THE COURT:  Okay.  Anyone else?

21       (No response.)

22           THE COURT:  All right.  Well, very good.  I'm going

23   to move ahead on this and will confirm to you, hopefully

24   before the 21st, through my courtroom deputy.  And, again,

25   given the late hour, I think it's going to be tomorrow before
```

132

1    I pick up the phone and reach out to Sylvia Mayer and former
2    Judge Gropper.
3        But, again, I did, in speaking generically with Sylvia
4    Mayer, asking her, Have you ever done like a two-mediator
5    mega-mediation, and she said, Oh, sure.  You know, that's --
6    she acted like it was quite common.  It's not something that I
7    have seen very often, but I think we'll be in business with
8    this game plan.
9        Because, you know, I know everyone on this call knows
10   this, but maybe not everyone's client knows this:  If we don't
11   -- if we don't have a successful mediation of both of these
12   claims, or at least one of these claims, it's going to be
13   years and years and years.  I mean, I know it's already been
14   years for UBS, but it will -- it will be many, many more
15   years.  And that's not what we're supposed to do in
16   bankruptcy.  We're supposed to stop burdensome litigation and
17   solve problems.  And I can't imagine your clients want to go
18   on with three or four more years of litigation.  But that's
19   exactly what it will be, it's exactly what it will be, many
20   more years of litigation, if we don't have mediated
21   settlements.
22       So, all right.
23           MS. PATEL:  Your Honor, if I may very quickly.  I
24   just wanted to make sure the Court was aware of something.  In
25   the context of mediation and as it relates to Acis's claim,

133

1    yesterday counsel for Mr. Dondero filed a joinder in the

2    Debtors' objection to Acis's claim.  So, again, just thinking

3    about this in the context of mediation, I think, with that

4    joinder, they will be a necessary party.  So, going back to

5    Mr. Seery's point, this is not just --

6            THE COURT:  Oh, absolutely.  Mr. Dondero is --

7            MS. PATEL:  -- a two-party --

8            THE COURT:  -- going to be a required party in

9    mediation.  Absolutely.  So, --

10           MS. PATEL:  Thank you, Your Honor.

11           THE COURT:  All right.  Well, if there's nothing

12   further, we'll see you on the 21st.  And, again, my courtroom

13   deputy may be reaching out before then if we've got things

14   nailed down on mediation.

15       (Proceedings concluded at 4:54 p.m.)

16                           --oOo--

17

18

19

20                         CERTIFICATE

21

22       I certify that the foregoing is a correct transcript to
     the best of my ability from the electronic sound recording of
     the proceedings in the above-entitled matter.

23

     /s/ Kathy Rehling                       07/16/2020

24
     _____     _____

25   Kathy Rehling, CETD-444                        Date
     Certified Electronic Court Transcriber

134

```
                           INDEX
 1
    PROCEEDINGS                                        4
 2
    WITNESSES
 3
    James P. Seery
 4  - Direct Examination by Mr. Morris              13
 5  - Examination by the Court                      57
    - Cross-Examination by Mr. Clubok               60
 6  - Examination by the Court                      68
 7  John Dubel
    - Direct Examination by Mr. Morris              75
 8  - Examination by the Court                      95
 9  Bradley Sharp
    - Examination by the Court                     101
10  - Direct Examination by Mr. Morris             102
11  EXHIBITS
12  Debtors' Exhibits 1 through 7        Received 13
13
    RULINGS
14
    Application to Employ James P. Seery, Jr. as CEO , CRO   106
15  and Foreign Representative Nunc Pro Tunc to March 15,
    2020 filed by Debtor Highland Capital Management, L.P.
16  (774) - Granted
17  Amended Application to Employ and Retain Development    106
    Specialists, Inc. to Provide a Chief Restructuring
18  Officer, Additional Personnel, and Financial Advisory
    and Restructuring-Related Services for Such Debtor, Nunc
19  Pro Tunc as of the Petition Date filed by Debtor
    Highland Capital Management, L.P. (775) - Granted
20
    END OF PROCEEDINGS                             133
21
    INDEX                                          134
22

23

24

25
```

# EXHIBIT 15

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

| | | |
|---|---|---|
| IN RE: | . | Case No. 19-34054-11(SGJ) |
| | . | |
| HIGHLAND CAPITAL | . | Earle Cabell Federal Building |
| MANAGEMENT, L.P., | . | 1100 Commerce Street |
| | . | Dallas, TX  75242-1496 |
| | . | |
| Debtor. | . | March 4, 2020 |
| . . . . . . . . . . . . . . .. | | 1:31 p.m. |

TRANSCRIPT OF HEARING ON MOTION OF THE DEBTOR FOR ENTRY OF AN
ORDER AUTHORIZING, BUT NOT DIRECTING, THE DEBTOR TO CAUSE
DISTRIBUTIONS TO CERTAIN "RELATED ENTITIES"
BEFORE HONORABLE STACEY G. JERNIGAN
UNITED STATES BANKRUPTCY COURT JUDGE

APPEARANCES:

For Highland Capital        Pachulski Stang Ziehl & Jones, LLP
Management:                 By:  JEFF POMERANTZ, ESQ.
                                 GREG DEMO, ESQ.
                            10100 Santa Monica Blvd., 13th Floor
                            Los Angeles, CA 90067


                            Hayward & Associates PLLC
                            By:  MELISSA HAYWARD, ESQ.
                                 ZACHARY ANNABLE, ESQ.
                            10501 N. Central Expry, Ste. 106
                            Dallas, TX 75231




Audio Operator:        Michael F. Edmond

Proceedings recorded by electronic sound recording, transcript
produced by a transcript service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@jjcourt.com**

**(609) 586-2311    Fax No. (609) 587-3599**

2

APPEARANCES (Cont'd):

```
For Acis Capital          Winstead, P.C.
Capital Management:       By:  RAKHEE V. PATEL, ESQ.
                          2728 N. Harwood Street, Suite 500
                          Dallas, TX  75201

                          Rogge Dunn Group, PC
                          By:  BRIAN SHAW, ESQ.
                          500 N. Akard St., Suite 1900
                          Dallas, TX 75201

For Official Committee    Sidley Austin LLP
of Unsecured Creditors:   By:  MATT CLEMENTE, ESQ.
                               DENNIS TWOMEY, ESQ.
                          One South Dearborn
                          Chicago, IL 60603

                          Sidley Austin LLP
                          By:  PENNY REID, ESQ.
                          2021 McKinney Avenue, Suite 2000
                          Dallas, TX 75201

For CalPERS:              Singer & Levick, P.C.
                          By:  MICHELLE SHRIRO, ESQ.
                          16200 Addison Road, Suite 140
                          Addison, TX 75001

For James Dondero:        Lynn, Pinker, Cox & Hurst, LLP
                          By:  MICHAEL LYNN, ESQ.
                               JOHN BOND, ESQ.
                          2100 Ross Avenue, Suite 2700
                          Dallas, Texas 75201

For Redeemer Committee:   Frost Brown Todd LLC
                          By:  MARK PLATT, ESQ.
                          100 Crescent Court, Suite 350
                          Dallas, TX 75201

For Issuers Group:        Jones Walker LLP
                          By:  AMY ANDERSON, ESQ.
                          811 Main Street, Suite 2900
                          Houston, TX 77002
```

**WWW.JJCOURT.COM**

3

APPEARANCES (Cont'd):

TELEPHONIC APPEARANCES:

For CalPERS:            Nixon Peabody, P.C.
                       By:  LOUIS CISZ, ESQ.
                       One Embarcadero Center, 32nd Floor
                       San Francisco, CA 94111

                           - - -

WWW.JJCOURT.COM

4

## INDEX

**WITNESSES**                                                         **PAGE**

**JAMES P. SEERY, JR.**
 Direct Examination by Ms. Hayward                                     60
 Cross-examination by Ms. Reid                                         84
 Cross-examination by Ms. Patel                                        97
 Examination by the Court                                             103

Closing argument by Mr. Pomerantz                                     110
Closing argument by Mr. Clemente                                      113


**EXHIBITS**                                              **ID**    **EVID**

**FOR THE DEBTOR:**

1     Chart of Dynamic Income Fund structure                          83
2     Partnership agreement for Dynamic Income                        83
       Fund
3     Chart of Latin America Argentina Fund                           83
4     Partnership agreement for Argentina Fund                        83
5     Chart Fund                                                      83
6     Limited partnership agreement                                   83
7     Order re ordinary course governance                            83
       procedures
8     Final term sheet                                                83
9     Notice of amended operating protocols                           83
       CVs of Board members                                           83


WWW.JJCOURT.COM

APP. 1514
Appx. 01561

5

1      THE COURT:  -- set a motion of the debtor for entry

2  of an order authorizing but not directing the debtor to cause

3  distributions to certain related entities.

4      Let's get lawyer appearances in the courtroom.

5      MR. POMERANTZ:  Good afternoon, Your Honor.  Jeff

6  Pomerantz and Greg Demo, Pachulski Stang Ziehl & Jones, on

7  behalf of the debtors.

8      THE COURT:  Thank you.

9      MS. HAYWARD:  Good afternoon, Your Honor.  Melissa

10  Hayward and Zachary Annable of Hayward & Associates on behalf

11  of the debtor.

12      THE COURT:  Thank you.

13      MR. CLEMENTE:  Good afternoon, Your Honor.  Matthew

14  Clemente, Dennis Twomey, and Penny Reid from Sidley Austin on

15  behalf of the Official Committee of Unsecured Creditors.

16      THE COURT:  Thank you.

17      MS. SHRIRO:  Good afternoon, Your Honor.  Michelle

18  Shriro on behalf of CalPERS.  And I also have my co-counsel

19  Louis Cisz from Nixon Peabody, and he is -- he should be on the

20  line.

21      THE COURT:  Okay.  Thank you.

22      MR. LYNN:  Good afternoon, Your Honor.  Michel Lynn

23  and John Bonds for James Dundero.

24      THE COURT:  Okay.  Thank you.

25      MS. PATEL:  Good afternoon, Your Honor.  Rakhee

6

1 Patel, Winstead PC, on behalf of Acis Capital Management, LP,

2 and Acis Capital Management, GP, LLC. Also, I have my co-

3 counsel Mr. Brian Shaw of the Rogge Dunn Firm on behalf of the

4 same clients.

5         THE COURT: Thank you.

6         MR. PLATT: Good afternoon, Your Honor. Mark Platt

7 firm Frost Brown Todd on behalf of the Redeemer Committee of

8 the Highland Crusader Fund. And I believe Terry Mascherin is

9 on the phone, as well --

10         THE COURT: All right.

11         MR. PLATT: -- from Jenner & Block.

12         THE COURT: Thank you.

13         MS. ANDERSON: Good afternoon, Your Honor. Amy

14 Anderson with Jones Walker on behalf of the Issuers. I believe

15 Mr. James Bentley with Schulte Roth is also on the phone on

16 behalf of the same parties.

17         THE COURT: Okay. Thank you.

18         All right. We do have a large number of people on

19 the phone. I'm just going to go through the live lines and

20 take roll. Asif Attarwalla for UBS, are you there?

21         MR. ATTARWALLA: Here. Yes, Your Honor.

22         THE COURT: All right. James Bentley?

23         MR. BENTLEY: Yes, Your Honor. I'm here.

24         THE COURT: Okay. Also Jeff Bjork from Latham?

25 Yes/no?

**WWW.JJCOURT.COM**

7

1                    (No response)

2        THE COURT:  All right.  Earnestiena Cheng for FTI?

3        MS. CHENG:  Yes, Your Honor.

4        THE COURT:  Okay, thank you.  And Louis Cisz, I think

5  we heard he was CalPERS co-counsel.  Are you there?

6        MR. CISZ:  Yes, I am, Your Honor.

7        THE COURT:  All right.  Thank you.  Kimberly Gianis

8  for Contrarian?  Yes/no?

9                    (No response)

10        THE COURT:  All right.  Terry Mascherin, I think we

11  heard he was there for the Redeemer Committee.

12        MR. MASCHERIN:  Yes, Your Honor.

13        THE COURT:  Okay.  I'll just ask anyone else on the

14  phone who wishes to appear, go ahead at this time.

15                    (No response)

16        THE COURT:  All right.  That may be it.

17        All right.  Mr. Pomerantz, I see a 20-minute time

18  estimate on our calendar.  I'm not sure where that came from,

19  but that --

20        MR. POMERANTZ:  I think that's quite aggressive.

21        THE COURT:  Okay.

22        MR. POMERANTZ:  Good afternoon again, Your Honor.

23  Jeff Pomerantz, Pachulski Stang Ziehl & Jones.  First, I want

24  to thank Your Honor for scheduling the hearing on shortened

25  time.  I would also like to introduce once again the three

APP. 1517
Appx. 01564

8

1 members of the independent board who have been appointed

2 pursuant to the settlement, Your Honor, that Your Honor

3 approved on January 9th.  That's James Seery, John Dubel, and

4 Russell Nelms.

5          THE COURT:  Okay.  Hello.

6          MR. POMERANTZ:  I thought it might be helpful, Your

7 Honor, to provide Your Honor with a brief background of each

8 board member, how they have been approaching their duties as

9 independent directors, and what the focus has been the first

10 two months of the case.  And then I will go into the background

11 of this present motion.

12          THE COURT:  Okay.

13          MR. POMERANTZ:  James Seery will be the debtor's

14 witness at today's hearing, and he's a 30-year restructuring

15 lawyer with extensive experience with high-yield and distressed

16 investing both as a principal and manager which is precisely

17 the business in which the debtors operate.  He is an attorney

18 licensed to practice in New York who has passed and held the

19 Series 7, 63, 79, SIE and Series 24 FINRA principal

20 designations.

21          From April 2012 to 2017, he was the president and

22 senior investing manager of RiverBirch Capital.  And RiverBirch

23 is an SEC-registered investment advisor managing a $1.3 billion

24 global long short fund that focused on high yield loans, bonds,

25 CLOs, and distressed investments.  Prior to that, Mr. Seery

WWW.JJCOURT.COM

9

1  spent ten years as a senior high yield manager at Lehman

2  Brothers, and he was the global head of Lehman Brothers fixed-

3  income loan business.

4       Accordingly, Mr. Seery brings to his role as an

5  independent director a unique combination of a legal

6  background, restructuring experience, and a deep knowledge of

7  the highly regulated business in which the debtor operates.

8       Mr. Dubel brings 35 years' practice in the

9  restructuring area.  His experience includes turnaround

10 management, crisis management, operational restructurings, and

11 corporate acquisitions and divestitures.  He's worked at both

12 sides of the table, both on the company side and other side.

13 And he brings a unique perspective to each situation, and he

14 spent the last ten years being an independent director for a

15 wide range of distressed companies including Purdue Pharma

16 which obviously is the newest in current Chapter 11, WMC

17 Mortgage, Wartaco (phonetic), FXI, and ResCap.

18      And as an independent board member, he's plated a

19 principle role in overseeing management, negotiating with

20 creditors, supervising and investigating resolution, either

21 consensually or through litigation of insider and affiliate

22 claims, and also spearheading reorganization efforts.

23      I'm sure Your Honor is familiar with Russell Nelms

24 but briefly he was a distinguished bankruptcy litigator with

25 Carrington Coleman for 20 years which followed a stint of six

10

 1  years as a United States Army judge advocate, and also he sat

 2  with the bankruptcy court here in Fort Worth from 2004 to 2018.

 3          Your Honor, these individuals bring a complementary

 4  skill set to the independent board that have made them uniquely

 5  qualified to manage the debtor's restructuring efforts in this

 6  case, that bring a combination of sophisticated asset

 7  management experience, financial restructuring, a legal

 8  insolvency background, and judicial experience.  They've been

 9  involved in many cases on all sides of the aisle, whether it's

10  been alleged wrongdoing or questionable conduct with people

11  they've ever had to supervise as a board member, advise as a

12  restructuring lawyer, work with as a financial advisor, or

13  administer their cases as a judge.

14          Mr. Seery and Dubel were selected by the Committee

15  not only because of their relevant expertise but because of

16  their commitment to independence and ability to stand up to

17  strong personalities that exist on all sides of this case.  Mr.

18  Nelms, while originally identified by the debtor, was scheduled

19  by the Committee, and was ultimately chosen to be the third

20  board member by Mr. Seery and Dubel from a group of highly-

21  qualified candidates.

22          Your Honor, I provide this background to stress that

23  the independent board consists of individuals whose background

24  and experience speak to their independence, experience, and

25  strength, and who take their job seriously to do what they

WWW.JJCOURT.COM

11

1 believe is right for this debtor, and they're not bring

2 influenced by any party in this case, be that the debtor, Jim

3 Dondero, members of the management committee, members of the

4 debtor's management, or the creditors' committee. The

5 reputations of each of these gentlemen at are stake in a case

6 like this, and they take their attendance very seriously.

7 Upon taking over on January 9th, 2020, the board

8 quickly made a few observations about the current circumstances

9 that have guided their actions today. First, the board

10 understood that the debtor was where it was in part due to many

11 years of intense litigation arising out of sometimes aggressive

12 management decisions or failure to settle certain employee

13 disputes and that the litigation led to cost and diversion of

14 time and energy for what the debtor did best which was manage

15 assets.

16 The board concluded that for case to succeed, the

17 board would have to chance the culture from one of litigation

18 to reconciliation and consensus building. It doesn't mean that

19 the debtor will back down from defending itself from claims

20 that it doesn't believe are legitimate but rather the

21 litigation that the company under their watch would be involved

22 in would need to be carefully vetted by the independent board,

23 outside advisors, and the results of which would guide the

24 board's conduct.

25 The board's focus has and continues to be operating

WWW.JJCOURT.COM

12

1 the debtor's business in accordance with its obligations of

2 their debtor in possession in conformance with its statutory,

3 contractual, and fiduciary obligations as an investment

4 advisor. By scrupulously meeting its obligations as an

5 investment advisor, the debtor will continue to enhance the

6 asset management business and avoid the litigation that

7 contributed to this case.

8 Second, the board understood the relationship between

9 the debtor's largest creditors and senior management had

10 materially deteriorated and that there was severe lack of trust

11 that creditors had with respect to management. The board

12 initially determined, has determined to continue retaining the

13 services of senior management because it believes that their

14 historical background and deep knowledge of the debtor's assets

15 provide material value to the estate. However, the board's

16 decisions thus far have and will continue to be based upon

17 their independent review of the facts and circumstances and

18 based upon consultation with outside advisors as appropriate.

19 Third, the board believe that a lengthy stay in

20 Chapter 11 only would serve to erode asset value while at the

21 same time leading to extensive restructuring costs. The Court

22 and the board developed a timeline that will hopefully lead to

23 a confirmed plan at the end of the year.

24 Against this backdrop, the board is focused on the

25 following things the first two months of the case. Initially,

WWW.JJCOURT.COM

13

1  the board met with all department heads and other members of

2  senior management including Mr. Dondero and let them know that

3  the board was now in charge and that all business decisions

4  needed to be run by the board subject to the board delegating

5  authority as it deemed appropriate.

6        The board has had several calls with the committee

7  and its professionals to discuss among other things the board's

8  initial determination as to staffing levels and employee

9  compensation, time-sensitive transactions that needed the

10 committee's input under the Court's approved operating

11 protocols, and the proposed timeline for achieving

12 restructuring.  There is an in-person meeting scheduled next

13 week in New York City between all the committee members and

14 their professionals and the debtor and their professionals.

15       Members of the board have also reached out to

16 individual committee members and have had or will have meetings

17 with them to understand their specific concerns with the debtor

18 and to importantly have a dialogue about the claims they have

19 against the debtor, as resolving the claims against the debtor

20 is a key part of achieving a consensual restructuring in this

21 case.

22       The debtor's asset basis is also extremely complex,

23 and the board has worked hard to get a grasp on how best to

24 maximize their value.  The board has analyzed the debtor's

25 liquidity needs and worked with the debtor's chief

APP. 1523
Appx. 01570

14

1 restructuring officer to develop a 13-week cash flow and

2 otherwise address how to enhance liquidity. The board has also

3 conducted a thorough review of the debtor's employee basis,

4 including performance reviews and address ongoing staffing and

5 compensation in a manner that the board believes will sustain

6 the debtor's business operations and maximize value.

7 Related to the motion before the Court, the board has

8 evaluated the status of certain funds which were in the process

9 of being wound down at the commencement of the case and has

10 supervised their wind-down in a manner consistent with the

11 debtors' fiduciary, statutory, contractual liabilities. The

12 board has also commissioned outside counsel to provide an

13 independent analysis of the significant litigation claims that

14 are facing the debtor. And as I mentioned, the board

15 anticipates engaging with these creditors to seek a resolution.

16 The board is acutely aware that resolving

17 consensually claims of creditors and claims the estate has

18 against third parties is the only way to restructure this

19 debtor efficiently and economically. I'll now turn Your Honor

20 to the background with respect to the motion, explain the

21 relief requested, and address the two objections that are

22 before the Court.

23 Your Honor will hear testimony from Mr. Seery that

24 the debtor is the asset manager of two hedge funds, Dynamic and

25 ARF, that are in liquidation because of redemption requests

15

 1  from large non-affiliated investors that render the funds

 2  economically not viable.  The term of the third fund, which is

 3  a private equity fund, Restoration Capital expired, and the

 4  governing board comprised of large institutional pension funds

 5  has refused to grant further extensions.

 6          Mr. Seery will testify that while these wind-downs

 7  were already in process and fully disclosed to the Court prior

 8  to the installation of the independent board, the board

 9  evaluated the decision to wind down the funds independently of

10  the debtor's decision and decided that the prudent exercise of

11  the debtor's business judgment was to continue with the wind-

12  down.  Neither the committee nor Acis challenge the board's

13  selection to continue with the wind-down.

14          You will hear testimony from Mr. Seery that a

15  priority of the independent board was to make sure that the

16  debtor operated in accordance with applicable law to ensure

17  that the debtor fills its obligations to investors and doesn't

18  act or fail to act in a manner which could expose the debtor to

19  liability.  After all, as I mentioned, Your Honor, a material

20  reason why the debtor is before the Court is because of

21  litigation claims that have plagued it over the last several

22  years.

23          Mr. Seery will testify that in evaluating the

24  debtor's duties and obligations as an asset manager of these

25  three funds, the board consulted with bankruptcy counsel with

WWW.JJCOURT.COM

16

1  respect to the applicability of the operated protocols and

2  domestic and Cayman counsel specializing in advising funds with

3  respect to their obligations under the transactional documents,

4  the Advisors Act, and general fiduciary duty obligations.

5      Tim Silva, a partner of WilmerHale, the debtor's

6  outside firm that provides fund advice, is present in the

7  courtroom and will be available to answer any questions the

8  Court or the parties have.  Dennis Olarou, a partner with Carey

9  Olsen, is on the phone.  He is the debtor's Cayman counsel and

10 also available.

11     Importantly, Mr. Seery will testify that the

12 independent board made the decisions that led to the filing of

13 this motion based upon their own expertise and the advise of

14 outside counsel and did not rely on the advice of the debtor's

15 employees or any of the related parties.

16     He will further testify that based upon the input of

17 outside counsel, the independent board concluded, one, that the

18 operating documents governing the funds did not permit the

19 debtor to unilaterally withhold distributions from some

20 investors and not others; that, two, the debtor risked

21 breaching its fiduciary duty to investors under principles of

22 common law if it withheld distributions on its own; and that,

23 three, the debtor risked liability under the Advisors Act if it

24 essentially attempted to use its position as an investment

25 manager to gain leverage against investors in connection with

17

1 an unrelated matter, to wit, potential claims that the estate

2 may have.

3        The motion describes in detail the nature and extent

4 of the debtor's obligations, and I think the substance of that

5 is not challenged by either the Committee or Acis.  I didn't

6 read their objections to challenge that the debtor has these

7 obligations and seeks to fulfill them.

8        Based upon the foregoing and to make sure that the

9 debtor didn't expose itself to liability, Mr. Seery will

10 testify that the board decided that it was obligated to

11 exercise its authority as asset manager to distribute the funds

12 to all investors.  After consultation with the bankruptcy

13 counsel, Mr. Seery will testify that the independent board

14 decided to provide the Committee with notice prior to making

15 such distributions as were required by the operating protocols

16 approved as part of the settlement.

17        The Committee objected to the distributions which led

18 to the filing of this motion.  The objections relate to

19 distributions to be made as follows.  Mr. Seery will testify

20 that Dynamic proposes to distribute $35 million of investor

21 funds that are held by Dynamic of which CLO Holdco stands to

22 receive $872,000 and Mr. Okada stands to receive $4,176,000.

23        With respect to ARF, Mr. Seery will testify that they

24 propose to distribute $22 million of investor funds held by

25 ARF.  HoldCo stands to receive $1.5 million.  And with respect

APP. 1527
Appx. 01574

18

1  to Restoration Capital Partners, it proposes to distribute

2  $123,250,000 of which 2.1 million will be received by ACM

3  Services and, importantly, the debtor will receive 18 and a

4  half million dollars, the balance of approximately 121 million

5  would be distributed to non -- or 103 million would be

6  distributed to non-related parties, including CalPERS which

7  filed the statement with the Court.

8         The Committee and Acis argue that the Court should

9  prohibit the debtor from making distributions to related

10 parties, notwithstanding the debtor has contractual, fiduciary,

11 statutory obligations to do so as an asset manager.  It is

12 important for the Court to understand that the money to be paid

13 to these related parties is not the debtor's money, it's not

14 property of the estate.  It's actually funds that are the

15 investors' funds that were invested in these various funds.

16        Essentially, the Committee argues and Acis argues

17 that because the debtor may assert claims against some of all

18 of these related parties at some time in the future, the Court

19 should prohibit the debtor from authorizing the distribution of

20 non-debtor estate funds.  Essentially as we said in our papers,

21 the objectors are asking this Court to issue a pre-judgment

22 write of attachment adjoining these distributions without the

23 filing of any complaint which would assert causes of action,

24 without the need to satisfy applicable standards for a pre-

25 judgment writ either under Federal Rule of Civil Procedure 64

APP. 1528
Appx. 01575

19

1  estate law, and without appropriate notice to the parties and

2  an opportunity to object.

3        The objectors want to use the debtor's position as an

4  asset manager to stop distribution of funds in which the debtor

5  has no interest to gain a potential litigation advantage

6  against these related parties.  The debtor just submits that is

7  not appropriate.  The Committee and Acis spent a lot of time in

8  their papers talking about the allegations and in some estate

9  case findings against the debtor's prior management relating to

10  the operation of the debtor's business, some of which have

11  matured into claims against the estate.

12        However, the fact that the debtor's actions taken by

13  prior management led to claims against the debtor is not

14  legally relevant as to whether the debtor should be permitted

15  to make these distributions of non-estate funds.  Allegations

16  of prior wrongdoing would not be sufficient in the context of a

17  pre-judgment attachment, and it should not form the basis for

18  essentially the injunctive relief the Committee and Acis urge

19  to the Court.

20        The Committee also argues that because the

21  Committee's currently investigating claims against the released

22  parties and other insiders that the distribution should be held

23  up essentially indefinitely until the Committee completes its

24  investigation.  Whether or not the estate has claims against

25  the related parties and insiders is unknown at this point

20

1  except for the notes which I will address in a moment.

2        Also, whether or not there are claims and how the

3  related parties acquired their investment in the funds is also

4  unknown at this time.  Since January 9th, the Committee has had

5  standing to investigate and prosecute these claims and the

6  debtor is cooperating with the Committee in its investigation.

7  If legitimate claims exist, they should most certainly be

8  prosecuted, and the independent board will cooperate with the

9  Committee in its efforts.

10       However, at this point other than with respect to the

11 notes, there is no admissible evidence that any claims exist,

12 and no claims have been clearly articulated other than some

13 vague allegations of fraudulent conveyance, breach of fiduciary

14 duty, the garden variety of claims you would expect to be

15 asserted in a case like this.  Again, no bankruptcy court, no

16 non-bankruptcy court would be authorized to enjoin payments on

17 the basis of these vague and unasserted claims, and the Court

18 shouldn't accept the invitation to do so wither.

19       The Committee also points to certain demand notes

20 executed by Jim Dondero, Mark Okada, and ACM Services in favor

21 of the debtor as a basis for withholding the distributions.

22 The debtor has made a demand on Mr. Okada to pay back the note,

23 and he has asserted that he may have potential offsets and the

24 nature of potential service obligations and expense

25 reimbursements allegedly owed to.  At some point in time, we

APP. 1530
Appx. 01577

21

1  suspect those issues will be resolved either consensually or

2  there will be litigation to recover the demand.

3         ACM Services which is owned 75 percent by Mr. Dondero

4  and 25 percent by Mr. Okada, executed several notes in favor of

5  the debtor of which 850,000 are demand notes.  The total amount

6  is approximately seven and a half million.  The remaining notes

7  are current and have been paid down over the years.

8         The debtor has not made demand on ACM Services for

9  payment of the notes, nor have they made demand on Mr. Dondero

10  for payment of the notes he issued in favor of the debtor.  Mr.

11  Seery will testify that the reason for that is that, as I

12  indicated before, the board recognizes that in order for there

13  to be a consensual restructuring in this case, it's going to

14  involve not only resolution with the creditors and their claims

15  but also resolution with Mr. Dondero or potential claims the

16  estate has.

17         The independent board at this early stage in the case

18  does not believe that commencement of an adversary proceeding

19  against Mr. Dondero at this time is in their best interest.  If

20  this case turns into a litigation case, and as Your Honor

21  experienced previously, then such litigation will be commenced.

22  However, until the board has the opportunity to try to forge a

23  consensual resolution, aggressive action is premature.   The

24  last thing, Your Honor, CLO Holdco is not a party to any demand

25  notes.

WWW.JJCOURT.COM

22

1    THE COURT:  Let me stop you.

2    MR. POMERANTZ:  Sure.

3    THE COURT:  You mentioned dollars on the notes.  The

4 note receivable from Okada I think is 1.3 million.

5    MR. POMERANTZ:  With credentials, yes.

6    THE COURT:  And then you mentioned roughly seven and

7 a half million of notes receivable from HCM Services.

8    MR. POMERANTZ:  Of which 950 are demand notes.  The

9 rest are currently before me in accordance with the terms.

10    THE COURT:  Okay.  You didn't mention a dollar amount

11 on the note receivable from Dondero.  My notes show 9.3

12 million.

13    MR. POMERANTZ:  Yeah, and so I think that's around

14 that --

15    THE COURT:  Is that a demand note or notes?

16    MR. POMERANTZ:  That is a demand note and then the

17 related party notes, yes --

18    THE COURT:  Okay.

19    MR. POMERANTZ:  -- Your Honor.  And, again, we're now

20 the board knows, fully aware.  The board could have commenced a

21 lawsuit.  Honestly, Your Honor, the Committee could have

22 commenced a lawsuit in the last two months.  I suspect the

23 Committee also would like to see a consensual restructuring.

24    And I think parties are taking the view of, again,

25 this can be a litigation case which would be like a lot of

WWW.JJCOURT.COM

23

1 money for all the professionals, not really do all that well

2 for the creditors. Or the parties could cooperatively work

3 towards a restructuring to see based upon the leverage, based

4 upon the claims everyone has that it makes more sense. And the

5 board's determination, again, made on its own coming into this

6 case in the last two months is that proceeding aggressively now

7 just does not make sense.

8        Even though it has not commenced any litigation

9 against the related parties nor presented any evidence of any

10 claims against the related parties, the Committee asks this

11 Court to use its equitable powers under Section 105 to enjoin

12 the distribution again of non-estate funds to the related

13 parties. Your Honor, bankruptcy court -- bankruptcy

14 practitioners in certain cases love to use 105, assert 105. My

15 experience has been when you assert 105 and that's all you

16 assert 105, it really means you don't have much authority and I

17 think that's the case here.

18        The courts have held that 105 is not -- grant the

19 court authority to be a roving commission to do equity because

20 it has to be tethered to something in the Bankruptcy Code.

21 Here the proper way for the Committee to obtain the relief they

22 sought was to file a complaint and seek pre-judgment remedy,

23 either an attachment under Rule 64 or an attachment under

24 applicable provisions of Texas law or other applicable law, or

25 an injunction under FRCP 65.

WWW.JJCOURT.COM

24

1          The debtor would not stand in the way if the
2     Committee decided to do that.  That's what the debtor bargained
3     for.  They gave the Committee the authority to do that.  The
4     Committee has not yet done that.  And the Court should just not
5     allow the debtor -- the Committee to use the debtor's position
6     as fiduciary to its investors as leverage.  That's what's
7     really happening.  The only reason we're here is because the
8     debtor is the asset manager of these other funds, and the
9     Committee and Acis want the debtor to use that leverage and
10    somehow to gain an advantage.

11          Your Honor, we would submit that the fiduciary duty
12    of the estate is to act in accordance with its obligations, and
13    that's the primary fiduciary duty and that the creditors are
14    best served if the company complies with its obligations and
15    doesn't expose the estate to any liability.

16          Lastly, Your Honor, I want to address the Committee
17    and Acis's allegations regarding the circumstances surrounding
18    the sale of the MGM shares, the proceeds of which the debtors
19    intend to use to distribute as part of the RCP fund.  Whether
20    or not Mr. Dondero's authorized to make that trade, it's really
21    irrelevant to the issues before the Court.  The independent
22    board first learned about the trade only a few weeks ago, and
23    the independent board -- and, again, this happened back in
24    November, two months before the independent board took over.
25    They promptly investigated the circumstances around the trade,

WWW.JJCOURT.COM

25

1  engaged counsel to advise whether it was binding and,

2  importantly, evaluated whether the trade was a sound exercise

3  in the debtor's business judgment at that time.

4        The board concluded that the trade was binding and

5  that it in fact was a good trade as of November 2019 and

6  disclosed that information to the Committee and engaged the

7  Committee in a dialogue to discuss the options that the debtor

8  had with respect to that trade.  The Committee, while I

9  understand was not unanimous, ultimately agreed with the

10  independent board that it was in the debtor's best interest to

11  consummate that trade.  While we understand that the Committee

12  and Acis may want to investigate the circumstances surrounding

13  that trade to determine whether the estate has any colorable

14  claims that could be asserted, that doesn't provide a basis for

15  enjoying the distribution of the funds.

16        Moreover, the allegation in Acis papers that Mr.

17  Dondero used his position on the board of MGM to facilitate the

18  trade so that ACM Services could receive $2.1 million of 123

19  and $250,000 sale, it just lacks and factual support.  And, in

20  fact, Mr. Dondero has steadfastly encouraged the investment

21  board not to sell the MGM shares because he believes they will

22  continue to appreciate and the estate and its creditors would

23  be benefitted thereby.

24        The reason that the RCP shares were sold is as I

25  mentioned before, the RCP, the term of that private equity fund

APP. 1535
Appx. 01582

26

1  expired.  No more extensions were given, and the debtor as a

2  fiduciary and as an asset manager needed to liquidate the

3  assets in that estate which included the shares.  But, again,

4  if there are claims surrounding how that happened, we

5  understand there's concern that the creditors have about the

6  circumstances, they can investigate them and the independent

7  board will surely cooperate with such investigation.

8          In conclusion, Your Honor, this independent board was

9  installed because of its independence and sophistication in

10 managing a business as complex as the debtor's.  As you will

11 hear in the testimony, the independent board has been

12 thoughtful and thorough in its approach to the issues raised by

13 this motion and is trying to manage the debtor in a responsible

14 way to maximize value and prevent the estate from incurring any

15 liability.  The independent board understands and shares the

16 Committee's and Acis's decision to hold other parties

17 accountable for any liability they have against the debtor

18 arising out of conduct that occurred pre- or post-bankruptcy.

19 But trying to use the debtor's role as an independent asset

20 manager and fiduciary duty to investors is inappropriate and

21 create risks for the estate.

22         For these reasons, Your Honor, the debtor

23 respectfully requests that the Court approve the motion and

24 overrule the objections.

25         THE COURT:  All right, thank you.  Other opening

27

1 statements, Mr. Clemente?

2 MR. CLEMENTE: Yes, Your Honor. You actually touched

3 on a question that I had. I assume I have more fulsome

4 comments that I had anticipated making after testimony, but so

5 I would reserve the opportunity to do that. It was quite a

6 lengthy opening there, so I didn't know whether there was going

7 to be the opportunity for that after testimony, but --

8 THE COURT: Certainly.

9 MR. CLEMENTE: -- I certainly want to reserve that.

10 Thank you, Your Honor.

11 So I do have some opening remarks prepared, but I'm

12 going to react a little bit to what I just heard. I and the

13 Committee do not dispute the credentials of the board. We

14 obviously were involved in choosing them. I heard a lot about

15 the duty to, quote/unquote, investors. I don't think I heard a

16 word about the duty to the creditors and to the estate. And I

17 think it's important when thinking about the investors that Mr.

18 Pomerantz keeps referring to, the Committee is not talking

19 about the legitimate third party investors, the CalPERS. The

20 Committee is talking about the very people that were in charge

21 of this debtor while breaches of fiduciary duty were rampant

22 and their related entities that resulted in the filing of this

23 bankruptcy case.

24 And I find it a little bit rich, Your Honor, that

25 their debtor is using the duty to investors to include third

WWW.JJCOURT.COM

28

1  parties to try and come in here and passionately argue that

2  distribution should be made at this time to these insider

3  parties without a word at all about why it may actually be in

4  the creditors' best interest or this estate's best interest to

5  not make those distributions at this time. So those were a

6  couple of comments that struck me as I was listening to what

7  Mr. Pomerantz said.

8          But let me be clear, Your Honor, as Your Honor is

9  aware the debtor is in bankruptcy because of the documented and

10 egregious breaches of fiduciary duties and contractual

11 obligations to its creditors and its propensity for fraudulent

12 and litigious conduct as documented. Mr. Dondero and until

13 recently Mr. Okada dominated all aspects of the debtor and

14 controlled all of its decision-making, including the decision-

15 making that led various tribunals, including this Court, to

16 conclude that the debtor had breached its fiduciary duty,

17 engaged in fraudulent conduct, and employed persons who are not

18 credible and not truthful.

19         Against this backdrop, Your Honor, the debtor wants

20 to make distributions to investors, again, the investors we're

21 talking about here are Mr. Okada, and entities owned and/or

22 controlled by Mr. Dondero and Mr. Okada without regard

23 apparently because I didn't hear anything about that to the

24 interest of creditors under the rubric of a fiduciary duty that

25 is supposedly owed to those insider parties, the same insider

APP. 1538
Appx. 01585

29

1  parties, Your Honor, who were found to have breached the duties

2  to the creditors of this estate or to the investors which then

3  resulted in them becoming creditors of this estate and led to

4  the bankruptcy.

5          Your Honor, I think the irony is fairly thick, and I

6  don't think the Court should allow the distributions at this

7  time.  These insider parties, and I'm glad Mr. Pomerantz

8  mentioned it to you because their papers did not mention the

9  notes that were owed, they owe the debtor millions of dollars.

10 The numbers that Your Honor read are just the direct notes

11 among those parties.  They do not include the notes that are

12 owed by, for example, affiliated entities of Mr. Dondero.  So

13 those numbers are even larger than what Mr. Pomerantz suggested

14 to Your Honor.

15         Second, as the debtors do finally disclose in their

16 papers, the insider parties receive certain of the insider

17 interests from the debtor pursuant to transactions that were

18 only recently disclosed to the Committee and not have been

19 examined by the Committee.  So in many of the circumstances,

20 the very interests that are giving rise to the basis for these

21 distributions once belonged to the debtor.

22         Third, obviously, the insider parties are the focus

23 of the Committee's ongoing investigation of the estate causes

24 of action, and that's entirely appropriate given the long

25 history and the findings made by this Court and others

WWW.JJCOURT.COM

30

1  regarding the behavior of this debtor prior to the bankruptcy.

2         Your Honor, instead of allowing the distributions to

3  be made, the Court should direct that the distributions that

4  the debtor seeks to make to the insider parties to be placed

5  into a segregated interest-bearing account pending the

6  resolution of potential claims against the insider parties

7  including the collection of notes owed by the insider parties

8  and the investigation into the validity of the insider

9  interests.

10        If the insider parties have an issue with this,

11 obviously, they can come before Your Honor, perhaps they'll

12 come before Your Honor today, and explain to you why what is

13 being proposed is unfair to them or why despite the

14 circumstances surrounding this case, the rampant breaches of

15 fiduciary duty, the questionable transactions, and the

16 existence of the notes they owe the debtor they should receive

17 those distributions now.  And we can do that after a fulsome

18 discovery of those parties, a fulsome record, full opportunity

19 to brief.

20        I believe, the Committee believes this is a very

21 sensible proposal, and it would seem to serve all interests.

22 The interests of the estate would be protected.  Let's talk

23 about those.  Obviously, we're more likely to recover on the

24 notes and any potential claims, including claims that the

25 insider interests were inappropriately obtained.

WWW.JJCOURT.COM

31

1          Mr. Pomerantz referred to the word "leverage."

2   Again, it's the estate, the estate should be thinking about how

3   it can actually collect on its claims and notes.  So the word

4   "leverage" I don't think is appropriate here.  It just seems

5   sensible.  The interest of the insider parties would also be

6   protected.  The money will be placed in a segregated account,

7   and the status quo would be preserved.  And legitimate third

8   party investors, we are all fully in support of the legitimate

9   third party investors receiving their distributions.  We've

10  never had an issue with that, Your Honor.

11         Mr. Pomerantz referred to the authority, Section 105.

12  I do believe the Court has ample authority under Section 105 of

13  the Bankruptcy Code to order the relief requested by the

14  Committee.  Obviously, Section 105 is broad and, as we'll

15  discuss further later, it's been interpreted by this Court and

16  other courts to apply very broadly and in circumstances similar

17  to this.

18         Additionally, Your Honor, although I do not believe

19  105 needs to be tethered, I believe is the word that was used,

20  to other sections of the Code.  I do believe that other

21  sections of the Code are implicated as the relief the Committee

22  requests impacts property of the estate which includes the

23  notes and potential claims against the insider parties as well

24  as the rights and obligations of the debtor under the various

25  contracts that Mr. Pomerantz referred to.

APP. 1541
Appx. 01588

32

1    So, we have 105. If we need to tether it to

2  something, we can tether it to 541 and we can tether it to 363.

3  What we're asking the Court to do impacts property of the

4  estate, impacts the rights and obligations of the debtor.

5    Finally, Your Honor, there was a long discussion or

6  somewhat of a discussion about the fact that the Committee has

7  not sought a preliminary injunction or has not filed claims

8  against the insider parties. First, again, I believe Section

9  105 gives the Court the authority that it needs to provide the

10  relief. Second, the Court has the flexibility should it choose

11  to construe or find it necessary to construe our objection as a

12  request for a preliminary injunction and the request satisfies

13  that standard.

14    Third, Your Honor, this has been an expedited process

15  initiated by the debtor. If this Court believes that other or

16  further proceedings or processes are necessary or appropriate,

17  the Court should allow the parties the time for that. We

18  agreed to an expedited motion practice under the protocols.

19  That's a fact. The protocols cover a variety of circumstances

20  designed with the exigencies of the debtor's business in mind,

21  not designed with trying to speed distributions to Dondero,

22  Okada, and the insider parties. There simply is no exigencies

23  surrounding that, and the Committee should not be prejudiced if

24  this Court believes a further or other procedural vehicle is

25  necessary.

WWW.JJCOURT.COM

33

1          And a moment, Your Honor, on the investigation, as

2 Your Honor is aware the insider parties have dominated the

3 debtor for years.  Only recently January 9th the Committee has

4 gotten the ability to investigate.  And to date, we've been

5 doing that.  I do dispute what Mr. Pomerantz said about the

6 debtor's cooperation.  I believe that they've used words to

7 that effect but we've not gotten the documents that we need.

8 This is a complicated enterprise as Your Honor is aware.  It's

9 unrealistic to think that we would be in a position to bring

10 claims against insider parties at this particular time in the

11 case.  And we cannot be prejudiced by saying we should have

12 completed our investigation and had brought claims every time

13 the debtor thinks it should make a distribution to Mr. Dondero

14 or one of its related entities.

15          And so, Your Honor, to sum up, we think that the most

16 logical solution here and frankly the one that I assume the

17 debtor would have agreed with me on would be to come to this

18 Court, allow the distributions to be made to all the third

19 party investors, to withhold the distributions to the related

20 parties while the investigation occurs, while the notes are

21 settled, and while the Committee determines and the Court may

22 perhaps ultimately determine whether the interest that gave

23 rise to those distributions were in fact appropriately with

24 those parties.

25          Instead, we're here talking about duties owed to,

**WWW.JJCOURT.COM**

34

1  quote/unquote, the investors without considering what it is

2  that's owed to these creditors and to this estate.  And with

3  that, Your Honor, we would ask that the motion be denied or

4  however you'd look at it but that the relief we noticed in our

5  paper be ordered by Your Honor.

6       THE COURT:  Let me follow up and make sure I

7  understand a couple of things.  You've said a couple of times

8  that it's just the distributions that would go to related

9  investors, Mark Okada, CLO Holdco, HCM Services.  And I got the

10 impression from your pleadings as well as your oral statements

11 that the Committee is not challenging in any way the decision

12 to wind down these three funds, if you will.  You know, my

13 reading of the pleadings was November 2019, you know, less than

14 a month after the bankruptcy was filed or about a month after

15 the bankruptcy was filed, you know, there were significant

16 redemptions.  In the face of significant redemptions, the

17 debtor decided it was appropriate to wind these down.

18      Is that going to be the subject of evidence and

19 testimony today?  Is the Committee at all concerned about how

20 that all played out, whether it was legitimate unaffiliated

21 investors seeking redemption or if it was by chance insider

22 investors?

23      MR. CLEMENTE:  No, Your Honor.  The Committee is not

24 challenging the wind-down as I believe you're referring to.  We

25 are not doing that, Your Honor.

**WWW.JJCOURT.COM**

35

1          THE COURT:  Okay.  And this may be one instance where

2   it's kind of hard for me to separate what happened in the

3   related case of Acis versus this where we had all of a sudden

4   we don't want Acis to, you know, manage these in that case CLOs

5   anymore until redemptions were happening.

6          MR. CLEMENTE:  I understand, Your Honor.

7          THE COURT:  And the business judgment of that --

8   well, it's complicated, right.

9          MR. CLEMENTE:  I completely understand.

10         THE COURT:  It was, in the end of the day, depriving

11  Acis debtor of management fees.  Same thing is happening here,

12  right?  Highland is being deprived of management fees by the

13  wind-down of these three funds, but you're not challenging the

14  business judgment of the --

15         MR. CLEMENTE:  That is correct, Your Honor.

16         THE COURT:  -- whole process of the redemptions

17  period?

18         MR. CLEMENTE:  That is correct, Your Honor.

19         THE COURT:  Okay.

20         MR. CLEMENTE:  There is a pot of funds sitting in

21  those funds, and there is a pot of funds sitting in RCP --

22         THE COURT:  It was a legitimate non-affiliated

23  entity's --

24         MR. CLEMENTE:  We're not challenging it, Your Honor.

25         THE COURT:  Okay.

**WWW.JJCOURT.COM**

36

1        MR. CLEMENTE:  What we are challenging obviously is

2   now the distribution of those funds to the related entities.

3   That's where we take issue with it at this particular moment in

4   time.

5        THE COURT:  Okay.

6        All right.  Who else wishes to make an opening

7   statement?  I know Acis had a joinder or a slightly different

8   objection, I think.

9        MS. PATEL:  Yes, Your Honor.  Good afternoon.

10  Again, Rakhee Patel on behalf of Acis.  And I'll address Your

11  Honor's question first.  Acis has concerns about the wind-down

12  of these funds.  I'll just clear with respect to it.  And Your

13  Honor referenced, you know, perhaps we need to separate what

14  happened in the Acis case and whether that's happening here or

15  not.

16       Your Honor, I'm not sure from Acis's perspective that

17  we don't object to the wind-down of these funds.  We just

18  frankly don't have enough information to kind of take a

19  position with respect to that whether these funds should be

20  wound down.  But the fact of the matter is is in the lead-in

21  into this motion -- and this is sort of the source and subject

22  of Acis's additional objection and not just plain vanilla

23  joinder and with the Committee -- is is that the transactions

24  happened.  The sale of the stock has happened.  So whether it's

25  in connection with the wind-down of the funds or whether it's

APP. 1546
Appx. 01593

37

1 just a sale, it's happened now.

2 So I'm not sure that we can unring that bell, but

3 Acis's whole point and as we sort of set out in our joinder and

4 our separate comment or objection was, Your Honor, the light of

5 day needs to be cast on this transaction as a whole and we need

6 to be talking about it that the transaction needs to be

7 discussed here in open court. And, frankly, the entire

8 creditor body needs to have and the Court needs to have

9 transparency with respect to that.

10 So to that point, Your Honor, the debtor filed the

11 motion to approve the distributions of the proceeds from the

12 sale in accordance with the procedures approved as part of the

13 broader settlement motion that Your Honor heard in January.

14 Now the debtor incredibly takes the position that this Court

15 and the creditors are effectively powerless to stop these

16 distributions. And here's the problems with that position.

17 First, from a technical legal perspective, the debtor

18 ignores the language of Section 363. Frankly, it's easy to

19 have a strong initial knee-jerk reaction that Section 363

20 doesn't apply here because there's no sale of property to the

21 estate. The MGM stock was held down in a different entity.

22 Your Honor, frankly, I did it myself. But when you analyze the

23 language of Section 363, it also prescribes the use of property

24 of the estate outside of the ordinary course of business. And

25 here, the use of property of the estate is the debtor's

WWW.JJCOURT.COM

38

1  valuable management rights of the various entities, so Dynamic,

2  AROF or AROF or NRCP.

3          And let's just assume for argument's sake that the

4  debtor's statement is correct and enforceable and there's no

5  problem with it that the funds are in liquidation.  No one can

6  rationally argue that that liquidation of a fund or a manager's

7  actions in liquidating said fund are ordinary course.  So there

8  is sort of the Section 363 hook for lack of a better term.

9          Second, from an equity perspective, it is wholly

10 inequitable for the debtor in an attempt to derail the Court

11 and the creditors from inserting a Chapter 11 trustee -- and

12 recall, Your Honor, that this case was filed on October 16th of

13 2019 where the debtor filed to seek protection from the

14 imminent within minutes if not hours of entry of $189 million

15 judgment against the debtor.  And it's really frankly, and as

16 Mr. Pomerantz acknowledged, the product of failed -- numerous

17 other failed litigation strategies.  Acis, UBS, Pat Daugherty,

18 quickly all -- and all of those the pieces of litigation

19 quickly coming home to roost.

20         Acis was clear right out of the gate, Your Honor, at

21 the first day hearings held on October the 18th, 2019 that it

22 would seek the appointment of a trustee.  And in an attempt to

23 sort of take itself out of a trustee potentially being

24 appointed or, you know, as to forestall that happening, the

25 debtor filed an ordinary course protocol motion.  And this is

WWW.JJCOURT.COM

39

1  in October of 2019.  And as a part of that ordinary course

2  protocol motion, the proposal was that Mr. Sharp, the CRO of

3  the debtor, be appointed the CRO of the debtor and that he

4  would be the gatekeeper, he would be in charge of all related

5  party transactions, and he would oversee all of those

6  transactions.

7          And, Your Honor, indeed Mr. Sharp testified that he

8  was the gatekeeper.  He was the guy in charge, and that was on

9  I want to say like November 20th of 2019.  And commensurately,

10  Mr. Waterhouse, the CFO for Highland Capital Management, also

11  testified and Mr. Waterhouse was the first day declarant for

12  Highland as well.  He testified that everyone understood that

13  Mr. Sharp was to be the gatekeeper.  And, indeed, Mr. Sharp

14  would -- they had training at Highland Capital Management to

15  the effect that all employees knew if you've got a related

16  party transaction, it's got to go through Brad Sharp.

17          So in an attempt to sort of derail Acis from getting

18  a trustee appointed, they affirmatively sought out these

19  protocols and ultimately agreed to protocols that look similar,

20  not exactly but similar to those proposed ordinary course

21  protocols.  And the protocols that ultimately were approved

22  required court approval.  And now we've got them coming back

23  and saying, ha ha, just kidding, no one can do anything about

24  it anyway and we have to make these distributions because we've

25  got a fiduciary duty to do it.

WWW.JJCOURT.COM

40

1       On that note, the debtor who should be fully

2  transparent during this process while it seeks the benefit of

3  bankruptcy including the automatic stay, argues in its reply

4  brief filed this morning at Footnote 9 that the underlying sale

5  transaction in excess of $123.25 million is sacrosanct and

6  irrelevant because the Committee blessed it.  Acis objected,

7  Your Honor.  When that transaction was presented to the

8  Committee, Acis objected.

9       First, it would have its cake and eat it, too.  It

10  can't take advantage of the protocols it likes while at the

11  same time stiff-arming those that are inconvenient to it.  It

12  can't say the transaction's good because the Committee blessed

13  it, but the Committee didn't bless the distributions to the

14  insiders and, oh well, you can't do anything about that anyway.

15       Second, the broader transaction is violative of at a

16  minimum traditional notions of transparency in bankruptcy and

17  likely 363 along what the debtor's fiduciary duties to its

18  creditors.  As Mr. Clemente pointed out, the debtor has dueling

19  fiduciary duties, and we didn't hear nearly a word with respect

20  to the debtor's fiduciary duties to its creditors.  And, Your

21  Honor, we're not looking to generally micromanage what this

22  debtor is doing, but this transaction is fundamentally flawed

23  and at a minimum has red flags all over it.

24       As we now know from the CalPERS objection, Mr.

25  Dondero entered into a transaction with Highland Capital

APP. 1550
Appx. 01597

41

1  Management buying CalPERS' interest and likely others'

2  interests at June 30 prices or by giving over a set number of

3  MGM shares to CalPERS.  That's the agreement that's attached to

4  the CalPERS objection.  The agreement was always a win-win for

5  Highland Capital Management because it could either make money

6  on the arbitrage of the stock -- it bought it at a particular

7  price, and if it's ordered at a different price, you got to

8  keep the differential -- or give over the stock if the stock be

9  valued and priced.  Win-win.

10        He then immediately the very next day fraudulently

11 transferred that agreement from Highland Capital Management to

12 Highland Capital Management Services, an entity in which he is

13 the 75-percent owner and Mr. Okada is the 25-percent owner.

14 That is 15 days before filing this Chapter 11 bankruptcy case.

15 The only purported consideration for the transfer, and I think

16 this is Exhibit B, to the CalPERS objection, was an indemnity

17 by Highland Capital Management Services.  That's the only

18 consideration that was transferred as a part of that

19 transaction, Your Honor.

20        Then when the stock price rises in November, he seeks

21 committee approval for a transaction that still benefits

22 Highland Capital Management Services.  Despite not having a

23 Committee response, he enters into a rogue unauthorized trade

24 of MGM stock on whose board he serves on and is thus privy to

25 information, violative of the very protocols that the debtor

42

1  was pressing so strenuously to avoid the appointment of a

2  trustee. Indeed, Brad Sharp testified the day before the rogue

3  trade that this exact type of transaction had to go through

4  him. And Mr. Waterhouse's testimony came right after that to

5  indicate that everybody at the debtor knew that Mr. Sharp had

6  to approve it.

7        Ultimately, the Committee rejected that transaction

8  in November, but the trade was already done. If Mr. Dondero

9  had his way, Highland Capital Management Services would have

10 benefitted from the transaction. Frankly, every one of these

11 transactions needs the light of day shed upon them here in

12 court to determine what is in the best interest of creditors.

13 The debtor's attempt to cloak itself in the Committee's non-

14 objection, and I want to be clear on this, it was a non-

15 objection. I think reference was made that the Committee

16 agreed to the sale of the MGM stock. That's not what happened.

17 The Committee just did not object to the transaction which can

18 likely best be characterized frankly as everyone plugging their

19 nose while simultaneously telling this Court it can't do

20 anything about the proceeds is the exact reason why the Court

21 should be inquiring into the transaction in the first place.

22       And not so incidentally, that stock that Mr. Dondero

23 traded without authority in November is trading approximately

24 20 percent higher today, around the low 90s.

25       THE COURT: All right. Thank you.


WWW.JJCOURT.COM

43

1        Thank you.  All right.

2        Do we have any other opening statements?  I'm

3   probably going to have to take a break before we do evidence

4   and hear my 2:30 matter, which I don't think is going to take

5   very long, at all.

6        All right.  Judge Lynn.

7        MR. LYNN:  Your Honor, thank you.

8        We're not opposed to the motion, and we understand

9   the concerns expressed both by the debtor, the debtor's

10  independent board, which feels that it's compelled to make the

11  distribution to insiders.  And while we don't necessarily agree

12  with them, we understand the Creditors Committee's concerns as

13  well.

14        We'd like to suggest the following should the Court

15  determine that the motion should be denied.  And that is that

16  instead of the debtor retaining the funds, that the debtor

17  distribute the funds into the registry of the Court.  That way,

18  they lose control over the funds and they can say that they've

19  distributed them in accordance with their agreements and

20  applicable law.

21        The funds would remain there until either a recipient

22  or prospective recipient posts a bond or other suitable

23  collateral or the Creditors Committee agrees to the

24  distribution to the insider or there is a Court entered for

25  another reason after a showing made before Your Honor.  The

44

1  debtor and the Creditors Committee would, of course, retain all

2  rights to seek the funds they would have had, which rights they

3  would have had immediately before the distribution to the

4  registry, plus any rights that would be gained by reason of the

5  distribution itself.

6          The debtor thus distributes, the Creditors Committee

7  retains its rights, the Court retains control, and this can all

8  be done, we believe, by a Court order and we hope this may give

9  the Court a suitable alternative.

10         THE COURT:  Okay.  Let me make sure I understand.

11 You said, if the Court is inclined to deny the motion.  Are you

12 offering, I guess Mr. Dondero's proposal that -- I mean, these

13 aren't disbursements that would all go to him, they would --

14 some would go to Okada, and -- who's not objected or appeared.

15 But -- let me cut to the chase.

16         Are you trying to avoid a hearing and evidence

17 altogether by saying, you know, these related entities agree

18 their distributions will go into the registry of the Court

19 right now?

20         MR. LYNN:  Mr. Dondero supports this position.  We do

21 not speak for Mr. Okada.

22         THE COURT:  Right.

23         MR. LYNN:  I understand that more than one of the

24 entities -- and Your Honor must forgive me.  We're relatively

25 new to this case.

**WWW.JJCOURT.COM**

45

1      THE COURT:  Yeah.  One is Holdco, and that is

2 technically a DAF, a charitable entity that --

3      MR. LYNN:  Yes.  I believe that's so, and I

4 understand there may have been communications between the

5 independent board and the trustee of a DAF, but I was not a

6 party to those communications.  I'm just trying to give the

7 Court an alternative -- Mr. Dondero is doing so -- that might

8 be acceptable to the debtor and at the same time would

9 accomplish what the Creditors Committee wants, which is to

10 retain control of the funds.

11     I must say, Your Honor, that having been there

12 myself, I have a great deal more confidence in the registry of

13 the Court protecting funds than I do in just about anyone else.

14     THE COURT:  All right.  Well, that would certainly

15 seem to give the Committee everything it's asking for, and --

16     MR. POMERANTZ:  Your Honor, if I may interrupt.

17     I understand from members of the debtor's independent

18 board who have spoken to Grant Scott, who is the principal in

19 charge of CLO Holdco, that CLO Holdco would also support the

20 proposal that has just been made by Judge Lynn.  We do not have

21 the agreement of Mr. Okada to support that proposal.

22     THE COURT:  Okay.  Although, he has not weighed in

23 with any sort of -- well, I don't know.  How do we feel about

24 Mr. Okada's interest here?  I mean, he's obviously been given

25 notice of all of that, and --

**WWW.JJCOURT.COM**

46

1           MR. POMERANTZ:  Well, actually we asked him --

2           THE COURT:  Okay.

3           MR. POMERANTZ:  -- when we heard last night that this

4    might be a possibility.  He has rejected that.  And in light of

5    his rejection of that proposal, we as the debtor feel we need

6    to proceed with the motion.  I would think it substantially

7    narrows the issues that are going to be in evidence, all the

8    stuff we've heard about MGM Trade, which may at some point in

9    time be something that people don't testify from the podium and

10   that actually the subject of real evidence.  But with respect

11   to Mr. Okada, we will have to go forward with the motion.

12          MR. LYNN:  Yeah, so let me express that at this

13   point, Mr. Dondero is of course not supporting the Acis

14   suggestion that a trustee should be appointed.  We did not

15   understand that this hearing would address that issue.

16          THE COURT:  Yeah.  I'm not sure.  That's what they

17   were suggesting today.  I think they were just saying at one

18   point, they adamantly wanted a trustee, and these protocols

19   alleviated their concerns and caused them to back off.  And

20   now, they're upset that, you know, the debtor is resisting the

21   protocols in a way.  So -- all right.

22          Mr. Clemente, what say you?  I --

23          MR. CLEMENTE:  Your Honor, I --

24          MR. LYNN:  Thank you, Your Honor.

25          THE COURT:  Thank you.


                          WWW.JJCOURT.COM

47

1    MR. CLEMENTE:  -- I think you can tell from our

2  papers, this is effectively what we asked for.

3    THE COURT:  Right.

4    MR. CLEMENTE:  I don't even know why it took us to

5  get to this point for that.  It seemed so obvious to me.  But

6  when it was articulated by the former Judge here, it -- I think

7  it just held more -- maybe it made more sense.

8    As far as Mr. Okada's concerned, I think Your Honor

9  could clearly deposit the funds in the registry of the Court,

10  and he's free to come in.  I think that's what Counsel for

11  Mr. Dondero was actually suggesting.  So I'm not sure that

12  anything is required further with respect to Mr. Okada, unless

13  he has a representative here that would like to raise something

14  with Your Honor.  So, to me, on behalf of the Committee, I

15  think that accomplishes what the Committee was trying to do

16  with its objection.

17    THE COURT:  All right.

18    Anyone else wish to be heard?  Ms. Shriro, I know

19  that you filed something for CalPERS, but obviously, your

20  client is an unaffiliated investor in the private equity fund,

21  RCP.  You just want to get paid.

22    MS. SHRIRO:  That's correct.  We just want to get

23  paid, and I would defer to my co-counsel on the phone.  If he

24  has any comments, this would be the time to raise them.

25    THE COURT:  All right.

48

1    Co-Counsel on the phone, I think it's Mr. Cisz.  Is

2  that correct?

3    MS. SHRIRO:  Yes.

4    THE COURT:  Okay.  Anything you want to say about

5  what's (indiscernible)?

6    MR. CISZ:  That's correct, Your Honor.  This is Louis

7  Cisz on behalf of CalPERS, and Ms. Shriro is correct.  So long

8  as CalPERS receives its distribution relative to the sale of

9  the MGM stock, CalPERS otherwise doesn't take a position with

10  respect to the motion.

11    THE COURT:  Okay.  Thank you.

12    All right.  Well, turning to the literal terms of the

13  motion, the relief the motion sought was simply an order

14  authorizing distribution of the cash from these wind-downs of

15  the three funds to insider investors.  And so we have the

16  Committee objection, we have the Acis objection, we have

17  Dondero's counsel here appearing.  I think I can, given this

18  request for relief and the opposition of the Committee, as well

19  as one of the Committee members, Acis, and due to these

20  representations of Dondero's counsel and the board, I can order

21  that the money that would otherwise go to insider investors --

22  I think it's roughly about 8.6 million -- will, instead of

23  going to the insider investors, will go into the registry of

24  the Court with reservation of everyone's rights later to file

25  motions requesting that it be disbursed to them.  So everyone

WWW.JJCOURT.COM

49

1  understands, this is just kind of a holding place for the funds

2  right now.

3          MR. POMERANTZ:  Your Honor, we do not have

4  Mr. Okada's representation and the debtor is not modifying its

5  motion.  The debtor would like to proceed with respect to

6  Mr. Okada.  We asked him, he did not want to agree to the same

7  things that would be in consideration by CLO Holdco, and for

8  the reasons we've identified in the motion and I've expressed

9  to Your Honor, we feel we have the obligation, we have the duty

10 to proceed, and we would request the opportunity to put on

11 evidence so you can hear from Mr. Seery and ultimately make a

12 determination whether the Committee and Acis have laid out a

13 legitimate basis for use of 105.  I'll reserve my comments and

14 their comments until the end.

15          But we would want to proceed in that limited matter

16 because we don't have all agreements of the parties and the

17 same reasons stand for why we filed the motion to proceed with

18 the distribution for Mr. Okada.

19          THE COURT:  Okay.  Well, I guess I misinterpreted

20 everything that I thought was going on out there.  Mr. Okada, I

21 guess, you said is owed 4.176 million from the Dynamic Hedge

22 Fund, and then -- I don't know if that was the total amount

23 from the three funds, but you feel like you have a fiduciary

24 duty to pursue that disbursement.

25          MR. POMERANTZ:  Absolutely, Your Honor.

**WWW.JJCOURT.COM**

50

1          THE COURT: All right.

2          MR. POMERANTZ: And again, you know, we could get

3   this into argument. Mr. Okada is in a much different position

4   than some of the other insiders. We understand the comments

5   about Mr. --

6          THE COURT: Well, I remember some of the dynamics

7   here, but let me tell you what I'm going to feel the need to

8   get into if we hear evidence. And what we'll do is we're going

9   to take a short break in a minute. Let me ask the Barker

10  people who I think are in the back.

11      (Off record discussion 2:34:51 to 2:35:01)

12         THE COURT: Okay. So we'll take a 10-minute break in

13  a minute.

14         But again, one reason I was sort of delighted to get

15  the suggestion of Judge Lynn is I see this evidentiary hearing

16  as being a little more involved than looking at contractual

17  obligations and whatnot, and you know, the fact that these are

18  non-property of the estate funds that we're talking about. I

19  have fundamental questions having read the pleadings about the

20  decision to wind-down these funds that was made in November

21  2019, days after Highland filed bankruptcy.

22         Who made the decision? Was it insider investors

23  seeking redemption? Or was it, you know, did we have large

24  unaffiliated investors exercising redemptions, and so

25  therefore, it was reasonable business judgment, you know, we

**WWW.JJCOURT.COM**

51

1  need to wind down?

2      I know the issues are a little bit different with the

3  two hedge funds versus the RCP fund that had the term.  And I

4  understand, I read the pleadings, how the term expired in April

5  2018, it was extended for one year, and then the advisory board

6  didn't consent to an additional extension.

7      Again, maybe the new board has thoroughly scrubbed

8  this and you're going to tell me that in evidence.  And maybe

9  the Committee has thoroughly scrubbed this, and you're going to

10  tell me that with evidence.  But I -- I'll want to hear that.

11  I'll want to hear that this was all legitimate, independent,

12  non-affiliated investors pressing for the wind-down of these

13  funds, and we didn't have what I refer to as the Acis situation

14  where -- well --

15      MR. POMERANTZ:  Your Honor, Mr. Seery is prepared to

16  testify to each of those.  And as I mentioned, the board did

17  thoroughly consider it and you will -- Your Honor will hear

18  evidence that led Mr. Seery and the board to conclude that each

19  of these were appropriate.  But we intended to get into that in

20  the evidence.

21      THE COURT:  Okay.

22      (Proceedings recessed from 2:37 p.m. to 3:01 p.m.)

23      THE COURT:  All right.  We're going back on the

24  record in Highland.  Mr. Pomerantz, are you ready to call your

25  witness?

**WWW.JJCOURT.COM**

52

1          MR. CLEMENTE:  Your Honor, if I might before.

2          THE COURT:  Mr. Clemente?

3          MR. CLEMENTE:  Matt Clemente on behalf of the

4    Committee, again.

5          I would just like to revisit the colloquy we had

6    before we broke.

7          THE COURT:  Okay.

8          MR. CLEMENTE:  I'm still confused as to why Your

9    Honor just can't enter or so order that the debtor has

10   satisfied its duty upon depositing the money into the Court

11   registry.  And we don't need to have any of this this

12   afternoon.  I see it as similar to the Foley hearing where Your

13   Honor expressed some frustration.  It's kind of maybe not the

14   best use of time.  I'm not sure what exactly we're trying to

15   accomplish here.

16         If the debtor's concerned about its duty to a

17   constituent who is not present in Court today, I think Your

18   Honor can deal with that by entering an order that says, you

19   know, based on the pleadings and the record so far, the debtor

20   has satisfied its duty and placed the money in the Court

21   registry.

22         And if Mr. Okada has an issue with that, he can come

23   back before Your Honor.  I'm just not quite sure what the point

24   is here, Your Honor.

25         THE COURT:  All right.  Well, let's turn back to

WWW.JJCOURT.COM

53

1  Mr. Pomerantz, and let's talk about what my, I guess, unrefuted

2  evidence is.  I have -- Mr. Okada would be due for the Dynamic

3  Hedge Fund, 4.176 million is what I read in the pleadings where

4  you told me.

5        And then, I don't know that I have written down what

6  he would be owed from either the Argentina Fund or the RCP

7  Fund.  Anything?

8        MR. POMERANTZ:  Zero.

9        THE COURT:  Zero.  So we're talking about the 4.176

10 from termination of the Dynamic Fund.

11       MR. POMERANTZ:  Right.

12       THE COURT:  Meanwhile, we know there is a $1.3

13 million demand note --

14       MR. POMERANTZ:  Correct.

15       THE COURT:  -- owing to Highland from Okada.  And I

16 feel like I heard that there was more, but that's the only --

17       MR. POMERANTZ:  That is the only note from Mr. Okada.

18       Your Honor, I think part of it is I stood up and gave

19 a lengthy presentation, and I told Your Honor what the

20 testimony would show.  Now there's been a lot of issues in this

21 case about what the board's doing, what it's not doing.  Part

22 of our reason for being here today and part of my presentation

23 was to get Your Honor comfortable with how the board is

24 handling its duties.  I didn't want you to hear that just from

25 me.  I wanted you to hear that from Mr. Seery.

54

1       There also have been allegations by Acis and concerns

2  Your Honor has raised as to what went into the wind-down of

3  these funds, given Your Honor's past experience with Acis.  And

4  I'm sure Ms. Patel's past experience with Acis.

5       I think it's important to hear from Mr. Seery because

6  he has good explanations of why each of these funds are in

7  wind-down.  And then, furthermore, look, Your Honor will decide

8  what Your Honor decides and whether the Committee and Acis have

9  met the showing under 105 to hold back the Okada funds.  If

10  Your Honor decides that, of course we will abide by that

11  decision.

12       But we didn't want any implication that we were sort

13  of laying down for that issue.  So I think it would be helpful

14  maybe to hear some testimony from Mr. Seery.  If Your Honor

15  then concludes that funds shouldn't be disbursed, Your Honor

16  will conclude that funds shouldn't be disbursed.  I don't think

17  this has to be very lengthy.  I think we've -- we've narrowed

18  the issues, given that we don't have an issue with respect to

19  RCP anymore.  We don't have the issue with HCM Services

20  receiving money on account of a trade that Acis is very

21  critical about.  Again, those issues at an appropriate time can

22  be raised in appropriate form, and Your Honor will have a full

23  evidentiary hearing, as opposed to a tail wagging the dog on

24  this motion when it's not even relevant anymore.

25       So what I would propose is that we allow Mr. Seery to

55

1  take the stand.  We allow him to address Your Honor's concerns.

2  We allow him to testify to the things that I said he would

3  testify to so it gives Your Honor some comfort, and hopefully

4  the other parties comfort, exactly how Mr. Seery and the other

5  board members are performing their duties.

6          THE COURT:  Okay.  Can we all agree to some

7  reasonable time limitations here?  I'm thinking we're done in

8  an hour.  Maximum 30 minute direct of debtor, or redirect, and

9  maximum 30 minute cross of all objectors.  Can we do that

10 today?

11         MR. POMERANTZ:  I think we can do that, Your Honor.

12         THE COURT:  Okay.  Then that's --

13         MR. CLEMENTE:  My only question, Your Honor -- Matt

14 Clemente on behalf of the Committee -- is what are we still

15 talking about here?  Are we just talking about the distribution

16 to Mr. Okada?  And the other distributions are off the table as

17 suggested by -- or as agreed to at least on behalf of

18 Mr. Dondero?  I don't even know what we're talking about.

19         MR. POMERANTZ:  That is correct, Your Honor.  It's

20 only the distributions to Mr. Okada.

21         THE COURT:  Although, I think he wanted the Court to

22 get some testimony from Mr. Seery about sort of the business

23 judgment of the three wind-downs, but I don't think that's

24 going to --

25         MR. POMERANTZ:  That shouldn't take a long time.

**WWW.JJCOURT.COM**

56

1          THE COURT:  -- be a probe today of MGM stock sales.

2          MR. POMERANTZ:  No, it won't be at all, Your Honor.

3   And again, look, we understand Your Honor has had experience

4   with Acis, and we understand the concerns, Your Honor, coming

5   in, seeing redemptions, and the questions you asked.

6          Again, it's important for the debtor to be able to

7   demonstrate to Your Honor that this board is doing its

8   appropriate things and hearing from Mr. Seery why he made these

9   decisions so Your Honor can get comfortable, not only in these

10  matters, but in other matters that brought before Your Honor in

11  the future that this board is doing exactly what they should be

12  doing acting as an independent fiduciary.

13         That's why I think some of our testimony, but we're

14  happy to live within the time frame that Your Honor has given

15  us.

16         THE COURT:  Okay.  All right.  Thank you.

17         MS. PATEL:  Your Honor, I just wanted to follow along

18  with one of the comments that I made during my opening

19  statement and hopefully, it will help further narrow the issues

20  and keep us within the time limits, is is that when -- in

21  responding to Your Honor's question about the wind-down of

22  these funds, and I said Acis had concerns, I want to say we've

23  got concerns with respect to the Argentina and the Dynamic

24  fund.  We frankly just don't understand or have that much

25  information with which to really evaluate the transaction, so

APP. 1566
Appx. 01613

57

1  we're a little hamstrung today for purposes of cross-

2  examination because that's not something that necessarily Acis

3  has inquired into.

4        But separate and apart from that, just again so

5  everyone's clear, with respect to the wind-down of RCP, Acis

6  does not take issue with respect to the genesis of the wind-

7  down.  So the decision to wind it down is a find from Acis's

8  perspective that should probably have been wound down.  Now,

9  the methodology of how it's being wound-down, that's fair game.

10        THE COURT:  I don't know what that meant --

11        MS. PATEL:  Okay.

12     (Laughter)

13        THE COURT:  -- the methodology of how it's being

14  wound-down.

15        MS. PATEL:  Okay.  Let me --

16        THE COURT:  Very quickly because, you know --

17        MS. PATEL:  Yes.  Your Honor, what I meant by that

18  was, in terms of the decision to wind-down RCP, that makes

19  sense to Acis because it is a fund that should have been wound-

20  down.  How it is going about being wound-down, that is open for

21  dispute, and one of those things being here this MGM stock

22  sale, etcetera.

23        THE COURT:  We'll hear from Mr. Seery.  I thought

24  there was a pile of cash at this point, but maybe I misread the

25  pleadings.

**WWW.JJCOURT.COM**

58

1          Okay.

2          MR. POMERANTZ:  Your Honor, let's remember what this

3 motion is.  This motion wasn't a referendum on wind-down, it

4 was the ability to make a distribution.

5          THE COURT:  Right.

6          MR. POMERANTZ:  Mr. Dondero's counsel, who is

7 speaking on behalf of ACM Services, said they're prepared to

8 hold those distributions in the registry of the Court.  The

9 issues regarding what Ms. Patel testified from the podium, at

10 some point, they may very well be the subject of a hearing in

11 the Court.  We're happy to continue responding to the Committee

12 and Ms. Patel's comments and questions about how, but it's just

13 not relevant here.

14          And, Your Honor, there is no way if Ms. Patel is

15 going to go down that road that we will ever be here only an

16 hour.  That is a much longer discussion.

17          THE COURT:  And let me just clarify where I was

18 coming from.

19          I thought if we were evaluating whether insiders

20 should get $8.6 million of distributions, the bona fides of the

21 decision to go into wind-down mode needed to be explored a

22 little bit and see if some of these insiders were improperly

23 exercising control in that.

24          So I agree with what you're saying.  Now, that we're

25 just talking about deferring to another day all but maybe

WWW.JJCOURT.COM

59

1 Mr. Okada's disbursement, we don't need to hear great detail

2 about the whole decision-making process for the wind-down of

3 these three.  A little bit of background would be useful,

4 but --

5          MR. POMERANTZ:  Absolutely, Your Honor, and we

6 will --

7          THE COURT:  -- it doesn't need to be, you know --

8          MR. POMERANTZ:  -- tailor our testimony to the issues

9 that Your Honor was concerned about and the comments that I

10 made, and we will keep within the time limit that Your Honor

11 wants us to keep it to.

12          THE COURT:  All right.  Very good.

13          Mr. Seery?

14          MR. SEERY:  Yes, Your Honor.

15          THE COURT:  There you are.  If you could approach the

16 witness stand.  I know I've been introduced to you before.  I'm

17 not sure if you've taken the witness stand yet.

18          MR. SEERY:  I have not.

19          THE COURT:  I don't think you have.

20          Please raise your right hand.

21          JAMES P. SEERY, JR., DEBTOR'S WITNESS, SWORN

22          THE COURT:  All right.  Please be seated.

23          MS. HAYWARD:  Your Honor, may I approach with an

24 exhibit binder?

25          THE COURT:  You may.

**WWW.JJCOURT.COM**

                              Seery - Direct/Hayward                    60

1            MS. HAYWARD:  Or two?

2            THE COURT:  Okay.  One for the Court.

3            Thank you.

4            MS. HAYWARD:  May I approach the witness?

5            THE COURT:  You may.

6                          DIRECT EXAMINATION

7    BY MR. HAYWARD:

8    Q    Well, good afternoon, Mr. Seery.  Since this is your first

9    time testifying, would you introduce yourself to the Court and

10   give her just a little bit of background?

11   A    I'll go pretty quickly because of the time constraints.

12   James P. Seery, Jr., for the record.  I am an independent

13   director for Highland Capital.  I've been in the asset

14   management restructuring business for about 32 years.

15           I started as a restructuring lawyer handling

16   everything from real estate to debtor's side to financial

17   transactions.  From there, I moved into asset management and

18   distressed investing.

19           From there, I moved into managing a large global loan

20   portfolio for a big investment bank.  That included teams of

21   people who both underwrote, distributed, held, managed,

22   restructured, and traded both loans, indicated loan assets,

23   primarily, but also high end bonds, distressed assets, as well

24   as CLO assets.

25           After that, I went into a hedge fund.  We had a

                            WWW.JJCOURT.COM

                              Seery - Direct/Hayward                    61

1  billion, three long-short credit fund.  I was the senior

2  investment partner and president of that firm.  We did similar

3  types of investments, high yield, high yield loans, distressed

4  loans, CLO assets, and some other structured products, long-

5  shorts.  So we were domestic primarily, but we also had a

6  global investment view and an office in London.

7           Subsequent to that, I was a co-head of a credit

8  business for an investment bank.  And then, in the last six

9  months, I've decided to do this job.

10 Q   So of the three board members, you're kind of the stock

11 guy.  Would that be a fair --

12 A   I think -- stock isn't really my stock and trade, but I do

13 know my way a little bit around the stock market.  But it's

14 primarily been credit products, but I do -- I am familiar with

15 equities and equity trade.

16 Q   Okay.  So since coming onto the board, give the Court a

17 day in the life, if you don't mind, and maybe starting with the

18 day that the board took over on January 9th.

19 A   I think, as Your Honor will recall, when we left and we

20 talked about what the role would be and what the compensation

21 would be, I think your comment was, Your Honor, that it -- we

22 wouldn't be 50,000 feet.  Well, we -- we're actually fully on

23 the ground.  We're not even five feet above.  We don't keep

24 track of our hours like lawyers, but probably logged about 190

25 hours in January starting on the 9th, and then about 150 hours,

Seery - Direct/Hayward                          62

1 160 hours in February.  And I know my fellow board members are

2 similar time commitments.

3        We're involved day-to-day in each of the decisions

4 that the debtor makes from assets management decisions,

5 understanding how the funds are being managed and what the ways

6 that they could either be walled off if they're in liquidation,

7 or if what the proper way to treat them on a day-to-day basis

8 is, evaluating assets that the debtor owns directly or through

9 funds, be thinking about ways to monetize those assets;

10 employee issues, what they're doing, who they're reporting to,

11 how they're -- how they're performing, how they're being paid;

12 claims issues.

13        This case got started, as we all know, by three major

14 litigations, and they're not all easy to understand.  They've

15 got the redeemer arbitration, which I think is fairly

16 straightforward in terms of liability and amount.  There's a

17 number of offsets that are complicated.

18        We've got the UVS litigation that is a lot more

19 complicated because it's not against the debtor.  The judgment

20 is against two offshore funds that are, in essence, shells, and

21 there's a very complex history around the 10-year litigation

22 that that is.

23        Then we have the Acis litigation, which comes out of

24 the Acis bankruptcy, but is an unliquidated claim.  So

25 understanding those thinking about what the pros and cons of

Seery - Direct/Hayward                          63

1  those claims are, how we would manage them down the road, how

2  we would go forward.  Thinking about how to resolve them has

3  been a key part of what we're doing on a day-to-day basis.

4  Q    So has the board done an independent analysis of all these

5  various litigation claims?

6  A    Not yet.  So we've -- we've done a preliminary analysis,

7  and then we've gone further.  So with respect -- we haven't sat

8  down with -- frankly with Redeemer, yet, although one of the

9  board members has had a call with them separately.  But we have

10 sat down with the Acis creditors, and we've done some

11 significant analysis around that.  And we have sat down with

12 UBS claimants, and we've done significant analysis around that.

13       All three of those require a ton more work, and not

14 because it's not easy to figure out what the numbers are.  It's

15 really difficult to figure out what the liability is, how it

16 rolls up to the debtor, and then how to satisfy it, and so

17 we're trying to get our hands around that.  But that is a

18 critical component of resolving this case.

19 Q    When the board took over, did -- what types of things did

20 you do immediately upon taking over control of this debtor?

21 Did you meet with people at the facility?

22 A    Oh, sure.  So the first thing we did, actually, is have

23 lunch with the Committee and with Acis, and we wanted to get

24 their perspective because they were here and it was easier to

25 do that than to run back to the debtor and try to -- try to

                          Seery - Direct/Hayward                 64

1  then set up another meeting.

2         And so we wanted to get their perspective.  They'd

3  been living with the debtor from the litigations and through

4  the time in Delaware and the litigation in this case.  So we

5  got a feel for them of what their desires were, how they

6  thought the case would work out or potentially resolve, and

7  also, how they thought about our role.

8         One of the things we stressed at that time, and I

9  stressed when I was interviewed for the role, is that -- I know

10 my fellow directors feel the same way, but I'm a pretty

11 independent person, and I wasn't going to be certainly the

12 management of Highlands guy, nor would I be the guy of the

13 Committee.  So we're going to -- I'm going to work

14 independently make decisions with the fellow board members in

15 what I think is the best way.

16        I'm going to try to exercise my duty in both care and

17 loyalty to the estate, but then if the estate has duties, I'm

18 going to make sure we exercise those.  And I feel very strongly

19 about that because this is just one -- a decent sized matter,

20 but one small piece of a career, and I'm not going to

21 compromise myself to satisfy either people on the management

22 side or people on the Committee side.

23 Q    Yeah.  Well, and I want to talk a little bit about the

24 duties since you mentioned them, because we heard I think the

25 Committee say that we -- the debtor has not mentioned the

                          WWW.JJCOURT.COM

                          Seery - Direct/Hayward                    65

1  fiduciary duties to the estate in the opening statement.  Do

2  you think that by presenting this motion the debtor -- does

3  this motion contemplate protecting the fiduciary duties that

4  the debtor owes to the estate?

5  A    To me, it absolutely does.  But to be fair, I think that

6  the rhetorical flair and opening remarks and missing the duties

7  to the estate, we're very conscious as a board of our duties to

8  the estate.  We're also very conscious of our duties as an

9  asset manager.  And what is in the pleadings is absolutely the

10 case, it's been -- it's my experience, my understanding of the

11 law, and it's being confirmed by both Cayman counsel, and by

12 fund counsel in the U.S. separate from bankruptcy counsel.

13        We owe a duty under the Advisor's Act to the funds

14 and to the investors in those funds.  That duty actually

15 supercedes the benefit to the estate, but it doesn't undercut

16 it because by vindicating the duty to the funds, you actually

17 vindicate the duty to the estate.  If you create liability at

18 the funds, it will roll to the estate.  So by exercising your

19 duty correctly, you do in fact, vindicate the duty of the

20 estate.

21        And what's important in the Advisor's Act, and it's

22 an interesting part of U.S. law.  At least my understanding,

23 it's been confirmed by outside counsel, is if the manager,

24 which would be Highland, has an interest, it's actually

25 required to subordinate that interest to the interest of the

                          WWW.JJCOURT.COM

Seery - Direct/Hayward                    66

1  investors in the funds it managed.  And it makes sense.

2        If you have funds invested in a fund with an outside

3  investor, you want to make sure that that investor is not --

4  that manager is not using your funds to aggrandize itself as

5  opposed to looking out for your best interest.  And so, I think

6  by vindicating our obligations with respect to the funds, we

7  actually enhance our obligations with respect to the estate.

8  Q    Let's talk a little bit about the funds now.  So

9  originally, the motion pertained to three different funds.

10  Could you just briefly explain to the Court the status of those

11  funds and how they got there?

12  A    Yeah.  I'll try to go quickly, and if I skip something or

13  I go too quickly, Your Honor, please let me know.

14        The Highland Dynamic Fund, which is the primary one

15  we're talking about now, I think you'll see at the end of Tab 1

16  how it's set up right before Tab 2.  And I haven't looked at

17  these exhibits in a long time, so I apologize.  I didn't know I

18  was getting this.  But it's really straightforward.

19        These funds are set up, and this is a pretty typical

20  structure.  It's a limited partnership structure.  It's got a

21  master feeder structure.  And what does that mean?  The master

22  is the main fund.  That's the King Exemptive Limited

23  Partnership at the bottom.

24        It's fed by two feeders, a domestic feeder and an

25  offshore feeder.  Why is it done that way?  Purely tax.

Seery - Direct/Hayward                    67

1  Offshore investors, non-taxables in the U.S. who are worried

2  about ECI or UVTI, or unrelated business income, we want to

3  make sure that there's no withholding or any tax ramifications

4  with respect to the distributions they get off the fund.  Since

5  it's a pass-through entity, both of those investors, either

6  domestic or foreign, are non-taxables in the U.S., will have

7  their own tax treatment when it gets up to them.  So they don't

8  want anything withheld.

9          When you look at the left side of the page, Dynamic

10 domestic feeder, the other investors is where you'd include

11 Mark Okada.  This fund was founded originally under a different

12 name.  I believe it was called the Highland Loan Fund.  It

13 might have been CLO Loan Fund, I apologize.  And then that was

14 in 2013.

15         Mark Okada put $2 million cash into the fund at that

16 time.  Why did he put it in?  This fund was designed to own CLO

17 assets and loan assets.  Okada was the founder of that part of

18 the business and the driver of that business.  It was pretty

19 essential that he put some money in.

20         However, in '13, they did get third-party investors,

21 but this fund never got real scale.  I think it was only a bit

22 over $100 million.  Not insignificant, but not a big fund.  And

23 they went out looking for loan funds, loan opportunities, and

24 CLO paper.  So the CLO papers, the debt of the CLOs, generally

25 (indiscernible) type paper that was higher yielding unless

WWW.JJCOURT.COM

Seery - Direct/Hayward                    68

1  there was some interesting opportunity in the -- in the higher

2  rated tranches.

3          In 2018, the fund got restructured, and they -- I'm

4  pretty sure that's when the name change occurred.  Okada put

5  another two and a half million dollars of cash in.  So he

6  didn't get this as free-carry or anything.  This was actually

7  cash that he deposited in the fund.

8          In 2019, Okada in the spring of 2019, determined that

9  he was leaving Highland.  And his separation was finally

10 completed in September of 2019.  So he is no longer an employee

11 of the debtor.  He has no influence, say, discussion, he's not

12 involved in anything.  He hasn't been since we've been there.

13         The investor, I think it was late summer, either

14 understood that or the fund hadn't performed that well.

15 Frankly, it was undersized anyway.  Realdania, a third-party, I

16 believe they're European, issued a redemption notice.  This was

17 a hedge fund style fund.  So we've got three different funds

18 here, two of them are hedge fund, and we explained a little bit

19 in the papers, but the real dynamic, no pun intended,

20 difference between the two is that Dynamic and Argentina are

21 hedge funds which provide liquidity to the investor.

22         What does that mean?  Monthly, quarterly, semi-

23 annually, they can look for redemptions.  The fund manager

24 sales assets because the assets are supposed to be a little bit

25 more liquid, makes distributions per the redemptions.

Seery - Direct/Hayward                              69

1          If the redemptions are too big and the sales will

2  somehow disadvantage the remaining investors, either gates come

3  down or you put the fund into liquidation.  Realdania had made

4  a, I believe it's a $65 million -- it was initially a smaller

5  one, then there was a $65 million redemption, and it -- this is

6  prepetition.  The debtor determined we've got to wind this fund

7  up because we can't basically more than halve it and then

8  continue to try to function.  It would have been far too

9  undersized.

10         So the debtor then went about selling the assets,

11 creating a pool of cash, and then this motion is to liquidate

12 it and pay the investors, including Okada.  When it's done,

13 assuming they made the full distributions, about 80-something

14 percent of the assets will have been distributed.  There's a

15 few small assets that are left.  They're not particularly

16 liquid, but they're small and I'm relatively certain we can

17 unload those at decent prices, create cash for the investors,

18 make the final distribution, so it would be a hold cash to

19 wind-down and then dissolve the various little limited

20 partnerships.

21         Argentina is similar.  The basically different

22 premise of why that fund existed, the original theory was post

23 the Argentina crisis with the election of Macri in '15.  Late

24 '15, Argentina started going through a number of changes in its

25 economy and the thought was that Argentina would start to grow

APP. 1579
Appx. 01626

Seery - Direct/Hayward                    70

1  and really be able to realize the potential of its people and

2  its resources.  That didn't work out that well, and then at the

3  end of, I think it was '18, Macri was voted out and the former

4  Kirchner, effectively, government is going to back.  Argentina

5  economy has slid into basically -- certainly recession over

6  multiple quarters, but even some would say depression.

7          Very difficult time.  This was not a unique fund for

8  Highland.  There were a lot of these Argentina-type opportunity

9  funds, and that -- that performance has not been particularly

10 good.  The decision there was made to wind-down a third-party

11 investor who made a 15 percent withdrawal, and that a number of

12 other funds that I forget the percentage, but they're managed

13 by UBS, third parties made a -- indicated that they were going

14 to have full redemptions, as well, so that fund was put into

15 liquidation.

16         Importantly, I think something that was mentioned

17 before, there's no benefit to keeping these funds around.  They

18 don't make any fees.

19 Q    Why is that?

20 A    And once they've gone into liquidation, they're not paying

21 any fees.  Similarly, RCP -- now, RCP is a different style of

22 fund, and I think Your Honor, you mentioned it in the papers,

23 you saw that it was a 10-year old fund.  That term was

24 extended.  It was originally a 2008 fund.  It was done as a

25 distressed for control.  Very different opportunity,

WWW.JJCOURT.COM

Seery - Direct/Hayward                71

1 (indiscernible), at the time, they probably didn't see the

2 global financial crisis, but saw it as distressed and the

3 opportunity to do distressed for control positions had to be

4 long term. So that fund had no liquidity provisions for

5 investors. Typical PE-style fund.

6        The -- when it got to the end of its life, the 10-

7 year life, Highland didn't have the ability to extend the term.

8 A steering committee of third-party institutional investors

9 with no Highland influence whatsoever, Ontario Teachers,

10 CalPERS, some of the biggest, most sophisticated investors in

11 the world in both debt, equity, and distress were driving that.

12 There was also a couple of other funds that are third parties

13 on that steering group. And they still exist. They gave a

14 one-year extension. Highland had no ability to do anything

15 about that.

16        In exchange for the extension, Highland waived fees.

17 So there are no fees being paid on the RCP Fund. There was a

18 series of one-month extensions that went -- was finished in

19 November of 2019. And with this distribution, there's still a

20 lot of assets in RCP that have to be managed, about 175

21 million. And so we're going to -- after we make the

22 distribution -- we've had a few calls and I've been on them,

23 with the steering group.

24        We've told them we're coming to Court to make the

25 distribution. We were confident that we would be able to -- to

APP. 1581

Appx. 01628

Seery - Direct/Hayward                          72

1  be able to make a distribution to them subject to the Court's

2  order, that we make that distribution and somewhere in the next

3  two weeks we're going to have a steering group meeting to talk

4  about the other assets and how we monetize them.

5          They are different types of assets.  Some have more

6  liquidity than others, so we're going to need to come up with a

7  plan.  It's 85 percent, roughly, third parties.  Highland

8  Capital Management, the debtor, actually has a roughly 15

9  percent interest in HCM Services, has as a couple percentage,

10 because I think there would have been about 2 percent of the

11 distribution.

12         So it's vast -- the vast majority of the owners of

13 the fund are outsiders, and we're going to need to come up with

14 a structured plan to get them their cash because they've been

15 invested for 12 years in this fund.

16 Q    Do you agree, having had the chance to come in and look

17 over all these things, that these funds should be wound-down?

18 A    Oh, absolutely.  So I think it's easiest to say,

19 Dynamic -- Okada was the driver.  It never got to where it

20 wanted.  The biggest investor wanted out.  It's not big enough

21 to support itself.  Even if one were to look today, and say, it

22 should have, frankly, owning CLO paper when this fund was

23 started until today, there should have been good appreciation

24 in it, and it just didn't -- I don't know the reasons it

25 didn't, but it didn't perform the way it should have, and it

APP. 1582
Appx. 01629

Seery - Direct/Hayward                    73

1  didn't attract the investors it should have.  Perhaps that had

2  something to do with it, you know, the way the other cases or

3  litigations were going on and the public nature of them.

4          And frankly, coming out of the global financial

5  crises, Highland had had a tough time of it, so it wasn't as if

6  it was the easiest thing to raise funds.  Argentina, there's

7  absolutely no question that the purpose and structure of that

8  fund and what it set out to do doesn't work, just doesn't work.

9  So it makes no sense to keep that going, and that's why the

10 investors -- third-party investors sought redemptions.

11         The insider interests, while not immaterial, are

12 pretty small.  Okada's interest is about 12 percent in the

13 fund, and he's not driving it.  Like I said, he's not even at

14 the debtor.  These two -- but to be fair -- both the decisions

15 to wind-down Dynamic and Argentina were made before the board

16 was involved and before the petition was filed, and they really

17 related to the withdrawals from third parties.

18 Q    So why are we here today?  Do you -- do these funds wind-

19 down in the ordinary course of their business?

20 A    Well, it -- they all have life.  So I'd say in the case of

21 RCP, it's pretty clearly in the ordinary course because it

22 reached the end of its life.  And the investors were very clear

23 that they wanted to be cashed out.  So the difficult part is

24 that it -- because of its structure and in the way it was

25 originally set up as a PE-style fund, it has illiquid, a number

APP. 1583
Appx. 01630

Seery - Direct/Hayward                    74

1 of illiquid assets.

2        And the challenge in any of the PE funds is to time

3 your exit, and the timing on this hasn't been opportune because

4 the opportunity to sale has not been as good as one might hope

5 and the investors are just at the point where they want to get

6 cashed out as we've heard today from CalPERS.  But we've seen

7 it in the documents and our discussions -- and my discussions

8 directly with them.

9        The other funds, once they've reached this -- it's an

10 ordinary course thing for funds.  When funds either they're --

11 they've reached their life or investors redeem and they get to

12 this state where they really can't support themselves, it's a

13 very ordinary thing for managers to wind-down funds.

14 Q    And as part of the winding down of the funds, is it also

15 ordinary then to make distributions once the funds have become

16 liquid?

17 A    Well, I mean one of the questions you started to ask, or

18 maybe did ask, and I didn't answer, was why are we here?

19        Our view as an independent board, my view as an

20 independent board member, is we have an obligation to all

21 investors.  It would be really easy if the documents or the law

22 said all investors, other than ones who might have been related

23 somehow to the asset manager.  It just doesn't say that.  And

24 as we talked about, this is -- these are not funds from

25 Highland.  If they were funds from Highland, again, it would be

WWW.JJCOURT.COM

Seery - Direct/Hayward                    75

1  really easy.

2          As I described for Highland Dynamic, I don't need to

3  hold and carry water for Mark Okada.  But I do need to carry my

4  own fiduciary duties and make sure that I exercise them well.

5  The gentleman put $2 million in -- this is April 2013, put 2

6  million -- 2.5 million in cash in 2018, and the fund is being

7  wound down.  It's not the debtor's money.  If it was the

8  debtor's money, it would be really easy to say, you know,

9  Mr. Okada, I'm not going to give you the money because we may

10  have claims against you, and a different discussion would

11  ensue.

12  Q    Well, I want to walk through that just a little bit.  You

13  say it's not the debtor's money.  Where is the money?

14  A    This money sits in funds or in bank accounts.  Its assets

15  are denominated and they're held in trust.  And the cash that's

16  in accounts, they're denominated in the name of the fund.  The

17  asset manager, Highland, has the ability to access the accounts

18  and use the funds in accordance with the fund documents.  It

19  does not have the ability to access the accounts and use the

20  funds however it see fit.

21  Q    So it's like an authorized signer?

22  A    It's certainly an authorized signer in terms of what its

23  ability to do in terms of accessing the funds.  Typically,

24  that's done through the trustee.  But it can manage the funds.

25  It couldn't take the funds and make an unrelated investment.

WWW.JJCOURT.COM

Seery - Direct/Hayward                          76

1 It couldn't take the funds and use it for its own purposes and

2 pay them back later.  It's just simply not permitted.

3 Q    Well, taking that to the next level.  If the Court did not

4 allow these distributions to be made, would the distributions

5 then go to the debtor?

6 A    No.

7 Q    Where would they go?

8 A    There's really no provision for it.  There are certain

9 provisions in the underlying documents that would enable the

10 manager to withhold funds.  If there was a change in law that

11 didn't permit a distribution.  If there was some other reason

12 that it became unfeasible to make the distribution.  If you

13 couldn't find the investor, and sometimes that happens.  There

14 are provisions of how you deal with those funds.  But they

15 never would go to the manager.

16 Q    So what is the -- why is the primary reason then that

17 we're here today asking this Court for permission to distribute

18 these funds?

19 A    It's pretty straightforward.  We have a fiduciary duty and

20 we've confirmed that with outside counsel, both Cayman and

21 domestic fund counsel, to make distributions and treat all

22 investors in the funds pro rata.  And we're here to make sure

23 we vindicate our duties, not exercising our fiduciary duties,

24 doing things that were not permitted.  One, we don't think

25 that's right or appropriate.  Two, that's not going to help

APP. 1586
Appx. 01633

Seery - Direct/Hayward                          77

1 resolve this case that probably contributes to some of the

2 things that led to this case. So we're not real interested as

3 an independent board in doing things that are close to the

4 edge, along the margin, try to use our positions to leverage

5 investors.

6 Q    Are you familiar with the protocols?

7 A    I am.

8 Q    Okay. But for the protocols, do you believe that the

9 debtor would need to obtain the Court's permission in order to

10 makes these distributions on behalf of these funds?

11 A    I don't think so, no.

12 Q    So then, why are we asking the Court's permission?

13 A    Well, the protocols require it, and I think the Committee,

14 you know, with due respect and I mean that truly, would like us

15 to withhold the funds, and that provides certain leverage

16 potentially over insiders. I think when I look at the

17 protocols, I think the main function of the protocols is to

18 assure that there isn't undue influence by insiders over the

19 actions of the company, and that insiders are not somehow

20 benefitting themselves by virtue of their control over the

21 company.

22        The independent board has control over the company.

23 We're not naive and think we have control over every single

24 persons every single second of every day, but we do have

25 control over what happens with the accounts, how payments are

Seery - Direct/Hayward                    78

1  made, when we wind something down, when an asset is sold, how

2  the proceeds will be used.  That's the board.  That's not

3  anybody in management.  The decision around these distributions

4  was made by the board independently.  We did consult with the

5  CCO, and that was important to make sure we got all the facts

6  with respect to these funds.

7          We then sought outside counsel to inform our

8  decision, both Cayman and domestic.  We didn't have any

9  influence whatsoever and we didn't speak to Mr. Dondero nor

10  Mr. Okada other than to tell Mr. Okada that we were coming to

11  court and then to ask him if he would defer his distribution.

12  And we know his response.

13  Q   I want to ask you just a couple -- I know I'm almost at my

14  30 minutes here, so I just want to ask you a few quick

15  questions because one of the issues that came up were these

16  demand notes.  I understand that Mr. Okada does have a demand

17  note.

18  A    He does.  We've --

19  Q    And has the board --

20  A    And we've sent a demand.

21  Q    Okay.  And what was -- what is the status of that demand

22  note?

23  A    He acknowledges that he signed it and he said that he's

24  owed certain things from the company.  He's asked how we work

25  those through because he was severed -- or severed himself in

WWW.JJCOURT.COM

                        Seery - Direct/Hayward                    79

1  September, and he has -- they reached a severance agreement

2  according to Mr. Okada.  I haven't personally investigated it

3  yet, but we will get to it quickly.  And he has some expenses

4  that are owed, but I don't think those are material.

5          I'm quite confident.  He said his severance was

6  agreement not money, but terms, was very standard.  We'll take

7  a look at that and make sure there's agreement on that.

8          I think it would be covered by the protocol, but it's

9  probably a transaction, so we'd have to talk to the Committee

10 about it, but we'll work -- I'm confident that we can work our

11 way through a standard severance agreement very quickly and

12 resolve that issue and collect on the note.

13 Q   Now, to be clear, the demand note is payable to whom?

14 A   The demand note is payable to the debtor.

15 Q   Okay.

16 A   It was actually a note that was -- he didn't receive cash

17 for the note.  It's basically a tax -- rather than gross-up

18 salary sometime in the past, for whatever reason they decided

19 not to gross it up to cover taxes.

20          Because of the structure of the limited partnership,

21 they could have had taxable income without matching cash, and

22 so they issued notes back to Highland to cover certain of those

23 obligations rather than actually making a distribution.

24 Q   To you knowledge, does Mr. Okada owe any money to the

25 fund?

                        WWW.JJCOURT.COM

Seery - Direct/Hayward                 80

1  A    No.  Not a -- my knowledge is that he does not.  So I am

2  knowledgeable of it, and he does not owe any money to the fund.

3  Q    Okay.  Quickly, I just want to talk a little bit about

4  Mr. Dondero.  One of I think the points that was made at the

5  very beginning of opening statements was that Mr. Dondero is

6  still around.  Why is that?

7  A    He's around because he has incredible knowledge about the

8  investments.  He is a portfolio manager for the fund.  He does

9  work with respect to non-Highland unrelated funds, some of

10 which Highland employees do work under shared services

11 arrangement and we get paid for them.  But Mr. Dondero is

12 around for those reasons and his knowledge about a number of

13 the investments in which we're involved.

14 Q    Does the Debtor -- or does the board have the power to

15 terminate Mr. Dondero if it decides to?

16 A    Yeah, he's -- we could, he's unpaid so there's no cost to

17 his involvement.  His expertise around certain investments,

18 particularly the equity funds as well as some of the larger

19 investments, including the PE investments, is really important.

20 Q    And with respect to the Dondero notes, what are the status

21 of those demand notes?

22 A    We've done an investigation of the notes and I wouldn't

23 say it's as exhaustive as -- it's in similar stages as our

24 examination of other assets.  We've looked at Dondero's notes,

25 we made a decision to send a demand letter to Okada because

APP. 1590
Appx. 01637

Seery - Direct/Hayward                               81

1  he's no longer a part of the company and there's no real

2  benefit that we saw strategically to not making that demand.

3  It's a small amount of money relative to the size of the case,

4  it's real money, but it's a small amount of money relative to

5  the size of the case.  We should clean that up and move on from

6  Mr. Okada.

7         With respect to the Dondero notes on Dondero entity

8  notes, we want to think about those strategically.  They're a

9  sizable amount of money, not just the ones that are demand, but

10 also there's a number of the notes that ate notes with

11 maturities and they're actually current, they're all current,

12 but how can we use those cash, can we collect those, and I

13 think that's more strategic in terms of how we resolve this

14 case.

15        I agree with Mr. Pomerantz's statement that I think

16 it evolves into a pure litigation case and we really hope it

17 doesn't.  That then -- those can just be sued on and the demand

18 notes are pretty clear as to how they work and even include

19 cost of collection.  So they're pretty straightforward notes.

20 Q    But so for now the board --

21 A    Well, we thought about it, we don't think it makes sense

22 to make that demand at this time.  There's -- our initial --

23 we're not -- we haven't come up with what the plan is for this

24 case, but we have ideas.  We do think they involve Mr. Dondero

25 and they involved contributions from Mr. Dondero whether in the

**WWW.JJCOURT.COM**

Seery - Direct/Hayward                    82

1  form of notes, whether in the form of cash, whether in the form

2  of other assets.  We haven't discussed those with him, but we

3  do think that's ultimately, at least preliminarily, where we're

4  going to end up somewhere.  So strategically we think that

5  that'll make sense to include in that sort of a resolution.

6  Q    Okay.  And --

7         THE COURT:  You have one minute.

8         MS. HAYWARD:  Yes, thank you, Your Honor.

9  BY MS. HAYWARD:

10 Q    Last question I'm going to ask you, are you aware of any

11 legal basis to withhold these funds now from Mr. -- from these

12 investors and these related parties?

13 A    I'm not aware of any, but as the Court has contemplating,

14 as the Committee has said, perhaps now that Section 105, you

15 know, grants that sort of authority, but that'll be up to the

16 Judge.

17        MS. HAYWARD:  Your Honor, a housekeeping matter.  I

18 move for the admission of Exhibits 1 through 12.  I don't think

19 any of them are controversial.  But I will let --

20        THE COURT:  You want me to look through

21        MS. HAYWARD:  Your Honor, they are --

22        THE COURT:    -- all of these.

23     (Laughter.)

24        MS. HAYWARD:  Your Honor, just for the record, they

25 are Number -- Exhibit 1 is the chart showing the structure of

**WWW.JJCOURT.COM**

Seery - Direct/Hayward                       83

1 the Dynamic Income Fund.

2          THE COURT:  Right.  We looked at that.

3          MS. HAYWARD:  Exhibit 2 is the partnership agreement,

4 so I know they're large documents, but they're not numerous

5 documents.  Exhibit 3 is just the chart of the Latin America

6 Argentina Fund.  Four, the partnership agreement for that fund.

7 Five, the chart (indiscernible) Third Fund.  Six would be the

8 agreement, the limited partnership agreement for that fund.

9 Seven, Your Honor, is Your Honor's order on the ordinary course

10 governance procedures.

11          THE COURT:  Okay.

12          MS. HAYWARD:  Eight is the final term sheet.  Nine is

13 the notice of amended operating protocols that was filed last

14 week.

15          THE COURT:  All right.  And then CVs of our board

16 members.

17          MS. HAYWARD:  And then the CVs for the board members.

18          THE COURT:  Any objections to these?

19          MS. REID:  No objection, Your Honor.

20          THE COURT:  Okay.  They're admitted.

21          MS. HAYWARD:  Okay.

22          THE COURT:  All right.  Any cross-examination?

23          MS. REID:  Yes, Your Honor.

24          THE COURT:  Okay.

25          MS. REID:  Good afternoon, Your Honor.  Penny Reid on

Seery - Cross/Reid 84

1  behalf of the Creditors Committee.

2                    CROSS-EXAMINATION

3  BY MS. REID:

4  Q    Good afternoon, Mr. Seery.

5  A    Good afternoon.

6  Q    You are aware, Mr. Seery, aren't you, of the Acis

7  bankruptcy?

8  A    I'm aware of it, yes.

9  Q    Okay.  And you're aware that prior to that bankruptcy Mr.

10  Terry obtained an arbitration award in October of 2017.

11  Correct?

12  A    I'm aware of that, yes.

13  Q    And, Mr. Seery, are you aware that four days after that

14  arbitration award assets started being transferred away from

15  Acis, stripping it of its value at that time?

16  A    I've read the judge's decision in the Acis case but I'm

17  not aware of any of the underlying facts, other than from

18  reading that case.

19  Q    So you aren't aware of all the assets that went out of

20  Acis the day after an arbitration award was entered.

21  A    No, I haven't looked at any of those.

22  Q    Okay.  And you're not aware that the day after a final

23  judgment was entered more assets were stripped from Acis.  Is

24  that correct?

25  A    Other than reading the Judge's decision I'm not aware of

WWW.JJCOURT.COM

Seery - Cross/Reid                                        85

1   any of the specific assets, no.

2   Q    Are you aware that two days after that, or entry of the

3   final judgment was ordered, Acis' entire risk retention

4   structure was transferred away from it and into the ownership

5   of Highland CLO Holdings?

6   A    I'm aware of some of the facts relating to the Acis case

7   from the decision and I'm aware of some of the facts from the

8   Acis case because of my discussions with Ms. Patel and Mr.

9   Terry.  I'm not aware of the specific transfers to which you're

10  referring without having -- looking at them.

11  Q    Okay.  So you're not aware that some of the assets that

12  were stripped from Acis went to one of the entities you're

13  wanting to send money to today.  Is that right?

14          MS. HAYWARD:  Objection.  Your Honor, I'm not sure

15  how this is relevant to the Debtor's distribution motion --

16          MS. REID:  Well, it's relevant to the distributions

17  that you're trying to give to the same entity.

18          MS. HAYWARD:  Your Honor, I think right now Mr.

19  Okada --

20          THE WITNESS:  What I --

21          THE COURT:  Just a minute.

22          THE WITNESS:  Sorry.

23          THE COURT:  We have an objection.  Let me hear the

24  objection.

25          MS. HAYWARD:  Your Honor, I think at this point Mr.

**WWW.JJCOURT.COM**

Seery - Cross/Reid                                86

1  Okada is the only one getting a distribution at issue in this

2  case as of now in light of the representation that was made by

3  Judge Lynn.

4        THE COURT:  All right.  Well, what is your response

5  to the relevance objection?  She's saying that this line of

6  inquiry has kind of been taken off the table since -- I'm not

7  sure which entity, I think you're talking about the Holdco, CLO

8  Holdco.  Right?

9        MS. HAYWARD:  Yes, Your Honor.

10        THE COURT:  Since now the disbursement that would

11  have gone to it is being put off the table and would go into

12  the registry of the Court.  So what is your response?

13        MS. REID:  Well, Your Honor, and I can take it off,

14  but currently it's my understanding that Mr. Okada is a 25

15  percent owner in Holdco.  But I can move on to the next

16  question.

17  BY MS. REID:

18  Q    Which is, are you aware that Mr. Okada right after the

19  final judgment was entered transferred their entire interest to

20  Nutra Limited?

21  A    Who transferred to whom?

22  Q    Right after the final judgment --

23  A    Right.

24  Q    -- that Mr. Terry obtained, Mr. Okada transferred their

25  entire limited partner interest in Acis, LP to Nutra.

**WWW.JJCOURT.COM**

                              Seery - Cross/Reid                87

1  A    So I apologize.  A couple of things.  One is it goes to

2  what you said, I don't believe Mr. Okada has any interest in

3  sale of Holdco, but you're saying Mr. Okada and their in your

4  question, and so it doesn't make sense.  He's an individual.

5  So I just don't know what you're asking me.  You said Mr. Okada

6  transferred their interest.  Who's their?

7  Q    Are you aware that Acis -- that you're aware that after

8  the entry of the Acis judgment that Mr. Okada's limited

9  partners interest in Acis was transferred to Nutra?

10            MS. HAYWARD:  Again, Your Honor, I lodge the same

11  objection to relevance.

12            THE COURT:  All right.  Again, what is your response

13  to the relevance objection?

14            MS. REID:  I think it's very relevant because I mean

15  he has been saying that they have a fiduciary duty to

16  investors.  Mr. Okada is not your normal independent investor.

17  It's a related party that has engaged in prior improper acts in

18  this court which you're aware, aren't you -- well.

19            THE COURT:  Yeah, I'll overrule the objection and

20  allow a little latitude.

21            THE WITNESS:  So I think what you're referring to is

22  the position in Nutra and I'm aware of some of those issues.

23  Mr. Okada apparently owns 25 percent of Nutra, Mr. Dondero owns

24  75 percent of it.  The control in Nutra is actually vested in

25  Highland Capital Management through a control agreement.  So

                          WWW.JJCOURT.COM

Seery - Cross/Reid                    88

1  I'm not -- I'm aware that they made a transfer and that Nutra

2  owns that interest now, and I'm aware that that split is 75-25,

3  I assume because of that split just like ATM Services, Mr.

4  Okada doesn't have any say in how it's run.  And the control in

5  that entity anyway is vested in Highland, the Debtor.

6  BY MS. REID:

7  Q    So you're aware there were improper transfers made at --

8  during -- before the Acis bankruptcy.  Is that correct?

9  A    I'm aware --

10 Q    You're not aware?

11 A    I'm aware of the decision and I'm aware of the transfers.

12 The designation of it then as improper, I'm not sure that I can

13 say one way or the other because I've looked at the transfers

14 and I can't tell you whether that transfer was improper.  So if

15 you're asking me if I'm aware that that transfer occurred, I

16 think I said I was.  I don't think it's fair for you to color

17 that the transfer was improper.  If somebody --

18 Q    Are you aware of the Court's decision --

19 A    I am --

20 Q     -- that they were improper?

21 A     -- I don't recall the Court's decision with respect to

22 that transfer.  There were a lot of transfers, a number of

23 which the Judge ruled were improper.

24 Q    Okay.  So you are aware that there were improper transfers

25 made from Acis that the Judge found were improper.  Correct?

WWW.JJCOURT.COM

Seery - Cross/Reid                                89

1  A    Yes, I am.

2  Q    Okay.  And you're aware that Mr. Okada was the Chief

3  Investment Officer at the time those transfers were made.

4  Correct?

5  A    Of which entity?

6  Q    Of Highland, of the Debtor.

7  A    I believe he was -- I believe he was a co-CIO of the

8  Debtor at that time, but I'm not positive.

9  Q    So you don't know.

10 A    I'm not sure, no.

11 Q    Okay.  Do you know he was -- he was the Debtor's -- so you

12 do not know one way or the other.

13 A    I am aware that at some time he was the CIO and then the

14 co-CIO.  I don't know the specific time that he was the sole

15 CIO.  I just don't know.

16 Q    Do you know if he was involved with the Debtor at the time

17 these improper transfers were made?

18 A    He definitely worked for the Debtor at that time.

19 Q    Okay.  You -- the reply that was filed today by the --

20 this morning by the Debtor states that the making of these

21 distribution to Mr. Dondero and Mr. Okada is essential to

22 rebuilding the Debtor's reputation in the marketplace.  Is that

23 correct?

24 A    I believe that's what it says, yes.  I assume you're

25 reading it?

**WWW.JJCOURT.COM**

Seery - Cross/Reid                                    90

1  Q    I am.

2  A    Okay.

3  Q    Aren't you -- is the marketplace not well aware of

4  Highland's history including the Acis and the Redeemer

5  Committee litigation?

6  A    I believe the market is aware of the Acis and Redeemer

7  litigations.

8  Q    Okay.  And is the marketplace well aware of the extensive

9  wrongdoing that Mr. Okada and Mr. Dondero engaged in as found

10  by this Court and the other tribunals?

11  A    I don't know how the marketplace -- I know that they're

12  aware of the decisions, I can't tell you whether the

13  marketplace as a large general matter knows the specifics.  I

14  don't know.

15  Q    Have any non-insider investors expressed concern to you

16  over the possibility of Mr. Okada not receiving the

17  distribution?

18  A    No, I don't believe so.  I think -- just to make sure I

19  answered your question, have the non-insiders raised issues

20  about Mr. Okada --

21  Q    Not getting distribution.

22  A    No, there won't --

23  Q    No one is really concerned about that except Mr. Okada.

24  Correct?

25  A    I think each investor is concerned about their own

WWW.JJCOURT.COM

Seery - Cross/Reid                                   91

1  distributions, so like with respect to RCP I don't CalPERS

2  referred at all to the distributions to Ontario, they probably

3  don't care, they care about their own distributions.

4  Q    And the only one we're talking about right now is the one

5  to Mr. Okada.  Correct?

6  A    That's correct.  I hope so.  Right?  Meaning I'm under the

7  impression that the Committee doesn't object to the investment,

8  to the release of funds and the distribution to third-party

9  investors.

10 Q    Mr. Seery, you testified that one of the reasons you're

11 seeking to distribute these funds is because the Debtor has

12 fiduciary duties to investors.  Correct?

13 A    Yes.

14 Q    Okay.  But these funds aren't being distributed to just

15 regular investors.  Correct?  They're being distributed to

16 insiders.

17 A    Again, unfortunately these are things one has to be

18 precise with.  The question is insider under some securities

19 law, or insider under the Bankruptcy Code?  So --

20 A    Insider under the protocols.

21 Q    I believe the term there, again, we should be precise, is

22 related party.  So he's a related party under the protocols.

23 As far as I know there's no separation under the Investment

24 Advisors Act, under the Cayman law, under Delaware law, or

25 under the contracts with respect to persons who might have

WWW.JJCOURT.COM

Seery - Cross/Reid                          92

1  worked for the investment manager who made an investment in the

2  fund.

3  Q    Are you aware that the Debtor also has duties to the

4  Creditors Committee?

5  A    I don't believe the Debtor has any duties to the Creditors

6  Committee.

7  Q    To the estate?

8  A    I believe the Debtor has significant and overriding

9  duties, but that's what we're here for, to the estate.

10 Q    To the estate.  And were very conscious of those duties.

11 Correct?

12 A    I am indeed.

13 Q    That's what you testified.  Right?

14 A    Yes.

15 Q    Okay.  So can you explain to me what -- how you consider

16 the estate's considerations in deciding to distribute these,

17 what was your consideration of the estates, how does this

18 benefit the estate?

19 A    This benefits the estate because we have an obligation to

20 the funds and to the investors in the funds to perform

21 according to the terms of the funds.  Unfortunately there is no

22 provision in the fund documents or in the law that allows us to

23 treat the investors in the funds in a disparate way.  And we

24 believe, after consulting with outside counsel, domestic and

25 Cayman, considering federal law under the Advisors Act, as well

WWW.JJCOURT.COM

Seery - Cross/Reid                                93

1 as Delaware law, that the only way to make distributions, other

2 than if there was a law change, was pro rata to all of the

3 investors.

4          So in order to vindicate our obligations to the

5 outside investors, we also have to pay the inside investors.

6 In addition, if we don't pay the inside investors, there's no

7 basis not to do that.  Now there may ultimately be no liability

8 because it will be hard to bring a case.  But it seems to me

9 that incurring potentially liability is not in the best

10 interest of the estate.  Holding up a distribution from non-

11 estate property doesn't seem to do anything to help the estate.

12 In fact, it puts it at risk.

13          And so we did the work and that's how we determined,

14 exercising what I think is our duty of care, which is really

15 researching this, and we spent a lot of time and a lot of money

16 making sure we got this right.  And our duty of loyalty.  Is

17 there some good reason that the fund could hold up the

18 distribution.  Until we have a claim is there a valid to attack

19 these distributions.

20          By the way, there were $8 million out of 180 million.

21 Now if there had been 180 -- if there had been 172 out of 180,

22 maybe we would come in here and say, We should something a

23 little bit different because we're really letting the small

24 outside investors dictate us and force us to make distributions

25 to related parties that the Committee has some concern about.

Seery - Cross/Reid                    94

1        But while $8 million is real money, and I don't deny

2   that, again, it's not huge in this case.  And it seemed to us,

3   after doing the work, that we were putting the estate at risk

4   by no exercising our fiduciary duties.  Moreover, we each have

5   reputations, and they're important to us, and they don't

6   override our fiduciary duties.  We're not going to do things to

7   aggrandize ourselves, to help our reputation versus the estate.

8   But running this Debtor correctly seems to us, looking at the

9   history, was the right thing to do.

10  Q    Has anyone, Mr. Seery, threatened to bring a fiduciary

11  duty claim against you if you don't pay these funds?

12  A    No.

13  Q    Has any -- has Mr. Okada said he's going to bring a claim

14  against you if you don't distribute these funds?

15  A    No, and nor did I consult him about it.  We just told him

16  what we were doing.  We're not -- I'm not inviting someone to

17  sue us.  That I think would be, you know, grossly wrong for us.

18  Q    Now we've touched a little bit on this, Mr. Okada owes the

19  Debtor 1.3 million.  Correct?  In the demand note?

20  A    Approximately, yes.

21  Q    All right.  And you have made a demand on Mr. Okada.

22  Correct?

23  A    That's correct.

24  Q    And he hasn't paid it.  Right?

25  A    No, he has not.

WWW.JJCOURT.COM

Seery - Cross/Reid                          95

1  Q    And that's money into the estate.  Correct?

2  A    That will be, yes.

3  Q    Now do you still think it's okay to just hand him off, you

4  know, $4 million and even though he's not paying the estate

5  that you have a duty to?

6  A    There's no such thing in my life as just handing off $4

7  million.  This is fund money --

8  Q    Distributable.

9  A     -- that will be distributed to the owners of the fund pro

10 rata.  We're not handing off anything to Mr. Okada or anybody

11 else.

12 Q    But Mr. Okada has not agreed to pay back his note.

13 Correct?

14 A    He's not agreed to pay it back, no.  Technically I would

15 say no.

16 Q    Okay.  And that's because of some severance agreement that

17 you're not aware of what the terms are.  Is that right?

18 A    I have not -- we have not -- I have not looked at the

19 terms, I don't believe many of my fellow directors yet have.

20 It's something that is on the burner for us to get to as soon

21 as this is over.

22 Q    And are --

23 A    He's pushing for it.

24 Q     -- are you aware that the Committee has asked for that

25 severance agreement?

Seery - Cross/Reid                                96

1   A    I was not aware of that, no.

2   Q    You're not aware of that.

3   A    I haven't seen it.

4   Q    And you don't know that it hasn't been produced to us.  Is

5   that correct?

6   A    I don't -- I have not seen it myself, I don't -- didn't

7   know that you'd asked for it, nor do I know that it hadn't been

8   produced.

9   Q    Okay.  And you haven't looked at it.

10  A    I haven't seen it.

11  Q    So you don't know if his failure to pay that money back is

12  valid or not.  Is that correct?

13  A    That's -- I don't -- he still owes the money whether he

14  has appropriate setoffs and whether a settlement agreement

15  would actually work as one.  I don't -- haven't really analyzed

16  that and I don't know that our counsel has either.  It may be

17  that he owes the money and we're holding a severance agreement,

18  but those aren't mutual obligations that are subject to setoff.

19  Q    You don't know one way or the other whether he has a right

20  of setoff.  Correct?

21  A    I don't believe he -- other than perhaps expenses I

22  don't -- haven't heard any articulated monetary setoff against

23  the obligations he owes.

24  Q    If the Court orders that his distribution be put into the

25  Court registry, do you still think you've breached your duty to

APP. 1606

Appx. 01653

Seery - Cross/Patel                    97

1  the estate somehow by that?

2  A    I think if the Court orders it, I don't think we would be

3  subject to a breach of liability.  I think that we're here

4  vindicating our responsibilities and our duties to investors.

5  If there's an interceding court order, we will follow it.

6  Q    Thank you.

7          MS. HAYWARD:  I have no further questions.

8          THE COURT:  All right.  I think that was about 17

9  minutes.  Any other examination?  Okay.  You'll have 13

10  minutes.

11          MS. PATEL:  Just a few questions, Your Honor.

12                    CROSS-EXAMINATION

13  BY MS. PATEL:

14  Q    Good afternoon, Mr. Seery.

15  A    Good afternoon.

16  Q    Mr. Seery, I think your testimony was that the fund, let's

17  use RCP -- or I'm sorry, that's the wrong one --

18  A    Dynamic?

19  Q    I think it was the Dynamic --

20  A    Dynamic.

21  Q    -- Income Fund is the one that Mr. Okada has an

22  investment in.  Correct?

23  A    That's correct.

24  Q    Okay.  And the fund has duties to Mr. Okada including

25  fiduciary duties as an investor.  Right?

**WWW.JJCOURT.COM**

Seery - Cross/Patel                                    98

1  A    That's correct.

2  Q    Okay.  Does Mr. Okada have duties to the fund?

3  A    I don't believe he does, no.

4  Q    Okay.  Did he ever?

5  A    I believe he did.

6  Q    Okay.  That was during his tenure at Highland Capital

7  Management.  Right?

8  A    I think as an officer of Highland Capital Management, the

9  investment manager, he would have had duties to the fund, yes.

10 Q    Okay.  And have you investigated whether he's breached any

11 of his duties to the fund?

12 A    We have looked, we have not seen anything.  We know that

13 the redemptions came in without any objection.  We have not

14 spoken to the individual investors.

15 Q    Okay.  So would it be fair to say then that you haven't

16 concluded your investigation of whether Mr. Okada has breached

17 any of his duties to the fund itself?

18 A    I don't think that would be fair.  I think what would be

19 fair to say is we've taken a look, we see no evidence

20 whatsoever that there were any breaches by Mr. Okada of his

21 duty to that fund, so there would be no reason to undertake an

22 investigation that we had yet to complete.

23 Q    Okay.  And who undertook that investigation, was it just

24 the board or did you have others involved?

25 A    It was the board.

WWW.JJCOURT.COM

Seery - Cross/Patel                    99

1  Q    Okay.  No one else?

2  A    The investigation with respect to the -- we got data from

3  other people but I'm the one who looked at whether there were

4  any claims related to the redemptions, any objections to any of

5  the other distributions, any objections to the fees, and we

6  found none.

7  Q    Okay.  So no outside counsel advised you with respect to

8  whether Mr. Okada had potentially breached any duties to the

9  fund?

10 A    No, again, it's not something that we would have looked at

11 with no evidence whatsoever that there was any sort of

12 complaint or breach.

13 Q    Okay.  All right.  Mr. Seery, with respect to the, I'll

14 call it the agreement because I'm assuming that it is an

15 agreement, that Mr. Dondero's counsel announced on the record

16 regarding putting the funds that would otherwise be payable to

17 Mr. Dondero into the registry of the Court.  Do you have an

18 understanding whether that agreement also extends to Highland

19 Capital Management Services?

20 A    Yeah, just to be clear because, again, we should be

21 precise, Mr. Dondero was not going to receive any money.  The

22 CLO Holdco, which is owned by the charitable DAF has

23 investments in the Argentina Fund and the Dynamic Fund.  It was

24 going to receive money.  Highland Capital Services has around a

25 2 percent interest in RCP, it was going to receive money.

WWW.JJCOURT.COM

Seery - Cross/Patel                    100

1       I understand that Mr. Dondero, through his counsel,

2   directed that the distribution to Highland Capital Services

3   would not be made.  Mr. Okada owns 25 percent of that, he was

4   not consulted.  I know that because I spoke to Mr. Okada.  The

5   distribution with respect to the CLO Holdco has been similarly

6   treated, but that was done by Grant Scott talking to Mr. Nelms

7   (phonetic) for the charitable DAF that controls the CLO Holdco.

8   Q    Okay.  So, again, to be clear, Mr. Okada has not consented

9   to the agreement that was announced on the record with respect

10  to any distributions to Highland Capital Management Services.

11  Correct?

12  A    He has not, but since he doesn't control it and Mr.

13  Dondero does, the agreement is binding.

14  Q    Okay.  And how do you know that Mr. Dondero controls

15  Highland Capital Management Services?

16  A    Mr. Okada told me.

17  Q    Okay.  All right.  Mr. Seery, with respect to Mr. Okada, I

18  believe your testimony was he separated from Highland Capital

19  Management in September of 2019.  Correct?

20  A    I believe I testified that he originally began his

21  separation in the spring, I don't know exactly when it was, and

22  I believe his official resignation was some time around

23  September.

24  Q    Okay.  Would September 30 of 2019 sound about right?

25  A    It -- approximately, I don't know the date.

**WWW.JJCOURT.COM**

                          Seery - Cross/Patel                    101

1  Q    Okay.  So it was towards the end of September though.

2  Correct?

3  A    I don't -- I don't know whether it was September 1,

4  September 15 or September 30, I just don't know the answer.

5  Q    Okay.  And at the time Mr. Okada separated from Highland

6  or any time before then, did Mr. Okada have a non-compete

7  agreement?

8  A    I have not looked at Mr. Okada's contract.

9  Q    Okay.

10 A    So I don't know.

11 Q    All right.  Does -- did Mr. Okada have something called a

12 non-solicit --

13 A    I don't know.

14 Q     -- where he wouldn't solicit clients for example of

15 Highland Capital Management?

16 A    I don't know.

17 Q    Okay.  Did Mr. Okada have what's called a non-recruit

18 where he wouldn't come in and try and recruit employees of

19 Highland Capital Management?

20 A    Again, because I haven't looked at his contract, if he had

21 one, I don't know that he did, and because I haven't looked at

22 it, and I testified that I haven't seen this severance

23 agreement he's talking about, I don't have any understanding of

24 the terms of Mr. Okada's employment with Highland Capital

25 Management.


                          **WWW.JJCOURT.COM**

Seery - Cross/Patel                    102

1  Q    Okay.  So you just haven't looked at any of those things.

2  A    That's correct.

3  Q    All right.  Are you aware -- well, did you have an

4  opportunity to look at -- I believe there was a press release

5  that was somewhere around September 2019 where Mr. Okada said

6  he was actually retiring from Highland Capital Management?

7  A    I would have no reason to have looked at such a thing in

8  September.

9  Q    Okay.  All right.  So you haven't seen that.  Let me ask

10  you another question, are you aware that Mr. Okada has a new

11  business by the name of Sycamore Tree Capital?

12  A    I'm aware that he intends to start a new fund, I have no

13  idea what the name is and I'd have no idea what development --

14  stage of development it's in.

15  Q    Okay.  Are you aware if any Highland employees have been

16  engaged by Sycamore Tree Capital

17  A    I'm aware that at least one maybe, I'd have no idea

18  whether that employee, ex-employee now, is involved or not.

19  Q    And isn't that employee Troy Parker?

20  A    That's correct, yes.

21  Q    Okay.  What did Troy Parker do for Highland Capital

22  Management?

23  A    Most recently he ran the PE book.

24  Q    Okay.

25        MS. PATEL:  No further questions, Your Honor.


WWW.JJCOURT.COM

Seery - By the Court                103

1      THE COURT:  All right.  We have seven minutes.  Do

2  you have questions, Judge Lynn?  We have a little bit of time?

3      JUDGE LYNN:  No, but I just want to make clear Mr.

4  Dondero's suggestion for resolving the motion was not a

5  dickered agreement, it was a suggestion that we would hope

6  would make life easier for the parties and the Court.

7      THE COURT:  Okay.  Thank you.  Thank you.

8      I had one or two questions.  Is there going to be

9  redirect?  Well, no, you used all your time, you don't get

10 redirect.

11     (Laughter.)

12

13     MS. HAYWARD:  And, Your Honor, I don't have redirect.

14     THE COURT:  Oh, very good.

15                    EXAMINATION

16 BY THE COURT:

17 Q   Let me ask you, sir, I want to revisit Dynamic, that's the

18 one I hear most about obviously since that's the one that Mr.

19 Okada --

20 A   Yes.

21 Q    -- has the distribution rights from.  You know, I was

22 fixated before I came out here a little on the time line.

23 Right?  So the pleadings said Dynamic, the termination date was

24 November 15, 2019.

25 A   Correct, Your Honor.

**WWW.JJCOURT.COM**

Seery - By the Court                    104

1 Q    About 30 days after the Highland bankruptcy was filed.

2 What I heard your testimony to be was that pre-petition the

3 largest third-party investor -- I wrote it down phonetically --

4 A    Realdania.

5 Q     -- Realdania --

6 A    I'm not sure if there's someone in the courtroom who know

7 them.

8 Q    Sounds like a Spanish company maybe.

9 A    I believe they're a European company, it's an investor I'm

10 not familiar with, Your Honor, but I have seen the redemption

11 notices.

12 Q    Okay.  They issued a $65 million --

13 A    I believe it was in the neighborhood of 65 million, yes.

14 Q    And it was pre-petition?  You wouldn't know?

15 A    It was pre-petition, I think it was around 40 percent of

16 the fund.

17 Q    Okay.  I mean do you remember when?  Was I t --

18 A    I believe it was in the spring and it followed a -- spring

19 or early summer and it followed a separate redemption from a

20 different investor.

21 Q    Okay.  So there was another third-party investor, even

22 before Realdania that --

23 A    That's my recollection, yes, Your Honor.

24 Q     -- that was unaffiliated with Highland.

25 A    That's correct.

WWW.JJCOURT.COM

Seery - By the Court                105

1 Q    Okay.  So it's your business judgment that once these two

2 biggies issued their redemptions, it just wasn't worthwhile to

3 keep this fund going anymore.

4 A    That's correct, Your Honor.  And as I said, Mr. Okada was

5 a driver to that fund and he had left.  He did not actually

6 redeem, but he was being compulsory redeemed as the fund went

7 into liquidation.  So all of the investors, redeemed and non,

8 will be treated the same.

9 Q    All right.  So I guess one thing I'm getting at is timing

10 of Mr. Okada leaving versus timing of these third-party

11 redemptions happening.

12 A    Right.  I could --

13 Q    Is there any --

14 A    I see no connection whatsoever.  And, again, his piece of

15 the fund was about -- I believe it was round 12 percent of the

16 fund.

17 Q    Yeah, his --

18 A    And it's a material amount of money I suppose to most

19 folks, including myself, but it's not -- it wasn't a driver

20 whatsoever that we could see, and he did not redeem.  So the

21 third-party redeemed, Okada was leaving having been the driver

22 of the fund, it was an undersized fund anyway, there was no

23 real valid reason to keep a small fund trying to do this around

24 after Mr. Okada left.

25 Q    Okay.  I'm just wondering whether I should or not, you

APP. 1615
Appx. 01662

Seery - By the Court                    106

1 know, the timing of this.  So this is -- starts spring of 2019,

2 but then a month post-petition let's terminate this thing.  I

3 mean who actually makes that decision?

4 A    Well, the decision to continue forward is made by the

5 board.  Before that it would have been made by the managers of

6 the funds or the compliance group.  So I have not looked into

7 specifically who said, Let's terminate it.  To be perfectly

8 frank, I don't know --

9 Q    But it would --

10 A    -- the specifics.

11 Q    -- the manager, Highland?

12 A    It's Highland who determines to terminate it.  Ultimately,

13 if all the investors issued redemption notices, then the fund

14 would have to liquidate --

15 Q    Right.

16 A    -- on its own.  So Highland --

17 Q    Right.

18 A    -- wouldn't have any say about it.  But to put it into

19 liquidation, I believe it was Highland that did it.  Some of

20 the funds, it could be foreign directors, but that's not what

21 happened.

22 Q    Uh-huh.  Okay.  So there are third-party non-affiliated

23 investors still in it, there's 35 million that would go out the

24 door and --

25 A    It's about -- there's a couple of assets that still have

Seery - By the Court                      107

1 to be liquidated.  Approximately 85 percent of the distribution

2 is to third-party un-affiliated investors.  And then we --

3 we'll have -- we'll retain some cash to make sure that we can

4 manage the liquidation of the fund and the dissolution of the

5 entities.  But we still have to get rid of a small amount of

6 assets that are pretty liquid.

7 Q    Okay.  Now I heard you also say that Highland isn't owning

8 any fees anymore on these refunds.  Did I not hear you say

9 that?

10 A    Yeah, certainly -- so I think on ours I think.  On Dynamic

11 and on AROF, the Argentina Recovery Opportunity Fund, once they

12 were put into liquidation they don't earn any fees anymore.

13 The --

14 Q    Okay.  Let me -- okay, so when did that stop, when were

15 they "put into liquidation" so the management fees stop?

16 A    I believe that Dynamic would have been in the fall, I

17 don't know the exact date, and Argentina --

18 Q    Well --

19 A    -- was before that.

20 Q    -- the Court termination date used in the pleadings was

21 November 20, 2019.

22 A    Yeah, but I don't recall the exact date, Your Honor.  We

23 can certainly figure that out, I just don't recall off the top

24 of my head.  When the fee cutoff date -- the fee cutoff date

25 for RCP was I believe in April of 2018 when the one-year

**WWW.JJCOURT.COM**

Seery - By the Court                    108

1 extension was given.  That was the trade for the extension.

2 Q   Okay.  But you don't know for sure when the management fee

3 cutoff was --

4 A   No.

5 Q    -- on either Argentina or Dynamic.

6 A   No, that's correct, Your Honor.

7 Q   I mean would it have been in November 2019 you think?

8 A   I think it was before that, but I don't -- I believe so

9 but I don't know for sure.

10 Q   Okay.

11 A   If I'm wrong, I'll figure that out and correct it to you.

12 Q   Okay.  All right.  Thank you.  You're --

13 A   Thank you.

14 Q    -- excused.

15 A   Thank you.

16         THE COURT:  Does anyone in the room know the answer

17 to that?

18         MS. HAYWARD:  Your Honor, we can figure it out very

19 quickly I think.

20         THE COURT:  Really?  Okay.

21     (Pause in the proceedings.)

22         THE COURT:  Actually I had one more question for Mr.

23 Seery.

24         THE WITNESS:  Yes.

25 BY THE COURT:

**WWW.JJCOURT.COM**

Seery - By the Court                    109

1  Q    Do we have any other Highland managed funds out there that

2  are imminently going to be going into wind-down mode?  Is that

3  easy to answer?

4  A    We have a number of CLO funds that are what we call 1.0

5  CLOs.  They're old and they're effectively winding down.  And a

6  number of those we don't get fees off of, but they had --

7  because they own very illiquid assets, we have to realize on

8  those assets.  May of those have cross-ownership to funds that

9  we do get fees on.  We need --

10 Q    Let me back you up.  Why didn't Highland get fees on

11 those?

12 A    Because sometimes in the CLO structure it depends on what

13 kind of asset gets treated under the net asset value, so for

14 example if it's equity, it may not count, even if it has a

15 value, you don't get paid a fee on it.  So if you had a loan

16 that converted to equity, some of those CLOs you  may not get a

17 fee on because you don't own any loans anymore.  So, but most

18 of those assets, if a CLO owned equity for example in a PE

19 company, we would have other funds that owned additional equity

20 in that same PE company.

21        We do have other assets where they aren't necessarily

22 wind-down, but there will be distributions to entities that may

23 or may not be related parties under the protocols, and we are

24 in the process, and the Committee's aware of it, selling

25 certain assets, and hopefully those sales will go the way we

WWW.JJCOURT.COM

Seery - By the Court                    110

1  want them to.  They're valuable assets so we feel we have a

2  good opportunity to realize good value for the estate.  There

3  would be requirements on certain of them to pay off debt from

4  certain entities before we can distribute money back up to

5  Highland Capital.

6  Q    All right.  Thank you.

7  A    Thank you.

8            THE COURT:  You're excused.

9            All right.  Anything else today?

10           MR. POMERANTZ:  Do you want to hear closings, or have

11 you heard enough, Your Honor?

12           THE COURT:  I mean if you  have a quick one or two

13 minute closing, I'll hear that, to recap anything.  Did you

14 have that quick answer that Ms. Hayward --

15           MR. POMERANTZ:  We are --

16           THE COURT:   -- was confident about?

17           MR. POMERANTZ:  We are trying to find it.

18           THE COURT:  Okay.

19           MR. POMERANTZ:  We have a couple of emails out,

20 hopefully by, we get a couple of answers.

21           THE COURT:  Okay.  Okay.

22            CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23           MR. POMERANTZ:  Your Honor, I just wanted the

24 highlight the fiduciary duty as you -- I know it was a subject

25 of discussion with Mr. Seery, cross-examination.  Again, as you

WWW.JJCOURT.COM

111

1 heard, and as the only evidence before Your Honor is, Mr.

2 Seery, who as Your Honor knows is a restructuring lawyer,

3 practice in it. He's fully aware of what the fiduciary duty

4 requires.

5       And first and foremost, I think it may even be 28 USC

6 959, the Debtor has to operate in accordance with applicable

7 law. Every debtor before Your Honor has to act in accordance

8 with applicable law, and if the debtor is not acting in

9 accordance with applicable law, then they are creating

10 liability. As Mr. Seery testified, that is exactly what that

11 the Debtor is doing. And this concept of dueling fiduciary

12 duties or the board taking certain actions that just happened

13 to benefit insiders as indicating that they are not looking out

14 for the estate is just not accurate. That's not how the law

15 works and I think Mr. Seery said it correctly, that the Debtor

16 fulfills its fiduciary duty to the estate by operating in

17 accordance with applicable law.

18       With respect to 105, Your Honor, the cases cited by

19 the Committee don't support granting injunctive relief forward

20 of attachment without going through the necessary process.

21 They do cite the DeLorean case which at first blush sounds like

22 a court authorized the holding of money, but if you read that

23 case carefully, it was done because there was a complaint and

24 because the Court ultimately determined that the evidence

25 before the Court established grounds for preliminary

112

1 injunction.

2          Mr. Clemente has asked Your Honor to hold that the

3 objection filed satisfies the standard. But the objection

4 isn't a legal document. The Committee has not put on any

5 evidence to support any claims that exist. The testimony from

6 Mr. Seery is that there's a claim under a note and that there

7 are defenses to the note. So Your Honor does not have the

8 sufficient evidentiary basis in order to meet the standards of

9 the injunction of which irreparable harm -- there's a whole

10 host of reasons.

11          So while we understand what the Committee wanted to

12 do. If they wanted to file an action, they could have. We

13 don't expect them to have completed their investigation on all

14 the types of claims they're looking at. But they've been aware

15 of this Okada note for a couple of months. It would not have

16 been difficult for them to file, as they have standing, a

17 lawsuit to recover any. They asked us to issue a demand note,

18 we did, and we got the answer.

19          So, Your Honor, I don't think there's a basis under

20 105, the way it's being used here and the lack of evidentiary

21 record to support it. And for those reasons, Your Honor, we

22 would ask that Your Honor support the motion and other than the

23 distributions that are being held in the registry, allow the

24 distribution to be made to Mr. Okada.

25          THE COURT: Okay.

**WWW.JJCOURT.COM**

113

1　　　　　MR. POMERANTZ:  Thank you, Your Honor.

2　　　　　THE COURT:  All right.  Other quick closings?

3　　　　　MR. CLEMENTE:  Your Honor, I'll be very quick.

4　　　　　CLOSING ARGUMENT ON BEHALF OF THE COMMITTEE

5　　　　　MR. CLEMENTE:  There's obviously a lot more that I

6　could say, but I'll be respectful and be very quick.

7　　　　　First of all, Your Honor is the judge and you're the

8　one that determines what the law is and what the duties

9　ultimately are for this Debtor.  Mr. Seery I think indicated in

10　his testimony that, for what it's worth, he does not believe

11　that there would be a viable claim for breach of fiduciary duty

12　if Your Honor ordered the distribution to Mr. Okada be put in

13　the Court registry.

14　　　　　I think the testimony was clear from Mr. Seery that

15　Mr. Okada, at all times relevant, when all the things that

16　happened that involved the Redeemer Committee, that involved

17　Acis, that involved UBS, Mr. Okada was at least co-Chief

18　Investment Officer and we all know he was co-founder of

19　Highland.  I think Your Honor's questions, and perhaps

20　frustration with sort of trying to figure out some of the

21　answers, show how interrelated all of these things are and the

22　various capacities and roles that Mr. Okada had back at the

23　time when all these different transactions occurred.

24　　　　　I think the testimony we heard is that Mr. Seery did

25　a lot of work around why we should pay Mr. Okada, but almost no

**WWW.JJCOURT.COM**

114

1  work around why we shouldn't pay Mr. Okada.  And so I go back

2  to what I said earlier, Your Honor, I think Mr. Okada is

3  perfectly capable of coming into this court and arguing that

4  once the monies that were put into this Court's registry should

5  be distributed to him, he can come in and do that.

6     But I think for purposes of today, Your Honor has

7  heard more than enough to come to the conclusion that the

8  appropriate remedy here is to place the money within the

9  registry of this Court.  It satisfies the fiduciary duty of the

10  Debtor and it protects the interest of Mr. Okada, who is free

11  to come into this court and make whatever argument he so

12  chooses as to his entitlement to those funds.

13     Unless Your Honor has any questions of me, I'll sit

14  down.

15     THE COURT:  Thank you.

16     MR. CLEMENTE:  Thank you.

17     THE COURT:  Anything else?

18     MR. POMERANTZ:  Your Honor, in answer to you

19  question, November 11 was the date that the fees were no longer

20  payable to the Debtor in the Dynamic Fund.

21     THE COURT:  November 11 post-petition.

22     MR. POMERANTZ:  Correct.

23     THE COURT:  I like being transparent and I -- and so

24  I sometimes share my thoughts hoping that it will help.  But

25  I'm -- you all get why I'm fixated on this point?  Maybe I'm

WWW.JJCOURT.COM

115

1 sharing my thoughts when I don't have to. But the time line

2 looks suspect, whether it should be or not, it looks maybe

3 problematic. Do you see what I'm saying?

4         We had this fund that I understand never got to real

5 scale and in spring 2019 we have a couple of big unrelated

6 third-parties -- third-party investors issue redemptions and

7 that makes it really not a very worthwhile fund, so maybe it

8 should go into wind-down mode. Nevertheless, Highland has been

9 continuing to get its management fee. I don't know how much

10 management fee, but it's been getting a management fee until it

11 files bankruptcy, and then, Oh, let's wind this sucker down.

12         Do you see what -- you know, I don't know. I mean

13 again, a hearing for another day. But this is the kind of

14 thing I get concerned about, and maybe kind of want to look

15 into the bona fides of the decision making process to wind

16 down, let's terminate this thing and make disbursements. And,

17 you know, did we have any fingerprints of this on insiders that

18 should make me troubled. I don't know. I mean if I'm going

19 out on a lark here, just stop me.

20         MR. POMERANTZ: Well, look, Your Honor, I certainly

21 understand why you're concerned. As you said at the first

22 hearing, you have stuff in your head that you can't forget, and

23 I understand. I wasn't around but I understand the history and

24 especially the history with certainly similar things that may

25 have happened in the Acis case.

116

1          The facts are that Realdania made its redemption

2  request on August 15, the fees that the -- August 15, but that

3  the liquidation was the time where the management fees stopped,

4  which incidentally were $12,000 a month based upon the level of

5  this spot.

6          THE COURT:  Okay.

7          MR. POMERANTZ:  So, Your Honor, I understand your

8  concerns, however, what I would say is, you have Mr. Seery here

9  answering your questions.  You have Mr. Seery who said he's

10 conducted an thorough investigation.  At some point, and I'm --

11 you know, obviously you brought up a couple of questions, at

12 some point the creditors -- Your Honor has to accept that if

13 the board has done a thorough analysis, and we're coming into

14 this hearing today, and before we filed the motion, as Mr.

15 Seery said, we crossed all our Ts and dotted all our Is.

16         We spent a lot of money collectively, the different

17 firms that are involved, because we wanted to make sure it's

18 the right thing.  We understood that coming to Your Honor

19 asking to pay investors who are related parties, given the

20 context of this case and given the Committee's opposition, was

21 going to be a big challenge.  We thought it was the right thing

22 to do, but we wanted to make sure Your Honor knows that the

23 board actually did a thorough investigation, again, spearheaded

24 by Mr. Seery, who is not just someone off the street, but as he

25 testified, this is what he's done over the last 10-15 years.

117

1        So I certainly understand Your Honor's concerns.  Mr.

2   Seery I think has testified about the thorough investigation,

3   and that the 12,000 a month, that I think if he got back on the

4   stand, he would testify that would be a breach of duty to the

5   investors to continue on getting fees.  There's an obligation

6   at some point, when the redemptions happened, to either pay the

7   redemptions, put the fund in liquidation, and that's what

8   happened.

9        And just because it wasn't done by the board, it was

10  done before, it was important, as I mentioned in my opening,

11  and as Mr. Seery testified, he looked at that carefully and

12  thoroughly.  He didn't want to be embarrassed, we didn't want

13  to be embarrassed coming in and not having those answers.  So,

14  Your Honor, this is a long way of saying I think at some point

15  the board is entitled to the deference of business judgment if

16  they can demonstrate that they've gone through the process

17  necessary to earn the deference to business judgment, which I

18  think Mr. Seery has done.

19        THE COURT:  Okay.  And while we're on the subject, I

20  mean 12,000 a month was the management fee to Highland from

21  Dynamic.  What was the management fee from Argentina, do you

22  have that off the top of your head?

23        MR. SEERY:  It would have been in the same -- these

24  are approximately --

25        THE COURT:  The same range?

WWW.JJCOURT.COM

118

1    MR. SEERY:   -- the same neighborhood.

2    THE COURT:  Okay.

3    MR. SEERY:  That the meetings would be based upon

4 fees.

5    THE COURT:  Okay.

6    MR. SEERY:  Or the redemptions (indiscernible)

7 variable asset now (indiscernible).

8    THE COURT:  Okay.

9    MR. SEERY:  (indiscernible).

10    THE COURT:  Okay.  All right.  Just a minute while I

11 do some math.

12    (Pause in the proceedings.)

13    THE COURT:  All right.  I'm doing this math in my

14 head.  There's a $7.4 million note receivable from HCM Services

15 of which Okada is the 25 percent owner of.

16    MR. POMERANTZ:  Your Honor, 7.4 is not the demand

17 notes.  Again, 985,000 is the demand notes.  The rest of those

18 notes are performing and not in the fall.

19    THE COURT:  Okay.  All right.  With regard to the

20 motion and the objection and the Committee there's been a lot

21 of argument about 105 and what it permits the Court to do and

22 what it doesn't as far as fashioning an equitable remedy here.

23 Here I mean it's clear that this Debtor has receivables owed by

24 these related parties, although they don't necessarily match up

25 perfectly with the amount of disbursements that are owed by

WWW.JJCOURT.COM

119

1  these funds and of course the funds are separate legal entities

2  than the Debtor.  So I'm not glossing over that fact or

3  ignoring that fact.

4  　　　　But I do think the Court has broad equitable powers

5  to remedy -- to fashion remedies that preserve the status quo

6  and I think it is appropriate here to order that most of this

7  money, that most of the 8.6 million that would go to related

8  investors in these three funds, be put into the registry of the

9  court pending further motions, orders, adversary proceedings

10 anyone wants to file to make a claim to that money.  I said

11 most of it.

12 　　　　I am going to order that with regard to the amount

13 that would be payable to Mr. Okada, the 4.176 million, we will

14 subtract from that the 1.3 million that represents the demand

15 note receivable that the Debtor has so that I'm essentially

16 doing an equitable offset at that point.  So he can only be

17 paid -- he should only be paid from the Dynamic Fund whatever

18 4.176 million minus 1.3 million is, and the rest shall be put

19 into the registry of the court.  And everybody's rights are

20 reserved on anything and everything with regarding to do tos

21 and do froms.

22 　　　　I reserve the right to supplement in more detail in a

23 written form of order to justify the Court's 105 action here.

24 But, Mr. Pomerantz, I'd ask you to upload a form of order on

25 this, please.

**WWW.JJCOURT.COM**

120

1          MR. POMERANTZ:  We'll be happy to, Your Honor.  We'll

2   circulate it to the Committee and Ms. Patel as well.

3          THE COURT:  All right.  Well, thank you all, and --

4          MR. CLEMENTE:  Your Honor, but just to be clear

5   though, the other amounts, correct, to HCM Services and CLO

6   Holdco, would that be part of the order or what did Your Honor

7   have in mind with respect to that?

8          THE COURT:  Well --

9          MR. CLEMENTE:  Because I believe those are to be

10  deposited with the Court as well, yes.

11         THE COURT:   -- all of -- everything gets deposited

12  in the registry of the court, except Mr. Okada will get

13  whatever the differential is of 4.176 minus 1.3.  Okay?

14         MR. CLEMENTE:  Thank you, Your Honor.

15         THE COURT:  All right.  Thank you.

16         COURT SECURITY OFFICER:  All rise.

17                         *****

18

19

20

21

22

23

24

25

**WWW.JJCOURT.COM**

121

1          **C E R T I F I C A T I O N**

2          We, DIPTI PATEL, KAREN WATSON and TERRI STARKEY,

3    court approved transcriber, certify that the foregoing is a

4    correct transcript from the official electronic sound recording

5    of the proceedings in the above-entitled matter, and to the

6    best of my ability.

7

8    /s/ Dipti Patel

9    DIPTI PATEL

10

11   /s/ Karen Watson

12   KAREN WATSON

13

14   /s/ Terri Starkey

15   TERRI STARKEY

16   J&J COURT TRANSCRIBERS, INC.      DATE:  March 6, 2020

17

18

19

20

21

22

23

24

25

WWW.JJCOURT.COM

# EXHIBIT 16

```
                IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
                           DALLAS DIVISION

                                  )   Case No. 19-34054-sgj11
     In Re:                       )
                                  )
     HIGHLAND CAPITAL             )   Dallas, Texas
     MANAGEMENT, L.P.,            )   June 15, 2020
                                  )   1:30 p.m. Docket
          Debtor.                 )
                                  )   UBS'S MOTION FOR RELIEF FROM
                                  )   THE AUTOMATIC STAY TO PROCEED
                                  )   WITH STATE COURT ACTION (644)
     _____ )

                     TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.

     WEBEX/TELEPHONIC APPEARANCES:

     For the Debtor:           Jeffrey N. Pomerantz
                               Alan J. Kornfeld
                               PACHULSKI STANG ZIEHL & JONES, LLP
                               10100 Santa Monica Blvd.,
                                 13th Floor
                               Los Angeles, CA  90067
                               (310) 277-6910

     For the Debtor:           Robert J. Feinstein
                               Greg Demo
                               PACHULSKI STANG ZIEHL & JONES, LLP
                               780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
                               (212) 561-7700

     For the Debtor:           Melissa S. Hayward
                               Zachery Z. Annable
                               HAYWARD & ASSOCIATES, PLLC
                               10501 N. Central Expressway,
                                 Suite 106
                               Dallas, TX  75231
                               (972) 755-7104

     For UBS Securities, LLC:  Martin A. Sosland
                               BUTLER SNOW, LLP
                               5430 LBJ Freeway, Suite 1200
                               Dallas, TX  75240
                               (469) 680-5502
```

2

```
 1   APPEARANCES, cont'd.:

 2   For UBS Securities, LLC:    Andrew Clubok
                                 Sarah A. Tomkowiak
 3                               LATHAM & WATKINS, LLP
                                 555 Eleventh Street, NW,
 4                                  Suite 1000
                                 Washington, DC  20004-1304
 5                               (202) 637-2335

 6   For the Official Committee  Matthew A. Clemente
     of Unsecured Creditors:     SIDLEY AUSTIN, LLP
 7                               One South Dearborn Street
                                 Chicago, IL  60603
 8                               (312) 853-7539

 9   For Alvarez & Marsal,       Michael A. Rosenthal
     Investment Manager,         GIBSON, DUNN & CRUTCHER, LLP
10   Highland Crusader Funds:    200 Park Avenue
                                 New York, NY  10066
11                               (212) 351-4000

12   For Acis Capital            Brian Patrick Shaw
     Management GP, LLC:         ROGGE DUNN GROUP, P.C.
13                               500 N. Akard Street, Suite 1900
                                 Dallas, TX  75201
14                               (214) 239-2707

15   For Acis Capital            Rakhee V. Patel
     Management GP, LLC:         WINSTEAD, P.C.
16                               2728 N. Harwood Street, Suite 500
                                 Dallas, TX  75201
17                               (214) 745-5250

18   For Redeemer Committee of   Mark A. Platt
     the Highland Crusader       FROST BROWN TODD, LLC
19   Fund:                       100 Crescent Court, Suite 350
                                 Dallas, TX  75201
20                               (214) 580-5852

21   For Redeemer Committee of   Marc B. Hankin
     the Highland Crusader       JENNER & BLOCK, LLP
22   Fund:                       919 Third Avenue
                                 New York, NY  10022-3098
23                               (212) 891-1600

24

25
```

3

APPEARANCES, cont'd.:

1

2  For Redeemer Committee of    Terri L. Mascherin
   the Highland Crusader        JENNER & BLOCK, LLP
   Fund:                        353 N. Clark Street
3                               Chicago, IL  60654-3456
                                (312) 923-2799
4

5  Recorded by:                 Michael F. Edmond, Sr.
                                UNITED STATES BANKRUPTCY COURT
                                1100 Commerce Street, 12th Floor
6                               Dallas, TX  75242
                                (214) 753-2062
7

8  Transcribed by:              Kathy Rehling
                                311 Paradise Cove
                                Shady Shores, TX  76208
9                               (972) 786-3063

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.

4

1          DALLAS, TEXAS - JUNE 15, 2020 - 1:35 P.M.

2          THE COURT:  Please be seated.  All right.  This is

3    Judge Jernigan.  We have a hearing in Highland.  I've got

4    problems with this chair.  Just a minute.  Here we go.  We

5    have a motion to lift stay in the Highland Capital case, Case

6    No. 19-34054.  It's a motion of UBS for relief from the stay

7    to go forward with litigation in the New York state court.

8       I'm going to do a roll call, hopefully as efficiently as

9    possible.  I'm going to first call the names that I think are

10   likely to be with us, and if I don't call your name, at the

11   end of the roll call, if you wish to appear, I'll invite you

12   to go ahead.

13      All right.  First, for UBS, the Movant, I'm guessing we

14   have some Latham & Watkins folks, and perhaps Marty Sosland as

15   well.  I'll start with you.  Mr. Sosland, are you by chance on

16   the phone?

17          MR. SOSLAND:  I am, Your Honor.

18          THE COURT:  Good afternoon.

19          MR. SOSLAND:  I'm on WebEx.

20          THE COURT:  You're on the video?

21          MR. SOSLAND:  Good afternoon.

22          THE COURT:  Good afternoon.  Who else do we have?  Do

23   we have Mr. Clubok, Ms. Tomkowiak?  Who do we have from Latham

24   & Watkins?

25          MR. CLUBOK:  Good afternoon, Your Honor.  It's Andrew

5

1   Clubok from Latham & Watkins. And I'm here with my partner,

2   Sarah Tomkowiak.

3          THE COURT: Okay. Good afternoon. All right. So I

4   think we have four objectors in all. I'll start with the

5   Debtor. Mr. Pomerantz, I'm assuming you're on the phone with

6   some of your team?

7          MR. POMERANTZ: Yes, I am, Your Honor. I'm also on

8   the phone with Robert Feinstein, Alan Kornfeld, and Greg Demo.

9          THE COURT: All right. Good afternoon to all of you.

10          MR. FEINSTEIN: Good afternoon, Your Honor.

11          THE COURT: All right. Do we have your local

12   counsel, Ms. Hayward or Mr. Annable?

13          MR. ANNABLE: Yes, Your Honor. Zachery Annable and

14   Melissa Hayward on behalf of the Debtor. We're here.

15          THE COURT: All right. Very good. Now I'll take --

16          MR. POMERANTZ: Your Honor, this is Jeff Pomerantz.

17   Before we went to the relief from stay, there was one minor

18   other item that Mr. Demo is going to handle that's resolved,

19   Hunton & Williams' application. So if he could put the

20   resolution on the record before we go into what's likely going

21   to be a lengthy hearing. But I didn't mean to interrupt Your

22   Honor from taking appearances.

23          THE COURT: All right. Thank you. You know, I

24   didn't see that on our calendar and I thought in my brain, we

25   continued that to today, I think. So we'll start with that

6

1   once we finish the roll call.

2       All right.  For the Unsecured Creditors' Committee, do we

3   have Ms. Reed, Mr. Clemente?  Who do we have on the phone?

4           MR. CLEMENTE:  Good afternoon, Your Honor.  Matthew

5   Clemente from Sidley Austin on behalf of the Committee.

6           THE COURT:  All right.  Anyone else from Sidley

7   Austin?

8           MR. CLEMENTE:  I think we're -- I think we're set,

9   Your Honor.

10          THE COURT:  All right.

11          MR. CLEMENTE:  Thank you.

12          THE COURT:  What about for the Redeemer Committee?

13  Do we have Mr. Platt or others on the phone?

14          MR. PLATT:  Yes, Your Honor.  Mark Platt is on, and I

15  believe Terri Mascherin from Jenner & Block is on video as

16  well, and Marc Hankin is on the phone --

17          THE COURT:  All right.

18          MR. PLATT:  -- from Jenner.

19          THE COURT:  Ms. Mascherin, Mr. Hankin, are you there?

20          MS. MASCHERIN:  Yes, Your Honor.  Terri Mascherin.

21          THE COURT:  All right.

22          MS. MASCHERIN:  Good afternoon.

23          THE COURT:  All right.  Then --

24          MR. HANKIN:  Marc Hankin, Your Honor.

25          THE COURT:  Okay.  Very good.  All right.  We also

7

1  had a joinder in the objections by Acis.  Do we have Ms. Patel

2  or others for Acis?

3          MR. SHAW:  Yes, Your Honor.  Brian Shaw and Ms. Patel

4  are on for Acis.

5          THE COURT:  All right.  Well, those are all --

6          MS. PATEL:  Good afternoon, Your Honor.

7          THE COURT:  Oh, go ahead.

8          MS. PATEL:  Good afternoon, Your Honor.  This is

9  Rakhee Patel.

10         THE COURT:  All right.  Thank you, Ms. Patel.

11    Those were all of the most likely appearances.  If you

12 want to appear and you've not appeared yet, you may go ahead.

13 (Pause.)  All right.

14         MR. ROSENTHAL:  Good afternoon, Your Honor.  Michael

15 Rosenthal from Gibson Dunn on behalf of Alvarez & Marsal.

16 They're the investment manager of the Highland Crusader Funds.

17         THE COURT:  Okay.  Thank you, Mr. Rosenthal.

18    Any other appearances?

19    All right.  Well, Mr. Pomerantz, or I think you said --

20         MR. DEMO:  Your Honor?

21         THE COURT:  -- Mr. Demo wanted to present the

22 resolution of Andrews Kurth Hunton & Williams' employment.

23 You may go ahead.

24         MR. DEMO:  Yes.  Thank you, Your Honor.  Greg Demo on

25 behalf of Highland Capital Management.

8

1      We did work with the Committee to come to a resolution on

2   this retention application.  We are looking to retain Hunton

3   to help us with a tax situation arising from a 2008 tax audit.

4   The Committee had some reservations, and we're able to resolve

5   them.  The resolution that we have is that the engagement, at

6   least in the first instance, will be limited to a certain time

7   period, and that's between June 15th through September 30th.

8   And it'll also be capped at a specific dollar amount, which is

9   $65,000 a month that is calculated on an average rolling basis

10  over the period.  So, total of fees of $227,500, although,

11  obviously, everybody will work to keep those fees down.

12     At the end of that period, the end of the September 30th

13  period, the idea is that either we'll come to a further

14  agreement with the Committee on how to expand the retention of

15  Hunton, or else we'll come back to this Court and seek a

16  further retention.

17     The Committee would reserve all of their objections, if

18  they had any, to the expanded retention, and the only

19  objection that they would not retain would be objecting to

20  Hunton's fees based on the fact that their retention was not

21  expanded.

22     All fees would be applied for under Section 330 and all

23  the other applicable provisions of the Bankruptcy Code.

24     And that is the resolution that we have with the

25  Committee, Your Honor, on the Hunton retention.

9

1          THE COURT:  All right.  Very good.  Mr. Clemente,

2   will you confirm that that reflects the deal?

3          MR. CLEMENTE:  Your Honor, Matthew Clemente on behalf

4   of the Committee.

5      I will, Your Honor.  I will confirm that.  As Your Honor

6   undoubtedly is aware, we're keenly focused on making sure that

7   Debtor funds, you know, benefit only the Debtor estate and not

8   other parties, and that was really the issue we had in dealing

9   with Mr. Demo.  But he accurately reflected our agreement.

10         THE COURT:  Okay.  Very good.  Well, I thank you all

11  for working that out, and I'd be happy to sign an order to

12  this effect.  So if you could please electronically submit it,

13  Mr. Demo.

14         MR. DEMO:  Will do, Your Honor.

15         THE COURT:  All right.  Well, the main event today,

16  as we have discussed, is the motion to lift stay of UBS.

17  Before we talk about oral -- or, opening statements, are there

18  any housekeeping matters or announcements, stipulations,

19  anything of that nature that affects how we proceed this

20  afternoon?

21         MR. CLUBOK:  Yes, Your Honor.  Again, Andrew Clubok

22  on behalf of UBS.

23     The parties, all of the parties have agreed that all of

24  the exhibits that are attached both to UBS's motion and to all

25  of the Objectors' papers, all of them, with one exception,

10

1   which I'll explain, are to be admitted for purposes of this

2   hearing only.  So, we've all stipulated to their admission.

3   We won't (inaudible).  And they're -- they will be deemed

4   admitted for all purposes, but just for this hearing.  We all

5   reserve the right to object to their use in further

6   proceedings or other matters.

7       The one exception and -- is Exhibit D to the Redeemer's

8   objection.  I believe that -- I believe the Debtor objected to

9   Exhibit D.  And I think that Redeemer, can't speak for them,

10  but I think everyone agreed that that would need to be

11  admitted for purposes of this hearing.  So that's the one

12  exception.

13          THE COURT:  All right.  I'm going to ask people to

14  speak up or forever hold your peace.  The Court is going to

15  admit into evidence today, only for today's hearing, not for

16  other hearings, all exhibits that were attached to the various

17  parties' -- UBS's motion, the objections -- except Exhibit D

18  to the Redeemer objection.

19      Before I get people's confirmation, let me just clarify

20  one thing.  All parties except the Debtor refer to Exhibit A,

21  B, et cetera to their pleadings.  The Debtor actually filed a

22  separate Appendix A of exhibits at Docket No. 688 with 12

23  items.  I assume that was included in addition to the

24  attachments to the motions and objections.

25          MR. CLUBOK:  Yes, Your Honor.

11

1          THE COURT:  Okay.

2          MR. CLUBOK:  Those were just duplicative of the

3     exhibits, is my understanding, --

4          THE COURT:  Oh, okay.

5          MR. CLUBOK:  -- that were otherwise filed as part of

6     the objection.

7          THE COURT:  All right.  Thank you.  Anyone have

8     anything to change about this announcement?

9       All right.  Very good.  So the record is clear, the Court

10    is considering all exhibits attached or submitted by the

11    parties before the hearing, except Exhibit D to the Redeemer

12    objection.

13      All right.  Well, I thank you all.  That saves some time

14    here today.

15      (All parties' exhibits admitted into evidence except

16    Exhibit D to Redeemer Objection.)

17          THE COURT:  Anything else?

18          MR. CLUBOK:  Your Honor?  Yes, there's one other

19    housekeeping issue, and that is UBS filed a motion to request

20    leave to file a reply brief.  And we submitted the reply brief

21    along with that motion.  Oh, dear.  Did we lose -- can you

22    still hear me, Your Honor?

23          THE COURT:  Yes, I can.  Can you hear me?

24          MR. CLUBOK:  Okay.  We had -- yes, we had a technical

25    glitch for a second and it warned me that we were losing

12

1  video, but everything's worked out.

2          THE COURT: Okay.

3          MR. CLUBOK: So, Your Honor, UBS filed a motion for

4  leave to file a reply. And by the way, there were further

5  exhibits attached to that, which are part of that stipulation

6  that we just referenced. Your Honor, I believe, has not yet

7  technically ruled on that, but we -- we wanted to preview

8  those arguments. We could obviously have just made them all

9  cold here, but there's a lot in there, so we thought it would

10  be helpful to the parties and hopefully to the Court to seek

11  leave to file a reply brief so that everyone can know, you

12  know, plenty of time in advance our response as to many of the

13  different arguments raised in the objection.

14      Your Honor, I think, technically, because of the Rules, we

15  were prohibited from providing you with an unredacted copy.

16  So I think that all Your Honor may have before you right now

17  is a redacted version. There are some minor issues that to

18  the extent we need to get into those details, we can certainly

19  talk about them in open court. But we do ask that the Court

20  rule on our motion for leave to file a reply brief.

21          THE COURT: All right. Do we have any objections to

22  that? It was filed, I think, about 6:15 Thursday night, and I

23  saw the motion for leave on Friday. Anyone have a problem

24  with the Court considering the reply?

25      It's something in our Rules, I think it's pretty common,

13

1   that -- you know, obviously, the motion, the average motion to

2   lift stay that's filed in the bankruptcy court deals with a

3   car or a house and we have very streamlined procedures to, you

4   know, a motion and an objection and that's it.  This is

5   obviously an atypical or something more complicated than usual

6   motion to lift stay.  Anyone have a problem with me

7   considering the reply?

8       All right.  Leave is granted, then, on that.  I will

9   consider the content of that reply.

10          MR. CLUBOK:  Thank you, Your Honor.  And I believe

11  those are all the housekeeping issues that I'm aware of.

12      There was -- Ms. Tomkowiak reminded me -- I guess a motion

13  -- motion to seal.  Some of the exhibits are -- I think both

14  sides are impacted by confidentiality agreements and so forth.

15  I don't think any of the motions to seal on any side are

16  objected to.

17      So perhaps those could all be agreed upon, particularly

18  for our reply brief, and that would allow us to then get you

19  an unredacted copy, if we're permitted, if the motion to seal

20  is granted.  Then you'll be -- we'll be able to get you very

21  quickly an unredacted copy of our reply brief.

22          THE COURT:  All right.  Anyone have a problem with

23  this?

24      All right.  Let me be clear.  We're only talking about the

25  reply and attachments to it?  We're not talking about anything

14

 1   else out there?

 2           MR. CLUBOK:  That's correct, Your Honor.

 3           THE COURT:  All right.  Well, I will grant that

 4   motion to seal.

 5       So, again, I just want to make sure the Clerk's Office

 6   ends up being clear.  You'll end up filing the unredacted

 7   version, and then I'll -- I'll be able to, obviously, compare

 8   it to what was filed.  And I think -- I'm just thinking

 9   through the mechanics.  The Clerk's Office always wants

10   clarity.  I'm giving you permission to file under seal an

11   unredacted version.  It's as simple as that.  So, the Clerk's

12   Office will follow up with you if they need any other piece of

13   paper.

14           MR. CLUBOK:  Thank you, Your Honor.  And would you

15   like -- I think Mr. Sosland can arrange, either by, whatever's

16   the easiest, to give you a courtesy copy, either by email or

17   by messenger, so that you can just quickly look at the

18   unredacted version, if that'll be helpful.

19           THE COURT:  All right.  Well, yes, let's have him

20   send it to my courtroom deputy.   So he should have that email

21   address:  sgjsettings -- wait, is that it?  Or is it

22   sgj_settings@txnb.uscourts.gov?  All right?

23           MR. SOSLAND:  We have it, Your Honor.  Thanks.

24           THE COURT:  Okay.  Very good.  Thanks.

25           MR. CLUBOK:  Thank you very much, Your Honor.

15

1        THE COURT:  All right.  Well, are there any other

2   housekeeping matters?  Otherwise, I presume you all want to

3   make some opening statements to kind of tie this all together.

4      All right.  Well, you may proceed with your opening

5   statement.

6          OPENING STATEMENT ON BEHALF OF UBS SECURITIES, LLC

7          MR. CLUBOK:  Thank you very much, Your Honor, and

8   good afternoon.

9      Your Honor, we're here today seeking relief from the

10  automatic stay provided by Section 362.  And we also ask that

11  the Court enter a related order that will explicitly allow us

12  to preserve UBS's rights to try the state court action, the

13  entirety of the claims that are permitted.  Have a jury.

14  Before a jury.  So we've asked the Court do that in one of two

15  ways, either by noting that pursuant to Section 105(a) or

16  simply by extending the times in the bar date past the trial

17  that we expect to have in the state court.

18      That's why we're here.  Now let me explain why we think

19  that relief should be granted, if I may.

20      Your Honor, very simply, to tie all -- you've got a

21  mountain of paper in front of you.  It is a lot more than the

22  usual motion --

23          THE COURT:  Uh-huh.

24          MR. CLUBOK:  -- for relief, as you noted.  And that

25  paper that you have before you, that mountain of paper and

16

1  those many, many exhibits, are a tiny, tiny fraction of the

2  paper that has been generated over 11 years of litigation in

3  New York state courts.

4      We are here seeking the relief to allow us to proceed and

5  complete that litigation because right now we are literally in

6  the middle of a trial that will finally resolve the claim that

7  UBS brought more than 11 years ago against Highland and other

8  non-debtor related entities.

9      Those claims involve, like I said, not just Highland, but

10  non-debtor entities that are not subject to the bankruptcy

11  stay, against whom we have jury rights, and those claims have

12  been litigated as extensively as certainly any case I've ever

13  been involved with, and according to Justice Friedman, she

14  said this in open court, it was the most complicated case

15  she's ever dealt with, and she's a judge who has dealt with

16  enormous complexity in the New York courts, including much

17  litigation related to the aftermath of the fiscal crisis,

18  Lehman Brothers, et cetera.

19      But after 11 years of litigation, five trips to the

20  appellate court in New York and back down, five different

21  opinions from the appellate court, including a TRO at one

22  point -- they found that we had a substantial likelihood of

23  success on our fraudulent conveyance claims -- after all of

24  that, we get to a trial.  We complete half of that trial.  The

25  second half of the trial is ready to be completed -- granted,

17

1    as soon as the New York courts reopen, but we'll come back to

2    that.  We expect that to certainly be within a matter of

3    months, certainly not years.

4        And we should be allowed to complete that trial, a trial

5    that has already had the judge make credibility determinations

6    about some 20 witnesses that she's seen either live or through

7    videotape deposition designations, almost all of whom

8    testimony will be relevant in the second phase of the trial,

9    many of whom, certainly, Highland's key witness, witnesses and

10   experts.  And she's literally in the middle of that trial.

11   She's in the middle of deciding one of the so-called threshold

12   issues.  Actually, she's already decided it, and we'll get to

13   that.  But this is a case, if any case screams out for relief

14   from the automatic stay, it's this one, to allow us to simply

15   finish the trial that is right now literally in the middle of

16   it.

17       Now, over that 11 years of litigation, I am pretty sure

18   that every single argument that could have been made has been

19   made, ruled on, and/or waived.  And that includes these so-

20   called two new threshold issues that, by my count, Highland's

21   fourth set of lawyers that have touched this case over the

22   years have now come up with and said, oh, gee, here's the key

23   to the kingdom, some new -- two new supposed threshold issues.

24   Those are their arguments in their papers, that if they could

25   just convince Your Honor somehow that our claim for the breach

18

 1   of implied duty of good faith and fair dealing that's directly

 2   against Highland, somehow that's affected in a way by res

 3   judicata that's not consistent with those five appellate court

 4   decisions and the countless decisions already by the trial

 5   court.

 6       And also they want you to rule right now on how the

 7   settlement with two prior Defendants in that litigation

 8   affects the -- or may potentially affect an offset against our

 9   total ultimate judgment.

10       Now, mind you, that issue was already litigated and

11   presented to Judge Friedman, and as reflected in her decision,

12   she said that that -- that issue is properly to be dealt with

13   as a post-trial motion.  She's already ruled on that.  A post-

14   judgment motion, not right here in the middle of the case,

15   where it's -- it's both too late and too early.  It's too late

16   because it's after the deadline for summary judgments and they

17   didn't make this argument.  In fact, they made a very

18   inconsistent argument, and they will be estopped from making

19   this argument.

20       It's also too early because it's not yet at the -- what

21   Justice Friedman ruled in her decision was the impact of that

22   settlement will be decided once we have a final judgment,

23   because Highland had argued that they should get a $70 million

24   setoff and we've argued that they may or may not, depending on

25   what claims we ultimately win at trial.  But it's a fairly

19

1   simple post-trial motion.

2       Justice Friedman already said -- and Highland already

3   urged her to rule on it upfront, in the first phase.  We had

4   briefed the issue, both sides, extensively.  She said no, it

5   can be decided later.

6       But what's happened here is what we have seen time and

7   time again over 11 years litigating with Highland.  As I

8   mentioned, this is their fourth set of lawyers who have been

9   -- whose thoughts have been brought to bear on this

10  litigation.  And we noted in our brief, I think Mr.

11  Pomerantz's firm has spent something like a million dollars by

12  our estimate in developing these new thoughts.  At least

13  according to their fee petition as of a couple months ago,

14  they're already up to $800,000; I'm guessing they're pushing a

15  million by now.

16      And what they've done is simply reargue, tried to

17  relitigate the same issues that have been litigated time and

18  time again.  As we explain -- it's obviously quite familiar --

19  on Page 4 of our reply brief, courts have routinely said you

20  cannot use Chapter 11 to relitigate instead of reorganize.

21  And this is a classic case of what the Debtor here is trying

22  to do.

23      Now, in terms of timeliness -- and I'm going to get to

24  that in a moment -- but in terms of how to deal with those so-

25  called threshold issues quickly, the very fastest way to deal

20

 1   with those threshold issues is to give us relief from the stay

 2   and let's present those two issues to Justice Friedman.

 3   Because from experience that we've seen and how Justice

 4   Friedman dealt with this the last time it happened, and I'll

 5   talk about that in a moment, Justice Friedman could deal with

 6   those issues extremely quickly.  I would expect she wouldn't

 7   even require briefing by us, because she knows those issues

 8   extremely well, she's written decisions on both of them over

 9   the years, and there's a carefully-studied appellate court

10   decision that relates to them.

11       And Justice Friedman, what she's already done in that

12   case, and Highland knows well, is that after we tried Phase I

13   but before the decision was issued, Highland swapped out its

14   attorneys and came on with I think by then its third set of

15   lawyers.  And when the third set of lawyers came in, after we

16   had already tried Phase I but before Phase II -- so,

17   basically, where we are now -- this was, I've lost track of

18   time, but maybe, you know, eight, nine months ago, or maybe

19   even a year ago, as we were waiting for the decision -- that

20   set of lawyers, they were brought on and they said, well, gee,

21   we've got a brand-new theory that cracks this case wide open.

22   Here's the new theory of Highland can avoid liability.  And

23   Judge, if you just let us bring this up, you won't even have

24   to bother with silly old Phase II and you can just end this

25   thing right now.  It's a simple rifle shot.

21

1    Justice Friedman -- I wish it had been on video, I wish

2  there had been a camera -- let's just say her reaction was

3  clear, unmistakable, and key.  And very quickly she rejected

4  Highland, in no uncertain terms, effort to do that.  Forced

5  them to withdraw the motion.  Explained to them, this is not

6  the proper time to bring new threshold motions, years after we

7  litigated motions to dismiss, years after we litigated summary

8  judgment, years after all those issues went up and down to the

9  appellate courts.

10         THE COURT:  Can I stop you?

11         MR. CLUBOK:  So, Highland knows this.

12         THE COURT:  Can I stop you right there?  I want to

13  make sure I am clear on what the so-called threshold issues

14  that you think Judge Friedman might be able to deal with

15  better, more efficiently.  I have in my brain that you're

16  talking about the res judicata issue, and then also this issue

17  of whether UBS released Highland as to fraudulent transfers

18  that might be related to Redeemer Fund assets.  Does that

19  makes sense?  I'm not sure I said that as crisply as possible.

20  They say that as to these fraudulent transfers you would be

21  pursuing, 80 percent plus were released as part of the

22  settlement with the Crusader Fund.  Are those the two

23  threshold issues, or are there many that I'm not naming?

24         MR. CLUBOK:  You've got them, Judge.  You've got

25  them.  Those are the two issues.  The one, the impact of res

22

1   judicata, which literally we've had, you know, multiple

2   different up-and-downs to the appellate court and summary

3   judgment rulings that are unmistakable that those should be

4   rejected.

5       The other one, I would put it more broadly, a little bit.

6   It's the impact of this prior settlement on our claim. And

7   Highland has a brand-new theory of how that settlement

8   agreement supposedly impacts our claim. I believe it's -- it

9   appears from the papers and from what we've been told that

10  this is coming from the Redeemer Committee primarily, because

11  they make the same argument and it seems to be a new argument

12  perhaps they came up with. Perhaps, in the million-dollars-

13  plus spent, Mr. Pomerantz's firm came up with it. But

14  regardless, it's a brand-new theory of supposedly how this

15  settlement agreement operates to supposedly cut the legs out

16  of most of our claim.

17      Now, mind you, Highland has already argued to the Court

18  how the settlement agreement operates, and what they've

19  previously argued -- and by the way, these settlement

20  agreements were signed, I believe, five years ago. For four

21  years and nine months or four years and ten months, we never

22  heard this argument. Instead, what we heard in the court in

23  New York was, oh, the settlement agreement means that Highland

24  gets $70 million of setoff to the total claim out of -- we

25  were seeking $500 million plus interest. They said, well, we

23

1    get a total of seventy million point five as a setoff.  And

2    there was arguments back and forth and it was briefed in front

3    of Justice Friedman, and they asked her to rule on that

4    upfront in the first phase of the trial.

5        After the briefing and after the argument that it was a

6    $70.5 million setoff, Justice Friedman, agree with you, yes,

7    and we said, look, it is possible they will get that $70.5

8    million setoff.  We agree.  It depends on what total claims we

9    win at trial.  For instance, if we won complete relief from

10   all of our claims, I think UBS would agree that $70.5 million

11   may well be an appropriate setoff, that amount.  However, if

12   Highland only wins some of its claims, and depending on how we

13   win the claims, they might not be entitled to that $70.5

14   million setoff.

15       Nowhere did Highland ever dream up that this contract we

16   signed with them five years ago somehow meant that they got

17   $200 million off or $400 million off or $800 million off or

18   $950 million off, whatever the new theory is, that somehow

19   that settlement agreement had some incredible destructive

20   power of Highland -- of UBS's claims.  This is the first we

21   have heard of it, you know, three months ago, after four years

22   and nine months of living with the settlement agreement, a

23   course of conduct, clear writing to the contrary, and parol

24   evidence that we, if we ever had to litigate this, we would

25   bring out.

24

1    But Justice Friedman would just look at, I predict -- it's

2  always dangerous to predict what a judge will do -- but we

3  have seen how Justice Friedman reacted to the last set of

4  Highland lawyers who came in after the trial and tried to

5  create a new argument that they hadn't raised before, post-

6  summary judgment, post even the trial starting.  I suspect

7  Justice Friedman would be able to handle this quickly.

8    I've only given you, even on this one little issue, I've

9  given you a very superficial statement about it, because it

10  goes back years of having -- entering into this agreement,

11  living with it for years, having a course of conduct that

12  reflected how the parties interpreted this agreement and what

13  it meant and how it didn't reduce -- if Highland had thought

14  that that agreement reduced our claim from a billion to $950

15  million, I'm pretty sure they would have argued it four and a

16  half years ago or 4.11 -- four years and eleven months ago.

17    The fact is, it's a brand-new argument.  We could prove

18  that if we had to litigate it.  But if we had to litigate it,

19  there's no one better, with all due respect, Your Honor, there

20  is no judge in the country more equipped to handle that issue

21  and every other issue relating to this case than Justice Marcy

22  Friedman, who has been living with this case almost as long as

23  I have.  I think she's on her eighth year now of overseeing

24  this case, through all these different iterations, all these

25  different efforts by Highland to delay proceedings and to

25

1    avoid ultimately getting to a jury, which will finally set our

2    -- the liability they owe.

3        So, and by the way, those two supposed threshold issues,

4    what Highland tells you is, well, gee, Judge, if you just rule

5    on them -- first of all, you learn about them and hear about

6    how we characterize what was said in front of Justice

7    Friedman, trying to tell you third-hand what we said,

8    reconstruct what the parties have argued there, ask you to

9    revisit her ruling.  If you do all that, and by the way, if

10   you rule in their favor, then somehow there's going to be a

11   significant reduction in our claim for fraudulent conveyance.

12       It's not even true.  Their math is wrong.  Even if they

13   were right about all that, we'd still have a claim for

14   fraudulent conveyance of over $150 million.  So, again, I

15   could write a whole brief explaining that to you.  Justice

16   Friedman would know it off the top of her head.

17       But even if all that happened, it would not impact our

18   claim for breach of implied duty of good faith and fair

19   dealing, a claim that has survived summary judgment, survived

20   an interlocutory appeal, which, by the way, Highland obtained

21   a stay from -- this trial would have been done years ago

22   except Highland obtained a stay from the loss of summary

23   judgment on our breach of duty of good faith and fair dealing.

24   It went up to the appellate court and the dismissal -- denial

25   of summary judgment was sustained and we finally got to go

26

1  forward with the trial.

2      So, this little one issue that's supposedly a threshold

3  issue, it alone has enough complexity to take up months of

4  this Court's time.  And nine, you know, nine out of ten of the

5  results of that is not going to impact Highland's argument --

6  or, Highland's claim or Highland's defense in anything like

7  the way they tell you it will.  And we'd have to brief that

8  extensively and you'd be asked to decide it, you'd be asked to

9  ignore what Justice Friedman already said about this very same

10  issue.  All of that doesn't make sense when we're right in the

11  middle of a trial.  And those are the two supposedly threshold

12  issues.

13      Now, what else will deciding those two supposedly

14  threshold issues not get you?  Or not get any of the parties?

15  What it won't get is, if we go forward as the Debtor now wants

16  to do, we will be stuck with two parallel proceedings.  We

17  have claims against non-debtor affiliates to the tune of well

18  over a hundred million dollars, from non-judgment-proof

19  defendants including in that.  We have these claims.  We have

20  a right to a jury.  They are not subject to the automatic

21  stay.  And we will proceed in front of a jury, as we're

22  scheduled to do in New York state court.

23      Now, what does Highland say to that?  They say, well, you

24  know, we haven't done it yet, but one day we could try to

25  remove those claims.  Then we could ask the federal court in

27

1    New York to transfer those claims to the federal court here in

2    Texas.  Then we could ask the Texas court to refer it to Your

3    Honor for a bunch of other proceedings, only so, at the end of

4    the day, that referral then is withdrawn so that we could

5    actually try it with a jury I guess in federal court in Texas.

6        I mean, it doesn't get us to a different place, because

7    ultimately we will have a right to -- even if they get what

8    they dream of, we'll have a right to try those claims in front

9    of a jury, and those claims substantially overlap in terms of

10   witnesses, facts, you know, all the -- the total trial, with

11   the claims that they're saying, well, gee, you could just try

12   them here after the threshold motion.  Then you're going to

13   have a trial here on the nonjury claims.

14       And, you know, Your Honor, that's best-case scenario.

15   Because what actually will happen, if they ever remove the

16   case and if they try this maneuver of getting it to Your

17   Honor, we will, as we've made clear in our reply brief, as we

18   made clear in our opening brief and then clarified in our

19   reply brief, we will seek mandatory abstention, or in the

20   alternative, permissive abstention.  And those claims clearly

21   fall within the rule for mandatory abstention.  They are --

22   there is no independent basis for jurisdiction for those

23   claims in this Court.  The claims are a non-core proceeding,

24   the ones against the non-debtors.  The actions are obviously

25   commenced in state court, about 11 years ago.  And they can be

28

1    timely adjudicated there.

2        And basically all the Debtor said in response, this is --

3    their whole defense boils down to this:  Um, we think, because

4    of COVID and the unusual circumstances of COVID, the trial

5    that you would theoretically have will be faster than a trial

6    that the state court will have in New York.  And by the way,

7    when I say you, I mean really the two trials.  That, at the

8    end of the day, there'll be a trial of -- against Highland,

9    and a jury trial against the non-debtor affiliates after the

10   reference is withdrawn after all of the up and down.  And that

11   will supposedly be faster than just finishing things up in New

12   York as soon as the courts open up in a few months, being the

13   first in line with Justice Friedman to finish this trial.

14       Now, that is not -- there's no -- they have certainly not

15   met their burden of proof that that is true, but moreover,

16   it's also not the standard.  We don't have to show that our

17   trial in New York will be two months after than the trial here

18   or two months slower.  The rule and the cases we cite -- we

19   cite these in our opening brief, and they were unresponded-to

20   -- is that the action -- the ability of the Court to timely

21   adjudicate is just something that you are required to analyze,

22   not as a relative matter, not as a prediction of, gee, the

23   state court could be four months and this Court could be two

24   months, or the state court could be six months and this Court

25   could be four months, even if that were possible.  No.  The

29

1   test is whether or not it is timely in and of itself.

2       And the cases that we cite on this issue, you know, in our

3   opening brief, you know, really make it clear the way the

4   Court should look at this.   *In re TransWorld Airlines* and *In*

5   *re Legal Extranet*, the latter being Bankruptcy Western

6   District of Texas, the former being Bankruptcy District of

7   Delaware, the courts both said, in effect, the issue is not

8   whether the action could be more timely adjudicated

9   theoretically here in bankruptcy court, but only that the

10  matter can be timely adjudicated in state court.

11      And Your Honor, as the Plaintiff in that state court

12  action, who've spent 11 years getting halfway through trial,

13  and now the only thing that's stopping us is the ability to

14  ask the Court to set the next available trial deadline, we

15  have hopes the courts will open in the fall.  Worst-case

16  scenario, it'll open up in about six months, in the first

17  quarter of next year, by all expectations.  A few extra months

18  to allow us to decide our case is certainly not -- it's

19  certainly timely.

20          THE COURT:  Okay.

21          MR. CLUBOK:  Because some of the cases we cited --

22          THE COURT:  Mr. Clubok, I want to drill down on that

23  just a bit.  The Phase II, which you hope will be a jury

24  trial, there's the breach of implied covenant of good faith

25  and fair dealing, but there's fraudulent conveyance and alter

30

1 ego. Do I understand correctly those have actually not been

2 pleaded yet, fraudulent conveyance and alter ego? Did I

3 misread, misunderstand, or is that correct?

4 　　　　MR. CLUBOK: No, Your Honor, that is incorrect. It's

5 not your fault that you misunderstand it, because, frankly,

6 reading some of the objections makes it very confusing. Okay?

7 　　For example, alter ego? Alter ego, the alter ego claim

8 that has been properly pled and is the issue that we tried in

9 that case, is an alter ego between two non-debtors, Highland

10 Financial Partners and an entity called SOHC. Acis, in their

11 objection, spent a lot of time trying to explain to you how

12 somehow that you're going to know more about the alter ego

13 claim because since UBS's assets increased in value, somehow

14 it affects the alter ego claim. And I don't blame Acis. They

15 haven't lived with that case for 11 years. I don't think

16 their -- I am sure their counsel didn't do this intentionally.

17 That has nothing to do with our case. What it does is just

18 demonstrate how confusing and complicated the proceedings are

19 in New York and for some new lawyers, particularly ones from,

20 you know, representing either Acis or the Redeemers, who don't

21 really understand our case. They start sending things, and

22 then the next thing you know the Court is I'll just say

23 misunderstanding the claim.

24 　　The alter ego claim that is going to be litigated in Phase

25 II is one that we have dealt with for years, and it's a part

31

1  of our TRO in which we showed a substantial likelihood of

2  success in a decision that we received in the appellate court

3  when we originally froze certain assets.

4      It is -- again, I could write a whole 'nother four page --

5  four -- you know, extended the briefing just on that part of

6  our case.  But suffice it to say that alter ego claim has also

7  gone up and down to the New York appellate courts, that not

8  only was it pleaded, it was pleaded, it survived motions to

9  dismiss.  It went up to the appellate court at least three

10 times.  It was the subject of a summary judgment motion.  They

11 lost the summary judgment motion.  The summary judgment motion

12 was appealed.  They lost that.

13     So that alter ego claim, not only was it pleaded, it's

14 ready to be tried.

15     And by the way, in all of the briefing that the parties

16 did in New York -- I suspect Acis doesn't know this.  I

17 suspect Redeemer -- why would they; it's not their

18 responsibility to know this -- the parties all agreed:  That

19 was a New York State law issue.  The test that the parties

20 have agreed should apply is a New York state test for alter

21 ego.  It, again, relates to two entities that are not the

22 Debtor.  It's complicated by how that relates into the case.

23 But it really just shows the perils of asking Your Honor to

24 come along, after 11 years, and try to figure out what the

25 heck is going on in that case, when Justice Friedman would

32

1  answer that in five seconds.

2         THE COURT: Okay. You're probably getting to this,

3  but you didn't answer the fraudulent conveyance question, and

4  I'm guessing the answer is no, that has not been pleaded yet,

5  and you have to win on the alter ego argument before you have

6  standing to pursue that, or no?

7         MR. CLUBOK: I hate to say this, Your Honor, but

8  that's incorrect. Again, I don't like to say that to judges

9  ever. But what we pleaded from the beginning, or actually

10  from -- I think from maybe 2011, not the -- you know, two

11  years into the case, we amended our pleadings, subject -- and

12  that briefing or those repleadings were subject to motions to

13  dismiss, summary judgment, held argument, et cetera. Both the

14  fraudulent conveyance and the alter ego have all been pled.

15  They've survived motions to dismiss. They've survived summary

16  judgments in New York, where you get interlocutory appeals of

17  state court decisions. They've survived multiple trips up and

18  down in the courts. And, again, like the alter ego, the

19  fraudulent conveyance was already subject to a -- the TRO,

20  which is -- which is the basis of our TRO. We presented both

21  the fraudulent conveyance evidence and the alter ego evidence

22  already to the appellate court as a part of getting our TRO.

23  We submitted it all to the trial court as part of defeating

24  summary judgment. And all of this has been upheld.

25         THE COURT: Okay.

33

1        MR. CLUBOK:  So, yes, all of that has already been

2   litigated.  It's not --

3      (Sound cuts out.)

4        THE COURT:  Whoops.  What just happened?  What just

5   happened?

6      (Pause.)

7        MR. CLUBOK:  ... issues.

8        THE COURT:  Okay.  Here we are.  We lost you for

9   about 30 seconds there, Mr. Clubok.

10        MR. CLUBOK:  Those were my best 30 seconds, Your

11  Honor.

12        THE COURT:  Let me ask you something.  Maybe it's

13  fate.  What I hear you saying, and you may have a lot more to

14  say, but is that if I lifted the stay, there would be great

15  efficiency, Judge Friedman would quickly, quickly deal with

16  these threshold issues, and there has been so much already

17  adjudicated and motions to dismiss and motions for summary

18  judgment and appeals back and forth that you think you'd get

19  to your jury pretty darn fast?  Nobody can say when, but you

20  think you're going to get to a jury pretty fast if it goes

21  back to the state court.  Yes or no?

22        MR. CLUBOK:  Absolutely yes.

23        THE COURT:  And so you -- okay.  Giving you, you

24  know, the benefit of every doubt here, you think -- and I'm

25  going to be as kind as I can be on this -- but a jury of 12

34

1  New Yorkers, you know, cab drivers, janitors, nurses, God love

2  them, they are the best trier of fact on issues of credit

3  default swaps and CLOs and offshore transfers?  I'm just

4  trying to get that one, why you want a jury trial on this kind

5  of subject matter.  That's a hard question for you to answer,

6  I suspect.

7           MR. CLUBOK:  No, Your Honor, it's not.  It's easy.

8  All the hard issues, all the complicated questions of CEOs and

9  credit default swaps and CSs, those were already decided by

10  Judge Friedman, who was the finder of fact on the breach of

11  contract claims.  The contract has a jury waiver clause.  So

12  Justice Friedman is the -- she --

13           THE COURT:  Right.

14           MR. CLUBOK:  -- was the finder of fact on those

15  complicated issues.  She's already made factual findings and

16  credibility determinations on all those complicated issues.

17  There are two sets of remaining issues that are -- were

18  scheduled to be tried concurrently.  That is the relatively

19  simple issues of fraudulent conveyance, alter ego, and

20  punitive damages.  Those, we have a right to a jury, as

21  Justice Friedman has already found, against all the

22  Defendants.  Okay?  And we absolutely want our right to a

23  jury.

24      I don't -- Your Honor, we don't do it lightly.  I can't

25  get into the jury research that's been done by both parties,

35

1    but suffice it to say we are one hundred percent (audio gap)

2    we want a jury for the claim.  And we've already told Judge

3    Friedman that's what we're going to do.

4        The more complicated claims, the, gee, what's a credit

5    default swap and all that other stuff, that has already been

6    decided, all those issues, by Judge Friedman.

7        And what happens in the second phase is Judge Friedman

8    gets to say to the jury, I've already decided these following

9    facts.  I will instruct you that you are to accept these facts

10   as true because I've already found them.  That's the way it

11   works in these bifurcated trials where you have a judge

12   deciding some issues and then you have a judge and jury

13   deciding others, in New York state court.

14       We -- the parties spent months and months and months going

15   through how to do this.  We agreed this is -- by the way, I

16   think it was originally Justice Friedman's idea.  Something

17   else in the papers and they try to -- I could write a whole

18   'nother brief about how we ended up with that kind of

19   proceeding.  But it was, I believe, originally Justice

20   Friedman's idea.  Highland's lawyers were very much for it.

21   In fact, they -- they were the ones originally who insisted on

22   the jury.  Originally -- it is the case that long ago we had a

23   noted issues years ago where we hoped that maybe the case

24   would just go faster if we went to a jury and there was no

25   position filed.  But Highland insists on a jury, and under the

36

1   law in New York, when any party insists on a jury, all parties

2   have the right to it.

3       We spent months and months going back and forth on that

4   issue.  Many discussions, both on the record and in chambers.

5   And we got to the point where what Justice Friedman said was,

6   I'll do the hard stuff, I'll do all these hard issues in Phase

7   I, the stuff that maybe we don't trust a jury to do.  But

8   besides, we have a jury waiver.

9       By the way, frankly, Your Honor, I believe in juries.

10  I've had super-complicated cases and we try to make them

11  simple if we can, and, you know, I think New Yorkers or

12  Texans, whether we try -- whether we try these claims in New

13  York or if the defense gets their way and they get to remove,

14  to transfer, or refer down, then withdraw the reference, and

15  we try it to a jury in Texas in federal court, I trust the

16  jury will be able to understand it.  We'll make it simple and

17  we'll make it clean for the jury to understand.  And we're

18  sure as heck not going to waive our right to a jury because

19  now Highland's fourth law firm suggests we could.

20      What's really going on here, Judge, is that they've been

21  in front of Justice Friedman for years.  They know how a lot

22  of these issues are going to come out, because she's already

23  ruled on all these issues.  And we're in the middle of a

24  trial, and except for COVID and except for -- and I haven't --

25  this is the one other issue that I've not really gotten to --

37

1 except for the detrimental reliance we had on the promise that

2 Highland made to us back in December, late November/early

3 December, when we first got this decision, we would have come

4 right away to the bankruptcy court and said, hey, we're in

5 middle of a trial. Justice Friedman had promised us, as soon

6 as she issued her first ruling, she would set the next

7 available jury trial date immediately. That was the deal we

8 all had.

9      We were ready to try the case, if not before Christmas,

10 certainly in January of 2020. Certainly, the first quarter.

11 We would have done that. We would have come to the bankruptcy

12 court and we would have said, Give us relief from the

13 automatic stay because, come on, we're in the middle of a

14 trial. There's a bunch of non-debtor affiliates. This will

15 go fast -- there's no possible way it could go faster. And we

16 were ready to do that, and Highland said to us, their general

17 counsel, Scott Ellington, said to us, no, no, no, please don't

18 do that. There's all these reasons why we don't want you to

19 do that. We think it'll facilitate -- we'll work with you in

20 good faith on settlement. We want to keep the decision

21 nonpublic for a while, while we have good-faith settlement

22 discussions. We -- we will enter into good-faith settlement

23 discussions with you, and we will work with you over the next

24 few months. And don't you worry, because we will tell Justice

25 Friedman that if you give us six months, we all agree that the

38

1  trial can happen in six months from now and we'll all push for

2  a speedy trial as soon after what is now June of 2020 as

3  possible.  That was the agreement we reached.

4        THE COURT:  All right.  Mr. Clubok, I'm going to save

5  you some time right here.  If you're arguing that there was a

6  waiver of Highland's right to oppose the motion to lift stay,

7  if you're arguing there's an agreement that should be binding

8  on them to lift the stay, that's just not going to persuade

9  me.  We have other parties in interest who are the

10  beneficiaries of the 362 automatic stay.  So I'm just going to

11  tell you right now, I don't think there's anything more you

12  can say that's going to persuade me on that one.  Okay?

13        MR. CLUBOK:  Appreciate it, Your Honor.  And I will

14  take your advice and not continue, although I will reserve my

15  right to reply to say one more thing about it, or -- if you

16  let me.  But we -- I want to be clear.  We're not saying

17  you're forced to hold -- uphold that agreement, even though we

18  had it in writing and even though we told another -- a judge,

19  a state court judge, that that was the deal.  We're not saying

20  that you're forced to hold it.

21     We are saying that you are entitled to consider, when you

22  balance the equities, and you hear them now saying, gee,

23  there's going to more -- several more months before you get to

24  trial in New York:  Well, sure.  The reason we didn't have a

25  trial back in January was because of that agreement.  That's

39

1    the only part we're saying.  We're not saying you're forced to

2    now hold onto it.  But there was some serious detrimental

3    reliance, because they said that they agreed with us that the

4    right thing to do six months hence from now, after trying to

5    settle, would be to tell Justice Friedman and to try to seek

6    to lift the stay.

7        That's the only reason we bring it up, not because you're

8    bound by it, because we respectfully ask you to consider that

9    when you hear their arguments of, gee, now it's going to take

10   another six months or so, or three months or four months or

11   six months or whatever it'll take in New York.  Yeah.  The

12   reason we've waited six months was because of that agreement.

13   Okay?  That's the only reason I bring it up.

14       The final thing that I want to say, Your Honor, is just

15   that I want to make it clear:  These so-called threshold

16   motions, they are not threshold motions.  They are motions

17   that are rehashing arguments that were made years ago,

18   repeatedly, that they think, because they're not in front of

19   Justice Friedman and because the New York Court of Appeal I

20   guess wouldn't have jurisdiction over however you rule, that

21   they can get away with relitigating issues that have already

22   been decided in litigation, they've already been ruled upon,

23   or they were long ago waived.  Or there's estoppel that

24   applies.

25       And we -- the threshold issues that we would argue about,

40

1   those so-called threshold issues, are -- is all of that stuff.

2   But we'd be litigating whether they could even pursue those

3   claims in front of Your Honor. Then we'd litigate the merits

4   of the claims. Then, even if they were resolved, they don't

5   take care of 95 percent of the claims that we have against the

6   Debtor.

7       If we were in front of Justice Friedman, she would know

8   what I'm talking about in a heartbeat and she would be able to

9   rule on this and she'd -- because she's done the same thing

10  when they tried this. They came up with some brand-new

11  threshold issue about a year ago that they tried to present to

12  her. They said, hey, don't bother to issue your ruling; we

13  have a new threshold issue that'll just cause us to win. And

14  she, you know, politely let them have it. And that is because

15  it's too late, it's past summary judgment, it's already been

16  decided on by the appellate courts in New York, we shouldn't

17  have to relitigate it, that alone is prejudicial, and by the

18  way, won't even have the impact they say.

19      So, Your Honor, I'd just like to conclude this opening. I

20  really appreciate you giving me all the time to make all of

21  these arguments. I realize you don't love our they got a

22  promise argument, but I do, like I said, even on that one,

23  there's a reason we raised it.

24      But at the end of the day, there's no court better

25  equipped to conclude these proceedings than Justice Friedman's

41

1    court in New York.  There's no judge in the country who could

2    possibly ever catch up to her on this case.  There is

3    definitely no judge in the country who's already made

4    credibility determinations, in the middle of a trial, in

5    which, by the way, she'll be called upon to be the fact-finder

6    again in the second phase, because part of the claims are for

7    a judge to decide.

8        So she's in the middle of making these determinations.

9    She's already seen witnesses.  There was no videotape of the

10   trial so there's nobody who can now jump into the middle and

11   make new credibility determinations.  And Highland, you know,

12   at least the new Highland, the new folks in charge of Highland

13   now, I guess they think a new bite at the apple, a chance to

14   relitigate here in this Court, maybe a different result, maybe

15   confusion will reign and the Court won't understand, you know,

16   what the nature of the claims are or think that, you know,

17   that we just pled these for the first time or they haven't

18   been pled.  For, again, no fault of Acis, no fault of

19   Redeemer, they don't seem to understand these claims, and

20   there's no way they could because they haven't lived with

21   them.  And again, our claims involve claims against non-

22   debtors as well as the Debtor.

23       All of those reasons are why it would be very prejudicial

24   not to lift the automatic stay.  There has been no substantial

25   showing to the contrary.  And UBS, having come forward with

42

1   this evidence of cause, showing that cause exists to lift the

2   automatic stay, as Your Honor knows, the Debtor then bears the

3   burden to show otherwise. They haven't met that burden. They

4   can't meet that burden. The things they say in their papers

5   are all what-ifs and speculation and, gee, if we just do this,

6   maybe we'll win this and maybe this will happen. That is not

7   satisfying the burden to overcome our request for relief from

8   the automatic stay, so that after 11 years of litigation our

9   case can finally finish, be brought to a closure, and we can

10  get a -- one court to conclude this business of deciding the

11  merits of these claims.

12          THE COURT: Okay. Just one more question for now.

13  The trial, the bench trial, was 13 days between July 9th and

14  July 27th, 2018 in Phase I. The judge issued her written

15  ruling -- when was it? Quite recently, right?

16          MR. CLUBOK: Well, November of 2019. So, a little --

17  it was actually issued originally in November of 2019. The

18  parties, as I said, as part of the deal, we agreed to keep it

19  nonpublic for a while and it wasn't really issued until

20  January because we, in good faith, Highland said they wanted

21  to work with us on settlement, and that's what we started

22  doing.

23          THE COURT: Okay.

24          MR. CLUBOK: So it was issued in November of 2019.

25          THE COURT: Okay. My point is, does it help you or

43

1   hurt you that it took Judge Friedman almost a year and a half

2   to issue the written ruling? I mean, when I say does it help

3   you or hurt you, help or hurt you, I'm thinking, whoa, the

4   Fifth Circuit would really slap my wrist if I took a year and

5   a half to get a written ruling out. We have, you know, our

6   slowpoke reports. If I take more than 60 days to get a ruling

7   out, you know, I'm going to get an embarrassing phone call,

8   perhaps. That sounds like a very long time.

9      On the other hand, you might tell me, well, she was

10  becoming such an expert during that 18 months that now she'll

11  be really quick.

12      So, what is your response to that?

13        MR. CLUBOK: Several things, Your Honor. Originally,

14  when Justice Friedman, we had the trial, she said, you know

15  what, I'll have -- this is complicated. It was enormously

16  complicated. And it did take a long time for her to digest

17  the mountains of evidence. It is not an easy case. Okay?

18  She said, it'll take me a while, but I'll finish up by about

19  October and then we'll immediately -- then we'll be ready to

20  try the case in the jury trial in October. That's what she

21  originally said.

22      We had post-trial briefing, though, Your Honor, and the

23  parties both wanted it. And then, frankly, there was medical

24  issues on the side of the Defendants that were raised, and we

25  were asked to greatly extend the period for post-trial

44

1  briefing.  We did that, obviously, without a second question,

2  without, you know, oh my gosh, is it going to delay the trial

3  for another few months, our decision, even though it'd been

4  ten years.  We didn't -- we -- and counsel, I'm sure, I'm a

5  hundred percent certain, would confirm this.  They were very

6  appreciative.  And we just said, you know, take whatever time

7  you need.

8      That significantly delayed the post-trial briefing.  So

9  the post-trial briefing wasn't completed until, I believe, you

10  know, after the original time she was going to do her trial.

11  So that was a big delay.

12      The other thing that happened was Highland then brought in

13  new counsel.  And like I said, they all of a sudden -- so we'd

14  already tried the case.  We'd already done the post-trial

15  briefing.  Highland then brings in new counsel.  That was

16  their third firm.  And those counsel said, hey, we've been

17  looking at the record and we see a massive issue that the

18  other two prior counsels missed and now we want to bring a new

19  threshold motion.  That's what they call it, a new threshold

20  motion.  And then we got deterred on that, with them seeking

21  to bring -- file leave to bring new threshold motion and

22  asking the judge and we got delayed on those things as well.

23      The -- that motion that they brought, it took Judge

24  Friedman one week, one week to rule on it once they brought

25  that.

45

1     So, yes, she learned a lot during our trial.  She studied

2   a lot.  She is a perfectionist, and she dug in like I've --

3   you know, few judges I've had.  But that so-called new

4   threshold motion, which was super-complicated and it had all

5   kinds of new theories and was going to crack the case, one

6   week, it took her, to opine.

7     So I'm confident that these new so-called threshold

8   motions, she would see them for what they are, not threshold

9   motions, rehashed arguments, either too late or already

10  overruled, and she would be able to deal with them quickly.

11    Also, Your Honor, a jury, you know, the next phase, as

12  soon as we can get a jury, the jury doesn't get -- juries,

13  it's usually my experience, don't take weeks or months to

14  deliberate.  You know, they're not going to take weeks or

15  months.  We're going to go sit in front of a jury, we're going

16  to present our case, and we're going to get a decision

17  lickety-split from that jury, I'll bet.  Maybe in a few days.

18  You know, any jury, I guess, could hold up.  But even the

19  fastest judge, I daresay that jury will be faster than the

20  fastest judge.

21    It is funny how we trust 12 people, or New York may be

22  fewer than 12, to make a decision very quickly, where a judge

23  is given, at least in federal court, 60 days, and in state

24  court sometimes more.  But juries somehow, with that

25  collective group, figure out a way to do it, and they'll give

46

1    us a decision, you know, within a few days after the trial.

2          THE COURT: Okay. I said that was the last question.

3    This really is the last question, for right now. Mediation.

4    Did you all ever mediate this?

5          MR. CLUBOK: Yes, Your Honor. That's a terrific

6    question. So, we did mediate this several times over the

7    years. Those mediations ultimately led to settlement with two

8    of the other Defendants. One of them, the Redeemer Committee.

9    So those mediations were successful, then. We did not get to

10   a success point with Highland back then.

11       However, in November, once we got the decision -- and by

12   the way, for years, all we heard was: You have no chance of

13   winning, we have a million in setoffs, there's going to be

14   this, that, and the other thing, your $500 million plus

15   interest to a billion-dollar claim is going to be -- you're

16   going to have lost money -- Highland. That's what we had to

17   hear for many years. So we couldn't get to settlement.

18       But after the judgment and after, I think, reality set in,

19   prior to the new law firm and new set of directors taking

20   their fourth fresh look at this, we -- we didn't lightly enter

21   into the agreement in November. We very much believed the

22   people who were running Highland at that point, that we could

23   have a very productive settlement discussion. I don't really

24   -- I think, if you were betting, I don't think you would bet

25   that there's going to be a trial, regardless. I think what

47

1  you'd bet is reasonable people, at this point, now that we

2  have the guidance of Phase I, should be able to go have a

3  mediation, figure out a value for the claim, and we wouldn't

4  have to try this case anywhere.

5       What Highland wants to do, though, what they're trying to

6  do is naturally put their thumb on that scale of that

7  mediation.  I mean, by the way, we thought that would have

8  happened in the last six months.  We've asked for it

9  repeatedly.  We've suggested mediators.  That's what we'd like

10 to do.  We do think that the claim should be subject to a

11 mediation.  And frankly, all the claims in this case could

12 probably be -- could do with mediation and help from a --

13 mediation or an arbitrator.

14      We thought that would happen.  It hasn't happened.  We

15 hope that it does happen.  But what Highland wants to do here

16 now is put their thumb on that mediation by saying, hey, we

17 already know how Justice Friedman would rule on these so-

18 called threshold issues, and by the way, we know what we're

19 probably faced with, because we probably did juror research

20 too and we know what we're facing in front of a jury in New

21 York.  So we just want this judge to help us out in our --

22           THE COURT:  Okay.

23           MR. CLUBOK:  -- settlement negotiations by making it

24 more complicated for you to recover.

25           THE COURT:  All right.  Thank you, Mr. Clubok.  All

48

1  right.  I will hear from Highland --

2        MR. CLUBOK:  Thank you, Your Honor.

3        THE COURT:  -- now.  Who is going to make the

4  argument for Highland?

5        MR. FEINSTEIN:  That'll be me, Your Honor, Robert

6  Feinstein, Pachulski Stang Ziehl & Jones.

7        THE COURT:  All right.  Thank you.  You may proceed,

8  Mr. Feinstein.

9        OPENING STATEMENT ON BEHALF OF THE DEBTOR

10        MR. FEINSTEIN:  Thank you, Your Honor.  First, good

11  afternoon.  Can you hear me and see me okay?

12        THE COURT:  I can, perfectly.  Thanks.

13        MR. FEINSTEIN:  And one of my colleagues, Elissa

14  Wagner, is going to share her screen so that Your Honor can

15  see just a few slides --

16        THE COURT:  Okay.

17        MR. FEINSTEIN:  -- while I talk.

18     So, Your Honor, this is a very important day for Highland,

19  the Debtor.  You know, my colleagues are on the call, and I

20  believe some of our directors are on the phone as well.  The

21  Debtor wants to make progress towards confirming a plan in

22  this case and make distributions to creditors.  That's one of

23  the principal goals of Chapter 11.  But here, the Debtor's

24  ability to do that has been stymied by one creditor, by UBS,

25  asserting a putative claim -- and I say putative literally --

49

1  putative claim so large as to dwarf every other claim in the

2  estate.

3      Mr. Clubok has argued since I've met him that he has got a

4  way of showing that Highland is going to become liable for the

5  billion-dollar judgment that was entered against the Funds,

6  but there he leaves out a lot of the story. He's testified

7  quite a bit from the podium, Your Honor. And while I can't

8  cross-examine him along the way, I will tell you things that

9  he said that are not consistent. And there's a lot of

10  testimony about what Judge Friedman said, what the client

11  said, what previous lawyers said. There's not enough time to

12  go into it, Your Honor, and some of it, I think, is

13  irrelevant.

14      But after all this time, and Mr. Clubok in this case,

15  since the beginning of Highland's bankruptcy, has said that

16  UBS has a good claim against the Debtor for over a billion

17  dollars. On that basis it obtained a seat on the Creditors'

18  Committee, which, by the way, opposes Highland's motion. But

19  it's now serving to gridlock the entire bankruptcy case.

20  Nobody is going to negotiate a plan -- and this is not just

21  Highland, but other creditors -- with a creditor who claims,

22  without a judgment in hand, that he has got a claim of a

23  billion dollars against the Debtor, and on theories that are

24  atypical, unusual, and that should be rejected.

25      But, you know, let's start with the fact that when Mr.

50

1  Clubok started the case, he brought a breach of contract claim

2  against Highland, the Debtor, for the liability of the Funds

3  that, you know, was the subject of the Phase I trial.  That

4  breach of contract claim against Highland was dismissed.  But

5  now what he's resorting to are a bunch of theories, and breach

6  of implied covenant and alter ego.

7      And Your Honor asked a question before.  It was a good

8  one.  And that is:  What is the status of the alter ego claim?

9  And Mr. Clubok answered about a different alter ego claim.

10  Their fraudulent conveyance claims don't work, Your Honor,

11  unless there's a link in the chain that's created, meaning

12  that HFP and SOHC have to be alter egos.  Otherwise, Highland

13  would not have standing -- excuse me, - UBS would not have

14  standing to bring the alter ego -- to bring the fraudulent

15  conveyance claim.

16      But here's the point, Your Honor:  The alter ego claim

17  against Highland, the Debtor, has never been asserted.  Never.

18  What's going on here is -- and I'll testify, I guess, in this

19  instance -- Mr. Clubok has said to me and others, hey, I

20  didn't -- I never brought a pleaded claim against Highland,

21  the Debtor, as the alter ego of the Funds, but I didn't -- I

22  didn't have to.  I can do this later.  I can do this as a

23  supplementary proceeding under New York practice.  And that's

24  categorically wrong, there, as here.  Highland was a party to

25  the initial case.  And we cited the *Board of Managers* case in

51

1    our brief, Your Honor, which I'll get to in a bit, to show

2    that that claim had to be brought at the time or it's barred

3    by res judicata.

4         So, but the salient point here, Your Honor, is that one of

5    the claims that Highland -- that UBS is asserting as a basis

6    for a billion-dollar liability has never been pleaded, has

7    never been brought, has never been tried.  So when Mr. Clubok

8    says we'll be litigating, these are issues that were already

9    rejected, that is categorically false as to the alter ego

10   claim.

11        And so much of what else he said in terms of what we're

12   relitigating is simply inaccurate.  The trial court in New

13   York never ruled on the effect of the credits from the

14   fraudulent conveyance settlement.  What you heard Mr. Clubok

15   say is that Justice Friedman said, we're not dealing with this

16   now, we can deal with it later.  But to suggest that that's

17   being relitigated is just categorically false.  Mr. Clubok may

18   know more about the state court proceedings, but that doesn't

19   give him the right to mischaracterize them.  This is why there

20   are transcripts.  This is why there are opinions.  That's what

21   we're relying upon, Your Honor, to make our case.

22        So, Mr. Clubok has acknowledged that, on this motion, UBS

23   has the burden of showing cause.  And that's a heavy burden,

24   Your Honor.  And we don't think that's been established here,

25   for a variety of reasons that I will try to relate.

52

1      As we've said, Your Honor, we do think that there are two

2    threshold issues that have not been litigated in state court

3    that, if decided, would take a lot of the mystery out of this

4    case about whether UBS's claim is a billion dollars or $50

5    million.  That's a huge difference.  And parties, the other

6    creditors who hold substantial claims, who want their

7    recoveries, aren't going to engage with a creditor who has a

8    highly-disputed billion-dollar claim that they knew, as we do,

9    is a small fraction of that, if it can be established.  And

10   again, there are serious substantive defects with the

11   fraudulent transfer claims that we think, Your Honor, on a

12   threshold basis, Your Honor can dispose of the notion that

13   there's a billion-dollar claim in this case relatively easy,

14   easily.

15      So I do want to just revisit a little bit of the

16   background to this case, Your Honor, just to kind of set the

17   record straight.  And, you know, as I said, the first time

18   that UBS filed suit, it brought a contract claim against

19   Highland, the Debtor, and that was dismissed.  And the basis

20   for the dismissal is that the documents that were signed

21   between UBS and Highland -- there was an engagement letter for

22   the structuring of the CLO syndication, and then there were

23   two warehouse agreements.  And Highland was a signatory to the

24   warehouse agreement, but it was the Funds, it was the non-

25   debtor Funds who were the parties who were ultimately liable

53

1   if there were investment losses.

2       And when the state court dismissed Highland, the Debtor,

3   from that case, it did so saying that Highland never, quote,

4   undertook that liability.  It was not a guarantor of that

5   liability.  So there's -- that is Mr. Clubok's first foray.

6   It was a complaint that he started in February of 2009.  And

7   while he's amended it to try to add different claims, it does

8   not change the fundamental fact that, as a matter of contract,

9   Highland, the Debtor, was found to be not liable for that

10  billion-dollar judgment that was adjudicated in Phase I of the

11  trial.

12      And, as a result of the fact that Mr. Clubok put his --

13  all his eggs in a basket in his complaint that he filed in

14  2009, under res judicata, and the single action theory, which

15  is -- I think it's true outside of New York as well as in --

16  is that if you're going to sue somebody based on a set of

17  facts, you need to put it all in there.  You need to put all

18  of your claims in there.  You can't sue people seriatim.  You

19  can't file certain claims and then, if you fail, come back

20  later and try to add new claims based on the same underlying

21  facts that were available to you when you first filed the

22  complaint.

23      That is the basis of an important ruling, Your Honor, by

24  the Appellate Division on res judicata, which is that, having

25  had his opportunity to plead claims based on the facts as he

54

1  knew them, Mr. Clubok chose certain causes of action and left

2  others out.  And his claims were dismissed.  But now he can't

3  come back and come up with new theories based upon facts,

4  operative facts that were known to him when he filed his first

5  complaint.

6      So the upshot of the Appellate Division's ruling is that

7  UBS is barred from bringing claims based on operative facts

8  that occurred prior to the date of their first complaint.

9      Now, Mr. Clubok tried to spin this in his opposition

10  papers, in the reply, and I think mischaracterized it.  He

11  said that it's simply untrue that he is barred from asserting

12  claims based on pre-February 2009 conduct.  That's not what

13  the Appellate Division ruled.  What the Appellate Division

14  ruled was it may be possible to bring in evidence of stuff,

15  the things that occurred prior to that date, but you're -- did

16  I lose Your Honor?

17          THE COURT:  No.

18          MR. FEINSTEIN:  Oh, okay.  I see a little circle.

19          THE COURT:  Oh.

20          MR. FEINSTEIN:  I thought maybe you froze.

21          THE COURT:  Okay.

22          MR. FEINSTEIN:  I'm sorry.

23          THE COURT:  I'm here.

24          MR. FEINSTEIN:  Thank you.  Thank you.

25      So, in order to bring a claim, you have to rely on

55

1  operative facts that form the basis for the cause of action

2  from and after March of 2009.  Does it mean that evidence

3  about things that happened before then is inadmissible?  No.

4  My colleague has -- Elissa has put up on the screen, Your

5  Honor, a portion of the Appellate Division's ruling in 2011.

6  And it couldn't be clearer, Your Honor.  It says, "Here, to

7  the extent that claims against Highland in the new complaint

8  implicate events alleged to have taken place before the filing

9  of the original complaint, res judicata applies."

10      Okay?  So, for that decision to have meaning, and that

11  decision has never been appealed, that means that operative

12  facts that support causes of action from and after February of

13  2009 are fair game.  But if any claim is based on operative

14  facts that occurred before then, it's barred.

15      And based on that, Your Honor, and that alone, there is no

16  liability here, under contract or any other theory, for

17  implied covenant or alter ego, for the breach of contract,

18  which occurred in 2008, before the first complaint was filed.

19      So it is a difficult, if not impossible, path for Mr.

20  Clubok to try to conjure up a claim that fits within the res

21  judicata bar by the Appellate Division that tries to go back

22  in time and hold the Debtor liable for a breach of contract

23  that happened in 2008.  It just doesn't work.

24      So, let me address, Your Honor, there are three claims

25  that they assert --

56

1     Elissa, will you put on Slide 2, please?  Thank you.

2     There are three claims that --

3          THE COURT:  Now, are you trying to share the content

4     with me and others of what Elissa is putting up?

5          MR. FEINSTEIN:  Yes.

6          THE COURT:  Okay.  It's not --

7          MR. FEINSTEIN:  I hope you're seeing it.

8          THE COURT:  It's not working.  I just see you.  I

9     don't see the shared content.

10         MR. FEINSTEIN:  Ah, okay.  All right.  Well, it's no

11    matter, Your Honor.  I'm going to plow through and we'll make

12    like the slides don't exist.

13         THE COURT:  Okay.

14         MR. FEINSTEIN:  Sorry.

15         THE COURT:  If you want me to look at one of the

16    exhibits as you talk, I can do that.

17         MR. FEINSTEIN:  Your Honor, oh, no.  It's okay, Your

18    Honor.

19         THE COURT:  Okay.

20         MR. FEINSTEIN:  (garbled) document.  It's --

21    technology in the last few months has been a challenge for

22    counsel and the Court.

23         THE COURT:  For all of us, uh-huh.

24         MR. FEINSTEIN:  It really has.

25     So, Your Honor, there are two pleaded claims and one

57

1  unpleaded claim by UBS against the Debtor, and we want to

2  consider them one by one.

3      So, one of them is the breach of the implied covenant of

4  good faith and fair dealing.  That's been pleaded.

5      Another is fraudulent conveyance.  That's been pleaded.

6      And as I noted, Your Honor, the last theory is alter ego

7  that Highland, the Debtor, is the alter ego of the Funds.

8  That's never been pleaded.  And Mr. Clubok's view is, I don't

9  need to do that, I can do that later.  The *Board of Managers*

10  decision that we've cited shows that he had to do it already

11  and he didn't.

12      So the implied covenant claim, Your Honor, I think I've

13  addressed, but there are a couple other things I want to say

14  about it.  First of all, if Your Honor will allow us to move

15  forward and brief this in the context of a claim objection, we

16  think that very quickly we could impress upon Your Honor that

17  this cause of action fails.  Again, the only basis that this

18  claim can be brought forward, because it was pleaded after the

19  initial complaint, it has to rely on post-February of 2009

20  facts.  Let's be clear that this claim was not brought in

21  Phase I.  And the only -- only breach of contract claim was

22  litigated in Phase I.  There was no judgment rendered against

23  Highland, because, again, they weren't -- they were found not

24  to be liable under the contract.

25      The implied covenant, as we, again, if you'll let us brief

58

1  this, Your Honor, the implied covenant theory can't be used to

2  create obligations on a party that are inconsistent with the

3  express terms of the party's contract.  And the Appellate

4  Division decision in 2010 that dismissed the contract claim

5  made it very clear that the contracts contain, quote, no

6  promise by the Debtor to undertake liability with respect to

7  UBS's losses.

8      So you can't, under applicable law, Your Honor, use an

9  implied covenant theory to contradict a contract, to create an

10  obligation that's not in the contract.  But that's precisely

11  what's being done here.  So, and to be clear, Your Honor, the

12  -- well, let me move on.

13      The next thing that they asserted is alter ego.  And as I

14  said, Your Honor, that has never been pleaded.  The *Board of*

15  *Managers v. Hudson Condo* case -- excuse me.  The *Board of*

16  *Managers v. Jeffrey Brown Associates*, which we cited in our

17  brief, is directly on point, that res judicata bars the

18  assertion of an alter ego claim against a party that was

19  initially named in the lawsuit.  So that the -- while you may

20  be able under New York law -- and I've practiced here for 40

21  years -- you may be able to use a supplementary proceeding to

22  assert a judgment against a party who was not named in the

23  lawsuit as the alter ego, but if that party was named in the

24  lawsuit, you needed to assert this at the outset.  And they

25  didn't, for whatever reason.  But that means that this claim

59

1   is also barred by res judicata.

2       So then we get to fraudulent transfer, Your Honor.  And on

3   fraudulent transfer, there are -- the issue really is one of

4   simply acknowledgment that the *ad damnum* has to be reduced

5   because there were settlements.  So, the initial fraudulent

6   transfer claims -- which did occur, by the way, after February

7   of 2009, so those are fair game under the time bar -- they

8   assert that HFP transferred approximately $440 million of

9   assets to a bunch of Highland funds and to the Debtor in March

10  of 2009.

11      In 2015, UBS settled with two -- on two of those counts.

12  It settled with Crusader and Credit Strategies.  Those were 80

13  percent of the amounts that were the subject of the fraudulent

14  transfers, again, under -- there are two ways to look at the

15  settlement, Your Honor.  One is that there should be a credit

16  for the Defendants on account of the dollars that were paid to

17  settle the claims.  But here, the dollars that were paid were

18  for far less than the face amount of the *ad damnum*.  Out of

19  the $240 million of *ad damnum*, oh, $180-or-so million were the

20  subject of the two claims that were settled.

21      So it just does not pass the straight-face test or any

22  kind of logic for UBS to argue that it could still sue

23  Highland, the Debtor, for $240 million, when it settled claims

24  that Highland was named on or Highland signed the settlement

25  agreement, like UBS did, leaving only $50 million worth of

60

1    transfers out there.

2        So, even with post-petition interest, you would get to

3    maybe $90 million on those claims.  That is a far cry than a

4    billion-dollar claim.  And it's a game-changer in the context

5    of a bankruptcy where parties need to negotiate with one

6    another and the Debtor to try to come up with a consensual

7    plan.  That's impossible when there is a chasm between what

8    the estate and other creditors think UBS's claim is worth and

9    UBS running around telling the world, I've got a billion-

10   dollar claim.

11       We need to bridge this gap, and we need to bridge it

12   quickly or this Debtor is going to languish in bankruptcy for

13   an indefinite period of time.

14       And Your Honor, the -- Mr. Clubok, on the one hand, said,

15   well, Justice Friedman is very familiar with this.  These --

16   Phase I was a prelude to Phase II.  That's not true.  That's

17   not true.  They're very different claims.  Phase I was just a

18   breach of contract liability.  Phase II has got all sorts of

19   theories and operative facts that occurred -- or, based on

20   operative facts that occurred well after the breach of

21   contract claim for fraudulent transfer.

22       So it's a fallacy to say that another judge other than

23   Justice Friedman couldn't decide these issues, because these

24   facts have not been presented to Justice Friedman.  The legal

25   theories have not been adjudicated by Justice Friedman.  We'll

61

1   guess at how long it might take to get in front of Justice

2   Friedman in a moment.  But the point is, they are very

3   different.  And in fact, as we've noted in our brief, UBS

4   counsel said in state court that the remaining claims, quote,

5   have little to do with the breach of contract claims.  They

6   present new parties, new factual issues that were not

7   addressed in Phase I.

8        So, you know, we think that there is no efficiency in

9   going to state court.  In fact, just the opposite.

10       And let me just stop and talk about that, Your Honor.  I

11  may be the only attorney on the phone who practices in New

12  York.  I haven't been in my office in over three months

13  because it's -- because of the shutdown order.  Lawyers are

14  not essential services in New York City.  Probably a lot of

15  people would agree.  So I haven't been able to go to my

16  office.  And you can't go in the courthouse.

17       Your Honor, I want to just cite to Your Honor the website

18  of the New York court system:  www.newyorkcourts.gov/crest.

19  The court, and this is the court administrator, issued a press

20  release with regard to the status of the New York City court

21  system.  So, the New York court system is now entering Phase

22  I.  And again, this is all a matter of public record.  Phase I

23  allows the judges and the clerk and security to go into the

24  courthouse, but not the general public.  There are no hearings

25  going on, as you -- as we would normally expect.  I mean, the

62

1   New York City courthouse is a very busy, bustling place that

2   usually is overrun with people.  I saw a picture online this

3   morning where the building was empty.  Why?  Because there are

4   no proceedings going on.  The justices are now going to try to

5   get up and running and maybe start doing video hearings.  But

6   the idea of a jury trial in that courthouse this year is

7   unimaginable for me, Your Honor.  Unimaginable.  Because

8   before you get out of Phase I, you've got to go to Phase II.

9   And Upstate New York, some of the courts have now gone into

10  Phase II, where they're hearing only essential family matters:

11  adoptions, child custody, things like that.  They're not

12  hearing commercial cases.  That's Phase II.

13      I don't know whether Phase III encompasses jury trials,

14  but we're two phases off of that in New York City.

15      So, I, you know, I continue to believe, Your Honor --

16  again, this is my opinion -- that this case will not be tried

17  this year, and I think there is a chance that it won't be

18  tried next year.  And in his presentation, Mr. Clubok said,

19  oh, this is going to happen in three months.  I wish.  I don't

20  think it's going to happen in six months.  But then he says,

21  And once the courthouse doors are open, we're going to be

22  first in line.  There is no evidence.  I mean, this is one of

23  those areas where Mr. Clubok is testifying with no basis at

24  all.  Okay?  There's no basis to believe that the UBS-Highland

25  case is first in line when the courthouse opens for a jury

63

1   trial. The courts have -- even in a non-pandemic situation,

2   Your Honor, I've been in practice here a long time, it takes a

3   long time to try a case in New York. And you can see that the

4   11-year history of this case was a function of there being

5   several lengthy delays, like the year and a half delay in

6   having the Phase I trial decided.

7       So, you know, there's just -- it's delay upon delay. When

8   are the courts going to open? When are they going to open for

9   jury trials, and where will this case be in the queue? And

10  then how long will it take to decide? Your Honor, I submit to

11  you that it's -- if it's not months, it could be years.

12      And here's the problem. This puts a freeze on Highland's

13  bankruptcy case. Highland wants to get out of bankruptcy.

14  Highland wants to distribute its assets to creditors. If the

15  case is going to be held in suspense indefinitely while we

16  wait for the court system in New York to reopen or the UBS-

17  Highland case to make its way to the front of the queue, to

18  pick a jury -- I don't know how you're going to conduct a jury

19  trial in the age of pandemics, how people are going to

20  evaluate the credibility of witnesses who are wearing face

21  masks. I mean, just a host of problems, Your Honor,

22  conducting a jury trial, even in a system like New York's that

23  wasn't already bogged down with delays and just a massive,

24  massive caseload. And the backlog could have only gotten

25  worse during the shutdown.

64

1       So, having taking that personal privilege, Your Honor, as

2   a New Yorker, let me just proceed with the argument on the

3   merits in terms of stay relief.

4       All right.  So, the burden is on UBS to show cause.  And

5   UBS has argued in its papers, citing 362(g)(2), I think it is,

6   that somehow the burden shifts to Highland.  Counsel just

7   misreads the statute.  He's pointing to a provision that talks

8   about lifting the stay where a secured creditor wants to

9   foreclose, and the issue is who -- where there's a burden of

10   showing equity in the property, which is a factor to deny stay

11   relief.  Obviously, that has nothing to do with our situation.

12   The burden is on UBS to show cause, and they haven't

13   established it.

14       So, what's the standard for the Court to apply?  Lifting

15   the stay is up to the Court's discretion.  There is no mandate

16   here that you must allow UBS to go to state court to litigate

17   their claim in front of a jury whenever.  They're -- they have

18   a claim against the Debtor.  Your Honor has the ability and

19   jurisdiction to adjudicate claims as part of the ordinary

20   bankruptcy process.

21       And here, Your Honor should exercise the discretion to

22   hear this claim and to see if these threshold issues carry

23   weight, because the claim is so large that its disposition is

24   really essential to the success or failure of Highland's plan.

25   And to relegate this case to a freeze of unknown length,

65

1 months, years, before creditors can ever see recovery from the

2 case is not judicial economy. It's inflicting unnecessary

3 delay and expense on the parties.

4  And we're talking about claims, Your Honor, that are well

5 within the expertise of this Court because they involve

6 fraudulent transfer claims and typical things that bankruptcy

7 courts resolve all the time.

8  So, you know, we think that the hardship on the parties of

9 being held in suspense while UBS goes on its jihad in state

10 court for months, if not years, that the balance of hardships

11 really tips in the favor of the estate and the other creditors

12 in the estate to try to see this claim resolved through Your

13 Honor's proceedings, rather than be subjected to indefinite

14 delay.

15  One moment, Your Honor, while I check my notes.

16  (Pause.)

17  I'm just going through my notes, Your Honor, because I

18 went a little out of order, but I covered a lot of what I

19 wanted to say.

20  So, Your Honor, let me make a suggestion. We -- the

21 issues that we want to tee up in terms of these dispositive

22 issues, one is whether or not there could be an alter ego

23 claim against Highland. It's never been alleged before. We

24 think that the state court rulings on res judicata as well as

25 some very persuasive authority like *Board of Managers* means

66

1  that that claim can't be brought.

2      That's something that has not been litigated in state

3  court before.  I think Your Honor could very easily address

4  it.

5      The other issue is the impact of the settlements on the

6  fraudulent transfers, because, again, it's very different if

7  UBS has a $50 million claim on a good day as opposed to a

8  billion-dollar claim.  And again, very straightforward.  It

9  will involve the interpretation of the settlement agreements.

10  We think it's very straightforward.  It's something that's

11  well within Your Honor's experience, jurisdiction, to decide.

12  It's a proof of claim.  And we think that that could really

13  break the logjam in this case.

14      And if those two issues are decided favorably for the

15  estate, that the asserted claim of UBS will now be within a

16  ballpark that other creditors and the Debtor can deal with, as

17  opposed to the continued threat that there's a billion-dollar

18  claim out there.

19      That ruling, Your Honor, really could make the difference

20  between whether or not this Debtor confirms a plan with you or

21  not and whether creditors can get distributions or not.

22      So -- and I would hasten to add, Your Honor, that I think

23  that, while the matters are complex, I think the specific

24  issues are not, and that they can be presented to Your Honor

25  and that Your Honor could decide them before the New York

67

1    court system even opens up, let alone before a jury trial can

2    be scheduled in this matter.  So we think that that is really

3    the way to go, Your Honor, and that will avoid the prejudice

4    to all the parties, not just the Debtor, but all the other

5    creditors who'd like to see their distribution.

6        So, Your Honor, I'm not going to address the agreement for

7    stay relief based on Your Honor's comments.

8        I just want to address, lastly, that if Your Honor does

9    deny the motion, that Your Honor -- for stay relief, that Your

10   Honor also deny the request by UBS for a further extension of

11   its proof of claim.  There was an agreement between the

12   parties that extended the bar date already for UBS and that

13   provided that we would have this stay relief that (inaudible).

14   There was never any discussion that, if stay relief was

15   denied, that there would be further time for UBS to file a

16   proof of claim.

17       While this is cloaked in the desire to preserve a jury

18   trial that we never had, the reality here, Your Honor, is that

19   this is just more delay and posturing and trying to keep the

20   notion that there's a big claim out there and a big trial in

21   the future for leverage purposes, for UBS to be able to say to

22   the other creditors, you know, I'm in control here, I've got a

23   billion-dollar claim, I'm still going to pursue a jury trial.

24   It is gumming up the case.  It is freezing the case.  And the

25   only way to break the logjam, Your Honor, is for Your Honor to

68

1  do that.  It's for Your Honor to deny stay relief, to require,

2  as they agreed, to require UBS to file a proof of claim within

3  five days of Your Honor's ruling.  We will then proceed with

4  an objection to claim that will lay out the issues, we think,

5  very clearly, the (inaudible) very clearly.  And UBS will have

6  their opportunity to be heard, and then Your Honor can decide.

7      And if Your Honor sustains the objections based on the

8  issues we've presented to the Court, like I said, that's going

9  to clear a path for this case to move to confirmation.

10     If Your Honor overrules the objection, then I guess what

11 have we lost but a couple months' time trying to adjudicate

12 that and spare the estate of being stuck in suspense for an

13 indefinite period of time?

14     So, on that basis, Your Honor, we would ask that you deny

15 the stay relief motion and deny the extension on the proof of

16 claim.  I'd be happy to answer any questions that Your Honor

17 has and then I'd yield to the parties.

18         THE COURT:  I have a question unrelated to the

19 arguments.  Exclusivity in this case, I know there was an

20 agreement regarding the most recent extension, and I can't

21 remember what the deadline is.  I feel like it's late July,

22 maybe.  Can someone remind me of that?

23         MR. POMERANTZ:  Your Honor?  Yes, Your Honor.  This

24 is Jeff Pomerantz.  So, the current exclusivity expires on

25 July 13th.  We have since filed, I believe it was last Friday

69

1  night, a further motion to extend for an additional 30 days.

2  We are in discussions with the Committee about various

3  structures, about a plan and whether -- and how we would

4  ultimately emerge from Chapter 11. That matter will be heard,

5  I believe, on July 8th. And it asks for 30 days and an

6  additional two -- additional 30 days, subject to Committee

7  consent.

8          THE COURT: All right. So you all are envisioning

9  walking and chewing gum at the same time, basically going down

10  a dual track if I deny the motion? You know, you're wanting

11  me to set a deadline five days from now or whatever it would

12  be for them to file a proof of claim, you would envision a

13  prompt objection, and going down that path at the same time as

14  proposing a plan in July or August?

15          MR. POMERANTZ: Your Honor, look, there's a couple of

16  ways this case could end, right? We kick the can down the

17  road, file some type of plan that shifts all the litigation

18  post-confirmation. That may be what happens in this case.

19  That is not what the Debtor wants to happen in this case.

20          THE COURT: Uh-huh.

21          MR. POMERANTZ: The Debtor has been moving very

22  quickly to try to engage with the various creditors. Mr.

23  Clubok said we spent a lot of time. Yes, the Debtor and the

24  independent directors did spend a lot of time dealing with

25  this claim, dealing with the Acis claim, and dealing with the

70

1  Redeemer claim. It's those three claims that are the primary

2  obstacles towards being able to distribute money to creditors.

3     So if, Your Honor, we are either litigating where we think

4  we should in this Court on UBS's matter and the Acis matter,

5  if we can't resolve it, Redeemer's matter, or elsewhere, we

6  are going to try to move things forward. But at the end of

7  the day, unless these claims can be resolved, and UBS is the

8  largest one, there will not be any distributions to creditors,

9  which is what the Court wants to have happen as quickly as

10  possible.

11     THE COURT: Okay. Thank you. All right. I have no

12  other questions for Debtor's counsel at this time, so how

13  about we go to Committee counsel now. Mr. Clemente?

14     OPENING STATEMENT ON BEHALF OF THE CREDITORS' COMMITTEE

15     MR. CLEMENTE: Yes. Thank you, Your Honor. Matthew

16  Clemente, Sidley Austin, on behalf of the Official Committee

17  of Unsecured Creditors.

18     Your Honor, as an initial matter, when I refer to the

19  Committee, as we did in our papers, I am referring to the

20  three non-UBS Committee members: --

21     THE COURT: Uh-huh.

22     MR. CLEMENTE: -- Acis, Meta (inaudible) and

23  Redeemer. UBS obviously did not participate in Committee

24  discussions regarding this objection. I just wanted to make

25  sure that Your Honor understood that.

71

 1      With that, Your Honor, the Committee does oppose the

 2  motion to lift stay.  I've been listening to Mr. Clubok and to

 3  the Debtor, and the merits, I think, you know, are probably

 4  very interesting, but I'm not sure they are necessarily

 5  terribly relevant to the determination that Your Honor has to

 6  make today.

 7      The issue is whether to lift the stay based on a showing

 8  of cause and after taking into consideration whether lifting

 9  the stay is in the best interest of the estate and the

10  creditors.  I don't think it's whether, you know, one party or

11  another is likely to prevail.  I think that's the

12  consideration that Your Honor instead must look at, cause and

13  the impact on the estate.

14      The Committee submits lifting the stay is not in the best

15  interests of the estate.  The Committee's focus remains on the

16  efficient and quick resolution of these cases that provides

17  for maximum recovery to its constituency, the general

18  unsecured creditors.

19      And while Mr. Pomerantz referred briefly to the plan,

20  obviously, Your Honor, we have just seen the exclusivity

21  extension motion.  I have not had an opportunity to discuss it

22  with the Committee, you know, so I don't know what position we

23  may take on that.  But as a general matter, we do believe it's

24  imperative to push forward as quickly as possible with a plan.

25      The asserted UBS claim, as Your Honor as heard, would

72

1    dwarf all other claims against the estate by far.  Resolution

2    of that claim will therefore impact the size and timing of any

3    distributions to the other general unsecured creditors.

4    That's just, I think, a plain fact of math.

5        Thus, the Committee believes having the UBS claim quickly

6    resolved is in the best interest of the estate and the

7    creditors.

8        And the Committee further believes that this Court is the

9    best forum and is in the best position to allow for the

10   quickest resolution of the claim.

11       Although I do not presume to speak for this Court's time

12   or its calendar, I do know that this Court is used to hearing

13   complicated matters and rendering decisions in a quick but

14   fulsome fashion that allows for all parties to fully present

15   their cases.

16       Additionally, Your Honor, bankruptcy proceedings are

17   designed for inclusion and public scrutiny, which will ensure

18   that any creditors or other parties in interest will be able

19   to participate in a process and forum that's accessible and

20   that they can participate in.  This is particularly important,

21   Your Honor, given the magnitude of the asserted UBS claim.

22       Your Honor, the speed and efficiency is balanced against

23   lifting the stay to allow the UBS claim to proceed forward in

24   New York state court.  There is no visibility by creditors in

25   terms of what the calendar looks like or when New York state

73

1   courts will resume in-person trials, let alone when they will

2   have a jury trial, to the extent UBS is entitled to one.

3       What information we do have clearly suggests that trials

4   will not resume anytime soon and that there logically would be

5   a backlog that would need to be worked through.

6       I am not a New York state court litigator, Your Honor.  I

7   am a bankruptcy attorney from the Midwest.  But I do know,

8   from looking at the history of the UBS claim that it does have

9   against the non-debtor affiliates, that the New York state

10  court process previously took a long time, and therefore it

11  can reasonably be expected to again take quite some time.

12      And given the vagaries of a state court process, it will

13  not provide for the level of transparency and participation

14  and speed that I submit this Court can provide, and frankly,

15  should provide, given the magnitude of the asserted claim,

16  while also, and importantly, giving UBS a full and fair

17  opportunity to advance its claim, Your Honor.

18      Additionally, the sheer magnitude of the claim asserted by

19  UBS dictates this Court should resist the motion to lift stay.

20  While it is complex -- or excuse me -- while it is clearly not

21  the only issue in this very complicated and very complex and

22  very difficult case, it will perhaps have the most meaningful

23  and material impact on creditor recoveries of any of those

24  other issues.

25      Given its central importance, Your Honor, the Committee

74

1  believes it is appropriate that the claim be adjudicated in

2  this collective forum through an established process with

3  which all other various stakeholders are familiar and provide

4  for the appropriate transparency and participation in the

5  adjudication of what is clearly the largest claim asserted

6  against the estate.

7      Finally, but not least, Your Honor, as I understand the

8  UBS claim, and we heard the Debtor speak to it, and Mr. Clubok

9  as well, it presents itself as the type of claim that is in

10 this Court's wheelhouse -- namely, fraudulent transfer claims

11 and other similar claims.  Although from reading the papers,

12 as with all things Highland, there's obviously an overwhelming

13 and significant degree of complexity, at bottom, it appears

14 that Your Honor would simply be required to call balls and

15 strikes on the kinds of claims which this Court has

16 undoubtedly addressed many times before:  namely, fraudulent

17 transfer and similar claims.

18     To sum up, Your Honor, the Committee's position is simple

19 and I think the analysis is simple.  It wants the UBS claim

20 resolved as quickly as possible in a forum that provides for

21 the appropriate level of transparency and participation, given

22 the asserted size of the claim and its impact on creditor

23 recoveries and therefore its centrality to this case.

24 Bankruptcy courts in general and this Court in particular are

25 designed to, and, frankly, are set up to efficiently yet

75

1  fairly adjudicate material claims in an expeditious and

2  transparent fashion, which is in the best interest of the

3  estate and its creditors.

4      Your Honor, for these reasons, the Committee believes the

5  lift stay motion should be denied.

6          THE COURT:  Okay.

7          MR. CLEMENTE:  With that, Your Honor, unless you have

8  questions for me, those are my remarks.

9          THE COURT:  Not at this time.  All right.  The

10 Redeemer Committee filed a very lengthy objection.  Who will

11 be presenting that objection today?

12         MS. MASCHERIN:  Your Honor, I will.  This is Terri

13 Mascherin on behalf of the Crusader Redeemer Committee.

14         THE COURT:  All right.  Thank you.  You may proceed.

15 OPENING STATEMENT ON BEHALF OF THE CRUSADER REDEEMER COMMITTEE

16         MS. MASCHERIN:  Thank you, Your Honor.  Your Honor,

17 the Redeemer Committee submits that there is -- there's

18 similar showing for cause to lift the stay when lifting the

19 stay would prejudice not only the estate but all other

20 creditors in this bankruptcy proceeding and would

21 substantially delay administration of the Debtor's estate and

22 any meaningful distributions to creditors.

23      I'd like to give Your Honor, if I may, just a couple words

24 of background on who the Redeemer Committee is and why we

25 believe we have some unique knowledge and -- that we'd -- that

76

1  we'd like to bring with respect to this objection.

2      The Redeemer Committee is a committee consisting of nine

3  individuals who serve as designated representatives of major

4  investors in the Highland Crusader Fund.  The Highland

5  Crusader Fund was Highland's flagship investment fund before

6  the last recession.  It went into redemption in 2008, followed

7  by an involuntary insolvency proceeding in Bermuda.  That

8  court proceeding, the insolvency proceeding in Bermuda, was

9  resolved by way of a scheme and plan of liquidation that was

10  negotiated between Highland Capital Management, the Debtor

11  here, and the two classes of redeeming investors.  And that

12  scheme and plan was approved by the Bermuda court.

13      The governance that is set up in the scheme and the plan

14  provided for the election of an oversight Committee -- that

15  is, the Redeemer Committee.

16      The Redeemer Committee members were elected from amongst

17  the consenting as opposed to the redeemers of the Crusader

18  Fund.

19      The scheme and plan permitted the Debtor, Highland, to

20  remain as manager of the Crusader Fund to complete the

21  liquidation of the fund, but the Redeemer Committee was given,

22  among other powers, the power to remove Highland as manager

23  for cause, or not for cause, and also to bring claims against

24  Highland Capital Management under the plan and the scheme.

25      The Redeemer Committee determined in July 2016 to remove

77

1  Highland as manager of the fund and simultaneously commence an

2  arbitration before the International Center for Dispute

3  Resolution. That proceeding resulted in an arbitration award

4  against the Debtor for $490 million in damages, inclusive of

5  pre-judgment interest as of the petition date.

6      Since the -- since Highland -- Highland filed, by the way,

7  filed this proceeding, this bankruptcy proceeding, literally

8  as we were on the steps of the courthouse in the Delaware

9  Chancery Court for the hearing on the motion to confirm the

10  arbitration award that was issued in favored of the Redeemer

11  Committee.

12      So UBS is not the only party who was denied access to its

13  preferred court, shall we say, but the Redeemer Committee is

14  cooperating in this bankruptcy. The Redeemer Committee, like

15  UBS, has been appointed a member of the Unsecured Creditors'

16  Committee. And the Redeemer Committee, we would submit, Your

17  Honor, has a unique perspective to bring on this motion for

18  two reasons.

19      First of all, the Redeemer Committee is the holder of a

20  very large liquidated though not-yet-allowed claim in this

21  bankruptcy by virtue of the arbitration award. We've

22  essentially concluded our litigation against the Debtor.

23      Second, the Redeemer Committee is uniquely knowledgeable

24  about the litigation and the work between UBS and the Debtor

25  because the Crusader Fund was a party to that suit. In fact,

78

1  the settlement agreement, which contains a release provision

2  which we submit and the Debtor submits ought to have a

3  significant impact upon the size of the claims that the Debtor

4  can -- or that UBS can prosecute now with respect to the

5  fraudulent transfers and the breach of implied covenant, that

6  was negotiated by my clients, the Redeemer Committee, and you

7  will see their signatures at the very end of Exhibit H, which

8  is -- to our objection, which is that settlement agreement.

9      Your Honor, we submit there has been no showing of cause

10  to lift the stay here.  I'd like to mention a couple of court

11  decisions which I think bring important principles that the

12  Court should consider in considering whether UBS has met its

13  burden here to show cause.

14      Courts have recognized, when relief from the automatic

15  stay is sought, the party seeking the relief has an initial

16  burden to demonstrate cause for the relief.  And where, as

17  here, the movant seeking to lift the stay is an unsecured

18  creditor, the burden on a movant is -- has been recognized as

19  being especially heavy.  That's recognized in the Southern

20  District Bankruptcy Court decision in the *(inaudible) Energy*

21  *Partners* case, for example, which we cited in our papers.

22      In fact, in the *Residential Capital, LLC* bankruptcy

23  proceedings in the Southern District, the Court said, and I

24  quote, "When the movant is an unsecured creditor, the policies

25  of the automatic stay weigh against granting the relief

79

1   requested."

2       And in *In re Leibowitz*, another Southern District

3   bankruptcy decision, the Court said, and I quote, "The general

4   rule is that claims that are not viewed as secured in the

5   context of 362(d)(1) should not be granted relief from the

6   stay unless extraordinary circumstances are established to

7   justify such relief."

8       We would submit, Your Honor, that UBS failed even to make

9   a *prima facie* showing of cause here.  They point to prejudice,

10  they say, to themselves if they can't go to New York and have

11  a jury trial, and they point to judicial economy.  We would

12  submit those factors actually argue very strongly against a

13  finding of cause in this case.

14      There would be substantial prejudice to other creditors in

15  this proceeding if UBS is permitted to essentially get cause

16  on large parts of this bankruptcy proceeding and go off to New

17  York to litigate.  UBS barely acknowledges that the lifting of

18  the stay to allow it to proceed in New York would have any

19  impact on creditors.  We submit that the impact would be quite

20  (inaudible).

21      It can't seriously be disputed, we submit, Your Honor,

22  that this Court could determine the validity and the amount of

23  UBS's claim more expeditiously than UBS could get relief for a

24  jury trial and the subsequent proceedings in New York.

25      We agree with the Debtor's counsel that there is no

80

1  prospect of jury trials and hearings in the courts in

2  Manhattan anytime certainly this year, and perhaps well into

3  next year, and we've cited some commentators who've written

4  pieces that have been published to that effect.

5      Meanwhile, the sheer size of the claim that UBS is

6  purporting to submit here -- of course, they haven't filed a

7  claim -- but the sheer size of the claim as it has been

8  described in this proceeding makes it central to these

9  proceedings.  And for -- for a fact, in the *Choice ATM*

10 *Enterprises* case, which was decided by Judge Lynn, Judge Lynn

11 denied a motion to lift stay that was brought by a creditor

12 where the creditor's claim at issue "would be the largest

13 claim against the estate and thus critical to the

14 reorganization."  That's very much the case here, and it's

15 appropriate for you to consider that this claim, if allowed at

16 the amount of roughly one billion dollars, which UBS is

17 asserting is the value of its claim, would dwarf the rest of

18 the estate.

19     Bankruptcy, of course, is designed to provide an orderly

20 liquidation procedure under which all creditors are treated

21 equally.  Given those policies, the bankruptcy court ought to

22 try to preserve a level playing field for all creditors.  And

23 we cited in our papers the decision in *In re Canejo*

24 *Enterprises*, which was a Ninth Circuit case from 1986, where

25 the Court denied a motion to lift stay for that reason,

81

1  because the -- because the Court found that lifting the stay

2  as to one large creditor in that case would in effect give

3  that creditor oversized leverage with respect to resolution of

4  the proceedings.

5      The same is true here.  As both Committee counsel and

6  Debtor counsel have pointed out, with the overhang of what we

7  think is an oversized one billion dollar claim, it's very

8  difficult to negotiate the way to see clear to a plan of

9  reorganization here, where other creditors, like my clients,

10  for example, don't know whether they stand to receive a

11  quarter of the estate's proceeds or something much less than

12  that.

13      And we submit, Your Honor, that that is, in fact, what UBS

14  wants to preserve here, is that leverage, that negotiating

15  leverage, which thus far has really stymied efforts to move

16  forward.

17      As both Mr. Pomerantz and Mr. Clemente alluded to, the

18  Creditors' Committee has been working hard on trying to get to

19  a plan of reorganization.  That's what we want.  We want some

20  certainty of how this proceeding will conclude, and it's just,

21  as a practical matter, very difficult to come to anything

22  close to certainty of a practical resolution with that one

23  billion dollar gorilla sitting in the room.

24      This Court, we would submit, as counsel for the Debtor

25  argued, can resolve the claims that UBS has pending against

82

1  the Debtor quite efficiently and quite expeditiously under the

2  rules that you have available to you under the Bankruptcy

3  Court Rules.  So we submit the New York court really has no

4  appreciable advantage in resolving these claims.

5      As counsel for the Debtor pointed out, there are

6  essentially -- there are two claims that are pending in the

7  New York action against the Debtor.  One is a fraudulent

8  transfer claim; the other is a claim for breach of the implied

9  covenant of good faith and fair dealing.

10      I won't get into whatever defenses the Debtor may have

11  against that good faith and fair dealing claim, but I will say

12  this much:  All of the claims, all of those claims arise from

13  the fraudulent transfers that were alleged to have taken place

14  in March of 2009.  So they essentially all stem from the

15  fraudulent transfer claims.  Those claims are based upon

16  entirely different facts, different witnesses, different legal

17  issues, than the claims that were tried back in 2018 that

18  resulted in that judgment that was entered against the CLO

19  warehouse counterparty that was entered last fall.

20      But you don't have to take my word for it that the

21  fraudulent transfer-based claims are premised on an entirely

22  different set of facts.  We can look at UBS's own words to

23  establish that.  When it suited UBS's strategy, when UBS

24  persuaded the Court to bifurcate the proceedings into what it

25  now refers to as two phases of the same trial -- and this is

83

1  going back to the spring of 2018, Your Honor -- UBS persuaded

2  the Court to bifurcate the proceedings, and UBS conceded at

3  that time that the claims against the Debtor that remained to

4  be adjudicated -- and I'm quoting from Exhibit J to our

5  objection here, which is UBS's brief in support of bifurcation

6  -- those claims, UBS argued, quote, "have minimal overlap in

7  evidence and issues" with the claims that Judge Friedman has

8  -- Justice Friedman has already tried in New York.

9      UBS went on to say, and I quote, "The second trial, which

10  will relate to new parties and different claims, will involve

11  new factual issues that will not be addressed at all in the

12  first trial."

13      And in that same pleading, UBS argued, "The issues and

14  evidence will be largely separate, and certainly will not be

15  inextricably interwoven and intertwined" with the issues from

16  the first case.

17      I would submit, Your Honor, that Your Honor could resolve

18  fraudulent transfer-based claims quite expeditiously.  Those

19  -- fraudulent transfers are the bread and butter, are the

20  kinds of claims that bankruptcy courts resolve every day.  And

21  to the extent that it was necessary for you to look to any of

22  the factual findings that Justice Friedman made, they're laid

23  out in her judgment, which is a very lengthy opinion that was

24  entered last fall and this Court could very easily find them

25  there.

84

1    Now, a couple of moments about the -- what we've talked to

2  about -- what we've talked -- what we've referred to as the

3  threshold issues.  And I'll preface this by saying that, over

4  the years, the Redeemer Committee and Highland Capital

5  Management have not agreed on very many things, but we do

6  agree that there are two threshold legal issues which we

7  submit would seriously materially impact the amount of any

8  claim that the -- that UBS can pursue in this bankruptcy

9  against the Debtor.

10    The first of those is the res judicata issue.  Mr. Clubok,

11  I think, has been a little less than precise about exactly

12  what the basis -- in his argument today about exactly what the

13  basis is for the $1 billion claim that he referred to.  But if

14  we look at UBS's motion to lift the stay at Page 10, UBS

15  stated, "If found liable, the Debtor will be responsible for

16  the judgment awarded to UBS in Phase I, in addition to any

17  other amounts awarded to UBS in Phase II."

18    So I think UBS stated quite clearly in its motion to lift

19  the stay at Page 10 that what it intends to pursue in this

20  bankruptcy court and what it purports to be intending to

21  pursue in the New York court, at least in large part, is to

22  hold the Debtor responsible for that $1 billion judgment that

23  was entered on the warehouse transactions.

24    It is that articulation of its claim which leads the

25  Redeemer Committee and leads the Debtor to raise the issue of

85

1   res judicata.  And I won't go through again all of the

2   analysis of the decisions, but I would direct Your Honor to

3   the *UBS Securities, LLC v. Highland Capital Management*

4   decision, which is cited in our papers.  It's found at 86

5   A.D.3d 469 or 927 New York Supplement 2nd at 59.

6       In that decision, when UBS first sought to bring the

7   claims that are part of the lawsuit that's now become known as

8   Phase II of the UBS proceedings, the Court ruled as follows,

9   and I quote:  "To the extent the claims against Highland in

10  the new complaint implicate events alleged to have taken place

11  before the filing of the original complaint" -- that date was

12  February 24th of 2009 -- "res judicata applies."

13      The Court went on to explain that any claims against the

14  Debtor arising from the restructured warehouse transaction are

15  barred by res judicata.  Quote, "That is because UBS's claims

16  against Highland in the original action and in this action all

17  arise out of the restructured warehousing transaction, while

18  the claim against Highland in the original action was based on

19  Highland's alleged obligation to indemnify UBS for actions

20  taken by the affiliate Fund, and the claims against Highland

21  in the second action arose out of Highland's alleged

22  manipulation of those Funds, *i.e.*, alter ego.  They form a

23  single factual grouping.  Both are related to the same

24  business deal and to the diminution of the value of securities

25  placed with UBS as a result of that deal."

86

1    So the Court held that to the extent that UBS in that

2   second proceeding, which is now being referred to as Phase II,

3   was asserting claims against Highland Capital Management that

4   were based upon the warehouse transaction or any other conduct

5   that occurred prior to February 24, 2009, those claims were

6   barred by res judicata because they were not raised as part of

7   the original action, which was a separate lawsuit, as we

8   explain in our papers.

9    So while we're not here to argue the merits of the res

10   judicata issue right now, it comes to the fore because of the

11   way UBS described its claim, because of the fact that UBS

12   asserted in its motion that it intends to seek to hold the

13   Debtor liable for that $1 billion judgment that was entered

14   for breach of the warehouse facility.  And we submit that when

15   the time comes for the Court to consider objections to UBS's

16   claim, that the res judicata -- that res judicata as a result

17   of the Appellate Division's decisions in New York will make

18   quick action of any effort by UBS to hold the Debtor

19   responsible for that $1 billion judgment.

20    Now, in its reply, UBS makes an interesting statement with

21   respect to this alter ego argument, this claim to hold the

22   Debtor responsible for the $1 billion judgment.  And we think

23   that the statement in the reply, Your Honor, is quite telling.

24   It's found on Page 6 in a footnote, Footnote 5.

25    In that footnote, UBS seems to try to preserve the right

87

1   to bring that $1 billion alter ego claim, to hold the Debtor

2   responsible for the judgment that was entered last fall.  And

3   this is the reply brief at Page 6, Footnote 5.  In that

4   footnote, UBS stated as follows, quote -- and this is at the

5   very end of the footnote, Your Honor -- that UBS, of course,

6   reserves all rights to pursue any post-trial relief, including

7   holding the Debtor liable as an alter ego.

8       So, Your Honor, we would submit what that suggests is that

9   what UBS wants to do here is to go to New York to get a jury

10   trial on its pleaded claims against the Debtor, which are only

11   fraudulent transfer and breach of the implied covenant of good

12   faith and fair dealing claims, and then to initiate even

13   further proceedings in New York, seeking to hold the Debtor

14   liable for the 2018 $1 billion judgment.

15       Your Honor, how long must all of the other creditors of

16   this estate wait for that, for UBS to finish adjudicating its

17   claims against Highland?  The delay, I submit, would be

18   crippling.

19       A few words about the issue of the release, and this is an

20   issue that the Redeemer Committee is quite familiar with

21   because the Redeemer Committee negotiated that settlement

22   agreement.  The -- again, this isn't the time to argue the

23   merits of the issue, but I raise the issue just to impress

24   upon Your Honor that it is a serious gating issue, we believe,

25   and an issue which ought to be addressed, because it could

88

1  have a material impact on the Debtor's exposure on any claims

2  from UBS.

3      Now, as I've said, the claims that UBS has stated in New

4  York against the Debtor are claims for fraudulent transfers

5  which were brought against the Debtor and certain of its

6  affiliates, and a claim against the Debtor for breach of an

7  implied covenant on fair dealing.  In its briefing with

8  respect to bifurcation, UBS made clear that both of those

9  claims against the Debtor relate to the fraudulent conveyances

10 which -- by which UBS contends the Debtor's affiliate, which

11 is a company called HLC, transferred certain assets to the

12 Crusader Fund, to the Credit Strategy Fund, to the Debtor

13 itself, and to other affiliates, including the fund that's

14 currently known as the Multi-Strategy Fund.

15     And again, you don't have to believe me when I say that

16 those claims all arise out of the fraudulent transfers.  We

17 can look at UBS's own arguments.  And this, again, is in

18 Exhibit J to the Redeemer Committee's objection, where UBS

19 described the implied covenant claim as follows:  "The implied

20 covenant claim which involved Highland Capital Management's

21 role in the March 2009 fraudulent conveyances overlaps

22 factually with the fraudulent conveyance claim."

23     Your Honor, as we've shown in Exhibits H and I, in 2015

24 the Highland Crusader Fund and the Highland Credit Strategy

25 Fund, which together were the recipient of over 80 percent of

89

1  the assets that comprised those claimed fraudulent transfers,

2  those two funds entered into settlements with UBS.  Those two

3  funds paid a total of approximately $70 million to settle the

4  fraudulent transfer claim.  The value of the fraudulent

5  transfer claims, as Mr. -- or as Debtor's counsel has pointed

6  out, the value of the fraudulent transfers to those two funds

7  was somewhere in the neighborhood of $180 to $200 million out

8  of the $240 million of fraudulent transfers that UBS is

9  seeking to recover from.

10      As part of the settlement agreement, UBS agreed to release

11 Highland Capital Management from any claim arising out of the

12 fraudulent transfers that took place either to the Crusader

13 Fund or the Credit Strategy Fund.  And I would direct Your

14 Honor to Exhibits H and I.  The language of the two settlement

15 agreements is quite similar.  If we look, for example, just at

16 Exhibit H, Section 5.3, of the Highland Crusader Fund

17 settlement, you will see that UBS released Highland Capital

18 Management for "losses or other relief specifically arising

19 from the fraudulent transfers to Crusader alleged in the UBS

20 litigation."

21      As we explained in our papers, the term that's used there,

22 I believe, is HCM Released Parties, or something similar to

23 that.  If you go back through the definitions, you'll see that

24 Highland Capital Management was specifically released with

25 respect to claims arising from the fraudulent transfers to

90

1    Crusader.

2        The same language appears in Exhibit I, which is the

3    settlement agreement between the Highland Credit Strategy Fund

4    and UBS.

5        So this is a threshold legal issue, Your Honor, which we

6    submit has the potential to significantly reduce the amount of

7    any allowable claims to UBS.  And because the Crusader Fund is

8    a party to that settlement -- and the Crusader Fund's counsel,

9    Mr. Rosenthal, I believe is listening to the proceedings today

10   -- because the Redeemer Committee members were signatories to

11   that settlement agreement, the Crusader Fund and Redeemer

12   Committee ought to have an opportunity to be heard with

13   respect to an objection to UBS's claim that is premised upon

14   the settlement agreement involving those two parties.

15       We submit, Your Honor, that you are well suited to

16   deciding the res judicata and release issues.  They're issues

17   that rely only upon what we think are very clear court

18   decisions on the res judicata -- outlining the bounds of res

19   judicata with respect to UBS's claim, and what we would submit

20   is unambiguous settlement language.

21       One final word I would like to express, Your Honor.  With

22   regard to the last-ditch argument that UBS made, their

23   argument that if you don't lift the stay you should at least

24   extend the bar date indefinitely only for UBS or enter some

25   sort of an order preserving UBS's right to jury trial:  Your

91

1   Honor, this case has been pending since October, this

2   bankruptcy case.  UBS waited until May to file a motion to

3   lift stay.  And I know they've made some arguments about why

4   they waited, but we've been sitting around for quite some

5   time, trying to make progress in this case.

6       UBS has already had the benefit of a special delay in the

7   bar date.  Everyone else filed their claims in April.  They

8   agreed to a stipulation, which this Court entered as an order,

9   which provides that UBS would file its claim within five

10  business days after the Court's ruling in the event that the

11  Court denies the motion to lift stay.

12      They've had their delay.  They asked for extra time, in

13  fact, to bring their motion to lift stay.  What UBS is

14  suggesting now is that they should get yet even more delay,

15  indefinite in length.  Your Honor, we're trying to get moving

16  with this proceeding.  We'd like to see the Debtor submit a

17  plan.  The Committee is trying to work with the Debtor on a

18  plan.  I tell you, my clients, Redeemer Committee, are in

19  serious discussions with the Debtor about resolving the

20  allowable amount of their claim.  And this case ought to move

21  forward.  But if Your Honor grants UBS's motion, what will

22  happen is this case will stall, to the prejudice of the estate

23  and to the prejudice of all other creditors.

24      Thank you, Your Honor.

25          THE COURT:  All right.  Thank you.

92

1      Ms. Patel, will you be making the argument for Acis?

2          MR. SHAW:  Your Honor, Brian Shaw on behalf of Acis.

3   I'll be very, very brief.

4          THE COURT:  Okay.

5      OPENING STATEMENT ON BEHALF OF ACIS CAPITAL MANAGEMENT

6          MR. SHAW:  Judge, one of the foundational principals

7   of the Bankruptcy Code is the policy of equal treatments of --

8   treatment of creditors.  Granting stay relief here would be to

9   prefer UBS over all other creditors.  And UBS is not unique.

10  We have plenty of litigation creditors in this case.  We have

11  Acis.  We have Mr. Daugherty.  We have the Redeemer Committee.

12  We have UBS.  So, granting relief from stay treats UBS

13  differently, makes them a super-creditor, and violates that

14  fundamental foundational principle of bankruptcy law.

15     The second and final point I'll make, Judge, is I think I

16  heard Mr. Clubok, in reference to your question about

17  mediation, say something like he did not expect to have to

18  ultimately try this case.  And if I misquote him, I'm sure

19  he'll let us know.  I think that tells you everything about

20  the motivations here.  I think that tells us everything about

21  the fact that this is about leverage and not about all of the

22  parties in interest here.

23     This is not a case just about UBS.  It's a case, a

24  bankruptcy case about all the parties in interest, including

25  the Debtor and creditors and other parties in interest.

93

1      That's all I have, Your Honor.

2           THE COURT:  Thank you.  All right.  Mr. Clubok,

3  you're the movant so you get the last word.

4           MR. CLUBOK:  I appreciate that, Your Honor.  A lot to

5  cover here.  Let me say, make this brief observation at the

6  outset, and then I'm going to talk about some of the specific

7  things that were said.

8      Number one, this really proves the old adage, the enemy of

9  my enemy is my friend.  I did hear Ms. Mascherin say, oh, gee,

10  we've never agreed with Highland before in years and years;

11  all of a sudden now we agree with them.  There is a reason why

12  we're like the skunk at a picnic here, we're getting ganged

13  up, and it's not, Your Honor, because the parties are trying

14  to get to a speedier resolution.  It's because they think they

15  can substantively impact our claim and get more -- each of the

16  creditors think they get more amongst themselves if they can

17  knock down our claim.

18      I heard over and over again Ms. Mascherin and others say,

19  oh, I'm not going to argue about the merits here, and then

20  they went on in great detail to try to argue about the merits

21  of our claim.

22      So my second point, overall point that I want to make is

23  -- and this is one where I've got to say at least one thing

24  was said by all the objectors.  Mr. Clemente -- I agree with

25  this.  What Mr. Clemente said was the merits aren't relevant

94

1 today. And to Mr. Clemente's credit, I think he less than

2 everyone else went on to then argue the merits, regardless of

3 the fact that they're not relevant today.

4 The merits aren't relevant to today, Your Honor. What's

5 relevant to today is who is going to be deciding those merits.

6 Okay. And it is so crystal clear from hearing the argument

7 and how they lived with these arguments for years and years

8 and years that what I'm hearing today is the same argument I

9 heard in the I think third appeal, the fourth appeal, the

10 summary judgment, and the fifth appeal.

11 So much of what you were told today, Your Honor, dates

12 back to some language, some stray language that was used in a

13 2011 decision. Okay? And ever since that language was used

14 in that 2011 decision that Mr. Feinstein cited and Ms.

15 Mascherin cited, ever since that 2011 decision, Highland has

16 argued over and over again, essentially, ha ha, this means you

17 lose the bulk of your claim.

18 That 2011 decision, they argued it, and we went up and

19 down to the appellate court multiple times to demonstrate

20 that's not true.

21 And Your Honor, we lay out a little snippet of that on

22 Page 5 of our reply brief. I'm not going to get into all of

23 the substance of decisions that happened since 2011, because

24 that's what you were told matters here, but I'll just briefly

25 quote that in rejecting summary judgment, denying summary

95

1   judgment that Highland had right before the trial, when they

2   said, hey, there's no breach of duty of an implied good faith

3   and fair dealing, hey, this 2011 decision kills your case,

4   hey, most of your damages can't be asserted, the Court said --

5   the district court rejected it.  And the appellate court said,

6   talking about the district -- the trial court, I mean, the

7   appellate court said, The Court correctly rejected Defendant's

8   argument because neither our prior decisions nor the doctrine

9   of res judicata bars Plaintiffs from introducing evidence of

10  pre-February 24, 2009 conduct, to the extent necessary to

11  prove with respect to post-[February] 24, 2009 conduct their

12  alter ego, fraudulent conveyance, and breach of implied

13  covenant claims.  That is, all three of those claims, the

14  alter ego claims that actually exist, not that we're being

15  told that -- and we've been supposedly -- with this, the

16  fraudulent conveyance claims that are directly against

17  Highland, and most importantly, because this will give up the

18  cap, if we win, to the entirety of that $500 million in

19  damages we suffered, a breach of implied duty of good faith

20  and fair dealing.

21      You just heard some terrific new arguments from Mr.

22  Feinstein and then a little bit from Ms. Mascherin as to why

23  we're going to probably supposedly lose that.

24      And again, going back to what Mr. Clemente said, without

25  getting into the merits, I'll just say we have defeated that

96

1　several times already in New York courts since 2011, that

2　language they claim -- they tell you means what it doesn't

3　mean.

4　　　They just want a new forum. They lost in front of Justice

5　Friedman. They lost in the appellate court in New York. We

6　defeated summary judgment, and we're in the middle of a trial

7　where we are pursuing these claims. And now they see this as

8　a possibility to relitigate in a new forum those exact same

9　claims. That's what this comes down to. We talk about

10　motivations. It's clear the motivation is to do what this

11　Court should not do, which is use Chapter 11 to let them

12　relitigate cases, not reorganize.

13　　　And the third big-picture -- that brings me to my third

14　big-picture point, Your Honor. Your Honor, you were told by

15　Mr. Feinstein the progress of confirming a plan is just

16　stymied by this one debtor. And then you were told many other

17　things. The success or failure of the plan all -- is all

18　dependent on UBS's claim. Ms. Mascherin asserted that she's

19　having discussions. And you're sort of being led to believe

20　that if we just could resolve UBS's claims, if that were

21　somehow possible in the next month or two, even though it's

22　enormously complex and it's going to take months, whether they

23　try and move it here or we finish up in New York City or --

24　but you're told that, oh, that's just the one thing holding up

25　the plan. Your Honor, I can't get into the settlement

97

1   discussions we've had, although you were -- you know, maybe I

2   can, because I have to rebut the false impression you've been

3   given.  But I'll say this:  There was a motion filed by

4   Debtor's counsel a couple days ago, I think maybe Friday,

5   where they asked for further extensions for the exclusivity

6   period so that they can continue with their plan.  And in

7   that, they reference a term sheet that they had signed.  They

8   said, hey, we've signed this term sheet, and because of that

9   we're pretty close, give us another 30 days.  And by the way,

10  that can be extended by two more 30 days.

11      I can -- let's just leave it at this:  It's Highland's

12  burden of proof.  They could not satisfy their burden of proof

13  to honestly tell you that agreeing to that term sheet is

14  dependent upon how we divvy up the proceeds from liquidating

15  assets among the creditors.

16      What I think is clear is that Highland has lots of non-

17  liquid assets that I believe we're going to be told are going

18  to take a year or two to turn into anything that would be

19  available to creditors.  Okay?  It's not like the plan is all

20  ready to go, they're ready to distribute all the money, and

21  all the proceeds are getting taken care of, including all the

22  claims.  That's kind of the impression they led you to

23  believe.  I mean, Mr. Feinstein basically said it directly.

24      It's just not true.  If it were true, let them show you

25  the term sheet.  Let them satisfy what is, by the way, their

98

1    burden of proof.  The cases make it clear that it's our burden

2    to come forward but then their burden of proof.

3        They can't do it because it's not true.  And to sit here

4    and listen to them try to tell you, oh, this is the one thing

5    holding things up, it's just -- it's on its face -- I don't

6    know how to characterize it other than to say -- let's just

7    say politely they've not met their burden of proof to show you

8    that they're all ready to go with a plan and the one thing

9    holding it back is whether -- the value of UBS's claim.

10       So those are the three big-picture things.  And then I'd

11   just like to respond to some very specific things that were

12   said and I believe misstated.

13       Most importantly, I would ask you to look at, please, Page

14   5 -- 4, 5, and 6 of our reply brief.  People kept saying,

15   Don't get into the merits.  This is not about the merits.  But

16   they just want you -- they want to ask you to relitigate the

17   res judicata issues that have already been decided.

18       And I say they've been decided.  They get up here and they

19   tell you, oh, no, they're new issues, or we haven't been

20   decided, or decided a different way.  Let's just go to Justice

21   Freidman.  She will have -- she will be able to handle that in

22   a week, like she did the last one, is my guess.

23       By the way, Mr. Feinstein bragged that he's the --

24   supposedly the only New York lawyer here.  That's not true.

25   I'm barred in New York.  I practice in New York.  I'm barred

99

1  in Ohio. But I litigate -- and New York and Washington, D.C.

2  And I daresay I'm the only lawyer here, other than Ms.

3  Mascherin, I imagine, who has practiced in front of Justice

4  Friedman. I practiced in front of Justice Friedman for years

5  in not just in this case but in other cases, and the notion

6  that she can't handle this very quickly and effectively and

7  wouldn't do it very quickly and effectively, for people to

8  start representing, gee, what it's like to be a New York

9  lawyer or what happens in New York state court, I think

10 there's a -- let's just say a difference of opinion.

11     Certainly, my client -- my client, who is on the phone,

12 Suzanne Forster, she's also a part of New York. We're

13 familiar with the New York courts. We litigate there quite a

14 bit. And the dispar... I mean, it's easy to hit on New

15 Yorkers, I guess even if you're a New Yorker you can claim to

16 hit on it, but I'm confident that Justice Friedman will do as

17 she promised and move this case along. I can't guarantee you

18 the trial date, because six months ago, when she -- we were

19 ready to try the case and we agreed to the delay. She said,

20 Great, I'll work on that schedule for you.

21     Now, COVID happened, right, and that's a crazy, unforeseen

22 circumstance. And so I can't predict that COVID will allow a

23 trial to start back up in September or in January. Some

24 people have said different things.

25     But when you're talking about a matter of months to

100

1  resolve a claim that is so complex that you've heard four

2  different lawyers tell you totally different things than what

3  the New York appellate courts have told us, and different from

4  what Justice Friedman told us, and different than what

5  Highland's last set of lawyers argued to Justice Friedman, all

6  of those are the things that we'd get into and not on the

7  merits if we actually had to deal with the merits of these so-

8  called threshold issues, which aren't threshold issues, but

9  that's again why that should be quickly resolved by Justice

10  Friedman, who would not even let them proceed, I imagine, as

11  opposed to asking for you to give them another bite at that

12  apple.

13      Now, I just want to make sure I address the other things

14  that they say.

15      You know, I never heard a single word, of all those

16  objectors, Your Honor, we filed our reply brief to make sure

17  that our position was clear.  I argued.  I just heard five

18  other folks argue.  Not a single one of them told you what's

19  going to happen to UBS to the extent that it is entitled to

20  try these same claims against the other defendants that are

21  still in the case that aren't in bankruptcy court.  I mean,

22  might say some of the claims are exactly the same.  Fraudulent

23  conveyance against Multi-Strat, for example, a nondebtor in

24  New York that we have a $60 to $90 million claim against.

25  Same facts.  Also, Highland is responsible just for that part

101

1    of the case.  And that's not affected in any way, shape, or

2    form by any settlement agreement with anyone.

3        So you've got the exact same claim, basically, the same

4    facts.  That particular fraudulent transfer, transfer just to

5    Multi-Strat, we can go after the transferee and we can go

6    after the transferor.  We have the right to punitives.  All of

7    it's a jury trial.  That's pending right now in New York.

8    And how are we not going to be prejudiced if we're going to

9    argue -- we're going to have to try that case in two separate

10   courts?  That case is not affected in any way by these so-

11   called threshold issues.  Not in any way, shape, or form.  Not

12   by the settlement agreement, not by the res judicata argument.

13   So, right there, that chunk of, you know, $60 to $90 million,

14   just that one claim alone.

15       There are other fraudulent transfers by Highland to itself

16   and to other entities that also were not subject to the

17   settlement.  We think there's something like $150 million, at

18   least, in fraudulent transfers, even if you credited this

19   settlement wipes out the rest of our fraudulent transfer

20   claims, an argument that, by the way, is inconsistent with

21   Highland's previous argument, and we'd be arguing that to you

22   if we're forced to get to the merits, which, of course, we're

23   not supposed to do today, even though many of the other

24   lawyers argued on the merits.

25       But then we get to breach of duty of good faith and fair

102

1   dealing.  And here is where, Your Honor, I agree, our

2   language, that one sentence that they jump on in the opening

3   brief was looser than it should have been.  We said something

4   like, in the second phase, we'll find out if Highland is

5   responsible for the $500 million judgment.  And they jumped on

6   that and they're trying to tell you, aha, that means these

7   guys have a secret plan to pursue a brand new alter ego theory

8   and that's the whole plan and that's really what's going on

9   here.

10      Your Honor, all that means is, as a practical matter,

11  Phase I, assess how much money, $500 million, was owed to UBS

12  as of February 24, 2009, when we filed suit.  Every action

13  that Highland took after that to ensure that those payments

14  would not be made -- and there were hundreds of millions of

15  dollars left after February 24th, 2009 where Highland could

16  have paid UBS or caused UBS to be paid -- when Highland chose

17  not to -- and by the way, not only did they choose not to, but

18  we gave you a little taste of the kind of things they did.

19  There's an email, I think it's Exhibit 5 to our opening.  I'm

20  sorry.  Exhibit H.  It -- anyway, there's a -- as you'll see,

21  there's a brief email chain where they talk about how they're

22  going to (inaudible) court and then they're going to stymy all

23  of our opportunity to recover the money.

24      So the $500 million just is the amount that two of the

25  Highland entities owed us under a contract that Highland had

103

1    signed.  We have already won, defeated summary judgment and

2    many appellate decisions that say that every single thing that

3    Highland did after February 2009 to not cause us to get paid

4    is potentially a breach of implied duty of good faith and fair

5    dealing.  That part of our claim is going forward.  That's not

6    something that Your Honor can -- unless you want to overturn

7    summary judgment and the appellate -- New York appellate

8    courts on an issue of New York state law, no matter how much

9    Mr. Feinstein or Ms. Mascherin would have liked that to be

10   changed, that's just asking to relitigate a decision that's

11   already been handed down by the appellate court in New York.

12   Okay?

13       And that's why this whole exercise is so terribly

14   misguided and wrong and why we would suffer terrific prejudice

15   to (a) have to relitigate those claims.  Assume we win, then

16   we're going to litigate the rest of our claim, I guess, in

17   their mind, here against Highland, while litigating a very

18   similar claim, on similar facts, with the same witnesses, in

19   front of a jury in New York.  They've apparently abandoned or

20   were going to remove it and you're going to survive

21   abstention, or because they didn't say it, maybe they're just

22   hoping that you agree with them.  But for all the reasons we

23   cite in our brief, mandatory abstention, leave permissive

24   abstention, will apply to those claims against the non-

25   debtors.

104

1    Turning to what Mr. Pomerantz said.  And I think it was

2  Mr. Pomerantz.  I apologize if it was Mr. Feinstein.  But I

3  think at one point Mr. Pomerantz jumped in and answered a

4  question you asked, and that answer was pretty revealing to

5  what's really going on here.  Okay?

6    What's really going on here is this isn't just about how

7  much gets paid to each creditor.  It's not about delaying the

8  total plan.  It's not about not being able to -- it's not

9  about getting people paid much faster, because it's going to

10  take a year or two to liquidate the assets in order to pay any

11  of the creditors a sufficient amount of money.  It's just

12  about short-circuiting our right to get a fair determination

13  of our claim when we're literally in the middle of a trial.

14    And I daresay none of the cases they've cited to you where

15  bankruptcy courts have decided to refuse to lift the automatic

16  stay are ones like this, where a party, after 11 years of

17  litigation, was in the middle of trial.  We cited those

18  timeliness cases.  That's something else I didn't hear any

19  response to by any of the Objectors.  We cite them on -- in

20  our opening brief, I think on Page 5 of our opening brief.  We

21  cite several cases that stand for the proposition that

22  timeliness just means is there going to be a timely

23  adjudication.  And in those cases, cases that were still in

24  the summary judgment stage or in the middle of discovery, the

25  Court said no.  In one case, it was a case that had just been

105

1  filed. At the same time the bankruptcy was filed, in the

2  state court, filed in bankruptcy about the same time, the

3  Court said the bankruptcy -- that's going to move things

4  along.

5      Those cases specifically say things like -- we're talking,

6  talking about a matter of months and not years with an S. It

7  easily satisfies the timely requirement. And for us to be

8  able -- Page 43 was -- Ms. Tomkowiak reminded me of the

9  opening brief, we think our cases on timeliness.

10     Ms. Mascherin. Ms. Mascherin, by the way, throws out as

11  an aside that she has a $190 million claim, that the Redeemer

12  Committee has a $190 million claim. Frankly, that's not -- we

13  don't believe that's true. That claim is not a secured claim.

14  That claim is subject to many setoffs. As an economic matter,

15  frankly, that claim is worth about $90 million maybe at most,

16  maybe even less.

17     Now, that's going to be the subject of either a

18  negotiation, which would be great if Ms. Mascherin is correct

19  and Highland is working with her in good faith to come to a

20  resolution of that claim. If it's a fair number, then that

21  will be great. And if not, I guess people will object.

22     Acis's claim, you know, it needs to be adjudicated or

23  resolved. Mr. Daugherty's claim needs to be adjudicated or

24  resolved.

25     There's a lot of things that need to happen in this Court,

106

1   along with seeing a plan. And by the way, the plan that we

2   expect to see is not going to be dependent on exactly which of

3   the creditors gets which, based on what we understand as of

4   this point. Certainly, it hasn't been demonstrated to be the

5   case by Highland in its argument.

6       And so when you talk about doing two things at the same

7   time, or walking and chewing gum at the same time, there's a

8   lot of gum and a lot of walking to be chewed by all the other

9   creditors in this estate and the directors in terms of

10  figuring out how they're going to liquidate some of these

11  long-term assets and how money is going to show up not a year

12  or two years from now but hopefully sooner.

13      Meanwhile, if you lift the stay, we can go to Judge

14  Friedman. We can say to her, hey, remember when you promised

15  that we'd have a trial in six months? We realized there's

16  COVID, but let's do everything else to be all ready to be on

17  the -- the first in your queue. And by the way, I'm not

18  guaranteeing. I never -- if I -- if you thought I said it, I

19  didn't, but I certainly would not guarantee we're going to be

20  first in the queue, but I predict that if we tell Judge

21  Friedman what's happened here and we ask her if we can be

22  first in the queue, I suspect we'll have a pretty good shot at

23  that. We certainly should be entitled to give it a shot and

24  to see before we just immediately lose all of our rights in

25  these cases.

107

1      Your Honor, there are extraordinary circumstances here.

2   You know, Ms. Mascherin said we have some kind of burden of

3   proof to show extraordinary circumstances.  That's not the

4   test.  You know, the test is cause, and then the burden

5   shifts, as we know from cases.  But there are some pretty

6   extraordinary circumstances.

7           THE COURT:  What -- what --

8           MR. CLUBOK:  We're in the middle of a fight.

9           THE COURT:  I just -- I can't resist chiming in on

10  that one, the burden shifting.  I mean, does the burden really

11  ever shift in this context if we're not talking about assets,

12  collateral, and equity/no equity?  I'm a little stumped on the

13  burden shifting that you've argued here.

14          MR. CLUBOK:  Well, Your Honor, Page 2 and 3 of our

15  brief sets it out.  Under Section 362(d)(1) of the Bankruptcy

16  Code, we have the initial burden of producing evidence

17  establishing a *prima facie* case that cause exists.  That's the

18  (inaudible) *Self* case.  Once that burden is met, however, the

19  debtor "has the ultimate burden of persuasion or the risk of

20  non-persuasion as to all stay issues under Section 362(d)(1)."

21  That's that same case.  And we cite that on Page 2 and 3, and

22  we also say *See also* a case from the Fifth Circuit.

23      So that is the law that we've cited.  The Defendants --

24  the Objectors, I should say, just hand-wave and just tell you

25  it's not true, but that's the case law that we've cited that I

108

1  think will stand on the Fifth Circuit and the bankruptcy court

2  decision that we cited.  But look.  So that will -- that is

3  the case.  But in any event, we -- there is an inescapable

4  fact here that we're in the middle of a trial, that there are

5  non-debtor defendants in that trial, that there's a lot of

6  overlapping facts.  And by the way, there's a level of

7  complexity that is so great that the stuff you've heard today

8  will take us a long, long time for us to explain to you why

9  it's not true, it's rehashed, it's incorrect, it's already

10 been decided, or it's been waived.  But it's not, as they say,

11 in all of these snippet and out-of-context arguments you've

12 heard while you hear lawyers telling you, hey, we're not

13 getting into the merits, but now let's just give you a little

14 preview of the merits, that's all the kind of stuff that

15 Justice Friedman could deal with so quickly and easily, and

16 they know it, and that's what's really going on here.

17      In terms of, you know, what Mr. Shaw said, and I'll just

18 briefly say, you know, it's not that you get -- you've got to

19 have a -- you've got -- put it this way.  Because of the stage

20 of the proceeding, Acis's claim, for example, which I had

21 heard might be $5 million, but now I hear it might be $100

22 million, I don't think that's even out of the gate in terms of

23 litigating.  And if Acis thinks that Your Honor can handle

24 that more quickly and efficiently, that's why it'll be here.

25 Or they're happier with you making decisions about that case

109

1  than, you know, the judge behind door number two.  That's

2  terrific.  That will move along the resolution of what their

3  claim is, or maybe they'll settle it, ideally, with the

4  Debtor.

5     But that claim is so differently-situated than our claim,

6  which is, after 11 years of litigation, literally in the

7  middle of a trial, where the judge has already made

8  credibility determinations, and she was the fact-finder under

9  part of the case and is going to be the fact-finder under the

10  second part of the case as well for some of the claims.  So

11  that's why that's very different.

12     The last thing I just want to say is we talk about

13  motivation.  We talk about leverage.  I mean, we haven't been

14  litigating with Highland for 11 years because it's fun.  I

15  mean, it's not fun.  I promise you.  Litigating with anyone --

16  and I will -- I think all the -- I think Ms. Mascherin even

17  would agree with me that it's not super-fun always litigating

18  with Highland.  Probably Acis would agree as well.

19     We've done that not to -- as an ultimate plan to have

20  leverage in the bankruptcy court.  We pursued that for 11

21  years because they owed us $500 million in 2009 after we sued.

22  They had hundreds of millions dollars that they controlled,

23  and they breached their duty of good faith and fair dealing

24  and caused fraudulent transfers, such that we've been paid not

25  one penny, not one penny from Highland, even though this Court

110

1  has -- the New York court has already found that they were

2  liable to us for $500 million as of that date.

3      So that's why we've been pursuing them.  It wasn't some

4  master plan so that one day we could be here in bankruptcy

5  court and somehow get an unfair shake.  It was so that we

6  could get a fair resolution of our claim.  And we fought

7  through all the same arguments I heard today.  I have been in

8  the New York Court of Appeals five times.  Or four times, I

9  guess.

10     By the way -- yeah, four times in the New York Court of

11 Appeals.  At least three of them since 2011.  I've lost track

12 of which ones came before or after.  But I've heard these same

13 arguments over and over again.  I heard them at summary

14 judgment briefing.  I heard them in the state court at the

15 trial.  They've been rejected.

16     To ask Your Honor to give them a new bite at the apple and

17 to ask you to make an interpretation of these issues that are

18 surely New York state law, that have been well resolved in New

19 York state law, that Justice Friedman could decide in her

20 sleep, and she proved the last time they did it she could

21 decide in about a week, that's not -- that's not appropriate,

22 and we've certainly showed good cause and we showed the

23 prejudice we would be suffering if the Objectors are given the

24 chance to just relitigate in a new forum issues that have

25 already been litigated.

111

1          THE COURT:  All right.

2          MR. CLUBOK:  Thank you.

3          THE COURT:  Thank you.  Well, I want you all to know

4    that I thought all of the briefing was spectacular.  It was

5    extremely well done.  And I want you to know that I spent all

6    weekend looking at it.  I'm telling you that both to

7    compliment you and to let you know why I am going to go ahead

8    and rule on this.

9       I, my law clerk, we've spent a lot of time looking at your

10   very wonderfully-prepared pleadings.  And if you saw me

11   occasionally looking over at my computer when you were

12   arguing, I was not drifting off, doing something else; I

13   actually opened the email that Mr. Sosland sent my courtroom

14   deputy earlier this afternoon with the unredacted UBS reply

15   and attachments, to make sure I considered that, because that

16   would have been the only thing that I hadn't reviewed before

17   coming in here this afternoon.  So I greatly appreciate the

18   complexity of this 11-year litigation dispute.  I guess the

19   dispute started earlier than February 2009.

20      But 362 is obviously the governing statute here.  I have

21   subject matter jurisdiction, and I'm able to enter a final

22   order on this motion of UBS.  And applying 362 and the cause

23   standard, I find that UBS has not established cause to lift

24   the stay, and I'm going to deny the motion.

25      First, I will say that I believe the burden has been on

112

1  the Movant here, and the Movant never did get past the 50-yard

2  line on showing cause.

3      As many of you noted, cause is a discretionary, highly

4  discretionary standard that governs the bankruptcy judge's

5  decision.  Here, there are a number of factors that have made

6  me decide there is just not cause to lift the stay here.

7  Timing is, as you would guess, the most critical factor here.

8  I don't believe UBS, as eloquent as its arguments were, met

9  its burden of convincing me that things could more timely be

10  resolved in the state court, or even timely be resolved.

11      While I certainly have the utmost respect for Justice

12  Friedman and all of the many years of scaling the learning

13  curve that she no doubt has here, we have this very

14  uncomfortable, unpleasant fact, I think we would all agree, of

15  the COVID pandemic.  None of us can say when things will get

16  back to normal in the New York state courts.  And the likely

17  prospects of delay here, we just cannot ignore.  The judge

18  will have a backlog for all of these months of not having

19  court hearings, and then who knows when a jury trial can

20  happen.  So that unpleasant fact does not work to UBS's

21  advantage here.

22      Also, the fact that this litigation has already been

23  pending over 11 years and only very recently resulted in a

24  written ruling in Phase I, I think is a very unpleasant fact

25  here.  While all of the prior rulings may set things up for

113

1  Phase II to go more rapidly, I'm just not convinced that a

2  state court anywhere would have the rapid focus that any

3  bankruptcy court will have, this one or any bankruptcy court

4  would have in getting a proof of claim resolved, especially an

5  allegedly $1 billion proof of claim that the whole

6  reorganization strategy hinges on.

7      Here, this Court has the capacity to address even a very

8  complicated proof of claim objection very fast.  We have been

9  up and running, doing evidentiary video hearings for a couple

10 of months now.  Even in this building in the past few months,

11 there have been live in-person hearings on rare occasion in

12 the bankruptcy court, but we have had a handful of them

13 amongst the bankruptcy judges, and the criminal judges are

14 still having live in-person hearings all through the pandemic,

15 and I think our chief district judge is empaneling a jury for

16 the first time this month.

17     So, while anything can change here for the worst as far as

18 the pandemic, I feel like the timing issues heavily weigh in

19 favor of us being able to resolve a UBS proof of claim faster

20 here with a bench trial.

21     This Debtor cannot wait years for this UBS claim of

22 liability of Highland to be resolved.  I will vow to get

23 through this promptly and give you thorough attention, just as

24 I'm sure Justice Freidman has done.  But we just cannot have

25 the massive uncertainty of a potentially $1 billion proof of

114

1  claim delay this case.

2      Someone called UBS the one billion dollar gorilla in the

3  room.  That's, I think, an apt description.  So, timing here

4  is the biggest problem for UBS.  I think a delay here that I

5  believe would be inherent if the state court adjudicated Phase

6  II would be very harmful to this Debtor's reorganization

7  prospects and the other creditors.

8      Other factors that the Court is, of course, supposed to

9  consider in this context -- judicial economy, judicial

10  efficiency, burden on the parties, equities -- I do not think

11  that any of these have been shown here to obviously favor

12  lifting of the stay.  So the motion is denied.

13      I do want to reiterate to people, I am not going to

14  relitigate anything that Justice Friedman has decided.  I will

15  be careful not to do that.  And so be careful what you ask me

16  to do.  I am going to respect the comity of the state court on

17  matters that have already been decided by her.

18      I'm also not going to litigate UBS's claims against non-

19  debtor affiliates, unless somehow there's mass movement for me

20  to do that that I'm convinced I should do that.  So this will

21  just be UBS filing a proof of claim against the Debtor,

22  Highland Capital Management, LP, and presumably the objection,

23  and then the trial on the merits, a bench trial on the merits.

24      I guess I should just reiterate for the record what I

25  hinted at early on, that I'm overruling UBS's argument that

115

1  the Debtor's alleged agreement a few months ago through Scott

2  Ellington to lift the stay in favor of this litigation going

3  forward in the New York state court is binding on the Debtor

4  or other creditors. Waivers of the automatic stay are

5  generally not enforceable unless there's an order of the Court

6  on notice to all the creditors who are beneficiaries of the

7  automatic stay. So, no matter what he said, he didn't have

8  the power, and the other creditors cannot be held to that

9  alleged agreement.

10      The last thing -- I mean, not the last thing, the next to

11  the last thing I'm going to say is the proof of claim -- we'll

12  say that UBS must file a proof of claim. Someone threw five

13  days out there. We're already past the regular bar date. So

14  UBS, any argument you want to make that that's not enough

15  time, to say -- and Friday is the 19th.

16          MR. CLUBOK: Yes, Your Honor. We would like some

17  more time on that.

18      You know, I will say a couple things. We are here six

19  months later. There's one thing I didn't address. I know

20  you're not giving us -- you're not going to credit us for the

21  agreement that was made, but we did rely on that agreement and

22  did not pursue preparing a proof of claim because we thought

23  we were in a settlement posture. I would ask the Court to

24  give us -- you know, given the nature of this claim and the

25  size of this, I think it's ambitious now to do it in five

116

 1  business days, or June 22nd.  I know there was an original

 2  agreement with that, although I also will note that we were

 3  assured we'd get more time if we needed to for various

 4  reasons, if they were reasonable.

 5      I also, frankly, Your Honor, I hate to raise this, but I

 6  do think we need to look at our appellate options, because

 7  this is going to put us in a situation where we're necessarily

 8  going to be trying this case in two different courts with two

 9  different decisions, and it is fairly -- you know, it is not

10  the case that there's some plan that's ready to go, that it's

11  just being held up by UBS's proof of claim.  So I guess we

12  would ask that we be given some period of time.  You know, I

13  think we have -- I think we have two weeks to decide whether

14  or not -- sorry.  Yeah, I think we have two weeks to decide

15  whether to appeal.  We would like to have at least that long.

16  Maybe we won't appeal.  That decision has not been made.  I

17  have to talk to my client.  We'll see how it goes.

18      We appreciate your ruling, and we -- you know, not --

19  we're going to appeal, and we'll certainly talk to the Debtor

20  and the other creditors about that and see if we can work

21  something out.  But we'd like a fair amount of time to

22  consider that as an option.  And then, if we do, we certainly

23  don't want a situation being, which is so easy to fix, that to

24  -- just like a proof of claim being filed, we lose our right

25  to end up with a jury trial.  You know, it ultimately makes

117

1  more sense to try all of this in front of one jury, which is

2  what's going to be the nature of our appeal.

3      We can do other things like, you know, give the substance

4  of what would be in a proof of claim, so we can keep moving

5  things along in this court.  There's other ways to deal with

6  it.  The Court can make decisions.  But it's a pretty big hit

7  if we're just forced to do that right away.  And also, given

8  the circumstances, and the reason we are six months later than

9  we would be in dealing with all of this is because we did rely

10 on that promise.  And even if you're not going to hold them to

11 it, it certainly is why we're here.  We would ask that the

12 Court issue a ruling that would help us out, given the

13 circumstances.

14          MR. FEINSTEIN:  Your Honor, may I be heard on this on

15 behalf of the Debtor?

16          THE COURT:  You may.

17          MR. FEINSTEIN:  Thank you.  For the record, Robert

18 Feinstein.

19      Your Honor, there was a -- a briefing schedule that was

20 fully negotiated with the Debtor and UBS, where it was agreed,

21 and it's recited in the stipulation, that there would be an

22 extension of the bar date until the later of June 22nd or five

23 business days after resolution of this motion.  And we worked

24 out a briefing schedule on this motion.

25      So this was already embodied in the document submitted to

118

1    the Court.  So -- and that was prepared well after any notion

2    that the putative agreement to lift the stay was going to move

3    forward.

4        We told Mr. Clubok months ago our position on that, and

5    the stipulation -- the stipulation with the (garbled) bar date

6    all came long after that.  Your Honor, we can't rely on the

7    supposed agreement to buy more time now.  We negotiated with

8    him to file a proof of claim five business days after Your

9    Honor's ruling on the motion, if Your Honor denied the motion.

10   And we think that that -- that we should stick to that.

11          MR. CLUBOK:  If I may briefly respond.  Of course,

12   it's ironic that, that agreement, we're to be held to, but the

13   other agreement that put us in this mess, that should be just

14   ignored.

15       I also will say there was an oral assurance by Mr.

16   Pomerantz toward many of my colleagues that, don't worry,

17   we'll get more time if we need it, we'll work it out.

18       I don't even want to get into the circumstances of where

19   we were when we reached that agreement.  There were medical

20   issues going on and everyone -- oh, and the other thing is,

21   when we set that deadline, it was because we were assured by

22   the Debtor that, well in advance of that, they would give us

23   an actual offer of settlement that we could start negotiating

24   settlement numbers.  That was the whole idea.  And they said,

25   oh, putting it off to June 22nd will be plenty of time.  You

119

1  guys will get -- I think at that time they promised us -- I

2  can't remember if it was April or early May.  You know, we've

3  not even seen that.

4       So that was the whole reason we agreed to set those dates,

5  was on the representation that we were going to be having

6  settlement discussions.  Instead, those were cut off, et

7  cetera.

8            THE COURT:  All right.  All right.

9            MR. CLUBOK:  I don't really want to get into the

10 whole back-and-forth.

11           THE COURT:  With respect, I've heard enough.

12      I do want to say, you know, we keep covering this ground

13 again, but it is crystal clear that a debtor cannot enter into

14 an agreement to lift the stay that is going to be binding on

15 all of the creditors and other parties in interest.  It's just

16 I can't -- you know, I don't know of one case that would be

17 supportive here of that argument.  You know, maybe -- I don't

18 know every case that gets decided, but it's -- I think it's

19 crystal clear.

20      And it's quite a different thing, informal agreements to

21 extend deadlines and have scheduling orders.  That's a very

22 different type of agreement.

23      But I am going to give the Debtor -- I mean, excuse me,

24 UBS two weeks.  Okay?  So, well, I'm going to make it close of

25 business Friday, the 26th.  Okay.  So that will be the

120

1  deadline for UBS to file a proof of claim. And that's just

2  the way it's going to be here.

3      Now, I don't think I have any other housekeeping matters.

4  I'll just ask Debtor's counsel to draft the form of order and

5  obviously run it by Mr. Clubok and his team and give them a

6  reasonable --

7          MR. FEINSTEIN: We'll do that.

8          THE COURT: -- a reasonable time to respond. But I

9  can't imagine it's going to be a very lengthy order. I

10 obviously reserve the right to supplement in a written form of

11 order anything I said orally today that I think I might need

12 to clarify or elaborate on.

13     Now, did anyone have any remaining housekeeping matters

14 before I go into one last topic I want to address regarding

15 mediation?

16     All right. Here's what I'm going to say. We obviously

17 have two gorillas, actually, in the room. I've not studied

18 the Redeemer Committee proof of claim. I just know that I

19 heard from day one that they had approximately a $200 million

20 proof of claims or claim resulting from an arbitration and all

21 they lacked was a judgment confirming it. Okay? So, you

22 know, we all know what the courts say about arbitration. You

23 know, it's just pretty darn hard to set aside an arbitration

24 award. Okay?

25     So the way I have been viewing this is Redeemer Committee

121

1   is a claim that has to be dealt with.  You know, I don't know,

2   I haven't studied the proof of claim, I don't know what

3   arguments, I don't what setoffs may be.  But my guess is

4   there's not a lot of wiggle room with regard to that claim.

5       But then you have this one, which I didn't know until the

6   last few days that UBS didn't actually have a judgment against

7   Highland.  I mean, at some point UBS comes in, we have a

8   billion-dollar claim against Highland, and it was only in the

9   last few days when I started looking at this I appreciated the

10  fact that, oh, they have a billion-dollar claim against these

11  two Funds, still, you know, contingent, unliquidated, unknown

12  what liability Highland is going to have to UBS.

13      So we've got that gorilla in the room that's making me

14  think about mediation.  And then Acis.  I well understand the

15  Acis issues, but oh my goodness, we have this giant adversary

16  with -- how many counts was it, Tom?  34 counts?

17              THE CLERK:  Yes.

18              THE COURT:  Thirty-four counts in the adversary that

19  Acis -- Reorganized Acis is pursuing against Highland and

20  HCOLF.  And when the stay went into effect from the Highland

21  bankruptcy, my law clerk and I had a giant report and

22  recommendation to the district court that we were soon going

23  to pull the trigger on, and, oh, well, this is all stayed.

24      So I don't think Acis has asserted anywhere close to a

25  billion dollars.  I don't know what the size of the Acis proof

122

1 of claim is.

2     Mr. Shaw, what is the size of the Acis proof of claim

3 that's been filed?

4         MR. SHAW:  At least $70 million, Your Honor.

5         THE COURT:  Okay.  I knew it made my eyes pop out a

6 little.  You know, obviously, there are 34 counts and multiple

7 defendants and unclear dollar amounts associated with each.

8 But what are we going to do here?

9     I'm going to start with you, Mr. Pomerantz.  We have too

10 many years of litigation, too, too many years of litigation.

11 And I think I said early on it's time to stop litigating and

12 figuring out how we're going to pay creditors.  But obviously

13 you have these two biggie unknown ones.  I am thinking about,

14 do I order mediation (echoing) of the UBS claim?

15     Someone may not have their phone on mute.  Please put your

16 phone on mute or your device on mute if you don't have it on

17 mute.

18     Okay.  Good.

19     Do I order mediation of the UBS proof of claim once it's

20 filed?  Do I order mediation of the Acis proof of claim and

21 adversary?  Do I get some sort of mediation czar to help with

22 mediation of the plan?  I hate to go that route, and, you

23 know, that's a lot of intermeddling with the Debtor-in-

24 Possession, especially when you've got this fine new board of

25 directors and whatnot.  But I'm just letting you know what's

123

1 going on in my head. I don't -- I want people to get off

2 their litigation mentality and get focused on the end game

3 here of a plan and everybody getting paid what they're

4 entitled to sooner rather than later.

5  So, Mr. Pomerantz, what is your initial reaction to what's

6 going through my brain?

7   MR. POMERANTZ: So, Your Honor, I think Your Honor is

8 where the board was when it took over on January 9th. I think

9 I've appeared before Your Honor on several occasions and told

10 you that the strategy and the game plan of this board was to

11 break the culture of Highland, which is litigating, and

12 attempt to resolve the litigation.

13  Your Honor has mentioned the three large claims. There

14 are others, but these are the three large claims. They're all

15 people who sit on the Creditors' Committee. And as you can

16 imagine, sitting from a standing start on January 9th, it's

17 taken -- it took the board quite a while to be in a position

18 to understand each of the claims.

19  They came to our firm. They asked us to do an extensive

20 analysis of the UBS claim. We then started to engage UBS in

21 negotiations. And they didn't go anywhere. And quite

22 frankly, I think at least our side and other -- the Objectors

23 felt that we needed to have this hearing, that Your Honor's

24 determination of the relief from stay matter might be a

25 catalyst to further discussions. And we are, of course, open

124

1    to further discussions.  We obviously have a big difference in

2    view of the UBS claim, as does UBS, but we're hoping that, as

3    a result of this hearing, that that would spur on negotiations

4    and allow the parties to sit down.

5        Acis, we are actually going to be meeting with Acis for

6    the first time on Wednesday in order to discuss their claim.

7    We've prepared an extensive objection to the claim, which, if

8    it hasn't already been forwarded to Mr. Shaw and Ms. Patel in

9    advance of that meeting, will be today.  And we're hoping,

10   after sitting down with them on Wednesday, that it will be the

11   first time the board could let Acis know where the board

12   believes are the concerns and issues with respect to the

13   claim, that we could have meaningful settlement discussions.

14       And with Redeemer, we are perhaps the furthest along,

15   partly because it's the least complex of the three, and we've

16   had several discussions back and forth.  We would not rule out

17   mediation.  That may be necessary.  It is not the board's

18   desire to spend the creditors' money litigating on multiple

19   fronts with each of these creditors.

20       However, I think at this point it might be a little

21   premature.  It may be appropriate to set some kind of a status

22   conference 30 days from now, where we can approach -- we could

23   come back to the Court with a further thoughtful

24   recommendation on whether we think mediation would be

25   appropriate or whether it wouldn't be appropriate.

125

1    But we're hoping, with, again, this hearing, the meeting

2  with Acis, and the discussions we had with Redeemer, that we

3  will be able to make progress.  And if not, litigation may be

4  necessary, but it may very well mean that some form of

5  mediation with each of these creditors on their claims is

6  helpful.

7    But I would like the opportunity to sit down, talk to the

8  board about that after the dust clears from this settlement --

9  this hearing, as well as the further discussions we intend to

10  have over the next couple of weeks.

11        THE COURT:  All right.  Well, do you remember, or we

12  can look it up, when our next hearing is in this case?

13        MR. POMERANTZ:  I believe we have a hearing on July

14  8th, Your Honor.

15        THE COURT:  Okay.

16        MR. POMERANTZ:  Perhaps we could report to the Court

17  at that point and have a status conference and be able to

18  address Your Honor's comments in more detail based upon where

19  we are then.

20        THE COURT:  All right.  So that's what we're going to

21  do.  July 8th, whatever time it is, we're going to add to the

22  calendar a status conference.  And just so you all know, we're

23  going to talk about do we need mediation -- again, with regard

24  to UBS or with regard to Acis or more globally?  So I hope

25  that you all will give that a lot of thought.  I'm sure you

126

1    will.

2        Is there anything else, Mr. Pomerantz?

3            MR. POMERANTZ:  Nothing else, Your Honor.  Thanks for

4    your time and effort and going through what was mounds of

5    paper, and the time and effort you spent today as well as

6    throughout the case.  Thank you, Your Honor.

7            THE COURT:  All right.  Well, thank you all again.

8    My compliments.  It was all very well done, so that made it

9    easier to get through.  All right.  We stand adjourned.

10       (Proceedings concluded at 4:43 p.m.)

11                            --oOo--

12

13

14

15

16

17

18

19

20                         CERTIFICATE

21
         I certify that the foregoing is a correct transcript to
22   the best of my ability from the electronic sound recording of
     the proceedings in the above-entitled matter.
23
      /s/ Kathy Rehling                        06/17/2020
24
     _____     _____
25   Kathy Rehling, CETD-444                    Date
     Certified Electronic Court Transcriber

127

INDEX

PROCEEDINGS                                                          4

OPENING STATEMENTS

- By Mr. Clubok                                                     15
- By Mr. Feinstein                                                  48
- By Mr. Clemente                                                   70
- By Ms. Mascherin                                                 75
- By Mr. Shaw                                                       92

WITNESSES

-none-

EXHIBITS

All Parties' Exhibits Received (exclusive of Exhibit D      11
to Redeemer Objection)

RULINGS

Application to Employ - *Granted*                                    9
Motion for Leave - *Granted*                                       13
Motion to Seal - *Granted*                                         14
Motion for Relief from the Automatic Stay - *Denied*      111
UBS Proof of Claim Deadline Set                                  119

END OF PROCEEDINGS                                                126

INDEX                                                             127

# EXHIBIT 17

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX  75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03000-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., NEXPOINT ADVISORS, L.P., | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

-----------------------------------------------------------
HIGHLAND INCOME FUND, NEXPOINT
STRATEGIC OPPORTUNITIES FUND,
NEXPOINT CAPITAL, INC., AND CLO
HOLDCO, LTD.,

                                    Defendants.
-----------------------------------------------------------

### DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AGAINST CERTAIN ENTITIES OWNED AND/OR CONTROLLED BY MR. JAMES DONDERO

Highland Capital Management, L.P., the plaintiff in the above-captioned adversary proceeding (the "Adversary Proceeding"), and the debtor and debtor-in-possession (the "Debtor" or "Highland") in the above-captioned chapter 11 case ("Bankruptcy Case"), submits this memorandum of law (the "Memorandum") in support of the *Debtor's Motion for a Temporary Restraining Order and Preliminary Injunction against Certain Entities Owned and/or Controlled by Mr. James Dondero* (the "Motion"), pursuant to sections 105(a) and 362(a) of title 11 of the United States Code (the "Bankruptcy Code"), and Rules 7001 and 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for a temporary restraining order ("TRO") and preliminary injunction enjoining defendants Highland Capital Management Fund Advisors, L.P. ("HCMFA"), NexPoint Advisors, L.P. ("NPA," and together with HCMFA, the "Advisors"), Highland Income Fund, NexPoint Strategic Opportunities Fund, NexPoint Capital, Inc. (collectively, the "Funds"), and CLO Holdco, Ltd. ("CLO Holdco," and together with the Advisors and Funds, the "Defendants") from engaging in any Prohibited Conduct.[2]  In support of its Motion, the Debtor states as follows:

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the *Declaration of Mr. James P. Seery, Jr. in Support of the Debtor's Motion for a Temporary Restraining Order Against Certain Entities Owned and Controlled by Mr. James Dondero*, being filed contemporaneously herewith (the "Seery Dec.").

**APP. 1760**
**Appx. 01807**

# I.
## INTRODUCTION

1.      Highland's immediate need for injunctive relief stems from Defendants' recent and repeated interference with the Debtor's operations and contractual rights.  These actions include, in pertinent part, Defendants' interference with the sale of certain collateralized loan obligation ("CLO") assets and Defendants' threats to initiate a process to terminate the Debtor's CLO management agreements (the "CLO Management Agreements").

2.      The Debtor assumed that the Defendants would have gotten the message on December 16, 2020, when this Court granted the Debtor's motion for a directed verdict dismissing their prior motion—characterized by the Court as, among other things, "frivolous"—on these very topics.  The Debtor was wrong.  With the support and encouragement of Mr. James Dondero, Defendants not only persist but have expanded their threats and refuse to back down.

3.      Mr. Dondero directly or indirectly (a) owns and controls each of the Advisors, (b) owns and/or controls CLO Holdco, and (c) controls each of the Funds.  In a recent deposition, Mr. Dondero candidly admitted that he supports all of the actions taken by the Defendants. But pursuant to the "corporate governance" settlement approved by the Court a year ago, Mr. Dondero is prohibited from causing Defendants to terminate any agreements with the Debtor, including the CLO Management Agreement.  Moreover, pursuant to Temporary Restraining Order, Mr. Dondero is enjoined from, among other things, interfering with the Debtor's business, or from causing or encouraging any entity controlled by Mr. Dondero to interfere with the Debtor's business.

4.      As discussed below, injunctive relief is necessary because if Defendants are not enjoined from interfering with the Debtor's ability to manage the Debtor's operations and sale of CLO assets, pursuant to the CLO Management Agreements—conduct which Defendants have no

3

legal or equitable right to engage in—the Debtor will be unable to fulfill its duties, and the Debtor's estate will be irreparably harmed.

5.    The Debtor has, therefore, filed the Motion and commenced a separate adversary proceeding, (1) bringing a cause of action against Defendants for tortious interference with contract, and (2) seeking declaratory relief and an order to temporarily, preliminarily, and permanently enjoin Defendants from: (a) interfering with or otherwise impeding, directly or indirectly, the Debtor's business, including but not limited to the Debtor's (i) management of the CLOs, (ii) decisions concerning the purchase or sale of any assets on behalf of the CLOs, or (iii) contractual right to serve as the portfolio manager (or other similar title) of the CLOs; (b) otherwise violating section 362(a) of the Bankruptcy Code; (c) seeking to terminate the portfolio Management Agreements and/or servicer agreements between the Debtor and the CLOs (collectively, (2)(a)-(c) constitute the "Prohibited Conduct"); (d) conspiring, colluding, or collaborating with (x) Mr. Dondero, (y) any entity owned and/or controlled by Mr. Dondero, and/or (z) any person or entity acting on behalf of Mr. Dondero or any entity owned and/or controlled by him, to, directly or indirectly, engage in any Prohibited Conduct; and (e) engaging in any Prohibited Conduct with respect to any of the Successor Parties (as that term is defined below).

## II.
## FACTUAL BACKGROUND

### A.    Mr. James Dondero Owns and/or Controls Each of the Defendants

6.    There can be no genuine dispute that Mr. Dondero owns and/or controls each of the Defendants. (Seery Dec. ¶ 5).

### *The Advisors and the Funds*

4

7.    On December 16, 2020, Mr. Dustin Norris ("Mr. Norris") testified under oath in support of the *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [Docket No. 1528] that was brought by the Advisors and Funds (the "Restriction Motion").

8.    Mr. Norris is the Executive Vice President of each the Advisors and each of the Funds. *See* Transcript of December 16, 2020, hearing on the Restriction Motion (the "Hearing"). Seery Dec. ¶ 7; Exhibit 1, at 38:15-39:2.

9.    During the hearing, Mr. Norris testified that Mr. Dondero (a) owns and controls, directly or indirectly, each of the Advisors, and (b) is the portfolio manager of each of the Funds, each of which is advised by one of the Advisors. Seery Dec. ¶ 8; Exhibit 1, at 35:15-37:13.

10.    In their public filings with the Securities and Exchange Commission, each of the Funds disclosed that the Advisors were owned and controlled by Mr. Dondero and that Mr. Dondero was the portfolio manager for each of the Funds. Seery Dec. ¶ 9.

### *CLO Holdco*

11.    CLO Holdco is a wholly-owned and controlled subsidiary of the DAF.  On information and believe, the DAF is managed by the Charitable DAF Holdco, Ltd. ("DAF Holdco"), which is the managing member of the DAF. Seery Dec. ¶ 10.

12.    DAF Holdco is owned by three different charitable foundations:  Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., and Highland Kansas City Foundation, Inc. (collectively, the "Highland Foundations").  Mr. Dondero is the president and one of the three directors of each of the Highland Foundations.  Mr. Grant Scott ("Mr. Scott") – Mr. Dondero's college roommate – is also an officer and director of each of the Highland Foundations. Seery Dec. ¶ 11.

**APP. 1763**
**Appx. 01810**

13.     Although the Debtor is the investment manager for the DAF, neither the Board nor Mr. Seery, as CEO and CRO of the Debtor, have any right or ability to control or direct the DAF or CLO Holdco.  That control is exercised by Mr. Scott at the direction of Mr. Dondero. Seery Dec. ¶ 12.

**B.**     **This Court has Entered Three Orders that are Implicated by the Defendants' Actions and Threatened Actions**

14.     This Court has entered three Orders that are relevant to the Motion and the relief sought by the Debtor.

15.     On December 27, 2019, the Debtor filed that certain *Motion of the Debtor for Approval of Settlement with the Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* [Docket No. 281] (the "Settlement Motion").  On January 9, 2019, this Court entered an Order granting the Settlement Motion [Docket No. 339] (the "Settlement Order"). Seery Dec. ¶ 14; Exhibit 2.

16.     As part of the Settlement Order, this Court also approved a term sheet (the "Term Sheet") [Docket No. 354-1] between the Debtor and the Official Committee of Unsecured Creditors (the "Committee") pursuant to which Mr. John S. Dubel, Mr. Russell Nelms, and Mr. Seery were appointed to the Board. Seery Dec. ¶ 15; Exhibit 3.

17.     As required by the Term Sheet, on January 9, 2020, Mr. James Dondero resigned from his roles as an officer and director of Strand and as the Debtor's President and Chief Executive Officer. Seery Dec. ¶ 16; Exhibit 4.

18.     The Settlement Order directed Mr. Dondero not to "cause any Related Entity to terminate any agreements with the Debtor." Seery Dec. ¶ 17; Exhibit 2 ¶ 9.

19.     Upon information and belief, each of the Defendants is a "Related Entity" as defined in the Term Sheet because each of the Defendants is directly or indirectly owned and/or

**APP. 1764**
**Appx. 01811**

Case 19-34054-sgj11 Doc 3445-3 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 1769
of 2723
Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 1768 of
2722
Case 21-03000-sgj Doc 6 Filed 01/06/21    Entered 01/06/21 20:00:40    Page 7 of 18

controlled by Mr. Dondero and/or Mr. Scott. Seery Dec. ¶ 18 Exhibit 3, Ex. D (Reporting

Requirements) ¶ 1.D(A)(i) and (ii).

20.     Defendants' actions and threatened actions also implicate the *Order Granting*

*Debtor's Motion for a Temporary Restraining Order Against James Dondero* [Adv. Pro. No. 20-

03190-sgj, Docket No. 10], entered on December 10, 2020 (the "TRO" and together with the

Settlement Order, the "Orders"). Seery Dec. ¶ 19; Exhibit 5.

21.     Pursuant to the TRO, the Court temporarily enjoined and restrained Mr. Dondero

from, among other things, "interfering with or otherwise impeding, directly or indirectly, the

Debtor's business" and from "causing, encouraging, or conspiring with (a) any entity owned or

controlled by [Mr. Dondero], and/or (b) any person or entity acting on his behalf, from, directly

or indirectly, engaging in any Prohibited Conduct [as defined in the TRO]," including interfering

or impeding the Debtor's business. *Id.* ¶¶ 2(d), 3.

22.     Finally, on December 8, 2020, Defendants (except CLO Holdco) filed the

Restriction Motion.  The Restriction Motion sought to prevent the Debtor from fulfilling its

duties as the portfolio manager of certain CLOs by impeding any attempted sale of assets.  After

hearing the testimony of Dustin Norris, the Court called the Defendants' Motion "frivolous,"

granted the Debtor's motion for a directed verdict, and subsequently entered an order denying

the Restriction Motion.

**C.     Defendants Interfere with and Impede the Debtor's Business and**
**        Threaten to Terminate the Debtor's Management Agreements**

23.     In addition to filing the Restriction Motion, on recent three occasions, Defendants

have either interfered with and impeded the Debtor's business or have threatened to do so by

initiating the process for removing the Debtor as the portfolio manager of the CLOs.  Such

**APP. 1765**
**Appx. 01812**

conduct also violates the Orders and flouts the Court's decision on the Restriction Motion and the Court's observations made at the Hearing. Seery Dec. ¶ 21.

24.    *First*, on December 22, 2020, employees of NPA and HCMFA interfered with and impeded the Debtor's business by refusing to settle the CLOs' sale of AVYA and SKY securities that Mr. Seery had personally authorized.  The Advisors engaged in this conduct notwithstanding (a) the denial of the Restriction Motion and the Court's pointed comments during that Hearing on the Restriction Motion, and (b) Mr. Norris's sworn acknowledgments on behalf of the Advisors and Funds during the Hearing that (i) the Debtor's management of the CLOs is governed by written contracts as to which none of the Advisors or Funds are parties, Seery Dec. ¶ 22; Exhibit 1 at 41:25-42-7; (ii) the Debtor has the exclusive duty and responsibility to buy and sell assets on behalf of the CLOs, *id.* at 42:17-43:3; and (iii) as the Advisors knew when they invested in the CLOs on behalf of the Funds, that holders of preference shares (such as the Funds) have no right to make investment decisions on behalf of the CLOs, *id.* at 43:4-11.

25.    Notably, the Advisors' interference with trades that Mr. Seery authorized on behalf of the CLOs is the same type of conduct that lead the Court to impose the TRO against Mr. Dondero. *See Declaration of Mr. James P. Seery, Jr. in Support of Debtor's Motion for a Temporary Restraining Order Against Mr. James Dondero* [Adv. Pro. No. Docket No. 4] ¶¶ 21-23, Ex. 8.

26.    *Second*, also on December 22, 2020, the Defendants wrote to the Debtor and renewed their "request" that the Debtor refrain from selling any assets on behalf of the CLOs until the confirmation hearing (the "December 22 Letter").  In support of their "request," the Debtor re-asserted almost verbatim the arguments advanced in connection with the Restriction Motion – all of which were soundly rejected by the Court. Seery Dec. ¶ 24.

**APP. 1766**
**Appx. 01813**

27.     The Debtor responded on December 24, 2020, demanding that Defendants withdraw their December 22 Letter and confirm that neither the Defendants nor anyone acting on their behalf will take any further steps to interfere with the Debtor's directions as the CLOs' portfolio manager by the close of business on December 28, 2020. Seery Dec. ¶ 25; Exhibit 6. The Defendants have not complied with (or even responded to) the Debtor's demands. *Id.*

28.     **Finally**, the Defendants recently threatened to seek to remove the Debtor as the portfolio manager of the CLOs.   Specifically, in a letter dated December 23, 2020 (the "December 23 Letter" and together with the December 22 Letter, the "Defendants' Letters"), the Defendants informed the Debtor that one or more of them "intend to notify the relevant trustee and/or issuers that the process of removing the Debtor as fund manager should be initiated, subject to and with due deference for the applicable provisions of the United State Bankruptcy Code, including the automatic stay of Section 362." Seery Dec. ¶ 26.

29.     The Debtor responded to the December 23 Letter the next day, and advised the Defendants that the Settlement Order prohibited the termination of the Debtor's Management Agreements with the CLOs, and that there was no factual, legal, or contractual basis to remove the Debtor as the CLOs' portfolio manager in any event.   The Debtor demanded that the Defendants withdraw their December 23 Letter and commit not to take any actions, directly or indirectly, to terminate the CLO Management Agreements, by the close of business on December 28, 2020.   The Defendants have not complied with (or even responded to) the Debtor's demands. Seery Dec. ¶ 27; Exhibit 7.

30.     Because Mr. Dondero owns and/or controls the Defendants, the Debtor forwarded the correspondence between the Debtor and the Defendants, including the Defendant's Threatening Letters, to Mr. Dondero's counsel.   In response, Mr. Dondero's counsel contended

**APP. 1767**
**Appx. 01814**

that "[w]hile there are relationships between my client and some of the movants, I believe they are separate entities and should be treated as such." Seery Dec. ¶ 28; Exhibit 8.

31.     Upon information and belief, Mr. Dondero has taken no steps to cause the Defendants – entities that he indisputably owns and/or controls and that are each a "Related Entity" under the Term Sheet – to comply with the Debtor's demands made in response to the Defendants' Letters. Seery Dec. ¶ 29.

### III.
### LEGAL STANDARD

32.     Pursuant to section 105(a) of the Bankruptcy Code, bankruptcy courts are authorized to "issue any order, process, of judgment that is necessary or appropriate to carry out the provisions of the Code. *In re FiberTower Network Servs. Corp.*, 482 B.R. 169, 182 (Bankr. N.D. Tex. 2012) (quoting 11 U.S.C. § 105); *see also In re OGA Charters, LLC*, 554 B.R. 415, 424 (Bankr. S.D. Tex. 2016) ("The Court may issue injunctions as part of its equitable powers, pursuant to 11 U.S.C. § 105.").   In other words, courts have broad authority to take actions necessary to "protect the integrity of the bankruptcy estate" and to "enjoin actions that 'might impede the reorganization process.'" *FiberTower*, 482 B.R. at 182 (quoting *MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 837 F.2d 89, 93 (2d Cir.1988)).   "A preliminary injunction seeks to 'prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'" *OGA Charters*, 554 B.R. at 424 (quoting *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir.1985)).

33.     Injunctive relief is warranted under section 105(a) where the movant shows: (1) a likelihood that it will prevail on the merits; (2) irreparable injury in the absence of injunctive relief; (3) that the balance of the equities favor the movant; and (4) that the injunction would serve the public interest. *See OGA Charters, 554 B.R. at 424*; *Green v. Wells Fargo Bank, N.A.*,

10

575 Fed.Appx. 322, 323 n. 3 (5th Cir. 2014) (stating the four prong test for a preliminary injunction as likelihood of success, irreparable harm, balance of the equities, and the public interest); *In re Commonwealth Oil Ref. Co., Inc.*, 805 F.2d 1175, 1189 (5th Cir. 1986) (same); *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 219 (5th Cir. 2010) (same).

34. A temporary restraining order should be granted pending a hearing for a preliminary injunction where it appears that "immediate and irreparable injury, loss or damage will result to the movant." *See* Fed. R. Bankr. P. 7065 (incorporating by reference Fed. R. Civ. P. 65); *see also In re Seatco, Inc.*, 259 B.R. 279, 285 (Bankr. N.D. Tex. 2001) (noting that Fed. R. Civ. P. 65 applies in adversary proceedings, "except that a temporary restraining order or preliminary injunction may be issued on application of a debtor, trustee, or debtor-in-possession without compliance with Rule 65(c)[.]"). The issuance of an injunction is within the broad discretion of the court. *See In re Compton Corp.*, 90 B.R. 798, 806 (Bankr.N.D.Tex. 1988) ("It is [] clear that the issuance of an injunction, as a general matter, is within the discretion of the court."); *Star Satellite, Inc. v. City of Biloxi*, 779 F.2d 1074, 1079 (5th Cir. 1986) (noting that the decision to issue or not to issue an injunction is subject to "considerable discretion" in the district court); *Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 511 (2d Cir. 2005) ("The district court has wide discretion in determining whether to grant a preliminary injunction, and this Court reviews the district court's determination only for abuse of discretion.").

35. For the reasons that follow, the Debtor satisfies the standard for injunctive relief.

**APP. 1769**
**Appx. 01816**

## IV.
### ARGUMENT

36.    Injunctive relief is necessary to prevent the imminent and irreparable harm that would be caused to the Debtor if Defendants are permitted to engage in any of the Prohibited Conduct.

37.    The Debtor is likely to succeed on the merits of its underlying claim for tortious interference with contractual relations because Defendants' interference with the Debtor's CLO Management Agreements cannot be disputed (they are in writing), and such interference is causing the Debtor's estate irreparable damages.  Moreover, the relief sought—the protection of its bankruptcy estate during its chapter 11 proceedings—is precisely the type of relief authorized under sections 105 and 362 of the Bankruptcy Code. *See OGA Charters*, 554 B.R. at 432-33 (granting injunctive relief to protect the debtor's assets during chapter 11 proceedings, and noting that a "preliminary injunction, is, in essence, merely an extension of § 362's stay" of the debtor's bankruptcy estate asset).

38.    The equities strongly (if not exclusively) favor the Debtor because the Debtor's ability to operate and comply with its obligations will be jeopardized if Defendants are permitted to engage in the Prohibited Conduct—conduct which Defendants have no legal or equitable right to engage in.  Moreover, the Court has already considered and summarily denied the Restriction Motion, rendering the Defendants' conduct indefensible.

39.    Finally, and for all these same reasons, granting injunctive relief serves the public interest because the Debtor's chances of a successful liquidation will be severely jeopardized if injunctive relief is not granted.

APP. 1770
Appx. 01817

A.    **The Debtor will Suffer Irreparable Harm in the Absence of Injunctive Relief**

40.    The Debtor's estate will be severely injured if Defendants are not enjoined from engaging in the Prohibited Conduct.  Irreparable harm is "a harm 'for which there is no adequate remedy at law.'" *OGA Charters,* 554 B.R. at 424 (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)); *see also Compass Bank v. Veytia*, EP-11-CV-228-PRM, 2011 WL 13234883, at *2 (W.D. Tex. Sept. 21, 2011) ("The general rule in the Fifth Circuit is that 'harm is irreparable where there is no adequate remedy at law, such as monetary damages.'") (quoting *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2010)).

41.    In the bankruptcy context, "irreparable harm" refers to either "irreparable harm to the interest of a creditor or irreparable harm to the bankruptcy estate." *In re Hunt*, 93 B.R. 484, 495 (Bankr. N.D. Tex. 1988) (internal quotations omitted).  The element of irreparable injury to the debtor's estates is described as "irreparable harm to the creditors and estates from disruption of th[e] Court's exclusive authority to effectively manage the[] cases." *Id*.  Moreover, "the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Compass Bank*, 2011 WL 13234883, at *2 (citing *Janvey*, 647 F.3d at 600); (holding that "dissipation of assets ... would impair the court's ability to grant an effective remedy").

42.    Here, in the absence of injunctive relief, both the Debtor's estate and its creditors will face imminent and irreparable harm that cannot be adequately remedied.  If Defendants continue to engage in the Prohibited Conduct, the Debtor's ability to perform under the CLO management agreements will be severely impaired.  Given the Defendants' threats and demands,

13

the harm is thus the not merely "speculative, theoretical, or remote," but imminent and irreparable. *FiberTower Network Services*, 482 B.R. at 187.

**B.**    **The Debtor Demonstrates Likelihood of Success on the Merits**

43.    The Debtor is likely to succeed on the merits of its underlying claim for tortious interference with contract.  To satisfy the likelihood of success element, the movant need only present their "prima facie case but need not show that [they] are certain to win." *Janvey*, 647 F.3d at 595 (internal quotations omitted).  Moreover, the relevant "merits" question in this case is not whether Debtor is likely to prevail on appeal, but rather "whether this [C]ourt is authorized and likely to grant the requested relief." *FiberTower*, 482 B.R. at 183–84 (citing COLLIER ON BANKRUPTCY ¶ 105.03[1][a] (16th ed. 2012) ("In connection with the 'likelihood' argument, many courts have looked to the purpose of the requested injunction ... the likelihood of success argument will track closely the bankruptcy right sought to be vindicated."); *see also Hunt*, 93 B.R. at 493 ("[t]he inquiry [for success on the merits] for a preliminary injunction necessarily focuses on the outcome of a later proceeding, at which time the merits giving rise to the litigation will be decided" rather than success on the merits "so that reorganization efforts mandated by the Bankruptcy Code will not be thwarted by the [enforcement] proceeding.") (internal quotations omitted).

44.    Here, the Debtor demonstrates a likelihood of success on the merits of its underlying claim.  To succeed on a claim for tortious interference with contract, the plaintiff must show: (1) the existence of a valid contract; (2) the defendant willfully and intentionally interfered with the contract; (3) the interference was a proximate cause of the plaintiff's injuries; and (4) the plaintiff suffered actual damages or loss. *See In re Cantu*, 400 B.R. 104, 111 (Bankr. S.D. Tex. 2008).  Proximate causation is shown where the defendant "interfered by actively persuading a party to breach a contract or otherwise causing the contract to be more difficult to

fulfill or of less or no value." *Weatherford Int'l, LLC v. Binstock*, 452 F. Supp. 3d 561, 576 (S.D. Tex. 2020).   Here, there can be no dispute that the CLO Management Agreements constitute valid contracts.   Defendants are willfully and intentionally interfering with the Management Agreements by, among other things, (1) threatening to initiate the process for removing the Debtor as the portfolio manager of the CLOs, (2) refusing to allow the sale of certain CLO assets and securities, in direct contravention of the Board's explicit business judgment and authorization to do so, and (3) otherwise attempting to influence and interfere with the Board's decisions concerning the purchase or sale of any assets on behalf of the CLOs.   Such interferences are hindering the Board's ability to fulfill its duties and contractual rights under the CLO Management Agreements to manage the Debtor's assets and smoothly wind down the Debtor's business.   Defendants' interferences, which include thwarting the Debtor's efforts to effectuate certain CLO trades, have damaged the Debtor's estate.

45.    Moreover, the relief the Debtor seeks is precisely the type contemplated by the Bankruptcy Court's broad powers to grant injunctive relief under Section 105. *See* 11 U.S.C § 105(a) (authorizing the bankruptcy court to "issue any order, process, of judgment that is necessary or appropriate to carry out the provisions of the Code."); *see also* 11 U.S.C. § 362. The Debtor seeks to enjoin Defendants from attempting to control, manage, or otherwise influence the Debtor's management and sale of its CLO assets.   Injunctive relief is, therefore, warranted for the purpose of protecting the Board's ability to manage the Debtor's assets, and in turn, to protect the integrity of the Debtor's bankruptcy estate. *See FiberTower*, 482 B.R. at 182. Furthermore, as noted above, there can be no credible dispute that Defendants engaged in the conduct complained of because it is reflected in contemporaneous, written communications.

**APP. 1773**
**Appx. 01820**

C.      **The Equities Strongly Favor the Debtor**

46.      The balance of the equities also tip decisively in the Debtor's favor.  In the absence of injunctive relief, the Debtor faces imminent and irreparable harm.  If Defendants are not prevented from continuing to interfere with the Debtor's business, management of its assets, and ability to perform and fulfill its duties as portfolio manager to the CLOs under the CLO Management Agreements, the Debtor's ability to successfully liquidate and satisfy its claims will be threatened.  By contrast, there are no equities that favor denying injunctive relief.  Defendants have no legal or equitable right to engage in any of the Prohibited Conduct, all of which is adverse to the Debtor's interests, and all of which undermine this Court's Orders.  Indeed, the Court already told them that less than a month ago when denying the Restriction Motion.

47.      In sum, the potential harm to the Debtor in the absence of injunctive relief far outweighs any harm to Defendants if injunctive relief issues. *See FiberTower*, 482 B.R. at 189 (finding that the balance of equities favored the debtors where "[t]he potential harm to Debtors … far outweighs the possible harm to Defendant" if injunctive relief is granted "because, among other reasons, the Debtors "face the loss of cash collateral[.]").

D.      **Injunctive Relief Serves the Public Interest**

48.      Injunctive relief will further the public interest because it is necessary to protect the Debtor's ability to successfully liquidate its assets and satisfy its claims.  "Courts have often held that injunctions that facilitate reorganizations serve the public interest." *FiberTower*, 482 B.R. at 189 (citing *SAS Overseas Consultants v. Benoit*, No. 99–1663, 2000 WL 140611, at *5 (E.D.La. Feb. 7, 2000); *Lazarus Burman Assocs. v. Nat'l Westminster Bank U.S.A. (In re Lazarus Burman Assocs.)*, 161 B.R. 891, 901 (Bankr.E.D.N.Y.1993)).  In other words, "[i]n bankruptcy, the public policy is to have an orderly administration of the debtor's assets via their bankruptcy estate, such that the debtor may be able to gain a fresh start, by satisfying valid claims against

APP. 1774
Appx. 01821

that estate." *OGA Charters*, 554 B.R. at 426; *see also In re Hunt*, 93 B.R. at 497 ("Chapter 11 expresses the public interest of preserving the going-concern values of businesses, protecting jobs, ensuring the equal treatment of and payment of creditors, and if possible saving something for the equity holders.").

49.     To this end, "[t]he Bankruptcy Court is vested with management duties to further this interest and ensure a meaningful process for all of these competing entities." *Id.* (citing *In re Timbers of Inwood Forest Assocs., LTD.*, 808 F.2d 363, 373 (5th Cir.1987) ("Early and ongoing judicial management of Chapter 11 cases is essential if the Chapter 11 process is to survive and the goals of reorganizability on the one hand, and creditor protection, on the other, are to be achieved."). Thus, in general, preventing the dissipation of potential assets belonging to the debtor that, pursuant to 11 U.S.C. § 541, may be brought into the bankruptcy estate is in the public interest. *See OGA Charters*, 554 B.R. at 426 (finding that the "public interest may be served where the purpose of the preliminary injunction is such that it serves to" uphold a core "pillar of bankruptcy by preserving a debtor's … assets that can be potentially used to satisfy valid claims against the bankruptcy estate.").

50.     Here, if Defendants are not enjoined from engaging in the Prohibited Conduct, the Debtor's liquidation process will be jeopardized at the expense of its creditors. *See FiberTower Network Services*, 482 B.R. at 189 (holding that an injunction would serve the public interest where, the "Debtors' chances of successfully reorganizing will be jeopardized unless injunctive relief is granted," further noting that "if the Debtors were to liquidate, their employees and customers would be adversely affected."). By contrast, the public interest would not be served by allowing Defendants to continue to interfere with the Debtor's CLO Management Agreements, and overall liquidation process. The Debtor's management must be able to fully

execute its duties of managing and selling its assets so that the Debtor can properly wind down, satisfy valid claims against the estate, and maximize the value of the Debtor's assets for the benefit of all stakeholders.

## **CONCLUSION**

WHEREFORE, the Debtor respectfully requests that the Court grant the Motion and enter an Order in the form annexed thereto as Exhibit A, and grant any further relief as the Court deems just and proper.

Dated:  January 6, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
           ikharasch@pszjlaw.com
           jmorris@pszjlaw.com
           gdemo@pszjlaw.com
           hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

18

# EXHIBIT 18



December 22, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

I am writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HCMFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "Funds"). CLO Holdco, Ltd. ("CLO Holdco") whose counsel is copied below, joins in this notice and request.

As you are aware, certain registered investment companies and a business development company managed by either NexPoint or HCMFA own preference shares in many of the CLOs. In the following cases those companies own a majority of such shares[1]:

- Stratford CLO, Ltd. 69.05%
- Grayson CLO, Ltd. 60.47%
- Greenbriar CLO, Ltd. 53.44%

---

[1] These ownership percentages are derived from information provided by the Debtor. If the Debtor contends that the ownership percentages are inaccurate, please inform us of the Debtor's differing calculations.

308494123.3

December 22, 2020

Page 2

In other cases, such companies in combination with CLO Holdco hold all, a super-majority, or a majority of the preference shares in the following CLOs:

- Liberty CLO, Ltd. 70.43%
- Stratford CLO, Ltd. 69.05%*[2]
- Aberdeen Loan Funding, Ltd. 64.58%
- Grayson CLO, Ltd. 61.65%*
- Westchester CLO, Ltd. 58.13%
- Rockwall CDO, Ltd. 55.75%
- Brentwood CLO, Ltd. 55.74%
- Greenbriar CLO, Ltd. 53.44%*

Additionally, such companies own significant minority stakes in the following CLO's:

- Eastland CLO, Ltd. 41.69%
- Red River CLO, Ltd. 33.33%

The ownerships described above represent in many cases the total remaining outstanding interests in such CLOs, because the noteholders have been paid in full. In others, the remaining noteholders represent only a small percentage of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco largely represent the investors in the CLOs identified above.

Contractually, the Debtor is obligated to maximize value for the benefit of the preference shareholders. Accordingly, we respectfully request that no further dispositions of CLO interests occur pending the confirmation hearing. While we recognize the Court denied the Advisor and Funds motion on this subject, the Court did not require liquidations occur immediately, and we reserve all rights to and remedies against the Debtor should the Debtor continue to liquidate CLO interests in contravention of this joint request. Given the Advisor, Funds, and CLO Holdco's requests, it is difficult to understand the Debtor's rationale for continued liquidations, or the benefit to the Debtor from pursuing those sales.

As you know, HCMLP's duties are set forth in the portfolio management agreements of the CLOs, which themselves have been adopted under the Investment Advisers Act of 1940 ("Advisers Act"). As HCMLP readily admits, it is: (i) terminating employees on January 31, 2021, which will result in a loss of the employees that have traditionally serviced those CLOs; (ii) ignoring the requests of the Advisors, Funds, and CLO Holdco, which together account for all or a majority of interests in certain CLOs, and selling assets of those CLOs prior to plan-confirmation; and (iii) adding a replacement manager as subadviser prior to January 31, 2021. The Advisors, Funds, and CLO Holdco assert that those actions run in contravention to HCMLP's duty to maximize value for the holders of preference shares and thus what HCMLP has agreed to under the portfolio management agreement, as well as its duties under the Advisers Act, which ultimately will adversely impact the economic owners noted above.

---

[2] CLO's marked with an asterisk (*) appear in the foregoing list as well.

December 22, 2020
Page 3

      For the forgoing and other reasons, we request that no further CLO transactions occur at least until the issues raised by and addressed in the Debtor's plan are resolved at the confirmation hearing.

Sincerely,

*A. Lee Hogewood, III*

A. Lee Hogewood, III

**APP. 1779**
**Appx. 01826**



December 23, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

I am writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HCMFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "Funds"). CLO Holdco, Ltd. ("CLO Holdco") whose counsel is copied below, joins in this notice and request.

As you are aware, certain registered investment companies and a business development company managed by either NexPoint or HCMFA own preference shares in many of the CLOs. In the following cases those companies own a majority of such shares[1]:

- Stratford CLO, Ltd. 69.05%
- Grayson CLO, Ltd. 60.47%
- Greenbriar CLO, Ltd. 53.44%

---

[1] These ownership percentages are derived from information provided by the Debtor. If the Debtor contends that the ownership percentages are inaccurate, please inform us of the Debtor's differing calculations.

308545876.3

December 23, 2020

Page 2

In other cases, such companies in combination with CLO Holdco hold, a super-majority, or a majority of the preference shares in the following CLOs:

- Liberty CLO, Ltd. 70.43%
- Stratford CLO, Ltd. 69.05%*[2]
- Aberdeen Loan Funding, Ltd. 64.58%
- Grayson CLO, Ltd. 61.65%*
- Westchester CLO, Ltd. 58.13%
- Rockwall CDO, Ltd. 55.75%
- Brentwood CLO, Ltd. 55.74%
- Greenbriar CLO, Ltd. 53.44%*

Additionally, such companies own significant minority stakes in the following CLO's:

- Eastland CLO, Ltd. 41.69%
- Red River CLO, Ltd. 33.33%

The ownerships described above represent in many cases the total remaining outstanding interests in such CLOs, because the noteholders have been paid in full.  In others, the remaining noteholders represent only a small percentage of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco largely represent the investors in the CLOs identified above.

In pleadings filed with the Bankruptcy Court, you asserted that one or more of the entities identified above lacked the authority to seek a replacement of the Debtor as fund manager because of the alleged affiliate status of the beneficial owners of such entities.  We disagree.

Consequently, in addition to our request of yesterday, where appropriate and consistent with the underlying contractual provisions, one or more of the entities above intend to notify the relevant trustees and/or issuers that the process of removing the Debtor as fund manager should be initiated, subject to and with due deference for the applicable provisions of the United States Bankruptcy Code, including the automatic stay of Section 362. The basis for initiating the process for such removal includes, but is not limited to, the fact that HCMLP's duties, as set forth in the portfolio management agreements of the CLOs, are subject to the requirements of the Investment Advisers Act of 1940 ("Advisers Act"). HCMLP appears to be acting contrary to those duties under the agreements and where HCMLP is not fulfilling its duties under the portfolio management agreement it is therefore violating the Advisers Act. Thus, because HCMLP is (i) terminating employees on January 31, 2021, which will result in a loss of the employees that have traditionally serviced, including key investment professionals identified in the transactional documents for those CLOs (generally Mark Okada and Jim Dondero); (ii) ignoring the requests of the Advisors, Funds, and CLO Holdco, which together account for all or a majority of interests in certain CLOs, and selling assets of those CLOs prior to plan confirmation;  (iii)

---

[2] CLO's marked with an asterisk (*) appear in the foregoing list as well.

December 23, 2020
Page 3

adding a replacement manager as subadviser prior to January 31, 2021; and (iv) for other cause, the Advisors, Funds, and CLO Holdco have concluded that they have no choice but to initiate HCMLP's removal as fund manager where such entities are contractually and legally permitted or obligated to do so.

Because the process of removal is being initiated, subject to the applicable provisions of the Bankruptcy Code, we respectfully request that no further CLO transactions occur at least until the issues raised by and addressed in the Debtor's plan are resolved at the confirmation hearing.   To the extent there are CLO transactions prior to the confirmation, we intend to fully explore the business justification for doing so, as we do not believe there is any rational business reason to liquidate securities prior to that time.

Sincerely,

*A. Lee Hogewood, III*

A. Lee Hogewood, III

308545876.3



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES
LIMITED LIABILITY PARTNERSHIP

NEW YORK, NY
LOS ANGELES, CA
SAN FRANCISCO, CA
WILMINGTON, DE

780 THIRD AVENUE
34th FLOOR
NEW YORK
NEW YORK 10017-2024

**TELEPHONE: 212/561 7700**

FACSIMILE: 212/561 7777

**LOS ANGELES**

10100 SANTA MONICA BLVD.

13th FLOOR

LOS ANGELES

CALIFORNIA 90067

**TELEPHONE: 310/277 6910**

FACSIMILE: 310/201 0760

**SAN FRANCISCO**

150 CALIFORNIA STREET

15th FLOOR

SAN FRANCISCO

CALIFORNIA 94111-4500

**TELEPHONE: 415/263 7000**

FACSIMILE: 415/263 7010

**DELAWARE**

919 NORTH MARKET STREET

17th FLOOR

P.O. BOX 8705

WILMINGTON

DELAWARE 19899-8705

**TELEPHONE: 302/652 4100**

FACSIMILE: 302/652 4400

WEB: www.pszjlaw.com

Gregory Demo

December 24, 2020

212-561-7700
gdemo@pszjlaw.com

**<u>Via E-mail</u>**

James A. Wright III
K&L Gates LLP
State Street Financial Center
One Lincoln Street
Boston, Massachusetts 02111

A. Lee Hogewood III
K&L Gates LLP
4350 Lassiter at North Hills Ave.
Suite 300
Raleigh, North Carolina 27609

Re: ***In re Highland Capital Management, L.P.***, Case
No. 19-34054-sgj (Bankr. N.D. Tex)

Dear Counsel:

As you know, we represent Highland Capital Management, L.P. (the "<u>Debtor</u>"), the debtor-in-possession in the above-captioned bankruptcy case.

On December 8, 2020, your firm filed that certain *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [D.I. 1528] (the "<u>Motion</u>")[1] on behalf of Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (collectively, the "<u>Movants</u>"). After hearing the sworn testimony of the Movants' witness and the arguments made on the Movants' behalf, Judge Jernigan found that the Motion was "a very, very frivolous motion" and that your firm "wasted [her]

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Motion.

DOCS_NY:41827.7 36027/002

**APP. 1783**
**Appx. 01830**



PACHULSKI
STANG
ZIEHL
JONES

LAW OFFICES

James A. Wright III
A. Lee Hogewood III
December 24, 2020
Page 2

time."   (Transcript, 64:5-12)   An order was entered denying the Motion on December 18, 2020 [D.I. 1605].

On December 22, we received the letter attached as Exhibit A (the "Letter") from your firm on behalf of the Movants and CLO Holdco, Ltd. (an entity affiliated with James Dondero) re-asserting almost verbatim the frivolous arguments raised in the Motion. Concurrently, we received notice that certain of the Movants' employees would not settle trades on behalf of the CLOs that were authorized by the Debtor acting in its capacity as the CLOs' portfolio manager.   The Movants' employees who interfered with the Debtor's directions justified their conduct by asserting – again almost verbatim – the frivolous arguments raised in the Motion.

The Movants have caused the Debtor to incur substantial costs defending itself against the Motion and preparing to defend against the frivolous suits forecasted in the Letter.   The Debtor demands that the Movants withdraw the letter by 5:00 p.m. CT on Monday, December 28, 2020, and confirm that the Movants and anyone acting on their behalf will take no further steps to interfere with the Debtor's directions as the CLOs' portfolio manager.  If the Movants fail to timely comply with these demands, the Debtor shall seek prompt judicial relief, including seeking sanctions under Federal Rule of Bankruptcy Procedure 9011.

The Debtor reserves all rights it may have, whether in law equity, or contract, including the right to seek reimbursement of any and all fees and expenses incurred in seeking sanctions.

Please feel free to contact me with any questions.

Sincerely,

Gregory Demo

Enclosure
cc:    Jeffrey Pomerantz, Esq.
       Ira Kharasch, Esq.
       John Morris, Esq.
       John J. Kane, Esq.

# Exhibit A



December 22, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Gregory V. Demo
Hayley R. Winograd
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

I am writing to you on behalf of our clients Highland Capital Management Fund Advisors, L.P. ("HMCFA") and NexPoint Advisors, L.P. ("NexPoint", and together with HCMFA, the "Advisors"), and Highland Income Fund, NexPoint Strategic Opportunities Fund, and NexPoint Capital, Inc. (together, the "Funds").  CLO Holdco, Ltd. ("CLO Holdco") whose counsel is copied below, joins in this notice and request.

As you are aware, certain registered investment companies and a business development company managed by either NexPoint or HCMFA own preference shares in many of the CLOs.  In the following cases those companies own a majority of such shares[1]:

- Stratford CLO, Ltd. 69.05%
- Grayson CLO, Ltd. 60.47%
- Greenbriar CLO, Ltd. 53.44%

---

[1] These ownership percentages are derived from information provided by the Debtor.  If the Debtor contends that the ownership percentages are inaccurate, please inform us of the Debtor's differing calculations.

308494123.3

December 22, 2020

Page 2

In other cases, such companies in combination with CLO Holdco hold all, a super-majority, or a majority of the preference shares in the following CLOs:

- Liberty CLO, Ltd. 70.43%
- Stratford CLO, Ltd. 69.05%*[2]
- Aberdeen Loan Funding, Ltd. 64.58%
- Grayson CLO, Ltd. 61.65%*
- Westchester CLO, Ltd. 58.13%
- Rockwall CDO, Ltd. 55.75%
- Brentwood CLO, Ltd. 55.74%
- Greenbriar CLO, Ltd. 53.44%*

Additionally, such companies own significant minority stakes in the following CLO's:

- Eastland CLO, Ltd. 41.69%
- Red River CLO, Ltd. 33.33%

The ownerships described above represent in many cases the total remaining outstanding interests in such CLOs, because the noteholders have been paid in full. In others, the remaining noteholders represent only a small percentage of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco largely represent the investors in the CLOs identified above.

Contractually, the Debtor is obligated to maximize value for the benefit of the preference shareholders. Accordingly, we respectfully request that no further dispositions of CLO interests occur pending the confirmation hearing. While we recognize the Court denied the Advisor and Funds motion on this subject, the Court did not require liquidations occur immediately, and we reserve all rights to and remedies against the Debtor should the Debtor continue to liquidate CLO interests in contravention of this joint request. Given the Advisor, Funds, and CLO Holdco's requests, it is difficult to understand the Debtor's rationale for continued liquidations, or the benefit to the Debtor from pursuing those sales.

As you know, HCMLP's duties are set forth in the portfolio management agreements of the CLOs, which themselves have been adopted under the Investment Advisers Act of 1940 ("Advisers Act"). As HCMLP readily admits, it is: (i) terminating employees on January 31, 2021, which will result in a loss of the employees that have traditionally serviced those CLOs; (ii) ignoring the requests of the Advisors, Funds, and CLO Holdco, which together account for all or a majority of interests in certain CLOs, and selling assets of those CLOs prior to plan-confirmation; and (iii) adding a replacement manager as subadviser prior to January 31, 2021. The Advisors, Funds, and CLO Holdco assert that those actions run in contravention to HCMLP's duty to maximize value for the holders of preference shares and thus what HCMLP has agreed to under the portfolio management agreement, as well as its duties under the Advisers Act, which ultimately will adversely impact the economic owners noted above.

---

[2] CLO's marked with an asterisk (*) appear in the foregoing list as well.

December 22, 2020
Page 3

       For the forgoing and other reasons, we request that no further CLO transactions occur at least until the issues raised by and addressed in the Debtor's plan are resolved at the confirmation hearing.

Sincerely,

*A. Lee Hogewood, III*

A. Lee Hogewood, III

308494123.3

**APP. 1788**
**Appx. 01835**



December 28, 2020

A. Lee Hogewood, III
Lee.hogewood@klgates.com

T: 1-919-743-7306

Via Email

Gregory V. Demo
Pachulski Stang Ziehl & Jones, LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067

Dear Counsel:

Thank you for your letters of December 24, 2020, demanding a reply by the afternoon of the 28th. To cut to the chase, we decline to withdraw the letters of December 22 and 23, 2020.  The letter dated December 22, 2020 was a request from counsel for the Funds and Advisors, as well as Holdco, to you as counsel for the Debtor, asking that the Debtor cease further trading in property you have acknowledged is not an asset of the Debtor's estate.  The request is continuing.  The letter dated December 23, 2020 was notification from counsel for the Funds and Advisors, as well as Holdco, to you as counsel for the Debtors that the process to remove the Debtor as manager of certain funds would be initiated, *subject to* applicable orders in the pending bankruptcy case, provisions of the Bankruptcy Code and, specifically the automatic stay.

Neither letter was presented to, or constituted a request for relief from, any court.  Thus, your threat to seek sanctions under Rule 9011 would not seem to be actionable or otherwise warranted by existing law.  That said, if you believe there is authority for seeking 9011 sanctions against a party or a lawyer based upon either a request or a notification exclusively between counsel, please provide and we will certainly consider it.  I would add that the demand to respond within a single business day, over an intervening holiday, is not in compliance with Rule 9011 in any event. Given that the rule is inapplicable, the procedural infirmity of your demand is immaterial.

Substantively, please consider the following:

308558666.5

December 28, 2020
Page 2

First, there is no confusion on the part of our Firm or our client that our motion was denied. Thus, the Debtor is not prohibited from engaging in sales of CLO assets. Because the Debtor is free to do so, however, does not mean that the Debtor must engage in such transactions. The Debtor has acknowledged that the assets it has sold and may sell are expressly not property of the estate. Thus, any benefits of such transactions to the estate are not evident. On the other hand, the parties holding a majority of the beneficial interests in the assets have requested, and continue to request, that the Debtor refrain from selling those assets for a short time. What is the harm in refraining?

Second, in order to pursue the trades over the last several days, the Debtor has initiated the trades, as we understand it, by giving instructions to a trading desk other than Highland Capital Management Fund Advisors ("HCMFA"). The Debtor has demanded that employees of HCMFA "book" or "settle" the trades. Having not initiated the trades and with the trades executed outside of compliance protocols including HCMLP's order management system, HCMFA employees have been reluctant to do so because, among other reasons, they did not initiate them and cannot be sure such trades were properly pre-cleared. The Debtor presently has adequate staff and resources to process and settle trades without requiring involvement of HCMFA employees. In short, if the Debtor wishes to make trades, it has the ability to make them without HCMFA's assistance. If the Debtor desires or requires the continued support of HCMFA to make such trades, we should discuss an appropriate protocol and payment for such support.

Third, the Debtor's view that the historic affiliate relationship between it, the Funds, the Advisors and Holdco precludes those entities from replacing management is misplaced. While Mr. Dondero was never a control person of Holdco, we acknowledge he was once a control person in connection with many of the relevant entities. There is no doubt that Mr. Dondero no longer has control over the activities of the Debtor as fund manager, and thus the affiliate status that might have precluded the Funds and Advisors from seeking the removal and replacement of the fund manager no longer exists. Indeed, in the transcript of the hearing of December 16, at which the Court denied my clients' motion, Debtor's counsel made crystal clear that the Debtor's board had no interest in speaking with Mr. Dondero and further that Mr. Seery viewed discussions with Mr. Dondero as "a waste of time." Once Mr. Dondero ceased to be a control person or employee of the Debtor, any affiliate status between the Debtor on the one hand and the Advisers and the Funds on the other also terminated. This termination was effective pursuant to both Investment Company Act of 1940 (the "1940 Act") and the Indentures governing the CLOs. Having reviewed these facts with the 1940 Act experts in our Firm, we are confident that affiliate status is no longer an impediment to removal.

In view of the foregoing, I suggest that the parties could benefit from a call this week to discuss our competing communications and perhaps broader questions as well. Please let me know your availability over the next few days and I will work to coordinate a call.

Warm regards,

*A. Lee Hogewood, III*

A. Lee Hogewood, III

308558666.5

**APP. 1790**
**Appx. 01837**

December 28, 2020
Page 3


Cc:  (via email)

Jeffrey N. Pomerantz
Ira D. Kharasch
John A. Morris
Hayley R. Winograd

John J. Kane

George Zornado
R. Charles Miller

**APP. 1791**
**Appx. 01838**

Docket #0003  Date Filed: 2/17/2021

# EXHIBIT 19

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA  90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX  75231
Tel: (972) 755-7100
FAX: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | 21-03010-sgj |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND | § | |
| ADVISORS, L.P., AND NEXPOINT ADVISORS, L.P. | § | |
| | § | |
| Defendants. | § | |

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725).  The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

## TABLE OF CONTENTS

                                                                                    **Page**

I. INTRODUCTION ................................................................................................................... 1

II. STATEMENT OF FACTS.................................................................................................... 4

      A.      The Debtor Has the Contractual Right to Terminate the Shared Services
           Agreements, and It Timely Exercised that Right.................................................... 4

                  The Debtor's Shared Services Agreement with HCMFA.......................... 4

                  The Debtor's Shared Services Agreement with NPA................................ 4

      B.      Prior to Providing the Termination Notices, the Debtor Worked on a
           Transition Plan, but the Advisors Failed to Engage or Pay for Services
           Rendered .............................................................................................................. 5

      C.      The Debtor Offers to Extend the Termination Date to Avoid a Catastrophe
           and Attempts to Engage the Funds' Board to Aid in the Adoption of a
           Transition Plan ..................................................................................................... 7

III. LEGAL STANDARD.......................................................................................................... 8

IV. ARGUMENT....................................................................................................................... 11

      A.      The Funds, their Investors, and the Debtor will Suffer Imminent and
           Irreparable Harm in the Absence of a Mandatory Injunction ............................. 11

      B.      The Debtor Will Demonstrate a Likelihood of Success on the Merits ................ 13

      C.      The Equities Strongly Favor the Debtor .............................................................. 14

      D.      Injunctive Relief Serves the Public Interest......................................................... 15

CONCLUSION........................................................................................................................... 16

DOCS_NY:42317.7 36027/002

APP. 1793
Appx. 01840

## <u>TABLE OF AUTHORITIES</u>

### CASES

*Canal Auth. of State of Fla. v. Callaway*,
 489 F.2d 567 (5th Cir. 1974) ................................................................................................... 10

*Compass Bank v. Veytia*,
 EP-11-CV-228-PRM, 2011 WL 13234883, at *2 (W.D. Tex. Sept. 21, 2011)................. 11, 12

*Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*,
 710 F.3d 579 (5th Cir. 2013) ................................................................................................... 11

*Davis v. Angelina College Board of Trustees*,
 No. 9:17-CV-179, 2018 WL 1755392 (E.D. Tex. 2018)............................................................. 9

*Friends for All Children, Inc. v. Lockheed Aircraft Corp.*,
 746 F.2d 816 n.21 (D.C. Cir. 1984) ........................................................................................ 10

*Green v. Wells Fargo Bank, N.A.*,
 575 Fed. Appx. 322, 323 n. 3 (5th Cir. 2014)............................................................................ 9

*Hernandez v. Sessions*,
 872 F.3d 976 (9th Cir. 2017) .................................................................................................... 10

*In re Commonwealth Oil Ref. Co., Inc.*,
 805 F.2d 1175 (5th Cir. 1986) .................................................................................................... 9

*In re FiberTower Network Servs. Corp.*,
 482 B.R. 169 (Bankr. N.D. Tex. 2012).............................................................................. passim

*In re Hunt*,
 93 B.R. 484 (Bankr. N.D. Tex. 1988)........................................................................... 11, 13, 15

*In re Life Partners Holdings, Inc.*,
 15-40289-RFN-11, 2017 WL 11517832, at *2 (N.D. Tex. Dec. 12, 2017) ............................. 10

*In re OGA Charters, LLC*,
 554 B.R. 415 (Bankr. S.D. Tex. 2016) .................................................................... 8, 9, 11, 15

*Janvey v. Alguire*,
 647 F.3d 585 (5th Cir. 2010) ........................................................................................ 11, 12, 13

*Justin Indus., Inc. v. Choctaw Sec., L.P.*,
 920 F.2d 262 (5th Cir. 1990) ...................................................................................................... 9

*La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*,
 608 F.3d 217 (5th Cir. 2010) ...................................................................................................... 9

ii

*Lake Charles Diesel, Inc. v. Gen. Motors*,
   328 F.3d 192 (5th Cir. 2003) ................................................................................................ 10

*Lazarus Burman Assocs. v. Nat'l Westminster Bank U.S.A. (In re Lazarus Burman Assocs.)*,
   161 B.R. 891 (Bankr. E.D.N.Y.1993)................................................................................... 15

*MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.)*,
   837 F.2d 89 (2d Cir.1988) ...................................................................................................... 9

*Martinez v. Matthews*,
   544 F.2d 1233 (5th Cir. 1976) .............................................................................................. 10

*Miss. Power & Light Co. v. United Gas Pipe Line*,
   760 F.2d 618 (5th Cir.1985) ................................................................................................... 9

*Pipkin v. JVM Operating, L.C.*,
   197 B.R. 47 (E.D. Tex. 1996)......................................................................................... 11, 12

*RoDa Drilling Co. v. Siegal*,
   552 F.3d 1203 (10th Cir. 2009) ............................................................................................ 10

*Rush v. Nat'l Bd. of Med. Examiners*,
   268 F. Supp. 2d 673 (N.D. Tex. 2003) ................................................................................ 10

*SAS Overseas Consultants v. Benoit*,
   No. 99–1663, 2000 WL 140611, at *5 (E.D. La. Feb. 7, 2000) ............................................ 15

*Texas v. Ysleta Del Sur Pueblo*,
   No. EP-17-CV-179-PRM, 2018 WL 1566866, at *9 (W.D. Tex. March 29, 2018) .................. 9

**STATUTES**

11 U.S.C. § 105.................................................................................................................... 8, 14

11 U.S.C. §§ 362, 542, 1107.................................................................................................... 14

**OTHER AUTHORITIES**

COLLIER ON BANKRUPTCY ¶ 105.03[1][a] (16th ed. 2012) ................................................. 13

iii

### DEBTOR'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A MANDATORY INJUNCTION REQUIRING THE ADVISORS TO ADOPT AND IMPLEMENT A PLAN FOR THE TRANSITION OF <u>SERVICES BY FEBRUARY 28, 2021</u>

Highland Capital Management, L.P., the plaintiff in the above-captioned adversary proceeding (the "<u>Adversary Proceeding</u>"), and the debtor and debtor-in-possession (the "<u>Debtor</u>" or "<u>Highland</u>") in the above-captioned chapter 11 case ("<u>Bankruptcy Case</u>"), submits this memorandum of law (the "<u>Memorandum</u>") in support of the *Debtor's Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021* (the "<u>Motion</u>"), pursuant to sections 105(a), 362(a), 542, and 1107 of title 11 of the United States Code (the "<u>Bankruptcy Code</u>") and Rules 7001 and 7065 of the Federal Rules of Bankruptcy Procedure (the "<u>Bankruptcy Rules</u>"), against defendants Highland Capital Management Fund Advisors, L.P. ("<u>HCMFA</u>") and NexPoint Advisors, L.P. ("<u>NPA</u>," and together with HCMFA, the "<u>Advisors</u>").[2] In support of its Motion, the Debtor states as follows:

### I.

### <u>INTRODUCTION</u>

1. The Advisors serve as the investment manager, either directly or indirectly, to a number of investment vehicles (collectively, the "<u>Funds</u>") regulated pursuant to the Securities Act of 1933, the Securities Exchange Act of 1934, and the Investment Company Act of 1940. Certain of the Funds are publicly traded and have thousands of retail investors who are at risk due to the Advisors' deleterious conduct.

---

[2] Capitalized terms not defined herein shall have the meanings ascribed to them in the *Declaration of Mr. James P. Seery, Jr. in Support of the Debtor's Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021* (the "<u>Seery Declaration</u>") being filed contemporaneously herewith.

2.    The Advisors are owned and controlled by James Dondero.  Pursuant to certain Shared Services Agreements, the Debtor has historically provided back office and middle office services that enable the Advisors to manage the Funds.  Although the Debtor is paid for these services, providing the services requires the Debtor to maintain a full staff, the cost of which has historically caused substantial net losses to the Debtor.

3.    Each of the Shared Services Agreements gives either party the unilateral right to terminate the respective Shared Services Agreement by providing prior written notice.  On November 30, 2020, the Debtor provided written notice of its intent to terminate the Shared Services Agreements effective as of January 31, 2021.

4.    The Termination Notices could not have come as a surprise to the Advisors because the Debtor was in bankruptcy and had been pursuing an "asset monetization" plan of reorganization that would leave it with a substantially scaled-down work force since at least August 2020.  With that in mind, the Debtor began developing a plan pursuant to which the shared services would be transitioned to an entity that would be created, owned, and operated by certain of the Debtor's employees who were expected to be terminated as part of the implementation of the Debtor's Plan.

5.    At the same time, the Debtor continued to provide the services required under the Shared Services Agreements – despite the Advisors being in substantial arrears with an outstanding amount due to the Debtor in excess of $3 million – and otherwise continued in its attempts to transition those services in a smooth and orderly manner.  Indeed, in order to give the Advisors more time to engage and complete the transition, the Debtor has extended the

APP. 1797

Appx. 01844

termination date on two occasions, with the current termination deadline being February 19, 2021.[3]

6.        Regrettably, as described in more detail below, and notwithstanding the Debtor's best efforts to aid in the transition of services, the Advisors have willfully failed and refused to adopt and effectuate a transition plan, choosing instead to spend the last months threatening the Debtor and certain of its employees and seeking to deflect responsibility for their own wrongful conduct.

7.        The status quo is untenable.  The Debtor has the contractual right to terminate the Shared Services Agreements, and it has exercised that right.  Pursuant to the Debtor's Plan, there will shortly be a substantial reduction in the Debtor's work force and the Debtor will be unable to provide services to the Advisors.  The Advisors' failure to work with the Debtor or to otherwise develop a transition plan of its own has put thousands of retail investors at risk.

8.        The Debtor is faced with an awful choice.  It can either (a) exercise its rights to terminate the Shared Services Agreements to the detriment of the Funds and their investors and be sucked into more litigation because of Mr. Dondero's conduct, or (b) attempt to provide services to the Advisors under the Shared Services Agreements at substantial losses and risk material delays in the implementation of the Debtor's Plan.

9.        Therefore, the Debtor moves, on an emergency basis, for a mandatory injunction compelling the Advisors to adopt and implement a transition plan by February 28, 2021, when the Debtor is expected to substantially reduce its workforce.  In the absence of such a mandate, the Funds (together with their thousands of investors) and the Debtor will be irreparably harmed.

---

[3] Although the Shared Services Agreement will terminate on February 19, 2021, the Debtor is willing to further extend the termination dates of the Shared Services Agreements through February 28, 2021, solely to prevent catastrophic harm to the retail investors in the Funds, but the Debtor will be unable to extend the termination date further as the Debtor is expected to reduce its workforce at the end of February and will have insufficient personnel thereafter to perform under the Shared Services Agreements.

APP. 1798
Appx. 01845

## II.

## STATEMENT OF FACTS

**A.    The Debtor Has the Contractual Right to Terminate the Shared
Services Agreements, and It Timely Exercised that Right**

10.    The Debtor is party to the Shared Services Agreements pursuant to which it has a contractual right of termination upon written notice.

### *The Debtor's Shared Services Agreement with HCMFA*

11.    The Debtor and HCMFA are parties to that certain *Second Amended and Restated Shared Services Agreement*, effective as of February 8, 2013.  Seery Dec. **Exhibit A**.

12.    Pursuant to section 2.01 of the HCMFA Shared Services Agreement and Annex A affixed thereto, the Debtor provides certain services to HCMFA that enable HCMFA to manage the Funds.

13.    The HCMFA Shared Services Agreement was for a one-year term, subject to automatic one-year renewals "unless sooner terminated under Section 7.02."

14.    Section 7.02 of the Shared Services Agreement provides that "[e]ither Party may terminate this Agreement, with or without cause, upon at least 60 days advance written notice at any time prior to the expiration of the Term."

15.    On November 30, 2020, the Debtor provided written notice to HCMFA that it intended to terminate the HCMFA Shared Services Agreement as of January 31, 2021.  Seery Dec. **Exhibit B**.

### *The Debtor's Shared Services Agreement with NPA*

16.    The Debtor and NPA are parties to that certain *Amended and Restated Shared Services Agreement*, effective as of January 1, 2018.  Seery Dec. **Exhibit C**.

4

17.    Pursuant to Article II of the NPA Shared Services Agreement, the Debtor provides certain services to NPA that enable NPA to manage the Funds.

18.    The NPA Shared Services Agreement did not have a fixed term.  Instead, section 7.01 provided that "[e]ither Party may terminate this Agreement at any time upon at least thirty (30) days' written notice to the other."

19.    On November 30, 2020, the Debtor provided written notice to NPA that it intended to terminate the NPA Shared Services Agreement as of January 31, 2021.  Seery Dec. **Exhibit D.**

**B.    Prior to Providing the Termination Notices, the Debtor Worked on a Transition Plan, but the Advisors Failed to Engage or Pay for Services Rendered**

20.    On August 12, 2020, after considering its strategic options, the Debtor filed an "asset monetization" plan of reorganization pursuant to which, in general, the Debtor proposed to reduce staff, reject certain contracts, and monetize its assets consistent with maximizing value for all stakeholders.  [Docket No. 944].

21.    Thus, at least as of that time, all stakeholders – including the Advisors – were on notice that the Debtor intended to continue operations on a scaled-down basis with the goal being an orderly monetization of assets.[4]

22.    Consistent with that intent, the Debtor began formulating a plan for the transition of services provided under the Shared Services Agreements.

---

[4] Furthermore, on November 13, 2020, the Debtor filed its *Third Amended Plan of Reorganization of Highland Capital Management* [Docket No. 1383] (the "Third Amended Plan").  In its Third Amended Plan (and subsequent plans), the Debtor explicitly stated that it did not intend to continue providing services under the Shared Service Agreements precisely because they are money losers.  Third Amended Plan, Art. IV.A ("[I]t is currently anticipated that neither the Reorganized Debtor nor the Claimant Trust will assume or assume and assign the contracts between the Debtor and certain Related Entities pursuant to which the Debtor provides shared services and sub-advisory services to those Related Entities.  The Debtor believes that the continued provision of the services under such contracts will not be cost effective.").

DOCS_NY:42317.7 36027/002

23.     Specifically, beginning in the summer of 2020, the Debtor attempted to negotiate for the orderly transition of services with James Dondero, the individual who owns and controls each of the Advisors.

24.     The Debtor's proposal contemplated the transition of services to the Advisors from the Debtor to an entity that would be created, owned, and operated by certain of the Debtor's employees ("NewCo") who were expected to be terminated as part of the Debtor's asset monetization plan.

25.     With Mr. Dondero in control, the Advisors never provided any constructive response to the Debtor's proposal.  Indeed, Mr. Dondero specifically informed the Debtor that he intended to make the transition difficult for the apparent purpose of creating leverage in plan negotiations.

26.     In addition to failing to engage in any process designed to provide for the orderly transition of services, the Advisors also failed to pay the Debtor for the services provided under the Shared Services Agreement.

27.     Since the Petition Date, each of the Advisors has failed to meet certain of its payment obligations under the Shared Services Agreements.  For the period between the Petition Date and January 31, 2021, (a) HCMFA owes the Debtor $2,121,276 for services rendered under the HCMFA Shared Services Agreement, and (b) NPA owes the Debtor $932,977 for services rendered under the NPA Shared Services Agreement.  These amounts exclude amounts owed for services provided prior to the Petition Date.

28.     The Debtor loses significant money providing services under the Shared Services Agreements, which is why it publicly stated its intention in the Third Amended Plan (and each subsequent amendment and modification to the Plan) not to assume or assume and assign them.

DOCS_NY:42317.7 36027/002

While that is bad enough, the Advisors failure to pay for services previously rendered is a blatant breach of the Agreements.

**C.      The Debtor Offers to Extend the Termination Date to Avoid a Catastrophe and Attempts to Engage the Funds' Board to Aid in the Adoption of a Transition Plan**

29.      Instead of engaging in the process, the Advisors and certain of their employees were more focused on threatening the Debtor and its employees, all in a transparent effort to deflect responsibility for their own obstinate and wrongful conduct.

30.      With the January 31, 2021, termination date fast approaching, and with the Advisors continuing to fail to work cooperatively on a transition plan, the Debtor took the initiative and offered to extend the termination date by two weeks (i) in order to avoid catastrophic consequences for the Funds and their investors that would result from an abrupt termination, and (ii) in the hope that the Advisors would use the extended time to finally and constructively engage.

31.      Thus, on January 29, 2021, the parties executed an agreement extending the termination date to February 14, 2021, in exchange for the Advisors paying in advance for services to be rendered by the Debtor during that two-week period.  Seery Dec. **Exhibit E**.

32.      During the following two weeks, the Debtor and its employees and professionals made every effort to bring the issue of the transition of services to a resolution.  Among other things, the Debtor continued to refine the proposal for the transition of services to NewCo.

33.      The Debtor also attempted to get the attention of the Funds' Boards because it was concerned that the Boards were either uninformed, not engaged, or were under the influence and control of Mr. Dondero.

34.      Among other communications, James P. Seery, Jr., the Debtor's Chief Executive Officer, sent formal written communications to the Board of Directors for the Funds on January

DOCS_NY:42317.7 36027/002

**APP. 1802**
**Appx. 01849**

27, 2021, February 8, 2021, and February 12, 2021.[5]  Seery Dec. **Exhibits F, G and H,** respectively.

35.    Despite the efforts of certain of the Advisors' professionals, and despite the Debtor's willingness to make all reasonable concessions on a transition agreement, Mr. Dondero and the Advisors have refused to "say yes" or to otherwise take steps to formulate a transition plan for the protection of the Funds and their investors.

36.    Faced with an untenable situation, the Debtor again agreed to extend the termination date, this time to February 19, 2021.  *See* Seery Dec. **Exhibit I**.

37.    Finally, on February 16, 2021, the Debtor made its last attempt to reach an agreement before being forced to take alternative actions to protect itself, the Funds, and investors, by sending the Advisors a proposed term sheet that provided a reasonable transition plan. Seery Dec. **Exhibit J**.  The Advisors refused to agree to the terms thereunder.

38.    Given that the Court will soon enter an order confirming the Debtor's Plan, and the reduction in the Debtor's work force will follow soon thereafter, the Debtor will be unable to provide services to the Advisors much longer.  The Advisors' failure to agree on or formulate a transition plan is creating catastrophic risk for the Funds and their investors.  The Advisors' failure to plan for a transition is also creating material risk to the Debtor.

### III.

### LEGAL STANDARD

39.    Pursuant to section 105(a) of the Bankruptcy Code, bankruptcy courts are authorized to "issue any order, process, of judgment that is necessary or appropriate to carry out the provisions of the Code. *In re FiberTower Network Servs. Corp.*, 482 B.R. 169, 182 (Bankr.

---

[5] Mr. Seery's formal correspondence was in addition to his informal correspondence and communications with the Funds' Board and the substantial communications between counsel to the Debtor, the Advisors, and the Funds.

DOCS_NY:42317.7 36027/002

**APP. 1803**
**Appx. 01850**

N.D. Tex. 2012) (quoting 11 U.S.C. § 105); *see also In re OGA Charters, LLC*, 554 B.R. 415, 424 (Bankr. S.D. Tex. 2016) ("The Court may issue injunctions as part of its equitable powers, pursuant to 11 U.S.C. § 105."). In other words, courts have broad authority to take actions necessary to "protect the integrity of the bankruptcy estate" and to "enjoin actions that 'might impede the reorganization process.'" *FiberTower*, 482 B.R. at 182 (quoting *MacArthur Co. v. Johns–Manville Corp. (In re Johns–Manville Corp.)*, 837 F.2d 89, 93 (2d Cir.1988)). "A preliminary injunction seeks to 'prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.'" *OGA Charters*, 554 B.R. at 424 (quoting *Miss. Power & Light Co. v. United Gas Pipe Line*, 760 F.2d 618, 621 (5th Cir.1985)).

40.    Injunctive relief is warranted under section 105(a) where the movant shows: (1) a likelihood that it will prevail on the merits; (2) irreparable injury in the absence of injunctive relief; (3) that the balance of the equities favor the movant; and (4) that the injunction would serve the public interest. *See OGA Charters*, 554 B.R. at 424; *Green v. Wells Fargo Bank, N.A.*, 575 Fed. Appx. 322, 323 n. 3 (5th Cir. 2014) (stating the four-prong test for a preliminary injunction as likelihood of success, irreparable harm, balance of the equities, and the public interest); *In re Commonwealth Oil Ref. Co., Inc.*, 805 F.2d 1175, 1189 (5th Cir. 1986) (same); *La Union Del Pueblo Entero v. Fed. Emergency Mgmt. Agency*, 608 F.3d 217, 219 (5th Cir. 2010) (same).

41.    A mandatory preliminary injunction—that is, a preliminary injunction that orders a party to "take action" or perform, as opposed to a prohibitory preliminary injunction—seeks to alter the *status quo* prior to litigation rather than maintain it. *See Davis v. Angelina College Board of Trustees*, No. 9:17-CV-179, 2018 WL 1755392 (E.D. Tex. 2018); *Texas v. Ysleta Del Sur Pueblo*, No. EP-17-CV-179-PRM, 2018 WL 1566866, at *9 (W.D. Tex. March 29, 2018).

42.    The factors for assessing a mandatory or prohibitory injunction are the same, although a plaintiff seeking a mandatory injunction must show a "clear entitlement" to the relief sought. *Texas,* 2018 WL 1566866, at *9 (citing *Justin Indus., Inc. v. Choctaw Sec., L.P.*, 920 F.2d 262, 268 (5th Cir. 1990) ("[B]ecause [the plaintiff] is seeking a mandatory injunction, it bears the burden of showing a clear entitlement to the relief under the facts and the law."); *see also Martinez v. Matthews*, 544 F.2d 1233, 1243 (5th Cir. 1976) (noting that in order for mandatory injunctions to issue, plaintiff must show that the "facts and the law clearly favors" them).

43.    Although there is a heavier burden on the plaintiff to establish that a mandatory injunction is warranted, the Fifth Circuit has cautioned that the focus must be on the prevention of injury rather than preserving the "status quo":

> It must not be thought, however, that there is any particular magic in the phrase 'status quo.' *The purpose of a preliminary injunction is always to prevent irreparable injury so as to preserve the court's ability to render a meaningful decision on the merits.* It often happens that this purpose is furthered by preservation of the status quo, but not always. If the currently existing status quo itself is causing one of the parties irreparable injury, it is necessary to alter the situation so as to prevent the injury, either by returning to the last uncontested status quo between the parties, by the issuance of a mandatory injunction, or by allowing the parties to take proposed action that the court finds will minimize the irreparable injury. *The focus always must be on prevention of injury by a proper order, not merely on preservation of the status quo.*

*Canal Auth. of State of Fla. v. Callaway*, 489 F.2d 567, 576 (5th Cir. 1974) (emphases added); *see also Rush v. Nat'l Bd. of Med. Examiners*, 268 F. Supp. 2d 673, 678 (N.D. Tex. 2003) ("An indispensable prerequisite to issuance of a preliminary injunction is prevention of irreparable injury."); *In re Life Partners Holdings, Inc.*, 15-40289-RFN-11, 2017 WL 11517832, at *2 (N.D. Tex. Dec. 12, 2017) (noting that "mandatory preliminary injunctions 'that goes beyond the status

DOCS_NY:42317.7 36027/002

quo' … may be appropriate to 'keep[] in effect a contractual relationship' to maintain the status quo." (quoting *Lake Charles Diesel, Inc. v. Gen. Motors*, 328 F.3d 192, 196 (5th Cir. 2003)).[6]

44.    For the reasons set forth above and below, the facts and the law show that the Debtor has a "clear entitlement" to the mandatory injunctive relief requested.

## IV.

## ARGUMENT

45.    A mandatory injunction requiring the Advisors to adopt and implement a plan for the transition of back office and middle office services from the Debtor is necessary to prevent imminent and irreparable harm to the Funds, their investors, and the Debtor that would be caused by the Advisors' continued failure to adopt and implement such a plan.

**A.    The Funds, their Investors, and the Debtor will Suffer Imminent and Irreparable Harm in the Absence of a Mandatory Injunction**

46.    The Funds, their investors, and the Debtor's estate will be severely injured if Defendants are not mandated to adopt and implement a transition plan.  Irreparable harm is "a harm 'for which there is no adequate remedy at law.'" *OGA Charters,* 554 B.R. at 424 (quoting *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 585 (5th Cir. 2013)); *see also Compass Bank v. Veytia*, EP-11-CV-228-PRM, 2011 WL 13234883, at *2 (W.D. Tex. Sept. 21, 2011) ("The general rule in the Fifth Circuit is that 'harm is irreparable where there is no adequate remedy at law, such as monetary damages.'") (quoting *Janvey v. Alguire*, 647 F.3d 585, 600 (5th Cir. 2010)).

---

[6] *See also RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1208 (10th Cir. 2009) ("While we recognize that mandatory preliminary injunctions are traditionally disfavored … when the moving party demonstrates that the 'exigencies of the case require extraordinary interim relief,' the district court may grant the motion upon satisfaction of the heightened burden.") (internal citations omitted); *Hernandez v. Sessions*, 872 F.3d 976, 999 (9th Cir. 2017) ("Mandatory injunctions are most likely to be appropriate when 'the status quo ... is exactly what will inflict the irreparable injury upon complainant.'" (citing *Friends for All Children, Inc. v. Lockheed Aircraft Corp.*, 746 F.2d 816, 830 n.21 (D.C. Cir. 1984)).

DOCS_NY:42317.7 36027/002

47. In the bankruptcy context, "irreparable harm" refers to either "irreparable harm to the interest of a creditor or irreparable harm to the bankruptcy estate." *In re Hunt*, 93 B.R. 484, 495 (Bankr. N.D. Tex. 1988) (internal quotations omitted). The element of irreparable injury to the debtor's estate is described as "irreparable harm to the creditors and estates from disruption of th[e] Court's exclusive authority to effectively manage the[] cases." *Id*.; *see also Pipkin v. JVM Operating, L.C.*, 197 B.R. 47, 51 (E.D. Tex. 1996) (noting that "[a]n injury is irreparable if it cannot be undone through monetary remedies[,]" and where, for instance, "there is injury to a party's operations, reputation, and goodwill.") (internal quotations omitted). Moreover, "the mere fact that economic damages may be available does not always mean that a remedy at law is 'adequate.'" *Compass Bank*, 2011 WL 13234883, at *2 (citing *Janvey*, 647 F.3d at 600); (holding that "dissipation of assets ... would impair the court's ability to grant an effective remedy").

48. Here, the Advisors' failure to adopt and implement a transition plan is untenable because – as the Advisors have known for months – the Debtor will soon be unable to provide services under the Shared Services Agreements, and such willful misconduct and gross negligence will cause irreparable harm to the Funds and their investors and to the Debtor's operations, goodwill, estate, and ability to implement the Plan. *See Pipkin*, 197 B.R. at 56 (affirming mandatory injunction where trustee showed that absent such relief, he would "be unable to fulfill his fiduciary duties to expeditiously liquidate the estate" and where such relief was proper "after confirmation of a plan to protect the debtor and the administration of the bankruptcy estate") (internal quotations omitted).

49. In the absence of a mandatory injunction, the Debtor will be forced to either (a) exercise its rights to terminate the Shared Services Agreements to the detriment of the Funds and

DOCS_NY:42317.7 36027/002

APP. 1807
Appx. 01854

their investors and be sucked into more litigation caused by Mr. Dondero's conduct, or (b) attempt to provide services to the Advisors under the Shared Services Agreements at substantial losses and risk material delays in the implementation of the Debtor's Plan.

50.    Either way, the ability of the Funds to function – and thus the ability of the Funds' retail and other investors to buy and sell interests in the Funds – will be at risk of substantial disruption, thereby creating the potential for catastrophic, unforeseeable, and incalculable consequences for investors, the Funds, the Debtor – and especially the Advisors.  Any such disruption will be at best a distraction for the Debtor and, at worst, cause the Debtor to incur substantial costs and litigation risk.  Regardless, there will be a significant impact on the Debtor's ability to implement its Plan and manage its estate.

**B.      The Debtor Will Demonstrate a Likelihood of Success on the Merits**

51.    To satisfy the likelihood of success element, the movant need only present their "prima facie case but need not show that [they] are certain to win." *Janvey*, 647 F.3d at 595 (internal quotations omitted).  Moreover, the relevant "merits" question in this case is not whether the Debtor is likely to prevail on appeal, but rather "whether this [C]ourt is authorized and likely to grant the requested relief." *FiberTower*, 482 B.R. at 183–84 (citing COLLIER ON BANKRUPTCY ¶ 105.03[1][a] (16th ed. 2012) ("In connection with the 'likelihood' argument, many courts have looked to the purpose of the requested injunction ... the likelihood of success argument will track closely the bankruptcy right sought to be vindicated."); *see also Hunt*, 93 B.R. at 493 ("[t]he inquiry [for success on the merits] for a preliminary injunction necessarily focuses on the outcome of a later proceeding, at which time the merits giving rise to the litigation will be decided" rather than success on the merits "so that reorganization efforts mandated by the Bankruptcy Code will not be thwarted by the [enforcement] proceeding.") (internal quotations omitted).

DOCS_NY:42317.7 36027/002

52.    Here, Debtor will succeed on the merits of its claims for (a) a declaratory judgment that it has the contractual right to terminate each of the Shared Services Agreements, that it properly exercised those rights, and that, effective February 19, 2021, it has no further legal or equitable obligation to provide any services to the Advisors; (b) damages for breach of contract; and (c) for a mandatory injunction requiring the Advisors to adopt and implement a plan for the orderly transition of shared services by February 28, 2021.

53.    The terms of the Shared Services Agreements are unambiguous and give the Debtor the unfettered right to terminate services upon prior written notice.  There will be no dispute that the Debtor timely and properly provided such written notice in conformity with the provisions of the Shared Services Agreements.

54.    Moreover, the relief the Debtor seeks is precisely the type contemplated by the Bankruptcy Court's broad powers to grant injunctive relief under Section 105. *See* 11 U.S.C § 105 (a) (authorizing the bankruptcy court to "issue any order, process, of judgment that is necessary or appropriate to carry out the provisions of the Code."); *see also* 11 U.S.C. §§ 362, 542, 1107.  The Debtor seeks to require the Advisors to fulfill their duty to the Funds by ensuring that they have services necessary to manage the Funds.  The injunction will also allow the Debtor to focus on its own business, including the implementation of its Plan, and avoid the substantial costs and disruption inherent in being forced to continue its relationship with the Advisors and Funds.  Injunctive relief is, therefore, warranted for the purpose of protecting the integrity of the markets in which the Funds' shares are traded, the Funds' investors, and the Debtor's reorganization process. *See FiberTower*, 482 B.R. at 182.

**C.    The Equities Strongly Favor the Debtor**

55.    The equities strongly favor the Debtor.  The evidence will show that: (a) the Advisors were on notice since at least August 2020 that the Debtor was unlikely to provide

DOCS_NY:42317.7 36027/002

**APP. 1809**
**Appx. 01856**

services under the Shared Services Agreement for an extended period of time; (b) the Debtor has been pursuing a transition plan since the summer of 2020; (c) the Third Amended Plan filed on November 13, 2020 (and each subsequent version of the Plan), expressly stated that the Debtor would not assume or assume and assign the Shared Services Agreements; (d) the Debtor timely provided notice of termination of the Shared Services Agreements on November 30, 2020; (e) upon information and belief, the Advisors (and not the Debtor) owe contractual and other duties to the Funds, the entities most at risk; and (f) the Debtor has acted in good faith by, among other things, twice extending the anticipated termination date.

56.     Based on these facts, the balance of the equities strongly favors the Debtor.

**D.     <u>Injunctive Relief Serves the Public Interest</u>**

57.     Injunctive relief will further the public interest because it is necessary to protect public markets and thousands of retail investors who currently have no knowledge of the risks they face, as well as the Debtor in its efforts to timely implement the Plan that was recently approved by the Court.  "Courts have often held that injunctions that facilitate reorganizations serve the public interest." *FiberTower*, 482 B.R. at 189 (citing *SAS Overseas Consultants v. Benoit*, No. 99–1663, 2000 WL 140611, at *5 (E.D. La. Feb. 7, 2000); *Lazarus Burman Assocs. v. Nat'l Westminster Bank U.S.A. (In re Lazarus Burman Assocs.)*, 161 B.R. 891, 901 (Bankr. E.D.N.Y.1993)).   In other words, "[i]n bankruptcy, the public policy is to have an orderly administration of the debtor's assets via their bankruptcy estate, such that the debtor may be able to gain a fresh start, by satisfying valid claims against that estate." *OGA Charters*, 554 B.R. at 426; *see also In re Hunt*, 93 B.R. at 497 ("Chapter 11 expresses the public interest of preserving the going-concern values of businesses, protecting jobs, ensuring the equal treatment of and payment of creditors, and if possible saving something for the equity holders.").

DOCS_NY:42317.7 36027/002

**APP. 1810**

**Appx. 01857**

58.     Indeed, the public interest virtually requires that the Advisors be directed to adopt and implement a transition plan.  In the absence of a mandatory injunction, thousands of retail investors are likely to suffer catastrophic losses, and there will likely be substantial market disruptions with unforeseeable consequences.  Each of these events will likely cause the Debtor substantial harm and interfere with the Debtor's ability to implement its Plan.

## <u>CONCLUSION</u>

WHEREFORE, the Debtor respectfully requests that the Court (i) grant its Motion and enter an Order in the form annexed hereto as Exhibit A, and (ii) grant the Debtor any further relief as the Court deems just and proper.

DOCS_NY:42317.7 36027/002

**APP. 1811**
**Appx. 01858**

Dated:  February 17, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No. 143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 266326)
Gregory V. Demo (NY Bar No. 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
Email: jpomerantz@pszjlaw.com
         ikharasch@pszjlaw.com
         jmorris@pszjlaw.com
         gdemo@pszjlaw.com
         hwinograd@pszjlaw.com

-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*

Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

17

**APP. 1812**
**Appx. 01859**

# EXHIBIT 20



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.

**Signed February 24, 2021**

_____

**United States Bankruptcy Judge**

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054-sgj11 |
| | § | |
| Debtor. | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | § | |
| | § | |
| Plaintiff, | § | Adversary Proceeding No. |
| | § | |
| vs. | § | Case No. 21-03010-sgj11 |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT FUND ADVISORS, L.P., AND NEXPOINT ADVISORS, L.P., | § | |
| | § | |
| Defendants. | § | |

## <u>ORDER</u>

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

This matter having come before the Court on the *Emergency Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021* [Docket No. 2] (the "Motion")[2] filed by Highland Capital Management, L.P., the debtor and debtor-in-possession in the above-captioned chapter 11 case (the "Bankruptcy Case"), and the plaintiff in the above-captioned adversary proceeding, and this Court having considered (i) the Motion; (ii) *Plaintiff Highland Capital Management, L.P.'s Verified Original Complaint for Damages and for Declaratory and Injunctive Relief* [Docket No. 1] (the "Complaint"); (iii) the arguments and law cited in the Debtor's *Memorandum of Law in Support of its Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021* [Docket No. 3] (the "Memorandum of Law," and together with the Motion and Complaint, the "Debtor's Papers"); (iv) the *Objection to Mandatory Injunction and Brief in Support Thereof* [Docket No. 20] (the "Objection"), filed on February 22, 2021, by the Advisors; (v) the testimonial and documentary evidence admitted into evidence during the hearing held on February 23, 2021 (the "Hearing"), including the credibility of witnesses Mr. James P. Seery, Jr., Mr. James Dondero, and Mr. Dustin Norris; and (vi) the arguments made during the Hearing; and this Court having jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and this Court having found that this is a core proceeding[3] pursuant to 28 U.S.C. § 157(b)(2);

---

[2] Capitalized terms used but not herein defined shall have the meanings ascribed to such terms in the Motion.

[3] **The court orally stated at the hearing that, at a minimum, there is bankruptcy subject matter jurisdiction in this action, since: (a) there is a conceivable effect on the bankruptcy estate being administered (i.e., the pre-confirmation test for bankruptcy subject matter jurisdiction), since there is a risk of potential liability or regulatory actions being pursued against the estate, if the Debtor does not obtain relief in this action, and, also (b) the outcome of this action could bear on the interpretation, implementation, and execution of a confirmed plan (i.e., the post-confirmation test for bankruptcy subject matter jurisdiction). The court also concluded, upon further analysis, that the action should be deemed to present a "core" matter, with regard to which the bankruptcy court may issue final orders and exercise Constitutional authority, since, among other things, the relief sought is, in essence, supplemental to the confirmation order and in furtherance of implementation of the confirmed plan.** *See* **11 U.S.C. § 1142(b). In all events, should this order ever be subject to an appeal, and the District Court concludes that "noncore" matters are involved, the bankruptcy**

APP. 1814
Appx. 01861

and this Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and this Court having found that the Debtor's notice of the Motion and opportunity for a hearing on the Motion were appropriate and that no other notice need be provided; and upon all of the proceedings had before this Court, the legal and factual bases set forth in the Debtor's Papers, and the evidence submitted at the Hearing; and after due deliberation and sufficient cause appearing therefor, and for the reasons set forth in the record on this Motion, the Court makes the following findings of fact:

1.       Each of the Advisors is controlled by Mr. Dondero.

2.       The Debtor had the contractual right to terminate the HCMFA Shared Services Agreement on 60 days' written notice.

3.       The Debtor properly exercised its right to terminate the HCMFA Shared Services Agreement by providing at least 60 days' written notice.

4.       The HCMFA Shared Services Agreement and the Debtor's obligation to provide services to HCMFA under the HCMFA Shared Services Agreement terminated on February 19, 2021.

5.       The Debtor had the contractual right to terminate the NPA Shared Services Agreement on 30 days' written notice.

6.       The Debtor properly exercised its right to terminate the NPA Shared Services Agreement by providing at least 30 days' written notice.

7.       The NPA Shared Services Agreement and the Debtor's obligation to provide services to NPA under the NPA Shared Services Agreement terminated on February 19, 2021.

---

court requests that the District Court regard this ruling as a *proposed* set of findings, conclusions and order from the bankruptcy court and that the District Court adopt this ruling, pursuant to 28 U.S.C. § 157(c)(1).

DOCS_NY:42406.7 36027/002

**APP. 1815**
**Appx. 01862**

8.      Except as expressly set forth herein, effective as of February 19, 2021, the Debtor has no obligation to provide any services, software, or assistance to any of HCMFA, NPA, the Funds, or any servicer or personnel retained by any of HMCFA, NPA, or the Funds.

9.      As of February 20, 2021, each of HCMFA and NPA had adopted an operating plan to obtain or provide all services previously provided by the Debtor that are necessary to fully perform under their agreements with the Funds without the aid or assistance of the Debtor.

10.     Except as expressly set forth herein, as of February 20, 2021, neither HCMFA nor NPA needs any services, including contractual arrangements and software, previously provided by the Debtor or its employees under the Shared Services Agreements that are necessary to fully perform under their agreements with the Funds.

11.     On or prior to February 28, 2021, the Advisors will promptly provide the Debtor with written notice of the documents, data, and books and records (collectively, the "Data") that the Advisors' believe constitute their property.  If the Debtor in reasonable good faith determines such Data is the Advisors' property, the Debtor will take reasonable efforts to provide the Advisors with a copy of such Data.  **Subject to paragraph 13 below, on and prior to February 28, 2021, each party will bear its own costs and expenses associated with the copying of the Data**.  Under no circumstances will the Debtor be required to erase or otherwise remove any Data from the Debtor's systems.  For the avoidance of doubt, the Debtor will have no obligation to provide any Data that constitutes the Debtor's privileged, confidential, or proprietary information.

12.     Subject to paragraph 14, the Debtor will have no obligation to provide any Data to the Advisors after February 28, 2021.  If the Debtor in reasonable good faith cannot satisfy any request for Data made pursuant to paragraph 11 by the close of business on February 28, 2021, the Debtor will have no further obligation to provide such Data.

DOCS_NY:42406.7 36027/002

13.    The Debtor will not be required to incur any *material* time, cost, or expense in furtherance of its obligations set forth in paragraph 11—**the Advisors' witness having represented to the court that the copying and/or transfer of the Data would be fairly easy to achieve and that the Advisors stood by ready to receive the Data**.  To the extent any requests require material time, cost, or expense, the Debtor may petition this Court for the payment of any fees, costs, or expenses incurred in connection with the fulfillment of its obligations under paragraph 11 (including the cost of such petition) and shall have no obligation to provide such Data until the Court has ruled on such petition.

14.    If the Debtor cannot in reasonable good faith provide requested Data by February 28, 2021, or if the Advisors request any Data after February 28, 2021, and in each case if the parties cannot agree on the propriety of such request after conferring in good faith, the Advisors may petition this Court for access to such Data.  Regardless, the Advisors will bear any and all costs associated with any requests for Data and the delivery of such Data under this paragraph.

15.    Notwithstanding anything herein to the contrary, the delivery of Data to the Advisors will not constitute a waiver of any privileges, including attorney-client privilege, or any confidentiality requirements.

16.    This Court retains exclusive jurisdiction with respect to all matters arising from or related to the implementation, interpretation, and enforcement of this Order.

17.    Based on the foregoing, the Motion is dismissed as moot.

### End of Order ###

DOCS_NY:42406.7 36027/002

# EXHIBIT 21

```
                IN THE UNITED STATES BANKRUPTCY COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
                           DALLAS DIVISION

                                    )   Case No. 19-34054-sgj-11
In Re:                              )   Chapter 11
                                    )
HIGHLAND CAPITAL                    )   Dallas, Texas
MANAGEMENT, L.P.,                   )   Tuesday, February 23, 2021
                                    )   9:00 a.m. Docket
          Debtor.                   )
_____   )
                                    )
HIGHLAND CAPITAL                    )   Adversary Proceeding 20-3190-sgj
MANAGEMENT, L.P.,                   )
                                    )
          Plaintiff,                )   PLAINTIFF'S MOTION FOR ORDER
                                    )   REQUIRING JAMES DONDERO TO
v.                                  )   SHOW CAUSE WHY HE SHOULD NOT
                                    )   BE HELD IN CIVIL CONTEMPT FOR
JAMES D. DONDERO,                   )   VIOLATING THE TRO [48]
                                    )
          Defendant.                )
_____   )
                                    )
HIGHLAND CAPITAL                    )   Adversary Proceeding 21-3010-sgj
MANAGEMENT, L.P.,                   )
                                    )
          Plaintiff,                )   DEBTOR'S EMERGENCY MOTION FOR
                                    )   MANDATORY INJUNCTION REQUIRING
v.                                  )   THE ADVISORS TO ADOPT AND
                                    )   IMPLEMENT A PLAN FOR THE
HIGHLAND CAPITAL MANAGEMENT )           TRANSITION OF SERVICES BY
FUND ADVISORS, L.P.,                )   FEBRUARY 28, 2021 [2]
et al.,                             )
                                    )
          Defendants.               )
_____   )

                    TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
               UNITED STATES BANKRUPTCY JUDGE.

WEBEX/TELEPHONIC APPEARANCES:

For the Debtor/Plaintiff:   Jeffrey N. Pomerantz
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            10100 Santa Monica Blvd.,
                             13th Floor
                            Los Angeles, CA  90067-4003
                            (310) 277-6910
```

2

```
 1
       APPEARANCES, cont'd.:
 2
       For the Debtor/Plaintiff:    John A. Morris
 3                                  PACHULSKI STANG ZIEHL & JONES, LLP
                                    780 Third Avenue, 34th Floor
 4                                  New York, NY  10017-2024
                                    (212) 561-7700
 5
       For the Official Committee   Matthew A. Clemente
 6     of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                    One South Dearborn Street
 7                                  Chicago, IL  60603
                                    (312) 853-7539
 8
       For the Advisor             Davor Rukavina
 9     Defendants:                 Julian Vasek
                                    MUNSCH HARDT KOPF & HARR, P.C.
10                                  500 N. Akard Street, Suite 3800
                                    Dallas, TX  75201-6659
11                                  (214) 855-7554

12     For the Advisor             A. Lee Hogewood, III
       Defendants:                 K&L GATES, LLP
13                                  4350 Lassiter at North Hills
                                      Avenue, Suite 300
14                                  Raleigh, NC  27609
                                    (919) 743-7306
15
       For Defendant James D.      John T. Wilson
16     Dondero:                    BONDS ELLIS EPPICH SCHAFER
                                      JONES, LLP
17                                  420 Throckmorton Street,
                                      Suite 1000
18                                  Fort Worth, TX  76102
                                    (817) 405-6900
19
       Recorded by:                Michael F. Edmond, Sr.
20                                  UNITED STATES BANKRUPTCY COURT
                                    1100 Commerce Street, 12th Floor
21                                  Dallas, TX  75242
                                    (214) 753-2062
22
       Transcribed by:             Kathy Rehling
23                                  311 Paradise Cove
                                    Shady Shores, TX  76208
24                                  (972) 786-3063

25          Proceedings recorded by electronic sound recording;
               transcript produced by transcription service.
```

3

1          DALLAS, TEXAS - FEBRUARY 23, 2021 - 9:07 A.M.

2          THE COURT:  This is Judge Jernigan, and we have

3    Highland settings this morning.  We have a couple of settings

4    in adversary proceedings, one in Adversary 21-3010, Debtor's

5    Emergency Motion for a Mandatory Injunction Requiring the So-

6    Called Advisors to Adopt and Implement a Plan for Transition

7    of Services; and then, second, in Adversary 20-3190, a Motion

8    to Hold James Dondero in Contempt for Violating a Previous

9    TRO, allegedly.

10      So, let's go ahead and get our lawyer appearances.  First,

11   for the Debtor, Highland, who is appearing this morning?

12          MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

13   Pomerantz and John Morris of Pachulski Stang Ziehl & Jones.

14   Mr. Morris will be handling the hearings today.

15          THE COURT:  All right.  Thank you.

16      All right.  For the Advisors, who do we have appearing?

17          MR. RUKAVINA:  Davor Rukavina and my co-counsel, Lee

18   Hogewood.  We are appearing for the two Defendants in

19   Adversary Proceeding 21-03010.  We are not appearing in the

20   other adversary and contempt matter.

21          THE COURT:  All right.  For Mr. Dondero, who do we

22   have appearing this morning?

23          MR. WILSON:  Your Honor, John Wilson with the law

24   firm of Bonds Ellis Eppich Schafer Jones.  And with me is

25   Bryan Assink.

4

1     (Interruption.)

2         THE COURT:  All right.  I didn't hear what you said,

3   Mr. Wilson, after appearing for yourself and Mr. Assink.

4   Would you repeat that?

5         MR. WILSON:  That was all I said, Your Honor.  I

6   don't know what that other noise was.

7         THE COURT:  Oh, okay.

8     (Court confers with Clerk.)

9         THE COURT:  Okay.  Someone came in as a PC user, is

10  what my court reporter said.

11    All right.  Well, do we have the Committee appearing

12  today?

13        MR. CLEMENTE:  Yes.  Good morning, Your Honor.

14  Matthew Clemente; Sidley Austin; on behalf of the Committee.

15        THE COURT:  All right.  Thank you.

16    All right.  Well, that's all the appearances I will ask

17  for right now.  I know we have interested observers, parties

18  in interest observing today.

19    Mr. Morris, how did you want to proceed this morning?

20        MR. MORRIS:  John Morris; Pachulski Stang Ziehl &

21  Jones.

22    What I thought we'd do, Your Honor, is begin with the

23  Debtor's Motion for the Mandatory Injunction.  I thought it

24  would -- may make sense to begin with some opening statements

25  and proceed right to the evidence.  The Debtor has two

5

1 witnesses to call, Mr. Seery and then Mr. Dondero. And then

2 we would rest after the admission into evidence of our

3 exhibits. The Advisors, you know, can certainly cross-examine

4 Mr. Seery. You know, and then we'll have closing statements

5 and hopefully finish that part of the proceeding up.

6 And then we'll move on to the contempt proceeding. Mr.

7 Dondero has a motion *in limine* to exclude certain evidence.

8 The Debtor has agreed -- I don't know if I've seen an order

9 from the Court -- but the Debtor has agreed to have that heard

10 today, if Your Honor would like to do that. The Debtor is

11 certainly prepared to argue that motion prior to the

12 commencement of the contempt proceeding. And then after that

13 motion is decided, we could just do the same drill: Some

14 opening statements, hopefully hear from a few witnesses, put

15 in our evidence, and finish up.

16 THE COURT: All right. Well, that was the sequence I

17 had envisioned. Since you're looking for an injunction, you

18 know, immediately, you're wanting to transition services by

19 February 28th, I thought that it made sense to take that one

20 up first. So, with that, I'll hear your opening statement.

21 MR. MORRIS: Okay. Thank you, Your Honor.

22 MR. RUKAVINA: Your Honor, Davor Rukavina, briefly.

23 I just would like for the record to be clear. Are we having a

24 combined record for both adversaries, or is the -- first the

25 one and then the other, which would be my strong preference?

6

1              THE COURT:  No, I did not envision a combined record.

2              MR. RUKAVINA:  Okay.

3              THE COURT:  Mr. Morris, was that what you were

4    suggesting and I didn't understand?

5              MR. MORRIS:  No.

6              THE COURT:  No, he was not.

7              MR. MORRIS:  Not at all.

8              THE COURT:  Okay.  So we're just --

9              MR. RUKAVINA:  Okay.  Thank you.

10             THE COURT:  -- focusing on the Advisor-Debtor dispute

11   this morning with the evidence.  Okay.

12         Mr. Morris, go ahead.

13             MR. RUKAVINA:  Thank you, Your Honor.

14             OPENING STATEMENT ON BEHALF OF THE PLAINTIFF

15             MR. MORRIS:  Okay.  Thank you, Your Honor.  John

16   Morris; Pachulski Stang Ziehl & Jones.

17         Before I begin, I just want to tell the Court that the

18   lawyers -- this has been a very difficult week.  We had three

19   depositions yesterday.  And I just, I think it's important for

20   the Court to know that the lawyers have cooperated really

21   quite well.  It's difficult circumstances.  Not every

22   conversation is polite and perfect.  But for Your Honor's

23   purposes, I do appreciate everybody's cooperation getting to

24   this point.

25             THE COURT:  Well, I'm glad you told me that, because

7

1   I was wrongly thinking I might hear this morning that you all

2   worked it out overnight.

3            MR. MORRIS:  No.

4            THE COURT:  I will let you know, I cannot for the

5   life of me figure out why this couldn't be worked out, but I'm

6   going to hear the evidence and argument and better understand

7   that, I guess.

8            MR. MORRIS:  You are.  And let me try to explain

9   that.  And what I'd like to do in my opening is just give you

10  some background as to how we got here, what the Debtor's

11  interest was in bringing the motion, and what the Debtor is

12  seeking from the Court today.  And I think, with that, perhaps

13  we'll fill in any of the blanks that may be appearing on your

14  page.

15           THE COURT:  Okay.

16           MR. MORRIS:  And I think the best place to start,

17  Your Honor, is just -- I know that the Court is familiar with

18  the relationship of the parties, but for the record in this

19  particular case I think that it's important to just put that

20  out there.  I've got a small demonstrative deck that I think

21  would be helpful, and I would just ask that we put up on the

22  screen --

23           THE COURT:  All right.

24           MR. MORRIS:  -- the first slide of the deck.

25           THE COURT:  Okay.

8

1       MR. MORRIS: And this slide, Your Honor, you'll hear

2  testimony and I don't think there will be any dispute about

3  the substance of this particular slide. But as Your Honor is

4  aware, HCMLP, the Debtor, has certain shared services

5  agreements with the two Defendants here that are the two

6  Advisors. That's HCM Fund Advisors, NexPoint Advisors.

7  Pursuant to those shared services agreements, the Debtor

8  provided certain back- and middle-office services. And the

9  shared services for purposes of this hearing contain some very

10  important termination clauses.

11     The evidence will show that the Advisors provide advisory

12  services to certain investment funds. There's about ten or

13  twelve investment funds to which they provide advisory

14  services pursuant to these advisory service agreements. Some

15  of those funds are publicly traded. As Your Honor has heard

16  previously, some of those funds have thousands of individual

17  investors, mom-and-pop investors and retail investors. So

18  that is the -- kind of the -- how this all fits together, and

19  we'd just like to keep that in context.

20     The agreements themselves, as I mentioned, have certain

21  termination clauses.

22     If we could just go to the next slide, please.

23     The agreement between the Debtor and Highland Capital

24  Management Fund Advisors had their shared services agreement,

25  and you can see in the footnote where I cite to the exhibit.

9

1   This is Debtor's Exhibit 2 that appears at the adversary

2   proceeding Docket No. 10.  It's a very straightforward

3   termination clause.  It's a clause that says the agreement is

4   for a period of a year, with automatic renewals.  And then

5   Section 7.02 provides that either party may terminate this

6   agreement with or without cause upon at least 60 days' written

7   notice.

8      If we could go to the next slide, you'll see that this is

9   the excerpt from the NexPoint Advisors shared services

10  agreement.  And this provision is slightly different because

11  it requires only 30-day written notice.  That -- and that

12  particular agreement can be found at Debtor's Exhibit No. 4.

13     So that's kind of the nature of the parties and that's the

14  important part of the agreement, at least from the Debtor's

15  perspective.

16     And how does this -- how is this all particularly relevant

17  today?  The Debtor filed for bankruptcy back in October of

18  2019.  As the Court is aware, Mr. Dondero was in control of

19  both the Debtor and the Advisors at that time.  The Advisors

20  had certainly prior notice that the Debtor would be filing for

21  bankruptcy.  And indeed, I think you'll hear some testimony

22  today from Dustin Norris that the Advisors had begun to think

23  about what would happen to the shared services agreements, you

24  know, a year and a half ago, prior to the bankruptcy filing.

25     Fast forward to August, August of 2020.  The Debtor had

10

1   been in bankruptcy at that point for about ten months. And if

2   Your Honor will recall, at around that time the Debtor filed

3   its first plan of reorganization.

4      And if we could just go to the next slide, please.

5      This was an important event for the Debtor at the time,

6   because while the Debtor did not yet have the support of any

7   meaningful constituency, it did make a public statement for

8   the first time that unless executory contracts were assumed or

9   otherwise treated in the manner provided in Article 5 of the

10   plan, they would be deemed rejected. So, as of August 2020,

11   this was the marker that the Debtor laid.

12      And certainly, discussions continued about a potential

13   grand bargain. You've heard a lot about that. They morphed

14   later on into discussions about a pot plan. But for purposes

15   of, you know, public disclosure, there is no question that by

16   August 2020 everybody should have been on notice that, in the

17   absence of an assumption of the executory contracts, they

18   would be deemed to be rejected.

19      You'll hear from Mr. Seery today. Mr. Seery will testify

20   as to the events that took place in the weeks following the

21   filing of this document. He'll -- he will describe for you at

22   a high level but just in general how the parties began

23   discussing the possibility of a transition of services

24   agreement, the form of which was not certain at the time.

25   There were a couple of possibilities, including a Dondero-

11

1  related entity taking it over. There was the possibility of a

2  -- what's been referred to and what will be referred to as

3  Newco, which was going to be a new entity formed by some of

4  the Debtor's employees upon consummation of the plan. I think

5  there was discussion about the possibility of just leaving

6  things in place if somehow a grand bargain could be achieved.

7  But discussions ensued in the fall.

8      And as Your Honor will also recall, you know, we had the

9  mediation. The mediation wasn't successful in resolving the

10  grand bargain. The mediation did result in the agreement with

11  Acis, and that's when, you know, tensions began to increase

12  with Mr. Dondero and the board.

13      Mr. Seery will testify that through the fall, while

14  discussions continued, you know, it became a little bit more

15  -- it became a little bit more difficult. And Your Honor will

16  recall that in October the board asked for Mr. Dondero's

17  resignation, which he complied with, pursuant to the corporate

18  governance provisions.

19      But it was in this time that Mr. Seery will also testify

20  that Mr. Dondero made it clear, in a call that there were

21  numerous people on, that if, you know, we could get to a grand

22  bargain, that would be great, but if that we couldn't, nobody

23  should assume that the transition of services would be easy.

24      Now, you know, Mr. Seery will testify that he found that

25  interesting because the transition of services really should

12

1  have been more of the Advisors' concern than the Debtor's, but

2  it was a point that Mr. Seery noted, and he'll tell you about.

3      By November, the Debtor had reached a consensus with the

4  Creditors' Committee on the formulation of a plan.  If you'll

5  recall, in late October, there was a contested disclosure

6  statement hearing during which the Committee objected to the

7  releases and to certain corporate governance provisions.  And

8  those -- those objections led to negotiations, and those

9  negotiations led to an amended plan, which was the Third

10 Amended Plan.

11     And if we could go to the next slide, this is also, from

12 our perspective, an important marker in the narrative here,

13 because in mid-November, we'd gone beyond just saying that if

14 the contracts aren't assumed they would be deemed rejected to

15 making a public statement that shared services agreements are

16 not going to be assumed.  And they're not going to be assumed

17 because they're not cost-effective.  And Mr. Seery will

18 testify as to why the contracts were not cost-effective.  But

19 there was no doubt by mid-November that the contracts weren't

20 going to be assumed by the Debtor.

21     A couple of weeks later, to remove any doubt, the Debtor

22 exercised its right under the shared services agreement and

23 gave notice of termination.

24     If we can go to the next slide, please.  You'll see in

25 this, in this slide, you've got -- yeah, there you go.

13

1   There's a letter dated November 30th.  And this can be found,

2   this is Debtor's Exhibit 3.  There is a letter notifying the

3   Fund Advisors that the Debtor intended to terminate the shared

4   services agreement on January 31, 2021.  In other words, the

5   Debtor gave the 60-day notice that we just looked at under the

6   shared services agreement of its intention to terminate the

7   shared services agreement.

8       Can we go to the next slide, please?

9       On the same day, the Debtor also gave notice of its

10  intention to terminate the shared services agreement with

11  NexPoint Advisors.  And I would note that, notwithstanding the

12  fact that the shared services agreement with NexPoint Advisors

13  only required a 30-day notice period, the Debtor, in fact,

14  gave 60 days' notice, just to keep them on the same track.

15      And as Your Honor knows, in the subsequent weeks, the

16  Debtors pushed ahead with their plan of reorganization.  They

17  amended it a couple of times.  Those amendments didn't have

18  anything -- have any impact on the termination notices.

19  You'll hear no evidence today that the Debtor rescinded the

20  termination notices.  You'll hear no evidence today that the

21  Debtor ever considered rescinding the termination notices.

22      And so we fast-forward now a couple of months later to

23  January, and what's happening?  Mr. Seery will testify that,

24  you know, the Debtor really was using its best efforts to try

25  to engage, to try to finish this up.  And he'll tell you what

14

1   the Debtor's motivations were here.  While the Debtor doesn't

2   owe any obligations directly to the Funds, while the Debtor

3   doesn't owe any obligations directly to the retail fund

4   investors, the Debtor was very, very concerned that it be able

5   to implement its plan of reorganization.  And that plan of

6   reorganization, which Your Honor just approved very recently,

7   and in fact entered the order yesterday, pursuant to that plan

8   the Debtor is going to and has begun the process of downsizing

9   substantially.  And they were going to eliminate a lot of the

10  employees, and they knew in January that there was no way the

11  Debtor was ever going to have the ability to provide any

12  services at any time after February 28th.  I mean, they gave

13  notice of January 31st.

14      So, the Debtor wanted to make sure that it could proceed

15  in the future without any obligation, without any claim that

16  there's obligations.  So the Debtor was really focused on

17  trying to try to finish up this transition services agreement.

18  And the negotiations picked up a little bit in late January,

19  but here we were, with a January 31st deadline, and the Debtor

20  -- the Debtor [sic] asked for an extension of time.  And the

21  Debtor [sic] asked for an extension of time presumably because

22  they weren't prepared to assume the back-office and the

23  middle-office services that the Debtor was providing.

24      And so the Debtor agreed and the parties agreed, pursuant

25  to a written agreement, to extend the deadline by two more

15

1    weeks.  And the parties continued to negotiate during those

2    two weeks, but there were difficulties.  And threats were

3    made.  And Mr. Seery will testify that those threats caused

4    the Debtor to insist that the negotiations basically be

5    chaperoned by outside counsel.

6        It didn't last long.  It was really just for the purpose

7    of trying to get the temperatures down to a degree where

8    people could engage in a more cooperative fashion.  But that's

9    what we were dealing with in late January and early February.

10   We couldn't get to yes.

11       And parties negotiated.  Terms sheets went back and forth.

12   You're going to hear this testimony, not from Mr. Seery, but

13   you'll hear it, ironically, from the Advisors, that last week

14   an agreement was reached.  The only sticking point was Mr.

15   Dondero's insistence that he be permitted access to the

16   Debtor's offices.  It is the only thing that prevented the

17   parties from reaching an agreement.

18       And they say that the Debtor was unreasonable in not

19   allowing him into their offices.  And Mr. Seery will testify

20   that we'd already been through this process, that we'd already

21   obtained a TRO, that we'd already obtained a preliminary

22   injunction that bars him from the offices, and we just,

23   admittedly, we would not agree to that provision.  But we

24   would not be here today if the Advisors simply said, we'll

25   leave that for another day, we've been operating for two

16

1  months without Mr. Dondero in the offices, we've otherwise got

2  an agreement that accomplishes everything we need to do.

3  Instead, they said no.

4      And here's another interesting point.  You're going to

5  hear the testimony from Mr. Norris, and he's going to tell you

6  that the so-called independent boards of the funds, they were

7  fully supportive of the Advisors' position.  They thought that

8  it was a really smart idea to walk away from a fully-

9  negotiated transition services agreement because the Debtor

10 wouldn't let Mr. Dondero into the office.  They thought that

11 was a great idea and they fully supported it.  Nobody -- none

12 of the board members are going to be here today to testify to

13 that, but Mr. Norris is going to -- I'm going to make sure

14 that Mr. Norris informs the Court that that was the boards'

15 view.

16     And so, instead of saying yes, they said no.  And we had

17 told them last Tuesday, if you don't agree to this, we're

18 going to commence the lawsuit.  So they didn't agree to it, so

19 we commenced the lawsuit.

20     But negotiations continued.  And you know, I think the

21 lawyers for the Advisors acted in very good faith here, Your

22 Honor.  They did the best they could.  We continued to

23 negotiate.  On Friday, they presented to the Debtor two

24 options, Option A and Option B.  And at one point, they said,

25 we're not -- we may have to tweak Option B, so hold off for

17

1   now.  And you're going to see this in the emails.  It was just

2   black and white.  And we said okay, fine.  And then they came

3   back and they said no, no, no, Option B is good, Option B is

4   good, so tell us what you want to do.  And at 1:00 o'clock on

5   Friday, there was a phone call.  The Debtor informed the

6   Advisors' lawyers that they choose Option B.  We're done.  And

7   we started talking about wire transfers.  We started talking

8   about documenting this for the Court in a consensual order.

9   And we would be done.

10      And we had a call scheduled, I think at first at 3:30.

11  Again, this will be -- this will all be in the evidence.  This

12  is what the evidence is going to show.  We had a call at 3:30.

13  They asked for an extension of time.  Then they told us they

14  were trying to get the consent of the person whose consent

15  they needed.  They pushed it off further.  And then, you know,

16  then we got the bad email from Mr. Hogewood that said, we're

17  not going to have a group call, I'm just going to call by

18  myself.  And we knew what that meant.

19      And so he called up.  He informed the Debtor that Plan B

20  was off the table, the one that we had just accepted like for

21  the second time.  So Plan B was now off the table, and we

22  said, we're done.  I mean, we can't continue to negotiate

23  this.

24      A couple of hours later, they send an email and they say,

25  Plan B is back now on the table, but we're taking back the

18

1   million dollars that we had previously agreed to.  And we

2   said, no, thank you.

3        They continued to make offers over the weekend, Mr. Seery

4   will testify, offers pursuant to which they were seeking I

5   think what they called the *a la carte* services from the

6   Debtor.  And we weren't able to reach that agreement.  And,

7   again, I think what Mr. Dondero is going to tell you, Your

8   Honor, is that -- well, you're going to hear two different

9   stories, actually.  Mr. Dondero is going to tell you that when

10  we wouldn't let him back in the office on Tuesday, he

11  disengaged.  So he didn't -- he didn't really care.  He didn't

12  really have anything to do with it.  He doesn't know what plan

13  the Debtor has today.  He doesn't know how the services are

14  being transitioned.  He really doesn't know anything after

15  last Wednesday as regards to this matter.

16       But Mr. Norris will tell you that it was, in fact, Mr.

17  Dondero who pulled Plan B on Friday afternoon because he

18  didn't understand it.  There was a misunderstanding, they

19  said, even though Mr. Dondero will tell you that he

20  specifically authorized Mr. Norris and D.C. Sauter to

21  negotiate the agreement.  Okay?  That's a -- it's not a pretty

22  story.  I don't know that there's going to be a lot of dispute

23  about the facts, to be honest with you, because they're

24  reflected in documents.  This is as much a document case as it

25  is anything else.

19

1    So, you know, where does that leave us?  Because there are

2 certain developments that have happened in the last 24 hours,

3 you know, that I'll -- that guess I'll share with you now.  We

4 did take discovery yesterday.  As I mentioned, we did have a

5 number of depositions.  And during one of those depositions,

6 Mr. Norris disclosed that the Advisors do, in fact, have a

7 plan, or at least they assert that they have a plan.  And the

8 plan has, I think, what I would characterize as four legs to

9 it.

10    Number one is they hired yesterday on a contract basis

11 somebody to perform audit and accounting services.  I think

12 his name is Mr. Palmer.  And he started yesterday.

13    They took in-house the payroll issues and are utilizing --

14 to supplement that, they're now going to utilize a firm called

15 Paylocity.  And Paylocity is a firm that the parties use

16 regularly now.  So that's the second leg of their plan.

17    The third leg is an IT company called Siepe.  I think

18 Siepe is run by a former Highland employee.  And Siepe will

19 provide -- and I think Mr. Norris is going to testify -- has

20 been providing for a couple of weeks on a shadow basis certain

21 IT functions.

22    And, finally, they're still trying to negotiate with

23 Newco.  Newco would be the entity that would be formed with

24 some of the Highland employees.  But those negotiations aren't

25 finished.

20

1    So, I appreciated the objection that was filed yesterday.

2  They basically said that this is moot, that they've got a

3  plan, so there is nothing for the Court to do.  We still have

4  concerns.  I think Mr. Seery will testify as to those

5  concerns.

6    But it does -- it does go, you know, much further than we

7  thought, even though it was just adopted.  I mean, I guess the

8  lawsuit had its intended effect, and in the last 24, 48, 72

9  hours, they're -- they're engaging in the process of

10  transition.

11    So, you know, why are we here and what are we hoping to

12  accomplish now that we've gotten news of that development?  I

13  think it's pretty simple, Your Honor.  We simply want the

14  Court to make sure that the Debtor is protected here, that the

15  Debtor -- that there is a plan in place pursuant to which the

16  Debtor will not be obligated to provide any services and it

17  will be allowed to implement its plan in a way that not only

18  protects the Debtor but really will protect the public

19  marketplace, it will protect the funds and the investors, and,

20  frankly, the Advisors as well.

21    We wanted this to be a smooth transition.  We tried very

22  hard to make it a smooth transition.  Unfortunately, that

23  didn't come to pass.  But we do believe that the Debtor needs

24  the comfort of an order.

25    And the Advisors are simply wrong in their papers when

21

1    they say we're asking the Court to dictate terms.  I don't

2    care if they have an agreement with the Debtor.  I don't care

3    who they have an agreement with.  I don't care what the

4    agreement says.  I don't think the Court has to order any

5    particular terms.  We just want to make sure that they have a

6    plan in place and that plan is implemented before the end of

7    the month, because we will not be able to do anything for them

8    after that time.

9        Thank you very much, Your Honor.

10           THE COURT:  Thank you.  Mr. Rukavina?

11           MR. HOGEWOOD:  Good morning, Your Honor.  Lee

12   Hogewood.  I'm going to take on the opening statement, if the

13   Court please.

14           THE COURT:  All right.  Thank you.

15     OPENING STATEMENT ON BEHALF OF THE ADVISOR DEFENDANTS

16           MR. HOGEWOOD:  And let me, let me begin by saying

17   that I agree with Mr. Morris that counsel, I think, have

18   cooperated throughout this process.  And I also -- and in

19   particular thank them for asking that the hearing be pushed

20   back for 30 minutes, which was at my request, as an earlier

21   start.

22       One other housekeeping matter that I would like to request

23   is I will not have a further speaking role after the opening

24   statement, and if it would be permissible for me to listen to

25   the rest of the hearing by telephone, that would be much

22

1  appreciated, if there's not an objection to that.

2          THE COURT: All right. I assume there's no

3  objection.

4          MR. MORRIS: No.

5          THE COURT: All right. Permission granted.

6          MR. HOGEWOOD: Thank you, Your Honor.

7      I think the theme of perhaps this hearing is a theme of

8  divorce. It's a divorce that is long overdue. The lawsuit

9  filed last week, it seems to be an effort of one of the

10 divorcing parties, the Debtor, to employ the power of this

11 Court to be sure that the Debtor is absolved of all

12 consequences of the divorce.

13     Divorces are often messy. This one is particularly so.

14 Presently, I think there are three or four other adversary

15 proceedings among these parties that will have to be sorted

16 out over the coming many months.

17     But on the issue before the Court today, the Advisors need

18 very little from the Debtor in this divorce in the final

19 analysis, other than access to data and books and records that

20 the Advisors own and which will remain on formerly-shared

21 systems.

22     To carry the divorce analogy further, like many divorcing

23 couples, there are so-called children at risk. In this case,

24 the children are the employees of the Debtor, the Advisors,

25 the funds and their investors.

23

1      The Debtor's other purpose seems to be that they -- to be

2   absolved of responsibility for the children.  And just to be

3   clear, the Advisors need no child support from the Debtor for

4   the funds or others beyond the access to data, books and

5   records that belong to our client and remain comingled with

6   the Debtor's data.

7      But we didn't seek any relief.  We are merely defending

8   ourselves in this action.  And I think what I say about what

9   the evidence will show is not going to be altogether that

10   different from what Mr. Morris has said.  There's absolutely

11   no dispute that the parties failed to reach an agreement.  I

12   also think there's no dispute that the parties worked

13   diligently to reach one.  They overcame very -- a large number

14   of very difficult business issues to make the orderly

15   transition happen.  But in the end, they could not complete a

16   deal.

17      And for the Debtor, you know, the question of who drew the

18   hard line in the sand about no, I think we see it a little bit

19   differently.  For the Debtor, it would not agree for Mr.

20   Dondero to have access, even if and only after the Advisors

21   paid for the construction of a wall to segregate the remaining

22   Debtor employees from Advisor employees and even if the Debtor

23   employees had separate access to the Debtor's section of the

24   premises, where the Advisors would be essentially subleasing

25   the remainder of the space.

24

1      For the Advisors, the prospect of its leader, the leader

2   of the enterprise, being prohibited from working in the same

3   office as the employees of the Advisors made no business sense

4   and was likely to become an ongoing logistical nightmare.

5      The gap could not be bridged in time, and so the Advisors

6   moved out on the 19th, as directed by the Debtor.

7      As the Court knows, there's no provision in the Bankruptcy

8   Code or any other statute that required these parties to agree

9   on a transition of shared services.  There's no legal

10  obligation on either party to reach an agreement on how to

11  divorce and separate.  Neither can be compelled to reach an

12  agreement if an agreement is not ultimately in their mutual

13  respective business interests, as determined by each of them.

14     The Debtor claims to have terminated the contract pursuant

15  to its terms.  It amended the termination date twice in

16  exchange for agreed advance payments to try to reach a deal.

17     In the meantime, the Advisors had to be aware of the

18  possibility that a deal might not be reached, and so they

19  began working in earnest on an alternative plan to be able to

20  continue to service their clients, their funds and investors,

21  as needed after the services were terminated.

22     So it is not clear exactly what the Debtors really seek

23  here.  A mandatory injunction to do what?  To have a plan?

24  The evidence will show, I think as Mr. Morris suggested, that

25  our clients have a plan.  It was implemented -- it began to be

25

1  implemented this past weekend, but it had been worked on for

2  some time in advance.  It's -- based on this, there's no

3  jurisdiction for or purpose in a court order directing us to

4  do that which we are determined to do anyway and have -- and

5  have already done.

6      The evidence will show that there's no meaningful

7  irreparable harm to the Debtor based on the current

8  circumstances.  Mr. Seery would be expected to testify, based

9  on yesterday's deposition, of some vague notion of confusion

10 among the employees, but there was no meaningful discussion of

11 irreparable harm to the Debtor.

12     So the -- and, indeed, the confusion of the employees, in

13 the context of a Chapter 11 debtor that has just confirmed a

14 plan of liquidation, I think confusion could be -- the source

15 of confusion could be a large number of things, not merely the

16 transition issues.

17     To carry the divorce analogy further, the requested

18 mandatory injunction is somewhat like requiring a divorcing

19 spouse who has left the home to explain the details of his or

20 her post-divorce life.  And there's -- there's no purpose in

21 that.  In our papers, we've explained the lack of jurisdiction

22 over this matter as a core proceeding, and certainly even

23 under the related-to jurisdiction of the Court, as well as a

24 constitutional -- lack of a constitutional basis for

25 jurisdiction under *Stern v. Marshall.*  And I know Mr. Rukavina

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 1846 of 2722

26

1   will take those issues up in his closing arguments.

2       We've also indicated -- made an arbitration demand, which

3   is provided for under one of the two advisory agreements.  And

4   in the context of seeking, in this case, seeking a permanent

5   injunction, as we stated in our papers, there's really no --

6   there's no proper exception from the arbitration demand.

7       So there's really, as we sit here today, there's really no

8   case or controversy, and the timeline that Mr. Morris

9   described is pretty much not in dispute.  The evidence is

10  going to show that there was a developing consensus among the

11  business teams in January to meet a January 31 deadline with a

12  transition.  On January 27th, the -- 27, the Debtor demanded

13  as a condition of transition nearly $5 million in what they

14  allege to be postpetition underpayments under the shared

15  services agreement.  This was a new and difficult issue.  The

16  amounts, we're disputing.  And the Debtor had not circulated a

17  term sheet, only a proposed schedule of services.  The term

18  sheet came on the 28th.

19      On the 29th, we were able to agree to the first two-week

20  extension to allow these discussions over a 13- or 14-page

21  term sheet to be continued and discussed.  That extension

22  required the advance payment of an agreed amount to cover that

23  two-week period of extension of services.  Negotiations

24  continued, as discussed, and a further extension through the

25  19th was granted.

27

1     Negotiations broke down at the time a suit was filed, and

2  were renewed and ultimately broke down again, as Mr. Morris

3  described.

4     In the end, the Court should dismiss the proceeding for

5  lack of jurisdiction. The bankruptcy court is not a divorce

6  court, nor is it a place where every perceived ill that the

7  Debtor may incur may be resolved by injunction. The Court is,

8  after all, a court of limited jurisdiction. If the Court does

9  proceed, we simply ask that the claims be rejected and

10  dismissed on the facts.

11     The Defendants have asked for nothing from the Debtor

12  other than continued access to data, books and records to

13  which they're entitled. We've moved out of the house. We

14  have plans that will allow us to continue to serve our

15  clients. And we would ask that you not order us to do so.

16  Thank you.

17        THE COURT: All right. Well, I realize, you know,

18  legal arguments have been hinted at here, and of course were

19  briefed. I want to hear the evidence, and then we'll talk

20  more about legal arguments at the close of the evidence.

21     All right. Mr. Morris, you may call your witness.

22        MR. MORRIS: All right. Your Honor, before I call my

23  witness, I think just for efficiency purposes I would like to

24  move my documents into evidence so that we don't have to do

25  that on a document-by-document basis.

28

1            THE COURT:  All right.

2            MR. MORRIS:  And the Court will find -- unlike some

3     of the prior proceedings, there actually aren't an

4     overwhelming number.  But the Court will find Exhibits 1

5     through 16 at the adversary proceeding docket, Docket No. 10,

6     --

7            THE COURT:  Uh-huh.

8            MR. MORRIS:  -- the original witness and exhibit list

9     that the Debtors filed.  And then we added a few more

10    documents I think late yesterday.  There was a supplement that

11    included Exhibits 17 through 21, and that can be found at the

12    adversary proceeding Docket No. 19.

13        So the Debtor would respectfully move into evidence

14    Exhibits 1 through 21 on those lists.

15            THE COURT:  All right.  Any objection?

16            MR. RUKAVINA:  Your Honor, I believe Mr. -- well, not

17    necessarily an objection, Your Honor.  I believe Mr. Morris

18    and I have an agreement that my Exhibits A through N as in

19    Nancy will also be admitted.  And if that agreement holds,

20    then I have no objection to his exhibits.

21            MR. MORRIS:  And it does, Your Honor.

22            THE COURT:  Okay.  And --

23            MR. RUKAVINA:  Then I would -- I would move for

24    admission at this time as well, Your Honor.

25            THE COURT:  All right.  And let's make sure I know

Seery - Direct                         29

1   where A through N appear.  It looks like they are -- are they

2   all at 18, Docket Entry 18?

3            MR. VASEK:  Correct, Your Honor.

4            THE COURT:  All right.  So I will admit 1 through 21

5   of the Debtor, which appear at Docket Entry No. 10 and 19, and

6   Exhibits A through N of the Advisors, which appear at Docket

7   Entry No. 18.  All right.

8       (Debtor's Exhibits 1 through 21 are received into

9   evidence.  Advisors' Exhibits A through N are received into

10  evidence.)

11           MR. MORRIS:  Okay.  And with that, the Debtor calls

12  James Seery as its first witness.

13           THE COURT:  All right.  Mr. Seery, I think I saw you

14  earlier on the video.  If you could --

15           MR. SEERY:  Good morning, Your Honor.

16           THE COURT:  Good morning.  All right.  Please raise

17  your right hand.

18       (The witness is sworn.)

19           THE COURT:  All right.  Thank you.  Mr. Morris?

20           MR. MORRIS:  Thank you, Your Honor.

21           JAMES P. SEERY, JR., DEBTOR'S WITNESS, SWORN

22                       DIRECT EXAMINATION

23  BY MR. MORRIS:

24  Q   Can you hear me okay, Mr. Seery?

25  A   I can.  Yes, sir.

Seery - Direct                        30

1   Q   Okay.  Let's just cut right to the chase.  Was the Debtor

2   party to certain shared services agreements with Highland

3   Capital Management Fund Advisors and NexPoint Fund Advisors?

4   A   Yes.

5   Q   And I'm going to refer to those two entities as the

6   Advisors; is that okay?

7   A   That's fine.  Thank you.

8   Q   And pursuant to the shared services agreements, did the

9   Debtor historically provide back- and middle-office services

10  to the Advisors?

11  A   Yes.

12  Q   Okay.  And is it your understanding that the Advisors

13  provide advisory services to certain investment funds?

14  A   That's my understanding, yes.

15  Q   Okay.  Do you have any understanding as to whether or not

16  the Advisors provide those services to the funds pursuant to

17  written agreements?

18  A   I believe they have agreements with each of the funds.

19  Q   Okay.  And do you understand that some of those investment

20  funds are publicly traded?

21  A   I believe most of those are, the -- those '40 Act funds

22  are retail funds, yes.

23  Q   And what does it mean, you know, in your -- in your world,

24  what does it mean to be a retail fund?

25  A   There are institutional-type investments which are only

Seery - Direct                         31

1    available to institutional investors or credit investors,

2    depending on the type of investment it is, and there's

3    particular rules around what types of investors can engage in

4    certain types of investing activity, designed to, really, have

5    more sophisticated investors engage, if they desire, in more

6    risky endeavors and less who's believed to be sophisticated

7    investors engage in more what are referred to as retail

8    activities.

9        That's not saying that the retail activities aren't

10   sophisticated and risky.  They can be.  But there's a division

11   in how certain types of investors are able to access certain

12   types of investments, and retail funds typically are open to

13   any investor that wants to invest, and they can buy those on a

14   -- or sell them on a regular basis.

15   Q    Are you aware of any agreement of any kind between the

16   Debtor and any of the funds that are advised by the Advisors?

17   A    No, there are no -- no such agreements.

18   Q    Okay.  Let's turn our attention to August 2020.  Did there

19   come a time in August when the Debtor filed its initial plan

20   of reorganization?

21   A    Yes.

22   Q    And can you just describe generally for the Court what the

23   structure of that plan was?

24   A    As we've discussed before, that was the monetization plan.

25   It was at this point that the Debtor determined that it had to

Seery - Direct                          32

1   file a monetization plan to effectively distribute the assets

2   to the stakeholders, depending on how their claims were

3   ultimately resolved.  And the monetization plan was the plan

4   we came up with.

5   Q   Okay.  And do you recall that that initial plan provided

6   for the treatment of certain executory contracts?

7   A   Yes.

8        MR. MORRIS:  Can we just put up on the screen Exhibit

9   12, please?  And if we could focus in on that first paragraph.

10  BY MR. MORRIS:

11  Q   Is it your understanding that the initial plan filed by

12  the Debtors provided that unless an executory contract was

13  subject to one of those provisions in the first paragraph,

14  that it would be deemed rejected?

15  A   Yes.  It was a pretty integral part of the plan, that we

16  were going to downsize the operations of the business

17  considerably, and many of the operating businesses, the

18  servicing of shared service counterparties, were going to be

19  eliminated, and we would either terminate those agreements

20  pursuant to their terms or they would be deemed rejected.

21  Q   Okay.  And what were the consequences for the shared

22  services agreements for a provision such as this?

23  A   Well, the counterparties would no longer have those

24  services and have to seek them, to the extent they needed

25  them, elsewhere.

Seery - Direct                          33

1   Q   Okay.  Was this the only plan that the Debtor was pursuing

2   at this time?

3   A   It was the only plan that we filed.  We were considering

4   other options, which at that point was the so-called grand

5   bargain, which we were attempting to negotiate alongside the

6   monetization plan.

7   Q   Did the Debtor engage in any discussions with the Advisors

8   after filing this plan about a possible transition of

9   services?

10  A   Yes.

11  Q   Can you describe for the Court your recollection about

12  those discussions in the fall of 2020?

13  A   Well, initially, it started in the summer.  And knowing

14  that this was a significant possibility, I gathered the

15  Highland operating team, many of whom are responsible for

16  servicing the counterparties under the shared service

17  arrangements, and they knew that they were not going to be

18  part of the continuing Debtor if the monetization plan was

19  confirmed.  And I described that there's a corporate carve-

20  out, that there would be significant work that had to be done,

21  that that team would have to accomplish, you'd have to

22  allocate responsibilities and know exactly how you're going to

23  perform these services, indeed, if the counterparties wanted

24  those services performed post-confirmation.

25      And we started with a Zoom meeting in August and tried to

Seery - Direct                                    34

1   replicate a similar meeting each week so that we stayed on a

2   timetable.

3       By the early fall, or mid-fall, I'm sorry, I guess it was

4   November 24th, I had a conversation directly with Mr. Dondero

5   by phone.  And on that phone call, I described very much to

6   him the same situation.

7       It was Mr. Dondero, Mr. Ellington, Mr. Lynn, Mr.

8   Pomerantz, Mr. Demo, and Mr. James Romey from DSI on the call.

9   And on that call, I know we went through several issues, and

10  some of them were becoming particularly heated, especially the

11  settlement with Acis, because that was problematic for Mr.

12  Dondero.

13      We advised Mr. Dondero that he would have to resign from

14  the board if he was going to take antagonistic -- not the

15  board, the portfolio manager position -- if he was going to

16  take antagonistic positions versus the Debtor.

17      Mr. Lynn indicated that he was going to depose me with

18  respect to the 9019 settlements and was -- wanted to be able

19  to object to those, as well as the Acis settlement as well as

20  the Redeemer settlement.

21      We also talked about the potential of the grand bargain

22  plan, and we talked very specifically about the filed plan,

23  the monetization plan, and the transition that would have to

24  be accomplished.  And I walked through, again, my comparison

25  to a corporate carve-out and the difficulty of achieving those

Seery - Direct                            35

1  kind of transactions even if all parties were working hard to

2  get them done and wanted to get them done.

3      And I recall very specifically Mr. Dondero telling me that

4  I should be prepared, if his grand bargain plan wasn't

5  accepted, that my transition plan wouldn't be very easy and he

6  would make it difficult.  And I recall very specifically

7  saying that I was a Boy Scout for a long time and that the

8  Debtor would, in fact, be prepared.  While we thought it was

9  going to be in his economic best interest to come to

10  agreement, that we would not be left unprepared and the Debtor

11  would move forward even if he didn't agree.

12  Q    During the negotiations that you're talking about, was the

13  form of -- just to focus on the transition part, was a form or

14  structure of a successor to the Debtor, at least in terms of a

15  provider of the back- and middle-office services, discussed?

16  A    Yes.

17  Q    And what was the -- what was the substance of those

18  discussions concerning the form of the successor?

19  A    The initial substance was that it would be some subsidiary

20  of NPA or a Dondero related-party entity.  I picked NPA just

21  as a -- because it was a registered investment advisor, it

22  would be an easy transition over, and that's where the

23  employees could go, that's where the services could be

24  provided from, it would be rather seamless, and they were

25  sharing certain services already -- for example, HR services

Seery - Direct                        36

1    like medical insurance, health insurance, et cetera.  And so I

2    thought that that would be the easiest entity.  It would

3    obviously require Mr. Dondero's agreement.

4        Subsequently, the idea of a Newco became an idea that was

5    developed originally by Mr. Ellington.  At least, his

6    representation to me was that the -- he and other employees

7    didn't want to work directly for Mr. Dondero because he's

8    already retraded them on the compensation.  Deferred

9    compensation.

10   Q    As time moved on, by November, was the Debtor gaining any

11   momentum with respect to its asset monetization plan?

12   A    Well, the asset monetization plan began to gain

13   considerable traction as the possibility of either a grand

14   bargain or a pot plan fell away.  There were significant

15   negotiations that we had already discussed in respect -- or,

16   at the confirmation hearing in respect of the terms of that

17   plan, and it began to gain significant momentum towards the

18   voting and the confirmation deadlines.

19   Q    And did the Debtor make a decision in November to

20   specifically disclose that it intended to reject all of the

21   shared services agreements?

22   A    Well, prior to that time, I had been in front of the

23   retail boards by phone a couple times and explained basically

24   the overview of the bankruptcy, what was happening.

25   Initially, the attempts at a grand bargain, then the filing of

Seery - Direct                              37

1   the monetization plan, and the -- and the possibility of a

2   grand bargain and the competition between the two and the

3   likely scenarios for each.

4        In addition, we talked about, if there wasn't a grand

5   bargain, what the transition would look like and my

6   expectation, as I described earlier, that it was in everyone's

7   economic best interest -- meaning NPA's, HCMFA's, as well as

8   the funds -- to transition these services from the Debtor,

9   because we weren't going to continue them, to a Dondero-

10  related entity to perform those services for the funds.

11       There were -- there came a time when the disputes with Mr.

12  Dondero became significant enough where the Advisors and the

13  funds were actually objecting to certain things that I and the

14  Debtor were doing in the case, and I told one of the retail

15  board members that I would no longer participate in any of

16  their calls.  And he understood why, and I was very specific

17  that it had to do with their antagonistic actions versus the

18  estate.

19       So, as we moved forward towards November, the monetization

20  plan became clear, it became more and more clear that the

21  monetization plan was the only plan on the table.  And by mid-

22  to late November, we had settled on terminating the shared

23  service agreements and send out termination notices at the end

24  of November.

25  Q    Before you send out the termination notices, do you recall

Seery - Direct                          38

1   the Debtor filed their Third Amended Plan --

2   A    Yes.

3   Q    -- in particular?

4            MR. MORRIS:  And can we just put up on the screen,

5   please, Exhibit 13?

6   BY MR. MORRIS:

7   Q    Do you recall if that's the plan that provided the notice

8   that the shared services agreements would be terminated?

9   A    That -- that -- well, the plan continued the position that

10  if agreements weren't specifically assumed they would be

11  deemed rejected.

12      It also made clear that we weren't going to continue to

13  provide any services for the Advisors and their managed funds.

14      And then we actually sent specific termination notices

15  under the agreements.  So those agreements were terminated

16  pursuant to their terms.  They didn't need to wait for the

17  confirmation of a plan to be deemed rejected.

18  Q    Okay.

19           MR. MORRIS:  Can we scroll down just a little bit?

20  Okay.  Keep going.  Yeah, right there.

21  BY MR. MORRIS:

22  Q    Do you see the provision beginning on the bottom of Page

23  24?  Again, this is Exhibit 13.  Continuing to the top of the

24  next page.  That's the provision that put the world on notice

25  that the Debtor was not going to assume or assume and assign

Seery - Direct                          39

1  the shared services agreements, right?

2  A    Well, this is another one of the provisions.  The original

3  plan made clear that that's what we were going to do, the

4  original filing that we did in August.

5  Q    Okay.

6  A    We were very clear that we would not be assuming these

7  agreements.

8       This filing made clear that we were, again, but with even

9  more specificity, not going to continue to provide these

10 services, and then subsequently we filed or delivered the

11 termination notices.

12 Q    Okay.  And I see the last sentence of the paragraph ending

13 at the top of Page 25 states that the contracts "will not be

14 cost-effective."  Do you see that?

15 A    Yes.

16 Q    What is that a reference to?

17 A    Well, I think we've had discussions before, around

18 confirmation and prior to that, those hearings, that the

19 Debtor was run at a loss.  And the more work we do, the more

20 losses we find.

21      Basically, the Debtor ran at an operating loss, and then

22 had to sell assets to pay deferred compensation or other

23 expenses.  The Debtor has been run that -- it appears the

24 Debtor has been run that way for a long time, and many of the

25 services that the Debtor provides to the shared services, the

Seery - Direct                          40

1  cost of those services exceed the amount that we receive under

2  those contracts.

3      In addition, there's other entities that services -- and

4  persons for whom significant services are provided and nobody

5  pays anything.  They're not even contracts.

6      So, these contracts, the Debtor as an operating entity was

7  run at a loss.  These contracts were negative.  And that

8  doesn't even deal with the fact that many times these entities

9  didn't pay what they did, in fact, owe under the contract.  So

10 there are significant receivables that are owed by these

11 entities that haven't been paid.

12     In addition, the Debtor advances funds on a regular basis

13 for effectively the operating expenses of the Advisors and is

14 often not repaid timely.

15 Q   Okay.  A couple of weeks -- I think you referred to

16 termination notices.  Did the Debtor send termination notices

17 to the Advisors shortly after filing this Third Amended Plan?

18 A   Yes.  They were sent at the end of November.

19 Q   Okay.  Let's just look at the termination provisions, and

20 then we'll quickly at the termination notices.

21         MR. MORRIS:  Can we put on the screen Trial Exhibit

22 2, which was part of the deck of my opening?

23 BY MR. MORRIS:

24 Q   Are you generally familiar, Mr. Seery, with the shared

25 services agreements with the Advisors?

```
                         Seery - Direct                    41

 1    A    I am.

 2    Q    And are you aware that the shared services agreements

 3    contain termination clauses?

 4    A    Yes.

 5    Q    All right.  So this is -- what I've put on the screen is

 6    the Debtor's Exhibit No. 2, and it's the shared services

 7    agreement with Highland Capital Management Fund Advisors.  Do

 8    you see that?

 9    A    I do.

10         MR. MORRIS:  Can we just focus in on Section 7,

11    please?

12    BY MR. MORRIS:

13    Q    Okay.  And is it your understanding that's the termination

14    clause?

15    A    Yes.  There's the term.  It's in 7.01.  And the

16    termination provision is in 7.02.

17    Q    Okay.  And can you just describe for the Court your

18    understanding of how Article 7 works?

19    A    Article 7 works that the agreement will automatically

20    renew on an annual basis unless one or the other parties

21    terminates the agreement.  And so each party is entitled to

22    terminate the agreement on 60 days' advance written notice.

23    Q    All right.

24         MR. MORRIS:  If we can take that down and put up

25    Debtor's Exhibit No. 4, please.
```

Seery - Direct                                   42

1  BY MR. MORRIS:

2  Q    And do you see this is the shared services agreement

3  between the Debtor and NexPoint Advisors, LP?

4  A    Yes.

5  Q    And are you generally familiar with this document?

6  A    I am.

7         MR. MORRIS:  Can we go to Article 7, please?  Thank

8  you.

9  BY MR. MORRIS:

10 Q    Can you tell the Court your understanding of what Article

11 7 provides?

12 A    It's a little bit different than the last one.  This is a

13 later agreement.  The other one was a document that was

14 clearly cribbed from another agreement that wasn't exactly a

15 shared service arrangement.  But this one doesn't have the

16 automatic renewal.  It just puts the agreement into operation,

17 and then either party may terminate it at any time on 30 days'

18 written notice.

19 Q    And did the Debtor rely on the two Article 7 provisions

20 that we just looked at to give notice of termination of the

21 shared services agreements?

22 A    I'm sorry.  Somebody clicked in.  Did you say did the

23 Debtor rely on?

24 Q    Yes.

25 A    Yeah, those are the governing provisions that we relied

Seery - Direct                        43

1  on, yes.

2  Q    Okay.

3         MR. MORRIS:  So can we put up on the screen Exhibit

4  3, please?

5  BY MR. MORRIS:

6  Q    And is this the Debtor's written notice to Highland

7  Capital Management Fund Advisors of its termination of the

8  shared services agreement effective as of January 31, 2021?

9  A    Yes.  That's our notice of termination.

10 Q    Did the Debtor ever rescind this notice?

11 A    No.

12 Q    Okay.  Did the Debtor ever tell the Advisors, to the best

13 of your knowledge, that the Debtor was considering rescinding

14 this notice?

15 A    No.

16        MR. MORRIS:  Thank you.  Can you take that down and

17 put up Trial Exhibit No. 5, please?

18 BY MR. MORRIS:

19 Q    And is this the Debtor's written notice to NexPoint

20 Advisors dated November 30, 2020 that it was terminating the

21 shared services agreement as of January 31, 2021?

22 A    Yes.  That's the Debtor's termination notice to NPA.

23 Q    Did the Debtor ever rescind this notice?

24 A    No.

25 Q    To the best of your knowledge, did the Debtor ever tell

Seery - Direct                    44

1  anybody at the Advisors that it was considering rescinding

2  this notice?

3  A    No.

4  Q    Okay.  The Debtor --

5         MR. MORRIS:  We can take that down now.  Thank you.

6  BY MR. MORRIS:

7  Q    The Debtor amended their plan of reorganization after

8  November; is that right?

9  A    Yes.  There were a couple of different amendments.

10 Q    To the best of your knowledge, did any amendment ever have

11 any impact at all on the Debtor's statement that it would not

12 be assuming or assuming and assigning the shared services

13 agreements?

14 A    No.  It goes beyond the best of my knowledge:  It didn't

15 happen, because it was an integral part of the plan.

16 Q    Okay.  And can you describe the Debtor's overall view of

17 the plan and the impact that it had or was expected to have on

18 the shared services agreements?

19 A    The basic nature of the plan, as I discussed earlier,

20 going back to August, but as refined, is that the Debtor will

21 no longer be in the business of providing shared services to

22 these Advisors.

23 Q    Okay.  So the notices are sent on November 30th.  They're

24 60-day notices.  What do you recall happening in December with

25 respect to negotiations over the transition of services, if

Seery - Direct                          45

1  anything?

2  A    The short answer is not much.  So, we did, as I said,

3  start the transition analysis and discussions and put together

4  detailed spreadsheets with the various agreements that might

5  be necessary for each side.  And some agreements would be

6  required for the Debtor to go forward, some contracts.  Other

7  contracts were not necessary for the Debtor but were deemed to

8  be necessary for the Advisors.  And we were working through

9  that analysis continually through the fall and through

10 December.  But there weren't -- at that point, there wasn't

11 very much going on with direct negotiations as to how this was

12 going to happen.  And my analogy for the Debtor was like

13 pushing on a string.

14     Frank Waterhouse in particular had been told by Jim

15 Dondero that he did not have authority to negotiate for him.

16 So once we had laid out what the contracts were, and we had an

17 original structure that the rent would be divided 75/25 and

18 paid by the Advisors, and then the costs of the contracts

19 would be divided 60/40, with the majority paid by the

20 Advisors, we really didn't get much traction other than trying

21 to put together that term -- that schedule so we knew what

22 those costs were, and then also to figure out what was unpaid

23 by the counterparties.

24     In addition, at that time, because it was pretty clear

25 that the monetization plan was going to go forward and go into

Seery - Direct                          46

1   the confirmation, right around that time, and it may have been

2   the beginning of January, the Advisors stopped paying on

3   certain of the notes, and then we accelerated those notes.

4   Q    And do you have an understanding as to who was the -- who

5   was the negotiating leader on behalf of the Advisors in the

6   December-January time period, if anybody?

7   A    Well, for the Advisors, it was a combination of the

8   Highland team that would transition over and their counsel.

9   And the -- meaning the counsel for the Advisors.

10  Q    So now, moving into -- withdrawn.  Were the Debtor's

11  professionals engaged in this process, not just you?

12  A    Oh.  Oh, yes.  Very deeply.  We spent literally hundreds

13  of hours with both DSI and your firm, the Pachulski firm,

14  negotiating provisions, the structure, how this would work,

15  what the transition would look like.

16      As I said earlier, corporate carve-out is very

17  complicated, and there are -- there are often transition

18  services that have to be carried through for a period of time

19  where both sides will use certain services.  And then there

20  are shared services which will be carried through for a longer

21  period of time.

22      We came up with a structure that we think worked really

23  well in light of the term of the lease or the tenor of the

24  lease, so that we knew how that would work between the

25  parties, as well as certain IT contracts specifically that

Seery - Direct                                    47

1   were required for both parties to function and when their

2   renewals would come up and then how those businesses -- how

3   those functions would transition or be subject to renewal of

4   additional contracts.

5   Q    As the calendar turns into January and January 31st is

6   approaching, do you recall the tenor of discussions or what's

7   happening in the last two weeks of January, if anything, with

8   respect to --

9   A    Well, --

10  Q    -- the negotiations?

11  A    Yeah.  I mean, we started really pushing it, particularly

12  after confirmation, to try to get this done, because either

13  the funds and the Advisors had alternative arrangements or

14  they didn't.  And if they didn't, we thought that would be

15  very difficult for, obviously, for them and their funds, but

16  also for the Debtor, because we had kept their records

17  previously, we had done the work previously, we had sent in

18  terminations, and these are SEC-regulated funds.  So we became

19  very concerned that there was not going to be a responsible

20  transition.  And in fact, we had gotten very little feedback

21  -- no feedback, frankly, from the boards -- but very little

22  feedback from anybody as to whether they were going to accept

23  the terms that we had put forth or whether they were going to

24  find an alternative arrangement.

25  Q    As the calendar got closer to January 31st, was there a

Seery - Direct                        48

1  request by the Advisors for an extension of the termination

2  deadline?

3  A    It became clear that they did not and had not done

4  virtually anything.  I sent, I think, three or four letters

5  and emails directly to board members imploring them to pay

6  attention, to take action, and if they had an alternative

7  plan, to tell us.  By the end of January, it was clear that

8  they didn't have any alternative plan and needed more time.

9          MR. RUKAVINA:  Your Honor, I'll move to strike that.

10  Clear that they had no alternative plan.  There's no

11  foundation for him to make that statement.

12          THE COURT:  I overrule.

13  BY MR. MORRIS:

14  Q    You mentioned the SEC.  Was the Debtor concerned about the

15  SEC's position if the Debtor had simply terminated services

16  under the contracts as of January 31st?

17  A    Very much so.  So, my own personal experience, as well as

18  the experience of our fund counsel, is that while the SEC

19  keeps a close eye on a number of issues related to investing

20  and fund management, retail funds get particular focus because

21  of the individuals who can invest in those and at least the

22  perception that they may not be as able to defend their rights

23  as others.  So the SEC does keep a particularly close watch on

24  those kinds of funds.

25      We were concerned that, even though we had done everything

Seery - Direct                    49

1   we believe correctly to terminate the agreements pursuant to

2   their terms, and in fact had negotiated for months in good

3   faith and spent millions of dollars trying to get a

4   transition, that if the funds were to simply stop providing

5   information to their investors or were to stop being able to

6   service their investors, that a SEC investigation would ensue

7   and that it would cost the Debtor time and considerable money

8   to deal with those issues.

9       Notwithstanding that, we felt it was important to notify

10  the SEC, and so we reached out through our counsel and advised

11  them of what we believed was going on and our view, based upon

12  the actual discussions and the request from the Advisors for

13  an extension, that nothing had been done up into the first

14  weeks of February.

15  Q    Thank you.  And ultimately, the Debtor and the Advisors

16  agreed to a two-week extension of time; do I have that right?

17  A    We agreed to a two-week extension in the first extension.

18  Q    Uh-huh.

19  A    And during that time, we tried to get, in particular, the

20  employees that would be transitioning and become the Newco to

21  really focus on trying to get an agreement nailed down.  And

22  so we had our -- our advisors take the agreement that was

23  largely structured in terms of knowing what the contracts were

24  and the costs that -- and work on trying to nail down the

25  final terms with respect to how the shared services would work

Seery - Direct                          50

1 over a period of time, including working with third-party

2 vendors.

3 Q    I just want to follow up on a couple of things that were

4 in your prior answer to make sure that the record is clear.

5 Does the Debtor have special fund counsel?

6 A    Yes.

7 Q    And who is the Debtor's fund counsel?

8 A    WilmerHale.

9 Q    And is it your understanding that they have the expertise

10 with respect to the securities and the management of funds of

11 the type that are at issue in this case?

12 A    Yes.  They're one of the top firms in the country in this

13 area.

14 Q    Okay.  And did -- well, I'll just leave it at that.  Do

15 you recall during this time if the Debtor informed the

16 Advisors that it would participate in negotiations only if

17 outside counsel were present?

18 A    Not negotiations.  I think we would always have been

19 willing to engage ourselves in negotiations.  What we were

20 concerned with were the employees who were forming Newco being

21 put in what we thought were untenable positions with respect

22 to negotiations involving certain members of the Advisors'

23 team and the board -- of the funds' boards of directors.  And

24 that came from very specific concerns that employees raised

25 with us about threatening conduct and statements from some of

Seery - Direct                         51

1  those folks.

2      There were a few employees that had shared service

3  responsibilities that were actually deemed employees or deemed

4  officers at some of the Advisors.  And so there was what I

5  will call a blame game going on, and the -- as soon as we came

6  to the end of January and there wasn't an ability to get a

7  deal done, certain members of the Advisor team or the fund

8  boards took very strident positions vis-à-vis those Debtor

9  employees.  And we were very concerned that, if there wasn't

10 someone there, counsel and taking notes, that those employees

11 would be at a disadvantage.

12     We also recommended that those employees resign those

13 positions because the negotiation and the positions of the

14 parties had separated such that we thought that having the

15 shared responsibility was untenable.

16     We made clear that we would have one of our counsel sit on

17 the phone and they would be there to listen and take notes and

18 nothing else.  And so that was something that I put in place

19 after advice of counsel that we were leaving our employees in

20 a very untenable space.

21 Q   And with respect to the notion of resigning, do you recall

22 if you gave the employees the option of resigning from one

23 entity or the other, or was it just from the Advisors?

24 A   From the Advisors.  But they obviously could have always

25 resigned from the Debtor.  We don't have any, with those

                            Seery - Direct                        52

1   employees, any contracts, and certainly it was -- I think I've

2   always made clear that if someone has a better opportunity,

3   they should go take it.

4   Q    And is it fair to say that during this two-week period,

5   notwithstanding some of the things that you described, the

6   parties did, in fact, make progress towards getting to a final

7   transition services agreement?

8   A    Yeah.  I think -- I think we made -- we made good

9   progress.  And even on the resignation issue, my understanding

10  -- and I didn't have these discussions directly -- was that

11  the Advisors agreed and I think the funds agreed that those

12  employees could resign, and if they ended up at Newco and

13  Newco was providing services, they could reassume those

14  positions post-termination from the Debtor.

15       So I think there was considerable progress around those

16  items.

17       The operational items, there was considerable progress

18  around.

19       There was already, I think, really good understanding and

20  agreement on the cost split.

21       And then there was considerable discussion around the

22  shared -- some of the shared items going forward, and then how

23  the transition mechanics would work in the event that one

24  party wanted to continue a contract and the other didn't.

25       So there was -- there was -- by the end of the two-week

Seery - Direct                              53

1  period, we'd started to make enough progress that we -- we

2  thought we'd actually get there.  It really shouldn't have

3  taken as long as it did.  It was -- it was, you know, one step

4  forward, one and a half steps back, quite often.  But I think

5  we had a -- largely had an idea that we were very close

6  towards the end of that two-week period.

7  Q    And was that the reason why the Debtor agreed to a short

8  further extension of the termination deadline to February

9  19th?

10 A    Yes.  The original concept that I had come up with with

11 one of the employees who was negotiating for the Newco was

12 that there was no reason that we would have any -- we

13 shouldn't be able to get it done in two weeks, particularly

14 since the economics had largely been agreed to and deemed fair

15 by the financial staff as well as the operators in the

16 business.  That we would use the next week to cross T's and

17 dot I's and get in a position to transition the employee team.

18      We also at that time extended the time for the employees

19 by a week, to make sure that, just in case we didn't get a

20 deal done, we had the staff to be able to clean up, if you

21 will, if negotiations completely fell apart.

22      But we did, we did agree to an extension at that point.

23 The counterparties paid for that extension.  They paid the

24 costs, not fully loaded, but costs of the employees, to help

25 defray the costs that we were carrying for them.  And that we

Seery - Direct                           54

1   hoped we'd have it completed by that final week.

2   Q    Did you have concerns, as the CEO, that the employees have

3   sufficient time to transition and wind down other aspects of

4   the Debtor's business that were being adversely impacted by

5   this process?

6   A    Oh, absolutely.  And if the deal was done, then we would

7   have a shared service arrangement.  And just to be clear, the

8   way that typically works is that -- we'll use the actual

9   parties -- the Debtor would still stay in its space, use its

10  systems, have its contracts.  The Newco or NPA entity would

11  stay in its space and use its contracts, most of which are in

12  the Debtor's name, but under the same arrangement that we had

13  previously, and we would be sharing a lot of services, so that

14  the transition issues that the Debtor has we would be able to

15  accomplish because the team would still be with us but they

16  would be part of the Newco or NPA as a shared resource.

17       In the event that we weren't able to reach agreement, I

18  needed to make accommodation with those employees to continue

19  to provide those services in order for the Debtor to complete

20  its transition.

21  Q    All right.  So let's take -- let's take this back a week,

22  to last Tuesday.  As of that time, did the Debtor believe that

23  it had reached an agreement on all material terms with the

24  Advisors?  With one exception?

25  A    Cautiously, yes.  I think at that point we felt that we

Seery - Direct                                55

1  were -- we were close, but there was a material open issue

2  that we had in terms of trying to get the final agreement

3  done.

4      And frankly, we were very concerned -- and this is borne

5  by history, not just of my own but the other folks on our team

6  who've been around a lot longer -- that there was a

7  considerable risk that the deal that was agreed to wouldn't

8  actually be signed and it would be retraded as we went

9  forward.

10 Q   As of Tuesday, did the Debtor inform the lawyers for the

11 Advisors that it was prepared to sign a fully-negotiated term

12 sheet, or, in the absence of that, it would seek judicial

13 relief?

14 A   Well, I gave instruction to counsel -- and this was -- you

15 know, we had reviewed this with both your firm and with

16 Wilmer, the WilmerHale firm -- as to how we should go about

17 making sure that the estate was protected in the event that

18 there was either a retrade or we simply couldn't come to a

19 final agreement.  And we had -- I advised your firm to tell

20 counsel on the other side that the agreement was done, that we

21 were prepared to sign it, but if they were unwilling to sign

22 it we were going to seek Court intervention to make sure that

23 we had approval of what we had done to date, declaratory

24 judgments setting forth or approving what we had done with

25 respect to the negotiations.

Seery - Direct                                56

1   Q    Was there -- was -- was there one issue that was -- one

2   meaningful issue that dividing the parties at that point in

3   time?

4   A    Well, the new -- the new issue that was surfaced, and it

5   was a new issue, was this idea that, notwithstanding the

6   preliminary injunction and notwithstanding how the business

7   has been run for the last couple months, that Mr. Dondero

8   would be able to come back into the office.  It didn't seem,

9   frankly, like a real business issue, but it became a

10  significant sticking issue.  Because for the Debtor, it's a

11  very significant issue.

12  Q    Why didn't the Debtor just agree to allow Mr. Dondero back

13  into the offices?

14  A    Well, as the Court has heard before in prior hearings, Mr.

15  Dondero's conduct through the fall, once the monetization plan

16  had been put in place, has been extremely difficult, to say

17  the least.  Threatening email or texts to me.  Obstreperous

18  litigation, I would say vexatious litigation, with respect to

19  every aspect of the transition.  Numerous retrading of

20  provisions in this negotiation.  And statements and

21  effectively, I think, threats to other employees, including

22  while he was on the stand, you know, in the court.  And I

23  found, from my seat, that that would be really difficult to

24  bring employees back into the Debtor to help implement the

25  plan while Mr. Dondero was in that space.  There was really no

Seery - Direct                              57

1  need for him to have to be in that space from an operational

2  perspective, as the funds and the Advisors had proved for the

3  prior two months.

4  Q   Is it your understanding that, but for the issue of Mr.

5  Dondero's access, the Advisors and the Debtor had otherwise

6  agreed to all material terms of a transition services

7  agreement as of last Tuesday evening?

8  A   Yes.

9  Q   Did the Advisors sign the term sheet that the Debtor had

10  tendered that reflected what you just described?

11  A   I don't recall if the Advisors did.  I certainly did.  But

12  there were -- there were additional changes.  So we -- we had

13  reached that agreement earlier in the week.  We didn't get

14  agreement on the final point of Mr. Dondero's access.  We

15  filed our pleadings in the Court, and I believe that was

16  Tuesday or Wednesday, and then moved forward towards this

17  hearing.

18      And during that time, the negotiations continued.  So

19  there were a number of different changes, but we -- we were

20  very clear that we had an arrangement, we had a deal that was

21  fully negotiated, we had a deal that we thought was extremely

22  beneficial to the Advisors, that it worked well for the

23  Debtor, that it worked well for the Debtor's employees, who

24  would then be Newco employees, or NPA employees, depending on

25  how they ended up splitting it, and that the flexibility of

Seery - Direct                                    58

1   that agreement served all the parties' interests and we didn't

2   intend to change it.

3   Q    Did -- do you know whether the Debtor provided to the

4   Advisors' counsel a copy of the complaint and the motion that

5   it was intending to file prior to the time that it actually

6   filed the documents?

7   A    Yes, we did.

8   Q    Okay.  So the Debtor gave -- is it fair to say the Debtor

9   gave the Advisors specific notice, and, indeed, copies of the

10  documents before the action was commenced?

11  A    Well, I think we -- part of the strategy we'd come up with

12  with WilmerHale was that we should do everything we can to be

13  accommodative, within the reason -- within what we thought was

14  reasonable for the Debtor being able to implement its plan.

15  And I believe we did that.  And out of caution and

16  frustration, both with respect to the inability to get TS, if

17  you will, as well as the concern that you could have a

18  retrade, based on past experience, we told him if we didn't

19  have an agreement that was signed and that was binding, that

20  we would move forward with the court hearing.

21       The reason this is structured, by the way, as a binding

22  term sheet, it was a scramble in January to try to put it

23  together.  Otherwise, we would have had a binding agreement.

24  It actually reads more like an agreement than a term sheet,

25  and has a significant Schedule A on the back.  But the amount

Seery - Direct                                    59

1  of time that's been spent on this, it's probably not fair to

2  call it a term sheet.  It's an agreement.

3  Q    After the Debtor commenced the action, do you recall that

4  last Friday the Advisors made a written proposal through their

5  counsel with two options, an Option A and an Option B?

6  A    Yes, I do.

7  Q    Did the Debtor perceive at that time that the Advisors'

8  attorneys were authorized to make that offer?

9  A    Well, they represented that they were.  We were at a -- we

10  were at a crossroads.  We had spent so much time on this

11  agreement and trying to get to a final shared service

12  arrangement that the last day for employees, which was

13  scheduled to be the last day of the month, was coming on us

14  very quickly.  And if we weren't going to get this shared

15  arrangement done, we had to make significant decisions with

16  respect to how to transition, with whom to transition, and how

17  to move forward to implement the plan.  So we couldn't,

18  frankly, waste any more time on this agreement.  And I say

19  "waste" with thought, because we thought it was productive,

20  but the amount of time, literally months, is astounding for

21  something that is not that complicated.

22      We got to Friday, and the new arrangement or proposal from

23  the Debtor was -- was basically you can -- I mean, from the

24  funds, Advisors, was you can take A or B.  A was, in essence,

25  the same arrangement we had prior in the week, but Mr. Dondero

Seery - Direct                              60

1  could come in the office.  We'd already told them that was

2  untenable, it didn't work.

3      B was you could -- we could do the same arrangement except

4  the Advisors would not be responsible for any of the rent.

5  Recall that I mentioned that this was a 75/25 split on the

6  rent.  Roughly, that's about a million dollars to the estate.

7      We spent time Friday morning with the IT folks and with

8  the operations folks on can this be done?  Can we actually

9  provide -- can you provide the services?  Can these funds be

10  run if they're not in the office?  And the answer was so long

11  as the operations people can have access to the office and so

12  long as the IT people can have access to the office, we could

13  largely run it.  So this was just really a retrade on

14  economics.

15      We determined that, fine, we'll take Option B, even though

16  it cost the estate.  We didn't have the luxury of being able

17  to continue to waste time and negotiate this with the

18  impending dates coming up.  So we agreed to Option B on

19  Friday.  I, in fact, sent my term sheet to counsel to deliver,

20  and it was scheduled, I think, as you mentioned earlier in

21  your opening, for the afternoon of Friday for a call to go

22  through wire transfers, which included an initial payment plus

23  a deferred payment, a monthly payment, plus the cost payments

24  that would be made under the agreement, and certain offsets

25  that we had previously agreed to.

Seery - Direct                                    61

1    Q    And are you aware, did the Debtor, through counsel, inform

2    the Advisors, through counsel, that the Debtor had accepted

3    Option B?

4    A    Yes.  My counsel told me that they had sent over notice to

5    them, that the call to walk through the final points and to

6    assure that wires were being sent and to engage in the

7    exchange of signatures was set up and everything was agreed

8    to.

9    Q    And what happened later in the day?

10   A    I would say shockingly, but it wasn't, we were told that

11   the call was off.  Mr. Hogewood advised that, through email,

12   that there would no longer be a necessity of a call and he

13   would be reaching out directly to Debtor's counsel.

14   Q    And did you learn after -- after -- in the afternoon that

15   the Advisors had withdrawn Option B, the one that the Debtor

16   had accepted?

17   A    Initially, it was withdraw Option B, and then it was

18   accompanied I think with a basic statement that we don't

19   really need you anymore, which was surprising, only because it

20   --

21        (Interruption.)

22   A    -- a transition like this, you would -- you would run

23   systems side by side, make sure that your IT folks were

24   heavily involved.  You would assure that your -- your human

25   resources and operations folks were involved.  And none of

Seery - Direct                                    62

1   that had been done because it was assumed that the transition

2   would happen.

3   Q   Is it your understanding that the Advisors were still at

4   that time willing to do Option A, the one that would allow Mr.

5   Dondero back in the office?

6   A   I believe they were, yes.

7   Q   Do you know if the Advisors made any further offers in

8   respect of a transition of services over the weekend?

9   A   Well, that was one of the things that was odd and belied

10   their statement that they could operate without any assistance

11   from the Debtor, is that they left Option A on the table.  If

12   they had alternate arrangements, why was Option A still on the

13   table?  So that was puzzling, but counsel made the

14   representation to us and we took it.  And then other counsel

15   over the weekend just started lobbing in proposals.

16   Q   Did those proposals contemplate in any way the continued

17   provision of services by the Debtor to the Advisors?

18   A   That's -- that's what they were, yes.

19   Q   Okay.  All right.  Why did the Debtor commence this

20   lawsuit?

21   A   Well, I -- as I explained earlier, we believe that we've

22   done everything we were supposed to do or required to do under

23   the contracts, the shared service arrangements, in terms of

24   both operating under those agreements and terminating them

25   according to their terms.  We believe we've done everything

Seery - Direct                           63

1    that we'd be required to do under the Bankruptcy Code with

2    respect to filing a plan, making clear what the provisions are

3    with respect to executory contracts, and making that plan --

4    making it even more clear what the provisions dealt with, how

5    the provisions of the plan would impact executory contracts

6    and how those contracts would be deemed rejected if they

7    weren't explicitly accepted and assumed.  And we made clear,

8    we wanted to make clear that we'd properly terminated the

9    agreements in accordance with their terms.

10        So we filed this action because of the, frankly, the back-

11   and-forth negotiations as well as the accusations and threats

12   from earlier in the negotiations that I previously described,

13   where we're seeking now a declaration that the shared services

14   were properly terminated in accordance with their terms, that

15   the shared services were not assumed pursuant to the contract,

16   and although they'd been terminated, even if they had not been

17   terminated, they would -- they would be deemed rejected.  That

18   the Debtor is permitted, because of the terms of both the plan

19   and the contracts, which have been terminated, to cease all

20   access and support and has no further responsibility for

21   providing any services to the shared service counterparties

22   under those terminated agreements, and that the shared service

23   parties, the Advisors, come forth and tell the Court, tell the

24   world, tell the investors, and tell the SEC that they have an

25   alternative arrangement.

```
                        Seery - Direct                  64
```

1    And, again, our concern is while, yes, we are good

2  corporate citizens and we want to make sure that we don't

3  leave, if you will, a mess because of the actions that are

4  happening in the court, we're very concerned that our

5  counterparties may not be as concerned about the mess they

6  leave.

7    And we -- one of the reasons we reached out to the SEC was

8  to make sure that they were on notice of this proceeding and

9  the potential impact on retail investors, and we think that

10 it's something that the Court should require these Advisors,

11 who have been in antagonistically fighting the case, knowing

12 the specific provisions of the case, and not making

13 arrangements until the last 24-48 hours, we do -- we do

14 believe that, as corporate citizens and as responsible

15 fiduciaries in a bankruptcy, we have some responsibility to

16 make sure these terminations are handled correctly.  While we

17 may not be able to force them to do so, we should have them

18 tell us how they're doing it.

19 Q    Does -- did the Debtor have any concerns that the failure

20 of the Advisors to adopt and implement a transition plan, that

21 that might have negative impacts on the Debtor's ability to

22 implement its plan of reorganization?

23 A    Well, as I said earlier, the SEC, in our experience and

24 our counsel's experience, takes a particular focus on retail

25 funds.  And where those funds have blown up for various

Seery - Direct                          65

1  reasons, whether they are unable to make a redemption or

2  they're caught in some kind of security that doesn't match the

3  investment parameters of the fund or whatever those are, the

4  SEC takes a particular focus, and investigations can take

5  significant time and have significant cost for all parties who

6  are anywhere near the retail funds.  And, clearly, as the

7  provider of shared services to the Advisors, while we didn't

8  have any agreement with the funds, if the SEC came in to

9  investigate or if they do come in to investigate what's gone

10 on here, there will be a significant cost, and it will, if not

11 derail, it will certainly slow down our implementation of our

12 plan.

13 Q   What exactly does the Debtor want the Court to -- what

14 relief is the Debtor seeking now that the Debtor has learned

15 of the four-legged plan that was described yesterday in the

16 deposition?

17 A   The declaratory relief that I just stated would be

18 essential for the Debtor.  One, that the contracts were

19 properly terminated, in accordance with their terms.  Two,

20 that they were not assumed pursuant to the plan.  And three,

21 that the Debtor is permitted to cease all services and all

22 access to the shared service counterparties.

23     To the extent that they need assistance, we'll help them

24 out, we'll give them information.  If they have third-party

25 professionals that they want to send over, we'll help them

Seery - Direct                         66

 1   with data retrieval.  But we do have a plan to implement, and

 2   we don't have necessarily the full staff to provide services

 3   that they were otherwise receiving from us.  So we would like

 4   a declaration that we do not owe them any of those prior

 5   services from the terminated contracts.

 6   Q    Did you hear in the opening Mr. Hogewood mention that the

 7   Advisors do want continued access to the Debtor's books and

 8   records?  Or to their, I guess, to their own books and

 9   records?

10   A    They'll be able to get access, but that doesn't mean that

11   it's access 24 hours a day.  That doesn't mean they get to

12   continue to use the systems without paying for them.  That

13   doesn't mean they get to use employees without paying for

14   them.  If they have data requests, we would certainly get to

15   them, but we have to maintain and employ people to do that.

16   Q    And is part of the injunction that the Debtor seeks here

17   is to have the Court direct the Advisors to implement and

18   adopt a transition plan that would include taking -- taking

19   their books and records so that the Debtor isn't in that

20   position for a long-term -- on a long-term basis?

21   A    Well, we certainly don't want to be in that position for a

22   long-term basis.  We -- we're certainly not going to be the

23   party that has to maintain their records.  If they can lift

24   them off, we will do that.

25       The challenge has been, according to our IT professionals,

Seery - Direct                          67

1  who are quite good, separating the data is difficult.

2      Now, we know that the Advisors' employees were extracting

3  a lot of data off the system over the last week.  And whether

4  it was on thumb drives or direct transfers, we know that a lot

5  of data has been taken, which is fine.  We just don't -- we

6  don't know what else they might need and we're not in a

7  position to provide a full level of service to them at --

8  after today.

9  Q   Is the Debtor asking the Court to force the Advisors to

10 adopt any particular plan?

11 A   Not at all.  If they -- if their plan works, that's great.

12 If they went to a third-party service, some other fund --

13 outside fund advisors or shared service providers that can do

14 the job, that's fine.  We would like to just have the least

15 amount of burden on our estate going forward, and a

16 declaration that we have no responsibility to provide any

17 particular services, I think, is essential.

18 Q   And would the mandatory injunction that required the

19 Advisors to adopt and implement a transition services plan,

20 would that -- how does that advance the Debtor's goals?

21 A   Well, it sets forth exactly what the Advisors and the

22 funds think they need.  And if it's something other than that,

23 then they're going to have to come talk to us, and we'll

24 figure out whether we can provide it and then how it gets paid

25 for.

Seery - Cross                          68

1              MR. MORRIS:  Your Honor, I have no further questions

2     of Mr. Seery right now.

3              THE COURT:  All right.  Pass the witness.  Mr.

4     Rukavina?

5              MR. MORRIS:  Your Honor, may I just ask for a short

6     break?

7              THE COURT:  All right.  Does everyone need a break?

8              MR. RUKAVINA:  Your Honor, I won't -- Your Honor, I

9     won't have much for this witness, so I might suggest if Mr.

10    Morris can wait five or ten minutes.  But whatever is good for

11    the Court.

12             MR. MORRIS:  Go right ahead, sir.

13             THE COURT:  All right.

14             MR. MORRIS:  Thank you.

15             THE COURT:  Ten minutes.  If you take more than ten,

16    we're going to break.  Thank you.

17             MR. RUKAVINA:  Yes.

18                        CROSS-EXAMINATION

19    BY MR. RUKAVINA:

20    Q   Mr. Seery, very quickly, I just want to make sure that the

21    record here is complete.  You were discussing Option A and B

22    that was put on the table on Friday, and you were discussing

23    then how Option B was taken off.  Do you recall that?

24    A   Yes.

25    Q   And you did mention to the judge that Option A was that my

Seery - Cross                    69

1   clients would take all of the leasehold space, correct?

2   A    I don't think I mentioned that, no.

3   Q    Okay.  Well, I just want to make sure the judge

4   understands that Option A, my clients would have paid for a

5   hundred percent of the rent going forward.  Correct?

6   A    I don't believe that's how Option A worked, no.  I believe

7   that Option A was structured that, in essence, the Debtor

8   would get out and the shared -- the Advisors would keep all of

9   the space as well as all of the systems and all of the

10  records.

11  Q    Correct.  But the Advisors would pay a hundred percent --

12  okay.

13        MR. RUKAVINA:  Let's just pull up Exhibit 19, Mr.

14  Vasek, please.

15  BY MR. RUKAVINA:

16  q    And I just want the -- I just the record to be clear here,

17  Mr. Seery.

18        MR. RUKAVINA:  Mr. Vasek, are you there?  (Pause.)

19  And then scroll down to Page 5 of 7.  Okay.  Stop there.

20  BY MR. RUKAVINA:

21  Q    Mr. Seery, can you see this to refresh your memory?

22  A    Yes.  I didn't need it to be refreshed.  That's what I

23  said.

24  Q    Well, doesn't Option -- doesn't Option A here say NexPoint

25  parties take one hundred percent of the leased premises and

Seery - Cross                    70

1   one hundred percent of the rental cost?

2   A    It does, but the key part of it is that the Debtor gets

3   out.

4   Q    I understand that.

5   A    It gives up control of that stuff.

6   Q    I understand that.  I was just trying to clarify for the

7   record, because you didn't mention it before, that NexPoint

8   would pay a hundred percent the rent.  And I am correct

9   about that, right?

10   A    That's correct.

11   Q    Okay.  And Option B, you mentioned in your direct

12   testimony that in Option B my clients would pay no rent.  Do

13   you recall that?

14   A    Yes.

15   Q    But do you also recall that under Option B my clients

16   would vacate the premises?

17   A    I believe -- yes.  I think I said that, yes.

18   Q    Okay.  I believe you also mentioned that the Dondero

19   access issue was a last-second issue.  In fact, that had been

20   a lingering issue for weeks, had it not?

21   A    I don't believe so.  I don't think it came in until after

22   January 31st.

23   Q    Are you not aware that with each turn of the draft

24   agreement your lawyers would change it to make it clear that

25   Dondero couldn't have access while the Advisors' lawyers would

Seery - Cross                          71

1   change it to make clear that Dondero could have access?

2   A    I'm aware that those went on, but I believe that was after

3   January 31st.

4   Q    Okay.  I think I have very few questions, since Mr. Morris

5   really, I think, went over it in quite some detail.  Please

6   confirm for the Court that my clients' employees have vacated

7   the premises as of last Friday?

8   A    That's my understanding, but they still are accessing

9   services.

10  Q    Okay.  And please confirm for the Court that the Debtor

11  has not and will not provide any transition services after

12  last Friday, February 19th.

13  A    We actually have provided assistance, and certain of the

14  employees of the Debtor are doing things for the -- your

15  clients.

16      So, for example, trades were conducted yesterday by

17  clients of HCMLP for your clients.  Data was accessed by your

18  clients.  Equipment was taken from the office and used by your

19  clients.  The systems were maintained by the Debtor and

20  accessed by your clients.  It's a pretty extensive list.

21  Q    But that's because you have decided to allow that to

22  facilitate the transition, correct?

23  A    That's correct.

24  Q    Yeah.  You're not doing that because there's an agreement

25  in place; you're doing it out of good faith but not because

Seery - Cross                              72

1   there's any kind of requirement to do that, correct?

2   A    That's correct.

3   Q    Okay.  As of February 19th, the Debtor is no longer

4   required to provide any of the shared services, and it will

5   not, unless you on a one-by-one basis agree to permit it,

6   correct?

7   A    I haven't been doing it on a one-by-one basis.  We did it

8   on a blanket basis.

9   Q    Okay.  And as of the end of today, that's over, right?

10  A    I hope so.  We'll have an order that will give us the

11  declarations we desire and we can move forward.

12  Q    Well, let me clarify my question.  If the judge does not

13  enter a mandatory injunction, the Debtor has nevertheless told

14  the Advisors that any of the shared services are done as of

15  the end of the day, correct?

16  A    I don't believe that's the case.  We'll consult with our

17  counsel, both bankruptcy and regulatory.

18  Q    I think you mentioned this, but you can confirm for the

19  Court that some of the data held by the Debtor is actually the

20  property of the Advisors, correct?

21  A    I don't -- I don't know that it's the property of the

22  Advisors.  I think they're entitled to receive it, but we're

23  entitled to keep a copy.

24  Q    Okay.  Well, I'm not going to waste the Court's time by

25  reading the transition services agreement, but if that -- I'm

Seery - Cross                                      73

1  sorry, the shared services agreement -- but if that agreement

2  provides that my clients' data is its property, you wouldn't

3  disagree with that, would you?

4  A    No, I wouldn't --

5          MR. MORRIS:  Objection.

6          THE WITNESS:  If that's what it says, I wouldn't

7  disagree with it.

8  BY MR. RUKAVINA:

9  Q    Okay.  And in fact, the Advisors have already copied a

10 large amount of data and have taken that copy for their own

11 use, correct?

12 A    That's what I've been advised.

13 Q    Okay.  And with respect to their own data, not the

14 Debtor's data, you will continue to, with reasonable access,

15 permit them to copy the balance of whatever their own data

16 remains, correct?

17 A    To the extent that we can, yes.

18 Q    Yeah.  Yeah.  Okay.  And just to confirm, other than the

19 employees that you determined will be retained by the

20 Reorganized Debtor, the remaining employees will be terminated

21 effective February 28th?

22 A    Not -- not all, no.  There's a -- there are some changes

23 to that.

24 Q    Okay.  Well, some employees are going to be terminated on

25 February 28th, correct?

```
                         Seery - Cross                      74
```

1  A    Yes.

2  Q    Okay.  And the Debtor doesn't have a problem with my

3  clients either directly or indirectly retaining those

4  employees, correct?

5  A    No problem at all.

6  Q    Okay.  Thank you.

7         MR. RUKAVINA:  Your Honor, I'll pass the witness.

8  Thank you.

9         THE COURT:  Any redirect?

10        MR. MORRIS:  I have no redirect, Your Honor.

11        THE COURT:  All right.  Thank you, Mr. Seery.

12    We'll take a ten-minute break.  It's 10:51 Central.  We'll

13 come back a minute or two after 11:00.

14        THE CLERK:  All rise.

15        MR. MORRIS:  Thank you, Your Honor.

16        MR. POMERANTZ:  Thank you, Your Honor.

17    (A recess ensued from 10:51 a.m. until 11:05 a.m.)

18        THE CLERK:  All rise.

19        THE COURT:  All right.  Please be seated.  All right.

20 We're back on the record in the Highland-Advisors matter.  Mr.

21 Morris, you may call your next witness.

22        MR. MORRIS:  Thank you, Your Honor.  The Debtor calls

23 (audio gap) Dondero.

24        THE COURT:  I'm sorry.  Did you say Mr. Dondero?

25        MR. MORRIS:  Yes.

75

1          THE COURT:  All right.  Mr. Dondero, could you speak

2   up?  Please say, "Testing, one, two" so we pick up your video.

3          MR. DONDERO:  Testing, one, two, three.

4      (Feedback.)

5          THE COURT:  All right.  Well, I heard you.  I don't

6   see the video yet.  There you are.  Okay.  We're going to hope

7   we've got some good audio.  I was hearing a little bit of

8   feedback.  Please raise your right hand.

9          MR. DONDERO:  Oops, I'm sorry.  I can't hear anybody.

10          THE COURT:  All right.  I need you to please raise

11   your right hand to be sworn in.  Well, this is a problem.  Mr.

12   Dondero, --

13          MR. DONDERO:  Take off the headphones?

14          MR. WILSON:  Judge, we're trying to get his

15   headphones to get the sound through them.  Should just be just

16   a second.

17      (Pause.)

18          THE COURT:  All right.  Do I need to be speaking to

19   see if they can hear me clearly?

20          A VOICE:  How's it going?

21          THE COURT:  All right.  What's going on?

22          MR. WILSON:  I can hear you, Judge.  We're just

23   working through a technical issue with Mr. Dondero's

24   headphones.

25          THE COURT:  All right.

Dondero - Direct                    76

1          MR. WILSON:  Hopefully we can resolve that

2    momentarily.  (Pause.)  We can try that.

3        (Pause.)

4          MR. WILSON:  Your Honor, we're going to move Mr.

5    Dondero to another room so that we can get this issue resolved

6    without the need for headphones.

7        (Pause.)

8          MR. DONDERO:  Testing, one, two, three.

9          THE COURT:  All right.  We got you.  Well, we've got

10   your sound.  Can you hear us okay, Mr. Dondero?

11         MR. DONDERO:  Yes.

12         THE COURT:  All right.  Please raise your right hand.

13       (The witness is sworn.)

14         THE COURT:  All right.  Mr. Morris, go ahead.

15         MR. MORRIS:  Thank you, Your Honor.  John Morris;

16   Pachulski, Stang, Ziehl & Jones; for the Debtor.

17          JAMES D. DONDERO, DEBTOR'S WITNESS, SWORN

18                      DIRECT EXAMINATION

19   BY MR. MORRIS:

20   Q    Can you hear me okay, Mr. Dondero?

21   A    Yes.

22   Q    Okay.  Just a few questions.  You were aware in November

23   that the Debtor had given notice of termination of the shared

24   services agreements with the Advisors, correct?

25   A    Yes.

Dondero - Direct                            77

1  Q   Okay.  And you understood that the Debtor was going to

2  terminate all shared services to the Advisors as of January

3  31, 2021, correct?

4  A   Yes.

5  Q   And were Dustin Norris and D.C. Sauter authorized by you

6  to try to negotiate with the Debtor the terms of a transition

7  services agreement?

8  A   Yes.

9  Q   And had the Debtor adopted a transition plan as of January

10 31, 2021 pursuant to which it would not need any services from

11 the Debtor?

12 A   I don't know.

13 Q   Okay.  You're not aware of the Advisors having a plan in

14 place as of the termination date that would have allowed the

15 Advisors to obtain back-office and middle-office services from

16 somebody other than the Debtor, correct?

17 A   I don't know.  They were always working on a Plan A and a

18 Plan B.

19 Q   Okay.  Are you -- did you become aware that the Debtor had

20 agreed to extend the termination deadline by a couple of

21 weeks?

22 A   Yes.

23 Q   And is it your understanding that that extension was

24 granted in order to give the Advisors more time to develop a

25 transition services plan?

Dondero - Direct                        78

1  A    I -- I think it was to continue negotiations.  I don't --

2  I don't know if the plan was part of the reason.

3  Q    Okay.  Did you learn at some point early last week that

4  the Debtor and the Advisors had reached an agreement on all

5  material terms of a transition services agreement but for your

6  access to the Debtor's offices?

7  A    Yes.  I believe over a thousand line items.

8  Q    Okay.  And did you learn that the Debtor had tendered a

9  term sheet that reflected the entirety of the parties'

10 agreement but for your access, with a demand that the

11 agreement get signed or the Debtor would commence a lawsuit?

12 A    I became aware of that Wednesday, in the middle of the ice

13 storm, middle of the day.

14 Q    Okay.  Let's pull up Exhibit 17 and see if I can refresh

15 your recollection as to the timing and the substance.

16         MR. MORRIS:  And if we could go to the bottom of the

17 email string.

18 BY MR. MORRIS:

19 Q    This is an email string between lawyers for the debtor

20 and the Advisors.  Do you see that there's an email from Mr.

21 Demo there dated Tuesday, February 16th?

22 A    Yes.

23 Q    Okay.  And the lawyers on this email from K&L Gates, those

24 were the lawyers who were representing the interests of the

25 Advisors; is that right?

Dondero - Direct                          79

 1  A    Yes.

 2  Q    And do you understand that Timothy Silva of WilmerHale and

 3  my colleague, Mr. Demo, were representing the interests of the

 4  Debtor?

 5  A    Yes.

 6  Q    And do you see in the first paragraph that Mr. Demo

 7  informs Mr. Hogewood that the Debtor is prepared to sign the

 8  attached term sheet, in the absence of which it would be

 9  filing an adversary proceeding?

10  A    Yes.

11  Q    Okay.  And does that reflect your recollection that, in

12  fact, it was on Tuesday afternoon that the Debtor made the

13  demand to either sign the term sheet or there would be

14  litigation?

15  A    It doesn't change my testimony.  The first time I heard

16  about it was -- about a suit coming at 6:00 was on Wednesday.

17  Q    Okay.  Let's go up to the -- Mr. Hogewood's response.  Did

18  you learn that -- did you have any communications with anybody

19  on Tuesday about the possibility of the Debtor filing a

20  lawsuit?

21  A    No.

22  Q    Okay.  Can you go -- can you go to the email above?  Do

23  you see -- let me see if this refreshes your recollection.  Do

24  you see that Mr. Demo sent to Mr. Hogewood on Tuesday, just

25  before 5:00 p.m., drafts of the Debtor's adversary proceeding

Dondero - Direct                    80

1  papers?

2  A   Yeah, I've never -- except for I think you gave me these

3  emails yesterday, but until yesterday I've never seen these

4  emails before.

5  Q   So, so the lawyers who were representing the Advisors'

6  interests weren't keeping you informed last week about the

7  status of negotiations; is that your testimony?

8  A   Generally.  Again, I delegated it to Dustin and D.C. to

9  handle the details.

10 Q   Okay.

11         MR. MORRIS:  And scroll up to the -- to Mr.

12 Hogewood's response.

13 BY MR. MORRIS:

14 Q   Did you learn that Mr. Hogewood had asked for an extension

15 of the deadline from 6:00 p.m. to midnight at any time last

16 week?

17 A   No.

18         MR. MORRIS:  Let's go -- let's go -- let's go to Mr.

19 Silva's email, the next one up.

20 BY MR. MORRIS:

21 Q   Were you aware that the parties were negotiating and

22 trying to finish up the agreement last Tuesday as the Debtor's

23 deadline for filing a lawsuit was drawing near?

24 A   I knew they were in negotiations on Tuesday and Wednesday,

25 but I didn't know the deadline was growing near until

Dondero - Direct                          81

1    Wednesday.

2    Q    Did you learn -- did you learn what the open issue or open

3    issues were as of that time?

4    A    I believe there was only one open issue.  It was regarding

5    my occupancy.

6    Q    And what is your understanding of what the issue was as of

7    that time last week?

8    A    Since the beginning of the case, the Highland employees

9    have been told to work from home so that the estate didn't

10   have any COVID liability.  There hasn't been a Highland

11   employee in the office in a year except for occasional visits.

12   NexPoint employees have worked every day through COVID, full

13   staff every day.

14       With us taking over either a hundred percent or 75 percent

15   of the lease, and the supervisory leadership strategy that I

16   deserve, and on a regulatory basis have a responsibility to

17   provide for the RIAs, I needed to be in the office on a going-

18   forward basis.  And I believe grand efforts were made on the

19   part of Dustin and D.C. to create a wall for a section of the

20   office for the Highland employees -- who have never come in

21   for the last year, probably aren't coming in for the next year

22   -- but if they were to come in, they would have private egress

23   and ingress, and nobody else in the office, including myself,

24   would ever see them come and go.

25       And I know there were clear negotiating representations

Dondero - Direct                    82

1   made on their part, but there's never anything that I've been

2   accused of that's been in-person activity.  There have been a

3   couple texts, a couple emails, but nothing ever in-person.  So

4   the separation for employees who probably were never going to

5   come in the office, and as NexPoint was paying 75 or a hundred

6   percent of the lease, it made inordinate sense -- in fact, it

7   was only tenable -- if I was able to come in and provide

8   leadership and oversight to the (audio gap) Advisors.

9   Q    Did you testify last night that it was Judge Jernigan who

10  ordered the Debtor's employees to stay out of the office

11  because of COVID?

12  A    That's what I remember from early in the case, so that

13  there wouldn't be any COVID liabilities in the estate, but

14  that's why the Highland employees haven't been around for a

15  year.

16  Q    So it's your -- it's your memory that Highland employees

17  haven't been around for a year and that the reason for that is

18  because Judge Jernigan issued an order telling them to stay

19  out of the office because of the COVID risk; is that right?

20  A    That's -- that was my recollection.

21  Q    Okay.  You haven't been in the office in the calendar year

22  2021 except for the day that you went to give your deposition

23  early in January; is that right?

24  A    Yes.

25  Q    And have the Advisors functioned, notwithstanding your

Dondero - Direct                                    83

1    absence from the office?

2    A    Yes.

3    Q    Okay.  And in fact, at the end of the day, notwithstanding

4    everything you just said, is it fair to say that the only

5    issue that you're aware of that separated the Debtor and the

6    Advisors as of last Wednesday was your access to the offices?

7    A    I believe that's the case.

8            MR. MORRIS:  And can we just scroll up a little bit

9    to Mr. Hogewood's -- the next email on the next page?  Yeah.

10   Right there.

11   BY MR. MORRIS:

12   Q    In fact, that's -- to put a fine point on it, the

13   Advisors' lawyer says specifically is keeping Jim Dondero away

14   from the office worth losing out on the financial advantages?

15   Is that the position that the Advisors took at that time?

16   A    Again, I've never seen these emails before and I'm not

17   aware of the specific back-and-forth negotiations.

18   Q    Okay.  But that's consistent with your understanding, that

19   the only issue that was outstanding as of that moment in time,

20   the only material issue, was your access to the office.

21   Right?

22   A    As of that moment in time, yes.

23   Q    And otherwise, the Advisors, but for your desire to have

24   access, the Advisors would have had a fully-negotiated

25   complete transition services agreement with the Debtor and

                        Dondero - Direct                    84

1  there would have been no lawsuit, fair?

2  A    I believe, yeah, I believe that's largely what -- the

3  status at that point.

4  Q    Okay.  And so -- and so, because you weren't given access,

5  the Advisors didn't agree to the proposal that was otherwise

6  acceptable, correct?

7  A    Yes.

8  Q    Okay.  And did you lose interest in the negotiations after

9  the Debtor made it clear that they wouldn't provide access to

10  you?

11  A    Lose interest?  Yeah, but I mean, the two parallel paths

12  for discretion I had given Dustin and D.C. to work on was

13  either complete the negotiated settlement that really would

14  have been, I think, the best transition for everybody and a

15  win-win for everybody, but if not, be prepared for us to go it

16  alone or the Advisors to be able to go it alone and operate

17  without Highland and without being in the space.

18  Q    And did you give that instruction last Thursday after the

19  -- after the Debtor refused to give you access?

20  A    Yeah.  They knew that that -- those were -- those were the

21  only two -- the only two -- the only two that I had approved.

22  They were the only two directions I had approved.

23  Q    Are you aware that on Friday -- withdrawn.  On Friday, the

24  lawyers at K&L Gates made a proposal to the Debtor that

25  contained two options; is that correct?

                              Dondero - Direct                          85

 1   A    Yes.

 2           MR. MORRIS:  Can we please put up on the screen

 3   Exhibit #19, please?  And if we could go to the bottom.

 4   BY MR. MORRIS:

 5   Q    Mr. Hogewood wrote to my colleague, Mr. Demo, just before

 6   noon on Friday, February 19th.  Do you see that?

 7   A    Yes.

 8   Q    And this -- Mr. Hogewood presented two options.  You were

 9   -- were you aware on Friday morning that Mr. Hogewood was

10   going to be presenting two options?

11   A    I was generally aware, which I think is what I testified

12   to in my depo yesterday, that D.C. and Dustin were

13   enthusiastically trying to come up with a settlement.  They

14   believed it was close enough to try and get something done,

15   and they were going to work, you know, an A and a B, but

16   consistent with my direction that there was really only two

17   alternatives, but they were still optimistic, because, besides

18   it being a win-win for everybody, it would be less risk and

19   less work for the Advisors if something like the original

20   transaction could get done.

21   Q    Okay.  Do you see --

22           MR. MORRIS:  If we could take a look at Option B.

23   BY MR. MORRIS:

24   Q    Option B, as written by Mr. Hogewood, would have had the

25   Debtor assume the entire lease and have NexPoint vacate at the

Dondero - Direct                              86

 1  end of the month.  Do you see that?

 2  A    Yes.

 3  Q    And that's an offer that was made by Mr. Hogewood on

 4  behalf of the Advisors on Friday just around noontime; is that

 5  fair?

 6  A    I believe so.

 7  Q    Okay.  Do you know --

 8           MR. MORRIS:  Can we scroll up, please?

 9  BY MR. MORRIS:

10  Q    And Mr. Demo responds just a few moments later by saying

11  that he would discuss the options, right?

12  A    Yes.

13  Q    Okay.  And then the very next moment, if you scroll to the

14  next one, Mr. Hogewood actually informs Mr. Demo that he had

15  been informed, "There may be an edit needed to Option B, so I

16  need to pull that back momentarily."  Do you see that?

17  A    Yes.

18  Q    Do you know what edit was being considered by the Advisors

19  early in the afternoon on Friday?

20  A    No.

21  Q    Okay.

22           MR. MORRIS:  Let's scroll up to the next email,

23  please.

24  BY MR. MORRIS:

25  Q    And Mr. Demo just responds and he says, "Understood."

Dondero - Direct                        87

1    Fair?

2    A    (garbled)

3    Q    Let's -- okay.  And then the next email from Mr. Hogewood

4    says, "I am authorized to put Option B back on the table as

5    stated below.  Both A and B are on the table for your

6    consideration."  Do you see that?

7    A    Yes.

8    Q    Do you believe that Mr. Hogewood was acting without

9    authority when he made that statement to the Debtor?

10   A    I don't know.

11   Q    Did you ever ask Mr. Sauter or Mr. Norris whether Mr.

12   Hogewood was acting outside the scope of his authority when he

13   made this offer?

14   A    No.

15        MR. MORRIS:  Can we scroll up to the email -- the

16   next email, please?

17   BY MR. MORRIS:

18   Q    Do you see that Mr. Silva on behalf of the Debtor was

19   looking for a time to discuss?

20   A    Yes.

21   Q    And then if we go to the next email in this string,

22   they're asking for dial-in.  Did you learn early in the

23   afternoon on Friday that the Debtor had accepted Option B as

24   presented by Mr. Hogewood on behalf of the Advisors?

25   A    I -- I don't know when I became aware of that.

Dondero - Direct                          88

1 Q    Did you learn --

2         MR. MORRIS:  Let's go ahead and take this down and go

3 to the next exhibit, please.  And start at the bottom.

4 BY MR. MORRIS:

5 Q   Do you see that Mr. Hogewood is writing to my colleagues

6 again, and in the middle paragraph he says, "As you know, the

7 term sheet preserves everyone's rights on various claims and

8 other litigation, and Davor suggested it would be appropriate

9 to track that language in the body of the agreed settlement

10 order in addition to attaching the term sheet to the order"?

11    Were you aware early Friday afternoon that the lawyers for

12 the parties were discussing the form of an agreed settlement

13 order that would embody the Option B approach?

14 A    No.

15 Q   Do you see in the next paragraph there's a question as to

16 whether John is preparing the order or an offer for the K&L

17 Gates firm to take that on?  Do you see that?

18 A    Yes.

19 Q   Were you aware that the law firm representing the Advisors

20 that you own and control were offering to prepare a settlement

21 offer -- a settlement order that would include the Option B

22 approach that had been accepted by the Debtor?

23 A    Nope.  I wasn't involved in any of these details, nor had

24 I seen any of these emails.

25 Q   Okay.  Let's go to the next email and see if you know

Dondero - Direct                        89

1  anything about the facts or the assertions in that email.  Do

2  you see Mr. Demo responds, and at the end of his first

3  sentence, there is enough -- there's a reference to having

4  enough room on the wires.  Do you see that?

5  A    Yes.

6  Q    Are you aware -- were you aware on Friday afternoon that

7  the lawyers for the Advisors that you own and control and the

8  lawyers for the Debtor were having discussions about how to

9  timely effectuate a wire transfer?

10  A    No.

11         MR. MORRIS:  Can we go up to the 3:33 p.m. email?

12  BY MR. MORRIS:

13  Q    And just to move this along, did you learn that the

14  parties -- that lawyers for the parties were expecting to go

15  through the final draft of the document?

16  A    No.

17  Q    Were you aware that the lawyers representing the entities

18  that you own and control wanted more time to be able to do

19  that?

20  A    I wasn't involved in this at all.

21  Q    Okay.

22         MR. MORRIS:  Can we scroll up to the email at 3:43

23  p.m.?

24  BY MR. MORRIS:

25  Q    And do you see where Mr. Hogewood informs Mr. Demo that he

Dondero - Direct                          90

1  needs to push the call further because he is "having trouble

2  connecting with someone to be sure they are in a position to

3  review."  Do you see that?

4  A    Yes.

5  Q    Was Mr. Hogewood trying to reach you on the afternoon of

6  February 19th in order to make sure you had the opportunity to

7  review the term sheet that was about to be signed?

8  A    I don't know.

9  Q    Do you see, if you scroll up, Mr. Demo asks Mr. Hogewood

10  if he needs a little bit more time?

11  A    Yes.

12  Q    And then, finally, the last email in this deck, do you see

13  at 4:15 Mr. Hogewood says to Mr. Demo, "We should cancel this

14  call and I should just call you and John."  Do you see that?

15  A    Yes.

16  Q    And that's because the Advisors pulled Option B that the

17  Debtor had agreed to; is that right?

18  A    Yes.

19  Q    And it's your testimony that you had nothing to do with

20  that decision; is that right?

21  A    No.  It -- no.  I didn't say that.  Once I became fully

22  aware of what A and B were, I had no interest in A or B, and I

23  pointed the team back to the conversations we had had on

24  Wednesday regarding either it's the win-win scenario for

25  everybody and continuity and the office and me being in the

Dondero - Direct                     91

1  office or it's a -- it's a divorce.  And -- but I didn't have

2  an interest in A or B.

3  Q    And yet it is fair to say, though, that the Advisors'

4  outside counsel and the Debtor's counsel spent the whole day

5  on Friday pursuing Options A and B, including preparing

6  settlement orders and for wire transfers, right?

7  A    They'd been working tirelessly Wednesday, Thursday,

8  Friday, Saturday, Sunday, trying to strike a deal, trying to

9  be reasonable, but to no avail.  I think now it's --

10  everybody's comfortable with the divorce and being out of the

11  office.

12  Q    Did -- do you know whether the Advisors made any proposals

13  to the Debtor over the weekend for an *a la carte* menu of

14  services that might be considered?

15  A    Yes.  I believe -- yes.

16  Q    Okay.  Does the Debtor -- withdrawn.  Do the Advisors have

17  a plan pursuant to which it will obtain all of the back-office

18  and middle-office services that it needs that were previously

19  provided by the Debtor in order to fully perform under the

20  advisory agreements with the funds?

21  A    I believe they have a plan.

22  Q    And is that plan sufficient to enable the Advisors to

23  fully perform their services under the advisory agreements

24  with the funds?

25  A    I believe so.  The major gating item, which I think

Dondero - Direct                    92

1  changed over the weekend, was the historic data for the funds

2  was being held hostage, and I think over the weekend, for the

3  first time, it was agreed that the funds could have their

4  historic data that they were entitled to.  And I think that

5  improved the quality of their alternative plans.

6  Q   Does the -- do the Advisors need anything from the Debtor

7  today?

8  A   I believe very little, if nothing.  They just need data

9  and information and software that they're entitled to that

10 they've paid for, paid for in full over the years.

11 Q   And does the -- do the Advisors have a plan in place to

12 obtain that information that it contends it's entitled to?

13 A   I don't have the specific -- specifics.  Dustin is your

14 person there.

15 Q   Do you personally believe that the Debtor had the right to

16 terminate the shared services agreement as of last Friday?

17        MR. RUKAVINA:  Your Honor, I'll object to that

18 question as that calls for a legal conclusion.  And I will

19 note for the record that we are not trying today their

20 declaratory action Count One, and we do not consent to that

21 being tried.

22        THE COURT:  Okay.  I overrule.  He can answer if he

23 has an answer.

24        THE WITNESS:  I don't know.

25 BY MR. MORRIS:

Dondero - Direct                                93

1  Q   Do you believe that there is anything defective about the

2  termination notices that you testified being aware to as of

3  last November 30th?

4  A   I don't know.

5  Q   Do you have any reason to believe that those termination

6  notices are unenforceable?

7  A   I don't know.

8  Q   Do you have any reason to believe that the Debtor has any

9  continuing obligation to the Advisors following last Friday,

10 after last Friday?

11 A   I do believe there's an overall industry standard practice

12 in terms of transitioning.  I do think there's a

13 responsibility of all parties to do things in a regulatorily-

14 compliant way.  So I do believe that that overrides and

15 supersedes some of this contract dancing.

16 Q   How much -- what regulatory regime are you referring to?

17 A   The SEC.

18 Q   Are you aware of any particular rule that would require

19 the Debtor to provide services of any kind to the Advisors

20 after the termination of the shared services agreements?

21 A   No.  I'm going based on experience.

22 Q   Okay.  So you don't have anything specific in mind; is

23 that fair?

24 A   I have specific historic experience --

25 Q   All right.  I'm asking you --

Dondero - Direct                    94

1  A   -- of the --

2  Q   I'm sorry.

3  A   And then, I mean, I do have in mind, you know, based on

4  our historic experience, like when we moved from State Street

5  to SCI, I think it took nine months longer than anybody

6  expected, and there wasn't a hard break in anybody's

7  activities or attitudes toward each other.  It was -- it

8  delayed for issues that were -- some were beyond everybody's

9  control, some of them were faults of the different parties,

10 but in no case did anybody try and cause damage or allow

11 damage to happen to regulated funds.

12 Q   How long is the Debtor, in your view, how long is the

13 Debtor obligated to make the data available to the Advisors?

14 How long does this obligation stay in effect?

15 A   I don't have a specific timeline.  I did hear Seery say a

16 few minutes ago that you would give it all and they would just

17 keep a copy.  I think to the extent that that happened, that

18 cures quite a bit of it.  But, again, the data had been held

19 hostage as a negotiating point up until this weekend.

20 Q   Hmm.  Have the Advisors made arrangements to make the copy

21 of the data that you just referred to?

22 A   I don't know.

23 Q   Do you know if there is a monetary amount that the Debtor

24 is required to incur in order to continue to maintain the data

25 until the Advisors can get a copy?

Dondero - Direct                              95

1   A    I don't know, but I -- I don't believe it's material at
2   all.
3   Q    Okay.  Have you done any analysis to -- if you don't know
4   how long it's going to take to get the copy, how do you know
5   how much it's going to cost to maintain the copy until it's
6   retrieved?
7   A    I don't, but large files up on the cloud in general are
8   not that complicated to move around.
9   Q    But it's your view, as the owner and controller of the
10  Advisors, that the Debtor has a continuing obligation,
11  notwithstanding the termination of the shared services
12  agreement, to maintain the data for some indefinite period of
13  time until the Advisors obtain a copy.  Is that right?
14  A    I'm saying there needs to be reasonable business
15  transition in these circumstances.  And I don't -- I don't --
16  I'm not the systems person, I don't know the details, but I
17  know the costs are minimal.  The monthly storage charge and --
18  what, is the Debtor going to delete everything to save $100 of
19  storage charge on the cloud to intentionally harm investors?
20  I mean, that's -- that's an alternative, but none of that
21  makes any sense to me.
22  Q    Let me ask you this.  Under the shared -- under the
23  transition services agreement that was fully negotiated as of
24  last Tuesday or Wednesday, but for your access, was the whole
25  issue of data access addressed in that document?

Dondero - Direct                                96

1   A    I don't know.  I assume so.

2   Q    Okay.  And do you also assume that the data issue would

3   have been fully and completely addressed under the Option B

4   that the Debtor accepted on Friday afternoon?

5   A    I have no idea what was in Option -- I mean, I have no

6   idea what was in Option B regarding the data.

7   Q    Okay.

8           MR. MORRIS:  Your Honor, I have nothing further.

9           THE COURT:  All right.  Pass the witness.  Mr.

10  Wilson?

11          MR. RUKAVINA:  I think, actually, Your Honor, he's my

12  witness on this one, since we're the Defendants.

13          THE COURT:  Oh, I'm sorry.  He's in Mr. Wilson's

14  office.  I got confused.  Go ahead, Mr. Rukavina.

15          MR. RUKAVINA:  No problem.  No problem.

16     Mr. Vasek, if you'll please pull up Debtor Exhibit 2, and

17  if you'll please go to Section 6.02.  Well, make it so we can

18  see 6.03 as well.

19                      CROSS-EXAMINATION

20  BY MR. RUKAVINA:

21  Q    Okay.  Mr. Dondero, can you hear me?

22  A    Yes.

23  Q    Mr. Morris was asking you about data and return of data.

24  I'd like for you to read with me Section 6.02, the second

25  half, where it starts, "For the avoidance of doubt."  Can you

Dondero - Cross                         97

1   see that, sir?

2   A    Yes.

3   Q    (reading)  "For the avoidance of doubt, all books and

4   records kept and maintained by Service Provider on behalf of

5   Recipient shall be the property of Recipient, and Service

6   Provider will surrender promptly to Recipient any such books

7   or records upon Recipient's request."  And then there's a

8   parenthetical about retaining a copy.  Do you see that, sir?

9   A    Yes.

10  Q    Did I read that correctly?

11  A    Yes.

12  Q    Okay.  And Service Provider here is the Debtor, and

13  Recipient is one of the Advisors, correct?

14  A    Yes.

15  Q    Okay.  And now let's quickly read Section 6.03.  (reading)

16  "Upon expiration or termination of this agreement, Service

17  Provider will be obligated to return to Recipient as soon as

18  is reasonably practicable any equipment or other property or

19  material of Recipient that is in Service Provider's control or

20  possession."  Did I read that correctly?

21  A    Yes.

22  Q    Okay.  And are the Advisors relying on these provisions

23  when you mentioned in response to Mr. Morris that the Debtor

24  had some obligation to provide them their own data?

25  A    Yes.  I -- again, I'm not involved in the details or the

Dondero - Cross                               98

1    specifics, but that's a very standard clause you'd expect to

2    see in a service agreement, and I'm -- in some form or

3    fashion, I'm sure D.C. and Dustin are aware of that and have

4    negotiated accordingly.

5    Q    Well, let's talk about that briefly.  Mr. Morris asked you

6    several questions with respect to the negotiations in the last

7    few weeks on the transition services agreement and with

8    respect to the weekend's events, to which you responded that

9    you don't know the answer.  Do you recall those questions

10   generally?

11   A    Yes.

12   Q    And is that because you delegated those decisions to both

13   D.C. and Dustin and outside counsel, or is that because you're

14   incompetent?

15   A    I've found that I am mischaracterized whenever I talk to

16   Seery directly or deal with things directly, and there's too

17   much of an intent in this case to make this personalized about

18   me.  And there was over a thousand line items to negotiate.

19   Dustin and D.C. are very capable executives.  And again, to

20   avoid mischaracterization and personalization of this stuff, I

21   let them handle it.

22   Q    Okay.  And you were also asked by Mr. Morris about the

23   Advisors' current backup plan or divorce plan, whatever we

24   want to call it, and you didn't know some of those answers.

25   Is that also because you delegated that to Mr. Norris, Dustin

Dondero - Cross                        99

1  Norris?

2  A    Yes.

3  Q    Okay.  It's not because you don't take an interest in it;

4  it's because you delegated it to someone that you just called

5  a very capable executive, correct?

6  A    Yes.

7  Q    Okay.  And Mr. Morris asked you about certain events of

8  last Tuesday and Wednesday.  What was going on, sir, here in

9  North Texas last Tuesday and Wednesday?

10 A    Well, it was the ice storm.  I couldn't get in touch with

11 my lawyers on Wednesday, including yourself, you know, and

12 people didn't have electricity, they didn't have coverage.

13 Q    Is it fair to say, sir, --

14 A    I couldn't --

15 Q    Is it fair to say, sir, just to speed this up, that last

16 Tuesday, Wednesday, and Thursday, the Advisors and you and

17 outside counsel, primarily me, were having a very hard time

18 getting in touch, and in fact, we really couldn't get in

19 touch?

20       MR. MORRIS:  Objection to the form of the question.

21 I mean, if Mr. Rukavina wants to testify, he's welcome to do

22 that, but I think he's leading.

23       THE COURT:  I'll overrule.

24       THE WITNESS:  The answer is yes.  The world wasn't

25 functioning --

Dondero - Cross                    100

1   BY MR. RUKAVINA:

2   Q    Okay.

3   A    -- in Dallas, Texas, or in my legal ecosystem.

4   Q    Is it possible that, as a result of that, certain

5   miscommunications between all of us took place?

6   Misunderstandings?

7   A    Lack of --

8   Q    Misunderstandings?

9   A    Yeah.  A lack of communication, period.

10  Q    And Mr. Morris discussed your physical presence on the

11  premises.  In fact, other than that one time that was

12  mentioned when you went to the office for the deposition, you

13  have not been at NexPoint or the other Advisor's corporate

14  offices for almost two months now; is that correct?

15  A    Correct.

16  Q    Has that caused disruption to the business of the

17  Advisors?

18  A    It's definitely affected the efficiency.  And again, I

19  don't think it's compliant on a long-term basis for a

20  registered investment advisor to not have its oversight

21  employees, you know, or oversight most senior employee on

22  staff.

23  Q    Thank you, Mr. Dondero.

24          MR. RUKAVINA:  Your Honor, I'll pass the witness.

25          THE COURT:  All right.  Mr. Morris?

Dondero - Redirect                      101

1                    REDIRECT EXAMINATION

2    BY MR. MORRIS:

3    Q    Sir, notwithstanding last week's weather, you knew that

4    the lawyers for both the Advisors and the Debtor had reached

5    an agreement on every single material term except for your

6    access to the office, correct?

7    A    Yes.

8    Q    The weather doesn't change anything about that, right?

9    A    Correct.

10   Q    And the only reason that the Advisors refused to sign the

11   agreement and this lawsuit was commenced is because you

12   personally would not reach an agreement that didn't allow you

13   into the offices, correct?

14   A    I mean, yes, largely.

15   Q    Okay.

16            MR. MORRIS:  No further questions, Your Honor.

17            THE COURT:  Any --

18            MR. RUKAVINA:  Isn't it --

19            THE COURT:  -- recross?

20            MR. RUKAVINA:  Thank you, Your Honor.

21                     RECROSS-EXAMINATION

22   BY MR. RUKAVINA:

23   Q    Isn't it also true, Mr. Dondero, that the same can be said

24   about Mr. Seery, that the only reason why the Debtor didn't

25   enter into that agreement was because he would not permit you

Dondero - Recross                              102

1   to be on the premises for the next couple of years?

2   A   Yes.

3          MR. RUKAVINA:  Thank you, Your Honor.

4          THE COURT:  All right.  That concludes Mr. Dondero's

5   testimony for now.

6      Mr. Morris, any more witnesses?

7          MR. MORRIS:  No, Your Honor.  The Debtor rests.

8          THE COURT:  All right.  Mr. Rukavina, you may call

9   your first witness.

10         MR. RUKAVINA:  Your Honor, just to give you a heads

11  up, I'm probably going to have an hour, hour and a half with

12  Mr. Norris.  So I don't know what the Court's plan is for

13  working through lunch or not, but I'll just give you that so

14  that you can make the appropriate decision.

15         THE COURT:  All right.  Well, I would like to go

16  ahead and get started and get some of that accomplished before

17  lunch.  My situation is I'm hoping to get an update, but I

18  have another 1:30 matter that I think is going to be very,

19  very short, but I'm waiting to -- you know, my courtroom

20  deputy was going to reach out to the lawyers involved in that

21  matter.  So my point is I may have to break from this for a

22  few minutes at 1:30, so I'd like to time our lunch break so

23  that it occurs a little bit before 1:30.  I think that'll make

24  this easier.

25      So let's go ahead and get started.  You wanted to call Mr.

Norris - Direct                           103

1    Norris?

2           MR. RUKAVINA:  Yes, Your Honor.  Dustin with a D,

3    Norris.

4           THE COURT:  All right.  Dustin Norris, would you

5    please say, "Testing, one, two"?

6           MR. NORRIS:  Testing, one, two.

7           THE COURT:  All right.

8           MR. NORRIS:  Testing, one, two.

9           THE COURT:  I hear you loud and clear.  I'm not

10   seeing you yet.  Oh, there you are.  Okay.  Please raise your

11   right hand.

12          MR. NORRIS:  Hello.

13       (The witness is sworn.)

14          THE COURT:  All right.  Thank you.  Mr. Rukavina?

15          DUSTIN NORRIS, DEFENDANT'S WITNESS, SWORN

16                       DIRECT EXAMINATION

17   BY MR. RUKAVINA:

18   Q    Mr. Norris, can you hear me?

19   A    Yes, I can.

20   Q    Okay.  Are you able to close the blinds behind you or

21   somehow make that room a little darker?

22   A    Let me reposition.  Is that better?

23   Q    Yes, thank you.  For the record, sir, what is your name?

24   A    Dustin Norris.

25   Q    And what is your educational background?

Norris - Direct                          104

1  A    I have a bachelor's and master's degree in accounting from

2  Brigham Young University.

3  Q    Okay.  Do you hold any professional licenses or

4  certifications?

5  A    Yes.  CPA license, as well as FINRA License Series 7, 63,

6  and 24.

7  Q    Have you ever been disciplined by any regulatory body with

8  respect to your licenses?

9  A    No.

10 Q    Have you ever had a crime, even a speeding ticket?

11 A    No, never -- never had a crime.  Not even a speeding

12 ticket.  For the record, I did get pulled over for not coming

13 to a complete stop at a stop sign, but was dismissed through

14 defensive driving.  This is actually my first experience or

15 interaction with a court other than the same interaction with

16 the Court in December of last year.

17 Q    Have you ever had your honesty or integrity challenged or

18 questioned?

19 A    No, I haven't.

20 Q    Okay.  And are you familiar with the two Advisors who are

21 my clients here today?

22 A    I am.

23 Q    And how are you or why are you familiar with them?

24 A    So, I am the executive vice president of each Advisor.

25 Q    Okay.

Norris - Direct                          105

1  A    And --

2  Q    Go ahead.

3  A    I've been working for the Advisors since 2012.

4  Q    So you have been employed by the Advisors since 2012?

5  A    That's correct.

6  Q    Okay.  And what does your role as executive vice president

7  entail?

8  A    So, I oversee the marketing, sales, distribution, business

9  development for our investment products, private placements,

10 registered products, the funds that we've -- been talked about

11 in this, this hearing.

12 Q    Okay.  And who do you report to?

13 A    To Mr. Dondero.

14 Q    Okay.  And briefly, for the record, what is the business

15 of these two Advisors that are Defendants today?

16 A    Yeah.  So, they primarily provide investment advice and

17 management of various investment vehicles.  That's private

18 investment vehicles, it's public investment vehicles,

19 publicly-registered closed-end funds, REITs, BDC, ETFs, and

20 mutual funds.

21 Q    Can you give the judge an estimate of the order of

22 magnitude of all of the underlying investments managed or

23 advised through all these vehicles that you mentioned?

24 A    It's several billion dollars under management for NexPoint

25 and Highland Capital Management Fund Advisors.

Norris - Direct                               106

1  Q   And is Mr. Dondero the fund manager, the guy in charge for

2  all those investments?

3  A   Most of them, yes.

4  Q   Okay.  And do you understand yourself to be a fiduciary?

5  A   I do, both to the funds and to our Advisors.

6  Q   Okay.  What do you mean, the funds?  And in particular,

7  what -- what are the retail funds that Mr. Seery talked about

8  earlier?

9  A   Yeah.  So, we have a number of publicly-registered mutual

10 funds, closed-end funds, and ETF.  And those are, as Mr. Seery

11 pointed out, available to anyone that really wants to buy

12 them, anybody that has a brokerage account or the ability to

13 buy them through a financial advisor.  And so those are the

14 funds that I'm talking about.  Primarily, they're 1940 Act--

15 registered mutual funds and closed-end funds.

16 Q   Do any of those funds have their own boards?

17 A   Yes.  All of the '40 Act funds have their own board.  It's

18 an independent board of trustees.

19 Q   What do you mean by an independent board of trustees?

20 A   Yeah.  So the majority of the board members are

21 independent, and it's actually a -- 75 percent of the board

22 members are independent trustees, as defined by the rules and

23 regulations of the SEC.  And so they actually hire us as the

24 advisor.  On an annual basis, they review our advisory

25 agreements.  And they control the day-to-day operation -- not

Norris - Direct                    107

1    the daily operations, but control the oversight of those

2    funds.  And on an annual basis, they renew or choose not to

3    renew our advisory agreements.

4        And so it is an independent process and an independent

5    board.  And each one of them have independent legal counsel as

6    well that advises them on all matters that they incur,

7    including everything we're talking about today.

8    Q    Who is that independent legal counsel, if you know?

9    A    Yeah.  Blank Rome is the name of the law firm, and Stacy

10   Louizos is the partner that represents them.

11   Q    Does Mr. Dondero sit now, or since this bankruptcy case

12   was filed, has he sat on any of these independent boards?

13   A    He has not, no.

14   Q    Okay.  For these funds with independent boards, are you

15   also any kind of employee or officer of them?

16   A    Yeah.  So, the funds themselves don't have individual

17   employees.  They have officers that oversee the operations.

18   And I am executive vice president of each of the funds.

19   Q    Okay.  And as the executive vice president of each of

20   those funds, who do you report to?

21   A    So, I regularly report to the board on matters pertaining

22   to the funds.  I'm the liaison between the funds and the board

23   on a number of matters.  So I've been attending board meetings

24   since December 2012 for these funds.

25   Q    Okay.  Have those boards met and had meetings in the last

Norris - Direct                    108

1   couple of months regarding the shared services agreements and

2   any transition thereof?

3   A    Extensive meetings.  They've held eight meetings since the

4   beginning of the year, board meetings.  And those weren't just

5   short.  Some of them were very long.  Last year, there were 24

6   recorded board meetings, and a number of conversations in

7   between, a number of discussions with their legal counsel, a

8   number of discussions with the chairman of the board.  So it's

9   -- they've been extensively involved through the process.

10          MR. MORRIS:  Your Honor, I move to strike the hearsay

11  that we're hearing here about discussions that the boards had

12  with other folks.  If Mr. Norris has personal knowledge,

13  that's one thing, but I think he's gone well beyond that.

14          THE COURT:  Okay.  Response, Mr. Rukavina?

15          MR. RUKAVINA:  I'm not sure what testimony Mr. Morris

16  is talking about, third-party testimony.  I think the witness

17  just said that the board has met many, many times to discuss

18  the issues that are up for today.

19          THE COURT:  Okay.

20          MR. MORRIS:  And I think to the extent that the

21  witness participated in such meetings, that's fine, he can

22  specifically testify about that, but I don't think he should

23  be otherwise testifying about what other people did who aren't

24  here today to testify as to their own personal conduct.

25          THE COURT:  Okay.  Okay.

Norris - Direct                          109

1          MR. RUKAVINA:  I can rephrase the question, Your

2    Honor.

3          THE COURT:  I sustain.  Rephrase.

4    BY MR. RUKAVINA:

5    Q    Have you personally participated in meetings of those

6    boards, Mr. Norris, at which those boards and you discussed

7    the transition services agreement potentially being negotiated

8    with the Debtor and the shared services agreements that were

9    being terminated by the Debtor?

10   A    Yes.  I participated in eight board meetings this year.

11   There's been five of them in February alone.  And there were

12   24 board meetings last year, and I was a participant in each

13   one of those meetings.

14   Q    Okay.  And did you advise those boards at some point in

15   time about the termination of the shared services agreements?

16   A    Yes, we did.

17   Q    When did you start advising those boards that that was

18   something that may happen or that has actually been noticed as

19   happening?

20   A    So, throughout the fall last year, I think the expectation

21   was that there would be a -- I mean, obviously, there had been

22   a plan filed with the Court.  That was discussed with the

23   board.  Mr. Seery testified that he joined the board meetings

24   in the fall and in the summer and talked about those.  The

25   discussions were around the transition of services.  There was

Norris - Direct                          110

1    discussion about a new company.  And so the discussions were

2    ongoing.

3        When the filing actually -- from when the filing actually

4    happened, that was ongoing, of how would we be able to

5    continue the services.  And so, from the beginning, those were

6    discussions that were had.

7        We did notify the board when the termination occurred.  As

8    well, we had a board meeting, a one-and-a-half day board

9    meeting on December -- I think the dates were December 10th

10   and 11th -- where the termination was discussed in detail.

11   Q    Now, obviously, the Debtor sent notices of termination of

12   these shared services agreements in late November.  You're

13   obviously familiar with that, right?

14   A    Correct.

15   Q    Separate and apart from the Debtor's decision to terminate

16   these agreements, were you and the Advisors considering

17   terminating these agreements?

18   A    We were.  We had discussion --

19   Q    Let me ask -- let me ask the next question.  I appreciate

20   you answering, but let me -- let me do my job.  When were the

21   Advisors considering making such a move, and why?

22   A    This was in the October-November time frame of last fall,

23   as the -- particularly around the services we had been

24   receiving related to the shared services agreement and the

25   payroll reimbursement agreements.  We didn't think that the

```
                        Norris - Direct                     111
```

1  service was fulsome, we didn't think we were getting the

2  service that was under the agreements, and the service had

3  dropped off.

4      And in particular, the -- there was -- there were

5  conflicts involved between the Debtor and between the service

6  providers, particularly legal and compliance services, given

7  all that was going on.  And there were a number of matters

8  they couldn't participate on.  Historically used their legal

9  and compliance services significantly.

10      And that, in addition to discovering that there were a

11  number of employees we were reimbursing for in payroll

12  reimbursement agreements that were no longer employed by the

13  Debtor, yet we were paying for the full services.

14      So, with that, we had discussions internally about if and

15  when or how we could terminate them, and --

16  Q    Let me stop you.

17  A    -- termination --

18  Q    Let me stop you.  Ultimately, I take it, the Advisors

19  never tried to terminate these shared services agreements,

20  correct?

21  A    That's correct.

22  Q    Why?

23  A    There was an order specifically that Jim or anybody

24  related to Jim could not terminate an agreement with the

25  Debtor.  And he specifically pointed that out to us when we

Norris - Direct                         112

1  discussed this, and so we knew we couldn't take action.  There

2  was also -- counsel discussed that the stay with the Court --

3  Q   Let's not -- let's not talk about counsel.  Let's not talk

4  about counsel, --

5  A   Sorry.

6  Q   -- Mr. Norris.  Okay.  But the point is, at least as of

7  last October, would you agree, that the notion that these

8  agreements would be terminated by one or the other parties was

9  known to you?

10 A   Yeah.  So, the -- we expected that at some point there

11 would need to be a termination.  I -- that was discussed.  And

12 there was a plan, and I'm sure we'll talk about it, but a plan

13 to transition the employees and the services to a new company

14 and to new service providers.  And I think both sides had been

15 working for quite a while to ensure there was a smooth

16 transition, and we expected that to happen.  But there would

17 need to be a termination of that agreement -- either a

18 transfer of that agreement or a termination to a new company

19 that would be providing new services, or transferred those

20 services directly to us.

21 Q   So I'd like you to pick what word you'd like to use, but

22 what I've called a backup plan in my objection or what Jim

23 called a divorce plan in his testimony, how -- what shall we

24 call this backup plan?

25 A   All-contingency plannings.  Or we'll call it backup plan.

Norris - Direct                    113

1   Q    Okay.

2   A    I think that works.

3   Q    So is it fair to conclude that since at least last

4   October, the Advisors have known about the possibility of

5   having to do a backup plan?

6   A    Yeah.  And I think even before then we knew there was a

7   possibility.  But the plan, the strong Plan A of everything

8   that had been communicated to us by the Debtor and their

9   employees was that the intent was to transfer all those

10  services to a new company, with the same individuals providing

11  the same services.  There was no significant indication to us

12  that that would be any different.

13      Yet we still had then begun planning, well, what if,

14  right, Plan B was implemented or began many months ago and in

15  recent weeks, in recent months, it's been expedited to be able

16  to ensure that we have a solid Plan B.  But yes, it's been

17  ongoing for months.

18  Q    So if there is an implication or allegation made that the

19  Advisors were negligent with respect to transitioning from the

20  shared services agreements because they didn't start taking it

21  seriously last August or September, would you agree or

22  disagree with that allegation?

23  A    I would disagree, because there were assurances or

24  discussions that made it very clear that everybody was working

25  together towards a Plan A.  Yet we were still discussing -- I

Norris - Direct                      114

1   know Mr. Seery mentioned he's a Boy Scout.  I agree in that.

2   Be prepared.  I'm an Eagle Scout.  And so we have been

3   preparing, but the preparations weren't needed in the manner

4   that we thought they were needed until in the last month,

5   right, and -- because everything was moving in the right

6   direction for a clean transition plan, and even up until last

7   week.

8       However, the last month and a half we've had to prepare in

9   earnest for Plan B, and that involved a tremendous amount of

10  effort.  And I'm happy to go into that now.  But yes, there's

11  -- there has been -- we have 80 employees across our Advisors,

12  and almost every single one of them have been involved in Plan

13  B, and a group of about 18 of us for several weeks, planning,

14  game-planning, and thinking through all the contingency plans.

15  Q   Well, let's round off the discussion about these boards.

16  Did you make the boards aware since last fall and into this

17  year about both the ideal plan, which was, I guess, you know,

18  an agreement with the Debtor, but also a backup plan, in case?

19  A   Yeah.  So, in -- in August, --

20  Q   When --

21  A   -- when the Court -- oh, sorry, yeah.

22  Q   No, no.  Well, go ahead.

23  A   Go ahead.

24  Q   I was going to ask you how and when, but you -- you -- go

25  ahead.

Norris - Direct                    115

 1  A    Yeah.  Yeah.  So, up until August, there was, I think, a

 2  view that there would be a negotiation, a negotiation reached.

 3  Things had been pushing along.  We know that in August there

 4  was a plan filed with the Court.  And Mr. Seery even joined

 5  our board meeting.  And so in that meeting he discussed with

 6  us, as well as the legal team of the Debtor, discussed with us

 7  the Plan B at that point, which was defined with the Court.

 8  That the goal and objective was a grand bargain, as he

 9  explained it, and that he -- that was the Plan A.  But even

10  under either plan, there would be a transition of services.

11  He joined again, I believe, one or two more times, to

12  additional board calls that fall.  There was mediation we were

13  aware of and had discussed with the board to help resolve some

14  of these items.

15       And so, you know, just in the same time frame Mr. Seery

16  shared earlier, it corresponded with those discussions that we

17  were having.

18       In addition, D.C. Sauter and other individuals at our

19  firm, as well as individuals from the Debtor, were working

20  throughout the fall and into the winter on the various

21  discussions on transition.  And so that's --

22  Q    Did you hear Mr. Dondero testify about over a thousand

23  line items?

24  A    Yeah, I did.

25  Q    Do you know what -- what is he referring to, do you know?

Norris - Direct                                116

1   A    So, within the transition services agreement, there --

2   there's about 11 or 12 pages in an exhibit that are a number

3   of agreements.  That's -- that's the remaining agreements that

4   we've agreed that are needed.  He may have had a little

5   hyperbole in his thousand, but there is -- there were -- there

6   was at least a thousand points of discussion that had to be

7   resolved.  Most of them were minor, right, and we came to a

8   quick agreement on most of those, and there was only a handful

9   of things that needed to be resolved.  And because of that, I

10  felt comfortable and confident, particularly from the middle

11  of January on, where I became much more involved, that there

12  would be an orderly agreement on those points.

13  Q    Did you tell the boards that the Debtor would enter into

14  the agreement that had been negotiated only on the condition

15  that Mr. Dondero not be permitted to be on the premises?

16  A    Sorry.  You said the Debtor would enter into or -- oh,

17  that he wouldn't be permitted onto the premises?

18  Q    Well, we'll go more -- we'll go in detail later, but I

19  want to round off the board discussion here.  Obviously, you

20  heard from Mr. Seery and in my paper that we had an agreement

21  done except for one issue, right?

22  A    Yes.  Yes.

23  Q    And that issue was whether Mr. Dondero would be on the

24  premises or not, right?

25  A    Yes.

Norris - Direct                          117

1  Q    Did you discuss that with the board, that issue?

2  A    We did.  We --

3  Q    And did you get any instructions from the board that have

4  led you to do anything other than you've actually done?

5  A    No.  No, we -- they -- the board, as I mentioned, we've

6  had eight board meetings this year discussing in detail our

7  backup planning.  They understood the Jim access issue and

8  they felt comfortable with our backup planning.  But also, you

9  know, our view, and I think that they shared that, that he

10 should have access --

11 Q    Well, let's stop there.  Let's stop there.  Let's stop

12 there.  I'll ask -- I'll ask more of those questions later.  I

13 don't -- I don't want to invite Mr. Morris's objections here

14 based on you talking outside the scope --

15 A    Yeah.

16 Q    -- of my question.  Let's move on now to the shared

17 services agreements themselves.  You heard Mr. Seery's

18 characterization of them from a top level.  Would you agree

19 with his characterization, or how would you characterize what

20 the shared services agreements actually did?

21 A    Yeah.  I think he called them middle- and back-office

22 services.  I think, to add a little bit more to that, it's IT

23 services, including the systems and computers that we all use.

24 It's HR.  It is accounting and back-office services, many of

25 those for our advisors and some of them for our funds.  We do

Norris - Direct                         118

1  outsource a number of accounting functions to other service

2  providers, and have for years, and they provide an oversight

3  function for the accounting and the books and records for our

4  funds.   They also provide tax services and things like that

5  for our advisors and funds.

6  Q    Now, in --

7  A    And as well legal and compliance services.  Legal and

8  compliance services as well.

9  Q    In our exhibits that have been admitted are two employee

10 or payroll reimbursement agreements.  We don't have to go

11 through those in detail, but you're -- are you aware of those

12 agreements?

13 A    I am, yes.  And I would add that -- and those are in

14 addition to the services that are provided under the shared

15 services agreement.  Those are front-office or investment

16 services.

17 Q    Okay.  Now, did there come a time when a dispute arose

18 between the Debtor and the Advisors as to how much an amount

19 was owing by the Advisors to the Debtor under the shared

20 services agreement?

21 A    That's correct.

22 Q    What was the basis of that dispute?

23 A    Yeah.  So, in particular, as I mentioned earlier, certain

24 of the services we believe we are no longer receiving.  Many

25 of those related to legal and compliance.  We've had to shift

Norris - Direct                    119

1   a lot of those responsibilities in-house and to outside

2   counsel.

3       And particularly related to the payroll reimbursement

4   agreements, we hadn't realized that we were overpaying for

5   employees that -- and again, they're payroll reimbursement

6   agreements for employees that are dual-hat employees, dual

7   employees of the Debtor and our Advisors, providing investment

8   services.  And there's a list or exhibit that shows the number

9   -- the actual employees with their names and the allocations

10  of their time.  And so two-thirds of those employees, when we

11  realized or saw the list or received the list on the exhibit

12  in the agreement, which was around the end of November or

13  early December, two-thirds of them are no longer employed by

14  the Debtor.  And we continue -- and they continue to bill us

15  based on historical averages, not based on the actual amounts.

16      So we inquired of that, we asked for email --

17  Q   Let me -- let me pause you.

18  A   Oh, sorry.

19  Q   Let me pause you.

20  A   Yeah.

21  Q   Let me pause you.  So, during the negotiations with the

22  Debtor in December, January, and February, did you ask for any

23  kind of clarification or reconciliation of these amounts?

24  A   Yeah.  So, on multiple occasions, we asked for the detail

25  of what they were invoicing us for, and then, in particular,

Norris - Direct                    120

1   in late January and again a couple times in February, I asked

2   multiple employees for reconciliation.  Two reconciliations.

3   One was a reconciliation of the employees that they were

4   charging under the expense -- I'm sorry -- payroll

5   reimbursement agreement, to the actual amounts that they

6   charged us, and then separately I asked for a reconciliation

7   of amounts billed to us under the shared services agreement to

8   what they actually incurred on their end.

9        And the rationale for the latter was because the expense

10  reimbursement -- or, sorry, the shared services agreement for

11  Highland Capital Management Fund Advisors is actually a cost

12  plus a margin of five percent.  So they are to charge us what

13  their costs are plus a margin of five percent, yet they

14  continue to bill us the same amounts based on historical

15  averages.

16       And so the amounts in dispute were particularly in the

17  last few months, where those amounts hadn't changed and where

18  we raised this concern.

19  Q   Did you get a response or a reconciliation from the Debtor

20  on these overpayment issues?

21  A   No.

22  Q   Okay.  Now, when did you become -- well, you heard Mr.

23  Dondero say that he delegated the primary responsibility for a

24  transition of services to you, correct?

25  A   Yes.

Norris - Direct                         121

1   Q    When was that?

2   A    Yeah.  So, January -- in mid-January, I became very

3   involved.  I had less of authorization prior to that.  I was

4   involved in some of the negotiations on contracts and things

5   like that in early December.  Had a meeting with Debtor

6   employees on that, and that they had been working on for

7   months, along with Mr. Sauter.  Mr. Sauter had taken more of

8   an active role prior, in December and October and even

9   September, and before -- before all that.

10       So, in January, mid-January, they actually came to me on

11  January 12th with permission from Mr. Seery to interact

12  directly with me and to negotiate the additional terms of the

13  transition with me.  And Jim authorized me at that time to

14  move forward.

15  Q    Okay.  Did you discuss with Mr. Seery whether you would be

16  permitted to talk to Debtor employees as part of this?

17  A    So, I did not talk to Mr. Seery, but I talked to J.P.

18  Sevilla, Brian Collins, David Klos, and Frank Waterhouse, who

19  they had told me explicitly that Mr. Seery had authorized them

20  to negotiate with me.

21  Q    Okay.  Was there some impediment prior to that

22  authorization to being able to discuss Newco issues with the

23  Debtor's employees?

24  A    So, there were a number of things.  And as this Court is

25  very well aware, that three weeks prior to that, there were a

Norris - Direct                           122

1    number of events.  There was a TRO for Mr. Dondero and our

2    Advisors, there was a preliminary injunction for Mr. Dondero,

3    and there were claims of interference.  And we took a very

4    cautious approach and didn't want to interfere in any manner.

5    And so in these regards, and in many, I mean, everyone was

6    very cautious.  And so those were -- those were steps that it

7    was challenging.

8         In addition, I should note that Mr. Scott Ellington was

9    helping the Debtor and negotiating this transition agreement

10   before he was let go in early January.

11        And so with all those events, we had to take a more

12   cautious approach to communication.

13   Q    Okay.  And approximately when did Mr. -- did the Debtor,

14   to your satisfaction, authorize direct interaction with the

15   employees so that you could negotiate a more fulsome

16   agreement?

17   A    Yeah.  It was when they called me on January 12th --

18   Q    Okay.  And is it fair to say --

19   A    -- and notified me of that.

20   Q    Is it fair to say that that's the date when the

21   negotiations really got going?

22   A    Absolutely, yes.  Yeah.

23   Q    Okay.  Did you ever ask the Debtor for a draft agreement

24   or term sheet or whatever you want to call it as far as a

25   transition of services would be?

Norris - Direct                    123

1   A    I did, on multiple occasions.

2   Q    When did you finally receive one?

3   A    So, it was on January 28th, which was the last business

4   day of the shared services agreement term.  Sorry, January

5   29th, a Friday.  And January 12th, we engaged, as I mentioned.

6   We came to quick resolution on various items.  And we began

7   asking for a term sheet.  I actually asked them whether they

8   -- who they wanted to draft it, their counsel or our counsel.

9   They checked with their counsel.  I thought it was a good idea

10  and agreed that it was a good idea for their counsel to draft

11  it, because, as they put it, this was their baby for many

12  months.  They had -- because the Debtor employees and DSI,

13  their consultants, had been very involved, in taking 15 months

14  to that point, in figuring out what contracts were needed,

15  analyzing what needed on a --

16  Q    Let me stop you.

17  A    -- go-forward basis --

18  Q    Let me stop you, --

19  A    Yeah.

20  Q    -- Mr. Norris.  The point being, it was agreed between you

21  and the Debtor that the Debtor would take the first stab at a

22  term sheet, and you received that on or about January 29th of

23  this year?

24  A    Correct.

25  Q    Okay.  Now, obviously, the Debtor extended the

Norris - Direct                           124

1    termination, first to February the 14th, and then, second, to

2    February 19.  Correct?

3    A    That is correct.

4    Q    Okay.  Did the Advisors pay the Debtor for those delays,

5    pay cash money to the Debtor for those delays?

6    A    We did.  And we -- yes, we did.

7    Q    Okay.  And without belaboring the point or taking any more

8    time than necessary, the numbers that I have in my objection

9    are that, for the first extension, we paid --

10   A    I believe it was around $560,000.

11   Q    Thank you.  Thank you.  And for the second extension, do

12   you recall?

13   A    Around two hundred -- just over $200,000.

14   Q    Okay.  Why were those extensions necessary?

15   A    They were necessary for multiple reasons, but it was

16   necessary to get a transition agreement completed, and that

17   was our goal and intent.  It was also necessary to protect our

18   funds and our investors, to have a smooth transition.  But

19   primarily, we were in a great spot until -- up until January

20   29th, we hadn't received a term sheet.  So we couldn't

21   negotiate a term sheet that was pages long, with schedules

22   that were 10 or 15 pages long, in a day, and so we asked, in

23   good faith, can we have an extension?  And they also were

24   agreeable to that, and it made sense for all parties.

25        Prior to that receiving the term sheet, though, there were

Norris - Direct                    125

1   concerns that we would lose those services.  They threatened

2   to pull those services.  However, at the end, all parties

3   agreed.

4        And then the extension, the second extension was needed in

5   order to continue those -- those agreements, negotiations as

6   well, as they had pushed the termination date of the employees

7   from the anticipated January 31st to January 19th, and so we

8   asked that they moved the termination date of the shared

9   services in line with the termination of the employees,

10  because our understanding was those employees would be

11  transitioning to a new company providing those same services.

12  Q   Okay.  Maybe I misunderstood something because of the

13  video nature of this, but you mentioned something like pushing

14  the termination of the employees from January 30th to January

15  19th.  Just for the record to be clear, because, again, I

16  might have misunderstood or misheard, but when was the Debtor

17  going to terminate nonessential employees originally and up to

18  what date was that pushed?

19  A   Yeah.  So our understanding is they were going to

20  terminate them on the 31st of January.  They did end up

21  receiving termination notices that said January 19th.  And so

22  that was pushed from what our understanding was, but that was

23  the first time I believe the employees received termination

24  notices for the 19th.  Thereafter, after we negotiated an

25  extension of our shared services agreement one more week

Norris - Direct                          126

1  before the 14th, to the 19th, the very next day they extended

2  the termination dates to the 28th for all employees, which

3  would extend it one week beyond the negotiated termination

4  date for the shared services agreement.

5  Q   Well, here's my fundamental question.  To your knowledge,

6  was that the Debtor's separate business decision as to when to

7  terminate employees or did you request that the Debtor extend

8  it to February 28th?

9  A   That was their separate business decision.  Um, --

10 Q   That's fine.

11 A   That was -- that was their separate business decision to

12 extend it.  We didn't even anticipate them extending it --

13 Q   I just want the record to --

14 A   (overspoken)

15 Q   I just want the -- I just want the record to be clear, Mr.

16 Norris.  Let me direct you, please.

17 A   Yes.

18 Q   That that decision to extend the employee termination was

19 not at our request?

20 A   Correct.

21 Q   Now, let's talk about these negotiations a little bit.  To

22 go back to this agreement that we had other than the Dondero

23 access issue as of last Tuesday, you agree that there was an

24 agreement other than the Dondero access issue as of last

25 Tuesday, right?

Norris - Direct                          127

1  A    Yes, that's correct.

2  Q    Okay.  How, if at all, was the amount of money that we

3  owed to the Debtor issue resolved between you and your

4  counterparts at the Debtor?

5  A    Yeah.  So, they, at the end of January, demanded that --

6  and this was the first time that I was aware of the extent of

7  the amounts or that they were going to include payment of

8  past-due or disputed amounts as part of this agreement.  That

9  came in on, I believe, January 27th.  And they demanded we pay

10 it or they would cut off all shared services effective Friday,

11 the 29th.  And that included our access to the -- to our

12 websites, our domains, our emails.  It would include access to

13 the office.  And so that was a major item.

14     They demanded five point -- approximately $5.2 million in

15 payments from our Advisors and a number of other entities.

16 And so, as part of that, that was a -- that was a problem,

17 because we can't speak for the other entities.

18     In addition, now we were commingling a financial dispute

19 with the peaceful transition of services.  And so that was

20 resolved.  We agreed with the Debtor and ultimately agreed

21 that, okay, we would pay these disputed amounts as part of

22 this, reserving our rights for any additional -- any

23 additional argument of that for another time, but we would

24 agree to pay our portion, which is approximately $3 million,

25 our disputed portion of what they were billing, with $1

```
                        Norris - Direct                    128
```

1   million up front.  They wanted it all up front, but they were

2   willing to allow us to pay $1 million up front and the

3   remainder over 14 months.

4   Q    Okay.  Going back to this agreement save the one issue,

5   how was the employee issue resolved?

6   A    Yeah.  So, the employee issue was an important one, and it

7   had been.  These employees had been working hard providing

8   service for our funds and advisors for a very long time.  The

9   plan all along was to transition them, as Mr. Seery said, to a

10  new entity.  It would either by controlled by Mr. Dondero or

11  by the employees themselves.

12       And so we needed -- we need those services, right, in the

13  long run.  And so that was resolved in that there would be a

14  new company formed, which we've been calling Newco.  It would

15  be employee-owned.  Initially, would be providing services

16  exclusively to our Advisors, but then would have the ability

17  to go out and provide the same services to other companies.

18  And so we found that as -- from the beginning a great

19  solution.  And the principals of what would become Newco have

20  been interfacing with us and with Mr. Dondero regarding the

21  combination of those services.

22       So, as part of this agreement, the services would

23  transition directly to Newco, with the same people providing

24  the same services in the same seats.

25  Q    Okay.  What about -- just so that the record is clear,

Norris - Direct                          129

1    there's a large corporate office over at Crescent Court here

2    in Uptown Dallas, right?

3    A    That's correct.

4    Q    And the lease, obviously, just to speed things up, the

5    lease is in the name of the Debtor, but for many years

6    NexPoint and other employees have been on premises, correct?

7    A    Yes.  We've been there since they opened the space.  I

8    believe it was February 2012 when we moved there.  Maybe

9    February 2011.  But our Advisors have been there in that space

10   since then.

11   Q    Okay.  So how was the future of this lease and resulting

12   lease payments resolved as part of this tentative agreement as

13   of last Tuesday?

14   A    Yeah.  So, it was a 75/25 split, where the Debtor would

15   pay 25 percent and we would pay 75 percent for the remaining

16   lease term, which was approximately 14 months.

17   Q    And approximately how much would our 75 percent over 14

18   months have amounted to?

19   A    I believe that's approximately one -- between $1-1/2 and

20   $2 million.

21   Q    Okay.  Now, we'll talk about this in some detail later,

22   but there are certain third-party software and information

23   providers -- Bloomberg, for example -- that the Debtor uses

24   that we have access to under the agreements but that the

25   Debtor must pay the third parties for, correct?

Norris - Direct                          130

1          MR. MORRIS:  Your Honor, I just object.  Again, if

2   Mr. Rukavina wants to testify -- this is not a question.  This

3   is testimony.

4          MR. RUKAVINA:  Your Honor, --

5          MR. MORRIS:  I mean, there's no foundation.  There's

6   nothing.

7          THE COURT:  Sustained.

8          MR. RUKAVINA:  Okay.  Very well.

9   BY MR. RUKAVINA:

10  Q   Mr. Norris, does the Debtor -- or, did the Debtor provide,

11  pursuant to shared services agreements, access to third-party

12  software platforms?

13  A   Yes.  They did.  There was a number of agreements --

14  Q   Stop.  Stop.

15  A   -- that were --

16  Q   Stop.  Stop.  Stop.  Were these some of the things that

17  you were negotiating with the Debtor as you were negotiating

18  that transition of services?

19  A   Yes.

20  Q   Name a few of the most important of these third-party

21  service providers that you were negotiating with the Debtor.

22  A   Yeah.  Bloomberg, particularly the order management system

23  of Bloomberg.  Oracle, which is an accounting system, to name

24  a few.  Those were the most important ones.

25  Q   Describe with some more specificity, please, what the

Norris - Direct                    131

1  order management system is.  OMS.

2  A    Yeah.  An order management system is an operating system

3  that allows you to trade various funds and asset classes all

4  through one system.  And so we have a number of funds, we have

5  a number of asset classes we trade, which include loans,

6  bonds, and equities.  And so trading all of that through a

7  system that then sorts it, allocates it, and does it all in an

8  efficient manner -- in addition, it incorporates various rules

9  and metrics for trading and efficiency -- so it's very

10  customized, it's very customized for the rules related to our

11  funds, very customized for the rules related to what we trade

12  for our Advisors, and it's been used primarily by the traders

13  from our Advisors or employed by our Advisors.

14      So that's what the OMS is.  And it's Bloomberg that has

15  the software, and it's been customized directly with

16  Bloomberg.

17  Q    Okay.  Did you come to an agreement with the Debtor as to

18  how the future costs or license fees for these platforms and

19  services would be allocated between the Debtor and the

20  Advisors?

21  A    We did.  It would be, for most of them, which is

22  approximately a hundred contracts, is about -- is a 60/40

23  allocation.  We would pay 60 percent and they would pay 40

24  percent.  There are some of them that they said they didn't

25  use that we agreed we would pay a hundred percent of.  But

Norris - Direct                         132

1   most of them are a 60/40 split.

2   Q    Okay.  And did you calculate approximately how much in

3   payments pursuant to that formula we would make, the Advisors

4   would make in the future under the draft agreement?

5   A    Yeah.  So, it is approximately $240,000 per month,

6   inclusive of the lease.  So, exclusive of the lease, it was

7   about $120,000 per month.

8        In addition, there were one-time payments for annual

9   payments, which I think was around $200,000 or $300,000.

10       So it is a -- it's a couple million dollars over the life

11  of the contract.

12  Q    Okay.  And to fast forward to last Tuesday, the one issue

13  that had not been resolved was Mr. Dondero's physical presence

14  on the premises, correct?

15  A    That's right.  That's right.

16  Q    Was this a last-second issue or had this been discussed

17  for some time?

18  A    No, it wasn't a last-second issue.  We actually included

19  it in our first multiple drafts or responses to their term

20  sheet.  We got the term sheet on the 29th of January and it

21  did not include any specifics around Mr. Dondero's access, but

22  we added that in early drafts of the term sheet and it was

23  removed by their counsel and reinserted in the -- I know there

24  was discussion between counsel on various aspects of it.  It

25  was removed from what was their final version, and maybe even

Norris - Direct                          133

1   the draft before that, but it was added in by us again as --

2   for all the reasons we mentioned before.  We thought it needed

3   to be stated explicitly in the agreement.  And the attorneys

4   had discussed that it could be handled --

5   Q   Let's not talk about -- yeah, let's not talk about the

6   attorney discussions.

7   A   Okay.

8   Q   You heard Mr. Seery say that the Debtor refused to permit

9   Mr. Dondero onto the premises and you heard him say why.  Did

10  the Advisors offer any compromise on this access issue?

11  A   We did.

12  Q   What was that offer?

13  A   So, we offered to -- and in all this, it's thinking, what

14  are the employees from the Debtor that are going to be using

15  this?  We haven't even really received a good understanding of

16  who that is.

17      However, we offered to take approximately 25 percent of

18  the office.  And there is a clear area where we could build a

19  wall.  They could have their own separate access, their own

20  separate restrooms, their own separate entrance, where they

21  wouldn't have any involvement or connection to us.  And so we

22  also offered with that, whenever you need access to the other

23  portion, let us know.  We can even have Jim Dondero leave, if

24  you're concerned.

25      And so that was one option.  We could build a wall.  And

Norris - Direct                          134

1   we even put that in the written agreement.  We will build a

2   wall at our expense.  That was the -- that was the -- what our

3   offer was.

4   Q    How did the Debtor respond to that offer?

5   A    They removed it from the agreement and they told us that

6   we had until 6:00 p.m. to sign their agreement with no Dondero

7   access or they would file a lawsuit.

8   Q    And this was last Tuesday?

9   A    This was Tuesday.

10  Q    Okay.  Were you able to respond by their deadline, which

11  they -- then they later moved to midnight of that same day?

12  A    I'm not sure if there was a response.  It was handled

13  between attorneys.  Our counsel.  I had -- just as Mr. Dondero

14  stated, I had rolling blackouts in my home from 2:00 a.m. on

15  Monday until Thursday.  I -- I and D.C. were aware of the

16  offer, as was our counsel, and I believe there was a -- and I

17  believe there was a response from our counsel in time, but I'm

18  not -- I wasn't certain at the time.  I knew that, as well,

19  there was an extension, but I didn't find out until the next

20  day because I did not have power.

21  Q    And ultimately, the Debtor either rejected that last offer

22  or let the offer expire by not accepting it.  It doesn't

23  matter which.  But is that accurate?

24        MR. MORRIS:  Objection to the form --

25        THE WITNESS:  Yes.

Norris - Direct                          135

 1          MR. MORRIS:  -- of the question.

 2          MR. RUKAVINA:  Your Honor, I'll ask it a different

 3   way.

 4          THE COURT:  Sustained.

 5          MR. RUKAVINA:  I'll ask it a different way.

 6   BY MR. RUKAVINA:

 7   Q    Did the Advisors accept the Debtor's last offer made on

 8   Tuesday of last week, the one you just referenced?

 9   A    No.

10   Q    Why?

11   A    As explained, I think, clearly by Mr. Dondero as well, it

12   did not have the provisions that we thought necessary.  And

13   when you think about this, we were going to be required to pay

14   significant dollars for an office space where our president

15   and principal was not permitted.

16       We had an option to go other -- elsewhere, right?  Here,

17   we're in a separation experience.  This agreement that they

18   had, they had told us early on it was fill-or-kill.  They told

19   us early on that it was not *a la carte*.  When we pushed them

20   on that a couple weeks later, they said, well, the only thing

21   that's not negotiable is the office, right?  If you want

22   everything else, you've got to have the office.  That was in a

23   discussion with various attorneys on the phone.

24       And so, with this, we knew this was a kind of take-it-or-

25   leave-it offer, and we could have gone elsewhere.  And we had

Norris - Direct                         136

1  already been preparing, in the event that we couldn't have a

2  deal, to go elsewhere.  And so, with that, if they were not

3  going to permit -- which we thought was very reasonable,

4  specifically with all of the additions, you know, the

5  consideration -- sorry, my battery is about to die on my

6  computer.  I'm plugging in the charger here.

7      So, with all of those considerations, we couldn't sign

8  that deal, especially as -- without that key access.

9  Q   You personally, Dustin Norris, now, personally, as an

10 officer and a fiduciary, did you think that it was appropriate

11 or inappropriate that Mr. Dondero be allowed on the premises

12 in the future?

13 A   I thought it would be appropriate for him to be there.

14 Q   Why?

15 A   So, I've been working for Mr. Dondero for a long time.  I

16 know the way he operates, and I know that the way that he

17 manages his organization, which is a complex organization, he

18 needs to be there in person.  We haven't been in the office

19 because of a -- a disregard for COVID.  We are an essential

20 business, and we have been, as a financial services business.

21 But the way we operate is very in-person, and that's how Jim

22 operates.

23     In addition, I've never heard of a situation where the

24 principal or the control person of a company -- there's no

25 question that Mr. Dondero controls the organization -- cannot

Norris - Direct                        137

1   be there in person.

2       And so, from that perspective, given and knowing all of

3   our other plans, given the ability for many people to

4   relocate, given the abundance of office space elsewhere, if we

5   were forced to accept an agreement that did not allow Mr.

6   Dondero for the next 14 months to be there in person, it was

7   -- it was going to be a challenge for us from a business

8   perspective.

9   Q    Do customers or investors or prospective customers and

10  investors come to the offices historically to meet with the

11  Advisors and their personnel?

12  A    Pre-COVID, yes.  Regularly.

13  Q    Okay.  Would Mr. Dondero participate in those meetings?

14  A    He would, yes.

15  Q    Were you concerned that him being unable to participate in

16  those meetings would affect future business and profitability?

17  A    Yeah.  I think if you look at this -- key investors come

18  in and see this big cavernous open office and ask why the

19  manager of the funds is not even allowed to be in your office,

20  you know, or is that impacting the way you operate, then yes,

21  I think he needs to interact with people that are coming

22  through the office.

23  Q    He has not been in the office since about the beginning of

24  this year; is that correct?

25  A    Correct.

Norris - Direct                      138

1   Q    Do you feel like that has caused any harm or disruption to

2   the Advisors' business?

3   A    Yeah.  I don't know that I would characterize it as harm,

4   but it has been disruption, right?  I'm -- the way that we

5   operate, having Jim there, being able to have consistent,

6   regular meetings in person, which for me were multiple times

7   per day on a regular basis, and many others, it was

8   disruptive.  Being able to reach him, how to reach him.  Do I

9   need to get in my car and drive to another location where he's

10  at, which I did on many occasions.  We typically get people

11  together very quickly in groups:  Let's go talk to Jim.  And

12  that becomes a challenge to get things done quickly and in an

13  efficient manner.

14       So it has been a disruption, and it's not something that

15  we would desire to do, if we had the choice, for another 14

16  months.

17  Q    Okay.  Now let's talk about the backup plan, please.  I

18  guess let's start with:  What is our backup plan?  Well, let

19  me start with this.

20  A    Yeah.

21  Q    Do we have a backup plan?

22  A    And I think the key now, instead of calling it a backup

23  plan, is an operating plan.

24  Q    Okay.

25  A    For --

Norris - Direct                                    139

1   Q    Do --

2   A    -- several weeks, --

3   Q    Let me -- let me -- that's a very good point.  Prior to a

4   few days ago, did we have a backup plan in place for what we

5   would do if we were not able to enter into a transition

6   services agreement with the Debtor?

7   A    We did, yes.  And --

8   Q    Since when -- let me -- let me direct you.  Let me direct

9   you.  Since when did we have that backup plan?

10  A    Yeah.  So, the backup plan -- the backup plan began many

11  months ago, but as I mentioned earlier, it began in earnest in

12  the end of January, right?  And over the last month

13  especially, we've been putting in place all of the required

14  systems and processes and procedures in order to continue

15  doing all the duties under our advisory agreements.  And that

16  includes all of the services that are provided for the Debtor

17  -- by the Debtor.

18       And our backup plan, a big part of that included the

19  transition, and it still includes the transition of those

20  employees to Newco.  We are in active negotiations and believe

21  that Newco, once those employees are terminated on the 28th,

22  they will be able to perform their same duties on March 1st of

23  this year.

24       And so we expect those services to happen.  In the

25  interim, we've prepared for and have contingency plans in

Norris - Direct                    140

1  place in order to do all that we need to do.  We have systems

2  and servers that are set up in an SEC-compliant manner.  We

3  are operating on a new email system.  We have our files --

4  Q   Let's go --

5  A   -- that are essential.

6  Q   Let's go step by step here so that the judge --

7  A   Yeah.

8  Q   -- has a very clear picture of what all is involved.  So

9  I'm going to try to break it down.  I think both you and Mr.

10 Seery talked about back-office and middle-office services.

11 What are those?  What does that refer to in the industry?

12 A   Yeah.  So, back-office -- back-office and middle-office

13 includes HR, IT.  Accounting is a big part of that back-office

14 services.  And in regards to our funds, it is the oversight of

15 the accounting process on a day-to-day basis and on a monthly

16 and quarterly basis, for annual reports, for audits.  It's the

17 day-to-day valuation services that are provided to our funds.

18 And so those are the key functions.  It's legal and compliance

19 as well --

20 Q   So let's --

21 A   -- the Debtor has been providing for our funds.

22 Q   Let's go step by step.  So let's assume that I'm -- I want

23 to invest in your fund.  In a retail fund, pardon me.  Am I

24 able to pop up daily or almost instant information regarding

25 its assets, its valuations, et cetera?

Norris - Direct                    141

1  A    Yes.  So, most of our --

2  Q    Is that -- is that --

3  A    -- funds --

4  Q    Is that part of what you were just describing about

5  valuation and accounting services on a real-time basis?

6  A    Yes, it's part.  It's more of the oversight function.

7  Q    Okay.

8  A    We outsource the daily processing and NAV-striking, or the

9  actual accounting, day-to-day accounting, to an outside third

10 party called SEI.  And the Debtor had provided oversight

11 function as well as valuation services for that daily

12 accounting process.

13 Q    Okay.  So the Debtor, for accounting, wasn't actually

14 crunching the numbers every day; it'll -- supervising third

15 parties.  And that's been the historical norm, correct?

16 A    That's correct.  I actually --

17 Q    Now, let's --

18 A    -- years ago filled that function.

19 Q    Okay.  So let's -- so how are we, the Advisors, today,

20 compensating for the lack of the Debtor's back-office and

21 middle-office services, or how are we transitioning from that

22 today?

23 A    Yeah.  So, a key part of that is the transition to Newco,

24 right, and as well that is planned for next week.  However, in

25 the interim, we have very good plans and processes in place.

Norris - Direct                    142

1   We have -- on the accounting front, on a day-to-day basis, we

2   have added our key personnel, our accounting teams, which has

3   been actually bulked up in recent years.  We have a number of

4   publicly-traded REITS that have SOX-compliant processes and

5   procedures.

6       And the CFO of our real estate platform, Brian Mitts, used

7   to be the principal financial officer of all of these funds.

8   He continues to be and operates as the principal financial

9   officer for one of them, or had been throughout all of this

10  time, and is a participant in all of the board meetings and

11  regular valuation processes.  In addition, he has a team of

12  accountants.

13      And so they are now copied on all the day-to-day

14  accounting emails from our third-party providers.  They have

15  been for several days.

16      In addition, as a backup measure, we hired on a consulting

17  basis the former senior accounting manager who worked until

18  April of about two years ago for the Debtor, providing these

19  same services to our funds.  And so, on a contract basis, he's

20  there as needed.

21      In addition, we have received from the Debtor a list of

22  employees, if they're needed, that we could hire.  There's

23  about seven of them in the accounting and operations

24  functions.  They gave us permission last week to do so.  And

25  one for valuation.

Norris - Direct                          143

1    So, those functions, if they're needed in the interim

2  period before Newco is in place, we'll have those.

3    In addition, from an IT perspective, which is an important

4  part here, they maintain -- the Debtor maintained our systems

5  and servers.  We have contracted --

6  Q   Let's not -- let's not -- we'll talk --

7  A   Yeah.

8  Q   We'll talk about -- we'll talk about IT momentarily.

9  A   Yeah.

10 Q   You mentioned -- so you just discussed accounting.  What

11 about -- and I think you -- did your discussion right now

12 include transition of the valuation services?

13 A   Yeah.  So, in that regard, --

14 Q   Okay.  What about -- what about -- what about legal,

15 transition of legal services and compliance, regulatory

16 compliance?

17 A   Yeah.  That -- as I had mentioned before, the services we

18 had been receiving from the Debtor have slimmed down

19 dramatically, and particularly around legal services.  We

20 still had been receiving significant support from Lauren

21 Thedford, who is a very reliable team member of the Debtor.

22 She was also serving as an officer of the funds, of our funds,

23 until Friday, when she resigned.  But we have in place with

24 SEI, they provide admini... regulatory and legal admin

25 services to us, and have all along.  They're prepared to step

Norris - Direct                     144

1  up in her absence.

2       And also K&L Gates, who already serves as advisor counsel

3  and fund counsel, is set and has been already picking up the

4  slack and prepared to do anything that Lauren was doing.  She

5  is a valuable team member.  We hope that as we transition to

6  Newco that she'll be able to, as mentioned earlier, step back

7  on as an officer of the funds.

8  Q   Now let's talk about IT, information technology.  What

9  services was the Debtor providing to the Advisors in the

10 nature of IT under the shared services agreements?

11 A   Yeah.  So, our IT equipment, our computers, our screens,

12 were their property, or at least that's -- that's the --

13 that's what -- it's in their name.  Not all of it, but some of

14 it.  In addition, they provide IT support.  So if we have an

15 IT problem, we need to call the IT guy, they provide that.

16 They provide support for the servers.  They own the servers.

17 They own the system.  Or at least that's what -- that's what

18 their -- their claim is.  And so they provide all of those

19 kind of IT functions for us, or had until this past weekend.

20 Q   Does that include email?

21 A   That's right.  They -- they --

22 Q   Does that include -- hold on.

23 A   We have a number of --

24 Q   Hold on.  Hold on.  Does that include Internet -- does

25 that include Internet connectivity?

Norris - Direct                    145

1  A   It included the Internet connections at work.  It included

2  the phones.  It included our emails and email servers and the

3  --

4  Q   What about --

5  A   -- domain that, even though they're in our names -- yeah.

6  Q   That's what I was going to ask next.  What about domain

7  names?  How are those handled?

8  A   They have claimed that those are theirs as well, that the

9  domains we use for our websites and for our emails are theirs.

10 Q   Okay.  And what about electronic data, just a wealth of

11 internal books and records, kind of corporate data?  Did the

12 Debtor provide --

13 A   Yeah.

14 Q   -- any services with respect to that?

15 A   Yeah.  So, they retain all of the data that we use on

16 their networks and servers, and all of that is stored on

17 shared drives and on their system or on the computers that are

18 owned by them.  And so even though they're our books and

19 records, I believe you read earlier the provisions of the data

20 provision, and so that is all stored on their systems.

21 Q   Okay.  So we just kind of discussed the universe of the IT

22 services that the Debtor provided.  Did we miss anything or is

23 that kind of the stuff that really matters?

24 A   I think that -- I think that covers the --

25 Q   Okay.

Norris - Direct                                146

1   A    -- the main items.

2   Q    How is that being handled by the Advisors today, or how is

3   that -- or has it been transitioned from the Debtor?

4   A    Yeah.  So, largely, we are handling it on our own and

5   through a third-party provider.  So, we have bought and

6   purchased our own domain names.  We've transitioned our emails

7   to those new domain names.  We have made copies of our data,

8   or a lot of our data.  There's still some stuff we need.  But

9   our essential data.  And we have transitioned to a new server

10  and systems that are -- that are secured and perform through

11  this third party who does this for a number of asset managers,

12  for endowments.  And the way he has set it up is in an SEC-

13  compliant matter.  So, dual authentication.  All of the things

14  that you would expect from a security standpoint are in place.

15  And we are operating starting on -- we were mirroring for a

16  couple weeks, but on our own beginning on Saturday, when the

17  shared services were terminated, and have been sending those

18  emails from those -- the new systems and servers.

19  Q    So that was going to be my next question.  Is it that we

20  just did this (snaps fingers) Saturday like that, or did we

21  actually have a mirroring in place for quite some time?

22  A    Yeah, we have for -- been working on this for multiple

23  weeks with the outside IT service provider, and it's been done

24  in phases.  And so we've been -- we had a certain small

25  portion of the people start early, they tested it out, and

Norris - Direct                                    147

1    then we rolled it out more broadly over the last couple of

2    weeks.

3    Q    Who is that third-party IT provider?  What was that --

4    A    Siepe.

5    Q    Is that -- that's not proprietary information, is it?

6    A    It's not.

7    Q    Okay.  Who is the third-party provider?

8    A    It's Siepe.  And they're a outsource --

9    Q    Well, let me -- let me -- let me --

10   A    -- provider --

11   Q    Let me --

12   A    Yeah.

13   Q    Let me direct you.  Will you please spell Siepe?  I'm not

14   even sure how to spell it.  And then tell the Court what Siepe

15   is and what it does.

16   A    Siepe, it's S-I-E-P-E, and I believe it's Italian for

17   hedge, and they are an outsourced IT and IT development

18   provider.  And it was actually started by a former member of

19   -- a former employee of Highland about a decade ago, I

20   believe.  He spun out and created his own firm.  And they do

21   this for a number of asset managers, including for Highland.

22   So they understand our systems.  They understand their

23   systems.  They're intimately familiar with what we need.

24   They've been servicing our Advisors for years and have created

25   a lot of the connections that we have with outside service

                              Norris - Direct                    148

1   providers.

2   Q   This ain't their first rodeo?

3   A   No.  I would think -- it would be -- have been challenging

4   to do it without Siepe, and -- but they were able to execute

5   very quickly because they knew and were already operating with

6   us for years.

7   Q   So can investors, clients, in these funds today get on the

8   Internet and get whatever information they were able to get a

9   week ago, can they still get that today regarding their

10  investments?

11  A   Yes, they can.  And I would add one other thing here,

12  important, is the investors, all of their books and records

13  and the data related to our advi... to our funds, the

14  accounting data and the client data, are held at third

15  parties.  So we have a third-party transfer agent that has all

16  of the information on client records.  That is -- they don't

17  come to us for their client statements.  They go to our

18  transfer agent.

19      In addition, our accounting functions, those data and

20  files are all on their systems.

21      And so as far as we're talking about data and what they

22  can come to us, they never come to us for their systems and

23  their data.  If they want to know what the value is, they can

24  go to  Morningstar.com or Yahoo Finance and see daily the

25  pricing of our funds, which are published daily, even

Norris - Direct                          149

1   yesterday, published there for them.  But their actual client

2   data is held at third-party administrators.

3   Q    The point being, do you, other than maybe a change in the

4   email address, the point being do you think that investors or

5   clients or customers are even aware of the transition away

6   from the Debtor in the last few days?

7   A    Based on business interaction --

8           MR. MORRIS:  Object to the form of the question.

9           THE COURT:  I'm sorry, was there an objection?

10          MR. MORRIS:  There is an objection.  To the extent

11  the question is asking for what other people think or believe

12  or perceive, I think that's improper.  No foundation.

13          THE COURT:  All right.  I sustain.

14  BY MR. RUKAVINA:

15  Q    Have you received any complaints from investors or

16  customers or clients in the last few days about their ability

17  to do anything with respect to their investments?

18  A    Not that I'm aware of, no.

19  Q    Okay.

20          THE COURT:  All right.  Mr. Rukavina, it's about

21  1:00.  How many more minutes do you have?

22          MR. RUKAVINA:  I don't think I have more than ten

23  minutes, Your Honor.  Fifteen minutes, tops.

24          THE COURT:  Okay.  Well, we need to take a lunch

25  break, so we're just going to break here.  It is 1:00 o'clock.

Norris - Direct                              150

1    I'm advised that my 1:30 matter is going to take maybe ten

2    minutes.  So we will convene -- let me get a clarification.

3        If we reconvene at 1:45, Mike, do we need to hang up?  Do

4    we need to terminate this and --

5            THE CLERK:  Yes.  We need to terminate this because

6    she's already gotten one set up at 1:30, the other one.

7            THE COURT:  Okay.

8            THE CLERK:  So they could probably just call in to

9    that one.  We just need to get them the information.  Let me

10   see if I can contract Traci, see what the best way.  Because,

11   like I said, we've already got one for them.

12           THE COURT:  Okay.

13           THE CLERK:  So this one is going to end.

14           THE COURT:  All right.  So just stay, I guess,

15   connected.  Is that what you're saying?

16           THE CLERK:  Yes, stay connected.

17           THE COURT:  Yes, stay connected.  We'll come back at

18   1:45.  And my staff will let you know if by chance we need to

19   terminate this and reconnect.  But I think you can just stay

20   connected.  Operate under that assumption for now.

21       All right.  So I will see you at 1:45.

22           MR. MORRIS:  Thank you, Your Honor.

23           THE CLERK:  All rise.

24           MR. POMERANTZ:  Thank you.

25       (A luncheon recess ensued from 1:01 p.m. to 2:14 p.m.)

Norris - Direct                              151

1        THE COURT:  Mr. Rukavina was examining Mr. -- I was

2   about to say Dustin -- Mr. Norris.  So, are you ready to

3   proceed, Mr. Rukavina?  You said you had a few more minutes.

4        MR. RUKAVINA:  Your Honor?  Pardon me.  Your Honor,

5   I'm ready.  Mr. Norris, can you hear me?

6        THE WITNESS:  Yes, I can.  Thank you.

7        THE COURT:  All right.  Mr. Norris, I'll remind you

8   you are still under oath from your prior swearing in.

9        All right.  You may proceed.

10        THE WITNESS:  Thank you.

11                 DIRECT EXAMINATION, RESUMED

12   BY MR. RUKAVINA:

13   Q   Mr. Norris, I think before we broke we rounded off a

14   discussion about the previously backup/now-operational plan

15   for IT and electronic data.  I'd like to move on now to office

16   space.

17   A   Okay.

18   Q   What is the current status and plan for the Advisors to

19   have office space, both for their current employees and for

20   the Newco employees?

21   A   Yeah.  So, from our perspective, we've been in talks with

22   an organization that's willing to sublease a space that is

23   approximately -- close to our current space.  And that is the

24   current plan.

25        In the interim period, all of our employees are working

Norris - Direct                              152

1   remotely, and are doing so without any major issues. They're

2   able to -- in this COVID environment, fortunately, there are

3   systems and processes that have already been built out and

4   we've been able to transition to that without any issues.

5   Major issues. Without any major issues.

6   Q   Is there any temporary office space available this week

7   for, you know, meetings or anything that might have to happen

8   in-person?

9   A   Yeah. So, I'm actually sitting in a temporary office

10  space for a meeting. A company we have a relationship with is

11  allowing -- and -- office space here.

12  Q   Okay. What about hardware, like computers, routers, all

13  of that stuff you testified earlier, most of which was the

14  Debtor's property that I'm taking it we left on the Debtor's

15  premises when we vacated Friday? What's the status of --

16         MR. MORRIS: Your Honor, objection. Again, I don't

17  know what the testimony is and the references to "we".

18  There's no -- there's no evidence in the record that anything

19  was left behind. There's no evidence of any of this.

20         MR. RUKAVINA: I'll start again, Your Honor.

21         THE COURT: All right. Sustained.

22  BY MR. RUKAVINA:

23  Q   Mr. Norris, you've heard Mr. Dondero testify or Mr. Seery

24  testify that the employees of the Advisors that were onsite at

25  Crescent Court vacated. Did you hear that testimony?

Norris - Direct                          153

1   A    Yes.

2   Q    Is that accurate testimony?

3   A    That is accurate.  We all moved out by the end of day on

4   Friday.

5   Q    That's Friday, the 19th of February?

6   A    Correct.

7   Q    Did any employees, to your knowledge, or did you see

8   anyone take any equipment, machinery, et cetera, that was not

9   property of the Advisors?

10  A    Yeah.  So, we were informed that we would have access to

11  the systems, as they testified to earlier, until today.  So we

12  held onto those.  They never told us they needed our laptops.

13  They never told us to leave our stuff, or their stuff.  And so

14  we're prepared to provide those and return those.  And we are

15  actually operating now independent of those IT resources,

16  being laptops, et cetera, and screens.

17       So, there were a number of laptops that were assigned to

18  us that we purchased just in the last few months, about 15 of

19  them.  A number of screens as well.  We took those, and those

20  continue to be used.

21       For essential personnel, we had, over the last several

22  weeks, purchased additional laptops.  As you know, laptops --

23  you may know laptops are in short supply, and so we ordered

24  them for the essential people that did not have a computer at

25  home, so that they could be operating.  Those were outfitted

Norris - Direct                              154

1 and ready, many of them picked up last week, some picked up

2 this morning.  And those that didn't have a laptop ready, we

3 ensured that they had home access and are able to log in

4 through the cloud.  So, all of our systems are hosted by AWS,

5 which is an Amazon system, set up so that we can remote login

6 through a VPN connection.  So, our employees are able to

7 access their email and our systems through there.

8 Q   Okay.  To the extent any of the Advisors' employees are in

9 possession of computer equipment that belongs to the Debtor,

10 will that be returned promptly?

11 A   Yes.  As they request it, it will be, yes.

12 Q   Okay.  Have the Advisors offered to purchase for cash

13 money those used laptops and other equipment?

14 A   We have, yes.

15 Q   Did the Debtor accept?

16 A   It was part of our, as we referred to earlier, a slimmed-

17 down proposal over the weekend, which was very minimal, and it

18 included the laptops.  And we offered a sum for that, and the

19 OMS system.  The sum we offered was $300,000, and we also

20 offered to take one hundred percent of the OMS invoice going

21 forward, and offered the Debtor to continue using that, as we

22 know they -- we believe they may or may not need use for it.

23 But we offered that over the weekend, and they simply

24 responded with, We don't even know why you need this.  And the

25 answer was their offer was still on the table, with no access

Norris - Direct                          155

1   to Jim, and the whole agreement.

2   Q    So, the Debtor wouldn't negotiate on an *a la carte*

3   purchase?

4   A    No.  We offered, actually, last Thursday as well, once we

5   had received the -- kind of the -- Wednesday or Thursday, I

6   can't remember the exact date, after the court filing had been

7   made, for a small, very slimmed-down, which was primarily the

8   OMS and certain data items, which they came back with some

9   counters which weren't workable.  And then again, throughout

10  the weekend, I worked all day Saturday.  They said they would

11  be willing to consider a slim-down, but send them an

12  agreement, and -- something that Jim Dondero had explicitly

13  agreed to.  And we spent all day, discussed with Jim, and sent

14  them to them Sunday morning, to which they -- they did not

15  agree to.

16  Q    Okay.  Did they counter, or did they just say no?

17  A    I think that the -- the counter was the offer from Friday,

18  and I can't remember which one it was.  But there was a

19  counter, but it was not what Jim had authorized.

20  Q    Okay.  Let's move onto the third-party software that we

21  discussed before, Bloomberg, OMS, or Oracle.  What is the

22  current status of that vis-à-vis our transition plan?

23  A    Yeah.  So, from a trading perspective, trading has been

24  done outside of OMS in the past, right?  And if you look at --

25  it's not as easy.  There's also -- so, we have a manual

Norris - Direct                    156

1    process in place that we're able to, and that we've tested,

2    that we're able to perform from a trading perspective, where

3    our traders interface directly with the brokers, where they're

4    able to manually input the trade.  They're able to be

5    communicated to our custodians and our accountants, and then

6    that is able to be settled manually.

7        So, that's not ideal.  We would like to have an order

8    management system.  That said, I know there's discussions with

9    the Debtor, more employees of DSI, about getting copies of

10   their OMS for the data that is ours within the OMS, or

11   allowing us to get that data in order to actually enter into

12   an agreement separately with Bloomberg, which we've been

13   discussing with Bloomberg.  And Bloomberg is willing, with

14   their approval, to get that copy and set it up without any

15   setup fees for us, and we would have a new instance of that

16   OMS.

17       Separately, there are some other free off-the-shelf OMS

18   solutions that our outside service providers have said they

19   can quickly implement.  And so it's just determining based on,

20   really, the events today, and the discussions going on on the

21   OMS, what our path forward is.  But we have a plan, which

22   we're executing on, to execute trades.

23       As the Debtor said, they are still providing access to our

24   -- their systems through the end of the case today.  And I

25   think, as Mr. Seery said, there's -- they still see trades

Norris - Direct                               157

1    going through the system.  That's at their goodwill, and I

2    think that's great.

3        But the OMS is an area of continued focus.  Again, we have

4    a plan to go forward or without it, but ideally we would have

5    a smooth transition there.

6    Q    So, if the OMS purchase -- the OMS system can't be

7    purchased from the Debtor, you mentioned a potential agreement

8    with Bloomberg where a new OMS system would be purchased or

9    built?  Or explain more what you mean by that.

10   A    Yeah.  So, Bloomberg has -- and this is their software,

11   the order management system through Bloomberg -- but it has

12   been highly customized over many years and has our historical

13   data in there, our rules, our Advisors' rules set up that we

14   use for trading.  And so it would take several months for us

15   to go in and code exactly how we would like it.  However, my

16   understanding is there's a backup where Bloomberg, with the

17   authorization from the Debtor, could transfer the underlying

18   data and setup.

19       Or alternatively, like I said, we offered over the weekend

20   to pay them a monetary sum to take over the Bloomberg

21   contract, and not just the OMS, but others that I think it was

22   approximately $450,000 a year in ongoing costs we would take

23   one hundred percent of and still provide them access.

24   Q    Access for a fee or access for free?

25   A    Free.  Free of charge.

Norris - Direct                              158

1    Q    Okay.  So just so that the judge knows, are we able to

2    execute trades today?

3    A    Yes.

4    Q    Will we be able to execute trades tomorrow?

5    A    Yes.

6    Q    Will we be able to execute trades into the future until we

7    either purchase or develop an OMS electronic system?

8    A    Yes.

9    Q    And in the meantime, it's being done manually, I think you

10   said?

11   A    Yep, manually.

12   Q    And do you have confidence that the manual system is going

13   to be safe and accurate?

14   A    I do.  There's -- there is multiple people involved.

15   They've actually run tests -- not test trades, but actual

16   trades, over the last couple of weeks through this system.

17   And our trader has been trading for over two decades, and this

18   is a system he used years ago before we put in place the OMS.

19   There is some --

20   Q    Stop, stop, stop, stop, stop.  What system did he use

21   years ago?  I want you to be specific.

22   A    This manual system --

23   Q    Okay.

24   A    -- that we're using today.  We call it manual. It's a

25   direct with -- with a process that we used previously.

Norris - Direct                    159

1  Q   Okay.  Thank you.  I just wanted that clarification.

2      Do we have -- the Advisors, that is -- do the Advisors

3  have insurance in place for whatever it's called in your

4  business, but for basically messing up a trade?  Whether it's

5  professional negligence or O&E or whatever it is.  E&O.

6  A   Yes.  Our funds have insurance that is through ICI, which

7  is a -- they do this specifically for investment companies.

8  So, we have a -- I think it's an errors and omissions

9  insurance that covers, for example, if there was a NAV error.

10 A NAV error is if a fund made a mistake.  In addition, we have

11 NAV error correction policies, where, if it's the Advisors'

12 fault, then the Advisor would have to kick in.  But the

13 Advisor has insurance as well, as well, to cover things of

14 that nature.

15 Q   What's the policy limit?

16 A   I believe it's $5 million.  I'm not certain, but I believe

17 it's $5 million.

18 Q   Okay.  So, over the course of the last several questions,

19 I've gone through kind of various processes and services that

20 the Debtor used to provide.  Have I missed anything big-ticket

21 that you feel is of importance?

22 A   As far as essential items, no.  There are some smaller

23 items like HR, which is recruiting and hiring, those types of

24 smaller things.  Cash management, communicating with

25 custodians, where those are smaller, minor items, but aren't

Norris - Direct                           160

1  -- we're able to cover internally but you didn't mention in

2  particular.  But those are -- those are the big items.

3  Q    And do you have confidence or a lack of confidence that

4  your backup plan, now the operating plan, is going to succeed?

5  A    I do.  It's not the path that we all wanted to go down,

6  right, as we wanted to have a transition.  We wanted to have

7  all these systems and software, as evidenced by trying again

8  to have the Bloomberg OMS through the weekend.  It's not going

9  to be perfect, but I feel like we have everything in place to

10  do the job that we're required to do.

11      And we've tried to put in place, you know, controls to

12  mitigate risks wherever possible, and so I feel confident in

13  the plan.  I've spent weeks and weeks losing sleep,

14  coordinating, you know, stressing over these items as a backup

15  plan, in addition to trying to negotiate an agreement.  I've

16  had a team of senior people across our firm who are from each

17  area of our firm.  I have spoken with Debtor employees to

18  consider what additional risks do we need to consider.  And so

19  I think it's been very well-thought-out.  And I mentioned the

20  last several weeks, that was when, again, when it became an

21  earnest necessity to ensure we had something.

22      Prior to that, you know, in December and November, we

23  received a list of all agreements.  We reviewed a list of all

24  of our agreements, all the Debtor's agreements.  And so we

25  were thoughtful already then what we needed.  And so as we had

Norris - Direct                        161

1   to then execute quickly, we knew exactly what was necessary

2   and what the Debtor was providing us.  And so, as well, with

3   this transition agreement, there's about a hundred or so

4   services in there, and discussing what were essential and what

5   were not, what we could enter into by ourselves and what we

6   couldn't.  And almost every one of them we could have entered

7   into ourselves.  We would have loved to -- and I think we

8   would have had a cost savings, and it would have been a

9   benefit to them -- to reach this broad agreement, but for the

10  one remaining issue that neither Jim would approve.

11       So, we tried.  We went through the, as I said earlier, a

12  thousand line items.  We negotiated, I believe, in good faith

13  all along the way.  Whenever -- an ultimatum was given to us

14  on Tuesday.  I continued pushing all the way through Friday,

15  all the way through the weekend, and this is what I wanted.

16  But along the way, we were preparing in every way for the

17  backup, because I have '40 Act registered mutual funds, I have

18  a board who's demanded it, and we were trying in every way to

19  be able to continue these services in the event that HCMLP

20  would no longer provide them.

21  Q   I think we've established that the Debtor will be

22  terminating the employees, some employees as of February the

23  28th.  Do you expect to hire those employees through Newco

24  come March 1?

25  A   Yeah.  So, to make an adjustment there, there are about

Norris - Direct                                162

1  eight to ten employees that are investment professionals that

2  we would need to hire directly at our Advisor.  Earlier on in

3  the process, there was a question of whether we hire all

4  employees directly, whether Newco hires them, whether Newco is

5  owned by Jim or whether it's an independent business.  The

6  current plan, which has been the last couple of months, is

7  that Newco would be independent, they'd be run by an

8  independent management team.  We would -- we would be --

9  provide -- providing them or entering into a shared services

10  agreement.

11      And so our full understanding and expectation is that

12  those employees for Newco will be hired or anticipated to be

13  hired after they're terminated on the 28th.  All of that, I

14  know, is in negotiations, but I believe that is what the

15  Debtor is willing to do, and that those eight or ten employees

16  will be hired by us once they're terminated.

17  Q   So, approximately how many employees, through Newco or

18  directly, do you expect to hire on or about March 1?

19  A   I think there's approximately fifty or so.  I know that

20  the Debtor is considering adding, I believe, somewhere around

21  five to ten employees, or taking those.  I think we have -- we

22  have not heard or been told.  We've been asked -- we've asked

23  several times.  They haven't told us who those employees are.

24  But I think we have a pretty good idea.

25      But at this point, we think that the majority of the

Norris - Direct                               163

1   people providing services to us in the back office and middle

2   office, again, because they'll want -- I believe they'll want

3   or are going to be handful of front-office people that help

4   with private equity and winding down those assets.  But the

5   bulk, if not all, of the back-office personnel will transfer

6   over to Newco, with a handful of the investment professionals

7   to us.

8   Q    Do you have any concern or is there anything outstanding

9   that would give you concern that that will not happen on or

10  about March 1?

11  A    I sure hope it does, but one thing that may cause me --

12  maybe the only thing that may cause me concern is they have

13  twice moved back or maybe three times moved back the

14  termination dates.  Now clearly know that our plan is to

15  involve Newco and all those employees to continue providing

16  services.

17       In the event that happens, we're prepared to continue.

18  The items that we're covering in the interim period are the

19  essential items.  There's a number of services that -- that

20  Newco would provide that are not essential for the operations

21  of our funds.  They include things like tax services for our

22  advisor or the books and records of our advisor, like the HR

23  recruiting services.  You know, those could wait, or we could

24  contract them elsewhere.

25       And so -- but I do hope -- and our -- we don't anticipate

Norris - Direct                                    164

1   any disruption here.  I know that they've said that Newco can

2   hire whoever they want.  I think that that's going to be

3   smooth and orderly.

4   Q    Well, so let me ask, let me ask -- I'm down to two or

5   three more questions, but let me ask a worst-case scenario

6   question.  Come tomorrow or come Friday, you realize that you

7   can't do OMS manually; for some reason, the Debtor doesn't

8   release its employees; all of your planning turns out to have

9   been inadequate, and essential functions are not able to get

10  done:  Are there third-party providers that could immediately

11  step in and provide basically every service that the Debtor is

12  currently providing to the Advisors in such an event?

13  A    There are.  I think the trading -- I think we have a good

14  plan.  But to your point, your promise, if we couldn't pull it

15  off or there were issues, you can outsource trading.  You can

16  outsource that.  It's not a turn-on-the-switch, but we do have

17  and have had discussions with service providers there.

18       In the end, if Newco didn't work out, there are other

19  service providers, which I know that people in our team and

20  the Debtor have talked to, to provide outsourced accounting

21  oversight.  There are -- there's multiple options.  We just

22  have not --

23  Q    So is it fair to say, is it fair to say that you have

24  currently a Plan B to your Plan B?

25  A    Yeah, well, there is, yes, but I feel very good about our

Norris - Direct                    165

1  current Plan B that we've implemented, to the extent I don't

2  think we're going to need that.  But if there is a lack of

3  cooperation for some reason, we do have other options to

4  outsource those services.

5  Q    Okay.  My final question --

6  A    Again, I don't anticipate -- I don't -- I don't -- I don't

7  think that's going to be the case, but --

8  Q    My final question, Mr. Norris.  This backup plan and now

9  the operational plan that you have, was it in any way

10  motivated, sped up, anything by the filing of this lawsuit?

11  A    No.  I think one thing the finalization -- the filing of

12  the lawsuit did was make us realize that the backup plan we

13  had been working on was absolutely needed.  I felt very good

14  about where we were at that point, and we were prepared to

15  move forward.

16      It did change that I, over the next six days, me and

17  several other of the critical employees that have been working

18  on the backup plan would be involved in preparing for this

19  exact situation.  Instead of continuing those discussions, I'd

20  rather be boots on the ground, dealing with my employees, the

21  senior management team and everyone else.  Luckily, you know,

22  after my deposition, before my deposition yesterday, I was

23  involved in how is everything going.  We had checkpoints and

24  touchpoints.  We had calls in the afternoon.

25      Fortunately, there were no significant issues, but there

Norris - Direct                           166

1   were a lot of minor issues.  There were things that needed to

2   be approved or people had questions.  But that, I think, is

3   the only thing that changed here.  It's -- we had to -- now we

4   knew that, okay, they're going to pull the plug because of

5   this.

6       At that point, I was not expecting that really to happen

7   at that point, that that would be the issue.

8   Q    Well, Mr. Norris, --

9   A    But luckily, we had planned for it.

10  Q    Mr. Norris, if an allegation is made that it was the

11  filing of this lawsuit that somehow spurred us into taking our

12  responsibilities seriously, would you agree with any such

13  allegation?

14  A    No.  I would disagree.

15  Q    Thank you.

16          MR. RUKAVINA:  I'll pass the witness.

17          THE COURT:  All right.  Mr. Morris?

18          THE WITNESS:  I can't hear you.  I think you might be

19  on mute, Mr. Morris.

20      (Pause.)

21                    CROSS-EXAMINATION

22  BY MR. MORRIS:

23  Q    Got it.  Can you hear me now?

24  A    I can, yes.

25  Q    Okay.  Super.  I have a few questions, sir.

Norris - Cross                              167

1  A   Yes.

2  Q   You spent a fair amount of time testifying about how

3  poorly the Debtor was performing under the shared services

4  agreements last October and November.  Do you remember that?

5  A   I remember I testified.  I wouldn't say it was some time,

6  but yes.

7  Q   You specifically mentioned the October and the November

8  time frame, right?

9  A   Correct.  I believe so.

10 Q   And you said that during that October and November time

11 frame, there were lots of conflicts of interest that were

12 arising; is that right?

13 A   I don't remember my specific wording, but if it's part of

14 the record, then yes.

15 Q   Uh-huh.  And you said that the Advisors weren't getting

16 the same level of services that they thought they were

17 entitled to; isn't that right?

18 A   That's correct.

19 Q   And you thought -- and the Advisors thought long and hard

20 about terminating, about taking the initiative and terminating

21 the shared services agreement, right?

22 A   I don't know if I used the word "long and hard", but yes,

23 we did consider and discuss the termination of the shared

24 services agreements.

25 Q   And the reason that you decided in October and November

Norris - Cross                    168

1   not to do that is because you knew there was an order in place

2   that prevented a Dondero-related entity from terminating an

3   agreement.  Isn't that right?

4   A    That's -- that's one of the reasons, yes.

5   Q    That's the only reason you identified before; isn't that

6   right?

7   A    I believe so.

8   Q    And that --

9   A    That was a determining -- that was a make-or-break point,

10  yes.

11  Q    And it was a -- and that was false testimony; isn't that

12  right?

13  A    No.

14  Q    Well, just a month later, in December, the Advisors sent a

15  letter to the Debtor threatening to terminate the CLO

16  management agreement; isn't that right?

17          MR. RUKAVINA:  Your Honor, I'll object to that, it's

18  not in the evidence, and I'll object on the basis of the best

19  evidence rule.

20          THE COURT:  Response?

21          MR. MORRIS:  You can answer, sir.

22          THE COURT:  Response?

23          MR. RUKAVINA:  Your Honor, I didn't hear a response.

24          MR. MORRIS:  The witness is the executive vice

25  president of the Advisors.  The Advisors were the subject of a

Norris - Cross                          169

1  preliminary injunction proceeding.  During that proceeding,

2  against these very same Defendants, this letter was admitted

3  into evidence where they -- where the Advisors did exactly

4  what Mr. Norris said they would never do because they didn't

5  think they had the authority to do that.  Mr. Norris is the

6  best evidence right now, Your Honor.

7          THE COURT:  Okay.  I overrule the objection.

8          MR. MORRIS:  Your Honor, that's not --

9          THE COURT:  I overrule the objection.  I remember the

10 evidence from the December hearing.  So he can answer.

11         THE WITNESS:  Yeah, so can you repeat the question,

12 just so I make sure I answer appropriately?

13 BY MR. MORRIS:

14 Q   Sure.  In December, the funds and the Advisors for which

15 you serve as the executive vice president, on, I think,

16 December 23rd, sent a letter to the Debtor threatening to

17 terminate, right?  Threatening to use what authority they

18 thought they had to go in and terminate the CLO management

19 agreements.  Isn't that right?

20 A   I was not involved in the drafting of the letter, but my

21 understanding is there was no threat.  It was -- and I believe

22 the letter even said, subject to court approval or stay or

23 process.  I would love for -- if there is a letter, if you

24 want to bring it up, but I wasn't directly involved with the

25 letter.

Norris - Cross                    170

1   Q    And the Advisors didn't send a letter to the Debtor in

2   October or November saying, We want to terminate the agreement

3   subject to whatever you just said.  In fact, you concluded

4   that you couldn't do it because of the injunction, right?

5   A    Correct.

6   Q    Yeah.  You've spent an awful lot of time talking about

7   this operational plan that the Advisors have today.  It was a

8   much more modest plan during your deposition yesterday; isn't

9   that right?

10  A    I wouldn't --

11        MR. RUKAVINA:  Your Honor, I'll object --

12        THE COURT:  I'm sorry?

13        MR. RUKAVINA:  I object to that characterization.

14        THE COURT:  You object to --

15        MR. RUKAVINA:  Your Honor, I'll --

16        THE COURT:  -- the charac...

17        MR. RUKAVINA:  I'll withdraw that.  I'll withdraw

18  that objection, Your Honor.

19        THE COURT:  All right.  Go ahead.

20        THE WITNESS:  No, I answered the questions in the

21  manner that you asked them in the deposition.  I don't think

22  that you asked for detailed descriptions.  In fact, I know you

23  didn't.  And so there was a lot more than what I discussed in

24  my deposition yesterday.

25  BY MR. MORRIS:

Norris - Cross                               171

1    Q    Okay.

2    A    Nothing -- there's nothing that -- nothing that conflicts

3    with what I said yesterday.

4    Q    James Palmer was hired to provide accounting and audit

5    services yesterday on a contract basis, correct?

6    A    He was hired yesterday, yes.  And that was, yes, part of

7    the additional oversight for our accounting function.  We're

8    handling a lot of that internally, but Mr. Palmer was

9    experienced with our platform and with our funds, and we

10   thought it was prudent, in the -- if needed, to have somebody

11   on call.  And our board actually requested it.  And so that's

12   a -- you know, that is someone who we feel very comfortable

13   with providing those services.

14           MR. MORRIS:  I move to strike everything after "Yes,"

15   Your Honor.

16           THE COURT:  Sustained.

17   BY MR. MORRIS:

18   Q    Okay.  I'm going to ask you, sir.  This is cross-

19   examination.  I'm going to ask you leading questions that are

20   intended to elicit a yes or no answer.

21   A    Got it.

22   Q    Your counsel will have the opportunity to redirect if he

23   think it's necessary.

24        So, let me ask the question again.  Mr. Palmer was hired

25   by the Advisors to provide audit and accounting services

Norris - Cross                     172

1  yesterday.  Isn't that correct?

2  A    No.

3  Q    Yesterday was his first day on the job.  Isn't that right?

4  A    He is a contract employee.  So we didn't hire him.

5  Q    Okay.  You did testify yesterday that yesterday was the

6  first day he was providing services that had been provided by

7  the Debtor.  Is that fair?

8  A    Yes.

9  Q    Okay.  And Siepe is another entity that the Debtor had a

10 -- that the Advisors had a prior relationship, right?

11 A    Correct.

12 Q    And you don't have an agreement with Newco today, do you?

13 A    Not yet.

14 Q    So, Newco is not providing any services today, right?

15 A    No.

16 Q    And you don't have office space today, right?

17 A    Not yet.

18 Q    Okay.  So, when the sun rose on Saturday morning, to use

19 the same analogy, I guess, you'd been kicked out of the house

20 and you had no place to go.  Is that fair?

21 A    No.

22 Q    Everybody's working remotely right now, right?

23 A    Yes.

24 Q    And the Advisors have no lease for any office space on a

25 long-term basis, right?

Norris - Cross                                    173

1  A    No, but we've toured space and have a -- we are ready to

2  sign a sublease as soon as we're ready.

3  Q    Okay.  But you didn't have that as of Friday; is that

4  fair?

5  A    No.

6  Q    Okay.  And you -- and you're doing trading now on --

7  A    Actually, can I make a -- can I make a correction?  I --

8  you said you didn't have that.  I said we had done a tour, and

9  I had done a tour before Friday, and that we had a lot lined

10  up, and I had them asking us, Are you ready to execute, will

11  you be here Monday?

12      So, that was there.  Again, realizing we were going to be,

13  hopefully, the plan was to reach a full agreement with you,

14  but having that backup plan in place, not to sign a lease and

15  spend the money unless we knew we weren't going to be able to

16  be in the office space.  So that's why.

17  Q    All right.  So let me ask the question again.  As of

18  Friday, the Advisors had no place to go at the end of the

19  extended shared services period, correct?

20  A    I disagree with that.

21  Q    Okay.  They don't have an -- does the Advisors have an

22  address today?

23  A    We have an address, yes.

24  Q    Yeah?  Where is the address?

25  A    So, we -- we have been -- we have a -- so we have a -- our

Norris - Cross                              174

1   NexPoint Securities has an office on McKinney Avenue in

2   Dallas, which is where we -- we have an ability to send our

3   mail to and to have an office, which is where we intend to

4   actually be subleasing.

5   Q   Okay.  But you don't have a sublease today, and that

6   address isn't the address of the Advisors, right?

7   A   It is all but in place, waiting to not spend the

8   significant expenditure in the event that we could, which our

9   plan was to hope to reach an agreement.

10  Q   Okay.  And you're doing trades manually?  Do I have that

11  right?

12  A   It is -- we call it a manual process, but it involves like

13  -- there's a certain -- it doesn't involve the OMS system.

14  That's right.

15  Q   And when your operational plan is fully in place, would

16  you expect it to have an OMS system?

17  A   Yes.

18  Q   But your operational plan today doesn't have one of the

19  pieces that you expect it to have in the future; is that

20  right?

21  A   It has -- it has a usable option, but no.  We're close to

22  entering into an OMS, and that's not the long term.  Yeah.  We

23  aren't going to be doing a manual -- our manual process

24  forever.

25  Q   Yeah.  But you're very, very, very happy with your

Norris - Cross                                    175

1   operational plan, right?  You're very proud of it?

2   A    Given the constraints we were working under, I feel it's

3   -- it is a plan that works.  Would I think that the

4   alternative with what we were negotiating would be better?

5   Probably.  Would it be better to have access to our systems,

6   to our computers, without having to turn them back into you?

7   Yes, absolutely.

8        So I don't remember the word you just used, but I think

9   very happy or very pleased, I wouldn't say that.  I would say

10  it is functional, it helps us do our duty and our job, and

11  we're going to get back to that ideal.  And the reason I

12  negotiated all the way through the week and all the way

13  through the weeks and all the way through the weekend is

14  because there was a better alternative, which was a negotiated

15  settlement.

16  Q    All right.  We'll talk about that in a moment.  But

17  notwithstanding the fact that there may have been a better

18  alternative, as of today the Advisors have adopted and

19  implemented an operating plan for the provision of all of the

20  same back-office and middle-office services that the Debtor

21  previously provided, correct?

22  A    To cover -- and I would say they do, yes.

23  Q    Okay.

24  A    Yes.

25  Q    And as of today, the Advisors are fully able to perform

Norris - Cross                                176

1   under their shared -- under their advisory agreements with the

2   funds; is that correct?

3   A    Yes.

4   Q    There is nothing the Debtor has done that has prevented

5   the Advisors from fully performing under their advisory

6   committee -- advisory agreements with the funds, correct?

7   A    It took great effort over the last several months, but no,

8   not that I'm aware of.

9   Q    Okay.  Other than access to the data, there are no

10  services that the Advisors need from the Debtor.  Is that

11  correct?

12  A    No, but the peaceful transition of the data is important,

13  right?  We have, as you mentioned, we have most of the data we

14  need, but the peaceful transition of the data and the files in

15  the systems -- not the systems, but the data backups of the

16  systems -- will be critical, yes.

17  Q    Okay.  But other than data, there are no services that the

18  Debtor needs to provide to the Advisors as of today, correct?

19  A    Not that I know of.

20  Q    And having been as involved in the process as you've been,

21  you would know if there was a service that the Debtor had to

22  provide to the Advisors today; isn't that right?

23  A    Yes.

24  Q    Okay.  And you don't know of any service that the Debtor

25  needs to provide to the Advisors as of today, right?

Norris - Cross                         177

1    A    I don't.  We mentioned data.  I think one of those --

2    well, I'll leave it as yes.

3    Q    Okay.

4    A    Yeah.

5    Q    Did you have this plan in place, this operational plan,

6    was that -- were all of the pieces in place last Tuesday

7    night?  No.  Withdrawn.

8         Were all of those pieces in place as of January 31st,

9    2021?

10   A    No.

11   Q    So is it fair to say that the Debtor didn't -- that the

12   Advisors did not have an operational plan that would permit

13   them to obtain all of the same services that the Debtor had

14   been providing under the shared services agreement as of

15   October -- as of January 31st?

16   A    No.

17   Q    They did have a plan in place at that time to get those

18   services?  Is that what you're saying?

19   A    Yes.  There was a plan, a Plan B.  It wasn't nearly what

20   Plan B is today because we've -- we've had multiple additional

21   weeks to ensure that everything's in place, but we had Plan B.

22   But at the time -- maybe I'll leave it there.  But at the

23   time, there was good faith negotiations up to that point,

24   where Plan A looked like it was going to happen.  And so that

25   was the full expectation with a backup plan which was not as

Norris - Cross                                  178

1   intricate.

2   Q    Did the Advisors ever inform the Debtor at any time during

3   the negotiations that they had an operational plan pursuant to

4   which it could obtain the same middle- and back-office

5   services that the Debtor had been providing?

6   A    If you include your Debtor employees, then yes.

7   Q    Did you ever use it as a point of negotiation?  Did you

8   ever try to tell the Debtor, you know, if you guys don't agree

9   to our terms, we're going to walk away, because we've got this

10  fully-operational plan to get the same services that you guys

11  are providing?  You're not the only game in town?

12  A    I never used that kind of exact approach, no.

13  Q    Did you use any approach where you relied on the

14  operational plan as leverage to try to drive a better deal

15  with the Debtor?

16  A    No.  I don't think so.

17  Q    No?  Okay.  And fast-forward to that Tuesday night when

18  the Debtor said take the plan without Mr. Dondero or we're

19  going to sue you.  You remember that, right?

20  A    Yes.

21  Q    And every aspect of the agreement was in place except for

22  Mr. Dondero, right?

23  A    Except for his access to the office, --

24  Q    And the --

25  A    -- yes.

Norris - Cross                        179

1   Q    And the Debtor had told you time and time again, every

2   time it appeared in a document, they removed it, and they told

3   you every single time no access for Mr. Dondero, right?

4   A    No.

5   Q    Did you have any reason to believe that that was ever

6   going to change?

7   A    I did.  And I said no to your last question, right?  I

8   didn't say yes.  I said no to your last question, that --

9   Q    And did the Advisors make a decision to reject the

10  Debtor's offer for the sole reason that Mr. Dondero wouldn't

11  be permitted access?

12  A    That was the last point.  As mentioned, every other point

13  was agreed to.

14  Q    And why didn't the -- why didn't the Advisors -- did the

15  Advisors -- withdrawn.

16      Did the Advisors say to the Debtor, we get it, you're not

17  going to let Mr. Dondero in, but that's a line in the sand for

18  us?  But please, there's no need for a lawsuit.  We've got a

19  wonderful operating plan ready to go.  You're asking the Court

20  to force us to adopt and implement the plan, we have one right

21  here, so let's not litigate.  Let's just walk away and let

22  bygones be bygones.  Did you ever offer to get rid of the

23  lawsuit by showing the Debtor your plan?

24  A    We would have loved to have gotten rid of the lawsuit, but

25  I didn't see it until it was filed.  When the ultimatum was

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21  Entered 03/18/21 20:59:39  Page 2000 of 2722

Norris - Cross                              180

1  given, we had rolling blackouts.  My home didn't have

2  electricity rolling from 2:00 a.m. on Monday until Thursday.

3  And so by the time there was -- and everybody else, inclusive

4  of our attorney, Mr. Rukavina.  And so to say that I -- I

5  received it Thursday or Wednesday morning, when one of your

6  employees forwarded it to us.  I hadn't seen drafts.  Maybe

7  our counsel had.  But we didn't even have a chance to say, oh,

8  let us -- let us pull this because we read what your report

9  was.  The Advisors didn't even have a chance to respond.  At

10  least that is my understanding.  I never had a chance to

11  respond.  I never saw it.  Maybe counsel did.

12  Q    Well, you saw the lawsuit eventually, didn't you?

13  A    I did.

14  Q    Did you ever -- did the Advisors -- after you saw the

15  lawsuit, did the Advisors ever call up the Debtor and say,

16  hey, look, let's not litigate?  We have exactly what you want.

17  We've got this fully-operational plan that provides us with

18  everything we need.  You don't need to do anything further.

19  Did you ever say that to the Debtor?

20  A    No, because the back -- the -- we still wanted to reach an

21  agreement.  That was the goal.  And it was a surprise for us

22  to have a shock, we're going to pull this or we're going to

23  sue you on Tuesday evening.  And so, no, we still -- I -- and

24  that's why I negotiated and continued to work all the way

25  through the end of the week and through the weekend on

Norris - Cross                    181

1  something, because I still felt like that was the better plan

2  for everybody.

3      I don't know why we had to be sued, I don't know why it

4  had to be urgent, because at that point we had been working

5  for weeks and months. And the weeks -- really good. And the

6  only difference was Jim Dondero's access. And it was Tuesday.

7  And they didn't even ask us, you know.

8      Anyway, so that was -- I just -- I just disagree with your

9  characterization of the process.

10         MR. MORRIS: I move to strike, Your Honor. It really

11 is a very simple question.

12         THE COURT: Sustained.

13 BY MR. MORRIS:

14 Q   Did the Advisors, after the commencement of the lawsuit,

15 did the Advisors ever tell the Debtor that there was no need

16 for litigation because the Advisors had a fully-operational

17 plan that they had adopted and were prepared to implement,

18 which is exactly what the Debtor was seeking from the Court?

19 A   I don't know.

20 Q   You're not aware of that, right?

21 A   I'm not.

22 Q   You don't -- you never thought that maybe we could avoid

23 this whole thing by just sharing with the Debtor this

24 operational plan that you've described in great detail, right?

25 A   Well, on Friday, I know you put in, in a response to our

Norris - Cross                         182

1    board and Advisors, that you were made aware that we had a

2    plan that felt good, yet there was no consideration or

3    discussion on removing the lawsuit.

4         So, I'll leave that to what counsel happened, but I would

5    have loved to not be involved.  I'm not a legal expert.  There

6    were many attorneys involved.  I wish that if that were an

7    option, it would have been raised.  But here we are today.

8    Q   Sir, not only did the Advisors not tell the Debtor that

9    they had an operational plan that could avoid the lawsuit,

10   instead, the Advisors made proposals on Friday, one of which

11   did not even include having access to the office by Mr.

12   Dondero.  Isn't that right?

13           MR. RUKAVINA:  Your Honor, I object to that question

14   as it mischaracterizes the evidence.  The question began with

15   that the Advisors never told the Debtor that they had a backup

16   plan.  I think the witness --

17           MR. MORRIS:  Your Honor, --

18           THE COURT:  Okay.  Sustained.  Rephrase.

19           MR. MORRIS:  Yeah.  No problem.

20   BY MR. MORRIS:

21   Q   So, so to the best of your knowledge, the Advisors never

22   told the Debtor that they thought litigation could be avoided

23   because they had an operational plan.  Is that right?

24   A   That's my -- that -- yeah, that's right.

25   Q   Okay.  And instead, on Friday, the Advisors continued to

Norris - Cross                               183

1    try to pursue an agreement with the Debtor.  Is that right?

2    A    I don't know about the "instead."  But, yes, we tried to

3    continue reaching an agreement.

4    Q    And are you familiar with the offer that was made by the

5    Advisors to the Debtor on Friday morning?

6    A    I am.

7    Q    Did you authorize the sending of that offer to the Debtor?

8    A    The request, yes.  Me and D.C. Sauter were involved with

9    counsel, so we -- we did -- we did.

10           MR. MORRIS:  All right.  Can we please put up on the

11   screen Exhibit 19?  Can we start at the bottom, please?

12   BY MR. MORRIS:

13   Q    So, are these the Options A and B that were presented to

14   the Debtor on Friday morning?

15   A    Based on the email, yes.

16   Q    Okay.  And Option B contemplated that the Advisors would

17   completely vacate the space by the end of the month, right?

18   A    Correct.

19   Q    And that's an option that you and Mr. Sauter authorized

20   the lawyers to send to the Debtor, correct?

21   A    Yes.

22   Q    Okay.  And you had that authority from Mr. Dondero, right?

23   Mr. Dondero gave you the authority to negotiate; is that

24   correct?

25   A    He gave me the authority to negotiate in those final

Norris - Cross                                    184

1  couple of days.  There were certain things he gave me

2  authority to negotiate on.  And specifically -- and to things

3  that shouldn't be included on this point, we discussed this

4  beforehand as well.  But we had authority to negotiate.

5  Q   And you had authority to make this proposal, right?

6  Option B?

7  A   Ultimately, no.

8  Q   At the time you made it, you thought you had it, right?

9  A   Yes.

10  Q   You weren't acting outside of what you knew to be your

11  scope of authority, were you?

12  A   No.

13  Q   Okay.  Did you discuss with Mr. Sauter these two options

14  before they were delivered by your lawyers to the Debtor?

15  A   Yes.

16        MR. RUKAVINA:  Your Honor?  Your Honor?  Hold on.

17     Your Honor, Mr. Sauter is an attorney.  He's in-house

18  counsel.  So I think that to the extent that they're

19  discussing business, that's not privileged.  To the extent

20  they're discussing legal strategy, that is privileged.  So I

21  would instruct the witness to be conscious of that --

22        THE COURT:  All right.

23        MR. RUKAVINA:  -- and to not disclose attorney-client

24  privileged communications.

25        THE COURT:  All right.

                        Norris - Cross                      185

1  BY MR. MORRIS:

2  Q   Sir, did you discuss these two proposals with Mr. Sauter

3  before it was delivered by your lawyers to the Debtor?

4  A   Yes.

5  Q   And did Mr. Sauter also agree with the substance of these

6  two offers that were being presented to the Debtor?

7           MR. RUKAVINA:  Mr. Norris, can you answer that

8  question without invading the attorney-client privilege?

9           MR. MORRIS:  I'm just asking about the offers.  I'm

10  not asking about any legal advice or anything.  I just want to

11  be that clear.

12           MR. RUKAVINA:  That's why I'm asking Mr. Norris.  If

13  they discussed business, I don't think we have a problem.  But

14  if they discussed legal strategy, I think it's a problem.  So

15  I think the witness just has to tell us whether --

16           THE WITNESS:  There --

17           MR. RUKAVINA:  -- they discussed business or legal.

18           THE WITNESS:  There -- there was a -- there was some

19  legal -- legal strategy as well, yeah.

20           MR. RUKAVINA:  Your Honor, I would -- I would ask

21  that that -- I would object to that question on that basis,

22  that it calls for the invasion of the attorney-client

23  privilege.

24           THE COURT:  All right.  I sustain.

25           MR. MORRIS:  I'll try -- I'll try and ask the

Norris - Cross                                186

1  question again, then.

2  BY MR. MORRIS:

3  Q   Mr. Norris, did Mr. Sauter agree and authorize the sending

4  of these two proposals by the Advisors' lawyers to the Debtor

5  on Friday morning?

6  A   We both agreed with that approach.

7  Q   Okay.  And you both -- is it fair to say that you both

8  believed that you were acting within the scope of authority

9  that Mr. Dondero had given you?

10 A   We thought so, and -- well, I'm sure your questions will

11 lead me to the -- to the ultimate of what happened here, but

12 yes.

13 Q   Yeah.  And this proposal didn't permit Mr. Dondero back

14 into the Highland office space; is that right?

15 A   It didn't prevent him?  Is that what you said?

16 Q   Didn't permit him.  Didn't allow him.

17 A   Option A just above did and Option B did not.

18 Q   Okay.  So, you and Mr. Sauter, as the Advisors' designated

19 negotiators, authorized the Advisors' lawyer to present as

20 Option B an option that did not permit Mr. Dondero access to

21 the Debtor's offices, right?

22 A   Yes, but gave us full access to everything else.

23 Q   Okay.  It was really --

24     (Pause.)

25         THE COURT:  Uh-oh.

Norris - Cross                                187

1   BY MR. MORRIS:

2   Q   How does Option B -- how does Option B, if you know, --

3   A   Sorry, you froze.  You froze there for a minute, I think.

4           THE COURT:  Yes.  I think you did.

5           MR. MORRIS:  No, I think I just paused.

6           THE WITNESS:  Oh, you were just thinking?  Oh, that

7   was really talented.  Wow.

8   BY MR. MORRIS:

9   Q   No, it's -- it's not that good.  Do you know how Option B

10  differs from the term sheet that the Debtor provided on

11  Tuesday night?

12  A   It would not include the access -- it wouldn't include

13  access to the office for anybody.  The, as it says there, the

14  Debtor would take a hundred percent of the lease.

15  Q   Okay.  So, it was going to be complete walkaway?  The

16  Advisors were going to completely walk away at the end of the

17  month, right?

18  A   Correct.

19  Q   And that was -- that was an offer that you believed you

20  were authorized to make to the Debtor, right?

21  A   Yes.

22  Q   Okay.

23          MR. MORRIS:  Can we go two emails up to Mr.

24  Hogewood's?  Oh.  Yeah.  The one at 12:04.  Yeah.

25  BY MR. MORRIS:

Norris - Cross                          188

1    Q    Were you aware that there came a time early in the

2    afternoon that the Debtor was informed that there may need to

3    be an edit to Option B, so they pulled that back for a bit?

4    A    I wasn't aware, no.

5    Q    No?  All right.  Do you have any knowledge as to what edit

6    Mr. Hogewood was referring to in his email there?

7    A    I don't.

8    Q    Okay.  Were you aware -- did you get a copy of Mr.

9    Hogewood's email?  Was it forwarded to you?  Do you know --

10   withdrawn.  Let me ask a better question.

11        Do you know if Mr. Hogewood delivered -- withdrawn.

12        Did you know on Friday morning that Mr. Hogewood had

13   delivered the two options, the two proposals, that you and Mr.

14   Sauter had authorized?

15   A    Yes.

16   Q    Okay.

17             MR. MORRIS:  Can we go up an email or two, please?

18   BY MR. MORRIS:

19   Q    And then Mr. Hogewood wrote back and he said that he was

20   authorized to put Option B back on the table, as stated above.

21   Do you see that?

22   A    I do.

23   Q    Do you know who authorized Mr. Hogewood to put Option B

24   back on the table?

25   A    I don't remember.  I don't know.  I wasn't on the chain.

Norris - Cross                          189

1  Q   Okay.  But it's fair to say at this point in time, midday

2  on Friday, as far as you knew, your lawyer had communicated

3  Option A and Option B to the Debtor, and they were authorized

4  to do that, right?

5  A   Yes.

6  Q   Okay.  And did you learn subsequently that there was a

7  phone call between the lawyers for the Advisors and the lawyer

8  for the Debtor during which the Debtor indicated that it was

9  prepared to accept Option B?

10 A   I don't know, no, I don't know about that.

11 Q   You were never told that?

12 A   No.  Not that there was a phone call.

13 Q   Uh-huh.  Did you learn at any point on Friday that the

14 Debtor had accepted Option B, the Option B that you and Mr.

15 Sauter had authorized the Advisors' lawyers to make?

16 A   Yes.

17 Q   Okay.  So, there did come a time when you knew that the

18 Debtor had accepted Option B, right?

19 A   Yes.

20 Q   And are you aware that, after accepting Option B, the

21 lawyers discussed turning the agreement into a settlement

22 order to resolve the litigation?

23 A   No.  I wasn't aware of that.

24 Q   Are you aware that the lawyers were discussing plans for

25 the transfer of -- by wire of cash that would be due under the

Norris - Cross                                190

1   agreement?

2   A    I was not.

3   Q    Okay.  After the Debtor accepted Option B, the Advisors

4   withdrew it, correct?

5   A    I don't know if we with... we did withdraw it, yes.

6   Q    And after it was presented, Mr. Dondero said that he

7   hadn't personally approved it, correct?

8   A    In the terms of which -- the actual offer, yes, that's

9   correct.

10  Q    So, Mr. Dondero, having given you and Mr. Sauter the

11  authority to negotiate, learned that the Debtor had agreed to

12  your proposal pursuant to which he wouldn't be allowed access

13  to office space and he made the decision to withdraw the

14  offer, correct?

15  A    I wouldn't agree with exactly the phrasing, no.

16  Q    Sir, Mr. Dondero is the person who decided that he had not

17  approved of Option B, and that's why it was retracted,

18  correct?

19  A    That's right.

20  Q    So, on Tuesday night, the Advisors had a fully-negotiated

21  agreement for the provision -- for the transition of all of

22  the back-office and middle-office services, but for access to

23  Mr. Dondero, correct?

24  A    Correct.

25  Q    And the only reason that didn't get signed is because of

Norris - Cross                              191

1    that issue, right?

2    A    That's my understanding, yes.

3    Q    And the Debtor continued to negotiate with the Advisors,

4    even after filing the lawsuit, correct?

5    A    Yes.

6    Q    The Debtor was never told that the Advisors had a fully-

7    operational plan pursuant to which it had an alternative to

8    obtain the same services, correct?

9    A    That's incorrect.

10   Q    After negotiations broke down, is that the moment that a

11   reference was made to alternative plans?

12   A    No.

13   Q    Sir, on Friday, you personally reached an agreement with

14   the Debtor on Plan B, right?  You authorized the making of an

15   offer that the Debtor accepted, correct?

16        MR. RUKAVINA:  Your Honor, I'm going to object at

17   this time based on a legal conclusion.  The witness is not a

18   lawyer and he's not qualified to opine on whether an

19   agreement, which to me suggests is something binding and

20   enforceable, was ever reached.

21        THE COURT:  Response?

22        MR. MORRIS:  Your Honor, I'm not looking to enforce

23   any agreement, so let me try and restate and --

24        THE COURT:  All right.  Sustained.

25        MR. MORRIS:  -- address Mr. Rukavina's --

Norris - Cross                                    192

1          THE COURT:  He'll rephrase.

2          MR. MORRIS:  Yeah.

3    BY MR. MORRIS:

4    Q   Even as late as Friday, after starting the lawsuit, you

5    had made an offer.  You had authorized the making of an offer

6    that the Debtor had agreed to again, correct?

7    A   I had auth... I had said we should -- yes, I had

8    authorized the offer and then your fax saying on the

9    acceptance.  I wasn't involved in the back-and-forth

10   communication among the attorneys.

11   Q   But you knew it was accepted, subject, let's say, subject

12   to the execution of definitive documentation.  How's that?

13   A   I was told that they were willing to take the offer.  And

14   so, yes.  And --

15   Q   And sometime later that day, it got pulled because of Mr.

16   Dondero, correct?

17   A   Correct.

18   Q   And even on Saturday, the Advisors made proposals on an *a*

19   *la carte* basis for the provision of services, correct?

20   A   Yes.  And we have made very similar *a la carte* provisions

21   on Thursday and Wednesday, which were also rejected by the

22   Debtor.

23   Q   And -- okay.  So it wouldn't have been the full kind of

24   deal that was contemplated in the term sheet; it would have

25   been a selection of very specific services.  Do I have that

Norris - Cross                                193

1  right?

2  A    That's right.  On Wednesday, it was Oracle and Bloomberg,

3  which was authorized by Mr. Dondero.  We were to offering to

4  continue with our offer to take over the lease and all the

5  other terms, or a slim-down, which would include no disputed

6  amounts or payments, which at that time I think we called Plan

7  B or Option B.  And that was -- I believe that was Thursday.

8  Or Wednesday night.  So, yes, those continued.  And then we

9  had a similar, very similar proposal again on Sunday, with the

10  same -- very similar services to what we asked for on

11  Wednesday night or Thursday.  And those were rejected both

12  times.

13  Q    And is it fair to say that the services that the Debtor

14  was seeking -- withdrawn.

15      Is it fair to say that the services of the Advisors were

16  seeking from the Debtor on Thursday, Friday, and Saturday were

17  services that the Advisors had not yet engaged anybody else to

18  provide?

19  A    The two -- we already talked about Bloomberg and where our

20  status is there.  And on Oracle, it would be a nice to have

21  instead of transitioning, and that is more for the Advisors'

22  books and records and would be nice to have.

23  Q    So, --

24  A    Yes.

25  Q    Okay.  You have a Plan B for the new operational plan.

Norris - Cross                                    194

1   Did I hear that part right?

2   A    As I mentioned -- oh, I said our operating plan was a

3   hypothetical from -- from Mr. Rukavina, that in these other

4   events fall through, are there other people that you could

5   hire to do these services?  And I said yes.

6   Q    Okay.  So if any part of the operational plan fails, the

7   Advisors would look to third parties to provide, you know,

8   whatever service they wouldn't obtain and they wouldn't look

9   to the Debtor to provide any services, correct?

10  A    That's correct.

11  Q    Is it fair to say that, other than access to the data, the

12  Advisors will never seek any services of any kind from the

13  Debtor going forward?

14  A    As we sit here today, I believe your employees are set to

15  have three more operating business days and then will be

16  terminated, those -- the employees that services our accounts.

17  So, with the expectation that Newco will be formed, I have no

18  expectation we'll be asking for any significant services,

19  other than data, transfer of emails, et cetera.

20  Q    Well, that's a pretty qualified answer.  What do you mean

21  by no significant services?

22  A    Most of them -- well, the data, emails, et cetera, are all

23  minor items, and I think they're -- you say data, but I think

24  there's -- there's a handful of things that probably fall

25  under that data and books and records that are what I'm

Norris - Cross                          195

1   talking about, yes.

2   Q    You know, one of the things that the Debtor is very

3   concerned about here is having no future obligation.  The

4   Debtor -- do you understand that the Debtor believes that it

5   has terminated the shared services agreements as of Friday?

6   A    I do, yes.

7   Q    Do you understand that, other than the data that it holds,

8   the Debtor wants the comfort of knowing that it has no future

9   obligations to the Advisors of any kind, other than to provide

10  access to the data?

11  A    Yeah, that's fair.  Yes, I understand that.

12  Q    As the executive vice president of the Defendants, as the

13  executive vice president of the Advisors, can you, under oath,

14  give the Debtor comfort that the Advisors will not look to the

15  Debtor for any services of any kind after today?  Other than

16  the access to the data?

17  A    Data and books and records, yes.

18  Q    Okay.  So access to data and books and records is the only

19  thing that the Advisors will look to the Debtor for at any

20  time in the future after today; is that fair?

21  A    I would say it's not fair, because to say there's not

22  other significant -- insignificant or minor items -- as Mr.

23  Dondero testified, there's usually a smooth transition.  I

24  don't anticipate there will be significant items that would

25  take a lot of your time or we need to invade you, but I would

Norris - Cross                                    196

1  hope there would be a fair and orderly transition.  And I

2  can't predict the minor items, but I don't think -- I can't

3  envision anything significant.

4  Q    Do you believe, as the executive vice president of the

5  Advisors, that the Debtor has an obligation to perform any

6  services for the Advisors after today, other than giving

7  access to the data and the books and records?

8  A    No.

9  Q    What happens if Newco isn't formed?  Is there any scenario

10 that you're aware of where the Advisors would look to the

11 Debtor for any services in the event that Newco is not formed?

12 A    No.  Not that I'm aware of.  I don't know.  I don't think

13 so.

14 Q    I think you mentioned earlier about the transfer of data.

15 What does the Debtor need to do, from your perspective, in

16 order to transfer the data and the books and records?

17 A    We need the Debtor to authorize its IT director to

18 transfer the data.  We stand by ready.  I sent an email to

19 your IT team asking for him to get the required approvals on

20 Friday morning, and our -- CFA, the outsource team, stands by

21 ready, at our cost, to transfer any remaining data.

22      So we just need you and Mr. Seery and -- to authorize the

23 free transfer of data.  Not necessarily you, but Mr. Seery,

24 and then your IT team and your employees can feel comfort.

25 Because over the last few weeks they have not provided any

Norris - Cross                              197

1  data or any assistance providing data because they're

2  concerned.  They're concerned about their liability, they're

3  concerned about things that the Debtor has told them.  And so

4  I just -- if you and Mr. Seery can tell them any data that is

5  -- I mean, yeah, we're prepared to send a request of what we

6  need, but they need Mr. Seery, because he has been holding

7  that over them.

8  Q    And what data are you referring to specifically?

9  A    Yeah.  We're talking about historical emails, emails that

10  are held in what's called the vault.  It is files in our

11  systems.  We've been able to copy, we think, most of what we

12  have, but there is a number of records.  We would like a copy

13  of the database that backs up home (phonetic).  We'd like a

14  copy of the Bloomberg OMS, which I mentioned before.  The data

15  that backs up our data.  Just a backup copy.

16      And there's a number of other items which we'll request,

17  but these are all very simple items that don't take very long.

18  I would imagine, with proper approval, and almost no work from

19  your end, maybe your one IT guy, these can be transferred in a

20  very efficient, effective, quick manner, most of it this week

21  or within a couple days.

22  Q    Okay.

23          MR. MORRIS:  I have no further questions, Your Honor.

24          THE COURT:  All right.  Redirect?

25          THE WITNESS:  Thank you, Mr. Morris.

Norris - Redirect                    198

1          MR. MORRIS:  Thank you.

2                    REDIRECT EXAMINATION

3    BY MR. RUKAVINA:

4    Q    Mr. Norris, you mentioned that Debtor employees knew of

5    our backup plan.  Give some more specificity, meaning how and

6    why you think they knew that and who did you talk to about

7    that and when.

8    A.   Yeah.  So, the individuals authorized to discuss with me

9    were David Klos, Frank Waterhouse, Brian Collins, and J.P.

10   Two of those individuals are members of the -- well, one's

11   still an officer, two or both were officers of our funds.  And

12   so in our discussions as well throughout, I mentioned, hey,

13   we're working on backup plans.  There were aspects of those

14   they couldn't be involved in because they were negotiating for

15   the other side.  But they were aware that we were working on

16   things.

17        In addition, Mr. Seery represented they knew we were

18   taking data off or copying data off the system, leaving it all

19   on their system, and that we were backing up emails and that

20   we were working on a backup plan.

21        So I don't think it was a surprise to anybody.  Their IT

22   team knew and was very aware.  We purchased new domains.  We

23   requested domains.  We even had requested if they would

24   forward domains to ours, which I think the answer was no.  If

25   they would forward emails.

Norris - Redirect                    199

1    And so I don't think there was any surprise that there was

2    backup planning going on.  And so there were discussions.  It

3    wasn't -- we didn't discuss the details.  We didn't discuss

4    the details because we were entered into a negotiation with

5    millions of dollars at stake, and if I show or we discuss all

6    of our alternative plans, then there is less ability to

7    negotiate.

8    Q    Okay.

9         MR. RUKAVINA:  Mr. Vasek, if you will please pull up

10   that letter that I sent you.

11   BY MR. RUKAVINA:

12   Q    Okay.  If we have to scroll down, Mr. Norris, we can, but

13   are you familiar with this letter from the Debtor's attorneys

14   to the boards and us the evening of February 19th, Friday?

15   A    I am.

16   Q    Okay.  Is this the letter that you referenced when Mr.

17   Morris was asking you about why we didn't just tell the Debtor

18   that we had a backup plan and therefore we could dismiss this

19   litigation?

20   A    I believe so, yes.

21   Q    Okay.

22        THE COURT:  Is this an exhibit?

23        MR. RUKAVINA:  No, Your Honor.  I'm about to move for

24   its admission.  Your Honor, I'd ask that this be admitted as

25   my Exhibit O.

```
                        Norris - Redirect                  200
```

1          THE COURT:  All right.  Any objections?

2          MR. MORRIS:  Sorry.  No, Your Honor.

3          THE COURT:  All right.  It'll be admitted.

4      (Advisors' Exhibit O is received into evidence.)

5          MR. RUKAVINA:  And Your Honor, we will --

6          THE COURT:  You'll have to supplement the docket with

7   it.

8          MR. RUKAVINA:  Thank you.  We will.

9          THE COURT:  Okay.

10         MR. RUKAVINA:  Mr. Vasek, if you'll please scroll

11  down to Page 3 of 4, the paragraph that begins, "During the

12  course of this conversation."  Actually, the next paragraph

13  that says, "We understand."

14  BY MR. RUKAVINA:

15  Q    Do you see that there, Mr. Norris?

16  A    Yes.

17  Q    Okay.

18         MR. RUKAVINA:  What is that there, Mr. Vasek?  I'm

19  seeing a square.  Okay.

20  BY MR. RUKAVINA:

21  Q    So that paragraph begins, "We understand, based on this

22  conversation, that HCMFA and NPA have made arrangements to

23  obtain the resources they need to provide the services on a

24  continuous and seamless basis to their clients, including the

25  registered investment companies to which they serve as

Norris - Redirect                                201

1   investment advisor.  We plan to proceed with our request for a

2   mandatory injunction at the February 23rd, '21 hearing."  And

3   then it keeps going.

4        Did I read that accurately?

5             MR. MORRIS:  Can you please --

6             THE WITNESS:  Yes.

7             MR. MORRIS:  -- keep going, because I think it's

8   important?

9             MR. RUKAVINA:  Well, you get to ask him next.

10  BY MR. RUKAVINA:

11  Q    Did I read that accurately, Mr. Norris?

12  A    Yes.

13  Q    Okay.  So tell me, then --

14            MR. RUKAVINA:  Well, strike that.  I'll move on.

15       You can leave that up, Mr. Vasek, if Mr. Morris needs to

16  use it.

17  BY MR. RUKAVINA:

18  Q    Now, do you recall you were asked about that Option A and

19  Option B from last Friday, and Option B had been withdrawn?

20  Do you recall that?

21  A    Yes.

22  Q    And do you recall that, under that Option B that was

23  withdrawn, that the Debtor accepted that Mr. Dondero wouldn't

24  be on the premises, right?

25  A    Yes.

Norris - Recross                              202

1   Q   Okay.  But would NexPoint have been on the -- on the

2   premises?

3   A   No.  No.

4   Q   So, under both Option A and Option B, would Mr. Dondero

5   have been with his employees?

6   A   Yes.

7   Q   Okay.

8           MR. RUKAVINA:  I'll pass the witness.  Thank you.

9           THE COURT:  Recross?

10          MR. MORRIS:  Can we put that exhibit back up on the

11  screen, please?

12                      RECROSS-EXAMINATION

13  BY MR. MORRIS:

14  Q   First of all, sir, you have no idea what was discussed in

15  the conversation that's referenced in the first sentence,

16  correct?

17  A   I don't.  I was not a part of it.

18  Q   Okay.  Do you know if the Debtor in this instance was

19  trying to hold the Advisors' feet to the fire?

20  A   Again, I was not part of the conversation.

21  Q   So you don't know the motivation for sending this letter;

22  is that fair?

23  A   I don't.

24  Q   Can you read out loud the letter -- the --

25          MR. MORRIS:  I can't see it, actually.  Can you just

Norris - Recross                    203

1   push it down a little bit, because I've got the little box in

2   the upper right corner?  No, the other way.  I'm sorry.  Yeah.

3   Perfect.

4   BY MR. MORRIS:

5   Q    Do you see -- can you read out loud the sentence that

6   begins, "We plan to proceed"?

7   A    (reading)  "We plan to proceed with our request for a

8   mandatory injunction at the February 23rd, 2021 hearing and

9   hope that we can submit to the Bankruptcy Court a consensual

10  order incorporating HCMFA's and NPA's acknowledgment of

11  HCMLP's right to terminate services under the shared services

12  agreement as provided for herein and their commitment to

13  provide services to their clients on a go-forward basis."

14  Q    So in fact, as of -- do you know when this -- do you know

15  when on Friday this letter was sent?

16  A    I don't know the time.

17  Q    Okay.  It's -- it's -- based on what you just saw, the

18  reference to the conversation, is it fair to say that this

19  occurred after the Debtor was informed that the Advisors were

20  withdrawing Option B?

21  A    I believe so.

22  Q    Right.  And here, in fact, the Debtor is asking the

23  Advisors to join it in providing a consensual order that would

24  resolve this motion, right?

25  A    I don't know.  They're -- it said, "hope that we can

Norris - Recross                                204

1   submit a consensual order incorporating HCMFA's and NPA's."

2   This was sent to our counsel.  So it was hoping that counsel

3   would agree to that, yes.

4   Q    Well, counsel is not going to agree to anything without

5   the client's authorization; --

6   A    Correct.

7   Q    -- is that fair?

8   A    Correct.

9   Q    And did the Advisors ever authorize their counsel to try

10  to negotiate a consensual order?

11        MR. RUKAVINA:  Your Honor, I object to that.  That's

12  clearly attorney-client privilege.

13        THE COURT:  Sustained.

14        MR. MORRIS:  All right.  I'll ask a different

15  question.

16  BY MR. MORRIS:

17  Q    Did the Advisors ever engage in negotiations with the

18  Debtor over a consensual order, as was offered by the Debtor

19  in this letter?

20  A    I defer to legal counsel on that.

21  Q    Okay.  You're not aware of any such negotiations, right?

22  A    I know there were discussions, particularly around our

23  plans over the weekend, where there were offers of something

24  related to the lawsuit.  Removal or what -- I don't know the

25  specific terms, but there were offers made, and I deferred to

                         Norris - Recross                    205

 1   counsel on that.

 2   Q    But we're here today because there is no consensual order

 3   pursuant to which the Advisors would present their plan to the

 4   Court and state specifically that the Debtor had no further

 5   obligation, correct?

 6          MR. RUKAVINA:  Your Honor, that's an irrelevant

 7   question.  And again, it's litigation strategy and attorney-

 8   client privilege.  And we're here today on a mandatory

 9   injunction.

10          THE COURT:  Sustained.

11          MR. RUKAVINA:  Not because --

12          THE COURT:  Sustained.

13          MR. MORRIS:  Withdrawn.  I have no further questions,

14   Your Honor.

15          THE COURT:  All right.  That concludes Mr. Norris's

16   testimony.  Thank you.

17          THE WITNESS:  Thank you, Your Honor.

18          THE COURT:  All right.  What else do you have, Mr.

19   Rukavina?  Your next witness?

20          MR. RUKAVINA:  I have nothing further, Your Honor.

21   The Defendants rest on this motion.

22          THE COURT:  All right.  Mr. Morris, anything further

23   from you?

24          MR. MORRIS:  No, Your Honor.  I'm prepared to proceed

25   to closing argument.

206

1      THE COURT: All right. I'll hear it.

2           CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

3      MR. MORRIS: Okay. Your Honor, thank you for taking

4  the time to listen today. We regret that we had to come down

5  this path, but the Debtor felt that it had no choice at the

6  time that it filed the action.

7      We think the evidence conclusively establishes that the

8  Debtor had the contractual right to terminate the shared

9  services agreements. It exercised that right. It exercised

10  that right after putting the world on notice that it wouldn't

11  be providing shared services after a specified period of time.

12      The Court is fully familiar with the Debtor's plan of

13  reorganization, the asset monetization plan, the downsizing of

14  employees that was expected. And it was the Debtor who had

15  concerns about the funds, the investors, the marketplace, and,

16  frankly, the Debtor's ability to implement its own plan of

17  reorganization, as Mr. Seery so fully testified to.

18      You know, trying to do the right thing here, the Debtors

19  extended the termination date by a couple of weeks. They

20  engaged in earnest negotiations. I don't think there is any

21  dispute at all that the parties actually reached an agreement

22  on every single business term, every single business term,

23  except Mr. Dondero's insistence for access to the Debtor's

24  offices.

25      I think the Court is familiar with the record in this

207

1   case.  There's already an injunction in place barring him from

2   the Debtor's offices.  The reasons for that are also familiar

3   to the Court.  I don't think the Debtor was at all

4   unreasonable in taking the position that it did.

5        They did what they could, but they came to a point where

6   they couldn't continue to provide services consistent with the

7   plan of reorganization that had been presented to the Court.

8   And in order to avoid the substantial risk of being impeded

9   from executing on its plan, in order to avoid the substantial

10  risk that would have occurred had it simply exercised its

11  right and walked away -- the risk of market disruption, the

12  risk of potential involvement by the SEC -- it had no choice

13  but to file this lawsuit.

14       And honestly, Your Honor, for the life of me, I don't know

15  why they didn't try to use this wonderful operating plan as

16  negotiating leverage.  I've never heard of such a thing.  But

17  that's their choice.  We're not here today because they failed

18  to do that.  But had they done that, this lawsuit wouldn't

19  exist.

20       Had Mr. Dondero not injected himself on Wednesday and

21  decided that his access was more important than the rest of

22  it, we wouldn't be here today.

23       Had the Advisors said, when we gave them the take-it-or-

24  leave-it option on Wednesday, we're leaving it, thanks for the

25  effort, we tried hard, this stuff means a whole lot to us, but

208

1   we have a great plan here, let's not litigate, there's no

2   reason to do this, we wouldn't be here today.

3      We wouldn't be here today had they not withdrawn Option B

4   on Friday.

5      I don't think -- again, this is summary judgment

6   territory.  There's no dispute about the facts.  There's no

7   dispute that, for the fourth time, the reason that we're here

8   is because Mr. Dondero completely undermined the people who he

9   had authorized to negotiate on behalf of the Advisors and the

10   lawyers who did diligent work, who tried very hard to bring

11   this to fruition, who were engaged in negotiations, as the

12   record shows, not just getting to a deal but going further and

13   preparing settlement documents, preparing wire transfers, only

14   to have the rug pulled out from under them again.

15      The Debtors had no knowledge of any plan whatsoever for

16   the transition of services.  I think -- I have respect for Mr.

17   Norris.  I think that he overstates things, but that's okay.

18   Everybody's allowed to -- their perspective.  But clearly,

19   there's a lot of pieces to that operating plan that aren't in

20   place.  But here, at the end of the day, Your Honor, we don't

21   care.

22      What we want to do is complete the divorce, as Mr.

23   Hogewood said.  And I've got a proposal now that, you know, I

24   hope will be acceptable to both the Court and to Mr. Rukavina.

25   And the proposal would be to allow us to submit to Your Honor

209

1   by the end of the day tomorrow a proposed form of order that

2   will contain a limited number of factual findings and will

3   render this motion moot.  And it would be moot because the

4   Advisors have now put into evidence an operational plan that

5   they have -- that they are committed to.  They have said on

6   the record that they no longer need any services of any kind

7   from the Debtor, except access to the data, and we would be

8   good with that.  We would be prepared to just say this is moot

9   because of the operational plan that Mr. Norris described in

10  such great detail.

11      I don't want to burden the Court with a lot more.  I think

12  that that's a way to just resolve this to the satisfaction,

13  really, of everybody.

14      I'll just briefly say on the jurisdictional issue and the

15  arbitration, because they are issues out there, it's

16  inconceivable that the Court doesn't have jurisdiction here.

17  This matter concerns the Debtor greatly.  You know, we're here

18  precisely because we need the relief that we requested

19  initially, and that -- and that, apparently, the -- that was

20  the adoption and the implementation of a plan so that the

21  Debtor knew it would have no further liability.  It was the

22  Debtor's plan of reorganization that was at issue here, its

23  ability to downsize in the way it told this Court and its

24  creditors that it would do.

25      So I don't think -- I don't think there's a question of

210

1    jurisdiction at all.

2        And with respect to arbitration, you know, I'll note,

3    firstly, of course, that the Advisors, they filed the claim

4    against the Debtor.  They didn't move to lift the stay.  They

5    haven't relied on the arbitration clause when -- when it's

6    good for them.

7        But more importantly, Your Honor, I don't think a motion

8    of this type in particular is the subject of any arbitration

9    provision.  It only applies to one of the agreements, as I

10    understand it, in any event.  But it's the arbitration clause.

11        This isn't about the interpretation of the agreement.  I

12    don't think there's any dispute about the Debtor's right to

13    terminate.  I don't think there's any dispute about any, you

14    know, language in the agreement.  There's no interpretive

15    provision of the agreement that we're talking about here.

16    What we're -- all we're talking about is making sure that, you

17    know, the Debtor wouldn't be taking on a potential liability.

18    And I've gotten comfort from Mr. Norris that we're not,

19    because, you know, Mr. Norris said that the Debtor -- that the

20    Advisors can fully perform under the advisory services

21    agreement, that there's nothing that the Debtor did to prevent

22    the Advisors from fully performing under the Advisors'

23    agreement, that they don't need any services from the Debtor

24    going forward.  And I think that's -- that really is what I

25    think appropriately does render this motion moot.

211

1      And what I would propose, again, just to be clear, is that

2    we could give a proposed order to Your Honor tomorrow at the

3    end of the day, give Mr. Rukavina until the end of the day

4    Thursday to make whatever edits he believes are appropriate,

5    and then Your Honor will do whatever Your Honor thinks is

6    best, as always.

7           THE COURT:  All right.  Well, while I like the

8    concept, and I haven't heard from Mr. Rukavina yet, I'm really

9    worried about false hope that you would prepare something, Mr.

10    Rukavina would be fine, and I'd simply sign it without much

11    time spent on it.

12      Let me start with this.  You said the order, it would be

13    something like an order resolving the motion.  It'll contain

14    certain findings of fact, you said, such as the Advisors have

15    an operating plan, the Advisors need no services from the

16    Debtor going forward except access to data.  Okay.  Would I

17    really get an order that has 14 additional findings, and if

18    so, what would those be?

19           MR. MORRIS:  I think we would just go through -- I

20    don't think that there's really any dispute as to these facts.

21    There would be no findings in there about, you know,

22    withdrawal of Plan B or we gave them an ultimatum or any --

23    there would be nothing like that, Your Honor.  It would simply

24    be:  The parties were signatories to shared services

25    agreements.  The Debtor exercised its right of termination.

212

1  The parties have agreed to extend the termination date twice.

2  The Debtor -- the Advisors have prevented -- I'm doing this

3  off the top of my head, of course -- but the Advisors have

4  prevented -- has -- have prevented -- presented uncontroverted

5  testimony that they have an operational plan pursuant to which

6  they will obtain all of the back-office and middle-office

7  services that were previously provided by the Debtor.  And in

8  case there's any failure in their plan, they have got

9  alternative arrangements with third parties and won't look to

10 the Debtor in the future for any services of any kind other

11 than the retrieval of their data.  I think that's about what

12 it would say.

13        THE COURT:  Okay.  My next question is this:  Are we

14 going to have a fight in a few days about the retrieval of the

15 data issue?  I mean, I just heard Mr. Norris say it was a no-

16 big-deal exercise, that the Debtor just needed to make its IT

17 director available and they would be standing ready to receive

18 it, and he made it sound like a no-big-deal task.

19        MR. MORRIS:  Yeah.  I guess my hope is that we would

20 be able to iron out that last wrinkle, but I think the

21 solution to that is to simply say, if the parties have a

22 dispute on that narrow issue, they come back to the Court,

23 that the Court has continuing jurisdiction to resolve any

24 dispute over -- I think it was the provision that Mr. Rukavina

25 had put up on the screen, I forget, I think it was with Mr.

213

1  Dondero, where the Debtor has some obligation with respect to

2  books and records.

3         THE COURT:  Well, and Mr. Seery said earlier today

4  that the Advisors can have access to the records and data, but

5  not 24 hours a day and not without a cost.  So is that going

6  to be an issue, the cost?

7         MR. MORRIS:  You know what, I have just I guess one

8  other alternative that I'm just thinking off the top of my

9  head.  Maybe put in some type of third-party neutral who can,

10 you know, to the extent that it's even necessary, and I hope

11 that it won't be because I think we've gotten a lot of

12 assurances about the lack of services that are needed going

13 forward, but perhaps we can -- perhaps the Court can appoint

14 some third party who would take the burden off of the Court of

15 any future dispute and try to resolve it that way, you know,

16 with the parties splitting the cost.  That's an alternative.

17        THE COURT:  All right.  Mr. Rukavina, what do you

18 say?

19        MR. RUKAVINA:  Your Honor, I'd like to give a

20 closing, please.

21        THE COURT:  Yes.

22         CLOSING ARGUMENT ON BEHALF OF THE ADVISORS

23        MR. RUKAVINA:  And please understand, Your Honor,

24 this is going to be a difficult closing for me to give because

25 I'm going to be rather blunt.  My bluntness should never,

214

1  never substitute my deep respect for this Court and for

2  bankruptcy courts and for bankruptcy jurisdiction. I'm a

3  bankruptcy nerd. Hopefully Your Honor knows that. And my

4  closing is also going to be made a little bit more difficult

5  because I honestly don't understand why we're here today.

6      We are here in a lawsuit, not a negotiation before the

7  Court. Mr. Morris and I had days to negotiate, we spoke, and

8  we didn't reach an agreement. We are here on a six-day notice

9  mandatory injunction where now the Debtor wants to have some

10  order with some findings. We are here today on a motion for a

11  mandatory injunction that compels my client to do something

12  where we're not told what it is to do.

13      We are not here today, Your Honor, on Count One, their

14  declaratory relief that they've terminated appropriately and

15  done nothing wrong. We're not here today on that. It is

16  inappropriate to make any findings on that. That issue will

17  be resolved in due course.

18      We're not here today on any future duties. I heard the

19  record, too. I heard the evidence. I can't imagine there

20  being any future duties. But that is an advisory ruling that

21  we're not here on today.

22      So, again, we are here today on whether my client is going

23  to be enjoined to do something. And the reason why we will

24  not agree to that --

25          THE COURT: Can I stop you? What I hear from the

215

1   Debtor is, in light of everything we have all heard the past

2   seven hours, and apparently things the Debtor was not

3   expecting to hear -- that is, we're ready to cut it off

4   tomorrow, today; all we need is the data -- he's happy to say,

5   okay, my request for an injunctive -- a mandatory injunction

6   is moot now.  I'm not asking the Court for that.

7       So, you know, I feel compelled to start with the pragmatic

8   possible resolution of this.  Why --

9           MR. RUKAVINA:  Your Honor?

10          THE COURT:  Why is that not an acceptable way of

11  resolving this?  He doesn't --

12          MR. RUKAVINA:  Because --

13          THE COURT:  He doesn't need an injunction, he says,

14  if we can have an order.

15          MR. RUKAVINA:  It's not -- Your Honor, I would then

16  humbly submit that why doesn't he withdraw his motion?  I

17  mean, the problem that I have, Your Honor, is that anything

18  that I agree to is going to submit my clients' internal

19  business affairs to this Court's oversight.

20      I think Your Honor asked very important questions.  What

21  happens in two or three days' time if something happens?  What

22  about these findings?  I am -- I think that this whole motion

23  is moot, but I am very worried that even a finding of mootness

24  is an exercise of jurisdiction over my clients' internal

25  affairs.

216

1   What I think the Court should do is dismiss this motion --

2   I'm sorry, deny this motion without commentary, without

3   findings, without conclusions.  There's still Count One and

4   Count Two which will be resolved in due course.  And you know

5   what?  If my client messes up somehow in this transition --

6   not to mention that my clients are highly reputable, they're

7   governed, they're regulated, there's other people looking at

8   this -- they can come back to Your Honor.

9   But please understand my perspective, please understand my

10  clients' perspective, because I think it's important.  We have

11  been hauled in front of this Court on allegations that we have

12  willfully failed and refused to adopt and effectuate a plan.

13  The allegations here are extreme.  They've been shared with

14  the creditors.  They've been shared with our boards, who knew

15  about this all along.  They've been shared with the SEC.

16  They've been shared publicly.

17  So I am glad that the record is now clear that these

18  allegations were baseless when made, but even if they were

19  made in good faith, they are baseless today.

20  But I don't even want the Court exonerating my clients'

21  plan.  I don't want the Court commenting on the wisdom of my

22  clients' plan.  Because we will not agree, as a nondebtor

23  party, with all respect, Your Honor, to have this Court take

24  any oversight over our affairs.  It'll lead to some future

25  dispute, some future contempt, some future sanctions, and

217

1    that's just not something that we as nondebtors are going to

2    consent to.

3        The Court doesn't have jurisdiction.  The Court doesn't

4    have core jurisdiction.

5        But let's put all that aside.  The four elements of an

6    injunction, Your Honor.  Where is any evidence of harm?  Mr.

7    Seery did not --

8            THE COURT:  You know what?  As long as we're not

9    going to have a consensual order here, we need to take the

10   issues you've raised, starting with subject matter

11   jurisdiction.  Okay?  If I don't have consensus, I've got to

12   examine my own subject matter jurisdiction.

13       So, on that point, do you say I apply the Fifth Circuit's

14   pre-confirmation test of bankruptcy subject matter

15   jurisdiction or post-confirmation test?

16           MR. RUKAVINA:  Your Honor, the plan has --

17           THE COURT:  Okay.  I signed the confirmation order,

18   but it's one day old.  It's still appealable.  And it's

19   nowhere close --

20           MR. RUKAVINA:  Your Honor?

21           THE COURT:  -- to going effective, I fear.  So, under

22   either test, tell me why I don't have subject matter

23   jurisdiction first.

24           MR. RUKAVINA:  I would like to argue that the pre-

25   confirmation -- that the post-confirmation test applies, but I

218

1  can't, in good faith.  The plan has not gotten -- gone

2  effective.  There still is an estate.  So, as of today, I

3  think Your Honor is dealing with the pre-confirmation

4  jurisdiction, --

5         THE COURT:  Okay.

6         MR. RUKAVINA:  -- which is definitely broader.

7         THE COURT:  Okay.

8         MR. RUKAVINA:  There is no jurisdiction, because you

9  have heard no evidence of any effect on this estate as a

10 result of this injunction being issued or not issued.  Mr.

11 Seery had every opportunity to be asked about harm,

12 interference, how does this affect the reorganization?  He did

13 not give you any.  This does not increase --

14        THE COURT:  Well, what I think I heard, and I may be

15 mixing up written pleadings, declarations, versus what he said

16 today, but what I know I heard in either the papers or his

17 oral testimony today was that the Debtor is worried about

18 exposure to liability from who knows who.

19        MR. RUKAVINA:  Okay.

20        THE COURT:  The investors in the private funds or

21 someone else for not having a smooth transition plan here and

22 cutting things off on February 28th without knowing there's a

23 plan.  Okay?  So if the estate is exposed to potential

24 liability, is that an impact on the estate being administered,

25 per *Wood v. Wood*?

219

1          MR. RUKAVINA:  Of course it is, Your Honor.  But we

2     have to go to evidence.  That's not in the evidence.  That's

3     in the brief that they filed.  It is not in Mr. Seery's

4     declaration.  It is conclusory.  It is not evidence.  There is

5     no evidence today of anyone that could sue the Debtor.  I have

6     no idea of anyone who could sue the Debtor -- pardon me --

7     regarding this.

8          THE COURT:  He did say in testimony he was worried

9     about the SEC if this was not done right.

10         MR. RUKAVINA:  Well, Your Honor, with due respect,

11    his worry is conclusory and his worry does not rise to an

12    effect.  He didn't tell you that the SEC has investigated or

13    is threatening anything.  It's a purely hypothetical worry.

14    So I do not think that Your Honor has even related-to

15    jurisdiction now that Your Honor has heard all of the

16    evidence.

17       Now, let me be clear.  Your Honor has jurisdiction over

18    Counts One and Counts Two in this lawsuit, subject to

19    arbitration, right?  That's the declaratory action as to

20    whether they terminated correctly.  That's a legitimate

21    exercise of jurisdiction.  And their monetary claim for unpaid

22    amounts:  Clearly, the Court has jurisdiction.  All I'm

23    talking about is whether the Court has jurisdiction to enjoin

24    a nondebtor party to do something.  Not -- not to not do

25    something, not a status quo injunction, but a mandatory

220

1    injunction.

2        And you have heard no evidence, Your Honor, no nexus as to

3    how the injunction that Your Honor has been asked to order is

4    going to affect the estate.  None.

5            THE COURT:  Okay.  But you say a nondebtor third

6    party.  It's not just any nondebtor third party.  Among other

7    things, it's a counterparty to executory contracts that the

8    Debtors say, you know, we either terminated these during the

9    case or they're deemed rejected, and we're wanting some

10   cooperation from the counterparty.

11       I mean, doesn't that give --

12           MR. RUKAVINA:  Okay.

13           THE COURT:  -- subject matter jurisdiction, because

14   we're talking about a counterparty to an agreement that would

15   have been governed by 365?

16           MR. RUKAVINA:  I think, Your Honor, if there is some

17   duty in those contracts or some duty in the law to act in a

18   particular manner upon termination or rejection, there would

19   be jurisdiction.

20       But just like when Your Honor ruled against us in December

21   -- Your Honor said, I find nothing in this contract that

22   provides for such a duty -- there's nothing in these contracts

23   that provides any obligation on my client.

24           THE COURT:  That is a different agreement.  That was

25   a different agreement, for the record.

221

1          MR. RUKAVINA:  Fair enough.

2          THE COURT:  That was --

3          MR. RUKAVINA:  Your Honor, fair enough.

4          THE COURT:  That was the CLO agreements that your

5     clients were not parties to.

6          MR. RUKAVINA:  But Your Honor asked the right

7     question then, and that's still the right question:  Point me

8     to some statutory or contractual right for what you want.

9     They have not pointed you to any.

10        So, yes, hypothetically, if these agreements -- let's just

11    assume that these agreements required post-termination good-

12    faith unwinding.  There would be jurisdiction.  But these

13    agreements don't provide any of that.  The only thing that's

14    provided is that, post-termination, the Debtor shall promptly

15    return to us our property.  And that -- there's no problem

16    with that.  We trust that the Debtor -- we heard Mr. Seery --

17    the Debtor's not going to mess that up.  It'll be done quickly

18    and painlessly, I hope.

19        That's not what they're asking for.  They're asking for

20    Your Honor to tell my client how to conduct its internal

21    business affairs, and there's nothing in these contractual

22    rights.

23        So, hypothetically, let's just assume that the Court has

24    some related-to jurisdiction.  Okay.  It's still not core

25    jurisdiction.  And these contracts have been terminated, Your

222

1  Honor.  There is no live contract.  No one has shown you any

2  statute or regulation that governs.  So, that's jurisdiction.

3      The same fact of no harm, the same fact of no right, goes

4  to the elements of an injunction, recalling that a mandatory

5  injunction requires a much greater, much clearer burden.

6  Again, Mr. Seery did not testify as to any harm.  He said he

7  was worried about the SEC and he said something like it might

8  make plan implementation more difficult.  Again, conclusory

9  allegations.  Those are not -- that's not evidence of

10 immediate and imminent injury.  It is certainly not evidence

11 of irreparable injury, and it is certainly not evidence of a

12 nonmonetary injury.

13     So, again, I ask -- I understand Your Honor has been in

14 this case for a long time.  I understand Your Honor has been

15 in the Acis case before that.  I understand from Your Honor's

16 confirmation ruling that you have formed certain opinions

17 about my clients, opinions that I think are unfair, quite

18 frankly, that basically conclude that we are a vexatious

19 litigant and that we are the tentacles of Mr. Dondero.  I ask

20 you to put all that aside.  Because that's what the Debtor

21 wants you -- the Debtor wants you to just reflexively conclude

22 that somehow we're nincompoops and incompetents and we need

23 court supervision.  Put all that aside, Your Honor, and just

24 ask yourself:  What am I being asked to do?  I'm being asked

25 to order a nondebtor as to how to conduct its own internal

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2043 of 2722

223

1   business -- not even business related to the Debtor, but how

2   to conduct its own internal business -- even if we are the

3   biggest nincompoops, which absolutely is not borne out by the

4   record.

5       This is the wrong court for any such relief.  It's the

6   wrong court.

7       The reason why I showed you that letter from last Friday

8   was I thought it was -- I think Mr. Morris is an excellent

9   lawyer and I've worked very well with him, but I think that

10  the allegation is so fundamentally unfair, that somehow this

11  is our fault because we didn't tell them about a backup plan

12  and we wouldn't just consent to the entry of an order that

13  gives Your Honor jurisdiction over us.  That's unfair, Your

14  Honor.  This is an inquisition in that respect.  In that

15  respect, it's an inquisition.

16      We were sued.  We defended ourselves.  We're not -- this

17  is the fourth lawsuit, by the way, that the Debtor filed

18  against us, Your Honor.

19      And as I asked you at the confirmation hearing, what

20  evidence is there that we're vexatious?  Okay, we filed a

21  motion in front of Your Honor that was frivolous.  It

22  happened.  And we're glad that the Court didn't sanction us.

23  We're glad.  Perhaps the Court still will.  But that's it.

24  Nothing else that we've done.

25      We've been quiet in this case.  We've been minding our own

224

1   business. We've been preparing a backup plan. We've done

2   everything right. And the Debtor comes to you shocked,

3   shocked, alleging that we don't have any plan, alleging that

4   the sky is falling. And even when the Debtor learns that

5   that's not the case, we still had to go through today.

6      Why did we go through today, Your Honor? Why did my

7   client -- why did my client have to sit here like someone that

8   had done something wrong, like a criminal defendant, and be

9   inquired as to all of its internal business practices, with

10   implications made that my client doesn't know what it's doing?

11   Why did we go through today just to have some order that's a

12   -- that provides for something?

13      They want a mandatory injunction, Your Honor. You should

14   thumbs-up it or thumbs-down it. And if you thumbs-up it,

15   it'll be without jurisdiction, without basis, and it'll be

16   extraordinary.

17      I can just keep talking and talking, but I'll repeating

18   the same points, Your Honor, so I thank you.

19         MR. MORRIS: Can I just have five minutes, Your

20   Honor?

21         THE COURT: You can.

22      REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23         MR. MORRIS: You know, I think the Court can issue an

24   order finding that the motion is moot on its own accord. It

25   doesn't need a consensual order to do that. I think the Court

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21  Entered 03/18/21 20:59:39  Page 2045 of 2722

225

1  -- I would believe that the Court would have a factual finding

2  to support the finding of mootness.

3      But I don't really get the righteous indignation at all.

4  It's as if Mr. Rukavina didn't hear anything I said.  Because

5  we're most certainly not asking the Court -- we weren't even,

6  in the motion, asking the Court to do anything specific other

7  than direct the Advisors to adopt and implement a plan.  It

8  didn't have to be with us.  We didn't care who it was with.

9  We didn't care what the elements were.  The fact of the matter

10  is Mr. Seery testified extensively, not just about the

11  potential impact this would have on the Debtor's plan of

12  reorganization, but he testified that certain of the Debtor's

13  employees had received threats.  He testified, based on his

14  experience, that this is a highly-regulated industry, and if

15  there was -- if we walked away without any plan in place,

16  which is exactly why he said we filed this motion, that it

17  would be -- that it would be potentially catastrophic and that

18  undoubtedly the SEC would be involved.  And Mr. Rukavina

19  cannot give the Debtor any assurances that it would have no

20  liability.  Mr. Rukavina, I'm sure, is not going to allow his

21  client to indemnify the Debtor for any damages that may have

22  occurred in the future.

23      We're a little far afield here, Your Honor.  We simply

24  wanted to make sure that there was a plan in place to avoid a

25  catastrophe.  That was the irreparable harm that we were

226

1   looking at.  And at the end of the day, they came in -- you

2   know, I wish they had done it last week.  I wish they had told

3   us last Thursday.  I wish they had told us last Wednesday.  I

4   wish they had told us during the negotiations.  I wish they

5   had told us last Friday, instead of pulling Plan B.  I wish

6   they -- you know.  But it doesn't matter.  They don't have an

7   obligation to do that and I'm not, you know, I'm not going to

8   pretend that they do.  It would have been better if they had.

9   They didn't.  But they did, they did what the Debtor needed

10  them to do today, and that is present their plan to the Court.

11       And while we, you know, have questions about when it was

12  prepared, whether it's fulsome, they like it, and that's the

13  important part.  And they're not going to look to the Debtor

14  for any services in the future.  That's the important part.

15       The risk that Mr. Seery was concerned about has been

16  eliminated, and I, you know, appreciate that.  And that's why

17  I thought we came in here with a very rational and pragmatic

18  solution, to just -- to just -- you know, they've done what

19  we've asked for.  We've gotten the relief that we've asked

20  for.  The Advisors have sworn under oath that they have an

21  operating plan to obtain the essential services that the

22  Debtor used to provide.  That's the relief we were asking for.

23  I'm not quite sure what there is left here.

24       THE COURT:  Okay.  Thank you.

25       All right.  The first thing I'm going to say is that the

227

1  Court believes it has subject matter jurisdiction, bankruptcy

2  subject matter jurisdiction, over the requested relief.  If

3  it's a pre-confirmation test that I am supposed to apply here

4  -- that is, the *Wood v. Wood,* could this dispute have a

5  conceivable effect on an estate being administered -- I find

6  that that test is met.

7      I think the concern of potential liability and exposure on

8  the part of the Debtor is well-founded, even if it was not

9  articulated to the Advisors' satisfaction today.  I think,

10  based on the litigious history here between these parties and

11  the contentiousness, I should say, between these parties

12  during this case, there is certainly a well-founded concern,

13  and certainly I think the Debtor is just being prudent,

14  worried about the SEC, investors, the Advisors, the funds,

15  someone else pointing fingers at the way the Debtor did or did

16  not act in transitioning services over.  I think that is a

17  basis for subject matter jurisdiction under the pre-

18  confirmation test.

19      If the post-confirmation test applies here, we know that

20  Fifth Circuit cases such as *In re Craig's Stores*, *In re Case*,

21  *National Gypsum*, among others, articulate the test of

22  bankruptcy subject matter jurisdiction being could the outcome

23  of the dispute bear on the implementation, the execution, or

24  the interpretation of a confirmed plan?  I think that test is

25  likewise met here.

228

1    Obviously, the plan contemplated a separation, and this

2    request for relief appears to be basically seeking some

3    supplemental -- a supplemental order to supplement the

4    confirmation order, to supplement the Debtor's attempt at

5    divorcing these parties as part of the monetization plan.

6        So I think bankruptcy subject matter jurisdiction does

7    exist here.

8        I didn't hear in oral arguments, closing arguments,

9    anything about the arbitration, but I think there's a real

10   question here whether the Advisors may have waived their right

11   to invoke the arbitration clause that's in one of the shared

12   services agreements, not both of them, by filing pleadings so

13   often, participating in this bankruptcy case so often, without

14   invoking that.

15       But again, as I see it, this adversary proceeding is

16   largely -- essentially, I should say -- asking for an order

17   supplementing the confirmation order, and it doesn't really

18   seem like a dispute *per se* under the shared services

19   agreements that have already been terminated.

20       So I think an argument can be made that there's been

21   waiver here, but even if there's not, that this is core in

22   that it bears on the plan confirmation, certainly more than a

23   dispute arising under the literal terms of the shared services

24   agreement.

25       I reserve the right to supplement and amend this, if I

229

1   need to, in a more thorough written ruling.

2      But anyway, based on the Court determining it does have

3   subject matter jurisdiction here, I see it appropriate to

4   enter an order that, based on the Court's several hours of

5   testimony today from three different witnesses -- Mr. Seery,

6   Mr. Dondero, Mr. Norris -- and based on many documents that

7   have been submitted into the evidence, the Court finds that

8   the shared services agreements were already terminated

9   pursuant to their terms and can also be deemed rejected under

10   365 of the Code previously.

11      The Court will find that the Advisors do not need any

12   further services from the Debtor under these agreements as of

13   today's date, except access to data and records, which, based

14   on the testimony of Dustin Norris, can be easily effectuated,

15   Mr. Norris's testimony being that what the Debtor would need

16   to do to allow access to the data is authorize the Debtor's IT

17   director to transfer data and we stand ready to receive it.

18   And data would include historical emails, vault emails, files

19   in the system, and a number of other items, but, quote, there

20   would almost be no work from the Debtor's end.

21      So, believing that to be the case, I would order that the

22   Debtor stand ready between now and the 28th to provide that

23   access and that the Advisors stand ready to receive that

24   access. And if the process extends beyond February 28th, then

25   it will have to be subject to further orders of this Court,

230

1  but the Court would expect there to be a cost if it extends

2  past February 28th.  And again, the Court would consider that

3  in a further hearing, how much cost should be imposed on the

4  Advisors.  But the advisors have represented to me through Mr.

5  Norris it's easy, it can be accomplished easily, so therefore

6  I would think it could happen between now and the 28th, and if

7  it does, no cost imposed on anyone.

8       I will further find that the Advisors have represented and

9  the Court therefore finds that there is an operating plan in

10  place for the Advisors to continue to operate uninterrupted

11  beyond today.  And again, the only thing I would envision that

12  needs to happen between today and February 28th is the access

13  to data.

14      So, having made these findings, the Court believes that

15  the request for a mandatory injunction is moot and is

16  therefore denied.

17      Are there any questions?  Mr. Morris, I want you to be the

18  scrivener, and, of course, run it by Mr. Rukavina.  But are

19  there any questions or concerns about what I've just

20  articulated?

21          MR. MORRIS:  I just have one, Your Honor.

22          THE COURT:  Uh-huh.

23          MR. MORRIS:  You made reference to rejection of the

24  contract.  From our perspective, it's not rejection.  We don't

25  want to open this up to a rejection claim of any kind.  It

231

1   really was just a termination of the agreement, in accordance

2   with the terms.  And I had put the provisions up before the

3   Court during my opening and walked Mr. Seery through.  That's

4   the basis for the --

5           THE COURT:  Okay.

6           MR. MORRIS:  -- termination of the agreement.  It's

7   not rejection at all.

8           THE COURT:  Fair point.

9           MR. RUKAVINA:  And Your Honor, there's no -- there's

10  no -- yeah, there's no problem.  There's no problem on that.

11  We do not disagree.  We do not disagree with Mr. Morris.

12          THE COURT:  Fair point.  I made the mistake of belts

13  and suspenders, trying to fill in any hole there might be.

14  But yes, I had the evidence that there was a termination of

15  both agreements on November 30th.  One of them had a 60-day

16  window before it became effective, the other a 30-day.  So

17  they are terminated.

18      All right.  Mr. Morris, anything else from you?

19          MR. MORRIS:  No.  We'll prepare a form of order.

20          THE COURT:  All right.  Mr. Rukavina, anything

21  further from you?

22          MR. RUKAVINA:  Your Honor, obviously, I have

23  questions.  I have reservations.  I need to look at whether

24  the Court's findings are going to be binding in this adversary

25  proceeding.  So, at this point in time, I'm just not prepared

232

1   to really say anything lest I get myself in trouble.  But I

2   thank you for your time today.

3          THE COURT:  All right.  Well, they are what they are,

4   and I hope we're not in an argument about that down the road.

5   But it seems like my hopes are always dashed when I want

6   things to be worked out.

7      I don't want you to think my calm demeanor means I am a

8   happy camper.  I am not.  I am beyond annoyed.  I mean, I

9   can't even begin to guesstimate how many wasted hours were

10  spent on the drafting Option A, Option B.  Wait.  Let me pull

11  up the exact words.  Mr. Norris confirming, We withdrew Option

12  B after the Debtor accepted it.

13     I mentioned fee-shifting once before in a different

14  context, and, of course, we haven't even gotten to the motion

15  for a show cause order declaring Mr. Dondero in contempt.  I

16  don't know if the lawyers fully appreciate how this looks.

17  Mr. Rukavina, you said that I have formed opinions that you

18  don't think are fair and made comments about vexatious

19  litigation and whatnot.  But while I continue, I promise you,

20  to have an open mind, it is days like this that make me come

21  out with statements that Mr. Dondero, repeating his own words,

22  apparently, he's going to burn the house down if he doesn't

23  get his baby back.

24     I mean, it seems so obviously transparent that he's just

25  driving the legal fees up.  It's as though he doesn't want the

233

1    creditors to get anything, is the way this looks.  If he wants

2    me to have a different impression, then he needs to start

3    behaving differently.  I mean, I can't even imagine how many

4    hundreds of thousands of dollars of legal fees were probably

5    spent the past two weeks on Option A, Option B, and all the

6    different sub-agreements and whatnot.  And as recently as

7    Friday afternoon, the K&L Gates lawyer saying we have a deal,

8    and then, oh, wait, maybe not, maybe we do, maybe we don't.

9    And then Mr. Dondero acting like he had no clue what the K&L

10   Gates lawyers were saying as far as we have a deal.  And Mr.

11   Norris distancing himself from having seen any of that, and I

12   didn't have power.  You know, I'm sure he had a cell phone,

13   like the rest of us, that gets emails.  I'm making a

14   supposition.  I shouldn't make that.  But it just feels like

15   sickening games.

16       And again, if this keeps on, if this keeps on, one day,

17   one day, there may be an enormous attorney fee-shifting order.

18   And, of course, I would have to find bad faith, and I wouldn't

19   be surprised at all if I get there.

20       So I don't know if Mr. Dondero is listening.  I suspect,

21   if he is, he doesn't care much.  But I am --

22             MR. DONDERO:  I'm on the line, Judge.

23             THE COURT:  Okay.

24             MR. DONDERO:  I'm on the line.

25             THE COURT:  I'm glad you're on the line.  I cannot

234

1  overstate how very annoyed I am by hearing all these hours of

2  testimony and to feel like none of it was necessary.  None of

3  it was necessary.  Okay?  There could have been a consensual

4  deal --

5          MR. DONDERO:  Judge, you have to pay attention --

6  Judge, you have to pay attention to what's going on, okay?

7          THE COURT:  I am --

8          MR. DONDERO:  When I was president of Highland, --

9          THE COURT:  -- razor-sharp focused on what is going

10 on.  Okay?  I read every piece of paper.  I listen to every

11 sentence of testimony.  And what is going on --

12         MR. DONDERO:  Okay.  How about this, Your Honor?

13         THE COURT:  -- is an enormous waste of parties and

14 lawyer time and resources.  People need to get their eye on

15 the ball.  Well, certain people do have their eye on the ball,

16 but certain people do not.  Okay?  So we're done.  You've got

17 your divorce now.  Okay?  And if the operating plan is all

18 shored up, as Mr. Norris testified, it sounds like you're in

19 good shape.  All right?

20     Mr. Morris, I'll look for the order from you.

21         MR. MORRIS:  Thank you, Your Honor.

22         THE CLERK:  All rise.

23     (Pause.)

24         THE COURT:  Oh, Michael?

25     (Court confers with Clerk.)

235

1          THE CLERK: Hello? Hang on. Mr. Morris?

2          THE COURT: Is anyone still there?

3          THE CLERK: Mr. Rukavina is still there. Mr.

4   Rukavina, Mr. Morris, are you all still there?

5          MR. RUKAVINA: Judge, this is Davor.

6          THE COURT: All right.

7          MR. RUKAVINA: I think we're all wondering whether

8   we're going to have the contempt hearing.

9          THE COURT: Well, yes, that's why I came back in.

10          MR. RUKAVINA: I can't hear you, Judge. We can't

11   hear you.

12          THE COURT: I realized I -- it's 4:19 Central time.

13   We are not starting the contempt hearing.

14       Mr. Morris, are you there now?

15          MR. MORRIS: I am. I did have one suggestion.

16          THE COURT: All right. I neglected to mention our

17   other setting, but we are not going to start at 4:19 Central

18   time. Do we want to talk about scheduling on that?

19          MR. MORRIS: I did, Your Honor. And it's just an

20   idea, and I understand we've had a long day. But I was going

21   to suggest if there was any way to just get their motion *in*

22   *limine* out of the way today, so that when we come back for the

23   evidentiary hearing parties are fully prepared. If you don't

24   want to do it, that's fine. Otherwise, I'm available at Your

25   Honor's convenience.

236

1          THE COURT:  All right.  I am going to have you all

2   communicate with Ms. Ellison about rescheduling that.  I have

3   no idea what my calendar looks like next week, but I'm not

4   going to do it this week.  I've got a backlog of other case

5   matters that I need to get to this week.

6          MR. MORRIS:  Okay.

7          THE COURT:  So, you know, maybe we'll do it next

8   week.  On the motion *in limine*, you've not filed a response?

9   It was just filed yesterday, so I'm guessing there's no

10  response.

11         MR. MORRIS:  Yeah.  I was going to do -- I was going

12  to do it orally.  I'm happy to do a written response, and I'm

13  happy to just proceed on the papers.  I just think it would be

14  helpful to have that, you know, or if we could put aside an

15  hour later this week to do that, because then preparing, if we

16  know the evidence is in or out, I think it'll just make the

17  trial a lot more smooth.

18         THE COURT:  All right.  I barely had time to pore

19  over it, so let me have Traci reach out to you all tomorrow

20  and let you know do I want a hearing on it or not.  I have an

21  initial reaction.  I don't know if Mr. Dondero's counsel is on

22  the phone.  I don't want to talk about this too much if he's

23  -- do we have Dondero's counsel?

24         MR. WILSON:  I'm present, Your Honor.  John Wilson.

25         THE COURT:  Okay.  I will tell you right now that,

237

1  having done a quick review of it, I didn't feel inclined to

2  grant it.  I'm going to have the TRO in front of me and I'm

3  going to hear the evidence of what happened, and it's either

4  going to match up as a violation of the provisions of the TRO

5  or not.  You know, I feel -- I'm not a jury.  I can decide

6  whether it is violative of the TRO or not.  The theme of it

7  was, oh, it's going to have a prejudicial effect.  I mean,

8  I've already heard about a lot of this.  So I'm inclined not

9  to grant it.  But, again, I did a very quick look at it at

10  5:00 o'clock last night.  And that's why I asked Mr. Morris,

11  was he going to have a response, because --

12        MR. MORRIS:  Yeah.  I was planning to do it orally

13  today, Your Honor.  If I may just have until 5:00 o'clock

14  tomorrow, I'll submit an opposition that won't exceed five

15  pages.

16        THE COURT:  Okay.  So that's what we'll do.  And then

17  once I've looked at the motion more carefully, as well as the

18  response, I'll decide if I need oral argument or if I'm just

19  going to rule on the pleadings, okay, and Traci will let you

20  all know.  All right?  And again, Traci will coordinate with

21  you tomorrow or sometime this week about a resetting on the

22  contempt motion.

23     All right.  Thank you.

24        MR. MORRIS:  Thank you, Your Honor.

25        MR. WILSON:  Thank you, Your Honor.

238

1          THE CLERK:  All rise.

2      (Proceedings concluded at 4:23 p.m.)

3                      --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                     CERTIFICATE

21      I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    **02/24/2021**

24  _____    _____
    Kathy Rehling, CETD-444                    Date
25  Certified Electronic Court Transcriber

239

INDEX

PROCEEDINGS                                                 3

OPENING STATEMENTS

- By Mr. Morris                                             6
- By Mr. Hogewood                                         21

WITNESSES

Debtor's Witnesses

James P. Seery, Jr.
- Direct Examination by Mr. Morris                        29
- Cross-Examination by Mr. Rukavina                       68

James D. Dondero
- Direct Examination by Mr. Morris                        76
- Cross-Examination by Mr. Rukavina                       96
- Redirect Examination by Mr. Morris                     101
- Recross-Examination by Mr. Rukavina                    101

Advisors' Witnesses

Dustin Norris
- Direct Examination by Mr. Rukavina                     103
- Cross-Examination by Mr. Morris                        166
- Redirect Examination by Mr. Rukavina                   198
- Recross-Examination by Mr. Morris                      202

EXHIBITS

Debtor's Exhibits 1 through 21          Received  29
Advisors' Exhibits A through N          Received  29
Advisors' Exhibit O                     Received 200

CLOSING ARGUMENTS

- By Mr. Morris                                          206
- By Mr. Rukavina                                        213
- By Mr. Morris                                          224

RULINGS                                                  226

END OF PROCEEDINGS                                       238

INDEX                                                    239

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Docket #1752  Date Filed: 01/14/2021

# EXHIBIT 22

Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com
Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust and Get Good Trust*

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

## MOTION TO APPOINT EXAMINER PURSUANT TO 11 U.S.C. § 1104(c)

NOW INTO COURT, through undersigned counsel, comes The Dugaboy Investment Trust and Get Good Trust (jointly, "Movers") and respectfully move this Court for the appointment of an Examiner for the reasons set forth herein:

## I.

## BACKGROUND

1. On December 23, 2019, the United States Trustee filed its *United States Trustee's Motion for an Order Directing the Appointment of a Chapter 11 Trustee* [Dkt. No. 271].  The United States Trustee's motion was denied by this Court's *Order Denying United States Trustee's Motion for an Order Directing the Appointment of a Chapter 11 Trustee* [Dkt.

1934054210115000000000009

APP. 2057
Appx. 02104

No. 428]. Since around that time, the Debtor has been operating as a debtor-in-possession at the direction of an appointed independent board of directors.

2. On November 24, 2020, the Court approved the Debtor's *Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* (the "Disclosure Statement") [Dkt. No. 1476]. As detailed in Article II.B. of the Disclosure Statement, the value of the Debtor's Assets has decreased by more than $235 million, or about 42%, from the commencement of the case to September 30, 2020. The Debtor's Monthly Operating Report for November of 2020 reports a loss in value of $248 million [Dkt. No. 1710].

3. The Plan of Reorganization proposed by the Debtor and set for hearing on January 26, 2021 contains significant release and exculpation provisions for the management of the Debtor and the Independent Directors that are not allowable under applicable 5th Circuit law (*Opposition to Confirmation of the Debtor's Fifth Amended Plan of Reorganization* filed by The Dugaboy Investment Trust and Get Good Trust [Dkt. No. 1667] and the *United States Trustee's Limited Objection to Confirmation of Debtors' Fifth Amended Plan of Reorganization* filed by the United States Trustee [Dkt. No. 1671]).

4. At a hearing held on January 8, 2021, this Court voiced a concern about costs and expenses in connection with this case. The Court noted that it believed over sixty (60) lawyers attended the hearing and that a mere Preliminary Injunction hearing, based upon a back of the envelope calculation, cost the estate and parties in interest in excess of $300,000.00.

5. On January 12, 2021, counsel for Movers sent a letter to various counsel enlisting their support to the appointment of an Examiner to investigate various issues in this case and

APP. 2058
Appx. 02105

to author a report that could be used by the Court and parties in interest. It was suggested by The Dugaboy Investment Trust that the appointment of an Examiner was a less costly means to resolve issues, as opposed to full blown litigation between the various parties and their legions of lawyers. The letter suggested that an Examiner be appointed to provide to the Court and the parties in interest a report that would address key matters. The Examiner's investigation and report would address issues and items that would not delay or cause a continuance of the confirmation hearing on the Debtor's Plan.

6. The appointment of a neutral, third party Examiner who would serve as an independent agent for the estate would be in the best interests of the Debtor and its creditors. The Examiner's investigation would alleviate the need for discovery disputes and litigation by getting to the bottom of the legitimacy of the allegations made by the parties and potential claims that may exist on behalf of the estate or against persons acting on behalf of the estate. The present claims retention statement filed by the Debtor is merely a laundry list of potential claims and parties and provides no real guidance or explanation as to the retained claims.

7. Movers will fully cooperate with the Examiner with respect to any examination of potential issues concerning the claims of or against Movers.

## II.

### REQUEST FOR RELIEF

8. Movers request that this Court appoint an Examiner in this case under section 1104(c) of the Bankruptcy Code in order to perform investigations and to prepare a report under section 1106(b). Section 1104(c) of the Bankruptcy Code states, in pertinent part:

If the court does not order the appointment of a trustee under this section, then at any time before the confirmation of a plan, on request of a party in interest or the

APP. 2059
Appx. 02106

United States trustee, and after notice and a hearing, the court shall order the appointment of an examiner to conduct such an investigation of the debtor as is appropriate, including an investigation of any allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or irregularity in the management of the affairs of the debtor of or by current or former management of the debtor…

11 U.S.C. § 1104(c) (emphasis added).

9. The express language of section 1104(c) and c(2) makes clear that where, as in this case, a party has previously moved for the appointment of a Chapter 11 trustee and the fixed liquidated unsecured debts exceed $5 million, the court shall appoint an Examiner at the request of a party in interest.  Id.  Even so, other courts note that an application to appoint a trustee is not a prerequisite for the appointment of an Examiner, only that no such trustee has been appointed in the case. *Keene Corp. v. Coleman* (*In re Keene Corp.*), 164 B.R. 844, 855 (Bankr. S.D.N.Y. 1994) (looking to identical language in § 1104(b), finding that the denial of a motion to appoint a trustee is not a prerequisite to appointing an Examiner); See also *In re Residential Capital, LLC*, 474 B.R. 112, 118, 121 (Bankr. S.D.N.Y. 2012) (requiring only that a chapter 11 trustee must not have been appointed).

10. Here, all elements for the appointment of an Examiner have been met under section 1104(c)(2) of the Bankruptcy Code: (i) the Court has not previously appointed a trustee in this case; (ii) Movers, parties in interest, move for the appointment of an Examiner prior to plan confirmation; and (iii) it is indisputable that the Debtor's fixed, liquidated, unsecured debts, other than debts for goods, services, or taxes, or owing to an insider, exceed $5,000,000.[1]

11. When all such elements are met, courts have no discretion whether to grant relief, and must appoint an Examiner.  *In re Erickson Retirement Communities*, LLC, 425 B.R. 309, 313 (Bankr. N.D. Tex. 2010).  This Court in *Erickson Retirement Communities* stated:

---

[1] See Debtor's Amended Schedules E-F, Dkt. No. 1082-1, and Dkt. Nos. 1273 and 1302.

APP. 2060
Appx. 02107

"This court agrees with such courts that, where the $5 million unsecured debt threshold is met, a bankruptcy court ordinarily has no discretion. This Court has complete discretion as to the matters that are examined."

12. The Court in *Erickson* denied the appointment of an Examiner due to the fact that "there was no allegations of wrongdoing on the part of the Debtor" at 313. In *Erickson* the Examiner was requested to report on an "appropriate value allocation". In this case Movers are requesting, and the Court should want, an explanation from a neutral third party as to why the assets of the Debtor had such a significant reduction in value during the case. Was it due to mismanagement or negligence? The reason for the decline in value is not an investigation that the Debtor or its counsel can make (they are not disinterested) but one that must be made by an independent third party. The discussion in the Debtor's Disclosure Statement [Dkt. No. 1473, pgs. 28-29] is conclusory and only accounts for $90 million of the decline in value. The balance is not explained except to assert that Covid was in part responsible. Leading market indicators for the period between October of 2019 and October of 2020 reflect annualized growth rate for the Dow of 4.67%, the S&P 14.95% and Nasdaq 43.11%. In light of these market gains, questions exist as to why the Debtor's Assets declined in value and whether the Debtor's management acted in a prudent fashion.

## III.

### SUGGESTED AREAS OF INQUIRY AND METHODOLOGY

13. Movers have received responses from the Debtor and the Creditors' Committee relative to Movers' letter of January 12, 2021, wherein the Debtor and the Creditors' Committee rejected joining in the Examiner motion and contended that the request was designed to

delay confirmation and that the Litigation Trustee would investigate the claims possessed by the estate.  The letters received from the Debtor and the Creditors' Committee assert that the claims that have been made against the Debtor and the parties it seeks to have released and exculpated in its Plan are frivolous.  The letters go on to state that the claims will be investigated by Marc Kirschner who is a highly qualified professional.

14. The areas of inquiry suggested by Movers below will not delay confirmation of the Debtor's Plan and the suggestion that the Litigation Trustee, through the use of its counsel, will investigate the claims in a more efficient manner than a highly qualified Examiner would misses the entire point of Movers' letter.  The assertion that the Litigation Trustee will investigate all claims is inaccurate since claims against the Debtor's management are released and exculpated and are not included in any retained claims.  It is difficult to believe that the Creditors' Committee does not want to know why there is a loss of over $200 million in Asset value and whether any of that loss could be recovered from responsible parties.  Secondly, this Court, under the Plan, will have no control over the costs and expenses of the Litigation Trustee and its counsel in pursuing such litigation, and the only means of ensuring benefit to the estate for the activities of the Litigation Trustee would be to require that counsel pursing the claims on behalf of the Litigation Trustee work on a contingent fee basis.

15.  The Plan filed by the Debtor contains significant releases and exculpations for the persons overseeing the Debtor's activities in the case.  Movers are troubled by the fact that the Debtor's Assets have declined in value with only a portion of the loss explained by "reserves" and forced stock sales due to margin issues.   The Court, at the Preliminary Injunction hearing, indicated that it was concerned with the dissipation in the value of

6

assets.   A neutral Examiner could provide an independent view as to the loss in value and avoid costly fights over production of documents.  Is the Debtor afraid to allow a third party to review and answer the question "Why"?

16.  The Debtor should welcome an Examiner viewing the claims that it and the Litigation Trustee have against various parties.  An Examiner's report would be difficult to rebut and, in all likelihood, would bring about settlement of claims without the need for multiyear and costly litigation.

17.  Movers suggest that each party provide the Court with a written submission suggesting areas of inquiry for an Examiner's report.  The Court can then fashion the areas of inquiry such that they do not slow down the confirmation process but provide a meaningful cost savings to the creditors of the estate and the potential party litigants.

## IV.

## PRAYER FOR RELIEF

**WHEREFORE**, The Dugaboy Investment Trust and Get Good Trust request that this Court grant this motion and appoint an Examiner under section 1104(c) of the Bankruptcy Code to conduct an investigation of the propriety of the Debtor's post-petition operations, sales, and trades in accordance with section 1106(b) of the Bankruptcy Code.

 January 14, 2021

APP. 2063
Appx. 02110

Respectfully submitted,

*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA 70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*
*and Get Good Trust*

### CERTIFICATE OF SERVICE

I do hereby certify that on the 14th day of January, 2021, a copy of the above and foregoing *Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* has been served electronically to all parties entitled to receive electronic notice in this matter through the Court's ECF system as follows:

- David G. Adams    david.g.adams@usdoj.gov, southwestern.taxcivil@usdoj.gov;dolores.c.lopez@usdoj.gov
- Amy K. Anderson    aanderson@joneswalker.com, lfields@joneswalker.com
- Zachery Z. Annable    zannable@haywardfirm.com
- Bryan C. Assink    bryan.assink@bondsellis.com
- Asif Attarwala    asif.attarwala@lw.com
- Joseph E. Bain    JBain@joneswalker.com, kvrana@joneswalker.com;joseph-bain-8368@ecf.pacerpro.com;msalinas@joneswalker.com
- Michael I. Baird    baird.michael@pbgc.gov, efile@pbgc.gov
- Sean M. Beach    bankfilings@ycst.com, sbeach@ycst.com
- Paul Richard Bessette    pbessette@KSLAW.com, ccisneros@kslaw.com;jworsham@kslaw.com;kbryan@kslaw.com;jcarvalho@kslaw.com;rmatsumura@kslaw.com
- John Y. Bonds    john@bondsellis.com, joyce.rehill@bondsellis.com
- Larry R. Boyd    lboyd@abernathy-law.com, ljameson@abernathy-law.com
- Jason S. Brookner    jbrookner@grayreed.com, lwebb@grayreed.com;acarson@grayreed.com
- Greta M. Brouphy    gbrouphy@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- M. David Bryant    dbryant@dykema.com, csmith@dykema.com

- Candice Marie Carson    Candice.Carson@butlersnow.com
- Annmarie Antoniette Chiarello    achiarello@winstead.com
- Shawn M. Christianson    schristianson@buchalter.com, cmcintire@buchalter.com
- James Robertson Clarke    robbie.clarke@bondsellis.com
- Matthew A. Clemente    mclemente@sidley.com, matthew-clemente-8764@ecf.pacerpro.com;efilingnotice@sidley.com;ebromagen@sidley.com;alyssa.russell@sidley.com;dtwomey@sidley.com
- Megan F. Clontz    mclontz@spencerfane.com, lvargas@spencerfane.com
- Andrew Clubok    andrew.clubok@lw.com
- Leslie A. Collins    lcollins@hellerdraper.com
- David Grant Crooks    dcrooks@foxrothschild.com, etaylor@foxrothschild.com,jsagui@foxrothschild.com,plabov@foxrothschild.com,jmanfrey@foxrothschild.com
- Gregory V. Demo    gdemo@pszjlaw.com, jo'neill@pszjlaw.com;ljones@pszjlaw.com;jfried@pszjlaw.com;ikharasch@pszjlaw.com;jmorris@pszjlaw.com;jpomerantz@pszjlaw.com;hwinograd@pszjlaw.com;kyee@pszjlaw.com
- Casey William Doherty    casey.doherty@dentons.com, dawn.brown@dentons.com;Docket.General.Lit.DAL@dentons.com;Melinda.sanchez@dentons.com
- Douglas S. Draper    ddraper@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com
- Lauren Kessler Drawhorn    lauren.drawhorn@wickphillips.com, samantha.tandy@wickphillips.com
- Vickie L. Driver    Vickie.Driver@crowedunlevy.com, crissie.stephenson@crowedunlevy.com;seth.sloan@crowedunlevy.com;elisa.weaver@crowedunlevy.com;ecf@crowedunlevy.com
- Jonathan T. Edwards    jonathan.edwards@alston.com
- Jason Alexander Enright    jenright@winstead.com
- Robert Joel Feinstein    rfeinstein@pszjlaw.com
- Matthew Gold    courts@argopartners.net
- Bojan Guzina    bguzina@sidley.com
- Thomas G. Haskins    thaskins@btlaw.com
- Melissa S. Hayward    MHayward@HaywardFirm.com, mholmes@HaywardFirm.com
- Michael Scott Held    mheld@jw.com, lcrumble@jw.com
- Gregory Getty Hesse    ghesse@HuntonAK.com, amckenzie@HuntonAK.com;tcanada@HuntonAK.com;creeves@HuntonAK.com
- Juliana Hoffman    jhoffman@sidley.com, txefilingnotice@sidley.com;julianna-hoffman-8287@ecf.pacerpro.com
- A. Lee Hogewood    lee.hogewood@klgates.com, haley.fields@klgates.com;matthew.houston@klgates.com;courtney.ritter@klgates.com;mary-beth.pearson@klgates.com;litigation.docketing@klgates.com;Emily.mather@klgates.com;Artoush.varshosaz@klgates.com
- Warren Horn    whorn@hellerdraper.com, dhepting@hellerdraper.com;esixkiller@hellerdraper.com;jmarino@hellerdraper.com

- John J. Kane    jkane@krcl.com, ecf@krcl.com;jkane@ecf.courtdrive.com
- Jason Patrick Kathman    jkathman@spencerfane.com, gpronske@spencerfane.com;mclontz@spencerfane.com;lvargas@spencerfane.com
- Edwin Paul Keiffer    pkeiffer@romclaw.com, bwallace@romclaw.com
- Jeffrey Kurtzman    kurtzman@kurtzmansteady.com
- Phillip L. Lamberson    plamberson@winstead.com
- Lisa L. Lambert    lisa.l.lambert@usdoj.gov
- Paul M. Lopez    bankruptcy@abernathy-law.com
- Faheem A. Mahmooth    mahmooth.faheem@pbgc.gov, efile@pbgc.gov
- Ryan E. Manns    ryan.manns@nortonrosefulbright.com
- Thomas M. Melsheimer    tmelsheimer@winston.com, tom-melsheimer-7823@ecf.pacerpro.com
- Paige Holden Montgomery    pmontgomery@sidley.com, txfilingnotice@sidley.com;paige-montgomery-7756@ecf.pacerpro.com;crognes@sidley.com
- J. Seth Moore    smoore@ctstlaw.com, jsteele@ctstlaw.com
- John A. Morris    jmorris@pszjlaw.com
- Edmon L. Morton    emorton@ycst.com
- David Neier    dneier@winston.com, dcunsolo@winston.com;david-neier-0903@ecf.pacerpro.com
- Holland N. O'Neil    honeil@foley.com, jcharrison@foley.com;acordero@foley.com
- Rakhee V. Patel    rpatel@winstead.com, dgalindo@winstead.com;achiarello@winstead.com
- Charles Martin Persons    cpersons@sidley.com
- Mark A. Platt    mplatt@fbtlaw.com, aortiz@fbtlaw.com
- Jeffrey Nathan Pomerantz    jpomerantz@pszjlaw.com
- Kimberly A. Posin    kim.posin@lw.com, colleen.rico@lw.com
- Linda D. Reece    lreece@pbfcm.com
- Penny Packard Reid    preid@sidley.com, txfilingnotice@sidley.com;penny-reid-4098@ecf.pacerpro.com;ncade@sidley.com
- Davor Rukavina    drukavina@munsch.com
- Amanda Melanie Rush    asrush@jonesday.com
- Alyssa Russell    alyssa.russell@sidley.com
- Douglas J. Schneller    douglas.schneller@rimonlaw.com
- Brian Patrick Shaw    shaw@roggedunngroup.com, cashion@roggedunngroup.com;jones@roggedunngroup.com
- Michelle E. Shriro    mshriro@singerlevick.com, scotton@singerlevick.com;tguillory@singerlevick.com
- Nicole Skolnekovich    nskolnekovich@hunton.com, plozano@huntonak.com;astowe@huntonak.com;creeves@huntonak.com
- Jared M. Slade    jared.slade@alston.com
- Frances Anne Smith    frances.smith@judithwross.com, michael.coulombe@judithwross.com
- Eric A. Soderlund    eric.soderlund@judithwross.com
- Martin A. Sosland    martin.sosland@butlersnow.com, ecf.notices@butlersnow.com,velvet.johnson@butlersnow.com

APP. 2066
Appx. 02113

- Laurie A. Spindler    Laurie.Spindler@lgbs.com, Dora.Casiano-Perez@lgbs.com
- Jonathan D. Sundheimer    jsundhimer@btlaw.com
- Kesha Tanabe    kesha@tanabelaw.com
- Chad D. Timmons    bankruptcy@abernathy-law.com
- Dennis M. Twomey    dtwomey@sidley.com
- Basil A. Umari    BUmari@dykema.com, pelliott@dykema.com
- United States Trustee    ustpregion06.da.ecf@usdoj.gov
- Artoush Varshosaz    artoush.varshosaz@klgates.com, Julie.garrett@klgates.com
- Donna K. Webb    donna.webb@usdoj.gov, brian.stoltz@usdoj.gov;CaseView.ECF@usdoj.gov;brooke.lewis@usdoj.gov
- Jaclyn C. Weissgerber    bankfilings@ycst.com, jweissgerber@ycst.com
- Elizabeth Weller    dallas.bankruptcy@publicans.com, dora.casiano-perez@lgbs.com;Melissa.palo@lgbs.com
- Daniel P. Winikka    danw@lfdslaw.com, craigs@lfdslaw.com,dawnw@lfdslaw.com,ivys@lfdslaw.com
- Hayley R. Winograd    hwinograd@pszjlaw.com
- Megan Young-John    myoung-john@porterhedges.com

*/s/Douglas S. Draper.*

**APP. 2067**
**Appx. 02114**

UNITED STATES BANKRUPTCY COURT FOR THE
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | * | Chapter 11 |
| | * | |
| | * | Case No. 19-34054sgj11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | * | |
| | * | |
| Debtor | * | |

**ORDER GRANTING THE MOTION TO
APPOINT EXAMINER PURSUANT TO 11 U.S.C. § 1104(c)**

Upon consideration of the *Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)*

(the "***Motion***") filed on January 14, 2021, by The Dugaboy Investment Trust and Get Good Trust

(jointly, "***Movers***") seeking an order appointing an examiner; and the Court having jurisdiction

to consider the Motion and all relief requested therein, as well as all related proceedings; and due

and sufficient notice of the Motion having been given under the circumstances; and the Court

having convened a hearing at which counsel for all interested parties had an opportunity to

appear and be heard; and good and sufficient cause appearing, the Court finds that the Motion

should be, and thereby is, Granted.

It is, therefore,

{00374942-3}                                          1

1. ORDERED that an Examiner be appointed for Highland Capital Management, L.P. in the captioned matter for the purposes set forth herein; and it is further

2. ORDERED that the United States Trustee for the Northern District of Texas (Dallas Division) (the "*United States Trustee*"), shall timely file its Application for Order Approving the Appointment of an Examiner and a proposed Order thereon (the "*UST Appointment Application Order*"); and it is further

3. ORDERED that immediately upon the entry of the UST Appointment Application Order, the Examiner is authorized to investigate the matters identified in a futher order issued by this Court; and it is further

4. ORDERED that within three (3) days of the entry of this Order, any party wishing to have a matter investigated by the Examiner shall submit in writing to this Court the following: a) identification of the matter to be investigated; b) a reason why such investigation is necessary; and c) why such investigation of the matter identified will not delay confirmation of a plan in this Case; and it is further

5. ORDERED that the Examiner shall have the duties, powers and responsibilities of an examiner under Section 1106(b) of the Bankruptcy Code; provided, however, that the scope of the Examiner's duties, unless expanded or limited by further order of this Court, shall be limited to the investigations identified by this Court in a Supplemental Order to be entered ; and it is further

6. ORDERED that the Examiner shall be a "party in interest" under Section 1109 of the Bankruptcy Code with respect to matters that are within the scope of the duties set forth in this Order and shall be entitled to appear at hearings held in these cases and to be heard at such hearing with respect to matters that are within the scope of the Examiner's duties; and it is further

7. ORDERED that nothing contained in this Order shall diminish the powers and authority of the Debtor , Committee, Reorganized Debtor and Litigation Trust under the Bankruptcy Code, including the powers to investigate transactions and entities, commence contested matters and adversary proceedings, and object to claims, and it is further

8. ORDERED that neither communications between the Examiner and Debtor nor communications between the Examiner and the Committee shall be deemed a waiver of any attorney–client or work product privilege otherwise belonging to the Examiner, the Debtor or the Committee; and it is further

9. ORDERED that any and all objections to the relief granted herein are overruled; and it is further

10. ORDERED that this Court shall retain exclusive jurisdiction over any dispute concerning this Order.

**APP. 2069**
**Appx. 02116**

### End of Order ###

Submitted by:


*/s/Douglas S. Draper.*
Douglas S. Draper, La. Bar No. 5073
ddraper@hellerdraper.com
Leslie A. Collins, La. Bar No. 14891
lcollins@hellerdraper.com
Greta M. Brouphy, La. Bar No. 26216
gbrouphy@hellerdraper.com

Heller, Draper & Horn, L.L.C.
650 Poydras Street, Suite 2500
New Orleans, LA  70130
Telephone: (504) 299-3300
Fax: (504) 299-3399
*Attorneys for The Dugaboy Investment Trust*
 *and Get Good Trust*

**APP. 2070**
**Appx. 02117**

# EXHIBIT 23

```
                IN THE UNITED STATES BANKRUPTCY COURT
                  FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION

                              )    Case No. 19-34054-sgj-11
 In Re:                       )    Chapter 11
                              )
 HIGHLAND CAPITAL             )    Dallas, Texas
 MANAGEMENT, L.P.,            )    Tuesday, February 2, 2021
                              )    9:30 a.m. Docket
         Debtor.             )
                              )    CONFIRMATION HEARING [1808]
                              )    AGREED MOTION TO ASSUME [1624]
 _____)


                      TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                UNITED STATES BANKRUPTCY JUDGE.

 WEBEX APPEARANCES:

 For the Debtor:              Jeffrey Nathan Pomerantz
                              PACHULSKI STANG ZIEHL & JONES, LLP
                              10100 Santa Monica Blvd.,
                                13th Floor
                              Los Angeles, CA  90067-4003
                              (310) 277-6910

 For the Debtor:              John A. Morris
                              Gregory V. Demo
                              PACHULSKI STANG ZIEHL & JONES, LLP
                              780 Third Avenue, 34th Floor
                              New York, NY  10017-2024
                              (212) 561-7700

 For the Debtor:              Ira D. Kharasch
                              PACHULSKI STANG ZIEHL & JONES, LLP
                              10100 Santa Monica Blvd.,
                                13th Floor
                              Los Angeles, CA  90067-4003
                              (310) 277-6910

 For the Official Committee   Matthew A. Clemente
 of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                              One South Dearborn Street
                              Chicago, IL  60603
                              (312) 853-7539
```

Exhibit C

2

```
 1   APPEARANCES, cont'd.:

 2   For Redeemer Committee of    Terri L. Mascherin
     the Highland Crusader        JENNER & BLOCK, LLP
 3   Fund:                        353 N. Clark Street
                                  Chicago, IL  60654-3456
 4                                (312) 923-2799

 5   For Acis Capital             Rakhee V. Patel
     Management GP, LLC:          WINSTEAD, P.C.
 6                                2728 N. Harwood Street, Suite 500
                                  Dallas, TX  75201
 7                                (214) 745-5250

 8   For UBS Securities, LLC:     Andrew Clubok
                                  LATHAM & WATKINS, LLP
 9                                555 Eleventh Street, NW,
                                    Suite 1000
10                                Washington, DC  20004
                                  (202) 637-2200
11
     For Patrick Daugherty:       Jason Patrick Kathman
12                                PRONSKE & KATHMAN, P.C.
                                  2701 Dallas Parkway, Suite 590
13                                Plano, TX  75093
                                  (214) 658-6500
14
     For HarbourVest, et al.:     Erica S. Weisgerber
15                                DEBEVOISE & PLIMPTON, LLP
                                  919 Third Avenue
16                                New York, NY  10022
                                  (212) 909-6000
17
     For James Dondero:           Clay M. Taylor
18                                John Y. Bonds, III
                                  D. Michael Lynn
19                                Bryan C. Assink
                                  BONDS ELLIS EPPICH SCHAFER
20                                  JONES, LLP
                                  420 Throckmorton Street,
21                                  Suite 1000
                                  Fort Worth, TX  76102
22                                (817) 405-6900

23   For Get Good Trust and       Douglas S. Draper
     Dugaboy Investment Trust:    HELLER, DRAPER & HORN, LLC
24                                650 Poydras Street, Suite 2500
                                  New Orleans, LA  70130
25                                (504) 299-3300
```

3

APPEARANCES, cont'd.:

| | |
|---|---|
| For Certain Funds and Advisors: | Davor Rukavina<br>Julian Vasek<br>MUNSCH, HARDT, KOPF & HARR<br>500 N. Akard Street, Suite 3800<br>Dallas, TX  75201-6659<br>(214) 855-7587 |
| For Certain Funds and Advisors: | A. Lee Hogewood, III<br>K&L GATES, LLP<br>4350 Lassiter at North Hills<br>  Avenue, Suite 300<br>Raleigh, NC  27609<br>(919) 743-7306 |
| For the NexPoint Parties: | Lauren K. Drawhorn<br>WICK PHILLIPS<br>3131 McKinney Avenue, Suite 100<br>Dallas, TX  75204<br>(214) 692-6200 |
| For Scott Ellington, Isaac Leventon, Thomas Surgent, and Frank Waterhouse: | Frances A. Smith<br>ROSS & SMITH, P.C.<br>Plaza of the Americas<br>700 N. Pearl Street, Suite 1610<br>Dallas, TX  75201<br>(214) 593-4976 |
| For Scott Ellington, Isaac Leventon, Thomas Surgent, and Frank Waterhouse: | Debra A. Dandeneau<br>BAKER & MCKENZIE, LLP<br>452 Fifth Avenue<br>New York, NY  10018<br>(212) 626-4875 |
| For CLO Holdco, Ltd.: | John J. Kane<br>KANE RUSSELL COLEMAN LOGAN, P.C.<br>901 Main Street, Suite 5200<br>Dallas, TX  75202<br>(214) 777-4261 |
| For Davis Deadman, Todd Travers, and Paul Kauffman: | Jason Patrick Kathman<br>PRONSKE & KATHMAN, P.C.<br>2701 Dallas Parkway, Suite 590<br>Plano, TX  75093<br>(214) 658-6500 |

4

```
 1   APPEARANCES, cont'd.:

 2   For the United States      David G. Adams
     of America (IRS):          U.S. STATES DEPARTMENT OF JUSTICE,
 3                                TAX DIVISION
                                717 N. Harwood Street, Suite 400
 4                              Dallas, TX  75201
                                (214) 880-2432
 5
     For Highland CLO Funding,  Rebecca Matsumura
 6   Ltd.:                      KING & SPALDING, LLP
                                500 West 2nd Street, Suite 1800
 7                              Austin, TX  78701
                                (512) 457-2024
 8
     For Crescent TC            Michael S. Held
 9   Investors:                 JACKSON WALKER, LLP
                                2323 Ross Avenue, Suite 600
10                              Dallas, TX  75201
                                (214) 953-5859
11
     For the Issuer Group:      Amy K. Anderson
12                              JONES WALKER, LLP
                                811 Main Street, Suite 2900
13                              Houston, TX  77002
                                (713) 437-1866
14
     Recorded by:               Michael F. Edmond, Sr.
15                              UNITED STATES BANKRUPTCY COURT
                                1100 Commerce Street, 12th Floor
16                              Dallas, TX  75242
                                (214) 753-2062
17
     Transcribed by:            Kathy Rehling
18                              311 Paradise Cove
                                Shady Shores, TX  76208
19                              (972) 786-3063

20

21

22

23

24        Proceedings recorded by electronic sound recording;
            transcript produced by transcription service.
25
```

5

1           DALLAS, TEXAS - FEBRUARY 2, 2021 - 9:38 A.M.

2           THE COURT:  Good morning.  Please be seated.  All

3    right.  We are ready to get started now in Highland Capital.

4    We have a confirmation hearing as well as a motion to assume

5    the non-residential real property lease at the headquarters.

6    All right.  This is Case No. 19-34054.  I know we're going to

7    have a lot of appearances today.  I think we're just down to a

8    handful of objections, but I'm nevertheless going to go ahead

9    and get formal appearances from our key parties that we've had

10   historically in this case.

11       First, for the Debtor team, do we have Mr. Pomerantz and

12   your crew?

13           MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Jeff

14   Pomerantz, along with John Morris, Ira Kharasch, and Greg

15   Demo, on behalf of the Debtor-in-Possession, Highland Capital.

16           THE COURT:  All right.  Good morning.  All right.

17   For the Unsecured Creditors' Committee team, do we have Mr.

18   Clemente and others?

19           MR. CLEMENTE:  Yes.  Good morning, Your Honor.

20   Matthew Clements; Sidley Austin; on behalf of the Official

21   Committee of Unsecured Creditors.

22           THE COURT:  All right.  I'm actually going to call a

23   roll call for the Committee members who have obviously been

24   very active during this case.  For the Redeemer Committee and

25   Crusader Fund, do we have Ms. Mascherin and her team?

6

1    (Pause.)  Okay.  We're -- if -- you must be on mute.

2              MS. MASCHERIN:  Your Honor, I apologize.

3              THE COURT:  Okay.  Go ahead.

4              MS. MASCHERIN:  I apologize, Your Honor.  I was on

5    mute and could not figure out how to unmute myself quickly.

6    Terri Mascherin; Jenner & Block; on behalf of the Redeemer

7    Committee.

8              THE COURT:  All right.  Good morning.

9        All right.  What about Acis?  Do we have Ms. Patel and

10   others for the Acis team?

11             MS. PATEL:  Good morning, Your Honor.  Rakhee Patel

12   on behalf of Acis Capital Management.

13             THE COURT:  Good morning.

14       All right.  Mr. Clubok, I see you there for the UBS team,

15   correct?

16             MR. CLUBOK:  Yes.  Good morning, Your Honor.

17             THE COURT:  Good morning.

18       All right.  For Patrick Daugherty, I think I see Mr.

19   Kathman out there, correct?

20             MR. KATHMAN:  Good morning, Your Honor.  Jason

21   Kathman on behalf of Patrick Daugherty.

22             THE COURT:  All right.  Good morning.

23       All right.  What about HarbourVest?  Anyone on the line

24   for HarbourVest?

25             MS. WEISGERBER:  Good morning, Your Honor.  Erica

7

1  Weisgerber for HarbourVest.

2       THE COURT:  All right.  Very good.

3    All right.  Well, I'll now, I guess, turn to some of the

4  Objectors that I haven't hit yet.  Who do we have appearing

5  for Mr. Dondero this morning?

6       MR. TAYLOR:  Good morning, Your Honor.  Clay Taylor

7  of the law firm of Bonds Ellis Eppich Schaefer & Jones

8  appearing on behalf of Mr. Dondero.  I have with me, of

9  course, Mr. Dondero, who is in the room with me.  Dennis

10 Michael Lynn, John Bonds, and Bryan Assink are also appearing

11 on behalf of Mr. Dondero.

12      THE COURT:  All right.  Thank you, Mr. Taylor.

13    All right.  For the Dugaboy Trust and Get Good Trust, do

14 we have Mr. Draper and others?

15      MR. DRAPER:  Yes, Your Honor.  This is Douglas Draper

16 on the line.

17      THE COURT:  All right.  Good morning.

18      MR. DRAPER:  Good morning, Your Honor.

19      THE COURT:  All right.  What about what I'll call

20 Highland Fund, the Highland Funds and Advisors?  Do we have

21 Mr. Rukavina this morning, or who do we have?

22      MR. RUKAVINA:  Your Honor, good morning.  Davor

23 Rukavina and Julian Vasek for the Funds and Advisors.  I can

24 make a full appearance, but it's the parties listed on Docket

25 1670.

8

1          THE COURT:  All right.  Thank you, Mr. Rukavina.

2      All right.  What about --

3          MR. HOGEWOOD:  Your Honor?

4          THE COURT:  Go ahead.

5          MR. HOGEWOOD:  Your Honor, Lee Hogewood.  I'm sorry,

6  Your Honor.  Lee Hogewood is also here on behalf of the same

7  parties.

8          THE COURT:  All right.  Thank you, sir.

9      All right.  What about NexPoint Real Estate Partners, HCRE

10 Partners?

11         MS. DRAWHORN:  Good morning, Your Honor.  Lauren

12 Drawhorn with Wick Phillips on behalf of NexPoint Real Estate

13 Partners, LLC.  I'm also here on behalf of the NexPoint Real

14 Estate entities which are listed on Docket 1677, and NexBank,

15 which is -- their objection is 1676.

16         THE COURT:  All right.  Thank you.

17     All right.  Let's cover some of the employees.  I think I

18 see Ms. Smith out there.  Are you appearing for Mr. Ellington

19 and Mr. Leventon?

20         MS. SMITH:  Yes, Your Honor.  Frances Smith with Ross

21 & Smith, along with Debra Dandeneau of Baker McKenzie, on

22 behalf of Scott Ellington, Isaac Leventon, Thomas Surgent, and

23 Frank Waterhouse.

24         THE COURT:  All right.  Could you spell the last name

25 of your co-counsel from Baker McKenzie?  I didn't clearly get

9

1 that.

2 MS. SMITH: Yes, Your Honor. It's Debra Dandeneau,

3 D-A-N-D-E-N-N-A-U [sic].

4 THE COURT: Okay. Thank you.

5 All right. CLO Holdco, do we have you appearing this

6 morning?

7 MR. KANE: Your Honor, John Kane on behalf of CLO

8 Holdco.

9 THE COURT: Thank you, Mr. Kane.

10 All right. I know we had a different group of current or

11 former employees -- Brad Borud, Jack Yang -- and some joining

12 parties: Kauffman, Travers, Deadman. Who do we have

13 appearing for those? (Pause.) Anyone? If you're appearing,

14 we're not hearing you. Go ahead.

15 MR. KATHMAN: Good morning, Your Honor. Jason

16 Kathman. I represent Mr. Deadman, Mr. Travers, and Mr.

17 Kauffman as well.

18 THE COURT: Okay. Thank you. And I can't remember

19 who represents Mr. Borud and Yang. Someone separately.

20 MR. KATHMAN: It's Mr. Winikka, Your Honor.

21 THE COURT: Oh, Mr. Winikka.

22 MR. KATHMAN: And I haven't scrolled through to see

23 whether he's with -- in the 120 people signed in this morning.

24 But I believe that objection has been resolved. I think Mr.

25 Pomerantz will probably address that later. So Mr. Winikka

10

1  may not be appearing.

2         THE COURT: Okay. All right. Well, anyone for the

3  IRS?

4         MR. ADAMS: Good morning, Your Honor. David Adams,

5  Department of Justice, on behalf of the United States and its

6  agency, the Internal Revenue Service.

7         THE COURT: Thank you, Mr. Adams.

8      For the U.S. Trustee, who do we have appearing this

9  morning? (No response.) I'm not hearing you. If you're

10 trying to appear, you must be on mute. (No response.) All

11 right. Well, I suspect at some point we'll hear from the U.S.

12 Trustee, even though I don't hear anyone now.

13     At this point, I will open it up to anyone else who wishes

14 to appear who I failed to call.

15        MS. MATSUMURA: Your Honor, this is Rebecca Matsumura

16 from King & Spalding representing Highland CLO Funding, Ltd.

17 Thank you.

18        THE COURT: All right. Thank you, Ms. Matsumura.

19 HCLOF.

20     Anyone else?

21        MR. HELD: Your Honor, this is Michael Held with the

22 law firm of Jackson Walker, LLP on behalf of the office

23 landlord, Crescent TC Investors, LP.

24        THE COURT: All right. Thank you, Mr. Held.

25        MR. HELD: Thank you, Your Honor.

11

1        THE COURT:  Okay.  Any other lawyer appearances?

2     All right.  Well, again, if there's anyone out there who

3   did not get to appear, maybe we'll hear from you at some point

4   as the day goes on.

5     All right.  Mr. Pomerantz, this is an important day,

6   obviously.  How did you want to begin things?

7        MR. POMERANTZ:  So, Your Honor, I have a brief

8   opening to talk about what I plan to do, and a little more

9   lengthy opening, and it'll be come clear.  So if I may

10  proceed, Your Honor?

11        THE COURT:  You may.

12        MR. POMERANTZ:  Your Honor, we're here to request

13  that the Court confirm the Debtor's Fifth Amended Plan of

14  Reorganization, as modified.  The operative documents before

15  Your Honor are the Fifth Amended Plan, as modified, that was

16  filed along with our pleadings in support of confirmation on

17  January 22nd and the minor amendments that we filed on

18  February 1st.

19     Here is my proposal on how we can proceed this morning.  I

20  would intend to provide the Court with an opening statement

21  that would last approximately 20 minutes.  And then after any

22  other party who desires to make an opening statement, I would

23  propose that the Debtor put on its evidence that it intends to

24  rely on in support of confirmation.  The evidence consists of

25  the exhibits that the Debtor filed with its witness and

12

1  exhibit list on January 22nd and certain amendments that we

2  filed yesterday.

3      We would also put on the testimony of the following

4  witnesses: Jim Seery, the Debtor's chief executive officer,

5  who Your Honor is very familiar with, and also a member of

6  Strand's board of directors; John Dubel, a member of Strand's

7  board of directors; and Mark Tauber, a vice president with Aon

8  Financial Services, the Debtor's D&O broker.

9      We have also submitted the declaration of Patrick Leatham,

10 who is with KCC, the Debtor's balloting agent. And we don't

11 intend to put Mr. Leatham on the stand, but he is available on

12 the WebEx for cross-examination, to the extent necessary.

13     I propose that I would leave the bulk of my argument,

14 which includes going through the Section 1129 requirements for

15 plan confirmation, as well as responding to the remaining

16 outstanding objections, until my closing argument.

17     With that, Your Honor, I will pause and ask the Court if

18 Your Honor has any questions before I proceed.

19         THE COURT: I do not have questions, so your method

20 of going forward sounds appropriate. You may go ahead.

21         MR. POMERANTZ: Thank you, Your Honor.

22          OPENING STATEMENT ON BEHALF OF THE DEBTOR

23         MR. POMERANTZ: As I indicated, Your Honor, we stand

24 here side by side with the Creditors' Committee asking that

25 the Court confirm the Debtor's plan of reorganization.

13

1    As Your Honor is well aware, this case started in December

2  in -- October 2019, was transferred to Your Honor's court in

3  December 2019, and has been pending for approximately 15

4  months.

5    On January 9, 2020, I stood before Your Honor seeking the

6  approval of the independent board of directors of Strand, the

7  general partner of the Debtor, pursuant to a heavily-

8  negotiated agreement with the Committee.  And as the Court has

9  remarked on occasions throughout the case, the economic

10  stakeholders in this case believed that the installation of a

11  new board consisting of highly-qualified restructuring

12  professionals and a bankruptcy judge, a former bankruptcy

13  judge, was far more attractive than the alternative, which was

14  appointment of a trustee.  And upon approval of the

15  settlement, members of the board -- principally, Mr. Seery --

16  testified that one of the board's goals was to change the

17  culture of litigation that plagued Highland in the decade

18  before filing and threatened to embroil the Debtor in

19  continued litigation if changes were not made.

20    And as Your Honor is well aware, the last 14 months have

21  not been easy.  The board took its role as an independent

22  fiduciary extremely seriously, much to the consternation of

23  the Committee at times, and more recently, to the

24  consternation of Mr. Dondero and his affiliated entities.

25    And what has the Debtor, under the leadership of the

14

1    board, been able to accomplish during this case?  The answer

2    is a lot more than many parties believed when the board was

3    installed.

4        The Debtor reached a settlement with the Redeemer

5    Committee, resolving disputes that had been litigated for many

6    years, in many forums, and that resulted in an arbitration

7    award that was the catalyst for the bankruptcy filing.

8        Participating in a court-ordered mediation at the end of

9    August 2020 and September, the Debtor reached agreement with

10   Acis and Josh Terry.  The Court is all too familiar with the

11   years of disputes between the Debtor and Acis and Josh Terry,

12   which spanned arbitration proceedings and an extremely

13   combative Chapter 11 that Your Honor presided over.

14       The Debtor next reached an agreement with HarbourVest

15   regarding their assertion of over $300 million of claims

16   against the estate.  The HarbourVest litigation stemmed from

17   its investment in the Acis CLOs and would have resulted in

18   complex, fact-intensive litigation which would have forced the

19   Court to revisit many of the issues addressed in the Acis

20   case.

21       And perhaps most significantly, Your Honor, the Debtor was

22   able to resolve disputes with UBS, disputes which took the

23   most time of any claim in this case, through a contested stay

24   relief motion, a hotly-contested summary judgment motion, and

25   a Rule 3018 motion.

15

1    While the Debtor and UBS hoped to file a 9019 motion prior

2  to the commencement of the hearing, they were not able to do

3  so.  However, I am now in a position to disclose to the Court

4  the terms of the settlement, which is the subject of

5  documentation acceptable to the Debtor and UBS.  The

6  settlement provides for, among other things, the following

7  terms:

8    UBS will receive a $50 million Class 8 general unsecured

9  claim against the Debtor.

10    UBS will receive a $25 million Class 9 subordinated

11  general unsecured claim against the Debtor.

12    UBS will receive a cash payment of $18.5 million from

13  Multi-Strat, which was a defendant and the subject of

14  fraudulent transfer claims.

15    The Debtor will use reasonable efforts to assist UBS to

16  collect its Phase I judgment against CDL Fund and assets CDL

17  Fund may have.

18    The parties will also agree to mutual and general

19  releases, subject to agreed carve-outs.

20    And, of course, the parties will not be bound until the

21  Court approves the settlement pursuant to a 9019 motion we

22  would hope to get on file shortly.

23    I am also pleased to let the Court know -- breaking news

24  -- that this morning we reached an agreement to settle Patrick

25  Daugherty's claims.  I would now like to, at the request of

16

1  Mr. Kathman, read into the record the Patrick Daugherty

2  settlement.

3      Under the Patrick Daugherty settlement, Mr. Daugherty will

4  receive a $750,000 cash payment on the effective date.  He

5  will receive an $8.25 million general unsecured claim, and he

6  will receive a $2.75 million Class 9 subordinated claim.

7      The settlement of all claims against the Debtor and its

8  affiliates -- and affiliates will be defined in the documents

9  -- with the exception of the tax claim against the Debtor, Mr.

10 Dondero, and Mr. Okada -- and for the avoidance of doubt,

11 except as I describe below, nothing in the settlement is

12 intended to affect any pending litigation Mr. Daugherty has

13 against Mr. Dondero, Scott Ellington, Isaac Leventon, Marc

14 Katz, Michael Hurst, and Hunton Andrew Kurth.

15     Mr. Daugherty will release the Debtor and its affiliates

16 and current employees for all claims and causes of action,

17 except for the agreements I identify below, and dismiss all

18 current employees as to pending actions.  We believe this only

19 applies to Thomas Surgent and no other employee is implicated.

20     Mr. Surgent and other employees, including but not limited

21 to David Klos, Frank Waterhouse, Brian Collins, Lucy Bannon,

22 and Matt Diorio, will receive releases similar to the covenant

23 in Paragraph 1D of the Acis settlement agreement, which

24 essentially provided the release would go away if they

25 assisted anyone in pursuing claims against Mr. Daugherty.

17

1      Highland and the above-mentioned parties will accept

2   service of any subpoenas and acknowledge the jurisdiction of

3   the Delaware Chancery Court for the purposes of accepting any

4   subpoenas.  And for the avoidance of doubt, Highland will

5   accept service on behalf of the employees only in their

6   capacity as such.

7      Highland will also use material -- will use reasonable

8   efforts at no material cost to assist Daugherty in vacating a

9   Texas judgment that was issued against him.  We've also looked

10   at a form of the motion and believe we have agreed on the form

11   of the motion.

12      Highland, its affiliates, and current employees will

13   covenant and agree they will not pursue or seek to enforce the

14   injunction and the Texas judgment against Daugherty.

15      And lastly, Daugherty will not be able to settle any

16   claims for negligence or other claims that might be subject to

17   indemnification by the Debtor or any successor.

18      Accordingly, Your Honor, other than the claims of Mr.

19   Dondero and his related entities, and the unliquidated claims

20   of certain employees, substantially all claims have been

21   resolved in this case, a truly remarkable achievement.

22      Separate and apart, Your Honor, from the work done

23   resolving the claims, the Debtor, under the direction of the

24   independent board, has worked extremely hard to develop a plan

25   of reorganization.

18

1    After the independent board got its bearings, it started

2   to work on various plan alternatives.  And the board received

3   a lot of pressure from the Committee to go straight to a plan

4   seeking to monetize assets like the one before Your Honor

5   today.  However, the board believed that before proceeding to

6   do so and go down an asset monetization path, it should

7   adequately diligence all alternatives, including a

8   continuation of the current business model, a reorganization

9   sponsored by Mr. Dondero and his affiliates, a sale of the

10  Debtor's assets, including a sale to Mr. Dondero.

11   In June 2020, plan negotiations proceeded in earnest, and

12  the Debtor started to negotiate an asset monetization plan

13  with the Committee, while still pursuing other alternatives.

14   Preparation of an asset monetization plan is not typically

15  a complicated process.  However, creating the appropriate

16  structure for a business like the Debtor's was extremely

17  complicated, because of the contractual, regulatory, tax, and

18  governance issues that had to be carefully considered.

19   At the same time the Committee negotiations were

20  proceeding down that path, Mr. Seery continued to spend

21  substantial time trying to negotiate a grand bargain plan with

22  Mr. Dondero.  It is not an exaggeration to say that over the

23  last several months Mr. Seery has dedicated hundreds of hours

24  towards a potential grand bargain plan.

25   And why did he do it?  Because he has always believed that

19

1   a global restructuring among all parties was the best

2   opportunity to fully and finally resolve the acrimony that

3   continued to plague the Debtor.

4        Notwithstanding Mr. Seery's and the independent board's

5   best efforts, they were not able to reach consensus on a grand

6   bargain plan, and the Debtor filed the plan, the initial plan,

7   on August 12th, which ultimately evolved into the plan before

8   the Court today.

9        The Court conducted an initial hearing on the disclosure

10  statement on October 27th, and then ultimately approved -- the

11  Court approved the disclosure statement at a hearing on

12  November 23rd.

13       While the Debtor continued to work towards resolving

14  issues with the Committee with the filed plan, Mr. Dondero,

15  beginning to finally see that the train was leaving the

16  station, started to do whatever he could to get in the way of

17  plan confirmation.

18       He objected to the Acis settlement.  When his objection

19  was overruled, he filed an appeal.

20       He objected to the HarbourVest settlement.  When his

21  objection was overruled, he had Dugaboy file an appeal.

22       He started to interfere with the Debtor's management of

23  its CLOs, stopping trades, refusing to provide support, and

24  threatening Mr. Seery and the Debtor's employees.

25       He had his Advisors and Funds that he owned and controlled

20

1    file motions that Your Honor said was a waste of time.

2        He had those same Funds and Advisors threaten to terminate

3    the Debtor as a manager, in blatant violation of the Court's

4    January 9, 2020 order.

5        His conduct was so egregious that it warranted entry of a

6    temporary restraining order and preliminary injunction against

7    him.  And of course, he has appealed that ruling as well.

8        But that was not all.  He brazenly threw out his phone, in

9    what the Court has remarked was spoliation of evidence, and he

10   violated the TRO in other ways, actions for which he will

11   answer for at the contempt hearing scheduled later this week.

12       And, of course, he and his pack of related entities have

13   filed a series of objections.  We have received 12 objections

14   to the plan, Your Honor, excluding three joinders.  And as I

15   mentioned, we have been pleased to report that we've been able

16   to resolve six of them:  those of the Senior Employees, those

17   of Patrick Daugherty, those of CLO Holdco, those of the IRS,

18   those of Texas Taxing Authorities, and those of Jack Young and

19   Brad Borud.

20       The CLO Holdco objection was withdrawn in connection with

21   the settlement reached with them in connection with the

22   preliminary injunction hearing that the Court heard -- started

23   to hear last week.

24       The Taxing Authorities' objections have been resolved by

25   the Debtor agreeing to make certain modifications to the plan

21

1  that were included in our filing yesterday and to include

2  certain provisions in the confirmation order to address other

3  concerns.

4       The group of employees who are referred to as the Senior

5  Employee are comprised of four individuals -- Frank

6  Waterhouse, Thomas Surgent, Scott Ellington, and Isaac

7  Leventon -- although Mr. Ellington and Mr. Leventon are no

8  longer employed by the Debtor.

9       On January 22nd, Your Honor, we filed executed

10  stipulations with Frank Waterhouse and Thomas Surgent.  These

11  stipulations were essentially the Senior Employee stipulations

12  that were referred to in the plan and the disclosure

13  statement.

14       And as part of those stipulations, the Debtor, in

15  consultation with and agreement from the Committee, agreed to

16  certain modifications of the prior version of the Senior

17  Employee stipulation with both Mr. Waterhouse and Mr. Surgent

18  that effectively reduced the compensation they needed to

19  provide for the release from 40 percent to five percent of

20  their claims.

21       The Debtor and the Committee believed the resolution with

22  Mr. Surgent and with Mr. Waterhouse was fair, given the

23  importance of these two people to the transition effort and

24  the increased reliance upon them that the Debtor would have

25  with the departure of Mr. Ellington and Mr. Leventon.  And as

22

1    a result of that agreement, Your Honor, on January 27th, Mr.

2    Waterhouse and Mr. Surgent withdrew from the Senior Employee

3    objection.

4        Subsequently, we reached agreement with Mr. Ellington and

5    Mr. Leventon to resolve the objections they raised with

6    confirmation.  And at Ms. Dandeneau's request, I would like to

7    read into the record the agreement reached with both of them,

8    and I know she will correct me if I get anything wrong.

9            THE COURT:  Okay.

10            MR. POMERANTZ:  Among other things, Mr. Ellington and

11   Mr. Leventon asserted in their objection that they were

12   entitled to have their liquidated bonus claims treated as

13   Class 7 convenience claims under the plan, under their reading

14   of the plan, and their understanding of communications with

15   Mr. Seery.  The Debtor disputed the entitlement to elect Class

16   7 based upon the terms of the plan, the disclosure statement,

17   and applicable law.  But as I said, the parties have resolved

18   this dispute.

19       Mr. Ellington asserts liquidated bonus claims in the

20   aggregate amount of $1,367,197, which, to receive convenience

21   class treatment under anybody's analysis, would have had to be

22   reduced to a million dollars.

23       Mr. Leventon asserts a liquidated bonus claim in the

24   amount of $598,198.

25       If Mr. Ellington and Mr. Leventon were entitled to be

23

1  included in the convenience class, as they claimed, they would

2  be entitled to receive 85 percent of their claim as and when

3  the claims were allowed under the plan.

4      To settle the dispute regarding whether, in fact, they

5  would be entitled to the convenience class treatment, they

6  have agreed to reduce the percentage they would otherwise be

7  entitled to receive from 85 percent to 70.125 percent.  And as

8  a result, Mr. Ellington's Class 7 convenience claim would be

9  entitled to receive $701,250 if allowed, and Mr. Leventon's

10 Class 7 convenience claim would be entitled to receive

11 $413,175.10 if allowed.

12     Mr. Ellington and Mr. Leventon would reserve the right to

13 assert that a hundred percent of their liquidated bonus claims

14 are entitled to administrative priority, and the Debtor, the

15 Committee, the estate and their successors, would reserve all

16 rights to object.

17     If anyone did object to the allowance of the liquidated

18 bonus claims and Mr. Ellington and/or Mr. Leventon prevailed

19 in such disputes, then the discount that was previously agreed

20 to -- 85 percent to 70.125 percent -- would go away and they

21 would be entitled to receive the full 85 percent payout as

22 essentially a penalty for litigating against them on their

23 allowed claims and losing.

24     As an alternative to the estate preserving the right to

25 object to the allowance of Mr. Ellington and Mr. Leventon's

24

1  liquidated bonus claims, the Debtor and the Committee have an

2  option to be exercised before the effective date to just agree

3  that both their claims will be allowed, and allowed as Class 7

4  convenience claims.  And if that agreement was reached, then

5  the amount of such liquidated bonus claims, they would receive

6  a payment equal to 60 percent of their allowed convenience

7  class claim.

8      In exchange, Mr. Ellington and Mr. Leventon would waive

9  their right to assert payment of a hundred percent of their

10 liquidated bonus claims as an administrative expense.

11     So, under this circumstance, Mr. Ellington would receive

12 an allowed claim of $600,000, which is 60 percent of a million

13 dollars, and Mr. Leventon will receive a payment on account of

14 his Class 7 claim of $358,918.80.

15     Under both scenarios, Mr. Ellington and Mr. Leventon would

16 preserve their paid time off claims that are treated in Class

17 6, and they would preserve their other claims in Class 8,

18 largely unliquidated indemnification claims, subject to the

19 rights of any party in interest to object to those claims.

20     Mr. Ellington will change his vote in Class 8 from

21 rejecting the plan to accepting the plan, and Mr. Leventon

22 would change his votes in Class 8 and Class 7 from rejecting

23 the plan to accepting the plan.  And Mr. Ellington and Mr.

24 Leventon would withdraw any remaining objections to

25 confirmation of the plan, and we intend to put this settlement

25

1    in the confirmation order.

2        Your Honor, six objections to the plan remain outstanding.

3    One objection was filed by the Office of the United States

4    Trustee, and the remaining five objections are from Mr.

5    Dondero and his related entities.  And I would like to put up

6    a demonstrative on the screen which shows how all of these

7    objections lead back to Jim Dondero.

8            THE COURT:  All right.

9            MR. POMERANTZ:  You see on the top left, Your Honor,

10   there's a box in white that says A through E, which are the

11   five remaining objections.  And you can see how they relate.

12   But all of it goes back to that orange box in the middle, Jim

13   Dondero.

14       These objections, which I will address in my closing

15   argument in detail, are not really focused on concerns that

16   creditors are being treated unfairly, and that's because Mr.

17   Dondero and his entities don't really have any valid claims.

18   Mr. Dondero owns no equity in the Debtor.  He owns the

19   Debtor's general partner, Strand, which in turn owns a quarter

20   percent of the total equity in the Debtor.  Mr. Dondero's only

21   other claim is a claim for indemnification.  And as Your Honor

22   would expect, the Debtor intends to fight that claim

23   vigorously.

24       Dugaboy and Get Good have asserted frivolous

25   administrative and unsecured claims, which I will discuss in

26

1  more detail later.

2      Dugaboy does have an equity interest in the Debtor, but it

3  represents eighteen-hundredths of a percent of the Debtor's

4  total equity.

5      And Mr. Rukavina's clients similarly have no general

6  unsecured claims against the Debtor.  Either his clients did

7  not file proofs of claim or filed claims and then agreed to

8  have them expunged.  The only claims that his clients assert

9  is a disputed administrative claim filed by NexPoint Advisors.

10     And the objections aren't legitimately concerned about the

11 post-confirmation operations of the estate, to preserve equity

12 value, how much people are getting, whether Mr. Seery is

13 really the right person to run these estates.  That's because

14 Mr. Dondero has repeatedly told the Court that he believes his

15 offer, which doesn't come close to satisfying claims in full

16 in this case, is for fair value and that creditors, who are

17 owed more than $280 million, will not receive anywhere close

18 to the amount of their claims.

19     Rather, Mr. Dondero and his entities are concerned with

20 one thing and one thing only:  how to preserve their rights to

21 continue their frivolous litigation after confirmation against

22 the independent directors, the Claimant Trustee, the

23 Litigation Trustee, the employees, the Claimant Trust

24 Oversight Board, and anyone who will stand in their way.  For

25 Mr. Dondero, the decision is binary:  Either give him what he

27

1  wants, or as he has told Mr. Seery, he will burn down the

2  place.

3      Your Honor will hear a lot of argument today about how the

4  -- and tomorrow, in closing -- about how the injunction, the

5  gatekeeper, and the exculpation provisions of the plan are not

6  appropriate under applicable law.  The Debtor, of course,

7  disagrees with these arguments, and I will address them in

8  detail in my closing argument.

9      But I do think it's important to focus the Court at the

10  outset on the January 9, 2020 order that the Court entered

11  which addressed some of these issues.  This order, which has

12  not been appealed, which was actually agreed to by Mr.

13  Dondero, has no expiration by its terms and will continue

14  post-confirmation, did some things that the Objectors just

15  refuse to recognize and accept.

16      It approved an exculpation for negligence for the

17  independent directors and their agents.  It provided that the

18  Court would be the gatekeeper to determine whether any claims

19  asserted for them -- against them for gross negligence and

20  willful misconduct could be pursued, and if so, provided that

21  this Court would have exclusive jurisdiction to adjudicate

22  those claims.  And it prevented Mr. Dondero and his related

23  entities from causing any related entity to terminate any

24  agreements with the Debtor.

25      I also note, Your Honor, that the Court's July 16, 2020

28

1  order approving Mr. Seery as chief executive officer and chief

2  restructuring officer included the same exculpation and

3  gatekeeping provision as contained in the January 29th --

4  January 9th order.

5      Your Honor, we have all come too far to allow Mr. Dondero

6  to make good on his promise to Mr. Seery to burn down the

7  place if he didn't get what he wanted.  The Debtor deserves

8  better, the creditors deserve better, and this Court deserves

9  better.

10     That concludes my opening argument, Your Honor.

11         THE COURT:  All right.  Thank you.  I had one follow-

12 up question about the Daugherty settlement.  You did not

13 mention, is it going to be reflected in the confirmation

14 order, is it going to be the subject of a 9019 motion, or

15 something else?

16         MR. POMERANTZ:  It'll be subject to a -- it'll be

17 subject to a 9019 motion, Your Honor.

18         THE COURT:  All right.

19         MR. POMERANTZ:  I apologize for leaving that out.

20         THE COURT:  All right.  Thank you.  Well, --

21         MR. KATHMAN:  Your --

22         THE COURT:  -- I appreciate that you stuck closely to

23 your 20-minute time estimate.

24     As far as other opening statements today, I'm going to

25 start with the objections that were resolved.  Mr. Kathman, I

29

1    see you there.  Who will speak on behalf of Patrick Daugherty

2    and the announced settlement?

3              OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

4              MR. KATHMAN:  Good morning, Your Honor.  Jason

5    Kathman on behalf of Mr. Daugherty.

6        Mr. Pomerantz correctly recited the bullet points of the

7    settlement that we agreed to in principle this morning.  There

8    was one that he did leave off that I do want to make sure that

9    I mention and that it's read into the record.  And he read at

10   the top end that Mr. Daugherty does maintain his ability to

11   pursue his 2008 tax refund bonus claim, or tax refund

12   compensation claim.  If the Court will recall, there's a

13   contingent liability out there based on how compensation was

14   paid back in 2008 that's the subject of an IRS audit.  And so

15   the settlement expressly contemplates that those -- that that

16   claim will be preserved and Mr. Daugherty may pursue that

17   claim.  Should the IRS have an adverse ruling and we have to

18   pay money back, we get to preserve that claim.

19       And so the one thing that is preserved, Your Honor -- and

20   the same way that Mr. Pomerantz read verbatim the words, I'm

21   going to read verbatim the words that we've agreed to:

22   Daugherty maintains and may pursue the 2008 tax refund

23   compensation portion of his claim that is currently a disputed

24   contingent liability.  The Debtor and all successors reserve

25   the right to assert any and all defenses to this portion of

30

1  the Daugherty claim.  The litigation of this claim shall be

2  stayed until the IRS makes a final determination, provided,

3  however, Daugherty may file a motion with the Bankruptcy Court

4  seeking to have the amount of his tax claim determined for

5  reservation purposes as a "disputed claim" under the Debtor's

6  plan.  The Debtor and all successors reserve the right to

7  assert any and all defenses to any such motion.

8      So the Debtor's plan says that they can make estimations

9  for disputed claims.  There is not currently something

10  reserving this particular claim, so we wanted to make sure we

11  reserve our rights to be able to have that amount reserved

12  under the Debtor's plan.  And the Debtor obviously preserves

13  their ability to object to that.

14      With that, Your Honor, it is going to be papered up in a

15  9019, and we'll have some further things to say at the 9019

16  hearing, but didn't want to derail the Debtor's confirmation

17  hearing this morning.

18          THE COURT:  All right.  And --

19          MR. POMERANTZ:  And Mr. Kathman is -- Mr. Kathman is

20  correct.  I neglected to mention that provision, but he is --

21  he read it, and that's agreed to.

22          THE COURT:  All right.  And I did not hear anything

23  about Mr. Daugherty's vote on the plan.  Is there an agreement

24  to change or a motion to change the vote from no to yes?

25          MR. KATHMAN:  Your Honor, that wasn't, I think,

31

1   directly -- and Mr. Pomerantz can correct me if I'm wrong, or

2   Mr. Morris, actually, probably more could -- that wasn't

3   directly addressed, but I think the answer to that is probably

4   they don't need our vote.

5           THE COURT:  Okay.

6           MR. KATHMAN:  I think they have enough votes in that

7   class to carry.

8           THE COURT:  Okay.

9           MR. KATHMAN:  But the answer directly is that that

10  wasn't specifically addressed one way or the other.

11          THE COURT:  All right.

12          MR. POMERANTZ:  That is correct, Your Honor.  We

13  would, of course, not oppose Mr. Daugherty changing his vote,

14  but as Your Honor saw in the ballot summary, we are way over

15  the amount in dollar amounts of claims.  But if they wanted to

16  change their vote, we wouldn't oppose.

17          THE COURT:  All right.  Well, --

18          MR. KATHMAN:  Your Honor, I have -- I have the

19  benefit of Mr. Daugherty.  He is on -- I should note, Mr.

20  Daugherty is on the hearing this morning.  He just let me know

21  that he is willing to change his vote.  If the Debtor were to

22  so make a motion, we're fine changing our vote to in favor of

23  the plan.

24          THE COURT:  All right.  All right.  Well, we'll get

25  the ballot agent declaration or testimony later.  At one time

32

1    when I had checked, there was a numerosity problem but not a

2    dollar amount problem.  And it sounds like that is no longer

3    an issue, perhaps because of the employee votes, or I don't

4    know.

5        But, all right.  Well, thank you.

6             MR. POMERANTZ:  Your Honor, there is still a

7    numerosity problem.

8             THE COURT:  Okay.

9             MR. POMERANTZ:  There's not a dollar amount problem.

10            THE COURT:  Okay.

11            MR. POMERANTZ:  But we'll address that and cram-down

12   in closing.

13            THE COURT:  All right.  Very good.

14        All right.  Well, I want to hear from the -- what we've

15   called the Senior Employee group.  Is Ms. Dandeneau going to

16   confirm the announcement of Mr. Pomerantz?

17            MS. DANDENEAU:  Yes, Your Honor.  I confirm that Mr.

18   Pomerantz's recitation of the terms to which we've agreed is

19   accurate.

20            THE COURT:  All right.  Very good.

21        All right.  I suppose I should circle back to UBS.  We've,

22   of course, heard in prior hearings the past few weeks that

23   there was a settlement with UBS, but Mr. Clubok, could I get

24   you to confirm what Mr. Pomerantz announced earlier about the

25   UBS settlement?

33

1          MR. CLUBOK:  Yes.  Good morning again, Your Honor.

2      Yes, we have reached a settlement, and it's just -- and

3   it's been approved internally at UBS and obviously by the

4   Debtor.  It's just subject to the final documentation.  And we

5   are working very closely with the Debtor to try to do that as

6   quickly as possible.

7          THE COURT:  All right.  Thank you.

8      All right.  Well, let me go, then, to other opening

9   statements.  Is there anyone else who at this time wishes to

10  make an opening statement?  And, you know, for the pending

11  objectors, please, no more than 20 minutes.

12         MR. CLEMENTE:  Your Honor?  Your Honor, if I may,

13  it's Matt Clemente on behalf of the Committee.

14         THE COURT:  Okay.

15         MR. CLEMENTE:  I'd be very brief, but I would like to

16  make some remarks to Your Honor.  It'll be less than five

17  minutes.

18         THE COURT:  All right.  Go ahead.

19         MR. CLEMENTE:  Thank you, Your Honor.

20  OPENING STATEMENT ON BEHALF OF THE UNSECURED CREDITORS' COMMITTEE

21         MR. CLEMENTE:  Again, for the record, Matt Clemente;

22  Sidley Austin; on behalf of the Official Committee of

23  Unsecured Creditors.

24      Your Honor, to be clear, the Committee fully supports

25  confirmation of the Debtor's plan and believes the plan is

34

1  confirmable and should be confirmed.

2      Although it has taken us quite some time to get to this

3  point, Your Honor, and as Mr. Pomerantz referred, the Debtor's

4  business is somewhat complex, the plan is remarkably

5  straightforward, Your Honor, and has only been made

6  complicated by the various objections filed by Mr. Dondero's

7  tentacles.

8      At bottom, Your Honor, the plan is designed to recognize

9  the reality of the situation that the Committee has

10  continually been expressing to Your Honor, and that is the

11  overwhelming amount of creditors in terms of dollars are

12  litigation creditors, creditors who are here entirely because

13  of the fraudulent and other conduct of Mr. Dondero and his

14  tentacles.

15      The other third-party creditors, Your Honor, by and large

16  are those collateral to these litigation claims in terms of

17  true trade creditors and service providers.

18      Recognizing this fact, Your Honor, the plan contains an

19  appropriate convenience class, which, in the Committee's view,

20  provides a fair way to capture a large number of claims and

21  appropriately recognizes the distinction between those claims

22  and the large litigation claims.  And the holders of these

23  large litigation claims, including now Mr. Daugherty, have

24  voted in favor of allowing this convenience class treatment.

25      Your Honor, after distributions are made to the

35

1 administrative creditors, the priority creditors, the secured

2 creditors, and the convenience creditors, the remainder goes

3 to general unsecured creditors who will control how this value

4 is realized. These are the large litigation creditors.

5     Additionally, Your Honor, recognizing the possibility of

6 recovery in excess of general unsecured claims plus interest,

7 and to thwart, from the Committee's perspective, what would

8 have undoubtedly been an argument by one of the Dondero

9 tentacles that the general unsecured creditors could be paid

10 more than they are owed, the plan provides for a contingent

11 interest to kick in after payment in full for interests of all

12 prior claims.

13     Your Honor, this is the sum and substance of the plan. At

14 bottom, fairly straightforward. And the true creditors, Your

15 Honor, have voted overwhelmingly in favor of the plan. Class

16 8 has voted to support the plan. Class 7 has voted to accept

17 the plan. And now I believe, with Mr. Daugherty's settlement,

18 one hundred percent in amount of Class 8, non-insider, non-

19 Dondero-controlled or (audio gap) have voted in favor of the

20 plan.

21     To be clear, as Your Honor pointed out and as Mr.

22 Pomerantz referenced, there is not numerosity in Class 8, Your

23 Honor, but that is driven, as Your Honor will see, from

24 approximately 30 no-votes of current employees who the

25 Committee believes are not owed any amounts and therefore they

36

1  will not be receiving payments under the plan, yet they voted

2  against the plan.  So although we have a technical cram-down

3  plan from the Class 8 perspective, Your Honor, the plan voting

4  reflects the reality that the economic parties in interest

5  overwhelmingly support the plan.

6      So, Your Honor, cutting through the machinations of the

7  Dondero tentacles, we do have a fairly straightforward plan

8  and a plan that the Committee believes is confirmable and

9  should be confirmed.

10     Your Honor, since I've been in front of you for over a

11  year now, I've referred to the goals of the Committee in this

12  case, and the goals are straightforward in terms of expressing

13  them but can be difficult in reality to implement them.  The

14  Committee's goals have been two-fold:  to maximize the value

15  of the estate and therefore the recoveries for its

16  constituency, and to disentangle from the Dondero (audio gap).

17     As with all things Highland, although these goals are

18  straightforward, they're remarkably difficult to achieve,

19  given the Dondero tentacles.  However, the Committee strongly

20  believes the plan achieves these two goals.

21     First, the plan provides a credible path to maximize

22  recovery with Mr. Seery, who has gotten to know the assets and

23  who has performed skillfully and credibly throughout this very

24  difficult process.  It is a difficult set of assets and

25  complex set of assets, as Your Honor knows very well.

37

1    To be sure, there is uncertainty associated with the

2 Debtor's projections, but that is inherent in the nature of

3 the assets of the Debtor, and frankly, is inherent in the

4 nature of projections themselves. And Mr. Dondero and his

5 tentacles will point to the downside, potentially, in those

6 projections, but the Court will be reminded that there is also

7 potential upside in those projections, an upside that would

8 inure to the benefit of the general unsecured claims.

9    Second, Your Honor, although it is seemingly impossible to

10 free yourself from the Dondero web until every single one of

11 the 2,000 barbed tentacles is painfully removed, if that's

12 even possible, Your Honor, the Reorganized Debtor, the

13 Claimant Trust, the Claimant Trustee, the Litigation Sub-

14 Trust, the Litigation Trustee, and the Oversight Board

15 construct and mechanisms is a structure that the Committee

16 believes provides the creditors with the best possibility to

17 do so, and that is to deal with what will undoubtedly be a

18 flurry of attacks from Mr. Dondero and his tentacles.

19    This is a virtual certainty, Your Honor. The creditors

20 have seen this movie before and Your Honor has seen this movie

21 before. They have seen Mr. Dondero make and break promises.

22 They have seen Mr. Dondero attempt to bludgeon adversaries

23 into submission in order to accept his offerings, and they

24 have heard Mr. Dondero say that which he has said in this

25 court during the preliminary injunction hearing --

38

1   specifically, that the Debtor's plan "is going to end up in a

2   myriad of litigation."

3       The creditors are steeled in their will to be rid of Mr.

4   Dondero, and they're confident in this structure to do so.

5       To be clear, Your Honor, what is before the Court today

6   for confirmation is the Debtor's plan, not some other plan

7   that no one supports other than Mr. Dondero and his tentacles.

8   The question isn't whether Mr. Dondero has a better proposal

9   -- and footnote, Your Honor, the answer is he does not, both

10  from a qualitative and quantitative perspective -- but whether

11  the plan before the Court is in the best interest of creditors

12  and should be confirmed.  The Committee strongly believes it

13  is, and should, and all the Committee members support

14  confirmation of the Debtor's plan.

15      Recognizing Mr. Dondero's behavior, Your Honor, and

16  threats regarding how he will behave in the future, there are

17  certain provisions in the plan that are of critical importance

18  to the creditors.  Of course, all provisions in the plan are

19  extremely important, Your Honor, but as Mr. Pomerantz

20  referenced, the creditors need the gatekeeper, exculpation,

21  and injunction provisions.

22      The reason is obvious, and is emphasized by the

23  supplemental objection filed just yesterday by some of Mr.

24  Dondero's tentacles -- namely, the Dugaboy and the Get Good

25  Trusts.  And I quote, Your Honor:  "It is virtually certain

39

1  that, under the Debtor's plan, there will be years of

2  litigation in multiple adversary proceedings, appeals, and

3  collection activities, all adding substantial uncertainty and

4  delay."

5      Additionally, Your Honor has seen from the proceedings in

6  this case and has expressed frustration at numerous times at

7  the myriad and at times baseless and borderline frivolous and

8  out of touch with reality suits and objections and proceedings

9  that the Dondero tentacles bring.  The creditors need the

10  gatekeeper, exculpation, and injunction provisions to preserve

11  and protect value.  And the record, I think, to this point is

12  clear, and will be further made clear through the confirmation

13  proceedings, that the protections are appropriate and entirely

14  within this Court's authority to grant.

15      In sum, Your Honor, the Committee fully supports

16  confirmation of the plan.  The Committee believes it is

17  confirmable and should be confirmed, and two classes of

18  creditors and the overwhelming amount of creditors in terms of

19  dollars agree.

20      That's it, Your Honor.  Unless you have questions for me,

21  I have nothing further at this time.

22          THE COURT:  All right.  Thank you, Mr. Clemente.

23          MR. CLEMENTE:  Thank you, Your Honor.

24          THE COURT:  All right.  Who else wishes to be heard?

25          MR. DRAPER:  Your Honor, this is Douglas Draper.  I'd

40

1  like to be heard.  I have a few -- I'll take five minutes, at

2  most --

3          THE COURT:  All right.  Go ahead.

4          MR. DRAPER:  -- and just focus on a few things.

5  OPENING STATEMENT ON BEHALF OF THE GET GOOD TRUST AND DUGABOY

6                    INVESTMENT TRUST

7          MR. DRAPER:  I'm going to focus my opening remarks on

8  the releases, the exculpations, and channeling injunctions in

9  the plan.  I'm not waiving my other objections, but, rather,

10  trying not to subject the Court to hearing the same argument

11  from multiple lawyers.

12    The good thing about the law is that it's absolute in

13  certain respects.  It does not matter who is asserting a legal

14  protection, the law applies it.  For example, a serial killer

15  is entitled to a *Miranda* warning and a protection against

16  unlawful search and seizure.  The law does not allow tainted

17  evidence or an unlawful admission into evidence,

18  notwithstanding the fact that the lack of admission of that

19  evidence may lead to the freeing of that serial killer.

20    Today, you must make an independent evaluation as to

21  whether the plan complies with 1129 and applicable law.  The

22  decision must be made notwithstanding the fact that it is

23  being made by a Dondero entity.  It's not being -- it must be

24  applied notwithstanding the fact that it's being made by me.

25    We contend that the plan does not meet the hurdle and

41

1   confirmation should be denied, notwithstanding the fact that

2   the infirmity with the plan is asserted by me and

3   notwithstanding the fact that Mr. Pomerantz and the unsecured

4   creditors have overwhelming support.

5       We all know 1141, the Barton Doctrine, and 544 -- 524

6   provide injunctions and protections for certain parties

7   associated with the Debtor.  Had the plan merely referenced

8   these sections and stated that the injunction, et cetera,

9   shall not exceed those allowed pursuant to *Pacific Lumber*, I

10  would not be making this argument.

11      Instead, we see a plan that has a definition of Exculpated

12  Parties, Released Parties, Related Parties, that exceed the

13  protections afforded by the Bankruptcy Code, the Barton

14  Doctrine, and 524.

15      We have a grant of jurisdiction and oversight that exceeds

16  that allowed under *Craig's Store*, the *Craig's Store* line of

17  cases.

18      We have releases of claims against non-debtor parties,

19  such as Strand, who is, under the Bankruptcy Code, under 723,

20  liable for the debts of the Debtor.

21      The plan, with its expansive releases, released parties,

22  grant of injunctions, exculpations and channeling injunctions,

23  are impermissible under Fifth Circuit case law.  And I would

24  ask the Court to look closely at those definitions, who is --

25  who the law allows to be exculpated and released and who the

42

1  law specifically prohibits being exculpated and released, and,

2  in fact, apply the *Pacific Lumber* line of -- case, as well as

3  524 and the Bankruptcy Code when you look at these issues.

4      Notwithstanding the overwhelming so-called support by the

5  creditors at issue, the law must be applied, and it must be

6  applied pursuant to what the Fifth Circuit requires.

7          THE COURT:  All right.  Thank you, Mr. Draper.

8      Other Objectors with opening statements?

9          MR. RUKAVINA:  Your Honor, Davor Rukavina.  Briefly?

10          THE COURT:  Okay.

11    OPENING STATEMENT ON BEHALF OF CERTAIN FUNDS AND ADVISORS

12          MR. RUKAVINA:  Your Honor, I represent various funds,

13  including three of which have independent boards.  The Debtor

14  manages more than $140 million of those funds, and the Debtor

15  manages around a billion dollars in CLOs.

16      Whether I am a tentacle of Mr. Dondero or not -- I'm not,

17  since there's an independent board -- the fact remains that

18  the Debtor wants to manage these assets and my clients' money

19  post-assumption and post-confirmation with effective judicial

20  immunity.  So our fundamental problem with this plan is the

21  assumption of those contracts under 365(c) and (b).  I think

22  we'll have to wait for the evidence to see what the Debtor

23  proposes and has, and I will reserve, I guess, the balance of

24  my arguments on that to closing, depending on what the

25  evidence is.

43

1     But I don't want the Court to lose sight of the fact that

2  what the Debtor wants to do is, in contravention of our

3  desires, continue managing our assets post-confirmation, even

4  as it liquidates, just to make a buck.  It's our money, Your

5  Honor, and whether we're Dondero or not, we're a couple

6  hundred million, probably, or more, of third-party investment

7  professionals, pension funds, et cetera, and we should not be

8  all tainted without evidence as a tentacle of someone whom,

9  I'll remind everyone here, built a multi-billion dollar

10 company and made a lot of money for people.

11     The second objection, Your Honor, goes to the Class 8

12 rejection.  It sounds like there's still a problem with the

13 number of creditors, even though certain creditors have

14 switched their votes.  That raises now the fair and equitable

15 standard, together with the undue discrimination and the

16 absolute priority rule.  I think we'll have to let the

17 evidence play out, and I'll reserve the balance of my closing

18 or the balance of my remarks to closing on that issue.

19     The third issue, Your Honor, is the same exculpation and

20 release and injunction provisions that Mr. Draper raised.

21 Those are legal matters that I'll discuss at closing, but I do

22 note that the Debtor purports to prevent my clients from

23 exercising post-assumption post-confirmation rights, period.

24 And that's just inappropriate, because if the Debtor wants the

25 benefits of these agreements, well, then of course it has to

44

1  comply with the burdens.  And to say *a priori* that anything

2  that my clients might do post-confirmation would be the result

3  of a bad-faith Mr. Dondero strategy, there's no basis for that

4  and that's not the basis on which my clients' rights in the

5  future, when there is no bankruptcy estate and there is no

6  bankruptcy jurisdiction, can be enjoined.

7      And the final point, Your Honor, entails this channeling

8  injunction.  I'll talk about it during closing.  It is

9  inappropriate under 28 U.S.C. 959.  This is not a Barton

10  Doctrine trustee issue, this is a debtor-in-possession, and a

11  channeling injunction, the Court will have no jurisdiction

12  post-confirmation.

13      Thank you, Your Honor.

14          THE COURT:  All right.  Thank you.

15      Does Mr. Dondero's counsel have an opening statement?

16          MR. TAYLOR:  I do, Your Honor.  I'll keep it brief.

17  This is Clay Taylor on behalf of Mr. Dondero.

18          THE COURT:  Okay.

19          OPENING STATEMENT ON BEHALF OF JAMES D. DONDERO

20          MR. TAYLOR:  Your Honor, the plan is clear in some

21  respects, and I'm not going to belabor these points, as other

22  objecting counsel have already addressed this.  But the plan

23  does provide for non-debtor releases, and it provides for non-

24  debtor releases for parties beyond that which is allowed by

25  *Pacific Lumber* and under the Code.

45

1    It also provides for exculpations of non-debtor parties in

2    excess of that which is allowed under the Code and applicable

3    case law.

4    Finally -- or, not finally, but third, it requires this

5    Court to keep a broad retention of post-confirmation

6    jurisdiction that could go on for years, and that is improper.

7    Finally, it requires the parties to submit to the

8    jurisdiction of this Court via a channeling injunction, which

9    we believe is beyond that which is allowed under applicable

10   Fifth Circuit precedent.

11   What is clear, what the evidence will show -- and I

12   thought it was interesting that none of the proponents of plan

13   confirmation ever talk about what the evidence is going to

14   show.  They testified a lot before Your Honor, but they didn't

15   ever talk about what the evidence would show.  What the

16   evidence will show is this plan was solicited via a disclosure

17   statement that told all the unsecured creditors, we project

18   that you're going to receive 87 cents on the dollar on your

19   claim.

20   About two months later, and this was Friday of this past

21   week, they changed those projections, and those projections

22   then showed unsecured creditors, under a plan analysis, that

23   they were going to receive 62 cents on the dollar.  That is in

24   contrast to the liquidation analysis that had been prepared

25   just two months prior showing that, under a hypothetical

46

1   Chapter 7 liquidation analysis, that the unsecured creditors

2   would receive 65 cents on the dollar.  Obviously, 62 cents is

3   less than 65 percent.

4        Realizing they had a problem, I guess, over the weekend,

5   they changed last night, the night before confirmation, and

6   sent us some new projections that now show that the unsecured

7   creditors under a plan would receive 71 cents on the dollar.

8        Your Honor, what the evidence will show, and it is

9   Highland's burden to show this, is that -- that they meet the

10  best interests of the creditors.  And part of that is that

11  they will do better under a plan rather than under a

12  hypothetical Chapter 7.

13       Quite simply, they don't have the evidence, nor have they

14  done the analysis to be able to prove that to this Court.

15       What the evidence will also show is clear is that Mr.

16  Seery, under the plan analysis, is scheduled to receive at

17  least $3.6 million over just the first two years of this plan

18  if it doesn't go any further.  And that's just for monthly

19  payouts of $150,000 per month.  That's not including a to-be-

20  agreed-upon success fee structure, which hasn't been

21  negotiated yet.  And if it hasn't been negotiated yet, it

22  can't be analyzed yet to see if those costs would exceed their

23  benefits and therefore drive the return down such that a

24  hypothetical Chapter 7 trustee could do better.

25       There is also going to be additional costs for the

47

1   Litigation Trustee and the fees that they are going to charge.

2   There's going to be an Oversight Committee, and those fees are

3   also to be negotiated.  There's also U.S. Trustee fees, which

4   Mr. Seery tells us that he has calculated within the

5   liquidation and plan analysis numbers, albeit both myself and

6   Mr. Draper, as the evidence will show, have asked for the

7   rollups that come behind the liquidation and plan analysis in

8   each instance of the three iterations that have been done in

9   two months, and we have been denied that information.  That

10  evidence is not going to come in before this Court, and

11  without that rollup information, this Court can't make an

12  independent verification that this meets the best interests of

13  the creditor and better than a hypothetical Chapter 7 trustee.

14      What the evidence will also show, make an assumption that,

15  under a plan analysis, that Mr. Seery will be able to generate

16  higher returns on the sale of the assets of the Highland

17  debtor and its subsidiaries, to the neighborhood of $60

18  million higher.  There is no independent verification of this.

19  There has been no due diligence done.  It was merely an

20  assumption done by Mr. Seery and his advisors, and we submit

21  that they will not have the evidence to show that they can

22  beat a Chapter 7 trustee.

23      This Court does have an alternative before it.  There is

24  an alternative plan that has been filed under seal.  The Court

25  is aware of it.  And it guarantees that creditors will receive

48

1  at least 65 cents on the dollar. Moreover, those claims are

2  guaranteed -- and they're going to be secured that they will

3  be paid that money.

4      MR. POMERANTZ: Your Honor, this is under -- this is

5  under seal. And I never interrupt somebody's argument, but

6  this plan is under seal for a reason, Your Honor, and I object

7  to any description of the terms of a plan that's not before

8  Your Honor and is under seal.

9      THE COURT: Okay. I sustain that objection.

10     MR. TAYLOR: Your Honor has a means to cut the

11 Gordian knot of the litigation and appeals before it and to

12 ensure that there is certainty for creditors. It would

13 massively reduce the administrative fee burn that is

14 contemplated under the proposed plan before the Court. As

15 I've mentioned, it's at least $3.6 million just in monthly

16 fees for Mr. Seery alone. All of the rest of the fees are yet

17 to be determined and to be negotiated. I don't see how any

18 analysis could have been done regarding the administrative fee

19 burn that is going to happen over the two years and

20 potentially much further as this case draws on.

21   For those reasons alone, Your Honor, we believe that the

22 plan confirmation should be denied and this Court should look

23 at the alternatives before it.

24     MR. KATHMAN: Can I say something before --

25     MR. TAYLOR: Thank you, Your Honor.

49

1          THE COURT:  All right.  Thank you.

2      All right.  Have I missed any Objectors?

3          MR. KATHMAN:  Your Honor?

4          MS. DRAWHORN:  Yes, Your Honor.

5          THE COURT:  Okay.  Ms. --

6          MR. KATHMAN:  Your Honor, if I could spend just one

7  minute, and I -- we -- I -- we filed a joinder on behalf of

8  Mr. -- or, Jason Kathman on behalf of Davis Deadman, Todd

9  Travers, and Paul Kauffman.

10          THE COURT:  Uh-huh.

11    OPENING STATEMENT ON BEHALF OF DAVIS DEADMAN, TODD TRAVERS,

12                     AND PAUL KAUFFMAN

13          MR. KATHMAN:  Mr. Pomerantz had noted, I think, at

14  the front end that the Debtor amended their plan that resolved

15  those objections.  I just want to say for the record that

16  those had been resolved.

17      And with that, Your Honor, may I be dismissed?

18          THE COURT:  Yes, you may.  Thank you.

19          MR. KATHMAN:  Thank you, Your Honor.

20          THE COURT:  All right.  Was Ms. Drawhorn speaking up

21  to make an opening statement?

22          MS. DRAWHORN:  Yes.

23          THE COURT:  Go ahead.

24          MS. DRAWHORN:  Yes, Your Honor.

25          THE COURT:  Go ahead.

50

1      OPENING STATEMENT ON BEHALF OF THE NEXPOINT PARTIES

2          MS. DRAWHORN:  Just very briefly, Lauren Drawhorn on

3   behalf of NexPoint Real Estate Partners, the NexPoint Real

4   Estate entities, and NexBank.

5      Just a very brief opening.  Just wanted to note that it

6   seems that the Debtor's and the Committee's position seems to

7   be if there's some way, any way, to connect an entity to Mr.

8   Dondero, then they don't need to perform any true evaluation

9   of potential claims or that party's rights or their concerns,

10   and that results in ignoring not only the merits of many

11   claims but also the basic requirements of due process and the

12   statutes, the Bankruptcy Code, and the case law.

13      We filed objections that were focused largely on the

14   injunctions and the releases, and then also the proposed

15   subordination provisions.

16      Two of my clients, one of them has a proof of claim, and

17   while it is being disputed, that claim is out there and should

18   get -- be entitled to be pursued and defended, and many of the

19   injunctions appear to prevent my client from doing so.

20      Similarly, it was mentioned that NexBank, in the

21   demonstrative, had a terminated service agreement, but there's

22   periods of time for which no services were provided but

23   payment was made, and that's a potential admin claim that has

24   been raised.  And the injunction, again, appears to prevent my

25   clients from pursuing these claims.

51

1    So I think, despite the general response to any connection

2  to Dondero means there's no merit, that's not what we're here

3  for today.  We need to really look at the merits of all

4  potential claims and all -- the rights of all parties and the

5  -- how the injunction and release provisions prevent that and

6  how they don't comply with the required law.

7    And, of course, we join in with many of the other

8  objections, but that's my main point for the opening today.

9         THE COURT:  All right.  Thank you.

10    All right.  I think I have covered all of the at least

11  pending objections except the U.S. Trustee.  I'll check again

12  to see if someone is out there for the U.S. Trustee.  (No

13  response.)  All right.  If you're there, we're not hearing

14  you.  You're on mute.

15    Okay.  Any other attorneys out there who wish to make an

16  opening statement?

17    All right.  Well, I'll turn back to Mr. Pomerantz.  You

18  may call your first witness.

19         MR. POMERANTZ:  Okay.  I will turn the virtual podium

20  over to my partner, John Morris, who will be putting on our

21  witnesses.

22         THE COURT:  All right.  Mr. Morris, you may call your

23  first witness.

24         MR. MORRIS:  Good morning, Your Honor.  John Morris

25  from Pachulski Stang Ziehl & Jones on behalf of the Debtor.

52

1  Can you hear me okay?

2          THE COURT:  I can.

3          MR. MORRIS:  Okay.  Thank you very much.

4      The Debtor calls James Seery as its first witness.

5          THE COURT:  All right.  Mr. Seery, if you could say,

6  "Testing, one, two," please.

7          MR. SEERY:  Testing, one, two.

8          THE COURT:  All right.  Hmm, I've not picked up your

9  video yet.  Let's try it again.

10         MR. SEERY:  Testing, one, two.  Testing.

11         MR. MORRIS:  We have the audio.

12         THE COURT:  We have the audio.

13         MR. SEERY:  Oh.

14         MR. MORRIS:  There we go.

15         THE COURT:  There you are.

16         MR. SEERY:  The video should be working.

17         THE COURT:  All right.

18         MR. POMERANTZ:  Yeah.  Actually, one -- Your Honor,

19 one thing before we start.  We have Patrick Leatham from KCC.

20 He is prepared to sit on the line for the whole day until his

21 time comes.  I would just like to know if anyone intends to

22 cross-examine him or object to his declaration.  Because if

23 they don't, we could excuse Mr. Leatham.

24         THE COURT:  All right.  What about that?  Anyone

25 want to cross-examine the balloting agent?

53

1          MR. RUKAVINA:  Your Honor, Davor Rukavina.  I do not.

2    If the Debtor would just state, with the change of votes in

3    Class 8, what the final tally is, I see no reason to dispute

4    that, and then we can dismiss this gentleman.  But I do think

5    that we should all know, with the change of votes, what it now

6    is.

7          THE COURT:  All right.

8          MR. POMERANTZ:  We will -- we will work on that, Your

9    Honor, with the changes as a result of the settlements today,

10   and including Mr. Daugherty's client.  We can get that

11   information sometime today.

12         THE COURT:  All right.  So, Mr. Rukavina, do you

13   agree that he can be excused with that representation, or do

14   you want --

15         MR. RUKAVINA:  Yes, Your Honor.

16         THE COURT:  Okay.  All right.  So, it's Mr. Leatham?

17   You are excused if you want to drop off this video.

18      All right.  Mr. Seery, please raise your right hand.

19          JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

20         THE COURT:  All right.  Thank you.  Mr. Morris, go

21   ahead.

22         MR. MORRIS:  Thank you, Your Honor.

23      If I may, I'd like to just begin by moving my exhibits

24   into evidence so that it'll make this all go a little bit

25   smoother.

54

1          THE COURT:  All right.

2          MR. MORRIS:  And if you'll indulge me just a little

3   patience, please, because the Debtor's exhibits are found in

4   three separate places.

5          THE COURT:  Uh-huh.

6          MR. MORRIS:  And I would just take them one at a

7   time.

8      First, at Docket No. 1822, the Court will find Debtor's

9   Exhibits A through what I'm referring to as 6Z.  Six Zs.  So

10  the Debtor respectfully moves into evidence Exhibits A through

11  6Z on Docket No. 1822.

12         THE COURT:  All right.  Are there any objections?

13         MR. RUKAVINA:  Your Honor, I have a number of

14  targeted objections to all of the exhibits.  Did I hear Mr.

15  Morris say 6Z?

16         THE COURT:  Yes.

17         MR. MORRIS:  Yes.

18         MR. RUKAVINA:  Or six -- then, Your Honor, I can go

19  through my limited objections, if that pleases the Court.

20         THE COURT:  All right.  Go ahead.

21         MR. RUKAVINA:  Your Honor, Exhibit B, a transcript, B

22  as in boy.  Exhibit D, an email, D as in dog.  Exhibit E as in

23  Edward.  Moving on, Your Honor, 4D as in dog.  4E as in

24  Edward.

25         MR. MORRIS:  Slow down, please.

55

1          THE COURT: Okay.

2          MR. RUKAVINA: I'm sorry.

3          THE COURT: You said 4D as in dog, correct?

4          MR. RUKAVINA: Then -- yes, Your Honor. Then 4E as

5  in Edward.

6          THE COURT: Okay.

7          MR. RUKAVINA: 4G as in George. Your Honor, one,

8  two, three, four, five T. 5T as in Tom. And then, Your

9  Honor, one, two -- 6R. 6S. 6T as in Tom. And 6U as in

10  under. That's it.

11          THE COURT: All right. Well, Mr. Morris, do you want

12  to carve those out for now and just offer them the old-

13  fashioned way and I can rule on the objections then?

14          MR. MORRIS: Why don't we do that? I may just deal

15  with it at the end of the case. But subject to those

16  objections, the Debtor then moves into evidence the balance of

17  the exhibits on Docket 1822.

18          THE COURT: All right. So, for the record, the Court

19  will admit all exhibits at Docket No. 1822 at this time except

20  B, D, E, 4D, 4E, 4G, 5T, 6R, 6S, 6T, and 6U.

21      (Debtor's Docket 1822 exhibits, exclusive of Exhibits B,

22  D, E, 4D, 4E, 4G, 5T, 6R, 6S, 6T, and 6U, are received into

23  evidence.)

24          THE COURT: All right. Mr. Morris, continue.

25          MR. MORRIS: Thank you, Your Honor.

56

1      Next, at Docket 1866, you'll find Debtor's Exhibits 7A

2  through 7E, and the Debtor respectfully moves those dockets --

3  documents into evidence.

4           THE COURT:  All right.  Any objection?  (No

5  response.)  Are there any objections?

6           MR. RUKAVINA:  Your Honor, not from -- not from me.

7           THE COURT:  All right.  Hearing no objections, the

8  Court will admit all Debtor exhibits appearing at Docket Entry

9  No. 1866.

10           MR. MORRIS:  Thank you, Your Honor.

11      (Debtor's Docket 1866 exhibits are received into

12  evidence.)

13           MR. MORRIS:  And finally, at Docket 1877, the Court

14  will find Debtor's Exhibits 7F through 7Q, and the Debtor

15  respectfully moves for the admission of those documents into

16  evidence.

17           THE COURT:  All right.  Any objection?

18           MR. RUKAVINA:  Your Honor, I might have to talk about

19  this with Mr. Morris, but I have 7F as any document entered in

20  the case, 7G as any document to be filed, et cetera.  Mr.

21  Morris, am I wrong about that?

22           MR. MORRIS:  I don't have that list in front of me.

23  So I'll reserve on those documents and we can talk about them

24  at a break, Your Honor.

25           THE COURT:  All right.

57

1          MR. DRAPER:  Your Honor, this is Douglas Draper.  I

2   object, and I don't have the number in front of me, it's the

3   liquidation analysis and the plan summary.  It's a summary

4   exhibit, and we've not been given the underlying documentation

5   with respect to them.  I'd ask Mr. Morris to deal with that

6   separately also.

7          MR. MORRIS:  All right.  Well, we're certainly going

8   to be moving that into evidence, so we can deal with that at

9   the time, Your Honor.

10          THE COURT:  Okay.  Which documents are they?  Which

11   exhibits are those?

12          MR. DRAPER:  I don't have the number in front -- Mr.

13   Morris, do you have the number for that exhibit?

14          MR. MORRIS:  I do, but why don't we just deal with it

15   when I -- when I get into --

16          THE COURT:  Okay.

17          MR. MORRIS:  -- into the testimony?

18          THE COURT:  I just wanted the record clear what I am

19   admitting at this time at Docket Entry No. 1877.  Or do you

20   want to just --

21          MR. MORRIS:  Okay.

22          THE COURT:  -- hold all those --

23          MR. MORRIS:  Mr. Rukavina, other than F and G, which

24   you noted, is there any objection to any of the other

25   documents on that witness and exhibit list?

Seery - Direct                                    58

1          MR. RUKAVINA:  Well, I also have H as impeachment/

2    rebuttal, I as any document offered by any other party.  So I

3    would suggest, Mr. Morris, that I have my associate confirm

4    that I have the right -- the right stuff here, and we can take

5    it up maybe during a break.  But I have F, G, H, I as so-

6    called catchalls, not any discrete exhibits.

7          MR. MORRIS:  All right.  All right, Your Honor.

8    Let's, let's just proceed.  We've got -- we took care of

9    Docket No. 1822 and 1866, and the balance we'll deal with at a

10   break, --

11         THE COURT:  All right.

12         MR. MORRIS:  -- unless they come up through

13   testimony.

14         THE COURT:  All right.  That sounds good.

15         MR. MORRIS:  Okay.  Thank you very much.  May I

16   proceed?

17         THE COURT:  You may.

18         MR. MORRIS:  Okay.

19                         DIRECT EXAMINATION

20   BY MR. MORRIS:

21   Q    Good morning, Mr. Seery.

22   A    (no response)

23   Q    Can you hear me?

24   A    Apologies.  I went on mute.  Can you hear me now?  I

25   apologize.

Seery - Direct                           59

1  Q   Yes.  Good morning.

2          MR. MORRIS:  So, let's begin, Your Honor, with just a

3  little bit of background of Mr. Seery and how he got involved

4  in the case.

5  BY MR. MORRIS:

6  Q   Mr. Seery, what's your current position with the Debtor?

7  A   I am the CEO, the CRO -- the chief restructuring officer

8  -- as well as an independent director on the Strand Advisors

9  board of directors.

10  Q   Okay.

11          MR. MORRIS:  Your Honor, I'm going to ask Mr. Seery

12  to describe a bit for his background.  For the record, you'll

13  find that Exhibits 6X, 6Y, and 6Z, on the Debtor's exhibit

14  list at Docket 1822, the resumes and *C.V.s* of the three

15  independent members of the board.  If Your Honor has any

16  question about their qualifications and their experience, that

17  evidence is already in the record.

18          THE COURT:  Okay.

19  BY MR. MORRIS:

20  Q   But Mr. Seery, without going into the detail of everything

21  that's on your *C.V.*, can you just describe for the Court

22  generally your professional background, starting, well, with

23  your time as a lawyer?

24  A   I've been involved in the restructuring, finance,

25  investing and managing of assets and banking-type assets for

Seery - Direct                         60

1   over 30 years.

2       I began in restructuring in real estate.  Became a lawyer,

3   and was a lawyer in private practice dealing with

4   restructuring and finance for approximately ten years, in

5   addition to time before that on the real estate side.

6       I joined Lehman Brothers on the business side in 1999,

7   where I immediately began working on the -- with a distress

8   team as a team member investing off the balance sheet, Lehman

9   Brothers assets in various types of distressed financing

10  investments.  Bonds, loans, equities.  In addition, then I

11  became the head of Lehman's loan business globally.  I ran

12  that business for the number of years.  Was one of the key

13  players in selling Lehman Brothers to Barclays in a very

14  difficult situation and structure.

15      After that, joined some of my partners, we formed a hedge

16  fund called RiverBirch Capital, about a billion and a half

17  dollar hedge fund in -- operating in -- globally, but mostly

18  U.S. stressed/distressed assets that we invested in.

19  Oftentimes, though, we would run from high-grade assets all

20  the way down to equities, different types of investors,

21  different types of investments.

22      Thereafter, I left -- was -- joined Guggenheim.  I left

23  Guggenheim, and shortly thereafter became a director at

24  Strand.

25  Q   Prior to acceptance of the positions that you described

Seery - Direct                          61

1    earlier, were you at all familiar with Highland or Mr.

2    Dondero?

3    A    Yeah.  I was, yes.

4    Q    Can you just describe for the Court how you became

5    familiar with Highland and Mr. Dondero?

6    A    Highland was a customer of Lehman Brothers, and it was --

7    particularly in the loan business.  And the CLO businesses.

8    Highland was run by Mr. Dondero, and I knew of that business

9    through that --

10       (Interruption.)

11           MR. MORRIS:  Can somebody please put their device on

12   mute?

13           A VOICE:  That's Mr. Taylor.

14           THE COURT:  Mr. Taylor, you were off mute,

15   apparently, for a moment.  Make sure you're staying on mute.

16   Thank you.

17           MR. TAYLOR:  Yes.  Sorry, Your Honor.  I thought we

18   might have a hearsay objection.  I wasn't sure what the answer

19   was going to be, so I wanted to be prepared to object.

20           THE COURT:  All right.  Thank you.

21   BY MR. MORRIS:

22   Q    Did you know or meet Mr. Dondero in the course of what you

23   just described?

24   A    Yes, I did.  I believe we met once or twice over the

25   years.  There was a senior team member who handled the

Seery - Direct                              62

1  Highland relationship.   He was quite good, quite experienced,

2  and he handled most of the Highland relationship issues.   But

3  Highland, we came across a number of times, whether it be in

4  -- I came across a number of times, whether it be in specific

5  investments we had where they would be either a competing

6  party or holding a similar interest, whether they were a

7  customer purchasing loans or securities, whether they were a

8  potential CLO customer where we were structuring some assets

9  for them.

10  Q    Okay.  And who are the two other members of the

11  independent board at Strand?

12  A    John Dubel and Russel Nelms.

13  Q    And had you had any personal experience with either of

14  those gentleman prior to this case?

15  A    I knew of Mr. Nelms and his experience as a bankruptcy

16  judge in the Northern District of Texas, and I had worked on

17  one matter with Mr. Dubel, but very, very briefly, while he

18  was the CEO of FGIC, which is a large insurer in the financial

19  insurance space that he was responsible for reorganizing and

20  ultimately winding down.

21  Q    Okay.  How did you learn about this particular case?  How

22  did you learn about the opportunity or the possibility of

23  becoming an independent director?

24  A    Initially, I was contacted by some of the creditors and

25  asked whether I was interested, and I indicated that I was.

Seery - Direct                               63

1  Subsequently, I received a call from the Debtor's

2  representatives as well meeting the counsel as well as the

3  financial advisor as well as specific members of the Debtor's

4  senior management.

5  Q   Do you know how long in advance of the January 9th

6  settlement you were first contacted?

7  A   Probably four, four or five days at the most, but started

8  working immediately at that time because it was a pretty

9  complicated matter and the interview process would be quick

10 because of the hearing date that was coming up.

11 Q   Do you recall the names of any of the creditors who

12 reached out to you?

13 A   I spoke to counsel for UBS.  Certainly, Committee counsel.

14 I don't recall if I spoke to anybody from Jenner Block in the

15 initial interview.  And then I spoke to representatives from

16 your firm as well as Mr. Leventon and ultimately Mr.

17 Ellington.

18 Q   Did you do any due diligence before accepting the

19 appointment?

20 A   I did, yes.

21 Q   Can you describe for the Court the due diligence you did

22 before accepting your appointment as independent director?

23 A   Well, I got the petition, I read the petition, as well as

24 the first day, as well as the venue-changing motion.  In

25 addition, I went through the schedules.  Ultimately, I took a

Seery - Direct                                    64

1    look at and examined the limited partnership agreement of the

2    Debtor, with particular focus on the indemnity provisions.  I

3    then sat down with the Committee to get their views as part of

4    the interview process, as well as the Debtor's counsel and

5    Debtor's representatives.

6    Q    Did you -- in the course of your diligence, did you come

7    to an understanding or did you form a view as to why an

8    independent board was being sought at that time?

9    A    Yes, I did.

10   Q    And what view or understanding did you come to?

11   A    There was extreme antipathy from the creditors, as

12   evidenced by the venue motion and the documents around that

13   venue motion.

14        In addition, in the first day order, or affidavit, you

15   could see the issues related to Redeemer and the length of

16   time that litigation has been gone on, going on.

17        The creditors became extremely concern with Mr. Dondero

18   having any control over the operations of the Debtor and

19   wanted to make sure that either he was removed from that or

20   that -- and someone else was brought in, or that the case was

21   somehow taken over by a trustee.

22   Q    Did you form any views as to the causes of the Debtor's

23   bankruptcy filing?

24   A    The initial cause was the entry or the soon-to-be-entered

25   order related to the arbitration with Redeemer, but it was

                         Seery - Direct                    65

1   pretty clear from looking at the first day that there was a

2   number of litigations.  The bulk of the creditor body was made

3   up of -- on the liquidated side was made up of litigation

4   creditors.  And then the other creditors, the Committee

5   members, other than Meta-e, were significant litigation

6   creditors.

7            MR. MORRIS:  Your Honor, I think Mr. Seery was sworn

8   in, but unless -- unless you -- if you think there's a need,

9   I'm happy to have you swear Mr. Seery in again just to make

10  sure his testimony is under oath.

11           THE WITNESS:  I was sworn in.

12           THE COURT:  Yes, I swore him in.

13           MR. MORRIS:  That's what I thought.  That's what I

14  thought.  Somebody had made the suggestion to me, so I was

15  just trying to make sure, because I didn't want any unsworn

16  testimony here today.

17           THE COURT:  We did.

18           MR. MORRIS:  Okay.

19           THE COURT:  We did.

20           MR. MORRIS:  Thank you.  Thank you.

21  BY MR. MORRIS:

22  Q    Ultimately, sir, just to move this along a little bit, do

23  you recall that an agreement was reached with the UCC and Mr.

24  Dondero and the Debtor concerning governance issues?

25  A    Yes, I do.

Seery - Direct                              66

1  Q    And did you accept your position as an independent

2  director at Strand as part of that corporate governance

3  settlement?

4  A    That, that was part of the appointment.  We -- the

5  independent directors were brought in to take -- really, to

6  take control of the company as independent fiduciaries.  And

7  the idea, I think, was that there was a Chapter 7 motion that

8  was about to be filed by the Committee, or at least that was

9  the representation, and the Debtor had a choice, they could

10 either accept the independent directors or they could face the

11 motion.

12      What actually happened was a little bit more complicated.

13 The creditors and the Debtor agreed on the selection of Mr.

14 Dubel and myself.  And then because they couldn't agree on the

15 third member of the independent board, they left it to Mr.

16 Dubel and myself to actually come up with a process, interview

17 candidates, and make that selection, which we did, which

18 ultimately became Mr. Nelms.

19 Q    And did all of this take place during that four- or five-

20 day period prior to January 9th?

21 A    It did, yes.

22 Q    Okay.  And let's talk about the makeup of the board.

23 You've identified the other individuals.  How would you

24 characterize the skillset and the capability of the

25 individual?

Seery - Direct                                67

1  A    Well, on paper, I think it's a pretty uniquely-constructed

2  board for this type of asset management business with the

3  diversity of these types of assets and the diversity of issues

4  that we had.

5       So, former Judge Nelms, obviously skilled in bankruptcy

6  and the law around bankruptcy, but also very skilled in

7  mediation, conflict resolution, and in particular his

8  prepetition or maybe pre-judicial experience in litigation and

9  litigation involving fiduciary duties we thought could be

10  very, very important because of the myriad of interrelated

11  issues that we could see that might arise.

12      John Dubel is an extremely well-known and respected

13  restructuring professional.  He has been dealing these kinds

14  of assignments as an independent fiduciary for, gosh, as long

15  as I can recall, but at least going back 15 to 20 years.  He

16  had experience in accounting, but he's also been the leader of

17  these kinds of organizations going through restructuring in

18  many operational type roles, and so he was a perfect fit.

19      And my experience in both restructuring as well as asset

20  management and investment I think dovetailed nicely with the

21  experience that Mr. Nelms and Mr. Dubel have.

22  Q    Okay.  Let's talk for just a moment at a high level of the

23  agreement that was reached.  Do you remember that there were

24  several documents that embodied the terms of the agreement?

25  A    Yes, I do.

Seery - Direct                          68

1  Q    And do you remember one of them was an order that the

2  Court entered on January 9th?

3  A    Yes.

4         MR. MORRIS:  All right.  Your Honor, just for the

5  record, and we'll be looking at this, but that would be

6  document Exhibit 5Q as in queen, and that's at Docket No.

7  1822.

8  BY MR. MORRIS:

9  Q    Do you remember there was a separate term sheet, Mr.

10 Seery, that was also part of the agreement among the

11 constituents?

12 A    Yes.  There were -- I think there were a couple of term

13 sheets and stipulations, but I do recall that there was some

14 very specific term sheets with the terms.

15        MR. MORRIS:  All right.  And we'll look at that one

16 as well, Your Honor, but that can be found at Exhibit 5O as in

17 Oscar.

18 BY MR. MORRIS:

19 Q    And then, finally, do you recall that Mr. Dondero signed a

20 stipulation that was also part of the agreement?

21 A    Yes.  That was absolutely key to the agreement for the

22 creditors and perhaps the Court.  But it was really -- it

23 needed to be clear that he was signed on to this transaction.

24        MR. MORRIS:  Okay.  And we'll look at that as well.

25 That's Exhibit 7Q.  And remind me, we'll move that one into

Seery - Direct                                  69

1    evidence.

2    BY MR. MORRIS:

3    Q    Did you and the other prospective independent directors

4    actually participate in the negotiation of any aspect of this

5    agreement that you've generally described?

6    A    Absolutely.  Although we hadn't been appointed yet, these

7    agreements were going to be the structure with which -- or

8    under which we would come in as independent fiduciaries.  They

9    would govern a lot of our relationships.  They would provide

10   for the protections that we required and that I required.  So

11   they were exceedingly important to me.

12   Q    Can you describe for the Court at a general level your

13   understanding of the overall structure of the corporate

14   governance settlement?

15   A    From a very high level, the settlement was -- Highland

16   Capital Partners is a limited partnership.  It's managed by

17   its general partner, Strand Advisors.  Although Strand is the

18   GP, its effective interest in Highland is minimal, about .25

19   percent of the effective partnership interest.  But it is the

20   general partner.  So it does govern the -- the partnership.

21       We came in as an independent board that would oversee and

22   control Strand Advisors and thereby, through the general

23   partner position, oversee and control HCMLP, the Debtor.

24       In addition, the Committee then overlaid what we could do

25   with respect to how we operated the business in the ordinary

Seery - Direct                    70

1    course in Chapter 11 with a specific set of protocols that

2    governed certain transactions that we would have to get

3    permission from either the Committee or the Court to engage

4    in.

5         And in addition, Mr. Dondero, notwithstanding the

6    insertion of the independent board at Strand, also had a set

7    of restrictions around him, because, of course, not only was

8    he the former control entity at Highland and Strand, he also

9    had a hundred percent of the ownership -- indirectly, of

10   course -- of Strand and could have removed the board.  So

11   there were restrictions around what he could do with respect

12   to the board.  There were also restrictions around what he

13   could do through various entities to terminate contracts and

14   --

15   Q    All right.  We'll look at some of those in detail.  Did,

16   to the best of your recollection, did Mr. Dondero give up his

17   position as president or CEO of the Debtor?

18   A    He did, yes.

19   Q    And did he nevertheless stay on as an employee of the

20   Debtor and retain a position as portfolio manager?

21   A    He did.  At the last second, I believe it was the night

22   before, when we were actually in Dallas preparing for the

23   hearing, but Mr. Ellington raised the concern that if Dondero

24   was removed from not only the presidency but also the

25   portfolio management position, potentially there would be some

                        Seery - Direct                    71

1   agreements that might or might not be subject to Court

2   approval that could be terminated and value would be lost.  So

3   this was a very last-second provision.  Obviously, the -- as

4   new estate fiduciaries, we didn't want value to be lost

5   instantly for key man or some other reason.  And the Committee

6   ultimately, or I guess you'd say reluctantly, agreed to that

7   because we just didn't have time to look at any of -- any such

8   agreements.

9            MR. MORRIS:  All right.  Let's -- can we put up on

10  the screen, Ms. Canty, Debtor's Exhibit 5Q?

11       And this is in evidence, Your Honor.  This is the January

12  9th order.

13       And can we please go to Paragraph 8?

14  BY MR. MORRIS:

15  Q   Mr. Seery, you had mentioned just a few minutes ago that

16  there were certain restrictions that were placed on Mr.

17  Dondero.  Does Paragraph 8, to the best of your recollection,

18  provide for the substance of at least some of those

19  restrictions?

20  A   It does, yes.

21  Q   And can you just describe for the Court your understanding

22  of the restrictions that were imposed on Mr. Dondero pursuant

23  to Paragraph 8?

24  A   Well, as I recall, when Mr. Ellington came in with the

25  last-minute request, the Committee was extremely upset about

Seery - Direct                                72

1  it.  We talked about it.  Obviously, we, as an independent

2  board that was going to come in, didn't know the underlying

3  contracts and couldn't really render any judgment as to

4  whether there would be value lost.  So, the Committee agreed,

5  but they wanted to make sure that Mr. Dondero still reported

6  to -- directly to the board, and if the board asked Mr.

7  Dondero to leave, he would do so.

8  Q    Okay.  Just looking at this paragraph, is it your

9  understanding that the scope and responsibilities of Mr.

10 Dondero would be determined by the board?

11 A    Yes.

12 Q    And was it your understanding that Mr. Dondero would serve

13 without compensation?

14 A    Yes.

15        MR. DRAPER:  Objection.  Leading, Your Honor.

16        THE COURT:  Overruled.

17 BY MR. MORRIS:

18 Q    Was it your understanding that Mr. Dondero's role would be

19 subject to the direct supervision, direction, and authority of

20 the board?

21 A    That's, you know, that's what the order says and that's

22 what the agreement was.  In practice, that was really going to

23 have to evolve because we were coming in very cold and

24 obviously he'd been there for --

25        (Interruption.)

Seery - Direct                              73

1          THE COURT:  All right.  Someone needs to put their

2    phone on mute.  I don't know who it is.

3    BY MR. MORRIS:

4    Q    Was it also part of the agreement that Mr. Dondero would

5    (garbled) upon the board's request?

6    A    I think I got you, but yes, that's contained in this

7    paragraph, and Mr. Dondero agreed to that.

8          THE COURT:  All right.  Whoever LC is, your phone

9    needs to be put on mute.  Okay.  Please be sensitive to

10   keeping your device on mute except for Mr. Morris and Mr.

11   Seery.

12       All right.  Go ahead.

13   BY MR. MORRIS:

14   Q    Do you recall, Mr. Seery, whether there were any

15   restrictions placed on Mr. Dondero's ability to terminate

16   agreements with the Debtor?

17   A    Yes.  That was a very specific provision as well.

18   Q    Can we take a look at Paragraph 9 below?  Is that the

19   provision that you're referring to?

20   A    That's the provision in the order.  I believe there were

21   other agreements -- certainly, discussion around it -- because

22   it was an important provision because it had been borne out of

23   some experience that Acis and Mr. Terry had had in particular.

24   So it was supposed to be broad and prevent both direct and

25   indirect termination of agreements.

Seery - Direct                          74

1    Q   Okay.  And do you know, do you recall that the definition

2    of related entity is contained within the term sheet that you

3    referred to earlier?

4    A   It's a pretty extensive -- I recall the definition not

5    specifically, but it's a pretty extensive definition.  It

6    includes any of the entities that he owns, that Mr. Dondero

7    owns, that Mr. Dondero controls, that Mr. Dondero manages,

8    that Mr. Dondero owns indirectly, that Mr. Dondero manages

9    indirectly, and it really covers a wide swath of those

10   entities in which he has interests and control.

11        MR. MORRIS:  All right.  Let's see if we could just

12   look at the definition specifically at Exhibit 5O as in Oscar.

13   And if we could just scroll down to the next page.

14        Now, this was -- this is part of the term sheet that was

15   filed at Docket 354.

16   BY MR. MORRIS:

17   Q   At Definition I(d), is that the definition of related

18   entity that you were referring to?

19   A   That's correct.

20   Q   Okay.  In addition to what you've described, I think you

21   also mentioned that there was a separate stipulation that Mr.

22   Dondero entered into as part of the corporate governance

23   settlement.  Do I have that right?

24   A   That's my recollection, yes.  And I believe he signed it,

25   and that was a key gating issue to the hearing that we had on

Seery - Direct                        75

1    January 9th.

2    Q    And what do you recall about that document as being a key

3    gating issue?

4    A    The key gating issue that I recall is that it had to be

5    signed.  And I don't believe it was signed until that very

6    morning.

7            MR. MORRIS:  All right.  Can we call up Exhibit 7Q as

8    in queen?

9    BY MR. MORRIS:

10   Q    All right.  Is this the stipulation that you were

11   referring to?  We can scroll down to any portion you want.

12   A    I believe that is, yes.

13           MR. MORRIS:  Okay.  Can we just scroll down to see

14   Mr. Dondero's signature?  Yeah.  That's -- okay.

15       So, that's dated January 9th.  This was filed at Docket

16   338.  It's on the Debtor's exhibit list as Exhibit 7Q.  And

17   the Debtor would respectfully move Exhibit 7Q into evidence.

18           THE COURT:  Any objection?  All right.  7Q is

19   admitted.

20       (Debtor's Exhibit 7Q is received into evidence.)

21           MR. MORRIS:  Okay.  And if we could just scroll up a

22   page or two to the four bullet points.  Yeah, right there.  A

23   little more.

24   BY MR. MORRIS:

25   Q    Okay.  So, do you see Paragraph 10 contains the

Seery - Direct                        76

1  stipulation?

2  A    Yes.

3  Q    And as you recall, Mr. Seery, in the events leading up to

4  the entry of the order approving the settlement, was this one

5  of the documents that was being negotiated among -- among the

6  parties?

7  A    Yes, it was.

8  Q    Okay.  You mentioned that there were certain provisions of

9  the January 9th order that were important to you and the other

10 independent directors.  Do I have that right?

11 A    Yes.

12        MR. MORRIS:  Let's see if we can back to Exhibit 5Q,

13 please, Paragraph 4.

14 BY MR. MORRIS:

15 Q    Okay.  Paragraph 4, can you tell me what Paragraph -- what

16 Paragraph 4 is and why it was important to you?

17 A    Well, there really were four key, I guess I'll use the

18 term gating items again, for my involvement, and ultimately in

19 discussions with Mr. Nelms and Mr. Dondero -- Mr. Dubel, their

20 involvement in the matter.

21     Because of the litigious nature of the Highland operations

22 and the expectations we had for more litigation after taking a

23 look at the Acis case, we wanted to make sure that, as

24 independents coming into a situation with really no stake in

25 the particular outcome, other than trying to achieve a

Seery - Direct                          77

1   successful reorganization, that we were protected.  So, number

2   one, I looked at the limited partnership agreement.  I wanted

3   to make sure that the LPA contained broad and at least

4   standard indemnification provisions and that they would apply

5   to the board.

6       Number two, because -- that then requires you to look at

7   the indemnification provisions at Strand, because you're a

8   director of Strand, the GP.  So then we looked at those.  I

9   took a close examination of those.  They looked okay, except

10  Strand didn't have any assets other than its equity interest

11  in Highland, and if that equity interest turned out to be

12  zero, that indemnity wouldn't be very valuable.

13      So I wanted to make sure that Highland, the Debtor,

14  guaranteed the indemnity (garbled) on a postpetition basis, so

15  that if there were a failure of D&O, which I'll get to in a

16  second, or it wasn't enough, that we would have a senior claim

17  in the case, an admin claim in the case.

18      I then, of course, wanted to make sure that we had D&O

19  insurance.  This was very difficult to get, because, frankly,

20  there's a Dondero exclusion in some of the markets, we've been

21  told by our insurance brokers, and so getting the right policy

22  that would cover the independent board was difficult.  We did

23  get that.

24      And then ultimately there'll be another provision in the

25  agreement here -- I don't see it off the top of my head -- but

Seery - Direct                              78

1   a gatekeeper provision.  And that provision --

2   Q    Hold on one second, Mr. Seery, because we'd want to

3   scroll.  So Paragraph 4 and Paragraph 5, were those, were

4   those provisions put in there at the insistence of the

5   prospective independent directors?

6   A    Yes.  And remember, so the Paragraph 4, as I said, is the

7   guarantee of Strand's obligations for its indemnity.  Again,

8   Strand didn't have any money, so the Debtor had to be the one

9   purchasing the D&O for the directors and for Strand.  So those

10  are the two provisions that really worked to address my

11  concerns about the indemnities and then the D&O.

12          MR. MORRIS:  Okay.  Can we go to Paragraph 10,

13  please?  There you go.

14  BY MR. MORRIS:

15  Q    Is this the other provision that you were referring to?

16  A    This is.  It's come to be known as the gatekeeper

17  provision, but it's a provision that I actually got from other

18  cases.  Again, another very litigious case that I thought it

19  was appropriate to bring in to this case.

20      And the concept here is that when you're dealing with

21  parties that seem to be willing to engage in decade-long

22  litigation in multiple forums, not only domestically but even

23  throughout the world, it seemed important and prudent for me

24  and a requirement that I set out that somebody would have to

25  come to this Court, the court with jurisdiction over these

Seery - Direct                              79

1   matters, to determine whether there was a colorable claim.

2   And that colorable claim would have to show gross negligence

3   and willful misconduct, *i.e.*, something that would not

4   otherwise be indemnified.

5       So it basically sets an exculpation standard for

6   negligence.  It exculpates the directors from negligence.  And

7   if somebody wants to bring a cause against the directors, they

8   have to come to this Court first and get a finding that

9   there's a colorable claim for gross negligence or willful

10  misconduct.

11  Q   Would you have accepted the engagement as an independent

12  director without the Paragraphs 4, 5, and 10 that we just

13  looked at?

14  A   No.  These were very specific requests.  The language here

15  has been 'smithed, to be sure, but I provided the original

16  language for 10 and insisted on the guaranty provision above

17  to assure that the indemnity would have some support.

18  Q   And ultimately, did the Committee and the Debtor agree to

19  provide all of the protection afforded by Paragraphs 4, 5, and

20  10?

21  A   Yes.

22  Q   Okay.

23          MR. MORRIS:  Your Honor, we're going to move on now

24  to good faith, Section 1129(e)(3), just to give you a little

25  bit of a roadmap of where we're going.

Seery - Direct                    80

1  BY MR. MORRIS:

2  Q    Let's talk about the process that led to the plan that the

3  Debtor is asking the Court to confirm today.  Real basic stuff

4  at the beginning.  Can you tell me your understanding of the

5  makeup of the UCC, of the Creditors' Committee?

6  A    The Creditors' Committee in this case has four members.

7  It's UBS, the Redeemer Committee, which are former holders of

8  interests in a fund called the Crusader Fund, which was a

9  Highland fund, who had redeemed and then had a dispute with

10  Highland.

11     And the next creditor is Mr. Terry and Acis.  We generally

12  group them as one, but the creditor is Acis.

13     And the fourth creditor is an entity called Meta-e, and

14  they provide litigation support and technical support and

15  discovery support in litigations for the Debtor, including in

16  this case now.

17  Q    All right.  Just focusing really on the early period, the

18  first few months, can you describe the early stages of the

19  negotiations with the UCC as best as you can recall?

20  A    Well, I think the early stage of the case wasn't directly

21  a negotiation; it was really trying to understand as best we

22  could the myriad of assets that we had here, the various

23  businesses that the Debtor either owned, controlled, or

24  managed, as well as the claims.

25     We went through a process of trying to understand each of

Seery - Direct                         81

1   the claims that the Debtor -- or against the Debtor that were

2   represented by the Committee, as well as some other claims

3   that were not on the Committee.

4   Q   Was the Debtor -- I mean, was the Committee initially

5   pushing the independent board to go to a monetization plan, an

6   asset monetization plan?

7   A   Very quickly and early on, the Debtor -- the Committee

8   took a pretty aggressive approach with the Debtor and the

9   independent board.  I think the Committee's perspective, as

10  articulated to me, and where -- at least how we took it, was

11  that they'd been litigating for years and they sort of knew

12  the situation and the value of their claims, that the Debtor

13  was insolvent, in their view, and that we should be operating

14  the estate in essence for the benefit of the creditors.

15  Q   And what was the board's view in reaction to that?

16  A   We disputed it.  And the reason we disputed it was very

17  straightforward.  Save for the Redeemer claim, which at least

18  had an arbitration award, Acis and Mr. Terry didn't have any

19  specific awards, notwithstanding the results of the Acis

20  bankruptcy, and UBS, while it had a judgment, that judgment

21  was not against the Debtor.

22      So our view was, until we have our hands around these

23  claims and we determine what the validity is in our estate,

24  that we would treat the Debtor as if it were solvent.  We also

25  wanted to assess the value of the assets.  So, looking at the

Seery - Direct                          82

1   assets not just from a book value but what they might be

2   really worth in the market.

3   Q    And did the board in the early portion of the case

4   consider all strategic alternatives?

5   A    I don't know if we considered every strategic alternative,

6   but we certainly considered a lot of alternatives.

7   Q    Can you describe for the Court the alternatives that were

8   considered by the board before settling on the asset

9   monetization plan?

10  A    Well, early on, you know, we looked at each of the -- what

11  we would think of the large category types of ways to resolve

12  a case.  Number one, could we go through a very traditional

13  reorganization with either stretching out claims to creditors

14  after settlement or converting some of those to equity,

15  getting new equity infusions?  We considered those

16  alternatives.

17      Number two, we considered whether we should simply sell

18  the assets.  That's one of the things that the Committee was

19  pushing for.  They could be sold to third parties.  They could

20  be sold individually.  Mr. Dondero potentially could buy some

21  of the assets.  That'd be a reasonable reorganization in this

22  case.

23      We also considered whether that, you know, we would just

24  do a straight liquidation.  Is there some value to doing --

25  converting the case to a 7 and doing a straight liquidation?

Seery - Direct                           83

1    We also considered a grand bargain plan, and this was

2    something that I worked on quite a bit.  The phrase is mine,

3    although no pride of authorship, certainly, since it didn't

4    work out.  But that perhaps we could come to an agreement with

5    the major creditors and with Mr. Dondero and then shift some

6    of the expenses in the case out further to litigate some of

7    the other claims while reorganizing around the base business.

8        And then, finally, we considered the asset monetization

9    plan, and ultimately that evolved into what we have today.

10   Q    Were there guiding principles or factors that the board

11   was focused on as it assessed these different options?

12   A    Well, the number one guiding principle was overall

13   fairness and equitable treatment of the various stakeholders.

14   So, again, at that point, we didn't know exactly what, if

15   anything, we would owe to claimants like UBS or HarbourVest or

16   even Mr. Terry and Acis.  We had a good sense of where we

17   would end up with Redeemer, I think, but we still had some

18   options and wanted to negotiate the issues related to

19   potential appeal rights that we had.  So I think that was the

20   number one overall concern.

21       But that did evolve over time.  Costs of the case were

22   exceptionally high.  And the reason they're so high is that

23   Highland was run for a long time, at least from what we can

24   tell, at an operating deficit.  Typically, what it would do is

25   run at a deficit and then sell assets to cover the shortfall,

Seery - Direct                              84

1    and it would defer a whole bunch of employee -- potential

2    employee compensation.  And because of the way the environment

3    was going, particularly in the first half of the year, it

4    didn't look to us like there was going to be any great asset

5    increase that would somehow save us from the hole that was

6    being dug, the considerable amount of expenses to run the

7    case.

8    Q    Did changing the culture of litigation factor into the

9    path that the board considered?

10   A    Well, we certainly looked at the way the company had run

11   and why it got to where it is in terms of litigating.  And not

12   just litigating valid claims, but litigating any claim to the

13   *nth* degree.  And stories are legion, I won't talk about them,

14   but of Highland taking outrageous positions and then pursuing

15   them, hoping that the other side caves.

16       We determined that this estate couldn't bear that kind of

17   expense, and it wasn't fair and equitable to do that anyway.

18   So we wanted to attack the claims that we could -- and I say

19   attack; try to resolve them as swiftly as we could --

20   protecting the Debtor's interests but trying to find an

21   equitable resolution.

22       I'm not averse to litigating.  And I think when there are

23   claims that are legitimate, the Debtor should pursue them.

24   There's always -- a good settlement is always better than a

25   bad litigation.  But if there (indecipherable) to resolve

Seery - Direct                          85

1    them, we should -- we should pursue those.  And if we have

2    defenses, we should pursue those, and not just be held up

3    because someone else is willing to, you know, take a more

4    difficult position than we are.

5        But in this case, it really did cry out for some sort of

6    resolution on many of these cases because they were far beyond

7    -- far beyond the facts and far beyond the dollars.  There was

8    personal antipathy involved in virtually every one of the

9    unlitigated or unliquidated Committee cases.

10   Q    Did the board, as it was assessing the various strategic

11   alternatives, consider maximization of the value?

12   A    Always number one was, can we maximize value?  But that

13   has to be done within the context of the risk you're taking

14   and the time it takes.  So, not all wine ages well in a cave

15   and not all investments get to be more valuable over time.  We

16   wanted to look at each individual asset that the Debtor had,

17   each claim that the Debtor had, each defense that the Debtor

18   had, and consider the time and the costs and then try to find

19   the best way to maximize value with those multiple

20   considerations.

21   Q    How about the role and support of the UCC, how did that

22   factor into the decision-making, the Debtor's decision-making

23   as to what plan to pursue?

24   A    Well, you know, the decision-making with the UCC was

25   cumbersome and oftentimes difficult.  Sometimes our relations

Seery - Direct                              86

1  were very contentious, and sometimes they continue to be.  But

2  the Committee had significant oversight because of the

3  protocols that had been agreed to.  Some of the disputes we

4  had with the Committee found their way into the court.  Those

5  time and that cost, some of which we won, some of which we

6  lost, but those factored into our analysis.

7      But eventually we knew that we were going to need to get,

8  you know, some significant portion of the Committee to agree,

9  because, at minimum, Meta-e had a liquidated claim, and

10  Redeemer was very close to fully liquidated, so we were going

11  to need support from the Committee with whatever we tried to

12  push through.  And so that's how we negotiated with the

13  Committee from that perspective.

14  Q   Is it fair to say that the Debtor and the Committee's

15  interests because aligned upon approval of the disclosure

16  statement back at the end of November?

17  A   I don't think they became perfectly aligned, because we

18  still have, you know, some disputes around, you know,

19  implementation and things like the employee releases, which

20  were very important to me.  But I think we're largely aligned

21  and that the Committee is supportive, as Mr. Clemente said at

22  the start of this hearing, of the plan.  We negotiated at

23  arm's length with them about most of the provisions.  I would

24  say virtually everything was a relatively significant

25  negotiation, or at least there was a good faith exchange of

Seery - Direct                          87

1  views on each side and assessment of legal and financial

2  risks.  And I think at this point they're largely in support

3  of the plan.

4  Q   All right.  Let's -- you mentioned the grand bargain, and

5  I just want to spend a few minutes talking about that, how

6  that evolved.  Focusing your attention in the kind of late

7  spring/early summer, can you tell me what efforts you and the

8  board made in trying to achieve a grand bargain in that early

9  part of the case?

10  A   Well, we had -- at that point, we had reached agreement,

11  at least in principle, with Redeemer.  And the thought was --

12  my thought was that we could construct a plan, understanding

13  what the cash flows looked like and what we thought the base

14  value of the asset looked like -- and those are not just the

15  assets that are tangible assets, but the notes that are

16  collectible by the Debtor as well -- and then engage with UBS

17  in particular.  Redeemer.  To some degree, Mr. Terry.  We had

18  not yet reached any agreement with him.  But UBS, we thought

19  of as a slightly -- I don't mean this to be disparaging -- but

20  a slightly more commercial player than Acis because of the

21  history that Acis had to deal with and endure.

22      And we were hoping that we could get some sort of

23  coalescence around an agreed distribution that would require

24  those creditors to take a lot less than they might have

25  otherwise agreed, Mr. Dondero to put in more than he otherwise

Seery - Direct                                88

1  thought he could put in or would be willing to put in, and

2  then we would get out to Acis and the other creditors with a

3  plan.

4      And so I built, with the team at DSI, a detailed model on

5  how the distributions could work and what the potential timing

6  could be, trying to, each time, move in a multidimensional way

7  with UBS, Redeemer, Mr. Dondero, and to some degree Acis,

8  around the respective issues for their claims.

9      Again, UBS and Acis had not been resolved and weren't

10  close, but the thought was if we could get dollar agreements

11  for distribution, perhaps we could then figure out how to

12  construct settlements of their claims.

13  Q    During this time period, did you work directly with Mr.

14  Dondero in the formulation of a potential grand bargain?

15  A    I did, yes.

16  Q    And the model that you described, did that go through a

17  number of iterations?

18  A    It went through multiple iterations.  I don't believe I

19  ever shared the model with anybody.  One of the reasons for

20  that is I didn't want -- I felt I had -- if I was going to

21  share it with Mr. Dondero, for example, I'd have to share it

22  with UBS and I'd have to share it with Redeemer.  And I wanted

23  it to be -- I wanted it to be a working model with the team at

24  DSI.  In particular, we would make, you know, adjustments on

25  an almost-daily basis.

Seery - Direct                          89

1    Mr. Dondero had -- remember, he was still portfolio

2   manager at that time.  He also had a related-party interest,

3   as people have seen from some of the litigation around the

4   sales of securities.  He had access and was receiving emails

5   from the team as well as from the finance team.  So he had

6   access to the information at that point and had a view around

7   the value.  And this was more trying to adjust what those

8   distributions would look like depending on the amounts that he

9   would be willing to contribute.

10  Q    Moving on in time, did there come a time when the Debtor

11  participated in a mediation with certain of the major

12  constituents in the case?

13  A    Yes.  That was towards the end of the summer.

14  Q    And during that mediation, did the concept of a grand

15  bargain, was that put on the table?  Without discussing any

16  particulars about it, just as a matter of process, was the

17  grand bargain subject to the mediation discussions?

18  A    Well, the mediation had multiple components, so the answer

19  to the question in short is yes, but I'll go longer because I

20  tend to.  The grand bargain plan stayed in place, and that was

21  going to be an overall settlement.  The mediation was

22  initially, I think, as a main course, focused on Acis, UBS,

23  and then the third piece being the grand bargain.  And if you

24  could settle one of those claims, perhaps -- obviously, if you

25  could settle both of them, you could get to then focusing on

Seery - Direct                              90

1   the grand bargain.

2        But even before we got to mediation, the idea of the

3   monetization plan had also been put forth.  Notwithstanding

4   that it wasn't my idea, I actually thought that it was a good

5   idea, ultimately.  Didn't initially.  And the reason for that

6   is that it set a marker for what a base expectation could be

7   for the creditors and just for Mr. Dondero.  And knowing that

8   that was out there, at least with them, that could hopefully

9   be a catalyst in the mediation for folks to say, let's see if

10  we can get our claims done and get a grand bargain done,

11  because if we don't we have this Debtor monetization plan.

12  And by that -- at that point, I don't think we had much

13  agreement with the Committee on anything, and certainly with

14  Mr. Dondero, on -- on a monetization plan.

15  Q   All right.  And let's just bring it forward from the fall,

16  post-mediation, to the present.  Has -- has -- have you and

17  the board continued discussing with Mr. Dondero the

18  possibility of a grand bargain?

19  A   Well, it's shifted.  So, the grand bargain discussions

20  really -- you had multiple phases.  So, you had pre-mediation.

21  There was the grand bargain discussions that I just described

22  previously that also involved UBS and Redeemer, and to some

23  degree Acis and Mr. Terry.  Then you have the mediation, which

24  is much more focused on the claims and whether they can fit

25  into the grand bargain with Mr. Dondero.

Seery - Direct                          91

1    And the way that was conducted was a little bit more

2    separated, meaning the parties would talk to the mediator, the

3    mediator would then go and talk to other parties and try to

4    work a settlement on each of those components.

5    Subsequent to the mediation where we reached the agreement

6    with Acis and Mr. Terry, and we ultimately in that timeframe

7    banged out the final terms of our agreement with Redeemer, we

8    engaged with Mr. Dondero around -- I wouldn't call it the

9    grand bargain, but a different plan.  By that point, the

10   monetization plan had started to gain some traction with the

11   creditor group, and Mr. Dondero and his counsel, I believe,

12   focused on the potential of what was referred to as a pot

13   plan.  And while it has the -- it could have the ability of

14   being a resolution plan, it wasn't the grand bargain plan that

15   I had initially envisioned.  And pot plan was really a

16   misnomer, because it didn't have a whole pot, so -- so it's a

17   little bit of a hybrid.

18   Q    Did the board spend time during its meetings discussing

19   various pot plan proposals that had been put forth by Mr.

20   Dondero?

21   A    Oh, absolutely.  And not only the board.  I mean, we did

22   our own work as an independent board and then brought in our

23   professional advisors, both your firm and the DSI folks, to go

24   through analytics around the pot plan, and even before that,

25   the other plan alternatives, but we had direct discussions

Seery - Direct                                92

1  with Mr. Dondero and his counsel.

2  Q    And in the last couple of months, has the board listened

3  to presentations that were made by Mr. Dondero and his counsel

4  concerning various forms of the pot plan?

5  A    Yes.  At least two or three.

6  Q    And during this time, has the board and the Debtor

7  communicated with the Committee concerning different

8  iterations of the proposed pot plan?

9  A    Yes.  We've had continual discussions with the Committee

10  regarding the various iterations of the potential grand

11  bargain all the way through the pot plan.

12  Q    And during this process, did the Debtor provide Mr.

13  Dondero and his counsel with certain financial information

14  that had been requested?

15  A    Yes.  As I said, up 'til the point where he resigned and

16  was then ultimately, at the end of the year, removed from the

17  office, he had access to financial information related to the

18  Debtor and even got the information from the financial group.

19  Subsequent to that, we've provided him with requests -- with

20  financial information that was requested by his counsel.

21  Q    Okay.  Were your efforts at the grand bargain or the

22  pursuit of the pot plan successful?

23  A    No, they were not.

24  Q    Do you have an understanding as to -- just, again, without

25  going into -- into details about any particular proposal, do

Seery - Direct                          93

1  you have an understanding as to what the barrier was to

2  success?

3  A    The grand bargain, we just never got the traction that we

4  needed to get that going and the sides were just far -- too

5  far apart.  And the pot plan, similarly.  Our discussions with

6  Mr. Dondero and the Committee, they're -- they're very far

7  apart.

8  Q    And is it fair to say that the Committee's lack of support

9  in either the grand bargain or the pot plan is the principal

10 cause as to why we're not talking about that today?

11 A    Well, it's -- it -- right now, we've got the plan that's

12 on file, the monetization plan.  The monetization plan has

13 gone out for creditor vote and has received support.  It

14 distributes, we think, equitably, as well as a significant

15 amount of distributions to unsecured creditors.  And there

16 really isn't an alternative that we see, based upon the

17 numbers I've seen, that competes with it or has any traction

18 with the largest creditors.

19 Q    All right.  So, now we've talked about various proposals

20 or alternatives that were considered by the board, including

21 the grand bargain and the pot plan.  Let's spend some time

22 talking about the plan that is before the Court today and how

23 we got here.  And I'd like to take you really back to the

24 beginning, if I may.

25      Tell us, tell the Court just what the board was doing in

Seery - Direct                                94

1  the early months after getting appointed, because I think

2  context is important here.  What were you all doing the first

3  few months of the case?

4  A    Well, the first few months, we really were drinking from

5  the proverbial fire hose, trying to get an understanding of

6  the business, how it had been managed previously, what the

7  issues related to the different parts of the business were.

8  And then an understanding of each of the employees that were

9  working under us, what their roles were, how they performed

10 them, who sat where with respect to each of the assets, what

11 the contracts looked like, whether they be shared service or

12 management agreements.  And then we started looking at the

13 individual assets in terms of value.

14     At the same time, we were trying to get up to speed on the

15 complex nature of the claims that were in the case.  The

16 liquidated claims were relatively easy, but there had been a

17 significant amount of transfers in and out of the Debtor, and

18 then there's a myriad of relationships involving related

19 entities that we had to understand, both with respect to the

20 claims as well as with respect to the assets.

21     And so that -- those were the main things we were doing

22 for those first few months in the case.

23 Q    Just a couple months into the case, the COVID pandemic

24 reared its head.  Do you recall that?

25 A    Yes.  We had been in Dallas every day working up 'til the

Seery - Direct                                95

1    time of the COVID and some of the shutdown orders,

2    particularly in the Northeast, and so that changed the dynamic

3    of how we could function every day.

4        Notwithstanding that, we -- we were able to manage from

5    afar, and ultimately, when there were some cases in the office

6    of COVID, we -- on the Highland side, not the related entity

7    side, but on the Highland side -- we determined that the staff

8    and the team should work from home, which they were able to do

9    quite well.

10   Q    Okay.  In those early months, do you recall that there was

11   a substantial erosion of value, at least as of the time you

12   were appointed in those first three or four months?

13   A    There was.  And I think we've heard some -- some noise

14   about what that value was and the drop in the asset value as

15   opposed to net value.  But the asset value did, did drop

16   significantly.

17   Q    Can you describe for the Court your recollection as to the

18   causes of the drop in the value that you just descried?

19   A    Yes.  The number one drop was a reservation that the board

20   took for a receivable from an entity called Hunter Mountain.

21   The quick version of this is that Hunter Mountain owns

22   Highland.  As I mentioned, while Strand is the GP, it only has

23   a quarter-percent interest in Highland.  The vast majority of

24   the interests are owned by an entity called the Hunter

25   Mountain Investment Trust in a very complicated, tax-driven

Seery - Direct                        96

1   structure.

2       Dondero and Okada transferred their interests in Highland

3   at a high valuation to Hunter Mountain.  Hunter Mountain then

4   didn't have the money, so it, in essence, borrowed the money

5   from the Debtor in a note to pay for those interests.  There's

6   a circular running of the cash, but we were not sure where, if

7   any, where any assets are, if they would be sufficient.  So we

8   took a reservation of $58 million for that note.

9       The second biggest piece of the reduction in value was the

10  equity that was lost in the Select Equity account.  This is a

11  Debtor trading account that was managed by Mr. Dondero.  $54

12  million was lost in that account.  Basically, it was really

13  highly margined, very high leverage in that account when the

14  market volatility came in.  As it grew through January,

15  February, March, more and more margin calls.  Ultimately,

16  Jefferies, which had Safe Harbor protections -- technically,

17  the account was not a Debtor account, but they would have had

18  it anyway -- they seized that account.  $54 million in equity

19  was lost in that account.

20      The next highest amount is about $35 million, but it's

21  higher now.  That's just the bankruptcy costs, where we have

22  spent cash and Debtor assets in the case.  It was about $36 to

23  $40 million through the end of the year.  That's now higher.

24      About $30 million was lost in paying back Jefferies on the

25  asset side of the ledger in the Highland internal equity

Seery - Direct                                    97

1    account.  This was similar to the equity -- the Select Equity

2    account, also managed by Mr. Dondero.  Extremely highly-

3    levered coming into the market volatility of the first

4    quarter, which was exacerbated, obviously, by the COVID.  That

5    was about $30 million that was repaid in margin loan in that

6    account.

7        In addition, $25 million of equity was lost in that

8    account while Mr. Dondero was managing it.  I took over

9    effectively managing it in mid-March and worked with Jefferies

10   to keep them from seizing the account.  We've since gotten a

11   bunch of value coming back from that account, but that was the

12   amount that was lost.

13       About $10 million was lost in the Carey Limousine loan

14   transaction.  That is a -- an interesting little company.  Has

15   done a nice job -- management did a very good job coming into

16   the year, and it actually had real value, notwithstanding the

17   changeover to Uber in people's preferences.  But with the

18   COVID, it really relied on events, airport travel, executive

19   travel, and that really took a bite out of it, although, you

20   know, we're hoping to be able to restructure, we have

21   restructured it to some degree, and we're hoping that there

22   could be value there.

23       And then about $7 million was lost in equity in an entity

24   called NexPoint Hospitality Trust.  This is another extremely

25   highly-levered hospitality REIT that NexPoint manages.  It

Seery - Direct                          98

1  trades on the Toronto Stock Exchange.  And I think likely that

2  -- it's got a lot of issues with respect to its mortgage debt.

3  And because it was hospitality, it was really hurt by the

4  COVID.

5      And I think that's probably -- those numbers add up to

6  north of $200 million of the loss.

7  Q   All right.  Thank you for that recitation, Mr. Seery.  So,

8  turning to the spring, after all of those issues were

9  addressed, at the same time you were working on the grand

10 bargain, did the Debtor and its professionals begin

11 formulating the monetization plan that we have today?

12 A   I'm sorry, in the spring?  I lost that question.  I

13 apologize.

14 Q   That's okay.  After you dealt with everything that you

15 just described, were you doing two things at once?  Were you

16 working on the grand bargain and the asset monetization plan

17 at the same time?

18 A   Yes, that's correct.

19 Q   All right.  Can you just describe for the Court kind of,

20 you know, how the asset monetization plan evolved up until the

21 point of the mediation?

22 A   Yes.  I alluded to it earlier, but because the Debtor was

23 running an operating deficit, we were very concerned about

24 liquidity.  Highland typically runs, from a liquidity

25 perspective and a cash perspective, very close to the edge.  I

Seery - Direct                                    99

1  don't feel particularly comfortable helping lead an

2  organization that's running that close to the edge.  And I was

3  very focused on the burn that we had on an operating basis, as

4  well as the professional cost burn, because for a case this

5  size it was significant.

6      The rest of the board felt similarly, and one of the

7  directors, and I'm not sure if it was Mr. Nelms or Mr. Dubel,

8  came up with the idea that we needed an alternative to

9  continuing to just burn assets while we were in this case.

10 There had to be some sort of catalyst to get the parties, both

11 Mr. Dondero as well as the creditors -- at that point, as I

12 said, we weren't settled with Acis or UBS, and we weren't,

13 frankly, close with either of them.  And so we needed what --

14 what I think the -- the idea was that we needed a catalyst to

15 have people focus on what the alternative was.  Because

16 continuing to run the case until we ran out of money was not

17 an acceptable alternative.

18     What I didn't like about the plan was it didn't have

19 anybody's support, and so I wasn't sure how we made progress

20 with it without having some Committee member or Mr. Dondero in

21 support of it.  I was outvoted, although maybe I came around

22 in the actual vote.  But ultimately, I think it was actually a

23 quite smart idea, because it did set the basis for what the

24 case would be.  Either there would be some resolution or it

25 would push towards the monetization plan, and parties could

Seery - Direct                    100

1  then assess whether they liked the monetization plan or not.

2  That if I was going to be the Claimant Trustee or the --

3  defending the, you know, against the claims, they would have

4  the pleasure of litigating with me for some period of time.

5  Or they could come to some either grand bargain or ultimately

6  some other resolution.

7      And as we started to develop a plan and put more of a

8  framework -- more flesh around the framework, it actually

9  started to look more and more like a real viable alternative

10 to either long-term litigation or some other grand bargain if

11 we couldn't get there.

12 Q   And ultimately, did the board authorize the Debtor to file

13 its initial version of the asset monetization plan at around

14 the time of the mediation?

15 A   Yeah.  We developed it over the summer and really fleshed

16 it out in terms of how the structure would work, what the tax

17 issues were, what the governance issues were.  We did that

18 largely negotiating with ourselves, so we -- we were extremely

19 successful.  And then we filed, we filed that plan right

20 before the mediation.

21     And my recollection is that there was some concern from

22 the mediators that they thought that putting that plan out in

23 the public could upset the possibility of a grand bargain, so

24 we ended up filing that under seal.

25 Q   Do you recall what the Committee's initial reaction was to

Seery - Direct                    101

1    the asset monetization plan that you filed under seal?

2    A    Well, initially, they -- the Committee didn't like it.

3    They didn't like the governance.  They didn't like the fact

4    that it set up for those creditors who didn't litigate the

5    prospect of litigations to try to resolve their claims.  It

6    effectively cut out some of the advisory that the Committee

7    currently had.  The -- one of the driving forces behind the

8    asset monetization plan and how we initially started it is we

9    can't continue these costs, as I said.  Well, an easy way to

10   get rid of -- to reduce the costs is to get rid of half of

11   them.

12       So if you could get rid of the Committee, effectively, and

13   coalesce around an asset monetization vehicle, then if folks

14   wanted to resolve their claim, you could.  If you had to

15   litigate it, you could, but you'd have one set of lawyers that

16   the estate was paying for, one set of financial advisors the

17   estate was paying for, as opposed to multiple sets.

18   Q    In addition to the corporate governance issues that you

19   just described, did the Committee and the Debtor quickly reach

20   an agreement on the terms of the treatment of employee claims

21   and the scope of the releases for the employees?

22   A    No.  Not very quickly at all.

23   Q    Yeah.

24   A    You know, again, one of the issues in this case that

25   drives perspectives is the history that creditors have in

                          Seery - Direct                    102

1  dealing with Highland and in dealing with many of the

2  employees at Highland, you know, who had worked for Mr.

3  Dondero and served at his pleasure for a long time, and how

4  they had been treated in various of their attempts to collect

5  their claims.  So the idea of giving any sort of releases to

6  the employees was anathema to -- to many of the Committee

7  members.

8      From my perspective, you know, releases are particularly

9  important because there's a *quid pro quo* leading up to the

10 confirmation of a plan, particularly with a monetization plan

11 where it's clear that the employees are all going to be or

12 largely going to be either transitioned or terminated.  If

13 they're going to keep working towards that, we either have to

14 have some sort of financial incentive or some sort of

15 assurance that their actions which are done in good faith to

16 try to pursue this give them the benefit of more than just

17 their paycheck.

18     And so we thought we were setting up the *quid pro quo* in

19 terms of work towards the monetization, bring the case home,

20 and you're entitled to a release, so long as you haven't done

21 something that was grossly negligent or willful misconduct.

22 And the Committee, I think, wanted to have a more aggressive

23 posture.

24 Q   And did those disagreements over corporate governance and

25 the employee releases kind of spill out into the public at

Seery - Direct                                    103

1   that disclosure statement hearing in October?

2   A    I think they spilled out at that hearing as well as in the

3   hearing either the next day or two days later around Mr.

4   Daugherty's claim.  And again, it was -- it was contentious.

5   I tend to try to reach resolution, but I tend to hold firm

6   when I think that there's a good reason, an equitable reason

7   to do so, and compromising that issue was very difficult for

8   me.

9   Q    But in the weeks that followed, did the Committee and the

10  Debtor indeed negotiate to resolve to their mutual

11  satisfaction the issues surrounding corporate governance and

12  employee releases?

13  A    We did, yes.

14  Q    And were -- was the Debtor able to get its disclosure

15  statement approved with Committee support in late November?

16  A    We did, yes.

17  Q    Can you describe for the Court generally kind of the

18  process by which the Debtor negotiated with the Committee?

19  I'll ask it as broadly as I can, and I'll focus if I need to.

20  A    Yeah.  The process was usually in group settings with the

21  independent directors, professionals, and the Committee

22  members and their professionals.  Oftentimes, then, there

23  would be certain one-off conversations if there was a

24  particular issue that was more important to one Committee

25  member or another, or if they were designated by the Committee

Seery - Direct                    104

1   to be the point on that.  And so I negotiated on behalf of the

2   Debtor, both collectively and individually, around these

3   points.

4       The biggest issues related to governance of the Claimant

5   Trust, the separation of the Claimant Trust and the Litigation

6   Trust, which was important to me, the treatment of employees

7   between the filing -- the time we came up with the case and

8   when we were going to exit, and then how that release

9   provision would work.

10  Q   Is it fair to say that numerous iterations of the various

11  documents that embodied the plan were exchanged between the

12  Debtor and the Committee?

13  A   Yes.  There were -- there were dozens.

14  Q   Fair to say that the negotiations were arm's length?

15  A   Absolutely.  Often contentious, always professional, but I

16  do think that there were, you know, well -- good-faith views

17  held by folks on both sides.  And I think we were fortunate to

18  be able to get resolution of those, because they were

19  strongly-held views.

20  Q   Okay.  And ultimately, I think you've already testified,

21  and Mr. Clemente certainly made it clear:  Is the Debtor --

22  does the Debtor have the Committee on board for their plan

23  today?

24  A   My understanding is again -- and you heard Mr. Clemente --

25  both the Committee and each of the individual members are

                          Seery - Direct                    105

1  supportive of the plan.

2  Q    All right.  Let's switch to Mr. Dondero and his reaction

3  to the asset monetization plan.  Can you describe for the

4  Court based on your experience and your interaction with him

5  what you interpreted Mr. Dondero's position to be?

6            A VOICE:  Objection, hearsay, or --

7            MR. DRAPER:  Objection, hearsay.  Calls for

8  speculation, Your Honor.

9            THE COURT:  Overruled.

10           THE WITNESS:  Yeah.  I had direct discussions with

11 Mr. Dondero regarding the plan, the asset monetization plan,

12 as I mentioned, direct discussions regarding a potential grand

13 bargain.  The initial view from Mr. Dondero was, and he told

14 me, that if he didn't get a plan that he agreed to, if he

15 didn't have a specific control or agreement around what got

16 paid to Acis and Mr. Terry and what got paid to Redeemer

17 specifically, that he would, quote, burn the place down.  I

18 know that because it is, excuse the pun, seared into my mind,

19 but I also wrote it down.  And that was, you know, in the

20 early summer.

21    We had subsequent discussions around the plan, and as we

22 were talking about the -- about the grand bargain or -- the

23 pot plan hadn't come out at that point -- even on a large call

24 -- the plan initially called for a transition, and still does,

25 of employees of the Debtor to a related entity to continue

Seery - Direct                              106

1  performing services that were under the prior shared service

2  agreements that we were going to terminate.

3      But that transition is wholly dependent on Mr. Dondero.

4  And we had a call with at least five to seven people on it

5  where I said to Mr. Dondero, look, this is going to be in your

6  financial interest to agree to a smooth transition.  These

7  people have worked for you for a long time.  It's for their

8  benefit.  You portfolio-manage these funds.  It's to the

9  benefit of those funds to do this smoothly.  And if there's

10  litigation between you and the estate later, then those chips

11  will fall where they may.

12      And he told me to be prepared for a much more difficult

13  transition than I envisioned.

14      And I specifically said to him, and this one sticks in my

15  mind because I recall it, I said, don't worry, Mr. Dondero --

16  I think I used Jim -- I will be prepared.  I was a Boy Scout

17  and we spend time preparing for these kinds of things.  So

18  we're -- we would love to get done the best transition we can,

19  but we will be prepared for a difficult one.

20      So, from the start, the idea of the monetization plan was

21  not something that obviously he supported.  We did agree with

22  -- after his inquiry or request with the mediators, to file it

23  under seal while we went into the mediation.

24  BY MR. MORRIS:

25  Q   And after, after that was filed in September, early

Seery - Direct                              107

1  October, did Mr. Dondero start to act in a way that the board

2  perceived to be against the Debtor's interests?

3  A    Certainly.  I mean, he previously had shown inclinations

4  of that, but that -- it got very aggressive as he interfered

5  with the trades we were trying to do in terms of managing the

6  CLO assets.  He took a position that postpetition, which was

7  really one of his entities taking a position, that

8  postposition a sale of life policy assets was somehow not in

9  the best interests of the funds and that we had abused our

10 position, notwithstanding that he turned it over to us with no

11 liquidity to maintain those life policies.  There were several

12 other instances.  And those led to the decision to, one, have

13 him resign, and then ultimately, after the text to me that I

14 perceived as threatening, and we've had subsequent hearings on

15 it, we asked him to leave the office.

16 Q    Okay.  Let's move back to the plan here.  Can you

17 describe, you know, generally, if you can, the purpose and

18 intent of the asset monetization plan?

19 A    Well, very simply, the main purpose is to maximize value.

20 This is not a competition between Mr. Dondero and myself.  I

21 have no stake in getting more money out of the maximization

22 other than my duty to do the job that I was hired to do.

23     So our goal is to manage the assets in what we think is

24 the best way to do that over time, and find opportunities

25 where the market is right to monetize the assets, primarily

Seery - Direct                                    108

1    through sales.  There may be other instances, depending on the

2    type of asset, whether a sale makes sense, if we can structure

3    it through some kind of distribution that's more structured.

4    Q   We've used the phrase a bunch of times already.  Can you

5    describe in your own words what an asset monetization plan is

6    in the context of the Debtor's proposal?

7    A   Well, it may be slightly an awkward moniker, but I think

8    it's not completely different than what you'd see, in some

9    respects, to a regular plan, where you equitize debt and you

10   operate the business for the benefit of the equitized debt.

11   Here, it's a little different in that we know exactly how

12   we're going to move forward.  We've effectively -- we'll

13   effectively turn the debt obligations into trust interests and

14   we will pay those as we sell down assets.  So we've got it

15   structured in a way where we can pivot depending on market

16   conditions and we'll be managing certain funds that the assets

17   sit in.

18        So there's really four assets where the assets sit, and

19   we'll manage those.  First are the ones that the Debtor owns

20   directly.  Second will be the ones that are in Restoration

21   Capital -- Restoration Capital Partners.  Third are the assets

22   in a fund called Multi-Strat.  Fourth is the direct ownership

23   interest in Cornerstone, and technically (garbled) would be

24   the -- would be the next one.

25        So we have the ability to manage these individual assets

Seery - Direct                                        109

1   and then be able to sell them in what we determine to be the

2   best way to maximize value, depending on the timing.

3   Q   And when you say that that you're going to continue to operate

4   the business, do you mean that the Debtor will continue to

5   manage the assets you've just described in the same way that

6   it had prior to the petition date?

7   A   It'll be a smaller team, but that's the Debtor's business.

8   So what we won't be doing are the shared services anymore.

9   That was part of the Debtor's business.  But we will be

10  managing the assets.  So the 1.0 CLOs, we'll manage those

11  assets.  The RCP assets, we'll manage those assets.  The

12  Trussway Holdings assets, we'll managing those assets.  Each

13  of them is a little bit different.  There's things as diverse

14  as operating companies to real estate.  We'll operate, subject

15  to final agreement, but the Longhorn A and B, which are

16  separate accounts that are -- were funded and are controlled

17  by the largest -- one of the largest investors in the world.

18  And so they have agreed that we should manage those assets for

19  them.

20      So we're -- that's the business that the Debtor is in.  It

21  won't be doing all of the businesses that the Debtor was in

22  before, like the shared services, but the management of the

23  assets will be very similar.

24  Q   And why do these funds and these assets need continued

25  management?  Why aren't you just selling them?

Seery - Direct                      110

1  A    Well, in some respects, they could just be sold, but the

2  -- we believe that the value would be a lot lower.  So, a lot

3  of them are complex.  The time to sell them may not be now.

4  Some will require restructuring in some way, whether -- not

5  through a reorganization process, but some sort of structural

6  treatment to how the obligations at the individual asset are

7  treated, or the equity at the individual asset.  So we're

8  going to manage each of them and look for market opportunities

9  where we think the value can be maximized.

10         MR. MORRIS:  Your Honor, I'm about to switch to

11  another topic.  We have been going for a little bit more than

12  two and a half hours.  I'm happy to just continue if you and

13  the witness are, but I just wanted to give you a head's up

14  that I'm about to switch topics.  If you wanted to take a

15  short break, we could.  If you want me to continue, I'm happy

16  to do that, too.

17         THE COURT:  Well, let me ask you, how much longer do

18  you think you're going to take overall with Mr. Seery?

19         MR. MORRIS:  I think I'll probably have another hour

20  to an hour and a half, Your Honor.  We want to make a complete

21  factual record here.

22         THE COURT:  All right.  Well, it's 12:07 Central

23  time.  Why don't we take a 30-minute lunch break, okay?  Can

24  everybody do their lunch snack that fast?

25         MR. MORRIS:  Sure.

Seery - Direct                         111

1            THE COURT:  I think that would probably be the way to

2    go.  So we'll come back -- it's now 12:08.  We'll come back at

3    12:38 Central time and resume --

4            MR. MORRIS:  Okay.

5            THE COURT:  -- resume this direct testimony, okay?

6    So, see you in 30 minutes.

7            MR. MORRIS:  Thank you very much.

8            THE COURT:  Okay.

9            THE CLERK:  All rise.

10       (A recess ensued from 12:08 p.m. to 12:44 p.m.)

11           THE COURT:  We are going back on the record in the

12   Highland confirmation hearing.  It's 12:44 Central time.  I

13   took a little bit longer break than I said we would.

14       Mr. Morris and Mr. Seery, are you ready to resume?

15           MR. MORRIS:  I am, Your Honor.

16           THE WITNESS:  Yes, Your Honor.

17           THE COURT:  Okay, good.  A couple of things.  I'm

18   required to remind you you're still under oath, Mr. Seery.

19   And also, just for people's planning purposes, what I intend

20   to do is, when the direct examination of Mr. Seery is

21   finished, I'm going to allow cross-examination of the

22   Objectors in the same amount of time in the aggregate that the

23   Debtor got, okay?  So, Objectors, in the aggregate, you can

24   spend as long cross-examining as the Debtor spent examining.

25   I can figure out this is the most significant witness, so I'm

```
                          Seery - Direct                    112

 1    assuming that Debtor's other witnesses are going to be a lot

 2    shorter than this, but --

 3              MR. MORRIS:  Yes, I promise.

 4              THE COURT:  -- that's how we'll proceed.  And I

 5    expect to finish Mr. Seery today.

 6         So, all right.  With that, you may proceed, Mr. Morris.

 7              MR. MORRIS:  Okay.

 8                   DIRECT EXAMINATION, RESUMED

 9    BY MR. MORRIS:

10    Q    Can you hear me okay, Mr. Seery?

11    A    Yes, sir.

12    Q    Okay.  Before we move on to the next topic, you spent some

13    time describing the asset monetization plan.  Would it be fair

14    to describe that as a long-term going-concern liquidation?

15    A    Long-term is subjective.  We anticipate that we'll be able

16    to monetize the assets in two years.  We could go out longer

17    to three.  There's no absolute restriction that we couldn't

18    take longer, depending on what we see in the market, but the

19    objective would be to find maximization opportunities within

20    that time period.

21    Q    Okay.  So let's turn now to the post-confirmation

22    corporate governance structure.

23         (Interruption.)

24              THE WITNESS:  Mr. Golub (phonetic), you should mute.

25              THE COURT:  Yes.  I don't know -- I didn't catch who
```

```
                         Seery - Direct                    113
```

 1  that was.  But anyway, anyone other than --

 2          A VOICE:  It's someone named Garrett Golub.

 3          THE COURT:  -- Morris and Seery, please mute.  All

 4  right.  Go ahead.

 5          MR. MORRIS:  Okay.

 6  BY MR. MORRIS:

 7  Q    At a high level, Mr. Seery, can you please describe for

 8  the Court the post-confirmation structure that's envisioned

 9  under the proposed plan?

10  A    At a high level, we anticipate reorganizing HCMLP such

11  that the current parties of interest will be extinguished and,

12  in exchange, creditors will get trust interests.  There'll be

13  a trust that will sit on top of HCMLP and it will have an

14  overall responsibility for the Claimant Trust, which will be

15  the HCMLP assets plus the assets that we move into the

16  Claimant Trust, depending on structural considerations.  And

17  then a Litigation Trust, which will be a separate trust, and

18  that will roll up into the main trust.  And the main trust

19  will be where the creditors hold their interests.  And those

20  interests take the form of senior interests or junior

21  interests.

22  Q    All right.  You mentioned a Claimant Trust.  Who is

23  proposed to serve as the Claimant Trustee?

24  A    I am.

25  Q    And you mentioned a Litigation Trust.  Is there someone

Seery - Direct                            114

1  proposed to serve as the Litigation Trustee?

2  A    A gentleman named Marc Kirschner.  He's been doing these

3  kinds of things for a long time.

4  Q    Is there going to be any kind of oversight group or

5  committee?

6  A    There is an oversight committee that sits at the main

7  trust.  Into it will report Mr. Kirschner and myself.  It has

8  oversight responsibilities similar to a board of directors in

9  terms of the operations of the Claimant Trust and the

10 Litigation Trust.

11 Q    Do you have an understanding as to who the initial members

12 of the Claimant Oversight Committee?

13 A    The initial members will be each of the members of the

14 Creditors' Committee.  So, UBS, Acis, Redeemer, a

15 representative from Redeemer, and Meta-e, as well as an

16 independent named David Pauker.  So that's the initial

17 structure.

18 Q    And can you describe for the Court, how did Mr. Pauker get

19 involved in this?

20 A    He was selected by the Committee.

21 Q    Okay.  Is there -- Meta-e is a convenience class claim

22 holder.  Do I have that right?

23 A    Yeah.  They're -- they -- as I went through earlier, they

24 had a liquidated claim for litigation services.  So we

25 expected that they'll be paid off rather early in the process.

Seery - Direct                          115

1   At that point, we suspect they wouldn't -- they would no

2   longer be an Oversight Committee member and they would be

3   replaced by an independent.

4   Q    And do you have any understanding as to how that

5   independent will be chosen?

6   A    I believe it's chosen by the other members.

7   Q    Okay.  Can you describe your proposed compensation

8   structure as the proposed Claimant Trustee?

9   A    My compensation will be $150,000 a month, which is the

10  same compensation I have now.  In addition, we'll negotiate a

11  bonus structure with the Oversight Committee.  And that will

12  likely be a bonus not just for myself but for the entire team,

13  depending on performance.

14  Q    Okay.  And that -- and who is that negotiation going to be

15  had with?

16  A    The Oversight Committee.

17  Q    Okay.  Are you familiar with Mr. Pauker's compensation

18  structure?

19  A    I -- I've seen it.  I don't recall specifically.  I think

20  his -- from the models, I think he's about 40 or 50 grand a

21  month, something along those lines.

22  Q    Okay.  How about Mr. Kirschner?  Do you recall -- let me

23  just ask you this.  Does it refresh your recollection at all

24  if I said that 250 in year one for Mr. Pauker?

25  A    Yeah.  So maybe closer to $20,000 to $25,000 a month.  And

Seery - Direct                    116

1  then Mr. Kirschner is a lower amount, but he would get a

2  contingency fee arrangement somewhere dependent on the

3  recoveries from his litigations.

4  Q    Okay.  You mentioned earlier that the Debtor intends to

5  continue operations at least for some period of time post-

6  effective date.  Do you have a view as to whether the post-

7  confirmation entity will have sufficient personnel to manage

8  the business?

9  A    I do, yes.

10 Q    And why is that?  What makes you believe that the Debtor

11 will have -- the post-confirmation Debtor will have sufficient

12 personnel to manage the business?

13 A    Well, we've gone through and looked at each of the assets

14 and what is required to manage those assets.  We have a lot of

15 experience doing it during the case.  The bulk of the

16 employees, who do a fine job, are really doing shared service

17 arrangements.  The direct asset management group is a smaller

18 group, and we'll be able to manage those with the team we're

19 putting together.

20 Q    Okay.  How does the ten employees compare to the original

21 plan that was set forth in the disclosure statement, if you

22 recall?

23 A    Well, we had less, and I believe the number was either two

24 or three, along with me, and then using a lot of outside

25 professional help.  But we determined that we wanted to have a

                              Seery - Direct                    117

1   much more robust team, based on the litigation that we're

2   seeing around the case and we expect to continue post-exit, so

3   that the team can manage those assets unfettered.

4       In addition, we were taking on the CLO management, the 1.0

5   CLO contracts.  These one -- as I've mentioned before, they're

6   not traditional CLOs in the sense that they require the same

7   hands-on management, but they do require an experienced team

8   to help manage the exposures, most of which are cross-holdings

9   in different -- in different entities or different investments

10  that Highland also has exposure to.

11  Q   In addition to the assumption of the CLO management

12  agreements, has the Debtor made any decisions regarding the

13  possibility of hiring a sub-servicer?

14  A   We have, yes.

15  Q   And did that factor into the Debtor's decision to increase

16  the number of personnel it was going to retain?

17  A   Well, we determined we weren't going to hire a sub-

18  servicer.  And I'm not sure exactly when we made that

19  determination.  We do have a TPA, which is SEI, and that's a

20  third-party administrator, to sift through the funds and

21  provide accounting supporting to those, to those funds.  So

22  that -- they will help.  We also have an outside consultant

23  that we're using, Experienced Advisory Consultants, who are

24  financial consultants who've worked in the business.  So we do

25  have those.

Seery - Direct                              118

1    But we didn't think that we would get a third-party sub-

2    servicer, as was the case in Acis, and determined that wasn't

3    in the best interest of the estate.

4    Q   Can you just shed a little light on what factors the

5    Debtor took into account in deciding not to hire a sub-

6    servicer?

7    A   Well, we primarily looked at cost, as well as control of

8    the assets, and determined that that was -- those were in the

9    best interests of the estate, to keep them managed internally.

10   We reviewed that with the Committee, and they agreed.

11   Q   Okay.

12        MR. MORRIS:  Let's turn now to the best interests of

13   creditors' test, Your Honor, 1129(a)(7), and let's talk about

14   whether the plan is in the best interests of creditors.

15   BY MR. MORRIS:

16   Q   Has the Debtor done any analysis to determine the likely

17   value to be realized in a Chapter 7 liquidation?

18   A   We have, yes.

19   Q   And has the Debtor done any analysis to determine the

20   likely recoveries under the plan?

21   A   Yes.

22   Q   Okay.  Do you recall when these projections were first

23   prepared?

24   A   We started working on projections in the fall, as we were

25   developing the monetization plan.  We filed projections, I

Seery - Direct                                    119

1  believe, in November.  We've subsequently updated those

2  projections based on the claims, market condition, and value

3  of the assets.

4  Q   And were those updates provided to plan objectors last

5  week?

6  A   Yes, they were.

7  Q   Okay.  Can we refer to the projections that were in the

8  disclosure statement as the November projections?

9  A   That'd be fine.

10 Q   And can we refer to the projections that were provided to

11 the objectors last week as the January projections?

12 A   Yes.

13 Q   And as --

14 A   I think they're actually -- I think they're actually dated

15 February 1, is the most recent update.

16 Q   Okay.  And then was a further update provided yesterday

17 and filed on the docket, to the best of your knowledge?

18 A   Yes.

19 Q   All right.  We'll talk about some of the changes in those

20 projections.

21       MR. MORRIS:  Can we call up on the screen Debtor's

22 Exhibit 7D as in dog?  And this document is in evidence.  Um,

23 --

24       THE COURT:  No, this is -- oh, wait.  How many Ds is

25 it?  Seven?

Seery - Direct                          120

1        MR. MORRIS:  It's 7D, so that would be on Docket

2   1866, all of which has been admitted.

3        THE COURT:  Okay.  You're right.

4        MR. MORRIS:  Okay.

5     And if we could just, I'm sorry, go to Page 3.

6   BY MR. MORRIS:

7   Q   Is there any way to look at this, Mr. Seery?  Is this the

8   January projections that were provided last week?

9   A   Yes.

10  Q   Okay.  Can you describe for the Court the process by which

11  this set of projections and the November projections were

12  prepared?  How did the Debtor go about preparing these

13  projections?

14  A   Yeah.  These are prepared what I would call bottoms-up.

15  So what we did was we looked at each of the assets that the

16  Debtor owns or manages or has a direct or indirect interest

17  in, used the values that we have for those assets, because we

18  do keep valuations for each of the assets that the Debtor owns

19  or manages in the ordinary course of business.  We then

20  adjusted those depending on what we saw as the outcomes for

21  the case, either a plan outcome or a liquidation outcome, and

22  then rolled those into the -- into the numbers that you see

23  here.

24     So the 257 and change.  And please excuse my eyesight.

25  I'm going to make this bigger.  The 257 is the estimated

Seery - Direct                    121

1    proceeds from monetization.  Above that, you see cash.  That's

2    our estimated cash at 131.  And we monitor those, those values

3    daily.

4    Q    And were these projections prepared under your

5    supervision?

6    A    They were, yes.

7    Q    Okay.  And who was involved in the preparation of this

8    document and other iterations of the projections?

9    A    The team at DSI.  Obviously, myself; the team at DSI; as

10   well as the, at least from a review perspective, counsel.

11   Q    All of these contain various assumptions.  Do I have that

12   right?

13   A    Yes.

14          MR. MORRIS:  Can we go to the prior page, please, I

15   think is where the assumptions are?  And let's just look at a

16   few of them.  Okay.  Can we make that a little bigger, La

17   Asia?  Okay.  Good.

18   BY MR. MORRIS:

19   Q    Why does the Debtor's projections and liquidation analysis

20   contain any assumptions?  Why, why include assumptions?

21   A    Well, all projections contain assumptions.  So an

22   assumption -- I was strangely asked the question at

23   deposition, what does that mean?  It's a thing or fact that

24   one accepts as true for the purposes of analysis.  And so in

25   terms of looking out into the future as to what the potential

Seery - Direct                              122

1    operation expenses will be and what the potential recoveries

2    will be, one has to make assumptions in order to be able to

3    compare apples to apples.

4    Q    And do you believe that these assumptions are reasonable?

5    A    Yes.  It would make no sense to have assumptions that

6    aren't reasonable.  I mean, and we've all seen that with

7    analysis through our respective careers.  It really should be

8    grounded in some fact and a reasonable projection on what can

9    happen in the future, based upon experience.

10   Q    Okay.  And have you personally vetted each of the

11   assumptions on this page?

12   A    Yes.

13   Q    Okay.  Let's just look at a few of them.  Let's start with

14   B.  It says, All investment assets are sold by December 31,

15   2022.  Do you see that?

16   A    Yes.

17   Q    Why did the Debtor make that assumption?

18   A    We looked at a two-year projection horizon.  We thought

19   that that was a reasonable amount of time, looking at these

20   assets, to monetize the assets.  Remember that we did go

21   through a process of the case over the last year, and we did

22   consider monetization asset events for certain of the assets

23   throughout the case, some of which we were successful on, some

24   of which we weren't, some we just determined to pull back.

25   But we do believe that, based upon our view of the market and

Seery - Direct                              123

1  where we think these assets will be positioned, that

2  monetizing them over a two-year period makes sense.

3  Q    And is it possible that it takes longer than that?

4  A    It's possible.  The -- you know, we would be wrong about

5  the market.  The -- we could go into a full-blown recession.

6  Capital could dry up.  The financing markets could turn

7  negative.  But they're extremely positive right now.  Those

8  things could happen.  But we're assuming that they won't.

9  Q    And is it possible that you complete the process on a more

10 accelerated timeframe?

11 A    That's always possible.  It's not, in my experience, a

12 good way to plan.  Luck really isn't a business strategy.  But

13 if good opportunity shows up and folks want to pay full value

14 for an asset, we certainly wouldn't turn them away just so we

15 could stretch out the time period.

16 Q    Is it fair to say that this projected time period is your

17 best estimate on the most likely timeframe needed?

18 A    It's -- I think it's the best estimate that we have based

19 upon our experience with the assets, again, and our projection

20 of the marketplace that we see now.  If things change, we'll

21 adjust it, but this is a fair estimate of when we can get the

22 monetization accomplished.

23 Q    Okay.  The next assumption relates to certain demand

24 notes.  Do you see that?

25 A    Yes.

Seery - Direct                            124

1   Q    Can you explain to the Court what that assumption is and

2   why the Debtor believed that it was reasonable?

3   A    Well, the Debtor has certain notes that are demand notes.

4   These are all from related entities.  Most of the notes, the

5   demand notes, we have demanded, and we've commenced litigation

6   to collect.  And we assume that we're going to be able to

7   collect those.

8        Three notes that were long-term notes -- these were notes

9   with maturities in 2047 that had been stretched out a couple

10  years ago -- were defaulted recently.  And we have accelerated

11  those notes and we've asserted demands and we have commenced

12  litigation, I believe, on each of those last week to collect.

13  So we do estimate that we will collect on all of the notes

14  that we've demanded and that we've commenced action on.  So

15  the demand notes as well as the accelerated notes.

16       The next, the next bullet shows there's one Dugaboy note

17  that has not defaulted.  That also has a 2047 maturity.  I

18  believe it's about $18 million.  And we expect that one to

19  stay current, because now I think the relater parties learned

20  that when you don't pay a long-dated note, it accelerates,

21  provided the holder, which is us, wishes to accelerate it,

22  which we did.  And so that note we do not expect to be

23  collected in the time period.

24  Q    Okay.

25            MR. MORRIS:  Let's go down to M.

Seery - Direct                                125

1  BY MR. MORRIS:

2  Q   M relates to certain claims.  Do you see that?

3  A   Yes.

4  Q   Can you just describe at a high level what assumption was

5  made with which -- with respect to which particular claims?

6  A   Well, we've summarized them there.  And what we've assumed

7  is that, with respect to Class 8, IFA, which is a derivative

8  litigation claim that seeks to hold, loosely, HCMLP liable for

9  obligations of NexBank, is worth zero.  I think that's pretty

10 close to settling.  We assumed here $94.8 million for UBS,

11 which was the estimated amount, and $45 million for

12 HarbourVest.

13 Q   And when you say the estimated amount, are you referring

14 to the 3018 order on voting?

15 A   Yes.  We just use the estimated amount in this projection

16 based upon the 3018 order.

17 Q   Okay.  And finally, let's look at P.  P has a payout

18 schedule.  Do I have that right?

19 A   That's an estimated payout schedule, yes.

20 Q   And what do you mean by that, that it's estimated?

21 A   Based upon our projections and how we perceive being able

22 to monetize the assets and reach the valuations that we want

23 to reach, we believe we could make these distributions.

24 However, there's no requirement to make them.

25     So the first and foremost objective we have, as I said

Seery - Direct                          126

1   earlier, is to maximize value, and not -- it's not based on a

2   payment schedule, it's based upon the market opportunity.  And

3   we've estimated for our purposes here that we'll be able to

4   meet these distribution amounts, but there's no requirement to

5   do so.

6   Q    Okay.

7          MR. MORRIS:  Let's go to Page 3 of the document,

8   please.

9   BY MR. MORRIS:

10  Q    Can you just describe generally what this page reflects?

11  A    This is a comparison of the plan analysis and what we

12  expect to achieve under the plan and the liquidation analysis

13  if a trustee, a Chapter 7 trustee, were to take over.  And it

14  compares those two distribution amounts based upon the

15  assumptions on the prior page.

16  Q    All right.  Let's just look at some of the -- some of the

17  data points on here.  If we look at the plan analysis, what is

18  -- what is projected to be available for distribution, the

19  value that's available for distribution?

20  A    $222.6 million.

21  Q    Okay.  So, 222?  And on a claims pool that's estimated to

22  be, for this purpose, how much?

23  A    $313 million.

24  Q    And what is the distribution, the projected distribution

25  to general unsecured creditors on a percentage basis?

Seery - Direct                    127

1   A   On this analysis, to general unsecured creditors, it's

2   62.14 percent. But remember, that backs out the payment to

3   the Class 7 creditors of 85 cents above.

4   Q   Okay. And does this plan analysis include any value for

5   litigation claims?

6   A   No, it does not.

7   Q   And is that true for all forms of the Debtor's

8   projections?

9   A   That's correct, yes.

10   Q   Okay. And let's look at the right-hand column for a

11   moment. It says, Liquidation Analysis. What does that column

12   represent?

13   A   That represents our estimate of what a Chapter 7 trustee

14   could achieve if it were to take over the assets, sell them,

15   and make distributions.

16   Q   Okay. And let's just look at the comparable data points

17   there. Under the liquidation analysis, as of -- the January

18   liquidation analysis as of last week, what was projected to be

19   available for distribution?

20   A   A hundred and -- approximately $175 million.

21   Q   Okay. And what was the claims pool?

22   A   The claims pool was $326 million. Recall that that's a

23   slightly larger claims pool because it doesn't back out the

24   Class 7 claims.

25   Q   Okay. The convenience class claims?

Seery - Direct                    128

1   A   Correct.

2   Q   Okay.  And what's the projected recovery for general

3   unsecured claims under the liquidation analysis?

4   A   Based on this analysis and the assumptions, 48 (audio

5   gap).

6   Q   Okay.  Based on the Debtor's analysis, are creditors

7   expected to do better under this analysis in the -- under the

8   Debtor's plan versus the hypothetical Chapter 7 liquidation?

9   A   Yes.  Both -- both Class 7 and Class 8.

10  Q   Okay.  Now, this set of projections differs from the

11  projections that were included in the disclosure statement; is

12  that right?

13  A   That's correct.

14  Q   Okay.  Can we just talk about what the differences are

15  between the November projections that were in the disclosure

16  statement and the January projections that are up on the

17  screen?  Let's start with the monetization of assets, the

18  second line.  Do you recall if there was an increase, a

19  decrease, or did the value from the monetization of assets

20  stay the same between the November projections and the January

21  projections?

22  A   They increased from November 'til -- 'til now.

23  Q   Okay.  Can you explain to the judge why the value from the

24  monetization of assets increased from November to January?

25  A   Well, really, it's the composition of the assets and their

Seery - Direct                                    129

1   value.  So there's four main drivers.

2       The first is HarbourVest.  We had a settlement with

3   HarbourVest, which include HarbourVest transferring to the

4   Debtor $22-1/2 million of HCLOF interests.  Those have a real

5   value, and we've now included them in the -- in the asset

6   pool.  We've also included HarbourVest in the claims pool.

7       The second was we talked a little bit earlier on the

8   assumptions on the notes.  We previously had anticipated that,

9   on the long-dated notes, a collection, we -- we'd receive

10  principal and interest currently, but we wouldn't receive the

11  full amount of the principal that was due well off in the

12  future, and we would sell it a discount.

13      So the amount of the asset pool has been increased by $24

14  million, and that reflects the delta between or the change

15  between what was in the prior plan, the notes paying and then

16  being sold at a discount, and what's in the current plan,

17  which include the accelerated notes, which is a $24 million

18  note that Advisors defaulted on that we have accelerated and

19  brought action on, as well as two six -- roughly $6 million

20  notes, one from Highland Capital Real Estate and the other

21  from HCM Services.  So that's, that's additional 24.

22      In addition, Trussway, we've reexamined where Trussway is

23  in the market, both its marketplace and its performance, and

24  reassessed where the value is.  So that has increased by about

25  $10.6 million.

Seery - Direct                     130

1    That doesn't mean that we would sell it today.  It means

2    that, when you look at the performance of the company, what we

3    think are the best opportunities in the market.  As we see the

4    marketplace with managing the company over time, we think that

5    that asset has appreciated considerably since November.

6        And then, finally, there were additional revenues that

7    flow into the model from the November analysis which would be

8    distributable, and those include revenues from the 1.0 CLOs.

9    Q    Okay.  So that accounts for the difference and the

10   increase in value from the monetization of assets.  Is there

11   also an increase in expenses from the November projections to

12   the January projections?

13   A    Yeah.  It's -- it's about -- it's around $25 million

14   additional increase.

15   Q    And can you explain to the Court what is the driver behind

16   that increase in expenses?

17   A    Yeah.  There's several drivers to that.  The first one is

18   head count.  So our head count, we've increased.  As I

19   mentioned earlier, we determined that we wanted to have a much

20   more robust management presence.  So we've increased the head

21   count, so we have a base comp, compensation, about $5 million

22   more than we initially thought.

23       Secondly, we have bonus comp.  So we've back-ended --

24   structured a backend bonus performance bonus for the team, and

25   that will run another $5 million, roughly.

Seery - Direct                     131

1    Previously, we had thought about, as you mentioned

2  earlier, the sub-servicing, but we've now talked about and we

3  have engaged a TPA, SEI, as well as experienced advisors.

4  That's another $1 to $2 million.

5    Operating expenses have increased by about $8 million,

6  based upon our assessment.  The biggest driver there is D&O,

7  which is up about $3 million.  In addition, we've gotten -- we

8  determined to keep a bunch of agreements related to data

9  collection and operations.  Those were requested by the

10 Committee, but they also serve us in performing our functions.

11 That's another couple million dollars.

12   My comp, my bonus comp was not in the prior model.  So I

13 have a bonus that has not been agreed to by the Court for the

14 bankruptcy performance.  This is not a future bonus.  And we

15 built that into the model.  Obviously, it's subject to Court

16 approval and Committee objection, and I suppose anybody else's

17 objection, but we'll -- we'll be before the Court for that.

18 But we wanted to build that into the model so that we had it

19 covered in the event that it was approved.

20 Q   Was there also a change in the assumption from November to

21 January with respect to the size of the general unsecured

22 claim pool?

23 A   Yes.  There have been -- there have been several changes

24 that have happened, and we've added those and refined the

25 claim pool numbers.

Seery - Direct                    132

1  Q   And are those changes reflected in the assumption we

2  looked at earlier, Exhibit -- Assumption M, which went through

3  certain claims that have been liquidated?

4  A   Some, some are.  That assumption, I don't believe, was --

5  it's not in front of me, but wasn't up to date.  So, that one,

6  for example, assumed UBS at the 3018 estimated amount.  We've

7  since refined that number to reflect the agreed-upon

8  transaction with UBS, which is subject to Court approval.

9  Q   Right.  But before we get to that, for purposes of the

10 January model, the one that's up on the page -- and if we need

11 to look at the prior page --

12        MR. MORRIS:  Let's go to the prior page, the

13 assumption.  Assumption M.

14 BY MR. MORRIS:

15 Q   Assume the UBS, the UBS claim at the $94.8 million, the

16 3018 number.  Do you remember that?

17 A   Yeah.  That's, that -- that's the assumption in this

18 model.  I think back in November we assumed HarbourVest at

19 zero and UBS at zero.  So we've since -- we've since refined

20 those numbers, obviously, through both the 3018 process as

21 well as the settlement with HarbourVest.

22 Q   And did the -- did the inclusion -- withdrawn.  At the

23 time that you prepared the November model -- withdrawn.  At

24 the time the Debtor prepared the November model, did it know

25 what the UBS or the HarbourVest claims would be valued at?

Seery - Direct                         133

1   A    No.  We just had our assumption back then, which was zero.

2   And now, obviously, we know.

3   Q    And so the January model took into account the settlement

4   with HarbourVest and the 3018 motion; do I have that right?

5   A    That's correct.  That's in the assumptions.

6   Q    And what was the impact on the projected recoveries to

7   general unsecured creditors from the changes that you've just

8   described, including the increase in the claims amount?

9   A    Well, when -- like any fraction, the distribution will go

10  down if the claimant pool goes up.  So, with the denominator

11  going up by the UBS and the UBS amount -- the UBS and the

12  HarbourVest amounts, the distribution percentage went down.

13  Q    Okay.  I want to focus your attention on the second line

14  where we've got the monetization of assets under the plan at

15  $258 million but under the liquidation analysis it's $192

16  million.  Do you see that?

17  A    Yes.

18  Q    Can you tell Judge Jernigan why the Debtor believes that

19  under the plan the Debtor or the post-confirmation Debtor is

20  likely to receive or recover more for the --

21       (Interruption.)

22            THE COURT:  All right.  Hang on a minute.  Where is

23  that coming from, Mike?

24            THE CLERK:  Someone is calling in.

25            THE COURT:  Okay.

Seery - Direct                          134

1          MR. MORRIS:  Thank you.

2          THE COURT:  Mr. --

3          MR. MORRIS:  Let me restate the question.

4          THE COURT:  Yes.  Restate.

5   BY MR. MORRIS:

6   Q   Can you explain to Judge Jernigan why the Debtor believes

7   that the -- under the plan corporate structure, the Debtor is

8   likely to recover more from the monetization of assets than a

9   Chapter 7 liquidation trustee would?

10  A   Sure.  My experience is that Chapter 7 trustees will

11  generally try to move quickly to monetize assets.  They will

12  retain their own professionals, they will examine the assets,

13  and they will look to sell those assets swiftly.

14      The monetization plan does not plan to do that.  I've got

15  a year's of experience -- a year now of experience with these

16  assets, as well as we'll have a team with several years at

17  least each of experience with the assets.  We intend to look

18  for market opportunities, and think we'll be able to do it in

19  a much better fashion than a liquidating Chapter 7 trustee.

20      The nature of these assets is complex.  Many of them are

21  private equity investments in operating businesses.  Certain

22  of them are complicated real estate structures that need to be

23  dealt with.  Some of them are securities that, depending on

24  when you want to sell them, we believe there'll be better

25  times than moving quickly forward to sell them now.

Seery - Direct                                135

1      So, with each of them, we think that we'll be able to do

2    better than a Chapter 7 trustee based upon our experience.

3    The only thing that we're level-set with a Chapter 7 trustee

4    on is that cash is cash.

5    Q    Do you have any concerns that a Chapter 7 trustee might

6    not be able to retain the same personnel that the Debtor is

7    projected to retain?

8    A    Well, again, in my experience, it would be very difficult

9    for a Chapter 7 trustee to retain the same professionals, and

10   typically they don't.

11     Secondly, retaining the individuals, I think, would be

12   very difficult for a Chapter 7 trustee, would not have a

13   relationship with them, and that gap of time and the risks

14   that they would have to take to join a Chapter 7 trustee I

15   think would lead most of them to look for different

16   opportunities.

17   Q    Okay.  One of the other things, one of the other changes I

18   think you mentioned between the November and the January

19   projections was the decision to assume the CLO management

20   contracts.  Do I have that right?

21   A    That's correct.

22   Q    And why has the Debtor decided to assume the CLO

23   management contracts?  How does that impact the analysis on

24   the screen?

25   A    Well, it does add to the expense, but it also adds to the

Seery - Direct                      136

1   proceeds.

2       When we did the HarbourVest settlement, we ended up with

3   the first significant interest in HCLOF.  HCLOF owns the vast

4   majority of the equity in Acis 7, and also owns significant

5   preferred share interests in the 1.0 CLOs.  And we think it's

6   in the best interest of the estate to keep the management of

7   those assets where we have an interest in the outcome of

8   maximizing value with the estate.

9       In addition, we're going to have employees who are going

10  to work with us to manage those specific assets, so we feel

11  like that will be something where we can control the

12  disposition much better.

13      There's also cross-interests that these CLOs have in --

14  the 1.0 CLOs have in a number of other investments that

15  Highland has.  As in all things Highland, it's interrelated,

16  and so many of the companies have direct loans from the CLOs.

17  We intend to refinance that, but we feel much more comfortable

18  and feel that there would be value maximization if we're able

19  to work directly with the Issuers as a manager while we seek

20  in those underlying investments to refinance the CLO debt.

21  Q   Has the Debtor -- has the Debtor reached an agreement with

22  the Issuers on the assumption of the CLO management

23  agreements?

24  A   Yes, we have.

25  Q   Can you describe for the Court the terms of the

```
                        Seery - Direct                    137
```

1    assumption?

2           MR. RUKAVINA:  Your Honor, this --

3           THE WITNESS:  Yes.

4           MR. RUKAVINA:  Your Honor, this is Davor Rukavina.  I

5    would object to this as hearsay.

6           THE COURT:  Well, he has not --

7           MR. MORRIS:  It's --

8           THE COURT:  He's not said an out-of-court statement

9    yet, so I overrule.

10      Go ahead.

11          THE WITNESS:  Yeah, we -- we are going to assume the

12   CLO contracts.  We have had direct discussions with the

13   Issuers.  They have agreed.

14      The basic terms are that we're going to cure them by

15   satisfying about $500,000 of cure costs related to costs that

16   the CLO Issuers have incurred in respect of the case, and

17   we'll be able to pay that over time.

18          MR. RUKAVINA:  Your Honor, this is Davor Rukavina.  I

19   would renew my objection and move to strike his answer that

20   they've agreed.  That is hearsay, an out-of-court statement

21   offered to prove the truth of the matter asserted.

22          THE COURT:  Okay.  Mr. Morris, what is your response?

23          MR. MORRIS:  He's describing an agreement.  I

24   actually think it's in the Debtor's plan that's on file

25   already.  But he's describing the terms of an agreement.  He's

Seery - Direct                    138

1  not saying what anybody said.  There's no out-of-court

2  statement.  It's an agreement that's being described.

3         THE COURT:  All right.  Thank you.  I overrule the

4  objection.

5         MR. MORRIS:  Okay.

6  BY MR. MORRIS:

7  Q   Does the Debtor believe that the CLO agreements will be

8  profitable?

9  A   Yes.

10 Q   And why does the Debtor believe that the CLO agreements

11 will be profitable to the post-confirmation estate?

12 A   Well, we don't -- we don't break out profitability on a

13 line-by-line basis.  But the simple math is that the revenues

14 from the CLO contracts which will roll in to the Debtor from

15 the management fees are more than what we anticipate the

16 actual direct costs of monitoring and managing those assets

17 would be.

18 Q   Okay.  Are you aware that yesterday the Debtor filed a

19 further revised set of projections?

20 A   I am, yes.

21 Q   All right.  Let's call those the February projections.

22         MR. MORRIS:  Can we put those on the screen?

23     It's Exhibit 7P, Your Honor.

24         THE COURT:  Okay.

25         MR. MORRIS:  All right.  I think that for some reason

Seery - Direct                          139

1   -- yeah, okay.  There we go.  Perfect.  Right there.

2        Your Honor, these are the projections that were filed

3   yesterday.  I'm going to move for the admission into evidence

4   of these projections.

5              THE COURT:  All right.

6              MR. TAYLOR:  Your Honor, this is Clay Taylor.

7              THE COURT:  Go ahead.

8              MR. TAYLOR:  We object.  These were -- these were not

9   previously provided.  They were provided on the eve of the

10  confirmation hearing, after the Debtors had already revised

11  them once and provided those on -- after close of business on

12  a Friday before Mr. Seery's deposition.  And these were

13  provided even later, certainly not within the three days

14  required by the Rule.  And therefore we move to -- that these

15  should not be allowed into evidence.

16             THE COURT:  Mr. Morris, what is your response to

17  that?

18             MR. MORRIS:  Your Honor, first of all, the January

19  projections were provided in advance of Mr. Seery's deposition

20  and he was questioned extensively on it.  These projections

21  have been updated since then, I think for the singular purpose

22  of reflecting the UBS settlement.

23       As Your Honor just saw, the prior projections included an

24  assumption based on the 3018 motion.  Since Mr. Seery's

25  deposition, UBS and the Debtor have agreed to publicly

Seery - Direct                          140

1  disclose the terms of the settlement, and that's reflected in

2  these revised numbers.  I think there was one other change

3  that Mr. Seery can testify to, but those are the only changes

4  that were made.

5         THE COURT:  All right.  Mr. Seery, what besides the

6  UBS settlement do you think was put in these overnight ones?

7         THE WITNESS:  I believe the only other change, Your

8  Honor, was correcting a mistake.  In Assumption M, the second

9  line is assumes RCP claims will offset against HCMLP's

10 interest in the fund and will not be paid from the Debtor's

11 assets.  That hasn't changed.

12    Basically, the Debtor got an advance from RCP that was to

13 -- for tax distributions, and did not repay it.  The RCP

14 investors are entitled to recovery of that.  So we had

15 previously backed that out.  It's about four million bucks.

16 What happened was it was just double-counted.

17        THE COURT:  Okay.

18        THE WITNESS:  So, as an additional claim, it was

19 counted as $8 million.  I think that's the only other change.

20        THE COURT:  All right.  I overrule the objection.

21 You may go forward.  I admit 7P.

22        MR. MORRIS:  Thank you, Your Honor.

23    (Debtor's Exhibit 7P is received into evidence.)

24        MR. MORRIS:  Can you just -- if we can go to the next

25 page, please.

Seery - Direct                                141

1  BY MR. MORRIS:

2  Q    So, with -- seeing that the claims pool under the plan

3  previously was $313 million, and what's the claims pool under

4  the projections up on the screen under the plan?

5  A    Two -- well, remember, there's 273 for Class 8, and then

6  you'd add in the Class 7 as well, which is the $10.2 million.

7  So the 273 went from 313 to 273 with that settlement.

8  Q    And is there any -- is there any reason for the decrease

9  other than the change from the 3018 settlement -- order figure

10 to the actual settlement amount?

11 A    For the UBS piece, no.  And then, as I mentioned, I

12 believe the other piece would have been that four million --

13 that additional $4 million that was taken out.

14 Q    And did those two changes have a -- did those two changes

15 have an impact on the projected recoveries under the plan?

16 A    Sure, particularly with respect to -- to the Class 8.

17 Those recoveries went up significantly because the denominator

18 went up.

19 Q    Okay.  Does the Debtor believe that its plan is feasible?

20 A    Yes, absolutely.

21 Q    And do you know whether the administrative priority and

22 convenience class claims will be paid in full under the

23 Debtor's plan?

24 A    Yes.  We monitor the cash very closely, so we do have

25 additional cash to raise, but we're set to reach or exceed

Seery - Direct                           142

1  that target, so we do believe we'll be able to pay all the

2  administrative claims when they come in.  Obviously, we have

3  to see what they are.  We will be able to pay Class 7 on the

4  effective date.  Any other distributions, we expect to be able

5  to make as well.

6       So, and then it's -- then it's a question of going forward

7  with a few other claims that we have to pay over time.  We

8  have the cash flow to pay those.  Frontier, for example, we'll

9  be able to pay that claim over time in accordance with the

10 restructured terms.  If the assets that secure that claim are

11 sold, they would be paid when those assets are sold.

12 Q    Frontier, will the plan enable the Debtor to pay off the

13 Frontier secured claim?

14 A    Yes.  That's what I was explaining.  The cash flow is

15 sufficient to support the current P&I on that claim.  We will

16 be able to satisfy it from other assets if we determine not to

17 sell the asset securing the Frontier claim, or if we sell the

18 asset securing the Frontier claim we could satisfy that claim.

19 The asset far exceeds the value of the claim.

20 Q    Has the plan been proposed for the purpose of avoiding the

21 payment of any taxes?

22 A    No.  We expect all tax claims to be paid in accordance

23 with the Code, and to the extent that there are additional

24 taxes generated, we would pay them.

25 Q    Okay.  Let's just talk about Mr. Dondero for a moment

Seery - Direct                               143

1    before we move on.  Are you aware that Mr. Dondero's counsel

2    has requested the backup to, you know, these numbers,

3    including the asset values?

4    A    It -- I'm not sure if it was his counsel or one of the

5    other related-entity counsels.

6    Q    Okay.  But you're aware that a request was made for the

7    details regarding the asset values and the other aspects of

8    this?

9    A    Yes.

10   Q    Those were -- were those formal requests or informal

11   requests?

12   A    They were certainly at my deposition.

13   Q    Right.  But you haven't seen a document request or

14   anything like that, have you?

15   A    No.

16   Q    Did the Debtor make a decision as to whether or not to

17   provide the rollup, the backup information to Mr. Dondero or

18   the entities acting on his behalf?

19   A    Yes.

20   Q    And what did the Debtor decide?

21   A    We would not do that.

22   Q    And why did the Debtor decide that?

23   A    Well, I think that's pretty standard.  The underlying

24   documentation and the specific terms of the model are very

25   specific, and they are -- they are confidential business

Seery - Direct                              144

1  information that runs through what we expect to spend and what

2  we expect to receive and when we expect to sell assets and

3  then receive proceeds, and the prices at which we expect to

4  sell them.

5      To the extent that any entity wants to have that

6  information as a potential bidder, that would be very

7  detrimental to our ability to maximize value.  So, typically,

8  I wouldn't expect that to be given out, and I would not

9  approve it to be given out here.

10  Q   Did the Debtor disclose to Mr. Dondero's counsel or

11  counsel for one of his entities the agreement in principle

12  with UBS before the updated plan analysis was filed last

13  night?

14  A   I believe that disclosure was done a while ago, to Mr.

15  Lynn.

16  Q   So, to the best of your -- so, to the best of your

17  knowledge, the Debtor actually shared the specifics of the

18  agreement with UBS with Mr. Dondero and his counsel before

19  last night?

20  A   Yes.  I have specific personal knowledge of it because we

21  had to ask UBS for their permission, and they agreed.

22  Q   Okay.

23         MR. MORRIS:  All right.  Let's move on to 1129(b),

24  Your Honor, the cram-down portion.

25  BY MR. MORRIS:

Seery - Direct                                   145

1   Q    Are you aware, Mr. Seery, how various classes have voted

2   under the plan?

3   A    I am generally, yes.

4   Q    Okay.  Did any class vote to reject the plan, to the best

5   of your knowledge?

6   A    I don't -- I guess it depends on how you define the class.

7   I think the answer is that I don't believe that, when you

8   count the full votes of the -- the allowed claims and the

9   votes in any class, I don't believe any of the classes voted

10  to reject the plan.

11  Q    What type of claims are in Class 8?

12  A    General unsecured claims.

13  Q    And what percentage of the dollar amount of Class 8 voted

14  to accept?

15  A    It's -- I think it's near -- now with the Daugherty

16  agreements, it's near a hundred percent of the third-party

17  dollars.  I don't know the individual employees' claims off

18  the top of my head.

19  Q    All right.  And what about the number in Class 8?  Have a

20  majority voted to accept or reject in Class 8?

21  A    If you include the employee claims -- which, again, we

22  think have no dollar amounts -- then I think it's a majority

23  would have rejected.  The vast dollar amounts did accept.

24  Q    Okay.  Let's talk about those employees claims for a

25  moment.  Do you have an understanding as to the basis of the

Seery - Direct                     146

1   claims?

2   A    Yes.

3   Q    What's your understanding of the basis of the claims?

4   A    Most of the claims are based on deferred compensation, and

5   that's the 2005 Highland Capital Management bonus plan.  And

6   that bonus plan provides certain deferred payment amounts to

7   the employees to be paid over multiple-year periods, provided

8   that they are in the seat when the payment is due.  That's the

9   vesting date.

10  Q    Okay.

11        MR. MORRIS:  Your Honor, just as a note-keeping

12  matter, the deferred compensation plan and the annual bonus

13  plan are Exhibits 6F and 6G, respectively, and they're on

14  Docket 1822.

15        THE COURT:  All right.

16  BY MR. MORRIS:

17  Q    And Mr. Seery, are you generally familiar with those

18  plans?

19  A    I am, yes.

20  Q    In order to receive benefits under the plans, are the

21  employees required to be employed at the time of vesting?

22  A    Yeah.  Our counsel refers to them, various terms, but

23  generally -- our outside labor counsel.  They're referred to

24  as seat-in-the-seat plans, meaning that your seat has to be in

25  a seat at the office at the day that the payment is due.  If

Seery - Direct                          147

1  you're terminated for cause or if you resign, you're not

2  entitled to any payment.

3      So either you're there and you receive it or you're not

4  and you don't.  The only exception to that, I believe, is

5  death and disability.  Or disability.

6  Q    All right.  Did the Debtor terminate the annual bonus

7  plan?

8  A    Yes, we did.

9  Q    And in what context did the Debtor terminate the annual

10 bonus plan?

11 A    Well, we had discussion on it last week.  As Mr. Dondero

12 had also testified, the plan was to terminate all the

13 employees prior to the transition.  That's well known among

14 the employees.  The board terminated the 2005 bonus plan and

15 instead replaced it with a KERP plan that was approved by this

16 Court.

17 Q    And what was your understanding of the consequences of the

18 termination of the bonus plan for -- for purposes of the

19 claims that have been asserted by the employees who rejected

20 in Class 8?

21 A    It's clear that, under the 2005 HCMLP bonus plan, no

22 amounts are due because the plan has been terminated.

23 Q    All right.  Do you have an understanding as to when

24 payments become due under the deferred compensation -- under

25 the compensation plan?

Seery - Direct                          148

1  A    I do, yes.

2  Q    And when are they due?

3  A    The next payments are due in May.

4  Q    And what is the Debtor intending to do with respect to the

5  objecting employees?

6  A    The Debtor will have terminated all those employees before

7  that date.

8  Q    All right.  So, what's -- what are the consequences of

9  their termination vis-à-vis their claims under the deferred

10  compensation plan?

11  A    They won't have any claims.

12  Q    Okay.  So is it the Debtor's view that the employees who

13  voted to reject in Class 8 have no valid claims under the

14  annual comp -- annual bonus plan or the deferred compensation

15  plan?

16        MR. RUKAVINA:  Your Honor, this is Davor Rukavina.

17  With due respect, Your Honor, these employees have voted.  The

18  voting is on file.  There has been no claim objections to

19  their claims filed.  There's been no motion to designate their

20  votes filed.  So Mr. Seery's answer to this is irrelevant.

21  They have votes -- pursuant to this Court's disclosure

22  statement order, they have votes and they have counted, and

23  now Mr. Seery is attempting to basically impeach his own

24  balloting summary.

25        THE COURT:  Mr. Morris, what is your response?

Seery - Direct                    149

1     MR. MORRIS:  The point of cram-down, Your Honor, is

2  it fair and equitable.  Does -- does -- is it really fair and

3  equitable to the 99 percent of the economic interests to allow

4  24 employees who have no valid claims to carry the day here?

5  And this is -- that's what cram-down is about, Your Honor.

6     THE COURT:  All right.  I overrule the objection.

7  BY MR. MORRIS:

8  Q   Let's talk about Class 7 for a moment, Mr. Seery.  That's

9  the convenience class; is that right?

10 A   That's correct.

11 Q   How and why was that created?

12 A   Well, initially, that was created because we had two types

13 of creditors in the case, broadly speaking.  We had liquidated

14 claims, which were primarily trade-type creditors, and we had

15 unliquidated claims, which were the litigation-type creditors.

16 And so that class was created to deal with the liquidated

17 claims, and the Class 8 would deal with the unliquidated

18 claims, which were expected to, as we talked about earlier

19 with respect to the monetization plan, take some time to

20 resolve.

21 Q   Was the creation of the convenience class a product of

22 negotiations with the Committee?

23 A   The initial discussion on how we set it up I believe was

24 generated by the Debtor's side, but how it evolved and who

25 would be in it and how it was treated in terms of

Seery - Direct                          150

1  distributions was a product of negotiation with the Committee.

2  Q    Okay.  So how was the dollar threshold figure arrived at?

3  How did you actually determine to create a convenience class

4  at a million dollars?

5  A    It was through negotiation with the Committee.  So this

6  was one of those items that moved a fair bit, in my

7  recollection, through the many negotiations we had, heated

8  negotiations on some of these items, with the Committee.

9  Q    And are all convenience class -- all holders of

10  convenience class claims holders of claims that were

11  liquidated at the time the decision was made to create the

12  class?

13  A    I believe so.  I don't think there's been -- other than --

14  well, there -- we just had some settlements today, and I think

15  that relates to the employees, but those would be the only

16  ones that there would be disputes about, and that would roll

17  into the liquidat... the convenience class.

18  Q    Okay.  Finally, is there any circumstance under which

19  holders of Class 10 or 11, Class 10 or Class 11 claims will be

20  able to obtain a recovery under the plan?

21  A    Theoretically, there's a circumstance, and that is if

22  every other creditor in the case were to be paid in full, with

23  interest at the federal judgment rate, including Class 9,

24  which are the subordinated claims.  If those all got paid in

25  full, then theoretically the junior interest holders could

Seery - Direct                        151

1   receive distributions.

2       However, based upon our projections, that would be wholly

3   dependent on a significant recovery in the Litigation -- by

4   the Litigation Trustee.

5   Q   Okay.  Let's move now to questions of the Debtor release

6   and the plan injunction.  Is the Debtor providing a release

7   under the plan?

8   A   Yes.

9   Q   Is anyone other than the Debtor providing a release under

10  the plan?

11  A   No.

12  Q   Who is the Debtor proposing to release under the plan?

13  A   The release parties are pretty similar to what you

14  typically would see, in my experience, in most plans.  You

15  have the independent board, myself as CEO and CRO, the

16  professional -- the Committee members, the professionals in

17  the case, and the employees that we reached agreement with

18  respect to certain of them who have signed on to a

19  stipulation, and others, get a broader release for negligence.

20  Q   Okay.  Is the Debtor aware of any facts that might give

21  rise to a colorable claim against any of the proposed release

22  parties?

23  A   Not with respect to any of the release parties.  So the --

24  obviously, I don't think there's any claims against me.  But

25  the same is true with respect to the oversight board, the

Seery - Direct                                        152

1   independent board.

2       The Committee has been, you know, working with us hand-in-

3   glove, and I think if they thought we -- there was something

4   there, we would have heard it.

5       With respect to the professionals, we haven't seen

6   anything as an independent board.

7       And with respect to the employees' that -- general

8   negligence release, these are current employees and we have

9   been monitoring them for a year and we don't have any evidence

10  or anything to suggest that there would be a claim against

11  them.

12  Q    Are there conditions to the employees' release?

13  A    There are.  So, the employee release, as we talked about

14  earlier, was highly negotiated with the Committee.  It

15  requires that employees assist in the monetization efforts,

16  which is really on the transition and the monetization.  They

17  don't have to assist in bringing litigations against anybody,

18  so that's not part of what the provision requires.  But it

19  does require that they assist generally in our efforts to

20  monetize assets.

21      We don't think that's going to be significant, but if

22  there are individual questions or help we need, we certainly

23  would reach out to them.  If it's significant time, that will

24  be a different discussion.

25      And then with respect to the two senior employees who

Seery - Direct                              153

1  signed the stipulation, they have to give up a part of their

2  distribution for their release.

3  Q    All right.  I think you just alluded to this, but has the

4  release been the subject of negotiation with the Creditors'

5  Committee?

6  A    Yeah.  We've touched on it a bunch of times, and we

7  certainly, unfortunately, let it spill over into the court a

8  couple times.  It was a hotly-negotiated piece of the plan.

9  Q    Okay.  Has the Committee indicated to the Debtor in any

10  way that anybody subject to the release is the subject of a

11  colorable claim?

12  A    Anyone subject to the release?  No.

13  Q    Yeah.  All right.  Let's talk about the plan injunction

14  for a moment.  Are you familiar with the plan injunction?

15  A    Broadly, yes.

16  Q    And what is your broad understanding of the plan

17  injunction?

18  A    Anybody who has a claim or thinks they have a claim will

19  broadly be enjoined from bringing that, other than as it's

20  satisfied under the plan or else ultimately bringing it before

21  this Court.  And that's the gatekeeper part, which is a little

22  bit of combining the two pieces.

23  Q    And what's your understanding of the purpose of the

24  injunction?

25  A    It's really to prevent vexatious litigation.  We, as

Seery - Direct                          154

1  independent directors, stepped into what I think most people

2  would fairly say is one of the more litigious businesses and

3  enterprises that they've seen.  And we have a plan that will

4  allow us to monetize assets for the benefit of the creditor

5  body, provided we're able to do that and not have to put out

6  fires every day on different fronts.  So what we're hoping to

7  do with the injunction is ensure that we can actually fulfill

8  the purposes of the plan.

9  Q   All right.  Let's talk about some of the litigation that

10 you're referring to.

11       MR. MORRIS:  Can we put up on the screen the

12 demonstrative for the Crusader litigation?

13 BY MR. MORRIS:

14 Q   And Mr. Seery, I would just ask you to kind of describe

15 your understanding in a general way about the history of the

16 Crusader litigation.

17       MR. MORRIS:  And, Your Honor, just to be clear here,

18 this is a demonstrative exhibit.  As you can see in the

19 footnotes, it's heavily footnoted to the documents and to --

20 and, really, to the court cases themselves.  The documents on

21 the exhibit list include the dockets from each of the

22 underlying litigations.  And I just want to just have Mr.

23 Seery describe at an extremely high level some of the

24 litigation that the Debtor has confronted over the years, you

25 know, as the driver, as he just testified to, for the decision

Seery - Direct                              155

1  to seek this gatekeeper injunction.

2          THE COURT:  All right.

3  BY MR. MORRIS:

4  Q    So, Mr. Seery, can you just describe kind of in general

5  terms the Crusader litigation?

6  A    Yeah.  I apologize to the Redeemer team for maybe not

7  doing this justice.  But this is litigation that came out of a

8  financial crisis upheaval related to this fund.  Disputes

9  arose with respect to the holders of the interests, which were

10 the -- ultimately became the Redeemers, and Highland as the

11 manager.

12     That went through initial litigation, and then into the

13 Bermuda courts, where it was subject to a scheme.  The scheme

14 required or allowed for the liquidation of the fund and then

15 distributions to the -- to the holders, and then deferred many

16 of the payments to Highland.

17     At some point, Highland, frustrated that it wasn't able to

18 get the payments, decided to just take them, and I think, you

19 know, fairly -- can be fairly described, at least by the

20 arbitration panel, as coming up with reasons that may not have

21 been wholly anchored in reality as to what its reasons were

22 for taking that money.

23     That led to further disputes with the Redeemers, who then

24 terminated Highland and brought an arbitration action against

25 Highland.  They were successful in that arbitration and

Seery - Direct                              156

1   received a $137 arbitration award.  And right up to the

2   petition date, that arbitration pursued.  When they finally

3   got their -- the arbitration award, they were going to

4   Delaware Chancery Court to file it and perfect it, and the

5   Debtor filed.

6   Q    Okay.

7            MR. MORRIS:  Let's go to the next slide, the Terry/

8   Acis slide.  If we could just open that up a little bit.  It's

9   -- as you can imagine, Your Honor, it's a little difficult to

10  kind of summarize the Acis/Terry saga in one slide, but we've

11  done the best we can.

12  BY MR. MORRIS:

13  Q    Mr. Seery, can you describe generally for Judge Jernigan,

14  who is well-versed in the matter, the broad overview of this

15  litigation?

16  A    There's clearly nothing I can tell the Court about the

17  bankruptcy that it doesn't already know.  But very quickly,

18  for the record, Mr. Terry was an employee at Highland.  He

19  also has a partnership interest in Acis, which was, in

20  essence, the Highland CLO business.  He -- and he got into a

21  dispute with Mr. Dondero regarding certain transactions that

22  Mr. Dondero wanted to enter into and Mr. Terry didn't believe

23  were appropriate for the investors.

24       Strangely, the assets that underlie that dispute are still

25  in the Highland portfolio, both Targa (phonetic) and Trussway.

Seery - Direct                           157

1   Mr. Terry was terminated, or quit, depending on whose side of

2   the argument you take.  Mr. Terry then sought compensation in

3   the arbitration pursuant to the partnership agreement.

4   Ultimately, he was awarded an arbitration award of roughly $8

5   million.

6       When he went to enforce that -- that was against Acis.

7   When he went to enforce that against Acis, which had all the

8   contracts, Highland went about, I think, terribly denuding

9   Acis and moving value.  Mr. Terry ultimately was able to file

10  an involuntary against Acis, and after a tremendous amount of

11  litigation had a plan confirmed that gave him certain rights

12  in Acis and any ability to challenge certain transactions with

13  respect to Highland that formed the basis of his claims in the

14  Highland bankruptcy.

15      That wasn't the end of the saga, because Highland

16  commenced a litigation -- well, not Highland, but HCLOF and

17  others, directed by others -- commenced litigation against Mr.

18  Terry in Guernsey, an island in the English Channel.  That

19  litigation wound its way for a couple -- probably close to two

20  years, at least a year and a half, and ultimately was -- it

21  was dismissed in Mr. Terry's favor.

22      While that was pending, litigation was commenced in New

23  York Supreme Court against Mr. Terry and virtually anybody who

24  had ever associated with him in the business, including --

25  including some of the rating agencies.  That was withdrawn as

Seery - Direct                          158

1  part of our efforts working with DAF to try to bring a little

2  bit of sanity to the case.  But it was withdrawn without

3  prejudice.

4       But ultimately, you know, we've agreed to a claims

5  settlement, which was approved by this Court, with Acis and

6  Mr. Terry.

7  Q   All right.

8            MR. MORRIS:  How about UBS?  Can we get the UBS

9  slide?

10            THE WITNESS:  I should mention that there's other

11  litigations involving Mr. Terry and Highland individuals that

12  are outstanding, I believe, in Texas court.  We have not yet

13  had to deal with those.

14  BY MR. MORRIS:

15  Q   Okay.  Can you describe for the Court your general

16  understanding of the UBS litigation?

17  A   Again, UBS comes out of the financial crisis.  It was a

18  warehouse facility that UBS had established for Highland.  It

19  actually was a pre-crisis facility that was restructured in

20  early '08, while the markets were starting to slide but before

21  they really collapsed.  That litigation started after Highland

22  failed to make a margin call.  UBS foreclosed out -- or it

23  wasn't really a foreclosure, because it's a warehouse

24  facility, but basically closed out all the interest and sought

25  recovery from Highland for the shortfall.

Seery - Direct                    159

1    Highland was one of the defendants, but there are numerous

2    defendants, including some foreign subsidiaries of Highland.

3    That case wend its way through the New York Supreme Court,

4    up and down between the Supreme and the Appellate Division,

5    which is the intermediate appellate court in New York.

6    Incredibly litigious effort over virtually every single item

7    you could possibly think of.

8    Ultimately, UBS got a judgment for $500-plus million and

9    -- plus prejudgment interest against two of the Highland

10   subsidiaries.  It then sought to commence action up -- enforce

11   its judgment through various theories against Highland.  That

12   is part of the settlement that we have -- it's been part of

13   the lift stay motion here, the 3019, as well as the 3018, and

14   as well as the ultimate settlement we've discussed today.

15   Q   Okay.  Moving on to Mr. Daugherty, can you describe for

16   the Court your understanding of the Daugherty litigation?

17   A   The Daugherty litigation goes back even further.  It did

18   -- I think the original disputes were -- or, again, started to

19   happen between Mr. Daugherty and Mr. Dondero even prior to the

20   crisis, but Mr. Dondero -- Daugherty certainly stayed with

21   Highland post-crisis.  And then when Mr. Daugherty was severed

22   or either resigned or terminated from his position, there was

23   various litigations that began between the parties very

24   intensely in state court, one of the more nasty litigations

25   that you can imagine, replete with salacious allegations and

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2233 of 2722

Seery - Direct                          160

1  press releases.

2      That litigation then led to an award originally for Mr.

3  Daugherty from HERA, which was an entity that had assets that

4  Mr. Daugherty alleges were stripped.  Mr. Daugherty had to pay

5  a judgment against Highland.  Ultimately, litigations were

6  commenced in both the state court and the Delaware Chancery

7  Court.  Those litigations, many of those continue, because

8  they're not just against the entities but specific

9  individuals.  Mr. Daugherty got a voting -- a claim allowed

10 for voting purposes in our case of $9.1 million, and we've

11 since reached an agreement with Mr. Daugherty on his claim,

12 save for a tax case which we announced earlier that relates to

13 compensation, claimed compensation with respect to a tax

14 distribution, which we have defenses for and he has claims

15 for.

16          MR. MORRIS:  All right.  We can take that down,

17 please.

18 BY MR. MORRIS:

19 Q   And let's just talk for a few minutes about some of the

20 things that have happened in this case.  Did Mr. Dondero

21 engage in conduct that caused the Debtor to seek and obtain a

22 temporary restraining order?

23 A   Yes, he did.

24 Q   And did the Debtor -- did Mr. Dondero engage in conduct

25 that caused the Debtor to seek and obtain a preliminary

Seery - Direct                          161

1   injunction against him?

2   A    Yes.

3   Q    And has the Debtor filed a motion to hold Mr. Dondero in

4   contempt for violation of the TRO?

5   A    Yes.

6   Q    Are you aware that -- of the CLO-related motion that was

7   filed in mid-December?

8   A    It's similar in that these are controlled entities that

9   brought similar types of claims against the Debtor and

10  interfered in similar ways, albeit not as directly threatening

11  with respect to the personnel of the Debtor.

12  Q    Okay.  And you're aware of how that -- that motion was

13  resolved?

14  A    I know we resolved it, and I'm drawing a blank on that.

15  But --

16  Q    All right.  Are you aware, did Mr. Daugherty also object

17  to the Acis and HarbourVest settlements, or at least either

18  him or entities acting on his behalf?

19  A    I think you meant Mr. Dondero.  I don't believe Mr.

20  Daugherty did.

21  Q    You're right.  Thank you.  Let me ask the question again.

22  Thank you for the clarification.  We're almost done.  To the

23  best of your knowledge, did Mr. Dondero or entities that he

24  controls file objections to the Acis and HarbourVest

25  settlements?

Seery - Direct                    162

1  A    Yes, they did.

2  Q    And we're here today with this long recitation because the

3  remaining objectors are all Mr. Dondero or entities owned or

4  controlled by him; is that right?

5  A    That's correct.

6  Q    All right.

7        MR. RUKAVINA:  Your Honor, I didn't have a chance to

8  object in time.  Entities owned or controlled by Mr. Dondero.

9  There's no evidence of that with respect to at least three of

10 my clients, and this witness has not been asked predicate

11 questions to lay a foundation.  Mr. Dondero does not own or

12 control the three retail (inaudible).  So I move to strike

13 that answer.

14       MR. MORRIS:  Your Honor, I withdraw with respect to

15 the three funds.  It's fine.

16       THE COURT:  All right.  With that withdrawal, then I

17 think that resolves the objection.

18       MR. MORRIS:  Uh, --

19       THE COURT:  Or I overrule the remaining portion.

20    Okay.  Go ahead.

21       MR. RUKAVINA:  That does, Your Honor.  Thank you.

22 BY MR. MORRIS:

23 Q    Are -- are -- is everything that you just described, Mr.

24 Seery, the basis for the Debtor's request for the gatekeeper

25 and injunction features of the plan?

Seery - Direct                          163

1    A    Well, everything I described are a part of the basis for

2    that.  I didn't describe every single basis with respect to

3    why those --

4    Q    So what are -- what are the other reasons that the Debtor

5    is seeking the gatekeeper and injunction provisions in the

6    plan?

7    A    We really do need to be able to operate the business and

8    monetize the assets without direct interference and litigation

9    threats.  We didn't go through some of the specifics, and I

10   hesitate to burden the Court again, but the email to me, the

11   email to Mr. Surgent, the testimony threatening -- effectively

12   threatening Mr. Surgent, in my opinion, by Mr. Dondero, in the

13   court in previous weeks, statements by his counsel indicating

14   that Mr. Dondero is going to sue me for hundreds of millions

15   of dollars down the road.

16       I mean, this is nonstop.  I'm an independent fiduciary.

17   I'm trying to maximize value for the estate.  I've got some

18   guy who's threatening to sue me?  It's absurd.

19           MR. MORRIS:  Your Honor, I have no further questions,

20   but what I would respectfully request is that we take just a

21   short five-minute break.  I'd like to just confer with my

22   colleagues before I pass the witness.

23           THE COURT:  All right.  Five-minute break.

24           MR. MORRIS:  Thank you, Your Honor.

25           THE CLERK:  All rise.

                           Seery - Direct                    164

1        (A recess ensued from 1:58 p.m. to 2:06 p.m.)

2             THE CLERK:  All rise.

3             THE COURT:  All right.  Please be seated.  We're back

4    on the record in Highland.  Mr. Morris, anything else?

5             MR. MORRIS:  All right, Your Honor.  Can you hear me?

6             THE COURT:  I can, uh-huh.

7             MR. MORRIS:  Okay.  Mr. Seery, are you there?

8             THE WITNESS:  I am, yes.

9             MR. MORRIS:  I just have a few follow-up questions,

10   Your Honor, if I may.

11            THE COURT:  Okay.

12                  DIRECT EXAMINATION, RESUMED

13   BY MR. MORRIS:

14   Q    Okay.  Mr. Seery, we talked for a bit about the difference

15   between the convenience class and the general unsecured

16   claims.  Do you recall that?

17   A    Yes.

18   Q    And that's the difference between Class 7 and 8; do I have

19   that right?

20   A    Yes.

21   Q    And what is the recovery for claimants in Class 7, to the

22   best of your recollection, the convenience class?

23   A    It's 85 cents.

24   Q    And under --

25   A    On the dollar.

Seery - Direct                              165

1   Q    And under the projections that were filed last night, and

2   we can call them up on the screen if you don't have total

3   recall, do you recall what Class 8 is projected to recover now

4   that we've taken into account the UBS settlement?

5   A    Approximately 71.

6   Q    Okay.

7   A    Percent.  71 cents on the dollar.

8           THE COURT:  Okay.  The answer --

9   BY MR. MORRIS:

10  Q    Okay.  Do I this right --

11          THE COURT:  The answer was a little garbled.  Can you

12  repeat the answer, Mr. Seery?

13          THE WITNESS:  Approximately 71 cents on the dollar,

14  Your Honor.

15          THE COURT:  Okay.  Thank you.

16  BY MR. MORRIS:

17  Q    Okay.  And do I have that right, that that 71 cents

18  includes no value for potential litigation claims?

19  A    That's correct.  We didn't even put that in our

20  projections at all.

21  Q    So is it possible, depending on Mr. Kirschner's work, that

22  holders of Class 8 claims could recover an amount in excess of

23  85 percent?

24  A    It's possible, yes.

25  Q    Okay.  Are you aware that Dugaboy has suggested that the

Seery - Direct                            166

1  Debtor should resolicit because their -- their -- the

2  projections in the November disclosure statement were

3  misleading?

4  A    I'm aware that they've made allegations along those lines,

5  yes.

6  Q    Okay.  Do you think the November projections were

7  misleading in any way?

8  A    No, not at all.

9  Q    And why not?

10  A    Well, the plan was -- the projections are for the plan,

11  and they contain assumptions.  And it was clear in the plan

12  that those assumptions could change.  So the value of the

13  assets, which aren't static, does change.  The costs aren't

14  static.  They do change.  The amount of the claims, the

15  denominator, was not static and would change.

16  Q    Okay.  And were the -- were the changes in the claims, for

17  example, changes that were all subject to public viewing, as

18  the Court ruled on 3018, as the settlement with HarbourVest

19  was announced?

20  A    Well, the plan -- the terms of the plan made clear that

21  the Class 8 claims would -- would be whatever the final

22  amounts of those claims were going to be.  We did resolve the

23  claims of HarbourVest and then ultimately the settlement

24  announced today, but in front of -- in front of the world, in

25  front of the Court, with a 9019 motion.

Seery - Direct                    167

1   Q    Okay.  We had finished up with some questioning about the

2   gatekeeper and the injunction provision.  Do you recall that?

3   A    Yes, I do.

4   Q    And you had testified as to the reasons why the Debtor was

5   seeking that particular protection.  Do you recall that?

6   A    Yes.

7   Q    In the absence of that protection, does the Debtor have

8   any concerns that interference by Mr. Dondero could adversely

9   impact the timing of the Debtor's plan?

10  A    Well, that's my opinion and what I testified to before.  I

11  think the -- the injunction -- the exculpation, the

12  injunction, and the gatekeeper are really critical and

13  essential elements of this plan, because we have to have the

14  ability, unfettered by litigation, particularly vexatious

15  litigation in multiple jurisdictions, we have to be able to

16  avoid that and be able to focus on monetizing the assets and

17  try to maximize value.

18  Q    Is there a concern that that value would erode if

19  resources and time and attention are diverted to the

20  litigation you've just described?

21  A    Absolutely.  The focus of the team has to be on the

22  assets' monetization, creative ways to get the most value out

23  of those assets, and not on defending itself, trying to paper

24  up some sort of litigation defense against vexatious

25  litigation, and also spending time actually defending

Seery - Direct                          168

1    ourselves in various courts.

2    Q    Okay.  Last couple of questions.  If there was no

3    gatekeeper provision in the plan, would you accept appointment

4    as the Claimant Trustee?

5    A    You broke up.  No which provision?

6    Q    If there was no gatekeeper provision in the -- in the

7    confirmation order, would you accept the position as Claimant

8    Trustee?

9    A    No, I wouldn't.  Just -- just like when I came on, there

10   were -- there are some pretty essential elements that I

11   mentioned before.  One is indemnification.  Two is directors

12   and officers insurance.  And three was a gatekeeper function.

13   I want to make sure that we're not at risk, that I'm not at

14   risk, for doing my job.

15   Q    And I think you just said it, but if you were unable to

16   obtain D&O insurance, would you accept the position as

17   Claimant Trustee?

18   A    No, I would not.

19             MR. MORRIS:  I have no further questions, Your Honor.

20             THE COURT:  All right.  So, you went two hours and 34

21   minutes in total with your direct.  So we'll now pass the

22   witness for cross.  And the Objectors get an aggregate of two

23   hours and 34 minutes.

24        Who's going to go first?

25             MR. RUKAVINA:  Your Honor, Davor Rukavina.  I will.

```
                          Seery - Direct                      169

1            THE COURT:  Okay.  Go ahead.

2            MR. RUKAVINA:  Mr. Vasek, if you can pull up Exhibit

3    6N, the ballot summary, Page 7 of 15 on the top.

4            MR. POMERANTZ:  Mr. Morris, you're not on mute.

5            MR. MORRIS:  Thank you, sir.

6            MR. RUKAVINA:  Mr. Vasek, did you hear me?  There it

7    is.

8                        CROSS-EXAMINATION

9    BY MR. RUKAVINA:

10   Q    Mr. Seery, are you familiar with this ballot tabulation

11   that was filed with the Court and that has been admitted into

12   evidence?

13   A    Yes, I believe I've seen this.

14   Q    Okay.  And this says that 31 Class 8 creditors rejected

15   and 12 Class 8 creditors accepted the plan, correct?

16   A    That's correct.

17   Q    And since then, I think we've heard that Mr. Daugherty and

18   maybe two other employees have changed their vote to an

19   accept; is that correct?

20   A    That's correct, yes.

21   Q    Okay.  Other than three, those three employees that are

22   changing, do you know of any other Class 8 creditors that are

23   changing their votes?

24   A    Mr. Daugherty is not an employee.

25   Q    I apologize.  Other than those three Class 8 creditors
```

Seery - Cross                          170

1  that are changing their votes, do you know of any other ones

2  that are changing their votes?

3  A    No.

4  Q    Okay.  You didn't tabulate the ballots, did you?

5  A    No, I did not.

6  Q    Do you have any reason to question the accuracy of this

7  ballot summary that's been filed with the Court?

8  A    No, I do not.

9  Q    Okay.  You mentioned that many of the people that rejected

10 the plan are former employees who you don't think will

11 ultimately have allowed claims, correct?

12 A    Not ultimately.  I said they don't have them now.

13 Q    Okay.  Are you aware that the Court ordered that

14 contingent unliquidated claims be allowed to vote in an

15 estimated amount of one dollar?

16 A    I'm aware of that, yes.

17 Q    Okay.  All right.  Now, no motion to reconsider that order

18 has been filed, correct?

19 A    Not to my knowledge.

20 Q    Okay.  No objection to these rejecting employees' claims

21 have been filed yet, correct?

22 A    Correct.

23 Q    Okay.  And no motion to strike or designate their vote has

24 been filed as of now, correct?

25 A    Correct.

Seery - Cross                                        171

1          MR. RUKAVINA:  You can take down that exhibit, Mr.

2    Vasek.

3    BY MR. RUKAVINA:

4    Q    Mr. Seery, the Debtor itself is a limited partnership; I

5    think you confirmed that earlier, correct?

6    A    Correct.

7    Q    And its sole general partner is Strand Advisors, Inc.,

8    correct?

9    A    Correct.

10   Q    And to your understanding, the Debtor, as a limited

11   partnership, is managed by its general partner, correct?

12   A    Correct.

13   Q    Okay.  And Strand, that's where the independent board of

14   you, Mr. Nelms, and Mr. Dubel -- or I apologize if I'm

15   misspelling, misstating his name -- that's where the board

16   sits, at Strand, correct?

17   A    Yes.

18   Q    Okay.  And that board has been in place since about

19   January 9, 2020?

20   A    Yes.

21   Q    Okay.  Strand is not a debtor in bankruptcy, correct?

22   A    No.

23   Q    Okay.  Do you have any understanding as to whether, under

24   non-bankruptcy law, a general partner is liable for the debts

25   of the limited partnership that it manages?

Seery - Cross                                        172

1    A    I do.

2    Q    Okay.  What's your understanding?

3    A    Typically, a general partner is liable for the debts of

4    the partnership.

5    Q    Okay.  And under the plan, Strand itself is an exculpated

6    party and a protected party and a released party for matters

7    arising after January 9, 2020, correct?

8    A    Yes.

9    Q    Okay.  You mentioned that you're the chief executive

10   officer and chief restructuring officer in this case for the

11   Debtor, correct?

12   A    For the Debtor, yes.

13   Q    Yeah.  You are not a Chapter 11 trustee, right?

14   A    No.

15   Q    Okay.  You are one of the principal authors of this plan,

16   correct?

17   A    Consultant.

18              MR. MORRIS:  Objection to the form of the question.

19              THE COURT:  Sustained.

20   BY MR. RUKAVINA:

21   Q    You are --

22              THE COURT:  Sustained.

23   BY MR. RUKAVINA:

24   Q    You are --

25              THE COURT:  Rephrase.

Seery - Cross                           173

1  BY MR. RUKAVINA:

2  Q   -- one of the principal --

3        MR. RUKAVINA:  I apologize.

4  BY MR. RUKAVINA:

5  Q   You had input in creating this plan, didn't you?

6  A   I did, yes.

7  Q   Okay.  And you're familiar with the plan's provisions,

8  aren't you?

9  A   Yes.

10  Q   Okay.  And you, of course, approve of the plan, correct?

11  A   Yes.

12  Q   Okay.  And you are, of course, familiar generally with

13  what the property of the estate currently is, correct?

14  A   Yes.

15  Q   Okay.  And part of the purpose of the plan, I take it, is

16  to vest that property in the Claimant Trust in some respects

17  and the Reorganized Debtor in some respects, correct?

18  A   I don't -- I don't know if that's a fair characterization.

19  Some property -- maybe some property will stay with the

20  Debtor, some will be transferred directly to the Trust.

21  Q   Okay.  All property of the estate as it currently exists

22  will stay with the Debtor or go to the Trust, correct?

23  A   Yes.

24  Q   Okay.  And under the plan, the Creditor Trust will be

25  responsible for payment of prepetition claims, correct?

Seery - Cross                              174

1  A    Yes.

2  Q    And under the plan, the Creditor Trust will be responsible

3  for the payment of postpetition pre-confirmation claims,

4  correct?

5  A    Do you mean admin claims?  I don't --

6  Q    Sure.

7  A    I don't understand your question.  I'm sorry.

8  Q    Yes.  We can call them admin claims.

9  A    Yeah.  Those -- they'll be -- they will be paid on the

10  effective date or in and around that time.  So I'm not sure if

11  that's actually going to be from the Trust, but I think it's

12  actually from the Debtor, as opposed to from the Trust.

13  Q    Okay.  But after the creation of the Claimant Trust, --

14  A    Uh-huh.

15  Q    -- whatever administrative claims are not paid by that

16  time will be assumed by and paid from the Claimant Trust,

17  correct?

18  A    I don't recall that specifically.

19  Q    Is it your testimony that the Reorganized Debtor will be

20  obligated post-effective date of the plan to pay any admin

21  claims that are then unpaid?

22         MR. MORRIS:  Objection to the form of the question.

23         THE COURT:  Sustained.  Rephrase.

24  BY MR. RUKAVINA:

25  Q    Who pays unpaid admin claims under the plan once the plan

Seery - Cross                   175

1  goes effective?

2  A    I believe the Debtor does.  The Reorganized Debtor.

3  Q    Okay.  The Reorganized Debtor also gets a discharge,

4  correct?

5  A    Yes.

6  Q    Okay.  And there is no bankruptcy estate left after the

7  plan goes effective, correct?

8         MR. MORRIS:  Objection to the form of the question.

9         THE COURT:  Overruled.

10        MR. RUKAVINA:  Your Honor, I have the right to know

11 what the objection to my question is.

12        THE COURT:  I overruled.

13        MR. MORRIS:  Okay.

14        THE COURT:  I overruled the objection.

15        MR. RUKAVINA:  Thank you.

16 BY MR. RUKAVINA:

17 Q    Mr. Seery, do you remember my question?

18 A    That whether there was a bankruptcy estate after the

19 effective date?

20 Q    Yes.

21 A    There wouldn't be a bankruptcy estate anymore, no.

22 Q    Okay.  Under the plan, the creditors, to the extent that

23 they have their claims allowed, the prepetition creditors,

24 they're the beneficiaries of the Claimant Trust, correct?

25 A    They are some of the beneficiaries, yes.

Seery - Cross                              176

1    Q   Okay.  And you would be the Trustee, I think you said, of

2    the Claimant Trust?

3    A   Of the Claimant Trust, yes.

4    Q   Okay.  And you will have fiduciary duties to the

5    beneficiaries of the Claimant Trust, correct?

6    A   I believe I have some, yes.

7    Q   Okay.  Well, as the Trustee, you will have some fiduciary

8    duties; you do agree with that?

9    A   That's what I said, yes.

10   Q   Okay.  What's your understanding of what those fiduciary

11   duties to the beneficiaries of the Claimant Trust will be?

12   A   I think they'll be -- they are cabined to some degree by

13   the provisions of the agreement, but generally there will be a

14   duty of care and a duty of loyalty.

15   Q   Do you feel like you'll have a duty to try to maximize

16   their recoveries?

17   A   That depends.

18   Q   On what?

19   A   My judgment on what's the -- if I'm exercising my duty of

20   care and my duty of loyalty.

21   Q   Okay.  But surely you'd like to, whether you have a duty

22   or not, you'd like to maximize their recoveries as Trustee,

23   wouldn't you?

24   A   Yes.

25   Q   Okay.  Now, in addition to the beneficiaries, which I

Seery - Cross                              177

1  believe are the Class 8 and Class 9 creditors, the plan

2  proposes to give non-vested contingent interests in the Trust

3  to certain holders of limited partnership interests, correct?

4  A    Yes.

5  Q    Okay.  And those non-vested contingent interests would

6  only be paid and would only vest if and when all unsecured

7  creditors and subordinated creditors are paid in full, with

8  interest, correct?

9  A    Yes.

10 Q    Okay.  And those non-vested contingent interests are a

11 property interest, although they're an inchoate property

12 interest, correct?

13 A    I don't know.  I think I testified in my deposition that I

14 -- I reached for inchoate, but I'm not an expert in the

15 definitions of property interests.  I don't know if they're

16 too ethereal to be considered a property interest.

17 Q    Okay.

18       MR. RUKAVINA:  Mr. Vasek, will you please pull up Mr.

19 Seery's deposition at Page 215?  And if you'll go to Page 200

20 -- can you zoom -- can you zoom that in a little bit?  Mr.

21 Vasek, can you zoom on that?

22       MR. VASEK:  Just a moment.  There's some sort of

23 issue here.

24       MR. RUKAVINA:  Okay.  And then go to Page 216.

25 Scroll down to 216, please.

Seery - Cross                        178

1        MR. VASEK:  Okay.  I can't see it, so --

2        MR. RUKAVINA:  Okay.  Stay, stay where you are.  Go

3   down one more row.

4   BY MR. RUKAVINA:

5   Q    Okay.  Mr. Seery, can you see this?

6   A    Yes.

7   Q    Okay.  So, I ask you on Line 21, "They may be a property

8   interest, but inchoate only, correct?"  And you answer, "That

9   is my belief.  I don't claim to be an expert on the different

10  types of property interests," --

11       MR. RUKAVINA:  Mr. Vasek, can you go to the next

12  page?

13  BY MR. RUKAVINA:

14  Q    (continues) "-- whether they be inchoate, reversionary,

15  ethereal.  I don't claim to be an expert on the different

16  types of property interests."

17       Do you see that answer, sir?

18  A    Yes.

19  Q    And do you stand by your answer given on Lines 23 through

20  Line 4 of the next page?

21  A    Yes.

22  Q    Okay.  And these non-vested contingency -- contingent

23  interests in the Claimant Trust, they may have some value in

24  the future, correct?

25  A    Yes.

Seery - Cross                              179

1          MR. RUKAVINA:  Okay.  You can take that down, Mr.

2   Vasek.

3   BY MR. RUKAVINA:

4   Q    Have you tried to see whether anyone outside this case, or

5   anyone at all, would pay anything for those unvested

6   contingent interests to the Claimant Trust?

7   A    No.

8   Q    Okay.  Now, the Debtor is a registered investment advisor

9   under the Investment Advisers Act of 1940; is that correct?

10  A    That's correct.

11  Q    And under that Act, the Debtor owes a fiduciary duty to

12  the funds that it manages and to the investors of those funds,

13  correct?

14  A    Clearly to the funds, and generally to the investors more

15  broadly, yes.

16  Q    Okay.  And would you agree that that duty compels the

17  Debtor to look for the interests of the funds and the

18  investors of those funds ahead of its own interests?

19  A    Generally, but it's a much more fine line than what you're

20  describing.  It means you can't -- the manager can't put its

21  own interests in front of the investors and the funds.  It

22  doesn't mean that the manager subordinates its interest in the

23  -- to the investors and the funds.

24          MR. RUKAVINA:  Well, Mr. Vasek, please pull up the

25  October 20th transcript at Page 233.

Seery - Cross                           180

1          MR. MORRIS:  What transcript is this?

2          MR. RUKAVINA:  October 20, 2019.  Mr. Vasek has the

3   docket entry.

4          MR. MORRIS:  Oh, so it's the -- Your Honor, I just do

5   want to point out that Mr. Rukavina objected, in fact, to the

6   use of trial transcripts, but we'll get to that when we put on

7   our evidence, when we finish up.

8          MR. RUKAVINA:  Well, Your Honor, I believe that

9   you're allowed to use a trial transcript to impeach testimony,

10  which is what I'm going to do now.

11     So, for that purpose, Mr. Vasek, if you could -- are you

12  on Page 233?

13         THE COURT:  And just so the record is clear, this is

14  from October 2020, not October 2019, which is, I think, what I

15  heard.  Continue.

16         MR. MORRIS:  Your --

17         MR. RUKAVINA:  Your Honor, I apologize, you did hear

18  that and I did make a mistake.  Yes, this is at Docket 1271.

19     Mr. Vasek, if you'll scroll down, please.  Okay.  No, stop

20  there.

21  BY MR. RUKAVINA:

22  Q    And you see on Line 16, sir, you're asked your

23  understanding, and then you answer, "Okay."  "And in

24  exercising those duties, the manager, under the Advisers Act,

25  has a duty to subordinate its interests to the interests of

Seery - Cross                                 181

1   those investors in the CLOs, correct?"  And you answer --

2        MR. RUKAVINA:  Go down, Mr. Vasek.

3   BY MR. RUKAVINA:

4   Q   -- "I think -- I think, generally, when you think about

5   the fiduciary duty, and I think that we -- I want to make sure

6   I'm very specific about this, is that the manager has a duty,

7   fiduciary duties -- there's a whole bunch of legal analysis of

8   what they are, but they are significant -- that the manager

9   owes to the investors.  And to the extent" --

10       MR. RUKAVINA:  Scroll down, please.

11  BY MR. RUKAVINA:

12  Q   "And to the extent that the manager's interests would

13  somehow be -- somehow interfere with the investors' in the

14  CLO, he is supposed to -- he or she is supposed to subordinate

15  those to the benefit of the investors."

16       Did I read that accurately, Mr. Seery?

17  A   You did.

18  Q   Was that your testimony on October 20th last?

19  A   Yes.

20  Q   Okay.  Are you willing to revise your testimony from a few

21  minutes ago that the manager does not have to subordinate its

22  interests to the interests of the investors?

23  A   No.  I think that's very similar.

24  Q   Okay.

25  A   You left out the part about garbled up top where I said it

Seery - Cross                          182

1  was nuanced, almost exactly what I just said.  On Line 9, I

2  believe, on the prior page.

3  Q   Well, I heard you say a couple of minutes ago, and maybe I

4  misunderstood because of the WebEx nature, that the manager

5  does not have to subordinate its interests to the interests of

6  the investors.  Did I misheard you say that a few minutes ago?

7  A   I think you misheard it.  I said it's a nuanced analysis,

8  and it's -- it's pretty significant.  But the manager does

9  subordinate his general interest and assures that the CLO or

10 any of the investors' interests are paramount, but he doesn't

11 subordinate every single interest.

12     For example, and I think it's in this testimony, the

13 manager, if the fund isn't doing well, doesn't just have to

14 take his fee and not get paid.  He's allowed -- entitled to

15 take his fee.  He doesn't subordinate every single interest of

16 his.  He doesn't give up his home and his family.  So it's --

17 it's a nuanced analysis.  The interests of the manager are

18 subordinated to the interests of the investors and the fund.

19 I don't -- I don't disagree with anything I said there.  I

20 think I'm consistent.

21 Q   Okay.

22         MR. RUKAVINA:  You can take that down, Mr. Vasek.

23 BY MR. RUKAVINA:

24 Q   So, how do you describe, sir, the fiduciary duty that the

25 Debtor owes to the funds that it manages and to the investors

Seery - Cross                          183

1   in those funds?

2           MR. MORRIS:  Objection to the -- to the extent it

3   calls for a legal conclusion, Your Honor.  I just want to make

4   sure we're -- we're asking a witness for his lay views.

5           THE COURT:  Okay.  I overrule the objection.  He can

6   answer.

7           THE WITNESS:  Yes.  As a manager of a fund, the

8   manager is a fiduciary to the fund, and sometimes to the

9   investors, depending on the structure of the fund.  Some funds

10  are purposely set up where the investors are actually debt-

11  holders, and their interests are much more cabined by the

12  terms of the contract, as opposed to straight equity holders.

13  But the manager has a duty to seek to maximize value of the

14  assets in the best interests of the underlying -- of the fund

15  and the underlying investors, to the extent that it can,

16  within the confines and structure of the fund.

17  BY MR. RUKAVINA:

18  Q   Okay.  And these duties as you just described them, they

19  would apply to the Reorganized Debtor, correct?

20  A   They would apply to the Reorganized Debtor to the extent

21  that it's a manager for a fund, not, for example, with respect

22  to necessarily interests -- the inchoate interests that we

23  talked about earlier.

24  Q   Sure.  And I apologize, I meant just for the fund.  And if

25  the manager, the Reorganized Debtor, breaches those duties,

Seery - Cross                                184

1  then it's possible that there's going to be liability,

2  correct?

3  A   It's possible.

4  Q   Okay.  Now, under the plan, the limited partnership

5  interests in the Reorganized Debtor will be owned by the

6  Claimant Trust, correct?

7  A   Yes.

8  Q   Okay.  And there's a new entity called New GP, LLC that

9  will be created or already has been created, correct?

10 A   Yes.

11 Q   Okay.  And that entity will hold the general partnership

12 interest in the Reorganized Debtor, correct?

13 A   I believe that's correct.

14 Q   Okay.  And that entity -- that being New GP, LLC -- will

15 also be owned by the Claimant Trust, correct?

16 A   Yes.

17 Q   Okay.  Who will manage the Reorganized Debtor?

18 A   The G -- the GP will manage the Reorganized Debtor.

19 Q   Okay.  And will there be an officer or officers of the

20 Reorganized Debtor, or will it all be managed through the GP?

21 A   It'll be managed through the GP.

22 Q   Okay.  And who will manage the GP?

23 A   Likely, I will.

24 Q   Okay.  That's the current plan, that you will?

25 A   I'll be the Claimant Trustee, and I believe that I'll be

Seery - Cross                              185

1  responsible for any assets that remain in the Reorganized

2  Debtor, yes.

3  Q   Okay.  Right now, the Debtor is managing its own assets as

4  the Debtor-in-Possession, right?

5  A   Yes.

6  Q   And it is managing various funds and CLOs, right?

7  A   Yes.

8  Q   Okay.  And right now, the Debtor is attempting to reduce

9  some of its assets to money, like the promissory notes that

10 you mentioned earlier that the Debtor filed suit on, correct?

11 A   Yes.

12 Q   And the Debtor is trying to reduce some of its assets to

13 money, like the promissory notes, to benefit its creditors,

14 correct?

15 A   Yes.

16 Q   Okay.  And correct me if I'm wrong, but the Committee has

17 filed various claims and causes of action against Mr. Dondero,

18 correct?

19 A   They -- they've filed some.  I haven't -- I haven't looked

20 at their (indecipherable) closely, but --

21 Q   Okay.

22 A   -- some are preserved in the case.

23 Q   You understand --

24 A   In the plan.  I'm sorry.

25 Q   You understand that the Committee is doing that for the

Seery - Cross                              186

1  benefit of the estate, correct?

2  A    Yes.

3  Q    And you understand that they're also doing that for the

4  benefit of creditors, correct?

5  A    Yes.

6  Q    Okay.  And under the plan, just so that I'm clear, those

7  claims that the Committee has asserted will be preserved and

8  will vest in either the Claimant Trust or the Litigation Sub-

9  Trust, correct?

10 A    Yes.

11 Q    Okay.  And under the plan, the Reorganized Debtor would

12 continue to manage its assets, correct?

13 A    Yes.

14 Q    And it would continue to manage the Funds and the CLOs,

15 correct?

16 A    Yes.

17 Q    And the Claimant Trust would attempt to liquidate and

18 distribute to its beneficiaries the assets that are

19 transferred to it, correct?

20 A    Yes.

21 Q    Okay.  And you mentioned that the Claimant Trust will have

22 an Oversight Board comprised of five members, right?

23 A    Yes.

24 Q    And four of them will be the people that are currently on

25 the Committee, right?

Seery - Cross                              187

1  A    Yes.

2  Q    And the fifth is David Pauker, and I think you mentioned

3  that he's independent.  David Pauker is the fifth member,

4  right?

5  A    Yes.

6  Q    Who -- who is he?

7  A    David Pauker is a very well-known professional in the

8  restructuring world.  He's a long-time financial advisor in --

9  in reorganizations.  He's served on numerous boards in

10 restructuring -- restructurings.

11 Q    Okay.  So, other than a different corporate structure and

12 the Claimant Trust, the monetization of assets for the benefit

13 of creditors would continue post-confirmation as now, correct?

14 A    I -- I believe so.  I'm not exactly sure what you asked

15 there.

16 Q    No one is putting in any new money under the plan, are

17 they?

18 A    No.  No.

19 Q    Okay.  There's no exit financing contingent on the plan

20 being confirmed, right?

21 A    You mean no exit -- the plan is not contingent on exit

22 financing.  I think you just mixed up your -- your financing

23 and your plan.

24 Q    I apologize.  There's no exit financing in place today,

25 correct?

Seery - Cross                                188

1  A    No.

2  Q    Okay.  So, post-confirmation, you are basically going to

3  continue managing the CLOs and funds and trying to monetize

4  assets for creditors the same as you are today, correct?

5  A    Similar, yes.

6  Q    Okay.  And just like the Committee has some oversight role

7  in the case, the members of the Oversight Board will have some

8  oversight role post-confirmation, correct?

9  A    Yes.

10  Q    Okay.  You don't need anything in the plan itself to

11  enable you to continue managing the Debtor and its assets,

12  correct?

13  A    I don't need anything in the plan?

14  Q    Correct.

15  A    I don't -- I don't understand the question.  Can you

16  rephrase it?

17  Q    Well, you are managing the Debtor and its assets today,

18  correct?

19  A    Yes.

20  Q    Okay.  Nothing in the plan is going to change that,

21  correct?

22  A    Well, it's going to change it a lot.

23  Q    Okay.  Well, with respect to you managing the Funds and

24  the CLOs, you don't need anything in the plan that you don't

25  have today to keep managing them, do you?

Seery - Cross                     189

1  A    No.  The Debtor manages them, and I will -- I'm the CEO

2  and I'll be in a similar position with a different team.

3  Q    Okay.  And I believe you told me that you expect the

4  Debtor to administer the CLOs for two or three years, maybe?

5  A    However long it takes, but we expect -- our projections

6  are that we'd be able to monetize most of the assets within

7  two years.

8  Q    Does that include the CLOs?

9  A    It does, yes.

10 Q    Okay.  Now, you're going to be the person for the

11 Reorganized Debtor in charge of managing the CLOs, correct?

12 A    I'll be the person responsible for managing the

13 Reorganized Debtor.  The Reorganized Debtor will be the

14 manager of the CLOs.

15 Q    Okay.  But the buck will stop with you at the Reorganized

16 Debtor, right?

17 A    Yes.

18 Q    Okay.  You're going to have a team of employees and

19 outside professionals helping you, but ultimately, on behalf

20 of the Reorganized Debtor, you're going to be the one in

21 charge of managing the CLOs, correct?

22 A    Yes.

23 Q    Okay.  That means that you'll also be making decisions as

24 to when to sell assets of the CLOs, correct?

25 A    Yes.

Seery - Cross                          190

1  Q    Okay.  And to be clear, the CLOs, they own their own

2  assets, whatever they are, and the Debtor just manages those

3  assets, right?

4  A    Correct.

5  Q    The Debtor doesn't directly own those assets, right?

6  A    No.

7  Q    And currently there's more than one billion dollars in CLO

8  assets that the Debtor manages?

9  A    Approximately.

10 Q    Yeah.  And the Debtor receives fees for its services,

11 correct?

12 A    Yes.

13 Q    Can you generally describe how the amount of those fees is

14 calculated and paid, if you have an understanding?

15 A    How the fees are calculated and paid?

16 Q    Yes, sir.

17 A    It's a percentage of the assets.

18 Q    Assets administered or assets sold in any given time

19 period?

20 A    Administered.

21 Q    Okay.  So the sale of CLO assets does not affect the fees

22 that the Reorganized Debtor would receive under these

23 agreements?

24        MR. MORRIS:  Objection to the form of the question.

25        THE COURT:  Over --

Seery - Cross                          191

1            THE WITNESS:  That's not correct.

2            THE COURT:  Overruled.

3    BY MR. RUKAVINA:

4    Q    Okay.  What is not correct about that?

5    A    When you sell the assets, the amount administered shrinks,

6    so you have less fees.

7            MR. RUKAVINA:  Your Honor, the answer cut out at the

8    very end.  You have less--?

9            THE WITNESS:  Fees.

10   BY MR. RUKAVINA:

11   Q    Fees?  I understand.  Okay.  So are you saying that there

12   is a disincentive to the Reorganized Debtor to sell assets in

13   the CLOs?

14   A    No.

15   Q    Okay.  Is there an incentive to the Reorganized Debtor to

16   sell assets in the CLOs?

17   A    To do their job correctly, yes.

18   Q    Okay.  And the Debtor wishes to assume those contracts

19   because the Debtor will get those fees going forward and

20   there'll be a profit, even after the expenses of servicing

21   those contracts are taken out, correct?

22   A    They are profitable. That's one of the reasons that we're

23   assuming, yes.

24   Q    Okay.  Now, over my objection, you testified that the CLOs

25   have agreed to the assumption of these contracts, right?

Seery - Cross                          192

1   A    Yes.

2   Q    Okay.  Is there anything in the record other than your

3   testimony here today demonstrating that?

4   A    I believe there is, yes.

5   Q    What do you believe there is in the record other than your

6   testimony?

7   A    I believe we filed a notice of assumption.

8   Q    Okay.  My question is a little bit different.  You

9   testified that the CLOs, over my objection, have agreed to the

10  assumption.  You did testify so, right?

11  A    Yes.

12  Q    Okay.  What is there in the record, sir, from the CLOs

13  confirming that?

14  A    You mean today's record?

15  Q    Yes, sir.

16  A    I'm the only one who's testified so far.

17  Q    Okay.  Are you aware of anything in the exhibits that

18  would confirm your testimony?

19  A    Not that I know of.

20  Q    Has there been an agreement with the CLOs that's been

21  reduced to writing?

22  A    Yes.

23  Q    So there is a written agreement with the CLOs providing

24  for assumption?

25  A    Yes.

```
                        Seery - Cross                    193
```

1    Q    A signed, written agreement?

2    A    No, it's -- it's email.

3    Q    Okay.  When was this email agreement reached?

4    A    Within the last couple weeks.  There's a number of back

5    and forths where that was agreed to, and I believe we filed a

6    notice of assumption.

7            MR. RUKAVINA:  Mr. Vasek, if you will please pull up

8    Mr. Seery's January 29th deposition.

9    BY MR. RUKAVINA:

10   Q    Mr. Seery, you remember me deposing you last Friday,

11   correct?

12   A    Yes.

13   Q    And you remember me asking you if there was a written

14   agreement in place with the CLOs?

15   A    I don't recall specifically.

16           MR. RUKAVINA:  Okay.  Mr. Vasek, if you would please

17   scroll to that.  Okay.  Stop there.

18   BY MR. RUKAVINA:

19   Q    Sir, you'll recall I also deposed you January 20th, right?

20   A    Yes.

21   Q    Okay.  And do you remember that we had some discussion

22   regarding whether the CLOs would consent or not?

23   A    Yes.

24   Q    Okay.  And do you remember telling me something like that

25   like you think that they will and that's still in the works on

Seery - Cross                              194

1  January 20th?

2  A    I don't recall specifically, but if you say that's what it

3  says.

4  Q    Okay.  Well, here I'm asking you on January 29th, Line 17,

5  "I asked you before and you didn't have anything in writing by

6  then, so let me ask now.  As of today, do you have anything in

7  writing from the CLOs consenting to the assumption of those

8  management agreements?"  I'm sorry.  Contracts.  Answer, "I

9  don't believe that I do.  It could be on my email I opened.  I

10 don't recall."

11        MR. RUKAVINA:  Scroll down, Mr. Vasek.

12 BY MR. RUKAVINA:

13 Q    Okay.  Then I ask, "Do you have an understanding of

14 whether those CLOs have consented in writing to the assumption

15 of the management agreements?"  And you answer, "I believe

16 they have.  The actual final docs haven't been completed, but

17 I believe they have agreed in writing, yes."

18     Then I ask --

19        MR. RUKAVINA:  Scroll down a little bit more.

20 BY MR. RUKAVINA:

21 Q    I ask, "Do you expect the final docs to be completed

22 before Tuesday's confirmation hearing?"  Answer, "I don't know

23 whether they will be done by Tuesday."

24     Did I read all of that correctly, sir?

25 A    Other than your misstatement.  The word was "unopened."

Seery - Cross                          195

1   Q    Thank you.  So, let me ask you again today.  As of today,

2   is there a written agreement that has been signed by the

3   parties providing for the assumption of the CLO agreements?

4   A    When phrased the way you did, is it signed by the parties,

5   no.

6   Q    Okay.

7            MR. RUKAVINA:  You can take that down, Mr. Vasek.

8   BY MR. RUKAVINA:

9   Q    I think -- I'm not sure if you quantified this earlier,

10  but it might help.  I believe that the Reorganized Debtor

11  projects that it will generate revenue of $8.269 million post-

12  reorganization from managing the CLO contracts, correct?

13  A    It's in that neighborhood.  I did not testify to that

14  earlier.

15  Q    That's what I meant.  And when I asked you at deposition,

16  you were able to give me an estimate of how much it would cost

17  to generate that revenue, correct?

18  A    I was not?

19  Q    You were?  I'm sorry.  Let me --

20  A    Did you say I wasn't or I was?

21  Q    Let me -- I apologize.  Let me ask again.  I talk too fast

22  and I have an accent.  You have been able to give an estimate

23  of how much the Reorganized Debtor will expend to generate

24  that revenue, correct?

25  A    Yes.

Seery - Cross                              196

1  Q   Okay.  Do you remember what your estimate is?

2  A   I -- I think it was around $2 million a year.  It was a

3  portion of our employees plus the contracts.

4  Q   Okay.  So, over the life of the projection at $8.2

5  million, do you remember that you projected costs of about

6  $3.5 to $4 million to generate that revenue?

7  A   If -- if you are representing that to me, I'd accept it.

8  Yes, that sounds about right.

9  Q   Well, suffice it to say you're projecting at least $4

10  million in net profit over the next two years for the

11  Reorganized Debtor from managing the CLO agreements, correct?

12  A   Net profit is not a fair, fair way to analyze it, no.

13  Q   Okay.  Are you projecting any profit for the Reorganized

14  Debtor from managing the CLO agreements post-confirmation?

15  A   Yes.

16  Q   Okay.  Do you have an estimate of what that profit is?

17  A   General overview are the contracts are profitable to about

18  the tune of $4 million over that period.

19  Q   Okay.  Thank you.  If the Reorganized Debtor makes a

20  profit post-confirmation, is it fair to say that that would

21  then be dividended up or distributed up to the partners,

22  ultimately to the Claimant Trust?

23  A   I don't think that's fair to say, no.

24  Q   Okay.  So, if the Reorganized Debtor makes a profit post-

25  confirmation, where does that profit go?

Seery - Cross                                 197

1    A    The Reorganized Debtor -- what kind of profit?  I don't

2    understand your question.

3    Q    Okay.  I apologize if I'm being too simplistic about it.

4    If a business, after it takes account of its expenses to

5    generate revenue, has any money left over, would that be

6    profit to you?

7    A    Yes.

8    Q    Okay.  Do you think that the Reorganized Debtor, post-

9    confirmation, will make a profit?

10   A    I don't know.

11   Q    Okay.  Do you think that the Reorganized Debtor, post-

12   confirmation, will lose money?

13   A    I think there will be costs, and the costs will exceed the

14   -- the amount that it generates on an income basis, yes.

15   Q    Okay.  Thank you.

16          MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

17   the plan, the injunctions, and releases.  9F.

18       (Pause.)

19   BY MR. RUKAVINA:

20   Q    I apologize, Mr. Seery.

21          MR. RUKAVINA:  So, Mr. Vasek, if you'll go to the

22   bottom of the Page 51.  Stop there.

23   BY MR. RUKAVINA:

24   Q    So, I'm going to read just the first couple sentences

25   here, Mr. Seery, if you'll read it along with me.  Subject --

Seery - Cross                              198

1   this is the bottom paragraph:  Subject in all respects to

2   Article 12(b), no enjoined party may commence or pursue a

3   claim or cause of action of any kind against any protected

4   party that arose or arises from or is related to the Chapter

5   11 case, the negotiation of the plan, the administration of

6   the plan, or property to be distributed under the plan, the

7   wind-down of the business of the Debtor or Reorganized Debtor.

8       I'd like to stop there.  Do you see that clause there, Mr.

9   Seery, talking about the wind-down of the business of the

10  Debtor or Reorganized Debtor?  Do you see that, sir?

11  A    Yes.

12  Q    Okay.  Do I understand correctly that this provision we've

13  just read means that, upon the assumption of these CLO

14  management agreements, if the counterparties to those

15  agreements want to take any action against the Reorganized

16  Debtor, they first have to go through this channeling

17  injunction?

18  A    I believe that's what it says, yes.

19  Q    Okay.  Because the wind-down of the business of the

20  Reorganized Debtor will include the management of these CLO

21  portfolio management agreements, correct?

22  A    Yes.

23  Q    Okay.  As well as the management of various funds that the

24  Debtor owns, correct?

25  A    Yes.

Seery - Cross                              199

1  Q   Okay.  And would you agree with me that the new general

2  partner, New GP, LLC, is also a protected party under the

3  plan?

4  A   I assume it is.  I don't recall specifically.

5  Q   I believe you discussed to some degree postpetition

6  losses.  I'd like to visit a little bit about those.  Since

7  January 9th, 2020, Mr. Dondero was not an officer of the

8  Debtor, correct?

9  A   Correct.

10  Q   And since January 9th, 2020, he was no longer a director

11  of Strand, correct?

12  A   That's correct.

13  Q   Since January 9th, 2020, until he was asked to resign, he

14  was an employee, correct?

15  A   Yes.

16  Q   And about -- I'm trying to remember.  About when did he

17  resign?  October something of 2020?  Do you remember?

18  A   I don't recall.

19  Q   Okay.  Do you recall if it was in October 2020?

20  A   It was in the fall.

21  Q   Okay.  And he resigned because the independent board asked

22  him to resign, correct?

23  A   Yes.

24  Q   Okay.  And you mentioned that the estate has had a

25  postpetition drop in the value of its assets and the assets

Seery - Cross                                    200

1   that it manages.  Right?

2   A    I believe I went through the estate's assets.  The only

3   asset that wasn't a direct estate asset was the hundred

4   percent control of Select Equity Fund.  I didn't talk about

5   the Fund assets.

6   Q    Okay.  Do you recall that the disclosure statement that

7   the Court approved states that, postpetition, there was a drop

8   from approximately $566 million to $328 million in the value

9   of Debtor assets and assets under Debtor management?

10  A    Yes.  That's the $200 million I walked through earlier.

11  Q    Okay.  And I believe you mentioned some of it was due to

12  the pandemic, right?

13  A    It certainly impacted the markets.  The pandemic didn't

14  cause a specific loss.  It impacted the markets and the

15  ability to work within those markets.

16  Q    But you also believe that Mr. Dondero was responsible for

17  something like a hundred million dollars of these losses,

18  right?

19  A    Probably more.

20  Q    Okay.  Mr. Dondero is not being released or exculpated for

21  that, is he?

22  A    No.

23  Q    And while Mr. Dondero was an employee during the period of

24  these losses, he answered to you as CEO and CRO, correct?

25  A    Not during that period.  I wasn't (audio gap) until later.

Seery - Cross                                    201

1  Q   I'm sorry.  As of January 9th, 2020, were you the CEO of

2  the Debtor?

3  A   No.

4  Q   When did you become the CEO of the Debtor?

5  A   I believe the order was July 9th, retroactive to a date in

6  March.

7  Q   July 9th, 2020?

8  A   Correct.

9  Q   Okay.  And when did you become the CRO of the Debtor?

10  A   At the same time.

11  Q   Okay.  So, between January and July 2020, you were one of

12  the independent directors, correct?

13  A   Yes.

14  Q   Okay.  So, during that period of time, would Mr. Dondero

15  have answered to that independent board?

16  A   Yes.

17  Q   Okay.  Now, if someone alleges that that independent board

18  has any liability on account of Mr. Dondero's losses, that's

19  released under this plan, isn't it?

20  A   Yes.

21  Q   Okay.  And if someone alleges that Strand has any

22  liability on account of Mr. Dondero's losses, that's released

23  under this plan, correct?

24  A   Yes.

25  Q   Okay.  And if someone believes that the Debtor -- that the

Seery - Cross                                202

1    way that the Debtor has managed the CLOs or its funds

2    postpetition gives rise to a cause of action in negligence,

3    that's also released and exculpated in the plan, correct?

4    A    I believe it would be.  I'm not positive, but I believe it

5    would be.

6    Q    Well, let's be clear.  The plan does not release or

7    exculpate you or Strand or the board for willful misconduct,

8    gross negligence, fraud, or criminal conduct, correct?

9    A    No, it does not.

10   Q    Okay.  And I'm not, just so we're clear, I'm not alleging

11   that, okay?  So I want the judge to understand I'm not

12   alleging that.  But the plan does release and exculpate for

13   negligence, right?

14   A    Yes.

15   Q    Okay.  Where do you have an understanding a cause of

16   action for breach of fiduciary duty lies on the spectrum of

17   negligence all the way to criminal conduct?

18   A    It's -- it's not -- generally not criminal, although I

19   suppose that breach of fiduciary duty could be criminal.

20   Typically, it's negligence, and that you would breach a duty

21   for either duty of care, duty of loyalty.  But it could slide

22   to willful.  And probably most of the instances where they

23   come up are where someone has done something willfully or

24   grossly negligent.

25   Q    Okay.  But -- and I would agree with you.  But there are

Seery - Cross                                    203

1    certain breaches of fiduciary duty that are possible based on

2    simple negligence, correct?

3    A    They are, and in these instances, they don't -- they don't

4    rise to actionable claims because they're indemnified by the

5    funds.

6    Q    Okay.  You have to explain that to me.  So, the negligence

7    claim is not actionable because someone is indemnifying it?

8    A    Typically, there's no way to recover because it's

9    indemnified by the fund that the investor might be in.  If it

10   goes beyond that, then it wouldn't be.

11   Q    Okay.  So there are potential negligence breach of

12   fiduciary duty claims that might be subject to these

13   exculpations and releases that would not be indemnified?

14   A    Gross negligence and willful misconduct, certainly.

15   Q    Okay.  Now, post-confirmation, post-confirmation, if the

16   Debtor, or the Reorganized Debtor, rather, engages in

17   negligence or any actionable conduct, that's when the

18   channeling injunction comes into play, right?

19   A    I don't quite understand your question.

20   Q    Okay.

21   A    Can you repeat that?

22   Q    Sure.  To your understanding, does the channeling

23   injunction we're looking at right now -- and you can read it

24   if you need to -- does it apply to purely post-confirmation

25   alleged causes of action?

Seery - Cross                          204

1  A   It does apply to those, yes.

2  Q   Okay.  And it says that the Bankruptcy Court will have

3  sole and exclusive jurisdiction to determine whether a claim

4  or cause of action is colorable, and, only to the extent

5  legally permissible and as provided for in Article 11, shall

6  have jurisdiction to adjudicate the underlying colorable claim

7  or cause of action.

8      Do you see that, sir?

9  A   I do.

10 Q   Okay.  And this -- the Bankruptcy Court's exclusive

11 jurisdiction here, that would continue after confirmation?  Is

12 that the intent behind the plan?

13 A   It has -- it says what it says.  Will have the sole and

14 exclusive jurisdiction to determine whether a claim is

15 colorable, and then, to the extent permissible, it'll have

16 jurisdiction to adjudicate.

17 Q   Okay.  Nothing in this plan limits the period of the

18 Bankruptcy Court's inquiry to the pre-confirmation time frame,

19 correct?

20 A   I don't believe it does, no.

21 Q   Okay.  Have you taken into account the potential that this

22 bankruptcy case will eventually be closed with a final decree?

23 A   Have I taken that into account?

24 Q   Well, do you know what a final decree in Chapter 11 is?

25 A   I do.

Seery - Cross                                        205

1  Q   Okay.  So, help me understand.  If there's a final decree

2  and the bankruptcy case is closed, then who do I go to,

3  because the Bankruptcy Court has exclusive jurisdiction, to

4  get this clearing injunction cleared?

5          MR. MORRIS:  Objection to the form of the question,

6  Your Honor.

7          THE COURT:  Sustained.  Rephrase.

8          MR. RUKAVINA:  Okay.

9  BY MR. RUKAVINA:

10 Q   Is it the plan's intent, Mr. Seery, that this channeling

11 injunction that we just looked at would continue to apply even

12 after a point in time in which the bankruptcy case is closed?

13 A   I don't believe so.

14         MR. RUKAVINA:  Again, Your Honor, someone -- I heard

15 someone's phone right when he answered, and I didn't hear his

16 answer, if he could please re-answer.

17         THE WITNESS:  I don't -- I don't think if the case is

18 closed that's the intention.

19 BY MR. RUKAVINA:

20 Q   Okay.  What about if there's a final decree entered?

21         MR. MORRIS:  Objection, Your Honor.  You know, the

22 document kind of speaks for itself.

23         THE COURT:  Overruled.  He can answer if he knows.

24         THE WITNESS:  Yeah.  I don't -- I don't -- I'm not

25 making a distinction between the case being closed and the

Seery - Cross                                      206

1    final decree.  I believe in both instances they'll be pretty

2    close to the same time and we'll make a judgment then as to

3    how to close the case in accordance --

4    Q    Okay.

5    A    -- with the rules.

6            MR. RUKAVINA:  Mr. Vasek, if you'll please scroll up

7    to the beginning of this injunction.  A little bit higher.

8    Right there.  Right there.

9    BY MR. RUKAVINA:

10   Q    The very first clause, Mr. Seery, if you'll read with me,

11   says, Upon entry of the confirmation order -- pardon me --

12   all enjoined parties are and shall be permanently enjoined on

13   and after the effective date from taking any actions to

14   interfere with the implementation or consummation of the

15   plan.

16       Do you see that, sir?

17   A    I do, yes.

18   Q    What does interfering with the implementation or

19   consummation of the plan mean?

20   A    It means in some way taking actions to upset, distract,

21   stop, or otherwise prohibit or hurt the estate from

22   implementing or consummating the plan.

23   Q    Okay.  And is that intended -- is that clause we just

24   read and you described intended to be very broad?

25   A    I -- I think it's -- if the words have meaning, yes, that

Seery - Cross                                    207

1  it should -- it's pretty broad.

2  Q   Okay.  Is the Debtor not able to state with more

3  specificity what it would believe interference with the

4  implementation or consummation of the plan would mean?

5          MR. MORRIS:  Objection to the form of the question.

6          THE COURT:  Sustained.

7          THE WITNESS:  I think it's -- I think it's --

8          THE COURT:  Sustained.

9          MR. RUKAVINA:  Okay.

10         THE WITNESS:  I'm sorry.

11 BY MR. RUKAVINA:

12 Q   Well, you just gave us four or five examples of what

13 interfering with the implementation or consummation of the

14 plan might be.  Why isn't that, those four or five examples,

15 why aren't they listed here?

16         MR. MORRIS:  Object to the form of the question.

17         MR. RUKAVINA:  Well, Your Honor, I'll withdraw it

18 and I'll argue this at closing argument.

19         THE COURT:  Okay.

20 BY MR. RUKAVINA:

21 Q   When did the Committee agree to you serving as the

22 Claimant Trustee?

23 A   In the late -- in the late fall.  I've been contemplated

24 to be the Claimant Trustee.  I'm willing to take -- if we can

25 come to an agreement.  They have their options open if we

Seery - Cross                                    208

1   can't come to an agreement on compensation.

2   Q    Okay.  And since the Committee agreed to you being the

3   Claimant Trustee, you have reached a resolution with UBS,

4   correct?

5   A    I don't think so.  I think that that was before UBS, the

6   UBS resolution was reached.

7   Q    I'm sorry.  When did you reach the UBS resolution in

8   principle with UBS?

9   A    I don't recall the exact date, but I do recall specific

10  conversations where some of the Committee members were

11  supportive.  I didn't know that UBS wasn't, but I assumed

12  that some meant not all.  And that was UBS, because I don't

13  think we had a deal yet.

14  Q    Well, let me ask the question in a little bit of a

15  different way.  Whenever the Debtor reached the agreement in

16  principle with UBS that your counsel described this morning,

17  whenever that point in time was, the Committee had already

18  agreed before that point in time to you serving as Claimant

19  Trustee, correct?

20  A    I believe so, yes.

21  Q    And is the answer the same with respect to the

22  HarbourVest settlement?

23  A    I believe so.  With HarbourVest, I believe so as well,

24  yes.

25  Q    What about the Acis settlement?

Seery - Cross                                    209

1  A    I don't believe so.  I think Acis came first.  I don't

2  think we settled on an agreement on Claimant Trustee until

3  after the Acis -- certainly after the Acis agreement, maybe

4  not after the Acis 9019.  I just don't recall.

5  Q    Okay.  And the million-dollar cutoff for convenience

6  class creditors, that number was a negotiated amount with the

7  Committee, correct?

8  A    Yes.

9  Q    Okay.  Thank you, Mr. Seery.

10         MR. RUKAVINA:  Your Honor, I'll pass the witness.

11         THE COURT:  All right.  Just for purposes of time,

12 it's 3:00 o'clock, so you went 48 minutes.

13     Who's next?

14         MR. DRAPER:  Mr. Taylor is.

15         THE COURT:  All right.  Mr. Taylor, go ahead.

16         MR. TAYLOR:  Yes, Your Honor.  At this time, what we

17 would like the Court to do, we are asking for a brief

18 continuance and to go into tomorrow, and there is a reason

19 for that and I would like to explain it.

20     Mr. Dondero has communicated an offer which we believe to

21 be a higher and better offer than what the plan analysis,

22 even in its most recent iteration that was just changed last

23 night, will yield significantly higher recoveries.  Those are

24 guaranteed recoveries.  There is a cash component to that

25 offer.  There are some debt components, but they would be

Seery - Cross                                    210

1   secured by substantially all of the assets of Highland.

2       We believe it's a higher and better offer, that the

3   creditors and the Creditors' Committee, Mr. Seery, who

4   obviously has been testifying all day on the stand, may have

5   heard some -- some inkling of it via a text or an email he

6   might have been able to glance at, or maybe not, because he's

7   been too busy, and that's understandable.

8       But we do believe it is a material offer.  It is a real

9   offer.  And for that reason, we would like to request the

10  Court's indulgence.  This has gone rather fast.  We believe

11  that in the event that it does not gain any traction, then we

12  could complete this confirmation hearing tomorrow, or it's

13  more than likely that we could.  And therefore we would

14  request a continuance until tomorrow morning beginning at

15  9:30 so all the parties can confer, consider that offer, and

16  see if it gains any traction.

17          THE COURT:  All right.

18          MR. POMERANTZ:  Your -- Your --

19          THE COURT:  Go ahead.  Mr. Morris?  Or who is going

20  to respond --

21          MR. POMERANTZ:  Your --

22          THE COURT:  -- to that?

23          MR. POMERANTZ:  Your Honor, this is Jeff --

24          THE COURT:  Mr. Pomerantz?

25          MR. POMERANTZ:  This is Jeff Pomerantz. I will

Seery - Cross                                  211

1    respond.

2       I think right at the beginning of the hearing, or

3    slightly after, I did receive an email from Michael Lynn

4    extending this offer.  The email was also addressed to Mr.

5    Clemente.  As we have told Your Honor before, if the Committee

6    is interested in continuing negotiations with Mr. Dondero, far

7    be it from us to stand in the way.

8       So what I would really ask is for Mr. Clemente to respond

9    to think if -- to see if he thinks that this offer is worthy.

10   If it's worthy and the Committee wants to consider it, we

11   would by all means support a continuance.  If it is not, I

12   think this is just a last-minute delay without a reason.  And

13   if there is no likelihood of that being acceptable or the

14   Committee wanting to engage, we would want to continue on.

15           THE COURT:  All right.  Mr. Clemente, what say you?

16           MR. CLEMENTE:  Yes.  Yes, Your Honor.  Matt Clemente

17   on behalf of the Committee.

18      Obviously, I haven't had a chance to confer with my

19   Committee members, but there's no reason to not continue the

20   confirmation hearing today.  I will be able to confer with

21   them over email, et cetera, this evening.  There's simply no

22   reason to not continue going forward at this particular point

23   in time, Your Honor.

24      So, although I haven't conferred with the Committee

25   members, that would be what I would recommend to them.  And so

Seery - Cross                                   212

1   my view, the Committee's view, I believe, would be let's

2   continue forward and we'll discuss Mr. Dondero's proposal that

3   I know came across after opening statements this morning, you

4   know, in due course.  But I do not believe that a continuance

5   here is necessary or appropriate.

6          THE COURT:  All right.  Mr. Taylor, that request is

7   denied, so you may cross-examine.

8          MR. TAYLOR:  Yes.  (Pause.)  I'm sorry, Your Honor.

9   I have a couple people that are in my ear.  But yes, I'm ready

10  to proceed.

11         THE COURT:  Okay.

12                        CROSS-EXAMINATION

13  BY MR. TAYLOR:

14  Q   Mr. Seery, I believe you can probably largely testify from

15  your memory of the various iterations of the plan analysis

16  versus the liquidation analysis.  But to the extent that

17  you're unable to, we can certainly pull those up.

18      Mr. Seery, you put forth or Highland put forth on November

19  24th of 2020 a plan analysis versus a liquidation analysis,

20  correct?

21  A   I think that's the approximate date, yes.

22  Q   Okay.  And do you recall what the plan analysis predicted

23  the recovery to general unsecured creditors in Class 8 would

24  be at that time?

25  A   I believe it was in the 80s.

Seery - Cross                          213

1  Q   And approximately 87.44 percent?

2  A   That sounds close, yes.

3  Q   Okay.  And then just right before -- the evening before

4  your deposition that took place on January 29th, I believe a

5  revised plan analysis versus a liquidation analysis was

6  provided.  Do you remember that?

7  A   Yes.

8  Q   Okay.  And what was the predicted recovery to general

9  unsecured creditors under that analysis?

10  A   I believe that was --

11        MR. MORRIS:  Object to the form of the question.  I

12  just want to make sure that we're talking about the -- and

13  maybe I misunderstood the question -- plan versus liquidation.

14        THE COURT:  Okay.  Could you restate --

15        MR. TAYLOR:  I said plan analysis.

16        THE COURT:  Plan.

17        THE WITNESS:  I believe that that initially was in

18  the -- in the high 60s.

19  BY MR. TAYLOR:

20  Q   It was --

21  A   Might have been --

22  Q   -- 62.14 percent; is that correct?

23  A   Okay.  Yeah.  That sounds -- I'll take your

24  representation.  That's fine.

25  Q   Okay.  And going back to the November 28th liquidation

Seery - Cross                                    214

1    analysis, what did Highland believe that creditors in Class 8

2    would get under a liquidation analysis?

3    A    I don't recall the -- if you just tell me, I'll -- I'll --

4    if you're reading it, I'll agree with -- because I -- from my

5    memory.

6    Q    62.6 percent?  Is that correct?

7    A    That sounds about right.

8    Q    You would agree with me, would you not, that 62.6 cents on

9    the dollar is higher than 62.14 cents, correct?

10   A    Yes.

11   Q    And so at least comparing the January 28th versus -- of

12   2021 versus the November 24th of 2020, the liquidation

13   analysis actually ended up being higher than the plan

14   analysis, correct?

15   A    Yes.

16   Q    But there was -- there was some changes also in the plan

17   analysis.  I'm sorry.  There were some subsequent changes that

18   were done over the weekend that were provided on February 1st.

19   Is that correct?

20   A    Yes.

21   Q    Okay.  And what were -- give us an overview of what those

22   changes were.

23   A    What are -- what are you comparing?  What would you like

24   me to compare?

25   Q    Okay.  The January to February plan analysis, what were

Seery - Cross                           215

1   the changes?  Why did it go up from 62.6 to 71.3?

2   A    The main changes, as we discussed earlier, and maybe the

3   only major change, was the UBS claim amount, which went down

4   significantly from the earlier iteration.  And then there was

5   the small change related to the RCP recovery, which was a

6   double-count.

7   Q    Okay.  And you talked about earlier about what assumptions

8   went into these analyses, correct?

9   A    Yes.

10  Q    And you said these assumptions were always done after

11  careful consideration.  Is that a correct summation of what

12  you said?

13  A    I think that's fair.

14  Q    Okay.

15        MR. TAYLOR:  Mr. Assink, could you pull up the

16  November assumptions?

17  BY MR. TAYLOR:

18  Q    I believe that's coming up, Mr. Seery.  The Court.

19       (Pause.)

20        MR. TAYLOR:  And go down one page, please, Mr.

21  Assink.  Roll up.  The Assumption L.

22  BY MR. TAYLOR:

23  Q    So, these are the November assumptions, correct, Mr.

24  Seery?

25  A    I believe so, yes.

Seery - Cross                              216

1   Q   Okay.  And what was the assumption that you made after

2   careful consideration regarding the claims for UBS and

3   HarbourVest?

4   A   The plan assumes zero, that was L, for those claims.

5   Q   Okay.  And ultimately what did -- and I believe you just

6   announced this today and made this public today -- what is

7   UBS's claim?  What are you proposing that it be allowed at?

8   A   $50 million in Class 8, and then they have a junior claim

9   as well.

10  Q   Okay.  And what about HarbourVest?  What kind of allowed

11  claim did they end up with?

12  A   $45 million in Class 8 and a $35 million junior claim.

13  Q   So your well-reasoned assumption, carefully considered,

14  was off by $95 million; is that correct?

15          MR. MORRIS:  Objection to the form of the question.

16          THE COURT:  Overruled.

17          THE WITNESS:  The difference between zero and those

18  numbers is $95 million, yes.

19  BY MR. TAYLOR:

20  Q   You solicited creditors of the Highland estate based upon

21  the November plan analysis and liquidation analysis that was

22  provided and that we're looking at right now, correct?

23  A   It was one of the bases, yes.  It's the plan is what --

24  what we solicited votes for, not the projections.

25  Q   But this was included within the disclosure statement; is

Seery - Cross                              217

1  that correct?

2  A    It's one of the bases.  It was included, yes.

3  Q    And this is the bases by which you believe that the best

4  interests of the creditors have been met better than a Chapter

5  7 liquidation, correct?

6  A    I believe this evidences that the best interest test would

7  be satisfied, yes.

8  Q    And so the record is very clear, for this Court and

9  anybody looking at the record, no solicitation was done of the

10 creditor body after the disclosure statement was sent out?  No

11 updates were sent, correct?

12 A    Updated projections were filed, but no solicitation was --

13 was -- there was only one solicitation.  We did not resolicit.

14 That's correct.

15 Q    Okay.  Mr. Seery, how much are you -- after this plan, or

16 if this plan is confirmed, how much are you going to be paid

17 per month to be the Trustee?

18 A    For the Trustee role, $150,000 per month is the base.

19 Q    It's a base amount?  On top of that, you're going to

20 receive some sort of bonus amount, correct?

21 A    There's two bonuses.  There's a bonus for the bankruptcy

22 case, which I'd need Court approval for, and then I'm going to

23 seek a bonus for the Trustee work, which would be a

24 combination of myself and the team for a performance bonus.

25 That's to be negotiated.

Seery - Cross                          218

1    To be fair, the Committee or the Oversight Group may not

2   agree to any change, in which case we would not have an

3   agreement.

4   Q   And what would happen if you don't come to an agreement,

5   Mr. Seery?

6   A   They would have to get a different Plan Trustee.

7   Q   Okay.  So it's certainly going to have to be greater than

8   zero, correct?

9   A   Typically.

10  Q   Is it going to be in the nature of three or four percent

11  of the sales proceeds, or have you considered that?

12  A   Oh, I'm sorry.  Yeah, you mean the bonus?  No.  I've been

13  thinking -- my apologies.  I misunderstood.  I thought you

14  meant any number.  I haven't -- I haven't had negotiation with

15  them.  I'm thinking about looking at the full recovery of the

16  team -- for the team, looking at expected performance numbers,

17  and then trying to negotiate a structure of bonus compensation

18  that would be payable to the whole team, and then allocated by

19  the CEO (garbled) which would be made.

20  Q   When predicting the expenses of the Trust going forward in

21  your projections, did you build in an amount for a bonus fee?

22  A   No.  It wouldn't be part of the expenses.  It would come

23  out at the end.

24  Q   Okay.  So those additional expenses are not shown in the

25  plan analysis, correct?

Seery - Cross                                    219

1   A    No, they're not.  It's just not going to be an expense.

2   It'll be a -- as an operating expense.  It'll be an

3   expenditure at the end out of distributions.

4   Q    Okay.  And did you subtract those from the distributions?

5   A    No.

6   Q    Okay.  A Chapter 7 trustee is not going to charge $150,000

7   or more to monetize these assets, is he?

8   A    No.

9   Q    Have you priced how much D&O insurance is going to be on a

10  go-forward basis post-confirmation?

11  A    I'm sorry.  I couldn't -- couldn't hear you.

12  Q    Sorry.  Let me get closer to my mic.  Have you priced what

13  D&O insurance is going to run the Trust on a go-forward basis

14  post-confirmation?

15  A    Yes.

16  Q    Okay.  And what are you projecting that to run?

17  A    About $3-1/2 million.

18  Q    And is that per annum for over the two-year life of this

19  plan?

20  A    Well, it's the two-year projection period, not life.  But

21  I expect that that's for the two-year projection period.

22  Q    Okay.  So approximately one point -- I'm sorry, you said

23  $3.5 million, correct?

24  A    Yes.

25  Q    Okay.  So, $1.75 million per year?

```
                           Seery - Cross                    220
```

1   A    Yes.

2   Q    On top of the minimum $1.8 million per year that you're

3   going to be paid, correct?

4   A    Well, that's -- that's the base compensation.  But, again,

5   to be fair to the Oversight Committee, they haven't approved

6   it yet.  So the Committee, the Committee reserves their rights

7   to negotiate a total package.

8   Q    And there's going to be a Litigation Trustee, correct?

9   A    Yes.

10  Q    And that Litigation Trustee is going to be paid some

11  amount of compensation, correct?

12  A    Yes.

13  Q    That has not been negotiated yet, correct?

14  A    No, I believe -- I believe the base piece has.  But his --

15  I don't know what the contingency fee or if that's been

16  negotiated yet.  I don't know.

17  Q    And what is the base fee for the Litigation Trustee?

18  A    My recollection is it was about $250,000 a year, some

19  number in that area.

20  Q    Thank you.  So, at this point, over the two-year period,

21  we're looking at approximately $3.6 million to you, $3.5

22  million to the D&O insurance, and approximately $500,000 base

23  fee to the Litigation Trustee, plus a contingency.  Is that

24  correct?

25  A    That's probably real close, yes.

Seery - Cross                                221

1  Q   Okay.  And how about U.S. Trustee fees?  You've estimated

2  of how much those are going to be during the two-year period,

3  correct?

4  A   They're built into the plan up 'til -- I think it's only

5  up until the actual effective date, but I don't recall the

6  specifics.

7  Q   Okay.  And U.S. Trustee fees, the case is going to stay

8  open and those are going to continue to have to be paid, even

9  after confirmation, correct?

10 A   Yes.

11 Q   Okay.  And do you have an estimate of how much those are

12 going to run per annum or over that two-year period?

13 A   I don't recall, no.

14 Q   Okay.  Well, they're provided within your projections,

15 correct?

16 A   Yes.

17 Q   Okay.  A Chapter 7 trustee would not have to incur any of

18 these costs, would they?

19 A   I don't think they'll have to incur Chapter -- U.S.

20 Trustee fees.  I don't know whether they would bring on a

21 litigation trustee or not.  I would assume, since there's --

22 appear to be valuable claims, they probably would, but perhaps

23 they would do it themselves.  So I don't know the specifics of

24 what they would do.

25 Q   In preparing your liquidation analysis, did you ask

Seery - Cross                                      222

1   Pachulski if they would be willing to work for a Chapter 7

2   trustee if one was appointed?

3   A    I didn't specifically ask, no.

4   Q    Did you ask DIS, your, for lack of a better word,

5   financial advisors in this case, if they would be willing to

6   work with a Chapter 7 trustee?

7   A    DSI.  No, I did not specifically ask them.

8   Q    Okay.  All right.  Any of the accountants that you're

9   working with, did you ask them if they would be willing to

10  work with a Chapter 7 trustee?

11  A    I didn't specifically ask them, no.

12  Q    Okay.  The proposed plan has no requirements that you

13  notice any potential sale of either Highland assets or

14  Highland subsidiary assets; is that correct?

15  A    Do you mean after the effective date?

16  Q    Yes.

17  A    No, it does not.

18  Q    In the SSP sale, which is a subsidiary of Trussway, which

19  is a subsidiary of Highland, or actually it's a sub of a sub

20  of Highland, you conducted the sale of SSP, correct?

21  A    The team did, yes.  I was part.

22  Q    All right.  That was not noticed to the creditor body; is

23  that correct?

24  A    That's correct.

25  Q    And it is the Debtor's and your position that no notice

Seery - Cross                           223

1    was required because this was a sub of a sub and therefore

2    this was in the ordinary course?

3    A    Not exactly, no.

4    Q    Okay.  Then what is your position?

5    A    It was in the ordinary course.  It was -- I believe it's a

6    sub of a sub of a sub, and a significant portion of the

7    interests are owned by third parties.

8    Q    It is possible, is it not, that had you noticed this to

9    the larger creditor body, that you might have engendered a

10   competitive bidding situation that might have reached a higher

11   return for investors, correct?

12   A    The same possibility is it could have gone lower.

13   Q    But it is possible, correct?

14   A    Certainly possible.

15   Q    In fact, there is normally requirements under the

16   Bankruptcy Code and the Rules that asset sales are noticed out

17   to the creditor body, correct?

18   A    Asset sales that -- property of the estate, yes.  Other

19   than in the ordinary course, of course.

20   Q    I believe you have described Mr. Dondero as being very

21   litigious within this case; is that correct?

22   A    I believe so, yes.

23   Q    Okay.  Did Mr. Dondero initiate any litigation in this

24   case prior to September 2020?

25   A    Prior to September?  I don't believe so.  I don't know

Seery - Cross                                224

1   when he filed the claim from NexPoint.  It certainly indicated

2   that -- I believe it was from NexPoint.  My memory is slightly

3   off here.  He filed a claim in -- administrative claim, which

4   effectively is like you're bringing a complaint, against HCMLP

5   for the management of Multi-Strat and the sale of the life

6   settlement policies out of Multi-Strat, which was conducted in

7   the spring.

8   Q    And wasn't Mr. Dondero seeking document production related

9   to that sale?

10  A    No.

11  Q    Okay.  I believe that the preliminary injunction that you

12  talked about and were questioned earlier, the plan asks to

13  enjoin (garbled) party from allowing the plan to go effective.

14  Is that correct?

15  A    I'm sorry.  I didn't understand you question.  There was a

16  -- there was a bunch of interference.

17  Q    Okay.  Sure.  I'm sorry about that.  I don't know if

18  that's -- I don't think that's me, but --

19  A    It may not be.  It sounded like someone else.

20  Q    The injunction prohibits anybody from interfering with the

21  plan going effective, correct?

22  A    The plan injunction?

23  Q    Yes.

24  A    Yes.

25  Q    Okay.  Just so I'm clear, is the plan injunction

Seery - Cross                          225

1   attempting to strip appellate rights of Mr. Dondero?

2   A    No.

3   Q    Okay.  So, if, for instance, if he were to file any appeal

4   of an order confirming this plan, he wouldn't be in violation

5   of that plan injunction?

6   A    I don't think so, because the order wouldn't be final.

7   Q    Okay.  But it -- it says upon entry of a confirmation

8   order, you're enjoined from doing so.  So that's not the

9   intent?

10  A    It certainly would not be my intent.  I don't think that

11  anybody had that in mind.

12  Q    Okay.  And if Mr. Dondero were to seek a stay pending

13  appeal either during that 14-day period or afterwards, is that

14  plan injunction attempting to stop that -- that sort of

15  action?

16  A    I apologize.  You're breaking up.  But I think I

17  understood your question.  No, it was -- it was your screen as

18  well.  No.  If either this Court stays its own order or a

19  higher court says that the order is stayed, then there would

20  be no way there could be any allegation that it's interfering

21  with an order if it's not effective.

22  Q    Mr. Dondero opposed the Acis sale, correct?

23  A    The Acis settlement?

24  Q    Correct.

25  A    Yes.

Seery - Cross                                226

1  Q    After he opposed the Acis settlement, the next filing Mr.

2  Dondero made was requesting that the Debtor notice the sale of

3  any assets or any major subsidiary assets.  Is that correct?

4  A    I don't recall the sequence of his filings.  I think that

5  Judge Lynn at least sent a letter to that effect.  I don't

6  recall if there is a filing to that effect.

7  Q    Did Mr. Dondero, through his counsel, attempt to resolve

8  that motion without filing anything further?

9  A    I don't recall the specifics of the motion.  I know they

10 asked for some sort of relief that -- that we thought was

11 inappropriate.

12 Q    When the Court postponed any hearing on Mr. Dondero's

13 request for relief until the eve of the confirmation hearing,

14 and Mr. Pomerantz announced that no sales were expected before

15 confirmation, did Mr. Dondero withdraw his motion?

16 A    Again, I don't recall the specifics of the motion.  I only

17 recall the letter from Judge Lynn.

18 Q    Did Mr. Dondero do anything more than object to the

19 HarbourVest deal?

20 A    Not that I know of.

21 Q    Did Mr. Dondero do anything more than respond to the

22 Defendants' injunction suit?

23         MR. MORRIS:  Objection to the form of the question.

24 I mean, -- objection to the form.

25         THE COURT:  Overruled.

Seery - Cross                          227

1          MR. TAYLOR:  I apologize.  I should have said the

2   Debtor's injunction suit.

3          THE WITNESS:  Yeah, the -- I'm not sure of the

4   specific order, but certainly the communications with me,

5   which I think are prior to the order.  The communications with

6   Mr. Surgent, which I believe are after the order.  Certain

7   communications with Mr. Waterhouse, which were oral.  Those

8   were all similarly difficult and obstreperous actions.

9   BY MR. TAYLOR:

10  Q   Has Mr. Dondero commenced any adversary proceeding or

11  litigation in this case other than filing a competing plan?

12         MR. MORRIS:  Objection to the form of the question.

13         THE COURT:  Over --

14         THE WITNESS:  Yeah, I don't --

15         THE COURT:  -- ruled.

16         THE WITNESS:  I don't believe he's commenced an

17  adversary.  I'm sorry, Judge.  I don't believe he's commenced

18  an adversary proceeding, no.

19  BY MR. TAYLOR:

20  Q   Mr. Dondero didn't file any opposition to the life

21  settlement sale, did he?

22  A   We didn't do the life settlement (garbled) Court.

23  Q   Right.  Again, that wasn't noticed through the -- this

24  Court, was it?

25  A   It was an -- the reason was it was an asset of Multi-Strat

Seery - Cross                              228

1   Fund.  It wasn't an asset of the Debtor's.

2   Q   Okay.  Mr. Dondero did have concerns regarding the life

3   settlement sale, correct?

4   A   Yes.

5   Q   In fact, he believed that they were being sold for

6   substantially less than what could have otherwise been

7   received, correct?

8   A   He may have.

9   Q   And if you conduct any subsequent sales for less than

10  market value that might ultimately prevent the waterfall from

11  ever reaching Mr. Dondero, he would have no recourse under

12  this proposed plan to object to this sale or otherwise have

13  any comment on it.  Is that correct?

14  A   I clearly object to the thinking that that was less than

15  market value.  It was -- it was more than market value.  So I

16  don't -- I disagree with the premise of your question.

17  Q   So, I don't believe that was the question that was asked.

18  The question that was asked is, as you move forward with your

19  -- what I will characterize as a wind-down plan, not putting

20  that word in your mouth -- but as you execute forward on your

21  plan, as these sales of these assets go through, no notice is

22  going to be provided, correct?

23  A   Not necessarily.  It depends on the asset and what we

24  think of the, you know, the -- the position of the parties at

25  the time.

Seery - Cross                              229

1      If we have a -- if we have a transaction that's pending

2   that wouldn't be hurt by a notice and that we'd be able to get

3   the Court's imprimatur to maybe more better insulate, if you

4   will, against Mr. Dondero's attacks, then we may well come to

5   the Court to seek that.

6      The problem with noticing sales is that -- that it often

7   depresses value.  That's just not the way folks outside of the

8   bankruptcy world (audio gap) sales.

9   Q    So there's no requirement that either public or private

10  notice be provided, correct?

11  A    No.  Meaning it is correct.

12  Q    Okay.  And if Mr. Dondero had objections either to the

13  pricing of the sale or the manner and means by which the sale

14  was being conducted, he would be prohibited by the plan

15  injunction from bringing any objection to such sale, correct?

16  A    I believe so, yes.

17  Q    Mr. Dondero also had concerns regarding the OmniMax sale,

18  correct?

19  A    Mr. Dondero did not go along with the OmniMax sale with

20  the assets that he managed.  I don't know if he had concerns

21  with -- with our sale or OmniMax's interests.

22  Q    Did Mr. Dondero ever express to you any concern that the

23  value wasn't being maximized regarding the sale of those

24  assets?

25  A    He thought he could get more.  I don't know that he

Seery - Cross                          230

1    thought that he could get more for his assets that he was

2    managing or whether he thought he could get more for all of

3    the assets.

4    Q    Other than voicing those concerns, did Mr. Dondero file

5    any pleading with this Court attempting to block that sale?

6    A    Pleading with the Court?  No.

7              MR. TAYLOR:  Your Honor, I would like to confer with

8    my colleagues just very briefly and see if they have anything

9    further.  And even if they don't, Mr. Lynn of my firm would

10   like a very brief moment to address the Court prior to me

11   passing the witness.

12       So, if I may have a literally hopefully one-minute break

13   where I can turn my camera off and my microphone off to confer

14   with my colleagues, and then move forward?

15             THE COURT:  Okay.  Well, you can have a one-minute

16   break, but we're going to continue on with cross-examination

17   at this point.  Okay?  I'm not sure what you meant by Mr. Lynn

18   wants to raise an issue at this point.  Could you elaborate?

19             MR. TAYLOR:  I will get some elaboration during our

20   30-second to one-minute break, Your Honor.  I was just passed

21   a note.

22             THE COURT:  All right.  So, but I'll just you know,

23   --

24             A VOICE:  Your Honor?

25             THE COURT:  -- I'm inclined to continue with the

Seery - Cross                        231

1   cross-examination.  You know, this isn't a time for, you know,

2   arguments or anything like that.  All right?

3      So, we'll take a one-minute break.  You can turn off your

4   audio and video for one minute, and come back.

5      (Off the record, 3:33 p.m. to 3:34 p.m.)

6           THE WITNESS:  Your Honor?

7           THE COURT:  Yes?

8           THE WITNESS:  It's Jim Seery.  Can I turn it into

9   just a two-minute break, since I've sat in my seat, and it

10  would be better for him to just continue straight through.  I

11  could use one or two minutes.

12          THE COURT:  Okay.

13          THE WITNESS:  I apologize.

14          THE COURT:  All right.  Well, it's been more than

15  minute.  Let's just say a five-minute break for everyone, and

16  we'll come back at 3:39 Central time.  Okay.

17          THE WITNESS:  Okay.  Thank you, Your Honor.  I

18  appreciate that.

19      (A recess ensued from 3:35 p.m. until 3:40 p.m.)

20          THE CLERK:  All rise.

21          THE COURT:  Please be seated.  All right.  We are

22  back on the record.  Mr. Taylor, are you there?

23          MR. TAYLOR:  I am, Your Honor.  My video is not

24  wanting to start, but my -- I believe my audio is on.

25          THE COURT:  Okay.  After you went offline for your

                         Seery - Cross                        232

1   one-minute break, Mr. Seery asked for a five-minute bathroom

2   break, or a couple-minute. Anyway, we've been gone on a

3   bathroom break. We're back now.

4            MR. TAYLOR: Thank you. I was actually -- I was

5   still listening with one ear, --

6            THE COURT: Okay.

7            MR. TAYLOR: -- Your Honor, so I understand.

8            THE COURT: All right.

9            MR. TAYLOR: So, thank you.

10           THE COURT: Are you finished with cross, or no?

11           MR. TAYLOR: Just a little bit of a follow-up.

12                  CROSS-EXAMINATION, RESUMED

13  BY MR. TAYLOR:

14  Q   Mr. Seery, you had previously testified that Mr. Dondero's

15  counsel had threatened you and/or the independent board, I was

16  not exactly sure who you were referring to, with suits, and I

17  believe you said a hundred million dollars' worth of suits and

18  getting dragged into litigation.

19      Is that still your testimony today, that you were -- you

20  were threatened with suit by this firm of a suit of over a

21  hundred million dollars?

22  A   I believe what I was told by my counsel was that, not Mr.

23  Dondero's, but one of the other counsel, who I can name, said

24  specifically that Dondero will sue Seery for hundreds of

25  millions of dollars. We're going to take it up to the Fifth

Seery - Cross                                    233

1  Circuit, get it reversed, and he'll go after him.

2  Q   Okay.  So it was not Mr. Dondero's counsel, and you were

3  not -- is that correct?

4  A   No.  It was one of the other counsel on the phone today.

5  Q   Okay.  And you base that not upon your own personal

6  knowledge but based on some -- something else that you were

7  told, correct?

8  A   Yes.  By my counsel.

9  Q   Thank you.

10      MR. TAYLOR:  Yes, Your Honor.  We can pass the

11 witness.

12      THE COURT:  Okay.  So, you've gone, or you and Mr.

13 Rukavina collectively have gone one hour and 17 minutes.  Mr.

14 Draper, you're next.

15      MR. DRAPER:  Yes, Your Honor.  Thank you.  I

16 basically have no more than ten questions, so I gather the

17 Court will welcome that.

18      THE COURT:  Okay.

19                  CROSS-EXAMINATION

20 BY MR. DRAPER:

21 Q   Mr. Seery, has the new general partner been formed yet?

22 A   I don't know if they've been -- we've actually done the

23 formation, but it -- it would be in process.

24 Q   So it either has been formed or has not been formed?

25 A   I don't -- I don't know the answer.

Seery - Cross                              234

1   Q    Okay.  Now, going forward, Judge Nelms and Mr. Dubel will

2   have nothing to do with the Reorganized Debtor, correct?

3   A    Not necessarily, but they don't have a specific role at

4   this time.

5   Q    They won't be officers or directors of the new general

6   partner or the Reorganized Debtor, correct?

7   A    I don't -- I don't believe so, but it's not set in stone.

8   Q    All right.  Has any finance -- has any party who is the

9   beneficiary of an exculpation, a release, or the channeling

10  injunction contributed anything to this plan of reorganization

11  in terms of money?

12  A    No.

13  Q    Have you ever interviewed a trustee as to how they would

14  liquidate the assets or monetize the assets in this case?

15  A    No.

16  Q    And last question is, is there any bankruptcy prohibition

17  that you're aware of that a Chapter 7 trustee could not do

18  what you're doing?

19  A    Which -- which -- what do you mean, under the plan?

20  Q    No.  Could not monetize the assets of the estate in the

21  manner that you're attempting to monetize them.

22  A    I don't think there's a specific rule, but I just haven't

23  -- I haven't seen that before, no.  So I don't think there's a

24  specific rule that I know of.

25  Q    Okay.

Seery - Cross                                    235

1          MR. DRAPER:  I have nothing further for this witness.

2          THE COURT:  All right.  I should have asked, we had a

3    couple of other objectors.  Ms. Drawhorn, did you have any

4    questions?

5          MS. DRAWHORN:  I have no questions, Your Honor.

6          THE COURT:  All right.  Were there any other

7    objectors out there that I missed that might have questions?

8        All right.  Any redirect?

9          MR. MORRIS:  Your Honor, if I may, can I -- can I

10   just take a short minute to confer with my colleagues?

11         THE COURT:  Sure.  You can --

12         MR. MORRIS:  Thank you.

13         THE COURT:  -- put you --

14         MR. MORRIS:  Two -- two minutes, Your Honor.

15         THE COURT:  Okay.

16      (Pause, 3:45 p.m. until 3:48 p.m.)

17         THE COURT:  All right.  We've been a couple of

18   minutes.  Mr. Morris?

19         MR. MORRIS:  Yes, Your Honor.

20         THE COURT:  What are --

21         MR. MORRIS:  Just, just a few points, Your Honor.

22         THE COURT:  Okay.

23         MR. MORRIS:  Hold on a sec.  You ready, Mr. Seery?

24         THE WITNESS:  I am, yes.

25                    REDIRECT EXAMINATION

Seery - Redirect                              236

 1  BY MR. MORRIS:

 2  Q   You were asked a number of questions about your

 3  compensation.  Do you recall all that?

 4  A   Yes, I do.

 5  Q   And you testified to the $150,000 a month.  Do you recall

 6  that?

 7  A   Yes.

 8  Q   Under the -- under the documentation right now, your

 9  compensation is still subject to negotiation with the

10  Committee; is that right?

11  A   Yes, it is.

12  Q   Okay.  You were asked a couple of questions about the

13  conduct of Mr. Dondero.  Earlier, you testified that the

14  monetization plan was filed under seal at around the time of

15  the mediation.  Do I have that right?

16  A   Yes.  Right at the start of the mediation.

17  Q   Okay.  And is that the first time that the Debtor made the

18  constituents aware, including Mr. Dondero, that it intended to

19  use that as a catalyst towards getting to a plan?

20  A   That's the first time that we filed it, but that plan had

21  been discussed prior to that.

22  Q   And do you recall that there came a point in time where

23  you -- when the Debtor gave notice that it intended to

24  terminate the shared services agreements with the Dondero-

25  related entities?

Seery - Redirect                                237

1    A    Yes.

2    Q    And when did that happen?

3    A    That was about 60 -- now it's like 62 days ago.

4    Q    Uh-huh.  And you know, from your perspective, from the

5    filing of the monetization plan in August through the notice

6    of shared services, is that what you believe has contributed

7    to the resistance by Mr. Dondero to the Debtor's pursuit of

8    this plan?

9    A    Well, I think there's a number of factors that

10   contributed, but the evidence that I've seen is that when we

11   started talking about a transition, if there wasn't going to

12   be a deal, if Mr. Dondero couldn't reach a deal with the

13   creditors, we were going to push forward with the monetization

14   plan.  And the monetization plan required the transition of

15   the employees.  And indeed, it called specifically, and we had

16   testimony regarding it all through the case, about the

17   employees being terminated or transferred.

18       In order to transfer them over to an entity that's

19   related, Mr. Dondero pulls all of those strings.  And he

20   refused to engage on that.  We started in the fall.  We

21   specifically told employees of the Debtor not to engage.  They

22   couldn't spend his money, which made sense --

23            MR. TAYLOR:  Objection, Your Honor.

24            THE WITNESS:  So, very -- that --

25            THE COURT:  Just -- there's an objection.

Seery - Redirect                               238

1          MR. MORRIS:  There's an objection.

2          THE WITNESS:  I'm sorry.

3          THE COURT:  There was an objection.

4          MR. TAYLOR:  Yes, Your Honor.  Object --

5          THE COURT:  Go ahead.

6          MR. TAYLOR:  Yes, Your Honor.  This is Clay, Clay

7    Taylor.  Objection.  He's directly said Mr. Dondero told other

8    employees $x$, and that is purely hearsay, not based upon his

9    personal opinion, or his personal knowledge, and therefore

10   that part of the answer should be struck.

11         MR. MORRIS:  Your Honor, it's a statement against

12   interest.

13         THE COURT:  Overrule the objection.  Go ahead.

14         THE WITNESS:  Yeah.  The difficulty of transitioning

15   this business, I've equated it to doing a corporate carve-out

16   transaction on an M&A side.  It's hard, and you need

17   counterparties on the other side willing to engage.  And what

18   we went through over the weekend, on Friday, was seemingly

19   that the Funds, you know, directed by Mr. Dondero, just

20   haven't engaged.

21      We actually gave them an extra two weeks to engage,

22   because it's -- they've really been unable to do anything.  I

23   mean, hopefully, we've got the employees working in a way that

24   can -- that can foster and get around some of this

25   obstreperousness, and I've used that word before, but that's

Seery - Redirect                          239

1  what it is.  It's really an attempt to just prevent the plan

2  from going forward.

3       And at some point, the plan will go forward.  And if we

4  are unable to transition people, we will simply have to

5  terminate them.  And that is not a good outcome for those

6  employees, but it's not a good outcome for the Funds, either.

7  And the Funds, Mr. Dondero, the Advisors, the boards, nobody

8  wants to do anything except come in this court.

9  BY MR. MORRIS:

10 Q    Do you recall being asked about Mr. Dondero and certain

11 things that he didn't do and certain actions that he hadn't

12 taken?

13 A    Yes.

14 Q    By Mr. Taylor?  To the best of your recollection, did Mr.

15 Dondero personally object to the HarbourVest settlement?

16 A    I -- I don't recall if he did or if it was one of the

17 entities.

18 Q    It was Dugaboy.  Does that refresh your recollection?

19 A    Dugaboy certainly objected, yes.

20 Q    And do you understand that Dugaboy has appealed the

21 granting of the 9019 order in the HarbourVest settlement?

22 A    Yes.

23 Q    And Mr. Taylor asked you to confirm that Mr. Dondero

24 hadn't taken any action with respect to the life settlement

25 deal.  Do you remember that?

                            Seery - Redirect                    240

1    A    I do.

2    Q    But are you aware that Dugaboy actually filed an

3    administrative claim relating to the alleged mismanagement of

4    the life settlement sale?

5    A    Yes, I did, I did allude to that.  I wasn't sure it was

6    Dugaboy, but -- but that was very --

7    Q    Uh-huh.

8    A    -- very early on, an objection filed in the form of an

9    administrative claim or complaint against, if you will,

10   against Highland for the management of Multi-Strat.

11   Q    Uh-huh.  And Mr. Dondero didn't personally file any motion

12   seeking to inhibit the Debtor from managing the CLO assets; is

13   that right?

14   A    No, not the CLO assets, no.

15   Q    Yeah.  But the Funds and the Advisors did.  That was the

16   hearing on December 16th.  Do you recall that?

17   A    Yeah.  That was the -- the Funds.  K&L Gates, the Funds,

18   and the various Advisors.

19   Q    All right.  Do you recall Mr. Rukavina asking you whether

20   there was any evidence in the record to support your testimony

21   that there was an agreement in place to assume the CLO

22   management agreements?

23   A    I recall the question, yes.

24   Q    Okay.

25            MR. MORRIS:  Your Honor, I'm going to ask Ms. Canty

Seery - Redirect                          241

1  to put up on the screen the Debtor's omnibus reply to the plan

2  objections.

3           THE COURT:  Okay.

4           MR. MORRIS:  It was filed -- it was filed on January

5  22nd.  And if we can go, I think, to -- I think it's Paragraph

6  -- I think it's Paragraph 135 on Page 71.  Yeah.  Okay.

7  BY MR. MORRIS:

8  Q    Take a look at that, Mr. Seery.  Does that -- does that

9  statement in Paragraph 135 accurately reflect the

10  understanding that's been reached between the Debtor and the

11  CLO Issuers with respect to the Debtor's assumption of the CLO

12  management agreements?

13  A    Yes.  I think that's consistent with what I testified to

14  earlier, the substance of the agreement.

15           MR. MORRIS:  And if we can just scroll to the top,

16  just to see the date.  Or the bottom.  I guess the top.

17           THE WITNESS:  Do you mean the date of this pleading?

18  BY MR. MORRIS:

19  Q    Yeah.  So, it was filed on January 22nd, right, ten days

20  ago?  Okay.

21  A    That's correct.

22           MR. MORRIS:  I'd like to put up on the screen an

23  email, Your Honor, that I'd like to mark as Debtor's Exhibit

24  10A.  And this is --

25  BY MR. MORRIS:

Seery - Redirect                           242

1  Q    Do you recall, Mr. Seery, you testified that the agreement

2  was reflected in an email?

3  A    Yes.

4  Q    Is this the email that you're referring to?

5         MR. MORRIS:  If we could scroll down.  Right there.

6         THE WITNESS:  Yes.

7         MR. MORRIS:  Okay.  One -- the email below.  Okay.

8  Right there.

9  BY MR. MORRIS:

10  Q    Is that the -- is that the email you had in mind?

11  A    It was the series of emails.  We -- we had a -- I think I

12  testified in the prior testimony, or my -- one of my

13  depositions, that we had had a number of conversations with

14  the Issuers and their counsel, and this was the summary of the

15  agreement that was contained in these emails.

16  Q    Okay.  And this is, this is the same date as the omnibus

17  reply that we just looked at, right, January 22nd?

18  A    That's correct.

19  Q    Okay.  You were asked a question, I think, late in your

20  cross-examination about a Chapter 7 trustee's ability to sell

21  the assets in the same way as you are proposing to do.  Do you

22  recall that testimony?

23  A    Yes.

24  Q    And I think, if I understood correctly, the question was

25  narrowly tailored to whether there was any legal impediment to

Seery - Redirect                                      243

1   a trustee doing -- performing the same functions as you.  Do I

2   have that right?

3   A    That's the question I was asked, whether the Bankruptcy

4   Code had a specific prohibition.

5   Q    Okay.  And I think, I think you testified that you weren't

6   aware of anything.  Is that right?

7   A    That's correct.

8   Q    All right.  But let's talk about practice.  Do you think a

9   Chapter 7 trustee will realize the same value as you and the

10  team that you're assembling will, in terms of maximizing value

11  and getting the maximum recovery for the assets?

12  A    No.  As I testified earlier, you know, I've been working

13  with these assets now for a year.  It's a complicated

14  structure.  The assets are all slightly different.  And

15  sometimes much more than slightly.  And the team that we're

16  going to have helping managing is familiar with the assets as

17  well.  We believe we'll be able to execute very well in the

18  markets that we (garbled).

19  Q    Do you think a Chapter 7 trustee will have a steep

20  learning curve in trying to even begin to understand the

21  nature of the assets and how to market and sell them?

22  A    I think anybody coming into this, the way this company is

23  set up, as an asset manager, and the diversity of the assets,

24  would have a steep learning curve, yes.

25  Q    Do you have any view as to whether the perception in the

Seery - Redirect                          244

1   marketplace of a Chapter 7 trustee taking over to sell the

2   assets will have an impact on value as compared to a post-

3   confirmation estate of the type that's being proposed under

4   the plan?

5   A   Yes, I do, and it certainly would be negative, in my

6   experience.  Typically, assets are not conducted -- asset

7   sales are not conducted through a bankruptcy court, and

8   certainly not with a Chapter 7 trustee that has to sell them,

9   and generally is viewed as having to sell them quickly.  So we

10  -- we approach each asset differently, but certainly in a way

11  that would be much more conducive to maximizing value than a

12  Chapter 7 trustee could, just by the nature of their role.

13  Q   Is it -- is it your understanding that, under the proposed

14  plan and under the proposed corporate governance structure,

15  that the Claims Oversight Committee will -- will manage you?

16  That you'll report to that Committee and that they'll have the

17  opportunity to make their assessment as to the quality of your

18  work?

19  A   Yeah, absolutely.  And that's consistent with what we've

20  done before in this case.  Even where it wasn't an asset of

21  the estate or was being sold in the ordinary course, we spent

22  time with the Committee and the Committee professionals before

23  selling assets.

24  Q   And you've worked with the Committee for over -- for a

25  year now, right?

Seery - Redirect                          245

1   A    It's over a year.

2   Q    And the Committee is comfortable with you taking this

3   role; is that right?

4   A    I think they're supportive of it.  Comfortable might be

5   not the right word choice.

6   Q    Okay.  I appreciate the clarification.  And do you have

7   any reason to believe that the -- that the Oversight Committee

8   is going to allow you the unfettered discretion to do whatever

9   you want with the assets of the Trust?

10  A    Not a chance.  Not with this group.  Nor would I want to.

11  There's no right or wrong answer for most of these things, and

12  the collaborative views from professionals and people who have

13  an economic stake in the outcome will be helpful.

14  Q    Okay.  You were asked some questions about the November

15  projections and the -- and the assumption that was made that

16  valued the HarbourVest and the UBS claims at zero.  Do you

17  recall that?

18  A    Yes.

19  Q    As of that time, was the Debtor still in active litigation

20  with both of those claim holders?

21  A    Very much so.

22  Q    And after the disclosure statement was issued, do you

23  recall that the Court entered its order on UBS's Rule 3018

24  motion?

25  A    Yes.

Seery - Redirect                      246

1  Q   And do you recall what the -- what the claims estimate was

2  for voting purposes under that order?

3  A   It was about $95 million.  That was -- it was together

4  with the summary judgment orders of that date.  They were

5  separate orders, but that was the lone hearing.

6  Q   And was that public information, that order was publicly

7  filed on the docket; isn't that right?

8  A   Yes, it was.

9  Q   Is there anything in the world that you can think of that

10 would have prevented any claim holder from doing the math to

11 try to figure out the impact on the estimated recoveries from

12 the -- by using that 3018 claims estimate?

13 A   No.  It would have -- it would have been quite easy to do.

14 Q   And, in fact, that's what you wound up doing with respect

15 to the January projections, right?

16 A   That's correct.

17 Q   And do you recall when the HarbourVest settlement, when

18 the 9019 motion was filed?

19 A   I don't recall the actual filing.  It was subsequent to

20 the UBS, though.

21         MR. MORRIS:  Ms. Canty, if you have it, can we just

22 put it on the screen, to see if we can refresh Mr. Seery's

23 recollection?  If we could just look at the very top.

24 BY MR. MORRIS:

25 Q   Does that refresh your recollection that the 9019 motion

Seery - Redirect                          247

1   was filed on December 23rd?

2   A   Yes, it does.  The agreement was reached before that, but

3   it took a little bit of time to document the particulars and

4   then to -- to get it filed.

5   Q   And this wasn't filed under seal, to the best of your

6   recollection, was it?

7   A   No, no.  This was -- this was open, and we had a very open

8   hearing about it, because it was a related-party objection.

9   Q   And to the best of your recollection, did this 9019 motion

10  publicly disclose all of the material terms of the proposed

11  settlement?

12  A   Yes, it did.

13  Q   Can you think of anything in the world that would have

14  prevented any interested party from doing the math to figure

15  out how this particular settlement would impact the claim

16  recoveries set forth in the Debtor's disclosure statement?

17  A   No.  And just again, to be clear, the plan and the

18  projections had assumptions, but the plan was very clear that

19  the denominator was going to be determined by the total amount

20  of allowed claims.

21  Q   And, again, at the time that that was filed, you hadn't

22  reached a settlement with HarbourVest, had you?

23  A   No.

24  Q   And the order on the 3018 motion hadn't yet been filed; is

25  that right?

Seery - Redirect                          248

1  A    That's correct.

2  Q    Okay.  Has -- are you aware of any creditor expressing any

3  interest in trying to change their vote as a result of the

4  updates of the forecasts?

5  A    Only Mr. Daugherty.  And actually, they have a stipulation

6  with the two -- the two former employees.

7  Q    All right.  But to be fair, that wasn't -- had nothing to

8  do with the revisions to the projections?  That was just in

9  connection with their settlement; is that right?

10  A    That's correct.  As was, I suspect, Mr. Daugherty's, but

11  he'd been aware of the settlements, just like everyone else.

12  Q    Okay.  You were asked a couple of questions, I think, by

13  Mr. Rukavina about whether there is anything that you need to

14  do your job on a go-forward basis.  And I think you said no.

15  Do I -- do I have that right?  Nothing further that you need?

16  A    I -- I'm not really sure what your question means, to be

17  honest.

18  Q    Okay.  Fair enough.  To be clear, is there any chance that

19  you would accept the position as the Claimant Trustee if the

20  gatekeeper and injunction provisions of the proposed plan were

21  extracted from those documents?

22  A    No.  As I said earlier, they're integral in my view to the

23  entire plan, but they're absolutely essential to my bottom.

24  Q    Okay.  And through -- through the date of the effective

25  date, are you relying on the exculpation clause of the -- have

Seery - Redirect                              249

1  you been relying on the exculpation clause in the January 9th

2  order that you testified to at the beginning of this hearing?

3  A    Yeah.  Both the January 9th order as well as the July

4  order with respect to my CEO/CRO positions.

5  Q    Okay.

6          MR. MORRIS:  I've got nothing further, Your Honor.

7          THE COURT:  All right.  Any recross on that redirect?

8          A VOICE:  I believe Mr. Rukavina is speaking but is

9  muted, Your Honor.

10          THE COURT:  Mr. Rukavina, do you have any recross?

11          MR. RUKAVINA:  Your Honor, I do, yes.  Thank you.  I

12  apologize.

13          THE COURT:  Okay.

14          MR. RUKAVINA:  Can you hear me now?

15          THE COURT:  Yes.

16          THE WITNESS:  Yes.

17          MR. RUKAVINA:  Thank you.

18      Mr. Vasek, if you'll please pull up the Debtor's Omnibus

19  Reply, Docket 1807.  And if you'll go to Exhibit C.  Do a word

20  search for Exhibit C.  It's attached to it.  Okay.  Now scroll

21  down.  Stop there.

22                      RECROSS-EXAMINATION

23  BY MR. RUKAVINA:

24  Q    Mr. Seery, do you see what's attached as Exhibit C to the

25  Omnibus Reply, which is proposed language in the confirmation

Seery - Recross                                    250

1   order?

2   A   I see the exhibit.  I didn't know if this was -- I don't

3   know exactly what it's for.  If it's proposed language, I'll

4   accept your representation.

5        MR. RUKAVINA:  Well, scroll back up to Exhibit C, Mr.

6   Vasek.  I want to make sure that I understand what you're

7   saying.  Scroll back up.  Do the word search for where Exhibit

8   C appears first.  Start again.  Okay.  So scroll up.

9   BY MR. RUKAVINA:

10  Q   So, you'll recall Mr. Morris was asking you about the

11  paragraph in here where you outlined the terms of the

12  agreement with the CLOs.  Do you recall that testimony?

13  A   Yes.

14  Q   Okay.  And then you see it says, The Debtor and the CLOs

15  agreed to seek approval of this compromise by adding language

16  to the confirmation order.  A copy of that language is

17  attached hereto as Exhibit C and will be included in the

18  confirmation order.

19       Do you see that, sir?

20  A   I do.

21  Q   Okay.

22       MR. RUKAVINA:  Mr. Vasek, go back to Exhibit C.

23  BY MR. RUKAVINA:

24  Q   So it's correct that this Exhibit C is the referenced

25  agreement that the Debtor and the CLOs will seek approval of,

Seery - Recross                                    251

1    correct?

2    A    The -- the -- it may be word-splitting, but I believe it

3    says that they've reached agreement and this is the language

4    that will evidence that agreement or embody that agreement.

5    Q    Okay.

6              MR. RUKAVINA:  Scroll down, Ms. Vasek, to the next

7    page, please.

8    BY MR. RUKAVINA:

9    Q    Real quick, do the CLOs owe the Debtor any money for the

10   management fees?

11   A    I don't -- well, the answer is there are accrued fees that

12   haven't been paid, but when they have cash they run through

13   the waterfall and pay them.

14   Q    And I believe you mentioned to me those accrued fees

15   before.  They're several million dollars, correct?

16   A    It -- I don't know right off the top of my head.  They can

17   aggregate and then they get paid down in the quarter depending

18   on the waterfall.  And it's -- it's not a fair statement by

19   either of us to say the CLOs, as if they're all the same.

20   Each one is different.

21   Q    I understand.  But as of today, you agree that the CLOs

22   collectively owe some amount of money to the Debtor in accrued

23   and unpaid management fees?

24   A    I believe that's the case.

25   Q    Okay.  And do you believe it's north of a million dollars?

Seery - Recross                           252

1   A    I don't recall.

2   Q    Okay.

3        MR. RUKAVINA:  Well, scroll down a couple of more

4   lines, Mr. Vasek.  Stay there.

5   BY MR. RUKAVINA:

6   Q    Sir, if you'll read with me, isn't the Debtor releasing

7   each Issuer, which is the CLOs, for and from any and all

8   claims, debts, et cetera, by this provision?

9   A    Claims.  Not -- not fees, but claims.  I don't believe

10  there's any release of fees that the CLOs might owe and would

11  run through the waterfall here.

12  Q    Okay.  For and from any and all claims, debts,

13  liabilities, demands, obligations, promises, acts, agreements,

14  liens, losses, costs, and expenses, including without

15  limitation attorneys' fees and related costs, damages,

16  injuries, suits, actions, and causes of action, of whatever

17  kind or nature, whether known or unknown, suspected or

18  unsuspected, matured or unmatured, liquidated or unliquidated,

19  contingent or fixed.

20      Are you saying that that does not release whatever fees

21  have accrued and the CLOs owe?

22  A    I don't believe it would.  If it did, your client should

23  be ecstatic.  But I don't believe it does that.

24  Q    And you don't believe that it releases the CLOs of any and

25  all other obligations that they may have to the Debtor and the

Seery - Recross                              253

1  estate?

2  A    I -- again, I don't believe there are any, but I think

3  it's a broad release of claims away from the actual fees that

4  are generated by the Debtor.  I don't believe there's an

5  intention to release fees that have accrued.

6  Q    Have you seen this language before I showed it to you

7  right now?

8  A    I believe I have, yes.

9  Q    Okay.  Take a minute.  Can you point the Court to anywhere

10 where present or future fees under the CLO agreements are

11 excepted from the release?

12 A    I could go through, I'll take your representation, but I

13 don't believe that that's what it -- it's supposed to release

14 fees.  Again, if the fees are owed, they get paid, if there

15 are assets there to pay them.

16 Q    Okay.  This release and this settlement was never noticed

17 out as part of a 9019, was it?

18 A    I don't believe so, no.

19 Q    Okay.  So, other than bringing it up here today, this is

20 the first that the Court, at least, has heard of this,

21 correct?

22 A    Yeah, again, I don't --

23          MR. MORRIS:  Objection to the form of the question.

24          THE WITNESS:  Yeah.  I just stated before that I

25 don't think this is a -- that there claims.

Seery - Recross                    254

1          THE COURT:  Wait.  Slow down.  I think --

2          MR. SEERY:  Oh, I'm sorry, Your Honor.

3          THE COURT:  -- there was an objection.  Go ahead, Mr.

4    Morris.

5          MR. MORRIS:  The notion that this is the first time

6    the Court has heard of this is just factually incorrect.

7    First of all, it's in the document from January 22nd.  Second

8    of all, Mr. Seery testified to it last week at the preliminary

9    injunction hearing.  I mean, --

10         THE COURT:  I -- I --

11         MR. MORRIS:  -- I don't know what the point of the

12   inquiry is, but there's -- this is not new news.

13         THE COURT:  Okay.  I sustain the objection.

14   BY MR. RUKAVINA:

15   Q   And Mr. Seery, can you point me to any document where

16   counsel for the CLOs has signed this particular confirmation

17   order or any other document agreeing to this language in the

18   confirmation order?

19   A   I don't think there's any document that's signed.  I think

20   we already went over that.  I think the email is evidence

21   their agreement to the general terms.  I don't see any

22   agreement with respect to this particular language.

23   Q   Well, you have no personal information?  You're going on

24   what your lawyers told you that the CLOs agreed to, correct?

25   A   That's correct.

Seery - Recross                          255

1  Q    Okay.  You didn't personally --

2  A    Excuse me.  That's correct with respect to this language,

3  not with respect to the agreement.  I was on the phone when

4  they agreed.

5  Q    Okay.  And they agreed orally, you're saying, to basically

6  the assumption of the CLO management agreements?

7  A    Correct.

8  Q    Okay.

9         MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

10 witness.

11        THE COURT:  All right.  Other recross?

12        MR. TAYLOR:  Yes, Your Honor, I do.

13        THE COURT:  Go ahead.

14                    RECROSS-EXAMINATION

15 BY MR. TAYLOR:

16 Q    Mr. Seery, Clay Taylor again.  You worked -- I'm sorry,

17 let me restart.  I believe you testified earlier, in response

18 to questions by Mr. Morris, that you didn't believe a Chapter

19 7 trustee would be very effective in monetizing these assets,

20 correct?

21 A    I think I said I didn't believe that the Chapter 7 trustee

22 would be as effective at monetizing the assets as the

23 Reorganized Debtor would be, and me in the role as Claimant

24 Trustee.

25 Q    And one of the reasons that you gave is you believe that

Seery - Recross                          256

1   the Chapter 7 trustee had to liquidate assets so quickly that

2   it could not be effective; is that correct?

3   A    Typically, that's the case, yes.

4   Q    You worked for the Lehman trustee, correct?

5   A    That's incorrect.

6   Q    Okay.  Did you work on the Lehman case?

7   A    Did I work in the case?  No.

8   Q    Okay.  Did you -- how were you involved within -- within

9   the Lehman case?

10  A    It's a long history, but I was a relatively senior person,

11  not senior level, not senior management level person at

12  Lehman.  I ran the loan businesses and I helped a number of

13  other places and I -- in the organization.  I helped construct

14  the sale of Lehman to Barclays out of the broker-dealer and

15  then helped consummate that sale.

16  Q    Okay.  I believe, in that case, it was a SIPC -- the

17  trustee was a SIPC trustee, correct?

18  A    With respect to the broker-dealer.

19  Q    Okay.  And you believe that a SIPC trustee is very -- has

20  very similar rules with respect to asset sales; is that

21  correct?

22  A    There are some similarities, absolutely.

23  Q    Okay.  And so in that case, the trustee was in place for

24  seven years, yet you believe -- you want this Court to believe

25  that a Chapter 7 trustee has to liquidate assets in a very

Seery - Recross                              257

1    short time frame, is that correct?

2            MR. MORRIS:  Objection to the form of the question.

3            THE WITNESS:  Yeah, in the Lehman case, --

4            THE COURT:  Overruled.

5            THE WITNESS:  I'm sorry, Judge.

6            THE COURT:  Go ahead.

7            THE WITNESS:  In the Lehman case, the SIPC trustee

8    spent years litigating, not liquidating.  The broker-dealer

9    was sold in our structured deal to Barclays, and then the SIPC

10   trustee liquidated the remainder of the estate, which was the

11   broker-dealer, but most of it had been sold to Barclays.  It

12   was really a litigation case.

13   BY MR. TAYLOR:

14   Q    But it did -- that trustee did sell off subsequent assets

15   after the initial sale, correct?

16   A    That trustee, I don't think, managed -- I don't know about

17   that.  The trustee didn't really manage any assets.  Other

18   than litigations.

19   Q    You've also testified that you didn't believe or that you

20   would not take on this role without the gatekeeper and

21   injunction -- gatekeeper role and injunction being in place;

22   is that correct?

23   A    Yes.

24   Q    And you're also familiar with the Barton Doctrine,

25   correct?

Seery - Recross                    258

1   A    I'm not.

2   Q    Okay.  Do you believe that a Chapter 7 trustee could be

3   sued by third parties without obtaining either relief from

4   this Court -- let me just stop there.  Do you believe that a

5   Chapter 7 trustee could be sued without seeking leave of this

6   Court?

7   A    I think it would be difficult.  I know that Chapter 7

8   trustees have qualified immunity, so I think, whether it would

9   be leave of this Court or it's just that there's a very high

10  bar to suing them, I'm not exactly sure.  It's not something

11  I've spent time on.

12  Q    Okay.  So a hypothetical Chapter 7 trustee would have no

13  need of the gatekeeper role or injunction if this case were

14  converted to one under Chapter 7, correct?

15  A    That's probably true.

16  Q    Thank you.

17          MR. TAYLOR:  No further questions.

18          THE COURT:  All right.  Any other recross?

19          MR. DRAPER:  Your Honor, I have nothing --

20          THE COURT:  All right.

21          MR. DRAPER:  -- further.

22          THE COURT:  All right.  I think we're done, but

23  anyone I've missed?

24      All right.  Mr. Seery, it's been a long day.  You are

25  excused from the virtual witness stand.

Seery - Recross                              259

1        THE WITNESS:  Thank you, Your Honor.

2        THE COURT:  All right.  Mr. Morris, let's see if

3   there's anything else we can accomplish today.  It's 4:18

4   Central time.  Who would be your next witness?

5        MR. MORRIS:  My next witness would be John Dubel,

6   Your Honor.

7        THE COURT:  All right.  Can you give us a time

8   estimate for direct?

9        MR. MORRIS:  I wouldn't expect Mr. Dubel to be more

10  than 20 minutes or so, but I would offer the Court, if you

11  think it would be helpful, counsel for the CLO Issuers is on

12  the call, and I believe that they would be prepared to just

13  confirm for Your Honor that there is an agreement in

14  principle, just as Mr. Seery has testified to, and maybe you

15  want to hear from her.  I know she's not really a witness, but

16  she might be able to make some representations to give the

17  Court some comfort that everything Mr. Seery has said is true.

18       THE COURT:  I think that would be useful.  Is it Ms.

19  Anderson or who is it?

20       MS. ANDERSON:  That is -- it is, Your Honor.  And you

21  know, I appreciate the testimony given.  I certainly do not

22  want to testify, but thought it might be useful for the Court

23  to hear from us.

24     Amy Anderson on behalf of the Issuers from Jones Walker.

25  Schulte Roth also represents the Issuers.  And I can represent

260

1    to the Court that the agreement as it's represented on Docket

2    1807, as more particularly described in Exhibit C, which Your

3    Honor has seen, is the agreement reached between the Issuers

4    and the Debtor.

5        There was some testimony about fees owed, accrued fees

6    owed to the Debtor.  I certainly cannot speak to the substance

7    of each particular management agreement with each CLO.  They

8    are all distinct and unique and very lengthy documents.  I

9    will -- I can represent to the Court that any accrued fees

10   that are owed were not intended to be included in the release.

11   It is -- it is not meant to release fees owed to Highland

12   under the particular management agreements.

13       Of course, if the Court has any questions or if I can

14   provide anything further, I'm happy to.  And I will be on the

15   hearing today and tomorrow, but I thought it might be useful,

16   given the topic of the testimony this afternoon.

17           THE COURT:  All right.  That was useful.  Thank you,

18   Ms. Anderson.

19       All right.  Well, Mr. Morris, shall we go ahead and hear

20   from Mr. Dubel today, perhaps finish up a second witness?

21           MR. MORRIS:  Yeah.  I think we have the time.  I

22   think Mr. Dubel is here.  Are you here, Mr. Dubel?

23           MR. DUBEL:  I am.  Can you hear me, Your Honor?

24           THE COURT:  I can hear you, but I cannot see you.

25   Oh, now I can see you.  Please raise your right hand.

Dubel - Direct                              261

1              JOHN S. DUBEL, DEBTOR'S WITNESS, SWORN

2              THE COURT:  All right.  Thank you.  Mr. Morris, go

3    ahead.

4              MR. MORRIS:  Thank you very much, Your Honor.

5                        DIRECT EXAMINATION

6    BY MR. MORRIS:

7    Q    Mr. Dubel, can you hear me?

8    A    I can, Mr. Morris.

9    Q    Okay.  Do you have a position today with the Debtor, sir?

10   A    I am a director of Strand Advisors, Inc., which is the

11   general partner of the Debtor.

12   Q    Okay.  And can you --

13             MR. MORRIS:  Your Honor, just as a reminder, I'm

14   going to ask Mr. Dubel to describe his professional experience

15   in some detail, to put into context his testimony, but his

16   *C.V.* can be found at Exhibit 6Y as in yellow on Docket No.

17   1822.

18             THE COURT:  All right.

19   BY MR. MORRIS:

20   Q    Mr. Dubel, can you describe your professional background?

21   A    Yes.  I have approximately, almost, and I hate to say it

22   because it's making me feel old, but I have almost 40 years of

23   experience working in the restructuring industry.

24        I have served in many roles in that, both as an advisor,

25   an investor in distressed debt, and also a member of

Dubel - Direct                                    262

1  management teams, and as a director, both an independent

2  director and a non-independent director.

3       My executive roles have included the -- both an executive

4  director, chief executive officer, president, chief

5  restructuring officer, chief financial officer.  And I have

6  been involved in some of the largest Chapter 11 cases over the

7  last several decades, including cases like *WorldCom* and

8  *SunEdison*.

9  Q    Let's focus your attention for a moment just on the

10 position of independent director.  Have you served in that

11 capacity before this case?

12 A    I have.

13 Q    Can you describe for the Court some of the cases in which

14 you've served as an independent director?

15 A    Sure.  I've served as an independent director in several

16 cases that were I'll call post-reorg cases.  *Werner Company*,

17 which was the largest climbing equipment manufacturer in the

18 world, manufacturer of ladders, Werner Ladders.  You'll see

19 them on every pickup truck running around the countryside.

20      *FXI Corporation*, which is a -- one of the largest foam

21 manufacturers.  Everybody's probably slept or sat on one of

22 their products.

23      *Barneys New York*, back in 2012, when they did an out-of-

24 court restructuring.  I had previously been involved with

25 Barneys 15 years before that, and so I was called upon because

Dubel - Direct                                  263

1  of my knowledge to be an independent director in that

2  situation.  Have had no relationship with Barneys since it

3  emerged from Chapter 11 back in 1998.

4      I have been the independent director in *WMC Mortgage*,

5  which was a mortgage company owned by General Electric.

6      And I am currently serving as an independent director in a

7  company -- in two companies.  One, *Alpha Media*, which is a

8  large radio station chain that recently filed Chapter 11, I

9  believe it was late Sunday night, and I am also an independent

10 director in the *Purdue Pharma* bankruptcy, and have served

11 prior to the bankruptcy and am the chair of the special

12 independent committee of directors -- special committee of

13 independent directors in that particular situation.

14 Q   That sounds like a lot.  In terms of other fiduciary

15 capacities, I think your *C.V.* refers to Leslie Fay.  Were you

16 involved in that case, and if so, how?

17 A   I was.  That was -- for those people who may remember it,

18 that goes back into the 1993 era.  *Leslie Fay* was a large

19 apparel manufacturer, and at the time was one of the largest

20 companies that had gone through an extensive fraud.  I say at

21 the time because it was about a $180 million fraud, which

22 pales by some of the ones that have followed it.

23     I was brought in as the executive vice president in charge

24 of restructuring, chief financial officer, and was also added

25 to the board of directors.  Even though I wasn't independent,

```
                         Dubel - Direct                    264
```

1   I was added to the board of directors to have the fresh face

2   on the board in that particular situation because of the fraud

3   that had taken place.

4   Q    And --

5   A    *Sun* --

6   Q    Go ahead.

7   A    *SunEdison*, I was brought in as the CEO.  Actually,

8   initially, as the chief restructuring officer, with a mandate

9   to replace the CEO, which took place shortly after I was

10  brought on board and -- because of various issues surrounding

11  investigations by the SEC, DOJ, and allegations by the

12  creditors of fraud.  And so I was brought in to run the

13  company through its Chapter 11 process.

14       As I'd mentioned earlier, *WorldCom*, I was brought in at

15  the beginning of the case as the fresh chief financial

16  officer.  And I think everybody is familiar with what happened

17  in the *WorldCom* situation.

18  Q    All right.  Based on that experience, do you have a view

19  as to whether the appointment of independent directors is

20  unusual?

21  A    It is not.  More recently, it has -- it had been in the

22  past.  Usually, you know, they would try and take the existing

23  directors and form a special committee of the existing

24  directors.  But I think the state of the art has become more

25  where independent directors are brought in, mainly because the

Dubel - Direct                    265

1   cases have become a lot more complex in nature, and larger,

2   and the transactions themselves are much more sophisticated.

3   And so having somebody independent has been important for

4   analyzing the various transactions.  And also, quite often,

5   it's just bringing a fresh, independent voice to the company

6   on the board.

7   Q   Do you have an understanding as to the purpose and the

8   role of independent directors generally in restructuring and

9   bankruptcy cases?

10  A   Sure.  As I kind of alluded to a little bit earlier, the

11  -- probably the most critical thing is for restoring

12  confidence in the company and in the management in terms of

13  corporate governance, especially when there have been troubled

14  situations, where -- whether it's been fraud or allegations

15  made against the company and its prior management or when

16  management has left under difficult situations.

17      Also, you know, independent thought process being brought

18  to the board is very important for helping guide companies.

19  It's quite often the existing management team or the existing

20  board may get stuck in a rut, as you can say, you know, in

21  terms of their thinking on how to manage it, and having

22  somebody with restructuring experience who provides that

23  independent voice is very important to the operations.

24      In addition, having someone who can look at conflicts that

25  might arise between shareholders or shareholders and the board

Dubel - Direct                                266

1   members is important.  As I mentioned earlier, the *WMC*

2   *Mortgage* situation was one where I was brought on to -- as an

3   independent member of the board to effectively negotiate an

4   agreement or a settlement between WMC and its parent, General

5   Electric.  That entity was being -- WMC was being sued for

6   billions of dollars, and there were issues as to whether or

7   not General Electric should fund those obligations.  And so

8   that was a role that is quite often occurring in today's day

9   and age.

10      In addition, evaluating transactions for companies is

11  important, whereby either the shareholders who sit on the

12  board or board members may be involved in those transactions,

13  needing an independent voice to review it.  And, you know, I

14  have served in situations.  Again, *Barneys New York* and *Alpha*

15  *Media* is another example where, as an independent director, I

16  am one of the parties responsible for evaluating those

17  transactions and making recommendations to the entire board.

18      And then, again, you know, situations where it's just

19  highly-contentious and having, as I said, having that

20  independent view brought to the table is something that is

21  very helpful in these cases.

22  Q   I appreciate the fulsomeness of the answer.  During the

23  time that you served in these various fiduciary capacities, is

24  it fair to say you spent a lot of time considering and

25  addressing issues relating to D&O and other executive

Dubel - Direct                               267

1  liability issues?

2  A   It's usually one of the things that you get involved with

3  thinking about prior to taking on the role because you want to

4  make sure that there are the appropriate protections for the

5  director.

6  Q   Can you describe for the Court some of the protections

7  that you've sought or that you've seen employed in some of the

8  cases you've worked on, including this one, by the way?

9  A   Sure.  I mean, one of the first things you look to is does

10 the company -- will the company indemnify the director for

11 serving in that capacity?  And if the company will not

12 indemnify, then there's always a question as to why not, and

13 it's probably something you don't want to get involved with.

14     Generally, that is something that I don't think I've ever

15 seen a case where there has not been indemnification.

16 Obviously, it would, you know, cause great pause or concern if

17 they weren't willing to indemnify.  But that is important.

18     Providing D&O insurance is very important.  And in most

19 situations, you know, over the last 10-15 years, if there's

20 not adequate D&O insurance -- quite often, the D&O insurance

21 has been tapped out because of claims that will -- have been

22 brought or are anticipated to be brought -- new D&O insurance

23 is something that's front and center for the minds of

24 independent directors such as myself.

25     As you -- that gets you into the case and gets you moving.

Dubel - Direct                              268

1    As you start to look towards the confirmation and exit from

2    the case, things that would be appropriate, that, you know,

3    would always be something you would want to look at would be

4    exculpation language, releases.  And in this particular case,

5    the injunction, or what Mr. Seery earlier referred to as the

6    gatekeeper clause, is something that is very important for

7    directors, both, you know, as they're thinking through it and

8    as they emerge.

9    Q    All right.  Let's shift now to this case, with that

10   background.  How did you learn about this case?

11   A    I had a party who was involved in the case reach out to me

12   in early part of December of 2019 to see if I would be

13   interested in getting involved.  I think that was about the

14   time -- it was after -- as I recall, it was after the case had

15   been moved to Dallas and when there was a -- consideration of

16   either a Chapter 11 or a Chapter 7 trustee.  I can't remember

17   exactly which it was.  But there was talk about a motion to

18   bring on a trustee and get rid of all the management and the

19   like and such.

20   Q    Can you describe in as much detail as you can recall the

21   facts and circumstances that led to your appointment as an

22   independent director?

23   A    Sure.  I, as I said, I had -- early December, I had an --

24   one of the parties involved -- had, probably within the next

25   week, probably two or three others -- that reached out to see

Dubel - Direct                                        269

1  if I would be interested in participating.  I met with the

2  Creditors' Committee or -- I'm not sure if it was all the

3  members, but representatives of the Creditors' Committee,

4  along with counsel, and I believe financial advisors were

5  involved.  They walked me through the issues.  They wanted to

6  hear about my *C.V.*  Quite a few of them knew me, knew me well,

7  but others wanted to hear about my background and how I would

8  look at things as an independent director.

9      That went through into the latter part of December.  I

10 knew that they were talking to other parties.  I think it was

11 probably right around the first of the year or so that I was

12 informed, maybe a little bit earlier than that, that I was

13 informed that Mr. Seery was one of the other parties that they

14 were talking to, and Mr. Seery and I were put in touch with

15 each other.  I had worked with Mr. Seery back probably nine

16 years earlier when I was the CEO of FGIC.  He was involved in

17 a matter that we were restructuring, and so knew him a little

18 bit and was comfortable working with him as a, you know,

19 another independent director.

20     Then we took the time that we had to to -- or, I took the

21 time to -- from the beginning, you know, the early part of

22 December, look at the docket, understand what was taking

23 place.  I -- in addition, I met with the company and its

24 advisors, in-house counsel, the folks at DSI who were at the

25 time the CRO and the company's counsel to better understand

```
                          Dubel - Direct                    270
```

1   some of the issues.

2       Mr. Seery and I, as I said, were both selected, and we

3   went through the process of, I guess, breaking the tie, I

4   think, if I could say it that way, amongst the creditors and

5   the Debtor as to who would be the third member of the board.

6   And we were given the opportunity to go out, interview, and

7   select the third member, which resulted in Russell Nelms'

8   appointment to the board.  And also during that time, we were

9   given the opportunity to have some input -- not a hundred

10  percent input, but some input -- on the January 9th order that

11  -- the January 9, 2020 order that was put in place appointing

12  us and giving us some of the protections that we felt were

13  appropriate and necessary in this case.

14  Q   All right.  We'll get to that in a moment, but during this

15  diligence period, did you form an understanding as to why an

16  independent board was being formed, why it was being sought?

17  A   Yes.  There was, my words, there was a lot of distrust

18  between the creditors and the management -- not the CRO, but

19  the prior management of the company -- and there had been a

20  motion brought both to obviously bring the case back to Dallas

21  from I think it was originally in Delaware and then there was

22  a motion to seek, you know, to remove management and put in a

23  trustee.

24      There had been a dozen years of litigation with one party,

25  about eight or nine years with another major party, and

Dubel - Direct                                    271

1  several other of the major creditors were litigants.  The

2  other, as I understood, the other creditors, main creditors in

3  the case were all lawyers who had not yet gotten paid for the

4  litigation work that they had done.  And so it was obvious

5  that this was a very -- a highly-litigious situation.

6  Q    In addition to speaking with the various constituents, did

7  you do any diligence on your own to try to understand the case

8  before you accepted the appointment?

9  A    Yes.  I went to the docket to look at all the -- not every

10  single thing that had been filed, but to try and look at all

11  the key, relevant items that had been filed, get a better

12  understanding of what was out there.  Looked at some of the

13  initial filings of the company in terms of the, you know, the

14  creditors, to understand who the creditor base was per the

15  schedules that had been filed.  Looked at the -- some of the

16  various pleadings that had been put in place.

17  Q    Did you form a view as to the causes of the bankruptcy

18  filing?

19  A    Litigation.  That was my clear view.  This company had

20  been in litigation with multiple parties, various different

21  parties, since around 2008.  Generally, you would see

22  litigation like the types that were, you know, that were here,

23  you know, you'd litigate for a while, then you'd try and

24  settle it.

25      It did not appear to me that there was any intention on

Dubel - Direct                                272

1   the -- the Debtor to settle these litigations, but would

2   rather just continue the process and proceed forward on the

3   litigation until the very last minute.  And so it was obvious

4   that this was going to -- that the Debtor was a, as I said, a

5   highly-litigious shop, and that was one of the causes,

6   obviously, the cause of the filing, along with the fact that

7   judgments were about to be entered against the Debtor.

8   Q    All right.  And in January 2020, do you recall that's when

9   the agreement was reached between the Debtor, the Committee,

10  and Mr. Dondero?

11  A    Yeah, it was the first week or so, which resulted in a

12  hearing on I believe it was January 9th in front of Judge

13  Jernigan.

14  Q    And as a part of that -- I think you testified at that

15  hearing.  Do I have that right?

16  A    I don't recall if I did.  I might have.  I might have

17  testified at a subsequent hearing.  But --

18  Q    But was --

19  A    -- I was in the courtroom for that hearing, yes.

20  Q    Was it part of that process by which you accepted the

21  appointment as independent director?

22  A    I accepted it based upon the order that had been

23  negotiated amongst the parties, the creditors, the Debtor, Mr.

24  Dondero, and others.  And that was the key thing that was --

25  and approved by the Court on that date.  And that was key for

Dubel - Direct                              273

1  my acceptance of the role as an independent director.

2  Q    And did you and the other prospective independent

3  directors participate in the negotiation of the substance of

4  the agreement?

5  A    We did.  We didn't have a hundred percent say over it, but

6  we were able to get our voices heard.  As Mr. Seery testified

7  earlier, he was instrumental in coming up with an idea about

8  how to put in place the injunction, you know, the -- I think

9  he referred to it as the gatekeeper injunction, which was

10  obviously in this case very critical to all three of us:  Mr.

11  Seery, Mr. Nelms, and myself.

12  Q    Can you describe for the Court kind of the issues of

13  concern to you and the other prospective board members?  What

14  was it that you were focused on in terms of the negotiations?

15  A    Well, obviously, indemnification was important, but that

16  was something that was going to be granted.  Having the right

17  to obtain separate D&O insurance just for the three directors

18  was important.  We were concerned that Strand Advisors, Inc.

19  really had no assets, and so we wanted to make sure that the

20  Debtor was going to get -- was going to basically guarantee

21  the indemnification.

22     The -- because of the litigious nature and what we had

23  heard from all of the various parties involved, including

24  people inside the Debtor who we had talked with, that it would

25  be something that was important for us to make sure that the

Dubel - Direct                                    274

1   injunction, the gatekeeper injunction was put in place.

2   Q    And can you elaborate a little bit on I think you said you

3   had done some diligence and you had formed a view as to the

4   causes of the bankruptcy filing, but did this case present any

5   specific concerns or issues that you and the board members had

6   to address perhaps above and beyond what you experienced in

7   some of the other cases you described?

8   A    Well, as I said earlier, the fact that the litigation --

9   the various litigations with the creditors have been going on

10  for what I viewed as an inordinate amount of years, and that

11  it was clear from my diligence that I had done that this had

12  been directed by Mr. Dondero, to keep this moving forward in

13  the litigation, and to, in essence, just, you know, never give

14  up on the litigation.

15       It was important that the types of protections that we

16  were afforded in the January 9th order were put in place,

17  because we -- none of us -- none of the three of us, and

18  myself in particular, did not want to be in a position where

19  we would be sued and harassed through lawsuits for the next,

20  you know, ten years or so.  That's not something anybody would

21  want to sign up for.

22  Q    All right.  Let's look at the January 9th order and the

23  specific provisions I think that you're alluding to.

24            MR. MORRIS:  Can we call up Exhibit 5Q, please?

25            THE WITNESS:  Pardon me while I put my glasses on to

Dubel - Direct                                 275

1  read this.

2        MR. MORRIS:   All right.  And if we can go to

3  Paragraph 4.

4  BY MR. MORRIS:

5  Q   Is that the paragraph, sir, that was intended to address

6  the concern that you just articulated about Strand not having

7  any assets of its own?

8  A   Yes, it is.

9  Q   And can you just describe for the Court how that

10 particular provision addressed that concern?

11 A   Sure.  Since we were directors of Strand, which is the

12 general partner of the Debtor, we felt it was important that

13 the general -- that Highland, the Debtor, would provide the

14 guaranty on indemnification, because Highland had the assets

15 to back up the indemnification.

16     It was also pretty clear, from my experience in having

17 placed D&O insurance, you know, over the last 25-30 years,

18 that if there was no, you know, opportunity for

19 indemnification, putting in place insurance would be very

20 difficult or exorbitantly expensive.  So having this

21 indemnification by Highland was a very important piece of the

22 order that we were seeking.

23 Q   And the next piece is the insurance piece in Paragraph 5.

24 Do you see that?

25 A   I do.

Dubel - Direct                              276

1   Q    Did you have any involvement in the Debtor's efforts to

2   obtain D&O insurance for the independent board?

3   A    I did.

4   Q    Can you just describe for the Court what role you played

5   and what issues came up as the Debtor sought to obtain that

6   insurance?

7   A    Sure.  The Debtors had been looking to get an insurance

8   policy in place.  They were not able to do that.  I happen to

9   have worked with an insurance broker on D&O situations in some

10  very difficult situations over the years and brought them into

11  the mix.  They were able to go out to the market and find a

12  policy that would cover us, the -- kind of the key components

13  of that policy, though, were, number one, the guaranty that

14  HCMLP would give -- I'm sorry, the guaranty that HCMLP would

15  give to Strand's obligations, and also the -- I'll call it the

16  gatekeeper provision was very important because these parties

17  did not want to have -- they wanted to have what was referred

18  to, commonly referred to as the Dondero Exclusion.

19       So while we were -- we purchased a policy that covered us,

20  it did have an exclusion, unless there were no assets left,

21  and then the what I'll call -- we refer to as kind of a Side A

22  policy would kick in.

23  Q    Okay.  What do you mean by the Dondero Exclusion?

24  A    The insurers did not want to cover the -- any litigation

25  that Mr. Dondero would bring against directors.  It was pretty

Dubel - Direct                    277

1  commonly known in the marketplace that Mr. Dondero was very

2  litigious, and insurers were not willing to write the

3  insurance without the protections that this order afforded

4  because they did not want to be hit with frivolous -- hit with

5  claims on the policy for frivolous litigation that might be

6  brought.

7          MR. TAYLOR:  Your Honor, this is Mr. Taylor.  I've

8  got to object to the last answer.  He testified as to what the

9  insurers' belief was and what they would or would not do based

10 upon their own knowledge.  It's not within his personal

11 knowledge.  And therefore we'd move to strike.

12         THE COURT:  I overrule that objection.

13         MR. MORRIS:  Your Honor?

14         THE COURT:  I overrule the objection.

15         MR. MORRIS:  Thank you.  Thank you, Your Honor.

16 BY MR. MORRIS:

17 Q   Mr. Dubel, can you explain to the Court, in your work in

18 trying to secure the D&O insurance, what rule the gatekeeper

19 provision played in the Debtor's ability to get that?

20 A   Based upon my discussions with the insurance broker, who I

21 have worked with for 25-plus years, had that gatekeeper

22 provision not been put in place, we would not have been able

23 to get insurance.

24 Q   All right.  Let's look at the gatekeeper provision.

25         MR. MORRIS:  Can we go down to Paragraph 10, please?

Dubel - Direct                          278

1   Perfect.  Right there.

2   BY MR. MORRIS:

3   Q    Is this gatekeeper provision, is this also the source of

4   the exculpation that you referred to?

5   A    Yes.

6   Q    And what's your understanding of how the exculpation and

7   gatekeeper functions together?

8   A    Well, my apologies, I'm not an attorney, so just from a

9   business point of view, the way I look at this is that, you

10  know, obviously, we're -- you know, the directors are not

11  protected from willful misconduct or gross negligence, but any

12  negligence -- you know, claims brought under negligence and

13  the likes of such, and things that might be considered

14  frivolous, would have to first go to Your Honor in the

15  Bankruptcy Court for a review to determine if they were claims

16  that should be entitled to be brought.

17  Q    If you take a look at the provision, right, do you

18  understand that nobody can bring a claim without -- in little

19  i, it says, first determining -- without the Court first

20  determining, after notice, that such claim or cause of action

21  represents a colorable claim of willful misconduct or gross

22  negligence against an indirect -- independent director.  Do

23  you see that?

24  A    I do.

25  Q    Is it your understanding that parties can only bring

Dubel - Direct                                279

1    claims for gross negligence or willful misconduct if the Court

2    makes a determination that there is a colorable claim?

3    A    That's my understanding.

4    Q    And the second --

5    A    I think they have the right -- I think they have the right

6    to go to the Court to ask if they can bring the claim, but the

7    Court has to make the determination that it's a colorable

8    claim for willful misconduct or gross negligence.

9    Q    And if the Court -- is it your understanding that if the

10   Court doesn't find that there is a colorable claim of willful

11   misconduct or gross negligence, then the claim can't be

12   brought against the independent directors?

13   A    That is my understanding, yes.

14   Q    And was -- taken together, Paragraphs 4, 5, and 10, were

15   they of importance to you and the other independent directors

16   before accepting the position?

17   A    They were absolutely critical to me and definitely

18   critical to the other directors, because we all negotiated

19   that together, and it would -- I don't -- I don't think any of

20   the three of us would have taken on this role if those

21   paragraphs had not been included in the order.

22   Q    Okay.  Just speaking for yourself personally, is there any

23   chance you would have accepted the appointment without all

24   three of those provisions?

25   A    I would not have.

Dubel - Direct                                    280

1  Q    And why is that?  In this particular case, why did you

2  personally believe that you needed all three of those

3  provisions?

4  A    Well, you know, people like myself, you know, someone

5  who's coming in as an independent director, come in in a

6  fiduciary capacity.  And, you know, we take on risks.  Now,

7  granted, in a Chapter 11 case, as the saying goes, you know,

8  it's a lot safer because everything has to be approved by the

9  Court, but there are still opportunities for parties to, in

10 essence, have mischief going on and bring nuisance lawsuits

11 that would take a lot of time and effort away from either the

12 role of our job of restructuring the entity or post-

13 restructuring, would just be nuisance things that would cost

14 us money.  And we, you know, I did not want to be involved in

15 that situation, knowing the litigious nature of Mr. Dondero

16 from the research that I had done, you know, the diligence

17 that I had done.  I did not want to subject myself to that.

18 And it has proven an appropriate and very solid order because

19 of the conduct of Mr. Dondero, as Mr. Seery has testified to

20 earlier.

21 Q    Do you have a view as to what the likely effect would be

22 on future corporate restructurings if you and your fellow

23 directors weren't able to obtain the type of protection

24 afforded in the January 9th order?

25 A    I think it would be very difficult to find qualified

                           Dubel - Direct                    281

1   people who would be willing to serve in these types of

2   positions if they knew they had a target on their backs.  You

3   know, it was something that was clear to us, to Mr. Seery, Mr.

4   Nelms, myself at the time, that if we had a target -- we felt

5   like we would have a target on our back if we didn't have

6   these protections.

7       It just wasn't worth the risk, the stress, the

8   uncertainty, the potential cost to us.  And so I don't think

9   anybody else would be, you know, willing to take on the roles

10  as an independent director with the facts and circumstances

11  and the players involved in this particular case.

12          MR. MORRIS:  I have no further questions, Your Honor.

13          THE COURT:  All right.  Pass the witness.  Let's see.

14  You went -- I'm going to give a time.  You went 32 minutes.

15  So, for cross of this witness, I'm going to limit it to an

16  aggregate of 32 minutes.  Who wants to go first?

17          MR. DRAPER:  Your Honor, this is Douglas Draper.

18  I'll be happy to go first.

19          THE COURT:  All right.

20                      CROSS-EXAMINATION

21  BY MR. DRAPER:

22  Q   Mr. Dubel, prior to your engagement, did you happen to

23  read the case of *Pacific Lumber*?

24  A   I did not.

25  Q   And were you advised about *Pacific Lumber* by somebody

Dubel - Cross                                    282

1  other than a -- your lawyer?

2  A    I'm not familiar with the case at all, Mr. Draper.

3  Q    Are you aware, and you've been around a long time, that

4  different circuits have different rules for liabilities of

5  officers, directors, and people like that?

6  A    I am aware that there are different, I don't know what the

7  right term is, but precedents, I guess, in different circuits

8  for any number of things, whether it's a sale motion or

9  protections of officers and directors or anything.  So each

10 circuit has its own unique situations.

11 Q    And one last question.  On a go-forward, after -- if this

12 plan is confirmed and on the effective date, you will not have

13 any role whatsoever as an officer or director of the new

14 general partner, correct?

15 A    I have not been asked to.  As Mr. Seery testified, he may

16 ask for assistance or just -- in most situations that I'm

17 involved with, I may have a continuing role just as a -- I'll

18 call it an advisor or somebody to provide a history.  But at

19 this point in time, I have not been asked to have any

20 involvement.

21 Q    And based on your experience, you know that there's a

22 different liability for a director and an officer versus

23 somebody who is an advisor?

24        MR. MORRIS:  Objection to the form of the question.

25 No foundation.

Dubel - Cross                              283

1              THE COURT:  Overruled.

2              MR. DRAPER:  Mr. Dubel has shown --

3              THE COURT:  Mr. Dubel, you can answer if you know.

4              MR. DRAPER:  Mr. Dubel, you can answer.

5              THE WITNESS:  I'm sorry, Your Honor, I didn't hear

6    you say overruled.  Thank you.

7         Mr. Draper, I apologize, could you repeat the question?

8    BY MR. DRAPER:

9    Q    The question is you know from your experience that there's

10   a different liability for somebody who is an officer or

11   director versus somebody who's an advisor?

12   A    Yes, that's my experience, which is why in several

13   situations post-reorganization, while I have not been involved

14   *per se*, and I use the term involved meaning, you know, on a

15   day-to-day basis, if someone asks me to assist, I'll usually

16   ask them to bring me in as a non -- an unpaid employee or a,

17   you know, a nominally-amount-paid employee, so that I would be

18   protected by whatever protections the company might provide.

19             MR. DRAPER:  I have nothing further for this witness,

20   Your Honor.

21             THE COURT:  All right.  Other cross?

22             MR. TAYLOR:  Yes, Your Honor.

23             MR. RUKAVINA:  Yes, Your Honor.

24             MR. TAYLOR:  Oh, go ahead, Davor.

25             MR. RUKAVINA:  No, Clay, go ahead.

Dubel - Cross                                      284

1                          CROSS-EXAMINATION

2     BY MR. TAYLOR:

3     Q    Mr. Dubel, this is Clay Taylor here on behalf on Mr.

4     Dondero.  I believe you had previously testified in response

5     to questions from Mr. Morris that Mr. Dondero had engaged in a

6     pattern of litigious behavior; is that correct?

7     A    I believe that's the testimony I gave, yes.

8     Q    Okay.  And please give me the specific examples of which

9     cases you believe he has engaged in overly-litigious behavior.

10    A    Well, all of the cases that resulted in creditors, large

11    creditors in our bankruptcy.  That would be the UBS situation,

12    the Crusader situation which became the Redeemer Committee,

13    litigation with Mr. Daugherty, with Acis and Mr. Terry.  And

14    as I mentioned earlier, I'd, you know, been informed by

15    members of the management team that it was Mr. Dondero's style

16    to just litigate until the very end to try and grind people

17    down.

18    Q    Okay.  Was Mr. Dondero or a Highland entity the plaintiff

19    in the UBS case?

20    A    No, but what was referred -- what I was referring to was

21    the nature in which he defended it and went overboard and

22    refused to ever, you know, try and settle things in a manner

23    that would have gotten things done.  And just looking at,

24    having been involved in the restructuring industry for the

25    last 40 years, as I said, almost 40 years, and been involved

Dubel - Cross                               285

1   in many, many litigious situations, it's obvious when someone

2   is litigious, whether they're the plaintiff or the defendant.

3   Q   So are you personally familiar with the settlement

4   negotiations in the UBS case that happened pre-bankruptcy,

5   then?

6   A   I have been informed that there were settlement

7   negotiations, and subsequently determined, through discussions

8   with the parties, that they weren't really close to -- to a

9   settlement.

10  Q   But are you aware of --

11  A   Mr. Dondero might have thought they were, but they were

12  not.

13  Q   Okay.  Would you be surprised to learn if UBS had offered

14  to settle pre-bankruptcy for $7 million?

15  A   As I understand, settlements -- settlement offers pre-

16  bankruptcy had a tremendous number of -- I don't know what the

17  right term is -- things tied to it and that clearly were never

18  going to get done.

19  Q   Okay.  When you say things were tied to it, what things

20  were tied to it?

21  A   I don't know all of the settlement discussions that took

22  place, but what I was informed was that there were a lot of

23  conditions that were included in that.  And it's -- if it had

24  been an offer of $7 million and Mr. Dondero didn't settle for

25  that, there must have been a reason why.  So, you know, since

                        Dubel - Cross                    286

1    the entities -- all of the entities within the Highland

2    Capital empire, if you'd call it that, were being sued for

3    almost a billion dollars.

4    Q    Okay.  And you say there was lots of conditions that were

5    tied to that.  What were the conditions?

6    A    As I said earlier, I wasn't informed of them on all the

7    prepetition settlements.  That's just what I was told, there

8    was conditions.

9    Q    Okay.  And who were you told these things by?

10   A    Both external counsel and internal counsel.  Mr.

11   Ellington, Scott Ellington, and Isaac -- the litigation

12   counsel.

13   Q    Okay.  So --

14   A    That's -- sorry.

15   Q    Okay.  In each of these cases, you were informed by your

16   views by statements that were made to you by other people?

17   A    Yes.

18   Q    Okay.

19   A    Made -- and particularly made by members of management of

20   the Debtor, which is pretty informed.

21   Q    Okay.  Which members of management were those?

22   A    As I just testified, it was Mr. Ellington, who was the

23   general -- the Debtor's general counsel, and Mr. Leventon,

24   Isaac Leventon, who was the -- I believe his title was

25   associate general counsel in charge of litigation.

Dubel - Cross                          287

1    Q    Okay.  Thank you.

2              MR. TAYLOR:  No further questions.

3              THE COURT:  All right.  Mr. Rukavina?

4                      CROSS-EXAMINATION

5    BY MR. RUKAVINA:

6    Q    Mr. Dubel, we've never met, although I think we were on

7    the phone once together.  I know you're a director, so you're

8    at the top, but having been in this case for more than a year,

9    you probably have some understanding of the assets that the

10   Debtor has, don't you?

11   A    I do, but I'm not as facile with it as Mr. Seery,

12   obviously.

13   Q    Sure.  Is it true, to your understanding, that the Debtor

14   owns various equity interests in third-party companies?

15   A    Either directly or indirectly.  That's my understanding,

16   yes.

17   Q    Okay.  Have you heard of an entity called Highland Select

18   Equity Fund, LP?

19   A    I have.

20   Q    And is that a publicly-traded company?

21   A    I'm not familiar with its nature there, no.

22   Q    Do you know how much of the equity of that entity the

23   Debtor owns?

24   A    I don't know off the top of my head, no.

25   Q    And again, these may be unfair questions because you're at

```
                         Dubel - Cross                      288
```

1  the top, so I'm not trying to make you look foolish.  I'm just

2  trying to see.  Let me ask one more.  Have you heard of

3  Wright, W-R-I-G-H-T, Limited?

4          MR. MORRIS:  Objection, Your Honor.  Beyond the

5  scope.

6          MR. RUKAVINA:  Your Honor, I can recall him on my

7  direct, then.

8          THE COURT:  Yeah.  I'll --

9          MR. RUKAVINA:  But I'd just rather get it over with.

10          THE COURT:  I'll allow it.

11          MR. MORRIS:  All right.  If we're going to get rid of

12  --

13          THE COURT:  Overruled.

14          MR. MORRIS:  No, that's fine.

15  BY MR. RUKAVINA:

16  Q    Have you heard of Wright, W-R-I-G-H-T, Limited?

17  A    I think I have, but I just don't recall it, Mr. Rukavina.

18  I'm sorry, Rukavina.  Sorry.

19  Q    It's okay.  It's a --

20  A    I'm looking at your chart here, at your name here, and it

21  looks like Drukavina, so I really apologize.

22  Q    Believe it or not, it's actually a very famous name in

23  Croatia, although it means nothing here.

24      So, all of the entities that the Debtor owns equity in, I

25  guess you probably, just because, again, you're not in the

Dubel - Cross                           289

1   weeds, you can't tell us how much of that equity the Debtor

2   owns, can you?

3   A    I can't individually, no.  You know, Mr. Seery is our CEO

4   and he's responsible for the day-to-day, you know, issues.  So

5   usually we look at it more on a consolidated basis and not in

6   the, you know, down in the weeds, as you refer to it, unless

7   something specific came up.

8   Q    Well, would you remember whether, when Mr. Seery or the

9   prior CRO would provide you, as the board member, financial

10  reports, whether that included P&Ls and balance sheets and

11  financial reports for the entities that the Debtor owned

12  interests in?

13  A    We might -- we would have seen certain consolidating

14  reports that might -- that would be, you know, consolidating

15  financial statements that would be P&Ls.  Where we didn't

16  consolidate them, I'm not sure we saw the actual individual-

17  entity P&Ls on a regular basis.  We might have seen them if

18  there was a transaction taking place.  But again, you know, I

19  don't have -- I don't remember every single one of them, no.

20  Q    And you would agree with me, sir, that the Pachulski law

21  firm is an excellent restructuring, reorganization, insolvency

22  law firm, wouldn't you?

23  A    Yes, I would agree with you there.

24  Q    Okay.  And you would expect them to ensure that anything

25  that has to be filed with Her Honor is timely filed, wouldn't

Dubel - Cross                           290

1  you?

2  A   I would expect that they would follow the rules.

3  Q   Okay.  And you have the utmost of confidence, I take it,

4  in your CRO, don't you?

5  A   I have a tremendous amount of confidence in our CEO, who

6  also happens to hold the title of CRO, yes, if that's what

7  you're referring to as, Mr. Seery.

8      (Interruption.)

9          MR. RUKAVINA:  John.

10 BY MR. RUKAVINA:

11 Q   Okay, I think -- yeah, I think I heard that you have

12 tremendous confidence in the CEO, who happens to be the CRO,

13 right?

14 A   Yes, that's the case.

15         MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

16 witness.

17         THE COURT:  All right.  Any other cross of Mr. Dubel?

18     All right.  Mr. Morris, redirect?

19         MR. MORRIS:  Yeah, just very briefly, Your Honor.

20                    REDIRECT EXAMINATION

21 BY MR. MORRIS:

22 Q   You were asked about that *Pacific Lumber* case, Mr. Dubel;

23 do you remember that?

24 A   I do remember being asked about it.

25 Q   And you weren't familiar with that case, right?

Dubel - Redirect                                         291

1  A    I'm not familiar with the name of the case, no.

2  Q    But you did know that the exculpation and gatekeeping

3  provisions were going to be included in the order; is that

4  fair?

5  A    I did.

6  Q    And did you testify that you wouldn't have accepted the

7  position without it?

8  A    I did testify that way.

9  Q    And if you knew that you couldn't get those provisions in

10 the Fifth Circuit, would you ever accept a position as an

11 independent director in the Fifth Circuit on a go-forward

12 basis?

13 A    Not in a situation such as this, no.

14 Q    Okay.  Okay.

15          MR. MORRIS:  No further questions, Your Honor.

16          THE COURT:  All right.  Any recross on that narrow

17 redirect?

18     All right.  Well, Mr. Dubel, you are excused from the

19 virtual witness stand.

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  All right.  I want to go ahead and --

22          MR. DUBEL:  Do you mind if I turn my video off?

23          THE COURT:  I'm sorry, what?

24          MR. DUBEL:  I said, do you mind if I turn my video

25 off?

292

1          THE COURT:  No, you may.  That's fine.

2          MR. DUBEL:  Thank you, Your Honor.

3          THE COURT:  All right.  I want to break now, unless

4   there's any quick housekeeping matter.  Anything?

5          MR. MORRIS:  No, Your Honor, but I would just ask

6   all parties to let me know by email if they have any

7   objections to any of the exhibits on the witness list that was

8   filed at Docket No. 1877, because I want to begin tomorrow by

9   putting into evidence the balance of our exhibits.

10          MR. RUKAVINA:  And Your Honor, I was responsible for

11   this due to an internal mistake.  The only ones I have an

12   objection to are -- is that 7?  John, is that 7, right, 7O --

13          MR. MORRIS:  Yes.

14          MR. RUKAVINA:  Your Honor, I only have an objection

15   to 7O and 7P, although I think -- think the Court has already

16   admitted 7P, so my objection is moot.

17          THE COURT:  I have.

18          MR. RUKAVINA:  Okay.

19          THE COURT:  So, what --

20          MR. RUKAVINA:  Then it would just be --

21          THE COURT:  Go ahead.

22          MR. RUKAVINA:  I'm sorry.  It would just be 7O.

23   Septuple O or whatever the word is.

24          THE COURT:  All right.  So I will go ahead and admit

25   7F through 7Q, with the exception of 7O.  Again, these appear

293

1    at Docket Entry 1877.  And Mr. Morris, you can try to get in

2    7O the old-fashioned way if you want to.

3              MR. MORRIS:  Yeah, I'll deal with 7O and the very

4    limited number of other objections at the beginning of

5    tomorrow's hearing.

6              THE COURT:  All right.

7         (Debtor's Exhibits 7F through 7Q, with the exception of

8    7O, are received into evidence.)

9              THE COURT:  So we will reconvene at 9:30 Central time

10   tomorrow.  I think we're going to hear from the Aon, the D&O

11   broker, Mr. Tauber; is that correct?

12             MR. MORRIS:  That's right.  And that should be

13   shorter than even Mr. Dubel.

14             THE COURT:  All right.  Well, we will see you at 9:30

15   in the morning.  We are in recess.

16             MR. MORRIS:  Thank you so much.

17             THE CLERK:  All rise.

18        (Proceedings concluded at 5:09 p.m.)

19                            --oOo--

20                          CERTIFICATE

21        I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                      **02/04/2021**

24   _____      _____
     Kathy Rehling, CETD-444                              Date
25   Certified Electronic Court Transcriber

294

INDEX

PROCEEDINGS                                                    5

OPENING STATEMENTS

- By Mr. Pomerantz                                           12
- By Mr. Kathman                                             29
- By Mr. Clemente                                            33
- By Mr. Draper                                              40
- By Mr. Rukavina                                            42
- By Mr. Taylor                                              44
- By Mr. Kathman                                             49
- By Ms. Drawhorn                                            50

WITNESSES

Debtor's Witnesses

James P. Seery
- Direct Examination by Mr. Morris                          58
- Cross-Examination by Mr. Rukavina                        169
- Cross-Examination by Mr. Taylor                          212
- Cross-Examination by Mr. Draper                          233
- Redirect Examination by Mr. Morris                       236
- Recross-Examination by Mr. Rukavina                      249
- Recross-Examination by Mr. Taylor                        255

John S. Dubel
- Direct Examination by Mr. Morris                         261
- Cross-Examination by Mr. Draper                          281
- Cross-Examination by Mr. Taylor                          284
- Cross-Examination by Mr. Rukavina                        287
- Redirect Examination by Mr. Morris                       290

EXHIBITS

Debtor's Docket 1822 Exhibits                    Received  55
   (exclusive of Exhibits B, D, E, 4D, 4E, 4G,
   5T, 6R, 6S, 6T, and 6U)
Debtor's Docket 1866 Exhibits                    Received  56
Debtors' Exhibits 7F through 7Q (exclusive of    Received 293
   Exhibit 7O)
Debtor's Exhibit 7P                              Received 140
Debtor's Exhibit 7Q                              Received  75

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

APP. 2364
Appx. 02411

295

INDEX
Page 2

RULINGS

Confirmation Hearing [1808] - *Continued to 2/3/2021*        293

Agreed Motion to (1) Assume Non-Residential Real Property    293
Lease with Crescent TC Investors, LP upon Confirmation of
Plan and (II) Extend Assumption Deadline [1624] -
*Continued to 2/3/2021*

END OF PROCEEDINGS                                           293

INDEX                                                      294-295

# EXHIBIT 24

# EXHIBIT N

EXECUTION COPY

## SERVICING AGREEMENT

This Servicing Agreement, dated as of December 21, 2006 is entered into by and among BRENTWOOD CLO, LTD., an exempted company incorporated under the laws of the Cayman Islands, with its registered office located at the offices of Maples Finance Limited, P.O. Box 1093GT, Queensgate House, South Church Street, George Town, Grand Cayman, Cayman Islands (together with successors and assigns permitted hereunder, the "Issuer"), and HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware limited partnership, with its principal offices located at Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, as servicer ("Highland" or, in such capacity, the "Servicer").

WITNESSETH:

WHEREAS, the Issuer and BRENTWOOD CLO, CORP. (the "Co-Issuer" and together with the Issuer, the "Co-Issuers") intend to issue U.S.$388,700,000 of their Class A-1A Floating Rate Senior Secured Extendable Notes due 2022 (the "Class A-1A Notes"), U.S.$75,000,000 of their Class A-1B Delayed Drawdown Floating Rate Senior Secured Extendable Notes due 2022 (the "Class A-1B Notes" and, together with the Class A-1A Notes, the "Class A-1 Notes"), U.S.$51,500,000 of their Class A-2 Floating Rate Senior Secured Extendable Notes due 2022 (the "Class A-2 Notes" and, together with the Class A-1 Notes, the "Class A Notes"), U.S.$68,000,000 of their Class B Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2022 (the "Class B Notes"), U.S.$23,800,000 of their Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2022 (the "Class C Notes" and, together with the Class A Notes and the Class B Notes, the "Senior Notes") and the Issuer will issue U.S.$21,000,000 of the Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2022 (the "Class D Notes" and, together with the Senior Notes, the "Notes") pursuant to the Indenture dated as of December 21, 2006 (the "Indenture"), among the Co-Issuers and Investors Bank & Trust Company, as trustee (the "Trustee") and 34,400 Class I Preference Shares, $0.01 par value (the "Class I Preference Shares") and 37,000 Class II Preference Shares, $0.01 par value (the "Class II Preference Shares" and, together with the Class I Preference Shares, the "Preference Shares" and, together with the Notes, the "Securities") pursuant to the Preference Share Documents;

WHEREAS, pursuant to the Indenture, the Issuer intends to pledge certain Collateral Obligations, Eligible Investments and Cash (all as defined in the Indenture) and certain other assets (all as set forth in the Indenture) (collectively, the "Collateral") to the Trustee as security for the Notes;

WHEREAS, the Issuer wishes to enter into this Servicing Agreement, pursuant to which the Servicer agrees to perform, on behalf of the Issuer, certain duties with respect to the Collateral in the manner and on the terms set forth herein; and

WHEREAS, the Servicer has the capacity to provide the services required hereby and is prepared to perform such services upon the terms and conditions set forth herein.

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, the parties hereto agree as follows:

    1.    Definitions.

Terms used herein and not defined below shall have the meanings set forth in the Indenture.

"Advisers Act" shall mean the Investment Advisers Act of 1940, as amended.

"Agreement" shall mean this Servicing Agreement, as amended from time to time.

"Governing Instruments" shall mean the memorandum, articles or certificate of incorporation or association and by-laws, if applicable, in the case of a corporation; the certificate of formation, if applicable, or the partnership agreement, in the case of a partnership; or the certificate of formation, if applicable, or the limited liability company agreement, in the case of a limited liability company.

"HFP" shall mean collectively, Highland Financial Partners, L.P. and any subsidiary thereof.

"Independent Advisor" shall have the meaning specified in Section IV.B. of Annex 1 hereto.

"Offering Memorandum" shall mean the Offering Memorandum of the Issuer dated December 21, 2006 prepared in connection with the offering of the Securities.

"Servicer Breaches" shall have the meaning specified in Section 10(a).

"Special Procedures Obligation" shall have the meaning specified in Section IV.A. of Annex 1 hereto.

    2.    General Duties of the Servicer.

    (a)    The Servicer shall provide services to the Issuer as follows:

    (i)    Subject to and in accordance with the terms of this Agreement and the other Transaction Documents, the Servicer shall supervise and direct the administration, acquisition and disposition of the Collateral, and shall perform on behalf of the Issuer those duties and obligations of the Servicer required by the Indenture and the other Transaction Documents, and including the furnishing of Orders, Requests and officer's certificates, and such certifications as are required of the Servicer under the Indenture with respect to permitted purchases and sales of the Collateral Obligations, Eligible Investments and other assets, and other matters, and, to the extent necessary or appropriate to perform such duties, the Servicer shall have the power to execute and deliver all necessary and appropriate documents and instruments on behalf of the Issuer with respect thereto. The Servicer shall, subject to the terms and conditions of this Agreement and the other Transaction Documents, perform its obligations hereunder and thereunder with reasonable care, using a degree of skill and attention no less than that which the Servicer exercises with respect to comparable assets that it services or manages for others having similar objectives and restrictions, and in a manner consistent with

APP. 2368
Appx. 02415

practices and procedures followed by institutional servicers or managers of national standing relating to assets of the nature and character of the Collateral for clients having similar objectives and restrictions, except as expressly provided otherwise in this Agreement and/or the other Transaction Documents. To the extent not inconsistent with the foregoing, the Servicer shall follow its customary standards, policies and procedures in performing its duties under the Indenture and hereunder. The Servicer shall comply with all terms and conditions of the other Transaction Documents affecting the duties and functions to be performed hereunder. The Servicer shall not be bound to follow any amendment to any Transaction Document until it has received written notice thereof and until it has received a copy of the amendment from the Issuer or the Trustee; provided, however, that the Servicer shall not be bound by any amendment to any Transaction Document that affects the rights, powers, obligations or duties of the Servicer unless the Servicer shall have consented thereto in writing. The Issuer agrees that it shall not permit any amendment to the Indenture that (x) affects the rights, powers, obligations or duties of the Servicer or (y) affects the amount or priority of any fees payable to the Servicer to become effective unless the Servicer has been given prior written notice of such amendment and consented thereto in writing;

(ii) the Servicer shall select any Collateral which shall be acquired by the Issuer pursuant to the Indenture in accordance with the Collateral criteria set forth herein and in the Indenture;

(iii) the Servicer shall monitor the Collateral on an ongoing basis and provide to the Issuer all reports, certificates, schedules and other data with respect to the Collateral which the Issuer is required to prepare and deliver under the Indenture and any Hedge Agreement, in the form and containing all information required thereby and in reasonable time for the Issuer to review such required reports, certificates, schedules and data and to deliver them to the parties entitled thereto under the Indenture; the Servicer shall undertake to determine to the extent reasonably practicable whether a Collateral Interest has become an Defaulted Collateral Obligation; and the Servicer shall monitor any Hedge Agreements and direct the Trustee on behalf of the Issuer in respect of all actions to be taken thereunder by the Issuer;

(iv) the Servicer, subject to and in accordance with the provisions of the Indenture may, at any time permitted under the Indenture, and shall, when required by the Indenture, direct the Trustee (x) to dispose of a Collateral Obligation, Equity Security or Eligible Investment or other securities received in respect thereof in the open market or otherwise, (y) to acquire, as security for the Notes in substitution for or in addition to any one or more Collateral Obligations or Eligible Investments included in the Collateral, one or more substitute Collateral Obligations or Eligible Investments, or (z) direct the Trustee to take the following actions with respect to a Collateral Obligations or Eligible Investment:

(1) retain such Collateral Obligations or Eligible Investment; or

(2) dispose of such Collateral Obligations or Eligible Investment in the open market or otherwise; or

(3) if applicable, tender such Collateral Obligations or Eligible Investment pursuant to an Offer; or

APP. 2369
Appx. 02416

(4)     if applicable, consent to any proposed amendment, modification or waiver pursuant to an Offer; or

(5)     retain or dispose of any securities or other property (if other than cash) received pursuant to an Offer; or

(6)     waive any default with respect to any Defaulted Collateral Obligations; or

(7)     vote to accelerate the maturity of any Defaulted Collateral Obligations; or

(8)     exercise any other rights or remedies with respect to such Collateral Obligations or Eligible Investment as provided in the related Underlying Instruments, including in connection with any workout situations, or take any other action consistent with the terms of the Indenture which is in the best interests of the Holders of the Securities;

(v)     subject to and in accordance with the terms of this Agreement and the Transaction Documents, the Servicer on behalf of the Issuer shall determine whether to enter into any additional hedging arrangements, increase or reduce the notional amounts of existing Hedge Agreements or terminate existing Hedge Agreements, and the Servicer shall use its reasonable efforts to cause the Issuer, promptly following the early termination of a Hedge Agreement (other than on a Redemption Date) and to the extent possible through application of funds received as a result of the early termination (including the proceeds of the liquidation of any collateral pledged by the hedge counterparty), to enter into a replacement Hedge Agreement

(vi)     the Servicer shall (a) on or prior to any day which is a Redemption Date, direct the Trustee to enter into contracts to dispose of the Collateral Obligation and any other Collateral pursuant to the Indenture and otherwise comply with all redemption procedures and certification requirements in the Indenture in order to allow the Trustee to effect such redemption and (b) conduct Auctions in accordance with the terms of the Indenture; and

(vii)     if the Servicer, on behalf of the Issuer, desires to make distributions of Eligible Equity Securities on any Payment Date pursuant to Section 2(e) of the Preference Shares Paying Agency Agreement, the Servicer shall so notify the Trustee and the Preference Shares Paying Agent and provide the Trustee and the Preference Shares Paying Agent (for forwarding to each Holder of the Preference Shares with respect to the applicable Record Date) details of such Eligible Equity Securities in accordance with the procedure set forth in Section 3(b) of the Preference Shares Paying Agency Agreement.

(b)     In performing its duties hereunder, the Servicer shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities taking into account the collateral criteria and limitations set forth herein and in the Indenture and the Servicer shall use reasonable efforts to select and service the Collateral in such a way that will permit a timely performance of all payment obligations by the Issuer under the Indenture; provided, that the Servicer shall not be responsible if such objectives are not achieved so long as the Servicer performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Servicer with respect to

APP. 2370
Appx. 02417

the Notes or the Preference Shares. The Servicer and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement.

(c)     The Servicer hereby agrees to the following:

(i)     The Servicer agrees not to institute against, or join any other Person in instituting against, the Issuer or the Co-Issuer any bankruptcy, reorganization, arrangement, insolvency, moratorium or liquidation proceedings or other proceedings under federal or state bankruptcy or similar laws of any jurisdiction until at least one year and one day (or if longer, any applicable preference period plus one day) after the payment in full of all Notes issued under the Indenture; provided, however, that nothing in this clause (i) shall preclude, or be deemed to estop, the Servicer (A) from taking any action prior to the expiration of such period in (x) any case or proceeding voluntarily filed or commenced by the Issuer or the Co-Issuer, as the case may be, or (y) any involuntary insolvency proceeding filed or commenced against the Issuer or the Co-Issuer, as the case may be, by a Person other than the Servicer, or (B) from commencing against the Issuer or the Co-Issuer or any properties of the Issuer or the Co-Issuer any legal action which is not a bankruptcy, reorganization, arrangement, insolvency, moratorium, liquidation or similar proceeding. The provisions of this Section 2(c)(i) shall survive the termination of this Agreement.

(ii) The Servicer shall cause each sale or purchase of any Collateral Obligations or Eligible Investment to be conducted on an arm's-length basis.

(d)     The Servicer shall not act for the Issuer in any capacity except as provided in this Section 2. In providing services hereunder, the Servicer may employ third parties, including its Affiliates, to render advice (including advice with respect to the servicing of the Collateral) and assistance; provided, however, that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties. Notwithstanding any other provision of this Agreement, the Servicer shall not be required to take any action required of it pursuant to this Agreement or the Indenture if such action would constitute a violation of any law.

(e)     Notwithstanding any other provision of this Agreement or the Indenture, (i) any granted signatory powers or authority granted to the Servicer on behalf of the Issuer with respect to the Special Procedures Obligations shall be conditioned upon the prior written approval of the Independent Advisor and (ii) neither the Servicer nor any Affiliate of the Servicer shall have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to the Special Procedures Obligations without the prior written approval of the Independent Advisor.

3.    Brokerage.

The Servicer shall seek to obtain the best prices and execution for all orders placed with respect to the Collateral, considering all reasonable circumstances. Subject to the objective of obtaining best prices and execution, the Servicer may take into consideration research and other brokerage services furnished to the Servicer or its Affiliates by brokers and dealers which are not Affiliates of the Servicer. Such services may be used by the Servicer or its Affiliates in connection with its other servicing or advisory activities or operations. The Servicer may aggregate sales and purchase orders of securities placed with respect to the Collateral with similar orders being made simultaneously for other accounts serviced or managed by Servicer or with accounts of the Affiliates of the Servicer, if in the Servicer's reasonable judgment such aggregation shall result in an overall economic benefit to the Issuer, taking into consideration the advantageous selling or purchase price, brokerage commission and other expenses. In the event that a sale or purchase of a Collateral Obligation or Eligible Investment (in accordance with the terms of the Indenture) occurs as part of any aggregate sales or purchase orders, the objective of the Servicer (and any of its Affiliates involved in such transactions) shall be to allocate the executions among the accounts in an equitable manner and consistent with its obligations hereunder and under applicable law.

In addition to the foregoing and subject to the provisions of Section 2 and the limitations of Section 5, the objective of obtaining best prices and execution and to the extent permitted by applicable law, the Servicer may, on behalf of the Issuer, direct the Trustee to acquire any and all of the Eligible Investments or other Collateral from, or sell Collateral Obligations or other Collateral to, the Placement Agent, the Trustee or any of their respective Affiliates, or any other firm.

4.    Additional Activities of the Servicer.

Nothing herein shall prevent the Servicer or any of its Affiliates from engaging in other businesses, or from rendering services of any kind to the Trustee, the Holders of the Securities, or any other Person or entity to the extent permitted by applicable law. Without prejudice to the generality of the foregoing, the Servicer and partners, directors, officers, employees and agents of the Servicer or its Affiliates may, among other things, and subject to any limits specified in the Indenture:

(a)    serve as directors (whether supervisory or managing), officers, partners, employees, agents, nominees or signatories for any issuer of any obligations included in the Collateral or their respective Affiliates, to the extent permitted by their Governing Instruments, as from time to time amended, or by any resolutions duly adopted by the Issuer, its Affiliates or any issuer of any obligations included in the Collateral or their respective Affiliates, pursuant to their respective Governing Instruments; provided, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Overcollateralization Ratio and the Interest Coverage Test; provided, further, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof;

(b)    receive fees for services of any nature rendered to the issuer of any obligations included in the Collateral or their respective Affiliates; provided, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Overcollateralization Ratio and the Interest Coverage Test; and provided, further that if any portion of such services are related to the purchase by the Issuer of any obligations included in the Collateral, the portion of such fees relating to such obligations shall be applied to the purchase price of such obligations; and

APP. 2372
Appx. 02419

(c)    be a secured or unsecured creditor of, or hold an equity interest in, the Issuer, its Affiliates or any issuer of any obligation included in the Collateral; provided, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Overcollateralization Ratio and the Interest Coverage Test; provided, further, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof.

It is understood that the Servicer and any of its Affiliates may engage in any other business and furnish servicing, investment management and advisory services to others, including Persons which may have policies similar to those followed by the Servicer with respect to the Collateral and which may own securities of the same class, or which are the same type, as the Collateral Obligations or other securities of the issuers of Collateral Obligations. The Servicer shall be free, in its sole discretion, to make recommendations to others, or effect transactions on behalf of itself or for others, which may be the same as or different from those effected with respect to the Collateral.

Unless the Servicer determines in its reasonable judgment that such purchase or sale is appropriate, the Servicer may refrain from directing the purchase or sale hereunder of securities issued by (i) Persons of which the Servicer, its Affiliates or any of its or their officers, directors or employees are directors or officers, (ii) Persons for which the Servicer or its Affiliate act as financial adviser or underwriter or (iii) Persons about which the Servicer or any of its Affiliates have information which the Servicer deems confidential or non-public or otherwise might prohibit it from trading such securities in accordance with applicable law. The Servicer shall not be obligated to have or pursue any particular strategy or opportunity with respect to the Collateral.

5.    Conflicts of Interest.

(a)    The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral from the Servicer or any of its Affiliates as principal or to sell an obligation to the Servicer or any of its Affiliates as principal unless (i) the Issuer shall have received from the Servicer such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the reasonable, good faith judgment of the Servicer, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii) such transaction is permitted by the Advisers Act.

(b)    The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for which the Servicer serves as servicer or investment adviser, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Servicer serves as servicer or investment adviser unless such acquisition or sale is (i) in the reasonable, good faith judgment of the Servicer, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (ii) permitted by the Advisers Act.

(c)    The Servicer shall not undertake any transaction described in this Section 5 unless such transaction is exempt from the prohibited transaction rules of ERISA and the Code. In addition, after the initial distribution of the Class D Notes and the Preference Shares, neither the Servicer nor any of its affiliates (as defined in the Plan Asset Regulation) shall acquire any Class D Notes or Preference Shares (including pursuant to the Extension Procedure or the Amendment Buy-Out Option) unless such acquisition would not, as determined by the Trustee in reliance on representations made in the applicable transfer certificates with respect thereto, result in persons that have represented that they are Benefit Plan Investors owning 25% or more of the aggregate outstanding amount of any of the Class D

APP. 2373
Appx. 02420

Notes, the Class I Preference Shares or the Class II Preference Shares immediately after such acquisition (determined in accordance with Section 3(42) of ERISA, the Plan Asset Regulation, the Indenture and the Preference Share Documents). The Class D Notes and the Preference Shares held as principal by the Servicer or any of its affiliates shall be disregarded and shall not be treated as outstanding for purposes of determining compliance with such 25% limitation to the extent that such person has represented that it is not a Benefit Plan Investor.

6.    Records; Confidentiality.

The Servicer shall maintain appropriate books of account and records relating to services performed hereunder, and such books of account and records shall be accessible for inspection by a representative of the Issuer, the Trustee, the Collateral Administrator, the Holders of the Securities and the Independent accountants appointed by the Issuer pursuant to the Indenture at a mutually agreed time during normal business hours and upon not less than three Business Days' prior notice.  At no time shall the Servicer make a public announcement concerning the issuance of the Notes or the Preference Shares, the Servicer's role hereunder or any other aspect of the transactions contemplated by this Agreement and the other Transaction Documents. The Servicer shall keep confidential any and all information obtained in connection with the services rendered hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Issuer, (ii) such information as either Rating Agency shall reasonably request in connection with the rating of any class of Securities, (iii) as required by law, regulation, court order or the rules or regulations of any self regulating organization, body or official having jurisdiction over the Servicer, (iv) to its professional advisers, (v) such information as shall have been publicly disclosed other than in violation of this Agreement, or (vi) such information that was or is obtained by the Servicer on a non-confidential basis, provided, that the Servicer does not know or have reason to know of any breach by such source of any confidentiality obligations with respect thereto.  For purposes of this Section 6, the Trustee, the Collateral Administrator and the Holders of the Securities shall in no event be considered "non-affiliated third parties."

Notwithstanding anything in this Agreement or the Indenture to the contrary, the Servicer, the Co-Issuers, the Trustee and the Holders of the Securities (and the beneficial owners thereof) (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such U.S. tax treatment and U.S. tax structure, as such terms are defined under U.S. federal, state or local tax law.

7.    Obligations of Servicer.

Unless otherwise specifically required by any provision of the Indenture or this Agreement or by applicable law, the Servicer shall use its best reasonable efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action, which would (a) materially adversely affect the Issuer or the Co-Issuer for purposes of Cayman Islands law, United States federal or state law or any other law known to the Servicer to be applicable to the Issuer or the Co-Issuer, (b) not be permitted under the Issuer's or the Co-Issuer's respective governing instruments, (c) violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer or the Co-Issuer including, without limitation, any Cayman Islands or United States federal, state or other applicable securities law the violation of which has or could reasonably be expected to have a material adverse effect on the Issuer, the Co-Issuer or any of the Collateral, (d) require registration of the Issuer, the Co-Issuer or the pool of Collateral as an "investment company" under the Investment Company Act, (e) cause the Issuer or the Co-Issuer to violate the terms of the Indenture, including, without limitation, any representations made by the Issuer or Co-Issuer therein, or any other agreement

APP. 2374
Appx. 02421

contemplated by the Indenture or (f) not be permitted by Annex 1 hereto and would subject the Issuer to U.S. federal or state income or franchise taxation or cause the Issuer to be engaged in a trade or business in the United States for U.S. federal income tax purposes. The Servicer covenants that it shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the Indenture. Notwithstanding anything in this Agreement to the contrary, the Servicer shall not be required to take any action under this Agreement or the Indenture if such action would violate any applicable law, rule, regulation or court order.

        8.      Compensation.

        (a)      The Issuer shall pay to the Servicer, for services rendered and performance of its obligations under this Agreement, the Servicing Fee, which shall be payable in such amounts and at such times as set forth in the Indenture. The provisions of the Indenture which relate to the amount and payment of the Servicing Fee shall not be amended without the written consent of the Servicer. If on any Payment Date there are insufficient funds to pay the Servicing Fee (and/or any other amounts due and payable to the Servicer) in full, the amount not so paid shall be deferred and shall be payable with accrued interest on such later Payment Date on which funds are available therefor as provided in the Indenture.

        The Servicer hereby agrees to waive the Class II Preference Share Portion of the Servicing Fees deposited by the Trustee into the Class II Preference Share Special Payment Account pursuant to the Indenture, which would otherwise be payable to the Servicer as Servicing Fees, on each Payment Date until February 3, 2008. After February 3, 2008, the Servicer may, in its sole discretion, at any time waive the Class II Preference Share Portion of its Servicing Fees then due and payable, in which event an amount equal to such waived portion will be paid by the Issuer as Class II Preference Share Special Payments pursuant to the Indenture. For purposes of any calculation under this Agreement and the Indenture, the Servicer shall be deemed to have received the Servicing Fee in an amount equal to the sum of the Servicing Fee actually paid to the Servicer and the amount distributed to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments.

        In addition, notwithstanding anything set out above, the Servicer may, in its sole discretion: (i) waive all or any portion of the Servicing Fee, any funds representing the waived Servicing Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Servicer) pursuant to the Priority of Payments; or (ii) defer all or any portion of the Servicing Fee, any funds representing the deferred Servicing Fees to be retained in the Collection Account, when they will become payable in the same manner and priority as their original characterization would have required unless deferred again.

        (b)      The Servicer shall be responsible for the ordinary expenses incurred in the performance of its obligations under this Agreement, the Indenture and the other Transaction Documents; provided, however, that any extraordinary expenses incurred by the Servicer in the performance of such obligations (including, but not limited to, any fees, expenses or other amounts payable to the Rating Agencies, the Collateral Administrator, the Trustee and the accountants appointed by the Issuer, the reasonable expenses incurred by the Servicer to employ outside lawyers or consultants reasonably necessary in connection with the evaluation, transfer or restructuring of any Collateral Obligations or other unusual matters arising in the performance of its duties under this Agreement and the Indenture, any reasonable expenses incurred by the Servicer in obtaining advice from outside counsel with respect to its obligations under this Agreement, brokerage commissions, transfer fees, registration costs, taxes and other similar costs and transaction related expenses and fees arising out of transactions effected for the Issuer's account and the portion allocated to the Issuer of any other fees and expenses that the Servicer customarily allocates among all of the funds or portfolios that it services or manages) shall be

reimbursed by the Issuer to the extent funds are available therefor in accordance with and subject to the limitations contained in the Indenture.

(c)    If this Agreement is terminated pursuant to Section 12, Section 14 or otherwise, the fees payable to the Servicer shall be prorated for any partial periods between Payment Dates during which this Agreement was in effect and shall be due and payable on the first Payment Date following the date of such termination and on any subsequent Payment Dates to the extent remaining unpaid and in accordance with, and to the extent provided in, the Indenture.

9.    Benefit of the Agreement.

The Servicer agrees that its obligations hereunder shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or the Holders of the Preference Shares, as applicable, as provided in the Indenture or the Preference Share Paying Agency Agreement, as applicable.

10.    Limits of Servicer Responsibility; Indemnification.

(a)    The Servicer assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement in good faith and, subject to the standard of liability described in the next sentence, shall not be responsible for any action of the Issuer or the Trustee in following or declining to follow any advice, recommendation or direction of the Servicer.  The Servicer, its directors, officers, stockholders, partners, agents and employees, and its Affiliates and their directors, officers, stockholders, partners, agents and employees, shall not be liable to the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, for any losses, claims, damages, judgments, assessments, costs or other liabilities (collectively, "Liabilities") incurred by the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, that arise out of or in connection with the performance by the Servicer of its duties under this Agreement and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement, except by reason of (i) acts or omissions constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Servicer hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement or (ii) with respect to any information included in the Offering Circular in the section entitled "The Servicer" and "Risk Factors—Relating to Certain Conflicts of Interest—The Issuer Will Be Subject to Various Conflicts of Interest Involving the Servicer" that contain any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (the preceding clauses (i) and (ii) collectively being the "Servicer Breaches").  For the avoidance of doubt, the Servicer shall have no duty to independently investigate any laws not otherwise known to it in connection with its obligations under this Agreement, the Indenture and the other Transaction Documents.  The Servicer shall be deemed to have satisfied the requirements of the Indenture and this Agreement relating to not causing the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes (including as those requirements relate to the acquisition (including manner of acquisition), ownership, enforcement, and disposition of Collateral) to the extent the Servicer complies with the requirements set forth in Annex 1 hereto.

(b)    The Issuer shall indemnify and hold harmless (the Issuer in such case, the "Indemnifying Party") the Servicer, its directors, officers, stockholders, partners, agents and employees (such parties collectively in such case, the "Indemnified Parties") from and against any and all Liabilities, and shall reimburse each such Indemnified Party for all reasonable fees and expenses

APP. 2376
Appx. 02423

(including reasonable fees and expenses of counsel) (collectively, the "Expenses") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "Actions"), caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering Memorandum, the Indenture or this Agreement, and/or any action taken by, or any failure to act by, such Indemnified Party; provided, however, that no Indemnified Party shall be indemnified for any Liabilities or Expenses it incurs as a result of any acts or omissions by any Indemnified Party constituting Servicer Breaches.  Notwithstanding anything contained herein to the contrary, the obligations of the Issuer under this Section 10 shall be payable solely out of the Collateral in accordance with the priorities set forth in the Indenture and shall survive termination of this Agreement.

(c)    With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request or other notice of any loss, claim, damage or liability served upon an Indemnified Party, for which such Indemnified Party is or may be entitled to indemnification under this Section 10, such Indemnified Party shall (or with respect to Indemnified Parties that are directors, officers, stockholders, agents or employees of the Servicer, the Servicer shall cause such Indemnified Party to):

(i)    give written notice to the Indemnifying Party of such claim within ten (10) days after such Indemnified Party's receipt of actual notice that such claim is made or threatened, which notice to the Indemnifying Party shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim; provided, however, that the failure of any Indemnified Party to provide such notice to the Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Section 10 unless the Indemnifying Party is materially prejudiced or otherwise forfeits rights or defenses by reason of such failure;

(ii)    at the Indemnifying Party's expense, provide the Indemnifying Party such information and cooperation with respect to such claim as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

(iii)    at the Indemnifying Party's expense, cooperate and take all such steps as the Indemnifying Party may reasonably request to preserve and protect any defense to such claim;

(iv)    in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Indemnifying Party the right, which the Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such claim;

(v)    neither incur any material expense to defend against nor release or settle any such claim or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such Indemnified Party to unindemnified liability) nor permit a default or consent to the entry of any judgment in respect thereof, in each case without the prior written consent of the Indemnifying Party; and

(vi)    upon reasonable prior notice, afford to the Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defense of such

claim, including, but not limited to, the right to designate counsel reasonably acceptable to the Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such claim; provided, that if the Indemnifying Party assumes the defense of such claim, it shall not be liable for any fees and expenses of counsel for any Indemnified Party incurred thereafter in connection with such claim except that if such Indemnified Party reasonably determines that counsel designated by the Indemnifying Party has a conflict of interest in connection with its representation of such Indemnified Party, such Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; provided, further, that prior to entering into any final settlement or compromise, such Indemnifying Party shall seek the consent of the Indemnified Party and use its commercially reasonable efforts in the light of the then prevailing circumstances (including, without limitation, any express or implied time constraint on any pending settlement offer) to obtain the consent of such Indemnified Party as to the terms of settlement or compromise. If an Indemnified Party does not consent to the settlement or compromise within a reasonable time under the circumstances, the Indemnifying Party shall not thereafter be obligated to indemnify the Indemnified Party for any amount in excess of such proposed settlement or compromise.

(d) In the event that any Indemnified Party waives its right to indemnification hereunder, the Indemnifying Party shall not be entitled to appoint counsel to represent such Indemnified Party nor shall the Indemnifying Party reimburse such Indemnified Party for any costs of counsel to such Indemnified Party.

(e) Notwithstanding any other provision of this Agreement, nothing herein shall in any way constitute a waiver or limitation of any rights which the Issuer or the Holders of the Securities may have under any U.S. federal securities laws.

11. No Partnership or Joint Venture.

The Issuer and the Servicer are not partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them. The Servicer's relation to the Issuer shall be deemed to be that of an independent contractor.

12. Term; Termination.

(a) This Agreement shall commence as of the date first set forth above and shall continue in force and effect until the first of the following occurs: (i) the payment in full of the Notes, the termination of the Indenture in accordance with its terms and the redemption in full of the Preference Shares; (ii) the liquidation of the Collateral and the final distribution of the proceeds of such liquidation to the Holders of the Securities; or (iii) the termination of this Agreement in accordance with subsection (b), (c), (d) or (e) of this Section 12 or Section 14 of this Agreement.

(b) Subject to Section 12(e) below, the Servicer may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer). If the Servicer resigns, the Issuer agrees to appoint a successor Servicer to assume such duties and obligations in accordance with Section 12(e).

APP. 2378
Appx. 02425

(c)    This Agreement shall be automatically terminated in the event that the Issuer determines in good faith that the Issuer or the pool of Collateral has become required to be registered under the provisions of the Investment Company Act, and the Issuer notifies the Servicer thereof.

(d)    If this Agreement is terminated pursuant to this Section 12, neither party shall have any further liability or obligation to the other, except as provided in Sections 2(c)(i), 8, 10 and 15 of this Agreement.

(e) No removal or resignation of the Servicer shall be effective unless:

(i)    (A) the Issuer appoints a successor Servicer at the written direction of a Majority of the Preference Shares (excluding any Preference Shares held by the retiring Servicer, any of its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority (or, with respect to Class I Preference Shares held by Investors Corp. at such time, Holding Preference Shares held by the retiring Servicer, any of its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority) other than, with respect to the Class II Preference Shares, HFP; provided that, with respect to the voting authority of Class II Preference Shares owned by HFP, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP and certified in writing to the Preference Shares Paying Agent by any of the "independent directors" of HFP) of HFP) (each such non-excluded Preference Share, a "Voting Preference Share"), (B) such successor Servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by either (x) a Super Majority of the Controlling Class of Notes (excluding any Notes held by the retiring Servicer, its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority other than HFP; provided that, with respect to the voting authority of Notes owned by HFP, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP and certified in writing to the Trustee by any of the "independent directors" of HFP) of HFP) (each such non-excluded Note, a "Voting Note") or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single class);

(ii)    if a Majority of the Voting Preference Shares has nominated two or more successor Servicers that have been objected to pursuant to the preceding clause (i)(C) or has failed to appoint a successor Servicer that has not been objected to pursuant to the preceding clause (i)(C) within 60 days of the date of notice of such removal or resignation of the Servicer, (A) the Issuer appoints a successor Servicer at the written direction of a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes), (B) such successor Servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor Servicer is not objected to within 30 days after notice of such succession by either (x) Majority of the Voting Preference Shares  or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single class); or

(iii)    if a Majority of the Voting Preference Shares and a Super Majority of the Controlling Class (excluding any Notes that are not Voting Notes) has

APP. 2379
Appx. 02426

nominated two or more successor Servicers that have been objected to pursuant to the preceding clauses (i)(C) and (ii)(C) or has otherwise failed to appoint a successor Servicer that has not been objected to pursuant to the preceding clause (i)(C) or (ii) (C) within 120 days of the date of notice of such removal or resignation of the Servicer, (A) any Holder of the Controlling Class of Notes (excluding any Notes that are not Voting Notes), any Holder of Voting Preference Shares or the Trustee petitions a court of competent authority to appoint a successor Servicer, (B) such court appoints a successor Servicer and (C) such successor Servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture.

In addition, any successor Servicer must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer hereunder, (ii) is legally qualified and has the capacity to act as Servicer hereunder, as successor to the Servicer under this Agreement in the assumption of all of the responsibilities, duties and obligations of the Servicer hereunder and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as Servicer under this Agreement and the Indenture without causing the Issuer, the Co Issuer or any Holder of Preference Shares to become subject to tax in any jurisdiction where such successor Servicer is established as doing business and (v) each Rating Agency has confirmed that the appointment of such successor Servicer shall not cause its then current rating of any Class of Notes to be reduced or withdrawn. No compensation payable to a successor Servicer from payments on the Collateral shall be greater than that paid to the retiring Servicer without the prior written consent of a Super Majority of the Controlling Class of Notes, a Majority of the Noteholders and a Majority of the Preference Shares. The Issuer, the Trustee and the successor Servicer shall take such action (or cause the retiring Servicer to take such action) consistent with this Agreement and the terms of the Indenture applicable to the Servicer, as shall be necessary to effectuate any such succession.

(f) In the event of removal of the Servicer pursuant to this Agreement, the Issuer shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Issuer or, to the extent so provided in the Indenture, the Trustee may by notice in writing to the Servicer as provided under this Agreement terminate all the rights and obligations of the Servicer under this Agreement (except those that survive termination pursuant to Section 12(d) above). Upon expiration of the applicable notice period with respect to termination specified in this Section 12 or Section 14 of this Agreement, as applicable, all authority and power of the Servicer under this Agreement, whether with respect to the Collateral or otherwise, shall automatically and without further action by any person or entity pass to and be vested in the successor Servicer upon the appointment thereof.

13.    Delegation; Assignments.

This Agreement, and any obligations or duties of the Servicer hereunder, shall not be delegated by the Servicer, in whole or in part, except to any entity that (i) is controlled by any of James Dondero, Mark Okada and Todd Travers and (ii) is one in which any of James Dondero, Mark Okada and Todd Travers is involved in the day to day management and operations (and in any such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), without the prior written consent of the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares and, notwithstanding any such consent, no delegation of obligations or duties by the Servicer (including, without limitation, to an entity described above) shall relieve the Servicer from any liability hereunder.

Subject to Section 12, any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing

APP. 2380
Appx. 02427

by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares and (ii) the Rating Agency Confirmation is satisfied with respect to any such assignment. Any assignment consented to by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares shall bind the assignee hereunder in the same manner as the Servicer is bound. In addition, the assignee shall execute and deliver to the Issuer and the Trustee a counterpart of this Agreement naming such assignee as Servicer. Upon the execution and delivery of such a counterpart by the assignee and consent thereto by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares, the Servicer shall be released from further obligations pursuant to this Agreement, except with respect to its obligations arising under Section 10 of this Agreement prior to such assignment and except with respect to its obligations under Sections 2(c)(i) and 15 hereof. This Agreement shall not be assigned by the Issuer without the prior written consent of the Servicer and the Trustee, except in the case of assignment by the Issuer to (i) an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Indenture. In the event of any assignment by the Issuer, the Issuer shall cause its successor to execute and deliver to the Servicer such documents as the Servicer shall consider reasonably necessary to effect fully such assignment. The Servicer hereby consents to the matters set forth in Article 15 of the Indenture.

14.    Termination by the Issuer for Cause.

Subject to Section 12(e) above, this Agreement shall be terminated and the Servicer shall be removed by the Issuer for cause upon 10 days' prior written notice to the Servicer and upon written notice to the Holders of the Securities as set forth below, but only if directed to do so by (1) the Trustee, acting at the direction of a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) or (2) the Holders of a Majority of the Voting Preference Shares. For purposes of determining "cause" with respect to any such termination of this Agreement, such term shall mean any one of the following events:

(a)    the Servicer willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of this Agreement or any terms of the Indenture applicable to it;

(b)    the Servicer breaches in any material respect any provision of this Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Servicer shall prove to have been incorrect in any material respect when made or given, and the Servicer fails to cure such breach or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation, warranty, certificate or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty, certificate or statement;

(c)    the Servicer is wound up or dissolved (other than a dissolution in which the remaining members elect to continue the business of the Servicer in accordance with its Governing Instruments) or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer, or the Servicer (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Servicer

APP. 2381

Appx. 02428

or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Servicer and continue undismissed for 60 days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Servicer without such authorization, application or consent and are approved as properly instituted and remain undismissed for 60 days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for 60 days;

(d)    the occurrence of any Event of Default under the Indenture that results from any breach by the Servicer of its duties under the Indenture or this Agreement, which breach or default is not cured within any applicable cure period; or

(e)    (x) the occurrence of an act by the Servicer related to its activities in any servicing, securities, financial advisory or other investment business that constitutes fraud, (y) the Servicer being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any servicing, securities, financial advisory or other investment business or (z) the Servicer being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder.

If any of the events specified in this Section 14 shall occur, the Servicer shall give prompt written notice thereof to the Issuer, the Trustee and the Holders of all outstanding Notes and Preference Shares upon the Servicer's becoming aware of the occurrence of such event.

15.    Action Upon Termination.

(a)    From and after the effective date of termination of this Agreement, the Servicer shall not be entitled to compensation for further services hereunder, but shall be paid all compensation accrued to the date of termination, as provided in Section 8 hereof, and shall be entitled to receive any amounts owing under Section 10 hereof.  Upon the effective date of termination of this Agreement, the Servicer shall as soon as practicable:

(i)    deliver to the Issuer all property and documents of the Trustee or the Issuer or otherwise relating to the Collateral then in the custody of the Servicer; and

(ii)    deliver to the Trustee an accounting with respect to the books and records delivered to the Trustee or the successor Servicer appointed pursuant to Section 12(e) hereof.

Notwithstanding such termination, the Servicer shall remain liable to the extent set forth herein (but subject to Section 10 hereof) for its acts or omissions hereunder arising prior to termination and for any expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Servicer in Section 16(b) hereof or from any failure of the Servicer to comply with the provisions of this Section 15.

(b)    The Servicer agrees that, notwithstanding any termination of this Agreement, it shall reasonably cooperate in any Proceeding arising in connection with this Agreement, the Indenture or any of the Collateral (excluding any such Proceeding in which claims are asserted against

APP. 2382
Appx. 02429

the Servicer or any Affiliate of the Servicer) upon receipt of appropriate indemnification and expense reimbursement.

    16.    <u>Representations and Warranties.</u>

    (a)    The Issuer hereby represents and warrants to the Servicer as follows:

    (i)    The Issuer has been duly registered and is validly existing under the laws of the Cayman Islands, has full power and authority to own its assets and the securities proposed to be owned by it and included in the Collateral and to transact the business in which it is presently engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement, the Indenture or the Securities would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of the Issuer.

    (ii)    The Issuer has full power and authority to execute, deliver and perform this Agreement, the other Transaction Documents and the Securities and all obligations required hereunder and thereunder and has taken all necessary action to authorize this Agreement, the other Transaction Documents and the Securities on the terms and conditions hereof and thereof and the execution by the Issuer, delivery and performance of this Agreement, the other Transaction Documents and the Securities and the performance of all obligations imposed upon it hereunder and thereunder.  No consent of any other person including, without limitation, shareholders and creditors of the Issuer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority, other than those that may be required under state securities or "blue sky" laws and those that have been or shall be obtained in connection with the other Transaction Documents and the Securities is required by the Issuer in connection with this Agreement, the other Transaction Documents and the Securities or the execution, delivery, performance, validity or enforceability of this Agreement, the other Transaction Documents and the Securities or the obligations imposed upon it hereunder or thereunder. This Agreement constitutes, and each instrument or document required hereunder, when executed and delivered hereunder, shall constitute, the legally valid and binding obligation of the Issuer enforceable against the Issuer in accordance with its terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

    (iii)    The execution by the Issuer, delivery and performance of this Agreement and the documents and instruments required hereunder shall not violate any provision of any existing law or regulation binding on the Issuer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Issuer, or the Governing Instruments of, or any securities issued by, the Issuer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Issuer is a party or by which the Issuer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Issuer, and shall not result in or require the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking (other than the lien of the Indenture).

APP. 2383
Appx. 02430

(iv)    The Issuer is not in violation of its Governing Instruments or in breach or violation of or in default under the Indenture or any contract or agreement to which it is a party or by which it or any of its assets may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Issuer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the performance by the Issuer of its duties hereunder.

(v)    True and complete copies of the Indenture and the Issuer's Governing Instruments have been delivered to the Servicer.

The Issuer agrees to deliver a true and complete copy of each amendment to the documents referred to in Section 16(a)(v) above to the Servicer as promptly as practicable after its adoption or execution.

(b)    The Servicer hereby represents and warrants to the Issuer as follows:

(i)    The Servicer is a limited partnership duly organized and validly existing and in good standing under the laws of the State of Delaware, has full power and authority to own its assets and to transact the business in which it is currently engaged and is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of this Agreement would require such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not have a material adverse effect on the business, operations, assets or financial condition of the Servicer or on the ability of the Servicer to perform its obligations under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

(ii)    The Servicer has full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and under the provisions of the other Transaction Documents applicable to the Servicer, and has taken all necessary action to authorize this Agreement on the terms and conditions hereof and the execution, delivery and performance of this Agreement and all obligations required hereunder and under the terms of the other Transaction Documents applicable to the Servicer. No consent of any other person, including, without limitation, creditors of the Servicer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by the Servicer in connection with this Agreement or the execution, delivery, performance, validity or enforceability of this Agreement or the obligations required hereunder or under the terms of the other Transaction Documents applicable to the Servicer. This Agreement has been, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall be, executed and delivered by a duly authorized partner of the Servicer, and this Agreement constitutes, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer when executed and delivered by the Servicer hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall constitute, the valid and legally binding obligations of the Servicer enforceable against the Servicer in accordance with their terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii)    The execution, delivery and performance of this Agreement and the terms of the other Transaction Documents applicable to the Servicer and the documents and instruments required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall not violate or conflict with any provision of any existing law or regulation binding on or applicable to the Servicer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Servicer, or the Governing Instruments of, or any securities issued by the Servicer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Servicer is a party or by which the Servicer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Servicer or its ability to perform its obligations under this Agreement and the provisions of the other Transaction Documents applicable to the Servicer, and shall not result in or require the creation or imposition of any lien on any of its material property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

(iv)    There is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Servicer, threatened that, if determined adversely to the Servicer, would have a material adverse effect upon the performance by the Servicer of its duties under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

(v)    The Servicer is a registered investment adviser under the Investment Advisers Act.

(vi)    The Servicer is not in violation of its Governing Instruments or in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its property may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Servicer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the provisions of the other Transaction Documents applicable to the Servicer, or the performance by the Servicer of its duties hereunder.

17.    Notices.

Unless expressly provided otherwise herein, all notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (including by telecopy) and shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of telecopy notice, when received in legible form, addressed as set forth below:

APP. 2385

Appx. 02432

(a) If to the Issuer:

Brentwood CLO, Ltd.
c/o Maples Finance Limited
P.O. Box 1093GT
Queensgate House
South Church Street
George Town, Grand Cayman, Cayman Islands
Telephone: (345) 945-7099
Telecopy: (345) 945-7100
Attention: The Directors

(b) If to the Servicer:

Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Road, Suite 1300
Dallas, Texas 75240
Telephone: (972) 628-4100
Telecopy: (972) 628-4147
Attention: James Dondero

(c) If to the Trustee:

Investors Bank & Trust Company
200 Claredon Street
Mailcode: EUC-108
Boston, Massachusetts 02116
Telecopy: (617 )351-4358
Attention: CDO Services – Brentwood CLO, Ltd.

(d) If to the Noteholders:

In accordance with Section 14.4 of the Indenture, at their respective addresses set forth on the Note Register.

(e) If to the Holders of the Preference Shares:

In accordance with Section 14.4 of the Indenture, to the Preference Shares Paying Agent at the address identified therein.

(f) if to the Rating Agencies:

In accordance with Section 14.3 of the Indenture, to the Rating Agencies at the address identified therein.

Any party may alter the address or telecopy number to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section 17 for the giving of notice.

APP. 2386
Appx. 02433

18.     Binding Nature of Agreement; Successors and Assigns.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns as provided herein.  The Servicer hereby consents to the collateral assignment of this Agreement as provided in the Indenture and further agrees that the Trustee may enforce the Servicer's obligations hereunder.

19.     Entire Agreement.

This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof.  The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof. This Agreement may not be modified or amended other than by an agreement in writing executed by the parties hereto and in accordance with the terms of Section 15.1(h) of the Indenture.

20.     Conflict with the Indenture.

Subject to the last two sentences of Section 2(a)(i), in the event that this Agreement requires any action to be taken with respect to any matter and the Indenture requires that a different action be taken with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture in respect thereof shall control.

21.     Priority of Payments.

The Servicer agrees that the payment of all amounts to which it is entitled pursuant to this Agreement and the Indenture shall be due and payable only in accordance with the priorities set forth in the Indenture and only to the extent funds are available for such payments in accordance with such priorities.

22.     Governing Law.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

23.     Indulgences Not Waivers.

Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

**APP. 2387**
**Appx. 02434**

24.    Costs and Expenses.

Except as may otherwise be agreed in writing, the costs and expenses (including the fees and disbursements of counsel and accountants) incurred by each party in connection with the negotiation and preparation of and the execution of this Agreement, and all matters incident thereto, shall be borne by such party.

25.    Titles Not to Affect Interpretation.

The titles of paragraphs and subparagraphs contained in this Agreement are for convenience only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation hereof.

26.    Execution in Counterparts.

This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

27.    Provisions Separable.

In case any provision in this Agreement shall be invalid, illegal or unenforceable as written, such provision shall be construed in the manner most closely resembling the apparent intent of the parties with respect to such provision so as to be valid, legal and enforceable; provided, however, that if there is no basis for such a construction, such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability and, unless the ineffectiveness of such provision destroys the basis of the bargain for one of the parties to this Agreement, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby.

28.    Number and Gender.

Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

29.    Written Disclosure Statement.

The Issuer and the Trustee acknowledge receipt of Part II of the Servicer's Form ADV filed with the Securities and Exchange Commission, as required by Rule 204-3 under the Advisers Act, more than 48 hours prior to the date of execution of this Agreement.

30.    Miscellaneous.

(a)    In the event that any vote is solicited with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, shall vote or refrain from voting any such security in any manner permitted by the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities. In addition, with respect to any Defaulted Collateral Obligation, the Servicer, on behalf of the Issuer, may instruct the trustee for such Defaulted Collateral Obligation to enforce the Issuer's rights under the Underlying Instruments governing such Defaulted

APP. 2388
Appx. 02435

Collateral Obligation and any applicable law, rule or regulation in any manner permitted under the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.  In the event any Offer is made with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, may take such action as is permitted by the Indenture and that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.

(b)    In connection with taking or omitting any action under the Indenture or this Agreement, the Servicer may consult with counsel and may rely in good faith on the advice of such counsel or any opinion of counsel.

Any corporation, partnership or limited liability company into which the Servicer may be merged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any corporation, partnership or limited liability company succeeding to all or substantially all of the servicing and collateral management business of the Servicer, shall be the successor to the Servicer without any further action by the Servicer, the Co-Issuers, the Trustee, the Noteholders or any other person or entity.

31.    Limitation of Liabilities.

The Issuer's obligations hereunder are solely the corporate obligations of the Issuer and the Servicer shall not have any recourse to any of the directors, officers, shareholders, members or incorporators of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby, except for any claims, losses, damages, liabilities, indemnities or other obligations caused by the gross negligence, bad faith or willful misconduct of such directors, officers, shareholders, members or incorporators of the Issuer.  The obligations of the Issuer hereunder shall be limited to the net proceeds of the Collateral, if any, as applied in accordance with the Priorities of Payments pursuant to the Indenture, and following realization of the Collateral and its application in accordance with the Indenture, any outstanding obligations of the Issuer hereunder shall be extinguished and shall not thereafter revive.  The provisions of this section shall survive termination of this Agreement.

32.    Consent to Posting of Documents on Repository.

The Servicer hereby consents to (i) the posting of the final Offering Memorandum, the Indenture and any Hedge Agreements (collectively, the "Documents") and the periodic reports to be delivered pursuant to the Documents and any amendments or other modifications thereto on the Repository (as such term is defined in the Indenture) for use in the manner provided in the Repository; and (ii) the display of its name on the Repository in connection therewith.

APP. 2389
Appx. 02436

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
as Servicer

By:_____
Name:            Todd Travers
Title:        Senior Portfolio Manager
        Highland Capital Management, L.P.

BRENTWOOD CLO, LTD.,
as Issuer

By:_____
Name:
Title:

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
    as Servicer


By: _____
Name:
Title:


BRENTWOOD CLO, LTD.,
    as Issuer


By: _____
Name:
Title:

**Chris Watler**
**Director**

## ANNEX 1

### Certain Tax Provisions

Unless otherwise noted, references to the Issuer in this Annex 1 include the Servicer and any other person acting on the Issuer's behalf.  Capitalized terms used but not defined herein will have the meanings ascribed to them in the Indenture.

For purposes of this Annex 1,

"Affiliate" means, with respect to a specified Person, (a) any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person and (b) any Person that is a member, director, officer or employee of (i) the specified Person or (ii) a Person described in clause (a) of this definition; and

"Person" means an individual, a corporation, a limited liability company, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

Section I.    General Restrictions.

As provided in this Annex 1, the Issuer (and the Servicer acting on the Issuer's behalf) shall only purchase debt securities, interests in loans and other assets (each a "Portfolio Collateral") only in secondary-market transactions and shall not engage in any lending or underwriting activities or otherwise participate in the structuring or origination of any Portfolio Collateral.

A.    Communications and Negotiations.

1.    The Issuer will not have any communications or negotiations with the obligor of a Portfolio Collateral or a Reference Obligation (directly or indirectly through an intermediary such as the seller of such Portfolio Collateral or the Synthetic Security) in connection with the issuance or funding of such Portfolio Collateral or Reference Obligation or commitments with respect thereto, except for communications of an immaterial nature or customary due diligence communications;  provided, that the Servicer may provide comments as to mistakes or inconsistencies in loan documents (including with respect to any provisions that are inconsistent with the terms and conditions of purchase of the loan by the Issuer).

2.    By way of example, permitted due diligence activities may include, but are not limited to, (a) attendance at an obligor's general "roadshow" or other presentations to investment professionals, (b) direct private discussions with personnel of the obligor, arranged by a sponsor, lead bank or other arranger, and (c) other due diligence activities of the kind customarily performed by offerees of  the type of Portfolio Collateral being offered, but may not include any negotiations with the obligor, employees or agents of the obligor of any terms or conditions of the Portfolio Collateral being offered.

3.    Negotiations between the Servicer and the underwriter, placement agent or broker of a Portfolio Collateral are permitted solely to the extent that they are limited to responses to customary pre-offering period and offering period inquiries by the underwriter or placement agent (e.g., "If we offered you 10-year senior subordinated bonds of XYZ company, what spread would it require to interest you?" or "If you will not buy the bonds as offered, would you buy if

APP. 2392
Appx. 02439

we convinced the obligor to add a fixed charge coverage test?"). For purposes of this Section I.A., "negotiations" shall not include (i) commenting on offering documents to an unrelated underwriter or placement agent when the ability to comment was generally available to other offerees, or (ii) communicating certain objective criteria (such as the minimum yield or maturity) the Issuer generally uses in purchasing the relevant type of Portfolio Collateral.

4.    The Issuer may consent or otherwise act with respect to amendments, supplements or other modifications of the terms of any Portfolio Collateral (other than a Subsidiary Obligation (as defined in Section III)) requiring consent or action after the date on which any such Portfolio Collateral is acquired by the Issuer if (a) such amendment, supplement or modification would not constitute a Significant Modification (as defined below), (b) (i) in the reasonable judgment of the Servicer, the obligor is in financial distress and such change in terms is desirable to protect the Issuer's interest and (ii) the Portfolio Collateral is described in clause 5(b) of this Section I.A., (c) the amendment or modification would not be treated as the acquisition of a new Portfolio Collateral under paragraph 5 of this Section I.A., or (d) otherwise, if it has received advice of counsel that its involvement in such amendment, supplement or modification will not cause the Issuer to be treated as engaged in a trade or business within the United States.

A "Significant Modification" means any amendment, supplement or other modification that involves (a) a change in the stated maturity or a change in the timing of any material payment of any Portfolio Collateral (including deferral of an interest payment), that would materially alter the weighted average life of the Portfolio Collateral, (b) any change (whether positive or negative) in the yield on the Portfolio Collateral immediately prior to the modification in excess of the greater of (i) 25 basis points or (ii) 5 percent of such unmodified yield, (c) any change involving a material new extension of credit, (d) a change in the obligor of any Portfolio Collateral (as determined for purposes of section 1001 of the Code), or (e) a material change in the collateral or security for any Portfolio Collateral, including the addition or deletion of a co-obligor or guarantor that results in a material change in payment expectations.

5.    In the event the Issuer owns an interest in a Portfolio Collateral the terms of which are subsequently amended or modified, or in the case of a workout situation not described in Section III hereof, which Portfolio Collateral is subsequently exchanged for new obligations or other securities of the obligor of the Portfolio Collateral, such amendments or modifications or exchange will not be treated as the acquisition of an interest in a new Portfolio Collateral for purposes of this Annex 1, provided, that (a) the Issuer does not, directly or indirectly (through the Servicer or otherwise), seek the amendments or modifications or the exchange, or participate in negotiating the amendments or modifications or the exchange, and (b) at the time of original acquisition of the interest in the Portfolio Collateral, it was not reasonably anticipated that the terms of the Portfolio Collateral would, pursuant to a workout or other negotiation, subsequently be amended or modified.

B.    Fees.

The Issuer will not earn or receive from any Person any fee or other compensation for services, however denominated, in connection with its purchase or sale of a Portfolio Collateral or entering into a Synthetic Security; the foregoing prohibition shall not be construed to preclude the Issuer from receiving (i) commitment fees or facility maintenance fees that are received by the Issuer in connection with revolving or delayed drawdown Loans; (ii) yield maintenance and prepayment penalty fees; (iii) fees on account of the Issuer's consenting to amendments, waivers or other modifications of the terms of any items of Portfolio Collateral; (iv) fees from permitted securities lending; or (v) upfront payments in lieu of

Annex 1-2

OHS West:260124435.7

periodic payments under a Synthetic Security. The Issuer will not provide services to any Person; the foregoing prohibition shall not be construed to preclude the Issuer from activities relating to the receipt of income described in (i) through (v) of the preceding sentence.

Section II.    Loans and Forward Purchase Commitments.

A.    Any understanding or commitment to purchase a loan, a participation, a loan subparticipation or a collateralized loan obligation (collectively, "Loans") from a seller before completion of the closing and full funding of the Loan by such seller shall only be made pursuant to a forward sale agreement at an agreed price (stated as a dollar amount or as a percentage) (a "Forward Purchase Commitment"), unless such an understanding or commitment is not legally binding and neither the Issuer nor the Servicer is economically compelled (e.g., would otherwise be subject to a significant monetary penalty) to purchase the Loan following the completion of the closing and full funding of the Loan (i.e., the Servicer will make an independent decision whether to purchase such Loan on behalf of the Issuer after completion of the closing of the Loan) (a "Non-Binding Agreement").

B.    No Forward Purchase Commitment or Non-Binding Agreement shall be made until after the seller (or a transferor to such seller of such Loan) has made a legally binding commitment to fully fund such Loan to the obligor thereof (subject to customary conditions), which commitment cannot be conditioned on the Issuer's ultimate purchase of such Loan from such seller.

C.    In the event of any reduced or eliminated funding, the Issuer shall not receive any premium, fee, or other compensation in connection with having entered into the Forward Purchase Commitment or Non-Binding Agreement.

D.    The Issuer shall not close any purchase of a Loan subject to a Forward Purchase Commitment or a Non-Binding Agreement earlier than 48 hours after the time of the closing of the Loan (i.e., execution of definitive documentation), and, in the case of a Forward Purchase Commitment, the Issuer's obligation to purchase such Loan is subject to the condition that no material adverse change has occurred in the financial condition of the Loan's obligor or the relevant market on or before the relevant purchase date.

E.    The Issuer cannot have a contractual relationship with the obligor with respect to a Loan until the Issuer actually purchases the Loan.

F.    The Issuer cannot be a signatory on the original lending agreement, and cannot be obligated to fund an assignment of or a participation in a Loan, prior to the time specified in subsection D above.

Section III.    Distressed Debt.

A.    The Issuer may only purchase a Debt Instrument that is a Potential Workout Obligation to the extent permitted by this Section III.

B.    Neither the Issuer nor the Servicer on behalf of the Issuer shall purchase a Subsidiary Obligation from any Issuer Subsidiary.

Annex 1-3

OHS West:260124435.7

C.      Special Procedures for Subsidiary Obligations.

1.      Potential Workout Obligations.  On or prior to the date of acquisition, the Servicer on behalf of the Issuer shall identify each Portfolio Collateral that is a Potential Workout Obligation.

2.      Transfer of Subsidiary Obligations.  From and after the occurrence of a Workout Determination Date with respect to a Subsidiary Obligation, neither the Issuer nor the Servicer on behalf of the Issuer shall knowingly take any action in respect of such Subsidiary Obligation that may result in the Issuer being engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes.  As soon as practicable, but in any event within 30 calendar days following a Workout Determination Date, the Servicer shall cause the Issuer either (i) to sell or dispose of any Subsidiary Obligation identified on such Workout Determination Date to a Person that is not an Affiliate of the Issuer or Servicer or (ii) to assign any Subsidiary Obligation identified on such Workout Determination Date to an Issuer Subsidiary.

For purposes of this Annex 1, an "Issuer Subsidiary" means any wholly-owned corporate subsidiary of the Issuer to which a Special Workout Obligation may be transferred in accordance with this Annex 1.

3.      Consideration for Assignment of Subsidiary Obligations.  Consideration given by an Issuer Subsidiary for the assignment to it of Subsidiary Obligations may be in the form of cash or in the form of indebtedness of, or equity interests in, such Issuer Subsidiary.

4.      Classification of Issuer Subsidiaries.  Each Issuer Subsidiary shall be an entity treated as a corporation for United States federal income tax purposes and formed under the laws of any state of the United States.

As used herein:

"Potential Workout Obligation" means any debt instrument (any such instrument, including an interest in a Loan, a "Debt Instrument") which, as of the date of acquisition by the Issuer or an Issuer Subsidiary, based on information specific to such Debt Instrument or the circumstances of the obligor thereof, is a Workout Obligation or, in the reasonable determination of the Servicer, has a materially higher likelihood of becoming a Workout Obligation as compared to debt obligations that par or other non-distressed debt purchasers or funds relating to that asset type customarily purchase and expect to hold to maturity.

"Subsidiary Obligation" means any Potential Workout Obligation (a) as to which the Issuer on any Workout Determination Date either (i) owns more than 40% of the aggregate principal amount of such class of Potential Workout Obligation outstanding or (ii) is one of the two largest holders of any class of debt of the obligor of such Potential Workout Obligation (based on the outstanding principal amount of such class of debt owned by the Issuer as a percentage of the aggregate outstanding principal amount of such class of debt) unless not fewer than three other holders and the Issuer collectively own at least 65% of such class of debt and, if the Issuer is the largest holder of such class, the Issuer's percentage of such class does not exceed the percentage held by the next largest holder of the debt by more than 5% of such class or (b) that would, upon foreclosure or exercise of similar legal remedies, result in the Issuer directly owning assets (other than securities treated as debt, equity in a partnership not engaged in a trade or business within the United States, or corporate equity for United States federal income tax

OHS West:260124435.7

purposes, provided in the case of corporate equity that the corporation is not a "United States real property holding corporation" within the meaning of section 897 of the Code) which are "United States real property interests" within the meaning of section 897 of the Code or which the Servicer reasonably expects it would, on behalf of the Issuer, be required to actively manage to preserve the value of the Issuer's interest therein; provided that a Potential Workout Obligation shall not be treated as a Subsidiary Obligation if the Issuer obtains a Tax Opinion that, based on all the surrounding circumstances, the activities in which the Issuer intends to engage with respect to such Potential Workout Obligation will not cause the Issuer to be treated as engaged in a trade or business for United States federal income tax purposes.

"Workout Determination Date" means any date on which, in connection with the occurrence of any event described in clauses (a) through (c), inclusive, of the definition of Workout Obligation, either (a) any material action by the Issuer is required to be taken, (b) the Servicer receives written notice that such material action shall be required or (c) the Servicer reasonably determines that the taking of such material action is likely to be required.

"Workout Obligation" means any Debt Instrument as to which the Servicer on behalf of the Issuer (a) consents to a Significant Modification in connection with the workout of a defaulted Portfolio Collateral, (b) participates in an official or unofficial committee or similar official or unofficial body in connection with a bankruptcy, reorganization, restructuring or similar proceeding, or (c) exercises, or has exercised on its behalf, rights of foreclosure or similar judicial remedies.

Section IV.    Purchases from the Servicer or its Affiliates.

A.    If the Servicer or an Affiliate of the Servicer acted as an underwriter, placement or other agent, arranger, negotiator or structuror, or received any fee for services (it being understood that receipts described in clauses (i) through (v) of Section I.B. are not construed as so treated), in connection with the issuance or origination of a Portfolio Collateral or was a member of the original lending syndicate with respect to the Portfolio Collateral (any such Portfolio Collateral, a "Special Procedures Obligation"), the Issuer will not acquire any interest in such Special Procedures Obligation (including entering into a commitment or agreement, whether or not legally binding or enforceable, to acquire such obligation directly or synthetically), from the Servicer, an Affiliate of the Servicer, or a fund managed by the Servicer, unless (i) the Special Procedures Obligation has been outstanding for at least 90 days, (ii) the holder of the Special Procedures Obligation did not identify the obligation or security as intended for sale to the Issuer within 90 days of its issuance, (iii) the price paid for such Special Procedures Obligation by the Issuer is its fair market value at the time of acquisition by the Issuer, and (iv) the transaction is proposed to, and the ultimate purchase is approved on behalf of the Issuer by, one or more Independent Advisors to the Issuer in accordance with the provisions of Section IV.B. below. The Issuer will not acquire any Special Procedures Obligation if, immediately following such acquisition, the fair market value of all Special Procedures Obligations owned by the Issuer would constitute more than 49% of the fair market value of all of the Issuer's assets at such time.

B.    An "Independent Advisor" is a Person who is not an Affiliate of the Issuer, the Servicer or any fund managed by the Servicer.

1.    The Issuer may not purchase or commit to enter into any such Special Procedures Obligation without prior approval by an Independent Advisor. If the Independent Advisor declines to approve a proposed Special Procedures Obligation, at least three months must elapse before any proposal with respect to the acquisition of debt or other obligations of the same obligor are proposed or considered.

APP. 2396
Appx. 02443

2.    The Issuer shall engage the Independent Advisor in an agreement the terms of which shall in substantial form set forth:

(a) the representation of the Independent Advisor, which the Servicer shall not know to be incorrect, that it has significant financial and commercial expertise, including substantial expertise and knowledge in and of the loan market and related investment arenas;

(b) the agreement between the Independent Advisor, the Issuer and the Servicer generally to the effect that (i) the Independent Advisor will operate pursuant to procedures consistent with maintaining his or her independence from the Servicer and its Affiliates, (ii) the Independent Advisor will have the sole authority and discretion to approve or reject purchase proposals made by the Servicer with respect to any Special Procedures Obligation, (iii) all proposals for the Issuer to acquire any Special Procedures Obligation will be first submitted to the Independent Advisor, (iii) the Servicer will prepare the materials it deems necessary to describe the Special Procedures Obligation to the Independent Advisor, (iv) the Investment Advisor will not be required to make any decision to accept or decline a Special Procedures Obligation at the price offered prior to its review of the materials prepared, plus any additional information requested by the Independent Advisor, and (v) no Independent Advisor may be proposed to be replaced by the Servicer, unless for cause or in the event of a resignation of such Independent Advisor; and

(c) such other commercially reasonable terms and conditions, including terms and conditions to the effect that (i) the Independent Advisor will be paid a reasonable fee for its services plus reimbursement of any reasonable expenses incurred in performance of his or her responsibilities, (ii) the Independent Advisor may be removed or replaced only by a majority (whether by positive act or failure to object) of the probable equity owners (as determined for United States federal income tax purposes) of the Issuer, (iii) if at any time there is more than one Independent Advisor to the Issuer, a majority of such Independent Advisors must approve any Special Procedures Obligation subject to Independent Advisor approval, (iv) an Independent Advisor may not engage, directly or indirectly, in the negotiation of the terms of any Special Procedures Obligation to be acquired by the Issuer (provided however, that an Independent Advisor may negotiate with the Servicer or the seller with respect to the price and terms of the Issuer's purchase of the Special Procedures Obligation, provided further that the Independent Advisor will not make suggestions to the Servicer or any other person about alternative or modified terms of the underlying Special Procedures Obligation on which they might be willing to approve such a Special Procedures Obligation).

3.    Any servicing agreement or other document under which the Servicer is granted signatory powers or other authority on behalf of the Issuer will provide that such powers or authority with respect to Special Procedures Obligations are conditioned upon the prior written approval of the Independent Advisor

4.    No Special Procedures Obligation will be presented to an Independent Advisor until at least 90 days have elapsed since the later of (a) the execution of final documentation and (b) the funding in whole or part of the Special Procedures Obligation and there will have been no commitment or arrangement prior to that time that the Issuer will acquire any such Special Procedures Obligation; provided, further, that if the person from whom the Issuer will acquire the

Annex 1-6

Special Procedures Obligation is an Affiliate of the Servicer, such person will not be treated as owning the Special Procedures Obligation for any day during which it does not enjoy substantially all of the benefits and burdens of ownership (for example, because it has hedged its credit exposure to the Special Procedures Obligation).

5.    The Issuer will have no obligation to, or understanding that it will refund, reimburse or indemnify any person (including an Affiliate of the Servicer), directly or indirectly, for "breakage" costs or other costs or expenses incurred by such person if the Independent Advisor determines that the Issuer should decline to purchase any Special Procedures Obligation.

6.    Neither the Servicer nor any Affiliate of the Servicer will have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to Special Procedures Obligations without the prior written approval of an Independent Advisor.  Except as may be conditioned upon  such prior written approval, neither the Servicer nor any Affiliate of the Servicer may hold itself out as having signatory powers on behalf of the Issuer or authority to enter into agreements with respect to Special Procedures Obligations on behalf of the Issuer.

Section V.    Synthetic Securities.

A.    The Issuer shall not (i) acquire or enter into any Synthetic Security with respect to any Reference Obligation the direct acquisition of which would violate any provision of this Annex 1 or (ii) use Synthetic Securities as a means of making advances to the Synthetic Security Counterparty following the date on which the Synthetic Security is acquired or entered into (for the avoidance of doubt, the establishment of Synthetic Security collateral accounts and the payment of Synthetic Security Counterparties from the amounts on deposit therein, shall not constitute the making of advances).

B.    With respect to each Synthetic Security, the Issuer will not acquire or enter into any Synthetic Security that does not satisfy all of the following additional criteria unless the Servicer has first received advice of counsel that the ownership and disposition of such Synthetic Security would not cause the Issuer to be engaged in a trade or business within the United States for United States federal income tax purposes:

1.    the criteria used to determine whether to enter into any particular Synthetic Security was similar to the criteria used by the Servicer in making purchase decisions with respect to debt securities;

2.    the Synthetic Security is acquired by or entered into by the Issuer for its own account and for investment purposes with the expectation of realizing a profit from income earned on the securities (and any potential rise in their value) during the interval of time between their purchase and sale or hedging purposes and not with an intention to trade or to sell for a short-term profit;

3.    the Issuer enters into the Synthetic Security with a counterparty that is not a special purpose vehicle and is a broker-dealer or that holds itself out as in the business of entering into such contracts;

4.    neither the Issuer nor any Person acting on behalf of the Issuer advertises or publishes the Issuer's ability to enter into Synthetic Securities;

Annex 1-7

OHS West:260124435.7

5. except with respect to (x) credit-linked notes or similar Synthetic Securities and (y) any other Synthetic Securities where standard form ISDA documentation is not applicable, the Synthetic Security is written on standard form ISDA documentation;

6. the net payment from the Issuer to the Synthetic Security Counterparty is not determined based on an actual loss incurred by the Synthetic Security Counterparty or any other designated person;

7. there exists no agreement, arrangement or understanding that (i) the Synthetic Security Counterparty is required to own or hold the related Reference Obligation while the Synthetic Security remains in effect or (ii) the Synthetic Security Counterparty is economically or practically compelled to own or hold the related physical Reference Obligation while the Synthetic Security remains in effect;

8. the Synthetic Security provides for (i) all cash settlement, (ii) all physical settlement or (iii) the option to either cash settle or physically settle; provided that, in the latter two cases, physical settlement provides the settling party the right to settle the Synthetic Security by delivering deliverable obligations which *may* include the Reference Obligation and the settling party must not be required to deliver the related Reference Obligation upon the settlement of such Synthetic Security.

Notwithstanding the preceding paragraph, a Synthetic Security providing for physical settlement may require a party to deliver the related Reference Obligation if either:

(i) at the time the Issuer enters into such Synthetic Security, such Reference Obligation is readily available to purchasers generally in a liquid market; or

(ii) the advice of both United States federal income tax and insurance counsel of nationally recognized standing in the United States experienced in such matters is that, under the relevant facts and circumstances with respect to such Synthetic Security, the acquisition of such Synthetic Security will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis and should not cause the Issuer to be treated as writing insurance in the United States under the law of the state in which the Synthetic Security Counterparty is organized.

9. the Synthetic Security is not treated by the Issuer as insurance or a financial guarantee sold by the Issuer for United States or Cayman Islands regulatory purposes.

As used herein:

"Reference Obligation" means a debt security or other obligation upon which a Synthetic Security is based.

"Synthetic Security" means any swap transaction or security, other than a participation interest in a Loan, that has payments associated with either payments of interest and/or principal on a Reference Obligation or the credit performance of a Reference Obligation.

"Synthetic Security Counterparty" means an entity (other than the Issuer) required to make payments on a Synthetic Security (including any guarantor).

Annex 1-8

Section VI.   Other Types of Assets.

A.   Equity Restrictions.  The Issuer will not purchase any asset (directly or synthetically) that is:

1.   not treated for U.S. federal income tax purposes as debt if the issuing entity is a "partnership"(within the meaning of Section 7701(a)(2) of the Code) unless such entity is not engaged in a trade or business within the United States, or

2.   a "United States real property interest" as defined in section 897 of the Code and the Treasury Regulations promulgated thereunder.

The Issuer may cause an Issuer Subsidiary to acquire assets set forth in clause (i) or (ii) above (each, an "ETB/897 Asset") in connection with the workout of defaulted Portfolio Collaterals, so long as the acquisition of ETB/897 Assets by such Issuer Subsidiary will not cause the stock of such Issuer Subsidiary to be deemed to be an ETB/897 Asset.

B.   Revolving Loans and Delayed Drawdown Loans.  All of the terms of any advance required to be made by the Issuer under any revolving or delayed drawdown Loan will be fixed as of the date of the Issuer's purchase thereof (or will be determinable under a formula that is fixed as of such date), and the Issuer and the Servicer will not have any discretion (except for consenting or withholding consent to amendments, waivers or other modifications or granting customary waivers upon default) as to whether to make advances under such revolving or delayed drawdown Loan.

C.   Securities Lending Agreements.  The Issuer will not purchase any Portfolio Collateral primarily for the purpose of entering into a securities lending agreement with respect thereto.

Section VII.   General Restrictions on the Issuer.

The Issuer itself shall not:

A.   hold itself out, through advertising or otherwise, as originating Loans, lending funds, or making a market in or dealing in Loans or other assets;

B.   register as, hold itself out as, or become subject to regulatory supervision or other legal requirements under the laws of any country or political subdivision thereof as, a broker-dealer, a bank, an insurance company, financial guarantor, a surety bond issuer, or a company engaged in Loan origination;

C.   knowingly take any action causing it to be treated as a bank, insurance company, or company engaged in Loan origination for purposes of any tax, securities law or other filing or submission made to any governmental authority;

D.   hold itself out, through advertising or otherwise, as originating, funding, guaranteeing or insuring debt obligations or as being willing and able to enter into transactions (either purchases or sales of debt obligations or entries into, assignments or terminations of hedging or derivative instruments, including Synthetic Securities) at the request of others;

E.   treat Synthetic Securities as insurance, reinsurance, indemnity bonds, guaranties, guaranty bonds or suretyship contracts for any purpose;

Annex 1-9

OHS West:260124435.7

APP. 2400
Appx. 02447

F.    allow any non-U.S. bank or lending institution who is a holder of a Security to control or direct the Servicer's or Issuer's decision to acquire a particular asset except as otherwise allowed to such a holder, acting in that capacity, under the related indenture or acquire a Portfolio Collateral conditioned upon a particular person or entity holding Securities;

G.    acquire any asset the holding or acquisition of which the Servicer knows would cause the Issuer to be subject to income tax on a net income basis;

H.    hold any security as nominee for another person; or

I.    buy securities with the intent to subdivide them and sell the components or to buy securities and sell them with different securities as a package or unit.

Section VIII.    Tax Opinion; Amendments.

A.    In furtherance and not in limitation of this Annex 1, the Servicer shall comply with all of the provisions set forth in this Annex 1, unless, with respect to a particular transaction, the Servicer acting on behalf of the Issuer and the Trustee shall have received written advice of Skadden, Arps, Slate, Meagher & Flom LLP or Orrick, Herrington & Sutcliffe LLP or an opinion of other counsel of nationally recognized standing in the United States experienced in such matters (a "Tax Opinion"), that, under the relevant facts and circumstances with respect to such transaction, the Servicer's failure to comply with one or more of such provisions will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.

B.    The provisions set forth in the Annex may be amended, eliminated or supplemented by the Servicer if the Issuer, the Servicer and the Trustee shall have received a Tax Opinion that the Servicer's compliance with such amended provisions or supplemental provisions or the failure to comply with such provisions proposed to be eliminated, as the case may be, will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.

OHS West:260124435.7

# EXHIBIT 25

# EXHIBIT J

APP. 2402
Appx. 02449

**EXECUTION COPY**

## SERVICING AGREEMENT

This Servicing Agreement, dated as of March 27, 2008 is entered into by and among ABERDEEN LOAN FUNDING, LTD., an exempted company incorporated with limited liability under the laws of the Cayman Islands, with its registered office located at Walker House, 87 Mary Street, George Town, Grand Cayman, KY1-9002, Cayman Islands (together with successors and assigns permitted hereunder, the "Issuer"), and HIGHLAND CAPITAL MANAGEMENT, L.P., a Delaware limited partnership, with its principal offices located at Two Galleria Tower, 13455 Noel Road, Suite 1300, Dallas, Texas 75240, as servicer ("Highland" or, in such capacity, the "Servicer").

WITNESSETH:

WHEREAS, the Issuer and ABERDEEN LOAN FUNDING CORP. (the "Co-Issuer" and together with the Issuer, the "Co-Issuers") intend to issue U.S.$376,000,000 of their Class A Floating Rate Senior Secured Extendable Notes due 2018 (the "Class A Notes"), U.S.$29,500,000 of their Class B Floating Rate Senior Secured Extendable Notes due 2018 (the "Class B Notes"), U.S.$25,250,000 of their Class C Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2018 (the "Class C Notes"), U.S.$19,250,000 of their Class D Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2018 (the "Class D Notes"), and the Issuer intends to issue U.S.$17,250,000 of its Class E Floating Rate Senior Secured Deferrable Interest Extendable Notes due 2018 (the "Class E Notes" and together with the Class A Notes, Class B Notes, Class C Notes and Class D Notes, the "Notes") pursuant to the Indenture dated as of March 27, 2008 (the "Indenture"), among the Co-Issuers and State Street Bank and Trust Company, as trustee (the "Trustee") and the Issuer intends to issue 12,000 Class I Preference Shares, $0.01 par value (the "Class I Preference Shares") and 36,000 Class II Preference Shares, $0.01 par value (the "Class II Preference Shares" and, together with the Class I Preference Shares, the "Preference Shares" and, together with the Notes, the "Securities") pursuant to the Preference Shares Paying Agency Agreement dated as of March 27, 2008 (the "Preference Shares Paying Agency Agreement") between the Issuer and State Street Bank and Trust Company, as the Preference Shares Paying Agent, and pursuant to the Issuer's amended and restated memorandum and articles of association (the "Memorandum and Articles of Association") and certain resolutions of the board of directors of the Issuer;

WHEREAS, the Issuer intends to pledge certain Collateral Obligations, Eligible Investments and Cash (all as defined in the Indenture) and certain other assets (all as set forth in the Indenture) (collectively, the "Collateral") to the Trustee as security for the Notes;

WHEREAS, the Issuer wishes to enter into this Servicing Agreement, pursuant to which the Servicer agrees to perform, on behalf of the Issuer, certain duties with respect to the Collateral in the manner and on the terms set forth herein; and

WHEREAS, the Servicer has the capacity to provide the services required hereby and in the applicable provisions of the other Transaction Documents and is prepared to perform such services upon the terms and conditions set forth herein.

OHS West:260392849.4

NOW, THEREFORE, in consideration of the mutual agreements herein set forth, the parties hereto agree as follows:

1.    Definitions.

Terms used herein and not defined below shall have the meanings set forth in the Indenture.

"Agreement" shall mean this Servicing Agreement, as amended from time to time.

"Governing Instruments" shall mean the memorandum, articles or certificate of incorporation or association and by-laws, if applicable, in the case of a corporation; the certificate of formation, if applicable, or the partnership agreement, in the case of a partnership; or the certificate of formation, if applicable, or the limited liability company agreement, in the case of a limited liability company.

"HFP" shall mean Highland Financial Partners, L.P. (which includes, for the avoidance of doubt, any subsidiary thereof).

"Offering Memorandum" shall mean the Offering Memorandum of the Issuer dated March 27, 2008 prepared in connection with the offering of the Securities.

"Servicer Breaches" shall have the meaning specified in Section 10(a).

"Servicing Fee" shall mean, collectively, the Senior Servicing Fee, the Subordinated Servicing Fee and the Supplemental Servicing Fee.

"Transaction Documents" shall mean the Indenture, the Preference Shares Paying Agency Agreement, the Servicing Agreement and the Collateral Administration Agreement.

2.    General Duties of the Servicer.

(a)    The Servicer shall provide services to the Issuer as follows:

(i)    Subject to and in accordance with the terms of this Agreement and the other Transaction Documents, the Servicer shall supervise and direct the administration, acquisition and disposition of the Collateral, and shall perform on behalf of the Issuer those duties and obligations of the Servicer required by the Indenture and the other Transaction Documents, and including the furnishing of Issuer Orders, Issuer Requests and officer's certificates, and such certifications as are required of the Servicer under the Indenture with respect to permitted purchases and sales of the Collateral Obligations, Eligible Investments and other assets, and other matters, and, to the extent necessary or appropriate to perform such duties, the Servicer shall have the power to execute and deliver all necessary and appropriate documents and instruments on behalf of the Issuer with respect thereto.  The Servicer shall, subject to the terms and conditions of this Agreement and the other Transaction Documents, perform its obligations hereunder and thereunder with reasonable care, using a degree of skill and attention no less than that which the Servicer exercises with respect to comparable assets that it services or manages for others having similar objectives and restrictions, and in a manner consistent with practices and procedures followed by institutional servicers or managers of national standing relating to assets of the nature and character of the Collateral for clients having

-2-

APP. 2404
Appx. 02451

similar objectives and restrictions, except as expressly provided otherwise in this Agreement and/or the other Transaction Documents.  To the extent not inconsistent with the foregoing, the Servicer shall follow its customary standards, policies and procedures in performing its duties under the Indenture and hereunder.  The Servicer shall comply with all terms and conditions of the other Transaction Documents affecting the duties and functions to be performed hereunder. The Servicer shall not be bound to follow any amendment to any Transaction Document until it has received written notice thereof and until it has received a copy of the amendment from the Issuer or the Trustee; provided, however, that the Servicer shall not be bound by any amendment to any Transaction Document that affects the rights, powers, obligations or duties of the Servicer unless the Servicer shall have consented thereto in writing.  The Issuer agrees that it shall not permit any amendment to the Indenture that (x) affects the rights, powers, obligations or duties of the Servicer or (y) affects the amount or priority of any fees payable to the Servicer to become effective unless the Servicer has been given prior written notice of such amendment and consented thereto in writing;

        (ii)     the Servicer shall select any Collateral which shall be acquired by the Issuer pursuant to the Indenture in accordance with the Collateral criteria set forth herein and in the Indenture;

        (iii)     the Servicer shall monitor the Collateral on an ongoing basis and provide to the Issuer all reports, certificates, schedules and other data with respect to the Collateral which the Issuer is required to prepare and deliver under the Indenture, in the form and containing all information required thereby and in reasonable time for the Issuer to review such required reports, certificates, schedules and data and to deliver them to the parties entitled thereto under the Indenture;

        (iv)     the Servicer shall undertake to determine to the extent reasonably practicable whether a Collateral Obligation has become a Defaulted Collateral Obligation;

        (v)     the Servicer, subject to and in accordance with the provisions of the Indenture may, at any time permitted under the Indenture, and shall, when required by the Indenture, direct the Trustee (x) to dispose of a Collateral Obligation, Equity Security or Eligible Investment or other securities received in respect thereof in the open market or otherwise, (y) to acquire, as security for the Notes in substitution for or in addition to any one or more Collateral Obligations or Eligible Investments included in the Collateral, one or more substitute Collateral Obligations or Eligible Investments, or (z) direct the Trustee to take the following actions with respect to a Collateral Obligation or Eligible Investment:

        (1)     retain such Collateral Obligation or Eligible Investment; or

        (2)     dispose of such Collateral Obligation or Eligible Investment in the open market or otherwise; or

        (3)     if applicable, tender such Collateral Obligation or Eligible Investment pursuant to an Offer; or

(4)    if applicable, consent to any proposed amendment, modification or waiver pursuant to an Offer; or

(5)    retain or dispose of any securities or other property (if other than cash) received pursuant to an Offer; or

(6)    waive any default with respect to any Defaulted Collateral Obligation; or

(7)    vote to accelerate the maturity of any Defaulted Collateral Obligation; or

(8)    exercise any other rights or remedies with respect to such Collateral Obligation or Eligible Investment as provided in the related Underlying Instruments, including in connection with any workout situations, or take any other action consistent with the terms of the Indenture which is in the best interests of the Holders of the Securities; and

(vi)    the Servicer shall (a) on or prior to any day which is a Redemption Date, direct the Trustee to enter into contracts to dispose of the Collateral Obligation and any other Collateral pursuant to the Indenture and otherwise comply with all redemption procedures and certification requirements in the Indenture in order to allow the Trustee to effect such redemption and (b) conduct auctions in accordance with the terms of the Indenture.

(b)    In performing its duties hereunder, the Servicer shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities taking into account the Collateral criteria and limitations set forth herein and in the Indenture and the Servicer shall use reasonable efforts to select and service the Collateral in such a way that will permit a timely performance of all payment obligations by the Issuer under the Indenture; provided, that the Servicer shall not be responsible if such objectives are not achieved so long as the Servicer performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Servicer with respect to the Notes or the Preference Shares.  The Servicer and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement.

(c)    The Servicer hereby agrees to the following:

(i)    The Servicer agrees not to cause the filing of a petition in bankruptcy against the Issuer or the Co-Issuer until the payment in full of all Notes issued under the Indenture and the payment to the Preference Shares Paying Agent of all amounts payable with respect to the Preference Shares in accordance with the Priority of Payments and the expiration of a period equal to the greater of (A) the applicable preference period plus one day or (B) one year and one day following the payment. Notwithstanding the foregoing, the Servicer may commence any legal action that is not a bankruptcy, insolvency, liquidation or similar proceeding against the Issuer or the Co-Issuer or any of their properties and may take any action it deems appropriate at any time in any bankruptcy, insolvency, liquidation or similar proceeding and any other Proceeding voluntarily commenced by the Issuer or the Co-Issuer or involuntarily commenced against the Issuer or the Co-Issuer by anyone other than the Servicer or any

APP. 2406
Appx. 02453

Affiliate of the Servicer. The provisions of this Section 2(c)(i) shall survive termination of this Agreement.

(ii) The Servicer shall cause each sale or purchase of any Collateral Obligation or Eligible Investment to be conducted on an arm's-length basis.

(d)    The Servicer shall not act for the Issuer in any capacity except as provided in this Section 2.  In providing services hereunder, the Servicer may employ third parties, including its Affiliates, to render advice (including advice with respect to the servicing of the Collateral) and assistance; provided, however, that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties.  Notwithstanding any other provision of this Agreement, the Servicer shall not be required to take any action required of it pursuant to this Agreement or the Indenture if such action would constitute a violation of any law.

(e)    Notwithstanding any other provision of this Agreement or the Indenture, (i) any granted signatory powers or authority granted to the Servicer on behalf of the Issuer with respect to the Special Procedures Obligations (as defined in Annex 1) shall be conditioned upon the prior written approval of the Independent Advisor (as defined in Annex 1) and (ii) neither the Servicer nor any Affiliate of the Servicer shall have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to the Special Procedures Obligations without the prior written approval of the Independent Advisor.

3.    Brokerage.

The Servicer shall seek to obtain the best prices and execution for all orders placed with respect to the Collateral, considering all reasonable circumstances. Subject to the objective of obtaining best prices and execution, the Servicer may take into consideration research and other brokerage services furnished to the Servicer or its Affiliates by brokers and dealers which are not Affiliates of the Servicer. Such services may be used by the Servicer or its Affiliates in connection with its other servicing or advisory activities or operations. The Servicer may aggregate sales and purchase orders of securities placed with respect to the Collateral with similar orders being made simultaneously for other accounts serviced or managed by the Servicer or with accounts of the Affiliates of the Servicer, if in the Servicer's reasonable judgment such aggregation shall result in an overall economic benefit to the Issuer, taking into consideration the advantageous selling or purchase price, brokerage commission and other expenses. In the event that a sale or purchase of a Collateral Obligation or Eligible Investment (in accordance with the terms of the Indenture) occurs as part of any aggregate sales or purchase orders, the objective of the Servicer (and any of its Affiliates involved in such transactions) shall be to allocate the executions among the accounts in an equitable manner and consistent with its obligations hereunder and under applicable law.

In addition to the foregoing and subject to the provisions of Section 2 and the limitations of Section 5, the objective of obtaining best prices and execution and to the extent permitted by applicable law, the Servicer may, on behalf of the Issuer, direct the Trustee to acquire any and all of the Eligible Investments or other Collateral from, or sell Collateral Obligations or other Collateral to, the Initial Purchaser, the Trustee or any of their respective Affiliates, or any other firm.

**APP. 2407**
**Appx. 02454**

    4.    <u>Additional Activities of the Servicer</u>.

Nothing herein shall prevent the Servicer or any of its Affiliates from engaging in other businesses, or from rendering services of any kind to the Trustee, the Holders of the Securities, or any other Person or entity to the extent permitted by applicable law. Without prejudice to the generality of the foregoing, the Servicer and partners, directors, officers, employees and agents of the Servicer or its Affiliates may, among other things, and subject to any limits specified in the Indenture:

(a)    serve as directors (whether supervisory or managing), officers, partners, employees, agents, nominees or signatories for any issuer of any obligations included in the Collateral or their respective Affiliates, to the extent permitted by their Governing Instruments, as from time to time amended, or by any resolutions duly adopted by the Issuer, its Affiliates or any issuer of any obligations included in the Collateral or their respective Affiliates, pursuant to their respective Governing Instruments; <u>provided</u>, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Overcollateralization Ratio and each Interest Coverage Test; <u>provided</u>, <u>further</u>, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof;

(b)    receive fees for services of any nature rendered to the issuer of any obligations included in the Collateral or their respective Affiliates; <u>provided</u>, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Coverage Test; and <u>provided</u>, <u>further</u>, that if any portion of such services are related to the purchase by the Issuer of any obligations included in the Collateral, the portion of such fees relating to such obligations shall be applied to the purchase price of such obligations; and

(c)    be a secured or unsecured creditor of, or hold an equity interest in, the Issuer, its Affiliates or any issuer of any obligation included in the Collateral; <u>provided</u>, that in the reasonable judgment of the Servicer, such activity shall not have a material adverse effect on the enforceability of Collateral or the ability of the Issuer to comply with each Coverage Test; <u>provided</u>, <u>further</u>, that nothing in this paragraph shall be deemed to limit the duties of the Servicer set forth in Section 2 hereof.

It is understood that the Servicer and any of its Affiliates may engage in any other business and furnish servicing, investment management and advisory services to others, including Persons which may have policies similar to those followed by the Servicer with respect to the Collateral and which may own securities of the same class, or which are the same type, as the Collateral Obligations or other securities of the issuers of Collateral Obligations. The Servicer shall be free, in its sole discretion, to make recommendations to others, or effect transactions on behalf of itself or for others, which may be the same as or different from those effected with respect to the Collateral.

Unless the Servicer determines in its reasonable judgment that such purchase or sale is appropriate, the Servicer may refrain from directing the purchase or sale hereunder of securities issued by (i) Persons of which the Servicer, its Affiliates or any of its or their officers, directors or employees are directors or officers, (ii) Persons for which the Servicer or its Affiliates act as financial adviser or underwriter or (iii) Persons about which the Servicer or any of its Affiliates have information which the Servicer deems confidential or non-public or otherwise might prohibit it from trading such securities in accordance with applicable law. The Servicer shall not be obligated to have or pursue any particular strategy or opportunity with respect to the Collateral.

5.    Conflicts of Interest.

(a)    The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral from the Servicer or any of its Affiliates as principal or to sell an obligation to the Servicer or any of its Affiliates as principal unless (i) the Issuer shall have received from the Servicer such information relating to such acquisition or sale as it may reasonably require and shall have approved such acquisition, which approval shall not be unreasonably withheld, (ii) in the commercially reasonable judgment of the Servicer, such transaction is on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (iii) such transaction is permitted by the United States Investment Advisers Act of 1940, as amended.

(b)    The Servicer shall not direct the Trustee to acquire an obligation to be included in the Collateral directly from any account or portfolio for which the Servicer serves as servicer or investment adviser, or direct the Trustee to sell an obligation directly to any account or portfolio for which the Servicer serves as servicer or investment adviser unless such acquisition or sale is (i) in the commercially reasonable judgment of the Servicer, on terms no less favorable than would be obtained in a transaction conducted on an arm's length basis between third parties unaffiliated with each other and (ii) permitted by the United States Investment Advisers Act of 1940, as amended.

(c)    In addition, the Servicer shall not undertake any transaction described in this Section 5 unless such transaction is exempt from the prohibited transaction rules of ERISA and Section 4975 of the Code.

6.    Records; Confidentiality.

The Servicer shall maintain appropriate books of account and records relating to services performed hereunder, and such books of account and records shall be accessible for inspection by a representative of the Issuer, the Trustee, the Collateral Administrator, the Holders of the Securities and the Independent accountants appointed by the Issuer pursuant to the Indenture at a mutually agreed time during normal business hours and upon not less than three Business Days' prior notice.  At no time shall the Servicer make a public announcement concerning the issuance of the Notes or the Preference Shares, the Servicer's role hereunder or any other aspect of the transactions contemplated by this Agreement and the other Transaction Documents. The Servicer shall keep confidential any and all information obtained in connection with the services rendered hereunder and shall not disclose any such information to non-affiliated third parties except (i) with the prior written consent of the Issuer, (ii) such information as either Rating Agency shall reasonably request in connection with the rating of any Class of Securities, (iii) as required by law, regulation, court order or the rules or regulations of any self regulating organization, body or official having jurisdiction over the Servicer, (iv) to its professional advisers, (v) such information as shall have been publicly disclosed other than in violation of this Agreement, or (vi) such information that was or is obtained by the Servicer on a non-confidential basis; provided, that the Servicer does not know or have reason to know of any breach by such source of any confidentiality obligations with respect thereto.  For purposes of this Section 6, the Trustee, the Collateral Administrator and the Holders of the Securities shall in no event be considered "non-affiliated third parties."

Notwithstanding anything in this Agreement or the Indenture to the contrary, the Servicer, the Co-Issuers, the Trustee and the Holders of the Securities (and the beneficial owners thereof) (and each of their respective employees, representatives or other agents) may disclose to any and all Persons, without limitation of any kind, the U.S. tax treatment and U.S. tax structure of the transactions contemplated by this Agreement and all materials of any kind (including opinions or other tax analyses) that are provided to them relating to such U.S. tax treatment and U.S. tax structure, as such terms are defined under U.S. federal, state or local tax law.

7.    <u>Obligations of Servicer</u>.

Unless otherwise specifically required by any provision of the Indenture or this Agreement or by applicable law, the Servicer shall use its best reasonable efforts to ensure that no action is taken by it, and shall not intentionally or with reckless disregard take any action, which would (a) materially adversely affect the Issuer or the Co-Issuer for purposes of Cayman Islands law, United States federal or state law or any other law known to the Servicer to be applicable to the Issuer or the Co-Issuer, (b) not be permitted under the Issuer's Memorandum and Articles of Association or the Co-Issuer's Certificate of Incorporation or By-Laws, (c) violate any law, rule or regulation of any governmental body or agency having jurisdiction over the Issuer or the Co-Issuer including, without limitation, any Cayman Islands or United States federal, state or other applicable securities law the violation of which has or could reasonably be expected to have a material adverse effect on the Issuer, the Co-Issuer or any of the Collateral, (d) require registration of the Issuer, the Co-Issuer or the pool of Collateral as an "investment company" under the Investment Company Act, (e) cause the Issuer or the Co-Issuer to violate the terms of the Indenture, including, without limitation, any representations made by the Issuer or Co-Issuer therein, or any other agreement contemplated by the Indenture or (f) not be permitted by Annex 1 hereto and would subject the Issuer to U.S. federal or state income or franchise taxation or cause the Issuer to be engaged in a trade or business in the United States for U.S. federal income tax purposes. The Servicer covenants that it shall comply in all material respects with all laws and regulations applicable to it in connection with the performance of its duties under this Agreement and the Indenture. Notwithstanding anything in this Agreement to the contrary, the Servicer shall not be required to take any action under this Agreement or the Indenture if such action would violate any applicable law, rule, regulation or court order.

8.    <u>Compensation</u>.

(a)    The Issuer shall pay to the Servicer, for services rendered and performance of its obligations under this Agreement, the Servicing Fee, which shall be payable in such amounts and at such times as set forth in the Indenture. The provisions of the Indenture which relate to the amount and payment of the Servicing Fee shall not be amended without the written consent of the Servicer. If on any Payment Date there are insufficient funds to pay the Servicing Fee (and/or any other amounts due and payable to the Servicer) in full, the amount not so paid shall be deferred and shall be payable on such later Payment Date on which funds are available therefor as provided in the Indenture.

With respect to any Payment Date, the Servicer may, in its sole discretion, at any time waive a portion (or all) of its Servicing Fees then due and payable. All waived amounts will be paid to the Class II Preference Shares as Class II Preference Share Special Payments pursuant to the Indenture. For purposes of any calculation under this Agreement and the Indenture, the Servicer shall be deemed to have received the Servicing Fee in an amount equal to the sum of the Servicing Fee actually paid to the Servicer and the amount distributed to the Holders of the Class II Preference Shares as Class II Preference Share Special Payments.

In addition, notwithstanding anything set out above, the Servicer may, in its sole discretion waive all or any portion of the Subordinated Servicing Fee or Supplemental Servicing Fee, any funds representing the waived Subordinated Servicing Fees and Supplemental Servicing Fees to be retained in the Collection Account for distribution as either Interest Proceeds or Principal Proceeds (as determined by the Servicer) pursuant to the Priority of Payments.

(b)    The Servicer shall be responsible for the ordinary expenses incurred in the performance of its obligations under this Agreement, the Indenture and the other Transaction Documents; <u>provided</u>, <u>however</u>, that any extraordinary expenses incurred by the Servicer in the

-8-

performance of such obligations (including, but not limited to, any fees, expenses or other amounts payable to the Rating Agencies, the Collateral Administrator, the Trustee and the accountants appointed by the Issuer, the reasonable expenses incurred by the Servicer to employ outside lawyers or consultants reasonably necessary in connection with the evaluation, transfer or restructuring of any Collateral Obligation or other unusual matters arising in the performance of its duties under this Agreement and the Indenture, any reasonable expenses incurred by the Servicer in obtaining advice from outside counsel with respect to its obligations under this Agreement, brokerage commissions, transfer fees, registration costs, taxes and other similar costs and transaction related expenses and fees arising out of transactions effected for the Issuer's account and the portion allocated to the Issuer of any other fees and expenses that the Servicer customarily allocates among all of the funds or portfolios that it services or manages, including reasonable expenses incurred with respect to any compliance requirements, including, but not limited to, compliance with the requirements of the Sarbanes-Oxley Act, related solely to the ownership or holding of any Securities by HFP or any of its subsidiaries) shall be reimbursed by the Issuer to the extent funds are available therefor in accordance with and subject to the Priority of Payments and other limitations contained in the Indenture.

(c)    If this Agreement is terminated pursuant to Section 12, Section 14 or otherwise, the fees payable to the Servicer shall be prorated for any partial periods between Payment Dates during which this Agreement was in effect and shall be due and payable on the first Payment Date following the date of such termination and on any subsequent Payment Dates to the extent remaining unpaid and in accordance with, and to the extent provided in, the Indenture.

9.    Benefit of the Agreement.

The Servicer agrees that its obligations hereunder shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or the Holders of the Preference Shares, as applicable, as provided in the Indenture or the Preference Shares Paying Agency Agreement, as applicable.

10.    Limits of Servicer Responsibility; Indemnification.

(a)    The Servicer assumes no responsibility under this Agreement other than to render the services called for hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement in good faith and, subject to the standard of liability described in the next sentence, shall not be responsible for any action of the Issuer or the Trustee in following or declining to follow any advice, recommendation or direction of the Servicer. The Servicer, its directors, officers, stockholders, partners, agents and employees, and its Affiliates and their directors, officers, stockholders, partners, agents and employees, shall not be liable to the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, for any losses, claims, damages, judgments, assessments, costs or other liabilities (collectively, "Liabilities") incurred by the Issuer, the Co-Issuer, the Trustee, the Preference Shares Paying Agent, the Holders of the Securities or any other person, that arise out of or in connection with the performance by the Servicer of its duties under this Agreement and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement, except by reason of (i) acts or omissions constituting bad faith, willful misconduct, gross negligence or breach of fiduciary duty in the performance, or reckless disregard, of the obligations of the Servicer hereunder and under the terms of the other Transaction Documents made applicable to it pursuant to the terms of this Agreement or (ii) with respect to any information included in the Offering Memorandum in the section entitled "The Servicer" that contains any untrue statement of material fact or omits to state a material fact necessary in order to make the statements therein, in the light of the circumstances under which they were made, not misleading (the preceding clauses (i) and (ii) collectively being the "Servicer Breaches"). For the

avoidance of doubt, the Servicer shall have no duty to independently investigate any laws not otherwise known to it in connection with its obligations under this Agreement, the Indenture and the other Transaction Documents. The Servicer shall be deemed to have satisfied the requirements of the Indenture and this Agreement relating to not causing the Issuer to be treated as engaged in a trade or business in the United States for U.S. federal income tax purposes (including as those requirements relate to the acquisition (including manner of acquisition), ownership, enforcement, and disposition of Collateral) to the extent the Servicer complies with the requirements set forth in Annex 1 hereto (unless the Servicer knows that as a result of a change in law the investment restrictions set forth in Annex 1 may no longer be relied upon).

(b)    The Issuer shall indemnify and hold harmless (the Issuer in such case, the "Indemnifying Party") the Servicer, its directors, officers, stockholders, partners, agents and employees (such parties collectively in such case, the "Indemnified Parties") from and against any and all Liabilities, and shall reimburse each such Indemnified Party for all reasonable fees and expenses (including reasonable fees and expenses of counsel) (collectively, the "Expenses") as such Expenses are incurred in investigating, preparing, pursuing or defending any claim, action, proceeding or investigation with respect to any pending or threatened litigation (collectively, the "Actions"), caused by, or arising out of or in connection with, the issuance of the Securities, the transactions contemplated by the Offering Memorandum, the Indenture or this Agreement, and/or any action taken by, or any failure to act by, such Indemnified Party; provided, however, that no Indemnified Party shall be indemnified for any Liabilities or Expenses it incurs as a result of any acts or omissions by any Indemnified Party constituting Servicer Breaches. Notwithstanding anything contained herein to the contrary, the obligations of the Issuer under this Section 10 shall be payable solely out of the Collateral in accordance with, and subject to, the Priority of Payments and shall survive termination of this Agreement.

(c)    With respect to any claim made or threatened against an Indemnified Party, or compulsory process or request or other notice of any loss, claim, damage or liability served upon an Indemnified Party, for which such Indemnified Party is or may be entitled to indemnification under this Section 10, such Indemnified Party shall (or with respect to Indemnified Parties that are directors, officers, stockholders, agents or employees of the Servicer, the Servicer shall cause such Indemnified Party to):

(i)    give written notice to the Indemnifying Party of such claim within ten (10) days after such Indemnified Party's receipt of actual notice that such claim is made or threatened, which notice to the Indemnifying Party shall specify in reasonable detail the nature of the claim and the amount (or an estimate of the amount) of the claim; provided, however, that the failure of any Indemnified Party to provide such notice to the Indemnifying Party shall not relieve the Indemnifying Party of its obligations under this Section 10 unless the Indemnifying Party is materially prejudiced or otherwise forfeits rights or defenses by reason of such failure;

(ii)    at the Indemnifying Party's expense, provide the Indemnifying Party such information and cooperation with respect to such claim as the Indemnifying Party may reasonably require, including, but not limited to, making appropriate personnel available to the Indemnifying Party at such reasonable times as the Indemnifying Party may request;

(iii)    at the Indemnifying Party's expense, cooperate and take all such steps as the Indemnifying Party may reasonably request to preserve and protect any defense to such claim;

APP. 2412
Appx. 02459

(iv)    in the event suit is brought with respect to such claim, upon reasonable prior notice, afford to the Indemnifying Party the right, which the Indemnifying Party may exercise in its sole discretion and at its expense, to participate in the investigation, defense and settlement of such claim;

(v)    neither incur any material expense to defend against nor release or settle any such claim or make any admission with respect thereto (other than routine or incontestable admissions or factual admissions the failure to make which would expose such Indemnified Party to unindemnified liability) nor permit a default or consent to the entry of any judgment in respect thereof, in each case without the prior written consent of the Indemnifying Party; and

(vi)    upon reasonable prior notice, afford to the Indemnifying Party the right, in its sole discretion and at its sole expense, to assume the defense of such claim, including, but not limited to, the right to designate counsel reasonably acceptable to the Indemnified Party and to control all negotiations, litigation, arbitration, settlements, compromises and appeals of such claim; provided, that if the Indemnifying Party assumes the defense of such claim, it shall not be liable for any fees and expenses of counsel for any Indemnified Party incurred thereafter in connection with such claim except that if such Indemnified Party reasonably determines that counsel designated by the Indemnifying Party has a conflict of interest in connection with its representation of such Indemnified Party, such Indemnifying Party shall pay the reasonable fees and disbursements of one counsel (in addition to any local counsel) separate from its own counsel for all Indemnified Parties in connection with any one action or separate but similar or related actions in the same jurisdiction arising out of the same general allegations or circumstances; provided, further, that prior to entering into any final settlement or compromise, such Indemnifying Party shall seek the consent of the Indemnified Party and use its commercially reasonable efforts in the light of the then prevailing circumstances (including, without limitation, any express or implied time constraint on any pending settlement offer) to obtain the consent of such Indemnified Party as to the terms of settlement or compromise.  If an Indemnified Party does not consent to the settlement or compromise within a reasonable time under the circumstances, the Indemnifying Party shall not thereafter be obligated to indemnify the Indemnified Party for any amount in excess of such proposed settlement or compromise.

(d)    In the event that any Indemnified Party waives its right to indemnification hereunder, the Indemnifying Party shall not be entitled to appoint counsel to represent such Indemnified Party nor shall the Indemnifying Party reimburse such Indemnified Party for any costs of counsel to such Indemnified Party.

(e)    The U.S. federal securities laws impose liabilities under certain circumstances on persons who act in good faith; accordingly, notwithstanding any other provision of this Agreement, nothing herein shall in any way constitute a waiver or limitation of any rights which the Issuer or the Holders of the Securities may have under any U.S. federal securities laws.

11.    No Partnership or Joint Venture.

The Issuer and the Servicer are not partners or joint venturers with each other and nothing herein shall be construed to make them such partners or joint venturers or impose any liability as such on either of them. The Servicer's relation to the Issuer shall be deemed to be that of an independent contractor.

12. <u>Term; Termination</u>.

(a) This Agreement shall commence as of the date first set forth above and shall continue in force and effect until the first of the following occurs: (i) the payment in full of the Notes, the termination of the Indenture in accordance with its terms and the redemption in full of the Preference Shares; (ii) the liquidation of the Collateral and the final distribution of the proceeds of such liquidation to the Holders of the Securities; or (iii) the termination of this Agreement in accordance with subsection (b), (c), (d) or (e) of this Section 12 or Section 14 of this Agreement.

(b) Subject to Section 12(e) below, the Servicer may resign, upon 90 days' written notice to the Issuer (or such shorter notice as is acceptable to the Issuer). If the Servicer resigns, the Issuer agrees to appoint a successor servicer to assume such duties and obligations in accordance with Section 12(e).

(c) This Agreement shall be automatically terminated in the event that the Issuer determines in good faith that the Issuer or the pool of Collateral has become required to be registered under the provisions of the Investment Company Act, and the Issuer notifies the Servicer thereof.

(d) If this Agreement is terminated pursuant to this Section 12, neither party shall have any further liability or obligation to the other, except as provided in Sections 2(c)(i), 8, 10 and 15 of this Agreement.

(e) No removal or resignation of the Servicer shall be effective unless:

(i) (A) the Issuer appoints a successor servicer at the written direction of a Majority of the Preference Shares (excluding any Preference Shares held by the retiring Servicer, any of its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority other than, with respect to the Class II Preference Shares owned by HFP or its subsidiaries; provided that, with respect to the voting authority of Class II Preference Shares owned by HFP or any of its subsidiaries, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP or such subsidiaries and certified in writing to the Preference Shares Paying Agent by any of the "independent directors" of HFP) of HFP or such subsidiaries) (each such non-excluded Preference Share, a "<u>Voting Preference Share</u>"), (B) such successor servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor servicer is not objected to within 30 days after notice of such succession by either (x) a Super Majority of the Controlling Class of Notes (excluding any Notes held by the retiring Servicer, its Affiliates or any account over which the retiring Servicer or its Affiliates have discretionary voting authority other than HFP; provided that, with respect to the voting authority of Notes owned by HFP or any of its subsidiaries, such vote shall not be excluded only if such vote is determined by a vote of the majority of the "independent directors" (determined in accordance with the governing documents of HFP or such subsidiaries and certified in writing to the Trustee by any of the "independent directors" of HFP) of HFP or such subsidiaries) (each such non-excluded Note, a "<u>Voting Note</u>") or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single class); or

APP. 2414
Appx. 02461

       (ii)     if a Majority of the Voting Preference Shares has nominated two or more successor servicers that have been objected to pursuant to the preceding clause (i)(C) or has failed to appoint a successor servicer that has not been objected to pursuant to the preceding clause (i)(C) within 60 days of the date of notice of such removal or resignation of the Servicer, (A) the Issuer appoints a successor servicer at the written direction of a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes), (B) such successor servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture and (C) such successor servicer is not objected to within 30 days after notice of such succession by either (x) a Majority of the Voting Preference Shares (voting as a single class) or (y) a Majority in Aggregate Outstanding Amount of the Voting Notes (voting as a single class); provided, that if a Majority of the Voting Preference Shares and a Super Majority of the Controlling Class (excluding any Notes that are not Voting Notes) have each nominated two or more successor servicers that have been objected to pursuant to the preceding clauses (i)(C) and (ii)(C) or have otherwise failed to appoint a successor servicer that has not been objected to pursuant to the preceding clause (i)(C) or (ii)(C) within 120 days of the date of notice of such removal or resignation of the Servicer, (A) any Holder of the Controlling Class (excluding any Notes that are not Voting Notes), any Holder of Voting Preference Shares or the Trustee petitions a court of competent authority to appoint a successor servicer, (B) such court appoints a successor servicer and (C) such successor servicer has agreed in writing to assume all of the retiring Servicer's duties and obligations pursuant to this Agreement and the Indenture.

       In addition, any successor servicer must be an established institution which (i) has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer hereunder, (ii) is legally qualified and has the capacity to act as Servicer hereunder, as successor to the Servicer under this Agreement in the assumption of all of the responsibilities, duties and obligations of the Servicer hereunder and under the applicable terms of the Indenture, (iii) shall not cause the Issuer or the pool of Collateral to become required to register under the provisions of the Investment Company Act, (iv) shall perform its duties as successor servicer under this Agreement and the Indenture without causing the Issuer, the Co-Issuer or any Holder of Preference Shares to become subject to tax in any jurisdiction where such successor servicer is established as doing business and (v) each Rating Agency has confirmed that the appointment of such successor servicer shall not cause its then-current rating of any Class of Notes to be reduced or withdrawn.  No compensation payable to a successor servicer from payments on the Collateral shall be greater than that paid to the retiring Servicer without the prior written consent of a Super Majority of the Controlling Class of Notes, a Majority of the Noteholders and a Majority of the Preference Shares.  The Issuer, the Trustee and the successor servicer shall take such action (or cause the retiring Servicer to take such action) consistent with this Agreement and the terms of the Indenture applicable to the Servicer, as shall be necessary to effectuate any such succession.

       (f)     In the event of removal of the Servicer pursuant to this Agreement, the Issuer shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Issuer or, to the extent so provided in the Indenture, the Trustee may by notice in writing to the Servicer as provided under this Agreement terminate all the rights and obligations of the Servicer under this Agreement (except those that survive termination pursuant to Section 12(d) above). Upon expiration of the applicable notice period with respect to termination specified in this Section 12 or Section 14 of this Agreement, as applicable, all authority and power of the Servicer under this Agreement, whether with respect to the Collateral or otherwise, shall automatically and without further action by any person or entity pass to and be vested in the successor servicer upon the appointment thereof.

-13-

13.    Delegation; Assignments.

This Agreement, and any obligations or duties of the Servicer hereunder, shall not be delegated by the Servicer, in whole or in part, except to any entity that (i) is controlled by any of James Dondero, Mark Okada and Todd Travers and (ii) is one in which any of James Dondero, Mark Okada and Todd Travers is involved in the day to day management and operations (and in any such case pursuant to an instrument of delegation in form and substance satisfactory to the Issuer), without the prior written consent of the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares and, notwithstanding any such consent, no delegation of obligations or duties by the Servicer (including, without limitation, to an entity described above) shall relieve the Servicer from any liability hereunder.

Subject to Section 12, any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, a Majority of Noteholders and the Holders of a Majority of the Preference Shares (excluding Notes and Preference Shares held by the Servicer or any of its Affiliates other than HFP) and (ii) the Rating Condition is satisfied with respect to any such assignment. Any assignment consented to by the Issuer, a Majority of Noteholders and the Holders of Preference Shares shall bind the assignee hereunder in the same manner as the Servicer is bound. In addition, the assignee shall execute and deliver to the Issuer and the Trustee a counterpart of this Agreement naming such assignee as Servicer. Upon the execution and delivery of such a counterpart by the assignee and consent thereto by the Issuer, a Majority of Noteholders and the Holders of the Preference Shares, the Servicer shall be released from further obligations pursuant to this Agreement, except with respect to its obligations arising under Section 10 of this Agreement prior to such assignment and except with respect to its obligations under Sections 2(c)(i) and 15 hereof. This Agreement shall not be assigned by the Issuer without the prior written consent of the Servicer and the Trustee, except in the case of assignment by the Issuer to (i) an entity which is a successor to the Issuer permitted under the Indenture, in which case such successor organization shall be bound hereunder and by the terms of said assignment in the same manner as the Issuer is bound thereunder or (ii) the Trustee as contemplated by the Indenture. In the event of any assignment by the Issuer, the Issuer shall cause its successor to execute and deliver to the Servicer such documents as the Servicer shall consider reasonably necessary to effect fully such assignment. The Servicer hereby consents to the matters set forth in Article 15 of the Indenture.

14.    Termination by the Issuer for Cause.

Subject to Section 12(e) above, this Agreement shall be terminated and the Servicer shall be removed by the Issuer for cause upon 10 days' prior written notice to the Servicer and upon written notice to the Holders of the Securities as set forth below, but only if directed to do so by the Trustee acting at the direction of (1) a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) or (2) a Majority of the Voting Preference Shares (excluding any Preference Shares that are not Voting Preference Shares). For purposes of determining "cause" with respect to any such termination of this Agreement, such term shall mean any one of the following events:

(a)    the Servicer willfully breaches in any respect, or takes any action that it knows violates in any respect, any provision of this Agreement or any terms of the Indenture applicable to it;

(b)    the Servicer breaches in any material respect any provision of this Agreement or any terms of the Indenture or the Collateral Administration Agreement applicable to it, or any representation, warranty, certification or statement given in writing by the Servicer shall prove to have been incorrect in any material respect when made or given, and the Servicer fails to cure such breach

APP. 2416
Appx. 02463

or take such action so that the facts (after giving effect to such action) conform in all material respects to such representation, warranty, certificate or statement, in each case within 30 days of becoming aware of, or receiving notice from, the Trustee of, such breach or materially incorrect representation, warranty, certificate or statement;

(c)     the Servicer is wound up or dissolved (other than a dissolution in which the remaining members elect to continue the business of the Servicer in accordance with its Governing Instruments) or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer, or the Servicer (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Servicer or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Servicer and continue undismissed for 60 days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Servicer without such authorization, application or consent and are approved as properly instituted and remain undismissed for 60 days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for 60 days;

(d)     the occurrence of any Event of Default under the Indenture that results from any breach by the Servicer of its duties under the Indenture or this Agreement, which breach or default is not cured within any applicable cure period; or

(e)     (x) the occurrence of an act by the Servicer related to its activities in any servicing, securities, financial advisory or other investment business that constitutes fraud, (y) the Servicer being indicted, or any of its principals being convicted, of a felony criminal offense related to its activities in any servicing, securities, financial advisory or other investment business or (z) the Servicer being indicted for, adjudged liable in a civil suit for, or convicted of a violation of the Securities Act or any other United States Federal securities law or any rules or regulations thereunder.

If any of the events specified in this Section 14 shall occur, the Servicer shall give prompt written notice thereof to the Issuer, the Trustee and the Holders of all outstanding Notes and Preference Shares upon the Servicer's becoming aware of the occurrence of such event.

15.     Action Upon Termination.

(a)     From and after the effective date of termination of this Agreement, the Servicer shall not be entitled to compensation for further services hereunder, but shall be paid all compensation accrued to the date of termination, as provided in Section 8 hereof, and shall be entitled to receive any amounts owing under Section 10 hereof.  Upon the effective date of termination of this Agreement, the Servicer shall as soon as practicable:

(i)     deliver to the Issuer all property and documents of the Trustee or the Issuer or otherwise relating to the Collateral then in the custody of the Servicer; and

APP. 2417
Appx. 02464

       (ii)     deliver to the Trustee and the Preference Shares Paying Agent an accounting with respect to the books and records delivered to the Trustee and the Preference Shares Paying Agent or the successor servicer appointed pursuant to Section 12(e) hereof.

Notwithstanding such termination, the Servicer shall remain liable to the extent set forth herein (but subject to Section 10 hereof) for its acts or omissions hereunder arising prior to termination and for any expenses, losses, damages, liabilities, demands, charges and claims (including reasonable attorneys' fees) in respect of or arising out of a breach of the representations and warranties made by the Servicer in Section 16(b) hereof or from any failure of the Servicer to comply with the provisions of this Section 15.

       (b)     The Servicer agrees that, notwithstanding any termination of this Agreement, it shall reasonably cooperate in any Proceeding arising in connection with this Agreement, the Indenture or any of the Collateral (excluding any such Proceeding in which claims are asserted against the Servicer or any Affiliate of the Servicer) upon receipt of appropriate indemnification and expense reimbursement.

      16.     <u>Representations and Warranties</u>.

       (a)     The Issuer hereby represents and warrants to the Servicer as follows:

       (i)     The Issuer has been duly incorporated and is validly existing under the laws of the Cayman Islands, has full power and authority to own its assets and the securities proposed to be owned by it and included in the Collateral and to transact the business in which it is presently engaged and is duly qualified under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of its obligations under this Agreement, the Indenture or the Securities would require, such qualification, except for failures to be so qualified, authorized or licensed that would not in the aggregate have a material adverse effect on the business, operations, assets or financial condition of the Issuer.

       (ii)     The Issuer has full power and authority to execute, deliver and perform its obligations pursuant to this Agreement, the other Transaction Documents and the Securities and all obligations required hereunder and thereunder and has taken all necessary action to authorize this Agreement, the other Transaction Documents and the Securities on the terms and conditions hereof and thereof and the execution by the Issuer, delivery and performance of its obligations pursuant to this Agreement, the other Transaction Documents and the Securities and the performance of all obligations imposed upon it hereunder and thereunder.  No consent of any other person including, without limitation, shareholders and creditors of the Issuer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority, other than those that may be required under state securities or "blue sky" laws and those that have been or shall be obtained in connection with the other Transaction Documents and the Securities is required by the Issuer in connection with this Agreement, the other Transaction Documents and the Securities or the execution, delivery, performance, validity or enforceability of this Agreement, the other Transaction Documents and the Securities or the obligations imposed upon it hereunder or thereunder. This Agreement constitutes, and each instrument or document required hereunder, when executed and delivered hereunder, shall constitute, the legally valid and binding obligation of the Issuer enforceable against

APP. 2418

Appx. 02465

the Issuer in accordance with its terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii)    The execution by the Issuer, delivery and performance of this Agreement and the documents and instruments required hereunder shall not violate any provision of any existing law or regulation binding on the Issuer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Issuer, or the Governing Instruments of, or any securities issued by, the Issuer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Issuer is a party or by which the Issuer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Issuer, and shall not result in or require the creation or imposition of any lien on any of its property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking (other than the lien of the Indenture).

(iv)    The Issuer is not in violation of its Governing Instruments or in breach or violation of or in default under the Indenture or any contract or agreement to which it is a party or by which it or any of its assets may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Issuer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement or the performance by the Issuer of its duties hereunder.

(v)    True and complete copies of the Indenture and the Issuer's Governing Instruments have been delivered to the Servicer.

The Issuer agrees to deliver a true and complete copy of each amendment to the documents referred to in Section 16(a)(v) above to the Servicer as promptly as practicable after its adoption or execution.

(b)    The Servicer hereby represents and warrants to the Issuer as follows:

(i)    The Servicer is a limited partnership duly organized and validly existing and in good standing under the laws of the State of Delaware, has full power and authority to own its assets and to transact the business in which it is currently engaged and is duly qualified and in good standing under the laws of each jurisdiction where its ownership or lease of property or the conduct of its business requires, or the performance of this Agreement would require such qualification, except for those jurisdictions in which the failure to be so qualified, authorized or licensed would not have a material adverse effect on the business, operations, assets or financial condition of the Servicer or on the ability of the Servicer to perform its obligations under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

(ii)    The Servicer has full power and authority to execute, deliver and perform this Agreement and all obligations required hereunder and under the provisions of the other Transaction Documents applicable to the Servicer, and has taken all necessary action to authorize this Agreement on the terms and conditions hereof and the execution, delivery and performance of this Agreement and all obligations required

APP. 2419
Appx. 02466

hereunder and under the terms of the other Transaction Documents applicable to the Servicer. No consent of any other person, including, without limitation, creditors of the Servicer, and no license, permit, approval or authorization of, exemption by, notice or report to, or registration, filing or declaration with, any governmental authority is required by the Servicer in connection with this Agreement or the execution, delivery, performance, validity or enforceability of this Agreement or the obligations required hereunder or under the terms of the other Transaction Documents applicable to the Servicer. This Agreement has been, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall be, executed and delivered by a duly authorized partner of the Servicer, and this Agreement constitutes, and each instrument and document required hereunder or under the terms of the other Transaction Documents applicable to the Servicer when executed and delivered by the Servicer hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall constitute, the valid and legally binding obligations of the Servicer enforceable against the Servicer in accordance with their terms, subject to (a) the effect of bankruptcy, insolvency or similar laws affecting generally the enforcement of creditors' rights and (b) general equitable principles.

(iii)    The execution, delivery and performance of this Agreement and the terms of the other Transaction Documents applicable to the Servicer and the documents and instruments required hereunder or under the terms of the other Transaction Documents applicable to the Servicer shall not violate or conflict with any provision of any existing law or regulation binding on or applicable to the Servicer, or any order, judgment, award or decree of any court, arbitrator or governmental authority binding on the Servicer, or the Governing Instruments of, or any securities issued by the Servicer or of any mortgage, indenture, lease, contract or other agreement, instrument or undertaking to which the Servicer is a party or by which the Servicer or any of its assets may be bound, the violation of which would have a material adverse effect on the business, operations, assets or financial condition of the Servicer or its ability to perform its obligations under this Agreement and the provisions of the other Transaction Documents applicable to the Servicer, and shall not result in or require the creation or imposition of any lien on any of its material property, assets or revenues pursuant to the provisions of any such mortgage, indenture, lease, contract or other agreement, instrument or undertaking.

(iv)    There is no charge, investigation, action, suit or proceeding before or by any court pending or, to the best knowledge of the Servicer, threatened that, if determined adversely to the Servicer, would have a material adverse effect upon the performance by the Servicer of its duties under, or on the validity or enforceability of, this Agreement and the provisions of the other Transaction Documents applicable to the Servicer.

(v)    The Servicer is a registered investment adviser under the Investment Advisers Act.

(vi)    The Servicer is not in violation of its Governing Instruments or in breach or violation of or in default under any contract or agreement to which it is a party or by which it or any of its property may be bound, or any applicable statute or any rule, regulation or order of any court, government agency or body having jurisdiction over the Servicer or its properties, the breach or violation of which or default under which would have a material adverse effect on the validity or enforceability of this Agreement

**APP. 2420**
**Appx. 02467**

or the provisions of the other Transaction Documents applicable to the Servicer, or the performance by the Servicer of its duties hereunder.

    17.   <u>Notices</u>.

    Unless expressly provided otherwise herein, all notices, requests, demands and other communications required or permitted under this Agreement shall be in writing (including by telecopy) and shall be deemed to have been duly given, made and received when delivered against receipt or upon actual receipt of registered or certified mail, postage prepaid, return receipt requested, or, in the case of telecopy notice, when received in legible form, addressed as set forth below:

    (a) If to the Issuer:

    Aberdeen Loan Funding, Ltd.
c/o Walkers SPV Limited
Walker House
87 Mary Street
George Town, Grand Cayman, KY1-9002, Cayman Islands
Telephone: (345) 945-3727
Telecopy: (345) 945-4757
Attention: The Directors

    (b) If to the Servicer:

    Highland Capital Management, L.P.
Two Galleria Tower
13455 Noel Road, Suite 1300
Dallas, Texas 75240
Telephone: (972) 628-4100
Telecopy: (972) 628-4147
Attention: James Dondero

    (c) If to the Trustee:

    State Street Bank and Trust Company
200 Clarendon Street
Mail Code: EUC-108
Boston, Massachusetts 02116
Telecopy: (617) 351-4358
Attention: CDO Services Group

    (d) If to the Noteholders:

    In accordance with Section 14.3 of the Indenture, at their respective addresses set forth on the Note Register.

    (e) If to the Holders of the Preference Shares:

    In accordance with Section 14.3 of the Indenture, to the Preference Shares Paying Agent at the address identified therein.

**APP. 2421**
**Appx. 02468**

(f) if to the Rating Agencies:

In accordance with Section 14.3 of the Indenture, to the Rating Agencies at the address identified therein.

Any party may alter the address or telecopy number to which communications or copies are to be sent by giving notice of such change of address in conformity with the provisions of this Section 17 for the giving of notice.

18.    <u>Binding Nature of Agreement; Successors and Assigns</u>.

This Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, personal representatives, successors and permitted assigns as provided herein.  The Servicer hereby consents to the collateral assignment of this Agreement as provided in the Indenture and further agrees that the Trustee may enforce the Servicer's obligations hereunder.

19.    <u>Entire Agreement</u>.

This Agreement contains the entire agreement and understanding among the parties hereto with respect to the subject matter hereof, and supersedes all prior and contemporaneous agreements, understandings, inducements and conditions, express or implied, oral or written, of any nature whatsoever with respect to the subject matter hereof.  The express terms hereof control and supersede any course of performance and/or usage of the trade inconsistent with any of the terms hereof.  This Agreement may not be modified or amended other than by an agreement in writing executed by the parties hereto and in accordance with the terms of Section 15.1(h) of the Indenture.

20.    <u>Conflict with the Indenture</u>.

Subject to the last two sentences of Section 2(a)(i), in the event that this Agreement requires any action to be taken with respect to any matter and the Indenture requires that a different action be taken with respect to such matter, and such actions are mutually exclusive, the provisions of the Indenture in respect thereof shall control.

21.    <u>Priority of Payments</u>.

The Servicer agrees that the payment of all amounts to which it is entitled pursuant to this Agreement and the Indenture shall be due and payable only in accordance with the priorities set forth in the Indenture and only to the extent funds are available for such payments in accordance with such priorities.

22.    <u>Governing Law</u>.

**THIS AGREEMENT SHALL BE CONSTRUED IN ACCORDANCE WITH AND GOVERNED BY THE LAWS OF THE STATE OF NEW YORK, WITHOUT REFERENCE TO ITS PROVISIONS THAT WOULD RESULT IN THE APPLICATION OF THE LAWS OF ANOTHER JURISDICTION.**

23.    <u>Indulgences Not Waivers</u>.

Neither the failure nor any delay on the part of any party hereto to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver thereof, nor shall any single or

**APP. 2422**
**Appx. 02469**

partial exercise of any right, remedy, power or privilege preclude any other or further exercise of the same or of any other right, remedy, power or privilege, nor shall any waiver of any right, remedy, power or privilege with respect to any occurrence be construed as a waiver of such right, remedy, power or privilege with respect to any other occurrence. No waiver shall be effective unless it is in writing and is signed by the party asserted to have granted such waiver.

24.    Costs and Expenses.

Except as may otherwise be agreed in writing, the costs and expenses (including the fees and disbursements of counsel and accountants) incurred by each party in connection with the negotiation and preparation of and the execution of this Agreement, and all matters incident thereto, shall be borne by such party.

25.    Titles Not to Affect Interpretation.

The titles of paragraphs and subparagraphs contained in this Agreement are for convenience only, and they neither form a part of this Agreement nor are they to be used in the construction or interpretation hereof.

26.    Execution in Counterparts.

This Agreement may be executed in any number of counterparts by facsimile or other written form of communication, each of which shall be deemed to be an original as against any party whose signature appears thereon, and all of which shall together constitute one and the same instrument. This Agreement shall become binding when one or more counterparts hereof, individually or taken together, shall bear the signatures of all of the parties reflected hereon as the signatories.

27.    Provisions Separable.

In case any provision in this Agreement shall be invalid, illegal or unenforceable as written, such provision shall be construed in the manner most closely resembling the apparent intent of the parties with respect to such provision so as to be valid, legal and enforceable; provided, however, that if there is no basis for such a construction, such provision shall be ineffective only to the extent of such invalidity, illegality or unenforceability and, unless the ineffectiveness of such provision destroys the basis of the bargain for one of the parties to this Agreement, the validity, legality and enforceability of the remaining provisions hereof or thereof shall not in any way be affected or impaired thereby.

28.    Number and Gender.

Words used herein, regardless of the number and gender specifically used, shall be deemed and construed to include any other number, singular or plural, and any other gender, masculine, feminine or neuter, as the context requires.

29.    Written Disclosure Statement.

The Issuer and the Trustee acknowledge receipt of Part II of the Servicer's Form ADV filed with the Securities and Exchange Commission, as required by Rule 204-3 under the Investment Advisers Act, more than 48 hours prior to the date of execution of this Agreement.

APP. 2423
Appx. 02470

30.    Miscellaneous.

(a)    In the event that any vote is solicited with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, shall vote or refrain from voting any such security in any manner permitted by the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.  In addition, with respect to any Defaulted Collateral Obligation, the Servicer, on behalf of the Issuer, may instruct the trustee for such Defaulted Collateral Obligation to enforce the Issuer's rights under the Underlying Instruments governing such Defaulted Collateral Obligation and any applicable law, rule or regulation in any manner permitted under the Indenture that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.  In the event any Offer is made with respect to any Collateral Obligation, the Servicer, on behalf of the Issuer, may take such action as is permitted by the Indenture and that the Servicer has determined in its reasonable judgment shall be in the best interests of the Holders of the Securities.

(b)    In connection with taking or omitting any action under the Indenture or this Agreement, the Servicer may consult with counsel and may rely in good faith on the advice of such counsel or any opinion of counsel.

Any corporation, partnership or limited liability company into which the Servicer may be merged or converted or with which it may be consolidated, or any corporation, partnership or limited liability company resulting from any merger, conversion or consolidation to which the Servicer shall be a party, or any corporation, partnership or limited liability company succeeding to all or substantially all of the asset servicing and collateral management business of the Servicer, shall be the successor to the Servicer without any further action by the Servicer, the Co-Issuers, the Trustee, the Preference Shares Paying Agent , the Holders of the Securities or any other person or entity.

31.    Limitation of Liabilities.

The Issuer's obligations hereunder are solely the corporate obligations of the Issuer and the Servicer shall not have any recourse to any of the directors, officers, shareholders, members or incorporators of the Issuer with respect to any claims, losses, damages, liabilities, indemnities or other obligations in connection with any transactions contemplated hereby.  The obligations of the Issuer hereunder shall be limited to the net proceeds of the Collateral, if any, and following realization of the Collateral and its application in accordance with the Indenture, any outstanding obligations of the Issuer hereunder shall be extinguished and shall not thereafter revive.  The provisions of this section shall survive termination of this Agreement.

APP. 2424
Appx. 02471

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
    as Servicer

BY: STRAND ADVISORS, INC.,
    as General Partner

By:_____
Name:
Title:

ABERDEEN LOAN FUNDING, LTD.,
    as Issuer

By:_____
Name:
Title:

Servicing Agreement

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first written above.

HIGHLAND CAPITAL MANAGEMENT, L.P.,
as Servicer

BY: STRAND ADVISORS, INC.,
as General Partner

By:_____
Name:
Title:

ABERDEEN LOAN FUNDING, LTD.,
as Issuer

By:_____
Name:  **John Cullinane**
Title:  Director

Servicing Agreement

**ANNEX 1**

Certain Asset Acquisition Provisions

Unless otherwise noted, references to the Issuer in this Annex 1 include the Servicer and any other person acting on the Issuer's behalf.  Capitalized terms used but not defined herein will have the meanings ascribed to them in the Indenture.

For purposes of this Annex 1,

"Affiliate" means, with respect to a specified Person, (a) any other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by, or is under common control with, the specified Person and (b) any Person that is a member, director, officer or employee of (i) the specified Person or (ii) a Person described in clause (a) of this definition; and

"Person" means an individual, a corporation, a limited liability company, a partnership, an association, a trust or any other entity or organization, including a government or political subdivision or an agency or instrumentality thereof.

Section I.    General Investment Restrictions.

Except as may otherwise be provided in this Annex 1, the Issuer (and the Servicer acting on the Issuer's behalf) shall only purchase debt securities, interests in loans and other assets (each a "Portfolio Obligation") only in secondary-market transactions and shall not engage in any lending or underwriting activities or otherwise participate in the structuring or origination of any Portfolio Obligation.

A.    Communications and Negotiations.

1.    The Issuer will not have any communications or negotiations with the obligor of a Portfolio Obligation or a Reference Obligation (directly or indirectly through an intermediary such as the seller of such Portfolio Obligation or the Synthetic Security) in connection with the issuance or funding of such Portfolio Obligation or Reference Obligation or commitments with respect thereto, except for communications of an immaterial nature or customary due diligence communications; provided, that the Servicer may provide comments as to mistakes or inconsistencies in loan documents (including with respect to any provisions that are inconsistent with the terms and conditions of purchase of the loan by the Issuer).

2.    By way of example, permitted due diligence activities may include, but are not limited to, (a) attendance at an obligor's general "roadshow" or other presentations to investment professionals, (b) direct private discussions with personnel of the obligor, arranged by a sponsor, lead bank or other arranger, and (c) other due diligence activities of the kind customarily performed by offerees of  the type of Portfolio Obligation being offered, but may not include any negotiations

Annex 1-1

OHS West:260399223.3

with the obligor, employees or agents of the obligor of any terms or conditions of the Portfolio Obligation being offered.

3.    Negotiations between the Servicer and the underwriter, placement agent or broker of a Portfolio Obligation are permitted solely to the extent that they are limited to responses to customary pre-offering period and offering period inquiries by the underwriter or placement agent (e.g., "If we offered you 10-year senior subordinated bonds of XYZ company, what spread would it require to interest you?" or "If you will not buy the bonds as offered, would you buy if we convinced the obligor to add a fixed charge coverage test?"). For purposes of this Section I.A., "negotiations" shall not include (i) commenting on offering documents to an unrelated underwriter or placement agent when the ability to comment was generally available to other offerees, or (ii) communicating certain objective criteria (such as the minimum yield or maturity) the Issuer generally uses in purchasing the relevant type of Portfolio Obligation.

4.    The Issuer may consent or otherwise act with respect to amendments, supplements or other modifications of the terms of any Portfolio Obligation (other than a Subsidiary Obligation (as defined in Section III)) requiring consent or action after the date on which any such Portfolio Obligation is acquired by the Issuer if (a) such amendment, supplement or modification would not constitute a Significant Modification (as defined below), (b) (i) in the reasonable judgment of the Servicer, the obligor is in financial distress and such change in terms is desirable to protect the Issuer's interest and (ii) the Portfolio Obligation is described in <u>clause 5(b)</u> of this Section I.A., (c) the amendment or modification would not be treated as the acquisition of a new Portfolio Obligation under <u>paragraph 5</u> of this Section I.A., or (d) otherwise, if it has received advice of counsel that its involvement in such amendment, supplement or modification will not cause the Issuer to be treated as engaged in a trade or business within the United States.

A "<u>Significant Modification</u>" means any amendment, supplement or other modification that involves (a) a change in the stated maturity or a change in the timing of any material payment of any Portfolio Obligation (including deferral of an interest payment), that would materially alter the weighted average life of the Portfolio Obligation, (b) any change (whether positive or negative) in the yield on the Portfolio Obligation immediately prior to the modification in excess of the greater of (i) 25 basis points or (ii) 5 percent of such unmodified yield, (c) any change involving a material new extension of credit, (d) a change in the obligor of any Portfolio Obligation, or (e) a material change in the collateral or security for any Portfolio Obligation, including the addition or deletion of a co-obligor or guarantor that results in a material change in payment expectations (all as determined for purposes of section 1001 of the Code).

5.    In the event the Issuer owns an interest in a Portfolio Obligation the terms of which are subsequently amended or modified, or in the case of a workout situation not described in Section III hereof, which Portfolio Obligation is

OHS West:260399223.3

subsequently exchanged for new obligations or other securities of the obligor of the Portfolio Obligation, such amendments or modifications or exchange will not be treated as the acquisition of an interest in a new Portfolio Obligation for purposes of this Annex 1, provided, that (a) the Issuer does not, directly or indirectly (through the Servicer or otherwise), seek the amendments or modifications or the exchange, or participate in negotiating the amendments or modifications or the exchange, and (b) at the time of original acquisition of the interest in the Portfolio Obligation, it was not reasonably anticipated that the terms of the Portfolio Obligation would, pursuant to a workout or other negotiation, subsequently be amended or modified.

B.    Fees. The Issuer will not earn or receive from any Person any fee or other compensation for services, however denominated, in connection with its purchase or sale of a Portfolio Obligation or entering into a Synthetic Security; the foregoing prohibition shall not be construed to preclude the Issuer from receiving (i) commitment fees, facility maintenance fees or other similar fees that are received by the Issuer in connection with revolving or delayed drawdown Loans or synthetic or pre-funded letter of credit Loans; (ii) yield maintenance and prepayment penalty fees; (iii) fees on account of the Issuer's consenting to amendments, waivers or other modifications of the terms of any Portfolio Obligations; (iv) fees from permitted securities lending; or (v) upfront payments in lieu of periodic payments under a Synthetic Security. The Issuer will not provide services to any Person; the foregoing prohibition shall not be construed to preclude the Issuer from activities relating to the receipt of income described in (i) through (v) of the preceding sentence.

Section II.    Loans and Forward Purchase Commitments.

A.    Any understanding or commitment to purchase a loan, a participation, or a loan subparticipation (collectively, "Loans") from a seller before completion of the closing and full funding of the Loan by such seller shall only be made pursuant to a forward sale agreement at an agreed price (stated as a dollar amount or as a percentage) (a "Forward Purchase Commitment"), unless such an understanding or commitment is not legally binding and neither the Issuer nor the Servicer is economically compelled (e.g., would otherwise be subject to a significant monetary penalty) to purchase the Loan following the completion of the closing and full funding of the Loan (i.e., the Servicer will make an independent decision whether to purchase such Loan on behalf of the Issuer after completion of the closing of the Loan) (a "Non-Binding Agreement").

B.    No Forward Purchase Commitment or Non-Binding Agreement shall be made until after the seller (or a transferor to such seller of such Loan) has made a legally binding commitment to fully fund such Loan to the obligor thereof (subject to customary conditions), which commitment cannot be conditioned on the Issuer's ultimate purchase of such Loan from such seller.

C.    In the event of any reduced or eliminated funding, the Issuer shall not receive any premium, fee, or other compensation in connection with having entered into the Forward Purchase Commitment or Non-Binding Agreement.

OHS West:260399223.3

D. The Issuer shall not close any purchase of a Loan subject to a Forward Purchase Commitment or a Non-Binding Agreement earlier than 48 hours after the time of the closing of the Loan (i.e., execution of definitive documentation), and, in the case of a Forward Purchase Commitment, the Issuer's obligation to purchase such Loan is subject to the condition that no material adverse change has occurred in the financial condition of the Loan's obligor or the relevant market on or before the relevant purchase date.

E. The Issuer cannot have a contractual relationship with the obligor with respect to a Loan until the Issuer actually purchases the Loan.

F. The Issuer cannot be a signatory on the original lending agreement, and cannot be obligated to fund an assignment of or a participation in a Loan, prior to the time specified in subsection D above.

G. In addition to the restrictions otherwise applicable to Loans, the Issuer shall not acquire any synthetic or pre-funded letter of credit Loan unless (1) the cash collateral deposit with respect to such Loan was fully funded by a predecessor in interest with respect to such Loan; (2) the Loan is part of a credit facility that includes another Loan (other than a synthetic or pre-funded letter of credit Loan) to the same obligor, and is being acquired in connection with the acquisition of such other Loan and from the same seller as such other Loan, with the intent to hold both parts and with the amount of the other Loan being significantly in excess of the amount of the synthetic or pre-funded letter of credit Loan; (3) such synthetic or pre-funded letter of credit Loan satisfies the requirements set forth in Section VI.B., treating the synthetic or pre-funded letter of credit Loan, for this purpose, as though it were a delayed drawdown or revolving Loan; and (4) at no time may more than 5% of the aggregate principal amount of Portfolio Obligations consist of synthetic or pre-funded letter of credit Loans.

Section III. Distressed Debt

A. The Issuer may only purchase a Debt Instrument that is a Potential Workout Obligation to the extent permitted by this Section III.

B. Neither the Issuer nor the Servicer on behalf of the Issuer shall purchase a Subsidiary Obligation from any Issuer Subsidiary.

C. Special Procedures for Subsidiary Obligations.

1. Potential Workout Obligations. On or prior to the date of acquisition, the Servicer on behalf of the Issuer shall identify each Portfolio Obligation that is a Potential Workout Obligation.

2. Transfer of Subsidiary Obligations. From and after the occurrence of a Workout Determination Date with respect to a Subsidiary Obligation, neither the Issuer nor the Servicer on behalf of the Issuer shall knowingly take any action in respect of such Subsidiary Obligation that may result in the Issuer being engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes. As soon as practicable, but in any event within

OHS West:260399223.3

30 calendar days following a Workout Determination Date, the Servicer shall cause the Issuer either (i) to sell or dispose of any Subsidiary Obligation identified on such Workout Determination Date to a Person that is not an Affiliate of the Issuer or Servicer or (ii) to assign any Subsidiary Obligation identified on such Workout Determination Date to an Issuer Subsidiary.

For purposes of this Annex 1, an "Issuer Subsidiary" means any wholly-owned corporate subsidiary of the Issuer to which a Special Workout Obligation may be transferred in accordance with this Annex 1.

3.     <u>Consideration for Assignment of Subsidiary Obligations</u>. Consideration given by an Issuer Subsidiary for the assignment to it of Subsidiary Obligations may be in the form of cash or in the form of indebtedness of, or equity interests in, such Issuer Subsidiary.

4.     <u>Classification of Issuer Subsidiaries</u>. Each Issuer Subsidiary shall be an entity treated as a corporation for United States federal income tax purposes.

As used herein:

"<u>Potential Workout Obligation</u>" means any debt instrument (any such instrument, including an interest in a Loan, a "<u>Debt Instrument</u>") which, as of the date of acquisition by the Issuer or an Issuer Subsidiary, based on information specific to such Debt Instrument or the circumstances of the obligor thereof, is a Workout Obligation or, in the reasonable determination of the Servicer, has a materially higher likelihood of becoming a Workout Obligation as compared to debt obligations that par or other non-distressed debt purchasers or funds relating to that asset type customarily purchase and expect to hold to maturity.

"<u>Subsidiary Obligation</u>" means any Potential Workout Obligation (a) as to which the Issuer on any Workout Determination Date either (i) owns more than 40% of the aggregate principal amount of such class of Potential Workout Obligation outstanding or (ii) is one of the two largest holders of any class of debt of the obligor of such Potential Workout Obligation (based on the outstanding principal amount of such class of debt owned by the Issuer as a percentage of the aggregate outstanding principal amount of such class of debt) unless not fewer than three other holders and the Issuer collectively own at least 65% of such class of debt and, if the Issuer is the largest holder of such class, the Issuer's percentage of such class does not exceed the percentage held by the next largest holder of the debt by more than 5% of such class or (b) that would, upon foreclosure or exercise of similar legal remedies, result in the Issuer directly owning assets (other than securities treated as debt, equity in a partnership not engaged in a trade or business within the United States, or corporate equity for United States federal income tax purposes, <u>provided</u> in the case of corporate equity that the corporation is not a "United States real property holding corporation" within the meaning of section 897 of the Code) which are "United States real property interests" within the meaning of section 897 of the Code or which the Servicer reasonably expects it

Annex 1-5

**APP. 2431**

**Appx. 02478**

would, on behalf of the Issuer, be required to actively manage to preserve the value of the Issuer's interest therein; <u>provided</u> that a Potential Workout Obligation shall not be treated as a Subsidiary Obligation if the Issuer obtains a Tax Opinion that, based on all the surrounding circumstances, the activities in which the Issuer intends to engage with respect to such Potential Workout Obligation will not cause the Issuer to be treated as engaged in a trade or business for United States federal income tax purposes.

"<u>Workout Determination Date</u>" means any date on which, in connection with the occurrence of any event described in clauses (a) through (c), inclusive, of the definition of Workout Obligation, either (a) any material action by the Issuer is required to be taken, (b) the Servicer receives written notice that such material action shall be required or (c) the Servicer reasonably determines that the taking of such material action is likely to be required.

"<u>Workout Obligation</u>" means any Debt Instrument as to which the Servicer on behalf of the Issuer (a) consents to a Significant Modification in connection with the workout of a defaulted Portfolio Obligation, (b) participates in an official or unofficial committee or similar official or unofficial body in connection with a bankruptcy, reorganization, restructuring or similar proceeding, or (c) exercises, or has exercised on its behalf, rights of foreclosure or similar judicial remedies.

Section IV.    <u>Purchases from the Servicer or its Affiliates</u>.

A.    If the Servicer or an Affiliate of the Servicer acted as an underwriter, placement or other agent, arranger, negotiator or structuror, or received any fee for services (it being understood that receipts described in clauses (i) through (v) of Section I.B. are not construed as so treated), in connection with the issuance or origination of a Portfolio Obligation or was a member of the original lending syndicate with respect to the Portfolio Obligation (any such Portfolio Obligation, a "<u>Special Procedures Obligation</u>"), the Issuer will not acquire any interest in such Special Procedures Obligation (including entering into a commitment or agreement, whether or not legally binding or enforceable, to acquire such obligation directly or synthetically), from the Servicer, an Affiliate of the Servicer, or a fund managed by the Servicer, <u>unless</u> (i) the Special Procedures Obligation has been outstanding for at least 90 days, (ii) the holder of the Special Procedures Obligation did not identify the obligation or security as intended for sale to the Issuer within 90 days of its issuance, (iii) the price paid for such Special Procedures Obligation by the Issuer is its fair market value at the time of acquisition by the Issuer, and (iv) the transaction is proposed to, and the ultimate purchase is approved on behalf of the Issuer by, one or more Independent Advisors to the Issuer in accordance with the provisions of Section IV.B. below. The Issuer will not acquire any Special Procedures Obligation if, immediately following such acquisition, the fair market value of all Special Procedures Obligations owned by the Issuer would constitute more than 49% of the fair market value of all of the Issuer's assets at such time.

B.    An "<u>Independent Advisor</u>" is a Person who is not an Affiliate of the Issuer, the Servicer or any fund managed by the Servicer.

Annex 1-6

OHS West:260399223.3

1.    The Issuer may not purchase or commit to enter into any such Special Procedures Obligation without prior approval by an Independent Advisor. If the Independent Advisor declines to approve a proposed Special Procedures Obligation, at least three months must elapse before any proposal with respect to the acquisition of debt or other obligations of the same obligor are proposed or considered.

2.    The Issuer shall engage the Independent Advisor in an agreement the terms of which shall in substantial form set forth:

(a) the representation of the Independent Advisor, which the Servicer shall not know to be incorrect, that it has significant financial and commercial expertise, including substantial expertise and knowledge in and of the loan market and related investment arenas;

(b) the agreement between the Independent Advisor, the Issuer and the Servicer generally to the effect that (i) the Independent Advisor will operate pursuant to procedures consistent with maintaining his or her independence from the Servicer and its Affiliates, (ii) the Independent Advisor will have the sole authority and discretion to approve or reject purchase proposals made by the Servicer with respect to any Special Procedures Obligation, (iii) all proposals for the Issuer to acquire any Special Procedures Obligation will be first submitted to the Independent Advisor, (iii) the Servicer will prepare the materials it deems necessary to describe the Special Procedures Obligation to the Independent Advisor, (iv) the Investment Advisor will not be required to make any decision to accept or decline a Special Procedures Obligation at the price offered prior to its review of the materials prepared, plus any additional information requested by the Independent Advisor, and (v) no Independent Advisor may be proposed to be replaced by the Servicer, unless for cause or in the event of a resignation of such Independent Advisor; and

(c) such other commercially reasonable terms and conditions, including terms and conditions to the effect that (i) the Independent Advisor will be paid a reasonable fee for its services plus reimbursement of any reasonable expenses incurred in performance of his or her responsibilities, (ii) the Independent Advisor may be removed or replaced only by a majority (whether by positive act or failure to object) of the probable equity owners (as determined for United States federal income tax purposes) of the Issuer, (iii) if at any time there is more than one Independent Advisor to the Issuer, a majority of such Independent Advisors must approve any Special Procedures Obligation subject to Independent Advisor approval, (iv) an Independent Advisor may not engage, directly or indirectly, in the negotiation of the terms of any Special Procedures Obligation to be acquired by the Issuer (provided however, that an Independent Advisor may

Annex 1-7

negotiate with the Servicer or the seller with respect to the price and terms of the Issuer's purchase of the Special Procedures Obligation, underlined provided further that the Independent Advisor will not make suggestions to the Servicer or any other person about alternative or modified terms of the underlying Special Procedures Obligation on which they might be willing to approve such a Special Procedures Obligation).

3. Any servicing agreement or other document under which the Servicer is granted signatory powers or other authority on behalf of the Issuer will provide that such powers or authority with respect to Special Procedures Obligations are conditioned upon the prior written approval of the Independent Advisor

.

4. No Special Procedures Obligation will be presented to an Independent Advisor until at least 90 days have elapsed since the later of (a) the execution of final documentation and (b) the funding in whole or part of the Special Procedures Obligation and there will have been no commitment or arrangement prior to that time that the Issuer will acquire any such Special Procedures Obligation; provided, further, that the Special Procedures Obligation will not be treated as outstanding for any day on which the Issuer enjoys the benefits and burdens of ownership (for example, because any Person has hedged its credit exposure to the Special Procedures Obligation with the Issuer).

5. The Issuer will have no obligation to, or understanding that it will refund, reimburse or indemnify any person (including an Affiliate of the Servicer), directly or indirectly, for "breakage" costs or other costs or expenses incurred by such person if the Independent Advisor determines that the Issuer should decline to purchase any Special Procedures Obligation.

6. Neither the Servicer nor any Affiliate of the Servicer will have any authority to enter into agreements, or take any action, on behalf of the Issuer with respect to Special Procedures Obligations without the prior written approval of an Independent Advisor. Except as may be conditioned upon such prior written approval, neither the Servicer nor any Affiliate of the Servicer may hold itself out as having signatory powers on behalf of the Issuer or authority to enter into agreements with respect to Special Procedures Obligations on behalf of the Issuer.

Section V.    Synthetic Securities.

A. The Issuer shall not (i) acquire or enter into any Synthetic Security with respect to any Reference Obligation the direct acquisition of which would violate any provision of this Annex 1 or (ii) use Synthetic Securities as a means of making advances to the Synthetic Security Counterparty following the date on which the Synthetic Security is acquired or entered into (for the avoidance of doubt, the establishment of Synthetic Security collateral accounts and the payment of Synthetic Security Counterparties from the amounts on deposit therein, shall not constitute the making of advances).

Annex 1-8

B.    With respect to each Synthetic Security, the Issuer will not acquire or enter into any Synthetic Security that does not satisfy all of the following additional criteria unless the Servicer has first received advice of counsel that the ownership and disposition of such Synthetic Security would not cause the Issuer to be engaged in a trade or business within the United States for United States federal income tax purposes:

1.    the criteria used to determine whether to enter into any particular Synthetic Security was similar to the criteria used by the Servicer in making purchase decisions with respect to debt securities;

2.    the Synthetic Security is acquired by or entered into by the Issuer for its own account and for investment purposes with the expectation of realizing a profit from income earned on the securities (and any potential rise in their value) during the interval of time between their purchase and sale or hedging purposes and not with an intention to trade or to sell for a short-term profit;

3.    the Issuer enters into the Synthetic Security with a counterparty that is not a special purpose vehicle and is a broker-dealer or that holds itself out as in the business of entering into such contracts;

4.    neither the Issuer nor any Person acting on behalf of the Issuer advertises or publishes the Issuer's ability to enter into Synthetic Securities;

5.    except with respect to (x) credit-linked notes or similar Synthetic Securities and (y) any other Synthetic Securities where standard form ISDA documentation is not applicable, the Synthetic Security is written on standard form ISDA documentation;

6.    the net payment from the Issuer to the Synthetic Security Counterparty is not determined based on an actual loss incurred by the Synthetic Security Counterparty or any other designated person;

7.    there exists no agreement, arrangement or understanding that (i) the Synthetic Security Counterparty is required to own or hold the related Reference Obligation while the Synthetic Security remains in effect or (ii) the Synthetic Security Counterparty is economically or practically compelled to own or hold the related physical Reference Obligation while the Synthetic Security remains in effect;

8.    the Synthetic Security provides for (i) all cash settlement, (ii) all physical settlement or (iii) the option to either cash settle or physically settle; provided that, in the latter two cases, physical settlement provides the settling party the right to settle the Synthetic Security by delivering deliverable obligations which *may* include the Reference Obligation and the settling party must not be required to deliver the related Reference Obligation upon the settlement of such Synthetic Security.

Annex 1-9

Notwithstanding the preceding paragraph, a Synthetic Security providing for physical settlement may require a party to deliver the related Reference Obligation if either:

(i)    at the time the Issuer enters into such Synthetic Security, such Reference Obligation is readily available to purchasers generally in a liquid market; or

(ii)    the advice of both United States federal income tax and insurance counsel of nationally recognized standing in the United States experienced in such matters is that, under the relevant facts and circumstances with respect to such Synthetic Security, the acquisition of such Synthetic Security will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis and should not cause the Issuer to be treated as writing insurance in the United States under the law of the state in which the Synthetic Security Counterparty is organized.

9.    the Synthetic Security is not treated by the Issuer as insurance or a financial guarantee sold by the Issuer for United States or Cayman Islands regulatory purposes.

As used herein:

"Reference Obligation" means a debt security or other obligation upon which a Synthetic Security is based.

"Synthetic Security" means any swap transaction or security, other than a participation interest in a Loan, that has payments associated with either payments of interest and/or principal on a Reference Obligation or the credit performance of a Reference Obligation.

"Synthetic Security Counterparty" means an entity (other than the Issuer) required to make payments on a Synthetic Security (including any guarantor).

Section VI.    Other Types of Assets.

A.    Equity Restrictions.  The Issuer will not purchase any asset (directly or synthetically) that is:

1.    not treated for U.S. federal income tax purposes as debt if the issuing entity is a "partnership"(within the meaning of Section 7701(a)(2) of the Code) unless such entity is not engaged in a trade or business within the United States, or

2.    a "United States real property interest" as defined in section 897 of the Code and the Treasury Regulations promulgated thereunder.

OHS West:260399223.3

3. a residual interest in a "REMIC" or an ownership interest in a "FASIT" (as such terms are as defined in the Code).

The Issuer may cause an Issuer Subsidiary to acquire assets set forth in clause (i) or (ii) above (each, an "ETB/897 Asset") in connection with the workout of defaulted Portfolio Obligations, so long as the acquisition of ETB/897 Assets by such Issuer Subsidiary will not cause the stock of such Issuer Subsidiary to be deemed to be an ETB/897 Asset.

B. Revolving Loans and Delayed Drawdown Loans. All of the terms of any advance required to be made by the Issuer under any revolving or delayed drawdown Loan will be fixed as of the date of the Issuer's purchase thereof (or will be determinable under a formula that is fixed as of such date), and the Issuer and the Servicer will not have any discretion (except for consenting or withholding consent to amendments, waivers or other modifications or granting customary waivers upon default) as to whether to make advances under such revolving or delayed drawdown Loan.

C. Securities Lending Agreements. The Issuer will not purchase any Portfolio Obligation primarily for the purpose of entering into a securities lending agreement with respect thereto.

D. Exception From Secondary Market Rule for Debt Securities. Any purchase of a Portfolio Obligation other than a Loan (a "Debt Security") pursuant to a commitment, arrangement or other understanding made before or contemporaneously with completion of the closing and funding of such Debt Security issuance shall be made only in connection with one of the following:

(i) an underwriting of a registered public offering in which the seller has made a firm underwriting commitment to the issuer of such Debt Security where none of the Servicer or any Affiliate thereof acted as an underwriter or placement agent or participated in negotiating or structuring the terms of the Debt Security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities),

(ii) a private placement to qualified investors (pursuant to Rule 144A or Section 4(2) under the Securities Act or other similar arrangement) in which such Debt Security was originally issued pursuant to an offering circular, private placement memorandum, or similar offering document and none of the Servicer or any Affiliate thereof acted as a placement agent or underwriter or participated in negotiating or structuring the terms of the Debt Security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities), or

(iii) an acquisition of or entry into a Synthetic Obligation in accordance with Section V. above;

Annex 1-11

If an Affiliate of the Servicer is acting as an underwriter or placement agent or an Affiliate of the Servicer or an employee of an Affiliate of the Servicer participated in the structuring of an issuance otherwise described in clause (i) or clause (ii) of this paragraph D, one of the following additional conditions must be met:

(x)    the Servicer did not participate in negotiating or structuring the terms of the obligation or security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities) and the Issuer purchases no more than 33% of the aggregate principal amount of the tranche of securities (or other instruments) of which such Debt Security is a part and more than 50% of the aggregate principal amount of such tranche is substantially contemporaneously sold to one or more Persons unrelated to the Servicer (and who have not given the Servicer discretionary trading authority) on terms and conditions substantially the same as those on which the Issuer is to purchase,

(y)    the Servicer did not participate in negotiating or structuring the terms of the obligation or security (other than to comment on offering documents to an unrelated underwriter or placement agent where the ability to comment was generally available to investors and to undertake due diligence of the kind customarily performed by investors in securities) and the Issuer purchases less than 33% of the aggregate principal amount of all tranches issued as part of the transaction in which the Debt Security was issued and more than 50% of the aggregate principal amount of such tranches are substantially contemporaneously sold to one or more Persons unrelated to the Servicer (and who have not given the Servicer discretionary trading authority) on terms and conditions substantially the same as those on which the Issuer is to purchase, or

(z)    such security or obligation satisfies the requirements and procedures applicable to Special Procedures Obligations in Section IV as though it were a Loan;

provided, however, in either of (x) or (y), the Affiliate of the Servicer was (or the employees of the Affiliate of the Servicer were)  acting as an underwriter or placement agent (or otherwise participated in the structuring of such issuance) solely as, or solely as an employee of, a Permitted Affiliate (as defined below).

"Permitted Affiliate" means any Affiliate (i) that is a separate legal entity that is operated independently of the Servicer, (ii) whose personnel are not managed by and who do not report to the personnel of the Servicer, and (iii) whose personnel are not compensated based upon the performance of the Servicer.

Section VII.    <u>General Restrictions on the Issuer</u>.  The Issuer itself shall not:

A.    hold itself out, through advertising or otherwise, as originating Loans, lending funds, or making a market in or dealing in Loans or other assets;

OHS West:260399223.3

B.    register as, hold itself out as, or become subject to regulatory supervision or other legal requirements under the laws of any country or political subdivision thereof as, a broker-dealer, a bank, an insurance company, financial guarantor, a surety bond issuer, or a company engaged in Loan origination;

C.    knowingly take any action causing it to be treated as a bank, insurance company, or company engaged in Loan origination for purposes of any tax, securities law or other filing or submission made to any governmental authority;

D.    hold itself out, through advertising or otherwise, as originating, funding, guaranteeing or insuring debt obligations or as being willing and able to enter into transactions (either purchases or sales of debt obligations or entries into, assignments or terminations of hedging or derivative instruments, including Synthetic Securities) at the request of others;

E.    treat Synthetic Securities as insurance, reinsurance, indemnity bonds, guaranties, guaranty bonds or suretyship contracts for any purpose;

F.    allow any non-U.S. bank or lending institution who is a holder of a Security to control or direct the Servicer's or Issuer's decision to acquire a particular asset except as otherwise allowed to such a holder, acting in that capacity, under the related indenture or acquire a Portfolio Obligation conditioned upon a particular person or entity holding Securities;

G.    acquire any asset the holding or acquisition of which the Servicer knows would cause the Issuer to be subject to income tax on a net income basis;

H.    hold any security as nominee for another person; or

I.    buy securities with the intent to subdivide them and sell the components or to buy securities and sell them with different securities as a package or unit.

Section VIII.    <u>Tax Opinion; Amendments</u>.

A.    In furtherance and not in limitation of this Annex 1, the Servicer shall comply with all of the provisions set forth in this Annex 1, unless, with respect to a particular transaction, the Servicer acting on behalf of the Issuer and the Trustee shall have received written advice of counsel of nationally recognized standing in the United States experienced in such matters (a "<u>Tax Opinion</u>"), that, under the relevant facts and circumstances with respect to such transaction, the Servicer's failure to comply with one or more of such provisions will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.

B.    The provisions set forth in the Annex 1 may be amended, eliminated or supplemented by the Servicer if the Issuer, the Servicer and the Trustee shall have received a Tax Opinion that the Servicer's compliance with such amended provisions or supplemental provisions or the failure to comply with such provisions proposed to be

OHS West:260399223.3

eliminated, as the case may be, will not cause the Issuer to be engaged, or deemed to be engaged, in a trade or business within the United States for United States federal income tax purposes or otherwise to be subject to United States federal income tax on a net basis.

Annex 1-14

OHS West:260399223.3

# EXHIBIT 26

```
                    IN THE UNITED STATES BANKRUPTCY COURT
                     FOR THE NORTHERN DISTRICT OF TEXAS
                                DALLAS DIVISION

                                        )    Case No. 19-34054-sgj-11
In Re:                                  )    Chapter 11
                                        )
HIGHLAND CAPITAL                        )    Dallas, Texas
MANAGEMENT, L.P.,                       )    Wednesday, February 3, 2021
                                        )    9:30 a.m. Docket
          Debtor.                       )
                                        )    CONFIRMATION HEARING [1808]
                                        )    AGREED MOTION TO ASSUME [1624]
                                        )
                                        )    Continued from 02/02/2021
_____        )

                        TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:              Jeffrey Nathan Pomerantz
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
                              13th Floor
                             Los Angeles, CA  90067-4003
                             (310) 277-6910

For the Debtor:              John A. Morris
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             780 Third Avenue, 34th Floor
                             New York, NY  10017-2024
                             (212) 561-7700

For the Debtors:             Ira D. Kharasch
                             PACHULSKI STANG ZIEHL & JONES, LLP
                             10100 Santa Monica Blvd.,
                              13th Floor
                             Los Angeles, CA  90067-4003
                             (310) 277-6910

For the Official Committee   Matthew A. Clemente
of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                             One South Dearborn Street
                             Chicago, IL  60603
                             (312) 853-7539
```



Exhibit D

APP. 2441
Appx. 02488

2

```
 1    APPEARANCES, cont'd.:

 2    For James Dondero:          Clay M. Taylor
                                  BONDS ELLIS EPPICH SCHAFER
 3                                  JONES, LLP
                                  420 Throckmorton Street,
 4                                  Suite 1000
                                  Fort Worth, TX  76102
 5                                (817) 405-6900

 6    For Get Good Trust and      Douglas S. Draper
      Dugaboy Investment Trust:   HELLER, DRAPER & HORN, LLC
 7                                650 Poydras Street, Suite 2500
                                  New Orleans, LA  70130
 8                                (504) 299-3300

 9    For Certain Funds and       Davor Rukavina
      Advisors:                   Julian Vasek
10                                MUNSCH, HARDT, KOPF & HARR
                                  500 N. Akard Street, Suite 3800
11                                Dallas, TX  75201-6659
                                  (214) 855-7587
12
      For the NexPoint            Lauren K. Drawhorn
13    Parties:                    WICK PHILLIPS
                                  3131 McKinney Avenue, Suite 100
14                                Dallas, TX  75204
                                  (214) 692-6200
15
      For the U.S. Trustee:       Lisa L. Lambert
16                                OFFICE OF THE UNITED STATES
                                    TRUSTEE
17                                1100 Commerce Street, Room 976
                                  Dallas, TX  75242
18                                (214) 767-8967

19    For Scott Ellington,        Debra A. Dandeneau
      Isaac Leventon, Thomas      BAKER & MCKENZIE, LLP
20    Surgent, and Frank          452 Fifth Avenue
      Waterhouse:                 New York, NY 10018
21                                (212) 626-4875

22    For Certain Funds and       A. Lee Hogewood, III
      Advisors:                   K&L GATES, LLP
23                                4350 Lassiter at North Hills
                                    Avenue, Suite 300
24                                Raleigh, NC  27609
                                  (919) 743-7306
25
```

3

```
1   Recorded by:              Michael F. Edmond, Sr.
                              UNITED STATES BANKRUPTCY COURT
2                             1100 Commerce Street, 12th Floor
                              Dallas, TX  75242
3                             (214) 753-2062

4   Transcribed by:           Kathy Rehling
                              311 Paradise Cove
5                             Shady Shores, TX  76208
                              (972) 786-3063
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24         Proceedings recorded by electronic sound recording;
              transcript produced by transcription service.
25
```

4

1       DALLAS, TEXAS - FEBRUARY 3, 2021 - 9:38 A.M.

2            THE CLERK:  All rise.  The United States Bankruptcy

3    Court for the Northern District of Texas, Dallas Division, is

4    now in session, the Honorable Stacey Jernigan presiding.

5            THE COURT:  Good morning.  Please be seated.  All

6    right.  We are ready for Day Two of the confirmation hearing

7    in Highland Capital Management, LP, Case No. 19-34054.  I'll

8    just make sure we've got the key parties at the moment.  Do we

9    have Mr. Pomerantz, Mr. Morris, for the Debtor team?

10           MR. POMERANTZ:  Yes.  Good morning, Your Honor.  Jeff

11   Pomerantz for the Debtors.

12           MR. MORRIS:  And I'm here as well, Your Honor.

13           THE COURT:  All right.  Good.

14       All right.  For our objecting parties, do we have Mr.

15   Taylor and your crew for Mr. Dondero?

16           MR. TAYLOR:  Yes, Your Honor.

17           THE COURT:  Good morning.

18       All right.  For Dugaboy Trust and Get Good Trust, do we

19   have Mr. Draper?  (No response.)  All right.  I do see Mr.

20   Draper.  I didn't hear an appearance.  You must be on mute.

21           MR. DRAPER:  I'm present, --

22           THE COURT:  Okay.

23           MR. DRAPER:  -- Your Honor.

24           THE COURT:  Okay.  Good morning.

25           MR. DRAPER:  I'm present, Your Honor.

5

1      THE COURT: Good morning. I heard you that time.

2 Thank you.

3   All right. And now for what I'll call the Funds and

4 Advisors Objectors, do we have Ms. Rukavina present?

5      MR. RUKAVINA: Yes, Your Honor. Good morning.

6      THE COURT: Good morning. All right. And I will

7 check. Do we have Mr. Clemente or your team there?

8      MR. CLEMENTE: Yes. Good morning, Your Honor. Matt

9 Clemente from Sidley Austin on behalf of the Committee.

10      THE COURT: All right. Ms. Drawhorn, do we have you

11 there for the NexPoint Real Estate Partners and related funds?

12      MS. DRAWHORN: Yes, Your Honor. Good morning.

13      THE COURT: Good morning. All right. Did I miss --

14 I think that captured all of our Objectors. Anyone who I've

15 missed?

16   All right. Well, when we recessed yesterday, Mr. Morris,

17 I think you were about to call your third witness; is that

18 correct?

19      MR. MORRIS: It is, Your Honor. But if I may, I'd

20 like to just address the objections to the remaining exhibits,

21 since I hope that won't take too long.

22      THE COURT: All right. You may.

23      MR. POMERANTZ: Actually, Your Honor, before we go

24 there, we filed the supplemental declaration of Patrick

25 Leatham, as we indicated we would do yesterday. We just

6

1  wanted to get confirmation again that nobody intends to cross-

2  examine him, so that he doesn't have to sit through the

3  festivities today.

4          THE COURT:  All right.  Well, I did see that you

5  filed that.

6      Does anyone anticipate wanting to cross-examine Mr.

7  Leatham, the balloting agent?

8          MR. RUKAVINA:  Your Honor, I take it that that

9  declaration is part of the record.  As long as the Court

10  confirms that, I do not intend to call the gentlemen.

11          THE COURT:  All right.  Well, I will take judicial

12  notice of it and make it part of the record.  It appears at

13  Docket Entry No. 1887.  Again, it was filed -- well, it was

14  actually filed early this morning, I think.  So, all right.

15  So, with --

16          MR. MORRIS:  And to avoid --

17          THE COURT:  Go ahead.

18          MR. MORRIS:  To -- I was just going to say, to avoid

19  any ambiguity, Your Honor, the Debtor respectfully moves that

20  document into the evidentiary record.

21          THE COURT:  All right.  The Court will --

22      (Interruption.)

23          THE COURT:  Someone needs to put their phone on mute,

24  perhaps.  Unless someone was intentionally speaking.

25      All right.  So, I will grant that request.  Docket Entry

7

1  No. 1887 will be part of the confirmation evidence of this

2  hearing.

3       (Debtor's Patrick Leatham Declaration at Docket 1887 is

4  received into evidence.)

5            THE COURT:  All right.  Anything else?  There were

6  other exhibits I think you were going to talk about?

7            MR. MORRIS:  Yeah.  Let me just go through them one

8  at a time, if I may, Your Honor.

9            THE COURT:  Okay.

10            MR. MORRIS:  All right.  So, I'm going to deal with

11  the transcripts that have been objected to one at a time.  And

12  I'll just take them in order.  The first one can be found at

13  Exhibit B.  It is on Docket No. 1822.

14            THE COURT:  Okay.

15            MR. MORRIS:  Exhibit B is the deposition transcript

16  from the December 16, 2020 hearing on the Advisor and the

17  Funds' motion for an order restricting the Debtor from

18  engaging in certain CLO-related transactions.

19       During that hearing, the Court heard the testimony of

20  Dustin Norris.  Mr. Norris is an executive vice president for

21  each of the Funds and each of the Advisors.

22       We would be offering the transcript for the limited

23  purposes of establishing Mr. Dondero's ownership and control

24  over the Advisors.

25       Mr. Norris also gave some pretty substantial testimony

8

1  concerning the so-called independent board of the Funds.

2      And as a general matter, Your Honor, to the extent that

3  the objection is on hearsay grounds, the transcript -- at

4  least the portions relating to Mr. Norris's testimony --

5  simply are not hearsay under Evidentiary Rule 801(d)(2).

6  These are statements of an opposing party, and I think we fall

7  well within that.

8      So, we would respectfully request that the Court admit

9  into the record the transcript from December 16th, at least

10 the portions of which are Mr. Norris's testimony.

11          THE COURT:  All right.  And, again, these appear at

12 -- I think I heard you say B and then E.  Is that correct?

13          MR. MORRIS:  Just B.  Just B at the moment.  B as in

14 boy.

15          THE COURT:  Okay.  Just B at the moment?

16      All right.  Any objections to that?

17          MR. RUKAVINA:  Your Honor, I had objected, but now

18 that it's offered for that limited purpose, I withdraw my

19 objection.

20          THE COURT:  All right.  Then B -- I'm sorry.  Was

21 there anyone else speaking?

22      B will be admitted.  And, again, it appears at Docket

23 Entry 1822.

24      (Debtor's Exhibit B, Docket Entry 1822, is received into

25 evidence.)

9

1          MR. MORRIS:  Okay.  Next, the next transcript can be

2   found at Exhibit 6R, and that's Docket 1866.  Exhibit 6R is

3   the transcript of the January 9, 2020 hearing where the Court

4   approved the corporate governance settlement.  We think that

5   that transcript is highly relevant, Your Honor, because it

6   reflects not only Mr. Dondero's notice and active

7   participation in the consummation of the corporate governance

8   agreement, but it also reflects the Court and the parties'

9   views and expectations that were established at that time,

10  such that if anybody contends that there's any ambiguity about

11  any aspect of the order, I believe that that would be the best

12  evidence to resolve any such disputes.

13      So, for the purpose of establishing Mr. Dondero's notice,

14  Mr. Dondero's participation, and the parties' discussions and

15  expectations with regard to every aspect of the corporate

16  governance settlement, including Mr. Dondero's stipulation,

17  the order that emerged from it, and the term sheet, we think

18  that that's properly into evidence.

19          THE COURT:  Any objection?

20      All right.  6R will be admitted.  Again, at Docket Entry

21  1822.

22      (Debtor's Exhibit 6R, Docket Entry 1822, is received into

23  evidence.)

24          MR. MORRIS:  Next, Your Honor, we've got Exhibits 6S

25  as in Sam and 6T as in Thomas.  They're companions.  And they

10

1  can be found at Docket 1866. And those are the transcripts.

2  The first one is from the October 27th disclosure statement

3  hearing, and the second one actually is from the Patrick

4  Daugherty, I believe, lift stay motion.

5      I'll deal with the first one first, Your Honor. We

6  believe that the transcript of the October 27th hearing goes

7  to the good faith nature of the Debtor's proposed plan. It

8  shows that the Debtor and the Committee were not always

9  aligned on every interest. It shows that the Committee, in

10 fact, strenuously objected to certain aspects of the then-

11 proposed plan by the Debtors. And we just think it goes to

12 the heart of the good faith argument.

13     The transcript for the 28th, we would propose to offer for

14 the limited purpose of the commentary that you offered at the

15 end of that hearing, where Your Honor made it clear that

16 employee releases would not be -- would not likely be

17 acceptable to the Court unless there was some consideration

18 paid.

19     And it was really, frankly, Your Honor's comments that

20 helped spur the Committee and the Debtor to discuss over the

21 next few weeks the resolution of the issues concerning the

22 employee releases.

23     So we're not offering Exhibit 6T for anything having to do

24 with Mr. Daugherty or his claim, but just the latter portion

25 relating to the discussion about the employee releases. And,

11

1    with that, we'd move those transcripts into evidence.

2            THE COURT:  Any objection?

3            MR. RUKAVINA:  Your Honor, yes, I do object.  6S is

4    hearsay, and under Rule 804(b)(1) it's admissible only if the

5    witnesses are unavailable to be called.  There's been no

6    suggestion that they're not.

7        As far as 6T, what Your Honor says is not hearsay, so as

8    long as it's just what Your Honor was saying, I do not object

9    to 6T.  I object to the balance of it.

10           THE COURT:  Okay.  What about that objection on 6S?

11           MR. MORRIS:  Yeah.  One second, Your Honor.  I would

12   go to the residual exception to the hearsay rule under 807.

13   807 specifically applies if the statement being offered is

14   supported by sufficient guarantees of trustworthiness and it's

15   more probative on the point -- and the point here is simply to

16   help buttress the Debtor's good faith argument -- and it's

17   more probative on the point than any other evidence.  And I'm

18   not sure what better evidence there would be than an on-the-

19   record discussion between the Debtor and the Committee as to

20   the disputes they were having on the disclosure statement.

21           THE COURT:  All right.  I'm going to overrule the

22   objection and accept that 807 exception as being valid here.

23   So, I am admitting both 6S and 6T.  And for the record, I

24   think you said they appeared at 1866.  They actually appear at

25   1822.

12

1          MR. MORRIS:  Okay, Your Honor.  I am corrected.  It

2    is 6S and 6T, and they are indeed at 1822.  Forgive me.

3          THE COURT:  Okay.

4      (Debtor's Exhibits 6S and 6T, Docket Entry 1822, is

5    received into evidence.)

6          MR. MORRIS:  The next transcript and the last one is

7    6U, which is also at 1822.  6U is the transcript from the

8    December 10th hearing on the Debtor's motion for a TRO against

9    Mr. Dondero.  We believe the entirety of that transcript is

10   highly relevant, and it relates specifically to the Debtor's

11   request for the exculpation, gatekeeper, and injunction

12   provisions of their plan.  And on that basis, we would offer

13   that into evidence.

14         THE COURT:  Any objection?

15         MR. TAYLOR:  Yes, Your Honor.  This is Clay Taylor on

16   behalf of Mr. Dondero.

17     We do object, on the same basis that it is hearsay.  There

18   has certainly been plenty of testimony before this Court and

19   on the record as to why the Debtor believes that its plan

20   provisions are appropriate and allowable, and there's no need

21   to allow hearsay in for that.  All of the witnesses were

22   available to be called by the Debtor.  The Debtor is in the

23   midst of its case and can call whoever else it needs to call

24   to get these into evidence or to get those docs into evidence.

25   And therefore, we don't believe that any residual exception

13

1  should apply.

2          THE COURT:  Mr. Morris, your response?

3          MR. MORRIS:  First, Your Honor, any statements made

4  by or on behalf of Mr. Dondero would not be hearsay under

5  801(d)(2).

6      And secondly, there is no other evidence of the Debtor's

7  motion of the -- of the argument that was had.  There is no

8  other evidence, let alone better evidence, than the transcript

9  itself.  And I believe 807 is certainly the best rule to

10 capture that.

11     It is a statement that's supported by sufficient

12 guarantees of trustworthiness.  Again, these are the litigants

13 appearing before Your Honor.  It may not be sworn testimony,

14 but I would hope that everybody is doing their best to comply

15 with the guarantee of trustworthiness in that regard, putting

16 aside advocacy.

17     And it is more probative on the point for which we're

18 offering -- and that is on the very issues of exculpation,

19 gatekeeper, and injunction -- than anything else we can offer

20 in that regard.

21         THE COURT:  All right.  I overrule the objection and

22 I will admit 6U.  Okay.

23     (Debtor's Exhibit 6U, Docket Entry 1822, is received into

24 evidence.)

25         MR. MORRIS:  All right.  Going back to the top, Your

14

1   Honor, Companions Exhibit D as in David and E as in Edward,

2   which are at Docket 1822.

3       Exhibit D is an email string that relates to the Debtor's

4   communications with the Creditors' Committee concerning a

5   transaction known as SSP, which stands for Steel Products --

6   Structural and Steel Products.  So that was an asset that the

7   Debtor was selling, trying to sell at a particular point in

8   time.  And Exhibit E is a deck that the Debtor had prepared

9   for the benefit of the UCC.

10      And if we looked that those documents, Your Honor, you'd

11  see that the Debtor was properly following the protocols that

12  were put in place in connection with the January 9th corporate

13  governance settlement.  And the Committee is being informed by

14  the Debtor of what the Debtor intends to do with that

15  particular asset.

16      And the reason that it's particularly relevant here, Your

17  Honor, is Dustin Norris had submitted a declaration in support

18  of their motion that was heard on September -- on December

19  16th.  That declaration is an exhibit to what is Exhibit A on

20  Docket 1822.  Exhibit A on the docket is the Advisor and the

21  Funds' motion.  Okay?  So, Exhibit A is the motion.  Attached

22  to that Exhibit A is an exhibit, which is Mr. Norris's

23  declaration.

24      At Paragraph 9 of Mr. Norris's declaration, he takes issue

25  with the Debtor's process for the sale of that particular

15

1    asset.

2       And so, having admitted already into the record Mr.

3    Norris's declaration, we believe that these documents rebut

4    the statements made in Mr. Norris's declaration, and indeed,

5    were part of the transcript that has now already been admitted

6    into evidence.  So we think the documents are needed because

7    they were exhibits during that hearing.

8          THE COURT:  All right.  Any objection?

9          MR. RUKAVINA:  Your Honor, yes, I object based on

10   authenticity.  This document has not been authenticated, nor

11   has the attachment.  And on hearsay.  And I don't think that

12   the Debtor can introduce one exhibit just to introduce another

13   to rebut the first.

14         THE COURT:  Your response?

15         MR. MORRIS:  You know, in all honesty, I wish that

16   the authenticity objection had been made yesterday and I might

17   have been able to deal with that.

18      These documents have already been admitted by the Court

19   against these very same parties.  I think it would be a little

20   unfair for them now to exclude the document that they had no

21   objection to the first time around.  They clearly relate to

22   Paragraph 9 of Mr. Norris's declaration, which was admitted

23   into evidence in this case without objection.

24         THE COURT:  All right.  I overrule the objection.  D

25   and E are admitted.

16

1      (Debtor's Exhibits D and E, Docket Entry 1822, is received

2    into evidence.)

3           MR. MORRIS:  Next, Your Honor, we have Exhibits 4D as

4    in David, 4E as in Edward, and 4G as in Gregory.  And those

5    can all be found on Docket 1822.  And to just cut to the

6    chase, Your Honor, these are the K&L Gates letter that were

7    sent in late December and my firm's responses to those

8    letters.

9      Those letters are being offered, again, to support --

10   well, the Debtor contends that, in the context of this case,

11   and at the time and under the circumstances, the letters

12   constituted interference and evinces a disregard for the

13   January 9th order, for Mr. Dondero's TRO, and for the Court's

14   comments at the December 16th hearing.  And they go

15   specifically to the Debtor's request for the gatekeeper,

16   exculpation, and injunction provisions.

17     To the extent that those exhibits contain the letters that

18   were sent on behalf of the Funds and on behalf of the

19   Advisors, they would simply not be hearsay under 801(d)(2).

20   And to the extent the objection goes to my firm's response, I

21   think just as a matter of completeness the Court -- I won't

22   offer them for the truth of the matter asserted.  I'll simply

23   offer the Pachulski responses at those exhibits for the

24   purpose of stating the Debtor's position, without regard to

25   the truth of the matter asserted.

17

1          THE COURT:  All right.  Any objection?

2          MR. RUKAVINA:  Your Honor, with that understanding,

3   I'll withdraw my objection to these exhibits.

4          THE COURT:  All right.  So, 4D, 4E, and 4G are

5   admitted.

6       (Debtor's Exhibits 4D, 4E, and 4G, Docket Entry 1822, are

7   received into evidence.)

8          MR. MORRIS:  Next, Your Honor, we've got Exhibit 5T

9   as in Thomas.  That document can be found at Docket No. 1822.

10  Your Honor, that document is a schedule of a long list of

11  promissory notes that are owed to the Debtor by the Advisors,

12  Dugaboy, and Mr. Dondero.  But I think that, upon reflection,

13  I'll withdraw that exhibit.

14         THE COURT:  All right.

15      (Debtor's Exhibit 5T is withdrawn.)

16         MR. MORRIS:  And then, finally, just one last one.  I

17  think Mr. Rukavina objected to Exhibit 7O as in Oscar, which

18  can be found at Docket No. 1877.  Exhibit 7O are the documents

19  that were admitted in the January 21st hearing, and I believe

20  that they all go -- they're being offered to support the

21  Debtor's application for the gatekeeper, exculpation, and

22  injunction provisions.

23         THE COURT:  All right.  7O is being offered.  Any

24  objection?

25         MR. RUKAVINA:  Yes, Your Honor.  I do object.  Those

18

 1   are exhibits from a separate adversary proceeding that has not

 2   been concluded.  In fact, my witness is still on the stand in

 3   that.

 4       And I'll note that that's another 20,000 pages that's very

 5   duplicative of the current record, and we already are going to

 6   have an unwieldy record.  So I question why Mr. Norris -- why

 7   Mr. Morris would even need this.

 8       So that's my objection, Your Honor.

 9           MR. MORRIS:  You know what?  That's a fair point,

10   Your Honor.  And -- that is a fair point, and I guess what I'd

11   like to do is at some point this morning see if I can single

12   out documents that are not duplicative and come back to you

13   with very specific documents.  I think that's a very fair

14   point.

15           THE COURT:  All right.

16           MR. MORRIS:  And with that, Your Honor, I think we've

17   now addressed every single document that the Debtor has

18   offered into evidence, and I believe, other than the

19   withdrawal of --

20           THE COURT:  5T.

21           MR. MORRIS:  -- 5T --

22           THE COURT:  Uh-huh.

23           MR. MORRIS:  -- and the open question on 7O, I

24   believe every single document at Docket 1822, 1866, and 1877

25   has been admitted.  Do I have that right?

19

1          THE COURT:  All right.  Yes, because I did admit

2    yesterday 7F through 7Q, minus 7O, at 1877.  So, yes, I agree

3    with what you just said.

4          MR. RUKAVINA:  Your Honor, I apologize.  And Mr.

5    Morris.  I have that 5S -- or six -- that 5S and 6C, Legal

6    Entities List, have not been admitted.  But if I'm wrong on

7    that, then I apologize.

8          THE COURT:  Okay.  5S was part of 1866, which I

9    admitted entirely.

10       And what was the other thing?

11         MR. RUKAVINA:  I'm counting letters, Your Honor.

12   One, two, three, four.  6D, Legal Entities List, Redacted.

13         THE COURT:  Okay.  6B would have been --

14         MR. RUKAVINA:  D, Your Honor, as in dog.  I'm sorry.

15   6-dog.

16         THE COURT:  Okay.  6D, yeah, that was part of 1822

17   that I admitted *en masse* yesterday.

18         MR. MORRIS:  Yeah, I didn't hear an objection to that

19   one yesterday, and I agree, Your Honor.  My records show that

20   it was already admitted.

21         MR. RUKAVINA:  Then I apologize to the Court.

22         THE COURT:  All right.  Any --

23         MR. MORRIS:  No worries.  Let's get --

24         THE COURT:  Any other housekeeping matters before we

25   go to the next witness?

20

1          MR. MORRIS:  No, Your Honor.  Not from the Debtor.

2          THE COURT:  Anyone else?

3      All right.  Well, let's hear from the next witness.

4          MR. MORRIS:  All right, Your Honor.  The Debtor calls

5  as its next and last witness Marc Tauber.

6          THE COURT:  All right.  Mr. --

7          MR. MORRIS:  Mr. Tauber, if you're on the phone,

8  please identify yourself.

9      (No response.)

10         THE COURT:  Mr. Tauber, we're not hearing you.

11  Perhaps you are on mute.  Could you unmute your device?

12     (No response.)

13         THE COURT:  All right.  If it's a phone, you need to

14  hit *6.

15     Hmm.  Any -- do you know which caller he is?

16         THE CLERK:  I'm trying to find out.

17         THE COURT:  All right.  We've got well over a hundred

18  people, so we can't easily identify where he is at the moment.

19     All right.  Mr. Tauber, Marc Tauber?  This is Judge

20  Jernigan.  We cannot hear you, so -- all right.  Well, maybe

21  we can --

22         MR. MORRIS:  Can we just take a three-minute break

23  and let me see if I can track him down?

24         THE COURT:  Yes.  Why don't you do that?  So let's

25  take a three-minute break.

21

1          MR. MORRIS:  Thank you, Your Honor.

2          THE COURT:  Okay.

3      (A recess ensued from 10:02 a.m. until 10:04 a.m.)

4          MR. MORRIS:  Your Honor, if we may, he'll be dialing

5  in in a moment.  But I've been reminded that there is one more

6  exhibit.  It's the exhibit I used on rebuttal yesterday with

7  Mr. Seery.  There was the one document that was on the docket,

8  and that was the Debtor's omnibus reply to the plan

9  objections, where we looked at Paragraph 135, I believe.  And

10 we would offer that into evidence for the purpose of just

11 establishing that the Debtor had given notice no later than

12 January 22nd of its agreement in principle to assume the CLO

13 management contracts.

14      And then the second exhibit that we had offered that I

15 think I suggested could be marked as Exhibit 10A was the email

16 string between my firm and counsel for the CLO Issuers where

17 they agreed to the agreement in principle for the Debtor's

18 assumption of the CLO management contracts.

19      And we would offer both of those documents into evidence

20 as well.

21          THE COURT:  All right.  Any objections?

22      All right.  Well, I will admit them.

23      As far as this email string with the CLO Issuers that you

24 called 10A, does that appear on the docket?  I remember you

25 putting it on the screen, but, if not, you'll need to file a

22

1  supplement to the record, a supplemental exhibit.

2         MR. MORRIS:  We will, Your Honor.  We'll do that for

3  both of those exhibits.

4         THE COURT:  And then as -- okay, for both?  Because I

5  -- I've read that reply, and I could reference the docket

6  number if we need to.

7         MR. MORRIS:  We'll clean that up, Your Honor.

8         THE COURT:  Okay.

9     (Debtor's Exhibit 10A is received into evidence.)

10    (Clerk advises Court re new caller.)

11        THE COURT:  Oh, okay.  Just a minute.  I was looking

12 up something.

13    (Pause.)

14        THE COURT:  All right.  Well, you're going to file --

15 hmm, I really wanted to just reference where that reply brief

16 appears on the record.  There were a heck of a lot of things

17 filed on January 22nd.

18    (Interruption.)

19        THE COURT:  Okay.  We'll --

20        MR. MORRIS:  All right.  We're just going to need one

21 more minute with Mr. Tauber.  It's my fault, Your Honor.

22        THE COURT:  Okay.

23        MR. MORRIS:  I didn't send him easily-digestible

24 dial-in instructions.  He'll be just a moment.

25        THE COURT:  Okay.

23

1        (Court confers with Clerk regarding exhibit.)

2            THE COURT:  Oh, it's at 1807?  Okay.  So, the reply

3    brief that we talked about Paragraph 35, that is at Docket No.

4    1807.  Okay?  All right.

5        (Debtor's Omnibus Reply to Plan Objections, Docket 1807,

6    is received into evidence.)

7        (Pause.)

8            MR. TAUBER:  Hi.  It's Marc Tauber.

9            THE COURT:  All right.

10           MR. MORRIS:  Excellent.

11           THE COURT:  Mr. Tauber, this is Judge Jernigan.  I

12   can hear you, but I can't see you.  Do you have a video --

13           MR. TAUBER:  Yeah, I don't know why it's not working.

14           THE COURT:  Hmm.

15           MR. TAUBER:  I'm on WebEx all day.  Usually it works

16   no problem.

17           THE COURT:  Okay.  Well, do you want to give it

18   another try or two?

19           MR. TAUBER:  Yeah.  It looks like it's starting to

20   come up.  It's all -- pictures, so --

21           THE COURT:  Okay.

22           MR. TAUBER:  -- hopefully you'll be able to see me in

23   a second.

24           THE COURT:  Okay.  The first thing I'm going to need

25   to do is swear you in, so we'll see if the video comes up here

24

1    in a minute.

2          MR. TAUBER:  Okay.

3          THE COURT:  Can you see us, Mr. Tauber?

4          MR. TAUBER:  I can see four people.  The rest are

5    just names still.

6          THE COURT:  Okay.

7          MR. TAUBER:  I can go out and try to come back in, if

8    you think that's --

9          THE COURT:  I'm afraid of losing you.  So, your

10   audio, is it on your phone or is it on --

11         MR. TAUBER:  No.

12         THE COURT:  -- a computer?

13         MR. TAUBER:  On the computer.  Yeah.

14         THE COURT:  Okay.  So you're coming through loud and

15   clear on your computer.

16         MR. TAUBER:  Yeah.  Like I said, we use WebEx for

17   work, so I have them on all day long without any issues,

18   typically.

19         THE COURT:  Okay.

20      (Court confers with Clerk.)

21         THE COURT:  Okay.  Our court reporter thinks it's a

22   bandwidth issue on your end, so I don't --

23         MR. TAUBER:  There's only two of us here at home on

24   the line right now, so I don't know why.  It looks like it's

25   trying to come in, and then just keeps --

Tauber - Direct                          25

1           THE COURT:  I at least see your name on the screen

2    now, which I did not before.

3           MR. TAUBER:  Yeah.

4           THE COURT:  So hopefully we're going to -- ah.  We

5    got you.

6           MR. TAUBER:  There it is.

7           THE COURT:  All right.

8           MR. TAUBER:  Yeah.

9           MR. MORRIS:  There we go.

10          MR. TAUBER:  I might lose you, though.  Give me one

11   second, because I have a thing saying the WebEx meeting has

12   stopped working.  Let me close that.

13          THE COURT:  Okay.  We've still got you.  Please raise

14   your right hand.

15          MR. TAUBER:  Okay.

16             MARC TAUBER, DEBTOR'S WITNESS, SWORN

17          THE COURT:  All right.  Thank you.  Mr. Morris?

18          MR. MORRIS:  Thank you, Your Honor.

19                   DIRECT EXAMINATION

20   BY MR. MORRIS:

21   Q    Good morning, Mr. Tauber.

22   A    Good morning.

23   Q    I apologize for the delay in getting you the information.

24   Are you currently employed, sir?

25   A    Yes, sir.

Tauber - Direct                          26

1  Q    By whom?

2  A    Aon Financial Services.

3  Q    And does Aon Financial Services provide insurance

4  brokerage services among its services?

5  A    Yes.

6  Q    And what position do you currently hold?

7  A    Vice president.

8  Q    How long have you been a vice president at Aon?

9  A    Since October of 2019.

10 Q    Can you just describe for the Court generally your

11 professional background?

12 A    Sure.  I spent about 20 years on Wall Street, working in a

13 variety of jobs, in research, trading, and as the COO of a

14 hedge fund.  And then in 2010 I switched to the insurance

15 world.  I was an underwriter for ten-plus years for Zurich and

16 QBE.  And then in 2019 switched to the brokering side for Aon.

17 Q    And what are your duties and responsibilities as a vice

18 president at Aon?

19 A    Well, we're responsible or my team and I are responsible

20 for creating bespoke insurance programs, focusing on D&O and

21 E&O insurance for our insureds.

22 Q    And what is, for the benefit of the record, what do you

23 mean by bespoke insurance program?

24 A    Well, each client is different, so the programs and the

25 policies that we put in place might be off-the-shelf policies,

Tauber - Direct                          27

1  but we endorse and amend them as needed to meet the needs of

2  the individual client.

3  Q    And during your work, both as an underwriter and now as a

4  broker, have you familiarized yourself with the market for D&O

5  and E&O insurance policies?

6  A    Yes.

7  Q    All right.  Let's talk about the early part of this case.

8  Did there come a time in early 2020 when Aon was asked to

9  place insurance on behalf of the board of Strand Advisors?

10 A    Yes.

11 Q    Can you describe for the Court how that came about?

12 A    Sure.  One of our account executives, a man by the name of

13 Jim O'Neill, had a relationship with a man named John Dubel,

14 who was one of the appointees to serve on -- as a member of

15 Strand, which was being appointed, as we understood it, to be

16 the general partner of Highland Capital Management by the

17 Bankruptcy Court.  And they -- we had done -- or, Jim and John

18 had a longstanding relationship.  I had actually underwritten

19 an account for a previous appointment of John's when I was an

20 underwriter, so I had some familiarity with John as well, and

21 actually brokered a subsequent deal for John at Aon.

22     So I had, again, some familiarity with John, and we were,

23 you know, tasked with going out and finding a program for

24 Strand.

25 Q    Can you describe what happened next?  How did you go about

Tauber - Direct                    28

1  accomplishing that task?

2  A    So, there are a number of markets or insurance companies

3  that provide management liability insurance, which this was a

4  management liability-type policy.  D&O is a synonym for

5  management liability, I guess you'd say.  And we approached

6  the, I think, 14 or 15 markets that we knew to provide

7  insurance in this space and that would be willing to buy the

8  type of policy we were seeking and have interest in a risk

9  like this, which had a little hair on it.  Obviously, there

10  was the Dondero involvement, as well as the bankruptcy.

11  Q    As part of that process, did you and your firm put

12  together a package of information for prospective interested

13  parties?

14  A    Yes.

15  Q    Can you describe for the Court what was contained in the

16  package?

17  A    Had the *C.V.s*, some relevant pleadings from the case,

18  court order.  I'd have to go back and look exactly.  But sort

19  of just general, you know, general information that was

20  available about the situation at hand and Strand's

21  appointment.

22  Q    And the court order that you just mentioned, is that the

23  one that had that gatekeeper provision in it?

24  A    Correct.

25  Q    And can you explain to the Court why you and your team

Tauber - Direct                              29

1 decided to include the order with the gatekeeper provision in

2 the package that you were delivering to prospective carriers?

3 A   Sure.  In our initial conversations to discuss our

4 engagement, the gatekeeper function was explained to us by

5 John.  And I'm not sure who else was on the initial call.

6 And, but it was explained to us that I guess Judge Jernigan

7 would sit as the gatekeeper between any potential claimant

8 against the insureds and, you know, would basically have to

9 approve any claim that would be made against (indecipherable),

10 which would thereby prevent any frivolous claims from

11 happening.

12 Q   All right.  Let's just talk for a moment.  How did you and

13 your firm decide which underwriters to present the package to?

14 A   Again, you know, I -- my background, or my Wall Street

15 background, obviously, sort of made me have a -- it was very

16 unique for the insurance world when I switched over, so I had

17 sort of risen to a certain level of expertise within the

18 space.  And, you know, our team also is very experienced, and

19 decades of experience in the insurance world.  So we're very

20 familiar with the markets that are willing to provide these

21 types of policies and the markets that would be likely to take

22 a look at a risk such as this.

23 Q   Okay.  You mentioned that there was -- I think your words

24 were a little hair on this, and one of the things you

25 mentioned was bankruptcy.  How did the fact that Strand was

Tauber - Direct                                30

1  the general partner of a debtor in bankruptcy impact your

2  ability to solicit D&O insurance?

3  A    Well, it's just not a plain vanilla situation, so people

4  are somewhat, you know, are -- I think -- so, the type of

5  insurance, D&O insurance, that we write is very different from

6  auto insurance, as an example.  Auto insurance, people expect

7  there to be a certain amount of claims, and they expect the

8  premiums to cover the claims plus the expenses and then

9  provide them a reasonable profit on top of that.

10      Our insurance is really much more by binary.  The

11  expectation for underwriters is that they will be completing

12  ignoring -- or, avoiding risk at all costs, wherever possible.

13  So anytime there is a situation that looks a little risky, so

14  the premium might be a little higher, the deductible might be

15  a little higher, but, again, the underwriters are really

16  making a bet that they will not have a claim.  Because the

17  premiums pale in comparison to the limits that are available

18  to the policyholder.

19  Q    And so --

20  A    So, -- I'm sorry.  What were you going to say?

21  Q    I didn't mean to interrupt.

22  A    Yeah.

23  Q    Have you finished your answer?

24  A    Sure.

25  Q    Okay.  So, were some of the 14 or 15 markets that you

Tauber - Direct                              31

1 | contacted reluctant to underwrite because there was a

2 | bankruptcy ongoing?

3 | A   Well, I think that probably -- I mean, there are certain

4 | markets that we didn't go to in the beginning because they

5 | would be very reluctant to write a risk that had that kind of

6 | hair on it, based on our experience from dealing with them.

7 | And, you know, I think the bankruptcy was certainly a little

8 | bit of an issue.  And then, obviously, as people did their

9 | research and -- or if they weren't already familiar with

10 | Highland and got to know, you know, got -- I will just say for

11 | a simple Google search and learned a little bit about Mr.

12 | Dondero, I think there was definitely some significant

13 | reluctance to write this program.

14 | Q   Was the fact that the Debtor -- was the fact that the

15 | Debtor is a partnership an issue that came up, in your -- in

16 | your process?

17 | A   There are certainly some carriers who won't write what's

18 | known as general partnership liability insurance.  So, yes,

19 | that is part of that.  It was part of the limiting factor in

20 | terms of who we went to.

21 | Q   Okay.  And, finally, you mentioned Mr. Dondero.  What role

22 | did he play in your ability to obtain insurance for the Strand

23 | board?

24 | A   Well, that's a very significant role.  As, you know, as

25 | mentioned, the underwriters are very risk-averse, so the

Tauber - Direct                              32

1  litigiousness of Mr. Dondero is a very strong red flag

2  prohibiting a number of people from writing the insurance at

3  all.  And the ones that were writing, that were willing to

4  provide options, were looking for protections from Mr.

5  Dondero.

6  Q    And what kind of protections were they looking for?

7  A    Well, the gatekeeper function was a key factor.  That was

8  really the only way we could even start a conversation with

9  any of the people that we were able to engage.  And in

10 addition, they wanted a, you know, sort of a belts and

11 suspenders additional protection of having an exclusion

12 preventing any litigation brought by or on behalf of Mr.

13 Dondero.

14 Q    Were you able to identify any carrier who was prepared to

15 underwrite D&O insurance for Strand without the gatekeeper

16 provision or without a Dondero exclusion?

17 A    We were not.

18 Q    Okay.  Let's fast-forward now.  Has your firm been

19 requested to obtain professional management insurance for the

20 contemplated post-confirmation debtor entities and individuals

21 associated with those entities?

22 A    Yes.

23 Q    Okay.  So let's just talk about the entities first, the

24 Claimant Trust and the Litigation Trust.  In response to that

25 request, have you and your team gone out into the marketplace

Tauber - Direct                                    33

1   to try to find an underwriter willing to underwrite a policy

2   for those entities?

3   A    Yes.

4   Q    And have you been able to find any carrier who's willing

5   to provide coverage for the Claimant Trust and the Litigation

6   Trust?

7   A    Yes.

8   Q    And how many -- how many have expressed a willingness to

9   do that?

10  A    Two.

11  Q    And have those two carriers indicated that there would be

12  conditions to coverage for the entities?

13  A    Both will require a -- the continuation of the gatekeeper

14  function, as well as a Dondero exclusion.

15  Q    Okay.  Have you also been tasked with the responsibility

16  of trying to find coverage for the individuals associated with

17  the Claimant Trust and the Litigation Trust, meaning the

18  Claimant Trustee, the Litigation Trustee, and the Oversight

19  Board?

20  A    Yes.  So we did it concurrently.

21  Q    Okay.  So, are the two firms that you just mentioned

22  willing to provide insurance for the individuals as well as

23  the entities?

24  A    Correct.  With the same stipulations.

25  Q    They require -- they both require the gatekeeper and the

Tauber - Direct                        34

1   Dondero exclusion?

2   A    That's correct.

3   Q    Is there any other firm who has indicated a willingness to

4   consider providing D&O insurance for the individuals?

5   A    There is one that is willing to do so, as long as the

6   gatekeeper function remains in place.  They have indicated

7   that if the gatekeeper function was to be removed, that they

8   would then add a Dondero exclusion to their coverage.

9   Q    So is there any insurance carrier that you're aware of who

10  is prepared to insure either the individuals or the entities

11  without a gatekeeper provision?

12  A    No.

13  Q    And that last company, I just want to make sure the record

14  is clear:  If the gatekeeper provision is overturned on appeal

15  or is otherwise not effective, do you have an understanding as

16  to what happens to the insurance coverage?

17  A    They will either add an exclusion for any claims brought

18  by or on behalf of Mr. Dondero or cancel the coverage

19  altogether.

20          MR. MORRIS:  I have no further questions, Your Honor.

21          THE COURT:  All right.  Cross of this witness?

22                      CROSS-EXAMINATION

23  BY MR. RUKAVINA:

24  Q    Mr. Tauber, I'm a little confused.  So, the insurance

25  that's being written now for the post-bankruptcy entities, did

Tauber - Cross                          35

1   I hear you say that there is one carrier that would give that

2   insurance subject to having a Dondero exclusion?

3   A   So, first of all, there's nothing currently being written.

4   We have solicited quotes.  So, just to make sure that that --

5   I want to make sure that's clear.

6       We have three carriers that are willing to provide varying

7   levels of coverage.  All three will only do so with the

8   existence of the gatekeeper function continuing to be in

9   place.  One of the three has -- two of those three will also

10  provide the coverage with -- even with the gatekeeper function

11  and the Dondero exclusion.  The third one was not requiring a

12  Dondero exclusion unless the gatekeeper function goes away.

13  Q   Okay.  So the third one, you believe, will, whatever the

14  term is, write the insurance or provide the coverage without a

15  gatekeeper, as long as there is a strong Dondero exclusion?

16  A   No.  Their initial requirement is that the gatekeeper

17  function remains in place.  That is their preferred option.

18  If the gatekeeper function is removed, then they will add a

19  Dondero exclusion in place of the gatekeeper exclusion.  In

20  addition, that carrier is only willing to provide coverage for

21  the individuals, not for the entities.

22  Q   Okay.  Thank you.

23          MR. RUKAVINA:  I'll pass the witness, Your Honor.

24          THE COURT:  All right.  Other cross?

25          MR. TAYLOR:  Clay Taylor on behalf of Mr. Dondero.

Tauber - Cross                                    36

1          THE COURT:  Okay.

2                              CROSS-EXAMINATION

3    BY MR. TAYLOR:

4    Q    Good morning, Mr. Tauber.

5    A    Good morning.

6    Q    Are you generally familiar with placing D&O insurance at

7    distressed debt level private equity firms?

8    A    I am familiar with it probably more from the underwriting

9    side, and I also worked at a fund that was distressed and had

10   to be liquidated, so I -- as the COO, so I have a fair amount

11   of familiarity, yes.

12   Q    Okay.  Before taking this to market for the first time for

13   the pre-confirmation policies that you have in place, did your

14   firm conduct any due diligence or analysis of comparing the

15   amount of litigation the Highland entities and Mr. Dondero

16   were involved in as compared to other comparable firms in the

17   marketplace?  Say, you know, Apollo, Fortress, Cerberus, other

18   similar market participants?

19   A    Well, it wouldn't really be our role as the broker.

20   That's the role of the underwriter.

21   Q    Are you familiar if any of the underwriters undertook any

22   such analysis?

23   A    I would assume that they did, since they all had concerns

24   about Mr. Dondero almost immediately.

25   Q    Do you have any -- you didn't conduct any personal due

Tauber - Cross                        37

1  diligence on comparing the amount of litigation that the

2  Highland entities were involved in as compared to, say,

3  Fortress, do you?

4  A   Well, again, that wouldn't really be my role as the

5  broker.  But I will say that I used to write the primary

6  insurance for Fortress Investment Group when I was at Zurich.

7  So I'm extremely familiar with Fortress, to use your example,

8  and I would say that the level of litigation at Fortress was

9  much, just out of personal knowledge, was significantly less

10 than I had encountered or than I had read about at Highland.

11 Q   That you have read about?  Is that based upon a number of

12 cases where Fortress was a plaintiff as compared to Highland

13 was a plaintiff?  Over what time period?

14 A   Again, not my role.  Not something that I've done.  I'm

15 just generally familiar with Fortress and I'm generally

16 familiar with Highland.

17 Q   All right.  So you're generally familiar and you say that

18 -- you're telling me and this Court that Fortress is involved

19 in less litigation.  Could you quantify that for me, please?

20 A   No, but it's really irrelevant to the situation at hand.

21 The issue is not my feelings whatsoever.  The issue is the

22 underwriters' feelings and their concern with Mr. Dondero, not

23 mine or anybody else's.

24 Q   So, I appreciate your answer and thank you for that, but I

25 believe the question that was before you is, have you

Tauber - Cross                        38

1   quantitatively -- do you have any quantitative analysis by

2   which you can back up the statement that Fortress is less

3   litigious than Highland?

4   A    I wouldn't even try, no.

5   Q    Okay.  Do you have any quantitative analysis for -- that

6   Cerberus is any less litigious than Highland?

7   A    I don't have any real knowledge of Cerberus's

8   litigiousness.

9   Q    Same question as to Apollo.

10  A    Again, the Fortress, you just happened to mention

11  Fortress, which was a special case because I used to be their

12  primary underwriter.  I don't have any specific -- I'm not a

13  claims attorney.  I don't have any specific knowledge of the

14  level of litigiousness.

15       And, again, it's not up to me, my decision.  It's the

16  underwriters' decision of whether or not they're willing to

17  write the coverage, not mine.

18  Q    You mentioned that the -- when you took this out to

19  market, it had a little hair on it.  Correct?

20  A    Correct.

21  Q    And you put together a package of materials that you sent

22  out to 14 or 15 market participants; is -- did I get that

23  correct?

24  A    Yes.

25  Q    And in that package, you had certain pleadings, including

Tauber - Cross                    39

1   the court order, correct?

2   A    Yes.  I believe that's correct.

3   Q    And that was after your initial conversation with John and

4   -- where he pointed out the gatekeeper role.  Correct?

5   A    Correct.

6   Q    And so when you went out to market, presumably you

7   highlighted the gatekeeper role to all the people you

8   solicited offers from because you thought it included less

9   risk, correct?

10  A    It offered a level of protection that was not -- that's

11  not common.  So it's, yes, it's a huge selling point for the

12  risk.

13  Q    Okay.  So, to be clear, you never went out to the market

14  to even see if you could get underwriting the first time

15  without the gatekeeper function; is that correct?

16  A    Well, it's my job as a broker to present the risk in the

17  best possible light.  So if we have a fact that makes the risk

18  a better write for the underwriters, we, of course, will

19  highlight it.  So, no, I did not do that.

20  Q    Okay.  So, the quick answer to the question is no, you did

21  not go out and solicit any bids without the gatekeeper

22  function?

23  A    Correct.

24  Q    When you have approached the market for the post-

25  confirmation potential coverage, did you approach the same 14

Tauber - Cross                           40

1   or 15 parties that you did before?

2   A    I don't have the two lists in front of me.  They would

3   have been vastly similar, yes.

4   Q    Okay.  And so, again, all of the 14 or 15 parties or the

5   lists that you solicited were already familiar with the

6   gatekeeper function, correct?

7   A    Yes.

8   Q    And so therefore they already had that right; they're not

9   going to trade against themselves and therefore say that,

10  without it, we'll go ahead and write coverage.  Correct?

11  A    I -- I -- it'd be hard to answer that question.  I don't

12  know.

13  Q    Okay.  Because you didn't try that, did you?

14  A    I would have had no reason to, no.

15  Q    Okay.  So you don't know if a market exists without the

16  gatekeeper function because you haven't asked, have you?

17  A    I guess that's fair, yeah.

18          MR. TAYLOR:  I have no further questions.

19          THE COURT:  All right.  Any other Objectors with

20  cross-examination?

21          MR. DRAPER:  I have no questions for the witness,

22  Your Honor.

23          THE COURT:  All right.  Anyone else?  Mr. Morris,

24  redirect?

25          MR. MORRIS:  Just one.

APP. 2480
Appx. 02527

Tauber - Redirect                    41

1                    REDIRECT EXAMINATION

2  BY MR. MORRIS:

3  Q    One question, Mr. Tauber.  Is there any -- do all

4  underwriters -- any underwriters for Fortress require, as a

5  condition to underwriting the D&O insurance, require a

6  gatekeeping provision?

7  A    In my, you know, 11, 12 years of experience in this

8  industry, in this space, I have never seen that gatekeeper

9  function be available, as an underwriter or as a broker.  So,

10  no.

11         MR. MORRIS:  No further questions, Your Honor.

12         THE COURT:  Any recross on that redirect?

13     All right.  Well, Mr. Tauber, you are excused.  We thank

14  you for your testimony today.  So you can log off.

15         THE WITNESS:  Thank you.

16         THE COURT:  Okay.

17     (The witness is excused.)

18         THE COURT:  Mr. Morris, does the Debtor rest?

19         MR. MORRIS:  The Debtor does rest, Your Honor.

20         THE COURT:  All right.  Well, what are we going to

21  have from the Objectors as far as evidence?

22         MR. RUKAVINA:  Your Honor, I will be very short.  I

23  will call Mr. Seery for less than ten minutes.  I will call

24  Mr. Post for less than ten minutes.  I will have one exhibit.

25  And I think that that's it for all the Objectors, unless I'm

42

1   mistaken, gentlemen.

2          MR. TAYLOR:  Your Honor, I had one witness, Mr.

3   Sevilla, under subpoena to testify, and needed a brief moment

4   to discuss with my colleagues whether we're going to call him,

5   and if so, put him on notice that he would be coming up

6   probably about -- I don't know your schedule, Your Honor, but

7   probably, I'm guessing, either before lunch or after, and I

8   need to let him know that also.

9       So I do need a brief three to five minutes to confer with

10  my colleagues and some direction from the Court to, if we

11  decide to call him, as to when we would tell him to be

12  available.

13         THE COURT:  All right.  Well, before I get to that,

14  Mr. Draper, do you have any witnesses?

15         MR. DRAPER:  I do not.

16         THE COURT:  All right.  Well, let's see.  It's 10:34.

17  We're making good time this morning.  If Seery is truly ten

18  minutes of direct, and Post is truly ten minutes of direct,

19  and I don't know how long the documentary exhibits are going

20  to take, it sounds to me like we are very likely to get to Mr.

21  Sevilla before a lunch break.

22      So if you want to -- you know, I don't know what that

23  involves, you sending text messages or making a quick phone

24  call.  Do you need a five-minute break for that?

25         MR. TAYLOR:  Yes, Your Honor.  It involves a phone

43

1  call and an email.  Just a confirmatory phone call just to

2  make sure that the guy -- just so you know who he is, he is

3  actually a Highland employee, but he's represented by separate

4  counsel, and so we do need to go through him just because

5  that's the right thing to do.

6        THE COURT:  All right.  Well, again, I mean, I never

7  know how long cross is going to take, but I'm guessing, you

8  know, we're going to get to him in an hour or so, if not

9  sooner, it sounds like.  So, all right.  So, do we need a

10  five-minute break?

11        MR. RUKAVINA:  And Your Honor, it might make more

12  sense to make it a ten-minute break.  I suspect that Mr.

13  Taylor will be able to release his witness if he and I will

14  just be able to talk.  So I would ask the Court's indulgence

15  for a ten-minuter.

16        THE COURT:  Okay.  We'll take a ten-minute break.

17  We'll come back at 10:46 Central time.

18        THE CLERK:  All rise.

19     (A recess ensued from 10:36 a.m. until 10:46 a.m.)

20        THE CLERK:  All rise.

21        THE COURT:  Please be seated.  We're going back on

22  the record in the Highland confirmation hearing.  Are the

23  Objectors ready to proceed?

24        MR. RUKAVINA:  Your Honor, Davor Rukavina.  We are.

25        THE COURT:  All right.  Well, Mr. Rukavina, are you

44

1   going to call your witnesses first?

2          MR. RUKAVINA:  Yes, I will.  Before that, if it might

3   help the Court and Mr. Morris:  Mr. Morris, with respect to

4   that last exhibit, I do not object to the admission of any of

5   the exhibits that were admitted at that PI hearing.

6      But I do think, Your Honor, for the record, that -- and I

7   would ask Mr. Morris that he should refile those exhibits here

8   in this case, except for those that are duplicative.  Because,

9   again, there's 10,000 pages of indentures, et cetera.

10         MR. MORRIS:  Thank you very much, sir.

11     Your Honor, if that's acceptable to you, we'll do that as

12  soon as possible.

13         THE COURT:  All right.  And let me make sure the

14  record is clear.  Are we talking about what you've described

15  as 7O?  I'm getting mixed up now.  Am I --

16         MR. MORRIS:  Yes, Your Honor.

17         THE COURT:  Okay.

18         MR. MORRIS:  It's 7O, which is the documents that

19  were introduced into evidence in the prior hearing.  And Mr.

20  Rukavina is exactly right, that there is substantial overlap

21  between that and other documents that have already been

22  admitted in the record in this case.  So we'll just file an

23  abridged version of Exhibit O that only includes non-

24  duplicative documents.

25         THE COURT:  All right.  So that will be admitted, and

Seery - Direct                          45

1   we'll look for your filed abridged version to show up on the

2   docket.  7O.

3       (Debtor's Exhibit 7O is received into evidence as

4   specified.)

5           THE COURT:  All right.  What's next?

6           MR. RUKAVINA:  Your Honor, Jim Seery, please.  Mr.

7   James Seery.

8           THE COURT:  All right.  Mr. Seery, welcome back.

9   Please raise your right hand.

10          MR. SEERY:  Can you -- can you hear me, Your Honor?

11          THE COURT:  I can now.

12     JAMES P. SEERY, CERTAIN FUNDS AND ADVISORS' WITNESS, SWORN

13          THE COURT:  All right.  Thank you.

14      Mr. Rukavina, go ahead.

15                      DIRECT EXAMINATION

16  BY MR. RUKAVINA:

17  Q   Mr. Seery, --

18          MR. RUKAVINA:  Thank you.

19  BY MR. RUKAVINA:

20  Q   Mr. Seery, good morning.

21          MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

22  the schedules.

23      What we have here, Your Honor, is Docket 247, the Debtor's

24  schedules.  I'd ask the Court to take judicial notice of it.

25          THE COURT:  All right.  The Court will do so.

Seery - Direct                          46

1  BY MR. RUKAVINA:

2  Q    Mr. Seery, are you familiar with these entities listed

3  here on the Debtor's schedules?

4  A    Generally.  Each one a little bit different.

5  Q    Okay.  Do you agree that the Debtor still owns equity

6  interests in these entities?

7  A    I believe it does, yes.

8  Q    Okay.  Is it true that none of these entities are publicly

9  traded?

10  A    I don't believe any of these are publicly-traded entities,

11  no.

12  Q    Okay.  And none of these, to your knowledge, are debtors

13  in this bankruptcy case, right?

14  A    No.  We only have one debtor in the case.

15  Q    Okay.  So, Highland Select Equity Fund, LP, the Debtor

16  owns more than 20 percent of the equity in that entity, right?

17  A    I believe the Debtor owns the majority of that entity.

18  That is a fund with an on- and offshore feeder.  And I, off

19  the top of my head, don't recall exactly how the allocations

20  of equity work.  But I believe we do.

21  Q    Does 67 percent refresh your memory?  Are you prepared to

22  say that the Debtor owns 67 percent of that equity?

23  A    I'm not prepared to say that, no.

24  Q    Okay.  Wright, Ltd.  Does the Debtor own more than 20

25  percent of that equity?

Seery - Direct                          47

1  A    There's about -- I don't recall.  There's about at least

2  25 artist, designers, or designs.  Wright, AMES, Hockney,

3  Rothco, all own in different places, and they all own in turn

4  some other thing.  So I don't know what each of them, off the

5  top of my head, own.  There's -- they're part of a myriad of

6  corporate structures here.

7  Q    Strak, Ltd.  Do you know whether the Debtor owns more than

8  20 percent of the equity of that entity?

9  A    Stark?  I don't know.

10 Q    Okay.  I don't know how to pronounce the next one.  Eamis

11 (phonetic) Ltd.  Do you know whether the Debtor owns more than

12 20 percent of that equity?

13 A    Off the top of my head, I don't recall.

14 Q    What about Maple Avenue Holdings, LLC?

15 A    I believe, I don't know if it's directly or indirectly,

16 that we own a hundred percent of that entity.  But I'm not

17 sure.

18 Q    What about Highland Capital Management Korea, Ltd.?

19 A    Effectively, Highland Capital Management is owned a

20 hundred percent.

21 Q    What about Highland Capital Management Singapore Pte.

22 Ltd.?

23 A    We are in the process of shutting it down, so I don't know

24 that -- what the equity percentages are.  It's really just a

25 question -- it's -- it's dissolved save for a signature from a

                        Seery - Direct                    48

1   Singaporean.

2   Q   Okay.  But did the Debtor own more than 20 percent of that

3   entity?

4   A   I don't know the specific allocations of equity ownership.

5   Q   Okay.  What about Pennant (phonetic) Management, LP?  Do

6   you know whether the Debtor owns or owned more than 20 percent

7   of that entity?

8   A   I don't recall, no.

9        MR. RUKAVINA:  You can take that exhibit down, Mr.

10   Vasek.

11   BY MR. RUKAVINA:

12   Q   Mr. Seery, very quick, are you familiar with Bankruptcy

13   Rule 2015.3?

14   A   I am, yes.

15   Q   Okay.  Has the Debtor filed any Rule 2015.3 statements in

16   this case?

17   A   I don't believe we have.

18   Q   Okay.

19        MR. RUKAVINA:  Thank you, Your Honor.  I'll pass the

20   witness.

21        THE COURT:  All right.  Any other Objector

22   questioning?  None from Mr. Taylor, none from Mr. Draper, none

23   from Ms. Drawhorn?

24      All right.  Any cross -- any examination from you, Mr.

25   Morris?

Seery - Cross                               49

1          MR. MORRIS:  Just one question.

2          THE COURT:  Go ahead.

3                          CROSS-EXAMINATION

4    BY MR. MORRIS:

5    Q    Mr. Seery, do you know why the Debtor has not yet filed

6    the 2015.3 statement?

7    A    I have a recollection of it, yes.

8    Q    Can you just describe that for the Court?

9    A    When we -- when we initially filed, when the Debtor filed

10   and it was transferred over, we started trying to get all the

11   various rules completed.  There are, as the Court is aware, at

12   least a thousand and maybe more, more like three thousand,

13   entities in the total corporate structure.

14        We pushed our internal counsel to try to get that done,

15   and were never able to really get it completed.  We did not

16   have -- we were told we didn't have separate consolidating

17   statements for every entity, and it would be difficult.  And

18   just in the rush of things that happened from the first

19   quarter into the COVID into the year, we just didn't complete

20   that filing.  There was no reason for it other than we didn't

21   get it done initially and I think it fell through the cracks.

22        MR. MORRIS:  Nothing further, Your Honor.

23        THE COURT:  All right.  Anything further, Mr.

24   Rukavina?

25                        REDIRECT EXAMINATION

Seery - Redirect                          50

1   BY MR. RUKAVINA:

2   Q   Mr. Seery, I appreciate that answer.  But you never sought

3   leave from the Bankruptcy Court to postpone the deadlines for

4   filing 2015.3, did you?

5   A   No.  If it hadn't fallen through the cracks, it would have

6   been something we recalled and we would have done something

7   with it.  But, frankly, it just fell off the -- through the

8   cracks.  We didn't deal with it.

9   Q   Okay.

10          MR. RUKAVINA:  Thank you, Your Honor.  Thank you, Mr.

11  Seery.

12          THE COURT:  All right.  Any other Objector

13  examination?

14      Mr. Morris, anything further on that point?

15          MR. MORRIS:  No, thank you, Your Honor.  No further

16  questions.

17          THE COURT:  All right.  Mr. Seery, thank you.  You're

18  excused once again from the witness stand.

19      (The witness is excused.)

20          THE COURT:  Your next witness?

21          MR. SEERY:  Thank you, Your Honor.

22          THE COURT:  Uh-huh.

23          MR. RUKAVINA:  Your Honor, I'll call Jason Post.  Mr.

24  Post, if you're listening, which I believe you are, if you'll

25  please activate your camera.

Post - Direct                              51

1          THE COURT:  Mr. Post, we do not see or hear you yet.

2          MR. RUKAVINA:  Talk, Mr. Post, and I think it'll

3   focus on you.

4          MR. POST:  Yes.  Can you hear me now?

5          THE COURT:  We can hear you.  We cannot see you yet.

6   Could you say, "Testing, one, two; testing, one, two"?

7          MR. POST:  Testing, one, two.  Testing, one, two.

8          THE COURT:  There you are.  Okay.  Please raise your

9   right hand.

10      JASON POST, CERTAIN FUNDS AND ADVISORS' WITNESS, SWORN

11         THE COURT:  All right.  Thank you.  You may proceed.

12                      DIRECT EXAMINATION

13  BY MR. RUKAVINA:

14  Q   Mr. Post, good morning.  State your name for the record,

15  please.

16  A   Robert Jason Post.

17  Q   How are you employed?

18  A   I'm employed by NexPoint Advisors, LP.

19  Q   What is your title?

20  A   Chief compliance officer.

21  Q   Were you ever employed by the Debtor here?

22  A   Yes.

23  Q   Between when and when?  Approximately?

24  A   I believe it was July of '08 through October of 2020.

25  Q   What was your last title while you were employed at the

Post - Direct                          52

1  Debtor?

2  A   Still chief compliance officer.  For the retail funds.

3  Q   Okay.  Very, very quickly, what does a chief compliance

4  officer do?  Or what do you do?

5  A   It's multiple things.  Interaction with the regulators.

6  Adherence to prospectus and SAI limitations for the funds.

7  And then establishment of written policies and procedures to

8  prevent and detect violations of the federal securities laws

9  and then testing those on a frequent basis.

10 Q   And I believe you mentioned you're the CCO for NexPoint

11 Advisors and Highland Capital Management Fund Advisors.  Are

12 you also the CCO for any funds that they advise?

13 A   Yes.  For all the funds that they advise.

14 Q   Okay.  Does that include so-called retail funds?

15 A   Yes.  They're all retail funds.

16 Q   What is a retail fund?

17 A   It typically constitutes funds that are subject to the

18 Investment Company Act of 1940, such as open-end mutual funds,

19 closed-end funds, ETFs.

20 Q   Obviously, you know who my clients are.  Are any of my

21 clients so-called retail funds that you just described?

22 A   Yes.

23 Q   Name them, please.

24 A   You've got NexPoint Capital, Inc., Highland Income Fund,

25 and NexPoint Strategic Opportunities Fund.

Post - Direct                            53

1   Q   Do those three retails funds hold any voting preference

2   shares in the CLOs that the Debtor manages?

3   A    Yes.

4           MR. RUKAVINA:  Mr. Vasek, if you'll please pull up

5   Exhibit 2.

6       Your Honor, I believe I have a stipulation with Mr. Morris

7   that this exhibit can be admitted, so I'll move for its

8   admission.

9           MR. MORRIS:  No objection, Your Honor.

10          THE COURT:  All right.  Exhibit 2 will be admitted.

11  And let's be clear.  That appears at -- is it Docket No. --

12  let's see.  Is it 1673 that you have your -- no, no, no, no.

13  1670?  Is that where your exhibits are?

14          MR. RUKAVINA:  No, Your Honor.  It's 1863.  I think

15  we did an amended one because we numbered our exhibits instead

16  of having seventeen Os and Ps.  So it's 1863.

17          THE COURT:  1863?  Okay.  All right.  There it is.

18  Okay.  Again, this is -- I'm sorry.  I got sidetracked.  What

19  exhibit?  It's Exhibit 2, is admitted.  Okay.

20          MR. RUKAVINA:  Thank you, Your Honor.

21      (Certain Funds and Advisors' Exhibit 2 is received into

22  evidence.)

23  BY MR. RUKAVINA:

24  Q   Real quick, Mr. Seery.  What do these HIF, NSOF, NC, what

25  do they stand for?  Do they stand for the retail funds you

Post - Direct                                54

1    just named?

2           MR. SEERY:  I don't think he meant me.

3           THE WITNESS:  Yeah.

4    BY MR. RUKAVINA:

5    Q    I'm sorry, Mr. Post.  I didn't hear you.

6    A    You addressed me as Mr. Seery.

7    Q    Oh.  I apologize.  What do those initials stand for?

8    A    The names of the funds that I mentioned.

9    Q    Okay.  And what do these percentages show?

10   A    The percentages show the amount of shares outstanding and

11   the preference shares that each of the respective funds hold

12   of the named CLOs.

13   Q    And those CLOs on the left there, those are the CLOs that

14   the Debtor manages pursuant to agreements, correct?

15   A    Yes.  Those are some of them, correct.

16   Q    Yes.  The ones that the retail funds you mentioned have

17   interests in, correct?

18   A    Correct.

19   Q    And what does the far-right column summarize or show?

20   A    That would be the aggregate across the three retail funds.

21   Q    In each of those CLOs?

22   A    Correct.

23   Q    Thank you.

24          MR. RUKAVINA:  Mr. Vasek, you may pull this down.

25   BY MR. RUKAVINA:

                     Post - Direct                    55

1   Q   Mr. Post, in the aggregate, how much do those three retail

2   funds have invested in those CLOs, ballpark?

3   A   I believe it's approximately $130 million, give or take.

4   Q   Is it closer to 140 or 130?

5   A   A hundred -- I think it's 140, actually.

6   Q   Okay.  Thank you.  Who controls those three retail funds?

7   A   Ultimately, the board --

8   Q   And what --

9   A   -- of the funds.

10  Q   What is -- what do you mean by the board?  Do they have

11  independent boards?

12  A   Yes.  They have a majority independent board, the funds

13  do.

14  Q   Do you report to that board?

15  A   Yes.

16  Q   Does Mr. Dondero sit on those boards?

17  A   He does not.

18  Q   Okay.

19          MR. RUKAVINA:  I'll pass the witness, Your Honor.

20  Thank you, Mr. Post.

21          THE COURT:  All right.  Any other Objector

22  examination of Mr. Post?

23      All right.  Mr. Morris, do you have cross?

24          MR. MORRIS:  Yes, Your Honor, I do.

25          THE COURT:  Okay.

Post - Cross                                    56

1                        CROSS-EXAMINATION

2    BY MR. MORRIS:

3    Q    Mr. Post, can you hear me okay, sir?

4    A    Yes, I can hear you.

5    Q    Okay.  Nice to see you again.  When did you first join

6    Highland?

7    A    I believe it was July of '08.

8    Q    So you've worked with the Highland family of companies for

9    about a dozen years now; is that right?

10   A    Yes.

11   Q    And you were actually employed by the Debtor from 2008

12   until October 2020; is that right?

13   A    Correct.

14   Q    And you left at that time and went to join Mr. Dondero as

15   the chief compliance office of the Advisors; do I have that

16   right?

17   A    Yes.  I transitioned to NexPoint Advisors shortly, I

18   believe, after Mr. Dondero left, but I was already the named

19   CCO for that entity.

20   Q    Right, but your employment status changed from being an

21   employee of the Debtor to being an employee of NexPoint; is

22   that right?

23   A    Correct.

24   Q    And that happened shortly after Mr. Dondero resigned from

25   the Debtor and went to NexPoint Advisors, correct?

```
                    Post - Cross                      57
```

1   A    Correct.

2   Q    Okay.  You mentioned that the funds are controlled by

3   independent boards; do I have that right?

4   A    It's a majority independent board, correct.

5   Q    Okay.  There's no independent board member testifying in

6   this hearing, is there?

7   A    I --

8          MR. RUKAVINA:  Your Honor, Mr. Post wouldn't know

9   that, but I'll stipulate to that as a fact.

10         THE COURT:  All right.

11         MR. MORRIS:  Okay.

12  BY MR. MORRIS:

13  Q    Did you -- do you speak with the board members from time

14  to time?

15  A    Yes.

16  Q    Did you tell them that it might be best if they came and

17  identified themselves and helped persuade the Court that they

18  were, in fact, independent?

19  A    They have counsel to assist them with that determination.

20  I never mentioned anything along those line to them.

21  Q    Okay.  Can you tell me who the board members are?

22  A    Yes.  Ethan Powell, Bryan Ward, Dr. Bob Froehlich, John

23  Honis, and then Ed Constantino.  He is only a board member,

24  though, for NSOF.  NexPoint Strategic Opportunities Fund.

25  Q    All right.  Mr. Honis, is he -- has he been determined to

Post - Cross                           58

1  be an interested director, for purposes of the securities

2  laws?

3  A    Yes.

4  Q    Okay.  Mr. Froeh..., do you know much about his

5  background?

6  A    I believe he worked at Deutsche Bank and a couple of the

7  other -- or maybe a couple of other investment firms in the

8  past.  And he also owns a minor league baseball team.

9  Q    Do you know how long he served as a director of the funds?

10  A    I don't know, approximately.  I think maybe seven -- six,

11  seven years.

12  Q    Okay.  How about Mr. Ward?  Did Mr. Froehlich ever work

13  for Highland?

14  A    Not that I can recall.

15  Q    Did Mr. Ward ever work for Highland?

16  A    Not that I can recall.

17  Q    Do you recall how long he's been serving as a director of

18  the funds?

19  A    Mr. Ward?

20  Q    Yes.

21  A    I believe -- I'd be -- I don't recall specifically.  I

22  think it's been, you know, 10 to 12 years, give or take.

23  Q    He was a director when you got to Highland; isn't that

24  right?

25  A    He was on the board of directors.

Post - Cross                            59

1  Q   Yeah.  So fair to say that Mr. Ward has been a director

2  since at least the mid to late oughts?  2005 to 2008?

3  A   I'm sorry, you cut out.  Late what?

4  Q   The late oughts.  Withdrawn.  Is it fair to say that Mr.

5  Ward's been a director of the funds since somewhere between

6  2005 and 2008?

7  A   Again, I don't recall specifically.  You know, I joined

8  the complex, the retail complex as the named CCO in 2015, and

9  he had been serving in that role prior to that, and I believe

10 it was for probably a period of five to seven years, so that

11 sounds in line.

12 Q   Did you have a chance to review Dustin Norris's testimony

13 from the December 16th hearing?

14 A   I did not.

15 Q   Do you know -- are you aware that he testified at some

16 length regarding the relationship of each of these directors

17 to Mr. Dondero and Highland?

18 A   I didn't review anything, so I don't know what he said or

19 how long it took.

20 Q   Do you know if Mr. Powell's ever worked for Highland?

21 A   He has.

22 Q   Do you know in what capacity and during what time periods?

23 A   He was -- I think his last title was -- I believe was

24 chief product strategist, I believe.  And he was also the

25 named PM for one of -- or, a suite of ETF funds.  I think he

Post - Cross                              60

1  was last employed maybe --from my recollection, 2014,

2  possibly.  Or 2015.  Somewhere around in there.

3  Q   Okay.  And to the best of your knowledge, did Mr. Dondero

4  appoint Mr. Powell to be the chief product strategist?

5  A   I don't -- I don't know.  I wasn't involved in the

6  decision for his appointment.  I don't know how he attained

7  that role.

8  Q   To the best of your knowledge, did Mr. Dondero appoint Mr.

9  Powell as the PM of the ETF funds?

10  A   Again, I wasn't involved in that determination, but he

11  probably would have had a role in making the determination on

12  who was the PM, along with probably some other investment

13  professionals.

14  Q   Okay.  And did Mr. Powell join the board of the funds

15  before or after he left Highland around 2015?

16  A   I can't recall specifically if he was already on the board

17  or was an interested member, but I believe he, you know, I

18  believe he joined shortly after he left.

19  Q   Okay.  So he went from being an employee and being a

20  portfolio manager at Highland to being on the board of these

21  funds.  Do I have that right?

22  A   Again, I can't recall specifically.  He may have already

23  been on the board as an interested board member.  But, you

24  know, I believe, you know, if that wasn't the case, he would

25  have joined the board shortly after leaving.

Post - Cross                          61

1  Q   And Mr. Ward, I think you said, has been on the funds'

2  board since somewhere between 2005 and 2008.  Does that sound

3  right?

4  A   I think that was a time frame you referenced, and I think

5  that was kind of in line, walking it back.  But I don't recall

6  specifically when he joined.

7  Q   And to the best of your knowledge, have the Advisors for

8  which you serve as the chief compliance officer managed the

9  Funds for which Mr. Ward has served as a director since the

10 time he became a director?

11 A   I'm sorry.  Can you repeat the question?

12 Q   Yeah.  I'm just trying to understand if the advisors --

13 withdrawn.  The Advisors manage the Funds; do I have that

14 right?

15 A   They provide investment advice on behalf of the Funds.

16 Q   And they do that pursuant to written agreements; do I have

17 that right?

18 A   Correct.

19 Q   And is it your understanding that, for the entire time

20 that Mr. Ward has served as a member of the board of the

21 Funds, the Advisors have provided the investment advice to

22 each of those Funds?

23 A   Yes, in one form or fashion.  I believe at one period in

24 time, historically, the Advisor may have changed its name, but

25 it would have been, you know, at the end of the day, one or

Post - Cross                                  62

1   more -- one of either NexPoint Advisors or Highland Capital

2   Management Fund Advisors would have advised those Funds.

3   Q   Is it fair to say that each of the Advisors for which you

4   serve as the chief compliance officer has always been managed

5   by an Advisor owned and controlled by Mr. Dondero?

6   A   I believe so, yes.

7            MR. MORRIS:  I have no further questions, Your Honor.

8            THE COURT:  All right.  Any redirect?

9            MR. RUKAVINA:  Yes.

10           THE COURT:  Okay.  Mr. Rukavina?

11           MR. RUKAVINA:  Your Honor, was I on mute?  I

12   apologize.

13           THE COURT:  Yes.

14                    REDIRECT EXAMINATION

15   BY MR. RUKAVINA:

16   Q   Mr. Post, why did you leave Highland?

17   A   It -- because I was a HCMLP employee and it was --

18   basically, there was conflicts that were created by being an

19   employee of the Debtor and by also serving as the CCO to the

20   named Funds and the Advisors, and it coincided with Jim

21   toggling over from HCMLP to NexPoint.  It just made sense more

22   functionally and from a silo perspective for me to be the

23   named CCO for that entity since he was no longer an employee

24   of HCMLP.

25   Q   And by Jim, you mean Jim Dondero?

Post - Redirect/Recross                          63

1   A    Yes, sorry.  Jim Dondero.

2   Q    You're not some kind of lackey for Mr. Dondero, where you

3   go wherever he goes, are you?

4           MR. MORRIS:  Objection to the question.

5           THE WITNESS:  No.

6           THE COURT:  Overruled.  He can answer.

7           MR. RUKAVINA:  Okay.

8           THE WITNESS:  No.

9           MR. RUKAVINA:  Okay.  Thank you, Your Honor.  I'll

10  pass the witness.

11          THE COURT:  Any other Objector examination?

12      All right.  Any recross, Mr. Morris?

13                      RECROSS-EXAMINATION

14  BY MR. MORRIS:

15  Q    Just one question, sir.  The conflicts that you just

16  mentioned, they were in existence for the one-year period

17  between the petition date and the date you left; isn't that

18  right?

19  A    I think -- I believe so, and I think they became more

20  evident as, you know, time progressed.

21  Q    Okay.  But they existed on day one of the bankruptcy

22  proceeding; isn't that right?

23  A    Yes, I believe so.

24  Q    All right.

25          MR. MORRIS:  No further questions, Your Honor.

Post - Recross                    64

1          THE COURT:  All right.  Thank you, Mr. Post.  You're

2    excused from the virtual witness stand.

3      (The witness is excused.)

4          THE COURT:  All right.  Your next witness?

5          MR. RUKAVINA:  Your Honor, my exhibit has been

6    admitted, I promised I'd be short, and my evidentiary

7    presentation is done.  Thank you.

8          THE COURT:  All right.  Well, Mr. Taylor, your

9    evidence?

10          MR. TAYLOR:  First of all, given the testimony that

11    we have received just recently, we have released Mr. Sevilla

12    from his subpoena and are not going to call him.

13      With that being said, we do have some documents that we

14    would like to get into evidence.  We filed our witness and

15    exhibit list at Docket No. 1874.  I don't believe any of these

16    are controversial.  I'm trying to keep from duplicating those

17    that are already into evidence by the Debtor.  And therefore I

18    would like to offer into evidence Exhibits No. 6 through 12

19    and 17.  And that is it, Your Honor.

20          THE COURT:  Okay.  Is there any objection to Dondero

21    Exhibits 6 through 12 and 17, appearing at Docket 1874?

22          MR. MORRIS:  I just want to be clear that Exhibits 6

23    and 7, which are letters, I believe, from Mr. Lee (phonetic)

24    are not being offered for the truth of the matter asserted in

25    either letter.

65

1          MR. TAYLOR:  That is correct, Your Honor.  Just

2    merely that those requests and the words that were stated in

3    there were indeed sent on those dates.

4          MR. MORRIS:  And the same comment, Your Honor, with

5    respect to Exhibits 9 through 12, that those documents are not

6    being offered for the truth of the matter asserted.

7          MR. TAYLOR:  Again, just that those requests were

8    sent and those responses as stated were sent.

9       And I apologize.  I missed one, Your Honor.  Also No. 15.

10   6 through 12, 15, and 17.

11         MR. MORRIS:  Your Honor, the Debtor has no objection

12   to Exhibits 15, 16, and 17.

13         THE COURT:  All right.  So, so they are all admitted

14   with the representation that 6 and 9 through 12 are not being

15   offered for the truth of the matter asserted.  With that

16   representation, you have no objection, Mr. Morris?

17         MR. MORRIS:  That's right.  I do just want to get

18   confirmation that Exhibits 1 through 5 and 13 through 16 -- 13

19   and 14 are not being offered at all.

20         THE COURT:  Mr. Taylor?

21         MR. TAYLOR:  So, that -- that is correct.  1 through

22   5 would be duplicative of what has already been introduced

23   into the record by Mr. Morris, so I am not offering those.

24   And do not believe that 13 and 14 are relevant anymore, and so

25   therefore did not offer those.

66

1          THE COURT:  Okay.  So, with that, I have admitted 6

2     through 12, 15, 16, and 17 at Docket Entry 1874.

3        (Dondero Exhibits 6 through 12 and 15 through 17 are

4     received into evidence.)

5          THE COURT:  All right.  Anything else, Mr. Taylor?

6          MR. TAYLOR:  No, Your Honor.  We are not calling any

7     witnesses.

8          THE COURT:  All right.  Mr. Draper, what about you?

9     Any evidence?

10          MR. DRAPER:  No evidence or witnesses.  The evidence

11     that's been introduced by Mr. Taylor and Mr. Rukavina are

12     sufficient for me.

13          THE COURT:  All right.  Ms. Drawhorn, anything from

14     you?

15          MS. DRAWHORN:  No additional evidence, Your Honor.

16          THE COURT:  All right.  Well, then, Mr. Morris, did

17     you have anything in rebuttal?

18          MR. MORRIS:  No, Your Honor.  I think we can proceed

19     to closing statements.  I would just appreciate confirmation

20     by the Objecting Parties that they rest.

21          THE COURT:  All right.  Well, I guess we'll get that

22     clear if it is isn't clear.  All of the Objectors rest.

23     Confirm, yes, Mr. Rukavina?

24          MR. RUKAVINA:  Confirm.

25          THE COURT:  And Mr. Taylor?

67

1          MR. TAYLOR:  Confirmed, Your Honor.

2          THE COURT:  Okay.  And Draper and Drawhorn?

3          MR. DRAPER:  Yes, Your Honor.

4          MS. DRAWHORN:  Confirmed, Your Honor.

5          THE COURT:  All right.  By the way, I assume Mr.

6  Dondero has been participating this morning.  I didn't

7  actually get that clarification before we started.  Mr.

8  Taylor, is he there with you this morning?

9          MR. TAYLOR:  Your Honor, he is.  He has been

10  participating.  He is sitting directly to my left about

11  slightly more than six feet apart.

12          THE COURT:  Okay.  All right.  Good.

13     All right.  Well, let's talk about our closing arguments

14  and let me figure out, do we have -- should we break a bit

15  before starting?  I have an idea in my brain about a time

16  limitation, but before I do that, let me ask.  Mr. Morris,

17  first I'll ask you.  How much time do you think you need for a

18  closing argument?

19          MR. MORRIS:  Your Honor, --

20          MR. POMERANTZ:  Your Honor?

21          MR. MORRIS:  -- I'll defer to Mr. Pomerantz, who's

22  going to deliver that portion of our presentation today.

23          THE COURT:  All right.  Mr. Pomerantz?

24          MR. POMERANTZ:  Your Honor, I will be making -- yes,

25  Your Honor.  I will be making the majority portion of the

68

1   argument.  Mr. Kharasch will be making the portion of the

2   argument dealing with the Advisor and Funds' objection.  But I

3   expect my closing to be quite lengthy, given the 1129

4   requirements, all the legal issues, which I plan to spend a

5   fair amount of time.  So I would anticipate a range of an hour

6   and 45 minutes.

7           THE COURT:  An hour and 45 minutes?  All right.

8   Well, --

9           MR. POMERANTZ:  Correct.

10          THE COURT:  I'm getting an echo.

11          MR. CLEMENTE:  Your Honor, it's Matt Clemente on

12   behalf on the Committee.  I'll have 15 minutes or less, Your

13   Honor.  Just some things I would like to touch on.

14          THE COURT:  All right.  So, two hours.  If I were to

15   --

16          MR. POMERANTZ:  And then you need, Your Honor, to add

17   Mr. Kharasch.  I think he's on.  He can indicate how long his

18   part of the closing will be.

19          THE COURT:  Mr. Kharasch?

20          MR. KHARASCH:  Yes.  I would figure my argument would

21   probably be about 20 minutes to 30 minutes.

22          THE COURT:  Okay.

23          MR. RUKAVINA:  Your Honor, let me interject something

24   that I think will help everyone out.  With the CLOs having

25   consented through their counsel to the assumption, the bulk of

69

1   my objection is now moot.  We no longer can and will argue

2   that the contracts are unassignable under 365(b) or (c)

3   because we do have now their consent.  So that will hopefully

4   help the Debtor on that issue.

5           MR. KHARASCH:  Your Honor, Ira Kharasch again.  I was

6   not anticipating that.  I believe that that will take away the

7   bulk of my argument.  I'm still going to be dealing with some

8   of the other non-assumption-type arguments raised by the CLO

9   Objectors, kind of dovetailing with Mr. Pomerantz's arguments

10  on the injunction.  But that will greatly reduce, Your Honor,

11  my argument.

12          THE COURT:  All right.  So if I say two hours of

13  argument for the Debtor and Creditors' Committee, Rukavina,

14  Taylor and Draper and Drawhorn, can you collectively manage to

15  share that two hours?  Have a two-hour argument in the

16  aggregate?  That seems fair to me.

17          MR. RUKAVINA:  Your Honor, I think -- I think that's

18  fine, Your Honor.

19          THE COURT:  All right.  And I guess I'll --

20          MR. TAYLOR:  This is Mr. Taylor.  And yes, I agree.

21          THE COURT:  Okay.  And Mr. Draper?

22          MR. DRAPER:  This is Douglas Draper.  I agree.  I

23  agree also, Your Honor.

24          THE COURT:  All right.  And I'm going to ask --

25          MR. POMERANTZ:  Your Honor, I --

70

1          THE COURT:  Go ahead.

2          MR. POMERANTZ:  Your Honor, we -- I think we may need

3   like two hours and ten minutes, because mine was 1:45, Mr.

4   Clemente was 15, and then Mr. Kharasch.  But we'll be around

5   that.  And I tend to speak fast, so I might even shorten mine.

6          THE COURT:  Okay.  You negotiated me up to two hours

7   and ten minutes, Debtors/Objectors, each.

8       I'm going to ask one more time.  The U.S. Trustee lobbed a

9   written objection, but we've not heard anything from the U.S.

10  Trustee.  Are you out there wanting to make an oral argument?

11         MS. LAMBERT:  Yes, Your Honor.  The United States

12  Trustee is on the line.  And we've been listening to the

13  hearing.  I can turn my video on.  I think you're --

14         THE COURT:  Yes.  I can hear you.  I can't see you.

15         MS. LAMBERT:  Okay.  All right.  And so the U.S.

16  Trustee feels that the issues about the releases have been

17  adequately joined and raised by the other parties and that

18  it's an issue of law.  The U.S. Trustee does not feel that we

19  can add to that dialogue by, you know, wasting more of the

20  Court's time.  I think it's been adequately briefed and it's

21  been adequately argued here today.

22         THE COURT:  Okay.

23         MS. LAMBERT:  And we do have an agreement to include

24  governmental release language in the order.  I understand that

25  agreement is still being honored.  That's a separate agreement

71

1  than the issue of whether the releases are precluded. But

2  we're going to let the other people carry the water on that.

3          THE COURT: Okay.

4          MR. POMERANTZ: Yeah. And that is correct. That is

5  correct, Your Honor. They asked for some information -- a

6  provision on government releases. They also asked for a

7  provision regarding joint and several liability for Trustee

8  fees.

9      As I mentioned previously, the IRS has asked for a

10  provision in the confirmation order, as have the Texas Taxing

11  Authorities.

12      We have not uploaded a proposed confirmation order, but I

13  will state right now on the record that, before we do so, we

14  will, of course, give Ms. Lambert, Mr. Adams, and the Texas

15  Taxing Authorities the opportunity to review. We expect there

16  won't be any issue because the language has already been

17  agreed to.

18          THE COURT: All right. Well, how about this. It's

19  11:23 Central time. Let's break until 12:00 noon Central

20  time, okay, so that gives everyone a little over 30 minutes to

21  have a snack and get their notes together, and we'll start

22  with closing arguments at 12:00 noon. All right? So we're in

23  recess until then.

24          THE CLERK: All rise.

25      (A recess ensued from 11:24 a.m. until 12:05 p.m.)

72

1          THE COURT:  All right.  Please be seated.  All right.

2   This is Judge Jernigan.  We are back on the record in

3   Highland.  Let me make sure we have the people we need.  Do we

4   have the Pachulski team there?  Mr. Pomerantz, Mr. Kharasch?

5          MR. POMERANTZ:  Yes, you do, Your Honor.

6          THE COURT:  All right.  For our Objectors, Mr.

7   Taylor, are you there?

8          MR. TAYLOR:  Yes, Your Honor, I am.

9          THE COURT:  All right.  I see Mr. Draper there on the

10  video.  You're there?

11         MR. DRAPER:  I'm here.  Can you hear me?

12         THE COURT:  I can hear you loud and clear, yes.

13         MR. DRAPER:  Great, because I didn't -- I'm not

14  hearing, something so I apologize.

15         THE COURT:  All right.  So we have Mr. Rukavina, and

16  I think I see Mr. Hogewood there as well.  Is that correct?

17  You're ready to go forward?

18         MR. RUKAVINA:  Yes, Your Honor.

19         THE COURT:  All right.

20         MR. RUKAVINA:  Yes, Your Honor.  Good afternoon.

21         THE COURT:  All right.  And Ms. Drawhorn, you're

22  there?

23         MS. DRAWHORN:  Yes, Your Honor.

24         THE COURT:  Okay.  Committee.  Mr. Clemente, are you

25  there?

73

 1          MR. CLEMENTE:  Yes, Your Honor.  I'm here, Your

 2   Honor.

 3          THE COURT:  Okay.  Very good.  All right.  So, let me

 4   reiterate.  We've given two-hour and 10-minute time

 5   limitations for the Debtor, and that'll be both any time you

 6   reserve for rebuttal and your closing, initial closing

 7   argument.  Mr. Clemente, you're going to be in that time frame

 8   as well.  Okay?

 9          MR. CLEMENTE:  Yes, Your Honor.

10          THE COURT:  And so, as supporters of the plan.

11       And then, of course, the Objectors, they have collectively

12   two hours and ten minutes.

13       A couple of things.  I'm going to have my law clerk, Nate,

14   who you can't see but he's to my right, he's going to keep

15   time.  I promise I won't be a jerk and cut anyone off

16   midsentence, but please don't push the limit if I say, you

17   know, "Time."

18       The other thing I will tell you is I'll probably have some

19   questions here or there.  And I've told Nate, cut off the

20   timer if we're in a question-answer session.  I won't count

21   that as part of the two hours and ten minutes.

22       All right.  So, with that, Mr. Pomerantz, you may begin.

23              CLOSING STATEMENT ON BEHALF OF THE DEBTOR

24          MR. POMERANTZ:  Thank you, Your Honor.  As Your Honor

25   is aware, the Debtor has been able to resolve all objections

74

1   to confirmation other than the objection by Mr. Dondero or his

2   entities and the United States Trustee.

3       Your Honor, I have a very lengthy closing argument, given

4   the number of issues that are raised in the objections, and I

5   want to make a complete record, since I understand that

6   there's a good likelihood that (garbled) appeal.

7       With that in mind, Your Honor, I'm prepared to go through

8   each and every confirmation requirement in Section 1129.

9   However, as an alternative, I might propose that I can go

10  through each of the Section 1129 requirements that are the

11  subject of pending objections or otherwise depend upon

12  evidence that Your Honor has heard.

13          THE COURT:  Okay.

14          MR. POMERANTZ:  And of course, I'll be happy to

15  answer any questions that you have in the process.

16          THE COURT:  Okay.

17          MR. POMERANTZ:  And after my closing argument, I will

18  turn it over to Mr. Kharasch to address the Advisor and Funds'

19  objections.

20          THE COURT:  Okay.

21          MR. POMERANTZ:  Before I walk the Court through the

22  confirmation requirements, I did want to note for the Court,

23  as I did previously, that we filed an updated ballot summary

24  at Docket No. 1887.  And as reflected in the summary, Classes

25  2 and 7 have voted to accept the plan with the respective

75

1  numerosity and amounts required.  In fact, the votes are a

2  hundred percent.

3      Class 8, however, has voted to reject the plan.  Seventeen

4  creditors in Class 8 voted yes and 24 objectors, which are, I

5  think, all but one the employees with one-dollar claims for

6  voting purposes, voted against.

7      In dollar amount, Class 8 has accepted the plan by 99.8

8  percent of the claims.  And I will address the issues of the

9  cram-down over that class a little bit later on.

10      Lastly, during the course of my presentation, I will

11  identify for the Court certain modifications we have made to

12  address the objections that were filed on January 22nd and

13  then also on February 1st.  And at the end of my presentation,

14  I will raise a couple of other modifications that I won't get

15  to during my presentation and will explain to the Court why

16  all the modifications do not require resolicitation and are

17  otherwise appropriate under Section 1127.

18      Your Honor, as Your Honor is aware, Section 1129 requires

19  the Debtors to demonstrate to the court that the plan

20  satisfies a number of statutory requirements.  1129(a)(1)

21  provides that the plan requires -- complies with all statutory

22  provisions of Title 11, and courts interpreted this provision

23  as requiring the debtor to demonstrate it complies with

24  Section 1122 and 1123.

25      With respect to classification, Your Honor, there has been

76

1   one objection that was raised to essentially a classification,

2   and that was raised by Mr. Dondero to Article 3C of the plan

3   on the grounds that it purports to eliminate a class that did

4   not have any claims in it as of the effective date but which

5   may later have a claim in that class.

6       I think he was primarily concerned about Class 9

7   subordinated claims.  But Mr. Dondero misunderstands the

8   provision.  It only eliminates a claim for voting purposes,

9   and if there's later a claim in that class, it will be treated

10  as the plan provides the treatment.

11      In any event, Class 9, as we know now, will be populated

12  by the HarbourVest claims, as well as the UBS claims and the

13  Patrick Daugherty claims, if the Court approves the settlement

14  approving those claims.

15      Next, Your Honor, Section 1123(a) contains seven mandatory

16  requirements that a plan must include.  Sections 1, 2, and 3

17  of 1123(a) apply to the classification of claims and where

18  they're impaired and treatment.  The plan does that.

19      There has been an objection to 1123(a)(3) raised by

20  several parties with respect to the classification and

21  treatment of subordinated claims.  The concerns stem from the

22  mistaken belief that the Debtor reserved the right to

23  subordinate claims without providing parties with notice and

24  without obtaining a court order.

25      The Debtor never intended to have unilateral ability to

77

1  subordinate claims without affording parties due process

2  rights, and we've added some clarificatory language to so

3  provide.

4      We made changes to the plan on January 22nd, and then on

5  February 1st, and the plan addresses all those issues in

6  Article 3(j) and it talks about when a claim is going to be

7  subordinated as a non-creditor.  We've also redefined the

8  definition of subordinated claims to make clear that a claim

9  is only subordinated upon entry of an order subordinating that

10 claim.

11     Mr. Dondero also objected on the grounds that the plan did

12 not contain a deadline pursuant to which the Debtor would be

13 required to seek any subordination, and we have revised

14 Article 7(b) of the plan to provide that any request to

15 subordinate a claim would have to be made on or before the

16 claim objection deadline, which is 180 days after the

17 effective date.

18     Lastly, certain former employees, Mr. Yang and Borud,

19 objection also joined by Mr. Deadman, Travers, and Kauffman,

20 objected to the inclusion of language in the definition of

21 "Subordinated Claims" that a claims arising from a Class A, B,

22 or C limited partnership is deemed automatically subordinated.

23 The concerns were that the language could broadly apply to any

24 potential claims by a former partner, and could be also read

25 to encompass claims outside the statutory scope of 510(b) or

78

1    otherwise relating to limited partnership interests.

2        While the Debtor does reserve the right to seek to

3    subordinate the claims on any basis, we have modified the plan

4    to address that concern and to address the concern that we're

5    not attempting to create any new causes of action for

6    subordination that don't otherwise exist under applicable law,

7    but it just preserves the parties' rights with respect to

8    subordination and deals with that at a later date.

9        Next, Your Honor, Section 1123(a)(5).  I skipped over

10   1123(a)(4) because there are no objections to that provision.

11            THE COURT:  Okay.

12            MR. POMERANTZ:  Section 1123(a)(5), a plan must

13   provide for adequate means of implementation.  And the plan

14   provides a detailed structure and blueprint how the Debtor's

15   operations will continue, how the assets will be monetized,

16   including the establishment of the Claimant Trust,

17   establishment of the Litigation Sub-Trust, the Reorganized

18   Debtor, the Claimant Trust Oversight Board.  And the documents

19   precisely describing how this will occur were filed as part of

20   the various plan supplements.

21       1123(a)(7), Your Honor, requires that the plan only

22   contain provisions that are consistent with the interest of

23   equity holders and creditors with respect to the manner,

24   selection, and -- of any director, officer, or trustee under

25   the plan.  And as discussed in the plan, at the disclosure

79

1  statement, and as testified to by Mr. Seery, the Committee and

2  the Debtor had arm's-length negotiations regarding the post-

3  effective date corporate governance and believe that the

4  selection of the claimant Trustee, the Litigation Sub-Trustee,

5  and the Claimant Trust Oversight Board are in the best

6  interest of stakeholders.

7      HCMFA has raised a particular objection, I think, to these

8  issues, but I will address it in the context of the

9  requirement under Section 1129(a)(5).

10      Your Honor, Section 1129(a)(2) requires that the plan

11  comply with the disclosure and solicitation requirements under

12  the plan.  Section 1125 requires that the Debtor only solicit

13  with a court-approved disclosure statement.  The Court

14  approved the disclosure statement on November 23rd, and

15  pursuant to the proofs of service on file, the plan and

16  disclosure statement were mailed, along with solicitation

17  materials that the court approved.

18      Now, there has been an objection raised by Dugaboy, and

19  also alluded to by Mr. Taylor in some of his comments before,

20  that the plan does violate 1129(a)(2) because the Debtor's

21  disclosure statement was deficient.

22      In support of that argument, Dugaboy points to the

23  reduction in the anticipated distribution to creditors from

24  the November plan analysis to the January plan analysis, and

25  argues that that reduction requires resolicitation.  However,

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2523 of 2722

80

1    those arguments are not well-taken.

2        First, none of the people making these objections were

3    solicited for their vote on the plan, or if they had been,

4    they didn't vote or decided to reject the plan.  And to the

5    extent that Class 8 creditors, the distribution has gone down

6    -- that's the class that Mr. Taylor and Mr. Draper are

7    concerned about -- you don't hear the Committee, Acis,

8    Redeemer, UBS, HarbourVest, Daugherty, or the Senior Employees

9    making their argument, this argument, and they represent over

10   99 percent of the claims in that class.  And in fact, of the

11   17 Class 8 creditors that have accepted the plan, 15 are

12   represented by the parties I just mentioned.

13       So who are the two creditors that they're so concerned

14   about?  One is Contrarian, which is a claims trader that

15   actually elected to be treated in Class 7, and one is one of

16   the employees who voted to accept the plan.

17       Second, Your Honor, the argument conflates the difference

18   between adverse change to the treatment of a claim or interest

19   that would require a resolicitation under Section 1127 and a

20   change to the distribution that would not.

21       More importantly, Your Honor, the argument is specious.

22   As Mr. Seery testified yesterday, the material differences

23   between the analysis contained on November and late January

24   and the one we filed on February 1st were based on three types

25   of changes:  an update regarding the increased value of assets

81

1   based upon events that had transpired during this period,

2   which included an increase in asset value, no recoveries, and

3   revenues expected to be generated by the CLO management

4   agreements; an update to the expected costs of the Reorganized

5   Debtor and the Claimant Trust as a result of the continued

6   evaluation of staffing needs, operational expenses, and

7   professional fees; and an update to reflect resolution of the

8   HarbourVest and UBS claims.

9       In the filing Monday, Your Honor, we updated the plan

10  projection, a liquidation analysis which revised the unsecured

11  claims based upon the UBS settlement that I was able to

12  disclose to Your Honor.  And in the filing, the distribution

13  now revised to Class 8 creditors is now 71 percent, compared

14  to the 87 percent that was in the disclosure statement that

15  went out for solicitation.

16      Your Honor, there can be no serious argument that the

17  creditors in this case were not fully aware of the potential

18  for the UBS and HarbourVest creditors receiving claims.  Your

19  Honor's UBS 3018 order granting its claim for voting purposes

20  was entered right around the time that the disclosure

21  statement was approved.  And, in fact, a last-minute addition

22  to the disclosure statement disclosed the 3018 amount,

23  although the amount did not make it to the attachment to the

24  disclosure statement.  And that reference, Your Honor, to the

25  UBS claim being allowed for voting purposes can be found at

82

1 | Page 41 of Docket No. 1473.

2 | And the HarbourVest settlement was filed on about December

3 | 23, two weeks before the voting deadline, sufficient time for

4 | people to take that into consideration.

5 | And as Your Honor surely knows, the hearings in this case

6 | have been very well-attended by the major parties, and I

7 | believe that if we went back and looked at the records of who

8 | was on the WebEx system during the HarbourVest and UBS

9 | hearings, you would find that representatives of basically

10 | every creditor, every major creditor in this case in Class 8

11 | participated.

12 | Moreover, Your Honor, creditors were not guaranteed any

13 | percentage recovery under the plan and disclosure statement,

14 | which clearly identified the size of the claims pool as a

15 | material risk.

16 | Article 4(a)(7) of the disclosure statement, which is at

17 | Docket 1473, is entitled "Claims Estimation" and warns

18 | creditors that there can be no assurances that the Debtor's

19 | claims estimates will prove correct, and that the actual

20 | amount of the allowed claims may vary materially.

21 | And if Dugaboy is arguing it was misled as the holder of a

22 | disputed administrative claim and general unsecured claim,

23 | that argument is simply preposterous.

24 | Dugaboy cites several cases for the proposition that

25 | deficient disclosure may warrant resolicitation, and the

83

1    Debtor agrees with the proposition as a general matter.  But

2    if one looks at the cases that were filed -- that Dugaboy

3    cited to, it will see that they are clearly inapposite and

4    distinguishable.

5        *In re Michaelson*, the Bankruptcy Court for the Eastern

6    District of California, revoked confirmation because the

7    debtor failed to disclose in the disclosure statement a mail

8    fraud indictment of the turnaround specialist who was to lead

9    the reorganization effort and a prior Chapter 7 company he

10   drove into the ground.

11       In *In re Brotby*, the Ninth Circuit BAP affirmed a decision

12   of the Bankruptcy Court that the individual debtor's decision

13   to modify its financial projections on the eve of confirmation

14   did not require a resolicitation.  And there, the financial

15   projections were off by 75 percent.

16       And in *Renegade Holdings*, the Bankruptcy Court granted a

17   motion by a group of states to revoke confirmation by the

18   debtors, who manufactured and distributed tobacco products,

19   because the debtors failed to disclose in its disclosure

20   statement that the debtor and its principals were under

21   criminal investigation for unlawful trafficking in cigarettes,

22   which was not disclosed to creditors.

23       Your Honor, none of these cases are remotely analogous to

24   this case, and they certainly do not stand for the proposition

25   that the Debtor was required to resolicit.

84

1    Next, Your Honor, the next requirement is 1129(a)(3),

2    which requires that any plan be proposed in good faith.  As

3    Mr. Seery testified at length, and the Court has personal

4    knowledge of, having presided over this case for a year, the

5    plan is the result of substantial arm's-length negotiations

6    with the Committee over a period of several months.

7    Mr. Seery testified yesterday that, soon after the board

8    was appointed, the Committee wanted to immediately pursue down

9    the path of an asset monetization plan.  However, as Mr. Seery

10   testified, the board decided that it was inappropriate to rush

11   to judgment and that it should consider all potential

12   restructuring alternatives for the Debtor.  And Mr. Seery

13   testified what those alternatives were:  a traditional

14   restructuring and continuation of the Debtor's business; a

15   potential sale of the Debtor's assets in one or more

16   transactions; an asset monetization plan like the one before

17   the Court today; and, last but not least, a grand bargain plan

18   that would involve Mr. Dondero sponsoring the plan with a

19   substantial equity infusion.

20   As Mr. Seery testified, by the early summer of 2020, the

21   Debtor decided that it was appropriate to start moving down

22   the path of an asset monetization plan while it continued to

23   work on the grand bargain plan.  Accordingly, Mr. Seery

24   testified that the Debtor commenced good-faith negotiations

25   with the Committee regarding the asset monetization plan, and

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2528 of 2722

85

1   that those negotiations took several months, were hard-fought

2   and at arm's-length, and involved substantial analysis of the

3   appropriate post-confirmation corporate structure, governance,

4   operational, regulatory, and tax issues.  And on August 12th,

5   Your Honor, the plan was filed with the Court.

6       And although the Debtor at that time had not reached an

7   agreement with the Committee on some of the most significant

8   issues, Mr. Seery testified that the independent board

9   believed that it was important to file that plan at that time,

10  a proverbial stake in the ground to act as a catalyst for

11  reaching a consensual plan with the Committee or others, which

12  it has done.

13      As Mr. Seery testified, he continued to work with Mr.

14  Dondero to try to achieve a grand bargain plan, while at the

15  same time proceeding down the path of the filed plan.

16      He testified that the parties participated in mediation at

17  the end of August and early September to try to reach an

18  agreement on a grand bargain plan, but were unsuccessful.  And

19  the Debtor proceeded on the path of the August 12th plan and

20  sought approval of its disclosure statement on August 27th,

21  2020.

22      Mr. Seery testified that, at that time, the Debtor still

23  had not reached an agreement with the Committee on certain

24  significant issues involving post-confirmation governance and

25  the scope of releases.  And as a result, after a contested

86

1   hearing, Your Honor, Your Honor did not approve the disclosure

2   statement on October 27th, but asked us to go back again to

3   try to work out the issues, and we came back on November 23rd.

4       Mr. Seery testified that the Debtor continued to negotiate

5   with the Committee to resolve the material disputes leading --

6   which led up to the November 23rd hearing, where we came in

7   with the support of the Committee.  But as Mr. Seery has also

8   testified, he has continued to try to reach a consensus on a

9   global plan, notwithstanding the approval of the disclosure

10  statement.  And he spent personally several hundred hours

11  since his appointment trying to build consensus.

12      As part of this process, Mr. Seery testified that Mr.

13  Dondero received access to substantial information regarding

14  the Debtor's assets and liabilities, most recently in

15  connection with a series of informal document requests which

16  were made at the end of December.

17      And after the Court asked the parties to again reengage in

18  efforts to try to reach a global hearing after the Debtor's

19  preliminary injunction motion, Mr. Seery testified that he and

20  the board participated in calls with Mr. Dondero and his

21  advisors and the Committee to see if common ground could be

22  attained.

23      Unfortunately, as Mr. Seery testified, the Committee and

24  Mr. Dondero were not able to reach an agreement.

25      Accordingly, Your Honor, the testimony unequivocally and

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2530 of 2722

87

 1 | overwhelmingly demonstrates that the plan was proposed in good

 2 | faith.

 3 |     I expect the Objectors may argue in closing that they have

 4 | filed a plan under seal that is a better alternative than that

 5 | being proposed by the plan that the Debtor seeks to confirm.

 6 | Your Honor, as a threshold matter, yesterday I said any

 7 | mention of the specifics of the recent plan would be

 8 | inappropriate.  We are not here today to debate the merits of

 9 | Mr. Dondero's plan, which the Court permitted him to file

10 | under seal.  He had ample opportunity to file this plan after

11 | exclusivity was terminated, seek approval of a disclosure

12 | statement, and, if approved, solicit votes in connection with

13 | a confirmation hearing, but he failed to do so.

14 |     What matters today, Your Honor, is whether the Debtor's

15 | plan, the plan that has been accepted by 99.8 percent of the

16 | amount of creditors, and opposed only by Mr. Dondero, his

17 | related entities, and certain employees, meets the

18 | confirmation requirements of Section 1129, which we most

19 | certainly argue it does.

20 |     And perhaps most importantly, Your Honor, the Court

21 | remarked at the last hearing that, without the Committee's

22 | support for a competing plan, Mr. Dondero's plan would be dead

23 | on arrival.  And as you have heard from Mr. Clemente, Mr.

24 | Dondero does not yet have the Committee's support.

25 |     Next, Your Honor, is Section 1129(a)(5).  That requires

88

1  that the plan disclose the identity of any director,

2  affiliate, officer, or insider of the debtor, and such

3  appointment be consistent with the best interest of creditors

4  and equity holders.  Courts have held that this section

5  requires the disclosure of the post-confirmation governance of

6  the reorganized entity.

7      HCMFA objects to the plan, arguing that it did not comply

8  with Section 1129(a)(5) because it didn't disclose the people

9  who would control and manage the Reorganized Debtor and who

10  might be a sub-servicer.  HCMFA's objection is off-base.

11  Under the plan, Mr. Seery will be the claimant Trustee and

12  Marc Kirschner will be the Litigation Trustee.  Mr. Seery

13  testified extensively about his background, and he has

14  appeared before the Court many times and the Court is familiar

15  with him.  We have also introduced his *C.V.* into evidence.

16      As he testified, he will be paid $150,000 per month,

17  subject to further negotiations with the Claimant Trust

18  Oversight Committee regarding the monthly amount and any

19  success fee and severance fee, which negotiation is expected

20  to be completed within the 45 days following the effective

21  date.

22      Mr. Seery also testified regarding the names of the

23  members of the Claimant Trust Oversight Committee, which

24  information was also contained in the plan supplement and it

25  generally includes the four members of the Committee and David

89

1  Pauker, a restructuring professional with decades of

2  restructuring experience.

3     The members of the Oversight Committee will serve without

4  compensation, except for Mr. Pauker, who Mr. Seery testified

5  will receive $250,000 in the first year and $150,000 for

6  subsequent years.

7     As set forth in the Claimant Trust agreement, if at any

8  time there is a vacant seat to be filled by another

9  independent member, their compensation will be negotiated by

10 and between the Claimant Trust Oversight Board and them.

11    Mr. Seery has also testified that he believed the Claimant

12 Trust will have sufficient personnel to manage its business.

13 Specifically, he has testified that he intends to employ

14 approximately ten of the Debtor's employees, who will be

15 sufficient to enable him to continue to operate the Debtor's

16 business, including as an advisor to the managed funds and the

17 CLOs, until the Claimant Trust is able to effectively and

18 efficiently monetize its assets for fair value, whether that

19 takes two years or whether that takes 18 months or whether

20 that takes longer.

21    Mr. Seery further testified that he believes that the

22 operations can be best conducted by the Debtor's employees.

23 And while he did consider the retention of a sub-servicer, he

24 ultimately decided, in consultation with the Committee, that

25 the monetization would be a lot more effective if done with a

90

1   subset of the Debtor's current employees.

2        The proposed corporate governance is also consistent with

3   the interests of the Debtor and its stakeholders.  The Court

4   is very familiar with Mr. Seery and the Debtor, and I believe

5   that Mr. Clemente, when he comments, will say the Committee

6   can think of no better person to continue managing the

7   Claimant Trust than Mr. Seery.

8        Mr. Kirschner is also well qualified to be the Litigation

9   Trustee.  His *C.V.* is part of the evidence that's been

10  admitted and contains additional information regarding his

11  background.  And he will receive $40,000 a month for the first

12  three months and $20,000 a month thereafter, plus a to-be-

13  negotiated success fee.

14       There just simply can be no challenge to Mr. Seery's or

15  Mr. Kirschner's qualifications or abilities to act in a manner

16  contemplated by the plan or that their involvement is not in

17  the best interest of the estate and its creditors.

18       Your Honor, the next requirement that is objected to is

19  Section 1129(a)(7).  That, of course, requires the Debtor to

20  demonstrate that creditors will receive not less under the

21  plan than they would receive if the Debtor was to be

22  liquidated in Chapter 7.  And on February 1st, Your Honor, we

23  filed our updated liquidation analysis, which contains the

24  latest-and-greatest evidence to support that.

25       These documents, the updated documents, in connection with

91

1    the prior analysis, was provided to objecting parties in

2    advance of the January 29th deposition, and Your Honor has

3    heard the differences between the January 29th and the

4    February 1st documents being very minimal.

5        The Court heard extensive evidence and testimony from Mr.

6    Seery regarding the assumptions that went into the preparation

7    of the liquidation analysis and the differences of what

8    creditors are projected to receive under the plan as compared

9    to what they are projected to receive in a Chapter 7.

10       Such testimony also included a comparison between the

11   liquidation analysis that was filed with the plan in November,

12   the updated liquidation analysis filed on the -- or, provided

13   to parties on January 28th, and the last version, filed on

14   February 1st.

15       Mr. Seery testified that, on the revenue side, the

16   liquidation analysis was updated to include the HCLOF

17   interest, which was required as part of the settlement with

18   HarbourVest; the increase in value of certain assets,

19   including Trussway; revenue expected to be generated from

20   continued management of the CLOs; and increased recovery on

21   notes as a result of the acceleration of certain related

22   notes.

23       On the expense side, Mr. Seery testified regarding his

24   best estimate of the likely expenses to be incurred by a

25   Chapter 7 trustee -- by the Claimant Trust, including

92

1  personnel costs; professional costs, which increase because of

2  the litigious nature this case has become; and operating

3  expenses.

4       And lastly, on the claim side, Your Honor, Mr. Seery

5  testified that the claims numbers have been updated to include

6  the settlement from HarbourVest and initially the amount

7  approved to UBS pursuant to the 3018 order and then the

8  reduction at $50 million based upon the settlement announced.

9  And like the prior liquidation analysis, the current analysis

10 demonstrates that creditors will fare substantially better

11 under in Chapter -- under the plan than in Chapter 7.  In

12 fact, the projected recovery under the plan is 85 percent for

13 Class 7 creditors and 71.32 percent for Class 8 creditors, as

14 compared to 54.96 percent for all unsecured creditors in a

15 Chapter 7.

16      Mr. Seery also testified that expenses are expected to be

17 more under Chapter 11 than under Chapter 7, but he also

18 testified that the tens of millions of dollars in greater

19 revenue and asset recoveries under the plan will more than

20 offset the additional expenses.

21      As a result, the Court has more than sufficient

22 evidentiary basis to conclude that the Debtor has carried its

23 burden to prove that it meets the best interest of creditors

24 best.

25      But Mr. Dondero's counsel spent a lot of time crossing --

93

1    cross-examining Mr. Seery, in a vain attempt to demonstrate to

2    the Court that a Chapter 7 actually would be much better for

3    creditors.  And this argument has also been made by Dugaboy

4    and the Advisors and the Funds.

5        Before I address these arguments on its merits, Your

6    Honor, I just wanted to remind the Court of the Objectors --

7    these Objectors' interest in this case.  Mr. Dondero owns no

8    equity in the Debtor.  He owns a general partner.  Strand, in

9    turn, owns a quarter-percent -- a quarter of one percent of

10   the total equity in the Debtor.  And Mr. Dondero's claim, it's

11   only a claim for indemnification.  Dugaboy asserts two claims:

12   a frivolous administrative claim relating to the postpetition

13   management of a Multi-Strat, which, as an administrative

14   claim, if it's valid, would not even be affected by the best

15   interest of creditors test, because it would have to be paid

16   in full.  And he also asserts a claim that the Debtor's

17   subsidiary -- against the Debtor's subsidiary for which it

18   tries to pierce the corporate veil.

19       Just think about it.  Dugaboy, Mr. Dondero's entity, is

20   arguing that he should be able to pierce the corporate veil to

21   get at the entity that was his before the bankruptcy.

22       Dugaboy's only other interest in this case relates to a --

23   a one -- point eighteen and several-hundredths percent of the

24   equity interest of the Debtor, and that is out of the money.

25       And as I mentioned previously, Your Honor, Mr. Rukavina's

94

1    clients either didn't file any general unsecured claims or

2    filed them and withdrew them.  Their only claim is a disputed

3    administrative claim against the Debtor that was filed a week

4    ago and which, at the appropriate time, the Debtor will

5    demonstrate is without merit.

6        And I understand that, just today, NexPoint Advisors also

7    filed administrative claim.

8        So I'm not going to argue to Your Honor that these parties

9    do not have standing, although their standing is tenuous, at

10   best, to assert this argument.  The Court should keep their

11   relative interests in mind when evaluating the merits and the

12   good faith of this objection.

13       The principal objection, as I said, is that creditors will

14   do better in a Chapter 7.  Essentially, they argue that a

15   Chapter 7 trustee can liquidate the assets just as well as Mr.

16   Seery can and not require the cost structure that is included

17   in the Debtor's plan projections.  Yes, they argue that a

18   Chapter 7 will be more efficient.

19       Mr. Seery's testimony, the only testimony on the topic,

20   however, establishes that this preposterous proposition has no

21   basis in reality.  Mr. Seery testified that a Chapter 7

22   trustee's mandate would be to reduce Debtor's assets as fast

23   as possible, while he will monetize assets as and when

24   appropriate to maximize the value.

25       But even if you can assume that the Chapter 7 trustee

95

1  could get court authority in a Chapter 7 to operate, there are

2  several reasons Mr. Seery testified why a liquidation by a

3  Chapter 7 trustee would be far worse than the plan.

4      First, Your Honor, no matter how competent the Chapter 7

5  trustee is -- and Mr. Seery did not say he is more competent

6  than anyone else out there -- the lack of a learning curve

7  that Mr. Seery established through the 13 months in this case

8  puts Mr. Seery at such a major advantage compared to a Chapter

9  7 trustee.

10      Second, Mr. Seery questioned whether the Chapter 7 trustee

11  would be able to retain the Debtor's existing professionals,

12  even assuming they were willing to be retained.  I'm not sure

13  what's the Court's practice or the practice in the Northern

14  District, but in many districts around the country debtor's

15  counsel and professionals cannot be retained by Chapter 7

16  trustee, as general counsel, at least.

17      And I could just imagine, Your Honor, Mr. Dondero's

18  position if the Chapter 7 trustee actually sought to hire

19  Pachulski Stang and DSI.

20      Third, Your Honor, regardless of whether the Chapter 7

21  trustee obtained some operating authority, the market

22  perception will be that a Chapter 7 trustee will sell assets

23  for less value than would Mr. Seery as claimant Trustee.  Mr.

24  Seery testified to that.

25      The argument that the Objectors make that a Chapter 7

96

1   process, whereby the trustee would seek court approval of

2   assets, is better for value than a process overseen by the

3   Claimant Trust Board lacks any evidentiary basis and also is

4   contradicted by Mr. Seery's testimony.

5        In fact, Mr. Seery testified that the Chapter 7 process,

6   the public process of it, would very likely result in less

7   recovery than a sale conducted in the Claimant Trust.

8        And lastly, Mr. Seery testified that it's unlikely that

9   the ten or so valuable employees who Mr. Seery is planning to

10  heavily rely on to assist him with post-confirmation would

11  agree to a work for Chapter 7 trustee.  Your Honor is all too

12  familiar with the fights in the *Acis* case and Chapter 7

13  trustee, and it's just hard to believe that any of the

14  Highland employees would go work for the Chapter 7 trustee.

15       So why is Mr. Dugaboy -- why is Dugaboy and Mr. Dondero

16  actually making this objection and advocating for a Chapter 7?

17  It's because they would expect to buy the Debtor's assets on

18  the cheap from a Chapter 7 trustee, exactly what they've been

19  trying to do in this case.

20       Your Honor, moving right now to Section 1129(a)(11), that

21  requires the debtor to demonstrate that the plan is feasible.

22  In other words, it's not likely to be followed by a further

23  liquidation or restructuring.  Under the Fifth Circuit law,

24  the debtor need only demonstrate that the plan will have a

25  reasonable probability of success to satisfy the feasibility

97

1  requirement, and the Debtor has easily met this standard.

2  As Mr. Seery testified, the Debtor's plan contemplates

3  continued operations through which time the assets will be

4  monetized for the benefit of creditors. The plan contemplates

5  that Class 7 creditors will be paid off shortly after the

6  effective date. Class 8 creditors are not guaranteed any

7  recovery but will receive pro rata distributions over a period

8  of time. Class 2, Frontier secured claim, will be paid off

9  over time, and the projections demonstrate that it will -- the

10 Debtor will have money to do so.

11 Mr. Seery testified at length regarding the assumptions

12 that went into the preparation of the projections most

13 recently filed on February 1, and based on that testimony, the

14 Debtor has clearly demonstrated that the plan is feasible.

15 Your Honor, I think that brings us to Section 1129(b). Of

16 course, again, Your Honor, if Your Honor has any other

17 questions with the sections I'm skipping over. I believe

18 we've adequately covered them in the briefs and I don't think

19 there's any objection.

20 But as I mentioned before, we have three classes that have

21 voted to reject the plan. Class 8 is the general unsecured

22 claims. They voted to reject the plan. Yes. Even though,

23 based upon the ballot summary, 99 percent of the amount of

24 claims in that class voted to accept the plan, approximately

25 24 employees voted to reject the plan. And accordingly, the

98

1  Debtor cannot satisfy the numerosity requirement of Section

2  1126(c).

3      I do want to briefly recount for Your Honor Mr. Seery's

4  testimony regarding the nature of the claims of the 24

5  employees who voted to reject the plan.  And I'm not doing

6  this to argue that the votes from these contingent creditors

7  are not valid or that the Debtor doesn't need to satisfy the

8  cram-down requirements.  The Debtor understands it needs to

9  demonstrate to the Court that Section 1129(b) is satisfied for

10 the Court to confirm the plan.

11     Rather, why I do this, Your Honor, is to provide the Court

12 with context about the nature and extent of the creditors in

13 this class as the Court determines whether the plan is, in

14 fact, fair and equitable and can be crammed down to a

15 dissenting vote.

16     Mr. Seery testified that these employees originally had

17 claims under the annual bonus plan and the deferred

18 compensation plan.  And as he testified, in order for claims

19 under each of those plans to vest -- I think he referred to

20 them as be-in-the-seat plans -- the employee was required to

21 remain employed as of that date.

22     Mr. Seery testified that the Debtor terminated the annual

23 bonus plan in the middle of January and replaced it with the

24 key employee retention plan that the Court previously

25 approved.

99

1    Accordingly, Mr. Seery testified that no employee who

2   voted to reject the plan anymore has a claim on the annual

3   bonus plan.  He also testified that, with respect to the

4   deferred compensation plan, people have contingent claims

5   under that plan and that no payments are due until May 20 --

6   2021.

7    As Mr. Seery testified, if the employees who would be

8   entitled to receive payments under the deferred compensation

9   plan do not agree to enter into a separation agreement that

10   was approved by the Court, they will be terminated before May

11   and there will no -- not longer be any deferred compensation

12   due.

13    Accordingly, while the 24 employees who voted to reject

14   the plan do technically have claims at this time they have

15   voted, Mr. Seery testified the claims will go away soon.

16    I do want to point out something that's obviously

17   painfully obvious at this point, that while Class 8 voted to

18   reject the plan, the Committee, the statutory fiduciary for

19   all unsecured creditors, supports the plan enthusiastically

20   and I believe it does so unanimously.

21    The other classes to reject the plan, Your Honor, are

22   Class 11, the A limited partnerships, and none of the holders

23   in Class B and C limited partnerships voted on the plan, so

24   cram-down is required over those classes as well.  So Your

25   Honor is able to confirm the plan pursuant to the cram-down

100

1    procedures under 1129(b) if the Court determines that the plan

2    is fair and equitable and does not discriminate unfairly

3    against the rejecting classes.

4         Let's first turn to the fair and equitable requirement.  A

5    plan is fair and equitable if it follows the absolute priority

6    rule, meaning that if a class does not receive payment in

7    full, no junior class will receive anything under the plan.

8    With respect to Class 8, no junior class -- junior class to

9    Class 8 will receive payment, and here is the key point,

10   unless Class 8 is paid in full, with appropriate interest.

11   NPA and Dugaboy -- Dugaboy in a brief filed on Monday -- argue

12   that the plan does not satisfy the absolute priority rule

13   because Class 10 and Class Equity Interests have a contingent

14   right to receive property under the plan.

15        Your Honor, this argument misunderstands the absolute

16   priority rule.  Class 10 and Class Creditors will only receive

17   payment after distribution to 8 and 9, the unsecured claims

18   and the subordinated claims, are all paid in full, plus

19   interest.

20        And, in fact, Dugaboy, in its brief, to its credit, admits

21   that the argument is contrary to the Bankruptcy Court's

22   decision of Judge Gargotta in the Western District case of *In*

23   *re Introgen Therapeutics*.  There, the Court was faced with a

24   similar argument by a group of unsecured creditors who argued

25   that the debtor's plan violated the absolute priority rule

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2544 of 2722

101

1  because equity was retaining a contingent interest that would

2  only be payable if general unsecured claims were paid in full.

3       In rejecting the argument, the Court reasoned, and I

4  quote, "The only way Class 4 will receive anything is if Class

5  3, in fact, gets paid in full, in satisfaction of

6  1129(b)(2)(B)(i)," meaning that the absolute priority rule

7  would not be an issue.  If Class 3 is not paid in full, Class

8  4's property interest is not -- is just -- is not just

9  valueless, it just doesn't exist.

10      Your Honor, this is precisely the situation in this case.

11 Equity interests will only receive a recovery if Class 8 and 9

12 are paid in full.

13      But Dugaboy attempts to escape the logical reading of the

14 absolute priority rule by claiming that *Introgen* was wrongly

15 decided and goes against the Supreme Court's decision in

16 *Ellers* (phonetic).  Dugaboy argues that because the Supreme

17 Court decided that property given to a junior class without

18 paying a senior class in full is property, even if it's

19 worthless.

20      But Dugaboy misses the point.  Like the debtor in the

21 *Introgen*, the Debtor here is not arguing that the property  --

22 the absolute priority rule is not violated because the

23 contingent trust is worthless.  Rather, the argument is that

24 the absolute priority rule is not violated; it's, in order to

25 receive anything on account of the junior -- of the equity,

102

1  the senior creditors have to be paid a hundred percent plus

2  interest.

3      In fact, Your Honor, if the plan just didn't give any

4  recovery to the equity Class 10 and 11, I bet you Dugaboy and

5  Mr. Dondero would be arguing that it violated the absolute

6  priority rule because senior classes, unsecured creditors,

7  could potentially receive more than a hundred percent of their

8  interest.  And there's a case in the Southern District of

9  Texas, *In re MCorp*, where the Bankruptcy Court said that for a

10  plan to be confirmed, its stockholders eliminated, creditors

11  must not receive more than payment in full.

12      Excess proceeds, Your Honor, if any, have to go somewhere.

13  They can't go to creditors, so they have to go to equity.  And

14  the absolute priority rule is not violated.

15      And how is Dugaboy harmed?  They say they may want to buy

16  the contingent interests, and the lack of a marketing effort

17  violates the *LaSalle* opinion as well.  And who holds the Class

18  B and Class C partnership interests that come before Dugaboy

19  that Dugaboy is concerned may have this opportunity rather

20  than them?  Yes, it's Hunter Mountain, Your Honor, an entity,

21  like Dugaboy, that's owned and controlled by Mr. Dondero.

22      Accordingly, the argument that the plan violates the

23  absolute priority rule is actually a frivolous argument.

24      Turning now to unfair discrimination, Your Honor, Dugaboy

25  argued in its brief Monday that because the projected

103

1  distribution to unsecured creditors has gone down in the

2  recent plan projections, the discrepancy between Class 7 and

3  Class 8 is so large that that amounts to unfair

4  discrimination.

5      Again, the Court should first ask why is Dugaboy even the

6  right party to be making the objection.  Its claim against the

7  Debtor to pierce the corporate veil, as I mentioned, is

8  frivolous.  It's subject to objection.  It didn't even bother

9  to have the claim temporarily allowed for voting purposes, as

10 did other creditors who thought they had a valid claim.  Yet

11 this is another example of Mr. Dondero, through Dugaboy,

12 trying to throw as many roadblocks in front of confirmation as

13 he can.

14     But this argument, like the other ones, fails as well.

15 Class 8 contains the general unsecured creditor claims,

16 predominately litigation claims that have been pending against

17 the Debtor for years.  The Debtor was justified in treating

18 the other unsecured creditors differently.

19     Class 6 consists of the PTO claims in excess of the cap,

20 which are of different quality and nature than the other

21 claims.

22     Class 7 consists of the convenience class.  And it's

23 appropriate to bribe convenience class creditors with a

24 discount option for smaller claims to be cashed out for

25 administrative convenience.

104

1     Mr. Seery testified that when the plan was formulated, the

2   concept was to separately classify liquidated claims in small

3   amounts in Class 7 and unliquidated claims in Class 8.  Mr.

4   Seery also testified that there's a valid business

5   justification to treat the -- hold business 7 -- Class 7

6   claims differently.  These creditors had a reasonable

7   expectation of getting paid promptly, as compared to

8   litigation creditors, who would expect to be paid over time.

9     As the Court is aware, the litigation claims in Class 8

10  involve litigation that has been pending for several years in

11  the case of Acis, Daugherty, Redeemer, and more than a decade

12  in UBS.

13    And most importantly, as Mr. Seery testified, the

14  Committee and the Debtor had significant negotiation regarding

15  the classification and treatment provisions of the plan for

16  Class 7.

17    The Committee does have one constituent who is a Class 7

18  creditor.  However, the other three creditors are all in Class

19  8 and hold claims in excess of $200 million and supported the

20  separate classification and the different treatment.

21    So, Your Honor, discrimination, different treatment among

22  Class 7 and 8 is appropriate, and the different treatment is

23  not unfair.  In the February 1 projections, the Class 8

24  creditors are estimated to receive 71.32 percent of their

25  claims, but that's just an estimate.  As Mr. Seery testified,

105

1  the number can go up based upon the value he can generate from

2  the assets and, importantly, from litigation claims.  Class 8

3  creditors could up end up receiving a hundred percent on

4  account of their claims.  Class 7 creditors are fixed at 85

5  percent.

6       Giving Class 8 creditors the opportunity to roll the dice

7  and potentially get more or less than the 85 percent offered

8  to Class 7 is not at all unfair.

9       For these reasons, Your Honor, the Court has the ability

10 and should confirm the plan pursuant to the cram-down

11 provisions of 1129(b).

12      Your Honor, I'm now going to switch from the statutory

13 requirements to all the issues raised by the release,

14 injunction, and exculpation provisions.

15      I'd just like to take a brief sip of water.

16      Dugaboy -- I will first deal with the Debtor release

17 provided in Article 9(f) of the plan, which we claim is

18 appropriate.  Dugaboy and the U.S. Trustee have objected to

19 the release contained in Article 9(f).  Dugaboy objects

20 because it believes that the Debtor release releases claims

21 that the Claimant Trust or Litigation Trust have that have not

22 yet arisen, and the U.S. Trustee objects because it believes

23 that the release is a third-party release.

24      These objections have no merit, and they should be

25 overruled.

106

1    I would like to ask Ms. Canty to put up a demonstrative

2  which contains the provision Article 9(f) of the plan.

3    Your Honor, as set forth in this Article 9(f), only the

4  Debtor is granting any release.  While that --

5         THE COURT:  And for the record, it's 9(d)?  9(d),

6  right?

7         MR. POMERANTZ:  9(d)?  9(d), correct, Your Honor.

8         THE COURT:  Yes.  Okay.

9         MR. POMERANTZ:  Sorry about that.

10         THE COURT:  Uh-huh.

11         MR. POMERANTZ:  While the release is broad, it does

12  not purport to release the claims of any third party.  The

13  Claimant Trust and the Litigation Trust are only included in

14  the release as successors of the Debtor.  The release is

15  specifically only for claims that the Debtor or the estate

16  would have been legally entitled to assert in their own right.

17    Section 1123(b)(3)(A) of the Bankruptcy Code provides that

18  a plan may provide for the settlement or adjustment of any

19  claims or interests belonging to the debtor or the estate, and

20  that's exactly what the Debtor release provides.

21    Accordingly, Dugaboy is wrong that the release effects a

22  release of claims that the Claimant Trust or the Litigation

23  Sub-Trust have that won't arise until after the effective

24  date.  And the U.S. Trustee is simply wrong; there's no third-

25  party release aspect under the release.

107

1      The last point I will address on the release, Your Honor,

2   is who is being released and why and what does the evidence

3   show.  The Debtor release extends to release parties which

4   include the independent directors, Strand, for actions after

5   January 9th, Jim Seery as the CEO and CRO, the Committee,

6   members of the Committee, professionals, and employees.

7      You have heard Mr. Seery's testimony that the Debtor does

8   not believe that any claims against the parties that are

9   proposed to be released actually exist.  You have heard Mr.

10  Seery's testimony that he worked closely with the employees

11  and believes that not only have they all been instrumental in

12  getting the Debtor to the -- be on the cusp of plan

13  confirmation, but that also Mr. Seery is not aware of any

14  claims against them.

15     Moreover, as Mr. Seery testified, the release for the

16  employees is only conditional.  He testified that the

17  employees are required to assist in the monetization of assets

18  and the resolution of claims, and if they do not like -- if

19  they do not lose their release, then any Debtor claims are

20  tolled, such that could be pursued by the Litigation Trustee

21  at a future time.

22     Lastly, I'm sure that the Dondero entities will argue that

23  someone needs to investigate claims against Mr. Seery for

24  mismanagement or for, God forbid, having failed to file the

25  2015.3 statements.  Such claims are part of the continuing

108

1    harassment of Mr. Seery that the Dondero entities have

2    embarked on after it was apparent that nobody would support

3    their plan.

4        There is no evidence of any claims that exist, Your Honor.

5    In fact, the Committee and its professionals have watched the

6    Debtor through this case like a hawk.  They have not been

7    afraid to challenge the Debtor's actions in general and Mr.

8    Seery's in particular.  FTI has worked on a daily basis with

9    DSI and the company, had access to information.  When COVID

10   was happening, they were looking at trades going on on a daily

11   basis.

12       So if the Committee, whose members hold approximately $200

13   million of claims against the estate, are okay with the

14   release against the independent directors and Mr. Seery, that

15   should provide the Court with comfort to approve the releases

16   as part of the plan.

17       In summary, Your Honor, the Debtor release is entirely

18   appropriate and does not affect the release of third-party

19   claims that have not yet arisen.

20       Next, Your Honor, I want to go to the discharge.  There's

21   been objections to the discharge.  Dugaboy and NexPoint have

22   objected that the Debtor receiving a discharge under the plan

23   -- argue a debtor is liquidating.  The objection is not well

24   taken based upon Mr. Seery's testimony regarding what it is

25   the Claimant Trust and the Reorganized Debtor plan to do after

109

1    the effective date, as compared to what the limitations of a

2    discharge are under 1141(d)(3).

3        Your Honor, Article 9 of the -- 9(b) of the plan provides

4    that as -- except as otherwise expressly provided in the plan

5    or the confirmation order, upon the effective date, the Debtor

6    and its estate will be discharged or released under and to the

7    fullest extent provided under 1141(d)(A) [sic] and other

8    applicable provisions of the Bankruptcy Court.  Bankruptcy

9    Code.

10       Section 1141(d)(3) provides an exception to the discharge,

11   and I'd like to have that section put up for Your Honor at

12   this point.  Ms. Canty?

13       As this -- as the section reflects, and as the Fifth

14   Circuit has ruled in the *TH-New Orleans Limited Partnership*

15   case cited in our materials, in order to deny the debtor a

16   discharge under 1141(d)(3), three things must be true:  (1)

17   the plan provides for the liquidation of all or substantially

18   all of the property in the estate; (2) the debtor does not

19   engage in business after consummation of the plan; and (3) the

20   debtor would be denied a discharge under 727(a) of this title

21   if the case was converted to Chapter 7.  Here, only C applies.

22       With respect to A, Your Honor, while the plan does project

23   that it will take approximately two years to monetize the

24   Debtor's assets for fair value, the Debtor is just not

25   liquidating within the meaning of Section A.

110

 1     As Mr. Seery testified, during the post-confirmation

 2  period, post-effective date period, the Debtor will continue

 3  to manage its funds and conduct the same type of business it

 4  conducted prior to the effective date.  It'll manage the CLOs.

 5  It'll manage Multi-Strat.  It'll manage Restoration Capital.

 6  It'll manage the Select Fund, and it'll manage the Korea Fund.

 7     The Bankruptcy Court for the Southern District of New

 8  York's 2000 opinion in *Enron*, cited in our materials, is on

 9  point.  There, the Court found that a debtor liquidating its

10  assets over an indefinite period of time that is likely to

11  take years is not liquidating within the meaning of Section

12  1141(b)(3)(A), justifying a denial of discharge.

13     But even if we failed A, based upon Mr. Seery's testimony,

14  we would not fail B.  The Debtor will be continuing to do what

15  it has done during the case, as it did before, as I said,

16  managing its business.  B says the debtor does not engage in

17  the business after management.  So while Mr. Seery testified

18  that it would take approximately two years, it could take

19  more, it could take less, and there is no requirement to

20  liquidate assets over a period of time.

21     Accordingly, Your Honor, the Debtor is conducting the type

22  of business contemplated by Section B so as not to just deny a

23  discharge.

24     As the Fifth Circuit said in the *TH-New Orleans* case, the

25  court granted a discharge there because it was likely that the

111

1    debtor would be liquidating its assets and conducting business

2    (indecipherable) years following a confirmation date. And

3    this result makes sense, Your Honor, because the Debtor will

4    need the discharge and the tenant injunctions, which I'll get

5    to in a moment, in order to prevent interference with the

6    Debtor's ability to implement the terms of the plan and make

7    distributions to creditors.

8        I would now like, Your Honor, to turn to the exculpation

9    provisions, which there's been -- there's been a lot of

10   briefing on it, and I know Your Honor is very aware of the

11   exculpation provisions and the *Pacific Lumber* case. And

12   several parties have objected to the exculpation contained in

13   the plan, based primarily on the Fifth Circuit ruling in

14   *Pacific Lumber*.

15       The exculpation provision, which is not dissimilar to what

16   is found in many plans around the country, including in plans

17   confirmed in bankruptcy courts in the Fifth Circuit, acts to

18   exculpate the exculpated parties for negligent-only acts as it

19   contains the standard carve-outs for gross negligence,

20   intentional conduct, and willful misconduct.

21       I do want to bring to the Court's attention a deletion we

22   made to the parties protected by the exculpation in the plan

23   and now -- were filed on February 1st. The definition of

24   exculpated parties included, before February 1, not only the

25   Debtor but its direct and indirect majority-owned subsidiaries

112

1   and the managed funds.  In the plan amendment, we have deleted

2   the Debtor's direct and indirect majority-owned subsidiaries

3   and managed funds from the definition and are not seeking

4   exculpation for those entities.

5       But before, Your Honor, I address *Pacific Lumber* and why

6   the Debtor believes it does not preclude the Court from

7   approving the exculpation in this case, I do want to focus on

8   something that the Objectors conveniently ignore from their

9   argument.

10      As I mentioned in my opening argument, Your Honor, the

11  independent directors were appointed pursuant to the Court's

12  order on January 9, 2020.  They have resolved many issues

13  between the Debtor and the Committee, and avoided the

14  appointment of a Chapter 11 trustee.

15      The January 9th order was specifically approved by Mr.

16  Dondero, who was in control of the Debtor at the time, and I

17  believe the transcripts that are admitted into evidence will

18  demonstrate that he was fully behind the approval of the

19  January 9th order.

20      In addition to appointing the independent directors into

21  what was sure to be a contentiously litigious case, the

22  January 9th order set the standard of care for the independent

23  directors, and specifically exculpated them from negligence.

24      You have heard Mr. Seery and Mr. Dubel testify that they

25  had input into what the order said and would have not agreed

113

1  to be appointed as independent directors if it did not include

2  Paragraph 10, as well as the provisions regarding

3  indemnification and D&O insurance.

4     I would like to put a demonstrative on the screen, which

5  is actually Paragraph 10 of that order. Your Honor, Paragraph

6  10, there's two concepts embedded here. First, it requires

7  any parties wishing to sue the independent directors or their

8  agents to first seek such approval from the Bankruptcy Court.

9  Secondly, and importantly for purposes of the independent

10  directors and their agents, who would include the employees,

11  it set the standard of care for them during the Chapter 11 and

12  entitled them to exculpation for negligence. Paragraph 10

13  says the Court will only permit a suit to go forward if such

14  claim represents a colorable claim for willful misconduct or

15  gross negligence.

16     And Your Honor, Paragraph 10 does not expire by its terms.

17     By not including negligence in the definition of what a

18  colorable claim might be, the Court has already exculpated the

19  independent directors and their agents, which include the

20  employees acting at their direction.

21     And because the independent directors and their agents are

22  exculpated under Paragraph 10, Strand needs to be exculpated

23  as well for actions occurring after January 9th. This is

24  because a suit against Strand for conduct after the

25  independent board was appointed is effectively a suit against

114

1   the independent directors, who were the only people in control

2   of Strand at that time.

3       After the effective date, Mr. Dondero will regain control

4   of Strand, as the independent directors will be discharged.

5   And for parties able to sue Strand essentially for negligence

6   for conduct conducted by the independent directors after

7   January 9th, Strand will then be able to seek indemnification

8   from the Debtor under the Debtor's partnership agreement

9   because the partnership agreement does provide the general

10  partner is entitled to indemnification.

11      Accordingly, an exculpation for Strand is really the

12  functional equivalent of an exculpation for the independent

13  directors and the Debtor.

14      The January 9th order was not appealed, and an objection

15  to exculpation at this point as it relates to the independent

16  directors, their agents, and Strand is a collateral attack on

17  this order.  So, Your Honor, Your Honor does not even need to

18  get to the thorny issues addressed by *Pacific Lumber*.

19      However, even in the absence of the January 9th order,

20  exculpation of the independent directors and their employees,

21  as well as the other exculpated parties, is not prohibited by

22  *Pacific Lumber*.  In *Pacific Lumber*, the Fifth Circuit reversed

23  a bankruptcy court order confirming a plan because the

24  exculpation provision was too broad and included parties that

25  the Fifth Circuit thought could not be exculpated under

115

1  Section 524(e) of the Code.

2      A close look at the issue before the Court, Your Honor,

3  the reasoning for the Court's ruling and why certain parties

4  like Committee and its members were entitled to exculpation,

5  reflects that this case does not prevent the Court from

6  approving exculpation of this case.

7      A careful read of the underlying briefs and opinions in

8  *Pacific Lumber* reveals that the concern that the Appellants

9  had in that case was the application of exculpation to non-

10  fiduciary sponsors.  There were two competing plans in the

11  case.  The first was filed by the indenture trustee.  The

12  second was filed by the debtor's parent and lender, and was

13  deemed -- called the Marathon Plan.  The Court confirmed the

14  Marathon Plan, and the indenture trustee appealed, and the

15  indenture trustee argued that the plan sponsors could not be

16  exculpated.

17      After determining that the appeal of the exculpation

18  provisions were not equitably moot, the Fifth Circuit

19  determined that exculpation was not authorized under 524(e) of

20  the Code because that section provides a discharge of the

21  debtor does not affect the liability of any other entity on

22  such debt.

23      However, and here's the important part, Your Honor:  The

24  Fifth Circuit did not say that all exculpations are prohibited

25  under the Code and authorized the exculpation of the Committee

116

1    and its members. And why did the Court do that? Because it

2    looked at the Committee's qualified immunity under 1103 and

3    also reasoned that Committee members are essentially

4    disinterested volunteers that should be entitled to

5    exculpation on negligence.

6        The Court also cited approvingly *Colliers* for the

7    proposition that if Committee members were not exculpated for

8    negligence and subject to suit by people who are unhappy with

9    them, they just would not serve.

10       Accordingly, the Fifth Circuit based its willingness to

11   exculpate Committee members on the strong public policy that

12   supports exculpation for those parties under those

13   circumstances. And against this backdrop, Your Honor, there

14   are several reasons why the Court should authorize exculpation

15   in this case, notwithstanding *Pacific Lumber*.

16       First, Your Honor, the independent directors in this case

17   are analogous -- much more analogous to the Committee members

18   that the Fifth Circuit ruled were entitled to than the

19   incumbent officer and directors.

20       Your Honor has the following facts before the Court, based

21   upon the testimony of Mr. Seery and Mr. Dubel and other

22   evidence in the record. The independent board members were

23   not part of the Highland enterprise before the Court appointed

24   them on January 9th. The Court appointed the independent

25   directors in lieu of a Chapter 11 trustee to address what the

117

1  Court perceived as the serious conflicts of interest and

2  fiduciary duty concerns with current management, as identified

3  by the Committee.

4      The independent directors would not have agreed to accept

5  their role without indemnification, insurance, exculpation,

6  and the gatekeeper function provided by the January 9th order.

7      And Mr. Dubel testified regarding the significant

8  experience he has as an independent director during his 30-

9  plus years in the restructuring community, including several

10 engagements as an independent director in Chapter 11 cases.

11 And he testified that independent directors have become

12 commonplace in complex restructurings over the last several

13 years and have been appointed in many cases, including high-

14 profile cases.  We've cited to just a few of those cases in

15 our brief, but we could go on and on.

16     Mr. Dubel testified that the independent directors are a

17 critical tool in proper corporate governance and restoring

18 creditor confidence in management in modern-day

19 restructurings, and he testified that, based upon his

20 experience, independent directors expect to be indemnified by

21 the company, expect to obtain directors and officers

22 insurance, and expect to be exculpated from claims of

23 negligence when they agree to be appointed.

24     He further testified that if independent directors cannot

25 be assured that they will be exculpated for simple negligence,

118

1  he believes they will be unwilling to serve in contentious

2  cases like the one we have here, which will have a material

3  adverse effect on the Chapter 11 restructuring process as we

4  know it.

5      Based upon the foregoing testimony, Your Honor, which is

6  uncontroverted, the Court should have no problem finding that

7  the independent directors are much more analogous to the

8  Committee members in *Pacific Lumber* who the Fifth Circuit said

9  could be exculpated.

10     The facts, these facts also distinguish this case from the

11 *Dropbox v. Thru* case which Your Honor decided and which was

12 reversed on this issue by the District Court.  In neither

13 *Pacific Lumber* or *Thru* was there an argument that the policy

14 reasons that supported exculpation of Committee members also

15 supported the exculpation of the parties sought to be

16 exculpated.

17     Moreover, Your Honor, the independent directors in this

18 case were pointed as essentially as substitute for a Chapter

19 11 trustee.  There was a Chapter 11 trustee motion filed a few

20 days before, I believe, and the Court, in approving this, said

21 that you -- better than a Chapter 11 trustee.  And Chapter 11

22 Trustees are entitled to qualified immunity.  So, while, yes,

23 the independent directors aren't truly Chapter 11 trustees,

24 they are analogous.

25     Second, Your Honor, while there is language in *Pacific*

119

1    *Lumber* that says that the directors and officers of the debtor

2    are not entitled to exculpation, the issue before the Court

3    really on appeal was the plan sponsors and whether they were.

4    So I would argue that any discussion of the exculpation not

5    being available for directors and officers in the Fifth

6    Circuit opinion in *Palco* is actually dicta.

7        Third, Your Honor, as I discussed before, the *Pacific*

8    *Lumber* decision was based solely on 524(e) of the Bankruptcy

9    Code, which only says that the discharge of a claim against

10   the debtor does not affect the discharge of a third party.

11   However, the Debtor is not relying on 524(e) as the basis of

12   their exculpation.  As we outline in our brief, Your Honor, we

13   believe that the exculpation is appropriate under Section 105

14   and 1123(b)(6) as a means -- part of an implementation of the

15   plan.

16       Importantly, Your Honor, as other courts hostile to third-

17   party releases have determined, exculpation only sets a

18   standard of care for parties and is not an effort to relieve

19   fiduciaries of liability.

20       Other courts that have aligned with the Fifth Circuit and

21   rejected third-party releases, like the Ninth Circuit, have

22   recently determined exculpation has nothing to do with 524(e).

23   In *In re Blixseth*, a Ninth Circuit case decided at the end of

24   2020 cited in our materials, they examined several of their

25   circuit cases that had strongly prohibited non-consensual

120

 1  third-party releases under 524(e).  But again, the Court

 2  concluded that 524(e) only prohibits third parties from being

 3  released from liability of a prepetition claim for which the

 4  debtor receives a discharge.  The Court reasoned that the

 5  exculpation clause, however, protects parties from negligence

 6  claims relating to matters that occurred during the Chapter 11

 7  case and has nothing to do with 524(e).

 8       The Ninth Circuit, which along with the Fifth Circuit has

 9  been notorious for prohibiting third-party releases, issued

10  its ruling against this backdrop and said that exculpations

11  are appropriate.

12       Your Honor, the Objectors made a point yesterday of

13  pointing out that Strand, as the Debtor's general partner, is

14  liable for the debts under applicable law.  To the extent they

15  intend to argue that the exculpation is seeking to discharge

16  any such prepetition liability, they would be wrong.  The

17  exculpation only applies to postpetition matters.  And to the

18  extent they argue that the exculpation seeks to discharge

19  Strand's potential postpetition liability, for the reasons I

20  discussed, a claim against Strand will essentially be a claim

21  against the Debtor because the Debtor will be obligated to

22  indemnify them.

23       Accordingly, Your Honor, we submit that if this matter

24  goes up to appeal to the Fifth Circuit, which it may very well

25  do, that the Fifth Circuit may very well come out the same way

121

1  as the Ninth Circuit and start relaxing the standard or

2  otherwise provide that the independent directors are much more

3  like Committee members.

4      Lastly, Your Honor, if the Court does confirm the plan,

5  which we certainly hope it will do, it will have made a

6  finding that the plan has been proposed in good faith, and in

7  doing so, the Court essentially finds that the independent

8  directors and their agents have acted appropriately and

9  consistent with their fiduciary duties, and it makes --

10  exculpation for negligence naturally flows from that finding.

11      Your Honor, I would now like to go to the injunction

12  provisions, and my argument is that the injunction provisions

13  as amended are appropriate.

14          THE COURT:  Can I stop you?

15          MR. POMERANTZ:  We received several of -- yes.

16          THE COURT:  I want to just recap a couple of things I

17  think I heard you say.  You're not asking this Court, you say,

18  to go contrary to *Pacific Lumber* per se.  You have thrown out

19  there the possibility that *Pacific Lumber* mistakenly relied on

20  524(e) in rejecting exculpations of plan sponsors.  You're

21  saying, eh, as a technical matter, I think they were wrong in

22  focusing on that statute because that statute seems to deal

23  with prepetition liability.  Okay?  Its actual wording, 524(e)

24  states, discharge of a debt of a debtor does not affect the

25  liability of any other entity on such debts.

122

1    And reading between the lines, I think you're saying --

2    well, maybe this isn't what you're saying, but here's what I

3    inferred -- "debt" is defined in 101(12) to mean liability on

4    a claim, and then "claim" is defined in 101(5) of the

5    Bankruptcy Code as meaning right to payment.  It doesn't say

6    as of the petition date, but I think if you look at, then,

7    Section 502 of the Bankruptcy Code that addresses claims and

8    interests, clearly, it seems to be referring to the

9    prepetition time period, you know, claims and interest as of

10   the petition date.  And then -- that's 502.  And then 503

11   speaks of, for the most part, postpetition administrative

12   expenses.

13       So that was my rambling way of saying I'm understanding

14   you to say, eh, as a technical matter, we think the Fifth

15   Circuit was wrong to focus on 524(e) because when you're

16   talking about exculpation you're talking about postpetition

17   liability, not prepetition liability.  And 524(e) is talking

18   more about prepetition liability.

19       But I think what I also hear you saying is, at bottom,

20   *Pacific Lumber* was sort of a policy-driven holding where, you

21   know, we're worried about no one would ever sign up for being

22   on an unsecured creditors' committee if they could be exposed

23   to lawsuits.  They're fiduciaries, we think, for policy

24   reasons.  Exculpation is appropriate for this one group.  And

25   you're saying, well, they didn't have an independent board

123

1   that they were considering.  They were just considering non-

2   fiduciary plan sponsors.  And so the rationale presented by

3   *Pacific Lumber* applies equally here, and just they didn't make

4   a holding in this factual context.

5       Have I recapped what you're saying?

6           MR. POMERANTZ:  Your Honor, that's generally --

7   generally correct, with a couple of nuances.  So, yes, first,

8   I think, on a policy basis, Your Honor -- again, putting aside

9   the January 9th order, because we don't see --

10          THE COURT:  Right.  Right.

11          MR. POMERANTZ:  -- Your Honor even needs to get to

12  this issue.

13          THE COURT:  I understand.

14          MR. POMERANTZ:  But if Your Honor does get to this

15  issue, we think, as a first point, Your Honor could be totally

16  consistent with *Pacific Lumber* because there's policy reasons

17  and there was not a categorical rejection of exculpation.

18  Okay.  So if there was a categorical rejection, then it

19  wouldn't have been okay for committee members.  Okay.

20      Second argument, yes, we don't think -- we think it's part

21  of dicta.  It's not part of the holding.  We understand that

22  other courts may have not agreed, maybe your *Thru* case, which

23  Your Honor was appealed on.

24      But the third issue, our argument is all they looked at

25  was 524(e).  They said 523 -- 4(e) does not authorize it.

124

1    They did not say 524(e) prohibits it.

2        We think there's other provisions in the Code.  And then

3    when you basically add in the analysis that Your Honor

4    provided, which we agree with, and what 524 was -- to do,

5    524(e) just says that discharge doesn't affect.  It doesn't

6    say that under another provision of the Code or for another

7    reason you are authorized to give an exculpation.  I think

8    it's a nuance and it's a difference there.

9        And my point of bringing up the *Blixseth* case -- which, of

10   course, is Ninth Circuit and it's not binding on Your Honor,

11   it's not binding on the Fifth Circuit -- is to say, when that

12   was presented to them, they saw the distinction that 524(e)

13   has nothing to do with an exculpation.  And while, yes, the

14   Fifth Circuit hasn't ruled on that, and if the Fifth -- if

15   that argument is made to the Fifth Circuit, we don't know how

16   they would rule, I think that, based upon their analysis --

17   which, again, Your Honor, is no more than a page and a half of

18   their opinion, right, of a long, lengthy opinion on the

19   confirmation issues.  So I think, Your Honor, with the Fifth

20   Circuit, there is a good chance that based upon the developing

21   case law of exculpation, based upon the sister circuit in

22   *Blixseth* making that distinction, that there is a very good

23   chance that the Fifth Circuit would change.

24       But look, I recognize that argument requires Your Honor to

25   say, okay, this is outside and -- and what *Pacific Lumber* did

125

1    or didn't do.  But I think, Your Honor, there's several

2    potential reasons, there's several potential arguments that

3    you can get to the same place.

4             THE COURT:  Okay.  Thank you.

5             MR. POMERANTZ:  Okay.  If I may just get another

6    glass of -- sip of water before my time starts?

7             THE COURT:  Okay.

8             MR. POMERANTZ:  Okay, Your Honor.  We're now turning

9    to the injunction provision.  The Debtor received several

10   objections to the injunction provisions in -- I think I have

11   it right now -- Article 9(f) to the plan.  And we've modified

12   Article 9(f) to address certain of those concerns, and we

13   believe that, as modified, that the injunction provision

14   implements and enforces the plan's discharge, release, and

15   exculpation provisions to prevent parties from pursuing claims

16   in interest that are addressed by the plan and otherwise

17   interfering with consummation and implementation of the plan.

18       I'd like to put up the first paragraph of the injunction

19   on the screen now.

20       Okay, Your Honor.  The first paragraph, all it does is

21   prohibits the enjoined parties from taking action to interfere

22   with consummation or implementation of the plan.  I suspect a

23   sentence like that is probably in hundreds of plans in the

24   Fifth Circuit and elsewhere.

25       Initially, to address a concern that it applied to too

126

1   many parties, the Debtor added a definition in the revised

2   plan that defines "enjoined parties," which I'd like to now

3   put that definition up on the screen.

4       The changes -- it's a little hard to read there, but you

5   have it in the -- oh, there you go.  The changes made clear

6   that only parties who have a relationship to this case, either

7   holding a claim or interest, having appeared in the case, be a

8   -- or be a party in interest, Jim Dondero, or related entity,

9   or related person of the foregoing are covered.  The claim

10  objectors argue that the word "implementation and

11  consummation" is vague, or vague and unclear.  Your Honor,

12  these terms are both defined in the Bankruptcy Code and under

13  the case law, and they're, as I said, common features of many

14  plans.

15      Section 1123(a)(5) of the Code provides that a plan shall

16  provide for its implementation, and identifies a list of items

17  that the plan can include.  Article 4 of our plan is defined

18  as "Means of Implementation of This Plan," and describes the

19  various corporate steps required to implement the provisions

20  of the plan, including canceling equity interests, creation of

21  new general partners and a limited part of the Reorganized

22  Debtor, the restatement of the limited partnership agreement,

23  and the establishment of the various trusts.

24      Paragraph 1 rightly and appropriately enjoins efforts to

25  interfere with these steps.

127

1      Nor is the term "consummation of the plan" vague.

2   "Consummation" also is a commonly-used term and has been

3   defined by the Fifth Circuit and the Code.  1102 -- 1101(2)

4   defines "Substantial Consummation" to be the transfer of

5   assets to be transferred under the plan, the assumption by the

6   debtor of the management of all the property dealt with by the

7   plan, and the commencement of distributions under the plan.

8      Section 1142 gives the Court authority to direct a party

9   to perform any act necessary for consummation of a plan.  And

10  as the Fifth Circuit, in *United States Brass Corp.*, which is

11  said in our material, states, said the Bankruptcy Court had

12  post-confirmation jurisdiction to enforce the unperformed

13  terms of a plan with respect to a matter that could affect the

14  parties' post-confirmation rights because the plan had not

15  been fully consummated.

16     And Your Honor just wrote on this issue last year in the

17  *Senior* -- the *Texas* -- the *TXMS Real Estate v. Senior Care*

18  case, and you cited to *U.S. Brass* to find that, in that case,

19  post-confirmation jurisdiction existed to resolve a dispute

20  relating to an assumed contract because the matter related to

21  interpretation, implementation, and execution of the plan.

22     Accordingly, Your Honor, neither implementation or

23  consummation are vague, and the first paragraph of the

24  injunction is necessary and appropriate to enforce the

25  Debtor's discharge.

128

1    As I said before, I will leave it to Mr. Kharasch to

2    address specifically the concerns that the Advisor and the

3    Funds have with the injunction.

4        The second and third paragraphs of the injunction, Your

5    Honor, certain parties have objected to them on the ground

6    that they constitute an improper release of the independent

7    directors as well as the release of claims against the

8    Reorganized Debtor, the Claimant Trust, and the Litigation

9    Sub-Trust, entities that will not have come into existence

10   until after the effective date.

11       We believe we have addressed these concerns by

12   modifications to the second and third paragraphs of the

13   injunction, which I would now like to put the second and third

14   paragraphs on the screen.

15       (Pause.)

16           MR. POMERANTZ:  As that is happening, Your Honor, I

17   will -- there we go.

18       We believe that the changes that were made to these

19   paragraphs should address the Objectors' concerns.

20       First, as with the first paragraph, we have created a

21   defined term of "Enjoined Parties" who are subject to the

22   injunction which is narrower than all persons, I believe, or

23   all entities that was included in the prior plan.  So we've

24   narrowed that.

25       "Enjoined Parties" are generally defined, as I mentioned

129

1    before, as entities involved in this case or related to Jim

2    Dondero, or have appeared in this case.

3        Second, we have removed independent directors from these

4    paragraphs to address the concern that the injunction was a

5    disguised third-party release.

6        Third, we have removed the Reorganized Debtor and the

7    Claimant Trust from the second paragraph and moved them to the

8    third paragraph.  We did this to make clear that the

9    Reorganized Debtor and Claimant Trust were only getting the

10   benefit of the injunction as the successors to the Debtor.  As

11   the Reorganized Debtor and the Claimant Trust receives the

12   property from the Debtor free and clear of all claims and

13   interests and equity holders under 1141(c), they are entitled

14   to the benefit of the injunction.

15       Fourth, we have addressed the concern that the injunction

16   improperly affected set-off rights.  We added language to make

17   clear that the injunction would only affect the parties' set-

18   off of an obligation owed to the Debtor to the extent that

19   that was permissible under 553 and 1141 of the Bankruptcy

20   Code.

21       In other words, we are punting the issue for another day,

22   and there's nothing in the plan that gives the Debtor any more

23   set-off rights than it otherwise has under the Bankruptcy

24   Code.

25       Lastly, Your Honor, certain Objectors have argued that the

130

1  injunction somehow prevents them from enforcing the rights

2  they have under the plan or the confirmation order.  We don't

3  really understand this concern, as the language leading into

4  the second paragraph of the injunction says, except as

5  expressly provided in the plan, the confirmation order, or a

6  separate order of the Bankruptcy Court.

7      With these modifications, Your Honor, the provisions do

8  nothing more than implement 1123(b)(6) and 1141 by preventing

9  parties from taking actions to interfere with the Debtor's

10 plan.

11     The Court has also heard testimony from Mr. Seery

12 regarding the importance of the injunction to implementation

13 of the plan.  He testified that he intends to monetize assets

14 in a way that will maximize value.  And to effectively do

15 that, he has testified that the Claimant Trust needs to be

16 able to pursue its objectives without interference and

17 continued harassment from Mr. Dondero and his related

18 entities.

19     In fact, Mr. Seery testified that if the Claimant Trust

20 were subject to interference by Mr. Dondero, it would take him

21 more time to monetize assets, they would be monetized for less

22 money, and creditors would be harmed.

23     If Your Honor doesn't have any questions for me on the

24 injunction provisions, I'd like to turn to the last part of

25 the injunction, which is really the gatekeeper provision.

131

1          THE COURT:  All right.  You may.

2          MR. POMERANTZ:  Your Honor, the last paragraph in

3   Article 9(f) is really not an injunction but is rather a

4   gatekeeper provision.  And as originally drafted, it'd do two

5   things:  first, it'd require that before any entity, which is

6   defined very broadly, could file an action against a protected

7   party relating to certain specified matters, the entity would

8   have to seek a determination from this Court that the claim

9   represented are colorable claim of bad faith, criminal

10  conduct, willful misconduct, fraud, or gross negligence.  The

11  specified matters to which the gatekeeper provision would

12  apply included the Chapter 11 case, negotiations regarding the

13  plan, the administration of the plan, the property to be

14  distributed under the plan, the wind-down of the Debtor's

15  business, the administration of the Claimant Trust, or

16  transactions related to the foregoing.

17      Subject to certain exceptions for Dondero-related parties,

18  protected parties were defined to include the Debtor, its

19  successors and assigns, indirect and direct, majority-owned

20  subsidiaries and managed funds, employees, Strand, Reorganized

21  Debtor, the independent directors, the Committee and its

22  members, the Claimant Trust, the Claimant Trustee, the

23  Litigation Trust, the Litigation Sub-Trustee, the members of

24  the Oversight Committee, retained professionals, the CEO and

25  CRO, and persons related to the foregoing.  Essentially,

132

1  parties related to the pre-effective-date administration of

2  the estate or the post-confirmation implementation of the

3  plan.

4      Second, the gatekeeper provision as originally presented

5  gave the Bankruptcy Court exclusive jurisdiction to adjudicate

6  any cause of action that it determined would pass through the

7  gate.  The gatekeeper provision, Your Honor, is not a release

8  in any way.  Rather, it permits enjoined parties who believe

9  they have a claim against the protected parties to pursue such

10  a claim, provided they first make a showing that the claim is

11  colorable to the Bankruptcy Court.

12      Several parties, Your Honor, objected to the Bankruptcy

13  Court having exclusive jurisdiction to adjudicate the claims

14  that pass through the gate.  The Debtor believes that the

15  Bankruptcy Court would ultimately have jurisdiction of any of

16  those claims that pass through the gate.  However, the Debtor

17  did, upon reflection, appreciate the concern that if the Court

18  agreed to that now, it would essentially be determining its

19  jurisdiction before a claim was filed.

20      Accordingly, in the January 22nd plan, Your Honor, we

21  amended the provision to provide that the Bankruptcy Court

22  will only have jurisdiction over such claims to the extent it

23  was legally permissible to do so, essentially deferring the

24  issue to a later time.

25      And as Your Honor, I believe, in one of cases called the

133

1    *Icing on the Cake*, the retention and jurisdiction provisions

2    in the plan only are to the extent under applicable law and

3    are quite broad and include the things that we would have the

4    Court -- have jurisdiction for the Court, otherwise

5    determined.

6        The Court made some other changes to the gatekeeper

7    provision, and I would like to place the amended gatekeeper

8    provision on the screen right now.  In addition to the change

9    I mentioned, the Debtor made the following changes:  the

10   provision is limited now to apply only to enjoined parties,

11   rather than any entity.  Than any entity.  Much narrower.  The

12   provision added the administration of the Litigation Sub-Trust

13   to the matters to which the provision would apply.  The

14   provision makes clear now that any claim, including

15   negligence, is a claim that could be sought and pursued

16   through the gatekeeper function.  And the provision made some

17   other syntax changes.

18       We believe, Your Honor, with these changes, we believe

19   that the gatekeeper provision is within the Court's

20   jurisdiction and it's appropriate to include under the plan.

21       But certain parties have argued that the Court does not

22   have the authority, the jurisdictional authority to perform

23   the gatekeeper function, separate and apart from whether it

24   has jurisdiction to adjudicate the claims that pass through

25   the gate.

134

1    Your Honor, we submit that these arguments represent a

2    fundamental misunderstanding of Bankruptcy Court jurisdiction

3    and the Court's authority to make sure the Debtor is free of

4    interference in carrying out the plan which I'll get to in a

5    couple moments.

6    As a preliminary matter, Your Honor, it is important for

7    the Court to remember that Paragraph 10 of the January 9 order

8    already contains a gatekeeper provision as it relates to the

9    independent directors and their agents.  And as I mentioned on

10   a couple of occasions, that order is not going away, it

11   doesn't expire by its terms, and it cannot be collaterally

12   attacked in this forum.

13   The Debtor does acknowledge, though, that the gatekeeper

14   provision in the plan is broader in terms of the people it

15   protects and it applies to post-confirmation matters.

16   Before I address the Court's authority to approve the

17   gatekeeper provision, I want to summarize the evidence that it

18   has heard from Mr. Seery and Mr. Tauber regarding why the

19   gatekeeper is so important a provision to the success of the

20   plan.

21   Although the Court is all too familiar with the history of

22   litigation initiated by and filed against Mr. Dondero and his

23   related affiliates, Mr. Seery spent some time on the stand

24   testifying about the litigation so the Court would have a

25   complete record for this hearing.  He testified that prior to

135

1   the petition date, the Debtor faced years of litigation from

2   Mr. Terry and Acis that led to the *Acis* bankruptcy case, which

3   Your Honor has said many times it's still in your mind.  Years

4   of litigation with the Redeemer Committee which precipitated

5   the filing of a bankruptcy case and resulted in an award very

6   critical of the Debtor's conduct.  Years of litigation with

7   UBS.  Years of litigation with Patrick Daugherty.  And we

8   placed all the dockets for all these matters before the Court.

9       Also, during the bankruptcy and after the Committee

10  essentially rejected the Debtor's pot plan proposal and

11  indicated -- and the Debtor indicated it would be terminating

12  the shared service agreements with Mr. Dondero and his related

13  entities, the Debtor was the subject of harassment from Mr.

14  Dondero and related entities which resulted in the temporary

15  restraining order against him, a preliminary injunction

16  against him, a contempt motion, which Your Honor is scheduled

17  to hear Friday, a motion by the Debtor's controlled -- by the

18  Dondero-controlled investors and funds in CLO managed --

19  managed by the Debtor, which the Court referred to that motion

20  as being frivolous and a waste of the Court's time.  Multiple

21  plan objections, most of which are focused on allowing the

22  Debtors to continue their litigation crusade against the

23  Debtor and its successors post-confirmation.  An objection to

24  the Debtor approval of the Acis order and a subsequent appeal.

25  An objection to the HarbourVest settlement and subsequent

136

 1    appeal.  A complaint and injunction against the Advisors and

 2    the Funds to prevent them from violating Paragraph 9 of the

 3    January 9th order.  And a temporary restraining order against

 4    those parties, which was by consent.

 5        Mr. Dondero's counsel tends to argue that he is the victim

 6    here and that the litigation is being commenced against him

 7    and -- instead of by him.  That response does not even deserve

 8    a response, Your Honor.  It is disingenuous.

 9        Mr. Tauber testified that he was part of the team at Aon

10    that sourced coverage for the independent directors after

11    their appointment in January 2020 and that he has over 20

12    years of underwriting experience.  He testified that at Aon he

13    builds bespoke insurance programs which are not cookie-cutter

14    programs for his clients, with an emphasis on D&O and E&O.

15    And he was asked by the independent board to obtain D&O and

16    E&O insurance after the board's appointment on January 9th.

17        Based upon the process Aon conducted in reaching out to

18    insurance carriers, Mr. Tauber testified that Aon was only

19    able to obtain D&O insurance based upon the inclusion of

20    Paragraph 10 of the January 9 order, the gatekeeper provision.

21    I know Mr. Taylor said that that was spoon-fed to the

22    insurers, but Mr. Tauber's testimony is they knew about Mr.

23    Dondero and they knew about his litigation tactics, so it is

24    not a good inference to be made from the testimony that they

25    would not have required something.  They probably would have

137

1  just said no.

2      Aon has now been -- Mr. Tauber testified that Aon has now

3  been asked to obtain D&O coverage for the Claimant Trustee,

4  the Litigation Trustee, the Oversight Committee, the members,

5  the Claimant Trust, and the Litigation Sub-Trust.  He

6  testified that he and Aon have approached the insurance

7  carriers that they believe might be interested in underwriting

8  coverage.

9      And no, he hasn't approached every D&O and E&O carrier out

10  there, and there may be, just like an investment banker

11  doesn't have to approach everyone.  They are experts in the

12  field, and he testified they approached the people they

13  thought would likely be willing or interested and potentially

14  be willing to extend coverage.  And as a result of Aon's

15  efforts, Mr. Tauber has determined that there's a continued

16  resistance to provide any coverage that does not contain an

17  exclusion for actions relating to Mr. Dondero or his related

18  entities.  And he further believes that all carriers that will

19  -- that have discussed a willingness to provide coverage will

20  only do so if there is a gatekeeper provision, and only one

21  carrier will agree to provide coverage without a Dondero

22  exclusion.

23      Mr. Tauber testified that he believes that any ultimate

24  policy will provide that if at any time the gatekeeper

25  provision is not in place, either the carrier will not cover

138

1   any actions related to Mr. Dondero or his affiliates or that

2   the coverage will be vacated or voided.

3       Based upon the foregoing record, Your Honor, which is

4   uncontroverted, there's ample justification on a factual basis

5   for approval of the gatekeeper provision.

6       I will now turn to the Court's authority to approve the

7   gatekeeper provision.

8       There are three alternative bases upon which the Court can

9   approve the gatekeeper provision.  First, several provisions

10  of the Bankruptcy Code give broad authority to approve a

11  provision like the gatekeeper provision.

12      Second, the Court can analogize to the Barton Doctrine the

13  facts and circumstances in this case and authorize the Court

14  to act as a gatekeeper to prevent frivolous litigation from

15  being filed against court-appointed officers and directors and

16  those that will lead the post-confirmation monetization of the

17  estate's assets.

18      And third, Your Honor, the Court can find that Mr. Dondero

19  and his entities are vexatious litigants, and use the

20  gatekeeper provision as a sanction to prevent the filing of

21  baseless litigation designed merely to harass those in charge

22  of the estate post-confirmation.

23      So, Bankruptcy Court authority.  Your Honor, there are

24  several provisions in the Bankruptcy Code which we rely on to

25  support the Court's authority.  First, Section 1123(a)(5)

139

1   permits the plan to approve adequate means of implementation,

2   and contains a long, non-exclusive list.  Mr. Seery's

3   testimony is uncontroverted that a gatekeeper provision is

4   necessary for the adequate implementation of the plan.

5        Second, Your Honor, 1123(b)(6) authorizes a plan to

6   include any appropriate provision in a plan not inconsistent

7   with any other provision in this Code.  There are not any

8   provisions and none have been cited by the Objectors that

9   would prohibit a gatekeeper provision.  Section 1141

10  effectively holds that the terms of a plan bind the debtor and

11  its creditors and vest property in a reorganized debtor, free

12  and clear of the interests of third parties.

13       If nothing else, Your Honor, the spirit of 1141 allows the

14  Court to prevent, in appropriate cases, vexatious litigation

15  by unhappy creditors and parties in interest from torpedoing

16  the plan.

17       1142(b), Your Honor, provides that the confirmation --

18  that, after confirmation, the Court may direct any parties to

19  perform any act necessary for the consummation of the plan,

20  and requiring the party to seek court-approval before filing

21  an action is certainly an act.

22       And lastly, Your Honor, Section 105 allows the Court to

23  enter orders necessary to order other things, enforce orders

24  of the Court like the confirmation order, and prevent an abuse

25  of process which would certainly occur if baseless litigation

140

1  were filed against the parties in charge of the Reorganized

2  Debtor and the trust vehicles entrusted with carrying out the

3  plan.

4      Your Honor, gatekeepers are not a novel concept and have

5  been approved by courts in appropriate circumstances.  In the

6  *Madoff* cases, the Court has been the gatekeeper post-

7  confirmation to determine whether investor claims are

8  derivative or direct claims.

9      In *General Motors*, the Court has been the gatekeeper post-

10 confirmation to determine whether product liability claims are

11 proper claims against the reorganized debtor.

12     Closer to home, Judge Lynn, Mr. Dondero's counsel,

13 approved a gatekeeper provision, arguably even more far-

14 reaching than the provision here, in the *Pilgrim's Pride* case.

15 In that case, Judge Lynn held that *Pacific Lumber* prevented

16 him -- prevented the Court from approving the exculpation

17 provision in the plan.  However, he did hold that it was

18 appropriate for the Court to ensure that debtor

19 representatives are not improperly pursued for their good-

20 faith actions by requiring that any actions against the debtor

21 or its representatives, and further, on the performance of

22 their obligations as debtor-in-possession, be heard

23 exclusively before the Bankruptcy Court.

24     And *Pilgrim's Pride* is not the only case in this district

25 to include a gatekeeper provision, as Judge Houser approved

141

1   one in the *CHC Group* in 2016, which is cited in our materials.

2       The theme in all these cases, Your Honor, is that there

3   are circumstances where it is necessary and appropriate for

4   the Bankruptcy Court to act as a gatekeeper as a means of

5   reducing litigation that could interfere with a confirmed plan

6   and that a Court has the authority to approve such provisions.

7       The Objectors argue that the Bankruptcy Court does not

8   have jurisdiction to approve that provision.  The Debtor

9   understands the argument as it related to the prior provision,

10  which gave the Court exclusive jurisdiction over any claim it

11  found colorable, and we've amended the plan to address that

12  issue.  The jurisdiction to deal with those claims could be

13  left to a later day.

14      But to the extent the Objectors still pursue the

15  jurisdiction argument in light of the current provision,

16  they're really conflating two very different things:  the

17  ability to determine whether a claim is colorable and the

18  ability to adjudicate that claim if the Court determines it's

19  colorable.

20      None of the authorities cited by the Objectors hold that

21  the Court is without jurisdiction to approve a gatekeeper

22  provision like the one here.  So, rather, what they do is they

23  try to -- they argue, based upon the *Craig's Stores* case,

24  which is narrower than other circuits of post-confirmation

25  jurisdiction in the Bankruptcy Court, and argue that the

142

1   gatekeeper provision doesn't fall within that. But that --

2   such reliance is misplaced, Your Honor.

3       *Craig* held that the Bankruptcy Court did not have

4   jurisdiction to adjudicate a post-confirmation dispute over a

5   private-label credit card agreement between the debtor and the

6   bank. In declining to find jurisdiction, the Fifth Circuit

7   remarked that there was no antagonism or claim pending between

8   the parties as of the reorganization and no facts or law

9   deriving from the reorganization or the plan was necessary to

10  the claim asserted by the debtor.

11      However, in so ruling, Your Honor, the Fifth Circuit did

12  reason that post-confirmation jurisdiction in the Bankruptcy

13  Court continues to exist for matters pertaining to

14  implementation and execution of the plan. Requiring parties

15  to seek Bankruptcy Court determination the claim is colorable

16  before embarking on litigation that will impact

17  indemnification rights and affect distributions to creditors

18  is not an expansion of jurisdiction and fits well within the

19  *Craig* reasoning.

20      Unlike the credit card agreement dispute in *Craig*, Mr.

21  Dondero and his entities have demonstrated tremendous

22  antagonism towards the Debtor. And while the Debtor's plan

23  may be confirmed, further litigation has been threatened by

24  Mr. Dondero. It's in the pleadings. That's one of the

25  reasons Mr. Dondero says his plan is better. It'll avoid

143

1    tremendous amount of litigation.

2        After *Craig*, the Fifth Circuit again examined the

3    bankruptcy court's post-confirmation jurisdiction in the

4    *Stoneridge* case in 2005. In that case, the Fifth Circuit

5    ruled that a bankruptcy court has post-confirmation

6    jurisdiction to resolve a dispute between two nondebtors that

7    could trigger indemnification claims against a liquidating

8    trust formed as a result of a confirmed plan.

9        And lastly, as I mentioned Your Honor's decision before,

10   the *TXMS Real Estate* case, I think just a couple of months

11   ago, it stands for the proposition that post-confirmation

12   jurisdiction exists for matters bearing on the implementation,

13   interpretation, and execution of a plan. In that case, Your

14   Honor ruled that Your Honor had jurisdiction to resolve a

15   post-confirmation dispute between a liquidating trust formed

16   under a plan and a landlord, the result of which could

17   significantly and adversely affect the value of the

18   liquidating trust and monies available for unsecured

19   creditors.

20       And you have heard Mr. Seery testify that litigation will

21   have an adverse effect on the ability to make distributions to

22   creditors.

23       So, Your Honor, under these authorities, the Court

24   undoubtedly would have jurisdiction to act as the gatekeeper

25   for the litigation.

144

1      There's also an independent basis for the gatekeeper

2   provision, Your Honor, the Barton Doctrine, which the Court is

3   very familiar from your opinion in the *In re Ondova* case in

4   2017 and which provides that before a suit may be brought

5   against a trustee, leave of Court is required.  In *Ondova*, the

6   Court reviewed the history of the doctrine in connection with

7   litigation brought by a highly-litigious debtor against a

8   trustee and his professionals.  This Court noted that there

9   are several important policies followed by the doctrine,

10  including a concern for the overall integrity of the

11  bankruptcy process and the threat of trustees being distracted

12  from or intimidated from doing their jobs.  And Your Honor's

13  language still:  For example, losers in the bankruptcy process

14  might turn to other courts to try to become winners there by

15  alleging the trustee did a negligent job.

16      Your Honor, this is precisely what the Debtor is trying to

17  prevent here, Mr. Dondero and his entities from putting the

18  bad experience before Your Honor in this case behind it and

19  going to try to find better luck in a more hospitable court.

20      Your Honor, the Barton Doctrine originally only applied to

21  receivers, and over the course of time has been extended to

22  apply to various court-appointed fiduciaries, as we have cited

23  in our materials:  trustees, debtors-in-possession, officers

24  and directors, employees, and attorneys representing the

25  debtor.

145

1    And I expect the Objectors to argue that there is a

2  statutory exception to the Barton Doctrine under 28 U.S.C. 959

3  and it does not apply to acts or transactions in carrying out

4  business conducted with a property.  The exception, Your

5  Honor, is very narrow and was meant to apply for things like

6  slip-and-fall cases.  In fact, the Eleventh Circuit in the

7  *Carter v. Rodgers* case, 220 F.3d 1249 in 2000, held that

8  Section 11 -- 28 U.S.C. 959(a) does not apply to suits against

9  trustees for administering or liquidating the bankruptcy

10  estate.

11    The Objectors also argue that the gatekeeper provision

12  violates *Stern v. Marshal*.  However, as the Court acknowledged

13  in *Ondova*, the Fifth Circuit in *Villegas v. Schmidt* has

14  recognized that the Barton Doctrine remains viable post-*Stern*

15  *v. Marshal*.  The Fifth Circuit reasoned that while Barton

16  Doctrine is jurisdictional in that a court does not have

17  jurisdiction of an action if preapproval has not been

18  obtained, it does not implicate the extent of a bankruptcy

19  court's jurisdiction to adjudicate the underlying claim,

20  precisely the distinction we're making here.  The bankruptcy

21  court would be the gatekeeper for deciding whether the claim

22  passes through the gate, and then after will decide if it has

23  jurisdiction to rule on the underlying claim.

24    And this is important especially in a case like this, Your

25  Honor, where Your Honor has had extensive experience with the

146

1  parties and is in the best position to determine whether the

2  claims are valid or attempted to be used as harassment.

3      The Objectors will complain about the open-ended nature of

4  the gatekeeper provision, whether it will or won't apply after

5  the case is closed or a final decree is issued, and the unfair

6  burden of their rights.

7      Your Honor has a previous reported opinion where basically

8  jurisdiction does extend after a case is closed or a final

9  decree is entered, so that issue is a red herring.

10     As Your Honor is well aware, it's a decade-long -- a

11 decade of litigation against the Dondero-controlled entities

12 that caused the Highland bankruptcy.  And the Court is very

13 well aware of the litigation that occurred in *Acis*, very well

14 aware of the litigation that's occurred here that I mentioned

15 a few minutes ago.  Your Honor, it is not over, you'll be

16 presiding over the contempt hearing.

17     And if the Court needs yet another ground to approve the

18 gatekeeper provision, the Debtor submits that the procedure is

19 an appropriate sanction for Dondero's vexatious litigation

20 activities.  We cited the *In re Carroll* case in the Fifth

21 Circuit of 2017 that held that a bankruptcy court has the

22 authority to enjoin a litigant from filing any pleading in any

23 action without the prior authority from the bankruptcy court.

24     And in affirming the decision of the bankruptcy court, the

25 Fifth Circuit commented on the reasons the bankruptcy court

147

1    gave for its ruling. After recounting the bad faith of

2    appellants, the bankruptcy court determined that the Carrolls'

3    true motives were to harass the trustee and thereby delay the

4    proper administration of the estate, in the hope that they

5    would be able to retain their assets or make pursuit of the

6    assets so unappealing that the trustee would be compelled to

7    settle on terms favorable to appellants.

8        Sounds familiar, Your Honor. The same can certainly be

9    said about what Mr. Dondero is doing in this case.

10       And to make a showing that a party is vexatious litigant,

11   the Court must find that the party has a history of vexatious

12   and harassing litigation, whether the party has a good faith

13   -- the litigation or has filed it as a means to harass, the

14   burden to the Court and other parties, and the adequacy of

15   alternative sanctions.

16       And as Your Honor is well aware from all the litigation,

17   Your Honor is well, well able to make the finding required for

18   the vexatious litigation finding.

19       But here, we don't ask for the drastic sanction of

20   enjoining from any further filings. Rather, we just ask for a

21   less-severe sanction, requiring Mr. Dondero and his entities

22   to first make a showing that he has a colorable claim.

23       The Fifth Circuit in *Baum v. Blue Moon*, 2007, did exactly

24   that. In *Baum*, the district court barred a vexatious litigant

25   from initiating litigation without first obtaining the

148

1  approval of the district court. Ultimately, the matter

2  reached the Fifth Circuit after the district court had

3  modified the pre-filing injunction to limit it to a certain

4  case, and then broadened it again based upon continued bad

5  faith conduct.

6      On appeal, the Fifth Circuit, citing several prior cases,

7  noted that a district court has the authority to impose a pre-

8  filing injunction to defer vexatious, abusive, and harassing

9  litigation.

10     And for those reasons, Your Honor, the Debtor asks the

11 Court to overrule any objections to the gatekeeper provision.

12     Your Honor, I was just going to then go to the plan

13 modification provisions, but I wanted to stop and see if you

14 had any questions at this point.

15          THE COURT: I do not. Let's give him a time

16 estimate, Nate. About how --

17          THE CLERK: Twenty.

18          MR. POMERANTZ: I have another five or six minutes, I

19 think, based upon --

20          THE COURT: Okay.

21          MR. POMERANTZ: And then I'll be ready to turn it

22 over to --

23          THE COURT: Okay.

24          MR. POMERANTZ: -- to Mr. Kharasch.

25          THE COURT: All right. Yes. You've got -- you've

149

1    done an hour and 33 minutes. So you have about, I guess, 37

2    minutes left. Okay. Go ahead.

3            MR. POMERANTZ: Thank you, Your Honor.

4      I would like to address the modifications of the plan that

5    were contained in our January 22nd plan and the additional

6    changes filed on February 1, several of which I have referred.

7      As a preliminary matter, Your Honor, under 1127(b), the

8    Debtor can modify a plan at any time prior to confirmation if

9    -- and not require resolicitation if there's no adverse change

10   in the treatment of claim or interest of any equity holder.

11      With that background, I won't go through the changes we

12   made that I've already discussed, but I will point out a

13   couple, Your Honor, that I would like to point out now. We

14   have modified the plan with respect to conditions of the

15   effective date in Article 8. First, a condition to the

16   effective date will now be entry of a final order confirming a

17   plan, as opposed just to entry of order. And final order is

18   defined as the exhaustion of all appeals.

19      In addition, the ability to obtain directors and officers

20   insurance coverage on terms acceptable to the Debtor, the

21   Committee, the Claimant Trustee, the Claimant Trustee

22   Oversight Board, and the Litigation Trustee is now a condition

23   to the effective date.

24      The Court heard testimony today and has experienced

25   firsthand the litigiousness of Mr. Dondero and his related

150

1  entities.  And the Court heard testimony from Mr. Tauber and

2  Aon that the D&O insurance will not be available post-

3  effective date without assurances that the gatekeeper

4  provision will be in effect for the duration of the policy and

5  any run-off period.

6      Mr. Tauber further testified that he expected the final

7  terms from the insurance carrier to provide that if the

8  confirmation order was reversed on appeal and the gatekeeper

9  was removed, it would void -- it would either void the

10  directors and officers coverage or it'd result in a Dondero

11  exclusion.

12      Mr. Dondero and his entities are no strangers to the

13  appellate process, as Your Honor knows.  They appealed several

14  of your orders, and continue the tack in this case, having

15  appealed the Acis and the HarbourVest orders and the

16  preliminary injunction.  It would not surprise the Debtor if

17  Mr. Dondero and his entities appealed your confirmation order,

18  if Your Honor decides to confirm the plan.

19      The Debtor is confident that it will prevail on any appeal

20  in the confirmation order, as we believe the Debtor has made a

21  compelling case for confirmation.

22      The Debtor also believes a compelling case exists that if

23  the plan went effective without a stay pending appeal, that

24  the appeal would be equitably moot, but we understand we are

25  facing headwinds from the courts, bankruptcy court have

151

1    addressed that issue before.

2        However, given the effect a reversal would have on the

3    availability of insurance coverage, the Claimant Trustee, the

4    Claimant Oversight Committee, and the Litigation Trustee are

5    just not willing to take that risk.

6        We are hopeful that Mr. Dondero and his entities will

7    recognize that any appeal is futile and step aside and let the

8    plan proceed and become effective.

9        If Mr. Dondero and his related entities do appeal the

10   confirmation order, preventing it from becoming final and

11   preventing the effective date from the occurring, the Debtor

12   intends to work closely with the Committee to ratchet down

13   costs substantially and proceed to operate and monetize assets

14   as appropriate until an order becomes final.

15       None of these modifications adversely affect the treatment

16   of claims or interests under the plan, Your Honor, and for

17   those reasons, Your Honor, we request that the Court approve

18   those modifications.

19       And with that, I would like to turn the podium over to Mr.

20   Kharasch to briefly address the remaining CLO objections.

21            THE COURT:  All right.  Mr. Kharasch?

22              CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

23            MR. KHARASCH:  Good afternoon, Your Honor.  I'll be

24   as brief as possible.  I know we're under a deadline.

25       As you've heard yesterday, you've heard before in other

152

1   proceedings, Your Honor, the CLO Objecting Parties, the so-

2   called investors, do have rights under the CLO management

3   agreements and indentures, including contractual rights to

4   terminate the management agreements under certain

5   circumstances.

6       What they complain about today, Your Honor, is that the

7   injunction language in the plan, including the language

8   preventing actions to interfere with the implementation and

9   consummation of the plan, is so broad and ambiguous that their

10  rights are or may be improperly impacted, especially any

11  rights to remove the manager for acts of malfeasance.

12      But the Debtor is primarily relying, Your Honor, not so

13  much on the plan injunctions but on the clear provisions of

14  the January 9 order, to which Mr. Dondero consented and which

15  provides that Mr. Dondero shall not cause any of his related

16  entities to terminate any agreements with the Debtor.

17      Yes, that is a broad provision, but it is very clear, and

18  it does not even allow the CLO Objecting Parties to come to

19  court under a gatekeeper-type provision.  But that is what Mr.

20  Dondero consented to on behalf of himself and his related

21  entities.

22      Important to note, Your Honor, we are not here today to

23  litigate who is and who is not a related entity.  That will be

24  left for another day.  However, Your Honor, we have considered

25  these issues, including last night and this morning, and we

153

1 are going to propose -- well, we will modify our plan through

2 a provision in the confirmation order to provide the

3 following: Notwithstanding anything in the plan or the

4 January 9 order, the CLO Objecting Parties will not be

5 precluded from exercising their contractual or statutory

6 rights in the CLOs based on negligence, malfeasance, or any

7 wrongdoing, but before exercising such rights shall come to

8 this Court to determine whether those rights are colorable and

9 to also determine whether they are a related entity. If the

10 Court has jurisdiction, the Court can determine the underlying

11 colorable rights or claims.

12      This does not impact the separate settlement we have with

13 CLO Holdco, Your Honor.

14      We think that such modification addresses some of the

15 concerns raised yesterday by the objecting parties by

16 providing more clarity as to what the plan is doing and not

17 doing with respect to the plan and the January 9 order, and we

18 think it is also a fair resolution of some legitimate

19 concerns.

20      So, with that, Your Honor, we think that, with that

21 clarification that we did not have to make but are willing to

22 make, that this should fully satisfy the CLO Objecting Parties

23 with regard to their objections to the injunction and the

24 gatekeeper.

25      Thank you, Your Honor.

154

1          THE COURT:  All right.  Mr. Clemente?

2     CLOSING ARGUMENT ON BEHALF OF THE CREDITORS' COMMITTEE

3          MR. CLEMENTE:  Yes, Your Honor.  And I actually am

4    going to be brief.  Mr. Pomerantz's discussion, obviously, was

5    very, very thorough, so I'm able to cut out a lot of stuff.

6       Thank you, Your Honor.  Matt Clemente, Sidley Austin, on

7    behalf of the Committee.

8       The plan, Your Honor, meets the confirmation standards and

9    should be confirmed.  Mr. Pomerantz covered a lot of ground,

10   and I will endeavor not to repeat that, but there are a few

11   points that I think the Committee wishes to emphasize.

12      Your Honor, since I first appeared in front of you, I have

13   maintained consistently that no plan can or should be

14   confirmed without the consent of the Committee.  Your Honor,

15   in her wisdom, understood this immediately, as it was obvious

16   -- it was the obvious conclusion, given the makeup of the

17   creditor body, the asset pool, and the impetus for the filing

18   of the case.

19      Unfortunately, not everyone came to this conclusion so

20   easily, and it took much hard-fought negotiations as well as a

21   defeated disclosure statement, among other things, and

22   tireless dedication and commitment by each individual

23   Committee member to drive for a value-maximizing plan that is

24   in the best interests of its constituencies and for us to get

25   to where we are today.

155

1    And where we are today, Your Honor, is at confirmation for

2  a plan that the Committee unanimously supports, which was the

3  inevitable outcome for this case from the very beginning.

4    I've also said, Your Honor, that context is critical in

5  this case.  It has been from the beginning, and it remains so

6  now.  Mr. Draper, interestingly, began his comments yesterday

7  by saying that even a serial killer is entitled to *Miranda*

8  rights.  While I will admit that at times the rhetoric in this

9  case has been heated, I have never certainly likened Mr.

10  Dondero to a serial killer.  But the record shows, and Mr.

11  Dondero's own words and actions show, that he is, in fact, a

12  serial litigator who has no hesitation at all to take any

13  position in an attempt to leverage an outcome that suits his

14  self-interest.  And he has no hesitation at all to use his

15  many tentacles in a similar fashion.

16    That is a very important context in which the Court should

17  view the remaining objections of the Dondero tentacles and

18  weigh confirmation of the Debtor's plan.

19    Against this context of a serial litigator, Your Honor, we

20  have a plan supported by each member of the Official Committee

21  of Unsecured Creditors, accepted by two classes of claims,

22  Class 2 and Class 7, and holders of almost one hundred percent

23  in amount of non-insider claims in Class 8.

24    The parties that have voted against the plan are either

25  employees who are not receiving distributions under the plan

156

1  or are insiders or parties related to Mr. Dondero.

2      The overwhelming number and amount of creditors who are

3  receiving distributions under this plan, therefore, have

4  accepted the plan.  The true creditors and economic parties in

5  interest have spoken, they have spoken loudly, and they have

6  spoken in favor of confirming the plan.

7      Your Honor, I'm not going to address the technical

8  requirements, as Mr. Pomerantz did that.  So I'm going to skip

9  over my remarks in that regard, except I do want to emphasize

10  the remarks regarding the gatekeeper, exculpation, and

11  injunction provisions as they're of critical importance to the

12  plan.

13      The testimony has shown and the proceedings of this case

14  has shown, again, Mr. Dondero is a serial litigator with a

15  stated goal of causing destruction and delay through

16  litigation.

17      The testimony has further shown that none of the

18  independent board members would have signed onto the role

19  without the gatekeeper and injunction provisions and the

20  indemnity from the Debtor.

21      Therefore, it follows that such provisions are necessary

22  to entice parties to serve in the Claimant Trustee and other

23  roles under the plan, which, as I remarked in my opening

24  comments, are integral to providing the structure that the

25  creditors believe is necessary to unlocking the value and

157

1    unlocking themselves from the Dondero web.

2        Regarding the exculpation and injunction provisions

3    specifically, Your Honor, the Court will recall that the

4    Committee raised objections to them in connection with the

5    first disclosure statement hearing.  In response, the Debtor

6    narrowed the provisions, and the Committee believes they

7    comply with the Fifth Circuit precedent, as Mr. Pomerantz ably

8    walked Your Honor through.

9        And to be clear, Your Honor, not only does the Committee

10   believe the exculpation and injunction provisions comply with

11   Fifth Circuit law, the Committee does not believe the estate

12   is harmed by such provisions, as the Committee does not

13   believe there are any cognizable claims that could or should

14   be raised that would otherwise be affected by the exculpation

15   or injunction, and, frankly, with respect to the release that

16   Mr. Pomerantz walked Your Honor through with respect to the

17   directors and the officers.

18       Regarding the gatekeeper, Your Honor, Your Honor

19   presciently approved it in her January 9th order, and the

20   developments since then only serve as further justification

21   for including it in the plan and confirmation order.  Mr.

22   Dondero is a serial and vexatious litigator, and the

23   instruments put in place under the plan to maximize value for

24   the creditors and to oversee that value-maximizing process

25   must be protected, and the gatekeeper function serves that

158

1  protection while also, importantly, as Mr. Pomerantz pointed

2  out, providing Mr. Dondero with a forum to advance any

3  legitimate claims he and his tentacles may have.

4      In short, Your Honor, the gatekeeper provision is

5  necessary to the implementation to the plan, is fair under the

6  circumstances of the case, and is therefore within this

7  Court's authority, and it is appropriate to approve.

8      Your Honor, in sum, it has been a long road to get here

9  today, but we are finally here.  And we are here, Your Honor,

10  I believe in large part as a result of the tireless efforts of

11  the individual members of my Committee, and for that I thank

12  them.

13      The Committee fully supports and unanimously supports

14  confirmation of the plan.  As demonstrated by the evidence,

15  the plan meets all the requirements of the Bankruptcy Code.

16  The Committee believes the plan is in the best interests of

17  its constituencies.  And therefore the Committee, along with

18  two classes of creditors and the overwhelming amount of

19  creditors in terms of dollars, urge you to confirm the plan.

20      That's all I have, Your Honor, but I'm happy to answer any

21  questions you may have for me.

22          THE COURT:  Okay.  Not at this time.

23      Nate, how much time --

24      (Clerk advises.)

25          THE COURT:  Twenty-five minutes remaining?  All

159

1   right.  Just so you know, you've got a collective Debtor's

2   counsel/Committee's counsel 25 minutes remaining for any

3   rebuttal, if you choose to make it.

4       Let's take a five-minute break, and then we'll hear the

5   Objectors' closing arguments.  Okay.

6           THE CLERK:  All rise.

7       (A recess ensued from 2:00 p.m. until 2:06 p.m.)

8           THE COURT:  All right.  Please be seated.  We're

9   going back on the record in Highland.  We're ready to hear the

10  Objectors' closing arguments.  Who wants to go first?

11          MR. DRAPER:  Your Honor, this -- this is Douglas

12  Draper.  I get the joy of going first.

13          THE COURT:  Okay.

14   CLOSING ARGUMENT ON BEHALF OF THE GET GOOD AND DUGABOY TRUSTS

15          MR. DRAPER:  We've heard a great deal of testimony

16  about the Debtor's belief that the circumstances in this case

17  warrant an exception to existing Fifth Circuit case law, the

18  Bankruptcy Code, and Court's post-confirmation jurisdiction.

19      I would not be standing here today objecting to the plan

20  if the Debtor didn't attempt to extend, move past and beyond

21  the Barton Doctrine, move beyond 1141, move beyond *Pacific*

22  *Lumber*.  In fact, I think I heard an argument that *Pacific*

23  *Lumber* is not applicable and this Court should disregard Fifth

24  Circuit case law.

25      Let's start with the exculpation provision.  And the focus

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2603 of 2722

160

1  of this case has been, and what we've heard over the last few

2  days, is about the independent directors.  I understand there

3  was an order entered earlier, the order stands, and the order

4  is applicable in this case.  It cuts off, however, when we

5  have a Reorganized Debtor, because these independent directors

6  are no longer independent directors.  It cuts off when we have

7  a new general partner.

8      And so the protections that were afforded by that order do

9  not need to be afforded to the new officers and new directors

10  of the new general partner.  And in fact, the protections that

11  they're entitled to are completely different than the

12  protections that were entitled -- that are covered by the

13  order that the Court has looked at.

14      Let's first focus on, however, the exculpation provision.

15  And I wanted to ask the Court to look at the exculpated

16  parties.  Have to be very careful and very interest -- and

17  focus solely on the independent directors.  But if you look at

18  the parties covered by exculpation provision, it includes the

19  professionals retained by the Debtor.  My reading of *Pacific

20  Lumber* is that neither the Creditors' Committee counsel nor

21  the Debtor can be covered by an exculpation provision.  This

22  in and of itself makes the plan non-confirmable.  This

23  exculpation provision is unwarranted and unnecessary.

24      Two, --

25          THE COURT:  Well, let's drill down on that.

161

1    MR. DRAPER:  -- we have --

2    THE COURT:  Let's drill down on that.  Mr. Pomerantz

3  says that this wasn't what they considered one way or another

4  by *Pacific Lumber*.  Debtor, debtor professionals.  Okay?  Do

5  you disagree with that?

6    MR. DRAPER:  I disagree with that.  *Pacific Lumber*

7  said you could only have releases and exculpations for the

8  Creditors' Committee members.  And the rationale behind that

9  was that those people volunteered to be part and parcel of the

10  bankruptcy process, that those parties did not get paid.

11  Here, we have two professionals who both volunteered and are

12  being paid, and are not entitled to an exculpation under

13  *Pacific Lumber*.  They're not entitled to a --

14    THE COURT:  Okay.  So you say *Pacific* --

15    MR. DRAPER:  -- release.  Now, ultimately, they --

16    THE COURT:  -- *Pacific Lumber* categorically rejected

17  all exculpations except to Creditors' Committee and its

18  members.  That's your --

19    MR. DRAPER:  I agree.  That's --

20    THE COURT:  -- interpretation of *Pacific Lumber*?

21    MR. DRAPER:  Yes.

22    THE COURT:  Okay.  All right.  So you just absolutely

23  disagree, one by one, with every one of the arguments, that it

24  was really -- the only thing before the Fifth Circuit was plan

25  sponsors, okay?  A plan proponent that I think was like a

162

1   competitor previously of the debtor, and I think a large

2   creditor or secured creditor.  I think those were the two plan

3   proponents.

4        So you disagree -- I'm going to, obviously, go back and

5   line-by-line pour through *Pacific Lumber*, but you disagree

6   with Mr. Pomerantz's notion that, look, it was really a page

7   and a half or two of a multipage opinion where the Fifth

8   Circuit said, no, I don't think 524(e) is authority to give

9   exculpation from postpetition liability for negligence as to

10  these two plan sponsors.  And I guess it was also -- I don't

11  know.  They say, Pachulski's briefing says it was really only

12  looking at these two plan sponsors and the Committee and its

13  members on appeal, you know, going through the briefing, and

14  in such, you can see that these were all that was presented

15  and addressed by the Fifth Circuit.  You disagree with that?

16          MR. DRAPER:  Look, I know the facts of *Pacific Lumber*

17  and they -- I know what the posture of the case was.  However,

18  the literal language by the opinion in it, it transcends just

19  a dispute in the case.  And I think the U.S. Trustee's

20  position that this exculpation provision is correct as a

21  matter of law support -- is further evidence of the fact that

22  the U.S. Trustee, as watchdog of this process, and *Pacific

23  Lumber* say this cannot be done, period, end of story.

24          THE COURT:  Okay.  So you, at bottom, just totally

25  disagree with Mr. Pomerantz?  You say *Pacific Lumber* is

163

 1  actually a very broad holding, and I guess, if such, there's a

 2  conflict among the Circuits, right?

 3          MR. DRAPER:  Well, that's okay.

 4          THE COURT:  So, --

 5          MR. DRAPER:  I mean, quite frankly, *Pacific Lumber* is

 6  binding on you.

 7          THE COURT:  Understood.

 8          MR. DRAPER:  There may be a conflict in the Circuits,

 9  and ultimately the Supreme Court may make a decision and

10  decide who's right and who's wrong.

11     But for purposes of today and for purposes of this

12  exculpation provision and for purposes of this confirmation,

13  *Pacific Lumber* is the applicable law.

14          THE COURT:  Okay.  Well, again, this is a hugely

15  important issue, although in many ways I don't understand why

16  it is, because we're just talking about postpetition acts and

17  negligence, okay?  You know, many might say it's much ado

18  about nothing, but it's front and center of your objection.

19  So I guess I'm just thinking through, if the Fifth Circuit was

20  presented these exact facts and was presented with the

21  argument, you know, the *Blixseth* case says 524(e) has nothing

22  to do with exculpation because exculpation is a postpetition

23  concept, and it's just talking about standard liability --

24  these people aren't going to be liable for negligence; they

25  can be liable for anything and everything else -- if presented

164

1  with that *Blixseth* case, you know, there are several arguments

2  that Mr. Pomerantz has made why, if you accept that 524(e)

3  might not apply here, let's look at the reasoning, the little

4  bit of reasoning we had of *Pacific Lumber*, that it was really

5  a policy rationale, right?  These independent fiduciaries,

6  strangers to the company and case, they'd never want to do

7  this if they knew they were vulnerable for getting sued for

8  negligence.  Mr. Pomerantz's argument is that these

9  independent board members are exactly analogous to a

10  Committee, more than prepetition officers and directors.  What

11  do you have to say about that policy argument?

12            MR. DRAPER:  Well, I think there's a huge distinction

13  between the members of a Creditors' Committee who are

14  volunteers and are not paid versus a paid independent

15  director.  And more importantly, I think there's a huge

16  difference between a member of a Creditors' Committee who's

17  not paid and counsel for a Debtor and counsel for a Creditors'

18  Committee.

19            THE COURT:  Okay.

20            MR. DRAPER:  Look, you have -- you've --

21            THE COURT:  So, at bottom, it was all about

22  compensation to the Fifth Circuit?

23            MR. DRAPER:  Well, no.  The Fifth Circuit policy

24  decision was we want to protect a party who wants to serve and

25  do their civic duty to serve on a Creditors' Committee for no

165

1  compensation.  I agree with that.  I think it's a laudable

2  policy decision.  I think it makes sense.

3      However, the Fifth Circuit in its language basically said,

4  nobody else gets it.  It didn't say, look, you know, if there

5  are circumstances that are different, we may look at it

6  differently.  The language is absolute in the opinion.  And

7  that's what I think is binding and I think that's what the

8  case stands for.

9      And look, just so the Court is very clear, when Pachulski

10  files its fee application and the Court grants the fee

11  application, any claim against them is res judicata.  So, in

12  fact, they do have -- they do have protection.  They do have

13  the ability to get out from under.  The Court -- they're just

14  not -- they just can't get out from under through an

15  exculpation provision.  And the same goes for Mr. Clemente and

16  his firm.

17          THE COURT:  Which, --

18          MR. DRAPER:  And the same goes for DSI.

19          THE COURT:  Which, by the way, that's one reason I

20  think sometimes this is much ado about nothing.  It goes both

21  ways.  The Debtor professionals, the Committee professionals,

22  estate professionals, they're going to get cleared on the day

23  any fee app is approved, right?  I mean, there's Fifth Circuit

24  law that says --

25          MR. DRAPER:  I -- I --

166

1          THE COURT:  -- says that's res judicata as to any

2     future claims.

3        But I guess I'm really trying to understand, you know, at

4     bottom, I feel like the Fifth Circuit was making a holding

5     based on policy more than any directly applicable Code

6     provision.

7        I mean, it's been said, for example, that Committee

8     members, they're entitled to exculpation because of, what,

9     1103, some people argue, 1103, which subsection, (c)?  That's

10    been quoted as giving, quote, qualified immunity to

11    Committees.  But it doesn't really say that, right?  It's just

12    something you infer.

13         MR. DRAPER:  No.  Look, what I think, if you really

14    want to put the two concepts together, I think what the Fifth

15    Circuit, when they told lawyers and professionals that you

16    can't get an exculpation, was very mindful of the fact that

17    you can get released once your fee app is approved.  So, as a

18    policy, they didn't need to do it in a exculpation provision.

19    There was another methodology in which it could be done.

20         THE COURT:  Uh-huh.

21         MR. DRAPER:  And so that's -- you have to look at it

22    as holistic and not just focus on the exculpation provision.

23    Because, in fact, they recognize and they -- I'm sure they

24    knew their existing case law on res judicata, and that's why

25    they read it out.

167

1    So, honestly, there's no reason for Pachulski to be in

2  here.  There's no reason for Mr. Clemente to be in here.

3  There's no reason for the professionals employed by the Debtor

4  to be in here.  They have an exit not by virtue of the plan.

5         THE COURT:  But so then it boils down to the

6  independent directors and Strand post January 9th?

7         MR. DRAPER:  It boils down somewhat to them, but

8  quite frankly, there are two parts to this.  One is you have

9  an order that's in place.  I am not asking the Court to

10  overturn the order.  And quite frankly, this provision could

11  have been written to the effect that the order that was in

12  place on -- that's been presented to the Court is applicable

13  and applied.

14    However, let's parse that down.  Let's look at Mr. Seery.

15  The order that's in place solely protects the independent

16  directors acting in their capacities as independent directors.

17  If somebody's acting as -- and if you want to liken it to a

18  trustee, their protection is afforded by the Barton Doctrine,

19  and that's how the protection arises.

20    What's going on here is they're extending the provisions,

21  first of all, of the Court's order, and number two, of the

22  Barton Doctrine, which are -- which cannot be -- which should

23  not be extended.  The law limits what protections you have and

24  what protections you don't have.  And we, as lawyers -- look,

25  I'll give you the best example.  Think of all the times you

168

1   had somebody write in the concept of superpriority in a cash

2   collateral order.  And how many times have you had a lawyer

3   rewrite the concept of the issue as to diminution in value?

4   The Code says diminution in value, and quite frankly, a cash

5   collateral order should just say if, to the extent there's

6   diminution in value, just apply the Code section.  It's

7   written there.  Smart people put it in, and Congress approved

8   it.  And once you start getting beyond that, those things

9   should be limited.

10      And what we have are lawyers trying to extend out by

11  definitions things that the Code limits by its reach.  That

12  goes for post-confirmation jurisdiction.  That goes for the

13  injunction.  That goes for the so-called gatekeeper provision.

14      And so, again, I would not be here if, in fact, they had

15  said, we have an injunction to the full extent allowed by the

16  Bankruptcy Code and *Pacific Lumber*.  We have an exculpation

17  provision that's allowed by virtue of the Court's order.  We

18  have the full extent and full reach of the Barton Doctrine.

19  Those are legitimate.  Once you start expanding upon that,

20  you're reaching into matters that are not authorized and not

21  allowed.

22      And then you get into 105 territory, which is always very

23  dangerous.  And that's really what's going on here.  And

24  that's the tenor of my argument and what I'm trying to say.

25  The Code gives protections.  It is not for us to extend the

169

1   protections.  It's not for us to enlarge them, even under a,

2   gee, the other party's litigious.

3       And so that's -- let's take *Craig's Store*.  Attempted to

4   limit its reach.  *Craig's Store* says once you have a confirmed

5   plan, any dispute between the parties, for -- let's take an

6   executory contract.  If there's a breach of the executory

7   contract, that's a matter to be handled aft... by another

8   court.  It's not a matter to be handled by this Court.  This

9   Court lets the parties out.

10      And in this case, it's even worse, because you basically

11  have a new general partner coming in, you have an assumption

12  of various executory contracts, and you have a -- Strand is no

13  longer present.

14      If you adopted Mr. Seery's argument, anybody who appeals a

15  decision, questions what he does or how he does it, is a

16  vexatious litigator.  That's not the case.  And the fact that

17  we are appealing a decision is a right that we have.  It

18  shouldn't be limited, and it shouldn't be held against us.

19  Courts can rule against us.  That's fine.

20      And so that's really what the focus is here and that's why

21  I gave the opening that I had.  We are willing to be bound by

22  applicable law.  And quite frankly, the concept that the

23  exigencies of a case allow a court to change what applicable

24  law is is problematic.  I gave the criminal example as a

25  reason.  And the reason was that, in certain instances, the

170

1  application of law may allow a criminal to go free.  It's a

2  problem with our system and how we work, but that's what the

3  law does, and it is absolute in its application.

4      Let me address the so-called gatekeeper provision.  The

5  gatekeeper provision, in a certain sense, is recognized in the

6  Barton Doctrine.  It's jurisdictional, and it says, to the

7  extent you're going to litigate with somebody who served

8  during the bankruptcy, who was a trustee, then you have to

9  come to the bankruptcy court and pass through a gate.  It

10  doesn't say you have to pass through a gate for a reorganized

11  debtor who does something after a plan is confirmed and going

12  forward.  And so that's -- there's a distinction.

13      And if you look at Judge Summerhays' decision, which I

14  will be happy to send to the Court, in *WRT* involving -- it's

15  kind of (indecipherable) and Mr. Pauker, where, in that case,

16  the trustee, the litigation trustee, spent more litigating

17  than it had in recoveries, and Baker Hughes filed suit.  Judge

18  Summerhays said, look, the Barton Doctrine only applies to a

19  certain extent.  It is limited once you get into post-

20  confirmation matters and related-to jurisdiction.

21      And so, again, the Barton Doctrine is what it stands for.

22  We agree with it, we recognize it, and it should be applied.

23  The Barton Doctrine, however, should not be extended, should

24  not go past its reach, and should not go past the grant of

25  jurisdiction for this Court.

171

1     And so you have in here, though they have -- they have

2   tried to hide it in a limited fashion, this gatekeeper

3   provision.  The gatekeeper provision, as currently written,

4   covers post-confirmation claims that somebody has to come

5   before this Court to the extent there's a breach of a

6   contract.  That's not proper, and it's not covered by your

7   post-confirmation jurisdiction.  To the extent there's an

8   interpretation of an existing contract and an interpretation

9   of the order, you do have authority, and I don't question

10  that.

11          THE COURT:  But address Mr. Pomerantz's statement

12  that there's a difference between saying you have to go to the

13  bankruptcy court and make an argument, we have a colorable

14  claim that we would like to pursue, and having that

15  jurisdictional step required.  There's a difference between

16  that and the bankruptcy court adjudicating the claim.

17          MR. DRAPER:  Well, there are two parts to that.

18  Number one is there's an injunction in place from an action

19  taken post-confirmation against property of the estate.  We

20  all agree at that, correct?  And we believe that the

21  injunction applies to post-confirmation action against

22  property of the pre-confirmation estate.  We all agree to

23  that.

24      However, if in fact there's a breach of a contract

25  postpetition that the parties have a dispute about, that

172

1   contract is now no longer under your purview once the contract

2   has been assumed.  And so they shouldn't have to make a

3   colorable claim to you that a breach of the contract has

4   occurred.  That should be the determining factor for another

5   court.

6       That's, in essence, what *Craig's Store* says.  Your

7   jurisdiction and the jurisdiction of a bankruptcy court is

8   limited.  It's limited by *Stern vs. Marshall*.  It's limited by

9   your ability to render findings of fact and conclusions of law

10  versus render a final decision.  That decision has been made

11  not by us, it's been made by Congress and it's been made by

12  the United States Constitution.

13          THE COURT:  All right.  And I think we all agree with

14  you regarding the holding of *Craig's Stores* and some of the

15  other post-confirmation bankruptcy subject matter jurisdiction

16  holdings.  But Mr. Pomerantz is arguing that this gatekeeping

17  function is warranted by, among other things, you know, there

18  was a district court holding, *Baum v. Blue Moon*, or a Fifth

19  Circuit case, that upheld a district court having the ability

20  to impose pre-filing injunctions in the context of a vexatious

21  litigator.  So, you know, that's a strong analogy he makes to

22  what's sought here.  What is your response to that?

23          MR. DRAPER:  My response to that is a district court

24  can do that.  A district court has jurisdiction to make that

25  decision.  And quite frankly, a district court can sanction a

173

1    vexatious litigator under Rule 11.

2        So, in fact -- again, you have to bifurcate your power

3    versus the power that a district court has.  And that

4    gatekeeper provision is allowed by a district court because

5    they had authority over the case.  You may not have authority

6    over being the gatekeeper for a post-confirmation matter that

7    you had no jurisdiction over to start with.

8            THE COURT:  Okay.

9            MR. DRAPER:  That, that's the distinction between

10   here.  That's -- what's going on here is they are -- they are

11   mashing together a whole load of concepts under the vexatious

12   litigator and the anti-Dondero function that fundamentally

13   abrogate the distinction between what your jurisdiction is

14   pre-confirmation versus your jurisdiction post-confirmation.

15   And that --

16           THE COURT:  Do you think --

17           MR. DRAPER:  -- is sacrosanct.

18           THE COURT:  Do you think Judge Lynn got it wrong in

19   *Pilgrim's Pride*?  Do you think Judge Houser got it wrong in

20   *CHC*?  Or do you think this situation is different?

21           MR. DRAPER:  There are two parts to that.  I have

22   told Judge Lynn, since I have been working with him, that I

23   think *Pilgrim's Pride* is wrongfully decided.  However, having

24   said that, *Pilgrim's Pride* and those cases dealt with claims

25   against the -- the channeling injunction affected actions

174

1    during the bankruptcy.  It did not serve as a post-

2    jurisdictional grant of jurisdiction to the bankruptcy court.

3    It did not pose as an ability -- as a limitation on a post-

4    confirmation litigator or a post-effective date litigator to

5    address a wrong done to them by an independent director of a

6    general partner.

7        In a sense, Judge Lynn's determination, and Judge Houser,

8    is consistent somewhat with the Barton Doctrine.  Now, do I

9    agree that they're right?  No.  But I understand the decision

10   and I understand the context in which it was rendered and I

11   don't have a huge problem with it.

12       So, again, let's parse what we're trying to do here.

13   Number one, we are -- we have to bifurcate post-confirmation

14   jurisdiction or post-effective date jurisdiction and what you

15   can do as a post-effective date arbiter versus what you could

16   do pre-effective date and pre-effective date claims.  And

17   again, that's the problem with what's written here.  It is

18   designed one hundred percent to expand your post-effective

19   date jurisdiction through both the gatekeeper provision and

20   the jurisdictional grant that's here from your pre-effective

21   date capability, your pre-effective date jurisdiction, and

22   your pre-effective date ability to either curb a claim or not

23   to curb a claim.  And that, that's the issue.

24       And again, let's start talking about the independent

25   directors.  I recognize, again, that there's an order there.

175

1   But if Mr. Seery -- let's take Mr. Seery -- is acting as a

2   director of Strand but is also an accountant for the Debtor

3   and makes a mistake, he would be sued in his capacity as the

4   accountant for the Debtor, not as an independent director of

5   Strand.  That distinction needs to be made.

6       What we are doing here under this plan, and what's been

7   argued by Mr. Pomerantz, is too broad a brush.  It needs to be

8   cut back.  The Court needs to take a very hard look at what's

9   being presented here.

10       And again, the Court's order is very clear.  And this is

11  binding.  I recognize that.  But the protection they got was

12  serving as an independent director.  The protection they

13  didn't get was -- let's take Mr. Seery, if Mr. Seery was

14  serving as an accountant and blew a tax return.  Those are

15  distinctions that warrant analysis and warrant looking at

16  here.  And again, it is too broad a brush that's touted here,

17  and that is why this plan on its face is not confirmable with

18  respect to both the post-confirmation jurisdiction, the

19  gatekeeper provision, the exculpation provisions.

20       And so let me address a few other things, just to address

21  them.  Number one, the argument has been made with respect to

22  the creditors and the resolicitation issue and that creditors

23  could have come in looking, seen, followed the case, and

24  basically calculated and made the same calculation that the

25  Debtor made when they filed this and put forth the new plan

176

1   analysis versus liquidation analysis.  And then they've also

2   made the argument, well, nobody came and complained.  Well,

3   two parts to that.

4       Number one, as you know, a disclosure statement needs to

5   be on its face and should not require a creditor to go back in

6   and monitor the record -- and quite frankly, in this record,

7   there are thousands of pages -- and do the calculation

8   himself.  This was incumbent upon the Debtor to possibly

9   resolicit when these material changes took place.

10       Number two, the recalculation has not been subject to the

11  entire creditor body seeing it.  And anybody who wanted to

12  call them would have had to have seen the document they filed

13  on February 1st and made a telephone call basically

14  contemporaneous with seeing it.

15       Those are two things.  The argument that they didn't call

16  me is just nonsensical.  There's nobody -- you, you are

17  sitting here -- and I've had a number of battles over the

18  years with Judge (indecipherable), who was -- who -- and her

19  view was, I'm here to protect the little guy who's not --

20  didn't hire counsel, who's not represented by Mr. Clemente and

21  his huge clients who have voted in favor of the plan.  It's

22  the little person, *i.e.*, the employees who would vote against

23  a plan that they so -- so desperately tried to get out from

24  under.

25          THE COURT:  Well, --

177

1          MR. DRAPER:  It's really a function --

2          THE COURT:  -- Mr. Pomerantz argues it's not as

3    though there was a materially adverse change in treatment; it

4    was the disbursement estimate.  And doesn't every Chapter 11

5    plan -- most Chapter 11 plans, not every -- they make an

6    estimate.  I mean, and it's, frankly, it's very often a big

7    range of recovery, right, a big range of recovery, because we

8    don't know what the allowed claims are going to compute to at

9    the end of the day.  There's obviously liquidation of assets.

10   We don't know.  Isn't this sort of like every -- not, again,

11   not every other plan, but most other plans -- where there's a

12   big range of possible estimated distributions?  I mean, this

13   wasn't a change in treatment, right?

14         MR. DRAPER:  Well, let me address that.  There are

15   two parts to that.  Most plans I see that contain some sort of

16   analysis have a range.  This one doesn't have a range.  What

17   they've done is they've buried in a footnote or assumption

18   that these numbers may change.  So had they said, look, your

19   recovery can go from 60 cents to 85 cents, God bless, they

20   probably would have been right.

21      Number two, which is more problematic to me, to be honest

22   with you, is the fact that, number one, the operating expenses

23   have increased over a hundred percent.  And number two, the

24   Debtor has made a determination post-disclosure statement and

25   pre-hearing that they're going to change their model of

178

1   business.

2       The original disclosure statement said we're not going to

3   get into the managing CLO part of the business and we're going

4   to let these contracts go.  However, at some point along the

5   way, they made a change.  I don't know to this day, because I

6   was never furnished the backup to the expense side.  I

7   understand what they said why they didn't give me the asset

8   side, but the expense side, they should have given me, and I

9   did ask for.

10      But, you know, what we have now is a more fundamental

11  problem with the execution of the plan and the expectation

12  that creditors -- what they're going to get, because, in fact,

13  the expense items have doubled.

14      I think creditors were entitled to know that, rather than

15  it having been sprung upon everybody, when I got it the day

16  before a deposition.  And so those are things that I think

17  warranted a change in solicitation.  Now, the result may have

18  been the same.  I don't know.  More people may have voted

19  against the plan.  More people may have opted in from Class 8

20  to Class 7, I mean, based upon that information.  That

21  information was not provided to them.

22      And so I look at two -- three things.  One is a range

23  could have been given, and they probably would have been a

24  whole lot better off.  Two, you have a material change in

25  expenses.  And three, you have a material change in business

179

1  model.  Three things that occurred between November and this

2  confirmation hearing.  Three things that were not known by the

3  creditor body and not told to them.

4          THE COURT:  Mr. Draper, I --

5          MR. DRAPER:  Now, it may have been told --

6          THE COURT:  I don't want to belabor this any more

7  than I think we need to, but I've got a Creditors' Committee

8  with very sophisticated professionals, very sophisticated

9  members.  They're fiduciaries to this constituency.  You know,

10  you mentioned the little guy.  I'm not quite sure who is the

11  little guy in this case.  I think it's a case of all big guys.

12  But, I mean, they're fine with what's happened here.

13  Meanwhile, you -- I mean, clarify your standing here for

14  Dugaboy and Get Good.  I mean, --

15          MR. DRAPER:  I have --

16          THE COURT:  -- I know you have standing.  Mr.

17  Pomerantz did not say you don't have standing.  But in

18  pointing out the economic interests here, I think he said your

19  clients only have asserted a postpetition administrative

20  expense.  Is that correct?

21          MR. DRAPER:  No.  I have a post -- I have an -- I

22  have a claim that's been objected to.  I don't think my

23  economic --

24          THE COURT:  A claim of what amount?

25          MR. DRAPER:  I think it's $10 million.  But Mr.

180

1  Pomerantz is right, it requires a looking through the --

2  through the entity that I had a loan relationship with.

3      I recognize all of those things.  I don't think that's

4  relevant to whether my argument is correct or incorrect.  I

5  have standing to do it.  I don't think whether my claim is 50

6  cents or $50 million should change the Court's view of whether

7  the claim is good or bad.

8          THE COURT:  Well, I do want to understand, though.

9  Okay.  So you have not asserted an administrative expense,

10  correct?

11          MR. DRAPER:  No.  There's been an administrative

12  expense that's been asserted, --

13          THE COURT:  For what?

14          MR. DRAPER:  -- but that --

15          THE COURT:  For what?

16          MR. DRAPER:  I don't have the number in front of me,

17  Your Honor.  I don't -- I don't have those numbers --

18          THE COURT:  Okay.  Well, then, --

19          MR. DRAPER:  -- in front of me.  I have asserted --

20          THE COURT:  -- what is the concept?  What is the

21  basis for it?

22          MR. DRAPER:  It deals with -- Mr. Pomerantz is

23  absolutely right as to how he's articulated it.

24          THE COURT:  I can't remember what he said.

25          MR. DRAPER:  It deals with -- it deals with a

181

 1   transaction that's unrelated to the Debtor that deals with

 2   Multi-Strat.  I agree with that.

 3          THE COURT:  Okay.  So I remember him saying piercing

 4   the corporate veil.  Your trusts -- both of them, one of them,

 5   I don't know -- engaged in a transaction with Multi-Strat that

 6   you say --

 7          MR. DRAPER:  No, that --

 8          THE COURT:  -- gave -- okay.  Well, you say Multi-

 9   Strat is liable and the Debtor is also liable?

10          MR. DRAPER:  No.  Let me make two things.  The

11   administrative claim deals with a Multi-Strat transaction that

12   took place during the bankruptcy.  My unsecured claim deals

13   with a transaction that took place prior to the bankruptcy,

14   where we lent money to another entity that then funneled money

15   out into the Debtor.  We're -- our contention is that the

16   Debtor is liable for that loan.

17          THE COURT:  All right.  So both the administrative

18   expense as well as the prepetition claim require veil-piercing

19   to establish liability of the Debtor?

20          MR. DRAPER:  Or single business enterprise.  I don't

21   necessarily have to veil-pierce.

22          THE COURT:  Okay.  I'm not even sure that single

23   business enterprise is completely available anymore in Texas,

24   by the Texas legislature doing different things, assuming

25   Texas law applies.  I don't know, maybe Delaware does.  But I

182

1    -- sorry.  Just let me let that sink in a little bit.  You're

2    -- okay.  Okay.  Let me let it --

3            MR. DRAPER:  Your Honor, I --

4            THE COURT:  -- sink in a little bit.

5            MR. DRAPER:  Okay.

6            THE COURT:  These trusts -- of which Mr. Dondero is

7    the beneficiary ultimately, right?

8            MR. DRAPER:  Yes.  Well, and to --

9            THE COURT:  So, your --

10           MR. DRAPER:  Again, I have not gone up --

11           THE COURT:  The beneficiary of your client --

12           MR. DRAPER:  Mr. Dondero is --

13           THE COURT:  The beneficiary of your client is

14   ultimately hoping to succeed on the administrative expense and

15   the claim on the basis that you should disregard the

16   separateness of Highland and these other entities?

17           MR. DRAPER:  Well, let's take the --

18           THE COURT:  When he's resisted that --

19           MR. DRAPER:  -- unsecured claim.  The --

20           THE COURT:  -- in multiple pieces of litigation?

21   Right?  I'm sorry.  I'm just trying to let this sink in.

22   Okay.  If you could elaborate.  I'm sorry.  I'm talking too

23   much.  You answer me.

24           MR. DRAPER:  Okay.  What we are saying is that, in

25   essence, the party we lent the money to was a conduit for the

183

1   Debtor.

2           THE COURT:  Okay.  And who was that entity that

3   either --

4           MR. DRAPER:  Highland Select.

5           THE COURT:  -- Dugaboy or Get Good lent money to?

6           MR. DRAPER:  The Get Good claim is completely

7   different.  The Get Good claim is written as a tax claim.

8   Honestly, I haven't taken a hard look at it.  I will, once we

9   get through this, and it may be withdrawn.  The Dugaboy claim

10  is a claim that arises through a conduit loan.

11          THE COURT:  Okay.  But to which entity?

12          MR. DRAPER:  Highland Select.

13          THE COURT:  Okay.  All right.  Well, continue with

14  your argument.  I'll get my flow chart out and --

15          MR. DRAPER:  Well, let me -- again, I think I've made

16  the points that I needed to make.  I think I've done it in a

17  sense that you -- what I think the Court needs to do is take a

18  very hard look at the jurisdictional extension that's being

19  granted here.  I think the exculpation provision, in and of

20  itself, just by the mere inclusion of Pachulski and the

21  Debtor's professionals and the Committee professionals, is

22  just unconfirmable.  It has to be stricken.

23      And I think the injunction and the juris... the gatekeeper

24  provision are not allowed by applicable law.  If this plan

25  merely said, we will enforce the Barton Doctrine, we will

184

```
 1    abide -- and this order the Court has entered stands, the

 2    injunction that's provided and the rights that we have under

 3    1141 stand, nobody would be objecting.  That's why the U.S.

 4    Trustee has objected, because of the expansive nature of what

 5    the -- what's been done in this plan.

 6        And with that, I'll turn it over to Mr. Taylor or Davor.

 7            THE COURT:  All right.  Who's next?

 8            MR. RUKAVINA:  Your Honor, Davor Rukavina.  Can you

 9    hear me?

10            THE COURT:  I can.

11      CLOSING ARGUMENT ON BEHALF OF CERTAIN FUNDS AND ADVISORS

12            MR. RUKAVINA:  Your Honor, thank you.  I'll try not

13    to repeat the arguments from Mr. Draper, but I do want to

14    point out a couple bigger-picture issues, I think.

15        One, the issue today is not Mr. Dondero, what he has been

16    alleged to have done, what he is alleged to do in the future.

17    The Debtor has gone out of its way to create the impression

18    that we're all tentacles, we're vexatious litigants, we're

19    frivolous litigants.  The issue today is whether this plan is

20    confirmable under 1129(a) and 1129(b).  And I think that that

21    has to be the focus.

22        Nor is the issue, I think, today any motivation behind my

23    objection or Mr. Draper's or anything else.

24        And I do take issue that my motivation or my client's

25    motivation has some ulterior motive for a competing plan or
```

185

1  burning down the house or anything like that.  It's very, very

2  simple.  My clients do not want $140 million of their money

3  and their investors' money, to whom they owe fiduciary duties,

4  to be managed by a liquidating debtor under new management

5  without proper staffing and with an obvious conflict of

6  interest in the form of Mr. Seery wearing two hats.

7      I respect very much that Mr. Seery wants to monetize

8  estate assets for the benefit of the estate creditors.  That's

9  his job.  That's incompatible with his job under the Advisers

10  Act and, as he said, to maximize value to my clients and over

11  a billion dollars of investments in these CLOs.

12      That should not be, Your Honor, a controversial

13  proposition.  I should not be described as a tentacle or

14  vexatious because my clients don't want their money managed by

15  someone that they, in effect, did not contract with.  I may be

16  -- I may lose that argument.  The CLOs have obviously

17  consented to the assumption.  But my argument should not be

18  controversial.  It should not be painted with a broad brush of

19  somehow being done in bad faith by Mr. Dondero.

20      And in fact, Mr. Seery has admitted that the Debtor and he

21  are fiduciaries to us.  The fact that today they call us

22  things like tentacles and serial litigants and vexatious

23  litigants -- we all know what a vexatious litigant is.  We've

24  all dealt with those.  The fact that our fiduciary would call

25  us that just reconfirms that it should have no business

186

1    managing our or other people's money.

2        And then for what?  Mr. Seery has basically said that the

3    Debtor will make some $8.5 million in revenue from these

4    contracts, net out $4 million of expenses.  That's net profit

5    of $4.5 million.  But then they have to pay $3.5 million for

6    D&O insurance and $525,000 in cure claims.  But it's the

7    Debtor's business decision, not ours.

8        Your Honor, the second issue is the cram-down of Class 8.

9    There are two problems here:  the disparate treatment between

10   Class 7 and Class 8, which also raises classification, and

11   then the absolute priority rule.  Class 7 is a convenience

12   class claim -- is a convenience claim, Your Honor, with a $1

13   million threshold.  Objectively, that is not for

14   administrative convenience, as the Code allows.  And the only

15   evidence as to how that million dollars was arrived at was,

16   oh, it was a negotiation of the Committee.

17       There is no evidence justifying administrative

18   convenience.  Therefore, there is no evidence justifying

19   separate classification.  And on cram-down, the treatment has

20   to be fair and equitable, which *per se* it is not if there is

21   unfair discrimination.  And there is unfair discrimination,

22   because Class 8 will be paid less.

23       On the absolute priority rule, Your Honor, I think that

24   it's very simple.  I think that the Code is very clear that

25   equity cannot retain anything -- I'm sorry, equity cannot

187

1    retain any property or be given any property.  Property is the

2    key word in 1129(b), not value.  It doesn't matter that this

3    property may not have any value, although Mr. Seery said that

4    it might.  What matters is whether these unvested contingent

5    interests in the trust are property.  And Your Honor, they are

6    property.  They have to be property.  They are trust

7    interests.

8         So the absolute priority rule is violated on its face.

9    There is no evidence that unsecured creditors in Class 8 will

10   receive hundred-cent dollars.  The only evidence is that

11   they'll receive 71 cents.  Mr. Seery said there's a potential

12   upside from litigation.  He never quantified that upside.  And

13   there is zero evidence that Class 8 creditors are likely to be

14   paid hundred-cent dollars.  So, again, you have the absolute

15   priority rule issue.

16        And this construct where, okay, well, equity won't be in

17   the money unless everyone higher above is paid in full, that

18   is just a way to try to get around the dictate of the absolute

19   priority rule.  If that logic flies, then the next time I have

20   a hotel client or a Chapter 11 debtor-in-possession client

21   where my equity wants to retain ownership, I'll just create

22   something like, well, here's a trust, creditors own the trust,

23   I won't distribute any money to equity, and equity can just

24   stay in control.

25        The point again is that this is property and it's being

188

1    received on account of prepetition equity.

2       And there's also the control issue.  The absolute priority

3    rule, the Supreme Court is clear that control of the post-

4    confirmation equity is also subject to the absolute priority

5    rule.  Here you have the same prepetition management

6    postpetition controlling the Debtor and the assets.

7       Your Honor, the Rule 2015.3 issue, someone's going to say

8    that it's trivial.  Someone's going to accuse me of pulling

9    out nothing to make something.  Your Honor, it's not trivial.

10   That's part of the problem in this case, that this Debtor owns

11   other entities that own assets, and there's been precious

12   little window given into that during the case, during this

13   confirmation hearing, and in the disclosure statement.

14      Rule 2015.3 is mandatory.  It's a shall.  I respect very

15   much Mr. Seery's explanation that there was a lot going on

16   with the COVID and with everything and that it just fell

17   through the cracks.  That's an honest explanation.  But the

18   Rule has not been complied with.  And 1107(a) requires that

19   the debtor-in-possession comply with a trustee's duties under

20   704(a)(8).  Those duties include filing reports required by

21   the Rules.

22      So we have an 1129(a)(3) problem, Your Honor, because this

23   plan proponent has not complied with Chapter 11 and Title 11.

24   I'll leave it at that, because I suspect, again, someone will

25   accuse me of being trivial on that.  It is not trivial.  It is

189

1  a very important rule.

2      On the releases and exculpations, Your Honor, I'm not

3  going to try -- I'm not going to hopefully repeat Mr. Draper.

4  But there's a couple of huge things here with this exculpation

5  that takes it outside of any possible universe of *Pacific*

6  *Lumber*.

7      First, you have a nondebtor entity that is being

8  exculpated.  I understand the proposition that, during a

9  bankruptcy case, the professionals of a bankruptcy case might

10 be afforded some protection.  I understand that proposition.

11 But here you have Strand and its board that's a nondebtor.

12     The other thing you have that takes this outside of any

13 plausible case law is that the Debtor is exculpated from

14 business decisions, including post-confirmation.  I understand

15 that professionals in a case make decisions, and

16 professionals, at the end of the case, especially if the Court

17 is making findings about a plan's good faith, that

18 professionals making decisions on how to administer an estate

19 ought to have some protection.

20     That does not hold true for whether a debtor and its

21 professionals should have protection for how they manage their

22 business.  GM cannot be exculpated for having manufactured a

23 defective product and sold it during its bankruptcy case.

24     Here, I asked Mr. Seery whether this language in these

25 provisions, talking about whether the administration of the

190

1  estate and the implementation of the plan includes the

2  Debtor's management of those contracts and funds. He said

3  yes. He said yes. So if you look at the exculpation

4  provision, it is not limited in time. It affects, Your Honor,

5  I'm quoting, it affects the implementation of the plan.

6  That's going forward.

7      So you are exculpating the Debtor and its professionals

8  from business decisions, including post-confirmation, from

9  negligence. Well, isn't negligence the number one protection

10 that people that have invested a billion dollars with the

11 Debtor have? It's cold comfort to hear, well, you can come

12 after us for gross negligence or theft. I get that. What

13 about negligence? Isn't that what professionals do? Isn't

14 that why professionals have insurance, liability insurance?

15 It's called professional negligence for malpractice.

16     So this exculpation, let there be no mistake -- I heard

17 Your Honor's view and discussion -- this is a different

18 universe, both in space and in time.

19     And we don't have to worry about *Pacific Lumber* too much

20 because we have the *Dropbox* opinion in *Thru, Inc.* We have

21 that opinion. Whether it's sound law or not, I don't wear the

22 robe. But the exculpation provision in that case was

23 virtually identical. And Your Honor, that's a 2018 U.S. Dist.

24 LEXIS 179769. In that opinion, Judge Fish -- I don't think

25 anyone could say that Judge Fish was not a very experienced

191

1   district court judge -- Judge Fish found that the exculpation

2   violated Fifth Circuit precedent.  That exculpation covered

3   the debtor's attorneys, the debtor, the very people that Mr.

4   Pomerantz is now saying, well, maybe the Fifth Circuit would

5   allow an exculpation for.

6          THE COURT:  Well, I think he is relying heavily on

7   the analogy of independent directors to Creditors' Committee

8   members, saying that's a different animal, if you will, than

9   prepetition officers and directors.  And he thinks, given the

10  little bit of policy analysis put out there by the Fifth

11  Circuit, they might agree that that's analogous and worthy of

12  an exculpation.

13         MR. RUKAVINA:  And they might.  And they might.  And

14  again, I usually do debtor cases.  You know that.  I'd love to

15  be exculpated.

16         THE COURT:  But --

17         MR. RUKAVINA:  And I think, again, I do -- I do --

18         THE COURT:  -- I really want people to give me their

19  best argument of why, you know, that's just flat wrong.  And

20  Mr. Draper just said it's, you know, there's a categorical --

21         MR. RUKAVINA:  Yeah.

22         THE COURT:  -- rejection of exculpations except for

23  Committee members and Committee in *Pacific Lumber*.  And I'm

24  scratching my head on that one.  And partly the reason I am,

25  while 524(e) was thrown out there, the fact is there's nothing

192

1 explicitly in the Bankruptcy Code, right, that explicitly

2 permits exculpation to a Committee or Committee members.

3 There's just sort of this notion, you know, allegedly embodied

4 in 1103(c), or maybe there are cases you want to cite to me,

5 that they're fiduciaries, they're voluntary fiduciaries, they

6 ought to have qualified immunity.

7     And again, I see it as more of a policy rationale the

8 Fifth Circuit gave than pointing to a certain statute.  So if

9 it's really a policy rationale, then I think the analogy given

10 here to a newly-appointed independent board is pretty darn

11 good.

12     So tell me why I'm all wrong, why Mr. Pomerantz is all

13 wrong.

14         MR. RUKAVINA:  I am not going to tell you that you're

15 all wrong.  I'm not going to tell Mr. Pomerantz that he's all

16 wrong.  Although I am, I guess, a Dondero tentacle, I am not a

17 Mr. Draper tentacle, and I happen to disagree with him.

18 That's my right.  I respect the man very much.  I thought he

19 did a very honorable and ethical job explaining his position

20 to Your Honor.  I believe that the Fifth Circuit would approve

21 exculpations for postpetition pre-confirmation matters taken

22 by estate fiduciaries.  I do believe that they would.  And I

23 do believe that that should be the case.

24     But again, I'm telling you that this one is different.

25 It's -- Mr. Pomerantz is misdirecting you.  The estate

193

1  professionals manage the estate. The Debtor manages its

2  business. It goes out into the world and it manages business.

3  And as Your Honor knows, under that 1969 Supreme Court case,

4  of course I blanked, and under 28 U.S. 959, a debtor must

5  comply, when it's out there, with all applicable law.

6      So if the Debtor -- and I'm making this up, okay? I am

7  making this up. I'm not alleging anything. But if the

8  Debtor, through actionable neglect, lost $500 million of its

9  clients' or its investor clients' money, I'm telling you that

10 under no theory can that be exculpated, and I'm telling you

11 that that's what this provision does.

12     The estate and the Debtor can release their claims. It

13 happens all the time. Whatever -- whatever claims the estate

14 may have against professionals, those can be released. It's a

15 9019. I'm not complaining about that. Although I do think

16 that it's premature in this case, because we don't know

17 whether there's any liability for the $100 million that Mr.

18 Seery told you Mr. Dondero lost. But in no event can business

19 -- business --

20         THE COURT: I don't understand what you just said.

21         MR. RUKAVINA: Your Honor, I --

22         THE COURT: Mr. Dondero is not released --

23         MR. RUKAVINA: -- went through Mr. Seery's --

24         THE COURT: -- by the estate.

25         MR. RUKAVINA: I understand. I understand. But we

194

1    all have to also understand that a board of directors and

2    officers can be liable, breaches of fiduciary duty by not

3    properly managing an employee.  So I'm not suggesting -- I

4    mean, I know that there's been an examiner motion filed.  I'm

5    not suggesting that we have a mini-trial.  I'm not suggesting

6    there's actionable conduct.  What I'm telling you is that the

7    evidence shows that there's a large postpetition loss.  And

8    it's premature to prevent third parties that might have claims

9    from bringing those.

10       And then I think -- I'm not sure that Your Honor

11   understood my point.  Let me try to make it again.  This

12   exculpation is not limited in time.  This exculpation is

13   expressly not limited in time and applies to the

14   administration of the plan post-confirmation.  I don't think

15   under any theory would the Fifth Circuit or any court at the

16   appellate level allow an exculpation for purely post-

17   reorganization post-bankruptcy matters.  I have nothing more

18   to tell Your Honor on exculpation.

19           THE COURT:  Well, again, I -- perhaps I go down some

20   roads I really don't need to go down here, but I'm not sure I

21   read it the way you did.  I thought we were just talking about

22   pre -- postpetition, pre-confirmation.  Or pre-effective date.

23           MR. RUKAVINA:  Your Honor, Page --

24           THE COURT:  The --

25           MR. RUKAVINA:  Page 48 of the plan, Section C,

195

1   Exculpation.  Romanette (iv).  The implementation of the plan.

2   And I -- and that's -- that's part of why I asked Mr. Seery

3   that yesterday.  Does the implementation of the plan, in his

4   understanding, include the Reorganized Debtor's management and

5   wind-down of the Funds, and he said yes.

6            THE COURT:  Okay.

7            MR. RUKAVINA:  So that's right there in black and

8   white.

9        It also includes the administration of the Chapter 11

10  case.  If that is defined broadly, as Mr. Seery wants it to

11  be, to define business decisions, then that also exceeds any

12  permissible exculpation.

13       So, again, I'm telling Your Honor, with due respect to you

14  and to Mr. Pomerantz, that the focus of Your Honor's

15  questioning is wrong.  The focus of Your Honor's questioning

16  should be on exculpation from what?  From business -- *i.e.*, GM

17  manufacturing and selling the car -- or from management of the

18  bankruptcy case?  Management of the bankruptcy case?  Okay.

19  Postpetition pre-confirmation managing business, never okay.

20       Your Honor, on the channeling -- and let me add, I think

21  it's very clear, there is no Barton Doctrine here.  This is

22  not a Chapter 11 trustee.  The Barton Doctrine does not

23  extend to debtors-in-possession.  And I can cite you to a

24  recent case, *In re Zaman*, 2020 Bankr. LEXIS 2361, that

25  confirms that the Barton Doctrine does not apply to a debtor-

196

1  in-possession.

2      I want to --

3          THE COURT:  Remind me of that --

4          MR. RUKAVINA:  -- discuss, Your Honor, the --

5          THE COURT:  Remind me of the facts of that case.  I

6  feel like I read it, but -- or saw it in the advance sheets,

7  maybe.

8          MR. RUKAVINA:  I honestly do not recall.  I read it a

9  few days ago, and since then, I hope Your Honor can

10  appreciate, I've been up very late trying to negotiate

11  something good in this case.

12          THE COURT:  I'd like to know --

13          MR. RUKAVINA:  So, I mean, I have the case in front

14  of me.

15          THE COURT:  I'd like to know about a holding that

16  says Barton Doctrine can't be applied in a Chapter 11 post-

17  confirmation context, if that's --

18          MR. RUKAVINA:  Well, I have it --

19          THE COURT:  -- indeed the holding.

20          MR. RUKAVINA:  I have it right in front of me here,

21  Your Honor, and I can certainly -- all I know is that this

22  case held that -- it rejected the notion that the Barton

23  Doctrine applies to a debtor-in-possession.

24          THE COURT:  Okay.

25          MR. RUKAVINA:  And maybe --

197

1              THE COURT:  That --

2              MR. RUKAVINA:  There it is, right there.

3              THE COURT:  What judge?

4              MR. RUKAVINA:  Your Honor, it is the Southern

5     District of Florida, and it is the Honorable -- Your Honor, it

6     is the Honorable Mindy Mora.

7              THE COURT:  Okay.

8              MR. RUKAVINA:  M-O-R-A.

9              THE COURT:  Okay.

10             MR. RUKAVINA:  I have not had the pleasure of being

11    in front of that judge.

12         Your Honor, let me discuss the channeling injunction.

13    This is the big one for me.  This is the big one.  And I think

14    we have to begin -- and it's the big one, as I'll get to,

15    because Your Honor knows that the CLO management agreements

16    give my clients certain rights, and this injunction would

17    prevent those rights from being exercised post-confirmation.

18    It's not dissimilar from the PI hearing that we're in the

19    middle of in an adversary.

20         But I begin my analysis, again, with 28 U.S.C. 959.  Your

21    Honor, that -- the first sentence of that statute makes it

22    very clear that when it comes to carrying on a business, a

23    debtor-in-possession may be sued without leave of the court

24    appointing them.

25         So the first thing that this channel -- gatekeeper,

198

1   channeling, I don't mean to miscall it -- the first thing that

2   this gatekeeping injunction does is it stands directly

3   opposite to 28 U.S.C. 959.

4       28 U.S.C. 959 also says that jury rights must be

5   preserved.  As I'll argue in a moment, this injunction also

6   affects those rights.

7       In addition to 959, we have the fundamental issue of post-

8   confirmation jurisdiction.  As Mr. Draper said, here, this

9   channeling injunction applies to post-confirmation matters.

10  Similar to my answer to you on exculpation, I can see there

11  being a place for a channeling injunction during the pendency

12  of a case or for claims that might have arisen during the

13  pendency of a case.  I cannot see that, and I don't know of

14  any court that, at least at a circuit level, that would agree

15  that this can apply post-confirmation.

16      It is, again, the equivalent of GM manufacturing a car

17  post-confirmation and having to go to bankruptcy court because

18  someone's wanting to sue it for product negligence or

19  liability.  It's unthinkable.  The reason why a debtor exits

20  bankruptcy is to go back out into the community.  It's no

21  longer under the protection of the bankruptcy court.  That's

22  what the media calls Chapter 11, it calls it the protection of

23  the court.  There's no such protection post-reorganization.

24  So, --

25          THE COURT:  Is that really analogous, Mr. Rukavina?

199

1    Let's get real.  Is this really analogous --

2            MR. RUKAVINA:  It is.

3            THE COURT:  -- to GM --

4            MR. RUKAVINA:  It is.

5            THE COURT:  -- manufacturing thousands of cars?

6            MR. RUKAVINA:  It absolutely is analogous.  Because

7    this Debtor is going to assume these contracts and it is going

8    to go out there and it is going to make daily decisions

9    affecting a billion dollars of other people's money.  Each of

10   those decisions hopefully will be done correctly and make

11   everyone a lot of money, but each of those decisions is the

12   potential for claims and causes of action.

13       So it is analogous, Your Honor.  They want my clients and

14   others to come to you for purely post-confirmation matters.

15   The Court will not have that jurisdiction.  There will be no

16   bankruptcy estate, nor can the Court's limited jurisdiction to

17   ensure the implementation of the plan go to and affect a post-

18   confirmation business decision.

19       That's the distinction.  The Debtor's post-confirmation

20   business is not the implementation of a plan.  As Mr. Draper

21   said, there's a new entity.  There's a new general partner.

22   There's a new structure.  Go out there and do business,

23   Debtor.  That's what they're telling you.  They're telling you

24   this is not a liquidation because they're going to be in

25   business.  Okay.  Well, the consequence of that is that

200

1   there's no post-confirmation jurisdiction.

2       Now, Mr. Pomerantz says, and I think you asked Mr. Draper,

3   well, the jurisdiction to adjudicate whether something is

4   colorable is different from the jurisdiction to adjudicate the

5   underlying matter.  Your Honor, I don't understand that

6   argument, and I don't see a distinction.  If the Court has no

7   jurisdiction to decide the underlying matter, then how can the

8   Court have any jurisdiction to pass on any aspect of that

9   underlying matter?

10      And whether something is colorable is a fundamental issue

11  in every matter.  That's the thing that courts look at in a

12  12(b)(6), in a Rule 11 issue, in a 1927 issue.  So they're

13  going to come -- or someone is going to have to come to Your

14  Honor and present evidence and law that something is

15  colorable.  Let's say that we've said there's a breach of

16  contract.  Aren't we going to have to show you, here's the

17  contract, here's the language, here's the facts giving rise to

18  the breach, here's the elements?  And Your Honor is going to

19  have to pass on that.  And if Your Honor decides that

20  something is not colorable, then there ain't no step two.

21      And if Your Honor decides that something is colorable,

22  then isn't that going to be binding on the future proceeding?

23  And if it's going to be binding on the future proceeding, then

24  of course you're exercising jurisdiction to adjudicate an

25  aspect of that lawsuit.

201

1   I don't think that that -- I don't know I can be clearer

2   than that, Your Honor, unless the Debtor has some other

3   understanding of what a colorable claim or cause of action is

4   that I'm misunderstanding.

5       And Your Honor, I would ask, when Your Honor is in

6   chambers, to look at one of these CLO management agreements.

7   I'm sure Your Honor has already.  I just pulled one out of the

8   Debtor's exhibits, Exhibit J as in Jason.  And Section 14, 14

9   talks about termination for cause.  Most of these contracts

10  are for cause.  So, Your Honor, cause includes willfully

11  breaching the agreement or violating the law, cause includes

12  fraud, cause includes a criminal matter, such as indictment.

13      So let's imagine, Your Honor, that I come to you a year

14  from now and I say, I would like to terminate this agreement

15  because I don't want the Debtor managing my $140 million

16  because of one of these causes.  What am I going to argue to

17  Your Honor?  I'm going to argue to Your Honor that those

18  causes exist.  And Your Honor is going to have to pass on

19  that.

20      And if Your Honor says they don't exist, again, I'm done.

21  I just got an effective final ruling from a federal judge that

22  my claim is without merit.  I'm done.  Your Honor has decided

23  the matter effectively, legally, and finally.

24      That's why, when Mr. Pomerantz says that the jurisdiction

25  to adjudicate the colorableness of a claim is different from

202

1   adjudicating that claim, it's not correct.  They're part of

2   the same thing, Your Honor.

3       We strenuously object to that injunction, we think it's

4   unprecedented, and we strenuously object to that injunction

5   because we are not Mr. Dondero.

6       I understand the January 9th order.  I'll let Mr.

7   Dondero's counsel talk about why that was never intended to be

8   a perpetual order.  I'll let Mr. Dondero's counsel argue as to

9   why the extension of that order *ad infinitum* in the plan is

10  illegal.

11      But even if Mr. Dondero is enjoined in perpetuity from

12  causing the related parties to terminate these agreements,

13  Your Honor, the related parties themselves are not subject to

14  that injunction.  That's why you have the preliminary

15  injunction proceeding impending in front of you on ridiculous

16  allegations of tortious interference.

17      So whether the Court enjoins Mr. Dondero or not in

18  perpetuity is a separate matter.  The question is, as you've

19  heard, at least my retail clients, they have boards.  Those

20  boards are the final decision-makers.  Mr. Dondero is not on

21  those boards.

22      In other words, it is wrong to conclude *a priori* that

23  anything that my clients do has to be at the direction of Mr.

24  Dondero.  There is no evidence of that.  The evidence is to

25  the contrary.

203

1    Yes, a couple of my clients, the Advisors are controlled

2  by Mr. Dondero.  Mr. Norris testified to that.  You'll not

3  find Mr. Norris anywhere testifying in that transcript that

4  Your Honor allowed into evidence that the funds, my retail

5  fund clients are controlled by Mr. Dondero.  You won't find

6  that evidence.  There was no evidence yesterday or today that

7  Mr. Dondero controls those retail funds.  The only evidence is

8  that they have independent boards.

9    So I ask the Court to see that it's a little bit of a

10  sleight of hand by the Debtor.  If I am to be enjoined or if I

11  am to have to come to Your Honor in the future as a vexatious

12  litigant or a tentacle or a frivolous litigant, whatever else

13  I've been called today, then let it be because of something

14  that I've done or failed to do, something that my client has

15  done to warrant such a serious remedy, not something that Mr.

16  Dondero is alleged to have done.

17    And what have my clients done, Your Honor?  What have we

18  done to be called vexatious litigants and serial litigants?

19  We've done nothing in this case, pretty much, until December

20  16th, when we filed a motion that was a poor motion,

21  unfortunately, the Court found it to be frivolous, and the

22  Court read us the riot act.

23    We refused, on December 22nd, we, my clients' employees,

24  to execute two trades that Mr. Dondero wanted us to execute.

25  We had no obligation to execute them.  We knew nothing about

204

1  them. And Mr. Seery -- I'm sorry. Not Mr. Dondero, that Mr.

2  Seery wanted to execute. And Mr. Seery closed those

3  transactions that same day. And then a professional lawyer at

4  K&L Gates, a seasoned bankruptcy lawyer, sent three letters to

5  a seasoned professional lawyer at Pachulski, and the letters

6  were basically ignored.

7      Okay. Those are the things that we've done. Other than

8  that, we've defended ourselves against a TRO, we've defended

9  ourselves against a preliminary injunction, we will continue

10 to defend ourselves against a preliminary injunction, and we

11 defend ourselves against this plan because it takes away our

12 rights. Is that vexatious litigation? Is that, other than

13 the frivolous motion, is that frivolous litigation?

14     And we heard you loud and clear when you read us the riot

15 act on December 16th. And I will challenge any of these

16 colleagues here today to point me to something that we have

17 filed since then that is in any way, shape, or form arguably

18 meritless.

19     So where is the evidence that my retail funds are

20 tentacles or vexatious litigants or anything else? There is

21 no evidence, Your Honor, and the Debtor is doing its best to

22 give you smoke and mirrors to just make that mental jump from

23 Mr. Dondero to my clients, effectively an alter ego, without a

24 trial on alter ego.

25     Once these contracts are assumed, the Debtor must live

205

1    with their consequences.  It's as simple as that.  Your Honor

2    has so held.  Your Honor has so held forcefully in the *Texas*

3    *Ballpark* case.  And the Court, I submit respectfully, cannot

4    excise by an injunction a provision of a contract.

5        Also, this injunction will -- is a permanent injunction.

6    We know from *Zale* and other cases the Fifth Circuit does

7    permit certain limited plan injunctions that are temporary in

8    hundred-cent plans.  This is a permanent one.  It doesn't even

9    pretend to be a temporary one.

10       It's also a permanent one because the Debtor knows and I

11   think the Debtor is banking on me being unable to get relief

12   in the Fifth Circuit before Mr. Seery is finished liquidating

13   these CLOs.

14       So what we are talking about today is effectively excising

15   valuable and important negotiated provisions of these

16   contracts, provisions that, although my clients are not

17   counterparties to these contracts, you've heard from at least

18   three of them we do control the requisite vote, the voting

19   percentages, to cause a termination, to remove the Debtor, or

20   to seek to enforce the Debtor's obligations under those

21   contracts.

22       And again, Your Honor, it's very simple.  Where those

23   contracts require cause, there either is cause or is not

24   cause.  If there is not cause, the Debtor has its remedies.

25   If there is cause, I'll have my remedies.  But it's not for

206

1   this Court post-confirmation to be making that determination.

2   That's not my decision.  That's Congress's decision.

3       So, Your Honor, for those reasons, we object, and we

4   continue to object, and we'd ask that the Court not confirm

5   this plan because it is patently unconfirmable.  Or if the

6   Court does confirm the plan, that it excise those provisions

7   of the releases, exculpations, and injunction that I just

8   mentioned as being not in line with the Fifth Circuit or

9   Supreme Court precedent.

10      Thank you.

11          THE COURT:  All right.  Can I -- I meant to ask Mr.

12  Draper this.  Can we all agree that we do not have third-party

13  releases *per se* in this plan?  Can we all agree on that?

14          MR. DRAPER:  I don't know.  I have to look at that.

15  I think what you have are exculpations and channeling

16  injunctions for third parties who have not paid for those

17  channeling injunctions or those exculpations.

18          THE COURT:  All right.

19          MR. RUKAVINA:  Your Honor, was that question -- was

20  that question solely to Mr. Draper?

21          THE COURT:  Well, no, it was to all of you.  I

22  thought we could all agree that we don't have third party

23  releases *per se*.  Okay.  There was --

24          MR. RUKAVINA:  Your Honor, we --

25          THE COURT:  -- a little bit of glossing over that in

207

1  some of the briefing, I can't remember whose. But we have

2  Debtor releases, we have --

3         MR. RUKAVINA: Yes.

4         THE COURT: -- exculpations that deal with

5  postpetition negligence only, we have injunctions, which I

6  guess the Debtor would say merely serve to implement the plan

7  provisions and are commonplace, but Mr. Draper would say maybe

8  are tantamount to third-party releases. Is that --

9         MR. RUKAVINA: Your Honor, I don't think --

10         THE COURT: -- where we are?

11         MR. RUKAVINA: -- there's any question -- I don't

12  think there's any question that the exculpation is a third-

13  party release, and that that's also what Judge Fish held in

14  the *Dropbox* case. It says that none of the exculpated parties

15  shall have any liability on any claim. So, --

16         THE COURT: All right.

17         MR. RUKAVINA: -- that necessarily --

18         THE COURT: I get what you're saying, but I just

19  think, in common bankruptcy lingo, most people regard a third-

20  party release as when third parties are releasing -- third

21  parties meaning, for example, creditors, interest holders --

22  are releasing officers and directors and other third parties

23  for anything and everything.

24     Exculpation, I get it, it's worded in a passive voice, but

25  it is third parties releasing third parties, but for a narrow

208

1  thing, postpetition conduct that is negligent. Okay. So I

2  think -- while there's technically something like a third-

3  party release there, it's not in bankruptcy lingo what we call

4  a third-party release. It's an exculpation means no liability

5  of the exculpated parties for postpetition conduct that's

6  negligent. So I -- anyway, I think we all agree that, I mean,

7  can we all agree there aren't any *per se* third-party releases

8  as that term is typically used in bankruptcy parlance?

9        MR. RUKAVINA: I apologize, Your Honor, and I'm not

10  trying to try your patience, but I cannot agree to that.

11  Whatever claims my client, a nondebtor, has against Strand, a

12  nondebtor, are gone. Whether it's a release or exculpations,

13  they're gone. So I apologize, I cannot agree to that, Your

14  Honor.

15        MR. DRAPER: Your Honor, this is Douglas Draper. I

16  can't agree, either. I think it's definitional. And quite

17  frankly, I think I'm looking at the functional effect of

18  what's here, and they appear to be third-party releases.

19        THE COURT: Okay. All right. Who is making the

20  argument for Mr. Dondero?

21        MR. TAYLOR: Your Honor, Clay Taylor appearing on

22  behalf of Mr. Dondero.

23        THE COURT: Okay.

24      CLOSING ARGUMENT ON BEHALF OF JAMES D. DONDERO

25        MR. TAYLOR: Your Honor, first of all, as this Court

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2652 of 2722

209

1    is well aware, this Court sits, as a bankruptcy court, as a

2    court of equity.  It has many different tools available to it.

3    One of those, of course, is denying confirmation of this plan

4    because of the laws that we have discussed today and that we

5    believe the evidence has shown, and I won't go into those.  Of

6    course, of course, Your Honor could confirm that plan.  Yet

7    another tool available to this Court is it can take it under

8    advisement.

9        To the extent that this Court decides to confirm this plan

10   and decides to confirm it today, it certainly takes a lot of

11   options off the table for all parties.  There are ongoing

12   discussions, I'm not going to go into any of the particulars

13   of those discussions, but a ruling on confirmation today would

14   effectively end that, because, absent, then, an order vacating

15   confirmation, there's a lot of eggs that can't become

16   unscrambled after a confirmation order is entered.

17       So we would respectfully ask that, to the extent that the

18   Court is even considering confirmation, we don't believe it to

19   be appropriate, but at least take it under advisement for 30

20   days, or at least, in the very alternative, that it announce

21   some date which it is going to give a ruling, so that we kind

22   of know when that is going to come down, to see if any

23   positive ongoing discussions can result in more of a global

24   resolution that all parties can agree upon.

25       Addressing more the merits of the case, Your Honor, Mr.

210

1     Dondero does indeed object to the nondebtor releases, the

2     exculpations, the injunction. I believe those have been

3     covered rather extensively in the prior argument, so I wasn't

4     going to go into those here because they've been addressed.

5     Of course, I will endeavor to answer any questions that Your

6     Honor may have on those.

7         I will say I think Your Honor asked for everybody's best

8     shot as to why this is different for a Committee member versus

9     the independent trustees here. I will say my best shot is,

10     first of all, *Pacific Lumber* says what it says. I believe Mr.

11     Pomerantz has indicated their position that that language is

12     dicta and therefore not binding upon this Court. I

13     respectfully disagree with that. But to the extent, more

14     directly answering Your Honor's question, to me, the

15     difference is clear. Chapter 7 trustees are a creature of

16     statute. So are Chapter 11 trustees. And -- as are members

17     of a Committee that are seated pursuant to the Bankruptcy

18     Code. Those are all creatures of statute. And the

19     independent board of trustees, while there are certainly --

20     there are some analogies that can be made, undoubtedly, but

21     they are not a creature of statute. There is no provision for

22     them under the Bankruptcy Code. And therefore I don't believe

23     that they should and can receive the same protections under

24     *Pacific Lumber*.

25         And so hopefully that -- that is my best shot at

211

1   answering, directly answering the question that Your Honor

2   posed.

3            THE COURT:  Okay.

4            MR. DRAPER:  Mr. Dondero also has issue with the

5   overbroad continuing jurisdiction of this Court.  I believe

6   Mr. Rukavina has stated that rather succinctly, too.  Merely

7   ruling upon whatever claim is colorable or not certainly has

8   definite impacts.  If this Court has jurisdiction to do that

9   when it otherwise wouldn't have jurisdiction, it enacts an

10  expansion, a potentially impermissible expansion of this

11  Court's jurisdiction.  And for that reason, the plan should --

12  confirmation should be denied.

13       Getting into the particulars of 1129, Your Honor, there is

14  problems under 1129(a)(2).  Those are the solicitation

15  problems.  Let's just kind of look at what the evidence

16  showed.  On November 28th, there was a disclosure statement,

17  it was published to all creditors, and it said, under this

18  plan, you're going to get 87 cents.  It wasn't a range.  Now,

19  there was some assumptions that went in there, but they said,

20  under a liquidation of all these assets, you're going to get

21  62 cents.

22       The Debtors came back approximately two months later, on

23  January 28th, and said, oh, wait, we missed the boat here, and

24  actually, under the plan, you're going to get 61 cents.  And

25  under a liquidation, though, you'd only get 48.

212

1      Well, the problem is, already, two months later, they've

2  already told you they missed the boat on what the liquidation

3  analysis was just two months ago. And two months ago, they

4  told you under a liquidation you'd get 62 cents, and now we're

5  telling you you're going to get less. That's at least some

6  very good evidence that the best interests of the creditors

7  isn't being met, and potentially a liquidation is much better.

8      They then came back, potentially maybe realizing that

9  problem, also because some new information came in with the

10  employees, and also with UBS, which adjusted the overall

11  general unsecured claims pool, and said, well, under the plan

12  you're going to get 71 cents, and under a liquidation you're

13  going to get 55 cents.

14      In between those iterations from November to February,

15  they found $67 million more in assets. So Mr. Seery testified

16  he believed some of that's as to market increases in values,

17  and some (garbling) investment, market -- securities. And

18  some were just in these private equity investments.

19      There are indeed some rollups behind all of these numbers.

20  I do understand why they wouldn't want to make some of these

21  numbers public, because they might not be able to get --

22  create the upside for any particular asset class that they're

23  seeking to monetize.

24      However, we and others, including Mr. Draper, asked for

25  those rollups to be provided, and we certainly could have

213

1  taken those under seal or a confidentiality agreement, could

2  have also put those before this Court under seal and the

3  Debtor could have put those rollups before this Court under

4  seal.  It elected not to do so.

5      So, rather, what you have is the naked assumptions of this

6  is what we think we can monetize the assets, or we're not

7  going to tell you what it is, but trust me, Creditors, and

8  cool, we found $67 million worth of value in the past two

9  months, so therefore we're going to beat the liquidation

10  analysis that we previously told you just two months ago.

11      They also acknowledge that, in those two months, that

12  there was going to be about $26 million in increased costs

13  from their November analysis to their February analysis.  And

14  they included that in their projections.

15      Finally, they acknowledged, in those two months, that we

16  had previously estimated -- and they even have it in their

17  assumptions in November liquidation and plan analysis -- that

18  UBS, HarbourVest, and I believe it was Acis, were all going to

19  be valued at zero dollars, and that's what the claims were

20  going to be.  Well, they kind of missed the boat on those, and

21  they missed it by a lot.  They -- it increased all the claims

22  in the pool from $195 million to $273 million, or sorry, I

23  don't -- look at that again, but it was an increase of $95

24  million.  I'm sorry, 190 -- the claims pool increased from

25  $194 million to -- I'm sorry, Your Honor, I have too many

214

1   papers in front of me -- on November, the claims pool was 176

2   and it increased by February 1st to 273.  Therefore,

3   approximately $95, almost $100 million worth of claims that

4   they weren't anticipating that actually came in.

5       That tells you about the quality of the assumptions that

6   went into the analysis to begin with.  They missed it by 50

7   percent on what the overall claims pool was going to be.

8   That's significant.  It's material.

9       There is a lot of other assumptions that could go into

10  this document, and one of those assumptions are how much are

11  we going to be able to monetize these assets for?  One other

12  assumption is, well, how much is it going to cost during the

13  two-year life of this wind-down?  Another assumption is going

14  to be, are we actually going to be able to wind down in two

15  years?  Because if we're not, well, guess what, all those

16  costs are going to go up.  Another assumption is, well, how

17  much are those fee claims going to be over the two-year

18  period?  Again, if it goes over two years, they're going to be

19  significantly higher.  Moreover, you might have just missed

20  what the burn rate is.

21      So I think it's rather telling that the assumptions made

22  of -- all the way back of over two -- of only two months ago

23  were off by $100 million, and therefore it skewed all of the

24  plan-versus-liquidation analysis all over the board.

25      That's the only evidence that the Debtor has put forth as

215

1  to why it's in the best interest of the creditors.  And quite

2  frankly, we don't believe they have met their burden.  And it

3  is their burden to prove to Your Honor that the plan is better

4  than what a Chapter 7 trustee will -- can do.

5      What the evidence does show, as far as what the plan would

6  do as compared to a hypothetical Chapter 7 trustee, is that we

7  know for sure that the Claimant Trust base fee, just over the

8  two years, is going to be $3.6 million.

9      (Interruption.)

10         MR. TAYLOR:  I'm sorry.

11         THE COURT:  Someone needs to put their device on

12  mute.  I don't know who that was.

13         MR. TAYLOR:  Oh, I'm sorry.  I thought you said

14  something, Your Honor.

15         THE COURT:  No.

16         MR. TAYLOR:  So what we do know is the Claimant

17  Trustee base fee is going to be $3.6 million.  What we don't

18  know and what was not put into evidence because they are still

19  negotiating it is there's going to be a bonus fee on top of

20  that that's going to be paid to Mr. Seery.  Is that $2

21  million?  Is that $4 million?  Is that $10 million?  Well, we

22  don't know.  We can't perform that analysis as compared to

23  what a hypothetical Chapter 7 trustee could be.  Nor can Your

24  Honor, based upon the evidence presented.

25      And quite frankly, I don't see how one could ever conclude

216

1  -- and there are some other unknowns that we're about to go

2  over, including the Litigation Trust base fee and there are

3  collection fees, contingency fees. Those are also to be

4  negotiated. To be negotiated and unknown. You can't perform

5  the analysis. The Debtor couldn't perform the analysis

6  because those are to be negotiated, so you can't tell whether

7  a Chapter -- hypothetical Chapter 7 trustee might come out

8  better because he's not going to incur all these costs. We

9  know that they're going to incur D&O costs.

10        THE COURT: Let me interject right now.

11        MR. TAYLOR: Sure.

12        THE COURT: Again, I'm going to go back to

13  understanding who your client is arguing for. Okay? Again,

14  as we've said before, Mr. Pomerantz did not technically say no

15  standing, but he thought it was important to point out the

16  economic interests that our Objectors either have or don't

17  have. Okay?

18     So I'm looking through my notes to see exactly what the

19  Dondero economic interest is. I have something written in my

20  notes, but I'm going to let you tell me. Tell me what his

21  economic interests are with regard to this Debtor, this

22  reorganization.

23        MR. TAYLOR: Your Honor, I believe he has been placed

24  into Class 9, Subordinated Claims. So to the extent that

25  there is recovery available to Class 9, he can recover on

217

 1    those claims.

 2            THE COURT:  But what proof of claim --

 3            MR. TAYLOR:  We also have --

 4            THE COURT:  What proof of claim does he have pending

 5    at this juncture?

 6            MR. TAYLOR:  Your Honor, I would have to go back and

 7    look.  I don't have the proofs of claim register in front of

 8    me.  And I'm sorry, if I tried to speculate, I would be doing

 9    a disservice to my client and this Court by trying to

10    speculate.  I did not prepare those proofs of claim.  People

11    in my firm did.  But I would be merely speculating if I tried

12    to give you an answer off the spot.  And I apologize.  I'm

13    happy to submit a post-confirmation hearing letter --

14            THE COURT:  No, no, no.

15            MR. TAYLOR:  -- as to that.

16            THE COURT:  I'm not going to allow one more piece of

17    paper in connection with confirmation.  I thought you would be

18    able to answer that.

19            MR. TAYLOR:  I'm sorry.  I just don't want to lie to

20    Your Honor.

21            THE COURT:  What about his -- what would be an

22    indirect equity interest?

23            MR. TAYLOR:  Well, again, there are a lot of people

24    that know this org chart a lot better than me.  This is me

25    going on hearsay myself.  But I understand he also owns a lot

218

1  of indirect interests in subsidiaries, some of which are

2  majority, some of which are minority, and some of which he

3  owns maybe directly, some of which through other entities.  So

4  the way in which these assets could be monetized at the sub-

5  debtor level could certainly impact his economic rights and

6  could impact him greatly.  For instance, if the --

7          THE COURT:  I really wanted an exact answer.

8          MR. TAYLOR:  Mr. Seery --

9          THE COURT:  I really wanted an exact answer, not just

10  he has an indirect interest in, you know, some of the 2,000 --

11  I'm not going to say tentacles, but --

12      I'm going to interrupt briefly, because I really want to

13  nail down the answer as best I can.  Mr. Pomerantz, can you

14  just remind me of what your answer was or statement was

15  regarding Mr. Dondero, individually, his economic stake in all

16  this?

17          MR. POMERANTZ:  He has an indemnification claim

18  that's been objected to, --

19          THE COURT:  That's the one and only --

20          MR. POMERANTZ:  -- although it's not before --

21          THE COURT:  That's the one and only pending proof of

22  claim, right?

23          MR. POMERANTZ:  That's my understanding.  And while

24  it's not before the Court, we could all imagine whether Mr.

25  Dondero's going to be entitled to indemnification.

219

1    He has an interest in Strand, which is the general

2  partner.

3          THE COURT:  Right.

4          MR. POMERANTZ:  And Strand owns a quarter-percent --

5  a quarter of one percent of the equity.  I believe that is all

6  of Mr. Dondero's economic interest in the Debtor.

7          THE COURT:  Okay.  So, again, I'm just trying to, you

8  know, understand who he's looking out for, for lack of a

9  better way of saying it, Mr. Taylor, in making these

10  arguments.

11          MR. TAYLOR:  So, there is also, and this is -- I'm

12  not involved in what are these going to be filed collection

13  suits, or some of which have been filed, some of which have

14  not been filed, none of which I believe the answer date has

15  been -- has passed or come to be yet.

16    But he is also a defendant in collection suits on these

17  notes, as you are undoubtedly aware.

18          THE COURT:  Okay.  He's a defendant in adversary

19  proceedings.  Okay?  That makes him a party in interest to --

20  well, I keep -- that makes him have standing to make an

21  1129(a)(7) argument?  That's why I'm going down this trail.

22  Because you've spent the last five minutes talking about, you

23  know, creditors could do better in a Chapter 7 liquidation.

24  I'm not sure he has standing to make that argument, so I'm

25  wanting you to address that squarely.

220

1    MR. TAYLOR:  Your Honor, I believe he has economic

2   interests up and down the capital structure.  And I cannot

3   describe to you, without wildly speculating and potentially

4   lying to this Court, which I'm not going to do, without some

5   time to have looked at that, because I was -- I was not

6   involved in the proofs of claim and I am not his accountant.

7   So I could not do that without wildly speculating, so I just

8   -- I would like to more directly answer your question, Your

9   Honor.  I am not trying to avoid the question.  But I can't

10   honestly answer your question with true facts as we sit here

11   right now.

12    THE COURT:  All right.  But do you agree or disagree

13   with me that only parties -- the only parties that really can

14   make an 1129(a)(7) argument are holders of claims or interests

15   in impaired classes?

16    MR. TAYLOR:  Your Honor, I believe that Mr. Dondero

17   has standing to do so by virtue of claims for indemnification

18   --

19    THE COURT:  Okay.

20    MR. TAYLOR:  -- if these -- if these -- if this

21   Debtor (indecipherable) able to meet its obligations to

22   indemnify him.  And some of those are significant claims that

23   are being brought against him that could total millions, if

24   not tens of millions of dollars, just in defense costs alone,

25   that I do believe give some standing.

221

1    THE COURT: Okay. So, assuming you're right, you
2  think the evidence does not show this is better than a Chapter
3  7 liquidation where we would have a stranger trustee come in
4  and just, yeah, I guess, cold-turkey liquidate it all.
5    MR. TAYLOR: Your Honor, I do believe that the
6  evidence shows that the Debtor hasn't met its burden as to
7  this. A Chapter 7 trustee doesn't necessarily have to
8  liquidate immediately. It can run these -- these assets. I
9  mean, Mr. Seery is going to do it with ten people. At one
10  time, just two months ago, he said he was going to do it with
11  three people. A Chapter 7 trustee could certainly have a
12  limited runway, or even an extended runway, if it so asked for
13  it, to liquate these Debtors.
14    Moreover, there would be at least the requirements that
15  the Chapter 7 trustee would request the sale, tell creditors
16  about it. And, as many courts have said, the competitive
17  bidding process is the best way to make sure that you ensure
18  the highest and best offer that you can get.
19    Mr. Seery has not committed to providing notice of sales
20  to creditors and other parties in interest, potentially
21  bringing them in as bidders. They -- he could name a stalking
22  horse, but he has not indicated any desire to do so. A
23  Chapter 7 trustee would endeavor to do so.
24    So I do believe that there are some advantages. And
25  you've heard no testimony that they've performed any analysis

222

1   or conducted any interviews with any Chapter 7 trustees as to

2   whether or not this was possible or not.  They just made the

3   naked assumption that they would do work based upon what they

4   said was their experience.  And Mr. Seery's deposition, when

5   it was taken and noticed as a 30(b)(6) deposition, and I

6   believe it has been entered into evidence here, he said the

7   last time he dealt with a Chapter 7 trustee was 11 or 13 years

8   ago, and it was the *Lehman* case, and that was the -- a SIPC

9   trustee.  So --

10          THE COURT:  Well, --

11          MR. TAYLOR:  -- that's the last time he had any

12  experience with it.

13          THE COURT:  -- again, I don't mean to belabor this

14  point, just like I didn't mean to belabor a few others.  But,

15  you know, there is a mechanism, yes, in Chapter 7, Section

16  704, for a trustee to seek court authority to operate a

17  business.  But it's not a statute that contemplates long-term

18  operation.  Okay?  It's just, oh, we've got a little bit of --

19  you know, we have some assets here that really require a

20  short-term operation here.

21     If it's long-term, then you convert to Chapter 11.  Okay?

22  It's just a temporary tool, Section 704.  Right?  Would you

23  agree with me?

24          MR. TAYLOR:  That's typically how it has been used.

25          THE COURT:  Okay.

223

1      MR. TAYLOR:  But that's not to say that it's limited

2  in time by the statute itself.  It doesn't say that it can't

3  go for one year or two years.  That can be a short wind-down

4  period.

5      THE COURT:  But hasn't your client's argument been

6  this past several weeks that Mr. Seery is moving too fast,

7  he's wanting to sell things and he needs to hold them longer?

8  I mean, these two argument seem inconsistent to me.

9      MR. TAYLOR:  So, just because a Chapter 7 trustee has

10  been appointed doesn't mean that he has to sell them any

11  faster than Mr. Seery.

12    I think what the -- the problem with the process that has

13  been going on with Mr. Seery, my client's problem with it, is

14  not necessarily the timing but the process that Mr. Seery is

15  going through with these sales.  Provide notice, allow more

16  bidders to come in, make sure that he's getting the highest

17  and best price.  And if that happens to be Mr. Dondero who

18  offers the highest and best price, great.  And if Mr. Dondero

19  gets outbid by somebody, well, that's all the more better for

20  the estate.

21      THE COURT:  Okay.  Continue your argument.

22      MR. TAYLOR:  I believe we covered a lot of it, Your

23  Honor, and the plan analysis is all based upon their

24  assumptions that there's $257 million worth of value.  Again,

25  there's no rollup provided as to how that asset allocation is

224

1    broken out, but they consist of a couple of items.

2        First, there's the notes; and second, there's the assets.

3    The notes are either long-term or demand notes. Those long-

4    term notes, Mr. Seery will tell you some have been validly

5    accelerated and therefore are now due and payable. I think

6    there's arguments to the contrary. But those long-term notes

7    probably have some both time value of money and collection

8    costs. And then, of course, you have to discount them by

9    collectability issues, too.

10       I don't believe any analysis went into it, or at least the

11   Court was not provided any data or analysis as to what

12   discounts were applied to those notes. And, therefore, I

13   don't think that this Court can make any determination that

14   the best interests of the creditors have been met.

15       As far as the assets that are to be monetized, again,

16   there's two sub-buckets of those assets. There's securities

17   that are to be sold. Some of those are semi-public securities

18   that have markets. Those are somewhat more readily

19   ascertained. The others are holdings in private equity

20   companies, and sometimes holdings in companies that own other

21   companies.

22       There's no evidence of the value -- empirical evidence of

23   the value of those companies, nor of the assumptions that went

24   into as to when they should be sold, how much they'd be sold

25   for.

225

1    Again, I do realize the sensitive nature of such

2  information, but that could have been placed under seal.  And

3  without that information, I don't believe that the Court can

4  conduct the due diligence it's necessary to say the best

5  interest of the creditors have been met.

6    To sum up, Your Honor -- oh, I'm sorry.  One other point

7  that I did want to talk about before I summed up is, you know,

8  Mr. Pomerantz and I were listening to a different record or I

9  was totally confused as to the testimony that was put forth

10 regarding the directors and officers.  I believe the testimony

11 in the record is extremely clear that the Debtor made no

12 effort to go out and find out if it could obtain directors and

13 officers insurance without a gatekeeping injunction or a

14 channeling injunction, whatever you want to call it.  I

15 believe that his testimony was extremely clear.  He didn't

16 shop it.  He doesn't know.  And that's what the record is

17 before this Court.

18    To the extent that the Debtor wants to rely upon we can't

19 get Debtor -- or, directors and officers insurance because

20 without this gatekeeping function we just can't get it, I

21 believe the record just wholly does not support that.  The

22 testimony was at least extremely clear, as how I heard it.

23 Your Honor will have to review the record herself, but I don't

24 believe that there was much argument about it.

25    I'm sure -- as I stated in the beginning, Your Honor, this

226

1  is a court of equity.  It could deny confirmation, as I

2  believe Your Honor should, based upon the flaws in the plan.

3      If Your Honor finds that the plan as written is

4  impermissible because of any of the exculpation or the

5  gatekeeping functions that they're asking, the testimony is

6  equally clear that the independent directors would not serve

7  in -- as officers of the Reorganized Debtor.  Any plan that is

8  put forth by the Debtor has to tell the people who are going

9  to be officers going forward.  And with that naked testimony

10  before the Court, that it's simply not feasible, and I don't

11  think it is one of the possible -- where the Court can come

12  back and say, well, I can't confirm this plan as written, but

13  if you change it and rewrite it to get rid of the certain

14  offensive parts of the exculpation or the gatekeeping

15  functions, then we can confirm this plan.  And I think the

16  evidence before this Court is it's not feasible because none

17  of the directors will serve in that capacity, and therefore

18  this plan should be dead on arrival if Your Honor agrees the

19  proposed provisions do not meet *Pacific Lumber*.

20      We would ask the Court to deny confirmation, but in the

21  alternative, to at least take this under advisement.  Give us

22  a time frame -- we'd ask for 30 days -- but give us a time

23  frame of when the Court is going to rule, to allow the

24  positive conversations to move forward.

25      To that end, Your Honor, there is, indeed, a hearing on

227

1  the extension of a temporary injunction and contempt that is

2  scheduled for Friday. I understand that the parties, at least

3  the joint parties, will not -- will agree to, I'm sorry, will

4  agree to the extension of the temporary injunction until such

5  time as the Court can rule on confirmation. I do see that

6  there could be a lot of harm done at the Friday hearing. We

7  would ask that the Court additionally continue that hearing on

8  that motion and on the injunction, and contempt, until such

9  time as confirmation has been ruled upon. It will be both

10 efficient and allow discussions to continue regarding

11 potential global resolution.

12      And so that is the end of my argument, Your Honor.

13          THE COURT: All right. Thank you. All right. Mr.

14 Pomerantz, do you have any rebuttal?

15      REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

16          MR. POMERANTZ: Yes, I do, Your Honor. I want to

17 address a couple of comments that Mr. Taylor made towards the

18 end. First of all -- and, actually, the beginning.

19      We think Your Honor should rule on confirmation. Ruling

20 on confirmation and having an entered confirmation order are

21 two separate things. We understand that a new offer was made.

22 Whether that's acceptable to the Committee -- I actually think

23 it will enhance the ability of the parties to see if they

24 could reach a deal if there's (audio gap) that Your Honor is

25 going to confirm the plan.

228

1     Again, doesn't mean a confirmation order has to be

2   entered, but I think, based upon my personal experience in

3   negotiating with Mr. Dondero, that your clear communication to

4   the parties that, unless something happens, you will enter a

5   confirmation order, I think will change things.  Okay?

6   Without getting into settlement discussions, things have

7   changed over the last several days, and we wish you would have

8   -- wish things would have happened sooner.  But we totally

9   disagree that Your Honor should hold your ruling for 30 days

10  or any other period of time.

11     Part of the reason I think they are making that argument

12  is because they have an examiner motion and they recognize

13  that, upon confirmation, the examiner motion is moot.  So I

14  think there's strategic reasons as well.

15     We don't think there should be a continuance of the TRO

16  hearing and of the contempt hearing.  As Your Honor recalls,

17  the contempt motion was specifically set for this time to give

18  Mr. Dondero enough time to prepare.  Your Honor was sensitive

19  to his due process concerns.  We set the TRO, the preliminary

20  injunction hearing against the Advisors and the Funds, we set

21  that, again, knowing that it would be after confirmation.

22     So we do not agree that either should be continued.

23  Again, we think the more direct, unequivocal answers Your

24  Honor can give to the parties, the better off we'll be.

25     I guess -- Mr. Taylor and I do agree that the record was

229

1  clear. I guess we just disagree on the clarity of it. I

2  heard Mr. Tauber testify that when he went out to people, to

3  insurance carriers, after he and Aon were engaged, they all

4  talked about a Dondero exclusion. Okay? They weren't

5  convinced into a gatekeeper provision because it was provided

6  as part of the normal materials you would provide in a

7  bankruptcy court and trying to get D&O liability in the

8  context of a bankruptcy case. Mr. Tauber's testimony was

9  pretty clear, that carriers wanted to have a Dondero

10  exclusion. And, in fact, the only reason we were able to get

11  any coverage was because of the gatekeeper.

12     So, yes, the record was clear. We just disagree.

13     I'd like to go back to Mr. Draper's comments going -- and

14  a couple of things, obviously, overlap. I guess one of the

15  things here, it's great that everyone is coming in here as

16  different interests and different parties or whatnot. But as

17  I mentioned, Your Honor, at the outset, and I've repeated a

18  few times, these are all -- the only people we have not been

19  able to resolve issues with are the Dondero parties and the

20  related parties. And I recall the tentacles. Mr. Davor

21  questioned that. Mr. Clemente, his comments. But the fact of

22  the matter is, Your Honor, Your Honor has heard testimony.

23  Your Honor has had hearings. Mr. Rukavina represents the

24  Advisors and the Funds. Your Honor has never seen the

25  independent board member testify in this case to demonstrate

230

1  how these entities are really different.  So while Mr.

2  Rukavina does -- you know, tries his best, and I think he has

3  limited stuff to work with, but I give him credit for doing

4  the best he can, these are all Dondero-related entities and

5  Your Honor has seen that.

6      So, Your Honor, going to the resolicitation argument, it

7  actually has taken up a lot more time than the argument is

8  worth, for one very simple reason.  As I said in my argument,

9  and as Mr. Taylor and Mr. Draper totally ignored, there were

10  17 creditors who voted yes, 17 creditors who were apparently

11  misled, that Mr. Draper is looking out for the little guy and

12  Mr. Taylor is fumbling over his reason for why that's

13  important to Dondero.  And of those 17 creditors that voted

14  yes, Your Honor, they were either the employees related to

15  HarbourVest, UBS, Redeemer, or Acis, except for two.  And you

16  know the other two?  One was Contrarian, a claim buyer, who,

17  yeah, elected to be in Class 7, and the other was an employee

18  with a dollar claim.

19      So the whole argument that there should be a

20  resolicitation is preposterous, Your Honor.  But to go to some

21  of the specifics in what they argued, we didn't require

22  creditors to monitor recovery.  The footnote -- as I

23  indicated, the UBS 3018 was in the disclosure statement that

24  went out.  It didn't make it to the projections.  It was

25  clearly -- and they characterize it, I think Mr. Draper

231

1    characterized it as buried in the document.  There is a

2    section that every disclosure statement is required to have

3    called Risk Factors.  This disclosure statement had that.  And

4    in the disclosure statement, it talked about the amount of

5    claims being a risk factor.

6        Mr. Draper also said that the Debtor totally changed its

7    business model from the first to the second analysis.  That is

8    incorrect.  The Debtor was always going to manage funds.  Yes,

9    did they add the CLOs?  But before, they were going to manage

10   Multi-Strat, they were going to manage Restoration Capital,

11   they were going to oversee Korea, they were going to be doing

12   the management of the funds.  So there wasn't a big change in

13   the business model, Your Honor.

14       Mr. Taylor, on the solicitation issue, says we found $67

15   million in assets.  You know, that's a disingenuous statement.

16   I think over $20 million was found because his client and

17   related entities didn't make a payment on notes and they got

18   accelerated.  So while before we would have had to wait over

19   time if they were paid, it's not surprising that Mr. Dondero

20   and his related entities just failed to basically pay the

21   notes.

22       So that was, I think, over $20 million.  And then there

23   was the HCLOF asset.  That was acquired in the HarbourVest

24   settlement.  And then there was basically an increase in some

25   value to some assets.

232

1     So there wasn't anything mysterious here.  There wasn't

2  anything that the Debtor was trying to hide.  There weren't

3  any found assets.  It was based upon different circumstances.

4     Mr. Taylor complains about the lack of rollup of assets,

5  the lack of evidence on the best interests of creditors test.

6  Your Honor, you've had extensive testimony from Mr. Seery

7  about what would happen in a Chapter 7 and what would happen

8  in a Chapter 11.  And you know why we didn't provide the

9  information to Mr. Taylor and his client on what the rollup of

10 the assets would be, and do you know why he wants them?  He

11 wants to know what the assets are so he can try to bid.

12    And there also was the allegation that the failure to

13 allow them to bid means we're going to get less in a Chapter

14 11 than a 7.  Two comments to that, Your Honor.  Number one,

15 if that was the case, a debtor would never be able to satisfy

16 the best interests of creditors test.  If the existence of a

17 public process *de facto* meant you would get more value than

18 outside, you would never be able to satisfy that.  And, quite

19 honestly, that's just not the law, Your Honor.

20    You have an Oversight Committee with over $200 million of

21 creditors who are going to watch Mr. Seery like a hawk, like

22 they have watched him during the case.  And the concern that

23 somehow, because these assets are not put into full view to

24 sell, that they will get less value, it's just not -- it's not

25 supported by the evidence at all, Your Honor.  And Mr. Seery

233

1  will make the determination. If it makes sense to notice up

2  and provide Mr. Dondero with notice, he will. If he doesn't,

3  he won't.

4      Your Honor, going -- oh, and then the last comment on the

5  -- that I'll make on the resolicitation and the liquidation

6  analysis is Mr. Taylor chides us and we've been criticized for

7  not disclosing more about the HarbourVest and the UBS

8  settlements and that we were off substantially. Your Honor,

9  you've heard testimony that we were in pending litigation with

10  HarbourVest and UBS at the time. What kind of litigant would

11  we be if we came in and said, you know, Your Honor, you know,

12  Creditors, we think the UBS claim is going to be allowed at

13  $60 million and we think the HarbourVest claim is going to be

14  allowed at $30 million? Would that really have benefited

15  creditors and this estate, to basically, after we took the

16  position, hard negotiations and hard pleadings that we

17  prepared, and in some cases filed, that we didn't have any

18  liability? It would have made no sense, and it would have

19  been a dereliction of our duty to actually come out and say

20  what the claims -- the claims were, or what we thought they

21  could be settled for.

22      Your Honor, going back to Mr. Draper's comments. He

23  started with the exculpation. First he made a comment that I

24  don't think he intended what he said, but he said that the

25  exculpation order, the January 9th order, cuts off when the

234

1  independent directors go away.  I think what he meant to say

2  is that since the three people are not going to be independent

3  directors anymore, that basically any actions going forward by

4  any of those three are not covered.  But let's be clear.  The

5  January 9th order is in effect, and if at some point in the

6  future somebody has a claim against those three gentleman, or

7  their agents, for what they did as independent directors or

8  their agents, that order will apply.

9       Your Honor, we next had a discussion, or Mr. Draper and

10  you had a discussion on professionals.  I'm aware of the Fifth

11  Circuit law that says res judicata, fee applications.  I think

12  that only applies to claims that the Debtor and estate would

13  have.  It doesn't really apply to an exculpation.  But there's

14  Texas state law that I identified in our brief and we cited to

15  that limits third parties' ability to go after professionals.

16      But the bottom line is the Fifth Circuit, in *Pacific*

17  *Lumber*, didn't deal with professionals.  Your Honor was

18  correct in pushing both Mr. Taylor and Mr. Rukavina.  What

19  really that was was a policy case.  And professionals have

20  nothing to do with 524(e).  So the *Palco* and the *Pacific*

21  *Lumber* reference and explanation of 524(e) doesn't have

22  anything to do with professionals.  And we would submit, Your

23  Honor, that an exculpation, especially in a case like this, is

24  important for professionals.

25      I understand Your Honor's comments that maybe it's much

235

1  ado about nothing, but I'm not really sure it's much ado about

2  nothing when we have Mr. Dondero and his affiliates who,

3  notwithstanding their efforts to just claim that all they are

4  doing is trying to get a fair shake, Your Honor knows better.

5  Your Honor knows better from the years you've been litigating

6  with them, and we know better and the Debtor knows better from

7  what the independent directors have been dealing with.

8          THE COURT:  Let me ask you this, though.  I came into

9  the hearing with the impression we were just talking about

10  postpetition pre-confirmation, or pre-effective date maybe I

11  should say, was the expanse of time covered by exculpation.

12  And Mr. Rukavina said no, no, no, go back, look at, I don't

13  know, Subsection 4 of something.  It is a post-confirmation

14  concept.  What is your response to that?

15          MR. POMERANTZ:  I believe it's implementation.  And,

16  again, --

17          THE COURT:  Implementation?  Yes.

18          MR. POMERANTZ:  -- I think Mr. Rukavina -- right.  I

19  think Mr. Rukavina and Mr. Taylor and Mr. Draper have done a

20  great job trying to muddy the issues.  They talk about our

21  sleight of hand and how we're trying to do things that are way

22  beyond the bankruptcy court's jurisdiction.  We are not.  I

23  think they are trying -- what they have done throughout the

24  case is throw up enough mud.  And here's, here's the answer to

25  that question, Your Honor.  Implementation.  Okay?  We know

236

1   what implementation means.  The plan says implementation is

2   cancelation of the equity interests, creation of new general

3   partners, restatement of the limited partners, establishment

4   of the Claimant Trust and Litigation Sub-Trust.  That's the

5   implementation.

6       We are not trying to get exculpation for post-confirmation

7   activity.  Actually, my partner, Mr. Kharasch, in specifically

8   addressing Mr. Rukavina's concern, said, look, if you have a

9   problem with cause, if you have a problem, want to exercise

10  your rights, we're only asking you to come back to the Court.

11  We are not stopping you.

12      So the whole argument that the exculpation is really broad

13  and is not really -- does not really cover just the plan, the

14  approved plan, I think is a red herring.  Implementation is

15  implementation in the context of the plan.

16      And also Mr. Rukavina tries to argue that, well, it's

17  administration, it's not really you acting any operation of

18  business.  I just don't think there's any support in the case

19  law.  Your Honor has overseen this case, overseen this

20  Debtor's activities, overseen the independent directors'

21  activities, overseen Strand's activities, overseen the

22  employees' activities.  And those activities have been

23  (indecipherable) administration of the case.  And his attempt

24  to create a different category for, well, it's not

25  administration, it's operation and so it doesn't apply, I just

237

1  think is wrong.

2      Your Honor made a couple of comments about what was

3  *Pacific Lumber* doing.  It was a policy decision.  If there was

4  a bright-line rule, then nobody would be entitled to

5  exculpation.  The very fact that the Fifth Circuit said that

6  Committee members are different made -- makes it clear it was

7  -- it was policy.

8      And Mr. Taylor's comments that, well, their creation of

9  statute, Chapter 11 trustees and Committee members, that's not

10  what basically the case said.  If you look at the citation to

11  touters in the case, it was we want people to volunteer and

12  who are needed for the process.  Committee members are needed

13  for the process.  We don't want to discourage them from coming

14  in.  And the only testimony you have on the independent

15  directors is from Mr. Dubel, and he testified the importance

16  of independent directors to modern-day Chapter 11 practice,

17  the importance of exculpation, indemnification, and D&O

18  insurance.  And his testimony:  uncontroverted.  The Objectors

19  could have brought in someone to say something different, but

20  the only testimony before Your Honor is, if Your Honor does

21  not approve exculpations in cases like this, you will not get

22  independent directors and it will have an adverse effect on

23  the Chapter 11 process.

24      So, while I appreciate all the Objectors trying to say

25  bright line, trying to say *Pacific Lumber*, that is the gut

238

1   reaction, right?  That's -- it's easy to say.  But Your Honor

2   will know better, from reading the cases, that's not what

3   *Pacific Lumber* says.  And for the several reasons I gave, it's

4   the reason why *Pacific Lumber* does not govern the decision in

5   this case.

6       Your Honor, Mr. Draper then started to talk about *Craig*.

7   And everyone cites *Craig* as this, you know, limiting

8   jurisdiction.  Now, we acknowledge that *Craig* and the Fifth

9   Circuit has a more limited post-confirmation jurisdiction

10  approach than the other Circuits, but it's not nonexistent.

11  And just because the Debtor is going out post-confirmation and

12  acting does not mean that the conduct that they are engaging

13  in is not -- and disputes that arise, doesn't come within the

14  Court's jurisdiction.  If that was the case, and I think Your

15  Honor recognized this, in your case it was the *TXMS* case,

16  while it's limited, more limited after confirmation, and I

17  think you even, in the case -- or, in one case of yours, said

18  that even after the case is closed there could be

19  jurisdiction.  So their just trying to argue *Craig* is just --

20  is just too much.

21      Going out of the gatekeeper, Mr. Draper tried to say we

22  are *Barton*, and that's it, and *Barton* has its limitations, et

23  cetera.  First of all, with respect to *Barton*, it is not

24  limited and doesn't include debtors-in-possession.  We have

25  cited cases in our materials where it has been applied to

239

1    debtors-in-possession.

2        So, you know, look, maybe this is a provision -- this is a

3    proposition like many in bankruptcy, you could find a

4    bankruptcy court to agree with a proposition, but there's

5    cases all over the place on that. There's cases applying to

6    post-confirmation. The trend has been to expand *Barton*. But

7    the beauty of it is, Your Honor, you don't have to rely on

8    *Barton*. *Barton* was one of our arguments. We gave *Barton* as,

9    you know, somewhat of an analogy but somehow applying because

10   in the -- because the independent directors were like the

11   trustees.

12       But we recognize it may be going farther than *Barton* has

13   previously gone. But the case law is clear, it is being

14   extended. But we -- I gave you several provisions of the

15   Bankruptcy Code that authorized you to enter a gatekeeper

16   order. None of the Objectors objected on any of those

17   grounds. They didn't say the statutes that I cited. And it

18   wasn't only 105, I know bankruptcy practitioners love to cite

19   105, but there were three or four others that I mentioned, and

20   they're in our brief. There's no case that they cited that

21   said that there is no authority on the gatekeeper.

22       But what was the argument that was raised? And I think

23   Mr. Rukavina raised it, saying, you know, look, I don't

24   understand the argument of no jurisdiction, of jurisdiction

25   for a gatekeeper but no jurisdiction for underlying cause of

240

1     action. Well, Mr. Rukavina should read and Your Honor should

2     read, when you're considering the plan, the case, the *Villegas*

3     case in the Fifth Circuit as it dealt with *Stern*. That was

4     particularly a case. Does *Barton* -- is *Barton* impacted from

5     *Stern*? By *Stern*? And *Stern*, we know, limits the bankruptcy

6     court's jurisdiction. But, no, the Fifth Circuit said, in

7     that case, no. Even though the bankruptcy court's

8     jurisdiction is limited to hear the claim, there is nothing

9     inconsistent with that and allowing the bankruptcy court to

10     act as a gatekeeper.

11     So Mr. Rukavina's argument that, well, he'll present to

12     you that there's cause and you'll find there's no cause and

13     then he will be without a remedy by someone that had

14     jurisdiction, that really sounds good but it just doesn't

15     withstand analytic scrutiny. There is a distinction. They

16     are glossing over the distinction. They don't like the

17     distinction.

18     And why is that distinction -- and why is it important in

19     this case? Again, we're not talking about garden-variety

20     people who are just involved with a debtor and will get caught

21     up in a bankruptcy. We narrowly tailored the gatekeeper to

22     enjoined parties. Enjoined parties are the people before Your

23     Honor, some of the people that have made the Debtor's life

24     miserable over the last few months.

25     We have every interest and desire, as does the Committee,

241

1  to go out post-confirmation and monetize these assets. But we

2  see the clouds on the horizon. We see all the pleadings that

3  have been filed by the Objectors saying how, if there's no

4  deal, there will be an unending amount of costs and appeals.

5  It's, you know, the point, not too subtle. It wasn't lost on

6  us.

7      Your Honor, going to Mr. Rukavina's arguments on Class 8

8  cram down, again, it's really a hard argument to understand,

9  but first I want to make a point. He sort of mentioned -- and

10 I'm not sure if he intends to preserve this on appeal, but it

11 was not objected to and I'll ask for a ruling on it, Your

12 Honor -- he said that there was inappropriate separate

13 classification. That was not raised in any of the objections.

14 We don't think it was properly before the Court. We

15 understand there's a component of that in unfair

16 discrimination in connection with a cram down, but there is no

17 objection, there was no filed objection, to the separate

18 classification of the deficiency claims and the Class 8

19 unsecured claims.

20     And if you look at the voting, you realize it wasn't done

21 for gerrymandering, because if you put both claims together,

22 both classes together, you would have had one class that voted

23 yes.

24     So I don't believe the separate classification under the

25 1129 standards is appropriate for Your Honor to consider,

242

1  other than in connection with the cram down.

2      Now, Mr. Rukavina complains that the only way the

3  convenience class was decided was by way of negotiation.  Your

4  Honor, how else do provisions like that get decided?  And who

5  was the negotiation between?  It was between the Committee.

6  And one of the benefits of a Committee process, and I

7  represent a lot of Committees, you put people in a Committee

8  that have diverse interests and they can come up with an

9  appropriate result.  And here you have that.  You had one

10  creditor who was a convenience creditor.  You have three other

11  creditors who would lose liquidity if convenience payments are

12  made.

13      Do you think that UBS, Acis and Redeemer, do you think

14  they had a desire just to pay people off?  No.  It was part of

15  a collaborative process.  So to say that there was no basis

16  and no testimony on the appropriateness to have -- and how the

17  convenience class was put together just would be wrong.

18      And with respect to the absolute priority rule, Your

19  Honor, again, there's a missing link here, okay?  These are

20  contingent interests.  They are property.  No doubt they are

21  property.  But if I did not allow those creditors or those

22  equity to have a contingent interest, the argument would have

23  been made that the plan violates the absolute priority rule.

24  And I said that in my argument.  And why would it have

25  violated the absolute priority rule?  Because there's a

243

1  potential that creditors could get over a hundred cents on the

2  dollar, plus interest. So it's a game of gotcha, right?

3  And why do they really care? Mr. Dugaboy said in his --

4  Mr. Draper said in his brief that Dugaboy cares because they

5  may have wanted to buy the interest. Well, I'm sure they can

6  go to Hunter Mountain, you know, Mr. Dondero's left hand can

7  go to his right hand, and I'm sure he'd be happy to sell the

8  contingent interests.

9  And with respect to the argument that Mr. Rukavina made

10 about control, equity be in control, yeah, control is a right.

11 No doubt. You've got -- if you're giving control to the post-

12 confirmation Debtor, that could be a right and implicate the

13 absolute priority rule. But what is the control here? Equity

14 is not given any rights. Your Honor heard how the post-

15 confirmation entity is structured. It's going to be Mr.

16 Seery, overseen by an Oversight Board. So I really don't

17 understand the concept of control. There just is no violation

18 of the absolute priority rule.

19 Your Honor, Mr. Rukavina then took us to task for 2000 --

20 or, for not filing the 2015.3 statement. And if you take his

21 argument to the logical conclusion -- well, we didn't file it,

22 we didn't comply with that Rule, so we're not in compliance

23 with the Bankruptcy Code, so we can never basically get our

24 plan confirmed, right, because it's a violation and we didn't

25 file and seek an extension.

244

1    That's just a preposterous argument, Your Honor.  Mr.

2  Seery poignantly told the Court, in the rush of things that

3  were going on, it wasn't filed.  Did Mr. Rukavina, before

4  yesterday, having Mr. Dubel on the stand, did he ever ask

5  where is our 2015.3 report?  He probably didn't ask it because

6  the answer -- when I told him the reason why it wasn't filed

7  before January 9 was because I don't think Mr. Dondero wanted

8  it filed, and I think that's why, as Mr. Seery testified, we

9  were having a challenging time getting that information from

10  the in-house -- in-house.

11    But, yes, should it have been filed?  Yes.  But if that is

12  all they could point to through the course of the case that

13  Mr. Seery or Mr. -- or the rest of the board did wrong, you

14  know, I think that just demonstrates they did a fine job.

15          THE COURT:  All right.

16          MR. POMERANTZ:  Your Honor?

17          THE COURT:  You've got four minutes left.

18          MR. POMERANTZ:  Oh.  Okay.  Your Honor, going to Mr.

19  Rukavina and the Strand argument that it's a nondebtor entity,

20  as I explained in my argument, the Strand -- Strand needs to

21  get exculpation or else that's a backdoor way to the Debtor.

22  Forget about the independent directors, it's a backdoor way to

23  the Debtor.  Because Mr. Dondero will be in control.  If

24  Strand is sued for post-January 9th activities, he will assert

25  an administrative claim.  And one thing from *Pacific Lumber* is

245

1  clear, the Debtor is entitled to an exculpation as part of the

2  injunction and the -- and the discharge.

3     Your Honor, Mr. Kharasch adequately addressed Mr.

4  Rukavina's comments with the gatekeeper and the gatekeeper

5  problem.  We are not seeking to stop his clients, however

6  related they may be, from exercising their rights.  We are

7  seeking a process that will not embroil the Debtor in

8  litigation going forward.  There is no problem with Your Honor

9  acting as the gatekeeper to do so.  And to the extent that

10  they are bound by the January 9th order is not really an issue

11  for today.  That'll be an issue at the temporary -- the

12  temporary -- at the preliminary injunction hearing.

13     I -- just one minute, Your Honor.

14     (Pause.)

15       MR. POMERANTZ:  Your Honor, I think I covered a lot.

16  If there's anything that any of the Objectors have mentioned

17  that I failed to respond to, I'd be happy to answer questions

18  Your Honor has.

19       THE COURT:  All right.  I guess there's, what, about

20  two minutes left, if Mr. Clemente had anything.

21     Mr. Clemente, have you drifted off?  I doubt it.  But

22  anything else from you, Mr. Clemente?

23       MR. TAYLOR:  Your Honor, I show him talking -- this

24  is Clay Taylor -- but no one's hearing him.

25       THE COURT:  Okay.  Mr. Clemente, we are not hearing

246

1   you, or I'm not seeing you.  Make sure you're not on mute.

2          THE CLERK:  He's not on mute, Judge.

3          THE COURT:  He's not on mute?  So we must have a

4   bandwidth issue or something else.

5      All right.  Mr. Clemente, still not hearing or seeing you.

6   We'll give him another 30 seconds.

7          THE CLERK:  He's coming up.

8          THE COURT:  He's coming up?  Ah, I see his name now.

9          MR. CLEMENTE:  Your Honor, can you hear me?

10         THE COURT:  I can hear you now.

11         MR. CLEMENTE:  Okay, Your Honor.  I don't know what

12  happened.  I just switched another camera, so you may not be

13  able to see me, but can you hear me?  I'll be very quick.

14         THE COURT:  Okay.  I can hear you.

15         MR. CLEMENTE:  Can you hear me?

16         THE COURT:  Yes.

17         MR. CLEMENTE:  Okay.  Thank you, Your Honor.

18  CLOSING ARGUMENT ON BEHALF OF THE UNSECURED CREDITORS' COMMITTEE

19         MR. CLEMENTE:  Two things I want to say.  First, just

20  on Class 8, I think what's important, as my comments

21  emphasized earlier, the structure of Class 8.  We must

22  remember what it is.  It's really designed so that Class 8

23  holders receive their pro rata share of what's left after

24  prior claims are paid.  That's really what Class 8 creditors

25  voted on.  That's what the disclosure provided.  They did not

247

1  vote on receiving a specific dollar or a specific recovery

2  percentage.

3      And regarding the projections and estimates, Your Honor,

4  we're talking about large litigation claims that were asserted

5  and then settled. And given the nature of these assets, the

6  values fluctuate. It's perfectly expected, Your Honor, and

7  indeed disclosed, that there could be wide swings in the

8  amount of claims. That does not lead to the conclusion that

9  the plan needs to be resolicited.

10      And then, finally, Your Honor, again, Mr. Pomerantz

11  adequately addressed all the points, as he did with his

12  earlier presentation, so I'm not going to touch on them, but I

13  did want to respond to one thing that Mr. Taylor said. And I,

14  of course, agree with Mr. Pomerantz. The Committee believes

15  there's no reason for you to delay a ruling and would in fact

16  urge you to rule as soon as Your Honor is ready to rule.

17  Confirmation of the plan, to the extent that there are

18  conversations occurring, is not going to prevent those

19  conversations from taking place, and they can continue after

20  the plan is confirmed. There's simply nothing inherent in

21  Your Honor confirming the plan that would prevent those

22  conversations from occurring or would ultimately prevent

23  parties from pivoting to a deal on the off-chance that one

24  should be reached.

25      So I just wanted to emphasize, Your Honor, again, Your

248

1   Honor is going to rule when Your Honor rules, but the

2   Committee would urge you to rule, and certainly the idea that

3   there may or may not be discussions with Mr. Dondero should

4   not at all in any way lead you to the conclusion that you

5   shouldn't rule or that those conversations cannot continue

6   after plan confirmation.

7       Thank you, Your Honor.  Unless you have questions for me.

8   And my apologies with the technology.

9           THE COURT:  No problem.  All right.  Here's what I'm

10  going to do.  We can see you now, Mr. Clemente.

11          MR. CLEMENTE:  Oh.  I'm sorry, Your Honor.  I

12  switched to another camera again because it wasn't working.

13  So, I apologize.

14          THE COURT:  All right.  I am going to call you back

15  Monday.  What day of the week will that be?  Is that -- I

16  mean, Monday, what date, I should say.  That'll be the 8th,

17  right?  I am going to call you back Monday, this coming

18  Monday, February 8th, at 9:30 Central time, and I am going to

19  give you my ruling.  It will be a detailed oral bench ruling.

20  And I'm not going to leave you hanging on the edge of your

21  seat over the next few days.  I will tell you I'm inclined to

22  confirm this plan.  I think it meets all of the requirements

23  of 1129 and 1123 and 1122.

24      The thing that I am going to spend some time thinking

25  about between now and Monday morning is, no surprise, the

249

1    propriety of the exculpations, the propriety of the plan

2    injunctions, the propriety of the gatekeeper provisions. I

3    certainly am duty-bound to go back and reread *Pacific Lumber*,

4    to go back and read *Thru, Inc.*, and to really think hard about

5    what is happening here.

6        So, I'm pretty much down, I think, to just those three

7    issues here. I'll talk to my law clerk. He may remind me of

8    something else that I'm not articulating right now. But I

9    think I'm just down to those issues. Okay? So it's not going

10   to be a mystery very long. We will come back Monday, 9:30.

11   My courtroom deputy will post on the docket the WebEx

12   connection instructions as usual, and we'll go from there.

13   Now, --

14           MR. POMERANTZ: Your Honor? Your Honor, this is Jeff

15   Pomerantz. I have a question, and it's going to sound odd

16   coming from someone on the West Coast, but I was wondering if

17   you could do it earlier. And the only reason I say that is,

18   the night before, I have to call in to see if I'm on jury duty

19   on Monday, and it would be helpful to me -- I assume your

20   reading the ruling would be within a half hour, 45 minutes.

21   That if you started at 9:00, if that was possible, I could

22   then get in a car, and if I'm actually called to jury duty, I

23   can get there. Of course, I don't know if I will be called,

24   but I'd hate to miss it.

25           THE COURT: Okay. Well, I don't want to make you

250

1    miss jury duty.  Okay.  We will do 9:00 o'clock.

2            MR. POMERANTZ:  Thank you, Your Honor.

3            THE COURT:  Hopefully no one will be, you know, hung

4    over from watching the Super Bowl.  Personally, I don't like

5    Tom Brady, so I may be boycotting the Super Bowl.  But maybe

6    I'll watch it.  Maybe I'll -- I'll watch it.  So we'll do it

7    9:00 o'clock.  So 9:00 o'clock next Monday.

8        Now, let's talk about next the currently-set hearing this

9    Friday, February 5th, on the injunction and contempt of court

10   motion as to Mr. Dondero and the other entities.  I want to

11   continue that, and here is what I am struggling with.  The

12   only day I have next week is Friday, the 12th, and I would

13   rather not use that date because I'm pretty jam-packed Monday

14   through Thursday, unless stuff has been settled that I haven't

15   become aware of.  So let me ask two things.  First, when is

16   the examiner motion set?  I'm just wondering if there's a

17   block of time we have coming up that --

18           MR. POMERANTZ:  I believe that's March 2nd, Your

19   Honor, so that's not for another month.

20           THE COURT:  Oh, that's not for another month?  All

21   right.

22       Traci, are you on the line?  I want to ask you --

23           THE CLERK:  Yes, I am.

24           THE COURT:  What about the following week?  I know

25   Monday, the 15th, is a federal holiday, but do we have

251

1   availability for -- I fear a full day is going to be needed

2   for continuing this Friday setting.

3          THE CLERK:  Wednesday, February 17th, is available.

4          THE COURT:  We've got all day on Wednesday, February

5   17th?

6          THE CLERK:  Yes.

7          THE COURT:  All right.  What about that?  I think I

8   heard Mr. Rukavina, I think he's the one who threw it out

9   there -- or maybe it was Mr. Taylor; I'm getting mixed up --

10   the possibility that they would agree to a continuation of the

11   preliminary injunction through -- well, I think you said

12   through confirmation.  Until the Court enters a confirmation

13   order.  And if I were to rule and approve confirmation Monday,

14   then we're talking about an order that might be entered sooner

15   than the 17th.  So, do you all have any --

16          MR. RUKAVINA:  Your Honor?

17          THE COURT:  -- mutually-agreeable suggestions?  If

18   not, I'm just going to set it the 12th and I'll, you know, I'm

19   killing myself, but I'll --

20          MR. TAYLOR:  Your Honor?

21          MR. RUKAVINA:  No, Your Honor.  I think Your Honor is

22   wise to do what's she's proposing.  The agreed TRO against my

23   clients expires on the 15th of February.

24          THE COURT:  Uh-huh.

25          MR. RUKAVINA:  We can easily move that back a week or

252

1   a sufficient amount of time so that there's no prejudice by

2   going on the 17th, if that would be acceptable to the Debtor,

3   and then we can just pick a date that's sufficiently after the

4   PI hearing so that there's protection for everyone.

5           THE COURT:  All right.  Mr. Taylor, do you agree?

6           MR. TAYLOR:  Yes, Your Honor.  That is acceptable to

7   Mr. Dondero.

8           THE COURT:  Okay.

9           MR. TAYLOR:  We can also push it back.  Can you hear

10  me?

11          THE COURT:  Yes, I can.  Uh-huh.

12          MR. TAYLOR:  Okay.

13          THE COURT:  All right.

14          MR. POMERANTZ:  I just want to make -- I just want to

15  make sure Mr. Morris, John Morris, is on, since he's taking

16  the lead in those matters.  I don't see his picture.

17          MR. MORRIS:  I am, Jeff, and I appreciate that.  I'm

18  available, Your Honor.  We were supposed to take the

19  depositions of Mr. Leventon and Mr. Ellington tomorrow.  I

20  don't know if their counsel is on the phone.  But given Your

21  Honor's decision to adjourn the hearing from Friday, I would

22  respectfully request at this time that counsel for those two

23  individuals work with me to find a date next week in order to

24  take those depositions.

25          THE COURT:  All right.  That's --

253

1          MS. DANDENEAU:  Debra Dandeneau from --

2          THE COURT:  Go ahead.

3          MS. DANDENEAU:  This is Debra Dandeneau from Baker

4   McKenzie.  We agree, and we're happy to work with you on a

5   rescheduled time.

6          MR. MORRIS:  Thank you very much.

7          THE COURT: All right.  All right.  So, someone had

8   filed a motion to continue Friday's hearing.  I think it was

9   your firm, Mr. Taylor.  I already had a motion pending for a

10  few days now.  So I'm going to direct you to upload an order,

11  Mr. Taylor, or someone at your firm, continuing the hearing to

12  the 17th at 9:30, with language in there that your -- the

13  injunction is continuing at least through that date.  And,

14  again, it's a continuance of the motion for contempt as well

15  as the setting on the preliminary injunction.  And, of course,

16  run that by Mr. Morris and Mr. Rukavina.

17         MR. TAYLOR:  Sure.  Your Honor, this is -- I'm not

18  handling the injunction hearing, or at least I don't think I

19  am.  But just so that I'm clear, should maybe the injunction

20  continue through the next day or something, so depending on

21  how Your Honor rules, there's not a rush to try and get an

22  order to you?

23         MR. RUKAVINA:  Your Honor, I think that Mr. Morris

24  and I can work this out.  Mr. Taylor is not involved in that

25  adversary, that's true, but Mr. Morris and I will be able to

254

1  very quickly enter a proposed agreed order that extends that

2  TRO for some period of time.

3          THE COURT:  Okay.

4          MR. RUKAVINA:  I'm not going to be difficult.

5          THE COURT:  Okay.  So we'll shift to you and Mr.

6  Morris to be the scriveners.  I just -- I suggested that

7  because I thought there was a motion to link the order to that

8  had been filed by Bonds Ellis.  I may be --

9          MR. MORRIS:  There was, Your Honor.  There was an

10 emergency motion to continue.  We filed an opposition, and

11 Your Honor has not yet ruled on that motion.  You're exactly

12 right.

13         THE COURT:  Okay.  All right.

14         MR. TAYLOR:  Your Honor, this is Clay Taylor.  I will

15 make sure the right people confer with Davor and John, and

16 we'll get -- we'll link it to that motion, because that makes

17 sense, to have something to link it to.

18         THE COURT:  Okay.  Yes.  And it can be a two-

19 paragraph order, I would think.

20     All right.  And then so I'm going to see you Monday at

21 9:00 o'clock Central time with the ruling.

22     Please, don't anyone file anymore paper.  I threw that out

23 earlier today.  I've got all the paper I need.  And I will see

24 you Monday at 9:00 o'clock.  Okay?  We're adjourned.

25         MR. POMERANTZ:  Thank you, Your Honor.

255

1          THE CLERK:  All rise.

2          MR. MORRIS:  Thank you, Your Honor.

3      (Proceedings concluded at 4:34 p.m.)

4                      --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                    **02/05/2021**

24   _____    _____
   Kathy Rehling, CETD-444                    Date
25   Certified Electronic Court Transcriber

256

INDEX

1

2       PROCEEDINGS                                              4

3       WITNESSES

4       Debtor's Witnesses

5       Marc Tauber
        - Direct Examination by Mr. Morris                      25
6       - Cross-Examination by Mr. Rukavina                     34
        - Cross-Examination by Mr. Taylor                       36
7       - Redirect Examination by Mr. Morris                    41

8       Certain Funds and Advisors' Witnesses

9       James P. Seery
        - Direct Examination by Mr. Rukavina                    45
10      - Cross-Examination by Mr. Morris                       49
        - Redirect Examination by Mr. Rukavina                 50
11
        Robert Jason Post
12      - Direct Examination by Mr. Rukavina                    51
        - Cross-Examination by Mr. Morris                       56
13      - Redirect Examination by Mr. Rukavina                 62
        - Recross-Examination by Mr. Morris                     63
14

15      EXHIBITS

16      Debtor's Docket 1887 - Leatham Declaration    Received   6
        Debtor's Exhibit B, Docket 1822                Received   8
17      Debtor's Exhibit 6R, Docket Entry 1822        Received   9
        Debtor's Exhibits 6S and 6T, Docket Entry 1822  Received  12
18      Debtor's Exhibit 6U, Docket Entry 1822        Received  13
        Debtor's Exhibits D and E, Docket Entry 1822  Received  15
19      Debtor's Exhibits 4D, 4E, and 4G, Docket 1822  Received  17
        Debtor's Exhibit 5T, Docket 1822              Withdrawn 17
20      Debtor's Exhibit 10A                          Received  22
        Debtor's Omnibus Reply to Plan Objections,    Received  23
21        Docket 1807
        Debtor's Exhibit 7O (Abridged)                Received  44
22

23      Certain Funds and Advisors' Exhibit 2,        Received  53
          Docket Entry 1863
24
        Dondero's Exhibits 6 through 12 and           Received  66
25        15 through 17

**APP. 2696**
**Appx. 02743**

257

```
 1                              INDEX
                               Page 2
 2
 3   EXHIBITS, cont'd.

 4   Judicial Notice to be Taken of Docket 1887,           6
         Patrick Leatham Declaration
 5
     Judicial Notice to be Taken of Docket 247,           45
 6       Schedules

 7   CLOSING ARGUMENTS

 8   - By Mr. Pomerantz                                   73
     - By Mr. Kharasch                                   151
 9   - By Mr. Clemente                                   154
     - By Mr. Draper                                     159
10   - By Mr. Rukavina                                   184
     - By Mr. Taylor                                     208
11   - By Mr. Pomerantz                                  227
     - By Mr. Clemente                                   246
12
13   RULINGS

14   Confirmation Hearing [1808] - *Taken Under Advisement*   248

15   Agreed Motion to (1) Assume Non-Residential Real Property   248
     Lease with Crescent TC Investors, LP upon Confirmation of
16   Plan and (II) Extend Assumption Deadline [1624] - *Taken
     Under Advisement*
17
18   END OF PROCEEDINGS                                  255

19   INDEX                                           256-257

20

21

22

23

24

25
```

# EXHIBIT 27

**EXHIBIT 2**

### Holdings of Preference Shares[1] in CLOs

| CLO | HIF | NSOF | NC | Total |
|---|---|---|---|---|
| Aberdeen | 0% | 30.21% | 0% | **30.21%** |
| Brentwood | 0% | 40.06% | 0% | **40.06%** |
| Eastland | 31.16% | 10.53% | 0% | **41.69%** |
| Gleneagles | 9.74% | 8.52% | 0% | **18.26%** |
| Grayson | 49.10% | 10.75% | 0.63% | **60.48%** |
| Greenbriar | 0% | 53.44% | 0% | **53.44%** |
| Jasper | 0% | 17.86% | 0% | **17.86%** |
| Liberty | 0% | 10.64% | 0% | **10.64%** |
| Red River | 0% | 10.49% | 0% | **10.49%** |
| Rockwall | 6.14% | 19.57% | 0% | **25.71%** |
| Rockwall II | 14.56% | 5.65% | 0% | **20.21%** |
| Southfork | 0% | 7.30% | 0% | **7.30%** |
| Stratford | 0% | 69.05% | 0% | **69.05%** |
| Loan Funding VII (aka Valhalla) | 0% | 1.83% | 0% | **1.83%** |
| Westchester | 0% | 44.38% | 0% | **44.38%** |

---

[1] Class E Certificates for Liberty CLO, Ltd.

308354413 v10

## Applications and Motions[1] filed in In re: Highland Capital Management, L.P., Case No.19-bk-34054

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 01/09/20 20 | 340 | Application to employ Hayward & Associates PLLC as Attorney | No Response | Granted by Dkt. 435 |
| | 281 | Motion to compromise controversy with Official Committee of Unsecured Creditors, filed by Debtor Highland Capital Management, L.P.) | No Response | Granted by Dkt. 339 |
| 01/13/20 20 | 351 | Motion to extend time to (Debtor's Motion for Entry of an Order Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure) | No Response | Granted by Dkt. 459 |
| 01/15/20 20 | 359 | Agreed Motion to continue hearing on (related documents 218 Motion for relief from stay) | No Response | Granted by Dkt. 361 |
| 01/17/20 20 | 370 | Joint Motion for Continuance of Hearing on (i) Debtor's Application for an Order Authorizing the Employment of Foley Gardere, Foley & Lardner LLP as Special Texas Counsel, Nunc Pro Tunc to the Petition Date, and (ii) Debtor's Application for an Order Authorizing the Retention and Employment of Lynn Pinker Cox & Hurst LLP as Special Texas Litigation Counsel, Nunc Pro Tunc to the Petition Date) Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 371 |
| 01/23/20 20 | 389 | First and Final Application for Compensation and Reimbursement of Expenses on behalf of Young Conaway Stargatt & Taylor, LLP as Co-Counsel for Official Committee of Unsecured Creditors, Creditor Comm. | No Response | Granted by Dkt. 458 |
| 01/24/20 20 | 395 | –Motion to extend or limit the exclusivity period Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 460 |
| | 396 | –Motion for expedited hearing on Exclusivity Motion | No Response | |
| | 397 | –Motion to enforce (Motion of the Debtor for the Entry of an Order Concerning the "Sealing Motion" and for a Conference Concerning the Substance, Scope and Intent of Certain Recent Rulings) (related document(s): | No Response | Granted by Dkt. 410 |

---

[1] Motions for Pro Hac Vice admission and motions to seal have been excluded. Effort was made to include all other substantive motions and applications.

APP. 2700
Appx. 02747

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 01/31/20 20 | 419 | – Agreed Motion to Extend by One Hundred Twenty Days the Deadline to Assume or Reject Unexpired Nonresidential Real Property Lease) Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 429 |
| | 421 | – *Debtor's Motion for an Order (i) Establishing Bar Dates for Filing Claims, Including 503(b)(9) Claims; and (ii) Approving the Form and Manner of Notice Thereof)* Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 488 |
| | 422 | -Motion for expedited hearing | No Response | Granted by Dkt. 427 |
| 02/14/20 20 | 451 | Motion for relief from stay  Filed by Jennifer G. Terry, Joshua Terry | No Response | Granted by Dkt. 519 |
| 02/24/20 20 | 474 | – *Motion of the Debtor for Entry of an Order Authorizing, but Not Directing, the Debtor to Cause Distributions to Certain "Related Entities")* Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 477 |
| | 475 | -Motion for expedited hearing | | |
| 02/27/20 20 | 483 | Application to employ Deloitte Tax LLP as Other Professional Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 551 |
| 03/23/20 20 | 545 | -Motion to extend time to file objection (Agreed Motion) (RE: related document(s)483 Application to employ) Filed by Creditor Committee Official Committee of Unsecured Creditors | No Response | Granted by Dkt. 548 |
| 03/31/20 20 | 557 | Motion to extend time to (Debtor's Emergency Motion for an Order Extending Bar Date Deadline for Employees to File Claims) (RE: related document(s)488 Order on motion for leave) Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 560 |
| 04/07/20 20 | 569 | -Application for compensation *Sidley Austin LLP's First Interim Application for Compensation and Reimbursement of Expenses for Official Committee of Unsecured Creditors, Creditor Comm. Atty, Period: 10/29/2019 to 2/29/2020* | No Response | Granted by Dkt. 661 (Amended) Granted by Dkt. 666 |
| | 570 | -Application for compensation *First Interim Application for Compensation and Reimbursement of Expenses for FTI* | No Response | Granted by Dkt. 662 (Amended) Granted by Dkt. 665 |

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | Consulting, Inc., Financial Advisor, Period: 10/29/2019 to 2/29/2020 | | |
| 04/13/20 20 | 582 | Motion for relief from stay - agreed Filed by Interested Party Hunton Andrews Kurth LLP | No Response | **Granted by Dkt. 623** |
| 04/15/20 20 | 590 | Motion to reclaim funds from the registry *(Motion for Remittance of Funds Held in Registry of Court)* Filed by Creditor CLO Holdco, Ltd. | No Response | **Denied by Dkt. 825** |
| 04/17/20 20 | 593 | Motion for relief from stay Filed by Acis Capital Management GP, LLC, Acis Capital Management, L.P. Objections due by 5/1/2020. | 617 Response unopposed to motion filed by Interested Party James Dondero. (05/01/2020) | **Granted by Dkt. 764** |
| 04/28/20 20 | 602 | *- First Interim Application for Compensation of Foley & Lardner LLP as Special Texas Counsel to the Debtor for the Period from October 16, 2019 through March 31, 2020* for Foley Gardere, Foley & Lardner LLP, Special Counsel, | No Response | **Granted by Dkt. 670** |
| | 604 | -Application to employ Hunton Andrews Kurth LLP as Special Counsel | No Response | **Granted by Dkt. 763** |
| | 605 | -Application to employ Wilmer Cutler Pickering Hale and Dorr LLP as Special Counsel ( | No Response | **Granted by Dkt. 669** |
| | 606 | -Motion to extend or limit the exclusivity period (RE: related document(s)460 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. Objections due by 5/22/2020. | No Response | **Granted by Dkt. 668** |
| | 607 | *- First Interim Application for Compensation and Reimbursement of Expenses of Pachulski Stang Ziehl & Jones LLP, as Counsel for the Debtor and Debtor in Possession, for the Period From October 16, 2019 Through March 31, 2020* | No Response | **Granted by Dkt. 663** |
| | 608 | *- First Interim Application for Compensation and Reimbursement of Expenses of Mercer (US) Inc., as Compensation Consultant to the Debtor for the Period From November 15, 2019 Through February 29, 2020* for Mercer (US) Inc., Consultant, | No Response | **Granted by Dkt. 664** |
| | 609 | -Application for compensation *(Hayward & Associates PLLC's First Interim Application for Compensation and Reimbursement of* | No Response | **Granted by Dkt. 667** |

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21    Entered 03/18/21 20:59:39    Page 2706 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | *Expenses for the Period from December 10, 2019 through March 31, 2020) for Hayward & Associates PLLC, Debtor's Attorney, Period: 12/10/2019 to 3/31/2020* | | |
| 04/29/20 20 | 615 | Motion to extend time to Assume or Reject Unexpired Nonresidential Real Property Lease (RE: related document(s)429 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 616 |
| 05/20/20 20 | 644 | Motion for relief from stay (UBS's Motion for Relief From the Automatic Stay to Proceed With State Court Action) Fee amount $181, Filed by Interested Parties UBS AG London Branch, UBS Securities LLC Objections due by 6/3/2020. | No Response | Denied by Dkt. 765 |
| 06/11/20 20 | 733 | –Motion for leave to File an Omnibus Reply to Objections to UBS's Motion for Relief from the Automatic Stay to Proceed With State Court Filed by Interested Parties UBS AG London Branch, UBS Securities LLC Objections due by 7/2/2020. | No Response | Granted by Dkt. 910 |
| 06/12/20 20 | 737 | Motion to extend or limit the exclusivity period Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 820 |
| 06/15/20 20 | 747 | Motion to extend time to (Debtor's Motion for Entry of an Order Further Extending the Period Within Which It May Remove Actions Pursuant to 28 U.S. C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure) (RE: related document(s)459 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 816 |
| 06/23/20 20 | 774 | –Application to employ James P. Seery, Jr. as Other Professional Debtors Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc to March 15, 2020 Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 854 |
| 06/23/20 20 | 775 | –Application to employ Development Specialists, Inc. as Other Professional Amended Motion of the Debtor Pursuant to 11 U.S.C. §§ 105(a) and 363(b) to Employ and Retain Development Specialists, Inc. to Provide Financial Advisory and Restructuring-Related Services, Nunc Pro Tunc to March 15, 2020 Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 853 |

APP. 2703
Appx. 02750

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 07/08/20 20 | 808 | Motion to compel Production by the Debtor. Filed by Creditor Committee Official Committee of Unsecured Creditors Objections due by 7/29/2020. | -832 Response opposed to (related document(s): 808 Moti on to compel Production by the Debtor. filed by Creditor Committee Official Committee of Unsecured Creditors) filed by Interested Party James Dondero. (07/14/2020) | **Dkt. 942**<br><br>The Discovery Motions are GRANTED to the extent specifically set forth herein and are otherwise DENIED. Except to the extent specifically set forth herein, the Objections are OVERRULED |
| 07/09/20 20 | 810 | -Motion for protective order (*Debtor's Motion for Entry of (i) a Protective Order, or, in the Alternative, (ii) an Order Directing the Debtor to Comply with Certain Discovery Demands Tendered by the Official Committee of Unsecured Creditors Pursuant to Federal Rules of Bankruptcy Procedure 7026 and 7034*) Filed by Debtor Highland Capital Management, L.P. | No Response | **Dkt. 942**<br><br>The Discovery Motions are GRANTED to the extent specifically set forth herein and are otherwise DENIED. Except to the extent specifically set forth herein, the Objections are OVERRULED |
| | 814 | -Motion for expedited hearing (related documents 808 Motion to compel) Filed by Creditor Committee Official Committee of Unsecured Creditors | | |
| 07/13/20 20 | | Proof of Claim 23 filed by Acis Capital Management, LP and Acis Capital Management GP, LLC | 827- Objection to Acis Claim Filed by Interested Party James Dondero. | N/A |
| 07/14/20 20 | 831 | -Application for compensation *Sidley Austin LLP's Second Interim Application for Compensation and Reimbursement of Expenses for Official Committee of Unsecured Creditors, Creditor Comm. Atty, Period: 3/1/2020 to 5/31/2020* | No Response | **Granted by Dkt. 1048** |
| 07/21/20 20 | 883 | Application for compensation *Second Interim Application for Compensation and Reimbursement of Expenses for FTI Consulting, Inc., Financial Advisor, Period: 3/1/2020 to 5/31/2020* | No Response | **Granted by Dkt. 1051** |
| 07/22/20 20 | 886 | -Motion to extend time to assume or reject unexpired nonresidential real property lease Filed by Debtor Highland Capital Management, L.P. | No Response | **Granted by Dkt. 909** |

APP. 2704
Appx. 02751

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2708 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 08/03/20 | 914 | -Motion for leave [CLO Holdco, Ltd.'s Motion for Clarification of Ruling] Filed by Creditor CLO Holdco, Ltd. | No Response | Resolved by Dkt. 935 |
| 08/06/20 | 924 | - Second Interim Application for Compensation and for Reimbursement of Expenses of Foley & Lardner LLP as Special Texas Counsel to the Debtor for the Period from April, 2020 through July 31, 2020 | No Response | Granted by Dkt. 1045 |
| 08/12/20 | 944 | Chapter 11 plan filed by Debtor Highland Capital Management, L.P. | No Response | |
| | 945 | -Disclosure statement filed by Debtor Highland Capital Management, L.P. | | |
| 08/13/20 | 947 | - Joint Motion to continue hearing on (related documents 771 Objection to claim) (Joint Motion to Continue Status Conference] Filed by Debtor Highland Capital Management, L.P. (Annable, Zachery) | No Response | Granted by Dkt. 951 |
| | 949 | - Motion to extend or limit the exclusivity period (RE: related document(s)920 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P. (Attachments: # 1 Exhibit A--Proposed Order) (Annable, Zachery) | No Response | Granted by Dkt. 1092 |
| 08/18/20 | 964 | Hayward & Associates PLLC's Second Interim Application for Compensation and Reimbursement of Expenses for the Period from April 1, 2020 through June 30, 2020 | No Response | Granted by Dkt. 1047 |
| 08/19/20 | 971 | - Second Interim Application for Compensation and for Reimbursement of Expenses of Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtor and Debtor in Possession for the Period from April 1, 2020 through July 31, 2020 | No Response | Granted by Dkt. 1043 |
| | 972 | - Second Interim Application for Compensation and for Reimbursement of Expenses of Mercer (US) Inc. as Compensation Consultant for the Debtor for the Period from March 1, 2020 through May 31, 2020 for Mercer (US) Inc., Consultant | No Response | Granted by Dkt. 1046 |
| | 975 | - Consolidated Monthly and First Interim Application of Wilmer Cutler Pickering Hale and Dorr LLP for Allowance of Compensation for Services Rendered and Reimbursement of | No Response | Granted by Dkt. 1044 |

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | *Expenses as Regulatory and Compliance Counsel for the Period November 1, 2019 through June 30, 2020* | | |
| 09/04/2020 | 1025 | Motion to compromise controversy with Carey International, Inc. Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 1123 |
| 09/16/2020 | 1214 | Motion for partial summary judgment on proof of claim(s) 190 and 191 of UBS Securities LLC and UBS AG, London Branch filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 1526 |
| 09/23/2020 | 1087 | –Motion to compromise controversy with (A) Acis Capital Management, L.P. and Acis Capital Management GP LLC (Claim No. 23), (B) Joshua N. Terry and Jennifer G. Terry (Claim No. 156), and (C) Acis Capital Management, L.P. . (Claim No. 159), Filed by Debtor Highland Capital Management, L.P. | –1121 Response opposed to Acis 9019 Motion filed by Interested Party James Dondero. (10/05/2020) | Granted by Dkt. 1302 |
| | 1089 | –Motion to compromise controversy with (a) the Redeemer Committee of the Highland Crusader Fund (Claim No. 72), and (b) the Highland Crusader Funds (Claim No. 81). Filed by Debtor Highland Capital Management, L.P. Objections due by 10/19/2020. | No Response | Granted by Dkt. 1273 |
| 09/24/2020 | 1099 | Motion for relief from stay - *Daugherty's Motion to Confirm Status of Automatic Stay, or alternatively to Modify Automatic Stay Fee amount* $181, Filed by Creditor Patrick Daugherty Objections due by 10/8/2020. | No Response | Granted by Dkt. 1327 |
| 09/28/2020 | 1108 | Motion to Approve Disclosure Statement Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 1476 |
| 10/02/2020 | 1118 | – Motion to extend time to Assume or Reject Unexpired Nonresidential Real Property Lease Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 1122 |
| | 1119 | –Motion to extend time to Deadline To File An Adversary Proceeding Against CLO Holdco, Ltd. (EMERGENCY) Filed by Creditor Committee Official Committee of Unsecured Creditors | No Response | Granted by Dkt. 1168 |
| | 1120 | | No Response | |

APP. 2706
Appx. 02753

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | -Motion for expedited hearing (related documents 1119) Motion to extend/shorten time) Filed by Creditor Committee Official Committee of Unsecured Creditors | | |
| 10/09/20 20 | 1154 | -Motion for leave to *Amend Certain Proofs of Claim* Filed by Creditor The Dugaboy Investment Trust Objections due by 10/30/2020. | No Response | N/A |
| 10/16/20 20 | 1179 | Omnibus Objection to claim(s) of Creditor(s) Crescent Research; Hedgeye Risk Management, LLC; James D. Dondero; NexVest, LLC; James D. Dondero.. Filed by Debtor Highland Capital Management, L.P. Responses due by 11/18/2020. | 1502 Stipulation by James Dondero and Highland Capital Management, L.P.. filed by Interested Party James Dondero (RE: related document(s)1179 Obj ection to claim). (12/03/2020) | Dkt. 1537 |
| 10/18/20 20 | 1207 | Motion to allow claims of *HarbourVest Pursuant to Rule 3018(A) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* Filed by Creditor HarbourVest et al Objections due by 11/9/2020. | No Response | |
| 10/16/20 20 | 1215 | -Redeemer Committee of the Highland Crusander Fund and the Crusader Funds Motion for partial summary judgment on proof of claim(s) 190 and 191 of UBS AG, London Branch and UBS Securities LLC filed by Interested Party Redeemer Committee of the Highland Crusader Fun and the Crusader's Funds' | No Response | Resolved by Dkt. 1526 |
| 10/20/20 20 | 1244 | - *Third Interim Application for Compensation and Reimbursement of Expenses for FTI Consulting, Inc.*, Financial Advisor, Period: 6/1/2020 to 8/31/2020. | No Response | Granted by Dkt. 1685 |
| 10/21/20 20 | 1263 | Emergency Motion to continue hearing on (related documents 1080 Disclosure statement) Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 1266 |
| 10/23/20 20 | 1281 | -Motion for leave - *Daugherty's Motion for Temporary Allowance of Claim for Voting Purposes Pursuant to Bankruptcy Rule 3018* Filed by Creditor Patrick Daugherty | No Response | Granted by Dkt. 1474 |

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2711 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 10/25/20 20 | 1289 | Amended disclosure statement filed by Debtor Highland Capital Management, L.P. (RE: related document(s)1945 Disclosure statement, 1080 Disclosure statement). | **No Response** | N/A |
| 10/27/20 20 | 1296 | Application for compensation *Sidley Austin LLP's Third Interim Application for Compensation and Reimbursement of Expenses for Official Committee of Unsecured Creditors, Creditor Comm. Aty, Period: 6/1/2020 to 8/31/2020,* | **No Response** | **Granted by Dkt. 1684** |
| 11/06/20 20 | 1338 | *Motion for Temporary Allowance of Claims for voting Purposes Pursuant to Federal Rule of Bankruptcy Procedure 3018)* Filed by Interested Parties UBS AG London Branch, UBS Securities LLC | **No Response** | **Granted by Dkt. 1518** |
| 11/09/20 20 | 1348 | Motion to continue hearing on (related documents 1207 Motion to allow claims) Filed by Creditor HarbourVest et al | **No Response** | **Granted by Dkt. 1352** |
| 11/13/20 20 | 1384 | Amended disclosure statement filed by Debtor Highland Capital Management, L.P. (RE: related document(s)1945 Disclosure statement, 1080 Disclosure statement). | **No Response** | N/A |
| 11/18/20 20 | 1424 | - Motion for leave *(Motion of the Debtor Pursuant to 11 U.S.C. 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements)* Filed by Debtor Highland Capital Management, L.P. | 1447 WITHDRAWN per # 1460 Response opposed to (related document(s): 1424 Mo tion for leave *(Motion of the Debtor Pursuant to 11 U.S.C. 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreements)* filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. **(11/20/2020)** | **Granted by Dkt. 1436 & 1475** |
| | 1425 | - Motion for expedited hearing (related documents 1424 Motion for leave) *(Debtor's Motion for an Expedited Hearing on the Motion of the Debtor Pursuant to 11 U.S.C. 105(a) and 363(b) for Authority to Enter into Sub-Servicer Agreement)* Filed by Debtor Highland Capital Management, L.P. | | **Granted by Dkt. 1436** |
| 11/19/20 20 | 1439 | - WITHDRAWN per docket # 1622 Motion for leave *(James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the* | N/A | Withdrawn by Dondero by Dkt. 1622 |

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2712 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | | *Ordinary Course of Business)* Filed by Interested Party James Dondero | | |
| | 1443 | - Motion for expedited hearing(related documents 1439 Motion for leave) (Request for Emergency Hearing on James Dondero's Motion for Entry of an Order Requiring Notice and Hearing for Future Estate Transactions Occurring Outside the Ordinary Course of Business) Filed by Interested Party James Dondero | | **Denied by Bankruptcy Court on the Record during hearing on November 23, 2020** |
| 11/25/20 20 | 1483 | *Third and Final Application for Compensation and Reimbursement of Expenses of Foley & Lardner LLP as Special Texas Counsel to the Debtor for the Period from October 16, 2019 through October 31, 2020* | No Response | Granted by Dkt. 1691 |
| 11/30/20 20 | 1491 | Motion for relief from stay Filed by Creditor Patrick Daugherty | No Response | Denied by Dkt. 1612 |
| 12/08/20 20 | 1528 | Motion for order imposing temporary restrictions on Debtor's ability, as portfolio manager, to initiate sales by non-debtor CLO Vehicles. Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund. | No Response | Denied by Dkt. 1605 |
| 12/09/20 20 | 1530 | Motion to extend time to Time to File An Adversary Proceeding Against CLO Holdco, Ltd. (Agreed) (RE: related document(s)1168 Order (generic)) Filed by Creditor Committee Official Committee of Unsecured Creditors Objections due by 12/30/2020. | No Response | Granted by Dkt. 1534 |
| 12/11/20 20 | 1544 | -Application for compensation (First Interim Application) for Hunton Andrews Kurth LLP, Special Counsel | No Response | Granted by Dkt. 1686 |
| | 1545 | - (Hayward & Associates PLLC's Third Interim Application for Compensation and Reimbursement of Expenses for the Period from July 1, 2020 through September 30, 2020) for Hayward & Associates PLLC, Debtor's Attorney | No Response | Granted by Dkt. 1728 |
| | 1547 | - Third Interim Application for Compensation and for Reimbursement of Expenses of Pachulski Stang Ziehl & Jones LLP as Counsel for the Debtor and Debtor in Possession for the Period from August 1, 2020 through November 30, 2020 | No Response | Granted by Dkt. 1687 |
| | | - Consolidated Monthly and Second Interim Application of Wilmer Cutler Pickering Hale and Dorr LLP for Allowance of | No Response | Granted by Dkt. 1715 |

APP. 2709
Appx. 02756

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| | 1552 | *Compensation for Services Rendered and Reimbursement of Expenses as Regulatory and Compliance Counsel for the Period from July 1, 2020 through November 30, 2020)* | | |
| 12/14/20 20 | 1564 | -Motion to quash *(Debtor's Emergency Motion to Quash Subpoena and for Entry of a Protective Order or, in the Alternative, for an Adjournment)* Filed by Debtor Highland Capital Management, L.P. | 1571  Objection to Motion to Quash filed by Interested Party James Dondero, . (12/14/2020) | Resolved by Dkt. 1603 |
| | 1565 | - Motion for protective order *(Debtor's Emergency Motion to Quash Subpoena and for Entry of a Protective Order or, in the Alternative, for an Adjournment)* Filed by Debtor Highland Capital Management, L.P. | | Resolved by Dkt. 1603 |
| 12/16/20 20 | 1583 | -Motion to extend time to Remove Actions Pursuant to 28 U.S.C. 1452 and Rule 9027 of the Federal Rules of Bankruptcy Procedure (RE: related document(s)1816 Order on motion to extend/shorten time) Filed by Debtor Highland Capital Management, L.P | No Response | Granted by Dkt. 1725 |
| 12/17/20 20 | 1590 | Motion to pay *(Debtor's Motion Pursuant to the Protocols for Authority for Highland Multi Strategy Credit Fund, L.P. to Prepay Loan)* Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 1746 |
| 12/23/20 20 | 1623 | -- Motion to extend time to assume unexpired nonresidential real property lease Filed by Debtor Highland Capital Management, L.P. | No Response | Granted by Dkt. 1636 |
| | 1625 | -Motion to compromise controversy with HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. Filed by Debtor Highland Capital Management, L.P. | 1697  Objection to HarbourVest 9019 Motion filed by Interested Party James Dondero (01/06/2021) | Granted by Dkt. 1788 |
| 12/31/20 20 | 1649 | Joint Motion to continue hearing on (related documents 1207 Motion to allow claims) Filed by Creditor HarbourVest et al | No Response | Granted by Dkt. 1652 |

APP. 2710
Appx. 02757

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2714 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 01/04/20 21 | 1655 | Application for compensation *Fourth Interim Application for Compensation and Reimbursement of Expenses for FTI Consulting, Inc.,* Financial Advisor, Period: 9/1/2020 to 11/30/2020, Fee: $710,280.45, Expenses: $1,479.47. Filed by Attorney Juliana Hoffman Objections due by 1/25/2021. | **No Response** | N/A |
| 01/11/20 21 | 1719 | Notice *(Second Notice of (I) Executory Contracts and Unexpired Leases to Be Assumed by the Debtor Pursuant to the Fifth Amended Plan, (II) Cure Amounts, If Any, and (III) Related Procedures in Connection Therewith)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s)1606 Support/supplemental document *(Debtor's Notice of Filing of Plan Supplement to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.)* filed by Debtor Highland Capital Management, L.P. (RE: related document(s)1472 Chapter 11 plan). | 1784 WITHDRAWN PER # 1876. Objection to (related document(s): 1719 No tice (generic) filed by Debtor Highland Capital Management, L.P.) filed by Interested Party James Dondero. **(01/20/2021)** | N/A |
| 01/14/20 21 | 1745 | Motion to appoint trustee *Motion to Appoint Examiner Pursuant to 11 U.S.C. § 1104(c)* Filed by Get Good Trust, The Dugaboy Investment Trust | 1756 Joinder by filed by Interested Party James Dondero **(01/15/2021)** | **Denied by Dkt. 1960** |
| 01/19/20 21 | 1777 | Motion *of the Debtor for Entry of an Order Authorizing the Debtor to Implement a Key Employee Retention Plan with Non-Insider Employees and Granting Related Relief)* Filed by Debtor Highland Capital Management, L.P. | **No Response** | **Granted by Dkt. 1849** |
| 01/27/20 21 | 1853 | *Sidley Austin LLP's Fourth Interim Application for Compensation and Reimbursement of Expenses for Official Committee of Unsecured Creditors,* Creditor Comm. Atty, Period: 9/1/2020 to 11/30/2020. | **No Response** | N/A |
| 02/01/20 21 | 1878 | Motion to compel an Order Requiring James D. Dondero to Preserve Documents and to Identify Measures Taken to Ensure Document Preservation. Filed by Creditor Committee Official Committee of Unsecured Creditors | 1969 Objection to UCC's Preservation Motion filed by Interested Party James Dondero. **(03/03/2021)** | N/A |
| 02/08/20 21 | 1914 | Motion for leave *(Motion for Status Conference)* Filed by Interested Party James Dondero | N/A | **Denied by Dkt. 1929** |

APP. 2711
Appx. 02758

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21   Entered 03/18/21 20:59:39   Page 2715 of 2722

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 02/28/2021 | **1955** | Motion to stay pending appeal (related documents 1943 Order confirming chapter 11 plan) Filed by Interested Parties Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. | **No Response** | **N/A** |
| 03/01/2021 | **1958** | Motion for expedited hearing (related documents 1955 Motion to stay pending appeal) Filed by Interested Parties Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P. | **No Response** | **N/A** |
| 03/03/2021 | **1967** | Motion to stay pending appeal (related documents 1943 Order confirming chapter 11 plan) Filed by Interested Parties Highland Global Allocation Fund, Highland Income Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund (Hogewood, A.) | **No Response** | **N/A** |
| 03/04/2021 | **11973** | -Joinder by filed by Interested Party James Dondero (RE: related document(s)1955 Motion to stay pending appeal (related documents 1943 Order confirming chapter 11 plan)) | **N/A** | **N/A** |

APP. 2712
Appx. 02759

Case 19-34054-sgj11 Doc 2062 Filed 03/18/21 Entered 03/18/21 20:59:39 Page 2716 of 2723

**EXHIBIT 29**

## Highland Capital Management, L.P. v. Dondero 20-03190-sgj

| FILING DATE | DOCKET NO. | DOCUMENT | DONDERO'S RESPONSE | DISPOSITION OF MOTION/APPLICATION |
|---|---|---|---|---|
| 12/07/2020 | 2 | - Motion for preliminary injunction (Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero) filed by Plaintiff Highland Capital Management, L.P. | **52** Response opposed to (related document(s); **2** Motion for preliminary injunction (Plaintiff Highland Capital Management, L.P.'s Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero) filed by Plaintiff Highland Capital Management, L.P.) filed by Defendant James D. Dondero. **(01/07/2021)** | **Granted by Dkt. 59** |
| | 5 | - Motion for expedited hearing/related document; **2** Motion for preliminary injunction (Plaintiff Highland Capital Management, L.P.'s Motion for Expedited Hearing on Its Emergency Motion for a Temporary Restraining Order and Preliminary Injunction against Mr. James Dondero) filed by Plaintiff Highland Capital Management, L.P. (Annable, Zachery). Related document(s); **6** Motion for protective order filed by Plaintiff Highland Capital Management, L.P. | No Response | **Granted by Dkt. 9** |
| | 6 | - Motion for temporary restraining order filed by Plaintiff Highland Capital Management, L.P. | | **Granted by Dkt. 10** |
| 12/16/2020 | 24 | WITHDRAWN per # **29** Motion for leave (James Dondero's Emergency Motion to Modify Temporary Restraining Order) (related document(s); **10** Order on motion for protective order) filed by Defendant James D. Dondero | **29** Withdrawal filed by Defendant James D. Dondero (RE: related document(s); **24** Motion for leave (James Dondero's Emergency Motion to Modify Temporary Restraining Order) (related document(s); **10** Order on motion for protective order)). | |
| 12/28/2020 | 32 | Motion for protective order (James Dondero's Emergency Motion for Entry of a Protective Order) filed by Defendant James D. Dondero | **34** Objection to (related document(s); **32** Motion for protective order (James Dondero's Emergency Motion for Entry of a Protective Order) filed by Defendant James D. Dondero) filed by Plaintiff Highland Capital Management, L.P. **(12/28/2020)** | **Denied by Dkt. 38** |
| | 33 | - Motion for expedited hearing/related document; **32** Motion for protective order filed by Defendant James D. Dondero. | No Response | |
| 01/07/2021 | 48 | Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order (Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO) filed by Plaintiff Highland Capital Management, L.P. | **110** Objection to (related document(s); **48** Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order (Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO) filed by Plaintiff Highland Capital Management, L.P.)(James Dondero's Objection and Response to Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause and Brief in Support) filed by Defendant James D. Dondero. **(02/21/2021)** | N/A |
| | 49 | - Brief in support filed by Plaintiff Highland Capital Management, L.P. (RE: related document(s); **48** Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order (Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO)) | | N/A |
| | 51 | - Motion for expedited hearing/related document; **48** Motion for Contempt) filed by Plaintiff Highland Capital Management, L.P. | | N/A |
| 01/13/2021 | 64 | Motion for leave to appeal (related document(s); **59** Order on motion for preliminary injunction, **60** Notice of appeal) filed by Defendant James D. Dondero) filed by Defendant James D. | No Response | **Denied by Dkt. 111** |
| 01/27/2021 | 75 | Emergency Motion to continue hearing on (related documents **48** Motion for Contempt, **49** Brief) filed by Defendant James D. Dondero | **77** Objection to (related document(s); **75** Emergency Motion to continue hearing on (related documents **48** Motion for Contempt, **49** Brief) filed by Defendant James D. Dondero) filed by Plaintiff Highland Capital Management, L.P. **(01/29/2021)** | N/A |
| 02/10/2021 | 95 | Motion to continue hearing on (related documents **48** Motion for Contempt, **49** Brief) filed by Defendant James D. Dondero | No Response | **Granted by Dkt. 97** |
| 02/17/2021 | 102 | Motion to continue hearing on (related documents **48** Motion for Contempt) filed by Plaintiff Highland Capital Management, L.P. | No Response | **Granted by Dkt. 104** |
| 02/20/2021 | 107 | Motion to strike (related document(s); **48** Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order (Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO) filed by Plaintiff Highland Capital Management, L.P.) (James Dondero's Emergency Motion in Limine and to Exclude Evidence and Argument) filed by Defendant James D. Dondero. | **115** Objection to (related document(s); **107** Motion to strike (related document(s); **48** Motion for contempt against James Dondero regarding Violation of the Temporary Restraining Order (Plaintiff's Motion for an Order Requiring Mr. James Dondero to Show Cause Why He Should Not Be Held in Civil Contempt for Violating the TRO) filed by Plaintiff Highland Capital Management, L.P. **(02/24/2021)** | N/A |
| | 108 | - Motion for expedited hearing/related documents; **107** Motion to strike document) filed by Defendant James D. Dondero | | N/A |
| 03/02/2021 | 119 | Motion to continue hearing on (related documents; **48** Motion for Contempt) filed by Plaintiff Highland Capital Management, L.P. | No Response | **Granted by Dkt. 120** |

| 03/10/2021 | 126 | Motion to continue hearing on (related document: 48 Motion for Contempt, 49 Brief, 125 Certificate of service)(Motion for Continuance of Contempt Hearing) filed by Defendant James D. Dondero (Attachments: # 1 Ex. A - Mandamus # 2 Ex. B - Letter # 3 Proposed Order) | No Response | N/A |

APP. 2714
Appx. 02761

# EXHIBIT 30

CRAWFORD, WISHNEW & LANG PLLC
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Movants*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Case No. 19-34054-sgj-11 |
| | ) | |
| Highland Capital Management, L.P., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DECLARATION OF MICHAEL J. LANG IN SUPPORT OF MOVANTS' MOTION
FOR RECUSAL PURSUANT TO 28 U.S.C. § 455**

I, Michael J. Lang, declare under penalty of perjury as follows:

1.      I am more than 21 years of age and am competent to make this Declaration. I have personal

knowledge of the facts set forth herein, and they are true and correct.

2.      I am a partner at the law firm of Crawford, Wishnew & Lang PLLC and represent Movants

James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P.,

The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC,

f/k/a HCRE Partners, LLC, a Delaware limited liability company (collectively, "Movants") in the

above-captioned action. I am authorized to make this Declaration in Support of Movants' Motion

for Recusal Pursuant to 28 U.S.C. § 455 (the "Motion").

3.      **Exhibit 1** referenced and incorporated into the Brief in Support of the Motion ("the Brief")

and contained in the Appendix in Support of the Motion (the "Appendix") (at APP. 0001-APP.

---

DECLARATION OF MICHAEL J. LANG                                    PAGE 1

0137) is a true and correct copy of a court record [ECF Dkt. 181] from the bankruptcy proceeding styled *In the Matter of: Highland Capital Management, L.P.*; Case No. 19-12239 (CSS) in the United States Bankruptcy Court for the District of Delaware.

4.     The following exhibits referenced and incorporated into the Brief and contained in the Appendix are true and correct copies of court records from this above-captioned bankruptcy proceeding styled *In Re: Highland Capital Management, L.P.*; Case No. 19-34054-sgj-11, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division:

| Exhibit Nos. | Description | Appendix Page Nos. |
|---|---|---|
| 2 | January 9, 2020 Debtor's Motion to Compromise Controversy with Official Committee of Unsecured Creditors Transcript | APP. 0138-APP. 0228 |
| 3 | February 19, 2020 Transcript | APP. 0229-APP. 0416 |
| 4 | December 8, 2020 Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles [ECF Dkt. 1522] | APP. 0417-APP. 0442 |
| 5 | December 16, 2020 Transcript - Motion for Order Imposing Temporary Restrictions | APP. 0443-APP. 0508 |
| 9 | February 8, 2021 Transcript - Bench Ruling on Confirmation Hearing and Agreed Motion to Assume | APP. 0990-APP. 1040 |
| 10 | July 8, 2020 Transcript - Motion to Extend Exclusivity Period and Motion to Extend Time to Remove Actions | APP. 1041-APP. 1098 |
| 12 | June 30, 2020 Transcript - Motion for Remittance of Funds Held in Registry of Court filed by CLO Holdco, Ltd. [ECF Dkt. 802] | APP. 1152-APP. 1251 |
| 13 | July 21, 2020 Official Committee of Unsecured Creditors Emergency Motion to Compel Production by the Debtor Transcript | APP. 1252-APP. 1376 |
| 14 | Applications to Employ James P. Seery and Development Specialists, Inc. Transcript [ECF Dkt. 864] | APP. 1377-APP. 1510 |
| 15 | March 4, 2020 Transcript - Hearing on Motion of The Debtor for Entry of an Order Authorizing, but not Directing, the Debtor to Cause Distributions to Certain "Related Entities" | APP. 1511-APP. 1631 |
| 16 | June 15, 2020 Transcript - UBS's Motion for Relief from the Automatic Stay to Proceed with State Court Action | APP. 1632-APP. 1758 |
| 22 | January 14, 2021 Motion to Appoint Examiner [ECF Dkt. 1752] | APP. 2057-APP. 2070 |
| 23 | February 2, 2021 Transcript of Proceedings | APP. 2071-APP. 2365 |
| 24 | Servicing Agreement – Exhibit N to the February 2, 2021 Transcript of Proceedings | APP. 2366-APP. 2401 |

| 25 | Servicing Agreement – Exhibit J to the February 2, 2021 Transcript of Proceedings | APP. 2402-APP. 2440 |
| 26 | February 3, 2021 Transcript of Proceedings | APP. 2441-APP. 2697 |
| 27 | Chart of Holdings of Preference Shares in CLOs – Exhibit 2 from February 3, 2021 Hearing | APP. 2698-APP. 2699 |

5.     **Exhibit 11** referenced and incorporated into the Brief and contained in the Appendix (at APP. 1099-1151) is a true and correct copy of a court record [ECF Dkt. 1186] from the proceeding styled *In the Acis Capital Management, L.P. and Acis Capital Management GP, LLC*; Case No. 18-30264-SGJ-11 in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division.

6.     The following exhibits referenced and incorporated into the Brief and contained in the Appendix are true and correct copies of court records from the adversary proceeding styled *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., et al.*, Adversary Proceeding No. 21-03000-sgj, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division:

| Exhibit Nos. | Description | Appendix Page Nos. |
|---|---|---|
| 6 | January 6, 2021 Plaintiff Highland Capital Management, L.P.'S Verified Original Complaint for Declaratory and Injunctive Relief [ECF Dkt. 1] | APP. 0509-APP. 0527 |
| 7 | January 26, 2021 Transcript - Motion for Entry of Order Authorizing Debtor to Implement Key Employee Plan | APP. 0528-APP. 0784 |
| 17 | January 6, 2021 Debtor's Memorandum of Law in Support of its Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero [ECF Dkt. 6] | APP. 1759-APP. 1776 |

7.     The following exhibit referenced and incorporated into the Brief and contained in the Appendix is a true and correct copy of a court record from the adversary proceeding styled *Highland Capital Management, L.P. v. James D. Dondero*, Adversary Proceeding No. 20-3190-sgj, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division:

---

**DECLARATION OF MICHAEL J. LANG**                                          **PAGE 3**

| Exhibit Nos. | Description | Appendix Page Nos. |
|---|---|---|
| 8 | January 8, 2021 Transcript - Preliminary Injunction Hearing | APP. 0785- APP. 0989 |

8.     The following exhibits referenced and incorporated into the Brief and contained in the Appendix are true and correct copies of court records from the adversary proceeding styled *Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., et al.*, Adversary Proceeding No. 21-03010-sgj, in the United States Bankruptcy Court for the Northern District of Texas, Dallas Division:

| Exhibit Nos. | Description | Appendix Page Nos. |
|---|---|---|
| 19 | February 17, 2021 Debtor's Memorandum of Law in Support of its Motion for a Mandatory Injunction Requiring the Advisors to Adopt and Implement a Plan for the Transition of Services by February 28, 2021 [ECF Dkt. 3] | APP. 1792- APP. 1812 |
| 20 | February 24, 2021 Order on Mandatory Injunction [ECF Dkt. 25] | APP. 1813- APP. 1817 |
| 21 | February 23, 2021 Transcript - Mandatory Injunction Hearing | APP. 1818- APP. 2056 |

9.     **Exhibit 18** referenced and incorporated into the Brief and contained in the Appendix (at APP. 1777-1791) contains true and correct courtesy copies of the K&L Gates Letters (as defined in the Brief), which are attached to the Declaration of James Seery [ECF 4] in the Adversary Proceeding styled *Highland Capital Mgmt. v. Highland Capital Management Fund Advisors, L.P., et al*. Adversary No. 21-03000-sgj.

10.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

**DECLARATION OF MICHAEL J. LANG**                                                   **PAGE 4**

EXECUTED ON the 18th of March, 2021 in Dallas, Dallas County, Texas.

Michael J. Lang
Declarant