**EXHIBIT 13**

**Appx. 04707**

```
              IN THE UNITED STATES BANKRUPTCY COURT
1               FOR THE NORTHERN DISTRICT OF TEXAS
                          DALLAS DIVISION
2

3                                  )    Case No. 19-34054-sgj-11
          In Re:                   )    Chapter 11
                                   )
4         HIGHLAND CAPITAL         )    Dallas, Texas
          MANAGEMENT, L.P.,        )    Thursday, June 10, 2021
5                                  )    9:30 a.m. Docket
                                   )
6              Debtor.             )
                                   )    MOTION TO COMPEL COMPLIANCE
7                                  )    WITH BANKRUPTCY RULE 2015.3
                                   )    FILED BY GET GOOD TRUST AND
                                   )    THE DUGABOY INVESTMENT TRUST
8                                  )    (2256)
          _____ )
9                                  )
          HIGHLAND CAPITAL         )    Adversary Proceeding 21-3006-sgj
10        MANAGEMENT, L.P.,        )
                                   )
11             Plaintiff,          )    DEFENDANT'S MOTION FOR LEAVE
                                   )    TO FILE AMENDED ANSWER AND
12        v.                       )    BRIEF IN SUPPORT [15]
                                   )
13        HIGHLAND CAPITAL         )
          MANAGEMENT SERVICES, INC.,)
14                                 )
               Defendant.          )
15        _____ )
                                   )
16        HIGHLAND CAPITAL         )    Adversary Proceeding 21-3007-sgj
          MANAGEMENT, L.P.,        )
17                                 )
               Plaintiff,          )    DEFENDANT'S MOTION FOR LEAVE
18        TO                       )    TO AMEND ANSWER TO PLAINTIFF'S
          v.                       )    COMPLAINT [16]
19                                 )
          HCRE PARTNERS, LLC       )
20        N/K/A NEXPOINT REAL      )
          ESTATE PARTNERS, LLC,    )
21                                 )
               Defendant.          )
22        _____ )

23                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
24                UNITED STATES BANKRUPTCY JUDGE.

25
```

**Appx. 04708**

```
 1   WEBEX APPEARANCES:

 2   For the Get Good Trust       Douglas S. Draper
     and Dugaboy Investment       HELLER, DRAPER & HORN, LLC
 3   Trust:                       650 Poydras Street, Suite 2500
                                  New Orleans, LA  70130
 4                                (504) 299-3300

 5   For the Debtor:              Jeffrey Nathan Pomerantz
                                  PACHULSKI STANG ZIEHL & JONES, LLP
 6                                10100 Santa Monica Blvd.,
                                    13th Floor
 7                                Los Angeles, CA  90067-4003
                                  (310) 277-6910
 8
     For the Debtor:              John A. Morris
 9                                PACHULSKI STANG ZIEHL & JONES, LLP
                                  780 Third Avenue, 34th Floor
10                                New York, NY  10017-2024
                                  (212) 561-7700
11
     For the Official Committee   Matthew A. Clemente
12   of Unsecured Creditors:      SIDLEY AUSTIN, LLP
                                  One South Dearborn Street
13                                Chicago, IL  60603
                                  (312) 853-7539
14
     For James Dondero:           Clay M. Taylor
15                                BONDS ELLIS EPPICH SCHAFER
                                    JONES, LLP
16                                420 Throckmorton Street,
                                    Suite 1000
17                                Fort Worth, TX  76102
                                  (817) 405-6900
18
     For the NexPoint             Lauren K. Drawhorn
19   Parties:                     WICK PHILLIPS
                                  3131 McKinney Avenue, Suite 100
20                                Dallas, TX  75204
                                  (214) 692-6200
21
     Recorded by:                 Michael F. Edmond, Sr.
22                                UNITED STATES BANKRUPTCY COURT
                                  1100 Commerce Street, 12th Floor
23                                Dallas, TX  75242
                                  (214) 753-2062
24

25
```

3

1    Transcribed by:              Kathy Rehling
                                  311 Paradise Cove
2                                 Shady Shores, TX  76208
                                  (972) 786-3063
3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23
          Proceedings recorded by electronic sound recording;
24              transcript produced by transcription service.

25

4

1          DALLAS, TEXAS - JUNE 10, 2021 - 9:44 A.M.

2          THE COURT:  All right.  Let me change my stacks here.

3 I will now hear what was Matter No. 1 on the docket, Highland

4 Capital, Case No. 19-34054.  We have a motion from the Dugaboy

5 and Get Good Trusts seeking compliance with Bankruptcy Rule

6 2015.3.

7     Who do we have appearing for the trusts this morning?

8          MR. DRAPER:  Douglas Draper, Your Honor.

9          THE COURT:  All right.  And for the Debtor this

10 morning?

11         MR. POMERANTZ:  Good morning, Your Honor.  Jeffrey

12 Pomerantz; Pachulski Stang Ziehl & Jones; on behalf of the

13 Debtor.

14         THE COURT:  All right.  Do we have any other parties

15 wishing to make an appearances?  These are the only parties

16 who filed pleadings, but I'll go ahead and ask if anyone wants

17 to appear for any reason.

18         MR. CLEMENTE:  Good morning, Your Honor.  It's Matt

19 Clemente at Sidley on behalf of the Committee.  I'm here.

20         THE COURT:  All right.  Thank you, Mr. Clemente.

21     All right.  Mr. Draper, how did you want to proceed?

22         MR. DRAPER:  I'd just -- I think the issue is

23 primarily a legal issue, Your Honor.

24         THE COURT:  Uh-huh.

25         MR. DRAPER:  So we've filed with the Court our

Appx. 04711

5

1 response to the Debtor's opposition, I have some comments I'd

2 I like to make, and just leave it at that. I think -- as I

3 said, I believe the issue is purely a legal issue --

4         THE COURT: Uh-huh. Okay.

5         MR. DRAPER: -- and can go from that.

6         THE COURT: All right.

7         MR. DRAPER: All right. We are here -- thank you,

8 Your Honor. Can I start?

9         THE COURT: Yes, you may.

10         MR. DRAPER: Thank you. We're here before the Court

11 today on what should be a rather routine matter. All I'm

12 asking the Court to do is to require the Debtor to do what it

13 should have done when the case was filed and is required

14 pursuant to Bankruptcy Rule 2015.3.

15    2015.3 uses the term "shall" and requires the Debtor to

16 file an official form -- and this is important, because I'm

17 going to come back to the official form -- with respect to the

18 value, operations, and profitability of each entity in which

19 the Debtor has a substantial or controlling interest.

20    The reports, the Rule says, shall be filed seven days

21 before the first meeting of creditors and every six months

22 thereafter.

23    Under 2015.3(d), I recognize a court may, after notice and

24 a hearing, modify the reporting requirement. No request has

25 been made by counsel for the Debtor, who I will stipulate

6

1  knows the Rules, are experienced, and understand that the rule

2  existed the day they came into the case.  And quite frankly,

3  what we have now is, from what I can see, an intentional

4  decision not to file the report.

5      As the Court knows, this matter was brought before this

6  Court in February, when the confirmation hearing was held.

7  And if the Court will recall, Mr. Seery's comment was (a) it

8  slipped through the cracks; and (b) he implied that it would

9  be done.  That was February.  I had hoped, and I think

10  everybody had hoped, that Mr. Seery, Highland, and Debtor's

11  counsel would be so embarrassed by the fact that they didn't

12  file [sic] the rule that they would have either (a) filed

13  [sic] the rule; or (b) sought -- sought a waiver of the rule.

14  They did neither.

15      Now, let's -- let's go through the 2015.3(d).  There are

16  two items that are not exclusive, and so I recognize it.  The

17  first is that they can't do it, and second is with respect to

18  the information is publicly available.  If you look at the

19  cases that the Debtor has cited in support of their position

20  that courts have waived compliance with the rule, you'll note

21  that three of the four cases deal with first day motions when

22  in fact they ask for extensions of time to file their

23  schedule, Statement of Financial Affairs, and other things.

24  These are normal first day motions.  I understand the

25  extension in that case.  And quite frankly, those extensions

7

1 are -- fall into the "I can't do it."

2     The only excuse the Debtor has offered, other than their

3 response to date, was, oh, I forgot, or it slipped through the

4 cracks.  That is not a legitimate excuse.  It never has been

5 and never will be, and should not be countenanced by the

6 Court.

7     And so let's start with the after-the-fact excuses offered

8 by the Debtor.  The first is the bad guy defense -- *i.e.*,

9 Dugaboy is a Dondero entity; they're asking for this

10 information for nefarious purposes.  That has to -- that

11 should be completely disregarded by the Court.  This is a

12 systematic issue that neither you nor I nor the Debtor's

13 counsel put in the Code or put in the Rules.  It is a

14 requirement, it's systematic, and we, as counsel and people

15 acting on behalf of the estate and sort of people who oversee

16 the system, should insist that this be filed.  The bad guy

17 defense is not an excuse.  And quite frankly, this is

18 information that is required.

19     So what I'm asking for today is not gamesmanship.  I don't

20 think it is ever gamesmanship when you ask for the compliance

21 with a rule that says shall.  Again, it's systematic, and we

22 are here -- and I don't know why -- either the U.S. Trustee

23 was asleep at the switch or anybody else was asleep at the

24 switch -- that this matter hadn't been brought to the Court's

25 attention.

8

1     So the word "shall" is not strained in any fashion.  It's

2  not limited in any fashion.  The word "shall" is absolute.

3     So, again, had -- was there some secret deal between the

4  Trustee -- U.S. Trustee and the Debtor?  I don't know.  That

5  may have been.  But quite frankly, --

6          THE COURT:  A secret deal?

7          MR. DRAPER:  -- the Code, in 2015 --

8          THE COURT:  Did you just use the term "a secret

9  deal"?

10          MR. DRAPER:  Well, some --

11          THE COURT:  What --

12          MR. DRAPER:  I'm not using the term.  What I --

13          THE COURT:  That's highly charged, that --

14  =       MR. DRAPER:  No, --

15          THE COURT:  -- choice of words.

16          MR. DRAPER:  What I mean, what I really mean is

17  sometimes we go to the U.S. Trustee and say, look, can we have

18  an extension?  Can we have -- can we do this a little bit

19  later?  And the U.S. Trustee, in fairness to them, basically

20  says, okay, you can do this or that.  I don't know if that

21  occurred in this case.  But quite frankly, what we have are 20

22  months of noncompliance.  And so I don't know if they said,

23  look, --

24          THE COURT:  Okay.

25          MR. DRAPER:  -- you don't have to file it now.

9

1          THE COURT:  So you meant an informal deal, not secret

2    deal?

3          MR. DRAPER:  Yes.

4          THE COURT:  A secret deal, that sounds like something

5    nefarious.  Okay?  So, --

6          MR. DRAPER:  No, it is not intended in that -- it's

7    --

8          THE COURT:  Okay.

9          MR. DRAPER:  Judge, it's not intended in that

10   fashion.

11         THE COURT:  Okay.

12         MR. DRAPER:  This goes to my issue that it's

13   systematic.  It's a systematic compliance.

14      And let's also go the fact that the Bankruptcy Code

15   requires complete and open disclosure.  It does not matter who

16   or why compliance is requested.

17      The next objection is I waited too long.  And they offer

18   an excuse, Judge, we're going to go effective.  Let's look at

19   what the Code requires -- the rule requires.  It says it shall

20   be filed, it has to be filed at certain points, through the

21   effective date of a plan.  It doesn't say after the effective

22   date of a plan is filed or after the effective date of a -- of

23   a plan occurs, your compliance is not required.

24      And I'll point out something where you ruled against me,

25   and we've contrasted that in our motion -- in our opposition.

10

 1  If you look at the examiner statute, which I know the Court

 2  has looked at and completely disagreed with my reading of it,

 3  it basically says after confirmation you don't have to do it.

 4  This statute doesn't say that.  This statute says you have to

 5  file these through the effective date of a plan.

 6      And so, you know, that "You waited too long" is really not

 7  a legitimate excuse.

 8      The next issue is -- and --

 9          THE COURT:  Well, on that point, --

10          MR. DRAPER:  And let's look at the cases.

11          THE COURT:  On that point, can I just ask, what is

12  the utility?  I mean, let's say we're one -- okay.  Let's say

13  we're one month away from the effective date.  Let's say we're

14  three months away from the effective date.  What is the

15  utility at this point?  There's a confirmed plan.  Now,

16  granted, it's on appeal.  But, you know, what -- what would

17  you --

18          MR. DRAPER:  Well, --

19          THE COURT:  What would you do with this information

20  at this point?  We have a confirmed plan.

21          MR. DRAPER:  Well, there are two responses to that.

22  First of all, the rule says you have to file it through the

23  effective date of a plan.  Somebody in rulemaking authority

24  made that determination.  And so it's not for you or I to

25  question.  That's the rule.

11

1      The second is the utility may be for further actions in

2  the case that occur after the effective date.  We just don't

3  know.

4      And so the rule is designed to require things to be filed

5  --

6          THE COURT:  Wait.  What did that last statement mean,

7  --

8          MR. DRAPER:  -- through the effective date.

9          THE COURT:  -- for actions that might occur after the

10 effective date?

11         MR. DRAPER:  It may be --

12         THE COURT:  What does that mean?

13         MR. DRAPER:  After the effective date of a plan.

14 There may be some -- some matter that comes up before the

15 Court.  And I'll give you the best example --

16         THE COURT:  Well, --

17         MR. DRAPER:  -- of all of them.

18         THE COURT:  Okay.

19         MR. DRAPER:  If you look -- if you look at the form,

20 all right, and what I'd ask the Court to look at is -- I think

21 it's Exhibit E that's required on the form.  And what Exhibit

22 E requires is disclosure of information where one of the

23 subsidiaries has either paid or has decided -- has incurred a

24 liability to somebody who would have an administrative expense

25 against the Debtor.

