# EXHIBIT 15

**Appx. 04858**

```
 1                    IN THE UNITED STATES BANKRUPTCY COURT
                      FOR THE NORTHERN DISTRICT OF TEXAS
 2                               DALLAS DIVISION

 3                                   )    Case No. 19-34054-sgj-11
       In Re:                        )    Chapter 11
 4                                   )
       HIGHLAND CAPITAL              )    Dallas, Texas
 5     MANAGEMENT, L.P.,             )    Thursday, January 14, 2021
                                     )    9:30 a.m. Docket
 6             Debtor.               )
                                     )    - MOTION TO PREPAY LOAN
 7                                   )      [1590]
                                     )    - MOTION TO COMPROMISE
 8                                   )      CONTROVERSY [1625]
                                     )    - MOTION TO ALLOW CLAIMS OF
 9     _____)      HARBOURVEST [1207]

10                          TRANSCRIPT OF PROCEEDINGS
                    BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
11                      UNITED STATES BANKRUPTCY JUDGE.

12     WEBEX APPEARANCES:

13     For the Debtor:               Jeffrey Nathan Pomerantz
                                     PACHULSKI STANG ZIEHL & JONES, LLP
14                                   10100 Santa Monica Blvd.,
                                       13th Floor
15                                   Los Angeles, CA  90067-4003
                                     (310) 277-6910
16
       For the Debtor:               John A. Morris
17                                   Gregory V. Demo
                                     PACHULSKI STANG ZIEHL & JONES, LLP
18                                   780 Third Avenue, 34th Floor
                                     New York, NY  10017-2024
19                                   (212) 561-7700

20     For the Official Committee    Matthew A. Clemente
       of Unsecured Creditors:       SIDLEY AUSTIN, LLP
21                                   One South Dearborn Street
                                     Chicago, IL  60603
22                                   (312) 853-7539

23     For CLO Holdco, Ltd.:         John J. Kane
                                     KANE RUSSELL COLEMAN LOGAN, P.C.
24                                   901 Main Street, Suite 5200
                                     Dallas, TX  75202
25                                   (214) 777-4261
```

                                                              2

```
 1   APPEARANCES, cont'd.:

 2   For James Dondero:         John T. Wilson
                                D. Michael Lynn
 3                              John Y. Bonds, III
                                Bryan C. Assink
 4                              BONDS ELLIS EPPICH SCHAFER
                                   JONES, LLP
 5                              420 Throckmorton Street,
                                   Suite 1000
 6                              Fort Worth, TX  76102
                                (817) 405-6900
 7
     For Get Good Trust and     Douglas S. Draper
 8   Dugaboy Investment Trust:  HELLER, DRAPER & HORN, LLC
                                650 Poydras Street, Suite 2500
 9                              New Orleans, LA  70130
                                (504) 299-3300
10
     For HarbourVest, et al.:   Erica S. Weisgerber
11                              M. Natasha Labovitz
                                Daniel E. Stroik
12                              DEBEVOISE & PLIMPTON, LLP
                                919 Third Avenue
13                              New York, NY  10022
                                (212) 909-6621
14
     For Highland CLO Funding,  Rebecca Matsumura
15   Ltd.:                      KING & SPALDING, LLP
                                500 West 2nd Street, Suite 1800
16                              Austin, TX  78701
                                (512) 457-2024
17
     Recorded by:              Michael F. Edmond, Sr.
18                              UNITED STATES BANKRUPTCY COURT
                                1100 Commerce Street, 12th Floor
19                              Dallas, TX  75242
                                (214) 753-2062
20
     Transcribed by:            Kathy Rehling
21                              311 Paradise Cove
                                Shady Shores, TX  76208
22                              (972) 786-3063

23

24

             Proceedings recorded by electronic sound recording;
25               transcript produced by transcription service.
```

3

1        <u>DALLAS, TEXAS - JANUARY 14, 2021 - 9:41 A.M.</u>

2        THE CLERK:  All rise.  The United States Bankruptcy

3   Court for the Northern District of Texas, Dallas Division, is

4   now in session, the Honorable Stacey Jernigan presiding.

5        THE COURT:  Good morning.  Please be seated.  All

6   right.  We're a little late getting started because we had

7   lots of reading material for the Court today.  All right.

8   This is Judge Jernigan, and we have a couple of Highland

9   settings.  The HarbourVest matters are the primary thing we

10  have set today, and then we also have a Debtor's motion

11  pursuant to protocols for authority for Highland Multi-Strat

12  to prepay a loan.

13     All right.  Well, let's get a few appearances.  First, for

14  the Debtor team, who do we have appearing this morning?

15        MR. POMERANTZ:  Good morning, Your Honor.  It's Jeff

16  Pomerantz, John Morris, and Greg Demo here on behalf of the

17  Debtor.

18        THE COURT:  Okay.  Thank you.

19     All right.  We have objections on HarbourVest.  Who do we

20  have appearing for Mr. Dondero this morning?

21        MR. WILSON:  Your Honor, it's John Wilson, and I'm

22  also joined by Michael Lynn, John Bonds, and Bryan Assink.

23        THE COURT:  Okay.  I'm sorry.  Could -- the court

24  reporter does yeoman's work in this case.  Let me just make

25  sure we got all three of those names.  Say again, Mr. Wilson.

4

1      MR. WILSON:  John Bonds and Michael Lynn and Bryan

2  Assink.

3      THE COURT:  Oh, okay.  So, see, I thought I heard

4  somebody Wilson in all of that, which was why I was pressing

5  the issue.

6    All right.  Is Mr. Dondero present on the video for

7  today's hearing?

8      MR. WILSON:  I believe he is, Your Honor.

9      THE COURT:  Mr. Dondero, could you confirm that you

10  are out there?  (No response.)  Okay.  My court reporter says

11  he sees the name out there.  Is he in your office?

12      MR. WILSON:  Your Honor, he is appearing remotely

13  from my office.  I'm not sure exactly where he's appearing

14  from.

15      THE COURT:  Okay.  Well, Mr. Dondero, if you're out

16  there and you're speaking up to confirm you're present, we're

17  not hearing you.  Maybe your device is on mute.  So please

18  unmute yourself.

19    (No response.)

20      THE COURT:  All right.  I'm going to take some other

21  appearances and you -- you need to try to communicate with

22  your client and let him know I need to confirm he's present.

23  Okay?

24    All right.  Meanwhile, let's go to our other Objectors.

25  CLO Holdco.  Who do we have appearing today?

5

1          MR. KANE:  John Kane; Kane Russell Coleman & Logan;

2   on behalf of CLO Holdco.

3          THE COURT:  All right.  Thank you, Mr. Kane.

4      We had an objection from Dugaboy Investment Trust and Get

5   Good Trust.  Who do we have appearing?

6          MR. DRAPER:  Douglas Draper, Your Honor, for -- for

7   Draper.

8          THE COURT:  All right.  Thank you, Mr. Draper.

9      All right.  I think those were the only written objections

10  we had.  Mr. Pomerantz, do you confirm, we don't have any

11  other objectors for the motions set, correct?

12         MR. POMERANTZ:  Your Honor, there was those three.

13         THE COURT:  I'm sorry.  I didn't catch your full

14  sentence.

15         MR. POMERANTZ:  That is correct, Your Honor.  There

16  were three objections to the motion.

17         THE COURT:  Okay.  Mr. Clemente, you're there for the

18  Creditors' Committee?

19         MR. CLEMENTE:  Yes.  Good morning, Your Honor.  Matt

20  Clemente on behalf of the Official Committee of Unsecured

21  Creditors.

22         THE COURT:  All right.  Good morning.  Thank you.

23  All right.  We have a lot of other folks on the video.  I'm

24  not going to go ahead and take a roll call of other lawyers.

25         MS. WEISGERBER:  Your Honor?

6

1           THE COURT:  Yes?

2           MS. WEISGERBER:  Excuse me, Your Honor.  It's Erica

3  Weisgerber from Debevoise on behalf of HarbourVest.

4           THE COURT:  Okay.

5           MS. WEISGERBER:  And I'm joined by Natasha Labovitz

6  and Dan Stroik --

7           THE COURT:  Okay.

8           MS. WEISGERBER:  -- from Debevoise as well.

9           THE COURT:  Thank you.  I was neglectful in not

10  getting your appearance, because, of course, you're at the

11  front and center of this motion to compromise, and I did see

12  that you filed a reply brief yesterday afternoon.  Okay.

13  Thank you.

14      All right.  Do we have -- do we have Mr. Dondero on the

15  line?  I'm going to check again.

16      (No response.)

17           THE COURT:  Mr. Dondero's counsel, I cannot hear you,

18  so please unmute your device.

19           MR. WILSON:  Your Honor, it appears to me that Mr.

20  Dondero's device was unmuted as soon as you asked if he was

21  available.  I sent him a communication a second ago asking if

22  he's having technical difficulties.  I have not received a

23  response, so I --

24           MR. DONDERO:  Hello.  Can anybody hear me?

25           THE COURT:  Oh.

7

1          MR. WILSON:  Okay.  I hear him.

2          THE COURT:  Mr. Dondero?

3          MR. DONDERO:  Hello?

4          THE COURT:  Is that you?

5          MR. DONDERO:  Yeah, it is.  I've been on.  I've heard

6   everything since the beginning.  It's just we've had technical

7   difficulties.  I couldn't use the Highland offices.  We've

8   been trying to set up something else.

9          THE COURT:  All right.

10          MR. DONDERO:  But I'm on now, if -- yes.

11          THE COURT:  All right.  Very good.  Well, I'm glad

12   we've got you.

13      All right.  Well, Mr. Pomerantz, how did you want to

14   proceed this morning?

15          MR. POMERANTZ:  Your Honor, we could take up the

16   HarbourVest motion first, and I will turn it over to John

17   Morris.  He and Greg Demo will be handling that.  And then

18   after that we can handle the other motion, which is unopposed.

19          THE COURT:  All right.  Mr. Morris?

20          MR. KANE:  Your Honor, this is -- sorry.  This is

21   John Kane for CLO Holdco.  Just very briefly, if I may.  And

22   this will affect, I think, the Debtor's case in chief, so I'll

23   expedite things a little bit, I believe.

24      CLO Holdco has had an opportunity to review the reply

25   briefing, and after doing so has gone back and scrubbed the

8

1  HCLOF corporate documents.  Based on our analysis of Guernsey

2  law and some of the arguments of counsel in those pleadings

3  and our review of the appropriate documents, I obtained

4  authority from my client, Grant Scott, as Trustee for CLO

5  Holdco, to withdraw the CLO Holdco objection based on the

6  interpretation of the member agreement.

7          THE COURT:  All right.  Well, thank you for that, Mr.

8  Kane.  I think that -- that eliminates one of the major

9  arguments that we had anticipated this morning.  So, thank you

10 for that.

11    Any other housekeeping matters that maybe someone had that

12 I didn't ask about?

13         MS. MATSUMURA:  Yes, Your Honor.  This is Rebecca

14 Matsumura from King & Spalding representing Highland CLO

15 Funding, Ltd.  I just wanted to put on the record, we -- our

16 client had requested that some of its organizational documents

17 be filed under seal.  But we have given permission for the

18 parties to present the relevant excerpts, to the extent it's

19 still relevant after Mr. Kane's announcement, in court.  And

20 we'd just ask that the underlying documents remain sealed, but

21 we're not going to object if they show them on a PowerPoint or

22 anything like that.

23    So, to the extent that you had that on your radar, I just

24 wanted to clear that up for the proceedings.

25         THE COURT:  All right.  Well, I did sign an order

9

1 late last night. I don't know if it's popped up on the

2 docket.

3      MS. MATSUMURA: Yes, Your Honor. That's what this

4 referred to. That was what -- these are the documents that

5 were being sealed. And so I just wanted to note, if you --

6 you know, if the Debtor puts up an excerpt of those documents

7 and you're like, wait a minute, didn't I seal those, that we

8 were the party that requested them be under seal and we're

9 fine with them being shown in court, as long as the underlying

10 documents aren't publicly accessible.

11      THE COURT: Okay. Got you. Thank you.

12    All right. Any other housekeeping matters?

13      MR. MORRIS: Yes, Your Honor. This is John Morris

14 from Pachulski Stang for the Debtor. Good morning.

15      THE COURT: Good morning.

16      MR. MORRIS: The only other matter that I wanted to

17 raise, and I can do it now or I can do it later, or Your Honor

18 may tell me that it's not appropriate to do at this time, is

19 to schedule the Debtor's motion to hold Mr. Dondero in

20 contempt for violation of the TRO.

21      THE COURT: All right. Well, let's do that at the

22 conclusion today. And please make sure I do it. I think I

23 was going to address this last Friday, and we went very late

24 and it slipped off my radar screen. But I did see from my

25 courtroom deputy that you all were reaching out to her

10

1  yesterday to get this set, and then Mr. Dondero's counsel

2  reached out to her and said, We're going to file an objection

3  to a setting next Wednesday, or I think you had asked for a

4  setting next Tuesday or Wednesday.

5          MR. MORRIS:  I did.

6          THE COURT:  And I don't -- I don't know if that

7  response/objection was ever filed last night.  I haven't seen

8  it if it was.  So, we'll -- please, make sure I don't forget.

9  We'll take that up at the end of today's matters.  All right.

10 Well, --

11         MR. MORRIS:  All right.  So, --

12         MS. WEISGERBER:  Your Honor, one last housekeeping

13 item from -- I'm joined this morning by Michael Pugatch of

14 HarbourVest, who will present some testimony this morning.  I

15 just want to confirm he's on the line and confirm no

16 objections to him sitting in for the rest of the hearing.

17         THE COURT:  All right.  Mr. Pugatch, this is Judge

18 Jernigan.  Could you respond?  Are you there with us?

19         MR. PUGATCH:  Yes.  Good morning, Your Honor.  Mike

20 Pugatch from HarbourVest here.

21         THE COURT:  All right.  Very good.  I think we had

22 you testify once before in the Acis matter, if I'm not

23 mistaken.  Maybe.  Maybe not.  Maybe I saw a video deposition.

24 I can't remember.

25    All right.  So, we're going to let Mr. Pugatch sit in on

11

1  this.  Anyone want to say anything about that?  I consider him

2  a party representative, so I don't -- I don't think anyone

3  could invoke the Rule.

4      All right.  Very good.  Well, let's go forward if there

5  are no more housekeeping matters.

6          MR. MORRIS:  Okay.

7          THE COURT:  Mr. Morris?

8          MR. MORRIS:  Thank you.  Thank you very much, Your

9  Honor.  John Morris; Pachulski Stang Ziehl & Jones; for the

10 Debtor.

11     It's a rather straightforward motion today.  It's a motion

12 under Rule 9019, pursuant to which the Debtor requests the

13 Court's authority and approval to enter into a settlement

14 agreement with HarbourVest that will resolve a number of

15 claims that HarbourVest has filed against the Debtor.

16     What I -- the way I propose to proceed this morning, Your

17 Honor, is to give what I hope is an informative but relatively

18 brief opening statement.  I'll defer to HarbourVest and its

19 counsel as to whether they want to make a presentation in

20 advance of the offer of evidence.  Any objecting party, I

21 suppose, should then be given the opportunity to present their

22 case to the Court.  Then the Debtor will call Jim Seery, the

23 Debtor's CEO and CRO.  We will offer documents into evidence.

24 I would propose then that the objecting parties take the

25 opportunity to ask Mr. Seery any questions they'd like on the

1  matter.

2      After the Debtor rests, I think HarbourVest would like to

3  put Mr. Pugatch on the stand to offer some testimony on their

4  behalf.  And I think that that will conclude the case.  We can

5  finish up with some closing arguments as to what we believe

6  the evidence showed, but that's the way that I'd like to

7  proceed, if that's okay with the Court.

8              THE COURT:  All right.  That sounds fine.

9              OPENING STATEMENT ON BEHALF OF THE DEBTOR

10             MR. MORRIS:  Okay.  So, as I said, Your Honor, this

11  is a -- this should be a very straightforward motion under

12  Rule 9019.  The standard is well-known to the Court.  There

13  are four elements to a 9019 motion.  The Debtor clearly has

14  the burden of proof on each one.  And we easily meet that

15  burden, Your Honor.

16      The standard, just to be clear, the first part is that we

17  have to establish a probability of success, with due

18  consideration for uncertainty of law and fact.  The second one

19  is the complexity, likely duration, expense and inconvenience

20  of the litigation.  The third part of the test is the

21  paramount interest of creditors.  And the fourth part of the

22  test is whether or not the proposed settlement was reached

23  after arm's-length negotiations.

24      The Debtor believes that it easily meets this standard,

25  and frankly, is a little bit frustrated that it's being forced

13

1    to incur the expense by Mr. Dondero in going through this

2    process.

3         A plain reading, a fair reading of the economics here

4    relative to the claim shows that this is a very reasonable

5    settlement.  I don't need to go beyond that, Your Honor.  I

6    don't even need to use the word reasonable.  It surely meets

7    the lowest standard.

8         We've prepared a couple of demonstrative exhibits, Your

9    Honor.  I'm going to use them with Mr. Seery.  But I'd like to

10   just put one up on the screen now, if I may.

11        Ms. Canty, can you please put up Demonstrative Exhibit #3?

12        Demonstrative Exhibit #3 is an outline of the economics of

13   the settlement.  It includes the various pieces, the

14   components that the parties have agreed to.  And it shows, at

15   least from the Debtor's perspective, just what HarbourVest is

16   being given here.

17        Up on the screen is a demonstrative exhibit.  It has

18   citations to the evidence that will be admitted by the Court.

19   The first line shows that HarbourVest will receive a $45

20   million allowed general unsecured nonpriority claim.  And that

21   -- that can be found at Debtor's Exhibit EE, Exhibit 1, at

22   Page 2.

23        That claim is discounted by the expected recovery that

24   general unsecured creditors are supposed to get.  As of

25   November, in the liquidation analysis that was part of the

14

 1   disclosure statement -- that's the citation in the footnote --

 2   the Debtor believed that unsecured creditors were estimated to

 3   recover approximately eighty-seven and a half cents on the

 4   dollar.  And so we just did the arithmetic there to get to the

 5   net economic value of the proposed general unsecured claim.

 6        And from that, we reduced $22-1/2 million because that is

 7   the net asset value of HarbourVest's interest in HCLOF, which,

 8   pursuant to the settlement agreement, it will transfer back to

 9   the Debtor, so that the net economic value is approximately

10   $16.8 million.

11        You will hear testimony from Mr. Seery that this number

12   is, in fact, overstated, and it's overstated because, since

13   the time the disclosure statement was filed in November, a

14   number of events have occurred that will -- that have caused

15   the estimated recovery percentage to be reduced from

16   approximately 87-1/2 percent to something lower than that.  We

17   don't have the exact number, Your Honor, but Mr. Seery will --

18   and the evidence will show that there's been more expenses,

19   that there's been some resolution of certain claims.  There's

20   been some positive issues, too.  But that number is probably

21   in the 70s somewhere.

22        And in any event, I think the point here is, Your Honor,

23   HarbourVest invested $80 million in HCLOF, which was going to

24   participate in the investment in CLOs.  They filed a claim for

25   $300 million, through treble damages and other claims.  But

15

1  the net economic impact of this is going to be somewhere
2  probably in between $12 and $14 million.  I'll let Mr. Seery
3  give more precision to that.  And it represents less than -- a
4  less than five percent recovery on the total claim.
5      And we think it's important for the Court to keep that in
6  mind.  What are the economics here?  Are we overpaying?  Is
7  this an unreasonable settlement?  And I think the evidence
8  will show that the Debtor is not, but that this settlement
9  that you see before you was the product of arm's length, and
10  I'm going to go in reverse order of the four-part test under
11  9019.
12      So, the last part is whether or not the settlement, the
13  proposed settlement was the product of arm's-length
14  negotiation.  You'll hear lots of evidence that this
15  settlement that's up on the screen right now very much was the
16  product of arm's-length negotiation.
17      The third part of the test, Your Honor, is whether it
18  meets the paramount interest of creditors.  You know,
19  regrettably, Mr. Dondero is the only purported creditor who is
20  objecting here.  He may have done so through different
21  vehicles, but every objecting party here is a debtor [sic]
22  owned and controlled by Mr. Dondero.  No other creditor -- not
23  the Creditors' Committee, UBS, Acis, Mr. Terry, Mr. Daugherty
24  -- nobody is objecting to this settlement except for Mr.
25  Dondero.  And we believe that that highlights the Debtor's

16

1 ability to meet the third prong of the test, and that is these

2 are -- this settlement is in the paramount interest of

3 creditors.

4 Again, going in reverse, the second part of the test is

5 the complexity, duration, and expense of litigation. There

6 will be no disputed evidence that we meet -- the Debtor easily

7 meets this prong of the test. The evidence is going to show

8 that HarbourVest's claim is based on fraud, fraud in the

9 inducement, fraudulent statements and omissions, the kind of

10 case, Your Honor, that I'm sure you're familiar with that is

11 incredibly fact-intensive, that will be incredibly difficult

12 to navigate through. It will be prolonged, it will be

13 expensive, because you're necessarily relying on he said/she

14 said, basically. And so we're going to have to get testimony

15 from every person that spoke in connection with the events

16 leading up to the transaction. So we think the second prong

17 will be easily met, Your Honor.

18 And then the last prong -- the first prong, if you will --

19 is the likelihood of success on the merits. We think that the

20 settlement, the economic recovery that's up on the screen

21 here, which ultimately will be less than five percent of the

22 claimed amount, in and of itself shows that the settlement is

23 consistent with the Debtor's perception of its likely success

24 on the merits. I'm certain that HarbourVest disagrees, but

25 that's okay, we're here today and that's the Debtor's view,

17

1   and the Court is here to assess the Debtor's business judgment

2   and whether the Debtor has properly analyzed the issues and

3   gone through the process.  And the evidence will show

4   conclusively that it will.  That it has.

5       Mr. Seery will testify at some length as to the risks that

6   he saw.  I think that you'll hear counsel for Mr. Dondero ask

7   both Mr. Seery and Mr. Pugatch a number of questions designed

8   to elicit testimony about this defense or that defense.  And

9   it's a little -- it's a little ironic, Your Honor, because,

10  really, every defense that they're going to try to suggest to

11  the Court was a valid defense is a defense that the Debtor

12  considered.  In fact, it's, you know, it's a little spooky,

13  how they've -- how they've been able to identify kind of the

14  arguments that the Debtor had already considered in the

15  prosecution of their objections here.

16      But be that as it may, the evidence will conclusively show

17  that the Debtor acted consistent with its fiduciary duties,

18  acted in the best interests of the Debtor's estate, acted

19  completely appropriately here in getting yet another very

20  solid achievement for the Debtor, leaving very few claims that

21  are disputed at this point, all but one of which I believe are

22  in the hands of Mr. Dondero.

23      So, that's what we think that the evidence will show.

24      I do want to express my appreciation to Mr. Kane for

25  reflecting on the arguments that we made with respect to the

18

1  ability of the Debtor to engage in the transfer or the

2  acquisition of the asset from HarbourVest.  I would -- I would

3  respectfully request that we just enter into a short

4  stipulation on the record reflecting that the Debtor's

5  acquisition of HarbourVest's interests in HCLOF is compliant

6  with all of the applicable agreements between the parties.

7      And with that, Your Honor, I look forward to putting Mr.

8  Seery on the stand and presenting the Debtor's case.

9          THE COURT:  All right.  Other opening statements?

10          OPENING STATEMENT ON BEHALF OF CLO HOLDCO, LTD.

11          MR. KANE:  Yes, Your Honor.  Sorry.  John Kane on

12  behalf of CLO Holdco.

13      In response to Mr. Morris, I'm not going to enter into a

14  stipulation on behalf of my client, but the Debtor is

15  compliant with all aspects of the contract.  We withdrew our

16  objection, and we believe that's sufficient.

17          THE COURT:  All right.  Well, I'm content with that.

18      Other opening statements?

19          OPENING STATEMENT ON BEHALF OF HARBOURVEST

20          MS. WEISGERBER:  Your Honor, Erica Weisgerber on

21  behalf of HarbourVest.

22      HarbourVest joins in Mr. Morris's comments in support of

23  the settlement, and we believe that the question of whether

24  the settlement between HarbourVest and the Debtor satisfies

25  the Rule 9019 standard is not even a close one.

19

1       Some Objectors have made arguments about the merits of

2   HarbourVest's claims, which is why we're here.  As Your Honor

3   will hear this morning, HarbourVest has meaningful and

4   meritorious claims against Highland, but made the business

5   decision to avoid the time, expense, and inherent risk of

6   litigation in the interest of preserving value, both for

7   itself and for the estate.

8       Today, Michael Pugatch, a managing director of

9   HarbourVest, will testify before the Court.  He'll explain

10  that HarbourVest claims against Highland arise out of certain

11  misrepresentations and omissions by Highland to HarbourVest in

12  connection with HarbourVest's purchase of an interest in

13  HCLOF, one of Highland's managed funds.  Those

14  misrepresentations and omissions, as Your Honor will hear,

15  relate to Highland's litigation with its former employee,

16  Joshua Terry, and transfers that were conducted in 2017 to

17  strip Acis of value and prevent Mr. Terry from collecting on

18  an $8 million judgment.

19      Mr. Pugatch will further explain that HarbourVest would

20  not have invested in HCLOF had it known the underlying facts

21  about those Acis transfers.

22      Mr. Pugatch will also testify that not only did

23  HarbourVest not know about those transfers, it learned about

24  those transfers when it was accused of orchestrating the

25  transfers itself in the Acis bankruptcy.  Your Honor will hear

1  that the Acis trustee sought extensive discovery from

2  HarbourVest after numerous accusations that HarbourVest was

3  behind the transfers.

4      Mr. Pugatch will also testify that Highland charged legal

5  fees for itself and its affiliates to HCLOF, essentially

6  forcing HCLOF to fund the litigation involving the Acis

7  bankruptcy and Mr. Terry.

8      In total, HarbourVest's claims for damages are over a

9  hundred million dollars in investment-related losses, lost

10  profits, legal fees inappropriately charged to HCLOF, its own

11  legal fees.  And that's before interest or trebling damages.

12      But HarbourVest stands ready to litigate its claims, but

13  following hard-fought and extensive negotiations with the

14  Debtors, the parties reached the settlement that's now before

15  the Court.  Mr. Pugatch's testimony regarding the strong

16  factual bases for HarbourVest's claims against Highland and

17  its recoverable damages will further underscore the risks that

18  the Debtors faced if they chose to litigate these claims, and

19  why this settlement is fair, equitable, and in the best

20  interest of the estate.

