# EXHIBIT 18

**Appx. 05175**

```
                 IN THE UNITED STATES BANKRUPTCY COURT
                FOR THE NORTHERN DISTRICT OF TEXAS
                          DALLAS DIVISION
```

| | |
|---|---|
| In Re: | ) **Case No. 19-34054-sgj-11** |
| | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL | ) Dallas, Texas |
| MANAGEMENT, L.P., | ) Friday, June 25, 2021 |
| | ) 9:30 a.m. Docket |
| Debtor. | ) |
| | ) EXCERPT:  MOTION FOR |
| | ) MODIFICATION OF ORDER |
| | ) AUTHORIZING RETENTION OF JAMES |
| | ) P. SEERY, JR. DUE TO LACK OF |
| | ) SUBJECT MATTER JURISDICTION |
| | ) (2248) |
| _____ | ) |

```
                    TRANSCRIPT OF PROCEEDINGS
           BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE.
```

WEBEX APPEARANCES:

| | |
|---|---|
| For the Debtor: | Jeffrey Nathan Pomerantz |
| | PACHULSKI STANG ZIEHL & JONES, LLP |
| | 10100 Santa Monica Blvd., |
| | 13th Floor |
| | Los Angeles, CA  90067-4003 |
| | (310) 277-6910 |
| | |
| For the Debtor: | John A. Morris |
| | PACHULSKI STANG ZIEHL & JONES, LLP |
| | 780 Third Avenue, 34th Floor |
| | New York, NY  10017-2024 |
| | (212) 561-7700 |
| | |
| For CLO Holdco, Ltd. and The Charitable DAF Fund, LP: | Jonathan E. Bridges |
| | Mazin Ahmad Sbaiti |
| | SBAITI & COMPANY, PLLC |
| | JP Morgan Chase Tower |
| | 2200 Ross Avenue, Suite 4900 W |
| | Dallas, TX  75201 |
| | (214) 432-2899 |
| | |
| For Get Good Trust and Dugaboy Investment Trust: | Douglas S. Draper |
| | HELLER, DRAPER & HORN, LLC |
| | 650 Poydras Street, Suite 2500 |
| | New Orleans, LA  70130 |
| | (504) 299-3300 |

2

1   APPEARANCES, cont'd.:

2   For the Official Committee   Matthew A. Clemente
    of Unsecured Creditors:      SIDLEY AUSTIN, LLP
3                                One South Dearborn Street
                                 Chicago, IL  60603
4                                (312) 853-7539

5   Recorded by:                 Michael F. Edmond, Sr.
                                 UNITED STATES BANKRUPTCY COURT
6                                1100 Commerce Street, 12th Floor
                                 Dallas, TX  75242
7                                (214) 753-2062

8   Transcribed by:              Kathy Rehling
                                 311 Paradise Cove
9                                Shady Shores, TX  76208
                                 (972) 786-3063
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
             transcript produced by transcription service.

3

1          DALLAS, TEXAS - JUNE 25, 2021 - 9:36 A.M.

2       (Transcript excerpt begins at 11:33 a.m.)

3              THE CLERK:  All rise.

4              THE COURT:  All right.  Please be seated.  We are

5    back on the record, and our last motion this morning is the

6    Motion to Reconsider filed by CLO Holdco and the DAF.  Do we

7    have Mr. Bridges and Mr. Sbaiti back with us now?

8              MR. BRIDGES:  Yes, Your Honor.  I have changed seats

9    because of audio problems we're having here, but we're both

10   here.

11             THE COURT:  Okay.  Well, I think we heard an

12   agreement that you all have agreed that you're going to have

13   an hour and a half each, and I presume that means everything:

14   opening statements, arguments, evidence.  So, we'll start the

15   clock.  Nate, it's 11:35.  So, Mr. Bridges, your opening

16   statement?

17    OPENING STATEMENT ON BEHALF OF CLO HOLDCO AND THE CHARITABLE

18                           DAF, LP

19             MR. BRIDGES:  Thank you, Your Honor.  We're here on a

20   motion to modify an order that we'd submit has already been

21   modified by the plan confirmation order, although that order

22   has not yet become effective.

23      The modification there was to add the phrase "to the

24   extent legally permissible" to the Court's assertion of

25   jurisdiction in what is essentially the same gatekeeper

4

1  provision that's at issue here.  We submit that change is an

2  admission or at least a strong indication that the unmodified

3  order, at least as applied in some instances, contains

4  legally-impermissible provisions.  The entire argument today

5  from our side is about what's not legally permissible in that

6  order.

7      And that starts with our concerns regarding the

8  application of 28 U.S.C. § 959(a).  As Your Honor knows well,

9  959(a) is a provision of law that the Fifth Circuit and

10  *Collier on Bankruptcy* call an exception to the *Barton*

11  doctrine.  I know from the last time we were here that the

12  Court is already aware of what 959(a) says.  It's the second

13  sentence, I understand, which the Court pointed to in our

14  previous hearing that creates general equity powers or

15  authorizes the Court to use its general equity powers to

16  exercise some jurisdiction, some control over actions that

17  fall within the first sentence of 959(a).  But that second

18  sentence also prohibits explicitly the Court's using general

19  equity powers to deprive a litigant of his right to trial by

20  jury.

21      Here, we're not under *Barton*, the statutory exception to

22  *Barton* applies, because Mr. Seery is a manager of hundreds of

23  millions of third-party investor property.  Instead, we're

24  here under the Court's general equity powers, as authorized by

25  959(a).  And those equity powers cannot deprive the right to

5

1  trial by jury.

2      But the order does deprive trials by jury, first by

3  asserting sole jurisdiction here, where jury trials are

4  unavailable, and secondly, by abolishing any trial rights for

5  claims that do not involve gross negligence or intentional

6  misconduct.

7      Movants' third cause of action in the District Court case

8  is for ordinary negligence.  It comes with a Seventh Amendment

9  jury right.  But it's barred by the order because the order

10 only allows colorable claims involving gross negligence or

11 intentional conduct, not ordinary negligence.

12     Movants' second cause of action in the District Court case

13 is for breach of contract.  That comes with a Seventh

14 Amendment jury right, but it's barred by the order because the

15 order only allows colorable claims of gross negligence or

16 intentional misconduct, not negligent or faultless breaches of

17 contractual obligations.

18     Movants' first cause of action in the District Court case,

19 breach of Advisers Act fiduciary duties, comes with a jury

20 right.  It's also barred by the order because the order only

21 allows colorable claims involving gross negligence or

22 intentional misconduct.

23     You see there what I mean.  Congress couldn't have been

24 clearer.  Courts cannot deprive litigants of their day in

25 court before a jury of their peers by invoking general equity

6

1   powers.  Those powers don't trump the constitutional right to

2   a jury trial.

3        Yet this Court's order purports to do precisely that, not

4   only for the Movants, but also for future potential litigants

5   who may have claims that have not even accrued yet.  If those

6   claims are for ordinary negligence or breach of contract or

7   breach of fiduciary duties and don't rise to the level of

8   gross negligence or intentional misconduct, this order says

9   that those claims are barred, and it would deprive them of

10  their day in court.

11       The Court's general equity powers are simply not broad

12  enough to uphold such an order.

13       This issue is even more problematic when the causes of

14  action at issue fall within the mandatory withdrawal of the

15  reference provisions of 28 U.S.C. § 157(d).  As this Court

16  knows, it lacks jurisdiction over proceedings that require

17  consideration of non-bankruptcy federal law regulating

18  interstate commerce.  Some such claims -- Movants' Advisers

19  Act claim, for instance -- do not involve culpability rising

20  to the level of gross negligence or intentional misconduct,

21  but the order purports to bar them nonetheless, despite this

22  Court's lacking jurisdiction over the subject matter of those

23  claims.

24       Even if there is gross negligence or intentional

25  misconduct, the order states that this Court will have sole

7

1  jurisdiction over such claims.  And that can't be right if

2  withdrawal of the reference is mandatory.

3      Opposing counsel will tell you that 157(d) is inapplicable

4  here because they think our claims in the District Court won't

5  require substantial consideration of the Advisers Act or any

6  other federal laws regulating interstate commerce.  But their

7  cases don't come anywhere close to making that showing, as the

8  briefing demonstrates.

9      And in any case, that argument is beside the point.  This

10  order is contrary to 157(d) because it asserts jurisdiction

11  over claims that 157(d) does not apply -- I'm sorry, does

12  apply to.  And that's true regardless of whether Movants'

13  claims are among those.

14      The idea that there's no substantial consideration of

15  federal law, however, in the District Court case is undermined

16  by Mr. Seery's testimony in support of his appointment in

17  which he confirmed that the Advisers Act applies to him and

18  that he has fiduciary duties under that Act to the investors

19  of the funds he manages.

20      Your Honor, importantly, the Advisers Act isn't the

21  typical federal statute with loads of case law under it.  It's

22  actually an underdeveloped, less-relied-upon statute, and most

23  -- most of the law under that Act is promulgated by regulation

24  and supervised by the SEC.  As a registered investment

25  advisor, Mr. Seery is bound by that Act, which he admits, he

8

1    agrees to.  But to flesh out what his duties are requires a

2    close exam of more than three dozen regulations under 17

3    C.F.R. Part 275.

4         The obligations include robust duties of transparency and

5    disclosure, as well as duties against self-dealing and the

6    necessity of obtaining informed consent, none of which are

7    waivable, these duties.

8         The proceedings here in this Court reflect an effort to

9    have those unwaivable duties waived.  The allegations in the

10   District Court are essentially insider trading allegations

11   that the Debtor and Mr. Seery knew or should have known

12   information that they had a duty under the Advisers Act to

13   disclose to their advisees.  Both under the Act and

14   contractually, they had those duties.  And, instead, they did

15   not disclose and consummated a transaction that benefited

16   themselves nonetheless.

17        In considering those claims, the presiding court will have

18   to consider and apply the Advisers Act and the many

19   regulations promulgated under it, in addition to other federal

20   laws regulating interstate commerce.  For that reason,

21   withdrawal of the reference on the District Court action is

22   mandatory.  That's the two major -- that's two major problems

23   out of four with the order that we're here on today.

24        First, it deprives litigants of their right to trial, to a

25   jury trial, when Section 959(a) says that can't be done.  And,

9

1 two, the order asserts jurisdiction -- sole jurisdiction, even

2 -- over proceedings in which withdrawal of the reference is

3 mandatory under 157(d).

4     The fourth major problem is what the Court called

5 specificity at the previous hearing. The Fifth Circuit's

6 *Applewood Chair* case holds that the rule from *Shoaf* does not

7 apply without a "specific discharge or release," and that that

8 release has to be enumerated and approved by the Bankruptcy

9 Court. Thus, the order here can't exculpate Mr. Seery of

10 liability for ordinary negligence and the like in a blanket

11 fashion. The claims being released must be identified.

12     That's what happened in *Shoaf*. Shoaf's guaranty

13 obligation was explicitly released. That's also what happened

14 in *Espinosa*. Espinosa's plan listed his student loan as his

15 only specific indebtedness. But it's not what happened here.

16 And it couldn't happen here, because the ordinary negligence

17 and similar claims being discharged by the order had not yet

18 accrued and thus were not even in existence at the time the

19 order issued.

20     Instead, what we have here is a nonconsensual, nondebtor

21 injunction or release that's precisely what the Fifth Circuit

22 refused to enforce in the *Pacific Lumber* case.

23     So, lack of specificity is the third major problem with

24 the order. And that brings us to the fourth problem, which is

25 the *Barton* doctrine. *Barton* is the only possible basis for

1  this Court to assert exclusive or sole jurisdiction over

2  anything.  Outside of *Barton*, it's plain black letter law that

3  the District Court's jurisdiction is equal to and includes

4  anything that this Court's derivative jurisdiction would also

5  reach.

6      But the exception to the *Barton* doctrine in 959(a) plainly

7  applies here, leaving no basis for exclusivity with regards to

8  jurisdiction and the District Court.  That's because Mr. Seery

9  is carrying on the business of a debtor and managing the

10  property of others, rather than merely administering the

11  bankruptcy estate.  The exclusive jurisdiction function of the

12  *Barton* doctrine has no applicability because 959(a) creates

13  that exception here.

14      Under its general equity powers, yes, 959(a) still

15  authorizes this Court to exercise some control over actions

16  against Mr. Seery, but short of depriving litigants of their

17  day in court.  And nothing in 959(a), that exception to

18  *Barton*, says that the Court can nonetheless exercise

19  exclusivity in that jurisdiction.  Those general equity powers

20  do not create exclusive or sole jurisdiction.  They do not

21  deprive the District Court of its Congressionally-granted

22  original jurisdiction.

23      Moreover, Mr. Seery is not an appointed trustee entitled

24  to the protections of the *Barton* doctrine in any case.  His

25  appointment was a corporate decision that the Court was asked

1  not to interfere with.  The Court was asked to defer under the

2  business judgment rule to the Debtor's appointment of Mr.

3  Seery.  And the Court did so.

4      As we asserted last time, no authority that we can find

5  combines these two unrelated doctrines, the *Barton* doctrine

6  and the business judgment rule.  And they don't go together.

7  None of the testimony or the briefing or argument, in the July

8  order, in the January order that preceded it, none of that

9  indicated that Mr. Seery would be a trustee or the functional

10 equivalent of a trustee.  The word "trustee" does not appear

11 in any of those briefs or transcripts.

12     Opposing -- and because of that, the District Court suit

13 is not about -- well, not because of that.  The District Court

14 suit simply is not about any trustee-like role that Mr. Seery

15 may have played anyway.  Opposing counsel will try to convince

16 you otherwise, will tell you that the District Court case is a

17 collateral attack on the settlement, but it's not.  Wearing

18 his estate administrator hat, Mr. Seery can settle claims in

19 this court.  Wearing his advisor hat, he has to fulfill his

20 Advisers Act duties and properly advise his clients.

21     He doesn't have to wear both hats, and it seems highly

22 unusual that he would choose to fill both of those roles

23 simultaneously.  But he has chosen both roles.  And the

24 District Court case is a hundred percent about his role as an

25 advisor.  Did he comply with the Act?  Did he do the things

12

1   that his advisor role obligated him to do as a manager of that

2   property?

3      The District Court suit really is only being used to

4   illustrate the issues that we're raising here.  It's

5   important, it's timely to address those issues now because of

6   the District Court action, but that's an illustration of the

7   problems with the order.  It is not exclusively that that

8   action is what we're attempting to address.  Rather, the order

9   exculpating Mr. Seery from ordinary negligence liability and

10   similar liability is problematic, is contrary to the law.  On

11   top of that, the Court is asserting jurisdiction over gross

12   negligence and intentional misconduct claims.  To the extent

13   that 157(d) applies, it is problematic and contrary to law as

14   well.

15        THE COURT:  Okay.  We're occasionally getting some

16   breakup of your sound.  So please -- I don't know what you can

17   do to adjust, but it was just now, and intermittently we get a

18   little bit of garbly.  So if you could just say your last

19   sentence one more time, and we'll see if it improves.

20        MR. BRIDGES:  Your Honor, I'm not sure I can say this

21   last sentence again.

22        THE COURT:  Okay.

23        MR. BRIDGES:  I was -- I was mentioning that the

24   District Court case is an illustration of our argument.  Our

25   argument is not merely that the District Court case should be

13

1    exempted or excepted from the order. Our argument is that the

2    order is legally infirm and that the District Court case and

3    the claims there illustrate some of those infirmities, but

4    that the infirmities go beyond just what's at issue in the

5    District Court case.

6        In sum, there are four problems with the order that render

7    parts of it legally infirm. It deprives the right of a jury

8    trial -- in fact, of any trial -- in contravention of 959(a)

9    for some causes of action.

10       It asserts jurisdiction -- two, it asserts jurisdiction

11   over claims that are subject to the mandatory withdrawal of

12   the reference provision (garbled) 157(d).

13       And three, it lacks the specificity required to discharge

14   future claims under *Applewood*.

15       Finally, Your Honor, number four, the order relies on the

16   *Barton* doctrine, which doesn't apply and which 959(a) creates

17   an exception to.

18       Movants respectfully submit the order should be modified

19   for those reasons.

20           MR. SBAITI: Tell him Mark Patrick is here, for the

21   record.

22           THE COURT: All right. I have a couple of follow-up

23   questions for you. I want to drill down on the issue of your

24   client not having appealed the July 2020 order. Or the

25   HarbourVest settlement order, for that matter. Tell me as

14

1   directly as possible why you don't view that as a big problem.

2   Because it's high on my list of possible problems here.

3           MR. BRIDGES:  I understand, Your Honor.  The

4   *Applewood Chair* case is our -- our defense to that argument,

5   that without providing specifics as to the claims being

6   discharged in the July order, that *Shoaf* cannot apply to

7   create a res judicata effect from the failure to appeal that

8   order.

9           THE COURT:  But is that really what we're talking

10  about, a discharge of certain claims?  We're talking about a

11  protocol that the Court established which wasn't appealed.

12          MR. BRIDGES:  Your Honor, your order does many

13  things.  We're talking about a few of them in one paragraph of

14  the order.  And in that order -- in that paragraph, yes, it

15  creates a protocol for determining the colorability of some

16  claims, claims that rise to the level of gross negligence or

17  intentional misconduct.  It does not create a protocol for

18  claims that fall below that threshold, claims for ordinary

19  negligence, as an example.

20          THE COURT:  Okay.

21          MR. BRIDGES:  For breach of contract that's not

22  intentional, is not grossly negligent, it's just a breach of

23  contract.  It can even be faultless.  There's still liability.

24  There's still a jury right under the Seventh Amendment for

25  faultless breach of contract.

15

1   The protocols in the order do not address such claims

2   other than to bar them.  To discharge them.  And thus, yes,

3   it's a release, it's a discharge of those claims.  It can be

4   viewed as a permanent injunction against bringing such claims.

5   It's what's -- it's what's not allowed by the *Applewood Chair*

6   case and by *Pacific Lumber*.

7          THE COURT:  All right.  So you're arguing that was --

8   the wording of the order was not specific enough to apprise

9   affected parties of what they were releasing, they're

10  releasing claims based on ordinary negligence against Mr.

11  Seery?  That's not specific enough?

12         MR. BRIDGES:  Correct.  Future unproved claims, the

13  factual basis for which has not happened yet.  Those cannot be

14  and were not disclosed with any specificity in this order.

15  If we compare it to *Shoaf* and to *Espinosa*, in *Shoaf* what

16  we had was a guaranty, Shoaf's guaranty on a transaction that

17  was listed in the actual release, describing what the

18  transaction was that was being -- that the guaranty was being

19  released for.

20  In *Espinosa*, what we had was a student loan --

21         THE COURT:  Right.

22         MR. BRIDGES:  -- that was listed in the plan

23  specifically, as the only specific indebtedness.

24  Here, we don't have any of that specificity.  What we have

25  is a notice to the entire world, Your Honor, that for an

16

1   unlimited period of time any claim for ordinary negligence,

2   for ordinary breach of contract or fiduciary duty against Mr.

3   Seery is barred if it relates to his CEO role.  And his CEO

4   role means as a manager of property, exactly precisely what

5   959(a) is talking about.

6       Those jury rights (garbled) claims cannot be released,

7   discharged, expunged, done away with, in an order that isn't

8   explicit.

9       On top of that, even in an explicit order, 959(a) tells

10  the Court it cannot deprive a litigant of its jury trial

11  right.

12          THE COURT:  Well, as anyone knows who's been around a

13  while in this case, my brain sometimes goes down an unexpected

14  trail, and maybe this one is one of those situations.  Are

15  there contracts that your clients would rely on in potential

16  litigation?

17          MR. BRIDGES:  Yes, Your Honor.

18          THE COURT:  What are those contracts?

19          MR. BRIDGES:  It is a management contract.  I don't

20  think I can give you the specifics at this moment, but I

21  probably can before we're done here today.  A management

22  contract in which the Debtor provides advisory and management

23  services to the DAF --

24          THE COURT:  Well, you know, the shared services

25  agreements that we heard so much about in this case?  A shared

17

1  service agreement?  I can't remember, you know, which entities

2  have them and which do not at times.  So, --

3         MR. BRIDGES:  The shared services agreement is one of

4  those contracts, Your Honor.

5         THE COURT:  Okay.

6         MR. BRIDGES:  It's not the only one.

7         THE COURT:  And what are the others?

8         MR. BRIDGES:  There's -- the other is the investment

9  advisory agreement.

10         THE COURT:  Those two?

11         MR. BRIDGES:  (no response)

12         THE COURT:  Those are the only two?

13         MR. BRIDGES:  There may be one other, Your Honor.

14  I'm not sure.

15         THE COURT:  Are they in evidence?

16         MR. BRIDGES:  I can find out shortly.

17         THE COURT:  Are they in evidence?  We haven't talked

18  about evidence yet, but are they going to be in evidence,

19  potentially?

20         MR. BRIDGES:  They are referenced in the District

21  Court case, the complaint, which is in evidence.

22         THE COURT:  I'm asking, are --

23         MR. BRIDGES:  But those contracts I don't believe are

24  listed as exhibits here in this motion, no.

25         THE COURT:  They are not?  Okay.

18

1    Well, what my brain is thinking about here is, of the

2   umpteen agreements I've seen -- more than umpteen -- of the

3   many, many agreements I've seen over time in this case, so

4   often there's a waiver of jury trial rights, as I recall, as

5   well as an arbitration clause.  I just was curious, hmm, you

6   know, you talked a lot about your clients' jury trial rights:

7   do we know that these agreements have not waived those?

8          MR. BRIDGES:  Your Honor, I think I can answer that

9   by the end of our hearing.  I don't have an answer off the top

10  of my head.  What I can tell you is a jury right has been

11  demanded in the federal court complaint, which is in evidence,

12  and that opposing counsel has brought no evidence indicating

13  that they have the defense of our having waived the right to a

14  jury trial here.

15         THE COURT:  Okay.  Well, I just --

16         MR. BRIDGES:  Or arbitra...

17         THE COURT:  -- would think that you would know that.

18  Does anyone know that on the Debtor's side off the top of your

19  head?

20         MR. POMERANTZ:  I do not, Your Honor.

21         THE COURT:  Uh-huh.

22         MR. POMERANTZ:  And to Mr. Bridges' last point, we

23  have filed a motion to dismiss.  We have not answered the

24  complaint.  So any time to object to their jury trial right

25  would be in the context of the answer.  So the implication

19

1    that we have not raised the issue and therefore it doesn't

2    exist is just not a correct implication and connection he's

3    trying to draw.

4           THE COURT:  Okay.  All right.

5      Well, let me also ask you about this.  I'm obsessing a

6    little over the *Barton* doctrine and your insistence that it

7    does not provide authority or an analogy here.

8      Well, for one thing, is there anything in the Fifth

9    Circuit case *Sherman v. Ondova* that you think either helps you

10    or hurts you on that point?  I'm intimately familiar with it,

11    although I haven't read it in a while, because it was my

12    opinion that the Fifth Circuit affirmed.  And I spent a lot of

13    time thinking about that.  It was a trustee, a traditional --

14    well, no, a Chapter 11 trustee and his counsel.  But anything

15    from that case that you think is worthy of pointing out here?

16           MR. BRIDGES:  No, Your Honor.  I'm not -- nothing

17    comes to mind.  That case is not fresh on my mind.

18      What I would tell you is that *Barton* doctrine and the

19    business judgment rule are incompatible, and the appointment

20    of a trustee never involves application of the business

21    judgment rule or deference to the Debtor or another party in

22    terms of making that appointment.

23      The *Barton* doctrine, as it applies to trustees, is viewed

24    as an extension, to some extent, of judicial immunity to the

25    trustee, who is chosen by, selected by the Court and assigned

20

1   by the Court to carry out certain functions.  That --

2            THE COURT:  Well, let me --

3            MR. BRIDGES:  -- quasi-immunity --

4            THE COURT:  -- stop you there.  You say it's an

5   extension of immunity.  But isn't it, by nature, really a

6   gatekeeping provision?  It's a gatekeeping provision, right?

7   Before you even get to immunity, maybe, in a lawsuit, it's a

8   gatekeeping function that the Supreme Court has blessed, you

9   know, obviously in the context of a receiver, but appellate

10  courts have blessed it in the bankruptcy context.  The

11  Bankruptcy Court can be the gatekeeper on whether the trustee

12  or someone I think in a similar position can get sued or not.

13      And then we had that Fifth Circuit case after *Ondova*.  It

14  begins with a V, *Villegas* or something like that.  Didn't

15  that, I don't know, further ratify, if you will, the whole

16  *Barton* doctrine by saying, oh, just because they're noncore

17  claims, state law or non-bankruptcy law claims, doesn't mean,

18  after *Stern*, the Bankruptcy Court still cannot serve the

19  gatekeeper function.

20      Tell me what you disagree.  That's my kind of combined

21  reading of all of that.

22            MR. BRIDGES:  Your Honor, I have to parse it out.

23  There's a lot to unpack there.  If I can make sure to get in

24  the follow-ups, I can start with saying it's okay for the

25  Court in many instances to act as a gatekeeper.

21

1          THE COURT:  Okay.

2          MR. BRIDGES:  Both under *Barton* -- under *Barton*, or

3   when the *Barton* exception in 959(a) applies, under the Court's

4   general equitable powers, that gatekeeping functions are not

5   across-the-board prohibited, --

6          THE COURT:  Okay.

7          MR. BRIDGES:  -- and we aren't trying to argue that

8   they're prohibited across the board.

9          THE COURT:  Okay.

10          MR. BRIDGES:  Now, to try to dig into that a little

11  deeper, the order does two things:  gatekeeping as to some

12  claims, and, frankly, discharging or barring other claims.

13  Those are two separate functions.

14      The first one, the gatekeeping, may be, in some

15  circumstances, which we'll come to, many circumstances, may be

16  allowable, may be even mandatory under *Barton*, not even

17  requiring an order from this Court, for the gatekeeping of

18  *Barton* to apply.  But nonetheless, allowable in many instances

19  under the Court's general equity powers under 959(a).  That

20  part is right about gatekeeping.

21      It does not create jurisdiction in this Court where 157(d)

22  deprives this Court of jurisdiction.  Just because it's

23  related to bankruptcy isn't enough to say that the Court

24  therefore has jurisdiction if, one, if mandatory withdrawal of

25  the reference is required.

22

1       Furthermore, Your Honor, that gatekeeping function, under

2   the equity powers authorized by 959(a), will not allow a court

3   to discharge or -- or deprive, is the word I'm looking for --

4   deprive a litigant of their right to a trial -- a specific

5   kind of trial, a jury trial -- but a trial.  And by crafting

6   an order that says certain kinds of claims that do (garbled)

7   jury rights are barred, rather than just providing a

8   gatekeeper provision, flat-out bars them, that doesn't -- that

9   doesn't comply with 959.

10          THE COURT:  Okay.

11          MR. BRIDGES:  Your Honor, if I could add one last

12  thing.

13          THE COURT:  Go ahead.

14          MR. BRIDGES:  The Supreme Court's *Stern* case points

15  out that -- that it's -- well, actually, it's the *Villegas*

16  case from the Fifth Circuit --

17          THE COURT:  The one I mentioned.

18          MR. BRIDGES:  -- points out that *Stern* -- *Stern* --

19  yes, you did.  *Stern* did not create an exception to the *Barton*

20  doctrine.  And that gives -- that endorses a *Barton* court's

21  ability to perform gatekeeping, even over claims that *Stern*

22  says there would not be jurisdiction over.

23      Contrast that with 959(a), which *Collier on Bankruptcy* and

24  the Fifth Circuit have held is an exception to the *Barton*

25  doctrine.  Because of that exception, *Barton* no longer

23

1  applies, and what you're using in invoking a gatekeeper order

2  is the Court's inherent equitable powers, its general powers

3  in equity.  And those equity powers are cabined.  They're

4  broad, but they're cabined by 959(a)'s prohibition of doing

5  away with a litigant's right to a trial, a jury trial.

6      Now, I also -- counsel is telling me I should note for the

7  record that Mr. Mark Patrick is here as a representative of

8  our clients.  But Your Honor, I'll -- I will quit now unless

9  you have further questions for me.

10         THE COURT:  All right.  I do not at this time.  Mr.

11 Morris or Mr. Pomerantz, who's going to make the argument?

12         MR. POMERANTZ:  It's me, Your Honor.

13          OPENING STATEMENT ON BEHALF OF THE DEBTOR

14         MR. POMERANTZ:  And I'll start with the jury trial

15 right.  In the last few minutes, we have been able to

16 determine that the Second Amended and Restated Investment

17 Advisory Agreement between the DAF and the Debtor has a broad

18 jury trial waiver under 14(f).  And in addition, as I will

19 include in my discussion, there is no private right of action

20 under the Investment Advisers Act.

21      I think those two points are fatal to Movants' argument,

22 and probably I can get away with not even responding to the

23 others.  But since I prepared a lengthy presentation to

24 address the issues that were raised today, and also the half

25 hour that Mr. Bridges spent with Your Honor on June 8th in

24

1  which was his first opening statement on the motion for

2  reconsideration, I'll now proceed.

3          THE COURT:  All right.

4          MR. POMERANTZ:  The arguments that the Movants made

5  in the original motion essentially boil down to one legal

6  proposition, that the Court did not have jurisdiction to enter

7  the July 16th order because those orders impermissibly

8  stripped the District Court from jurisdiction, in violation of

9  (inaudible) Supreme Court precedent and 28 U.S.C. Section

10  157(d).

11      As with all things Dondero, the arguments continue to

12  morph, and you heard argument at the contempt hearing on June

13  8th and further argument today that now the prospective

14  exculpation for negligence in the order is also unenforceable

15  and should be modified.

16      Movants continue to try to distance themselves from the

17  January 9th order and argue that it is not relevant because

18  they seek to pursue claims against Mr. Seery as CEO and not as

19  an independent director.  Movants ignore, however, that the

20  January 9th order not only protects Mr. Seery in his role as

21  the independent director, but also as an agent of the board.

22  I will walk the Court through my arguments on that issue in a

23  few moments.

24      Of course, the Movants had no explanation, Your Honor, for

25  the question of why it took them until May of 2021, 10 months

25

1 after the entry of the July 16th order that appointed Mr.

2 Seery as CEO and CRO, and 16 months after the Court appointed

3 the independent board, with Mr. Dondero's blessing and

4 consent, as a substitute for what would have surely been the

5 imminent appointment of a Chapter 11 trustee.

6     Movants try to distance themselves from the prior orders

7 by essentially arguing that the DAF is a newcomer to the

8 Chapter 11 and is not under Mr. Dondero's control but is

9 rather managed separately and independently by Mr. Patrick,

10 who recently replaced Mr. Scott.

11     The Movants admit, as they must, that the DAF is the

12 parent and the sole shareholder of CLO Holdco and conducts its

13 business through CLO Holdco, and both entities conduct their

14 business through one individual.  It was Grant Scott then;

15 it's Mark Patrick now.  So even if Mr. Dondero does not

16 control the DAF and CLO Holdco, which issue was the subject of

17 lengthy testimony in connection with the DAF hearing, both the

18 DAF and the CLO Holdco are bound by the Debtor's res judicata

19 argument, which I will discuss shortly.

20     In any event, I really doubt the Court is convinced that

21 the DAF operates truly independently of Mr. Dondero any more

22 than the Court has been convinced that the Advisors, the

23 Funds, Dugaboy and Get Good, all operate independently from

24 Mr. Dondero.  The only explanation for the delay is that Mr.

25 Dondero has been and continues to be unhappy with the Court's

26

1   rulings and has now hired a new set of lawyers in a desperate

2   attempt to evade this Court's jurisdiction.  Having failed in

3   their attempt to recuse Your Honor from the case, this is

4   essentially their last hope.

