# EXHIBIT 19

**Appx. 05377**

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                    )   Case No. 19-34054-sgj-11
 3   In Re:                         )   Chapter 11
                                    )
 4   HIGHLAND CAPITAL               )   Dallas, Texas
     MANAGEMENT, L.P.,              )   March 1, 2022
 5                                  )   1:30 p.m. Docket
          Reorganized Debtor.       )
 6                                  )   - REORGANIZED DEBTOR'S MOTION
                                    )     FOR ENTRY OF AN ORDER
 7                                  )     APPROVING SETTLEMENT WITH
                                    )     PATRICK DAUGHERTY [3088]
 8                                  )   - REORGANIZED DEBTOR'S MOTION
                                    )     FOR ENTRY OF AN ORDER
 9                                  )     FURTHER EXTENDING THE PERIOD
                                    )     WITHIN WHICH IT MAY REMOVE
10                                  )     ACTIONS [3199]
     ───────────────────────────────)
11                                  )
     ELLINGTON,                     )   Adversary Proceeding 22-3003-sgj
12                                  )
          Plaintiff,                )
13                                  )   STATUS CONFERENCE
     v.                             )   (NOTICE OF REMOVAL)
14                                  )
     DAUGHERTY,                     )
15                                  )
          Defendant.                )
16   ───────────────────────────────)

17               TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
18              UNITED STATES BANKRUPTCY JUDGE.

19   APPEARANCES:

20   For the Debtor:            John A. Morris
                                PACHULSKI STANG ZIEHL & JONES, LLP
21                              780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
22                              (212) 561-7700

23   For Scott Ellington:       Debra A. Dandeneau
                                Laura R. Zimmerman
24                              BAKER & MCKENZIE, LLP
                                452 Fifth Avenue
25                              New York, NY  10018
                                (212) 626-4875
```

2

```
 1    APPEARANCES, cont'd.:

 2    For Patrick Daugherty:         Thomas A. Uebler
                                     MCCOLLOM D'EMILIO SMITH UEBLER,
 3                                      LLC
                                     2751 Centerville Road, Suite 401
 4                                   Wilmington, DE  19808
                                     (302) 468-5967
 5
      For Patrick Daugherty,        Drew York
 6    Adversary Proceeding          GRAY REED & MCGRAW, LLP
      Counsel:                      1601 Elm Street, Suite 4600
 7                                  Dallas, TX  75201
                                    (469) 320-6114
 8
      Recorded by:                  Michael F. Edmond, Sr.
 9                                  UNITED STATES BANKRUPTCY COURT
                                    1100 Commerce Street, 12th Floor
10                                  Dallas, TX  75242
                                    (214) 753-2062
11
      Transcribed by:               Kathy Rehling
12                                  311 Paradise Cove
                                    Shady Shores, TX  76208
13                                  (972) 786-3063

14

15

16

17

18

19

20

21

22

23

24
             Proceedings recorded by electronic sound recording;
25              transcript produced by transcription service.
```

3

1              DALLAS, TEXAS - MARCH 1, 2022 - 1:33 P.M.

2              THE COURT:  All right.  We have settings in Highland.

3    We have a motion to approve a settlement with Patrick

4    Daugherty.  We also had a status conference in a recently-

5    removed adversary or state court action, but I'm not sure

6    we're going to accomplish much on that one since there's a

7    motion for remand that's set later in the month.

8        So let's start with the Highland Motion to Approve

9    Compromise with Mr. Daugherty.  And I'll get appearances.  Who

10   do we have appearing for the Reorganized Debtor?

11             MR. MORRIS:  Good afternoon, Your Honor.  It's John

12   Morris from Pachulski Stang Ziehl & Jones for the Reorganized

13   Debtor.

14             THE COURT:  All right.  Thank you.  For Mr.

15   Daugherty, do we have a lawyer appearance?

16             MR. UEBLER:  Good afternoon, Your Honor.  This is Tom

17   Uebler on behalf of Patrick Daugherty.  And Mr. Daugherty is

18   also attending today.

19             THE COURT:  All right.  Thank you.  That's U-E-B-L-E-

20   R, correct?

21             MR. UEBLER:  Yes.

22             THE COURT:  Okay.  All right.  We have an objection

23   from Scott Ellington, and we're going to talk about the

24   standing, but who do we have appearing for Scott Ellington?

25             MS. DANDENEAU:  Good afternoon, Your Honor.  This is

4

1  Debra Dandeneau from Baker & McKenzie.  I'm appearing here on

2  behalf of Scott Ellington.

3          THE COURT:  Okay.  Do we have any other lawyer

4  appearances before we get started?

5      (No response.)

6          THE COURT:  All right.  Well, I don't mean to steal

7  your thunder, Mr. Morris, on how we proceed here today.  As

8  I've already alluded to, I have a standing concern right off

9  the bat.  But how did you want to proceed, Mr. Morris, before

10  we address that?

11          MR. MORRIS:  Before we address that, my intention was

12  to make an opening statement, move my exhibits into evidence,

13  put Mr. Seery on the stand in order to adduce evidence that we

14  believe establishes the grounds for granting the 9019 motion,

15  and then turning it over to Ms. Dandeneau.

16          THE COURT:  All right.  Well, obviously, I need to

17  hear evidence and have a prove-up, whether we have a pending

18  objection or not.  So I'll let you go forward in that manner,

19  and then we'll talk to Ms. Dandeneau about the standing of her

20  client to pursue to the objection and see where we go from

21  there.  All right?

22          MR. MORRIS:  All right.  And I will mention the

23  standing issue as part of my presentation.  But we thought it

24  was important, you know, the Reorganized Debtor's position, as

25  stated in the papers, is that we don't believe that Mr.

5

1   Ellington has standing, but even if the Court found that he

2   did, there is no basis to sustain the objection.  So we're

3   kind of prepared to proceed on that basis.

4        As Your Honor knows, the issue of standing has come up so

5   many times in this case.  The Court has observed countless

6   times the tenuous nature of various individuals and entities

7   who were pursuing various relief in this Court.  And

8   notwithstanding the tenuous nature, which, you know,

9   respectfully, we didn't think it existed in certain

10  circumstances, we've always gone to the merits.  And so I'd

11  like to tackle both issues today in case there is an appeal,

12  in case, you know, we just want to -- we just want to button

13  down the hatches and try to get done with Mr. Daugherty and

14  notch another hole in our belt, so to speak.

15       So if I may, Your Honor, I'd like to proceed.

16            THE COURT:  You may.

17             OPENING STATEMENT ON BEHALF OF THE DEBTOR

18            MR. MORRIS:  Okay.  So, as Your Honor pointed out,

19  we're here on a 9019 motion.  The Debtor seeks the Court's

20  authority to consummate a proposed settlement that it has

21  negotiated with Mr. Daugherty.  As the Court has also

22  observed, there's only one limited objection on file, the one

23  by Mr. Ellington.

24       As Your Honor may recall, just about a year ago, maybe a

25  little bit more than a year ago, actually, at confirmation, we

6

1  had announced a settlement in principle with Mr. Daugherty.

2  And it's taken some time to get to this point, and I'll

3  describe some of the reasons for that, and Mr. Seery will

4  certainly testify as to those issues.

5       But before I get into kind of the substance, I would like

6  to just move into evidence the documents that are listed on

7  the Reorganized Debtor's witness and exhibit list that can be

8  found at Docket No. 3270. It's really a very modest set of

9  exhibits, in contrast to some of the other hearings that we've

10  had. It is the 3018 order that Your Honor may recall entering

11  about a year and a half ago. It is the settlement agreement

12  itself, which is attached to my declaration so that it would

13  be admissible for evidentiary purposes. And it's the three

14  proofs of claim that Mr. Daugherty filed initially: Claim 67,

15  which was amended by 77, which was amended by 205.

16       So we'd move for the admission of those documents into

17  evidence.

18            THE COURT: All right. I presume no one has an

19  objection to that. Okay.

20            MS. DANDENEAU: That's correct, Your Honor. We don't

21  -- we don't object.

22            THE COURT: Okay.

23       (Debtor's exhibits identified in Docket 3270 are received

24  into evidence.)

25            MR. MORRIS: Okay. So, with that, we do intend to

7

1  call Mr. Seery.  Mr. Seery is going to testify, you know, to

2  his understanding of the nature of Mr. Daugherty's claims.

3  He'll testify to the -- to some of the litigation.  We're not

4  going to go on at length here, but we do want to make a

5  record.

6      He'll testify as to the litigation that took place in this

7  Court, because it really was very important in establishing

8  some of the strengths and weaknesses of the case.  It was

9  important because we actually received Your Honor's opinion,

10 at least with respect to voting purposes.  And we all

11 acknowledge that that was for that limited purpose at that

12 time.

13     He'll describe the negotiations, the participation of the

14 Independent Board, the reasons why it took a little bit longer

15 to get here than we had hoped a year ago.

16     And so he will -- he will give you the evidence that I

17 hope the Court finds is sufficient to approve this settlement.

18     He'll also address the two issues raised by Mr. Ellington,

19 the observer access issue as well as the transfer of HERA and

20 ERA under the proposed settlement.

21     I just want to make sure the record is clear as to what

22 claim is being compromised here and the status of the other

23 claims.  Mr. Daugherty -- and this is all laid out in the

24 settlement agreement, so I don't think that I'm saying

25 anything controversial here.  But as set forth in the

8

1  settlement agreement, back in April of 2020 Mr. Daugherty

2  filed his original proof of claim. That was denoted as Claim

3  No. 67. A couple of weeks later, or maybe a week later, his

4  claim was -- he amended his claim and superseded his claim.

5  So Claim 67 is no longer an operable claim, and that was

6  superseded by Claim No. 77. And then in the fall he made a

7  motion for leave to further amend his claim. After a hearing,

8  that motion was granted and Mr. Daugherty filed another

9  superseding claim. This one was denoted as Claim No. 205, in

10  the approximate amount of $40 million.

11     So Claim 205 is the operative claim here. The other two

12  claims will be expunged as part of the order because they've

13  been superseded. And that's, that's what we're here to

14  compromise today.

15     Mr. Seery is going to testify that he and the independent

16  directors, really early on in the case, familiarized

17  themselves with Mr. Daugherty. You know, they communicated

18  with him and introduced themselves to him. The evidence will

19  show that there's -- there's just a really voluminous record

20  that preceded the Highland bankruptcy filing. Mr. Seery is

21  going to testify that, you know, he's somewhat familiar with

22  that record, that his lawyers became very familiar with that

23  record, and on the basis of that review he and the independent

24  directors really began to understand kind of the nature of Mr.

25  Daugherty's claims.

1    The attachments to the proof of claim, Your Honor, as you

2    may recall from the 3018 hearing, are enormous.  And they're

3    enormous for good reason.  For probably seven or eight years

4    before I ever heard of Highland Capital, Mr. Daugherty and Mr.

5    Dondero and Highland and Mr. Ellington were engaged in very

6    lengthy, acrimonious litigation.  The litigation started in

7    Texas state court.  You know, this is a story that's been told

8    many times.  It started in state court.  There were claims.

9    There were counterclaims.  I think at the end of it Highland

10   had a $2.8 million verdict against Mr. Daugherty and Mr.

11   Daugherty had a $2.6 million verdict against Highland.  And I

12   think in a rational world, Your Honor, Mr. Daugherty would

13   have paid Highland $200,000, everybody would have said we've

14   taken our best shot, and people would have gone on with their

15   lives.

16   Regrettably, as so much happened, you know, with Highland

17   prepetition, that was not the case.  And it wasn't even close,

18   right?  During that whole litigation, you had -- you had

19   criminal contempt.  You had appeals.  And then Mr. Daugherty,

20   you know, made good on his judgment and he actually paid his

21   judgment to Highland, but Highland didn't return the favor.

22   Didn't comply, frankly, with their legal obligation.

23   And so Mr. Daugherty took the litigation from Texas up to

24   Delaware.  He sued Highland.  He sued HERA.  He sued Mr.

25   Dondero.  And he was seeking not only to collect on his

1  judgment but he was also seeking to collect on assets that had

2  been held on his behalf within HERA, which was, you know, a

3  form of deferred compensation program that was established

4  following the financial crisis in order to retain employees.

5      And during the course of that litigation -- again, this is

6  all documented in the proof of claim -- Mr. Seery can testify

7  not on the basis of personal knowledge but on the basis of his

8  review, the advice that he's received, and the litigation that

9  we've had before Your Honor -- I think the record is pretty

10  clear that Mr. Daugherty then learned that Highland had not

11  only stripped HERA of its assets but had, you know, engaged in

12  other wrongful conduct, including taking the money that was in

13  an escrow account that the Texas state court, I understand,

14  was specifically told was earmarked for the benefit of Mr.

15  Daugherty.  They took that, too.

16      And so, you know, Mr. Daugherty continued to pursue his

17  litigation.  Before the petition date, the Delaware Chancery

18  Court found that there was a likelihood of a fraud.  They

19  found an exception to the attorney-client privilege under the

20  crime-fraud exception.  And, again, all of this happened

21  before Jim Seery, the independent directors, my firm, anybody

22  came on the scene.  This was the nature -- this was the life

23  that these folks were living.

24      And then, you know, we got hired.  We took Highland into

25  bankruptcy as the trial was about to begin.  The automatic

11

1   stay went into effect.  And we moved, you know, obviously, in

2   a very different direction a few months later after the

3   Independent Board was appointed and put in place.

4       So, with that, you know, Mr. Daugherty had a very

5   substantial claim, and -- and we worked very hard, and Mr.

6   Seery is going to testify that he worked very hard to

7   understand the claim and to try to get down to the strengths

8   and weaknesses of the claim itself.  And we engaged in

9   substantial motion practice, as Your Honor may recall,

10  particularly in the fall of 2020, before we had a plan

11  confirmed.

12      We had -- Mr. Daugherty had the comfort motion, where he

13  sought the Court's approval to continue to pursue his claims

14  against nondebtor individuals and entities, and that motion

15  was granted.  We had another contested hearing where he moved

16  to amend his claim again.  The Court granted Mr. Daugherty's

17  motion at that time, and that's what resulted in the

18  preparation and filing of what became Claim No. 205 that we're

19  here to compromise today.

20      Mr. Daugherty then sought permission to lift the stay so

21  that he could go -- Highland -- go after Highland in Delaware,

22  and that's where Your Honor drew the line and said no, the

23  claims against the Debtor will be determined here.

24      And then, of course, we had the very lengthy contested

25  evidentiary hearing on Mr. Daugherty's 3018 motion.  And,

12

