# EXHIBIT 36

**Appx. 05791**

**PACHULSKI STANG ZIEHL & JONES LLP**
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

**HAYWARD PLLC**
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | |
| | § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § | Case No. 19-34054 |
| | § | Chapter 11 |
| | § | |
| Debtor. | § | |
| | § | |

**DEBTOR'S OMNIBUS REPLY TO OBJECTIONS
TO CONFIRMATION OF THE FIFTH AMENDED PLAN OF
REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT L.P. (WITH
TECHNICAL MODIFICATIONS)**

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

1934054210122000000000012

Appx. 05792

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................................... 1

OBJECTIONS ............................................................................................................... 3

I.     Objections Addressed in the Memorandum .......................................................... 3

II.    The Plan Impermissibly Allows for Set Off .......................................................... 4

III.   The Plan Impermissibly Allows Assumption or Rejection After Confirmation ........................................................................................................ 6

IV.   The Attack on the Plan's Release Is Baseless. ...................................................... 6

      A.   Debtor Release Provisions ....................................................................... 6

      B.   Objections and Responses........................................................................ 7

V.    The Court Has Already Exculpated the Independent Directors and their agents For Negligence Pursuant to the January 9, 2020 Settlement Order and, to the Extent Not Covered Therein, the Plan's Exculpation Provisions Effectuate Essential Protections for Estate Fiduciaries and their agents, and Are Fully Supported by the Bankruptcy Code and Applicable Law. .......... 11

      A.   The Settlement Order Already Exculpates the Independent Directors and Their Agents from Claims of Negligence and Those Protections Should Be Continued Post-Confirmation ........................... 12

      B.   Plan Exculpation Provisions .................................................................... 14

      C.   Pacific Lumber ......................................................................................... 16

      D.   Exculpation of the Exculpated Parties Is Permissible and Not Prohibited by *Pacific Lumber*. .................................................................. 19

      E.   Approval of the Exculpation Provisions Is a Legitimate Exercise of the Court's Powers and Follows Directly from the Findings and Conclusions the Court Must Make to Confirm a Plan .......................... 24

VI.   The Plan Injunction Is Appropriate and is Narrowly Tailored to Effectuate the Plan and related provisions of the bankruptcy code. .................................... 28

      A.   Plan Injunction Provisions ...................................................................... 29

      B.   Objections ................................................................................................ 32

      C.   An Injunction against Interfering with the Implementation and Consummation of the Plan Is Both Common and Appropriate. ............. 33

      D.   The Injunction Is Not a Disguised Non-Debtor Third-Party Release. .................................................................................................... 35

i

E.  The Injunction Does Not Prevent the Holders of Claims or Equity Interests from Enforcing Rights Arising under the Plan or Confirmation Order.................................................................. 37

VII.  The Gatekeeper Provision Is Necessary and Appropriate, and Supported by Applicable Law. ...................................................................... 38

A.  The Gatekeeper Provision ................................................................ 38

B.  The Gatekeeper Provision Is Permissible under Sections 105, 1123(b)(6), and 1141(a), (b) and (c) of the Bankruptcy Code. ............... 39

C.  The Gatekeeper Provision Is not an Impermissible Extension of the Post-Confirmation Jurisdiction of the Bankruptcy Court. ...................... 44

D.  The Gatekeeper Provision Is Consistent with the Barton Doctrine. ........ 51

E.  The Gatekeeper Provision Is a Necessary and Appropriate Shield against the Actions of Dondero and his Related Entities......................... 54

VIII.  the exception to discharge does not apply ........................................... 55

IX.  The Senior Employee Objection ....................................................... 57

A.  The Senior Employee Objection Should Be Overruled .......................... 57

B.  Background Related to Senior Employees ................................. 58

C.  Treatment of Senior Employee Claims Under Plan ................................ 62

D.  Plan Solicitation ...................................................................... 63

E.  The Plan Does Not Violate Section 1123(a)(4) ...................................... 64

F.  The Senior Employees Are Not Permitted to Make Convenience Class Election............................................................................ 66

G.  Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Applicable Bankruptcy Law................................................................................ 66

H.  Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Disclosure Statement Order for Voting Purposes ...................................... 68

I.  Even if Convenience Claim Election Were Available, Convenience Claim Election Does Not Impact Voting ................................................ 69

X.  The HCMFA/NPA Gates Objection .................................................... 70

A.  The HMCFA/NPA Objection, the CLO Holdco Objection, and NREP Joinder Should Be Overruled...................................................... 72

B.  The CLO Objectors Cannot Override the CLOs' Consent to Assumption ........................................................................... 74

C.  The CLO Objectors Lack Standing to Object to the Plan........................ 76

**Appx. 05794**

D.      Even if the CLO Objectors Had Standing and the Management
        Contracts Were Not Assignable, the Debtor Could Assume Them
        Because the *Actual Test* Applies in the Fifth Circuit ............................... 82

E.      Even if the CLO Objectors Have Standing and the *Hypothetical
        Test* Applies, the Management Agreements Are Assignable................... 86

F.      The Inadequate Assurance of Future Performance Objection is
        Meritless.................................................................................................. 90

G.      The "Impermissible Partial Assignment" Objection is Meritless............ 92

XI.     State Taxing Authority Objection ....................................................................... 92

XII.    IRS Objection ..................................................................................................... 93

CONCLUSION.................................................................................................................... 99

DOCS_SF:104855.7 36027/002

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp.*
  *(In re Peabody Energy Corp.)*,
  933 F.3d 918 (8th Cir. 2019) ................................................... 65

*Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm.*
  *(In re Pac. Lumber Co.)*,
  584 F.3d 229 (5th Cir. 2009) ................................................... 64

*Bonneville Power Admin. v. Mirant Corp.*
  *(In re Mirant Corp.)*,
  440 F.3d 238 (5th Cir. 2006) ................................................... 83

*Cajun Elec. Members Comm. v. Mabey*
  *(In re Cajun Elec. Power Coop., Inc.)*,
  230 B.R. 693 (Bankr. M.D. La. 1999) ............................... 84, 85

*Cargill, Inc. v. Nelson (In re LGX, LLC)*,
  2005 Bankr. LEXIS 2072 (10th Cir. Oct. 31, 2005) ................. 75

*Concord Square Apartments v. Ottawa Properties*
  *(In re Concord Square Apartments)*,
  174 B.R. 71 (Bankr. S.D. Ohio 1994) ...................................... 67

*CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*,
  2018 U.S. Dist. LEXIS 90174, at *12 (S.D.N.Y. May 23, 2018) ........... 88

*Figter Ltd. v. Teachers Ins. Annuity Ass'n  (In re Figter Ltd.)*,
  118 F.3d 635, 640-641 (9th Cir. 1997) ...................................... 67

*Goldstein v. SEC*,
  451 F.3d 873 (D.C. Cir. 2006) ................................................... 71

*Hertz Corp. v. ANC Rental Corp.*
  *(In re ANC Rental Corp.)*,
  278 B.R. 714 (Bankr. D. Del. 2002) ............................ 74, 75, 80

*Hertz Corp. v. ANC Rental Corp.*
  *(In Re ANC Rental Corp.)*,
  280 B.R. 808 (D. Del. 2002) ..................................................... 75

*In re Acequia, Inc.*,
  787 F.2d 1352 (9th Cir. 1986) ................................................... 65

*In re ANC Rental Corp.*,
  277 B.R. 226 (Bankr. D. Del. 2002) .......................................... 89

*In re Gilbert*,
  104 B.R. 206 (Bankr. W.D. Mo. 1989) ...................................... 67

*In re Hartec Enters., Inc.*,
  117 B.R. 865 (Bankr. W.D. Tex. 1990) ...................................... 85

iv

**Appx. 05796**

*In re Irwin Yacht Sales, Inc.*,
  164 B.R. 678 (Bankr. M.D. Fla. 1994) ................................................................................................. 75

*In re Jacobsen*,
  465 B.R. 102 (Bankr. N.D. Miss. 2011) ............................................................................................. 84

*In re Jones*,
  2012 Bankr. LEXIS 1076, *7 (Bankr. M.D. Ga. 2012) .......................................................... 67

*In re Latham Lithographic Corp.*,
  107 F.2d 749 (2d Cir. 1939) ............................................................................................ 67

*In re Lil' Things, Inc.*,
  220 B.R. 583 (Bankr. N.D. Tex. 1998) ............................................................................................. 84

*In re Lindell Drop Forge Co.*,
  111 B.R. 137 (Bankr. W.D. Mich. 1990) ........................................................................................... 66

*In re Riverside Nursing Home*,
  43 B.R. 682 (Bankr. S.D.N.Y. 1984) ............................................................................................... 75

*In re Virgin Offshore USA, Inc.*,
  No. 13-79, 2013 U.S. Dist. LEXIS 128995, at *15 (E.D. La. Sep. 10, 2013) ......................... 84

*In re Visser*,
  232 B.R. 362 (Bankr. N.D. Tex. 1999) ............................................................................................. 66

*Mabey v. Sw. Elec. Power Co.*
  *(In re Cajun Elec. Power Coop., Inc.)*,
  150 F.3d 503 (5th Cir. 1998) ........................................................................................... 65

*Riemer & Braunstein LLP v. DeGiacomo*
  *(A & E 128 North Corp.)*,
  528 B.R. 190, 199 (1st Cir. B.A.P. 2015) ........................................................................................ 66

*Texaco Inc. v. Louisiana Land & Exploration Co.*,
  136 B.R. 658 (Bankr. M.D. La.1992) .................................................................................... 84, 85

## STATUTES

11 U.S.C. § 365 ....................................................................................................................... 83, 86

## OTHER AUTHORITIES

*American Century Companies, Inc./JP Morgan & Co. Incorporated*, Staff No-Action Letter
  (12/23/1997) ....................................................................................................................... 89

Investment Management Staff Issues of Interest,
  http://www.sec.gov/divisions/investment/issues-of-interest.shtml [June 5, 2012] ................... 89

DOCS_SF:104855.7 36027/002

The above-captioned debtor and debtor-in-possession (the "Debtor") files this omnibus reply to the objections (this "Reply") to the Debtor's *Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (with technical modifications)*[2] (as modified, amended, or supplemented from time to time, the "Plan"). Concurrently herewith, the Debtor has filed its *Debtor's Memorandum of Law in Support of Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management L.P.* (the "Memorandum"). To the extent the Debtor is unable to consensually resolve the Objections, the Debtor respectfully requests that the Bankruptcy Court overrule any remaining or pending Objections as of the Confirmation Hearing and confirm the Plan.

## INTRODUCTION

1.      The Debtor received twelve objections to confirmation of the Plan, inclusive of joinders (collectively, the "Objections" and each objecting party, an "Objector"). As discussed in greater detail in the Memorandum, seven of the twelve objections were filed by Mr. Dondero either individually or via his related entities (collectively, the "Dondero Entities"). **Exhibit A** lists the Dondero Entities and their relationships to each other.[3] The following are the Objections filed by the Dondero Entities:

- *James Dondero's Objection to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1661];

- *Objection to Confirmation of the Debtor's Fifth Amended Plan of Reorganization (filed by Get Good Trust, The Dugaboy Investment Trust)* [Docket No. 1667] (the "Dugaboy Objection");

---

[2] Unless otherwise noted, capitalized terms used in this Reply have the meanings ascribed in the Plan.

[3] As set forth in the Memorandum, none of the Dondero Entities, including the NexPoint RE Entities (defined below), has an actual economic interest in the Estate.

- *Senior Employees' Limited Objection to Debtor's Fifth Amended Plan of Reorganization (filed by Scott Ellington, Thomas Surgent, Frank Waterhouse, Isaac Leventon)* [Docket No. 1669] (the "<u>Senior Employee Objection</u>");[4]

- *Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. (filed by Highland Capital Management Fund Advisors, L.P., Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Advisors, L.P., NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund)* [Docket No. 1670] (the "<u>NPA/HCMFA Objection</u>");[5]

- *NexPoint Real Estate Partners LLC's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexPoint Real Estate Partners LLC f/k/a HCRE Partners LLC)* [Docket No. 1673] (the "<u>NREP Objection</u>");

- *CLO Holdco, Ltd.'s Joinder to Objection to Confirmation of Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. and Supplemental Objections to Plan Confirmation* [Docket No. 1675] (the "<u>CLOH Objection</u>"); and

- *NexBank's Objection to Debtor's Fifth Amended Plan of Reorganization (filed by NexBank Title, Inc., NexBank Securities, Inc., NexBank Capital, Inc., and NexBank)* [Docket No. 1676] (the "<u>NexBank Objection</u>").

2.    That leaves the following as the only non-Dondero related Objections:

- *Objection of Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County to Confirmation of the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1662] (the "<u>State Taxing Authority Objection</u>");

---

[4] Subsequent to the filing of the Senior Employee Objection, Mr. Waterhouse and Mr. Surgent reached an agreement with the Debtor and will withdraw their objections to the Plan.

[5] The NPA/HCMFA Objection is joined (1) by CLO Holdco, Ltd., through the CLOH Objection, and (2) by the following Dondero-controlled entities: NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by the foregoing (collectively, the "<u>NexPoint RE Entities</u>") [Docket No. 1677] (the "<u>NPRE Joinder</u>").

**Appx. 05799**

- *Limited Objection of Jack Yang and Brad Borud to Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.* [Docket No. 1666];

- *United States' (IRS) Limited Objection to Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1668] (the "<u>IRS Objection</u>");

- *United States Trustee's Limited Objection to Confirmation of Debtor's Fifth Amended Plan of Reorganization* [Docket No. 1671] (the "<u>UST Objection</u>"); and

- *Patrick Hagaman Daugherty's Objection to Confirmation of Fifth Amended Plan of Reorganization* [Docket No. 1678].

As of the date hereof, the Date is working to resolve certain of the non-Dondero related Objections.

3.     To avoid duplication, this Reply does not address each objection individually. Rather, it is organized by substantive objection where possible because of the cross-over in the issues raised in the Objections.  Also, as discussed below, where the Debtor has addressed an Objection in the Memorandum, the response is not repeated here.  However, parts of the Senior Employee Objection, the NPA/HCMFA Objection, State Taxing Authority Objection, and the IRS Objection, are addressed individually below.  A summary chart addressing each Objection and the Debtor's response thereto is attached as **Exhibit B**.

<u>OBJECTIONS</u>

## I.     OBJECTIONS ADDRESSED IN THE MEMORANDUM

4.     The Memorandum addresses the Debtor's compliance with the statutory requirements of sections 1123 and 1129 of the Bankruptcy Code.  As part of the analysis in the Memorandum, the Debtor addresses the portions of the Objections alleging that the Debtor failed to comply with and/or violated the statutory provisions set forth in sections 1123 and 1129 of the Bankruptcy Code.  Specifically, the Debtor addresses the arguments that (i) the Plan provides for

**Appx. 05800**

improper subordination; (ii) the Disputed Claims Reserve violates due process; (iii) the Plan does not satisfy the "best interests test;" (iv) the Plan impermissibly provides no Bankruptcy Court oversight of post-effective date transactions; (v) the elimination of vacant classes does not allow for post-Effective Date reclassification of Claims; (vi) the Plan violates the absolute priority rule; (vii) the Plan does not disclose the insiders or the compensation of insiders retained post-Effective Date; (viii) the Plan impermissibly allows modifications to the Plan without Bankruptcy Court approval; and (ix) the Plan is not final because the Plan Supplement is not final.

## II.    THE PLAN IMPERMISSIBLY ALLOWS FOR SET OFF

5.    The NREP Objection and the NexBank Objection erroneously contend that Article VI.M of the Fifth Amended Plan provides for "improper set-off of unidentified claims." NREP Obj. ¶¶ 11-13; NexBank Obj. ¶¶ 10-12.  The challenged language in the NREP Objection and the NexBank Objection is as follows:

> The Distribution Agent may, to the extent permitted under applicable law, set off against any Allowed Claim and any distributions to be made pursuant to this Plan on account of such Allowed Claim, the claims, rights and causes of action of any nature that the Debtor, the Reorganized Debtor, or the Distribution Agent may hold against the Holder of such Allowed Claim….  Any Holder of an Allowed Claim subject to such setoff reserves the right to challenge any such setoff in the Bankruptcy Court or any other court with jurisdiction with respect to such challenge.

Plan, Art. VI.M.

6.    Article VI.M of the Plan accords with Bankruptcy Code section 558 (formerly section 541(e)), which provides that "[t]he estate shall have the benefit of any defense available to the debtor as against any entity other than the estate, including statutes of limitation, statutes

DOCS_SF:104855.7 36027/002

**Appx. 05801**

of frauds, usury, and other personal defenses." 11 U.S.C. § 558; *see In re Braniff Airways, Inc.*, 42 B.R. 443, 447 (Bankr. N.D. Tex. 1984) (a debtor in possession may exercise setoff rights pursuant to Bankruptcy Code section 558 (then section 541(e)); *In re Circuit City Stores, Inc.*, 2009 Bankr. LEXIS 4011 (Bankr. E.D. Va. Dec. 3, 2009) (same); *In re Women First Healthcare, Inc.*, 345 B.R. 131, 135 (Bankr. D. Del. 2006) (same); *In re PSA, Inc.*, 277 B.R. 51, 53 (Bankr. D. Del. 2002) (same); *Second Pa. Real Estate Corp. v. Papercraft Corp. (In re Papercraft Corp.)*, 127 B.R. 346, 350 (Bankr. W.D. Pa. 1991) (same).

7.      In support of the argument that the provision is improper, the NREP Objection and the NexBank Objection contend that Bankruptcy Code section 553 and cases construing that provision limit parties' right of setoff in bankruptcy only to prepetition claims.  NREP Obj. ¶¶ 11-13; NexBank Obj. ¶¶ 10-12.  However, the issue of the scope of the Distribution Agent's setoff rights and the application of section 553 is not even adjudicated by the Plan.[6]  Rather, on its face, the Plan states that the Distribution Agent may exercise setoff rights only "to the extent permitted by law."  Thus, it does not purport to expand setoff rights of the Distribution Agent beyond what is permitted by the Bankruptcy Code but only preserves whatever setoff rights the estate has – no more and no less.  Moreover, as quoted above, it expressly preserves the right of creditors to challenge any setoff that the Distribution Agent seeks to take.

8.      Accordingly, whether the Distribution Agent may take any specific setoffs is reserved by the Plan for another day.  The NREP Objection and the NexBank Objections on this issue are not well-taken, and both such objections should be overruled.

---

[6] The Debtor reserves its rights with respect to the applicability of section 553 to the Distribution Agent's preserved rights of setoff, if any.

DOCS_SF:104855.7 36027/002

**Appx. 05802**

## III.    THE PLAN IMPERMISSIBLY ALLOWS ASSUMPTION OR REJECTION AFTER CONFIRMATION

9.      The NPA/HCMFA Objection contends that the Plan violates section 365(d)(2) because it allows the Debtor to assume or rejection executory contracts or unexpired leases on or prior to the Effective Date.  While the Debtor believes that the original language in the Plan is defensible, the Debtor has elected to amend the Plan to clarify that all executory contracts and leases must be assumed or rejected on or prior to the Confirmation Date.

## IV.    THE ATTACK ON THE PLAN'S RELEASE IS BASELESS.

### A.    Debtor Release Provisions

10.     Article IX of the Plan provides for releases only by the Debtor, its Estate, and the Reorganized Debtor (including their successors, the Claimant Trust and the Litigation Sub-Trust) of any and all Causes of Action, including any derivative claims that might be asserted on behalf of, or in the name of, the Debtor, that the Debtor or the Estate could otherwise assert against the Released Parties[7] (the "Debtor Release").  The Debtor Release is the product of extensive good faith, arm's-length negotiations and complies fully with the Bankruptcy Code and prevailing law. The Debtor Release provides:

> On and after the Effective Date, each Released Party is deemed to be, hereby conclusively, absolutely, unconditionally, irrevocably, and forever released and discharged *by the Debtor and the Estate, in each case on behalf of themselves and their respective successors, assigns, and representatives, including, but not limited to, the Claimant Trust and the Litigation Sub-Trust* from any and all Causes of Action, including any derivative claims, *asserted on behalf of the Debtor,* whether known or unknown, foreseen or unforeseen, matured or unmatured, existing or hereafter arising, in law, equity, contract, tort or otherwise,

---

[7] The "Released Parties" under the Plan are: (i) the Independent Directors; (ii) Strand (solely from the date of the appointment of the Independent Directors through the Effective Date); (iii) the CEO/CRO; (iv) the Committee; (v) the members of the Committee (in their official capacities); (vi) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case; and (vii) the Employees. Plan, Art. I.B., Def. 111.

6

Appx. 05803

*that the Debtor or the Estate would have been legally entitled to assert in their own right* (whether individually or collectively) *or on behalf of* the holder of any Claim against, or Interest in, a Debtor or other Person.

Plan, Art. IX.D (emphasis added.)

11.    The Debtor Release releases, among others, the Independent Directors (each of whom was appointed by the Bankruptcy Court post-petition), Strand (solely from January 9, 2020, the date of the appointment of the Independent Directors, through the Effective Date), the CEO/CRO (who is also an Independent Director and whose role was expanded to include the CEO/CRO role on July 16, 2020), the Committee and its members in their official capacities, the Professionals retained with this Court's approval by the Debtor or by the Committee and, to a more limited extent, the Employees.[8]

12.    The Debtor Release is a release of the Released Parties by the Debtor, the Estate and their successors on account of Causes of Action that belong to the Debtor or the Estate, whether directly or derivatively. *The Debtor Release does not release any Causes of Action of any person other than the Debtor, the Estate and their successors and does not release any claims that could not have been asserted by the Debtor or the Estate prior to the Effective Date.*

### B.    <u>Objections and Responses</u>

13.    Three parties in interest have objected to the Debtor Release.  The Dugaboy Objection objects to the Debtor Release under the mistaken view that the Claimant Trust and Litigation Sub-Trust are (in Dugaboy's view) granting releases of claims that have not yet arisen,

---

[8] The Debtor Release contains restrictions on the releases of the Employees, as may be determined by the Claimant Trust Oversight Committee.  Plan, Art. IX.D.

**Appx. 05804**

*i.e.,* causes of action of the Claimant Trust and Litigation Sub-Trust that arise after the Effective

Date against the Released Parties. *See Dugaboy Objection* at p. 9. The U.S. Trustee Objection

erroneously argues the Debtor Release is an impermissible non-consensual third-party release.

*See UST Objection* at pp. 2-3. The Senior Employee Objection objects to the Debtor Release

because the Senior Employees believe that the Debtor should not be able to condition a release of

the Senior Employees on concessions not required of other Employees obtaining a release. *See*

*Senior Employee Objections* at p. 3.

14. Both Dugaboy and the U.S. Trustee misread the Debtor Release provision. The

Claimant Trust and Litigation Sub-Trust are included solely in their capacity as "successors,

assigns and representatives" of the Debtor and the Estate, and the Debtor Release applies solely

to Causes of Action that ***the Debtor or the Estate*** themselves would have against the Released

Parties (whether a direct claim or a derivative claim, but in either case, only Causes of Action

owned by the Debtor or the Estate). By its express terms, the Debtor Release does not apply to

any future claims or Causes of Action that the Claimant Trust or the Litigation Sub-Trust would

have in its own right, based on post-Effective Date acts or omissions, rather than as a successor

to or assignee of Causes of Action of the Debtor and the Estate.

15. The U.S. Trustee's contention that the Debtor Release provision includes a third-

party release is incorrect. The Debtor Release applies only to claims held by the Debtor and the

Estate, on behalf of themselves and each of their successors, assigns and representatives in favor

of the Released Parties. Any direct claims and causes of action owned by any other person are

not released by the Debtor Release, and nothing in the language of the provision implicates any

**Appx. 05805**

non-derivative claims or causes of action that any third party might have against any of the Released Parties.

16.     The Senior Employees' objection to the proposed Debtor Release also is devoid of merit.  As discussed at length, in Section IX, herein, Employees are not entitled, either contractually or legally, to any release.  Nor does a release given to one Employee entitle any other employee to a similar release.  Releases are discretionary and can be provided, in an exercise of discretion, to persons who have provided consideration to the Debtor and the Estate.  Unlike the other Released Parties, the Senior Employees have not yet fully provided that consideration.  As the Court is aware, the Committee and the Court have consistently voiced concerns regarding the potential release of the Employees, and specifically, the Senior Employees.  The Plan resolves these concerns by imposing significant restrictions and affirmative requirements for any Employee to obtain the benefit of the Debtor Release and additional requirements for the Senior Employees to do so.  *See* Plan, Art. IX.D.

17.     The Bankruptcy Code explicitly provides for and sanctions the inclusion of debtor releases in plans.  Section 1123(b)(3)(A) of the Bankruptcy Code states clearly that a chapter 11 plan may provide for "the settlement or adjustment of any claim or interest belonging to the debtor or to the estate."  The Debtor Release is an essential *quid pro quo* for the Released Parties' significant contributions to the Debtor's restructuring, which has been highly complex and contentious.  There are multiple precedents in which courts have approved releases by a debtor's estate of its own claims against a far more extensive group of persons than those

**Appx. 05806**

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 17 of
126
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 16 of 106

included here.[9]  The Committee and its members (who are Released Parties), who have had over

a year to investigate potential claims against the Employees, among others, fully support the

Debtor Release as to the other identified Released Parties.

18.    It is also important to bear in mind that the Debtor Release applies to claims *of*

*the Debtor or the Estate* against the Released Parties that others might purport to assert

derivatively on behalf of the Debtor or the Estate.  To the extent that Released Parties have

indemnification rights against the Debtor, the assertion of such derivative claims – no matter

how specious – would trigger claims for indemnification that would deplete the assets available

for distribution to creditors. Moreover, regardless of such rights of indemnification, the assertion

of such purported derivative claims on behalf of the Debtor would subject the Debtor to the costs

– both economic, in terms of legal fees, and of the time and distraction of personnel – that would

result from becoming embroiled in such derivative litigation – again, no matter how specious the

claim.

19.    Both the U.S. Trustee and Dugaboy erroneously cite *Pacific Lumber*[10] for the

proposition that releases of third parties – even by the debtor – are always impermissible.

*Pacific Lumber*, however, did not involve the release of claims by a debtor.  The issue addressed

in *Pacific Lumber* was whether a bankruptcy court could approve injunction and exculpation

provisions in a plan that effectively mandated that **holders of claims** release, or be precluded

---

[9] *See, e.g., In re Bigler LP*, 442 B.R. 537, 547 (Bankr. S.D. Tex. 2010) (plan release provisions were acceptable
settlement under § 1123(b)(3) because the debtors and the estate were releasing claims that were property of the
estate); *In re Heritage Org., LLC*, 375 B.R. 230, 259 (Bankr. N.D. Tex. 2007); *In re Mirant Corp.*, 348 B.R. 725,
737-39 (Bankr. N.D. Tex. 2006); *In re Gen. Homes Corp.*, 134 B.R. 853, 861 (Bankr. S.D. Tex. 1991).

