# EXHIBIT 51

**Appx. 06478**

Docket #2660 Date Filed: 8/4/2021



**CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS**

# ENTERED

**THE DATE OF ENTRY IS ON
THE COURT'S DOCKET**

**The following constitutes the ruling of the court and has the force and effect therein described.**

Signed August 3, 2021

**United States Bankruptcy Judge**

---

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE NORTHERN DISTRICT OF TEXAS
### DALLAS DIVISION

| | | |
|---|---|---|
| In re: | § | Chapter 11 |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | § § § | Case No. 19-34054-sgj11 |
| Debtor. | § § § | |

### MEMORANDUM OPINION AND ORDER HOLDING CERTAIN PARTIES AND THEIR ATTORNEYS IN CIVIL CONTEMPT OF COURT FOR VIOLATION OF BANKRUPTCY COURT ORDERS[2]

### I.     Introduction.

This Memorandum Opinion and Order addresses the ***second*** civil contempt matter that this

bankruptcy court has been asked to address since confirmation of a Chapter 11 plan for Highland

Capital Management, L.P. (the "Debtor" or "Highland") on February 22, 2021. In this instance,

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2] This ruling constitutes the court's findings of fact and conclusions of law, pursuant to Fed. R. Bankr. Pro. 7052, in connection with the Motion, Memorandum of Law, Declaration, and Show Cause Order found at DE ## 2235, 2236, 2237, 2247, and 2255 in the above-referenced Bankruptcy Case.



Highland seeks to have at least two entities held in civil contempt of two bankruptcy court orders and imposed with sanctions: Charitable DAF Fund, L.P. ("DAF") and CLO Holdco, Ltd. ("CLO Holdco") (collectively, the "Alleged Contemnors"). Highland also seeks to have a law firm that has recently begun representing the Alleged Contemnors (Sbaiti & Company PLLC) held in civil contempt of the bankruptcy court, as well as any control-persons who authorized the Alleged Contemnors ("Authorizing Persons") to take the allegedly contemptuous actions.

First, who are these Alleged Contemnors? DAF[3] is alleged to be a charitable fund and a limited company that was formed in the Cayman Islands. DAF is the 100% owner of CLO Holdco, which is also a Cayman Islands entity. Thus, DAF controls CLO Holdco.[4] DAF was founded by Highland's former Chief Executive Officer ("CEO") and indirect beneficial equity owner—Mr. James Dondero ("Mr. Dondero"). DAF controls $200 million of assets, which asset base was derived from Highland, Mr. Dondero, Mr. Dondero's family trusts, or other donor trusts.[5] Mr. Dondero has historically been DAF's informal investment advisor (without an agreement), and he was DAF's managing member until 2012.[6] In 2012, an individual named Grant Scott (a patent lawyer with no experience in finance or running charitable organizations, who was Mr. Dondero's long-time friend, college housemate, and best man at his wedding) became DAF's managing member.[7] Then, Grant Scott resigned from that role, on or around January 31, 2021, after apparent

---

[3] The acronym "DAF" stands for donor advised fund.

[4] Debtor's Exh. 25 [DE # 2410]. CLO Holdco has sometimes been referred to as the "investment arm" of the DAF organizational structure. Transcript of 6/8/21 Hearing at 122:17-20.

[5] Transcript 6/8/21 Hearing at 98:3-99:15 (testimony that the donors "gave up complete dominion and control over the respective assets and at that time claimed a federal income tax donation for that").

[6] Id. at 149:16-150:2.

[7] Id. at 150:3-5; 154:11-24; 156:7-10. See also Debtor's Exh. 23 (Grant Scott Deposition 1/21/21) at 24-25; 28:21 ("I think he is my closest friend") [DE # 2410].

Appx. 06480

disagreements with Mr. Dondero.  After having no manager for a couple of months, an individual named Mark Patrick ("Mr. Patrick") became DAF's general manager on March 24, 2021 (just 19 days before the events occurred that are the subject of this contempt matter). It appears that Mr. Scott assigned his interests that undergirded his managing member role to Mr. Patrick at Mr. Patrick's direction.[8] Mr. Patrick was an employee of Highland (having had some sort of a "tax counsel" role—but not in Highland's legal department) from 2008 until early 2021, and he now is an employee of Highgate Consultants, d/b/a Skyview Group, which is an entity recently created by certain former Highland employees.[9] Mr. Patrick had no prior experience running a charitable organization prior to becoming DAF's manager on March 24, 2021 (just like Grant Scott).[10] He testified that he "hold[s] [him]self out as a tax professional versant on setting up offshore master fund structures."[11]

        <u>What were the allegedly contemptuous actions?</u>  DAF and CLO Holdco filed: (a) on April 12, 2021, a Complaint[12] ("Complaint") in the United States District Court for the Northern District of Texas (the "District Court Action"), against the Debtor and two Debtor-controlled entities (*i.e.*, Highland HCF Advisor, Ltd. ("Highland HCFA") and Highland CLO Funding, Ltd. ""HCLOF"));[13] and then (b) one week later, on April 19, 2021, filed a motion for leave to amend

---

[8] Debtor's Exh. 24 at 90-93 [DE # 2410].

[9] Transcript from 6/8/21 Hearing, at 95:18-97:2 [DE # 2440].

[10] *Id.* at 100:2-103:9. For further clarity, above the Cayman Islands structure for DAF and CLO Holdco, there are various foundations that hold "participation shares." *Id.* Mr. Dondero is president and director of those foundations. Debtor's Exh. 23 at 57.

[11] *Id.* at 144:7-8.

[12] Debtor's Exh. 12 [DE # 2410].

[13] Highland HCFA is a Cayman Islands limited company 100% owned by the Debtor.  HCLOF is a limited company incorporated under the laws of Guernsey. It is 49.02% owned by CLO Holdco and the remaining 50%+ is owned by the Debtor or Debtor's designee, as a result of the HarbourVest Settlement, as further explained herein.

**Appx. 06481**

the Complaint to add the Debtor's current CEO, James P. Seery, Jr. ("Mr. Seery") as a defendant in the action (the "Seery Motion").[14] ***It is the Seery Motion that is primarily in controversy here***. Note that in the original Complaint, Mr. Seery is named as a "potential party"[15] and, while not nominally a party, he was mentioned approximately 50 times, by this court's count.  Mr. Seery's conduct is plastered throughout the Complaint, accusing him of deceitful, improper conduct. ***The original Complaint does not mention that Highland is still in bankruptcy, nor that the claims asserted in the Complaint are related to a bankruptcy case pursuant to 28 U.S.C. § 1334, but, rather, asserts that federal subject matter jurisdiction exists in the District Court pursuant to 28 U.S.C. §§ 1331 & 1367***.

As will be explained further below, the District Court Action—which in some ways reads like a minority shareholder suit[16]—is all about the alleged impropriety of a settlement (*i.e.,* the "HarbourVest Settlement") that was proposed by the Debtor to the bankruptcy court in December 2020[17] and approved by the bankruptcy court (with notice to all creditors and after an evidentiary hearing) on January 14, 2021.[18]  "HarbourVest" was a collective of investors that had invested approximately $80 million in the year 2017 into the defendant-entity herein known as HCLOF (acquiring a 49.98% interest in it), and filed six proofs of claim against the Debtor in the bankruptcy case, totaling $300 million, alleging that the Debtor had committed fraud back in 2017, in

---

[14] Debtor's Exh. 19 [DE # 2410].

[15] Debtor's Exh. 12 [DE # 2410], ¶ 6.

[16] Indeed, as alluded to in footnote 13 above, CLO Holdco is a minority shareholder (49.02%) of one of the Defendants, HCLOF, and HCLOF is now more than 50% owned by the Debtor or its designee as a result of the HarbourVest Settlement—a fact that CLO Holdco and DAF apparently do not like.

