# EXHIBIT 53

Docket #2454 Date Filed: 06/16/2021

PACHULSKI STANG ZIEHL & JONES LLP
Jeffrey N. Pomerantz (CA Bar No. 143717) (*admitted pro hac vice*)
Ira D. Kharasch (CA Bar No. 109084) (*admitted pro hac vice*)
John A. Morris (NY Bar No. 2405397) (*admitted pro hac vice*)
Gregory V. Demo (NY Bar No. 5371992) (*admitted pro hac vice*)
Hayley R. Winograd (NY Bar No. 5612569) (*admitted pro hac vice*)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760

HAYWARD PLLC
Melissa S. Hayward (TX Bar No. 24044908)
MHayward@HaywardFirm.com
Zachery Z. Annable (TX Bar No. 24053075)
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, TX 75231
Telephone: (972) 755-7100
Facsimile: (972) 755-7110

*Counsel for the Debtor and Debtor-in-Possession*

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) | Case No. 19-34054-sgj11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

**DEBTOR'S SECOND AMENDED WITNESS AND EXHIBIT LIST WITH
RESPECT TO EVIDENTIARY HEARING TO BE HELD ON JUNE 8, 2021**

Highland Capital Management, L.P. (the "Debtor") submits the following second

amended witness and exhibit list with respect to the *Order Requiring the Violators to Show*

*Cause Why They Should Not Be Held in Civil Contempt for Violating Two Court Orders* [Docket

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service
address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.



1934054210616000000000004

No. 2255] (the "Show Cause Order"), which the Court set for hearing at 9:30 a.m. (Central Time) on June 8, 2021 (the "Hearing") in the above-styled bankruptcy case (the "Bankruptcy Case").

**A.   Witnesses:**

1. James Dondero;

2. Mark Patrick;

3. Grant Scott (by deposition designation);

4. Gregory V. Demo;[2]

5. Any witness identified by or called by any other party; and

6. Any witness necessary for rebuttal.

**B.   Exhibits:**

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 1. | Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-1] | | |
| 2. | Declaration of John A. Morris in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-2] | | |
| 3. | Exhibit A, the [Proposed] Order on the Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-3] | | |
| 4. | James Dondero's Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest [Docket No. 2237-4] | | |

---

[2] If needed, Mr. Demo will be called as a witness for the sole purpose of authenticating Exhibits 54 and 55, time records from Pachulski Stang Ziehl & Jones, LLP relating to the Show Cause Order.

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 5. | Objection to Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-5] | | |
| 6. | CLO Holdco's Objection to HarbourVest Settlement. [Docket No. 2237-6] | | |
| 7. | Notice of Deposition to James Dondero [Docket No. 2237-7] | | |
| 8. | Transcript of January 11, 2021 Deposition of Michael Pugatch [Docket No. 2237-8] | | |
| 9. | Omnibus Reply in Support of Debtor's Motion for Entry of an Order Approving Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-9] | | |
| 10. | Transcript of January 14, 2021 Hearing [Docket No. 2237-10] | | |
| 11. | Order Approving Debtor's Settlement with HarbourVest (Claim Nos. 143, 147, 149, 150, 153, 154) and Authorizing Actions Consistent Therewith [Docket No. 2237-11] | | |
| 12. | Original Complaint (Charitable DAF Fund, L.P. v. Highland Capital Management, L.P., Case No. 21-cv-00842, U.S. District Court Northern District of TX) (GScott000389) [Dondero June 1, 2021 Deposition Exhibit 7] [Docket No. 2237-12] | | |
| 13. | Email string dated April 19, 2021, between counsel for the Debtor and counsel for the plaintiffs in the DAF Action [Docket No. 2237-13] | | |
| 14. | Second email string dated April 19, 2021, between counsel for the Debtor and counsel for the plaintiffs in the DAF Action [Docket No. 2237-14] | | |
| 15. | Order Approving Settlement with Official Committee of Unsecured Creditors Regarding Governance of the Debtor and Procedures for Operations in the Ordinary Course [Docket No. 2237-15] | | |
| 16. | Order Approving Debtor's Motion Under Bankruptcy Code Sections 105(a) and 363(b) for Authorization to Retain James P. Seery, Jr., as Chief Executive Officer, Chief Restructuring | | |

| Letter | Exhibit | Offered | Admitted |
|---|---|---|---|
| | Officer and Foreign Representative *Nunc Pro Tunc* to March 15, 2020 [Docket No. 2237-16] | | |
| 17. | Plaintiff's Motion for Leave to File First Amended Complaint (Charitable DAF Fund, L.P. v. Highland Capital Management, L.P., Case No. 21-cv-00842, U.S. District Court Northern District of TX) [Docket No. 2237-17] | | |
| 18. | CM/ECF Notice dated April 20, 2020 and lodged as Docket No. 8 in the DAF Action [Docket No. 2237-18] | | |
| 19. | Transcript of March 22, 2021 Hearing [Docket 2351-1] | | |
| 20. | Email from DAF counsel to Debtor's counsel dated April 20, 2021 [Docket 2351-2] | | |
| 21. | All communications between Debtor's counsel and the Bankruptcy Court courtroom deputy [Docket 2355-3] | | |
| 22. | Debtor's Motion for an Order to Enforce the Order of Reference [Docket 2351-4] | | |
| 23. | Grant Scott January 21, 2021 Deposition Transcript | | |
| 24. | Grant Scott June 1, 2021 Deposition Transcript | | |
| 25. | DAF/CLO Holdco Structure Chart (GScott000007) [Dondero June 1, 2021 Deposition Exhibit 1] | | |
| 26. | Amended and Restated Limited Liability Company Agreement of Charitable DAF GP, LLC, effective as of January 1, 2012 (PATRICK_000031) [Dondero June 1, 2021 Deposition Exhibit 2] | | |
| 27. | Amended and Restated Investment Advisory Agreement by and between Charitable DAF Fund, L.P., Charitable DAF GP, LLC, and HCMLP, effective July 1, 2014 (GScott000325) [Dondero June 1, 2021 Deposition Exhibit 3] | | |
| 28. | January 31, 2021 Meeting Appointment (GScott000011) [Dondero June 1, 2021 Deposition Exhibit 4] | | |
| 29. | Email chain re Grant Scott's notice of intent to resign (GScott000018) [Dondero June 1, 2021 Deposition Exhibit 5] | | |

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 30. | Email chain re Highland Adherence Agreement in connection with HarbourVest shares (GScott000085) [Dondero June 1, 2021 Deposition Exhibit 6] | | |
| 31. | Email and attached A&R Service and Advisory Agreements and GP Resolutions (GScott000312) [Scott June 1, 2021 Deposition Exhibit 8] | | |
| 32. | Notice of CLO Holdco Settlement Agreement [Scott June 1, 2021 Deposition Exhibit 9] | | |
| 33. | Email between Grant Scott and Mark Patrick re Complaint (GScott000080) [Scott June 1, 2021 Deposition Exhibit 10] | | |
| 34. | Email chain re TerreStar Corporation Equity Investment and Residual Assets held by HOCF (GScott000138) [Scott June 1, 2021 Deposition Exhibit 11] | | |
| 35. | Email chain re request for information from Elysium Fund Management, Ltd. (GScott000361) [Scott June 1, 2021 Deposition Exhibit 12] | | |
| 36. | Assignment and Assumption of Membership Interest Agreement between Grant J. Scott and Mark E. Patrick dated March 24, 2021 (PATRICK_000006) [Scott June 1, 2021 Deposition Exhibit 13] | | |
| 37. | Written Resolutions of the Sole Director of the Company Dated March 25, 2021 (PATRICK_000003) [Scott June 1, 2021 Deposition Exhibit 14] | | |
| 38. | Written Shareholder Resolutions of the Sole Shareholder of the Company Made on March 24, 2021 (PATRICK_000012) [Scott June 1, 2021 Deposition Exhibit 15] | | |
| 39. | Written Shareholder Resolutions of the Sole Shareholder of the Company Made on March 31, 2021 (PATRICK_000001) [Scott June 1, 2021 Deposition Exhibit 16] | | |
| 40. | Written Shareholder Resolutions of the Sole Shareholder of the Company Made on April 2, 2021 (PATRICK_000002) [Scott June 1, 2021 Deposition Exhibit 17] | | |
| 41. | Amended and Restated Investment Advisory Agreement by and between Charitable DAF Fund, L.P., Charitable DAF GP, LLC, and HCMLP, effective July 1, 2014 (PATRICK_000923) | | |

Appx. 06814

| Letter | Exhibit | Offered | Admitted |
|--------|---------|---------|----------|
| 42. | Amended and Restated Service Agreement by and among HCMLP, Charitable DAF Fund, L.P., and Charitable DAF GP, LLC , effective July 1, 2014 (PATRICK_000938) | | |
| 43. | Email from Mark Patrick to Grant Scott dated April 6, 2021 re Urgent Questions (PATRICK_001129) | | |
| 44. | Original Complaint (Docket No. 1, PCMG Trading Partners XXIII, LP v. Highland Capital Management, L.P., Case No. 21-cv-01169, U.S. District Court Northern District of TX) | | |
| 45. | Defendant's Motion For Leave to Amend Answer (Docket No. 32, Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., Adv. Pro. No. 21-03004) | | |
| 46. | Email chain re NDA for D&O Insurance Quote (GScott000172) | | |
| 47. | Check Request dated April 7, 2021 (D1 Landscape & Irrigation) (GScott000354) | | |
| 48. | Check Request dated April 7, 2021 (Sanders Lawn & Maintenance) (GScott000355) | | |
| 49. | Check Request dated April 7, 2021 (BB Services) (GScott000358) | | |
| 50. | Highland Capital Management, L.P.'S Notice of Amended Subpoena to Grant Scott [Docket No. 2366] | | |
| 51. | Certificate of Service for Notice of Deposition of Grant Scott (Docket No. 41, Highland Capital Management, L.P. v. Highland Capital Management Fund Advisors, L.P., et al., Adv. Pro. No. 21-03000) | | |
| 52. | Email re Zoom Instructions for June 1, 2021 Deposition of Grant Scott | | |
| 53. | Email re Zoom Instructions for January 21, 2021 Deposition of Grant Scott | | |
| 54. | Pachulski Stang Billing Detail (April 18 – April 30, 2021) | | |
| 55. | Pachulski Stang Billing Detail (May 1 – June 7, 2021) | | |

**Appx. 06815**

| Letter | Exhibit | Offered | Admitted |
|:---:|---|---|---|
| 56. | Any document entered or filed in the Bankruptcy Case, including any exhibits thereto | | |
| 57. | All exhibits necessary for impeachment and/or rebuttal purposes | | |
| 58. | All exhibits identified by or offered by any other party at the Hearing | | |

*[Remainder of Page Intentionally Blank]*

Dated:  June 16, 2021.

**PACHULSKI STANG ZIEHL & JONES LLP**

Jeffrey N. Pomerantz (CA Bar No.143717)
Ira D. Kharasch (CA Bar No. 109084)
John A. Morris (NY Bar No. 2405397)
Gregory V. Demo (NY Bar 5371992)
Hayley R. Winograd (NY Bar No. 5612569)
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone: (310) 277-6910
Facsimile: (310) 201-0760
E-mail:    jpomerantz@pszjlaw.com
            ikharasch@pszjlaw.com
            jmorris@pszjlaw.com
            gdemo@pszjlaw.com


-and-

**HAYWARD PLLC**

*/s/ Zachery Z. Annable*
Melissa S. Hayward
Texas Bar No. 24044908
MHayward@HaywardFirm.com
Zachery Z. Annable
Texas Bar No. 24053075
ZAnnable@HaywardFirm.com
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231
Tel: (972) 755-7100
Fax: (972) 755-7110

*Counsel for Highland Capital Management, L.P.*



# EXHIBIT 23

Page 1

1          GRANT SCOTT - 1/21/2021

2      IN THE UNITED STATES BANKRUPTCY COURT
         FOR THE NORTHERN DISTRICT OF TEXAS
3               DALLAS DIVISION

4   IN RE:                    )
                              )   Chapter 11
5   HIGHLAND CAPITAL MANAGEMENT,  )
    L.P.                      )     Case No.
6                             )  19-34054-sgj11
              Debtor.         )
7   ---------------------------  )
    HIGHLAND CAPITAL MANAGEMENT,  )
8   L.P.,                     )
              Plaintiff,      )
9                             )     Adversary
      vs.                     )   Proceeding No.
10                            )    21-03000-sgj
    HIGHLAND CAPITAL MANAGEMENT  )
11  FUND ADVISORS, L.P.; NEXPOINT  )
    ADVISORS, L.P.; HIGHLAND      )
12  INCOME FUND; NEXPOINT        )
    STRATEGIC OPPORTUNITIES FUND;  )
13  NEXPOINT CAPITAL, INC.; and    )
    CLO HoldCo, LTD.,          )
14                            )
              Defendants.     )
15  -------------------------------

16

17      VIDEOCONFERENCE DEPOSITION OF Grant SCOTT

18        Thursday, 21st of January, 2021

19

20

21

22

23   Reported by: Lisa A. Wheeler, RPR, CRR

24   Job No: 188910

25

Case 19-34054-sgj11 Doc 3445-53 Filed 08/15/22   Entered 08/15/22 16:45:41   Page 12 of
235
Case 19-34054-sgj11 Doc 2454-1 Filed 06/16/21   Entered 06/16/21 16:18:26   Page 3 of
110

Page 2

1        GRANT SCOTT - 1/21/2021

2              January 21, 2021

3              2:02 p.m.

4

5

6        Videoconference deposition of Grant

7   SCOTT, pursuant to the Federal Rules of

8   Civil Procedure before Lisa A. Wheeler,

9   RPR, CRR, a Notary Public of the State of

10   North Carolina.  The court reporter

11   reported the proceeding remotely and the

12   witness was present via videoconference.

13

14

15

16

17

18

19

20

21

22

23

24

25

**Appx. 06820**

Page 3

1          GRANT SCOTT - 1/21/2021

2   REMOTE APPEARANCES:

3       PACHULSKI STANG ZIEHL & JONES

4       Attorneys for Debtor

5          780 Third Avenue

6          New York, NY 10017

7       BY:   JOHN MORRIS, ESQ.

8

9       LATHAM & WATKINS

10       Attorneys for UBS

11          885 Third Avenue

12          New York, NY 10022

13       BY:   SHANNON McLAUGHLIN, ESQ.

14

15       SIDLEY AUSTIN

16       Attorneys for the Creditors Committee

17          2021 McKinney Avenue

18          Dallas, TX 75201

19       BY:   PENNY REID, ESQ.

20          ALYSSA RUSSELL, ESQ.

21          PAIGE MONTGOMERY, ESQ.

22

23

24

25

1          GRANT SCOTT - 1/21/2021

2    REMOTE APPEARANCES:  (Continued)

3       KING & SPALDING

4       Attorneys for Highland CLO Funding, Ltd.

5          500 West 2nd Street

6          Austin, TX 78701

7       BY:  REBECCA MATSUMURA, ESQ.

8

9       K&L GATES

10      Attorneys for Highland Capital Management

11      Fund Advisors, L.P., et al.

12          4350 Lassiter at North Hills Avenue

13          Raleigh, NC 27609

14      BY:   A. LEE HOGEWOOD, III, ESQ.

15          EMILY MATHER, ESQ.

16

17      HELLER DRAPER & HORN

18      Attorneys for The Dugaboy Investment Trust

19      and The Get Good Trust

20          650 Poydras Street

21          New Orleans, LA 70130

22      BY:  MICHAEL LANDIS, ESQ.

23

24

25

**Appx. 06822**

1        GRANT SCOTT - 1/21/2021

2    REMOTE APPEARANCES:  (Continued)

3      KANE RUSSELL COLEMAN & LOGAN

4      Attorneys for Defendant CLO HoldCo Limited

5          Bank of America Plaza

6          901 Main Street

7          Dallas, TX 75202

8      BY:   BRIAN CLARK, ESQ.

9          JOHN KANE, ESQ.

10

11    ALSO PRESENT:  La Asia Canty

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1          GRANT SCOTT - 1/21/2021

2   G R A N T   S C O T T,

3     called as a witness, having been duly sworn

4     by a Notary Public, was examined and

5     testified as follows:

6          MR. MORRIS:  Good afternoon.  My

7     name is John Morris.  I'm an attorney with

8     Pachulski Stang Ziehl & Jones, a law firm

9     who represents the debtor in the bankruptcy

10     known as In Re: Highland Capital

11     Management, L.P., and we're here today for

12     the deposition of Grant Scott.

13          Before I begin, I would just like to

14     have confirmation on the record that

15     everybody here who's representing their

16     respective parties agrees that this

17     deposition can be used in evidence in any

18     subsequent hearing, notwithstanding the

19     fact that it's being conducted remotely,

20     and that the witness is not in the same

21     room as the court reporter.

22          Does anybody have an objection to

23     the admissibility of the transcript subject

24     to any reservation of -- of actual

25     objections on the record to using this

Appx. 06824

Page 7

1            GRANT SCOTT - 1/21/2021

2      transcript going forward?

3            Okay.  Nobody's spoken up, so I --

4      I'd like to begin.

5                  EXAMINATION

6    BY MR. MORRIS:

7      Q.    Good afternoon, Mr. Scott.  As I

8    mentioned, my name is John Morris, and we're

9    here for your deposition today.  Have you ever

10   been deposed before?

11     A.    On two occasions.

12     Q.    And -- and when did the -- when did

13   those depositions take place?

14     A.    This past October and maybe six to

15   eight years ago.

16     Q.    Okay.  Can you just tell me

17   generally what the subject matter was of the

18   deposition this past October.

19     A.    It was relating to Jim Dondero's --

20   it was a family law issue in -- in -- with

21   respect to Jim Dondero.

22     Q.    Okay.  And did you testify in a

23   courtroom, or was it a deposition like this?

24     A.    I -- right here, actually.

25     Q.    Okay.  Super.  And -- and what about

Page 8

1          GRANT SCOTT - 1/21/2021

2   the -- the deposition six to eight years ago,

3   do you have a recollection as to what that was

4   about?

5        A.    Yeah.  It was a -- it was a patent I

6   wrote for Samsung Electronics.

7        Q.    Okay.

8        A.    And as being the person that I --

9   that wrote it and the patent was in litigation,

10  not -- not being handled by me, but by virtue

11  of having written the patent, I was -- I was

12  deposed --

13       Q.    Okay.  So you --

14       A.    -- on the -- on the patent.

15       Q.    Okay.  So you've had a little bit of

16  experience with depositions.  But just

17  generally speaking, I'm going to ask you a

18  series of questions.  It's very important that

19  you allow me to finish my question before you

20  begin your answer.

21            Is that fair?

22       A.    Absolutely.

23       Q.    And I will certainly try to extend

24  the same courtesy to you, but if I -- if I step

25  on your words, will you let me know that?

**Appx. 06826**

Page 9

1          GRANT SCOTT - 1/21/2021

2     A.    Okay.

3     Q.    And if there's anything that I ask

4   that you don't understand, will you let me know

5   that as well?

6     A.    Yes.  I'll try -- I'll do my best.

7     Q.    Okay.  So this is a virtual

8   deposition.  We're not in the same room.  I am

9   going to be showing you documents today.  The

10  documents will be put up on the screen.  This

11  isn't a -- a trick of any kind.  If at any time

12  you see a document up on the screen and either

13  you believe or you have any reason to want to

14  read other portions of the document, will you

15  let me know that?

16    A.    Yes, I -- yes, I will.  Uh-huh.

17    Q.    With respect to the Dondero family

18  matter, I really don't want to go into the

19  substance of that, but I do want to know

20  whether you testified voluntarily in that

21  matter or whether you -- whether you testified

22  pursuant to subpoena.

23    A.    I would have done that, but the

24  first time I found out about it was a -- was a

25  subpoena that I received.  I wasn't given the

Page 10

1          GRANT SCOTT - 1/21/2021

2    choice.

3          Q.    Okay.  And do you recall who served

4    the subpoena on you?  Actually, let me ask a

5    different question because I'm really not

6    interested in the -- in the details.

7              Did Mr. Dondero serve that subpoena

8    on you or did somebody else?

9          A.    His counsel for his ex-wife.

10         Q.    Mr. -- so -- so the lawyer acting on

11   behalf of Mr. Dondero's ex-wife served you with

12   the subpoena?

13         A.    Correct.

14         Q.    Okay.  You're familiar with an

15   entity called CLO HoldCo Limited; is that

16   right?

17         A.    Yes.

18         Q.    Do you know what that entity is?

19         A.    Yes.

20         Q.    What -- what -- can you describe for

21   me what CLO HoldCo Limited is.

22         A.    It's a holding company of assets

23   including collateralized loan obligation-type

24   assets.  That's a portion of the overall

25   portfolio.  It's an organization that is

Page 11

1          GRANT SCOTT - 1/21/2021

2    integrated with other entities as part of a

3    charitable -- loosely what we -- what we refer

4    to as a charitable foundation equivalent.

5    Yeah.

6        Q.    All right.  We'll -- we'll get into

7    some detail about the corporate structure in a

8    moment.  Do you personally play any role at CLO

9    HoldCo Limited?

10       A.    Yes.  My technical title is

11   director, but I -- I don't necessarily know

12   specifically what that title means other than I

13   act, as I understand it, as -- as a trustee for

14   those -- for those assets.

15       Q.    And where did you get that

16   understanding?

17       A.    Approximately ten years ago from the

18   group that -- that set up the hierarchy.

19       Q.    And which group set up the

20   hierarchy?

21       A.    Employees at Jim Don- -- as I

22   understand it, employees of Highland along with

23   outside counsel, as I understand it, and also,

24   I guess, input from -- from Jim Dondero.

25       Q.    At the time that you assumed the

Page 12

1          GRANT SCOTT - 1/21/2021

2     role of director of CLO HoldCo Limited, was

3     that entity already in existence?

4          A.    I believe so.  I'm not certain.  I'm

5     not certain.

6          Q.    What are your duties and

7     responsibilities as a director of CLO HoldCo

8     Limited?

9          A.    Well, my day-to-day responsibilities

10    are to interface with -- with the manager of

11    the -- of the assets of CLO.  I do have some

12    role in -- with respect to some of the entities

13    that are -- I -- I have a limited role with

14    respect to a subset of the charitable

15    foundations that receive money from the CLO

16    HoldCo structure, which is commonly referred to

17    as the DAF.  There's -- sometimes those are

18    used interchangeably.

19         Q.    What terms are used interchangeably?

20         A.    Well, the DAF and CLO HoldCo are

21    frequently -- by -- by other people they're --

22    it's the short -- it's the -- I guess it's

23    easier to use the acronym DAF than CLO HoldCo

24    Limited, so I'm frequently having to -- there

25    is a DAF entity so -- that's above -- above CLO

Appx. 06830

Page 13

1          GRANT SCOTT - 1/21/2021

2   in terms of the management, and so it's

3   frequently confusing and I'm having to clarify

4   at times which entity we're talking about,

5   but -- but other parties frequently use those

6   terms interchangeably.

7        Q.    Okay.

8             MR. MORRIS:  Lisa, when we use the

9        phrase DAF, because you'll hear that a lot,

10        it's all caps, D-A-F.

11   BY MR. MORRIS:

12        Q.    You mentioned that you interface

13   with the manager of assets of CLOs.  Do I have

14   that right?

15        A.    Well, of all the assets.

16        Q.    Okay.  Who is the manager of the

17   assets that you're referring to?

18        A.    Highland Capital Management.

19        Q.    Highland Capital Management manages

20   all of the assets -- withdrawn.

21             Is it your understanding that

22   Highland Capital Management manages all the

23   assets that are owned by CLO HoldCo Limited?

24        A.    Yes.

25        Q.    Who makes the investment decisions

Page 14

1          GRANT SCOTT - 1/21/2021

2    on behalf of CLO HoldCo Limited?

3         A.    Highland -- those managers that you

4    mentioned.

5         Q.    Okay.  I didn't mention anybody in

6    particular.

7         A.    Oh, I'm sorry.  The -- the -- the

8    money manager -- could you repeat that

9    question?  I'm sorry.  I'm so sorry.

10        Q.    Can you just -- can you just

11   identify for me the person who makes investment

12   decisions on behalf of CLO HoldCo Limited.

13        A.    It's -- well, it's -- it's persons

14   as I understand it.  I inter- -- interface with

15   a -- with a group, but it's -- it's Highland

16   Capital employee -- Highland Capital Management

17   employees.

18        Q.    Okay.  Can you just name any of

19   them, please.

20        A.    Hunter Covitz, Jim Dondero.  Mark

21   Okada's no longer there, but I believe he was

22   involved, and there are others that I interface

23   with.

24        Q.    Can you -- can you recall the name

25   of anybody other than Mr. Okada and Mr. Dondero

Page 15

1          GRANT SCOTT - 1/21/2021

2   and Mr. Covitz?

3        A.    Yeah.  Over the years I've worked

4   with Tim Cournoyer, Thomas Surgent, but I

5   think -- I think that's the core -- the core

6   group.

7        Q.    All right.  And is there anybody

8   within that core group who has the final

9   decision-making authority concerning the

10  investments in CLO HoldCo Limited?

11       A.    I don't -- I don't know.  I'm sorry.

12  Say that again.  I just want to -- I'm sorry.

13  I'm trying to be -- I'm not trying to -- I'm

14  trying to be --

15       Q.    I understand.  And --

16       A.    Sorry.  If you could just repeat it.

17       Q.    Sure.  Is there any particular

18  person who has the final decision-making

19  authority for investments that are being made

20  on behalf of CLO HoldCo Limited?

21       A.    Amongst that group I am -- I am not

22  sure.

23       Q.    Okay.  So are there any other

24  directors of CLO HoldCo besides yourself?

25       A.    No.

Appx. 06833

Page 16

1       GRANT SCOTT - 1/21/2021

2   Q.   Is it fair to say that you do not

3 make decisions, investment decisions, on behalf

4 of CLO HoldCo Limited?

5   A.   Yes.

6   Q.   Does CLO HoldCo Limited have any

7 employees that you know of?

8   A.   No.

9   Q.   Does CLO HoldCo have any --

10 withdrawn.

11       Does CLO HoldCo Limited have any

12 officers that you know of?

13   A.   No.

14   Q.   So am I correct that you're the only

15 representative in the world of CLO HoldCo in

16 terms of being a director, officer, or

17 employee?

18   A.   Yes.

19   Q.   Do you receive any compensation from

20 CLO HoldCo for your services as the director?

21   A.   I do now.

22   Q.   When did that begin?

23   A.   I believe in the middle of 2012.

24   Q.   Okay. And had you served as a

25 director prior to that time without

Page 17

1         GRANT SCOTT - 1/21/2021

2    compensation?

3       A.    Yes.

4       Q.    And have you been the sole director

5    of CLO HoldCo Limited since the time of your

6    appointment approximately ten years ago?

7       A.    Yes.

8       Q.    Nobody else has served in that

9    capacity; is that right?

10      A.    That is correct.

11      Q.    There have been no employees or

12   officers of that entity during the time that

13   you've served as director, correct?

14      A.    Yes.

15      Q.    Do you know who formed CLO HoldCo

16   Limited?

17      A.    I do not.

18      Q.    Do you know why CLO HoldCo Limited

19   was formed?

20      A.    I believe so.

21      Q.    Can you explain to me why -- your

22   understanding as to why CLO HoldCo was formed.

23      A.    So as I understand things, Jim

24   Dondero wanted to create a charitable

25   foundation-like entity or entities, and tax

Page 18

1            GRANT SCOTT - 1/21/2021

2    people particularly, I guess, finance people,

3    lawyers, they created this network of entities

4    to carry out that charitable goal.  At one

5    point, I thought it was a novel type of

6    institution, if you want to call it, or a

7    novel -- novel type of group of entities, but

8    over time, I came to understand that although

9    not cookie cutter, it -- it follows a general

10   arrangement of entities for legal and tax

11   purposes, compliance purposes, IRS purposes,

12   various insulating purposes to maintain -- or

13   to meet the necessary requisites to carry out

14   that charitable function.

15       Q.    When did you come to that

16   understanding?

17       A.    Over the last couple of years.  I

18   periodically have to refresh my recollection.

19   It's -- it's fairly complex.

20       Q.    Okay.  In your capacity as the sole

21   director of CLO HoldCo Limited, do you report

22   to anybody?

23       A.    No.

24       Q.    Other than interfacing with the

25   manager of the assets of the CLO, do you have

Appx. 06836

Page 19

1        GRANT SCOTT - 1/21/2021

2    any other duties and responsibilities as a

3    director of CLO HoldCo Limited?

