# EXHIBIT 62

**Appx. 07201**

Docket #1670 Date Filed: 01/05/2021

K&L GATES LLP
Artoush Varshosaz (TX Bar No. 24066234)
1717 Main Street, Suite 2800
Dallas, TX 75201
Tel: (214) 939-5659
artoush.varshosaz@klgates.com

Stephen G. Topetzes (*pro hac vice*)
1601 K Street, NW
Washington, DC 20006-1600
Tel: (202) 778-9328
stephen.topetzes@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Lee.hogewood@klgates.com

*Counsel for Highland Capital Management Fund
Advisors, L.P., NexPoint Advisors, L.P., Highland
Funds I and its series Highland Healthcare
Opportunities Fund, Highland/iBoxx Senior Loan
ETF, Highland Opportunistic Credit Fund, and
Highland Merger Arbitrage Fund, Highland Funds II
and its series Highland Small-Cap Equity Fund,
Highland Socially Responsible Equity Fund,
Highland Fixed Income Fund, and Highland Total
Return Fund, NexPoint Capital, Inc., NexPoint
Strategic Opportunities Fund, Highland Income
Fund, Highland Global Allocation Fund, and
NexPoint Real Estate Strategies Fund, and NexPoint
Latin America Opportunities Fund*

Davor Rukavina, Esq.
Texas Bar No. 24030781
Julian P. Vasek, Esq.
Texas Bar No. 24070790
MUNSCH HARDT KOPF & HARR, P.C.
3800 Ross Tower
500 N. Akard Street
Dallas, Texas 75202-2790
Telephone: (214) 855-7500
Facsimile: (214) 978-4375

*Counsel for Highland Capital Management Fund
Advisors, L.P., NexPoint Advisors, L.P., Highland
Funds I and its series Highland Healthcare
Opportunities Fund, Highland/iBoxx Senior Loan
ETF, Highland Opportunistic Credit Fund, and
Highland Merger Arbitrage Fund, Highland Funds II
and its series Highland Small-Cap Equity Fund,
Highland Socially Responsible Equity Fund,
Highland Fixed Income Fund, and Highland Total
Return Fund, NexPoint Capital, Inc., NexPoint
Strategic Opportunities Fund, Highland Income
Fund, Highland Global Allocation Fund, and
NexPoint Real Estate Strategies Fund, and NexPoint
Latin America Opportunities Fund*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Chapter 11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P. | ) | Case No. 19-34054 (SGJ11) |
| | ) | |
| Debtor. | ) | (Jointly Administered) |
| | ) | |

## OBJECTION TO CONFIRMATION OF FIFTH AMENDED PLAN OF
## REORGANIZATION OF HIGHLAND CAPITAL MANAGEMENT, L.P.

1934054210105000000000016

Highland Capital Management Fund Advisors, L.P., and NexPoint Advisors, L.P. (each, an "**Advisor**," and collectively, the "**Advisors**"), Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, NexPoint Real Estate Strategies Fund, and NexPoint Latin America Opportunities Fund (each, a "**Fund**," and collectively, the "**Funds**," and together with the Advisors, the "**Funds and Advisors**" or "**Objectors**"), by and through their undersigned counsel, hereby submit this objection (the "**Objection**") to the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1472], together with that certain Plan Supplement [Dkt. No. 1648] filed December 30, 2020 (the "**Fifth Amended Plan**").[1] In support of the Objection, the Funds[2] and Advisors respectfully submit to the Court as follows:

## SUMMARY OF OBJECTION

The Debtor owes strict statutory and contractual fiduciary obligations to manage the billions of dollars of other peoples' money that it manages. No actual or hypothetical conflict of interest is allowed. Yet, the Fifth Amended Plan, by purporting to assume various agreements pursuant to which the Debtor manages portfolios of assets, places the interests of the Debtor's creditors ahead of the interests of the beneficial interest holders in those portfolios,

---

[1] Capitalized terms used but not otherwise defined herein shall have the meanings ascribed to such terms in the Plan.

[2] The Funds are investment companies and a business development company registered under the Investment Company Act of 1940 as open-end or "mutual" funds, closed end funds or a business development company. None of the Funds are private or hedge funds.

thereby representing a clear conflict of interest and breach of fiduciary duty in violation of the Advisers Act (defined below) and the 1940 Act (defined below).

This is because the Plan provides for the assumption of numerous management agreements in connection with, among other investments, interests in collateralized loan obligations ("**CLOs**") owned in part by the Funds and/or Advisors, together with other investors. In some cases, either the Funds, the Advisors or these entities in conjunction with other objecting creditor(s) own or manage a majority of the remaining beneficial interests in such CLOs. To be clear, the CLO -- not the Funds nor the Advisors nor the Debtor -- is the issuer of these interests. Nevertheless, it is the Funds and Advisors who hold the beneficial and economic interests and who, pursuant to the underlying agreements, in many instances have the ability to control who the servicer or manager of the portfolios is. However, the Plan reveals that the Debtor intends to dismiss its investment management employees by the end of January 2021 and to employ a subagent to perform its current portfolio manager/servicer role. The Debtor intends to effectively wind-down and liquidate the CLOs' assets within two years—an arbitrary proposition having nothing to do with what is in the best interests of the CLOs. The Debtor also intends to strip the Funds and the Advisors of their contractual and statutory rights, and to improperly insulate itself from potential future liabilities that it may incur on account of its portfolio management.

The Plan cannot be confirmed so long as it provides for the assumption of these agreements. First, these agreements cannot be assigned under the Advisers Act or the 1940 Act, meaning that they cannot be assumed pursuant to section 365(c) of the Bankruptcy Code. Second, these agreements cannot be assumed under section 365(b) of the Bankruptcy Code because the Debtor cannot adequately assure its future performance under the agreements.

Appx. 07204

Third, these agreements cannot be assumed if the Plan purports to change their provisions or relieve the Debtor from its fiduciary obligations and resulting potential liabilities.  Fourth, the Plan is not feasible and is illusory so long as it depends on future income from these non-assumable agreements.  Fifth, the Plan fails to comply with applicable law by seeking to relieve the Debtor of the strict duties imposed on it by the Advisers Act and 1940 Act.  Indeed, the Plan is an invitation for future litigation against the Debtor for future breaches by the Debtor of its contractual obligations and violations by the Debtor of federal law.

The Plan is not merely a disagreement between the Debtor, on the one hand, and the Funds and Advisers, on the other hand, as to how to manage the CLOs.  The Plan instead represents an attempt by the Debtor to strip beneficial interest holders of their contractual and statutory rights, to improperly insulate itself against its future actions and liabilities, to avoid the dictates of the Advisers Act, and to use assets that it manages—assets that do not belong to the Debtor—to benefit the Debtor's creditors at the expense of the actual owners of those assets. It is one thing for the Debtor to liquidate and to seek to repay its creditors, but it is another thing entirely for the Debtor to do this on the backs, and at the expense, of those investors whose interests the Debtor is charged with serving first.

For these and other reasons argued below, the Objectors object to the confirmation of the Plan.

The purported contract assumption is also illusory in that the Debtor's plan is premised upon the liquidation of assets in which the Debtor has no interest and which a majority of the beneficial owners has expressed, and continue to express, a desire for a different portfolio management strategy than the one the Debtor intends to continue to employ.  The contracts the Debtor proposes to assume contain provisions requiring the maximization of the return to or

**Appx. 07205**

preservation of the value of the collateral for the preference shareholders; these parties prefer that the assets not be liquidated, but maximized or preserved. Moreover, the Advisers Act[3] requires the Debtor to comply with the portfolio management contracts for the protection of the investors in the Funds, CLOs and other products. The Debtor's purported assumption of these agreements, while other provisions of the Fifth Amended Plan make clear key provisions of the assumed contracts will be ignored and rejected in this context, is a similar form of "cherry picking" that section 365 does not countenance.[4]

## **BACKGROUND**

**A.** *General Background on Funds and Advisors*

1.      Each Advisor is registered with the U.S. Securities and Exchange Commission ("**SEC**") as an investment adviser under the Investment Advisers Act of 1940, as amended, 15 U.S.C. § 80b-1 *et. seq.* (the "**Advisers Act**").

2.      Each of the Funds is a registered investment company or business development company under the Investment Company Act of 1940, as amended, 15 U.S.C. § 80a-1, *et. seq.* (the "**1940 Act**") and is advised by one of the Advisors.

3.      As an investment company or business development company, each Fund is managed by an independent board of trustees subject to 1940 Act requirements. That board determines and contracts with one of the Advisors for each Fund. As is typical for nearly all

---

[3] The Advisers Act and the 1940 Act (defined in numbered paragraph 2 below) are two separate acts, both adopted in 1940, and provide the essential statutory and regulatory structure for the Debtor's business, as well as the Advisors and the Funds, to operate legally and transparently for the benefit of the public.

[4] The Funds and Advisors are aware that the Court has heard and rejected a form of this argument in a different context. By raising the point here, we mean no disrespect to the Court or the prior ruling. However, we contend that the issue is appropriately joined in connection with confirmation of a plan containing proposed contract assumptions that simply are not contract assumptions, fairly construed. Moreover, at the time of the Motion that was denied, only the Funds and Advisors took a position on the issues; now, other parties, on information and belief, will object or have objected on a similar basis.

Appx. 07206

investment companies, the Funds do not have employees. Instead, pursuant to the 1940 Act, each Fund's board oversees the Advisor and the Advisor, acting pursuant to the advisory agreements, provides the services necessary to the Fund's operations.[5] The Funds are each managed by one of the two Advisors. The Advisors have some employees, but they also rely heavily on the Debtor to provide a variety of services. Further, certain individuals employed or affiliated with the Debtor also hold roles for the Advisors and/or the Funds, and some of these roles are fiduciary in nature (the "**Fiduciaries**"). The Fiduciaries are privy to confidential commercial information about the Funds and Advisors, including data relating to the Funds' investment holdings and investment strategies.

