CRAWFORD, WISHNEW & LANG PLLC
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Movants*

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In re: | ) | Case No. 19-34054-sgj-11 |
| | ) | |
| Highland Capital Management, L.P., | ) | Chapter 11 |
| | ) | |
| Debtor. | ) | |
| | ) | |

## AMENDED APPENDIX TO MOTION FOR FINAL APPEALABLE ORDER AND SUPPLEMENT TO MOTION TO RECUSE PURSUANT TO 28 U.S.C. § 455 AND BRIEF IN SUPPORT [DKT. 3406]

James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC, f/k/a HCRE Partners, LLC, a Delaware limited liability company (collectively, "Movants") file this Amended Appendix in support of their *Motion for Final Appealable Order and Supplement to Motion to Recuse Pursuant to 28 U.S.C. § 455* and *Brief in Support*:

| Exhibit No. | Description | Appendix Nos. |
|---|---|---|
| **31** | June 10, 2021 Hearing Transcript | APP'X. 2720-2810 |
| **32** | December 10, 2020 Hearing Transcript | APP'X. 2811-2815 |
| **33** | June 17, 2021 Order | APP'X. 2816-2828 |
| **34** | February 9, 2022 Memorandum Opinion and Order by Judge Kinkeade | APP'X. 2829-2842 |

| 35 | Withdrawn | APP'X. 2843-2924 |
|----|-----------|------------------|
| 36 | Withdrawn | APP'X. 2925-3013 |
| 37 | Withdrawn | APP'X. 3014-3044 |
| 38 | January 14, 2021 Hearing Transcript | APP'X. 3045-3049 |
| 39 | May 20, 2021 Hearing Transcript | APP'X. 3050-3054 |
| 40 | May 10, 2021 Hearing Transcript | APP'X. 3055-3067 |
| 41 | June 25, 2021 Hearing Transcript | APP'X. 3068-3070 |
| 42 | March 1, 2022 Hearing Transcript | APP'X. 3071-3073 |

Dated: August 26, 2022

Respectfully submitted,

CRAWFORD, WISHNEW & LANG PLLC

By: /s/ Michael J. Lang
Michael J. Lang
Texas State Bar No. 24036944
mlang@cwl.law
1700 Pacific Ave, Suite 2390
Dallas, Texas 75201
Telephone: (214) 817-4500

*Counsel for Movants*

## CERTIFICATE OF SERVICE

The undersigned certifies that, on August 26, 2022, a true and correct copy of the above and foregoing document was served on all parties and counsel set to receive notice by the Court's ECF system.

/s/ Michael J. Lang
Michael J. Lang

# EXHIBIT 31

```
                IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
                          DALLAS DIVISION

                              )     Case No. 19-34054-sgj-11
In Re:                        )     Chapter 11
                              )
HIGHLAND CAPITAL              )     Dallas, Texas
MANAGEMENT, L.P.,             )     Thursday, June 10, 2021
                              )     9:30 a.m. Docket
          Debtor.             )
                              )     MOTION TO COMPEL COMPLIANCE
                              )     WITH BANKRUPTCY RULE 2015.3
                              )     FILED BY GET GOOD TRUST AND
                              )     THE DUGABOY INVESTMENT TRUST
                              )     (2256)
_____)
                              )
HIGHLAND CAPITAL              )     Adversary Proceeding 21-3006-sgj
MANAGEMENT, L.P.,             )
                              )
          Plaintiff,          )     DEFENDANT'S MOTION FOR LEAVE
                              )     TO FILE AMENDED ANSWER AND
v.                            )     BRIEF IN SUPPORT [15]
                              )
HIGHLAND CAPITAL              )
MANAGEMENT SERVICES, INC.,    )
                              )
          Defendant.          )
_____)
                              )
HIGHLAND CAPITAL              )     Adversary Proceeding 21-3007-sgj
MANAGEMENT, L.P.,             )
                              )
          Plaintiff,          )     DEFENDANT'S MOTION FOR LEAVE
                              )     TO AMEND ANSWER TO PLAINTIFF'S
TO                            )     COMPLAINT [16]
v.                            )
                              )
HCRE PARTNERS, LLC            )
N/K/A NEXPOINT REAL           )
ESTATE PARTNERS, LLC,         )
                              )
          Defendant.          )
_____)

                   TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                 UNITED STATES BANKRUPTCY JUDGE.
```

```
 1   WEBEX APPEARANCES:

 2   For the Get Good Trust    Douglas S. Draper
     and Dugaboy Investment    HELLER, DRAPER & HORN, LLC
 3   Trust:                    650 Poydras Street, Suite 2500
                               New Orleans, LA  70130
 4                             (504) 299-3300

 5   For the Debtor:           Jeffrey Nathan Pomerantz
                               PACHULSKI STANG ZIEHL & JONES, LLP
 6                             10100 Santa Monica Blvd.,
                                 13th Floor
 7                             Los Angeles, CA  90067-4003
                               (310) 277-6910
 8
     For the Debtor:           John A. Morris
 9                             PACHULSKI STANG ZIEHL & JONES, LLP
                               780 Third Avenue, 34th Floor
10                             New York, NY  10017-2024
                               (212) 561-7700
11
     For the Official Committee Matthew A. Clemente
12   of Unsecured Creditors:    SIDLEY AUSTIN, LLP
                                One South Dearborn Street
13                              Chicago, IL  60603
                                (312) 853-7539
14
     For James Dondero:        Clay M. Taylor
15                             BONDS ELLIS EPPICH SCHAFER
                                 JONES, LLP
16                             420 Throckmorton Street,
                                 Suite 1000
17                             Fort Worth, TX  76102
                               (817) 405-6900
18
     For the NexPoint          Lauren K. Drawhorn
19   Parties:                  WICK PHILLIPS
                               3131 McKinney Avenue, Suite 100
20                             Dallas, TX  75204
                               (214) 692-6200
21
     Recorded by:              Michael F. Edmond, Sr.
22                             UNITED STATES BANKRUPTCY COURT
                               1100 Commerce Street, 12th Floor
23                             Dallas, TX  75242
                               (214) 753-2062
24

25
```

3

Transcribed by:                  Kathy Rehling
                                 311 Paradise Cove
                                 Shady Shores, TX   76208
                                 (972) 786-3063

Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

4

1              DALLAS, TEXAS - JUNE 10, 2021 - 9:44 A.M.

2              THE COURT:  All right.  Let me change my stacks here.

3  I will now hear what was Matter No. 1 on the docket, Highland

4  Capital, Case No. 19-34054.  We have a motion from the Dugaboy

5  and Get Good Trusts seeking compliance with Bankruptcy Rule

6  2015.3.

7     Who do we have appearing for the trusts this morning?

8              MR. DRAPER:  Douglas Draper, Your Honor.

9              THE COURT:  All right.  And for the Debtor this

10  morning?

11             MR. POMERANTZ:  Good morning, Your Honor.  Jeffrey

12  Pomerantz; Pachulski Stang Ziehl & Jones; on behalf of the

13  Debtor.

14             THE COURT:  All right.  Do we have any other parties

15  wishing to make an appearances?  These are the only parties

16  who filed pleadings, but I'll go ahead and ask if anyone wants

17  to appear for any reason.

18             MR. CLEMENTE:  Good morning, Your Honor.  It's Matt

19  Clemente at Sidley on behalf of the Committee.  I'm here.

20             THE COURT:  All right.  Thank you, Mr. Clemente.

21     All right.  Mr. Draper, how did you want to proceed?

22             MR. DRAPER:  I'd just -- I think the issue is

23  primarily a legal issue, Your Honor.

24             THE COURT:  Uh-huh.

25             MR. DRAPER:  So we've filed with the Court our

5

1    response to the Debtor's opposition, I have some comments I'd

2    I like to make, and just leave it at that. I think -- as I

3    said, I believe the issue is purely a legal issue --

4            THE COURT: Uh-huh. Okay.

5            MR. DRAPER: -- and can go from that.

6            THE COURT: All right.

7            MR. DRAPER: All right. We are here -- thank you,

8    Your Honor. Can I start?

9            THE COURT: Yes, you may.

10           MR. DRAPER: Thank you. We're here before the Court

11   today on what should be a rather routine matter. All I'm

12   asking the Court to do is to require the Debtor to do what it

13   should have done when the case was filed and is required

14   pursuant to Bankruptcy Rule 2015.3.

15      2015.3 uses the term "shall" and requires the Debtor to

16   file an official form -- and this is important, because I'm

17   going to come back to the official form -- with respect to the

18   value, operations, and profitability of each entity in which

19   the Debtor has a substantial or controlling interest.

20      The reports, the Rule says, shall be filed seven days

21   before the first meeting of creditors and every six months

22   thereafter.

23      Under 2015.3(d), I recognize a court may, after notice and

24   a hearing, modify the reporting requirement. No request has

25   been made by counsel for the Debtor, who I will stipulate

6

1    knows the Rules, are experienced, and understand that the rule

2    existed the day they came into the case.  And quite frankly,

3    what we have now is, from what I can see, an intentional

4    decision not to file the report.

5        As the Court knows, this matter was brought before this

6    Court in February, when the confirmation hearing was held.

7    And if the Court will recall, Mr. Seery's comment was (a) it

8    slipped through the cracks; and (b) he implied that it would

9    be done.  That was February.  I had hoped, and I think

10   everybody had hoped, that Mr. Seery, Highland, and Debtor's

11   counsel would be so embarrassed by the fact that they didn't

12   file [sic] the rule that they would have either (a) filed

13   [sic] the rule; or (b) sought -- sought a waiver of the rule.

14   They did neither.

15       Now, let's -- let's go through the 2015.3(d).  There are

16   two items that are not exclusive, and so I recognize it.  The

17   first is that they can't do it, and second is with respect to

18   the information is publicly available.  If you look at the

19   cases that the Debtor has cited in support of their position

20   that courts have waived compliance with the rule, you'll note

21   that three of the four cases deal with first day motions when

22   in fact they ask for extensions of time to file their

23   schedule, Statement of Financial Affairs, and other things.

24   These are normal first day motions.  I understand the

25   extension in that case.  And quite frankly, those extensions

Case 19-34054-sgj11   Doc 3470-1   Filed 08/26/22   Entered 08/26/22 17:11:52   Page 9 of
154
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 9 of 106   PageID 9587

7

1    are -- fall into the "I can't do it."

2        The only excuse the Debtor has offered, other than their

3    response to date, was, oh, I forgot, or it slipped through the

4    cracks.  That is not a legitimate excuse.  It never has been

5    and never will be, and should not be countenanced by the

6    Court.

7        And so let's start with the after-the-fact excuses offered

8    by the Debtor.  The first is the bad guy defense -- *i.e.*,

9    Dugaboy is a Dondero entity; they're asking for this

10   information for nefarious purposes.  That has to -- that

11   should be completely disregarded by the Court.  This is a

12   systematic issue that neither you nor I nor the Debtor's

13   counsel put in the Code or put in the Rules.  It is a

14   requirement, it's systematic, and we, as counsel and people

15   acting on behalf of the estate and sort of people who oversee

16   the system, should insist that this be filed.  The bad guy

17   defense is not an excuse.  And quite frankly, this is

18   information that is required.

19       So what I'm asking for today is not gamesmanship.  I don't

20   think it is ever gamesmanship when you ask for the compliance

21   with a rule that says shall.  Again, it's systematic, and we

22   are here -- and I don't know why -- either the U.S. Trustee

23   was asleep at the switch or anybody else was asleep at the

24   switch -- that this matter hadn't been brought to the Court's

25   attention.

8

1       So the word "shall" is not strained in any fashion.  It's

2   not limited in any fashion.  The word "shall" is absolute.

3       So, again, had -- was there some secret deal between the

4   Trustee -- U.S. Trustee and the Debtor?  I don't know.  That

5   may have been.  But quite frankly, --

6            THE COURT:  A secret deal?

7            MR. DRAPER:  -- the Code, in 2015 --

8            THE COURT:  Did you just use the term "a secret

9   deal"?

10           MR. DRAPER:  Well, some --

11           THE COURT:  What --

12           MR. DRAPER:  I'm not using the term.  What I --

13           THE COURT:  That's highly charged, that --

14 =         MR. DRAPER:  No, --

15           THE COURT:  -- choice of words.

16           MR. DRAPER:  What I mean, what I really mean is

17  sometimes we go to the U.S. Trustee and say, look, can we have

18  an extension?  Can we have -- can we do this a little bit

19  later?  And the U.S. Trustee, in fairness to them, basically

20  says, okay, you can do this or that.  I don't know if that

21  occurred in this case.  But quite frankly, what we have are 20

22  months of noncompliance.  And so I don't know if they said,

23  look, --

24           THE COURT:  Okay.

25           MR. DRAPER:  -- you don't have to file it now.

9

1          THE COURT:  So you meant an informal deal, not secret

2  deal?

3          MR. DRAPER:  Yes.

4          THE COURT:  A secret deal, that sounds like something

5  nefarious.  Okay?  So, --

6          MR. DRAPER:  No, it is not intended in that -- it's

7  --

8          THE COURT:  Okay.

9          MR. DRAPER:  Judge, it's not intended in that

10  fashion.

11          THE COURT:  Okay.

12          MR. DRAPER:  This goes to my issue that it's

13  systematic.  It's a systematic compliance.

14      And let's also go the fact that the Bankruptcy Code

15  requires complete and open disclosure.  It does not matter who

16  or why compliance is requested.

17      The next objection is I waited too long.  And they offer

18  an excuse, Judge, we're going to go effective.  Let's look at

19  what the Code requires -- the rule requires.  It says it shall

20  be filed, it has to be filed at certain points, through the

21  effective date of a plan.  It doesn't say after the effective

22  date of a plan is filed or after the effective date of a -- of

23  a plan occurs, your compliance is not required.

24      And I'll point out something where you ruled against me,

25  and we've contrasted that in our motion -- in our opposition.

10

1    If you look at the examiner statute, which I know the Court

2    has looked at and completely disagreed with my reading of it,

3    it basically says after confirmation you don't have to do it.

4    This statute doesn't say that. This statute says you have to

5    file these through the effective date of a plan.

6        And so, you know, that "You waited too long" is really not

7    a legitimate excuse.

8        The next issue is -- and --

9            THE COURT: Well, on that point, --

10           MR. DRAPER: And let's look at the cases.

11           THE COURT: On that point, can I just ask, what is

12   the utility? I mean, let's say we're one -- okay. Let's say

13   we're one month away from the effective date. Let's say we're

14   three months away from the effective date. What is the

15   utility at this point? There's a confirmed plan. Now,

16   granted, it's on appeal. But, you know, what -- what would

17   you --

18           MR. DRAPER: Well, --

19           THE COURT: What would you do with this information

20   at this point? We have a confirmed plan.

21           MR. DRAPER: Well, there are two responses to that.

22   First of all, the rule says you have to file it through the

23   effective date of a plan. Somebody in rulemaking authority

24   made that determination. And so it's not for you or I to

25   question. That's the rule.

11

1       The second is the utility may be for further actions in

2   the case that occur after the effective date.  We just don't

3   know.

4       And so the rule is designed to require things to be filed

5   --

6           THE COURT:  Wait.  What did that last statement mean,

7   --

8           MR. DRAPER:  -- through the effective date.

9           THE COURT:  -- for actions that might occur after the

10  effective date?

11          MR. DRAPER:  It may be --

12          THE COURT:  What does that mean?

13          MR. DRAPER:  After the effective date of a plan.

14  There may be some -- some matter that comes up before the

15  Court.  And I'll give you the best example --

16          THE COURT:  Well, --

17          MR. DRAPER:  -- of all of them.

18          THE COURT:  Okay.

19          MR. DRAPER:  If you look -- if you look at the form,

20  all right, and what I'd ask the Court to look at is -- I think

21  it's Exhibit E that's required on the form.  And what Exhibit

22  E requires is disclosure of information where one of the

23  subsidiaries has either paid or has decided -- has incurred a

24  liability to somebody who would have an administrative expense

25  against the Debtor.

12

1        The utility of that post-effective date is important,

2    because post-effective date you'll be dealing with fee

3    applications and other things.  So the rule envisions

4    disclosure --

5            THE COURT:  Okay, I -- say that again for me slowly.

6    How --

7            MR. DRAPER:  Okay.

8            THE COURT:  How could there be an administrative

9    expense --

10           MR. DRAPER:  If you'll --

11           THE COURT:  -- claim against the estate in your

12   scenario, again?

13           MR. DRAPER:  Well, my scenario, if you look at

14   Exhibit E that's required in the form, --

15           THE COURT:  Do I have that, Nate?

16           MR. DRAPER:  -- it basically requires a disclosure.

17           THE COURT:  Okay.  I don't know if I have it in my

18   stack of paper.  I --

19           MR. DRAPER:  Well, let me read it to -- I can read it

20   to you, Your Honor.  It's easy.  Let me pull it up.

21       Exhibit E, "Describe any payment by the controlled

22   nondebtor entity of any claim, administrative expense, or

23   professional fee that have been paid or could be asserted

24   against the Debtor or the incurrence of any obligation to make

25   such payments, together with the reason for the entity's

13

1   payment thereof or the incurrence of any obligation with

2   respect thereof."

3       That is clearly a post-effective date issue that the Court

4   should be concerned about, all parties should be concerned

5   about, and so if that occurred, then everybody needs to know

6   about it.

7       So E envisions something that is absolutely after the

8   effective date that will be -- has a utility after the

9   effective date.

10      Let's look at B.  Again, something that may have something

11  to do with after the effective date.  That deals with tax-

12  sharing agreements and tax-sharing attributes.

13      So -- and then C, which also has something to do with

14  after the effective date and how things sort out through the

15  liquidation, is described claims between controlled debtor,

16  controlled nondebtor entity and any other controlled nondebtor

17  entity.

18      So there needs to be a disclosure of due-to's and due-

19  from's between the entities.  This is -- this is not secret

20  stuff.  This is stuff that transcends the effective date of a

21  plan.

22      And so when I focused on the rule, what I think the Court

23  really needs to look at for the utility of this is exactly

24  what the -- is required by a 2015.3 disclosure.

25      Does that answer the Court's question?

14

1          THE COURT:  Yes.

2          MR. DRAPER:  Now, my favorite excuse that's been

3   offered is really what I'll call the secret sauce dispute --

4   excuse, or the former lawyers for the Debtor.  Again, let's

5   break this down and let's look at the form.

6      What the form requires is there's nothing the Debtor's

7   former lawyers did or who were working for Mr. Dondero.  If

8   you look at Exhibit A that's required, is contains the most

9   readily-available balance sheet.  That's not a legal issue.

10  Statement of income or loss.  That's -- that's just an

11  accounting concept.  Statement of cash flows.  That's also an

12  accounting concept.  And statement of changes in shareholders

13  or partners equity for the period covered by the entire

14  report.

15     B again has nothing to do with the lawyers, is describe

16  the controlled nondebtor business entity's business

17  operations.

18     So the information that's here is purely accounting

19  information and it is not secret.

20     Let's, again, let's focus on A, which -- which I think

21  just deals with financial information.  The first one is

22  balance sheet.  All right.  They've argued that this tells

23  what the value -- what we think the value of an asset is.

24  That's not true.  A balance sheet may have a fair market

25  value.  A balance sheet may have a book value.  I don't know

15

1    what they have here.  But quite frankly, if you or I sell my

2    house, our house, we go to our agent and we say, hey, look,

3    agent, you know, this is my listing price.  That's my opinion

4    as to value.  It may not be somebody else's opinion as to

5    value.  And quite frankly, when somebody asks or wants to buy

6    an asset, what they come to, don't they ask, hey, what do you

7    want for it?

8        You know, book value does not equal value.  And I know the

9    Court has held -- has had before it many clients or many

10   debtors, and I've represented a lot of debtors, who think a

11   Bic pen that they have is not worth ten cents but is worth a

12   gazillion dollars.

13       So that issue doesn't go to any secret information.  The

14   statement of income doesn't go to secret information.

15   Statement of cash flows does not.  And changes in shareholders

16   does not.  There's no secret information.  The only person who

17   this may be kept away from, possibly, and that -- that, I

18   don't think applies, is a competitor who may want to look at

19   these.  And a court can fashion that relief and say, okay,

20   let's put this under seal.  If somebody signs a

21   confidentiality agreement, they can have access to this.

22       But this is purely accounting information.  It's nothing

23   more.

24       And the reference to trade secrets that the Debtor

25   attempts to make is just not true.  This is not a trade

16

1   secret.  There's no confidential research or development or

2   commercial information that's being disclosed.  And 9018 that

3   they cite is truly an evidentiary rule.  We're not -- this --

4   this requirement does not go to customers.  It does not go to

5   pricing.  It does not go to business processes.  It just goes

6   to financial information.

7       So the global argument that they're making is undercut

8   significantly by the -- by what is required under the rule.

9   I'm just asking for mere compliance with the rule, nothing

10  more.

11      And so, you know, what -- I still don't understand what

12  the issue is, why it hadn't been done.  And quite frankly,

13  again, this is systematic.  It has nothing to do with who is

14  requesting it, what is requesting it.  It should have been

15  done.  It should have been done probably by the U.S. Trustee.

16  You know, somebody -- you know, and quite frankly, I've been

17  in this case since December.  It was raised in February.  You

18  know, I don't understand why, from February to the time I

19  filed this motion, they didn't come in and either (a) file the

20  reports, which on their face appear to be benign; or (b) ask

21  for some reason other than, oops, I forgot.

22      And so I'd ask the Court to require compliance.  I don't

23  think the information here falls into any category of for

24  cause.  They can do it.  This -- and the cases -- any case

25  they cite does not support their proposition that it shouldn't

17

 1    be done.

 2        Does the Court have any questions for me?

 3            THE COURT:  Well, I do.  My brain just constantly

 4    goes to standing.  And remind me again, the trusts you

 5    represent have each filed proofs of claim, correct?

 6            MR. DRAPER:  Yes.  And they're objected to, --

 7            THE COURT:  They are objected to.

 8            MR. DRAPER:  -- just so the Court's aware.

 9            THE COURT:  Okay.  Remind me again what the substance

10    of the claim is about.

11            MR. DRAPER:  The substance of the claim is I have a

12    -- I have a $17 million debt owed to me by Highland Select.

13    And it is our position that this Debtor is also liable for the

14    Highland Select debts through its general partner status,

15    through its comingling of things, and how these assets fit

16    together, between Highland Select, which is a hundred percent

17    owned by the -- ultimately owned by this Debtor.  So I'd --

18    again, the standing issue --

19            THE COURT:  And the debt is --

20            MR. DRAPER:  And I am also an equity holder.

21            THE COURT:  And the debt is pursuant to a note?

22            MR. DRAPER:  It's pursuant to a loan agreement

23    between my client and Highland Select.

24            THE COURT:  All right.  And was an administrative

25    expense filed by your client?

18

1          MR. DRAPER:  Not by my client.  No.  And I'm also an

2   equity holder in the Debtor that, when the plan goes

3   effective, I ultimately have, at best, a residual interest

4   when the Star Trek Enterprise returns.

5          THE COURT:  Okay.  And what is that residual

6   interest?  Remind me again.  Isn't it less than one percent --

7          MR. DRAPER:  After the --

8          THE COURT:  -- of a subordinated --

9          MR. DRAPER:  After all the class --

10         THE COURT:  Go ahead.

11         MR. DRAPER:  Right.  Well, after all the classes are

12  paid in full plus a hundred cents on the dollar -- get a

13  hundred cents on the dollar plus some interest factor, and the

14  -- there's another party who has an equity interest that's

15  ahead of me get paid, I get some -- some money.

16      Again, I have a residual interest.  It's very tangential.

17  And I'll be very frank to the Court and honest, I think

18  ultimately I will receive nothing under that residual

19  interest.

20      However, my -- the standing is not really an issue here.

21  Honestly, this is a systematic issue.  I've tried to make that

22  clear for the Court.  It's something that should be employed,

23  and who is asking for it is irrelevant.  The Code requires --

24  the Rules require it.  There is no excuse that they've given

25  that should absolve them of that.  And whatever excuse they've

19

1  given basically falls in -- falls in the face of what the rule

2  -- the official form requires.

3      I'm not asking for a variance of the official form.  I'm

4  asking that this Court not allow a "Oops, I forgot" or "It

5  slipped through the cracks" excuse.

6          THE COURT:  All right.  And who is the current

7  trustee of these trusts now?

8          MR. DRAPER:  My trusts?  Nancy Dondero is the trustee

9  of the Dugaboy Trust, and I think Grant Scott is the trustee

10  of the Get Good Trust.

11          THE COURT:  Okay.  I'm asking because we heard

12  earlier this week that Grant Scott has resigned from certain

13  roles.

14      All right.  Mr. Pomerantz, do you have evidence, --

15          MR. POMERANTZ:  Yes, Your Honor.

16          THE COURT:  -- or argument only?

17          MR. POMERANTZ:  Argument only, Your Honor.

18          THE COURT:  Okay.

19          MR. POMERANTZ:  As with -- as with many of the other

20  motions that have been filed with this -- in this case and has

21  burdened the Court's docket over the last several months, I

22  really can't help to wonder why we are here.

23      Eighteen months after the case was filed, after plan

24  confirmation, and with the effective date that's set to occur

25  soon, Dugaboy and Get Good, the family trusts, ask the Court

20

1   to compel the Debtor's compliance with 2015.3. It reminds me

2   of the motion that Mr. Draper mentioned that he filed on the

3   eve of confirmation, the eve of confirmation, fourteen months

4   after the case had been filed, seeking an examiner. And the

5   Court denied that motion without a hearing.

6       Now they're back again with, as Your Honor mentioned and

7   I'll get to in a little bit, with the same tangential

8   connection to the bankruptcy case and the same tenuous

9   standing that the Court has alluded to on several occasions,

10  including just a couple minutes ago.

