# EXHIBIT 1

1 IN THE UNITED STATES BANKRUPTCY COURT

2 FOR THE NORTHERN DISTRICT OF TEXAS

3 DALLAS DIVISION

4 _____

5 IN RE:    )
        ) CHAPTER 11
6 HIGHLAND CAPITAL  )
 MANAGEMENT, L.P.,  ) CASE NO. 19-34054-SGJ11
7        )
 Reorganized Debtor. )
8 _____ )

9

10

11

12

13 REMOTE ORAL DEPOSITION OF

14 BH EQUITIES, LLC

15 BY AND THROUGH ITS DESIGNATED REPRESENTATIVE

16 DUSTIN THOMAS

17 Des Moines, Iowa

18 Thursday, August 4, 2022

19

20

21

22

23 REPORTED REMOTELY BY:

24 JANICE K. McMORAN, CSR, RDR, CRR, TCRR

25 JOB NO. 213053

Page 2

```
1
2
3
4
5
6            Thursday, August 4, 2022
7            10:00 a.m. CST
8
9
10
11
12
13       REMOTE ORAL DEPOSITION OF BH EQUITIES,
14  LLC, BY AND THROUGH ITS DESIGNATED REPRESENTATIVE
15  DUSTIN "DUSTY" THOMAS, produced as a witness
16  remotely via Zoom videoconference at the instance
17  of the Reorganized Debtor, and duly remotely sworn,
18  was taken in the above-styled and -numbered cause
19  on the 4th of August, 2022, from 10:00 a.m. Central
20  Time until 1:23 p.m. Central Time, before Janice K.
21  McMoran, RDR, CRR, TCRR, and Certified Shorthand
22  Reporter in and for the State of Texas, reported
23  stenographically, with the witness appearing
24  remotely from his office in Des Moines, Iowa,
25  pursuant to the Federal Rules of Civil Procedure.
```

Page 3

```
1          A P P E A R A N C E S
2
3  APPEARING FOR THE REORGANIZED DEBTOR/PLAINTIFF:
4    JOHN MORRIS, ESQ.
     HAYLEY WINOGRAD, ESQ.
5    Pachulski Stang Ziehl & Jones LLP
     780 Third Avenue
6    New York, New York 10017
7
8  APPEARING FOR NEXPOINT REAL ESTATE PARTNERS, LLC:
9    CHARLES GAMEROS, JR., ESQ.
     Hoge & Gameros LLP
10   6116 North Central Expressway
     Dallas, Texas 75206
11
12
     APPEARING FOR THE WITNESS:
13
     CASEY DOHERTY, ESQ.
14     Dentons US LLP
       LyondellBasell Tower
15     1221 McKinney Street
       Houston, Texas 77010
16
17
18  APPEARING FOR WILLIAM T. NEARY, U.S. TRUSTEE:
19   LISA LAMBERT, ESQ.
     U.S. Department of Justice
20    Office of the United States Trustee
      1100 Commerce
21    Dallas, Texas 75242
22
23
24
25
```

Page 4

```
1       A P P E A R A N C E S (CONTINUED)
2
2
3  ALSO PRESENT:
3
4    La Asia Cantey -
4      Pachulski Stang Ziehl & Jones LLP
5    --
     Travis Sheets - General Counsel
6      BH Companies
7    Kyle Hougham - Corporate Counsel
       BH Companies
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 5

```
1              I N D E X
2                         PAGE
```

```
3  Appearances....................................3
4  Proceedings...................................7
5  WITNESS: DUSTIN "DUSTY" THOMAS
6    Examination by Mr. Morris..................9
7  Reporter's Certificate.....................159
8  Acknowledgment of Deponent.................161
9  Errata.....................................162
10
11
12
13         EXHIBIT INDEX
   BH EXHIBIT
14  NUMBER    DESCRIPTION        IDENTIFIED
15  EXHIBIT 1 - Notice and Subpoena issued to
            BH Equities, LLC.................16-17
16
   EXHIBIT 2 - First Amended and Restated
17     Limited Liability Company
       Agreement dated as of March 15,
18     2019 to be effective as of
       August 23, 2018 (BH0001238 -
19     BH0001266)......................40
20  EXHIBIT 3 - E-mail chain Re Unicorn Portfolio
            (BH0000091 - BH0000093)...........68
21
   EXHIBIT 4 - E-mail chain Re SEMF LLC
22      (BH0000133 - BH0000134)...........71
23  EXHIBIT 5 - E-mail from Paul Broaddus dated
       3/15/19; Re: First A&R LLCA of
24     SE Multifamily Holdings LLC
       (BH0001271 - BH0001273)...........74
25
```

Page 6

1       EXHIBIT INDEX (CONTINUED)
2
   BH EXHIBIT
3    NUMBER    DESCRIPTION      IDENTIFIED
4   EXHIBIT 6 - E-mail chain Re: Unicorn
       Combined Underwriting
5       (BH0001363 - BH0001367)..........80-81
6   EXHIBIT 7 - E-mail chain Re: Unicorn
       Combined Underwriting
7       (BH0001437 - BH0001437)..........88
8   EXHIBIT 8 - E-mail from Paul Broaddus dated
       3/15/19; Re: First A&R LLCA of
9       SE Multifamily Holdings LLC
       (BH0001140)......................94
10
   EXHIBIT 9 - E-mail from Paul Broaddus dated
11       7/25/19; Re: First A&R LLCA of
       SE Multifamily Holdings LLC
12       (BH0000277 - BH0000282)..........95
13   EXHIBIT 10- E-mail from Paul Broaddus to Matt
       Mulcahy dated 9/10/20: Re: SE
14       Multifamily Follow-up
       (BH0000716)......................103
15
   EXHIBIT 11- Withdrawn and not identified......--
16
   EXHIBIT 12- E-mail chain attaching 10/30/20
17       Unicorn Distribution Calculation
       (BH0000192 - BH0000194)..........107
18
   EXHIBIT 13- E-mail chain dated 6/9/2021
19       Re: SE Multifamily Holdings
       (BH0000173 - BH0000174)........121-122
20
   EXHIBIT 14- SE Multifamily 2019 Tax Return
21       (BH0000010 - BH0000075)..........128
22   EXHIBIT 15- SE Multifamily 2020 K-1
      (BH0000076 - BH0000078)..........144
23
24
25

Page 7

1      BH EQUITIES, LLC - D. MILLER
2      P R O C E E D I N G S
3     THE REPORTER: Today's date is August
4 4th, 2022. The time is 10:00 a.m.
5     This is the oral deposition of Dustin
6 Thomas, and it is being conducted
7 remotely. The witness is located at his
8 office in Des Moines, Iowa.
9     My name is Janice McMoran, Texas
10 CSR No. 1959. I am administering the oath
11 and reporting the deposition remotely by
12 stenographic means from my residence in
13 Granbury, Texas, on behalf of TSG
14 Reporting.
15     Would counsel please state their
16 appearances and locations for the record?
17     MR. MORRIS: This is John Morris of
18 Pachulski Stang Ziehl & Jones. I'm in New
19 Rochelle, New York. N-E-W, second word,
20 capital R-O-C-H-E-L-L-E.
21     MR. GAMEROS: Bill Gameros here for
22 NexPoint Partners, LLC. I'm in Dallas.
23     MR. DOHERTY: This is Casey Doherty
24 for Dentons Law Firm. I am in Houston,
25 Texas. I represent BH Equities. I

Page 8

1      BH EQUITIES, LLC - D. MILLER
2 don't -- Travis Sheets is observing, but
3 I'll let him introduce -- if he would
4 like, he can introduce himself, but he
5 will not be participating in the
6 deposition. The same with Kyle Hougham.
7     MR. SHEETS: I'm Travis Sheets. I am
8 general counsel for BH Companies located
9 in Des Moines, Iowa, and as Casey
10 indicated, I'll just be observing today.
11     THE REPORTER: I'm sorry. I didn't
12 hear the last part.
13     MR. SHEETS: Oh, Travis Sheets,
14 general counsel for BH Companies. I'll be
15 observing today. I'm located in
16 Des Moines, Iowa.
17     MR. HOUGHAM: And Kyle Hougham,
18 corporate counsel for BH Companies. I'm
19 located in Charlotte, North Carolina, also
20 just observing today.
21     THE REPORTER: And at this time, do
22 counsel agree to allow me to swear the
23 witness remotely?
24     MR. MORRIS: Yes, please.
25     (Witness sworn.)

Page 9

1      BH EQUITIES, LLC - D. MILLER
2     MR. MORRIS: Before we begin, Bill,
3 can you give your verbal assent to having
4 this deposition taken remotely? I don't
5 think I heard you.
6     MR. GAMEROS: I definitely consent to
7 that. Thank you.
8     MR. MORRIS: Okay. Thank you.
9     DUSTIN "DUSTY" THOMAS,
10 having been first duly remotely sworn, testified
11 follows:
12      EXAMINATION
13 BY MR. MORRIS:
14    Q. Good morning, Mr. Thomas. My name is
15 John Morris. I'm an attorney at Pachulski
16 Stang Ziehl & Jones, and we represent Highland
17 Capital Management, L.P. I just want to begin
18 by thanking you for your time today and
19 thanking you and your counsel for their
20 cooperation in complying with the subpoena. We
21 appreciate the effort that's been undertaken;
22 the expense, no doubt, that's been incurred to
23 comply with the subpoena. I think that's --
24 that's a sign of a good corporate citizen. I
25 just wanted to begin by saying that we

Page 10

BH EQUITIES, LLC - D. MILLER

1       BH EQUITIES, LLC - D. MILLER
2 appreciate that.
3       A.  Thank you.
4       Q.  Can you just state your name for the
5 record, sir?
6       A.  Yeah.  My name is Dustin Thomas.
7       Q.  Okay.  Mr. Thomas, are you employed
8 today?
9       A.  I am.
10      Q.  By whom?
11      A.  That's not as easy as it might sound.
12 But I work for BH Equities.  We have a parent
13 who I'm actually employed through with a master
14 services agreement.
15      Q.  Okay.
16      A.  And the parent is BH Management
17 Services.
18      Q.  And do you have a title?
19      A.  I do.  I'm managing director of
20 capital markets and investor relations.
21      Q.  Have you ever been deposed before?
22      A.  I have one other time.
23      Q.  Was it in a personal capacity or in a
24 business?
25      A.  It was in a corporate capacity as a

Page 11

BH EQUITIES, LLC - D. MILLER

1       BH EQUITIES, LLC - D. MILLER
2 just information witness.
3       Q.  And how long ago was that?
4       A.  Approximately three years, three and
5 a half.
6       Q.  So really simple ground rules here.
7 This is a deposition where I am going to ask
8 questions and you'll provide answers.  It's
9 important that you allow me to finish my
10 question before you begin an answer.  Is that
11 fair?
12      A.  That is fair.
13      Q.  And I will attempt to do the same and
14 allow you to finish your answer before I begin
15 a question, but if I fail to do so, will you
16 let me know that?
17      A.  I will do my best.
18      Q.  If there's something that I ask that
19 you don't understand, will you let me know
20 that?
21      A.  I will.
22      Q.  If you need a break at any time, feel
23 free to let me know and I'll do my best to
24 accommodate you.  I only request that you not
25 seek a break while a question is pending.  Is

Page 12

BH EQUITIES, LLC - D. MILLER

1       BH EQUITIES, LLC - D. MILLER
2 that fair?
3       A.  That is fair.
4       Q.  Okay.  From time to time, a lawyer
5 might object to a question.  Allow the lawyers
6 to do their job and figure out what to do with
7 the objection before you begin your answer.  Is
8 that understood?
9       A.  That is understood.
10      Q.  Okay.  So what are your duties and
11 responsibilities as a managing director of BH
12 Equities?
13      A.  I -- BH Equities invests in various
14 partnerships of real estate, and when we
15 invest, I help with the structure of those,
16 both debt and equity investment.  And if we
17 have outside capital, I'm a liaison for that
18 outside capital.
19      Q.  So that -- is it fair to say that the
20 nature of the business of BH Equities is to
21 invest in real estate partnerships, or at least
22 the primary business?
23      A.  I would say that, yeah, alongside
24 sourcing investment opportunities for partners.
25      Q.  How long have you been with BH

Page 13

BH EQUITIES, LLC - D. MILLER

1       BH EQUITIES, LLC - D. MILLER
2 Equities?
3       A.  Counting on my fingers, sorry.  A
4 little over six years.
5       Q.  And were you employed before being
6 employed by BH Equities?
7       A.  I was.
8       Q.  Can you describe just briefly your
9 professional background?
10      A.  Yeah.  Prior to BH Equities, I was a
11 partner in a private equity fund acquiring
12 small businesses of, you know, 5 to 10 million
13 of EBITDA.  And prior to that, I was in private
14 investment on the balance sheet of a power
15 company.
16      Q.  Did you graduate from college?
17      A.  I did.
18      Q.  Where did you go to college?
19      A.  Simpson College, a liberal arts
20 school in, Indianola, Iowa.
21      Q.  Do you have any graduate degrees?
22      A.  I do.  I have a master's in business
23 from the University of Iowa.
24      Q.  Do you hold any licenses or
25 certificates?

Page 14

```
1        BH EQUITIES, LLC - D. MILLER
2     A.  I do.  I hold the chartered financial
3  analyst designation and the chartered
4  alternative investment analyst designation.
5     Q.  Within the BH Equities corporate
6  structure, to whom do you report?
7     A.  I report to Travis Sheets, our
8  general counsel.
9     Q.  Have you spoken with -- are you
10  familiar with the entity called HCRE or what
11  was known as HCRE?
12     A.  Only through our transactions.
13     Q.  And have you spoken with anybody that
14  you believed was acting on behalf of HCRE in
15  connection with today's deposition?
16     A.  I have not.
17     Q.  Do you know whether anybody acting on
18  behalf of BH Equities has communicated with
19  anybody acting on behalf of HCRE concerning
20  today's deposition?
21     A.  Not to my knowledge.
22     Q.  I'd like to -- so from time to time
23  today, I'm going to ask my assistant, La Asia
24  Canty, to put some documents on the screen.
25  You know, this is not a test.  Some of the
```

Page 15

```
1        BH EQUITIES, LLC - D. MILLER
2  documents that we'll put up there, obviously,
3  are very lengthy.  I'm going to show you
4  portions of documents.  It would be much easier
5  if we were in a room together.  So that if you
6  think that there's portions of a document that
7  you need to read in order to -- in order to
8  have context, in order to kind of fully
9  understand the questions that I'm asking, will
10  you let me know that?
11     A.  I will.
12     Q.  Okay.  So the first document that I'd
13  like to put up on the screen, which we've
14  marked as, let's call it BH-1, is the subpoena,
15  the amended subpoena that Highland served in
16  this case.
17        And before we get to that, actually,
18  I just want to deal with a few definitions.
19        As I mentioned at the beginning I
20  represent Highland Capital Management, L.P.
21  I'm going to try to refer to that entity as
22  HCMLP.  Is that fair?
23     A.  Yep, I understand that.
24     Q.  Okay.  And then there's another
25  entity that was a party to the amended and
```

Page 16

```
1        BH EQUITIES, LLC - D. MILLER
2  restated LLC agreement that we'll talk about in
3  a few minutes that was called HCRE Partners,
4  LLC.  I think you told me that you're familiar
5  with that entity, right?
6     A.  Yes.
7     Q.  And if I use the -- if I use the term
8  HCRE, that's the entity that I'll be referring
9  to, okay?
10     A.  Uh-huh.
11     Q.  And you're familiar with an entity
12  called SE Multifamily Holdings, LLC; is that
13  right?
14     A.  Yeah.
15     Q.  All right.  I may refer to that
16  either as SE Multifamily or SEM.  Is that fair?
17     A.  Yes.
18     Q.  Okay.  And then I'm going to refer to
19  the entity either that you're employed by or
20  that you have a shared services agreement with
21  as either BH or BH Equities, okay?
22     A.  Understood.
23        (Exhibit 1 marked.)
24     Q.  Okay.  So let's go back to the
25  subpoena.  Have you seen this document before?
```

Page 17