12

```
 1        The utility of that post-effective date is important,

 2   because post-effective date you'll be dealing with fee

 3   applications and other things.  So the rule envisions

 4   disclosure --

 5             THE COURT:  Okay, I -- say that again for me slowly.

 6   How --

 7             MR. DRAPER:  Okay.

 8             THE COURT:  How could there be an administrative

 9   expense --

10             MR. DRAPER:  If you'll --

11             THE COURT:  -- claim against the estate in your

12   scenario, again?

13             MR. DRAPER:  Well, my scenario, if you look at

14   Exhibit E that's required in the form, --

15             THE COURT:  Do I have that, Nate?

16             MR. DRAPER:  -- it basically requires a disclosure.

17             THE COURT:  Okay.  I don't know if I have it in my

18   stack of paper.  I --

19             MR. DRAPER:  Well, let me read it to -- I can read it

20   to you, Your Honor.  It's easy.  Let me pull it up.

21        Exhibit E, "Describe any payment by the controlled

22   nondebtor entity of any claim, administrative expense, or

23   professional fee that have been paid or could be asserted

24   against the Debtor or the incurrence of any obligation to make

25   such payments, together with the reason for the entity's
```

13

1  payment thereof or the incurrence of any obligation with

2  respect thereof."

3      That is clearly a post-effective date issue that the Court

4  should be concerned about, all parties should be concerned

5  about, and so if that occurred, then everybody needs to know

6  about it.

7      So E envisions something that is absolutely after the

8  effective date that will be -- has a utility after the

9  effective date.

10      Let's look at B.  Again, something that may have something

11  to do with after the effective date.  That deals with tax-

12  sharing agreements and tax-sharing attributes.

13      So -- and then C, which also has something to do with

14  after the effective date and how things sort out through the

15  liquidation, is described claims between controlled debtor,

16  controlled nondebtor entity and any other controlled nondebtor

17  entity.

18      So there needs to be a disclosure of due-to's and due-

19  from's between the entities.  This is -- this is not secret

20  stuff.  This is stuff that transcends the effective date of a

21  plan.

22      And so when I focused on the rule, what I think the Court

23  really needs to look at for the utility of this is exactly

24  what the -- is required by a 2015.3 disclosure.

25      Does that answer the Court's question?

14

1      THE COURT:  Yes.

2      MR. DRAPER:  Now, my favorite excuse that's been

3  offered is really what I'll call the secret sauce dispute --

4  excuse, or the former lawyers for the Debtor.  Again, let's

5  break this down and let's look at the form.

6      What the form requires is there's nothing the Debtor's

7  former lawyers did or who were working for Mr. Dondero.  If

8  you look at Exhibit A that's required, is contains the most

9  readily-available balance sheet.  That's not a legal issue.

10  Statement of income or loss.  That's -- that's just an

11  accounting concept.  Statement of cash flows.  That's also an

12  accounting concept.  And statement of changes in shareholders

13  or partners equity for the period covered by the entire

14  report.

15      B again has nothing to do with the lawyers, is describe

16  the controlled nondebtor business entity's business

17  operations.

18      So the information that's here is purely accounting

19  information and it is not secret.

20      Let's, again, let's focus on A, which -- which I think

21  just deals with financial information.  The first one is

22  balance sheet.  All right.  They've argued that this tells

23  what the value -- what we think the value of an asset is.

24  That's not true.  A balance sheet may have a fair market

25  value.  A balance sheet may have a book value.  I don't know

15

1  what they have here.  But quite frankly, if you or I sell my

2  house, our house, we go to our agent and we say, hey, look,

3  agent, you know, this is my listing price.  That's my opinion

4  as to value.  It may not be somebody else's opinion as to

5  value.  And quite frankly, when somebody asks or wants to buy

6  an asset, what they come to, don't they ask, hey, what do you

7  want for it?

8      You know, book value does not equal value.  And I know the

9  Court has held -- has had before it many clients or many

10 debtors, and I've represented a lot of debtors, who think a

11 Bic pen that they have is not worth ten cents but is worth a

12 gazillion dollars.

13     So that issue doesn't go to any secret information.  The

14 statement of income doesn't go to secret information.

15 Statement of cash flows does not.  And changes in shareholders

16 does not.  There's no secret information.  The only person who

17 this may be kept away from, possibly, and that -- that, I

18 don't think applies, is a competitor who may want to look at

19 these.  And a court can fashion that relief and say, okay,

20 let's put this under seal.  If somebody signs a

21 confidentiality agreement, they can have access to this.

22     But this is purely accounting information.  It's nothing

23 more.

24     And the reference to trade secrets that the Debtor

25 attempts to make is just not true.  This is not a trade

16

1  secret.  There's no confidential research or development or

2  commercial information that's being disclosed.  And 9018 that

3  they cite is truly an evidentiary rule.  We're not -- this --

4  this requirement does not go to customers.  It does not go to

5  pricing.  It does not go to business processes.  It just goes

6  to financial information.

7  So the global argument that they're making is undercut

8  significantly by the -- by what is required under the rule.

9  I'm just asking for mere compliance with the rule, nothing

10 more.

11 And so, you know, what -- I still don't understand what

12 the issue is, why it hadn't been done.  And quite frankly,

13 again, this is systematic.  It has nothing to do with who is

14 requesting it, what is requesting it.  It should have been

15 done.  It should have been done probably by the U.S. Trustee.

16 You know, somebody -- you know, and quite frankly, I've been

17 in this case since December.  It was raised in February.  You

18 know, I don't understand why, from February to the time I

19 filed this motion, they didn't come in and either (a) file the

20 reports, which on their face appear to be benign; or (b) ask

21 for some reason other than, oops, I forgot.

22 And so I'd ask the Court to require compliance.  I don't

23 think the information here falls into any category of for

24 cause.  They can do it.  This -- and the cases -- any case

25 they cite does not support their proposition that it shouldn't

17

1   be done.

2        Does the Court have any questions for me?

3            THE COURT:  Well, I do.  My brain just constantly

4   goes to standing.  And remind me again, the trusts you

5   represent have each filed proofs of claim, correct?

6            MR. DRAPER:  Yes.  And they're objected to, --

7            THE COURT:  They are objected to.

8            MR. DRAPER:  -- just so the Court's aware.

9            THE COURT:  Okay.  Remind me again what the substance

10  of the claim is about.

11           MR. DRAPER:  The substance of the claim is I have a

12  -- I have a $17 million debt owed to me by Highland Select.

13  And it is our position that this Debtor is also liable for the

14  Highland Select debts through its general partner status,

15  through its comingling of things, and how these assets fit

16  together, between Highland Select, which is a hundred percent

17  owned by the -- ultimately owned by this Debtor.  So I'd --

18  again, the standing issue --

19           THE COURT:  And the debt is --

20           MR. DRAPER:  And I am also an equity holder.

21           THE COURT:  And the debt is pursuant to a note?

22           MR. DRAPER:  It's pursuant to a loan agreement

23  between my client and Highland Select.

24           THE COURT:  All right.  And was an administrative

25  expense filed by your client?

18

1          MR. DRAPER:  Not by my client.  No.  And I'm also an

2   equity holder in the Debtor that, when the plan goes

3   effective, I ultimately have, at best, a residual interest

4   when the Star Trek Enterprise returns.

5          THE COURT:  Okay.  And what is that residual

6   interest?  Remind me again.  Isn't it less than one percent --

7          MR. DRAPER:  After the --

8          THE COURT:  -- of a subordinated --

9          MR. DRAPER:  After all the class --

10         THE COURT:  Go ahead.

11         MR. DRAPER:  Right.  Well, after all the classes are

12  paid in full plus a hundred cents on the dollar -- get a

13  hundred cents on the dollar plus some interest factor, and the

14  -- there's another party who has an equity interest that's

15  ahead of me get paid, I get some -- some money.

16     Again, I have a residual interest.  It's very tangential.

17  And I'll be very frank to the Court and honest, I think

18  ultimately I will receive nothing under that residual

19  interest.

20     However, my -- the standing is not really an issue here.

21  Honestly, this is a systematic issue.  I've tried to make that

22  clear for the Court.  It's something that should be employed,

23  and who is asking for it is irrelevant.  The Code requires --

24  the Rules require it.  There is no excuse that they've given

25  that should absolve them of that.  And whatever excuse they've

19

1    given basically falls in -- falls in the face of what the rule

2    -- the official form requires.

3        I'm not asking for a variance of the official form.  I'm

4    asking that this Court not allow a "Oops, I forgot" or "It

5    slipped through the cracks" excuse.

6            THE COURT:  All right.  And who is the current

7    trustee of these trusts now?

8            MR. DRAPER:  My trusts?  Nancy Dondero is the trustee

9    of the Dugaboy Trust, and I think Grant Scott is the trustee

10   of the Get Good Trust.

11           THE COURT:  Okay.  I'm asking because we heard

12   earlier this week that Grant Scott has resigned from certain

13   roles.

14       All right.  Mr. Pomerantz, do you have evidence, --

15           MR. POMERANTZ:  Yes, Your Honor.

16           THE COURT:  -- or argument only?

17           MR. POMERANTZ:  Argument only, Your Honor.

18           THE COURT:  Okay.

19           MR. POMERANTZ:  As with -- as with many of the other

20   motions that have been filed with this -- in this case and has

21   burdened the Court's docket over the last several months, I

22   really can't help to wonder why we are here.

23       Eighteen months after the case was filed, after plan

24   confirmation, and with the effective date that's set to occur

25   soon, Dugaboy and Get Good, the family trusts, ask the Court

20

 1  to compel the Debtor's compliance with 2015.3.  It reminds me

 2  of the motion that Mr. Draper mentioned that he filed on the

 3  eve of confirmation, the eve of confirmation, fourteen months

 4  after the case had been filed, seeking an examiner.  And the

 5  Court denied that motion without a hearing.

 6      Now they're back again with, as Your Honor mentioned and

 7  I'll get to in a little bit, with the same tangential

 8  connection to the bankruptcy case and the same tenuous

 9  standing that the Court has alluded to on several occasions,

10  including just a couple minutes ago.

11      It's clear that the motion, which is not supported by any

12  other creditor in the case and is actually opposed by the

13  Official Unsecured Creditors' Committee, is not about

14  financial transparency, as Mr. Draper would like Your Honor to

15  believe, but it's filed as a further litigation tactic to gain

16  access to information that Mr. Dondero would not be able to

17  obtain through discovery, who has tried to obtain through

18  other means, and that the Debtor believes will be used for

19  improper purposes.

20      One of the Movants, Dugaboy, is actually the holder of two

21  claims against the Debtor.  I guess Mr. Draper forgot about

22  his administrative claim, which really goes to the validity of

23  it.  One is the claim against the Select Fund, a subsidiary of

24  the Debtor, for which Mr. Draper says they should be liable,

25  including under an alter ego theory.

1      Yes, Your Honor heard me right.  Dugaboy is saying that

2  the Debtor is an alter ego with a nondebtor entity.  One would

3  think that, given the recent disclosures and commencement of

4  litigation -- and I'm talking about the UBS litigation -- that

5  Mr. Dondero would be the last one to raise alter ego.  In any

6  event, that claim is disputed.

7      The second claim is an administrative claim that Mr.

8  Draper filed on account of their 1.71 percent interest in

9  Multistrat, saying they were damaged by decisions Mr. Seery

10  made by selling certain life insurance policies in the spring

11  of 2020.

12      There is a theme here, Your Honor:  Claims that Mr. Seery

13  made decisions that harmed -- in this case -- Dugaboy's 1.71

14  percent interest.

15      The claim has no merit.  The Debtor will contest it.  But

16  even if it was allowed, the claim would be paid a hundred

17  cents on the dollar under the plan.  And accordingly, the

18  information under 2015.3 is not relevant.

19      Get Good filed a claim which alleges they may have a claim

20  from its limited partnership interest in the Debtor.  But for

21  the record, Get Good is not a limited partner of the Debtor.

22      So, how did we get here, Your Honor?  The Dondero entities

23  sandbagged the Debtor by raising the issue for the first time

24  during the confirmation trial.  Not in their briefs, not in

25  communications to the Debtor in advance of the confirmation,

22

1  but while the Debtor had its witness on the stand.

2      And why did they do it that way?  Because they wanted to

3  be able to argue, and they did argue to Your Honor, that the

4  Court couldn't confirm the plan because the Debtor did not

5  comply with Rule 2015.3, was in violation of 1129(a)(2), and

6  the Court could not confirm the plan.

7      Of course, the Court rejected that argument.  And when the

8  Debtor entity -- when the Dondero entities raised it as a

9  reason for Your Honor to enter a stay pending appeal, Your

10  Honor commented that that claim bordered on frivolous.  And of

11  course, that issue has been raised to the Fifth Circuit as one

12  of the reasons to overturn Your Honor's confirmation order.

13      And why are the Dondero entities persisting now in their

14  effort to obtain disclosure?  It's because they're desperate

15  to obtain financial information about the Debtor because they

16  want to become involved in the Debtor's future asset

17  dispositions at the nondebtor affiliates and they want to get

18  information.

19      As Your Honor will recall, Mr. Dondero filed a motion in

20  January asking for this Court to require the Debtor to bring

21  affiliated -- affiliated entity asset sales to the Court.  The

22  Debtor opposed the motion, and before the hearing it was

23  withdrawn.

24      Your Honor has heard testimony from Mr. Seery throughout

25  the case that Mr. Dondero previously interfered with the

23

1   Debtor's asset sales and that -- and on that basis, the Debtor

2   was not comfortable including Mr. Dondero in sale processes.

3   And I'm not talking about the AVYA and the SKY stock from the

4   CLO funds, but rather certain transactions regarding SSP and

5   OmniMax which were subject to a motion made by, I believe, the

6   Funds or the Advisors -- I get them confused sometimes --

7   accusing the Debtor of mismanaging the CLOs.  And if Your

8   Honor recalls, Your Honor denied that motion based upon a

9   directed verdict.

10      So, having been rebuffed by the Debtor in its attempts to

11  obtain financial information that they're not entitled to, the

12  trusts have one last effort.  Press 2015.3 arguments, because,

13  of course, they're very interested in the integrity of the

14  process, in the institution, in the following of the

15  Bankruptcy Code.  That is exactly what their motivation is.

16      But there's yet another reason, Your Honor, the Debtor

17  believes Mr. Dondero, through the trusts, is pursuing this

18  motion.  As Your Honor is aware, the Debtor recently

19  discovered some extremely troubling information regarding a

20  massive fraud involving a previous --

21      (Audio cuts out.)