21         THE COURT:  All right.  Thank you, Counsel.

22      Other opening statements?

23    OPENING STATEMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS

24         MR. DRAPER:  Your Honor, this is Douglas Draper on

25  behalf of one of the Objectors.  I'd like to just make a few

21

 1  comments with respect to what I've heard and what the Court is

 2  going to hear.

 3      The first issue I'd like to address is the comment by

 4  counsel for the Debtor that no other party has objected.  The

 5  9019 motion is one of the issues that this Court has to rule

 6  on, whether or not there was an objection or not.  So the fact

 7  that this may be -- bankruptcy is not a popularity contest and

 8  not an issue of who votes for what and doesn't vote.  This,

 9  along with the 1129(a) tests, are clearly within your

10  province, and you need to listen carefully because you'll have

11  to make your own independent analysis whether my objection is

12  correct or incorrect.

13      Two other points I'd like to make that I think are very

14  salient.  Number one is, if you look at the Debtor's

15  disclosure statement, it basically took the position that the

16  HarbourVest claim is of little or no value.  And lo and

17  behold, thirty days later, there's a settlement that brings

18  about a significant recovery to HarbourVest.  The timing is

19  interesting, and I think the Court needs to pay careful

20  attention to what transpired between the two dates.

21      And then the last point I'd like to make is, as you listen

22  to the evidence, and what I learned abundantly clear from

23  hearing the depositions, is that the claim of HarbourVest, if

24  there is a claim at all, is probably one hundred percent --

25  should be subordinated in that it appears to arise out of the

22

1  purchase or sale of a security.  And, again, I would ask the

2  Court to listen carefully to this because that's what it

3  appears to be and that's what the evidence is going to show to

4  the Court.

5        THE COURT:  All right.  Mr. Draper, let me clarify

6  something I'm not sure if I heard you say or not.  Were you

7  saying that the Court still needs to drill down on the issue

8  of whether the Debtor can acquire HarbourVest's interest in

9  HCLOF?

10        MR. DRAPER:  No.

11        THE COURT:  Okay.  I was confused whether you were

12  saying I needed to take an independent look at that, now that

13  the objection has been withdrawn of Holdco.  You are not

14  pressing that issue?

15        MR. DRAPER:  No, I am not.  Basically, I think it's

16  the fairness of the settlement.  I think the transferability

17  of the interest is separate and apart from the fairness of the

18  settlement itself.  I think the fairness -- the

19  transferability was a contractual issue between two parties

20  that the Court does not have to drill down on.

21        THE COURT:  All right.  I have another question for

22  you.  I want to clarify your client's standing.  Tell me --

23  I'm looking through a chart I printed out a while back.  I

24  guess Dugaboy Investment Trust filed a couple of proofs of

25  claim; is that right?

23

1          MR. DRAPER:  Yes.

2          THE COURT:  Okay.  What --

3          MR. DRAPER:  And objections are pending.

4          THE COURT:  Pardon?

5          MR. DRAPER:  Objections to those claims are pending

6   before the Court, Your Honor, --

7          THE COURT:  Okay.

8          MR. DRAPER:  -- and have not been litigated.

9          THE COURT:  And what about Get Good Trust?

10         MR. DRAPER:  Get Good Trust has a proof of claim also

11  that objections are pending to.  Pending.

12         THE COURT:  Okay.  I don't want to get too

13  sidetracked here, but I know standing was -- was mentioned as

14  a legal argument today.  What is the basis for those proofs of

15  claim?

16         MR. DRAPER:  The first one is, with respect to the

17  proof of claim for Dugaboy, there is an investment that

18  Dugaboy made that was then funneled, we believe, up to the

19  Debtor.  And the -- the loan that exists, we believe is a

20  Debtor loan, as opposed to a loan to the entity that we made

21  the loans to.

22     And, again, it's a matter that the Court is going to hear.

23  The claim may or may not be allowed.  It has not been

24  disallowed yet.

25     The second part to the Dugaboy ownership is we own an

24

1 interest in the Debtor. And so we are, in fact, a party in

2 interest.

3             THE COURT: Okay.

4             MR. DRAPER: It may be a small interest, but it is an

5 interest.

6             THE COURT: It has a limited partnership interest in

7 the Debtor?

8             MR. DRAPER: Yes.

9             THE COURT: Is that correct?

10            MR. DRAPER: Yes.

11            THE COURT: Okay. Well, I'll move forward. Thank

12 you.

13     Does that cover -- any other opening statements? I think

14 that covered everyone who was -- who filed some sort of

15 pleading today. No.

16            MR. WILSON: Your Honor, John Wilson on behalf of --

17            THE COURT: I'm sorry. I'm sorry.

18            MR. WILSON: -- Mr. Dondero.

19            THE COURT: I missed Mr. Dondero's counsel. I knew

20 we had visited at some point this morning. I just got

21 confused there. Go ahead, Mr. Wilson.

22            MR. WILSON: No problem, Your Honor. I was just

23 going to say that we will reserve our comments until after the

24 conclusion of the testimony.

25            THE COURT: All right. Very well.

25

1      Mr. Morris, you may call your first witness.

2          MR. MORRIS:  Thank you, Your Honor.  Before I do,

3  just two very, very quick points.

4          THE COURT:  Okay.

5          MR. MORRIS:  To be clear, Dugaboy's interest in the

6  Debtor is 0.1866 percent.  Less than two-tenths of one

7  percent.

8      Secondly, the argument that Mr. Draper just made with

9  respect to subordination is one that appears in nobody's

10  papers.  And, in fact, not only doesn't it appear in anybody's

11  papers, but Mr. Dondero, I believe, specifically took issue

12  with the fact that a portion of the consideration that

13  HarbourVest would receive would be on a subordinated basis,

14  and he would -- and I think he took the position there is no

15  basis to give them a subordinated claim.

16      So, I just wanted to point those items out to the Court,

17  not that I think either one makes a large difference today,

18  but I do want to deal with the facts.

19          THE COURT:  Thank you.

20          MR. MORRIS:  The Debtor would call -- you're welcome,

21  Your Honor.  The Debtor calls Mr. James Seery.

22          THE COURT:  All right.  Mr. Seery, welcome back to

23  virtual court.  If you could say, "Testing, one, two" so I can

24  see you and swear you in.

25          MR. SEERY:  Testing, one, two.

                          Seery - Direct                          26

1           THE COURT:  All right.  I heard you but I'm not yet

2   seeing your video.  Is your video turned on?

3           MR. SEERY:  Video is on.  Yes, Your Honor.

4           THE COURT:  Okay.  I see you now.  Please raise your

5   right hand.

6               JAMES SEERY, DEBTOR'S WITNESS, SWORN

7           THE COURT:  Thank you.  Mr. Morris?

8           MR. MORRIS:  Thank you, Your Honor.

9                        DIRECT EXAMINATION

10  BY MR. MORRIS:

11  Q    Good morning, Mr. Seery.  Can you hear me?

12  A    I can.  Thank you, Mr. Morris.

13  Q    Okay.  Let's just cut to the chase here.  Are you familiar

14  with HarbourVest's claims filed against the Debtor?

15  A    I am, yes.

16  Q    And did you personally review them?

17  A    I did, yes.

18  Q    Do you recall that over the summer the Debtor objected to

19  HarbourVest's claim?

20  A    Yes, we did.

21  Q    Why -- can you explain to the judge why Harbour -- why the

22  Debtor objected to HarbourVest's claim last summer?

23  A    Sure.  The HarbourVest claims, I believe there are about

24  six of them, initially were filed, and they were -- they were

25  relatively vague in terms of what the specifics of the claims

Seery - Direct                               27

1  were.

2      So, we saw the claims but didn't, frankly, pay a lot of

3  attention to the underlying transaction that was referred to

4  in the proofs of claim and the losses that HarbourVest had

5  claimed to suffer -- to suffer with respect to their purchase

6  of securities related to HCLOF and the damages caused by the

7  Acis case.  So we filed a pretty pro forma objection.  I

8  believe it was a simply stated objection that we didn't have

9  any record that there was anything in the Debtor's books and

10 records that they had a valid claim for any amount against the

11 Debtor.

12 Q   Are you aware that HarbourVest subsequently filed a

13 response to the Debtor's objection to their claims?

14 A   Yes.  Yes, I am aware.

15 Q   And did you familiarize yourself with that particular

16 response?

17 A   I did indeed.  It was a pretty extensive response, really

18 developing the full panoply of their claims, which included

19 claims for expenses relating to the Acis case, which

20 HarbourVest viewed as being improperly charged to HCLOF by its

21 manager, which is effectively Highland.  Those expenses,

22 HarbourVest took the view, were excessive, had nothing to do

23 with the investment, and were simply a pursuit of a personal

24 vendetta against Mr. Terry and his interests by Mr. Dondero,

25 and using HCLOF's money to actually pursue those interests.

Seery - Direct                        28

1      In addition, and this was the first time we saw that,

2  HarbourVest brought forth its claims that it was entitled to

3  effectively rescind the transaction.  And I say rescind the

4  transaction:  In security parlance, they claim that they were

5  induced by fraud, I think as most are -- to enter into the

6  transaction.

7      As most are aware, the liability limitations in the OMs

8  and the exculpation in the documents are pretty broad, and

9  HarbourVest's position was that they weren't going to be

10 subject to those limitations because the actual transaction

11 that they entered into was a fraud on them, designed by Mr.

12 Dondero, Mr. Ellington, and the Highland team.

13 Q   All right.  Let's talk about your understanding, the

14 Debtor's understanding of the factual background to

15 HarbourVest's claim.  What is your understanding of the

16 investment that HarbourVest made?

17 A   Well, HarbourVest made an investment in the Highland CLO

18 business.  The Highland CLO business was -- was Acis.  And

19 effectively, the business had been separated, but in name

20 only.  Acis was just a shell, with a few partners --

21 obviously, Mr. Terry as well -- but it was all Highland

22 personnel doing all the work.

23     And what they were trying to do with Acis was, in essence,

24 resuscitate a business that had been in a bit of a decline

25 from its pre-crisis heyday.

Seery - Direct                    29

1      They were looking to take additional outside capital.

2   They would -- they would pay down or take money out of the

3   transaction, Highland would, or ultimately Mr. Dondero, and

4   they would -- they would seek to invest in Acis CLOs,

5   Highland's 1.0 CLOs.  And then with respect to the Acis CLOs,

6   and potentially new CLOs, but with the Acis CLOs, they'd seek

7   to reset those and capture what they thought would be an

8   opportunity in the market to -- to really use the assets that

9   were there, not have to gather assets in the warehouse but be

10  able to use those assets to reset them to market prices for

11  the liabilities and then make money on the equity.

12  Q    Do you have an understanding --

13  A    Then --

14  Q    I'm sorry.  Go ahead.

15  A    Why don't I continue?  So, the transaction, they found

16  HarbourVest as a potential investor, and the basis of the

17  transaction was that they would make an investment into Acis.

18       Shortly before the transaction, and while they were doing

19  diligence, Mr. Terry received his arbitration award.  I

20  believe that was in October of 2017.  The transaction with

21  HarbourVest closed in mid- to late November of 2017.  But Mr.

22  Terry was not an integral part.  Indeed, he wasn't going to be

23  a key man.  He had been long gone from Highland by that time.

24       What the -- I think you asked me originally what the basis

25  of their claim was.  The transaction went forward, and the

Seery - Direct                                    30

1   basis of their claim is that they really were never -- nothing

2   was disclosed to them about the nature of the dispute with Mr.

3   Terry other than in the highest-level terms; the animosity

4   with respect to which that dispute was held by Highland and

5   potentially Mr. Terry; and really, how those costs would be

6   borne and risks be borne by the investment that they were

7   making.

8       That was, in essence, the transaction and the high-level

9   view of their claim.

10  Q    Okay.  Just a few very specific facts.  Do you have an

11  understanding as to how much HarbourVest invested and what

12  they got in exchange for that investment?

13  A    Yeah.  HarbourVest invested in a couple tranches, and I

14  forget the exact dates, but approximately $75 million

15  originally, and then they added another five.  Some

16  distributions were made in the first half of 2018, putting

17  their net investment in the mid-seventies on the investment,

18  which now is worth about 22-1/2 million bucks.

19  Q    And what percentage interest in HCLOF did HarbourVest

20  acquire, to the best of your knowledge?

21  A    They have 49.98 percent of HCLOF.  HCLOF, just to refresh

22  -- the Court is, I think, well aware of this, but to refresh,

23  is a Guernsey entity.  Not -- not atypical for structures of

24  this type to use offshore jurisdictions and sell the

25  securities under -- at least to U.S. -- can't sell them to

Seery - Direct                                   31

1  U.S. investors unless they qualify, and these are sold under

2  Reg S to -- to investors that otherwise qualify.  And

3  HarbourVest was investing in that transaction through the

4  Guernsey structure.

5  Q    And do you have an understanding as to who owned the 50-

6  plus percent of HCLOF that HarbourVest was not going to

7  acquire?

8  A    Yeah.  There's -- you can tell by the name.  HCLOF is

9  Highland CLO Funding.  This is a Highland vehicle.  So

10 Highland owned and controlled the vehicle.  The DAF, which is

11 -- which is Dondero-controlled trusts, have the -- 49 percent.

12 Highland has, I believe, around .63-65 percent directly.  And

13 then Highland employees at the time who were involved in the

14 business owned another small percentage.

15     So the majority was going to be controlled by Highland

16 through its control of DAF and its control of the employees

17 that worked for it.  HarbourVest would be a minority investor.

18 Q    Okay.  And I believe you testified that the investment was

19 made in mid-November; is that right?

20 A    That's correct.  I think it was the 15th, may have been

21 the 17th of November.

22 Q    And do you recall when in October the Terry arbitration

23 award was rendered?

24 A    It was about a month before.  I think it was right around

25 the 20th, the 17th to the 20th.  I may be slightly wrong on

Seery - Direct                                  32

1   each of those dates.

2   Q    Okay.  What is your understanding as to what happened

3   after the issuance of the award that is the basis or at least

4   one of the bases for HarbourVest's claim?

5   A    I don't think there's -- I don't think there's any

6   dispute.  And there certainly are judicial findings.  Dondero

7   and Highland went about stripping Acis of all of its assets.

8   So, remember that Acis is not a separate standalone company,

9   in any event.  It's controlled and dominated completely by

10  Highland at the time.  But it did have contracts.  And those

11  contracts had value.

12      So the first idea was to strip out the management contract

13  and put it into a separate vehicle, which we called HCF

14  Advisor, which Highland still owns.  The second piece was to

15  strip out some valuable assets, the risk retention piece,

16  which was a loan that in essence was equity that Highland had

17  put into Acis but structured as a loan, as many of the

18  transactions we'll see down the road are, in order to deal

19  with some -- avoid taxes in any way possible.  And that

20  structure, that value moved value out of Acis for the express

21  purpose of trying to run, in essence, the Highland business

22  back in Highland.

23      Remember, as I said, Acis is just a Highland business

24  moved to a separate shell.  When Mr. Terry got his arbitration

25  award against Acis and was seeking to enforce it, it was

Seery - Direct                                    33

1  pretty straightforward, let's take all the assets -- Dondero

2  scheme -- let's take all the assets and move them back into

3  Highland so Terry can't get anything.

4  Q   And how does that scheme relate to the HarbourVest claim,

5  to the best of your knowledge?

6  A   Well, HarbourVest -- HarbourVest's position is that they

7  invested in Acis and -- and whether Acis was called Acis or

8  called Highland, it doesn't really matter; there were valuable

9  assets in the -- in the entity that they were going to be

10 investing in through the equity in these CLOs and some of the

11 debt securities in those CLOs.

12     And then the stripping out and the fraudulent conveyances

13 out of Acis caused them damages because that's what left the

14 damage to Mr. Terry.

15     The quick math on Acis, by the way, is Acis has probably

16 lost, total damages, 175 million bucks.  And that's pretty

17 easy.  DAF lost 50.  HarbourVest lost 50.  Fifteen million of

18 fees charged to HCLOF.  Another five million of fees, at

19 least, incurred by Mr. Terry.  Ten million that went to Mr.

20 Terry, 15 to Highland fees, another five, plus Mr. Terry's

21 settlement in this case, over eight million bucks.

22     So HarbourVest's position, which, on a factual basis, you

23 know, is problematic for the estate, is, wait a second, we

24 invested in this vehicle with Highland.  That was supposed to

25 invest in Highland CLOs.  They were called Acis, but they were

Seery - Direct                                34

1  Highland CLOs.  And then you went about causing tremendous

2  damage to that vehicle that we ultimately were investing in,

3  and then charge us for the pleasure.

4  Q    You used the phrase earlier "OM," I believe.

5  A    Offering memorandum.

6  Q    Offering memorandum?  Can you just explain to the Court

7  your understanding of what an offering memorandum is?

8  A    Typically, under U.S. law, and foreign jurisdictions have

9  similar laws, you have to have a document that explains the

10 securities that you're selling.  And it goes into extreme

11 detail about the securities and the risks related to those

12 securities.

13     And the idea is not to have a document that tells you

14 whether it's a good investment or a bad investment, but it's a

15 document that discloses to the potential investor all of the

16 risks with respect to that security or related to the

17 investment over the duration of the security.  It doesn't

18 predict the future, but it's supposed to make sure that it

19 gives you a very clean view of the past and a very clean view

20 of what the facts from the past are and how they would

21 implicate the future of the investment.

22 Q    And in the course of its diligence, did the Debtor have an

23 opportunity to review the offering memorandum in the context

24 of the claims that were being asserted by HarbourVest?

25 A    Oh, absolutely.  It was originally effectively -- it's an

Seery - Direct                          35

1    HCLOF offering memorandum.  But as I said, HCLOF was managed

2    and controlled by Highland, and Highland originally prepared

3    it.  And then, of course, in connection with -- with this

4    dispute and these claims, we reviewed it, both myself and my

5    legal team.

6    Q    All right.

7             MR. MORRIS:  Your Honor, the offering memorandum is

8    on the Debtor's exhibit list, and I think this is an

9    appropriate time to move into evidence Debtor's Exhibits A

10   through EE, all of which appear at Docket No. 1732.

11            THE COURT:  1732?

12            MR. MORRIS:  It's the Debtor's Second Amended Witness

13   and Exhibit List.

14            THE COURT:  All right.  Any objection to admission of

15   A through EE?

16            MR. DRAPER:  Douglas Draper.  No objection, Your

17   Honor.

18            THE COURT:  All right.  Mr. --

19            MR. MORRIS:  May I proceed?

20            THE COURT:  Yeah.  Mr. Wilson, did you want to

21   confirm no objection?

22        (Echoing.)

23            THE COURT:  All right.  Hearing no objection,

24   Debtor's A through EE are admitted.

25        (Debtor's Exhibits A through EE are received into

                              Seery - Direct                    36

1   evidence.)

2           THE COURT:  Go ahead, Mr. Morris.

3           MR. MORRIS:  Thank you, Your Honor.  The offering

4   memorandum itself is one of the documents that we filed under

5   seal, and we did so at the request of counsel to HCLOF.  But

6   HCLOF has consented to our sharing up on the screen certain

7   very limited provisions of the document, without waiving the

8   request that the agreement otherwise be maintained under seal.

9           THE COURT:  All right.

10          MR. MORRIS:  So may I proceed on that basis, Your

11  Honor?

12          THE COURT:  You may.  Uh-huh.

13          MR. MORRIS:  Okay.  Ms. Canty, can you please put up

14  on the screen Demonstrative Exhibit #1?  Okay.  Can we just --

15  is there a way to just expand that just a bit, Ms. Canty?

16  Thank you very much.  And if we could just scroll it up?

17  Thank you very much.  Perfect.

18     Okay.  So, Your Honor, this, as the footnote says, is an

19  excerpt from the offering memorandum that can be found at

20  Debtor's Exhibit AA.  Double A.  And this particular portion

21  of the offering memorandum is at Page 35.

22          THE COURT:  Okay.

23  BY MR. MORRIS:

24  Q   Mr. Seery, have you seen this portion of the offering

25  memorandum before?

Seery - Direct                              37

1   A    Yes, I have.  But before I continue, I just -- I should

2   have checked.  Are you able to hear me clearly?  Am I speaking

3   too quickly or am I cutting out?  I just want to make sure.

4   I'm using a different set of audio today.

5            THE COURT:  All right.

6            MR. MORRIS:  That's fine.

7            THE COURT:  I hear you very well.

8            MR. MORRIS:  Yeah.

9            THE COURT:  So I think we're good right now.  Thank

10  you.

11           THE WITNESS:  Yeah.  Thank you, Your Honor.  I was

12  just checking.

13           THE COURT:  Okay.

14           THE WITNESS:  In response to your question, Mr.

15  Morris, yes, I have seen this before.

16  BY MR. MORRIS:

17  Q    Okay.  And can you -- did you form a view in doing the due

18  diligence as to the adequacy of this disclosure?

19  A    Yes, I did.

20  Q    Can you share your -- or share with Judge Jernigan the

21  Debtor's view as to the adequacy of this disclosure concerning

22  the litigation between Highland and Acis?

23  A    With respect to the litigation between Highland and Acis,

24  or, really, between Acis, Highland, and Highland's principals

25  and Acis's principal, totally inadequate.  The disclosure here

Seery - Direct                                    38

1   is very high-level.  And if there were no other litigation

2   going on, it might serve to suffice.  It basically says, In

3   our business, because we invest in distressed loans, there's a

4   lot of litigation around distressed investments, and that's

5   what we have.  And then it says, We've talked with the

6   investor about other things and we're -- we think that's

7   enough.

8   Q    Is there anything in this portion or anywhere in the

9   offering memorandum that you're aware of that disclosed to

10  HarbourVest that in the weeks leading up to the investment

11  Highland was engaged in the fraudulent transfer of assets away

12  from Acis?

13  A    No.  And I apologize, because I think it's -- I've

14  conflated two provisions.  This one only deals with the very

15  high-level nature of the business.  It doesn't give any

16  indication that there's any material litigation going on

17  elsewhere with respect to Acis.

18       I believe there's another provision that says, We -- we

19  have talked to -- oh, here -- I'm sorry.  It is here.

20  Shareholders have had an opportunity to discuss with Highland

21  to their satisfaction all litigation matters against Highland

22  and its affiliates unrelated to its distressed business.

23       That, in my opinion, is wholly inadequate.

24  Q    Okay.

25            MR. MORRIS:  And let's put up -- actually, let's just

Seery - Direct                                    39

1    move on.

2    BY MR. MORRIS:

3    Q    Let's go to the settlement itself.

4            MR. MORRIS:  Can we put back up Demonstrative Exhibit

5    #3?

6    BY MR. MORRIS:

7    Q    Mr. Seery, can you see that?

8    A    Yes, I can.

9    Q    Does this generally describe the net economic recovery of

10   the HarbourVest settlement based on estimated recoveries for

11   general unsecured creditors as of November 2020?

12   A    As of November 2020, it does.  And you alluded to this in

13   your opening, but to be clear, the numbers have shifted.

14   Costs have increased.  The -- so the -- effectively, the

15   numerator, in terms of distributable value that we estimate,

16   is lower.  And settlements, the denominator, have also

17   increased.  So the claims against the estate that have been

18   recognized have increased.  And that, that probably takes it

19   down closer, in our view, to about seventy cents distribution,

20   a number closer to nine to ten million, maybe a little bit

21   less.

22          However, there's also some additional value that we -- we

23   believe we will recover directly.  There are north of $150

24   million of intercompany notes owed by Dondero entities to

25   Highland.  A number of those notes are demand notes, and we've

Seery - Direct                    40

1  already made demand.  We'll be initiating actions next week.

2  So those are -- those value, we believe, we'll recover

3  directly from Mr. Dondero and from related entities.

4      To the extent those related entities don't have value, we

5  feel very strongly about our ability to pierce the veil and

6  reach in to Mr. Dondero.  And then his assets, either his

7  personal assets or the assets that he claims are in trusts.

8      In addition, there are a significant amount of notes that

9  were extended in two -- I believe around 2017, for no

10  consideration.  Those notes were demand notes, I believe, and

11  then extended it 30 years.  So they have 2047 maturities.

12  Those were probably going to have to be subject to fraudulent

13  conveyance type actions or -- or some sort of sale at a very

14  discounted value because third parties wouldn't want long-

15  dated notes with Mr. Dondero as the counterparty for very much

16  money.

17      Those -- they defaulted on some of those parties, so we

18  effectively turned them into demand notes.  We've accelerated,

19  and we'll be bringing actions against those entities next week

20  as well.

21      So I think (garbled) have come up, so I apologize.  One

22  way of saying I think the sixteen and a half is a bit high

23  right now, based upon what we know, but the value is going to

24  be higher than our estimate a couple of weeks ago because we

25  do believe we'll be able to recover on the notes.

Seery - Direct                    41

1        One additional caveat, just to be fully transparent here.

2   This summary with the 16.8 doesn't include the subordinated

3   piece of this -- of this claim and our resolution.  That --

4   recovery of that piece will be dependent upon the success of

5   litigations.

6        In order for the subordinated piece to get paid, all

7   general unsecured claims in Class -- Classes 7 and 8 will have

8   to be paid in full.  And then -- and then the subordinated

9   class in Class 9, which we believe UBS will have a piece of,

10  and HarbourVest will have a piece of by this settlement, those

11  will be able to recover, and those will be based upon other

12  claims of action against -- primarily against related parties.

13  Q    And then that last point, is that what's reflected in

14  Footnote 3 on this page?

15  A    That's correct, yes.

16  Q    Okay.  And just for the record, there's a reduction in

17  value of $22-1/2 million.  Do you see that?

18  A    Yes.

19  Q    And can you just explain to the Court what that is and how

20  that value was arrived at?

21  A    Yes.  I may be getting slightly ahead of you, Mr. Morris.

22  But to give the Court a reflection of the transaction -- and

23  we can go into the details in a moment -- ultimately, the

24  transaction we structured we think is very fair both

25  economically to the Debtor, but there -- there is some

Seery - Direct                                          42

1   complexity to it to satisfy some of HarbourVest's concerns

2   that they be able to effectively rescind the transaction, at

3   least from an optical perspective.  Value was important, but

4   optics were as well.  The twenty-two and a half is the current

5   -- actually, the November value of HCL -- the HarbourVest

6   interests in HCLOF.  And that's based upon Highland's

7   evaluation of those interests.

8       So we do believe that that is a fair value as of that

9   date.  It has not gone done.  It hasn't gone up explosively,

10  either, but it hasn't gone down.  We think that's good, real

11  value.  That value is in the Acis CLOs, the equity in those

12  CLOs, which is 2 through 6, that we -- we will be working with

13  the HCLOF folks to get Mr. Terry to monetize those assets and

14  those longer-dated CLOs.