5       And these new lawyers, Your Honor, have not only filed

6   this DAF lawsuit in the District Court which is the subject of

7   the contempt motion and today's motion, but they also filed

8   another lawsuit in the District Court on behalf of an entity

9   called PCMG, another Dondero entity, challenging yet another

10  of Mr. Seery's postpetition decisions.

11      And there's no doubt that this is only the beginning.  Mr.

12  Dondero recently told Your Honor at a hearing that there were

13  many more sets of lawyers waiting in the wings.  And as the

14  Court remarked at the hearing on the Trusts' motion to compel

15  compliance with Rule 2015.3, the Trusts were trying through

16  that motion to obtain information about the Debtor's control

17  entities so that they could file more lawsuits against the

18  Debtor, a concern that Mr. Draper unconvincingly denied.

19      I would like to focus the Court preliminarily on exactly

20  what the January 9th and July 16th orders do, because Movants

21  try to confuse things by casting the entire order with a broad

22  brush of their jurisdictional overreach arguments, and they

23  misinterpret Supreme Court and Fifth Circuit precedent.

24      I would like to put up on the screen the language of

25  Paragraph 10 of the January 9th order and Paragraph 35

27

1  (garbled) of the July 16th.

2      Your Honor is very familiar with these orders, I'm sure,

3  having dealt with them in connection with confirmation and in

4  prior proceedings.  But to recap, the orders essentially do

5  three things.

6      First, they require the parties to first come to the

7  Bankruptcy Court before commencing or pursuing a claim against

8  certain parties.

9      Second, they provided the Court with the sole jurisdiction

10 to make a finding of whether the party has asserted a

11 colorable claim of negligence -- of willful misconduct or

12 gross negligence.

13     And lastly, the orders provided the Court with exclusive

14 jurisdiction over any claims that the Court determined were

15 colorable.

16     The protected parties under the January 9th order are the

17 independent directors, their agents and advisors, which, as I

18 mentioned earlier, includes Mr. Seery -- who, at least as of

19 March 2020, was acting as the agent on the board's behalf as

20 the CEO -- for any actions taken under their direction.

21     The protected parties under the July 16th order are Mr.

22 Seery, as the CEO and CRO, and his agents and advisors.

23     Movants spend a lot of time in their moving papers and

24 reply arguing that the Court may not assert exclusive

25 jurisdiction over any claims that pass through the gate.  They

28

1    also spend a lot of time arguing that the Bankruptcy Court

2    does not even have jurisdiction at all to assert -- to

3    adjudicate claims against Mr. Seery because such claims are

4    subject to mandatory withdrawal under Section 157(d).

5        The Debtor doesn't agree, and has briefed why mandatory

6    withdrawal of the reference is inapplicable.  The Debtor has

7    also filed in the District Court a motion to enforce the

8    reference in effect in this district which refers cases in

9    this district arising under, arising in, or related to Chapter

10    11 to the Bankruptcy Court.

11        The motion to enforce the reference, Your Honor, which

12    extensively briefs this issue, is contained in Exhibit 3 of

13    the Debtor's exhibits.

14        We were somewhat surprised that the complaint filed in the

15    District Court wasn't automatically referred to this Court

16    under the standing order in effect in this district, given the

17    related bankruptcy case, the Court's prior approval of the

18    HarbourVest settlement, and the appeal in the District Court

19    of the HarbourVest settlement.

20        When we dug a little further, we found out that Movants

21    filed a civil case cover sheet accompanying the complaint in

22    the District Court.  They neglected in that initial filing to

23    point out that there was any related case to the lawsuit they

24    filed.

25        Mr. Bridges fell on his sword at the contempt hearing on

29

 1   June 8th and took complete responsibility for the oversight.

 2   I commend him for not trying to argue that the bankruptcy

 3   case, the HarbourVest settlement, and the District Court

 4   appeal are not related cases that would require disclosure, an

 5   argument that surely would have been unsupportable.

 6       But as I said at the contempt hearing, I find it curious

 7   that such an important issue was overlooked, an issue which

 8   would have likely changed the entire trajectory of the

 9   proceedings and landed the DAF lawsuit in this Court rather

10   than the District Court.

11       And this Tuesday, Your Honor, Movants filed a revised

12   civil cover sheet with the District Court.  Although they

13   referenced the bankruptcy case as a related case, they didn't

14   bother to mention the appeal already pending in the District

15   Court regarding the HarbourVest settlement -- surely, a

16   related case.

17       Your Honor also asked Mr. Bridges at the June 8th hearing

18   whether it was an oversight or intentional that he didn't

19   mention 28 U.S.C. Section 1334 as a basis for jurisdiction in

20   his complaint.  Mr. Bridges had no answer for Your Honor then,

21   and has given no answer now.  His only comment at the hearing

22   last time was that it must have been Ms. Sbaiti that wrote it

23   because he had no recollection of it.

24       So, Your Honor, it's no surprise that Movants conveniently

25   found themselves in the District Court, which was their

30

1  ultimate strategy from the get go.

2      In any event, Your Honor, we have briefed the withdrawal

3  of the reference issue.  A response by the Movants is due --

4  CLO Holdco and DAF is due on June 29th.  And we hope the

5  District Court will decide soon thereafter whether to enforce

6  the reference.

7      While I'm happy to argue why Movants' mandatory withdrawal

8  of the reference argument is [not] persuasive, I don't think

9  it's necessary, but I do, again, want to highlight that there

10  is no private right of action under the Investment Advisers

11  Act.

12      Your Honor, it's not really relevant to today's hearing,

13  since we have argued in opposition to the motion before Your

14  Honor that resolving the issue of the Bankruptcy Court's

15  jurisdiction to adjudicate claims contained in the complaint

16  as they relate to Mr. Seery is premature at this point.  The

17  January 9th and July 16th orders first require the Court to

18  determine whether a claim is colorable.  It's not until this

19  Court determines if a claim is colorable that the decision on

20  where the lawsuit should be tried is relevant.

21      Having said that, Your Honor, we read the Movants' reply

22  brief very carefully and noticed in Footnote 6 that the

23  Movants state that modifying the exclusive grant of

24  jurisdiction to adjudicate any claims that pass through the

25  gate to include the language "to the extent permissible by

31

1  law," in the same way the Debtor modified the plan, would

2  resolve the motion.  So let's look at the provision as it

3  exists in the plans.

4      Ms. Canty, if you can put up the next demonstrative,

5  please.

6      This provision provides that the Bankruptcy Court will

7  have sole and exclusive jurisdiction to determine whether a

8  claim or cause of action is colorable, and, only to the extent

9  legally permissible and provided in Article XI, shall have

10  jurisdiction to determine -- to adjudicate the underlying

11  colorable claim or cause of action.

12      The Movants request in their reply brief in Footnote 6

13  that the July 16th order be given the plan treatment.  That

14  treatment:  sole authority to determine colorability and

15  jurisdiction, and, to the extent legally permissible, to

16  adjudicate underlying claim, only if jurisdiction existed.

17      After reviewing the reply brief and prior to the June 8th

18  hearing, we decided that we would agree to modify both the

19  January 9th and the July 16th orders to provide that the

20  Bankruptcy Court would only have jurisdiction to adjudicate

21  claims that pass through the colorability gate to the extent

22  permissible by law.

23      Prior to the June 8th hearing, Mr. Morris and I had a

24  conversation with Mr. Bridges.  We conferred about a potential

25  resolution and a proposed modification.  Mr. Bridges indicated

32

1    they were interested in exploring a resolution and wanted to

2    --

3                MR. BRIDGES:  Objection, Your Honor.

4                THE COURT:  There's an objection?

5                MR. BRIDGES:  Objection, Your Honor.  There's a Rule

6    408 settlement discussion.  He's welcome to talk about the

7    results, but he shouldn't be talking about what was -- what

8    was proposed by opposing counsel in a settlement conversation.

9                THE COURT:  Okay.  I overrule.

10               MR. POMERANTZ:  Your Honor, this was not --

11               THE COURT:  I don't think this is a 408 issue.

12   Continue.

13               MR. BRIDGES:  Thank you.

14               MR. POMERANTZ:  The stipulation and order which we

15   provided to counsel is attached to my declaration, which is

16   found at Document 2418, and it was filed in connection with a

17   Notice of Revised Proposed Orders that we filed at Docket

18   2417.  And I would like to put up on the screen the relevant

19   paragraphs of the order that we provided to the Movants.

20        So, you see, we agreed to modify each of the orders at the

21   end to do what the plan says.  The Court would only have

22   jurisdiction for claims passing through the gate if the Court

23   had jurisdiction and it was legally permissible.

24        Movants' counsel, however, responded with a mark-up that

25   went beyond -- went beyond what Movants proposed in Footnote 6

33

1   and sought to fundamentally change the January 9th and July

2   16th orders in ways that were not acceptable to the Debtor and

3   not even contemplated by the original motion.

4        Ms. Canty, can you put up on the screen the relevant

5   paragraphs of the response we received?

6        Specifically, Your Honor, you see at the first part they

7   wanted to provide that the only -- the order only applied to

8   claims involving injury to the Debtor, presumably as opposed

9   to alleged injuries to affiliated funds or third parties.

10  They also provided that the Court's ability to make the

11  initial colorability determination was also qualified by "to

12  the extent permissible by law" in the way that the Court --

13  that the Debtor agreed to modify the ultimate adjudication

14  jurisdiction provision.

15       Your Honor, Movants haven't even talked about this back

16  and forth.  They haven't talked about their about-face.  And

17  I'll leave it for Your Honor to read their Footnote 6 that

18  said it would resolve their motion, the back and forth, our

19  proposal, and now Mr. Bridges' modified, morphed arguments

20  that now point out other issues.

21       In any event, Your Honor, we made the change, and we think

22  it should resolve the motion, or at least it resolves part of

23  the motion.  There can't be any argument that the Court is

24  trying to exert exclusive jurisdiction on claims that pass

25  through the gate.

34

1     What apparently remains from the arguments raised by the

2    Movants is the argument that the Court does not even have

3    jurisdiction to act as a gatekeeper in the first place because

4    it doesn't have jurisdiction of the underlying lawsuit.  And

5    on June 8th and today, they've added a new argument, that the

6    orders impermissibly exculpate Mr. Seery and others, violate

7    their jury trial rights, and are contrary to the Fifth Circuit

8    precedent.

9     Movants claims that the orders are a jurisdictional

10    overreach, a violation of constitutional proportions, a

11    violation of due process, and inconsistent with several U.S.

12    Supreme Court cases.  But, of course, they cite no cases whose

13    facts are even remotely similar to this one.  Instead, they

14    are content to rely on general statements regarding bankruptcy

15    jurisdiction, how it is derived from district court

16    jurisdiction and is constitutionally limited, legal

17    propositions which are not terribly controversial or even

18    applicable to these facts.

19     There are several arguments -- I mean, there are several

20    reasons, Your Honor, why Movants' arguments fail.  Initially,

21    Movants have not cited any authority, any statute, or any rule

22    which would allow this Court to revisit the January 9th and

23    July 16th orders.  As I will discuss in a moment, Your Honor,

24    *Republic v. Shoaf*, a case the Court is very familiar in and

25    relied on in connection with plan confirmation, bars a

35

1  collateral attack on these orders under the doctrine of res

2  judicata.

3      Similarly, as the Court remarked on June 8th, the Supreme

4  Court's *Espinosa* decision, which rejected an attack based upon

5  Federal Rule of Civil Procedure 60(b)(4) to a prior order that

6  may have been unlawful, prohibits the Court from now

7  reconsidering the January 9th and July 16th orders.

8      But even if Your Honor rules that res judicata does not

9  apply, there are two independent reasons why the orders were

10  not an unlawful extension of the Court's jurisdiction.  The

11  first is because the Court had jurisdiction to enter both of

12  those orders as the ability to determine the colorability of

13  claims is within the jurisdiction of the Court.  The second is

14  because the orders are justified by the *Barton* doctrine.

15      Lastly, Your Honor, Movants' argument that the Court may

16  not act as a gatekeeper to determine the colorability of a

17  claim for which it may not have jurisdiction is incorrect, and

18  as Your Honor has mentioned and as Mr. Bridges unconvincingly

19  tried to distinguish, the Fifth Circuit *Villegas v. Schmidt*

20  case is a case on point and resolves that issue.

21      Turning to res judicata, Your Honor, it prevents the Court

22  from revisiting these governance orders.  CLO Holdco had

23  formal notice of the Seery CEO motion and the opportunity to

24  respond.  It failed to do so.  It is clearly bound.

25      As reflected on Debtor's Exhibit 4, CLO Holdco is a

36

1   wholly-owned subsidiary of the DAF.  The DAF is its sole

2   shareholder.  There is no dispute about that.  Importantly, at

3   the time of both the January and July orders, Grant Scott was

4   the only human being authorized to act on behalf of CLO Holdco

5   and the DAF.  The DAF did not respond to the Seery CEO motion,

6   either.

7       And why is that important, Your Honor?  It's because

8   Movants argue in their reply that the DAF cannot be bound by

9   res judicata because they did not receive notice of the July

10  16th order.  However, Your Honor, that is not the law.  Res

11  judicata binds parties to the dispute and their privies, and

12  the DAF is bound to the prior orders even though it did not

13  receive notice.

14      There are several cases, Your Honor, that stand for this

15  unremarkable proposition.  First I would point Your Honor to

16  the Fifth Circuit's opinion of *Astron Industrial Associates v.*

17  *Chrysler*, found at 405 F.2d 958, a Fifth Circuit case from

18  1968.  In that case, Your Honor, the Fifth Circuit held that

19  the appellant was barred by the doctrine of res judicata from

20  bringing a claim because its parent, which was its sole

21  shareholder, would have been bound by res judicata.

22      *Astron* is consistent with the 1978 Fifth Circuit case of

23  *Pollard v. Cockrell*, 578 F.2d 1002 (1978).  And the Northern

24  District of Texas in 2000 case of *Bank One v. Capital*

25  *Associates*, 2000 U.S. Dist. LEXIS 11652, found that a parent

1  and a sole shareholder of an entity couldn't assert res

2  judicata as a defense when those claims could have been

3  brought against its wholly-owned subsidiary.

4      And lastly, Your Honor, the 2011 Southern District of

5  Texas case, *West v. WRH Energy Partners*, 2011 LEXIS 5183, held

6  that res judicata applied with respect to a partnership's

7  general partner because the general partner was in privity

8  with the partnership.

9      These cases are spot on and make sense.  DAF is CLO

10  Holdco's parent.  Grant Scott was the only live person to

11  represent these entities in any capacity at the relevant

12  times.  Accordingly, just as CLO Holdco is bound, DAF is

13  bound.

14      Allowing DAF to assert a claim when its wholly-owned and

15  controlled subsidiary is barred would allow entities to

16  transfer claims amongst their related entities in order to

17  relitigate them and they would never be finality.  And, of

18  course, Jim Dondero, as we know, consented to the January 9th

19  order, which provided Mr. Seery protection in a variety of

20  capacities.

21      And as Your Honor has pointed out, and as Mr. Bridges

22  didn't have an answer for, neither CLO Holdco nor the DAF or

23  any other party appealed any of the governance orders.  And

24  nobody challenged the validity of these orders at the

25  confirmation hearing, where the terms of these orders were

38

1  front and center.

2      And importantly, Your Honor, the orders are clear and

3  unambiguous.  They require a Bankruptcy Court [sic] to seek

4  Bankruptcy Court approval before they commence or pursue an

5  action against the independent board, the CEO, CRO, or their

6  agents.  And they clearly and unambiguously set the standard

7  of care for actions prospectively:  gross negligence or

8  willful misconduct.

9      The Bankruptcy Court had jurisdiction to enter the

10  governance orders, which, as expressly indicated in the

11  orders, were core proceedings dealing with the administration

12  of the estate.  No one challenged this finding of core

13  jurisdiction.  And as I will discuss later, the failure to

14  challenge core jurisdiction is waived under applicable Supreme

15  Court and Fifth Circuit precedent.

16      Your Honor, the Court [sic] does not argue that Movants

17  have waived their right to seek adjudication of a lawsuit that

18  passes through the colorability gate by an Article III Court.

19  The issue is not before the Court, but the changes to the

20  order that the Debtor agreed to make clearly -- clearly will

21  provide Mr. Bridges' clients the ability to make that

22  determination.

23      The Debtor is, however, arguing that the Movants have

24  waived their right to contest the core jurisdiction of the

25  Bankruptcy Court to make the determination that the claims are

39

1  colorable in the first place, and to challenge the exculpation

2  provisions provided to the beneficiaries of those orders.

3      Accordingly, Your Honor, the elements of res judicata are

4  satisfied.  Both proceedings involve the same parties.  The

5  prior judgment was entered by a court of competent

6  jurisdiction.  The prior order was a final judgment on its

7  merits.  And they involved the same causes of action.

8      Importantly, the members of the independent board,

9  including Jim Seery, relied on the protections contained in

10  the January 9th and July 16th orders and would not have

11  accepted these appointments if the protections weren't

12  included.  And how do we know this?  Because each of them,

13  both Mr. Seery and Mr. Dubel, both testified at the

14  confirmation hearing on this very topic.

15      And I would like to put up on the screen an excerpt from

16  Mr. Seery's testimony at confirmation, which is testimony

17  included in the February 2nd, 2021 transcript, which is

18  Exhibit 2 of the Debtor's exhibits.

19          THE COURT:  Okay.

20          MR. POMERANTZ:  And I would like to just read this,

21  Your Honor.

22      "Q   Okay.   You  mentioned  that  there  were  certain

23      provisions of the January 9th order that were important

24      to you and the other independent directors.  Do I have

25      that right?"

40

1          MR. POMERANTZ:  A little bit later on, Mr. Seery

2     testifies:

3          "A   And then ultimately there'll be another provision

4          in the agreement here, I don't see it off the top of my

5          head, but a gatekeeper provision.  And that provision"

6          --

7          "Q   Hold on one second, Mr. Seery."

8          MR. POMERANTZ:  Please scroll.

9          "Q   So, Paragraph 4 and 5, were those -- were those --

10         were those provisions put in there at the insistence of

11         the prospective independent directors?

12         "A   Yes.

13         "Q   Okay.  Can we go to Paragraph 10, please?  There

14         you go."

15         Mr. Morris:  Is this the other provision that you were

16    referring to?

17         "A   This is -- it's become to be known as the

18         gatekeeper provision, but it's a provision that I

19         actually got from other cases -- again, another very

20         litigious case -- that I thought it was appropriate to

21         bring it into this case.  And the concept here is that

22         when you are dealing with parties that seem to be

23         willing to engage in decade-long litigation and

24         multiple forums, not only domestically but even

25         throughout the world, it seemed important and prudent

1    to me and a requirement that I set out that somebody

2    would have to come to this Court, the Court with

3    jurisdiction over these matters, and determine whether

4    there was a colorable claim.  And that colorable claim

5    would have to show gross negligence and willful

6    misconduct -- i.e., something that would not otherwise

7    be indemnifiable" --

8        MR. POMERANTZ:  Hold on one second.

9    "A   So, basically, it set an exculpation standard for

10    negligence.    It exculpates the directors from

11    negligence, and if somebody wants to bring a cause

12    against the directors, they have to come to this Court

13    first to get a finding that there's a colorable claim

14    for gross negligence or willful misconduct."

15    "Q   Would you have accepted the engagement as an

16    independent director without the Paragraphs 4, 5, and

17    10 that we just looked at?

18    "A   No, these were very specific requests.   The

19    language here has been smithed, to be sure, but I

20    provided the original language for Paragraph 10 and

21    insisted on the guaranty provisions above to ensure

22    that the indemnity would have some support.

23    "Q   And ultimately did the Committee and the Debtor

24    agree to provide all the protections afforded by

25    Paragraphs 4, 5, and 10?

42

1    "A    Yes."

2         MR. POMERANTZ:  So, Your Honor, these -- this

3    testimony also applied to as well as the CEO.

4         The testimony was echoed by Mr. Dubel, another member of

5    the board.  And I'm not going to put his testimony on the

6    screen, but it can be found at Pages 272 to 281 of Exhibit 2,

7    which is the February 2nd transcript.

8         Movants argue, however, that res judicata doesn't apply

9    because the Court didn't have jurisdiction to enter these

10   orders.  And they argue that the order stripped the District

11   Court of this jurisdiction.  As I previously described, the

12   Debtor is prepared to modify the governance orders to provide

13   that the Court shall retain jurisdiction to -- on claims that

14   pass through the gate only to the extent legally permissible.

15   The modification does not appear to be good enough for the

16   Movants.  They continue to argue that the Bankruptcy Court

17   can't even act as the exclusive gatekeeper to determine

18   whether such actions are colorable as a prerequisite for

19   commencing or pursuing an action.

20        The problem Movants run into is the Fifth Circuit's

21   opinion of *Republic v. Shoaf* and various Supreme Court

22   decisions, including *Espinosa*.

23        In *Shoaf*, the Fifth Circuit held that a party cannot

24   subsequently challenge a confirmed plan that clearly and

25   unambiguously released a third party, even if the Bankruptcy

43

1   Court lacked jurisdiction to approve the release in the first

2   place. Movants' proper recourse was to appeal the governance

3   orders, not to seek to collaterally attack them.

4      In *Shoaf*, the Fifth Circuit held that the confirmed plan

5   was res judicata with respect to a suit by the creditor

6   against the guarantor. And in so ruling, the Fifth Circuit

7   says that the prong of res judicata standard that requires an

8   order, prior order to be made by a court of competent

9   jurisdiction is satisfied regardless of whether the issue was

10   actually litigated. This is because whenever a court enters

11   an order, it does so by implicitly making a finding of its

12   jurisdiction, a determination that can't be attacked. And in

13   fact, in the January 9th and the July 16th orders, it wasn't

14   implicit, the Court's jurisdiction; it was set out that the

15   Court had core jurisdiction.

16      Movants try to brush *Shoaf* aside, arguing that is the only

17   case the Debtor cites to support res judicata argument and is

18   a narrow opinion that has been questioned and distinguished.

19   That's just not correct, Your Honor. Movants ignore that we

20   have cited two United States Supreme Court cases, *Stoll v.*

21   *Gottleib* and *Chicot County Drainage District*, upon which the

22   Fifth Circuit based its *Shoaf* decision. In each case, the

23   U.S. Supreme Court gave res judicata effect to a Bankruptcy

24   Court order that made a ruling party -- that a ruling party

25   later claimed was beyond the Court's jurisdiction to do so.

44

1   In *Stoll*, it was a release of guaranty without jurisdiction,

2   like *Shoaf*.  In *Chicot*, it was an extinguishment of a bond

3   claim without jurisdiction.

4       Similarly, Your Honor, the U.S. Supreme Court held in

5   *Espinosa* that a party was not entitled to reconsideration of a

6   Bankruptcy Court order under Federal Rule of Civil Procedure

7   60(b)(4) discharging a student loan without making the

8   required statutory finding of undue hardship in an adversary

9   proceeding.  And the Supreme Court reasoned in that opinion as

10  follows:  A judgment is not void, for example, simply because

11  it may have been erroneous.  Similarly, a motion under

12  60(b)(4) is not a substitute for a timely appeal.  Instead,

13  60(b)(4) applies only in the rare instance where a judgment is

14  premised either on a certain type of jurisdictional error or a

15  violation of due process that deprives a party of notice or

16  the opportunity to be heard.

17      Federal courts considering Rule 60(b)(4) motions that

18  assert a judgment is void because of a jurisdictional defect

19  generally have reserved it only for the exceptional case in

20  which the court that rendered the judgment lacked even an

21  arguable basis for jurisdiction.  This case is not the

22  exceptional -- exceptional circumstance that was referred to

23  by *Espinosa*.

24      In addition, we argue in our brief, and I'll get to in a

25  few moments, that both of the orders are justified under the

45

1  *Barton* doctrine.

2      Actually, before I go to that, Your Honor, I think Movants

3  are really trying to distinguish *Espinosa* by arguing that the

4  Court's order exculpating Mr. Seery for negligence liability

5  did not provide people, mom-and-pop investors, with the due

6  process informing them that they would not be able to assert

7  duty claims based upon mere negligence.  I think that's the

8  core of Mr. Bridges' argument, that, hey, you entered an

9  order, you gave this exculpation, it was inappropriate, and it

10  couldn't be done.

11      There are several problems with Movants' argument.  First,

12  Movants mischaracterize both the facts and the law in

13  connection with the Debtor's relationship with its investors.

14  The Debtor is the registered investment advisor for HCLOF as

15  well as approximately 15 to 18 CLOs.  The only investor in

16  HCLOF other than the Debtor is CLO Holdco.  The investors in

17  the CLOs are the retail funds advised by the Dondero advisors

18  and the other -- and other institutional investors.

19  Accordingly, the thousands of investors, the mom-and-pop

20  investors whose due process rights have allegedly been

21  trampled by the January 9th and July 16th orders, are not

22  investors in any funds managed by the Debtor.

23      And, of course, I have mentioned, as I've mentioned

24  before, no non -- non-Dondero investor, be it a mom-and-pop

25  investor, another institutional investor, anyone unrelated to

46

1  Mr. Dondero, has ever appeared in this Court to challenge the

2  Debtor's activities.

3      But more fundamentally, Your Honor, the Debtor does not

4  owe fiduciary duties to investors in any of the funds that the

5  Debtor advises.  The fiduciary duty that the Debtor owes is to

6  the funds themselves, not the investors in the funds.

7      And while Movants point to Mr. Seery's prior testimony to

8  support the argument that the Debtor owes a duty to investors,

9  Mr. Seery was not testifying as a lawyer and his testimony

10 just cannot change the law.

11     As to each of the funds that the Debtor manages, HCLOF and

12 the CLOs, they were each provided with actual notice of the

13 January 16th -- the July 16th order and didn't object.  And as

14 Your Honor will recall, the Trustees for the CLOs, the party

15 that could potentially have claims for breach of fiduciary

16 duty, they participated in the January 9th hearing.  They came

17 to the Court and were concerned about the protocols that the

18 Debtor was agreeing to with the Committee.  We revised them.

19 The Trustees didn't object.  They didn't object then; they

20 didn't object now.  And, in fact, they consented to the

21 assumption of the contracts between the Debtor and the CLOs.

22     So the argument that the orders, by having this

23 exculpation for future conduct, violated due process rights of

24 anyone and is the type -- essentially, the type of order that

25 *Espinosa* would have contemplated could be attacked, is --

1 relies on faulty legal and factual premises.  No duty to

2 investors.  No private right of action.  And both -- and all

3 the funds received due process.

4      In addition, Your Honor, as we argue in our brief and I'll

5 get to in a few moments, both of the orders are justified

6 under the *Barton* doctrine, as Mr. Seery is entitled to

7 protection based upon how courts around the country have

8 interpreted the *Barton* doctrine.  As such, Mr. Seery is

9 performing his role both as an agent of the independent board

10 under the January 9th order, as a CEO under the July 16th

11 order, as a quasi-judicial officer.  And as Your Honor

12 examined in the *Ondova* opinion which you mentioned, trustees

13 are entitled to qualified immunity for damage to third parties

14 resulting from simple negligence, provided that the trustee is

15 operating within the scope of his duties and is not acting in

16 an *ultra vires* manner.

17      So, exculpating the independent directors, their agents,

18 and the CEO in the January 9th and July 16th orders was a

19 recognition by this Court that they would be entitled to

20 qualified immunity, much in the same way trustees are.

21      No doubt that Movants contend that this was error and that

22 the Court overreached.  However, the remedy for that overreach

23 was an appeal, not a reconsideration 16 months later.  The

24 Court's orders based upon the determination that in this

25 highly contentious case that these court officers needed to be

48

1   protected from negligence suits is not the exceptional case

2   where the Court lacked any arguable basis for jurisdiction.

3   Accordingly, this Court must follow *Espinosa*, *Shoaf*, *Stoll*,

4   and *Chicot* and reject the attack on the prior court orders.

5       The only case Movants cite to challenge the Supreme

6   Court's decision -- to challenge the Supreme Court precedent I

7   mentioned and the Fifth Circuit's *Shoaf* decision is the

8   *Applewood* case.  *Applewood* is totally consistent with *Shoaf*.

9   *Applewood* also involved a plan that purported to release a

10  guaranty claim that the guarantor argued was res judicata in

11  subsequent litigation regarding the guaranty.  The Fifth

12  Circuit held in that case that the plan was not res judicata.

13  It made that ruling because the plan did not contain clear and

14  unambiguous language releasing the guaranty.  In that way, the

15  Fifth Circuit distinguished *Shoaf*.

16      *Applewood* and *Shoaf* are consistent.  A Bankruptcy Court

17  order will be given res judicata effect, even if the Court

18  didn't have jurisdiction to enter it, if the order was clear

19  and unambiguous.  In *Shoaf*, the release was.  In *Applewood*, it

20  wasn't.

21      Movants argued on June 8th and argue now that the

22  *Applewood* case really argues -- really deals with prospective

23  exculpation of claims.  I went back and read Mr. Bridges'

24  comments carefully of June 8th.  He said *Applewood*,

25  exculpation.  Well, that's just not correct.  *Applewood* is all

49

1   about requiring specificity of a (garbled) to give it res

2   judicata effect.  Claims that existed at that time, were they

3   described clearly and unambiguously?  Yes?  *Shoaf* applies.

4   No?  *Applewood* does -- applies.

5       So how should the Court apply these principles here?  The

6   Court approved a procedure for certain claims in the

7   governance orders.  The procedure:  come to Bankruptcy Court

8   before pursuing a claim against the independent directors and

9   Seery or their agents so that the Court can make a

10  colorability determination.  Clear and unambiguous.  The

11  governance orders each provide that the Bankruptcy Court had

12  jurisdiction to enter the orders, and the orders were not

13  appealed.

14      Movants attempt to confuse the Court and argue *Applewood*

15  is on point because the January 9th and July 16th orders do

16  not clearly identify specific claims that Movants now have

17  that are being released.  And because they're not specific,

18  then basically it's an ambiguous release and *Applewood*

19  applies.

20      The problem with the Movants' argument is that neither the

21  January 9th or July 16th orders released claims that existed

22  at that time.  If they did, and if there wasn't an adequate

23  description, I might agree with Mr. Bridges that *Applewood*

24  applied.  But there were no claims.  It was prospective.  It

25  was a standard of care.  The Court clearly and unambiguously

50

1   said what the standard of care would be going forward.

2   Clearly, under *Shoaf* and Supreme Court precedent, they are

3   entitled to res judicata because it's a clear and unambiguous

4   provision.  *Applewood* just simply doesn't apply.

5       Mr. Phillips at the last hearing made an impassioned plea

6   to the Court for a narrow interpretation of the exculpation

7   provisions in the January 9th and July 16th orders, and he

8   argued that the Court could not possibly have intended for the

9   exculpation for negligence to apply on a go forward basis.  He

10  thus argued to the Court that the Court should construe the

11  exculpation narrowly and only apply it to potential claims of

12  harm caused to the Debtor, as opposed to harm caused to third

13  parties, which he said included thousands of innocent

14  investors.

15      Of course, Mr. Phillips made those arguments unburdened by

16  the actual facts and the prior proceedings which led to the

17  entry of these orders, because, as he was the first to admit,

18  he only became involved in the case a month ago.

19      As the Court recalls, and as reinforced by Mr. Seery's and

20  Mr. Dubel's testimony I just mentioned, the exculpation

21  provisions were included precisely to prevent Mr. Dondero,

22  through any one of the entities he's owned and controlled, the

23  Movants being two of those, from asserting baseless claims

24  against the beneficiaries of those orders, exactly the

25  situation Mr. Seery now finds himself in.

51

1     And, again, it bears emphasizing:  throughout this case,

2  not one of the purported public investors Mr. Phillips

3  lamented would be prevented from holding Mr. Seery responsible

4  for his conduct has ever appeared in this case to object about

5  anything.  And none of the directors of the funds, the funds

6  where the Debtor acts as an investment adviser, have ever

7  stepped foot in this court, either.