```
 1    again, that motion was brought simply to allow his claim for
 2    voting purposes.  That's where the two-thousand-some-odd-page
 3    appendix was, you know, first presented to the Court.  And at
 4    the conclusion of that, Your Honor granted the 3018 motion and
 5    allowed his claim in the approximate amount of $9.1 million.
 6    I believe that's Exhibit 1 on our witness and exhibit list.
 7         And so with that background, having litigated not the
 8    merits but pretty much -- pretty much everything but the
 9    merits, and I daresay as close to the merits as you can get,
10    and with the Debtors at that point actively pursuing a viable
11    plan, because by the time Claim No. 205 was filed the Court
12    has approved the disclosure statement and we were trying to
13    get to confirmation, negotiations with Mr. Daugherty began in
14    earnest.
15         You'll hear Mr. Seery testify that, you know, he had a lot
16    on his plate.  The Independent Board had a lot on its plate.
17    But one of the things on their plate was Mr. Daugherty and
18    trying to get a resolution of his claim.  And there was a lot
19    of back and forth, you know, between the lawyers, between the
20    principals, and we were able to announce at the commencement
21    of the hearing -- I think Mr. Ellington quoted from it in the
22    very first paragraph of his limited objection -- the
23    presentation of the terms of the agreement as they existed at
24    that time.
25         Mr. Seery will testify that, you know, it took another
```

13

1    nine months or so to actually document the agreement.  He'll

2    testify that, you know, Pat Daugherty's settlement wasn't the

3    only thing that the Independent Board and that he were

4    involved with, that they were working very hard to get to an

5    effective date.

6        He'll testify that Mr. Daugherty is not an easy

7    negotiator.  And I mean this respectfully to Mr. Daugherty.

8    But he personally engaged in negotiations directly with Mr.

9    Seery.  We did it through lawyers.  We went through countless

10   drafts.  And Mr. Daugherty was a dogged negotiator.  He asked

11   for -- you know, the interesting thing here is we're having

12   this hearing today, Your Honor, and Mr. Ellington did not seek

13   any discovery at all.  Had he done so, he would have found out

14   that there were, you know, probably a dozen or more draft

15   settlement agreements that went back and forth.  And if you --

16   Mr. Seery will testify to some of the things that Mr.

17   Daugherty asked for that we said no to.

18       And, again, you know, Mr. Daugherty has the right to ask

19   for whatever he wants, and Mr. Seery and the Independent

20   Board, now the Oversight Board, certainly in consultation with

21   the Oversight Board, have the authority to decide what's in

22   the best interest of their estate.

23       And so it was -- it was a -- it was a difficult

24   negotiation.  And at the end of the day, we did get to yes,

25   and I think the Court will find that the settlement is very

14

1    modestly different from what was presented to the Court back

2    in February of 2021.

3        And, you know, let's just talk about the two issues. Mr.

4    Seery -- Mr. Ellington, rather, seems to suggest in his papers

5    that somehow, you know, Mr. Seery just caved and gave him

6    these observer rights in HERA and ERA in order to enable Mr.

7    Daugherty to have more weapons to go after Mr. Ellington.

8    Ms. Dandeneau is free to ask Mr. Seery any questions she wants

9    today, subject to the attorney-client privilege, but I don't

10   think there will be a scintilla of evidence that will show

11   that Mr. Seery thought about any of these issues that Mr.

12   Ellington is apparently taking quite personally. What Mr.

13   Seery will testify to is that he was singularly focused on

14   getting to yes, on getting a deal done with Mr. Daugherty.

15       And with respect to the observer rights, I want to just

16   focus on that for a second because I think it's -- I think Mr.

17   Ellington mistakenly characterizes what that is, because it's

18   not a right at all. Mr. Daugherty has no rights whatsoever

19   vis-à-vis the Oversight Board. It is a very simple and

20   uncontro... it should be a relatively uncontroversial

21   provision. It's Paragraph 3 of the settlement agreement, and

22   it simply says that Highland will use reasonable efforts --

23   not best efforts, as Mr. Ellington's pleading says --

24   reasonable efforts to see if the Oversight Board will give him

25   access to the meetings.

15

1    Mr. Daugherty has absolutely no right to be in the

2  meeting.  The Oversight Board has the "sole discretion" to let

3  him into the meeting.  And so they can restrict him

4  arbitrarily.  They can restrict him for no reason.  They have

5  the sole discretion on whether to let him in.

6    And, importantly, Mr. Daugherty, if he's permitted to

7  participate or listen in or observe these meetings, he will be

8  required to abide by the Oversight Board's policies,

9  procedures, and agreements, including agreements concerning

10  confidentiality.

11    Mr. Daugherty has no decision-making authority.  He's not

12  a member of the Oversight Board.  He has no ability to bind

13  the Oversight Board.  He would merely be given access to

14  observe Oversight Board meetings, at the discretion of the

15  Oversight Board.  And it's no more, no less.  He has no rights

16  whatsoever, no ability to control the Oversight Board, no

17  right.

18    And I was actually thinking about this earlier.  And, you

19  know, Mr. Ellington's pleadings suggest that he's very

20  concerned that, you know, he may share information or that

21  kind of thing.  You know, this is America.  There's a First

22  Amendment.  Mr. Daugherty has the right to speak with whoever

23  he wants to speak with who's willing to speak with him.  And

24  so there is nothing right now preventing Mr. Daugherty from

25  picking up the phone and calling one of the Oversight Board

16

1  members and say, I want to share something with you.

2  Absolutely nothing in the trust agreement that prevents that,

3  nor should it.  The Oversight Board should have the ability to

4  hear views from anybody who they want to hear from.  They just

5  should.

6       The Oversight Board members are still going be bound by

7  their fiduciary obligations.  They are going to be bound by

8  their -- all of the duties that they have.  But we shouldn't

9  sit here today and speculate that something untoward might

10  happen in the future.  It's not fair to the Oversight Board

11  members.  There is absolutely no evidence in the record to do

12  it.  And there's really no basis to suggest that this is

13  somehow a plan modification.  That's it.

14       The other piece is HERA and ERA.  You know what?  Before I

15  leave that, I did want to point out where Your Honor started,

16  and that is Mr. Ellington has no claims.  He's withdrawn every

17  single claim.  Therefore, he's not a beneficiary of the trust.

18  Therefore, the Oversight Board owes him no duty whatsoever.

19  And so he really has no standing to challenge that portion of

20  it.  I don't think he has standing, frankly, to challenge the

21  HERA/ERA portion, but that part of it is just crystal clear,

22  because he has no interest in the trust itself.

23       And so I don't understand how his interest can be -- he

24  may have a personal interest.  But that's not -- that's not

25  standing.  That's not a legally cognizable interest that would

1  allow him to object to the access that might be given to him,

2  subject to the Oversight Board's discretion.

3      HERA and ERA, Your Honor, is very simple.  Mr. Seery will

4  testify that, you know, Mr. Daugherty's claim itself seeks

5  over $26 million of damages related to the dissipation of the

6  assets from HERA, as well as Highland's acquisition of the

7  interests of the other limited partners, his theory of the

8  case.  And, frankly, we -- we disagree with this very hard,

9  and that's why the numbers don't bear any relation to what the

10  claim is.  But his theory is that Highland wrongfully bought

11  out all of the limited partners.  He became the last limited

12  partner.  And since Highland is not entitled to the assets

13  that Highland took, they should be given to him.

14      Again, not a theory that we put a lot of weight on, but it

15  is a theory.  And at the end of the day, Mr. Seery is going to

16  -- and this will be the most important part of his testimony,

17  I think -- he's going to testify that the issue of HERA and

18  ERA was of great concern to the Debtor, and it was of great

19  concern because we have seen Mr. Daugherty litigate with Mr.

20  Ellington, with Mr. Leventon, with Mr. Dondero, with Highland,

21  for the better part of a decade, and we wanted to make one

22  hundred percent certain that we were done with Mr. Daugherty

23  in terms of litigation and claims.

24      And so Mr. Seery is going to testify that we tried two or

25  three different ways to address the HERA/ERA issue, and this

18

1  is what we ultimately came up with.  Let's just give it to him

2  and get that release.  Really, one of the most important

3  aspects of the -- of the settlement agreement is attached as

4  an exhibit.  It's the HERA release itself, Your Honor.  And

5  that's what gives the Debtor finality with Mr. Daugherty.

6  That is among the most important pieces of the settlement

7  agreement.  It's attached as an exhibit.  It's all signed up

8  and ready to go.

9     But that's, that's really -- you know, when Mr. Ellington

10  says in his pleading that there's no basis for doing this

11  other than to help Mr. Daugherty, respectfully, Mr. Ellington

12  has it wrong.  And if he had taken any discovery, he would

13  have found that out and maybe we could have saved today's

14  hearing.  Because the Debtor had a vital interest in resolving

15  the HERA and ERA issues because it was part and parcel of

16  getting to yes -- it was part and parcel of both getting to

17  yes as well as making sure that Mr. Daugherty had his allowed

18  claim in the manner in which we've agreed but is otherwise

19  done with the Debtor.

20     So, with that, Your Honor, I think the evidence ultimately

21  is going to establish, you know, very, very easily that this

22  settlement is fair, reasonable, and in the best interests of

23  the Debtor and its stakeholders.

24     I have nothing further unless Your Honor has any

25  questions.

19

1          THE COURT:  All right.  First, let's be clear for the

2    record that I have admitted the Debtor's exhibits at Docket

3    Entry 3270 that were earlier mentioned.

4       And next, I guess I'll hear any opening statement from a

5    friendly party.  Mr. Daugherty's counsel, did you want to say

6    anything as far as an opening statement?

7          MR. UEBLER:  Thank you, Your Honor.

8          OPENING STATEMENT ON BEHALF OF PATRICK DAUGHERTY

9          MR. UEBLER: I just want to say that Mr. Daugherty

10   joins in Highland's request that the settlement be approved,

11   but otherwise we'll rely on Mr. Morris's presentation today.

12         THE COURT:  All right.  Thank you.  Ms. Dandeneau,

13   we've obviously been speculating about the standing of your

14   client.  What did you want to say as far as an opening

15   statement and addressing that?

16         OPENING STATEMENT ON BEHALF OF SCOTT ELLINGTON

17         MS. DANDENEAU:  Your Honor, I would reserve any

18   comments on the settlement until after Mr. Seery's

19   examination.

20      But with respect to standing, we acknowledge that Mr.

21   Ellington is no longer a creditor of Highland's estate.  I

22   understand the typical standing requirements to appear in

23   bankruptcy court.

24      I would note that Mr. Ellington was very careful in terms

25   of his objection to the settlement agreement.  I thought it

20

1  was interesting that I've been criticized now for not taking

2  discovery.  That's probably a first in this case.

3       But he does not -- he made it very clear.  He does not

4  object to the economic terms of the Debtor's proposed

5  settlement.  And if you look at -- if you look at the nature

6  of our objection, it was more that there are -- there are

7  issues that we thought were important and should be considered

8  by the Debtor in the exercise of its business judgment that we

9  don't think it was raised.

10      And the reason why Mr. Ellington brought that to the

11  Court's attention and to the Debtor's attention, Mr. Ellington

12  -- what's unusual about this settlement is that, after the

13  terms of the settlement were announced to this Court at the

14  confirmation hearing, now over a year ago, the settlement was

15  amended to give Mr. Daugherty observer status to the Oversight

16  Board, but it also was amended to include the HERA provision.

17  And I understand Mr. Morris's -- I hear Mr. Morris's arguments

18  about that.

19      But the effect of the observer status provision with

20  respect to -- on the Oversight Board is if the Oversight Board

21  -- and, again, we don't challenge the fact that the Oversight

22  Board, according to the settlement agreement, has the

23  discretion on whether or not to allow Mr. Daugherty access --

24  but we believe the result of this is to give Mr. Daugherty

25  access to confidential information about Mr. Ellington.

21

1    And also, by the way, Mr. Daugherty himself has stated

2  that one of the purposes of the transfer of the HERA shares is

3  to enable Mr. Daugherty to have access to nonpublic

4  information about Mr. Ellington.

5    These are noneconomic provisions, so I would argue, Your

6  Honor, whether Mr. Ellington is a beneficiary of the Claimant

7  Trust or not should not be relevant to the standing issues

8  with respect to these issues.

9    And Your Honor knows that Mr. Ellington has filed a

10  complaint.  He filed a complaint in state court against Mr.

11  Daugherty, alleging that Mr. Daugherty has engaged in stalking

12  activities with respect to Mr. Ellington, Mr. Ellington's

13  family, including his elderly father, his sister, and her

14  minor children.  And we're not here to argue the merits of

15  those, but we do think that those allegations and what the

16  Debtor would have done with respect to those allegations and

17  what the Debtor will do in light of those allegations is

18  important to consider.

19    And Mr. Daugherty, by the way, chose to remove that action

20  to this Court, but that's the subject of a separate adversary

21  proceeding.  It's subject to a remand and abstention motion.

22    But I do think, Your Honor, in light of everything that

23  has occurred, or even allegedly has occurred, we feel that it

24  is incumbent upon this Court and the Debtor to take notice of

25  these allegations and to really not put these -- not put

22

1  themselves in a position where they could generate additional

2  claims by providing Mr. Daugherty access to information that

3  could enable the activities of Mr. Daugherty.

4     So, on that basis, I understand, Your Honor, this is an

5  unusual argument, but we would respectfully request that we be

6  able to at least make our record at the hearing and be heard

7  on these issues.

8        THE COURT:  All right.  Well, with that, as I said

9  earlier, while I find the standing to be extremely I guess I

10 should say doubtful, the Debtor has to prove up the bona fides

11 of the settlement in any event.  Put on evidence for me to

12 assess whether it's fair and equitable, in the best interest

13 of the estate, and analyze it under all of the Fifth Circuit

14 standards.

15    So I'll allow you to examine Mr. Seery on behalf of Mr.

16 Ellington to ask him anything you think is pertinent to the

17 settlement.  I would hope we don't spend too much time in

18 court on this, because, again, I'm really doubtful about

19 whether a higher court would find standing in this situation

20 where he's not a creditor, he has no pending proofs of claim,

21 and, you know, is he a party aggrieved by this proposed

22 settlement?  Again, I think it's doubtful.  But I will give

23 Mr. Ellington the benefit of the doubt and let counsel ask

24 questions that you think are pertinent to the issues here.

25    All right.  Mr. Morris, do you call Mr. Seery at this

Seery - Direct                              23