[10] *Bank of New York Trust Co., NA v. Official Unsecured Creditors' Committee (In re Pacific Lumber Co.)*, 584 F.3d
229, 251-253 (5th Cir. 2009) ("*Pacific Lumber*")

DOCS_SF:104855.7 36027/002

**Appx. 05807**

from imposing liability on, **non-debtor third parties**. Nothing in *Pacific Lumber* prevents a debtor or its estate on its own behalf and on behalf of assignees and successors created pursuant to a plan, from releasing its own claims against third parties. Indeed, any such ruling would be directly contrary to the express provisions of section 1123(b)(3)(A).

20.     The Debtor Release is a customary plan provision consistent with the business judgement rule, is fair and equitable and in the best interest of the Estate and its creditors and should be approved. No party that has objected to it has cited any case or statutory basis for preventing a debtor and its successors from releasing the debtor's own claims against third parties, or has demonstrated any basis for believing that any claims of the Debtor or the Estate even exist against the Released Parties.

**V.     THE COURT HAS ALREADY EXCULPATED THE INDEPENDENT DIRECTORS AND THEIR AGENTS FOR NEGLIGENCE PURSUANT TO THE JANUARY 9, 2020 SETTLEMENT ORDER AND, TO THE EXTENT NOT COVERED THEREIN, THE PLAN'S EXCULPATION PROVISIONS EFFECTUATE ESSENTIAL PROTECTIONS FOR ESTATE FIDUCIARIES AND THEIR AGENTS, AND ARE FULLY SUPPORTED BY THE BANKRUPTCY CODE AND APPLICABLE LAW.**

21.     Exculpation provisions effectuate the entitlement of court-supervised fiduciaries to qualified immunity for their actions. *See, e.g., In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000); *In re A.P.I., Inc.*, 331 B.R. 828, 868 (Bankr. D. Minn. 2005), *aff'd sub nom., OneBeacon Am. Ins. Co. v. A.P.I., Inc.*, No. CIV. 06-167 (JNE), 2006 U.S. Dist. LEXIS 34297 (D. Minn. May 25, 2006); *Pan Am Corp. v. Delta Air Lines, Inc.*, 175 B.R. 438, 514 (S.D.N.Y. 1994). Such provisions also allow the parties to a chapter 11 case "to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any

**Appx. 05808**

potentially negligent actions in those proceedings" and, on that rationale, have even been approved when necessary to protect non-fiduciary participants in the chapter 11 process. *Blixseth v. Credit Suisse*, 961 F.3d 1074, 1084 (9th Cir. 2020).

22.     As discussed in detail below, the Settlement Order[11] previously entered by this Court has already exculpated the Independent Directors and their agents from potential negligence claims. Accordingly, as it relates to the Independent Directors and their agents, the Plan's Exculpation Provisions simply respect the integrity of the Settlement Order. Moreover, it would be a mistake to construe *Pacific Lumber as* categorically prohibiting exculpation provisions. In fact, *Pacific Lumber* itself expressly endorsed a plan provision exculpating the committee and its members. For the reasons set forth below, exculpating the Exculpated Parties in respect of their post-petition services for the Estate is entirely consistent with *Pacific Lumber*, other applicable law, and the purposes and policies of chapter 11. Exculpation is particularly appropriate in this case to stem the tide of frivolous and vexatious litigation against the Exculpated Parties which Dondero and his Related Entities are seeking so desperately to continue to pursue.

   A.     **The Settlement Order Already Exculpates the Independent Directors and Their Agents from Claims of Negligence and Those Protections Should Be Continued Post-Confirmation**

23.     The Objectors challenge the Exculpation Provisions on the grounds that they constitute an impermissible third-party release that is prohibited by *Pacific Lumber*. What the

---

[11] *See*, *Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course* entered January 9, 2020 [D.I. 339] (the "Settlement Order") and *Order Approving Debtor's Motion under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer and Foreign Representative Nunc Pro Tunc To March 15, 2020* entered July 16, 2020 [D.I. 854].

DOCS_SF:104855.7 36027/002

**Appx. 05809**

Objectors ignore, however, is that this Court has *already* exculpated the Independent Directors and their agents for negligence pursuant to the terms of the Settlement Order – a final order to which Dondero agreed as a means of avoiding the appointment of a chapter 11 trustee, and which has been in place for over a year and was never appealed by any of the Objectors, all of whom had notice of it.[12]  Accordingly, the Court should reject Objectors challenge to exculpation of the Independent Directors and their agents as a collateral attack on the Settlement Order which is indisputably a final order of this Court.[13]

24.    Paragraph 10 of the Settlement Order expressly provides:

> ***No entity may commence or pursue a claim or cause of action of any kind*** against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of <u>willful</u> misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

Settlement Order, ¶ 10 (emphasis added).  Thus, as to the Independent Directors and their agents, they have already been exculpated for negligence, and the Plan Exculpation Provisions simply preserve the necessary protections and standard of liability already established by the Court for these court-appointed fiduciaries by final order which continues in effect pursuant to the plan.[14]

---

[12] *See Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987) (*res judicata* barred a debtor from bringing a claim that was specifically and expressly released by a confirmed reorganization plan because the debtor failed to object to the release at confirmation and was now collaterally attacking the release).

[13] *See Miller v. Meinhard-Commercial Corp.*, 462 F.2d 358, 360 (5th Cir. 1972) ("[e]ven though an action has an independent purpose and contemplates some other relief, it is a collateral attack if it must in some fashion overrule a previous judgment.").

[14] *See* Plan, Art. IX.H (Paragraphs 9 and 10 of the Settlement Order remain in effect post-Confirmation).

13

**Appx. 05810**

25.     Unlike in *Pacific Lumber*, the Independent Directors (which include the CEO/CRO) are not prepetition officers and directors of the Debtor.  The Independent Directors were appointed post-petition by the Court pursuant to the Settlement Order as an urgent measure to address serious concerns raised by the Committee as to extensive breaches of fiduciary duty and lack of disinterestedness by the Debtor's prepetition management.  In recognition of the extraordinarily complex, litigious and volatile situation the Independent Directors were getting into, the Court expressly exculpated the Independent Directors (including the CEO/CRO) and their agents from claims for negligence in connection with their actions in the case.

### B.     Plan Exculpation Provisions

26.     Article IX.C of the Plan addresses the exculpation of certain Exculpated Parties[15] and provides that each Exculpated Party shall be exculpated from any Cause of Action arising out of acts or omissions in connection with this chapter 11 case and certain related transactions, except for any acts or omissions that are determined by Final Order to have constituted bad faith, fraud, willful misconduct, criminal misconduct, or gross negligence (the "Exculpation Provisions").  Although the Exculpation Provisions apply to Strand and certain Employees, the Exculpation Provisions apply solely with respect to actions taken by Strand and such Employees

---

[15] The Plan defines the "Exculpated Parties" as: (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Independent Directors, (v) the Committee, (vi) the members of the Committee (in their official capacities), (vii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (viii) the CEO/CRO, and (ix) the Related Persons of each of the parties listed in (iv) through (viii); provided, however, that, for the avoidance of doubt, none of James Dondero, Mark Okada, NexPoint Advisors, L.P. (and any of its subsidiaries and managed entities), the Charitable Donor Advised Fund, L.P. (and any of its subsidiaries, including CLO Holdco, Ltd., and managed entities), Highland CLO Funding, Ltd. (and any of its subsidiaries, members, and managed entities), Highland Capital Management Fund Advisors, L.P. (and any of its subsidiaries and managed entities), NexBank, SSB (and any of its subsidiaries), the Hunter Mountain Investment Trust (or any trustee acting for the trust), the Dugaboy Investment Trust (or any trustee acting for the trust), or Grant Scott is included in the term "Exculpated Party."

14

**Appx. 05811**

from and after the date of the post-petition appointment of the Independent Directors, through the Effective Date of the Plan, and expressly exclude James Dondero and a number of other specified entities.[16]   The provision provides:

> Subject in all respects to ARTICLE XII.D of this Plan, to the maximum extent permitted by applicable law, no Exculpated Party will have or incur, and each Exculpated Party is hereby exculpated from, any claim, obligation, suit, judgment, damage, demand, debt, right, Cause of Action, remedy, loss, and liability for conduct occurring on or after the Petition Date in connection with or arising out of (i) the filing and administration of the Chapter 11 Case; (ii) the negotiation and pursuit of the Disclosure Statement, the Plan, or the solicitation of votes for, or confirmation of, the Plan; (iii) the funding or consummation of the Plan (including the Plan Supplement) or any related agreements, instruments, or other documents, the solicitation of votes on the Plan, the offer, issuance, and Plan Distribution of any securities issued or to be issued pursuant to the Plan, including the Claimant Trust Interests, whether or not such Plan Distributions occur following the Effective Date; (iv) the implementation of the Plan; and (v) any negotiations, transactions, and documentation in connection with the foregoing clauses (i)-(v); *provided, however,* the foregoing will not apply to (a) any acts or omissions of an Exculpated Party arising out of or related to acts or omissions that constitute bad faith, fraud, gross negligence, criminal misconduct, or willful misconduct or (b) Strand or any Employee other than with respect to actions taken by such Entities from the date of appointment of the Independent Directors through the Effective Date. This exculpation shall be in addition to, and not in limitation of, all other releases, indemnities, exculpations, any other applicable law or rules, or any other provisions of this Plan, including ARTICLE IV.C.2, protecting such Exculpated Parties from liability.

27.    An exculpation provision differs from a release.[17]   An exculpation provision sets a standard of liability that absolves a person from liability for ordinary negligence, but not from liability for more egregious conduct.  In this respect, it is consistent with the duty of care and duty of loyalty standards of the business judgment rule that protects business entities and

---

[16] To the extent there is any conflict between the descriptions of the Exculpation Provisions herein and the Plan, the Plan shall control.

[17] *See In re PWS Holding Corp.*, 228 F.3d 224, 246 (3d Cir. 2000) (holding that an exculpation provision "is apparently a commonplace provision in Chapter 11 plans," does not affect the liability of these parties, but rather states the standard of liability under the Code, and as it exculpated the named parties for actions during the course of the case did not implicate section 524(e).)

individual fiduciaries from liability when their actions are taken within their authority and good faith.[18]

28.     Various objections have been raised to the inclusion of the Exculpation Provisions in the Plan.  Each of the Objectors argues that, except with regard to the Committee and its Professionals, the Exculpation Provisions are impermissible based upon their misunderstanding and overly-broad reading of the opinion of the Fifth Circuit in *Pacific Lumber*.[19]

### C.     Pacific Lumber

29.     Because every argument relied upon by the Objectors as to the permissibility of the Exculpation Provisions is premised on *Pacific Lumber*, it is important to analyze exactly what the Fifth Circuit actually held based on the appeal and the briefing before it.  The portion of the *Pacific Lumber* opinion addressing non-debtor exculpation and releases is less than two pages long and, when appropriately construed, is inapposite to this case, except insofar as it approved the exculpation of the creditors' committee and its members.

30.     In *Pacific Lumber*, a prepetition secured creditor joined with a competitor of one of the debtors to propose a chapter 11 plan (the "MRC/Marathon Plan").  The MRC/Marathon Plan included a provision that exculpated the plan proponents, the reorganized debtors, the unsecured creditors' committee and each of their respective professionals, officers and directors from liability (other than for willful misconduct and gross negligence) relating to proposing, implementing and administering the chapter 11 plan.  The bankruptcy court approved the

---

[18] *See* Bernard S. Sharfman, *Importance of the Business Judgement Rule*, Harvard Law School Forum on Corporate Governance, posted at https://corpgov.law.harvard.edu/2017/01/19/the-importance-of-the-business-judgment-rule/

[19] The Objectors acknowledge the Fifth Circuit expressly held that the exculpation of the unsecured creditors' committee and its members and professionals was appropriate.  Therefore, the Exculpation Provisions as applied to these parties will not be discussed further herein.

DOCS_SF:104855.7 36027/002

Appx. 05813

discharges, releases, exculpations and injunctions pursuant to sections 105, 524, 1123(a)(5) and 1129.

31.     The appellants were an indenture trustee and certain bondholders who had voted against the MRC/Marathon Plan and were the unsuccessful proponents of a competing plan which, incidentally, contained non-debtor third-party releases and exculpation provisions identical in scope to those in the MRC/Marathon Plan.[20]  On appeal, the Fifth Circuit either affirmed or dismissed on mootness grounds in respect of every issue raised on appeal, other than the release and exculpation provisions.  While the issues on appeal had been broadly worded,[21] the only issue in respect of the release and exculpation provisions actually briefed by the appellants was the impropriety of the release and exculpation provisions for the benefit of the non-debtor plan proponents and the committee.[22]

32.     The Fifth Circuit relied *exclusively* on section 524(e) of the Bankruptcy Code for its observation that non-consensual releases or exculpations of non-debtors are not allowed, even for actions taken during the case.  *Id.* at 252-3.  Section 524 is entitled "Effect of discharge" and subsection 524(e) provides that a "discharge of a debt of a debtor does not affect the liability of

---

[20] *See First Amended Chapter 11 Plan for Scotia Pacific Company LLC proposed by the Bank of New York Trust Company, N.A., as Indenture Trustee for the Timber Notes (as modified on April 28, 2008)* [*In re: Scotia Development LLC, et al.*, Case No. 07-20027, U.S. Bankruptcy Court for the S.D. Tex., D.I. 2774], Sections 10.1, 10.3 and 10.4.

[21] *See The Indenture Trustee's Statement of Issues on Appeal of the Order Confirming the MRC/Marathon Plan* [*In re: Scotia Development LLC, et al.*, Case No. 07-20027, U.S. Bankruptcy Court for the S.D. Tex., D.I. 3431] at p. 4, Issue No. 18.

[22] *See Brief of Appellants* [*Bank of New York Trust Co., NA v. Official Unsecured Creditors' Committee,* Case No.08-40746, U.S. Court of Appeals for the Fifth Circuit, August 25, 2008], at pp. 55-56 ("The Plan contains an expansive "Exculpation Clause" which purports to release claims of non-consenting creditors against numerous non-debtors, including "officers, directors, professionals, members, agents and employees" of MRC, Marathon and the Committee. . . . *Having obtained confirmation of the Plan through the erroneous means set forth above, the Plan Proponents propose to use this overbroad release language to exonerate* themselves.") (emphasis added; record cites omitted)

any other entity on . . . such debt." Thus, on its face, section 524(e), only prohibits a plan from discharging obligations of third parties who are liable with the debtor on its debts. The Fifth Circuit focused on co-liability for "pre-petition debts,"[23] yet applied the prohibition to causes of action for "any negligent conduct that occurred during the course of the bankruptcy."[24]

33. Notably, the briefing on the issue presented to the Fifth Circuit had dealt with the impropriety of the exculpation of the non-debtor plan proponents and the committee, but not with the officers and directors of the Debtor. Thus, to the extent the Fifth Circuit included the debtor's officers and directors in its discussion, that discussion constituted mere *dicta*.

34. Although the Fifth Circuit ruled that section 524(e) did not support exculpation for certain persons, such as the non-debtor plan proponents in that case, the Court did not treat section 524(e) as an absolute bar to exculpation provisions in a plan that were supportable by other sections of the Bankruptcy Code, by other applicable law or by legitimate policy considerations relating to the chapter 11 process. In approving the exculpation as to the committee and its members, the court cited to the qualified immunity of committees under section 1103(c) of the Bankruptcy Code and to an important policy concern regarding the effect of denying exculpation on the chapter 11 process: "actions 'against committee members in their capacity as such should be discouraged. If members of the committee can be sued by persons unhappy with the committee's performance during the case or unhappy with the outcome of the case, it will be extremely difficult to find members to serve on an official committee.' The

---

[23] *Id.* at 252.

[24] *Id.*

DOCS_SF:104855.7 36027/002

**Appx. 05815**

Creditors' Committee and its members are the only disinterested volunteers among the parties sought to be released here." *Id.,* at 252 (cites omitted).

35. The Debtor is, of course, not asking this court to override the Fifth Circuit's holding in *Pacific Lumber*. Rather, as discussed below, the facts of this case are such that the rationale applied by the Fifth Circuit to permit exculpation of the committee and its members fully supports the Plan Exculpation Provisions. The need for exculpation has already been recognized by this Court in the Settlement Order. Furthermore, as the *Pacific Lumber* ruling was based solely on section 524(e), nothing in that opinion precludes approval of the Exculpation Provisions pursuant to other provisions of the Bankruptcy Code or other applicable law.

**D.** **Exculpation of the Exculpated Parties Is Permissible and Not Prohibited by *Pacific Lumber*.**

36. The propriety of the Plan Exculpation Provisions should be considered as they apply to each respective Exculpated Party.

37. <u>The Debtor</u>. The Debtor and its successors and assigns are entitled to the relief embodied in the Exculpation Provision. With exceptions not applicable here, the Debtor, as debtor in possession, has all the rights and powers of a trustee. 11 U.S.C. § 1107(a). Accordingly, the Debtor's right to qualified immunity is co-extensive with that of a trustee. Moreover, granting the Debtor such relief falls squarely within the "fresh start" principles underlying the Bankruptcy Code. *See* 11 U.S.C. §§ 524 and 1141. The Claimant Trust and Litigation Sub-Trust are successors to and assigns of the Debtor, and thus, to the extent applicable to the scope of the Exculpation Provisions, should be similarly protected. In the context of this Plan, the Claimant Trust and Litigation Sub-Trust are court-approved fiduciaries

19

**Appx. 05816**

whose sole purpose is to operate the Debtor's business for a limited period of time to effectuate an orderly monetization of the Debtor's assets and pay the claims of creditors. Post-Confirmation, the Debtor and its successors are entitled to exculpation.

38.    The Independent Directors.    Even if the Settlement Order did not plainly provide the Independent Directors with exculpation, in the context of this case, the Independent Directors are akin to committee members and the same rationale the Fifth Circuit used in *Pacific Lumber* to uphold the exculpation of committee members applies to the Independent Directors. The use of independent directors has become commonplace in large complex commercial cases, both on the eve of bankruptcy[25] and post-petition,[26] especially where there are allegations of mismanagement, breaches of fiduciary duty or other conflicts that cast shadows on the relationship between the debtor in possession and its creditors, who question whether existing officers and directors can faithfully perform their fiduciary duties as the face of the debtor in possession.[27]    Independent directors tend to be either experienced restructuring professionals

---

[25] Some examples of major bankruptcy cases in which independent directors have been appointed just prior to bankruptcy, usually due to accounting  irregularities and other events that resulted in distrust of management by major creditor constituencies, include: *Neiman Marcus Group, Inc.* (S.D. Tex); *WorldCom* (S.D. N.Y.); *Sears* (S.D. N.Y.); *California Pizza Kitchen* (S.D. Tex.); *PG&E Corp.* (N.D. Cal.); *Adelphia Communication Corp.* (S.D. N.Y.); Station Casinos (D. Nev.); and *Cengage Learning Centers* (E.D. N.Y.)

[26] *See* Regina Kelbon and Michael DeBaecke, *Appointment of Independent Directors on the Eve of Bankruptcy: Why the Growing Trend*, paper prepared for the Penn. Bar Institute 19th Annual Bankruptcy Institute, June 27, 2014, at pp. 17-23, available at
https://www.blankrome.com/siteFiles/publications//B3795676DF921A7E3BED8A9F15E7FDF3.pdf (discussing use of independent directors both pre- and post-petition and certain cases utilizing same).

[27] *See, e.g., In re Natrol, Inc*., Case No. 14-22446 (Bankr. D. Del.) Motion and Order Appointing Independent Directors [Docket Nos. 248 and 305] (independent directors appointed to settle motion for appointment of trustee by large creditor); *In re 4 West Holdings, Inc.,* Case No. 18-30777 (Bankr. N.D. Tex) Motion and Order Appointing Independent Directors [Docket Nos. 311 and 383] (independent director appointed to review propriety of certain settlements and business and marketing plan); *In re Synergy Pharmaceuticals, Inc*., Case No. 18-14010 (Bankr. S.D.N.Y.) Motion and Stipulation and Order Appointing Independent Directors [Docket Nos. 373 and 553] (independent directors appointed because of pending shareholder derivative actions against prepetition board members); *In re Zohar III, Corp.*, Case No. 18-10512 (Bankr. D. Del.) Order Appointing Independent Director [Docket No. 267] (independent director appointed as part of a mediated settlement over sale of a portfolio of financial services entity debtor]; *In re Interlogic Outsourcing, Inc.*, Case No. 19-31444 (Bankr. N.D. Ind.) Motion

**Appx. 05817**

(attorneys or financial advisors) or seasoned industry professionals with immaculate corporate records. Reliance on the use of independent directors has thus become a critical tool in proper corporate governance and restoring creditor confidence in management in modern day corporate restructurings. Failure to protect independent directors from claims of ordinary negligence will discourage sophisticated restructuring personnel from accepting appointment to such roles and will have a substantial negative effect on the efficacy of the chapter 11 process and the efficient realization of its purposes and goals.

39.     The Independent Directors appointed in this case are persons of such stature, as they include a former bankruptcy judge, former commercial bankruptcy practitioners and a person with expertise in hedge fund operations. As indicated by the Fifth Circuit in *Pacific Lumber*, if estate fiduciaries who are "disinterested volunteers" can be sued for actions taken during the course of a case pursuant to the Bankruptcy Code and under judicial supervision, qualified people would not serve, and the integrity of the chapter 11 process would be compromised. This policy concern is particularly acute where, as here, the Independent Directors undertook their duties in the midst of a highly contentious and litigious case.

40.     In this case, the Independent Directors also are analogous to bankruptcy trustees. Section 1107(a) of the Bankruptcy Code provides that a debtor in possession has all of the rights and powers, and substantially all of the duties, of a bankruptcy trustee, and the case law makes it clear that the debtor in possession and its officers and directors serve in the same fiduciary capacity as a trustee. The Independent Directors were approved by the court to serve as post-

___

and Order Appointing Independent Directors [Docket Nos. 198 and 394] (independent director appointed for general corporate oversight).

DOCS_SF:104855.7 36027/002

**Appx. 05818**

petition fiduciaries in this case in order to resolve insistent and urgent demands for the appointment of a trustee to supplant the prepetition directors and senior officers. In fact, the Court denied the U.S. Trustee's motion seeking appointment of a chapter 11 trustee based primarily on its approval of the Independent Directors to act as court-supervised fiduciaries for the Debtor and the Estate – the functional equivalent of a chapter 11 trustee. It is well established that trustees have qualified immunity for acts taken within the scope of their appointment. *Boullion v. McClanahan*, 639 F.2d 213, 214 (5th Cir. 1981). Like trustees, the Independent Directors are estate fiduciaries. *In re Houston Regional Sports Network, L.P.*, 505 B.R. 468, 481-82 (Bankr. S.D. Tex. 2014) (directors of a non-debtor general partner owe fiduciary duties to the estate of a debtor limited partnership and the fiduciary duties to the estate are paramount.)

41. For the same reasons that the Fifth Circuit upheld the exculpation of committee members in *Pacific Lumber*, and pursuant to sections 105, 1106, 1107, 1123, and 1129 of the Bankruptcy Code and the related applicable non-bankruptcy law governing the immunity and exculpation of fiduciaries, none of which were actually addressed in *Pacific Lumber*, the Exculpation Provisions should be approved as to the Independent Directors and CEO/CRO.

42. Professionals. The Debtor's Professionals are entitled to exculpation. *See, In re Ondova Ltd. Co. v. Sherman*, 914 F.3d 990 (5th Cir. 2019) (protecting counsel for trustee from suit when acting pursuant to direction of its client within the scope of its employment); *Harris v. Wittman (In re Harris)*, 590 F.3d 730 (9th Cir. 2009)(same). There is no distinction in the Bankruptcy Code between counsel for a trustee and counsel for a debtor in possession – both are

**Appx. 05819**

subject to court approval of their retention, both serve as counsel to estate fiduciaries and both are subject to their actions and compensation being reviewed and approved by the Court.[28]

43. Additionally, under applicable Texas law, attorneys are immune from civil liability to non-clients for actions taken in connection with representing a client in litigation. *See Cantey Hanger, LLP v. Byrd, 467 S.W.3d 477, 481* (Tex. 2015); *see also Troice v. Proskauer Rose, L.L.P.,* 816 F.3d 341 (5th Cir. 2016) (dismissing securities fraud litigation brought by third parties against counsel for certain companies related to Ponzi scheme perpetrator Allen Stanford).

44. <u>Strand.</u> It is appropriate to include Strand in the Exculpation Provisions. Strand is the Debtor's general partner, and the Independent Directors are the directors of Strand. Strand should be protected to the same extent as the Debtor and the Independent Directors, and for the same reasons. *See In re Houston Reg'l Sports Network, L.P.,* (directors of a non-debtor general partner owe fiduciary duties to the estate of a debtor limited partnership and the fiduciary duties to the estate are paramount.) In regard to Strand, the Exculpation Provisions apply solely with respect to actions taken by Strand from and after the date of the post-petition appointment of the Independent Directors, through the Effective Date of the Plan.

45. <u>Employees.</u> The Employees, as agents of the Independent Directors, are already covered by the Settlement Order's exculpation provision for acts taken in furtherance of and

---

[28] *See Osherow v. Ernst & Young, LLP (In re Intelogic Trace, Inc.),* 200 F.3d 382 (5th Cir. 2000) (order approving final fee application of court-appointed professional was *res judicata* in respect of subsequent lawsuit by trustee alleging malpractice and negligence where potential claims were known to trustee at the time of final fee hearing.). *See also, Southmark Corp. v. Coopers & Lybrand (In re Southmark Corp.),* 163 F.3d 925 at 931 (5th Cir.), *cert. denied,* 527 U.S. 1004 (1999) (judgment in bankruptcy court lawsuit brought by reorganized debtor seeking fee disgorgement against accountant for debtor for failure to disclose relationship with potential litigant was *res judicata* in respect of subsequent state court lawsuit by debtor for malpractice).

**Appx. 05820**

under the direction and supervision of the Independent Directors in administering, managing and operating the Debtors. However, even if the Employees were not already covered by the Settlement Order, it would be appropriate to include the Employees in the Exculpation Provisions. The Exculpation Provisions apply to the Employees solely with respect to actions taken by the Employees from and after the date of the post-petition appointment of the Independent Directors, through the Effective Date of the Plan.

**E. Approval of the Exculpation Provisions Is a Legitimate Exercise of the Court's Powers and Follows Directly from the Findings and Conclusions the Court Must Make to Confirm a Plan**

46. The Debtor is seeking approval of the Exculpation Provisions in its Plan pursuant to sections 105, 1106, 1107, 1123, and 1129 of the Bankruptcy Code; the qualified immunity of bankruptcy trustees and their agents, and the correlative qualified immunity of debtors in possession; the related applicable non-bankruptcy law on immunity and exculpation of fiduciaries; and the strong policy reasons offered by the Fifth Circuit as to committee members, which apply to the Independent Directors in the same way as the Fifth Circuit applied them to committee members. The Bankruptcy Code makes it clear that "any appropriate provision not inconsistent with the applicable provisions of this title" may be included in a chapter 11 plan.[29]

47. The Fifth Circuit's *Pacific Lumber* ruling denying exculpation to certain parties was based on section 524(e). Some recent court decisions approving exculpation provisions have held, however, that in dealing with complex and litigious bankruptcy cases, section 524(e)

---

[29] 11 U.S.C. § 1123(b)(6).