[17] Declaration of John Morris (Exhs. 1 & 2 attached thereto) [DE # 2237].

[18] "HarbourVest" refers to the collective of HarbourVest Dover Street IX Investment, L.P., HarbourVest 2017 Global AIF, L.P., HarbourVest 2017 Global Fund, L.P., HV International VIII Secondary, L.P., and HarbourVest Skew Base AIF, L.P.

4

connection with its encouraging HarbourVest to invest in and acquire the 49.98% interest in HCLOF. The Debtor and HarbourVest eventually negotiated a settlement of HarbourVest's proofs of claim which, in pertinent part, allowed HarbourVest a $45 million general unsecured claim in the bankruptcy case and involved HarbourVest transferring its 49.98% interest in defendant HCLOF to the Debtor or Debtor's designee.[19] The bankruptcy court approved this settlement as fair and equitable and in the best interests of the bankruptcy estate.[20]

Despite the full vetting in the bankruptcy court of the HarbourVest Settlement and an order approving the HarbourVest Settlement, which was not appealed by DAF or CLO Holdco,[21] various torts and other causes of action are now being alleged by DAF and CLO Holdco against the Debtor *relating entirely to the HarbourVest Settlement*, including: breach of fiduciary duties owed to DAF and CLO Holdco; breach of the HCLOF membership agreement, and an alleged right of first refusal provision therein; negligence; violations of RICO;[22] and tortious interference. In a nutshell, the gravamen of DAF's and CLO Holdco's Complaint is that the economics of the HarbourVest Settlement resulted in the Debtor obtaining HarbourVest's 49.98% in HCLOF for a value of $22.5 million, and DAF and CLO Holdco believe that the 49.98% interest was worth far more than this. DAF and CLO Holdco assert that they and HarbourVest were deceived. Somewhat shockingly to

---

[19] Declaration of John Morris (Exhs. 1 & 2 attached thereto) [DE # 2237]. HarbourVest basically wanted to rescind its earlier acquisition of the 49.98% to extract itself from Highland.

[20] Declaration of John Morris (Exh. 11 attached thereto) [DE # 2237].

[21] *Id.* The court notes that certain family trusts of Mr. Dondero (known as the Dugaboy and Get Good Trusts) did appeal the bankruptcy court order approving the HarbourVest Settlement. However, there was no stay pending appeal and the settlement was implemented.

[22] Shockingly, DAF and CLO Holdco state that Highland's "actions (performed through Seery and others) constitute violations of the federal wire fraud, mail fraud, fraud in connection with a case under Title 11, and/or securities fraud laws, pursuant to 18 U.S.C. § 1961(1)(B) and (D)." Debtor's Exh. 12, [DE # 2410], at ¶ 117.

Appx. 06483

this court, the Complaint implies that information was withheld from DAF and CLO Holdco.[23]

DAF and CLO Holdco further argue that they should have been given the opportunity to purchase HarbourVest's 49.98% interest in HCLOF. Mr. Seery is alleged to be the chief perpetrator of wrongdoing. Subsequently, in the Seery Motion, in which DAF and CLO Holdco seek leave to amend the Complaint to add Mr. Seery to the District Court Action, DAF and CLO Holdco were clear for the first time that there is a "pending Chapter 11 proceeding" and disclosed to the District Court that they did not name Mr. Seery in the Complaint since the bankruptcy court "issued an order prohibiting the filing of any causes of action against Seery in any way related to his role at [Highland], subject to certain prerequisites. In that order, the bankruptcy court also asserted 'sole jurisdiction' over all such causes of action."[24] DAF and CLO Holdco went on to state that the bankruptcy court's order "exceeds the bankruptcy court's powers and is unenforceable," but even if enforceable, in an abundance of caution, DAF and CLO Holdco are satisfying the bankruptcy court's mandates by asking the ***District Court*** for leave to sue Mr. Seery, since the bankruptcy court's powers are derivative from the District Court.[25]

Disturbingly, one of the Alleged Contemnors (CLO Holdco) objected to the HarbourVest Settlement during the bankruptcy case[26] and later withdrew its objection during the bankruptcy

---

[23] Mr. Dondero and CLO Holdco appeared at and examined the HarbourVest witness, Michael Pugatch, at a deposition before the hearing on the HarbourVest Settlement. Declaration of John Morris, Exhs. 7 & 8 thereto [DE # 2237]. Moreover, it is rather astounding to this court for anyone to suggest that any human being (Mr. Seery or anyone else) knew more, or withheld, any information that wasn't ***well known*** to Mr. Dondero and all principals/agents of DAF and CLO Holdco. Mr. Dondero and any personnel associated with DAF and CLO Holdco were as (or more) familiar with HCLOF's assets and their potential value than any human beings on the planet—having managed these assets for years. As one example, it has been represented to the court that HCLOF owns shares in MGM Holdings, Inc. ("MGM"). It is undisputed that Mr. Dondero sits on the MGM Board of Directors. *See* DE # 2236, n.14.

[24] Debtor's Exh. 17 [DE # 2410] at paragraph 2, p. 1.

[25] *Id.* at paragraph 3, pp. 1-2; & pp.5-8.

[26] Declaration of John Morris (Exh. 6 attached thereto) [DE # 2237].

Appx. 06484

court hearing regarding the settlement,[27] and did not appeal the order approving the HarbourVest Settlement. CLO Holdco, in its later-withdrawn objection, made the very same argument that it now makes in Count 2 of the Complaint (in its breach of HCLOF membership agreement claim)—*i.e.,* that the Debtor committed a breach of a "right of first refusal" in the HCLOF membership agreement (in fact, this was the sole argument CLO Holdco made in its objection).[28] The Debtor and CLO Holdco submitted briefing on the alleged "right of first refusal" prior to the hearing on the HarbourVest Settlement, and the bankruptcy court spent a fair amount of time reviewing the briefing—only to learn on the morning of the hearing that CLO Holdco was withdrawing its objection.

In any event, the Debtor now alleges that the District Court Action is not only an improper collateral attack on the bankruptcy court's order approving the HarbourVest Settlement, but—more germane to this civil contempt matter—the motion to amend the District Court Action to add Mr. Seery is a violation of ***two*** earlier bankruptcy court orders[29] that contained "***gatekeeper provisions***"—*i.e.,* specific provisions ***requiring parties to seek bankruptcy court approval before filing lawsuits against the persons controlling the Debtor***. These gatekeeper provisions—which the bankruptcy court considered to be both (a) a way to maintain control of potentially vexatious, distracting litigation (which might interfere with the reorganization effort), and (b) consistent with the United States Supreme Court case of *Barton v. Barbour*,[30] and some of its progeny (as well as

---

[27] Declaration of John Morris (Exh. 10 attached thereto), Transcript of 1/14/21 Hearing, at 7:20-8:6 [DE # 2237]. Note that two family trusts of Mr. Dondero had objected to the HarbourVest Settlement (in addition to Mr. Dondero personally), but they made clear at the January 14, 2021 Hearing on the HarbourVest Settlement that they were not asserting that the HCLOF membership agreement (or an alleged right of first refusal therein) was being violated by the HarbourVest Settlement. *Id.* at 22:5-20.

[28] Declaration of John Morris (Exh. 6 attached thereto) [DE # 2237].

[29] Debtor's Exh. 15 & 16 [DE # 2410].

[30] 104 U.S. 126 (1881).

the second sentence of 28 U.S.C. § 959(a))—were heavily negotiated in the case and significant, since they were put in place against a backdrop of contentious litigation. ***No one appealed the two bankruptcy court orders with the gatekeeper provisions***. There were still more gatekeeping provisions in the Debtor's Chapter 11 plan that the bankruptcy court confirmed on February 22, 2021 (that plan is on appeal at the Fifth Circuit, although the Fifth Circuit has denied a stay pending appeal; at the time of the hearing on this civil contempt matter, the plan had not yet gone effective).