4        A.    Yes.  Sorry.  My mouth is a little

5    dry.

6        Q.    By the way, if you ever need to take

7    a break, just let me know.

8        A.    Okay.  Thank you.  Now I forgot your

9    question.  The -- the -- the --

10        Q.    I understand.

11        A.    The answer -- the -- the answer is

12    yes.  I -- why don't you ask -- ask your

13    question again.  I'm sorry.

14        Q.    Sure.  Other than interfacing with

15    the manager of the assets of the CLO, do you

16    have any other duties and responsibilities as

17    the sole director of CLO HoldCo Limited?

18        A.    Yes.  So Highland Capital because of

19    its -- the way it's set up to manage or service

20    CLO HoldCo and the DAF, it has a relatively

21    large group of people that I have to interface

22    with to do everything from -- everything from

23    soup to nuts.  Finances and the money

24    management is one aspect, but most of my

25    time -- on a day-to-day or week-to-week basis,

Page 20

1          GRANT SCOTT - 1/21/2021

2    most of my time is spent working with the

3    various compliance and other people for

4    addressing issues of get- -- you know, getting

5    taxes filed.  It runs -- it runs the gamut of

6    every aspect of the organization being -- being

7    handled by Highland.

8        Q.    Okay.

9        A.    You know, unlike -- unlike my

10   financial -- unlike a financial planner that

11   might, you know, manage assets, they -- they do

12   it all, and I interface with them regularly to

13   maintain -- mostly to deal with compliance

14   issues.

15       Q.    Who's the com- -- is there a person

16   who's in charge of compliance?

17       A.    I believe Thomas Surgent.  I

18   mentioned him.  I believe he also has that

19   role, but it's -- you know, they do have

20   turnover, I guess, in that.  It's -- I guess

21   they refer to it as the back office.  I've

22   heard that term be used, but -- basically, it's

23   a large number of people that have changed over

24   time, but it's -- it's more -- I believe it's

25   more than one collectively.

Page 21

1          GRANT SCOTT - 1/21/2021

2      Q.    How much time do you devote -- you

3    know, can you estimate either on a weekly or a

4    monthly basis how many -- how much time do you

5    devote to serving as the director of CLO HoldCo

6    Limited?

7      A.    I thought about that.  Well, let --

8    let's put it this way:  There was the

9    prebankruptcy time I spent per day, and then

10   there was the postbankruptcy time I've spent

11   per -- per -- or per week -- excuse me, or

12   per -- I've estimated it as probably a day --

13   it's so intermittent it's -- it's hard, okay?

14   It's -- I don't dedicate my Mondays to only

15   doing that and then Tuesday through Friday I

16   don't, right?  I -- it's -- I have to piece

17   together everything that occurs during the

18   week.  There might be some weeks where I don't

19   have any contact.  There might be every day of

20   the week I have multiple contact.  There may be

21   days where from morning to night there is so

22   much contact, it precludes me from doing

23   anything else meaningfully.  So -- but I would

24   estimate it's probably three or four -- maybe

25   three days, four days a month when things are

Page 22

1        GRANT SCOTT - 1/21/2021

2   going well.

3        Q.    And -- and I think you -- you

4   testified just now that there was kind of a

5   difference between prebankruptcy and

6   postbankruptcy.  Do I have that right?

7        A.    Yes.

8        Q.    And can you tell me -- is it fair to

9   say that before the bankruptcy, you didn't

10   devote much time to CLO HoldCo, or do I have

11   that wrong?

12        A.    Well, I -- just the time that --

13   that I mentioned just -- I'm sorry.  The -- the

14   time I just mentioned now when you asked me,

15   that was the pre period.  Excuse me.  I haven't

16   talked about the postbankruptcy period.

17        Q.    So are you -- are you -- are you

18   devoting more time or less time since the

19   bankruptcy?

20        A.    Much more.

21        Q.    Much more since the bankruptcy

22   filing?

23        A.    Yes.

24        Q.    And so why did the bankruptcy filing

25   cause you to spend more time as a director of

Page 23

1          GRANT SCOTT - 1/21/2021

2  CLO HoldCo Limited?

3      A.    Well, initially, and this would

4  be -- this would be late 2019, it was --

5  aft- -- after the bankruptcy was -- was filed

6  and I obtained counsel, who are on the phone

7  now -- or in this deposition now, excuse me,

8  that was -- that transition occurred because

9  CLO was a debtor -- excuse me, a creditor to --

10  to the debtor and had to take steps to

11  establish its -- its claim.  So if I understand

12  the -- things correctly, the -- the debtor

13  identified as part of the filing -- I don't

14  know how bankruptcy works, but if I under- --

15  if my recollection is correct, there's a

16  hierarchy from biggest to smallest, and we were

17  relatively high up.  And when I say we or I,

18  I -- I just mean CLO was relatively high up.

19  And so initially, for the first period of so

20  many months, the -- the exclusive focus was on

21  our position as a creditor -- a creditor having

22  a certain claim against a debtor.

23      Q.    Can you describe for me your

24  understanding of the nature of the claim

25  against the debtor.

Page 24

1          GRANT SCOTT - 1/21/2021

2     A.    It was various obligations that were

3   owed to -- to CLO, things that had been

4   previously donated or -- or agreements that had

5   been set up that transferred certain assets,

6   and it was basically the -- the -- the amounts

7   were derived from those sorts of transactions.

8     Q.    Okay.  You're a patent lawyer; is

9   that right?

10     A.    I -- I'm exclusively a patent

11   attorney, yes.

12     Q.    Have you been a patent lawyer on an

13   exclusive basis since the time you graduated

14   from law school?

15     A.    From law school, yes.

16     Q.    Can you just describe for me

17   generally your educational background.

18     A.    So I'm an electrical engineer by

19   training.  I graduated from the University of

20   Virginia in 1984.  I then went to graduate

21   school at the University of Illinois.  I

22   received my master's degree in 1986, and then I

23   immediately joined IBM Research at the Thomas

24   Watson Institute in New York where I was a --

25   my title was research scientist, but I was -- I

Page 25

1            GRANT SCOTT - 1/21/2021

2   guess I was more of a research engineer, if

3   that matters. And I did that until I

4   transitioned -- or I began law school in the

5   fall of 1988, and then I graduated law school

6   in May of 1991.

7       Q.    And where did you go to law school?

8       A.    University of North Carolina.

9       Q.    Do you have any formal training in

10   investing or finance?

11       A.    I do not.

12       Q.    Do you hold yourself out as an

13   expert in any field of investment?

14       A.    None -- none at all.

15       Q.    Have you had any formal training

16   with respect to compliance issues? You

17   mentioned compliance issues earlier.

18       A.    No.

19       Q.    Now, do you have any knowledge about

20   compliance rules or regulations?

21       A.    Minimal that I've -- that have

22   occurred organically but -- but generally, no.

23       Q.    You don't hold yourself out as an

24   expert in com- -- in the area of compliance,

25   correct?

Page 26

1              GRANT SCOTT - 1/21/2021

2    A.    No.  No.  I'm -- no.

3    Q.    Do you have any particular

4  investment philosophy or strategy?

5           MR. CLARK:  I'm going to object to

6      the form of the question.  And, John,

7      can -- can we get an agreement that -- I

8      know you were objecting just simply on the

9      form basis yesterday -- that objection to

10      form is sufficient today?

11          MR. MORRIS:  Sure.

12          MR. CLARK:  Okay.  And I object to

13      form.  Grant, you can answer to the extent

14      you can.

15          THE WITNESS:  I forget the question

16      now that you interrupted.  I'm sorry.

17  BY MR. MORRIS:

18    Q.    So -- so -- and I'm going to ask a

19  different question because in hindsight, that's

20  a good objection.

21          In your capacity as the director

22  of -- withdrawn.

23          Do the employees of Highland that

24  you identified earlier, do they make investment

25  decisions on behalf of CLO HoldCo Limited

Page 27

1          GRANT SCOTT - 1/21/2021

2    without your prior knowledge on occasion?

3          A.    On occasion, they do.

4          Q.    So there's no rule that your prior

5    approval is needed before investments are made,

6    right?

7          A.    I don't know whether they have an

8    internal guideline as to the amount that

9    triggers when they get in touch with me or

10   whether it's a new -- a change, something new,

11   or -- versus recurring.  So I don't -- I don't

12   know what they use internally for that metric.

13         Q.    Okay.  Are you aware of any

14   guideline that was ever used by the Highland

15   employees whereby they were required to obtain

16   your consent prior to effectuating transactions

17   on behalf of CLO HoldCo Limited?

18         A.    I understand there was one or more,

19   but I do not know that.

20         Q.    Okay.  Did you ever see such a

21   policy or list of rules that would require your

22   prior consent before the Highland employees

23   effectuated transactions on behalf of CLO

24   HoldCo Limited?

25         A.    Possibly some time ago, but I -- I

Appx. 06845

Page 28

1        GRANT SCOTT - 1/21/2021

2   don't recall.

3        Q.   Okay.  So -- withdrawn.  I'll --

4   I'll go on.

5             How did you come to be the director

6   of CLO HoldCo?

7        A.   I was asked either by Jim Dondero

8   or -- directly or indirectly by -- by Jim

9   Dondero.

10       Q.   And who is Jim Dondero?

11       A.   Well, at the time, he was the head

12  or one of the heads of Highland Capital

13  Management, a friend of mine.

14       Q.   How long have you known Mr. Dondero?

15       A.   Since high school so that -- 1976.

16       Q.   Where did you and Mr. Dondero grow

17  up?

18       A.   In northern New Jersey.

19       Q.   Do you consider him among the

20  closest friends you have?

21       A.   I think he is my closest friend.

22       Q.   Did you two go to college together?

23       A.   We actually -- for the last -- last

24  two years I was at UVA, University of Virginia,

25  excuse me, he and I were -- were at UVA.  So we

**Appx. 06846**

Page 29

1          GRANT SCOTT - 1/21/2021

2   did not start out at UVA initially, but -- but

3   we both transferred -- I transferred my

4   sophomore year.  I was actually a chemical

5   engineer at the University of Delaware when I

6   transferred in, and then he transferred in his

7   junior year.  So we were there at college for

8   two years.

9       Q.    And -- and based on your

10   relationship with him, is it your understanding

11   that one of the reasons he chose to transfer to

12   UVA is -- is to -- because you were there?

13       A.    Oh, no.  He transferred -- he --

14   he -- he transferred there because of the -- so

15   he went to the University of -- he -- he went

16   to Virginia Tech University, which is more

17   known as being an engineering school, which I

18   might have wanted to go to, and less a finance

19   business school.  And if I understand things

20   correctly, and I believe I do, he transferred

21   to UVA because of the well-known

22   business/finance program, accounting program.

23       Q.    And did you -- did you and

24   Mr. Dondero become roommates at UVA?

25       A.    We weren't roommates, but we lived

Appx. 06847

Page 30

1           GRANT SCOTT - 1/21/2021

2    in the -- we were housemates.  I'm sorry.  We

3    were housemates.

4        Q.    So you shared a house together.  How

5    would you describe your relationship with

6    Mr. Dondero today?

7        A.    It's -- it's been strained a while,

8    for some time, but -- but generally, very good.

9    Good to very good.

10        Q.    Without -- without getting personal

11    here, can you just generally identify the

12    source of the strain that you described.

13        A.    This -- I think it would be fair to

14    say that this bankruptcy, particularly events

15    in 2020 so some months after the bankruptcy was

16    declared, things have become -- we -- we still

17    have a close friendship, but -- but things

18    are -- are a bit -- are a bit more difficult.

19        Q.    Were you ever married?

20        A.    I've never been married.

21        Q.    Did you serve as Mr. Dondero's best

22    man at his wedding?

23        A.    I did.

24        Q.    Is it fair to say that -- that

25    Mr. Dondero trusts you?

Appx. 06848

Page 31

1          GRANT SCOTT - 1/21/2021

2          MR. CLARK:  Objection, form.

3    BY MR. MORRIS:

4     Q.    Withdrawn.

5          Do you believe that Mr. Dondero

6    trusts you?

7     A.    I do.

8     Q.    Over the years, is it fair to say

9    that Mr. Dondero has confided in you?

10          MR. CLARK:  Objection, form.

11   BY MR. MORRIS:

12    Q.    You can answer if you understand it.

13    A.    I think so.

14    Q.    I -- I -- what's your answer?  You

15   think so?

16    A.    Maybe you can de- -- I think of

17   confide as -- could you define confide, please.

18    Q.    Sure.  Is it -- is it fair to say

19   that over the -- let me -- you've known

20   Mr. Dondero for almost 45 years, right?

21    A.    Yes.

22    Q.    And you consider him to be your

23   closest friend in the world, right?

24    A.    Yes.

25    Q.    And is it fair to say over the

Page 32

1          GRANT SCOTT - 1/21/2021

2    course of those 45 years, Mr. Dondero has

3    shared confidential information with you that

4    he didn't want you to reveal publicly to other

5    people?

6       A.    Yes.

7       Q.    And is it your understanding that

8    because of the nature of your relationship with

9    him, he asked you to serve as the director of

10   CLO HoldCo Limited?

11      A.    Yes.  I believe it's because he --

12   he trusted -- trusted me with -- with assets

13   relating to his charitable vision.  I -- I --

14   yeah.  Yes.

15      Q.    And is it your understanding that he

16   thought you would help him execute his

17   charitable vision?

18      A.    That was the point of attraction

19   initially.  It wasn't for money.  I wasn't

20   being paid.  That was -- the charitable mission

21   was the attraction.

22      Q.    Does Mr. Dondero play any role in

23   the management of the CLO HoldCo Limited asset

24   pool?

25          MR. CLARK:  Objection, form.

Page 33

1           GRANT SCOTT - 1/21/2021

2     A.     I'm sorry.  Could you repeat that?

3   My -- my screen went small and then big again.

4   I was distracted.

5     Q.     What role does Mr. Dondero play with

6   respect to the management of the CLO HoldCo

7   Limited asset pool?

8           MR. CLARK:  Objection, form.

9     A.     He is with the company that manages

10   that asset pool.  He's one of the people I

11   named previously as managing those assets.

12     Q.     He is -- he -- he is the -- do you

13   understand that he has the final

14   decision-making power with respect to the

15   management of the assets that are held by CLO

16   HoldCo Limited?

17           MR. CLARK:  Objection, form.

18     A.     I believe I ansel -- answered that

19   previously.  I -- I don't know who has -- for

20   certainty I do not know who has that within

21   that company.  I don't.  If -- if -- I -- I

22   don't know, consistent with my prior answer.

23     Q.     Did you ever ask anybody who had the

24   final decision-making authority for investments

25   on behalf of CLO HoldCo Limited?

**Appx. 06851**

Page 34

1                GRANT SCOTT - 1/21/2021

2      A.    I -- I did not.

3      Q.    Did you ever make a decision on

4   behalf of -- withdrawn.

5           In your capacity as a director --

6   withdrawn.

7           In your capacity as the sole

8   director of CLO HoldCo Limited, can you think

9   of any decision that you've ever made that

10   Mr. Dondero disagreed with?

11      A.    Since -- prior to the bankruptcy,

12   no, not that I'm aware of.

13      Q.    And since the bankruptcy?

14      A.    There are decisions that I've made

15   that he's disagreed with.

16      Q.    Can you identify them?

17      A.    Yes.

18      Q.    Please do so.

19      A.    Okay.  So the reason I'm pausing is

20   I'm trying to put these in chronological order

21   and, at the same time, identify maybe some of

22   the more important ones versus the lesser

23   important ones.  One of the decisions I made

24   related to a request that I received from the

25   independent board of Highland.  I don't know

**Appx. 06852**

Page 35

                    GRANT SCOTT - 1/21/2021

1

2   how the request was transmitted to me, but I

3   believe the way it played out is as follows:  I

4   believe I was asked to call Jim Seery, and the

5   other -- and Russell Nelms, and the third

6   independent director, I believe his name is

7   John.  I -- I forget right now what his last

8   name is.  They were in New York, said they were

9   in a conference room.  I called in.  They were

10  very pleasant.  They identified who they were,

11  and they had a request, and the request was

12  that I agree to a transfer -- or that I -- that

13  I agree to allow certain assets that were not

14  Highland's assets but they were CLO's as- --

15  assets -- apparently, there was no dispute

16  about that at any point in time, but that I

17  agree to allow certain assets that were due CLO

18  to be transferred to the registry of the

19  bankruptcy court.  And either on that call I

20  immediately agreed or ended the call, called my

21  attorney, and then immediately agreed.  It was

22  a very -- I accommodated the request quickly.

23       Q.    Okay.  And can you just tell me at

24  what point in time you spoke with Mr. Dondero,

25  and what did he say that you recall?

Appx. 06853

Page 36

1          GRANT SCOTT - 1/21/2021

2     A.    I don't know when he became aware of

3   that decision.  I'm not sure I ever volunteered

4   that the decision was even made, but at some

5   point, it became an issue because he found out

6   through -- if I understand the sequence of

7   events correctly, he found out possibly through

8   his counsel because there was ultimately

9   litigation about that issue.  It became known

10  to everyone at some point what I had done, I --

11  I think.  And subsequent to that, it became an

12  issue because of CLO HoldCo having fairly

13  significant cash flow issues with respect to

14  its expenses and obligations, including payment

15  of management fees as well as some of the

16  scheduled charitable giving that was -- that

17  was by contract already predefined.  My

18  decision to tuck that money -- or to agree

19  to -- my agreement to let that money be tucked

20  away created some -- created some -- created

21  some problems --

22     Q.    And -- and --

23     A.    -- for CLO HoldCo.

24     Q.    Okay.  And I just want you to focus

25  specifically on my question, and that is, what

Appx. 06854

Page 37

1          GRANT SCOTT - 1/21/2021

2    did Mr. Dondero say to you that -- that causes

3    you to testify as you did, that this is one

4    issue that he didn't agree with?

5          A.    I believe his concern was that

6    because it was money that was undisputably to

7    flow to CLO HoldCo that -- which had many, many

8    other nonliquid assets -- this was a form of a

9    liquid asset.  It was cash in effect, proceeds.

10   -- that the money should have been allowed to

11   flow to be available for obligations.  He

12   didn't under- -- I -- I -- I don't know what he

13   was thinking, but the -- the issue was that the

14   decision to put it into escrow was -- was --

15   was in- -- incorrect, that there was no basis

16   for it.

17         Q.    That -- that's an issue where after

18   learning of your decision, he didn't agree with

19   it; is that fair?

20         A.    That's right.

21         Q.    Okay.  Can you think of any decision

22   that you've ever made on behalf of CLO HoldCo

23   Limited where Mr. Dondero had advance knowledge

24   of what you were going to do and he objected to

25   it, but you nevertheless overruled his

Page 38

1          GRANT SCOTT - 1/21/2021

2    objection and went ahead and did what -- did

3    what you thought was right?

4        A.    Okay.  Let me -- let me -- I have --

5    I'm sorry.

6        Q.    We're here.

7        A.    Oh, I'm sorry.  I'm having some

8    issues with my screen.  So that may have

9    occurred with respect to the original proof of

10   claim.  Then there was a subsequent amendment

11   to the proof of claim, and I -- I believe it --

12   I believe that he might have been aware of both

13   of those and was in disagreement with -- with

14   those.  But after working with my attorney, we

15   just -- you know, we did what we thought was

16   right, and I still think what we did was right.

17   There was an issue with respect to Har- --

18   HarbourVest that occurred relatively recently

19   where he objected to a decision that I had

20   made.  As I understand it, I could have

21   contacted my attorney and changed the decision,

22   but I didn't, and I still think that was the

23   right decision.

24          We have filed plan objections.  I

25   can't say if he has any -- in that regard, I --

Appx. 06856

Page 39

1          GRANT SCOTT - 1/21/2021

2    I -- I don't know what his thoughts are on

3    objections.  They would not have been

4    communicated with -- by me to him, but my

5    attorney might have consulted with his

6    attorney, and there -- they may know what that

7    difference is, but I -- that was just another

8    big decision.  I -- I -- maybe that --

9        Q.    All right.  Let me see if I can --

10   let me see if I can summarize this.  So two

11   proofs of claim.  Is it fair to say that

12   Mr. Dondero saw those proofs of claim before

13   they were filed?

14            MR. CLARK:  Objection, form.

15   BY MR. MORRIS:

16       Q.    Withdrawn.

17       A.    It --

18       Q.    Do -- do you know whether

19   Mr. Dondero saw the proofs of claim before they

20   were filed?

21       A.    I don't believe he did.

22       Q.    What -- what steps in filing the

23   proofs of claim did he object to that you

24   overruled?  Did he think there was -- something

25   should be different about them?

**Appx. 06857**

Page 40

1          GRANT SCOTT - 1/21/2021

2     A.    So we had to interface with Highland

3    employees at some point to get information to

4    support our proof of claim, and my guess, and

5    it's just a guess, is that he was aware of

6    those inquiries.  I -- I'm sorry.  I shouldn't

7    speculate.  I don't know.  But he -- with

8    respect to the original proof of claim, I'm --

9    I'm not aware of what specifically he was

10   objecting to or was -- thought should have been

11   different, but the -- with respect to the

12   amended proof of claim, which reduced the

13   original proof of claim to zero, I think that's

14   where he had a -- an issue.

15     Q.    And did you speak with him about

16   that topic prior to the time the amended claim

17   was filed, or did you only speak with him after

18   it was filed?

19     A.    I'm not sure the timing of that.

20     Q.    And with respect to HarbourVest, did

21   he ask you to object to the settlement on

22   behalf of CLO HoldCo Limited, and is that

23   something that you declined to do?

24          MR. CLARK:  Objection, form.

25     A.    I'm -- I'm sorry.  I was confused

Appx. 06858

Page 41

1          GRANT SCOTT - 1/21/2021

2    with the word.  Could you please repeat that?

3          Q.    Yes.  You mentioned HarbourVest

4    before, right?

5          A.    Yes.

6          Q.    And you mentioned that there was an

7    issue with Mr. Dondero and you concerning

8    HarbourVest; is that right?

9          A.    Yes.

10          Q.    And did that have to do with whether

11   or not CLO HoldCo Limited would -- would object

12   to the debtor's motion to get the HarbourVest

13   settlement approved?

14          A.    Would -- would get the

15   HarbourVest --

16          Q.    Settlement approved by the court.

17          A.    I'm not trying to be difficult.

18   I'm -- I'm -- could you just repeat that one

19   more time?  I'm --

20          Q.    What was -- what was --

21          A.    There was --

22          Q.    Let me try again.

23          A.    Okay.

24          Q.    What was the issue with respect to

25   HarbourVest that he objected to and -- and you

Page 42

1          GRANT SCOTT - 1/21/2021

2  overrode his objection and did what you thought

3  was right anyway?

4      A.    Okay.  Okay.  That's -- that's

5  easier for me to understand.  I'm sorry.  So I

6  had worked with my attorney or he did the work

7  and consulted with -- we consulted, but we had

8  filed an objection, motion objecting to the

9  settlement, if I understand the terminology and

10  nomenclature correctly.  Okay.  He had -- we

11  had come to an agreement that we had a very

12  valid argument.  That argument was evidenced

13  by, I guess it was, our motion that was

14  submitted to the court.  On the day of the

15  hearing to resolve this issue, we pulled our

16  request, and that was because I believed it did

17  not have a good-faith basis in law to move

18  forward on.

19      Q.    And did you discuss that issue with

20  Mr. Dondero before informing the court that CLO

21  HoldCo Limited was withdrawing its objection,

22  or did he learn about that for the first time

23  during the hearing --

24          MR. CLARK:  Objection, form.

25  BY MR. MORRIS:

Page 43

1        GRANT SCOTT - 1/21/2021

2     Q.    -- if you know?

3     A.    I -- I understand that he learned it

4   during the hearing.  I don't know the -- I -- I

5   don't know the -- whether there was any -- I --

6   I don't know for certain on the second half of

7   your question.

8     Q.    Let me -- let me try it -- let me

9   try it this way:  Did you speak with

10   Mr. Dondero about your decision to withdraw the

11   objection to the HarbourVest settlement prior

12   to the time your counsel made the announcement

13   in court?

14     A.    I don't -- I don't believe so.  No.

15   No.  No.  I'm sorry.  No.

16     Q.    And did --

17     A.    Okay.  No.  Here -- here's where

18   I'm -- I can clarify, okay?  I'm sorry.  I can

19   clarify.

20     Q.    That's all right.

21     A.    I gave the decision to my

22   attorney -- I -- I agreed with the

23   recommendation of my attorney, okay?  It wasn't

24   my --

25     Q.    Did you have a good --

Page 44

1           GRANT SCOTT - 1/21/2021

2    A.    -- thought, okay?

3          THE REPORTER:  I didn't --

4    A.    Okay.  So he --

5    Q.    It was a recommendation.

6    A.    Yeah.  So he -- he called me with a

7    recommendation.  It was highly urgent.  You

8    know, I was coming out of the men's room, had

9    my phone with me.  I got the call.

10          MR. CLARK:  Hey, Grant, I -- Grant,

11          I just want to caution you not to -- to --

12          and I don't think counsel is looking for

13          this but not to disclose the -- the

14          substance of any of your communications

15          with counsel, okay?

16          THE WITNESS:  Thank you.

17    A.    So --

18          THE WITNESS:  Thank you.  I'm -- I'm

19    sorry.

20    BY MR. MORRIS:

21    Q.    It's -- it's really a very simple

22    question.  Do you recall --

23    A.    He made a recommendation.  I -- I --

24    I think I can answer your question without

25    going off tangent.  I'm sorry.  So he -- my

Page 45

1           GRANT SCOTT - 1/21/2021

2    attorney made a recommendation.  I agreed with

3    it.  We with- -- I -- I told him to withdraw --

4    or I authorized him to withdraw.

5        Q.    Okay.

6        A.    Then I received a communication, and

7    I -- I guess the most likely scenario is the

8    motion had been withdrawn by the time Jim

9    Dondero found out.

10       Q.    And -- and did he write to you, or

11   did he call you?  Did he send you a text?

12       A.    He called me.

13       Q.    What did he say?

14       A.    He was asking why, and I explained,

15   and I said I agreed with the decision and I was

16   sticking with the decision.

17       Q.    Let's just -- let's just move on to

18   a new topic, and let's talk about the structure

19   of -- of CLO HoldCo.  Are you generally

20   familiar with the ownership structure of CLO

21   HoldCo?

22       A.    Yeah.  I mean, in terms --

23       Q.    Are -- are you -- are you generally

24   familiar with it?  It's not a test.  I'm just

25   asking do you have a general familiarity --

Appx. 06863

Page 46

1      GRANT SCOTT - 1/21/2021

2    A.    With CLO HoldCo or the entities

3    associated with CLO HoldCo?

4    Q.    The latter.

5    A.    Yes, I believe so.

6    Q.    All right.  I've prepared what's

7    called a demonstrative exhibit.  It's just --

8    A.    Yes.

9    Q.    -- just -- it's a document that, I

10   think, reflects facts, but I want to ask you

11   about it.

12        MR. MORRIS:  La Asia, can we please

13        put up Exhibit 1.

14        (SCOTT EXHIBIT 1, Organizational

15        Structure:  CLO HoldCo, Ltd., was marked

16        for identification.)

17   BY MR. MORRIS:

18   Q.    Okay.  Can you see that, Mr. Scott?

19   A.    Yes, I can.

20   Q.    Okay.  So I think I took the

21   information from resolutions that were attached

22   to the CLO HoldCo proof of claim, and that's

23   why you got that little footnote there at the

24   bottom of the page.  But let's start in the

25   lower right-hand corner and see if this chart

Page 47

1          GRANT SCOTT - 1/21/2021

2   comports with your understanding of the facts.

3          Do you know that CLO HoldCo Limited

4   was formed in the Cayman Islands?

5      A.   Yes.

6      Q.   And to the best of your knowledge,

7   is CLO HoldCo Limited 100 percent owned by the

8   Charitable DAF Fund, L.P.?  If you're not sure,

9   just say you're not sure if you don't know.

10  It's not a test.

11     A.   So the -- the -- the familiarity

12  I -- I'm -- I'm familiar with the different --

13  I'm confused with the arrangement of the boxes

14  and the ownership interest versus managerial

15  interest.  I believe that's -- that's right.

16     Q.   Okay.  And -- and you're the sole

17  director of CLO HoldCo Limited, right?

18     A.   Yes.

19     Q.   And this whole structure was -- the

20  idea for this structure, to the best of your

21  knowledge, was to implement Mr. Dondero's plan

22  for charitable giving; is that fair?