### B. *Shared Services and Payroll Reimbursement Agreements with the Debtor*

4. Each Advisor is party with the Debtor to a shared services agreement. Specifically, NexPoint Advisors, L.P. ("**NexPoint**") and the Debtor are parties to an Amended and Restated Shared Services Agreement dated January 1, 2018 (as amended, the "**NexPoint SSA**"), and Highland Capital Management Fund Advisors, L.P. ("**HCMFA**") and the Debtor are parties to a Second Amended and Restated Shared Services Agreement dated February 8, 2013 (as amended, the "**HCMFA SSA**," and collectively with the NexPoint SSA, the "**Shared Services Agreements**").[6]

5. Under the Shared Services Agreements, the Debtor provides a variety of services, including operational, financial and accounting, human resources, information technology, legal, tax, and compliance services, to the Advisors. As part of its provision of

---

[5] Each of the Funds' respective boards meets quarterly and, consistent with statutory requirements, each is advised by independent counsel.

[6] Copies of the Shared Services Agreements and the Payroll Reimbursement Agreements (as defined below) are attached to the proofs of claim filed by the Advisors at Claim Nos. 95, 104, 108 and 119.

**Appx. 07207**

services, the Debtor maintains books and records (the "**Books and Records**") on behalf of the Advisors.

6. Under the HCMFA SSA, the costs of the Debtor's services are allocated on a percentage of use basis. The Debtor submits quarterly expense statements to HCMFA to reconcile amounts due to the Debtor. In addition, with respect to certain taxes related to the Shared Services, the Debtor collects those taxes from HCMFA on the same basis as with the Debtor's other customers. To the extent of a related tax refund, the Debtor is obligated to submit the refund to HCMFA.

7. Under the NexPoint SSA, NexPoint pays the Debtor a fixed monthly fee for the provision of services.

8. The Advisors and the Debtor are also parties to separate payroll reimbursement agreements (as amended, the "**Payroll Reimbursement Agreements**"). The Payroll Reimbursement Agreements address the splitting of costs for certain employees that are "dual employees" of the Debtor and an Advisor and who provide advice to funds, such as the Funds, advised by the Advisors. The Payroll Reimbursement Agreements provide for the subject Advisor to reimburse the Debtor at a set cost.

9. The Advisors also participate in the Debtor's self-insured healthcare plan (the "**Self-Insured Plan**"), which provides employee healthcare coverage. Depending on the contributions made and the claims submitted to the Self-Insured Plan at any given time, an Advisor may be owed money by, or owe additional contributions to, the Self-Insured Plan.

10. The Plan proposes to reject those executory contracts [Fifth Am. Plan, Dkt. No. 1472 at p. 37] that are not otherwise listed for assumption in a plan supplement. The Debtor has filed its Plan Supplement listing executory contracts to be assumed [Dkt. No. 1648], which

**Appx. 07208**

Plan Supplement does not include the foregoing executory contracts.  Accordingly, it appears that the Plan proposes to reject the Shared Services Agreements, the Payroll Reimbursement Agreements, and the Self-Insured Plan.  The Advisors will therefore have potentially sizable rejection damages claims, on account of which they are preparing to file corresponding proofs of claim.

### C. *The CLOs*

11.    The Funds also have economic interests in certain collateralized loan obligations (the "**CLOs**") (the Fifth Amended Plan refers to the CLOs as "Issuers"), for which the Debtor serves as portfolio manager.

12.    The CLOs are Aberdeen Loan Funding, Ltd., Brentwood CLO, Ltd., Eastland CLO, Ltd., Gleneagles CLO, Ltd., Grayson CLO, Ltd., Greenbriar CLO, Ltd., Jasper CLO Ltd., Red River CLO, Ltd., Rockwall CDO, Ltd., Rockwall CDO II Ltd., Southfork CLO, Ltd., Stratford CLO Ltd., Loan Funding VII, LLC,[7] and Westchester CLO, Ltd.

13.    The CLOs are securitization vehicles that were formed to acquire and hold pools of debt obligations.  They also issued various tranches of notes and preferred shares, which are intended to be repaid from proceeds of the subject CLO's pool of debt obligations.  The notes issued by the CLOs are paid according to a contractual priority of payments, or waterfall, with the value remaining in the CLO after the notes are fully paid flowing to the holders of the preferred shares.

14.    The CLOs were created many years ago.  Most of the CLOs have, at this point, paid off all the tranches of notes or all but the last tranche.  Accordingly, most of the economic value remaining in the CLOs, and all of the upside, belongs to the holders of the preferred

---

[7] The portfolio management agreements with Loan Funding VII, LLC is not proposed to be assumed.

**Appx. 07209**

shares.

15. Further, such ownerships represent in many cases the total remaining outstanding interests in such CLOs, the noteholders otherwise having been paid. In others, the remaining noteholders represent a small percentage only of remaining interests. Thus, the economic ownership of the registered investment companies, business development company, and CLO Holdco represent a majority of the investors in the CLOs as follows:

a. CLOs in which NexPoint or HCMFA manage owners of a majority of the preference shares: Stratford CLO, Ltd. 69.05%, Grayson CLO, Ltd. 60.47% and Greenbriar CLO, Ltd. 53.44%.

b. CLOs in which a combination of NexPoint and HCMFA managed funds and CLO Holdco hold all, a supermajority or majority of preference shares: Liberty CLO, Ltd. 70.43%, Stratford CLO, Ltd. 69.05%*[8], Aberdeen Loan Funding, Ltd. 64.58%, Grayson CLO, Ltd. 61.65%*, Westchester CLO, Ltd. 58.13%, Rockwall CDO, Ltd. 55.75%, Brentwood CLO, Ltd. 55.74%, Greenbriar CLO, Ltd. 53.44%*

16. The issuer of each CLO has separately contracted with the Debtor for the Debtor to serve as the CLO's portfolio manager or servicer (the "**Servicing Agreements**").[9] In this capacity, the Debtor is responsible for, among other things, making decisions to buy or sell the CLOs' assets in accordance with the indenture and its obligations under the Servicing Agreements. Although the Servicing Agreements vary, they generally impose a duty on the

---

[8] CLOs marked with an asterisk (*) appear in the foregoing list as well.

[9] The title given to the Debtor by the CLOs varies from CLO to CLO based on the relevant agreements, but the Debtor has the same general rights and obligations for each CLO. In this Objection, the Funds and Advisors have used the term "portfolio manager" when referring to the Debtor's role for each CLO regardless of the precise title in the underlying documents.

Appx. 07210

Debtor when acting as portfolio manager to maximize the value of the CLOs' assets for the benefit of the CLOs' noteholders and preferred shareholders.  In particular, the Servicing Agreements contain language providing for the maximization or preservation of value for the benefit of the preference shares as shown in the following examples:

> In performing its duties hereunder, the Portfolio Manager shall seek to maximize the value of the Collateral for the benefit of the Noteholders and the Holders of the Preference Shares taking into account the investment criteria and limitations set forth herein and in the Indenture and the Portfolio Manager shall use reasonable efforts to manage the Collateral in such a way that will (i) permit a timely performance of all payment obligations by the Issuer under the Indenture and (ii) subject to such objective, maximize the return to the Holders of the Preference Shares; provided, that the Portfolio Manager shall not be responsible if such objectives are not achieved so long as the Portfolio Manager performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Portfolio Manager with respect to the Notes or the Preference Shares.

Liberty Portfolio Management Agreement, Sec. 2(b) containing language above.

> In performing its duties hereunder, the Servicer shall seek to preserve the value of the Collateral for the benefit of the Holders of the Securities taking into account the Collateral criteria and limitations set forth herein and in the Indenture and the Servicer shall use reasonable efforts to select and service the Collateral in such a way that will permit a timely performance of all payment obligations by the Issuer under the Indenture; provided, that the Servicer shall not be responsible if such objectives are not achieved so long as the Servicer performs its duties under this Agreement in the manner provided for herein, and provided, further, that there shall be no recourse to the Servicer with respect to the Notes or the Preference Shares. The Servicer and the Issuer shall take such other action, and furnish such certificates, opinions and other documents, as may be reasonably requested by the other party hereto in order to effectuate the purposes of this Agreement and to facilitate compliance with applicable laws and regulations and the terms of this Agreement.

Aberdeen Servicing Agreement, Sec. 2(b).

**Appx. 07211**

17.     Moreover, each of the Servicing Agreements contain express language that the portfolio manager's obligations thereunder are for the benefit of and "shall be enforceable at the instance of the Issuer, the Trustee, on behalf of the Noteholders, or the requisite percentage of Noteholders or Holders of Preference Shares, as applicable, as provided in the Indenture of the Preference Share Paying Agency Agreement, as applicable." Servicing Agreement Sec. 9.

18.     The Servicing Agreements also generally allow the holders of preference shares to remove the portfolio manager for cause, while their affirmative consent is required to an assignment of the agreements. Cause includes the anticipated "ipso facto" provisions related to insolvency and bankruptcy, but cause is not so limited and includes material breach of the Servicing Agreement which would clearly include the failure to maximize value or the failure to preserve collateral. Servicing Agreement, Sec. 14. However, certain Servicing Agreements provide for a certain percentage of holders of preference shares to remove the portfolio manager without cause. *See, e.g.*, Gleneagles CLO , Ltd., Portfolio Management Agreement, Sec. 12(c).

### E.     *The Fifth Amended Plan and Disclosure Statement*

19.     On November 24, 2020, the Debtor filed the Fifth Amended Plan and the Disclosure Statement for the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P. [Dkt. No. 1473] (the "**Disclosure Statement**").