11      It's clear that the motion, which is not supported by any

12  other creditor in the case and is actually opposed by the

13  Official Unsecured Creditors' Committee, is not about

14  financial transparency, as Mr. Draper would like Your Honor to

15  believe, but it's filed as a further litigation tactic to gain

16  access to information that Mr. Dondero would not be able to

17  obtain through discovery, who has tried to obtain through

18  other means, and that the Debtor believes will be used for

19  improper purposes.

20      One of the Movants, Dugaboy, is actually the holder of two

21  claims against the Debtor. I guess Mr. Draper forgot about

22  his administrative claim, which really goes to the validity of

23  it. One is the claim against the Select Fund, a subsidiary of

24  the Debtor, for which Mr. Draper says they should be liable,

25  including under an alter ego theory.

21

1    Yes, Your Honor heard me right.  Dugaboy is saying that

2    the Debtor is an alter ego with a nondebtor entity.  One would

3    think that, given the recent disclosures and commencement of

4    litigation -- and I'm talking about the UBS litigation -- that

5    Mr. Dondero would be the last one to raise alter ego.  In any

6    event, that claim is disputed.

7        The second claim is an administrative claim that Mr.

8    Draper filed on account of their 1.71 percent interest in

9    Multistrat, saying they were damaged by decisions Mr. Seery

10   made by selling certain life insurance policies in the spring

11   of 2020.

12       There is a theme here, Your Honor:  Claims that Mr. Seery

13   made decisions that harmed -- in this case -- Dugaboy's 1.71

14   percent interest.

15       The claim has no merit.  The Debtor will contest it.  But

16   even if it was allowed, the claim would be paid a hundred

17   cents on the dollar under the plan.  And accordingly, the

18   information under 2015.3 is not relevant.

19       Get Good filed a claim which alleges they may have a claim

20   from its limited partnership interest in the Debtor.  But for

21   the record, Get Good is not a limited partner of the Debtor.

22       So, how did we get here, Your Honor?  The Dondero entities

23   sandbagged the Debtor by raising the issue for the first time

24   during the confirmation trial.  Not in their briefs, not in

25   communications to the Debtor in advance of the confirmation,

**APP. 2740**

22

1    but while the Debtor had its witness on the stand.

2         And why did they do it that way?  Because they wanted to

3    be able to argue, and they did argue to Your Honor, that the

4    Court couldn't confirm the plan because the Debtor did not

5    comply with Rule 2015.3, was in violation of 1129(a)(2), and

6    the Court could not confirm the plan.

7         Of course, the Court rejected that argument.  And when the

8    Debtor entity -- when the Dondero entities raised it as a

9    reason for Your Honor to enter a stay pending appeal, Your

10   Honor commented that that claim bordered on frivolous.  And of

11   course, that issue has been raised to the Fifth Circuit as one

12   of the reasons to overturn Your Honor's confirmation order.

13        And why are the Dondero entities persisting now in their

14   effort to obtain disclosure?  It's because they're desperate

15   to obtain financial information about the Debtor because they

16   want to become involved in the Debtor's future asset

17   dispositions at the nondebtor affiliates and they want to get

18   information.

19        As Your Honor will recall, Mr. Dondero filed a motion in

20   January asking for this Court to require the Debtor to bring

21   affiliated -- affiliated entity asset sales to the Court.  The

22   Debtor opposed the motion, and before the hearing it was

23   withdrawn.

24        Your Honor has heard testimony from Mr. Seery throughout

25   the case that Mr. Dondero previously interfered with the

23

1    Debtor's asset sales and that -- and on that basis, the Debtor

2    was not comfortable including Mr. Dondero in sale processes.

3    And I'm not talking about the AVYA and the SKY stock from the

4    CLO funds, but rather certain transactions regarding SSP and

5    OmniMax which were subject to a motion made by, I believe, the

6    Funds or the Advisors -- I get them confused sometimes --

7    accusing the Debtor of mismanaging the CLOs. And if Your

8    Honor recalls, Your Honor denied that motion based upon a

9    directed verdict.

10       So, having been rebuffed by the Debtor in its attempts to

11   obtain financial information that they're not entitled to, the

12   trusts have one last effort. Press 2015.3 arguments, because,

13   of course, they're very interested in the integrity of the

14   process, in the institution, in the following of the

15   Bankruptcy Code. That is exactly what their motivation is.

16       But there's yet another reason, Your Honor, the Debtor

17   believes Mr. Dondero, through the trusts, is pursuing this

18   motion. As Your Honor is aware, the Debtor recently

19   discovered some extremely troubling information regarding a

20   massive fraud involving a previous --

21       (Audio cuts out.)

22           THE COURT: Uh-oh.

23           THE CLERK: He froze up.

24       (Pause.)

25           THE COURT: All right. Mr. Pomerantz, you're frozen.

24

1   Is everybody frozen, or is it just him?

2          MR. POMERANTZ:  There'll be some judicial estoppel.

3          THE COURT:  Okay.  Mr. Pomerantz?

4          MR. POMERANTZ:  Yes.

5          THE COURT:  You were frozen for about one minute.  So

6   I am sorry, --

7          MR. POMERANTZ:  Uh-huh.

8          THE COURT:  -- you're going to need to repeat the

9   past minute for me.

10         MR. POMERANTZ:  Just to check if you were listening,

11  Your Honor, what was the last thing you remember me saying?

12         THE COURT:  I was listening.

13         MR. POMERANTZ:  Okay.  So I will -- did you hear me

14  talk about Mr. Seery's testimony throughout the case?

15         THE COURT:  No.  No.

16         MR. POMERANTZ:  Okay.  I'll go back a paragraph

17  before.  Okay.  Okay.

18     And why are the Debtor -- why are the Dondero entities

19  persisting now in their effort to obtain disclosure?  It's

20  because the Dondero entities are desperate to try to obtain

21  financial information, information they would not otherwise be

22  entitled to under discovery rules, because they want to become

23  involved, he wants to become involved in the Debtor's asset

24  dispositions in the future regarding affiliated nondebtor

25  entities.

25

1        If Your Honor will recall, Mr. Dondero made a motion in

2   January seeking an order from this Court requiring the Debtor

3   to bring to this Court asset sales from nondebtor affiliates.

4   The Debtor opposed the motion, and before the hearing on the

5   motion it was withdrawn.

6        Your Honor has heard testimony from Mr. Seery throughout

7   the case that Mr. Dondero previously interfered or tried to

8   interfere with the Debtor's asset sales, and on that basis the

9   Debtor was not comfortable inviting Mr. Dondero into its asset

10  sale processes.

11       And I'm not talking about the AVYA and SKY stock from the

12  CLOs, but rather certain transactions regarding SSP and

13  OmniMax, which were closed for fair value, which were subject

14  of a motion that the Advisors or the Funds -- and I often get

15  them confused -- that they made, accusing the Debtor of

16  mismanaging the CLOs. And I'm sure Your Honor recalls. Your

17  Honor denied that motion on a directed verdict basis.

18       So, having been rebuffed in their attempts to try to get

19  the information that they weren't entitled to, they're now

20  proceeding under 2015.3. And, of course, Mr. Draper say he is

21  a protector of the process, the integrity of the system

22  demands it. It has nothing to do with Mr. Dondero's

23  interests, of course, because Mr. Draper is just there to make

24  sure everything runs on time and everything is done according

25  to the law, notwithstanding the fact that the U.S. Trustee

26

1  hasn't brought this motion, notwithstanding the fact that the

2  Unsecured Creditors' [Committee] supports our position, and

3  notwithstanding the fact that not one creditor, not one

4  unaffiliated creditor, has asked this Court for that

5  information and relief.

6      There's yet another reason, Your Honor, the Debtor

7  believes that the trusts are pursuing this motion.  As Your

8  Honor is aware, the Debtor recently discovered some extremely

9  troubling information regarding a massive fraud involving a

10  previously-unknown entity called Sentinel Reinsurance.  And

11  that information is the subject of an adversary proceeding

12  filed by UBS, which Your Honor heard substantial information

13  about both in connection with hearings on that motion practice

14  and also at the UBS 9019 motion.

15      The Debtor believes that the 2015.3 motion is a veiled or

16  pretty transparent effort of Dondero trying to find out what

17  the Debtor knows and what the Debtor doesn't know and trying

18  to get the Debtor to go on record with information that later

19  in litigation they will use as a judicial estoppel.

20      Your Honor, that's not an appropriate predicate for the

21  motion.  Mr. Draper will deny that that's the reason, of

22  course, but I leave it for Your Honor to look at the

23  circumstances and make your own conclusions.

24      As the Court has mentioned many times, context matters,

25  and the Court should take this context into account in looking

27

1    at the motion and the requested relief.

2        In our opposition, we argue that the Court should either

3    waive the 2015.3 compliance, given the anticipated effective

4    date, or continue the hearing to September 1 for a further

5    status conference if the effective date doesn't occur.

6        The burden on the estate if it was required to comply with

7    2015.3 is significant, and this goes to the issue Your Honor

8    mentioned, that, really, what's the point at this stage of the

9    case?  There are more than 150 entities that arguably meet the

10   definition of substantial or controlling interest for which

11   the Debtor would be required to file reports under 2015.3.  As

12   the Court knows, the Debtor is down to 12 staff, 13 if you

13   include Mr. Seery.  And if those employees working with the

14   Debtor's financial advisors were required to devote the

15   necessary time and effort to prepare the reports, the time and

16   the cost it would take would be substantial.  The Debtor just

17   doesn't have the bandwidth to comply.

18       More importantly, Your Honor, as we mention in our

19   opposition, Mr. Seery and the board are extremely concerned

20   with the quality of information it has received from the

21   Debtor's employees who have since been terminated by the

22   Debtor and now most of them are working for Mr. Dondero and

23   his related entities in one form or another.  It's not just

24   the lawyers, as Mr. Draper says.  It's the financial advisors,

25   who, in other contexts, and you'll hear a little later, are

Case 19-34054-sgj11   Doc 3470-1   Filed 08/26/22    Entered 08/26/22 17:11:52    Page 30 of
154
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21    Page 30 of 106   PageID 9608

28

1   coming up with new information, new defenses on notes, et

2   cetera.  The Debtor has no confidence that the information in

3   its records is accurate from a financial perspective or from a

4   legal perspective.

5        As I mentioned, the Court is aware of the Sentinel cover-

6   up.  And uncovering just the facts regarding Sentinel was a

7   very difficult process and required the Debtor to essentially

8   conduct discovery against itself.  It just couldn't rely on

9   its information.  So conducting the diligence that would be

10  required to provide accurate information for 150 entities,

11  intercompany claims, administrative claims, back and forth,

12  due-to's, due-from's, tax issues, all the stuff required by

13  the forms would be an extremely arduous task.  It would take

14  millions of dollars of forensic accounting.  And it wouldn't

15  -- and for what purpose?  There is no purpose.

16       In addition, Your Honor, to waiving filing the reports,

17  2015.3 also allows the Court to modify the reports requirement

18  for cause when the debtor is not able, in making a good faith

19  effort, to comply with the requirements.  Your Honor, in this

20  case, cause is clearly established under 2015.3.

21       Dugaboy spends a lot of time in their reply attacking the

22  cases that the Debtor cites in its opposition.  While the

23  facts in those cases are different from the case here, they

24  all share something in common which is the key point:  All of

25  the cases involve a waiver of the 2015.3 requirement for plans

29

1  that will be confirmed or will soon become effective.

2      Mr. Draper doesn't contest that this Court has the power

3  to waive.  He says, well, those requests were made in the

4  first 30 days of the case or in the initial part of the case.

5  But they all granted relief where the effective date -- where

6  either the confirmation date occurred and they were waiting

7  for the effective date, or the confirmation case was -- was

8  pending.

9      And Your Honor, we would ask the Court to treat the

10  Debtor's opposition as a motion to waive the requirement under

11  2015.3.  We could file a separate motion after this hearing.

12  It would be a waste of time.  But we would ask Your Honor,

13  treat our opposition as a motion.

14      Dugaboy spends the rest of its time, in the papers and its

15  argument that Mr. Draper made, challenging several arguments,

16  other arguments the Debtor makes in its opposition.  First,

17  they argue that there is no deadline for seeking compliance

18  and that the insinuation that we made that this is

19  gamesmanship is off base.  I'll acknowledge, Your Honor,

20  2015.3 does not contain a deadline for a party seeking

21  compliance.  But as I said before, context matters.  And given

22  how this motion has come to be before your court, I will leave

23  it for Your Honor to determine which party is the true one

24  playing games here.

25      Second, Dugaboy argues that there's nothing confidential

30

1  in any of the information required to be filed in the 2015.3

2  reports and that the disclosure of information will facilitate

3  interest in the assets and maximization of the Debtor's

4  assets.  Twenty months into this case, Your Honor, no party

5  other than Mr. Dondero or his related entities has complained

6  to the Court that the Debtor is not being transparent or

7  forthcoming.

8      And there's good reason for that.  Even during the early

9  stages of this case, when the Debtor and the Committee had

10  their differences, the Debtor was entirely forthcoming with

11  information about its assets, nondebtor affiliates, and

12  strategy for maximizing assets of the Debtor and its

13  affiliated entities.  That collaborative effort continues

14  today, and I suspect is one of the reasons that the Committee

15  has joined in the Debtor's opposition here.

16      Similarly, the Debtor's nondebtor affiliates have

17  transacted business with third parties postpetition.  The

18  Debtor has provided information to those parties as

19  appropriate, subject to nondisclosure agreement, and several

20  successful processes have been run that have maximized value.

21      And just to make clear, Your Honor, we do not believe that

22  Mr. Dondero or his related entities signed a nondisclosure

23  agreement that they would comply with the obligations.  So we

24  have no interest and no desire, unless ordered by the Court,

25  either in this context or another context, to provide Mr.

Case 19-34054-sgj11  Doc 3470-1  Filed 08/26/22    Entered 08/26/22 17:11:52    Page 33 of
154
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 33 of 106   PageID 9611

31

1   Dondero or his related entities with information that the

2   Debtor believes would prejudice its ability to monetize

3   assets.

4       The alleged transparency that Mr. Draper and the trusts

5   seek is not borne out of a desire to open the playing field

6   and make it level and put financial information in the public

7   domain for the good of the case.  It's about getting access to

8   information that the Debtor, in the exercise of its business

9   judgment -- should not be disclosed.

10      Lastly, Mr. Draper again, during oral argument, harped on

11  Mr. Seery's testimony that the reason the reports were not

12  filed is that they fell through the cracks.  It's misleading.

13  He also stated that Mr. Seery said they would file the

14  reports.  I've looked at the testimony.  That's not what he

15  said.  But he did say at confirmation that it slipped through

16  the cracks.  No doubt.  That's in the transcript.

17      And yes, the Debtor stands behind the fact that, in the

18  months leading to the confirmation hearing, neither Mr. Seery

19  nor the Debtor's professionals even thought about 2015.3.

20      But Your Honor, it's what has happened since that

21  justifies the Debtor's request for a waiver.  The plan is soon

22  to become effective.  As I said, the Debtor is down to 12

23  employees, who could not possibly prepare this information

24  without substantial time and effort.  Their effort and their

25  time should be focused on monetizing assets that will put

32

1  money in creditors' pockets, hopefully sooner than later.

2      And on top of that, given the massive fraud that

3  management has uncovered, and continues to uncover information

4  to this day, Your Honor, on matters separate from the Sentinel

5  matter -- every week, we are finding out new information that

6  has not been made public that causes us real concern, and at

7  the appropriate time that information will be brought before

8  the Court -- the Debtors simply can't rely on that

9  information.  And to be required to go through the effort to

10 put that information out in the public record so Mr. Dondero

11 can later say that the Debtor was judicially estopped, or use

12 that information for an ulterior purpose or a litigation

13 strategy, just does not make sense.

14     Based upon the foregoing, Your Honor, we would ask that

15 the Court deny the motion and grant the Debtor a waiver of the

16 2015.3 requirements.

17     Does Your Honor have any questions?

18         THE COURT:  I do not think so.  Well, I just -- am I

19 correct in remembering the Debtor had somewhere around 75

20 employees at the beginning of this case?  And I didn't know it

21 was down to 12.  I knew it was down very low.  But that's what

22 we're talking about?

23         MR. POMERANTZ:  Yeah, that -- that sounds about

24 right, Your Honor.

25         THE COURT:  Okay.

33

1          MR. POMERANTZ:  And I should mention, you know, I was
2    there at the beginning.  I was there before the board.  The
3    first couple months of the case, it was extremely difficult to
4    get the Debtor's employees focused on trying to get the
5    information for the 2015.3.  They did not want that
6    information disclosed.  And it's sort of a -- sort of a little
7    ironic that now they're here asking for disclosure.

8        But, look, we're not going to walk away from the fact
9    that, yeah, it slipped through the cracks.  After the board
10   took over, Your Honor has heard many times what they did, the
11   efforts they went to.  If the U.S. Trustee had approached us,
12   if Mr. Dondero had approached us early on, we would have
13   figured out a way to address that and deal with that.  The
14   fact of the matter, it wasn't.  The fact of the matter, it was
15   brought up as a litigation tactic on confirmation, to defeat
16   confirmation of the plan.  And as I mentioned, for the
17   reasons, it's being used as a tactic now as well.

18          THE COURT:  All right.  Thank you.

19          MR. DRAPER:  Your Honor, I -- can I -- can I make a
20   few comments?

21          THE COURT:  No, not --

22          MR. DRAPER:  I'll be short.

23          THE COURT:  Not yet.  Mr. Clemente, --

24          MR. DRAPER:  Okay.

25          THE COURT:  -- I neglected to mention when I was

34

1   taking appearances, you filed a joinder on behalf of the

2   Committee with regard to --

3            MR. CLEMENTE:  That's correct, Your Honor.

4            THE COURT:  So I need to hear from you next, and then

5   I'll circle back to Mr. Draper.

6            MR. CLEMENTE:  That's correct, Your Honor.  And just

7   for the record, Matt Clemente from Sidley Austin.

8            THE COURT:  I should say, a joinder in the

9   opposition.  That was a confusing statement I just made.

10            MR. CLEMENTE:  Yeah, that's correct, Your Honor.

11            THE COURT:  Uh-huh.

12            MR. CLEMENTE:  And so I will be very brief, because

13   Mr. Pomerantz was obviously very thorough.  But just to echo

14   what he said, you know, the Committee is comfortable with the

15   information that it has received.  And as Your Honor knows, we

16   haven't been and won't be shy about coming to the Court if we

17   felt that that was not the case.

18        You know, we obviously had our issues early on in the

19   case, including with respect to getting information from the

20   Debtor.  But, again, the Committee, you know, has been

21   comfortable with the information that it's received from the

22   Debtor.

23        Therefore, at this point, Your Honor, from the Committee's

24   perspective, there doesn't seem to be any bona fide purpose to

25   making the Debtor go through the cost and the expensive effort

35

1  that Mr. Pomerantz said would be required to create the Rule

2  2015.3 reports. And, again, I -- without casting aspersions,

3  it would suggest, based on previous activity, that there's

4  really only a nefarious purpose for what is being pressed

5  before Your Honor today.

6      So, Your Honor, again, we support the Debtor's position.

7  I absolutely agree with Mr. Pomerantz's arguments. We would

8  request that Your Honor, you know, enter the relief that the

9  Debtor is requesting today.

10         THE COURT: All right. And Mr. Clemente, I just --

11         MR. CLEMENTE: Yes?

12         THE COURT: I just want to seal in my brain the

13  context that I think applies here. The January 2020 corporate

14  governance settlement order. In there, we all know there were

15  lots of protocols about lots of things, but one of them or a

16  set of the protocols dealt with transfers of assets in these

17  nondebtor subs or entities controlled by the Debtor. And, of

18  course, Mr. Pomerantz alluded to this, but I'm just going to

19  make sure I'm crystal clear on what I remember. You know, the

20  whole -- well, it was a protocol that the Committee would have

21  to be consulted on transfers of assets of those nondebtor

22  subs, those nondebtor controlled entities, and, you know,

23  there was a discussion that 363 doesn't apply, of course, to

24  nondebtor assets, and you could really argue all day, even if

25  it did apply, about whether these are ordinary course or non-

36

1  ordinary course because of the business Highland is in. But

2  the Debtor negotiated with you and your clients: We're going

3  to have full transparency to let you all get notice of

4  transfers of assets of these subs, and you could even object

5  and bring a motion. I mean, you can file some sort of

6  pleading, even though we were not so sure 363 under any

7  stretch might apply.

8      Am I correctly restating the context that -- you know, Mr.

9  Pomerantz alluded to it, but I just want to make sure I'm

10  clear and the record is clear.

11          MR. CLEMENTE: Your Honor, you are -- you are

12  absolutely correct. There's a very complex set of protocols

13  that we painstakingly negotiated with the Debtor that had

14  different categories depending upon the asset --

15          THE COURT: Uh-huh.

16          MR. CLEMENTE: -- and the Debtor's ownership and its

17  relationship with respect to the nondebtor entities or the

18  related parties. That required the Debtor to come to the

19  Committee in certain sets of circumstances and explain a

20  potential transaction and get the input from the Committee,

21  and either the Committee could consent to the transaction, or

22  if the Committee did not consent to the transaction, the

23  Debtor could seek relief from the Court.

24      Your Honor will remember that, in fact, one of the

25  hearings we had with respect to the monies that were placed in

37

1    the Court registry arose out of the protocols.  So the

2    protocols worked from that perspective in requiring the Debtor

3    to come to the Committee, allow the Committee to make an

4    evaluation, and then the Debtor would make a decision from the

5    perspective of how it wished to proceed.

6         So, Your Honor is absolutely correct.  That was all part

7    of the governance settlement that was negotiated back in

8    January.  And from the Committee's perspective, again, it

9    hasn't always been lemon water and rose petals, but we believe

10   that those protocols worked, and worked to provide the

11   Committee with information so it could appropriately evaluate

12   what the Debtor was doing.

13            THE COURT:  All right.  So I'm correct, you would

14   say, in thinking there was a lot of transparency built in?  It

15   didn't always work smoothly in the beginning, and as we know,

16   there were document production requests, many of them from the

17   Committee.  That all came to a head last July, with more

18   protocols put in place.  But lots of transparency was

19   negotiated by the Committee with regard to all of these

20   controlled entities and subs?

21            MR. CLEMENTE:  That was a critical, Your Honor, that

22   was a critical component of the governance settlement.

23            THE COURT:  Okay.

24            MR. CLEMENTE:  Because that was obviously the impetus

25   for us wanting that governance settlement, so we could get

38

1    that transparency.

2        So, to answer your question, Your Honor, yes, the

3    protocols served that function of providing the Committee with

4    information on transactions that the Debtor was proposing to

5    enter into.

6            THE COURT:  Okay.  And of course, there was a waiver

7    of the privilege -- I don't know if that's the word; I guess

8    that is the right word -- with regard to possible estate

9    causes of action.  Maybe I'm getting into something unrelated.

10   Maybe I'm not.  But that was part of the protocol, too, right,

11   the Debtor would waive its --

12           MR. CLEMENTE:  That's correct, Your Honor.

13           THE COURT:  -- privilege with regard to --

14           MR. MORRIS:  Your Honor, I apologize for

15   interrupting.  This is John Morris from Pachulski Stang.  I

16   just want to recharacterize that a bit.

17           THE COURT:  Okay.

18           MR. MORRIS:  It's not a waiver of the privilege.  We

19   agreed to share the privilege --

20           THE COURT:  Share the privilege.  Okay.

21           MR. MORRIS:  -- with the Debtor.  The Debtor --

22           MR. CLEMENTE:  I --

23           MR. MORRIS:  I'm sorry to -- sorry to correct you,

24   but it's a --

25           THE COURT:  Well, no, --

39

1          MR. MORRIS:  -- very important point.

2          THE COURT:  -- that's why I hesitated on that word.

3   I wasn't sure if that was the word, the concept.

4          MR. MORRIS:  There's no waiver.

5          THE COURT:  Okay.  Okay.  I'm not always --

6          MR. CLEMENTE:  That is -- and that is correct, Your

7   Honor.

8          THE COURT:  Okay.

9          MR. CLEMENTE:  Mr. Morris is correct.  As are you.

10         THE COURT:  Okay.  So I'm asking you, is all of this

11  protocol that was in place, I mean, is it reasonable for me to

12  think maybe that's the reason you all never pressed the 2015.3

13  issue, because you were getting a full look, as best you could

14  tell, and more?  You were getting more information, perhaps,

15  than these reports would have provided, even.  Is that fair

16  for me to think?

17         MR. CLEMENTE:  It is fair for you to think that, Your

18  Honor.  We viewed the protocols as our mechanism to get the

19  information that was necessary for the Committee to evaluate

20  the transactions that the Debtor wanted to engage in.  And so

21  we were looking to the protocols, and in fact, I think the

22  protocols were very broad in certain respects, and we were not

23  thinking about the Rule 2015 reports, nor would we have said

24  that that would have been a substitute for negotiating those

25  protocols and implementing them.