```
1        BH EQUITIES, LLC - D. MILLER
2     A.  I have.
3     Q.  Okay.  And is it your understanding,
4  are you aware that you're giving testimony
5  today in your capacity as a corporate
6  representative of BH Equities?
7     A.  Yes, I am aware.
8     Q.  Okay.
9        MR. MORRIS:  Can we go to, I guess
10     it's page 2 of the attachment?  Yeah,
11     right there.
12  BY MR. MORRIS:
13     Q.  Have you seen these topics before
14  today?
15     A.  Yes, sir.
16     Q.  And are you prepared to testify on
17  behalf of BH Equities as to each of these
18  topics?
19     A.  I am.
20     Q.  Did you do anything to prepare for
21  today's deposition?
22     A.  I did.
23     Q.  What did you do?
24     A.  I reviewed the bulk of our discovery.
25  And, pardon me, the legal terms are not second
```

Page 18

BH EQUITIES, LLC - D. MILLER

1    nature to me. And then I talked with Matt
2    Mulcahy, as our BH Equities controller as well,
3    on a couple of clarifications.
4        Q. And when you used the phrase "the
5    bulk of discovery," you're talking about the
6    documents that BH Equities produced to Highland
7    in response to the subpoena. Do I have that
8    right?
9        A. Correct.
10       Q. Okay. And can you tell me for the
11   record who -- it's Matt Mulcahy?
12       A. Mulcahy, yes.
13       Q. Okay. Who is Mr. Mulcahy?
14       A. Mr. Mulcahy is the controller for BH
15   Equities and its, you know, various investment
16   subsidiaries.
17       Q. Did Mr. Mulcahy play any role in
18   connection with the SE Multifamily transaction?
19       A. He would have coordinated certain
20   accounting matters.
21       Q. Other than Mr. Mulcahy and BH
22   Equities' counsel, did you speak with anybody
23   else to prepare for today's deposition?
24       A. No, not directly.

Page 19

BH EQUITIES, LLC - D. MILLER

1        Q. Did you speak with or communicate
2    with anybody indirectly?
3        A. Only review of e-mails that would
4    have been part of the discovery package that we
5    shared.
6        Q. Okay. So looking at the screen,
7    we're just going to take them one at a time.
8    Do you see topic 1 there?
9        A. Yes, sir.
10       Q. Have you reviewed, to the best of
11   your knowledge, all of the written
12   communications between BH Equities and either
13   HCRE or HCMLP relating to the amended
14   agreement?
15       A. To the best of my knowledge, I have.
16       Q. Okay. And there's another phrase
17   that I want to get out there. The subpoena
18   defined amended LLC agreement as the agreement
19   that was entered into on March 15th, 2019. Are
20   you aware of that?
21       A. I am.
22       Q. All right. I may from time to time
23   today use the phrase "amended agreement," and
24   that's the agreement that I'll be referring to.

Page 20

BH EQUITIES, LLC - D. MILLER

1    Do you understand that?
2        A. I do.
3        Q. Okay. So other than -- other than
4    your conversations with counsel and Mr. Mulcahy
5    and your review of the e-mails that BH
6    produced, that's the totality of your
7    preparation for topic number 1? Do I have that
8    right?
9        A. Alongside with reading the agreement
10   several times.
11       Q. Okay. I appreciate that.
12          Topic number 2 is Schedule A,
13   including all communications with either HCMLP
14   or HCRE concerning that Schedule A.
15          Do you have an understanding of what
16   Schedule A is?
17       A. I do.
18       Q. And do you believe that you are
19   adequately prepared to testify as to that
20   topic?
21       A. I do.
22       Q. Is there anybody that you think you
23   should have spoken to about that topic that you
24   kind of forgot to or that you wish you had?

Page 21

BH EQUITIES, LLC - D. MILLER

1        A. No. No. I came prepared.
2        Q. Okay. Topic number 3 concerns your
3    interests in SE Multifamily, including
4    distributions or allocations made to you. And,
5    as you may know, "you" is defined in the
6    subpoena as BH Equities. Are you prepared to
7    testify as to that topic?
8        A. I am.
9        Q. And, again, same answer for all four
10   topics, the scope of document review are the
11   documents that BH produced, correct?
12       A. Correct.
13       Q. Okay. And topic number 4 -- there's
14   a reference to paragraph 5 of the response. Do
15   you see that at the end of topic 4?
16       A. Yes.
17       Q. Okay. Have you seen that response?
18       A. I believe I have.
19          MR. DOHERTY: Just one second. Could
20   we see what the response is defined as in
21   the subpoena, Mr. Morris?
22          MR. MORRIS: Sure, we can scroll up.
23          MR. DOHERTY: Pardon me. I forgot
24   which one it is.

Page 22

1    BH EQUITIES, LLC - D. MILLER
2        MR. MORRIS: No problem. It's just
3    NexPoint's written response to the claim
4    objection.
5        MR. DOHERTY: Okay. Thank you,
6    Mr. Morris.
7    BY MR. MORRIS:
8        Q. All right. So let's go back to the
9    topic. Mr. Thomas, have you personally ever
10   seen the response?
11       A. I believe that was provided to me,
12   and I did review it.
13       Q. Okay. And BH Equities is aware today
14   of HCRE's contention as set forth in paragraph
15   5, right?
16       A. I believe so.
17       Q. Do you know when BH Equities first
18   learned -- actually, I'm going to use a defined
19   term just to make our lives simpler. The
20   quotation that we have in topic 4 says, "All
21   facts and communications concerning HCRE's
22   contention that" -- and then there's a
23   quotation.
24       Do you see that?
25       A. Yes, sir.

Page 23

1    BH EQUITIES, LLC - D. MILLER
2        Q. If I -- if I use the phrase
3    "contention," will you know that I'm meaning
4    that very quotation right there?
5        A. I can understand that, yes.
6        Q. Okay. So when did -- when did BH
7    Equities first learn of HCRE's contention?
8        A. I don't know for sure exactly when we
9    first learned. I couldn't give you an exact
10   date as to when corporately we learned about
11   that contention. But we have been aware of it.
12       Q. Can you tell me what year BH Equities
13   first learned of the contention?
14       A. I don't know exactly when we would
15   have learned of that contention, no.
16       Q. Okay. I'll come back to this with
17   more specificity later on.
18       MR. MORRIS: Let's take this down.
19   BY MR. MORRIS:
20       Q. And let's kind of cut to the chase a
21   little bit. BH Equities entered into the
22   amended agreement with HCMLP and HCRE and
23   Liberty on March 15, 2019, correct?
24       A. Correct.
25       Q. Okay. And you're aware that that

Page 24

1    BH EQUITIES, LLC - D. MILLER
2    agreement was effective as of August 23rd,
3    2018, correct?
4        A. I am.
5        Q. Okay. Did you personally have any
6    role in the negotiation of the amended
7    agreement?
8        A. I was involved in the back and forth
9    and working with parties during the -- that
10   time period to -- as the agreement was -- was
11   going back and forth.
12       Q. Were there any particular issues that
13   you were personally focused on?
14       A. Yes. The allocation -- the biggest
15   issue was getting capital back to the parties
16   prior to any allocations on percentages or
17   those things that I was focused on.
18       Q. Can you identify -- when did you
19   first get involved in this project? Do you
20   recall?
21       A. Prior to the closing of the purchase
22   of the assets, I would have been involved.
23       Q. And when was the closing?
24       A. I believe it was September 26th of
25   2018.

Page 25

1    BH EQUITIES, LLC - D. MILLER
2        Q. Can you identify for me all of the
3    people acting on behalf of BH Equities that
4    were, you know, primarily responsible for
5    negotiating the amended agreement?
6        A. Myself, Ben Roby, and Joanna
7    Zabriskie, our president and CEO, would have
8    been the most actively involved.
9        Q. Did you have legal counsel involved
10   in the review and negotiation or drafting of
11   the amended agreement?
12       A. We did.
13       Q. And who was that?
14       A. Nick Roby, previously Davis Brown,
15   which is now part of Dentons.
16       Q. So in addition to yourself and the
17   president and Ben, you had outside counsel? Do
18   I have that right?
19       A. Yes.
20       Q. Is there anybody else within BH
21   Equities who was involved in the negotiation,
22   drafting, or review of the amended agreement?
23       A. Off the top of my head, I'm sure
24   Travis Sheets would have been copied, at least
25   on correspondence.

Page 26

BH EQUITIES, LLC - D. MILLER

1
2    Q.  Now, there were three other parties
3  to the amended agreement, right?  Liberty,
4  HCRE, and HCMLP.  Do I have that right?
5    A.  Yes, that's my understanding.
6    Q.  Are you able to identify for me the
7  people who were representing the interests of
8  each of those parties and the drafting,
9  negotiation, and execution of the amended
10  agreement?  And if you want me to take them one
11  at a time, I'm happy to.
12    A.  Yeah, that would be...
13    Q.  From BH Equities' perspective as you
14  were negotiating this agreement, did BH
15  Equities form a view that HCMLP and HCRE and
16  Liberty were related parties?
17    A.  Yes.
18    Q.  And did -- was this more of a
19  bilateral negotiation between BH Equities on
20  the one hand and HCMLP and HCRE and Liberty on
21  the other hand?
22    A.  Yes.
23    Q.  Can you identify the people who were
24  working on behalf of -- withdrawn.
25        Based on that, for convenience I'm

Page 27

BH EQUITIES, LLC - D. MILLER

1
2  going to use the phrase "Highland" to refer
3  to -- withdrawn.
4        I'm going to use the phrase
5  "Highland" to refer to HCRE, HCMLP, and
6  Liberty.  Is that okay?
7    A.  That's okay, yes.
8    Q.  Okay.  Can you identify for me the
9  individuals who were representing the interests
10  of Highland in connection with the negotiation
11  of the amended agreement?
12    A.  I can identify my primary
13  correspondence during that time.  Is that
14  acceptable?
15    Q.  Sure.
16    A.  I was primarily corresponding with
17  Paul Broaddus.  Freddy Chang was cc'd on much
18  of the correspondence and occasionally chimed
19  in.  And then only by copy of e-mail, I
20  believe, Wick Phillips was the law firm
21  representing and working with them.
22    Q.  And was Wick Phillips involved in the
23  drafting, negotiation, or review of the amended
24  LLC agreement, to the best of your knowledge?
25    A.  I can't say for certain because I

Page 28

BH EQUITIES, LLC - D. MILLER

1
2  didn't correspond with them directly.
3    Q.  Fair enough.
4        How about Matt McGraner?  Is he
5  somebody who was involved on behalf of Highland
6  in the negotiation, drafting, and review of the
7  amended agreement?
8    A.  I did not have direct correspondence
9  with Mr. McGraner on the topic.
10    Q.  Do you know -- was there anybody
11  involved in the negotiation or drafting of the
12  agreement who BH Equities believed was looking
13  out exclusively for the interests of HCMLP?
14    A.  As -- you know, kind of in the
15  framing of your question, we were viewing them
16  as a bilateral entity.  So -- so I can't say
17  for certain if they were or weren't as to
18  who -- who was looking after what interest.
19    Q.  And that's all I'm asking for is the
20  perspective of BH Equities, was there anybody
21  from BH Equities' perspective that BH Equities
22  believed was looking out only for HCMLP's
23  interests?
24    A.  Again, we viewed them as related
25  parties and coordinating amongst themselves as

Page 29

BH EQUITIES, LLC - D. MILLER

1
2  necessary.  But we viewed it as a bilateral
3  negotiation, as you framed it.
4    Q.  Did you ever -- to the best of your
5  knowledge, did BH Equities ever communicate
6  with anybody who claimed to represent the
7  exclusive interests of Liberty?
8    A.  Not to my knowledge.
9    Q.  And to the best of BH Equities'
10  knowledge, did anybody ever represent to BH
11  Equities that there was an individual who was
12  looking out for the exclusive interests of
13  HCRE?
14    A.  Again, we lumped HCRE and HCM kind of
15  together as the two -- the two large parties
16  kind of, you know, related and things.  So
17  exclusively, no, given that context.
18    Q.  Okay.  Are you familiar with the
19  phrase "Project Unicorn"?
20    A.  I am.
21    Q.  Do you have an understanding of what
22  that phrase means?
23    A.  Yes.
24    Q.  And what's your understanding of the
25  phrase "Project Unicorn"?

Page 30

BH EQUITIES, LLC - D. MILLER

1 
2 A. Project Unicorn was a marketing
3 phrase for a portfolio of -- I believe it was
4 26 properties marketed by -- by CBRE as
5 Starwood was -- as Starwood or Starwood
6 affiliates were selling these properties, and
7 they were purchased by SE Multifamily LLC.
8 Q. All right. Do you know why this
9 project was given the name Project Unicorn?
10 A. No, sir.
11 Q. Sometimes people use the word unicorn
12 to refer to something unique. Did you ever
13 participate in any discussions with anybody
14 where they suggested that they were, you know,
15 unique or rare features of a transaction of
16 this type?
17 A. My understanding is the designation
18 was given by the marketing firm, which would be
19 in line with precedent that the investment bank
20 or brokerage firm would give the project its
21 name. And it's typically under -- included in
22 the NDA and things like that.
23 Q. Okay. Do you know when BH Equities
24 first learned of Project Unicorn?
25 A. Specifically, no. It would have been

Page 31

BH EQUITIES, LLC - D. MILLER

1 
2 the summer of 2018.
3 Q. Do you know how BH Equities learned
4 about Project Unicorn?
5 A. I believe it was introduced to us
6 through the -- I'm going to use your term
7 prior, kind of Highland broadly, the HCRE, HCM,
8 you know, group.
9 Q. Is BH Equities aware that HCRE and
10 HCMLP entered into an LLC agreement with
11 respect to SE Multifamily in August of 2018?
12 A. We were given copies of that at some
13 point along the way, yes.
14 Q. Are you aware that HCRE, HCMLP, and
15 certain other borrowers obtained a loan from
16 KeyBank in September 2018 related to Project
17 Unicorn?
18 A. Yes.
19 Q. Did BH Equities have anything to do
20 with the KeyBank loan?
21 MR. GAMEROS: Objection -- objection,
22 form.
23 BY MR. MORRIS:
24 Q. That's fair. Let me restate the
25 question, Mr. Thomas. BH Equities is not a

Page 32

BH EQUITIES, LLC - D. MILLER

1 
2 signatory to the KeyBank loan, is it?
3 A. That's correct.
4 Q. Okay. Did BH Equities provide any
5 services or any resources, including capital of
6 any kind, in connection with the negotiation or
7 drafting of the KeyBank loan?
8 A. That's a bit nuanced. There was
9 underwriting and things like that done on
10 behalf of all parties involved. Underwriting,
11 diligence, those kinds of things, which I'm
12 certain was used as part of the negotiation
13 work with KeyBank to secure the loan.
14 Q. Were you working with Highland on
15 obtaining the KeyBank loan?
16 A. Again, it's nuanced. Directly
17 working as an agent or things like that, no.
18 Q. Were they keeping you informed?
19 A. In parts, yes. It was an important
20 capitalization to the transaction.
21 Q. Is it BH Equities' understanding that
22 the KeyBank loan was a necessary component to
23 the closing of the transaction on September
24 26th?
25 A. Yes.

Page 33

BH EQUITIES, LLC - D. MILLER

1 
2 Q. SEC Multifamily -- withdrawn.
3 To the best of BH Equities'
4 knowledge, SE Multifamily could not have
5 financed the acquisition of the 26 properties
6 at the end of September without obtaining the
7 KeyBank loan; is that fair?
8 A. That's my understanding.
9 Q. Did there come a time when
10 BH Equities began to negotiate with Highland
11 about a potential participation interest in SE
12 Multifamily?
13 A. Yeah, it was always expected we would
14 participate in the -- in the LLC through
15 capital and, you know, sharing of return of
16 capital and profits and things, yes.
17 Q. Okay. Focusing solely on 2018, did
18 BH Equities loan any money to SE Multifamily in
19 the year 2018?
20 A. Not to my knowledge.
21 Q. Do you know if BH Equities loaned
22 money to anybody in connection with Project
23 Unicorn in 2018?
24 A. Not -- not to my knowledge.
25 Q. And as opposed to loans, do you know

BH EQUITIES, LLC - D. MILLER

1  whether BH Equities made any investment in SE
2  Multifamily in the year 2018?
3
4  A. Yes, we did.
5  Q. Okay. Can you describe for me the
6  investment that BH Equities made in SE
7  Multifamily in 2018?
8  A. The investment in totality was
9  approximately 21.5 million, I believe.
10  Q. And when you say it was made in 2018,
11  is that because the agreement was ultimately
12  made effective as of August 2018, or was the
13  actual cash -- well, withdrawn. Let me ask
14  this.
15  You mentioned a $21 million
16  investment. Is that an actual cash outlay by
17  BH Equities?
18  A. Yes.
19  Q. And where did that money go, do you
20  know?
21  A. It went to purchase the properties.
22  Q. And do you know when BH Equities made
23  the $21 million investment?
24  A. It would have been in traunches
25  between the -- and, again, I'm using air quotes

BH EQUITIES, LLC - D. MILLER

1  here -- the broad Highland group entities,
2  HCRE, HCM, et cetera. There are expenses
3  leading up such as, you know, earnest money,
4  loan app fees, those kind of things, and we
5  would have likely shared in parts of that. And
6  then by the time the transaction closed on
7  September 26th, the remaining funds would have
8  been invested, likely funded through title,
9  potentially a little bit directly to a bank
10  account. But the bulk would have gone through
11  title or to pay for pre- -- preclosing
12  expenses.
13  Q. And so do I have this right, that BH
14  Equities laid out the $21 million in 2018
15  before there was an actual written agreement?
16  A. That is correct.
17  MR. DOHERTY: Objection, form.
18  BY MR. MORRIS:
19  Q. Was the $21 million investment the
20  subject of negotiation? Like, how was that
21  number arrived at?
22  A. It was -- it was a number used to
23  close the transaction, and all parties were
24  aware that BH was investing that money as a

BH EQUITIES, LLC - D. MILLER

1  member of SE Multifamily at that time. So it
2  was a known fact amongst all the parties
3  participating.
4  Q. And when you use the phrase
5  "parties," are you talking about the parties
6  that ultimately became members of SE
7  Multifamily or something else?
8  A. Yes. Yeah, the additional members
9  and parties there.
10  Q. Do you know if KeyBank was aware of
11  the role that BH Equities was playing?
12  A. I don't know specifically, as we
13  weren't involved. I would assume so, though.
14  Q. Prior to 2018, had any agreement been
15  reached on the nature of the interest that
16  BH Equities was going to receive in exchange
17  for its $21 million investment?
18  A. I don't believe there was anything
19  formal fully agreed to at that time.
20  Q. BH Equities ultimately obtained a
21  6 percent interest in SE Multifamily, right?
22  A. It's more nuanced than that. I'm
23  sorry, I don't mean to avoid the question, but
24  given the -- written how capital flows and

BH EQUITIES, LLC - D. MILLER

1  things like that, it's more nuanced than just
2  the 6 percent. So I -- so I wouldn't say that
3  we only had a 6 percent interest, so to speak.
4  Q. How would you characterize
5  BH Equities' interest in SE Multifamily? How
6  would you describe it?
7  A. The expectation was we would give
8  capital back, and then the residual interest
9  thereafter was what was up for negotiation.
10  Q. What do you mean, it was up for
11  negotiation?
12  MR. DOHERTY: Objection. And I don't
13  want to make it -- John, you can tell me
14  not to say anything. I think I see a
15  disconnect, but if you want me to let you
16  proceed, I will.
17  MR. MORRIS: Yeah, go ahead, Casey.
18  I appreciate it. Go ahead.
19  MR. DOHERTY: Okay. I think there
20  might be a disconnect on -- with at least
21  for me on the time -- the time frame for
22  the question, about after the amended
23  agreement or before about --
24  MR. MORRIS: Ah, okay.

Page 38

BH EQUITIES, LLC - D. MILLER
1
2    MR. DOHERTY: That's just my humble
3 suggestion there, but I'll -- okay. All
4 right.
5    MR. MORRIS: I appreciate that.
6 BY MR. MORRIS:
7    Q. In the amended agreement as executed,
8 did BH Equities obtain a 6 percent equity
9 interest in SE Multifamily?
10    A. Again, it's more nuanced than that.
11 We have six -- we have an interest of 6 percent
12 after the return of capital and those things,
13 as the agreement was written.
14    Q. Okay. So after capital is returned,
15 SE Multifamily -- withdrawn.
16    After the original capital investment
17 is returned, BH Equities would have a 6 percent
18 interest in SE Multifamily. Do I have that
19 right?
20    A. Yes, that's a correct
21 characterization.
22    Q. Okay. And at what point in time was
23 an agreement reached that BH Equities would
24 receive 6 percent of SE Multifamily after the
25 return of the initial capital? Was that done

Page 39

BH EQUITIES, LLC - D. MILLER
1
2 in 2018? I'm just trying to get a timeline.
3    A. That was -- that was finalized in
4 March of '19 formally.
5    Q. Okay. So at the time in 2018 that
6 BH Equities laid out the $21 million, there not
7 only had not been a written agreement, but
8 there had not yet been an agreement as to the
9 nature and extent of BH Equities' interest in
10 SE Multifamily. Is that fair?
11    MR. DOHERTY: Objection, form.
12    You may answer, Mr. Thomas.
13    A. I don't think that it's fair. There
14 was multiple discussions and things like that.
15 No written agreement is fair. But there was
16 ongoing discussions trying to formalize things.
17    Q. Okay. Let's turn our attention to
18 HCRE. Do you know whether HCRE ever loaned any
19 money to SE Multifamily?
20    A. I don't believe they did.
21    Q. Do you know if HCMLP ever loaned any
22 money to SE Multifamily?
23    A. Could I ask for clarification around
24 the idea of "loan," just so we're on the same
25 page there? For both HCRE and HCM. I just

Page 40

BH EQUITIES, LLC - D. MILLER
1
2 want to make sure I'm answering the question
3 you're asking here.
4    Q. Sure. Like a loan like an IOU where
5 you give someone money with the expectation
6 that it would be returned with interest that's
7 not -- that's not dependent on the outcome of
8 the enterprise.
9    A. No, I don't believe there were any
10 loans provided by either party.
11    Q. All right. Let's get to the LLC
12 agreement itself.
13    MR. MORRIS: If we can put that on
14 the screen. We'll mark it as BH
15 Exhibit 2.
16    (Exhibit 2 marked.)
17 BY MR. MORRIS:
18    Q. And you've seen this document before,
19 right, sir?
20    A. Yes, sir.
21    Q. And you've reviewed it in preparation
22 for today's deposition, correct?
23    A. I have.
24    Q. All right.
25    MR. MORRIS: If we could go to the

Page 41

BH EQUITIES, LLC - D. MILLER
1
2 signature page.
3 BY MR. MORRIS:
4    Q. Do you see that the document was
5 signed on behalf of HCMLP and HCRE by James
6 Dondero?
7    A. I do.
8    Q. Do you know who Mr. Dondero is?
9    A. Yes.
10    Q. And who do you understand Mr. Dondero
11 to be?
12    A. My understanding is he was a primary
13 owner of both parties and a manager or
14 executive in that capacity as well, you know,
15 CEO type.
16    Q. And what's the basis for that
17 understanding?
18    A. Just understanding of the parties',
19 you know, business as -- you know, and our
20 perspective as a partner.
21    Q. Did anybody from Highland ever
22 explain to you or anybody at BH Equities who
23 Mr. Dondero was?
24    A. Not specifically, no. But -- at
25 least not to my understanding.

Page 42

BH EQUITIES, LLC - D. MILLER

1
2    MR. MORRIS: Can we scroll down to --
3 BY MR. MORRIS:
4    Q. Do you see that right there is the
5 signature of Grant Scott, the director of
6 Liberty CLO Holdco, Ltd.?
7    A. I do.
8    Q. Do you know who Mr. Scott is?
9    A. I do not.
10    Q. Did you ever speak with Mr. Scott?
11    A. I don't believe so.
12    Q. Do you know if anybody on behalf of
13 BH Equities ever communicated with Mr. Scott in
14 any way about this amended agreement?
15    A. Not to my knowledge.
16    Q. Did you ever see any comments that
17 were made on behalf of Liberty concerning this
18 agreement?
19    A. No.
20    Q. Is it fair to say that there were
21 various drafts of this agreement prepared
22 before it was signed?
23    A. Yes.
24    Q. Do you recall when the first draft
25 was prepared?

Page 43

BH EQUITIES, LLC - D. MILLER

1
2    A. I believe it was on March 14th.
3    Q. Who was the scribner, if you will?
4 Who was in charge of drafting this amended
5 agreement?
6    MR. DOHERTY: Objection, form.
7    MR. MORRIS: Withdrawn.
8 BY MR. MORRIS:
9    Q. Do you know who drafted this amended
10 agreement?
11    A. I do not specifically, no.
12    Q. Was it Highland or was it
13 BH Equities?
14    A. It was not BH --
15    MR. DOHERTY: Objection -- hold on.
16    THE WITNESS: I'm sorry.
17    MR. DOHERTY: It's hard virtually,
18 Mr. Thomas.
19    Objection. Objection, form. I'm
20 sorry. You can answer the question.
21    A. BH Equities was not the drafter.
22 BY MR. MORRIS:
23    Q. And so is it fair to say from
24 BH Equities' perspective that BH Equities
25 provided comments to drafts that were created

Page 44

BH EQUITIES, LLC - D. MILLER

1
2 by Highland?
3    A. Yes.
4    Q. Do you recall how many drafts of the
5 agreement the parties went through?
6    A. A specific number, no. A handful, to
7 give it, you know, an order of magnitude, I
8 guess.
9    MR. MORRIS: Can we scroll to the
10 next one, please?
11 BY MR. MORRIS:
12    Q. There's the signature of Ben Roby.
13 Do you see that?
14    A. Yes, sir.
15    Q. That's the person that I think you
16 identified earlier today as someone who was
17 involved in Project Unicorn on behalf of
18 BH Equities. Do I have that right?
19    A. Correct.
20    Q. And I apologize if you testified to
21 this earlier, but can you remind me, then, of
22 what role Mr. Roby played within BH Equities?
23    A. At the time he was an acquisition
24 manager focused on acquiring properties in
25 which we made investments.

Page 45

BH EQUITIES, LLC - D. MILLER

1
2    Q. Was there an internal process for
3 reviewing documents like this before execution?
4    MR. DOHERTY: Objection. I want to
5 say, too -- I think this question is fair,
6 but if it goes into what attorneys said or
7 did, Mr. Thomas, you're not to go into
8 details of it.
9    But I just wanted to qualify that,
10 Mr. Morris, for the question. It's a fair
11 question, but I just wanted to make that
12 statement.
13    Go ahead, Mr. Thomas.
14    A. Yeah, this agreement was somewhat
15 fast moving. So I would say it didn't go
16 through the typical process. But Ben, Joanna,
17 and myself were communicating frequently over
18 the couple of days as it was going back and
19 forth.
20    Q. Does BH Equities believe today that
21 it had sufficient time to review the document
22 before signing?
23    A. I believe we knew -- I believe we
24 understood the economics portion of the
25 document as it affected us at the time we

Page 46

BH EQUITIES, LLC - D. MILLER
1
2 signed it.
3    Q.  Okay.  Before signing -- before
4 BH Equities signed the amended agreement, did
5 BH Equities take steps to make sure that the
6 document reflected BH Equities' intent?
7    A.  Yes.
8    Q.  At the time BH Equities signed the
9 amended agreement, did BH Equities believe that
10 the amended agreement was consistent with BH
11 Equities' intent?
12    A.  We were prepared to abide by the
13 agreement as written.  There were certain
14 pieces we hoped to maybe further negotiate, but
15 we understood the agreement and the economic
16 relationship at the time.
17    Q.  Is there anything about the amended
18 agreement that BH Equities believed was
19 inconsistent with its intent at the time it
20 signed the document?
21       MR. DOHERTY:  Objection, form.
22 BY MR. MORRIS:
23    Q.  You can answer.
24    A.  Yeah.  I struggle with the word
25 "intent."  There were certain parts we didn't

Page 47

BH EQUITIES, LLC - D. MILLER
1
2 like or hoped to further discuss, negotiate,
3 but we understood the relationship and -- of
4 capital and return of capital and further
5 economics at that time, and signed
6 understanding those.
7    Q.  Can you identify for me the parts
8 that BH Equities didn't like but it hoped that
9 it would be able to renegotiate?
10       MR. DOHERTY:  Objection, form.
11       And, Mr. Thomas, if this goes into,
12    you know, legal analysis from attorneys,
13    then just be careful.
14    A.  From a business standpoint, we had
15 hoped to increase the 6 percent residual
16 interest after capital was returned.
17 BY MR. MORRIS:
18    Q.  And did you have any discussions
19 with -- withdrawn.  I don't mean to personalize
20 this.
21       Did BH Equities have any
22 communications with Highland prior to the
23 execution of this agreement about BH Equities'
24 desire to increase the 6 percent residual
25 interest?

Page 48

BH EQUITIES, LLC - D. MILLER
1
2    A.  Can you clarify if we're talking
3 about HCMLP, as we talked about the -- as the
4 bilateral, yes, there would have been e-mail
5 communication that we had hoped to have a
6 larger residual interest than 6 percent.
7    Q.  Okay.  And notwithstanding that hope,
8 BH Equities nevertheless entered into this
9 agreement with their eyes open, right?  They
10 understood that they were getting a 6 percent
11 residual interest that could only be changed if
12 the parties agreed in the future to amend the
13 agreement, right?
14    A.  Yes.
15    Q.  Okay.  Is there any other piece of
16 amended agreement that BH Equities hoped to
17 change in the future?
18       MR. DOHERTY:  Objection, form.
19       And I want to, again, Mr. Thomas, if
20    it involves legal analysis --
21       MR. MORRIS:  Withdrawn.  That's fair.
22    I'll rephrase the question, Casey.
23 BY MR. MORRIS:
24    Q.  Is there any other issue that
25 BH Equities told Highland that it wasn't happy

Page 49

BH EQUITIES, LLC - D. MILLER
1
2 with at the time it signed the agreement and
3 that it hoped to negotiate an amendment for?
4    A.  Not to my knowledge.
5    Q.  At the time BH Equities signed the
6 amended agreement, did BH Equities have any
7 reason to believe that the agreement did not
8 reflect the intent of all of the members of
9 SEM?
10       MR. DOHERTY:  Objection, form.
11 BY MR. MORRIS:
12    Q.  You can answer.
13    A.  As far as I know, or as far as we
14 knew, no, we did not have any direct knowledge.
15    Q.  So kind of the flip side to that, is
16 it fair to say that at the time BH Equities
17 signed this agreement on March 15th,
18 BH Equities believed that the agreement
19 reflected the intent of the parties?
20       MR. DOHERTY:  Objection, form.
21       MR. MORRIS:  What's the objection?
22       MR. DOHERTY:  This intent about him
23    knowing what the other side thinks.  But I
24    understand your question, but just
25    maybe --

Page 50

BH EQUITIES, LLC - D. MILLER

1    BH EQUITIES, LLC - D. MILLER
2        MR. MORRIS: I'll rephrase the
3    question.
4        MR. DOHERTY: Okay.
5    BY MR. MORRIS:
6        Q. At any time prior to the -- to March
7    15th, did anybody acting on behalf of Highland
8    inform BH Equities that it believed any aspect
9    of the amended agreement was inconsistent with
10   Highland's intent?
11       A. Not that I'm aware.
12       MR. MORRIS: Hey, Casey, you were
13   spot on. Thank you. That was a better
14   question.
15   BY MR. MORRIS:
16       Q. At the time BH Equities signed the
17   amended agreement, did BH Equities have any
18   reason to believe that the amended agreement
19   contained any errors or mistakes?
20       A. No, I don't believe so.
21       Q. Was BH Equities aware of any error or
22   mistake in the amended agreement at the time it
23   signed it?
24       A. No. Not related to anything that we
25   were focused on.

Page 51

1    BH EQUITIES, LLC - D. MILLER
2        Q. Did anybody acting on behalf of
3    Highland ever inform BH Equities prior to the
4    execution of the agreement that Highland
5    believed there was an error or mistake in that
6    document?
7        A. No, not to my knowledge.
8        Q. All right.
9        MR. MORRIS: Let's go to Schedule A,
10   please.
11       MR. DOHERTY: And, Mr. Morris, is
12   this -- Mr. Thomas, this has been sent to
13   you in the chat, right, the entire
14   document, so he could pull it open if he
15   wanted to, or he could print it out if he
16   wanted to? I just wanted to let you know.
17   Virtual depositions are hard.
18       THE WITNESS: I was not aware. Thank
19   you, Casey.
20   BY MR. MORRIS:
21       Q. And again, Mr. Thomas, this is not a
22   memory test. I am not trying to trick you. I
23   really appreciate your counsel's suggestion and
24   observation. If there's anything you need to
25   see to make your answers, you know, more

Page 52

1    BH EQUITIES, LLC - D. MILLER
2    complete or accurate, just let me know, okay?
3        A. Okay.
4        Q. All right. So this is Schedule A to
5    the amended agreement. Do you see that?
6        A. Yes.