22          THE COURT:  Uh-oh.

23          THE CLERK:  He froze up.

24      (Pause.)

25          THE COURT:  All right.  Mr. Pomerantz, you're frozen.

24

 1 | Is everybody frozen, or is it just him?

 2 |         MR. POMERANTZ:  There'll be some judicial estoppel.

 3 |         THE COURT:  Okay.  Mr. Pomerantz?

 4 |         MR. POMERANTZ:  Yes.

 5 |         THE COURT:  You were frozen for about one minute.  So

 6 | I am sorry, --

 7 |         MR. POMERANTZ:  Uh-huh.

 8 |         THE COURT:  -- you're going to need to repeat the

 9 | past minute for me.

10 |         MR. POMERANTZ:  Just to check if you were listening,

11 | Your Honor, what was the last thing you remember me saying?

12 |         THE COURT:  I was listening.

13 |         MR. POMERANTZ:  Okay.  So I will -- did you hear me

14 | talk about Mr. Seery's testimony throughout the case?

15 |         THE COURT:  No.  No.

16 |         MR. POMERANTZ:  Okay.  I'll go back a paragraph

17 | before.  Okay.  Okay.

18 |     And why are the Debtor -- why are the Dondero entities

19 | persisting now in their effort to obtain disclosure?  It's

20 | because the Dondero entities are desperate to try to obtain

21 | financial information, information they would not otherwise be

22 | entitled to under discovery rules, because they want to become

23 | involved, he wants to become involved in the Debtor's asset

24 | dispositions in the future regarding affiliated nondebtor

25 | entities.

25

1        If Your Honor will recall, Mr. Dondero made a motion in

2    January seeking an order from this Court requiring the Debtor

3    to bring to this Court asset sales from nondebtor affiliates.

4    The Debtor opposed the motion, and before the hearing on the

5    motion it was withdrawn.

6        Your Honor has heard testimony from Mr. Seery throughout

7    the case that Mr. Dondero previously interfered or tried to

8    interfere with the Debtor's asset sales, and on that basis the

9    Debtor was not comfortable inviting Mr. Dondero into its asset

10   sale processes.

11       And I'm not talking about the AVYA and SKY stock from the

12   CLOs, but rather certain transactions regarding SSP and

13   OmniMax, which were closed for fair value, which were subject

14   of a motion that the Advisors or the Funds -- and I often get

15   them confused -- that they made, accusing the Debtor of

16   mismanaging the CLOs.  And I'm sure Your Honor recalls.  Your

17   Honor denied that motion on a directed verdict basis.

18       So, having been rebuffed in their attempts to try to get

19   the information that they weren't entitled to, they're now

20   proceeding under 2015.3.  And, of course, Mr. Draper say he is

21   a protector of the process, the integrity of the system

22   demands it.  It has nothing to do with Mr. Dondero's

23   interests, of course, because Mr. Draper is just there to make

24   sure everything runs on time and everything is done according

25   to the law, notwithstanding the fact that the U.S. Trustee

26

1  hasn't brought this motion, notwithstanding the fact that the

2  Unsecured Creditors' [Committee] supports our position, and

3  notwithstanding the fact that not one creditor, not one

4  unaffiliated creditor, has asked this Court for that

5  information and relief.

6      There's yet another reason, Your Honor, the Debtor

7  believes that the trusts are pursuing this motion.  As Your

8  Honor is aware, the Debtor recently discovered some extremely

9  troubling information regarding a massive fraud involving a

10 previously-unknown entity called Sentinel Reinsurance.  And

11 that information is the subject of an adversary proceeding

12 filed by UBS, which Your Honor heard substantial information

13 about both in connection with hearings on that motion practice

14 and also at the UBS 9019 motion.

15     The Debtor believes that the 2015.3 motion is a veiled or

16 pretty transparent effort of Dondero trying to find out what

17 the Debtor knows and what the Debtor doesn't know and trying

18 to get the Debtor to go on record with information that later

19 in litigation they will use as a judicial estoppel.

20     Your Honor, that's not an appropriate predicate for the

21 motion.  Mr. Draper will deny that that's the reason, of

22 course, but I leave it for Your Honor to look at the

23 circumstances and make your own conclusions.

24     As the Court has mentioned many times, context matters,

25 and the Court should take this context into account in looking

27

 1  at the motion and the requested relief.

 2      In our opposition, we argue that the Court should either

 3  waive the 2015.3 compliance, given the anticipated effective

 4  date, or continue the hearing to September 1 for a further

 5  status conference if the effective date doesn't occur.

 6      The burden on the estate if it was required to comply with

 7  2015.3 is significant, and this goes to the issue Your Honor

 8  mentioned, that, really, what's the point at this stage of the

 9  case?  There are more than 150 entities that arguably meet the

10  definition of substantial or controlling interest for which

11  the Debtor would be required to file reports under 2015.3.  As

12  the Court knows, the Debtor is down to 12 staff, 13 if you

13  include Mr. Seery.  And if those employees working with the

14  Debtor's financial advisors were required to devote the

15  necessary time and effort to prepare the reports, the time and

16  the cost it would take would be substantial.  The Debtor just

17  doesn't have the bandwidth to comply.

18      More importantly, Your Honor, as we mention in our

19  opposition, Mr. Seery and the board are extremely concerned

20  with the quality of information it has received from the

21  Debtor's employees who have since been terminated by the

22  Debtor and now most of them are working for Mr. Dondero and

23  his related entities in one form or another.  It's not just

24  the lawyers, as Mr. Draper says.  It's the financial advisors,

25  who, in other contexts, and you'll hear a little later, are

28

1   coming up with new information, new defenses on notes, et

2   cetera.  The Debtor has no confidence that the information in

3   its records is accurate from a financial perspective or from a

4   legal perspective.

5       As I mentioned, the Court is aware of the Sentinel cover-

6   up.  And uncovering just the facts regarding Sentinel was a

7   very difficult process and required the Debtor to essentially

8   conduct discovery against itself.  It just couldn't rely on

9   its information.  So conducting the diligence that would be

10  required to provide accurate information for 150 entities,

11  intercompany claims, administrative claims, back and forth,

12  due-to's, due-from's, tax issues, all the stuff required by

13  the forms would be an extremely arduous task.  It would take

14  millions of dollars of forensic accounting.  And it wouldn't

15  -- and for what purpose?  There is no purpose.

16      In addition, Your Honor, to waiving filing the reports,

17  2015.3 also allows the Court to modify the reports requirement

18  for cause when the debtor is not able, in making a good faith

19  effort, to comply with the requirements.  Your Honor, in this

20  case, cause is clearly established under 2015.3.

21      Dugaboy spends a lot of time in their reply attacking the

22  cases that the Debtor cites in its opposition.  While the

23  facts in those cases are different from the case here, they

24  all share something in common which is the key point:  All of

25  the cases involve a waiver of the 2015.3 requirement for plans

29

1    that will be confirmed or will soon become effective.

2        Mr. Draper doesn't contest that this Court has the power

3    to waive.  He says, well, those requests were made in the

4    first 30 days of the case or in the initial part of the case.

5    But they all granted relief where the effective date -- where

6    either the confirmation date occurred and they were waiting

7    for the effective date, or the confirmation case was -- was

8    pending.

9        And Your Honor, we would ask the Court to treat the

10   Debtor's opposition as a motion to waive the requirement under

11   2015.3.  We could file a separate motion after this hearing.

12   It would be a waste of time.  But we would ask Your Honor,

13   treat our opposition as a motion.

14       Dugaboy spends the rest of its time, in the papers and its

15   argument that Mr. Draper made, challenging several arguments,

16   other arguments the Debtor makes in its opposition.  First,

17   they argue that there is no deadline for seeking compliance

18   and that the insinuation that we made that this is

19   gamesmanship is off base.  I'll acknowledge, Your Honor,

20   2015.3 does not contain a deadline for a party seeking

21   compliance.  But as I said before, context matters.  And given

22   how this motion has come to be before your court, I will leave

23   it for Your Honor to determine which party is the true one

24   playing games here.

25       Second, Dugaboy argues that there's nothing confidential

30

1  in any of the information required to be filed in the 2015.3

2  reports and that the disclosure of information will facilitate

3  interest in the assets and maximization of the Debtor's

4  assets.  Twenty months into this case, Your Honor, no party

5  other than Mr. Dondero or his related entities has complained

6  to the Court that the Debtor is not being transparent or

7  forthcoming.

8       And there's good reason for that.  Even during the early

9  stages of this case, when the Debtor and the Committee had

10  their differences, the Debtor was entirely forthcoming with

11  information about its assets, nondebtor affiliates, and

12  strategy for maximizing assets of the Debtor and its

13  affiliated entities.  That collaborative effort continues

14  today, and I suspect is one of the reasons that the Committee

15  has joined in the Debtor's opposition here.

16       Similarly, the Debtor's nondebtor affiliates have

17  transacted business with third parties postpetition.  The

18  Debtor has provided information to those parties as

19  appropriate, subject to nondisclosure agreement, and several

20  successful processes have been run that have maximized value.

21       And just to make clear, Your Honor, we do not believe that

22  Mr. Dondero or his related entities signed a nondisclosure

23  agreement that they would comply with the obligations.  So we

24  have no interest and no desire, unless ordered by the Court,

25  either in this context or another context, to provide Mr.

31

1   Dondero or his related entities with information that the

2   Debtor believes would prejudice its ability to monetize

3   assets.

4       The alleged transparency that Mr. Draper and the trusts

5   seek is not borne out of a desire to open the playing field

6   and make it level and put financial information in the public

7   domain for the good of the case.  It's about getting access to

8   information that the Debtor, in the exercise of its business

9   judgment -- should not be disclosed.

10      Lastly, Mr. Draper again, during oral argument, harped on

11  Mr. Seery's testimony that the reason the reports were not

12  filed is that they fell through the cracks.  It's misleading.

13  He also stated that Mr. Seery said they would file the

14  reports.  I've looked at the testimony.  That's not what he

15  said.  But he did say at confirmation that it slipped through

16  the cracks.  No doubt.  That's in the transcript.

17      And yes, the Debtor stands behind the fact that, in the

18  months leading to the confirmation hearing, neither Mr. Seery

19  nor the Debtor's professionals even thought about 2015.3.

20      But Your Honor, it's what has happened since that

21  justifies the Debtor's request for a waiver.  The plan is soon

22  to become effective.  As I said, the Debtor is down to 12

23  employees, who could not possibly prepare this information

24  without substantial time and effort.  Their effort and their

25  time should be focused on monetizing assets that will put

32

 1  money in creditors' pockets, hopefully sooner than later.

 2      And on top of that, given the massive fraud that

 3  management has uncovered, and continues to uncover information

 4  to this day, Your Honor, on matters separate from the Sentinel

 5  matter -- every week, we are finding out new information that

 6  has not been made public that causes us real concern, and at

 7  the appropriate time that information will be brought before

 8  the Court -- the Debtors simply can't rely on that

 9  information.  And to be required to go through the effort to

10  put that information out in the public record so Mr. Dondero

11  can later say that the Debtor was judicially estopped, or use

12  that information for an ulterior purpose or a litigation

13  strategy, just does not make sense.

14      Based upon the foregoing, Your Honor, we would ask that

15  the Court deny the motion and grant the Debtor a waiver of the

16  2015.3 requirements.

17      Does Your Honor have any questions?

18          THE COURT:  I do not think so.  Well, I just -- am I

19  correct in remembering the Debtor had somewhere around 75

20  employees at the beginning of this case?  And I didn't know it

21  was down to 12.  I knew it was down very low.  But that's what

22  we're talking about?

23          MR. POMERANTZ:  Yeah, that -- that sounds about

24  right, Your Honor.

25          THE COURT:  Okay.

33

1          MR. POMERANTZ:  And I should mention, you know, I was

2    there at the beginning.  I was there before the board.  The

3    first couple months of the case, it was extremely difficult to

4    get the Debtor's employees focused on trying to get the

5    information for the 2015.3.  They did not want that

6    information disclosed.  And it's sort of a -- sort of a little

7    ironic that now they're here asking for disclosure.

8       But, look, we're not going to walk away from the fact

9    that, yeah, it slipped through the cracks.  After the board

10   took over, Your Honor has heard many times what they did, the

11   efforts they went to.  If the U.S. Trustee had approached us,

12   if Mr. Dondero had approached us early on, we would have

13   figured out a way to address that and deal with that.  The

14   fact of the matter, it wasn't.  The fact of the matter, it was

15   brought up as a litigation tactic on confirmation, to defeat

16   confirmation of the plan.  And as I mentioned, for the

17   reasons, it's being used as a tactic now as well.

18          THE COURT:  All right.  Thank you.

19          MR. DRAPER:  Your Honor, I -- can I -- can I make a

20   few comments?

21          THE COURT:  No, not --

22          MR. DRAPER:  I'll be short.

23          THE COURT:  Not yet.  Mr. Clemente, --

24          MR. DRAPER:  Okay.

25          THE COURT:  -- I neglected to mention when I was

34

1   taking appearances, you filed a joinder on behalf of the

2   Committee with regard to --

3          MR. CLEMENTE:  That's correct, Your Honor.

4          THE COURT:  So I need to hear from you next, and then

5   I'll circle back to Mr. Draper.

6          MR. CLEMENTE:  That's correct, Your Honor.  And just

7   for the record, Matt Clemente from Sidley Austin.

8          THE COURT:  I should say, a joinder in the

9   opposition.  That was a confusing statement I just made.

10          MR. CLEMENTE:  Yeah, that's correct, Your Honor.

11          THE COURT:  Uh-huh.

12          MR. CLEMENTE:  And so I will be very brief, because

13  Mr. Pomerantz was obviously very thorough.  But just to echo

14  what he said, you know, the Committee is comfortable with the

15  information that it has received.  And as Your Honor knows, we

16  haven't been and won't be shy about coming to the Court if we

17  felt that that was not the case.