15      In addition, I think it's 85 percent of the equity in Acis

16  7 -- Acis 7 is managed by Highland -- that is also beyond its

17  reinvestment period.  And in talking to the directors -- and

18  they're new directors, and I'll get to that in a minute, for

19  HCLOF -- they'll seek to push Highland, which is the

20  reorganized Highland, to monetize that asset, with due regard

21  to fair value.

22      In addition, Harbour -- HCLOF owned a significant amount

23  of the preferred or equity pieces, if you will, in the

24  Highland CLO, 1.0 CLOs.  As we've talked about, those are not

25  really CLOs.  Those are effectively closed-end funds with

Seery - Direct                                    43

1   illiquid assets, primarily illiquid assets in them.  We've had

2   some dispute in front of the Court about selling the liquid

3   assets in them, which we can go into it another time.  Those

4   are being liquidated in the market at fair value.

5        But HCLOF also is a significant holder of those preferred

6   shares, and those directors would -- have indicated to me that

7   they would like to see those interests also monetized.

8   Q    All right.  Let's shift gears for a moment to talk about

9   the diligence that the Debtor did before entering into this

10  agreement.  Can you just describe for the Court generally the

11  diligence that was undertaken at your direction?

12  A    Well, when we first received the reply to our objection,

13  we dug into that reply and the specifics in it very

14  aggressively.  So we reviewed all of the underlying documents

15  related to the original transaction.  We discussed with

16  counsel the legal basis for the HarbourVest claims.  We

17  interviewed our own HCMLP employees who were involved in the

18  transaction and tested their recollection, specifically around

19  who dealt with HarbourVest, who had the discussions with

20  HarbourVest, what was disclosed to HarbourVest with respect to

21  the Terry dispute and the Acis litigation.

22       We also had done, as I think the Court is well aware from

23  prior 9019 testimony, extensive work around the transfers and

24  the issues related to Acis.  So we were familiar with their

25  impact on HCLOF.

Seery - Direct                    44

1    We also did extensive work valuing the remaining HCLOF

2   interests to get a good feel of not only how much HarbourVest

3   originally invested, but how much they actually lost in this

4   transaction.  And as I said, their original investment was

5   around, in total, in two tranches, about $80 million, of which

6   they got about $5 million back, and they've lost $22 million.

7   So it -- I mean, remaining with $22 million.  So they've lost,

8   you know, in excess of $50 million.

9   Q   Do you recall whether the Debtor reviewed and analyzed all

10  of the documents that were cited in HarbourVest's response to

11  the Debtor's objection to the HarbourVest proofs of claim?

12  A   Yeah.  I think -- I forget, to be honest, which -- exactly

13  what documents were in there.  But we went through their

14  objection with a fine-toothed comb, not only with respect to

15  the issues related to the Acis case, but also their references

16  to Guernsey law, other U.S. law, any of the documents between

17  the parties.  And obviously, as I mentioned before, the

18  offering memorandum.

19       MR. MORRIS:  Your Honor, I would just note for the

20  record that Debtor's Exhibits I through X are all of the

21  documents that are cited in HarbourVest's response to the

22  Debtor's objection to the HarbourVest proofs of claim, and

23  those are the documents that Mr. Seery just referred to.

24       THE COURT:  All right.

25       MR. MORRIS:  Just, they're in evidence now, and I

Seery - Direct                                    45

1   just wanted the Court to understand why they're in evidence.

2            THE COURT:  Okay.  Thank you.

3            MR. MORRIS:  You're welcome.

4   BY MR. MORRIS:

5   Q    Let's talk about the Debtor and whether or not it had or

6   has any viable defenses.  Did the Debtor form any views as to

7   whether or not it had any defenses to the HarbourVest claims?

8   A    Yes, we did.

9   Q    Can you describe for the Court the defenses that were

10  reviewed and analyzed by the Debtor?

11  A    Yeah.  I think we -- we had very significant defenses.

12  So, first and foremost, with respect to the original proof of

13  claim, as I mentioned earlier, it alluded to the expenses and

14  the overcharge.  And I think with respect to the 15 million of

15  fees that were charged to HCLOF by Highland, we didn't have a

16  lot of defenses to that claim.

17       It's pretty clear, by any fair view of the Acis case, that

18  HCLOF, as the investor in the Acis CLOs and the Highland CLOs,

19  had no real responsibility for fighting with Acis and Josh

20  Terry and shouldn't have been charged those fees.  I don't --

21  I don't think there's a legitimate investor that would

22  actually think that that was an appropriate amount to be

23  charged to a fund.

24       However, the claim was not as broad -- the proof of claim

25  was not as fulsome in terms of discussing and only vaguely

Seery - Direct                                          46

1    referred to other damages.  So we did -- we did, as a

2    threshold matter, think about whether we could argue that it

3    was time-barred because they had not met their obligations to

4    fully disclose under the proof of claim.

5        Secondly, we considered the defenses to the overall claim

6    of fraudulent inducement.  Our perspective was that if we

7    could stop the claim of fraudulent inducement, the damages

8    would likely be limited to the 15 and maybe some -- some other

9    damages.  With respect to the 15, again, the problem that we

10   had when we got past -- past motions for summary judgment is

11   the factual predicate for our defense was going to be that we

12   divulged these things to HarbourVest and that they did not

13   reasonably -- it was -- reasonably rely on some failure to

14   divulge because they're a sophisticated investor.

15       The problem with that defense is that our witnesses, which

16   really would have primarily been Mr. Dondero and Mr.

17   Ellington, and one other employee who runs the CLO business,

18   Mr. Covitz, would not be pretty good.  They've been -- two of

19   them have been in front of this Court and they're not viewed

20   favorably and their testimony would be challenged and

21   potentially suspect.

22       So that gave us a real focus on trying to make sure that

23   we could, if we had to litigate, that we would litigate around

24   the fraudulent inducement.

25       As I said, reasonable reliance, what was disclosed, lack

Seery - Direct                                    47

1  of digging into the public record, because you don't have to

2  go far on Google to find "fraud" within two words of

3  "Highland," and the tremendous, you know, litigious nature of

4  Highland.  You know, even at that point, when this investment

5  was made, aside from Mr. Terry's arbitration, which by that

6  point, at least by the time (inaudible) was public, there was,

7  you know, significant public disclosure around the Credit

8  Strat and the litigation, the Crusader litigation, the UBS

9  litigation, the, gosh knows, the Daugherty litigation.

10       So our defense was going to be that you should have

11  figured this out, you're a sophisticated investor, and you

12  should have been able to figure out that there was significant

13  risk that, with respect to Mr. Terry, that Mr. Dondero would

14  not stop litigating and that those costs would put significant

15  risk on the investment.

16       The problem with that, as I mentioned earlier, is that the

17  OM is wholly deficient.  If you have a typical risk factor in

18  the offering memorandum, you would have disclosed that there

19  was a litigation with Mr. Terry, a former partner in the

20  business, and that the Debtor had no intention of settling it.

21  There was no intention of settling.  That litigation would go

22  on.  It could go on for years and it could result in

23  bankruptcy or attachments and other risks to the business, and

24  that the investor should be fully aware that the Offeror does

25  not intend to be involved in any -- or the manager, in any

Seery - Direct                                    48

1  settlement with Mr. Terry, and the fact it undermined the

2  investment.  That wasn't there.

3      But that was our preliminary focus, to try to stop fraud

4  in the inducement.  And then we -- we had specific facts

5  related to that.  You know, once they knew about the

6  bankruptcy in HarbourVest of -- I'm sorry, of Acis,

7  HarbourVest made a second funding, which was there was a -- it

8  was an initial $75 million draw, and then a second, I believe,

9  about a $5 million draw, which was in -- I believe in

10 February.  And they made it without -- without objection, and

11 that was after the commencement of the bankruptcy.

12     In addition, they were -- they were active in the

13 bankruptcy, so the -- some of the things that happened in the

14 bankruptcy, there were many opportunities to settle that case,

15 from our examination, all of which were turned down to -- by

16 Mr. Dondero.  But you don't see HarbourVest pounding the table

17 to settle, either, either with respect to the Oaktree

18 transaction or any other transaction.

19     Now, HarbourVest's defense to that is, well, we were

20 taking advice and all of our information from Highland, and we

21 were getting that information directly from senior folks at

22 Highland why -- what the value was and why we shouldn't do

23 those things.  We thought that that would mitigate some of the

24 arguments that -- some of the damages that we might have, I'm

25 sorry, if we -- if we lost.

Seery - Direct                                         49

1      But the focus at that point, you know, our legal strategy,

2  was can we stop HarbourVest at the very forefront to say,

3  You've got to come into the factual realm and get out of the

4  fraud in the inducement realm.  And then the defenses and the

5  exculpations and the liability limitations in the documents

6  would also come into play.

7      So that -- those are some of the defenses that we focused

8  on and our analytical thinking around them.

9  Q   So, if the Debtor had viable defenses, why is it settling?

10 A   Well, this is a significant claim.  And we -- we looked at

11 it with respect to both the impact on the case, but, really,

12 the merits of the claim.

13     As I said, there's really little dispute that the legal

14 fees should not have been charged to HarbourVest.  We think

15 based upon the testimony in Acis, the suspect credibility of

16 those who would have been our witnesses, and the experience in

17 Acis that the Court has had in terms of the completely hell-

18 bent on litigation, it would be hard for anyone to justifiably

19 defend those fees being charged.  So, as an initial matter, we

20 had exposure there.

21     In addition, if HarbourVest got by our defense of -- was

22 able, for example, to claim fraud in the inducement, then we

23 were open to significant damages.

24     We really didn't put much value, frankly, on the RICO part

25 of it.  We think that that's waved around often to show treble

Seery - Direct                                50

1  damages.  Although in this case certainly somebody could lay

2  out the predicate acts and put forth a RICO-type argument, we

3  just didn't think that that had real merit in this commercial

4  dispute, even with a fraud claim.

5      But even without the trebling of the damages, there's no

6  dispute that HarbourVest lost more than $50 million in this

7  investment.  You know, we -- we thought about that risk as

8  well.

9      In addition, because the case would really be fact-based,

10 even if we had a high degree of confidence based upon our

11 discussions with our employees and the factual testimony, it

12 was going to be expensive to litigate this case, and time-

13 consuming.

14     And so we looked at the economic value, the potential

15 risks, and the actual value that we were giving up, and found

16 this to be an extremely, extremely reasonable settlement.

17     Importantly, and I think what drove it, you -- one of --

18 one of the things that drove it is another one of our defenses

19 on why, notwithstanding their -- what they held out as

20 meritorious claims, I don't think HarbourVest really wanted to

21 publicly litigate this claim.  And we were aggressive in our

22 discussions with HarbourVest of how we would litigate it,

23 which would be quite publicly.

24     Now, that may or may not be fair, but that does put risk

25 on the counterparty.  And so I think that helped drive the

Seery - Direct                                        51

1  settlement.

2      In addition, the structure of the settlement we think is

3  extremely favorable to the Debtor and to the estate because,

4  rather than taking the full claim and putting it into a senior

5  unsecured position, we have bifurcated it.  We did think about

6  whether this was a claim that could be subordinated under 510.

7  There won't be any arguments, I would be surprised if there's

8  arguments today that we didn't actually give to the Highland

9  employees who have given them to Mr. Dondero's respective

10 counsel.

11     We did structure it in a way that we thought gave

12 HarbourVest the opportunity to effectively claim a rescission,

13 even though that's not really what it is, and then be able to

14 claim that their recovery is based on the bankruptcy, which it

15 is, but not really dilute all the other stakeholders in the

16 case.

17     (Pause.)

18          THE COURT:  Mr. Morris?  Anything else?

19          MR. MORRIS:  I can hear you, Your Honor.

20          THE COURT:  Okay.

21          MR. MORRIS:  I can hear you.

22          THE COURT:  Okay.  Now can you --

23          MR. MORRIS:  I got cut off from Mr. Seery for a

24 moment.

25          THE COURT:  Okay.

Seery - Direct                              52

1  BY MR. MORRIS:

2  Q    Okay.  I appreciate that.  Are you done giving the

3  Debtor's basis for entering into this settlement, Mr. Seery,

4  if you can hear me?

5  A    I think so, but I think as the Court has probably seen, I

6  can go on.

7  Q    Yes.

8  A    So I will try to be -- I'll try to be more concise.  But

9  this was a -- this was a difficult settlement.  We felt good

10 about our defenses.  Felt that we could -- we could try them.

11 But it would be extremely expensive, time-consuming, and there

12 would be a lot of risk.  And settling at a level which we

13 believe is actually below the damages that were clearly caused

14 only by the fees was a -- was a -- is a -- is a very

15 reasonable settlement.

16 Q    Okay.  Let's just talk about the process by which we got

17 to the settlement.  Do you recall generally when the

18 settlement negotiations have -- were commenced?

19 A    I believe it was -- was late summer, early -- early fall.

20 Q    Okay.  Before I move on, I just want to go back to the

21 Acis matter that you were talking about, one last issue.  Do

22 you know how, if at all, the injunction that was entered in

23 the Acis bankruptcy impacted or related to the HarbourVest

24 claims?

25 A    Yeah.  I -- yes, I do.  And I believe it -- it did.  I

Seery - Direct                               53

1  think there's an argument, and we analyzed it thoroughly, that

2  the injunction effectively caused a lot of the damages.

3  Because if you look at the values of the equity that

4  HarbourVest had, the -- and HCLOF had in the CLOs, it went

5  down dramatically after the Trustee in the Acis case took over

6  and then subsequently, when the case was reorganized and Mr.

7  Terry took over, you know, with Brigade as the sub-advisor.

8      Now, that would -- you know, we would -- we could

9  certainly attempt to throw, in our defense, the causation at

10 Mr. Terry's feet or at Mr. Phelan's feet.  HarbourVest's

11 retort is that none of this would have occurred but for the

12 burn-it-down litigation that Mr. Dondero engaged in with

13 Highland.

14     In addition, in Mr. Terry's defense, you know, he did try

15 multiple times with HCLOF, tried to petition, if you will, the

16 HCLOF entity to -- and directors, former directors, to reset

17 the CLOs to make them more economically viable, based upon the

18 current level of asset returns versus the debt costs in the

19 CLOs.  And that was rejected by the HCLOF and the Debtor as

20 the controlling party of HCLOF.  So, we thought about those

21 risks.

22     You know, similarly, the economic values in Acis 7 went

23 down pretty significantly from that date as well.  So I think

24 there's -- there are some defenses, but that's really Mr.

25 Terry's issue, not our issue.  So we thought about those

Seery - Direct                                    54

1  issues, we analyzed them, and we certainly did all the work

2  around month-to-month reductions in NAVs and how different

3  events in the Acis case might have -- might have caused those

4  and was that some sort of break from the original

5  transgression that HarbourVest claims, which was the

6  fraudulent inducement.

7  Q    Do you recall that in November HarbourVest's motion under

8  3018 was scheduled to be heard?

9  A    Yes.

10 Q    And can you just tell the Court your understanding of what

11 the 3018 motion was about?

12 A    Well, the 3018 motion was going to be on voting.  And we

13 took the view that it really was not -- it shouldn't have been

14 that big an issue and HarbourVest should have been content

15 with just taking their actual losses of roughly a $50-$60

16 million claim for voting purposes and then we would move on.

17      HarbourVest was very insistent that they have a $300

18 million claim, because they took the position -- and with

19 extensive documentation; not only the pleadings they filed,

20 but also detailed decks that were prepared by their counsel,

21 which they had presented to us on the merits of their claim --

22 that they were going to litigate for -- the 3018 and for the

23 full $300 million value.

24      And that became the genesis, if you will, of the

25 negotiations to settle.

Seery - Direct                                          55

1    So, we started talking about the 3018.  It was very

2  contentious.  My apologies to Ms. Weisgerber and her counsel,

3  her partners, because it was a significant and contentious

4  negotiating call.  But the reasons for that I think were that

5  -- their insistence on litigating the 3018 and our view that

6  this was just, you know, another -- another of a series of

7  delays and costs in this case that we really were hoping to

8  avoid.

9    That led to Mr. Pugatch and I stepping away from counsel,

10 no offense to counsel, you know, ours and his, to begin

11 negotiations around the potential for a settlement.  First, it

12 started with a 3018, and then, you know, argued that we would,

13 if we got past the 3018, we were going to litigate this,

14 because we effectively had -- thought we could get everyone

15 else done at -- in and around that time.  And I think we were

16 also probably a little bit optimistic about UBS at that time

17 and the mediation, which subsequently we have settled.  But

18 that was the genesis of those settlements.

19 Q   And how did the structure, how did the Debtor and

20 HarbourVest derive at the structure whereby there is a general

21 unsecured claim, there is a subordinated piece, and there's

22 the takeback of the HCLOF interest?

23 A   Well, as I outlined, we -- we aggressively set forth our

24 various defenses.  Their position was that they -- they should

25 never have been in this transaction before.  And they --

Seery - Direct                                    56

1   HarbourVest is, in essence, a fund of funds, and they have

2   investors, and it certainly wouldn't be their, I'm sure, the

3   best-performing asset in their portfolio, to have made this

4   investment and lost $50 million over this period of time.  So

5   they felt strongly that they should never have been in this

6   investment, and but for the failure to disclose and the

7   improper disclosures, they would not have been in this

8   investment.

9        So, optically, getting out of it was important to them,

10  and that led to our idea and construction of a subordinated

11  claim and the transfer of the HCLOF interests to the estate.

12       Importantly, the HCLOF interests, as I mentioned, are --

13  the investments are in the Acis CLOs controlled by Acis and

14  Mr. Terry.  The reorganized Acis.  As well as the 1.0 CLOs and

15  the Acis 7.

16       So we were keenly focused on, if we were going to get that

17  interest, would we then have the majority control in HCLOF,

18  which we will, and would we be able to drive the recoveries,

19  as opposed to what Highland typically does in these

20  investments is use other people's money, drive down the value,

21  and then try to buy back the interest on the cheap.

22  Q    Just in terms of timing, because I think there was a

23  suggestion in one of the openings that there was something

24  untoward about the timing here:  At the time the liquidation

25  analysis was prepared on November 24th, had the Debtor reached

Seery - Direct                                        57

1   any agreement in principle with HarbourVest?

2   A    If we had, it would have been reflected, so I don't -- I

3   don't think we were agreed by then.  I don't recall the

4   specific dates, but if we had, it would have -- it would have

5   been reflected.

6   Q    If I can refresh your recollection that the motion was

7   filed on December 24th, does that help form your understanding

8   or refresh your recollection that there was no agreement in

9   principle on November 24th?

10  A    Yeah.  Well, I'm quite sure there was no agreement in

11  principle or we would have reflected it minimally by a

12  footnote.  There's -- there's no chance.  It's a material

13  reduction in the claims pool that we were previously telling

14  people that, at least for purposes of distribution, like UBS

15  and a couple others we said we thought we would get to zero

16  on.  So we didn't calculate in that amount.  So I'm quite sure

17  we didn't have a deal when we filed the disclosure statement.

18       In terms of the timing, anyone who's done this business

19  for any degree of time knows that the crucible of bankruptcy

20  brings people to the settlement when they see something

21  happening in the case, and not before.  I think HarbourVest

22  looked at our -- this is my supposition -- HarbourVest looked

23  at our plan, our ability to get this done, our settlement with

24  Redeemer, our settlement with Mr. Terry and Acis, and saw that

25  this plan was coming together, and if they didn't think about

Seery - Direct                                    58

1  the settlement, they were going to think about not only the

2  risks that we laid forth for them with respect our defenses,

3  but also the opportunity to litigate with the Claimant Trustee

4  over a long period of time, which couldn't have been

5  particularly appetizing.

6  Q   Can you describe for the Court the role played by the

7  independent board of Strand, the general partner of the

8  Debtor, in analyzing and participating in the approval

9  process?

10 A   Yes.  I think, as the Court is aware and I've testified

11 before, Mr. Russell Nelms and Mr. John Dubel are fellow

12 independent directors with me, appointed pursuant to the Court

13 order.  They are kept abreast of every detail, and -- along

14 the way, not just in a summary form at the end.  We have

15 reviewed and analyzed collectively each of the issues.  Mr.

16 Dubel has extensive experience in these types of litigation

17 matters.  Obviously, Mr. Nelms, from his -- both his practice

18 and his time on the bench, has a keen insight into how to

19 resolve and what the risks and benefits are from settling

20 litigation.  So I consult them every step of the way.

21 Q   And as part of this process, did the Debtor reach out to

22 the directors of HCLOF?

23 A   Yes, we did.  So, we reached out and we've had several

24 conversations on video chats with the directors.  The

25 directors of HCLOF are two new gentlemen, Mr. Richard Boleat

Seery - Direct                                    59

1    and Mr. Dicky Burwood.  They are extremely professional.  They

2    are exceptionally well-informed.  They are truly careful, and

3    I would say very experienced professional not only directors,

4    but experienced in -- in these matters, both in respect of

5    structured finance as well as these types of vehicles and

6    litigation.

7         They were appointed by the old directors, Scott and

8    Bestwick, and they have been in control.  They have outside

9    counsel, which is King & Spalding in the U.S.  They have

10   Guernsey counsel.  They have accountants and professional

11   advisors, and are being, in my opinion, exceptionally careful.

12   I've got -- very quickly developed a lot of respect for them,

13   and we consulted with them on this settlement and how it would

14   work.

15        They've been very clear that they represent HCLOF and they

16   work for the benefit of the equity, whomever owns it, and

17   taking a view that they would like to see these assets

18   monetized swiftly, with due regard to value, for the benefit

19   of the equity.

20   Q    And is it your understanding that the directors of HCLOF

21   approved of this transaction?

22   A    They -- I don't know that their approval was required.

23   It's really -- there are a number of hoops to jump through

24   under the documentation, including opinion of outside counsel

25   that we received from WilmerHale in terms of the effectiveness

Seery - Direct                                     60

1   of the transfer under the documents.  We had a negotiation

2   with -- with those directors, and making sure that we did

3   everything correct -- correctly, excuse me -- with respect to

4   the requirements for the transfer under the documents.  And

5   they've indicated their support and acknowledgement that we're

6   doing it correctly.

7       I don't know if it's fair to say they approved it.  I'd

8   just have to go check the documents.  But they certainly

9   support it.  And I think they generally support our position

10  with respect to how to move forward with the assets.

11  Q   I appreciate that.  I guess I meant approval with a small

12  a and not a capital A.

13      You mentioned WilmerHale.  Who do they represent in all of

14  this?

15  A   WilmerHale is the Debtor's outside corporate counsel, in

16  particular with respect to the fund issues that we don't

17  handle in-house.  We have significant support for fund issues

18  from the expertise of Mr. Surgent, who's been the CCO, and he

19  is also a lawyer, with respect to, you know, some of the

20  difficult fund issues that Highland has.  But when we use

21  outside counsel, we use WilmerHale for that, and they've been

22  -- they've been exceptional.

23  Q   Okay.  Just the last two points that were made in Mr.

24  Dondero's objection, I believe.  Did the Debtor overpay in

25  this settlement in order to gain the support of HarbourVest in

Seery - Direct                                    61

1    connection with its -- with the Debtor's attempt to get its

2    plan confirmed?

3    A    Not in any way.  My -- I believe the settlement is

4    extremely reasonable.  As I testified, it's -- it's less than

5    the -- the actual value going out, depending on unless there's

6    successful litigation, and there well could be, is less than

7    on a pro forma basis the fees that were taken and charged to

8    HCLOF.  We didn't do this for votes.  We will have Class 2,

9    Class 7, Class 8, and Class 9.  So I don't think that's a --

10   there's no vote purchasing, I think you called it.  No, not at

11   all.

12   Q    Yeah.  Well, on that topic, I think the phrase that was

13   used was gerrymandering.  Are you aware of the argument that's

14   been made that the subordinated claim was dropped in there in

15   order to gerrymander a positive vote for the impaired class of

16   Class 9, I believe?

17   A    In a word, I would say that's preposterous.  The -- as I

18   said, we have a number of classes that will vote for the plan.

19   The plan is -- the plan is a monetization plan.  And if -- if

20   the creditors determine that they don't want to pursue this

21   plan, we'll go forward with another -- we'll try to get

22   another plan.  We tried to have a grand bargain plan.  We

23   tried to have a pot plan, as I've testified previously.  I'm

24   quite certain that I've done more work on that than anyone

25   else, including Mr. Dondero and anybody who works for him.

Seery - Direct                                    62

1   And he hasn't been willing to do that.

2       This is a -- this is a plan that's come together.  We

3   think it's going to be in the best interests of the estate.

4   That'll be confirmation next week.  Or two weeks, I guess.

5   But I don't see how this is any way related -- this settlement

6   is not any way related to the voting on that -- on that -- on

7   that plan.

8   Q   Just to put the finest point on it, is the Debtor relying

9   on Class 9 to be the impaired consenting class?

10  A   No.  I think -- I think what I've -- as I said, I believe

11  we already have the votes in Class -- I think it's 2 or 3, 7,

12  8, and -- and 9 will vote in favor as well.  So that won't be

13  an issue.

14          MR. MORRIS:  Your Honor, I have no further questions

15  of Mr. Seery.

16          THE COURT:  All right.  Pass the witness.  I'll ask

17  HarbourVest counsel first:  Do you have any questions of Mr.

18  Seery?

19          MS. WEISGERBER:  No, Your Honor.

20          THE COURT:  All right.  Thank you.

21      What about cross-examination?  Mr. Dondero's counsel?

22                      CROSS-EXAMINATION

23  BY MR. WILSON:

24  Q   Mr. Seery, how are you doing today?

25  A   I'm well, thank you.

Seery - Cross                                    63

1   Q    I'm John Wilson, and I represent Jim Dondero.  I have a

2   few questions for you today.

3        Now, the HarbourVest proof of claims were filed on April

4   8th, 2020; is that your recollection?

5   A    I believe that's correct.  I don't recall the specific

6   date.

7   Q    Okay.  And do you know when you first became aware of the

8   HarbourVest claims?

9   A    I believe it was early in the summer when we filed the

10  omnibus objection.  It may have been in late spring, shortly

11  after that.  I don't recall the specific date of the filing.

12  Q    And before the time of the filing of the omnibus

13  objection, did Highland educate itself regarding the

14  HarbourVest proof of claims?

15  A    I'm sorry, could you say that again?  I didn't quite

16  understand it.

17  Q    Before the omnibus objection was filed, did HarbourVest --

18  I'm sorry, did Highland educate itself on the HarbourVest

19  proof of claims?