8     Even if the Court declines to apply res judicata, Your

9  Honor, to prevent challenges to the governance orders, the

10  Court has the jurisdiction, had the jurisdiction to include

11  the gatekeeping provisions in those orders.  The Bankruptcy

12  Court derives its jurisdiction from 28 U.S.C. Section 157, and

13  bankruptcy jurisdiction is divided into two parts:  core

14  matters, which are those arising in or arising under Title 11,

15  and noncore matters, those matters which are related to a

16  Chapter 11 case.

17     Bankruptcy Courts may enter final orders in core

18  proceedings, and with the consent of parties, noncore

19  proceedings.  If a party does not consent to a final judgment

20  in the noncore matters or waives its right to consent, then

21  the Bankruptcy Court -- or does not waive its right to

22  consent, then the Bankruptcy Court issues a report and

23  recommendation to the District Court.

24     The seminal Fifth Circuit case on bankruptcy court

25  jurisdiction is the 1987 case of *Wood v. Wood*, 825 F.2d 90.

52

1    There, the Fifth Circuit held that the Bankruptcy Court has

2    related to jurisdiction over matters if the outcome of that

3    proceeding could conceivably have any effect on the estate

4    being administered in the bankruptcy.

5        More recently, the Fifth Circuit, in the 2005 case, in

6    *Stonebridge Tech's*, elaborated on when a matter has a

7    conceivable effect on the estate such as to confer Bankruptcy

8    Court jurisdiction.  There, the Fifth Circuit held that an

9    action is related to bankruptcy if the outcome could alter the

10   debtor's rights, liabilities, options, or freedom of action,

11   either positively or negatively, and which in any way impacts

12   upon the handling and the administration of the bankruptcy

13   estate.  It is against this backdrop, Your Honor, that the

14   Court should evaluate its jurisdiction to have entered the

15   orders.

16       So, again, what did the orders do?  They established

17   governance over the Chapter 11 debtor with new independent

18   directors being approved.  They established the procedures and

19   protocols of how transactions were going to be presented to

20   and approved by the Committee.  They vested in the Committee

21   certain related-party claims, and they provided for the

22   procedures parties would have to follow to assert any claims

23   against the independent directors and the CRO and the agents

24   and advisors.

25       Your Honor, it's hard to imagine that there is a more core

53

1  order than the entry of these orders.  At the time the orders

2  were entered, the Court was well aware of the potential for

3  acrimony from Mr. Dondero and his related entities, and

4  included the gatekeeper provisions to prevent the Debtor's

5  estate from being embroiled in frivolous litigation against

6  the board and the CEO.

7       Such protections were clearly within the Court's

8  jurisdiction, both to protect the administration of the estate

9  but also under applicable Fifth Circuit law dealing with

10 vexatious litigants, as set forth in the *Baum* and *Carroll*

11 cases that the Court cited in its confirmation order.

12      Not that it was hard to predict, but the last several

13 months have reinforced how important the gatekeeping

14 provisions in the order are and how important similar

15 provisions in the plan are.

16      The Court heard extensive testimony at the confirmation

17 hearing regarding the havoc continued litigation by Mr.

18 Dondero and his related entities would cause, which

19 predictions have unfortunately been borne out by the

20 unprecedented blizzard of litigation involving Mr. Dondero and

21 his related entities that has consumed the Court over the last

22 several months and caused the estate to incur millions of

23 dollars in fees that could have been used to pay its

24 creditors.

25      And these attacks are continuing.  As I mentioned before,

54

1  in addition to the DAF lawsuit, Sbaiti & Co. filed an action

2  against the Debtor on behalf of PCMG, another related entity,

3  alleging postpetition mismanagement of the Select Fund.

4      And to complete the hat trick, they are the lawyers

5  seeking to sue Acis in the Southern District of New York for

6  allegedly post-confirmation matters.

7      The Court knew then and certainly knows now that the

8  potential for sizable indemnification claims could consume the

9  estate.  The Court used that as the potential basis for

10  determining that the orders were within its jurisdiction, just

11  as it used that potential to justify the exculpation

12  provisions in the plan as being consistent with *Pacific*

13  *Lumber*.

14      Movants also ignore the cases -- and we cited in our

15  opposition -- where courts in this district, including Judge

16  Lynn in *Pilgrim's Pride* in 2010 and Judge Houser in the *CHC*

17  *Group* in 2016, approved gatekeeper provisions that provided

18  the Bankruptcy Court with exclusive jurisdiction to adjudicate

19  claims against postpetition fiduciaries.

20      Movants also ignore cases outside this district, including

21  *General Motors* and *Madoff*, which we cited in our brief as

22  examples of cases where Bankruptcy Courts have been used as

23  gatekeepers to determine if claims are colorable or being

24  asserted against the correct entity.

25      And there's another reason, Your Honor, why Movants may

55

1   now not contest the Court's jurisdiction to have entered those

2   orders.  Each of those orders, as I said before, include a

3   finding that the Court had core jurisdiction to enter the

4   orders.  No party contested that finding or refused to consent

5   to the core jurisdiction.

6       Under well-established Supreme Court precedent, parties

7   can waive their right to challenge the Bankruptcy Court's

8   jurisdiction, core jurisdiction, by failing to object.  In

9   *Wellness v. Sharif* in 2015, the Supreme Court expressly held

10   that Article III was not violated if parties knowingly and

11   voluntarily consented to adjudication of *Stern v. Marshall*-

12   type alter ego claims, and that the consent need not be

13   express, so long as it was knowing and voluntary.

14       And *Wellness* confirmed the pre-*Stern* opinion of the Fifth

15   Circuit in the 1995 *McFarland* case, which held that a person

16   who fails to object to the Bankruptcy Court's assumption of

17   core jurisdiction is deemed to have consented to the entry of

18   a final order by the Bankruptcy Court.

19       Your Honor, I'd now like to turn to the *Barton* doctrine.

20   The Court also has jurisdiction to have entered the orders

21   based upon the *Barton* doctrine.  The *Barton* doctrine dates

22   back to an old United States Supreme Court case and provides

23   as a general rule that, before a suit may be brought against a

24   trustee, consent from the appointing court must be obtained.

25       Movants essentially make two arguments why the *Barton*

56

 1 | doctrine doesn't apply.

 2 |     First, Movants, without citing any authority, argue that

 3 | it does not apply to Mr. Seery because he is not a trustee or

 4 | receiver and was not appointed by the Court.  Although the

 5 | doctrine was originally applied to receivers, it has been

 6 | extended over time to cover various court-appointed

 7 | fiduciaries and their agents in bankruptcy cases, including

 8 | debtors in possession, officers and directors of the debtor,

 9 | and the general partner of the debtor.  And although Mr.

10 | Bridges says he couldn't find one case that applied the *Barton*

11 | doctrine to a court-retained professional, I will now talk

12 | about several such cases.

13 |     In *Helmer v. Pogue*, a 2012 case cited in our brief, the

14 | District Court for the Northern District of Alabama

15 | extensively analyzed the *Barton* doctrine jurisprudence from

16 | the Eleventh Circuit and beyond and concluded that it applied

17 | to debtors in possession.  The *Helmer* Court relied in part on

18 | a prior 2000 decision of the Eleventh Circuit in *Carter v.*

19 | *Rodgers*, which held that the doctrine applies to both court-

20 | appointed and court-approved officers of the debtor, which is

21 | consistent with the law in other circuits.

22 |     And subsequently, the Eleventh Circuit again considered --

23 | and in that case, the distinction of a court-appointed as a

24 | court-retained professional was -- was not persuasive to the

25 | Court, and the Court held that a court-retained professional

57

1 can still have *Barton* protection, notwithstanding that he

2 wasn't appointed, the argument that Mr. Bridges tries to make.

3 And subsequently, --

4 THE COURT: I wonder, was that -- was that Judge

5 Clifton Jessup, by chance? Or maybe Bennett?

6 MR. POMERANTZ: Your Honor, this was -- this was the

7 Eleventh Circuit *Carter v. Rodgers*, so I think Judge Jessup

8 was --

9 THE COURT: Oh, I thought you were still talking

10 about the Alabama case. No?

11 MR. POMERANTZ: Yeah, the Alabama -- well, the

12 Alabama case referred to the Eleventh Circuit case, *Carter v.*

13 *Rodgers*, --

14 THE COURT: Okay.

15 MR. POMERANTZ: -- and the appointment and -- or

16 retention issue was discussed in the *Carter v. Rodgers* case.

17 THE COURT: Okay.

18 MR. POMERANTZ: And subsequently, the Eleventh

19 Circuit again considered the contours of the *Barton* doctrine

20 in *CDC Corp.*, a 2015 case, 2015 U.S. App. LEXIS 9718. In that

21 case, which Your Honor referenced in your *Ondova* opinion,

22 which I will discuss in a few moments, the Eleventh Circuit

23 held that a debtor's general counsel who had been approved by

24 the Court, who was appointed by a chief restructuring officer

25 who was also approved by the Court, was covered by the *Barton*

58

1  doctrine for acts taken in furtherance of the administration

2  of the estate and the liquidation of the assets.

3      And the Eleventh Circuit last year, in *Tufts v. Hay*, 977

4  F.3d 204, reaffirmed that court-approved counsel who function

5  as the equivalent of court-appointed officers are entitled to

6  protection under *Barton*.  While the Court in that case

7  ultimately ruled that counsel could be sued without first

8  going to the Bankruptcy Court, it did so because it determined

9  that the suit between two sets of lawyers would not have any

10 effect on the administration of the estate.

11     So, Your Honor, not only is there authority, there is

12 overwhelming authority that Mr. Seery is entitled to the

13 protections.

14     In *Gordon v. Nick*, a District -- a case from 1998 from the

15 Fourth Circuit, the Court that the *Barton* doctrine applied to

16 a lawsuit against a general partner who was responsible for

17 administering the bankruptcy estate.

18     And as I mentioned, Your Honor, and as Your Honor

19 mentioned, Your Honor had reason to look at the *Barton*

20 doctrine in length and in depth in the 2017 *Ondova* opinion.

21 And in the course of the opinion, Your Honor discussed one of

22 the policy rationales for the doctrine, which you took from

23 the Seventh Circuit's *Linton* opinion, and you said as follows:

24 "Finally, another policy concern underlying the doctrine is a

25 concern for the overall integrity of the bankruptcy process

59

1   and the threat of trustees being distracted from or

2   intimidated from doing their jobs.  For example, losers in the

3   bankruptcy process might turn to other courts to try to become

4   winners there by alleging the trustee did a negligent job."

5       Here, the independent board was approved by the Court as

6   an alternative to the appointment of a Chapter 11 trustee.

7   And it and its agent, including Mr. Seery as the CEO, even

8   before the July 16th order, were provided protections in the

9   form of the gatekeeper order and exculpation.

10      I'm sure the Court has a good recollection of the January

11  9th hearing -- we've talked about it a lot in the proceedings

12  before Your Honor -- where the Debtor and the Committee

13  presented the governance resolution to Your Honor.  And as

14  Your Honor will recall, the appointment of the board was a

15  hotly-contested issue among the Debtor and the Committee and

16  was heavily negotiated.  And the appointment of the

17  independent board was even contested by the United States

18  Trustee at a hearing on January 20th, 2020.

19      I refer the Court to the transcripts of the hearings on

20  January 9th and January 20th of 2020, which clearly

21  demonstrate that appointing this board and giving it the

22  rights and protections and its agents the rights and

23  protections was not your typical corporate governance issue,

24  but it was essentially the Court's alternative to appointing a

25  trustee.  And recognizing that the members of the independent

60

1  board were essentially officers of the Court, the Court

2  approved the gatekeeper provision, requiring parties first to

3  come and seek the Court's permission before suing them, in

4  order to prevent them from being harassed by frivolous

5  litigation.

6      And the independent board was given the responsibility in

7  the January 9th order to retain a CEO it deemed appropriate,

8  and it did so by retaining Mr. Seery.

9      Recognizing the *Barton* doctrine as it applies to Mr. Seery

10 is consistent with a legion of cases throughout the United

11 States, and Movants' argument that Mr. Seery is not court-

12 appointed is just wrong.

13     Second, Your Honor, Movants cite without any authority,

14 argue that even if the *Barton* doctrine applied there is an

15 exception which would allow it to pursue a claim against Mr.

16 Seery without leave of the Court.

17     The Debtor agrees the 28 U.S.C. § 959 is an exception to

18 the *Barton* doctrine.  Section 959(a) provides that trustees,

19 receivers, or managers of any property, including debtors in

20 possession, may be sued without leave of the court appointing

21 them with respect to any of their acts or transactions in

22 carrying on business connected with such property.

23     As the Court also pointed out at the June 8th hearing, and

24 Mr. Bridges alluded to in his argument, the last sentence of

25 959(a) provides that such actions -- clearly referring to

1  actions that may be pursued without leave of the appointing

2  court -- shall be subject to the general equity power of such

3  court, so far as the same may be necessary to the ends of

4  justice.

5      And Mr. Bridges made a plea, saying you can't take away my

6  jury trial right there.  You just cannot do that.  Well, I

7  have two answers to that, Your Honor.  One, they relinquished

8  their jury trial right.  We've established that.  Okay?

9      The second is allowing Your Honor to act as a gatekeeper

10 has nothing to do with their jury trial right.  Allowing Your

11 Honor to act as a gatekeeper allows you to determine whether

12 the action could go forward, and it'll either go forward in

13 Your Honor's court or some other court.

14     And the argument that the exculpation was essentially a

15 violation of 959 is just -- is just -- it just is twisting

16 what happened.  You have an exculpation provision.  We already

17 went through the authority the Court had to give an

18 exculpation.  With respect to these litigants who are before

19 Your Honor -- we're not talking about anyone else who's coming

20 in to try to get relief from the order; we're talking about

21 these litigants -- we've already established that they were

22 here, they're bound by res judicata.  So their 959 argument

23 goes away.

24     And as the Court -- and separate and apart from that, the

25 issue at issue in the District Court litigation is -- is not

62

1 even subject to 959.

2 Mr. Bridges says, well, of course it is because it deals

3 with the administration of the estate. I'd like to refer to

4 what the Court said -- this Court said in its *Ondova* opinion:

5 The exception generally applies to situations in which the

6 trustee is operating a business and some stranger to the

7 bankruptcy process might be harmed, such as a negligence claim

8 in a slip-and-fall case, and is inapplicable to suits based

9 upon actions taken to further the administering or liquidating

10 the bankruptcy estate.

11 And your *Ondova* opinion is consistent with the Third and

12 Eleventh Circuit opinions Your Honor cited in your opinion, as

13 well as numerous other --

14 (Interruption.)

15 MR. POMERANTZ: -- from the -- from around the

16 country, including cases from the First, Second, Sixth,

17 Seventh, and Ninth Circuits. And I'm not going to give all

18 the cites to those cases, but it's not a -- it's not a

19 remarkable proposition that Your Honor relied on in *Ondova*.

20 In addition, several of these cases, including the

21 Eleventh Circuit's *Carter* opinion, have been cited with

22 approval by the Fifth Circuit in *National Business Association*

23 *v. Lightfoot*, a 2008 unpublished opinion for this very point.

24 The *Barton* exception of 959 does not apply to actions taken in

25 the administration of the case and the liquidation of assets

63

1  in the estate.

2      Suffice it to say that it's clear that the Section 959

3  exception to *Barton* has no applicability in this case.

4  Movants, hardly strangers to the bankruptcy case, want to sue

5  Mr. Seery for acts taken relating to a settlement of very

6  complex and significant claims against the estate.  They want

7  to sue a court-appointed fiduciary for doing his job,

8  resolving claims against the estate and his management of the

9  bankruptcy estate.  And they want to do this outside of the

10 Bankruptcy Court.

11     Settlement of the HarbourVest claim, which is where this

12 claim arises under -- whether it's a collateral attack now or

13 not, and we say it is, is for another issue -- but it clearly

14 arises in the context of settlement of the HarbourVest claim,

15 is the quintessential act to further the administration and

16 liquidation of the bankruptcy estate, and certainly doesn't

17 fall within the 959 exception.

18     Movants seem to be arguing that 959(a) makes a distinction

19 between claims against Mr. Seery that damaged the Debtor and

20 claims against Mr. Seery that damaged third parties.  However,

21 the Movants make up that distinction, and it's not in the

22 statute, it's not in the case law.  The focus is not on who

23 the conduct damages, but it's rather on whether the conduct

24 was taken in connection with the administration or the

25 liquidation of the estate.

64

1        And even if the Debtor is wrong, Your Honor, which it's

2   not, the savings clause allows the Court to determine whether

3   leave to be -- sue will be granted.  Given that these claims

4   are asserted by Dondero-related entities, if not controlled

5   entities, no serious argument exists that the equities do not

6   permit this Court to determine if leave to sue is appropriate.

7        Accordingly, Movants' argument that the orders create this

8   tension with 959 is simply an over-dramatization.  And in any

9   event, Your Honor, there's a basis independent of *Barton* that

10  supports the jurisdiction to enter the orders, as I mentioned.

11       But even if the orders only relied on *Barton*, there is an

12  easy fix to Movants' concerns:  let them come to court and

13  argue that the type of suit they are bringing allegedly falls

14  within the exception of 959.

15       Your Honor, Movants argue that the Bankruptcy Court may

16  not act as a gatekeeper if it would not have jurisdiction to

17  deal with the underlying action.  They essentially argue that

18  an Article I judge may not pass on the colorability of a

19  claim, that it should be decided by an Article III judge.

20  This is the same argument, Your Honor, that Your Honor

21  rejected in connection with plan confirmation and which I

22  touched on earlier.

23       And the reason why Your Honor rejected it is because

24  there's no law to support it.  In fact, there is Fifth Circuit

25  law that holds to the contrary.  And we talked about a little

65

1 bit the Fifth Circuit case decided is *Villegas v. Schmidt* in

2 2015. And *Villegas* is a simple case. Schmidt was appointed

3 trustee over a debtor and liquidated its estate and the

4 Bankruptcy Court approved his final fees. Four years later,

5 Villegas and the prior debtor sued Schmidt in District Court,

6 the district in which the Bankruptcy Court was pending,

7 arguing that he was negligent in the performance of his

8 duties. The District Court dismissed the case because

9 Villegas failed to obtain Bankruptcy Court approval to bring

10 the suit under the *Barton* doctrine.

11 On appeal, Villegas argued *Barton* didn't apply for two

12 reasons. First, that *Stern v. Marshall* created an exception

13 to the *Barton* doctrine for claims that the Bankruptcy Court

14 would not have the jurisdiction to adjudicate. And second,

15 that *Barton* did not apply if the suit is brought in the

16 District Court, which exercises supervisory authority over the

17 Bankruptcy Court that appointed the trustee. Pretty much the

18 argument that was made by Movants at the contempt hearing.

19 The Fifth Circuit rejected both arguments. It held that

20 the existence of a *Stern* claim does not impact the Bankruptcy

21 Court's authority because *Stern* did not overrule *Barton* and

22 the Supreme Court had cautioned circuit courts against

23 interpreting later cases as impliedly overruling prior cases.

24 More importantly, the Fifth Circuit pointed to a post-

25 *Stern* 2014 case, *Executive Benefits v. Arkison*, 573 U.S. 25

66

1 (2014), which held that *Stern* does not decide how a Bankruptcy

2 Court or District Courts should proceed when a *Stern* creditor

3 is identified, as support for the argument that *Barton* is

4 still good law, even dealing with a *Stern* claim.

5     Second, the Fifth Circuit, joining every circuit to have

6 addressed the issue, ruled that the District Court and the

7 Bankruptcy Court are distinct from one another and the

8 Bankruptcy Court has the exclusive authority to determine the

9 colorability of *Barton* claims and that the supervisory

10 District Court does not.

11     Movants didn't address *Villegas* in their reply. Briefly

12 tried to distinguish it, unconvincingly, today. The bottom

13 line is *Villegas* is directly applicable. Your Honor cited it

14 in the *Ondova* opinion for precisely the proposition that

15 *Barton* applies whether or not the Court has authority to

16 adjudicate the claim.

17     Accordingly, Your Honor, it was within the Court's

18 jurisdiction to require a party to seek approval of Your Honor

19 on the colorability of a claim before an action may be

20 commenced or pursued against the protected parties, even if

21 Your Honor wouldn't have authority to adjudicate the claim at

22 the end of the day.

23     In fact, some courts have even addressed the proper

24 procedure for doing so, requiring the putative plaintiff to

25 not only seek leave of Bankruptcy Court but also to provide a

67

1  draft complaint and a basis for the Court to determine if the

2  claim is colorable.

3      Movants have done neither, and they should not be

4  permitted to modify the final orders of the Court as a

5  workaround.

6      Your Honor, that concludes my presentation.  I'm happy to

7  answer any questions Your Honor may have.

8          THE COURT:  All right.  Not at this time.  All right.

9  I'm going to figure out, do we need a break or not, depending

10 on what Mr. Bridges tells me.  I assume we're just doing this

11 on argument today.  I think that's what I heard.  No witnesses

12 or exhibits.

13         MR. BRIDGES:  That is correct, Your Honor.

14         THE COURT:  Okay.  Mr. Bridges, how long do you

15 expect your rebuttal to take so I can figure out does the

16 Court need a break?

17         MR. BRIDGES:  Fifteen minutes plus whatever it takes

18 to submit agreed-to exhibits.

19         THE COURT:  Okay.  Let's take a five-minute bathroom

20 break.  We'll come back.  It's -- what time is it?  It's 1:11

21 Central time.  We'll come back in five minutes.

22         THE CLERK:  All rise.

23     (A recess ensued from 1:11 p.m. until 1:17 p.m.)

24         THE CLERK:  All rise.

25         THE COURT:  All right.  Please be seated.  We're

68

1  going back on the record in the Highland matters.

2      Mr. Bridges, time for your rebuttal.  I want to ask you a

3  question right off the bat.  Mr. Pomerantz pointed out

4  something that was on my list that I forgot to ask you when

5  you made your initial presentation.  What is the authority

6  you're relying on?  You did not cite a statute or a rule *per*

7  *se*, but I guess we can probably all agree that Bankruptcy Rule

8  9024 and Federal Rule 60 is the authority that would govern

9  your motion, correct?

10          MR. BRIDGES:  I don't agree, Your Honor.  I don't

11  believe this is a final order that we're contesting here.  And

12  I think that's demonstrated by the Court's final confirmation

13  -- plan -- plan confirmation order that seeks to modify this

14  order or will modify this order upon being -- being effective.

15  So I don't think so.

16      In the alternative, if we are challenging a final order,

17  then I think you're right as to the rules that would be

18  controlling.

19          THE COURT:  All right.  Well, let me back up.  Why

20  exactly do you say this would be an interlocutory order as

21  opposed to a final order?

22          MR. BRIDGES:  Because of its nature, Your Honor.

23  While the appointment in the order or the approval of the

24  appointment in the order might, as a separate component of the

25  order, have -- have finality, the provisions -- the provisions

69

1  in it relating to gatekeeping and exculpation are, we think,

2  by their very nature, quite obviously interlocutory and not

3  permanent.  They don't seem to indicate an intention by any of

4  the parties that, 30 years from now, if Mr. Seery is still CEO

5  at Highland, long after the bankruptcy case has ended, that

6  nonetheless parties would be prohibited from bringing claims,

7  strangers to this action would be prohibited from bringing

8  claims related to his CEO role.

9      I think the nature of it demonstrates that, the

10  modifications to it, and even the inclusion of it in the final

11  plan confirmation, as well as -- can't read that.

12          THE COURT:  Can you give me some authority?  Because

13  as we know, there's a lot of authority out there in the

14  bankruptcy universe on what discrete orders are interlocutory

15  in nature that a bankruptcy judge might routinely enter and

16  which ones are final.  You know, it would just probably, if I

17  flipped open *Collier's*, I could -- you know, it would be mind-

18  numbing.

19      So what authority can you rely on?  I mean, is there any

20  authority that says an employment order is not a final order?

21  That would be shocking to me if you have cases to that effect,

22  but, I mean, of course, sometimes we do interim on short

23  notice and then final.  But this would be shocking to me if

24  there is case authority to support the argument this is not a

25  final order.  But I learn something new every day, so maybe I

70

1  would be shocked and there is.

2          MR. BRIDGES:  Your Honor, I'd point you to *In re*

3  *Smyth*, 207 F.3d 758, and *In re Royal Manor*, 525 B.K. 338

4  [sic], for the proposition that retaining a bankruptcy

5  professional is an interlocutory order.

6          THE COURT:  Okay.  Stop for a moment.  The *Smyth*

7  case.  Which court is that?

8          MR. BRIDGES:  Fifth Circuit.

9          THE COURT:  Okay.  So tell me the facts.  I'm

10 surprised I don't know about this case.  But, again, I don't

11 know every case.  So, it held that an employment order is an

12 interlocutory order?

13         MR. BRIDGES:  Appointing counsel.  A professional in

14 the bankruptcy context, Your Honor.

15         THE COURT:  Counsel for a debtor-in-possession?  An

16 order approving counsel was an interlocutory order?

17         MR. BRIDGES:  Yes, or the Trustee's counsel.

18         THE COURT:  Or the Trustee's counsel?  Okay.  What

19 were the circumstances?  Was this on an expedited basis and

20 there wasn't a follow-up final order, or what?

21         MR. BRIDGES:  Your Honor, I don't have -- I don't

22 have that at the tip of my memory.  I'm sorry.

23         THE COURT:  Okay.  And the other one, 525 B.R. 338,

24 what court was that?

25         MR. BRIDGES:  It's a Bankruptcy Court within the

1  Sixth Circuit.  I'm not certain which district.

2          THE COURT:  All right.  Well, maybe one of you two

3  over there can look them up and give me the context, because

4  that is surprising authority.  Or other lawyers on the WebEx

5  maybe can do some quickie research.

6      Okay.  We'll come back to that.  But assuming that this

7  was a final order, which I have just been presuming it was,

8  Rule 60 is the authority you're going under?  9024 and Rule

9  60, correct?

10         MR. BRIDGES:  Your Honor, we have not invoked those

11 rules.  Alternatively, I think you're right that they would

12 control if we are wrong about the interlocutory nature of the

13 order.

14         THE COURT:  Well, you have to be going under certain

15 -- some kind of authority when you file a motion.  So I'm --

16         MR. BRIDGES:  As an alternative --

17         THE COURT:  I'm approaching this exactly, I assure

18 you, as the District Court or a Court of Appeals would.  You

19 know, you start out, what is the legal authority that is being

20 invoked here?

21         MR. BRIDGES:  Well, --

22         THE COURT:  So I just assume Rule 60.  I can't, you

23 know, come up with anything else that would be the authority.

24         MR. BRIDGES:  Yes, Your Honor.  You also have

25 inherent power to modify orders that are in violation of the

72

1  law.  And we pointed you to --

2          THE COURT:  Now, is that right?  Is that really

3  right?  Why do we have Rule 60 if I can just willy-nilly, oh,

4  I feel like I got that wrong two years ago?  I can't do that,

5  can I?  Rule 60 is the template for when a court can do that.

6  Parties are entitled to rely on orders of courts.  And that's

7  why we have Rule 60, right?  So, --

8          MR. BRIDGES:  Your Honor, I think -- I think that

9  we're miscommunicating.  I'm trying not to rely on Rule 60 in

10 the first instance because in the first instance we view this

11 as not a final order.  So, in the first instance, --

12         THE COURT:  I got that.  And I've got my law clerks

13 looking up your cases to see if they convince me.  But I'm

14 asking you to go to layer two.  Assuming I don't agree with

15 you these are final orders, what is your authority for the

16 relief you're seeking?

17         MR. BRIDGES:  Yes, Your Honor.  Rule 60 would apply

18 in the alternative.

19         THE COURT:  All right.

20         MR. BRIDGES:  That's correct.

21         THE COURT:  So, which provision?  Which provision of

22 Rule 60?  (b) what?

23         MR. BRIDGES:  Your Honor, I'm not prepared to concede

24 any of them.  I don't have the rule in front of me.

25         THE COURT:  You're not prepared to concede what?

73

1          MR. BRIDGES:  Any of the provisions of Rule 60.  Just

2    (b)(1), (b)(2), especially, but I'm -- I'm -- Rule 60 is our

3    basis, as is the particulars (b)(1), (2), (6) --

4          (Garbled audio.)

5          THE COURT:  Okay.  You're breaking up.  Can you

6    restate?

7          MR. BRIDGES:  (b)(1), (2), and (6), as -- as well as

8    any other provision, Your Honor, of Rule 60.

9          THE COURT:  Okay.  Well, so (1), mistake,

10   inadvertence, surprise, excusable neglect.  Which one of

11   those?

12         MR. BRIDGES:  All of the above, Your Honor.

13         THE COURT:  Surprise?  Who's surprised?

14         MR. BRIDGES:  Your Honor, I think every potential

15   litigant who discovers that your order purports to bar

16   prospective unaccrued claims at the time the order issued

17   would be surprised.

18      Frankly, I think Mr. Seery would be surprised, given his

19   testimony that he owes fiduciary duty -- duties that he must

20   abide by and that he appears to have, as I continue to

21   represent to clients, to advisees, and to the SEC, that those

22   duties are owing.

23         THE COURT:  Okay.  I'm giving you one more chance

24   here to make clear on the record what provision of Rule 60(b)

25   are you relying on, okay?  I need to know.  It's not in your

74

1  pleading.

2  　　　　　MR. BRIDGES: Your Honor, --

3  　　　　　THE COURT: So tell me specifically. I can only --

4  　　　　　MR. BRIDGES: -- (b)(1) --

5  　　　　　THE COURT: -- come up with a result here if I know

6  exactly what's being presented.

7  　　　　　MR. BRIDGES: Your Honor, (b)(1), (b)(2), and (b)(6)

8  --

9  　　　　　THE COURT: Which, okay, there are multiple parts to

10  (1). You're saying somebody's surprised by the ruling. I

11  don't know who. Really, all that matters is your client, the

12  Movants. You're saying, even though they participated, --

13  　　　　　MR. BRIDGES: Yes, Your Honor.

14  　　　　　THE COURT: -- got notice, they're somehow surprised?

15  Why are they surprised?

16  　　　　　MR. BRIDGES: Yes, Your Honor.

17  　　　　　THE COURT: Do you have evidence of their surprise?

18  　　　　　MR. BRIDGES: Your Honor, our brief shows the

19  intentions of all involved were not the interpretation of that

20  order being advanced at this -- at this point in time. And

21  so, yes, I believe that is evidence. The transcripts of the

22  hearings I believe evidence that as well, that the

23  understanding of everyone involved was not that future --

24  unspecified future claims that had not accrued yet would be

25  released under (b)(1). Yes, Your Honor.

75

1          THE COURT:  Okay.

2          MR. BRIDGES:  Under (b)(2), --

3          THE COURT:  I don't have any evidence of that.  All I

4    have is the clear wording of the order.  Okay.  Let me just --

5    just let me go through this.

6       Assuming Rule 60 (1) through (6) are what you're arguing

7    here, what about Rule 60(c):  a motion under Rule 60(b) must

8    be made within a reasonable time?  We're now 11 months --

9          MR. BRIDGES:  Your Honor, --

10          THE COURT:  We're now 11 months past the July 2020

11   order.  What is your authority for this being a reasonable

12   time?

13          MR. BRIDGES:  Yes, Your Honor.  If I may back up one

14   step before answering your question.  Under (b)(2), we're

15   relying on newly-discovered evidence that was discovered in

16   late March and caused both the filing of this motion and the

17   filing of the District Court action.

18       Under (b)(4), we believe that the order is --

19          THE COURT:  Let me stop.  Let me stop.  What is my

20   evidence that you're putting in the record that's newly

21   discovered?