```
 1   time?

 2             MR. MORRIS:  I do, Your Honor.

 3             THE COURT:  All right.  Mr. Seery, if you could say

 4   "Testing, one, two; testing, one, two" so we can --

 5             MR. SEERY:  Testing, one, two.  Good afternoon, Your

 6   Honor.

 7             THE COURT:  Good afternoon.  Please raise your right

 8   hand.

 9        (The witness is sworn.)

10             THE COURT:  All right.  Thank you.  Mr. Morris, go

11   ahead.

12             MR. MORRIS:  Thank you, Your Honor.  I'm going to try

13   to make this much briefer than I had originally intended.

14   JAMES P. "JIM" SEERY, JR., REORGANIZED DEBTOR'S WITNESS, SWORN

15                     DIRECT EXAMINATION

16   BY MR. MORRIS:

17   Q    Mr. Seery, can you hear me okay?

18   A    Yes, I can.

19   Q    Okay.  Can you just -- are you generally familiar with the

20   nature of Mr. Daugherty's claim against Highland?

21   A    Yes, I am.

22   Q    Can you just describe for the Court your understanding of,

23   you know, in general terms, the nature of the --

24   A    Basically, Mr. Daugherty has a claim that has one or more

25   of the components, but distilled down to the essence, there's
```

Seery - Direct                                    24

1  five major components that come out of about 12 years' worth

2  of litigation with the Debtor.

3      The first is the enforcement of the HERA judgment that he

4  received in Texas state court.  This was -- I think we call it

5  Texas Litigation 1.  Highland got a judgment, as Mr. Morris

6  said in his opening, against Mr. Daugherty for about $2.8

7  million.  Mr. Daugherty got a judgment against Highland for

8  about $2.6 million.  Rather than offset, the parties appealed,

9  and it went on from there.

10      An important component of that piece is Mr. Daugherty's

11  argument that, throughout the case in Texas, Highland and the

12  other defendants maintained that there was an escrow that was

13  going to benefit Mr. Daugherty in the event that he got his

14  judgment.

15      And that relates to the second component of his claims,

16  which is the transfer of the HERA assets.  HERA was the

17  Highland Employee Retention vehicle, it was put in place after

18  the financial crisis, and it was purportedly designed to

19  retain employees.  Mr. Daugherty maintains that the removal of

20  the assets from HERA and the transfer of those assets to

21  Highland and perhaps other places was a detriment to him

22  because not only did he not get his roughly 20 percent

23  interest in HERA, he also had a claim that the structure of

24  HERA was a last-man-standing structure, meaning that it was a

25  pool of assets designed to hold a team of employees together.

Seery - Direct                                25

1   If you left, the pool stayed the same.  In his reading, other

2   -- other employees -- the remaining employees picked up the

3   assets that you left behind.

4       We have defenses to each of these, but that's his

5   position.

6       The third component of his -- and that was a big piece.

7   That's over $25 million.  The first piece is, with interest,

8   around four.  The next piece is the indemnity.  Mr. Daugherty

9   maintains that he was a -- as a partner, he was entitled to

10  certain indemnification for acts that he did and costs that he

11  incurred in advancing the interests of Highland, and that's

12  around a $5 million piece.

13      In addition, he's got a claim from the 2008 compensation

14  -- this is from the 2007-2008 tax audit -- for about $2.7

15  million.  He received -- Mr. Daugherty received a net loss

16  from Highland that year which gave him an economic benefit by

17  reducing his taxes.  That tax year is still under audit at

18  Highland.  Amazingly.  But maybe not for Highland.  And we

19  thought it would be resolved by now.  That's -- that's, he

20  claims, around $2.7 [million].  I think our thought, that even

21  if it was -- there are a lot of defenses to it, but it would

22  be a much lower number.  That battle is still going on.  We

23  are not addressing that piece in this settlement.

24      And the final piece of his claim, distilled down, is fees,

25  fee-shifting, fees on fees, related to mainly the Delaware

Seery - Direct                        26

 1  action.  And I think the best support for that, for our

 2  defense, is that the best support for that is when you go

 3  through that materials that Mr. Daugherty received in the --

 4  from production related to the Delaware judge exercising the

 5  crime-fraud exception to the attorney-client privilege, it's a

 6  pretty torrid tale of stripping of HERA -- HERA's assets,

 7  stripping of the so-called escrow.  It actually looks like,

 8  frankly, the escrow was never really an escrow and it was a --

 9  it was a fraud from the beginning.  And that one's a pretty

10  disturbing one.  We think it's -- our defenses are it's very

11  hard to shift fees in the American system, but it's -- it's

12  not a bare claim.

13       And so that's the essence of his claim, distilled down.

14  Q    And -- thank you, Mr. Seery.  And just to move this along,

15  do you recall, in the fall of 2020, we had the contested 3018

16  hearing?

17  A    Yes.

18  Q    And were all of these issues analyzed, debated, and

19  presented to the Court, to the best of your recollection?

20  A    They were.  I would say that the fee-shifting one got

21  shorter shrift.  We probably had less information at the time

22  than we do now.  Mr. Daugherty clearly had the information.

23  But because it was an estimation hearing, it was a little more

24  truncated, and I think that at that time he was -- the fee

25  shifting was, at least from the Court's perspective, and I

Seery - Direct                              27

1   think following the traditional American rule, looked on a

2   little bit -- with a bit of a jaundiced eye in terms of its

3   validity.  And he was going -- he was clear that he could in

4   the future prove that up, but we didn't -- he didn't really

5   explore that issue too often.  Or too much.

6   Q   Can you describe for the Court what you and the

7   Independent Board did between the end of the 3018 hearing and

8   confirmation to negotiate the agreement in principle that was

9   announced to the Court in early February 2021?

10  A   Sure.  As a quick prelude to that, let me just say that

11  the board, the Independent Board, along with counsel and

12  financial advisors, spent a tremendous amount of time on Mr.

13  Daugherty's claims as they evolved.

14      In addition, because the record is so voluminous, we spent

15  a tremendous amount of time deciphering the record and trying

16  to divine exactly where the risks were and where our better

17  defenses were.

18      So, coming into the 3018, we felt pretty -- pretty good

19  about where we -- where we were clearly exposed and where we

20  had good defenses.

21      Where we were clearly exposed, and we actually

22  acknowledged at the 3018, is on the HERA, the initial HERA

23  piece, which was his $2.6 million judgment plus interest.

24  There -- there really were no defenses to that.  It had been

25  affirmed on appeal.  Highland simply didn't pay the judgment.

Seery - Direct                            28

1    After the 3018, we brought a new focus to trying to

2   resolve with Mr. Daugherty what the remaining components would

3   be.

4    We'd hoped to get a holistic settlement, including with

5   respect to the 2007-2008 tax piece, which is the loss

6   carryforward that he was able to use and the value of that.

7   We were not able to reach that conclusion, and I can go

8   through that a little bit more later.  But we did go through

9   each of the other components and negotiate with Mr. Daugherty

10  as we moved towards confirmation.

11  Q    And what took so long to get from February of 2021 until

12  the end of the year when you finally got signatures on the

13  page?  What was happening during that intervening period?

14  A    Well, I would say, first and foremost, while Mr.

15  Daugherty's claim was exceptionally important, he's a large

16  claim, UBS's claim was bigger, and we were in intense

17  negotiations with UBS.

18    As you'll recall, right around that time we discovered the

19  Sentinel fraud, and that was extremely problematic because it

20  upset the UBS negotiation.  That led to us focusing on the --

21  what we could divine on what happened with respect to the

22  transfers out of the Defendants of UBS and Highland's role in

23  that and the negotiations, which led to a renegotiation around

24  the terms of the UBS settlement.  That wasn't completed until

25  I believe it was March of '21.

Seery - Direct                                    29

1       We then turned to focus on the remaining claims, including

2  with -- obviously, other issues in terms of asset monetization

3  and trying to move towards effective date financing, indemnity

4  trust.  But we did turn to Mr. Daugherty and try to document

5  the settlement we had.

6       Mr. Daugherty took the perspective that, well, wait a

7  second, now that I see what happened with UBS and I see those

8  transfers, I think my claims regarding asset stripping are

9  even better.  Where he thought his only good third-party

10 support for asset tripping and the intentions of a personal

11 vendetta and sweeping it for personal gain was really around

12 Acis, he now -- he could now rely on both the Acis transfers

13 and the transfers that we had exposed with respect to SOHC and

14 CDO Fund, which were the two UBS defendants.  And from Mr.

15 Daugherty's perspective, that changed the nature of his claims

16 and his risk profile.  So, but I wouldn't say the negotiations

17 began in earnest again, but there was a renegotiation around

18 terms.

19 Q   Okay.  And during the negotiations, did the parties

20 exchange numerous drafts of the agreement?

21 A   It has to be at least a dozen.  And it was -- really, the

22 focus around those, after we got into negotiation, argument, I

23 don't think it's fair to call it a dispute, but certainly

24 healthy argument our respective positions, we still settled on

25 a Class 8 claim and a Class 9 claim.  I was very firm on where

Seery - Direct                                                30

1   I thought the maximum exposure was on the Class 8/9 -- Class 8

2   claim, and then we settled on -- negotiated around the Class 9

3   number and not wanting to move, because our cash was tight,

4   any other kind of distribution to Mr. Daugherty.  And we had

5   healthy arm's-length negotiations with respect to each of

6   those components.

7       We then focused on the other terms.  Mr. Daugherty's

8   always been clear from the start that he was not releasing

9   anybody who wasn't a current employee at the time we settle.

10  He didn't want to do that.  That was -- that was my

11  insistence, and I had a team that I wanted to make sure we

12  were protecting, because we also have some obligations to them

13  as current employees. But he was -- he was certainly keeping

14  his litigations against Mr. Dondero, Mr. Ellington, some third

15  parties, as well as HERA and ERA.

16      And what he was looking for in the negotiations around the

17  terms were -- was as much flexibility around HERA and ERA,

18  because he had a judgment against HERA and ERA.  And he wanted

19  to make sure that he could -- I believe it's the only creditor

20  from our records of HERA and ERA -- that he could control that

21  entity, and he was going to try to do that through an

22  involuntary, if that's what it took.  And he wanted to be able

23  to use that in his continuing litigation against the other

24  parties that he thinks defrauded him with respect to the so-

25  called escrow.

Seery - Direct                                31

1    And then the other component was I think he really was

2    pushing hard on the structure of the settlement so that it

3    might provide some value to him from an evidentiary

4    perspective, even around things like the whereas clauses.

5    So we took the perspective that I can only put in the

6    whereas clause what I have personal knowledge or that I have

7    been able to decipher from our own records, and that anything

8    else would be an assertion of his. And Mr. Daugherty took the

9    perspective that if I had -- if he has court records in

10   Delaware, why can't I simply affirm those? And that was a

11   rather healthy negotiation around those types of items.

12   Q    Before entering into the agreement, did you consider the

13   potential costs, and I think you've described some of the

14   risks, but if you could just perhaps concisely let the Court

15   know if you considered the costs and risks of litigation as

16   the alternative to the settlement before deciding that this

17   was the right thing to do.

18   A    Absolutely. In all of our settlements, you know, we weigh

19   the risk of winning versus the cost of settling. We also

20   factor in the cost of litigation.

21   To describe the various litigations that have gone on here

22   as acrimonious and personal and bitter is to grossly

23   understate how vituperative and how dug-in the parties are.

24   These are exceptionally deep-cutting litigations and personal

25   issues between the respective parties. And our objective was,

Seery - Direct                                    32

1   frankly, to extricate ourselves from that at what we think is

2   a reasonable price.  If the risk-reward wasn't balancing

3   correctly, we would have litigated on the components.

4        But litigating here would have been extremely difficult.

5   And the reason I say that is because we're talking, as I

6   mentioned, about a ten-plus year litigation record.  We're

7   talking about three separate litigations that are currently

8   either outstanding or have various components that have to be

9   dealt with.  Multiple parties in each of them.  A very

10  voluminous record.  And from our perspective, our witnesses we

11  don't think would have been -- one is they're hostile to us,

12  but two, we don't think that they would have been the best

13  witnesses from a credibility perspective.  So we would have

14  been weak on witnesses, relying on docs, a giant record.  It

15  would have been exceptionally expensive.

16  Q   All right.  Let's just finish up with the issues that Mr.

17  Ellington has raised.  Are you generally familiar with the two

18  issues that Mr. Ellington is objecting to?

19  A   I am, yes.

20  Q   Can you describe for Judge Jernigan how the issue of

21  oversight access came to be and what your understanding is of

22  the Reorganized Debtor's obligation under Section 3 of the

23  proposed settlement agreement?

24  A   Sure.  Mr. Daugherty has the perspective of a senior

25  partner at Highland.  And many of the assets that we own,

Seery - Direct                                    33

1    oddly, are still there from when he was there.