DOCS_SF:104855.7 36027/002

is not a bar to setting a standard of liability that limits liability for negligence for acts taken during the course of the case in furtherance of the purpose of chapter 11. For example, in *Blixseth*,[30] the Ninth Circuit (which generally does not permit third-party releases in plans) determined that the exculpation clause at issue did not implicate section 524(e) because it related to post-petition actions that occurred during the bankruptcy process, and did not implicate any potential liability on prepetition debts of the debtor. The Court further explained that, despite prior Ninth Circuit decisions disproving third-party releases relating to such prepetition debts of the debtor, exculpation provisions with third-party releases are permissible because chapter 11 cases are often "highly litigious" where "oxes [sic] are gored" and such releases limited in time and scope "allow the settling parties. . . to engage in the give-and-take of the bankruptcy proceeding without fear of subsequent litigation over any potentially negligent actions in those proceedings." *Id.* at 1084. Finally, the court held, as many of its sister circuits have held, that under sections 105(a) and 1123 "the bankruptcy court here had the authority to approve an exculpation clause intended to trim subsequent litigation over acts taken during the bankruptcy proceedings and so render the Plan viable." *Id.* Significantly, the creditor whose exculpation was at issue in *Blixseth* was not even an estate fiduciary. *Id.* at 1081.

48. Another court recently dealing with exculpation issues discussed the need for an appropriately-constructed exculpation of estate fiduciaries and exculpation relating to court approved transactions in order to preserve the basic integrity of the chapter 11 process. In *In re Aegean Marine Petroleum Network, Inc.*, 599 B.R. 717 (Bankr. S.D.N.Y 2019), the bankruptcy

---

[30] 961 F.3d 1074 (9th Cir. 2020)

Appx. 05822

court was presented with a broad exculpation clause in a plan that protected not only court-supervised fiduciaries, but also entities such as the acquirer, the acquirer's professionals, the pre- and post-petition lenders and the indenture trustees. As here, the exculpation provision pertained to acts and omissions taken in connection with and during the bankruptcy case, but excluded acts of fraud, willful misconduct or gross negligence.

49. The court declined to approve the exculpation provision as written, holding that it was overly broad, but nevertheless provided significant guidance on what an appropriate exculpation provision should provide:

> *I think that a proper exculpation provision is a protection not only of court-supervised fiduciaries, but also of court-supervised and court-approved transactions.* If this Court has approved a transaction as being in the best interests of the estate and has authorized the transaction to proceed, then the parties to those transactions should be not be subject to claims that effectively seek to undermine or second-guess this Court's determinations. In the absence of gross negligence or intentional wrongdoing, parties should not be liable for doing things that the Court authorized them to do and that the Court decided were reasonable things to do. *Cf. Airadigm Commc'ns., Inc. v. FCC (In Re Airadigm Communs., Inc.)*, 519 F.3d 640, 655-57 (7th Cir. 2008) (approving a plan provision that exculpated an entity that funded a plan from liability arising out of or in connection with the confirmation of the Plan, except for willful misconduct); *In re Granite Broad. Corp.*, 369 B.R. 120, 139 (Bankr. S.D.N.Y. 2007) (approving exculpation provision that was limited to conduct during the bankruptcy case and noting that the effect of the provision is to require "that any claims in connection with the bankruptcy case be raised in the case and not be saved for future litigation.").

599 B.R. at 720-721 (emphasis added). The Exculpation Provisions in the Plan here are consistent with the policy-based and chapter 11 process-based guidelines provided by Judge Wiles in *Aegean Marine*, in that they apply to court-supervised fiduciaries and transactions entered into under the auspices of the court.

50.     Additionally, the bankruptcy court's power to approve an exculpation provision in a chapter 11 plan flows naturally from the fact that it cannot confirm a chapter 11 plan unless it finds that the proponent of the plan has complied with the applicable provisions of the Bankruptcy Code and the plan has been proposed in good faith.[31]  The plan is the culmination of the chapter 11 case.  By confirming a plan and making the "good faith" finding, the court is determining that the plan proponent (usually, the debtor) and its officers and directors have acted appropriately throughout the case, consistent with their fiduciary duties and have been administering, managing and operating the debtor in accordance with the provisions of the Bankruptcy Code and applicable law.[32]  Once the court makes its good faith finding, it is appropriate to set the standard of liability of the fiduciaries (and, as in *Blixseth*, other parties) involved in the formulation of that chapter 11 plan.[33]

51.     An exculpation provision appropriately prevents future collateral attacks against fiduciaries of the debtor's estate.  Here, the Exculpation Provisions are appropriate because they provide protection to those parties who served as post-petition court-approved fiduciaries during the restructuring process – relief that in this litigious case, as all participants are painfully aware, is indispensable.  The Exculpation Provisions are in consideration for services rendered, hard work, and perseverance in the face of threats to professional reputation and bodily harm.  The Exculpation Provisions should be approved, and the objections, asserted for the most part by the

---

[31] *See* 11 U.S.C. § 1129(a)(2) and (3).

[32] *See* 11 U.S.C. § 1129(a).

[33] *See PWS*, 228 F.3d at 246-247 (observing that creditors providing services to the debtors are entitled to a "limited grant of immunity . . . for actions within the scope of their duties . . . .").

DOCS_SF:104855.7 36027/002

Appx. 05824

very individual and entities that have created the need for such provisions by turning this case into a war zone, should be overruled.

## VI. THE PLAN INJUNCTION IS APPROPRIATE AND IS NARROWLY TAILORED TO EFFECTUATE THE PLAN AND RELATED PROVISIONS OF THE BANKRUPTCY CODE.

52.    The Court should approve the injunction provisions (the "Injunction" or "Injunction Provisions"), set forth in Article IX.F of the Plan.  This is because the Injunction Provisions are necessary and appropriate to enable the Debtor and its successors to carry out, and obtain the benefits of, the provisions of the Bankruptcy Code relating to the Plan and the proper implementation and consummation of the Plan.  Approval of the requested Injunction Provisions is well within this Court's powers.

53.    The Objectors have objected to the Injunction Provisions on several grounds.  The Debtor has reviewed the Injunction Provisions and revised them to address certain of the Objectors' concerns as follows:

- The Injunction and Gatekeeper Provisions have been narrowed to apply only to Enjoined Parties.[34]

- The Independent Directors are no longer included in the second paragraph of the Injunction.

- The Reorganized Debtor and the Claimant Trust have been deleted from the second paragraph of the Injunction in order to eliminate any potential confusion that they were included in any capacity other than as successors to the Debtor, which is now clarified in the third paragraph of the Injunction.

---

[34] "*Enjoined Parties*" means (i) all Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether or not proof of such Claims or Equity Interests has been filed and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan), (ii) James Dondero ("Dondero"), (iii) any Entity that has appeared and/or filed any motion, objection, or other pleading in this Chapter 11 Case regardless of the capacity in which such Entity appeared and any other party in interest, (iv) any Related Entity, and (v) the Related Persons of each of the foregoing.  Plan, Art. I.B., Def. 56 (new definition in the Plan (as amended)).

**Appx. 05825**

- The Injunction is subject to parties' rights to set off to the extent permitted post-confirmation under sections 553 and 1141 of the Bankruptcy Code.

- The Gatekeeper Provision has been amended to clarify the actions for which parties must first seek the approval of the Bankruptcy Court to pursue.

- The grant of exclusive jurisdiction over the merits previously contained in the Gatekeeper Provision has been removed, and the Gatekeeper Provision has been modified to provide that if the Bankruptcy Court, as gatekeeper, decides an action can be brought, the Bankruptcy Court will adjudicate that action on the merits *only* to the extent the court has jurisdiction to do so.

- Articles IX.G and H of the Plan have been modified to clarify the duration of the automatic stay and other injunctions which are either currently in effect or contained in the Plan.

54.     The Injunction Provision, as modified, merely implement and enforce the Plan's discharge, release, and Exculpation Provisions and related provisions of the Bankruptcy Code and enjoin the Enjoined Parties from commencing or maintaining actions to interfere with the implementation or consummation of the Plan. The Injunction Provisions are a necessary part of the Plan because they protect the Plan implementation provisions required to monetize the Debtor's assets and pursue the Causes of Action, all of which has been vociferously and continually opposed and litigated by Dondero and his numerous Related Entities, with such vexatious opposition likely to continue post-confirmation. Several parties – principally Dondero, Dugaboy and his Related Entities – have objected to the Injunction, which is not surprising because Dondero and his Related Entities undoubtedly intend to continue their litigation crusade against the Debtor and its successors after confirmation of the Plan.

### A.     Plan Injunction Provisions

55.     Section IX.F of the Plan is entitled "Injunction" and applies post-Effective Date. The Injunction contains three distinct provisions:

29

**Appx. 05826**

56. Paragraph 1, as amended, provides:

**Upon entry of the Confirmation Order, all** ~~holders of Claims and Equity Interests and other parties in interest, along with their respective Related Persons,~~ **Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, from taking any actions to interfere with the implementation or consummation of the Plan.**

57. As revised, paragraphs 2 and 3 provide:

**Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court, all** ~~Entities who have held, hold, or may hold Claims against or Equity Interests in the Debtor (whether proof of such Claims or Equity Interests has been filed or not and whether or not such Entities vote in favor of, against or abstain from voting on the Plan or are presumed to have accepted or deemed to have rejected the Plan) and other parties in interest, along with their respective Related Persons, are~~ **Enjoined Parties are and shall be permanently enjoined, on and after the Effective Date, with respect to** ~~such~~ **any Claims and Equity Interests, from directly or indirectly (i) commencing, conducting, or continuing in any manner**~~, directly or indirectly~~ **any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor**~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor**~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~**, (ii) enforcing, levying, attaching (including any prejudgment attachment), collecting, or otherwise recovering, enforcing, or attempting to recover or enforce, by any manner or means**~~, whether directly or indirectly~~**, any judgment, award, decree, or order against the Debtor**~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor**~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~**, (iii) creating, perfecting, or otherwise enforcing in any manner,** ~~directly or indirectly,~~ **any security interest, lien or encumbrance of any kind against the Debtor**~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or the property of** ~~any of~~ **the Debtor**~~, the Independent Directors, the Reorganized Debtor, or the Claimant Trust~~**, (iv) asserting any right of setoff, directly or indirectly, against any obligation due** ~~from~~ **to the Debtor** ~~Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **or against property or interests in property of** ~~any of the Debtor, Independent Directors, the Reorganized Debtor, or the Claimant Trust~~ **the Debtor, except to the limited extent permitted under Sections 553 and 1141 of the Bankruptcy Code, and (v) acting or proceeding in any manner, in any place whatsoever, that does not conform to or comply with the provisions of the Plan.**

**The injunctions set forth herein shall extend to, and apply to any act of the type set forth in any of clauses (i)-(v) of the immediately preceding**

DOCS_SF:104855.7 36027/002

**paragraph against** any successors of the Debtor, including, but not limited to, **the Reorganized Debtor,** the Litigation Sub-Trust, **and the Claimant Trust and their respective property and interests in property.**

Plan, Art. IX.F.

58.    As amended, paragraph 4 of Section IX.F contains a gatekeeper provision (the "Gatekeeper Provision") which provides:

**Subject in all respects to ARTICLE XII.D, no** ~~Entity~~ Enjoined Party **may commence or pursue a claim or cause of action of any kind against any Protected Party that arose** or arises **from or is related to the Chapter 11 Case, the negotiation of** ~~this~~ the **Plan, the administration of the Plan or property to be distributed under the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the administration of the Claimant** Trust or the Litigation Sub-~~Trust,~~ **or the transactions in furtherance of the foregoing without the Bankruptcy Court (i) first determining, after notice** and a hearing, **that such claim or cause of action represents a colorable claim** of any kind, including, but not limited to, negligence, **bad faith, criminal misconduct, willful misconduct, fraud, or gross negligence against a Protected Party and (ii) specifically authorizing such** ~~Entity~~ Enjoined Party **to bring such claim** or cause of action against **any such Protected Party;** *provided, however,* **the foregoing will not apply to** a claim or cause of action against **Strand or** against **any Employee other than with respect to actions taken,** respectively, by Strand or **by such** ~~Entities~~ Employe**e from the date of appointment of the Independent Directors through the Effective Date.** ~~As set forth in ARTICLE XI, the~~ The **Bankruptcy Court will have sole** and exclusive jurisdiction to determine whether a claim or cause of action is colorable and, only to the extent legally permissible and as provided for in ARTICLE XI, shall have **jurisdiction to adjudicate** ~~any such claim for which approval of the Bankruptcy Court to commence or pursue has been granted~~ the underlying colorable claim or cause of action.

Plan, Art. IX.F.

59.    To the extent an Enjoined Party believes it has any claims against a Protected Party, such Enjoined Party must first seek permission of the Bankruptcy Court to file such action and demonstrate that the claims it seeks to assert are colorable claims.  Subject to certain carve outs, Protected Parties are defined collectively as:

31

**Appx. 05828**

> (i) the Debtor and its successors and assigns, direct and indirect majority-owned subsidiaries, and the Managed Funds, (ii) the Employees, (iii) Strand, (iv) the Reorganized Debtor, (v) the Independent Directors, (vi) the Committee, (vii) the members of the Committee (in their official capacities), (viii) the Claimant Trust, (ix) the Claimant Trustee, (x) the Litigation Sub-Trust, (xi) the Litigation Trustee, (xii) the members of the Claimant Trust Oversight Committee (in their official capacities), (xiii) New GP LLC, (xiv) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, (xv) the CEO/CRO; and (xvi) the Related Persons of each of the parties listed in (iv) through (xv); . . . .

Plan, Art. I.B. Def. 105.   If the Bankruptcy Court determines a claim is colorable, the Bankruptcy Court will make a separate determination as to whether it has jurisdiction to adjudicate such claim on its merits in accordance with the terms of the Plan and applicable law.

### B.    Objections

60.    A number of parties, including Dondero and many of his affiliated, controlled or influenced entities, object to the Injunction Provisions (as identified in the chart of objections attached as Exhibit B).  The Objectors all raise similar arguments and allege:

- The Injunction is ambiguous and overly-broad because the meaning of the phrase "implementation and consummation of the plan" is unclear.

- The Injunction operates post-effective date and enjoins post-confirmation claims against non-debtor third parties for post confirmation conduct.

- The Injunction is a disguised non-debtor third party release.

- The Injunction Provisions prevent holders of Claims and Equity Interests from enforcing rights created by the Plan after the Effective Date.

- The Gatekeeper Provision effectuates an impermissible extension of the jurisdiction of the Bankruptcy Court.

61.    As summarized above and discussed more fully below, the Injunction Provisions, as amended, have addressed certain of these arguments.  The remaining objections, however,

**Appx. 05829**

lack merit and are based on either a misreading of the actual Injunction Provisions or a misstatement of applicable law. Each objection will be addressed below.

### C. An Injunction against Interfering with the Implementation and Consummation of the Plan Is Both Common and Appropriate.

62. Certain objectors argue that the first paragraph of the Plan Injunction, which enjoins all holders of Claims or Equity Interests and other parties in interest, along with their Related Persons, from taking any action to interfere with the "implementation or consummation of the Plan," is overly-broad and ambiguous because the meaning of the phrase "implementation and consummation of the plan" is somehow unclear. These objections are specious.

63. An injunction in aid of the effectuation of a confirmed plan is typically included in a plan and confirmation order to prevent actions to impede or frustrate the plan proponent's necessary and appropriate actions after confirmation to effectuate the plan and carry out the court's confirmation order. The Injunction is supported by the express provisions of sections 1123(a)(5), 1123(b)(6), 1141(a), 1141(c), and 1142. The Injunction effectuates the purposes of plan confirmation and chapter 11 and preserves and protects the integrity of the chapter 11 process and the court's orders.

64. The terms "implementation" and "consummation" are neither vague nor overly-broad; they are both terms found in the text of chapter 11 of the Bankruptcy Code and are well understood – and injunctions against interfering with them are common features of plans confirmed throughout the country, including in this District.[35] Section 1123(a)(5) expressly

---

[35] *See, e.g., In re Tuesday Morning Corp.* (Case No. 20-31476, Bankr. N.D. Tex.) *Debtor's Second Amended Plan of Reorganization* [D.I. 1913-1] attached to *Order Confirming the Revised Second Amended Joint Plan of Reorganization,* at pp. 90-91/137; *In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) *Debtors' Fourth Amended Joint Amended Chapter 11 Plan of Reorganization Pursuant to Chapter 11 of the United States*

**Appx. 05830**

mandates that "a plan <u>shall</u> . . . provide adequate means for the plan's <u>implementation</u>" (emphasis added) and contains a non-exclusive list of what means that could include. In compliance with section 1123(a)(5), this Plan expressly sets out the means for its "implementation." *See* Plan, Article IV: Implementation of Plan. *See also* 11 U.S.C. § 1142. The Injunction would enjoin any interference with these implementation steps.

65. The word "consummation" is also found in the Bankruptcy Code and has been discussed by numerous courts. For example, section 1101(2) defines "substantial consummation" of a plan to be (A) the transfer of the assets to be transferred under the plan; (B) the assumption by the debtor or the successor to the debtor of the management of all of the property dealt with by the plan; and (C) commencement of distribution under the plan. Of course, the term "consummation," without the qualifier "substantial," is more expansive and would extend, for example, to the completion of distributions under the Plan and the disposition of all of the property dealt with by the Plan. *See, e.g., United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 305 (5th Cir. 2002) (distinguishing "substantial consummation" of a plan from final consummation of a plan, which occurs after the effective date when the plan distributions are concluded.)

66. This portion of the Injunction merely prevents holders of Claims or Equity Interests and other Enjoined Parties from interfering with the actions the Debtor, and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust must take

---

*Bankruptcy Code* [D.I. 1671-1, attached to *Findings of Fact and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Amended Chapter 11 Plan of Reorganization Pursuant to Chapter 11 of the United States Bankruptcy Code*, Sec. 10.5.

DOCS_SF:104855.7 36027/002

**Appx. 05831**

to effectuate the terms of the Plan after the Plan is confirmed by the Court. There is nothing nefarious or unusual about this provision and it should be approved.

### D. The Injunction Is Not a Disguised Non-Debtor Third-Party Release.

67. The Injunction does not contain a non-debtor third-party release. As set forth in the Plan, as amended, the Debtor has provided clarification to address the concerns of the Objectors who interpreted the prior provision to effectuate a non-debtor third-party release. The amended second and third paragraphs of the Injunction prevent the Enjoined Parties from taking the enumerated actions on or after the Effective Date against the Debtor or its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, or against the property of the Debtor, or its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, except as set forth in the Plan or in the Confirmation Order. The Debtor has eliminated the Independent Directors from these provisions of the Injunction. As revised, nothing in this section of the Injunction does anything more than prevent the Enjoined Parties from taking actions that do not comply with or conform to the provisions of the Plan, and limit holders of Claims and Equity Interests with respect to such Claims and Equity Interests to the recoveries provided under the Plan, all as contemplated by sections 1123(b)(6) and 1141 in respect of claims or interests arising either prepetition or post-petition. The ultimate goal of a chapter 11 case is for a debtor to confirm a plan which, after confirmation, effectively channels all claims and interests of creditors and interest holders to the treatment provided for the pre- and post-petition claims and interests under the plan, and limits the liability of the debtor (including the

DOCS_SF:104855.7 36027/002

**Appx. 05832**

"reorganized debtor") and any successor that receives property of the debtor dealt with by the plan (such as a plan trust) to the liability imposed by that treatment.

68. Sections 1123 and 1129 of the Bankruptcy Code require a plan to describe how it will treat the claims of creditors and the interests of equity holders, both those that existed prepetition and those that arise during the course of a case. The purpose of the Injunction is to protect the Debtor and its successors under the Plan – the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust –against litigation to pursue the very same prepetition and post-petition claims and interests that are being treated under the Plan. As described below, providing the protection of the Injunction to all of such entities is both legal and appropriate.

69. As to the Debtor, the Injunction is appropriate, because it implements the injunctive relief the Bankruptcy Code affords the Debtor, whether or not it gets a discharge, as a result of plan confirmation. If the Debtor is entitled to the discharge as contemplated by the Plan, then it is accorded the injunction provided by sections 1141(d) and 524(a). But even if the Debtor does not receive a discharge then, pursuant to section 362(c)(2)(A), the automatic stay will remain in effect until the case is closed, and the Injunction is in aid of that stay. Moreover, pursuant to section 1141(c) of the Bankruptcy Code, because *all* of the Debtor's property is "dealt with by the plan," all of that property will be "free and clear of all claims and interests . . . .," both as to property retained by the Debtor, and property transferred to its successors. Accordingly, the Injunction is an appropriate means of enforcing section 1141(c).

70. Nothing in the Injunction effectuates a third-party release in contravention of section 524(e) of the Bankruptcy Code. As to the "Reorganized Debtor," this term simply means

the Debtor on and after the Effective Date. *See* Plan, Art. I.B., Definition 112. The Reorganized Debtor, therefore, should be entitled to the same injunctive relief as the Debtor. To hold otherwise would be illogical.

71. The Claimant Trust and Litigation Sub-Trust are successors to the Debtor – both in structure and in assets. Neither the Claimant Trust nor the Litigation Sub-Trust come into existence until the Effective Date, and thus, the only liability they could have to the holders of Claims and Equity Interests would be the liability to treat such Claims and Equity Interests as set forth in the Plan. All of the property of the Claimant Trust and Litigation Sub-Trust is property of the Debtor and the Estate that these Trusts will receive from the Debtor and the Estate pursuant to the Plan on the Effective Date and is "dealt with" by the Plan. Accordingly, under section 1141(c), that property will be received and held by the Claimant Trust and the Litigation Sub-Trust "free and clear of all claims and interests of creditors and equity security holders." Paragraph 2 of the Injunction is in aid of this provision and, in the words of section 105, is "necessary or appropriate to carry out the provisions of" the Bankruptcy Code, *i.e.,* section 1141(c).

### E. The Injunction Does Not Prevent the Holders of Claims or Equity Interests from Enforcing Rights Arising under the Plan or Confirmation Order.

72. The Injunction does not prevent holders of Claims or Equity Interests from enforcing, after the Effective Date, rights arising under the Plan or the Confirmation Order. The scope of the Injunction is specifically subject to the Plan, the Confirmation Order and any other order of the Court. Thus, the right of the holder of a Claim or Equity Interest to receive its plan distributions, as set out in the Plan, is not impacted – such persons are merely enjoined from

DOCS_SF:104855.7 36027/002

**Appx. 05834**

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 45 of
126
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 44 of 106

taking the enumerated actions to enforce their Claims or Equity Interests outside of the Plan

process and treatment.  If, for example, the Claimant Trust made distributions to certain creditors

but not others, those who did not receive their distribution, would be free to enforce the

provisions of the Plan contract.  This is clear from the language of the Injunction, which begins

"[e]xcept as expressly provided in the Plan, the Confirmation Order, or a separate order of the

Bankruptcy Court. . . ."  Plan, Art. IX.F.

73.      The Injunction is not a third-party release, does not prevent enforcement of the

provisions of the Plan itself, and is neither vague nor overly-broad.  The Court should overrule

the objections and approve the Injunction in aid of the consummation and administration of the

Plan as appropriate and consistent with sections 362, 1123 and 1141 of the Bankruptcy Code.

## VII.    THE GATEKEEPER PROVISION IS NECESSARY AND APPROPRIATE, AND SUPPORTED BY APPLICABLE LAW.

### A.    The Gatekeeper Provision

74.      Paragraph 4 of Section IX.F contains neither a release nor an injunction.  Rather,

Paragraph 4 contains a provision that requires any Enjoined Party that believes it has <u>any</u> claims

against a Protected Party "**that arose or arises from or is related to the Chapter 11 Case, the**

**negotiation of the Plan, the administration of the Plan or property to be distributed under**

**the Plan, the wind down of the business of the Debtor or Reorganized Debtor, the**

**administration of the Claimant Trust or the Litigation Sub-Trust, or the transactions in**

**furtherance of the foregoing**" to first seek leave from the Bankruptcy Court to pursue such

alleged claims and present evidence as to why it believes it has a colorable claim against the

DOCS_SF:104855.7 36027/002

**Appx. 05835**

Protected Person. As discussed below, provisions such as this one, which have been referred to as "gatekeeper" or "channeling" provisions, are neither uncommon nor impermissible.

75.    It should come as no surprise that Dondero and his cohorts are the only ones who object to the Gatekeeper Provision. The last thing they want is for a court that has had the misfortune of familiarizing itself with their antics to pass on the *bona fides* of any new tactics and lawsuits they may conjure up to stymie this case. However, as set forth below, their challenges to this Court's power and jurisdiction to pre-screen if their new lawsuits are colorable represent wishful thinking.

**B.    The Gatekeeper Provision Is Permissible under Sections 105, 1123(b)(6), and 1141(a), (b) and (c) of the Bankruptcy Code.**

76.    The Gatekeeper Provision is a legitimate exercise of this Court's powers under sections 105,[36] 1123(b)(6),[37] and 1141(a), (b) and (c).[38] The Bankruptcy Court serves as the literal guardian at the gate – determining whether a litigant has a colorable claim and may pass

---

[36] Section 105 is entitled "Power of court" and provides: (a) The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title. No provision of this title providing for the raising of an issue by a party in interest shall be construed to preclude the court from, *sua sponte*, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent an abuse of process.

[37] Section 1123(b)(6) provides: (b) Subject to subsection (a) of this section, a plan may— (6) include any other appropriate provision not inconsistent with the applicable provisions of this title.

[38] Section 1141 is entitled "Effect of confirmation" and provides, in relevant part:

> (a) Except as provided in subsections (d)(2) and (d)(3) of this section, the provisions of a confirmed plan bind the debtor, any entity issuing securities under the plan, any entity acquiring property under the plan, and any creditor, equity security holder, or general partner in the debtor, whether or not the claim or interest of such creditor, equity security holder, or general partner is impaired under the plan and whether or not such creditor, equity security holder, or general partner has accepted the plan.

> (b) Except as otherwise provided in the plan or the order confirming the plan, the confirmation of a plan vests all of the property of the estate in the debtor.

> (c) Except as provided in subsections (d)(2) and (d)(3) of this section and except as otherwise provided in the plan or in the order confirming the plan, after confirmation of a plan, the property dealt with by the plan is free and clear of all claims and interests of creditors, equity security holders, and of general partners in the debtor.

39

Appx. 05836

through the gate to the applicable clerk of court and file a lawsuit. The Debtor recognizes that a Gatekeeper Provision is not found in every chapter 11 plan. However, this case is not a typical case. Indeed, recognizing the need for, and importance of, this role under the facts of this case, the Court previously entered the Settlement Order (agreed to by Dondero) which itself contains a gatekeeper provision protecting the Independent Directors. The purpose of the Gatekeeper Provision in the Plan is to insulate the Protected Persons, many of whom will be either successors to the Debtor or the fiduciaries charged with continuing the administration of the Debtor's property and causes of action post-Effective Date (which essentially involves the wind-down of the business, the monetization of the Debtor's assets and the distribution of the proceeds of same to pay the Claims of legitimate creditors), from non-stop, vexatious litigation in multiple jurisdictions over every conceivable action they take to implement and consummate the Plan.