Objections to the Debtor's request to have the Alleged Contemnors, the Alleged Contemnors' lawyers, and Authorizing Persons held in civil contempt of court were filed by DAF, CLO Holdco, Sbaiti & Company, PLLC,[31] by Mr. Patrick,[32] and by Mr. Dondero.[33] They argue that the Alleged Contemnors have not violated the bankruptcy court's prior orders containing gatekeeper provisions because the Alleged Contemnors have ***not actually sued*** Mr. Seery but, rather, have sought permission from the District Court to sue him. They argue that, even though the January 2020 Corporate Governance Order and July 2020 Seery CEO Order required parties to seek bankruptcy court permission to sue Mr. Seery, that seeking ***District Court*** permission is appropriate, since district courts actually have bankruptcy subject matter jurisdiction and bankruptcy courts are mere units of the district courts. Moreover, the Alleged Contemnors suggest that the bankruptcy court's gatekeeper provisions in the two orders ***exceeded the reach of its powers***, and, again, their Seery Motion was simply about asking the court with original bankruptcy subject matter jurisdiction (*i.e.*, the District Court) for authority to sue Mr. Seery.

---

[31] DE # 2313.

[32] DE # 2309.

[33] DE # 2312.

The bankruptcy court held an evidentiary hearing on the civil contempt matter on June 8, 2021. For the reasons set forth below, the court finds and concludes that DAF, CLO Holdco, Sbaiti & Company, PLLC (and its lawyers Jonathan Bridges and Mazin Sbaiti), Mr. Patrick, and Mr. Dondero are all in civil contempt of at least two bankruptcy court orders of which they had knowledge and were well aware. They shall each be jointly and severally liable for the sum of **$239,655** as a compensatory sanction for their civil contempt, and they will be purged from their contempt if they pay this amount within 15 days of entry of this Order. Moreover, the court will add on a sanction of **$100,000** for each level of rehearing, appeal, or petition for *certiorari* that the Alleged Contemnors may choose to take with regard to this Order, to the extent any such motions for rehearing, appeals, or petitions for *certiorari* are not successful.

## II.    Background.

A brief summary of the above-referenced bankruptcy case can be found in this court's Memorandum and Opinion issued June 7, 2021, regarding an earlier contempt motion that involved Mr. Dondero and different allegedly contemptuous actions.[34] This court will not repeat that summary herein but will hit some of the most pertinent highlights.

Bankruptcy Filing. On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Highland is a registered investment advisor that manages billions of dollars of assets. Highland's assets are spread out in numerous, separate fund vehicles. While the Debtor has continued to operate and manage its business as a debtor-in-possession, the role of Mr. Dondero *vis-à-vis* the Debtor was significantly limited early in the bankruptcy case and ultimately terminated. The Debtor's current CEO, Mr. Seery, was selected by the creditors and approved by the bankruptcy court during the Chapter 11 case.

---

[34] Adversary Proceeding No. 20-03190, [DE # 190].

**Appx. 06487**

Corporate Governance Shake-Up. Specifically, early in the case, the Official Unsecured Creditors Committee (the "UCC")—whose members asserted well over $1 billion worth of claims and whose members had been in litigation with Highland for many years in many courts—and the U.S. Trustee ("UST") both desired to have a Chapter 11 Trustee appointed in Highland's bankruptcy case—absent some major change in corporate governance—due to conflicts of interest and the alleged self-serving, improper acts of Mr. Dondero and possibly other former officers. Under this pressure, the Debtor negotiated a term sheet and settlement with the UCC, which was executed by Mr. Dondero and approved by a bankruptcy court order on January 9, 2020 (the "January 2020 Corporate Governance Order").[35] The settlement and term sheet contemplated a *complete overhaul of the corporate governance structure of the Debtor*. Mr. Dondero resigned from his role as an officer and director of the Debtor and of the Debtor's general partner. Three new independent directors (the "Independent Board") were appointed to govern the Debtor's general partner—Strand Advisors, Inc. ("Strand")—which, in turn, manages the Debtor. All of the new Independent Board members were selected by the UCC and are very experienced within either the industry in which the Debtor operates, restructuring, or both. The three Independent Board members are: Retired Bankruptcy Judge Russell Nelms; John Dubel; and Mr. Seery. As noted above, one of the Independent Board members, Mr. Seery, was ultimately appointed as the Debtor's new CEO and CRO on July 16, 2020 (the "July 2020 Seery CEO Order").[36] To be clear, Highland—during the bankruptcy case and still now—is governed by these wholly new,

---

[35] *See* Debtor's Exh. 15 [DE # 2410]. The exact title and location on the Bankruptcy Docket for this Order is: Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [DE # 339].

[36] *See* Debtor's Exh. 16 [DE # 2410]. The exact title and location on the Bankruptcy Docket for this Order is: Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) Authorizing Retention of James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring Officer, and Foreign Representative Nunc Pro Tunc to March 15, 2020 [DE # 854].

Independent Board members who had no prior connection to Highland. They were brought in to build trust with creditors and to hopefully put an end to a litigation culture that permeated Highland.

As for Mr. Dondero, while not originally contemplated as part of the January 2020 Corporate Governance Settlement, the Debtor proposed at the hearing on the January 2020 Corporate Governance Settlement that Mr. Dondero remain on as an unpaid employee of the Debtor and also continue to serve as a portfolio manager for certain separate ***non-Debtor*** investment vehicles/entities whose funds are managed by the Debtor. The court approved this arrangement when the UCC ultimately did not oppose it.  Mr. Dondero's authority with the Debtor was subject to oversight by the Independent Board,[37] and Mr. Seery was given authority to oversee the day-to-day management of the Debtor, including the purchase and sale of assets held by the Debtor and its subsidiaries, as well as the purchase and sale of assets that the Debtor manages for various separate non-Debtor investment vehicles/entities.

Eventually, the Debtor's new Independent Board concluded that it was untenable for Mr. Dondero to continue to be employed by the Debtor in any capacity because of conflicts and friction on many issues. Mr. Dondero's employment arrangement with the Debtor ceased in October 2020, but the termination of his employment was not the end of the friction between the Debtor and Mr. Dondero.  In fact, a week after his termination, litigation posturing and disputes began erupting between Mr. Dondero and certain of his related entities, on the one hand, and the Debtor on the other.

---

[37] "Mr. Dondero's responsibilities in such capacities shall in all cases be as determined by the Independent Directors . . . [and] will be subject at all times to the supervision, direction and authority of the Independent Directors.  In the event the Independent Directors determine for any reason that the Debtor shall no longer retain Mr. Dondero as an employee, Mr. Dondero agrees to resign immediately upon such determination." *See* Debtor's Exh. 15 (paragraph 8 therein). [DE # 2410].

**Appx. 06489**

Plan Confirmation. The bankruptcy court confirmed a Chapter 11 plan on February 22, 2021. The plan was supported by the UCC and an overwhelming dollar amount of creditors. Mr. Dondero and certain entities related to him objected to the plan and have appealed the Confirmation Order. Mr. Seery remains as the executive of the Debtor, and will continue to serve in that role, under a specific structure established in the plan and accompanying documents (with oversight by the court and creditor representatives).

III.    **The Impetus for this Second Civil Contempt Matter**.

A. The Orders.

The subject of this second civil contempt matter is, primarily, two orders *that were never appealed*: (a) the January 2020 Corporate Governance Order; and (b) the July 2020 Seery CEO Order—both referenced above.[38]

B. The Gatekeeper Provisions in the Two Orders.

As mentioned above, these orders contained certain provisions that are sometimes referred to as "gatekeeper" provisions. These "gatekeeper" protections require litigants to obtain the bankruptcy court's approval before suing certain protected parties in control of the Debtor for actions arising in the course of their duties, including Mr. Seery.