23     A.   Yes.  Ultimately, yes.

24     Q.   And is it fair to say then that

25  he -- he made the decision to establish this

Page 48

1           GRANT SCOTT - 1/21/2021

2    particular structure, to the best of your

3    knowledge?

4        A.    I -- I didn't -- I'm sorry.  I

5    didn't hear you very well.

6        Q.    To the best of your knowledge, did

7    Mr. Dondero make the decisions to establish the

8    structure that's reflected on this page?

9        A.    Oh, I don't know if he made the

10   decision to establish this structure, although

11   it's -- it's -- I'm sorry.  Strike that.  I --

12   if -- if what you're saying is did he approve

13   of this structure, to my knowledge, yes.

14       Q.    Okay.  Do you hold any position with

15   respect to Charitable DAF Fund, L.P.?

16       A.    I -- I -- your chart says no.  I --

17   I -- I thought I had a role there, too.

18       Q.    I don't know.  I don't have

19   information on that.  That's why I'm asking the

20   question.

21       A.    I -- I -- I believe -- yes, I

22   believe I have the same role as I do in -- in

23   CLO HoldCo.

24       Q.    And that would be director?

25       A.    Yes.

Appx. 06866

Page 49

1        GRANT SCOTT - 1/21/2021

2     Q.    And to the best of your knowledge,

3   is the Charitable DAF GP, LLC, the general

4   partner of Charitable DAF Fund, L.P.?

5     A.    Yes.

6     Q.    And is it your understanding that

7   you are the managing member of Charitable DAF

8   GP, LLC?

9     A.    Yes.

10     Q.    Does Charitable DAF GP, LLC, have

11   any employees?

12     A.    No.

13     Q.    Does Charitable DAF GP, LLC, have

14   any officers or directors?

15     A.    No.

16     Q.    Are you the only person affiliated

17   with Charitable DAF GP, LLC, to the best of

18   your --

19     A.    I believe so.

20     Q.    Do you receive any compensation for

21   serving as the managing member of Charitable

22   DAF GP, LLC?

23     A.    No.  The -- I don't interact with it

24   very often.  It's -- no, I don't receive any

25   compensation.

Page 50

1    GRANT SCOTT - 1/21/2021

2    Q.    Can you tell me in your capacity as

3    the managing member of Charitable DAF GP, LLC,

4    what's the nature of that entity's business?

5    A.    It -- it doesn't perform any

6    day-to-day operations.  My understanding is --

7    is that it's -- it's there for purposes of

8    compliance.  I can't recall the last time I had

9    any activity with respect to that.

10       Q.    How about the Charitable DAF Fund,

11   L.P.?  I apologize if I've asked you these

12   questions.

13       A.    It -- it's the same.  I -- I -- my

14   activity is almost exclusively CLO HoldCo.

15       Q.    All right.  Let me just ask the

16   questions nevertheless.  Does Charitable DAF

17   Fund, L.P., have any employees?

18       A.    Employees?  No.

19       Q.    Does it have any officers and

20   directors?

21       A.    No.

22       Q.    Are you the sole director of

23   Charitable DAF Fund, L.P.?

24       A.    Yes, I believe so.

25       Q.    So if we -- if we put under

Appx. 06868

Page 51

1          GRANT SCOTT - 1/21/2021

2    Charitable DAF Fund, L.P., Grant Scott,

3    director, and we put under CLO HoldCo Limited

4    Grant Scott, director, would everything on the

5    right side of that page be accurate, to the

6    best of your --

7          A.    I believe so.

8          Q.    Well, let's move to the left side of

9    the page.  Have you heard of the entity

10   Charitable DAF HoldCo Limited?

11         A.    Yes.

12         Q.    Are you the sole director of

13   Charitable DAF HoldCo Limited?

14         A.    Yes.

15         Q.    How did you become -- how did you

16   come to be the char- -- the sole director of

17   Charitable DAF HoldCo Limited?

18         A.    That was when it was established.

19         Q.    And did Mr. Dondero ask you to serve

20   in that capacity?

21         A.    Yes.

22         Q.    And did Mr. Dondero ask you to serve

23   as the managing member of Charitable DA- -- DAF

24   GP, LLC?

25         A.    Yes.

**Appx. 06869**

Page 52

1       GRANT SCOTT - 1/21/2021

2    Q.    And did Mr. Dondero ask you to serve

3   as the director of Charitable DAF, L.P. --

4   withdrawn.

5       Did Mr. Dondero ask you to serve as

6   director of Charitable DAF Fund, L.P.?

7    A.    Yes.

8    Q.    To the best of your knowledge, does

9   Charitable DAF HoldCo Limited own 99 percent of

10   the limited partnership interests in Charitable

11   DAF Fund, L.P.?

12    A.    Yes.  The -- the feed -- the -- the

13   feeds -- the -- the three horizontal blocks

14   there that identify Highland Dallas Foundation,

15   Kansas City, Santa Barbara -- there's a fourth

16   of -- relatively de minimus in terms of

17   participation.  There's a fourth entity that's

18   missing.  It's Dallas -- I forget the name.

19   That -- that -- that structure is -- is a bit

20   dated --

21    Q.    Okay.

22    A.    -- as it -- as is shown.

23    Q.    Okay.  So I will tell you and we can

24   look the documents if you want, but attached to

25   CLO HoldCo Limited's claim are a number of

Page 53

1          GRANT SCOTT - 1/21/2021

2     resolutions, and there's one that I have in

3     mind that shows Charitable DAF HoldCo Limited

4     holding 99 percent of the limited partnership

5     interests of Charitable DAF Fund, L.P., and

6     there's another that shows it being a hundred

7     percent.  Do you -- do you know which is

8     accurate at least at this time?

9          A.    There's a 1 percent/99 percent

10    division, and I am -- I believe it's the 99

11    percent, but I'm -- I'm getting confused by

12    the -- by the arrangement.  I'm so used to

13    another arrangement.  I -- I believe the 99

14    percent is correct.

15         Q.    Okay.  Do you have any understanding

16    as to who owns the other 1 percent of the

17    limited partnership interests of Charitable DAF

18    Fund, L.P.?

19         A.    No.  This -- this is confusing to

20    me.  No.

21         Q.    Okay.  There are, at least on this

22    page, three foundations that I think you've

23    identified.  Are those three foundations

24    together with the fourth that you mentioned the

25    owners of the Charitable DAF HoldCo Limited?

Page 54

1        GRANT SCOTT - 1/21/2021

2    A.    Owners?

3    Q.    Yes.

4        MR. CLARK:  Objection, form.

5    A.    They -- they only participate in the

6    money that flows up to them.

7    Q.    And what does that mean exactly?

8    A.    What's that?

9    Q.    What does that -- what do you mean

10   by that?  Do the foundations fund Charitable

11   DAF Fund HoldCo Limited?

12     A.    Initially.  Initially, as I

13   understand it, the money flows downward into

14   the Charitable DAF HoldCo Limited before it

15   ultimately makes its way to CLO HoldCo, and

16   then each of those three entities, the various

17   foundations, obtain participation interest in

18   the money that flows back to them.

19     Q.    And -- and is that par- -- are those

20   participation interests in Charitable -- you

21   know what, let -- let me just pull up one

22   document and see if that helps.

23        MR. MORRIS:  Can we put up -- I

24     think it's Exhibit Number 5.

25        (SCOTT EXHIBIT 2, Unanimous Written

Page 55

1        GRANT SCOTT - 1/21/2021

2    Consent of Directors In Lieu of Meeting,

3    was marked for identification.)

4        MR. MORRIS:  I apologize.  Let's go

5    to --

6        MS. CANTY:  I'm sorry, John.  I

7    can't hear you.  Was that not the exhibit?

8        MR. MORRIS:  4.

9        MS. CANTY:  Okay.

10       THE REPORTER:  And Mr. Morris, you

11    are -- Mr. Morris, you are breaking up just

12    a little bit at the end of your questions.

13  BY MR. MORRIS:

14    Q.   Okay.  Do you see the document on

15  the screen, sir?

16    A.   Yes, I do.

17    Q.   Okay.  And so this is a unanimous

18  written consent of the directors of the

19  Highland Dallas Foundation.  That's one of the

20  entities that was on the chart.

21       MR. MORRIS:  Can we scroll down to

22    the -- the bottom of the document where the

23    signature lines are.  Right there.

24  BY MR. MORRIS:

25    Q.   Are you a director of the Highland

Page 56

1          GRANT SCOTT - 1/21/2021

2    Dallas Foundation?

3       A.    Yes, selected by them.

4       Q.    Selected by whom?

5       A.    By that foundation.

6       Q.    Are you -- are you a director of all

7    of the four foundations that feed into the

8    Charitable DAF HoldCo Limited entities that --

9       A.    No.

10       Q.    Which of the four foundations are

11    you a director of?

12       A.    This and the Santa Barbara -- I'm

13    sorry, Santa Barbara and Kansas City.

14       Q.    So is -- there's one that you're not

15    a director of; is that right?

16       A.    Yes.

17       Q.    And which one is that?

18       A.    The -- could you go back to the --

19       Q.    Yeah.

20          MR. MORRIS:  Go back to the

21    demonstrative.

22       A.    It's the Highland Dallas Foundation

23    and Santa Barbara Foundation.

24       Q.    Those are the two that you're a

25    director of?

Page 57

1        GRANT SCOTT - 1/21/2021

2    A.   Yes.

3    Q.   To the best of your knowledge, does

4  Mr. Dondero serve as the president for each of

5  the foundations that we're talking about?

6    A.   Yes.

7    Q.   To the best of your knowledge, is

8  Mr. Dondero a director of each of the

9  foundations that we're talking about?

10    A.   Say that again.  I'm sorry.

11    Q.   Is he also a director of each of the

12  foundations?

13    A.   Yes.

14    Q.   Do you know whether any of the

15  foundations has any employees?

16    A.   I believe they do, but I -- I -- I

17  can't say for certain.

18    Q.   Does -- withdrawn.

19       Do you know if there are any

20  officers of any of the four foundations other

21  than Mr. Dondero's service as president?

22    A.   I'm sorry.  Say that one more time,

23  please.

24    Q.   Yes.  Do you know whether any of the

25  four foundations has any officers other than

Appx. 06875

1          GRANT SCOTT - 1/21/2021

2    Mr. Dondero's service as president?

3    A.    No.

4    Q.    You don't know, or they do not?

5    A.    I -- I don't believe anyone else

6    has.  I -- actually, I should say I don't -- I

7    don't recall.  I -- I don't know.  I don't -- I

8    don't know.

9    Q.    As a director of the Dallas and

10   Santa Barbara foundations, are you aware of any

11   officers serving for either of those

12   foundations other than Mr. Dondero?

13   A.    No.

14   Q.    Do you know who the beneficial owner

15   of the Charitable DAF HoldCo Limited entity is?

16   A.    The beneficial owner?

17   Q.    Correct.

18   A.    The various -- various trusts that

19   were used to -- that were the vehicles by which

20   the money originally was established within --

21   within -- within CLO HoldCo.

22   Q.    Would that be -- would one of them

23   be the Get Good Nonexempt Trust?

24   A.    Yes.

25   Q.    And you're a trustee of the Get Good

Page 59

1              GRANT SCOTT - 1/21/2021

2    Nonexempt Trust, right?

3      A.    Yes.

4      Q.    When did you become a trustee of the

5    Get Good Nonexempt Trust?

6      A.    Many years ago.  I -- I don't

7    remember.

8      Q.    Are there any other trustees of the

9    Get Good Nonexempt Trust?

10     A.    No.

11     Q.    Does the Get Good Nonexempt Trust

12   have any officers, directors, or employees?

13     A.    No.

14          MR. CLARK:  Objection, form.  Sorry.

15   BY MR. MORRIS:

16     Q.    Withdrawn.

17          Do you know whether the Get Good

18   Nonexempt Trust has any officers, directors, or

19   employees?

20     A.    It does not.

21     Q.    And I apologize if I asked this, but

22   are you the only trustee of the Get Good

23   Nonexempt Trust?

24     A.    Yes.

25     Q.    Is the Dugaboy Investment Trust also

Appx. 06877

Page 60

1          GRANT SCOTT - 1/21/2021

2     one of the trusts that has an interest in

3     Charitable DAF HoldCo Limited?

4          A.    Yes.

5          Q.    Are you a trustee of the Dugaboy

6     Investment Trust?

7          A.    I am not.

8          Q.    Do you know who is?

9          A.    I believe it's his sister.

10         Q.    And is that -- you're referring to

11     Mr. Dondero's sister?

12         A.    I'm sorry.  Yes.

13         Q.    And what's the basis for your

14     understanding that Mr. Dondero's siv- -- sister

15     serves as the trustee of the Dugaboy Investment

16     Trust?

17         A.    Many years ago there was a -- there

18     was a clerical error that identified me as the

19     trustee of the Dugaboy.  That error was present

20     for approximately two weeks or a week and a

21     half before it was detected and corrected, and

22     so I know from that correction that it's Nancy

23     Dondero.

24         Q.    Are there any other trusts that have

25     an interest in Charitable DAF HoldCo Limited

Appx. 06878

Page 61

1          GRANT SCOTT - 1/21/2021

2     besides those trusts, to the best of your

3     knowledge?

4     A.    No.

5     Q.    Is it your understanding based on

6     what we've just talked about that the Get Good

7     Nonexempt Trust and the Dugaboy Investment

8     Trust are the indirect beneficiaries of CLO

9     HoldCo Limited?

10    A.    Yes.

11    Q.    Can you tell me who the

12    beneficiaries are of the Get Good trust?

13    A.    I mean, Jim Dondero.

14    Q.    And -- and what is that -- is that

15    based on the trust agreement -- your knowledge

16    of the trust agreement?

17    A.    Yes.

18    Q.    Do you have an understanding of who

19    the beneficiary is of the Dugaboy Investment

20    Trust?

21    A.    I don't know anything about that

22    trust.

23        MR. MORRIS:  Okay.  All right.

24    Let's take a short break and reconvene at

25    3:30 Eastern Time.  We've been going for a

**Appx. 06879**

Page 62

1          GRANT SCOTT - 1/21/2021

2      while.

3          MR. CLARK:  Thank you.

4          MR. MORRIS:  Okay.  Thank you.

5          (Whereupon, there was a recess in

6      the proceedings from 3:20 p.m. to

7      3:31 p.m.)

8    BY MR. MORRIS:

9      Q.    Mr. Scott, earlier I think you

10   testified that you interfaced with the folks at

11   Highland in connection with your duties as the

12   director of CLO HoldCo Limited, right?

13     A.    Yes.

14     Q.    Are you aware of any written

15   agreement between Highland Capital Management

16   and CLO HoldCo Limited?

17     A.    Yes, the various servicer

18   agreements.

19     Q.    Okay.  Are you aware that

20   Mr. Dondero resigned from his position at

21   Highland Capital Management sometime in

22   October?

23     A.    No.

24     Q.    Have you communicated with anybody

25   at Highland Capital Management about the

Page 63

1        GRANT SCOTT - 1/21/2021

2    affairs of CLO HoldCo Limited at any time since

3    October?

4        A.    Yes.

5        Q.    Anybody other than Jim Seery?

6        A.    Yes.

7        Q.    Okay.  Let's start with Mr. Seery.

8    You've spoken with him before, right?

9        A.    Yes.

10       Q.    Do you have his phone number?

11       A.    Yes.

12       Q.    How many times have you spoken with

13   Mr. Seery, to the best of your recollection,

14   just generally?  It's not a test.

15       A.    Three, maybe four times.

16       Q.    Okay.  Can you identify by name

17   anybody else at Highland that you've spoken

18   with since -- in the last two or three months?

19       A.    I spoke to Jim Dondero.  I've spoken

20   with Mike Throckmorton.  The usual suspects, so

21   to speak.  Mark Patrick, Mel- -- Melissa

22   Schroth.

23       Q.    Can you recall anybody else?

24       A.    No.  No.  Sorry.

25       Q.    Did you -- did you -- withdrawn.

Appx. 06881

Page 64

1          GRANT SCOTT - 1/21/2021

2          Do you recall the subject matter of

3   your discussions with Mr. Throckmorton?

4          MR. CLARK:  Objection, form.

5   BY MR. MORRIS:

6     Q.    Withdrawn.

7          Do you recall your -- the subject

8   matter of your communications with

9   Mr. Throckmorton?

10         MR. CLARK:  Objection, form.

11  BY MR. MORRIS:

12    Q.    You can answer.

13    A.    I -- I regularly interface with

14  Mr. Throckmorton regarding approvals of

15  expenses, and he's my sort of -- he's my point

16  person for approving wire transfers and things

17  of that nature.

18    Q.    How about Mr. Patrick, what -- what

19  area of responsibility does he have with

20  respect to CLO HoldCo Limited?

21    A.    He -- he doesn't, to my knowledge.

22    Q.    Do you recall the nature of the

23  substance of any communications that you've had

24  with Mr. Patrick since -- you know, the last

25  two or three months?

Page 65

1           GRANT SCOTT - 1/21/2021

2    A.    Yes.  Or -- yes.

3    Q.    And what -- what are the nature of

4    those conversations or the substance?

5    A.    He was -- he was one of the

6    individuals that helped to establish the

7    hierarchy for the -- what I keep referring to

8    as the charitable foundation.

9    Q.    And -- and do you recall why you

10   spoke to him in the last -- or -- withdrawn.

11         Do you recall the nature of your

12   communications in the last two or three months

13   with Mr. Patrick?

14   A.    I --

15         MR. CLARK:  And hold on, Grant.  I'm

16   going to caution -- my understanding -- I

17   believe Mr. Patrick's an attorney, and so

18   I'm going to caution you that you shouldn't

19   disclose the substance of -- of those

20   communications based on the attorney-client

21   privilege.

22         MR. MORRIS:  Well, I'm -- I -- I am

23   the lawyer for the company so -- I guess

24   there are other people on the phone and I

25   appreciate that, but let's see if we can --

Appx. 06883

Page 66

1         GRANT SCOTT - 1/21/2021

2     I don't mean to be contentious here, so it

3     wouldn't -- I -- I'd be part of the

4     privilege anyway.

5   BY MR. MORRIS:

6     Q.    But in any event, can you tell me

7   generally -- I'm just looking for general

8   subject matter of your conversations with

9   Mr. Patrick.

10     A.    I asked him how I would go about

11   re- -- resigning my position.

12     Q.    And when did that conversation take

13   place?

14     A.    Within the last two weeks.

15     Q.    Have you made a decision to resign?

16     A.    No.

17     Q.    I think you mentioned Melissa

18   Schroth.  Do I have that right?

19     A.    Yes.

20     Q.    Can you describe generally the

21   communications you had with Ms. Schroth in the

22   last few months.

23     A.    They -- she has e-mailed me certain

24   documents that I needed to sign.  I had a

25   conversation with her about -- about some

Appx. 06884

Page 67

GRANT SCOTT - 1/21/2021

1

2 home -- home improvements, home construction

3 with respect to Jim Dondero's home in Colorado,

4 and that's -- I -- I think that's -- that's it.

5      Q.    Okay.  Do you recall communicating

6 with anybody at Highland in the last three

7 months other than Mr. Dondero,

8 Mr. Throckmorton, Mr. Patrick, and Ms. Schroth?

9      A.    I -- I spoke with Jim Seery this

10 week.

11      Q.    Anybody else?

12      A.    I don't -- I don't know.

13      Q.    Okay.

14      A.    I don't think so.

15      Q.    In your communications with

16 Mr. Seery, did you two ever discuss his reasons

17 for making any trade on behalf of any CLO?

18      A.    No.

19      Q.    In your discussions with Mr. Seery,

20 did you ever tell him that you believed that

21 Highland Capital Management had breached any

22 agreement in relation to any CLO?

23      A.    Have I had that discussion with Jim

24 Seery?

25      Q.    Yes.

Appx. 06885

Page 68

1          GRANT SCOTT - 1/21/2021

2     A.    No.

3     Q.    In your discussions with Mr. Seery,

4  did you ever tell him that you thought Highland

5  Capital Management was in default under any

6  agreement in relation to the CLOs?

7     A.    No.

8     Q.    I want to focus in particular on the

9  shared services agreement.  In -- in your

10  discussions with Mr. Seery, did you ever tell

11  him that you believed that Highland Capital

12  Management was in default or in breach of its

13  shared services agreement with CLO HoldCo

14  Limited?

15     A.    No.

16     Q.    In your communications with

17  Mr. Seery, did you ever indicate any concern on

18  the part of CLO HoldCo Limited with respect to

19  Highland Capital's Man- -- Highland Capital

20  Management's performance under the shared

21  services agreement?

22     A.    No.

23     Q.    As you sit here today, do you have

24  any reason to believe that Highland Capital

25  Management has done anything wrong in

Appx. 06886

Page 69

1          GRANT SCOTT - 1/21/2021

2   connection with its performance as the

3   portfolio manager of the CLOs in which CLO

4   HoldCo Limited has invested?

5          MR. CLARK:  Object to form.

6      A.    In terms of the -- are you saying --

7   please say that again.  I'm sorry.

8      Q.    That's okay.  I ask long questions

9   sometimes so forgive me, but I'm trying to

10   get -- I'm trying to be precise so that's why

11   it's difficult sometimes.  But let me try

12   again.

13          Does CLO HoldCo Limited contend that

14   Highland Capital Management has done anything

15   wrong in the performance of its duties as

16   portfolio manager of the CLOs in which CLO

17   HoldCo has invested?

18          MR. CLARK:  Objection, form.

19      A.    Yes.  It's -- it's outlined in our

20   objections to -- to the plan.

21      Q.    Okay.  Any -- are you aware of

22   anything that's not contained within CLO Holdco

23   Limited's objection to the plan?

24          MR. CLARK:  Objection, form.

25      A.    I don't know if this is responsive

Page 70

                    GRANT SCOTT - 1/21/2021

1

2    to your quest -- request, but two -- two

3    issues, I believe, also pose an in- -- a

4    problem for CLO HoldCo.  One is we are paying

5    for services.  I think I referred to the

6    services as being soup to nuts, but we are not

7    getting the full services.  We haven't been for

8    some time.  So we're likely overpaying.  There

9    was a Highland Select Equity issue, 11-month

10   payment that was delayed which I was unaware of

11   was due.  Normally, I would have interfaced

12   with someone at Highland about that, but my

13   attorney -- but my -- my attorney had to make a

14   request for payment, and that payment was

15   ultimately made.  I -- other than that, I -- I

16   don't -- I don't know.  I don't believe so.

17        Q.    I want to distinguish between the

18   shared services agreement between Highland

19   Capital Management and CLO HoldCo Limited on

20   the one hand and on the other hand the

21   management agreements pursuant to which

22   Highland Capital Management manages certain

23   CLOs that CLO HoldCo invests in.

24            You understand the distinction that

25   I'm making?

Page 71

1            GRANT SCOTT - 1/21/2021

2      A.    Now I do.  I'm sorry.  I didn't

3  appreciate that.

4      Q.    Okay.  So let's just take each of

5  those pieces one at a time.  You mentioned your

6  concern about services.  That's a concern that

7  arises under the shared services agreement,

8  right?

9      A.    Yes.

10     Q.    And you mentioned something about a

11  delayed payment having to do with Highland

12  Select.  Do I have that generally right?

13     A.    Correct.

14     Q.    And is that a concern that you have

15  that arises under the shared services

16  agreement?

17     A.    It's not the agreement with respect

18  to the CLOs as I understand it.

19     Q.    Okay.  So then let's turn to that

20  second bucket.  You were aware -- you are

21  aware, are you not, that Highland Capital

22  Management has certain agreements with CLOs

23  pursuant to which it manages the assets that

24  are owned by the CLOs?

25     A.    I'm so sorry.  Could you please --

Appx. 06889

Page 72

1          GRANT SCOTT - 1/21/2021

2     Q.    I'll try again.

3     A.    I'm just -- I'm sorry.  I was

4   distracted and -- and I -- I'm sorry for asking

5   you to repeat it again.  Please --

6     Q.    Okay.

7     A.    Please re- --

8     Q.    Are you aware that CLO HoldCo

9   Limited has made investments in certain CLOs?

10    A.    Oh, yes, certainly.

11    Q.    And are you aware that those CLOs

12   are managed by Highland Capital Management?

13    A.    Yes.  As the -- as the servicer,

14   yes.

15    Q.    Okay.  Have you ever seen any of the

16   agreements pursuant to which Highland Capital

17   Management acts as a servicer?

18    A.    I've seen a few, yes.

19    Q.    Does CLO HoldCo Limited contend that

20   it is a party to any agreement between Highland

21   Capital Management and the CLOs?

22         MR. CLARK:  Object to form.  And I

23       just want to note for the record that

24       Mr. Scott is here testifying in his

25       individual capacity, I believe, not as a

Appx. 06890

Page 73

1          GRANT SCOTT - 1/21/2021

2     corporate representative.

3          MR. MORRIS:  Fair enough.  But he is

4     the only representative so...

5          MR. CLARK:  Fair enough.  I just

6     want that made -- stated for the record,

7     but I also object as to form.

8          MR. MORRIS:  Got it.

9     A.    It's a third-party beneficiary under

10    the agreements.

11    Q.    And is that because of something you

12    read in the document, or is that just your

13    belief and understanding?

14    A.    My belief and understanding.

15    Q.    And is that belief and understanding

16    based on anything other than conversations with

17    counsel?

18    A.    In -- in -- recently it has, but I

19    don't recall from previous interactions over

20    the years how we discussed that or how I came

21    to -- to understand that.

22    Q.    Does HCLO [sic] HoldCo -- did -- in

23    your capacity as the sole director of HCLO

24    HoldCo Limited, are you aware of anything that

25    Highland Capital Management has done wrong in

Appx. 06891

Page 74

1          GRANT SCOTT - 1/21/2021

2     connection with the services provided under the

3     CLO management agreements?

4          MR. CLARK:  Objection, form.

5     A.   I -- I don't -- I don't -- I

6     don't -- your answer's no.

7          Q.   In your capacity as the director of

8     CLO HoldCo Limited, are you aware of any

9     default or breach under the CLO management

10    agreements that -- that Highland Capital

11    Management has caused?

12         MR. CLARK:  Objection, form.

13         A.   We have raised the issue about

14    ongoing sales in various -- I'm not sure

15    whether they represent a technical breach,

16    though.

17         Q.   Okay.  Are you aware of any

18    technical breach?

19         MR. CLARK:  Objection, form.

20    A.   No.

21    Q.   I'm sorry.  You said, no, sir?

22    A.   My answer's no.

23    Q.   Thank you.  Do you know who made the

24    decision to cause the CLO HoldCo Limited entity

25    to invest in the CLOs that are managed by

Page 75

1          GRANT SCOTT - 1/21/2021

2     Highland Capital?

3          A.     The select -- ultimately, I had to.

4          Q.     I thought you testified earlier that

5     you didn't make decisions as to investment.  Do

6     I have that wrong?

7          A.     The selection.

8          Q.     Okay.

9          A.     I -- I'm --

10         Q.     So -- so explain to me --

11         A.     I have to approve -- I have to

12    approve the selection.  I'm sorry.  But the

13    people making -- I was putting that in the camp

14    of the people that make the selection.

15         Q.     Okay.  Do you know if -- do you know

16    if there are CLOs in the world that exist that

17    aren't managed by Highland Capital Management?

18             MR. CLARK:  Objection, form.

19         A.     Are there CLOs in the -- in the

20    world that are not --

21         Q.     Yes.

22         A.     Yes.  It's -- it's a well-known --

23    it's a well-known --

24         Q.     In your capacity as the director of

25    CLO HoldCo Limited, did you ever consider

Appx. 06893

1      GRANT SCOTT - 1/21/2021

2  making an investment in a CLO that wasn't

3  managed by Highland?

4      A.   No.

5      Q.   Is there any particular reason why

6  you haven't given that any consideration?

7      A.   That hasn't been my role.  That's

8  not my expertise.  That's been something

9  Highland has done and, quite frankly, over the

10  years brilliantly so, no.

11      Q.   You're aware that HCM, L.P., has

12  filed for bankruptcy, right?

13      A.   Yes.

14      Q.   When did you learn that Highland had

15  filed for bankruptcy?

16      A.   After the fact sometime in late --

17  late 2019.

18      Q.   Since the bankruptcy filing, have

19  you made any attempt to sell CLO HoldCo

20  Limited's position in any of the CLOs that are

21  managed by Highland?