11

20.    The Fifth Amended Plan provides for the transfer of the majority of the Debtor's

assets to a Claimant Trust that will be established for the benefit of the Claimant Trust

Beneficiaries.  The Debtor's rights to manage investment vehicles managed by the Debtor

pursuant to executory contracts that are assumed pursuant to the Fifth Amended Plan, defined

as the "Managed Funds," are to remain with the Reorganized Debtor, which, in turn, is to be

managed by New GP LLC, a wholly-owned subsidiary of the Claimant Trust.  The Disclosure

Statement states that "[t]his structure will allow for continuity in the Managed Funds and an

orderly and efficient monetization of the Debtor's Assets." Dkt. No. 1473 at 11.  Ultimately,

however, the Claimant Trust and the Reorganized Debtor will "sell, liquidate, or otherwise

monetize all Claimant Trust Assets and Reorganized Debtor Assets."  *Id.*  More specifically,

the Reorganized Debtor will manage the wind down of the Managed Funds in addition to any

other remaining Assets.  Moreover, the Financial Projections attached as Exhibit C to the

Disclosure Statement make clear that, assuming confirmation of the Plan in its current form, the

Debtor intends to liquidate its remaining assets and the assets within the Managed Funds over

the next two years, concluding in December 2022.

21.    The Disclosure Statement further states that the Debtor does not anticipate either

the Reorganized Debtor or the Claimant Trust assuming or assuming and assigning the contracts

between the Debtor and certain of its Related Entities[10] pursuant to which the Debtor provides

shared services and sub-advisory services relating to such Related Entities.  Dkt. No. 1473 at

42.  Accordingly, it appears that the Debtor's intent is to reject the Shared Services Agreements,

the Payroll Reimbursement Agreements, and the Self-Insured Plan.

---

[10] Footnote 10 to the Disclosure Statement clarifies that the Debtor does not consider any of the Issuers to be a
Related Entity.

**Appx. 07213**

22.     With respect to the Shared Services Agreements, the Disclosure Statement provides that the cost of staffing to fulfil the agreements has historically resulted in a net loss to the Debtor and is not beneficial to the estate.  The Disclosure Statement further states that the agreements contain anti-assignment provisions which it believes to be enforceable under section 365(c) of the Bankruptcy Code, and moreover, are terminable at will by either party.  In light of these considerations, the Debtor apparently does not believe that the agreements may be assumed or assumed and assigned, and even if they could, there would not be any corresponding benefit to the estate.  Notwithstanding the foregoing, the Disclosure Statement indicates that the Debtor is still assessing whether to assume and assign the agreements with a Related Entity. Dkt. No. 1473 at 42.

23.     The Disclosure Statement also discusses the Debtor's role as portfolio manager for the CLOs (which the Disclosure Statement defines as "Issuers") in Article II(U) (pg. 32). After explaining the Debtor's role and noting some proofs of claim filed by the CLOs, the Disclosure Statement states as follows:

> The Issuers have taken the position that the rejection of the Portfolio Management Agreements (including any ancillary documents) would result in material rejection damages and have encouraged the Debtor to assume such agreements. Nonetheless, the Issuers and the Debtor are working in good faith to address any outstanding issues regarding such assumption. The Portfolio Management Agreements may be assumed either pursuant to the Plan or by separate motion filed with the Bankruptcy Court.
>
> The Debtor is still assessing its options with respect to the Portfolio Management Agreements, including whether to assume the Portfolio Management Agreements.

24.     The Debtor's Supplement to the Plan, filed on December 30, 2020 at Dkt. No. 1648, indicates that the Debtor intends to assume the Servicing Agreements with all of the CLOs except Loan Funding VII, LLC.  *See* Dkt. No. 1648, Sched. A.

13

**Appx. 07214**

## OBJECTION

**A.**     ***The Debtor Cannot Assume the Servicing Agreements Pursuant to Section 365(c)(1)
of the Bankruptcy Code***

25.    The Objectors object to the assumption of the Servicing Agreements for the
fundamental reason that the Debtor will not manage the CLOs' assets appropriately in order to
maximize value for the CLOs and the Objectors, but will instead breach its fiduciary duties by
managing a winding-down those CLOs and assets in order to provide a recovery for its creditors,
in what is an obvious and irreconcilable conflict of interest.

26.    As explained below, the Debtor and the Servicing Agreements which it seeks to
assume are subject to the Advisers Act.  As the Supreme Court has repeatedly held, it is a
fundamental purpose of the Advisers Act to impose strict fiduciary duties on investment
advisors and to "eliminate conflicts of interest between the investment adviser and the clients."
*SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 191 (1963).  This extends to any
"conflicts of interest which might incline an investment adviser—consciously or
unconsciously—to render advice which was not disinterested."  *Id.*  "[T]he Act's legislative
history leaves no doubt that Congress intended to impose enforceable fiduciary obligations."
*Transamerica Mort. Advisors v. Lewis*, 444 U.S. 11, 17 (1979).

27.    Under the Plan, the Debtor would be owned by its creditors.  The Debtor and the
Claimant Trust would be managed by a person holding fiduciary duties to the Debtor's creditors.
The Debtor would manage and presumably wind-down and liquidate the assets of the CLOs
within a span of two years, not for the benefit of the CLOs and their beneficial interest holders,
but for the benefit of the Debtor's creditors.  And, it would do this without employees or
resources, or by impermissibly delegating its duties to yet a different party—something that it
is not permitted to do under applicable law and the governing contracts.  In sum, the Debtor

14

would manage the CLOs and their assets for the benefit of the Debtor's creditors, which it is fundamentally impossible to do without simultaneously violating the Debtor's strict fiduciary duties to others and which represents a clear conflict of interest under the Advisers Act.

28.     This inescapable conclusion is precisely why the Bankruptcy Code prohibits an assumption of personal service contracts like the Servicing Agreements. The Bankruptcy Code provides that:

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> (1) (A) applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and (B) such party does not consent to such assumption or assignment.

11 U.S.C. § 365(c)(1).

29.     The first question is whether "applicable law" excuses the counterparties to the Servicing Agreements from accepting performance from the Debtor. In this respect, both the Advisers Act and the 1940 Act represent "applicable law" that provides for precisely that.

30.     The Advisers Act governs "investment advisors." The Advisers Act defines an investment advisor as:

> any person who, for compensation, engages in the business of advising others, either directly or through publications or writings, as to the value of securities or as to the advisability of investing in, purchasing, or selling securities, or who, for compensation and as part of a regular business, issues or promulgates analyses or reports concerning securities.

15 U.S.C. § 80b-2(a)(11).

31.     There is no question that the Debtor receives compensation under the Servicing Agreements. The only question is whether, under the Servicing Agreements, and in connection

Appx. 07216

with managing the investments and securities of the CLOs, the Debtor satisfies the remaining

element(s).    Case law confirms that, in providing investment services and investment

management under the Servicing Agreements, is acting as an "investment advisor" under the

Advisers Act.  The Second Circuit authoritatively considered and decided the issue of whether

a portfolio manager is an investment advisor in *Abrahamson v. Fleschner*, 568 F.2d 862 (2d

Cir. 1977).  The case concerned general partners who managed various investments on behalf

of limited partners.  *See id*. at 866.  Regarding whether the general partners were investment

advisors on account of managing the investments, the court concluded that they were "on two

independent grounds":

> First, the monthly reports which contained the alleged fraudulent representations
> were reports which provided investment advice to the limited partners.   The
> general partners' compensation depended in part upon the firm's net profits and
> capital gains.  These in turn were affected by the size of the total funds under
> their control.  The monthly reports were an integral part of the general partners'
> business of managing the limited partners' funds.  In deciding whether or not to
> withdraw their funds from the pool, the limited partners necessarily relied
> heavily on the reports they received from the general partners.
>
> Second, wholly aside from the monthly reports, we believe that the general
> partners as persons who managed the funds of others for compensation are
> 'investment advisers' within the meaning of the statute.  This is borne out by the
> plain language of Section 202(a)(11) and its related provisions, by evidence of
> legislative intent and by the broad remedial purposes of the Act.

*Id*. at 870.  Thus, by virtue of managing the underlying investments and related activities, the

general partners were providing investment advice and were therefore investment advisors

subject to the Advisers Act.

32.    The court in *SEC v. Smith*, 1995 U.S. Dist. LEXIS 22352 (E.D. Mich. 1995),

considered a similar issue.  In that case, the SEC sought summary judgment that the defendant

was an investment adviser under the Advisers Act.  The defendant argued that he was not an

investment adviser merely by virtue of managing a portfolio of accounts on behalf of third

16

parties. *See id.* at \*12-\*13. Specifically, the defendant argued that he was not giving investment advice, but that he was instead "a professional trustee who exercises sole discretionary control over trust investments. . . I am the trustee. I have absolute full power and authority to make all buy, hold and sell decisions. And, therefore, I am the one that receives information and research and I make the decisions." *Id.* at \*13. In other words, because he had sole discretion and control over how to manage the invested assets, he was not giving "advice" within the meaning of the Advisers Act. The court rejected this argument: "Smith is clearly an investment advisor under the Advisers Act." *Id.* at \*15.

33. The court in *SEC v. Saltzman*, 127 F. Supp. 2d 660 (E.D. Pa. 2000) reached the same conclusion with respect to a portfolio manager:

> Saltzman maintained exclusive control over the investment portfolio, brokerage accounts, and bank account of Saltzman Partners, L.P. He made all investment decisions for the portfolio. As the Act intended to embrace those who wield power over their clients' money, as Saltzman did over the investments of the limited partners, the facts alleged qualify Saltzman as an investment adviser.