Case 19-34054-sgj11 Doc 3470-1 Filed 08/26/22   Entered 08/26/22 17:11:52   Page 42 of
154
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 42 of 106   PageID 9620

40

```
 1            THE COURT:  Uh-huh.

 2            MR. CLEMENTE:  So that's how the Committee was

 3   looking at it, Your Honor.

 4            THE COURT:  Okay.  All right.  Well, okay.  Mr.

 5   Draper, I'm going to come back to you.  You get the last word

 6   on that.

 7            MR. DRAPER:  Thank you.  First of all, the answer is

 8   yes, there are extensive protocols between the Debtor and the

 9   Committee.  I one hundred percent agree with you.  And the

10   other point I'd make with that is this information is a

11   scaled-down version of what they're giving the Committee on a

12   regular basis.  So the argument that it would take hundreds of

13   man hours and millions of dollars to do that is absolutely not

14   true.  This information, in large measure, even vaster

15   portions of it have already been given to the Committee.

16   Number one.

17       Number two, we as lawyers are literalists --

18            THE COURT:  But I presume not in this format.  I

19   presume not in the format of filling out the form A through E

20   exhibits.  I mean, maybe it's an email.

21            MR. DRAPER:  Well, --

22            THE COURT:  Maybe it's a phone call.

23            MR. DRAPER:  -- it's not in a form -- no, there is --

24   there is -- they both have financial advisors who I'm sure

25   you're going to see whopping fee applications from who have
```

41

1    pored through all of this.  My bet, and I'd bet big dollars on

2    this, is that financial -- balance sheets are given to them on

3    a regular basis, statements of financial information for

4    subsidiaries and changes in cash flow are given to them.

5    Otherwise, there's no way the Creditors' Committee could

6    monitor what's going on and what's happening.

7         So, really, this is -- this is not a phone call thing.

8    There is real financial data that's being given that is

9    available and can be given on a scaled-down basis.

10        My real point of this is we as lawyers are literalists

11   until it suits our purposes not to be literalists.  There is

12   no exception in 2015.3 for information being given to a

13   creditors' committee.  In fact, when you look at 2015.3, it

14   basically figures there is information going to a creditors'

15   committee.  This is for the others who don't have access to

16   that information.

17        And the interesting part of that is, as the Court's aware,

18   the Bankruptcy Code was amended that if I had gone to the

19   Creditors' Committee and made a request as a creditor, I

20   probably have a right to get even more information than 2015.3

21   allows me to get.

22        Next, which is the giant smokescreen.  We're basically

23   dealing now with the gee, Mr. Dondero's a bad guy; gee, they

24   want this information because they want to uncover what we

25   know.  That's just not true with respect to these reports.  If

42

1    you look at what the reports do, the reports start from the

2    day that the case was filed and ask for changes in financial

3    condition from the day the case was filed going forward.  It

4    is all postpetition in its effect.  And to the extent they've

5    uncovered things that are incorrect in the Debtor's schedules,

6    the truth is the amendment of the schedules is warranted.

7    2015.3 does not deal with prepetition activity in any way,

8    shape, or form.  They are balance sheets that ask for -- or

9    changes in financial condition that go from the filing of the

10   case, or seven days before, and require reports every six

11   months.

12       So this giant smokescreen that there's a massive fraud,

13   there's all this other stuff that's been uncovered, is just

14   not true.  It is an attempt to cover up or give an excuse that

15   is unwarranted with respect to why they haven't done the

16   2015.3.

17       Next point.  There is no secret stuff that's being done.

18   There's no valuation that we're asking for.  2015.3 asks for

19   balance sheet information.  So, in fact, if they own ten

20   pieces of property, 2015.3 would bind them together in a

21   balance sheet and say, this is the total real estate that we

22   have.  If an entity has 15 entities under its umbrella, it

23   would have a balance sheet entry.  Assets and liabilities.

24   It's not broken down.  The assets are probably at book value

25   or some sort of mark to market.

Case 19-34054-sgj11 Doc 3470-1 Filed 08/26/22   Entered 08/26/22 17:11:52   Page 45 of
154
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 45 of 106   PageID 9623

43

1     But honestly, this is -- there is no way that this

2   information gives anybody any benefit in terms of any bidding.

3     And the other point that's problematic is anybody who

4   wants to buy these assets would walk in and say, look, I want

5   a data room, let me look at this.  If what Mr. Pomerantz is

6   saying, which I don't understand, is that we're not going to

7   let a Dondero entity buy an asset, notwithstanding the fact

8   that they may pay more for the asset than somebody else would,

9   I think that's -- I have a huge problem with that.  We're here

10  for monetization of assets.  We're here to maximize the value.

11  And if, in fact, somebody walks in that may be a tangentially-

12  related Dondero entity and is willing to pay more, they should

13  be thrilled with that fact, not jettison it or disregard it.

14  That is -- their job is to maximize value, not minimize value

15  through a controlled sale process.

16    Again, I'm looking at the Code section.  I'm looking at

17  2015.3.  It basically says what it says.  It's designed to

18  give basic financial information.  It has nothing to do and

19  offers no disclosures of anything Mr. Pomerantz has thrown up

20  before the Court or that Mr. Dondero or any of his entities or

21  people are alleged to have done.

22    And the last is, if in fact there's financial information

23  that's incorrect in any of these entities, I question what the

24  Debtor's financial advisors have been doing for the last

25  months.  Honestly, they should be poring over these books.  If

Case 19-34054-sgj11 Doc 3470-1 Filed 08/26/22    Entered 08/26/22 17:11:52    Page 46 of
154
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21    Page 46 of 106   PageID 9624

44

1    they find a problem, they should correct 'em and address them.

2    And so there's no basis under the Code.  We've -- what's been

3    given to you and what their argument is is an excuse for not

4    doing something they should have done.  It can't be couched as

5    to who's asking.  It is systematic in nature.  And what's been

6    thrown up before the Court in Mr. Pomerantz's arguments are

7    just not true when you look at what the form requires.

8            THE COURT:  You know, I can't remember ever being in

9    a contested matter involving this rule.  And I was kind of

10   pondering before coming out here, I wonder why that is.  And,

11   you know, I'm thinking the vast majority of our complex

12   Chapter 11s that involve many, many, many entities, they all

13   file.  Okay?  You know, they're kind of a different animal, if

14   you will, from Highland.

15       You know, we know how it normally works.  You've got maybe

16   the mothership, holding company, and many, many subs, and

17   you've got asset-based lending, right, where, you know, maybe

18   the majority of the entities in the big corporate complex are

19   liable, so you just put them all in.  Okay?

20       We don't have -- I have not experienced a lot of Chapter

21   11s where you have basically just the mothership and then you

22   keep subs and lots of affiliates out.  Okay?  So I'm thinking

23   that's one reason.

24       Another thing, I can't remember how old this rule is.

25   Does anyone -- can anyone educate me?  How long has this rule

45

1    been around?

2            MR. DRAPER:  Your Honor, this is Douglas.  I think it

3    came in after Lehman Brothers.  And it came --

4            THE COURT:  Uh-huh.

5            MR. DRAPER:  It was put in to deal with off-balance

6    sheet items.

7            THE COURT:  Uh-huh.

8            MR. POMERANTZ:  2008, Your Honor.

9            THE COURT:  2008?

10           MR. DRAPER:  Which is exactly right.  It --

11           THE COURT:  Okay.

12           MR. DRAPER:  Yep.

13           THE COURT:  Okay.  So that, that's another reason.

14   Because I was thinking like *Enron* days.  You know, that's a

15   big giant, a gazillion entities, and, of course, a whole huge

16   slew of them were all put in.

17       So, there's not a lot of case law.  And you know, maybe

18   there are other situations where a judge ruled on this issue

19   but without issuing an opinion.  So, anyway, that's neither

20   here nor there.

21       Mr. Draper, you've urged me to focus on the literal

22   wording of the rule.  It's "shall" language.  You've talked

23   about essentially the integrity of the system as being the

24   reason for the rule.  You've told me not to accept the

25   Debtor's "bad guy" defense, you know, as an excuse.  This is

Case 19-34054-sgj11 Doc 3470-1 Filed 08/26/22    Entered 08/26/22 17:11:52    Page 48 of
154
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21    Page 48 of 106   PageID 9626

46

1    just Dondero, you know, wanting the information, and therefore

2    I should discount the motivations here.

3        But let me tell you something that is nagging very, very

4    much at me, and I'll hear whatever response you want to give

5    to this.  I just had an all-day hearing a couple of days ago,

6    and this involved the Charitable DAF entities and a contempt

7    motion the Debtor filed because those entities went into the

8    U.S. District Court upstairs in April and filed a lawsuit that

9    was all about Mr. Seery's alleged mismanagement with regard to

10   HarbourVest.

11       So what I'm really worried about is the idea that your

12   client wants this information to cobble together a new

13   adversary alleging mismanagement.  How can I not be worried

14   about that?

15           MR. DRAPER:  It's real simple.  Because the

16   information that's here doesn't go to management decisions.

17   The information that's requested here has balance sheet items.

18   It has to do with changes in cash flow.  It is not something

19   that you can cobble together a claim, because it doesn't deal

20   with discrete transactions.  It deals with only transactions

21   between affiliated entities.  It only deals with disclosure of

22   administrative expenses that are incurred by a subsidiary for

23   which the Debtor is liable.  It only deals with changes in

24   condition on a go-forward basis and a balance sheet.  It

25   doesn't say, gee, we have to disclose that, with respect to

47

1    HarbourVest or with respect to the MGM stock or whatever,

2    we're doing A, B, or C.  It doesn't go there.

3        That's why I asked the Court in my opening, look at the

4    form.  Because the form is what I'm asking for adherence to.

5    I'm not asking the form to be varied.  I'm just asking the

6    form to be approved -- to be addressed.  And the form

7    controls.  It is not something you can cobble together a

8    complaint with.

9            THE COURT:  Well, you left out when I asked, you

10   know, did your client have an administrative expense claim in

11   this case, and Mr. Pomerantz corrected the record on that.

12   Your client, while it's not a lawsuit in another court, has

13   filed an administrative expense that there was mismanagement

14   of a nondebtor sub or nondebtor controlled entity, --

15           MR. DRAPER:  That -- that's --

16           THE COURT:  -- Multistrat.

17           MR. DRAPER:  No, that's not -- if -- if I understand

18   the claim -- again, I didn't file it, and I forgot, that's an

19   oops on me as opposed to an oops on Mr. Seery for not filing,

20   and I apologize for the Court for that.  But if I understand

21   that claim, is when he acquired whatever he acquired, he

22   should have offered it to the other -- to the other members of

23   the -- that group.  Again, I'm not -- that's not -- I'm a

24   bankruptcy lawyer, as the Court's well aware.  This other

25   stuff is beyond me.

48

1          But the truth is, my understanding of the claim, it goes

2     to who should have benefited by the transaction and whether

3     the Debtor got CLO interests or got cash for it is irrelevant

4     and that it should have been offered.  That's what I

5     understand the claim.

6                THE COURT:  Okay.  So the same sort of theory --

7                MR. DRAPER:  So, the claim --

8                THE COURT:  -- as HarbourVest?  The same sort of

9     theory as HarbourVest?

10               MR. DRAPER:  No.  No.  Well, no, I'm just saying,

11    that's -- that's what -- again, you're asking me for something

12    that's outside my expertise.

13               THE COURT:  Okay.

14               MR. DRAPER:  Yes, we may have filed a claim.

15               THE COURT:  Who filed a proof of claim?

16               MR. DRAPER:  And the point I'm making --

17               THE COURT:  Who filed the proof of claim?

18               MR. DRAPER:  What?  I did not -- I have not filed the

19    proof of claims that were asserted by Dugaboy.

20               THE COURT:  I mean, --

21               MR. DRAPER:  I think that was --

22               THE COURT:  -- request for administrative expense.

23    Who filed this?  You say you don't -- you didn't file it.

24               MR. DRAPER:  I did -- I don't think I did.

25               MR. POMERANTZ:  Your Honor, to clarify, it was filed

49

1    as a proof of claim, but it related to postpetition actions.

2    And, again, I don't have it before me.  This has been raised

3    --

4            MR. DRAPER:  I --

5            MR. POMERANTZ:  -- several times in the confirmation

6    hearing when Mr. Draper was there, so I guess he must have

7    just forgotten about it.  But I don't know who actually filed

8    it.  But it is -- it is -- it is a proof of claim that is on

9    the record.

10           MR. DRAPER:  Mr. Pomerantz, God forbid that I should

11   forget something.  I'm sure you never have.

12           THE COURT:  Okay.  Well, here's what I'm going to do.

13   I'm not going to grant the relief being sought today, but I

14   will continue the hearing to a date in early September.  And

15   Mr. Draper, you can coordinate with my courtroom deputy, Traci

16   Ellison, with regard to a setting in early September.

17       I can assure you it's not going to be until after Labor

18   Day.  I think Labor Day falls on the 6th, maybe, and I plan to

19   be far away the first few days of September, far away from

20   this country.

21       But here are a few things I want to say.  First, I care

22   about transparency, and I tend to strictly construe a rule

23   like this.  I think, you know, it should be very clear for

24   anyone who's appeared before me that I really like -- I say

25   open kimono.  I probably shouldn't use that expression, but I

50

1 use that expression a lot. You know, when you're in Chapter

2 11, the world changes and you have to be very transparent.

3 But while I generally feel that way, we have -- as I also

4 always say, facts matter, contexts matter -- and here we are

5 twenty months into a case and we're post-confirmation. This

6 motion was filed post-confirmation. So I acknowledge that the

7 Rule 2015.3(b) has the requirement of filing reports as to

8 these nondebtor controlled entities until the effective date

9 of a plan. We're so -- we're presumably so very close to the

10 effective date that I think I should exercise my discretion

11 under Subsection (d) of this rule to, after notice and a

12 hearing, vary the reporting requirements for cause. I think

13 there's cause, and that cause is I think we're oh so close to

14 the effective date. That's number one. Number two, we're

15 down to 12 staff members. And I've heard that 150 entities

16 may be implicated, and I don't think that is a necessary and

17 reasonable use of staff members at this extremely late

18 juncture of the case.

19 And my third reason for cause under Subsection (d) of this

20 rule is we have had an active, a very active Creditors'

21 Committee in this case with sophisticated members and

22 sophisticated professionals who negotiated getting more

23 information, I think more useful information than this rule

24 even contemplates with the various form blanks.

25 Now, obviously, I'm continuing this to September because,

51

1    if we don't have an effective date by early September, well,

2    context matters, maybe that causes me to view this in a whole

3    different light.  But that is the ruling of the Court.

4        You know, I just want to say on behalf of the U.S.

5    Trustee, I don't know if anyone's listening in, but it was an

6    unfortunate use of words earlier, I think, saying, you know,

7    secret deal with them.  And I use unfortunate words all the

8    time.  I'm not being critical.  But I just want to defend

9    their honor here.  Oh my goodness, they --

10       (Phone ringing.)

11           THE COURT:  -- exercise integrity in every case I see

12   to the utmost degree, and I suspect they were satisfied that

13   the Committee was getting so much access to the Debtor, with

14   the sharing of the privilege and the protocols, that it just

15   didn't seem necessary in the facts and circumstances of this

16   case to require strict compliance with 2015.3.

17       So I'm going to ask Mr. Pomerantz to upload a form of

18   order reflective of my ruling.  And, again, if --

19       Whose phone is ringing?  Is there something going on with

20   our equipment?

21           THE CLERK:  No.

22           THE COURT:  I don't know where that phone ringing is

23   coming from.

24           THE CLERK:  I can hear it.

25           THE COURT:  Okay.  So, you'll get a day from Ms.

52

1  Ellison in -- after labor day, and we'll see where we are.

2  This will be a moot matter as far as I'm concerned if we've

3  had an effective date at that point.

4      (Continued phone ringing.)

5          MR. POMERANTZ:  Your Honor, one clarification I would

6  ask to have.  I don't think -- I think Your Honor intends that

7  to be a status conference, so to save the Debtor from, you

8  know, spending time in doing a pleading, and Mr. Draper as

9  well, and Your Honor from reading them, I would say that there

10  should be no pleadings filed in advance.  We will appear

11  before Your Honor with a status conference.  And to the extent

12  Your Honor determines there's further briefings or further

13  issues that need to be decided, you could decide at that

14  point.  But no further briefing.

15          THE COURT:  Okay.  I think that is a fair request.

16      (Ringing stops.)

17          THE COURT:  And so that -- that is the way we'll set

18  this up.  Status conference.  No further pleading.

19          MR. DRAPER:  Your Honor?

20          THE COURT:  All right?  Mr. Draper?

21          MR. DRAPER:  Can I make a request, Your Honor?  Can I

22  change -- can I make a comment about the Court's ruling?

23  Because I want to be transparent about this.  And I think the

24  Court's ruling, I would request that you shapeshift it a

25  little bit.

53

1    If, in fact, you're going to take the position that if the

2  plan goes effective, this issue -- this -- this motion is moot

3  and will be denied, I think, quite frankly, why don't we enter

4  that order now, rather than waiting.  Because that at least

5  gives me the ability to address the issue.

6    I don't think the rule has a waiver of it on the effective

7  date.  Let's -- let's get the issue before the -- before

8  everybody.  Because, again, as I said, if in fact your

9  position is that if it goes effective I'm going to deny the

10  relief and claim it's -- and assert it's moot in a ruling, I'm

11  fine, let's get the ruling now.  Because -- because my

12  position is that that waiver -- there is no basis for that

13  waiver due to time.  The rule requires being filed through a

14  point.

15    And, look, again, that way I'm not wasting the Court's

16  time.  We're not rearguing it.  If we're not having new

17  pleadings, let's get it over with.

18        MR. POMERANTZ:  Your Honor, I would reject that.

19  It's pretty transparent what Mr. Draper wants.  He wants

20  another appeal --

21        THE COURT:  Uh-huh.

22        MR. POMERANTZ:  -- because he wants to go to another

23  court, and he's unhappy that Your Honor has essentially given

24  an interlocutory order that he will be stuck with.

25    So we have, I think, close to a dozen appeals.  We're

54

1    spending millions of dollars.  And I find -- I find Mr.

2    Draper's request, quite honestly, offensive, that it would

3    require us to -- a lot more time and money on an issue we

4    shouldn't.  So, I would ask Your Honor to reject Mr. Draper's

5    request.

6             THE COURT:  All right.  I do --

7             MR. DRAPER:  And again, my --

8             THE COURT:  -- reject it.  That's exactly where my

9    brain went, Mr. Draper.  This is an order continuing your

10   motion.  Okay?  And we'll have a status conference in early

11   September on your motion.

12       And you know, again, I'm just letting you know my view it

13   will be moot if the effective date has occurred, and then

14   we'll get some sort of order to that effect issued at that

15   time.  And then I guess you'll have your final order that you

16   can appeal if you want at that point.

17       The last thing I'm going to say is this.  Mr. Draper, as

18   I'm sure you remember, at some point many weeks back -- I

19   think it was in January, actually -- I ordered that Mr.

20   Dondero should be on the WebEx, or if we're live in the court

21   for a hearing, live in the court, any time there's a hearing

22   where he, his lawyers, have taken a position, filed an

23   objection or filed the motion himself.  If he and his lawyers

24   are requesting relief or --

25            MR. DONDERO:  I'm here.

Case 19-34054-sgj11   Doc 3470-1   Filed 08/26/22   Entered 08/26/22 17:11:52   Page 57 of
154
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 57 of 106   PageID 9635

55

1          THE COURT:  -- objecting to relief, that he has to be

2     in the courtroom.

3       I am now going to make the same requirement with regard to

4     the trusts.  Any time the trusts file a pleading seeking

5     relief, object to a pleading seeking relief, file any kind of

6     position paper, I'm going to require a trust representative to

7     be in court.

8       Now, I don't know if that's the trustee, Nancy Dondero.  I

9     don't know if that's Mr. Dondero's wife, a sister, who that

10    is.  But it'll either be her or whoever the trustee is or Mr.

11    Dondero as beneficiary.  But it has gotten to that point.

12    Okay?  And --

13          MR. DRAPER:  Your Honor?

14          THE COURT:  And it's not -- it's not personal.  I

15    have said this before.  I've done this in many cases.  If we

16    have a party who feels so invested in what's going on that

17    they're waging litigation, litigation, litigation, at some

18    point very often I will make this order.  Like, okay, we're

19    all spending a lot of time on what you want, so you need to

20    show you're invested in it and be here with the rest of us.

21    And, you know, potentially we're going to want testimony in

22    certain contexts.  Okay?

23      So I don't know who that human being is for the trusts,

24    but I'm now to the point where I'm making that same order that

25    I did with regard to Mr. Dondero personally.  All right?

Case 19-34054-sgj11  Doc 3470-1  Filed 08/26/22   Entered 08/26/22 17:11:52   Page 58 of
154
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 58 of 106   PageID 9636

56

1          MR. POMERANTZ:  Your Honor?

2          THE COURT:  Yes?

3          MR. POMERANTZ:  Your Honor, just to clarify, that's

4     Mr. Dondero and the trustee.

5       And I would also ask Your Honor, I know Mr. Dondero will

6     say that he was on, and that's what Mr. Taylor is going to

7     say, he was on audio.  I think, in order to have them actively

8     participating, they should be on the video the entire hearing.

9     Because if they're just on the phone on mute, Your Honor is

10    not able to really tell if they are really listening.  So I

11    would ask Your Honor to clarify to both Mr. Draper and Mr.

12    Taylor that, for both the trustee and Mr. Dondero, they should

13    be on video.

14         THE COURT:  All right.

15         MR. DRAPER:  Your Honor, Mr. Dondero is on.  You can

16    see him down in the lower screen.

17         THE COURT:  All right.  Just so you know, I mean, the

18    screen I'm looking at is not quite the same screen you're

19    looking at.  We have this Polycom.  And I show that there are,

20    you know, thirty-something people, but I only see the people

21    who have most recently talked.  Okay?  So, I see you, Mr.

22    Draper.  I see Mr. Pomerantz.  I see Mr. Clemente.  A few

23    minutes ago, I saw Mr. Morris.  But, you know, we've set it up

24    where I'm not overwhelmed with blocks; I'm just seeing the

25    people when they speak.

57

1          MR. POMERANTZ:  Your Honor, and those were the only

2  four people whose videos were on during the entire hearing.

3          THE COURT:  Oh, okay.

4          MR. POMERANTZ:  So I hope Mr. Draper is not going to

5  say that Mr. Dondero was on video, because he was not.

6          THE COURT:  Okay.

7          MR. DRAPER:  No, you can see -- Mr. Pomerantz, what I

8  said is you can see him on the screen here.  You can see that

9  he has dialed in.  I don't see him jumping up and down or his

10 person.

11         THE COURT:  Oh, okay.

12         MR. DRAPER:  But it is clear that somebody dialed in

13 on his behalf.

14         MR. POMERANTZ:  Well, --

15         MR. DRAPER:  Or he dialed in.  He is -- he is

16 present.

17         MR. POMERANTZ:  Exactly.  That's my point, Your

18 Honor, that someone may have dialed in on his behalf.  And I

19 think Mr. Dondero, for them to have active, meaningful

20 participation, because I think that's what Your Honor is

21 getting at, that they should be here, engaged.  And if we were

22 in court like we were the other day, Mr. Dondero would have

23 had to sit in Your Honor's courtroom.  And if he is going to

24 take up the time of Your Honor and all the parties, he and the

25 trustee should be really engaged, which you cannot be if

58

1   you're only on the phone.

2          THE COURT:  Okay.  All right.  Well, --

3          MR. DRAPER:  Your Honor?

4          THE COURT:  Go ahead, Mr. Draper.

5          MR. DRAPER:  Mr. Dondero just talked a few moments

6   ago, so Mr. Pomerantz heard him.  This is -- this is truly

7   unwarranted.  He's appeared, he's here, and he's made a

8   comment to the Court.  So, again, we are invested.  He was

9   present at this hearing.  He heard the hearing.  And so, you

10  know, I just don't know where this is coming from.  I

11  understand he missed a hearing before, but he is here for this

12  one.

13         THE COURT:  Okay.  Well, I'm not going to get bogged

14  down in this issue.  I am going to issue an order, though,

15  that is going to be reflective of what I said, and we'll just

16  -- we'll make sure we have him check in or whoever the

17  representative is of the trusts in future hearings and turn

18  the video on and we'll make sure.

19      Again, this is -- I used the word frustrated the other

20  day.  I'm very frustrated.  This is just -- this is -- it's

21  out of control.  Okay?  I ordered mediation earlier in this

22  case.  I believed that an earnest effort was put in.  But if

23  we're not going to have settlement of issues, you know, I'll

24  address these issues, but everyone who files a pleading,

25  whether it's Mr. Dondero personally or the trusts, the family

59

1   trusts, and, of course, we're going to get -- I'm going to go

2   the same direction, actually, with all these other entities.

3   You know, it's -- I've gotten to where I had my law clerk the

4   other day prepare me basically what was like a program from a

5   sports event, you know, who represents which entities, because

6   it's gotten overwhelming. And --

7            MR. POMERANTZ: Your --

8            THE COURT: And I mentioned the other day, I'm very

9   close to requiring some sort of disclosures about the

10  ownership of each of these entities, because I -- you know,

11  the standing is just so tenuous, so tenuous with regard to

12  certain of these entities. And I've erred on the side of

13  being conservative and, you know, okay, we maybe have

14  prudential standing, constitutional standing, even if it's

15  kind of hard finding statutory standing under the Bankruptcy

16  Code. But it's gotten to the point where it's just costing

17  too much time and expense for me to not press some of these

18  issues and hold people accountable.

19     So, Mr. Pomerantz, were you about to say something?  I

20  know that we had talked at another hearing about the Court

21  maybe requiring some sort of disclosures for me to really

22  understand party in interest status maybe better than I do.