7        Q. And you've seen this page before,
8    correct?
9        A. Correct.
10       Q. And this page shows that Highland
11   Capital Management, L.P. made a capital
12   contribution of $49,000. Do I have that right?
13       A. Yes.
14       Q. And it also shows that Highland
15   Capital Management, L.P. had a 46.06 percentage
16   interest in SE Multifamily, correct?
17       A. Yes, that's what it says.
18       Q. Okay. And those facts were known to
19   BH Equities at or before the time it signed
20   this amended agreement, correct?
21       A. Correct.
22       Q. In fact, BH Equities agreed that
23   HCMLP would hold a 46.06 percentage interest in
24   SE Multifamily while making a capital
25   contribution of $49,000, correct?

Page 53

1    BH EQUITIES, LLC - D. MILLER
2        A. Again, clarifying a little bit on
3    the -- when the percentages came into play
4    being subject to capital being returned, yes.
5        Q. And by that, just to clarify, you
6    mean that the percentage interests only kicks
7    in after the capital contributions are returned
8    in full, correct?
9        A. Yes, that's what I mean.
10       Q. So for purposes of the waterfall, do
11   I have this right -- and there may be some
12   exceptions to this -- but the money had to get
13   paid back to KeyBank first, right?
14       A. Yes.
15       Q. And then any money that was original
16   capital above and beyond the KeyBank loan would
17   then have to be paid back, right?
18       A. Yes.
19       MR. DOHERTY: Object -- sorry.
20   BY MR. MORRIS:
21       Q. And it was only after at least those
22   two events occurred that the remaining value
23   would be distributed in accordance with the
24   percentages under the percentage interest
25   column. Is that fair?

Page 54

BH EQUITIES, LLC - D. MILLER

1  
2  A. Yes, that was the deal as we
3  understood it.
4  Q. Okay. And is it fair to say that at
5  the time the amended agreement was executed,
6  that BH Equities believed Schedule A accurately
7  reflected the intent of the parties?
8  A. Yes.
9  Q. Again, flip side, before signing the
10  agreement, did BH Equities have any reason to
11  believe that Schedule A did not accurately
12  reflect the intent of the parties?
13  A. No.
14  Q. Prior to signing this agreement, did
15  BH Equities ever hear from anybody acting on
16  behalf of Highland that Highland believed
17  Schedule A was inaccurate in any way?
18  A. Using Highland as the counterparty
19  that we were working with, no, we did not.
20  Q. I'm going to -- I'm going to now ask
21  about each of the component members, because I
22  want to make sure that we're clear here.
23  Prior to the time that BH Equities
24  signed the amended agreement, did anybody
25  acting on behalf of HCRE tell BH Equities that

Page 55

BH EQUITIES, LLC - D. MILLER

1  
2  they believed Schedule A was wrong in any way?
3  A. I don't know that I can say that
4  affirmatively, as it wasn't -- again, with us
5  it was very much a bilateral. We knew there
6  were two counterparties outside of BH,
7  excluding Liberty, from that discussion. We
8  didn't exactly know the roles clearly as to who
9  was responsible for what parties' interests
10  other than BH's was very clear and there was a
11  related party of Highland, HCRE, as well.
12  Q. All right. Let me ask a different
13  question, then. Prior to the time that
14  BH Equities signed the amended agreement, did
15  anybody acting on behalf of any of the other
16  members of SE Multifamily inform BH Equities
17  that they believed there was an error in
18  Schedule A?
19  A. Not to my knowledge.
20  Q. Thank you. The percentage interests
21  that are reflected in Schedule A were used
22  elsewhere in the amended agreement; is that
23  correct?
24  MR. DOHERTY: Objection. If
25  there's -- objection, form.

Page 56

BH EQUITIES, LLC - D. MILLER

1  
2  A. I'd have to look through the document
3  or search it.
4  BY MR. MORRIS:
5  Q. Okay. So let's go to Section 1.7.
6  Do you see 1.7 is entitled "Company Ownership"?
7  A. Yes, I see that.
8  Q. And am I reading it correctly that
9  the percentages set forth in Section 1.7 match
10  exactly with the percentage interest set forth
11  on Schedule A?
12  A. Yes.
13  Q. And was it, from BH Equities'
14  perspective, the parties' intent that the
15  company ownership percentages set forth in 1.7
16  would match the percentage interests set forth
17  in Schedule A?
18  MR. DOHERTY: Objection. Form.
19  Objection, form. I need to say objection,
20  form. Sorry.
21  BY MR. MORRIS:
22  Q. You can answer.
23  A. It -- I believe it makes sense,
24  without further -- again, I've read the
25  document. I don't recall specifically what 1.7

Page 57

BH EQUITIES, LLC - D. MILLER

1  
2  governs, if it governs anything in particular.
3  But as written, the numbers match up, and we
4  didn't have an issue with this specific clause
5  at the time of signing.
6  Q. And this is the clause that
7  specifically identifies what ownership interest
8  each member shall have in SE Multifamily. Am I
9  reading that fairly?
10  A. Yes, with respect -- and I think it
11  has to give deference to the waterfall
12  provisions and distribution provisions later in
13  the agreement.
14  Q. Okay. So subject to the waterfall
15  and distribution provisions, would you agree
16  that Section 1.7 was intended to identify the
17  ownership interest of each of the members of SE
18  Multifamily?
19  A. I believe so, yes.
20  Q. Okay. Can we go to Section 6.1,
21  please? Do you see there's --
22  MR. DOHERTY: John, I could use a
23  break in a few minutes, but I can wait. I
24  just didn't know for a break point if you
25  could take it. But if you want to keep on

BH EQUITIES, LLC - D. MILLER

1
2 going, that's fine.
3 MR. MORRIS: Casey, if you could just
4 hold on, I've just got two more provisions
5 and then we'll take a break.
6 MR. DOHERTY: Sure. No problem. I
7 just wanted to flag it.
8 BY MR. MORRIS:
9 Q. Section 6.1(a), do you see that, sir?
10 A. Yes, sir.
11 Q. Okay. And that provision deals with
12 the distribution of distributable cash as
13 defined, correct?
14 A. Yes.
15 Q. And subject to Article VI and
16 Article IX, distributable cash is going to be
17 distributable in the same percentages as the
18 percentage interests set forth in Schedule A,
19 correct?
20 A. Correct.
21 Q. And that's -- that's what the parties
22 intended when they wrote this provision and
23 agreed to it, correct?
24 A. That's what we agreed to, yes.
25 MR. MORRIS: Okay. Can we go to

BH EQUITIES, LLC - D. MILLER

1
2 Section 9.3, please? All right. So if we
3 could just go to the top of it.
4 BY MR. MORRIS:
5 Q. All right. So this Section 9.3 deals
6 with liquidation. Do you see that?
7 A. Yes.
8 Q. And it -- is it fair to say that
9 Section 9.3, if we can scroll down just a
10 little bit, is intended to provide for the
11 waterfall in a liquidation scenario?
12 A. Yes.
13 Q. And is it fair to say that after the
14 expenses and payments are made in Sections
15 9.3(a) through (d), that any remaining cash or
16 assets would be distributed to the members of
17 SE Multifamily in the same percentage as the
18 percentage interests set forth on Schedule A?
19 A. Yes.
20 Q. And that's what the parties intended
21 when they signed this agreement, to the best of
22 BH Equities' understanding, correct?
23 A. Correct.
24 MR. MORRIS: Okay. We can take that
25 break now. It's 12:03. Can we just come

BH EQUITIES, LLC - D. MILLER

1
2 back at 12:10?
3 MR. DOHERTY: We can go off of the
4 record, too. I'm fine with that. I know
5 it's getting around -- I'm good on
6 lunchtime. I don't know how much time, if
7 you want to talk, John, me and you after,
8 but I'm fine to come back in five minutes
9 from break.
10 MR. MORRIS: Okay. 12:10. Seven
11 minutes. Thank you.
12 MR. DOHERTY: Okay.
13 (Recess taken 11:03 a.m. Central Time
14 - 11:12 Central Time.)
15 BY MR. MORRIS:
16 Q. Let's go back to Schedule A, please.
17 Mr. Thomas, can you hear me okay?
18 A. Yes.
19 Q. Okay. Before signing this amended
20 agreement, did BH Equities ever raise any
21 concerns with Highland about HCMLP receiving a
22 46.06 percentage interest while putting in
23 capital of $49,000?
24 A. I don't recall any specific concerns.
25 Q. In fact, it was acceptable to

BH EQUITIES, LLC - D. MILLER

1
2 BH Equities that Highland Capital Management,
3 L.P. receive a 46.06 percentage interest in SE
4 Multifamily in exchange -- withdrawn.
5 It was acceptable to BH Equities that
6 Highland Capital Management, L.P. make a
7 capital contribution of $49,000 to SE
8 Multifamily while receiving a 46.06 percentage
9 interest, correct?
10 A. I would say we were somewhat
11 indifferent, as it didn't affect our economics
12 in -- you know, beyond the 6 percent that we
13 understood we were getting into.
14 Q. You agreed to it, correct?
15 A. Yes.
16 Q. And you didn't voice any objections
17 about that, correct?
18 A. Not to my knowledge.
19 Q. And you knew that that was part of
20 the overall deal, correct?
21 A. Yes.
22 Q. Before signing this agreement, did
23 BH Equities have any understanding as to why
24 Highland Capital Management, L.P. was going to
25 be a member of SE Multifamily?

Page 62

BH EQUITIES, LLC - D. MILLER

1
2  A. I don't believe we did.
3  Q. Did BH Equities ever speak with
4  Highland about why HCMLP was participating in
5  this transaction?
6  A. Not to my knowledge.
7  Q. Did BH Equities ever ask Highland why
8  HCMLP was obtaining a 46.06 percent interest?
9  A. I don't recall that we did.
10  Q. So this was -- Schedule A was
11  something that BH Equities knew about and
12  agreed to at the time it signed this agreement.
13  Fair?
14  A. Yes.
15  Q. Okay. Let's go to Section 6.4(a) on
16  page 12, please. Okay. Do you see in Section
17  6.4(a), there's a -- well, 6.4 deals with
18  allocations of profits and losses.
19     Do you see that?
20  A. Yes.
21  Q. In Section 6.4(a), the parties agreed
22  that except as provided in that section, 94
23  percent of SE Multifamily's profits and losses
24  would be allocated to HCMLP; is that fair?
25  A. Yes.

Page 63

BH EQUITIES, LLC - D. MILLER

1
2  Q. Was this allocation the subject of
3  any negotiation?
4     MR. DOHERTY: Objection, form.
5     MR. MORRIS: Withdrawn.
6  BY MR. MORRIS:
7  Q. Was the allocation of 94 percent to
8  6 percent for BH Equities on profits and losses
9  the subject of any negotiation?
10  A. It was on a phone call between myself
11  and Mr. Broaddus, it came up as it, you know,
12  wasn't exactly normal. But it was an issue
13  that, you know, was kind of internal, so it
14  wasn't broadly negotiated past or those things,
15  as we were, again, somewhat indifferent.
16  Q. And what does it mean that it was not
17  exactly normal?
18  A. Normally the allocation of profit and
19  losses would also follow an allocation -- the
20  waterfall allocation or those things more
21  closely.
22  Q. And did Mr. Broaddus provide any
23  explanation as to why Highland wasn't following
24  that course that you just described?
25  A. Not in any -- not in detail.

Page 64

BH EQUITIES, LLC - D. MILLER

1
2  Q. Did he describe any reason for
3  allocating 94 percent of SE Multifamily's
4  profits and losses to HCMLP?
5  A. No.
6  Q. Am I correct that under the terms of
7  the amended agreement, none of SE Multifamily's
8  profits and losses would be allocated to HCRE,
9  correct?
10  A. That's correct.
11  Q. Did BH Equities ask Highland why none
12  of the profits and losses were being allocated
13  to HCRE?
14  A. I don't believe so.
15  Q. Did anybody acting on behalf of any
16  of the other members ever discuss with
17  BH Equities why HCRE was not being allocated
18  any of SE Multifamily's profits or losses?
19  A. I don't believe so.
20  Q. To the best of -- withdrawn.
21     To the best of BH Equities'
22  knowledge, does paragraph 6.4(a) accurately
23  reflect the parties' intent?
24  A. To the best of our knowledge, yes.
25  Q. Did anybody acting on behalf of any

Page 65

BH EQUITIES, LLC - D. MILLER

1
2  member to the SEM amended agreement ever inform
3  BH Equities that Section 6.4(a) was incorrect
4  in any way?
5  A. I don't believe so.
6  Q. Do you know if the amended agreement
7  that we're looking at was ever amended for any
8  reason at any time?
9  A. There was a slip page at some
10  point -- and I believe it was after this --
11  just to update capital. But it was a
12  nonsubstantial update.
13  Q. I think we'll get to that in a few
14  minutes.
15     Other than the slip page that you
16  just described, is BH Equities aware of any
17  amendment to the amended agreement as we've
18  defined it here today?
19  A. No.
20  Q. BH Equities never signed an amendment
21  to the amended agreement, correct?
22  A. Correct.
23  Q. And BH Equities was never informed by
24  anybody acting on behalf of HCRE or any of the
25  other members to the agreement that the amended

Page 66

BH EQUITIES, LLC - D. MILLER
1
2 agreement had been amended, correct?
3   A.  Correct.
4   Q.  Did BH Equities ever receive in
5 writing any draft agreement to the amended
6 agreement?
7   A.  I don't believe so.
8   Q.  Did -- after the time that this
9 agreement was executed, did BH Equities ever
10 discuss with any member whether this amended
11 agreement would be further amended?
12   A.  Yes.
13   Q.  Can you describe for me when those
14 conversations take place or communications took
15 place?
16   A.  Sure.  There was e-mails expressing
17 our desire to amend our 6 percent amount, right
18 around the time of signing and a couple of
19 times thereafter.  I don't remember specific
20 dates.
21   So, you know, starting in March of --
22 of '19 and then occasionally thereafter, we
23 expressed a desire to expand our 6 percent
24 number.
25   Q.  And what was BH -- what did Highland

Page 67

BH EQUITIES, LLC - D. MILLER
1
2 say in response?
3   A.  I believe in the e-mail
4 correspondence it said something along the
5 lines of there may be future amendments needed
6 or something along that line.
7   Q.  But it never happened; is that fair?
8   A.  That is fair.
9   Q.  And is it also fair that any
10 discussion of any amendment that BH Equities is
11 aware of would be reflected in the e-mails that
12 BH Equities produced in response to the
13 subpoena?
14   A.  Could you reask the question?  I just
15 want to make sure I answer it correctly.
16   Q.  Sure.  Are the communications
17 concerning a possible amendment to the amended
18 agreement reflected in the e-mails that
19 BH Equities produced in response to the
20 subpoena?
21   A.  Yes.
22   Q.  Are you aware of any communications
23 concerning a possible amendment that are not
24 reflected in the e-mails that BH Equities
25 produced in response to the subpoena?

Page 68

BH EQUITIES, LLC - D. MILLER
1
2   A.  I am not.
3   Q.  Let's -- let's start to look at some
4 other documents.
5   (Exhibit 3 marked.)
6   MR. MORRIS:  Let's put up on the
7 screen what we've marked as Exhibit 3.
8 And so we're going to go back in time a
9 little bit to prior to the execution of
10 the agreement.
11 BY MR. MORRIS:
12   Q.  And I'm directing your attention to a
13 document that's been marked, if we could look
14 at the bottom, Bates stamp BH 92.  I'm going to
15 skip the zeros.
16   MR. DOHERTY:  Mr. Morris, with
17 e-mails, I always like to, you know, if
18 possible, have it so I can start reading
19 from the bottom of the conversation.  Will
20 these be put in the chat as where we're
21 going?
22   MR. MORRIS:  Oh, yeah, we'll put it
23 in the chat.
24   MR. DOHERTY:  Okay.
25   MR. MORRIS:  I don't think there's

Page 69

BH EQUITIES, LLC - D. MILLER
1
2 anything below what I'm asking about, but
3 can you scroll --
4   MS. CANTY:  It's in there now.
5   MR. DOHERTY:  These virtual
6 depositions, I know it's -- you go to the
7 top, you don't have context.  So I just
8 wanted to -- I'll let you go.  Thank you.
9 BY MR. MORRIS:
10   Q.  So do you see -- if we could just put
11 this whole e-mail up on the screen right there.
12 Okay.  It's an e-mail from Mr. Roby to Matt
13 McGraner, do you see that, from October 7,
14 2018?
15   A.  Yes.
16   Q.  Okay.  We talked -- I think you
17 mentioned or maybe I mentioned Mr. McGraner
18 earlier.  Do you have an understanding as to
19 whose interest Mr. McGraner was representing in
20 these communications?
21   A.  We would have viewed them as -- or
22 Matt as representing kind of the broader -- you
23 know, again, we viewed it as a bilateral
24 negotiation, so BH -- and then I'm going to use
25 air quotes again -- Highland broadly, the other

Page 70

BH EQUITIES, LLC - D. MILLER

1
2 two parties. You know, I don't specifically
3 know which of those two parties, but -- that he
4 was representing, the other party to the
5 agreement.
6     Q.  Okay. I'm focused on the chart with
7 the sentence above it, but, again, you should
8 read whatever you want of the e-mail for
9 context. My question for you, the first
10 question is, do you know what that chart is in
11 the middle of the page under the word "Cash"?
12     A.  Yes.
13     Q.  And what's your understanding of what
14 this chart depicts?
15     A.  It is depicting the sources of the
16 capitalization for SE Multifamily Holdings.
17     Q.  And so is this a proposal that's
18 being made by BH Equities, or is this a summary
19 of discussions that have been taking place, if
20 you know?
21     A.  A little of both.
22     Q.  Okay. And I see that there's a
23 reference to Highland there on the left. Do
24 you see that? Is that -- do you know what that
25 refers to?

Page 71

BH EQUITIES, LLC - D. MILLER

1
2     A.  We were kind of lumping -- in this
3 correspondence, we were lumping Highland
4 together as the counterparty to BH in the -- in
5 the agreement and in the transaction.
6     Q.  Okay. So this is October 7, 2018,
7 and it's after the closing of the acquisition
8 of the real property by SE Multifamily,
9 correct?
10     A.  Correct.
11     Q.  Do you know if the numbers reflected
12 on this chart changed between October and the
13 time the deal was consummated in March?
14     A.  I believe they were modestly updated,
15 but not in any order of magnitude.
16        MR. MORRIS:  Let's go to the next
17 document, we'll mark as Exhibit 4. It has
18 Bates number BH 133 to 44.
19        (Exhibit 4 marked.)
20 BY MR. MORRIS:
21     Q.  And if you go to the bottom of the
22 first page, you'll see that Mr. Roby asks
23 Mr. Broaddus for a copy of the SE Multifamily
24 LLC agreement. Do you see that?
25     A.  Yes.

Page 72

BH EQUITIES, LLC - D. MILLER

1
2        MR. MORRIS:  And if we could scroll
3 up just to see Mr. Broaddus's response.
4 BY MR. MORRIS
5     Q.  Mr. Broaddus again was acting on
6 behalf of Highland. Do I have that right?
7        MR. DOHERTY:  Objection. I know we
8 have some kind of defined terms for the
9 deposition, but I just want to --
10 objection, form.
11 BY MR. MORRIS:
12     Q.  Based on the prior testimony, you can
13 answer, sir.
14     A.  He was acting on behalf of what we
15 viewed as the Highland, you know, broad entity.
16 So we didn't know specifically HCMLP or HCRE in
17 particular. But as a counterparty to the
18 broader Highland, you know, ecosystem, yes.
19     Q.  Okay. Can you just -- can you just
20 read Mr. Broaddus's e-mail to yourself and tell
21 me when you're finished?
22     A.  I've finished.
23     Q.  Okay. Do you know if anybody ever
24 told KeyBank that the SE Multifamily, LLC
25 agreement that was in existence at that time

Page 73

BH EQUITIES, LLC - D. MILLER

1
2 was just a placeholder?
3     A.  I don't have knowledge one way or the
4 other.
5     Q.  Do you know if anybody told KeyBank
6 that the original LLC agreement was
7 meaningless?
8     A.  The same answer. I don't have
9 knowledge one way or the other.
10     Q.  Okay. But as of this time,
11 obviously, BH Equities did know that an
12 original LLC agreement existed, right?
13     A.  Yes.
14     Q.  And that the original agreement was
15 going to be amended to reflect, quote, whatever
16 the deal terms are, closed quote, correct?
17     A.  Correct.
18     Q.  And, in fact, the original LLC
19 agreement was amended, correct?
20     A.  Yes.
21     Q.  And that's the agreement we just
22 looked at; is that fair?
23     A.  Yes.
24     Q.  So is it fair to say that consistent
25 with Mr. Broaddus's November 7th e-mail, the

Page 74

BH EQUITIES, LLC - D. MILLER

1 original LLC agreement was amended to, quote,
2 reflect whatever the deal terms were?
3 A. I think that's fair.
4 MR. MORRIS: Let's go to the next
5 document, Exhibit 5, which has Bates
6 number BH 1271 to -73.
7 (Exhibit 5 marked.)
8 BY MR. MORRIS:
9 Q. Before I ask you any questions about
10 this document, the agreement was dated
11 March 15th, 2019. Do you remember that?
12 A. Yes.
13 Q. And was there a sense of urgency to
14 get the agreement signed by the end of that
15 particular day?
16 A. Yes.
17 Q. Do you have an understanding as to
18 what the cause of that urgency was?
19 A. My understanding from the
20 correspondence of March 15th is the deadline to
21 either file or extend taxes for pass-through
22 entities, and that was driving the urgency.
23 Q. And was the goal to make the
24 agreement effective as of August 23rd, 2018,

Page 75

BH EQUITIES, LLC - D. MILLER

1 the date on which the original LLC agreement
2 was entered into?
3 A. Yes.
4 Q. And is it BH Equities' understanding
5 that in order to make the amended and restated
6 agreement retroactive to August 23rd, 2018, it
7 had to be signed by the end of the day on March
8 15, 2019?
9 MR. DOHERTY: Objection -- withdraw
10 my statement.
11 A. I'm not an expert in that matter, but
12 that would certainly be the understanding we
13 were given.
14 BY MR. MORRIS:
15 Q. Okay. I appreciate the distinction.
16 Was BH Equities told by Highland that the
17 agreement had to be executed on or before March
18 15th in order for it to be retroactive to
19 August 2018?
20 A. Yes. That was the -- what we were
21 told.
22 Q. Okay. So let's take a look at the
23 e-mail that's up on the screen. You'll see
24 there's actually two e-mails. The one on the

Page 76

BH EQUITIES, LLC - D. MILLER

1 bottom is from Mr. Broaddus to you and to
2 Mr. Roby with a copy to Mr. McGraner, and it's
3 sent on March 14th. Do you see that?
4 A. Yes, sir.
5 Q. And do you recall -- I think you may
6 have testified to this earlier, but does this
7 refresh your recollection that BH Equities was
8 presented with a draft amended LLC agreement
9 for SE Multifamily on March 14th?
10 A. Yes.
11 Q. And do you see in the
12 next-to-the-last paragraph in Mr. Broaddus'
13 first e-mail there, he says, quote, the
14 contribution schedule in the attached needs to
15 be updated with the actual contribution
16 numbers. I have an updated version I can send
17 in a separate e-mail.
18 Do you see that?
19 A. Yes.
20 Q. So were the actual contribution
21 numbers and the contribution schedule a subject
22 of discussion between BH Equities and Highland
23 prior to the execution of the amended
24 agreement?

Page 77

BH EQUITIES, LLC - D. MILLER

1 A. Yes.
2 Q. And then you can see the e-mail
3 above, and Mr. Broaddus follows up and he says,
4 among other things, quote, "Contribution
5 schedule attached." Do you see that?
6 A. Yes.
7 Q. And if we can scroll to the next
8 page, the next page actually has Schedule A
9 attached. If we could scroll down. I don't
10 know if you can see it in the chat room because
11 I don't want you to just take my word for it.
12 But do you recall receiving a Schedule A from
13 Mr. Broaddus prior to the execution of the
14 agreement?
15 A. Yes.
16 Q. Okay. And is this the schedule that
17 Highland prepared and delivered to BH Equities
18 prior to the execution of the amended
19 agreement?
20 A. I believe so.
21 Q. And is it BH Equities' understanding
22 that somebody acting on behalf of Highland
23 completed Schedule A before delivering it to
24 BH Equities?

Page 78

BH EQUITIES, LLC - D. MILLER

1    
2  A.  Yes, that was our understanding.
3  Q.  Okay.  BH Equities didn't prepare the
4  numbers that are set forth on Schedule A, did
5  it?
6  A.  No.
7  Q.  That was Highland, correct?
8  A.  Correct.
9  Q.  And Highland delivered this document
10 to BH Equities the day before the agreement
11 was -- withdrawn.  Actually, delivered it to BH
12 Equities on March 15, 2019, correct?
13 A.  This particular Schedule A, yes, was
14 delivered on March 15th.
15 Q.  And it was delivered as a stand-alone
16 document by itself with nothing else; is that
17 right?
18 A.  That's my recollection, based on -- I
19 believe so without, you know, seeing some other
20 sourcing.
21 THE REPORTER:  I'm sorry,
22 Mr. Doherty, did you say something?
23 MR. DOHERTY:  Objection.  Well,
24 objection that -- John, may I make a
25 comment?

Page 79

BH EQUITIES, LLC - D. MILLER

1    
2  If you need a document to refresh
3  yourself, Dusty, especially if it's on the
4  screen and -- you know, let Mr. Morris
5  know that you want to look at the prior
6  e-mail or, you know, if you're asking
7  to -- I hope that was okay, Mr. Morris.
8  Appreciate it.
9  MR. MORRIS:  It's okay.  I mean, I'm
10 happy to show him the third page of the
11 document.  I just --
12 MR. DOHERTY:  I just know Mr. Thomas
13 is a very detailed-oriented man, so I know
14 if he doesn't -- you know, if it's a
15 question like was this the one sent, in
16 case he wants to go back and see that it
17 was attached to the document or he can ask
18 Mr. Morris is this the attachment.  But,
19 you know, I just wanted to make that --
20 make that point.
21 MR. MORRIS:  All right.  First of
22 all, La Asia, can you show Mr. Thomas the
23 third page of the exhibit?  It's blank.
24 BY MR. MORRIS:
25 Q.  And do you see, Mr. Thomas, that

Page 80

BH EQUITIES, LLC - D. MILLER

1    
2  BH Equities has Bates stamped these documents
3  consecutively 1271, 1272, and 1273?
4  A.  Yes.
5  Q.  And do you see that Mr. Broaddus's
6  e-mail at the very first page shows that
7  there's an attachment?
8  A.  Yes.
9  MR. MORRIS:  Can we go up to the
10 first page, please?
11 BY MR. MORRIS:
12 Q.  And do you see that Mr. Broaddus's
13 first sentence says attached is the
14 contribution schedule, at least in substance?
15 A.  Yes.
16 Q.  And do you have any reason to believe
17 that the Schedule A that we just looked at is
18 not the contribution schedule that Mr. Broaddus
19 attached to his e-mail on March 15, 2019, at
20 2:02 p.m.?
21 A.  No, I do not.  I believe that is the
22 schedule.
23 (Exhibit 6 marked.)
24 Q.  Okay.  So let's go, then, to
25 Exhibit 6, which is a document Bates numbered

Page 81

BH EQUITIES, LLC - D. MILLER

1    
2  1363 to -67.  Now, this is an e-mail from you,
3  and attached here -- do you see that there is
4  an attachment that's mentioned in the header of
5  your e-mail?
6  A.  Yes.
7  Q.  And you refer to an attachment in the
8  first sentence of your e-mail.  Do you see
9  that?
10 A.  Yes.
11 MR. MORRIS:  And if we can scroll
12 down.
13 BY MR. MORRIS:
14 Q.  Again, you're free to look at
15 whatever you want.  I'm looking for the
16 attachment.
17 MR. MORRIS:  If we can keep going.
18 Right there.
19 BY MR. MORRIS:
20 Q.  Please scroll down and confirm, if
21 you can, that the document that's set forth on
22 page 1366 and 1367 is the attachment to the
23 e-mail that we're looking at that you sent.
24 A.  Yeah.  And I'm looking to my left
25 because I pulled it up via the chat link.  So

Page 82

BH EQUITIES, LLC - D. MILLER

1 I'm just -- it gives me a bigger screen to view
2 it.
3
4 Q. Okay. So that's the attachment that
5 you sent, right?
6 A. Yes.
7 Q. And your attachment deals with the
8 very issue that you identified earlier today
9 that you were focused on, and that was the
10 waterfall; is that right?
11 A. Correct.
12 Q. Okay. And in the first sentence when
13 you say that, "Attached is what we proposed in
14 October to try and handle this," this is
15 expressly referring to the waterfall provision,
16 correct?
17 A. Yes.
18 Q. Okay. And you go on to say, "This
19 covers the distribution language in a way that
20 we can get comfortable with, as we need to make
21 sure that if the capital that Highland put in
22 associated with debt is off, that it's not
23 dilutive."
24 Do you see that?
25 A. I do.

Page 83

BH EQUITIES, LLC - D. MILLER

1
2 Q. What capital that Highland put in
3 associated with debt, what does that refer to?
4 A. The KeyBank facility.
5 Q. And what specifically was your
6 concern about how that was treated?
7 A. Our understanding is it would be a
8 loan to HCRE or you, know, an entity affiliated
9 with, you know, kind of the broad Highland, and
10 would be put in as capital, and that obviously
11 it would have a preference to getting paid off,
12 but that it wouldn't then also keep us from
13 getting our capital back after the KeyBank
14 was -- KeyBank facility was paid off.
15 Q. Okay. And then you go on to say
16 later in the paragraph, "We think the
17 attachment does that while still allocating the
18 taxable income loss in a way that meets your
19 needs by percentage."
20 Do you see that?
21 A. Yes.
22 Q. What did you mean by that?
23 A. I had had a brief phone call with
24 Mr. Broaddus, and that was in that -- in
25 relation to the profit and loss allocation

Page 84

BH EQUITIES, LLC - D. MILLER

1
2 where we were kind of indifferent.
3 Q. And what needs did Mr. Broaddus
4 describe for you?
5 MR. DOHERTY: Objection.
6 MR. MORRIS: Withdrawn.
7 BY MR. MORRIS:
8 Q. Did Mr. Broaddus describe for you the
9 needs that Highland had with respect to the
10 allocation of taxable income and loss?
11 A. Not in any level of detail.
12 Q. So when you said that you believed
13 your provision would meet their needs, how did
14 you believe their provision would meet
15 Highland's needs?
16 A. The provision that we shared was
17 focused more on the distribution of cash and
18 not the allocation of profits and losses.
19 Q. And is that because Section 6.1 deals
20 with the allocation of cash and Section 6.4
21 deals with the allocation of profits and
22 losses?
23 A. Could you show me Section 6.4, just
24 to verify the numbers? But, yes, 6.1 was
25 focused exclusively on the allocation of cash

Page 85

BH EQUITIES, LLC - D. MILLER

1
2 or the distribution of cash and that a
3 different section, presumably 6.4, would focus
4 on the allocation of profits and losses,
5 separate and distinct from cash.
6 Q. Okay. And I apologize for asking it
7 again, but help me to understand how the
8 attached -- oh, is it because your attached
9 proposal doesn't impact the allocation of
10 taxable income and losses at all?
11 A. Correct.
12 Q. Ah, okay. So I understand. So -- so
13 you're trying to explain -- is it fair to say
14 that you're trying to explain to Mr. Broaddus
15 that your concern is the distribution waterfall
16 but that he can leave the tax allocation the
17 way they wanted it?
18 A. Yes, yes.
19 Q. Okay. Do you recall -- actually,
20 towards the end it says, "The capital in this
21 agreement would only be the capital that
22 Highland put in that is not also incorporated
23 in the bridge loan agreements. I think that is
24 plus or minus $40 million based on my
25 understanding."

Page 86

BH EQUITIES, LLC - D. MILLER

1
2 Is what you're saying there that
3 Highland was going to put in approximately --
4 withdrawn.
5 Is what you're saying there that
6 Highland was going to get credit for having put
7 in $290 million or thereabouts into SE
8 Multifamily, 250 million of which was coming
9 from the KeyBank loan and the other 40 million
10 of which was coming from Highland?
11 A. Yes, that's the distinction I was
12 trying to make.
13 Q. Okay. And under the waterfall is it
14 BH Equities' understanding that it agreed that
15 the $250 million that had been borrowed from
16 KeyBank would be paid back first?
17 A. Yes.
18 Q. Before return of capital?
19 A. Yes.
20 Q. Does BH Equities know the source of
21 funding for the other $40 million?
22 A. No, not at this time.
23 Q. Did BH Equities ever ask Highland
24 where the $40 million was coming from?
25 A. No, not that I -- not that I'm aware.

Page 87

BH EQUITIES, LLC - D. MILLER

1
2 Q. Does BH Equities know when HCRE was
3 formed?
4 A. I don't believe so. We may have an
5 organizational doc or something that was
6 provided as part of a deal that was shared with
7 a lender, et cetera, but not in the ordinary
8 course would we know that.
9 Q. Had BH Equities done business with
10 HCRE prior to Project Unicorn?
11 A. I don't know for sure. In our
12 business generally there are a lot of
13 subsidiaries and things like that that are
14 formed for specific deals. So it's quite
15 possible that HCRE could have been an upper
16 entity that owned a subsidiary, et cetera. But
17 I just don't know the waterfalls cold -- or the
18 organizational charts cold to know if we did or
19 did not specifically with HCRE.
20 Q. Okay. That's fair.
21 Had BH Equities done business with
22 HCMLP or any entity that BH Equities believed
23 was related or affiliated with HCMLP prior to
24 Project Unicorn?
25 A. We had numerous projects and

Page 88

BH EQUITIES, LLC - D. MILLER

1
2 partnerships with Highland broadly, you know,
3 whether that be HCRE, HCMLP, the NexPoint RE,
4 et cetera, to the tune of 40-plus property
5 partnerships, et cetera. So we had significant
6 relations with them and still do on the
7 management company side. So I don't
8 specifically know what entities were owned or
9 related to what, but we had significant prior
10 experience with the parties involved.