18      You know, we obviously had our issues early on in the

19  case, including with respect to getting information from the

20  Debtor.  But, again, the Committee, you know, has been

21  comfortable with the information that it's received from the

22  Debtor.

23      Therefore, at this point, Your Honor, from the Committee's

24  perspective, there doesn't seem to be any bona fide purpose to

25  making the Debtor go through the cost and the expensive effort

35

1    that Mr. Pomerantz said would be required to create the Rule

2    2015.3 reports.  And, again, I -- without casting aspersions,

3    it would suggest, based on previous activity, that there's

4    really only a nefarious purpose for what is being pressed

5    before Your Honor today.

6        So, Your Honor, again, we support the Debtor's position.

7    I absolutely agree with Mr. Pomerantz's arguments.  We would

8    request that Your Honor, you know, enter the relief that the

9    Debtor is requesting today.

10            THE COURT:  All right.  And Mr. Clemente, I just --

11            MR. CLEMENTE:  Yes?

12            THE COURT:  I just want to seal in my brain the

13    context that I think applies here.  The January 2020 corporate

14    governance settlement order.  In there, we all know there were

15    lots of protocols about lots of things, but one of them or a

16    set of the protocols dealt with transfers of assets in these

17    nondebtor subs or entities controlled by the Debtor.  And, of

18    course, Mr. Pomerantz alluded to this, but I'm just going to

19    make sure I'm crystal clear on what I remember.  You know, the

20    whole -- well, it was a protocol that the Committee would have

21    to be consulted on transfers of assets of those nondebtor

22    subs, those nondebtor controlled entities, and, you know,

23    there was a discussion that 363 doesn't apply, of course, to

24    nondebtor assets, and you could really argue all day, even if

25    it did apply, about whether these are ordinary course or non-

36

 1  ordinary course because of the business Highland is in.  But

 2  the Debtor negotiated with you and your clients:  We're going

 3  to have full transparency to let you all get notice of

 4  transfers of assets of these subs, and you could even object

 5  and bring a motion.  I mean, you can file some sort of

 6  pleading, even though we were not so sure 363 under any

 7  stretch might apply.

 8      Am I correctly restating the context that -- you know, Mr.

 9  Pomerantz alluded to it, but I just want to make sure I'm

10  clear and the record is clear.

11          MR. CLEMENTE:  Your Honor, you are -- you are

12  absolutely correct.  There's a very complex set of protocols

13  that we painstakingly negotiated with the Debtor that had

14  different categories depending upon the asset --

15          THE COURT:  Uh-huh.

16          MR. CLEMENTE:  -- and the Debtor's ownership and its

17  relationship with respect to the nondebtor entities or the

18  related parties.  That required the Debtor to come to the

19  Committee in certain sets of circumstances and explain a

20  potential transaction and get the input from the Committee,

21  and either the Committee could consent to the transaction, or

22  if the Committee did not consent to the transaction, the

23  Debtor could seek relief from the Court.

24      Your Honor will remember that, in fact, one of the

25  hearings we had with respect to the monies that were placed in

37

1   the Court registry arose out of the protocols.  So the

2   protocols worked from that perspective in requiring the Debtor

3   to come to the Committee, allow the Committee to make an

4   evaluation, and then the Debtor would make a decision from the

5   perspective of how it wished to proceed.

6       So, Your Honor is absolutely correct.  That was all part

7   of the governance settlement that was negotiated back in

8   January.  And from the Committee's perspective, again, it

9   hasn't always been lemon water and rose petals, but we believe

10  that those protocols worked, and worked to provide the

11  Committee with information so it could appropriately evaluate

12  what the Debtor was doing.

13          THE COURT:  All right.  So I'm correct, you would

14  say, in thinking there was a lot of transparency built in?  It

15  didn't always work smoothly in the beginning, and as we know,

16  there were document production requests, many of them from the

17  Committee.  That all came to a head last July, with more

18  protocols put in place.  But lots of transparency was

19  negotiated by the Committee with regard to all of these

20  controlled entities and subs?

21          MR. CLEMENTE:  That was a critical, Your Honor, that

22  was a critical component of the governance settlement.

23          THE COURT:   Okay.

24          MR. CLEMENTE:  Because that was obviously the impetus

25  for us wanting that governance settlement, so we could get

38

1  that transparency.

2  So, to answer your question, Your Honor, yes, the

3  protocols served that function of providing the Committee with

4  information on transactions that the Debtor was proposing to

5  enter into.

6  THE COURT:  Okay.  And of course, there was a waiver

7  of the privilege -- I don't know if that's the word; I guess

8  that is the right word -- with regard to possible estate

9  causes of action.  Maybe I'm getting into something unrelated.

10  Maybe I'm not.  But that was part of the protocol, too, right,

11  the Debtor would waive its --

12  MR. CLEMENTE:  That's correct, Your Honor.

13  THE COURT:  -- privilege with regard to --

14  MR. MORRIS:  Your Honor, I apologize for

15  interrupting.  This is John Morris from Pachulski Stang.  I

16  just want to recharacterize that a bit.

17  THE COURT:  Okay.

18  MR. MORRIS:  It's not a waiver of the privilege.  We

19  agreed to share the privilege --

20  THE COURT:  Share the privilege.  Okay.

21  MR. MORRIS:  -- with the Debtor.  The Debtor --

22  MR. CLEMENTE:  I --

23  MR. MORRIS:  I'm sorry to -- sorry to correct you,

24  but it's a --

25  THE COURT:  Well, no, --

39

1          MR. MORRIS:  -- very important point.

2          THE COURT:  -- that's why I hesitated on that word.

3    I wasn't sure if that was the word, the concept.

4          MR. MORRIS:  There's no waiver.

5          THE COURT:  Okay.  Okay.  I'm not always --

6          MR. CLEMENTE:  That is -- and that is correct, Your

7    Honor.

8          THE COURT:  Okay.

9          MR. CLEMENTE:  Mr. Morris is correct.  As are you.

10         THE COURT:  Okay.  So I'm asking you, is all of this

11   protocol that was in place, I mean, is it reasonable for me to

12   think maybe that's the reason you all never pressed the 2015.3

13   issue, because you were getting a full look, as best you could

14   tell, and more?  You were getting more information, perhaps,

15   than these reports would have provided, even.  Is that fair

16   for me to think?

17         MR. CLEMENTE:  It is fair for you to think that, Your

18   Honor.  We viewed the protocols as our mechanism to get the

19   information that was necessary for the Committee to evaluate

20   the transactions that the Debtor wanted to engage in.  And so

21   we were looking to the protocols, and in fact, I think the

22   protocols were very broad in certain respects, and we were not

23   thinking about the Rule 2015 reports, nor would we have said

24   that that would have been a substitute for negotiating those

25   protocols and implementing them.

40

1          THE COURT:  Uh-huh.

2          MR. CLEMENTE:  So that's how the Committee was

3   looking at it, Your Honor.

4          THE COURT:  Okay.  All right.  Well, okay.  Mr.

5   Draper, I'm going to come back to you.  You get the last word

6   on that.

7          MR. DRAPER:  Thank you.  First of all, the answer is

8   yes, there are extensive protocols between the Debtor and the

9   Committee.  I one hundred percent agree with you.  And the

10  other point I'd make with that is this information is a

11  scaled-down version of what they're giving the Committee on a

12  regular basis.  So the argument that it would take hundreds of

13  man hours and millions of dollars to do that is absolutely not

14  true.  This information, in large measure, even vaster

15  portions of it have already been given to the Committee.

16  Number one.

17      Number two, we as lawyers are literalists --

18          THE COURT:  But I presume not in this format.  I

19  presume not in the format of filling out the form A through E

20  exhibits.  I mean, maybe it's an email.

21          MR. DRAPER:  Well, --

22          THE COURT:  Maybe it's a phone call.

23          MR. DRAPER:  -- it's not in a form -- no, there is --

24  there is -- they both have financial advisors who I'm sure

25  you're going to see whopping fee applications from who have

41

1 pored through all of this. My bet, and I'd bet big dollars on

2 this, is that financial -- balance sheets are given to them on

3 a regular basis, statements of financial information for

4 subsidiaries and changes in cash flow are given to them.

5 Otherwise, there's no way the Creditors' Committee could

6 monitor what's going on and what's happening.

7 So, really, this is -- this is not a phone call thing.

8 There is real financial data that's being given that is

9 available and can be given on a scaled-down basis.

10 My real point of this is we as lawyers are literalists

11 until it suits our purposes not to be literalists. There is

12 no exception in 2015.3 for information being given to a

13 creditors' committee. In fact, when you look at 2015.3, it

14 basically figures there is information going to a creditors'

15 committee. This is for the others who don't have access to

16 that information.

17 And the interesting part of that is, as the Court's aware,

18 the Bankruptcy Code was amended that if I had gone to the

19 Creditors' Committee and made a request as a creditor, I

20 probably have a right to get even more information than 2015.3

21 allows me to get.

22 Next, which is the giant smokescreen. We're basically

23 dealing now with the gee, Mr. Dondero's a bad guy; gee, they

24 want this information because they want to uncover what we

25 know. That's just not true with respect to these reports. If

42

1  you look at what the reports do, the reports start from the

2  day that the case was filed and ask for changes in financial

3  condition from the day the case was filed going forward.  It

4  is all postpetition in its effect.  And to the extent they've

5  uncovered things that are incorrect in the Debtor's schedules,

6  the truth is the amendment of the schedules is warranted.

7  2015.3 does not deal with prepetition activity in any way,

8  shape, or form.  They are balance sheets that ask for -- or

9  changes in financial condition that go from the filing of the

10  case, or seven days before, and require reports every six

11  months.

12      So this giant smokescreen that there's a massive fraud,

13  there's all this other stuff that's been uncovered, is just

14  not true.  It is an attempt to cover up or give an excuse that

15  is unwarranted with respect to why they haven't done the

16  2015.3.

17      Next point.  There is no secret stuff that's being done.

18  There's no valuation that we're asking for.  2015.3 asks for

19  balance sheet information.  So, in fact, if they own ten

20  pieces of property, 2015.3 would bind them together in a

21  balance sheet and say, this is the total real estate that we

22  have.  If an entity has 15 entities under its umbrella, it

23  would have a balance sheet entry.  Assets and liabilities.

24  It's not broken down.  The assets are probably at book value

25  or some sort of mark to market.

43

1    But honestly, this is -- there is no way that this

2  information gives anybody any benefit in terms of any bidding.

3    And the other point that's problematic is anybody who

4  wants to buy these assets would walk in and say, look, I want

5  a data room, let me look at this.  If what Mr. Pomerantz is

6  saying, which I don't understand, is that we're not going to

7  let a Dondero entity buy an asset, notwithstanding the fact

8  that they may pay more for the asset than somebody else would,

9  I think that's -- I have a huge problem with that.  We're here

10  for monetization of assets.  We're here to maximize the value.

11  And if, in fact, somebody walks in that may be a tangentially-

12  related Dondero entity and is willing to pay more, they should

13  be thrilled with that fact, not jettison it or disregard it.

14  That is -- their job is to maximize value, not minimize value

15  through a controlled sale process.

16    Again, I'm looking at the Code section.  I'm looking at

17  2015.3.  It basically says what it says.  It's designed to

18  give basic financial information.  It has nothing to do and

19  offers no disclosures of anything Mr. Pomerantz has thrown up

20  before the Court or that Mr. Dondero or any of his entities or

21  people are alleged to have done.

22    And the last is, if in fact there's financial information

23  that's incorrect in any of these entities, I question what the

24  Debtor's financial advisors have been doing for the last

25  months.  Honestly, they should be poring over these books.  If

44

 1  they find a problem, they should correct 'em and address them.

 2  And so there's no basis under the Code.  We've -- what's been

 3  given to you and what their argument is is an excuse for not

 4  doing something they should have done.  It can't be couched as

 5  to who's asking.  It is systematic in nature.  And what's been

 6  thrown up before the Court in Mr. Pomerantz's arguments are

 7  just not true when you look at what the form requires.

 8          THE COURT:  You know, I can't remember ever being in

 9  a contested matter involving this rule.  And I was kind of

10  pondering before coming out here, I wonder why that is.  And,

11  you know, I'm thinking the vast majority of our complex

12  Chapter 11s that involve many, many, many entities, they all

13  file.  Okay?  You know, they're kind of a different animal, if

14  you will, from Highland.

15      You know, we know how it normally works.  You've got maybe

16  the mothership, holding company, and many, many subs, and

17  you've got asset-based lending, right, where, you know, maybe

18  the majority of the entities in the big corporate complex are

19  liable, so you just put them all in.  Okay?

20      We don't have -- I have not experienced a lot of Chapter

21  11s where you have basically just the mothership and then you

22  keep subs and lots of affiliates out.  Okay?  So I'm thinking

23  that's one reason.

24      Another thing, I can't remember how old this rule is.

25  Does anyone -- can anyone educate me?  How long has this rule

45

1   been around?

2           MR. DRAPER:  Your Honor, this is Douglas.  I think it

3   came in after Lehman Brothers.  And it came --

4           THE COURT:  Uh-huh.

5           MR. DRAPER:  It was put in to deal with off-balance

6   sheet items.

7           THE COURT:  Uh-huh.

8           MR. POMERANTZ:  2008, Your Honor.

9           THE COURT:  2008?

10          MR. DRAPER:  Which is exactly right.  It --

11          THE COURT:  Okay.

12          MR. DRAPER:  Yep.

13          THE COURT:  Okay.  So that, that's another reason.

14  Because I was thinking like *Enron* days.  You know, that's a

15  big giant, a gazillion entities, and, of course, a whole huge

16  slew of them were all put in.

17     So, there's not a lot of case law.  And you know, maybe

18  there are other situations where a judge ruled on this issue

19  but without issuing an opinion.  So, anyway, that's neither

20  here nor there.

21     Mr. Draper, you've urged me to focus on the literal

22  wording of the rule.  It's "shall" language.  You've talked

23  about essentially the integrity of the system as being the

24  reason for the rule.  You've told me not to accept the

25  Debtor's "bad guy" defense, you know, as an excuse.  This is

46

1  just Dondero, you know, wanting the information, and therefore

2  I should discount the motivations here.

3      But let me tell you something that is nagging very, very

4  much at me, and I'll hear whatever response you want to give

5  to this.  I just had an all-day hearing a couple of days ago,

6  and this involved the Charitable DAF entities and a contempt

7  motion the Debtor filed because those entities went into the

8  U.S. District Court upstairs in April and filed a lawsuit that

9  was all about Mr. Seery's alleged mismanagement with regard to

10 HarbourVest.

11     So what I'm really worried about is the idea that your

12 client wants this information to cobble together a new

13 adversary alleging mismanagement.  How can I not be worried

14 about that?