20  A    Not especially, no.

21  Q    Okay.  And -- but at some point, Highland did investigate

22  those proofs of claim, correct?

23  A    That's correct.

24  Q    And when would you -- when do you recall that that

25  investigation began?

Seery - Cross                    64

1   A    I don't recall the date, but the triggering event was

2   HarbourVest's response to our omnibus objection.

3   Q    Okay.  And that would have been filed September 11th of

4   2020?

5   A    I'll take your representation.  I don't -- I don't recall

6   the specific date.

7   Q    Okay.  And so when you began to investigate the

8   HarbourVest claims, what was your initial reaction?

9   A    My initial reaction was that the -- the larger claims that

10  they were asserting -- the fraud in the inducement, the RICO

11  -- that those claims were, in my view, attorney-made and that

12  when we dug in and did the work, we saw that HarbourVest

13  clearly lost north of $50 million on the investment.  We had

14  just started to uncover the fee issue and saw the risk we had

15  there.

16       But I thought the bulk of those claims were attorney-made.

17  Clever, but attorney-made, as opposed to what I would think

18  are more legitimate.  And so we started to develop our

19  defenses around that.

20  Q    And was your initial reaction that the HarbourVest claims

21  were largely worthless?

22  A    I think with respect to the claim around the fees, I

23  believed there was significant risk.  With respect to the

24  other claims, I thought our defenses would make them

25  worthless, yes.

Seery - Cross                                65

1  Q   And did you ever represent to any party that the

2  HarbourVest claim was worth, at most, $5 million?

3  A   I think I represented often, including to HarbourVest,

4  that it was worth nothing.  I don't recall if I specifically

5  said $5 million.  $5 million would have been a nominal amount

6  to -- which is litigation costs.  So it may -- it may have

7  been in my models that I put in that as a settlement amount,

8  but I -- I thought that there were valid and good defenses to

9  those larger claims.

10 Q   And you recognize that HarbourVest was a large,

11 sophisticated investor, correct?

12 A   Yes.  I think they manage north of -- right around a

13 hundred billion dollars.

14 Q   And you recognize that HarbourVest routinely structured

15 complex customized investments, correct?

16 A   I believe that -- I don't know the intricate part of their

17 businesses, but as a fund of funds who does creative

18 investments, I think that they do do quite a bit of that.

19 This, I believe, was their first investment in the CLO space.

20 Q   And it was not -- or I should say, you did not believe

21 that HarbourVest was simply a passive investor in HCLOF,

22 correct?

23 A   I don't think that that's true, no.

24 Q   You don't -- you don't believe that you denied their claim

25 to be a passive investor?

**Appx. 04923**

Seery - Cross                                66

1   A    Oh, I think -- I'm sure that in defense of their claims I

2   would argue that they were -- they were more than a passive

3   investor.  But it was pretty clear when you look at the

4   structure of what they invested that there was an intent that

5   they be passive on their part.  They didn't take a majority

6   interest.

7        In fact, Highland made it clear in the structure of the

8   deal that they couldn't -- it would be hard for them to get a

9   majority interest because Highland entities would control that

10  and Dondero-controlled entities or individuals would control

11  the majority.

12       I think that they -- they had hoped to be a passive

13  investor.

14  Q    But was it not your position that HarbourVest was actually

15  an active, involved investor?

16  A    I think our defense was going to be that they knew exactly

17  what was going on, that they participated, that they were

18  active, and that, indeed, that they were in and around some of

19  the subsequent issues in the Acis case.

20  Q    And you understood that HarbourVest played a material role

21  in the various outcomes in the Acis bankruptcy case, correct?

22  A    I don't believe that to be correct, no.

23  Q    Have you ever made that representation to anyone before?

24  A    Not -- not that I recall.

25  Q    Well, do you recall giving statements to a reporter named

                         Seery - Cross                    67

1  Syed Khaderi?

2  A   I've never spoken to a reporter named Syed Khaderi in my

3  life.

4  Q   Well, did you participate in the preparation of statements

5  to be given to Syed Khaderi?

6  A   I've never heard of Syed Khaderi, nor have I participated

7  in any preparation of statements.  I don't know who that is.

8         MR. WILSON:  All right.  I'm going to have Bryan

9  Assink put on the screen a document.

10     And Bryan, can you go to Page 7?  Bottom of -- the top of

11 Page 7.  Well, actually, before you do that, go to the very

12 top of the document.

13 BY MR. WILSON:

14 Q   Now, Mr. Seery, are you familiar with Lucy Bannon?

15 A   Yes.

16 Q   And who is Lucy Bannon?

17 A   She is the Highland public relations person.

18         MR. WILSON:  Okay.  Now go back to Page 7.

19 BY MR. WILSON:

20 Q   Now, do you -- do you see on your screen an email of

21 September 14th from Syed Khaderi that says, Hi, Lucy, how are

22 you?

23 A   Yes.

24 Q   Have you seen this email before?

25 A   Not that I recall, no.

Seery - Cross                                    68

1  Q   All right.  It continues on that, I saw the filing on

2  Friday about HarbourVest claims against Highland for a CLO

3  investment, and I'm looking to put out a report tomorrow

4  morning London time.  Ahead of that, I wanted to check if

5  Highland would like to comment on the matter.

6          MR. MORRIS:  Your Honor, this is -- the Debtor

7  respectfully objects.  A, this document is not in evidence.

8  B, it's rank hearsay.

9          THE COURT:  Response, Mr. Wilson?

10          MR. WILSON:  Your Honor, I am attempting to

11  authenticate this document, but I'm using it in rebuttal to

12  the testimony that Mr. Seery just offered.

13          THE COURT:  All right.  I'll allow it.  Overrule the

14  objection.

15          MR. WILSON:  All right.  Thank you, Your Honor.

16  BY MR. WILSON:

17  Q   All right.  Now, if we -- and oh, that September 14th

18  date, that was three days after the September 11th date that

19  we discussed was the date that HarbourVest filed its response

20  to the omnibus objection, correct?

21  A   Yes.  If that's the date that they filed it, then I -- if

22  you're representing that, I concede that the 14th is three

23  days after the 11th.

24  Q   All right.  And if you go back to the first page of this,

25  it looks like, on the following day, Lucy Bannon sends an

Seery - Cross                                    69

1  email to you, and is that your email address,

2  jpseeryjr@gmail.com?

3  A    That's correct, yes.

4  Q    And do you recall receiving this email from Lucy Bannon?

5        MR. MORRIS:  Your Honor, I renew my objection that

6  this is hearsay.  He's not rebutting anything that Mr. Seery

7  testified to.  He testified that he'd never heard of the

8  gentleman at the bottom of the document.  There's nothing in

9  this document that rebuts Mr. Seery's testimony at all.

10       THE COURT:  Response, Mr. Wilson?

11       MR. WILSON:  Well, I'm not -- I'm not trying to rebut

12  his statement that he hadn't -- that he hadn't heard of Syed

13  Khaderi.  My rebuttal is attempted to -- attempting to show

14  that he has made various statements that he denied.

15       THE COURT:  I'll overrule the objection.

16  BY MR. WILSON:

17  Q    All right.  So, back to this exhibit, Mr. Seery.  You

18  recall receiving this email from Lucy Bannon on Tuesday,

19  September 15, 2020?

20  A    Not specifically.  But to be clear, I recall talking to

21  Lucy Bannon about the HCMLP dispute with HarbourVest.

22  Q    Okay.  And --

23       MR. WILSON:  Bryan, can you go down to the next page?

24  Scroll down to where -- the James Seery email.

25  BY MR. WILSON:

Seery - Cross                                        70

1  Q    Do you see this email on your screen that's dated

2  September 15, 2020 at 10:33 p.m.?

3  A    Yes, I do.

4  Q    And do you recall sending this email to Lucy?

5  A    Not specifically, no.

6  Q    Well, do you deny that you sent this email to Lucy?

7  A    It appears to be my email.

8         MR. WILSON:  Your Honor, we would move to admit this

9  document into evidence as Dondero Exhibit Letter N.

10        THE COURT:  Any objections?

11        MR. MORRIS:  I would consent to the admission of Mr.

12 Seery's email, but the balance of it ought to be excluded as

13 hearsay.

14        THE COURT:  What about that?

15        MR. WILSON:  Well, Your Honor, I think that this

16 document -- and I'll get into this in a little more detail in

17 a second -- but I think this document is a combination of the

18 work product of Lucy Bannon and Mr. Seery in preparing a

19 response for the reporter who requested comment from Highland.

20        THE COURT:  Okay.  I --

21        MR. MORRIS:  Your Honor, um, --

22        THE COURT:  Go ahead.

23        MR. MORRIS:  I just -- I do question how they got

24 this document, but that's for another day.  That's number one.

25 Number two, in addition to the hearsay argument, I just --

Seery - Cross                              71

1   relevance grounds.

2            THE COURT:  Okay.  I'll allow the portion that is the

3   communication of Seery, that portion of Exhibit N.  All right?

4            MR. WILSON:  Okay.  With due -- thank you, Your

5   Honor.  With due respect, I -- to use that portion, I need to

6   refer to the portion below it, because he says, Good to submit

7   with your final edit/revisions.  And so we need to know what

8   those final edit/revisions are, which are contained in the

9   email directly below that on the document that was four

10  minutes earlier in time.

11           THE COURT:  All right.  Fair enough.  That'll be

12  allowed.

13           MR. WILSON:  All right.  Thank you, Your Honor.

14      (James Dondero's Exhibit N is received into evidence as

15  specified.)

16           MR. WILSON:  So, Bryan, now can you scroll to the

17  next page?  Oh, actually, let's just -- let's just stop at the

18  top -- at the bottom of the page.  What's this statement?

19  BY MR. WILSON:

20  Q    So, to be clear, Mr. Seery, when -- in response to Mr.

21  Khaderi's request for information and comment, you prepared

22  actually two responses, and one of those was a statement on

23  the record attributed to a spokesperson for HCMLP or something

24  along those lines.  And then --

25           MR. WILSON:  Can you scroll down to that next page?

1  BY MR. WILSON:

2  Q    And this says -- I think part of this got cut off for some

3  reason, but it looks like the official statement is in

4  quotation marks.  It says, "We dispute the allegations made in

5  the filing and believe the underlying claims are invalid and

6  will be found to be without merit.  Our focus continues to be

7  treating all valid claims in a transparent, orderly, and

8  equitable manner, and vigorously disputing meritless in the

9  court.  That focus will assure that HCMLP's reorganization

10  process -- progress is towards an efficient and equitable

11  resolution."

12      And then below that there's another section of this email

13  that says, Background/Clarification, Not for Attribution.  And

14  do you know the purpose of this second section of the

15  response?

16  A    Do I know the purpose of that?  Yes.

17  Q    And what would that purpose be?

18  A    Ms. Bannon was speaking on background to reporters.  As I

19  said earlier, I've -- I never heard of the gentleman from

20  London.  If he's at the bottom of the email, I didn't pay any

21  mind, never heard of him.  Nor have I heard it since.  Ms.

22  Bannon didn't ever reference the specific person.

23      But she is the public relations person.  So, as I

24  testified earlier, she does communicate with the press.  And

25  as I previously testified when Mr. Morris questioned me, one

Seery - Cross                          73

1   of our tactics and our defenses for HarbourVest was going to

2   be that we were going to be very public and aggressive about

3   the investment and it would have a negative impact or negative

4   perspective for viewers, in our opinion, about HarbourVest's

5   investment.

6   Q   All right.  Well, look with me in the middle of that

7   paragraph right after the closed parenthetical, where it says,

8   "But it's important to note the background of HarbourVest's

9   active and deep involvement in the investment of which it now

10  complains."

11       And so it was your position that HarbourVest had an active

12  and deep involvement in the investment, correct?

13  A   No.  I don't think that's correct.  Ms. Bannon prepared

14  the statement, it was a litigation defense on background, and

15  that's our -- that was our position for this purpose.  It was

16  not my view that they were active and deeply involved.  They

17  were certainly involved.  There's no doubt about it.  But they

18  got all their information, in our estimation and our research,

19  from Highland.

20  Q   But in any event, you would agree with me that four

21  minutes after receiving this email, you approved this

22  statement to go out to the reporter, correct?

23  A   No, that's not correct.  That's -- this portion is on

24  background.  That statement doesn't go out.  The previous

25  statement was the official statement.  This is the background

Seery - Cross                                    74

1  discussion that she would have.  So, no, she was not

2  authorized in any way whatsoever to send that out.  She was

3  authorized to have conversations with those general facts.

4          MR. WILSON:  Okay.  Bryan, go to the top, or the

5  bottom of the page immediately preceding that.  That's it.

6  Yes, that's it right there.

7  BY MR. WILSON:

8  Q   Now, you'll see that this email from Lucy Bannon on

9  September 15, 2020 at 10:29 p.m. starts off, "Jim, let me know

10 what you think of the below.  And, again, the first would be

11 on the record and the second will be sent for information

12 purposes to ensure accuracy, not for attribution."

13     So the intent was that this -- that this entire statement

14 be sent to the reporter, correct?

15 A   I don't believe that's correct.  I think when she goes on

16 background she doesn't send them a written doc.  It's got to

17 be clear to the reporter, at least my understanding is that

18 what on background means -- I've been involved with this

19 before -- is that typically that's done orally.  I don't know

20 if she's done it in a written statement before.  I have never

21 seen that done in a written statement before.  You give the

22 official statement and then you walk the reporter through your

23 other views on background.  And you're not quoted.  And it's

24 usually attributed to a source with knowledge.

25 Q   Okay.  We'll come back to that in a minute.  The next

Seery - Cross                                    75

1    sentence after the one I just read to you --

2              MR. WILSON:  Go back to where we were on the

3    background.

4    BY MR. WILSON:

5    Q   Now, we just read you the sentence that starts with, "Then

6    it's important."  The following sentence says, "HarbourVest

7    was not simply invested in HCLOF as an ignorant,

8    unsophisticated, passive investor, but was an active and

9    informed participant in the inception of its investment

10   through all of the Acis bankruptcy proceedings, and

11   HarbourVest played a material role in various outcomes related

12   to that case and its impact on HCLOF."

13        And is it -- did you not just tell me before we

14   investigated this document that HarbourVest did not play a

15   material role in the various outcomes of the Acis bankruptcy?

16   A   I don't know exactly what I said, but I think that's

17   correct, after we'd done the research on it, yeah.

18   Q   But you took the position in this email that you approved

19   to go out to a reporter that says that -- that HarbourVest was

20   an active and informed participant in the inception of -- of

21   its investment through all of the Acis bankruptcy proceedings

22   and played a material role in various outcomes related to that

23   case and its impact on HCLOF.  Can we agree with that?

24   A   Yes.

25   Q   And then the final sentence of this paragraph says that,

Seery - Cross                                    76

1   We believe that neither the facts nor the law support

2   HarbourVest's, quote, We-were-too-lazy-to-know allegations.

3        Whose words were those, "We-were-too-lazy-to-know

4   allegations"?

5   A   I don't recall.  They may be mine.  It's aggressive the

6   way I am, so that -- that may well be the case.

7             MR. WILSON:  All right.  Go -- go down to the next

8   page.

9   BY MR. WILSON:

10  Q   And with respect your comment that that second paragraph

11  would not have gone to the reporter, look at this email in the

12  middle of the page from Lucy Bannon to Syed Khaderi, September

13  16, 2020, at 1:51 a.m.  And --

14            MR. MORRIS:  Your Honor, this I will object to as

15  hearsay.  There is no witness here to testify to anything on

16  this document.

17            THE COURT:  All right.  How about that?

18            MR. WILSON:  Well, it's -- well, scroll up just a

19  little bit.  This email at the top of the page is three

20  minutes after the one in the middle of the page, where Lucy

21  Bannon is forwarding this to James Seery, saying, See below

22  for responses sent to *Creditflux*.  Will follow up with the

23  story when it runs or with any other updates.

24            MR. MORRIS:  Your Honor, these --

25            MR. WILSON:  So I think this --

Seery - Cross                          77

1          MR. MORRIS:  These documents don't appear on the

2     witness list.  They're not being offered to impeach anything.

3     They're just -- he's taking discovery as we sit here.

4          MR. WILSON:  Your Honor, in response, I'm simply

5     trying to rebut the statements that Mr. Seery made.  In fact,

6     he told me just a minute ago that that second paragraph would

7     not have gone out to the reporter.  However, this email from

8     Lucy Bannon to Syed Khaderi directly rebuts that statement.

9          THE COURT:  But your whole purpose in this line of

10    questioning, with an undisclosed document, is to rebut the

11    earlier testimony he gave before you even put this exhibit in

12    front of him.

13         MR. WILSON:  I'm trying to rebut multiple statements

14    that Mr. Seery has made today, and I think it -- you know, if

15    he's going to testify that this information did not go out to

16    a reporter, I think I'm allowed to rebut that to demonstrate

17    that it did.

18         THE COURT:  All right.  Why didn't you disclose this

19    in advance?  It's feeling less and less like an impeachment

20    document the more we go through it.

21         MR. WILSON:  Your Honor, I did not -- I did not

22    actually have this document at the time we filed our witness

23    and exhibit list, but I would also say that I didn't have any

24    purpose to use it if I didn't need it for rebuttal.

25         THE COURT:  Okay.  First off, you're supposed to

Seery - Cross                              78

1  disclose all exhibits you anticipate using except those for

2  purposes of impeachment.  Okay?  Not rebuttal, to be

3  technical.

4      So, if you didn't disclose this exhibit, the only way you

5  can use it, subject to other possible objections, is if you're

6  impeaching a statement.  And I'm just saying I think we're

7  going beyond trying to impeach the original statement and now

8  we're trying to impeach statements he's made after seeing

9  portions of the document.

10     What did you mean, you didn't have this document in time

11 to disclose it?

12         MR. WILSON:  Well, I actually just received this

13 document this morning, Your Honor.

14         THE COURT:  Where did you receive it from?

15         MR. MORRIS:  From who?

16         MR. WILSON:  I -- I honestly do not know the source

17 of this document, although it was provided to me by my client.

18         MR. MORRIS:  Your client being Mr. Dondero?

19         THE COURT:  Could you answer that, Mr. Wilson?

20         MR. WILSON:  Yes, that's -- yes, that's correct.

21         THE COURT:  All right.  I will -- that's --

22         MR. MORRIS:  Your Honor, I'd like to --

23         THE COURT:  That's a different can of worms.  But for

24 now, I sustain the objection.  You're done questioning on this

25 document.

Seery - Cross                                  79

1          MR. WILSON:  That's fine, Your Honor.  I can move on.
2     BY MR. WILSON:
3     Q    Now, Mr. Seery, you would agree with me that whether or
4     not HarbourVest played an active role in the Acis bankruptcy,
5     it was kept apprised of the -- of the ongoings in the
6     bankruptcy?  (Pause.)  I'm sorry.  Could you hear that?
7     A    Yes.  My understanding is that -- that they were.
8     Q    And in fact, did Highland have weekly conference calls
9     with HarbourVest during the Acis bankruptcy to discuss what
10    was going on in the bankruptcy?
11    A    I don't know if they were weekly.  I've been told that
12    they had regular calls updating HarbourVest, yes.
13    Q    Okay.  And did Highland produce over 40,000 pages of
14    documents to HarbourVest related to the Acis bankruptcy?
15    A    I'm not aware of that, no.
16    Q    Have those documents been provided to you?
17    A    I hope not.
18    Q    So, in your role --
19    A    I'm sorry.  I don't -- I didn't receive 40,000 documents
20    from anybody.
21    Q    Well, did you receive any number of documents that were
22    provided by Highland to HarbourVest during the Acis
23    bankruptcy?
24    A    I wasn't involved in this during the Acis bankruptcy.  I'm
25    sorry.

Seery - Cross                    80

1  Q   Well, I'm referring to, after you became involved in this

2  Highland bankruptcy, whether you were provided with these

3  documents that were sent from Highland to HarbourVest.

4  A   I don't -- I don't know what the documents are.  I've

5  reviewed tons of documents with respect to the HarbourVest

6  claims, but I don't know of the documents to which you're

7  referring.

8  Q   Okay.  And after you performed your investigation into the

9  HarbourVest claim, what was your opinion as to the cause in

10  the reduction in value of HarbourVest's investment in HCLOF?

11  A   I think the main cause of the reduction in the investment

12  was the imposition of the Trustee and the failure of Highland

13  HCLOF and then subsequently with the injunction to reset the

14  CLOs.

15      You know, these are -- these are some of the worst-

16  performing CLOs in the market because they weren't reset.  And

17  when the liabilities of the CLOs are set at a level to match

18  assets, and then liability -- the assets run off, and the

19  asset financings or the new deals come in at much lower

20  levels, and the obligations of the CLO are not reset, the

21  arbitrage that is the CLO shrinks.  And that's what happened

22  to these CLOs.

23  Q   And during the course of the Acis bankruptcy, Acis and

24  Brigade were given management responsibilities over the CLOs

25  and HCLOF, correct?

Seery - Cross                                81

1  A   I believe that the Trustee had the overall, and then

2  subsequently, with the confirmation of the plan, they took it

3  over.  So I think that ultimately Mr. Terry had the management

4  authority, full management authority, and some advice through

5  Brigade.  But I think technically it wasn't actually during

6  the Chapter 7.  The Chapter 7 proceeding, I believe that Mr.

7  Phelan had the actual authority.

8       (Echoing.)

9  Q   I'm sorry.  And so your testimony is that Mr. Phelan had

10 the actual authority but he delegated that authority to Josh

11 Terry and Brigade?

12 A   I think that's fair, yes.

13 Q   And do you know when that occurred?

14 A   I believe that the control of the CLOs was in July of

15 2018, and then the ultimate confirmation of the case was at

16 the very beginning of '19.

17 Q   So, after being instituted as portfolio manager, and

18 during the time when Acis and Brigade were working under the

19 direction of the Trustee, who would have receive the fees for

20 managing those portfolios?

21 A   I believe -- I don't know.  I believe the -- that the Acis

22 estate would have received those fees.

23 Q   And who -- and so is that your testimony, that prior to

24 confirmation the Acis estate would have received the

25 management fees?

Seery - Cross                                    82

1   A    I believe that -- I believe they would have if they were

2   the manager, yeah.

3   Q    Okay.  And who would have received the fees after

4   confirmation?

5   A    Acis.

6   Q    Okay.  And who would have had the discretion to set the

7   amount of those management fees?

8   A    They would be agreed to in the -- in the investment

9   management agreement.

10  Q    They would be agreed to?

11  A    Yes.  As far as I've seen, I've -- I haven't seen

12  unilateral ability of a manager to set fees at its -- at its

13  whim.

14  Q    So is it your understanding that Acis and Brigade ended up

15  charging substantially more fees than Highland had charged

16  when it was under Highland's management?

17  A    I think the fees were -- the fees were -- the fees were

18  set by the agreement.

19          MR. MORRIS:  Your Honor, I just object to the line of

20  questioning on relevance grounds.  This is a 9019 hearing,

21  Your Honor.  How -- I just don't think this has any relevance

22  at all.

23          THE COURT:  All right.  Mr. Wilson, what is the

24  relevance?

25          MR. WILSON:  The relevance is that Mr. Seery has

Seery - Cross                                    83

1  testified that these Acis CLOs were among the worst-performing

2  in the market, and frankly, we would agree with that, and I'm

3  trying to get his understanding as to why, because I think

4  there's direct relevance in the reason that the value of the

5  HarbourVest investment diminished.

6        MR. MORRIS:  I don't think that was his testimony,

7  Your Honor.  But at the end of the day, Your Honor has heard

8  the litany of reasons why the Debtor is entering into this

9  agreement.  I just, I just think it's irrelevant, Your Honor.

10       THE COURT:  All right.  Mr. Wilson, I barely think

11  this is relevant.  I mean, I'm going to give you some benefit

12  of the doubt on that because of, you know, the testimony that

13  HarbourVest lost $50 million of value and --

14     (Echoing.)

15       THE COURT:  -- maybe that shouldn't, you know, lie at

16  the feet of Highland.  I think the compromise reflects that

17  they don't -- it doesn't lie entirely at the feet of Highland.

18  But, you know, maybe two or three more questions.

19       MR. WILSON:  Yes.  Thank you, Your Honor.  And I

20  didn't have very much more on this point.  But to be a hundred

21  percent honest, I can't remember my question right before the

22  objection.

23       THE WITNESS:  I think you were asking me about the

24  fees and somehow alluding or implying that the manager could

25  unilaterally set fees.

Seery - Cross                                84

1    The fees are set in the investment management contract.

2    The manager doesn't get to wake up on Wednesday and say, you

3    know, I'd like another half a basis point.  It doesn't work

4    that way.

5    BY MR. WILSON:

6    Q   But you would agree with me that the fees and expenses

7    charged to an investment would impact the performance of that

8    investment in the market?

9    A   Absolutely.

10   Q   Would you also agree with me that there was one CLO -- and

11   I think you referred to it in your direct testimony -- but CLO

12   7, which continued to be managed by Highland?

13   A   That's correct.

14   Q   And is it fair to say that CLO 7 exceeded the performance

15   of the CLOs that were managed by Acis and Brigade?

16   A   I think that's fair.  I don't -- I don't recall the

17   magnitude, but I think it's outperformed those -- those CLOs,

18   yes.

19   Q   All right.  Well, thank you.  I want to turn your

20   attention to the portion of the settlement agreement that

21   deals with voting of the HarbourVest claim.  How did

22   HarbourVest's commitment to vote for the plan become a part of

23   the settlement?

24   A   Pretty straightforward negotiation.  We -- in negotiating

25   the settlement, one of the key factors was the cost and

Seery - Cross                                    85

1  expense of the litigation, in addition to the risk on the --

2  on the fees, and whether we could wrap this up in a global

3  settlement now.  So in my experience, it's fairly typical, we

4  would try to do this in every settlement, have the settling

5  party, be that the claimant, agree to support the case and the

6  plan.

7      You know, we did not do that with the Committee members,

8  although we wanted to.  (Echoing) I frankly still wish I had.

9  Those little -- little bits that have been difficult

10 (echoing).  The Committee members have a different interest in

11 (echoing) than their more global interest for creditors at

12 large, which is more difficult than traditionally in

13 bankruptcy cases, less likely to have a Committee member, a

14 sitting Committee member, actually support the (echoing) of

15 the plan.

16         THE COURT:  Mr. Wilson, could you be careful to put

17 your device on mute every time you're not talking?  Because

18 we're getting some feedback loop from you when Mr. Seery

19 answers your questions.  Okay?