22          MR. BRIDGES:  The evidence is detailed in the

23   complaint that is in the record.  You know, --

24          THE COURT:  That's not evidence.

25          MR. BRIDGES:  -- honestly, Your Honor, --

1          THE COURT:  That is not evidence.  Okay?  A lawyer-

2    drafted complaint in another court is not evidence.  Okay?

3          MR. BRIDGES:  Your Honor, I think, to be technical,

4    that there is not a record yet, that we have evidence yet to

5    be admitted on our exhibit list.  I believe in this

6    circumstance -- I understand that, in general, allegations in

7    a pleading are not evidence.  In this instance, when we're

8    talking about whether or not new facts led to the filing of a

9    lawsuit, I do believe that the allegations in the lawsuit are

10   evidence of those new facts.

11         THE COURT:  All right.  Go on.

12         MR. BRIDGES:  Under (b)(4), we believe the order is,

13   in part, void.  It is void because of the jurisdictional and

14   other defects noted in our argument.

15       And also, under (b)(6) (garbled) ground for relief that

16   we're appealing to the equitable powers of this Court to

17   correct errors and manifest injustice towards not just the

18   litigants here but to correct the order of the Court to make

19   it comply with -- with the law, with the statutes promulgated

20   by Congress and to respect the jurisdiction of the District

21   Court.

22         THE COURT:  All right.  Do you agree with Mr.

23   Pomerantz that the case law standard for Rule 60(b)(4) is

24   exceptional circumstances?  It's only applied so that a

25   judgment is voided in exceptional circumstances.  Do you

77

1  disagree with that case authority?

2       MR. BRIDGES:  I would -- I would agree, in part, that

3  unusual circumstances is not the ordinary case.  I'm not

4  entirely sure what you mean by exceptional, but I think we're

5  on the same page.

6       THE COURT:  Okay.  It's not what I mean.  That's just

7  the case law standard.  And I'm asking, do you agree with Mr.

8  Pomerantz that that is the standard set forth in case law when

9  applying 60(b)(4)?  There have to be some sort of exceptional

10  circumstances where there's just basically no chance the Court

11  had authority to do what it did.

12       MR. BRIDGES:  Out of the ordinary would be the phrase

13  I would use, Your Honor.

14       THE COURT:  Okay.  So I guess then I'll go from

15  there.  Is it your argument that gatekeeping provisions in the

16  bankruptcy world are out of the ordinary?

17       MR. BRIDGES:  The exculpation of Mr. Seery for

18  liability falling short of gross negligence or intentional

19  wrongdoing in connection with his continuing to conduct the

20  business of the Debtor as an investment advisor subject to the

21  Advisers Act, yes, I would say that is out of the ordinary,

22  that it is extraordinary, that it is --

23       THE COURT:  Okay.  What is your authority or evidence

24  on that?  Because this Court approves exculpation provisions

25  regularly in connection with employment orders, and pretty

78

1   much every judge I know does. In fact, I'm wondering why this

2   isn't just a term of compensation. You know, he's going to do

3   x, y, z in the case. His compensation is going to be a, b, c,

4   d, e. And by the way, we're going to set a standard of

5   liability for his performance as CEO or investment banker,

6   financial advisor, whatever, so that no one can sue him

7   regarding his performance of his job duties unless it rises to

8   the level of gross negligence, willful misconduct.

9       It's a term of employment that, from my vantage point,

10  seems to be employed all the time. So it would be anything

11  but exceptional circumstances. Do you have authority or

12  evidence --

13              MR. BRIDGES: Your Honor, frankly, --

14              THE COURT: -- to the contrary?

15              MR. BRIDGES: Your Honor, frankly, I'm astonished at

16  your view of that situation, that it would merely be a term of

17  his employment, that vitiates the entire fiduciary duty

18  standard created by the Advisers Act that tells him, with

19  hundreds of millions of dollars of assets under management for

20  people he's advising as a registered investment advisor,

21  people he's advising who believe that he has a fiduciary duty

22  to them and that it's enforceable, that the SEC, who monitors,

23  believes he has an enforceable fiduciary duty to those people,

24  and that he's testified that he has fiduciary duties to those

25  people, and that Your Honor is saying no, just as a regular

79

1   term of employment we have undone the Advisers Act's

2   imposition of an unwaivable fiduciary duty.

3       Your Honor, the order is void to the extent that it

4   attempts to do so.

5       This is not an ordinary employment agreement, Your Honor.

6   This is an attempt to exculpate someone from the key thing

7   that our entire investment system depends upon, regulation by

8   the SEC and the requirement in investment advisors to act as

9   fiduciaries when they manage the money of another.

10      It would be the equivalent of telling lawyers who are

11  appointed in a bankruptcy proceeding that they don't have any

12  duties to their client, or at least not fiduciary duties.

13  That the lawyers merely owe a duty not to be grossly negligent

14  to their clients.  That's not an ordinary term of employment,

15  Your Honor.

16          THE COURT:  All right.  So I guess we're back to my

17  question, was this brought within a reasonable time under Rule

18  60(c)?

19          MR. BRIDGES:  It was brought very quickly after the

20  new evidence was discovered at the end of March, Your Honor,

21  yes.

22          THE COURT:  Okay.  Well, I guess I'll just ask you

23  one more question before you continue on with your rebuttal

24  argument.  I mean, again, I want your best argument of why

25  *Villegas* doesn't absolutely permit the gatekeeping provisions

80

1 that you're challenging. And many cases were cited by Mr.

2 Pomerantz in his brief where courts have extended the *Barton*

3 doctrine to persons other than trustees. And so what is your

4 best rebuttal to that?

5        MR. BRIDGES: Your Honor, we've already given it.

6 I'm afraid --

7        THE COURT: Okay. If you don't want to say more, --

8        MR. BRIDGES: -- what I have is not --

9        THE COURT: -- I'm not going to make you say more.

10        MR. BRIDGES: I --

11        THE COURT: I'm just telling you what's on my brain.

12        MR. BRIDGES: I do. I want to -- I am apologizing in

13 advance for repeating, but yes, *Villegas*, *Villegas*, however

14 that case is pronounced, says that *Stern* is not an exception

15 to the *Barton* doctrine.

16        THE COURT: Uh-huh.

17        MR. BRIDGES: 959(a) is an exception to the *Barton*

18 doctrine. You are not operating under the *Barton* doctrine

19 here. Even counsel's brief, the Debtor's brief, doesn't say

20 *Barton* applies. It says it's consistent with *Barton*.

21     Your Honor, in our previous hearing, you directed me to

22 the second sentence of 959(a) because you believe it's what

23 empowers you to do the gatekeeping. It limits the gatekeeping

24 that you can do by protecting jury rights, the right to trial,

25 says you cannot discharge, undo, deprive a litigant of their

81

 1   right to a trial, a jury trial.

 2            THE COURT:  Well, you mentioned it again, jury trial

 3   rights.  Do you have any argument --

 4            MR. BRIDGES:  Yes, Your Honor.

 5            THE COURT:  -- of why that hasn't flown out the

 6   window?

 7            MR. BRIDGES:  Yes, Your Honor.  I am told that

 8   Section 14(f) that counsel for the Debtor referred to is not a

 9   waiver of jury rights at all.  It is an arbitration agreement.

10   Your Honor is probably familiar how arbitration agreements

11   work, is that they need not be elected.  They need not be

12   invoked by the parties.  When they are, they create a

13   situation where arbitration may be required.  But a waiver of

14   a jury right outside of arbitration is not part of this

15   arbitration clause, or of any.  The issue is not briefed or in

16   evidence before the Court.  We're relying on representations

17   of counsel as to what that provision contains.  That Mr. Seery

18   wasn't even a party to that agreement, the advisory agreement,

19   with the Charitable DAF.  The arbitration agreement is subject

20   to defenses that are not at issue here before the Court.  That

21   Movants' rights, their contractual rights to invoke the

22   arbitration clause, also appear to be terminated by the

23   orders' assertion of sole jurisdiction in this matter.

24        Your Honor, yes, our jury rights survive Section 14(f) in

25   the advisory agreement with the DAF for all of those potential

1  reasons.

2      On top of that, it doesn't go to all of our causes of

3  action.  It goes to the contract cause of action.  And to the

4  extent they can argue that the other claims are subject to

5  arbitration, that also is a defense and -- defensible and

6  complex issue requiring the application of the Federal

7  Arbitration Act, requiring consideration of the Federal

8  Arbitration Act, which this Court doesn't have jurisdiction to

9  do under 157(d).

10          THE COURT:  What?  Repeat that.

11          MR. BRIDGES:  Yes.  This Court does not have

12  jurisdiction to determine whether or not arbitration --

13  arbitration is enforceable due to the mandatory withdrawal of

14  the reference provisions of 157(d).

15          THE COURT:  That's just not consistent with Fifth

16  Circuit authority.  *National Gypsum*.  What are some of these

17  other arbitration cases?  I've written an article on it.  I

18  can't remember them.  That's just not right.  Bankruptcy

19  courts look at arbitration clauses all the time.  Motions to

20  compel arbitration.

21          MR. BRIDGES:  Your Honor, under 157(d), in the

22  circumstances of this case, if the Court is going to take into

23  consideration an arbitration clause under the Federal

24  Arbitration Act, when that clause is not in evidence and is

25  not before the Court, then Movants respectfully move to

83

1   withdraw the reference of your consideration of that issue and

2   of any proceeding and ask that you would issue only a report

3   and recommendation rather than an order on that issue.

4          THE COURT:  Okay.  I regret that we even got off on

5   this trail.  I'm sorry.  So just proceed with your rebuttal

6   argument as you had envisioned it, Mr. Bridges.

7          MR. BRIDGES:  Thank you, Your Honor.

8       Debtor's counsel says there's no private right of action

9   under the Advisers Act.  That is both inaccurate and

10  misleading.  The Advisory Act creates, imposes fiduciary

11  duties that state law provides the cause of action for.  It is

12  a state law breach of fiduciary duty claim regarding --

13  regarding fiduciary duties imposed as a matter of law by the

14  Investment Advisers Act that is Count One in the District

15  Court action.

16      Furthermore, that Act does create a private right of

17  action for rescission.  That would be rescission of the

18  advisory agreement with the Charitable DAF, not rescission of

19  the HarbourVest settlement.

20      Second, Your Honor, the notion that this Court has related

21  to jurisdiction is irrelevant and beside the point.  I would

22  like to note for the record that the District Court civil

23  cover sheet that omitted to state that this was a related

24  action has been corrected, has been amended, and that that has

25  taken place.

84

1    Counsel for the Debtor also appears to agree with us that

2  the order ought to be modified for having asserted exclusive

3  jurisdiction over colorable claims to the extent it's not

4  legally permissible to do.  And in trying to invoke the

5  discussions between us as to how the orders might be fixed,

6  what counsel does is tries to cabin the legally-permissible

7  caveat to just the second half of the paragraph at issue.  It

8  is both -- both portions, the gatekeeping and the subsequent

9  hearing of the claims, that should be limited to the extent it

10  would be impermissible legally for this Court to make those

11  decisions.

12    On top of that, Your Honor, merely stating "to the extent

13  legally permissible" would result in a considerable amount of

14  ambiguity in the order that would lead it, I fear, to be

15  unenforceable as a matter of law.

16    Next, Your Honor, when Debtor's counsel talks about the

17  authority in this case, it feels like we're ships passing in

18  the night.  He says that we're wrong in asserting that no case

19  we can find involves both the *Barton* doctrine and the

20  application of the business judgment rule where the Court is

21  asked to defer, and he mentions cases that apply the *Barton*

22  doctrine to an approval rather than an appointment.  The Court

23  is asked to --

24    (Garbled audio.)

25        THE COURT:  I lost you for a moment.  Could you

85

1   repeat the last 30 seconds?

2   MR. BRIDGES: Thank you, Your Honor. Yes. He points

3   -- opposing counsel points us to case law where the *Barton*

4   doctrine has been applied despite the Bankruptcy Court having

5   merely approved rather than appointed the trustee or the, I'm

6   sorry, the professional. But in doing so, he doesn't

7   reference any case that has done so in the context of business

8   judgment rule deference. It's like we're ships passing in the

9   night.

10  What we're saying isn't that a mere approval can never

11  rise to the level of the *Barton* doctrine. What we're saying

12  is that, in combination with the business judgment rule

13  deference, the two cannot go together. There's no authority

14  for saying that they do.

15  We -- I further feel like we're ships passing in the night

16  when he talks about *Shoaf*. Counsel says that in *Shoaf* there

17  was a confirmed final plan and it specifically identified the

18  released guaranty. And yeah, that distinguishes it from this

19  case, just as it distinguished -- just as the *Applewood Chair*

20  case distinguished it when there's not that specific

21  identification. And here, we don't even have a final plan

22  confirmation at the time these orders are being issued.

23  Without that express -- express notion of what the claims are

24  being discharged, *Shoaf* doesn't apply.

25  There, there was a guaranty to a party on a specific

86

1    indebtedness that was listed, identified with specificity, and

2    disappeared as a result of the judgment, as a result of the

3    judgment in the underlying case.  Here, we're talking about

4    any potential claim that might arise in the future.  As of the

5    July order's issuance, it didn't apply on its -- either it

6    didn't apply to future claims that had not yet accrued or else

7    in violation of *Applewood Chair*, it was releasing claims

8    without identifying them.

9         Who does Seery owe a fiduciary duty to?  Is it, as

10   Debtor's counsel says, only to the funds and not to the

11   investors, or does he also owe those duties to the investors

12   as well?  Your Honor, that is going to be a hotly-contested

13   issue in this litigation, and it involves -- it requires

14   consideration of the Advisers Act and the multitude of

15   accompanying regulations.  To just state that his fiduciary

16   duties are limited in a way that couldn't affect anyone that

17   is -- whose claims are precluded by the July order is both

18   wrong on the law and is invoking something that will be a

19   hotly-contested issue that falls under 157(d), where, again,

20   this Court doesn't have the jurisdiction to decide that, other

21   than in a report and recommendation.

22        The order is legally infirm because it's issued without

23   jurisdiction for doing that as well.

24        Finally, Your Honor, I think (garbled) wrong direction

25   with a statement that suggests that Mr. Seery is an agent of

87

1    the independent directors under the January order.  He is, in

2    fact, not an independent agent -- not an agent of any of the

3    independent directors, but, at most, of the company that is

4    controlled by the board, not -- not of individual directors

5    who could confer on him -- who could confer on him any

6    immunity that they have obtained from the January order just

7    by having appointed him.

8        The proposed order from the other side failed to address

9    either the ambiguity in the order or its attempt to exculpate

10   Mr. Seery from the liability, including liability for which

11   there is a jury trial right, and it is not a fix to the

12   problem for that reason.

13       In order to make the order enforceable and to fix its

14   infirmities, the Court would have to do significantly more.

15   It would have to both apply the caveat from the final

16   confirmation plan order, rope that caveat to the first part of

17   the relevant paragraph, as well as the second part, and it

18   would have to provide directive clarity to be enforceable

19   rather than too vague.

20       Your Honor, I think that's all I have.

21           THE COURT:  Okay.  Just FYI, my law clerk pulled the

22   *Smyth* case from 21 years ago from the Fifth Circuit.  And

23   while it more prominently deals with the issue of whether

24   trustees -- in this case, it was a Chapter 11 trustee -- could

25   be subjected to personal liability for damages to the

88

1  bankruptcy estate --

2       (Echoing.)

3           THE COURT:  Someone, put your phone on mute.  I don't

4  know who that is.

5      It dealt with, you know, the standard of liability, that

6  the trustee could not be sued for matters not to the level of

7  gross negligence.

8      But it does say, in the very last paragraph, to my shock

9  and amazement, that -- it's just one sentence in a 10-page

10 opinion -- orders appointing counsel -- and it was talking

11 about the trustee's lawyer he hired to handle appeals to the

12 Fifth Circuit -- orders appointing counsel under the

13 Bankruptcy Code are interlocutory and are not generally

14 considered final and appealable.  And it cites one case from

15 1993, the Middle District of Florida.  Live and learn.  There

16 is one sentence in that opinion that says that.  But I don't

17 know that it's hugely impactful here, but I did not know about

18 that opinion and I'm rather surprised.

19     All right.  You were going to walk me through evidence,

20 you said?

21          MR. BRIDGES:  Well, do I -- Your Honor, do you want

22 to do that first before I submit --

23          THE COURT:  Yes, please.

24          MR. BRIDGES:  -- my rebuttal argument?

25          THE COURT:  Please.

89

1          MR. BRIDGES:  Okay.

2          THE COURT:  Uh-huh.

3          MR. BRIDGES:  Your Honor, we would submit and offer

4   Exhibits 1 through 44, with the exception of those that have

5   been withdrawn, that are 2, 13 --

6          THE COURT:  Okay.  Slow down.  Slow down.  I need to

7   get to the docket entry number we're talking about.  Are we

8   talking -- are your -- the Debtor's exhibits are at 2412.  But

9   Nate, I misplaced my notes.  Where are Charitable DAF and

10  Holdco's?

11         THE CLERK:  I have 2411.

12         THE COURT:  2411?  Is that it?

13         MR. BRIDGES:  2420, Your Honor.

14         THE COURT:  2420?  Okay.  Give me a minute.  (Pause.)

15  2420?

16         MR. BRIDGES:  Yes, Your Honor.

17         THE COURT:  Okay, I'm there.  And it's which

18  exhibits?

19         MR. BRIDGES:  It's Exhibits 1 through 44, Your

20  Honor, with four exceptions.  We have agreed to withdraw

21  Exhibit 2, 13, 14, and 29.

22         THE COURT:  All right.

23         MR. BRIDGES:  Also, Your Honor, we'd like to submit

24  Debtor's Exhibit 1, which is under Exhibit 49 on our list,

25  would be anything offered by the other side.  But we'd like

90

1   to make sure that Debtor's Exhibit 1 gets in the record as

2   well.

3         THE COURT: Let me back up. When I pull up the

4   docket entry you just told me, I have Exhibits 44, 45, and 46

5   only. Am I misreading this?

6         MR. BRIDGES: I have a chart showing Exhibits 1

7   through 49 titled Docket 2420 filed 6/7/21.

8         THE COURT: Okay. The docket entry number you told

9   me, 2420, it only has three exhibits: 44, 45, and 46. So,

10   first off, I understand -- are you offering 45 and 46 or not?

11         MR. BRIDGES: No, Your Honor.

12         THE COURT: Okay. So you said you were offering 1

13   through 44 minus certain ones. 44 is here.

14         MR. BRIDGES: Yes.

15         THE COURT: But I've got to go back to a different

16   docket number.

17         THE CLERK: It's actually 2411.

18         THE COURT: It's at 2411. That has all the others?

19         THE CLERK: Yes.

20         THE COURT: Okay.

21     So, Mr. Pomerantz, do you have any objection to Exhibits

22   1 through 44, which he's excepted out 2, 13, 14, and 29, and

23   then he's added Debtor's Exhibit 1? Any objection?

24         MR. POMERANTZ: I don't believe so. I just would

25   confirm with John Morris, who has been focused on the

91

1  exhibits, just to confirm.

2          THE COURT:  Mr. Morris?

3          MR. MORRIS:  No objection, Your Honor.  It's fine.

4          THE COURT:  Okay.  They're admitted.

5      (Movants' Exhibits 1, 3 through 12, 15 through 28, and 30

6  through 44 are received into evidence.  Debtor's Exhibit 1 is

7  received into evidence.)

8          THE COURT:  So, any --

9          MR. BRIDGES:  Thank you, Your Honor.

10         THE COURT:  Anything you wanted to call to my

11 attention about these?

12         MR. BRIDGES:  Your Honor, the things that we

13 mentioned in the argument, for sure, but especially that the

14 word "trustee" is not used in the January hearing's

15 transcript, nor is it under discussion in that transcript

16 that it would be a trustee-like role being played by the

17 Strand directors, as well as the transcript of the July

18 hearing on the order at issue here, Your Honor, where you are

19 asked to defer both in that transcript and in the motion, the

20 motion that was at issue in that hearing, you are asked to

21 defer to the business judgment of the company.

22     And finally, Your Honor, I'd ask you to look at the

23 allegations in the District Court complaint.

24         THE COURT:  All right.

25     Mr. Pomerantz or Morris, let's see what exhibits you're

92

1    wanting the Court to consider.  Your exhibits, it looks like,

2    are at Docket Entry 2412.

3              MR. MORRIS:  As subsequently amended at 2423.

4              THE COURT:  Oh.  All right.  So which ones are you

5    offering?

6              MR. MORRIS:  We're offering all of the exhibits on

7    2423, which is 1 through 17.

8         (Echoing.)

9              THE COURT:  Whoops.  We got some distortion there.

10   Say again?

11             MR. MORRIS:  Yeah.  All of the exhibits that are on

12   2423, which are Exhibits 1 through 17.  But I want to make

13   sure that, as I did earlier, that that has the exhibits that

14   we're relying on.  Does that --

15        (Pause.)

16             THE COURT:  Okay.  Let me make sure I know what's

17   going on here.  You're double-checking your exhibits, Mr.

18   Morris?

19             MR. MORRIS:  Yes, Your Honor.

20             THE COURT:  Okay.

21        (Pause.)

22             MR. MORRIS:  Your Honor, we start with Docket No.

23   2419, --

24             THE COURT:  Okay.

25             MR. MORRIS:  -- which was the amended exhibit list.

93

1   And that actually had Exhibits 1 through 17.  And then that

2   was amended at Docket 2423.  So, the exhibits on both of

3   those lists.

4              THE COURT:  Well, they're one and the same, it looks

5   like, right?

6              MR. MORRIS:  Yes.

7              THE COURT:  Okay.  So you're offering those?

8              MR. MORRIS:  I think -- yeah.

9              THE COURT:  Any objection?

10             MR. BRIDGES:  No objection.

11             THE COURT:  All right.  They're admitted.

12       (Debtor's Exhibits 1 through 17 are received into

13   evidence.)

14             MR. POMERANTZ:  Your Honor, if I may take a few

15   moments to respond to Mr. Bridges' reply?

16             THE COURT:  All right.   Is he still within his hour

17   and a half?

18             THE CLERK:  At an hour and one minute.

19             THE COURT:  Okay.  All right.  You have a little

20   time left, so go ahead.

21             MR. POMERANTZ:  Thank you, Your Honor.

22       So look, I -- it sort of was really not fair to us.  Mr.

23   Bridges was really making things up on the fly.  He was

24   changing the theories of his case and responding to Your

25   Honor.  But I'm going to do my best to respond to the

94

1   arguments made, many of which I sort of anticipated.

2       I'll first start with the issue that Your Honor raised,

3   which was whether this is under Rule 60 or not.  Mr. Bridges

4   identified a couple of cases, said that the order was

5   interlocutory, said that somehow the orders have anything to

6   do with a plan confirmation order.  They do not.  Your Honor

7   didn't hear that argument at the plan confirmation.  The

8   January 9th and July 16th orders are old and cold.  There's

9   an exculpation provision in the plan.  There's a gatekeeper

10  in the plan.  The provisions do not overlap entirely.  The

11  gatekeeper applies prospectively.  The exculpation provision

12  includes additional parties.

13      So the arguments that basically the plan had anything to

14  do -- and the fact that the plan is not a final order -- has

15  anything to do with the January 9th and July 16th orders is

16  just wrong.  It's just wrong.

17      More fundamentally, Your Honor, as Your Honor pointed

18  out, the *Smyth* case is a professional employment order.  And

19  ironically, if you abide by the *Smyth* case, that order is

20  never appealable because it's interlocutory.

21      But more fundamentally, Your Honor, that's dealing with

22  327 professionals.  And again, there's not much analysis in

23  the *Smyth* case, but we're not dealing with a 327

24  professional.  We're dealing with orders that were approved

25  under 363.

1    So the premise of the argument that Rule 60(b) -- 60

2  doesn't apply and they have other arguments just doesn't make

3  any sense.

4    Okay.  So now that gets us to Rule 60.  And Your Honor,

5  Your Honor hit the nail on the head.  They haven't presented

6  any evidence.  Allegations in a complaint aren't evidence.

7  They can't stand up there and say surprise evidence.  They

8  had the opportunity -- and this hearing's been continued a

9  few weeks -- they had the opportunity to bring it up, and

10  it's -- they had the opportunity to claim that there was

11  surprise, but they just didn't.  Okay?

12    So to go on to the Rule 60 arguments.  Surprise.

13  Surprise and reasonable delay are really -- go hand in hand

14  with Mr. Bridges' argument.  He says, well, we didn't find

15  out that -- months after the order was entered that he

16  violated a duty to us, so we are surprised by that, and it's

17  a reasonable time.  Well, Your Honor, the order provided for

18  an exculpation.  CLO Holdco and DAF knew that it applied to

19  an exculpation.  They were bound.  They knew based upon that

20  order that they would not be able to bring claims for normal

21  negligence.  There is no surprise.

22    If you take Mr. Bridges' argument to its conclusion, he

23  could wait until the end of the statute of limitations after

24  an order and have come in four years from now and say, Your

25  Honor, we just found out facts so we should go back four

96

1    years before.  That, Your Honor, that's not how the surprise

2    works.  That's not how the reasonable time works.

3        Mr. Bridges did not contest that they're bound by res

4    judicata.  He did not contest that the exculpation itself was

5    clear and unambiguous.  Of course he argued Your Honor

6    couldn't enter an order saying there was exculpation, again,

7    with no authority.  And he seemed surprised, as I suspect he

8    should, since he's not a bankruptcy lawyer, that retention

9    orders, whether it's investment bankers, financial advisors,

10   include exculpations all the time.  So there's no grounds

11   under surprise.

12       There's no grounds -- the motions are late under 60(c).

13       And they're not void.  I went through a painstaking

14   analysis, Your Honor, and I described in detail what the

15   *Espinosa* case held, and the exceptional circumstances which

16   Mr. Bridges tried to get away from as much as he could.

17   Maybe he can try to get away from language in a district

18   Court opinion, in a Bankruptcy Court opinion, in a Circuit

19   Court opinion.  You can't get away from language in a Supreme

20   Court opinion.  The Supreme Court opinion said exceptional

21   circumstances, where there was arguably no basis for

22   jurisdiction for what the Court did.  They have not even come

23   close to convincing Your Honor that there was absolutely no

24   basis.

25       Now, they disagree.  We granted, we think it's a good-

97

1  faith disagreement, but they haven't come close to

2  establishing the *Espinosa* standard, so their motion under 60

3  does not -- it fails.

4      And I don't think -- look, these are good lawyers.  Mr.

5  Bridges and Mr. Sbaiti are good lawyers.  They didn't just

6  inadvertently not mention Rule 60.  They never mentioned it

7  because they knew they had no claim under Rule 60.

8      Your Honor, Mr. Bridges has made comments about the

9  fiduciary duty of Mr. Seery, about what the Investor's Act

10 provides.  He's just wrong on the law.  Now, Your Honor

11 doesn't have to decide that.  Whichever court adjudicates the

12 DAF lawsuit will have to decide it.  But there is no private

13 cause of action for damages.  There are no fiduciary duties to

14 the investors.

15     And what Mr. Bridges doesn't even mention, in that the

16 investment agreement that's so prominent in his complaint,

17 they waived claims other than willful misconduct and gross

18 negligence against Highland.  They waived those claims.  So

19 for Mr. Bridges to come in here and argue that there's some

20 surprise, when he hasn't even bothered to look at the document

21 that's underlying the contractual relationship between the DAF

22 and the Debtor, is -- you know, I'll just say it's

23 inadvertence.

24     Your Honor, Mr. Bridges tried to argue that Mr. Seery is

25 not a beneficiary of the January 9th order.  He's not an

98

1  agent.  Well, again, Your Honor, Mr. Bridges wasn't there.

2  Your Honor and we were.  On January 9th, an independent board

3  was picked, and at the time Mr. Dondero ceased to become the

4  CEO.  So you have three gentlemen coming in -- Mr. Seery, Mr.

5  Dubel, and Mr. Nelms -- coming in to run Highland, in a very

6  chaotic time.  They had to act through their agents.  There

7  was no expectation that this board was going to actually run

8  the day-to-day operations of the Debtor.  Of course not.  They

9  needed someone to run.  And they picked Mr. Seery.  And the

10  argument that well, he's an agent of the company, he's not an

11  agent of the board, that just doesn't make sense.  The

12  independent board had to act.  The directors had to act.  And

13  the directors, how do they deal with that?  They acted through

14  Mr. Seery.  So he is most certainly governed by the January

15  9th order.

16      Your Honor, I want to talk about the jury trial right.

17  Mr. Bridges said that Paragraph 14 is an arbitration clause

18  and not a jury trial waiver.  Now, again, I will forgive Mr.

19  Bridges because I assume he didn't read the provision, okay,

20  and he -- somebody told him that, and that person just got it

21  wrong.  But what I would like to do is read for Your Honor

22  Paragraph 14(f).  It doesn't have to do with arbitration.

23  It's a waiver of jury trial.  14(f), Jurisdiction Venue,

24  Waiver of Jury Trial.  The parties hereby agree that any

25  action, claim, litigation, or proceeding of any kind

99

1  whatsoever against any other party in any way arising from or

2  relating to this agreement and all contemplated transactions,

3  including claims sounding in contract, equity, tort, fraud,

4  statute defined as a dispute shall be submitted exclusively to

5  the U.S. District Court for the Northern District of Texas, or

6  if such court does not have subject matter jurisdiction, the

7  courts of the State of Texas, City of Dallas County, and any

8  appellate court thereof, defined as the enforcement court.

9  Each party ethically and unconditionally submits to the

10  exclusive personal and subject matter jurisdiction of the

11  enforcement court for any dispute and agrees to bring any

12  dispute only in the enforcement court.  Each party further

13  agrees it shall not commence any dispute in any forum,

14  including administrative, arbitration, or litigation, other

15  than the enforcement court.  Each party agrees that a final

16  judgment in any such action, litigation, or proceeding is

17  conclusive and may be enforced through other jurisdictions by

18  suit on the judgment or in any manner provided by law.

19      And then the kick, Your Honor, all caps, as jury trial

20  waiver always are:  Each party irrevocably and unconditionally

21  waives to the fullest extent permitted by law any right it may

22  have to a trial by jury in any legal action, proceeding, cause

23  of action, or counterclaim arising out of or relating to this

24  agreement, including any exhibits, schedules, and appendices

25  attached to this agreement or the transactions contemplated

100

1   hereby.  Each party certifies and acknowledges that no

2   representative of the owner of the other party has represented

3   expressly or otherwise that the other party won't seek to

4   enforce the foregoing waiver in the event of a legal action.

5   It has considered the implications of this waiver, it makes

6   this waiver knowingly and voluntarily, and it has been induced

7   to enter into this agreement by, among other things, the

8   mutual waivers and certifications in this section.

9       Your Honor, I will forgive Mr. Bridges.  I assume he just

10  did not read that.  But to represent to the Court that that

11  language does not contain a jury trial waiver is -- is just

12  wrong.

13          THE COURT:  All right.  I'm going to stop right

14  there.  And you were reading from the Second Amended and

15  Restated Shared Services Agreement between Highland --

16          MR. POMERANTZ:  Not shared services.  I'm reading

17  from the Second Amended and Restated Investment Advisory

18  Agreement --

19          THE COURT:  Investment --

20          MR. POMERANTZ:  -- between the Charitable DAF, the

21  Charitable DAF GP, and Highland Capital Management.  The

22  agreement whereby the Debtor was the investment advisor to the

23  Charitable DAF Fund and the Charitable DAF GP.

24          THE COURT:  All right.  Well, Mr. Bridges, I'm going

25  to bounce quickly back to you.  This is your chance to defend

101

1    your honor.

2          MR. BRIDGES:  Yeah, we're -- we're looking at a

3    different agreement, where -- where literally the words that

4    were read to you are not in the agreement in front of us and

5    it is news to me.  So, Your Honor, this is a problem --

6          THE COURT:  What is the agreement you're looking at?

7          MR. BRIDGES:  It is the Amended -- I assume that

8    means First Amended -- Restated Advisory Agreement.