2        Now, to be fair and to be sure, they are very different

3    assets ten-plus years later.  But it's not unusual for

4    settlements, particularly creditors of entities that are

5    stressed, to want to give their input into how they think an

6    asset should be monetized, what's the best way to bring that

7    value, because that's going to inure to their benefit as a

8    settling creditor.

9        Mr. Daugherty had the perspective that he could bring a

10   significant amount of expertise to that endeavor.  Frankly,

11   since, as I said, he's been out for a long time, he does have

12   significant business acumen, and he put many of these

13   investments on, including MGM and Trussway, at Highland.  They

14   were his.  But the world has changed, but that's not an

15   unusual ask.

16       So I couldn't promise to him that I could put him on the

17   Oversight Board because I'm not on the Oversight Board.  I

18   couldn't promise him that I could even give him observer

19   status, because, again, I'm not on the Oversight Board.  I

20   have the -- I'm overseen by the Oversight Board in many

21   respects, and I do -- I am entitled to attend the Oversight

22   Board meetings.  But he asked for observer status, and I said

23   I would ask for it, but it would be entirely up to the

24   Oversight Board to make a determination if it should be

25   granted, how it should be granted, whether it can be

Seery - Direct                                    34

1    rescinded, how -- what the terms would be.

2        Like any board that I've been around in these types of

3    situations, there are often observers.  They are either

4    contractual or granted other -- for other reasons.  And their

5    status is limited.  If -- oftentimes, if it's anything to do

6    with that particular creditor or anything that might be

7    extremely sensitive, they'll usually -- the boards go into

8    executive session without observers.

9    Q    Does --

10   A    So I agreed -- I agreed to ask for it.

11   Q    Okay.  Before getting to that agreement, did Mr. Daugherty

12   initially demand an actual seat on the Oversight Board?

13   A    I don't recall.  It would not surprise me at all, but I

14   just don't recall.

15   Q    And I appreciate the candor.  Under the settlement

16   agreement, does Mr. Daugherty have any right to participate in

17   any Oversight Board meeting?

18   A    No.  Again, it's -- I was very specific that I'm not the

19   Oversight Board.  I can't grant observer status.  I can simply

20   ask for it in good faith and the board will make its own

21   determination.

22   Q    Okay.  Does Mr. Daugherty have -- withdrawn.  Let's move

23   to the HERA and ERA.  Can you explain to the Court how, you

24   know, the issue of the treatment of HERA and ERA evolved and

25   how you wound up at the point of actually agreeing to transfer

Seery - Direct                                    35

1  those entities to Mr. Daugherty?

2  A    Yes.  So, recall that Mr. Daugherty has a judgment against

3  ERA.  And ERA is the management arm of HERA, but it has no

4  other business or assets.  And I think it has a very small few

5  hundred dollars, maybe a few thousand dollar checking account.

6  I don't recall what it is, but minimal assets.  So, really no

7  value to the estate.

8      One of the components, critical components to Mr.

9  Daugherty from the start was that he was not going to release

10  his claims against HERA and ERA, only the claims against

11  Highland, because if that Delaware -- I think we call it

12  Delaware 1 Litigation, but it might be Delaware 2 -- was still

13  outstanding, and he wanted to continue to pursue that

14  litigation with Highland severed off.

15     My concern was that if he was continuing to sue HERA and

16  ERA and he had a -- he has a judgment against HERA and ERA or

17  he has a joint and several judgment, HERA and ERA could find

18  itself in an insolvent situation, and then either Mr.

19  Daugherty or a trustee acting for Mr. Daugherty might come

20  after Highland or the estate.  I think it would be attenuated

21  and hard to do, but there was a risk of that.

22     So we initially started negotiations around a structure

23  where he would -- he could maintain his claims against HERA

24  and ERA, but if he received anything from Highland on account

25  of anything that happened to HERA and ERA, he had to turn it

Seery - Direct                                    36

1  back over to us, so that he can use it to continue his

2  litigations with nonsettling parties but he couldn't back-door

3  that into something against the Reorganized Debtor or the

4  Highland estate.

5      The problem with that was that we were set up to

6  effectively maintain HERA and ERA as the owners of the GP and

7  the -- it effectively is a GP, but I believe it's an LLC

8  structure -- and the other membership interests.

9      He then wanted us to turn it over to him, because I think

10 he thought that was a more effective way to accomplish what he

11 wanted to anyway without having to go through the step of a

12 bankruptcy.  It was certainly more efficient for us.  But what

13 that led to was then negotiation around making it clear that,

14 once again, none of the -- since we're a settling party, we're

15 bringing those claims, none of the actions out of HERA and ERA

16 come against the former owner of HERA and ERA, either directly

17 or indirectly.

18     And so we structured it with a rather detailed and

19 extremely broad release of HCMLP and any of the Highland --

20 Highland Limited -- Capital Management Limited Partner related

21 parties.  And that's the structure of the deal that you see

22 now.

23     When the deal was originally announced in court, we had

24 not yet started to document.  We were just on the financial

25 terms.  But it was clear that these -- he wanted to maintain

Seery - Direct                                37

1  his litigations, and we were -- we were focused on the key

2  financial terms, the Class 8, the Class 9, the cash component,

3  which was really covering the expenses, some of the expenses

4  he's had, as well as the releases related to anybody who's

5  going to be a continuing employee at the Reorganized Debtor.

6      When we got into the documentation, it went to this

7  structure where he'd maintain his claims, but if he received

8  anything on account of a Highland loss, any Highland party

9  related loss, he would have to turn it over.  And then it

10 evolved to the structure where we are now, which is we'll give

11 him HERA and ERA.  They have no value to Highland.  And we

12 want to make sure that we are extricated completely from any

13 of the litigations or costs.

14 Q   And last question on this topic.  I guess last two

15 questions.  You're familiar with the HERA release that is

16 attached to the settlement agreement?

17 A   Yes.

18 Q   Okay.  Last question.  Is that an integral component of

19 the settlement agreement from the Reorganized Debtor's

20 perspective?

21 A   Essential to the transaction.  The basic terms of the deal

22 were initially approved by the Independent Board.  And that

23 included the initial deal that was announced in court as well

24 as the evolving financial terms.  But before the document was

25 done, the Independent Board -- we had the effective date, the

Seery - Direct                                          38

1   Independent Board is gone, and it's been approved by the

2   Oversight Board.  I believe it's a component of the trust

3   agreement that this type of settlement has to be approved by

4   the Oversight Board, that I can't do it on my own, but we're

5   running it so that I use the Oversight Board -- or rely on the

6   Oversight Board; I shouldn't say use -- as a true board of

7   directors.  This is a critical component, both to me as the

8   CEO of HCMLP, to me as the Claimant Trustee, and to the

9   Oversight Board sitting above me and observing and monitoring

10  my activities.

11          MR. MORRIS:  All right.  I have no further questions,

12  Your Honor.

13          THE COURT:  All right.  Friendly parties first.  Mr.

14  Uebler, do you have a question or questions of Mr. Seery?

15          MR. UEBLER:  I do not, Your Honor.  Thank you.

16          THE COURT:  All right.  Ms. Dandeneau, do you have

17  cross?

18          MS. DANDENEAU:  Yes, I do, Your Honor.  And thank you

19  again for your indulgence.  I will attempt to streamline my

20  examination of Mr. Seery as much as possible.

21      If I may, Your Honor, could the Court allow Laura

22  Zimmerman to share her screen for purposes of this

23  examination?

24          THE COURT:  All right.  That's fine.

25          MS. DANDENEAU:  Okay.  And so I would just ask Ms.

Seery - Cross                                        39

1    Zimmerman to put on the screen what is Exhibit 1 to the

2    Debtor's Exhibit 2, which is the settlement agreement attached

3    to Mr. Morris's declaration that's been admitted into

4    evidence.  It's at Docket 3270-2.  And let's just go to Page 5

5    of the -- 5 of the PDF, which is Paragraph 3 of the settlement

6    agreement.  And if we can maybe just make it larger for some

7    of us to see.

8                        CROSS-EXAMINATION

9    BY MS. DANDENEAU:

10   Q    All right.  Mr. Seery, I just wanted to -- this is, when

11   we talk about the observer rights, this Paragraph 3, I'm not

12   going to read it out loud, but this is the document, the

13   paragraph that has the heading Observation Access, is what

14   you've been referring to with respect to the provisions

15   relating to the observer status on the Oversight Board.  Is

16   that correct?

17   A    That's correct.  Just one clarification, again.  And I

18   hope it may just be nomenclature, but to the extent that

19   there's weight to it, it's observation access.  There are no

20   rights.  The rights vest with the Oversight Board and how

21   they'll grant access or not.

22   Q    Okay.  Thank you for that clarification.  And just for

23   simplicity, can we refer to this provision when we're talking

24   as the observer provision, --

25   A    Yes.

Seery - Cross                                          40

1   Q    -- or would you -- okay.  Thank you.

2          MS. DANDENEAU:  And so, Ms. Zimmerman, if we could

3   please turn to Page 10 of the settlement agreement, which I

4   believe is Page 14 of the PDF, and just look at the Paragraph

5   8.

6   BY MS. DANDENEAU:

7   Q    And again, I'm not going to -- I will spare everyone a

8   dramatic reading of the provision, but is this what we would

9   refer to as the HERA provision?

10  A    That's correct.

11  Q    Not really intending to leave ERA out, but just it's hard

12  enough to pronounce HERA.  So let's talk a little bit about

13  the changes made to the settlement agreement.

14         MS. DANDENEAU:  If we could please, Ms. Zimmerman,

15  pull up Docket -- Exhibit -- what we have marked as Exhibit

16  SE-5, which is found at Docket 3088.

17      I would note that Highland did incorporate in its witness

18  and exhibit list all pleadings in the case.  This is just

19  Highland's motion to approve the settlement agreement.  And we

20  are marking this as Exhibit SE-5.  No need, I believe, to move

21  it into evidence.  This is just as a demonstrative.

22      If we could please turn to Page 9 of the motion, which I

23  believe is Page 12 of the PDF.  And if we could just blow up

24  those bullets on Paragraph -- under Paragraph 40.  And maybe

25  move it down, just to make sure we've captured all of the

Seery - Cross                          41

1    bullets.

2    BY MS. DANDENEAU:

3    Q    These bullets -- in these bullets, Highland recites the

4    material terms of the settlement.  Correct, Mr. Seery?

5    A    I believe so, yes.

6    Q    And the fifth bullet, okay, refers to what we call the

7    HERA provision.  Correct?

8    A    Yes.

9    Q    Now, there's -- there's -- if we scroll down a little bit,

10   there is a Footnote 5.

11          MS. DANDENEAU:  And maybe we can blow that up a

12   little bit.

13   BY MS. DANDENEAU:

14   Q    And the Footnote 5, but I'll read it, says, "With two

15   exceptions, the settlement terms are materially the same as

16   those announced on the record on February 2, 2021 in

17   connection with the confirmation hearing on the Debtor's plan.

18   The two exceptions are that (a) the Class 9 claim was

19   increased by a million dollars; and (b) the Reorganized Debtor

20   agreed to transfer its interests in HERA and ERA to Mr.

21   Daugherty."

22        Did I read that correctly, Mr. Seery?

23   A    I believe so, yes.

24   Q    Okay.  And the granting of the observer provision, let's

25   say, is not within these two exceptions mentioned in this

Seery - Cross                              42

1  footnote, correct?

2  A    That's correct.

3  Q    Okay.  And in fact, nowhere in the motion itself is there

4  a reference to the observer provision, correct?

5  A    I don't know, but I'll accept that.

6  Q    Okay.  When -- I don't think you testified to this.  When

7  did Highland agree to the observer provision?

8  A    Now, remember, we agreed to ask the board to give Mr.

9  Daugherty observer access.  So the -- if it's okay, I don't

10  recall the exact date; I can elaborate on the evolution of the

11  provision.

12  Q    Well, why don't we just agree, was it prior to the

13  confirmation hearing or after the confirmation hearing?

14  A    It would have been after.

15  Q    Okay.  And so just for what it's worth, if it's after the

16  confirmation hearing, the Footnote 5 is somewhat inaccurate,

17  correct, without -- because it does not reference the observer

18  provision?

19            MR. MORRIS:  Objection to the form of the question.

20            THE WITNESS:  I would disagree with you, --

21            THE COURT:  Sustained.

22            THE WITNESS:  -- Ms. Dandeneau, because I don't think

23  it's material.

24  BY MS. DANDENEAU:

25  Q    Okay.  Thank you.  Did you review the settlement motion

Seery - Cross                                    43

1  before it was filed?

2  A    Yes.

3  Q    Okay.  And did you review any prior drafts of the

4  settlement motion?

5  A    I don't recall.  Typically, and I apologize for

6  elaborating, but typically counsel sends me a very well-

7  developed draft.  Typically, I have comments.  And so I go --

8  I review virtually every pleading that's filed, probably every

9  pleading, and I comment on virtually every pleading.

10 Q    I have no doubt, Mr. Seery, that you get a well-developed

11 draft, and I sympathize with Mr. Morris.  Did anyone request

12 -- did any of the prior drafts contain an express reference to

13 the observer provision?  To your recollection?

14 A    Not that I recall.

15 Q    And to be clear, and I believe you testified to this, Mr.

16 Daugherty is the one who requested that the observer provision