77. Based upon the history and record of this case – including increased activity during the past several weeks – this Court is well aware of the reality of that threat and risk in this case. During the course of this case, many of the significant actions taken by the Independent Directors have been challenged, litigated and appealed. Moreover, Dondero has interfered with the Debtor's business operations, resulting in the Court's entry of a Temporary Restraining Order and Preliminary Injunction against him.[39] A hearing on the Debtor's Motion to Hold Dondero in Contempt is scheduled for February 5, 2021. The Independent Directors, CEO/CRO, Employees, Committee and its members, and the Professionals of the Debtor and the

---

[39] *Highland Capital Management, L.P. v. James D. Dondero (In re Highland Capital Management, L.P)*, Adv. No. 20-03190 (Bankr. N.D. Tex), December 10, 2020 *Order Granting Debtor's Motion for Temporary Restraining Order against James D. Dondero* [D.I. 10] and January 11, 2021 *Order Granting Debtor's Motion for Preliminary Injunction against James D. Dondero* [D.I. 59].

DOCS_SF:104855.7 36027/002

**Appx. 05837**

Committee have been harassed and threatened by Dondero and his Related Entities. There is no reason to believe these litigious tactics, threats and intimidation will cease post-Confirmation and post-Effective Date; and their unchecked continuance will seriously impair the ability of the Claimant Trust and the Litigation Sub-Trust to implement and effectuate the Plan and carry out the orders of this Court. The Gatekeeper Provision is essential to the confirmation of this Plan and the efficient effectuation and consummation of the Plan post-Effective Date.

78. The need for the Gatekeeper Provision is illustrated by the fact that the Independent Directors would not have been able to obtain Directors' & Officers' insurance coverage, upon their appointment, in the absence of the Settlement Order. Insurers were unwilling to underwrite coverage without a broad exclusion restricting any type of coverage for the Independent Directors if the Settlement Order did not contain the exculpation and gatekeeper provision found in Paragraph 10 of the Settlement Order. Similarly, the Claimant Trustee, the Litigation Trustee and the Claimant Trust Oversight Board will not be able to obtain coverage for the period of time after the Effective Date without a similar gatekeeper provision. Accordingly, the failure to approve the Gatekeeper Provision as part of the Plan will completely frustrate the Debtor's ability to carry out the Plan and Confirmation Order.

79. Gatekeeper provisions are not some new creative attempt to circumvent limitations on bankruptcy court jurisdiction or restrictions on non-consensual third-party releases. They are utilized by many courts to provide a single clearing court to determine whether a claim is colorable or appropriate under the applicable facts of the main case. For example, in the *Madoff* cases, the bankruptcy court has served as the gatekeeper for determining

**Appx. 05838**

whether claims of certain creditors against certain Madoff feeder funds are direct claims (claims which may be brought by the creditor) or derivative claims (claims which either can only be brought by the Madoff post-confirmation liquidating trust or have already been settled by the trust.)[40] In the *General Motors* cases, certain issues arose post-effective date in regard to defects in ignition switches. Questions arose as to whether the causes of action arising from those defects were such that "New GM" had liability for them, notwithstanding that it had purchased the assets of the debtor "Old GM" free and clear. The bankruptcy court serves as a gatekeeper for this litigation, determining whether a lawsuit can go forward against New GM or is more properly dealt with as a claim against Old GM.[41]

80.     Gatekeeper or channeling provisions similar to this one, and in some instances, more extensive than the proposed Gatekeeper Provision in this Plan, have been approved by other courts in this district. In *In re Pilgrim's Pride Corp.*, 2010 Bankr. LEXIS 72 (Bankr. N.D. Tex. January 14, 2010), Judge Lynn, after concluding that *Pacific Lumber* precluded the court from granting certain requested releases and exculpations, determined that nothing in *Pacific Lumber* prevented the court from retaining exclusive jurisdiction over some of the suits against third parties which might otherwise have been covered by the third party protections. *Id*. at *16-17. Judge Lynn then expressly held that the bankruptcy court would "channel to itself any claims that may be asserted against Debtors' management (including their boards of directors and Chief Restructuring Officer) and the professionals based upon their conduct in pursuit of

---

[40] *See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC*, 546 B.R. 284 (Bankr. S.D.N.Y. 2016) (discussion of court's gatekeeper function).

[41] *See, e.g., In re Motors Liquidation Co.*, 541 B.R. 104 (Bankr. S.D.N.Y. 2015) (discussing court's gatekeeper function); *In re Motors Liquidation Co.*, 568 B.R. 217 (Bankr. S.D.N.Y. 2017) (same).

their responsibilities during the Chapter 11 Cases." *Id.* at *18, 20-21. In furtherance of this, the confirmation order provided that the court "shall retain **exclusive** jurisdiction over any suit brought on any claim or causes of action related to the Chapter 11 Cases that exists as of the Effective Date against a Committee; any member of a Committee; any Committee's Professionals; Debtors; Reorganized Debtors; or any Protected Person for conduct pertaining to Debtors during the Chapter 11 Cases, and that any entity wishing to bring such suit shall do so in this court;" *Id.* (emphasis added). Thus, in *Pilgrim's Pride*, the court approved a broad retention of exclusive jurisdiction to adjudicate the ultimate merits of certain types of suits against protected parties, rather than merely a gatekeeper provision.

81.     Other courts in this district have agreed with Judge Lynn and ordered similarly. *See, e.g., In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) *Debtors'* Fourth *Amended Joint Chapter 11 Plan of Reorganization* [D.I. 1671-1, attached to *Findings of Fact and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization*], Section 10.8(b) at p. 57 (court retained **exclusive** jurisdiction to hear claims against any "Protected Party," including any claims "in connection with or arising out of . . . the administration of this Plan or the property to be distributed under this Plan, . . . or the transactions in furtherance of the foregoing, . . . .") (emphasis added).

82.     In regard to the Independent Directors, the proposed Gatekeeper Provision is a continuation of the provision set forth in Paragraph 10 of the Settlement Order, which, by its terms never expires and is expressly to remain in effect after the Effective Date under the Plan. Moreover, because of the Independent Directors' rights of indemnification against the Debtor,

**Appx. 05840**

the Gatekeeper Provision serves the important function of protecting assets that would otherwise be available for distribution to creditors from being depleted by indemnification claims resulting from the assertion of frivolous claims against the Independent Directors.

83. As to the remaining Protected Parties, the Gatekeeper Provision is a valid exercise of the Court's authority under sections 105 and 1123(b)(6) to prevent the Protected Parties from being embroiled in frivolous litigation designed to derail implementation of the Plan. Importantly, if, in the exercise of its gatekeeper role, the Bankruptcy Court were to determine that a colorable claim exists, then it would allow the prosecution of such claim and the filing of the lawsuit in the court with applicable jurisdiction.[42]

**C.      The Gatekeeper Provision Is not an Impermissible Extension of the Post-Confirmation Jurisdiction of the Bankruptcy Court.**

84. Nor is the Gatekeeper Provision an impermissible extension of the post-confirmation jurisdiction of the bankruptcy court. As discussed above, the Debtor modified the Gatekeeper Provision to eliminate the provision that granted the Bankruptcy Court exclusive jurisdiction to hear any claim that the Court allows to pass through the gate. The Gatekeeper Provision requires a putative plaintiff to obtain Bankruptcy Court approval prior to bringing an action and is in aid of the Court's enforcement of the Confirmation Order and the Plan. It is supported by sections 1141(a), (b) and (c), and thus, by section 105. As amended, nothing in the Gatekeeper Provision is determinative of the jurisdiction of the Court over any particular claim or cause of action. The Gatekeeper Provision only requires the court to determine <u>if a claim is</u>

---

[42] *Texas & P. R. Co. v. Gulf, C. & S. F. R. Co.*, 270 U.S. 266, 274 (1926) (Court always has jurisdiction to determine its own jurisdiction).

DOCS_SF:104855.7 36027/002

**Appx. 05841**

colorable. This is a determination commonly made by bankruptcy courts in the analogous context of determining whether a creditors' committee should be granted standing to file litigation on behalf of a recalcitrant debtor. *See, e.g., Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233 (5th Cir. 1988) (court must determine that claim is colorable before authorizing a committee to sue in the stead of the debtor). Thus, the Bankruptcy Court has the jurisdiction to determine if a claim is colorable.

85. Section 1142(b) provides that post-confirmation, the bankruptcy court may direct any parties to "perform any act" necessary for the consummation of the plan). *See United States Brass Corp. v. Travelers Ins. Group, Inc. (In re United States Brass Corp.)*, 301 F.3d 296, 305 (5th Cir. 2002) (holding that bankruptcy court had jurisdiction to determine whether arbitration could be used to liquidate claims post-effective date; while the plan had been substantially consummated, it had not been fully consummated, the dispute related directly to the plan, the outcome would affect the parties' post confirmation rights and responsibilities and the proceeding would impact compliance with, or completion of the plan; specifically referencing section 1142(b)).

86. Several objectors attempt to rely on *Bank of La. v. Craig's Stores of Texas, Inc. (In re Craig's Stores of Tex., Inc.)*, 266 F.3d 388, 390 (5th Cir. 2001) to argue that the bankruptcy court cannot exercise a gatekeeper role and adjudicate matters related to the administration of the case and the plan. In fact the opposite is true. In *Craig's Stores*, the Fifth Circuit expressly recognized that post-confirmation bankruptcy jurisdiction **continues to exist for "matters pertaining to the implementation or execution of the plan**." *Id.* at 390 (*citing In re*

*Fairfield Communities, Inc.*, 142 F.3d 1093, 1095 (8th Cir. 1998); *In re Johns-Manville Corp.*, 7 F.3d 32, 34 (2d Cir. 1993) (emphasis added).

87.    *Craig's Stores* did not involve a gatekeeper provision necessary to enable the debtor to implement its plan.[43]  In contrast to *Craig's Stores*, the Plan provision that Dondero and other Objectors are challenging pertains to the Court's jurisdiction over matters specifically in aid of the implementation and effectuation of the Plan – acting as gatekeeper – and does not implicate an improper extension of bankruptcy court jurisdiction.  As previously explained, the Gatekeeper Provision is necessary to obtain insurance coverage for the Claimant Trustee, the Litigation Trustee, and the members of the Claimant Trust Oversight Board – all of whom will play critical roles in the implementation of the Plan.  Moreover, unchecked rampant litigation against the Protected Persons, many of whom have indemnification rights against the Debtor, Reorganized Debtor or Claimant Trust would predictably engulf the Reorganized Debtor and Claimant Trust negatively impacting their ability to effectuate and implement the Plan and wasting valuable resources.  *See, In re Farmland Industries, Inc.,* 567 F.3d 1010, 1020 (8th Cir. 2010) (bankruptcy court had "related to" jurisdiction over a claim by a disgruntled bidder against the post-effective date liquidating trustee because the estate was actually paying legal fees of the non-debtor defendants under the estate's indemnification obligations.); *see also Buffets, Inc. v.*

---

[43] In *Craig's Stores*, the issue was whether the court could hear a post-confirmation action brought by the debtor for damages against a bank that was administering the debtor's post-confirmation private label credit card program under an agreement that had been assumed by the debtor in its chapter 11 plan.  On appeal, the Fifth Circuit held that the bankruptcy court did not have jurisdiction to hear the dispute, reasoning that (1) the debtor's claim principally dealt with post-confirmation relations between the parties, (2) no facts or law derived from the reorganization or the plan were necessary to the claim, and (3) the claim did not bear on the interpretation or execution of the debtor's plan.  *Id.* at 391.

DOCS_SF:104855.7 36027/002

**Appx. 05843**

*Leischow*, 732 F.3d 889 (8th Cir. 2013) (related-to jurisdiction existed where bankruptcy estate was obligated to indemnify non-debtor defendants for attorney's fees and other amounts).

88.     In addition, *Craig's* Stores did not involve a liquidating chapter 11 plan, and this case does involve such a plan. There is persuasive case law, including this Court's decision in *TMXS Real Estate* (discussed below) and circuit-level authority, holding that the scope of the bankruptcy court's post-confirmation jurisdiction in the case of a liquidating chapter 11 plan is broader than that in the case of a chapter 11 plan that is not a liquidating plan.

89.     In *Boston Regional Med. Ctr., Inc. v. Reynolds (In re Boston Regional Med. Ctr., Inc.)*, 410 F.3d 100 (1st Cir. 2005), the debtor, a charitable hospital, brought an adversary proceeding against a testator trust, seeking to compel payment from the trust of an amount allegedly due to the hospital as a residual beneficiary under the trust. The testator had died prepetition, but before the estate's assets were distributed, and the litigation was filed after confirmation of the debtor's liquidating plan of reorganization because the hospital had been unaware it was a beneficiary under the trust. The trustee had argued that the bankruptcy court had no residual jurisdiction over the debtor's lawsuit against the trustee because the plan had been confirmed, but the bankruptcy court found it had "related to" jurisdiction.

90.     The First Circuit first analyzed the long line of cases (including *Craig's Stores*) which hold that after a debtor emerges from bankruptcy, it enters the marketplace and is no longer under the aegis of the bankruptcy court. *Id.* at 106-107. The court did not end its analysis there, however, but dug deeper into the significant distinctions between a liquidating plan and a true reorganization. Under a liquidating plan, the debtor is not really re-entering the

47

**Appx. 05844**

marketplace; rather its "sole purpose is to wind up its affairs, convert its assets to cash, and pay creditors a pro rata dividend." *Id.* at 107. Thus, while a reorganized debtor may have litigation that clearly is outside the scope of its prior bankruptcy proceeding, that is generally not the case with a liquidating debtor. The court determined that 28 U.S.C. § 1334 had to be applied in conjunction with the applicable facts of the case, and jurisdiction was appropriate. *Id.* A "liquidating debtor exists for the singular purpose of executing an order of the bankruptcy court. Any litigation involving such a debtor thus relates much more directly to a proceeding under title 11." *Id.*

91.     This Court has also recognized the jurisdictional distinction between liquidating plans and operational reorganizations. In *TXMS Real Estate Invs., Inc. v. Senior Care Ctrs., LLC (In re Senior Care Ctrs., LLC)*, 2020 Bankr. LEXIS 3205 (Bankr. N.D. Tex. Nov. 12, 2020), this Court held it had jurisdiction to hear a post-confirmation dispute concerning the ability of a liquidating trust, which had been formed pursuant to the plan, to liquidate the stock of the reorganized debtor it received under the plan which involved the issue of whether such action would effectuate a "change in control" that would constitute a default under a lease that had been assumed by the reorganized debtor pursuant to the plan. This Court held that (i) the liquidating trust had been formed for the purpose of liquidating the assets transferred to it pursuant to the plan and distributing the proceeds of those assets to creditors; (ii) the litigation at issue was an attempt to limit the ability of the liquidating trust to effectuate the very purpose for which it had been formed and had to be resolved prior to full consummation of the plan; (iii) resolution of the dispute would require the review of the plan, the confirmation order and possibly other orders of

**Appx. 05845**

the court; (iv) the litigation would impact compliance with, or completion of the plan; and (v) the litigation directly related to the plan's implementation or execution. *Id.* at *21-23.

92.     Just as in the *TXMS Real Estate* and *Boston Regional* cases, the Claimant Trust, Litigation Sub-Trust and Reorganized Debtor exist solely for the purpose of operating the Debtor's business and properties to monetize its assets and pay creditors. Any "post-confirmation operations" of the Reorganized Debtor will, therefore, be directed towards that monetization process and, furthermore, properly subject to the Court's purview to ensure consummation of the Plan and creditor distributions pursuant to section 1142 of the Bankruptcy Code. Any prospective, but baseless, litigation over the acts taken by these entities in effectuating the Plan will have a significantly negative impact on the ability of the Claimant Trust, Litigation Sub-Trust and Reorganized Debtor to effectuate the Plan and will deplete the assets otherwise available for distribution to creditors. The Gatekeeper Provision simply ensures that any such prospective litigation is colorable before it can be filed.

93.     The Fifth Circuit's decision in *EOP-Colonnade of Dallas Ltd. P'ship v. Faulkner (In re Stonebridge Techs., Inc.)*, 430 F.3d 260, 266-67 (5th Cir. 2005), is instructive. In *Stonebridge*, the liquidating trustee under a confirmed chapter 11 plan sued a landlord in connection with the landlord's draw on a letter of credit that had been provided as security in connection with a real property lease the debtor had rejected during its bankruptcy case, where the trustee was assigned the issuing bank's claim against the landlord for alleged misrepresentation. Although the Fifth Circuit had concerns over jurisdiction of the bank's assigned claim to the trustee, the court went on to opine that "[u]pon closer review, however,

**Appx. 05846**

additional effects on the estate are evident: a claim by the Bank against [the landlord] affects the need for the Bank to seek reimbursement from Stonebridge's bankruptcy estate. [The landlord's] draw on the Letter of Credit triggered [the debtor's] contractual responsibility to reimburse the Bank for the draw on the Letter of Credit. . . . If the Bank is successful against [the landlord] on its negligent misrepresentation claims, the need for reimbursement from [the bankruptcy] estate is alleviated." *Id.* at 266-267. Accordingly, the court held that the negligent misrepresentation claims of the bank against the landlord fell within bankruptcy jurisdiction. The court noted other cases that involved litigation between third parties that have been found to have an effect on the administration of the bankruptcy estate, including suits by creditors against guarantors and a suit by creditors of a debtor against defendants that allegedly perpetrated a fraud. *Id.* at 267 (*citing* 3 *Collier on Bankruptcy* ¶ 3.01 (15th ed. rev. 2005)).

94. Based on the reasoning of *Stonebridge*, other courts, including this Court, have held that contingent indemnification rights trigger "related to" subject-matter jurisdiction of state law disputes between two non-debtors in the pre-confirmation context. *See, e.g.*, Principal *Life Ins. Co. v. JP Morgan Chase Bank, N.A. (In re Brook Mays Music Co.)*, 363 B.R. 801 (Bankr. N.D. Tex. 2007) (contingent right of indemnity in pre-confirmation litigation between two non-debtors triggers bankruptcy court's pre-confirmation "related to" jurisdiction (*citing Stonebridge*)). In *In re Farmland Industries, Inc.*, the Eighth Circuit has similarly held that it had <u>post</u>-confirmation subject-matter jurisdiction over state law claims between non-debtors where the liquidating trustee was paying the legal fees incurred to defend individuals (former officers and directors) in the dispute.

50

95.     In sum, in light of the proposed amendments to the Plan and under the circumstances here, Dondero's objection to this Court's jurisdiction to serve as a gatekeeper is not well-taken and should be overruled. The retention of the *de minimis* jurisdiction to perform the gatekeeper function is clearly supported by Fifth Circuit law.

## D.     The Gatekeeper Provision Is Consistent with the Barton Doctrine.

96.     Support for the Gatekeeper Provision can be found in the Barton Doctrine, which by analogy, should be applied to many of the Protected Parties identified in the Gatekeeper Provision. The Barton Doctrine is based on the U.S. Supreme Court case, *Barton v. Barbour*, 104 U.S. 126, 26 L. Ed. 672 (1881) dealing with receivers. As this Court has recognized, the Barton Doctrine:

> provides that, as a general rule, before a suit may be brought against a trustee, leave of the appointing court (*i.e.*, the bankruptcy court) must be obtained. The *Barton* doctrine is ***not*** an immunity doctrine but – strange as this may sound – has been held to be a ***jurisdictional*** provision (in other words, a court will not have subject matter jurisdiction to adjudicate a suit against a trustee ***unless and until*** the bankruptcy court has granted leave for the lawsuit to be filed).

Baron v. Sherman (In re Ondova Ltd. Co.), 2017 Bankr. LEXIS 325, *29 (Bankr. N.D. Tex. February 1, 2017); report and recommendation adopted, Baron v. Sherman (In re Ondova Co.), 2018 U.S. Dist. LEXIS 13439 (N.D. Tex., Jan. 26, 2018), aff'd., In re Ondova Ltd., 2019 U.S. App. LEXIS 3493 (5th Cir. Tex., Feb. 4, 2019). The Barton Doctrine originated as a protection for federal receivers, but courts have applied the concept to various court-appointed and court-approved fiduciaries and their agents in bankruptcy cases, including trustees,[44] debtors in

---

[44] *Id.*

possession,[45] officers and directors of a debtor,[46] the general partner of the debtor,[47] employees,[48] and attorneys retained by debtors and trustees.[49]   The Barton Doctrine has also been applied to non-court appointed agents who are retained by the trustee for purposes relating to the administration of the estate.[50]   The Barton Doctrine continues to protect those who are within its scope post-Confirmation and post-Effective Date.[51]

97.   The Fifth Circuit has expressly recognized the continuing viability of the Barton Doctrine, notwithstanding the jurisdictional issues raised by *Stern v. Marshall*.[52]   Since the Barton Doctrine is jurisdictional only as to the ability of the prospective plaintiff to file the lawsuit, it does not implicate the issue of expansive post-effective date bankruptcy court jurisdiction as to the actual underlying lawsuit.   Thus, the gatekeeper court can determine if a

---

[45] *Helmer v. Pogue*, 212 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to debtor in possession); *see also*, 11 U.S.C §§ 1107(a) of the Bankruptcy Code, providing that a debtor in possession has all the rights and duties of a trustee and serves in the same fiduciary capacity.

[46] *See Carter v. Rodgers*, 220 F.3d 1249, 1252 and n.4 (11th Cir. 2000) (debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court.); *Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*, 167 B.R. 389 (Bankr. D. Md. 1994) (president of debtor).

[47] *Gordon v. Nick*, 1998 U.S. App. LEXIS 21519 (4th Cir. 1998) (managing partner of debtor).

[48] *Lawrence v. Goldberg*, 573 F.3d 1265, 1270 (11th Cir. 2009) (affirming dismissal of lawsuit under the Barton Doctrine due to the plaintiff's failure to seek leave in the bankruptcy court to file an action against the trustee and other parties assisting the trustee in carrying out his official duties).

[49] *Lowenbraun v. Canary (In re Lowenbraun)*, 453 F.3d 314, 321 (6th Cir. 2006) (trustees' counsel).

[50] *See, e.g., Wells Fargo Fin. Leasing, Inc. v. Jones*, 2015 WL 1393257, at *3-*5 (W.D. Ky. Mar. 25, 2015) (holding that because defendant acted as bankruptcy trustee's agent in performing duties at the direction of and in furtherance of the trustee's responsibilities, claims asserted against defendant were essentially clams against trustee, and court lacked jurisdiction over the claims under *Barton* Doctrine); *Ariel Preferred Retail Group, LLC v. CWCapital Asset Mgmt.*, 883 F. Supp. 2d 797, 817 (E.D. Mo. 2012) (property management company engaged by receiver).

[51] *Helmer v. Pogue* at *15, *citing Carter*, 220 F.3d at 1252-53.  *See also, Beck v. Fort James Corp. (In re Crown Vantage, Inc.)*, 421 F.3d 963, 972-73 (9th Cir. 2005) (Barton Doctrine applies to trustee of a post-confirmation liquidating trust formed pursuant to a plan of liquidation); *Muratore v. Darr*, 375 F.3d 140, 147 (1st Cir. 2004) (doctrine serves additional purposes even after the bankruptcy case has been closed and the assets are no longer in the trustee's hands; suit was for malfeasance of trustee in performing his duties filed after estate was closed.)

[52] *See Villegas v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015) (holding that a litigant must still seek authority from the bankruptcy court that appointed the trustee before filing suit even if the bankruptcy court might not have jurisdiction over the suit itself.)

proposed lawsuit asserts colorable claims, and, if it does, the gatekeeper court can then turn to the separate issue of whether it has jurisdiction over the merits of the lawsuit.

98. The Barton Doctrine requires a litigant to obtain approval of the appointing or approving court before commencing a suit against court-appointed or court approved officers and their agents – which arguably encompasses most, if not all, of the Protected Parties. The Gatekeeper Provision preserves the integrity of the process, and prevents valuable estate resources from being spent on specious litigation, without impairing the rights of legitimate prospective litigants with potentially valid causes of action. The Gatekeeper Provision is not only a prudent use of the Court's authority under section 105 and is within the spirit of the protections afforded fiduciaries and their agents under the Barton Doctrine – it is also critical to ensuring the success of the Plan.

99. The Gatekeeper Provision does not effectuate a non-consensual third-party release. It merely requires potential litigants to first vet their alleged causes of action with a single court – the bankruptcy court – before they can be prosecuted. If there has ever been a case where a Gatekeeper Provision is appropriate it is this case. As the Court is well aware, Dondero appears to thrive on litigation. This Court has remarked on many occasions during this case that prepetition, the Debtor operated under a culture of litigation under the control of Dondero. It was the years of sharp practices by the Debtor and an avalanche of litigation against it that resulted in the Debtor commencing a chapter 11 case and the ultimate appointment of the Independent Directors. Faced with impending confirmation and the loss of his company forever, Dondero has turned the tables and the Debtor and the Protected Parties have become his target

**Appx. 05850**

for litigation. Left unchecked, there is no doubt that Dondero will continue his litigation crusade after the Effective Date and attempt to thwart implementation of the Plan at every turn by commencing baseless lawsuits. Requiring this Court, which approved the appointment of the Independent Directors and has extensive familiarity with the Debtor and this case to first determine whether alleged claims are colorable is prudent and within this Court's authority. Moreover, centralizing the gatekeeper function in one court puts that court in a unique position to ascertain whether there is a pattern of spurious litigation by certain entities and their related parties.

> **E.    The Gatekeeper Provision Is a Necessary and Appropriate Shield against the Actions of Dondero and his Related Entities.**

100.    The Fifth Circuit has recognized that in appropriate circumstances, a federal court can enjoin or issue other appropriate sanctions against vexatious litigants – persons who have a history of filing repetitive and spurious litigation for the purposes of harassment and intimidation. *See* All Writs Act, 28 U.S.C. §1651. In *Caroll v. Abide (In re Carroll)*, 850 F.3d 811 (5th Cir. 2017), the Fifth Circuit held that a bankruptcy court could properly sanction certain debtors as vexatious litigants when the debtors and their various family members continually filed litigation to prevent the bankruptcy trustee from performing his duties. When considering whether to enjoin future filings, the court must consider the circumstances of the case, including four factors:

> (1) the party's history of litigation, in particular whether he has filed vexatious, harassing, or duplicative lawsuits; (2) whether the party had a good faith basis for pursuing the litigation, or simply intended to harass; (3) the extent of the burden on the courts and other parties resulting from the party's filings; and (4) the adequacy of alternative sanctions.

*Id.* at 815, *citing Baum v. Blue Moon Ventures, LLC*, 513 F.3d 181, 189 (5th Cir. 2008) (*quoting Cromer v. Kraft Foods N. Am., Inc.*, 390 F.3d 812, 818 (4th Cir. 2004)).