Paragraph 10 of the January 2020 Corporate Governance Order provided:

> No entity may commence or pursue a claim or cause of action of any kind against any Independent Director, any Independent Director's agents, or any Independent Director's advisors relating in any way to the Independent Director's role as an independent director of Strand without the Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Independent Director, any Independent Director's agents, or any Independent Director's advisors and (ii) specifically authorizing such entity to bring such claim. The Court will have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

---

[38] Debtor's Exhs. 15 & 16. The HarbourVest Settlement Order described above is likewise significant to this analysis (also not appealed by the Alleged Contemnors).

**Appx. 06490**

Similarly, paragraph 5 of the July 2020 Seery CEO Order provided:

> No entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim. The Bankruptcy Court shall have sole jurisdiction to adjudicate any such claim for which approval of the Court to commence or pursue has been granted.

Despite these gatekeeper provisions, on April 12, 2021, the Alleged Contemnors, through new counsel (*i.e.,* different from the lawyers who represented them during the Bankruptcy Case previously) filed the District Court Action and promptly thereafter filed the Seery Motion asking the District Court for permission to add him as a defendant.

### C.  A Few Words About Gatekeeper Provisions.

Gatekeeper provisions are not uncommon in the world of bankruptcy. There are multiple decisions from the Northern District of Texas[39] (as well as other districts)[40] approving gatekeeper

---

[39] *See, e.g., In re Pilgrim's Pride Corp.,* 2010 Bankr. LEXIS 72 (Bankr. N.D. Tex. Jan. 14, 2010) (bankruptcy court channeled to itself exclusive jurisdiction to hear claims against debtors' management (including their boards of directors and chief restructuring officer) and the professionals based upon their conduct in pursuit of their responsibilities during the chapter 11 cases.); *see also In re CHC Group, Ltd.* (Case No. 16-31854, Bankr. N.D. Tex.) Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization [DE # 1671-1, attached to Findings of Fact and Conclusions of Law, and Order Confirming the Debtors' Fourth Amended Joint Chapter 11 Plan of Reorganization], Section 10.8(b) at 57 (court retained *exclusive* jurisdiction to hear claims against any "Protected Party," including any claims "in connection with or arising out of . . . the administration of this Plan or the property to be distributed under this Plan, . . . or the transactions in furtherance of the foregoing, . . . .") (emphasis added); *see also Louisiana World Exposition v. Federal Ins. Co.,* 858 F.2d 233 (5th Cir. 1988) (bankruptcy court must determine that claim is colorable before authorizing a committee to sue in the stead of the debtor).

[40] *See, e.g., Sec. Investor Prot. Corp. v. Bernard L. Madoff Inv. Sec. LLC,* 546 B.R. 284 (Bankr. S.D.N.Y. 2016) (bankruptcy court acts as gatekeeper to determine whether claims of certain creditors against certain Madoff feeder funds are direct claims (claims which may be brought by the creditor) or derivative claims (claims which either can only be brought by the Madoff post-confirmation liquidating trust or have already been settled by the trust)); *In re Motors Liquidation Co.,* 541 B.R. 104 (Bankr. S.D.N.Y. 2015) (discussing bankruptcy court's gatekeeper function over GM ignition switch cases); *In re Motors Liquidation Co.,* 568 B.R. 217 (Bankr. S.D.N.Y. 2017) (same). The use of the gatekeeper structure in the General Motors cases is particularly noteworthy. The causes of action arising from defective ignition switches are based on state tort law – both product liability and personal injury – and are causes of action unquestionably outside the jurisdiction of a bankruptcy court to hear on the merits. Nevertheless, the General Motors bankruptcy court acted as the gatekeeper post-confirmation to determine whether such litigation should proceed against the estate of the old debtor or the asset purchaser under the confirmed plan.

**Appx. 06491**

provisions that either: (a) granted exclusive jurisdiction in the bankruptcy court to hear matters challenging the actions of debtors' officers and directors arising from their conduct in the bankruptcy cases; or (b) at least granted power to a bankruptcy court to determine whether such matters could go forward.[41]

Bankruptcy courts frequently determine that the "Barton Doctrine" supports gatekeeper provisions and may, by analogy, sometimes be applied to executives and independent directors of debtors in possession. The "Barton Doctrine" originated from an old Supreme Court case[42] dealing with receivers. The "Barton Doctrine" was eventually expanded in bankruptcy jurisprudence to apply to bankruptcy trustees. As this court once noted regarding the "Barton Doctrine":

> [It] provides that, as a general rule, before a suit may be brought against a trustee, leave of the appointing court (*i.e.,* the bankruptcy court) must be obtained. The Barton doctrine is not an immunity doctrine but—strange as this may sound— has been held to be a jurisdictional provision (in other words, a court will not have subject matter jurisdiction to adjudicate a suit against a trustee unless and until the bankruptcy court has granted leave for the lawsuit to be filed).[43]

Courts have articulated numerous rationales for having this jurisdictional gatekeeping doctrine. One is that, because a "trustee in bankruptcy is an officer of the court that appoints him,"[44] the appointing court "has a strong interest in protecting him from unjustified personal liability for acts taken within the scope of his official duties."[45] Another rationale is that the leave requirement

---

[41] *See Villegas v. Schmidt*, 788 F.3d 156, 158-59 (5th Cir. 2015) (under "Barton Doctrine," litigant must still seek authority from the bankruptcy court that appointed the trustee before filing litigation even if the bankruptcy court may not have jurisdiction to adjudicate the underlying claim).

[42] *Barton v. Barbour*, 104 U.S. 126 (1881).

[43] *Baron v. Sherman (In re Ondova Ltd. Co.)*, 2017 Bankr. LEXIS 325, *29 (Bankr. N.D. Tex. February 1, 2017); report and recommendation adopted, *Baron v. Sherman (In re Ondova Co.)*, 2018 U.S. Dist. LEXIS 13439 (N.D. Tex. Jan. 26, 2018), *aff'd, In re Ondova Ltd.*, 2019 U.S. App. LEXIS 3493 (5th Cir. 2019).

[44] *In re Lehal Realty Assocs.*, 101 F.3d 272, 276 (2d Cir. 1996).

[45] *Id.*

**Appx. 06492**

"enables the bankruptcy court to maintain control over the estate and furthers the goal of centralizing all creditors' claims so they can be efficiently administered."[46]  Yet other courts have expressed an underlying reason for the doctrine is to maintain a panel of competent and qualified trustees and to ensure efficient administration of bankruptcy estates:   Without the leave requirement, "trusteeship w[ould] become a more irksome duty" and it would become "harder for courts to find competent people to appoint as trustees.  Trustees w[ould] have to pay higher malpractice premiums" and "this w[ould] make the administration of bankruptcy estates more expensive."[47] Finally, another policy concern underlying the doctrine is a concern for the overall integrity of the bankruptcy process and the threat of trustees being distracted from or intimidated from doing their jobs.  For example, losers in the bankruptcy process might turn to other courts to try to become winners there—by alleging the trustee did a negligent job.[48]  The Fifth Circuit has recently recognized the continuing vitality of the "Barton Doctrine"—even after *Stern v. Marshall*[49] (that is, even in a scenario in which the appointing bankruptcy court might not itself have Constitutional authority to **adjudicate** the claims asserted against the trustee pursuant to the *Stern* decision).[50]

To be clear, the "Barton Doctrine" originated as a protection for federal receivers, but courts expanded the concept to bankruptcy trustees, and eventually it has been applied to various court-appointed and court-approved fiduciaries and their agents in bankruptcy cases, including debtors in

---

[46] *In re Ridley Owens, Inc.*, 391 B.R. 867, 871 (Bankr. N.D. Fla. 2008).