22      A.   No.

23      Q.   So notwithstanding the bankruptcy

24  filing, you as the director haven't made any

25  attempt to transfer out of the CLOs that are

Page 77

1          GRANT SCOTT - 1/21/2021

2   managed by Highland, correct?

3      A.    Correct.

4      Q.    Did you ever give any thought to

5   exiting the CLO vehicles that were managed by

6   Highland in light of its bankruptcy filing?

7      A.    No.

8      Q.    Have you ever discussed with

9   Mr. Seery anything having to do with the

10   management -- withdrawn.

11          Have you ever discussed with

12   Mr. Seery any aspect of the debtor's management

13   of the CLOs in which CLO HoldCo Limited is

14   invested?

15      A.    No.

16      Q.    You mentioned earlier a request to

17   stop trading.  Do I have that right?

18      A.    Yes.

19      Q.    Okay.  And are you aware that a

20   letter was written purportedly on behalf of CLO

21   HoldCo Limited in which a request to stop

22   trading was made?

23      A.    As a cos- -- yeah.  Yes.

24      Q.    Okay.  Have you ever seen that

25   letter before?

Page 78

1        GRANT SCOTT - 1/21/2021

2    A.    Yes.

3        MR. MORRIS:  Can we put up on the

4    screen -- I think it's now Exhibit 6.  It's

5    Exhibit DDDD.

6        (SCOTT EXHIBIT 3, Letter to James A.

7    Wright, III, et al., from Gregory Demo,

8    December 24, 2020, with Exhibit A

9    Attachment, was marked for identification.)

10        MR. MORRIS:  Can we scroll down to,

11    I guess, what's Exhibit A.  Ri- -- right

12    there.

13  BY MR. MORRIS:

14    Q.    You see this is a letter Dece- --

15  dated December 22nd?

16    A.    Yes.

17    Q.    In the first paragraph there there's

18  a reference to the entities on whose behalf

19  this letter is being sent.

20        Do you see that?

21    A.    Yes.

22    Q.    Okay.  So this letter was sent on

23  December 22nd.  Did you see a copy of it before

24  it was sent?

25    A.    A -- a draft -- an earlier draft of

1            GRANT SCOTT - 1/21/2021

2    this I did.

3        Q.    Okay.  Did you provide any comments

4    to it?

5        A.    I did.

6            MR. CLARK:  Well, hold on.  Grant,

7        let me caution you.  To the extent you

8        provided comments to counsel, we're going

9        to assert the attorney-client privilege on

10        those comments.

11            MR. MORRIS:  It's just a yes-or-no

12        question.  I'm not looking for the

13        specifics.

14            MR. CLARK:  Thank you.

15        A.    Yes.

16        Q.    Are you aware that earlier letters

17    were -- withdrawn.

18            Are you aware that prior to December

19    22nd, the entities other than CLO HoldCo

20    Limited that are listed in this pers- -- first

21    paragraph had sent a letter making the same

22    request?

23        A.    With respect to a letter, no.  No,

24    I -- I did not.

25        Q.    Are you aware as you sit here now

Page 80

1            GRANT SCOTT - 1/21/2021

2    that the entities other than CLO HoldCo Limited

3    that are listed in the first paragraph made a

4    motion in the court asking the court for an

5    order that would have prevented Highland from

6    making any transactions for a limited period of

7    time?

8      A.    Yes.

9      Q.    Did you know that motion was being

10   made prior to the time that it was made?

11     A.    I'm not sure.

12     Q.    Did you ever think about whether CLO

13   HoldCo Limited should join that particular

14   motion?

15     A.    I believe we were -- my attorney was

16   aware of it.  I don't recall our discussion

17   about it.  We were aware -- when I say we, I

18   mean collectively -- and did not join it.

19     Q.    Okay.  Can you tell me why you did

20   not join it.

21          MR. CLARK:  And, again, Grant, to --

22          to the extent it's based on communications

23          with counsel, you're free to say that

24          but -- but not to disclose any substance of

25          communications with counsel.

Page 81

1          GRANT SCOTT - 1/21/2021

2      A.    The subject of this letter on the

3    22nd which yielded the original letter you

4    briefly showed me on the 24th as well as an

5    additional letter on the 28th identified two

6    points as I understand it.  The first point is

7    what I believe is the somewhat innocuous

8    request to halt sales, not a demand in any way.

9    And the second more substantive issue has to do

10   with steps to remove Highland or a subsequent

11   derived entity from Highland from the various

12   services agreements that you had previously --

13   we had previously discussed.  Neither of those

14   issues met the require- -- neither of those

15   issues led us to believe that a motion such as

16   what you've just mentioned was -- was right --

17      Q.    Okay.

18      A.    -- because no -- no decision has

19   been made on that.

20      Q.    Okay.

21          MR. MORRIS:  So I want to go back to

22      my question and move to strike as

23      nonresponsive, and I'll just ask my

24      question again.

25   BY MR. MORRIS:

Appx. 06899

Page 82

1          GRANT SCOTT - 1/21/2021

2     Q.    Why did CLO HoldCo Limited decide

3   not to participate in the earlier motion that

4   was brought by the other entities that are

5   identified in Paragraph 1 that asked the court

6   to stop Highland from engaging in trades?

7     A.    John, I'm so sorry.  There was a

8   feedback loop that came up when you started to

9   re- -- re- -- recite -- restate your question.

10  I'm sorry.

11    Q.    That's okay.  Why did CLO HoldCo

12  Limited decide not to join in the earlier

13  motion where the entities listed in Paragraph 1

14  asked the court to order Highland not to make

15  any further trades?  Why did they not join that

16  motion?

17    A.    The -- the issue didn't rise to

18  the -- I don't believe we had formulated a

19  legal basis sufficient to justify such steps.

20  We hadn't laid the foundation necessary to --

21  to do that.

22    Q.    Are you aware of what the court

23  decided?

24    A.    By virtue of the original letter you

25  sent me dated the -- or show -- showed

Page 83

1          GRANT SCOTT - 1/21/2021

2   initially dated the 24th, I have a general

3   understanding of what they decided.

4       Q.    Did you -- did you ever review the

5   transcript of the hearing where the other

6   parties asked the court to stop Highland from

7   engaging in any further trades on the CLOs?

8       A.    I did not.

9       Q.    Is there anything different about

10  the request in this letter, to the best of your

11  knowledge, from the request that was made of

12  the court just six days earlier?

13          MR. CLARK:  Objection, form.

14      A.    Yes.  There's a -- in -- in my -- my

15  view there's a substantial difference between

16  filing an action converting a request into

17  essentially a demand versus a gentle request

18  with multiple caveats, that that request is not

19  a demand.

20      Q.    Okay.  Let me ask you this:  Are you

21  aware -- what -- when did you first learn that

22  Highland was making trades in its capacity as

23  the servicer of the CLOs?  When -- when did you

24  first learn that Highland was doing that?  Ten

25  years ago, right?  I mean --

Page 84

1  GRANT SCOTT - 1/21/2021

2  A.  Oh.  Oh.  Oh, I'm -- yeah.  Yeah.

3  Oh, yes.  I'm sorry.  Of course.

4  Q.  Right?  I mean, Highland has been

5  making trades on behalf of CLOs for years,

6  right?

7  A.  Yes.

8  Q.  And Highland was making trades on

9  behalf of CLOs throughout 2020, to the best of

10  your knowledge, right?

11  A.  Yes.

12  Q.  And you know when Jim Dondero was

13  still with Highland, he was making trades on

14  behalf of CLO -- on behalf of the CLOs, right?

15  A.  Yes.

16  Q.  And you never objected when Jim

17  Dondero was doing it; is that right?

18  A.  That is correct.

19  Q.  Okay.  So what changed that caused

20  you in your capacity as the director of CLO

21  HoldCo to request a full stoppage of trading?

22  A.  It was my understanding that because

23  of the bankruptcy and the removal of Jim

24  Dondero that the replacement decision-makers

25  did not have the expertise where I felt

Page 85

1        GRANT SCOTT - 1/21/2021

2    comfortable with them making those decisions,

3    but...

4        Q.    I thought you testified earlier that

5    you weren't aware that Mr. Dondero left

6    Highland.  Am I mistaken in my recollection?

7        A.    I think you said in October, and

8    I -- as I -- there's some con- -- I have

9    confusion about when he left versus when he was

10   still there but other -- but he was not making

11   those trades.

12       Q.    Okay.  Fair enough.  The bankruptcy

13   has nothing to do with your desire to stop

14   trading, right, because Highland traded for a

15   year after the bankruptcy and never took any

16   action to try to stop Highland from trading on

17   behalf of the CLOs, fair?

18       A.    The -- Highland as of right now

19   isn't the same entity it was -- well, the

20   decision-making team -- the -- the financial

21   decision-making team for CLO Holdco's is no

22   longer the team I have worked with, and upon

23   discussion with counsel, we agreed -- I agreed

24   to this letter, which I did, to just maintain

25   the status quo.

Page 86

1        GRANT SCOTT - 1/21/2021

2      Q.     How did you form your opinion that

3    the debtor doesn't have the expertise to

4    execute trades on behalf of the CLOs today?

5    What's the basis for that belief?

6      A.     I -- as I understood it, the -- the

7    people historically making that decision were

8    no longer making that decision.

9      Q.     Who besides Mr. Dondero --

10    withdrawn.

11           Who are you referring to?

12      A.     Well, Mr. Dondero is one.  I don't

13    know the names, but I -- I understood it to

14    mean that the group previously responsible, for

15    exam- -- for example, Hunter Covitz, including

16    Hun- -- him, were no longer involved in the

17    decision-making process, but...

18      Q.     How did you -- how -- how -- who

19    gave you the information that led you to

20    conclude that Hunter Covitz was no longer

21    involved in the decision-making process?

22      A.     Specifically him and that name being

23    mentioned, I -- I -- I wasn't informed of his

24    speci- -- him -- him being removed.  I was

25    under the impression that the team that had

Page 87

1          GRANT SCOTT - 1/21/2021

2    previously been doing that was no longer doing

3    it.

4        Q.    And what gave you that impression?

5        A.    Was communications I had with my

6    attorney.

7        Q.    Okay.  Is there any source for your

8    information that led you to conclude that the

9    team was no longer there that was able to

10   engage in the trades on behalf of the CLOs

11   other than your attorneys?

12       A.    Well, this -- this letter -- I -- I

13   think the answer is no.

14       Q.    Thank you.  Do you know if Jim -- do

15   you have an opinion or a view as to whether Jim

16   Seery is qualified to make trades?

17       A.    This --

18           MR. CLARK:  Objection, form.

19       A.    I don't know -- I spoke to Jim Seery

20   earlier this week.  You -- you asked me whether

21   I had his number.  I said I did.  That's only

22   because he called me.  My phone rang with his

23   number.  It was a number I did not recognize,

24   it was not in my contacts, but he left me a

25   voice mail so I called him back.  Then I

Page 88

1          GRANT SCOTT - 1/21/2021

2   updated my contacts to -- to add his name so

3   now I have his name.  And during that

4   conversation he informed me that he did have

5   that expertise --

6       Q.    And --

7       A.    -- without me making any inquiry.

8   He volunteered that.

9       Q.    But you hadn't made any inquiry

10  prior to the time that you authorized the

11  sending of this letter; is that fair?

12      A.    That's correct.

13      Q.    Do you know whether Mr. Seery, in

14  fact, engaged in transactions on behalf of the

15  debtor since he was appointed back in January?

16      A.    I do not.

17      Q.    Did you ask that question prior to

18  the time you authorized the sending of this

19  letter?

20      A.    I did not.

21      Q.    Can you identify a single

22  transaction that Jim Seery has ever made that

23  you disagree with?

24      A.    No.

25      Q.    Can you identify any transaction

Appx. 06906

Page 89

1          GRANT SCOTT - 1/21/2021

2    that the debtor made on behalf of any of the

3    CLOs since the time that you understand

4    Mr. Dondero left Highland that you disagree

5    with?

6        A.    No.

7        Q.    Did you have any discussion with any

8    representative of any of the entities listed on

9    this document where they told you they believe

10   Jim Seery didn't have the expertise to engage

11   in transactions on behalf of the whole -- of

12   the CLOs?

13       A.    You -- your question -- I'm -- I'm

14   sorry.  I'm trying to be -- I'm trying to be a

15   hundred perc- -- I'm trying to be accurate

16   here.

17       Q.    Let me interrupt you and just say,

18   I'm very grateful for your testimony.  I know

19   this is not easy, and I do believe that you're

20   earnestly and honestly trying to answer the

21   questions the best you can.  So no apologies

22   necessary anymore.  If you need me to repeat

23   the question or rephrase it, just say that,

24   okay?

25       A.    Please -- yes.

Page 90

1          GRANT SCOTT - 1/21/2021

2     Q.    Okay.

3     A.    Please -- please repeat that.

4     Q.    Did you ever communicate with any

5   employee, officer, director, representative of

6   any of the entities that are on this page

7   concerning the debtor's ability to service the

8   CLOs?

9     A.    I believe so.

10    Q.    And can you identify the person or

11   persons?

12    A.    I think it's Jim Dondero.

13    Q.    Anybody else other than Mr. Dondero?

14    A.    No.

15    Q.    When did you have that conversation

16   or those conversations with Mr. Dondero?

17    A.    This letter is dated the 22nd --

18    Q.    Correct.

19    A.    -- right?

20    Q.    Yes.

21    A.    I believe that's the Tuesday before

22   Christmas, and this would have been on the

23   21st, the Monday.

24    Q.    What do you recall about your

25   conversation on the 21st regarding the

Appx. 06908

Page 91

1          GRANT SCOTT - 1/21/2021

2   substance of this particular letter?

3       A.    Jim Dondero described why he

4   believed sales being made on an ongoing basis

5   after a request was made to stop was im- --

6   improper.

7       Q.    Do you -- do you rely on what

8   Mr. Dondero said to you during that phone call

9   on December 21st in -- in deciding to join in

10   this particular letter?

11      A.    No.

12      Q.    Did you only then rely on the

13   information you obtained from counsel?

14      A.    Yes.  I -- I -- I -- I considered

15   this letter to be nearly the most gentle

16   request imaginable amongst lawyers to maintain

17   the status quo.

18      Q.    And the request that's made in this

19   letter is perfectly consistent with what

20   Mr. Dondero told you on the 21st of December,

21   correct?

22      A.    I don't -- no.

23      Q.    How --

24          MR. MORRIS:  Can we go to the end of

25   this letter, please.  All right.  Right

Page 92

1          GRANT SCOTT - 1/21/2021

2      there.

3   BY MR. MORRIS:

4      Q.   Do you see the request that's in the

5   last sentence?

6      A.   Yes.

7      Q.   Is that the same thing that

8   Mr. Dondero told you should happen, that --

9   that there should be no further CLO

10   transactions at least until the issues raised

11   and addressed by the debtor's plan were

12   resolved substantively?

13      A.   Yes.

14      Q.    Is there anything that he said

15   that's inconsistent with the request that's

16   made here?

17          MR. CLARK:  Objection, form.

18      A.   This -- and can you -- can you show

19   me earlier parts?

20      Q.   Of course.  You know what, I'll

21   withdraw the question.

22          And let me see if I can do it this

23   way:  In your discussion with Mr. Dondero, did

24   he indicate that he had seen a draft of this

25   letter?

Page 93

1          GRANT SCOTT - 1/21/2021

2     A.    No.  And I didn't -- I didn't have a

3  discussion with him.  I -- I merely listened to

4  him.  There was no -- I -- I had no input to

5  the conversation.

6     Q.    Okay.  I -- I did -- I didn't --

7  I -- I appreciate that.  So he called you; is

8  that right?

9     A.    We -- we called in.

10    Q.    Oh, was it --

11    A.    I --

12    Q.    Was it --

13    A.    I don't know --

14    Q.    Was it --

15    A.    I don't know the sequence of the

16  calls.  I'm sorry.

17    Q.    Was there anybody on the call other

18  than you and Mr. Dondero, the call that you're

19  describing on December 21st?

20    A.    Yes, my attorney and an attorney --

21  I believe the attorney that signed this letter.

22    Q.    Okay.  And I just want to focus on

23  what Mr. Dondero said.  Did he -- did he say

24  during the call that Highland should not be

25  engaging in any further CLO transactions?

Page 94

1        GRANT SCOTT - 1/21/2021

2    A.   He took a more -- if I can

3 characterize his mental -- I looked at the

4 issue of maintaining the status quo since there

5 was somebody that was complaining about it,

6 that that -- because it -- it isn't assets of

7 Highland, it doesn't adversely affect Highland.

8 If -- if stopping the sales -- you know, my --

9 my thought was -- is if stopping the sales

10 reduces the likelihood of litigation

11 disputes -- you already saw that there was the

12 one from middle of December. I -- I thought

13 that would be the more appropriate way to go.

14 I didn't think there'd be any harm.

15    Q.   And was that your --

16    A.   I think -- I think Jim Dondero had a

17 more legalistic view of its impro- -- im- --

18 improper nature.

19    Q.   And did he share that view with you?

20    A.   On Monday, yes.

21    Q.   Can you describe for me your

22 recollection of what he said about the

23 legalistic view?

24    A.   Just the mention of -- all I recall

25 is in terms of -- the law associated with it

Appx. 06912

Page 95

1          GRANT SCOTT - 1/21/2021

2    was -- the Advisers Act was mentioned --

3        Q.    Did you have --

4        A.    -- but I don't -- I don't know what

5    that is.  You know, I don't know what that is.

6        Q.    And you -- and -- and you never --

7    it never occurred to you to pick up the phone

8    and -- and to speak with Mr. Seery to see why

9    it was he thought he should be engaging in

10   transactions?

11       A.    No.  And -- but I -- my lack of

12   volunteering a phone call to Jim Seery isn't --

13   it's -- it's because of -- I -- I thought any

14   phone call by me to Jim Seery would be

15   inappropriate because he's represented by

16   counsel.  I mean, we were working on claims

17   against him --

18       Q.    Okay.

19       A.    -- right, so...

20       Q.    Did you -- did you -- did you think

21   to instruct your lawyers to reach out to

22   Mr. Seery to actually speak to him instead of

23   just sending a letter like this and to -- and

24   to ask -- and to maybe inquire as to why he

25   thought it was appropriate to engage in

Page 96

1          GRANT SCOTT - 1/21/2021

2   transactions before they made a request six

3   days after the court threw out their suit as

4   frivolous?  I'll withdraw that.  That's too

5   much.

6          A few days later did you authorize

7   the sending of another letter to the debtor in

8   which you suggested that the -- the entities on

9   behoove -- on -- on whose behalf the letter was

10   sent might take steps to terminate the CLO

11   management agreements?

12     A.   I did not see -- so there is a --

13   there is a December 28th letter.

14          MR. MORRIS:  Let's just go to the

15     next letter, and -- and let's just call

16     that up.

17   BY MR. MORRIS:

18     Q.   I think it's -- I think it's

19   actually dated December 23rd.  It was the next

20   day.

21     A.   Yes.

22          (SCOTT EXHIBIT 4, Letter to James A.

23     Wright, III, et al., from Gregory Demo,

24     December 24, 2020, with Exhibit A

25     Attachment, was marked for identification.)

Appx. 06914

Page 97

1     GRANT SCOTT - 1/21/2021

2  BY MR. MORRIS:

3     Q.    And do you recall that the next day

4  CLO HoldCo Limited joined in another letter to

5  the debtors?  Do you have that recollection?

6     A.    Yes.  Not -- not be- -- yes, I do,

7  but -- yes, I do.

8     Q.    Did you see this letter before it

9  was sent?

10     A.    I don't believe so.

11     Q.    Did you authorize the sending of

12  this letter?

13     A.    I gave -- I relied on my attorney to

14  guide me through this process.

15     Q.    I appreciate that.

16     A.    I let him make that call on this

17  letter, which is -- copies most of the prior

18  letter and then adds another issue.

19     Q.    Okay.  Do you have an understanding

20  of what that issue is?

21     A.    Yes.

22     Q.    And what is your understanding of

23  what that additional issue is?

24     A.    Somewhere in this letter of the 23rd

25  there's an -- there's an -- an inclusion of

Appx. 06915

Page 98

1        GRANT SCOTT - 1/21/2021

2    a -- a statement of an -- a future intent.

3        Q.    A future intent to do what?

4        A.    To remove Highland as the servicer

5    of the agreements you talked to me about

6    previously.

7        Q.    Can you tell me whether there's a

8    factual basis on which CLO HoldCo Limited

9    believes that the debtor should be removed as

10   the servicer of the portfolio manager of the

11   CLOs?

12       A.    Yes.  There are -- there are

13   multiple bases to consider subject to all the

14   other conditional language in the request of

15   these letters to consider that going forward

16   but no decision.  That intent is an intent to

17   evaluate, not an intent to take any action.  I

18   haven't authorized any action.  I don't feel

19   comfortable with my knowledge base at this

20   time, but it's something being explored.

21       Q.    So knowing everything that you know

22   as of today, you have not yet formed a decision

23   as to whether CLO HoldCo Limited will take any

24   steps to terminate Highland's portfolio

25   management agreements, correct?

Appx. 06916

Page 99

1          GRANT SCOTT - 1/21/2021

2     A.    I don't -- I don't want to be

3   difficult, but I'm -- I'm confused yet again

4   with your question.  But I have not -- there --

5   there are a number of cr- -- a number of issues

6   that with my nonfinance background would

7   suggest to me that they -- they may be bases

8   for -- for cause, to -- to assert a cause.  And

9   I've been conferring with my attorney about

10   that, but it's very preliminary and no -- no

11   decision has been made.  I -- no decision is

12   being made.

13     Q.    So what -- what are the factors that

14   are causing you to consider possibly seeking to

15   begin the process of terminating the CLO

16   management agreements?

17     A.    Well, I guess I would break them

18   down into maybe two categories, maybe more.

19   The one that resonates most with me -- I don't

20   know -- maybe because even though I'm a patent

21   attorney, I guess at one point I was an

22   attorney.  But the thing that resonates most

23   with me --

24     Q.    You are an attorney.

25     A.    -- at the moment -- well, now you

Page 100

1          GRANT SCOTT - 1/21/2021

2    know why I'm a patent attorney and not one of

3    you guys.  But the thing that resonates with me

4    the most from a legal substantive, black letter

5    law sort of issue is the plan for

6    reorganization, which we've objected to.  I've

7    re- -- I've reviewed the objection, and that

8    sets forth our -- that sets forth my position,

9    and I consider that to be quite material.  The

10   others are issues of practical effects of

11   what's happened thus far with the bankruptcy,

12   the termination of the experts with a long

13   track record of success, the soon-to-be

14   termination of all employees, the cancellation

15   of various representation agreements, things of

16   that nature looked at from an additive sort of

17   perspective.

18      Q.    You know that -- can we refer to the

19   counterparties under the CLO management

20   agreements as the issuers?  Are you familiar

21   with that term?

22      A.    I -- I am familiar with the term

23   issuers, yes.

24      Q.    Okay.  And do you understand --

25      A.    There's an agreement between the --

Page 101

1          GRANT SCOTT - 1/21/2021

2    I'm sorry.

3        Q.    There's an agreement between the

4    issuers and Highland pursuant to which Highland

5    manages the CLO assets, right?

6        A.    With res- -- yes.

7        Q.    Okay.  And do you understand what's

8    going to happen to those management contracts

9    in connection with the plan of reorganization?

10       A.    Partially.

11       Q.    What's your partial understanding?

12       A.    Well, I -- I wouldn't want to

13   characterize it as a partial understanding.  I

14   mean, with respect to part of the agreement.

15       Q.    Okay.

16       A.    Okay.  Our plan objection lays out

17   our basis for objecting to steps that Highland

18   is actively taking to preclude us from the full

19   rights that we have as third-party

20   beneficiaries under that agreement, and they're

21   not de minimus.  They're quite material.  They

22   relate to cause issues and no-cause issues, for

23   example, as out- -- as outlined in our --

24   our -- our objections.

25       Q.    Okay.  Did you ever make any attempt

Page 102

1          GRANT SCOTT - 1/21/2021

2    to speak with any issuer concerning Highland's

3    performance under the CLO management

4    agreements?

5      A.    No.

6      Q.    Why not?

7      A.    I -- I don't have any facts --

8    understand I -- I get all of the reports

9    periodically from Highland -- from Highland.

10   I -- I don't have a basis that I'm aware of to

11   complain about performance issues.  This is a

12   legal issue that I'm talking about.

13     Q.    So you have no basis to suggest that

14   Highland hasn't performed under the CLO

15   management agreements, correct?

16     A.    Well, Highland as of right now,

17   the -- the issue really is as -- as to what's

18   next, not -- not -- I -- I don't -- I don't

19   believe I have facts that support a com- --

20   a -- an issue right now.  It's -- it's --

21   it's -- it's going forward that is the problem.

22     Q.    I --

23     A.    That's -- you know, that's --

24     Q.    Have you given any thought to

25   speaking with the issuers to try to get their

Page 103

1          GRANT SCOTT - 1/21/2021

2     views as to what they think is going to happen

3     in the future?

4          A.    No.

5          Q.    They're the -- they're the actual

6     direct beneficiaries under the CLO management

7     agreements, to the best of your understanding,

8     right?

9          A.    Yes.  Their rights may not be

10    impacted; it's CLO Holdco's rights that are

11    going to be adversely impacted.  So it's -- I

12    don't know that our view is in alignment with

13    their view.  But to answer your question, no,

14    we did not contact them.

15         Q.    Do you have any knowledge or

16    information as to any assertion by the issuers

17    that Highland is in breach of any of the CLO

18    management agreements?

19         A.    No.

20         Q.    Do you have any knowledge or

21    information as to whether or not any of the

22    issuers believe that Highland is in default

23    under the CLO management agreements?

24         A.    No, I don't have any of those facts.

25         Q.    Are you aware that the issuers are

Page 104

1          GRANT SCOTT - 1/21/2021

2    negotiating with Highland to permit Highland to

3    assume the CLO management agreements and to

4    continue operating under them?

5        A.    I believe so --

6        Q.    Is that --

7        A.    -- but they're --

8        Q.    Go ahead.  I'm sorry.

9        A.    As I understand it, Highland

10   wants -- Highland or its subsidiary -- or

11   its -- its -- its postbankruptcy relative --

12   post- -- excuse me, that Highland

13   postbankruptcy -- or postplan confirmation

14   wants to move forward, substitute itself for

15   the prior issuer -- no, sorry, substitute

16   itself for the prior servicer under those

17   agreements to assume those agreements but in

18   the process of assuming those agreements,

19   carving out a bunch of provisions that from a

20   legal standpoint and a potentially future

21   practical and monetary standpoint are quite

22   substantial, and that has to relate to the

23   removal rights based on cause and without

24   cause.  As I understand it, that's all set

25   forth in our plan objection.

Page 105

1          GRANT SCOTT - 1/21/2021

2     Q.    Okay.  Are you aware of a third

3   letter that was sent to Highland on behalf of

4   CLO HoldCo and the other entities that are

5   listed in this document?

6     A.    The December 28th letter, is that

7   what you mean?

8     Q.    It's actually December 31st, if I

9   can refresh your recollection.

10          MR. MORRIS:  Can we put up Exhibit

11     F?

12          (SCOTT EXHIBIT 5, Letter to Jeffrey

13     N. Pomerantz from R. Charles Miller,

14     December 31, 2020, was marked for

15     identification.)

16   BY MR. MORRIS:

17     Q.    You remember that there was a letter

18   dated on or about December 31st that was

19   sent -- oh, actually, you know, I apologize.

20   If we scroll down to the -- to the next -- to

21   the first box, there actually is no mention of

22   CLO HoldCo.

23          Are you aware that Mr. Dondero was

24   evicted from Highland's offices as of the end

25   of the year?

Page 106

1        GRANT SCOTT - 1/21/2021

2      A.    I -- I didn't know the time, but I

3    understand he's no longer there.

4      Q.    Does CLO HoldCo Limited contend that

5    it was damaged in any way by Mr. Dondero's

6    eviction from the Highland suite of offices?

7            MR. CLARK:  Objection, form.

8      A.    I -- I don't have any information to

9    support that as of this time.

10     Q.    It's not -- it's not a belief that

11    you hold today?

12     A.    I don't have a belief of that, yes.

13           MR. MORRIS:  All right.  Let's take

14    a short break.  I may be done.  I -- I'm

15    grateful, Mr. Scott, and don't want to

16    abuse your time.  Give me -- let -- just

17    let -- let's come back at 4:50, just eight

18    minutes, and if I have anything further, it

19    will be brief.

20           (Whereupon, there was a recess in

21    the proceedings from 4:42 p.m. to

22    4:49 p.m.)