*Id.* at 669. Therefore, the Debtor, by virtue of managing the CLO assets, and even though it has the sole control and authority over that management, is providing investment advice and is therefore an investment advisor with respect to the Servicing Agreement.

34. More particularly, the Servicing Agreements, because they provide for investment advice, are "Investment Advisory Contracts" under the Advisers Act. This is further confirmed by the language of the Advisers Act with respect to the definition of Investment Advisory Contract:

> any contract or agreement whereby a person agrees to act as investment adviser to <u>or to manage any investment</u> or trading account <u>of another person</u> other than an investment company registered under title I of this Act.

15 U.S.C. § 80b-5(d) (emphasis added). Managing the investments of others is of course

Appx. 07218

precisely what the Debtor does under the Servicing Agreements.

35.    There should therefore be no question that the Servicing Agreements are "investment advisory contracts" subject to the Advisers Act.  Should there be any doubt, the Servicing Agreements in multiple places reference the Advisers Act and subject the agreements to the requirements of the Advisers Act.

36.    The Advisers Act prohibits an assignment of an investment advisory contract without consent.  The Advisers Act defines "assignment" as including "any direct or indirect transfer or hypothecation of an investment advisory contract."  15 U.S.C. § 80b-2(a)(1).  With respect to an assignment, the Advisers Act provides as follows:

> No investment adviser registered or required to be registered with the Commission shall enter into, extend, or renew any investment advisory contract, or in any way perform any investment advisory contract entered into, extended, or renewed on or after the effective date of this title, if such contract—
>
> (2) fails to provide, in substance, that no assignment of such contract shall be made by the investment adviser without the consent of the other party to the contract.

15 U.S.C. § 80b-5(a)(2).

37.    Each of the Servicing Agreements contain substantially similar provisions related to any assignment:

> any assignment of this Agreement to any Person, in whole or in part, by the Servicer shall be deemed null and void unless (i) such assignment is consented to in writing by the Issuer, a Super Majority of the Controlling Class of Notes (excluding any Notes that are not Voting Notes) and a Majority of the Voting Preference Shares.

38.    Accordingly, the Advisers Act represents "applicable law" under section 365(c)(1) that excuses the counterparty to an investment advisory contract from accepting performance from an assignee.  As such, because the agreement cannot be assigned, it cannot

Appx. 07219

be assumed by the Debtor without consent.

39.     It is true that courts in this District construe section 365(c)(1) such that, where the applicable law is merely a general prohibition on assignment, the section does not prevent an assumption. *See, e.g., In re Lil' Things*, 220 B.R. 583, 590-91 (Bankr. N.D. Tex. 1998). Here, however, the Advisers Act is not a general law that would prohibit an assignment; it is a very specific law, applicable to a very narrow set of persons, and one which prohibits only the assignment of an investment advisory agreement.

40.     Even so, this District recognizes that section 365(c)(1) becomes paramount "where the identity of the party rendering performance under the contract is material to the contract, and the contract is non-delegable under applicable non-bankruptcy law." *Id.* at 591. This is certainly true where, as here, a party has contracted with someone to manage that party's property and investments: that is a fiduciary relationship of the highest trust where the identity of the person providing the services is absolutely paramount. The Fifth Circuit recognized this fundamental principle the highly analogous situation of an attorney retention agreement: the contract was not assumable under otherwise applicable law because the contract was a highly personal one involving elements of trust, legal, and ethical considerations. *See In re Tonry*, 724 F.2d 467, 468-69 (5th Cir. 1984).

41.     In *In re Mirant Corp.*, 303 B.R. 319 (Bankr. N.D. Tex. 2003), this Court concluded that the debtor-in-possession may assume a contract even if section 365(c) would prevent a trustee from being able to assume the contract. In large part, the Court construed the addition, in 1984, of the term "debtor-in-possession" into the statute as evidence that Congress intended for a debtor-in-possession to be able to assume its contracts even if section 365(c) would otherwise prohibit a trustee from assuming the contract. *See id.* at 333. "The specific

19

**Appx. 07220**

use of the words 'the debtor or the debtor in possession' leads the court to conclude that a contract to be performed by a debtor or debtor in possession (as opposed to a trustee) is subject to assumption whether or not applicable law limits its assignability. *Id.* However, the Fifth Circuit has not adopted this view and the logic of *In re Mirant Corp.* is not correct.

42.    The statute begins by providing that the "trustee may not assume or assign any executory contract . . ." 11 U.S.C. § 365(c)(1). That "trustee" must include a debtor-in-possession, for it is the same "trustee" as in section 365(a) which provides that a "trustee . . . may assume or reject any executory contract." *Id.* at § 365(a). Thus, the section 365(c)(1) prohibition on a trustee must also extend to a "debtor-in-possession," unless the Court concludes that the use of the word "trustee" in the same statute means two different things. Rather, what *In re Mirant Corp.* was referring to was the following language in section 365(c)(1):

> applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession.

*Id.* at § 365(c)(1).

43.    The addition of the term "debtor-in-possession" to this statute does not change the result; *i.e.* it does not mean that a debtor-in-possession, unlike a trustee, may assume, but not assign, its own contracts. The question is whether applicable law excuses a party from accepting performance from an entity other than the debtor-in-possession. The Debtor is a debtor-in-possession and, if the counterparty is excused by applicable law from accepting performance from anyone else, then the contract may not be assumed by the Debtor. *In re Mirant Corp.* was simply wrong in concluding that the 1984 amendment somehow excepted a debtor-in-possession's assumption of its own contracts from the operation of section 365(c)(1).

44.    The Fifth Circuit's opinion in *Strumpf v. McGee (In re O'Connor)*, 258 F.3d 392

**Appx. 07221**

(5th Cir. 2001) is on point. That opinion was rendered after the 1984 amendment at issue in *Mirant*, and that opinion concerned a Chapter 11 debtor. The question was whether a non-assignable partnership agreement could be assumed under section 365(c)(1). The Fifth Circuit held that "the agreement was *not* assumable under § 365(c)(1)." *Id*. at 402 (emphasis in original). And, as here, the confirmed plan provided for a postconfirmation liquidating trust. *See id*. at 396. The only difference was that, in *In re O'Connor*, a Chapter 11 trustee proposed the confirmed plan. This difference does not matter because the Fifth Circuit held that the agreement itself was not assumable; not that one person may assume it while a second not. *See id*. at 402 and 404 (twice holding that the "agreement is *not* assumable" (emphasis in original)).[11] Only one person may assume an executory contract, and that person is the trustee, even if the debtor-in-possession is exercising the powers of a trustee. Thus, if the contract itself is not assumable, then it is not assumable period. This difference also does not matter because the identity of the plan proponent is immaterial: the question is still whether it is the debtor-in-possession, or the estate, that can assume the executory contract.

45. The Debtor will respond that the Fifth Circuit, in *In re Mirant Corp.*, 440 F.3d 238 (5th Cir. 2006), rejected the so-called "hypothetical test" and adopted instead the "actual test" regarding the assignment of an executory contract or lease. In *Mirant*, the issue concerned section 365(e)(2) of the Bankruptcy Code and whether an *ipso facto* clause was enforceable against a debtor-in-possession because the executory contract was not assignable. The

---

[11] In *Strumpf*, the Fifth Circuit held that, because the agreement was not assumable, it passed through the Chapter 11 unaffected. However, *Strumpf* itself concluded that this "pass-through" principle does not apply in a liquidating plan, as further confirmed by *In re Tex. Rangers Baseball Partners*, 521 B.R. 134,183 (Bankr. N.D. Tex. 2014). Even if the agreements could pass through unaffected to the reorganized debtor, even though it is liquidating, the Plan cannot limit the ability to terminate the agreements in the future based on the change in control and other facts that are present. Otherwise, the agreements would be affected by the Plan, meaning that they would have to first be assumed, as recognized in *Strumpf* by holding that a plan effect on the executory contract means that it cannot pass through bankruptcy unaffected. *Strumpf*, 258 F.3d at 405.

**Appx. 07222**

"hypothetical test" required a court to review whether a hypothetical assignment was prohibited by applicable law; if it was, then the *ipso facto* clause could be enforced even though no assignment was proposed. *See id*. at 246-47. The Fifth Circuit rejected this approach and instead applied the "actual test," which looked at whether an assignment was actually being proposed. *See id*. at 249-50. The Debtor will argue that this same logic should apply to section 365(c)(1) such that, when no actual assignment is being proposed, the section is not implicated.

46.    *Mirant* and its logic, however, do not apply to section 365(c)(1). First, and most obviously, the Fifth Circuit stated that "[a]lthough this Circuit has addressed § 365(c)(1), we have yet to address § 365(e)," and then it cited to its *In re O'Connor* and *In re Braniff Airways* precedent. *See id*. at 248-49. The circuit, in analysing this prior precedent, noted that it was the contract itself that was not assumable ("declaring the contract unassumable," *id*.) and reaffirmed the holdings of both prior opinions notwithstanding the change in the language of section 365(c)(1). Thus, and having been afforded the opportunity to revisit its prior precedent or to find that the added "debtor-in-possession" language to section 365(c)(1) compelled a different result, the circuit instead reaffirmed its prior precedent holding that the contract itself was not assumable. More precisely, the "actual test" cannot apply to section 365(c)(1) because that section provides that a trustee may not "assume <u>or</u> assign" an executory contract. If the test were an actual one, *i.e.* whether an actual assignment was being proposed, then the section would simply provide that the trustee may not "assume and assign" the executory contract. But, in preventing an assumption even without a proposed assignment, section 365(c)(1) necessarily applies the "hypothetical test" such that, even though no assignment is proposed, if an assignment is prohibited then so is an assumption.