23           MR. POMERANTZ: That, Your Honor, was where I was

24  going to go before Your Honor made the comment. Your Honor

25  made that comment a few weeks ago. I think, since then, quite

60

1  honestly, nothing really has changed. And I think it would be

2  helpful -- it would be helpful for the Debtor, and more

3  importantly, I think it would be helpful to the Court to have

4  a list that you can refer to every time we are in a hearing of

5  every entity that has appeared that Mr. Dondero has a

6  relationship with, who the lawyers are, what the claims they

7  filed, what the status of the claims they filed, and maybe

8  even what litigation they are in pending with the Debtor.

9      We're happy with -- part of it we could prepare. But I

10  would think Your Honor should order that from Mr. Dondero's

11  related entities, because it might cut through a lot of it,

12  and give Your Honor the information Your Honor needs and the

13  context and perspective as you're hearing a lot of these

14  motions.

15          THE COURT: All right. Well, is there anything else

16  before we move on to the other matter? I'm about to close the

17  loop on this by saying I am --

18          MR. TAYLOR: Your Honor? Your Honor?

19          THE COURT: Who is that speaking?

20          MR. TAYLOR: This is Clay -- this is Clay Taylor,

21  Your Honor, --

22          THE COURT: All right.

23          MR. TAYLOR: -- representing Jim Dondero

24  individually.

25          THE COURT: Okay.

61

1          MR. TAYLOR:  And I just wanted to be heard.  I've

2     just listened in, even though Mr. Dondero was not the movant,

3     because sometimes issues like this do come up where his name

4     is thrown about.

5          First of all, Jim Dondero was indeed, as Mr. Draper said,

6     was indeed present.  He did indeed try to speak.  I kind of

7     overrode him.  And because, you know, he needs to speak

8     through his lawyer most of the time and shouldn't address the

9     Court directly.  But I wanted to let you know that Mr. Dondero

10     was indeed on the line, was actively listening, and was

11     participating.

12          As far as additional disclosures, it would be, I would

13     just note, somewhat ironic if the Court denies the motion for

14     what appears to be mandatory disclosures under Rule 2015.3 but

15     then imposes additional disclosure requirements on somebody --

16     on another party, without any rule stating that there is such

17     disclosures.  It just -- it strikes me as ironic, and I would

18     like Your Honor to consider that, at least, as Your Honor

19     says, context matters.

20          You know, that's the context in which this arises.  And we

21     would just ask Your Honor to reflect upon that before she

22     imposes additional duties upon my client.

23          But there is -- and the Debtor has asked for the response

24     to be taken as a motion for leave to not comply with a rule,

25     but yet Mr. Seery is not here.  The UCC regularly

62

```
 1  participates.  Its members are not here.  And so I just, to

 2  the extent Your Honor is going to impose duties upon certain

 3  parties, then what's good for the goose is good for the

 4  gander, Your Honor.

 5          THE COURT:  All right.

 6          MR. POMERANTZ:  Your Honor, I would point out that

 7  Mr. --

 8          THE COURT:  I respect your argument.  I always

 9  respect your arguments, Mr. Taylor.

10      By the way, you aren't wearing a jacket.  You know, next

11  time you need to wear a jacket.  And forgive me if I seem

12  nagging, but I'm letting you all know, if you all are soon

13  going to be having lots of litigation in the District Court, I

14  promise you the district judges are way more formal than me

15  and sticklers for every rule.  You'll also be doing everything

16  live in the courtroom, too.  I'm just letting you know that.

17      But while I respect your argument, apples and oranges.  I

18  mean, the 2015.3 rule, not only is it not -- not -- I wouldn't

19  say mandatory, since the Court has discretion for cause to

20  waive the requirement.  But it's a very onerous set of forms

21  that would have to be filled out for 150 entities by 12 staff

22  members.  I don't really consider that the same as the

23  disclosure that I'm now going to require.

24      But my law clerk and I will -- we'll craft a form of order

25  that will be specific as far as what I'm going to require.
```

Case 19-34054-sgj11 Doc 3470-1 Filed 08/26/22    Entered 08/26/22 17:11:52    Page 65 of
154
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21    Page 65 of 106   PageID 9643

63

1       And, again, I think it's way beyond the point of this

2    being necessary.  And just so -- again, I'm wanting to explain

3    this thoroughly.  You know, standing -- for the nonlawyers; I

4    don't know how many nonlawyers are on the phone, WebEx -- it's

5    a subject matter jurisdiction thing.  Okay?  And, you know, if

6    there's a dispute and someone involved in a dispute

7    technically doesn't have standing, that means the Court didn't

8    have subject matter jurisdiction to be adjudicating it.  Okay?

9    That's first year law school concept.

10      And it's been mentioned we have lots and lots of appeals,

11   and I can promise you, if you've never been through the

12   appellate process, that's the very first thing they'll look at

13   -- you know, District Court, Fifth Circuit, any Court of

14   Appeals -- because they have an overwhelming docket.  And if

15   there's a reason to push out this appeal before then because

16   of lack of subject matter jurisdiction, which would include

17   lack of standing, of course they are going to quickly get it

18   off their plates because they have other things to get to,

19   like criminal matters that are, you know, their top priority

20   because of the Constitution.

21      So this has been an evolving thing with me.  At some

22   point, I feel like the Courts of Appeals that are involved

23   with all of these appeals, they might be really, really

24   zeroing in on the standing of parties more than perhaps even I

25   have.  So I want to do my job and I want it clear on the

64

```
 1   record, this is why this person has standing or doesn't have

 2   standing.  Okay?  I just feel like we've gotten to that point.

 3   And so we'll issue an order in that regard, and it will, I

 4   promise you, be crystal clear.

 5       Anything else?

 6           MR. POMERANTZ:  Your Honor, one last point.  Mr.

 7   Taylor insinuated that the board is not present here, which is

 8   incorrect.  A member or two members or three members of the

 9   board have been present at every hearing before Your Honor.

10   And that's without an order requiring them to do so, because

11   they are -- they are interested, they are engaged.  Mr. Dubel

12   is on the phone.  He has been on the phone.  I think this may

13   have been only the second hearing that Mr. Seery has missed,

14   felt it wasn't necessary to take him away from his running the

15   company.  So the Debtor has been, through its board members,

16   fully engaged, and I just wanted Your Honor to know that, that

17   we would never have a hearing before Your Honor without at

18   least one member of the independent board listening in and

19   participating as necessary.

20           THE COURT:  All right.  Thank you.

21       All right.  Well, let's move on to the other contested

22   matters, or adversary proceeding matters, I should say.  And

23   they're Adversary 21-3006 and 21-3007.  We have Motions for

24   Leave to Amend Answers.  And do we have Ms. Drawhorn appearing

25   for that motion or those motions?
```

65

 1           MS. DRAWHORN:  Yes, Your Honor.  Lauren Drawhorn with

 2    Wick Phillips on behalf of Highland Capital Management

 3    Services, Inc. and NexPoint Real Estate Partners, LLP,

 4    formerly known as HCRE Partners, LLC.

 5           THE COURT:  All right.  And who will be making the

 6    argument for the Debtor on this one?

 7           MR. MORRIS:  John Morris, Your Honor; Pachulski Stang

 8    Ziehl & Jones; for the Debtor.

 9           THE COURT:  All right.  Are there any other

10    appearances on this?

11       Okay.  Ms. Drawhorn?

12           MS. DRAWHORN:  Yes, Your Honor.  We are -- so, my

13    clients are seeking leave to amend the answer to add two

14    affirmative defenses.  As you know, under Rule 15(a), there is

15    a bias towards granting leave, and leave should be freely

16    granted unless there's a substantial reason to deny it.

17       The main factors that are considered in determining

18    whether there is a substantial reason to deny a motion for

19    leave to amend are prejudice, bad faith, and futility.

20       Here, there is no prejudice to the Plaintiff.  Under the

21    case law, if the -- as long as a proposed amendment is not

22    presented on the eve of trial, continuing deadlines or

23    reopening discovery does not constitute sufficient prejudice

24    to deny leave.

25       Here, discovery does not close until July 5th for Highland

Case 19-34054-sgj11 Doc 3470-1 Filed 08/26/22   Entered 08/26/22 17:11:52   Page 68 of
154
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 68 of 106   PageID 9646

66

1   Capital Management Services, and it does not close until July

2   26th for NexPoint Real Estate Partners.

3       The Plaintiff has not -- neither party has taken any

4   depositions in this case.  And we are open and willing to

5   extend the discovery deadlines if necessary.  We think that

6   discovery can be extended as necessary without extending any

7   dispositive motion deadline or the docket call which are set

8   in August.  Dispositive motions are August 16th for Highland

9   Capital Management and September 6th for NexPoint Real Estate

10  Partners, with docket call in those cases being October and

11  November.

12      So there's significant time.  If the -- if the party just

13  wants to conduct additional written discovery, I think that

14  that -- they would be easily be able to do that.

15      We're also open to continuing all the deadlines in this

16  case, and practically speaking, those -- the deadlines may be

17  continued depending on what happens with the pending motion to

18  withdraw the reference and the motion to stay.

19      So we don't think -- we don't see any reason why our

20  amended additional affirmative defenses will result in any

21  prejudice to the Plaintiff, and don't see that as a reason --

22  a substantial reason to deny the motion for leave.

23      There is no bad faith here.  The motion for leave was

24  filed two months after our original answer.  Again, this is

25  not a situation where we're trying to add a new defense on the

67

1  eve of trial.  We're not even waiting until after discovery is

2  closed to try and add this new defense.  And it's not after

3  one of our prior defenses failed.  Instead, we've been

4  conducting additional investigations, preparing for written

5  discovery.  And as set forth in more detail in the Sauter

6  declaration that was filed yesterday, we discovered these

7  additional defenses through that additional investigation.

8      So there's certainly no bad faith here in adding these two

9  defenses.  We are just trying to make sure that we can prove

10  up our defenses and prove up our case on the merits, as we

11  need to.

12     And then the last factor, the new affirmative defenses

13  we're seeking to add, they're not futile.  I cited some cases

14  in the pleadings.  There are some judges in the Northern

15  District of Texas that refrain from even evaluating futility

16  at this stage, at a motion for leave to amend stage,

17  preferring to address those on a motion for summary judgment

18  situation.  But even when it is considered, futility looks

19  more at is there a statute of limitations that prevents the

20  claim from being successful, or does the court lack subject

21  matter on its face, based on this defense?  And that's not the

22  case here.

23     The Debtor -- the Plaintiff tries to argue on the merits

24  of our affirmative defenses, and a motion for leave to amend

25  is not a basis for that.  This isn't a motion for summary

68

1    judgment.  This is just -- just a motion for leave to add

2    these defense, and they can certainly address the merits later

3    on in the case.

4        So we think we provided sufficient notice in our proposed

5    amendment.  I mean, our proposed amended answer.  To the

6    extent we need to add any specifics, we are certainly open to.

7    We've noted them in our reply.  The ambiguity is -- is to the

8    notes as a whole.  We noted the Highland Capital Management,

9    there's two notes that are signed by Frank Waterhouse without

10   indication of corporate capacity, which creates some

11   ambiguity.  The notes reference other related agreements,

12   which create some ambiguity.  So we think there's sufficient

13   pleading of these new defenses to support leave to amend and

14   address those on the merits.

15       And then the condition subsequent defenses, while we --

16   the schedules and the SOFAs, the notes related to that

17   reference that some loans between parties and related -- to

18   affiliates and related entities may not be enforceable, we

19   think that supports our position and this defense here, now

20   that we've furthered our investigation and heard about this

21   additional subsequent agreement that supports the condition

22   subsequent.

23       And the opposition, the Plaintiff's opposition notes that

24   there has been some discovery on this defense.  It's similar

25   to one that's asserted in a related note adversary.  And

69

1   while, again, they try to assert the merits and the

2   credibility of certain testimony, that's -- that's a decision,

3   credibility of a witness is a decision for a fact finder and

4   not for this stage of the proceedings and not for a motion for

5   leave to amend.

6       So we don't believe there's a substantial reason to deny

7   leave.  Again, under Rule 15, leave should be granted freely.

8   And so we would request that the Court grant our motion for

9   leave to amend so that we can have our amended answer and

10  affirmative defenses in this case.

11          THE COURT:  All right.  Well, Mr. Morris, you know,

12  the law is not too much in your favor on this one.  So what do

13  you have to say?

14          MR. MORRIS:  I have to say a few things first, Your

15  Honor.  The notes are one of the most significant assets of

16  the estate.  As the Court will recall at the confirmation

17  hearing, Mr. Dondero and all of his affiliated entities

18  objected to confirmation on the ground -- challenging, among

19  other things, both the liquidation analysis as well as the

20  projections on feasibility going forward.

21      One of the assumptions in those projections and in the

22  liquidation analysis was indeed the collection of these notes

23  in 2021.  They all sat on their hands, attacked the

24  projections, attacked the liquidation analysis, but never on

25  the grounds that the notes wouldn't be collectable in 2001

70

1   [sic], never informing the Court that there was some agreement

2   by which collection would be called into question, never ever

3   disclosing to anybody that the plan might not be feasible or

4   the liquidation analysis might not be accurate because these

5   notes were uncollectable.

6       So what happened after that, Your Honor?  We commenced

7   these actions.  Actually, before the hearing.  We actually

8   commenced these actions before the confirmation hearing, when

9   they sat silently on this.

10      And Mr. Dondero's first answer, because this is all very

11  important because they say that they're -- they're

12  piggybacking on Mr. Dondero.  Mr. Dondero's first answer to

13  the complaint said, I don't have to pay because there is an

14  agreement by which the Debtor said they would not collect.

15  It's in the record.  It's attached to my declaration.  And

16  that was it.  Full stop.  I don't have to pay because the

17  Debtor agreed that I would not have to collect.

18      So we served a request for admission.  Admit that you

19  didn't pay taxes.  He realized, okay, that defense doesn't

20  work, so he changes it completely and he amends his answer.

21  Now the amended answer says, I don't -- the Debtor agreed that

22  I wouldn't have to pay based on conditions subsequent.

23      And we said, what are those conditions subsequent?  Please

24  tell us in an interrogatory response.  And under oath, Mr.

25  Dondero said, I don't have to pay if the Debtor sells their

Case 19-34054-sgj11   Doc 3470-1   Filed 08/26/22   Entered 08/26/22 17:11:52   Page 73 of
154
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 73 of 106   PageID 9651

71

1  assets in the future.  At a favorable price, I think it says.

2  Again, this is in the record.  And we asked him under oath,

3  who made that agreement on behalf of the Debtor?  And he said,

4  I did.

5      And Your Honor will recall that we had a hearing on that

6  very defense, on the motion to compel, where they said Mr.

7  Seery has to come in and testify to the defense that Mr.

8  Dondero made this agreement with himself.  And then the

9  following week, on a Tuesday, we had the hearing on the motion

10 to withdraw the reference, and Your Honor said finish

11 discovery, because we told you discovery was going to be

12 concluded on Friday with Mr. Dondero's deposition.  You know

13 what they did, Your Honor?  The night before the hearing, they

14 amended Mr. Dondero's interrogatory.  Again, these are sworn

15 statements.  They amended it again to say he didn't enter the

16 agreement on behalf of the Debtor; Nancy Dondero, his sister,

17 did.

18     And then I took his deposition.  And we're going to get to

19 that in a moment, because I'm going to put it up on the screen

20 so you can see these answers, Your Honor.  And I say this by

21 way of background because it goes to both good faith -- or,

22 actually, bad faith -- as well as the lack of a bona fide

23 affirmative defense here.

24     This is -- there are five notes litigation.  One against

25 Mr. Dondero.  So that's package number one.  And they're

72

```
 1    represented by the Stinson firm, who is signing all of these
 2    things.  The Stinson firm is out there claiming that in good
 3    faith each of these -- each of these amendments, each of these
 4    amendments to the interrogatories, are in good faith.  They're
 5    not in good faith, Your Honor.  They're just not.
 6         And the Bonds firm.
 7         Then bucket two is what we have here today.  That's HCRE
 8    and Highland Capital Management Services.  They're represented
 9    by Ms. Drawhorn.  I think the Stinson firm has now also
10    entered an appearance in those two adversary proceedings.
11         And the other two are against the two Advisors.  More
12    entities controlled by Dondero.  And Mr. Rukavina, I believe,
13    last night filed his motion to amend to add these same
14    defenses.
15         Okay?  Is this good faith?  I don't think this is good
16    faith.
17         Let's look at Mr. Dondero's testimony so that the Court
18    has an understanding of what we're talking about here.  I
19    think I have Ms. Canty on the phone, and I'd ask her to go to
20    Page 178.  3.  Just going to read (garbled) so you can see.
21    This was Mr. Dondero's testimony the day after telling me that
22    he amended his interrogatory -- sworn interrogatory answer to
23    say that he didn't enter the agreement on behalf of the Debtor
24    but Ms. -- but Ms. Dondero, his sister, did.
25         Question.  Are we -- 178, please.
```

73

```
 1              MS. DRAWHORN:  Your Honor, I would --

 2              MR. MORRIS:  Question.  Please --

 3              MS. DRAWHORN:  This is not testimony in this

 4    adversary and I was not -- my clients were not present at this

 5    deposition that Mr. Morris is referring to, so I --

 6              MR. MORRIS:  Your Honor, with all due respect, she's

 7    interrupting me, and I would ask her to allow me to finish my

 8    presentation and then she can make whatever comments she

 9    wants.  Because -- because --

10              MS. DRAWHORN:  Well, I'm objecting to this testimony

11    --

12              THE COURT:  Okay.

13              MS. DRAWHORN:  -- coming into evidence.

14              THE COURT:  Okay.  So your objection is -- if you

15    could just articulate your objection for the record, please,

16    Ms. Drawhorn.

17              MS. DRAWHORN:  I would object to this -- this

18    deposition is not in this proceeding, this adversary

19    proceeding, either of these two the adversary proceedings, and

20    my client was not present at this deposition, so I would

21    object to it as hearsay.

22              THE COURT:  Response?

23              MR. MORRIS:  Your Honor, if I may, I think this --

24    this points to just one of the fundamental problems that we

25    have here.  As we pointed out in our objection, the Debtor, as
```

74

1  we sit here right now, still has no notice of the facts and

2  circumstances surrounding this alleged agreement. We still

3  don't know who entered into the agreement on behalf of the

4  Debtor. We don't know what the terms of the agreement were.

5  We don't know when the agreement was entered into. We don't

6  -- right?

7      If they're going to assert that there's an agreement --

8  and they seem to be piggybacking on this conversation between

9  Mr. Dondero and his sister. If there's a different one, they

10 need to say that right now. They need to put their cards on

11 the table and they need to inform the Debtor who entered the

12 agreement on behalf of the Debtor pursuant to which the Debtor

13 agreed to waive millions and millions of dollars without

14 telling anybody.

15         THE COURT: Okay. I overrule the objection. We can

16 go through the transcript.

17         MR. MORRIS: So, I'm just going to use part of it,

18 Your Honor. But on Lines 3 to 7:

19     "Q  Did anybody else participate -- did anybody

20     participate in any of the conversations other than you

21     and your sister?

22     "A  I don't believe it was necessary. It didn't

23     include anybody else."

24     Go down to Line 19, please.

25     "Q  Was the agreement subject to any negotiation? Did

Case 19-34054-sgj11 Doc 3470-1 Filed 08/26/22   Entered 08/26/22 17:11:52   Page 77 of
154
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 77 of 106   PageID 9655

75

1    she make any kind of -- any counterproposal of any

2    kind?

3    "A   No."

4    Page 179, Line 2.

5    "Q   Do you know if she sought any independent advice

6    before entering into the agreement that you have

7    described?

8    "A   I don't know."

9    Line 23, please.

10   "Q   Do you know if there were any resolutions that

11   were adopted by Highland to reflect the agreement

12   that's referred to in the -- in the answer?

13   "A   Resolutions that -- no.  Not that I'm aware of."

14   Page 180, Line 5.

15   "Q   Did you give Nancy a copy of the promissory notes

16   that were a subject of the agreement?

17   "A   No."

18   Continue.

19   "Q   Did she ask to see any documents before entering

20   into the agreement that's referred to?

21   "A   I don't remember."

22   Page 181, Line 19.

23   "Q   Under the agreement that you reached with Nancy

24   that's referred to in Paragraph 40, was it your

25   understanding that Highland surrendered its right to

76

1      make a demand for payment of unpaid principal and

2      interest under the notes?

3      "A   Essentially, I think so."

4          Page 219.  I'll just summarize 219, Your Honor.  Mr.

5   Dondero has no recollection of telling Mr. Waterhouse, the

6   chief financial officer, or any other employee of Highland

7   that he'd entered into this agreement with his sister pursuant

8   to which the Debtor agreed to not collect almost $10 million

9   of principal and interest.

10         Now let's -- let's go -- I think it's really -- because it

11  took me an awfully long time to get there.  On Page 214 at

12  Lines 16 through 24.  This is what the agreement was, because

13  this is -- this is -- this is his third try to describe the

14  agreement.  Right?  The first time -- it's just his third try,

15  and this is what the agreement is, Your Honor.

16      "Q   Did you and Nancy agree in January or February

17      2019 that if Highland sold either MGM or Cornerstone or

18      Trussway for an amount that was equal to at least one

19      dollar more than cost, that Highland would forgive your

20      obligations under the three notes?

21      "A   I believe that is correct."

22          That's -- that's the agreement.  It took him three times

23  to get there, but look at -- look at that.  He and his sister

24  did that.

25         And I do want to point out, Your Honor, that in their

77

1    opposition that they filed last night, the Defendants claim

2    that Ms. Dondero was authorized because she was -- she was the

3    trustee of Dugaboy and Dugaboy holds the majority of the

4    limited partnership interests in the Debtor and therefore she

5    had the authority to enter into the agreement on behalf of the

6    Debtor.

7        There is that flippant -- there is just that unsupported

8    statement out there.  Section 4.2(b) of the limited

9    partnership agreement says, and I quote, "No limited partner

10   shall take part in the control of the partnership's business,

11   transact any business in the partnership's name, or have the

12   power to sign documents for or otherwise bind the partnership,

13   other than as specifically set forth in the agreement."

14       So I look forward to hearing what basis there was to

15   submit a document to this Court that Nancy Dondero had the

16   authority to bind the Debtor in an agreement with her brother

17   pursuant to which tens of millions of dollars was apparently

18   forgiven.

19       Can we go to Page 238?  This is the last piece, Your

20   Honor.  The Debtor's outside auditors were

21   PricewaterhouseCoopers.  There's management representation

22   letters signed by both Mr. Dondero and Mr. Waterhouse

23   attesting that they had given their auditors all of the

24   information necessary to conduct the audit.  We will get to

25   that in due course, but these are very important questions

Case 19-34054-sgj11   Doc 3470-1   Filed 08/26/22   Entered 08/26/22 17:11:52   Page 80 of
154
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 80 of 106   PageID 9658

78

1   right here.

2       What page are we on?  Is it 238?  Okay.  So, Line 16, I

3   believe.

4       "Q   You knew at the time -- you knew at the time the

5       audited  financials  were  finalized  that  Highland  was

6       carrying  on  its  balance  sheet  notes  and  other  amounts

7       due from affiliates?

8       "A   Yep."

9       And if we could just keep going, Your Honor, you will see:

10      "Q   Did     you     personally     tell     anybody     at

11      PricewaterhouseCoopers   in   connection   with   the

12      preparation  of  the  audited  financial  statements  for

13      2018  that  you  and  your  sister  had  entered  into  the

14      agreement  with  your  sister  Nancy  in  January  or  February

15      of 2019?

16      "A   Not that I recall."

17      There's a lot more here, Your Honor.  I'm really just

18   touching the surface.  I am going to take Nancy's deposition

19   later this month.  But there is -- this is wrong.  This is

20   just all so wrong.  For three different reasons.  At least.

21   This is not a viable defense and will never be a viable

22   defense.

23      The audited financial statements carry these loans as

24   assets on the books, without qualification, and they were

25   subject to Mr. Dondero and Mr. Waterhouse's representations.

Case 19-34054-sgj11 Doc 3470-1 Filed 08/26/22    Entered 08/26/22 17:11:52    Page 81 of
154
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21    Page 81 of 106   PageID 9659

79

1        There is partial performance.  These entities that we're

2   talking about today, they made payments on these notes.  How

3   do you make payments on the notes and then come to this Court

4   and say the notes are ambiguous?  How do you -- how do you

5   make payments on the notes and come to this Court and tell

6   this Court, I just learned that there was an agreement by

7   which I don't have to pay, subject to conditions precedent in

8   the future.

9        Mr. Sauter submits a declaration in support of this

10   motion.  He has no personal knowledge.  He states in Paragraph

11   14 that his review of the Defendants' books and records did

12   not reveal any background facts regarding the notes.  Mr.

13   Dondero is the maker on all of the notes except for two of

14   them.  Mr. Dondero owns and controls the Defendants.  Mr.

15   Dondero was not employed or otherwise affiliated with the

16   Debtor after these actions were commenced.  Mr. Sauter takes

17   Mr. Seery to task for telling the Debtor's employees not to

18   take actions that were adverse, and he uses that as his excuse

19   for not knowing these facts.  He is the general counsel.  He

20   was served with a complaint that alleged that his clients were

21   liable for millions and millions of dollars.  His boss is

22   James Dondero.  He had unfettered access to James Dondero.

23   Mr. Dondero is the one who signed the notes, except for two of

24   them.  There is absolutely no excuse for not doing the

25   diligence to find out from Mr. Dondero that this defense

80

1   existed.

2       And you know why it didn't happen?  Because the defense is

3   not real.  It is completely fabricated.  It continues to

4   change and evolve every single time I -- every single time I

5   talk about these note cases, it's a new defense, it's a

6   different defense, the contours change, somebody else is

7   involved.  This is an abuse of process, Your Honor.  It is bad

8   faith.  It just really is.  And somebody's got to start to

9   take responsibility and say, I won't do this.  I won't do

10  this.