11 Q. And were -- were Mr. McGraner or
12 Mr. Broaddus or Mr. Chang involved in any of
13 those other deals?
14 A. Yes.
15 Q. Were they the primary contacts that
16 BH Equities had for the transactions that
17 BH Equities did with Highland and its
18 affiliated and related entities?
19 A. I believe so, yes.
20 (Exhibit 7 marked.)
21 Q. Let's go to Exhibit 7, please, which
22 is a two-page e-mail with Bates number 1437 to
23 -38. And if we could start at the bottom,
24 you'll see -- this is the e-mail that you just
25 looked at from you, right?

Page 89

BH EQUITIES, LLC - D. MILLER

1
2 A. Yep.
3 Q. It's the exact same e-mail?
4 A. Yes.
5 Q. And then if we scroll a little higher
6 on the page, you'll see that it appears that
7 Mr. Broaddus, the person to whom you sent it,
8 forwarded it to Mr. Chang. Do you see that?
9 A. Yes.
10 Q. And then if we can keep scrolling up,
11 Mr. Chang sent an e-mail back to Mr. Broaddus.
12 Do you see that?
13 A. Yes.
14 Q. And then Mr. Broaddus forwarded
15 that -- Mr. Chang's e-mail to you. Is that
16 fair?
17 A. Yes.
18 Q. And Mr. Chang's e-mail was a direct
19 response to the proposal that was attached to
20 the e-mail that we just looked at that was
21 marked as Exhibit 6, right?
22 A. Yes.
23 Q. And what's in Mr. Chang's e-mail is a
24 different provision for the waterfall. Fair?
25 A. Yes.

BH EQUITIES, LLC - D. MILLER

1　　BH EQUITIES, LLC - D. MILLER
2　　MR. DOHERTY: Objection. Could I see
3　the -- could we zoom out so I can see that
4　whole e-mail? Do y'all mind?
5　　MR. MORRIS: Sure. Yep.
6　　MR. DOHERTY: Okay. Not really an
7　objection but a request .
8　　I think There's an (e). And maybe
9　it's not. Could you scroll down just so I
10　can see the (e)?
11　　MR. MORRIS: It's at the bottom of
12　the page there.
13　　MR. DOHERTY: I'm sorry to be
14　annoying. I just wanted to see it. While
15　we were talking about it, I didn't know if
16　we could zoom out so we could have the
17　whole --
18　　THE WITNESS: Yeah, I can see it. I
19　can see the provision (e), Casey.
20　　MR. DOHERTY: Okay. Then I'm okay.
21　I was more talking for you, Dusty. I
22　wanted everybody to be able to see the
23　document. Okay. Sounds good.
24　BY MR. MORRIS:
25　　Q. Just let me try to clean this up a

1　　BH EQUITIES, LLC - D. MILLER
2　bit, Mr. Thomas.
3　　Is it your understanding that
4　Mr. Chang's e-mail was effectively a
5　counterproposal to the one that you had made
6　earlier in the day on March 15th with respect
7　to the waterfall?
8　　A. Yes. That's how we interpreted it.
9　　Q. Okay. And is it your
10　understanding -- withdrawn.
11　　Is it BH Equities' understanding that
12　this provision in Mr. Chang's e-mail was a
13　provision that was drafted by Highland?
14　　A. Yeah, Highland is kind of the broad
15　counterparty perspective, yes.
16　　Q. Okay. And, Mr. Chang's -- withdrawn.
17　　Other than the fact that it's labeled
18　1.1 instead of 6.1, are you aware that
19　Mr. Chang's e-mail is -- was adopted verbatim
20　in the executed amended agreement?
21　　MR. DOHERTY: Objection.
22　　A. I would compare, but, yeah, I believe
23　it is -- it looks to be the language, the final
24　language.
25

1　　BH EQUITIES, LLC - D. MILLER
2　BY MR. MORRIS:
3　　Q. And did Mr. Chang's section -- and
4　what's on Mr. Chang's e-mail, is it your
5　understanding that it ultimately became Section
6　6.1 of the amended agreement? And, again, I'm
7　happy to pull it up if you'd like because I
8　don't mean to test you.
9　　A. Yeah, if you wouldn't mind pulling it
10　up, that would be great.
11　　Q. Let's do that. Let's pull it up.
12　It's Exhibit 2. If we can pull up 6.1.
13　　MR. DOHERTY: Mr. Morris, do you
14　think it would be helpful for Mr. Thomas
15　to print out the amended agreement during
16　this series of questions, or is this kind
17　of a one-off question?
18　　MR. MORRIS: I think it's a one-off
19　question.
20　　MR. DOHERTY: Okay.
21　　MR. MORRIS: But if he wants to do
22　that, I don't mean to stop him.
23　　MR. DOHERTY: I understand.
24　BY MR. MORRIS:
25　　Q. Here's 6.1. You'll see that it's got

1　　BH EQUITIES, LLC - D. MILLER
2　five Sections, (a) through (e)?
3　　A. Yep.
4　　Q. You'll see that -- if we can go back
5　up to (a). You've got the percentages that are
6　set forth in Schedule A, 47.94 percent to HCRE,
7　46.06 percent to HCMLP, and 6 percent to BH.
8　Do you see that?
9　　A. Yes.
10　　Q. Okay. And then if we scroll down to
11　(e), it basically says, notwithstanding
12　everything that came before it, the first
13　amounts of distributable cash shall be deemed
14　distributed to each member in proportion to
15　amounts borrowed on behalf of SE Multifamily.
16　　Is that a fair characterization?
17　　A. Borrowed and then invested as equity
18　into the deal, yes.
19　　Q. That's right. So that's the pay
20　KeyBank back first provision. Fair?
21　　A. Yes.
22　　Q. And then little (ii) there says that
23　after that's done, it's pro rata in proportion
24　to the members' respective capital accounts.
25　　Do you see that?

Page 94

BH EQUITIES, LLC - D. MILLER
1
2 A. Yes.
3 Q. That's the return of capital
4 provision, correct?
5 A. Correct.
6 Q. And that's what BH Equities was
7 concerned about, correct?
8 A. Correct.
9 Q. And so Mr. Chang's proposal was
10 acceptable to BH Equities, correct?
11 A. Yes.
12 Q. BH Equities accepted Mr. Chang's
13 entire proposal with respect to Section 6.1,
14 correct?
15 A. Correct.
16 Q. Okay.
17 MR. MORRIS: All right. If we can go
18 to the next exhibit, Number 8, Bates
19 number 1140.
20 (Exhibit 8 marked.)
21 BY MR. MORRIS:
22 Q. Okay. So we're still on the 15th.
23 This was a busy day for you. At least it looks
24 that way. It's now 11:20 at night.
25 A. Uh-huh.

Page 95

BH EQUITIES, LLC - D. MILLER
1
2 Q. And Mr. Broaddus sends to you and to
3 Mr. Roby, and he copies his colleagues, and he
4 attaches the agreement with the change, quote,
5 Dusty and I discussed, closed quote, and the
6 document was ready for execution. Do you see
7 that?
8 A. Yes.
9 Q. Is the change that you and
10 Mr. Broaddus discussed the change to 6.1 that
11 we just looked at in the two e-mails?
12 A. Yes.
13 Q. Okay. So that Mr. Broaddus is
14 informing BH Equities that after negotiating
15 Section 6.1 to the satisfaction of all members,
16 they were ready to sign; is that fair?
17 A. Yes.
18 Q. Okay.
19 (Exhibit 9 marked.)
20 MR. MORRIS: All right. Let's go to
21 the next exhibit, please. It's an e-mail
22 string with Bates number 277 to 282.
23 BY MR. MORRIS:
24 Q. And we can start at the bottom so
25 there's no confusion here.

Page 96

BH EQUITIES, LLC - D. MILLER
1
2 A. That would be appreciated.
3 Q. Yep. Okay. So you'll see that at
4 9:24, you know, some version of the agreement,
5 Mr. Roby sent it to himself. Do you see that
6 at 9:24?
7 A. Yes. Yes, sorry.
8 Q. And if we can scroll up just a bit.
9 It looks like -- it's not clear to whom
10 Mr. Roby sent it to, but at 9:28, he had a
11 signed agreement at that time. And he asked
12 about working on a promote structure by the end
13 of April. Do you see that?
14 A. Uh-huh. Yes.
15 Q. So do you recall that there were two
16 different versions of the agreement that were
17 signed, or is that the slip page that you were
18 referring to earlier?
19 A. I don't recall exactly --
20 Q. Okay.
21 A. -- where version control was at that
22 point.
23 Q. Okay. So somebody responds, "Thanks,
24 Ben." It's hard to tell.
25 MR. MORRIS: But keep scrolling up.

Page 97

BH EQUITIES, LLC - D. MILLER
1
2 BY MR. MORRIS:
3 Q. Oh, I guess Mr. Broaddus did. He
4 says, "Thank you, Ben."
5 MR. MORRIS: Keep scrolling up.
6 BY MR. MORRIS:
7 Q. At 9:45, Mr. Chang sends what he says
8 is a fully executed agreement. Do you see
9 that?
10 A. Yes.
11 MR. MORRIS: Keep scrolling up.
12 BY MR. MORRIS:
13 Q. Okay. So a few days later, you sent
14 an e-mail to Mr. Chang and to Mr. Broaddus
15 where you noted a small issue in the agreement.
16 Do I have that correct?
17 A. Correct.
18 Q. Can you describe for me what that
19 small issue was?
20 A. I believe it was just the amount of
21 capital -- exact amount of capital contribution
22 was off slightly.
23 Q. And the piece that was off slightly
24 was the capital contribution amount set forth
25 in Schedule A for BH Equities; is that right?

Page 98

BH EQUITIES, LLC - D. MILLER

1
2  A. Yes, that's my understanding.
3  Q. And so you or somebody acting on
4  behalf of BH Equities was looking at Schedule A
5  and noticed that the capital contribution
6  amount was off by a little bit; is that fair?
7  A. Yes.
8  Q. Okay. And you brought that to
9  Highland's attention, correct?
10  A. Correct.
11  Q. But BH Equities didn't identify
12  anything else about Schedule A that appeared to
13  be in error or by mistake at that time,
14  correct?
15  A. Correct.
16  Q. And let's -- let's just look to see.
17  So you identify the error, and then you say,
18  "As I understand it, several other items
19  related to the agreement will get discussed and
20  an amendment will be coming. Can we make that
21  update at the time of the amendment?"
22       Right? So it was BH Equities'
23  expectation that there would be an amendment;
24  is that right?
25  A. Yes.

Page 99

BH EQUITIES, LLC - D. MILLER

1
2  Q. And that amendment that BH Equities
3  was hoping to have made was specifically
4  limited to the question of whether the
5  6 percent residual interest would be increased;
6  is that right?
7  A. Yes.
8  Q. Okay. And is that -- was the promote
9  an attempt to get value through another means,
10  or is that related to the desire to get the
11  6 percent increase?
12  A. They were one and the same.
13  Q. Oh, okay. So -- so the amendment
14  that -- this is what you were referring to
15  earlier, right, that BH Equities agreed to
16  accept the 6 percent residual interest with the
17  hope and expectation that there would be an
18  amendment that would increase that amount,
19  right?
20  A. Right.
21  Q. And that's the only issue that BH
22  Equities wanted changed in the amended
23  agreement, correct?
24       MR. DOHERTY: Objection.
25

Page 100

BH EQUITIES, LLC - D. MILLER

1
2  BY MR. MORRIS:
3  Q. You can answer.
4  A. The only issue that I was aware of.
5  Again, I'm focused more on the economics,
6  though.
7  Q. Okay. Not -- there is no other
8  provision of the amended agreement that BH
9  Equities ever asked Highland to change except
10  for that number 6. Fair?
11  A. That's my understanding.
12  Q. So let's see what Mr. Broaddus says
13  in response. Okay. Right there. And he
14  suggests the slip page. Do you see that?
15  A. Yes.
16  Q. And he asks a question of Kim and
17  Matt at the bottom about whether the increase
18  in BH Equities' capital contribution would
19  change Highland's contribution or would it be
20  just additional capital to BH only. Do you see
21  that?
22  A. Yes.
23  Q. And the answer to that question was
24  that it was only going to change the capital
25  contribution made by BH Equities, correct?

Page 101

BH EQUITIES, LLC - D. MILLER

1
2  A. I believe so, yes.
3  Q. BH Equities wasn't intending to
4  change the capital contribution of any of the
5  Highland parties, correct?
6  A. No.
7  Q. And then -- and then Mr. Chang
8  weighed in in response and said that, you know,
9  quote, we are fine handling this with a slip
10  page if BH Equities, closed quote, is fine with
11  that. Do you see that?
12  A. Yes.
13  Q. And then Mr. Broaddus responds to
14  that and says that Highland would leave it up
15  to BH Equities because, as he understood it,
16  "we do plan to amend anyways; however, if you
17  want it slip paged in the meantime, we can do
18  that."
19       Have I read that correctly?
20  A. Yes.
21  Q. But no amendment was ever executed,
22  correct?
23  A. Correct.
24  Q. No agreement was ever reached on a
25  modification of any kind to BH Equities'

Page 102

BH EQUITIES, LLC - D. MILLER

1    BH EQUITIES, LLC - D. MILLER
2  residual interest in SE Multifamily, correct?
3      A.  Correct.
4      Q.  Do you know if a slip page was ever
5  inserted in the agreement to make the small
6  change that BH Equities identified to its
7  capital contribution?
8      A.  I believe it was.
9      Q.  So Highland was responsive to
10 BH Equities' request that Schedule A be changed
11 to accurately reflect BH Equities' capital
12 contribution; is that fair?
13     A.  Yes.
14     Q.  Did Highland ever ask BH Equities to
15 make any change to Schedule A at any time after
16 the agreement was executed on March 15, 2019?
17     A.  There was correspondence as KeyBank
18 was paid back in that process and as other
19 assets were sold to get -- get things right as,
20 you know, contributions were paid back along
21 the way.  So there was back-and-forth
22 correspondence.  I don't know if it was
23 specific to update Schedule A, per se, but
24 there were iterative communications ensuring
25 that the capital that was put in was the

Page 103

1    BH EQUITIES, LLC - D. MILLER
2  capital that was paid back, et cetera.
3      Q.  Okay.  So -- so is it fair to say,
4  then, that Highland never asked BH Equities to
5  amend Schedule A, but there were discussions
6  about distributions and cash flow?
7      A.  Yes.
8      MR. MORRIS:  Okay.  Let's go to the
9      next document, which is Exhibit 10.  It's
10     Bates number 716.
11     (Exhibit 10 marked.)
12 BY MR. MORRIS:
13     Q.  Have you seen this e-mail before,
14 sir?
15     A.  Yeah, I believe it was part of our
16 discovery process.
17     Q.  Okay.  And do you see -- this is an
18 e-mail from Mr. Mulcahy of BH Management.  Do I
19 have that right?
20     A.  Yes.
21     Q.  Okay.  And do you see he refers to
22 tranche B debt?
23     A.  Yes.
24     Q.  That's a reference to the KeyBank
25 loan, correct?

Page 104

1    BH EQUITIES, LLC - D. MILLER
2      A.  It is.
3      Q.  And is this again pointing out that
4  $250 million of tranche B was considered
5  contributable capital by HCRE?
6      A.  Yes.
7      Q.  And by August of 2020, that $250
8  million had been paid back; is that right?
9      A.  Yes, that's my understanding.
10     Q.  So that approximately $39 million of
11 original capital that was credited to HCRE had
12 yet to be returned; is that right?
13     A.  Yes, that's my understanding at that
14 time.
15     Q.  Okay.  And do you recall that in the
16 fall of 2020, there were discussions about the
17 return of capital?
18     A.  Yeah.  In that rough time frame, yes.
19     MR. MORRIS:  Let's go to the
20     next exhibit, 482 through 485.
21     MR. DOHERTY:  Mr. Morris, is it -- I
22     just wanted to ask about another break or
23     lunch break.  I don't know, it's your
24     presentation, your deposition.  I know
25     it's around noon.  It's been an hour.

Page 105

1    BH EQUITIES, LLC - D. MILLER
2      MR. MORRIS:  I'm happy to take a
3      short break, but after that break, my goal
4      would be to take it to the finish line
5      because I don't think that I'll have a
6      whole lot more.
7      MR. DOHERTY:  I can defer to -- do
8      you know how much -- the goal there --
9      MR. MORRIS:  It will be another half
10     hour to an hour.  So if you want to take a
11     short break, I'm happy to do that.
12     MR. DOHERTY:  I could use a little --
13     I think -- do you want to do it now, or do
14     you want to go through a couple more?
15     MR. MORRIS:  No, I think now is fine.
16     It's 1:07 here in New York.  Let's just
17     come back at 1:15 and I'll, you know, try
18     to finish up within an hour.
19     MR. DOHERTY:  Okay.  1:15 Central
20     Time, right?
21     MR. MORRIS:  No.  I don't want to
22     take a lunch break.  I want to take --
23     MR. DOHERTY:  Oh, no lunch break.
24     Okay.
25     MR. MORRIS:  No.

Page 106

BH EQUITIES, LLC - D. MILLER

1      BH EQUITIES, LLC - D. MILLER

2      MR. DOHERTY: I just got a call from

3  my -- a personal call. I wanted to be

4  able to call it back. I can jump back on.

5      MR. MORRIS: You go take that --

6  Let's go off the record, please.

7      MR. DOHERTY: Yeah, sorry, off the

8  record.

9      (Recess taken 12:07 p.m. Central Time

10     - 12:17 p.m. Central Time.)

11  BY MR. MORRIS:

12    Q.  So we're at Exhibit 11, Bates number

13  482 to 485. You know what, I'm going to

14  withdraw this exhibit. So just leave a blank

15  in the transcript -- yeah, just leave a blank

16  simply because it's redundant.

17      Let's shift topics, because I've only

18  got a little bit left here, to the topic of

19  distributions, Mr. Thomas. Do you recall that

20  that's one of the 30(b)(6) topics that we had

21  written about?

22    A.  Yes.

23    Q.  Okay. And I think we just confirmed

24  that in the fall of 2020, there were

25  discussions between Highland and BH Equities

Page 107

1  concerning the return of capital. Do you

2  remember that?

3    A.  Yes.

4    Q.  Okay.

5      (Exhibit 12 marked.)

6      MR. MORRIS: So let's put up what's

7  been marked as Exhibit 12, which is a

8  document with Bates number BH 192 to -94.

9      And if we could start at the bottom.

10  BY MR. MORRIS:

11    Q.  Okay. Do you see that Mr. Mulcahy

12  sent an e-mail on Saturday, November 7th to

13  Bonner McDermett and Paul Broaddus with copies

14  to you and Phyllis Jones?

15    A.  Yes.

16    Q.  I don't think we've seen

17  Mr. McDermett's name before. Do you know who

18  Mr. McDermett is?

19    A.  I don't know his exact title, but he

20  has been a correspondent with various

21  properties that we've worked with the Highland

22  entities before, kind of in an acquisition and

23  somewhat asset management type role.

24    Q.  And how about Ms. Jones? Who is

Page 108

1      BH EQUITIES, LLC - D. MILLER

2  that?

3    A.  She's the CFO of BH Companies.

4    Q.  And was there discussions within BH

5  prior to November 7th concerning BH's desire to

6  have its capital returned?

7    A.  Yes.

8    Q.  And did BH Equities express that to

9  Highland in or before November 2020?

10    A.  I don't know the first time it would

11  have been expressed, but, you know, it

12  wasn't -- it was a fairly known fact that we

13  would like to get our capital back.

14    Q.  Okay. And the subject of this

15  e-mail, indeed, is called, quote, Unicorn

16  proposed distribution and detail schedules. Do

17  you see that?

18    A.  Yes.

19    Q.  Okay. And in the second paragraph,

20  Mr. Mulcahy references requested detail as well

21  as a, quote, updated distribution calculation.

22  Do you see that?

23    A.  Yes.

24    Q.  Do you have an understanding of what

25  a distribution calculation is?

Page 109

1      BH EQUITIES, LLC - D. MILLER

2    A.  Yes.

3    Q.  What's your understanding of that

4  term?

5    A.  Just the -- split of the next

6  dollars going out, who is going to get what

7  from -- from the next amount that would be

8  distributed.

9    Q.  And did BH Equities maintain a

10  distribution calculation that it updated from

11  time to time as circumstances changed?

12    A.  Yeah, based on our understanding of

13  the agreements, we did.

14    Q.  And did Highland ask BH Equities to

15  do that, or is that something that BH Equities

16  just did of its own accord?

17    A.  I believe we did it on our own

18  accord.

19    Q.  And did BH Equities share their

20  distribution calculations with Highland from

21  time to time?

22    A.  Yes.

23    Q.  And, in fact, it wasn't attached to

24  this particular document, but Mr. Mulcahy wrote

25  to Highland on November 7th that he was

Page 110

BH EQUITIES, LLC - D. MILLER

1 attaching an updated distribution calculation.
2 Have I read that fairly?
3 A. Yes.
4 Q. And do you see that the updated
5 distribution calculation was for BH, HCRE, and
6 HCM?
7 A. I'd need to see the document, but
8 that would be in line with what I understand
9 from that document.
10 Q. Okay. And it's your understanding
11 that BH refers to BH Equities, correct?
12 A. Yes.
13 Q. And HCRE refers to HCRE Partners,
14 LLC, correct?
15 A. Yes.
16 Q. And HCM refers to Highland Capital
17 Management, L.P., correct?
18 A. Yes.
19 Q. And was it BH Equities' intention to
20 create a distribution calculation that was
21 consistent with the terms and provisions of the
22 amended agreement?
23 A. As we understood them, yes.
24 Q. Okay. And as BH Equities understood

Page 111

BH EQUITIES, LLC - D. MILLER

1 the terms and provisions of the amended
2 agreement on or around November 7th, it
3 prepared a distribution calculation that showed
4 the return of capital to each of the three
5 members of SE Multifamily, correct?
6 A. I -- I'd prefer to see the document
7 to state in the affirmative on that, but that
8 would be in line with, you know, my
9 understanding.
10 Q. And it's in line with what
11 Mr. Mulcahy wrote, correct?
12 A. Yes.
13 Q. There's no question in BH Equities'
14 mind that Mr. Mulcahy told Highland on
15 November 7, 2020 that it had an updated
16 distribution calculation for BH Equities, HCRE,
17 and HCMLP. Fair?
18 A. Yes.
19 Q. Okay.
20 MR. MORRIS: Let's -- let's go up to
21 the response to that, if we could scroll
22 up.
23 BY MR. MORRIS:
24 Q. And you'll see that Mr. McDermett

Page 112

BH EQUITIES, LLC - D. MILLER

1 responded the following Tuesday to that e-mail,
2 and he added Matt McGraner and DC Sauter to the
3 thread. Do you see that?
4 A. Yes.
5 Q. Do you know who Mr. Sauter is?
6 A. Yes.
7 Q. Who is Mr. Sauter?
8 A. He is legal counsel within NexPoint,
9 HCRE, those entities.
10 Q. Had BH Equities dealt with Mr. Sauter
11 on Project Unicorn before November 2020?
12 A. Yes. I don't know -- at one point he
13 was with Wick Phillips as well. And I don't
14 know exactly when he made his transition, but
15 he was involved either as outside counsel or
16 internal, you know, several times throughout
17 the deal.
18 Q. Okay. And Mr. McDermett told
19 Mr. Mulcahy and the others copied on the
20 e-mail, including yourself, that he presented
21 BH Equities' proposed distribution and set of
22 facts to Mr. McGraner and Mr. Sauter, correct?
23 A. Yes.
24 Q. Okay. And a couple of days later, BH

Page 113

BH EQUITIES, LLC - D. MILLER

1 Equities hadn't received a response, so
2 Mr. Mulcahy followed up, is that fair, on
3 November 12th, in the e-mail above, if we can
4 scroll up?
5 A. Yes, I see that.
6 Q. Okay. Okay. Let's see what the
7 response to that is. All right. I'm just
8 going to read the paragraph out loud, and then
9 I'm going to ask you some questions about it.
10 "On November 19th, 2020, Mr. McDermett told
11 you, Mr. Mulcahy, and Ms. Jones, among others,
12 quote, we have confirmed internally that we are
13 standing by our position that distributions may
14 be returned to BH and HCRE in order to
15 extinguish their debts. But the HCMLP
16 bankruptcy is temporarily inhibiting our
17 ability to distribute a return of equity at
18 this time. DC Sauter and our team are working
19 toward a solution there and we will get back to
20 you as soon as we have clearance to move
21 forward with additional distributions (return
22 of equity and profits)."
23 Have I quoted that correctly?
24 A. Yes.

Page 114

BH EQUITIES, LLC - D. MILLER

1    Q.  Okay.  Let's just take this in
2    pieces.  At this moment in time, BH Equities
3    wanted their capital back, right?
4    A.  Correct.
5    Q.  And Highland was refusing to do that,
6    correct?
7    A.  In whole, yes.
8    Q.  Okay.  And their position was that,
9    quote, distributions may be returned to B&H and
10   HCRE in order to extinguish their debts.  Do
11   you see that?
12   A.  Yes.
13   Q.  Do you have an understanding as to
14   what debts are being referred to there?
15   A.  I do.
16   Q.  What debts are being referred to?
17   A.  BH is part of our $21 million --
18   $21.2 or $21.5 million.  Had a $15 million line
19   of credit or debt facility that was drawn to
20   make that investment, and I believe HCRE, it
21   was determined that the entirety of its, you
22   know, 39 or $40 million amount was also
23   borrowed from NexVest Bank and that that's what
24   we were -- what extinguished their debts is

Page 115

BH EQUITIES, LLC - D. MILLER

1    referring to.
2    Q.  All right.  Let me make sure that I
3    understand that.  15 of the $21 million that
4    BH Equities put into the deal was borrowed from
5    a third party.  Do I have that right?
6    A.  That is correct.
7    Q.  And BH Equities' understanding is
8    that the difference between HCRE's capital
9    contribution of approximately $290 million and
10   the $250 million that was borrowed from KeyBank
11   was also borrowed from a third party, that $40
12   million.  Do I have that right?
13   A.  That's our understanding during this
14   time frame.
15   Q.  And it was BH Equities' understanding
16   that Highland's position was that it would
17   permit the repayment of amounts sufficient to
18   allow BH and HCRE to repay in full the
19   third-party debt but nothing more; is that
20   right?
21   A.  Yes.
22   Q.  All right.  So you're in November
23   2020, BH wants its entire initial capital
24   contribution returned, and they're told by HCRE

Page 116

BH EQUITIES, LLC - D. MILLER

1    that only amounts sufficient to repay
2    third-party debt would be permitted, correct?
3    A.  Correct.
4    Q.  Okay.  And then the next sentence
5    says, "But the HCMLP bankruptcy is temporarily
6    inhibiting our ability to distribute a return
7    of equity at this time."
8    Do you see that?
9    A.  Yes.
10   Q.  Do you know what they meant by that?
11   A.  No.  Not -- we were not in the weeds,
12   so to speak, on that.
13   Q.  Did BH Equities ever ask Highland or
14   anybody acting on behalf of the HCMLP
15   bankruptcy would inhibit HCRE's ability to
16   distribute a return of equity in November 2020?
17   A.  I don't know that we asked that
18   directly.  We knew it was a tricky situation
19   and were somewhat deferential to it.
20   Q.  When did BH Equities learn that
21   Highland was in bankruptcy?
22   A.  I don't know a specific date, but it
23   would have been, you know, shortly after the
24   filing, as it started to make the public

Page 117

BH EQUITIES, LLC - D. MILLER

1    rounds.
2    Q.  And how did BH Equities learn of
3    that?  Did they learn it from public
4    information, or did they learn it from anybody
5    acting on behalf of HCRE?
6    A.  I don't recall specifically if we
7    were given a heads-up directly from HCRE or our
8    first knowledge was public information.
9    Q.  You don't have a recollection of
10   anybody on behalf of HCRE specifically
11   informing BH Equities that HCMLP would be
12   filing for bankruptcy, do you?
13   MR. DOHERTY:  Objection, form.
14   BY MR. MORRIS:
15   Q.  You can go ahead.
16   A.  I don't.  And in my preparation, I
17   was not made aware of any contact.  That
18   doesn't mean it didn't happen and I just wasn't
19   able to gather that info.
20   Q.  I'll represent to you that HCMLP
21   filed for bankruptcy in October 2019.  So my
22   question is whether BH Equities had any
23   communications with HCRE at any time prior to
24   November 2020 concerning any impact that the

Page 118

BH EQUITIES, LLC - D. MILLER

1  bankruptcy filing would have on HCRE's ability
2  to make distributions in accordance with the
3  amended agreement.
4      A.  I don't know of anything that
5  specific.  We were very focused at the time on
6  continuing the process to get KeyBank paid off
7  and then kind of taking it stride by stride,
8  given the complication of this very complex
9  transaction.
10      Q.  Okay.  Had anybody acting on behalf
11  of HCRE informed anybody acting on behalf of
12  BH Equities prior to November 19th, 2020 that
13  the HCMLP bankruptcy would have any impact at
14  all on the ability to make distributions?
15      MR. DOHERTY:  Objection, form.
16      A.  Could you repeat the question?
17  BY MR. MORRIS:
18      Q.  Sure.  BH Equities is being told in
19  this e-mail that, quote, the HCMLP bankruptcy
20  is temporarily inhibiting our ability to
21  distribute a return of equity at this time.
22      Do you see that?
23      A.  Yes.
24      Q.  Had anybody acting on behalf of HCRE
25

Page 119

BH EQUITIES, LLC - D. MILLER

1  ever told anybody acting on behalf of
2  BH Equities of that -- of that issue prior to
3  the time you received this e-mail?
4      MR. DOHERTY:  Objection, form.
5      A.  I don't know that there was anything
6  specifically said in that regard.  I'm not
7  aware of anything that specific.  We knew of
8  the bankruptcy from both -- from public -- or
9  not both, but from public forums, and we knew
10  that would have an impact, being that it was a
11  direct partner.  I don't recall any -- or know
12  of any very specific conversation with HCRE
13  about what impact it was going to have.
14  BY MR. MORRIS:
15      Q.  Did anybody from HCRE ever describe
16  for BH Equities the impact that the bankruptcy
17  would have on SE Multifamily or HCRE's ability
18  to make distributions prior to the sending of
19  this e-mail?
20      MR. DOHERTY:  Objection, asked and
21  answered.
22      You may answer, Mr. Thomas, the
23  question.
24      A.  Okay.  Not to my knowledge.
25

Page 120

BH EQUITIES, LLC - D. MILLER

1  BY MR. MORRIS:
2      Q.  Okay.  And then in the next sentence
3  it says that DC Sauter and our team are working
4  toward a solution.
5      Do you see that?
6      A.  Yes.
7      Q.  Did they ever explain -- did anybody
8  acting on behalf of HCRE ever explain to
9  BH Equities what the solution was?
10      A.  No.  Not to my knowledge.
11      Q.  Did BH Equities ever ask Highland or
12  HCRE what the solution was that Mr. Sauter was
13  working towards?
14      A.  I don't know if we had a specific
15  question or conversation about that within the
16  firm.
17      Q.  So if we scroll up, you'll see that
18  Mr. McDermett, I guess, re-sent his e-mail with
19  an attachment.  I don't believe that was
20  attached to the document that we received.  But
21  in any event, Mr. Mulcahy responded at the top
22  of the e-mail chain.  And is it fair to say
23  that in substance --
24      MR. MORRIS:  I think if we could keep
25

Page 121

BH EQUITIES, LLC - D. MILLER

1  scrolling up.  Yeah.
2  BY MR. MORRIS:
3      Q.  Is it fair to say in substance that
4  BH Equities was willing to accept the
5  distributions so that it could repay the
6  third-party debt that it had incurred but still
7  wanted to get the remaining funded capital out
8  of SE Multifamily?
9      A.  I might say it slightly differently.
10      Q.  Okay.
11      A.  HCRE was the manager.
12      Q.  Yep.
13      A.  And they instructed us to do
14  something as the manager of the entity, and
15  that was done.  But, yes, as it's stated
16  clearly here, we hope to find a solution to get
17  our remaining 6.2 million of capital out as
18  well.
19      Q.  Okay.
20      MR. MORRIS:  Let's go to the next
21  exhibit, please, Exhibit 13.
22      (Exhibit 13 marked.)
23  BY MR. MORRIS:
24      Q.  So this is seven months later.
25

Page 122

BH EQUITIES, LLC - D. MILLER

1 Exhibit 13 is a two-page document Bates
2 numbered BH 173 to 174. The second page is
3 just an icon. And at that e-mail at the bottom
4 of the first page, Mr. Mulcahy is raising the
5 exact same issue that he had raised seven
6 months earlier, and that is BH Equities wanted
7 the return of its capital; is that fair?
8    A.  Yes.
9    Q.  Okay. And, in fact, that
10 $6.258 million that he refers to in his e-mail,
11 that's the same amount that he referred to in
12 his e-mail back in November of 2020, because no
13 capital had been distributed since that time,
14 correct?
15    A.  Correct.
16    Q.  And BH Equities pointed out that SE
17 Multifamily had $8 million in its bank account,
18 and so it wanted every dollar of invested but
19 unreturned capital repatriated to it, correct?
20    A.  Yes.
21    Q.  And if you scroll up, Mr. McDermett
22 again calls others to the table, in this case
23 Mr. McGraner and Rob Harris. Do you see that?
24    A.  Yes.

Page 123

BH EQUITIES, LLC - D. MILLER

1    Q.  And at the top, Mr. McGraner -- no,
2 withdrawn.
3       At the top, Mr. McDermett informs
4 Mr. Mulcahy that Mr. McGraner has approved the
5 repatriation of the remaining unpaid capital to
6 BH Equities. Do I have that right?
7    A.  Yes.
8    Q.  And so, in fact, in June of 2021,
9 BH Equities got the last of its capital
10 investment out of SE Multifamily, correct?
11    A.  Yes.
12    Q.  Does SE -- withdrawn.
13       Does BH Equities know whether all of
14 HCRE's original capital contribution has been
15 repatriated?
16    A.  We believe it has at that point.
17    Q.  Does BH Equities know whether the
18 capital contribution made by Highland Capital
19 Management was returned to it?
20    A.  As of the date of this e-mail, we
21 don't believe it has.
22    Q.  Do you know when HCRE's capital
23 contribution was repatriated in full? When was
24 either the month or at least the year when HCRE

Page 124

BH EQUITIES, LLC - D. MILLER

1 had all of its capital returned or at least
2 credited to it?
3    A.  I believe -- my apologies. We're
4 talking about HCRE, correct?
5    Q.  Yes.
6    A.  I believe it was in 2020 when they
7 had received all of their invested capital
8 back.
9    Q.  So -- and is that because all of
10 their invested capital, to the best of
11 BH Equities' understanding, was borrowed from
12 third parties?
13    A.  Yes.
14    Q.  And so the deal was to repatriate all
15 capital contributions that were sourced from
16 third parties, correct?