15         MR. DRAPER:  It's real simple.  Because the

16 information that's here doesn't go to management decisions.

17 The information that's requested here has balance sheet items.

18 It has to do with changes in cash flow.  It is not something

19 that you can cobble together a claim, because it doesn't deal

20 with discrete transactions.  It deals with only transactions

21 between affiliated entities.  It only deals with disclosure of

22 administrative expenses that are incurred by a subsidiary for

23 which the Debtor is liable.  It only deals with changes in

24 condition on a go-forward basis and a balance sheet.  It

25 doesn't say, gee, we have to disclose that, with respect to

47

1  HarbourVest or with respect to the MGM stock or whatever,

2  we're doing A, B, or C.  It doesn't go there.

3      That's why I asked the Court in my opening, look at the

4  form.  Because the form is what I'm asking for adherence to.

5  I'm not asking the form to be varied.  I'm just asking the

6  form to be approved -- to be addressed.  And the form

7  controls.  It is not something you can cobble together a

8  complaint with.

9          THE COURT:  Well, you left out when I asked, you

10  know, did your client have an administrative expense claim in

11  this case, and Mr. Pomerantz corrected the record on that.

12  Your client, while it's not a lawsuit in another court, has

13  filed an administrative expense that there was mismanagement

14  of a nondebtor sub or nondebtor controlled entity, --

15          MR. DRAPER:  That -- that's --

16          THE COURT:  -- Multistrat.

17          MR. DRAPER:  No, that's not -- if -- if I understand

18  the claim -- again, I didn't file it, and I forgot, that's an

19  oops on me as opposed to an oops on Mr. Seery for not filing,

20  and I apologize for the Court for that.  But if I understand

21  that claim, is when he acquired whatever he acquired, he

22  should have offered it to the other -- to the other members of

23  the -- that group.  Again, I'm not -- that's not -- I'm a

24  bankruptcy lawyer, as the Court's well aware.  This other

25  stuff is beyond me.

48

1          But the truth is, my understanding of the claim, it goes

2     to who should have benefited by the transaction and whether

3     the Debtor got CLO interests or got cash for it is irrelevant

4     and that it should have been offered.  That's what I

5     understand the claim.

6               THE COURT:  Okay.  So the same sort of theory --

7               MR. DRAPER:  So, the claim --

8               THE COURT:  -- as HarbourVest?  The same sort of

9     theory as HarbourVest?

10               MR. DRAPER:  No.  No.  Well, no, I'm just saying,

11    that's -- that's what -- again, you're asking me for something

12    that's outside my expertise.

13               THE COURT:  Okay.

14               MR. DRAPER:  Yes, we may have filed a claim.

15               THE COURT:  Who filed a proof of claim?

16               MR. DRAPER:  And the point I'm making --

17               THE COURT:  Who filed the proof of claim?

18               MR. DRAPER:  What?  I did not -- I have not filed the

19    proof of claims that were asserted by Dugaboy.

20               THE COURT:  I mean, --

21               MR. DRAPER:  I think that was --

22               THE COURT:  -- request for administrative expense.

23    Who filed this?  You say you don't -- you didn't file it.

24               MR. DRAPER:  I did -- I don't think I did.

25               MR. POMERANTZ:  Your Honor, to clarify, it was filed

49

1    as a proof of claim, but it related to postpetition actions.

2    And, again, I don't have it before me.  This has been raised

3    --

4              MR. DRAPER:  I --

5              MR. POMERANTZ:  -- several times in the confirmation

6    hearing when Mr. Draper was there, so I guess he must have

7    just forgotten about it.  But I don't know who actually filed

8    it.  But it is -- it is -- it is a proof of claim that is on

9    the record.

10             MR. DRAPER:  Mr. Pomerantz, God forbid that I should

11   forget something.  I'm sure you never have.

12             THE COURT:  Okay.  Well, here's what I'm going to do.

13   I'm not going to grant the relief being sought today, but I

14   will continue the hearing to a date in early September.  And

15   Mr. Draper, you can coordinate with my courtroom deputy, Traci

16   Ellison, with regard to a setting in early September.

17        I can assure you it's not going to be until after Labor

18   Day.  I think Labor Day falls on the 6th, maybe, and I plan to

19   be far away the first few days of September, far away from

20   this country.

21        But here are a few things I want to say.  First, I care

22   about transparency, and I tend to strictly construe a rule

23   like this.  I think, you know, it should be very clear for

24   anyone who's appeared before me that I really like -- I say

25   open kimono.  I probably shouldn't use that expression, but I

50

1    use that expression a lot.  You know, when you're in Chapter

2    11, the world changes and you have to be very transparent.

3         But while I generally feel that way, we have -- as I also

4    always say, facts matter, contexts matter -- and here we are

5    twenty months into a case and we're post-confirmation.  This

6    motion was filed post-confirmation.  So I acknowledge that the

7    Rule 2015.3(b) has the requirement of filing reports as to

8    these nondebtor controlled entities until the effective date

9    of a plan.  We're so -- we're presumably so very close to the

10   effective date that I think I should exercise my discretion

11   under Subsection (d) of this rule to, after notice and a

12   hearing, vary the reporting requirements for cause.  I think

13   there's cause, and that cause is I think we're oh so close to

14   the effective date.  That's number one.  Number two, we're

15   down to 12 staff members.  And I've heard that 150 entities

16   may be implicated, and I don't think that is a necessary and

17   reasonable use of staff members at this extremely late

18   juncture of the case.

19        And my third reason for cause under Subsection (d) of this

20   rule is we have had an active, a very active Creditors'

21   Committee in this case with sophisticated members and

22   sophisticated professionals who negotiated getting more

23   information, I think more useful information than this rule

24   even contemplates with the various form blanks.

25        Now, obviously, I'm continuing this to September because,

51

 1  if we don't have an effective date by early September, well,

 2  context matters, maybe that causes me to view this in a whole

 3  different light.  But that is the ruling of the Court.

 4      You know, I just want to say on behalf of the U.S.

 5  Trustee, I don't know if anyone's listening in, but it was an

 6  unfortunate use of words earlier, I think, saying, you know,

 7  secret deal with them.  And I use unfortunate words all the

 8  time.  I'm not being critical.  But I just want to defend

 9  their honor here.  Oh my goodness, they --

10      (Phone ringing.)

11          THE COURT:  -- exercise integrity in every case I see

12  to the utmost degree, and I suspect they were satisfied that

13  the Committee was getting so much access to the Debtor, with

14  the sharing of the privilege and the protocols, that it just

15  didn't seem necessary in the facts and circumstances of this

16  case to require strict compliance with 2015.3.

17      So I'm going to ask Mr. Pomerantz to upload a form of

18  order reflective of my ruling.  And, again, if --

19      Whose phone is ringing?  Is there something going on with

20  our equipment?

21          THE CLERK:  No.

22          THE COURT:  I don't know where that phone ringing is

23  coming from.

24          THE CLERK:  I can hear it.

25          THE COURT:  Okay.  So, you'll get a day from Ms.

52

1   Ellison in -- after labor day, and we'll see where we are.

2   This will be a moot matter as far as I'm concerned if we've

3   had an effective date at that point.

4       (Continued phone ringing.)

5           MR. POMERANTZ:  Your Honor, one clarification I would

6   ask to have.  I don't think -- I think Your Honor intends that

7   to be a status conference, so to save the Debtor from, you

8   know, spending time in doing a pleading, and Mr. Draper as

9   well, and Your Honor from reading them, I would say that there

10  should be no pleadings filed in advance.  We will appear

11  before Your Honor with a status conference.  And to the extent

12  Your Honor determines there's further briefings or further

13  issues that need to be decided, you could decide at that

14  point.  But no further briefing.

15          THE COURT:  Okay.  I think that is a fair request.

16      (Ringing stops.)

17          THE COURT:  And so that -- that is the way we'll set

18  this up.  Status conference.  No further pleading.

19          MR. DRAPER:  Your Honor?

20          THE COURT:  All right?  Mr. Draper?

21          MR. DRAPER:  Can I make a request, Your Honor?  Can I

22  change -- can I make a comment about the Court's ruling?

23  Because I want to be transparent about this.  And I think the

24  Court's ruling, I would request that you shapeshift it a

25  little bit.

53

1     If, in fact, you're going to take the position that if the

2 plan goes effective, this issue -- this -- this motion is moot

3 and will be denied, I think, quite frankly, why don't we enter

4 that order now, rather than waiting.  Because that at least

5 gives me the ability to address the issue.

6     I don't think the rule has a waiver of it on the effective

7 date.  Let's -- let's get the issue before the -- before

8 everybody.  Because, again, as I said, if in fact your

9 position is that if it goes effective I'm going to deny the

10 relief and claim it's -- and assert it's moot in a ruling, I'm

11 fine, let's get the ruling now.  Because -- because my

12 position is that that waiver -- there is no basis for that

13 waiver due to time.  The rule requires being filed through a

14 point.

15     And, look, again, that way I'm not wasting the Court's

16 time.  We're not rearguing it.  If we're not having new

17 pleadings, let's get it over with.

18         MR. POMERANTZ:  Your Honor, I would reject that.

19 It's pretty transparent what Mr. Draper wants.  He wants

20 another appeal --

21         THE COURT:  Uh-huh.

22         MR. POMERANTZ:  -- because he wants to go to another

23 court, and he's unhappy that Your Honor has essentially given

24 an interlocutory order that he will be stuck with.

25     So we have, I think, close to a dozen appeals.  We're

54

1  spending millions of dollars.  And I find -- I find Mr.

2  Draper's request, quite honestly, offensive, that it would

3  require us to -- a lot more time and money on an issue we

4  shouldn't.  So, I would ask Your Honor to reject Mr. Draper's

5  request.

6          THE COURT:  All right.  I do --

7          MR. DRAPER:  And again, my --

8          THE COURT:  -- reject it.  That's exactly where my

9  brain went, Mr. Draper.  This is an order continuing your

10 motion.  Okay?  And we'll have a status conference in early

11 September on your motion.

12     And you know, again, I'm just letting you know my view it

13 will be moot if the effective date has occurred, and then

14 we'll get some sort of order to that effect issued at that

15 time.  And then I guess you'll have your final order that you

16 can appeal if you want at that point.

17     The last thing I'm going to say is this.  Mr. Draper, as

18 I'm sure you remember, at some point many weeks back -- I

19 think it was in January, actually -- I ordered that Mr.

20 Dondero should be on the WebEx, or if we're live in the court

21 for a hearing, live in the court, any time there's a hearing

22 where he, his lawyers, have taken a position, filed an

23 objection or filed the motion himself.  If he and his lawyers

24 are requesting relief or --

25         MR. DONDERO:  I'm here.

55

```
 1        THE COURT:  -- objecting to relief, that he has to be
 2   in the courtroom.
 3      I am now going to make the same requirement with regard to
 4   the trusts.  Any time the trusts file a pleading seeking
 5   relief, object to a pleading seeking relief, file any kind of
 6   position paper, I'm going to require a trust representative to
 7   be in court.
 8      Now, I don't know if that's the trustee, Nancy Dondero.  I
 9   don't know if that's Mr. Dondero's wife, a sister, who that
10   is.  But it'll either be her or whoever the trustee is or Mr.
11   Dondero as beneficiary.  But it has gotten to that point.
12   Okay?  And --
13        MR. DRAPER:  Your Honor?
14        THE COURT:  And it's not -- it's not personal.  I
15   have said this before.  I've done this in many cases.  If we
16   have a party who feels so invested in what's going on that
17   they're waging litigation, litigation, litigation, at some
18   point very often I will make this order.  Like, okay, we're
19   all spending a lot of time on what you want, so you need to
20   show you're invested in it and be here with the rest of us.
21   And, you know, potentially we're going to want testimony in
22   certain contexts.  Okay?
23      So I don't know who that human being is for the trusts,
24   but I'm now to the point where I'm making that same order that
25   I did with regard to Mr. Dondero personally.  All right?
```

56

1          MR. POMERANTZ:  Your Honor?

2          THE COURT:  Yes?

3          MR. POMERANTZ:  Your Honor, just to clarify, that's

4  Mr. Dondero and the trustee.

5       And I would also ask Your Honor, I know Mr. Dondero will

6  say that he was on, and that's what Mr. Taylor is going to

7  say, he was on audio.  I think, in order to have them actively

8  participating, they should be on the video the entire hearing.

9  Because if they're just on the phone on mute, Your Honor is

10 not able to really tell if they are really listening.  So I

11 would ask Your Honor to clarify to both Mr. Draper and Mr.

12 Taylor that, for both the trustee and Mr. Dondero, they should

13 be on video.

14         THE COURT:  All right.

15         MR. DRAPER:  Your Honor, Mr. Dondero is on.  You can

16 see him down in the lower screen.

17         THE COURT:  All right.  Just so you know, I mean, the

18 screen I'm looking at is not quite the same screen you're

19 looking at.  We have this Polycom.  And I show that there are,

20 you know, thirty-something people, but I only see the people

21 who have most recently talked.  Okay?  So, I see you, Mr.

22 Draper.  I see Mr. Pomerantz.  I see Mr. Clemente.  A few

23 minutes ago, I saw Mr. Morris.  But, you know, we've set it up

24 where I'm not overwhelmed with blocks; I'm just seeing the

25 people when they speak.

57

1          MR. POMERANTZ:  Your Honor, and those were the only

2    four people whose videos were on during the entire hearing.

3          THE COURT:  Oh, okay.

4          MR. POMERANTZ:  So I hope Mr. Draper is not going to

5    say that Mr. Dondero was on video, because he was not.

6          THE COURT:  Okay.

7          MR. DRAPER:  No, you can see -- Mr. Pomerantz, what I

8    said is you can see him on the screen here.  You can see that

9    he has dialed in.  I don't see him jumping up and down or his

10   person.