20     (Echoing continues.)

21         THE COURT:  Like right now.  I'm hearing feedback of

22 my own voice through your speakers.

23     Right, Mike?  Isn't that what --

24         A VOICE:  I am, too.

25         THE COURT:  Yes.  Okay.  So please be sure you put

Seery - Cross                                          86

1  your device on mute whenever you are not speaking.  All right.

2  Go ahead.

3  BY MR. WILSON:

4  Q    I mean, I think you just answered this question, but there

5  was -- there was no similar voting provision in the Acis or

6  the Redeemer settlements, correct?

7  A    There is not, no.  And just as a -- by way of explanation,

8  if it's okay, the reason was my counsel advised against it.  I

9  did ask for it.

10 Q    Your counsel advised against putting that voting

11 requirement in the Acis and Redeemer settlements?

12 A    For the reasons I stated.  And in my experience, that's

13 consistent, where sitting members of Committees don't

14 generally sign up to resolve their own claims and support the

15 plan because of their larger fiduciary duties to the creditor

16 body as a whole.

17 Q    And during the settlement negotiations of the HarbourVest

18 claim, was this commitment to vote a topic of discussion?

19 A    Not -- not particularly, no.  It was pretty clear that

20 HarbourVest, if they were going to agree to the settlement and

21 the numbers, could see structure.  Obviously, it wanted to

22 understand what the potential distributions would be under the

23 plan, but this was not a hotly-negotiated point.

24 Q    And would you consider HarbourVest's commitment to vote

25 for the plan an important part of the settlement?

Seery - Cross                                    87

1   A    I think it's an important part of the settlement, that the
2   part of the settlement is the subordinated claim.  We could
3   put that into presumably any plan.  But our plan does -- does
4   have a Class 9 for that.  So I think it's a -- it's a part of
5   the settlement that is important or we wouldn't have included
6   it.  It clearly wraps everything up and moves us towards
7   confirmation.
8   Q    And would you have made the deal with HarbourVest if they
9   had pushed back on the commitment to vote for the plan?
10  A    Yeah, I would have.
11  Q    All right.  Thank you.
12          MR. WILSON:  No further questions.
13          THE COURT:  All right.  Mr. Draper, anything from
14  you?
15          MR. DRAPER:  Yes, Your Honor.
16                      CROSS-EXAMINATION
17  BY MR. DRAPER:
18  Q    Mr. Seery, I may not understand the settlement, and I
19  apologize, but the way I think the settlement reads, the
20  interest that you're acquiring, you have the right to place in
21  any entity.  Is that my -- is that correct?
22  A    I don't recall the -- the specifics, but just from a
23  structural standpoint, we wanted to be able to put it into a
24  subsidiary as opposed to putting it directly in HCMLP.  If we
25  couldn't do that, we would -- we would put it into HCMLP.  So

Seery - Cross                                          88

1   there wasn't a -- I don't recall the actual specifics, but we
2   certainly thought about holding that interest in a -- in a
3   subsidiary, just to have a cleaner hold.
4   Q    Why aren't you putting it into the Debtor so the Court and
5   the estate have jurisdiction over that?
6   A    I think the Court certainly has jurisdiction over an
7   entity that the estate owns a hundred percent of.  I don't
8   think that's -- that's even a close call.  So the important --
9   Q    Now, --
10  A    Can I finish?
11  Q    Sure.
12  A    You asked me why.  To the extent that somebody thinks that
13  problematic, I will consent to the Court having complete
14  jurisdiction over it, since I control it a hundred percent.
15  Q    No.  The real reason is, if I remember correctly, Mr.
16  Dondero and Judge Lynn filed a motion to have some say or some
17  information as to sales by subsidiaries, and I think you took
18  the position that they weren't entitled to it.  And so my
19  concern was that putting this in a subsidiary in a sense gave
20  you unfettered control without any review of the item.
21  A    I don't -- I don't think that's the case where we --
22  there's a directly-held subsidiary where we own a hundred
23  percent of it.  I don't think that that's the case.
24  Q    Okay.  But you're willing to (a) put this into the Debtor,
25  number one; and number two, have the estate and have the Court

Seery - Cross                                89

1    have complete control over the disposition of it and its

2    actions, correct?

3    A    That's not correct, no.

4    Q    What -- what is incorrect about my statement?

5    A    The debtor-in-possession has control of its assets.  The

6    Court doesn't have complete control over its assets.  There's

7    --

8    Q    Well, --

9    A    -- issues -- hold on a second.  This is not -- this is not

10   a game and a trap.  We put it in a subsidiary for specific

11   reasons.  You asked why.  I'm giving you the why.  It's not to

12   hide it from anybody.  We're not going to sell the asset

13   unless somebody comes up with a great price for it.  We're

14   going to monetize the assets.  We're going to control HCLOF by

15   a majority.

16   Q    But, again, the issue is, if it's in the estate, the Court

17   has supervision over it.  If it's not in the estate, the Court

18   has no supervision of it.

19   A    I don't think that's correct, because the Court has

20   supervision over the estate, which owns a hundred percent of

21   the special-purpose entity that will own the shares.

22   Q    Okay.  All right.  Now, let's talk about the $15 million

23   that you discussed and the legal fees that were incurred.  Is

24   that the total amount that was spent, or is -- or is that --

25   was the total amount $30 million and HarbourVest was only

Seery - Cross                                    90

1    responsible for one half of it or functionally took the brunt

2    of one half of it?

3    A    I think the total amount is between $15 and $20 million.

4    I don't have the exact numbers.

5    Q    So, in fact, the HarbourVest loss due to its ownership

6    would have been one half of that, not $15 million?

7    A    Well, the vehicle lost the money.  HarbourVest owned 49.98

8    percent of it, and Highland controlled the rest.  So if you

9    allocate it that way, I suppose that would be a -- that's how

10   you would divide it, in -- roughly in half, yes.

11   Q    And so HarbourVest's actual dollar loss due to the legal

12   fees is really the 49-point-whatever percent of $15 million,

13   not $15 million?

14   A    I don't know if -- I certainly would argue that.  I don't

15   think that HarbourVest has that position.

16   Q    Okay.  Now, in connection -- you were asked a question

17   about the documentation that was provided by Highland to

18   HarbourVest both during the bankruptcy of Acis and before.

19   You have control over the Harbour -- over the Highland server,

20   correct?

21   A    I'm sorry.  Can -- can we do two things?  One is, Mr.

22   Draper, I can't see you, so it would be better if I could see

23   you during the questioning.

24   Q    Okay.

25   A    And could you repeat the question?

Seery - Cross                                        91

1  Q    All right.  I'll be happy to.  You were asked a question

2  about the documentation that was provided by Highland to

3  HarbourVest during the Acis bankruptcy and meetings that took

4  place between the parties.  Correct?

5  A    Yes.

6  Q    And you stated you were unaware of the material that was

7  sent over?

8  A    I think I testified that I didn't receive the 40,000

9  documents that were mentioned.

10 Q    Did you do any search or order a search of the Highland

11 server to see what material was sent over by any party to

12 HarbourVest to analyze what -- what information they had

13 available to them and what was provided to them?

14 A    Yes, we did a search.

15 Q    And did you review the documentation that was sent over?

16 A    The -- the documentation that we looked at was very

17 specific to the investment and to the OM.  So we didn't look

18 for the -- the supposed 40,000 documents, no.

19 Q    Did you look for the material that was provided to them

20 during the Acis bankruptcy and the periodic meetings that you

21 discussed?  Or that you testified to earlier?

22 A    The answer is no.

23 Q    One last question.  I think, and just so I understand your

24 testimony, you've broken out the HarbourVest claim into two

25 pieces.  One is the legal fee amount that we've just

Seery - Cross                                    92

1  discussed, and I gather the other piece of that is the fraud

2  in the inducement to enter into the CLO purchase?

3  A    It's -- it's more -- it's much more than that.

4  Q    Okay.  Well, let me say it in a different way.  The other

5  part of it is the losses as a result of the fraud in the

6  inducement to purchase the interest?

7  A    I don't think that's -- that's fair.  If I could explain?

8  Q    Sure.

9  A    Yeah.  The legal fee piece is pretty clear.  The other

10 piece starts with fraud in the inducement, but it's extensive

11 fraud claims.  Fraud in the inducement, as I testified

12 earlier, would get them around the exculpation and liability

13 limitations in the OM.  You don't get around all of those with

14 just the fraud.  And so that's -- that's the split of that

15 claim.  So the fraud in the inducement contains fraud

16 allegations.  Even if you didn't have inducement, you'd have

17 other potential fraud claims.

18 Q    But let me state it in a different fashion.  But for the

19 investment, the fraud that you allege wouldn't have occurred?

20 A    I -- HarbourVest alleges it.

21 Q    No, I'm just -- in your analysis of the claim, but for the

22 inducement, the rest of the damages wouldn't have flowed?

23 A    That's HarbourVest's position, yes.  But for the fraud,

24 they wouldn't have made the investment.

25 Q    All right.

                              Seery - Redirect                    93

 1              MR. DRAPER:  I have nothing further for this witness.
 2              THE COURT:  All right.  Any redirect, Mr. Morris?
 3              MR. MORRIS:  Just a few very questions, Your Honor.
 4  Just a very few questions.
 5                        REDIRECT EXAMINATION
 6  BY MR. MORRIS:
 7  Q   Mr. Seery,  you were asked about that document that Lucy
 8  prepared.  Do you remember that?
 9  A   Yes, I do.
10  Q   In your experience, don't defendants often deny liability
11  before entering into settlements, or even worse, getting
12  adverse judgments entered against them?
13  A   Of course.  Yes.
14  Q   Okay.  And in response to Mr. Draper's questions, isn't
15  the Guernsey claim another claim that the Debtor took into
16  account in assessing the potential risks of this settlement?
17  A   There's a number of claims contained in it.  As I
18  mentioned earlier, I mentioned the RICO claim.  But there is a
19  Guernsey shadow director claim, which is not dissimilar to
20  U.S. claims that somebody effectively controls an enterprise,
21  notwithstanding them not having the official role.
22  Q   Okay.
23              MR. MORRIS:  I have nothing further, Your Honor.
24              THE COURT:  All right.  Any recross on that redirect?
25  All right.

Seery - Redirect                          94

1           MR. WILSON:  No, Your Honor.

2           MR. DRAPER:  No, Your Honor.

3           THE COURT:  Thank you.  Mr. Seery, that concludes

4  your testimony.  Thank you.

5           THE WITNESS:  Thank you, Your Honor.

6           THE COURT:  We need to take a bathroom break.  Before

7  we do, I just want to be clear with what we have left.  As I

8  understood it, we were having Mr. Pugatch from HarbourVest.

9  Mr. Morris, will that conclude the Debtor's evidence?

10 (Pause.)  Okay.  You were on mute, but I think you were saying

11 yes.

12          MR. MORRIS:  Sorry.  But to be clear, Debevoise is

13 going to be putting their witness on the stand.

14          THE COURT:  Okay.

15          MR. MORRIS:  But it's part of the evidence in support

16 of the motion.

17          THE COURT:  All right.  Do the Objectors have any

18 witnesses today?

19          MR. WILSON:  Your Honor, Mr. Dondero intends to

20 examine Mr. Pugatch, but if he's going to be called by his

21 counsel, then we will do that as a cross-examination.

22          THE COURT:  All right.

23          MR. DRAPER:  This is Douglas Draper.  I have no

24 witnesses.

25          THE COURT:  Okay.  All right.  Well, I'm asking --

95

1  well, I do want to ask:  Can we get a time estimate

2  potentially for Mr. Pugatch?

3          MS. WEISGERBER:  For my examination, Your Honor,

4  twenty minutes, perhaps.

5          THE COURT:  Okay.

6          MS. WEISGERBER:  Or less.

7          THE COURT:  All right.  Well, let me tell you what

8  we're going to do.  We're going to take a ten-minute bathroom

9  break.  But I have a 1:30 hearing and I have a 2:00 o'clock.

10  Well, I have a 1:30 docket, multiple matters, and a 2:00

11  o'clock docket.  So, you know, I'm really intending that we

12  get finished in time to give me and my staff a little bit of a

13  lunch break before launching into the 1:30 docket, so I'm

14  hopeful we can get done around 1:00-ish.  If we can't, then

15  we're going to have to reconvene, I'm going to say probably

16  3:00-ish Central time.  So let's hope we can get through

17  everything.  All right?  Ten-minute break.

18          THE CLERK:  All rise.

19     (A recess ensued from 11:58 a.m. until 12:08 p.m.)

20          THE CLERK:  All rise.

21          THE COURT:  All right.  Please be seated.  We're

22  going back on the record in the Highland matters.  Do we have

23  everyone?  It looks like we do.  Ms. Weisgerber is going to

24  call the next witness; is that correct?

25          MS. WEISGERBER:  Yes, Your Honor.  We call Michael

Pugatch - Direct                                          96

1  Pugatch of HarbourVest to the stand.

2          THE COURT:  All right.  Mr. Pugatch, if you could

3  turn on your video and say, "Testing one, two."

4          MR. PUGATCH:  Two.

5          THE COURT:  All right.  There you are.  Please raise

6  your right hand.

7       MICHAEL PUGATCH, HARBOURVEST'S WITNESS, SWORN

8          THE COURT:  Thank you.  You may proceed.

9          MS. WEISGERBER:  Thank you, Your Honor.

10                     DIRECT EXAMINATION

11  BY MS. WEISGERBER:

12  Q   Good morning.  Can you please state your name for the

13  record?

14  A   Sure.  It's Michael Pugatch.

15  Q   And where do you work, Mr. Pugatch?

16  A   HarbourVest Partners.

17  Q   And what is your title?

18  A   I'm a managing director in our secondary investment

19  group.

20  Q   Did HarbourVest file claims in the Highland bankruptcy,

21  Mr. Pugatch?

22  A   We did, yes.  Several claims, in fact.

23  Q   What was the basis for those claims?

24  A   Yeah.  Among other things, fraudulent inducement based on

25  misrepresentations and omissions on the part of Highland in

**Appx. 04954**

Pugatch - Direct                                    97

1   connection with our original investment, mismanagement at the

2   HCLOF level, including inappropriate fees that were charged

3   to investors, among a number of other items as well.

4   Q    Can you explain what you mean by misrepresentations made

5   to HarbourVest by Highland?

6   A    Yeah, sure.  So, you know, based on a number of

7   statements that were made to us around the litigation

8   involving Mr. Terry, some of the intentions found, the

9   structural changes that came to light with respect to HCLOF

10  and our investment, as well as the fact that the arbitration

11  award specifically against Mr. Terry would have no impact or

12  implication on Highland's sale or business.

13  Q    And can you explain what you mean by omissions made by

14  Highland to HarbourVest?

15  A    Sure.  So I would say, really, the implications behind

16  the structural changes that were made at the time of our

17  investment into HCLOF.  Also, the intention, clear intentions

18  that Highland had to never, in fact, pay the arbitration

19  award that came to light during our due diligence period to

20  Mr. -- to Mr. Terry as part of the investment.  And

21  ultimately the -- what Highland went about doing in terms of

22  stripping assets of Acis that led to the material value

23  declines and destruction of value that we've experienced

24  since our investment.

25  Q    You mentioned a diligence period.  Did HarbourVest

Pugatch - Direct                                    98

1  conduct diligence on the investment?

2  A   We did.  We conducted very detailed due diligence, as we

3  do for all of our investments.  That diligence period lasted

4  several months ahead of our investment decision.

5  Q   And did HarbourVest conduct that diligence by itself?

6  A   No.  So, in addition to internal investment professionals

7  at HarbourVest, we engage with outside advisors, both

8  consultants as well as legal advisors, in connection with

9  that due diligence.

10 Q   And did Highland answer all of HarbourVest's questions

11 during that diligence period?

12 A   They did.  And they were numerous.  But yes, they

13 answered all the questions that we had for them.

14 Q   Was the Terry dispute part of HarbourVest's diligence?

15 A   It was.  That came up as one of the outstanding items of

16 litigation as part of our due diligence.

17 Q   I'm going to ask my colleague to pull up on the screen an

18 exhibit that was on our exhibit list as Items -- Exhibits 34

19 and 35.  It's an August 15, 2017 email from Brad Eden to

20 Dustin Willard.  Mr. Pugatch, do you recognize this document?

21 A   I do, yes.

22 Q   And what is it?

23 A   This was an email sent to us during our due diligence

24 period in response to a request for more information on the

25 outstanding litigation that Highland was involved with.

Pugatch - Direct                                    99

1          MS. WEISGERBER:  And if my colleague can just scroll

2     to the attachment to that email.

3     BY MS. WEISGERBER:

4     Q    And do you recall the attachment as well, Mr. Pugatch?

5     A    Yes, I do.

6          MS. WEISGERBER:  And if you can scroll back up to the

7     first email.

8     BY MS. WEISGERBER:

9     Q    Who is Dustin Willard?

10    A    Yes.  Dustin is a colleague of mine at HarbourVest who

11    worked closely with me on this investment.

12    Q    And you said that this document was shared with

13    HarbourVest during the diligence period before the HCLOF

14    investment?

15    A    It was, correct.

16    Q    Is it typical during diligence to receive a description

17    of litigation such as this?

18    A    It is.  It's a question that we always ask.  Certainly a

19    component of our diligence to understand any outstanding

20    litigation on the part of our counterparty or manager that

21    we're investing in.

22         MS. WEISGERBER:  Your Honor, I'd move to offer this

23    exhibit into evidence.

24         THE COURT:  Any objection?

25         MR. DRAPER:  No objection, Your Honor.

Pugatch - Direct                            100

1          MR. MORRIS:  No objection from the Debtor, Your

2   Honor.

3          THE COURT:  All right.  What is the letter or number

4   for this exhibit?

5          MS. WEISGERBER:  It's HarbourVest Exhibit 34.

6          THE COURT:  All right.  So HarbourVest Exhibit 34 is

7   admitted.

8        (HarbourVest's Exhibit 34 is received into evidence.)

9          THE COURT:  And I need to be clear where it appears

10  on the docket.  Can someone tell me?

11         MS. WEISGERBER:  So, it's identified on our exhibit

12  list, not -- it's not attached to the exhibits.  It is on the

13  docket.  We were -- when we initially filed the exhibit list,

14  we were working out confidentiality issues.  But it was

15  subsequently filed with our reply last night.  It's at Docket

16  No. 1735 --

17         THE COURT:  All right.

18         MS. WEISGERBER:  -- at Pages A -- Pages A345 to A350.

19         THE COURT:  All right.  Very well.  Thank you.

20  BY MS. WEISGERBER:

21  Q   Mr. Pugatch, we'll just scroll down to the second page of

22  the attachment.  Can you describe generally what the

23  litigation says regarding the Terry dispute?

24  A   Yes.  Generally speaking, this dispute was described as

25  an employee dispute, employment agreement dispute, with Mr.

Pugatch - Direct                    101

1  Terry, who was a former employee of Highland involved in

2  their CLO business, and is described by Highland to us really

3  having to do with a series of false claims, in their opinion,

4  but having to do with a disgruntled former employee.

5  Q    And did it strike you as an unusual or significant

6  dispute?

7  A    No.  I would say we often -- we'll see, you know, former

8  employees with, you know, claims against a former employer in

9  connection with wrongful termination.  I wouldn't say it's

10  extremely common, but certainly not entirely out of the

11  ordinary.  And based on the explanations that we'd received

12  from Highland, seemed to be more of an ordinary-course type

13  former employee litigation suit.

14  Q    Based on what you now know about the Terry dispute, do

15  you believe that this was an adequate disclosure regarding

16  the dispute?

17  A    I would say very clearly not, you know, based on the

18  facts that came to light subsequently, the various rulings in

19  connection with the Acis bankruptcy case.  What was very

20  clearly not stated are the actual facts and implications of

21  the ongoing litigation with Mr. Terry.

22        MS. WEISGERBER:  I'd ask my colleague to put up the

23  next exhibit.  Okay.  So, this is on a HarbourVest exhibit

24  list, which is Document No. 1723.  It's Exhibit 36 on that.

25  Same issue with respect to initially not filed, but it is on

Pugatch - Direct                              102

1  the docket at our response last evening at ECF No. 1735 at

2  Page A351.

3            THE COURT:  Page what?

4            MS. WEISGERBER:  A351.

5            THE COURT:  A351.  Thank you.

6            MS. WEISGERBER:  You're welcome.

7  BY MS. WEISGERBER:

8  Q    Mr. Pugatch, I just put up a November 29, 2017 email from

9  Hunter Covitz to Dustin Willard, Michael Pugatch, and Nick

10 Bellisario.  Do you recall this document?

11 A    I do, yes.

12 Q    And what is this document?

13 A    This was an email sent to us by Highland a couple weeks

14 after we closed on our investment on the (inaudible) in

15 response to a *Wall Street Journal* article that had come out

16 regarding Highland, a number of actions that they had taken,

17 and what Highland was articulating to us, a number of false

18 claims that had been made about Highland's prior actions, and

19 specifically trying to explain some of that and also share

20 with HarbourVest a letter that was being sent to the editor

21 of the *Wall Street Journal* highlighting, in their view, some

22 of the inaccuracies around the reporting.

23 Q    And did you receive this document?

24 A    We did, yes.

25            MS. WEISGERBER:  I'd move to offer this, so

Pugatch - Direct                                      103

1  HarbourVest Exhibit 36, into evidence.

2          THE COURT:  Any objections?

3          MR. WILSON:  Your Honor, John Wilson.  I would object

4  as to the relevance of this document.

5          THE COURT:  All right.  What's your response?

6          MS. WEISGERBER:  Your Honor, it shows

7  misrepresentations that the witness will testify how it

8  relates back to prior representations prior to HarbourVest's

9  investment, as well as misrepresentations at that time.

10         THE COURT:  Okay.  I overrule the objection.  I'm

11 going to admit it.

12     (HarbourVest's Exhibit 36 is received into evidence.)

13 BY MS. WEISGERBER:

14 Q    Mr. Pugatch, can you describe generally -- we spoke about

15 this a little bit -- just what this communication from

16 Highland was conveying to HarbourVest at the time?

17 A    Yes.  Specifically, again, responding to this *Wall Street*

18 *Journal* article that had been published, trying to defend,

19 again, Highland's own views why there were inaccuracies in

20 the reporting.  But importantly, from our perspective, trying

21 to reassure us as to the fact that, you know, these

22 accusations would have no bearing and any results from it

23 would have no bearing on their ongoing business or

24 partnership or the investment that we had made in HCLOF.

25         MS. WEISGERBER:  And if you can scroll to the second

Pugatch - Direct                                    104

1  page.

2  BY MS. WEISGERBER:

3  Q   We'll just look at the last paragraph of another email

4  from Mr. Covitz.  Can you just read that first sentence of

5  the last paragraph?

6  A   Sure.  (reading)  While the dispute has no impact on our

7  investment activities, as always, we welcome any questions

8  you may have.

9  Q   Mr. Pugatch, was this email and the discussion regarding

10 the Terry dispute consistent with the representations made to

11 you prior to HarbourVest's investment into HCLOF?

12 A   It was, yes.  Both the message, the lack of any impact

13 that ultimately the dispute with Mr. Terry, the arbitration

14 award would have around Highland's ongoing CLO business, or

15 HCLOF specifically, was all, you know, very clear in this

16 document, but all consistent with the representations that

17 had been made to us leading up to our investment in the

18 middle of November 2017 as well.

19 Q   Thank you.

20       MS. WEISGERBER:  And you can take down the exhibit,

21 Emily.  Thank you.

22 BY MS. WEISGERBER:

23 Q   You mentioned, Mr. Pugatch, an arbitration award to Mr.

24 Terry.  How did you learn about that arbitration award?

25 A   That was initially disclosed to us by Highland as we were

 1  in the late stages of our diligence and closing process on

 2  the investment into HCLOF.

 3  Q    And generally, what did Highland tell you about the

 4  arbitration award?

 5  A    We were aware of its existence.  We were aware of the

 6  quantum of the award, I think it was around an $8 million

 7  arbitration award in the favor of Mr. Terry, and that was

 8  following the litigation around the wrongful termination and

 9  employee dispute that Highland had described to us

10  previously.

11  Q    Did you ask to see a copy of the arbitration award?

12  A    No, we did not.

13  Q    Why not?

14  A    Ultimately, we -- you know, the explanations that

15  Highland had provided to us all seemed very reasonable.  We

16  relied on their representations that this was, again, nothing

17  more than a dispute with a former disgruntled employee, in

18  their words, that had no bearing or, you know, would not have

19  any bearing on our investment in HCLOF or their ongoing CLO

20  business, which all very clearly was not the case, as

21  we've -- as we've learned over the last several years.

22  Q    Following learning about the arbitration award, did

23  HarbourVest do other diligence?

24  A    We did.  So, in addition to asking questions related to

25  the arbitration award and any impact that it would have, we

Pugatch - Direct                    106

1  also spent some time diligencing a couple of structural

2  changes that were proposed by Highland, and, in fact, ended

3  up delaying the closing of our investment by about two weeks

4  as we vetted some of those structural changes that Highland

5  had proposed.  Vetted those both, you know, internally with

6  Highland directly and with external counsel in order to make

7  sure that those structural changes were in fact legally sound

8  in ultimately making our investment.

9  Q    And were those changes proposed following the arbitration

10 award?

11 A    They were, yes.

12 Q    Did Highland tell you the reason for the structural

13 changes?

14 A    Yeah.  So, so some of this -- and specifically, this

15 involved a change of the portfolio manager at the HCLOF level

16 that was really in connection with a rebranding as Highland

17 was going through a rebuild of its CLO business and wanting

18 to align, from a brand perspective, their business on an

19 ongoing basis with the Highland brand as opposed to the Acis

20 brand.  But more specifically, in the case of a late change

21 from a structured standpoint, the -- part of the intention

22 and the investment thesis of HCLOF was to pursue a reset, a

23 refinancing of all the underlying CLOs as they approached the

24 end of their investment period or came out of their

25 investment period.

Pugatch - Direct                                    107

1      And in connection with that, in light of the arbitration

2    award, Highland's view was that there may be difficulties in

3    the market in resetting certain of those Acis CLOs with the

4    Acis brand associated with them, given, again, the existence

5    of the arbitration award and concerns in the market around

6    the Acis brand reputation.

7    Q    And what did they tell you was the market view of Acis,

8    or the Acis brand?

9    A    Yeah.  Their view or their concern was that the, you

10   know, because of the existence of that arbitration award, the

11   brand would be viewed as toxic.

12   Q    Didn't this put you on notice that perhaps there was

13   something wrong with the structural changes?