9          MR. POMERANTZ:  Your Honor, we are happy to file this

10   agreement with the Court so the Court has the benefit of it in

11   connection with Your Honor's ruling.

12         THE COURT:  Okay.  I would like you to do that.  Uh-

13   huh.

14         MR. BRIDGES:  I'd like -- I'd like to request -- I'll

15   withdraw that.

16         THE COURT:  Okay.  Go on, Mr. Pomerantz.

17         MR. POMERANTZ:  Mr. Bridges, if you could put us on

18   mute.  If you could put us on mute, Mr. Bridges, so I don't

19   hear your feedback.  Thank you.

20      Mr. Bridges also complains about the language "to the

21   extent permissible by law."  As Your Honor knows and as has

22   been my practice over 30 years, that language is probably in

23   every plan where there's a retention of jurisdiction:  to the

24   extent permissible by law.  And Mr. Bridges says that this

25   will create ambiguity in the order that couldn't be enforced.

102

1  There's no basis for that.  Our including the language "to the

2  extent permissible by law" in the orders, as we are prepared

3  to do, is consistent with the plan confirmation order where we

4  addressed that issue.  And we addressed that issue because we

5  didn't want to put Your Honor in a position where thereby Your

6  Honor may have an action before Your Honor that passes the

7  colorability gate that Your Honor may not be able to assert

8  jurisdiction.  And since jurisdiction can't be waived in that

9  regard, we will agree to amend that.

10     There's nothing ambiguous about that, and there's no

11  reason, though, that clause has to modify the Court's ability

12  to act as a gatekeeper, because, as we've argued *ad nauseam*,

13  gatekeeper provisions where the Court has that ability is not

14  only part of general bankruptcy jurisprudence but also part of

15  the Bankruptcy Code.

16     Counsel says that *Barton* doesn't apply because the

17  business judgment of Your Honor was used in retaining Mr.

18  Seery as opposed to in some other capacity.  There's no basis

19  for that, Your Honor.  A court-appointed -- a court-approved

20  CEO, CRO, professional, they are all entitled to protection

21  under the *Barton* act.  And the argument -- and again, this is

22  separate and apart from whether he's entitled to protection

23  under the January 9th order. But the argument that because it

24  was the business judgment -- again, business judgment in doing

25  something that Your Honor expressly contemplated under the

103

 1  January 9th corporate governance order -- there's just no law

 2  to support that. And I guess he's trying to get around the

 3  plethora of cases that deal with the situation where *Barton*

 4  has been extended.

 5      Your Honor, Mr. Bridges, again, in arguing that we're

 6  ships passing in the night on *Shoaf* and *Applewood* and

 7  *Espinosa*, no, we're not ships passing in the night. We have a

 8  difference in agreement on what these cases stand for. These

 9  cases stand for the proposition that a clear and unambiguous

10  provision, plain and simple, if it's clear and unambiguous, it

11  will be given res judicata effect. The release in *Shoaf*,

12  clear and unambiguous. The release in *Applewood*, not. The

13  issue here is the exculpation language. That was clear and

14  unambiguous. It applied prospectively. The argument makes no

15  sense that we didn't identify -- we didn't identify claims

16  that might arise in the future, so therefore an exculpation

17  clause doesn't apply? That doesn't make any sense.

18      Your Honor clearly exculpated parties. Mr. Dondero knew

19  it. CLO Holdco knew it. The DAF knew it. So the issue Your

20  Honor has to decide is whether that exculpation was a clear

21  and unambiguous provision such that it should be entitled to

22  res judicata effect. And we submit that the answer is

23  unequivocally yes.

24      That's all I have, Your Honor.

25          THE COURT: All right. Well, --

104

```
1            MR. MORRIS:  Your Honor?  I apologize.

2            THE COURT:  Okay.

3            MR. MORRIS:  This is John Morris.

4            THE COURT:  Yes?

5            MR. MORRIS:  I just want to, with respect to the

6   exhibits, I know there was no objection, but I had cited to

7   Docket Nos. 2419 and 2423.  The original exhibit list is at

8   Docket No. 2412.  So it's the three of those lists together.

9   2412, as amended by 2419, as amended by 2423.  Thank you very

10  much.

11           THE COURT:  All right.  Thank you.  All right.

12           MR. BRIDGES:  Your Honor, I still have no objection

13  to that, but may I have the last word on my motion?

14           THE COURT:  Is there time left?

15           THE CLERK:  Yes.

16           THE COURT:  Okay.  Go ahead.

17           MR. BRIDGES:  I just need a minute, Your Honor.  They

18  agreed to change the order.  They proposed it to us.  They

19  proposed it in a proposed order to you.  They can't also say

20  that it cannot be changed.

21      Secondly, Your Honor, in *Milic v. McCarthy*, 469 F.Supp.3d

22  580, the Eastern District of Virginia points out that the

23  Fourth Circuit treats appointment of estate professionals as

24  interlocutory orders as well.

25      That's all.  Thank you, Your Honor.
```

105

1          THE COURT:  All right.  Here's what we're going to

2     do.  We've been going a very long time.  I'm going to take a

3     break to look through these exhibits, see if there's anything

4     in there that I haven't looked at before and that might affect

5     the decision here.  So we will come back at 3:00 o'clock

6     Central Time -- it's 2:22 right now -- and I will give you my

7     bench ruling on this.  All right.

8          So, Mike, they can all stay on the line, right?

9          Okay.  You can stay on, and we'll be back at 3:00 o'clock.

10          THE CLERK:  All rise.

11     (A recess ensued from 2:22 p.m. to 3:04 p.m.)

12          THE CLERK:  All rise.

13          THE COURT:  All right.  Please be seated.  All right.

14     Everyone presented and accounted for.  We're going back on the

15     record.

16          MR. POMERANTZ:  Your Honor, before you start, this is

17     Jeff Pomerantz.  We had sent to your clerk, and hopefully it

18     got to you, a copy of the Second Amended and Restated

19     Investment Advisory Agreement.  We also copied Mr. Sbaiti with

20     it as well.  And we would also like to move that into

21     evidence, just so that it's part of the Court's record.

22          THE COURT:  All right.

23          MR. BRIDGES:  We would object to that, Your Honor.

24     We haven't had an opportunity to even verify its authenticity

25     yet.

106

1          THE COURT:  All right.  Well, I'll tell you what.

2    I'm going to address this in my ruling.  So it's not going to

3    be part of the record for this decision, and yet -- well, I'll

4    get to it.

5       All right.  So we're back on the record in Case Number 19-

6    34054, Highland Capital.  The Court has deliberated, after

7    hearing a lot of argument and allowing in a lot of documentary

8    evidence, and the Court concludes that the motion of CLO

9    Holdco, Ltd. and The Charitable DAF to modify the retention

10   order of James Seery, which was entered almost a year ago, on

11   July 16th, 2020, should be denied.

12      This is the Court's oral bench ruling, but the Court

13   reserves discretion to supplement or amend in a more fulsome

14   written order what I'm going to announce right now, pursuant

15   to Rule 7052.

16      First, what is the Movants' authority to request the

17   modification of a bankruptcy court order that has been in

18   place for so many months, which was issued after reasonable

19   notice to the Movants, and after a hearing, which was not

20   objected to by the Movants, or appealed, when the Movants were

21   represented by sophisticated counsel, I might add, and which

22   order was relied upon by parties in this case, most notably

23   Mr. Seery and the Debtor, and in fact was entered after

24   significant negotiations involving a sophisticated court-

25   appointed Unsecured Creditors' Committee with sophisticated

107

1   professionals and sophisticated members, and after negotiation

2   with an independent board of directors, court-appointed, one

3   of whose members is a retired bankruptcy judge?  What is the

4   Movants' authority?

5        Movants fumbled a little on that question, in that the

6   exact authority wasn't set forth in the motion.  But Movants'

7   primary argument is that Movants think the Seery retention

8   order was an interlocutory order and that the Court simply has

9   the inherent authority to modify it as an interlocutory order.

10       The Court disagrees with this analysis.  I do not think

11  the Fifth Circuit's *Smyth* case dictates that the Seery

12  retention order is still interlocutory.  The Seery retention

13  order was an order entered pursuant to Section 363 of the

14  Bankruptcy Code, not a Section 327 professionals to a debtor-

15  in-possession, professionals to a trustee employment order

16  such as the one involved in the *Smyth* case.

17       But even if the Seery retention order is interlocutory --

18  the Court feels strongly that it's not, but even if it is --

19  the Court believes it would be an abuse of this Court's

20  inherent discretion or authority to modify that order almost a

21  year after the fact and under the circumstances of this case.

22       Now, assuming Rule 60(b) applies to the Movants' request,

23  the Court determines that the Movants have not made their

24  motion anywhere close to within a reasonable time, as Rule

25  60(c) requires, nor do I think the Movants have demonstrated

108

1   any exceptional circumstances to declare the order or any of

2   its provisions void.  The Movants have put on no evidence that

3   constitutes surprise or constitutes newly-disputed evidence.

4   So why are there no exceptional circumstances here such that

5   the Court might find, you know, a void order or void

6   provisions of an order?

7      First, this Court concludes that there's no credible

8   argument that the Court overreached its jurisdiction with the

9   gatekeeping provisions in the order.  Gatekeeping provisions

10   are not only very common in the bankruptcy world -- in

11   retention orders and in plan confirmation orders, for example

12   -- but they are wholly consistent with the *Barton* case, the

13   U.S. Supreme Court's *Barton's* case, and its progeny that has

14   become known collectively as the *Barton* doctrine.  Gatekeeping

15   provisions are wholly consistent with 28 U.S.C. Section

16   959(a)'s complete language.

17      The Fifth Circuit has blessed gatekeeping provisions in

18   all sorts of contexts.  It has blessed them in the situation

19   of when *Stern* claims are involved in the *Villegas* case.  It

20   even blessed Bankruptcy Courts' gatekeeping functions a long

21   time ago, in 1988, in a case that I don't think anyone

22   mentioned in the briefing, but as I've said, my brain

23   sometimes goes down trails, and I'm thinking of the *Louisiana*

24   *World Exposition* case in 1988, when the Fifth Circuit blessed

25   there a procedure where an unsecured creditors' committee can

109

1  bring causes of action against persons, such as officers and

2  directors or other third parties, if they first come to the

3  Bankruptcy Court and show a colorable claim.  They have to

4  come to the Bankruptcy Court, show they have a colorable claim

5  and they're the ones that should be able to pursue them.  Not

6  exactly on point, but it's just one of many cases that one

7  could cite that certainly approve gatekeeper functions of

8  various sorts of Bankruptcy Courts.

9      It doesn't matter which court might ultimately adjudicate

10  the claims; the Bankruptcy Court can be the gatekeeper.

11      And the Court agrees with the many cases cited from

12  outside this circuit, such as the case in Alabama, in the

13  Eleventh Circuit, and there was another circuit-level case, at

14  least one other, that have held that the *Barton* doctrine

15  should be extended to other types of case fiduciaries, such as

16  debtor-in-possession management, among others.

17      Finally, as I pointed out in my confirmation ruling in

18  this case, gatekeeping provisions are commonplace for all

19  types of courts, not just Bankruptcy Courts, when vexatious

20  litigants are involved.  I have commented before that we seem

21  to have vexatious litigation behavior with regard to Mr.

22  Dondero and his many controlled entities.

23      Now, as far as the Movants' argument that there was not

24  just improper gatekeeping provisions but actually an improper

25  discharge in the Seery retention order of negligence claims or

1  other claims that don't rise to the level of gross negligence

2  or willful misconduct, again, I reiterate there's nothing

3  exceptional in the bankruptcy world about exculpation

4  provisions like this.  They absolutely are a term of

5  employment very often.  Just like compensation, they're

6  frequently requested, negotiated, and approved.  They are

7  normal in the corporate governance world, generally.  They are

8  normal in corporate contracts between sophisticated parties.

9  And most importantly of all, even if this Court overreached

10 with the exculpation provisions in the Seery retention order,

11 even if it did, res judicata bars the attack of these

12 provisions at this late stage, under cases such as *Shoaf,*

13 *Republic Supply v. Shoaf* from the Fifth Circuit, the *Espinosa*

14 case from the U.S. Supreme Court, and even *Applewood*, since

15 the Court finds the language in this order was clear,

16 specific, and unambiguous with regard to the gatekeeping

17 provisions and the exculpation provisions.

18     Last, and this is the part where I said I'm going to get

19 to this agreement that has been submitted, the Second Amended

20 and Restated Investment Advisor Agreement or whatever the

21 title is.  I am more than a little disturbed that so much of

22 the theme of the Movants' pleadings and arguments, and I think

23 even representations to the District Court, have been they

24 have these sacred jury trial rights, these inviolate jury

25 trial rights, and an Article I Court like this Court should

111

1 have no business through a gatekeeping provision impinging on

2 the possible pursuit of an action where there's a jury trial

3 right.

4 　　I was surprised initially when I thought about this.  I

5 thought, wow, I've seen so many agreements over the months.  I

6 can't say every one of them waived the jury trial right, but I

7 just remembered seeing that a lot, and seeing arbitration

8 provisions, and so that's why I asked.  It just was lingering

9 in my brain.  So I'm going to look at what is submitted.  I'm

10 not relying on that as part of my ruling.  As you just heard,

11 I had a multi-part ruling, and whether there's a jury trial

12 right or not is irrelevant to how I'm choosing to rule on this

13 motion.  But I do want to see the agreement, and then I want

14 Movants within 10 days to respond with a post-hearing trial

15 brief either saying you agree that this is the controlling

16 document or you don't agree and explain the oversight, okay?

17 Because it feels like a gross omission here to have such a

18 strong theme in your argument -- we have a jury trial right,

19 we have a jury trial right, by God, the gatekeeping

20 provisions, among other things, impinge on our sacred pursuit

21 of our jury trial right -- and then maybe it was very

22 conspicuous in the controlling agreement that you'd waived

23 that, the Movants had waived that.

24 　　So, anyway, I'm requiring some post-hearing briefing, if

25 you will, on whether omissions, misrepresentations were made

112

1  to the Court.

2      Anyway, so I reserve the right to supplement or amend this

3  ruling with a more fulsome written order.  I am asking Mr.

4  Pomerantz to upload a form of order that is consistent with

5  this ruling, and --

6           MR. POMERANTZ:  Your Honor, we will do so.  I do have

7  one thing to bring to the Court's attention, unrelated to the

8  motion, before Your Honor leaves the bench.

9           THE COURT:  All right.  So just a couple of follow-up

10 things.  Have you -- I'm not clear I heard what you said about

11 this agreement.  Did you email it to my courtroom deputy or

12 did you file it on the docket?

13          MR. POMERANTZ:  We emailed it to your courtroom

14 deputy.  We're happy to file it on the docket.  And we also

15 provided a copy to Mr. Sbaiti.

16     I would note for the Court that it's signed both by The

17 Charitable DAFs by Grant Scott, just for what it's worth.

18          THE COURT:  Okay.  All right.  Well, I'm trying to

19 think what I want -- I do want you to file it on the docket,

20 and I'm trying to think of what you label it.  Just call it

21 Post-Hearing Submission or something and link it to the motion

22 that we adjudicated here today.  And then, again, you've got

23 10 days, Mr. Bridges, to say whatever you want to say about

24 that agreement.

25     I guess the last thing I wanted to say is we sure devoted

113

1   a lot of time to this motion today.  We have -- this is a

2   recurring pattern, I guess you can say.  We have a lot of

3   things that we devote a lot of time to in this case that I get

4   surprised, but it is what it is.  You file a motion.  I'm

5   going to give it all the attention Movants and Respondents

6   think it warrants.  I'm going to develop a full record,

7   because, you know, there's a recurring pattern of appeals

8   right now, 11 or 12 appeals, I think, not to mention motions

9   to withdraw the reference.  If we're going to have higher

10  courts involved in the administration of this case, I'm going

11  to make a very thorough record so nobody is confused about

12  what we did, what I considered, what my reasoning was.

13      So I kind of think it's unfortunate for us to have to

14  spend case resources and so much time and fees on things like

15  this, but I'm going to make sure a Court of Appeals is not

16  ever confused about what happened and what we did.  So that's

17  just the way it's going to be.  And I feel like we have no

18  choice, given, again, the pattern of appeals.

19      All right.  So, with that, Mr. Pomerantz, you had one

20  other case matter, you said?

21          MR. POMERANTZ:  Yes.  But before I get to that, Your

22  Honor, I assume that, in response to the Movants' submission

23  on the agreement, that we would have right at four or seven

24  days to respond if we deem it's appropriate?

25          THE COURT:  I think that's reasonable.  That's

114

1   reasonable.

2           MR. POMERANTZ:  Okay.  Thank you, Your Honor.

3           THE COURT:  So let me think of how I want to do this.

4   I'll just do a short scheduling order of sorts that just, it

5   says in one or two paragraphs, at the hearing on this motion,

6   the Court raised questions about the jury trial rights and the

7   Debtor has now submitted the controlling agreements, I'm

8   giving the Movants 10 days to respond to whether this is

9   indeed a controlling agreement, and why, if it is, the Movants

10  have heretofore taken the position they have jury trial

11  rights.  And then I will give you seven days thereafter to

12  reply, and then the Court will set a further status conference

13  if it determines it's necessary.  Okay?

14      So, Nate, we'll do a short little order to that effect.

15  Okay?

16          MR. POMERANTZ:  Thank you, Your Honor.

17      I -- again, before I raise the other issue, I want to pick

18  up on a comment Your Honor just made towards the end.  I know

19  the Court has been frustrated with the time and effort we've

20  been spending.  The Debtor and the creditors have been

21  extremely frustrated, because in addition to the time and

22  effort everyone's spending, we're spending millions of

23  dollars, millions of dollars on litigation that --

24          THE COURT:  It's one of the reasons you needed an

25  exit loan, right?

115

1        MR. POMERANTZ:  Right.  No, exactly.  That's

2   frivolous, that we think is made in bad faith.

3        And Your Honor, and everyone else who's hearing this on

4   behalf of Mr. Dondero, should understand we're looking into

5   what appropriate authority Your Honor would have to shift some

6   of the costs.  Your Honor did that in the contempt motion.

7   Your Honor can surely do that in connection with the notes

8   litigation.  But all this other stuff that is requiring us to

9   spend hundreds and hundreds of hours and spend millions of

10  dollars, we are clearly looking into whether it would be

11  appropriate and what authority there is.  I just wanted to let

12  Your Honor know that.

13       And in connection with that, the last point, Your Honor, I

14  can't actually even believe I'm saying this, but there was

15  another lawsuit filed -- we just found out in the break -- on

16  Wednesday night by the Sbaiti firm on behalf of Dugaboy in the

17  District Court.

18       Now, to make matters worse, Your Honor, the litigation

19  relates to alleged improper management by the Debtor of Multi-

20  Strat.  If Your Honor will recall, at many times I've told

21  this Court what Dugaboy's claims they filed in this case.

22  Dugaboy has a claim that is filed in this case for

23  mismanagement postpetition of Multi-Strat.  Now the Sbaiti

24  firm, in addition to representing CLO Holdco, in addition to

25  representing the DAF, and whatever the Plaintiffs' lawyers are

116

1    in that other District Court, PCMG, and in connection with the

2    Acis matter, they've decided they haven't had enough.  They've

3    now filed another motion that -- you know, why they filed it

4    in District Court and there's a proof of claim on the same

5    issues, I don't know.  But I thought Your Honor should know.

6    I'm not asking Your Honor to do anything about it.  But we

7    will act aggressively, strongly, and promptly.

8         Thank you, Your Honor.

9              THE COURT:  All right.  Well, you've reminded me of

10   what came out earlier today about the entity -- I left my

11   notepad in my chambers -- PMC or PMG or something.

12        Mr. Bridges, we're not going to have a hearing right now

13   on me doing anything, but what are you thinking?  What are you

14   doing?

15             MR. BRIDGES:  Your Honor, I'm not trying to duck your

16   question.  I literally have no involvement with any other

17   claim, and we would have to ask Mr. Sbaiti to answer your

18   questions.

19             THE COURT:  All right.  Is he there?

20             MR. BRIDGES:  He is.

21             THE COURT:  I'll listen.

22             MR. BRIDGES:  I'll switch seats and give him this

23   chair.

24             MR. SBAITI:  Sorry, Your Honor.  We had two computers

25   going and weren't able to use the sound on one, so we ended up

1  turning that off.

2      Your Honor, I'm not sure what the question is about when

3  you say what are we thinking.  We have a client that's asked

4  us to file something, and when we're advised by bankruptcy

5  counsel that it's not prohibited for us to do so, and don't

6  know why we're precluded from doing so, and when the time

7  comes I'm sure we'll be able to explain to Your Honor --

8  someone will be able to explain to Your Honor why what we're

9  doing, despite Mr. Pomerantz's exacerbation, or excuse me,

10  exasperation, why that wasn't improper.  It's our belief that

11  it wasn't improper or a violation of the Court's rule.

12          THE COURT:  Just give me a quick shorthand *Readers'*

13  *Digest* of why you don't think it's improper.

14          MR. SBAITI:  Sure.  My understanding is, Your Honor,

15  there's not a rule that says we can't file it against the

16  Debtor for postpetition actions.  So that, that's as -- that's

17  as much as I understand.  And I'm going to -- I'm not trying

18  to duck it, either.  And if I'm wrong about that and someone

19  wants to correct me on our side offline and if we have to

20  explain to the Court why that's so or what rule has been

21  violated, I'm sure we'll be able to put together something for

22  that.  But that's what I've been advised.

23          THE COURT:  Have you done thorough --

24          MR. POMERANTZ:  Your Honor, I think what --

25          MR. SBAITI:  (garbled), Your Honor.

118

1          THE COURT:  Have you done thorough research yourself?

2   Your Rule 11 signature is on the line, not some bankruptcy

3   counsel you talked to.  Have you done the research yourself?

4          MR. SBAITI:  Well, Your Honor, I've relied on the

5   research and advice of people who are experts, and I believe

6   my Rule 11 obligations also allow me to do that, so yes.

7          MR. POMERANTZ:  Your Honor, I think we're entitled to

8   know if it's Mr. Draper's firm who has been representing

9   Dugaboy.  He's the bankruptcy counsel.  I don't think it's an

10  attorney-client privilege issue.  If Mr. Sbaiti is going to be

11  here and sort of say, hey, bankruptcy counsel said it was

12  okay, I think we would like to know and I'm sure Your Honor

13  would like to know who is that bankruptcy counsel.

14         THE COURT:  Yes.  Fair enough.  Mr. Sbaiti?

15         MR. SBAITI:  Your Honor, in consultation with Mr.

16  Draper and with consultation with other counsel that we've

17  spoken to, that has been our understanding.

18         THE COURT:  Who's the other counsel?

19         MR. SBAITI:  Well, we've talked to Mr. Rukavina about

20  some of these things for the PCMG and the Acis case.  We've

21  talked to the people who, when they tell us you can't do this

22  because they're bankruptcy counsel for our client, then we

23  don't do something.  So, and I'm not trying to throw anybody

24  under the bus, but my understanding of what goes on in

25  Bankruptcy Court is incredibly limited, so, you know, and if

119

1  it's a mistake then I'll own it, if I have a mistaken

2  understanding, but I also wasn't anticipating having to make a

3  presentation about this right here right now, so --

4          THE COURT:  Well, you're filing lawsuits that involve

5  this bankruptcy case during the hearing, so --

6          MR. SBAITI:  Oh, we didn't file it during the

7  hearing, Your Honor.  It was filed last night, I believe.

8          THE COURT:  Okay.  Well, I assume that you're going

9  to go back and hit the books, hit the computer, and be

10 prepared to defend your actions, because your bankruptcy

11 experts, they may think they know a lot, but the judge is not

12 very happy about what she's hearing.

13         MR. POMERANTZ:  Your Honor, if I may ask when Your

14 Honor intends to issue the contempt ruling in connection with

15 the June 8th hearing?  I strongly believe -- and, obviously,

16 this has nothing to do with the contempt hearing; this

17 happened after -- but I strongly believe that sending a

18 message that Your Honor is inclined to hold counsel in

19 contempt, which obviously is one of the violators we said

20 should be held in contempt, it may be important to do that

21 sooner rather than later so that people know that Your Honor

22 is serious.

23         THE COURT:  All right.  Well, I understand and

24 respect that request.  And let me tell you all, I had a seven-

25 day -- okay.  You all were here on that motion June 8th.  I

120

1  had a seven-day, all-day, every-day, 9:00 to 5:00, 45-minute

2  lunch break, in-person hearing with a dozen or so live

3  witnesses that I just finished Tuesday at 5:00 o'clock. So

4  you all were here on the 8th, and then -- what day was that --

5  what was -- Tuesday, I finished. Tuesday was the 22nd. So I

6  started on the 14th, okay? So you all were here on the 8th

7  and I had a live jury trial -- I mean, not jury trial, a live

8  bench trial -- live human beings in the courtroom, beginning

9  June 14th. So you're here the 8th. June 14th through 22nd, I

10  did my trial. And here we are on the 25th. And guess what, I

11  have another live human-being bench trial next week, Monday

12  through Friday.

13      So we've been working in other things like this in between

14  those two. So I'm telling you that not to whine, I'm just

15  telling you that, that's the only reason I didn't get out a

16  quick ruling on this, okay?

17          MR. POMERANTZ: And Your Honor, I was not at all

18  making that comment to imply anything about the Court.

19          THE COURT: Well, --

20          MR. POMERANTZ: The time and effort that you have

21  given to this case is extraordinary, --

22          THE COURT: Okay.

23          MR. POMERANTZ: -- so please don't misunderstand my

24  comment.

25          THE COURT: Okay. And I didn't mean to express

121

1  annoyance or anything like that.  I guess what I'm trying to

2  do is I don't want anyone to mistake the delay in ruling on

3  the contempt motion to mean I'm just not that -- you know, I'm

4  not prioritizing it, other things are more serious to me or

5  important to me, or I'm going to take two months to get to it.

6  It's literally been I've been in trial almost all day long

7  every day since you were here.  But trust me, I'm about as

8  upset as upset can be about what I heard on June 8th, and I'm

9  going to get to that ruling, and I know what I'm going to do.

10  And, well, like I said, it's just a matter of figuring out

11  dollars and whom, okay?  There's going to be contempt.  I just

12  haven't put it on paper because I've been in court all day and

13  I haven't come up with a dollar figure.  Okay?

14      So I hope -- I don't know if that matters very much, but

15  it should.

16      All right.  We stand adjourned.

17      (Proceedings concluded at 3:35 p.m.)

18                          --oOo--

19

20                        CERTIFICATE

21      I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22  above-entitled matter.

23   **/s/ Kathy Rehling**                    **06/29/2021**

24  _____    _____

    Kathy Rehling, CETD-444                    Date
25  Certified Electronic Court Transcriber

122

INDEX
*Excerpt*
*11:33 a.m. to 3:35 p.m.*

PROCEEDINGS                                                        3

OPENING STATEMENTS

- By Mr. Bridges                                                   3
- By Mr. Pomerantz                                               23

WITNESSES

-none-

EXHIBITS

Movants' Exhibits 1, 3 through 12, 15 through        Received 91
28, and 30 through 44

Debtor's Exhibit 1                                   Received 91
Debtor's Exhibits 1 through 17                       Received 93

RULINGS                                                         106

END OF PROCEEDINGS                                              121

INDEX                                                           122

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

|   |   |
|---|---|
| In Re: | ) **Case No. 19-34054-sgj-11** |
|   | ) Chapter 11 |
|   | ) |
| HIGHLAND CAPITAL | ) Dallas, Texas |
| MANAGEMENT, L.P., | ) Friday, June 25, 2021 |
|   | ) 9:30 a.m. Docket |
| Debtor. | ) |
|   | ) EXCERPT: |
|   | ) - MOTION TO ENTER INTO EXIT |
|   | ) FINANCING AGREEMENT [2229] |
|   | ) - MOTION TO AUTHORIZE PAYMENT |
|   | ) OF RESTRUCTURING FEE [2395] |
|   | ) |

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
UNITED STATES BANKRUPTCY JUDGE.

WEBEX APPEARANCES:

For the Debtor:               Jeffrey Nathan Pomerantz
                              PACHULSKI STANG ZIEHL & JONES, LLP
                              10100 Santa Monica Blvd.,
                                13th Floor
                              Los Angeles, CA  90067-4003
                              (310) 277-6910

For the Debtor:               John A. Morris
                              PACHULSKI STANG ZIEHL & JONES, LLP
                              780 Third Avenue, 34th Floor
                              New York, NY  10017-2024
                              (212) 561-7700

For Get Good Trust and        Douglas S. Draper
Dugaboy Investment Trust:     HELLER, DRAPER & HORN, LLC
                              650 Poydras Street, Suite 2500
                              New Orleans, LA  70130
                              (504) 299-3300

For the Official Committee    Matthew A. Clemente
of Unsecured Creditors:       SIDLEY AUSTIN, LLP
                              One South Dearborn Street
                              Chicago, IL  60603
                              (312) 853-7539

2

1   APPEARANCES, cont'd.

2   For CLO Holdco, Ltd. and      Jonathan E. Bridges
    The Charitable DAF Fund,       Mazin Ahmad Sbaiti
3   LP:                            SBAITI & COMPANY, PLLC
                                   JP Morgan Chase Tower
4                                  2200 Ross Avenue, Suite 4900 W
                                   Dallas, TX  75201
5                                  (214) 432-2899

6   Recorded by:                   Michael F. Edmond, Sr.  VP
                                   UNITED STATES BANKRUPTCY COURT
7                                  1100 Commerce Street, 12th Floor
                                   Dallas, TX  75242
8                                  (214) 753-2062

9   Transcribed by:                Kathy Rehling
                                   311 Paradise Cove
10                                 Shady Shores, TX  76208
                                   (972) 786-3063
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25          Proceedings recorded by electronic sound recording;
               transcript produced by transcription service.

3

1          DALLAS, TEXAS - JUNE 25, 2021 - 9:36 A.M.

2          THE CLERK:  All rise.  United States Bankruptcy Court

3   for the Northern District of Texas, Dallas Division, is now in

4   session, The Honorable Stacey Jernigan presiding.

5          THE COURT:  Good morning.  Please be seated.  All

6   right.  We have three motions set this morning in Highland

7   Capital, Case No. 19-34054.  I'll get lawyer appearances at

8   this time.  Who do we have appearing for the Debtor team?

9          MR. POMERANTZ:  Good morning, Your Honor.  Jeff

10  Pomerantz and John Morris appearing for the Debtor.  Also in

11  the virtual courtroom are Mr. Jim Seery, the Debtor's CEO,

12  member of the board, and Chief Restructuring Officer, and also

13  John Dubel, member of the board and chairman of the Debtor's

14  Compensation Committee.

15         THE COURT:  All right.  Good morning.

16     We have an objection to the exit financing from the

17  Dugaboy Trust.  Mr. Draper, are you appearing for Dugaboy this

18  morning?

19         MR. DRAPER:  Yes, Your Honor.  Can you hear me?

20         THE COURT:  I can.  Uh-huh.  Well, I could, but now I

21  can't.  I lost you.

22         MR. DRAPER:  Your Honor, I'm here for the Dugaboy

23  Trust, but, quite frankly, the issues in connection with the

24  exit financing have been dramatically reduced, and I've been

25  in discussion with Mr. Pomerantz and Mr. Morris, so I think

4

1 | that hearing is going to be much shorter and much easier.

2 | MR. POMERANTZ: Your Honor, we have been in

3 | discussions with Mr. Draper. We still intend to put on our

4 | full case. So after Your Honor gets appearances, I will give

5 | Your Honor at least my view of how the day is going to go in

6 | connection with the three motions.