17 be included in the settlement agreement, correct?

18 A    Yes.

19 Q    And also so the record is clear, the HERA provision, and I

20 believe this is what's stated in Footnote 5, is -- was agreed

21 to post-confirmation as well.  Is that correct?

22 A    I think, the way the provision works now, in that I

23 couldn't -- that is correct.  The evolution I described

24 earlier, I don't recall, other than he wasn't going to

25 maintain his claims against HERA and ERA, if that started

Seery - Cross                              44

1  before or after confirmation.  Certainly, before confirmation,

2  there was not a written agreement.  There was only agreement

3  in principle.

4  Q    All right.  Thank you.  And at the time of the

5  confirmation hearing, in accordance with the terms announced

6  on the record, Mr. Daugherty already was going to get under

7  his settlement a substantial claim against the estate pursuant

8  to that settlement.  Correct?

9  A    That's correct.

10 Q    Mr. Seery, I'd like to turn to the Claimant Trust

11 Agreement.  And this is a document that we have marked as

12 Exhibit SE-2.  It's at Docket 3265-2.  I would represent to

13 you and to the Court we were unable to locate a publicly-

14 available copy of the executed form of the Claimant Trust

15 Agreement, but this is the copy that was included in the plan

16 supplement.  I understand that there was an amendment that

17 changed, like, two provisions that are not material to what

18 we're going to discuss.

19     But I would ask, Mr. Seery, do you recognize this

20 agreement?  Or this form of agreement?

21 A    I do recognize the form, yes.

22 Q    Okay.  And you are the Claimant Trustee as that term is

23 used in this agreement, correct?

24 A    (no audible response)

25 Q    Okay.

Seery - Cross                          45

1          MS. DANDENEAU:  Your Honor, I would move for

2    admission of the document that's been marked as SE-2 into

3    evidence.

4          THE COURT:  All right.  Any objection?

5          MR. MORRIS:  No objection.

6          THE COURT:  Okay.  So, --

7          MR. MORRIS:  No, Your Honor.

8          THE COURT:  -- it's admitted, but let's be clear

9    where it's found on the docket.

10          MS. DANDENEAU:  Your Honor, it is at 3265-2.

11          THE COURT:  Okay.  So that is admitted.  Thank you.

12          MS. DANDENEAU:  Thank you, Your Honor.

13      (Scott Ellington's Exhibit SE-2 is received into

14    evidence.)

15    BY MS. DANDENEAU:

16    Q   Mr. Seery, the Claimant Trust Agreement is the

17    organizational document for the Claimant Trust, correct?

18    A   Yes.

19    Q   And you would agree with me that one of the purposes of an

20    organizational document of an entity is to govern the

21    management and operations of that entity, correct?

22    A   Yes.

23    Q   All right.

24          MS. DANDENEAU:  So let's turn, Ms. Zimmerman, please,

25    to Section 4.1.  And, again, I'm going to try to spare

Seery - Cross                                46

1   everybody from dramatic readings of these sections.

2   BY MS. DANDENEAU:

3   Q    So, Section -- so just so we -- before we start, Article 4

4   is the provision that sets forth the rights and

5   responsibilities of the members of the Oversight Board,

6   correct?

7   A    Essentially correct, yes.

8   Q    Okay.  And so Section 4.1 describes the initial members of

9   the Oversight Board, and I'm just going to ask you, and I'll

10  ask you this for every provision:  Is there anything in this

11  section that expressly allows the appointment of a third party

12  as an observer to the Oversight Board?

13  A    I don't believe so, no.

14  Q    And I believe you've talked about observation access as

15  opposed to observer.  And so we're clear, when I say observe

16  -- well, I can ask you, is there anything in here that allows

17  the Oversight Board to grant -- expressly allows the Oversight

18  Board to grant observation access?  So let's go with your

19  terminology with that question.

20  A    I think we can -- we can use them interchangeably.  No.

21  So, --

22  Q    Okay.

23  A    -- observation access, observer status, the concepts are

24  similar and quite common in most corporations.

25  Q    Thank you, Mr. Seery.  That will greatly ease the

Seery - Cross                                    47

1  questioning.

2      All right.  Well, then let's go to Section 4.2.  I will

3  ask you the same question.  Is there anything in this Section

4  4.2 that expressly permits the Claimant Trustee to share

5  information with a person not associated with a member of the

6  Oversight Board?

7  A    I don't believe there was a -- it's not -- it's not a

8  section dealing with sharing of information, but it does

9  reference myself, who's not a member of the Oversight Board,

10 obviously, and the Litigation Trustee, who's not a member of

11 the Oversight Board.  We do receive quite a bit of information

12 from the Oversight Board and share information with the

13 Oversight Board.  But I don't think this provision actually

14 deals with that.

15 Q    And I believe what you're referring to is Paragraph 4.C,

16 correct, where you as the Claimant Trustee are required to

17 provide the Oversight Board with information sufficient to

18 enable the Oversight Board to meet its obligations under the

19 Claimant Trust Agreement, correct?

20 A    That's, that's part of it.  There's also -- the way that

21 the structure of the board works is -- and it was highly

22 negotiated in terms of how each of the entities or persons

23 would function -- I'm entitled to be at Oversight Board

24 meetings, but the Oversight Board can exclude me if it's in

25 their reasonable determination to do so.  I'm entitled to

Seery - Cross                                   48

 1  bring advisors, I believe is the term, and I forgot where it

 2  is in the -- exactly in the section, but I certainly can bring

 3  my advisors.

 4  Q    Okay.  Thank you, --

 5  A    The Oversight Board, once again, provided they're acting

 6  reasonably, can reasonably exclude me or my advisors.

 7  Q    Thank you, Mr. Seery.  And now let's go to -- I was just

 8  -- Section 4.4 and 4.6, which deal with meetings of the

 9  Oversight Board.  We'll start with 4.4.  Is there anything in

10  Section 4.4 that expressly permits an observer or any other

11  third party that is not acting as a representative of the

12  Claimant Trust, the Litigation Sub-Trust, or the Oversight

13  Board to participate in meetings of the Oversight Board?

14  A    Not that I recall.

15  Q    And same question, if we can move to Section 4.6.  Is

16  there anything in Section 4.6 that expressly permits an

17  observer or any other third party that is not acting as a

18  representative of the Claimant Trust, the Litigation Sub-

19  Trust, or the Oversight Board to participate in any meetings

20  of the Oversight Board?

21  A    I don't believe so.

22  Q    Okay.

23  A    Uh, --

24  Q    And to -- I'm sorry.  I did not mean to --

25  A    I apologize, because I didn't read the top section.  Some

Seery - Cross                                    49

 1  of the former creditors have some specific reference in there,

 2  but I think that's really dealing with excluding Redeemer or

 3  Acis and/or UBS, depending on what the particular issue being

 4  discussed would be and how a quorum would work.  I think that

 5  -- I don't think there's a specific provision that allows you

 6  to bring somebody else in, and that doesn't surprise me at

 7  all.  I don't know that I've ever seen one.

 8  Q    Okay.  Thank you.  And just so that we're clear, at the

 9  time the Claimant Trust Agreement was drafted, those specific

10  creditors who are referenced, those were contemplated to be

11  members of the Oversight Board; is that correct?

12  A    I believe that is correct, yes.

13  Q    Okay.  And by the way, when I say participate, can we

14  agree that participate includes observing?

15  A    For -- for -- if we need to distinguish, we can.

16  Q    For --

17  A    Yeah.  I mean, typically, participating one would think

18  would be someone who's active, has a vote, has a discussion.

19  Observers, in my experience, whether they be creditors,

20  whether they be regulators, whether they be large

21  shareholders, only get to watch, unless asked something.

22  Q    So, so let's talk about attend, I guess.  There's nothing

23  -- because I didn't mean to (overspoken) --

24  A    Yeah, no, I'm not trying to (overspoken) the distinction.

25  Q    Okay.

Seery - Cross                                    50

1   A    There's nothing in the agreement that would say some third

2   party can come in or that the board can invite some third

3   party in, just like there's nothing in the agreement that says

4   you -- the board could serve lunch at the meetings.

5   Q    All right.  Thank you, Mr. Seery.  Let's skip to Section

6   4.9.  And, again, this section purports to allow the removal

7   of a member of the Oversight Board for cause or disability.

8   Is that -- is there anything in that section that expressly

9   permits the Oversight Board to remove someone to whom it has

10  granted some form of observer status?

11  A    No.

12  Q    Now, Section 4.10, which sets forth in detail how a

13  successor member of the Oversight Board will be appointed

14  following the removal, death, or resignation of a member, does

15  this Section 4.10 expressly contain anything that would permit

16  the Oversight Board to grant observer status to any third

17  party?

18  A    No, not that I recall.

19  Q    Okay.  And Section 4.12 requires each member of the

20  Oversight Board to hold strictly confidential and not use for

21  personal gain any confidential trust information.  Is that

22  correct?

23  A    That's correct.

24  Q    Okay.  Is there anything in this Section 4.12 that sets

25  forth the same requirements for an observer or another -- a

Seery - Cross                                51

 1  third party attending an Oversight Board meeting?

 2  A    I'm sorry, Ms. Dandeneau.  I got lost in reading the

 3  section.  But I apologize; I missed the question.

 4  Q    Oh, I'll repeat it.  And it was a long question.  Sorry

 5  for that.  Is there anything in this Section 4.12 that sets

 6  forth the same confidentiality requirements for an observer or

 7  any other third party who is attending a meeting of the

 8  Oversight Board?

 9  A    I don't recall.  I would expect that if an Oversight Board

10  member brought a colleague, whether that be a junior colleague

11  or an outside professional because they had outside counsel or

12  expert, that that colleague or affiliate, if you will, small

13  A, will be bound by the confidentiality that binds the member.

14  But there's -- it doesn't deal with observer status.  I don't

15  think that's something in the document at all.

16  Q    Okay.  Thank you.  So, so in your view, I'd like to

17  understand how the sharing of confidential information with a

18  third party by the Oversight Board would work.  Does the

19  Oversight Board need to make a decision to share confidential

20  information with a third party, collectively, the Oversight

21  Board?

22            MR. MORRIS:  Objection, Your Honor.  This is a

23  hypothetical and it's being asked of a person who's not even a

24  member of the Oversight Board.

25            THE COURT:  Sustained.

Seery - Cross                                    52

1  BY MS. DANDENEAU:

2  Q    Is there anything in the Claimant Trust Agreement that

3  actually contemplates the sharing of confidential information

4  with a third party?

5  A    Not that I recall, except the sharing with professionals,

6  which is clearly contemplated, and perhaps my employees.  When

7  I mean mine, I mean the Reorganized Debtor.  It's not

8  expressed that I recall, but employees of the Reorganized

9  Debtor can and do attend Oversight Board meetings and they are

10 bound by confidentiality, as am I, on confidential issues.

11 There may be things that aren't particularly confidential that

12 are discussed at times.

13 Q    And Mr. Seery, I believe you testified that the Oversight

14 Board in your view would impose reasonable protections if they

15 were going to allow a third party to attend an Oversight Board

16 meeting or observe an Oversight Board meeting.  Is that

17 correct?

18 A    I apologize.  I don't recall actually saying that.  But I

19 would expect such.

20 Q    Okay.  Thank you.  Are you, sitting here today, prepared

21 to vouch to the Oversight Board that Mr. Daugherty is likely

22 to comply with confidentiality requirements imposed on him?

23 A    No.

24 Q    Now, for the sake of completeness, let's take a look at

25 Article 10 of the Claimant Trust Agreement.  Now, this allows

Seery - Cross                                    53

1  amendments to the agreement, correct?

2  A    Yes.

3  Q    Okay.  And for anything other than clarifying nonmaterial

4  provisions of the Claimant Trust Agreement, an amendment

5  requires an instrument signed in writing by you as the

6  Claimant Trustee, correct?

7  A    I haven't looked at the provision in a while, but I would

8  expect such, yes.

9  Q    Okay.  And an amendment to the Claimant Trust Agreement

10 requires the unanimous approval of the Oversight Board,

11 correct?

12 A    It -- that's -- that's what it appears to say, yes.  I

13 apologize.  I just haven't looked at the provision in a long

14 time.

15 Q    I'm not trying to rush you through this, so if you need

16 time to look at it --

17 A    No, that's okay.  I believe you're correct.

18 Q    Okay.  And then, finally, an amendment requires the

19 approval of the Bankruptcy Court, after notice and a hearing.

20 Is that correct?

21 A    A material amendment.  That's correct.  It seems a little

22 odd to me, as an aside, that, depending on when this happened,

23 whether the Court would undertake to hear that, but that's

24 what it says.

25 Q    Okay.  Well, just so we're clear, it says the Oversi...

Seery - Cross                          54

1  may amend this agreement to correct or clarify any nonmaterial

2  provisions.  And then it says, it may not otherwise be

3  amended, et cetera, without these components.  So, I believe

4  that that's -- that is how -- how it works.  I don't know if

5  that changes your answer, Mr. Seery.

6  A    No.  I believe my answer is sufficient.

7  Q    Okay.  Now, you've previously testified, and as the

8  observer provision states, whether Mr. Daugherty will be

9  granted observer access and any continuing access will remain

10 at the sole discretion of the Claimant Trust Oversight Board.

11 Correct?

12 A    Yes.

13 Q    And nothing in the observer provision actually references

14 your approval in your capacity as the Claimant Trustee for

15 granting observer -- what I'm going to say, observer status on

16 the Oversight Board to Mr. Daugherty.  Correct?

17 A    That -- that's correct.  I think it's presumed, since I'm