101. In some circumstances where courts feel that enjoining all future litigation by a vexatious litigant may be too difficult to articulate or have potential due process implications, courts essentially issue a gatekeeper injunction. *See, e.g., Baum v. Blue Moon Ventures, LLC*, 513 F.3d at 189 (after the bankruptcy court and district court were able to piece together that the Baums interjected themselves in various bankruptcy proceedings by filing vexatious, abusive and harassing litigation, an injunction was entered preventing the Baums from filing litigation without the consent of the district court judge.); *Safir v. United States Lines, Inc.*, 792 F.2d 19, 25 (2d Cir. 1986) (Second Circuit agreed the litigant's conduct warranted a pre-filing injunction, but narrowed the scope such that the litigant had to seek permission from the district court before filing certain types of additional actions.)

102. Dondero and his Related Entities are the quintessential vexatious litigants, and the Gatekeeper Provision is a legitimate tool for the Bankruptcy Court, properly within the jurisdiction of the Bankruptcy Court, and less burdensome on Dondero and his Related Entities than a full injunction – which the Debtor believes would be justified in seeking in this case.

## VIII. THE EXCEPTION TO DISCHARGE DOES NOT APPLY

103. The exception to discharge contained in 11 U.S.C. § 1141(d)(3) does not apply. Section 1141(d)(3) provides that:

Confirmation of a plan does not discharge a debtor if --

(A) The plan provides for the liquidation of all or substantially all of the property estate;

55

**Appx. 05852**

(B) The debtor does not engage in business after consummation of the plan; and

(C) The debtor would be denied a discharge under section 727(a) of this title if the case were a case under Chapter 7 of this title.

*See* 11 U.S.C. § 1141(d)(3).

104.     Since the provisions of § 1141(d)(3) are in the conjunctive, if any one of the three prongs of the test is lacking, confirmation of a plan results in the discharge of debt. House Rep. No. 95-595, 95th Cong. 1st Sess. 418-19 (1977), *reprinted in*, 1978 U.S.C.C.A.N. 5963, 6374-75 ("if all or substantially all of the distribution under the plan is of all or substantially all of the property of the estate or the proceeds of it, if the business, if any, of the debtor does not continue, ***and*** if the debtor would be denied a discharge under section 727 … then the Chapter 11 discharge is not granted.") (emphasis added); *Financial Sec. Assur. v. T-H New Orleans Lt. Pshp. (In re T-H New Orleans Lt. Pshp.)*, 116 F.3d 790, 804 (5th Cir. 1997) ("[T]his section requires that all three requirements be present in order to deny the debtor a discharge."); *In re River Capital Corp.*, 155 B.R. 382, 387 (Bankr. E.D. Va. 1991) (the provisions of § 1141(d)(3) are in the conjunctive).

105.     Here, only subpart C of § 1141(d)(3) clearly applies.[53]  With respect to the subpart A of § 1141(d)(3), here, the Plan clearly provides for a gradual liquidation of all or substantially all the estate's assets.  However, a discharge is nonetheless appropriate because an orderly wind down is anticipated to last for up to two years, and the Reorganized Debtor will continue to manage various funds during that period.  Under similar circumstances, at least one court has suggested that the plan would fall outside the policies of § 1141(d)(3)(A).  *In re Enron Corp.*,

---

[53] As a corporate debtor, the Debtor would not receive a discharge under section 727(a) in a Chapter 7.

**Appx. 05853**

2004 Bankr. LEXIS 2549, **215-17 (Bankr. S.D.N.Y. July 15, 2004) ("[T]the indeterminate period of retention of the assets after the Effective Date and the clear need for ongoing business operations to maximum value for all creditors in liquidating the assets necessitates the application of the section 1141 discharge to the Reorganized Debtors."). Moreover, even if subpart A of § 1141(d)(3) is met, subpart B of § 1141(d)(3) – engaging in business – is lacking. *T-H New Orleans Lt. Pshp.*, 116 F.3d at 804, n. 15 (holding that the reorganized entity's likelihood of conducting business for two years following plan confirmation satisfies § 1141(d)(3)(B)); *In re River Capital Corp.*, 155 B.R. at 387 (discharge warranted where current management stated its intention to continue to engage in business after consummation of the plan).

## IX. THE SENIOR EMPLOYEE OBJECTION

### A. The Senior Employee Objection Should Be Overruled

106. Scott Ellington, Isaac Leventon, Frank Waterhouse, and Thomas Surgent (collectively, the "Senior Employees")[54] filed the Senior Employee Objection. Subsequent to its filing, Mr. Waterhouse and Mr. Surgent executed a Senior Employee Stipulation (as discussed below) and will withdraw their support of the Senior Employee Objection. The only remaining Senior Employees objecting to the Plan are Mr. Ellington and Mr. Leventon. Mr. Ellington and Mr. Leventon argue, among other previously addressed objections, that the Plan is not confirmable because (1) the Plan violates section 1123(a)(4)'s requirement that claims in the same class be treated the same, and (2) the Debtor has prevented the Senior Employees from

---

[54] Although Mr. Ellington and Mr. Leventon are included in the definition of Senior Employees, they were both terminated for cause and are no longer employees of the Debtor.

DOCS_SF:104855.7 36027/002

**Appx. 05854**

making the Convenience Class Election. These objections are meritless, and the Senior Employee Objection should be overruled.

### B. Background Related to Senior Employees

107. The Debtor's employees, including the four Senior Employees, were eligible to receive compensation under two separate bonus plans: an annual bonus plan and deferred compensation plan. Both of these plans required the employee to remain employed as of the applicable vesting date to receive the bonus. On December 4, 2019, the Debtor filed a motion seeking authorization to pay bonuses under these plans, to which the Committee objected to the inclusion of the Senior Employees. At a hearing on the motion, the Debtor agreed to remove the Senior Employees (*see* 1/21/2019 Hearing Tr., Docket No. 393 at 119:21-22), and the motion was granted as presented at the hearing [Docket No. 380]. Accordingly, the rank and file employees were paid on account of their bonuses that vested in 2020, with the exception of the Senior Employees who have vested bonus claims.

108. On May 26, 2020, each of the Senior Employees filed a single proof of claim against the Debtor in an unliquidated amount.[55] *See* Proof of Claim Nos. 192 (claim of Ellington claiming "not less than $7,604,375"); 184 (claim of Leventon claiming "not less than $1,342,379.68"); (collectively, the "Proofs of Claim"). The Proofs of Claim did not provide any calculations or breakdown of amounts to support the minimum claimed.

---

[55] An amended proof of claim was filed by Mr. Ellington on July 16, 2020. Each Senior Employee asserted that a portion thereof, in a liquidated amount pursuant to the statutory cap of section of section 507(a)(4), is entitled to priority under the Bankruptcy Code. In addition, the portion of the claim related to PTO was classified in Class 6 under the Plan.

DOCS_SF:104855.7 36027/002

**Appx. 05855**

109. Each Proof of Claim sets forth the following with respect to "compensation" owed:

> Claimant is owed compensation for his services, including, without limitation, (i) all salaries and wages; benefits; (ii) bonuses (including performance bonuses, retention bonuses, and similar awards), (iii) vacation and paid time off, and (iv) retirement contributions, pensions and deferred compensation. The amount of the Claim for such compensation includes both liquidated and unliquidated amounts.

*See* Claim Nos. 192, 182, 184, 183, each at Attachment ¶3.

110. The official claims register maintained by KCC lists the general unsecured claim amount for each Senior Employee as "UNLIQUIDATED." The claim of each Senior Employee not requiring separate classification under the Plan (*i.e.*, the priority and PTO portions), was classified as a General Unsecured Claim in Class 8 (each, a "GUC Claim").

111. On October 27, 2020, during a hearing on the Debtor's then-existing disclosure statement, this Court and the Committee were highly critical of the proposed plan provisions concerning employee releases and strongly suggested that the plan was unlikely to be confirmed as drafted. As a result, the Debtor began negotiating with the Committee concerning the terms on which Senior Employees would be permitted to obtain a release. Ultimately, the Debtor and the Committee agreed that the Senior Employee would be required to execute a stipulation with the Debtor providing for the resolution and payment of deferred compensation at reduced rates and other consideration in exchange for a Plan release. Specifically, the Senior Employee Stipulation, if approved by this Court and signed by the Senior Employee, would allow the "Earned Bonus" (as defined in the Senior Employee Stipulation) portion of the Senior Employees' to be treated as a separate Convenience Claim (subject to reduction as set forth in

the Senior Employee Stipulation). In exchange for this reduction, and together with the Senior

Employee's agreement to (a) cooperate with the Claimant Trustee and Reorganized Debtor, (b)

refrain from taking certain actions against those parties, and (c) support and vote in favor of the

Plan, the Senior Employee would receive a Plan release and the treatment provided with respect

to the "Earned Bonus" in the Plan and Senior Employee Stipulation.

112. As part of its settlement discussions with the Senior Employees, the Debtor

provided the Senior Employees with a chart outlining how the reduction of the "Earned Bonus"

would work if the Senior Employees executed the Senior Employee Stipulation. This chart was

the same chart provided to the Committee in connection with the negotiation of the Senior

Employee Stipulation. This chart was never publicly-filed and did not contain "representations"

or promises. It was a chart provided to the Senior Employees to illustrate how a portion of the

Senior Employees' total claims would be treated if they signed the Senior Employee Stipulation

and to describe the consideration that the Senior Employee would provide in exchange for the

release contained in the Plan. Notably, the Disclosure Statement included the same calculation

that was set forth in the chart provided to the Senior Employees.[56]

113. In no world was the chart – provided in settlement discussions and for substantive

purposes – a promise to pay.

---

[56] *See* Disclosure Statement, page 71, which states:

> In addition to the obligations set forth in Article IX.D. of the Plan, as additional consideration for
> the foregoing releases, the Senior Employees will waive their rights to certain deferred
> compensation owed to them by the Debtor. As of the date hereof, the total deferred compensation
> owed to the Senior Employees was approximately $3.9 million, which will be reduced by
> approximately $2.2 million to approximately $1.7 million. That reduction is composed of a
> reduction of (i) approximately $560,000 in the aggregate in order to qualify as Convenience
> Claims, (ii) approximately $510,000 in the aggregate to reflect the Convenience Claims treatment
> of 85% (and may be lower depending on the number of Convenience Claims), and (iii) of
> approximately $1.15 million in the aggregate to reflect an additional reduction of 40%.

114.     Despite this, the Senior Employee Objection argues that such chart "shows the recovery to the Senior Employees if they do not sign the Senior Employee Stipulation but make the Convenience Class Election, and it separately shows the reduced recovery" if they sign the Senior Employee Stipulation.  The Senior Employees further argue that the chart evidences the Debtor's intent that the Senior Employees could elect Convenience Class treatment of their "Earned Bonus" whether or not they executed the Senior Employee Stipulation.  As set forth above, nothing in the chart supports that argument.  The chart was simply a illustration of how the Senior Employee Stipulation would work if executed and the consideration that would be given by each Senior Employee for the release.[57]

115.     Finally, the Senior Employees' comments were solicited on all but the economic terms of the Senior Employee Stipulation.  The Senior Employees were also encouraged to raise any issues they had with the Senior Employee Stipulation to the Committee and/or this Court.  The Senior Employees' counsel at Winston & Straw provided comments on the Senior Employee Stipulation, which both the Debtor and the Committee accepted.   The Senior Employees themselves, however, refused to comment despite having the opportunity to do so and instead demanded that the Debtor retract the Senior Employee Stipulation because it did not reflect an agreement between the Senior Employees and the Debtor. On information and belief,

---

[57] As part of the Plan negotiations, Mr. Seery engaged in multiple conversations with all or some of the Senior Employees. Some of these conversations were with counsel; some were not. In each case, however, the conversations were part of a broader settlement discussion.  During these discussions, the Senior Employees asked questions about how the Senior Employee Stipulation would work but also made blatant threats about how they would react if they were not treated in the manner they deemed appropriate.  Mr. Seery made no promises to the Senior Employees during these conversations.

DOCS_SF:104855.7 36027/002

**Appx. 05858**

the Senior Employees never approached the Committee to discuss the Senior Employee Stipulation. The only communication with this Court has been the Senior Employee Objection.

116. None of the Senior Employees elected to sign the Senior Employee Stipulation. Subsequent to the filing of the Senior Employee Objection, Mr. Seery discussed with Mr. Waterhouse and Mr. Surgent the possibility of signing the Senior Employee Stipulation, and Mr. Waterhouse and Mr. Surgent elected to sign the Senior Employee Stipulation (with certain revisions). However, as Mr. Ellington and Mr. Leventon are not currently employed by the Debtor, they are no longer eligible to sign the Senior Employee Stipulation.

### C.    Treatment of Senior Employee Claims Under Plan

117. The Plan provides the following treatment to the Class 8 GUC Claims of the Senior Employees:

> Treatment:  On or as soon as reasonably practicable after the Effective Date, each Holder of an Allowed Class 8 Claim, in full satisfaction, settlement, discharge and release of, and in exchange for, such Claim shall receive (i) its Pro Rata share of the Claimant Trust Interests, (ii) such other less favorable treatment as to which such Holder and the Claimant Trustee shall have agreed upon in writing, or (iii) the treatment provided to Allowed Holders of Class 7 Convenience Claims if the Holder of such Class 8 General Unsecured Claim is eligible and makes a valid Convenience Class Election.

Plan, III.H.8.

118. The Plan provides that a Holder of a General Unsecured Claim may make a "Convenience Class Election" as follows:

> "*Convenience Class Election*" means the option provided to each Holder of a General Unsecured Claim *that is a liquidated Claim as of the Confirmation Date on their Ballot* to elect to reduce their claim to $1,000,000 and receive the treatment provided to Convenience Claims.[58]

---

[58] A "Convenience Claim" is defined as:

DOCS_SF:104855.7 36027/002

**Appx. 05859**

Plan, I.B.43 (emphasis added).

119.    As discussed above, the Senior Employees' claims are unliquidated and were disclosed as unliquidated on the official claims register maintained by KCC. As unliquidated and unsecured claims, the Senior Employees' claims are, in each case, Class 8 (General Unsecured Claims), and, as holders of unliquidated GUC Claims, none of the Senior Employees were entitled to make the Convenience Class Election.

120.    Irrespective of their claims, the Senior Employees are not entitled to a release under of the Plan unless they execute a Senior Employee Stipulation. *See* Article IX.D.

### D.    Plan Solicitation

121.    Although each of the Senior Employee's GUC Claim was classified *in toto* as Class 8 (General Unsecured Claims), the Senior Employees erroneously received both a Class 7 (Convenience Class) and Class 8 (General Unsecured) Ballot.  Except for Mr. Surgent, each of the Senior Employees voted their Class 8 (General Unsecured Claim) ballot to reject the Plan, and each of the Senior Employees voted their erroneously Class 7 (Convenience Class) ballot to reject the Plan.  Mr. Surgent abstained from voting on the Plan.  Because they have now executed the Senior Employee Stipulation, Mr. Waterhouse and Mr. Surgent's votes will be cast to accept the Plan.

---

any prepetition, liquidated, and unsecured Claim against the Debtor that as of the Confirmation Date is less than or equal to $1,000,000 or any General Unsecured Claim that makes the Convenience Class Election.  For the avoidance of doubt, the Reduced Employee Claims will be Convenience Claims.

Plan, I.B.41.

**Appx. 05860**

### E.    The Plan Does Not Violate Section 1123(a)(4)

122.    Section 1123(a)(4) requires that the Plan "provide the same treatment for each claim or interest of a particular class, unless the holder of a particular claim or interest agrees to a less favorable treatment of such particular claim or interest." 11 U.S.C. § 1123(a)(4).

123.    The Senior Employees argue that the Plan does not treat them the same as other Employees in the same class because the Senior Employees are not automatically being granted a release under the Plan, whereas other Employees are being granted a release automatically upon confirmation.   However, the Senior Employees conflate treatment of their claims with the decision not to automatically provide them a release.  The treatment of claims in either Class 7 or Class 8 solely consists of distributions on account of the allowed amounts of such claims, and there is no difference in treatment among members of either class in terms of the distribution scheme provided.  The releases under the plan are not part of the "treatment" of Class 7 or Class 8 claims.

124.    Indeed, the releases granted under the Plan are part of an entirely different section of the Plan (Article IX).   Debtors are not required to grant releases to anyone nor are they required to grant releases to all employees equally, especially here, where there are allegations of material misconduct against some, but not all, of the employees.[59]  Nonetheless, the Debtor, after extensive negotiations with the Committee (which did not want to provide *any* release to the Senior Employees) presented the Senior Employees with a mechanism by which the Senior Employees could obtain a release *if* they agreed to the conditions of the Senior Employee

---

[59] Indeed, the grant of third party releases is heavily scrutinized and could not be granted to all general unsecured creditors across the board as part of the Plan's treatment of general unsecured claims.  *See Bank of N.Y. Trust Co. v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229 (5th Cir. 2009).

DOCS_SF:104855.7 36027/002

**Appx. 05861**

Stipulation.[60] But just as the Senior Employees were not required to sign the stipulation,[61] the Debtor cannot be forced to provide a release to each Senior Employee just because it has provided releases to other Employees. Nor would this Court or the Committee have allowed the Debtor to provide releases to the Senior Employees without those Senior Employees providing additional consideration to the Debtor's estate. As the Court will recall, at the October 28, 2020, the Court specifically told the Debtor that it would be hard-pressed to approve releases to certain of the Debtor's employees if such employees did not provide consideration for the releases.[62] The Senior Employee Stipulation was crafted to address the Court's concerns by conditioning the release of *certain* of the Debtor's employees on the provision of other consideration.

125.    Finally, the Senior Employees devote considerable time arguing that the proposed Senior Employee Stipulation suffers from numerous defects and that the terms are too harsh. But

---

[60]As Mr. Ellington and Mr. Leventon are no longer employed by the Debtor, they are not eligible to sign the Senior Employee Stipulation. Accordingly, they are not entitled to a release regardless of the Senior Employee Stipulation.

[61] While voluntary agreement is expressly excepted from section 1123(a)(4) anyway, debtors are permitted to treat one set of claim holders more favorably than another so long as the treatment is not on account of the claim but for distinct, legitimate rights or contributions from the disparately-treated group separate from the claim. *Ad Hoc Comm. of Non-Consenting Creditors v. Peabody Energy Corp. (In re Peabody Energy Corp.)*, 933 F.3d 918, 925 (8th Cir. 2019). The Ninth Circuit, for instance, upheld a plan that provided preferential treatment to one of a debtor's shareholders apparently because the preferential treatment was tied to the shareholder's service to the debtor as a director and officer of the debtor, not to the shareholder's ownership interest. *See In re Acequia, Inc.*, 787 F.2d 1352, 1362-63 (9th Cir. 1986) ("[The shareholder's] position as director and officer of the Debtor is separate from her position as an equity security holder."); *see also Mabey v. Sw. Elec. Power Co. (In re Cajun Elec. Power Coop., Inc.)*, 150 F.3d 503, 518-19 (5th Cir. 1998) (plan proponent's payments to certain members of power cooperative did not violate § 1123(a)(4) because the payments were "reimbursement for plan and litigation expenses," not payments "made in satisfaction of the [members'] claims against [the debtor]"). Here, too, the release consideration required from the Senior Employees *solely in order for the Senior Employees' to obtain a release* relates to their positions as senior employees rather than their position as general unsecured creditors.

[62] *See* Hearing Transcript, Oct. 28, 2020, at 30:17-22:

> So, and I'll just throw in one last bit of food for thought. . . the Debtor has had a year now, close to a year now, to knock some of these out, you know, maybe reach some compromises with some of the related Highland parties and officers, to maybe participate in the plan with some sort of contribution, and it's just not happening. It's not happening. . . . So, at this point, I would be hard-pressed to protect any nondebtor defendants who aren't ponying up something to the whole plan reorganization process.

**Appx. 05862**

those objections are irrelevant to confirmation.  If the Senior Employees believed that the cost of the release was too high, they had no obligation to sign the Senior Employee Stipulation.

**F.     The Senior Employees Are Not Permitted to Make Convenience Class Election**

126.    The Senior Employees next argue that the Debtor has improperly prevented the Senior Employees from electing Convenience Class treatment for a portion of their Claims. Under applicable bankruptcy law, the Plan, and the Disclosure Statement Order, the Senior Employees are not entitled to split their claims to create a liquidated claim for which Convenience Class Election would even be possible.[63]   Further, even if the Senior Employees were entitled to elect a Convenience Class Election for a *portion* of their Class 8 Claims for distribution purposes, as discussed below, their Claims are only entitled to be voted in Class 8 for voting and numerosity purposes.

**G.     Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Applicable Bankruptcy Law**

127.    The Senior Employees argue that the "Earned Bonus" portion of each GUC Claim is "liquidated"[64] and therefore eligible for the Convenience Class Election.[65]   The "Earned

---

[63] The Senior Employees claim the Debtor's statements contradict the plan; however, any purported contradiction stems from the Senior Employees' misstatement of the Debtor's position.  Indeed, even if the Debtor had made contradictory statements, it is irrelevant.  The Plan says what it says and the Debtor cannot unilaterally change the terms of the Plan with respect to a select group of creditors.  While a Class 7 Ballot was mistakenly sent to the Senior Employees, the Senior Employees cannot make the Convenience Class Election under the Plan because they each hold a single, unliquidated Class 8 Claim.

[64] The Plan did not need to define the term "liquidated."  Generally, a debt is liquidated if the amount due and the date on which it was due are fixed or certain, or when they are ascertainable by reference to (1) an agreement or (2) to a simple mathematical formula.  *In re Visser*, 232 B.R. 362, 364-65 (Bankr. N.D. Tex. 1999).  However, even if the Earned Bonus *portion* is liquidated in that the amount is capable of being ascertained, it is not considered liquidated for purposes of voting where the amount owed or formula for calculation are missing from the proof of claim.  *See In re Lindell Drop Forge Co.*, 111 B.R. 137, 142-43 (Bankr. W.D. Mich. 1990); *see also Riemer & Braunstein LLP v. DeGiacomo (A & E 128 North Corp.)*, 528 B.R. 190, 199 (1st Cir. B.A.P. 2015) (court looks to proof of claim forms to determine if they sufficiently demonstrate liquidated claims).

[65] None of the Senior Employees' Proofs of Claim contains any liquidated amount with respect to any component of

**Appx. 05863**

Bonus" portion, even if liquidated, is not a standalone claim entitled to make a Convenience Class Election, nor can the Senior Employees split their GUC Claim after filing a single proof of claim. The Senior Employees do not cite any law to support their contention that claims of a single creditor in a given class, set forth in a single proof of claim, may be split into multiple claims.[66] Indeed, case law holds the opposite. Courts have found that where a claimant files a single proof of claim, even if it covers multiple debts, he is not entitled to split his claims. *In re Jones*, 2012 Bankr. LEXIS 1076, *7 (Bankr. M.D. Ga. 2012) (noting that the creditor could have filed multiple proofs of claim to avoid the issue); *see also In re Latham Lithographic Corp*., 107 F.2d 749 (2d Cir. 1939) (claimant cannot split claim into multiple claims for the purpose of creating multiple creditors who could vote in a trustee election). The Senior Employees each filed a single proof of claim: they cannot split their GUC Claim in order to make the Convenience Class Election under the Plan and applicable bankruptcy law. And the Plan is clear on this; no other Holder of an unliquidated or partially liquidated Class 8 claim attempted to split its claim or make the Convenience Class Election.

---

the GUC Claim, including the "Earned Bonus." The Senior Employees appear to make the stunning assertion that the Debtors' books and records establish whether a claim is liquidated and the amount of such claim, even when the proof of claim lists no such amounts. There is no proof of claim on file listing a liquidated amount, no executed stipulation agreeing on a liquidated amount, and no order of the Court setting a liquidated amount. The Senior Employees' assertion that any portion of their GUC Claims is liquidated is untenable.

[66] The cases the Senior Employees cite only support that separate claims, each covered by a separate proof of claim, **_purchased_** from other creditors, are entitled to be counted as separate claims. *See Figter Ltd. v. Teachers Ins. Annuity Ass'n (In re Figter Ltd.)*, 118 F.3d 635, 640-641 (9th Cir. 1997) (claimant entitled to vote multiple claims where it "purchased a number of separately incurred and separately approved claims (each of which carried one vote) from different creditors"); *Concord Square Apartments v. Ottawa Properties (In re Concord Square Apartments)*, 174 B.R. 71, 74 (Bankr. S.D. Ohio 1994) ("purchaser of claims is entitled to a vote for each separate claim it holds"); *In re Gilbert*, 104 B.R. 206, 211 (Bankr. W.D. Mo. 1989) (purchased claim arose out of a separate transaction, evidencing a separate obligation for which a separate proof of claim was filed). Notably, in each of these cases a separate proof of claim had been filed for each separate claim, evidencing an entirely separate obligation, and owed to a different party. Here in contrast, each single Senior Employee filed a single proof of claim, and the "Earned Bonus" is a mere *component* of an overall compensation claim stemming from obligations under an employment contract.

Appx. 05864

**H.**     **Convenience Class Election Is Unavailable Because Senior Employee's GUC Claims Cannot Be Split Under Disclosure Statement Order for Voting Purposes**

128.     Even if splitting claims contained in a single proof of claim were allowed under applicable case law (which it is not) and the Senior Employees were entitled to make the Convenience Claim Election with respect to a portion of their GUC Claim, this Court's Disclosure Statement Order prohibits the splitting of claims within a given class for voting purposes:

> Claims or interests shall not be split for purposes of voting; thus, each creditor and equity security interest holder shall be deemed to have voted the full amount of its claim and interest either to accept or reject the Plan;

Disclosure Statement Order ¶ 25.b.

129.     Similarly, paragraph 23 provides:

> For purposes of the numerosity requirement of section 1126(c), separate claims held by a single creditor in a particular Class shall be aggregated as if such creditor held one claim against the Debtor in such Class, and the votes related to such claims shall be treated as a single vote to accept or reject the Plan;

*Id.* ¶ 23.h.

130.     Read together, these provisions clearly establish that there can be no claim splitting within a class, and no claim splitting between Class 7 and Class 8. Accordingly, even if claims classified in a given class set forth in a single proof of claim could be split and the Senior Employee were entitled to make the Convenience Class Election, the Disclosure Statement Order precludes the Senior Employees from splitting their claims for voting purposes.

DOCS_SF:104855.7 36027/002

**Appx. 05865**

## I. Even if Convenience Claim Election Were Available, Convenience Claim Election Does Not Impact Voting

131. Even if the Senior Employees were deemed to hold separate, liquidated claims on account of their "Earned Bonuses" that could be split from the remainder of their GUC Claims, a Convenience Class Election does not morph a Class 8 Claim into a Class 7 Claim *for voting purposes*. Specifically, the Class 8 Ballot, approved by the Disclosure Statement Order, provides:

> If you check the box below and elect to have your Class 8 General Unsecured Claim treated as a Class 7 Convenience Claim; *(i) your vote on this Ballot to accept or reject the Plan will still be tabulated as a vote in Class 8 with respect to the Plan, but your Claim (as reduced) will receive the treatment afforded to Class 7 Convenience Claims;*

Disclosure Statement Order, Exhibit A at 26 (emphasis added).[67] Accordingly, at most, the Convenience Class Election only impacts the Senior Employees' treatment for distribution purposes. Moreover, even if the Court finds that Mr. Leventon has a liquidated claim that was entitled to be classified in Class 7 and vote in that class, Mr. Ellington's claim, which exceeds $1 million could not vote in Class 7. Mr. Ellington would only be entitled to reduce his Class 8 Claim and elect treatment in Class 7 but his claim would otherwise be included in Class 8 for voting purposes.