[47] *McDaniel v. Blust*, 668 F.3d 153, 157 (4th Cir. 2012) (citing *In re Linton*, 136 F.3d 544, 545 (7th Cir. 1998)). *See also generally* 1 COLLIER ON BANKRUPTCY 10-4 & 10-5 (Alan R. Resnick and Henry J. Sommer, eds., 16th Ed. 2016).

[48] *Linton*, 136 F.3d at 545-546.

[49] *Stern v. Marshall*, 564 U.S. 462 (2011).

[50] *See Villegas v. Schmidt*, 788 F.3d 156, 58-59 (5th Cir. 2015).

Appx. 06493

possession,[51] officers and directors of a debtor,[52] and the general partner of a debtor.[53] In the Highland case, since Mr. Seery and the Independent Directors were proposed by the UCC to avoid the appointment of a trustee, it seemed rather obvious to the bankruptcy court that they should have similar protections from suit—particularly against the backdrop of a litigation culture at Highland that had theretofore existed.

DAF and CLO Holdco argue that the gatekeeper provisions that are involved here run afoul of 28 USC § 959(a) and are an inappropriate extension of the "Barton Doctrine" and, more generally, they argue that the January 2020 Corporate Governance Order and July 2020 Seery CEO Order simply went too far by precluding claims being asserted against Mr. Seery that are lesser than gross negligence and willful misconduct—suggesting that precluding claims lesser than gross negligence and willful misconduct (such as a mere negligence claim) would violate federal law (the Investment Advisors Act) because Mr. Seery cannot contract away his fiduciary duties in this regard.

Putting aside for the moment the fact that the January 202 Corporate Governance Order and the July 2020 Seery CEO Order are final and nonappealable orders that have *res judicata* effect, DAF and CLO Holdco are simply wrong about 28 U.S.C. § 959(a) and the unavailability of the "Barton Doctrine" in a situation such as this. 28 U.S.C. § 959(a) states:

---

[51] *Helmer v. Pogue*, 2012 U.S. Dist. LEXIS 151262 (N.D. Ala. Oct. 22, 2012) (applying Barton Doctrine to debtor in possession); *see also* 11 U.S.C §§ 1107(a) (providing that a debtor in possession has all the rights and duties of a trustee and serves in the same fiduciary capacity).

[52] *See Carter v. Rodgers*, 220 F.3d 1249, 1252 & n.4 (11th Cir. 2000) (debtor must obtain leave of the bankruptcy court before initiating an action in district court when that action is against the trustee or other bankruptcy-court-appointed officer for acts done in the actor's official capacity, and finding no distinction between a "bankruptcy-court-appointed officer" and officers who are "approved" by the court); *Hallock v. Key Fed. Sav. Bank (In re Silver Oak Homes)*, 167 B.R. 389 (Bankr. D. Md. 1994) (president of debtor).

[53] *Gordon v. Nick*, 1998 U.S. App. LEXIS 21519 (4th Cir. 1998) (managing partner of debtor).

**Appx. 06494**

> Trustees, receivers or managers of any property, including debtors in possession, may be sued, without leave of the court appointing them, with respect to any of their acts or transactions in carrying on business connected with such property. **Such actions shall be subject to the general equity of such court** so far as the same may be necessary to the ends of justice, but this shall not deprive a litigant of his right to trial by jury. (Emphasis added.)

To be sure, this statute has long been recognized as a limited exception to the "Barton Doctrine," so that trustees and debtors in possession can be sued for postpetition torts or other causes of action that happen to occur in the ***ordinary course of operating a business*** (as opposed to actions of the trustee while engaged in the general administration of the case)—the classic example being a "slip and fall" personal injury suit that might occur on the premises of a business that a trustee or debtor in possession is operating.[54]  However, DAF and CLO Holdco ignore the last sentence of the statute that gives the appointing court the equitable powers to control the litigation "as the same may be necessary to the ends of justice." This is precisely what a gatekeeper provision is all about.[55]

But as earlier noted, DAF and CLO Holdco are too late to argue about the legality or enforceability of the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order. The Fifth Circuit has made clear that, if a party fails to object to or appeal a final order— even one that grants relief that may be outside of a bankruptcy court's jurisdiction—the order is *res judicata* as to parties who had the opportunity to object to it.  It becomes the law of the case and is

---

[54] *E.g., Muratore v. Darr*, 375 F.3d 140, 144 (1st Cir. 2004) (section 959(a) "is intended to 'permit actions redressing torts committed in furtherance of the debtor's business, such as the common situation of a negligence claim in a slip and fall case where a bankruptcy trustee, for example, conducted a retail store'") (quoting *Carter v. Rodgers*, 220 F.3d 1249, 1254 (11th Cir. 2000)).  *See also Lebovits v. Scheffel (In re Lehal Realty Assocs.)*, 101 F.3d 272, 276 (2d Cir. 1996); *In re Am. Associated Sys., Inc.*, 373 F. Supp. 977, 979 (E.D. Ky. 1974).

[55] The court further notes anecdotally that DAF and CLO Holdco demanded a jury trial in their Complaint, and they have alluded to this as a reason why it was appropriate to bring their suit in the District Court. But it appears they contractually waived their jury trial rights in a prepetition agreement with Highland. *See* DE # 2495, Ex. A thereto, ¶ 14(f).

**Appx. 06495**

not subject to collateral attack.[56] The Supreme Court has more recently stated this principle in the

bankruptcy context in *United Student Aid Funds, Inc. v. Espinosa.*[57]

In summary, there can be no doubt that there are two binding, nonappealable final orders[58]

that govern in the situation at bar. Not only were they wholly proper but parties are now bound by

them regardless.

IV.    **The Evidence at the June 8, 2021 Hearing.**

The bankruptcy court held an evidentiary hearing on the civil contempt matter on June 8,

2021. The court considered the Declaration of John Morris (with Exhibits 1-18 thereto), at DE #

2237; Debtor's Exhibits 12-55, at DE ## 2410 & 2421; Exhibits 1, 3-12, 15-28, 30-46 of DAF,

CLO Holdco, and Mr. Patrick at DE ## 2411 & 2420; and the live witness testimony of Mr. Patrick

and Mr. Dondero.

There really is very little, if anything, in dispute.  No one disputes the existence of the

January 2020 Corporate Governance Order or the July 2020 Seery CEO Order or the Harbourvest

Settlement.  No one disputes the existence of the District Court Action or the Seery Motion. Thus,

all that the court heard at the June 8, 2021 hearing that was "new," beyond what was in the pleadings

and documents, was the explanations/rationales given by those involved with filing the District

Court Action and the Seery Motion.

---

[56] *Republic Supply Co. v. Shoaf*, 815 F.2d 1046 (5th Cir. 1987).

[57] 130 S. Ct. 1367 (2010) (order confirming Chapter 13 plan, that improperly proposed to discharge a student loan without a hardship adversary proceeding, was not void where there had been no objection or appeal).

[58] DAF and CLO Holding presented a case at the June 8, 2021 hearing suggesting the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order might not have been final orders. The case dealt with an employment order under Section 327 of the Bankruptcy Code, and this court does not believe it was applicable here.

**Appx. 06496**

Mr. Patrick testified that he became the manager/director of DAF and CLO Holdco on March 24, 2021,[59] and he earns no compensation for that role, although the prior manager/director, Mr. Grant Scott, earned $5,000 per month.[60] Mr. Patrick testified that he authorized the filing of the Complaint and the Seery Motion.[61] He testified that he retained the Sbaiti law firm 12 days before the District Court Action was filed, and the idea for filing the Complaint came from that firm,[62] although Mr. Dondero "brought certain information" to Mr. Patrick. Mr. Patrick then "engaged the Sbaiti firm to launch an investigation," and "also wanted Mr. Dondero to work with the Sbaiti firm with respect to their investigation of the underlying facts."[63] Mr. Patrick elaborated that he had no specific knowledge about the HarbourVest Settlement before taking charge of DAF and CLO Holdco,[64] but Mr. Dondero came to him with information about it.[65] Mr. Patrick did not talk to DAF's and CLO Holdco's prior managing member (Grant Scott) about the District Court Action, even though Grant Scott had been the managing member at the time of the HarbourVest Settlement that is the subject of the District Court Action.[66] Mr. Patrick hired the Sbaiti law firm at the unsolicited recommendation of D.C. Sauter,[67] the in-house general counsel of NexPoint

---

[59] Transcript 6/8/21 Hearing, at 97:3-21. [DE# 2440].