23           MR. MORRIS:  Okay.  Mr. Scott, thank

24    you very much for your time.  I have no

25    further questions.

Page 107

1          GRANT SCOTT - 1/21/2021

2          THE WITNESS:  Thank you.

3          MR. CLARK:  We will reserve our

4     questions.

5          THE WITNESS:  I appreciate it, John.

6          MR. MORRIS:  Take care.  Thanks for

7     your time and your -- and your diligence.

8     I do appreciate it.  Take care, guys.

9          THE REPORTER:  Okay.

10         MR. CLARK:  Thank you.

11         MR. HOGEWOOD:  No questions from us.

12         (Time Noted:  4:50 p.m.)

13

14

15              ---------------------

16              GRANT SCOTT

17

18    Subscribed and sworn to before me

19    this      day of            2021.

20

21    --------------------------------------

22

23

24

25

Appx. 06925

Page 108

1          GRANT SCOTT - 1/21/2021

2              C E R T I F I C A T E

3     STATE OF NORTH CAROLINA  )

4                      ) ss.:

5     COUNTY OF WAKE          )

6

7          I, LISA A. WHEELER, RPR, CRR, a

8     Notary Public within and for the State of New

9     York, do hereby certify:

10          That GRANT SCOTT, the witness whose

11     deposition is hereinbefore set forth, having

12     produced satisfactory evidence of

13     identification and having been first duly sworn

14     by me, according to the emergency video

15     notarization requirements contained in G.S.

16     10B-25, and that such deposition is a true

17     record of the testimony given by such witness.

18          I further certify that I am not

19     related to any of the parties to this action by

20     blood or marriage; and that I am in no way

21     interested in the outcome of this matter.

22          IN WITNESS WHEREOF, I have hereunto

23     set my hand this 21st day of January, 2021.

24          -------------------------

25          LISA A. WHEELER, RPR, CRR

Appx. 06926

Page 109

1    GRANT SCOTT - 1/21/2021

2    --------------------I N D E X------------------

3                          PAGE

4    EXAMINATION BY MR. MORRIS                7

5

6
     --------------------EXHIBITS------------------
7
                          PAGE
8
     EXHIBIT 1  Organizational Structure:     46
9            CLO HoldCo, Ltd.

10   EXHIBIT 2  Unanimous Written Consent of    54
             Directors In Lieu of Meeting
11
     EXHIBIT 3  Letter to James A. Wright,      78
12           III, et al., from Gregory
             Demo, December 24, 2020, with
13           Exhibit A Attachment

14   EXHIBIT 4  Letter to James A. Wright,      96
             III, et al. From Gregory
15            Demo, December 24, 2020, with
             Exhibit A Attachment
16
     EXHIBIT 5  Letter to Jeffrey N.           105
17            Pomerantz from R. Charles
             Miller, December 31, 2020
18

19

20

21

22

23

24

25

Appx. 06927

# EXHIBIT 24

Page 1

1                         Grant Scott

2           IN THE UNITED STATES BANKRUPTCY COURT

3             FOR THE NORTHERN DISTRICT OF TEXAS

4                      DALLAS DIVISION

5     In Re:                          Case No.

6     HIGHLAND CAPITAL MANAGEMENT L.P.,   19-34054

7                 Debtor,              Chapter 11

8     _____

9     HIGHLAND CAPITAL MANAGEMENT,      Adversary No.

10    L.P.,                           21-03003-sgi

11              Plaintiff,

12    Vs.

13    JAMES D. DONDERO,

14              Defendant.

15

16        Virtual Zoom Deposition of Grant Scott

17              Tuesday, June 1, 2021

18                 At 2:00 p.m.

19

20

21

22

23    Reported by LeShaunda Cass-Byrd, CSR, RPR

24    TSG Job No. 194692

25

Appx. 06929

Page 2

1                          Grant Scott

2          Videoconference Deposition of Grant Scott,

3     pursuant to Federal Rules of Civil Procedure, before

4     LeShaunda Cass Byrd, CSR, RPR, a Notary of the State

5     of North Carolina.  The Court Reporter reported the

6     proceeding remotely and the witness was present via

7     videoconference

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1                         Grant Scott

2    APPEARANCES OF COUNSEL:

3    On behalf of Debtor:

4         BY: GREGORY DEMO, Esq.
              JOHN MORRIS, Esq.
5         Pachulski Stang Ziehl & Jones
          780 Third Avenue
6         New York, New York 10017

7         BY: SHANNON McLAUGHLIN, Esq.
          Latham & Watkins
8         885 Third Avenue
          New York, New York 10022.

9
     On behalf of the Creditors Committee:
10
          BY: PAIGE MONTGOMERY, Esq.
11        Sidley Austin
          2021 McKinney Avenue
12        Dallas, Texas 75201.

13   On behalf of the Witness:

14        BY: JOHN KANE, Esq.
          Kane Russell Coleman & Logan
15        901 Main Street
          Dallas, Texas 75202

16

17   On behalf of CLO HoldCo & the DAF:

18        BY: JONATHAN BRIDGES, Esq.
          Sbaiti & Company
19        1201 Elm Street
          Dallas, Texas 75270

20

21   Also Present:

22        Mark Patrick
          Amelia Hurt
23        La Asia Canty, Paralegal

24

25

Page 4

1                          Grant Scott

2                 EXAMINATION OF GRANT SCOTT

3    By Mr. Morris                                    6

4    By Mr. Kane                                     103

5    By Mr. Morris                                   105

6                    DEPOSITION EXHIBITS

7    EXHIBIT    DESCRIPTION                         PAGE

8    Exhibit 1  DAF CLO HoldCo Structure Chart        8

9    Exhibit 8  E-mail Exchange, Bates GScott000312  19

10   Exhibit 9  Notice of Settlement                 44

11   Exhibit 10 E-mail Exchange, Bates GScott000080  75

12   Exhibit 11 E-mail Exchange, Bates GScott000138  80

13   Exhibit 12 E-mail Exchange, Bates GScott000361  88

14   Exhibit 13 Assignment and Assumption of

15              Membership Interest Agreement

16   Exhibit 14 Written Resolutions of the Sole

17              Director of the Company, Dated

18              March 25, 2021                       94

19   Exhibit 15 Written Resolutions of the Sole

20              Shareholder of the Company, Dated

21              March 24, 2021                       97

22   Exhibit 16 Written Resolutions of the Sole

23              Shareholder of the Company, Dated

24              March 31, 2021                       97

25

Appx. 06932

Page 5

 1                    Grant Scott

 2

      Exhibit 17 Written Resolutions of the Sole
 3
                 Shareholder of the Company, Dated
 4
                 April 2, 2021                          98
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 6

1              Grant Scott

2              GRANT SCOTT,

3    having been first duly sworn, was examined and

4    testified as follows:

5              EXAMINATION

6    BY MR. MORRIS:

7        Q.    Good afternoon, Mr. Scott.

8        A.    Good afternoon, John.

9        Q.    Okay.  As you recall, my name is John

10   Morris.  I'm an attorney with Pachulski Stang Ziehl &

11   Jones.  We represent Highland Capital Management LP, a

12   debtor in a bankruptcy case that is pending in the

13   Northern District of Texas.

14             Do you recall any of that?

15       A.    Yes.

16       Q.    Okay.  And we are here today for your

17   deposition, and I appreciate your compliance with the

18   subpoena.  Just a few ground rules to remind you, I'm

19   going to ask you a series of questions, and it's

20   important that you allow me to finish my question

21   before you begin your answer; is that fair?

22       A.    Yes.

23       Q.    And I will attempt to give you the same

24   courtesy, but if for some reason I step on your words,

25   just let me know that because I don't mean to cut you

Page 7

Grant Scott

 1   off.  Okay?

 2       A.    Okay.

 3       Q.    If there's anything that I ask you that you

 4   do not understand, will you let me know?

 5       A.    Yes, sir.

 6       Q.    If you need a break at any time, will you

 7   let me know?

 8       A.    Yes.

 9       Q.    Okay.  Because this deposition is being

10   conducted remotely, we are going to be putting

11   documents on the screen.  I'm not attempting to trick

12   you in any way.  If you believe there is any of

13   portion of a document that you need to see, either to

14   put something in context or to refresh your

15   recollection, I encourage to let me know that, and I

16   will be happy to accommodate you.  Okay?

17       A.    Okay.

18       Q.    Okay.  Have you seen the subpoena that the

19   debtors served on your lawyer in this case?

20       A.    The one relating to my deposition?

21       Q.    Correct.

22       A.    Yes.

23       Q.    And are you here today pursuant to that

24   subpoena?

Page 8

1                          Grant Scott

2      A.      Yes.

3      Q.      So today's deposition concerns a particular

4  motion that the debtor filed recently where the debtor

5  is seeking to hold certain individuals and entities in

6  contempt of court.  Have you seen or reviewed the

7  debtor's motion that was filed?

8      A.      I have seen the e-mails which I kept, but I

9  have not read them.

10     Q.      Okay.  I want to just begin with some

11  background.

12             MR. MORRIS:  And then I would ask Ms.

13      Canty to put up what we will mark as

14      Exhibit -- you know, let's pick up the

15      numbering from this morning, La Asia.  Did

16      we use 7 this morning?

17             Actually, this is going to be Exhibit

18      1.  It's the same document that we had this

19      morning.

20             MS. CANTY:  Yes.

21             MR. MORRIS:  We will call it Exhibit

22      1, and it's an organizational chart.  If we

23      can just put that on the screen.

24             (Deposition Exhibit 1 was marked for

25      identification.)

Page 9

1                          Grant Scott

2    BY MR. MORRIS:

3         Q.    Okay.  Have you seen this before,

4    Mr. Scott?

5         A.    Yes.

6         Q.    Do you know what it is?

7         A.    It's the -- yes.  The DAF CLO HoldCo

8    structure chart.

9         Q.    And this is structure chart that you

10   produced in response to the subpoena; is that right?

11        A.    Correct.

12        Q.    You are familiar with the gentleman named

13   Mark Patrick; is that right?

14        A.    Yes.

15        Q.    Is it your understanding that Mr. Patrick

16   was one of the individuals that helped establish the

17   hierarchy that is depicted on Exhibit 1?

18        A.    Yes.

19        Q.    And what is the basis for that

20   understanding?

21        A.    That goes back many years to the

22   origination of my role.

23        Q.    Okay.  And do you recall that you assumed

24   your role in or around 2012?

25        A.    Yes.

Page 10

1                              Grant Scott

2       Q.      Okay.  Did you know Mr. Patrick prior to

3    the time that you assumed your role?

4       A.      I did not.

5       Q.      Okay.  Do you know -- withdrawn.

6               Do you have any knowledge as to whether

7    anybody other than Mr. Patrick helped establish the

8    hierarchy that is depicted on Exhibit 1?

9       A.      There was a law firm name that came to

10   mind, and there was an expert, I gather, a lawyer that

11   was familiar with charitable entities that I believe

12   was involved.

13      Q.      Can you identify any -- withdrawn.

14              At the time that you understood Mr. Patrick

15   had helped to create this hierarchy, did you

16   understand who employed Mr. Patrick?

17      A.      Yes.  I believe so.

18      Q.      Who did you believe Mr. Patrick worked for

19   at that time?

20      A.      Highland Capital Management.

21      Q.      Can you identify any other person at

22   Highland Capital Management who was involved in the

23   creation of this hierarchy?

24      A.      No.

25      Q.      Okay.  Now for looking at the hierarchy

Appx. 06938

Page 11

1                          Grant Scott

2    here, for the period for approximately 10 years prior

3    to March 24th, 2021, you served as the managing member

4    of the charitable DAF GP, LLC, correct?

5         A.     Correct.

6         Q.     And for approximately 10 years prior to

7    March 30 -- 20 -- withdrawn.

8                For approximately 10 years prior to March

9    24th, 2021, you were the sole director of charitable

10   DAF HoldCo, LTD, correct?

11        A.     Correct.

12        Q.     And for approximately 10 years prior to

13   March 24th, 2021, you were the sole director of

14   charitable DAF Fund LP, correct?

15        A.     I believe that is correct.

16        Q.     And for approximately 10 years prior to

17   March 24, 2021, you served as the sole director of CLO

18   HoldCo Limited, correct?

19        A.     Yes.  That is correct.

20        Q.     Did you serve in any capacity for any other

21   entity that is depicted on this sheet at any time

22   prior to March 24th, 2021?

23        A.     If you go -- if you look at the top of that

24   chart where it's directed at the charitable giving

25   components, I had some involvement with various

Page 12

1                        Grant Scott

2    members of some of those organizations.

3        Q.    And would they be the ones that are

4    labelled as third parties or as supporting

5    organizations?

6        A.    The -- the third party organizations.

7    And -- and possibly the supporting organizations.

8        Q.    Do you know what the difference is between

9    a third party and a supporting organization as those

10   phrases are used on Exhibit 1?

11       A.    I don't recall anymore what the delineation

12   is between those two.

13       Q.    Okay.  Do you hold any position today with

14   any of the entities that are depicted on Exhibit 1?

15       A.    I do not -- I do not believe so.  Well, I

16   believe technically, I'm still -- I may still be a

17   director of CLO HoldCo, but I -- I'm not certain of

18   the status as of today.

19       Q.    Is there a particular reason why you may

20   remain today as a director of CLO HoldCo Limited?

21       A.    I don't know if the -- I don't know if the

22   transfer after my resignation has been completely

23   finalized, and I haven't -- yeah.  I don't know how

24   close it is to being completely finalized.  I'm not --

25   I'm not sure.

Appx. 06940

Page 13

1                          Grant Scott

2       Q.      But your intent is to resign as the

3   director of CLO HoldCo Limited; is that right?

4       A.      Yes.

5       Q.      And the only reason that that hasn't

6   happened yet, is it fair to say, is for administrative

7   reasons?

8               MR. BRIDGES:  Objection.  Assumes

9        facts not in evidence.

10  BY MR. MORRIS:

11      Q.      You can answer.

12      A.      I --

13      Q.      Withdrawn.  I will ask a different

14  question.

15              Do you know why your intended resignation

16  from CLO HoldCo Limited has not yet become effective?

17              MR. BRIDGES:  The same objection.

18       Facts not in evidence.

19  BY MR. MORRIS:

20      Q.      You can go ahead.

21              MR. KANE:  I object to form, also.

22              Grant, go ahead.

23              THE WITNESS:  I do not.

24  BY MR. MORRIS:

25      Q.      Okay.  Do you hold any positions of any

Appx. 06941

Page 14

1                           Grant Scott

2    kind today with any entity that you believe is either

3    directly or indirectly owned or controlled by

4    Mr. Dondero?

5        A.    I don't believe so.

6        Q.    Do you have -- I'm just going to explore

7    that for a little bit.

8              Do you know have -- do you know whether you

9    continue to HoldCo any position with any NexBank

10   entity?

11       A.    I'm not in -- no, I don't have any

12   involvement with NexBank.

13       Q.    Okay.

14             MR. KANE:  Hey, John, can you shed a

15        little light on why that is relevant?

16             MR. MORRIS:  I'm just trying to find

17        connections between Mr. Scott and

18        Mr. Dondero because I -- I just -- I

19        think -- I think the purpose of the

20        deposition is to try to -- to try to deduce

21        facts that are related to whether or not

22        Mr. Dondero is going to be a responsible

23        party under the contempt motion.  So I'm

24        just looking for --

25             MR. KANE:  I understand.  I'm just

Page 15

```
 1                      Grant Scott
 2        trying to figure out Grant's -- you know,
 3        whether he has a --
 4             MR. MORRIS:  That is all right.  I'm
 5        moving on anyway.
 6             MR. KANE:  Appreciate it.
 7   BY MR. MORRIS:
 8        Q.    Now looking at the chart, Mr. Scott, I
 9   believe you testified that you were either the
10   managing member or a director of each of the DAF
11   entities and CLO HoldCo Limited.
12             Do I have that right?
13        A.    I believe that is correct.
14        Q.    All right.  Is it your understanding that
15   Mr. --
16        A.    Excuse me.  I am sorry.  Currently or was?
17        Q.    Was.  Up until March 24th.
18        A.    Okay.  Correct.
19        Q.    All right.  Let me ask the question again
20   so it's clean.
21             Did you serve as either the managing member
22   or the director for each of the charitable DAF
23   entities and the CLO HoldCo Limited entity for
24   approximately 10 years prior to March 24th, 2021?
25             MR. KANE:  Objection.  Form.  Go
```

Appx. 06943

Page 16

1                        Grant Scott

2        ahead, Grant.

3               (Reporter clarification.)

4               THE WITNESS:  I believe so.

5   BY MR. MORRIS:

6        Q.     And is it your understanding that Mr. Mark

7   Patrick replaced you in those capacities on or about

8   March 24th, 2021?

9        A.     It's my understanding that on March 24th,

10  the management shares that I had previously -- that

11  had been in my name were transferred to him.  I am not

12  sure how that impacts the current status in the

13  various other entities.

14       Q.     Okay.  During the time that you served as

15  the managing member of the charitable DAF GP LLC, that

16  entity had no officers or employees, correct?

17       A.     I believe that is correct.

18               MR. KANE:  Object to the form.

19  BY MR. MORRIS:

20       Q.     And you served as the sole director of that

21  entity during the time that you served as the

22  director, correct?

23       A.     I believe that is correct.

24       Q.     And during the period of time that you

25  served as a director of charitable DAF HoldCo Limited,

Page 17

1                        Grant Scott

2   you were the only person to serve in that capacity; is

3   that correct?

4        A.     I believe so.

5        Q.     And during the period that you served as

6   director of charitable DAF HoldCo Limited, that entity

7   had no officers or employees, correct?

8        A.     I believe that is correct.

9        Q.     During the time that you served as a

10  director of charitable DAF Fund LP, you were the sole

11  director of that entity, correct?

12       A.     Correct.

13       Q.     And during the time that you served as the

14  sole director of charitable DAF Fund LP, that entity

15  had no officers or employees, correct?

16       A.     I believe that is correct.

17       Q.     You served as the sole director of CLO

18  HoldCo Limited; is that right?

19       A.     Yes.  That is correct.

20       Q.     And during the period that you served as

21  the sole director of CLO HoldCo Limited, that entity

22  had no officers or employees, correct?

23       A.     That is correct.

24       Q.     Is that why the DAF had certain agreements

25  with Highland Capital Management LP pursuant to which

Page 18

1                      Grant Scott

2   HCMLP provided back office and advisory and investment

3   services?

4              MR. KANE:  Objection.  Form.

5              THE WITNESS:  I think that is

6       correct.

7   BY MR. MORRIS:

8       Q.    Do you recall that that DAF had agreements

9   with Highland Capital Management that were amended and

10  restated in 2014?

11             MR. KANE:  Objection.  Form.

12             THE WITNESS:  I understand there were

13      various agreements over the years that had

14      been restated.  I'm not entirely sure

15      anymore of the dates that we received

16      that --

17             MR. MORRIS:  Okay.  Let's mark --

18             THE WITNESS:  I'm sorry?

19             MR. MORRIS:  Let's mark as Exhibit

20      8 --

21             MR. BRIDGES:  Objection.  Objection.

22      Please let the witness answer his question.

23             MR. MORRIS:  Let's mark this --

24             MR. BRIDGES:  No.  Please allow the

25      witness to continue his answer.

Page 19

1                           Grant Scott

2    BY MR. MORRIS:

3        Q.     Grant, do you have anything else to add?

4        A.     You had asked me -- you asked about a

5    specific date, I think, 2014.  I just -- I don't know

6    what the dates are or were.

7        Q.     That is what I heard you say.  Is there

8    anything else that you have to add?

9        A.     No, I don't -- I don't think so.

10       Q.     I didn't think so either.

11              MR. MORRIS:  Let's go to Exhibit 8,

12         please, the next document.

13              (Deposition Exhibit 8 was marked for

14    identification.)

15              MR. MORRIS:  Okay.  If we could just

16         scroll down a little bit.  Just to the

17         e-mail.

18    BY MR. MORRIS:

19       Q.     All right.  Were you familiar with Caitlin

20    Nelson and Helen Kim and Thomas Surgent and David Klos

21    in and around August 2004?

22       A.     I believe they were all Highland employees.

23       Q.     Okay.

24              MR. MORRIS:  Can we just scroll up to

25         the next e-mail, please?

Appx. 06947

Page 20

1                          Grant Scott

2     BY MR. MORRIS:

3         Q.     Okay.  Do you see that Mrs. Kim sends you

4     an e-mail on August 26th, 2014?

5         A.     Yes.  I see that.

6         Q.     And do you see that she had attached for

7     your review and execution, drafts of an amended and

8     restated service agreement and amended and restated

9     advisory agreement and GP resolutions?

10        A.     I do see that.

11        Q.     Okay.  Do you have any recollection as to

12    whose idea it was to amend and restate those

13    agreements at that moment in time?

14        A.     I do not.

15        Q.     Do you have any recollection as to why

16    those agreements were amended and restated at that

17    time?

18        A.     No, I do not.

19        Q.     Okay.  Let's just scroll down and just show

20    Mr. Scott the agreements.  I'm not going to ask

21    anything substantive about it.  But do you see here is

22    the -- if we can stop right there -- the Amended and

23    Restated Service Agreement that is dated from the

24    first day of July, 2014, and it's between the DAF

25    Fund -- the charitable DAF Fund LP, the charitable DAF

Appx. 06948

Page 21

1          Grant Scott

2    GP LLC, as well as Highland Capital Management LP.

3          Do you see that?

4    A.    I do see that.

5    Q.    Do you recall that the entity that is

6    commonly referred to as the DAF had a service

7    agreement with Highland Capital Management LP?

8    A.    I believe that is correct.  Yes.

9    Q.    Do you recall whether -- whether the

10   service agreement was ever the subject of any

11   negotiations?

12   A.    I don't know.

13   Q.    Did you participate in any negotiations

14   concerning the service agreement that was entered --

15   entered in between the entity known as the DAF and

16   Highland Capital Management LP?

17          MR. KANE:  Objection to form.

18          John, will you clarify the time

19     period?

20   BY MR. MORRIS:

21   Q.    Right here.  2014.

22   A.    Sir, I don't recall anything about this

23   with respect to 2014.

24   Q.    Do you know if -- if the agreement was ever

25   amended at any time after 2014?  And when I use the

Page 22

1                         Grant Scott

2    phrase "agreement," I'm specifically referring to the

3    Amended and Restated Service Agreement that we are

4    looking at.

5         A.    I believe -- I think there was a further

6    amended and restated agreement.

7         Q.    Okay.  Did you participate in any

8    negotiations concerning that further amended and

9    restated agreement?

10        A.    I don't remember.

11        Q.    Do you remember offering any comments

12   concerning any subsequent amendment or restatement?

13        A.    I don't -- I don't remember.

14        Q.    Did you ever hire outside counsel to assist

15   you in the negotiation of any service agreements with

16   Highland Capital Management LP?

17        A.    I did not.

18        Q.    Do you -- do you recall who prepared each

19   of the service agreements to which the DAF was a

20   party?

21        A.    I don't remember.

22        Q.    To the best of your recollection, would it

23   have been inhouse counsel at Highland Capital

24   Management?

25               MR. KANE:  Objection.  Form.

Appx. 06950

Page 23

Grant Scott

 1

 2        THE WITNESS:  I don't -- I don't

 3     know.

 4   BY MR. MORRIS:

 5        Q.    Can you recall the name of any law firm

 6   that was involved in the drafting or the negotiation

 7   of any service agreement between the entity known as

 8   the DAF and Highland Capital Management LP?

 9        MR. KANE:  Objection.  Form.

10        THE WITNESS:  I don't remember any.

11   BY MR. MORRIS:

12        Q.    Can you recall during your tenure as the

13   managing member of the DAF GP LLC, whether there was

14   any particular term or provision in any service

15   agreement that was the subject of negotiation or even

16   discussion?

17        A.    I don't remember those -- any of those

18   discussions.

19        Q.    Do you know if they took place or you just

20   can't remember them?

21        A.    I just can't remember them.

22        Q.    Do you recall ever seeing multiple drafts

23   of any service agreement that you -- withdrawn.

24        Did you personally sign service agreements

25   on behalf of the entity known as the DAF?

Page 24

1                        Grant Scott

2       A.      I believe so.

3       Q.      And the agreements that you signed on

4    behalf of that entity, were any of them -- were there

5    multiple drafts of any such agreement?

6       A.      There were frequently multiple drafts or

7    agreements.  But I just don't remember them.

8       Q.      Do you remember whether you personally ever

9    provided any comments to any particular draft?

10      A.      I do not.

11      Q.      Let me ask you this:  Are you familiar with

12   the phrase "arm's length negotiations"?

13      A.      Yes.

14      Q.      And can you tell me what your understanding

15   is of an arm's length negotiation?

16      A.      Well, it would depend on the nature of the

17   parties.  For example, a -- two strangers would

18   have -- arm's length would differ from the nature of

19   an agreement between parties maybe having fiduciary or

20   related obligations.

21      Q.      Let me ask you this --

22      A.      I don't know what the black -- I don't know

23   what the blackball definition is to that term.

24      Q.      Would you agree that arm's length

25   negotiations take place between two parties that are

Appx. 06952

Page 25

1                            Grant Scott

2    acting out of their own self interest?

3            MR. KANE:  Objection.

4            MR. BRIDGES:  Objection to form and

5        foundation.

6    BY MR. MORRIS:

7        Q.    Withdrawn.  Withdrawn.

8            MR. BRIDGES:  Calls for a legal

9        opinion.

10   BY MR. MORRIS:

11       Q.    Mr. Scott, do you believe that the service

12   agreements between the entity known as the DAF and

13   the -- and Highland Capital Management LP were arm's

14   length agreements?

15           MR. BRIDGES:  Objection.  Again, lack

16       of foundation, calls for a legal opinion.

17           MR. MORRIS:  Okay.  I'm not asking

18       for a legal opinion.  I'm asking for

19       Mr. Scott's view of it, so I will try one

20       more time.

21   BY MR. MORRIS:

22       Q.    Mr. Scott, do you believe that the service

23   agreements between the DAF and HCMLP were the subject

24   and result of arm's length negotiations?

25           MR. BRIDGES:  Objection.  Foundation,

Page 26

```
 1                          Grant Scott

 2        calls for legal opinion.

 3    BY MR. MORRIS:

 4        Q.     You can answer, sir.

 5        A.     I don't have any reason to believe they

 6    weren't.  But I --

 7        Q.     Well --

 8        A.     I don't recall them.  I -- I can't give --

 9    I mean, I don't know.

10        Q.     Did get any advice from anybody at any time

11    before entering into the agreement on behalf of the

12    DAF?

13            MR. BRIDGES:  Objection to form.

14            THE WITNESS:  With respect to

15         agreements generally, I often received

16         advice, sometimes in writing, sometimes by

17         telephone.  I just -- with respect to this

18         agreement and -- I just don't recall.

19    BY MR. MORRIS:

20        Q.     Yeah, okay.  Maybe I asked a bad question,

21    so let me try again, Mr. Scott.

22            Do you recall whether you ever got any

23    advice from anybody at any time with respect to any

24    service agreement that you entered into on behalf of

25    the entity known as the DAF and HCMLP?
```

Page 27

1              Grant Scott

2         MR. BRIDGES:  Objection, asked and

3    answered.

4         MR. KANE:  Form.

5    BY MR. MORRIS:

6    Q.    You can answer sir.

7    A.    Yes, I just -- I don't recall.

8    Q.    Okay.  How about with respect to the

9    advisory agreement?  Can we scroll down to page -- I

10   think it's 341?  Oh, no, those are the resolutions.

11        Did Highland Capital Management take

12   responsibility for preparing the corporate resolutions

13   for the DAF entities and CLO HoldCo Limited?

14        MR. BRIDGES:  Objection, foundation.

15        MR. KANE:  Object to the form.

16   BY MR. MORRIS:

17   Q.    You can answer, sir.

18   A.    Do I know who prepared those documents?

19   Q.    Yeah.

20   A.    I don't.

21   Q.    Did you prepare -- have you ever prepared

22   any corporate resolutions for any of the DAF entities

23   or CLO HoldCo Limited?

24   A.    I have not.

25   Q.    To the best of your knowledge, have all of

Appx. 06955

Page 28

Grant Scott

 1    the corporate resolutions for each of the DAF entities

 2    and CLO HoldCo Limited been prepared by inhouse

 3    counsel at HCMLP?

 4            MR. BRIDGES:  Objection.  Form.

 5            THE WITNESS:  I don't know the

 6        division of labor within HCMLP, whether it

 7        was inhouse and/or outside counsel.  I

 8        just -- I just don't know.