47.    Thus, were the Fifth Circuit presented with the precise issue with respect to

**Appx. 07223**

section 365(c)(1), to the extent it was not in *In re O'Connor*, the Objectors submit that the Fifth Circuit would join its sister circuits in concluding that, so long as even a hypothetical assignment would be prohibited, so too is an assumption, whether by a trustee, debtor, or debtor-in-possession. *See In re Catapult Entertainment*, 165 F.3d 747, 750 (9th Cir. 1999) ("a debtor in possession may not assume an executory contract . . . if applicable law would bar assignment to a hypothetical third party, even where the debtor in possession has no intention of assigning the contract in question to any such third party"); *In re James Cable Partners L.P.)*, 27 F.3d 534, 537 (11th Cir. 1994); (holding that debtor-in-possession may not assume executory contract under section 365(c)(1) notwithstanding that no assignment was proposed); *In re Catron*, 1994 U.S. App. LEXIS 14585 (4th Cir. 1994) (affirming holding that "agreement was the type of executory contract that could not be assumed by Catron, a debtor-in-possession, absent consent of the nondebtor parties as required by § 365(c)(1)(B)"); *In re West Electronics Inc.*, 852 F.2d 79, 83 (3d Cir. 1988) ("the relevant inquiry is not whether [applicable law] would preclude an assignment from West as a debtor to West as a debtor in possession, but whether it would foreclose an assignment by West to another defense contractor");[12] *but see Institut Pasteur v. Cambridge Biotech Corp.*, 104 F.3d 489 (1st Cir. 1997).

48.     The result may not be to the liking of the Debtor and, in other circumstances, the result may be harsh on a debtor-in-possession.  But this case aptly demonstrates why the section

---

[12] In fact, as recognized in *West*, the addition of the term "debtor-in-possession" into section 365(c)(1) demonstrates Congress's intent to prevent a debtor-in-possession from assuming its own personal services contracts:

> We think that by including the words "or the debtor in possession" in 11 U.S.C. § 365(c)(1) Congress anticipated an argument like the one here made and wanted that section to reflect its judgment that in the context of the assumption and assignment of executory contracts, a solvent contractor and an insolvent debtor in possession going through bankruptcy are materially distinct entities.

*In re West Electronics*, 852 F.2d at 83.

Appx. 07224

exists and why the result is fair. Many innocent parties have entrusted billions of dollars of their property to the Debtor to manage, for their benefit. Now, the Debtor wants to manage that property for the benefit of its creditors, and with insufficient experience, resources, and employees at that. This is not a case where the debtor is a person, who holds investment management contracts. That person is the same before, during, and after a Chapter 11 case. But here the Debtor is the same entity in name only: no reasonable fund would contract with the postconfirmation Debtor here to manage a penny, let alone life savings and the investments of many. That is the whole point of why personal services contracts cannot be assumed without consent.

49. Moreover, the Court should not permit the Debtor to place form over substance, especially when the rights of innocent, third party funds and investors are concerned. While technically the post-confirmation Debtor will still be the same corporate shell, it will have been gutted of everything that made the Debtor the Debtor. It is in substance and in every real and practical consideration an assignment of the contracts. Indeed, it appears that the only reason why the Debtor will even maintain a corporate existence after confirmation is an attempt to obviate the prohibition on assumption under section 365(c)(1), as all other property of the Debtor is transferred to the Claimant Trust. On this point, the Plan expressly provides that the "Reorganized Debtor may, in its discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of officers and employees." Plan at p. 32-33. If the intent of this provision is to provide services required by the Servicing Agreements, then this is a blatant violation of the Servicing Agreements' and the Advisers Act's anti-assignment and anti-delegation provisions. In other words, this admission in the Plan may well be precisely the type of assignment, or subsequent assignment, that would be prohibited by section 365(c)(1) regardless of any

24

discussion between the "hypothetical test" and the "actual test."

50.     Separate and apart from the above discussion, and understand that there is uncertainty in the law as to the interplay between sections 365(f) and 365(c)(1), it is clear that a "personal services contract" falls squarely within the protection of section 365(c)(1).  As the Fifth Circuit has held, a personal services contract is subject to section 365(c)(1): "Congress' enactment of § 365(c) was to preserve the pre-Code rule that 'applicable law' precluding assignment of personal service contracts is operative in bankruptcy."  *In re Braniff Airways Inc.*, 700 F.2d 935, 943 (5th Cir. 1983).  A personal services contract is one which "involves a matter of personal trust and confidence between the original contracting parties."  *In re Grove Rich Realty Corp.*, 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996).  "A personal services contract has been defined as a contract which contemplates the performance of personal services involving the exercise of special knowledge, judgment, taste, skill, or ability."  *In re Wofford*, 608 B.R. 494, 496 (Bankr. E.D. Tex. 2019) (internal quotation omitted).

> It is well settled that when an executory contract is of such a nature as to be based upon personal services or skills, or upon personal trust or confidence, the debtor-in-possession or trustee is unable to assume or assign the rights of the bankrupt in such contract.

*In re Grove Rich Realty Corp.*, 200 B.R. 502, 510 (Bankr. E.D.N.Y. 1996) (emphasis added).

51.     The Service Agreements are clearly personal service contracts: the Debtor's position is one of trust and that of a fiduciary, the Debtor's performance requires personal confidence and high skill and knowledge, the agreements provide that the Debtor's duties are not delegable, and no person entrusting another with managing billions of dollars in assets would want the underlying contract to be assumable by a trustee or a liquidating debtor.  Indeed, the Supreme Court has recognized the "personalized character of the services of investment advisors."  *SEC v. Capital Gains Research Bureau Inc.*, 375 U.S. 180, 191 (1963).  This Court

Appx. 07226

has characterized financial advisory and brokerage contracts as personal services contracts.  *See In re Consolidated Capital Equities Corp.*, 157 B.R. 280, 283 (Bankr. N.D. Tex. 1993).  Other courts have held that the Investors Act imposes a trust relationship.  *See e.g. In re Peterson*, 96 B.R. 314, 323 (Bankr. D. Colo. 1988).  The strict fiduciary and anti-assignment provisions of the Advisor Act and the 1940 Act further confirm Congress' strong view that these contracts are in the nature of personal service contracts.

52.    Even if the Court is inclined to adopt the "actual test" under section 365(c)(1) such that an assumption is possible where there is no assignment, and recognizing that section 365(c)(1) is broader in application than to only personal services contracts, the law overwhelmingly confirms that a personal services contract is not assumable in the first instance. *See, e.g., In re Braniff Airways Inc.*, 700 F.2d 935, 943 (5th Cir. 1983).

53.    The final issue concerning section 365(c)(1) is consent.  Assuming that the CLOs do not object to the assumption of the Servicing Agreements, the statute requires affirmative consent to the assumption.  The statute prohibits the assumption if "such party does not consent to such assumption."  11 U.S.C. § 365(c)(1)(B).  The plain meaning of this language is that consent is required, as opposed to merely the absence of an objection.  In *Strumpf v. McGee (In re O'Connor)*, 258 F.3d 392 (5th Cir. 2001), the issue concerned an executory contract that was neither expressly assumed nor assigned under a Chapter 11 plan.  The Fifth Circuit held that the contract was not assumable under section 365(c)(1) and concluded that the counterparty "did not consent" to an assumption.  *See id*. at 402.  If the absence of an objection was all that was required, then the Fifth Circuit would not have so held.  In fact, the Fifth Circuit expressly rejected the argument that the "Appellees consented to the assumption by failing to object to the Plan."  *Id*. at 400.  This is in line with the case law, which requires affirmative, or actual,

**Appx. 07227**

consent to the assumption.  *See In re Allentown Ambassadors Inc.*, 361 B.R. 422, 448 n. 60 (Bankr. E.D. Pa. 2007).

54.     Finally, there is the issue of the Objectors' standing to make the foregoing arguments.  The Objectors have standing for at least four reasons.  First, as creditors and parties in interest,[13] they have the right to object to the Plan.  11 U.S.C. § 1109(b).  Insofar as it is the Fifth Amended Plan that provides for assumption of the Servicing Agreements, the Objectors may object to said assumption, especially because assumption of the Servicing Agreements and future performance thereunder affect the feasibility of the Plan as a whole.  Second, the Objectors have standing and the right to object to confirmation of the Fifth Amended Plan under sections 1129(a)(1), (a)(2), and (a)(3) of the Bankruptcy Code.  Insofar as the Fifth Amended Plan and the Debtor propose to impermissibly assume the Servicing Agreements in violation of the law, the Objectors may object to such assumption on those bases.  Third, in several of the Servicing Agreements, the Objectors have the right to remove the Debtor or to control who the servicer under the agreements is.  They have similar rights under the Indentures with respect to assignment or modification of the Servicing Agreements.  Insofar as the Fifth Amended Plan purports to limit or to take those rights away from them, and to change their rights, the Objectors have standing to object to their rights being limited or eliminated.  Likewise, under the 1940 Act, an investment adviser must be approved by a majority of the voting securities, and the Servicing Agreements cannot continue in effect for more than two years without the consent of either the CLOs' boards of directors or a majority of the outstanding voting securities--i.e., the Objectors.  15 U.S.C. § 80a-15(a)(2).  Insofar as the Fifth Amended Plan purports to limit the

---

[13] "The term 'party in interest' is not defined in the Bankruptcy Code."  *Khan v. Xenon Health, LLC (In re Xenon Anesthesia of Tex., PLLC)*, 698 Fed. Appx. 793, 794 (5th Cir. 2017) (quoting *In re Megrelis*, No. 13-35704-H3-7, 2014 Bankr. LEXIS 3905, at *2 (Bankr. S.D. Tex. Sept. 12, 2014)).  "It generally 'means anyone who has a legally protected interest that could be affected by the bankruptcy case.'"  *Id.*

Appx. 07228

Objectors' right to withhold their consent or influence the CLOs' boards of directors, the Objectors have standing to challenge any modification of those rights. Fourth, in several of the Servicing Agreements, it is not just the CLO that must approve an assignment, but also the Objectors. The Objectors have similar rights under the Indentures. Insofar as the test under section 365(c)(1) is a hypothetical assignment, and the Objectors have the right to approve or not approve that assignment under applicable law and the agreements, that right should extend to consent under section 365(c)(1)(B) as well, as the CLOs' consent is not possible without a concurring consent by the Objectors.