11      Somebody's got to stand up and say that, because, I'm

12  telling you, it's not enough, Your Honor, that the Debtor is

13  going to collect all of its fees under the notes at the end of

14  this process.  It's not enough,  because we're now giving an

15  interest-free loan.  These are -- these are notes that are

16  part of the Debtor's plan that nobody objected to, that nobody

17  suggested were the subject of some condition subsequent.

18      This is not your normal, you know, gee, I'd like leave to

19  amend the complaint.  They're simply following what Mr.

20  Dondero did.  And I would really ask the Court to press the

21  Defendants to identify specifically who made the agreement on

22  behalf of the Debtors, when was the agreement made, is there

23  any document that they know of today that reflects this

24  agreement, and what were the terms of the agreement?  Is it

25  really that he would sell -- if he sells MGM for a dollar over

**APP. 2799**

81

1    cost, $70 million of notes get forgiven?  How is that

2    possible?  How is that possible?  It doesn't pass the good

3    faith test.  The Court should deny the motion.

4        Thank you, Your Honor.

5            THE COURT:  Mr. Morris, in all of your listing of

6    allegedly problematic things, one trail my brain was going

7    down is this:  Is this adversary going to morph even further

8    to add fraudulent transfer allegations?  I mean, if notes --

9            MR. MORRIS:  Here's the --

10           THE COURT:  -- were forgiven or agreements were made

11   --

12           MR. MORRIS:  Yeah, I --

13           THE COURT:  -- that they would be forgiven if, you

14   know, assets are sold at a dollar more than cost, is the

15   Debtor going to say, well, okay, if this is an agreement,

16   there was a fraudulent transfer?

17           MR. MORRIS:  Your Honor, that is an excellent

18   question, one which I was discussing with my partners just

19   this morning.  You know, we have to -- we're balancing a

20   number of things on our side, including the delay that that

21   might entail; including, you know, what happens if we go down

22   that path.  You know, the benefit of suing under the notes, of

23   course, is that he's contractually obligated to pay all of our

24   fees.

25       And so we're balancing all of those things as these -- as

82

1    these defenses metastasize.  But it's something that we're

2    considering, and we reserve the right to do exactly that, as

3    these defenses continue to get -- and it would be fraudulent

4    transfer, it would be breach of fiduciary duty against Nancy

5    Dondero, it would be breach of fiduciary duty against Jim

6    Dondero.  I'm sure that there are other claims, Your Honor.

7    But if they want to -- if I'm forced to go down that path, I'm

8    certainly going to use every tool that I have available to

9    recover these amounts from the -- for the Debtor and their

10   creditors.  This is just an abuse of process.

11       How do you -- how does one enter into agreements of this

12   type without telling your CFO, without telling your auditors,

13   without putting it in writing?  And I asked Mr. Dondero, what

14   benefit did the Debtor get from all of this?  And you know

15   what his answer was, Your Honor?  Because it's really -- it's

16   appalling.  It was going to give him heightened focus on

17   getting the job done because of this agreement that he entered

18   into with his sister, Nancy, acting on behalf of the Debtor,

19   with no information, with no documents, with no notes, with no

20   advice, with no corporate resolutions.  The Debtor was going

21   to get Mr. Dondero's heightened focus to sell MGM, Trussway,

22   or Cornerstone for one dollar above cost.

23       I think the fraudulent transfer claim is probably a pretty

24   solid one.  But why do we have to do this?  Why do we have to

25   do this?

83

1          THE COURT:  Well, one of the reasons I'm asking is I

2     would not set the motion to withdraw the reference status

3     conference on an expedited basis, which I was asked to do a

4     few days ago in these two adversary proceedings, and I can't

5     remember when I've set it, but now I'm even worried, if I

6     grant this motion, is it going to be premature to have that

7     status conference in a month or so, whenever I've set it,

8     because if I grant this motion I'm wondering, am I going to

9     have your motion to amend to add fraudulent transfer claims?

10    It's -- you know, I want to give as complete a package to the

11    District Court as I can whenever I have that motion to

12    withdraw the reference.

13         All right.  Ms. Drawhorn, back to you.  As I said --

14              MS. DRAWHORN:  Yes.

15              THE COURT:  -- before inviting Mr. Morris to make his

16    argument, I know the law is very much on your clients' favor

17    as far as the law construing Rule 15(a).  But my goodness, I'm

18    wondering if your client needs -- your client needs to be

19    careful what they're asking for here, after what I've just

20    heard.

21         Anyway, what -- you get the last word on this.

22              MS. DRAWHORN:  Yes.  Thank you, Your Honor.  My

23    response is that Mr. Morris's argument was all on the merits

24    of the defenses, and certainly he is free to argue on the

25    merits, but that's not a determination for today and that's

84

1   not a determination for the motion for leave to amend.  That's

2   a determination for if he files a dispositive motion.

3       Like I said, we are still in the discovery phase.  Mr.

4   Morris mentioned at least three parties that will be -- likely

5   be deposed and potentially give us the additional information

6   that he's asking for to support this defense.  He mentioned

7   PricewaterhouseCoopers; Nancy Dondero, who he's already got

8   scheduled in a different adversary; Frank Waterhouse.

9       So it's too early, as you know, to look at the merits.

10  That's not -- that's not what's the focus of a motion for

11  leave to amend.

12      As to the -- the what amendment, what agreement, what are

13  the conditions subsequent, I believe we provided sufficient

14  information in our reply.  And if the Court would like us to

15  update our proposed amended answer, if the Court is inclined

16  to grant our motion, we can certainly do that.  But I think

17  the Plaintiff seems to be well aware of what the defenses are,

18  especially after his argument today on why he thinks it's not

19  a valid defense.

20      And then, on the due diligence, we did -- we did do due

21  diligence.  That's why we're seeking to amend the answer,

22  obviously, and add these claims.

23      If the Court -- if the Plaintiff wants to file a motion to

24  amend later, then we can address those amendments then.

25      But I think, on the Rule 15 standard, we have met our

85

1  burden and there's no substantial reason to deny the motion to

2  amend to add these defenses.

3      THE COURT: All right. By the way, have your

4  clients, have they filed proofs of claim? And I'm asking for

5  a different reason than maybe I was asking earlier. NexPoint

6  Real Estate Partners?

7      MS. DRAWHORN: They're -- NexPoint Real Estate

8  Partners, LLC, formerly known as HCRE Partners, does have a

9  proof of claim on file. It's unrelated to the notes. And it

10  is subject to a contested matter that's pending -- that's a

11  separate matter that's before the Court being addressed.

12     And then HCMS initially filed a proof of claim that was

13  objected to in the Debtor's first omnibus objection and then

14  was disallowed. There was no response to that omnibus

15  objection, so there's no longer a proof of claim for Highland

16  Capital Management Services.

17     THE COURT: Okay. Again, I'm just thinking ahead to

18  this report and recommendation I'm eventually going to have to

19  make on the motions to withdraw the reference. And as I

20  alluded to, if this morphs to the point of including

21  fraudulent transfer claims, that certainly --

22     MS. DRAWHORN: And Your Honor, one --

23     THE COURT: It's going to affect the report and

24  recommendation. And, you know, proofs of claim affect that,

25  too. So, --

Case 19-34054-sgj11   Doc 3470-1   Filed 08/26/22   Entered 08/26/22 17:11:52   Page 88 of
154
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 88 of 106   PageID 9666

86

1          MS. DRAWHORN:  Uh-huh.  Yes.  And I understand that,

2     Your Honor.  And the issue, I think, with you -- we need to

3     have this motion resolved, because it -- unless the Court is

4     going to continue discovery or stay.  You know, one of the

5     reasons why we had initially requested the expedited hearing

6     was because of the discovery is continued -- continuing to --

7     discovery deadlines are continuing to move.  And obviously

8     whatever the Court decides on this motion for leave to amend

9     will determine what the scope of that discovery is.

10         Similarly, if the Debtor decides to amend, that could

11    change the scope of discovery as well.

12         So we are open to continuing deadlines, and I think, you

13    know, might end up filing a motion to continue.  I haven't

14    conferred with Mr. Morris yet.  I suspect he's opposed, based

15    on our prior conversations.  But that's something that might

16    be helpful, especially if the Court is concerned on how it

17    will affect the motion to withdraw the reference, to -- maybe

18    we continue some of these upcoming deadlines, and that might

19    appease, you know, solve some of your concerns.

20          THE COURT:  All right.  Well, Rule 15(a), of course,

21    is the governing rule here, and the case law is abundant that

22    courts "should freely give leave when justice so requires."

23    And the law is also abundantly clear that the rule "evinces a

24    bias in favor of granting leave to amend."  And again and

25    again, cases say that leave should be granted unless there's

87

1  substantial reason to deny leave, and courts may consider

2  factors such as delay or prejudice to the non-movant, bad

3  faith or dilatory motives on the part of the movant, repeated

4  failure to cure deficiencies, or futility of the amendment.

5       While the Debtor has presented arguments that there might

6  be bad faith here on the part of the Movants and there might

7  be futility in allowing the amendments because of various

8  strong arguments and defenses the Debtor believes it has to

9  this issue of agreements with regard to the notes that

10  allegedly provide affirmative defenses, the Court believes the

11  rule requires me to allow leave to amend the answer.

12       Now, a couple of things.  I am going to require, though,

13  that the amended answer be more specific than has been

14  suggested.  I am going to agree that if new affirmative

15  defenses are made that there was this agreement to forgive

16  when certain conditions happened, then there does need to be

17  identification of who the human beings were that were involved

18  in making the agreement, the date of any agreement or

19  agreements, and disclose what documents substantiate the

20  agreement or reflect the agreement.  All right?  So if that

21  could --

22            MR. MORRIS:  Your Honor?

23            THE COURT:  Yes?

24            MR. MORRIS:  John Morris.  I apologize for

25  interrupting, but just a fourth thing is what is the

88

1   agreement?  I mean, what is the agreement?

2          THE COURT:  Well, okay.  That's fair enough.  What is

3   the agreement?  I guess --

4          MR. MORRIS:  And -- and --

5          THE COURT:  -- that needs to be spelled out.  I mean,

6   I guess I was assuming that that would be spelled out in --

7   but maybe it's not.  So we'll go ahead and add that.

8       As far as extension of the discovery, Ms. Drawhorn has

9   offered that.  I think it would be reasonable if the Debtor or

10  Plaintiff wants that.  Do you want an extension of discovery?

11         MR. MORRIS:  What I really want, Your Honor, is a

12  direction for them to serve this amended answer within 24 or

13  48 hours and grant leave to the Debtor to promptly file

14  written discovery.  We've got Nancy Dondero -- if it turns out

15  -- and maybe Ms. Drawhorn can just answer the question right

16  now.  Who entered the agreement on behalf of the Debtor?

17  Because I'm already taking Nancy Dondero's deposition on the

18  28th.  And it seems to me, if they would just answer the

19  question of whether Ms. Dondero is the person who did that, I

20  could just add a notice of deposition and take the deposition

21  on that date, too, and it would be, really, more efficient for

22  everybody.

23         THE COURT:  Ms. Drawhorn, who was the human being?

24         MS. DRAWHORN:  Yes.  It was -- yes, Nancy Dondero

25  entered into the -- the subsequent agreement.

89

```
1          MR. MORRIS:  Okay.  Super.

2          THE COURT:  All right.  You said you've already --

3          MR. MORRIS:  So, --

4          THE COURT:  -- got a depo scheduled of her?

5          MS. DRAWHORN:  Well, what's the date --

6          MR. MORRIS:  I do --

7          MS. DRAWHORN:  -- Mr. Morris?

8          MR. MORRIS:  I believe it's the 28th.  Your co-

9     counsel can confirm, but I think it's the 28th.

10        And I'll just get another deposition notice for that one,

11    and we'll figure out a time to take Mr. Sauter's deposition,

12    too.

13        But I don't think that there is a need, frankly, for --

14    having been told by Mr. Dondero that there's no documents

15    related to this, having the Court just ordered the Defendants

16    to disclose the identity of any documents that relate to this

17    agreement, I don't think we need to extend the discovery

18    deadline at all.  I can take Ms. Dondero's deposition, I can

19    take Mr. Dondero's deposition, and I can take Mr. Sauter's

20    deposition in due course over the next four weeks.

21          THE COURT:  All right.  Well, Ms. Drawhorn, we'll say

22    that this amended answer needs to be filed by midnight Friday

23    night, 11:59.  That gives you a day and a half to get it done.

24    All right.  If you could please --

25          MS. DRAWHORN:  Yes, Your Honor.
```

Case 19-34054-sgj11 Doc 3470-1 Filed 08/26/22   Entered 08/26/22 17:11:52   Page 92 of
154
Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 92 of 106   PageID 9670

90

1          THE COURT:  Please upload an order, Ms. Drawhorn,

2   granting your motion with these specific requirements that

3   I've orally worked in.

4      I think clients need to be careful what they ask for.  I'm

5   very concerned.  And I know it was just argument and I'll hear

6   evidence, but of all of the things that I guess -- well, I'm

7   concerned about a lot of things, but do we have audited

8   financial statements that didn't disclose these agreements

9   with regard to --

10         MR. MORRIS:  Yes, Your Honor.

11         THE COURT:  I mean, that's -- I'm just -- you know,

12   there's a lot to be concerned about on that point alone, I

13   would think.  But, all right.  If there's nothing further, we

14   are adjourned.  Thank you.

15         THE CLERK:  All rise.

16      (Proceedings concluded at 11:58 a.m.)

17                      --oOo--

18

19                     CERTIFICATE

20      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
21   above-entitled matter.

22   **/s/ Kathy Rehling**                      **06/12/2021**

23   _____     _____

     Kathy Rehling, CETD-444                        Date
24   Certified Electronic Court Transcriber

25

91

<div align="center">INDEX</div>

PROCEEDINGS                                                        4

WITNESSES

-none-

EXHIBITS

-none-

RULINGS

19-34054-sgj

Motion to Compel Compliance with Bankruptcy Rule 2015.3   49/54
filed by Get Good Trust, The Dugaboy Investment Trust
(2256)

21-3006-sgj

Motion for Leave to File Amended Answer and Brief in        86
Support filed by Defendant Highland Capital Management
Services, Inc. (15)

21-3007-sgj

Motion for Leave to Amend Answer to Plaintiff's            86
Complaint filed by Defendant HCRE Partners, LLC (n/k/a
NexPoint Real Estate Partners, LLC) (16)

END OF PROCEEDINGS                                          90

INDEX                                                      91

EXHIBIT 32

```
                IN THE UNITED STATES BANKRUPTCY COURT
                 FOR THE NORTHERN DISTRICT OF TEXAS
                           DALLAS DIVISION
```

| | |
|---|---|
| In Re: | ) **Case No. 19-34054-sgj-11**<br>) Chapter 11<br>) |
| HIGHLAND CAPITAL<br>MANAGEMENT, L.P., | ) Dallas, Texas<br>) December 10, 2020<br>) 9:30 a.m. Docket |
| Debtor. | )<br>) |
| HIGHLAND CAPITAL<br>MANAGEMENT, L.P., | ) **Adversary Proceeding 20-3190-sgj**<br>) |
| Plaintiff, | )<br>) - MOTION FOR PRELIMINARY<br>) INJUNCTION |
| v. | ) - MOTION FOR TEMPORARY<br>) RESTRAINING ORDER |
| JAMES D. DONDERO, | )<br>) |
| Defendant. | )<br>) |

```
                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
                  UNITED STATES BANKRUPTCY JUDGE.
```

WEBEX/TELEPHONIC APPEARANCES:

For the Plaintiff:          Jeffrey N. Pomerantz
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            10100 Santa Monica Blvd.,
                             13th Floor
                            Los Angeles, CA  90067-4003
                            (310) 277-6910

For the Plaintiff:          John A. Morris
                            PACHULSKI STANG ZIEHL & JONES, LLP
                            780 Third Avenue, 34th Floor
                            New York, NY  10017-2024
                            (212) 561-7700

For the Official Committee  Matthew A. Clemente
of Unsecured Creditors:     SIDLEY AUSTIN, LLP
                            One South Dearborn
                            Chicago, IL  60603
                            (312) 853-7539

35

1   the protocols have been followed.

2        As Your Honor knows, when we've had an issue under the

3   protocols, I remember several months ago when we argued about

4   certain distributions being made, the Committee certainly was

5   not shy about bringing it to Your Honor's attention.

6        So we have been very vigilant and very diligent in holding

7   the Debtor accountable under the protocols.  And we believe

8   that -- although, again, when we've had an issue, we've come

9   to Your Honor.  We believe that the protocols have worked as

10  they were intended to and as they were designed, Your Honor.

11       So I can assure you that the Committee has been very

12  vigilant and the Committee will continue to be very vigilant.

13  These issues were all raised in the context of negotiating the

14  protocols.  That was before Your Honor.  Mr. Dondero was

15  involved with that.  It was very difficult negotiations, Your

16  Honor.

17       But this does seem like somebody now trying to renegotiate

18  what it was that the parties agreed to and Your Honor approved

19  early on in this case.

20       So, Your Honor, rest assured, the Committee has been very

21  vigilant and will continue to be very vigilant.

22            THE COURT:  All right.  And I guess the last thing

23  I'll say on that point is, while of course we always want

24  transparency --

25       (Interruption.)

36

1          THE COURT:  While we, of course, always want

2     transparency and notice and opportunity to object, I mean,

3     these are not your typical run-of-the-mill assets.  They're

4     not a parcel of real property or a building somewhere or

5     inventory somewhere or intellectual property.  I mean, these

6     are -- you know, again, we have a unique business here.  And I

7     think that was very much recognized in the process of

8     negotiating the protocols, that this is not the type of

9     business where you do a 363 motion on 21 days' notice any time

10    you feel like, oh, today's a great day to trade this or that

11    in whatever fund.

12         Well, we will go forward on this motion, because Mr.

13    Dondero is entitled to his day in court to make his argument,

14    put on his evidence, and try to convince me that this is not

15    just trying to renegotiate something Mr. Dondero agreed to 11

16    months ago on the eve of confirmation.  But I want to make

17    sure -- oh, we're getting --

18         (Echoing.)

19         (Clerk advises Court.)

20         THE COURT:  Okay.  You're on mute.  You're on mute,

21    Mr. Lynn.

22         MR. LYNN:  Your Honor, may I explain briefly?  This

23    is very distressing.  Mr. Morris says that it is the ordinary

24    course of this Debtor's business to sell a subsidiary.  This

25    is not the ordinary course of the Debtor's business.  There is

37

1  nothing in the protocols that says that the independent board

2  and just the creditors on the Creditors' Committee may make

3  decisions concerning major sales.  We will present evidence to

4  that effect when it occurs, and we believe strongly -- and I

5  want to state, Your Honor, I didn't participate in

6  negotiations of those protocols.  I wasn't involved.  And I've

7  looked at them.  There's nothing that says that this can occur

8  without going to a hearing.  And there is nothing in the

9  protocols that defines ordinary course of business to involve

10  this.

11     This motion was not filed because Mr. Dondero wanted to

12  get in the way.  It was filed because I thought it was the

13  right thing to do because I thought that this was contrary to

14  the way bankruptcy and Chapter 11 should work.  And it was

15  reasoned by me, with Mr. Dondero's consent.  And I very, very

16  much am upset to hear things people say that he's trying to

17  get in the way with this.  He is not.  He's asking for

18  something that is very, very, very reasonable.  If they have

19  nothing to hide, and I hope they don't and don't believe they

20  do, but if the Debtor has nothing to hide, what is wrong with

21  notice and a chance for hearing?

22       MR. POMERANTZ:  Your Honor, this is Jeff Pomerantz.

23  If I briefly may be heard.

24       THE COURT:  Go ahead.

25       MR. POMERANTZ:  I actually did negotiate the

57

1  Court next Wednesday, he needs to testify.  And if NexPoint,

2  through whoever their decision-maker is, is wanting to urge a

3  position to the Court, they need a human being to testify.

4  And I'll hear Seery and I'll hear Dondero and I'll hear

5  whoever that person is, and that's what's going to matter, you

6  know, most to me.  Yeah, we have some legal issues, certainly,

7  but I like to hear business people explain things, no offense

8  to the lawyers.  But it's always very helpful to hear the

9  business people in addition to the lawyers.  All right.  So,

10 Mr. Morris, you're going to upload that TRO for me.

11          MR. MORRIS:  Yes, Your Honor.

12          THE COURT:  Mr. Wright, you can upload your order

13 setting your motion for hearing next Wednesday at 1:30.  And I

14 think we have our game plan for now.  Anything else?  All

15 right.  We're adjourned.

16          THE CLERK:  All rise.

17      (Proceedings concluded at 11:33 a.m.)

18                      --oOo--

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript to
   the best of my ability from the electronic sound recording of
22 the proceedings in the above-entitled matter.

23  **/s/ Kathy Rehling**                    **12/11/2020**

24 _____    _____

   Kathy Rehling, CETD-444                     Date
25 Certified Electronic Court Transcriber

# EXHIBIT 33



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

# ENTERED

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

**The following constitutes the ruling of the court and has the force and effect therein described.**

**Signed June 17, 2021**

_____
**United States Bankruptcy Judge**

---

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | |
|---|---|
| --------------------------------------------------------- § | |
| In re: § | Chapter 11 |
| § | |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] § | Case No. 19-34054-sgj11 |
| § | |
| Debtor. § | |
| --------------------------------------------------------- § | |

### <u>ORDER REQUIRING DISCLOSURES</u>

**I.      Introduction.**

This Order is issued by the court *sua sponte* pursuant to Section 105 of the Bankruptcy Code

and the court's inherent ability to efficiently monitor its docket and evaluate the standing of parties

who ask for relief in the above-referenced case. More specifically, the Order is directed at clarifying

the party-in-interest status or standing of numerous parties who are regularly filing pleadings in the

above-referenced 20-month-old Chapter 11 bankruptcy case. The court has determined that there is

---

[1] The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

a need to: (a) fully understand whether such parties (defined below) have statutory or constitutional standing with regard to recurring matters on which they frequently file lengthy and contentious pleadings and, if so, (b) ascertain whether their interests are sufficiently aligned such that the parties might be required to file joint pleadings hence forth, rather than each file pleadings that are similar in content. The court has commented many times that certain active parties (*i.e.,* Mr. James Dondero and numerous non-debtor entities that he controls—hereinafter the "Non-Debtor Dondero-Related Entities") seem to have tenuous standing.  Mr. Dondero is, of course, the Debtor's co-founder, former President, Chief Executive Officer ("CEO"), and indirect beneficial equity owner.[2]  Since standing is a subject matter jurisdiction concern, the court has determined that it is in the interests of judicial economy to gain some clarity with regard to the standing of the various Non-Debtor Dondero-Related Entities.  It is also in the interests of judicial economy, the interests of other parties in this case, and in the interest of reducing administrative expenses of this estate that there be consolidation of pleadings, wherever possible, of the Non-Debtor Dondero-Related Entities.

---

[2] In addition to being the former CEO, Mr. Dondero represents that he is a "creditor, indirect equity security holder, and party in interest" in the Debtor's bankruptcy.  This court has stated on various occasions that this assertion is ostensibly true, but somewhat tenuous. Mr. Dondero filed five proofs of claim in the Debtor's bankruptcy case.  Two of those proofs of claim were withdrawn with prejudice on November 23, 2020 [DE # 1460].  The other three are unliquidated, contingent claims, each of which stated that Mr. Dondero would "update his claim in the next ninety days."  Ninety days has long-since passed since those proofs of claim were filed and Mr. Dondero has not updated those claims to this court's knowledge. With regard to Mr. Dondero's assertion that he is an "indirect equity security holder," the details have been represented to the court many times to be as follows (undisputed): Mr. Dondero holds no direct equity interest in the Debtor.  Mr. Dondero instead owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner. Strand, however, holds only 0.25% of the total limited partnership interests in the Debtor through its ownership of Class A limited partnership interests.  The Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests.  The Class A interests are also junior to all other claims filed against the Debtor.  Finally, Mr. Dondero's recovery on his indirect equity interest is junior to any claims against Strand itself.  Consequently, before Mr. Dondero can recover on his indirect equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be paid.

**APP. 2817**

## II.     Background: The Chapter 11 Case.[3]

On October 16, 2019 (the "Petition Date"), Highland filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code. Highland is a registered investment advisor that is in the business of buying, selling, and managing assets on behalf of its managed investment vehicles.  It manages billions of dollars of assets—to be clear, the assets are spread out in numerous, separate fund vehicles. While the Debtor has continued to operate and manage its business as a debtor-in-possession, the role of Mr. Dondero *vis-à-vis* the Debtor was significantly limited early in the bankruptcy case and ultimately terminated. The Debtor's current CEO is an individual selected by the creditors named James P. Seery.

Specifically, early in the case, the Official Unsecured Creditors Committee ("UCC") and the U.S. Trustee ("UST") desired to have a Chapter 11 Trustee appointed—absent some major change in corporate governance[4]—due to conflicts of interest and the alleged self-serving, improper acts of Mr. Dondero and possibly other officers (for example, allegedly engaging, for years, in fraudulent schemes to put Highland's assets out of the reach of creditors).  Under this pressure, the Debtor negotiated a term sheet and settlement with the UCC (the "January 2020 Corporate Governance Settlement"), which was executed by Mr. Dondero and approved by a court order on January 9, 2020 (the "January 2020 Corporate Governance Order").[5] The settlement and term sheet contemplated a complete overhaul of the corporate governance structure of the Debtor.  Mr. Dondero resigned from his role as an officer and director of the Debtor and of its general partner. Three new independent directors (the "Independent Board") were appointed to govern the Debtor's

---

[3] For a more detailed factual description of some of the disputed issues in this case, see the Memorandum of Opinion and Order Granting in Part Plaintiff's Motion to Hold James Dondero in Civil Contempt of Court for Alleged Violation of TRO, entered June 7, 2021, DE # 190, in AP # 20-3190.