17    A.  Yes.
18    Q.  So it's BH Equities' understanding
19 that HCRE did not put in any of its own capital
20 in connection with the funding of
21 SE Multifamily, correct?
22    A.  Its own capital being that that
23 wasn't borrowed from a third party, yes, that's
24 correct.

Page 125

BH EQUITIES, LLC - D. MILLER

1    Q.  Okay. And that's why it got paid --
2 well, withdrawn.
3       That's why it was credited with the
4 return of all of its capital before
5 BH Equities; is that fair?
6    A.  Yes.
7       MR. DOHERTY: Mr. Morris -- and you
8 can tell me -- I believe that the witness
9 misunderstood a question a couple back
10 about Highland Capital. I can --
11       MR. MORRIS: Sure, go ahead.
12       MR. DOHERTY: -- identify it now.
13       Okay. You asked about whether he
14 knew Highland Capital had been -- had
15 their capital returned, the 49,000; is
16 that right?
17       MR. MORRIS: Yep.
18       MR. DOHERTY: And then I think
19 Mr. Thomas said as of -- he, I think,
20 added a qualifier, as of the date of this
21 e-mail it hadn't.
22       MR. MORRIS: Right.
23       MR. DOHERTY: But did you mean
24 what -- so was that the intent of your

Page 126

BH EQUITIES, LLC - D. MILLER

1  question, or was it had it been returned
2  at all?
3  MR. MORRIS: I appreciate that.
4  Well, let me try and clean that up, Casey.
5  BY MR. MORRIS:
6  Q. Mr. Thomas, as of the time that --
7  withdrawn.
8  Do you know whether HCMLP's $49,000
9  was original out-of-pocket capital or whether
10 HCMLP borrowed that money as that third-party
11 debt?
12 A. I don't know for certain, as we
13 haven't traced the source, but we're led to
14 believe that it was not borrowed capital.
15 Q. Okay. So in 2020, all borrowed
16 capital was paid back in full, correct?
17 A. Yes.
18 Q. And to the best of BH Equities'
19 knowledge, all of HCRE's capital was borrowed,
20 correct?
21 A. Yes.
22 Q. And by June 2021, all of BH Equities'
23 capital contribution was paid back or credited
24 in full, correct?
25

Page 127

BH EQUITIES, LLC - D. MILLER

1  A. Yes.
2  Q. And that's both the third-party debt
3  as well as the original sourced funding,
4  correct?
5  A. Yes.
6  Q. But HCMLP is the only member who had
7  no capital returned to it, at least as of June
8  2021, correct?
9  A. Correct.
10 Q. Do you know why HCRE and BH Equities
11 was made whole by June 2021 but HCMLP was not?
12 A. That was how we were directed to make
13 payments by the manager.
14 Q. And who on behalf of the manager
15 directed you to make the payments in that
16 manner?
17 A. We coordinated through Mr. McDermett,
18 but it was -- as you can see with his e-mail
19 exchange, I believe the discussion was had with
20 Mr. McGraner, potentially others.
21 Q. Did anybody acting on behalf of the
22 manager explain to BH Equities why it was not
23 instructing BH Equities to make HCMLP whole?
24 A. No.
25

Page 128

BH EQUITIES, LLC - D. MILLER

1  Q. Did BH Equities ask that question?
2  A. I don't believe so.
3  Q. All right. Let's go to -- just two
4  more documents, sir. Let's start with some tax
5  returns.
6  (Exhibit 14 marked.)
7  MR. MORRIS: Can we go to Exhibit 14,
8  which is BH 10 through 75.
9  BY MR. MORRIS:
10 Q. Are you aware that BH Equities
11 produced in response to the subpoena
12 SE Multifamily's tax returns, including K-1s
13 for 2019?
14 A. Yes.
15 Q. And did you review those in
16 preparation for today's deposition?
17 A. Yes.
18 Q. And the document that's on the screen
19 is a cover letter. Do you see that?
20 A. Yes.
21 Q. Is BH Equities aware that a firm
22 called Barker Viggato prepared the tax returns
23 for SE Multifamily?
24 A. Yes.
25

Page 129

BH EQUITIES, LLC - D. MILLER

1  Q. And do you see that this is a
2  letter -- the first page of this exhibit is a
3  letter from Barker Viggato dated September 9,
4  2020?
5  A. Yes.
6  Q. Okay. And can you confirm that
7  BH Equities received this letter with the
8  attachments in or around September 2020?
9  A. Yes.
10 Q. All right. Do you know who was
11 responsible for communicating with Barker
12 Viggato on behalf of SE Multifamily? Was that
13 the manager's job?
14 A. Yes.
15 Q. Okay. I'm not asking -- do you know
16 who on behalf of the manager was primarily
17 responsible for communicating with Barker
18 Viggato?
19 A. I do not.
20 Q. Is it BH Equities' understanding that
21 under the terms of the amended agreement that
22 the manager was responsible for causing SE
23 Multifamily's tax returns to be prepared?
24 A. Yes.
25

Page 130

BH EQUITIES, LLC - D. MILLER

1    BH EQUITIES, LLC - D. MILLER
2    Q.  Okay.  Is it BH Equities'
3    understanding that the manager was responsible
4    for providing the information that Barker
5    Viggato needed to prepare SE Multifamily's tax
6    returns?
7    A.  Yes.
8    Q.  Has Barker Viggato been the firm that
9    has prepared SE Multifamily's tax returns since
10   SE Multifamily was formed in August of 2018?
11   A.  I don't recall specifically if they
12   did the 2018 return.  I do know they did '19
13   and '20.
14   Q.  I appreciate the specificity.
15       So we can take a look at anything you
16   want in this document.  If we turn to the next
17   page, we'll see that it says 2019 Tax Return
18   Filing Instructions.  Do you see that?
19   A.  Yep.
20   Q.  Do you know if SE Multifamily's tax
21   returns for 2019 were ever amended?
22   A.  Not to my knowledge.
23   Q.  Did BH Equities have any discussions
24   with anybody at any time over whether
25   SE Multifamily's 2019 tax returns should be

Page 131

1    BH EQUITIES, LLC - D. MILLER
2    amended?
3    A.  Could you scroll in here?  There
4    should be the allocation of BH Equities in
5    this.  And in one of the years -- and I don't
6    recall if it was '19 or '20 -- we did have a
7    question about, you know, allocations.  So...
8    Q.  Okay.  And would that be the K-1?
9    A.  Yes.
10   Q.  Okay.  We'll get to that in just a
11   moment, and then we'll come back to the
12   question of amendment at that time.
13       Are you aware that K-1s for each of
14   the members of SE Multifamily were included in
15   the package of documents prepared by Barker
16   Viggato?
17   A.  Yes.
18   Q.  Did BH Equities -- withdrawn.
19       Do you know whether any K-1 that was
20   issued to any member of SE Multifamily was ever
21   amended?
22   A.  Not to my knowledge.
23       MR. MORRIS:  Let's go to Bates number
24   17, please.  And if we could scroll down
25   to line 19a.  Yeah, there you go.

Page 132

1    BH EQUITIES, LLC - D. MILLER
2    BY MR. MORRIS:
3    Q.  Do you see 19a refers to
4    distributions of cash and marketable
5    securities?
6    A.  Yes.
7    Q.  And the number there is $267 million?
8    Do you see that?
9    A.  Yes.
10   Q.  Is that the return of the third-party
11   debt that we've been talking about, if you
12   know?
13   A.  The majority of it would have been,
14   yes.
15   Q.  Okay.  Do you know what portion of
16   that would have related to a distribution other
17   than the repayment of third-party debt?
18   A.  I don't specifically without, you
19   know, referencing the work papers or things
20   like that.
21   Q.  Okay.  Hold on one sec.
22       Do you know, who authorizes the
23   making of distributions on behalf of SE
24   Multifamily?
25   A.  The manager would do that.

Page 133

1    BH EQUITIES, LLC - D. MILLER
2    Q.  And who does BH Equities understand
3    the manager to be?
4    A.  HCRE Partners.
5    Q.  Let's go to Bates number 21, please.
6       MR. DOHERTY:  When you're saying
7    Bates 21, Mr. Morris, is that our Bates
8    numbering?  Okay, thank you.  Okay.
9    BY MR. MORRIS:
10   Q.  So this is Schedule B-1.  Do you see
11   that?
12   A.  Yes.
13   Q.  And Highland Capital Management, L.P.
14   is identified as an entity owning 50 percent or
15   more of the partnership.  Do you see that?
16   A.  Yes.
17   Q.  And Highland Capital Management,
18   L.P.'s interest is fixed at 94 percent.  Do you
19   see that?
20   A.  Yes.
21   Q.  And is it BH Equities' understanding
22   that that 94 percent is a reference to that
23   Section 6.4 where 94 percent of the profits and
24   losses are allocated to HCMLP?
25   A.  Yes.

Page 134

BH EQUITIES, LLC - D. MILLER

1
2    Q.  Okay.  Any reason to believe that
3 this portion of the tax return is incorrect or
4 mistaken?
5    A.  No.
6    Q.  Okay.  Nobody ever suggested to you
7 that this page should be amended, correct?
8    A.  No.
9    Q.  All right.
10      MR. MORRIS:  Let's go to -- let's
11     jump to 55.
12 BY MR. MORRIS:
13    Q.  Do you see that this is the K-1 for
14 HCMLP?
15    A.  Yes.
16    Q.  And do you see that, if we can scroll
17 down just a little bit, that the profits and
18 losses for HCMLP with respect to SE Multifamily
19 were approximately 90.6 percent at the
20 beginning of 2016 and they remained at 90.6
21 percent at the end of that year?
22    A.  Yes.
23    Q.  Do you have any understanding as to
24 why it wasn't 94 percent, as set forth in the
25 agreement?

Page 135

BH EQUITIES, LLC - D. MILLER

1
2    A.  No.
3    Q.  Okay.  Do you see that Highland's
4 capital percentage is fixed at 46.06 at the
5 beginning of 2019 and it remained at 46.06 at
6 the end of the year?
7    A.  Yes.
8    Q.  Is that consistent with your
9 understanding of the residual interest that
10 Highland Capital Management, L.P. has in
11 SE Multifamily?
12    A.  Yes.
13    Q.  And did anybody ever tell you that
14 that capital percentage was incorrect or
15 mistaken in any way?
16    A.  No.
17    Q.  And do you see that in the -- in the
18 Box K, Partner's Share of Liabilities, at the
19 beginning of the year there was qualified
20 nonrecourse financing of over $336 million to
21 HCMLP?
22    A.  Yes.
23    Q.  And that by the end of the year it
24 was reduced to an amount just less than a
25 hundred million dollars.  Do you see that?

Page 136

BH EQUITIES, LLC - D. MILLER

1
2    A.  Yes.
3    Q.  Did BH Equities understand that
4 Highland Capital Management, L.P. was a
5 guarantor and was jointly and severally liable
6 under the KeyBank loan?
7    A.  I don't know if we had that specific
8 knowledge.  I don't believe so.
9    Q.  Okay.  Do you know whether the
10 reduction of approximately $238 million in the
11 qualified nonrecourse financing related to the
12 return of capital to KeyBank under the KeyBank
13 loan?
14    A.  Based on my understanding, that is
15 not what that would be related to.
16    Q.  Do you know what it's related to?
17    A.  Typically, the qualified nonrecourse
18 financing relates to nonrecourse financing on
19 the properties underneath the entity, and if
20 there were properties being sold and those
21 debts being extinguished, that would naturally
22 go down.
23    Q.  Is it BH Equities' understanding that
24 at the beginning of 2019, Highland Capital
25 Management, L.P. was liable on a qualified

Page 137

BH EQUITIES, LLC - D. MILLER

1
2 nonrecourse basis to the tune of $336 million
3 in connection with the property that was
4 acquired by SE Multifamily?
5    A.  Liable throws me off in there because
6 of it being nonrecourse financing.
7    Q.  All right.  I'm going to -- I'm going
8 to pretend -- I'm not going to pretend.
9      Do you see Section K is entitled
10 Partner's Share of Liabilities?
11    A.  Yes.
12    Q.  You know what, I'll ask this of
13 somebody else.
14      Can we -- actually, let's just stay
15 here.  And then there's a Partner Capital
16 Account Analysis in Box L.  Do you see that?
17    A.  Yes.
18    Q.  And did BH Equities have any
19 information relating to the partners' capital
20 accounts?
21    A.  No, I don't believe so.
22    Q.  Okay.  Do you see that Highland is
23 shown as having a capital account worth $15.555
24 million at the end of 2019?
25    A.  Yes.

Page 138

1      BH EQUITIES, LLC - D. MILLER
2   Q. Okay. Does BH Equities have any
3 reason to believe that that's a mistake?
4   A. No.
5   Q. Okay. Has anybody ever told
6 BH Equities that they believe Highland had a
7 capital account at the end of 2019 that was
8 something other than the number represented in
9 Box L on Bates-numbered page BH 55?
10   A. No.
11     MR. MORRIS: Can we scroll back up
12   further to the top of this page?
13 BY MR. MORRIS:
14   Q. Do you see that in Box 2, over $30
15 million of rental income is being passed
16 through to Highland from SE Multifamily?
17   A. Yes.
18   Q. And is it BH Equities' understanding
19 that that number in Box 2 should represent
20 90.6119893 percent of SE Multifamily's profits
21 in 2019?
22     MR. DOHERTY: Objection, form.
23   A. Yeah, it's a little nuanced, and I'm
24 not a CPA nor have access to work papers, so I
25 can't specifically say that that -- that number

Page 139

1      BH EQUITIES, LLC - D. MILLER
2 could include multiple other things, and I'm
3 just not privy to that information.
4 BY MR. MORRIS:
5   Q. Okay. Let's go to page 61, which is
6 the K-1 for NexPoint Real Estate Partners.
7     Did there come a time when HCRE
8 Partners, LLC's name was changed to NexPoint
9 Real Estate Partners, LCC?
10   A. I don't recall specifically, but
11 that's -- that's possible, yes.
12   Q. Okay. Do you see that in Part J to
13 this K-1, it shows that the profits and losses
14 were zero percent at the beginning of 2019 and
15 they were zero percent at the end of 2019?
16   A. Yes.
17   Q. And that's consistent with the
18 provision that we looked at earlier in the
19 amended agreement that none of SE Multifamily's
20 profits or losses would be allocated to HCRE,
21 correct?
22   A. Correct.
23   Q. Okay. And the capital, though, is
24 set at 47.94 percent at the beginning of the
25 year, and it remains steady until the end of

Page 140

1      BH EQUITIES, LLC - D. MILLER
2 the year, correct?
3   A. Correct.
4   Q. And that's consistent with the
5 residual interest that we saw on Schedule A to
6 the amended agreement, correct?
7   A. Yes.
8   Q. Okay. And then if you look to the
9 right in Box 19 -- well, actually, if you look
10 up in Box 2, you'll see there's nothing there,
11 right?
12   A. Yes.
13   Q. So that none of SE Multifamily's
14 profits were passed through to HCRE or its
15 successor, correct?
16   A. Correct.
17   Q. And Box 19 in the Distributions, that
18 $250 million was the money that was paid back
19 to HCRE in 2019 so that it could pay off the
20 KeyBank loan, tranche B, correct?
21   A. Potentially with other distributions,
22 but, yes, but it would have been the total
23 distributions received and then applied to
24 KeyBank or other sources.
25   Q. Are you aware of any distributions

Page 141

1      BH EQUITIES, LLC - D. MILLER
2 that were made to HCRE in 2019 other than
3 amounts sufficient to repay the third-party
4 debt?
5   A. I don't believe so.
6   Q. Okay. And let's go to the next K-1,
7 which I think is BH Equities, page 64. All
8 right. This is BH Equities' K-1. Do you see
9 that?
10   A. Yes.
11   Q. Now, do you see the profit and loss
12 there is a shade under 5.8 percent at the
13 beginning of the year and the same at the end
14 of the year?
15   A. Yes.
16   Q. Do you know why that's not 6 percent?
17   A. Not without reviewing work papers or
18 things, no.
19   Q. Okay. But the residual percentage
20 interest is -- was 6 percent at the beginning
21 of the year and it was 6 percent at the end of
22 the year, right?
23   A. Yes.
24   Q. And that's again consistent with
25 Schedule A to the amended agreement, correct?

Page 142

BH EQUITIES, LLC - D. MILLER

2  A.  Correct.

3  Q.  And nobody ever suggested that either

4  HCMLP's or HCRE's or BH Equities' 2019 K-1s

5  were incorrect in any way, correct?

6  A.  Correct.

7  Q.  Okay.  Do you see there's a

8  distribution there in Box 19 of $46,000?

9  A.  Yes.

10  Q.  Do you have any idea why BH Equities'

11  K-1 for 2019 shows that it received a

12  distribution of $46,926?

13  A.  No, other than seeing there's a

14  footnote A or a notation A next to it, which

15  may have more description.

16      MR. DOHERTY:  Mr. Morris, can you

17  show the witness A?  May I ask that?

18      MR. MORRIS:  Yeah, I'm looking for

19  it.  I actually -- if we could scroll

20  down, the next -- the next page is Code Z.

21  The next page -- I don't see it there.

22  Yeah, I don't see it.  So I'll just move

23  on.  I can only work with what I have.

24  BY MR. MORRIS:

25  Q.  And then let's go to Bates number 70,

Page 143

BH EQUITIES, LLC - D. MILLER

2  please.  And this is the K-1 for Liberty,

3  correct?

4  A.  Yes.

5  Q.  And they have zero percent capital at

6  the beginning of the year and at the end of the

7  year because they didn't make an equity

8  investment in SE Multifamily, correct?

9  A.  It was a preferred equity investment,

10  which would be treated differently.

11  Q.  Correct.  And they got distributions

12  of approximately $17 million, as reflected in

13  paragraph -- in Section 19, because they were

14  preferred holders and they were entitled to get

15  paid first, correct?

16  A.  Yes.

17  Q.  Do you know why they were allocated

18  3.6 percent of the profits and losses in 2019?

19  A.  I don't, no.

20  Q.  Did you know that they were allocated

21  3 percent of the profits and losses in 2019

22  before now?

23  A.  Only from reviewing the documentation

24  and things.

25  Q.  No agreement was ever -- no amendment

Page 144

BH EQUITIES, LLC - D. MILLER

2  to the amended agreement was ever made to

3  change the allocation set forth in Section 6.4,

4  right?

5  A.  Not that I'm aware.

6      MR. MORRIS:  Let's go to the last

7  exhibit, 15, BH 76 to 78.

8      (Exhibit 15 marked.)

9  BY MR. MORRIS:

10  Q.  And do you see this is BH Equities'

11  K-1 for 2020?

12  A.  Yes.

13  Q.  All right.  Let's just scroll down a

14  little bit.  It's just a two-page -- I guess

15  it's a three-page document.

16      In looking at it, does it refresh

17  your recollection -- I had asked you earlier

18  whether there was ever any discussion at any

19  time about filing an amendment to any of SE

20  Multifamily's tax returns or the K-1s at issue.

21  Do you remember that question?

22  A.  Yes, I remember that question.

23  Q.  And I think you testified that there

24  may have been?

25  A.  We had questions.  If you could

Page 145

BH EQUITIES, LLC - D. MILLER

2  scroll up on this.  We were curious as to why

3  there was no allocation in Box 1 or 2 to

4  BH Equities in 2020.

5  Q.  Oh, okay.  So the question was why

6  did BH Equities not receive any allocation of

7  ordinary business income or net rental income

8  from the real estate; is that right?

9  A.  Correct.

10  Q.  Did BH Equities ever get an answer to

11  that question?

12  A.  I don't believe we did.

13  Q.  But BH Equities' allocation of

14  profits and losses doesn't seem to have

15  changed, right?  It's the same 5.78 percent as

16  it was in 2019, at least according to the K-1s,

17  correct?

18  A.  Correct.

19  Q.  Do you know if this K-1 was reported

20  to the IRS?

21      MR. DOHERTY:  Objection, form.  What

22  is reported?  Was it filed, John?

23      MR. MORRIS:  Yeah, that's a fair

24  question.

25

Page 146

BH EQUITIES, LLC - D. MILLER
1
2  BY MR. MORRIS:
3      Q.  Yeah.  Do you know if this K-1 was
4  ever filed with the IRS?
5      A.  I don't.  It would have been the
6  manager's responsibility to file the tax return
7  on behalf of the entity, and then BH Equities,
8  given our complex nature, you know, has a very
9  complicated tax return.  So its information
10  would have been used in the broader
11  BH Equities' filing, but we wouldn't have sent
12  this directly attached to our tax return, per
13  se.
14      Q.  Okay.  I appreciate the
15  clarification.
16          Did BH Equities rely on the
17  information in this K-1 to prepare its tax
18  returns for 2020?
19          MR. DOHERTY:  Object.  I don't -- I'm
20  just making this objection in caution.  I
21  think this is a little outside the scope.
22  I mean, I know if you're going places, but
23  if this involves, like, tax advice from
24  attorneys or something, then don't go into
25  detail on that.  I just wanted to -- it's

Page 147

BH EQUITIES, LLC - D. MILLER
1
2  fair.  If there's a question pending, you
3  can answer the question.
4  BY MR. MORRIS:
5      Q.  Look, the question is really simple,
6  Mr. Thomas.  Is this a draft document, or is
7  this something that BH Equities has actually
8  relied upon in the preparation of its tax
9  returns for 2020?
10      A.  Those aren't necessarily the same
11  question.  Or it's not --
12      Q.  I understand.  I'm trying to clean it
13  up and make it as simple as I can to show
14  you --
15      A.  Well, there's not -- sorry to be
16  difficult.  Those aren't the only two
17  possibilities.  And my understanding is
18  we may -- we may have taken a different stance
19  as it is our tax return.  So that's why I'm --
20  I'm saying it was not delivered to us as a
21  draft so that we believed this was the K-1
22  delivered to us, even though we had questions.
23          I can't affirm -- I can't say that we
24  relied on it because I believe we took a
25  different course, as is our right with our

Page 148

BH EQUITIES, LLC - D. MILLER
1
2  taxes.
3      Q.  Why did BH Equities take a different
4  course?  What does that mean?
5          MR. DOHERTY:  Objection, form.
6  BY MR. MORRIS:
7      Q.  You can answer.
8          MR. DOHERTY:  Well, you can answer --
9  again, I think this is outside the scope,
10  but if it involves outside attorney's
11  advice about your taxes, then you need to
12  be careful if you need to -- if you think
13  you're getting attorney advice, then you
14  need to be careful.
15      A.  Yeah, I think it would be just
16  related to internal decision making.
17  BY MR. MORRIS:
18      Q.  Internal decision making is not a
19  reason to not share the answer with me.
20          MR. DOHERTY:  Mr. Thomas, if it's
21  legal counsel, then --
22          MR. MORRIS:  Then you should say so.
23  Then you should say so.
24          MR. DOHERTY:  Right.
25          If you can answer without that, then

Page 149

BH EQUITIES, LLC - D. MILLER
1
2  you can answer the question.
3      A.  We just took a more conservative
4  approach and allocated 6 percent of the net
5  income into our tax liability, given the
6  complexity of our return.
7  BY MR. MORRIS:
8      Q.  I just want to make sure that I
9  understand correctly, that notwithstanding
10  what's stated on this K-1, BH Equities made the
11  decision to allocate to itself 6 percent of
12  SE Multifamily's profits in 2020; is that
13  right?
14      A.  For the purposes of taxes, yes.
15      Q.  Yes.  Okay.  Did BH Equities ever
16  discuss that decision with anybody acting on
17  behalf of HCRE?
18      A.  No.
19      Q.  Did BH Equities ever discuss that
20  decision with anybody acting on behalf of
21  Barker Viggato?
22      A.  No.
23      Q.  Did BH Equities ever discuss this K-1
24  with anybody at Barker Viggato?
25      A.  I don't know for sure.  I know there

Page 150

BH EQUITIES, LLC - D. MILLER

1    BH EQUITIES, LLC - D. MILLER
2    was an e-mail request -- or an e-mail ask on
3    this K-1, and I don't know for sure if Barker
4    Viggato people were included or not on that or
5    if it was just directed to HCRE.
6        Q.   Okay.
7            MR. MORRIS:  If we can scroll down
8        just a little bit.
9    BY MR. MORRIS:
10       Q.   Do you see Box L?
11       A.   Yes.
12       Q.   And there's an ending capital account
13   of approximately $8.5 million.  Do you see
14   that?
15       A.   Yes.
16       Q.   Since all of the original funded
17   capital has been returned with the exception of
18   Highland's $49,000, is it fair to say that that
19   number, $8.5 million, equals approximately
20   6 percent of the capital accounts among the
21   members of SE Multifamily?
22       A.   The tax capital account, yes.  That
23   would be my understanding.
24       Q.   Okay.  So that -- would it be
25   BH Equities' expectation that HCMLP's capital

Page 151

BH EQUITIES, LLC - D. MILLER

1    BH EQUITIES, LLC - D. MILLER
2    account would be approximately five to six
3    times bigger than that because they have a
4    46.06 percent residual interest?
5        A.   Not necessarily.
6        Q.   Is there a relationship between
7    BH Equities' capital account and the capital
8    accounts of the other members, given that all
9    of the original capital contributions have been
10   paid in full but for HCMLP?
11           MR. DOHERTY:  Objection.  I think
12       that mischaracterizes --
13           MR. MORRIS:  You've got the -- you've
14       got the objection.  I'm going to cut you
15       off this time.
16       A.   Relationship, yes.  But it's not a
17   direct linear relationship given how tax --
18   given how tax remedies work and allocations of
19   profit and loss, capital, those things.  So
20   it's not a simple linear relationship.
21   BY MR. MORRIS:
22       Q.   All right.  Let's shift gears now,
23   last topic, no documents.  Actually, just hold
24   on one second.
25           Okay.  Let's just shift gears and

Page 152

BH EQUITIES, LLC - D. MILLER

1    BH EQUITIES, LLC - D. MILLER
2    finish this up.  If we could go back to the
3    subpoena, which I think was Exhibit 1.  Again,
4    page 2 of the exhibit, PDF page 9 of 13.  And I
5    know I asked a couple of questions, but I said
6    we'd come back to it.
7            So we're on topic 4, and remember I
8    defined what's in the parenthetical there as
9    HCRE's contention.  Do you remember that?
10       A.   Yes.
11       Q.   Okay.  Really, I don't have a lot
12   here.  Do you recall when BH Equities first
13   learned of HCRE's contention as set forth in
14   topic 4?
15       A.   I believe it would have been, I don't
16   know, a few days after filings or something
17   along those lines, as we tried to pay
18   attention.
19       Q.   When do you think it was?
20       A.   Shortly after the filing of it, once
21   it was on the public record.
22       Q.   And how did -- how did BH Equities
23   learn of the contention?
24       A.   I think we'd been an interested party
25   in the case as it relates to SE Multifamily, so

Page 153

BH EQUITIES, LLC - D. MILLER

1    BH EQUITIES, LLC - D. MILLER
2    we were paying attention to the court records
3    and things.
4        Q.   Did BH Equities have any source of
5    information other than court records by which
6    it learned of HCRE's contention?
7        A.   I don't believe so.
8        Q.   Okay.  So is it fair to say that to
9    the best of your recollection, BH Equities
10   relied exclusively on what was on the court
11   record in order to learn about HCRE's
12   contention?
13       A.   To the best of my knowledge.
14       Q.   Okay.  Do you know whether BH
15   Equities has ever discussed this contention
16   with anybody at HCRE?
17       A.   Not to my knowledge.
18       Q.   Do you know if anybody acting on
19   behalf of BH Equities has ever communicated
20   with anybody at HCRE concerning the contentions
21   set forth in topic 4?
22       A.   Not to my knowledge.
23       Q.   Do you know whether HCRE, in its
24   capacity as the manager, has ever done anything
25   to address the mistake that's described in its

Page 154

BH EQUITIES, LLC - D. MILLER

1 contention other than file with a proof of
2 claim?
3     A. Not to my knowledge. I don't believe
4 so.
5     Q. And also with -- they also, at least
6 in November 2020, decided to withhold --
7 withdrawn.
8     Other than responding to the
9 subpoena, has BH Equities done anything in
10 response to learning about the contentions set
11 forth in paragraph -- topic 4?
12     MR. DOHERTY: Objection. If this --
13 if this involves legal discussions, then
14 you are not to answer, but you can follow
15 the question.
16     A. I don't believe we've taken any --
17 any business action in regard to this
18 contention.
19 BY MR. MORRIS:
20     Q. Okay. Does BH Equities have a view
21 as to whether the contention is fair and
22 accurate?
23     MR. DOHERTY: Objection.
24
25

Page 155

BH EQUITIES, LLC - D. MILLER

1 BY MR. MORRIS:
2     Q. Well, let me ask a different
3 question. Does BH Equities believe that the
4 organizational documents relating to
5 SE Multifamily improperly allocate the
6 ownership percentages of the members thereto
7 due to mutual mistake, lack of consideration,
8 and/or failure of consideration?
9     MR. DOHERTY: Objection.
10 BY MR. MORRIS:
11     Q. You can answer.
12     MR. DOHERTY: Form.
13     You can answer, Mr. Thomas.
14     A. I don't know that I can answer
15 specifically because, again, we viewed it as a
16 bilateral negotiation at the time, and that
17 would take into account the parties'
18 consideration that we just didn't have -- we
19 weren't privy to nor frankly had an interest in
20 knowing at the time.
21 BY MR. MORRIS:
22     Q. Is it fair to say that BH Equities
23 does not have a position as to whether or not
24 the organizational documents relating to
25

Page 156

BH EQUITIES, LLC - D. MILLER

1 SE Multifamily improperly allocated the
2 ownership percentages of the members thereto
3 due to mutual mistake, lack of consideration,
4 and/or failure of consideration?
5     A. Yes. We do not have a position on
6 that.
7     MR. MORRIS: I have no further
8 questions.
9     MR. DOHERTY: Mr. Morris, I'd like to
10 ask one or two questions on redirect to
11 clarify something. Is that okay to do it
12 now, or would you like a --
13     MR. MORRIS: No, I think you should
14 do it now.
15     EXAMINATION
16 BY MR. DOHERTY:
17     Q. Mr. Thomas, I'm going to ask you a
18 couple of questions as if we were in court, you
19 know, as you were with Mr. Morris.
20     During the testimony, I believe --
21 I'm unsure how it came about exactly, but you
22 were asked questions that did Highland Capital
23 Management ever receive their capital
24 contribution back, and you answered at one

Page 157

BH EQUITIES, LLC - D. MILLER

1 point that they had not received it as of June
2 9th, 2021; is that correct?
3     A. That is correct.
4     Q. Were you referring to the $49,000 in
5 capital that's reflected on Schedule A?
6     A. Yes.
7     Q. Has Highland Capital, to BH's
8 knowledge, now received that $49,000?
9     A. Yes.
10     MR. DOHERTY: No further questions.
11     MR. MORRIS: I have nothing further.
12     MR. GAMEROS: No questions, either.
13     (Discussion off the record.)
14     MR. DOHERTY: And for the transcript,
15 now that we're on the phone, is that
16 something where y'all will -- we'll get it
17 e-mailed to us for checking it for errata
18 and everything --
19     MR. MORRIS: Sure.
20     MR. DOHERTY: -- Ms. McMoran?
21     THE REPORTER: Yes, for read and
22 sign, we'll send it to you, Mr. Doherty.
23     Mr. Gameros, did you need a copy of
24 this one, too?
25

Page 158

1  BH EQUITIES, LLC - D. MILLER
2  MR. GAMEROS: Yes.
3  MR. MORRIS: I'm expediting this.
4  THE REPORTER: Mr. Gameros, did you
5  need it expedited as well?
6  MR. GAMEROS: Yes.
7  (Time noted: 1:23 p.m. Central Time)
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 159

1
2  IN THE UNITED STATES BANKRUPTCY COURT
3  FOR THE NORTHERN DISTRICT OF TEXAS
4  DALLAS DIVISION
5  IN RE:  )
   ) CHAPTER 11
6  HIGHLAND CAPITAL  )
   MANAGEMENT, L.P.,  ) CASE NO. 19-34054-SGJ11
7  )
   Reorganized Debtor.  )
8
9  REPORTER'S CERTIFICATION
10  BH EQUITIES, LCC
11  BY AND THROUGH ITS DESIGNATED REPRESENTATIVE
12  DUSTIN "DUSTY" THOMAS
13  AUGUST 4, 2022
14
15  I, Janice K. McMoran, RDR, CRR, TCCR,
16  and Certified Shorthand Reporter in and for the
17  State of Texas, hereby certify to the following:
18  That the witness, BH EQUITIES, LCC BY AND
19  THROUGH ITS DESIGNATED REPRESENTATIVE DUSTIN
20  "DUSTY" THOMAS, was duly remotely sworn by the
21  officer, and that the transcript of the oral
22  deposition is a true record of the testimony given
23  by the witness;
24  I further certify that pursuant to
25  Federal Rules of Civil Procedure, Rule 30(e)(1)(A)

Page 160

1
2  and (B) as well as Rule 30(e)(2), that review of
3  the transcript and signature of the deponent:
4  __X___ was requested by the deponent or
5  a party before the completion of the deposition and
6  is to be returned within 30 days from date of
7  receipt of the transcript if returned, the
8  attached Errata contains any changes and the
9  reasons therefor;
10  _____ was not requested by the deponent
11  or a party before the completion of the deposition.
12  I further certify that I am neither
13  counsel for, related to, nor employed by any of the
14  parties or attorneys to the action in which this
15  proceeding was taken. Further, I am not a
16  relative or employee of any attorney of record in
17  this cause, nor am I financially or otherwise
18  interested in the outcome of the action.
19  Subscribed and sworn to on this the 4th
20  day of August, 2022.
21
22  _____
23  JANICE K. McMORAN, RDR, CRR, TCRR
24  Texas CSR #1959
25  Expiration Date: 2/28/23

Page 161

1  ACKNOWLEDGMENT OF DEPONENT
2
3  I, DUSTIN "DUSTY" THOMAS, do hereby
4  certify that I have read the foregoing pages, and
5  that the same is a correct transcription of the
6  answers given by me to the questions therein
7  propounded, except for the corrections or changes
8  in form or substance, if any, noted in the attached
9  Errata Sheet.
10
11
12  _____
13  DUSTIN "DUSTY" THOMAS  DATE
14
15
16
17
18
19
20
21
22
23
24
25

Page 162