11         THE COURT:  Oh, okay.

12         MR. DRAPER:  But it is clear that somebody dialed in

13   on his behalf.

14         MR. POMERANTZ:  Well, --

15         MR. DRAPER:  Or he dialed in.  He is -- he is

16   present.

17         MR. POMERANTZ:  Exactly.  That's my point, Your

18   Honor, that someone may have dialed in on his behalf.  And I

19   think Mr. Dondero, for them to have active, meaningful

20   participation, because I think that's what Your Honor is

21   getting at, that they should be here, engaged.  And if we were

22   in court like we were the other day, Mr. Dondero would have

23   had to sit in Your Honor's courtroom.  And if he is going to

24   take up the time of Your Honor and all the parties, he and the

25   trustee should be really engaged, which you cannot be if

58

1  you're only on the phone.

2        THE COURT:  Okay.  All right.  Well, --

3        MR. DRAPER:  Your Honor?

4        THE COURT:  Go ahead, Mr. Draper.

5        MR. DRAPER:  Mr. Dondero just talked a few moments

6  ago, so Mr. Pomerantz heard him.  This is -- this is truly

7  unwarranted.  He's appeared, he's here, and he's made a

8  comment to the Court.  So, again, we are invested.  He was

9  present at this hearing.  He heard the hearing.  And so, you

10  know, I just don't know where this is coming from.  I

11  understand he missed a hearing before, but he is here for this

12  one.

13        THE COURT:  Okay.  Well, I'm not going to get bogged

14  down in this issue.  I am going to issue an order, though,

15  that is going to be reflective of what I said, and we'll just

16  -- we'll make sure we have him check in or whoever the

17  representative is of the trusts in future hearings and turn

18  the video on and we'll make sure.

19     Again, this is -- I used the word frustrated the other

20  day.  I'm very frustrated.  This is just -- this is -- it's

21  out of control.  Okay?  I ordered mediation earlier in this

22  case.  I believed that an earnest effort was put in.  But if

23  we're not going to have settlement of issues, you know, I'll

24  address these issues, but everyone who files a pleading,

25  whether it's Mr. Dondero personally or the trusts, the family

59

1  trusts, and, of course, we're going to get -- I'm going to go

2  the same direction, actually, with all these other entities.

3  You know, it's -- I've gotten to where I had my law clerk the

4  other day prepare me basically what was like a program from a

5  sports event, you know, who represents which entities, because

6  it's gotten overwhelming.  And --

7         MR. POMERANTZ:  Your --

8         THE COURT:  And I mentioned the other day, I'm very

9  close to requiring some sort of disclosures about the

10  ownership of each of these entities, because I -- you know,

11  the standing is just so tenuous, so tenuous with regard to

12  certain of these entities.  And I've erred on the side of

13  being conservative and, you know, okay, we maybe have

14  prudential standing, constitutional standing, even if it's

15  kind of hard finding statutory standing under the Bankruptcy

16  Code.  But it's gotten to the point where it's just costing

17  too much time and expense for me to not press some of these

18  issues and hold people accountable.

19     So, Mr. Pomerantz, were you about to say something?  I

20  know that we had talked at another hearing about the Court

21  maybe requiring some sort of disclosures for me to really

22  understand party in interest status maybe better than I do.

23         MR. POMERANTZ:  That, Your Honor, was where I was

24  going to go before Your Honor made the comment.  Your Honor

25  made that comment a few weeks ago.  I think, since then, quite

60

1  honestly, nothing really has changed.  And I think it would be

2  helpful -- it would be helpful for the Debtor, and more

3  importantly, I think it would be helpful to the Court to have

4  a list that you can refer to every time we are in a hearing of

5  every entity that has appeared that Mr. Dondero has a

6  relationship with, who the lawyers are, what the claims they

7  filed, what the status of the claims they filed, and maybe

8  even what litigation they are in pending with the Debtor.

9      We're happy with -- part of it we could prepare.  But I

10  would think Your Honor should order that from Mr. Dondero's

11  related entities, because it might cut through a lot of it,

12  and give Your Honor the information Your Honor needs and the

13  context and perspective as you're hearing a lot of these

14  motions.

15            THE COURT:  All right.  Well, is there anything else

16  before we move on to the other matter?  I'm about to close the

17  loop on this by saying I am --

18            MR. TAYLOR:  Your Honor?  Your Honor?

19            THE COURT:  Who is that speaking?

20            MR. TAYLOR:  This is Clay -- this is Clay Taylor,

21  Your Honor, --

22            THE COURT:  All right.

23            MR. TAYLOR:  -- representing Jim Dondero

24  individually.

25            THE COURT:  Okay.

61

1          MR. TAYLOR:  And I just wanted to be heard.  I've

2    just listened in, even though Mr. Dondero was not the movant,

3    because sometimes issues like this do come up where his name

4    is thrown about.

5          First of all, Jim Dondero was indeed, as Mr. Draper said,

6    was indeed present.  He did indeed try to speak.  I kind of

7    overrode him.  And because, you know, he needs to speak

8    through his lawyer most of the time and shouldn't address the

9    Court directly.  But I wanted to let you know that Mr. Dondero

10   was indeed on the line, was actively listening, and was

11   participating.

12         As far as additional disclosures, it would be, I would

13   just note, somewhat ironic if the Court denies the motion for

14   what appears to be mandatory disclosures under Rule 2015.3 but

15   then imposes additional disclosure requirements on somebody --

16   on another party, without any rule stating that there is such

17   disclosures.  It just -- it strikes me as ironic, and I would

18   like Your Honor to consider that, at least, as Your Honor

19   says, context matters.

20         You know, that's the context in which this arises.  And we

21   would just ask Your Honor to reflect upon that before she

22   imposes additional duties upon my client.

23         But there is -- and the Debtor has asked for the response

24   to be taken as a motion for leave to not comply with a rule,

25   but yet Mr. Seery is not here.  The UCC regularly

62

 1  participates.  Its members are not here.  And so I just, to

 2  the extent Your Honor is going to impose duties upon certain

 3  parties, then what's good for the goose is good for the

 4  gander, Your Honor.

 5         THE COURT:  All right.

 6         MR. POMERANTZ:  Your Honor, I would point out that

 7  Mr. --

 8         THE COURT:  I respect your argument.  I always

 9  respect your arguments, Mr. Taylor.

10     By the way, you aren't wearing a jacket.  You know, next

11  time you need to wear a jacket.  And forgive me if I seem

12  nagging, but I'm letting you all know, if you all are soon

13  going to be having lots of litigation in the District Court, I

14  promise you the district judges are way more formal than me

15  and sticklers for every rule.  You'll also be doing everything

16  live in the courtroom, too.  I'm just letting you know that.

17     But while I respect your argument, apples and oranges.  I

18  mean, the 2015.3 rule, not only is it not -- not -- I wouldn't

19  say mandatory, since the Court has discretion for cause to

20  waive the requirement.  But it's a very onerous set of forms

21  that would have to be filled out for 150 entities by 12 staff

22  members.  I don't really consider that the same as the

23  disclosure that I'm now going to require.

24     But my law clerk and I will -- we'll craft a form of order

25  that will be specific as far as what I'm going to require.

63

1      And, again, I think it's way beyond the point of this

2   being necessary.  And just so -- again, I'm wanting to explain

3   this thoroughly.  You know, standing -- for the nonlawyers; I

4   don't know how many nonlawyers are on the phone, WebEx -- it's

5   a subject matter jurisdiction thing.  Okay?  And, you know, if

6   there's a dispute and someone involved in a dispute

7   technically doesn't have standing, that means the Court didn't

8   have subject matter jurisdiction to be adjudicating it.  Okay?

9   That's first year law school concept.

10      And it's been mentioned we have lots and lots of appeals,

11   and I can promise you, if you've never been through the

12   appellate process, that's the very first thing they'll look at

13   -- you know, District Court, Fifth Circuit, any Court of

14   Appeals -- because they have an overwhelming docket.  And if

15   there's a reason to push out this appeal before then because

16   of lack of subject matter jurisdiction, which would include

17   lack of standing, of course they are going to quickly get it

18   off their plates because they have other things to get to,

19   like criminal matters that are, you know, their top priority

20   because of the Constitution.

21      So this has been an evolving thing with me.  At some

22   point, I feel like the Courts of Appeals that are involved

23   with all of these appeals, they might be really, really

24   zeroing in on the standing of parties more than perhaps even I

25   have.  So I want to do my job and I want it clear on the

64

1 record, this is why this person has standing or doesn't have

2 standing. Okay? I just feel like we've gotten to that point.

3 And so we'll issue an order in that regard, and it will, I

4 promise you, be crystal clear.

5     Anything else?

6         MR. POMERANTZ: Your Honor, one last point. Mr.

7 Taylor insinuated that the board is not present here, which is

8 incorrect. A member or two members or three members of the

9 board have been present at every hearing before Your Honor.

10 And that's without an order requiring them to do so, because

11 they are -- they are interested, they are engaged. Mr. Dubel

12 is on the phone. He has been on the phone. I think this may

13 have been only the second hearing that Mr. Seery has missed,

14 felt it wasn't necessary to take him away from his running the

15 company. So the Debtor has been, through its board members,

16 fully engaged, and I just wanted Your Honor to know that, that

17 we would never have a hearing before Your Honor without at

18 least one member of the independent board listening in and

19 participating as necessary.

20         THE COURT: All right. Thank you.

21     All right. Well, let's move on to the other contested

22 matters, or adversary proceeding matters, I should say. And

23 they're Adversary 21-3006 and 21-3007. We have Motions for

24 Leave to Amend Answers. And do we have Ms. Drawhorn appearing

25 for that motion or those motions?

65

 1          MS. DRAWHORN:  Yes, Your Honor.  Lauren Drawhorn with

 2   Wick Phillips on behalf of Highland Capital Management

 3   Services, Inc. and NexPoint Real Estate Partners, LLP,

 4   formerly known as HCRE Partners, LLC.

 5          THE COURT:  All right.  And who will be making the

 6   argument for the Debtor on this one?

 7          MR. MORRIS:  John Morris, Your Honor; Pachulski Stang

 8   Ziehl & Jones; for the Debtor.

 9          THE COURT:  All right.  Are there any other

10   appearances on this?

11      Okay.  Ms. Drawhorn?

12          MS. DRAWHORN:  Yes, Your Honor.  We are -- so, my

13   clients are seeking leave to amend the answer to add two

14   affirmative defenses.  As you know, under Rule 15(a), there is

15   a bias towards granting leave, and leave should be freely

16   granted unless there's a substantial reason to deny it.

17      The main factors that are considered in determining

18   whether there is a substantial reason to deny a motion for

19   leave to amend are prejudice, bad faith, and futility.

20      Here, there is no prejudice to the Plaintiff.  Under the

21   case law, if the -- as long as a proposed amendment is not

22   presented on the eve of trial, continuing deadlines or

23   reopening discovery does not constitute sufficient prejudice

24   to deny leave.

25      Here, discovery does not close until July 5th for Highland

66

1  Capital Management Services, and it does not close until July

2  26th for NexPoint Real Estate Partners.

3      The Plaintiff has not -- neither party has taken any

4  depositions in this case.  And we are open and willing to

5  extend the discovery deadlines if necessary.  We think that

6  discovery can be extended as necessary without extending any

7  dispositive motion deadline or the docket call which are set

8  in August.  Dispositive motions are August 16th for Highland

9  Capital Management and September 6th for NexPoint Real Estate

10  Partners, with docket call in those cases being October and

11  November.

12      So there's significant time.  If the -- if the party just

13  wants to conduct additional written discovery, I think that

14  that -- they would be easily be able to do that.

15      We're also open to continuing all the deadlines in this

16  case, and practically speaking, those -- the deadlines may be

17  continued depending on what happens with the pending motion to

18  withdraw the reference and the motion to stay.

19      So we don't think -- we don't see any reason why our

20  amended additional affirmative defenses will result in any

21  prejudice to the Plaintiff, and don't see that as a reason --

22  a substantial reason to deny the motion for leave.

23      There is no bad faith here.  The motion for leave was

24  filed two months after our original answer.  Again, this is

25  not a situation where we're trying to add a new defense on the

67

1   eve of trial.  We're not even waiting until after discovery is

2   closed to try and add this new defense.  And it's not after

3   one of our prior defenses failed.  Instead, we've been

4   conducting additional investigations, preparing for written

5   discovery.  And as set forth in more detail in the Sauter

6   declaration that was filed yesterday, we discovered these

7   additional defenses through that additional investigation.

8       So there's certainly no bad faith here in adding these two

9   defenses.  We are just trying to make sure that we can prove

10  up our defenses and prove up our case on the merits, as we

11  need to.

12      And then the last factor, the new affirmative defenses

13  we're seeking to add, they're not futile.  I cited some cases

14  in the pleadings.  There are some judges in the Northern

15  District of Texas that refrain from even evaluating futility

16  at this stage, at a motion for leave to amend stage,

17  preferring to address those on a motion for summary judgment

18  situation.  But even when it is considered, futility looks

19  more at is there a statute of limitations that prevents the

20  claim from being successful, or does the court lack subject

21  matter on its face, based on this defense?  And that's not the

22  case here.

23      The Debtor -- the Plaintiff tries to argue on the merits

24  of our affirmative defenses, and a motion for leave to amend

25  is not a basis for that.  This isn't a motion for summary

68

1    judgment.  This is just -- just a motion for leave to add

2    these defense, and they can certainly address the merits later

3    on in the case.

4        So we think we provided sufficient notice in our proposed

5    amendment.  I mean, our proposed amended answer.  To the

6    extent we need to add any specifics, we are certainly open to.

7    We've noted them in our reply.  The ambiguity is -- is to the

8    notes as a whole.  We noted the Highland Capital Management,

9    there's two notes that are signed by Frank Waterhouse without

10   indication of corporate capacity, which creates some

11   ambiguity.  The notes reference other related agreements,

12   which create some ambiguity.  So we think there's sufficient

13   pleading of these new defenses to support leave to amend and

14   address those on the merits.