14   A    I mean, we -- I mean, short answer, no.  We ultimately

15   asked questions, we diligenced the legal structure, but

16   relied on the representations that were made to us by

17   Highland around the rationale for the structural changes,

18   that these are all changes that were within a Highland-

19   managed vehicle or sat below the vehicle that we were

20   investing in, and so ultimately were in Highland's purview,

21   was the representations that we relied on.

22   Q    And did HarbourVest alone do that diligence of the

23   structural changes?

24   A    So, no.  I mean, in connection with the diligence that we

25   did internally and with Highland directly, we engaged with

Pugatch - Direct                                        108

1   outside counsel who was working with us at the time to vet

2   those structural changes as well.

3   Q    Did HarbourVest rely on Highland's representations

4   regarding the arbitration award and the structural changes in

5   making its investment in HCLOF?

6   A    We did, absolutely.

7   Q    If Highland had disclosed the nature of the structural

8   changes, of removing Acis as the portfolio manager and

9   related transfers, would HarbourVest have proceeded with its

10  investment?

11  A    Definitively, no, we would not have.

12  Q    Why not?

13  A    I think the reality is if we had understood the intent,

14  you know, that Highland was ultimately undertaking here, we

15  would not have wanted to be any part of this, and certainly

16  getting dragged into all of this, the hassle, the value

17  destruction that we've seen on behalf of the investors and

18  the funds that we manage.  And I would say, lastly, we just

19  full stop would not have done business with a firm who

20  engages with this type of behavior, had we actually known the

21  truth.

22  Q    Mr. Pugatch, are you familiar with the bankruptcy that

23  followed of Acis?

24  A    Yes.

25  Q    And what was your -- or, did HarbourVest participate in

Pugatch - Direct                                         109

1  that bankruptcy?

2  A    So, initially, no.  Subsequently, we ended up getting

3  dragged into that on account of a number of misstatements by

4  Highland about the role that HarbourVest had played as part

5  of our investment into HCLOF and some of that structure and

6  the structural changes that I alluded to.

7  Q    How did HarbourVest learn about those misstatements in

8  the bankruptcy about HarbourVest's role?

9  A    So, ultimately, those came to light on -- you know, on

10  account of the ongoing proceedings within the Acis bankruptcy

11  process, and specifically brought to light to us by the Acis

12  trustee at the time, who decided to pursue, you know, further

13  diligence or discovery around the claims that Highland had

14  made around HarbourVest's involvement in those changes.

15  Q    And what is your understanding of what the allegations

16  were that caused the Acis trustee to investigate HarbourVest?

17  A    Sure.  So, you know, our understanding was that Highland

18  had made statements, again, false statements that HarbourVest

19  had actually instructed some of those structural changes,

20  that we were the ones that had said that we would not do

21  business with Acis and had ordered some of the underlying

22  transfer of assets or, again, structural changes, that, you

23  know, very clearly I would say were not the case.  Also, that

24  HarbourVest was -- was calling the shots as it relates to any

25  of the ongoing management or future resets of the CLOs.

Pugatch - Direct                                    110

1  Q    Did HarbourVest instruct any of those structural changes

2  or transfers to occur?

3  A    We did not.  Absolutely not.

4  Q    Why didn't HarbourVest itself appear in the Acis

5  bankruptcy and file a claim?

6  A    Yeah.  HarbourVest's role, again, in HCLOF, we were a

7  passive investor in a Highland-managed company.  We had no

8  direct interaction with or relationship with Acis.  There was

9  really no reason for us to be directly involved until we were

10 subsequently dragged into involvement on account of those

11 misstatements.  And then at that point our focus really

12 pivoted to, you know, whether we needed to defend ourselves

13 against those accusations that had been made by Highland and

14 after a request for further information in discovery by the

15 Acis trustee.

16 Q    Did HCLOF participate in the Acis bankruptcy?

17 A    They did, yes.

18 Q    Did HCLOF incur fees for participating in the Acis

19 bankruptcy?

20 A    Yes.  In fact, very meaningful fees, to the tune of well

21 in excess of $15 million of legal fees, as we understand it,

22 that have been incurred, largely in connection with the

23 ongoing Acis bankruptcy and Highland's continued pursuit of

24 and in connection with the litigation with Mr. Terry, which

25 we firmly believe was entirely inappropriate that HCLOF and

Pugatch - Direct                                111

1   ultimately investors in HCLOF bear those expenses, which were

2   not just expenses of HCLOF but of Highland and a number of

3   other Highland affiliates.

4   Q    Do those expenses form a basis of separate claims filed

5   by HarbourVest against Highland?

6   A    They do, yes.  One of the multiple claims that we had

7   filed against Highland.

8   Q    And a few more questions, just for the record, Mr.

9   Pugatch.  How much did HarbourVest initially invest in HCLOF?

10  A    Sure.  So, our initial investment in November of 2017 was

11  right about $73-1/2 million, I believe.

12  Q    Did HarbourVest invest any additional money in HCLOF?

13  A    We did.  There was a subsequent capital call investment

14  of about $5 million, bringing our total investment to just

15  under $80 million in aggregate.

16  Q    When HarbourVest initially made the investment, did it

17  anticipate making a profit on it?

18  A    We did, yes.

19  Q    How much did HarbourVest anticipate earning from the

20  investment?

21  A    Yeah.  So, our -- based on the original $73-1/2 million

22  investment, we had expected a total return of about $137

23  million on that -- on that investment.

24  Q    What was that projection based on?

25  A    So, that projection was based on materials that we had

Pugatch - Direct                            112

1   received from Highland, their internal projection models on

2   the future performance of the underlying CLOs that we were

3   acquiring exposure to through our investment in HCLOF, and

4   was one of the inputs or formed the basis in connection with

5   our diligence that we ultimately ran different sensitivities

6   -- projections around and helped employ -- helped inform our

7   investment thesis.

8   Q    Do you know the current value of HarbourVest's investment

9   in HCLOF?

10  A    Yes.  The current value is right around $22-1/2 million.

11  Q    So roughly how much has the investment itself decreased

12  from HarbourVest's initial investment?

13  A    So, net of what was about $4-1/2 million of distributions

14  that we received early on in the investment, we've lost, to

15  date, in excess of $50 million on our original investment.

16  Q    And just for -- to close out, Mr. Pugatch, knowing all

17  that you know, if HarbourVest had known that -- about the

18  nature of the transfers by Acis or Highland's intent with

19  respect to the arbitration award, would HarbourVest have made

20  this investment?

21  A    No.  The reality is, had we known the truth, or even had

22  a sense of the truth, the true intentions behind some of

23  those transfers and ultimately what would have happened, we

24  never would have made this investment, full stop.

25  Q    Thank you, Mr. Pugatch.

Pugatch - Cross                                    113

1           THE COURT:  All right.  I didn't hear you, Ms.
2    Weisgerber.  Do you pass the witness?
3           MS. WEISGERBER:  Yes, I pass the witness.
4           THE COURT:  All right.  Thank you.
5       Mr. Morris, any examination from you?
6           MR. MORRIS:  No, thank you, Your Honor.
7           THE COURT:  All right.
8       (Interruption.)
9           THE COURT:  All right.  I'm not sure whose voice that
10   was, but please, again, mute your devices when you're not
11   talking.
12      Any cross-examination of Mr. Pugatch?  I'll start with
13   you, Mr. Wilson.
14          MR. WILSON:  Yes, Your Honor.
15          THE COURT:  Okay.
16                      CROSS-EXAMINATION
17   BY MR. WILSON:
18   Q    How are you -- I guess we're afternoon now.  How are you
19   this afternoon, Mr. Pugatch?
20   A    I'm doing well.  Yourself?
21   Q    I'm doing well as well.  Do you recall that on Monday of
22   this week I took your deposition?
23   A    Yes, I do.
24   Q    And so you understand that my name is John Wilson and I
25   represent Jim Dondero, who has filed an objection to the 9019

Pugatch - Cross                           114

1   motion filed by the Debtor?

2       I've got a few questions for you today.  Has HarbourVest

3   been around for over 35 years?

4   A   We have, yes.

5   Q   And does HarbourVest have ten offices around the world?

6   A   Correct, yes.

7   Q   And does HarbourVest employ over 150 investment

8   professionals?

9   A   Yes.

10  Q   Does HarbourVest have over $74 billion in assets under

11  management?

12  A   Correct, yes.

13  Q   And is HarbourVest's client base largely comprised of

14  institutional investors?

15  A   Also correct.

16  Q   And you would agree with me that HarbourVest is a

17  sophisticated investor, right?

18  A   I would, yes.

19  Q   How long have you worked for HarbourVest?

20  A   I've been employed by HarbourVest for 17 years now.

21  Q   And how long have you been a managing director?

22  A   I've been a managing director for approximately six

23  years.

24  Q   And you were, in fact, the managing director for the

25  investment that HarbourVest made in Highland CLO Funding,

Pugatch - Cross                          115

1   Ltd., which has been referred to today as HCLOF, correct?

2   A    I was, correct.

3   Q    And HarbourVest, I think you just testified, invested

4   approximately $73 million as its initial investment in HCLOF?

5   A    Yes, correct.

6   Q    And before HarbourVest made that investment, it had made

7   many investments of this type, correct?

8   A    Yeah.  We've made hundreds of investments into

9   partnerships over our history, correct.

10  Q    So HarbourVest was well-experienced in evaluating and

11  deciding whether to invest in large investments, correct?

12  A    It was, yes.

13  Q    Now, in your -- and by your, I mean HarbourVest -- in the

14  response to the Debtor's omnibus objection, it says that by

15  summer 2017 HarbourVest was engaged in preliminary

16  discussions with Highland regarding the investment.  Is that

17  a correct statement?

18  A    Correct, yes.

19  Q    And, in fact, those talks began in the second quarter of

20  2017, correct?

21  A    Yes.

22  Q    And so the investment closed ultimately on November 15th,

23  2017?

24  A    Yes, that's correct.

25  Q    So it's fair to say that HarbourVest considered and

Pugatch - Cross                                    116

1   evaluated this transaction for over six months before

2   investing its $73 million, right?

3   A    From the time of the initial conversations that we had

4   with Highland, yes.

5   Q    And one of the reasons that it took over six months to

6   complete the investment is that HarbourVest performs due

7   diligence before it makes an investment, correct?

8   A    Correct.

9   Q    And when you're performing due diligence -- well, first

10  off, you would agree with me that that's a common practice

11  amongst sophisticated investors such as HarbourVest, correct?

12  A    To perform due diligence?

13  Q    Yes.

14  A    Yes.

15  Q    And describe -- describe what HarbourVest does in a

16  general sense when it performs its due diligence.

17  A    Sure.  So, we spend time with the manager -- in this

18  case, Highland -- certainly around the investment thesis, the

19  opportunity, receive materials around the underlying assets.

20  We take that and perform our own independent due diligence

21  around the value of those assets, perform due diligence on

22  the manager itself, the go-forward opportunity.  In many

23  cases, and certainly in this case, engage with outside

24  advisors to assist with that due diligence.  It's a very

25  robust and thorough process.

Pugatch - Cross                    117

1  Q    And by outside advisors, are you referring to the outside

2  counsel that you testified about earlier?

3  A    Yes.  Both outside counsel and outside consultants.

4  Q    Okay.  And so did you say that it's typical to engage

5  outside counsel when performing due diligence?

6  A    Yes.

7  Q    And which outside counsel did you retain with respect to

8  this due diligence?

9  A    Debevoise and Plimpton as well as Milbank.

10  Q    And during the course of HarbourVest's due diligence, did

11  it identify some items of concern?

12  A    As with any investment, there are always items that are

13  identified that require further diligence, risks that are

14  identified that we look to mitigate through our due

15  diligence, et cetera.

16  Q    And if Harbour -- I'm sorry, did you say something else?

17  A    No.

18  Q    You were finished?  Okay.  Now, if HarbourVest identifies

19  an item of concern, is it typical to request additional

20  information regarding those items of concern?

21  A    It is, yes.

22  Q    And so that actually happened with respect to the HCLOF

23  investment, correct?

24  A    In certain cases, yes.

25  Q    HarbourVest identified several litigation matters that it

Pugatch - Cross                           118

1   had questions about, correct?

2   A    Correct.  As we would with any investment.

3   Q    And it went back to Highland and asked them to explain

4   their position on those litigation matters?

5   A    Correct.

6   Q    And one of those litigation matters was the Joshua Terry

7   litigation, correct?

8   A    Yes.

9   Q    And at the time that HarbourVest was considering this

10  investment, beginning in the second quarter and continuing

11  through the summer, that Josh Terry litigation had not

12  resulted in an award or a final judgment, correct?

13  A    Correct.

14  Q    And I think we looked earlier at a document that your

15  counsel admitted as HarbourVest Exhibits 34 and 35.  There

16  was an email from a HarbourVest -- or, I'm sorry, from a

17  Highland representative to a HarbourVest representative that

18  was discussing Highland's position on the litigation,

19  including the Terry litigation, correct?

20  A    Are you referring to the document that we looked at

21  earlier?

22  Q    I am.  And I can put it on the screen if we need to.

23  A    No.  Right, I recall that, and yes, that's correct.

24  Q    Okay.  And just to be clear, that document, which stated

25  Highland's positions on the -- and summaries of the

Pugatch - Cross                           119

1   litigation, was issued months before the arbitration award to

2   Josh Terry, correct?

3   A    I don't remember the exact timing, but it was certainly

4   during our due diligence period and prior to the arbitration

5   award, yes.

6   Q    Well, it seems to me that that email that you -- your

7   counsel admitted as an exhibit was issued in August of 2017.

8   Does that sound right to you?

9   A    If that's what the email said, yes.

10  Q    And if the Terry arbitration award came out in October,

11  then you would agree with me that that is several months

12  prior to the -- or at least two months prior to the

13  arbitration award?

14  A    Yes.

15  Q    And so when HarbourVest made requests of Highland to

16  provide information regarding its items of concern, Highland

17  complied with those requests, correct?

18  A    It did, correct.

19  Q    And was there ever a time when HarbourVest requested

20  Highland to provide information and that information was not

21  provided?

22  A    Our requests for information, or at least, you know,

23  responses or color to a question, were always met either

24  with, you know, written or verbal communication back to us,

25  yeah.

Pugatch - Cross                        120

1  Q    And you would agree with me that, in fact, HarbourVest

2  delayed the closing of the investment by two weeks to

3  continue its due diligence, correct?

4  A    Correct, related to the structural changes that were made

5  close to closing.  That's right.

6  Q    And after conducting that due diligence, HarbourVest

7  satisfied itself that the investment was sound?

8  A    That the legal structure that had been put in place in

9  connection with those proposed changes by Highland was -- was

10 legally sound, yes, and on the back of, again, statements and

11 misrepresentations on the part of Highland around the nature

12 and potential impact to their ongoing CLO business and HCLOF.

13          MR. WILSON:  Well, I'm going to object to the latter

14 part of your response as nonresponsive.

15          THE COURT:  Sustained.

16 BY MR. WILSON:

17 Q    Now, after you conducted the due diligence, HarbourVest

18 made the investment of $73 million on November 15th, 2017,

19 correct?

20 A    Correct.

21 Q    And so I think you testified earlier that prior to that

22 investment HarbourVest had become aware that that Josh Terry

23 litigation had resulted in an arbitration award, correct?

24 A    Yes.

25 Q    But I think you've also testified that HarbourVest did

Pugatch - Cross                                        121

1  not request that Highland provide a copy of the arbitration

2  award, correct?

3  A    That's correct.

4  Q    And you further testified that you were represented by

5  outside counsel at the time, correct?

6  A    Correct.

7  Q    And as of Monday of this week, you had not reviewed that

8  arbitration award; is that correct?

9  A    That's correct.

10 Q    Have you reviewed that arbitration award since Monday of

11 this week?

12 A    I have not.

13 Q    But in any event, you testified that Highland told you

14 about the award?

15 A    Yes.

16 Q    And they told you the amount of the award?

17 A    Yes.

18 Q    And then they told you that the award had been converted

19 to a judgment?

20 A    When you say the award had been converted to a judgment,

21 can you be more specific?

22 Q    Well, I don't know how familiar you are with the

23 litigation process, but in this instance, that award was

24 taken to a court and the court entered a judgment on the

25 arbitration award.  Did you -- were you aware of that?

Pugatch - Cross                           122

1  A    I don't recall the specific legal terms of judgment

2  against it.  I was award of the existence of the arbitration

3  award and the -- and the obligation for Highland to comply

4  with that arbitration award.

5  Q    And HarbourVest did not make an appearance in the Acis

6  bankruptcy, right?

7  A    We did not.

8  Q    But you were aware of the Acis bankruptcy, correct?

9  A    Yes.

10 Q    And you were kept apprised of the Acis bankruptcy by

11 Highland individuals, correct?

12 A    We had conversations with a couple of Highland

13 individuals throughout the Acis bankruptcy process, yes.

14 Q    Right.  And in fact, you testified that you participated

15 in regular conference calls with Highland regarding that

16 bankruptcy?

17 A    That's correct, yes.

18 Q    And do you recall having been provided with over 40,000

19 documents by Highland related to the Acis bankruptcy?

20 A    I do not recall that, no.

21 Q    Would those documents have been provided to your outside

22 counsel, had you received them?

23 A    I don't know the answer to that.

24 Q    Did the outside counsel that represented you in the due

25 diligence continue to represent you throughout the Acis

Pugatch - Cross                    123

1   bankruptcy?

2   A    They did.  One of the counsels did, correct.

3   Q    And which counsel was that?

4   A    Debevoise.

5   Q    So was your counsel actively involved with monitoring the

6   Acis bankruptcy?

7   A    They were, yes, particularly after we were ultimately

8   accused of having something to do with the original structure

9   and -- as a result of misstatements by Highland.

10  Q    Did your counsel attend hearings in the Acis bankruptcy?

11  A    I don't recall.

12  Q    Are you familiar with the PACER system?

13  A    I am not.

14  Q    Now, I think that HarbourVest has been described as a

15  passive investor.  You recall that description of HarbourVest

16  in this instance?

17  A    Yes.

18  Q    But, in fact, HarbourVest invested substantial assets

19  such that it owned a 49.98 percent share of HCLOF.  Would you

20  agree with that?

21  A    That's correct.

22  Q    And in fact, the next largest investor was CLO Holdco,

23  which owned 49.02 percent of the shares, correct?

24  A    That sounds right.

25  Q    And there was an advisory board that was created pursuant

Pugatch - Cross                                124

1  to the formation documents of this investment, correct?

2  A    That's correct.

3  Q    And in fact, that advisory board only had two members,

4  and one was a representative of HarbourVest and one was a

5  representative of CLO Holdco, correct?

6  A    Correct.

7  Q    And the advisor -- I'm sorry, the portfolio manager was

8  not allowed to disregard the recommendations of the advisory

9  board, correct?

10 A    With respect to the limited set of items that the

11 advisory board could opine on, that is correct.

12 Q    All right.  I want to go over a couple of the

13 misrepresentations that HarbourVest has identified in its

14 filings related to its claim.  The first one is -- and just

15 for the record, I'm reading from Docket No. 1057 filed on

16 September 11, 2020, HarbourVest Response to Debtor's First

17 Omnibus Objection.

18     But the first misrepresentation identified in that

19 document says that Highland never informed HarbourVest that

20 Highland had no intention of paying the arbitration award.

21 And was -- was Highland obligated to pay the Josh Terry

22 arbitration award against Acis?

23         MR. MORRIS:  Objection to the question to the extent

24 it calls for a legal conclusion.

25         THE COURT:  Sustained.

Pugatch - Cross                                         125

1          MS. WEISGERBER:  Join in that objection.

2          THE COURT:  Sustained.  I think --

3   BY MR. WILSON:

4   Q    Your understanding was --

5          MR. WILSON:  I'm sorry, Judge?

6          THE COURT:  I sustained the objection as calling for

7   a legal conclusion.  So, next question.

8          MR. WILSON:  Yes, I -- I heard that.  Thank you, Your

9   Honor.

10  BY MR. WILSON:

11  Q    In your understanding, was Highland responsible for

12  paying the arbitration award to Josh Terry?

13  A    My understanding is on the account of the fact that Acis

14  --

15         MS. WEISGERBER:  Objection, Your Honor.  Objection,

16  Your Honor, same basis.

17         THE COURT:  Sustained.  It was essentially the same

18  question.

19         MR. WILSON:  Well, Your Honor, I didn't ask --

20         THE COURT:  It was essentially the same question, Mr.

21  Wilson.  Move on.

22         MR. WILSON:  Okay.

23  BY MR. WILSON:

24  Q    The next misrepresentation identified by HarbourVest said

25  that Highland did not inform HarbourVest that it undertook

Pugatch - Cross                                                    126

1   the transfers to siphon assets away from Acis, LP and that

2   such transfers would prevent Mr. Terry from collecting on the

3   arbitration award.  So the basis for that allegation would be

4   that Highland was siphoning assets from Acis to avoid having

5   Acis pay the arbitration award, correct?

6   A    That -- that would be the implication, yes.

7   Q    Okay.  And then that misrepresentation continues on and

8   says that Highland represented to HarbourVest that it was

9   changing the portfolio manager because Acis was toxic.  And

10  do you recall that representation being made to you?

11  A    Yes, I do.

12  Q    And would you agree with me that whether or not Acis is

13  toxic in the industry would be an opinion?

14  A    I suppose it would be an opinion, but by the manager of

15  the vehicle responsible for managing the HCLOF investment and

16  the underlying CLOs.  Yeah, we viewed the Acis name and the

17  Highland name as synonymous, if you will.  I mean, Acis was a

18  subsidiary of Highland.  For all intents and purposes, it was

19  the same from our perspective as we made the investment into

20  HCLOF.

21  Q    So did HarbourVest have an independent understanding of

22  whether or not the Acis name was toxic in the industry?

23  A    We did not, no.  We relied on Highland's views of that as

24  manager of HCLOF.

25        MR. WILSON:  Your Honor, just a brief housekeeping

Pugatch - Cross                                    127

1  item.  Did you say that we need to be done at 1:00 o'clock?

2          THE COURT:  Well, I said I really wanted you to be

3  done by 1:00 o'clock because I have a 1:30 docket and a 2:00

4  o'clock docket and I'd rather not have to hang up 70-

5  something people and reconnect them again at 3:00 o'clock.

6  How close are you to being finished?

7          MR. WILSON:  Well, --

8          THE COURT:  This is going at a very slow pace.

9          MR. WILSON:  Well, I apologize for that, Your Honor.

10 I think I've got at least ten more minutes, but -- but I know

11 we also have closing remarks.  And I was just going to ask if

12 Your Honor had a preference of --

13         THE COURT:  Keep going.

14         MR. WILSON:  -- of breaking now --

15         THE COURT:  Keep -- let's --

16         MR. WILSON:  -- or keep going?  Okay.

17         THE COURT:  Let's talk fast and try to get through.

18 You know, even if I'm sacrificing lunch today, I don't want

19 to inconvenience 75 people this way.  So we'll just probably

20 start our 1:30 hearing a little late and inconvenience those

21 people.

22     All right.  Go ahead.

23         MR. WILSON:  All right.  Thank you, Your Honor.

24 BY MR. WILSON:

25 Q   Did Acis form its -- I can't recall if you answered this

Pugatch - Cross                                     128

 1 | question, but did Acis form its own opinion on whether or not
 2 | -- I'm sorry, strike that.  Did HarbourVest form its own
 3 | opinion on whether or not the Acis name was toxic in the
 4 | industry?
 5 |          MS. WEISGERBER:  Objection, --
 6 |          THE WITNESS:  We did not.  We didn't have a basis.
 7 |          THE COURT:  I'm sorry, did I have an objection?
 8 | BY MR. WILSON:
 9 | Q    You did not --
10 |          THE COURT:  Did I have an objection?
11 |          MS. WEISGERBER:  Yeah.  Objection.  Yes.  Objection,
12 | asked and answered, Your Honor.
13 |          THE COURT:  Overruled.  He can answer.
14 | BY MR. WILSON:
15 | Q    Okay.  But --
16 | A    We did not.
17 | Q    Did Highland have the ability to investigate the Acis
18 | name and make its own determination of whether that name was
19 | toxic?  I'm sorry, I think I'm misspeaking.  HarbourVest.
20 | A    HarbourVest had the ability to do that, yes.
21 | Q    I apologize I misspoke.  I meant HarbourVest.  Did
22 | HarbourVest have the ability to investigate that name and
23 | determine if it was toxic?
24 | A    It was irrelevant to our investment thesis.  And as I
25 | said before, Acis was a subsidiary of Highland.  We viewed

**Appx. 04986**

Pugatch - Cross                               129

1   them as interchangeable in the context of our investment.

2   Q   Okay.  The next misrepresentation that you refer to says

3   that Highland indicated to HarbourVest that the dispute with

4   Mr. Terry would have no impact on its investment activities.

5   Would you agree with me that that is also an opinion?

6   A   It was a statement that --

7          MS. WEISGERBER:  Your Honor, I'm going to object to

8   the extent these questions are seeking a legal conclusion

9   regarding, you know, if something's an opinion or not.

10         THE COURT:  Okay.  Overruled.  He can answer.

11         THE WITNESS:  It was -- it was a statement that was

12  made to us by Highland and represented in multiple different

13  formats as fact.  And a representation that we relied on in

14  connection with our investment.

15  BY MR. WILSON:

16  Q   And finally, the misrepresentation, the last

17  misrepresentation identified, is that Highland expressed

18  confidence in the ability of HCLOF to reset or redeem the

19  CLOs.  Would you agree with me that that statement is an

20  opinion?

21  A   On the basis that it was the core investment thesis of

22  the -- of the investment of HCLOF.  Again, whether that's

23  legally viewed as an opinion or a fact, it  was -- it was

24  certainly the investment thesis that we made the investment

25  predicated upon.

Pugatch - Cross                        130

1   Q   And you just testified that you thought that Acis and

2   Highland were interchangeable from the perspective of the

3   investment opportunity, correct?

4   A   Correct.

5   Q   But you also accepted Highland's recommendation because

6   HarbourVest agreed that the change in the -- to a Highland

7   manager made commercial sense, correct?

8   A   We took at face value what Highland recommended because

9   this all had to do with the structuring of an entity that

10  they fully managed with respect to multiple underlying

11  subsidiaries that weren't managed by Highland.

12  Q   But would you agree that, at the time, you -- HarbourVest

13  thought that made commercial sense?

14  A   It did not seem unreasonable to us based on the

15  explanation we were given.

16  Q   Okay.

17          MR. WILSON:  I want to refer to HarbourVest Exhibit

18  39.