7 | THE COURT: All right. Well, Mr. Draper, you, of

8 | course, are aware of the order I entered a week or so ago

9 | regarding a client representative being in the virtual

10 | courtroom whenever your client takes a position. So I presume

11 | you have a client representative here today?

12 | MR. DRAPER: Yes. Nancy Dondero is in the virtual

13 | courtroom.

14 | THE COURT: All right. Ms. Dondero?

15 | MS. DONDERO: I'm present. I'm present, Your Honor.

16 | Good morning.

17 | THE COURT: Okay. Well, I've got your audio but not

18 | your video. Can you turn on your video, please, just so we

19 | can confirm? (Pause.) All right.

20 | MS. DONDERO: I'm right here, Your Honor.

21 | THE COURT: Okay. Good morning. Thank you.

22 | MS. DONDERO: Good morning.

23 | THE COURT: All right. Well, as noted, we have three

24 | matters set. Let me see if we have CLO Holdco and The

25 | Charitable DAF Fund making an appearance today.

5

1          MR. BRIDGES:  Yes, Your Honor.  Jonathan Bridges

2    here, with my colleague Mazin Sbaiti, on behalf of those

3    clients.

4          THE COURT:  All right.  I think those were our only

5    objectors.  Correct?  So, I'll ask if we have the Unsecured

6    Creditors' Committee counsel in the virtual courtroom.

7          MR. CLEMENTE:  Yes, good morning, Your Honor.  Good

8    morning, Your Honor.  Matthew Clemente from Sidley on behalf

9    of the Committee.

10          THE COURT:  All right.  Thank you.

11          MR. CLEMENTE:  Thank you.

12          THE COURT:  Anyone else who's wishing to appear?

13    Again, I think we just had the one objection on the exit

14    financing and then the one motion with regard to the July 2020

15    order that is contested.

16       All right.  Well, Mr. Pomerantz, how did you want to

17    proceed this morning?

18          MR. POMERANTZ:  Your Honor, as I mentioned, there are

19    three matters.  The first matter, the motion to approve a

20    restructuring fee to Mr. Seery has not been opposed.  We have

21    -- we do intend to proffer the testimony of John Dubel, who is

22    the chairman of the Compensation Committee.  I anticipate that

23    that presentation and proffer will take approximately 15

24    minutes, as Mr. Dubel is also on the WebEx and is available to

25    answer any questions Your Honor may have in connection with

6

1  the motion, but no parties have objected.

2      Second is the financing motion.  And while Mr. Draper has

3  indicated, we've been in discussions about certain issues, we

4  intend to put on our full case to address the issues raised in

5  the motion.  We intend to put on the testimony of Mr. Seery,

6  which will be done by my partner, John Morris.  I anticipate

7  that hearing taking an hour or less.

8      And then thirdly, Your Honor, is the motion to modify Your

9  Honor's July 16th order.  I've had discussions with Movants'

10 counsel and we have agreed to allocate an hour and a half for

11 each side.  Our understanding is that (garbled) will be the

12 only people appearing on behalf of the Movants.  And we would

13 again allocate an hour and a half each side.

14     I believe that, with those three motions, we can get

15 through all of them today, and that's how we would intend to

16 proceed if it makes sense to the Court.

17          THE COURT:  All right.  Anyone want to weigh in with

18 any comment about the sequence?

19          MR. BRIDGES:  Yes, Your Honor.  Jonathan Bridges on

20 behalf of CLO Holdco and The Charitable DAF.  Would just like

21 to know, we don't have an objection to the order, but would

22 like to know if it's acceptable for us to dial back in in a

23 couple of hours since that seems to fit the estimation of how

24 long the initial proceedings will take.

25          THE COURT:  Well, I'm happy to excuse you for a

7

1  while, but by my count it's maybe going to be an hour and a

2  half, right, Mr. Pomerantz?

3      MR. POMERANTZ:  I suspect that's correct, Your Honor.

4      THE COURT:  Okay.  So I would suggest you come back

5  at 11:15-ish.

6      (Echoing.)

7      MR. BRIDGES:  Thank you, Your Honor.

8      THE COURT:  All right.  Mr. Pomerantz, go ahead.

9      MR. POMERANTZ:  I'm ready to proceed, Your Honor.

10  Can you hear me?  I'm working at a different computer today

11  because my laptop wasn't working.  I just want to make sure

12  you can hear me well.

13     THE COURT:  Well, it could be better.  You're more

14  faint than usual.  So I don't know if you can adjust the

15  volume.

16     MR. POMERANTZ:  Is this any better?

17     THE COURT:  A little.  Not a lot.

18     MR. POMERANTZ:  How about this?  Is that any better?

19     THE COURT:  We'll see if we can make do.  Mike, are

20  you hearing him okay?  Okay, the court reporter is hearing you

21  okay, so we'll try to make this work.

22     MR. POMERANTZ:  Okay.  If at any time Your Honor is

23  having trouble hearing me, I will call my IT person in.

24  Again, for some reason, my laptop wasn't connecting in my

25  office, and I'm on my desktop, which I do not usually appear

8

1  before Your Honor with.  So if you have any problems hearing

2  me, please let me know.

3          THE COURT:  Okay.

4          MR. POMERANTZ:  With that, Your Honor, I'll proceed

5  with the motion for order authorizing payment of restructuring

6  fee to James Seery, the Debtor's chief executive officer and

7  chief restructuring officer.

8      Pursuant to the motion, Your Honor, the Debtor requests

9  approval of a restructuring fee to Mr. Seery, which was

10 contemplated by the letter agreement dated June 23rd, 2020,

11 between the Debtor and Mr. Seery.

12     As the Court will recall, Your Honor entered an order on

13 July 16th approving the Debtor's retention of Mr. Seery as the

14 CEO and the CRO.  At the time that we filed the motion, at the

15 time of the hearing, the Committee had not agreed on the

16 payment of a restructuring fee for Mr. Seery, so the board and

17 the Debtor agreed to defer that until a later time.

18     This motion presently before Your Honor was filed on June

19 1, 2021, and now it seeks payment of the fee.  And the motion

20 describes in detail the factual and legal support for the

21 restructuring fee, the establishment of the Compensation

22 Committee headed by Mr. Dubel, and the diligence undertaken by

23 the Compensation Committee to determine if the restructuring

24 fee was appropriate.

25     With the motion, the Debtor seeks authority to pay Mr.

9

 1   Seery a fee in the amount of $2.25 million, which was

 2   identified as the case resolution fee in the agreement.  As

 3   you'll hear from the proffer of Mr. Dubel's testimony, the

 4   Compensation Committee determined that confirmation of a plan

 5   and resolution of all material nondebtor claims, including the

 6   claims of Redeemer, Acis, HarbourVest, UBS, (garbled)

 7   occurred, and that the combination of the confirmed plan and

 8   the resolution of those claims entitle Mr. Seery to the fee.

 9       You'll hear that the Compensation Committee conducted

10   additional diligence to determine that the $2.25 million fee

11   was justified based on the market for restructuring fees and

12   the nature and the complexity of work performed by Mr. Seery.

13       Pursuant to the motion, Mr. Seery has earned one million

14   of the fee by virtue of the confirmation of the plan, would

15   earn additional $500,000 of the fee upon the effective date,

16   and an additional $750,000 upon completion of distribution of

17   the plan.

18       Mr. Seery has agreed to defer the first two payments of

19   this fee based upon the Debtor's liquidity position, as I will

20   summarize in a couple of moments and explain to the Court what

21   the deal is and how each of the payments will be made and the

22   time they'll be made.

23       We've received no objections to the motion, and I would

24   now like to proffer the testimony of John Dubel, who is

25   chairman of the Compensation Committee, to provide evidentiary

Dubel - Proffer                    10

1  support for the motion.  And as I indicated, Your Honor, Mr.

2  Dubel is on the WebEx if Your Honor has any questions.

3          THE COURT:  All right.  You may --

4          MR. POMERANTZ:  May I proceed?

5          THE COURT:  You may proceed with the proffer.

6          MR. POMERANTZ:  Thank you.

7            JOHN DUBEL, PROFFER OF DIRECT TESTIMONY

8          MR. POMERANTZ:  Mr. Dubel, if called to testify in

9  connection with the motion, would testify that on June -- on

10  January 9, 2020, the Court approved his employment as one of

11  the independent directors of Strand Advisors, the Debtor's

12  general partner.

13      He would testify that the other members of the board were

14  former bankruptcy judge Russell Nelms and James Seery.

15      He would testify that the employment of the board was part

16  of a broader corporate governance agreement between the

17  Debtor, the Committee, and Mr. Dondero, pursuant to which --

18  things Mr. Dondero ceded control of the Debtor in order to

19  avoid the appointment of a Chapter 11 trustee.

20      He would testify that the corporate governance agreement

21  anticipated the potential need for a full-time chief executive

22  officer, and in the spring of 2020 the independent board

23  created a Compensation Committee consisting of John Dubel and

24  Mr. Nelms.

25      He would testify that this Compensation Committee

**Appx. 05307**

Dubel - Proffer                    11

1  considered Mr. Seery for the CEO position and subsequently

2  negotiated the terms of the engagement that were ultimately

3  approved by the Court's July 16, 2020 order, nunc pro tunc to

4  March 15, 2020.  And that order, Your Honor, is found at

5  Docket No. 854.

6      He would testify that Mr. Seery's employment agreement,

7  which was negotiated with the Compensation Committee, provided

8  for two possibilities for the potential payment of a

9  restructuring fee.

10     The first, which was called a case resolution fee, would

11 be paid on -- under two conditions.  One, the confirmation of

12 a plan, and second, the resolution of material claims.  It

13 would be payable $1 million at confirmation, $500,000 on the

14 effective date, and $750,000 upon completion of the

15 distributions.

16     The second fee, which was just a confirmation fee, just a

17 plan was confirmed but there wasn't any global plan and there

18 weren't material claims resolved, would be $500,000 upon

19 confirmation, $250,000 on the effective date, and then there

20 would be a potential discretionary bonus.

21     At the time, Mr. Dubel would testify, there were

22 negotiations with the Creditors' Committee with respect to the

23 payment of the restructuring fee, and that at that time the

24 Committee was not willing to support the payment of a

25 restructuring fee, so the Debtor, Mr. Seery, and the

Dubel - Proffer                    12

1  Compensation Committee agreed to defer consideration of the

2  restructuring fee to a later time.

3      Mr. Dubel would testify that starting even before his

4  March 15, 2020 appointment as the CEO, and continuing

5  thereafter, Mr. Seery spent substantial time to address and

6  resolve all the material claims against the estate.  The Court

7  is familiar with the facts and circumstances of each

8  settlement, including the mediation and the motion practice

9  that preceded the settlement, and Mr. Dubel would testify as

10  to each of those claims resolutions as follows:

11      The Redeemer Committee was resolved.  That settlement was

12  on appeal, but the appeal was subsequently withdrawn.  The

13  order approving the Redeemer Committee settlement is found at

14  Docket No. 1272.

15      Next was the Acis and Terry claims.  The Court conducted

16  an evidentiary hearing and ultimately approved the settlement.

17  That settlement is also on appeal.  The settlement order is

18  found at Docket No. 1347.

19      Then the court approved the HarbourVest settlement, after

20  an evidentiary hearing.  That settlement is on appeal, and

21  that's found -- the order is found at Docket No. 1788.

22      The UBS settlement was next.  That is found at Docket No.

23  2389.  That was also subject to an evidentiary hearing, and is

24  on appeal.

25      And lastly, the Debtor has reached an agreement with Mr.

Dubel - Proffer                    13

1  Daugherty.  It's taking a little more time to document that

2  settlement, but we expect to submit a 9019 motion in the near

3  future approving that settlement.

4      Mr. Dubel would testify that Mr. Seery led the

5  negotiations in each of those matters and he testified at

6  length before the Court in support of the Debtor's motion to

7  approve each of the settlements.

8      Mr. Dubel would testify that, at the same time, under Mr.

9  Seery's leadership, the Debtor proposed a plan of

10 reorganization, and that the Debtor's fifth amended plan was

11 filed on November 24th, 2020, subsequently amended twice, and

12 then on February 2nd and 3rd Your Honor conducted confirmation

13 hearings and ultimately approved the plan and entered an order

14 confirming the plan.

15     Mr. Dubel would then testify that the Compensation

16 Committee started the process of reviewing the restructuring

17 fee for Mr. Seery in late February, shortly after confirmation

18 of the plan.  And he would testify that the Compensation

19 Committee had over a half a dozen informal telephonic meetings

20 in March, April, and May, with and without Mr. Seery, as

21 reflected in the minutes that were filed as Exhibits 1 through

22 3.  Three of the meetings that I referred to, Mr. Dubel would

23 testify were formal meetings subject to minutes and limited to

24 the record, but will be in the record.

25     Mr. Dubel would testify that as part of the Compensation

Dubel - Proffer                              14

1  Committee's deliberation, Mr. Nelms and he had reviewed the

2  terms of the engagement approved by the Court on July 20th and

3  also discussed with Mr. Seery his perspectives on the possible

4  payment of a restructuring fee and sought additional

5  information from them.

6      Mr. Dubel -- Nelms would testify -- Dubel would testify

7  that he and Mr. Nelms concluded that Mr. Seery had met the

8  benchmarks for the case resolution fee in that there was a

9  confirmed plan and that all material nonaffiliated claims had

10 been resolved.

11     Mr. Dubel would further testify that while the

12 Compensation Committee concluded that these benchmarks were

13 met, they still conducted additional diligence to determine

14 that the $2.25 million restructuring fee was reasonable under

15 the circumstances.  And as part of that process, Mr. Dubel

16 would testify that they reviewed the market study for

17 compensation prepared by Mercer, the estate's compensation

18 consultant in the spring of 2020 in connection with the

19 original employment motion.

20     Mr. Dubel would testify that, to make sure that the

21 Compensation Committee took into account any changes that may

22 have occurred in market since March 2020, that the

23 Compensation Committee asked Mercer to update its analysis and

24 bring it forward, based upon events in the case and recent

25 comps and, actually, the length of the case, which has been

Dubel - Proffer                              15

1  longer than originally anticipated.

2      Mr. Dubel would testify that he and Mr. Nelms reviewed the

3  updated Mercer report and noted that, based upon the time

4  frame and the complexity of the case, that the restructuring

5  fee was well within the market for these types of services.

6      And finally, Mr. Dubel would testify that they analyzed

7  the restructuring fee in relation to what other professionals

8  would have charged if work was performed on an hourly basis,

9  both in this case and in the market globally.  He would

10 testify that the Compensation Committee's analysis showed that

11 the restructuring fee was fair and reasonable when compared to

12 what Mr. Seery would have received if paid on an hourly basis.

13 And he would testify that, while supportive of the

14 restructuring fee, the hourly rate does not take into

15 consideration the fact that the restructuring fee was designed

16 to incentivize CEO performance, and in his experience, when

17 there is a downside risk for non-performance, there is also an

18 upside risk for performance.

19     And as stated earlier, he would testify Mr. Seery's

20 performance was exemplary and deserving of the restructuring

21 fee.

22     While satisfied that Mr. Seery had earned the case

23 resolution fee and the fee was appropriate in the context of

24 the market and otherwise fair and reasonable, the Compensation

25 Committee asked Mr. Seery whether the payment of the case

Dubel - Proffer                    16

1   resolution fee consistent with the terms of the agreement on
2   the dates provided in the agreement fit within the Debtor's
3   liquidity.
4       He would testify that, in response, given his liquidity
5   concerns, Mr. Seery proposed to the Compensation Committee and
6   the Compensation Committee agreed to adjust the payment of the
7   restructuring fee to defer payment, given the Debtor's
8   liquidity condition, such that it would be paid as follows:
9   The $1 million payment which was earned on confirmation
10  February 22nd of 2021 and otherwise would have been payable
11  will be deferred and will not be payable until September 30th,
12  2021.  Second, the $500,000 fee that would be payable if and
13  when the Court -- the plan goes effective will not be payable
14  until the later of the effective date or September 30th, 2021.
15  And the remaining $750,000 will be paid on the earlier of the
16  distribution of not less than 75 percent of the estimated cash
17  available for Class 8 claims, as set forth in the amended
18  liquidation analysis and financial projections that were filed
19  at Document -- Docket No. 1875-1 or the substantial completion
20  of the monetization of assets.
21      He would testify that after reaching agreement with Mr.
22  Seery on the terms of payment of the case resolution fee, that
23  the Compensation Committee and the Debtor and counsel
24  discussed the proposal with the Creditors' Committee and were
25  informed that the Creditors' Committee would not oppose the

Dubel - Proffer                                    17

1  Debtor's motion.

2      And after reviewing and analyzing the services performed,

3  the market data provided by Mercer's updated report, the

4  Compensation Committee determined that the restructuring fee

5  was appropriate and authorized the filing of this motion.

6      Your Honor, that concludes my proffer.  As I mentioned,

7  Mr. Dubel is on the WebEx and is happy to answer any questions

8  Your Honor may have.

9          THE COURT:  Mr. Dubel, can you hear me and will you

10  turn on your video and audio?

11          MR. DUBEL:  Yes, Your Honor.  I can hear you.  My

12  video is -- has been on, but I think I have to speak to get it

13  to come to the forefront of your screen.

14          THE COURT:  All right.  I've got you now.  Please

15  raise your right hand.

16      (Whereupon, the witness is sworn.)

17          THE COURT:  All right.  Thank you.  Well, is there

18  anything you want to add to what Mr. Pomerantz just proffered?

19          MR. DUBEL:  No, Your Honor.

20          THE COURT:  Okay.  All right.  Well, we had no

21  objections to this motion.  I'll just ask specifically, Mr.

22  Clemente, to weigh in.  Is there anything you want to say?

23  You confirm obviously the representations that were made with

24  regard to the Committee's role in this?

25          MR. CLEMENTE:  For the record, Your Honor, yes, Matt

18

1  Clemente from Sidley on behalf of the Committee.  I confirm

2  that, Your Honor, and the Committee has no objection to the

3  relief requested by the Debtor.

4        THE COURT:  All right.  Anything else on this motion?

5        MR. POMERANTZ:  No, Your Honor.  I would seek entry

6  into evidence of Exhibits 1 through 3, which are found in

7  Documents 2472, 2472, and believe that we have established,

8  through the argument, the motion, and the evidence in support

9  of the motion, that the Debtor, acting within its business

10 judgment, through Section 363 of the Bankruptcy Code, has made

11 a compelling case for the payment of the fee to Mr. Seery, and

12 we would ask Your Honor approve the motion.

13       THE COURT:  All right.  I will admit into evidence

14 Exhibits 1 through 3 that are found at Docket Entry 2472.

15     (Whereupon, Debtor's Exhibits 1 through 3 are entered into

16 evidence.)

17     Based on this unrefuted evidence, the Court is going to

18 approve payment of the case resolution fee in the amount of

19 $2,250,000 as having been earned by Mr. Seery here.

20     Not only does it appear to be contemplated by the defined

21 term "Case Resolution Fee" as set forth in his retention order

22 because we have a confirmed plan, we have resolution of a

23 material amount of the outstanding claims against the estate,

24 but it appears to be in all ways justified based on the

25 marketplace and the facts and circumstances of this case.

19

1    The Court is of the belief that, because we had a

2  Compensation Committee and a consultant, that certainly gave

3  some wisdom to the Debtor and board here.

4    And so under 363(b)(1) as well as Section 503(c)(3), to

5  the extent it applies, this is within the sound business

6  judgment of the Debtor and justified by the facts and

7  circumstances of the case, to use the words of 503(c)(3).  So

8  I do approve it as slightly modified, as I understand.  I

9  guess you'd call it a modification, where there's a staggering

10  of the timing.  One million is deferred until September 30,

11  2021; $500,000 is deferred to the later of the effective date

12  or 9/30/2021; and then $750,000 paid at such time as 75

13  percent of the distributions have been made to the general

14  unsecured claims or substantial completion of monetization of

15  the assets.

16    All right.  So I will be looking for an order on that.

17  Shall we move to the next motion, Mr. Pomerantz?

18        MR. POMERANTZ:  Yes.  Yes, we can, Your Honor.  Thank

19  you, Your Honor.

20        THE COURT:  Okay.

21        MR. POMERANTZ:  So the next motion, Your Honor, is

22  the Debtor's motion to approve exit financing.  And by this

23  motion, Your Honor, the Debtor seeks entry -- Court authority

24  for the Debtor to enter into a secured exit financing facility

25  contemporaneously with the occurrence of the effective date

20

1  with Blue Torch Capital.

2      As detailed in the motion, Your Honor, the Debtor's

3  decision to enter the term sheet was the result of a

4  competitive, robust process involving several lenders who had

5  expressed an interest in providing the financing.  The terms

6  set forth in the term sheet represent the best terms available

7  to the Debtor to obtain the financing which not only provides

8  the Debtor and the Claimant Trust with needed liquidity, but

9  also results in the comprehensive restructuring of debt at the

10 Trussway entities, which, in addition to litigation claims, is

11 perhaps the most valuable asset of the estate.

12     Importantly, Your Honor, the Debtor is not asking this

13 Court to approve the terms of the financing between nondebtor

14 Trussway entities and Blue Torch.  Those entities are solvent

15 entities, they're nondebtors, and they do not require this

16 Court's approval to enter into the financing.

17     Even though the Trussway entities do not need court

18 approval, thereby rendering the majority of Dugaboy's

19 objections irrelevant, we believe it's important for the Court

20 to understand the relationship between the entities and

21 certain issues that are raised in the objection to the motion.

22     To facilitate that understanding, Your Honor, I would like

23 to put up a demonstrative, which is a construction chart.

24         THE COURT:  All right.

25         MR. POMERANTZ:  I've asked my -- Ms. Canty to do

21

1  that.

2       The exit financing contemplates two separate financing

3  facilities.  The first is a $32 million Term A loan, Term Loan

4  A, and the principle borrowers, which will be Trussway

5  Industries, LLC and Trussway, LLC.  And those are the two

6  orange rectangles with the red border at the bottom of the

7  middle of the chart.

8       Trussway Industries and LLC and will use the proceeds of

9  the financing to satisfy a $31.7 million loan owed by Trussway

10 Industries to certain (garbled) 1.0 CLOs which come due in

11 November 2021.

12      Entities related to Mr. Dondero will actually be paid off

13 by this refinancing at par plus accrued interest.

14      The refinancing of the Trussway Industries loan will also

15 enable Trussway, LLC, the operating entity, to refinance the

16 asset-based lending and term loan liquidity that it has on

17 advantageous terms, which, of course, this whole restructuring

18 facilitates the recovery by Mr. Dondero and his related

19 entities of the $31.7 million loan.

20      There is also a $20 million loan, Term Loan B, which will

21 be used by the Debtor and the Claimant Trust for working

22 capital and to fund obligations under the confirmed plan.  The

23 Term Loan B borrower is HCMLP, the Debtor, as reflected in the

24 green box, which is the second box from the top in the middle

25 of the chart.

22

1     The Claimant Trust and the Debtor will guarantee both the

2  Term Loan A and Term Loan B loans.

3     Trussway Holdings, LLC, T-Way Investments, LLC, Trussway

4  Industries, LLC, and Trussway, LLC, the four orange boxes in

5  the middle, will guarantee both the Term A and Term B loans.

6  And that is reflected in the red arrows to the right of the

7  middle of the chart.

8     And it is important to note that the trust, Trussway

9  Holdings, currently guarantees the existing 1.0 CLO loan of

10  $31.7 million.

11     As indicated, Your Honor, the Debtor received one

12  objection to the motion filed by Mr. Dondero's trust, the

13  Dugaboy Trust. And in its objection, the Trust really only

14  raises one objection to the Debtor obtaining the financing.

15  The Trust argues that the Debtor doesn't need the financing.

16     As we have argued in the past, Your Honor, the Trust's

17  standing to object to the Debtor's actions are tenuous at

18  best, as the Trust does not have a valid claim against the

19  Debtor, and in the Debtor's estimation never will.

20     However, we are prepared to address the Trust's argument,

21  hear the testimony of Mr. Seery, as Your Honor still needs to

22  make a determination, separate and apart from the objection,

23  that the Debtor needs the financing.

24     Mr. Seery will testify that the Debtor requires the

25  financing because of several material changes in the Debtor's

23

1 cash flow projections from those that were put forth to the

2 Court in connection with confirmation of the plan.

3     First, the original plan projections contemplated the

4 Debtor's receipt of approximately $58 million on account of

5 demand notes payable by Mr. Dondero and his related entities.

6 And that was expected to occur in or around June 2021. As

7 Your Honor is painfully aware, rather than satisfying the

8 objection -- their obligations in accordance with their terms,

9 Mr. Dondero and his related entities are throwing whatever

10 roadblocks they can to frustrate the Debtor's ability to

11 collect on such notes, such that they will not be paid in the

12 time frame originally projected. Mr. Dondero's related

13 entities seem intent on dragging those litigations out as much

14 as possible, with a series of procedural maneuvers and

15 frivolous and fraudulent defenses.

16     Second, Your Honor, the Debtor anticipated that it would

17 sell Trussway in June 2021. Trussway manufactures products

18 used in the building industry, and based upon Trussway's

19 strong performance in what was a volatile environment during

20 the pandemic, the Debtor has decided that deferring sale at

21 this time will maximize value from that asset. Similar

22 restructuring of other assets, such as the Debtor's interest

23 in the MGM stock, will not be monetized on the timetable

24 originally contemplated, based upon events surrounding the MGM

25 stock, which the Court is aware and which was discussed at the

24

1   prior hearing.

2       Third, the burning-down-the-house litigation tactics that

3   have been employed by the Dondero entities have significantly

4   increased professional fees from the plan projections and has

5   caused the Debtor to incur millions of dollars of more fees

6   than anticipated.  While the Debtor had hoped to have some of

7   those costs reimbursed in light of Your Honor's contempt

8   order, Mr. Dondero has chosen to appeal and Your Honor

9   approved the posting of a $600,000 bond.

10      While we still expect to receive that $600,000 and other

11  reimbursement of recoveries due to the litigation and our

12  costs, it will take additional time defending against the

13  litigation defenses, the contemptuous and vexatious litigation

14  that the Debtor -- that Mr. Dondero and his entities have

15  caused the Debtor to undertake.

16      Exhibit 5, Your Honor, which Mr. Seery will testify about,

17  of the Debtor's exhibit list, which can be found at Docket No.

18  2477, is the Debtor's current cash flow projection.  And Mr.

19  Seery will testify that the cash flow projection reflects the

20  Debtor's needs for exit financing to maintain liquidity and

21  comply with its obligations under the plan.

22      The balance of the Trust's arguments against the motion

23  have nothing to do with approval of the motion as being a

24  proper exercise of the Debtor's business judgment, but rather

25  whether Trussway, LLC and its related subsidiaries and

25

1   affiliates should be obligated under both Term Loan A and Term

2   Loan B, where $20 million of Term Loan B proceeds are funding

3   the obligations of the Reorganized Debtor and the Claimant

4   Trust.

5        As I mentioned, Your Honor, at the outset, the Debtor is

6   not seeking court approval by this motion for Trussway and its

7   related entities to enter into the exit financing, so the

8   Trust's arguments are essentially irrelevant at today's

9   hearing.

10       Nevertheless, Your Honor, to cut off what we expect could

11  be further frivolous litigation, Mr. Seery will testify as to

12  the solvency of each of the Trussway, LLC, Trussway

13  Industries, and Trussway Holdings Entities, each of the

14  entities which the Debtor directly or indirectly controls, and

15  definitively demonstrate that any objection to the proposed

16  financing is not only frivolous, but evidences bad faith.

17       After we filed our reply, Your Honor, Mr. Draper and I did

18  discuss the scope of today's hearing.  And I understand from

19  that discussion that a lot of the (inaudible) comments earlier

20  today, that in light of the Debtor's agreement that it is not

21  seeking approval of Trussway's entry into the loans, they

22  would essentially withdraw the objection related to whether

23  the exit facility is in the best interest of the Debtor's

24  estate.

25       Nevertheless, as I indicated, Your Honor, since the issues

26

1  were raised as part of the objection, and in order to provide

2  this Court with a complete record and answer many questions

3  this Court had after reading the Dugaboy objection, we are

4  going to present a response to each of those objections, in

5  the hope, again, that it will cut off some wasteful litigation

6  that we anticipate is on the horizon.

7      A threshold question relating to Dugaboy's Trussway

8  objection is why does Trussway's entry into the Dugaboy --

9  into the exit facility matter to Dugaboy?  And the answer to

10 that question, Your Honor, turns on two purported claims that

11 Dugaboy asserts against two of the nondebtor entities.  The

12 first claim is against Trussway Holdings.  That is the top

13 orange rectangle in the middle of the chart.  And the claim is

14 in the amount of approximately $2.8 million, when you include

15 accrued interest.

16     Trussway Holdings is not in default under that obligation,

17 and it does not mature until November 2021.

18     In our reply, we indicated that if Trussway Holdings is

19 required to pay the loan as a condition of closing the

20 financing of Blue Torch, that it will do so.  Trussway will

21 have the liquidity to do so either from the proceeds of the

22 financing or otherwise.  Neither the Debtor nor Trussway

23 Holdings will close the proposed financing into a potential

24 default.

25     That should resolve any concern that the Dugaboy Trust has

27

1  either in this Court or any other court with respect to

2  Trussway Holdings becoming obligated under the exit facility.

3  That claim will either be paid, or if there are defenses to

4  that claim, they will be litigated as appropriate.  There is

5  simply no risk to the payment of the Dugaboy-Trussway Holdings

6  note by entering into the exit facility.

7       The Dugaboy Trust also asserts in its opposition that it

8  has a claim of over $17 million against the Select Equity

9  Fund.  This claim arises from the loan of certain equity

10 securities that were used to shore up the Jefferies account.

11 You'll recall the Debtor had an active Jefferies account where

12 it traded stock at the beginning of the case in order to allow

13 additional borrowings or prevent a margin call.

14      As a preliminary matter, Your Honor, the Trust -- the

15 Trust is apparently now recognizing that its claim is not $17

16 million, but is actually much less.  Dugaboy filed as Exhibit

17 10 in its exhibits found at Docket No. 2475 a summary that

18 reflects that it believes now that it was -- or it believes

19 that as of September 30th the amount of the claim is actually

20 $12 million.

21      However, the amount of the claim, which fluctuates based

22 upon the value of the securities that were loaned to Select,

23 is more like $8.3 million, at most.  And there are additional

24 expenses.

25      But to be precise, which Dugaboy is not, that claim is not

28

1  against Highland Select Equity Fund, LLC, -- LP, which is the

2  light blue box in the middle of the entity and the owner of

3  the Trussway entity.  The claim actually is against Highland

4  Select Equity Master Fund of Bermuda, Limited Partnership,

5  which is the blue box on the left side of the page.  That

6  entity, which I'll refer to as the Select Master Fund, as I

7  said, is in the blue box.  It has very few assets, as its

8  trading account was seized by Jefferies while Mr. Dondero was

9  still managing it, subject to Mr. Seery's oversight, in the

10 first quarter of 2020.

11     And how do we know that this is the entity against whom

12 Dugaboy asserts its claim and that the claim is not asserted

13 against the Highland Select Equity Fund?  That is because

14 Dugaboy filed its proof of claim, which is Exhibit 8 in the

15 Debtor's exhibits, and reflects that the claim is against the

16 Select Master Fund.  And Dugaboy has included in Exhibit 9 to

17 its exhibit the underlying agreements relating to those

18 claims.  Those agreements reflect a loan of securities from

19 Dugaboy to the Select Master Fund.  Of course, Mr. Dondero

20 executed the lending agreement as the trustee of Dugaboy and

21 of course on behalf of the Select Master Fund.