18 asking for it.

19 Q    Okay.  Have you signed anything in writing agreeing --

20 agreeing to grant Mr. Daugherty observer access or observer

21 status?

22           MR. MORRIS:  Objection to the form of the question.

23           THE WITNESS:  No, I've simply --

24           THE COURT:  Overruled.

25           THE WITNESS:  I'm sorry.

Seery - Cross                               55

1          THE COURT:  Overruled.  You can answer.

2          THE WITNESS:  I simply -- I've simply signed the

3    settlement agreement which says that I will use my reasonable

4    efforts to request that the Oversight Board grant observer

5    status to Mr. Daugherty, and the terms, limitations,

6    provisions are for the Oversight Board, or even -- even

7    granting it.

8    BY MS. DANDENEAU:

9    Q    And as the Claimant Trustee, you have fiduciary duties to

10   the Claimant Trust and its beneficiaries, correct?

11   A    Correct.

12   Q    And nothing in the Claimant Trust Agreement or Delaware

13   trust law allows you to delegate those fiduciary duties,

14   correct?

15          MR. MORRIS:  Objection to the form of the question.

16          THE COURT:  Sustained.

17   BY MS. DANDENEAU:

18   Q    Nothing in the observer provision that's included in the

19   settlement agreement references any amendment to the Claimant

20   Trust Agreement; is that correct?

21   A    Yes.

22   Q    And nothing in the observer provision references the

23   requirement for further approval of an amendment by the

24   Bankruptcy Court after notice and a hearing; is that correct?

25   A    That's correct.

Seery - Cross                          56

1  Q    Okay.  And I know you testified to this already, but is

2  there anything in the Claimant Trust Agreement that prohibits

3  the Claimant Trust from consulting with Mr. Daugherty if he is

4  not a member of the Oversight Board or granted some kind of

5  observer status?

6  A    I believe Mr. Morris testified to that, but the answer --

7  Q    Oh, I'm sorry.  I get confused sometimes when Mr. Morris

8  testifies.

9  A    No, the answer -- the answer, there's -- there is no

10  prohibition from consulting with whomever the Oversight Board

11  wants to consult, whether they're a professional, whether

12  they're Claimant Trustee, Litigation Trustee, whether they're

13  an observer, or whether they're someone on the street.

14  Q    And is there anything in the Claimant Trust Agreement that

15  prohibits the Claimant Trust from receiving information from

16  Mr. Daugherty?

17  A    No.

18  Q    Now, Mr. Daugherty stopped being employed by Highland in

19  2011; is that correct?

20  A    That's my recollection, yes.

21  Q    Yes.  With respect to the pending actions that are being

22  -- let's start with the Reorganized Debtor -- being pursued by

23  Highland as the Reorganized Debtor, does the estate require

24  any assistance from Mr. Daugherty?

25  A    I apologize.  I missed the first part.  You said with

Seery - Cross                                    57

1   respect to the pending actions that Highland has brought.

2   Meaning litigation actions?

3   Q    Yes.  Mr. Seery, let me -- let me rephrase that terrible

4   question.  With respect to whatever litigation is currently

5   pending that is being pursued by Highland as the Reorganized

6   Debtor, as opposed to a Litigation Sub-Trust, does the estate

7   require -- does Highland require any assistance from Mr.

8   Daugherty?

9   A    No.

10  Q    Okay.  And in fact, Reorganized Highland and the Claimant

11  Trust are represented by the Pachulski firm, correct?

12  A    That's correct.

13  Q    And --

14  A    Generally, yes.

15  Q    Okay.  And in your view, does the Pachulski firm require

16  any assistance from Mr. Daugherty in connection with the

17  matters on which it is representing the Reorganized Highland

18  or the Claimant Trust?

19  A    No.  Those -- those matters are all wrapped -- packed and

20  ready to go.

21  Q    Okay.  Are you familiar with the action being generally

22  commenced by Mr. Kirschner as the Trustee of the Litigation

23  Sub-Trust --

24  A    Yes.

25  Q    -- against numerous defendants, including Mr. Ellington?

Seery - Cross                                    58

1   A    Yes.

2   Q    Now, I will represent to you that there are certain counts

3   -- namely, Counts 1 and 2 -- that include causes of action for

4   the recovery of equity distributions going back as far as

5   April of 2010.  But putting those aside, would you agree with

6   me with respect to the Kirschner action that nearly all of the

7   relevant facts in that action arose after 2011?

8             MR. MORRIS:  Objection to the form of the question.

9   Just relevance, Your Honor.

10            THE COURT:  Okay.  What is the relevance?

11            MS. DANDENEAU:  Your Honor, what it is going to show,

12  and I think this is consistent with what Mr. Seery has

13  testified, is that nobody really needs the advice of Mr.

14  Daugherty with respect to whatever the Reorganized Debtor is

15  doing and also with respect to whatever the Litigation Sub-

16  Trust is doing.

17            THE COURT:  What does advice of Mr. Daugherty have to

18  do with anything?  Isn't it access, observer access?

19            MS. DANDENEAU:  Well, I believe that it is also

20  having him attend -- having him attend and do whatever

21  observers do with respect to the Oversight Committee.  But I

22  do believe that there was testimony that he might be useful in

23  connection with certain facets of liquidating Highland's --

24  kind of the longstanding, long-held assets.  But I think it is

25  worth at least getting -- having it recognized that there is

Seery - Cross                        59

1    really no utility served by having the Litigation Sub-Trust or

2    even having Highland have "access" to Mr. Daugherty.

3            THE COURT:  All right.  Well, I think it's of dubious

4    relevance, but I'll allow the question.

5        Mike, how long have we been going with this cross-

6    examination, by the way?

7            THE CLERK:  Approximately 29 minutes, Judge.

8            THE COURT:  Okay.  Twenty-nine minutes.  All right.

9    You may proceed.

10           THE WITNESS:  I think I have the gist of the

11   question.  I don't purport to understand exactly what Mr.

12   Kirschner's strategy is on every point, but I don't think

13   additional information from Mr. Daugherty is required for Mr.

14   Kirschner or the Quinn Emanuel firm to pursue the cause of

15   action.  Whether he would be helpful or not for certain

16   aspects, he may be, but I don't have specific information on

17   that and that would depend on the give and take of what

18   happens in the litigation.

19       And to clarify, I said earlier that Mr. Daugherty believes

20   that he could be useful in providing advice around certain of

21   the positions that he's familiar with that he put on.  But

22   aside from public information, which is certainly his right to

23   receive, and some of it is available for some of the

24   companies, he hasn't been involved with those companies for

25   ten years, so I don't -- I don't purport to say that he is

Seery - Cross                                60

1   necessary for me to monetize those assets.

2   Q    Thank you, Mr. Seery.  Now, has Mr. Daugherty been

3   assisting the bankruptcy estate through his own

4   investigations?

5         MR. MORRIS:  Objection to the form of the question.

6   Your Honor, we've got -- we've got two -- we've got an

7   objection about access and we've got an objection about HERA

8   and ERA.  I don't think it's appropriate or relevant to try to

9   get discovery for a different lawsuit here.

10        MS. DANDENEAU:  Your Honor, I'm -- may I respond?

11        THE COURT:  Please.

12        MS. DANDENEAU:  Your Honor, first of all, this is a

13  quote from Mr. Daugherty's joinder to the motion, where Mr.

14  Daugherty says he's been assisting the bankruptcy estate

15  through his own investigations.  And we are particularly

16  concerned, we've made no surprise about it, with respect to

17  the observer -- granting of the observer status, the potential

18  granting of the observer status, and potentially giving Mr.

19  Daugherty access to confidential information.

20       And what we'd like to establish is whether the estate --

21  and we're not -- I'm not going to go in a lot of detail, but

22  this is what Mr. Daugherty has said, and we'd like to know

23  whether he has shared information with the estate up until

24  this point, personal nonconfi... you know, personal

25  confidential information that is -- that's not public --

Seery - Cross                                61

1            MR. MORRIS:  Your --

2            MS. DANDENEAU:  -- with the estate.

3            MS. DANDENEAU:  Your Honor, if I may just briefly.

4            THE COURT:  You may.

5            MR. MORRIS:  Mr. Daugherty -- Mr. Ellington does not

6   have standing to challenge the access.  He's not a beneficiary

7   of the trust, number one.

8        Number two, to the extent that they contend that it's a

9   plan modification, make the argument that it's a plan

10  modification.  You know, what discussions were had, I don't

11  understand how this is relevant.  It's clear that Mr.

12  Ellington thinks that somehow Mr. Seery is, you know, aiding

13  and abetting, I guess, whatever wrongdoing Mr. Ellington

14  alleges Mr. Daugherty is engaged it.  It's exactly why we're

15  trying to extricate ourselves from this.  Challenge --

16  challenge the provision.  You know, we've heard the analysis

17  and the questioning on the provision itself.  But we're going

18  very far afield, and it's just -- it's not relevant.

19            THE COURT:  Okay.  I agree --

20            MS. DANDENEAU:  Mr. Morris, I mean, I do --

21            THE COURT:  I agree we're going very far afield.

22  This feels like it's discovery relevant to what I'm going to

23  call the stalking action.  So, anyway, I sustain the

24  objection.

25            MS. DANDENEAU:  All right.  Thank you.  And for

Seery - Cross                                    62

1    record, Your Honor, I just want to make clear that we are not

2    trying to allege in any respect -- I mean, to the contrary --

3    that the Debtor was somehow kind of in cahoots with Mr.

4    Daugherty with respect to any of the allegations. So I do

5    want to make that clear on the record.

6             MR. MORRIS: I appreciate that.

7             THE COURT: Okay. Anything else?

8             MS. DANDENEAU: Well, Your Honor, there are -- I'd

9    like to ask some questions, and maybe I -- I will try to

10   simplify them. But -- and then wrap up very quickly. And

11   then Mr. Morris is free to object, obviously.

12   BY MS. DANDENEAU:

13   Q   Mr. Seery, if prior to the execution of the settlement

14   agreement somebody had told you that there were allegations

15   that Mr. Daugherty had been observed outside someone's office,

16   residence, sister's residence, father's residence, no less

17   than 143 times, often taking photographs and video recordings,

18   or that Mr. Daugherty had been observed at least eight times

19   outside the home where Mr. Ellington's sister resides with her

20   husband and children, or that Mr. Daugherty was observed at

21   least seven times outside the home of Mr. Ellington's widower

22   father, again, putting aside whether those -- just on the

23   basis of those allegations, would any of those allegations

24   have changed your view about agreeing to the inclusion of the

25   observer provision in the settlement agreement?

Seery - Cross                                    63

1          MR. MORRIS:  Objection; calls for a hypothetical.

2          THE COURT:  Sustained.

3    BY MS. DANDENEAU:

4    Q   Well, just so I can clarify for the record, let me ask

5    this.  Have you, Mr. Seery, have you read or has somebody

6    explained to you the allegations that were contained in the

7    state court petition filed against Mr. -- filed by Mr.

8    Ellington against Mr. Daugherty?

9    A   I read enough of the -- I'm sorry.  Did I cut you off,

10   John?

11         MR. MORRIS:  I was just going to say yes or no, to

12   the extent it involves attorney-client communications.  But

13   you can --

14         MS. DANDENEAU:  I'm only asking for a yes or no.

15         THE WITNESS:  It's hard to say yes or no.  But I

16   don't -- I don't recall (inaudible) under the state court

17   proceedings that I -- that I know of.  I have read the -- at

18   least glanced at the remand -- removal and remand documents

19   that have been filed in this Court.

20   BY MS. DANDENEAU:

21   Q   Okay.  And would you agree that one of the effects of

22   giving Mr. Daugherty observer status could be that Mr.

23   Daugherty will have access to confidential information that is

24   not otherwise publicly-available?

25   A   Around the assets, I don't -- I don't know what the

Seery - Cross                                    64

1  limitation -- I don't know because I don't know what the

2  limitations, if any, the Oversight Board would put on access

3  for Mr. Daugherty if they grant it.  It would be up to them.

4  But I would -- I would -- if there was confidential

5  information regarding either assets or regarding litigations,

6  we would -- I would assure and I'm sure the board would assure

7  that confidentiality agreements are in place and that

8  materials like that could not be released or used otherwise.

9  Q    But as we sit here today, there's nothing in the Claimant

10  Trust Agreement or the settlement agreement that provides

11  assurance that no member of the Oversight Board will share

12  confidential personal information with Mr. Daugherty?

13  A    I don't think that's true.  I think there's a specific

14  confidentiality provision that you have in the -- in the trust

15  agreement, and the language that we included in the settlement

16  agreement, which was that I would request that the board grant

17  Mr. Daugherty observer access or status, it's subject to the

18  types of confidentiality that one would typically expect from

19  a board-type deliberation.

20      So if one were to breach that, that would be a breach of

21  the agreement, would certainly abuse whatever observer status,

22  even as limited that you might have been granted.  But it

23  would also subject somebody to potential damages for breaching

24  the agreement if it hurt the Trust.

25  Q    And Mr. Seery, sitting here today -- this is my last

Seery - Cross                                            65

1    question -- are you prepared to recommend to the Oversight

2    Board that they agree to grant observer status to Mr.

3    Daugherty?

4    A    I -- I don't know if I would recommend.  I said I would

5    ask, and I'll do it in good faith, and I'll provide my views

6    as they evolve depending on the discussion we have.  I

7    certainly think a significant creditor appearing -- observing