132. For each of the foregoing, independent reasons, each Senior Employee holds a single, unliquidated claim in Class 8. No Senior Employee is entitled to split his GUC Claim under applicable bankruptcy law, and such an action is further prohibited by the Disclosure Statement Order. Even if any GUC Claim could be split and the Convenience Class Election

---

[67] The Plan itself is also clear that the Convenience Class Election only impacts *treatment*, and does not impact *voting*. *See* Plan, I.B.43; III.H.8.

DOCS_SF:104855.7 36027/002

**Appx. 05866**

was made, the Convenience Class Election only impacts treatment but does not impact voting. Finally, the Senior Employees' argument that their entitlement to make the Convenience Class Election stems from an erroneously mailed ballot is misplaced. As set forth above, the mailing of the Class 7 Ballot was an administrative error and cannot entitle the Senior Employees to rights that contradict the Plan and the Disclosure Statement Order.

## X.      THE HCMFA/NPA GATES OBJECTION

133.    The Debtor manages fifteen collateralized loan obligations ("CLOs") pursuant to certain agreements, which are referred to sometimes as portfolio management agreements and sometimes as servicer agreements (the "Management Agreements"). Each CLO is a Cayman-domiciled entity that owns a portfolio of loans. They are passive single purpose entities with no ability to self-manage. The CLOs have no employees; however, they do have Cayman-based boards of directors, which have limited duties under Cayman law and which do not actively manage the CLOs. Each CLO contracted with the Debtor as a third-party "Portfolio Manager" to manage the loan portfolio pursuant to the terms of the various Management Agreements. As discussed below, the only parties to the Management Agreements are the Debtor and the respective CLO.

134.    To finance its acquisition of the loans, each CLO issued notes to third party investors. Those notes come in different tranches with different payment priorities. The lowest in priority are called "preference shares," which receive the available residual cash flow after the CLO has made the required payments on the notes. Although called equity, the preference shares are not common equity. The CLOs themselves are purely creatures of contract, and

**Appx. 05867**

investor rights are governed by the terms of the indentures governing the CLOs (collectively, the "Indentures"), the preference share paying agency agreements, and in certain cases the Management Agreements.[68]  The Indentures define the procedures for buying, managing, and selling the CLOs' assets.  *See generally* Indenture § 12.1; Management Agreement § 2. Fiduciary duties under the Investment Advisers Act of 1940 (the "Advisers Act") are owed solely to the CLOs and not their investors.[69]    Nothing in the Indentures or the Management Agreements gives any investor in the CLOs the right to block, interfere with, influence, control, or otherwise direct the asset sale process.  The Management Agreements set forth the Portfolio Manager's duties and obligations and the requirements for removing the Portfolio Manager if investors are not satisfied.

135.    By agreement with CLOs, which are the sole counterparties to the Management Agreements, the Debtor will assume the Management Agreements pursuant to the Plan.  The Debtor and the CLOs have agreed, in summary, that in full satisfaction of the Debtor's cure obligations under section 365(b)(1) of the Bankruptcy Code, the CLOs will receive a total of $525,000, comprising $200,000 within five days of the Effective Date and $325,000 in four equal quarterly payments of $81,250, and that the Debtor and the CLOs will exchange mutual releases.  The Debtor and the CLOs agreed to seek approval of this compromise by adding

---

[68] The Debtor's role is referred to as either the Servicer or Portfolio Manager.  All of the Management Agreements and Indentures are governed by New York law, and the relevant provisions of those agreements are identical in all material respects across the CLOs at issue.

[69] The Debtor's fiduciary duties under the Advisers Act are owed to the CLO, not to its investors.  *Goldstein v. SEC*, 451 F.3d 873, 881-82 (D.C. Cir. 2006) (under Section 206 of the Investment Advisers Act of 1940 and other provisions "[t]he adviser owes fiduciary duties only to the fund, not to the fund's investors. . . If the investors are owed fiduciary duty and the entity is also owed a fiduciary duty, then the adviser will inevitably face conflicts of interest.").  The Debtor's duties, as Portfolio Manager, to the underlying investors in the CLO, if any, are prescribed by contract.

71

**Appx. 05868**

language to the Confirmation Order.  A copy of that language is attached hereto as Exhibit C and will be included in the Confirmation Order.

A.    **The HMCFA/NPA Objection, the CLO Holdco Objection, and NREP Joinder Should Be Overruled**

136.    As the Court is well aware, Highland Capital Management Fund Advisors, L.P. ("HCMFA") and NexPoint Advisors, L.P. ("NPA" and, together with HCMFA, the "Advisors"), are controlled by Mr. James Dondero.  Mr. Dondero is also the portfolio manager of each of the investment funds objecting to the Debtor's assumption of the Management Agreements (the "Funds").[70]   The Advisors and three of the Funds have actively interfered in the Debtor's management of the CLOs and sought to exercise management authority over the CLOs.  This Court ruled on these issues in connection with the Advisors and Funds' *Motion for Order Imposing Temporary Restrictions on Debtor's Ability, as Portfolio Manager, to Initiate Sales by Non-Debtor CLO Vehicles* [Docket No. 1528] (the "CLO Motion").

137.    Now, the Funds and Advisors have objected to confirmation of the Plan and are joined only in their objection by other Dondero-controlled entities – the NexPoint RE Partners and CLO Holdco, Ltd. ("CLO Holdco" and, together with the Funds and the Advisors, the "CLO Objectors").   Although the NPA/HCMFA Objection makes different arguments than those contained in the CLO Motion, the goal of the NPA/HCMFA Objection is the same.  It seeks to use this Court to transfer control of the CLOs away from the Debtor and back to Mr. Dondero.

---

[70] The Funds are Highland Fixed Income Fund, Highland Funds I and its series, Highland Funds II and its series, Highland Global Allocation Fund, Highland Healthcare Opportunities Fund, Highland Income Fund, Highland Merger Arbitrate Fund, Highland Opportunistic Credit Fund, Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Total Return Fund, Highland/iBoxx Senior Loan ETF, NexPoint Capital, Inc., NexPoint Real Estate Strategies Fund, NexPoint Strategic Opportunities Fund.

**Appx. 05869**

138.    The CLO Objectors contend that the Advisers Act prohibits assignment of the Management Agreements and/or that they are non-assignable personal service contracts.  From this, the CLO Objectors argue that the Management Agreements may not be assumed by the Debtor under Section 365(c) because the "*hypothetical test*" applies in the Fifth Circuit.  They also contend that there is inadequate assurance of future performance because of staff reductions and that the contracts are being modified and thus are being only partially (and so impermissibly) assumed.  The CLO Objectors also speculate that they may be harmed by future investment decisions made by the Debtor because the time-frame contemplated by the Plan for disposition of assets may be shorter than what they believe is optimal to maximize the value of the preference shares.  The objections should be overruled on several grounds:

- The contract counterparties – the CLOs – consent to assumption and will release the Debtor from all claims.

- The CLO Objectors are non-contracting parties with no standing to object on behalf of the CLOs and have pointed to no contractual basis for their assertion of management authority over the CLOs.

- The CLO Objectors cannot create standing by asserting they are creditors of the estate.  Each CLO Objector agreed to the expungement of its claims or has no claims.

- Even if the CLO Objectors were creditors, their standing to object to assumption would be limited to whether it benefits the Estate, and they would *still* lack standing to assert rights belonging to the contracting parties.

- Even if the CLO Objectors had the right to object to assignment, that does not give them the standing to object to the Debtor's assumption of the Management Agreements.

- Even if the Management Agreements were non-assignable, the Debtor could still assume the Management Agreements without consent because the *actual test* applies in the Fifth Circuit.

73

**Appx. 05870**

Case 19-34054-sgj11 Doc 3445-36 Filed 08/15/22    Entered 08/15/22 16:45:41    Page 81 of
126
Case 19-34054-sgj11 Doc 1807 Filed 01/22/21    Entered 01/22/21 18:52:03    Page 80 of 106

- Even if the *hypothetical test* applies, "applicable law" does not prevent assignment of the Management Agreements.

- There is no detriment to the Estate in assuming the Management Agreements, and there is no mismatch in investing timelines between the Debtor and the CLOs' investors.

**B.    The CLO Objectors Cannot Override the CLOs' Consent to Assumption**

139.    The Debtor and its counterparties (the CLOs) agreed to the assumption of the Management Agreements.  Any objections were waived.  Hence the CLO Objectors' argument is *not* that there is no consent to assume the Management Agreements; it is that the *correct* party has not consented.  In other words, the CLO Objectors are arguing that the CLO Objectors (and therefore Mr. Dondero) have the authority and prerogative to dictate the actions of the CLOs and whether the CLOs should consent to assumption.  This has to be the CLO Objectors' argument because unless the CLO Objectors have such right, they have no standing as non-contracting parties to object under section 365 to the assumption of the Management Agreements.

140.    Only parties to contracts have standing to object to assumption, even when the objector claims that assumption will result in a breach of that contract or violate the law.  *See Hertz Corp. v. ANC Rental Corp. (In re ANC Rental Corp.*), 278 B.R. 714, 718-19 (Bankr. D. Del. 2002), *aff'd*, 280 B.R. 808 (D. Del. 2002), 57 F. App'x 912 (3d Cir. 2003).  As the district court explained:

> The language of section 365 is clearly intended to protect the rights of those persons or entities who share contractual relationships with the debtors. In other words, in order to invoke the protections provided in section 365, an entity must be a party to a contract with the debtor.
>
> * * *
>
> Although section 365 does confer the right to refuse assignment where excused by applicable law, that right is nevertheless conferred only upon parties to the

74

**Appx. 05871**

> contracts at issue. It creates no separate right of enforcement for other creditors of the estate who are not parties to the contract. Therefore, even if the appellants feel that the alleged violation of the law may effect them, they have not demonstrated that they have the legal right to enjoin such a violation.

*Hertz Corp. v. ANC Rental Corp. (In Re ANC Rental Corp.)*, 280 B.R. 808, 817-18 (D. Del. 2002); *see also Cargill, Inc. v. Nelson (In re LGX, LLC)*, 2005 Bankr. LEXIS 2072 (10th Cir. Oct. 31, 2005) (creditor had standing on whether court should approve settlement between trustee and another creditor, but no standing under § 365 on whether quitclaim license from trustee to that creditor violated applicable patent law because it was not party to contract); *In re Riverside Nursing Home*, 43 B.R. 682, 685 (Bankr. S.D.N.Y. 1984) (assignee of rents is not "party to such contract or lease" so as to confer standing under section 365); *In re Irwin Yacht Sales, Inc.*, 164 B.R. 678 (Bankr. M.D. Fla. 1994) (denying standing to co-owner notwithstanding her economic interest since she was not party to the lease); *see also ANC Rental*, 57 F. App'x at 916 (citations omitted) ("Third-party standing is of special concern in the bankruptcy context where, as here, one constituency before the court seeks to disturb a plan of reorganization based on the rights of third parties who apparently favor the plan. In this context, the courts have been understandably skeptical of the litigant's motives and have often denied standing as to any claim that asserts only third-party rights.")

141. The only parties to the Management Agreements are the Debtor and the respective CLOs. Consequently, the CLO Objectors are effectively asking the Court to treat them as the contracting parties, so that they, rather than the CLOs, may decide whether to oppose assumption. But an adjudication of the CLO Objectors' rights vis-à-vis the CLOs is not before the Court. Regardless, this assertion of management authority over the CLOs was already

DOCS_SF:104855.7 36027/002

**Appx. 05872**

rejected by Court as "almost Rule 11 frivolous." In the CLO Motion, the movants sought to restrict sales of the CLOs' assets on terms that they believed might be disadvantageous to the holders of preference shares, but they could not substantiate any contractual basis for the exercise of such management authority.[71]

142. The only acknowledgement of this Court's ruling in the NPA/HCMFA Objection is offered in a footnote, in which the CLO Objectors suggest that the issues are different "in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed."[72] In all honesty, the Debtor has no idea what the Objector's statement means, but whatever it means, the underlying issue and rationale are the same here as in the CLO Motion. As before, the issue is who has the right to make business decisions for the CLOs, and in both the CLO Motion and here, the proffered justification is a nonspecific risk that investment decisions may be made with which the CLO Objectors disagree.

**C.   The CLO Objectors Lack Standing to Object to the Plan**

**1.   The CLO Objectors Rights Under the Management Agreements Are Not Affected by the Plan**

---

[71] 12/16/20 Tr. of Proceedings at 64:1-10.

> This is almost Rule 11 frivolous to me. You know, we're -- we didn't have a Rule 11 motion filed, and, you know, I guess, frankly, I'm glad that a week before the holidays begin we don't have that, but that's how bad I think it was, Mr. Wright [of K&L Gates] and Mr. Norris. This is a very, very frivolous motion. Again, no statutory basis for it. No contractual basis. You know, you didn't even walk me through the provisions of the contracts. I guess that would have been fruitless. But you haven't even shown something equitable, some lack of reasonable business judgment.

[72] The CLO Objectors state: "The Funds and Advisors are aware that the Court has heard and rejected a form of this argument in a different context. By raising the point here, we mean no disrespect to the Court or the prior ruling. However, we contend that the issue is appropriately joined in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed. Moreover, at the time of the Motion that was denied, only the Funds and Advisors took a position on the issues; now, other parties, on information and belief, will object or have objected on a similar basis." Obj. at 5, n. 4.

76

**Appx. 05873**

143.    The CLO Objectors offer four bases for standing in the Objection.  The first is that "in several of the Servicing Agreements, the CLO Objectors have the right to remove the Debtor or to control who the servicer under the agreements is.  They have similar rights under the Indentures with respect to assignment or modification of the Servicing Agreements.  Insofar as the Fifth Amended Plan purports to limit or to take those rights away from them, and to change their rights, the CLO Objectors have standing to object to their rights being limited or eliminated."  Obj. at 27.  Elsewhere they state that the Management Agreements "generally allow the holders of preference shares to remove the portfolio manager for cause" and may provide for a certain percentage of holders of Preference Shares to remove a manager without cause. Obj. at 11.

144.    As an initial matter, nowhere in the NREP Joinder do any of the NexPoint RE Partners allege or state that they have any interest in the CLOs.  Without an interest in the CLOs, the NexPoint RE Partners cannot allege that any of their rights are affected.  Further, nowhere in the NPA/HCMFA Objection is there any attempt to establish any basis on which the CLO Objectors are presently entitled to replace the Debtor as the Portfolio Manager or authorized to decide for the CLOs whether the CLOs should consent to the Debtor's assumption of the Management Agreements.  This is telling.

145.    As set forth in the Management Agreements, the Debtor can only be removed as Portfolio Manager *for cause* by a majority of the preference shares that are *not* held by affiliates of the Debtor.  By the CLO Objectors own admission, they only hold a majority of the preference shares in eight of the fifteen CLOs at issue.  That means that the CLO Objectors have

DOCS_SF:104855.7 36027/002

*no* right to remove the Portfolio Manager in approximately half of the Management Agreements. However, even with respect to the CLOs in which they hold a majority of the preference shares, the CLO Objectors cannot remove the Debtor unless cause exists – and cause does not exist. Moreover, the CLO Objectors, under the Management Agreements, are prohibited from replacing the Debtor because each of the CLO Objectors should be considered an affiliate of the Debtor for purposes of the Management Agreements and therefore be prohibited from exercising removal rights. Finally, on January 9, 2020, this Court entered an order (the "January Order"), which, in pertinent part, stated that "Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor." [Docket No. 339] It is beyond dispute that each of the CLO Objectors is for all intents and purposes Mr. Dondero, and Mr. Dondero should not be allowed to do by proxy what he was prohibited by this Court from doing directly.

146. However, whether the CLO Objectors have the right to remove and replace the Debtor as Portfolio Manager is not a question that will be decided by the Plan nor will the CLO Objectors' rights to remove the Debtor – whatever they are – be impacted by the Plan. On January 6, 2021, the Debtor filed that certain *Debtor's Memorandum of Law in Support of Its Motion for a Temporary Restraining Order and Preliminary Injunction Against Certain Entities Owned and/or Controlled by Mr. James Dondero*, Adv. Proc. No. 20-03000-sgj, Docket No. 6] (the "Adversary Complaint"). In the Adversary Complaint, the Debtor seeks a declaratory judgment that the CLO Objectors have no right to replace the Debtor under the Management Agreements for the reasons set forth above, among others. The CLO Objectors should assert their rights, if any, at the hearing on the Adversary Complaint, not through an objection to

assumption. Consequently, the CLO Objectors' rights, if any, under the Management Agreement will be determined by this Court in a separate hearing, and will not be impacted by the Plan.

### 2. The CLO Objectors Lack Standing to Object to Assumption as Creditors or Parties in Interest

147. Two of the CLO Objectors' four claimed bases for standing are that they are creditors, or at least parties in interest, and as such have standing to object to assumption of the Management Agreements "especially because assumption of the Servicing Agreements and future performance thereunder affect the feasibility of the Plan as a whole," and under sections 1129(a)(1)-(3) because assumption of the Management Agreements purportedly violates the law. Obj. at 27. These arguments fail for numerous reasons.

148. First, these arguments for standing are circular. If a party lacks standing to object to assumption of a contract because it has no protected interest in the contract under section 365, it cannot argue that a plan should not be confirmed because of the assumption of such contract. A party cannot use an objection to a plan to create standing under section 365.

149. Second, the CLO Objectors are not creditors. As set forth in the Memorandum, each of the Advisors, the Funds, and CLO Holdco filed claims in this Case; however, each of those parties voluntarily agreed to have their Claims expunged or reduced to $0.00. None of the NexPoint RE Entities filed claims. As such, the CLO Objectors are barred from asserting that they have prepetition claims against the Debtor or its Estate. The CLO Objectors also cannot create claims by asserting that they will have claims arising from the rejection of the shared services agreements with the Debtor. *None* of the shared services agreements are being rejected. Each of the shared services agreements is freely terminable. In November 2020, the Debtor

**Appx. 05876**

provided notice that the shared services and other agreements were being terminated. Such agreements will terminate no later than January 31, 2021, which is prior to the anticipated Effective Date of the Plan. Because none of the shared services agreements are being rejected, none of the CLO Objectors will have a rejection damages claim.

150. Third, *even if* any of the CLO Objectors were creditors: "[E]ven creditors do not have standing to raise the rights of a landlord or contract party under section 365. . . While section 1109 allows a creditor to be heard on any issue in a bankruptcy case, it does not change the general principle of standing that a party may assert only its own legal interests and not the interests of another." *In re ANC Rental*, 278 B.R. at 718-19 (citations omitted). As the bankruptcy court held in *ANC Rental*, the CLO Objectors cannot usurp the CLO's standing to object to assumption.

151. Fourth, as set forth below, there is no "applicable law" prohibiting assumption and/or assignment for purposes of Section 365(c) and therefore no argument under section 1129(a). Each of the Management Agreements can be assumed and could be assigned without the consent of any party (although the CLOs have consented to assignment). Therefore, there is no violation of law.

152. Finally, the CLO Objectors cannot boot strap into standing by arguing that the assumption of the Management Agreements will not benefit the estate. First, it is anticipated that the Debtor's chief executive officer and chief restructuring officer will testify as to how assumption benefits the estate. Second, granting the relief requested by the CLO Objectors would be catastrophic to the Debtor's estate. The Debtor's inability to assume the Management

DOCS_SF:104855.7 36027/002

**Appx. 05877**

Agreements does not mean that the CLO Objectors will be magically installed as Portfolio Manager. It means that the Management Agreements will be rejected and that *none* of the CLOs will have a Portfolio Manager following the Confirmation Date. Any damage to the CLOs will presumably be part of the claims asserted by the CLOs against the Debtor in connection with that rejection. Those claims are currently incalculable. The Debtor also has exposure to each of the CLOs and any loss in value caused by having no Portfolio Manager would directly impact the Reorganized Debtor's and Claimant Trust's assets. Even assuming the CLO Objectors can appoint themselves Portfolio Manager in the CLOs in which they hold a majority of the preference shares (which is contested and which in no event would happen by the Confirmation Date), that still leaves approximately half of the CLOs without a manager. It is beyond disingenuous for the CLO Objectors to argue that there is no benefit to the estate in assuming the Management Agreements while at the same time arguing that those same agreements should be rejected with the Debtor suffering the consequences.

### 3. The Contractual Right to Object to Assignment of the Management Agreements Does Not Create Standing to Object to Their Assumption

153. The fourth and final basis for standing is: "[I]n several of the Servicing Agreements, it is not just the CLO that must approve an assignment, but also the CLO Objectors. The CLO Objectors have similar rights under the Indentures. Insofar as the test under section 365(c)(1) is a hypothetical assignment, and the CLO Objectors have the right to approve or not approve that assignment under applicable law and the agreements, that right should extend to consent under section 365(c)(1)(B) as well, as the CLOs' consent is not possible without a concurring consent by the CLO Objectors." Obj. at 28.

DOCS_SF:104855.7 36027/002

**Appx. 05878**

154.     For purposes of standing, the CLO Objectors asserted contractual right to object to assignment of the Management Agreements is irrelevant, for three reasons.  First, there is no assignment here.  The Debtor is assuming the Management Agreements with the consent of the CLOs.  Second, even if it were correct that (a) the CLO Objectors have a contractual right to object to assignment, and (b) the *hypothetical test* applies, they still have no interest in the contract that would permit them to enforce section 365's protections for their benefit in derogation of the rights of the actual contracting parties.  Third, as discussed immediately below, the *actual test* applies in the Fifth Circuit, and thus the Management Agreements would be assumable even if they were not assignable.

**D.      Even if the CLO Objectors Had Standing and the Management Contracts Were Not Assignable, the Debtor Could Assume Them Because the *Actual Test* Applies in the Fifth Circuit**

155.     As the CLO Objectors recognize, there is a split of authority among the circuits regarding the appropriate test to apply to determine whether:

- a contract that is otherwise non-assignable under applicable non-bankruptcy law  can be assumed by a debtor  under Bankruptcy Code section 365(c)(1); and

- whether the same contract can be terminated if it contains an "ipso facto" clause pursuant to Bankruptcy Code section 365(e)(2)(A).

The Fifth Circuit has ordered lower courts to apply the so-called *actual test* in considering whether an ipso facto termination clause can be enforced under Bankruptcy Code section 365(e)(2)(A).  For the reasons set forth below, even though the Fifth Circuit has not ruled on the issue directly, the *actual test* has been applied by every bankruptcy court that has considered the issue in the Fifth Circuit to assumption of contracts under Bankruptcy Code section 365(c)(1).

**Appx. 05879**

Accordingly, the *actual test* should be applied in this Case to conclude that the Management Contracts can be assumed by the Reorganized Debtor without the consent of any party.

156. The Fifth Circuit's decision in *Bonneville Power Administration v. Mirant Corporation* applied the *actual test* to a determination of whether a contract can be terminated as a result of the filing of a bankruptcy case under Bankruptcy Code section 365(e)(2). *Bonneville Power Admin. v. Mirant Corp. (In re Mirant Corp.),* 440 F.3d 238 (5th Cir. 2006). The reasoning in *Mirant* also supports application of the *actual test* to Bankruptcy Code section 365(c)(1). Specifically, in *Mirant,* a non-debtor counterparty sought to terminate its executory contract with the chapter 11 debtor based on an ipso facto clause after the debtor filed for bankruptcy. In support of its argument, the non-debtor counterparty relied on section 365(e)(2)(A) and asserted that, under applicable law, the Anti-Assignment Act, 41 U.S.C. § 15 (which generally prohibits the transfer of contracts to which the United States is a party), it was excused from accepting performance from or rendering performance to the trustee or an assignee. Critically, in reaching its conclusion that the *actual test* applied, the Fifth Circuit relied on cases analyzing section 365(c)(1).

157. While the CLO Objectors would like this Court to believe there is some risk that if faced with the direct question of whether the *actual* test also applies under section 365(c)(1), the Fifth Circuit would reach a different result, that argument strains credibility. Notwithstanding the technical language differences[73] between the two statutes, the same test

---

[73] Subsection (e)(2) provides that the invalidation of ipso facto clauses does not apply to an executory contract where "applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to the trustee or to an assignee of such contract or lease, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties[.]" 11 U.S.C. § 365(e)(2). This language is very similar—but not identical—to the language employed by subsection (c)(1), which speaks to excusing

must apply to both the assumption of a contract under section 365(c)(1) and the termination of a

contract under section 365(e)(2)(A).  There is no logical reading of these two subsections that

would support application of different tests.  The language of section 365(e)(2)(A) is intended to

allow the counterparty to a contract that cannot be assumed or assigned to enforce its remedy of

termination so that it is not in limbo while the bankruptcy case proceeds.  Section 365(c) cannot

be read in isolation from the other subsections.  It would make no sense for a court to hold that a

contract cannot be assumed because the *hypothetical test* applies, but nonetheless cannot be

terminated because the *actual test* applies.  For this reason, every lower court in the Fifth Circuit

that has considered the issue has held that the *actual test* applies to a debtor's assumption of

contracts under section 365(c).  *See In re Virgin Offshore USA, Inc.*, No. 13-79, 2013 U.S. Dist.

LEXIS 128995, at *15 (E.D. La. Sep. 10, 2013):

> Though the *Mirant* court used the actual test in the context of § 365(e), which was
> not amended in the same way as § 365(c) and thus is not subject to the same
> circuit split, the Court nonetheless finds this decision to be an indicator of the way
> that the Fifth Circuit would undertake an analysis under § 365(c).  Further, in *In
> re O'Connor*, the Fifth Circuit appears to have applied an actual test to determine
> that a partnership interest was strictly personal under Louisiana law, thus not
> assumable under § 365(c).  The court did not expressly adopt the actual test
> because, regardless of the test applied, the partnership interest would have been
> unassumable under § 365(c); however, the language used in the opinion indicated
> a predilection for the actual test.

*See also In re Jacobsen*, 465 B.R. 102, 105-06 (Bankr. N.D. Miss. 2011); *Cajun Elec. Members

Comm. v. Mabey (In re Cajun Elec. Power Coop., Inc.)*, 230 B.R. 693, 705 (Bankr. M.D. La.

1999); *In re Lil' Things, Inc.,* 220 B.R. 583, 587 (Bankr. N.D. Tex. 1998); *Texaco Inc. v.

Louisiana Land & Exploration Co.,* 136 B.R. 658, 669 (Bankr. M.D. La.1992); *In re Hartec*

---

performance from, or rendering performance to, "an entity other than the debtor or the debtor in possession" as
opposed to just "the trustee or [] an assignee." Compare *id*. § 365(c)(1) with § 365(e)(2).

DOCS_SF:104855.7 36027/002

**Appx. 05881**

*Enters., Inc.,* 117 B.R. 865, 871 (Bankr. W.D. Tex. 1990), *vacated by settlement*, 130 B.R. 929 (W.D.Tex. 1991).