[60] *Id*. at 132:6-17. *See also* Debtor's Exh. 24 at 96:2-18 [DE # 2410].

[61] Transcript 6/8/21 Hearing, at 103:10-14; 104:3-13. [DE # 2440].

[62] *Id*. at 104:9-22.

[63] *Id*. at 105:1-5.

[64] *Id*. at 104:17-22.

[65] *Id*. at 105:13-106:16.

[66] Debtor's Exh. 24 at 101:10-102:20 [DE # 2410]; *see also* Transcript 6/8/21 Hearing, at 108:20-109:22. [DE # 2440].

[67] Transcript 6/8/21 Hearing, at 106:22-107:11. [DE # 2440].

**Appx. 06497**

Advisors (a company of which Mr. Dondero is president and controls).[68] Mr. Patrick further testified that Mr. Dondero communicated directly with the Sbaiti firm in relation to the investigation that was being undertaken and he "did not participate in those conversations";[69] Mr. Patrick "considered Mr. Dondero as the investment advisor to the portfolio . . . I wanted him to participate in the investigation."[70] Mr. Patrick confirmed that there is no formal investment advisory agreement with Mr. Dondero, and DAF and CLO Holdco had previously been in an investment advisory agreement with Highland.[71] While Mr. Patrick's testimony was replete with comments that he deferred to the Sbaiti law firm quite a bit, he did confirm that he authorized the filing of the Seery Motion and he was aware of the July 2020 Seery CEO Order.[72]

As for Mr. Dondero, much of the testimony elicited from Mr. Dondero centered around whether he essentially controls DAF and CLO Holdco and the sequence of events that led to Mr. Grant Scott resigning as their managing member. Recall that Mr. Scott had been their managing member at the time of the HarbourVest Settlement—to which CLO Holdco objected and then

---

[68] NexPoint Advisors is 99% owned by Mr. Dondero's family trust, Dugaboy Investment Trust, and is 1% owned by NexPoint Advisors GP, LLC, which is 100% owned by Mr. Dondero. [DE # 2543].

[69] *Id.* at Transcript 6/8/21 Hearing, at 107:24-108:18. [DE # 2440].

[70] *Id.* at 107:18-23.

[71] The lawyers at Sbaiti & Company commented during opening statements that Mr. Dondero was the source of certain of the information in the Complaint and that they were asserting "work product privilege" and "attorney-client privilege" as to their communications with Mr. Dondero "because he's an agent of our client." *Id.* at 41:6-10. The court ultimately overruled this claim of privilege since, among other things, Mr. Patrick's own testimony confirmed that Mr. Dondero had no contractual arrangement of any sort with DAF and CLO Holdco, and he was not a board member and had no decision-making authority for them. *Id.* at 137:2-12; *See also id.* at 180:23-188:7. For purposes of privilege assertion, there was no evidence whatsoever that Mr. Dondero was an agent or representative of DAF and CLO Holdco.

[72] *Id.* at 111:5-112:9.

**Appx. 06498**

withdrew its objection.[73] Mr. Dondero testified that he believed Mr. Scott's decision to withdraw the objection to the HarbourVest Settlement was inappropriate.[74]

Mr. Dondero further confirmed that he was the founder and primary donor to DAF.[75] He expressed disapproval for Mr. Scott's various decisions on behalf of DAF and CLO Holdco during the bankruptcy case (such as withdrawing a proof of claim and settling a lawsuit with the Debtor).[76] He testified about general knowledge of the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order.[77] He confirmed that he participated in discussions with Mr. Sbaiti regarding the filing of the Complaint—indicating he spoke with the firm a "[h]alf dozen times, maybe."[78] He testified that he was not involved with the Seery Motion itself.[79]

The totality of the evidence was clear that Mr. Dondero sparked this fire (*i.e.,* the idea of bringing the District Court Action to essentially re-visit the HarbourVest Settlement and to find a way to challenge Mr. Seery's and the Debtor's conduct), and Mr. Patrick and Sbaiti & Company, PLLC, were happy to take the idea and run with it. The court believes the evidence was clear and convincing that Mr. Dondero encouraged Mr. Patrick to do something wrong, and Mr. Patrick basically abdicated responsibility to Mr. Dondero with regard to dealing with Sbaiti and executing the litigation strategy.

### Conclusions of Law

---

[73] *Id.* at 163:10-165:18.

[74] *Id.*

[75] *Id.* at 165:19-24.

[76] *Id.* at 161:24-168:1; 169:1-170:9.

[77] *Id.* at 178:16-180:11.

[78] *Id.* at 180:12-22; 207:10-12.

[79] *Id.* at 210:7-14.

Appx. 06499

A.  Jurisdiction and Authority.

Bankruptcy subject matter jurisdiction exists in this matter, pursuant to 28 U.S.C. § 1334(b). This bankruptcy court has authority to exercise such subject matter jurisdiction, pursuant to 28 U.S.C. § 157(a) and the Standing Order of Reference of Bankruptcy Cases and Proceedings (Misc. Rule No. 33), for the Northern District of Texas, dated August 3, 1984. This is a core matter pursuant to 28 U.S.C. § 157(b) in which this court may issue a final order.

The contempt motion currently before the court seeks for this court to hold DAF, CLO Holdco, Sbaiti & Company, PLLC, and any persons who authorized their actions in civil contempt of court for violating two orders of this court.  Mr. Patrick and Mr. Dondero have both responded herein—neither, of course, admitting to any wrongdoing.

It is well established that bankruptcy courts have civil (as opposed to criminal) contempt powers.  "The power to impose sanctions for contempt of an order is an inherent and well-settled power of all federal courts—including bankruptcy courts."[80]  A bankruptcy court's power to sanction those who "flout [its] authority is both necessary and integral" to the court's performance of its duties.[81]  Indeed, without such power, the court would be a "mere board[ ] of arbitration, whose judgments and decrees would be only advisory."[82]

---

[80] *In re SkyPort Global Comm's, Inc.,* No. 08-36737-H4-11, 2013 WL 4046397, at *1 (Bankr. S.D.Tex. Aug. 7, 2013), *aff'd.,* 661 Fed. Appx. 835 (5th Cir. 2016); *see also In re Bradley,* 588 F.3d 254, 255 (5th Cir. 2009) (noting that "civil contempt remains a creature of inherent power[,]" to "prevent insults, oppression, and experimentation with disobedience of the law[,]" and it is "widely recognized" that contempt power extends to bankruptcy) (quoting 11 U.S.C. § 105(a), which states, in pertinent part, that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."); *Placid Refining Co. v. Terrebonne Fuel & Lube, Inc. (In re Terrebonne Fuel & Lube, Inc.),* 108 F.3d 609, 613 (5th Cir.1997) ("[W]e assent with the majority of the circuits … and find that a bankruptcy court's power to conduct civil contempt proceedings and issue orders in accordance with the outcome of those proceedings lies in 11 U.S.C. § 105."); *Citizens Bank & Trust o. v. Case (In re Case),* 937 F.2d 1014, 1023 (5th Cir. 1991) (held that bankruptcy courts, as Article I as opposed to Article III courts, have the inherent power to sanction and police their dockets with respect to misconduct).

[81] *SkyPort Global,* 2013 WL 4046397, at *1.