 9    BY MR. MORRIS:

10        Q.    Are you aware that inhouse counsel prepared

11    resolutions on behalf of the DAF entities and CLO

12    HoldCo Limited?

13            MR. BRIDGES:  Objection.  Form.

14            THE WITNESS:  Yes.

15    BY MR. MORRIS:

16        Q.    You are aware of that, right?

17        A.    I believe inhouse counsel was -- no,

18    that's -- I've frequently worked with inhouse counsel.

19    I -- but I just don't know with respect to these

20    agreements whether I worked with them on -- on these

21    agreements.  I just don't have a present recollection

22    of any of this.

23        Q.    And I'm just asking if you have a present

24    recollection of anybody other than inhouse counsel

Appx. 06956

Page 29

1                           Grant Scott

2    ever preparing any resolutions for any of the DAF

3    entities or CLO HoldCo Limited?

4             MR. BRIDGES:  Objection.  Asked and

5        answered.

6             MR. KANE:  Objection.  Form.

7    BY MR. MORRIS:

8        Q.    You can answer, Mr. Scott.

9        A.    It's -- it's conceivable that documents

10   were forwarded to me exclusively, but who prepared

11   them in the background?  I don't know.

12       Q.    Okay.  I don't want to know what's

13   conceivable.  I'm again, asking you to focus on what

14   you know or what you don't know or what you recall.

15            Do you have any recollection in your mind

16   of anybody other than Highland inhouse counsel

17   preparing any resolutions on behalf of any DAF entity

18   or CLO HoldCo, Limited?

19            MR. KANE:  Objection to form.

20            He has answered that question three

21        times.

22            MR. MORRIS:  He has not.  But thank

23        you.  He told me --

24   BY MR. MORRIS:

25       Q.    Just ask it again -- answer again, please.

Appx. 06957

Page 30

1                        Grant Scott

2        A.    Sir, inhouse counsel can -- let's say

3   inhouse counsel exclusively provided me with all of

4   the agreements.  I don't necessarily know who prepared

5   them.  I thought that's what you were asking me.  I'm

6   sorry.

7        Q.    From the time you assumed the role of sole

8   authorized representative of the DAF and CLO HoldCo

9   through January 1st, 2021, can you think of any

10  resolution or consent or corporate document that was

11  not prepared by HCMLP?

12            MR. KANE:  Objection.  Form.

13            THE WITNESS:  If "prepared" means it

14        was forwarded to me by them, then I am -- I

15        don't recall receiving any documents

16        outside them as -- outside of that conduit

17        of -- of information flow, I guess.

18  BY MR. MORRIS:

19        Q.    Okay.  And during that same period of time,

20  can you think of any resolution or consent or

21  corporate document that you signed after you

22  personally had provided substantive comments or asked

23  for changes?

24            MR. BRIDGES:  Objection.  Asked and

25        answered.

Page 31

1                          Grant Scott

2              THE WITNESS:  I don't -- I don't

3        recall.

4    BY MR. MORRIS:

5        Q.    Okay.  From the time you assumed your role

6    as the sole authorized representative of the DAF and

7    CLO HoldCo through the beginning of this year, can you

8    think of any resolution or consent or other corporate

9    document that you signed where you or the DAF or

10   CLO HoldCo obtained independent counsel?

11             MR. BRIDGES:  Objection.  Asked and

12        answered.

13             MR. KANE:  Objection to form.

14             THE WITNESS:  Since January 1st of

15        this year?

16   BY MR. MORRIS:

17       Q.    Prior to January 1st of this year.

18             MR. BRIDGES:  Same objection.  Asked

19        and answered.

20             THE WITNESS:  Yeah, I don't recall.

21   BY MR. MORRIS:

22       Q.    Okay.  Do you recall that I took your

23   deposition back in January; is that right, sir?

24       A.    Correct.

25       Q.    And do you recall that you testified that

Page 32

 1                      Grant Scott

 2    during the two-week period leading up to the

 3    deposition you discussed the possibility of resigning

 4    from your positions with Mr. Patrick?

 5       A.    Yes.  I'm not sure -- I'm not sure of the

 6    exact timing.  We had -- we had multiple conversations

 7    about it.

 8       Q.    When was the first time you thought about

 9    resigning?

10       A.    The -- I don't know the exact date.  I know

11    the event.  It was the day I -- I had a conversation

12    with my -- my attorney, John Kane, about.

13             MR. KANE:  Grant, hold on.  You don't

14          need to have any discussions about

15          conversations between you and counsel.

16          That's attorney client privileged.

17             THE WITNESS:  Understood.  I'm sorry.

18             It's when I became aware of the

19          outcome of the escrow hearing sometime in I

20          guess early or mid 2020.

21    BY MR. MORRIS:

22       Q.    And can you describe for me your

23    understanding of what the escrow hearing was about?

24       A.    So I had agreed to allow certain CLO HoldCo

25    and calculated assets to be put in the court registry,

Page 33

1                              Grant Scott

2    and there was a motion that was made to have those

3    released.  There was an evidentiary hearing that my

4    attorney attended -- or rather CLO HoldCo's attorney

5    attended, John Kane, and based on our discussions of

6    the outcome, I began contemplating my -- my

7    resignation.

8        Q.    And what about the outcome that prompted

9    you to consider resigning?

10       A.    It -- it was the first time, I guess, where

11   I thought my friendship with Jim Dondero would likely

12   adverse or could adversely affect CLO HoldCo from the

13   standpoint of demonstrating independence.  I thought

14   maybe I -- yeah.

15       Q.    Did -- did you and Mr. Dondero have a

16   conversation at around the time of the escrow hearing

17   that caused you concern about your relationship with

18   Mr. Dondero?

19       A.    It wasn't with respect to concern over my

20   relationship with Mr. Dondero.  It -- it was my

21   concern about CLO HoldCo.  I'm sorry, I didn't

22   understand your question.

23       Q.    I may have misunderstood.  So what was your

24   concern about CLO HoldCo?

25                 MR. KANE:  Objection.  Asked and

Appx. 06961

Page 34

1                            Grant Scott

2         answered.

3    BY MR. MORRIS:

4         Q.     You can answer, sir.

5         A.     My concern was that my friendship with

6    Jim Dondero would eventually provide a presumption

7    that anything that I did in my role was in some way

8    influenced by my friendship and not independence.

9               And so I -- that's when I started thinking

10   about resigning.  That was one of the reasons why I

11   was thinking about resigning, but that's -- that's

12   when it began, to my recollection.

13        Q.     And what were the other reasons that you

14   can recall that caused him to consider resigning at

15   around the time of the escrow hearing?

16        A.     Around the escrow hearing that was at -- it

17   was later.

18        Q.     When was the next time that you recall

19   thinking again about the possibility of resigning?

20        A.     Well, there was a -- I mean, it was as 2020

21   went on, I guess maybe over the course of about six

22   months, there were certain developments during that

23   time that led me to have other reasons for thinking --

24   resigning was something I should -- I should do.

25        Q.     Were you -- were you ever concerned prior

Appx. 06962

Page 35

1                               Grant Scott

2    to the date that you gave notice of your intent to

3    resign, that you didn't have the ability to act

4    independently from what Mr. Dondero wanted you to do?

5        A.    No.

6              MR. KANE:  Object to form.

7              THE WITNESS:  If I understand your

8        question -- well, actually could you repeat

9        that question.

10   BY MR. MORRIS:

11       Q.    You know, I'll try and get to specific

12   conversations.  That might be the better way to deal

13   with this.

14             Do you recall that there came a point in

15   time when CLO HoldCo filed an objection to a proposed

16   settlement with the group of entities known as

17   HarbourVest?

18       A.    Yes.  CLO HoldCo filed an objection.  Yes.

19       Q.    And -- and do you recall that prior to the

20   hearing where the Court was going to consider whether

21   or not to approve the HarbourVest settlement, you

22   caused CLO HoldCo to withdraw the objection?

23       A.    I authorized the withdraw.

24       Q.    And did you believe that you were acting in

25   CLO HoldCo's best interest when you made the decision

Appx. 06963

Page 36

1                    Grant Scott

2    to withdraw CLO HoldCo's objection to the HarbourVest

3    settlement?

4        A.    I was following counsels' advice,

5    CLO HoldCo's counsel's advise.  So...

6            MR. KANE:  Be careful, Grant.

7    BY MR. MORRIS:

8        Q.    I'm just asking you if you believed at the

9    time that you made the decision you were acting in

10   CLO HoldCo's best interest?

11           MR. BRIDGES:  Objection.  Foundation.

12           THE WITNESS:  I believe --

13   BY MR. MORRIS:

14       Q.    What is your answer, sir?

15       A.    Yes, I believe I was acting in CLO HoldCo's

16   best interest.

17       Q.    Did you have any motivation to withdraw

18   CLO HoldCo's objection to the HarbourVest settlement

19   other than your belief that you thought that was the

20   right thing to do, based on the advice of counsel that

21   you received and your own assessment of the situation?

22           MR. BRIDGES:  Objection.  Form,

23       foundation, compound.

24           MR. KANE:  Objection, form.

25   BY MR. MORRIS:

Page 37

1                                          Grant Scott

2          Q.      You can answer, sir.

3          A.      Yes.  I was following advice of counsel,

4     and I thought that was the best thing to do.

5          Q.      You thought you were doing the right thing,

6     right?

7          A.      At that time, yes.

8          Q.      Did you ever discuss your decision to

9     withdraw CLO HoldCo's objection to the HarbourVest

10    settlement with Mr. Dondero?

11         A.      Decision?  No.

12         Q.      Did you discuss with Mr. Dondero the fact

13    that the objection had been withdrawn at your

14    direction?

15         A.      Yes.

16         Q.      Can you tell me everything you remember

17    about your communications with Mr. Dondero on that

18    topic?

19         A.      He just asked whether I had indeed

20    authorized it.  That's it.

21         Q.      That's the only question that he asked?

22         A.      Yes.  And I said yes.

23         Q.      Did he -- did he suggest that you had acted

24    inappropriately in any way?

25         A.      He didn't make any suggestion.

Appx. 06965

Page 38

```
1                         Grant Scott

2      Q.     Did he say that you had acted

3   inappropriately?

4      A.     No.

5      Q.     Did he suggest that you had breached your

6   fiduciary duties to anybody?

7             MR. BRIDGES:  Objection.  Asked and

8     answered.

9   BY MR. MORRIS:

10     Q.     You can answer, sir.

11     A.     He just wanted to know if I had in fact

12  authorized it, and I said yes.  And then the

13  conversation was over.

14     Q.     Okay.  Do you recall that there came a

15  subsequent time -- actually withdrawn.

16            Before that, do you recall that you

17  authorized CLO HoldCo to amend its proof of claim?

18     A.     Yes.

19     Q.     And do you remember that pursuant to the

20  amended proof of claim, the value of the claim was

21  reduced to zero?

22     A.     That is correct.

23     Q.     Did you ever discuss with Mr. Dondero the

24  amended proof of claim?

25     A.     No.
```

**Appx. 06966**

Page 39

1                    Grant Scott

2      Q.      You never had a conversation with him about

3   the decision to amend the proof of claim?

4      A.      No, I don't think so.

5      Q.      And you never discussed with him your

6   decision to reduce the proof of claim to zero dollars?

7              MR. BRIDGES:  Objection to form.

8              THE WITNESS:  I don't believe so.

9   BY MR. MORRIS:

10     Q.      Okay.  Do you recall that in late January,

11  CLO HoldCo was a defendant in a lawsuit that was

12  commenced by the debtor?

13     A.      Yes.

14     Q.      And do you recall that you authorized

15  CLO HoldCo to enter into a settlement agreement with

16  the debtor?

17     A.      Correct.

18     Q.      Did you ever discuss that settlement

19  agreement with Mr. Dondero?

20     A.      I was on a phone call where the agreement

21  was discussed.

22     Q.      And what do you recall about the

23  discussions?

24              MR. BRIDGES:  Objection to the

25       extent -- to the extent that lawyers were

Appx. 06967

Page 40

1                        Grant Scott

2        privy to those discussions.  We haven't

3        made that clear yet.

4               THE WITNESS:  I'm sorry.  I had a

5        conversation -- well, actually, I

6        participated in a call.  I was on the call.

7        A number of the attorneys were on the call.

8               MR. BRIDGES:  Objection.  Objection.

9        Privileged.  On behalf of CLO HoldCo and

10        the DAF, I'm instructing the witness not to

11        answer that question.

12               MR. MORRIS:  He is not your client,

13        number 1.  Number 2, he hasn't identified

14        who was on the call.  How are you doing

15        this?  How are you doing this?  He hasn't

16        even told you who was on the call.

17               MR. BRIDGES:  I'm happy to answer

18        your question if you don't shout over my

19        answer.

20               The privilege belongs to the

21        entities, not to him, and those entities

22        are my clients, I'm asserting a privilege.

23               MR. MORRIS:  You don't --

24    BY MR. MORRIS:

25        Q.    Mr. -- Mr. Scott, can you please tell me

Appx. 06968

Page 41

```
 1                    Grant Scott

 2    who was on the call?

 3              THE WITNESS:  Am I allowed to answer?

 4              MR. BRIDGES:  Yes, you are.  You can

 5         answer that question, who was on the call.

 6              THE WITNESS:  Oh.  John Kane was on

 7         the call.  Jim Dondero was on the call.  I

 8         was on the call, and there were at least

 9         two other attorneys on the call, but I'm

10         not -- I'm not sure who -- I'm not sure who

11         they were -- I mean, their names.

12    BY MR. MORRIS:

13         Q.    What was the subject matter of the call?

14         A.    The call was to give clarification of a --

15    on how a lack of communication had occurred, and that

16    communication related to --

17              MR. BRIDGES:  Objection.  Objection.

18         Just the subject matter is all that you can

19         answer without violating privilege here,

20         the general subject matter.

21              THE WITNESS:  The general subject

22         matter related to the flow of information

23         between the time I settled, signed off on

24         the --

25              MR. KANE:  I think -- Grant, you're
```

Page 42

```
 1                        Grant Scott

 2        going -- you're going too specific.

 3        Talking about the general subject matter of

 4        the call, so you avoid privilege issues.

 5        Just big picture.

 6             MR. BRIDGES:  Flow of information

 7        sounds like a big picture.  Mr. Morris, I

 8        think we're done on this line of

 9        questioning.

10   BY MR. MORRIS:

11        Q.    Mr. Scott, at the time of this

12   conversation, had CLO HoldCo already settled with the

13   debtor?

14        A.    Yes.

15        Q.    So CLO HoldCo was no longer a defendant in

16   the litigation; is that right?

17        A.    Correct.

18        Q.    Okay.  Can you tell me what was discussed

19   during the conversation?

20             MR. BRIDGES:  Objection.  Privileged

21        for the same reasons we just discussed.  I

22        am instructing the witness not to answer

23        because the privilege belongs to CLO HoldCo

24        and the DAF.

25   BY MR. MORRIS:
```

Appx. 06970

Page 43

1                             Grant Scott

2      Q.      Are you going to follow that instruction,

3   Mr. Scott?

4      A.      Yes.

5      Q.      Did you ever have a discussion other than

6   the one that counsel is preventing you from describing

7   with Mr. Dondero on the subject of CLO HoldCo's

8   settlement with the debtor?

9              MR. BRIDGES:  Objection to the set

10        up, to the lack of foundation to that

11        question.

12             Sir, if you've got an issue with my

13        privilege objection, please feel free to

14        explain.  If there's a factual mistake you

15        think I'm making, please feel free to

16        explain.

17             But -- but using pejoratives to

18        describe the objection to the witness is

19        improper.  I object to it.

20             MR. MORRIS:  Okay.  That's fine.  I

21        don't see what -- you prevented him from

22        answering the question, right?  So I don't

23        know what's pejorative.  Your sense of

24        pejorative is very different from mine.

25   BY MR. MORRIS:

Appx. 06971

Page 44

1                              Grant Scott

2        Q.     Mr. -- Mr. Scott, did you have any other

3    conversation with Mr. Dondero besides the one that I'm

4    not being allowed to inquire about?

5        A.     I'm sorry, is there any objection to my

6    answer?

7        Q.     No.

8        A.     No, I do not.

9        Q.     Did you resign -- did you give notice of

10   your intent to resign at around the same time that you

11   had this conversation with all of the lawyers?

12       A.     No.  It was beforehand.

13       Q.     Okay.  Let's -- let's put up the settlement

14   agreement first.  I think it's the next exhibit,

15   Exhibit 9?

16             (Deposition Exhibit 9 was marked for

17   identification.)

18   BY MR. MORRIS:

19       Q.     Okay.  Just to refresh your recollection,

20   sir, do you see that this is -- if we can just scroll

21   down a little bit, it's dated January 26th.

22             And do you see it's signed by your lawyer

23   and my law firm?

24       A.     Correct.

25       Q.     And if we can scroll down to the agreement

Appx. 06972

Page 45

1                       Grant Scott

2  itself, is that the agreement that you entered into on

3  behalf of CLO HoldCo, on or around January 26th, 2021?

4      A.     I believe so.

5      Q.     And did you tell Mr. Dondero of your

6  intention to enter into this agreement before you did

7  so?

8      A.     No.

9      Q.     And Mr. Dondero never told you that he

10 disagreed with your decision to enter into this

11 agreement; is that right?

12            MR. KANE:  Objection to form.

13            THE WITNESS:  It's correct that he

14       never did.

15            MR. MORRIS:  Yeah.  Okay.  Can we go,

16       please, to the document that is marked

17       Scott Bates stamp 18.  It's at the bottom

18       of page 5 of the exhibit, La Asia.

19            If we can start at the bottom.

20 BY MR. MORRIS:

21     Q.     Do you know what this e-mail is, sir?

22     A.     Yes.  This is my resignation e-mail, for

23 lack of a better word.

24     Q.     And why did you send your resignation

25 e-mail at that moment in time?

Page 46

1                              Grant Scott

2       A.      Why did I send it at the end of January?

3       Q.      What caused you to send this e-mail at that

4    moment in time?

5       A.      Well, I mean, there are a couple of

6    reasons.  It was -- it was necessary that I do it, and

7    the time seemed right in view of the events in

8    January.  It was like a good transition point from my

9    perspective.

10      Q.      And why was it necessary at that time?

11      A.      Well, there was --

12              MR. BRIDGES:  Objection.  Assumes

13       facts not in evidence.

14   BY MR. MORRIS:

15      Q.      You can answer.

16      A.      I previously testified during this

17   deposition that throughout 2020, the desire -- or,

18   rather, the appropriateness of my wanting to resign

19   was expanding, and based on what had happened in

20   January and December as well, but mostly January, I

21   basically just did a critical mass on whether I could

22   sustain my role, given my commitments to my existing

23   firm and given my discussions with the managing

24   members of my existing firm.

25              And it -- there was just no way I could

Appx. 06974

Page 47

                            Grant Scott

1

2    continue with the time commitment required.  I had

3    made various promises and representations to my firm

4    throughout 2020 that the bankruptcy would be handled

5    relatively efficiently and wouldn't require a great

6    deal of time commitment.  And then I guess the straw

7    that broke the camel's back was the second lawsuit,

8    meaning me personally, and it just -- from a personal

9    standpoint, the most significant factor was just my --

10   my being overwhelmed, trying to sustain my career and

11   engage in what seem like the 2021 that was going to

12   involve my having to defend two lawsuits.  And I felt

13   like I got CLO HoldCo through the bankruptcy and then

14   that was a good jumping off point.

15        Q.    What -- why did you send this e-mail to

16   Mr. Dondero?

17        A.    I knew, or at least I reasonably believed

18   he would know where to who to send it to because I

19   wasn't exactly sure.

20        Q.    So you were the managing member of the

21   general partnership and the director of the other DAF

22   entities and CLO HoldCo Limited, and you were not sure

23   who to send your notice of resignation to.

24             Do I have that right?

25             MR. KANE:  Objection.  Form.  That's

Page 48

                     Grant Scott

 1

 2       John Kane.

 3              THE WITNESS:  Yes.  I didn't know who

 4        best to inform my decision.

 5   BY MR. MORRIS:

 6       Q.    And why did you think that Mr. Dondero

 7   would know?

 8              MR. BRIDGES:  Objection.  Asked and

 9        answered.

10              THE WITNESS:  He knows a lot more

11        about the workings of -- I mean, it was --

12        CLO HoldCo and the charitable admission was

13        something that he worked to develop with

14        others 10 years ago, and he was committed

15        to the charity and he knew all of the

16        players and I just -- I guess I just

17        assumed he would know where to direct it.

18   BY MR. MORRIS:

19       Q.    Did you ever ask?

20       A.    He knew how to effectuate -- he knew how to

21   effectuate -- or I thought he knew how to effectuate

22   my resignation by directing it to the appropriate

23   personnel.

24       Q.    Did you ever ask him who it should be

25   directed to?

Page 49

1                          Grant Scott

2       A.      No.

3       Q.      Looking at the third paragraph, it says,

4    quote, my resignation will not be effective until I

5    approve of the indemnification provisions and obtain

6    any and all releases.

7               Do you see that?

8       A.      Yes.

9       Q.      Why did you condition the effectiveness of

10   your resignation on those things?

11      A.      Well, although I'm a patent attorney and

12   basically just a technical writer that doesn't deal

13   with legal issues all of the time, it seemed like

14   appropriate language.

15              I have a number of outstanding litigations

16   where I am named personally, and the actions that I

17   took which resulted in my being sued were actions I

18   took on behalf of CLO HoldCo solely in that position,

19   and so I thought just to have the appropriate notice

20   that I would like indemnification to help -- to help

21   deal with those litigation matters.  That is all.

22      Q.      Did anybody suggest to you at any time

23   prior to the time that you sent this e-mail, that any

24   of the DAF entities or CLO HoldCo Limited might have

25   claims against you?

Page 50

1                           Grant Scott

2      A.      No.  No.

3      Q.      Were you concerned that Mr. Dondero or

4   anyone acting on his behalf might sue you?

5      A.      No.

6      Q.      Did Mr. Dondero ever threaten to sue you?

7      A.      No.

8      Q.      Did you ever obtain the Indemnity provision

9   and any and all necessary releases that you asked for

10  in this e-mail?

11     A.      Not yet.

12     Q.      And what does that mean?

13     A.      I understand that those provisions are --

14  indemnification proposals are in the works, I think.

15     Q.      And do you know who is negotiating --

16  withdrawn.

17             Is somebody negotiating those

18  indemnification and release provisions on your behalf?

19     A.      My -- my attorney would be.

20     Q.      And do you know if your attorney is

21  negotiating with anybody concerning potential

22  indemnification and release provisions for you?

23     A.      I don't know specifically, no.

24     Q.      Do you know if he is -- if -- from whom do

25  you want to obtain releases?

Appx. 06978

Page 51

1          Grant Scott

2          MR. BRIDGES:  Objection.  Facts not

3     in evidence.

4  BY MR. MORRIS:

5     Q.     Withdrawn.

6          When you refer to any and all necessary

7  releases, who did you want to obtain releases from?

8     A.     CLO HoldCo.

9     Q.     Anybody else?

10    A.     Well, I mean, and -- and the related

11  entities in that structure chart that you showed.

12  I'm -- I'm -- understand that to me, that is just

13  boilerplate legal language to put in a resignation,

14  you know, just to cross the T's, dot the I's, so to

15  speak.  I'm not anticipating that will be -- that will

16  be a problem.  I am sorry.

17    Q.     You asked for this more than three months

18  ago now, right?

19    A.     Correct.

20    Q.     Do you know why you haven't gotten what you

21  asked for more than three months ago?

22          MR. BRIDGES:  Objection.  Form.

23          THE WITNESS:  I -- I don't.

24  BY MR. MORRIS:

25    Q.     But you still want the releases, right?

Appx. 06979

Page 52

1                          Grant Scott

2      A.     I would like to, yes.

3      Q.     Did you ever have any discussion with

4   Mr. Dondero about the releases that you wanted?

5      A.     No.

6      Q.     Have you communicated with Mr. Dondero

7   since -- since you sent this e-mail?

8      A.     Yes.

9      Q.     Other than the birth date text that he sent

10  to you, have you spoken with him?

11     A.     In February.

12     Q.     So you haven't spoken to him since then?

13     A.     That is correct.

14     Q.     What did you speak to him about in

15  February?

16     A.     He called me to ask me if I knew anything

17  about in particular -- I think it might have been an

18  asset of CLO HoldCo, if I was aware of whether it had

19  been purchased or sold, and I just told them I didn't

20  know what he was -- I didn't know what -- I didn't

21  know what he was referring to.  That was the last

22  conversation that we had.

23     Q.     Can I refer to the period from the date of

24  this --

25            MR. MORRIS:  Actually, let's look

Appx. 06980

Page 53

1                       Grant Scott

2       at -- let's scroll up a little bit, please.

3    BY MR. MORRIS:

4       Q.    Did Mr. Dondero ever try to talk you out of

5    resigning?

6       A.    No.

7             MR. MORRIS:  Can you scroll up?

8             THE WITNESS:  I -- I am sorry.  I

9         need to correct that.  I had conversations

10        with him where I had expressed, not so much

11        a desire to resign, but a belief that it --

12        it made strategic sense or was appropriate.

13        And it had to do with this issue of my

14        independence, and he suggested that family

15        members and friends are not precluded from

16        occupying positions of trust like trustees

17        and things like that, and that there was

18        nothing per se wrong with my -- my activity

19        with CLO HoldCo by virtue of being a friend

20        of his.  So in that sense, he was trying to

21        talk me out of that, I guess.

22   BY MR. MORRIS:

23      Q.    When did that conversation take place?

24      A.    We had a number of those in 2020 and

25   January of 2021.

Appx. 06981

Page 54

1                              Grant Scott

2                    MR. MORRIS:  Can we scroll up just a

3          little bit on this e-mail, please?

4                    MR. BRIDGES:  May I ask what exhibit

5          number this is?  I've lost track.  I am

6          sorry.

7                    MS. CANTY:  This is Exhibit 5 from

8          earlier.  We are continuing the numbers.

9          So this was marked as Exhibit 5 in this

10         morning's deposition.

11                   MR. BRIDGES:  Thank you so much.

12   BY MR. MORRIS:

13        Q.    Do you see where Mr. Dondero wrote to

14   you -- it's just of above the yellow highlighting

15   at -- 9:57 a.m.  This is the next day.  Quote, you

16   need to tell me ASAP that you have no intent to divest

17   assets.

18              Do you see that?

19        A.    Yes.

20        Q.    Did Mr. -- do you have any understanding as

21   to why he said that to you?

22        A.    I know that he was mistaken in that

23   statement.

24        Q.    Right.  Do you have any understanding as to

25   whether Mr. Dondero had the ability to stop you from

Appx. 06982

Page 55

Grant Scott

1

2    selling assets?

3        A.    No.  It wasn't -- it was a misunderstanding

4    about what the word "divest" meant in the subject

5    line.

6        Q.    And did you understand that until you

7    corrected him, he was concerned and he expressed the

8    concern to you not to sell any assets?

9            MR. KANE:  Objection to form.

10           THE WITNESS:  No.  It had -- I am

11       sorry.  There -- the term "divest" was

12       maybe not a term I should have used.

13       However, my understanding was that my -- my

14       status at CLO HoldCo had a property related

15       aspect to it.  And I used that term to

16       emphasize that I would need to -- that that

17       property aspect would need to be

18       transferred, meaning to the next entity or

19       person.  He mistook it as something being

20       sold.  It had nothing to do with that.

21       That is all.

22    BY MR. MORRIS:

23       Q.    I understand that.  But did you

24    understand -- did you have any understanding as to

25    what interest he had and whether or not assets were

Page 56

1                          Grant Scott

2   being sold?

3              MR. BRIDGES:  Object to form.

4              MR. KANE:  Objection.  Asked and

5       answered.

6   BY MR. MORRIS:

7       Q.     You can answer.

8       A.     No.  I had -- I had no idea what he was --

9       Q.     Okay.  Let's -- let's -- can we -- can we

10  call the period of time between the time you sent this

11  notice of your intent to resign in March 24, 2021 as

12  the interim period?

13      A.     Sure.

14      Q.     And that's the period during which you had

15  expressed your intent to resign, but your resignation

16  had not yet become effective; is that fair?

17      A.     I guess it was the period of time when --

18  yes.  I guess that is correct.

19      Q.     Okay.  Is it fair to say that there were

20  certain things you needed to do during the interim

21  period on behalf of CLO HoldCo and the DAF entities

22  before -- even before your resignation became

23  effective?