55. The Fifth Amended Plan does not comply with section 1129(a)(1) of the Bankruptcy Code because it violates a fundamental principal of contract assumption under section 365 of the Bankruptcy Code. Contracts must be assumed or rejected; there is no such thing as a partial assumption. *In re Nat'l Gypsum Co.*, 208 F.3d 498, 506 (5th Cir. 2000) ("Where the debtor assumes an executory contract, it must assume the entire contract, *cum onere*--the debtor accepts both the obligations and the benefits of the executory contract."); *In re Rigg*, 198 B.R. 681, 685 (Bankr. N.D. Tex. 1996) ("An executory contract cannot be rejected in part and assumed in part; the debtor must assume both the benefits and the burdens on the contract.").

56. The Fifth Amended Plan contravenes established law with respect to the proposed treatment of the CLOs and the Debtor's obligations under the portfolio management agreements.

57. First, the Fifth Amended Plan reveals that the Debtor, while claiming to assume the various Servicing Agreements, also intends to deprive the counterparties to those agreements from exercising their rights to change management.

28

**Appx. 07229**

58. Under the Servicing Agreements at issue, either a majority, or in some cases, a supermajority of owners may initiate a change in management. See attached Exhibit A.

59. The Debtor's Plan makes clear, however, that it intends to engage a subagent to perform the management and servicing function and, implicitly to deprive the CLOs as issuers from exercising contractual rights with respect to making a change in management.

60. Second, the Debtor's duties under the Servicing Agreements, which themselves have been adopted under the Advisers Act, subject to Rule 206(4)-8 thereunder as noted below, are owed to, and provide the rights of, the preference shareholders under the portfolio management agreements. The Debtor's proposed liquidation of Managed Assets (which it does not own) is contrary to the performance of its contractual and statutory duties under the portfolio management agreements.

61. The preference shareholders, as the only remaining owners of the Managed Assets of many of the CLOs, contend that the Debtor's (i) sales of Managed Assets and (ii) continued management of the Managed Assets, notwithstanding the Debtor's stated intention to wind down and liquidate all assets, violates the provisions of Section 2(b) of the portfolio management agreements.

62. These violations are detrimental to the counterparties to the assumed contracts because:

    a. liquidation sales of Managed Assets the Debtor does not own are unlikely to maximize the value of the Managed Assets when compared to the long term investment horizon of the beneficial owners of the Managed Assets;

    b. liquidation sales of Managed Assets are likely to subtract value when duress sales occur based on the short term horizon and liquidation

29

strategy of the Debtor;

c.  the Debtor has announced the termination of its personnel, resulting in loss of knowledgeable portfolio managers; and

d.  any potential consultant engaged by the Debtor in the absence of its terminated personnel will be subservient to the Debtor's short-term objective of liquidation in violation of the assumed contracts and applicable securities law.

63.    Manifestly, where the investors in a pooled vehicle state to the manager both that their objectives and desires differ from those of the portfolio manager, and that the portfolio manager's actions are contrary to the manager's duties to maximize returns for the benefit of the investors established under the agreement, that portfolio manager is not acting reasonably under or in accordance with its agreement.  The owners of the Managed Assets, in requisite majority or supermajority,[14] have expressly requested that the Managed Assets not be liquidated as contemplated by the Debtor's business plan.  In that context, the Debtor is unreasonably acting contrary to the required contractual objective and therefore statutory obligation to maximize value for the preference shareholders.   In implementing the Fifth Amended Plan, the Debtor is likely to violate its duty of reasonableness under Section 2(b) under these circumstances, because the Debtor is not "perform[ing] its duties under [the] Agreement in the manner provided for" in the Agreement.

64.    As the Debtor is an investment management firm familiar with established securities laws, the Fifth Amended Plan's violations of such laws is blatant and should not be permitted.

---

[14] Objectors acknowledge that they do not hold a majority in all of the CLOs, for example, Jasper.

**Appx. 07231**

65.    Based upon the Fifth Amended Plan's attempt to assume contracts partially, and not fully, the Court should find that the Fifth Amended Plan fails to satisfy section 1129(a)(1) of the Bankruptcy Code and cannot be confirmed

66.    Moreover, as discussed below, with respect to the injunction and release provisions of the Fifth Amended Plan, the Plan purports to release the Debtor from its contractual and statutory obligations with respect to the Servicing Agreements.  As explained above, those agreements require the Debtor to preserve and to maximize the value of the CLOs assets, for the benefit of the CLOs and the holders of beneficial interests in them.  The Advisers Act requires the same.  The Fifth Amended Plan purports to enjoin parties from "taking any actions to interfere with the implementation or consummation of this Plan."  Plan at p. 50.  This is an unprecedented, overbroad injunction that does not comport with fundamental due process, as what "interference," "implementation," or "consummation" mean is not specified.  Are the Objectors to be enjoined from enforcing future rights under the Servicing Agreements even if the Debtor commits future malfeasance?

67.    The Fifth Amended Plan likewise enjoins all creditors and other parties, and their "Related Persons" (who may not even have notice of the injunction) from "commencing, conducting, or continuing in any manner, directly or indirectly, any suit, action, or other proceeding of any kind (including any proceeding in a judicial, arbitral, administrative or other forum) against or affecting the Debtor, the Independent Directors, the Reorganized Debtor."  Plan at p. 51.  Read literally, this means that the Objectors and the CLOs will not be able to assert any claims, or seek any relief, against the Debtor or Reorganized Debtor for any present or future actionable wrongs under the Servicing Agreements and the Advisers Act.  Again, so broad an injunction, not limited in time, is unprecedented, legally impermissible, violates due

process, and seeks to strip parties of their contractual and Advisers Act rights—even as the

Debtor purports to assume the Servicing Agreements which, as is black letter law, means that

the Debtor is requiring to provide full future performance (and suffer potential future obligations

and liabilities).

68.    The balance of the Plan injunction is equally fatally defective.  If there are future

obligations and defaults, and even if there are present ones, under the Servicing Agreements

and applicable law, affected parties have to have the right to seek legal redress, enforce awards

and injunctions, and assert setoff rights.  On this last basis in particular, if there are setoff rights

under the CLOs or other agreements, those rights cannot be permanently enjoined.  And, the

same injunction applies to any "successors" of the Debtor and its property interests, meaning

that, if the Debtor assigns or delegates its duties under the Servicing Agreements, some future

and unknown party may claim protections under these injunctions without any protection to the

Objectors or the CLOs.

69.    The Plan's channeling injunction is similarly improper and defective, at least

with respect to post-confirmation actions.  *See* Plan at p. 51.  That injunction requires *anyone*

with any complaint against a "Protected Party" that is "related to the Chapter 11 Case," or to

the "wind down of the business of the Debtor or the Reorganized Debtor," to first seek relief

from this Court, including by proving that a colourable claim exists and obtaining leave.  The

same section then purports to grant "sole jurisdiction" to this Court to "adjudicate" any such

dispute.  Read literally, this means that the Objectors and the CLOs will have to first seek leave

from this Court before enforcing any right under the Servicing Agreements and the Advisers

Act, which is unprecedented and is incompatible with respect to the assumption of those

agreements for post-assumption claims, and then this Court would adjudicate the claims.  This

**Appx. 07233**

Court will have no jurisdiction to adjudicate such post-confirmation claims, however, and the channeling injunction is am impermissible attempt to confer such jurisdiction where none exists.

70. All of the foregoing affects, limits, and eviscerates future rights under the assumed Servicing Agreements—something that defeats the whole purpose of an assumption of an executory contract and that contradicts the established law that an executory contract, and its future obligations, must be assumed *in toto*.

## B. *Other objections to the Fifth Amended Plan*

The Debtor's Fifth Amended Plan is objectionable for other reasons as well. Those Objections are discussed briefly below. The Funds and Advisors reserve the right to object upon any appropriate basis under Sections 1129(a) and (b) and other applicable provisions of the Bankruptcy Code. The Funds and Advisors also reserve the right to join in and support the objections asserted by other parties at the Confirmation Hearing.

### Section 1129(a)(5)

71. In order to be confirmed, the Debtor must satisfy the following non-waiveable requirements:

(i) the proponent of the plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the plan, as a director, officer, or voting trustee of the debtor, an affiliate of the debtor participating in a joint plan with the debtor, or a successor to the debtor under the plan; and

(ii) the appointment to, or continuance in, such office of such individual, is consistent with the interests of creditors and equity security holders and with public policy.

11 U.S.C. § 1129(a)(5).

72. This is of particular importance here, where the Debtor proposes to manage billions of dollars of other entities' assets, and ties in as well to section 362(b)'s requirement of

33

**Appx. 07234**

demonstrating adequate assurance of future performance.  Yet, the Debtor fails completely with

respect to even an attempt to satisfy these requirements.

73.    In this respect, the sole disclosure in the Plan and Disclosure Statement with

respect to who will manage these billions of dollars in assets is as follows:

> Subject to and consistent with the terms of the Reorganized Limited Partnership
> Agreement, the Reorganized Debtor shall be managed by its general partner,
> New GP LLC. The initial officers and employees of the Reorganized Debtor
> shall be selected by the Claimant Trustee. The Reorganized Debtor may, in its
> discretion, also utilize a Sub-Servicer in addition to or in lieu of the retention of
> officers and employees.