[4] The UST was steadfast in wanting a Trustee.

[5] *See* DE ## 281 & 339.

3

Case 19-34054-sgj11 Doc 3470-1 Filed 08/26/22 Entered 08/26/22 17:11:52 Page 102 of 154
Case 3:21-cv-00879-K Document 17 Filed 06/28/21 Page 97 of 106 PageID 9675
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21 Entered 06/18/21 09:09:15 Page 4 of 13

general partner Strand Advisors, Inc.—which, in turn, managed the Debtor. All of the new Independent Board members were selected by the UCC and are very experienced within either the industry in which the Debtor operates, restructuring, or both (Retired Bankruptcy Judge Russell Nelms, John Dubel, and James P. Seery). As noted above, one of the Independent Board members, James P. Seery ("Mr. Seery"), was ultimately appointed as the Debtor's new CEO and CRO.[6] As for Mr. Dondero, while not originally contemplated as part of the January 2020 Corporate Governance Settlement, the Debtor proposed at the hearing on the January 2020 Corporate Governance Settlement that Mr. Dondero remain on as an unpaid employee of the Debtor and also continue to serve as and retain the title of a portfolio manager for certain separate **non-Debtor** investment vehicles/entities whose funds are managed by the Debtor. The court approved this arrangement when the UCC ultimately did not oppose it. Mr. Dondero's authority with the Debtor was subject to oversight by the Independent Board, and Mr. Seery was given authority to oversee the day-to-day management of the Debtor, including the purchase and sale of assets held by the Debtor and its subsidiaries, as well as the purchase and sale of assets that the Debtor manages for various separate non-Debtor investment vehicles/entities. Significant to the court and the UCC was a provision in the order, at paragraph 9, stating that "Mr. Dondero shall not cause any Related Entity to terminate any agreements with the Debtor."

To be sure, this was a complex arrangement. Apparently, there were well-meaning professionals in the case that thought that having the founder and "face" behind the Highland brand still involved with the business might be value-enhancing for the Debtor and its creditors (even though Mr. Dondero was perceived as not being the type of fiduciary needed to steer the ship through bankruptcy). For sake of clarity, it should be understood that there are at least hundreds of

---

[6] "CRO" means Chief Restructuring Officer. *See* DE # 854, entered July 16, 2020.

entities—the lawyers have sometimes said 2,000 entities—within the Highland byzantine organizational structure (sometimes referred to as the "Highland complex"), most of which are **not** subsidiaries of the Debtor, nor otherwise owned by Highland. And only Highland itself is in bankruptcy. However, these entities are very much intertwined with Highland—in that they have shared services agreements, sub-advisory agreements, payroll reimbursement agreements, or perhaps, in some cases, less formal arrangements with Highland. Through these agreements Highland (***through its own employees***) has historically provided resources such as fund managers, legal and accounting services, IT support, office space, and other overhead. Many of these non-Debtor entities appear to be under the *de facto* control of Mr. Dondero—as he is the president and portfolio manager for many or most of them—although Mr. Dondero and certain of these entities stress that these entities have board members with independent decision making power and are not the mere "puppets" of Mr. Dondero. This court has never been provided a complete organizational chart that shows ownership and affiliations of all 2,000 Non-Debtor Dondero-Related Entities, but the court has, on occasion, been shown information about some of them and is aware that a great many of them were formed in non-U.S. jurisdictions, such as the Cayman Islands.

Eventually, the Debtor's new Independent Board and management concluded that it was untenable for Mr. Dondero to continue to be employed by the Debtor in any capacity. Various events occurred that led to the termination of his employment with the Debtor. For one thing, Mr. Dondero prominently opposed certain actions taken by the Debtor through its CEO and Independent Board including: (a) objecting to a significant settlement that the Debtor had reached in court-ordered mediation[7] with creditors Acis Capital Management and Josh and Jennifer Terry (the "Acis

---

[7] The court appointed Retired Bankruptcy Judge Allan Gropper, S.D.N.Y., and Attorney Sylvia Mayer, Houston, Texas (both with the American Arbitration Association), to be co-mediators over multiple disputes in the Bankruptcy Case, including the Acis dispute. The co-mediators, among other things, attempted to mediate disputes/issues with Mr. Dondero.

APP. 2820

Case 19-34054-sgj11 Doc 3470-1 Filed 08/26/22 Entered 08/26/22 17:11:52 Page 104 of 154
Case 3:21-cv-00879-K Document 17 Filed 06/28/21 Page 99 of 106 PageID 9677
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21 Entered 06/18/21 09:09:15 Page 6 of 13

Settlement")—which settlement helped pave the way toward a consensual Chapter 11 plan, and (b) pursuing, through one of his family trusts (the Dugaboy Investment Trust), a proof of claim alleging that the Debtor (including Mr. Seery) had mismanaged one of the Debtor's subsidiaries, Highland Multi Strategy Credit Fund, L.P. ("MSCF") with respect to the sale of certain of its assets during the bankruptcy case (in May of 2020).[8] The Debtor's Independent Board and management considered these two actions to create a conflict of interest— if Mr. Dondero was going to litigate significant issues against the Debtor in court, that was his right, but he could not continue to work for the Debtor (among other things, having access to its computers and office space) while litigating these issues with the Debtor in court.

But the termination of his employment was not the end of the friction between the Debtor and Mr. Dondero. In fact, literally a week after his termination, litigation posturing and disputes began erupting between Mr. Dondero and certain Non-Debtor Dondero-Related Entities, on the one hand, and the Debtor on the other.

At the present time, 11 adversary proceedings have been filed related to this bankruptcy case involving Non-Debtor Dondero-Related Entities. Additionally, Non-Debtor Dondero-Related entities have filed 11 appeals of bankruptcy court orders. Non-Debtor Dondero-Related entities have begun filing lawsuits relating to the bankruptcy case in other *fora* that are the subject of contempt motions.

III.     **The Non-Debtor Dondero-Related Entities**.

The following are the Non-Debtor Dondero-Related Entities encompassed by this Order and their known counsel[9]:

---

[8] *See, e.g.*, Proof of Claim No. 177 and DE # 1154.
[9] There are three other entities that the court is not including in this Order at this time, since, although they have appeared in the past, they are no longer active in the case because of either resolving issues with the Debtor or other reasons: (a) Highland CLO Funding Ltd. (previously represented by the law firm of King and Spaulding); (b) Hunter

6

A. *James D. Dondero*

Mr. Dondero has had three law firms representing him in the bankruptcy proceedings:  Bonds Ellis Eppich Schafer Jones LLP; Stinson L.L.P.; and Crawford Wishnew Lang.

As earlier mentioned, Mr. Dondero has three pending proofs of claim that are unliquidated, contingent claims. Each of these claims state that Mr. Dondero would "update his claim in the next ninety days."  Ninety days has long-since passed since those proofs of claim were filed and Mr. Dondero has not updated those claims to this court's knowledge.  While this court is unclear what the alleged amount of Mr. Dondero's three unliquidated, contingent proofs of claim might be, the court takes judicial notice that the Debtor has filed an adversary proceeding (Adv. Proc. # 21-3003) alleging that Mr. Dondero is liable to three bankruptcy estate on three demand notes, on which the total amount due and owing is $9,004,013.07. Mr. Dondero has also been sued along with CLO Holdco, Grant Scott, Charitable DAF Holdco, Charitable DAF Fund, Highland Dallas Foundation, and the Get Good Trust for alleged fraudulent transfers in Adv. Proc. # 20-3195.

As far as equity interests in the Debtor, the Debtor is a Delaware limited partnership. The general partner is named Strand Advisors, Inc. ("Strand"). Mr. Dondero owns 100% of Strand Advisors, Inc. ("Strand"), the Debtor's general partner, but gave up control of Strand pursuant to a court-approved corporate governance agreement reached in this case in January 2020, to which Mr. Dondero agreed. As of the Petition Date, the Debtor's limited partnership interests were held: (a) 99.5% by an entity called Hunter Mountain Investment Trust; (b) 0.1866% by The Dugaboy Investment Trust (Mr. Dondero's family trust—described below), (c) 0.0627% by the retired co-founder of the Debtor, Mark Okada, personally and through family trusts, and (d) 0.25% by Strand. These limited partnership interests were in three classes (Class A, Class B, and Class C).  The

---

Mountain Trust (previously represented by Sullivan Hazeltine Allinson and Rochelle McCullough); and (c) NexBank (previously represented by Alston & Bird).

Class A interests were held by The Dugaboy Investment Trust, Mark Okada, and Strand.  The Class B and C interests were held by Hunter Mountain Investment Trust and Hunter Mountain. The significance of this is that the Class A limited partnership interests are junior in priority of distribution to the Debtor's Class B and Class C limited partnership interests.  The Class A interests are also junior to all other claims filed against the Debtor. And, of course, Mr. Dondero's recovery on his equity interest in Strand is junior to any claims against Strand itself. Consequently, before Mr. Dondero can recover on his indirect equity interest, the Debtor's estate must be solvent, priority distributions to Class B and Class C creditors must be satisfied, and all claims against Strand must be paid.

B. _The Dugaboy Investment Trust ("Dugaboy") and Get Good Nonexempt Trust ("Get Good")_

The Dugaboy and Get Good Trusts are represented by the law firm Heller Draper & Horn.

Mr. Dondero is the beneficiary of Dugaboy and the settlor of Get Good (and family members are the beneficiaries). It has been represented in pleadings that Get Good is a trust established under the laws of the State of Texas. It has been represented in pleadings that Dugaboy is a trust established under the laws of the State of Delaware. At least as of the Petition Date, an individual named Grant Scott (a long-time friend of Mr. Dondero's, who is a patent lawyer and resides in Colorado) is the trustee of both.  Mr. Dondero's sister may also be a trustee of Dugaboy.

As mentioned above, Dugaboy owns a 0.1866% of the Class A junior limited partnership interest in the Debtor.

Get Good has filed a proof of claim in this Bankruptcy Proceeding (submitted by Grant Scott). Dugaboy has filed several proofs of claim in this Bankruptcy Proceeding (all were submitted by Grant Scott). The court is not aware of the nature or amount of these claims, except the court has been apprised that: (a) one Dugaboy proof of claim alleges that Highland is obligated on a debt

APP. 2823

owed to Dugaboy by an entity known as Highland Select, allegedly because Highland is Highland Select's general partner and might also be its alter ego; and (b) another proof of claim asserts postpetition mismanagement by the Debtor of assets of one or more Debtor subsidiaries. While the court knows nothing about the Get Good proof of claim, it does know that the Get Good Trust (along with others, including Grant Scott) has been sued for alleged fraudulent transfers in an adversary proceeding in this case (Adv. Proc. # 20-3195)—which may affect the allowability of its proof of claim.

C. _Highland Capital Management Fund Advisors, L.P. ("HCMFA") and NexPoint Advisors, L.P. ("NPA") (sometimes collectively referred to as the "Advisors")_

These entities have been represented by the K&L Gates law firm at times and currently are represented by the law firm of Munsch Hardt Kopf & Harr. The entities are registered investment advisors that previously had shared services agreements with the Debtor.

It has been represented that Mr. Dondero directly or indirectly owns and/or effectively controls each of the Advisors. He is the President of each of them.

It is the court's understanding that both of these entities withdrew their original proofs of claim. However, the Advisors filed an application for an administrative expense claim on January 24, 2021, relating to services the Advisors allege the Debtor did not perform under a shared services agreement. The Debtor has since filed an objection to the claim and the matter is set for trial on September 28, 2021. Further, the Debtor has filed an adversary proceeding (Adv. Pro. # 21-3004) alleging that HCMFA owes the Debtor an aggregate of $7,687,653.07 pursuant to two promissory notes and the Debtor has filed an adversary proceeding (Adv. Pro. # 21-3005) alleging that NPA owes the Debtor $23,071,195.03 pursuant to a promissory note.

Case 19-34054-sgj11 Doc 3470-1 Filed 08/26/22    Entered 08/26/22 17:11:52    Page 108 of 154

Case 3:21-cv-00879-K   Document 17   Filed 06/28/21   Page 103 of 106   PageID 9681
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21   Entered 06/18/21 09:09:15   Page 10 of 13

> D. *Highland Funds I and its series Highland Healthcare Opportunities Fund, Highland/iBoxx Senior Loan ETF, Highland Opportunistic Credit Fund, and Highland Merger Arbitrage Fund, Highland Funds II and its series Highland Small-Cap Equity Fund, Highland Socially Responsible Equity Fund, Highland Fixed Income Fund, and Highland Total Return Fund, NexPoint Capital, Inc., NexPoint Strategic Opportunities Fund, Highland Income Fund, Highland Global Allocation Fund, and NexPoint Real Estate Strategies Fund*

These entities are represented by the K&L Gates law firm. They are apparently each managed by the Advisors and these funds are specifically managed by Mr. Dondero as portfolio manager.

The court has no idea who owns these companies (assuming they should be regarded as separate companies). The court does not know which, if any of them, have filed proofs of claims.

> E. *Charitable DAF Holdco, Ltd. ("DAF Holdco"), Charitable DAF Fund, LP ("DAF"), Highland Dallas Foundation, Inc., ("Highland Dallas Foundation")*

These entities are represented by the law firms of Kelly Hart Pitre and Sbaiti & Company PLCC.

It has been represented to the court that the DAF is managed by DAF Holdco, which is the managing member of the DAF.  It has further been represented to the court that DAF Holdco is owned by three different purported charitable foundations:  Highland Dallas Foundation, Inc., Highland Santa Barbara Foundation, Inc., and Highland Kansas City Foundation, Inc. (collectively, the "Highland Foundations").  DAF Holdco is an exempted company incorporated in the Cayman Islands.  Grant Scott has apparently, until recently, served as its managing member. The DAF is an exempted company incorporated in the Cayman Islands. Highland Dallas Foundation is a Delaware nonprofit, nonstock corporation.

Mr. Dondero is the president and one of the three directors of each of the Highland Foundations.  Apparently, Grant Scott was recently replaced by a former Highland employee named Mark Patrick (who is now an employee of Skyview Group, an entity created by former Highland employees). Although the Debtor is the non-discretionary investment advisor to the

**APP. 2825**

Case 19-34054-sgj11 Doc 3470-1 Filed 08/26/22 Entered 08/26/22 17:11:52 Page 109 of 154

Case 3:21-cv-00879-K Document 17 Filed 06/28/21 Page 104 of 106 PageID 9682
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21 Entered 06/18/21 09:09:15 Page 11 of 13

DAF, the Debtor does not have the right or ability to control or direct the DAF or CLO Holdco. Instead, the DAF takes and considers investment and payment advice from the Debtor, but ultimate decisions are in the control of Mr. Patrick, presumably at Mr. Dondero's direction.

The court is not aware whether these entities have filed proofs of claim. However, they, along with Messrs. Dondero and Scott, CLO Holdco and the Get Good have been sued for fraudulent transfers in Adv. Proc. # 20-3195.

F. *CLO Holdco, Ltd.*

This entity was previously represented by the law firm of Kane Russell Coleman & Logan and more recently is represented by the law firm of Sbaiti & Company PLLC.

CLO Holdco is a wholly owned and controlled subsidiary of the DAF. CLO Holdco is an exempted company incorporated in the Cayman Islands. CLO Holdco has filed two proofs of claim in this Bankruptcy Proceeding. Both proofs of claim were submitted by Grant Scott in his capacity as Director of CLO Holdco.

CLO Holdco, along with Messrs. Dondero and Scott, DAF Holdco, DAF Fund, Highland Dallas Foundation, and the Get Good have been sued for fraudulent transfers in Adv. Proc. # 20-3195.

G. *NexPoint Real Estate Finance Inc., NexPoint Real Estate Capital, LLC, NexPoint Residential Trust, Inc., NexPoint Hospitality Trust, NexPoint Real Estate Partners, LLC, NexPoint Multifamily Capital Trust, Inc., VineBrook Homes, Trust, Inc., NexPoint Real Estate Advisors, L.P., NexPoint Real Estate Advisors II, L.P., NexPoint Real Estate Advisors III, L.P., NexPoint Real Estate Advisors IV, L.P., NexPoint Real Estate Advisors V, L.P., NexPoint Real Estate Advisors VI, L.P., NexPoint Real Estate Advisors VII, L.P., NexPoint Real Estate Advisors VIII, L.P., and any funds advised by any of the foregoing and any of their subsidiaries (sometimes collectively referred to as "NPRE")*

These entities are represented by the law firm of Wick Phillips Gould & Martin, LLP.

The entity known as HCRE Partners, LLC (n/k/a NexPoint Real Estate Partners, LLC) is alleged to owe the Debtor over $11 million pursuant to five promissory notes (as asserted in Adv.

APP. 2826

Pro. # 21-3007). The court understands this same entity has filed a proof of claim relating to its alleged interest in "SE Multifamily Holdings, LLC," which has been objected to and has not been resolved.

The court has no idea who owns or manages these companies or what exact function they play in the Highland complex of companies. The court does not know anything about the substance of the proof of claims.

### H. *Highland Capital Management Services, Inc.*

This entity appears to be represented by both Wick Phillips Gould & Martin, LLP (which also represents NPRE) and Stinson L.L.P. (which also sometimes represents Mr. Dondero personally).

This entity earlier filed two proofs of claim that were objected to and disallowed. Also, this entity is alleged to owe the Debtor approximately $7.7 million pursuant to five different promissory notes (as asserted in Adv. Pro. # 21-3006). The court has no idea who owns or manages this company or what exact function it plays in the Highland complex of companies.

### IV.   Disclosure Requirement

Accordingly, in furtherance of this court's desire to be more clear about the standing of various of these entities, and to assess whether their interests may be sufficiently aligned, in some circumstances, so as to require joint pleadings (rather than have a proliferation of similar pleadings) it is hereby **ORDERED** that:

Within 21 days of the entry of this Order, the Non-Debtor Dondero-Related Entities named in this Order shall file a Notice in this case disclosing thereon: (a) who owns the entity (showing percentages);[10] (b) whether Mr. Dondero or his family trusts have either a direct or indirect

---

[10] With regard to any minor children who may be beneficiaries of trusts, actual names should not be used (Child 1, Child 2, *etc.* would be sufficient).

**APP. 2827**

Case 19-34054-sgj11 Doc 3470-1 Filed 08/26/22    Entered 08/26/22 17:11:52    Page 111 of
154
Case 3:21-cv-00879-K    Document 17    Filed 06/28/21    Page 106 of 106    PageID 9684
Case 19-34054-sgj11 Doc 2460 Filed 06/18/21    Entered 06/18/21 09:09:15    Page 13 of 13

ownership interest in the entity and, if so, what percentage of ultimate ownership; (c) who are the officers, directors, managers and/or trustees of the Non-Debtor Dondero-Related Entity; and (d) whether the entity is a creditor of the Debtor (explaining in reasonable detail the amount and substance of its claims).

### End of Order ###

APP. 2828

**EXHIBIT 34**

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| In Re: HIGHLAND CAPITAL MANAGEMENT, L.P., Debtor | § § § | |
| ———————————————— | § | |
| JAMES DONDERO, *et al.*, | § § § | |
| Appellants, | § § | |
| v. | § § | Civil Action No. 3:21-CV-0879-K |
| HON. STACEY G. C. JERNIGAN, | § § § | |
| Appellee. | § | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Appellants James Dondero, Highland Capital Management Fund Advisors, L.P., NexPoint Advisors, L.P., The Dugaboy Investment Trust, The Get Good Trust, and NexPoint Real Estate Partners, LLC. f/k/a HCRE Partners, LLC's (collectively "Appellants") appeal the Bankruptcy Court's Order Denying [Appellants'] Motion to Recuse Pursuant to 28 U.S.C. § 455 which was entered March 23, 2021. *See generally* Am. Notice of Appeal (Doc. No. 1-1); Appellants' Br. (Doc. No. 16). Because the Court lacks jurisdiction over this appeal, the Court hereby **dismisses** this appeal.

ORDER – PAGE 1

I.     **Relevant Background**

Appellants filed a Motion to Recuse under § 455 with the Bankruptcy Court, asking United States Bankruptcy Judge Stacey G. C. Jernigan (the "Bankruptcy Judge") to recuse herself from presiding over the bankruptcy proceeding of Debtor Highland Capital Management, L.P.  In an 11-page Order Denying Motion to Recuse Pursuant to 28 U.S.C. § 455 ("Recusal Order"), the Bankruptcy Judge denied the Motion while also reserving the right to supplement or amend the ruling.  *See* Am. Notice of Appeal (Doc. No. 1-1) at 5-15.  The Bankruptcy Court entered the Recusal Order on March 23, 2021.  *See id.*; Appellants' Br. (Doc. No. 16).  On April 18, 2021, the Clerk of the Bankruptcy Court transmitted the Notice of Appeal filed by Appellants on April 6, 2021.  *See generally* Doc. No. 1.  It is the Recusal Order that forms the basis of this appeal.  *See id.*  Appellants designated the Bankruptcy Judge as "Appellee".  *See id.*

Before appellate briefing began, Debtor Highland Capital Management, L.P. moved the Court for leave to intervene in this appeal.  *See* Mot. to Intervene (Doc. No. 2).  Debtor Highland Capital Management, L.P. argued that it is the real party-in-interest, not the Bankruptcy Judge.  Mot. to Intervene at 3.  After the Motion to Intervene was fully briefed and ripe, the Court granted the Motion and allowed Debtor Highland Capital Management, L.P. ("Debtor/Intervenor") to file a responsive brief as accorded to an appellee under the bankruptcy rules.  *See generally* Order (Doc. No. 10).

APP. 2830

Appellants then filed their Appellants' Brief identifying and arguing two issues on appeal: (1) whether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 as untimely; and (2) whether the Bankruptcy Court abused its discretion in denying Appellants' Motion to Recuse Pursuant to 28 U.S.C. § 455 on the merits. Appellants' Br. at 1. Intervenor/Debtor filed an Appellee's Brief in response (Doc. No. 20), and Appellants filed their Reply Brief (Doc. No. 23). The Bankruptcy Record on Appeal does not reflect that a final judgment has been entered by the Bankruptcy Court in this matter.

Upon an initial review of the appellate briefing, the Court *sua sponte* questioned its jurisdiction over this appeal. *See FW/PBS, Inc. v. City of Dallas*, 493 U.S. 215, 230-31 (1990); *see also Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583 (1999) ("[S]ubject-matter delineations must be policed by the courts on their own initiative even at the highest level."). The Court issued an Order (Doc. No. 28) directing the parties to file briefs, respectively, addressing this Court's jurisdiction over an appeal of the Bankruptcy Judge's order denying a motion to recuse when final judgment has not yet been entered. The parties timely filed their respective jurisdictional briefs, and the Court has carefully considered the arguments, the applicable and binding law, and relevant portions of the record. The Court turns now to this threshold jurisdictional issue.

ORDER – PAGE 3

## II.    Applicable Law

Section 455 of Chapter 28 of the United States Code provides, in relevant part, that:

> (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned.
> (b) He shall also disqualify himself in the following circumstances:
>> (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceedings.

28 U.S.C. § 455(a) & (b)(1).  Bankruptcy Rule 5004(a) provides that "A bankruptcy judge shall be governed by 28 U.S.C. § 455, and disqualified from presiding over the proceeding or contested matter in which the disqualifying circumstances arises or, if appropriate, shall be disqualified from presiding over the case."  FED. R. BANKR. P. 5004(a).

District courts have jurisdiction over appeals from the following entered by a bankruptcy judge:

> (1) from final judgments, orders, and decrees;
> (2) from interlocutory orders and decrees under section 1121(d) of title 11 increasing or reducing the time periods referred to in section 1121 of such title; and
> (3) with leave of the court , from other interlocutory orders and decrees.

28 U.S.C. § 158(a).

ORDER – PAGE 4

III.   **Analysis**

   A.   **Recusal Order is an Interlocutory Order and Not Immediately Appealable as a Matter of Right**

It is well-established law in the Fifth Circuit that a court's order denying a recusal motion is not a final order, is not an appealable interlocutory order, and is not an appealable collateral order, therefore it is reviewable on appeal only from final judgment. *Willis v. Kroger*, 263 F.3d 163, 163 (5th Cir. 2001); *United States v. Henthorn*, 68 F.3d 465, 465 (5th Cir. 1995); *Chitimacha Tribe of La. v. Harry L. Laws Co., Inc.*, 690 F.2d 1157, 1164 n.3 (5th Cir. 1982); *In re Corrugated Container Antitrust Litig.*, 614 F.2d 958, 960 (5th Cir. 1980); *Martin v. Driskell*, 2021 WL 4784756, at *1 (5th Cir. July 12, 2021); *In re Gordon*, 2019 WL 11816606, at *1 (5th Cir. Apr. 10, 2019); *Stancu v. Hyatt Corp./Hyatt Regency Dallas*, Civ. Action No. 3:18-CV-1737-E-BN, 2020 WL 853859, at *2 (N.D. Tex. Jan. 30, 2020), *adopted by* 2020 WL 833645 (Feb. 20, 2020)(Brown, J.); *Prather v. Dudley*, Civ. Action No. 9:06cv100, 2006 WL 3317124, at *2 (E.D. Tex. Oct. 18, 2006); *Hardy v. Fed. Express Corp.*, No. Civ.A 97-1620, 1998 WL 104686, at *1 (E.D. La. Mar. 6, 1998).  Moreover, both the Fifth Circuit and district courts in this Circuit have applied this very clear, decades-old law in appeals taken from a bankruptcy court's order denying a motion to recuse.  *In re Dorsey*, 489 F. App'x 763, 764 (5th Cir. 2012); *In re Schweitzer*, Civ. Action No. 07-4036, 2007 WL

2965045, at *1 (E.D. La. Oct. 9, 2007); *In re Moerbe*, No. 03-57260-LMC/04-5043-LMC/SA-04-CA-801-FB, 2005 WL 3337634, at *3 (W.D. Tex. Sept. 1, 2005).