```
1       ERRATA SHEET
2   Case Name:
3   Deposition Date:
4   Deponent:
5   Pg.  No. Now Reads   Should Read  Reason
6   ____ ___ _____  _____  _____
7   ____ ___ _____  _____  _____
8   ____ ___ _____  _____  _____
9   ____ ___ _____  _____  _____
10  ____ ___ _____  _____  _____
11  ____ ___ _____  _____  _____
12  ____ ___ _____  _____  _____
13  ____ ___ _____  _____  _____
14  ____ ___ _____  _____  _____
15  ____ ___ _____  _____  _____
16  ____ ___ _____  _____  _____
17  ____ ___ _____  _____  _____
18  ____ ___ _____  _____  _____
19  ____ ___ _____  _____  _____
20
21      _____
22           Signature of Deponent
    SUBSCRIBED AND SWORN BEFORE ME
23  THIS ____ DAY OF _____, 2022.
24  _____
25  (Notary Public)  MY COMMISSION EXPIRES:_____
```

Page 163

```
1       FURTHER CERTIFICATION UNDER RULE 203 TRCP
2       The original deposition was/was not returned to the
3   deposition officer on _____, 2022;
4       If returned, the attached Changes and Signature
5   page contains any changes and the reasons therefor;
6       If returned, the original deposition was delivered
7   to _____, Custodial Attorney;
8       That $_____ is the deposition officer's
9   charges to the Defendant for preparing the original
10  deposition transcript and any copies of exhibits;
11      That the deposition was delivered in accordance
12  with Rule 203.3, and that a copy of this certificate was
13  served on all parties shown herein on and filed with the
14  Clerk.
15      Certified to by me this _____ day of
16  _____, 2022.
17
18
        _____
19      JANICE K. McMORAN, RDR, CRR, TCRR
20      TSG Reporting
21      Firm Registration No. 615
22
23
24
25
```

**$**

**$15** 114:19

**$15.555** 137:23

**$17** 143:12

**$21** 34:15,23 35:15, 20 36:18 39:6 114:18 115:4

**$21.2** 114:19

**$21.5** 114:19

**$238** 136:10

**$250** 86:15 104:4,7 115:11 140:18

**$267** 132:7

**$290** 86:7 115:10

**$30** 138:14

**$336** 135:20 137:2

**$39** 104:10

**$40** 85:24 86:21,24 114:23 115:12

**$46,000** 142:8

**$46,926** 142:12

**$49,000** 52:12,25 60:23 61:7 126:9 150:18 157:5,9

**$6.258** 122:11

**$8** 122:18

**$8.5** 150:13,19

**(**

**(a)** 93:2,5

**(d)** 59:15

**(e)** 90:8,10,19 93:2,11

**-**

**-38** 88:23

**-67** 81:2

**-73** 74:7

**-94** 107:9

**1**

**1** 16:23 19:9 20:8 145:3 152:3

**1.1** 91:18

**1.7** 56:5,6,9,15,25 57:16

**10** 13:12 103:9,11 128:9

**10:00** 7:4

**11** 106:12

**1140** 94:19

**11:03** 60:13

**11:12** 60:14

**11:20** 94:24

**12** 62:16 107:6,8

**1271** 74:7 80:3

**1272** 80:3

**1273** 80:3

**12:03** 59:25

**12:07** 106:9

**12:10** 60:2,10

**12:17** 106:10

**12th** 113:4

**13** 121:22,23 122:2 152:4

**133** 71:18

**1363** 81:2

**1366** 81:22

**1367** 81:22

**14** 128:7,8

**1437** 88:22

**14th** 43:2 76:4,10

**15** 23:23 75:9 78:12 80:19 102:16 115:4 144:7,8

**15th** 19:20 49:17 50:7 74:12,21 75:19 78:14 91:6 94:22

**17** 131:24

**173** 122:3

**174** 122:3

**19** 39:4 66:22 130:12 131:6 140:9,17 142:8 143:13

**192** 107:9

**1959** 7:10

**19a** 131:25 132:3

**19th** 113:11 118:13

**1:07** 105:16

**1:15** 105:17,19

**1:23** 158:7

**2**

**2** 17:10 20:13 40:15, 16 92:12 138:14,19 140:10 145:3 152:4

**20** 130:13 131:6

**2016** 134:20

**2018** 24:3,25 31:2,11, 16 33:17,19,23 34:3, 7,10,12 35:15 36:15 39:2,5 69:14 71:6 74:25 75:7,20 130:10,12

**2019** 19:20 23:23 74:12 75:9 78:12 80:19 102:16 117:22 128:14 130:17,21,25 135:5 136:24 137:24 138:7,21 139:14,15 140:19 141:2 142:4, 11 143:18,21 145:16

**2020** 104:7,16 106:24 108:9 111:16 112:12 113:11 115:24 116:17 117:25 118:13 122:13 124:7 126:16 129:5,9 144:11 145:4 146:18 147:9 149:12 154:7

**2021** 123:9 126:23 127:9,12 157:3

**2022** 7:4

**17**

**21** 133:5,7

**21.5** 34:9

**23rd** 24:2 74:25 75:7

**250** 86:8

**26** 30:4 33:5

**26th** 24:24 32:24 35:8

**277** 95:22

**282** 95:22

**2:02** 80:20

**3**

**3** 21:3 68:5,7 143:21

**3.6** 143:18

**30(b)(6)** 106:20

**39** 114:23

**4**

**4** 21:14,16 22:20 71:17,19 152:7,14 153:21 154:12

**40** 86:9

**40-plus** 88:4

**44** 71:18

**46.06** 52:15,23 60:22 61:3,8 62:8 93:7 135:4,5 151:4

**47.94** 93:6 139:24

**482** 104:20 106:13

**485** 104:20 106:13

**49,000** 125:16

**4th** 7:4

**5**

**5** 13:12 21:15 22:15 74:6,8

**5.78** 145:15

**5.8** 141:12

**50** 133:14

**55** 134:11 138:9

**6**

**6** 36:22 37:3,4 38:8, 11,17,24 47:15,24 48:6,10 61:12 63:8 66:17,23 80:23,25 89:21 93:7 99:5,11, 16 100:10 141:16,20, 21 149:4,11 150:20

**6.1** 57:20 84:19,24 91:18 92:6,12,25 94:13 95:10,15

**6.1(a)** 58:9

**6.2** 121:18

**6.4** 62:17 84:20,23 85:3 133:23 144:3

**6.4(a)** 62:15,17,21 64:22 65:3

**61** 139:5

**64** 141:7

**7**

**7** 69:13 71:6 88:20,21 111:16

**70** 142:25

**716** 103:10

**75** 128:9

**76** 144:7

**78** 144:7

**7th** 73:25 107:13 108:5 109:25 111:3

**8**

**8** 94:18,20

**9**

**9** 95:19 129:4 152:4

**9.3** 59:2,5,9

**9.3(a)** 59:15

**90.6** 134:19,20

**90.6**119893 138:20

**92** 68:14

**94** 62:22 63:7 64:3 133:18,22,23 134:24

**9:24** 96:4,6

**9:28** 96:10

**9:45** 97:7

**9th** 157:3

**A**

**a.m.** 7:4 60:13

**abide** 46:12

**ability** 113:18 116:7, 16 118:2,15,21 119:18

**accept** 99:16 121:5

**acceptable** 27:14 60:25 61:5 94:10

**accepted** 94:12

**access** 138:24

**accommodate** 11:24

**accord** 109:16,18

**accordance** 53:23 118:3

**account** 35:11 122:18 137:16,23 138:7 150:12,22 151:2,7 155:18

**accounting** 18:21

**accounts** 93:24 137:20 150:20 151:8

**accurate** 52:2 154:23

**accurately** 54:6,11 64:22 102:11

**acquired** 137:4

**acquiring** 13:11 44:24

**acquisition** 33:5 44:23 71:7 107:23

**acting** 14:14,17,19 25:3 50:7 51:2 54:15, 25 55:15 64:15,25 65:24 72:5,14 77:23 98:3 116:15 117:6 118:11,12,25 119:2 120:9 127:22 149:16, 20 153:18

**action** 154:18

**actively** 25:8

**actual** 34:13,16 35:16 76:16,21

**added** 112:3 125:21

**addition** 25:16

**additional** 36:9 100:20 113:22

**address** 153:25

**adequately** 20:20

**administering** 7:10

**adopted** 91:19

**advice** 146:23 148:11,13

**affect** 61:11

**affected** 45:25

**affiliated** 83:8 87:23 88:18

**affiliates** 30:6

**affirm** 147:23

**affirmative** 111:8

**affirmatively** 55:4

**agent** 32:17

**agree** 8:22 57:15

**agreed** 36:20 48:12 52:22 58:23,24 61:14 62:12,21 86:14 99:15

**agreement** 10:14 16:2,20 19:15,19,24, 25 20:10 23:22 24:2, 7,10 25:5,11,22 26:3, 10,14 27:11,24 28:7, 12 31:10 34:11 35:16 36:15 37:24 38:7,13, 23 39:7,8,15 40:12 42:14,18,21 43:5,10

44:5 45:14 46:4,9,10, 13,15,18 47:23 48:9, 13,16 49:2,6,7,17,18 50:9,17,18,22 51:4 52:5,20 54:5,10,14, 24 55:14,22 57:13 59:21 60:20 61:22 62:12 64:7 65:2,6,17, 21,25 66:2,5,6,9,11 67:18 68:10 70:5 71:5,24 72:25 73:6, 12,14,19,21 74:2,11, 15,25 75:2,7,18 76:9, 25 77:15,20 78:10 85:21 91:20 92:6,15 95:4 96:4,11,16 97:8, 15 98:19 99:23 100:8 101:24 102:5,16 110:23 111:3 118:4 129:22 134:25 139:19 140:6 141:25 143:25 144:2

**agreements** 85:23 109:13

**ahead** 37:18,19 45:13 117:16 125:12

**air** 34:25 69:25

**allocate** 149:11 155:6

**allocated** 62:24 64:8,12,17 133:24 139:20 143:17,20 149:4 156:2

**allocating** 64:3 83:17

**allocation** 24:14 63:2,7,18,19,20 83:25 84:10,18,20, 21,25 85:4,9,16 131:4 144:3 145:3,6, 13

**allocations** 21:5 24:16 62:18 131:7 151:18

**alongside** 12:23 20:10

**alternative** 14:4

**amend** 48:12 66:17 101:16 103:5

**amended** 15:15,25 19:14,19,24 23:22 24:6 25:5,11,22 26:3, 9 27:11,23 28:7 37:23 38:7 42:14 43:4,9 46:4,9,10,17 48:16 49:6 50:9,17, 18,22 52:5,20 54:5, 24 55:14,22 60:19 64:7 65:2,6,7,17,21, 25 66:2,5,10,11 67:17 73:15,19 74:2 75:6 76:9,24 77:19 91:20 92:6,15 99:22 100:8 110:23 111:2 118:4 129:22 130:21 131:2,21 134:7 139:19 140:6 141:25 144:2

**amendment** 49:3 65:17,20 67:10,17,23 98:20,21,23 99:2,13, 18 101:21 131:12 143:25 144:19

**amendments** 67:5

**amount** 66:17 97:20, 21,24 98:6 99:18 109:7 114:23 122:12 135:24

**amounts** 93:13,15 115:18 116:2 141:3

**analysis** 47:12 48:20 137:16

**analyst** 14:3,4

**and/or** 155:9 156:5

**annoying** 90:14

**answering** 40:2

**answers** 11:8 51:25

**apologies** 124:4

**apologize** 44:20 85:6

**app** 35:5

**appearances** 7:16

**appeared** 98:12

**appears** 89:6

**applied** 140:23

**appreciated** 96:2

**approach** 149:4

**approved** 123:5

**approximately** 11:4 34:9 86:3 104:10 115:10 134:19 136:10 143:12 150:13,19 151:2

**April** 96:13

**arrived** 35:22

**Article** 58:15,16

**arts** 13:19

**Asia** 14:23 79:22

**asks** 71:22 100:16

**aspect** 50:8

**assent** 9:3

**asset** 107:24

**assets** 24:22 59:16 102:19

**assistant** 14:23

**assume** 36:14

**attached** 76:15 77:6, 10 79:17 80:13,19 81:3 82:13 85:8 89:19 109:23 120:21 146:12

**attaches** 95:4

**attaching** 110:2

**attachment** 17:10 79:18 80:7 81:4,7,16, 22 82:4,7 83:17 120:20

**attachments** 129:9

**attempt** 11:13 99:9

**attention** 39:17 68:12 98:9 152:18 153:2

**attorney** 9:15 148:13

**attorney's** 148:10

**attorneys** 45:6 47:12 146:24

**August** 7:3 24:2

Index: authorizes..capital

31:11 34:12 74:25
75:7,20 104:7 130:10

**authorizes** 132:22

**avoid** 36:24

**aware** 17:4,7 19:21
22:13 23:11,25 31:9,
14 35:25 36:11
50:11,21 51:18 65:16
67:11,22 86:25 91:18
100:4 117:18 119:8
128:11,22 131:13
140:25 144:5

---

**B**

**B&h** 114:10

**B-1** 133:10

**back** 16:24 22:8
23:16 24:8,11,15
37:9 45:18 53:13,17
60:2,8,16 68:8 79:16
83:13 86:16 89:11
93:4,20 102:18,20
103:2 104:8 105:17
106:4 108:13 113:20
114:4 122:13 124:9
125:10 126:17,24
131:11 138:11
140:18 152:2,6
156:25

**back-and-forth**
102:21

**background** 13:9

**balance** 13:14

**bank** 30:19 35:10
114:24 122:18

**bankruptcy** 113:17
116:6,16,22 117:13,
22 118:2,14,20
119:9,17

**Barker** 128:23 129:4,
12,18 130:4,8 131:15
149:21,24 150:3

**based** 26:25 72:12
78:18 85:24 109:12
136:14

**basically** 93:11

**basis** 41:16 137:2

**Bates** 68:14 71:18
74:6 80:2,25 88:22
94:18 95:22 103:10
106:12 107:9 122:2
131:23 133:5,7
142:25

**Bates-numbered**
138:9

**began** 33:10

**begin** 9:2,17,25
11:10,14 12:7

**beginning** 15:19
134:20 135:5,19
136:24 139:14,24
141:13,20 143:6

**behalf** 7:13 14:14,18,
19 17:17 25:3 26:24
28:5 32:10 41:5
42:12,17 44:17 50:7
51:2 54:16,25 55:15
64:15,25 65:24 72:6,
14 77:23 93:15 98:4
116:15 117:6,11
118:11,12,25 119:2
120:9 127:15,22
129:13,17 132:23
146:7 149:17,20
153:19

**believed** 14:14
28:12,22 46:18 49:18
50:8 51:5 54:6,16
55:2,17 84:12 87:22
147:21

**Ben** 25:6,17 44:12
45:16 96:24 97:4

**BH** 7:1,25 8:1,8,14,18
9:1 10:1,12,16 11:1
12:1,11,13,20,25
13:1,6,10 14:1,5,18
15:1 16:1,21 17:1,6,
17 18:1,3,7,15,22
19:1,13 20:1,6 21:1,
7,12 22:1,13,17 23:1,
6,12,21 24:1 25:1,3,
20 26:1,13,14,19
27:1 28:1,12,20,21
29:1,5,9,10 30:1,23
31:1,3,9,19,25 32:1,
4,21 33:1,3,10,18,21
34:1,2,6,17,22 35:1,

14,25 36:1,12,17,21
37:1,6 38:1,8,17,23
39:1,6,9 40:1,14
41:1,22 42:1,13 43:1,
13,14,21,24 44:1,18,
22 45:1,20 46:1,4,5,
6,8,9,10,18 47:1,8,
21,23 48:1,8,16,25
49:1,5,6,16,18 50:1,
8,16,17,21 51:1,3
52:1,19,22 53:1 54:1,
6,10,15,23,25 55:1,6,
14,16 56:1,13 57:1
58:1 59:1,22 60:1,20
61:1,2,5,23 62:1,3,7,
11 63:1,8 64:1,11,17,
21 65:1,3,16,20,23
66:1,4,9,25 67:1,10,
12,19,24 68:1,14
69:1,24 70:1,18 71:1,
4,18 72:1 73:1,11
74:1,7 75:1,5,17
76:1,8,23 77:1,18,22,
25 78:1,3,10,11 79:1
80:1,2 81:1 82:1 83:1
84:1 85:1 86:1,14,20,
23 87:1,2,9,21,22
88:1,16,17 89:1 90:1
91:1,11 92:1 93:1,7
94:1,6,10,12 95:1,14
96:1 97:1,25 98:1,4,
11,22 99:1,2,15,21
100:1,8,18,20,25
101:1,3,10,15,25
102:1,6,10,11,14
103:1,4,18 104:1
105:1 106:1,25
107:1,9 108:1,3,4,8
109:1,9,14,15,19
110:1,6,12,20,25
111:1,14,17 112:1,
11,22,25 113:1,15
114:1,3,18 115:1,5,8,
16,19,24 116:1,14,21
117:1,3,12,23 118:1,
13,19 119:1,3,17
120:1,10,12 121:1,5
122:1,3,7,17 123:1,7,
10,14,18 124:1,12,19
125:1,6 126:1,19,23
127:1,11,23,24
128:1,2,9,11,22
129:1,8,21 130:1,2,
23 131:1,4,18 132:1
133:1,2,21 134:1
135:1 136:1,3,23

14,25 36:1,12,17,21
137:1,18 138:1,2,6,9,
18 139:1 140:1
141:1,7,8 142:1,4,10
143:1 144:1,7,10
145:1,4,6,10,13
146:1,7,11,16 147:1,
7 148:1,3 149:1,10,
15,19,23 150:1,25
151:1,7 152:1,12,22
153:1,4,9,14,19
154:1,10,21 155:1,4,
23 156:1 157:1 158:1

**BH's** 55:10 108:5
157:8

**BH-1** 15:14

**bigger** 82:2 151:3

**biggest** 24:14

**bilateral** 26:19 28:16
29:2 48:4 55:5 69:23
155:17

**Bill** 7:21 9:2

**bit** 23:21 32:8 35:10
53:2 59:10 68:9 91:2
96:8 98:6 106:18
134:17 144:14 150:8

**blank** 79:23 106:14,
15

**Bonner** 107:14

**borrowed** 86:15
93:15,17 114:24
115:5,11,12 124:12,
24 126:11,15,16,20

**borrowers** 31:15

**bottom** 68:14,19
71:21 76:2 88:23
90:11 95:24 100:17
107:10 122:4

**Box** 135:18 137:16
138:9,14,19 140:9,
10,17 142:8 145:3
150:10

**break** 11:22,25
57:23,24 58:5 59:25
60:9 104:22,23
105:3,11,22,23

**bridge** 85:23

**briefly** 13:8

**broad** 35:2 72:15
83:9 91:14

**Broaddus** 27:17
63:11,22 71:23 72:5
76:2 77:4,14 80:18
83:24 84:3,8 85:14
88:12 89:7,11,14
95:2,10,13 97:3,14
100:12 101:13
107:14

**Broaddus'** 76:13

**Broaddus's** 72:3,20
73:25 80:5,12

**broader** 69:22 72:18
146:10

**broadly** 31:7 63:13
69:25 88:2

**brokerage** 30:20

**brought** 98:8

**Brown** 25:14

**bulk** 17:24 18:6 35:11

**business** 10:24
12:20,22 13:22 41:19
47:14 87:9,12,21
145:7 154:18

**businesses** 13:12

**busy** 94:23

---

**C**

**calculation** 108:21,
25 109:10 110:2,6,21
111:4,17

**calculations** 109:20

**call** 15:14 63:10
83:23 106:2,3,4

**called** 14:10 16:3,12
108:15 128:23

**calls** 122:23

**Canty** 14:24 69:4

**capacity** 10:23,25
17:5 41:14 153:24

**capital** 7:20 9:17
10:20 12:17,18 15:20
24:15 32:5 33:15,16

36:25 37:9 38:12,14, 16,25 47:4,16 52:11, 15,24 53:4,7,16 60:23 61:2,6,7,24 65:11 82:21 83:2,10, 13 85:20,21 86:18 93:24 94:3 97:21,24 98:5 100:18,20,24 101:4 102:7,11,25 103:2 104:5,11,17 107:2 108:6,13 110:17 111:5 114:4 115:9,24 121:8,18 122:8,14,20 123:6, 10,15,19,23 124:2,8, 11,16,20,23 125:5, 11,15,16 126:10,15, 17,20,24 127:8 133:13,17 135:4,10, 14 136:4,12,24 137:15,19,23 138:7 139:23 143:5 150:12, 17,20,22,25 151:7,9, 19 156:23,24 157:6,8

**capitalization** 32:20 70:16

**careful** 47:13 148:12, 14

**Carolina** 8:19

**case** 15:16 79:16 122:23 152:25

**Casey** 7:23 8:9 37:18 48:22 50:12 51:19 58:3 90:19 126:5

**cash** 34:13,16 58:12, 16 59:15 70:11 84:17,20,25 85:2,5 93:13 103:6 132:4

**causing** 129:23

**caution** 146:20

**CBRE** 30:4

**cc'd** 27:17

**Central** 60:13,14 105:19 106:9,10 158:7

**CEO** 25:7 41:15

**certificates** 13:25

**cetera** 35:3 87:7,16 88:4,5 103:2

**CFO** 108:3

**chain** 120:23

**Chang** 27:17 88:12 89:8,11 97:7,14 101:7

**Chang's** 89:15,18,23 91:4,12,16,19 92:3,4 94:9,12

**change** 48:17 95:4,9, 10 100:9,19,24 101:4 102:6,15 144:3

**changed** 48:11 71:12 99:22 102:10 109:11 139:8 145:15

**characterization** 38:21 93:16

**characterize** 37:5

**charge** 43:4

**Charlotte** 8:19

**chart** 70:6,10,14 71:12

**chartered** 14:2,3

**charts** 87:18

**chase** 23:20

**chat** 51:13 68:20,23 77:11 81:25

**checking** 157:18

**chimed** 27:18

**circumstances** 109:11

**citizen** 9:24

**claim** 22:3 154:3

**claimed** 29:6

**clarification** 39:23 146:15

**clarifications** 18:4

**clarify** 48:2 53:5 156:12

**clarifying** 53:2

**clause** 57:4,6

**clean** 90:25 126:5 147:12

**clear** 54:22 55:10 96:9

**clearance** 113:21

**CLO** 42:6

**close** 35:24

**closed** 35:7 73:16 95:5 101:10

**closely** 63:21

**closing** 24:21,23 32:23 71:7

**Code** 142:20

**cold** 87:17,18

**colleagues** 95:3

**college** 13:16,18,19

**column** 53:25

**comfortable** 82:20

**comment** 78:25

**comments** 42:16 43:25

**communicate** 19:2 29:5

**communicated** 14:18 42:13 153:19

**communicating** 45:17 129:12,18

**communication** 48:5

**communications** 19:13 20:14 22:21 47:22 66:14 67:16,22 69:20 102:24 117:24

**Companies** 8:8,14, 18 108:3

**company** 13:15 56:6,15 88:7

**compare** 91:22

**complete** 52:2

**completed** 77:24

**complex** 118:9 146:8

**complexity** 149:6

**complicated** 146:9

**complication** 118:9

**comply** 9:23

**complying** 9:20

**component** 32:22 54:21

**concern** 83:6 85:15

**concerned** 94:7

**concerns** 21:3 60:21,24

**conducted** 7:6

**confirm** 81:20 129:7

**confirmed** 106:23 113:13

**confusion** 95:25

**connection** 14:15 18:19 27:10 32:6 33:22 124:21 137:3

**consecutively** 80:3

**consent** 9:6

**conservative** 149:3

**consideration** 155:8,9,19 156:4,5

**considered** 104:4

**consistent** 46:10 73:24 110:22 135:8 139:17 140:4 141:24

**consummated** 71:13

**contact** 117:18

**contacts** 88:15

**contained** 50:19

**contention** 22:14,22 23:3,7,11,13,15 152:9,13,23 153:6, 12,15 154:2,19,22

**contentions** 153:20 154:11

**context** 15:8 29:17 69:7 70:9

**continuing** 118:7

**contributable** 104:5

**contribution** 52:12, 25 61:7 76:15,16,21, 22 77:5 80:14,18 97:21,24 98:5 100:18,19,25 101:4 102:7,12 115:10,25 123:15,19,24 126:24 156:25

**contributions** 53:7 102:20 124:16 151:9

**control** 96:21

**controller** 18:3,15

**convenience** 26:25

**conversation** 68:19 119:13 120:16

**conversations** 20:5 66:14

**cooperation** 9:20

**coordinated** 18:20 127:18

**coordinating** 28:25

**copied** 25:24 112:20

**copies** 31:12 95:3 107:14

**copy** 27:19 71:23 76:3 157:24

**corporate** 8:18 9:24 10:25 14:5 17:5

**corporately** 23:10

**correct** 18:10 21:12, 13 23:23,24 24:3 32:3 35:17 38:20 40:22 44:19 52:8,9, 16,20,21,25 53:8 55:23 58:13,19,20,23 59:22,23 61:9,14,17, 20 64:6,9,10 65:21, 22 66:2,3 71:9,10 73:16,17,19 78:7,8, 12 82:11,16 85:11 94:4,5,7,8,10,14,15 97:16,17 98:9,10,14, 15 99:23 100:25 101:5,22,23 102:2,3 103:25 110:12,15,18 111:6,12 112:23 114:5,7 115:7 116:3, 4 122:15,16,20

Index: correctly..drawn

123:11 124:5,17,22, 25 126:17,21,25 127:5,9,10 134:7 139:21,22 140:2,3,6, 15,16,20 141:25 142:2,5,6 143:3,8,11, 15 145:9,17,18 157:3,4

**correctly** 56:8 67:15 101:19 113:24 149:9

**correspond** 28:2

**correspondence** 25:25 27:13,18 28:8 67:4 71:3 74:21 102:17,22

**correspondent** 107:21

**counsel** 7:15 8:8,14, 18,22 9:19 14:8 18:23 20:5 25:9,17 112:9,16 148:21

**counsel's** 51:23

**counterparties** 55:6

**counterparty** 54:18 71:4 72:17 91:15

**counterproposal** 91:5

**Counting** 13:3

**couple** 18:4 45:18 66:18 105:14 112:25 125:10 152:5 156:19

**court** 153:2,5,10 156:19

**cover** 128:20

**covers** 82:19

**CPA** 138:24

**create** 110:21

**created** 43:25

**credit** 86:6 114:20

**credited** 104:11 124:3 125:4 126:24

**CSR** 7:10

**curious** 145:2

**cut** 23:20 151:14

### D

**Dallas** 7:22

**date** 7:3 23:10 75:2 116:23 123:21 125:21

**dated** 74:11 129:4

**dates** 66:20

**Davis** 25:14

**day** 74:16 75:8 78:10 91:6 94:23

**days** 45:18 97:13 112:25 152:16

**DC** 112:3 113:19 120:4

**deadline** 74:21

**deal** 15:18 54:2 61:20 71:13 73:16 74:3 87:6 93:18 112:18 115:5 124:15

**deals** 58:11 59:5 62:17 82:7 84:19,21 87:14 88:13

**dealt** 112:11

**debt** 12:16 82:22 83:3 103:22 114:20 115:20 116:3 121:7 126:12 127:3 132:11, 17 141:4

**debts** 113:16 114:11, 15,17,25 136:21

**decided** 154:7

**decision** 148:16,18 149:11,16,20

**deemed** 93:13

**defer** 105:7

**deference** 57:11

**deferential** 116:20

**defined** 19:19 21:6, 21 22:18 58:13 65:18 72:8 152:8

**definitions** 15:18

**degrees** 13:21

**delivered** 77:18 78:9,11,14,15 147:20,22

**delivering** 77:24

**Dentons** 7:24 25:15

**dependent** 40:7

**depicting** 70:15

**depicts** 70:14

**deposed** 10:21

**deposition** 7:5,11 8:6 9:4 11:7 14:15,20 17:21 18:24 40:22 72:9 104:24 128:17

**depositions** 51:17 69:6

**Des** 7:8 8:9,16

**describe** 13:8 34:5 37:7 64:2 66:13 84:4, 8 97:18 119:16

**description** 142:15

**designation** 14:3,4 30:17

**desire** 47:24 66:17, 23 99:10 108:5

**detail** 63:25 84:11 108:16,20 146:25

**detailed-oriented** 79:13

**details** 45:8

**determined** 114:22

**difference** 115:9

**differently** 121:10 143:10

**difficult** 147:16

**diligence** 32:11

**dilutive** 82:23

**direct** 28:8 49:14 89:18 119:12 151:17

**directed** 127:13,16 150:5

**directing** 68:12

**directly** 18:25 28:2

32:16 35:10 116:19 117:8 146:12