15       And then the condition subsequent defenses, while we --

16   the schedules and the SOFAs, the notes related to that

17   reference that some loans between parties and related -- to

18   affiliates and related entities may not be enforceable, we

19   think that supports our position and this defense here, now

20   that we've furthered our investigation and heard about this

21   additional subsequent agreement that supports the condition

22   subsequent.

23       And the opposition, the Plaintiff's opposition notes that

24   there has been some discovery on this defense.  It's similar

25   to one that's asserted in a related note adversary.  And

69

1  while, again, they try to assert the merits and the

2  credibility of certain testimony, that's -- that's a decision,

3  credibility of a witness is a decision for a fact finder and

4  not for this stage of the proceedings and not for a motion for

5  leave to amend.

6    So we don't believe there's a substantial reason to deny

7  leave.  Again, under Rule 15, leave should be granted freely.

8  And so we would request that the Court grant our motion for

9  leave to amend so that we can have our amended answer and

10 affirmative defenses in this case.

11         THE COURT:  All right.  Well, Mr. Morris, you know,

12 the law is not too much in your favor on this one.  So what do

13 you have to say?

14         MR. MORRIS:  I have to say a few things first, Your

15 Honor.  The notes are one of the most significant assets of

16 the estate.  As the Court will recall at the confirmation

17 hearing, Mr. Dondero and all of his affiliated entities

18 objected to confirmation on the ground -- challenging, among

19 other things, both the liquidation analysis as well as the

20 projections on feasibility going forward.

21   One of the assumptions in those projections and in the

22 liquidation analysis was indeed the collection of these notes

23 in 2021.  They all sat on their hands, attacked the

24 projections, attacked the liquidation analysis, but never on

25 the grounds that the notes wouldn't be collectable in 2001

70

1    [sic], never informing the Court that there was some agreement

2    by which collection would be called into question, never ever

3    disclosing to anybody that the plan might not be feasible or

4    the liquidation analysis might not be accurate because these

5    notes were uncollectable.

6        So what happened after that, Your Honor?  We commenced

7    these actions.  Actually, before the hearing.  We actually

8    commenced these actions before the confirmation hearing, when

9    they sat silently on this.

10       And Mr. Dondero's first answer, because this is all very

11   important because they say that they're -- they're

12   piggybacking on Mr. Dondero.  Mr. Dondero's first answer to

13   the complaint said, I don't have to pay because there is an

14   agreement by which the Debtor said they would not collect.

15   It's in the record.  It's attached to my declaration.  And

16   that was it.  Full stop.  I don't have to pay because the

17   Debtor agreed that I would not have to collect.

18       So we served a request for admission.  Admit that you

19   didn't pay taxes.  He realized, okay, that defense doesn't

20   work, so he changes it completely and he amends his answer.

21   Now the amended answer says, I don't -- the Debtor agreed that

22   I wouldn't have to pay based on conditions subsequent.

23       And we said, what are those conditions subsequent?  Please

24   tell us in an interrogatory response.  And under oath, Mr.

25   Dondero said, I don't have to pay if the Debtor sells their

71

1  assets in the future.  At a favorable price, I think it says.

2  Again, this is in the record.  And we asked him under oath,

3  who made that agreement on behalf of the Debtor?  And he said,

4  I did.

5      And Your Honor will recall that we had a hearing on that

6  very defense, on the motion to compel, where they said Mr.

7  Seery has to come in and testify to the defense that Mr.

8  Dondero made this agreement with himself.  And then the

9  following week, on a Tuesday, we had the hearing on the motion

10  to withdraw the reference, and Your Honor said finish

11  discovery, because we told you discovery was going to be

12  concluded on Friday with Mr. Dondero's deposition.  You know

13  what they did, Your Honor?  The night before the hearing, they

14  amended Mr. Dondero's interrogatory.  Again, these are sworn

15  statements.  They amended it again to say he didn't enter the

16  agreement on behalf of the Debtor; Nancy Dondero, his sister,

17  did.

18      And then I took his deposition.  And we're going to get to

19  that in a moment, because I'm going to put it up on the screen

20  so you can see these answers, Your Honor.  And I say this by

21  way of background because it goes to both good faith -- or,

22  actually, bad faith -- as well as the lack of a bona fide

23  affirmative defense here.

24      This is -- there are five notes litigation.  One against

25  Mr. Dondero.  So that's package number one.  And they're

72

1   represented by the Stinson firm, who is signing all of these

2   things.  The Stinson firm is out there claiming that in good

3   faith each of these -- each of these amendments, each of these

4   amendments to the interrogatories, are in good faith.  They're

5   not in good faith, Your Honor.  They're just not.

6       And the Bonds firm.

7       Then bucket two is what we have here today.  That's HCRE

8   and Highland Capital Management Services.  They're represented

9   by Ms. Drawhorn.  I think the Stinson firm has now also

10  entered an appearance in those two adversary proceedings.

11      And the other two are against the two Advisors.  More

12  entities controlled by Dondero.  And Mr. Rukavina, I believe,

13  last night filed his motion to amend to add these same

14  defenses.

15      Okay?  Is this good faith?  I don't think this is good

16  faith.

17      Let's look at Mr. Dondero's testimony so that the Court

18  has an understanding of what we're talking about here.  I

19  think I have Ms. Canty on the phone, and I'd ask her to go to

20  Page 178.  3.  Just going to read (garbled) so you can see.

21  This was Mr. Dondero's testimony the day after telling me that

22  he amended his interrogatory -- sworn interrogatory answer to

23  say that he didn't enter the agreement on behalf of the Debtor

24  but Ms. -- but Ms. Dondero, his sister, did.

25      Question.  Are we -- 178, please.

73

1          MS. DRAWHORN:  Your Honor, I would --

2          MR. MORRIS:  Question.  Please --

3          MS. DRAWHORN:  This is not testimony in this

4   adversary and I was not -- my clients were not present at this

5   deposition that Mr. Morris is referring to, so I --

6          MR. MORRIS:  Your Honor, with all due respect, she's

7   interrupting me, and I would ask her to allow me to finish my

8   presentation and then she can make whatever comments she

9   wants.  Because -- because --

10          MS. DRAWHORN:  Well, I'm objecting to this testimony

11   --

12          THE COURT:  Okay.

13          MS. DRAWHORN:  -- coming into evidence.

14          THE COURT:  Okay.  So your objection is -- if you

15   could just articulate your objection for the record, please,

16   Ms. Drawhorn.

17          MS. DRAWHORN:  I would object to this -- this

18   deposition is not in this proceeding, this adversary

19   proceeding, either of these two the adversary proceedings, and

20   my client was not present at this deposition, so I would

21   object to it as hearsay.

22          THE COURT:  Response?

23          MR. MORRIS:  Your Honor, if I may, I think this --

24   this points to just one of the fundamental problems that we

25   have here.  As we pointed out in our objection, the Debtor, as

74

1  we sit here right now, still has no notice of the facts and

2  circumstances surrounding this alleged agreement.  We still

3  don't know who entered into the agreement on behalf of the

4  Debtor.  We don't know what the terms of the agreement were.

5  We don't know when the agreement was entered into.  We don't

6  -- right?

7      If they're going to assert that there's an agreement --

8  and they seem to be piggybacking on this conversation between

9  Mr. Dondero and his sister.  If there's a different one, they

10 need to say that right now.  They need to put their cards on

11 the table and they need to inform the Debtor who entered the

12 agreement on behalf of the Debtor pursuant to which the Debtor

13 agreed to waive millions and millions of dollars without

14 telling anybody.

15          THE COURT:  Okay.  I overrule the objection.  We can

16 go through the transcript.

17          MR. MORRIS:  So, I'm just going to use part of it,

18 Your Honor.  But on Lines 3 to 7:

19     "Q   Did  anybody  else  participate  --  did  anybody

20     participate in any of the conversations other than you

21     and your sister?

22     "A   I  don't  believe  it  was  necessary.   It  didn't

23     include anybody else."

24     Go down to Line 19, please.

25     "Q   Was the agreement subject to any negotiation?  Did

75

1    she make any kind of -- any counterproposal of any

2    kind?

3    "A   No."

4    Page 179, Line 2.

5    "Q   Do you know if she sought any independent advice

6    before entering into the agreement that you have

7    described?

8    "A   I don't know."

9    Line 23, please.

10   "Q   Do you know if there were any resolutions that

11   were adopted by Highland to reflect the agreement

12   that's referred to in the -- in the answer?

13   "A   Resolutions that -- no.  Not that I'm aware of."

14   Page 180, Line 5.

15   "Q   Did you give Nancy a copy of the promissory notes

16   that were a subject of the agreement?

17   "A   No."

18   Continue.

19   "Q   Did she ask to see any documents before entering

20   into the agreement that's referred to?

21   "A   I don't remember."

22   Page 181, Line 19.

23   "Q   Under the agreement that you reached with Nancy

24   that's referred to in Paragraph 40, was it your

25   understanding that Highland surrendered its right to

76

1     make a demand for payment of unpaid principal and

2     interest under the notes?

3     "A  Essentially, I think so."

4     Page 219. I'll just summarize 219, Your Honor. Mr.

5  Dondero has no recollection of telling Mr. Waterhouse, the

6  chief financial officer, or any other employee of Highland

7  that he'd entered into this agreement with his sister pursuant

8  to which the Debtor agreed to not collect almost $10 million

9  of principal and interest.

10     Now let's -- let's go -- I think it's really -- because it

11  took me an awfully long time to get there. On Page 214 at

12  Lines 16 through 24. This is what the agreement was, because

13  this is -- this is -- this is his third try to describe the

14  agreement. Right? The first time -- it's just his third try,

15  and this is what the agreement is, Your Honor.

16     "Q  Did you and Nancy agree in January or February

17     2019 that if Highland sold either MGM or Cornerstone or

18     Trussway for an amount that was equal to at least one

19     dollar more than cost, that Highland would forgive your

20     obligations under the three notes?

21     "A  I believe that is correct."

22     That's -- that's the agreement. It took him three times

23  to get there, but look at -- look at that. He and his sister

24  did that.

25     And I do want to point out, Your Honor, that in their

77

1    opposition that they filed last night, the Defendants claim

2    that Ms. Dondero was authorized because she was -- she was the

3    trustee of Dugaboy and Dugaboy holds the majority of the

4    limited partnership interests in the Debtor and therefore she

5    had the authority to enter into the agreement on behalf of the

6    Debtor.

7        There is that flippant -- there is just that unsupported

8    statement out there.  Section 4.2(b) of the limited

9    partnership agreement says, and I quote, "No limited partner

10   shall take part in the control of the partnership's business,

11   transact any business in the partnership's name, or have the

12   power to sign documents for or otherwise bind the partnership,

13   other than as specifically set forth in the agreement."

14       So I look forward to hearing what basis there was to

15   submit a document to this Court that Nancy Dondero had the

16   authority to bind the Debtor in an agreement with her brother

17   pursuant to which tens of millions of dollars was apparently

18   forgiven.

19       Can we go to Page 238?  This is the last piece, Your

20   Honor.  The Debtor's outside auditors were

21   PricewaterhouseCoopers.  There's management representation

22   letters signed by both Mr. Dondero and Mr. Waterhouse

23   attesting that they had given their auditors all of the

24   information necessary to conduct the audit.  We will get to

25   that in due course, but these are very important questions

78

1 right here.

2     What page are we on?  Is it 238?  Okay.  So, Line 16, I

3 believe.

4     "Q  You knew at the time -- you knew at the time the

5     audited financials were finalized that Highland was

6     carrying on its balance sheet notes and other amounts

7     due from affiliates?

8     "A  Yep."

9     And if we could just keep going, Your Honor, you will see:

10     "Q  Did    you    personally    tell    anybody    at

11     PricewaterhouseCoopers    in    connection    with    the

12     preparation  of  the  audited  financial  statements  for

13     2018  that  you  and  your  sister  had  entered  into  the

14     agreement with your sister Nancy in January or February

15     of 2019?

16     "A  Not that I recall."

17     There's a lot more here, Your Honor.  I'm really just

18 touching the surface.  I am going to take Nancy's deposition

19 later this month.  But there is -- this is wrong.  This is

20 just all so wrong.  For three different reasons.  At least.

21 This is not a viable defense and will never be a viable

22 defense.

23     The audited financial statements carry these loans as

24 assets on the books, without qualification, and they were

25 subject to Mr. Dondero and Mr. Waterhouse's representations.

79

1       There is partial performance.  These entities that we're

2    talking about today, they made payments on these notes.  How

3    do you make payments on the notes and then come to this Court

4    and say the notes are ambiguous?  How do you -- how do you

5    make payments on the notes and come to this Court and tell

6    this Court, I just learned that there was an agreement by

7    which I don't have to pay, subject to conditions precedent in

8    the future.

9       Mr. Sauter submits a declaration in support of this

10   motion.  He has no personal knowledge.  He states in Paragraph

11   14 that his review of the Defendants' books and records did

12   not reveal any background facts regarding the notes.  Mr.

13   Dondero is the maker on all of the notes except for two of

14   them.  Mr. Dondero owns and controls the Defendants.  Mr.

15   Dondero was not employed or otherwise affiliated with the

16   Debtor after these actions were commenced.  Mr. Sauter takes

17   Mr. Seery to task for telling the Debtor's employees not to

18   take actions that were adverse, and he uses that as his excuse

19   for not knowing these facts.  He is the general counsel.  He

20   was served with a complaint that alleged that his clients were

21   liable for millions and millions of dollars.  His boss is

22   James Dondero.  He had unfettered access to James Dondero.

23   Mr. Dondero is the one who signed the notes, except for two of

24   them.  There is absolutely no excuse for not doing the

25   diligence to find out from Mr. Dondero that this defense

80

1    existed.

2        And you know why it didn't happen?  Because the defense is

3    not real.  It is completely fabricated.  It continues to

4    change and evolve every single time I -- every single time I

5    talk about these note cases, it's a new defense, it's a

6    different defense, the contours change, somebody else is

7    involved.  This is an abuse of process, Your Honor.  It is bad

8    faith.  It just really is.  And somebody's got to start to

9    take responsibility and say, I won't do this.  I won't do

10   this.