19      (Pause.)

20          THE COURT:  What are we waiting on?  What are we

21  waiting on?

22          MR. WILSON:  I'm trying to get the document on the

23  screen, Your Honor.

24      (Pause.)

25          THE COURT:  We can't hear you.  We can't hear you.

Pugatch - Cross                                    131

1              MR. WILSON:  I'm sorry.  I'm sorry, Your Honor.  I'm

2     speaking with my --

3              THE COURT:  Okay.

4              MR. WILSON:  -- co-counsel here.

5              THE COURT:  All right.

6         (Pause.)

7              MS. WEISGERBER:  Mr. Wilson, is it 39 or 38 that

8     you're referring to?

9              MR. WILSON:  39.   HarbourVest 9019 motion on the

10    main -- on the Dondero file.  And then there's the -- it's --

11    it's John  -- and then there's the HarbourVest, and then the

12    exhibits are all in one file.

13             MS. WEISGERBER:  Mr. Wilson, I'll just note that 39

14    was subject to confidentiality based on HCLOF's request.

15    HCLOF's counsel is present.  I think they know it's an

16    excerpt.  But I'd just -- that for HCLOF's counsel.

17             MR. WILSON:  Well, is there an objection to showing

18    this document on the screen?  Yes.  All right.  We're not

19    going to put Document 39 on the screen.

20             A VOICE:  Yes.

21             MR. WILSON:  All right.  Scroll down to the next

22    page.

23    BY MR. WILSON:

24    Q    This is a -- this is a document that was produced to us

25    this week, the Highland production.  It appears to be a

Pugatch - Cross                                    132

1  Highland CLO Funding, Ltd. Statement of Operations for the

2  Year Ended 31 December 2017.  Do you see at the top of that --

3  at the top of that document where it says total investment

4  income of $26 million?

5  A    I do, yes.

6  Q    And total expenses were roughly $1.8 million?

7  A    Yes.

8  Q    And then net change and unrealized depreciation on

9  investments and net realized loss on investments was $4.26

10 million cumulative, resulting in a net increase in net assets

11 resulting from operations of $20.224 million.  Do you agree

12 with that?

13 A    Yes.

14 Q    Okay.

15           MR. WILSON:  Go to the next one.

16 BY MR. WILSON:

17 Q    And you understand that, in the course of the Acis

18 bankruptcy, the portfolio managers for certain of the CLOs

19 were changed by the Trustee, correct?

20 A    Yes, around the underlying CLOs.  That's -- that's my

21 understanding, yes.

22 Q    And, in fact, Mr. Seery testified earlier today that that

23 occurred in the summer of 2018, correct?

24           MR. WILSON:  Scroll.

25           THE WITNESS:  I don't recall the timing, but that's

Pugatch - Cross                               133

1  what he testified to.

2  BY MR. WILSON:

3  Q    Well, this document is HarbourVest Exhibit 40, and this is

4  the statement of operations for the financial year ended 31

5  December 2018.  Here, the total investment income is only

6  $11.1 million.  Do you see that?

7  A    I do.

8  Q    And do you see where the expenses have increased to $13.6

9  million?

10  A    I do, yes.

11         MR. WILSON:  Okay.  Scroll down some more.

12  BY MR. WILSON:

13  Q    And do you see where it says net change and unrealized

14  loss on investments of $48.47 million?

15  A    Yes.

16  Q    And so after Acis and Brigade took over the managements of

17  these CLOs, we had a net decrease in net assets resulting from

18  operations of $52.483 million in the year 2018, correct?

19         MS. WEISGERBER:  Objection, Your Honor.  Assumes a

20  fact not in evidence.

21         THE COURT:  Overruled.  He --

22         MR. WILSON:  Your Honor, --

23         THE COURT:  We're just looking at this statement and

24  testifying about it says, so I overrule the objection.

25         MR. WILSON:  Thank you, Your Honor.  Thank you, Your

 1 │ Honor.  I'm now going to turn to HarbourVest Exhibit 41.  All

 2 │ right.  I'll --

 3 │ BY MR. WILSON:

 4 │ Q    Did you answer the question, Mr. Pugatch?

 5 │ A    No, I -- I would agree with the second part of your

 6 │ statement that for the year 2018 the -- the loss was $52

 7 │ million.  I don't -- I don't believe that jives with the first

 8 │ part of your statement that that was after Acis and Brigade

 9 │ took over.  As I understand, that was in the middle of the

10 │ year.

11 │ Q    But in any event, Acis and Brigade had been managing this

12 │ for at least six months of 2018 when that loss occurred,

13 │ correct?

14 │ A    They had been managing a portion of the underlying CLO

15 │ portfolio held by Highland CLO Funding.

16 │ Q    All right.  We're now looking at Exhibit #41, which is the

17 │ Draft Unaudited Statement of Comprehensive Income, 31 December

18 │ 2019.  Total income has now dropped to $4.664 million.

19 │          MR. WILSON:  And scroll down.

20 │ BY MR. WILSON:

21 │ Q    Expenditures are at $3.645 million.  And then it says

22 │ investment gains and losses net out to $11.493 million, a

23 │ negative $11.493 million.  And --

24 │          MR. WILSON:  Scroll down to the --

25 │ BY MR. WILSON:

Pugatch - Cross                                    135

1   Q    And so would you agree with me that in the year 2019,

2   HCLOF showed a net loss of $10.476 million?

3   A    Yes, that's what the financial statements say.

4   Q    And in this year, the Acis CLOs were solely managed by

5   Acis and Brigade, correct?

6   A    The Acis CLOs were.  Yes, correct.

7   Q    All right.

8          MR. WILSON:  Now, go to 42.

9   BY MR. WILSON:

10  Q    Now, this is HarbourVest #42.

11         MR. WILSON:  Go down to the next page.

12  BY MR. WILSON:

13  Q    And this is the Highland CLO Funding, Ltd. Unaudited

14  Condensed Statement of Operations for the Financial Period

15  Ended 30 June 2020.  And so this is just half a year of

16  operations.  And would you -- and this actually has a

17  comparison between 2019 and 2020.  But do you see where it

18  says investment income has dropped from a million dollars in

19  the first half of 2019 to $381,000 in the first half of 2020?

20  A    Yes.

21         MR. WILSON:  Okay.  Scroll down.

22  BY MR. WILSON:

23  Q    And do you see where, in the first half of 2019, total

24  expenses were $1.85 million, and then in the first half of

25  2020 total expenses were $2.16 million?  Do you see that?

Pugatch - Cross                                                    136

1   A    I do.

2   Q    And if you go down below that, where it says Net Realized

3   and Unrealized Gain/Loss on Investments, the first half of

4   2019 HCLOF lost $12 million, and in the first half of 2020 it

5   lost $39.472 million?

6           MR. MORRIS:  Your Honor, I'm going to object.  It's

7   John Morris for the Debtor.  I'm happy to stipulate.  In fact,

8   he can offer this document into evidence.  There's no

9   foundation that Mr. Pugatch has any particularized knowledge

10  about any of the numbers behind this.  All he's asking him to

11  do is to confirm what the document says.  It says what it

12  says.  But this -- I'll object on that basis, Your Honor.

13          THE COURT:  All right.  Mr. Wilson, what about it?

14  You're just getting him to read numbers off of these exhibits.

15          MR. WILSON:  Well, --

16          THE COURT:  Shall we just --

17          MR. WILSON:  -- I understood --

18          THE COURT:  -- by stipulation get them into evidence?

19          MR. WILSON:  Well, --

20          MR. MORRIS:  No objection, Your Honor.

21          MS. WEISGERBER:  No objection.

22          THE COURT:  All right.  So these are exhibits what?

23  We've gone through 39, 41, and I don't know what else.  40,

24  maybe?

25          MR. WILSON:  It was Exhibits 39, 40, 41, and 42 that

Pugatch - Cross                    137

1  were on the HarbourVest exhibit list.

2            THE COURT:  All right.  Those will be admitted, and

3  we've already discussed what docket entry number they appear

4  at.

5       (HarbourVest's Exhibits 39 through 42 are received into

6  evidence.)

7            THE COURT:  All right.  Anything else?  You told me

8  you had 10 more minutes about 15 minutes ago.

9            MR. WILSON:  Well, I'm sorry if I -- I think I had

10  said I had at least ten more minutes, and I was looking at the

11  -- it was 10:50 [sic] and you wanted to quit at 1:00.  So I do

12  have longer than that.  I'm sorry, Your Honor.

13            THE COURT:  Well, --

14            MR. WILSON:  But --

15            THE COURT:  -- I feel like I'm being --

16            MR. WILSON:  -- I'll try to proffer --

17            THE COURT:  Okay, Mr. Wilson, let me just tell you

18  something.  I feel like I'm being disrespected now, and the

19  parties are.  We really need to pick up the pace.  I've told

20  you I've got a 1:30 docket -- with four or five matters on it,

21  by the way.  I've got a 2:00 o'clock docket.  I'm starting

22  them late.  No one advised my courtroom deputy that we were

23  going to need all day today for this, okay?  So you've got

24  five more minutes to wrap it up, and then, of course, I have

25  to go to Mr. Draper and see if he has cross.  All right?  So

Pugatch - Cross                                      138

1  please don't test my patience any more.  Five minutes to

2  finish.

3          MR. DRAPER:  Judge, I have no questions.

4          THE COURT:  I didn't hear you, Mr. Draper.  What did

5  you say?

6          MR. DRAPER:  I have no questions.

7          THE COURT:  All right.  Very good.

8          MR. WILSON:  I apologize, Your Honor.  I was actually

9  trying to be respectful of your time when I informed you that

10 I had at least ten more minutes left at 12:50, but I will try

11 to be as expedient as I can as I finish up.

12 BY MR. WILSON:

13 Q   And I don't see you on my screen.

14         MR. WILSON:  You can take that document down.

15         THE WITNESS:  Here.

16 BY MR. WILSON:

17 Q   Mr. Pugatch, do you have an opinion as to what caused

18 these incredible losses of value at HCLOF?

19         MS. WEISGERBER:  Objection to the extent it calls for

20 a legal conclusion.

21         THE COURT:  Overruled.  He can answer.

22         THE WITNESS:  I would say that there's no one cause

23 for the decline in value.  I can point to a number of

24 different things, including the exorbitant fees that were

25 charged to HCLOF, including the inability to be able to re --

Pugatch - Cross                                    139

1  refine the CLOs on the part of HCLOF, all of which stems

2  from the actions that Highland took prior to our investment in

3  HCLOF.

4  BY MR. WILSON:

5  Q   And you've -- I think it's been referenced several times

6  in HarbourVest's arguments that -- that the reset was a

7  fundamental -- the inability to get a reset was a fundamental

8  cause of the loss in value.  Is that -- is that HarbourVest's

9  position?

10  A   That -- that is a part of the -- the cause in the

11  declining value of the CLOs, yes.

12  Q   And you would agree with me that a reset is fundamentally

13  a reset of interest rates, correct?

14  A   Of the interest rates of the liabilities of the -- the

15  timing for repayment of those liabilities, yes.

16  Q   Now, just say with -- for the sake of a hypothetical

17  example.  If you had a home that was valued at $5 million, or

18  let's just say $500,000, let's make it more realistic.  If you

19  had a $500,000 home and you had a mortgage on that home at

20  five percent interest, your inability to refinance that home

21  at a lower interest rate would not affect the underlying value

22  of that home, correct?

23          MS. WEISGERBER:  Objection, Your Honor.  Hypothetical.

24  And objection to relevance as well.

25          THE COURT:  Sustained.

Pugatch - Cross                    140

1              MS. WEISGERBER:  Calls for speculation.

2              THE COURT:  Sustained.

3   BY MR. WILSON:

4   Q    Is there any reason to believe that the change in the

5   interest rate would have prevented the massive losses of

6   investment value that occurred in HCLOF?

7              MS. WEISGERBER:  Object on the same grounds.

8              THE COURT:  Sustained.

9              THE WITNESS:  The short -- the short answer is yes,

10  with a -- with the amount of leverage --

11             MS. WEISGERBER:  I --

12             THE WITNESS:  -- that exists.  Oh, sorry.

13             MS. WEISGERBER:  The objection was sustained.

14             THE COURT:  Yeah, I sustained the objection.  That

15  means you don't answer.

16             THE WITNESS:  I'm sorry, Your Honor.

17  BY MR. WILSON:

18  Q    So, would you agree with me that if the expenses and the

19  fees charged by the portfolio manager increased dramatically,

20  that would -- that would impact the value of the investment,

21  correct?

22             MS. WEISGERBER:  Objection on the same grounds, and

23  relevance.  This is a 9019 hearing, Your Honor.  We are not

24  here to try every minutia.  And in fact, we're trying to avoid

25  a trial on the merits.  And it feels like we're getting a bit

Pugatch - Cross                          141

1   far afield now.

2           THE COURT:  I sustain.

3           MR. WILSON:  All right.  I'll pass the witness.

4           THE COURT:  All right.  Mr. Draper said he had no

5   cross.  So, any redirect, Ms. Weisgerber?

6           MS. WEISGERBER:  No, Your Honor.

7           THE COURT:  All right.  Mr. Morris, did you have any

8   redirect?

9           MR. MORRIS:  I do not, Your Honor.  I have a very

10  brief closing and then some additional remarks if -- if we

11  finish.

12          THE COURT:  All right.  So, Mr. Pugatch, that

13  concludes your testimony.  Thank you.  You're excused if you

14  want to be.

15      All right.  So, as I understood it, there would be no more

16  evidence after this.

17          MR. WILSON:  Well, Your Honor, along those lines, as

18  a housekeeping measure, I think everything on my exhibit list

19  is included on someone else's exhibit list, but just for belt

20  and suspenders I would move to admit all of the exhibits on

21  the -- on Mr. Dondero's exhibit list.

22          THE COURT:  Well, is that agreed or not?  Because we

23  didn't have a witness to get them in.

24          MR. MORRIS:  No objection, Your Honor.

25          THE COURT:  Any objection?  All right.  If there's no

142

1  objection, I'll --

2            MR. MORRIS:  Your Honor, --

3            THE COURT:  I'm sorry.  Was there an objection?  I

4  will admit Dondero Exhibits A through M, and those appear at

5  Docket Entry 1721, correct, Mr. Wilson?

6            MR. WILSON:  That is correct, Your Honor.

7            THE COURT:  All right.

8            MR. WILSON:  That is correct, Your Honor.

9      (James Dondero's Exhibits A through M are received into

10  evidence.)

11           MR. WILSON:  And one final matter is, during the

12  examination of Mr. Seery, you at least partially admitted

13  Dondero's Exhibit N, and I was wondering if we need to -- how

14  we'd need to submit that for the record.

15           THE COURT:  Okay.  First, I'm confused.  I think you

16  said Mr. Terry's testimony.  You --

17           MR. WILSON:  I said Seery.  I'm sorry.

18           THE COURT:  Oh, Seery?

19           MR. WILSON:  Or I may have said Terry, but I meant to

20  say Seery.

21           THE COURT:  Okay.  Maybe you said it.  Okay.  During

22  Mr. Seery's testimony -- oh, the email that I admitted a

23  portion of?

24           MR. WILSON:  That is -- that's correct, Your Honor.

25           THE COURT:  What -- what are you asking?  It's not in

143

1   your notebook.  Are you asking do you need to separately

2   submit it or what?

3          MR. WILSON:  Yeah, I was just asking what the Court's

4   preference on how we submit that for the -- put it in the

5   record.

6          THE COURT:  Okay.  That was so garbled I didn't hear

7   you.  You need to file that on the docket as a supplemental

8   exhibit that was admitted, okay?

9          MR. WILSON:  Okay.  Thank you, Your Honor.

10         THE COURT:  All right.  Closing arguments?  Mr.

11  Morris?

12           CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

13         MR. MORRIS:  Yes, very briefly, Your Honor.  The

14  Debtor easily meets the standard here.  The settlement

15  consideration relative to the claim establishes and reflects

16  the likelihood of success on the merits.

17      You know, I've never -- I did hear Mr. Pugatch in the

18  deposition the other day, but I otherwise haven't heard from

19  him.  I found him to be incredibly credible, Your Honor, and I

20  regret the fact that he and HarbourVest are being blamed twice

21  here.  The fact that they got 40,000 documents or didn't read

22  the arbitration award, it's just -- it's a shame that they're

23  being dragged through this yet again.

24      The fact is, Your Honor, there is no evidence that they

25  made the disclosures that HarbourVest claims -- complains

144

1    about. They just don't. The fraudulent transfers led to the

2    bankruptcy, led to the appointment of a trustee, led to --

3    right? So, so it's -- that's why -- but they're getting

4    something for their claim.

5        It was a hard negotiation, Your Honor. There is no

6    dispute that if we litigated this it would be complex. It

7    would fact-intensive. The Debtor would be forced to rely upon

8    witnesses who are no longer employed by it. That it would be

9    expensive, for sure. There's no dispute about any of that.

10   There's no dispute that the creditor body has spoken loudly

11   here by unanimously refraining from objecting except for Mr.

12   Dondero and the entities controlled by him.

13       And you heard Mr. Seery's testimony. I think he

14   exhaustively informed the Court as to the process by which the

15   transaction was analyzed and negotiated, and there's no

16   evidence to the contrary that this was an arm's-length

17   negotiation.

18       Unless Your Honor has any questions, we would request that

19   the motion be granted.

20          THE COURT: Thank you. Ms. Weisgerber, your closing

21   argument?

22             CLOSING ARGUMENT ON BEHALF OF HARBOURVEST

23          MS. WEISGERBER: Sure. Thank you, Your Honor. I'll

24   also be brief. We again join in Mr. Morris's arguments and

25   comments.

1    The Court has now heard testimony from Mr. Pugatch

2  regarding the factual detail underlying HarbourVest's claims.

3  The Court has also heard about the significant damages that

4  HarbourVest stands to recover for those claims. And

5  HarbourVest came to this Court ready to litigate. It would --

6  it's ready to do so if needed. It believes it would prevail

7  on its claims if it had to do so.

8    But the Court also heard from Mr. Seery about his

9  understanding of HarbourVest's claims, his calculus, and his

10  decision to settle them. And we submit that nothing further

11  is needed by this Court in order to approve the settlement.

12  This is a question of the Debtor's business judgment. We're

13  not here to have a trial on the merits of HarbourVest's

14  claims. The Objectors have made various arguments, including

15  about the cause of HarbourVest's damages. But even the nature

16  of the legal claims that HarbourVest is asserting, some do not

17  require a loss causation. So we submit that's not even

18  relevant to the merits of the claims.

19    The settlement is clearly in the best interest of the

20  estate, and we respectfully request that the Court approve it.

21        THE COURT: Thank you. All right. Mr. Wilson, your

22  closing argument?

23        MR. LYNN: Michael Lynn. I will give the closing

24  argument, if that's satisfactory to the Court.

25        THE COURT: All right. Go ahead.

146

CLOSING ARGUMENT ON BEHALF OF JAMES DONDERO

1    MR. LYNN:  Good afternoon, Your Honor.  I just want

2    to make a few points, and I'll try to do it as quickly as

3    possible.

4        First, I feel compelled to address the argument of the

5    Debtor that Mr. Dondero is repeating his litigious behavior

6    from the Acis case.  I don't know about the Acis case.  I

7    wasn't involved except very, very peripherally.  But with

8    respect to this case, we have only taken positions in court

9    that we believed -- that is, his lawyers -- believed were

10   warranted by law, facts as we knew them, and that are

11   consistent with professionalism.  I'd be glad to explain any

12   position we took.

13       Often, through the Debtor's very persuasive powers, we

14   never had the chance to explain our position previously to the

15   Court.  In fact, for the most part, as today, we have been

16   reactive rather than commencing proceedings.  In fact, during

17   the first seven months of this case, we only appeared in court

18   a few times, when we felt we had to -- for example, when

19   discovery was being sought by the Creditors' Committee that we

20   feared might invade privilege.  Then, much to the Debtor's

21   fury, we opposed the Acis 9019.  We did so because we thought

22   it was too much.

23       Since, as the Court can see, the principal instigators of

24   litigation have been the Debtor, and to a lesser extent, the

147

1  Committee.

2      Indeed, in an apparent effort to drown Mr. Dondero and his

3  counsel in litigation, the Debtor has repeatedly sought court

4  action on a very short fuse, claiming need for expedited

5  hearing.

6      Perhaps the most startling example of this is the recent

7  contempt motion, for which there is no good reason for a quick

8  hearing.  Resolution of that motion is not necessary to reach

9  the confirmation hearing.  The motion could be heard after the

10  confirmation hearing.  There is no need to put Mr. Dondero and

11  his professionals in a position where they have to respond in

12  a couple of days, two business days, and then will have two

13  days to prepare for trial.

14      Second, Your Honor, Mr. Seery has repeatedly asserted,

15  contrary to today's motion, that the HarbourVest claim was of

16  no merit.  That is why, when he came in to settle for tens of

17  millions of dollars, we opposed this motion.  It appears that

18  the motion is occurring without any cross-party discovery.

19  There is no consideration, apparently, of trying dispositive

20  -- dispositive motions first.  There is no consideration for

21  junior classes of equity, which Mr. Seery has previously

22  opined were in the money.  This, even though there's no reason

23  that this settlement is necessary pre-confirmation, unless Mr.

24  Seery wants HarbourVest's vote.

25      Third, for whatever reason, that seems to be the driving

148

1  factor for settling.  On its face, the vote seems to be a key

2  factor of the settlement.  About the longest provision of the

3  settlement agreement relates to voting.  The motion itself --

4  in the motion itself, five of seven bullet points cited by the

5  Debtor for approval of the settlement deal with and emphasize

6  support of the plan or the vote that is to be cast for the

7  plan.

8      If the settlement is a good deal, it didn't need to have

9  as one of its parts the requirement that HarbourVest vote for

10  the plan.

11      Your Honor, I'll stop there.  I know Your Honor would like

12  to get just a few minutes before your 1:30 docket.  I've been

13  there and I understand that, and I do apologize for taking the

14  time we have, but I think that responsibility is shared with

15  the Debtor and HarbourVest.

16      Thank you, Your Honor.

17          THE COURT:  All right.  Thank you for that.

18      Mr. Draper, any closing argument from you?

19    CLOSING ARGUMENT ON BEHALF OF GET GOOD AND DUGABOY TRUSTS

20          MR. DRAPER:  Yes, I have three comments.  The first

21  is the claim -- the loss claim, absent the fraud claim, is, at

22  best, $7 million.  I think Mr. Seery's argument that a hundred

23  -- one hundred percent is attributable to there is just wrong.

24  If he and I both invested in a company 50-50 and it goes

25  broke, we only lost 50 cents each.

149

1    Number two, I think the Court heard the evidence.  I think
2  this is, at best, a subordinated claim under 5 -- under the
3  Bankruptcy Code.  It's really a "But for the
4  misrepresentations, we wouldn't have invested."
5    And the last one is the -- Judge Lynn represented the
6  voting, so I won't deal with that.  But the one that troubles
7  me the most is the fact that this asset that is ultimately
8  being paid for in claim dollars that's being transferred over
9  to the Debtor and being put it outside the estate, outside the
10 purview of this Court, and placed in some subsidiary, this --
11 this transaction, if it is approved, must -- should contain a
12 provision that the asset that's being acquired come into the
13 Debtor and be owned by the Debtor.
14         THE COURT:  All right.
15         MR. DRAPER:  I have nothing further, Your Honor.
16         THE COURT:  Thank you, Mr. Draper.
17    Mr. Morris, you get the last word since it's your motion.
18         MR. MORRIS:  Very quickly, Your Honor.  The
19 subordination argument doesn't hold water.  This is not a
20 claim against the Debtor for the security; it's a claim for
21 fraud.  Okay?  So, so 510(b), if it was a claim against HCLOF,
22 that might make sense, but this is a claim against the Debtor.
23 And it's a Debtor -- it's a claim for fraud.  That's number
24 one.
25    Number two, we need to keep this exactly as it's been

150

1 structured in order to avoid litigation. Mr. Seery told the

2 Court. I'm sure the Court can make its own assessment as to

3 Mr. Seery's credibility as to whether or not the Debtor is

4 intending to somehow get this asset beyond the Court.

5 But there are reasons why we've done this, Your Honor.

6 They could have made an objection on that basis. In fact, if

7 they did, it would be overruled, because there's no -- there's

8 no basis for this Court to find that somehow the Debtor and

9 Mr. Seery are doing something untoward to get assets away from

10 this Court's jurisdiction.

11 You know, I don't know what to say about Mr. Lynn's

12 commentary. Much of it had nothing to do with any evidence in

13 the record.

14 The fact remains, Your Honor, that this settlement is

15 fair. It's reasonable. It's in the best interest of the

16 estate. And we would respectfully request that the Court

17 grant the motion.

18 THE COURT: All right. Thank you. Well, I

19 appreciate all the arguments and evidence I have heard today.

20 I'm going to be brief in my ruling here, but I reserve the

21 right to supplement in a more fulsome written order, which I'm

22 going to instruct Mr. Morris to submit. I am approving the

23 motion to compromise the HarbourVest claim today, and I guess

24 subsumed in that is granting the motion to allow their claim

25 for 3018 voting purposes.

151

1    I in all ways find this compromise to meet the required

2  legal standard set forth in such cases as *TMT Trailer Ferry*,

3  *AWECO*, and *Foster Mortgage*, numerous other Fifth Circuit

4  cases.

5    First, I'm going to specifically say for the record that I

6  found both witnesses today, Mr. Seery and Mr. Pugatch, to be

7  very credible. Very credible testimony and meaningful

8  testimony was provided to the Court today. And based on that

9  testimony, I find, first, that this compromise was the product

10  of arm's-length negotiations. It was a hard-fought

11  negotiation, as far as I'm concerned. The Debtor objected to

12  these numerous HarbourVest proofs of claim. The Debtor did

13  not want to allow HarbourVest a significant claim for voting

14  purposes. I duly note the statements made in the disclosure

15  statement before this compromise was reached suggesting, you

16  know, the Debtor didn't think HarbourVest should have a large

17  claim.

18    That is consistent with everything I typically see in a

19  bankruptcy case when there's a claim objection. The objector

20  vehemently denies the claimant should have a proof of claim,

21  and then people sit down and think about the risks and rewards

22  of litigating things. And I believe very fervently that's

23  what happened here. There were good-faith, arm's-length

24  negotiations that resulted in this proposed compromise.