22     And why does it matter?  It matters, Your Honor, because

23 the Select Master Fund does not have any interest in any of

24 the Trussway entities that are signing on to the exit

25 financing.  The Select Master Fund is neither a borrower nor a

29

1   guarantor under the proposed exit facility. It will not be

2   impacted by the exit facility at all, and none of the assets

3   related to the financing are assets of the Select Master Fund

4   that could be used to pay whatever claim Dugaboy has.

5       This Highland Select Equity Fund, LP, as I said, the light

6   blue rectangle in the middle of the chart that has an interest

7   in Trussway Holdings, it is not obligated in any way to pay

8   the claims of the Select Master Fund.

9       Accordingly, Your Honor, the premise of Dugaboy's

10  argument, that its interest in Trussway is prejudiced by

11  Trussway obligating itself to pay $20 million on Term Loan B,

12  which is being used at the Debtor/Claimant Trust level, is

13  just not correct, and they know it.

14      Nevertheless, Mr. Seery will testify regarding the

15  circumstances leading up to the Debtor and Trussway's

16  determination to enter into the comprehensive restructuring

17  facility. Mr. Seery will testify that the Debtor's equity in

18  Trussway, aside from litigation claims, is probably the

19  Debtor's most valuable asset. He will testify that the

20  Trussway equities are significantly solvent. Trussway

21  Industries, Trussway Holdings, and the other entities' --

22  value to not only pay the exit financing, but also provide

23  meaningful recovery to the Debtor.

24      He will testify that the ABL and the term loan at Trussway

25  Industries -- Trussway, LLC have covenant issues, do not

30

1  provide Trussway with its liquidity needs, and that Trussway

2  needed to obtain a replacement ABL and term loan to finance

3  its operations.

4      He will testify that the proposed replacement ABL lender

5  at Trussway, Wells Fargo, required Trussway Industries, the

6  indirect parent of the Trussway entities, to refinance its

7  $31.7 million debt maturing in 2021 as a condition of

8  providing the asset-based lending facility.

9      He will testify that, in the first quarter of 2021,

10  Trussway ran its own financing process and explored different

11  structures to enable it to address its financing needs,

12  including separate refinancings of the ABL, the term loan, and

13  the Industries loan, and a new (inaudible) facility and a

14  first and second lien structure.

15      He will also testify that certain lenders wanted to defer

16  financing with Trussway until the market stabilized, and that

17  the failure of financing negatively impacted Trussway's

18  ability to capture profitable business.

19      Therefore, Mr. Seery will testify that he determined that

20  having the Debtor provide credit support to Trussway and

21  pursue the Blue Torch financing, which followed a robust

22  process at the Debtor's level, was in the best interest of the

23  Debtor's estate and accomplished two goals:  one, liquidity

24  for the Debtor, and two, dealing with the Trussway financing

25  needs.

1     He will testify that the marketing process that led to the

2  exit financing included reaching out to six parties with

3  experience in providing complex restructuring financing.

4  Included substantial diligence of five of them, three term

5  sheets, and two verbal indications of interest.  And he will

6  testify that the Debtor had each of these lenders compete

7  against each other in order to get the best offers from what

8  ended up being Blue Torch, the potential lender.  And as a

9  result of that process, Your Honor, Mr. Seery will testify

10  that he chose Blue Torch.

11     Clearly, Your Honor, the evidence will overwhelmingly

12  demonstrate that obtaining the Blue Torch financing, which

13  addresses the Debtor's liquidity needs and solidifies the

14  financing of Trussway, is a valid exercise of the Debtor's

15  business judgment under Section 363 and the Court should

16  approve the motion.

17     Before we proceed with Mr. Seery's testimony, Your Honor,

18  I wanted to let the Court know that we've reached agreement

19  with Mr. Draper on the exhibits.  The Debtor's exhibits were

20  filed at Docket No. 2477, 1 through 8.  And we understand Mr.

21  Draper does not object to the entry into evidence of any of

22  the exhibits.  Dugaboy's Exhibits 1 through 10 were filed at

23  Document Number 2 -- Docket No. 2475, and we don't object to

24  any of the Dugaboy exhibits, provided, however, that the

25  exhibit which purports to be a summary of Dugaboy's claims,

32

1  which I think is Exhibit 10, is only being admitted to

2  demonstrate Dugaboy's belief as to what the claim is and it's

3  not being admitted for evidence as to the actual amount of the

4  claim.

5       So, with that, Your Honor, and I'm sure Your Honor wants

6  to hear if Mr. Draper agrees with my agreement on the

7  exhibits, we would be prepared to turn to the testimony of Mr.

8  Seery.

9            THE COURT:  All right.  Mr. Pomerantz, --

10           MR. DRAPER:  Your Honor?

11           THE COURT:  -- it was a little hard to hear you here

12  and there, so I ask you again to maybe try to turn up your

13  volume or make some adjustments.

14      All right.  So, first, Mr. Draper, you confirm that you

15  are stipulating to the admissibility of Exhibits 1 through 8

16  of the Debtor that are found at Docket Entry 2477?

17           MR. DRAPER:  Your Honor, let me make a few comments.

18  In light of the removal of the Trussway asking the Court for

19  authority with respect to Trussway, I think some of the

20  exhibits don't need to be introduced, and I would object on

21  relevancy grounds.  And that's why I'd like to make a

22  statement --

23           THE COURT:  Okay, so you did not stipulate to these

24  after all?

25           MR. POMERANTZ:  He did stipulate yesterday.  We had a

33

1  conversation and he agreed.  Now he's going back on that

2  agreement.

3          THE COURT:  Okay.  Mr. Draper, --

4          MR. DRAPER:  I'm not going back on it, Your Honor.

5  Your Honor, I am not going back on it.

6          THE COURT:  Okay.  Your audio is poor as well.  I

7  mean, it sounds like you're saying, well, now that we've

8  understood that the Debtor's not seeking approval of the terms

9  or borrowing as to Trussway, you don't think he should be able

10 to make his record with regard to some of these exhibits?

11         MR. DRAPER:  No.  No, Your Honor, what I'm saying to

12 you is some of the documents are now irrelevant in connection

13 with what the Debtor is really seeking.  If they want to put

14 it on to make their record, that's fine.  I will not object to

15 authenticity.  But I will make a comment to the Court that a

16 great deal of what Mr. Seery is going to testify to should be

17 -- is not relevant in light of where we are right now.

18    Number two is hearsay.  There's no -- there's no --

19 there's no representative or witness who is either an officer

20 or director of Trussway.  And I will be making objections to

21 that with respect to those items.

22    What -- can I -- let me go through what I -- where I think

23 we are.

24         THE COURT:  Well, I don't understand --

25         MR. DRAPER:  If -- if --

34

 1          THE COURT:  Let me stop you.  I don't understand what
 2    you just said.  You said you didn't have a problem or an
 3    objection to their authenticity, and then you said we don't
 4    have a representative of Trussway to testify about them.  So I
 5    don't -- those seem inconsistent.
 6          MR. DRAPER:  No.  I didn't say -- no.  The documents
 7    can come in.  I'll agree to that, Your Honor.
 8          THE COURT:  Okay.
 9          MR. DRAPER:  What I'm stating to you --
10          THE COURT:  So Exhibits 1 through 8 at Docket 2477
11    are admitted by stipulation, and likewise the Debtor --
12          MR. DRAPER:  Yes.
13          THE COURT:  -- agrees that your Exhibits 1 through 10
14    at Docket 2475 are admitted?  Okay.  So those are admitted.
15          MR. DRAPER:  Yes.
16       (Whereupon, Debtor's Exhibits 1 through 8 and Dugaboy
17    Trust's Exhibits 1 through 10 are admitted into the record.)
18          THE COURT:  Now, what else did you want to say?
19          MR. DRAPER:  What I'd like to say is, again, I have
20    agreed and the Debtor has agreed that the issue as to the
21    Trussway entrance into the exit loan is not before the Court
22    today, that they're not seeking authority from this Court to
23    bless Trussway's entrance into that exit loan.  Trussway will
24    do what it's going to do separate and apart from a court
25    order.

35

1    What that -- in addition, with that off the table now,

2  some of Mr. Seery's testimony with respect to both the

3  Trussway need for the exit loan as well as Mr. Seery's

4  testimony with respect to the conditions at Trussway are

5  either hearsay -- the process by which Trussway went to obtain

6  exit loans in the past are also hearsay.  I can deal with that

7  as the testimony comes up.

8    I have -- the only issue I have with respect to the exit

9  loan is both the need and are there -- is there a better way

10  to do it?  And that's it.  It's simple.  It's limited in scope

11  and appearance.  And this has now become a much more complex

12  hearing, inasmuch as this Court may be asked to address the

13  claims that Dugaboy has.  That's not before the Court today,

14  and nor is the issue with respect to Trussway and its entrance

15  into the exit loans.  That's -- that's the sole point that I'm

16  making.

17        THE COURT:  Okay.  Well, we'll address objections to

18  testimony as they may be made, but given that the Debtor is

19  asking for approval of borrowing $50 million, up to $50

20  million -- I think that was the amount, correct -- that it

21  would be obligated on even, if $30-something million is going

22  to Trussway, I think I need to hear, you know, in total the

23  facts and circumstances somewhat as to why --

24        MR. DRAPER:  I agree.

25        THE COURT:  -- Trussway is getting borrowing that the

36

1   Debtor will be on the hook for.

2         MR. DRAPER:  I have -- I understand that.  What I'm

3   really saying, though, is the adverse effect on the -- on

4   Dugaboy is not before the Court, because, quite frankly, if

5   the Debtor wants to borrow $50 million and the Debtor needs

6   it, that's -- that's for the Debtor's business decision.

7   That's not a Trussway business decision.  And that's the line

8   I'd ask the Court to understand where my position is coming

9   from.

10         THE COURT:  All right.

11         MR. POMERANTZ:  Your Honor, may I respond?

12         THE COURT:  You may.  Go ahead.

13         MR. POMERANTZ:  Your Honor, I think Your Honor hit

14   the nail on the head.  The Debtor is borrowing $52 million,

15   $32 million of which are being used at the Trussway level.

16   Independent of Trussway's -- of Dugaboy's objection, which

17   they did make -- they didn't have to oppose the motion, but

18   they did -- but independent of that, Your Honor has to make

19   findings and has to conclude that it's appropriate for the

20   Debtor to enter into that agreement and become obligated on

21   the $32 million.

22      That necessarily requires this Court having an

23   understanding.  And Mr. Seery is qualified to testify at -- at

24   Trussway.  Mr. Morris will handle any objections to his

25   testimony on any grounds of relevance or hearsay.  He will

37

testify on the circumstances that Your Honor needs to create

the record to demonstrate that what the Debtor is doing is

appropriate.

    We agree.  We're not seeking approval of Trussway or

Trussway entities entering into the loan.  We're not doing

that today.  So that does not obviate his testimony.  Right?

    And to allay Mr. Draper's concerns, we're not seeking to

litigate the allowability of the $17 million, now $12 million,

really $8 million or less claim, or the $2 million claim.  We

did it just to provide Your Honor with perspective that, as is

the case pretty much all the time when the Dondero entities

assert claims, (garbled) and -- and they don't really have

these claims that they say that -- excuse me, Your Honor.

    So for that reason, Your Honor, I would ask the Court to

allow us to proceed with Mr. Seery's testimony.  We can deal

with any objections, evidentiary objections as they come up,

and then we can go to closing arguments.

        THE COURT:  All right.  Well let's hear the evidence.

You call Mr. Seery at this time?

        MR. MORRIS:  Good morning, Your Honor.  It's John

Morris; Pachulski, Stang, Ziehl & Jones; for the Debtor.  Can

you hear me?

        THE COURT:  I can.  Loud and clear.

        MR. MORRIS:  Okay.  Two things before I call Mr.

Seery.

38

1        First, I respectfully request that the Court ask all

2    people on the line to mute their lines, because I think that

3    feedback is what's causing the interference with some of the

4    sound.

5            THE COURT:  All right.  Well, could be, I guess, but

6    it doesn't hurt to say that.  So, we have 50-something people.

7    Please make sure your device is on mute until it's your turn

8    to speak.  All right?

9            MR. MORRIS:  Thank you, Your Honor.  And the second

10    thing, at the risk of reopening the door, which I don't intend

11    to do, I just want to clarify for the record the exhibits that

12    were referred to earlier.

13        The Debtor actually filed an initial exhibit list and then

14    an amended exhibit list.  And while the Exhibits 1 through 8

15    on Docket 2477 are the entirety of the exhibits that are

16    coming into evidence, the fact is that the physical exhibits 2

17    through 4 can be found at Docket 2473, and that -- that was

18    the original exhibit list, which also contained Exhibit No. 1,

19    but we're using the Exhibit No. 1 that's on the amended list

20    at 2477.

21        So, to summarize, the Exhibits 2 through 4 can be found at

22    Docket No. 2473 and Exhibits 1 and 5 through 8 can be found at

23    Docket No. 2477.

24            THE COURT:  Okay.  Thank you for clarifying.  And so

25    those are the places on the docket where 1 through 8 are

Seery - Direct                                    39

1  found.

2           MR. MORRIS:  Okay.  Can I proceed?

3           THE COURT:  You can proceed.

4           MR. MORRIS:  Okay.  The Debtor calls James P. Seery,

5  Jr., please.

6           THE COURT:  All right.  Mr. Seery, let's see if we

7  can have you say, "Testing, one, two" so we pick up your video

8  here in the courtroom.

9           MR. SEERY:  Testing, one, two, Your Honor.

10          THE COURT:  All right.

11          MR. SEERY:  Testing, one, two.

12          THE COURT:  There you are.  Got you now.  Please

13  raise your right hand.

14       (Whereupon, the witness was sworn.)

15          THE COURT:  All right.  Thank you.  Mr. Morris?

16          MR. MORRIS:  Okay.

17          JAMES P. SEERY, DEBTOR'S WITNESS, SWORN

18                     DIRECT EXAMINATION

19  BY MR. MORRIS:

20  Q   Okay.  Good morning, Mr. Seery.  Can you hear me?

21  A   I can, yes.  Thank you.

22  Q   Okay.  Mr. Seery, are you familiar with the Debtor's exit

23  financing motion?

24  A   I am, yes.

25  Q   And have you reviewed that before it was filed?

Seery - Direct                                40

1  A    I have, yes.

2  Q    And did you authorize the Debtor to file that particular

3  motion?

4  A    I did.

5  Q    Can you describe for the Court why the Debtor is seeking

6  the relief that's set forth in the exit financing motion?

7  A    Well, the plan and the trust agreement contemplated the

8  potentiality of exit financing if it was needed.  Frankly,

9  when we were going through confirmation hearing, we expected

10 that our liquidity would be sufficient that we would not need

11 to go get any financing.  If we needed it down the road

12 because we needed to defer monetizations or because our costs

13 were higher, the plan and the trust agreement both had the

14 flexibility to get it.  However, because our costs have

15 increased and because we've delayed or have had delayed for us

16 certain monetizations, our liquidity is tight when we go

17 effective.

18 Q    And did the Debtor undertake any analysis to project their

19 future cash flows?

20 A    We did.  We went through in detail, and we do it

21 regularly, our cash flow statements, our projected liquidity.

22 We considered the deferral that Mr. Pomerantz mentioned in his

23 opening of the $58 million in demand notes that we expected to

24 collect.  We considered the timing of the effective date,

25 which has been considerably delayed, based upon a number of

**Appx. 05337**

Seery - Direct                              41

1   litigations.  We pushed out our monetization of certain

2   assets, including MGM and Trussway, because of market

3   opportunities and conditions that we believe are better in the

4   future.  And then because of our professional fee costs.

5   We've had a considerable increase in those.

6       All of those factors are factored into our liquidity

7   analysis.

8              MR. MORRIS:  I would ask Ms. Canty to put up Debtor's

9   Exhibit No. 5.

10  BY MR. MORRIS:

11  Q   Is this the analysis that you were referring to?

12  A   This is.  This is a high-level view of our liquidity

13  forecast for the next 13 weeks.  And maybe to cut to the

14  chase, what it shows is an effective date around August 1st,

15  and anticipated financing.  That's the $19.8 million at the

16  Debtor level in the middle of the page in grey.  It's $19.8

17  million because there are some fees that will come out of

18  that.  And then it shows the liquidity that the Debtor would

19  have with and without the financing.

20      So at the bottom line, where you have it highlighted, it

21  shows our cash position less the financing.  So if we do not

22  have the financing, we would be negative in those last weeks

23  of the 13-week forecast.

24  Q   And based on this forecast, does the Debtor believe that

25  the financing provided in the proposed exit financing package

Seery - Direct                                              42

1  would be sufficient to get it through this projection

2  period, --

3  A    Yes.

4  Q    -- making all of the assumptions set forth in this

5  document?

6  A    Yes.  This -- basically, we look at -- we think we've

7  captured everything in it.  The cost to go effective, the

8  payment of claims, the payment of administrative claims, the

9  reserves we have to make, and the projected expenses that we

10 have litigating, both with respect to collections like the

11 notes, other expenses.  Frankly, litigating things that we can

12 anticipate other sort of crazy objections, as the Court is

13 well aware.  And then our timing of our monetization.  So we

14 do plan on monetizing assets during this period, but we want

15 to make sure we have the flexibility to do that and do it

16 efficiently.

17          MR. MORRIS:  Your Honor, I don't know who GR is.

18 There's still a lot of background --

19          THE COURT:  Okay.  GR?

20     (Court confers with Clerk.)

21          THE COURT:  Okay.  My court reporter says everyone's

22 on mute, so --

23          MR. MORRIS:  Okay.  Somebody's dialed in from area

24 code 303.  Now they're on mute.

25          THE COURT:  Okay.

Seery - Direct                                    43

1        MR. MORRIS:  Maybe that was it.

2        THE COURT:  Okay.

3        MR. MORRIS:  They've just muted.  Okay.

4   BY MR. MORRIS:

5   Q    All right.  So, Mr. Seery, you started to mention some of

6   the factors that created the liquidity needs.  I just want to

7   make sure we've identified them all.  You mentioned the $58

8   million in notes from Mr. Dondero.  Do I have that right?

9   A    Yes.  Sorry.  I was just grabbing some water.

10  Q    That's okay.  And had that -- what changed with respect to

11  the original projections as it relates to the $58 million in

12  notes?

13  A    Well, as the Court is aware, we anticipated that those

14  notes would be collected.  We didn't anticipate that they

15  would be collected immediately, but we expected a swift

16  resolution because there, in our opinion, are no legitimate

17  defenses to them.  Those collection efforts have been dragged

18  out, both for procedural and now amendments to defenses and

19  claims of the Debtor giving away assets and things to that

20  nature, so that those collections, which we expected to take

21  place in the first half of this year, we now expect to be

22  deferred for some time.  Ultimately, we do expect full

23  collection.

24  Q    I think you mentioned the effective date.  What's

25  different about the effective date today as compared to the

Seery - Direct                                          44

1   original projections?

2   A    Well, we originally anticipated that we would go effective

3   on March 1st.  We've had a number of additional delays related

4   to both collections and litigations that have deferred our

5   ability to go effective.

6       In addition, frankly, the timing of getting the financing

7   has also extended it, as well as insurance issues that we're

8   working our way through now.  So we do anticipate an exit on

9   August 1st, and we're pretty set on that date, frankly,

10  because of certain issues related to the financing.  We want

11  to make sure that we can get that done and make sure that we

12  maintain the value of the assets.  So we do expect to exit on

13  August 1st, which puts us out from the original time frame,

14  you know, a solid five months.

15  Q    Okay.  And I believe you mentioned MGM.  How does the MGM

16  issue impact liquidity today as compared to the original

17  projections at confirmation?

18  A    Well, we -- our view coming into this year was that MGM

19  was in play.  That was publically disclosed numerous places,

20  in addition to an illegal and improper disclosure that I

21  received in December.  But, frankly, again, we can wrestle

22  with that issue later.

23      But our view was that, with the MGM transaction that's

24  been publically announced, it doesn't make sense to monetize

25  that asset now.  The transaction with Amazon, which has been

Seery - Direct                                        45

 1  publically announced, we think is a very good transaction.  We
 2  do anticipate that it will close.  We have a particular
 3  perspective on the timing which I'd prefer not to share at
 4  this time.
 5  Q    Did the Debtor make any changes in its decisions regarding
 6  the monetization of its Trussway asset that impacted
 7  liquidity?
 8  A    All of the monetizations impact liquidity to some degree,
 9  because unlike an operating company, and Trussway certainly is
10  an operating company, but the Debtor, the Debtor is operating
11  with very little revenue.  So if you look at the operating
12  receipts, our cash receipts are relatively modest compared to
13  our expenditures.  Where we will generate liquidity is when we
14  sell assets.
15      We looked at Trussway last year, and I think folks are
16  aware that we engaged in a process of considerable interest,
17  even in COVID.  However, as has been bandied about
18  considerably in the popular press, there have been some
19  significant movements in pricing for some of the commodities
20  that make up a significant portion of the cost of goods sold
21  of Trussway, most predominantly lumber, but steel as well.
22  Trussway is operating exceptionally well for a company its
23  size in that environment, and we are -- we're very positive on
24  that asset.  But it doesn't make sense to sell it now while
25  it's -- while it's taking advantage of the market.  So we've

Seery - Direct                                    46

1  deferred that sale to what we think will be a more opportune

2  time later down the road.

3  Q   Okay.  Let's talk about the efforts to identify a lender.

4  Did there come a time when the lender -- when the Debtor began

5  to seek third-party exit financing?

6  A   Yes.  In the early part of the spring, once we got -- we

7  looked up and noticed that we weren't going to make the March

8  1 date, that we were going to likely be starting to get

9  deferred on some of the note collections and that we were

10  considering pushing out some of our monetizations, we

11  considered that we would need to get financing for the Debtor,

12  and we started to investigate that opportunity.

13  Q   And can you describe for the Court the process that the

14  Debtor ran in order to identify a lender?

15  A   Well, working with each of the companies that we have, the

16  PE companies that we have, working closely with them, we

17  determined what their financing needs might be.  We worked on

18  those financings, and we also worked simultaneously on our own

19  financing.  And what we did was identify experienced -- for

20  our own financing, we identified experienced financiers who

21  would be interested in doing this type of financing.  We

22  discussed with them potential structures.  We discussed with

23  them potential costs.  We analyzed the market in terms of what

24  we thought of our situation, on the positive side, we'd be

25  able to get from various lenders.  And then we went out

Seery - Direct                                          47

1  seeking proposals from lenders.

2  Q    How many lenders -- how many potential lenders did the

3  Debtor contact, if you recall?

4  A    I believe the Debtor contacted about six lenders.  These

5  were all lenders that are experienced in this type of

6  financing.  And again, when I say this type of financing, I

7  mean a company that doesn't -- is not a typical, like the

8  Debtor, a typical operating company that generates EBITDA and

9  lenders look to a typical EBITDA leverage ratio or a coverage

10 ratio.

11      This is a financing where the financier really has to look

12 at the asset coverage and have confidence in our ability to

13 monetize the assets in accordance with our plan.

14 Q    Did the Debtor have these potential lenders execute

15 nondisclosure agreements?

16 A    Yes.  I believe we had five or six, again, lenders execute

17 NDAs.  Five of the total went into a data room that we

18 prepared which contained information relative to each of the

19 assets that the Debtor owns and the Debtor's plan.  Then we

20 sought to negotiate or work through with each of those

21 potential lenders what issues they might have around those

22 assets and how they viewed the value versus how we viewed the

23 value.  And then we began to negotiate terms.

24 Q    As part of the diligence process, did the prospective

25 lenders have access to the Debtor, its employees, and its

Seery - Direct                                    48

1  advisors?

2  A    Yes.  We spent considerable time with each of the lenders.

3  I spent considerable time with each of them personally, with

4  our team, walking through, again, the structure of the plan,

5  the trust structure, how the Debtor would be governed, our

6  monetization schedule, what the potential benefits to that or

7  upsides in that schedule were in respect to both timing and

8  value, and what the potential risks might be with respect to

9  both timing and value.

10 Q    At the conclusion of the due diligence process, did any of

11 the prospective lenders tender preliminary term sheets to the

12 Debtor?

13 A    Yes.  My recollection is that we got three written term

14 sheets and one detailed oral proposal that was delivered

15 directly to me.  We then took those proposals and began to

16 compete them against one another, working through with the

17 prospective lenders where their hot buttons were and things

18 that were risky to them, as well as pushing them on cost.  So,

19 a combination of structure and cost.

20 Q    Do you believe, in your capacity as the Debtor's CEO, that

21 the terms that are proposed are the best available terms for

22 the Debtor?

23 A    I do.  It's a complicated financing.  Again,

24 sophisticated, arm's-length negotiations with multiple

25 potential lenders, ultimately with their respective counsel,

Seery - Direct                                    49

1  detailed term sheets, negotiations regarding each of the

2  provisions of the term sheets.  I think we got the best of all

3  the financing we could get.

4  Q   Okay.  Let's talk about what the ultimate proposal is.

5          MR. MORRIS:  If we could put up what is actually

6  Dugaboy Exhibit 3 from Docket 2475.

7  BY MR. MORRIS:

8  Q   Can you see it, Mr. Seery?

9  A   Yes, I can.

10         MR. MORRIS:  If we could just scroll down a little

11 bit so he has a chance to see the balance of the document.

12 Okay.

13 BY MR. MORRIS:

14 Q   And is that your signature there, sir, on Page 6 of 29?

15 A   Yes, it is.

16 Q   Okay.  Can you tell the Court what this is?

17 A   This is a letter of intent from Blue Torch Capital.  Blue

18 Torch Capital is a private lender.  They have approximately $3

19 billion of their own capital they invest, and they also

20 leverage some of that capital to give them more lending power.

21 It's a -- it's probably a four-year-old entity, formed by a

22 pioneer in the direct lending business, extremely well-known

23 in the industry, and one of the -- I think one of the most

24 experienced players in the business.

25 Q   And while the document speaks for itself, can you

Seery - Direct                              50

1  summarize for the Court your understanding of the proposed
2  terms (garbled)?
3  A    Basically, it's a $52 million exit financing broken into
4  two tranches, as has been loosely described.  There'll be a
5  $32 million tranche, which will be at Trussway Industries,
6  LLC, and then there will be a $20 million tranche, which will
7  be at the Debtor.  The Debtor and the Trust.  There'll be, in
8  essence, a combined credit for Blue Torch, but there is a
9  complicated sharing arrangement or intercreditor arrangement
10 between Blue Torch and the ABL lender at Trussway, LLC that
11 includes a standstill provision and certain other protections
12 for the ABL, to assure that if there's any issues at Highland,
13 HCMLP, or the Trust, that those won't cause any disruptions to
14 the operations of the operating company, Trussway, LLC.
15 Q    We'll talk in a few minutes about the Trussway aspect of
16 the exit financing, but can you just tell the Court generally
17 about sources and uses.  What's the use of the Tranche A
18 portion of the loan?
19 A    So the -- I hope I don't get my A's and B's mixed up.  But
20 Tranche A, I believe, is the $32 million.
21 Q    Yes.
22 A    That is going to be used to refinance seven what we call
23 1.0 CLOs that have approximately $31.7 million of an
24 outstanding term loan that sits at Trussway Industries, LLC.
25 That loan is currently 10 percent PIC.  It currently matures

Seery - Direct                                        51

1  in November.  It's well, well covered, meaning that the asset

2  Trussway is worth multiples of the amount of the loan, so

3  there's not any issue with respect to its security and value.

4      It does, however, mature -- this loan is rather what's --

5  one might call it long in the tooth.  The Court may remember

6  that the original reason that Mr. Terry ended up leaving Acis

7  had to do with issues related to the Trussway loan.

8      So we -- we intend to refinance this loan in advance of

9  its maturity with this financing.  We expect to have it done

10 by August 1st.

11 Q    And can you describe for the Court what the intended use

12 of is for Tranche B, the $20 million loan?

13 A    That will be to the Debtor and to effectively the Trust.

14 It will be used to pay our exit costs, which include certain

15 creditor claims that have to be paid on exit, as well as our

16 administrative expenses that have to be either paid or

17 allocated on or around exit.  And there's some additional

18 capital that would be identified for general corporate

19 purposes that we would use for our liquidity.

20 Q    Okay.  Is it your understanding that if the Court grants

21 the motion the Debtor will be obligated to close on this exit

22 facility?

23 A    No, it won't be.  So, so this is a -- there's a letter of

24 intent.  Both Blue Torch and the Debtor are not obligated.

25 Again, we have a high degree of confidence in Blue Torch as a

Seery - Direct                                    52

1  lender.  They don't do these things easily.  They don't do

2  them cheaply.  But when they say they're going to close, they

3  will close.

4      But if we don't have to close, we won't.  So if, for

5  example, MGM closed tomorrow, we might reevaluate our needs.

6  If someone wanted to buy Trussway for what we think is the

7  proper amount, we wouldn't have to necessarily get this

8  facility.  If someone came along to buy one of the other

9  assets and we had liquidity, we might not need it.  Right now,

10 if the note litigation was settled and we received the $58

11 million that we're owed, plus the costs of collection,

12 tomorrow, we'd have to reevaluate our needs and may not need

13 it.

14     So we don't have to close the facility.  Right now, all

15 projections are that we will.

16 Q   And if the Debtor proceeds, do you have a timeline as to

17 when you expect to close?

18 A   Yes.  We expect to close by August 1st, and that's tied

19 very much to the ABL refinancing.  So we want to make sure

20 that Trussway has sufficient capital to attack what we think

21 is a really advantageous market opportunity at Trussway, and

22 they are doing that.  So the new ABL, which is from Wells

23 Fargo, it's robust, flexible, and gives Trussway Operating

24 Company sufficient capital to go out into this market and take

25 advantage of it.

Seery - Direct                                           53

1   Q    Okay.  Let's transition to the Trussway part.  Why is

2   Trussway involved in the Debtor's exit financing proposal?

3   A    Well, Trussway -- as I said, Trussway is an operating

4   company, and it's been operating in an environment right now

5   where there's a significant demand that they are meeting, but

6   there's also significant volatility in some of their material

7   costs of their operations, specifically lumber and steel, but

8   mostly lumber.  And as I mentioned earlier, the price of

9   lumber spiked tremendously during the first half of the year.

10  It's well-publicized as a potential inflation indicator.

11  While it's leveling off, that has made the business more

12  difficult to operate.  Trussway has done a great job doing it.

13  It's got price protections in its contracts.  It forward-buys

14  lumber.  But keeping up with the spike in that material has

15  been difficult.  It also created great opportunities, because

16  some of the Trussway competitors have just not been able to

17  deliver on jobs and Trussway has.

18       When we thought about the financing at Trussway with the

19  Trussway management team, and we spent considerable time

20  working with them on this and discussions that I personally

21  had with the Trussway management team, we considered the

22  opportunities for financing directly at Trussway.  Could we

23  initially -- we looked at could we do a financing of the $32

24  million plus a new ABL just at Trussway?  We thought about it

25  in respect of an ABL that was standalone with a second lien,

Seery - Direct                                54

1  or what's sometimes referred to as a uni-tranche, where we

2  would have one financing the $32 million plus the ABL.  We

3  determined, with Trussway management, that it made much more

4  sense to have Trussway stand alone and do a standalone ABL

5  facility.  Why?  Trussway went out to 40-plus borrowers,

6  examined various term sheets from various players, and worked

7  with us --

8           MR. DRAPER:  Your Honor?

9           THE WITNESS:  -- to turn --

10          MR. DRAPER:  Your Honor?

11          MR. MORRIS:  Please don't interrupt the witness.

12          MR. DRAPER:  No, I'd like to make an objection.

13          MR. MORRIS:  You can't now.  After he's finished --

14  after he's finished his answer.  Please don't interrupt the

15  witness.

16          MR. DRAPER:  Your Honor, this is --

17          THE COURT:  I'll hear the objection.  Go ahead.

18          MR. DRAPER:  This is hearsay testimony --

19          THE COURT:  Say again?

20          MR. DRAPER:  Your Honor, this is hearsay testimony.

21  This is Douglas Draper.  This is hearsay testimony as to what

22  Trussway did.  There's not a Trussway representative.  Mr.

23  Seery is neither an officer or director of Trussway.  There's

24  been no foundation for this.