8    board deliberations around the monetization of assets is

9    nothing unusual, having done this for it seems like

10   forever.  I have been an observer.  I've had observers at

11   boards that -- observers on boards that I've been on.  It's a

12   pretty typical construct, where you have assets that are being

13   monetized, as opposed to necessarily -- or a straight board

14   with an operating committee, although you see them as

15   well.  And I -- I don't know that the limitations we're

16   talking about, how they would pertain, but it would depend on

17   each thing.

18        Obviously, the sensitivity around confidentiality and

19   attorney-client privilege and common interest related to

20   Litigation Trustee issues and note litigation issues, et

21   cetera, is a little bit different than the sensitivity and

22   confidentiality around private companies and their operations,

23   although that is still sensitive and we want to make sure it's

24   protected.

25   Q    All right.  Thank you, Mr. Seery.

                          Seery - Redirect                    66

 1              MS. DANDENEAU:  I have no further questions at this

 2     time.

 3              THE COURT:  All right.  Mr. Morris, redirect?

 4              MR. MORRIS:  Yeah.  Just a couple of quick questions.

 5                         REDIRECT EXAMINATION

 6     BY MR. MORRIS:

 7     Q   Mr. Seery, in Paragraph 3, the observer access provision

 8     of the proposed settlement agreement, did Mr. Daugherty agree

 9     that he would be bound by all policies, procedures, and

10     agreements, including confidentiality agreements of the

11     Oversight Board, if he's given access?

12     A   I don't recall the specifics of the provision in that

13     regard, but the terms of the request would be that, if he gets

14     it, --

15     Q   All right.

16     A   -- he will be bound by whatever strictures the Oversight

17     Board puts on him.  And that -- again, this is -- I understand

18     the sensitivity by counsel, but it's a pretty common

19     provision.

20          It's also common that an observer's access is

21     circumscribed.  It's not something where it's just sit and

22     watch all the proceedings.  For example, if there's employee

23     discussions or how some -- the company, the Trust, might deal

24     with certain claims or taxes or things that may not deal with

25     or impact the observer's realization on their claim, I would

Seery - Redirect                            67

1    expect there would be limitations.  There typically are.

2    Q    Okay.  And can you just confirm that Paragraph 3, in

3    Paragraph 3 Mr. Daugherty agreed that he would have absolutely

4    no right of access to Oversight Board meetings unless the

5    Oversight Board made that determination in its sole

6    discretion?

7    A    That, that is correct.  I couldn't promise him something

8    that I can't deliver, and I wanted to make sure that I wasn't

9    in any way limiting the rights of the Oversight Board to

10   determine who, if anyone, could observe their deliberations.

11   Q    Okay.  Ms. Dandeneau took you through certain provisions

12   of the trust agreement and asked you whether or not certain

13   things were expressly authorized.  Do you recall that?

14   A    Yes.

15   Q    And you're generally familiar with the trust document; is

16   that right?

17   A    I am, although clearly from my testimony not as sharp as I

18   need to be.

19   Q    Okay.  Do you recall that there's anything in the trust

20   agreement that expressly prohibits the granting of observer

21   status to third parties?

22   A    I'm quite certain there isn't.

23   Q    Do you recall if there's anything in the trust agreement

24   that expressly prohibits the sharing of information with third

25   parties?

Seery - Redirect                              68

1   A    I'm quite certain there isn't.

2   Q    Are you aware of anything in the trust agreement that

3   expressly prohibits the Oversight Board from deciding that it

4   doesn't want to grant observer access to third parties?

5   A    There is not.

6   Q    Okay.  Is there anything that you're aware of in the trust

7   agreement that prohibits the observer access provision in

8   Paragraph 3 of the proposed settlement agreement?

9   A    No, there isn't.  And just, again, nor would there be.

10  There are observers at boards of directors or trusts.  It's

11  common.  I've never seen, never seen a corporate

12  organizational document or trust organizational document that

13  prohibits observers if the trustee or an oversight board or a

14  board of directors wants to have them.

15          MR. MORRIS:  Okay.  I have no further questions, Your

16  Honor.

17          THE COURT:  Any recross on that redirect?

18          MS. DANDENEAU:  No, Your Honor.  Thank you.

19          THE COURT:  All right.  Thank you, Mr. Seery.

20          THE WITNESS:  Thank you, Your Honor.

21      (The witness is excused.)

22          THE COURT:  Mr. Morris, anything else?

23      CLOSING ARGUMENT ON BEHALF OF THE REORGANIZED DEBTOR

24          MR. MORRIS:  Just really briefly, Your Honor.  The

25  Reorganized Debtor doesn't believe that Mr. Ellington has

1   standing to prosecute his objection because he holds no claim

2   against the Debtor, the Reorganized Debtor, the Trust, or any

3   aspect of the estate.

4       We believe that we've easily met the standard under 9019.

5   We believe this settlement is fair, reasonable, and in the

6   best interests of the estate.  We believe the evidence

7   conclusively shows that the proposed settlement is the subject

8   of arm's-length negotiations; that after doing an exhaustive

9   cost-benefit analysis, that the Debtor, in an exercise of its

10  reasonable judgment, believes that the benefits of the

11  proposed settlement greatly outweigh the costs and expenses of

12  litigation.

13      We believe specifically that with respect to the two items

14  that Mr. Ellington has objected to, that there's absolutely no

15  foundation for characterizing Paragraph 3 of the settlement

16  agreement as a plan modification.  It grants absolutely no

17  rights to Mr. Daugherty whatsoever.  It simply allows the

18  Oversight Board to exercise, in its sole discretion, whether

19  to give him access.  And if he's ever given access, it will be

20  subject to the policies and procedures and agreements of the

21  Oversight Board, including confidentiality.

22      HERA and ERA was an integral part of Mr. Daugherty's

23  claim.  You heard testimony from Mr. Seery that that issue was

24  debated and morphed several times into different types of

25  resolutions before ultimately settling on the final

1 resolution.

2      It's clear from Mr. Ellington's papers, from Mr.

3 Daugherty's papers, that the two of them are going to continue

4 their litigation pattern in the future whether or not the

5 HERA/ERA aspect is part of the agreement or not.  I mean, if

6 somehow that were not part of the agreement, I don't think

7 there's any evidence, I don't think there's any basis, and

8 indeed, it's contrary to what both of them have said, that

9 that would somehow end litigation between them.

10      So it doesn't really matter.  What does matter, Your

11 Honor, is that the Debtor had a very rational business reason

12 for agreeing to that particular term, and that business reason

13 is reflected not just in the transfer of the asset, but most

14 importantly, in the exhibit to the settlement agreement, the

15 HERA release.

16      So, on that basis, Your Honor, we respectfully request

17 that the Court overrule the objection and grant the motion in

18 its entirety.  Thank you.

19           THE COURT:  All right.  Mr. Uebler, any closing

20 argument from you?

21           CLOSING ARGUMENT ON BEHALF OF PATRICK DAUGHERTY

22           MR. UEBLER:  Your Honor, just that Mr. Daugherty

23 requests that the motion be approved.  Thank you for your time

24 this afternoon.

25           THE COURT:  All right.  Ms. Dandeneau, what would you

1   like to say as far as closing argument?

2            MS. DANDENEAU:  Thank you, Your Honor.

3            CLOSING ARGUMENT ON BEHALF OF SCOTT ELLINGTON

4            MS. DANDENEAU:  We fully understand that the standard

5   for approval of a compromise under Bankruptcy Rule 9019

6   focuses on what is in the best interest of the debtor's

7   estate.  And we know that the Court typically defers to the

8   debtor's business judgment.

9        As outlined in our objection, though, Mr. Ellington has

10  two principal concerns with the proposed settlement.  The

11  first raises a legal concern.  Mr. Morris addressed that, his

12  view of it, which is that Highland incorporated the Claimant

13  Trust Agreement into its plan.  The Claimant Trust Agreement

14  is the document that governs the management and operations of

15  the Claimant Trust.  That includes the activities of the

16  Claimant Trust Oversight Board.

17       Article 4 of the Claimant Trust Agreement has extensive

18  provisions dealing with the appointment of the board, the

19  replacement of members, and their rights and responsibilities.

20  And those rights and responsibilities include fiduciary duties

21  and a duty to keep confidential information confidential and

22  not use it for personal gain.  And nowhere in the Claimant

23  Trust Agreement is the granting of observer status to a third

24  party contemplated.

25       The Claimant Trust Agreement never reserved to the

72

1 Claimant Trust the right to invite third parties, otherwise

2 unassociated with the Claimant Trust or the Oversight Board or

3 the Litigation Sub-Trust, to obtain access to confidential

4 information. And granting that kind of provision

5 substantially deviates from the terms of the Claimant Trust

6 Agreement.

7 Indeed, nothing in the Claimant Trust Agreement, other

8 provisions of the plan, or even the settlement agreement even

9 ever mentioned, much less truly defined, what an observer is.

10 That's a significant part of the problem. We have a Claimant

11 Trust that goes to great lengths to lay out the rights and

12 responsibilities of all parties and to protect the Claimant

13 Trust from breaches of confidentiality. And now what we have

14 is really Mr. Seery's word for what will happen with an

15 observer to the Claimant Trust, because those provisions are

16 not included in any document.

17 What are the duties of an observer? What are the rights?

18 What is to prevent Mr. Daugherty from accessing confidential

19 information and then using it? And why does Mr. Daugherty

20 even need access to confidential information?

21 Moreover, Highland would argue that the Claimant Trust has

22 the ability to grant observer status through an amendment.

23 Well, again, we don't believe -- I know that they're not

24 saying that, but we don't believe an amendment can be

25 accomplished through simply the exercise of the Oversight

73

1    Board's sole discretion.  Among other things, an amendment to

2    the Claimant Trust Agreement requires notice and a hearing

3    before this Court for this Court to expressly approve that

4    provision.

5        The second issue, Your Honor, goes to the issue of whether

6    Highland was fully and properly informed of the relevant facts

7    in exercising its business judgment to agree to the inclusion

8    of the observer provision and the HERA provision.  The effect

9    of both of these provisions is to give Mr. Daugherty, who has

10   been accused of stalking Mr. Ellington and family members and

11   other people closely associated with Mr. Ellington, including

12   children, of giving Mr. Daugherty access to information about

13   Mr. Ellington that is not otherwise publicly available.  And

14   there is nothing that we've heard today that provides

15   assurance that the Oversight Board will not provide that

16   access to Mr. Daugherty.

17       No one disputes, at least with respect to the observer

18   provision, that that is a -- that is a significant potential

19   effect.  And Mr. Daugherty himself has stated that he wants

20   the HERA equity so he can access otherwise-privileged

21   communications between HERA and its counsel.  Those are also

22   likely to include confidential information.

23       And I recognize Highland sits here today and says, we had

24   no idea when we signed, our hands are tied, well, this doesn't

25   really hurt Highland's estate.  Should the Court, which is a

1    court of equity, really allow a settlement to be approved when

2    one of the purposes of two provisions that were added after

3    the agreement in principle is to give an alleged stalker

4    better access to his victims?  Should the Court really allow a

5    settlement to be approved when Mr. Daugherty insisted on these

6    provisions that never disclosed to Highland what his so-called

7    investigations of Mr. Ellington and others entailed?

8        Maybe Highland decided to humor Mr. Daugherty, and maybe

9    Highland decided it just wanted to put Mr. Daugherty and all

10   his litigation against Highland behind it.  We get that.  But

11   did Highland really intend to do so in a manner that could

12   pose risk to individuals?

13       We would respectfully submit, Your Honor, that even if

14   Highland was humoring Mr. Daugherty, this is no laughing

15   matter.

16       And moreover, shouldn't this Court question why Mr.

17   Daugherty requested these provisions?  We've heard no credible

18   explanation for why Mr. Daugherty needed the observer

19   provision as a result of the so-called revelations following

20   the confirmation hearing.  I mean, we know that the only

21   effect on the estate from the Sentinel -- so-called Sentinel

22   transaction was that Highland agreed to give UBS a larger

23   claim.  But Highland also agreed to give Mr. Daugherty a

24   larger claim following those "revelations."

25       And if Mr. Daugherty, by the way, is not willing to do a

1  settlement with Highland unless the observer provision is

2  included, what does that tell us about Mr. Daugherty and his

3  motivations?

4      We would respectfully submit, Your Honor, that Mr.

5  Daugherty was less than candid with Highland Capital in

6  requesting these provisions.  Highland should have the

7  opportunity to reject those provisions in light of the

8  allegations, or at least have the opportunity to assure itself

9  and to assure the Oversight Board, by whatever means it deems

10  necessary, that the allegations are not a concern before

11  Highland is bound to the terms of this settlement agreement.

12     Accordingly, Your Honor, so long as the observer provision

13  and the HERA provision remain in the settlement agreement, we

14  would respectfully ask Your Honor to refuse to approve

15  Highland's settlement with Mr. Daugherty.

16         MR. MORRIS:  Your Honor, can I have 15 seconds?

17         THE COURT:  Fifteen seconds.  Timer's on.