158.    Moreover, other bankruptcy courts within the Fifth Circuit have expressly rejected the *hypothetical test*, concluding that:

> If the court were to adopt the [hypothetical test] and focus primarily upon assignability, a chapter [sic] 11 filing would have the virtual effect of rejecting executory contracts covered by section 365(f). As suggested by the court in *Texaco,* this analysis would extend section "365(c) beyond its fair meaning and intended purpose, contrary to the ultimate goal of rehabilitation of the debtor's enterprise."

*Cajun Elec.,* 230 B.R.at 705 (Bankr. M.D. La. 1999)  (quoting *Texaco,* 136 B.R. at 670).

159.    The CLO Objectors prediction that the Fifth Circuit would apply a different test under subsection 365(c) than it does under 365(e) is based solely on the use of the word "or" rather than "and" in subsection 365(c).  However, the language cited by the CLO Objectors in the statute is the same language that was considered by each of the lower courts in the Fifth Circuit; each of those courts nonetheless applied the *actual test*.  The CLO Objectors reading is overly simplistic and imposes a literal reading that, as noted by the *Cajun Electric* Court above, is "beyond its fair meaning and intended purpose, contrary to the ultimate goal of rehabilitation of the debtor's enterprise."  *Id.*  Accordingly, the argument that assumption of the Management Contracts must be evaluated using the *hypothetical test* is unavailing and contrary to this Circuit's case law.

    **E.**      **Even if the CLO Objectors Have Standing and the *Hypothetical Test* Applies, the Management Agreements Are Assignable**

160.    The CLO Objectors, assuming the *hypothetical test* applies, contend the Management Agreements cannot be assigned or assumed under section 365(c)(1) without the consent of the contracting party because they are non-assignable personal services contracts and because Section 205(a)(2) of the Advisers Act proscribes assignment of such contracts without consent. Under these circumstances, the CLO Objectors argue that "applicable law excuses a party, other than the debtor, to such contract . . . from accepting performance from . . . an entity other than the debtor. . . ." 11 U.S.C. § 365(c)(1)(A).

161.    This Court has previously (and correctly) rejected both of these arguments – at that time made by the Debtor under the control of Mr. Dondero – in *In re Acis Capital Management, L.P., et al*, Case No. 18-30264-sgj, Docket No. 549 (Bankr. N.D. Tex. Aug. 30, 2018) (the "Acis Order"). In the Acis Order, this Court held that: (a) the portfolio management agreements at issue were not personal services contracts; and (b) Section 205(a)(2) of the Advisers Act is not "applicable law" precluding assignment under section 365. Specifically, this Court ruled as follows:

> The court overrules any objection that there is some applicable law that excuses the counterparties to the PMAs [portfolio management agreements] (i.e., the CLO Issuers) from accepting performance from a party other than the debtor. First, these are not personal services contracts. . . . [I]n order to determine whether the PMAs are personal service contracts, the court must assess the particular circumstances in the case, the nature of the services provided by Acis under the PMAs, and whether such services are nondelegable. Highland contends that because the PMAs "depend on the skill and reputation of the performing party," the PMAs are personal service contracts, and thus unassignable. If this were the standard, the exception would swallow the rule – any prudent party contracting for another's services considers the other party's skill, expertise, and reputation – and any contract for services premised on the skill and reputation of the party providing services would be a personal service contract. It is not whether the party

DOCS_SF:104855.7 36027/002

**Appx. 05883**

providing services is skilled and reputable – it is whether such services are unique in nature. *See Compass Van & Storage Corp.*, 65 B.R. at 1011. . . . Here. . . [p]ursuant to the Shared Services Agreement and Sub-Advisory Agreement, Acis LP delegated certain of its responsibilities under the PMAs to Highland. Accordingly, the personal qualities of Acis LP were not essential to performance under the PMAs. While the expertise of Acis LP was relevant to its selection as portfolio manager, such expertise is not unique – as demonstrated by the expertise and reputation of Oaktree, Brigade, and others who act as CLO portfolio managers. Also, importantly, the PMAs themselves provide that Acis may delegate the performance of its duties under the PMAs to third parties: "In providing services hereunder, the Portfolio Manager may employ third parties, including its Affiliates, to render advice (including investment advice), to provide services to arrange for trade execution and otherwise provide assistance to the Issuer, and to perform any of the Portfolio Manager's duties under this Agreement; provided that the Portfolio Manager shall not be relieved of any of its duties hereunder regardless of the performance of any services by third parties." 2014-3 PMA § 3(h)(iii). And although section 14 the PMAs requires consent for assignment, section 14 contemplates that an Affiliate assignee "has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to this Agreement." *Id.* § 14(a). Further, sections 14 and 32 of the PMAs provide for merger, consolidation, or amalgamation of Acis with another company, where the resulting entity succeeds "to all or substantially all of the collateral management business of the Portfolio Manager." Pursuant to the terms of the PMAs themselves, the duties of Acis were not "so unique that the dut[ies were] thereby rendered nondelegable." . . . As such, unlike personal service contracts, the PMAs do not "synthesize into those consensual agreements . . . distinctive characteristics that commit to a special knowledge, unique skill or talent, singular judgment and taste." . . . Accordingly, because the duties of Acis LP under the PMAs are delegable (and were delegated) and are not unique, the PMAs cannot be personal service contracts that fall within the narrow exception of section 365(c)(1).

Additionally, Section 205(a)(2) of the Investment Advisors Act of 1940 ("IAA") is not a nonbankruptcy law that precludes assumption and assignment of the PMAs. Section 205(a)(2) of the IAA provides that a registered investment adviser (such as Acis) cannot enter into an investment advisory contract unless such contract provides "that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract[.]" 15 U.S.C. § 80b-5(a)(2).

Thus, this provision of the IAA merely requires that the PMAs contain an anti-assignment provision – the IAA is not "applicable law" that prohibits assumption or assignment without consent of the counterparties to the PMAs. Indeed, in the Southern District of New York, the court held:

"Section 205(a)(2) of the [IAA] . . . does not . . . prohibit an

> investment adviser's assignment of an investment advisory contract without client consent. The section merely provides that the contract must contain the specified provision. Thus, the assignment of a non-investment company advisory contract, without obtaining client consent, could constitute a breach of the advisory contract, but not a violation of Section 205(a)(2)."

*CWCapital Cobalt VR Ltd. v. CWCapital Invs. LLC*, 2018 U.S. Dist. LEXIS 90174, at *12 (S.D.N.Y. May 23, 2018). Assignment of the PMAs without consent of the counterparties simply constitutes breach of the PMAs, but the IAA is not "applicable law" that excuses the counterparties to the PMAs from accepting or rendering performance without such consent.

162. For the exact reasons found by this Court in the Acis Order, the CLO Objectors' argument that "applicable law" prevents assignment under 11 U.S.C. § 365(c) should be overruled. First, the Management Agreements are on all fours with the management agreements discussed in the Acis Order. The Management Agreements have the same delegation provisions, the same assignment provisions, and the same provisions on merger, consolidation, and amalgamation.[74] The Court has already ruled on these exact agreements and found that they preclude a finding that the Management Agreements are personal services contracts.

---

[74] *See, e.g.,* Servicing Agreement, dated as of November 30, 2006, by and among Grayson CLO Ltd., and Highland Capital Management, L.P. ("Grayson Agreement"):

> In providing services hereunder the Servicer may employ third parties including its Affiliates to render advice including advice with respect to the servicing of the Collateral and assistance provided however that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties.

(*Id.,* § 2(d))

> In addition any successor Servicer must be an established institution which has demonstrated an ability to professionally and competently perform duties similar to those imposed upon the Servicer hereunder

(*Id.,* § 12(e))

> Any corporation partnership or limited liability company into which the Servicer may be merged or converted or with which it may be consolidated or any corporation partnership or limited liability company resulting from any merger conversion or consolidation to which the Servicer shall be party or any corporation partnership or limited liability company succeeding to all or substantially all of the servicing and collateral management business of the Servicer shall be the successor to the Servicer without any further action by the Servicer the Co-Issuers the Trustee the

163.    Second, as this Court ruled, the Advisers Act does not prohibit assignment without consent.  It simply requires that an advisory agreement contain certain language and that any failure to obtain consent is a breach, not a nullification of the assignment.  If the CLO Objectors had done their diligence, they would have realized that the Acis Order is not unique. The SEC has expressly stated that:

> Section 205(a)(2) does not prohibit an adviser's assignment of an investment advisory contract without client consent. The section merely provides that the contract must contain the specified provision. Thus, the assignment of a non-investment company advisory contract, without obtaining client consent, could constitute a breach of the advisory contract, but not a violation of Section 205(a)(2).

*American Century Companies, Inc./JP Morgan & Co. Incorporated*, Staff No-Action Letter (12/23/1997); *see also* Investment Management Staff Issues of Interest, http://www.sec.gov/divisions/investment/issues-of-interest.shtml [June 5, 2012] ("In particular, the staff previously has clarified that Section 205(a)(2) does not prohibit an adviser's assignment of an investment advisory contract without client consent.  The section merely provides that the contract must contain the specified provision.").

164.    As such, there is no applicable law prohibiting the assignment – let alone the assumption – of the Management Agreements.  "[F]or section 365(c)(1) to apply, the applicable law must specifically state that the contracting party is excused from accepting performance from a third party under circumstances where it is clear from the statute that the identity of the contracting party is crucial to the contract or public safety is at issue."  *In re ANC Rental Corp.*, 277 B.R. 226, 236 (Bankr. D. Del. 2002).

---

Noteholders or any other person or entity

(*Id.*, § 31)

DOCS_SF:104855.7 36027/002

**Appx. 05886**

### F.  The Inadequate Assurance of Future Performance Objection is Meritless

165.   The CLO Objectors contend that the reorganized Debtor will have inadequate resources to perform its obligations under the Management Agreements, and so has not given adequate assurance of future performance.  The CLO Objectors also allege that there is a mismatch between the Debtor's investment timeline and the timeline expected by the investors in the CLOs.  Both of those arguments fail.  First, assurance of future performance is a protection conferred by section 365 on contracting parties, which the CLO Objectors are not.  They lack standing to invoke it when the actual contracting parties – the CLOs – are satisfied.  Second, even if they had standing, the objection is without merit.  The CLO Objectors argue (i) because the Debtor is terminating all of its employees, it will not be able to manage the CLOs post-Effective Date and (ii) the Debtor cannot hire a Sub-Servicer to manage the CLOs without violating the Management Agreements.  As an initial matter, the Debtor is not retaining a Sub-Servicer to manage the CLOs, and, although the Debtor will terminate a number of employees, it will retain sufficient and appropriate staff to manage the CLOs post-Effective Date.  However, even if the Debtor were terminating all employees, the Management Agreements *expressly* allow the Debtor to retain a Sub-Servicer to manage the CLOs.[75]

166.   Similarly, the CLO Objectors' contention that the Debtor's timeline for monetizing the assets in the CLOs is contrary to the timeline expected by the CLOs' investors also ignores the facts.  As disclosed in the CLOs' offering memoranda, the notes and preference shares issued by the CLOs have come due or will, with two exceptions, come due shortly.

---

[75] *See* Grayson Agreement, § 2(d) ("In providing services hereunder **the Servicer may employ third parties** including its Affiliates **to render advice including advice with respect to the servicing of the Collateral and assistance** provided however that the Servicer shall not be relieved of any of its duties or liabilities hereunder regardless of the performance of any services by third parties.") (emphasis added).

90

| CLO | Note Maturity | Preference Share Redemption |
|---|---|---|
| Aberdeen | November 2018 | November 2018 |
| Brentwood | February 2022 | February 2022 |
| Eastwood | May 2022 | May 2022 |
| Gleneagles | November 2017 | November 2017 |
| Grayson | November 2021 | November 2021 |
| Greenbriar | November 2021 | November 2021 |
| Highland Legacy Limited | June 2011 | N/A |
| Highland Loan Funding V | August 2014 | August 2014 |
| Highland Park CDO I | November 2051 | November 2051 |
| Jasper | August 2017 | August 2017 |
| Pam Capital | May 2010 | N/A |
| PamCo | August 2009 | N/A |
| Red River | July 2018 | July 2018 |
| Rockwall | August 2021 | N/A |
| Rockwall II | August 2021 | N/A |
| Southfork | February 2017 | February 2017 |
| Stratford | November 2021 | November 2021 |
| Valhalla | April 2038 | April 2038 |
| Westchester | August 2022 | August 2022 |

As such, there is no mismatch between the expectations of the CLOs' investors and the Debtor. With the exception of the CLO Objectors who presumably want the CLOs to stay extant forever, the expectations of the CLOs' investors are set by the offering memoranda, which clearly disclose the expected timeline for the CLOs.

167.    Finally, the disingenuousness of the CLO Objectors' arguments on future performance cannot be overstated.  The CLO Objectors are arguing that the Debtor must *reject* the Management Agreements because – in their estimation – the Reorganized Debtor will not be able to satisfactorily manage the CLOs.  The CLO Objectors' argument is therefore that it is

DOCS_SF:104855.7 36027/002

**Appx. 05888**

better for the CLOs to have no manager at all. The CLO Objectors arguments are an abject danger to the Estate and could create potential liability in the millions of dollars.

### G. The "Impermissible Partial Assignment" Objection is Meritless

168. The CLO Objectors contend that their rights are being modified by the Debtor's assumption of the Management Agreements, effectively resulting in an impermissible "partial assumption" of the contracts. Once again, they are not contracting parties with standing to object on this basis. But even if they were, the factual predicate is missing. The Management Agreements are being assumed *in toto*. There is no modification of any contract rights of the CLO Objectors. And, as set forth above, the Debtor filed the Adversary Complaint in which it sought a declaratory judgment on the CLO Objectors' rights to replace the Debtor as Portfolio Manager under the Management Agreements. Regardless of whether the Plan is confirmed, the CLO Objectors will have their rights under the Management Agreements as those rights are determined by this Court in connection with the adjudication of the Adversary Complaint.

## XI. STATE TAXING AUTHORITY OBJECTION

169. Following the filing of the State Taxing Authority Objection, the Debtor reached out to Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County (collectively, the "State Authorities") to see whether the State Taxing Authority Objection could be resolved consensually. Although the Debtor and the State Taxing Authority have not yet reached resolution, the Debtor is optimistic that the State Taxing Authority Objection will be resolved and will continue working with the State Authorities.

DOCS_SF:104855.7 36027/002

**Appx. 05889**

### XII.    IRS OBJECTION

170.    The Internal Revenue Service ("IRS") raises three objections to the Plan in the IRS Objection, two of which are not controversial, and the Debtor has amended the plan to address these points.

171.    First, in paragraph 1 of the IRS Objection, the IRS requests that the Debtor provide it with interest on account of its Allowed Claim as required under 11 U.S.C. 1129(a)(9)(C).  The Plan previously provided for payment of the full amount of the Allowed Priority Tax Claims (which would include any applicable interest on account of such Allowed Claim) on the Initial Distribution Date in order to fully satisfy these tax claims and avoid the incurrence of any unnecessary interest.  To clarify this issue and resolve this first objection, the Debtor has amended the Plan to provide for an additional treatment mechanism that provides that Allowed Claims shall be treated in accordance with section 1129(a)(9)(C) of the Bankruptcy Code in the event the entirety of the IRS's Allowed Claims (inclusive of any interest pursuant to which such claims are entitled to) are not paid on the Initial Distribution Date, as provided in section II.C of the Plan.

172.    Second, in paragraph 3 of the IRS Objection, the IRS argues that its claims should not be "fixed" unless and until any required tax returns are filed.  The Debtor does not dispute this contention and believes that the proposed language that was provided to the IRS and reprinted below addresses this concern because it provides that the IRS's claims shall survive the bankruptcy as if the cases had not yet been filed, which is standard in chapter 11 confirmation orders.  Further, the Debtor believes that it has filed all applicable returns but, in an effort to resolve the IRS Objection, proposes the language below.

DOCS_SF:104855.7 36027/002

173. In paragraph 2 of the IRS Objection, the IRS asserts that it has no record of the Debtor having filed its Form 720 with respect to its self-insured health plan for the June 30, 2014, June 30, 2016 and June 30, 2018 tax periods. Because of this alleged non-compliance, the IRS proposes certain default provisions detailed in the chart below (the "Default Provisions"). The Debtor asserts that the Default Provisions are not warranted because that Debtor has filed all applicable tax returns. Specifically, with respect to Form 720, on April 22, 2020, the Debtor responded to an IRS inquiry about the forms and provided an explanation about forms which were not required and provided the IRS with Form 720 for the 2015, 2016 and 2017 tax periods. Further the Default Provisions are not warranted because the IRS has adequate collection and enforcement remedies available through applicable law and should not be granted additional remedies through the Plan. Finally, the Default Provisions are vague and contain undefined terms which will result in confusion if enforcement is ever attempted. Certain examples of these problems are discussed below.

174. Default Provision (1) provides certain remedies to the IRS in the event of certain failures to pay taxes or timely file returns by the Debtor, the Reorganized Debtor or any successor in interest. The Debtor asserts that the Default Provisions are unnecessary since the Debtor has provided all applicable returns. Default Provisions (2) and (3) are not needed and are problematic because of their vagueness. The Debtor would agree to Default Provision (1) provided that it is clarified to state that nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that

Appx. 05891

the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States.

175.    Default Provision (2), presumably intended to provide remedies in addition to those provided under Default Provision (1), would allow the IRS to declare the Debtor to be in **"default"** if the certain failures were not cured within fourteen (14) days and then the **"entire imposed liability, together with any unpaid current liabilities, shall become due and payable immediately upon written demand to the Debtor, Reorganized Debtor, an/or any successor in interest."**  The term **"entire imposed liability"** is not defined in the proposed Default Provision.  The ability of the IRS to unilaterally declare the Debtor to be in default and the imposition of a fourteen (14) day deadline is inappropriate and the IRS should rely on applicable law without imposing additional requirements through the confirmation process. Further, if this provision is intended to cut off the Debtor's right to challenge any obligation that is asserted against it by the IRS, it goes beyond applicable law and would deprive the Debtor of valuable rights to legitimately challenge such asserted amounts, including applicable appeal rights.  Further, to the extent that the Debtor may legitimately dispute certain tax obligations, acceleration of payment of other tax obligations is not appropriate and not in accordance with applicable law.

176.    Default Provision (3) requires full payment of the entire imposed liability, together with an unpaid current liabilities within fourteen (14) days of demand and also purports to extend the collection statute expiration date again attempting to augment remedies available to the IRS.  Such remedies are not warranted.  Again, the IRS has adequate remedies available to it

DOCS_SF:104855.7 36027/002

**Appx. 05892**

under applicable law and should not seek to augment them through the bankruptcy plan confirmation process.

177. Aside from the fact that the pre-determination of the parties' applicable rights and defenses under applicable non-bankruptcy law does not belong in a chapter 11 plan or confirmation order, the IRS's language is problematic for another reason. By grafting these requirements to a chapter 11 plan and or a court order, the IRS is creating additional remedies that it would otherwise not be entitled to under non-bankruptcy law because it could then use the Confirmation Order to hold the Debtor in contempt, and potentially foreclose any applicable defenses or other substantive rights in a later proceeding that contravene the IRS's Court-ordered default language.

178. The Debtor has proposed (and the IRS has rejected) the standard "neutrality" language that protects the parties' respective rights and defenses and places them in the "the administrative or judicial tribunals in which such rights or claims would have been resolved or adjudicated if the bankruptcy case had not been commenced" which is where they belong.

179. The Debtor believes that the Court should not pre-adjudicate either the Debtor's or the IRS's applicable rights and remedies with respect to any unfiled tax returns or claims asserted by the IRS and these issues should be preserved for adjudication in the appropriate forums post-confirmation. The Debtor believes that its neutrality language initially proposed is consistent with language approved by this Court and in other cases without pre-adjudicating the parties' substantive rights. While the Debtor does not believe that any of the proposed Default Provisions are warranted because it has complied with applicable filing requirements, the Debtor

DOCS_SF:104855.7 36027/002

**Appx. 05893**

would agree to include Default Provision (1) as modified below. The Debtor believes that the language proposed to the IRS for insertion to the Confirmation Order[76] preserves each party's respective rights and defenses and adequately protects the IRS form enforcing any statutory claims or rights it may possess.

| Proposed Resolution of Objection of United States of America. | Default Provision - IRS. Notwithstanding any other provision or term of this Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the IRS Claim): |
|---|---|
| **Default Provision - IRS**. Notwithstanding any other provision or term of this Plan or Confirmation Order, the following Default Provision shall control as to the United States of America, Internal Revenue Service ("IRS") and all of its claims, including any administrative claim (the IRS Claim): | |
| (1) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of said notice and demand, then the following shall apply to the IRS: | (1) Notwithstanding any other provision in the Plan, if the Debtor, the Reorganized Debtor, or any successor in interest fails to pay when due any payment required to be made on federal taxes, the IRS Claim, or other payment required to be made to the IRS under the terms and provisions of this Plan, the Confirmation Order, or the Internal Revenue Code (26 U.S.C.), or fails to timely file any required federal tax return, or if any other event of default as set forth in the Plan occurs, the IRS shall be entitled to give the Debtor, the Reorganized Debtor and/or any successor in interest and their counsel of record, by United States Certified Mail, written notice of the failure and/or default with demand that it be cured, and if the failure and/or default is not cured within 14 days of said notice and demand, then the following shall apply to the IRS: |
| (A) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code; | (A) The administrative collection powers and the rights of the IRS shall be reinstated as they existed prior to the filing of the bankruptcy petition, including, but not limited to, the assessment of taxes, the filing of a notice of Federal tax lien and the powers of levy, seizure, and collection as provided under the Internal Revenue Code; |
| (B) The automatic stay of 11 U.S.C. § 362 and any injunction of this Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Court, and the entire | (B) The automatic stay of 11 U.S.C. § 362 and any injunction of this Plan or in the Confirmation Order shall, with regard to the IRS only, lift or terminate without further notice or hearing by the Court, and the entire imposed liability owed to the IRS, together with any unpaid current liabilities, may |

---

[76] The Debtor discussed its concerns with IRS counsel provided it with certain neutrality language to resolve the IRS objection. The IRS responded that it could not agree to such language and would stand on its objection and its requested default language

DOCS_SF:104855.7 36027/002

**Appx. 05894**

imposed liability owed to the IRS, together with any unpaid current liabilities, may become due and payable immediately; and

(C) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed; and

(3) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service;

(4) Nothing contained in the Plan or the Confirmation Order shall be deemed to be a waiver or relinquishment of any rights, claims, causes of action, rights of setoff or recoupment, rights to appeal tax assessments, or other legal or equitable defenses that the Debtor or Reorganized Debtor have under non-bankruptcy law in connection with any claim, liability or cause of action of the United States; and

(5) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full.

become due and payable immediately; and

(C) The IRS shall have the right to proceed to collect from the Debtor, the Reorganized Debtor or any successor in interest any of the prepetition tax liabilities and related penalties and interest through administrative or judicial collection procedures available under the United States Code as if no bankruptcy petition had been filed and as if no plan had been confirmed.

(2) If the IRS declares the Debtor, the Reorganized Debtor, or any successor in interest to be in default of the Debtor's, the Reorganized Debtor's and/or any successor in interest's obligations under the Plan, then the entire imposed liability, together with any unpaid current liabilities, **shall become due and payable immediately upon written demand to the Debtor, Reorganized Debtor, and/or any successor in interest**. Failure of the IRS to declare a failure and/or default does not constitute a waiver by the United States or its agency the IRS of the right to declare that the Debtor, Reorganized Debtor, and/or any successor in interest is in default.

(3) **If full payment is not made within fourteen (14) days of such demand**, then the Internal Revenue Service may collect any unpaid liabilities through the administrative collection provisions of the Internal Revenue Code. **The IRS shall only be required to send two notices of failure and/or default, and upon the third event of a failure and/or default the IRS shall be entitled to proceed as set out in paragraphs (A), (B), and/or (C) herein above without further notice to the Debtor, the Reorganized Debtor, or any successor in interest, or its counsel. The collection statute expiration date will be extended from the Petition Date until substantial default under the Plan**.

(4) The Internal Revenue Service shall not be bound by any release provisions in the Plan that would release any liability of the responsible persons of the Debtor, the Reorganized Debtor, and/or any successor in interest to the IRS. The Internal Revenue Service may take such actions as it deems necessary to assess any liability that may be due and owing by the responsible persons of the Debtor, the Reorganized Debtor and/or any successor in interest to the Internal Revenue Service.

(5) The term "any payment required to be made on federal taxes," as used herein above, is defined as: any payment or deposit required by the Internal Revenue Code to be made by the Debtor from and

98

**Appx. 05895**

| | after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. The term "any required tax return," as used herein above, is defined as: any tax return or report required by the Internal Revenue Code to be made by the Debtor from and after the Confirmation Date, or the Reorganized Debtor and/or any successor in interest from and after the Effective Date, to the date the IRS Claim is together with interest paid in full. |
|---|---|

## **CONCLUSION**

For the reasons set forth herein and in the Memorandum, the Debtor respectfully requests that the Bankruptcy Court overrule the Objections for the reasons set forth herein and confirm the Plan as requested by the Debtor.

DOCS_SF:104855.7 36027/002

**Appx. 05896**

Dated:  January 22, 2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No.143717)
(*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084)
(*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992)
(*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            gdemo@pszjlaw.com

-and-

*/s/ Zachery Z. Annable*
HAYWARD PLLC
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

DOCS_SF:104855.7 36027/002

**Appx. 05897**

# EXHIBIT A

**Appx. 05898**

# Plan Objections from Dondero-Related Entities: Organizational Charts



[1] CLO Holdco, Ltd., is a wholly-owned subsidiary of the Charitable Donor Advised Fund, L.P. (the "DAF"). HCMLP has terminated its shared services agreement with the DAF. The DAF owes HCMLP past due fees and expenses.
[2] Amounts owed as of November 30, 2020.

# EXHIBIT B

## OBJECTION SUMMARY[1]

| Objecting Party | Objection | Response |
|---|---|---|
| U.S. Trustee | The release is overbroad and releases non-debtors in violation of Pacific Lumber | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and LST only in their capacity as successors.  No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable.  Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. |
| | The exculpation is overbroad and releases non-debtors in violation of Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| Internal Revenue Service | Plan does not state that the Debtor will pay IRS priority tax claims on the Effective Date. | The Plan provides that Allowed Priority Claims would be paid on the Initial Distribution Date.  In response to this objection, the Plan has been amended to provide for treatment of priority claims in accordance with 1129(a)(9)(C) |
| | The plan does not provide for statutory interest on the IRS claims under Section 511 | Plan has been amended to provide for treatment of priority claims in accordance with 1129(a)(9)(C) |
| | The IRS asserts that the Debtor failed to file tax Form 720 returns related to its self-insured health plan for 2014, 2016, and 2017 and requests that the Plan be amended to include certain "Default Provisions" that, among other things, allow the IRS to declare defaults, demand that the "entire imposed liability" become due and payable, and the ability to collect unpaid liabilities upon 14 days' notice of demand for payment | The Debtor has provided all applicable tax forms and the proposed Default Provisions are unwarranted.  The Debtor would agree, however, to modified Default Provisions.