[82] *Id.* (internal quotations omitted); *see also Bradley,* 588 F.3d at 266 (noting that contempt orders are both necessary and appropriate where a party violates an order for injunctive relief, noting such orders "are important to the

**Appx. 06500**

Contempt is characterized as either civil or criminal depending upon its "primary purpose."[83] If the purpose of the sanction is to punish the contemnor and vindicate the authority of the court, the order is viewed as criminal. If the purpose of the sanction is to coerce the contemnor into compliance with a court order, or to compensate another party for the contemnor's violation, the order is considered purely civil.[84] It is clear that Highland's intent is to both seek compensation for the expenses incurred by Highland, due to the Alleged Contemnors' purported violations of the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order (*i.e.,* the gatekeeper provisions therein), and to coerce compliance going forward.

B. Type of Civil Contempt: Alleged Violation of a Court Order.

There are different types of civil contempt, but the most common type is violation of a court order (such as is alleged here). "A party commits contempt when [they] violate[] a definite and specific order of the court requiring [them] to perform or refrain from performing a particular act or acts with knowledge of the court's order."[85] Thus, the party seeking an order of contempt in a civil contempt proceeding need only establish, by clear and convincing evidence:[86] "(1) that a court order was in effect, and (2) that the order required certain conduct by the respondent, and (3) that the respondent failed to comply with the court's order."[87]

---

management of bankruptcy cases, but have little effect if parties can irremediably defy them before they formally go into effect.").

[83] *Bradley*, 588 F.3d at 263.

[84] *Id.* (internal citations omitted).

[85] *Travelhost*, 68 F.3d at 961.

[86] *United States v. Puente*, 558 F. App'x 338, 341 (5th Cir. 2013) (per curiam) (internal citation omitted) ("[C]ivil contempt orders must satisfy the clear and convincing evidence standard, while criminal contempt orders must be established beyond a reasonable doubt.").

[87] *F.D.I.C. v. LeGrand*, 43 F.3d 163, 170 (5th Cir. 1995); *see also Martin v. Trinity Indus., Inc.,* 959 F.2d 45, 47 (5th Cir. 1992) (same); *Travelhost*, 68 F.3d at 961 (same).

Appx. 06501

C. <u>Specificity of the Order.</u>

To support a contempt finding in the context of an order alleged to have been violated, the order must delineate 'definite and specific' mandates that the defendants violated."[88] The court need not, however, "anticipate every action to be taken in response to its order, nor spell out in detail the means in which its order must be effectuated."[89]

D. <u>Possible Sanctions.</u>

To be clear, if the court ultimately determines that the Alleged Contemnors are in contempt of court, for not having complied with the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order, the court can order what is necessary to: (1) compel or coerce obedience of the order; and (2) to compensate the Debtor/estate for losses resulting from the Alleged Contemnors' non-compliance with the court orders.[90] The court must determine that the Debtor/movant showed by clear and convincing evidence that: (1) the orders were in effect; (2) the orders required or prohibited certain conduct; and (3) that the Alleged Contemnors failed to comply with the orders.[91] "[T]he factors to be considered in imposing civil contempt sanctions are: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in disregarding the court's order."[92] "Compensatory civil contempt reimburses the injured party for

---

[88] *Am. Airlines, Inc. v. Allied Pilots Ass'n,* 228 F.3d 574, 578 (5th Cir. 2000) (citing Fed. R. Civ. P. 65).

[89] *Id.*

[90] *In re Gervin*, 337 B.R. 854, 858 (W.D. Tex. 2005) (citing *United States v. United Mine Workers*, 330 U.S. 258 (1947)).

[91] *In re LATCL&F, Inc.,* 2001 WL 984912, at *3 (N.D. Tex. 2001) (citing to *Petroleos Mexicanos v. Crawford Enterprises, Inc.,* 826 F.2d 392, 400 (5th Cir. 1987)).

[92] *Lamar Financial Corp. v. Adams,* 918 F.2d 564, 567 (5th Cir. 1990) (citing *United States v. United Mine Workers,* 330 U.S. 258 (1947)).

**Appx. 06502**

the losses and expenses incurred because of [their] adversary's noncompliance."[93] Ultimately, courts have "broad discretion in the assessment of damages in a civil contempt proceeding."[94]

### E. Knowledge of the Order.

"An alleged contemnor must have had knowledge of the order on which civil contempt is to be based. The level of knowledge required, however, is not high. And intent or good faith is irrelevant."[95] To be clear, "intent is not an element in civil contempt matters. Instead, the basic rule is that all orders and judgments of courts must be complied with promptly."[96]

### F. Willfulness of Actions.

For civil contempt of a court order to be found, "[t]he contemptuous actions need not be willful so long as the contemnor actually failed to comply with the court's order."[97] For a stay violation, the complaining party need not show that the contemnor intended to violate the stay. Rather, the complaining party must show that the contemnor intentionally committed the acts which violate the stay. Nevertheless, in determining whether damages should be awarded under the court's contempt powers, the court considers whether the contemnor's conduct constitutes a willful violation of the stay.[98]

---

[93] *Norman Bridge Drug Co. v. Banner*, 529 F.2d 822, 827 (5th Cir. 1976); *see also Travelhost*, 68 F.3d at 961 (noting that "[b]ecause the contempt order in the present case is intended to compensate [plaintiff] for lost profits and attorneys' fees resulting from the contemptuous conduct, it is clearly compensatory in nature."); *In re Terrebonne Fuel & Lube, Inc.*, 108 F.3d at 613 (affirming court's decision to impose sanctions for violating injunction and awarding plaintiff costs and fees incurred in connection with prosecuting defendant's conduct); *F.D.I.C.*, 43 F.3d at 168 (affirming court's imposition of sanctions requiring defendant to pay movant attorneys' fees).

[94] *Am. Airlines*, 228 F.3d at 585; *see also F.D.I.C.*, 43 F.3d at 168 (reviewing lower court's contempt order for "abuse of discretion" under the "clearly erroneous standard."); *In re Terrebonne Fuel & Lube, Inc.*, 108 F.3d at 613 ("The bankruptcy court's decision to impose sanctions is discretionary[]").

[95] *Kellogg v. Chester*, 71 B.R. at 38.

[96] *In re Unclaimed Freight of Monroe, Inc.*, 244 B.R. 358, 366 (Bankr. W.D. La. 1999); *see also In re Norris*, 192 B.R. 863, 873 (Bankr. W.D. La. 1995) ("Intent is not an element of civil contempt.")

[97] *Am. Airlines*, 228 F.3d at 581 (citing *N.L.R.B. v. Trailways, Inc.*, 729 F.2d 1013, 1017 (5th Cir. 1984)).

[98] *In re All Trac Transport, Inc.*, 306 B.R. 859, 875 (Bankr. N.D. Tex. 2004) (internal citations omitted).

Appx. 06503

G. Applying the Evidence to the Literal Terms of the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order.

The court concludes that there is clear and convincing evidence that DAF, CLO Holdco, Sbaiti & Company, PLLC (through attorneys Mazin Sbaiti and Jonathan Bridges), Mr. Patrick, and Mr. Dondero—each and every one of them, with their collaborative actions—violated the specific wording of the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order, and all are in contempt of the bankruptcy court. The evidence was clear and convincing: (1) that two court orders were in effect (the January 2020 Corporate Governance Order and the July 2020 Seery CEO Order); (2) that the orders prohibited certain conduct (*i.e.,* "[n]o entity may commence or pursue a claim or cause of action of any kind against Mr. Seery relating in any way to his role as the chief executive officer and chief restructuring officer of the Debtor without the Bankruptcy Court (i) first determining after notice that such claim or cause of action represents a colorable claim of willful misconduct or gross negligence against Mr. Seery, and (ii) specifically authorizing such entity to bring such claim.");[99] and (3) that the all of the Alleged Contemnors (DAF, CLO Holdco, Sbaiti & Company, PLLC, Mr. Mazin Sbaiti, Mr. Jonathan Bridges, Mr. Patrick, and Mr. Dondero) knew about the orders and failed to comply with the court's orders.