24      A.     Yes.

25      Q.     Okay.  Was someone designated to act as

Page 57

1                          Grant Scott

2      your liaison with respect to matters concerning the --

3      the DAF entities and the CLO HoldCo during the interim

4      period?

5                    MR. KANE:  Objection.  Form.

6                    THE WITNESS:  I had conversations

7           with Mark Patrick in February when I came

8           to -- to believe he -- he would be director

9           elect, so to speak, in terms -- in terms of

10          moving forward.

11     BY MR. MORRIS:

12          Q.    During the interim period, did you have any

13     understanding as to whether Mr. Patrick had any

14     authority to act on behalf of any of the DAF entities

15     or CLO HoldCo?

16                   MR. KANE:  Objection.  Form.

17                   THE WITNESS:  I came to believe he

18          did, upon signing the management shared

19          transfer agreement.

20     BY MR. MORRIS:

21          Q.    Okay.  So that was -- that was on or about

22     March 24th, 2021, right?

23          A.    Correct.

24          Q.    So I'm asking just about the interim period

25     between January 31st, 2021 when you sent your notice

Page 58

1          Grant Scott

2   of intent to resign, and March 24th.  That is what I

3   am defining as the interim period.

4          So with that understanding, did you have

5   any reason to believe that Mr. Patrick had any

6   authority to act on behalf of any of the DAF entities

7   or CLO HoldCo during the interim period?

8       A.    Well, it was -- he was part of a group of

9   entity -- a group of individuals that were with an

10  entity that had taken over from -- from Highland, and

11  so in -- certainly in that capacity, he -- as -- as

12  occurred for 10 years or more prior, that -- in that

13  role, you certainly had rights to -- to perform or to

14  act on CLO's behalf here.

15      Q.    And what entity are you referring to?

16      A.    I think it's the Highgate Consulting Group,

17  the Highland employees that took over -- or that

18  created that entity.

19      Q.    And did the -- do you have an understanding

20  as to whether the Highgate Employment Group succeeded

21  to Highland Capital Management LP in the shared

22  services capacity or in the investment advisory

23  capacity or something else?

24          MR. BRIDGES:  Object to form.

25          (Reporter clarification.)

Appx. 06986

Page 59

1            Grant Scott

2            THE WITNESS:  I'm not entirely sure

3      of that.

4  BY MR. MORRIS:

5      Q.    So is --

6      A.    But he -- but --

7      Q.    I am sorry.  Did you finish your answer?

8      A.    I'm not -- I'm not sure of the delineation

9  between the two.

10     Q.    So on what basis did you believe that

11  Mr. Patrick had the authority to act on behalf of the

12  DAF entities and CLO HoldCo during the interim period?

13            MR. BRIDGES:  Objection.  Asked and

14      answered.

15            THE WITNESS:  We had -- we had had a

16      number of conversations.  And over the

17      course of a number of weeks, I came to -- I

18      came to understand that he would be the

19      director going forward.  So...

20  BY MR. MORRIS:

21     Q.    How did you come to that understanding?

22     A.    Through the conversations that we had had,

23  I guess.

24     Q.    What conversations did you have with Mr. --

25  were these conversations with Mr. Patrick?

Appx. 06987

Page 60

1                           Grant Scott

2       A.     They were conversations about the workings

3    with outside counsel to arrange the -- to arrange the

4    transfer of my responsibilities to another person or

5    entity at first, and then I came to learn that that

6    person was -- was -- would be Mark.

7       Q.     Do you know who selected mark?

8       A.     I do not.

9       Q.     Do you know how Mark was selected?

10      A.     I -- I do not.

11      Q.     Did you ever ask Mark how he was selected?

12      A.     I did not.

13      Q.     Did you ever ask Mark who selected him?

14      A.     I did not.

15      Q.     Did you ever ask anybody at any time how

16   Mr. Patrick was selected to succeed you?

17      A.     No, I did not.

18      Q.     Did you ask anybody at any time as to who

19   made the decision to select Mr. Patrick to succeed

20   you?

21      A.     No, I did not.

22             MR. BRIDGES:  Objection.  Facts not

23        in evidence and foundation.

24   BY MR. MORRIS:

25      Q.     Okay.  Do you have any understanding today,

Page 61

1                          Grant Scott

2    as to who has the authority to select your --

3    withdrawn.

4            Do you have any understanding today, as to

5    who had the authority to select your replacement?

6        A.    I do not.

7            MR. MORRIS:  All right.  Let's take a

8        short break.  And I am certainly -- I'm

9        closer to the end than the beginning.  It's

10       3:22 Eastern Time.  Let's come back at

11       3:35, please, and hopefully I will be

12       finished by about 4, 4:15.

13           (Recess taken.)

14   BY MR. MORRIS:

15       Q.    I want to go back, Mr. Scott, to the time

16   that you became appointed the managing member of the

17   general partnership and to the director of the other

18   DAF entities and CLO HoldCo.  Do you remember how that

19   came to be?

20       A.    My recollection is that various law firms

21   and Mark Patrick had a role in its creation and

22   configuration following some -- it's -- I believe it's

23   modeled after some expert -- expert in the field.  I

24   am sorry.  I don't know if I answered your question.

25       Q.    You did not.  So let me try it again.  Do

Appx. 06989

Page 62

1           Grant Scott

2   you recall how it came to be that you assumed those

3   positions?

4       A.      Ten years ago I accepted that role.

5       Q.      And who offered the role to you?

6       A.      Jim Dondero.

7       Q.      Did -- did you communicate with anybody

8   other than Mr. Dondero concerning the opportunity that

9   he presented to you to assume these roles prior to the

10  time you accepted the position?

11              MR. KANE:  Objection.  Form.

12  BY MR. MORRIS:

13      Q.      Withdrawn.

14      A.      Possibly or --

15      Q.      Withdrawn.  Let me ask -- let me ask --

16  it's a good objection.

17              Mr. Scott, prior to the time that you

18  assumed your positions with the DAF entities and

19  CLO HoldCo, did you speak with anybody other than

20  Mr. Dondero, about the duties and responsibilities of

21  those positions?

22              MR. KANE:  Objection to form.

23              THE WITNESS:  The only thing that

24          comes to mind is Hunton & Williams.  But

25          I -- I'm not sure.  I don't know.

Page 63

1                          Grant Scott

2   BY MR. MORRIS:

3       Q.     Do you have any memory of interviewing with

4   anybody?

5       A.     I don't have any recollection of that, no.

6       Q.     Did you submit a resume of any kind?

7       A.     Possibly a CV.  But I -- I just don't

8   remember anymore.

9       Q.     Do you know who made the decision to select

10  you to serve in those capacities?

11             MR. KANE:  Objection.  Form.

12             THE WITNESS:  I don't know.

13  BY MR. MORRIS:

14      Q.     Did anybody -- withdrawn.

15             Did you meet with Patrick before or after

16  you assumed these roles?

17      A.     It's going back 10 years.  I -- I'm not

18  sure.

19             MR. MORRIS:  Can we put up on the

20      screen a document that we marked this

21      morning.  I believe it's Exhibit 2.

22  BY MR. MORRIS:

23      Q.     And this is a document titled An Amended

24  and Restated Limited Liability Company Agreement of

25  Charitable DAF GP LLC.

Page 64

1                          Grant Scott

2              Do you see that?

3      A.     Yes.

4      Q.     And do you see that it's effective January

5  1, 2012?

6              And if we could go to the last page.  And

7  is that your signature, sir?

8      A.     That is correct.

9      Q.     And is this the document that you signed on

10  March 12th, 2012, pursuant to which you became the

11  general partner of the DAF GP?

12             MR. KANE:  Objection.  Form.

13             THE WITNESS:  It's not March 12th.

14      It's dated as March 21st, just to clarify,

15      but I believe so.

16  BY MR. MORRIS:

17      Q.     I appreciate that.  I'm going to ask the

18  question again, just because I was wrong and I want to

19  get it right.

20             Is this the document you signed on or about

21  March 21, 2012, pursuant to which you became the

22  managing member of the DAF GP, LLC?

23      A.     I believe so.

24      Q.     Okay.  And you replaced Mr. Dondero in that

25  capacity; is that right?

Page 65

1                          Grant Scott

2       A.      Yes.

3       Q.      And your recollection is that Mr. Dondero

4    presented the opportunity to you; is that right?

5               MR. KANE:  Objection.  Form.

6               THE WITNESS:  Yes.  I guess you could

7         call it an opportunity.

8    BY MR. MORRIS:

9       Q.      And do you have any recollection as to

10   whether or not anybody else was involved in the

11   decision to offer the opportunity to you?

12      A.      I -- I don't recall.

13      Q.      Okay.  We can take that down, please.

14              Do you recall whether Mr. Patrick was

15   involved in your selection as the replacement

16   management member of the DAF GP, LLC in 2012?

17      A.      I have no recollection.

18              MR. KANE:  Objection to form.

19              Yes.  Okay.

20   BY MR. MORRIS:

21      Q.      I want to go back to what we had defined

22   earlier as the interim period, and that was the period

23   between January 31st, 2021, when you sent in that

24   notice and March 24, 2021, when you transferred the

25   shares.  That is what we were calling the interim

Page 66

                              Grant Scott

1

2    period, right?

3        A.    Yes.

4        Q.    Okay.  Is it fair to say that Mr. Patrick

5    served as your primary contact with respect to matters

6    concerning CLO HoldCo and the DAF during the interim

7    period?

8        A.    Yes.

9        Q.    Okay.  And, in fact, Mr. Patrick gave you

10   instructions on what to do for the DAF and the

11   CLO HoldCo on certain matters during the interim

12   period, correct?

13             MR. KANE:  Objection to form.

14             THE WITNESS:  Periodically, yes.

15   BY MR. MORRIS:

16       Q.    I am sorry.  What is the answer?

17       A.    Periodically, yes.

18       Q.    Okay.  Did somebody ever tell you that you

19   should follow Mr. Patrick's instructions?

20       A.    No, I don't believe so.

21       Q.    And, Mr. Patrick, to the best of your

22   knowledge, didn't HoldCo any positions with any of the

23   DAF entities or CLO HoldCo Limited, correct?

24             MR. KANE:  Objection to form.

25             MR. BRIDGES:  Object to foundation.

```
                                                   Page 67
 1                      Grant Scott

 2   BY MR. MORRIS:

 3        Q.      You can answer.

 4        A.      During the interim period?

 5        Q.      Correct.

 6        A.      I do not believe so.

 7        Q.      If Mr. Patrick didn't hold any positions,

 8   why did you follow his instructions?

 9               MR. BRIDGES:  Objection.

10               MR. KANE:  Objection.  Go ahead,

11      sorry.

12               MR. BRIDGES:  Facts not in evidence.

13               MR. KANE:  And objection to form.

14   BY MR. MORRIS:

15        Q.      You can answer, sir.

16        A.      Yes.  Well, there -- I mean, there was a

17   lot of activity that was required to transfer over

18   from how things had been handled under Highland, to

19   how they would now be handled under -- with the

20   services being provided by Highgate, and he was a

21   member, and he was the point person, I guess, and he

22   was my main interface to get those large numbers of

23   issues resolved.

24               There was -- you know, it was a very busy,

25   challenging time.
```

Appx. 06995

Page 68

1             Grant Scott

2      Q.     Did you sign any agreement on behalf of any

3    of the DAF entities or CLO HoldCo with the entity that

4    you are referring to as Highgate?

5      A.     I'm not sure.

6      Q.     Do you have any recollection at all of ever

7    signing any agreements in your capacity as the

8    authorized representative of any of the DAF entities

9    or CLO HoldCo and Highgate?

10            MR. KANE:  Objection.  Form.

11            THE WITNESS:  I -- I don't recall.

12   BY MR. MORRIS:

13     Q.     And I may have asked you this already.  If

14   I have, I'm sure there will be an objection.  But do

15   you recall if Highgate was providing services

16   equivalent to the shared services that Highland

17   previously provided, or was it providing investment

18   advisory services of the type Highland previously

19   provided?

20            MR. KANE:  Objection to form.

21            MR. BRIDGES:  Objection.

22   BY MR. MORRIS:

23     Q.     You can answer.

24     A.     I don't know the delineation of the

25   services they were providing.

Appx. 06996

Page 69

1                         Grant Scott

2        Q.      Do you know whether during the interim

3    period, any entity other than Highgate was providing

4    services on behalf of any of the DAF entities or

5    CLO HoldCo?

6        A.      Well, I knew from various wires that were

7    approved, that various entities were providing

8    services.  Law firms, for example.

9        Q.      But was there any -- any entity other than

10   Highgate that was providing any of the services that

11   had previously been provided by Highland?

12       A.      Well, Highland provided a lot of legal

13   services.  I don't know that Highgate had the same

14   capability.  So I don't know how to answer that.

15       Q.      All right.  I'm going to try a different

16   way.

17               Before -- before 2021, the DAF entities had

18   both a shared services arrangement and an investment

19   advisory arrangement with Highland.

20               Do I have that right?

21       A.      Yes.

22       Q.      During the interim period, Highland was no

23   longer providing any of those services, correct?

24       A.      That's what I understand, yes.

25       Q.      Did anybody replace Highland in the

Page 70

1                          Grant Scott

2    provision of those services during the interim period?

3              MR. BRIDGES:  Objection, asked and

4        answered.

5    BY MR. MORRIS:

6        Q.    You can answer, sir.

7        A.    I mean, besides the services Highgate

8    were -- was -- were providing, I'm not sure.

9        Q.    And -- and I do know that I've asked this

10   before, but now with that context:  Do you know

11   whether Highgate was providing services of the shared

12   services type, or the investment advisory type, or you

13   just don't know?

14             MR. BRIDGES:  Objection to the form.

15             THE WITNESS:  At least I would think

16        mostly the shared services type.

17   BY MR. MORRIS:

18       Q.    Okay.  Is it your understanding that under

19   the shared services agreement, that Highgate had the

20   ability to make decisions on behalf of any of the DAF

21   entities or CLO HoldCo?

22             MR. BRIDGES:  Objection.

23             MR. KANE:  Objection to form.

24             MR. BRIDGES:  Misstates testimony.

25             THE WITNESS:  Yeah, my prior

Appx. 06998

Page 71

1                    Grant Scott

2        testimony was I didn't see the agreements,

3        so I don't know.

4    BY MR. MORRIS:

5        Q.    You haven't seen any agreement with

6    Highgate; is that right?

7        A.    I don't recall that I have.

8        Q.    Do you have any understanding as to whether

9    Highgate had the authority to bind any of the DAF

10   entities or CLO HoldCo during the interim period?

11              MR. BRIDGES:  Objection.  Calls for a

12       legal conclusion.

13              THE WITNESS:  I don't know.

14   BY MR. MORRIS:

15       Q.    Do you have any understanding as to whether

16   Mark Patrick had the ability as an individual to bind

17   any of the DAF entities or CLO HoldCo during the

18   interim period?

19              MR. BRIDGES:  Objection.  Calls for a

20       legal conclusion.

21              MR. KANE:  Objection.  Calls for a

22       legal conclusion.

23              THE WITNESS:  I don't know.

24   BY MR. MORRIS:

25       Q.    Okay.  And I'm just asking as a matter of

Page 72

1                        Grant Scott

2    fact, to be clear.  I'm not asking for any legal

3    conclusions.  I'm asking for your understanding as the

4    authorized representative of the DAF entities and

5    CLO HoldCo during the interim period.

6              So with that -- with that background as the

7    authorized entity, that -- withdrawn.

8              As the authorized representative during the

9    interim period, did you have any understanding as to

10   whether Mr. Patrick had the authority to bind any of

11   the DAF entities or CLO HoldCo during that time?

12             MR. KANE:  Objection.

13             MR. BRIDGES:  Objection.  Calls for

14       legal conclusion.  Also, objection as to

15       vagueness of the question.

16   BY MR. MORRIS:

17      Q.    I'm sorry, Mr. Scott, did you answer?

18      A.    I did not.  No, I have not.  I --

19      Q.    I apologize.

20      A.    I don't know what the status of his legal

21   authorization was.

22      Q.    Do you recall that in early March, you

23   bought a couple of events to Mr. Patrick's attention?

24      A.    I know that I forwarded documents to his

25   attention, yes.

Appx. 07000

Page 73

1           Grant Scott

2      Q.     And why did you forward documents to

3  Mr. Patrick's attention during the interim period?

4      A.     Because I was resigning, and I understood

5  that he was essentially going to be, or was the

6  director elect, and I just thought it appropriate to

7  bring such things to his attention.

8      Q.     And when did you -- when did you learn that

9  he was doing to be the director elect?

10     A.     I -- I believe it was February.  Sometime

11  in February.

12     Q.     Do you recall how you learned that he was

13  going to become the director elect?

14     A.     I can't point to a specific conversation.

15  I can't -- I can't point to the specific conversation.

16  At some point, it went from being some future third

17  party, and I came to believe it would be him.  I'm

18  not -- I'm not sure of the timing.

19     Q.     Okay.  Do you know from whom you learned

20  that he was going to be the director elect?

21     A.     I believe it was him.

22     Q.     Okay.  So he told you that he was going to

23  replace you; is that right?

24     A.     I don't know that he said it specifically.

25  I don't remember our conversations.

Appx. 07001

Page 74

1                           Grant Scott

2      Q.      Did you ever do anything to confirm with

3  anybody that Mark Patrick was going to be the director

4  elect, or did you just take his word for it?

5      A.      I did not independently confirm it, no.

6      Q.      Did you ever ask Mr. Dondero if -- if he

7  approved of the selection of Mr. Patrick as your

8  successor?

9      A.      I did not.

10     Q.      Did you ever discuss with Mr. Dondero, the

11  topic of who would be your successor?

12     A.      Going back.  Prior to the interim period, I

13  had recommended him, Mark.

14     Q.      Did you -- did you discuss Mr. Patrick's

15  selection as your successor with anybody in the world

16  at any time other than Mr. Patrick?

17     A.      I talked with my attorney about it.  But I

18  don't think so.  No.

19     Q.      Did you talk with anybody that you believed

20  was authorized to make the decision on behalf of the

21  DAF entities and CLO HoldCo about your successor?

22     A.      No, I did not.

23             MR. MORRIS:  Can we put up the

24        document that was marked, La Asia, on Page

25        7, as Bates number 80.

Page 75

1                         Grant Scott

2             (Deposition Exhibit 10 was marked for

3     identification.)

4     BY MR. MORRIS:

5        Q.    Do you see that -- if you scroll just down

6     a little bit.  I guess not.

7             Mr. Patrick wrote an e-mail to you and

8     said, "The successor will respond to this complaint,"

9     and at the top you wrote "understood" --

10       A.    Yes.

11       Q.    -- or the top of the e-mail.

12             Do you recall that in early March, you

13    received a new complaint in which CLO HoldCo was named

14    the defendant?

15       A.    I believe this -- this was the unsecured

16    creditors' committee complaint; is that correct?

17       Q.    I think so, but it's your testimony.  I'm

18    just asking you if you recall that in early March,

19    CLO HoldCo was sued?

20       A.    Yes.  I think this was the second lawsuit

21    that I was referring to personally.

22       Q.    Okay.  And so this -- this actually

23    occurred after the time you had already given notice,

24    right?

25       A.    Yes.

Page 76

1                          Grant Scott

2       Q.     Yeah.  And was the first lawsuit, the one

3   that you settled, before you gave notice?

4       A.     No.  The -- no, both lawsuits are pending.

5       Q.     Okay.  Do you know when the -- who's the

6   plaintiff in the first one?

7       A.     Acis.

8              (Reporter clarification.)

9              THE WITNESS:  Acis, A-C-I-S.

10  BY MR. MORRIS:

11      Q.     So the debtor never sued you personally; is

12  that right?

13      A.     Not yet.

14      Q.     And is it right that Mr. Patrick told you

15  that -- that the successor will respond to the

16  complaint?

17      A.     Yes.

18      Q.     Now, he's not referring to himself yet, is

19  he?

20      A.     That appears correct, yes.

21      Q.     Does that refresh your recollection that

22  you had not known yet as of March 2nd who the

23  successor would be?

24      A.     I guess it does.

25             MR. MORRIS:  Can we put up the next

Appx. 07004

Page 77

1                    Grant Scott

2         exhibit, please, the one ending in -- the

3         one Bates number 85.  And please remind us,

4         La Asia, what exhibit number are we up to?

5              MS. CANTY:  We're up to 10, but the

6         one I'm about to put up is Exhibit 6 from

7         earlier today.

8              MR. MORRIS:  Thank you very much.

9    BY MR. MORRIS:

10        Q.    Now, if we can just scroll down a little

11   bit.  Do you remember something called an Adherence

12   Agreement being discussed in March of 2021?

13        A.    A what agreement?

14        Q.    Adherence Agreement.

15        A.    I see that.  Was it directed to me?

16        Q.    Yeah.  If we can just scroll up.

17              Okay.  So right there, do you see that

18   Thomas Surgent sends it to Mr. Kane?  The subject is

19   'Adherence Agreement."

20        A.    Yes.

21        Q.    And you do see that you forwarded that

22   e-mail to Mr. Patrick on the same day, March 2nd?

23        A.    Yes.

24        Q.    And it says "This relates to the second

25   issue from the debtor."

Page 78

1                          Grant Scott

2                  Do you see that?

3        A.    Yes.

4        Q.    And the first issue was the complaint that

5    we just looked at; is that right?

6        A.    I believe that's correct.

7        Q.    And the Adherence Agreement is the second

8    issue that you wanted to bring to Mr. Patrick's

9    attention on March 2nd, correct?

10       A.    Yes.

11       Q.    And did you understand that the debtor had

12   requested that CLO HoldCo sign the Adherence Agreement

13   in connection with the consummation -- or in

14   connection with the HarbourVest settlement?

15       A.    I don't know that I formed an opinion of

16   what was being requested.  I just forwarded it to the

17   person the best to be able to handle going forward.

18       Q.    Okay.  And can we just scroll up a little

19   bit on this e-mail.

20                  Do you see that Mr. Patrick gave you

21   instructions, quote, "Do not sign the Adherence

22   Agreement from the debtor," close quote.

23       A.    Yes.

24       Q.    Okay.  And you followed Mr. Patrick's

25   instructions, right?

Page 79

1                          Grant Scott

2        A.      Yes.  I resigned.  I wasn't going to do

3    anything to -- yes.  Yes.

4        Q.      You actually hadn't resigned yet.  Well,

5    withdrawn.

6            Your resignation had not become effective

7    yet, correct?

8        A.      Yes.  I guess I gave a March 1st date, but

9    it dragged on, so technically, I was still in that

10   role, but quite frankly, any issue that could be

11   pushed to the future for the -- I was going to push it

12   to the future.

13       Q.      Did -- did Mr. Patrick ever tell you that

14   he had spoken with Mr. Dondero about any of the issues

15   that you were communicating with him about?

16       A.      No.

17       Q.      Do you recall also on March 2nd --

18   March 2nd seems like it was a busy day.  Do you recall

19   also, on March 2nd, that you were informed of an

20   opportunity, whereby, CLO HoldCo Limited could

21   purchase certain equity in a company called TerreStar?

22            MR. KANE:  Objection.  Form.

23            THE WITNESS:  I'm familiar with the

24        name TerreStar.

25   BY MR. MORRIS:

Appx. 07007

Page 80

1                              Grant Scott

2        Q.      And do you remember communicating with

3    Mr. Patrick about an opportunity that had been

4    presented to CLO HoldCo in early March about the

5    opportunity to purchase certain equity in TerreStar?

6        A.      Vaguely.

7        Q.      Okay.

8                MR. MORRIS:  Can we put up the next

9        exhibit, please?

10               (Deposition Exhibit 11 was marked for

11   identification.)

12   BY MR. MORRIS:

13       Q.      And if we can just scroll down, there's Joe

14   Sowin.  Do you know who Joe Sowin is?

15       A.      I've worked with him over the years.

16       Q.      And do you see that Joe Sowin is the next

17   point?

18       A.      I see that.

19               MR. KANE:  Objection.  Form.

20   BY MR. MORRIS:

21       Q.      And does this refresh your recollection

22   that on or about March 2nd, 2021, Mr. Sowin wrote to

23   you about an opportunity to purchase from HOCF

24   approximately 5,000 shares issued by TerreStar?

25       A.      I see that.

Page 81

1                          Grant Scott

2        Q.     Okay.  Did you communicate with Mr. Sowin

3    from time to time?

4        A.     Yes.

5        Q.     Did you ever tell Mr. Sowin that he should

6    direct all communications to Mr. Patrick?

7        A.     I don't know if I did or not.  Who -- who

8    did I get this -- did this come through Highgate?

9        Q.     I can only look at what you see.

10               Can we scroll up to the next e-mail.

11               And you forwarded it to Mr. Patrick; is

12   that right?

13       A.     Yes.  It appears so.

14       Q.     And -- and you asked him for his thoughts,

15   right?

16       A.     Yeah.  I didn't -- yeah.

17       Q.     Okay.  And if we can scroll up and just

18   take a look at Mr. Patrick's response.  It says --

19       A.     Okay.  I see that.

20       Q.     Yeah.  It's at the top.  "Please --"

21       A.     I see that.

22       Q.     Okay.  And did you act -- withdrawn.

23               Did you follow Mr. Patrick's instructions,

24   as set forth in this e-mail?

25       A.     I think I responded favorably to Joe's

Page 82

Grant Scott

1

2    recommendation.

3        Q.    Well, Mr. Patrick told you to act on the

4    request below.  Do you see that?

5            MR. BRIDGES:  Objection.  Form.

6        Objection.  Misstates the exhibit.

7    BY MR. MORRIS:

8        Q.    Okay.  I will quote the exhibit.  Do you

9    see that Mr. Patrick said, quote, "Please act on the

10   request below"?

11       A.    I do see that, yes.

12       Q.    And did you act on the request below?

13           MR. KANE:  Objection to form.  Asked

14        and answered.

15           THE WITNESS:  I did.

16   BY MR. MORRIS:

17       Q.    Thank you.

18           Do you recall any issues coming up

19   concerning directors' and officers' insurance for the

20   DAF entities or CLO HoldCo Limited?  And I'm

21   specifically referring to the interim period.

22       A.    Relating to --

23           MR. BRIDGES:  Objection.  Vague.

24   BY MR. MORRIS:

25       Q.    Directors' and officers' insurance.  Let me

Appx. 07010

Page 83

1                              Grant Scott

2     ask the question again, Mr. Scott.

3              During the interim period, do you remember

4     any issues arising with respect to directors' and

5     officers' insurance for any of the DAF entities or

6     CLO HoldCo?

7        A.    I don't -- I don't recall.

8        Q.    Do you know who Chris Rice is?

9        A.    Yes.

10       Q.    Who is Chris Rice?

11       A.    He is an employee at Highgate.

12       Q.    Are you familiar with an entity called

13    Elysium?

14       A.    The name sounds familiar.

15       Q.    All right.

16              MR. MORRIS:  La Asia, can we mark the

17        next exhibit?  It's in the middle of page

18        9, Bates number 361.

19              MS. CANTY:  This is going to be 12.

20              MR. MORRIS:  Thank you.  And if we

21        can scroll towards the bottom.

22              (Deposition Exhibit 12 was marked for

23    identification.)

24    BY MR. MORRIS:

25       Q.    Do you remember that there was this firm

Appx. 07011

Page 84

1                          Grant Scott

2    called Elysium?

3        A.      Yes.  Now I remember.

4        Q.      And they were asking you for information?

5        A.      That is correct.

6        Q.      Did you ever provide the information to

7    Elysium that had been requested back in February?

8        A.      No, I did not.

9        Q.      Is there a reason why you didn't respond to

10   Elysium's request for information?

11       A.      Because of the transition, I thought much

12   of the information that they were requesting was going

13   to be changing, so I -- I -- I didn't know that it was

14   particularly urgent.  But I -- I figured it would be a

15   waste of time to give him information which would be

16   changed in any -- at any moment.

17       Q.      Okay.  Can we just scroll up a little bit

18   and see what happened with this request.

19               So you actually responded the same day and

20   told Mr. -- Mr. Robins that you were working on it.

21   Do I have that right?

22       A.      Yes.  That's correct.

23       Q.      Is that a true statement at the time you

24   wrote it?

25       A.      Yes.  I'm working on this, meaning not me

Appx. 07012

Page 85

1                          Grant Scott

2   personally.  I mean, I'm work- -- I wanted to let him

3   know that I'd received the e-mail, and then I

4   forwarded it to Highgate, thinking that at any moment,

5   they would be able to provide the information, so I

6   just wanted, as a courtesy, to let them know that I'd

7   received it and was aware of this request.  That's --

8   that's all.