Plan at p. 32-33.

74.    Neither the identity nor the compensation of the people who will control and

manage the Reorganized Debtor is provided, much less as to who may be a Sub-Servicer.  While

Mr. Seery is disclosed as the Claimant Trustee who will be responsible for "winding down the

Reorganized Debtor's business operations," this is insufficient.  All the more so because,

without additional disclosures and facts, not only can adequate assurance of future performance

not be proven, but the Debtor cannot prove that the employment and compensation of these

unnamed officers and managers of the Reorganized Debtor is "is consistent with the interests

of creditors and equity security holders and with public policy."  Public policy in particular,

given the dictates of the Advisers Act, is implicated.

Accordingly, the Plan is fatally defective with respect to section 1129(a)(5) and cannot be

confirmed on that basis alone.

### *The Fifth Amended Plan is not feasible*

75.    Section 1129(a)(11) requires that confirmation of a plan not be likely to be

followed by liquidation or the need for further reorganization.  "Establishing a likelihood that a

plan itself will be successful is a question of feasibility."  *In re Dernick*, Case No. 18-32417,

**Appx. 07235**

2020 WL 6833833, at *17 (Bankr. S.D. Tex. Nov. 20, 2020). Feasibility contemplates whether the plan is workable and offers a reasonable assurance of success. *Id.*; *see also In re Frascella Enters., Inc.*, 360 B.R. 435, 453 (Bankr. E.D. Pa. 2007). "An obvious illegality . . . exposes the plan on feasibility grounds." *In re Food City*, 110 B.R. at 813 n. 12; *see also In re McGinnis*, 453 B.R. at 773 (chapter 13 plan premised on illegal activity could not be confirmed); *In re Frascella*, 360 B.R. at 445, 456 (citing *Food City*, 110 B.R. at 812 n. 10) (debtor failed to establish plan was feasible where it rested on questionable legal basis).

76. As discussed above, the proposed treatment with respect to the portfolio management agreements and the CLOs contravenes section 365 of the Bankruptcy Code and the Adviser Act. This illegality hampers the feasibility of the Fifth Amended Plan, and accordingly, the Court should find that it is not feasible and deny confirmation.

### ***The Debtor's proposed assumption of the Servicing Agreements is improper under section 365 because there is no adequate assurance of future performance***

77. Under section 365(b) of the Bankruptcy Code, an executory contract may only be assumed if the Debtor "provides adequate assurance of future performance under such contract[.]" 11 U.S.C. § 365(b)(1)(C).

78. Although the Fifth Amended Plan provides for the assumption of the Servicing Agreements with many of the CLOs, it does not offer any assurance with respect to the Debtor's ability to perform under such agreements. Indeed, given the Debtor's plan to wind down and liquidate its remaining assets, and in light of the contractual and statutory breaches discussed above, the Debtor cannot possibly provide such assurance. Furthermore, it is uncertain whether sufficient employees will be retained by the Debtor to fulfil its obligations under the portfolio management agreements, even its most significant duties are delegated to a Sub-Advisor. Accordingly, assumption is improper and must be disallowed under section 365(b).

Appx. 07236

79.     Equally important, the Debtor's failure to offer or provide adequate assurance is intensified because the purported assumption is, in reality, a *sub rosa* assumption *and assignment* to an as yet unnamed third party.  This unidentified third party has also not offered adequate assurance of future performance as required in the context of such assignments.

### *The Release and Exculpation Provisions of the Fifth Amended Plan are overly broad and extend beyond the Effective Date*

80.     In the Fifth Circuit, permanent injunctions against nondebtors are not permissible.  *Feld v. Zale Corp. (In re Zale Corp.)*, 62 F.3d 746, 761 (5th Cir. 1995).  In fact, and quite to the contrary, the case law "seem[s] broadly to foreclose non-consensual non-debtor releases and permanent injunctions."  *Bank of N.Y. Trust Co., NA v. Official Unsecured Creditors' Comm. (In re Pac. Lumber Co.)*, 584 F.3d 229, 252 (5th Cir. 2009).  Such permanent injunctions would "improperly insulate nondebtors in violation of section 524(e)," and "without any countervailing justification of debtor protection."  *Id.* at 760 (quoting *Landsing Diversified Props. v. First Nat'l Bank & Trust Co. (In re W. Real Estate Fund, Inc.)*, 922 F.2d 592, 601-02 (10th Cir. 1990)); *see also In re Pac. Lumber*, 584 F.2d at 252 (noting that costs that the released parties might incur defending against suits are unlikely to swamp such parties or the reorganization).

81.     Indeed, courts within this District have found that injunctions and release provisions substantively identical to that proposed in Fifth Amended Plan, and which purport to release causes of action against non-debtor third parties, violate Fifth Circuit precedent and are impermissible.  *Dropbox, Inc. v. Thru, Inc. (In re Thru, Inc.)*, Civil Action No. 3:17-CV-1958-G, 2018 WL 5113124, at *21 (N.D. Tex. Oct. 19, 2018) (finding that bankruptcy court erred by approving injunction that would have effectively discharged non-debtor third parties); *In re Pac. Lumber*, 584 F.3d at 251-53 (striking release provision purporting to release non-

debtor third parties from liability relating to the proposal, implementation, and administration of the plan).

82.     The injunction contained in Article XI.F of the Fifth Amended Plan is almost identical to that struck down in *In re Thru*. Like the injunction provision in *In re Thru*, the Debtor's proposed injunction would bar the Debtor's creditors "from pursuing causes of action against a number of non-debtor third parties, if those causes of action relate to the creditors' claims against the debtor." 2018 WL 5113124, at *21. The Fifth Amended Plan purports to release creditors' claims against not only the Debtor, but also the Independent Directors. Dkt. No. 1472 at 56-57. Not only that, but the Fifth Amended Plan purports to release creditors' claims stemming from the bankruptcy case, as well as the negotiation, administration and implementation of the Plan, as against many of the specific third parties that the courts in this Circuit have found to be impermissible, including, but not limited to, employees, officers and directors, and professionals retained by the Debtor, among others. *Id.*; *In re Thru*, 2018 WL 5113124, at *21 (concluding it was "clearly erroneous" for the bankruptcy court to approve an injunction covering causes of action against such parties); *In re Pac. Lumber*, 584 F.3d at 252-53.

83.     Furthermore, the exculpation provision contained in Article XI.C of the Fifth Amended Plan is incompatible with Fifth Circuit precedent, as explained by the court in *In re Thru*. The court in *In re Thru* found that it was clear error for the bankruptcy court to approve an exculpation provision that exculpated non-debtor third parties, including the debtor's employees, officers, directors, advisors, affiliates and professionals, from liability in connection with formulating, implementing, and consummating the plan of reorganization. 2018 WL 5113124, at *22. The exculpation provision in the Fifth Amended Plan provides the "same

**Appx. 07238**

insulation" as the impermissible provision in the *In re Thru* plan, and as such, it cannot be approved. *See also In re Pac. Lumber*, 584 F.3d at 252 ("We see little equitable [sic] about protecting the released non-debtors from negligence suits arising out of the reorganization.").

84. In sum, the Fifth Amended Plan impermissibly seeks to exculpate certain non-debtor third parties from a broad array of claims relating to such entities' pre- and post-petition conduct. The Funds and Advisors submit there is no authority that would permit such broad exculpatory and/or injunctive language in favor of third parties.

### *The Fifth Amended Plan appears to eliminate the right of setoff*

85. The Funds and Advisors object to the extent that the Plan purports to divest them of their rights of setoff against the Debtor.

### *The Fifth Amended Plan violates section 365(d)(2) by impermissibly allowing the Debtor to assume or reject executory contracts and unexpired leases after confirmation*

86. Section 365(d)(2) of the Bankruptcy Code provides that, in a case under chapter 11, the debtor may assume or reject an executory contract or unexpired lease "at any time *before confirmation of a plan* . . . ." 11 U.S.C. § 365(d)(2) (emphasis added).

87. Notwithstanding this clear language, the Fifth Amended Plan authorizes the Debtor to amend the Plan Supplement by adding or removing a contract or lease from the list of contracts to be assumed, or assign an Executory Contract or Unexpired Lease, at any time up until the Effective Date. Dkt. No. 1472 at 43. Further, the Disclosure Statement indicates that the Debtor is still evaluating whether to assume and assign the Shared Services Agreements. This is contrary to the explicit language of the Bankruptcy Code.

88. Accordingly, the Advisors object to the Fifth Amended Plan to the extent that it purports to reserve the Debtor's right and ability to assume or assume and assign the Shared

Appx. 07239

Services Agreements or the Payroll Reimbursement Agreements post-confirmation. Furthermore, the Funds object to the Fifth Amended Plan to the extent it purports to reserve the Debtor's right and ability to alter the proposed treatment of the Servicing Agreements.

### *The Debtor is not entitled to a discharge*

89.     Although section 1141(d) of the Bankruptcy Code discharges a debtor from most pre-confirmation debt, it expressly <u>does not</u> discharge a debtor if:

> (A) the plan provides for the liquidation of all or substantially all of the property of the estate;
> (B) the debtor does not engage in business after consummation of the plan; and
> (C) the debtor would be denied a discharge under section 727(a) of this title if the case were a case under chapter 7 of this title.

11 U.S.C. § 1141(d)(3).

90.     Here, the Plan provides for liquidation of all of the Debtor's property over a period of time.  Although the Debtor may technically continue business for a brief period of time, its ultimate goal is liquidation.  Further, the Debtor would be denied a discharge under section 727(a)(1) because it is not an individual.  Accordingly, the Court should find that the Debtor is not entitled to a discharge under section 1141 of the Bankruptcy Code.