In this case, the Bankruptcy Record on Appeal does not establish that a final judgment has been entered. The law in the Fifth Circuit specifies that a court's order on a motion to disqualify the judge "is not an appealable final order" and "a party 'must await final judgment to appeal [a] judge's refusal to recuse.'" *In re Dorsey*, 489 F. App'x at 764 (holding court was without jurisdiction to review bankruptcy court's decision on motion to recuse because, although final judgment had been entered, the appeal of it had not yet been resolved). Appellants attempt to get around this law by arguing that the courts have considered the "finality" of an order on a motion to recuse only under 28 U.S.C. § 1291 (which applies to jurisdiction of courts of appeals over appeals from final orders of district courts) and not § 158(a) (which applies to jurisdiction of district court over appeals from bankruptcy court orders). Appellants contend this is crucial because the bankruptcy appellate statute, § 158(a), applies here and that statute contemplates the more liberal and flexible "finality" standard accorded to bankruptcy courts, rather than the finality standard under § 1291 pertaining to district court orders. Resp. Br. (Doc. No. 31) at 2-7.

The Court rejects Appellants' suggestion that the Court should or even can construe this Recusal Order under a different "finality" standard mere because the

ORDER – PAGE 6

Bankruptcy Court entered it.  There is nothing in the Court's own research, nor anything provided by Appellants, to suggest that the Court should ignore this binding precedent and apply a more liberal and flexible "finality" standard to this appeal of the Recusal Order merely because it is an order of the Bankruptcy Court.  Indeed, courts in this Circuit have not hesitated in applying this well-settled law to an appeal of a bankruptcy court order on a motion to recuse.  *See, e.g., In re Schweitzer*, 2007 WL 2965045, at *1 (court found jurisdiction lacking over appeal from bankruptcy court's order denying motion to recuse because "the law is quite clear that an order denying a motion to disqualify a judge is an interlocutory order from which no appeal lies prior to final judgment in the case."); *In re Moerbe*, 2005 WL 3337634, at *3 ("Because an order denying a motion to recuse or disqualify a judge is interlocutory, not final, and is not immediately appealable, it would seem to follow that the [the bankruptcy court's] order in this case granting recusal but denying its permanency is likewise interlocutory.").  The Court finds no justification for straying from the well-settled law in the Fifth Circuit and finds that the Bankruptcy Court's Recusal Order is not a final appealable order.

The Court also finds that the Recusal Order is not subject to the collateral order doctrine and it is not an interlocutory order that is not immediately appealable.  Appellants ask the Court to treat the Recusal Order as subject to the collateral order

doctrine.    The Court rejects this request as there is no legal basis for doing so.
Appellants again ignore very clear Fifth Circuit law that a court order denying a recusal
motion is not an appealable collateral order. *Willis*, 263 F.3d at 163 (citing *Nobby
Lobby*, 970 F.2d at 85-86 & n.3); *Henthorn*, 68 F.3d at 465; *Chitimacha Tribe of La.*, 690
F.2d at 1164 n.3; *In re Corrugated Container Antitrust Litig.*, 614 F.2d at 960; *In re Dorsey*,
489 F. App'x at 764; *Martin*, 2021 WL 4784756, at *1; *In re Gordon*, 2019 WL
11816606, at *1.    There is no justification to stray from this well-settled law.
Moreover, the Recusal Order is not an appealable interlocutory order under § 1292(a).
*Nobby Lobby*, 970 F.2d at 85-86 & n.3; *In re Dorsey*, 489 F. App'x at 764.

For these reasons, the Court finds, as it must, that the Recusal Order is an
interlocutory order from which no appeal lies prior to the Bankruptcy Court entering
a final judgment.    *See Willis*, 263 F.3d at 163; *Nobby Lobby*, 970 F.2d at 85-86 & n.3;
*In re Corrugated Container Antitrust Litig.*, 614 F.2d at 960.    Therefore, the Court lacks
jurisdiction over this appeal.

## B.    Leave to Bring an Interlocutory Appeal

Appellants' last hope for their appeal is securing leave of this Court to bring an
interlocutory appeal of the Recusal Order.    28 U.S.C. § 158(a)(3) (district courts may
hear appeals "with leave of the court, from other interlocutory orders" of the
bankruptcy court).    Appellants were required to file a motion for leave to appeal

ORDER – PAGE 8

contemporaneously with their notice of appeal. FED. R. BANKR. P. 8004(a). The motion for leave to appeal must also include certain contents. *Id.* 8004(b). Despite these unambiguous requirements of the Bankruptcy Rules, Appellants did not comply with them. Their failure, however, does not foreclose the appeal entirely because Bankruptcy Rule 8004(d) permits the Court to "treat the notice of appeal as a motion for leave and either grant it or deny it." FED. R. BANKR. P. 8004(c). In their jurisdictional brief, Appellants ask the Court to treat their Notice of Appeal as a motion for leave to appeal should the Court find the Recusal Order is an interlocutory order. Appellants' Resp. (Doc. No. 29) at 8. The Court turns now to this analysis.

Section 158(a)(3) does not articulate the standard a district court must use in deciding whether to grant leave in its discretion, but "[c]ourts in the Fifth Circuit . . . have applied 28 U.S.C. § 1292(b), the standard governing interlocutory appeals generally." *In re Hallwood Energy, L.P.*, Civ. Action No. 3:12-CV-1902-G, 2013 WL 524418, at *2 (N.D. Tex. Feb. 11, 2013)(Fish, SJ) (citing *In re Ichinose*, 946 F.2d 1169, 1177 (5th Cir. 1991); *Panda Energy Int'l, Inc. v. Factory Mut. Ins.*, 2011 WL 610016, at *3 (N.D. Tex. Feb. 14, 2011)(Kinkeade, J.)); *accord Rivas v. Weisbart*, 2019 WL 5579726, at *2 (E.D. Tex. Oct. 28, 2019); *Celadon Trucking Servs., Inc. v. Moser*, 2019 WL 4226854, at *2 (E.D. Tex. Sept. 4, 2019). There are three elements of the § 1292(b) standard: "(1) a controlling issue of law must be involved; (2) the question

ORDER – PAGE 9

must be one where there is substantial ground for difference of opinion; and (3) an immediate appeal must materially advance the ultimate termination of the litigation." *In re Ichinose*, 946 F.2d at 1177. An appeal of an interlocutory order is appropriate only where all three elements are satisfied. *See In re Genter*, Civ. Action No. 3:19-CV-1951-E, 2020 WL 3129637, at *2 (N.D. Tex. June 12, 2020)(Brown, J.) (citing *Arparicio v. Swan Lake*, 643 F.2d 1109, 1110 n.2 (5th Cir. 1981)). "The Fifth Circuit disfavors interlocutory appeals and leave to appeal is sparingly granted." *Id.* (internal citations omitted); *In re Hallwood Energy*, 2013 WL 524418, at *2 ("[I]nterlocutory appeals are 'sparingly granted' and reserved for 'exceptional' cases.") (internal citations omitted). The decision whether to grant an interlocutory appeal is firmly within the district court's discretion. *Panda Energy Int'l*, 2011 WL 610016, at *3.

In this case, there is no controlling question of law with substantial grounds for disagreement for which resolution would materially advance the end of the bankruptcy litigation. It is well-settled that a recusal motion under § 455 is left to the sound discretion of the judge. *Chitimacha Tribe of La. v. Harry L. Laws Co.*, 690 F.2d 1157, 1166 (5th Cir. 1982); *see In re Pendergraft*, 745 F. App'x 517, 520 (5th Cir. 2018) (citing *Trevino v. Johnson*, 168 F.3d 173, 178 (5th Cir. 1999)). "[C]ontrolling issue of law is one that has 'the potential for substantially accelerating the disposition of the litigation' and does not concern 'matters that are entrusted to the discretion of the bankruptcy

ORDER – PAGE 10

court.'" *In re Moerbe*, 2005 WL 3337634, at *4 (W.D. Tex. Sept. 1, 2005) (quoting *In re Aquatic Dev. Group, Inc.*, 196 B.R. 666, 669 (S.D.N.Y. 1996)). The Recusal Order was an exercise of the Bankruptcy Judge's discretion, so there is no controlling issue of law presented. *Cf. In re Tullius*, 2011 WL 5006673, at *3 (W.D. Tex. Oct. 20, 2011). Appellants also cannot satisfy the second factor because the Court cannot find there exists substantial ground for difference of opinion as to the Recusal Motion.

> [C]ourts have found substantial ground for difference of opinion where a trial court rules in a manner which appears contrary to the rulings of all Courts of Appeals which have reached the issue, if the circuits are in dispute on the question and the Court of Appeals of the circuit has not yet spoken on the point, if complicated questions arise under foreign law, or if novel and difficult questions of first impression are presented.

*Ryan v. Flowserve Corp.*, 444 F.Supp.2d 718, 723-24 (N.D. Tex. 2006)(Boyle, J.) (internal citation omitted). The Recusal Order does not fall within any of those categories. Simply because Appellants believe the Bankruptcy Court ruled incorrectly does not demonstrate substantial ground for disagreement. *Id.* at 724. Finally, the third element eludes Appellants as well. An interlocutory appeal of the Recusal Order will in no way materially advance the ultimate end to this bankruptcy matter.

The Fifth Circuit strongly disfavors interlocutory appeals and, accordingly, they are rarely granted and reserved for "exceptional cases". *See, e.g., In re Genter*, 2020 WL 3129637, at *2. Appellants failed to satisfy any of the three § 1292(b) criteria. *Id.*

Therefore, in its discretion, the Court **denies** Appellants leave to take an interlocutory appeal of the Bankruptcy Court's Recusal Order.

Finally, the Court turns to the remaining arguments Appellants assert. First, the Court declines to *sua sponte* withdraw the reference of Appellants' motion for the bankruptcy judge to recuse herself. The case Appellants cite in support of this suggestion is inapposite here. In the unpublished Fifth Circuit opinion, *Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958 (5th Cir. 2003), the appellant sought leave to appeal the dismissal of his 28 U.S.C. § 2254 petition. *See generally Maddox v. Cockrell*, 2003 U.S. App. LEXIS 28958. The magistrate judge recommended dismissal the § 2254 petition and the district judge adopted the recommendation and dismissed the petition. *See id.* at *1-2. The Fifth Circuit did not address the merits of the dismissal, but, instead, *sua sponte* vacated the district court's final judgment and remanded with instructions to assign the case to a different district judge. *Id.* at *2. The Fifth Circuit's reasoning—the district judge was the spouse of the magistrate judge and the *pro se* prisoner likely did not know nor could he have reasonably known this. *Id.* Unlike the unusual and exceptional facts in *Maddox*, the Court does not find this appeal to justify *sua sponte* withdrawing the reference of and ruling on Appellants' motion to recuse.

The Court also finds no justification for treating Appellants' notice of appeal as a petition for writ of mandamus, which Appellants also request. A question of recusal

ORDER – PAGE 12

is reviewable on a petition for writ of mandamus. *United States v. Gregory*, 656 F.2d 1132, 1136 (5th Cir. 1981); *In re Placid Oil Co.*, 802 F.2d 783, 786 (5th Cir. 1986); *In re Cameron Int'l Corp.*, 393 F. App'x 133, 134-35 (5th Cir. 2010). "However, the writ will not lie in the absence of exceptional circumstances, and the party seeking the writ has the burden of proving a clear and indisputable right to it." *In re Placid Oil Co.*, 802 F.2d at 786 (citing *Gregory*, 656 F.2d at 1136); *accord In re Cameron Int'l Corp.*, 393 F. App'x at 134-35. Appellants fail to make the required showing. The Court refuses to construe Appellants' appeal as a petition for writ of mandamus.

### C. Conclusion

The well-established precedent in the Fifth Circuit is that no jurisdiction lies over an appeal of a motion to recuse until final judgment has been entered. Appellants make arguments about potential inefficiency and wasted resources if they must wait to appeal the Recusal Order until the final judgment has been entered. But these arguments are not novel. The Court is certain those same arguments have been advanced in other courts considering this same issue and those courts have rejected them, as this Court does here. Appellants would have this Court carve out an exception to the well-settled law for them without any justifiable basis other than because they think the Bankruptcy Judge was wrong. Appellants must await final judgment, or other

ORDER – PAGE 13

final resolution, of their bankruptcy proceeding in order to appeal the Recusal Order. This Court has no jurisdiction to hear this appeal.

### IV.    Conclusion

The Recusal Order is not a final, appealable order, is not subject to the collateral order doctrine, and is not an appealable interlocutory order under § 1292(a) and the Court is **without jurisdiction** over this appeal of the Bankruptcy Court's Recusal Order.  The Court further **denies** Appellants leave to appeal the Recusal Order under § 1292(b), **denies** Appellants' request to withdraw the reference of their motion to recuse, and **denies** Appellants' request to construe their appeal as a petition for writ of mandamus.  Accordingly, the Court **dismisses** this appeal for lack of jurisdiction.

**SO ORDERED.**

Signed February 9th, 2022.

ED KINKEADE
UNITED STATES DISTRICT JUDGE

ORDER – PAGE 14

**EXHIBIT 38**

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
 2
                                      )    Case No. 19-34054-sgj-11
 3   In Re:                           )    Chapter 11
                                      )
 4   HIGHLAND CAPITAL                 )    Dallas, Texas
     MANAGEMENT, L.P.,                )    Thursday, January 14, 2021
 5                                    )    9:30 a.m. Docket
                                      )
 6          Debtor.                   )
                                      )    - MOTION TO PREPAY LOAN
 7                                    )      [1590]
                                      )    - MOTION TO COMPROMISE
 8                                    )      CONTROVERSY [1625]
                                      )    - MOTION TO ALLOW CLAIMS OF
 9   _____)      HARBOURVEST [1207]

10                    TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
11                UNITED STATES BANKRUPTCY JUDGE.

12   WEBEX APPEARANCES:

13   For the Debtor:           Jeffrey Nathan Pomerantz
                               PACHULSKI STANG ZIEHL & JONES, LLP
14                             10100 Santa Monica Blvd.,
                                13th Floor
15                             Los Angeles, CA  90067-4003
                               (310) 277-6910
16
     For the Debtor:           John A. Morris
17                             Gregory V. Demo
                               PACHULSKI STANG ZIEHL & JONES, LLP
18                             780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
19                             (212) 561-7700

20   For the Official Committee Matthew A. Clemente
     of Unsecured Creditors:   SIDLEY AUSTIN, LLP
21                             One South Dearborn Street
                               Chicago, IL  60603
22                             (312) 853-7539

23   For CLO Holdco, Ltd.:     John J. Kane
                               KANE RUSSELL COLEMAN LOGAN, P.C.
24                             901 Main Street, Suite 5200
                               Dallas, TX  75202
25                             (214) 777-4261
```

22

1    purchase or sale of a security.  And, again, I would ask the

2    Court to listen carefully to this because that's what it

3    appears to be and that's what the evidence is going to show to

4    the Court.

5              THE COURT:  All right.  Mr. Draper, let me clarify

6    something I'm not sure if I heard you say or not.  Were you

7    saying that the Court still needs to drill down on the issue

8    of whether the Debtor can acquire HarbourVest's interest in

9    HCLOF?

10             MR. DRAPER:  No.

11             THE COURT:  Okay.  I was confused whether you were

12   saying I needed to take an independent look at that, now that

13   the objection has been withdrawn of Holdco.  You are not

14   pressing that issue?

15             MR. DRAPER:  No, I am not.  Basically, I think it's

16   the fairness of the settlement.  I think the transferability

17   of the interest is separate and apart from the fairness of the

18   settlement itself.  I think the fairness -- the

19   transferability was a contractual issue between two parties

20   that the Court does not have to drill down on.

21             THE COURT:  All right.  I have another question for

22   you.  I want to clarify your client's standing.  Tell me --

23   I'm looking through a chart I printed out a while back.  I

24   guess Dugaboy Investment Trust filed a couple of proofs of

25   claim; is that right?

23

1          MR. DRAPER:  Yes.

2          THE COURT:  Okay.  What --

3          MR. DRAPER:  And objections are pending.

4          THE COURT:  Pardon?

5          MR. DRAPER:  Objections to those claims are pending

6    before the Court, Your Honor, --

7          THE COURT:  Okay.

8          MR. DRAPER:  -- and have not been litigated.

9          THE COURT:  And what about Get Good Trust?

10         MR. DRAPER:  Get Good Trust has a proof of claim also

11   that objections are pending to.  Pending.

12         THE COURT:  Okay.  I don't want to get too

13   sidetracked here, but I know standing was -- was mentioned as

14   a legal argument today.  What is the basis for those proofs of

15   claim?

16         MR. DRAPER:  The first one is, with respect to the

17   proof of claim for Dugaboy, there is an investment that

18   Dugaboy made that was then funneled, we believe, up to the

19   Debtor.  And the -- the loan that exists, we believe is a

20   Debtor loan, as opposed to a loan to the entity that we made

21   the loans to.

22      And, again, it's a matter that the Court is going to hear.

23   The claim may or may not be allowed.  It has not been

24   disallowed yet.

25      The second part to the Dugaboy ownership is we own an

24

1  interest in the Debtor.  And so we are, in fact, a party in

2  interest.

3          THE COURT:  Okay.

4          MR. DRAPER:  It may be a small interest, but it is an

5  interest.

6          THE COURT:  It has a limited partnership interest in

7  the Debtor?

8          MR. DRAPER:  Yes.

9          THE COURT:  Is that correct?

10         MR. DRAPER:  Yes.

11         THE COURT:  Okay.  Well, I'll move forward.  Thank

12  you.

13     Does that cover -- any other opening statements?  I think

14  that covered everyone who was -- who filed some sort of

15  pleading today.  No.

16         MR. WILSON:  Your Honor, John Wilson on behalf of --

17         THE COURT:  I'm sorry.  I'm sorry.

18         MR. WILSON:  -- Mr. Dondero.

19         THE COURT:  I missed Mr. Dondero's counsel.  I knew

20  we had visited at some point this morning.  I just got

21  confused there.  Go ahead, Mr. Wilson.

22         MR. WILSON:  No problem, Your Honor.  I was just

23  going to say that we will reserve our comments until after the

24  conclusion of the testimony.

25         THE COURT:  All right.  Very well.

171

1          MR. BONDS:  Thank you, Your Honor.

2        (Proceedings concluded at 2:04 p.m.)

3                          --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20                      CERTIFICATE

21        I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                    **01/16/2021**

24   _____        _____
     Kathy Rehling, CETD-444                      Date
25   Certified Electronic Court Transcriber

**APP. 3049**

**EXHIBIT 39**

UNITED STATES BANKRUPTCY COURT

FOR THE NORTHERN DISTRICT OF TEXAS

BEFORE THE HONORABLE STACEY G. JERNIGAN, JUDGE

| | | |
|---|---|---|
| In Re: | ) | Case No. 19-34054-sgj11 |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | |
| | ) | |
| Debtor. | ) | |
| ——————————————————— | ) | |
| | ) | |
| OFFICIAL COMMITTEE OF UNSECURED | ) | Adv. Proc. No. 20-03195-sgj |
| CREDITORS, | ) | |
| | ) | PLAINTIFF'S MOTION for |
| Plaintiff, | ) | CONTINUANCE |
| | ) | |
| v. | ) | |
| | ) | |
| CLO HOLDCO, LTD., et al., | ) | |
| | ) | |
| Defendants. | ) | |
| ——————————————————— | ) | |
| | ) | |
| HIGHLAND CAPITAL MANAGEMENT, L.P., | ) | Adv. Proc. No. 21-03003-sgj |
| | ) | |
| Plaintiff, | ) | |
| | ) | DEFENDANT DONDERO'S MOTION |
| v. | ) | to COMPEL DISCOVERY, the |
| | ) | TESTIMONY of JAMES P. |
| JAMES DONDERO, | ) | SEERY, JR. |
| | ) | |
| Defendant. | ) | May 20, 2021 |
| ——————————————————— | ) | Dallas, Texas (Via WebEx) |

Appearances in 21-03003:

For Plaintiff Highland      John A. Morris
Capital Management,         Pachulski Stang Ziehl & Jones LLP
                            10100 Santa Monica Boulevard, 13th Floor
                            Los Angeles, California  90067

For Defendant-Movant       Michael P. Aigen
James Dondero:             Stinson, L.L.P.
                           3102 Oak Lawn Avenue, Suite 777
                           Dallas, Texas  75219

                           Bryan C. Assink
                           Bonds Ellis Eppich Schafer Jones LLP
                           420 Throckmorton Street, Suite 1000
                           Forth Worth, Texas  76102

Appearances continued on next page.

*Adversary 21-3003, Motion to Compel Discovery*                    20

1    it just maybe fell through the cracks, and I apologize, Your

2    Honor.

3              THE COURT:  All right.

4              MR. ASSINK:  You know, we — Your Honor, —

5              THE COURT:  Well, I'm going to say a couple of things.

6    You know this could have been raised Tuesday, when we were here

7    on the adversary proceeding, in which the preliminary injunction

8    was issued, okay, it would have been — it would have been wise,

9    it would have been very wise to raise the issue.

10             Second, it screams irony, if nothing else, that at a

11   time when I have under advisement a motion to hold Mr. Dondero

12   in contempt of Court that there would be a trip-up, the

13   second-recent trip-up, by the way, where he didn't appear at a

14   hearing.  There was a time a few weeks ago, two or three weeks

15   ago, can't remember what hearing it was then, but he wasn't

16   here.

17             Okay.  The —

18             MR. ASSINK:  Well, Your Honor, I just want to say —

19             THE COURT:  — the third thing I'm going to say — the

20   third thing I'm going to say is I guess I'll issue an order in

21   the main case now, you know, a one- or two-sentence order in the

22   main case saying repeating the sentence that was in the

23   preliminary injunction, that he's going to show up at every

24   hearing.  I never said only at substantive hearings.  The only

25   thing I hesitated on at all, because I've done this in other

1  cases, is sometimes I'll say any hearing at which, you know, the

2  person is taking a position, okay, an opposition, an objection,

3  you know, even if you file a pleading taking a neutral stand, if

4  he's going to file a pleading that requires the Court and all

5  the lawyers' attention to some extent, he's going to need to be

6  in court.  So that's something I thought about doing, but then I

7  was reminded, that I said, no, he's just going to be at all

8  hearings in the future.

9         And procedural, substantive, I never made that

10  distinction and I never would because — because it's taking up

11  time, it's taking up time of the Court, lawyers, parties.  And

12  if he is going to use the offices of this Court or, you know,

13  take up the time of any lawyers, then he needs to be a part of

14  it, okay?

15         MR. ASSINK:  Your Honor, yes, I —

16         THE COURT:  So I thought I made that very clear the

17  last time he didn't show up, but I think —

18         MR. ASSINK:  Your Honor, I apologize.  You know that's

19  certainly not our intention here.  We've been rushing around.  I

20  think this is more — this is more on — on me and just the fast

21  pace with everything.  We would intend that he would be here at

22  all hearings.  We're not trying to make any exception.  We're

23  not trying to say that the preliminary injunction got rid of his

24  obligation to be before, Your Honor.  You know, we weren't clear

25  exactly what the directive was for these kinds of hearings, or

1  based in.  And, again, no one would have better information

2  about his own compensation than Mr. Dondero himself.

3          I mean I want to stress that this comes against a

4  backdrop of — well, it seems like some antagonism, to say the

5  least, on the part of Mr. Dondero where Mr. Seery's concerned.

6  It seems like it's always a fight with Mr. Seery.  And you say,

7  well, we didn't handpick him as the 30(b)(6) witness, but, you

8  know, the motion to compel names him by name.  It just — it

9  feels like another antagonistic move.

10          You've got him for a deposition next Monday on 13 or

11 so different topics.  I think it is appropriate to draw the line

12 on these six or so topics that again just don't seem relevant or

13 proportional to the needs of the case.

14          All right.  So, Mr. Morris, would you please upload

15 just a simple order reflecting the Court's ruling?

16          MR. MORRIS:  I would be happy to, Your Honor.

17          THE COURT:  Okay.  Actually I'm going to ask Mr. Aigen

18 to do it.  I'm sorry.  I need to be thinking about attorney's

19 fees and who should bear the costs of what.

20          So, Mr. Aigen, would you please electronically submit

21 an order?

22          MR. AIGEN:  Yes.

23          THE COURT:  All right.  Thank you.

24          All right.  Well, if there's nothing else on this

25 particular adversary, let me just double check.  Any

```
State of California          )
                            )    SS.
County of San Joaquin       )
```

            I, Susan Palmer, certify that the foregoing is a true and correct transcript, to the best of my ability, of the above pages, of the digital recording provided to me by the United States Bankruptcy Court, Northern District of Texas, Office of the Clerk, of the proceedings taken on the date and time previously stated in the above matter.

            I further certify that I am not a party to nor in any way interested in the outcome of this matter.

            I am a Certified Electronic Reporter and Transcriber by the American Association of Electronic Reporters and Transcribers, Certificate Nos. CER-124 and CET-124.  Palmer Reporting Services is approved by the Administrative Office of the United States Courts to officially prepare transcripts for the U.S. District and Bankruptcy Courts.