**director** 10:19 12:11 42:5

**disconnect** 37:16,21

**discovery** 17:24 18:6 19:5 103:16

**discuss** 47:2 64:16 66:10 149:16,19,23

**discussed** 95:5,10 98:19 153:15

**discussion** 55:7 67:10 76:23 127:20 144:18 157:14

**discussions** 30:13 39:14,16 47:18 70:19 103:5 104:16 106:25 108:4 130:23 154:14

**distinct** 85:5

**distinction** 75:16 86:11

**distributable** 58:12, 16,17 93:13

**distribute** 113:18 116:7,17 118:22

**distributed** 53:23 59:16 93:14 109:8 122:14

**distribution** 57:12, 15 58:12 82:19 84:17 85:2,15 108:16,21,25 109:10,20 110:2,6,21 111:4,17 112:22 132:16 142:8,12

**distributions** 21:5 103:6 106:19 113:14, 22 114:10 118:3,15 119:19 121:6 132:4, 23 140:17,21,23,25 143:11

**doc** 87:5

**document** 15:6,12 16:25 21:11 40:18 41:4 45:21,25 46:6, 20 51:6,14 56:2,25 68:13 71:17 74:6,11 78:9,16 79:2,11,17 80:25 81:21 90:23

32:16 35:10 116:19 117:8 146:12

95:6 103:9 107:9 109:24 110:8,10 111:7 120:21 122:2 128:19 130:16 144:15 147:6

**documentation** 143:23

**documents** 14:24 15:2,4 18:7 21:12 45:3 68:4 80:2 128:5 131:15 151:23 155:5, 25

**Doherty** 7:23 21:20, 24 22:5 35:18 37:13, 20 38:2 39:11 43:6, 15,17 45:4 46:21 47:10 48:18 49:10, 20,22 50:4 51:11 53:19 55:24 56:18 57:22 58:6 60:3,12 63:4 68:16,24 69:5 72:7 75:10 78:22,23 79:12 84:5 90:2,6,13, 20 91:21 92:13,20,23 99:24 104:21 105:7, 12,19,23 106:2,7 117:14 118:16 119:5, 21 125:8,13,19,24 133:6 138:22 142:16 145:21 146:19 148:5, 8,20,24 151:11 154:13,24 155:10,13 156:10,17 157:11,15, 21,23

**dollar** 122:19

**dollars** 109:6 135:25

**Dondero** 41:6,8,10, 23

**doubt** 9:22

**draft** 42:24 66:5 76:9 147:6,21

**drafted** 43:9 91:13

**drafter** 43:21

**drafting** 25:10,22 26:8 27:23 28:6,11 32:7 43:4

**drafts** 42:21 43:25 44:4

**drawn** 114:20

**driving** 74:23

**due** 155:8 156:4

**duly** 9:10

**Dustin** 7:5 9:9 10:6

**Dusty** 9:9 79:3 90:21 95:5

**duties** 12:10

**E**

**e-mail** 27:19 48:4 67:3 69:11,12 70:8 72:20 73:25 75:24 76:14,18 77:3 79:6 80:6,19 81:2,5,8,23 88:22,24 89:3,11,15, 18,20,23 90:4 91:4, 12,19 92:4 95:21 97:14 103:13,18 107:13 108:15 112:2, 21 113:4 118:20 119:4,20 120:19,23 122:4,11,13 123:21 125:22 127:19 150:2

**e-mailed** 157:18

**e-mails** 19:4 20:6 66:16 67:11,18,24 68:17 75:25 95:11

**earlier** 44:16,21 69:18 76:7 82:8 91:6 96:18 99:15 122:7 139:18 144:17

**earnest** 35:4

**easier** 15:4

**easy** 10:11

**EBITDA** 13:13

**economic** 46:15

**economics** 45:24 47:5 61:11 100:5

**ecosystem** 72:18

**effective** 24:2 34:12 74:25

**effectively** 91:4

**effort** 9:21

**employed** 10:7,13

13:5,6 16:19

**end** 21:16 33:6 74:15 75:8 85:20 96:12 134:21 135:6,23 137:24 138:7 139:15, 25 141:13,21 143:6

**ending** 150:12

**ensuring** 102:24

**entered** 19:20 23:21 31:10 48:8 75:3

**enterprise** 40:8

**entire** 51:13 94:13 115:24

**entirety** 114:22

**entities** 35:2 74:23 88:8,18 107:23 112:10

**entitled** 56:6 137:9 143:14

**entity** 14:10 15:21,25 16:5,8,11,19 28:16 72:15 83:8 87:16,22 121:15 133:14 136:19 146:7

**equals** 150:19

**Equities** 7:1,25 8:1 9:1 10:1,12 11:1 12:1,12,13,20 13:1,2, 6,10 14:1,5,18 15:1 16:1,21 17:1,6,17 18:1,3,7,16 19:1,13 20:1 21:1,7 22:1,13, 17 23:1,7,12,21 24:1 25:1,3,21 26:1,15,19 27:1 28:1,12,20,21 29:1,5,11 30:1,23 31:1,3,9,19,25 32:1,4 33:1,10,18,21 34:1,2, 6,17,22 35:1,15 36:1, 12,17,21 37:1 38:1,8, 17,23 39:1,6 40:1 41:1,22 42:1,13 43:1, 13,21,24 44:1,18,22 45:1,20 46:1,4,5,8,9, 18 47:1,8,21 48:1,8, 16,25 49:1,5,6,16,18 50:1,8,16,17,21 51:1, 3 52:1,19,22 53:1 54:1,6,10,15,23,25 55:1,14,16 56:1 57:1

58:1 59:1 60:1,20 61:1,2,5,23 62:1,3,7, 11 63:1,8 64:1,11,17 65:1,3,16,20,23 66:1, 4,9 67:1,10,12,19,24 68:1 69:1 70:1,18 71:1 72:1 73:1,11 74:1 75:1,17 76:1,8, 23 77:1,18,25 78:1,3, 10,12 79:1 80:1,2 81:1 82:1 83:1 84:1 85:1 86:1,20,23 87:1, 2,9,21,22 88:1,16,17 89:1 90:1 91:1 92:1 93:1 94:1,6,10,12 95:1,14 96:1 97:1,25 98:1,4,11 99:1,2,15, 22 100:1,9,25 101:1, 3,10,15 102:1,6,14 103:1,4 104:1 105:1 106:1,25 107:1 108:1,8 109:1,9,14, 15,19 110:1,12,25 111:1,17 112:1,11 113:1,2 114:1,3 115:1,5 116:1,14,21 117:1,3,12,23 118:1, 13,19 119:1,3,17 120:1,10,12 121:1,5 122:1,7,17 123:1,7, 10,14,18 124:1 125:1,6 126:1 127:1, 11,23,24 128:1,2,11, 22 129:1,8 130:1,23 131:1,4,18 132:1 133:1,2 134:1 135:1 136:1,3 137:1,18 138:1,2,6 139:1 140:1 141:1 142:1 143:1 144:1 145:1,4, 6,10 146:1,7,16 147:1,7 148:1,3 149:1,10,15,19,23 150:1 151:1 152:1, 12,22 153:1,4,9,15, 19 154:1,10,21 155:1,4,23 156:1 157:1 158:1

**Equities'** 18:23 26:13 28:21 29:9 32:21 33:3 37:6 39:9 43:24 46:6,11 47:23 56:13 59:22 64:21 75:5 77:22 86:14 91:11 98:22 100:18 101:25 102:10,11

110:20 111:14 112:22 115:8,16 124:12,19 126:19,23 129:21 130:2 133:21 136:23 138:18 141:7, 8 142:4,10 144:10 145:13 146:11 150:25 151:7

**equity** 12:16 13:11 38:8 93:17 113:18,23 116:8,17 118:22 143:7,9

**errata** 157:18

**error** 50:21 51:5 55:17 98:13,17

**errors** 50:19

**estate** 12:14,21 139:6,9 145:8

**event** 120:22

**events** 53:22

**exact** 23:9 89:3 97:21 107:20 122:6

**EXAMINATION** 9:12 156:16

**exception** 150:17

**exceptions** 53:12

**exchange** 36:17 61:4 127:20

**excluding** 55:7

**exclusive** 29:7,12

**exclusively** 28:13 29:17 84:25 153:10

**executed** 38:7 54:5 66:9 75:18 91:20 97:8 101:21 102:16

**execution** 26:9 45:3 47:23 51:4 68:9 76:24 77:14,19 95:6

**executive** 41:14

**exhibit** 16:23 40:15, 16 68:5,7 71:17,19 74:6,8 79:23 80:23, 25 88:20,21 89:21 92:12 94:18,20 95:19,21 103:9,11 104:20 106:12,14

107:6,8 121:22,23 122:2 128:7,8 129:3 144:7,8 152:3,4

**existed** 73:12

**existence** 72:25

**expand** 66:23

**expectation** 37:8 40:5 98:23 99:17 150:25

**expected** 33:13

**expedited** 158:5

**expediting** 158:3

**expense** 9:22

**expenses** 35:3,13 59:14

**experience** 88:10

**expert** 75:12

**explain** 41:22 85:13, 14 120:8,9 127:23

**explanation** 63:23

**express** 108:8

**expressed** 66:23 108:11

**expressing** 66:16

**expressly** 82:15

**extend** 74:22

**extent** 39:9

**extinguish** 113:16 114:11

**extinguished** 114:25 136:21

**eyes** 48:9

**F**

**facility** 83:4,14 114:20

**fact** 36:3 52:22 60:25 73:18 91:17 108:12 109:23 122:10 123:9

**facts** 22:21 52:18 112:23

**fail** 11:15

**failure** 155:9 156:5

**fair** 11:11,12 12:2,3, 19 15:22 16:16 28:3 31:24 33:7 39:10,13, 15 42:20 43:23 45:5, 10 48:21 49:16 53:25 54:4 59:8,13 62:13, 24 67:7,8,9 73:22,24 74:4 85:13 87:20 89:16,24 93:16,20 95:16 98:6 100:10 102:12 103:3 111:18 113:3 120:23 121:4 122:8 125:6 145:23 147:2 150:18 153:8 154:22 155:23

**fairly** 57:9 108:12 110:3

**fall** 104:16 106:24

**familiar** 14:10 16:4, 11 29:18

**fast** 45:15

**features** 30:15

**feel** 11:22

**fees** 35:5

**figure** 12:6

**file** 74:22 146:6 154:2

**filed** 117:22 145:22 146:4

**filing** 116:25 117:13 118:2 130:18 144:19 146:11 152:20

**filings** 152:16

**final** 91:23

**finalized** 39:3

**financed** 33:5

**financial** 14:2

**financing** 135:20 136:11,18 137:6

**find** 121:17

**fine** 58:2 60:4,8 101:9,10 105:15

**fingers** 13:3

**finish** 11:9,14 105:4, 18 152:2

**finished** 72:21,22

**firm** 7:24 27:20 30:18,20 120:17 128:22 130:8

**fixed** 133:18 135:4

**flag** 58:7

**flip** 49:15 54:9

**flow** 103:6

**flows** 36:25

**focus** 85:3

**focused** 24:13,17 44:24 50:25 70:6 82:9 84:17,25 100:5 118:6

**Focusing** 33:17

**follow** 63:19 154:15

**footnote** 142:14

**forgot** 20:25 21:24

**form** 26:15 31:22 35:18 39:11 43:6,19 46:21 47:10 48:18 49:10,20 55:25 56:18,19,20 63:4 72:10 117:14 118:16 119:5 138:22 145:21 148:5 155:13

**formal** 36:20

**formalize** 39:16

**formally** 39:4

**formed** 87:3,14 130:10

**forums** 119:10

**forward** 113:22

**forwarded** 89:8,14

**frame** 37:22 104:18 115:15

**framed** 29:3

**framing** 28:15

**frankly** 155:20

**Freddy** 27:17

**free** 11:23 81:14

**frequently** 45:17

**full** 53:8 115:19 123:24 126:17,25 151:10

**fully** 15:8 36:20 97:8

**fund** 13:11

**funded** 35:9 121:8 150:16

**funding** 86:21 124:21 127:4

**funds** 35:8

**future** 48:12,17 67:5

**G**

**Gameros** 7:21 9:6 31:21 157:13,24 158:2,4,6

**gather** 117:20

**gears** 151:22,25

**general** 8:8,14 14:8

**generally** 87:12

**give** 9:3 23:9 30:20 37:8 40:5 44:7 57:11

**giving** 17:4

**goal** 74:24 105:3,8

**good** 9:14,24 60:5 90:23

**governs** 57:2

**graduate** 13:16,21

**Granbury** 7:13

**Grant** 42:5

**great** 92:10

**ground** 11:6

**group** 31:8 35:2

**guarantor** 136:5

**guess** 17:9 44:8 97:3 120:19 144:14

**H**

**half** 11:5 105:9

**hand** 26:20,21

**handful** 44:6

**handle** 82:14

**handling** 101:9

**happen** 117:19

**happened** 67:7

**happy** 26:11 48:25 79:10 92:7 105:2,11

**hard** 43:17 51:17 96:24

**Harris** 122:24

**HCM** 29:14 31:7 35:3 39:25 110:7,17

**HCMLP** 15:22 19:14 20:14 23:22 26:4,15, 20 27:5 28:13 31:10, 14 39:21 41:5 48:3 52:23 60:21 62:4,8, 24 64:4 72:16 87:22, 23 88:3 93:7 111:18 113:16 116:6,15 117:12,21 118:14,20 126:11 127:7,12,24 133:24 134:14,18 135:21 151:10

**HCMLP's** 28:22 126:9 142:4 150:25

**HCRE** 14:10,11,14, 19 16:3,8 19:14 20:15 23:22 26:4,15, 20 27:5 29:13,14 31:7,9,14 35:3 39:18, 25 41:5 54:25 55:11 64:8,13,17 65:24 72:16 83:8 87:2,10, 15,19 88:3 93:6 104:5,11 110:6,14 111:17 112:10 113:15 114:11,21 115:19,25 116:15 117:6,8,11,24 118:12,25 119:13,16 120:9,13 121:12 123:25 124:5,20 127:11 133:4 139:7,

20 140:14,19 141:2 149:17 150:5 153:16, 20,23

**HCRE's** 22:14,21 23:7 115:9 116:16 118:2 119:18 123:15, 23 126:20 142:4 152:9,13 153:6,11

**head** 25:23

**header** 81:4

**heads-up** 117:8

**hear** 8:12 54:15 60:17

**heard** 9:5

**helpful** 92:14

**Hey** 50:12

**higher** 89:5

**Highland** 9:16 15:15, 20 18:7 27:2,5,10 28:5 31:7 32:14 33:10 35:2 41:21 43:12 44:2 47:22 48:25 50:7 51:3,4 52:10,14 54:16,18 55:11 60:21 61:2,6, 24 62:4,7 63:23 64:11 66:25 69:25 70:23 71:3 72:6,15, 18 75:17 76:23 77:18,23 78:7,9 82:21 83:2,9 84:9 85:22 86:3,6,10,23 88:2,17 91:13,14 100:9 101:5,14 102:9,14 103:4 106:25 107:22 108:9 109:14,20,25 110:17 111:15 114:6 116:14, 22 120:12 123:19 125:11,15 133:13,17 135:10 136:4,24 137:22 138:6,16 156:23 157:8

**Highland's** 50:10 84:15 98:9 100:19 115:17 135:3 150:18

**hold** 13:24 14:2 43:15 52:23 58:4 132:21 151:23

**Holdco** 42:6

**holders** 143:14

**Holdings** 16:12 70:16

**hope** 48:7 79:7 99:17 121:17

**hoped** 46:14 47:2,8, 15 48:5,16 49:3

**hoping** 99:3

**Hougham** 8:6,17

**hour** 104:25 105:10, 18

**Houston** 7:24

**humble** 38:2

**hundred** 135:25

---

**I**

**icon** 122:4

**idea** 39:24 142:10

**identified** 44:16 82:8 102:6 133:14

**identifies** 57:7

**identify** 24:18 25:2 26:6,23 27:8,12 47:7 57:16 98:11,17 125:13

**ii** 93:22

**impact** 85:9 117:25 118:14 119:11,14,17

**important** 11:9 32:19

**improperly** 155:6 156:2

**inaccurate** 54:17

**include** 139:2

**included** 30:21 131:14 150:4

**including** 20:14 21:4 32:5 112:21 128:13

**income** 83:18 84:10 85:10 138:15 145:7 149:5

**inconsistent** 46:19 50:9

**incorporated** 85:22

**incorrect** 65:3 134:3 135:14 142:5

**increase** 47:15,24 99:11,18 100:17

**increased** 99:5

**incurred** 9:22 121:7

**Indianola** 13:20

**indifferent** 61:11 63:15 84:2

**indirectly** 19:3

**individual** 29:11

**individuals** 27:9

**info** 117:20

**inform** 50:8 51:3 55:16 65:2

**information** 11:2 117:5,9 130:4 137:19 139:3 146:9,17 153:5

**informed** 32:18 65:23 118:12

**informing** 95:14 117:12

**informs** 123:4

**inhibit** 116:16

**inhibiting** 113:17 116:7 118:21

**initial** 38:25 115:24

**inserted** 102:5

**instructed** 121:14

**instructing** 127:24

**Instructions** 130:18

**intended** 57:16 58:22 59:10,20

**intending** 101:3

**intent** 46:6,11,19,25 49:8,19,22 50:10 54:7,12 56:14 64:23 125:25

**intention** 110:20

**interest** 28:18 33:11 36:16,22 37:4,6,9 38:9,11,18 39:9 40:6 47:16,25 48:6,11 52:16,23 53:24 56:10 57:7,17 60:22 61:3,9 62:8 69:19 99:5,16 102:2 133:18 135:9 140:5 141:20 151:4 155:20

**interested** 152:24

**interests** 21:4 26:7 27:9 28:13,23 29:7, 12 53:6 55:9,20 56:16 58:18 59:18

**internal** 45:2 63:13 112:17 146:18,18

**internally** 113:13

**interpreted** 91:8

**introduce** 8:3,4

**introduced** 31:5

**invest** 12:15,21

**invested** 35:9 93:17 122:19 124:8,11

**investing** 35:25

**investment** 12:16,24 13:14 14:4 18:16 30:19 34:2,6,8,16,23 35:20 36:18 38:16 114:21 123:11 143:8, 9

**investments** 44:25

**investor** 10:20

**invests** 12:13

**involved** 24:8,19,22 25:8,9,21 27:22 28:5, 11 32:10 36:14 44:17 88:10,12 112:16

**involves** 48:20 146:23 148:10 154:14

**IOU** 40:4

**Iowa** 7:8 8:9,16 13:20,23

**IRS** 145:20 146:4

**issue** 24:15 48:24 57:4 63:12 82:8 97:15,19 99:21 100:4 119:3 122:6 144:20

**issued** 131:20

**issues** 24:12

**items** 98:18

**iterative** 102:24

**IX** 58:16

---

**J**

**James** 41:5

**Janice** 7:9

**Joanna** 25:6 45:16

**job** 12:6 129:14

**John** 7:17 9:15 37:14 57:22 60:7 78:24 145:22

**jointly** 136:5

**Jones** 7:18 9:16 107:15,25 113:12

**jump** 106:4 134:11

**June** 123:9 126:23 127:8,12 157:2

---

**K**

**K-1** 131:8,19 134:13 139:6,13 141:6,8 143:2 144:11 145:19 146:3,17 147:21 149:10,23 150:3

**K-1S** 128:13 131:13 142:4 144:20 145:16

**K1** 142:11

**keeping** 32:18

**Keybank** 31:16,20 32:2,7,13,15,22 33:7 36:11 53:13,16 72:24 73:5 83:4,13,14 86:9, 16 93:20 102:17 103:24 115:11 118:7 136:6,12 140:20,24

**kicks** 53:6

**Kim** 100:16

**kind** 15:8 20:25 23:20 28:14 29:14,16 31:7 32:6 35:5 49:15 63:13 69:22 71:2 72:8 83:9 84:2 91:14 92:16 101:25 107:23 118:8

**kinds** 32:11

**knew** 45:23 49:14 55:5 61:19 62:11 116:19 119:8,10 125:15

**knowing** 49:23 155:21

**knowledge** 14:21 19:12,16 27:24 29:5, 8,10 33:4,20,24 42:15 49:4,14 51:7 55:19 61:18 62:6 64:22,24 73:3,9 117:9 119:25 120:11 126:20 130:22 131:22 136:8 153:13, 17,22 154:4 157:9

**Kyle** 8:6,17

---

**L**

**L.P.** 9:17 15:20 52:11,15 61:3,6,24 110:18 133:13 135:10 136:4,25

**L.p.'s** 133:18

**La** 14:23 79:22

**labeled** 91:17

**lack** 155:8 156:4

**laid** 35:15 39:6

**language** 82:19 91:23,24

**large** 29:15

**larger** 48:6

**law** 7:24 27:20

**lawyer** 12:4

**lawyers** 12:5

**LCC** 139:9

**leading** 35:4

**learn** 23:7 116:21 117:3,4,5 152:23 153:11

**learned** 22:18 23:9, 10,13,15 30:24 31:3 152:13 153:6

**learning** 154:11

**leave** 85:16 101:14 106:14,15

**led** 126:14

**left** 70:23 81:24 106:18

**legal** 17:25 25:9 47:12 48:20 112:9 148:21 154:14

**lender** 87:7

**lengthy** 15:3

**letter** 128:20 129:3,4, 8

**level** 84:11

**Liabilities** 135:18 137:10

**liability** 149:5

**liable** 136:5,25 137:5

**liaison** 12:17

**liberal** 13:19

**Liberty** 23:23 26:3, 16,20 27:6 29:7 42:6, 17 55:7 143:2

**licenses** 13:24

**limited** 99:4

**linear** 151:17,20

**lines** 67:5 152:17

**link** 81:25

**liquidation** 59:6,11

**lives** 22:19

**LLC** 7:1,22 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1,2,4,12

**located** 7:7 8:8,15,19

**locations** 7:16

**long** 11:3 12:25

**looked** 73:22 80:17 88:25 89:20 95:11 139:18

**loss** 83:18,25 84:10 141:11 151:19

**losses** 62:18,23 63:8,19 64:4,8,12,18 84:18,22 85:4,10 133:24 134:18 139:13,20 143:18,21 145:14

**lot** 87:12 105:6 152:11

**loud** 113:9

**lumped** 29:14

**lumping** 71:2,3

**lunch** 104:23 105:22, 23

**lunchtime** 60:6

**M**

**made** 21:5 34:2,6,10, 12,22 42:17 44:25 52:11 59:14 70:18 91:5 99:3 100:25 112:15 117:18 123:19 127:12 141:2 144:2 149:10

**magnitude** 44:7 71:15

**maintain** 109:9

**majority** 132:13

**make** 22:19 37:14 40:2 45:11 46:5 51:25 54:22 61:6 67:15 74:24 75:6 78:24 79:19,20 82:20 86:12 98:20 102:5,15 114:21 115:3 116:25 118:3,15 119:19 127:13,16,24 143:7 147:13 149:8

**makes** 56:23

**making** 52:24 132:23 146:20 148:16,18

**man** 79:13

**management** 9:17 10:16 15:20 52:11,15 61:2,6,24 88:7 103:18 107:24 110:18 123:20 133:13,17 135:10 136:4,25 156:24

**manager** 41:13 44:24 121:12,15 127:14,15,23 129:17, 23 130:3 132:25 133:3 153:24

**manager's** 129:14 146:6

**managing** 10:19 12:11

**manner** 127:17

**March** 19:20 23:23 39:4 43:2 49:17 50:6 66:21 71:13 74:12,21 75:8,18 76:4,10 78:12,14 80:19 91:6 102:16

**mark** 40:14 71:17

**marked** 15:14 16:23 40:16 68:5,7,13 71:19 74:8 80:23 88:20 89:21 94:20 95:19 103:11 107:6,8 121:23 128:7 144:8

**marketable** 132:4

**marketed** 30:4

**marketing** 30:2,18

**markets** 10:20

**master** 10:13

**master's** 13:22

**match** 56:9,16 57:3

**Matt** 18:2,12 28:4 69:12,22 100:17 112:3

**matter** 75:12

**matters** 18:21

**Mcdermett** 107:14, 19 111:25 112:19 113:11 120:19 122:22 123:4 127:18

**Mcdermett's** 107:18

**Mcgraner** 28:4,9 69:13,17,19 76:3 88:11 112:3,23 122:24 123:2,5 127:21

**Mcmoran** 7:9 157:21

**meaning** 23:3

**meaningless** 73:7

**means** 7:12 29:22 99:9

**meant** 116:11

**meantime** 101:17

**meet** 84:13,14

**meets** 83:18

**member** 36:2 57:8 61:25 65:2 66:10 93:14 127:7 131:20

**members** 36:7,9 49:8 54:21 55:16 57:17 59:16 64:16 65:25 95:15 111:6 131:14 150:21 151:8 155:7 156:3

**members'** 93:24

**memory** 51:22

**mentioned** 15:19 34:15 69:17 81:4

**middle** 70:11

**MILLER** 7:1 8:1 9:1 10:1 11:1 12:1 13:1 14:1 15:1 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1

17:1 18:1 19:1,19 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1, 24 28:1 29:1 30:1,7 31:1,10 32:1 33:1,14 34:1 35:1 36:1 37:1 38:1 39:1 40:1,11 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1,24 72:1,24 73:1,6,12,18 74:1,2 75:1,2 76:1,9 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1,15 111:1 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1 125:1 126:1 127:1 128:1 129:1 130:1 131:1 132:1 133:1 134:1 135:1 136:1 137:1 138:1 139:1 140:1 141:1 142:1 143:1 144:1 145:1 146:1 147:1 148:1 149:1 150:1 151:1 152:1 153:1 154:1 155:1 156:1 157:1 158:1

**LLC's** 139:8

**loan** 31:15,20 32:2,7, 13,15,22 33:7,18 35:5 39:24 40:4 53:16 83:8 85:23 86:9 103:25 136:6,13 140:20

**loaned** 33:21 39:18, 21

**loans** 33:25 40:10

58:1 59:1 60:1 61:1
62:1 63:1 64:1 65:1
66:1 67:1 68:1 69:1
70:1 71:1 72:1 73:1
74:1 75:1 76:1 77:1
78:1 79:1 80:1 81:1
82:1 83:1 84:1 85:1
86:1 87:1 88:1 89:1
90:1 91:1 92:1 93:1
94:1 95:1 96:1 97:1
98:1 99:1 100:1
101:1 102:1 103:1
104:1 105:1 106:1
107:1 108:1 109:1
110:1 111:1 112:1
113:1 114:1 115:1
116:1 117:1 118:1
119:1 120:1 121:1
122:1 123:1 124:1
125:1 126:1 127:1
128:1 129:1 130:1
131:1 132:1 133:1
134:1 135:1 136:1
137:1 138:1 139:1
140:1 141:1 142:1
143:1 144:1 145:1
146:1 147:1 148:1
149:1 150:1 151:1
152:1 153:1 154:1
155:1 156:1 157:1
158:1

**million** 13:12 34:9,
15,23 35:15,20 36:18
39:6 85:24 86:7,8,9,
15,21,24 104:4,8,10
114:18,19,23 115:4,
10,11,13 121:18
122:11,18 132:7
135:20,25 136:10
137:2,24 138:15
140:18 143:12
150:13,19

**mind** 90:4 92:9
111:15

**minus** 85:24

**minutes** 16:3 57:23
60:8,11 65:14

**mischaracterizes**
151:12

**mistake** 50:22 51:5
98:13 138:3 153:25
155:8 156:4

**mistaken** 134:4
135:15

**mistakes** 50:19

**misunderstood**
125:10

**modestly** 71:14

**modification** 101:25

**Moines** 7:8 8:9,16

**moment** 114:3
131:11

**money** 33:18,22
34:19 35:4,25 39:19,
22 40:5 53:12,15
126:11 140:18

**month** 123:25

**months** 121:25
122:7

**morning** 9:14

**Morris** 7:17 8:24 9:2,
8,13,15 17:9,12
21:22,23 22:2,6,7
23:18,19 31:23 35:19
37:18,25 38:5,6
40:13,17,25 41:3
42:2,3 43:7,8,22
44:9,11 45:10 46:22
47:17 48:21,23
49:11,21 50:2,5,12,
15 51:9,11,20 53:20
56:4,21 58:3,8,25
59:4,24 60:10,15
63:5,6 68:6,11,16,22,
25 69:9 71:16,20
72:2,4,11 74:5,9
75:15 79:4,7,9,18,21,
24 80:9,11 81:11,13,
17,19 84:6,7 90:5,11,
24 92:2,13,18,21,24
94:17,21 95:20,23
96:25 97:2,5,6,11,12
100:2 103:8,12
104:19,21 105:2,9,
15,21,25 106:5,11
107:7,11 111:21,24
117:15 118:18
119:15 120:2,25
121:3,21,24 125:8,
12,18,23 126:4,6
128:8,10 131:23
132:2 133:7,9

**mistaken** 134:4
135:15

**mistakes** 50:19

**misunderstood**
125:10

**modestly** 71:14

134:10,12 138:11,13
139:4 142:16,18,24
144:6,9 145:23 146:2
147:4 148:6,17,22
149:7 150:7,9
151:13,21 154:20
155:2,11,22 156:8,
10,14,20 157:12,20
158:3

**move** 113:21 142:22

**moving** 45:15

**Mulcahy** 18:3,12,13,
14,15,18,22 20:5
103:18 107:12
108:20 109:24
111:12,15 112:20
113:3,12 120:22
122:5 123:5

**Multifamily** 16:12,16
18:19 21:4 30:7
31:11 33:2,4,12,18
34:3,7 36:2,8,22 37:6
38:9,15,18,24 39:10,
19,22 52:16,24 55:16
57:8,18 59:17 61:4,8,
25 70:16 71:8,23