11       Somebody's got to stand up and say that, because, I'm

12   telling you, it's not enough, Your Honor, that the Debtor is

13   going to collect all of its fees under the notes at the end of

14   this process.  It's not enough,  because we're now giving an

15   interest-free loan.  These are -- these are notes that are

16   part of the Debtor's plan that nobody objected to, that nobody

17   suggested were the subject of some condition subsequent.

18       This is not your normal, you know, gee, I'd like leave to

19   amend the complaint.  They're simply following what Mr.

20   Dondero did.  And I would really ask the Court to press the

21   Defendants to identify specifically who made the agreement on

22   behalf of the Debtors, when was the agreement made, is there

23   any document that they know of today that reflects this

24   agreement, and what were the terms of the agreement?  Is it

25   really that he would sell -- if he sells MGM for a dollar over

81

1  cost, $70 million of notes get forgiven?  How is that

2  possible?  How is that possible?  It doesn't pass the good

3  faith test.  The Court should deny the motion.

4      Thank you, Your Honor.

5          THE COURT:  Mr. Morris, in all of your listing of

6  allegedly problematic things, one trail my brain was going

7  down is this:  Is this adversary going to morph even further

8  to add fraudulent transfer allegations?  I mean, if notes --

9          MR. MORRIS:  Here's the --

10          THE COURT:  -- were forgiven or agreements were made

11  --

12          MR. MORRIS:  Yeah, I --

13          THE COURT:  -- that they would be forgiven if, you

14  know, assets are sold at a dollar more than cost, is the

15  Debtor going to say, well, okay, if this is an agreement,

16  there was a fraudulent transfer?

17          MR. MORRIS:  Your Honor, that is an excellent

18  question, one which I was discussing with my partners just

19  this morning.  You know, we have to -- we're balancing a

20  number of things on our side, including the delay that that

21  might entail; including, you know, what happens if we go down

22  that path.  You know, the benefit of suing under the notes, of

23  course, is that he's contractually obligated to pay all of our

24  fees.

25      And so we're balancing all of those things as these -- as

82

1   these defenses metastasize.  But it's something that we're

2   considering, and we reserve the right to do exactly that, as

3   these defenses continue to get -- and it would be fraudulent

4   transfer, it would be breach of fiduciary duty against Nancy

5   Dondero, it would be breach of fiduciary duty against Jim

6   Dondero.  I'm sure that there are other claims, Your Honor.

7   But if they want to -- if I'm forced to go down that path, I'm

8   certainly going to use every tool that I have available to

9   recover these amounts from the -- for the Debtor and their

10  creditors.  This is just an abuse of process.

11      How do you -- how does one enter into agreements of this

12  type without telling your CFO, without telling your auditors,

13  without putting it in writing?  And I asked Mr. Dondero, what

14  benefit did the Debtor get from all of this?  And you know

15  what his answer was, Your Honor?  Because it's really -- it's

16  appalling.  It was going to give him heightened focus on

17  getting the job done because of this agreement that he entered

18  into with his sister, Nancy, acting on behalf of the Debtor,

19  with no information, with no documents, with no notes, with no

20  advice, with no corporate resolutions.  The Debtor was going

21  to get Mr. Dondero's heightened focus to sell MGM, Trussway,

22  or Cornerstone for one dollar above cost.

23      I think the fraudulent transfer claim is probably a pretty

24  solid one.  But why do we have to do this?  Why do we have to

25  do this?

83

1          THE COURT:  Well, one of the reasons I'm asking is I

2     would not set the motion to withdraw the reference status

3     conference on an expedited basis, which I was asked to do a

4     few days ago in these two adversary proceedings, and I can't

5     remember when I've set it, but now I'm even worried, if I

6     grant this motion, is it going to be premature to have that

7     status conference in a month or so, whenever I've set it,

8     because if I grant this motion I'm wondering, am I going to

9     have your motion to amend to add fraudulent transfer claims?

10    It's -- you know, I want to give as complete a package to the

11    District Court as I can whenever I have that motion to

12    withdraw the reference.

13         All right.  Ms. Drawhorn, back to you.  As I said --

14              MS. DRAWHORN:  Yes.

15              THE COURT:  -- before inviting Mr. Morris to make his

16    argument, I know the law is very much on your clients' favor

17    as far as the law construing Rule 15(a).  But my goodness, I'm

18    wondering if your client needs -- your client needs to be

19    careful what they're asking for here, after what I've just

20    heard.

21         Anyway, what -- you get the last word on this.

22              MS. DRAWHORN:  Yes.  Thank you, Your Honor.  My

23    response is that Mr. Morris's argument was all on the merits

24    of the defenses, and certainly he is free to argue on the

25    merits, but that's not a determination for today and that's

84

1  not a determination for the motion for leave to amend.  That's

2  a determination for if he files a dispositive motion.

3      Like I said, we are still in the discovery phase.  Mr.

4  Morris mentioned at least three parties that will be -- likely

5  be deposed and potentially give us the additional information

6  that he's asking for to support this defense.  He mentioned

7  PricewaterhouseCoopers; Nancy Dondero, who he's already got

8  scheduled in a different adversary; Frank Waterhouse.

9      So it's too early, as you know, to look at the merits.

10  That's not -- that's not what's the focus of a motion for

11  leave to amend.

12      As to the -- the what amendment, what agreement, what are

13  the conditions subsequent, I believe we provided sufficient

14  information in our reply.  And if the Court would like us to

15  update our proposed amended answer, if the Court is inclined

16  to grant our motion, we can certainly do that.  But I think

17  the Plaintiff seems to be well aware of what the defenses are,

18  especially after his argument today on why he thinks it's not

19  a valid defense.

20      And then, on the due diligence, we did -- we did do due

21  diligence.  That's why we're seeking to amend the answer,

22  obviously, and add these claims.

23      If the Court -- if the Plaintiff wants to file a motion to

24  amend later, then we can address those amendments then.

25      But I think, on the Rule 15 standard, we have met our

85

1  burden and there's no substantial reason to deny the motion to

2  amend to add these defenses.

3       THE COURT:  All right.  By the way, have your

4  clients, have they filed proofs of claim?  And I'm asking for

5  a different reason than maybe I was asking earlier.  NexPoint

6  Real Estate Partners?

7       MS. DRAWHORN:  They're -- NexPoint Real Estate

8  Partners, LLC, formerly known as HCRE Partners, does have a

9  proof of claim on file.  It's unrelated to the notes.  And it

10 is subject to a contested matter that's pending -- that's a

11 separate matter that's before the Court being addressed.

12    And then HCMS initially filed a proof of claim that was

13 objected to in the Debtor's first omnibus objection and then

14 was disallowed.  There was no response to that omnibus

15 objection, so there's no longer a proof of claim for Highland

16 Capital Management Services.

17       THE COURT:  Okay.  Again, I'm just thinking ahead to

18 this report and recommendation I'm eventually going to have to

19 make on the motions to withdraw the reference.  And as I

20 alluded to, if this morphs to the point of including

21 fraudulent transfer claims, that certainly --

22       MS. DRAWHORN:  And Your Honor, one --

23       THE COURT:  It's going to affect the report and

24 recommendation.  And, you know, proofs of claim affect that,

25 too.  So, --

86

1          MS. DRAWHORN:  Uh-huh.  Yes.  And I understand that,

2     Your Honor.  And the issue, I think, with you -- we need to

3     have this motion resolved, because it -- unless the Court is

4     going to continue discovery or stay.  You know, one of the

5     reasons why we had initially requested the expedited hearing

6     was because of the discovery is continued -- continuing to --

7     discovery deadlines are continuing to move.  And obviously

8     whatever the Court decides on this motion for leave to amend

9     will determine what the scope of that discovery is.

10         Similarly, if the Debtor decides to amend, that could

11     change the scope of discovery as well.

12         So we are open to continuing deadlines, and I think, you

13     know, might end up filing a motion to continue.  I haven't

14     conferred with Mr. Morris yet.  I suspect he's opposed, based

15     on our prior conversations.  But that's something that might

16     be helpful, especially if the Court is concerned on how it

17     will affect the motion to withdraw the reference, to -- maybe

18     we continue some of these upcoming deadlines, and that might

19     appease, you know, solve some of your concerns.

20          THE COURT:  All right.  Well, Rule 15(a), of course,

21     is the governing rule here, and the case law is abundant that

22     courts "should freely give leave when justice so requires."

23     And the law is also abundantly clear that the rule "evinces a

24     bias in favor of granting leave to amend."  And again and

25     again, cases say that leave should be granted unless there's

87

1　substantial reason to deny leave, and courts may consider

2　factors such as delay or prejudice to the non-movant, bad

3　faith or dilatory motives on the part of the movant, repeated

4　failure to cure deficiencies, or futility of the amendment.

5　　　While the Debtor has presented arguments that there might

6　be bad faith here on the part of the Movants and there might

7　be futility in allowing the amendments because of various

8　strong arguments and defenses the Debtor believes it has to

9　this issue of agreements with regard to the notes that

10　allegedly provide affirmative defenses, the Court believes the

11　rule requires me to allow leave to amend the answer.

12　　　Now, a couple of things.  I am going to require, though,

13　that the amended answer be more specific than has been

14　suggested.  I am going to agree that if new affirmative

15　defenses are made that there was this agreement to forgive

16　when certain conditions happened, then there does need to be

17　identification of who the human beings were that were involved

18　in making the agreement, the date of any agreement or

19　agreements, and disclose what documents substantiate the

20　agreement or reflect the agreement.  All right?  So if that

21　could --

22　　　　　　MR. MORRIS:  Your Honor?

23　　　　　　THE COURT:  Yes?

24　　　　　　MR. MORRIS:  John Morris.  I apologize for

25　interrupting, but just a fourth thing is what is the

88

1  agreement?  I mean, what is the agreement?

2          THE COURT:  Well, okay.  That's fair enough.  What is

3  the agreement?  I guess --

4          MR. MORRIS:  And -- and --

5          THE COURT:  -- that needs to be spelled out.  I mean,

6  I guess I was assuming that that would be spelled out in --

7  but maybe it's not.  So we'll go ahead and add that.

8      As far as extension of the discovery, Ms. Drawhorn has

9  offered that.  I think it would be reasonable if the Debtor or

10 Plaintiff wants that.  Do you want an extension of discovery?

11         MR. MORRIS:  What I really want, Your Honor, is a

12 direction for them to serve this amended answer within 24 or

13 48 hours and grant leave to the Debtor to promptly file

14 written discovery.  We've got Nancy Dondero -- if it turns out

15 -- and maybe Ms. Drawhorn can just answer the question right

16 now.  Who entered the agreement on behalf of the Debtor?

17 Because I'm already taking Nancy Dondero's deposition on the

18 28th.  And it seems to me, if they would just answer the

19 question of whether Ms. Dondero is the person who did that, I

20 could just add a notice of deposition and take the deposition

21 on that date, too, and it would be, really, more efficient for

22 everybody.

23         THE COURT:  Ms. Drawhorn, who was the human being?

24         MS. DRAWHORN:  Yes.  It was -- yes, Nancy Dondero

25 entered into the -- the subsequent agreement.

89

1          MR. MORRIS:  Okay.  Super.

2          THE COURT:  All right.  You said you've already --

3          MR. MORRIS:  So, --

4          THE COURT:  -- got a depo scheduled of her?

5          MS. DRAWHORN:  Well, what's the date --

6          MR. MORRIS:  I do --

7          MS. DRAWHORN:  -- Mr. Morris?

8          MR. MORRIS:  I believe it's the 28th.  Your co-

9    counsel can confirm, but I think it's the 28th.

10      And I'll just get another deposition notice for that one,

11   and we'll figure out a time to take Mr. Sauter's deposition,

12   too.

13      But I don't think that there is a need, frankly, for --

14   having been told by Mr. Dondero that there's no documents

15   related to this, having the Court just ordered the Defendants

16   to disclose the identity of any documents that relate to this

17   agreement, I don't think we need to extend the discovery

18   deadline at all.  I can take Ms. Dondero's deposition, I can

19   take Mr. Dondero's deposition, and I can take Mr. Sauter's

20   deposition in due course over the next four weeks.

21          THE COURT:  All right.  Well, Ms. Drawhorn, we'll say

22   that this amended answer needs to be filed by midnight Friday

23   night, 11:59.  That gives you a day and a half to get it done.

24   All right.  If you could please --

25          MS. DRAWHORN:  Yes, Your Honor.

90

1          THE COURT:  Please upload an order, Ms. Drawhorn,

2    granting your motion with these specific requirements that

3    I've orally worked in.

4       I think clients need to be careful what they ask for.  I'm

5    very concerned.  And I know it was just argument and I'll hear

6    evidence, but of all of the things that I guess -- well, I'm

7    concerned about a lot of things, but do we have audited

8    financial statements that didn't disclose these agreements

9    with regard to --

10          MR. MORRIS:  Yes, Your Honor.

11          THE COURT:  I mean, that's -- I'm just -- you know,

12   there's a lot to be concerned about on that point alone, I

13   would think.  But, all right.  If there's nothing further, we

14   are adjourned.  Thank you.

15          THE CLERK:  All rise.

16       (Proceedings concluded at 11:58 a.m.)

17                         --oOo--

18

19                      CERTIFICATE

20       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    **/s/ Kathy Rehling**                    **06/12/2021**

23   _____      _____
     Kathy Rehling, CETD-444                      Date
24   Certified Electronic Court Transcriber

25

**Appx. 04797**

91

INDEX

1

2     PROCEEDINGS                                                    4

3     WITNESSES

4     -none-

5     EXHIBITS

6     -none-

7     RULINGS

8     <u>19-34054-sgj</u>

9     Motion to Compel Compliance with Bankruptcy Rule 2015.3   49/54
      filed by Get Good Trust, The Dugaboy Investment Trust
10    (2256)

11    <u>21-3006-sgj</u>

12    Motion for Leave to File Amended Answer and Brief in          86
      Support filed by Defendant Highland Capital Management
13    Services, Inc. (15)

14    <u>21-3007-sgj</u>

15    Motion for Leave to Amend Answer to Plaintiff's               86
16    Complaint filed by Defendant HCRE Partners, LLC (n/k/a
      NexPoint Real Estate Partners, LLC) (16)
17
      END OF PROCEEDINGS                                            90
18
      INDEX                                                         91
19

20

21

22

23

24

25