25    I find the compromise -- and I'll add to that point, on

152

1  the good-faith point, I find nothing sinister or improper

2  about the fact that the compromise includes a commitment of

3  HarbourVest to vote in favor of the plan.  Again, we see this

4  a lot.  You know, there's even a buzz word that doesn't even

5  exist in the Bankruptcy Code:  "plan support agreement."  You

6  know, we see those a lot -- you know, oftentimes negotiated

7  before the case, but sometimes after.  You know, it may be

8  improper in certain situations, but there was nothing here

9  that troubles me about that component of the compromise.

10      I find the compromise to meet the paramount interest of

11  creditors here.  Notably, we have very large creditors in this

12  case who have not objected.  The *Foster Mortgage* case from the

13  Fifth Circuit tells me I am supposed to consider support or

14  opposition of creditors.  No opposition of UBS.  No opposition

15  of the Redeemer Committee Crusader Fund.  No opposition from

16  Josh Terry or Acis.  No opposition from Daugherty.

17      But moreover, when considering the paramount interest of

18  creditors, I find this compromise to be in all ways fair and

19  equitable and in the best interest of the estate, and

20  certainly within the range of reasonableness.  The evidence

21  showed that HarbourVest asserted over $300 million.  Over $300

22  million.  Granted, that was based on all kinds of legal

23  theories that would be contested and expensive to litigate,

24  but the evidence also showed that they invested over $70

25  million.  You know, close to $75 million.  I forget the exact

153

1  number. $75 or $80 million, somewhere in that range. And now

2  the credible evidence is that investment is worth about $22

3  million.

4  So, certainly, while the claim may not have, at the

5  ultimate end of the day in litigation, resulted in a $300

6  million proof of claim, certainly, certainly there were strong

7  arguments for a very sizeable claim, more than this compromise

8  amount. So it's certainly fair and equitable and reasonable

9  when considering the complexity and duration of further

10  litigation, the risks and rewards, the expense, delay, and

11  likely success.

12  A couple of last things I'm going to say are these. I

13  understand, you know, there is vehement disagreement on the

14  part of our Objectors to the notion that Highland might have

15  caused a $50 million loss to HarbourVest. But I will tell

16  you, for what it's worth -- I want the record clear that this

17  is part of my evaluation of the reasonableness of the

18  settlement -- my reaction is that, indeed, Highland's

19  litigation strategy in the Acis case caused HCLOF to lose a

20  huge portion of its value, to the detriment of HarbourVest.

21  You know, whether all evidence at the end of the day would

22  convince me of that, I don't know, but that's -- that is

23  definitely this judge's impression.

24  I'm very sympathetic to HarbourVest. It appears in all

25  ways from the record, not just the record before me today, but

154

1  the record in the Acis case that I presided over, that

2  Highland back then would have rather spent HarbourVest's

3  investment for HCLOF legal fees than let Josh Terry get paid

4  on his judgment.  They were perfectly happy to direct the

5  spending of other people's money, is what the record suggested

6  to me.

7       And then, you know, I have alluded to this very recently,

8  as recently as last Friday:  I can still remember Mr.

9  Ellington sitting on the witness stand over here to my left

10  and telling the Court, telling the parties under oath, that

11  HarbourVest -- he didn't use its name back then, okay?  For

12  the first phase of the Acis case, or most of the Acis case, we

13  were told it was an investor from Boston.  And at some point

14  someone even said their name begins with H.  I mean, it seemed

15  almost humorous.  But Mr. Ellington said it was they,

16  HarbourVest, the undisclosed investor, who was insistent that

17  the Acis name was toxic, and so that's what all of this had

18  been about:  the rebranding, the wanting to extract or move

19  things away from Acis.

20       So, you know, I have heard for the -- well, at least the

21  second time today, from Mr. Pugatch, what I perceive to be

22  very credible testimony that that's just not the way it

23  happened.

24       And I guess the last thing I want to say here today, and

25  you know, I guess I have multiple reasons for saying this, not

155

 1   just in connection with approving the settlement, you know,

 2   I've heard about how the Acis CLOs, the HCLOF CLOs have lost,

 3   you know, a crazy amount of value, that they underperform in

 4   the market, that, you know, during the Acis/Brigade tenure

 5   and, you know, they should have been reset.  You know, I hope

 6   those who have not been around as long as some of us in this

 7   whole saga know that the -- Mr. Terry, Mr. Phelan, I think

 8   Brigade, they all desperately wanted to reset these things,

 9   but it was HCLOF, I believe directed by Highland, that wanted

10   to redeem, wanted to liquidate, take the pot of money,

11   warehouse it, and then do their own thing.

12       And there was, I think, from my vantage point, a

13   monumental effort to try to get everyone to the table to do

14   reasonable resets that would be good for the stakeholders at

15   HCLOF and be good for the creditors of Acis, including Josh

16   Terry.  That was always the balancing act that most of us were

17   focused on during the Acis bankruptcy.  But Highland, I

18   believe, directing HCLOF's strategy, just did not want the

19   resets to happen.

20       So, again, part of me, I suppose, just wants to make the

21   record clear on something that I fear not everyone is clear

22   about.  And I say that because the comment was made that the

23   injunctions, the preliminary injunctions sought by the Acis

24   trustee caused the plummet in value, and I think that's just

25   not an accurate statement.  I think litigation strategies are

156

1  what caused the plummet in value, and that's why I think

2  ultimately HarbourVest would potentially have a meritorious

3  claim here in a significant amount if this litigation were to

4  go forward.

5      So, I approve this under 9019. And again, Mr. Morris,

6  you'll upload an order.

7      It is now 1:41, so let's as quickly as possible hear the

8  other motion that I don't think had any objections. Mr.

9  Morris?

10         MR. MORRIS: Your Honor, just -- yes, just very

11 quickly, just four things.

12     With respect to the order, I just want to make it clear

13 that we are going to include a provision that specifically

14 authorizes the Debtor to engage in -- to receive from

15 HarbourVest the asset, you know, the HCLOF interest, and that

16 that's consistent with its obligations under the agreement.

17     The objection has been withdrawn, I think the evidence is

18 what it is, and we want to make sure that nobody thinks that

19 they're going to go to a different court somehow to challenge

20 the transfer. So I just want to put the Court on notice and

21 everybody on notice that we are going to put in a specific

22 finding as to that.

23         THE COURT: All right. Fair --

24         MR. MORRIS: Number two is --

25         THE COURT: Fair enough. I do specifically approve

157

1    that mechanism and find it is appropriate and supported by the

2    underlying agreements.

3        And just so you know, I spent some time noodling this

4    yesterday before I knew it was going to be settled, so I'm not

5    just casually doing that.  I think it's fine.

6        Okay.  Next?

7            MR. MORRIS:  Thank you very much, Your Honor.  Number

8    two, with respect to the motion to pay, there is no objection.

9    If we can just submit an order.  Or if Your Honor has other

10   guidance for us, we're happy to take it.

11           THE COURT:  Okay.  Does anyone have anything they

12   want to say about that motion?

13       Again, I looked at it.  I didn't see any objections.  I

14   didn't see any problem with it.  It's -- you know, you're

15   going through this exercise because of the earlier protocol

16   order.

17           MR. MORRIS:  Correct.

18           THE COURT:  All right.  Well, if there's nothing,

19   then, I will approve that, finding there is good cause to

20   grant that motion.

21           MR. MORRIS:  Okay.

22           THE COURT:  All right.  Is the only other

23   housekeeping matter --

24           MR. MORRIS:  I --

25           THE COURT:  -- we have the contempt motion?

158

1          MR. MORRIS:  It is, and I do -- I do have to point

2   out how troubled the Debtor is to learn that Mr. Dondero was

3   still receiving documents from Highland as late as this

4   morning.  It's got to be a violation of both the TRO -- I

5   guess it's now the preliminary injunction.

6        I would respectfully request -- I know that time is what

7   it is -- but maybe Mr. Dondero can answer now where he got the

8   document, who he got the document from, what other documents

9   he's gotten from the Debtor since Your Honor ordered him not

10  to communicate with the Debtor's employees.

11       This is not saying hello in the hallway.  I mean, this is

12  just -- it is really troubling, Your Honor, and it's why we

13  need the contempt motion heard as soon as possible.

14          THE COURT:  Well, Mr. Wilson, do you want to address

15  that?  I think the words I heard were that you just got the

16  document this morning, and you got it from Mr. Dondero, but we

17  don't know where and when Mr. Dondero got it.  Mr. Wilson, are

18  you there?

19          MR. LYNN:  I'm afraid I'm back, Your Honor.

20          THE COURT:  Okay.

21          MR. LYNN:  I am not sure whether Mr. Dondero had it

22  in his files from some -- from back before he was asked not to

23  communicate with members or with employees of the Debtor.  I

24  believe -- I believe he's with us, though I don't think he's

25  available by video.

159

1      Are you there, Mr. Dondero?

2              THE COURT:  We can't hear you, Mr. Dondero.

3              MR. DONDERO:  Judge?

4              THE COURT:  Oh, go ahead.

5              MR. DONDERO:  Can you hear me now?

6              THE COURT:  Yes.

7              MR. DONDERO:  Yes, I -- I -- when I moved offices, I

8      found it in a stack of paper, and --

9              MR. LYNN:  I understand it shows that his microphone

10     is working.

11             THE COURT:  Okay.  Go ahead.

12             MR. DONDERO:  Can you hear me?

13             THE COURT:  Yes, go ahead.

14             MR. DONDERO:  Yeah, I -- I'm sitting in new offices.

15     I've got everything in boxes.  I was going through everything

16     yesterday, and I found those emails in a stack of papers and I

17     sent them over because I thought they would be relevant

18     relative to Seery's initial impression.

19             THE COURT:  Okay.  Well, let's talk about the timing

20     of this hearing.  Mr. Morris, I'm going to -- I'm going to ask

21     you why --

22             MR. LYNN:  Michael Lynn, Your Honor.  I don't want to

23     waste the Court's time.  We have not made available anything

24     to the Court objecting to the expedited hearing on the

25     contempt motion.  We've been here.

160

1    I would say to Your Honor that if Mr. Dondero is indeed in

2  contempt, or was in contempt toward the motion, which has

3  nothing to do with the document that was presented as Dondero

4  Exhibit N, there is no need to hear this on an expedited

5  basis.

6    Every time you turn around, Your Honor, the Debtor is

7  asking that something be heard on an expedited basis.  And we

8  have not opposed that.  We have not fought that, to speak of,

9  to date.  But this is getting a little ridiculous.  We're

10  within days of confirmation of the Debtor's plan, and it is

11  simply a means of causing pain and suffering to Mr. Dondero

12  and those who are working with him and for him.  And he does

13  have employees at NexPoint who are assisting him.

14    So we most strongly object to being put on a schedule

15  where we are expected to get a response to the contempt motion

16  on file by Monday, today being Thursday, and a weekend

17  intervening.  And we strongly object to any setting of this

18  contempt motion on Tuesday or Wednesday.  It is absurd, and it

19  is done solely, solely, Your Honor, to cause pain.

20        THE COURT:  All right.

21        MR. MORRIS:  Your Honor, if I may?

22        THE COURT:  Please.

23        MR. MORRIS:  Just very briefly, we had a hearing the

24  other day.  The evidence is the exact same.  The evidence is

25  crystal clear that the violations are meaningful, they're

161

1  substantial, and they are repeated.

2      After the TRO was entered into, Mr. Dondero and only Mr.

3  Dondero chose to interfere with the Debtor's business.  Mr.

4  Dondero and only Mr. Dondero chose to communicate with the

5  Debtor's employees, not about saying hello in the hallway but

6  about coordinating a legal defense strategy against the

7  Debtor.

8      The need is immediate, Your Honor, and I would

9  respectfully request that the hearing be set for Tuesday or

10  Wednesday.  They've had this motion now since the 7th of

11  January.  They had a full evidentiary hearing, so they know

12  most of the evidence that's going to be presented.  They have

13  a whole team of -- they have an army of lawyers, Your Honor,

14  and half a dozen firms working on behalf of Mr. Dondero and

15  his interests.  For him to cry here, for him to cry that this

16  is too much is really -- it's obscene.  It just is.

17          THE COURT:  All right.  I'm going to say a couple --

18          MR. LYNN:  That is absurd.

19          THE COURT:  I'm going to say a couple of things.  One

20  is that I -- well, the one time I remember getting reversed

21  for holding someone in contempt of court, the District Court

22  felt like I had not given enough notice of that.  The District

23  Courts, what they think is reasonable notice, is sometimes

24  very different from what the bankruptcy judges think.  We're

25  used to going very lickety-split fast in the bankruptcy

162

1   courts.  And the Courts of Appeals, District Court, Courts of
2   Appeals obviously, for good reason, are very concerned about
3   due process in this kind of context.  So I'm sensitive to
4   that.
5       I'm also sensitive to the fact that it is monetary damages
6   that are being sought here to purge the contempt.  Okay?  The
7   shifting of attorneys' fees is basically what I understand is
8   being sought at this point.  You know, we have a preliminary
9   injunction halting behavior at this point, and so I think
10  that's another reason I'm hesitant to give an emergency
11  hearing.  I feel like monetary damages can wait and we can
12  give 21-plus days' notice of the hearing.
13      But I'm going to throw this out there as well.  If I do
14  feel like there is a showing of contempt, if I do feel like
15  the phone -- as I told you the other day, I'm very, very
16  fixated on the phone that may have been destroyed or thrown
17  away, maybe at Mr. Dondero's suggestion.  I mean, the
18  potential monetary sanction here may be very, very large if
19  the evidence plays out in the way I fear it might play out.
20  So I need to make sure everybody has adequate time to prepare
21  for that hearing and make sure I get all the evidence I need
22  to see.  All right?  Contempt of court is very, very, very,
23  very serious, and I don't think anyone would deny that.
24      So, with that, it was filed what day?  January 4th?  Is
25  that what I heard?  Or --

163

1          MR. MORRIS:  January 7th, I believe, Your Honor.

2          THE COURT:  January 7th?  All right.  Well, Traci,

3   are you there?  Hopefully, you're not in a hunger coma at this

4   point.

5          THE CLERK:  I am here.

6          THE COURT:  Okay.  We have -- we're going to have to

7   go to that first week of February, right?  Because we've got

8   the confirmation hearing that, you know, late in January, and

9   then --

10          THE CLERK:  Yes.  Uh-huh.

11          THE COURT:  Okay.  Do you have an available date to

12   give right now?

13          THE CLERK:  How about -- if you're willing to hear

14   them on Friday, February 5th.

15          THE COURT:  Okay.  I can do that.  February 5th at

16   9:30.  Any -- anybody want to argue about that?

17          MR. MORRIS:  Thank you, Your Honor.  That's

18   acceptable to the Debtor.

19          THE COURT:  Okay.  Mr. Lynn, is that good with you?

20          MR. LYNN:  We'll do that, Your Honor.  I would say,

21   by the way, that I'll be happy to buy Mr. Seery, out of my own

22   pocket, five cell phones, which ought to make up for the one

23   that was lost, though I recognize that those cell phones will

24   not have on them the privileged information, the conversations

25   between his lawyers and Mr. Dondero that I imagine he was

164

1  looking forward to seeing.

2        THE COURT:  Well, I wouldn't want him to see that

3  information, but I do think he's entitled to any nonprivileged

4  information, texting, or calls that are on that phone.  So,

5  again, I'm either going to hear good explanations for that or

6  not, but it's something very concerning to me.

7     All right.  So we have a game plan.

8     I'm going to ask, Did we have good-faith negotiations

9  between Dondero and the Committee and anything positive to

10 report?  I'll ask Mr. Lynn and Mr. Clemente to weigh in.

11        MR. CLEMENTE:  Yes, Your Honor.  I'll go first, Your

12 Honor.  Mr. Lynn and I have exchanged several emails over the

13 weekend, and the message that I sent to Mr. Lynn was very

14 clear.  There had been a term sheet that Mr. Seery had sent

15 back to Mr. Dondero.  I had asked Mr. Lynn to take a pencil

16 out and be very specific as to what it was Mr. Dondero was

17 prepared to do in connection with the pot plan.  I instructed

18 him that some of the issues that the Committee still has is

19 obviously the overall value, along with the concept that's

20 signing up to a promise from Mr. Dondero to comply with

21 (indiscernible) as part of that value.  As Your Honor may

22 understand, the Committee is obviously very skeptical of Mr.

23 Dondero's future performance under an agreement that he enters

24 into.

25     Those are but a couple of issues, Your Honor, that I

165

1  advised Mr. Lynn were very concerning to the Committee.  And I

2  suggested to him that if he wanted to move things forward, the

3  best way to do it would be to come to us with a fulsome term

4  sheet that explained exactly what it was in clear and precise

5  detail that Mr. Dondero was proposing, and that would be the

6  best way to move the process forward, Your Honor.

7          THE COURT:  All right.  Mr. Lynn, anything to add to

8  that?

9          MR. LYNN:  Well, Your Honor, my experience in

10 negotiations is that it is useful to agree on substantive

11 terms, or at least be in the ballpark, before term sheets are

12 exchanged.  Long ago, a term sheet was prepared and presented

13 to the Committee.  Ultimately, I think it was rejected, though

14 I don't know if we ever received a formal rejection.

15   I explained in my emails, which I'm happy to share with

16 the Court if Your Honor wants to see them, why I was reluctant

17 to try to put into a term sheet form the proposal that I

18 suggested to Mr. Clemente.  As I said, I'm more than happy to

19 provide you with that email chain and let you form your own

20 judgment, Your Honor, as to whether we're proceeding in good

21 faith.

22          THE COURT:  All right.  Well I'm not going to ask --

23          MR. POMERANTZ:  Your Honor?  Your Honor, this is Jeff

24 Pomerantz.

25          THE COURT:  -- to see any of that.  Mr. Pomerantz?

166

1          MR. POMERANTZ:  May I just be heard real quickly?

2          THE COURT:  Sure.

3          MR. POMERANTZ:  Your Honor, we also took Your Honor's

4   comments to heart.  We, Mr. Seery and I, had an over-an-hour

5   conversation with Mr. Lynn and with Mr. Bonds.  We provided

6   them with our thoughts as to what they needed to do in order

7   to move forward.  Of course, it's not really the Debtor to

8   agree.  It's the creditors to agree.  But as Mr. Seery has

9   testified many times before and as I have told the Court, we

10  would support a plan that the Committee and Mr. Dondero could

11  get behind.

12      So we again -- I'm not going to divulge the nature of

13  those communications, but we suggested several things that Mr.

14  Dondero could do in order to move the ball forward, and

15  unfortunately, we have not seen any of those things done thus

16  far.  So we are, at this point, not optimistic that there will

17  be a grand bargain plan.

18          THE COURT:  All right.

19          MR. DONDERO:  Your Honor, could I comment for a

20  second?  This is Mr. Dondero.

21          THE COURT:  If you and your counsel want you to

22  comment, you can comment.

23          MR. DONDERO:  I'd love to do a pot plan.  I would

24  love to reach some kind of settlement and everybody move on

25  with their lives.  The estate started with $360 million of

167

1  third-party assets and $90 million of notes.  The $360 million

2  of third-party assets are down to $130 million.

3          MR. POMERANTZ:  Again, Your Honor, I must interrupt.

4  I did this at the last hearing, and it's not my practice to

5  interrupt, but issues regarding what the value is or not, it's

6  going to require a response, and that's not really before Your

7  Honor.  I think before Your Honor is --

8          MR. DONDERO:  Okay.

9          MR. POMERANTZ:  -- have there been negotiations?

10  Have they been in good faith?  If Mr. Dondero wanted to

11  address that, that's fine, but I object to having any

12  discussion at this point, especially with Mr. Dondero not even

13  under oath, on what the nature of the value of the assets and

14  why they have changed and what not.

15          THE COURT:  Well, --

16          MR. POMERANTZ:  It's just not appropriate.

17          THE COURT:  I understand --

18          MR. DONDERO:  Okay.  Can I --

19          THE COURT:  Stop.

20          MR. DONDERO:  Can I -- can I finish?

21          THE COURT:  Let me please respond to that.  I

22  understand your concern, but I've heard from Mr. Seery

23  testimony many months ago about the value plummeting during

24  the case.  And I asked why, and I got some explanations.  This

25  is not evidence.  This is just, you know, this is not going to

168

1  be binding in any way.  Mr. Dondero can speak as to what he

2  thinks, you know, the situation is.

3      Go ahead, Mr. Dondero.

4          MR. DONDERO:  Okay.  I'm not trying to fixate on the

5  numbers.  And as far as the third-party assets are, we would

6  be willing to pay -- I would be willing to pay for those.  I'd

7  be willing to pay more, and even some value for the affiliate

8  notes that were really part of compensation agreements

9  throughout the history of Highland and avoid the POC

10  arguments.  I'd be willing to pay for the assets and I'd be

11  willing to pay even more than that.

12      I have no transparency in terms of what the assets are,

13  and there's no fulsome discussion in terms of, well, here are

14  the assets, here are the notes, here's what we think the

15  values are, can you get to this number?  It's just a -- you --

16  the -- it -- I don't view there is good-faith negotiations

17  going on because it's always just a:  You need to put a big

18  number on a piece of paper; otherwise, you're going to get run

19  over.

20      And there's no back and forth going on, but it's not due

21  to a lack of willingness on my part.  And maybe there needs to

22  be a committee set up.  Maybe there needs to be, I don't know,

23  a mediator or an examiner or somebody to try and push through

24  the pot plan, but there's nothing happening.  People are not

25  returning the judge's calls, I mean, Mr. Lynn's calls, or my

169

1   calls.  They're -- there's -- despite efforts of our -- of my
2   own and a willingness of my own, there's no negotiations of
3   any sort going on at the moment.

4            THE COURT:  All right.  I don't want anyone to
5   respond to that.  I know people have different views of what's
6   going on.  But let me just say a couple of things, and then
7   we're done.

8        We do have a Committee in this case.  We have a Committee
9   with very sophisticated members and very sophisticated
10  professionals.  Okay?  That's who I wanted you to be talking
11  to before the end of the day Tuesday.

12       We have had co-mediators in this case.  Okay?  And, you
13  know, I identified very sophisticated human beings for that
14  role.  Okay?  And in fact, there ended up being settlements
15  that flowed out of the co-mediator process.

16       We're now 15 months into the case.  There are major,
17  significant compromises now:  HarbourVest, UBS, Acis, Terry,
18  and Redeemer Committee.  I hate to use a worn-out metaphor,
19  but the train is leaving the station.  We've got confirmation.
20  I've pushed out two weeks.  I mean, you all are either going
21  to get there in the next few days or we're just going to go
22  forward with I think what everyone, you know, would rather be
23  a pot plan, but if we can't get there, we're just going to
24  have to consider the plan that's on the table now.  Okay?

25       You know, the Committee, again, they're sophisticated.

170

1  They can compare apples to oranges and decide whether the plan

2  on the table, with its risks of future litigation and

3  recoveries, whether it's better or worse than whatever

4  consideration you're offering, Mr. Dondero.

5      And you know, as we all know, there is distrust here,

6  there, and everywhere among these parties.  So I can totally

7  understand them, you know, taking a hard line:  We either get

8  all cash or we're just not going to mess with it.  We don't

9  want to risk broken promises.  We'd rather just do litigation.

10     So, anyway, that's as much as I'm going to say except I am

11 going to further direct good-faith negotiations.  It sounds

12 like to me a written term sheet might be the appropriate next

13 step, given where I've heard things are at the moment.  But,

14 you know, I guess we don't have any hearings between now and

15 the 26th, right?  No Highland hearings that I can think of

16 between now and the 26th.

17         MR. POMERANTZ:  I don't think so.

18         MR. MORRIS:  I think that's correct, Your Honor.

19         THE COURT:  So you have all this time --

20         MR. MORRIS:  At the moment.

21         THE COURT:  You have all this time to negotiate and

22 simultaneously get ready for the confirmation hearing without

23 any other battles.  So I know you will use the time well.

24     All right.  We're adjourned.

25         THE CLERK:  All rise.

171

1        MR. BONDS:  Thank you, Your Honor.

2     (Proceedings concluded at 2:04 p.m.)

3                        --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                    CERTIFICATE

21     I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22  above-entitled matter.

23  **/s/ Kathy Rehling**                    **01/16/2021**

24  _____     _____

25  Kathy Rehling, CETD-444                     Date
    Certified Electronic Court Transcriber

**Appx. 05029**

172

INDEX

1
2
PROCEEDINGS                                                    3
3
OPENING STATEMENTS
4
- By Mr. Morris                                              12
- By Mr. Kane                                                18
5
- By Ms. Weisgerber                                          18
- By Mr. Draper                                              20
6
WITNESSES
7
Debtor's Witnesses
8
James Seery
9
- Direct Examination by Mr. Morris                          26
- Cross-Examination by Mr. Wilson                           62
10
- Cross-Examination by Mr. Draper                           87
- Redirect Examination by Mr. Morris                        93
11
HarbourVest's Witnesses
12
Michael Pugatch
13
- Direct Examination by Ms. Weisgerber                      96
- Cross-Examination by Mr. Wilson                          113
14
EXHIBITS
15
Debtor's Exhibits A through EE                Received  35
16
James Dondero's Exhibits A through M          Received 142
17
James Dondero's Exhibit N (as specified)      Received  71
18
HarbourVest's Exhibit 34                      Received 100
19
HarbourVest's Exhibit 36                      Received 103
HarbourVest's Exhibits 39 through 42          Received 137
20
CLOSING ARGUMENTS
21
- By Mr. Morris                                            143
22
- By Ms. Weisgerber                                        144
- By Mr. Lynn                                              146
23
- By Mr. Draper                                            148
24
25

**Appx. 05030**

173

1                              INDEX
                             Page 2
2

3     RULINGS

4     Motion to Compromise Controversy with HarbourVest 2017      150
      Global Fund L.P., HarbourVest 2017 Global AIF L.P.,
5     HarbourVest Dover Street IX Investment L.P., HV
      International VIII Secondary L.P., HarbourVest Skew Base
6     AIF L.P., and HarbourVest Partners L.P. filed by Debtor
      Highland Capital Management, L.P. (1625)
7
      Motion to Allow Claims of HarbourVest Pursuant to Rule      150
8     3018(a) of the Federal Rules of Bankruptcy Procedure for
      Temporary Allowance of Claims for Purposes of Voting to
9     Accept or Reject the Plan filed by Creditor HarbourVest
      et al. (1207)
10
      Debtor's Motion Pursuant to the Protocols for Authority     157
11    for Highland Multi-Strategy Credit Fund, L.P. to Prepay
      Loan (1590)
12
      END OF PROCEEDINGS                                          171
13
      INDEX                                                   172-173
14

15

16

17

18

19

20

21

22

23

24

25

Appx. 05031