25     Now, he can testify as to what he understood, but this

Seery - Direct                                        55

1  cannot be offered for the -- for the -- for the proof of the

2  item.  It may go into his understanding or his decision, but

3  it cannot be offered for what Trussway did in the past in

4  terms of its borrowing.

5          THE COURT:  Okay.  Well, first off, there was no out-

6  of-court statement, so I overrule a hearsay objection.

7     With regard to foundation, I'll sustain that.

8     Mr. Morris, you might explain the hierarchy or give us

9  some foundation to know how Mr. Seery has the knowledge about

10 what Trussway did.  All right?  So that's my ruling.

11         MR. MORRIS:  All right.  Thank you, Your Honor.

12 BY MR. MORRIS:

13 Q   Mr. Seery, what's the basis for your knowledge?

14 A   I worked very closely with the Trussway management team,

15 the CEO and CFO, as well as directly with the bankers at

16 Trussway.  I've personally been on calls with Trussway's ABL

17 lenders.  I've personally sat with the Trussway team by video

18 and gone through their liquidity needs and their business

19 plan, along with the people on my team who deal with it every

20 day.

21 Q   Can you explain to the Court the relationship that the

22 Debtor has to Trussway?

23 A   Sure.  You know, we're here out of sometimes an abundance

24 of caution, and I think at one earlier hearing Your Honor said

25 that, you know, the Debtor's a bit damned if it does and

Seery - Direct                                              56

1   damned if it doesn't.  Trussway is an indirect subsidiary of

2   the Debtor, but it's -- effectively, the Debtor controls 90

3   percent of Trussway.  And the 10 percent is owned by current

4   or former Trussway executives or current or former Highland

5   executives, none of the -- none of the folks that have been

6   sort of day-to-day involved in any of the proceedings that you

7   would have heard of.  So these are former -- former employees

8   of Highland.  None of the Dondero, Okada, or any of those

9   folks have any interest in Trussway.

10  Q    And --

11  A    We do control -- we do effectively control Trussway

12  through our 90 percent control.  And the LLC agreement at

13  Trussway at the various levels gives us complete control as

14  the managing member to direct its operations.

15          MR. MORRIS:  Your Honor, I believe that establishes a

16  sufficient foundation for Mr. Seery to testify as to what he

17  did with respect to this matter.

18          THE COURT:  All right.  I agree with that.  So any

19  pending objection is overruled.

20  BY MR. MORRIS:

21  Q    Okay.  I'm not sure where we were, Mr. Seery, but let me

22  try -- is it your understanding that Trussway has a loan

23  that's coming due later this year?

24  A    Trussway has two facilities.  One doesn't come due this

25  year but has some covenant issues, and -- that's the ABL.  And

Seery - Direct                                    57

1   that's Trussway, LLC, the bottom box on the chart that we saw

2   earlier.  The intermediate loan is the Trussway Industries,

3   LLC.  That's the $32 million CLO loan that does come due in

4   November.

5   Q   Okay.  And I think you were -- I think you were describing

6   the efforts that had been made for Trussway to obtain its own

7   independent financing.  Do I have that right?

8   A   That's right.  So, when -- what I was explaining was that

9   we worked with Trussway and determined that the best

10  opportunity for Trussway was to get a very flexible ABL term

11  loan structure from one of the traditional lenders.  And they

12  competed a number of lenders in that proposal, all excellent,

13  first-rate institutions.  Ended with an agreement with Wells

14  Fargo, which is the financing that we expect to pursue and

15  expect to close at Trussway, LLC.

16      But we determined that the best way to do that was just to

17  do that standalone, for a couple reasons.  One is it's much --

18  it's difficult, particularly in a borrowing environment, for

19  management teams to operate in a leverage -- with more

20  leverage.  And so throwing the extra $32 million on the

21  shoulders and the operating day-to-day of Trussway would have

22  been a little bit more difficult and would have also made it

23  more expensive for Trussway from a working capital

24  perspective.

25      We looked at also doing a financing at -- just doing it at

Seery - Direct                                    58

1 | Trussway Industries, which is the $32 million.  That, that
2 | financing would have been very expensive.  Why?  Again,
3 | borrowing environment, and you're only sitting secured by only
4 | the Trussway assets.  So while the company's got sufficient
5 | liquidity from the ABL, it's a much different financing than
6 | if you -- if you have any kind of security at either Trussway
7 | or collateral from the parent, from HCMLP.  And we determined
8 | that the cost would be much lower, we'd have much more
9 | flexibility if we used the Debtor to provide credit support to
10 | Trussway Industries.
11 | Q    And can you explain a little bit further how the
12 | guarantees work within the total exit financing package?
13 | A    In essence, the Debtor's assets stand for all of the
14 | financing.  Trussway's assets effectively stand for all of the
15 | financing as well, but there's a significant sharing
16 | arrangement and a significant standstill that Wells Fargo
17 | wanted to assure that, as I said earlier, nothing that
18 | happened at the Debtor would somehow impact negatively the
19 | operations, liquidity, and functionality of Trussway, LLC.
20 |      So the structure is that we expect to have the two
21 | separate loans.  We expect that, from liquidity at Trussway,
22 | we'll generally service the $32 million, which would be
23 | effectively sending it up to its immediate parent.  We will --
24 | we will not have any money go from Trussway's operating
25 | company up to the Debtor.  We don't need it and we don't

Seery - Direct                              59

1  expect to do that.  If we did that, we would have to satisfy

2  certain other equity holders, the 10 percent that is not held

3  by Highland directly or indirectly.  And so we don't expect to

4  need to do that.

5      But it's -- the financing is $52 million, effectively

6  guaranteed all by the Debtor and the Debtor's assets.  And we

7  do have a -- it doesn't have an amortization schedule, but we

8  do have a fairly sophisticated and well-negotiated sharing

9  arrangement in respect of, when we sell an asset, how we'll

10 use the proceeds from that asset sale to provide additional

11 liquidity to the Debtor as well as to pay down the Blue Torch

12 loan.

13 Q   Does the Debtor have a view as to whether adding Trussway

14 to the package creates any meaningful risk for the Debtor?

15 A   Oh, yeah, absolutely, it does not.  Trussway -- as I

16 testified earlier, Trussway, LLC is indisputably solvent.  The

17 company is a very valuable asset.  We believe that indirectly

18 we have over a hundred million dollars of current equity value

19 in that asset, just at our entity.

20     Trussway Industries is likewise solvent, because its only

21 asset is Trussway, LLC and its only claim is the $32 million

22 that's owed to the CLOs that we're refinancing.

23     Likewise, Trussway Holdings is indisputably solid.  It

24 owns the equity, ultimate equities in Trussway, LLC as well as

25 the equity in Targa, which is -- which is worth, we believe,

**Appx. 05356**

Seery - Direct                                          60

1  at least $30 million, as well as it has cash on its balance

2  sheet of $4 million today.

3  Q   Okay.  Let's move to the objection at this time.  Are you

4  familiar with Dugaboy's objections?

5  A   I am, yes.

6  Q   Do you have an understanding as to the bases for these

7  objections?

8  A   I think generally, although I don't think that they're

9  well-founded.

10     So, my understanding is that Dugaboy, in essence, says,

11 I'm owed $2 million at Trussway Holdings, and although it's

12 not due, although it's not in default, although the entities

13 are solvent, I'd prefer if you didn't borrow any money.

14     Likewise, they seem to have a claim that -- the Master

15 Fund claim is, frankly, frivolous.

16 Q   All right.  Let's just take them one at a time.  Has the

17 Debtor made any assessment as to whether the proposed

18 financing will adversely impact Dugaboy's $2 million note

19 against Trussway Holdings?

20 A   Yes, it has.

21 Q   And what assessment have you made?

22 A   It won't negatively impact at all.  To the extent that we

23 close the financing and to the extent that Dugaboy is owed

24 money, and it does have covenants, we will pay that loan off.

25 We have sufficient liquidity in the facility to pay it off.

Seery - Direct                               61

1  We would pay it off and reserve our rights.  And I can go into

2  some detail as to what that loan actually comes from.  But,

3  strangely, when Trussway was converted from a corp. to an LLC,

4  that --

5          MR. DRAPER:  Your Honor?

6          THE WITNESS:  -- to handle appraisal rights that Mr.

7  --

8          MR. DRAPER:  Your Honor, let me object.

9          THE WITNESS:  -- gentleman had that Mr. Dondero

10 didn't want to satisfy.

11         THE COURT:  Okay.  There's an objection.  Go ahead,

12 Mr. Draper.

13         THE WITNESS:  I'm sorry.

14         MR. DRAPER:  Your Honor, there's a relevancy

15 objection.  Whether there are defenses or not to the loan and

16 what he's testifying to is irrelevant in connection with this

17 hearing.  That goes to the merits of the claim between the

18 parties.  If -- and there's no reason to raise that before

19 this Court today and in connection with this hearing.

20         THE COURT:  Your response, Mr. Morris?

21         MR. MORRIS:  Your Honor, I think Mr. Seery testified

22 as to why the Debtor has concluded that the financing won't

23 impact the Dugaboy note.  The defenses, I can leave for

24 another day, Your Honor.  So it's fine.

25         THE COURT:  All right.  Well, I think you're agreeing

Seery - Direct                                    62

1   to withdraw certain --

2           MR. MORRIS:  Yes.

3           THE COURT:  -- of your line of questioning.  Okay.

4           MR. MORRIS:  I'll -- I'll --

5           THE COURT:  So, based on that, I think the objection

6   is resolved.

7           MR. MORRIS:  Right.  And I'll agree to strike the

8   portion of the testimony after Mr. Draper's objection.

9           THE COURT:  All right.  Very well.  You may proceed.

10          MR. MORRIS:  All right.

11  BY MR. MORRIS:

12  Q   Let's just go to the second part of the Dugaboy objection

13  at least with respect to their claims.  Has the Debtor made an

14  assessment as to whether the proposed financing will adversely

15  impact Dugaboy's purported claim against Select?

16  A   It has, yes.

17  Q   Okay.  And can you describe generally for the Court the

18  nature of the assessment?

19  A   Yes.  Let me be really clear.  Number one, neither the

20  Debtor nor Blue Torch, knowing Blue Torch, is going to close

21  into a loan that will default.  I think it's very relevant to

22  the Court as to whether there was some obligation that has to

23  be satisfied at the close.  If it does, like every other loan,

24  we will provide a representation that we're in compliance with

25  all our agreements.  If the loan has to be paid off, it will

Seery - Direct                          63

1   be paid off, and we have the liquidity built into the loan and

2   into our projections to do it.  We have $4 million currently

3   sitting in Trussway Holdings.  If that loan has to be paid

4   off, it will be paid off.

5       Number two, with respect to the Master Fund, it does not

6   have to be paid off.  The Select Master Fund is the obligor

7   that Dugaboy loaned securities to, and they borrowed those

8   securities in order to meet margin calls in the Jefferies

9   account that was managed by Mr. Dondero.  Mr. Dondero signed

10  for Dugaboy as the trustee -- that's interesting -- as well as

11  --

12              MR. DRAPER:  Your Honor, same objection.

13              THE WITNESS:  So there's no --

14              THE COURT:  Overruled.  Hs can continue.

15              THE WITNESS:  There's no possibility that that loan

16  is against Select, not Select Master.  There's no way Mr. --

17  I'm sure everyone's quite aware of what the requirements are

18  for piercing or alter ego.  Those would be pretty impossible

19  to meet.  Nonetheless, there is no current claim against

20  Select that is going to be in the chain of ownership of the

21  assets, and currently is in the chain of ownership of the

22  assets, and no amount could possibly be due under that note.

23  BY MR. MORRIS:

24  Q   Let's just put a finer point on this.

25              MR. MORRIS:  Can we please put up Dugaboy Exhibit 9

Seery - Direct                                  64

1  from Docket 2475?

2  BY MR. MORRIS:

3  Q    Have you seen this before, Mr. Seery?

4  A    Yes, I have.

5  Q    Do you have an understanding as to what this is?

6  A    Yes.  This is a master securities loan agreement.  It's

7  the BMA form.  That's the Bond Market Association.  It's a

8  pretty standard form that you see for loaning securities.

9       This agreement was entered into by the Master Fund and the

10  Dugaboy Investment Trust in order to shore up the Jefferies

11  margin account.  Again, that account came into play early in

12  the case.  The Court may recall that while Mr. Dondero was the

13  portfolio manager of that account, it lost $54 million in

14  equity in the first quarter of 2020, as well as, from an asset

15  perspective, the $30 million of margin that had to be repaid

16  to Jefferies.

17            MR. MORRIS:  Can we go to the signature lines, just

18  to see who signed this agreement?  (Pause.)  Stop right there.

19  BY MR. MORRIS:

20  Q    Is it your understanding that Mr. Dondero signed this

21  agreement, both in his capacity as trustee of the Dugaboy

22  Investment Trust and in his capacity as the president of

23  Strand Advisors, Inc.?

24  A    Yes, it is.  I'm quite familiar with his signature and

25  I've seen it on hundreds of documents, many similar to this.

Seery - Direct                              65

1  Q    And is it your understanding that this document is the

2  basis for what was originally asserted to be a $17 million

3  obligation from Select, and then I guess in Exhibit 10 was

4  reduced to 12, that Mr. Pomerantz referred to as perhaps eight

5  or less?

6  A    In our examination of claims in the case, this was one of

7  the documents, and this is the one that that claim is

8  purportedly based on.

9  Q    Okay.  Let's just see if we can help the judge understand

10 kind of where this fits into the loan.

11         MR. MORRIS:  If we could put up Debtor's Exhibit No.

12 1 from Docket 2477.

13 BY MR. MORRIS:

14 Q    Okay.  This was the document that Mr. Pomerantz used in

15 his opening.  Do you recall that?

16 A    Yes.

17 Q    Okay.  And can you describe for the judge who the

18 borrowers are under the proposed exit financing?

19 A    So, under the proposed exit financing, the borrowers are

20 Trussway Industries, LLC.  That's where the $31.7 million,

21 call it $32 million, approximately, sits right now.  Trussway

22 Holdings, which is the intermediate holding company right

23 below the Highland Select Equity Fund, which is the domestic

24 feeder that owns actual assets, as opposed to simply a

25 securities account.  And then HCMLP and the Trust.

Seery - Direct                                    66

1  Q   Okay.  And we were just looking at the loan agreement

2  between Dugaboy and the Master Fund.  Can you just describe

3  for the Court where on this structure the Select Master Fund

4  is located?

5  A   On the left-hand side of the page, two-thirds of the way

6  down, there's a golden box that says Highland Select Equity

7  Master Fund.  It has two obligations.  It has -- it currently

8  has an asset, which is some -- some remaining securities

9  (garbled) at Jefferies, and most of them are illiquid.  They

10 don't have real value.  There's two obligations.  A $3 million

11 note to HCMLP.  That note was put in -- cash was put in the

12 first quarter of 2020 to try to shore up the margin calls that

13 Jefferies was making on a daily basis.  And the Dugaboy

14 securities loan, which was done in 2014, and those, those

15 securities were put into that master account, and very

16 importantly, directly put into the Jefferies account owned by

17 the master.  They didn't go through some circuitous route.

18 It's very clear that the Master Fund which controlled and

19 operated that account borrowed those shares, and those shares

20 have been effectively seized by Dugaboy -- I mean, by

21 Jefferies -- and the claim sits at that entity.

22     It's important to note that through all times relative to

23 -- until that seizure by Jefferies, Mr. Dondero was the

24 portfolio manager of that account.

25 Q   Does the Master Fund have any interest in any of the

Seery - Direct                                    67

1  Trussway entities?

2  A    No, none at all.  Zero.

3  Q    And is that why the Debtor has concluded that this exit

4  financing will have no impact on Dugaboy's purported claim

5  against the Master Fund?

6  A    Yes.

7  Q    Okay.  Let's just finish up here, Mr. Seery.  Do you

8  believe -- withdrawn.  Has the Debtor concluded that the

9  proposed financing is in the Debtor's best interests?

10  A    We have.  It's financing that is needed.  The terms are

11  negotiated at arm's length, in good faith.  Hard-fought.  We

12  expect the documents will be cooperative, but I'm sure there

13  will be negotiated closing documents between now and closing

14  that will be hard-fought as well.

15      We have sufficient liquidity at each of the entities when

16  we get this loan to be able to satisfy any obligations,

17  including the purported $2 million, $3 million Dugaboy

18  obligation.  Trussway, LLC is solvent.  Trussway Industries is

19  solvent.  Trussway Holdings is solvent.  And when HCMLP gets

20  this loan and we do the conversion of all the creditor claims

21  to partnership interests or trust interests, HCMLP and the

22  Trusts will also be solvent.

23          MR. MORRIS:  I have no further questions, Your Honor.

24          THE COURT:  All right.  Pass the witness.  Mr.

25  Draper, questions?

Seery - Cross                                      68

1           MR. DRAPER:  Your Honor, can you hear me?

2           THE COURT:  I can now.

3           MR. DRAPER:  Okay.  Great.

4                    CROSS-EXAMINATION

5    BY MR. DRAPER:

6    Q   Mr. Seery, I just have a few questions.  In connection

7    with HC -- in connection with the Debtor, do you have certain

8    assets that are easily liquefied or easily sold?

9           MR. MORRIS:  Objection to the form of the question.

10          THE WITNESS:  There are certain assets --

11          THE COURT:  Overruled.  You can answer.

12          THE WITNESS:  Yeah.  There are certain assets that

13   can be sold more easily than others.  We don't have, in the

14   Debtor, any truly liquid securities.

15   BY MR. DRAPER:

16   Q   Well, let me ask you.  In connection with the HarbourVest

17   settlement, you acquired certain interests in CLOs, correct?

18   A   Incorrect.

19   Q   Who acquired the interests?

20   A   The Debtor acquired interest in HCLOF, which is not a CLO.

21   Q   Okay.  Let's take HC -- let's take the interest that the

22   Debtor acquired.  Where is that interest presently housed?

23   A   In the -- I believe it's in a hundred-percent owned

24   subsidiary of the Debtor.  I don't recall the name.

25   Q   Which subsidiary is that?

Seery - Cross                                    69

1  A    It's a standalone SPV.  I don't -- I don't recall the

2  name.  It's not on that chart.

3  Q    Was it created after the interest was acquired?

4  A    No.  It was created before the interest was acquired, and

5  we acquired it directly into that subsidiary.

6  Q    All right.  Now, that interest -- that entity is holding

7  that as nominee for the Debtor, correct?

8  A    I don't think it's technically a nominee.  I think it's

9  technically holding it and we own a hundred percent of it and

10 own and control the entity.

11 Q    Well, didn't the HarbourVest settlement in fact say that

12 the Debtor could acquire it or its nominee will acquire it?

13 A    I think it said -- be put into a subsidiary or it could

14 acquire it directly.

15 Q    And does the Debtor own a hundred percent of that

16 subsidiary?

17 A    Yes.

18 Q    Could that -- in fact, could that interest be easily

19 liquefied to solve the Debtor's liquidity problems?

20 A    No.

21 Q    Why not?

22 A    Doesn't have a liquid market.

23 Q    Does the Debtor -- does the SPV still own that interest?

24 A    Yes.

25 Q    So it has not been transferred?

Seery - Cross                              70

1   A    No.

2   Q    All right.  Now, let's talk about the MGM stock.  Is the

3   MGM stock restricted in terms of the Debtor's trading?

4   A    Which MGM stock?

5   Q    The MGM stock that's subject to the Amazon transaction.

6   A    Owned by the Debtor or owned by somebody else?

7   Q    That's what I'm asking you.  Is it owned by the Debtor?

8   A    The Debtor does own some, yes.

9   Q    And, just ballpark, what's the value of that MGM stock

10  that the Debtor owns?

11  A    Approximately $25 million in today's current market

12  values.

13  Q    And couldn't that asset be used to obtain a loan, as

14  opposed to what's being done here?

15  A    That asset is already liened up by Frontier Bank.

16  Q    All right.  Now, does the Debtor have a wholly-owned

17  subsidiary that has MGM stock that could be used?

18  A    No.

19  Q    Okay.  So, really, the only assets that are available for

20  the Debtor to solve its liquidity problems are, in fact, the

21  assets that are being used in the Blue -- in the loan that's

22  being proposed to the Court?

23  A    That's not correct.

24  Q    What other assets could be used that would generate, serve

25  as security for a loan?

Seery - Cross                                    71

1  A    We're going to use not just the assets we've talked about

2  today but all of the estate's assets.

3  Q    No, I understand that.  What -- I guess what I'm asking is

4  I understand what this loan is and I understand what assets

5  are being used; I'm just asking, is there something that's

6  easily marketable?

7       And I'll give you an example.  When -- on my home loan, my

8  home loan is secured by my -- part of my stock portfolio, so I

9  have a lower rate.  And I'm asking, is there other collateral

10 that you could have used in order to get a better rate and

11 have a less complex transaction?

12 A    Just to be clear, we're using virtually all of the assets

13 that the Debtor owns to support the financing.  Some of it

14 will serve as collateral.  Other assets that are either more

15 difficult to transfer and put a lien on or require additional

16 time will serve as support but they won't be collateral, and

17 there'll be covenants around those assets, such that even if

18 they're not collateral, if they're sold, they'll be a sharing

19 mechanism and a sweep provision that will pay down the Blue

20 Torch facility.

21 Q    Great.

22           MR. DRAPER:  I have nothing further for this witness,

23 Your Honor.

24           THE COURT:  All right.  Redirect?

25           MR. MORRIS:  No, thank you, Your Honor.

**Appx. 05368**

1          THE COURT:  Mr. Seery, I have just one follow-up

2     question.

3                     EXAMINATION BY THE COURT

4          THE COURT:  The pertinent terms were in the motion or

5     its attachments, but just to recap, the maturity is going to

6     be three years after closing; is that correct?

7          THE WITNESS:  That's correct, Your Honor.

8          THE COURT:  Okay.  And there is a prepayment premium

9     if prepaid, and remind me what that is.

10          THE WITNESS:  I believe -- if it's okay, can I grab a

11     copy of the term sheet, which I --

12          THE COURT:  Certainly.

13          THE WITNESS:  Basically, Your Honor, there's an up-

14     front fee of a point, and then there is call protection that

15     is basically another point.  And the way the facility works,

16     that if we pay it back very quickly, the lender is still

17     entitled to receive its minimum return.  And so if -- from a

18     return perspective for the lender, as it goes longer, it

19     actually is less, the rate is effectively lower.

20          THE COURT:  Okay.

21          THE WITNESS:  But overall, it's expensive.  So the

22     facility is designed so that when we get to where we believe

23     we'll be more flush because we have been able to monetize

24     assets, we'll be paying back the lender.  The lender will have

25     received the minimum return.  But it won't be -- the call

Seery - Examination by the Court                73

1  protection, I think, is pretty advantageous.

2      And just so Your Honor is aware, each of the lenders for

3  this type of facility required this.  So, while rates are very

4  low, both absolute rates and spreads, for either high-grade

5  companies or high-yield companies, a more customized bespoke-

6  type financing like this, where the company doesn't have, as I

7  mentioned earlier, a regular EBITDA that -- and cash flow that

8  the lender could look at, it tends to be more expensive.  And

9  each of the lenders we looked at specialized in this kind of

10  financing, and Blue Torch provided the best facility of the

11  group.

12              THE COURT:  Okay.  All right.  Thank you.

13      All right.  Well, we appreciate your testimony on this,

14  Mr. Seery.  You'll be excused from that virtual witness box.

15              THE WITNESS:  Thank you, Your Honor.

16      (The witness is excused.)

17              THE COURT:  Mr. Morris, anything else?

18              MR. MORRIS:  No, Your Honor.  The Debtor rests.

19              THE COURT:  All right.

20              MR. POMERANTZ:  Your Honor, a closing -- brief

21  closing argument, if that's -- pleases the Court.

22              THE COURT:  Okay.  Well, I want to double-check with

23  Mr. Draper.  Did you have a witness or any other evidence?

24              MR. DRAPER:  No, Your Honor.

25              THE COURT:  All right.  Then I'll hear your closing

74

1    arguments.

2            MR. POMERANTZ:  Your Honor, can you hear me better

3    now?  I've changed devices.  Hopefully, --

4            THE COURT:  Yes, I can hear you much better now.  Uh-

5    huh.

6            MR. POMERANTZ:  Great.  Thank you, Your Honor.

7              CLOSING ARGUMENT ON BEHALF OF THE DEBTORS

8            MR. POMERANTZ:  Your Honor, Mr. Seery's testimony

9    provides the necessary evidentiary basis to demonstrate that

10   the Debtor's entry into the exit facility is a proper exercise

11   of the Debtor's business judgment and should be approved by

12   Your Honor under 363 of the Bankruptcy Code.

13       The terms of the bankruptcy -- the terms of the financing,

14   as Mr. Seery testified, were reached after a competitive

15   arm's-length process negotiated among multiple unrelated

16   parties.  The Debtor and Blue Torch engaged in good-faith

17   negotiations to reach the terms in the term sheet.  And each

18   of the parties are indisputably solvent.  And Mr. Seery

19   testified that none of them will close the loan into a default

20   under any binding agreement.

21       Mr. Seery's uncontroverted testimony demonstrated that the

22   Dondero entities' failure to honor their obligations under

23   several notes and litigious strategy have adversely affected

24   the Debtor's liquidity, and that those actions, coupled with

25   the (inaudible) delays on monetizing Trussway and MGM, have

75

1  impacted the Debtor's liquidity, thereby requiring the exit

2  facility.

3      The cash flow projections, which were Exhibit 5 and

4  admitted into evidence, demonstrate that the Debtor needs the

5  financing to maintain liquidity and comply with its

6  obligations under the plan.

7      Accordingly, Your Honor, there can be no serious argument

8  that the Debtor does not need the liquidity for -- that is

9  provided by the financing.

10     Mr. Seery also provided uncontroverted testimony regarding

11 the robust process the Debtor ran to seek the exit financing.

12 He testified that one of the goals of the financing process

13 was to obtain financing for Trussway in order to preserve and

14 enhance value at Trussway -- other than litigation claims, the

15 most valuable asset of the Debtor.

16     As I said, he testified that the process was arm's-length

17 and involved significant negotiations, and resulted in a term

18 sheet which is the best terms available to the Debtor.

19     He also testified as to the facts and circumstances which

20 led the Debtor and Trussway to agree to the comprehensive

21 financing facilities that resolved financing issues not only

22 at the Debtor but also at Trussway.  And I mention this, Your

23 Honor, not because we ask Your Honor to approve the Trussway

24 financing, we do not, and I made that clear at the closing.

25     Accordingly, for all these reasons, Your Honor, we request

76

1  that the Court overrule the objection and approve the motion.

2          THE COURT:  All right.  Thank you.

3       Mr. Draper, closing argument?

4          CLOSING ARGUMENT ON BEHALF OF THE DUGABOY TRUST

5          MR. DRAPER:  Yes, Your Honor.  I have a few comments.

6  And quite frankly, in light of both the testimony today and

7  the fact that this is -- they're not asking the Court to

8  approve the Trussway financing piece of this, I've agreed to

9  an order with Mr. Pomerantz that I have no issue with it being

10 uploaded and the Court entering the order.

11         THE COURT:  All right.  So that concludes your

12 remarks?

13         MR. DRAPER:  Yes.

14         THE COURT:  All right.  I'll just ask the Creditors'

15 Committee.  You obviously did not file a pleading to weigh in,

16 but I always like to hear from you.  Mr. Clemente, anything

17 you want to say about this?

18      CLOSING ARGUMENT ON BEHALF OF THE CREDITORS' COMMITTEE

19         MR. CLEMENTE:  Your Honor, for the record, Matt

20 Clemente on behalf of the Committee.

21      Your Honor, the financing need has been demonstrated.  And

22 it is a complex structure, but that's necessitated by the

23 complex nature of the Debtor and its holdings.  So the

24 Committee believes it's an appropriate financing facility, and

25 the Committee believes that Your Honor should enter the order.

77

1    So we support the financing facility, Your Honor.

2         THE COURT: All right. Well, based on the evidence

3    I've heard, the Court is going to approve the proposed exit

4    financing for up to a $52 million facility with Blue Torch

5    Capital.

6      First, I'll say, while reasonable minds might differ

7    whether 363 applies or 364, I think probably the better-

8    reasoned authority in this post-confirmation context would be

9    that 363 applies. But under either legal standard, I find

10   this motion has met the legal standards. The evidence

11   supported that the exit loan is necessary to address liquidity

12   needs of the company, of Highland, due to the reorganization

13   costs, litigation expenses being higher than anticipated, --

14      (Interruption.)

15         THE COURT: Whoever has your phone not on mute,

16   please put it on mute.

17      Second, we have heard that there's a sound business

18   justification for holding onto certain assets of the Debtor

19   longer than earlier contemplated because of market conditions.

20   So there is a need for this. The terms appear to be

21   reasonable. And again, there was adequate and fulsome

22   marketing. Many entities were contacted and executed NDAs and

23   went into the data room, spent time. And so the Court finds

24   that the Debtor and Blue Torch have negotiated in good faith.

25      Finally, in all ways, the evidence supports this being an

78

1  exercise of reasonable business judgment and there being a

2  sound business justification.  I will add that there has been

3  evidence supporting these various fees and expenses that would

4  go to the lender.

5     The Court reserves the right to supplemental and amend in

6  a more detailed written order, but with this, this financing

7  is approved.  So I presume a written order will be submitted

8  promptly, Mr. Pomerantz or Mr. Morris.

9     All right.  Well, it's 11:25.  I suggest we take a five-

10 minute break, and then we'll come back and have the last

11 motion of CLO Holdco and the DAF, the motion to reconsider.

12 All right.  So, again, 11:25.  We'll come back in five

13 minutes.

14        THE CLERK:  All rise.

15        MR. POMERANTZ:  Thank you, Your Honor.

16    (Transcript excerpt concluded at 11:25 a.m.  Proceedings

17 concluded at 3:35 p.m.)

18                 --oOo--

19

20                CERTIFICATE

21    I certify that the foregoing is a correct transcript from
the electronic sound recording of the proceedings in the
22 above-entitled matter.

23  **/s/ Kathy Rehling**                **06/29/2021**

24 _____    _____

Kathy Rehling, CETD-444              Date
25 Certified Electronic Court Transcriber

**Appx. 05375**

79

INDEX
*Excerpt*
*9:36 to 11:25 a.m.*

PROCEEDINGS                                              3

WITNESSES

Debtor's Witnesses

John Dubel
- Proffer of Direct Testimony                          10

James P. Seery, Jr.
- Direct Examination by Mr. Morris                     39
- Cross-Examination by Mr. Draper                      68
- Examination by the Court                             72

EXHIBITS

Debtor's Exhibits 1 through 3            Received 18
Debtor's Exhibits 1 through 8            Received 34

Dugaboy Trust's Exhibits 1 through 10    Received 34

CLOSING ARGUMENTS

- By Mr. Pomerantz                                     74
- By Mr. Draper                                        76
- By Mr. Clemente                                      76

RULINGS

Debtor's Motion for Entry of an Order Authorizing      18
Payment of a Restructuring Fee to James P. Seery, Jr.,
the Debtor's Chief Executive Officer and Chief
Restructuring Officer (2395) - *Granted*

Debtor's Motion for Entry of an Order (I) Authorizing  77
the Debtor to (A) Enter into Exit Financing Agreement
in Aid of Confirmed Chapter 11 Plan and (B) Incur and Pay
Related Fees and Expenses, and (II) Granting Related
Relief (2229) - *Granted*

END OF PROCEEDINGS                                      78

INDEX                                                  79

**Appx. 05376**