18       REBUTTAL CLOSING ARGUMENT ON BEHALF OF THE DEBTOR

19         MR. MORRIS:  Okay.  I think the -- I think the

20  rebuttal is to simply point Ms. Dandeneau to the two questions

21  she asked Mr. Seery, and that is, is there anything that

22  prohibits the members of the Oversight Board from consulting

23  with Mr. Daugherty outside a meeting?  Mr. Seery testified no.

24     Mr. Seery was asked whether there was anything that

25  prevented Oversight Board members from receiving information

1  from third parties outside of the Oversight Board meeting.

2  Mr. Seery said no.

3      That's it.  They -- this is form over substance.  They can

4  do exactly what she's trying to stop outside of -- there's

5  just no substance here.  There's no reason for an amendment.

6  There is no plan modification.  Thank you.

7          THE COURT:  All right.  Thank you.

8      All right.  This will be the Court's ruling on the

9  Reorganized Debtor's motion for an order approving its

10  proposed settlement with Patrick Daugherty.

11      First, the Court has jurisdiction over this contested

12  matter pursuant to 28 U.S.C. Section 1334, and this is a core

13  proceeding under 28 U.S.C. § 157(b).  Bankruptcy Rule 9019 is

14  the governing rule, as well as a multitude of cases, including

15  *AWECO*, *Foster Mortgage*, *Jackson Brewing*, and *TMT Trailer* from

16  the U.S. Supreme Court.

17      What those cases dictate is that a bankruptcy court, when

18  presented with a proposed settlement, should look at is it

19  fair and equitable and in the best interest of the estate,

20  when considering the probability of success if there were to

21  be further litigation, with due consideration of uncertainty

22  of law and fact; the complexity and likely duration of the

23  litigation and any attendant expense and delay; and all other

24  factors bearing on the wisdom of the compromise, keeping in

25  view at all times the paramount interests of creditors, with

1   deference to their reasonable views.

2      Here, the Court obviously just -- well, I'm going to say

3   that reasonable notice has been given of this proposed

4   compromise. The motion has been on file since December 8,

5   2021, so close to three months. And during that time frame,

6   we only had the one objection of Scott Ellington, who is the

7   former general counsel of Highland and holds no claim as a

8   creditor in this case. At one time, he had pending proofs of

9   claim, but they have been disallowed.

10      So, with regard to the Ellington objection, we've talked

11   about standing or no standing. I am of the view that he does

12   not have standing, either statutory or constitutional. It

13   would not appear to be that he is a person affected by the

14   settlement in that he does not have a claim that remains

15   against the estate. He does not seem to qualify as a person

16   aggrieved under case law interpreting that standard.

17      But if I'm wrong about this, I nevertheless overrule the

18   objection as having no merit. This Court is in a unique

19   position to evaluate the bona fides of the settlement, that

20   being that the Court has had many hours of court time in which

21   it has seen evidence and heard argument from Patrick

22   Daugherty.

23      Significant, in the fall of 2020, there was a lengthy

24   multi-hour hearing on what we call a Rule 3018 motion to

25   estimate Mr. Daugherty's claim for voting purposes, for plan

78

1    voting purposes.  In hindsight, I cannot remember how many

2    hundreds of pages of exhibits I looked at in that multi-hour

3    hearing, but after that multi-hour hearing this Court ruled, I

4    think much to the Debtor's dismay and maybe other party in

5    interest dismay, that Mr. Daugherty should be given a claim

6    for voting purposes in the amount of $9,134,019.

7        Of course, that was an estimation based on some evidence

8    but not all evidence.  But again, it puts the Court in a

9    unique position today to not simply look forward on how on how

10   this Court might rule if there was litigation on the remaining

11   proof of claim and how a Court of Appeals might rule; I've

12   actually seen a lot of evidence.

13       So, based on that, I do find the settlement to be

14   certainly within the range of reasonableness, and fair and

15   equitable and in the best interest of the estate.

16       Again, despite what the Court earlier ruled on the 3018

17   motion, Daugherty is going to be given an $8.25 million

18   general unsecured claim, a subordinated general unsecured

19   claim of $3.75 million, a lump sum payment of $750,000 cash in

20   the short term, and then the various releases and transfer of

21   HERA and ERA to Daugherty, as well as this new provision that

22   -- to make sure I've got the wording -- Debtor will use

23   reasonable efforts to petition the Oversight Board to give

24   Daugherty observer access.

25       I find this all, again, to be within the range of

79

1  reasonableness.  The testimony was credible that there had

2  been not just arm's length but hard-fought negotiations over a

3  very long period of time.  Again, it's been a year, or 13

4  months, almost, since the settlement was orally announced.

5  The testimony was credible that there were many drafts, many

6  written drafts of the settlement documents that have gone back

7  and forth since the oral announcement.

8      With regard to the modifications that are objected to

9  here, the observer access to the Oversight Board that may or

10  may not actually happen and the transfer of Highland's

11  interests in HERA and ERA, and then I guess there was a slight

12  increase in the subordinated unsecured claim, none of these,

13  in this Court's view of the evidence and testimony, are

14  materially different from what was orally announced.  But more

15  importantly, they certainly don't rise to the level of plan

16  modifications.

17      And I will add just another word or two about this

18  observer access that has been such a trouble spot for Mr.

19  Ellington.  If this is granted, not only does it not seem

20  materially inconsistent with what might be construed to be

21  allowed under the Claimant Trust Agreement, but during the

22  hearing I couldn't help but think about a Bankruptcy Code

23  statute that I wondered if anybody was going to mention.  No

24  one did.  But it's 1102(b)(3).  Okay?

25      So the bankruptcy nerds on the WebEx will remember that in

1  October 2005 1102(b)(3) was added to the Bankruptcy Code.  And

2  it's a provision that deals with official committees of

3  unsecured creditors during the pendency of the Chapter 11.  So

4  it technically doesn't apply to the Oversight Board, this

5  post-confirmation Oversight Board.  But it provides,

6  1102(b)(3), in case you don't have it in front of you, that a

7  committee, meaning an official unsecured creditors committee,

8  shall, quote, provide access to information for creditors who

9  hold claims of kinds represented by that committee and are not

10  appointed to the committee.  It shall solicit and receive

11  comments from the creditors that I just described, and be

12  subject to a court order that compels any additional report or

13  disclosure to be made to creditors described in Subparagraph

14  A.

15      So I guess my point is, even though we're in a post-

16  confirmation phase, what we're dealing with is an oversight

17  board that basically substitutes in many respects for an

18  official creditors committee when you're in a post-

19  confirmation stage of a Chapter 11.  And if Mr. Daugherty is

20  given access to deliberations, meetings, information of the

21  Oversight Board, it certainly doesn't feel offensive to me,

22  because in a pre-confirmation stage we have a Bankruptcy Code

23  section that is designed to give access to creditors like Mr.

24  Daugherty.  And certainly, you know, we see protocol orders

25  all of the time in Chapter 11s where, you know, people will be

81

1  worried, okay, yes, we have to give access, but we want to

2  require this person to sign confidentiality agreements if

3  there's something confidential about the information.

4      The point is, there are workarounds to deal with concerns

5  about confidentiality and sensitive information.

6      So not only do I determine that this observer access

7  concept is not by any stretch something that should be viewed

8  as a plan modification, but it is within the spirit of the

9  Claimant Trust Agreement, it doesn't run grossly afoul, or

10 afoul, I think, of anything in there.  And, again, it's just

11 observer status.  And it seems to be consistent also with the

12 spirit of this provision of the Bankruptcy Code I just cited.

13     So the Court reserves the right to supplement and amend in

14 the written form of order.  I direct, Mr. Morris, you to

15 submit a form of order, but I do hereby approve the compromise

16 as presented to me.

17     All right.  Well, we do have one other matter on the

18 calendar, as I mentioned in the beginning.  It is in the

19 adversary *Ellington v. Daugherty*, Adversary 22-3003.  This was

20 a routinely-set status conference after removal.  Okay?  This

21 was a state court action that was removed by Mr. Daugherty's

22 counsel to the Bankruptcy Court.  And we did here what we

23 always do:  Roughly 30 days after removal, we set a status

24 conference to see do we need a scheduling order, what kind of

25 case matters do we need to address, and are we going to have

1   consent to Bankruptcy Court adjudication or are we going to

2   have a motion for remand.

3       So I don't know what we're going to attempt to accomplish

4   here because later in this month we have set a hearing on Mr.

5   Ellington's motion for remand and abstention.  So I'll ask

6   counsel, did you all view this setting as something that, you

7   know, we needed to address issues on, or is it premature

8   before we have the hearing on the motion for remand and

9   abstention?

10          MR. YORK:  Your Honor, this is Drew York from Gray

11  Reed.  I represent Mr. Daugherty in the adversary action.  And

12  I agree with the Court that it is, based upon the motion to

13  abstain and remand that was filed, it's premature.  We set the

14  status conference at the Court's request immediately after we

15  filed the removal notice.  I think we can address all of the

16  issues at the hearing at the end of the month.

17          THE COURT:  All right.  Ms. --

18          MS. DANDENEAU:  Your Honor?

19          THE COURT:  Go ahead.

20          MS. DANDENEAU:  We agree with Mr. York and the Court,

21  Your Honor.

22          THE COURT:  Okay.  Well, so I guess we will see you

23  at the end of the month.  I think, what is it, maybe March

24  28th, something like that?  March 29th?

25          MS. DANDENEAU:  I believe it's March 29th.

83

1           THE COURT:  Okay.  And you know that I tend to

2    sometimes share my views just to see if it will spur a fit of

3    reasonableness or encourage people to settle or walk away.

4    I'm pretty exasperated with that attempt in this case.  But

5    this litigation is -- I'm going to call it the stalking

6    lawsuit.  Okay?  Every time -- I don't know how much longer it

7    will be in my court, but as long as it's in my court I'm going

8    to call it what it is, a stalking lawsuit.  It is one grown

9    man accusing another grown man of stalking.  You know, it's

10   just embarrassing to me, and it should be embarrassing to

11   those involved.

12       Now, I have read the lawsuit and I have read that Mr.

13   Ellington accuses Mr. Daugherty of driving by his house,

14   driving by his father's house, driving by his sister's house,

15   driving by his office, 143 sightings, he's taking pictures.

16   And you know, if that's true, again, that's embarrassing.  If

17   -- I don't even know what to say except this is embarrassing.

18   One grown man accusing another grown man of stalking.  Okay?

19   A statute, by the way, that was designed to protect, you know,

20   ex-wives, girlfriends, battered women, from abusive men.  You

21   know, gender doesn't matter, but wow.  It's just -- I don't

22   know what to say except people should be embarrassed, and so

23   that's what I'm going to say.

24       I don't know if it's going to make a whit of difference in

25   anyone's litigation posture.  But we'll come back on March

84

1   29th and we'll do what we need to do on the motions before the

2   Court.

3        (Proceedings concluded at 3:41 p.m.)

4                                 --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                             CERTIFICATE

20       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
21   above-entitled matter.

22    **/s/ Kathy Rehling**                        **03/07/2022**

23   _____    _____

     Kathy Rehling, CETD-444                         Date
24   Certified Electronic Court Transcriber

25

85

INDEX

PROCEEDINGS                                                          3

OPENING STATEMENTS

By Mr. Morris                                                        5
By Mr. Uebler                                                       19
By Ms. Dandeneau                                                    19

WITNESSES

Reorganized Debtor's Witnesses

James P. "Jim" Seery, Jr.
- Direct Examination by Mr. Morris                                 23
- Cross-Examination by Ms. Dandeneau                               39
- Redirect Examination by Mr. Morris                               66

EXHIBITS

Debtor's Exhibits at Docket 3270                      Received  6

Scott Ellington's Exhibit SE-2                        Received 45

CLOSING ARGUMENTS

By Mr. Morris                                                       68
By Mr. Uebler                                                       70
By Ms. Dandeneau                                                    71
By Mr. Morris                                                       75

RULINGS

19-34054-sgj

    Reorganized Debtor's Motion for Entry of an Order               76
    Approving Settlement with Patrick Hagaman Daugherty
    (Claim No. 205) and Authorizing Actions Consistent
    Therewith [3088] - *Granted*

    Reorganized Debtor's Motion for Entry of an Order               --
    Further Extending the Period Within Which It May
    Remove Actions [3199] - *Court Approved Motion at
    Docket 3199 in Chambers Prior to Hearing*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Appx. 05462**

86

```
 1                              INDEX
                                Page 2
 2      RULINGS, cont'd.

 3      22-3003-sgj

 4      Status Conference (Notice of Removal)                81

 5      END OF PROCEEDINGS                                    84

 6      INDEX                                               85-86
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

RULINGS, cont'd.

22-3003-sgj

Status Conference (Notice of Removal) ... 81

END OF PROCEEDINGS ... 84

INDEX ... 85-86