The IRS' proposed Default Provisions graft the IRS' potential non-bankruptcy and arguably additional rights and remedies into the Plan, including the IRS' unilateral rights to declare defaults, impose successor liability, and to require payments of "entire imposed liabilities" upon 14 days' notice of demand.  The Debtor does not think it is appropriate for the Plan or Confirmation Order to dictate these rights and they should be determined under applicable non bankruptcy law. |

---

[1] The following are summaries only.  Parties should read the entirety of the Debtor's Reply.

| Objecting Party | Objection | Response |
|---|---|---|
| Dallas County, City of Allen, Allen ISD, City of Richardson, and Kaufman County | Plan does not appropriately apply for treatment of postpetition and effective date interest on tax claims, Plan does not provide for continued security interest and Plan does not provide that failure to pay tax claims is a default under the plan | The Debtor is currently negotiating language with these taxing authorities to resolve the issues raised in their objection through insertion of language in the Confirmation Order in order to consensually resolve this objection. |
| Jack Yang and Brad Borud (joined by Deadman, Travers, Kauffman [D.I. 1674; 1679]) | Subordinated Claims are defined overly broad as not just claims subordinated under § 510 but also claims arising from Class A/B/C Limited Partnership interests in a way that impermissibly broadens § 510(b) | The Plan has been amended to clarify that it does not provide for categorical subordination of claims relating to partnership interests to address this objection |
| Patrick Daugherty | The Disputed Claims Reserve allows the Debtor to estimate claims for distribution, which provides for impermissible disparate treatment under § 1123(a)(4) | The Plan does not provide for disparate treatment of claims.  The Plan provides for a mechanism for the Debtor or Mr. Daugherty (or any creditor) to file a motion to estimate any Disputed Claim for purposes of establishing the amount of the Disputed Claims Reserve pending the allowance or disallowance of his claim.  Neither Daugherty or any other creditor is entitled to a reserve for the full amount of a disputed claim.  This procedure does not constitute disparate treatment of claims under section 1123(a)(4) |
| Dugaboy Investment Trust and Get Good Investment Trust | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |
| | The Plan is not complete as it doesn't list final documents governing the claimant trust/litigation trust/reorg debtor, retained causes of action, executory contracts | Dugaboy's reference to documents still under negotiation with the Committee was a vestige from a prior draft. Three Plan Supplements have been filed that contain those documents.  An additional Plan Supplement is being filed concurrently herewith. |
| | Plan violates 1129(a)(7) because it doesn't provide the value that would be received in a chapter 7 liquidation because:  (i) Reorg Debtor has no affirmative obligation to report to holders of beneficial interests in the Claimant Trust, (ii) Claimant Trustee is only liable for fraud, willful misconduct, or gross negligence and not breach of fiduciary duty; and (iii) a chapter 7 trustee would need to get court authority to sell assets and no such requirement exists for Claimant Trustee

[ | The Liquidation Analysis provides that creditors will receive distributions under the Plan that are not less than the value they would receive under a hypothetical distribution under chapter 7. This objection does not contest the conclusions set forth in the Liquidation Analysis.

The Plan, consistent with other plans including ones confirmed in this court, properly allows the Claimant Trustee and Reorganized Debtor to sell assets post-confirmation without the need for court approval. The standard of liability is also appropriate and consistent with confirmed chapter 11 plans.  Moreover, a chapter 7 trustee would enjoy qualified immunity for its actions. |

**Appx. 05902**

| Objecting Party | Objection | Response |
|---|---|---|
| | Exculpation provisions are overbroad as (i) they do not relate to a specific time period (just apply from Petition Date through implementation), especially when read in connection with the exculpation provision in the Claimant Trust Agreement, (ii) cover non-Debtors, and (iii) violates Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. The CTA includes standard language limiting liability and is not an improper exculpation. |
| | Release provision (i) is overbroad and releases claims not related to the BK; (ii) waives future claims of the Claimant Trust | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of the Debtor and its successors, which include the CT and the LST only as successors to the Debtor, not any claims the CT or LST might subsequently have of their own. No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable. Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. |
| | The injunction provisions in Article IX.F are overbroad and arguably violates Pacific Lumber as an improper release and In re Zale and Thru, which prevents a non-debtor injunction if it effectively discharges a no debtor | The Injunction Provisions have been modified to address these concerns. The Injunction Provision, as modified, merely implements the Plan's discharge, release, and Exculpation Provisions by enjoining the Enjoined Parties from commencing or maintaining any actions to interfere with the implementation or consummation of the Plan. Implementation and consummation are words used in the Code and have meanings known by practitioners and the Court. The injunction is only applicable to the Debtor and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust, or against the property of the Debtor, and its successors, the Reorganized Debtor, the Claimant Trust and the Litigation Sub-Trust – none of whom are non-debtor third parties as the debtor has eliminated the Independent Directors from these provisions. |
| | The release provided to released parties does not meet the standards for a release as there is no meaningful contribution to the BK and is not necessary to protect non-debtor entities that are essentially the debtor | Section 1123(b)(3) expressly permits a debtor to settle and release its own claims. The consideration provided by the Released Parties will be presented. The Released Parties are only being released by the Debtor and its successors. |

**Appx. 05903**

| Objecting Party | Objection | Response |
|---|---|---|
| | The "channeling injunction" and retention of jurisdiction is improper because it expands the BK court's jurisdiction to actions not arising under, related to, or arising in the BK. This is especially so since there is no post-effective date Reorganized Debtor | The Gatekeeper Provision is a legitimate exercise of the Court's jurisdiction, does not (as modified) implicate the Court's post-effective date jurisdiction as the Court will initially, only be determining if a claim is colorable. Furthermore, as a liquidating plan, the court has – under applicable law – jurisdiction because all acts taken by the trust are related to implementing and effectuating the Plan. Furthermore, the Gatekeeper Provision is supported by the Barton Doctrine (which requires that claims against court-appointed and court-approved fiduciaries be sanctioned by the approving or appointing court) and by the All Writs Act, which permits courts to place limits on the ability of vexatious litigants to continue to file litigation. |
| | The injunction prevents parties from enforcing the rights created by the plan post-effective date | Art. IX.F starts with "Except as expressly provided in the Plan, the Confirmation Order, or a separate order of the Bankruptcy Court. . . . " It does not prevent enforcement of rights created under the Plan |
| | The "channeling injunction" is not a proper channeling injunction under Section 524(j) and even if it were, 524(j) only applies to debtors that are eligible for a discharge under 1141 and HCMLP is not eligible for a discharge because it is a liquidation plan. | The Gatekeeper Provision has nothing to do with Section 524(j). Although the Debtor will be engaging in a long term liquidation given the nature of its assets, during that same time period the Debtor will be engaging in business to maximize such liquidation, including by continuing to manage non-debtor funds |
| James Dondero | The exculpation provision in IX.D is overbroad as it relates to non-debtors under Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| | The "channeling injunction" in Article IX.F includes post-confirmation conduct and non-debtors and is effectively a third party release prohibited under Dropbox. | The Gatekeeper Provision is a legitimate exercise of the Court's jurisdiction, does not (as modified) implicate the Court's post-effective date jurisdiction as the court will initially, only be determining if a claim is colorable. Furthermore, as a liquidating plan, the Court has – under applicable law – jurisdiction because all acts taken by the trust are related to implementing and effectuating the Plan. Furthermore, the Gatekeeper Provision is supported by the Barton Doctrine (which requires that claims against court-appointed |

| Objecting Party | Objection | Response |
|---|---|---|
| | | and court-approved fiduciaries be sanctioned by the approving or appointing court) and by the All Writs Act, which permits courts to place limits on the ability of vexatious litigants to continue to file litigation. There is no "release" in the Gatekeeper Provision as it does not prevent claims from being brought – it merely requires that the Bankruptcy Court determine the claim is colorable before it can be brought. |
| | The "channeling injunction" limits jurisdiction to the Bankruptcy Court and ignores other courts with exclusive jurisdiction and specialized jurisdiction | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable. |
| | The "channeling injunction" is impermissibly vague under FRBP 3016(c) | The Gatekeeper Provision is not vague and, to the extent FRBP 3016(c) is applicable, expressly complies with the rule in that the Gatekeeper Provision describes in specific and conspicuous language (bold, italic, or underlined text) all acts to be enjoined and identifies the entities that would be subject to the injunction |
| | The Plan does not provide appropriate mechanisms for oversight of post-confirmation sales and would allow impermissible sales similar to that which occurred during the BK | This is the same objection filed by other Dondero Entities to prevent the post-confirmation monetization of assets. The Plan, consistent with other plans including ones confirmed in this Court, properly allows the Claimant Trustee and Reorganized Debtor to sell assets post-confirmation without the need for court approval. The standard of liability is also appropriate and consistent with confirmed chapter 11 plans. |
| | The jurisdictional provisions are overbroad and would require all claims to be heard in the BK without regard to whether they arise in connection with implementation of the plan or otherwise | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable. The Bankruptcy Court has jurisdiction to determine if a claim is colorable |
| | The elimination of vacant classes on the effective date would impermissibly limited later re-allocation of claims | The elimination of the only vacant class (Class 5 (Retained Employees)) is for voting tabulation purposes only. This provision permissibly provides for the treatment of any claims that may arise or become Allowed as a Class 5 Claim post-confirmation. |
| | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |
| NexPoint Real Estate Partners LLC, f/k/a HCRE Partners, LLC | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | Section III.J of the Plan has been amended to clarify that subordination will occur after notice and a hearing and any order by the Bankruptcy Court. |

Appx. 05905

| Objecting Party | Objection | Response |
|---|---|---|
| | Plan allows Distribution Agent to setoff amounts owed to the Debtor against amounts owed to a creditor in violation of s. 553 and impermissibly shifts burden of proving setoff was improper to the creditor | Creditors have the right to challenge set off in an appropriate manner. The Plan has been amended to clarify this language. |
| | The "channeling injunction" improperly insulates non-debtors under s. 524(e). | The Gatekeeper Provisions do not implicate section 524(e). There is no insulation of any non-debtor. The Gatekeeper Provision simply requires the Bankruptcy Court to determine if a claim is colorable before it can be brought. |
| | The exculpation and release provision release claims not related to the BK but also the administration and implementation of the plan | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| | Period of time covered by the release and exculpation provisions impermissibly extends post-effective date. Cf. Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| NexPoint Advisors, Highland Capital Management Fund Advisors, and related funds<br><br>(joined by CLO Holdco)<br><br>(joined by NexPoint RE Entities [D.I. 1677] | Investment Advisers Act is "applicable law" that prohibits assumption/assignment of the Portfolio Management Agreements ("PMAs") under 365(c) | As this Court has ruled in Acis, and as SEC No Action Letters advise, the Investment Advisers Act does not prohibit assignment. The "actual test" applies and thus even if the PMAs were nonassignable, they would still be assumable. |
| | PMAs are "personal services contracts" and cannot be assigned under 365(c) | As this Court ruled in Acis, the PMAs are not nonassignable personal services contracts. Further, the counterparties have consented, and under the "actual test" the PMAs would be assumable even if nonassignable. |

| Objecting Party | Objection | Response |
|---|---|---|
| | Fifth Circuit applies the hypothetical test under Section 365(c), not the actual test | Fifth Circuit has applied the actual test under §365(e) and lower courts within the Fifth Circuit have applied the actual test to §365(c). |
| | Even if "actual" test applies, the Reorg Debtor is not the Debtor because of slimmed down staff and use of subservicers | The objectors lack standing to object.  As this Court held in Acis, services under the PMAs are delegable and the Debtor is entitled to use a servicer.  However, the Reorganized Debtor will have sufficient employees and resources to manage the CLOs post-Confirmation Date.  This is an adequate assurance issue, and the contract counterparties have consented. |
| | There is no consent to assumption under 365(c) | CLO issuers are the counterparties and they consent.  The objectors have no contract right to object to assumption. |
| | The objectors have standing because they have claims against the estate or will have large rejection claims under shared services agreements. | The Funds, Advisors and CLO Holdco are not creditors and will not be creditors.  They agreed to expungement of their claims or reduction to zero.  There will be no rejection damages because the contracts are freely terminable upon notice and are being terminated, not rejected.  Even if objectors were creditors, that would give them standing only as to whether assumption benefits the estate, not their particular interests. |
| | The objectors have standing because the plan violates 1129 because it provides for assumption of contracts in violation of law. | The objectors have no standing as creditors, they have no standing to object to assumption of contracts to which they are not parties and to which the counterparties have consented, and assumption of the PMAs does not violate any law. |
| | The objectors have standing because the plan seeks to limit their right to remove the manager | The Plan does not limit their removal rights. |
| | Debtor should take direction from the majority of the preference shareholders in the CLOs | The objectors have no contractual right to control the management of the CLOs. |
| | The injunction and release provisions are overbroad because they do not appropriately define their scope and prevent the movants from suing for future malfeasance | The Debtor Release is not overly broad and only releases claims owned (either directly or derivatively) by the Debtor and the Estate on behalf of  the Debtor and its successors, which include the CT and LST only in their capacity as successors.  No third party is implicated by the Debtor Release and Pacific Lumber is inapplicable.  Section 1123(b)(3) expressly permits a debtor to settle and release its own claims.  The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | The injunction prevents the objectors and the CLOs from seeking relief against the | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan |

**Appx. 05907**

| Objecting Party | Objection | Response |
|---|---|---|
| | debtor/reorg debtor from any present or future actionable wrongs under the servicing agreements and advisers act | and attempts to collect the claims and interests dealt with by the Plan. |
| | Injunction prevents set off or other damages under the servicing agreements and to seek legal redress | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | "Channeling Injunction" is defective with respect to post-confirmation actions and is overly broad | The Gatekeeper Provision has been modified to eliminate the exclusive jurisdiction of the Bankruptcy Court to hear permitted claims on the merits unless it determines it has jurisdiction to do so after determining if a claim is colorable. The Bankruptcy Court has jurisdiction to determine if a claim is colorable. |
| | Plan does not disclose who will be operating the reorganized debtor and claimant trust or their comp as required under s 1123(a)(7) or insider compensation under 1129(a)(5) | The Plan Supplement discloses the identity of the Claimant Trustee, Litigation Trustee and Oversight Committee members. The Debtor discloses in the Confirmation Brief the compensation of insiders pursuant 1129(a)(5) under the Plan who will serve post-confirmation in their Confirmation Brief |
| | The plan is not feasible because the treatment of the CLO management agreements is illegal and violates s. 365 | The Plan does not impact any party's rights under the CLO management agreements, and applicable law does not prohibit the Debtor's assumption of the CLO management agreements. |
| | The plan does not provide assurance of future performance with respect to the assumption of the CLO management agreement as required by 365(b) | The objectors lack standing to object. As this Court held in Acis, services under the PMAs are delegable and the Debtor is entitled to use a servicer. However, the Reorganized Debtor will have sufficient employees and resources to manage the CLOs post-Confirmation Date. This is an adequate assurance issue, and the contract counterparties have consented. |
| | Release and injunction provisions are overbroad under Pacific Lumber because they release third parties | Neither the Release nor the Injunction Provisions release non-debtor third parties. |
| | Exculpation provisions are overbroad under Thru | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |

Appx. 05908

| Objecting Party | Objection | Response |
|---|---|---|
| | The plan divests movants from their set off rights | Creditors have the right to challenge set off in an appropriate manner. The Plan has been amended to clarify this language. |
| | The plan provides that contracts can be assumed until the Effective Date in violation of 365(d)(2) | The Plan has been amended to address this objection. |
| | Debtor is not entitled to a discharge under 1141 because it's a liquidating plan | Although the Debtor will be engaging in a long term liquidation given the nature of its assets, during that same time period the Debtor will be engaging in business to maximize such liquidation, including by continuing to manage non-debtor funds |
| | The plan violates the absolute priority rule because equity gets to keep assets while senior creditors may not be paid in full | This assertion is false. Equity Interests will not receive any property on account of the their interests pursuant to the Plan unless and until the claims of creditors are full paid, inclusive of interests, as provided in the Plan. |
| CLO Holdco Ltd. | CLO Holdco has standing to object because of its interests in the CLOs | As set forth above, CLO Holdco has no standing to assert the rights of the contracting parties to the PMAs. It is also not a creditor, having reduced its claim to zero and having no rejection claim. Even if it was a creditor it would not have standing to object to assumption on the basis of rights held by contracting parties. |
| | Joined NPA/HCMFA objection | NPA/HCMFA objection responses are set forth above. |
| | Plan provides for impermissible "partial assumption" because it cherry picks provisions of the CLO management agreements that are going to be assumed by preventing removal of the CLO manager by the preference shares | For the reasons set forth above, CLO Holdco has no standing to assert objections to assumption held by the contracting parties, who consent to assumption. Further, the Plan does not deprive preference shareholders of removal rights. |
| | Injunction and exculpation prohibits creditors from interfering with implementation or consummation of the plan and would prevent the movants from removing the Debtor as the CLO manager | The Injunction, as amended, is clear in scope and application, and only applies to acts to implementation and consummation of the Plan and attempts to collect the claims and interests dealt with by the Plan. |
| | The plan impermissibly modifies the movants' rights under the CLO management agreements without their consent | The Plan does not modify CLO Holdco's rights under the PMAs |
| | Exculpation and indemnification provisions are third party releases in violation of applicable law under Pacific Lumber | The Plan does not contain an" indemnification provision." The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents. The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity |

**Appx. 05909**

| Objecting Party | Objection | Response |
|---|---|---|
| | | of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees. |
| NexBank Capital, Inc., NexBank Securities, Inc., NexBank Title, Inc., and NexBank | Art. III.J allows for subordination under § 510 without the requirement for a hearing, which is impermissible | The Debtor amended Plan section III.J of the Plan to provide for "notice and a hearing" with respect to any subordination proceeding and corresponding changes to the definition of "Subordinated Claim" and the treatment of any claims that may, potentially, be subordinated after notice and a hearing and any order by the Bankruptcy Court. |
| | Plan allows Distribution Agent to setoff amounts owed to the Debtor against amounts owed to a creditor in violation of s. 553 and impermissibly shifts burden of proving setoff was improper to the creditor | Creditors have the right to challenge set off in an appropriate manner.  The Plan has been amended to clarify this language. |
| | The exculpation and release provision release claims not related to the BK but also the administration and implementation of the plan | |
| | The exculpation and release provisions violate Pacific Lumber | The 1/9/20 Settlement Order has already exculpated the Independent Directors and their agents.  The exculpation provisions as to each Protected Party are permissible under other sections of the Bankruptcy Code not relied on in Pacific Lumber (sections 105, 1106, 1107, 1123, and 1129), other applicable law on the immunity of estate fiduciaries and under the policy reasons set forth in the Pacific Lumber case relating to committees and their members because the Protected Parties in this case are more akin to committee members and trustees.  The Release is only a release of claims owned by the Debtor and its estate and does not implicate Pacific Lumber which had nothing to do with debtor released which are permitted under section 1123(b)(3). |
| Senior Employees | The Plan violates § 1123(a)(4) because it treats the Senior Employees differently than similarly situated employees by requiring the Senior Employees to sign a Senior Employee Stipulation and reduce a portion of their claim to obtain a release. | The treatment of claims in either Class 7 or Class 8 solely consists of distributions on account of the allowed amounts of such claims, and there is no difference in treatment among members of either class in terms of the distribution scheme provided.  The potential Debtor release of its own claims against employees or ex-employees under the Plan does not constitute "treatment" of Class 7 or Class 8 claims. |

**Appx. 05910**

| Objecting Party | Objection | Response |
|---|---|---|
| | The Senior Employee Stipulation was not approved by the Senior Employees and contains material problems. | Whether or not the Senior Employees voluntary elect to sign the Senior Employee Stipulation does not constitute a valid basis to object to Plan confirmation.  The voluntary decision to execute the Senior Employee Stipulation was at the option of the employee.  Moreover, the Debtor has settled this objection with respect to Mr. Surgent and Mr. Waterhouse. |
| | The Debtor has improperly prevented the Senior Employees from making the Convenience Class Election because, as reflected in the chart prepared by the Debtor, the Senior Employees have liquidated claims which are not in dispute. | Under applicable bankruptcy law, the Plan and the Disclosure Statement Order, the Senior Employees are not entitled to split their claims to create a liquidated claim for which Convenience Class Election would even be possible.

Each Senior Employee filed a single proof of claim and the Senior Employees have not cited any authority supporting the proposition that a claimant may split claims listed in a single proof of claim; to the contrary, courts have stated that claim splitting is impermissible when covered by a single proof of claim.  Further, the Plan and Disclosure Statement Order prohibit claim splitting for voting purposes.  Finally, as explicitly set forth on the ballots approved by the Disclosure Statement Order, even if a Senior Employee could split his claims in order to elect Convenience Class treatment, the Convenience Class Election only impacts *treatment*, and explicitly does not impact voting. |
| | The Plan provides that a Class 8 Creditor can make the Convenience Class Election for a liquidated claim.  Since a portion of each Senior Employee's claim is liquidated, the Senior Employees have a right to make the Convenience Class Election under the Plan.

The Debtor has contradicted the Plan in how in its conversations with the Senior Employees.  Each Senior Employee received two ballots (one Class 7 and one Class 8) and this confusion justifies the Senior Employees review of the Plan.

The fact that the Plan splits employee claims into PTO claims and other claims is evidence that the Plan allows Claim splitting.   The | As set forth directly above, each Senior Employee would have to split his claim in order to also retain the remainder of his Class 8 claim.  This is impermissible under applicable case law and the Plan.

The Debtor's statements have been consistent with the Plan.  In any event, the Plan governs.  The Senior Employee's receipt of two ballots was an administrative error and cannot override the express terms of the Plan and Disclosure Statement Order.

As to the PTO Claims, those were separately classified *by the Plan*.  The Senior Employees seek to split claims *within the same class*.  It is splitting claims within the same class that is prohibited by applicable case law and the Plan and Disclosure Statement Order. |

Appx. 05911

| Objecting Party | Objection | Response |
|---|---|---|
| | exhibit is a representation that the Senior Employee claims have the right to a split claim because it discusses a Convenience Class claim. | |
| | The Plan identifies no basis for disparate and unfair treatment of the Senior Employees. | Debtors are not required to grant releases to anyone nor are their required to grant releases to all employees equally, especially here, where there are allegations of material misconduct against some, but not all, of the employees. |
| | The Plan appears to impermissibly grant the Debtor, the Reorganized Debtor, and the Claimant Trustee the unfettered power to "reclassify" any claim as a Subordinated Claim. | Section III.J of the Plan has been amended to provide for "notice and a hearing" with respect to any subordination proceeding and corresponding changes to the definition of "Subordinated Claim" and the treatment of any claims that may, potentially, be subordinated after notice and a hearing and any order by the Bankruptcy Court. |
| | The Plan allows the Debtor to make changes to the Plan without Court approval, including changes to the plan supplement documents. | To the contrary, Article XII of the Plan explicitly requires that modifications to the Plan be in compliance with section 1127. |

**Appx. 05912**

**Appx. 05913**

# **<u>EXHIBIT C</u>**

On the Effective Date, the Debtor will assume the agreements set forth on Appendix [_] hereto (collectively, the "Issuer Executory Contracts") pursuant to section 365 of the Bankruptcy Code and Article V of the Plan. In full and complete satisfaction of its obligation to cure outstanding defaults under section 365(b)(1) of the Bankruptcy Code, the Debtor or, as applicable, any successor manager under the Issuer Executory Contracts (collectively, the "Portfolio Manager") will pay to the Issuers[1] a cumulative amount of $525,000 (the "Cure Amount") as follows:

- $200,000 in cash on the date that is five business days from the Effective Date, with such payment paid directly to Schulte Roth & Zabel LLP ("SRZ") in the amount of $85,714.29, Jones Walker LLP ("JW") in the amount of $72,380.95, and Maples Group ("Maples" and collectively with SRZ and JW, the "Issuers' Counsel") in the amount of $41,904.76 as reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case; and

- $325,000 in four equal quarterly payments of $81,250.00 (each, a "Payment"), which amounts shall be paid to SRZ in the amount of $34,821.43, JW in the amount of $29,404.76, and Maples in the amount of $17,023.81 as additional reimbursement for the attorney's fees and other legal expenses incurred by the Issuers in connection with the Debtor's bankruptcy case (i) from any management fees actually paid to the Portfolio Manager under the Issuer Executory Contracts (the "Management Fees"), and (ii) on the date(s) Management Fees are required to be paid under the Issuer Executory Contracts (the "Payment Dates"), and such obligation shall be considered an irrevocable direction from the Debtor and this Court to the relevant CLO Trustee to pay, on each Payment Date, the Payment to Issuers' Counsel, allocated in the proportion set forth in such agreement; *provided, however,* that (x) if the Management Fees are insufficient to make any Payment in full on a Payment Date, such shortfall, in addition to any other amounts due hereunder, shall be paid out of the Management Fees owed on the following Payment Date, and (y) nothing herein shall limit either Debtor's liability to pay the amounts set forth herein, nor the recourse of the Issuers or Issuers' Counsel to the Debtor, in the event of any failure to make any Payment.

Effective as of the Effective Date, and to the maximum extent permitted by law, each Issuer on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, (i) the Debtor and (ii) the Professionals retained by the Debtor and the Committee in the Chapter 11 Case, the Independent Directors, the CEO/CRO, and with respect to the Persons listed in this subsection (ii), such Person's Related Persons (collectively, the

---

[1] The "Issuers" are: Brentwood CLO, Ltd., Gleneagles CLO, Ltd., Greenbriar CLO, Ltd., Highland CLO 2018-1, Ltd., Highland Legacy Limited, Highland Loan Funding V Ltd., Highland Park CDO I, Ltd., Pam Capital Funding LP, Rockwall CDO II Ltd., Rockwall CDO Ltd., Southfork CLO Ltd., Stratford CLO Ltd., Westchester CLO, Ltd., Aberdeen Loan Funding, Ltd., Eastland CLO, Ltd., Grayson CLO, Ltd., Highland Credit Opportunities CDO Ltd., Jasper CLO, Ltd., Liberty Cayman Holdings, Ltd., Liberty CLO, Ltd., Red River CLO, Ltd., Valhalla CLO, Ltd.

"Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Issuer Released Claims").

Effective as of the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each Issuer and (ii) Wendy Ebanks, (iii) Yun Zheng, (iv) Laura Chisholm, (v) Mora Goddard, (vi) Stacy Bodden, (vii) Suzan Merren (viii) Scott Dakers, (ix) Samit Ghosh, (x) Inderjit Singh, (xi) Ellen Christian, (xii) Andrew Dean, (xiii) Betsy Mortel, (xiv) David Hogan, (xv) Cleveland Stewart, (xvi) Rachael Rankin, (xvii) Otelia Scott, (xviii) Martin Couch, (xx) Ferona Bartley-Davis, (xxi) Charlotte Cloete, (xxii) Christina McLean, (xxiii) Karen Ellerbe, (xxiv) Gennie Kay Bigord, (xxv) Evert Brunekreef, (xxvii) Evan Charles Burtton  (collectively, the "Issuer Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained herein will apply to the Issuer Released Parties set forth in subsection (ii) above only with respect to Debtor Released Claims arising from or relating to the Issuer Executory Contracts.

Notwithstanding anything in this Order to the contrary, the releases set forth in paragraphs [__] hereof will not apply with respect to the duties, rights, or obligations of the Debtor or any Issuer hereunder.