As earlier noted, the District Court Action is all about Mr. Seery's allegedly deceitful conduct in connection with a bankruptcy court-approved settlement (*i.e.,* the HarbourVest Settlement), to which CLO Holdco objected, but then withdrew its objection the day of the hearing. ***The lawsuit is, from this court's estimation, wholly frivolous***. This court is in a better position to realize its frivolousness than any other—having spent hours reflecting on the merits of the HarbourVest Settlement. This court believes that it is clear and convincing that each of the Alleged

---

[99] This is quoting from the July 2020 Seery CEO Order. The January 2020 Corporate Governance Order, of course, had the same prohibitory language as to all three of the Independent Directors.

**Appx. 06504**

Contemnors knew that it would be a "hard sell" to convince this bankruptcy court that the District Court Action and the claims against Mr. Seery should be allowed to go forward.  That's why they tried their luck with the District Court—concocting a rationale that their methods were proper since the bankruptcy court's power to exercise bankruptcy subject matter is derivative, by statute, from the District Court.  This rationale is nothing more than thinly veiled forum shopping. But worse, it is, in this instance, contempt of court.  The Alleged Contemnors argue that they should not be held in contempt because, in filing the Complaint (which mentions Mr. Seery 50 times—but merely names him as a "potential party"), they did not "commence or pursue" a claim against Mr. Seery. Likewise, they argue that, in filing the Seery Motion, they did not actually "commence or pursue" a claim against Mr. Seery.  They argue that a request for leave from the District Court, to add him to the District Court Action, cannot possibly meet the definition of "pursue"—and that one can only "pursue" litigation against a party *after* "commencing" an action against the party.  This is linguistic gymnastics that does not fly.  The Alleged Contemnors were pursuing litigation when they filed the Seery Motion in the District Court (and maybe even as early as when they filed the Complaint mentioning Mr. Seery 50 times and describing him as a "potential party").  These were all sharp litigation tactics, to be sure, but more problematic, were contemptuous of this court's orders.

**V. Damages**.

The Contempt Motion requests that the court: (a) find and hold each of the Alleged Contemnors (directed at DAF, CLO Holdco, Sbaiti & Company, PLLC, and any persons who actually authorized their acts—*i.e.,* "Authorizing Persons") in contempt of court; (b) direct the Alleged Contemnors, jointly and severally, to pay the Debtor's estate an amount of money equal to two times the Debtor's actual expenses incurred in bringing this contempt matter, payable within three calendar days of presentment of an itemized list of expenses; (c) impose a penalty of three

27

times the Debtor's actual expenses incurred in connection with any future violation of any order of this court; and (d) grant the Debtor such other and further relief as the court deems just and proper under the circumstances.[100]

As indicated earlier, the court can order what is necessary to: (1) compel or coerce obedience of an order; and (2) to compensate the Debtor/estate for losses resulting from non-compliance with a court order. Here, the court believes compensatory damages are more appropriate than a remedy to compel or coerce future compliance. Compensatory damages are supposed to reimburse the injured party for the losses and expenses incurred because of their adversary's noncompliance. Courts have broad discretion but may consider such factors as: (1) the harm from noncompliance; (2) the probable effectiveness of the sanction; (3) the financial resources of the contemnor and the burden the sanctions may impose; and (4) the willfulness of the contemnor in disregarding the court's order.

As far as the harm from noncompliance, the Debtor presented invoices of the fees incurred by its counsel relating to this matter. The invoices were Exhibits 54 & 55 [DE # 2421]. The invoices reflect fees of the Debtor's primary bankruptcy counsel, Pachulski Stang, relating to this contempt matter, during the time period of April 18–April 30, 2021, of $38,796.50,[101] and another $148,998.50,[102] during the time period of May 1–June 7, 2021. These total **$187,795**, and the court determines these to have been reasonable and necessary fees incurred in having to respond and react to the contemptuous conduct set forth herein. Moreover, the court considers it to likely be a

---

[100] Debtor's Motion for an Order Requiring the Violators to Show Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders. [DE # 2247].

[101] The total fees and expenses for this time period were $1,295,070.58, but the court has calculated the fees related to this contempt matter.

[102] The total fees and expenses for this time period were $1,465,010 but the court has calculated the fees related to this contempt matter.

conservative number because: (a) it does not reflect the fees and expenses incurred at the June 8, 2021 Hearing (which went 4+ hours); (b) it does not include any expenses the firm incurred (the court notes from the time entries that there were depositions taken—thus, there must have been expenses); (c) it does not include any fees and expenses that the UCC may have incurred monitoring this contested matter; and (d) it does not include any fees for Pachulski's local counsel (Hayward & Associates). As for the June 8, 2021 Hearing, the court is aware that at least three professionals from Pachulski Stang participated (Jeff Pomeranz at $1,295/hour; John Morris at $1,245/hour; and paralegal Asia Canty at $425/hour, for a total of $2,965/hour; multiplied by 4 hours equals $11,860)—thus, the court will add on another $11,860 of fees that should be reimbursed. The expenses the Pachulski firm incurred during this time period were $22,271.14, but they are not itemized. Thus, the court will assume $10,000 of this related to the contempt matter. The court will conservatively assume the UCC incurred $20,000 in fees monitoring this matter—as this matter could impact their constituency's recovery (the court is aware that the UCC's lawyer Matthew Clemente attended the June 8, 2021 Hearing). The court will conservatively assume that Hayward and Associates incurred $10,000 in fees assisting Pachulski. Thus, all totaled, this amounts to **$239,655** of fees and expenses that this court is imposing upon the Alleged Contemnors, jointly and severally, to reimburse the bankruptcy estate for the fees and expenses it has incurred relating to their contemptuous acts.

The Debtor has asked for the court to impose a penalty of three times the Debtor's actual expenses incurred in connection with any future violation of any order of this bankruptcy court. The court declines to do this. However, the court will add on a sanction of $100,000 for each level of rehearing, appeal, or petition for *certiorari* that the Alleged Contemnors may choose to take

with regard to this Order, to the extent any such motions for rehearing, appeals, or petitions for certiorari are not successful.

Accordingly, it is hereby ORDERED that:

(i)     DAF, CLO Holdco, Sbaiti & Company, PLLC (including Mazin Sbaiti and Jonathan Bridges), Mark Patrick, and James Dondero (collectively, now the "Contemnors") are each in civil contempt of court in having violated the court's January 2020 Corporate Governance Order and July 2020 Seery CEO Order—the court having found by clear and convincing evidence that: (1) these orders were in effect and each of the Contemnors knew about them; (2) the orders prohibited certain conduct; and (3) the Contemnors failed to comply with the orders;

(ii)    In order to compensate the Debtor's estate for loss and expense resulting from the Contemnors' non-compliance with the orders, the Contemnors are jointly and severally liable for the compensatory sum of **$239,655** and are directed to pay the Debtor (on the 15th day after entry of this order) an amount of money equal to **$239,655;**

(iii)   The court will add on a monetary sanction of **$100,000** for each level of rehearing, appeal, or petition for *certioriari* that the Contemnors may choose to take with regard to this Order, to the extent that any such motions for rehearing, appeals, or petitions for *certiorari* are pursued by any of them and are not successful;

(iv)    Other sanctions (such as further deterrence sanctions) are denied at this time but, ***should any of these Contemnors be subject to another contempt motion in this court in the future and be found to have committed contempt***, the court anticipates imposing significant deterrence sanctions (the court duly notes that this is the second

Appx. 06508

time in the last several weeks that the court has found Mr. Dondero to be in contempt

of court); and

(v)        The court reserves jurisdiction to interpret and enforce this Order.

### End of Memorandum Opinion and Order ###

Appx. 06509