9       Q.     Okay.  You didn't let him know that there

10  was a transition in the works, right?

11      A.     No.  No, I -- I may have.

12      Q.     Yeah, you may have.  Let's see what happens

13  next.

14             So in early March, he asked -- he follows

15  up; is that fair?

16      A.     Yes.

17      Q.     Okay.  Let's go to the next e-mail.

18             And you forwarded to Mark Patrick, a month

19  later; is that right?

20      A.     Yes.  I'm -- there may have been an interim

21  e-mail where I --

22      Q.     Okay.  But the long and the short of it is

23  you never -- you -- you didn't respond to these

24  inquiries from Elysium; is that right?

25             MR. KANE:  Objection.

Appx. 07013

Page 86

1                          Grant Scott

2              MR. BRIDGES:  Objection.

3              MR. MORRIS:  Withdrawn.  Withdrawn.

4    BY MR. MORRIS:

5        Q.    You didn't provide a substantive response

6    to Elysium; is that right?

7              MR. KANE:  Objection.  Assumes facts

8        not in evidence.

9              MR. MORRIS:  That is why I'm asking

10       the question.

11   BY MR. MORRIS:

12       Q.    Go ahead, Mr. Scott.  You can answer.

13       A.    I did not provide a substantive response to

14   their inquiry.

15       Q.    Okay.  Thank you.

16             Can we go to the top.  In fact -- in fact,

17   you were instructed by Mr. Patrick to do nothing,

18   correct?

19             MR. BRIDGES:  Objection.  Misstates

20       the testimony.

21             THE WITNESS:  No.

22   BY MR. MORRIS?

23       Q.    Sir, the e-mail says "Do nothing," correct?

24       A.    That is correct, and they were handling it,

25   not me.

Appx. 07014

Page 87

1                    Grant Scott

2      Q.    Okay.  Now, did you resign on or about

3   March 24th, 2021?

4      A.    Yes.  That's -- that's when the transfer --

5   share of transfer.

6      Q.    Okay.

7            MR. MORRIS:  Can we put the next

8       exhibit up, please.  It's the one at the

9       top at page 10.  It's file 3, document 5.

10           MR. BRIDGES:  Mr. Morris, can I ask

11       you how it is for time because you told us

12       earlier -- you teased us with a 4:15 end

13       time, potentially.

14           MR. MORRIS:  Yeah, I'm just on the

15       last couple of documents.

16           MR. BRIDGES:  Thank you.

17           MR. MORRIS:  You bet.

18   BY MR. MORRIS:

19      Q.    Do you see this is a document called an

20   Assignment and Assumption of Membership Interest

21   Agreement?

22      A.    Yes.

23           MR. MORRIS:  And if we can scroll

24       down.

25   BY MR. MORRIS:

Page 88

1                            Grant Scott

2        Q.     Did you sign this document?

3        A.     Yes, sir.

4        Q.     Okay.  Do you know what this document is?

5        A.     I believe it's the Management Share

6    Transfer Agreement.

7        Q.     Okay.  And do you know who prepared it?

8        A.     I do not.

9        Q.     Did you assign something pursuant to this

10   document?

11       A.     Yes.  The -- the -- the management shares.

12              MR. MORRIS:  Okay.  Can we go to the

13        first page, please?

14   BY MR. MORRIS:

15       Q.     And do you see in paragraph 1, there is a

16   description of the assignment and assumption of the

17   signed interest?

18       A.     Yes, I see that.

19       Q.     Okay.  Does that paragraph describe

20   everything that you assigned to Mr. Patrick?

21       A.     In this agreement.  Yes.

22              MR. BRIDGES:  Objection.  Calls --

23        objection.  Calls for a legal conclusion.

24              MR. KANE:  I join the objection.

25   BY MR. MORRIS:

Appx. 07016

Page 89

1                          Grant Scott

2          Q.     You can answer, sir.

3          A.     Yes.  I mean, it says what it says.  But

4     yes, that is what I was transferring.

5          Q.     And can you identify for me anything that

6     you know that you ever assigned to Mr. Patrick that is

7     not set forth in paragraph 1?

8                 MR. BRIDGES:  Objection.  Form.

9                 THE WITNESS:  I'm unaware of

10         anything.

11    BY MR. MORRIS:

12         Q.     Do you know if -- if the items and assets

13    that are set forth in paragraph 1 had any value?

14                MR. KANE:  Objection.  Form.

15                THE WITNESS:  They had value, maybe

16         not monetary.

17    BY MR. MORRIS:

18         Q.     And what value did they have?

19         A.     I believe they had the property interest

20    that I referred to previously.

21         Q.     And what property interest are you

22    referring to?

23                MR. KANE:  Objection.  Form.  Calls

24         for a legal conclusion.

25    BY MR. MORRIS:

Appx. 07017

Page 90

```
 1                      Grant Scott

 2      Q.     You can answer.  Sir, it's your words we

 3    need.

 4      A.     The shares were the -- these management

 5    shares were the -- I was treating as property.

 6      Q.     Do you have any understanding as to what

 7    the value of the management shares was at the time you

 8    entered into this agreement?

 9      A.     I did not.

10      Q.     Did you have any understanding as to

11    whether those management shares held any particular

12    rights at the time you entered into this agreement?

13             MR. KANE:  Objection to form.

14             THE WITNESS:  My understanding was

15       they had my rights previously.  Ultimately.

16    BY MR. MORRIS:

17      Q.     And what rights did you believe flowed from

18    the management shares?

19      A.     The controlling rights that flowed down to

20    the various entities.

21      Q.     Did you receive anything in return in

22    exchange for your assignment of these property

23    interests and the other assets set forth in paragraph

24    1?

25      A.     It allowed me to finally resign.  That is
```

Page 91

1                        Grant Scott

2    what I received.  I mean, it ended my -- it ended my

3    role as a -- maybe as an agent, or an employee or

4    whatever.  Those are my substantive rights, as I

5    understood it.

6          Q.    Okay.  So you -- you surrendered the

7    substantive rights in an exchange -- you no longer had

8    your substantive rights?

9                MR. BRIDGES:  Objection.  Asked and

10        answered.

11               MR. KANE:  Objection.  Form.

12   BY MR. MORRIS:

13         Q.    You can answer, sir.  Did you get anything

14   other than -- withdrawn.

15               Did you get anything other than what you

16   already described?

17         A.    Relief.  Yes.

18         Q.    Excellent.  Did you ever consider assigning

19   these interests or assets to anybody other than

20   Mr. Patrick?

21         A.    I did not.

22         Q.    Did you ever consider -- did you have any

23   belief as to whether the interests that were assigned

24   were freely tradeable?

25               MR. BRIDGES:  Objection.  Calls for a

Appx. 07019

Page 92

1                           Grant Scott

2        legal conclusion.

3               MR. KANE:  I join the objection.

4               THE WITNESS:  I didn't make -- I did

5        not make an assessment of that.

6    BY MR. MORRIS:

7        Q.    Do you know -- withdrawn.

8               Do you have any understanding as to whether

9    there were any restrictions on the transferability of

10   the interests that you assigned pursuant to this

11   agreement?

12              MR. KANE:  Objection.  Calls for a

13       legal conclusion.

14              THE WITNESS:  I did not.

15   BY MR. MORRIS:

16       Q.    Did you let anybody know that you were

17   willing to assign the interests that are described in

18   paragraph 1 other than Mr. Patrick?

19       A.    Anyone that I -- conceivably, anyone that I

20   let know that was at all familiar with the structure,

21   anyone that was informed of my desire to resign would

22   have arguably have known that.

23       Q.    Okay.  I'm not asking you to put yourself

24   in the shoes of anybody else.  I'm asking for what you

25   recall telling people.

Page 93

1              Grant Scott

2        Did you ever tell anybody at any time that

3   you were ready, willing and able to transfer and

4   assign the interests that are in this document other

5   than Mr. Patrick and your lawyers?

6        A.    I am sorry.  I misunderstood your question.

7   The answer is no.

8        Q.    Did you ever think to try to assign these

9   interests for a profit?

10       A.    Good grief, no.

11             (Reporter clarification.)

12       A.    No.

13       Q.    Did you -- was anybody, other than

14  Mr. Patrick, ever identified as a potential assignee

15  of the interests that are described in paragraph 1?

16             MR. KANE:  Objection to form.

17             THE WITNESS:  I was unaware of any.

18  BY MR. MORRIS:

19       Q.    Okay.  Did you make any effort to identify

20  anybody other than Mr. Patrick as a potential assignee

21  for the interests that are set forth in paragraph 1?

22       A.    No, I did not.

23       Q.    Did any -- did anybody acting on your

24  behalf, to the best of your knowledge, ever make any

25  efforts to identify any potential assignee other than

Appx. 07021

Page 94

1                        Grant Scott

2    Mr. Patrick for the interests set forth in paragraph

3    1?

4              MR. BRIDGES:  Objection.  Foundation.

5              THE WITNESS:  I don't have that

6         knowledge.  No.

7              MR. MORRIS:  Can we go to the next

8         exhibit, please?

9              (Deposition Exhibit 14 was marked for

10   identification.)

11   BY MR. MORRIS:

12        Q.    Okay.  And do you see that these are

13   written resolutions dated the next day, March 25th?

14        A.    Yes.

15        Q.    And these resolutions provide for the

16   shared transfer described in the document?

17        A.    It appears so, yes.

18        Q.    And are these the management shares that

19   you were referring to earlier?

20        A.    I believe so.

21        Q.    Did you believe at the time that you owned

22   all of the management shares of charitable DAF HoldCo

23   Limited?

24        A.    That was my understanding.

25        Q.    How did you acquire those shares?

Page 95

```
 1                      Grant Scott
 2     A.     I'm not sure the exact timing, but I
 3  believe that was all established when I became
 4  involved.
 5     Q.     Did you pay anything of value for the
 6  shares at the time that you acquired them?
 7     A.     I am -- I don't believe so, no.
 8     Q.     Did you need to obtain anybody's approval
 9  before you could transfer the shares?
10     A.     No.  I don't believe so.
11     Q.     Did you make any effort to obtain anybody's
12  approval before you transferred the shares?
13     A.     I did not.
14     Q.     Did you have any reason to believe that
15  Mr. Dondero approved of the transfer of the management
16  shares to Mr. Patrick?
17     A.     I -- I don't know that.
18     Q.     Did you testify earlier, that you had
19  discussed with Mr. Dondero in January, Mark Patrick
20  succeeding you?
21          MR. BRIDGES:  Objection.  Misstates
22      prior testimony.
23  BY MR. MORRIS:
24     Q.     You can answer, sir.
25     A.     I believe it was prior to that.
```

Page 96

1                          Grant Scott

2        Q.      Were you paid anything of value for your

3    services as the, either the managing member of the DAF

4    GP, or as a director of any of the other DAF or

5    CLO HoldCo Limited entities at any time?

6        A.      For a majority of the years, yes, I

7    received a monthly statement.

8        Q.      And is that -- how much was the monthly

9    statement?

10       A.      I believe it was $5,000.

11       Q.      Did it ever increase to an amount more than

12   $5,000?

13       A.      No.

14       Q.      Did you receive anything else of value for

15   your service to the DAF entities and CLO HoldCo

16   Limited other than the $5,000 monthly stipend that you

17   just described?

18       A.      I did not.

19       Q.      Do you recall that after you resigned, you

20   got reappointed, and then subsequently replaced again

21   by Mr. Patrick?

22              MR. KANE:  Objection to form.

23              (Reporter clarification.)

24              THE WITNESS:  Can you repeat -- did

25         you say -- it went away, and then it came

Appx. 07024

Page 97

```
1                         Grant Scott

2        back.  I don't understand the question.  I

3        am sorry.

4     BY MR. MORRIS:

5        Q.     That is okay.  I just saw this in the

6     documents, and I thought it was odd.  But let me put

7     the documents up and see if you can shed any light.

8             MR. MORRIS:  Let's start with the

9          next exhibit, Patrick File 3, Document 9.

10             (Deposition Exhibit 15 was marked for

11     identification.)

12     BY MR. MORRIS:

13        Q.     And do you see in the resolutions, if we

14     can go up just a bit, dated March 24th, and it was

15     resolved that you were removed as a director of the

16     company and Mr. Patrick was appointed as your

17     replacement, if that is a fair characterization?

18             Do you see that?

19        A.     I see that.

20             MR. MORRIS:  And now if we can put up

21          the next document.

22             (Deposition Exhibit 16 was marked for

23     identification.)

24     BY MR. MORRIS:

25        Q.     So this is a week later.  It's March 31st.
```

Appx. 07025

Page 98

                        Grant Scott

1

2           MR. MORRIS:  And if we can just

3       scroll down and see if it's signed.

4    BY MR. MORRIS:

5       Q.    Do you see that Mr. Patrick was removed as

6    the director and you were reappointed?

7       A.    Yes, I do see that.

8       Q.    Do you have any understanding as to why

9    Mr. Patrick resigned and reappointed you as the

10   director a week later?

11      A.    I don't have -- I don't -- I don't know.

12      Q.    Did you even know this happened?

13      A.    Is my signature on that agreement?

14      Q.    No.

15      A.    I'm not sure.

16      Q.    Do you have any -- do you have any

17   recollection as -- as to whether or not you were ever

18   reappointed as the director of the company on or about

19   March 31st, 2021?

20      A.    I don't know if I have received any

21   communication about this or not.

22      Q.    Okay.

23          MR. MORRIS:  Can we go to the next

24       document, please?

25          (Deposition Exhibit 17 was marked for

Page 99

```
 1                    Grant Scott
 2   identification.)
 3             MR. KANE:  Mr. Morris, can you help
 4        me with the exhibit numbers?  Was that 16,
 5        or are we still on 15, additional portions
 6        of it?
 7             MS. CANTY:  That was 16 but not going
 8        to 17.
 9             MR. KANE:  Thank you.  I apologize.
10             MR. MORRIS:  That is okay, Jonathan.
11        We will get to everything and clear up any
12        confusion.
13   BY MR. MORRIS:
14        Q.    So if you go to the bottom of that
15   document, can you see that it was signed?
16             All right.  Do you see Mr. Patrick signed
17   this document?
18        A.    Yes, I see that.
19        Q.    Do you see that it's dated -- if we can go
20   back up to the top.  It's April 2nd, and do you see
21   that you are -- pursuant to these resolutions, you
22   were removed as the director again and replaced by
23   Mr. Patrick?
24        A.    Yes, I see that.  And they seem to be
25   correcting an error of some sort.
```

Page 100
1                          Grant Scott

2      Q.      Did anybody ever describe for you or

3  explain to you what error had been made?

4      A.      I am sorry.  I'm not familiar with these

5  documents.

6      Q.      Okay.  Is it fair to say that -- well, I

7  will just leave it at that.

8              So nobody ever informed you that there was

9  a mistake that had to be corrected; is that right?

10             MR. BRIDGES:  Objection.  Asked and

11         answered.

12  BY MR. MORRIS:

13     Q.      You can answer.

14     A.      I don't know that there was this -- this

15  may have -- I don't know that there was a mistake.

16     Q.      You have no knowledge of --

17     A.      I have no knowledge of this.  I was in a

18  very complex process.  I think there...

19     Q.      And nobody ever asked -- nobody ever asked

20  your consent to be reappointed as the director of the

21  company, correct?

22             MR. BRIDGES:  Objection.  Asked and

23         answered.

24             THE WITNESS:  I didn't receive any

25         communications about this.

Appx. 07028

Page 101

1                        Grant Scott

2    BY MR. MORRIS:

3        Q.    And so you didn't provide your consent to

4    be reappointed as the director of the company,

5    correct?

6              MR. BRIDGES:  Objection.  Asked and

7          answered.

8              THE WITNESS:  That's correct.

9    BY MR. MORRIS:

10       Q.    Okay.  Did you become aware that after you

11   resigned, that DAF and CLO HoldCo started a lawsuit

12   against the debtor and some other defendants related

13   to the HarbourVest settlement?

14       A.    I did become aware of it, yes.

15       Q.    And were you aware of the lawsuit -- were

16   you aware that DAF and CLO HoldCo were considering

17   filing the lawsuit before it was actually commenced?

18       A.    No.

19       Q.    Did you have any communications with

20   anybody at any time about the possibility that the DAF

21   and CLO HoldCo would commence a lawsuit against the

22   debtor and others relating to the HarbourVest

23   settlement prior to the time that the lawsuit was

24   commenced?

25       A.    I did not.

Appx. 07029

Page 102

1                          Grant Scott

2        Q.      So is it fair to say that you did not

3    provide any information to anybody at any time to

4    support the claim -- the complaint that was filed

5    against the debtor and the other defendants in the

6    lawsuit that was brought by the DAF and CLO HoldCo?

7                MR. BRIDGES:  Objection.  Foundation.

8                THE WITNESS:  I didn't provide

9         anything with respect to the litigation

10        that was filed.

11   BY MR. MORRIS:

12       Q.      And did anybody ever ask you for

13   information relating to potential claims against the

14   debtor and others?

15       A.      No.

16       Q.      Did you ever have any discussions with

17   anybody at any time as to whether Jim Seery should be

18   named as a defendant in the lawsuit that was bought by

19   the DAF and CLO HoldCo against the debtor and others?

20       A.      No.

21                MR. MORRIS:  I have no further

22        questions.  Thank you, Mr. Scott.

23                MR. BRIDGES:  I don't have any

24        questions.

25                MR. KANE:  Can I -- I've got a couple

Appx. 07030

Page 103

1          Grant Scott

2      just follow-up for clarification purposes.

3                    EXAMINATION

4  BY MR. KANE:

5      Q.    Grant, earlier you were testifying about

6  resigning and noted -- I believe your testimony was

7  one of the reasons was an issue of independence.  Can

8  you clarify what you meant by issue of independence?

9      A.    I came to believe that there was a

10  perception, and my friendship with Jim Dondero

11  precluded my -- my independence.

12      Q.    Perception by whom?

13      A.    The judge in the case.

14            (Reporter clarification.)

15      A.    The judge in the bankruptcy case.

16      Q.    Was there a specific reason or instance

17  that caused you to have that belief?

18      A.    Yes.  When I spoke with you about the --

19      Q.    Well, I don't want to go into any

20  attorney-client communications.

21      A.    I am sorry.

22      Q.    So let me ask you a different question.

23  Were you provided a transcript of the Court's ruling

24  on the escrow hearing for the registry dispute?

25      A.    I believe so.

Page 104

1                            Grant Scott

2       Q.     And did you read that transcript?

3       A.     I believe we discussed it.  I'm not -- I'm

4   not sure.

5       Q.     Did you have a recollection that Judge

6   Jernigan made a comment or comments about you and

7   Jim Dondero during her ruling?

8       A.     Yes.

9       Q.     Do you believe that Judge Jernigan's

10  comments were inaccurate?

11             MR. MORRIS:  Objection to the form of

12     the question.  No foundation.  Leading.

13  BY MR. KANE:

14      Q.     I will rephrase.  I will rephrase.

15             I will ask it -- a different question.

16             Mr. Scott, do you believe that you acted

17  independently during the bankruptcy case?

18      A.     Yes.

19      Q.     Do you believe you acted in the best

20  interests of CLO HoldCo?

21      A.     Yes, I do.

22             MR. KANE:  I'm done.

23             MR. MORRIS:  Just some follow-up

24     questions, Mr. Scott.

25

Page 105

1               Grant Scott

2               EXAMINATION

3    BY MR. MORRIS:

4         Q.    Did you ever testify before Judge Jernigan?

5         A.    I have not.

6         Q.    So is it fair to say that you had no reason

7    to believe that she could ever access your credibility

8    as a witness?

9               MR. BRIDGES:  I'm going to object.

10         That calls for a legal conclusion.

11   BY MR. MORRIS:

12        Q.    You can answer.

13        A.    From -- from what I understand from the

14   transcript of that hearing, a number of comments were

15   made by the judge regarding my independence, that sort

16   of thing, that made me -- that made me think that

17   maybe I could just remove that as an issue in the case

18   by resigning.  That is essentially, what my conclusion

19   was from that hearing.

20        Q.    But you didn't resign at the time that the

21   judge made those statements, did you?

22              MR. BRIDGES:  Objection.

23         Argumentative.

24   BY MR. MORRIS:

25        Q.    You can answer.

Page 106

1                          Grant Scott

2       A.     I did not at that time.

3       Q.     In fact, you didn't resign for probably

4   seven months after, correct?

5              MR. BRIDGES:  Objection.  Asked and

6        answered.  Really?

7              THE WITNESS:  Yes.

8   BY MR. MORRIS:

9       Q.     And you continued to actively participate

10  in the bankruptcy case, correct?

11      A.     That is correct.

12      Q.     And months later, you made the decision to

13  amend CLO HoldCo's proof of claim, correct?

14      A.     Correct.

15      Q.     And months later, you made the decision to

16  file an objection to the HarbourVest settlement,

17  correct?

18      A.     Correct.

19      Q.     And months after this hearing, you made the

20  decision to withdraw that objection, correct?

21             MR. BRIDGES:  Objection to repeating

22        the same questions from the last two hours

23        over and over again.  Are we going to keep

24        going all the way to the end.

25  BY MR. MORRIS:

Appx. 07034

Page 107

1                         Grant Scott

2       Q.      Only -- only if people keep opening the

3    door.

4               Can you please answer my question?

5       A.      Yes, I removed the objection.

6       Q.      And -- and you remained in the case, and

7    you remained active in the case, and you filed on

8    behalf of your -- withdrawn.

9               You stayed in the case even after

10   CLO HoldCo was sued by the debtor, correct?

11      A.      Yes.

12      Q.      And you stayed in the case long enough to

13   negotiate a settlement on behalf of CLO HoldCo with

14   the debtor, correct?

15      A.      Correct.

16      Q.      And you can't identify anything that the

17   judge said following the escrow hearing that had

18   anything to do with you personally, correct?

19               MR. KANE:  Objection.  Form.

20               MR. MORRIS:  Withdrawn.

21   BY MR. MORRIS:

22      Q.      Can you identify anything that the judge

23   said following the escrow hearing that had to do with

24   your independence?

25      A.      I don't remember -- I'm -- what I'm telling

Page 108

1                                Grant Scott

2    you is -- let's just be clear here since I think the

3    point is -- is being missed.  The issue of when I

4    wanted to resign or when I first thought about

5    resigning has been raised.  It was raised during my

6    first deposition with you as well.  And what I'm

7    saying is -- is that after I heard about the hearing,

8    and what was said, I don't remember the exact

9    language.  My first reflection was, hey, maybe that

10   is -- maybe that is -- if I'm going to be in this

11   court having to make a claim, maybe it would be best

12   if it wasn't being made by me.  That is all.

13        Q.     And I appreciate that.  And I am just

14   trying to test the credibility of that statement.

15   Okay?

16             MR. BRIDGES:  Objection to the

17        sidebar.

18   BY MR. MORRIS:

19        Q.     Did Judge Jernigan ever issue a ruling

20   against you personally?

21             MR. BRIDGES:  Asked and answered.

22        Objection.

23             MR. MORRIS:  It is not asked and

24        answered.

25   BY MR. MORRIS:

Page 109

1                          Grant Scott

2        Q.      But go ahead, sir.

3        A.      Not against me personally.

4        Q.      Did Judge Jernigan ever issue a ruling

5    against CLO HoldCo Limited?

6        A.      Well, to my --

7                MR. BRIDGES:  Objection.  Objection.

8         Calls for legal conclusion as to the

9         meaning of "against."

10               (Reporter clarification.)

11               THE WITNESS:  The denial of the

12        escrow motion created a fairly big headache

13        for CLO HoldCo in the remainder of 2020.

14               So I believe that was a ruling

15        against CLO HoldCo, to answer your

16        question.

17   BY MR. MORRIS:

18        Q.      Okay.  Are you aware of any others?

19               MR. BRIDGES:  Objection.  Calls for a

20         legal conclusion as to the meaning of

21         "against."

22   BY MR. MORRIS:

23        Q.      You can answer.

24        A.      I don't know that she's made any other

25    rulings except to approve the settlement.

**Appx. 07037**

Page 110

1                              Grant Scott

2        Q.     Which settlement are you referring to?

3        A.     The -- the TRO settlement.

4        Q.     And were you on the -- did you listen in to

5   the hearing during that hearing when -- when the judge

6   approved the settlement?

7        A.     I did not.

8        Q.     Did you read the transcript?

9        A.     I did not.

10       Q.     Did anybody ever tell you that the judge

11  said anything during that hearing to question your

12  independence?

13             MR. KANE:  Objection to the extent it

14         calls for attorney/client privileged

15         information.

16             THE WITNESS:  No.  No, I think you

17         misunderstand.  I had one data point to go

18         on, and that's what made me start the

19         process of thinking of resigning.  That's

20         all.

21  BY MR. MORRIS:

22       Q.     I appreciate that.

23       A.     The issue -- the issue has been raised

24  repeatedly, whether it was my idea or somebody else's

25  idea, that's all I'm saying.  If you can, it was my

Page 111

1                     Grant Scott

2    idea.

3        Q.    Okay.  And I'm asking you if you have any

4    other data points after that hearing to support the

5    notion that Judge Jernigan questioned your

6    independence?

7        A.    No.

8              MR. MORRIS:  I have no further

9        questions.

10             MR. BRIDGES:  Me either.

11             MR. KANE:  I'm done.  Thank you.

12        Mr. Scott.

13             (Deposition adjourned at 4:42 p.m.)

14

15

16

17

18

19

20

21

22

23

24

25

Page 112

1        Grant Scott

2        REPORTER'S CERTIFICATE

3        I, LESHAUNDA CASS-BYRD, CSR No. B-2291, RPR,

4    Registered Professional Reporter, certify that the

5    foregoing proceedings were taken before me at the time

6    and place therein set forth, at which time the witness

7    was put under oath by me;

8        That the testimony of the witness, the questions

9    propounded, and all objections and statements made at

10   the time of the examination were recorded

11   stenographically by me and were thereafter

12   transcribed;

13       That the foregoing is a true and correct

14   transcript of my shorthand notes to taken.

15   I further certify that I am not a relative or employee

16   of any attorney or the parties, nor financially

17   interested in the action.

18       I declare under penalty of perjury under the laws

19   of North Carolina that the foregoing is true and

20   correct.

21       Dated this June 1, 2021.

22

23       *Leshaunda Byrd*

24       _____
         LESHAUNDA CASS-BYRD, CCR-B-2291, RPR

25

Appx. 07040

Page 113

```
 1                    ERRATA SHEET

 2   Case Name:

 3   Deposition Date:

 4   Deponent:

 5   Pg.  No. Now Reads      Should Read  Reason

 6   ___  ___ _____    _____  _____

 7   ___  ___ _____    _____  _____

 8   ___  ___ _____    _____  _____

 9   ___  ___ _____    _____  _____

10   ___  ___ _____    _____  _____

11   ___  ___ _____    _____  _____

12   ___  ___ _____    _____  _____

13   ___  ___ _____    _____  _____

14   ___  ___ _____    _____  _____

15   ___  ___ _____    _____  _____

16   ___  ___ _____    _____  _____

17   ___  ___ _____    _____  _____

18   ___  ___ _____    _____  _____

19   ___  ___ _____    _____  _____

20

                             _____
21                           Signature of Deponent

22   SUBSCRIBED AND SWORN BEFORE ME

23   THIS _____ DAY OF _____, 2021.

24   _____

25   (Notary Public)   MY COMMISSION EXPIRES:_____
```

**Appx. 07041**

Page 114

 1

 2   WITNESS SIGNATURE:_____

 3                * * * * * * * * * * * * * * *

 4   State of _____

 5   County of _____

 6   Subscribed and sworn to before me this _____ day of

 7   _____, 2021.

 8

 9                  _____

10                        Notary Public

11   My Commission expires_____

12   (Seal)

13

14

15

16

17

18

19

20

21

22

23

24

25

Appx. 07042

Page 115

1                          Grant Scott

2     J U R A T

3     I,              , do hereby certify under penalty of

4     perjury that I have read the foregoing transcript of

5     my deposition taken on;_____that I have made

6     such corrections as appear noted herein in ink,

7     initialed by me; that my testimony as contained

8     herein, as corrected, is true and correct.

9     Dated this _____ day of _____, 2021, at

10    _____,

11

12

13    _____

14    SIGNATURE OF WITNESS

15

16

17

18

19

20

21

22

23

24

25

Appx. 07043