### *The Fifth Amended Plan may violate the absolute priority rule*

91.     Section 1129(b)(2)(B)(ii) provides that the holder of any claim or interest that is junior to the claims of unsecured creditors may not retain any property unless general unsecured creditors are paid in full.  11 U.S.C. § 1129(b)(2)(B)(ii).  The "absolute priority rule is a bedrock principle of chapter 11 practice."  *In re Texas Star Refreshments, LLC*, 494 B.R. 684, 703 (Bankr. N.D. Tex. 2013).  "Under this rule, unsecured creditors stand ahead of investors in the receiving line and their claims must be satisfied before any investment loss is compensated." *In re SeaQuest Diving, LP*, 579 F.3d 411, 420 n.5 (5th Cir. 2009) (comparing subordination

Appx. 07240

under section 510 to absolute priority rule) (quoting *In re Geneva Steel Co.*, 281 F.3d 1173, 1180 n.4 (10th Cir. 2002)).

92. In the event the unsecured creditor classes (Class 7 and 8) vote against the Fifth Amended Plan, the absolute priority rule prohibits the retention of equity in the Reorganized Debtor by existing equity holders in the absence of a new investment and opportunity for competitive bidding for that investment opportunity.

## **CONCLUSION**

93. For the reasons set forth above, the Funds and Advisors respectfully request that the Court deny confirmation of the Fifth Amended Plan and grant such other and further relief as the Court deems just and proper.

Dated:     January 5, 2020

**MUNSCH HARDT KOPF & HARR, P.C.**

By: /s/ Davor Rukavina
     Davor Rukavina, Esq.
     Texas Bar No. 24030781
     Julian P. Vasek, Esq.
     Texas Bar No. 24070790
     3800 Ross Tower
     500 N. Akard Street
     Dallas, Texas  75201-6659
     Telephone: (214) 855-7500
     Facsimile: (214) 855-7584
     Email:     drukavina@munsch.com

     - and -

     K&L GATES LLP

     Artoush Varshosaz (TX Bar No. 24066234)
     1717 Main Street, Suite 2800
     Dallas, TX 75201
     Tel: (214) 939-5659
     artoush.varshosaz@klgates.com

     Stephen G. Topetzes (*pro hac vice*)
     1601 K Street, NW
     Washington, DC 20006-1600

40

Tel: (202) 778-9328
stephen.topetzes@klgates.com

A. Lee Hogewood, III (*pro hac vice*)
4350 Lassiter at North Hills Ave., Suite 300
Raleigh, NC 27609
Tel: (919) 743-7306
Lee.hogewood@klgates.com

*Counsel for Highland Capital Management
Fund Advisors, L.P., NexPoint Advisors,
L.P., Highland Funds I and its series
Highland Healthcare Opportunities Fund,
Highland/iBoxx Senior Loan ETF,
Highland Opportunistic Credit Fund, and
Highland Merger Arbitrage Fund,
Highland Funds II and its series Highland
Small-Cap Equity Fund, Highland Socially
Responsible Equity Fund, Highland Fixed
Income Fund, and Highland Total Return
Fund, NexPoint Capital, Inc., NexPoint
Strategic Opportunities Fund, Highland
Income Fund, Highland Global Allocation
Fund, and NexPoint Real Estate Strategies
Fund, and NexPoint Latin America
Opportunities Fund*

41

**Appx. 07242**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that, on this the 5th day of January, 2021, and in addition to electronic service on parties entitled to notice thereon through the Court's ECF system, the undersigned caused the foregoing document to be served, by U.S. first class mail, postage prepaid, on the following:

Pachulski Stang Ziehl & Jones LLP
Attn: Jeffrey N. Pomerantz, Ira D. Kharasch, and Gregory V. Demo
10100 Santa Monica Blvd.
13th Floor
Los Angeles, CA 90067

Hayward & Associates PLLC
Attn: Melissa S. Hayward and Zachery Z. Annable
10501 N. Central Expy, Ste. 106
Dallas, Texas 75231

Sidley Austin LLP
Attn: Matthew A. Clemente and Alyssa Russell
One South Dearborn Street
Chicago, Illinois 60603

Office of the United States Trustee
U.S. Department of Justice, Region 6: Northern District of Texas
1100 Commerce Street, Room 976
Dallas, TX 75242

and, on the same day, by e-mail, on the following:

jpomerantz@pszjlaw.com
ikharasch@pszjlaw.com
gdemo@pszjlaw.com
MHayward@HaywardFirm.com
ZAnnable@HaywardFirm.com
mclemente@sidley.com
Alyssa.russell@sidley.com
Lisa.L.Lambert@usdoj.gov

/s/  Davor Rukavina
Davor Rukavina

**Highland Capital Management Fund Advisors, L.P.**

**CLOs Review**

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Aberdeen Loan Funding, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Shares Paying Agency Agreement. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Trustee, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Brentwood CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

1

Exhibit A

**Appx. 07244**

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Eastland CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Gleneagles CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice. PMA § 12(c).<br><br>The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date). PMA § 12(c).<br><br>For cause removal may be effected in connection with the Portfolio Manager | 66 2/3% of Preference Shares Holders. PMA § 12(c). |

2

308393059.4

**Appx. 07245**

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | | | breaching the portfolio management agreement by not maximizing the value of the Collateral. PMA § 2(b). | |
| **Grayson CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |
| **Greenbriar CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture. SA § 9. The Indenture references a Preference Shares Paying Agency Agreement. Indenture § 1.1 (Definitions-- Preference Share Documents). | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Trustee, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

308393059.4

Appx. 07246

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | | | | |
| **Jasper CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice. PMA § 12(a). The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 15% IRR since the Closing Date). PMA § 12(a). For cause removal may be effected in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral. PMA § 2(b). | 66 2/3% of Preference Shares Holders. PMA § 12(a). |
| **Liberty CLO, Ltd.** | Requisite percentage of Class E Certificates Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Class E | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Class E Certificates holders. PMA § 2(b). | Removal without cause permitted by 66 2/3% of Class E Certificates Holders (excluding Class E Certificates held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice. PMA § 12(c). | 66 2/3% of Class E Certificates Holders. PMA § 12(c). |

308393059.4

**Appx. 07247**

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | Certificates Paying Agency Agreement. PMA § 9. | | The Portfolio Manager may avoid removal by purchasing all Class E Certificates voting for removal (and Class E Certificates not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date). PMA § 12(c).<br><br>For cause removal may be effected in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral. PMA § 2(b). | |
| **Red River CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

308393059.4

**Appx. 07248**

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Rockwall CDO Ltd.** | Requisite percentage of Preferred Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by 66 2/3% of Preferred Shares Holders (excluding Preferred Shares held by the Servicer and affiliates, or for which they have discretionary voting authority, but HFP may vote Preferred Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | 66 2/3% of Voting Preference Share Holders. SA § 14. |
| **Rockwall CDO II Ltd.** | Requisite percentage of Preferred Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by 66 2/3% of Preferred Shares Holders (excluding Preferred Shares held by the Servicer and affiliates, or for which they have discretionary voting authority, but HFP may vote Preferred Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | 66 2/3% of Voting Preference Share Holders. SA § 14. |

308393059.4

**Appx. 07249**

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| **Southfork CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Portfolio Management Agreement of Portfolio Manager, as provided in the Indenture or Preference Share Paying Agency Agreement. PMA § 9. | The Portfolio Manager must seek to maximize the value of the Collateral for the benefit of the Preference Shares holders. PMA § 2(b). | Removal without cause permitted by 63% of Preference Shares Holders (excluding Preference Shares held by the Portfolio Manager and affiliates, or for which they have discretionary voting authority) directing the Issuer, upon 90 days' notice.  PMA § 12(c).  The Portfolio Manager may avoid removal by purchasing all Preference Shares voting for removal (and Preference Shares not voting for removal but seeking to sell) at the Buy-out Amount (i.e., 12% IRR since the Closing Date).  PMA § 12(c).  For cause removal may be effected upon the Portfolio Manager authorizing or filing a voluntary petition in connection with the Portfolio Manager breaching the portfolio management agreement by not maximizing the value of the Collateral.  PMA § 2(b). | 63% of Preference Shares Holders. PMA § 12(c). |
| **Stratford CLO Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders.  SA § 2(b). | No removal without cause.  Removal for cause permitted by 66 2/3% of Preference Shares Holders (excluding Preference Shares held by the Servicer | 66 2/3% of Preference Shares Holders. SA § 14. |

7

308393059.4

| CLO | Enforcement Rights | Obligation Regarding Collateral | Removal Rights | Requisite Threshold For Removal Rights |
|---|---|---|---|---|
| | Servicer, as provided in the Indenture. SA § 9. The Indenture references a Preference Shares Paying Agency Agreement. Indenture § 1.1 (Definitions-- Preference Share Documents). | | and affiliates, or for which they have discretionary voting authority, but HFP may vote Preference Shares it owns up to the Original HFP Share Amount) directing the Issuer, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | |
| **Valhalla CLO, Ltd.** | [No Preference Shares or Class E Certificates.] | [No Preference Shares or Class E Certificates.] | [No Preference Shares or Class E Certificates.] | |
| **Westchester CLO, Ltd.** | Requisite percentage of Preference Shares Holders may enforce obligations under Servicing Agreement of Servicer, as provided in the Indenture or Preference Share Paying Agency Agreement. SA § 9. | The Servicer must seek to preserve the value of the Collateral for the benefit of the securities holders. SA § 2(b). | No removal without cause. Removal for cause permitted by Majority of Voting Preference Shares Holders directing the Issuer, upon 10 days' notice. SA § 14. For cause removal may be effected in connection with the Servicer breaching the servicing agreement by not preserving the value of the Collateral. SA § 2(b). | Majority of Voting Preference Share Holders. SA § 14. |

308393059.4

**Appx. 07251**