```
Susan Palmer
Palmer Reporting Services

Dated May 22, 2021
```

<p style="text-align:center; color:blue"><b>EXHIBIT 40</b></p>

```
                    IN THE UNITED STATES BANKRUPTCY COURT
 1                   FOR THE NORTHERN DISTRICT OF TEXAS
                                DALLAS DIVISION
 2
                                    )     Case No. 19-34054-sgj-11
 3   In Re:                         )     Chapter 11
                                    )
 4   HIGHLAND CAPITAL               )     Dallas, Texas
     MANAGEMENT, L.P.,              )     Monday, May 10, 2021
 5                                  )     1:30 p.m. Docket
             Debtor.               )
 6   _____)
                                    )
 7   HIGHLAND CAPITAL               )     Adversary Proceeding 20-3190-sgj
     MANAGEMENT, L.P.,              )
 8                                  )
             Plaintiff,            )     - TRIAL DOCKET CALL
 9                                  )     - DEFENDANT'S EMERGENCY MOTION
     v.                             )       TO STAY PROCEEDINGS PENDING
10                                  )       RESOLUTION OF DEFENDANT'S
     JAMES D. DONDERO,              )       PETITION FOR WRIT OF
11                                  )       MANDAMUS [154]
             Defendant.            )
12   _____)

13                      TRANSCRIPT OF PROCEEDINGS
                 BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
14                   UNITED STATES BANKRUPTCY JUDGE.

15   WEBEX APPEARANCES:

16   For the Plaintiff:         John A. Morris
                                PACHULSKI STANG ZIEHL & JONES, LLP
17                              780 Third Avenue, 34th Floor
                                New York, NY  10017-2024
18                              (212) 561-7700

19   For the Plaintiff:         Jeffrey Nathan Pomerantz
                                PACHULSKI STANG ZIEHL & JONES, LLP
20                              10100 Santa Monica Blvd.,
                                  13th Floor
21                              Los Angeles, CA  90067-4003
                                (310) 277-6910
22

23

24

25
```

44

1     Can everyone hear me okay?  I don't know if we're having

2  connectivity issues.  Can everyone hear me?

3          MR. MORRIS:  Yes, Your Honor.

4          THE COURT:  Can you hear me, Mr. Wilson?

5          MR. MORRIS:  Yes, Your Honor.

6          MR. WILSON:  Yes, Your Honor.

7          THE COURT:  Okay.  I have been pondering something

8  the past few days.  And I haven't figured out how I want to

9  address it, but maybe Mr. Dondero's counsel and counsel from

10 some of the Dondero-controlled entities, maybe they can listen

11 to what I'm about to say and figure out a solution.

12     As you all know, there are so many law firms, so many

13 lawyers involved now that are basically singing the same tune

14 at a lot of these hearings as far as objections, me too, me

15 too, me too.  And so just quickly eyeballing what we have, we

16 obviously have Mr. Dondero represented by Bonds Ellis.  There

17 is another firm that represents Mr. Dondero that filed a

18 motion asking that I recuse myself.  I can't remember the name

19 of that firm, but I think they appealed my denial of that

20 motion.  So, I can't remember who that was.  Then we have the

21 various affiliates.  We have -- well, I'll just start

22 chronologically.  Highland CLO Funding, Ltd. has historically

23 been represented by King & Spalding.  I don't know if that's

24 -- I know there were some changes there with the ownership of

25 that entity, so maybe they're gone.  But then we have NexPoint

45

 1   Advisors and Highland Capital Management Fund Advisors.  We

 2   call them the Advisors and then the Funds.  Originally, they

 3   were all represented by K&L Gates, but now they've divvied it

 4   up and Munsch Hardt is representing, I guess, the Advisors,

 5   and the Funds are represented by K&L Gates.  CLO Holdco, Ltd.,

 6   it was Kane Russell Coleman & Logan representing them, but I

 7   now think I'm seeing Kane Russell is representing Grant Scott

 8   and -- individually.  I'm not sure if Kane Russell is still

 9   representing CLO Holdco.  We have Dugaboy and Get Good Trusts

10   represented by Doug Draper, Heller Draper.  We have now Louis

11   Phillips representing the Charitable DAFs, Highland Dallas

12   Foundation.  We have NexPoint Real Estate Partners represented

13   by Wick Phillips, although there's the motion to disqualify

14   them.  And then I guess I'll just throw in we've had Baker &

15   McKenzie and Ross & Smith representing certain groups of

16   employees, but now I guess those proofs of claim have been

17   bought by Dondero entities and so I'm not sure who's

18   representing who there.

19       I'm not even sure I got everyone just now, but here's what

20   I'm getting at.  You talk about judicial efficiency and

21   judicial economy and economy of the partners.  We can't go on

22   efficiently with 12 law firms or whatever I just named filing

23   the very same type of motion or objection.  You know, I almost

24   -- if we were in different circumstances, I'd say we need to

25   have an ad hoc committee of these Dondero-controlled

46

1  affiliates, something like that.

2      But I've been thinking about this for a few days because I

3  see, like in one adversary, I think we now have three motions

4  to withdraw the reference.  And I haven't studied them all,

5  but I'm pretty sure they're going to tell me the exact same

6  thing.  And again, I'm just doing some predictions that the

7  UBS settlement, I wouldn't be surprised if I get eight or ten

8  or twelve objections that say the very same thing.

9      We're going to have to work something out.  Okay?  This is

10 not efficient.  It's not useful.  I would think a person such

11 as Mr. Dondero would want to rein in legal fees, but maybe

12 not.

13     Do you all have any ideas, Mr. Taylor, Mr. Wilson?  How

14 can we rein this in?  There's got to be a better way --

15          MR. TAYLOR:  Your Honor?

16          THE COURT:  -- than twelve different law firms filing

17 almost identical pleadings.

18          MR. TAYLOR:  Your Honor, I understand what you're

19 saying, on the one hand.  On the other hand, each of these

20 entities do have -- are separate corporations.  They have

21 different duties to various stakeholders, and they are

22 controlled by different stakeholders.  And that is one of the

23 things that has been a consistent, at least from what I

24 understand from my limited understanding and length of time in

25 the case, that that is one thing that is very important to Mr.

1  Dondero and those related entities, is that those duties do

2  run to different parties.  So each party has to preserve its

3  individual rights.

4      Sure.  Could it be more efficient?  Of course.  But Mr.

5  Dondero has a different set of duties than do the Advisor,

6  than do the Funds, than do the Trusts that are controlled by a

7  separate trustee.  And while of course there's some

8  interrelated cooperation amongst them, amongst the joint

9  defense agreement, it is very important that they maintain

10 their separate corporate identities and act independently from

11 each other, because they truly do have to act independently

12 from each other in many different circumstances.  They don't

13 want to lose sight of that.

14     So that is my initial explanation.  Of course, I can talk

15 with my client about it further, about seeing what can be

16 done, because he does indeed want to make it more efficient.

17 Has been hammering on me and my firm every month to try to do

18 so, and I'm sure he has with the other professionals.

19     But we do hear Your Honor, but we do want to make sure

20 that that -- those different separate corporate identities of

21 these entities is both recognized and laid out in this case.

22 It is very important to us and just integral to a lot of the

23 things that we've done in this case.

24         THE COURT:  You know what would help me understand

25 that better?  Is if in every case I had this entity is owned

48

1  by, you know, 25 percent by this, this.  If I knew the owners,

2  if I knew the equitable owners.  But I don't.  That's just all

3  kind of glossed over.  And so that's how perceptions get

4  created that Dondero, Dondero, Dondero, Dondero.  You know

5  what I'm saying?

6          MR. DONDERO:  Your Honor?

7          THE COURT:  And I don't know if you want to share

8  that information or not, but that's why I can't just accept a

9  generalization that, oh, we have very different stakeholders

10  behind --

11          MR. TAYLOR:  Your Honor?  Wait, hold on a second.

12  Your Honor, --

13          THE COURT:  -- this entity versus this one versus

14  this one.

15          MR. TAYLOR:  Your Honor, if you would allow my

16  client, he would like to very briefly address the Court on

17  those points, if he may.

18          THE COURT:  Okay.

19          MR. DONDERO:  Your Honor, just a brief history from

20  my perspective, okay?  We filed with $450 million of assets

21  and $110 million of estimated, as presented by the independent

22  board and Pachulski to the Court, trying to do a quick

23  settlement the first three or four months into bankruptcy.

24  The claims, the awards, the Class 8, the Class 9 awards, the

25  people who didn't even have standing, have all of a sudden

49

1  ballooned to $300-some-odd million.  And the assets in the

2  estate, which we haven't had an examiner go through all these

3  no-process asset sales at a loss, when I would have bought

4  them for more, has driven the estate value down to less than

5  $250 million.

6       We made an offer to try and settle this thing a few months

7  ago at 20 percent more than the estimated value in the

8  recoveries.  But Seery and the UCC are emboldened because they

9  feel in this Court there's going to be no respect of third-

10  party investors, no respect of other Dondero entities, and

11  they've been told that they can get more than a hundred cent

12  recovery by going after me and all my other entities going

13  back ten or twelve years.

14       So there's no chance that this case ever settles.  And

15  what you're going to see is there's a half a dozen or more --

16            MR. POMERANTZ:  Your Honor, I have to -- I have to --

17            MR. DONDERO:  -- there's a half a dozen more law

18  firms coming --

19            THE COURT:  Just a moment.

20            MR. DONDERO:  -- and there's a half a dozen -- there

21  are a half a dozen more --

22            MR. POMERANTZ:  Your Honor, this --

23            THE COURT:  Mr. Morris?

24            MR. POMERANTZ:  This is Jeff Pomerantz.

25            THE COURT:  Mr. Morris?

50

1          MR. POMERANTZ:  This is Jeff Pomerantz, Your Honor.

2          THE COURT:  Oh, Mr. Pomerantz?

3          MR. POMERANTZ:  This is Jeff Pomerantz, Your Honor.

4          THE COURT:  Uh-huh.

5          MR. POMERANTZ:  You know, I think what Mr. Dondero is

6   doing is totally inappropriate.  We're not here to relitigate

7   the history of the case.  We're not here to relitigate or

8   determine why a settlement hasn't been reached.  Your Honor

9   raised some important questions, (garbled) gave an answer, you

10  pushed him, but what Mr. Dondero is doing is just

11  inappropriate, and we shouldn't -- don't think he should be

12  doing this in this manner.

13     If he wants to at some point be put on to testify, he

14  could be cross-examined.  But he's testifying about things

15  that actually just happen not to be true and it's totally

16  inappropriate for this context.

17          THE COURT:  Okay.  Well, I understand --

18          MR. DONDERO:  But Your Honor, there's going to a half

19  dozen --

20          THE COURT:  -- that -- I understand, you know, Mr.

21  Pomerantz is concerned because I asked a specific question

22  aimed at how do we rein in all the lawyers, and the answer

23  was, well, they all are separate entities with separate

24  interests and separate stakeholders.  And my question was,

25  well, could I maybe see a list, a breakdown on all of these

51

1  entities?  Because, you know, in so many cases, --

2          MR. DONDERO:  But Your Honor, --

3          THE COURT:  -- in almost every case I have, I get a

4  big giant what I call spaghetti chart at the beginning of the

5  case where I get a breakdown of debtor affiliates and who owns

6  what.  And this hasn't been clear to me with all of these

7  affiliates.

8      But I do very much have the impression, Mr. Dondero, that

9  all roads lead back to you.  So I let you speak to this, and

10  we've kind of gone down a different trail.  And I want you to

11  know, I know --

12          MR. DONDERO:  Right.

13          THE COURT:  I know where you stand on this because

14  you have told me before.  You have huge concern that Highland

15  had *x* hundred million dollars of assets at the beginning of

16  the case and now it's a lot lower.  I know you have concerns

17  with liquidation at what you think were very inappropriate

18  times.  I know you have all kinds of beefs, beefs about the

19  settlement with Acis, and probably UBS and the Redeemer

20  Committee.  I understand that.  But what I'm talking about

21  right now is going forward.  Going forward, how do we rein

22  this in where we don't --

23          MR. DONDERO:  But going forward, there's going to be

24  more lawyers.  There's going to be more defense.  Because the

25  Debtor is just going to keep trying to broaden, because they

52

1  feel empowered and enabled to go after anything related to

2  Highland, me, et cetera. But there's probably half a dozen

3  more attorneys coming into this case. I don't know what to

4  tell you. It's a circus.

5          THE COURT: Okay. Well, I'm going to let you all

6  think about this out of court. Is there a way you can

7  streamline? I mean, I know -- I almost chuckle at myself at

8  saying ad hoc committee of Dondero-controlled entities. I

9  know that that sort of sounds, I don't know, unworkable,

10  maybe. Maybe not. I'm not going to read 14 different

11  objections to the UBS settlement that say the very same thing.

12  I'm not going to read a different motion to withdraw the

13  reference by every single defendant in every single adversary

14  that gets filed. This is just not an efficient way to go

15  forward.

16      So I want you all to think about how you can make this

17  more efficient. You know, it -- a perception could exist that

18  you're trying to carpet-bomb us all with paper, the Court

19  included. I mean, it's my job. I'm going to read everything

20  that's put before me. That's what I do. That's what I'm

21  supposed to do. But it's out of control. So you all think of

22  a way to get it in control or I might impose something. The

23  wheels are turning. What could I do? You know, page limits.

24          MR. POMERANTZ: Your Honor, this is Jeff Pomerantz.

25  One suggestion might be, following up on what Your Honor made

53

1  some comments about, and Your Honor has used the word ad hoc

2  committees, and obviously it's sort of a different animal

3  here.  But as Your Honor knows, that every time an ad hoc

4  committee comes in, they have to file a 2019 statement.  So I

5  think it would at least provide Your Honor with information,

6  as it would provide all of us with information, to really

7  understand and know, when people are appearing, is it all

8  roads leading back to Dondero, or, as Mr. Taylor says, what

9  are the different constituents?  Who are the different people?

10       As Your Honor has heard from us, we lump them all together

11  because we believe the evidence has shown throughout this case

12  that it all leads -- the road leads back to Dondero.  But Your

13  Honor may consider asking them to file sort of the equivalent

14  of a 2019 statement to provide Your Honor with that

15  information under oath that Your Honor could then see, when

16  you get several objections to the same thing, whether you

17  really need to be dealing with them as seven different matters

18  or whether dealing with them as one.

19            THE COURT:  Okay.  All right.  Well, I'm giving this

20  thought.  And again, I'll let you all think about it and make

21  a proposal.  But I may or may not accept any proposal you

22  make.  And I am leaning towards requiring information to be

23  filed of who owns what, who are the stakeholders.  That'll

24  help me understand, is it necessary to have this entity filing

25  a separate objection or motion from this other entity or not?

54

1  Can we just have an hoc committee each time?

2     I don't even think I listed all the law firms.  I know a

3  new law firm filed a lawsuit in front of Judge Jane Boyle

4  recently.  We've got a hearing on that coming up in June.  I

5  mean, and now you're -- I'm hearing there are going to be

6  more.  Well, if you don't figure out a way to rein it in, then

7  I'm just going to have to get that list of who are the

8  stakeholders in these entities, under oath, because I don't

9  understand it.  I don't understand why we need these many

10  lawyers filing position papers.

11     So, all right.  Well, we're going to adjourn, and I guess

12  I'll see you next Monday, right?

13        MR. MORRIS:  Thank you, Your Honor.  Yes.

14        THE COURT:  Okay.  Thank you.

15        THE CLERK:  All rise.

16     (Proceedings concluded at 3:07 p.m.)

17                 --oOo--

18

19

20                 CERTIFICATE

21     I certify that the foregoing is a correct transcript from
   the electronic sound recording of the proceedings in the
22  above-entitled matter.

23    **/s/ Kathy Rehling**            **05/11/2021**

24  _____   _____
   Kathy Rehling, CETD-444            Date
25  Certified Electronic Court Transcriber

54

1    Can we just have an hoc committee each time?

2       I don't even think I listed all the law firms.  I know a

3    new law firm filed a lawsuit in front of Judge Jane Boyle

4    recently.  We've got a hearing on that coming up in June.  I

5    mean, and now you're -- I'm hearing there are going to be

6    more.  Well, if you don't figure out a way to rein it in, then

7    I'm just going to have to get that list of who are the

8    stakeholders in these entities, under oath, because I don't

9    understand it.  I don't understand why we need these many

10   lawyers filing position papers.

11      So, all right.  Well, we're going to adjourn, and I guess

12   I'll see you next Monday, right?

13              MR. MORRIS:  Thank you, Your Honor.  Yes.

14              THE COURT:  Okay.  Thank you.

15              THE CLERK:  All rise.

16      (Proceedings concluded at 3:07 p.m.)

17                          --oOo--

18

19

20                      CERTIFICATE

21      I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23   **/s/ Kathy Rehling**                          **05/11/2021**

24   _____      _____
     Kathy Rehling, CETD-444                      Date
25   Certified Electronic Court Transcriber

# EXHIBIT 41

```
                 IN THE UNITED STATES BANKRUPTCY COURT
1                 FOR THE NORTHERN DISTRICT OF TEXAS
                            DALLAS DIVISION
2
                               )    Case No. 19-34054-sgj-11
3   In Re:                     )    Chapter 11
                               )
4   HIGHLAND CAPITAL           )    Dallas, Texas
    MANAGEMENT, L.P.,          )    Friday, June 25, 2021
5                              )    9:30 a.m. Docket
                               )
6            Debtor.           )    EXCERPT:  MOTION FOR
                               )    MODIFICATION OF ORDER
7                              )    AUTHORIZING RETENTION OF JAMES
                               )    P. SEERY, JR. DUE TO LACK OF
8                              )    SUBJECT MATTER JURISDICTION
                               )    (2248)
9   _____)

10                    TRANSCRIPT OF PROCEEDINGS
              BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
11                 UNITED STATES BANKRUPTCY JUDGE.

12  WEBEX APPEARANCES:

13  For the Debtor:            Jeffrey Nathan Pomerantz
                               PACHULSKI STANG ZIEHL & JONES, LLP
14                             10100 Santa Monica Blvd.,
                                 13th Floor
15                             Los Angeles, CA  90067-4003
                               (310) 277-6910
16
    For the Debtor:            John A. Morris
17                             PACHULSKI STANG ZIEHL & JONES, LLP
                               780 Third Avenue, 34th Floor
18                             New York, NY  10017-2024
                               (212) 561-7700
19
    For CLO Holdco, Ltd. and   Jonathan E. Bridges
20  The Charitable DAF Fund,   Mazin Ahmad Sbaiti
    LP:                        SBAITI & COMPANY, PLLC
21                             JP Morgan Chase Tower
                               2200 Ross Avenue, Suite 4900 W
22                             Dallas, TX  75201
                               (214) 432-2899
23
    For Get Good Trust and     Douglas S. Draper
24  Dugaboy Investment Trust:  HELLER, DRAPER & HORN, LLC
                               650 Poydras Street, Suite 2500
25                             New Orleans, LA  70130
                               (504) 299-3300
```

1   bring causes of action against persons, such as officers and

2   directors or other third parties, if they first come to the

3   Bankruptcy Court and show a colorable claim.  They have to

4   come to the Bankruptcy Court, show they have a colorable claim

5   and they're the ones that should be able to pursue them.  Not

6   exactly on point, but it's just one of many cases that one

7   could cite that certainly approve gatekeeper functions of

8   various sorts of Bankruptcy Courts.

9       It doesn't matter which court might ultimately adjudicate

10  the claims; the Bankruptcy Court can be the gatekeeper.

11      And the Court agrees with the many cases cited from

12  outside this circuit, such as the case in Alabama, in the

13  Eleventh Circuit, and there was another circuit-level case, at

14  least one other, that have held that the *Barton* doctrine

15  should be extended to other types of case fiduciaries, such as

16  debtor-in-possession management, among others.

17      Finally, as I pointed out in my confirmation ruling in

18  this case, gatekeeping provisions are commonplace for all

19  types of courts, not just Bankruptcy Courts, when vexatious

20  litigants are involved.  I have commented before that we seem

21  to have vexatious litigation behavior with regard to Mr.

22  Dondero and his many controlled entities.

23      Now, as far as the Movants' argument that there was not

24  just improper gatekeeping provisions but actually an improper

25  discharge in the Seery retention order of negligence claims or

121

1    annoyance or anything like that.  I guess what I'm trying to

2    do is I don't want anyone to mistake the delay in ruling on

3    the contempt motion to mean I'm just not that -- you know, I'm

4    not prioritizing it, other things are more serious to me or

5    important to me, or I'm going to take two months to get to it.

6    It's literally been I've been in trial almost all day long

7    every day since you were here.  But trust me, I'm about as

8    upset as upset can be about what I heard on June 8th, and I'm

9    going to get to that ruling, and I know what I'm going to do.

10   And, well, like I said, it's just a matter of figuring out

11   dollars and whom, okay?  There's going to be contempt.  I just

12   haven't put it on paper because I've been in court all day and

13   I haven't come up with a dollar figure.  Okay?

14       So I hope -- I don't know if that matters very much, but

15   it should.

16       All right.  We stand adjourned.

17       (Proceedings concluded at 3:35 p.m.)

18                           --oOo--

19

20                        CERTIFICATE

21       I certify that the foregoing is a correct transcript from
     the electronic sound recording of the proceedings in the
22   above-entitled matter.

23    **/s/ Kathy Rehling**                    **06/29/2021**

24   _____     _____

25   Kathy Rehling, CETD-444                     Date
     Certified Electronic Court Transcriber

# EXHIBIT 42

```
                    IN THE UNITED STATES BANKRUPTCY COURT
  1                 FOR THE NORTHERN DISTRICT OF TEXAS
                              DALLAS DIVISION
  2
                                  )   Case No. 19-34054-sgj-11
  3   In Re:                       )   Chapter 11
                                  )
  4   HIGHLAND CAPITAL             )   Dallas, Texas
      MANAGEMENT, L.P.,            )   March 1, 2022
  5                                )   1:30 p.m. Docket
            Reorganized Debtor.    )
  6                                )   - REORGANIZED DEBTOR'S MOTION
                                  )     FOR ENTRY OF AN ORDER
  7                                )     APPROVING SETTLEMENT WITH
                                  )     PATRICK DAUGHERTY [3088]
  8                                )   - REORGANIZED DEBTOR'S MOTION
                                  )     FOR ENTRY OF AN ORDER
  9                                )     FURTHER EXTENDING THE PERIOD
                                  )     WITHIN WHICH IT MAY REMOVE
 10                                )     ACTIONS [3199]
      _____)
 11                                )
      ELLINGTON,                   )   Adversary Proceeding 22-3003-sgj
 12                                )
            Plaintiff,             )
 13                                )   STATUS CONFERENCE
      v.                           )   (NOTICE OF REMOVAL)
 14                                )
      DAUGHERTY,                   )
 15                                )
            Defendant.             )
 16   _____)

 17                 TRANSCRIPT OF PROCEEDINGS
            BEFORE THE HONORABLE STACEY G.C. JERNIGAN,
 18            UNITED STATES BANKRUPTCY JUDGE.

 19   APPEARANCES:

 20   For the Debtor:          John A. Morris
                               PACHULSKI STANG ZIEHL & JONES, LLP
 21                            780 Third Avenue, 34th Floor
                               New York, NY  10017-2024
 22                            (212) 561-7700

 23   For Scott Ellington:     Debra A. Dandeneau
                               Laura R. Zimmerman
 24                            BAKER & MCKENZIE, LLP
                               452 Fifth Avenue
 25                            New York, NY  10018
                               (212) 626-4875
```

83

1        THE COURT:  Okay.  And you know that I tend to

2   sometimes share my views just to see if it will spur a fit of

3   reasonableness or encourage people to settle or walk away.

4   I'm pretty exasperated with that attempt in this case.  But

5   this litigation is -- I'm going to call it the stalking

6   lawsuit.  Okay?  Every time -- I don't know how much longer it

7   will be in my court, but as long as it's in my court I'm going

8   to call it what it is, a stalking lawsuit.  It is one grown

9   man accusing another grown man of stalking.  You know, it's

10  just embarrassing to me, and it should be embarrassing to

11  those involved.

12      Now, I have read the lawsuit and I have read that Mr.

13  Ellington accuses Mr. Daugherty of driving by his house,

14  driving by his father's house, driving by his sister's house,

15  driving by his office, 143 sightings, he's taking pictures.

16  And you know, if that's true, again, that's embarrassing.  If

17  -- I don't even know what to say except this is embarrassing.

18  One grown man accusing another grown man of stalking.  Okay?

19  A statute, by the way, that was designed to protect, you know,

20  ex-wives, girlfriends, battered women, from abusive men.  You

21  know, gender doesn't matter, but wow.  It's just -- I don't

22  know what to say except people should be embarrassed, and so

23  that's what I'm going to say.

24      I don't know if it's going to make a whit of difference in

25  anyone's litigation posture.  But we'll come back on March

84

1  29th and we'll do what we need to do on the motions before the

2  Court.

3      (Proceedings concluded at 3:41 p.m.)

4                          --oOo--

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19                        CERTIFICATE

20      I certify that the foregoing is a correct transcript from
    the electronic sound recording of the proceedings in the
21  above-entitled matter.

22   **/s/ Kathy Rehling**                    **03/07/2022**

23  _____    _____
    Kathy Rehling, CETD-444                    Date
24  Certified Electronic Court Transcriber

25

**APP. 3073**