72:24 76:10 86:8
93:15 102:2 111:6
119:18 121:9 122:18
123:11 124:22
128:24 129:13
130:10 131:14,20
132:24 134:18
135:11 137:4 138:16
143:8 150:21 152:25
155:6 156:2

**Multifamily's** 62:23
64:3,7,18 128:13
129:24 130:5,9,20,25
138:20 139:19
140:13 144:20
149:12

**multiple** 39:14 139:2

**mutual** 155:8 156:4

**N**

**N-E-W** 7:19

**naturally** 136:21

**nature** 12:20 18:2
36:16 39:9 146:8

**NDA** 30:22

**necessarily** 147:10
151:5

**needed** 67:5 130:5

**negotiate** 33:10
46:14 47:2 49:3

**negotiated** 63:14

**negotiating** 25:5
26:14 95:14

**negotiation** 24:6
25:10,21 26:9,19
27:10,23 28:6,11
29:3 32:6,12 35:21
37:10,12 63:3,9
69:24 155:17

**net** 145:7 149:4

**Nexpoint** 7:22 88:3
112:9 139:6,8

**Nexpoint's** 22:3

**next-to-the-last**
76:13

**Nexvest** 114:24

**Nick** 25:14

**night** 94:24

**nonrecourse** 135:20
136:11,17,18 137:2,6

**nonsubstantial**
65:12

**noon** 104:25

**normal** 63:12,17

**North** 8:19

**notation** 142:14

**noted** 97:15 158:7

**noticed** 98:5

**notwithstanding**
48:7 93:11 149:9

**November** 73:25
107:13 108:5,9
109:25 111:3,16
112:12 113:4,11
115:23 116:17
117:25 118:13
122:13 154:7

**nuanced** 32:8,16
36:23 37:2 38:10
138:23

**number** 20:8,13
21:3,14 35:22,23
44:6 66:24 71:18
74:7 88:22 94:18,19
95:22 100:10 103:10
106:12 107:9 131:23
132:7 133:5 138:8,
19,25 142:25 150:19

**numbered** 80:25
122:3

**numbering** 133:8

**numbers** 57:3 71:11
76:17,22 78:4 84:24

**numerous** 87:25

**O**

**oath** 7:10

**object** 12:5 53:19
146:19

**objection** 12:7 22:4
31:21 35:18 37:13
39:11 43:6,15,19
45:4 46:21 47:10
48:18 49:10,20,21
55:24,25 56:18,19
63:4 72:7,10 75:10
78:23,24 84:5 90:2,7
91:21 99:24 117:14
118:16 119:5,21
138:22 145:21
146:20 148:5 151:11,
14 154:13,24 155:10

**objections** 61:16

**observation** 51:24

**observing** 8:2,10,15,
20

**obtain** 38:8

**obtained** 31:15
36:21

**obtaining** 32:15 33:6
62:8

**occasionally** 27:18
66:22

**occurred** 53:22

**October** 69:13 71:6, 12 82:14 117:22

**office** 7:8

**one-off** 92:17,18

**ongoing** 39:16

**open** 48:9 51:14

**opportunities** 12:24

**opposed** 33:25

**oral** 7:5

**order** 15:7,8 44:7 71:15 75:6,19 113:15 114:11 153:11

**ordinary** 87:7 145:7

**organizational** 87:5, 18 155:5,25

**original** 38:16 53:15 73:6,12,14,18 74:2 75:2 104:11 123:15 126:10 127:4 150:16 151:9

**out-of-pocket** 126:10

**outcome** 40:7

**outlay** 34:16

**owned** 87:16 88:8

**owner** 41:13

**ownership** 56:6,15 57:7,17 155:7 156:3

**owning** 133:14

**P**

**p.m.** 80:20 106:9,10 158:7

**Pachulski** 7:18 9:15

**package** 19:5 131:15

**paged** 101:17

**paid** 53:13,17 83:11, 14 86:16 102:18,20 103:2 104:8 118:7 125:2 126:17,24 140:18 143:15

151:10

**papers** 132:19 138:24 141:17

**paragraph** 21:15 22:14 64:22 76:13 83:16 108:19 113:9 143:13 154:12

**pardon** 17:25 21:24

**parent** 10:12,16

**parenthetical** 152:8

**part** 8:12 19:5 25:15 32:12 61:19 87:6 103:15 114:18 139:12

**participate** 30:13 33:14

**participating** 8:5 36:4 62:4

**participation** 33:11

**parties** 24:9,15 26:2, 8,16 28:25 29:15 32:10 35:24 36:3,6, 10 41:13 44:5 48:12 49:19 54:7,12 58:21 59:20 62:21 70:2,3 88:10 101:5 124:13, 17

**parties'** 41:18 55:9 56:14 64:23 155:18

**partner** 13:11 41:20 119:12 137:15

**Partner's** 135:18 137:10

**partners** 7:22 12:24 16:3 110:14 133:4 139:6,8,9

**partners'** 137:19

**partnership** 133:15

**partnerships** 12:14, 21 88:2,5

**parts** 32:19 35:6 46:25 47:7

**party** 15:25 40:10 55:11 70:4 115:6,12 124:24 152:24

**pass-through** 74:22

**passed** 138:15 140:14

**past** 63:14

**Paul** 27:17 107:14

**pay** 35:12 93:19 140:19 152:17

**paying** 153:2

**payments** 59:14 127:14,16

**PDF** 152:4

**pending** 11:25 147:2

**people** 25:3 26:7,23 30:11 150:4

**percent** 36:22 37:3,4 38:8,11,17,24 47:15, 24 48:6,10 61:12 62:8,23 63:7,8 64:3 66:17,23 93:6,7 99:5, 11,16 133:14,18,22, 23 134:19,21,24 138:20 139:14,15,24 141:12,16,20,21 143:5,18,21 145:15 149:4,11 150:20 151:4

**percentage** 52:15, 23 53:6,24 55:20 56:10,16 58:18 59:17,18 60:22 61:3, 8 83:19 135:4,14 141:19

**percentages** 24:16 53:3,24 56:9,15 58:17 93:5 155:7 156:3

**period** 24:10

**permit** 115:18

**permitted** 116:3

**person** 44:15 89:7

**personal** 10:23 106:3

**personalize** 47:19

**personally** 22:9 24:5,13

**perspective** 26:13 28:20,21 41:20 43:24 56:14 91:15

**Phillips** 27:20,22 112:14

**phone** 63:10 83:23 157:16

**phrase** 18:5 19:17,24 23:2 27:2,4 29:19,22, 25 30:3 36:5

**Phyllis** 107:15

**piece** 48:15 97:23

**pieces** 46:14 114:3

**place** 66:14,15 70:19

**placeholder** 73:2

**places** 146:22

**plan** 101:16

**play** 18:18 53:3

**played** 44:22

**playing** 36:12

**point** 31:13 38:22 57:24 65:10 79:20 96:22 112:13 123:17 157:2

**pointed** 122:17

**pointing** 104:3

**portfolio** 30:3

**portion** 45:24 132:15 134:3

**portions** 15:4,6

**position** 113:14 114:9 115:17 155:24 156:6

**possibilities** 147:17

**potential** 33:11

**potentially** 35:10 127:21 140:21

**power** 13:14

**pre-** 35:12

**precedent** 30:19

**preclosing** 35:12

**prefer** 111:7

**preference** 83:11

**preferred** 143:9,14

**preparation** 20:8 40:21 117:17 128:17 147:8

**prepare** 17:20 18:24 78:3 130:5 146:17

**prepared** 17:16 20:20 21:2,7 42:21, 25 46:12 77:18 111:4 128:23 129:24 130:9 131:15

**presentation** 104:24

**presented** 76:9 112:21

**president** 25:7,17

**pretend** 137:8

**previously** 25:14

**primarily** 25:4 27:16 129:17

**primary** 12:22 27:12 41:12 88:15

**print** 51:15 92:15

**prior** 13:10,13 24:16, 21 31:7 36:15 47:22 50:6 51:3 54:14,23 55:13 68:9 72:12 76:24 77:14,19 79:5 87:10,23 88:9 108:5 117:24 118:13 119:3, 19

**private** 13:11,13

**privy** 139:3 155:20

**pro** 93:23

**problem** 22:2 58:6

**proceed** 37:17

**process** 45:2,16 102:18 103:16 118:7

**produced** 18:7 20:7 21:12 67:12,19,25 128:12

**professional** 13:9

**profit** 63:18 83:25 141:11 151:19

**profits** 33:16 62:18, 23 63:8 64:4,8,12,18 84:18,21 85:4 113:23 133:23 134:17 138:20 139:13,20 140:14 143:18,21 145:14 149:12

**project** 24:19 29:19, 25 30:2,9,20,24 31:4, 16 33:22 44:17 87:10,24 112:12

**projects** 87:25

**promote** 96:12 99:8

**proof** 154:2

**properties** 30:4,6 33:5 34:21 44:24 107:22 136:19,20

**property** 71:8 88:4 137:3

**proportion** 93:14,23

**proposal** 70:17 85:9 89:19 94:9,13

**proposed** 82:13 108:16 112:22

**provide** 11:8 32:4 59:10 63:22

**provided** 22:11 40:10 43:25 62:22 87:6

**providing** 130:4

**provision** 58:11,22 82:15 84:13,14,16 89:24 90:19 91:12,13 93:20 94:4 100:8 139:18

**provisions** 57:12,15 58:4 110:22 111:2

**public** 116:25 117:4, 9 119:9,10 152:21

**pull** 51:14 92:7,11,12

**pulled** 81:25

**pulling** 92:9

**purchase** 24:21 34:21

**purchased** 30:7

**purposes** 53:10 149:14

**put** 14:24 15:2,13 40:13 68:6,20,22 69:10 82:21 83:2,10 85:22 86:3,6 102:25 107:7 115:5 124:20

**putting** 60:22

---

## Q

**qualified** 135:19 136:11,17,25

**qualifier** 125:21

**qualify** 45:9

**question** 11:10,15, 25 12:5 28:15 31:25 36:24 37:23 40:2 43:20 45:5,10,11 48:22 49:24 50:3,14 55:13 67:14 70:9,10 79:15 92:17,19 99:4 100:16,23 111:14 117:23 118:17 119:24 120:16 125:10 126:2 128:2 131:7,12 144:21,22 145:5,11,24 147:2,3, 5,11 149:2 154:16 155:4

**questions** 11:8 15:9 74:10 92:16 113:10 144:25 147:22 152:5 156:9,11,19,23 157:11,13

**quotation** 22:20,23 23:4

**quote** 73:15,16 74:2 76:14 77:5 95:4,5 101:9,10 108:15,21 113:13 114:10 118:20

**quoted** 113:24

**quotes** 34:25 69:25

---

## R

**R-O-C-H-E-L-L-E**

7:20

**raise** 60:20

**raised** 122:6

**raising** 122:5

**rare** 30:15

**rata** 93:23

**re-sent** 120:19

**reached** 36:16 38:23 101:24

**read** 15:7 56:24 70:8 72:20 101:19 110:3 113:9 157:22

**reading** 20:10 56:8 57:9 68:18

**ready** 95:6,16

**real** 12:14,21 71:8 139:6,9 145:8

**reask** 67:14

**reason** 49:7 50:18 54:10 64:2 65:8 80:16 134:2 138:3 148:19

**recall** 24:20 42:24 44:4 56:25 60:24 62:9 76:6 77:13 85:19 96:15,19 104:15 106:19 117:7 119:12 130:11 131:6 139:10 152:12

**receive** 36:17 38:24 61:3 66:4 145:6 156:24

**received** 113:2 119:4 120:21 124:8 129:8 140:23 142:11 157:2, 9

**receiving** 60:21 61:8 77:13

**recess** 60:13 106:9

**recollection** 76:8 78:18 117:10 144:17 153:9

**record** 7:16 10:5 18:12 60:4 106:6,8 152:21 153:11 157:14

**records** 153:2,5

**redirect** 156:11

**reduced** 135:24

**reduction** 136:10

**redundant** 106:16

**refer** 15:21 16:15,18 27:2,5 30:12 81:7 83:3

**reference** 21:15 70:23 103:24 133:22

**references** 108:20

**referencing** 132:19

**referred** 114:15,17 122:12

**referring** 16:8 19:25 82:15 96:18 99:14 115:2 157:5

**refers** 70:25 103:21 110:12,14,17 122:11 132:3

**reflect** 49:8 54:12 64:23 73:15 74:3 102:11

**reflected** 46:6 49:19 54:7 55:21 67:11,18, 24 71:11 143:12 157:6

**refresh** 76:8 79:2 144:16

**refusing** 114:6

**regard** 119:7 154:18

**related** 26:16 28:24 29:16 31:16 50:24 55:11 87:23 88:9,18 98:19 99:10 132:16 136:11,15,16 148:16

**relates** 136:18 152:25

**relating** 19:14 137:19 155:5,25

**relation** 83:25

**relations** 10:20 88:6

**relationship** 46:16 47:3 151:6,16,17,20

**relied** 147:8,24 153:10

**rely** 146:16

**remained** 134:20 135:5

**remaining** 35:8 53:22 59:15 121:8,18 123:6

**remains** 139:25

**remedies** 151:18

**remember** 66:19 74:12 107:3 144:21, 22 152:7,9

**remind** 44:21

**remotely** 7:7,11 8:23 9:4,10

**renegotiate** 47:9

**rental** 138:15 145:7

**repatriate** 124:15

**repatriated** 122:20 123:16,24

**repatriation** 123:6

**repay** 115:19 116:2 121:6 141:3

**repayment** 115:18 132:17

**repeat** 118:17

**rephrase** 48:22 50:2

**report** 14:6,7

**reported** 145:19,22

**REPORTER** 7:3 8:11,21 78:21 157:22 158:4

**reporting** 7:11,14

**represent** 7:25 9:16 15:20 29:6,10 117:21 138:19

**representative** 17:6

**represented** 138:8

**representing** 26:7 27:9,21 69:19,22 70:4

Index: request..specific

**request** 11:24 90:7
102:10 150:2

**requested** 108:20

**residence** 7:12

**residual** 37:9 47:15,
24 48:6,11 99:5,16
102:2 135:9 140:5
141:19 151:4

**resources** 32:5

**respect** 31:11 57:10
84:9 91:6 94:13
134:18

**respective** 93:24

**responded** 112:2
120:22

**responding** 154:9

**responds** 96:23
101:13

**response** 18:8
21:15,18,21 22:3,10
67:2,12,19,25 72:3
89:19 100:13 101:8
111:22 113:2,8
128:12 154:11

**responsibilities**
12:11

**responsibility** 146:6

**responsible** 25:4
55:9 129:12,18,23
130:3

**responsive** 102:9

**restate** 31:24

**restated** 16:2 75:6

**retroactive** 75:7,19

**return** 33:15 38:12,
25 47:4 86:18 94:3
104:17 107:2 111:5
113:18,22 116:7,17
118:22 122:8 125:5
130:12,17 132:10
134:3 136:12 146:6,
9,12 147:19 149:6

**returned** 38:14,17
40:6 47:16 53:4,7
104:12 108:6 113:15
114:10 115:25

123:20 124:2 125:16
126:2 127:8 150:17

**returns** 128:6,13,23
129:24 130:6,9,21,25
144:20 146:18 147:9

**review** 19:4 20:6
21:11 22:12 25:10,22
27:23 28:6 45:21
128:16

**reviewed** 17:24
19:11 40:21

**reviewing** 45:3
141:17 143:23

**Rob** 122:24

**Roby** 25:6,14 44:12,
22 69:12 71:22 76:3
95:3 96:5,10

**Rochelle** 7:19

**role** 18:18 24:6 36:12
44:22 107:24

**roles** 55:8

**room** 15:5 77:11

**rough** 104:18

**rounds** 117:2

**rules** 11:6

---

**S**

**satisfaction** 95:15

**Saturday** 107:13

**Sauter** 112:3,6,8,11,
23 113:19 120:4,13

**scenario** 59:11

**schedule** 20:13,15,
17 51:9 52:4 54:6,11,
17 55:2,18,21 56:11,
17 58:18 59:18 60:16
62:10 76:15,22 77:6,
9,13,17,24 78:4,13
80:14,17,18,22 93:6
97:25 98:4,12
102:10,15,23 103:5
133:10 140:5 141:25
157:6

**schedules** 108:16

**school** 13:20

**scope** 21:11 146:21
148:9

**Scott** 42:5,8,10,13

**screen** 14:24 15:13
19:7 40:14 68:7
69:11 75:24 79:4
82:2 128:19

**scribner** 43:3

**scroll** 21:23 42:2
44:9 59:9 69:3 72:2
77:8,10 81:11,20
89:5 90:9 93:10 96:8
111:22 113:5 120:18
122:22 131:3,24
134:16 138:11
142:19 144:13 145:2
150:7

**scrolling** 89:10
96:25 97:5,11 121:2

**search** 56:3

**sec** 33:2 132:21

**section** 56:5,9 57:16,
20 58:9 59:2,5,9
62:15,16,21,22 65:3
84:19,20,23 85:3
92:3,5 94:13 95:15
133:23 137:9 143:13
144:3

**Sections** 59:14 93:2

**secure** 32:13

**securities** 132:5

**seek** 11:25

**selling** 30:6

**SEM** 16:16 49:9 65:2

**send** 76:17 157:23

**sending** 119:19

**sends** 95:2 97:7

**sense** 56:23 74:14

**sentence** 70:7 80:13
81:8 82:12 116:5
120:3

**separate** 76:18 85:5

**September** 24:24

31:16 32:23 33:6
35:8 129:4,9

**series** 92:16

**served** 15:15

**services** 10:14,17
16:20 32:5

**set** 22:14 56:9,10,15,
16 58:18 59:18 78:4
81:21 93:6 97:24
112:22 134:24
139:24 143:3 152:13
153:21 154:11

**severally** 136:5

**shade** 141:12

**share** 109:19 135:18
137:10 148:19

**shared** 16:20 19:6
35:6 84:16 87:6

**sharing** 33:15

**sheet** 13:14

**Sheets** 8:2,7,13 14:7
25:24

**shift** 106:17 151:22,
25

**short** 105:3,11

**shortly** 116:24
152:20

**show** 15:3 79:10,22
84:23 142:17 147:13

**showed** 111:4

**shown** 137:23

**shows** 52:10,14 80:6
139:13 142:11

**side** 49:15,23 54:9
88:7

**sign** 9:24 95:16
157:23

**signatory** 32:2

**signature** 41:2 42:5
44:12

**signed** 41:5 42:22
46:2,4,8,20 47:5
49:2,5,17 50:16,23
52:19 54:24 55:14

59:21 62:12 65:20
74:15 75:8 96:11,17

**significant** 88:5,9

**signing** 45:22 46:3
54:9,14 57:5 60:19
61:22 66:18

**simple** 11:6 147:5,13
151:20

**simpler** 22:19

**simply** 106:16

**Simpson** 13:19

**sir** 10:5 17:15 19:10
22:25 30:10 40:19,20
44:14 58:9,10 72:13
76:5 103:14 128:5

**situation** 116:19

**skip** 68:15

**slightly** 97:22,23
121:10

**slip** 65:9,15 96:17
100:14 101:9,17
102:4

**small** 13:12 97:15,19
102:5

**sold** 102:19 136:20

**solely** 33:17

**solution** 113:20
120:5,10,13 121:17

**sound** 10:11

**Sounds** 90:23

**source** 86:20 126:14
153:4

**sourced** 124:16
127:4

**sources** 70:15
140:24

**sourcing** 12:24
78:20

**speak** 18:23 19:2
37:4 42:10 62:3
116:13

**specific** 44:6 57:4
60:24 66:19 87:14
102:23 116:23 118:6

119:8,13 120:15 136:7

**specifically** 30:25 36:13 41:24 43:11 56:25 57:7 70:2 72:16 83:5 87:19 88:8 99:3 117:7,11 119:7 130:11 132:18 138:25 139:10 155:16

**specificity** 23:17 130:14

**split** 109:5

**spoken** 14:9,13 20:24

**spot** 50:13

**stamp** 68:14

**stamped** 80:2

**stance** 147:18

**stand-alone** 78:15

**standing** 113:14

**standpoint** 47:14

**Stang** 7:18 9:16

**start** 68:3,18 88:23 95:24 107:10 128:5

**started** 116:25

**starting** 66:21

**Starwood** 30:5

**state** 7:15 10:4 111:8

**stated** 121:16 149:10

**statement** 45:12 75:11

**stay** 137:14

**steady** 139:25

**stenographic** 7:12

**steps** 46:5

**stop** 92:22

**stride** 118:8

**string** 95:22

**structure** 12:15 14:6 96:12

**struggle** 46:24

**subject** 35:21 53:4 57:14 58:15 63:2,9 76:22 108:14

**subpoena** 9:20,23 15:14,15 16:25 18:8 19:18 21:7,22 67:13, 20,25 128:12 152:3 154:10

**subsidiaries** 18:17 87:13

**subsidiary** 87:16

**substance** 80:14 120:24 121:4

**successor** 140:15

**sufficient** 45:21 115:18 116:2 141:3

**suggested** 30:14 134:6 142:3

**suggestion** 38:3 51:23

**suggests** 100:14

**summary** 70:18

**summer** 31:2

**swear** 8:22

**sworn** 8:25 9:10

---

**T**

**table** 122:23

**taking** 70:19 118:8

**talk** 16:2 60:7

**talked** 18:2 48:3 69:16

**talking** 18:6 36:6 48:2 90:15,21 124:5 132:11

**tax** 85:16 128:5,13,23 129:24 130:5,9,17, 20,25 134:3 144:20 146:6,9,12,17,23 147:8,19 149:5 150:22 151:17,18

**taxable** 83:18 84:10 85:10

**taxes** 74:22 148:2,11 149:14

**team** 113:19 120:4

**temporarily** 113:17 116:6 118:21

**term** 16:7 22:19 31:6 109:4

**terms** 17:25 64:6 72:8 73:16 74:3 110:22 111:2 129:22

**test** 14:25 51:22 92:8

**testified** 9:10 44:20 76:7 144:23

**testify** 17:16 20:20 21:8

**testimony** 17:4 72:12 156:21

**Texas** 7:9,13,25

**thanking** 9:18,19

**thereabouts** 86:7

**thereto** 155:7 156:3

**things** 24:17 29:16 30:22 32:9,11,17 33:16 35:5 37:2 38:12 39:14,16 63:14,20 77:5 87:13 102:19 132:19 139:2 141:18 143:24 151:19 153:3

**thinks** 49:23

**third-party** 115:20 116:3 121:7 126:11 127:3 132:10,17 141:3

**Thomas** 7:6 9:9,14 10:6,7 22:9 31:25 39:12 43:18 45:7,13 47:11 48:19 51:12,21 60:17 79:12,22,25 91:2 92:14 106:19 119:23 125:20 126:7 147:6 148:20 155:14 156:18

**thread** 112:4

**three-page** 144:15

**throws** 137:5

**time** 7:4 8:21 9:18 10:22 11:22 12:4 14:22 19:8,23 24:10 26:11 27:13 33:9 35:7 36:2,20 37:22 38:22 39:5 44:23 45:21,25 46:8,16,19 47:5 49:2,5,16 50:6, 16,22 52:19 54:5,23 55:13 57:5 60:6,13, 14 62:12 65:8 66:8, 18 68:8 71:13 72:25 73:10 86:22 96:11 98:13,21 102:15 104:14,18 105:20 106:9,10 108:10 109:11,21 113:19 114:3 115:15 116:8 117:24 118:6,22 119:4 122:14 126:7 130:24 131:12 139:7 144:19 151:15 155:17,21 158:7

**timeline** 39:2

**times** 20:11 66:19 112:17 151:3

**title** 10:18 35:9,12 107:20

**today** 8:10,15,20 9:18 10:8 14:23 17:5, 14 19:24 22:13 44:16 45:20 65:18 82:8

**today's** 7:3 14:15,20 17:21 18:24 40:22 128:17

**told** 16:4 48:25 72:24 73:5 75:17,22 111:15 112:19 113:11 115:25 118:19 119:2 138:5

**top** 25:23 59:3 69:7 120:22 123:2,4 138:12

**topic** 19:9 20:8,13, 21,24 21:3,8,14,16 22:9,20 28:9 106:18 151:23 152:7,14 153:21 154:12

**topics** 17:13,18 21:11 106:17,20

**total** 140:22

**totality** 20:7 34:8

**traced** 126:14

**tranche** 103:22 104:4 140:20

**transaction** 18:19 30:15 32:20,23 35:7, 24 62:5 71:5 118:10

**transactions** 14:12 88:16

**transcript** 106:15 157:15

**transition** 112:15

**traunches** 34:24

**Travis** 8:2,7,13 14:7 25:24

**treated** 83:6 143:10

**trick** 51:22

**tricky** 116:19

**TSG** 7:13

**Tuesday** 112:2

**tune** 88:4 137:2

**turn** 39:17 130:16

**two-page** 88:22 122:2 144:14

**type** 30:16 41:15 107:24

**typical** 45:16

**typically** 30:21 136:17

---

**U**

**Uh-huh** 16:10 94:25 96:14

**ultimately** 34:11 36:7,21 92:5

**underneath** 136:19

**understand** 11:19 15:9,23 20:2 23:5 41:10 49:24 85:7,12 92:23 98:18 110:9 115:4 133:2 136:3

147:12 149:9

**understanding** 17:3 20:16 26:5 29:21,24 30:17 32:21 33:8 41:12,17,18,25 47:6 59:22 61:23 69:18 70:13 74:18,20 75:5, 13 77:22 78:2 83:7 85:25 86:14 91:3,10, 11 92:5 98:2 100:11 104:9,13 108:24 109:3,12 110:11 111:10 114:14 115:8, 14,16 124:12,19 129:21 130:3 133:21 134:23 135:9 136:14, 23 138:18 147:17 150:23

**understood** 12:8,9 16:22 45:24 46:15 47:3 48:10 54:3 61:13 101:15 110:24, 25

**undertaken** 9:21

**underwriting** 32:9, 10

**unicorn** 29:19,25 30:2,9,11,24 31:4,17 33:23 44:17 87:10,24 108:15 112:12

**unique** 30:12,15

**University** 13:23

**unpaid** 123:6

**unreturned** 122:20

**unsure** 156:22

**update** 65:11,12 98:21 102:23

**updated** 71:14 76:16,17 108:21 109:10 110:2,5 111:16

**upper** 87:15

**urgency** 74:14,19,23

---

**V**

**verbal** 9:3

---

**verbatim** 91:19

**verify** 84:24

**version** 76:17 96:4, 21

**versions** 96:16

**VI** 58:15

**view** 26:15 82:2 154:21

**viewed** 28:24 29:2 69:21,23 72:15 155:16

**viewing** 28:15

**Viggato** 128:23 129:4,13,19 130:5,8 131:16 149:21,24 150:4

**virtual** 51:17 69:5

**virtually** 43:17

**voice** 61:16

---

**W**

**wait** 57:23

**wanted** 9:25 45:9,11 51:15,16 58:7 69:8 79:19 85:17 90:14,22 99:22 104:22 106:3 114:4 121:8 122:7,19 146:25

**waterfall** 53:10 57:11,14 59:11 63:20 82:10,15 85:15 86:13 89:24 91:7

**waterfalls** 87:17

**weeds** 116:12

**weighed** 101:8

**Wick** 27:20,22 112:14

**withdraw** 75:10 106:14

**withdrawn** 26:24 27:3 33:2 34:13 38:15 43:7 47:19 48:21 61:4 63:5 64:20 78:11 84:6

---

86:4 91:10,16 123:3, 13 125:3 126:8 131:18 154:8

**withhold** 154:7

**word** 7:19 30:11 46:24 70:11 77:12

**work** 10:12 32:13 132:19 138:24 141:17 142:23 151:18

**worked** 107:22

**working** 24:9 26:24 27:21 32:14,17 54:19 96:12 113:19 120:4, 14

**worth** 137:23

**writing** 66:5

**written** 19:12 22:3 35:16 36:25 38:13 39:7,15 46:13 57:3 106:21

**wrong** 55:2

**wrote** 58:22 109:24 111:12

---

**Y**

**y'all** 90:4 157:17

**year** 23:12 33:19 34:3 123:25 134:21 135:6, 19,23 139:25 140:2 141:13,14,21,22 143:6,7

**years** 11:4 13:4 131:5

**York** 7:19 105:16

---

**Z**

**Zabriskie** 25:7

**zeros** 68:15

**Ziehl** 7:18 9:16

**zoom** 90:3,16