# EXHIBIT 3

,"

Execution Version

BRIDGE LOAN AGREEMENT

dated as of

September 26, 2018

among

HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY
INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL
ESTATE ADVISORS IV, L.P., SE MULTIFAMILY REIT HOLDINGS, LLC, AND CERTAIN
PROPERTY OWNERS LISTED HEREIN,
collectively, as Borrower

and

The Lenders Party Hereto

and

KEYBANK NATIONAL ASSOCIATION,
as Administrative Agent

and

KEYBANC CAPITAL MARKETS,
As Sole Lead Arranger and Bookrunner

# TABLE OF CONTENTS

ARTICLE I Definitions .................................................................................................. 1

Section 1.01 Defined Terms ......................................................................... 1
Section 1.02 Classification of Loans and Borrowings................................. 25
Section 1.03 Terms Generally ..................................................................... 25
Section 1.04 Accounting Terms; GAAP...................................................... 25
Section 1.05 Appointment of Lead Borrower.............................................. 25

ARTICLE II The Loans ............................................................................................... 26

Section 2.01 [Intentionally Omitted] .......................................................... 26
Section 2.02 Commitments.......................................................................... 26
Section 2.03 Loans and Borrowings............................................................ 27
Section 2.04 [Intentionally Omitted] .......................................................... 27
Section 2.05 [Intentionally Omitted] .......................................................... 27
Section 2.06 [Intentionally Omitted] .......................................................... 27
Section 2.07 [Intentionally Omitted]. ......................................................... 27
Section 2.08 Interest Elections.................................................................... 27
Section 2.09 Reserved.................................................................................. 28
Section 2.10 Repayment of Loans; Evidence of Debt................................. 29
Section 2.11 Prepayment of Loans.............................................................. 29
Section 2.12 Fees......................................................................................... 31
Section 2.13 Interest. ................................................................................... 31
Section 2.14 Alternate Rate of Interest....................................................... 32
Section 2.15 Increased Costs. ...................................................................... 33
Section 2.16 Break Funding Payments ....................................................... 34
Section 2.17 Taxes....................................................................................... 35
Section 2.18 Payments Generally; Pro Rata Treatment; Sharing of Set-offs. .......................... 39
Section 2.19 Mitigation Obligations; Replacement of Lenders................... 40
Section 2.20 Defaulting Lenders. ................................................................ 41
Section 2.21 Extension of Tranche A Maturity Date................................... 42
Section 2.22 Extension of Tranche B Maturity Date................................... 43

ARTICLE III Representations and Warranties.............................................................. 43

Section 3.01 Organization; Powers............................................................. 43
Section 3.02 Authorization; Enforceability ................................................ 43
Section 3.03 Governmental Approvals; No Conflicts ................................. 44
Section 3.04 Financial Condition; No Material Adverse Change. ............... 44
Section 3.05 Properties. ............................................................................... 44
Section 3.06 Intellectual Property............................................................... 45
Section 3.07 Litigation and Environmental Matters.................................... 46
Section 3.08 Compliance with Laws and Agreements ................................ 48
Section 3.09 Investment and Holding Company Status .............................. 48
Section 3.10 Taxes....................................................................................... 48

Section 3.11 ERISA .................................................................................... 48
Section 3.12 Disclosure .............................................................................. 48
Section 3.13 Solvency ................................................................................ 48
Section 3.14 Margin Regulations ............................................................... 49
Section 3.15 Subsidiaries ........................................................................... 49
Section 3.16 OFAC; Anti-Money Laundering ........................................... 49
Section 3.17 EEA Financial Institution ..................................................... 49
Section 3.18 Single Asset Entity; Compliance With Laws ......................... 49

ARTICLE IV Conditions ................................................................................ 51

Section 4.01 Effective Date ....................................................................... 51
Section 4.02 Each Borrowing ..................................................................... 53

ARTICLE V Affirmative Covenants ............................................................... 53

Section 5.01 Financial Statements; Ratings Change and Other Information ........................... 53
Section 5.02 Financial Tests. ...................................................................... 54
Section 5.03 Notices of Material Events .................................................... 54
Section 5.04 Existence; Conduct of Business .............................................. 55
Section 5.05 Payment of Obligations ......................................................... 55
Section 5.06 Maintenance of Properties; Insurance. ................................... 55
Section 5.07 Books and Records; Inspection Rights. ................................... 58
Section 5.08 Compliance with Laws .......................................................... 58
Section 5.09 Use of Proceeds ..................................................................... 58
Section 5.10 Fiscal Year ............................................................................. 58
Section 5.11 Environmental Matters .......................................................... 58
Section 5.12 Collateral Requirement. ........................................................ 60
Section 5.13 Further Assurances ................................................................ 62
Section 5.14 [Intentionally Omitted] ......................................................... 62
Section 5.15 [Intentionally Omitted] ......................................................... 62
Section 5.16 Approved Leases .................................................................... 62
Section 5.17 Permanent Financing ............................................................. 63
Section 5.18 Keepwell. ............................................................................... 63
Section 5.19 DST Offerings. ....................................................................... 63

ARTICLE VI Negative Covenants .................................................................. 65

Section 6.01 Liens ...................................................................................... 65
Section 6.02 Fundamental Changes ............................................................ 66
Section 6.03 Investments, Loans, Advances and Acquisitions .................... 66
Section 6.04 Hedging Agreements .............................................................. 66
Section 6.05 Restricted Payments .............................................................. 66
Section 6.06 Transactions with Affiliates ................................................... 66
Section 6.07 [Intentionally Omitted] ......................................................... 66
Section 6.08 Restrictive Agreements .......................................................... 67
Section 6.09 Indebtedness .......................................................................... 67
Section 6.10 Subordination of Claims ........................................................ 68
Section 6.11 Amendment to Organizational Documents ............................. 68

Section 6.12 Sanctions .......................................................................................... 68
Section 6.13 Specified DSTs. ................................................................................. 69

ARTICLE VII Events of Default ................................................................................. 70

ARTICLE VIII The Administrative Agent .................................................................. 73

ARTICLE IX Miscellaneous ....................................................................................... 76

Section 9.01 Notices .............................................................................................. 76
Section 9.02 Waivers; Amendments....................................................................... 77
Section 9.03 Expenses; Indemnity; Damage Waiver.............................................. 78
Section 9.04 Successors and Assigns. .................................................................... 79
Section 9.05 Survival .............................................................................................. 82
Section 9.06 Counterparts; Integration; Effectiveness. .......................................... 83
Section 9.07 Severability ........................................................................................ 83
Section 9.08 Right of Setoff.................................................................................... 83
Section 9.09 Governing Law; Jurisdiction; Consent to Service of Process. ........... 84
Section 9.10 WAIVER OF JURY TRIAL ............................................................. 85
Section 9.11 Headings ............................................................................................ 85
Section 9.12 Confidentiality ................................................................................... 85
Section 9.13 Interest Rate Limitation ..................................................................... 86
Section 9.14 USA PATRIOT Act............................................................................ 86
Section 9.15 Fiduciary Duty/No Conflicts. ............................................................ 87
Section 9.16 Acknowledgement and Consent to Bail-In of EEA Financial Institutions .......... 87
Section 9.17 Multiple Borrowers; Joint and Several Liability. ............................... 88

SCHEDULES:

Schedule 1.01    –    Property Owner Borrowers
Schedule 2.01    –    Commitments
Schedule 3.05    –    Portfolio Properties
Schedule 3.07    –    Litigation Disclosure
Schedule 3.15    –    Subsidiaries
Schedule 6.09    –    Existing Indebtedness
Schedule 6.10    –    Junior Claims


EXHIBITS:

Exhibit A    --    Form of Assignment and Acceptance
Exhibit B    –    Form of Compliance Certificate
Exhibit C    –    Form of Guaranty
Exhibit D    –    Form of Note
Exhibit E    –    Form of Borrowing Request/Interest Rate Election
Exhibit F    –    Form of Tax Compliance Certificate

BRIDGE LOAN AGREEMENT ("Agreement") dated as of

September 26, 2018, among

HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., SE MULTIFAMILY REIT HOLDINGS, LLC, AND THE PROPERTY OWNERS LISTED ON SCHEDULE 1.01 HERETO, individually and collectively, jointly and severally, as Borrower,

the LENDERS party hereto,

KEYBANK NATIONAL ASSOCIATION, as Administrative Agent,

And

KEYBANC CAPITAL MARKETS, as Sole Lead Arranger and Boookrunner

# ARTICLE I

## Definitions

Section 1.01 <u>Defined Terms</u>. As used in this Agreement, the following terms have the meanings specified below:

"<u>ABR</u>," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Alternate Base Rate.

"<u>Adjusted EBITDA</u>" means (a) EBITDA for the most recently ended calendar quarter, annualized, *less* (b) the Capital Expenditure Reserve.

"<u>Adjusted LIBO Rate</u>" means, with respect to any Eurodollar Borrowing for any Interest Period, an interest rate per annum (rounded upwards, if necessary, to the next 1/100 of 1%) equal to (a) the LIBO Rate for such Interest Period multiplied by (b) the Statutory Reserve Rate.

"<u>Administrative Agent</u>" means KeyBank, National Association, in its capacity as administrative agent for the Lenders hereunder.

"<u>Administrative Questionnaire</u>" means an Administrative Questionnaire in a form supplied by the Administrative Agent.

"<u>Advisor</u>" means, collectively, NexPoint Advisors, L.P. and NexPoint Real Estate Advisors IV, L.P.

"<u>Affiliate</u>" means, with respect to a specified Person, another Person that directly, or indirectly through one or more intermediaries, Controls or is Controlled by or is under common Control with the Person specified.

"<u>Alternate Base Rate</u>" means, for any day, a rate per annum equal to the greatest of (a) the Prime Rate in effect on such day, (b) the Federal Funds Effective Rate in effect on such day plus 1/2 of 1%, and (c) the applicable LIBO Rate for a one month Interest Period plus one percent (1%) per annum.  Any change in the Alternate Base Rate due to a change in the Prime Rate or the Federal Funds Effective Rate shall be effective from and including the effective date of such change in the Prime Rate or the Federal Funds Effective Rate, respectively.

"<u>Anti-Corruption Laws</u>" means all Legal Requirements of any jurisdiction concerning or relating to bribery or corruption, including without limitation, the Foreign Corrupt Practices Act of 1977.

"<u>Anti-Money Laundering Laws</u>" means all Legal Requirements related to the financing of terrorism or money laundering, including without limitation, any applicable provision of the Patriot Act and The Currency and Foreign Transactions Reporting Act (also known as the "Bank Secrecy Act," 31 U.S.C. §§ 5311-5330 and 12U.S.C. §§ 1818(s), 1820(b) and 1951-1959).

"<u>Applicable Percentage</u>" means, with respect to any Lender, the percentage of the total Commitments of the Lenders represented by such Lender's Commitment.  If the Commitments have terminated or expired, the Applicable Percentages shall be determined based upon the Commitments most recently in effect, giving effect to any assignments.

"<u>Applicable Rate</u>" means, a rate per annum equal to: (a) with respect to Tranche A Loans, for any Eurodollar Borrowing or Daily LIBOR Borrowing, 140 basis points, and for any ABR Borrowing, 40 basis points and (b) with respect to Tranche B Loans, for any Eurodollar Borrowing or Daily LIBOR Borrowing, 375 basis points, and for any ABR Borrowing, 275 basis points.

"<u>Appraisal</u>" (whether one or more) means a written appraisal of the Mortgaged Properties by an MAI appraiser satisfactory to the Administrative Agent.  Each Appraisal must comply with all Legal Requirements and, unless specifically provided to the contrary in this Agreement, must be in form and substance reasonably satisfactory to the Administrative Agent.

"<u>Appraised Value</u>" means the "as is" value of Real Property, as set forth in the most recent Appraisal for such Real Property.

"<u>Approved Fund</u>" has the meaning set forth in <u>Section 9.04(b)</u>.

"<u>Approved Lease</u>" has the meaning set forth in <u>Section 5.16</u>.

 "<u>Arranger</u>" means KeyBanc Capital Markets or any successors thereto.

"<u>Assignment and Acceptance</u>" means an assignment and acceptance entered into by a Lender and an assignee (with the consent of any party whose consent is required by <u>Section 9.04</u>), and accepted by the Administrative Agent, in the form of <u>Exhibit A</u> or any other form approved by the Administrative Agent.

"Assignment of Leases and Rents" means an assignment of leases and rents from the applicable Borrower to the Administrative Agent delivered to secure the Obligations, as may be modified or amended.

"Bail-In Action" means the exercise of any Write-Down and Conversion Powers by the applicable EEA Resolution Authority in respect of any liability of an EEA Financial Institution.

"Bail-In Legislation" means, with respect to any EEA Member Country implementing Article 55 of Directive 2014/59/EU of the European Parliament and of the Council of the European Union, the implementing law for such EEA Member Country from time to time, which is described in the EU Bail-In Legislation Schedule.

"Beneficial Ownership Certification" means a certification regarding beneficial ownership required by the Beneficial Ownership Regulation, which certification shall be substantially similar in form and substance to the form of Certification Regarding Beneficial Owners of Legal Entity Customers published jointly, in May 2018, by the Loan Syndications and Trading Association and Securities Industry and Financial Markets Association, or such other form as may be reasonably requested by any Lender.

"BH Pledgor" means BHSL Holdings, LLC, an Iowa limited liability company.

"BH Loan" means that certain $10,000,000 loan from SE Multifamily Holdings, LLC, a Delaware limited liability company, to the BH Pledgor pursuant to the BH Loan Agreement.

"BH Loan Agreement" means that certain Promissory dated as of the Effective Date by SE Multifamily Holdings, LLC, a Delaware limited liability company, and BH Pledgor.

"BH Loan Documents" means, collectively, the BH Loan Agreement, the BH Pledges, and each other documents or certificate entered into in connection therewith.

"BH Pledges" means those certain Pledge and Security Agreements by the BH Pledgor and/or its Subsidiaries in favor of the Lender to secure the BH Loan, which have been assigned to the Administrative Agent as Collateral for the loan.

"Board" means the Board of Governors of the Federal Reserve System of the United States of America.

"Borrower" means, individually and collectively, jointly and severally, Highland Capital, HCRE PARTNERS, LLC, a Delaware limited liability company, The Dugaboy Investment Trust, The SLHC Trust, NEXPOINT ADVISORS, L.P., a Delaware limited partnership, NEXPOINT REAL ESTATE ADVISORS IV, L.P., a Delaware limited partnership, the REIT Borrower, and each Property Owner Borrower.

"Borrowing" means Loans of the same Type, made, converted or continued on the same date and, in the case of Eurodollar Loans, as to which a single Interest Period is in effect.

"Borrowing Request" means a request by the Borrower for a Borrowing in accordance with Section 2.03.

"Business Day" means any day that is not a Saturday, Sunday or other day on which commercial banks in Boston, Massachusetts or New York, New York are authorized or required by law to remain closed; provided that, when used in connection with a Eurodollar Loan or Daily LIBOR Loan, the term "Business Day" shall also exclude any day on which banks are not open for dealings in dollar deposits in the London interbank market.

"Capital Expenditure Reserve" means, on an annual basis, an amount equal to $250 per unit with respect to each Real Property owned by the Borrower or any Subsidiary.

"Capital Lease Obligations" of any Person means the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP, and the amount of such obligations shall be the capitalized amount thereof determined in accordance with GAAP.

"Capital Stock" means, collectively, all shares of capital stock (whether denominated as common or preferred stock), equity interests, partnership, limited liability company, or membership interests, joint venture interests or other ownership interests in or equivalents of or in a Person (other than an individual), whether voting or non-voting, and to the extent not included in the foregoing, any of a member's or partner's control rights in such Person, including the rights to manage or participate in management, voting rights, inspection rights and other rights.

"Change in Control" means (a) a transfer or series of transfers of any legal or equitable interest since the Effective Date that results in a change of more than 50% of the ownership interests in any Borrower (other than the Property Owner Borrowers); (b) James Dondero ceases to be the manager of HCRE Partners, LLC, a Delaware limited liability company, the sole member of NexPoint Advisors GP, LLC, or the sole member of NexPoint Real Estate Advisors GP, LLC, in each case, unless replaced with an Affiliate thereof; (c) the acquisition of more than 50% of the ownership interests in HCRE Partners, LLC by any Person other than The Dugaboy Investment Trust, unless replaced with an Affiliate of James Dondero; (d) the failure of Highland Capital, HCRE Partners, LLC, and the REIT Borrower, in the aggregate, to own, directly or indirectly, free and clear of any Liens except those granted in favor of the Agent, 90% of the ownership interests in, and Control, each Property Owner Borrower, (e) the replacement, removal or resignation of NexPoint Real Estate Advisors GP, LLC as general partner of NexPoint Real Estate Advisors IV, L.P., unless replaced with an Affiliate thereof, (f) the replacement, removal or resignation of NexPoint Advisors GP, LLC as general partner of NexPoint Advisors, L.P., unless replaced with an Affiliate thereof, or (g) the replacement, removal or resignation of the trustee of the SLHC Trust as of the Effective Date, unless replaced with an Affiliate thereof.

"Change in Law" means (a) the adoption of any law, rule or regulation after the date of this Agreement by any Governmental Authority, (b) any change in any law, rule or regulation or in the interpretation or application thereof by any Governmental Authority after the date of this Agreement or (c) compliance by any Lender (or, for purposes of Section 2.15(b), by any lending office of such Lender or by such Lender's holding company, if any) with any request, guideline

or directive (whether or not having the force of law) of any Governmental Authority made or issued after the date of this Agreement. Notwithstanding anything herein to the contrary, (a) the Dodd-Frank Wall Street Reform and Consumer Protection Act and all requests, rules, guidelines or directives thereunder or issued in connection therewith and (b) all requests, rules, guidelines or directives promulgated by the Bank for International Settlements, the Basel Committee on Banking Supervision (or any successor or similar authority) or the United States or foreign regulatory authorities, in each case pursuant to Basel III, shall in each case be deemed to be a "Change in Law", regardless of the date enacted, adopted or issued.

"Code" means the Internal Revenue Code of 1986, as amended from time to time.

"Collateral" means all property, tangible or intangible, real, personal or mixed, now or hereafter subject to the liens and security interests of the Loan Documents, or intended so to be, which Collateral shall secure the Obligations and Hedging Obligations.

"Collateral Assignment of Management Contract" means each Collateral Assignment of Management Contract by and among a Borrower, the applicable manager and the Administrative Agent previously, now or hereafter delivered to secure the Obligations, as the same may be amended, modified, supplemented or replaced from time to time.

"Collateral Subsidiary" means each Subsidiary of the Borrower which owns a direct or indirect interest in a Portfolio Property.

"Commitment" means, with respect to each Lender, the commitment of such Lender to make Loans hereunder as set forth on Schedule 2.01. As of the Effective Date, the aggregate amount of the Lenders' Commitments is $556,275,000.00.

"Commodity Exchange Act" means the Commodity Exchange Act (7 U.S.C. § 1 et seq.), as amended from time to time, and any successor statute.

"Communication" has the meaning set forth in ARTICLE VIII.

"Compliance Certificate" has the meaning set forth in Section 5.01(d) hereof and a form of which is attached hereto as Exhibit B.

"Connection Income Taxes" means Other Connection Taxes that are imposed on or measured by net income (however denominated) or that are franchise Taxes or branch profits Taxes.

"Control" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise, which includes the customary powers of a managing member of any limited liability company, any general partner of any limited partnership, or any board of directors of a corporation. "Controlling" and "Controlled" have meanings correlative thereto.

"Cost To Repair" has the meaning set forth in Section 5.06(d).

"Current Survey" means a boundary survey of each Mortgaged Property.

"Daily LIBOR" means, for any Business Day, the LIBO Rate as determined by the Administrative Agent for a Loan with an Interest Period of one month in the amount of the subject Daily LIBOR Loan.

"Debtor Relief Laws" means any applicable liquidation, conservatorship, bankruptcy, moratorium, rearrangement, insolvency, fraudulent conveyance, reorganization, or similar laws affecting the rights, remedies, or recourse of creditors generally, including without limitation the Bankruptcy Code and all amendments thereto, as are in effect from time to time during the term of this Agreement.

"Default" means any event or condition which constitutes an Event of Default or which upon notice, lapse of time or both would, unless cured or waived, become an Event of Default.

"Defaulting Lender" means any Lender that: (a) has failed to perform any of its funding obligations hereunder, including in respect of its Commitment, within two (2) Business Days of the date required to be funded by it hereunder; (b) has notified the Borrower or Administrative Agent that it does not intend to comply with its funding obligations or has made a public statement to that effect with respect to its funding obligations hereunder (unless such notification or public statement relates to such Lender's obligation to fund a Loan and indicates that such position is based on such Lender's good faith determination that a condition precedent (specifically identified and including the particular Default, if any) to funding a Loan is not or cannot be satisfied) or under other agreements in which it commits to extend credit; (c) has failed, within two (2) Business Days after written request by the Administrative Agent or a Borrower (and the Administrative Agent has received a copy of such request), to confirm in a manner satisfactory to the Administrative Agent that it will comply with its funding obligations hereunder; or (d) has, or has a direct or indirect parent company that has: (i) become the subject of a proceeding under any Debtor Relief Law; (ii) had a receiver, conservator, trustee, administrator, assignee for the benefit of creditors or similar Person charged with reorganization or liquidation of its business or a custodian appointed for it; or (iii) in the good faith determination of the Administrative Agent, taken any material action in furtherance of, or indicated its consent to, approval of or acquiescence in any such proceeding or appointment; or (iv) become the subject of a Bail-In Action; provided that a Lender shall not be a Defaulting Lender solely by virtue of the ownership or acquisition of any equity interest in that Lender or any direct or indirect parent company thereof by a Governmental Authority; provided, further, that such ownership interest does not result in or provide such Lender with immunity from the jurisdiction of courts within the United States or from the enforcement of judgments or writs of attachment on its assets or permit such Lender (or such Governmental Authority) to reject, repudiate, disavow or disaffirm any contracts or agreements made by such Lender.

"Designated Jurisdiction" means any country, region, or territory to the extent that such country, region, or territory itself, or its government, is the subject or target of any Sanction.

"Dollars" or "$" refers to lawful money of the United States of America.

"DST" means, a Delaware statutory trust.

"DST Depositor" means the Portfolio One DST Depositor, the Portfolio Two DST Depositor, the Portfolio Three DST Depositor, the Stonebridge DST Depositor, and any other Person approved by the Agent that becomes a depositor with respect to any DST that owns an interest in the properties owned by the Portfolio One DST, Portfolio Two DST, or Portfolio Three DST, as of the Effective Date.

"DST Sale" has the meaning set forth in Section 6.13(a).

"DST Permitted Sale" has the meaning set forth in Section 6.13(a).

"EBITDA" means an amount derived from (a) net income, plus (b) to the extent included in the determination of net income, depreciation, amortization, interest expense and income taxes, plus or minus (c) to the extent included in the determination of net income, any extraordinary losses or gains, such as those resulting from sales of payment of Indebtedness, plus (d) to the extent not capitalized, the amount of non-recurring expenses, fees, costs and charges incurred in connection with the Loan, plus (e) to the extent not capitalized, the amount of all non-recurring expenses, fees, costs and charges incurred with any acquisition, issuance of debt or equity, asset disposition or investment permitted hereunder, or any proposed or actual amendment, modification or refinancing of any Indebtedness, plus or minus (f) to the extent included in the determination of net income, any realized or unrealized losses or gains on investments; in each case, as determined for Borrower and its Wholly-Owned Subsidiaries on a consolidated basis, and including (without duplication) the Equity Percentage of EBITDA for the Borrower's Unconsolidated Affiliates.

"Economic Interests Pledge" means that certain Pledge and Security Agreement (Economic Interests), dated as of the date hereof, by and among certain of the Borrowers and the Administrative Agent.

"EEA Financial Institution" means (a) any credit institution or investment firm established in any EEA Member Country which is subject to the supervision of an EEA Resolution Authority, (b) any entity established in an EEA Member Country which is a parent of an institution described in clause (a) of this definition, or (c) any financial institution established in an EEA Member Country which is a subsidiary of an institution described in clauses (a) or (b) of this definition and is subject to consolidated supervision with its parent;

"EEA Member Country" means any of the member states of the European Union, Iceland, Liechtenstein, and Norway.

"EEA Resolution Authority" means any public administrative authority or any Person entrusted with public administrative authority of any EEA Member Country (including any delegee) having responsibility for the resolution of any EEA Financial Institution.

"Effective Date" means the date on which the conditions specified in Section 4.01 are satisfied (or waived in accordance with Section 9.02).

"Electronic System" has the meaning set forth in ARTICLE VIII.

"Environmental Assessment" shall mean a written assessment and report approved by the Administrative Agent as to the status of each Mortgaged Property regarding compliance with any Legal Requirements related to environmental matters and accompanied by a reliance letter satisfactory to the Administrative Agent. Each Environmental Assessment must comply with all Legal Requirements.

"Environmental Claim" means any notice of violation, action, claim, Environmental Lien, demand, abatement or other order or direction (conditional or otherwise) by any Governmental Authority or any other Person for personal injury (including sickness, disease or death), tangible or intangible property damage, damage to the environment, nuisance, pollution, contamination or other adverse effects on the environment, or for fines, penalties or restriction, resulting from or based upon (i) the existence, or the continuation of the existence, of a Release (including, without limitation, sudden or non-sudden accidental or non-accidental Releases) of, or exposure to, any Hazardous Material, or other Release in, into or onto the environment (including, without limitation, the air, soil, surface water or groundwater) at, in, by, from or related to any property owned, operated or leased by the Borrower or any of its Subsidiaries or any activities or operations thereof; (ii) the environmental aspects of the transportation, storage, treatment or disposal of Hazardous Materials in connection with any property owned, operated or leased by the Borrower or any of its Subsidiaries or their operations or facilities; or (iii) the violation, or alleged violation, of any Environmental Laws or Environmental Permits of or from any Governmental Authority relating to environmental matters connected with any property owned, leased or operated by the Borrower or any of its Subsidiaries.

"Environmental Indemnity" means that certain Environmental Compliance and Indemnity Agreement of even date herewith by the Borrower and delivered to the Administrative Agent, together with any other environmental risk or indemnity agreement hereafter executed with respect to any Mortgaged Property.

"Environmental Laws" means all applicable laws, rules, regulations, codes, ordinances, orders, decrees, judgments, injunctions, or binding agreements issued, promulgated or entered into by any Governmental Authority, relating in any way to the environment, preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or to health and safety matters and includes (without limitation) the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., the Hazardous Materials Transportation Act, 49 U.S.C. § 1801 et seq., the Federal Insecticide, Fungicide, and Rodenticide Act, 7 U.S.C. § 136 et seq., the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. § 6901 et seq., the Toxic Substances Control Act, 15 U.S.C. § 2601 et seq., the Clean Air Act, 42 U.S.C. §7401 et seq., the Clean Water Act, 33 U.S.C. § 1251 et seq., the Occupational Safety and Health Act, 29 U.S.C. § 651 et seq., (to the extent the same relates to any Hazardous Materials), and the Oil Pollution Act of 1990, 33 U.S.C. § 2701 et seq., as such laws have been amended or supplemented, and the regulations promulgated pursuant thereto, and all analogous state and local statutes.

"Environmental Liability" means any liability, contingent or otherwise (including any liability for damages, costs of environmental remediation, fines, penalties or indemnities), of the Borrower or any Subsidiary directly or indirectly resulting from or based upon (a) violation of

any Environmental Law, (b) exposure to any Hazardous Materials in violation of any Environmental Law, (c) the Release or threatened Release of any Hazardous Materials into the environment in violation of any Environmental Law or (d) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"Environmental Lien" means any lien in favor of any Governmental Authority arising under any Environmental Law.

"Environmental Permit" means any permit required under any applicable Environmental Law or under any and all supporting documents associated therewith.

"Equity Interests" means, with respect to any Person, all of the shares, partnership or membership interests, economic and other rights, participations or other equivalents (however designated) of Capital Stock of such Person, all of the warrants, options or other rights for the purchase or acquisition from such Person of shares of Capital Stock of such Person, all of the securities convertible into or exchangeable for shares of Capital Stock of such Person or warrants, rights or options for the purchase or acquisition from such Person of such shares (or such other interests), and all of the other ownership or profit interests in such Person (including partnership, membership or trust interests therein), whether voting or nonvoting, and whether or not such shares, warrants, options, rights or other interests are outstanding on any date of determination.

"Equity Offering" means, any issuance and/or sale after the effective Date by any Person of any Equity Interests or equity securities of such Person, including, without limitation, (a) any new preferred securities, and (b) any conversion of equity interests or securities into equity interests in such Person.

"Equity Percentage" means the aggregate ownership percentage of Borrower in each Unconsolidated Affiliate, which shall be calculated as the greater of (a) Borrower's nominal capital ownership interest in the Unconsolidated Affiliate as set forth in the Unconsolidated Affiliate's organizational documents, and (b) Borrower's economic ownership interest in the Unconsolidated Affiliate, reflecting Borrower's share of income and expenses of the Unconsolidated Affiliate.

"Equity Proceeds Pledge" shall mean the pledge and security agreement dated as of even date herewith related to any equity issuance proceeds of the Borrower granted by the Borrower to the Administrative Agent, together with all other instruments, agreements and written obligations executed and/or delivered by any of the Borrowers in connection therewith.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time.

"ERISA Affiliate" means any trade or business (whether or not incorporated) that, together with the Borrower, is treated as a single employer under Section 414(b) or (c) of the Code or, solely for purposes of Section 302 of ERISA and Section 412 of the Code, is treated as a single employer under Section 414 of the Code.

"ERISA Event" means (a) any "reportable event", as defined in Section 4043 of ERISA or the regulations issued thereunder with respect to a Plan (other than an event for which the 30-day notice period is waived); (b) the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; (c) the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; (d) the incurrence by the Borrower or any of its ERISA Affiliates of any liability under Title IV of ERISA with respect to the termination of any Plan; (e) the receipt by the Borrower or any ERISA Affiliate from the PBGC or a plan administrator of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; (f) the incurrence by the Borrower or any of its ERISA Affiliates of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or (g) the receipt by the Borrower or any ERISA Affiliate of any notice, or the receipt by any Multiemployer Plan from the Borrower or any ERISA Affiliate of any notice, concerning the imposition of Withdrawal Liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"EU Bail-In Legislation Schedule" means the EU Bail-In Legislation Schedule published by the Loan Market Association (or any successor person), as in effect from time to time.

"Eurodollar," when used in reference to any Loan or Borrowing, refers to whether such Loan, or the Loans comprising such Borrowing, are bearing interest at a rate determined by reference to the Adjusted LIBO Rate.

"Event of Default" has the meaning assigned to such term in Article VII.

"Excluded Swap Obligation" means, with respect to the liability of any Borrower with respect to a Swap Obligation, including the grant of a security interest to secure such Swap Obligation, any Swap Obligation if, and to the extent that, such Swap Obligation is or becomes illegal under the Commodity Exchange Act or any rule, regulation or order of the Commodity Futures Trading Commission (or the application or official interpretation of any thereof) by virtue of such Borrower's failure for any reason to constitute an "eligible contract participant" as defined in the Commodity Exchange Act and the regulations thereunder at the time the liability or grant of such security interest becomes effective with respect to such Swap Obligation. If a Swap Obligation arises under an agreement governing more than one swap, such exclusion shall apply only to the portion of such Swap Obligation that is attributable to swaps for which such Swap Obligation or security interest is or becomes illegal.

"Excluded Taxes" means, any of the following Taxes imposed on or with respect to a Recipient or required to be withheld or deducted from a payment to a Recipient, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of such Recipient being organized under the laws of, or having its principal office or, in the case of any Lender, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are Other Connection Taxes, (b) in the case of a Lender, U.S. federal withholding Taxes imposed on amounts payable to or for the account of such Lender with respect to an applicable interest in a Loan or its Commitment pursuant to Legal Requirements in effect on the date on which (i)

such Lender acquires such interest in the Loan or its Commitment (other than pursuant to an assignment request by the Borrowers under Section 2.17 as a result of costs sought to be reimbursed pursuant to Section 2.17 or (ii) such Lender changes its lending office, except in each case to the extent that, pursuant to Section 2.17 amounts with respect to such Taxes were payable either to such Lender's assignor immediately before such Lender became a party hereto or to such Lender immediately before it changed its lending office, (c) Taxes attributable to such Recipient's failure to comply with Section 2.17 and (d) any U.S. federal withholding Taxes imposed under FATCA.

"FATCA" means Sections 1471 through 1474 of the Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreements entered into pursuant to Section 1471(b)(1) of the Code.

"Federal Funds Effective Rate" means, for any day, the weighted average (rounded upwards, if necessary, to the next 1/100 of 1%) of the rates on overnight Federal funds transactions with members of the Federal Reserve System arranged by Federal funds brokers, as published on the next succeeding Business Day by the Federal Reserve Bank of New York, or, if such rate is not so published for any day that is a Business Day, the average (rounded upwards, if necessary, to the next 1/100 of 1%) of the quotations for such day for such transactions received by the Administrative Agent from three Federal funds brokers of recognized standing selected by it.  Notwithstanding the foregoing, if the Federal Funds Effective Rate shall be less than zero, such rate shall be deemed zero for the purposes of this Agreement.

"Fee Letter" means that certain Fee Letter dated as of the date hereof by and between the Borrower and the Agent, as the same may be amended, restated, supplemented, or otherwise modified from time to time.

"Financing Statements" means all such Uniform Commercial Code financing statements as the Administrative Agent shall require, duly authorized by the Borrower, to give notice of and to perfect or continue perfection of the Lenders' security interest in all Collateral.

"Fixed Charge Coverage Ratio" means the ratio of (a) Adjusted EBITDA for the immediately preceding calendar quarter of Borrower and its Subsidiaries to (b) the sum of (i) all regularly scheduled principal due and payable and actually paid on Indebtedness (other than amounts paid in connection with balloon maturities and payments in respect of the Loans), including the Equity Percentage for such amounts for the Borrower's Unconsolidated Affiliates, plus (ii) all Interest Expense, plus (iii) the aggregate amount of all cash dividends payable on any preferred stock for the immediately preceding calendar quarter, in each case, for the Borrower and its Subsidiaries.

"Foreign Lender" means, if a Borrower is a U.S. Person, a Lender that is not a U.S. Person, and if a Borrower is not a U.S. Person, a Lender that is resident or organized under the laws of a jurisdiction other than that in which such Borrower is resident for tax purposes.

"GAAP" means generally accepted accounting principles in the United States of America, subject to the provisions of Section 1.04.

"Governmental Authority" means the government of the United States of America, any other nation or any political subdivision thereof, whether state or local, and any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government.

"Guarantee" of or by any Person (the "guarantor") means any obligation, contingent or otherwise, of the guarantor guaranteeing or having the economic effect of guaranteeing any Indebtedness or other obligation of any other Person (the "primary obligor") in any manner, whether directly or indirectly, and including any obligation of the guarantor, direct or indirect, (a) to purchase or pay (or advance or supply funds for the purchase or payment of) such Indebtedness or other obligation or to purchase (or to advance or supply funds for the purchase of) any security for the payment thereof, (b) to purchase or lease property, securities or services for the purpose of assuring the owner of such Indebtedness or other obligation of the payment thereof, (c) to maintain working capital, equity capital or any other financial statement condition or liquidity of the primary obligor so as to enable the primary obligor to pay such Indebtedness or other obligation or (d) as an account party in respect of any letter of credit or letter of guaranty issued to support such Indebtedness or obligation; provided, that the term Guarantee shall not include endorsements for collection or deposit in the ordinary course of business.

"Hazardous Materials" means all explosive or radioactive substances or wastes and all hazardous or toxic substances or wastes, including petroleum or petroleum distillates, asbestos or asbestos containing materials, polychlorinated biphenyls, radon gas, infectious or medical wastes and all other substances or wastes of any nature regulated pursuant to any Environmental Law; provided, that Hazardous Materials shall not include any such substances or wastes utilized or maintained at the Real Property in the ordinary course of business and in accordance with all applicable Environmental Laws.

"HCRE Property" "individually, or collectively "HCRE Properties," means, as of the Effective Date, each of the Real Properties set forth in Schedule 1.01(A) hereto.

"Hedging Agreement" means any interest rate protection agreement (including an interest rate cap), foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement.

"Hedging Obligations" means, with respect to the any Borrower or any Subsidiary of the Borrower, any obligations arising under any Hedging Agreement entered into with the Administrative Agent or any Lender with respect to the Loans. Under no circumstances shall any of the Hedging Obligations secured or guaranteed by any Loan Document as to a surety or guarantor thereof include any obligation that constitutes an Excluded Swap Obligation of such Person.

"Highland Capital" means HIGHLAND CAPITAL MANAGEMENT, LP, a Delaware limited partnership.

"Impacted Interest Period" has the meaning set forth in the definition of LIBO Rate.

"Indebtedness" of any Person means, without duplication, (a) all obligations of such Person for borrowed money or with respect to deposits or advances of any kind, (b) all obligations of such Person evidenced by bonds, debentures, notes or similar instruments, including mandatorily redeemable preferred stock, (c) all obligations of such Person upon which interest charges are customarily paid, (d) all obligations of such Person under conditional sale or other title retention agreements relating to property acquired by such Person, (e) all obligations of such Person in respect of the deferred purchase price of property or services (excluding current accounts payable incurred in the ordinary course of business), (f) all Indebtedness of others secured by (or for which the holder of such Indebtedness has an existing right, contingent or otherwise, to be secured by) any Lien on property owned or acquired by such Person, whether or not the Indebtedness secured thereby has been assumed, (g) all Guarantees by such Person of Indebtedness of others, but excluding customary non-recourse, carveout guarantees and environmental indemnitees until such time as such guarantees or indemnitees become a recourse obligation, (h) all Capital Lease Obligations of such Person, (i) all obligations, contingent or otherwise, of such Person as an account party in respect of letters of credit and letters of guaranty, (j) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances, (k) all obligations, contingent or otherwise, of such Person with respect to any Hedging Agreements (calculated on a mark-to-market basis as of the reporting date), and (l) payments received in consideration of sale of an ownership interest in Borrower when the interest so sold is determined, and the date of delivery is, more than one (1) month after receipt of such payment and only to the extent that the obligation to deliver such interest is not payable solely in such interest of such Person. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide that such Person is not liable therefor. For purposes of calculating the financial covenants set forth herein, Indebtedness shall not include any Indebtedness that has been expressly subordinated in right of payment to the Obligations on terms and conditions acceptable to the Administrative Agent, including, without limitation, intercompany Indebtedness that is subject to Section 6.10(b). Indebtedness shall be calculated on a consolidated basis for the Borrower and its Wholly-Owned Subsidiaries, and including (without duplication) the Equity Percentage of Indebtedness for the Borrower's Unconsolidated Affiliates.

"Indemnified Taxes" means (a) Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Borrowers under any Loan Document and (b) to the extent not otherwise described in the immediately preceding clause (a), Other Taxes.

"Information Materials" has the meaning set forth in ARTICLE VIII.

"Interest Election Request" means a request by the Borrower to convert or continue the then outstanding amount of the Loan in accordance with Section 2.07.

"Interest Expense" means, with respect to any Person, all paid, accrued or capitalized interest expense on such Person's Indebtedness (whether direct, indirect or contingent, and

including, without limitation, interest on all convertible debt), and including (without duplication) the Equity Percentage of Interest Expense for the Borrower's Unconsolidated Affiliates.

"Interest Payment Date" means the first Business Day of each calendar month.

"Interest Period" means with respect to any Eurodollar Loan, the period commencing on the date that the then outstanding portion of the Loan is converted to or continued as a Eurodollar Loan, and ending on the numerically corresponding day in the calendar month that is one or three months thereafter; provided, that (a) if any Interest Period would end on a day other than a Business Day, such Interest Period shall be extended to the next succeeding Business Day unless such next succeeding Business Day would fall in the next calendar month, in which case such Interest Period shall end on the next preceding Business Day and (b) any Interest Period pertaining to a Eurodollar Loan that commences on the last Business Day of a calendar month (or on a day for which there is no numerically corresponding day in the last calendar month of such Interest Period) shall end on the last Business Day of the last calendar month of such Interest Period. For purposes hereof, the date of a Borrowing initially shall be the date on which such Borrowing is made and, in the case of a Borrowing, thereafter shall be the effective date of the most recent conversion or continuation of such Borrowing.

"Interpolated Rate" means, at any time, for any Interest Period, the rate per annum (rounded to the same number of decimal places as the LIBO Rate) determined by the Administrative Agent (which determination shall be conclusive and binding absent manifest error) to be equal to the rate that results from interpolating on a linear basis between: (a) the LIBO Rate for the longest period for which the LIBO Rate is available that is shorter than the Impacted Interest Period; and (b) the LIBO Rate for the shortest period for which that LIBO Rate is available that exceeds the Impacted Interest Period, in each case, at such time.

"KeyBank" means KeyBank, National Association, in its individual capacity.

"Lead Borrower" means HCRE Partners, LLC.

"Legal Requirement" means any law, statute, ordinance, decree, requirement, order, judgment, rule, regulation (or interpretation of any of the foregoing) of, and the terms of any license or permit issued by, any Governmental Authority.

"Lenders" means the Persons listed on Schedule 2.01 and any other Person that shall have become a party hereto pursuant to an Assignment and Acceptance, other than any such Person that ceases to be a party hereto pursuant to an Assignment and Acceptance.

"LIBO Rate" means, subject to Section 2.14(b),with respect to any Eurodollar Borrowing for any Interest Period, the London interbank offered rate as administered by ICE Benchmark Administration (or any other Person that takes over the administration of such rate for U.S. Dollars) for a period equal in length to such Interest Period as displayed on pages LIBOR01 or LIBOR02 of the Reuters screen that displays such rate (or, in the event such rate does not appear on a Reuters page or screen, on any successor or substitute page on such screen that displays such rate, or on the appropriate page of such other information service that publishes such rate

from time to time as selected by the Administrative Agent in its reasonable discretion; in each case the "LIBOR Screen Rate") at approximately 11:00 a.m., London time, two Business Days prior to the commencement of such Interest Period; provided that (i) if the LIBOR Screen Rate shall be less than zero, such rate shall be deemed to be zero for the purposes of this Agreement; provided further that if the LIBOR Screen Rate shall not be available at such time for such Interest Period (an "Impacted Interest Period") then the LIBO Rate shall be the Interpolated Rate; provided that if any Interpolated Rate shall be less than zero, such rate shall be deemed to be zero for purposes of this Agreement, and (ii) if no such rate administered by ICE Benchmark Administration (or by such other Person that has taken over the administration of such rate for U.S. Dollars) is available to the Administrative Agent, the applicable LIBO Rate for the relevant Interest Period shall instead be the rate determined by the Administrative Agent to be the rate at which KeyBank or one of its Affiliate banks offers to place deposits in U.S. dollars with first class banks in the London interbank market at approximately 11:00 a.m. (London time) two Business Days prior to the first day of such Interest Period, in the approximate amount of the relevant Eurodollar Loan and having a maturity equal to such Interest Period.

"LIBOR Screen Rate" is defined in the definition of LIBO Rate.

"Lien" means, with respect to an asset, (a) any mortgage, deed of trust, lien (statutory or other), pledge, hypothecation, negative pledge, collateral assignment, encumbrance, deposit arrangement, charge or security interest in, on or of such asset; (b) the interest of a vendor or a lessor under any conditional sale agreement, capital lease or title retention agreement (or any financing lease having substantially the same economic effect as any of the foregoing) relating to such asset; (c) the filing under the Uniform Commercial Code or comparable law of any jurisdiction of any financing statement naming the owner of the asset to which such Lien relates as debtor; (d) any other preferential arrangement of any kind or nature whatsoever intended to assure payment of any Indebtedness or other obligation; and (e) in the case of securities, any purchase option, call or similar right of a third party with respect to such securities, including any dividend reinvestment or redemption plans.

"Liquidity" means the sum of (i) unencumbered and unrestricted cash and cash equivalents of the Borrower, excluding any debt service, capital improvement or other similar reserve funds held under or required by any loan documents entered in to by the Borrower or any Subsidiary, plus (ii) the market value of all common shares of NexPoint Residential Trust, Inc. or operating partnership units in NexPoint Residential Operating Partnership, LP, in each case, owned by The Dugaboy Investment Trust and which have been pledged as Collateral for the Obligations, plus (iii) the market value of all unencumbered and unrestricted marketable securities held by Borrower, plus (iv) the market value of all unencumbered and unrestricted marketable securities held by Borrower less all related outstanding Indebtedness.

"Loan" means the loans made by the Lenders to the Borrower pursuant to Section 2.02 of this Agreement, including, without limitation, the Tranche A Loan and Tranche B Loan.

"Loan Documents" means this Agreement, the Notes, the Mortgages, the Environmental Indemnity, the Pledge Agreement, the Equity Proceeds Pledge, the Economic Interests Pledge, the Financing Statements, and all other instruments, agreements and written obligations executed and delivered by any of the Borrowers in connection with the transactions contemplated hereby.

"Management Company" means, each of BH Management Services, LLC, an Iowa limited liability company, and Milestone Management, LLC, a Delaware limited liability company.

"Mandatory Prepayment" has the meaning set forth in Section 2.11(d).

"Material Adverse Effect" means a material adverse effect on (a) the business, assets, operations, or financial condition of (i) the Borrower and its Subsidiaries taken as a whole, (b) the ability of any of the Borrowers to perform their obligations under the Loan Documents or (c) the rights of benefits available to the Administrative Agent or the Lenders under the Loan Documents; provided, however, that none of the following shall constitute, or shall be considered in determining whether there has occurred, and no event, circumstance, change or effect resulting from or arising out of any of the following shall constitute, a Material Adverse Effect: (A) changes in the national or world economy or financial markets as a whole or changes in general economic conditions that affect the industries in which the Borrower, and its Subsidiaries conduct their business, so long as such changes or conditions do not adversely affect the Borrower, and its Subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (B) any change in applicable Law, rule or regulation or GAAP or interpretation thereof after the date hereof, so long as such changes do not adversely affect the Borrower, and its Subsidiaries, taken as a whole, in a materially disproportionate manner relative to other similarly situated participants in the industries or markets in which they operate; (C) the failure, in and of itself, of the Borrower to meet any published or internally prepared estimates of revenues, earnings or other financial projections, performance measures or operating statistics; or (D) compliance with the terms of, and taking any action required by, this Agreement, or taking or not taking any actions at the request of, or with the consent of, the Administrative Agent.

"Material Contract" means any contract or other arrangement (other than Loan Documents), whether written or oral, to which any Borrower is a party as to which the breach, nonperformance, cancellation or failure to renew by any party thereto could reasonably be expected to have a Material Adverse Effect.

"Maturity Date" means the Tranche A Maturity Date or the Tranche B Maturity Date, as applicable.

"Maximum Rate" shall have the meaning set forth in Section 9.13.

"Mortgage" (whether one or more) means a deed of trust and security agreement, a mortgage and security agreement, or a security deed (or deed to secure debt) and security agreement granted by each Property Owner Borrower in favor of the Administrative Agent, for the benefit of the Lenders, covering each Mortgaged Property in the aggregate amount of the Tranche A Loan.

"Mortgaged Property" individually, or collectively "Mortgaged Properties," means, as of the Effective Date, each of the nine (9) Real Properties identified as "Mortgaged Properties" in Schedule 3.05 hereto.

"Multiemployer Plan" means a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"Note" means a promissory note in the form attached hereto as Exhibit D payable to a Lender evidencing certain of the obligations of the Borrower under the Loans to such Lender and executed by Borrower, as the same may be amended, supplemented, modified or restated from time to time; "Notes" means, collectively, all of such Notes outstanding at any given time.

"Obligations" means all liabilities, obligations, covenants and duties of any Borrower to the Administrative Agent and/or any Lender arising under or otherwise with respect to any Loan Document, whether direct or indirect (including those acquired by assumption), absolute or contingent, due or to become due, now existing or hereafter arising and including interest and fees that accrue after the commencement by or against any Borrower or any Affiliate thereof of any proceeding under any bankruptcy or other insolvency proceeding  naming such person as the debtor in such proceeding, regardless of whether such interest and fees are allowed claims in such proceedings.  For the avoidance of doubt, "Obligations" shall not include any indebtedness, liabilities, obligations, covenants or duties in respect of Hedging Obligations.

"OFAC" has the meaning set forth in Section 3.16.

"Offering Documents" means, each Private Placement Memorandum and any supplements thereto relating to the sale of beneficial interests in any Specified DST, all as approved by Agent.

"Other Taxes" means, all present or future stamp, court or documentary, intangible, recording, filing or similar Taxes that arise from any payment made under, from the execution, delivery, performance, enforcement or registration of, from the receipt or perfection of a security interest under, or otherwise with respect to, any Loan Document, except any such Taxes that are Other Connection Taxes imposed with respect to an assignment (other than an assignment made pursuant to Section 2.17 as a result of costs sought to be reimbursed pursuant to Section 2.17).

"Patriot Act" has the meaning set forth in Section 9.14.

"PBGC" means the Pension Benefit Guaranty Corporation referred to and defined in ERISA and any successor entity performing similar functions.

"Permitted Encumbrances" means:

      (a)      Liens imposed by law for taxes that are not yet due or are being contested in compliance with Section 5.05;

      (b)      pledges and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations;

      (c)      deposits to secure the performance of bids, trade contracts, purchase, construction or sales contracts, leases, statutory obligations, surety and appeal bonds,

performance bonds and other obligations of a like nature, in each case in the ordinary course of business;

(d) the Title Instruments, Liens and other matters described in the Title Insurance Policy for each Portfolio Property or HCRE Property;

(e) uniform commercial code protective filings with respect to personal property leased to the Borrower or any Subsidiary;

(f) landlords' liens for rent not yet due and payable;

(g) Liens on the Equity Interests in the Stonebridge DST and NexPoint Residential Trust Inc. securing the Stonebridge Term Loan; and

(g) liens on a Portfolio Property (other than a Mortgaged Property) arising under the Senior Loan or on an HCRE Property arising under property-level Indebtedness secured by such Real Property;

provided that the term "Permitted Encumbrances" shall not include any Lien securing Indebtedness other than the Senior Loan and the Stonebridge Term Loan.

"Permitted Investments" means:

(a) direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States of America (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States of America), in each case maturing within one year from the date of acquisition thereof;

(b) investments in commercial paper maturing within 270 days from the date of acquisition thereof and having an investment grade credit rating on the date of acquisition;

(c) investments in certificates of deposit, banker's acceptances and time deposits maturing within 180 days from the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States of America or any State thereof which has a combined capital and surplus and undivided profits of not less than $500,000,000;

(d) fully collateralized repurchase agreements with a term of not more than 90 days for securities described in clause (a) above and entered into with a financial institution satisfying the criteria described in clause (c) above; and

(e) investments of a Borrower in Subsidiaries and Unconsolidated Affiliates made in accordance with this Agreement.

"Person" means any natural person, corporation, limited liability company, trust, joint venture, association, company, partnership, Governmental Authority or other entity.

"Plan" means any employee pension benefit plan (other than a Multiemployer Plan) subject to the provisions of Title IV of ERISA or Section 412 of the Code or Section 302 of ERISA, and in respect of which the Borrower or any ERISA Affiliate is (or, if such plan were terminated, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Pledge Agreement" means those certain Pledge and Security Agreements executed by the Borrower in favor of Administrative Agent pledging Borrower's interest in the Pledged Interests.

"Pledged DST Account" has the meaning set forth in Section 6.13(d).

"Pledged Interests" means, collectively, the ownership (or in the reasonable discretion of the Administrative Agent, the economic) interests now or hereafter pledged by Borrower and each Collateral Subsidiary and the economic interest, including rights to receive cash and other distributions from each other Subsidiary of the Borrower hereunder and subject to the liens and security interests of the Loan Documents, or intended so to be.

"Portfolio One DST" means NREA Southeast Portfolio One, DST, a Delaware statutory trust, in its capacity as owner of Equity Interests in the Andros Isles, Arborwalk, Walker Ranch, and Towne Crossing properties.

"Portfolio One DST Depositor" means NREA SE MF Investment Co, LLC, a Delaware limited liability company, in its capacity as depositor for the Portfolio One DST.

"Portfolio Property" individually, or "Portfolio Properties" collectively, means each of the twenty three (23) Real Properties listed on Schedule 3.05 hereto, including, without limitation, the Mortgaged Properties.

"Portfolio Three DST" means NREA Southeast Portfolio Three, DST, a Delaware statutory trust, in its capacity as owner of Equity Interests in the Arboleda, Fairways, and Grand Oasis properties.

"Portfolio Three DST Depositor" means NREA SE MF Investment Co, LLC, a Delaware limited liability company, in its capacity as depositor for the Portfolio Three DST.

"Portfolio Two DST" means NREA Southeast Portfolio Two, DST, a Delaware statutory trust, in its capacity as owner of Equity Interests in the West Place, Vista Ridge, and Hidden Lake properties.

"Portfolio Two DST Depositor" means NREA SE MF Investment Co, LLC, a Delaware limited liability company, in its capacity as depositor for the Portfolio Two DST

"Prime Rate" means the rate of interest per annum publicly announced from time to time by KeyBank, National Association, as its prime rate in effect at its principal office in Cleveland, Ohio; each change in the Prime Rate shall be effective from and including the date such change is publicly announced as being effective.

"Property Owner Borrower" means each of the Persons listed on Schedule 1.01 hereto, which own the Mortgaged Properties.

"Qualified ECP Party" means, in respect of any interest rate cap, swap or other hedging obligation, each Person which is a Borrower that has total assets exceeding $10,000,000 at the time such Borrower's guarantee, mortgage and/or other credit or collateral support, of such interest rate cap, swap or other hedging obligation secured pursuant to the Deed to Secure Debt becomes effective, or otherwise constitutes an "eligible contract participant" under the Commodity Exchange Act or any regulations promulgated thereunder.

"Real Property" means, collectively, all interest in any land and improvements located thereon (including direct financing leases of land and improvements owned by a Borrower or any of Borrower's Subsidiaries), together with all equipment, furniture, materials, supplies and personal property now or hereafter located at or used in connection with the land and all appurtenances, additions, improvements, renewals, substitutions and replacements thereof now or hereafter acquired by a Borrower or any of Borrower's Subsidiaries.

"Recipient" means, each of the Administrative Agent and any Lender.

"Register" has the meaning set forth in Section 9.04.

"REIT Borrower" means SE MULTIFAMILY REIT HOLDINGS, LLC, a Delaware limited liability company.

"Related Parties" means, with respect to any specified Person, such Person's Affiliates and the respective directors, officers, employees, agents and advisors of such Person and such Person's Affiliates.

"Release" means any release, spill, emission, leaking, pumping, pouring, dumping, emptying, injection, deposit, disposal, discharge, dispersal, leaching or migration on or into the indoor or outdoor environment or into or out of any property in violation of applicable Environmental Laws.

"Remedial Action" means all actions, including without limitation any capital expenditures, required or necessary to (i) clean up, remove, treat or in any other way address any Hazardous Material; (ii) prevent the Release or threat of Release, or minimize the further Release, of any Hazardous Material so it does not migrate or endanger public health or the environment; (iii) perform pre-remedial studies and investigations or post-remedial monitoring and care; or (iv) bring facilities on any property owned or leased by the Borrower or any of its Subsidiaries into compliance with all Environmental Laws.

"Required Lenders" means, as of any date of determination, Lenders having more than 66 2/3% of the Commitments or, if the Commitments of each Lender to make Loans have been terminated pursuant to Article VII, Lenders holding in the aggregate at least 66 2/3% of the aggregate Obligations; provided that the Commitment of, and the portion of the Obligations held or deemed held by, any Defaulting Lender shall be excluded for purposes of making a determination of Required Lenders.

"Restricted Payment" means any dividend or other distribution (whether in cash, securities or other property) with respect to any ownership interests in the Borrower or any Subsidiary, or any payment (whether in cash, securities or other property), including any sinking fund or similar deposit, on account of the purchase, redemption, retirement, acquisition, cancellation or termination of any such ownership interests in the Borrower or any option, warrant or other right to acquire any such shares of capital stock of the Borrower.

"Senior Credit Agreement" means, collectively, each of those certain Loan Agreements, as amended, with the Federal Home Loan Mortgage Corporation, as lender, set forth on Schedule 3.05 hereof with respect to the Portfolio Properties (other than the Mortgaged Properties).

"Senior Loan" means each loan made pursuant to a Senior Credit Agreement.

"Senior Loan Documents" means each Senior Credit Agreement and all other instruments, agreements and written obligations executed and delivered in connection with the transactions contemplated by a Senior Credit Agreement.

"Specified DST" means the Portfolio One DST, the Portfolio Two DST, the Portfolio Three DST, the Stonebridge DST, and any other DST approved by the Agent that owns an interest in the properties owned by the Portfolio One DST, Portfolio Two DST, o Portfolio Three DST, as of the Effective Date.

"Specified DST Depositor" means the Portfolio One DST Depositor, the Portfolio Two DST Depositor, the Portfolio Three DST Depositor, the Stonebridge DST Depositor, and any other depositor approved by the Agent with respect to any DST that owns an interest in the properties owned by the Portfolio One DST, Portfolio Two DST, or Portfolio Three DST, as of the Effective Date.

"Statutory Reserve Rate" means a fraction (expressed as a decimal), the numerator of which is the number one and the denominator of which is the number one minus the aggregate of the maximum reserve percentages (including any marginal, special, emergency or supplemental reserves) expressed as a decimal established by the Governmental Authority to which the Administrative Agent is subject, with respect to the Adjusted LIBO Rate, for Eurocurrency funding (currently referred to as "Eurocurrency Liabilities" in Regulation D of the Board).  Such reserve percentages shall include those imposed pursuant to such Regulation D.  Eurodollar Loans shall be deemed to constitute Eurocurrency funding and to be subject to such reserve requirements without benefit of or credit for proration, exemptions or offsets that may be available from time to time to any Lender under such Regulation D or any comparable regulation.  The Statutory Reserve Rate shall be adjusted automatically on and as of the effective date of any change in any reserve percentage.

"Stonebridge DST" means NREA Retreat, DST, a Delaware statutory trust, which will own the Retreat at Stonebridge Ranch property located in McKinney, TX.

"Stonebridge DST Depositor" means NREA Retreat Investment Co, LLC, a Delaware limited liability company, in its capacity as depositor for Stonebridge DST.

"Stonebridge Term Loan" means the term loan made by KeyBank pursuant to that certain Second Amended and Restated Credit Agreement dated as of September 17, 2018 by and among NexPoint Real Estate Advisors IV, L.P. and The Dugaboy Investment Trust, as borrowers, and KeyBank National Association, as lender.

"Subsidiary" means, with respect to Borrower, as applicable (the "parent"), at any date, any corporation, limited liability company, partnership, association or other entity the accounts of which would be consolidated with those of the parent in the parent's consolidated financial statements if such financial statements were prepared in accordance with GAAP as of such date, as well as any other corporation, limited liability company, partnership, association or other entity (a) of which securities or other ownership interests representing more than 50% of the equity or more than 50% of the ordinary voting power or, in the case of a partnership, more than 50% of the general partnership interests are, as of such date, owned, controlled or held by parent, or (b) that is, as of such date, otherwise Controlled, by the parent or one or more subsidiaries of the parent.

"Summers Landing Property" means that certain Real Property known as Summers Landing and located at 3900 Centreport Drive, Fort Worth, Texas 76155, which is indirectly owned by the BH Pledgor.

"Swap Obligation" means, any Hedging Obligation that constitutes a "swap" within the meaning of section 1a(47) of the Commodity Exchange Act.

"Tangible Net Worth" shall mean, with respect to the Borrowers and their Subsidiaries, (a) total assets (without deduction for accumulated depreciation and accumulated amortization of lease intangibles) less (b) all intangible assets and (c) all liabilities (including contingent and indirect liabilities), all determined in accordance with sound accounting principles, consistently applied. The term "intangible assets" shall include, without limitation, (i) deferred charges such as straight-line rents and other non-cash items, and (ii) the aggregate of all amounts appearing on the assets side of any such balance sheet for franchises, licenses, permits, patents, patent applications, copyrights, trademarks, trade names, goodwill, treasury stock, experimental or organizational expenses and other like intangibles (other than amounts related to the purchase price of real property which are allocated to lease intangibles). The term "liabilities" shall include, without limitation, (i) Indebtedness secured by Liens on property of the Person with respect to which Tangible Net Worth is being computed whether or not such Person is liable for the payment thereof, (ii) deferred liabilities, and (iii) Capital Lease Obligations. Tangible Net Worth shall be calculated on a consolidated basis Borrower and their Wholly-Owned Subsidiaries and including the Borrower's Equity Percentage of Tangible Net Worth of the Borrower's Unconsolidated Affiliates.

"Taxes" means any and all present or future taxes, levies, imposts, duties, deductions, charges or withholdings imposed by any Governmental Authority.

"The Dugaboy Investment Trust" means THE DUGABOY INVESTMENT TRUST, under trust agreement dated November 15, 2010.

"The SLHC Trust" means THE SLHC TRUST, under trust agreement dated December 27, 2016.

"Title Instruments" means true and correct copies of all instruments of record in the Office of the County Clerk, the Real Property Records or of any other Governmental Authority affecting title to all or any part of the Portfolio Properties, including but not limited to those (if any) which impose restrictive covenants, easements, rights-of-way or other encumbrances on all or any part of such Real Properties.

"Title Insurance Policy" means, collectively, (i) with respect to the Mortgaged Properties, the policies of title insurance in the aggregate face amounts equal to the Tranche A Loan, issued in favor of the Administrative Agent by a title insurance company satisfactory to the Administrative Agent and insuring that title to each Mortgaged Property is vested in the applicable Property Owner Borrower, free and clear of any Lien, objection, exception or requirement, and that each Mortgage creates a valid first and prior lien on all the applicable Mortgaged Property, subject only to the Permitted Encumbrances and such other exceptions as may be approved in writing by the Administrative Agent, and (ii) with respect to other Real Property, the policies of title issued in favor of the respective Collateral Subsidiary by a title insurance company satisfactory to the lender under a Senior Credit Agreement or other Indebtedness secured by such Real Property and insuring that title to such Real Property is vested in such Collateral Subsidiary, free and clear of any Lien, objection, exception or requirement, subject only to the Permitted Encumbrances.

"Titled Agents" means, collectively, the Arranger and any syndication agents or documentation agent named as such on the cover page of this Agreement.

"Total Asset Value" means the sum of (without duplication) (a) the aggregate Appraised Value of all of the Portfolio Properties, plus (b) total assets (without deduction for accumulated depreciation and amortization) of the Borrowers (other than the Property Owner Borrowers) determined in accordance with sound accounting principles, consistently applied. For any non-wholly owned Real Properties, Total Asset Value shall be adjusted for Borrower's and Subsidiaries' Equity Percentage thereof.

"Total Leverage Ratio" means the ratio (expressed as a percentage) of (a) the Indebtedness of Borrower to (b) Total Asset Value.

"Tranche A Initial Maturity Date" means March 26, 2019.

"Tranche A Maturity Date" means the earlier of (i) the Tranche A Initial Maturity Date, as such date may be extended as provided in Section 2.21, and (ii) the date on which the Tranche A Loans shall become due and payable pursuant to the terms hereof.

"Tranche B Initial Maturity Date" means September 26, 2019.

"Tranche B Maturity Date" means the earlier of (i) the Tranche B Initial Maturity Date, as such date may be extended as provided in Section 2.22, and (ii) the date on which the Tranche B Loans shall become due and payable pursuant to the terms hereof.

"Transactions" means the execution, delivery and performance by the Borrowers of the Loan Documents, the borrowing of the Loans, and the use of the proceeds thereof.

"Trust Agreement" means the Trust Agreement for the Portfolio One DST dated as of the Effective Date, the Trust Agreement for the Portfolio Two DST dated as of the Effective Date, the Trust Agreement for the Portfolio Three DST dated as of the Effective Date, the Amended and Restated Trust Agreement for Stonebridge DST dated as of the Effective Date, and the trust agreement for any other Specified DST.

"Trust Interests" means the beneficial interests in each Specified DST which will be (x) sold pursuant to the applicable Offering Document or (y) issued to an Affiliate of Borrower that owns any unsold beneficial interests.

"Type," when used in reference to any Loan or Borrowing, refers to whether the rate of interest on such Loan, or on the Loans comprising such Borrowings, is determined by reference to the Adjusted LIBO Rate, the Daily LIBOR Rate, or the Alternate Base Rate.

"Unconsolidated Affiliate" means, without duplication, in respect of any Person, any other Person (other than a Person whose stock is traded on a national trading exchange) in whom such Person holds, directly or indirectly, an investment consisting of a voting equity or ownership interest, which investment is accounted for in the financial statements of such Person on an equity basis of accounting.

"U.S. Person" means any Person that is a "United States Person" as defined in Section 7701(a)(30) of the Code.

"Wholly-Owned" means, with respect to a Subsidiary of a Person, a Subsidiary of such Person all of the outstanding Equity Interests of which (other than (x) director's qualifying shares and (y) shares issued to foreign nationals to the extent required by applicable law) are owned by such Person and/or by one or more wholly owned Subsidiaries of such Person.  In determining whether a Subsidiary of a Person is a Wholly-Owned Subsidiary, all preferred shareholders of a Subsidiary that is organized as a real estate investment trust shall be disregarded.

"Withdrawal Liability" means liability to a Multiemployer Plan as a result of a complete or partial withdrawal from such Multiemployer Plan, as such terms are defined in Part I of Subtitle E of Title IV of ERISA.

"Withholding Agent" means any Borrower and the Administrative Agent.

"Write-Down and Conversion Powers" means, with respect to any EEA Resolution Authority, the write-down and conversion powers of such EEA Resolution Authority from time to time under the Bail-In Legislation for the applicable EEA Member Country, which write-down and conversion powers are described in the EU Bail-In Legislation Schedule.

Section 1.02 <u>Classification of Loans and Borrowings</u>. For purposes of this Agreement, Loans may be classified and referred to by Type (e.g., a "Eurodollar Loan"). Borrowings also may be classified and referred to by Type (e.g., a "Eurodollar Borrowing").

Section 1.03 <u>Terms Generally</u>. The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes," and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall". Unless the context requires otherwise (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof," and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Articles, Sections, Exhibits and Schedules shall be construed to refer to Articles and Sections of, and Exhibits and Schedules to, this Agreement and (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights.

Section 1.04 <u>Accounting Terms; GAAP</u>. Except as otherwise expressly provided herein, all terms of an accounting or financial nature shall be construed in accordance with sound accounting principles, consistently applied; provided that, if GAAP accounting is expressly required and the Borrower notifies the Administrative Agent that the Borrower requests an amendment to any provision hereof to eliminate the effect of any change occurring after the date hereof in GAAP or in the application thereof on the operation of such provision (or if the Administrative Agent notifies the Borrower that the Required Lenders request an amendment to any provision hereof for such purpose), regardless of whether any such notice is given before or after such change in GAAP or in the application thereof, then such provision shall be interpreted on the basis of GAAP as in effect and applied immediately before such change shall have become effective until such notice shall have been withdrawn or such provision amended in accordance herewith.

Section 1.05 <u>Appointment of Lead Borrower</u>.

(a) For the purpose of implementing the joint borrower provisions of this Agreement and the other Loan Documents, each Borrower hereby irrevocably appoints the Lead Borrower as its agent and attorney-in-fact for the purpose of requesting and obtaining Borrowings hereunder, including delivery of any Borrowing Request or Interest Election Request, and such Borrower shall be obligated to the Administrative Agent and the Lenders on account of Borrowings so made as if made directly by the Lenders to such Person. Further, each Borrower hereby irrevocably appoints the Lead Borrower as its agent and attorney-in-fact for all other purposes under the Loan Documents, including the giving and receiving of notices and other communications, the giving of consents or approvals pursuant to the terms hereof, and

submitting Compliance Certificates and other similar certificates required hereunder. Any request by the Lead Borrower for a Borrowing or an Interest Election Request shall in all events be deemed and construed as a request for such Borrowing by all Borrowers hereunder.

(b)      The proceeds of each loan and advance provided under the Loans which is requested by the Lead Borrower shall be advanced as and when otherwise provided herein or as otherwise indicated by the Lead Borrower. The Lead Borrower shall cause the transfer of the proceeds thereof to the Borrower(s) on whose behalf such loan and advance was obtained. Neither the Administrative Agent nor any Lender shall have any obligation to see to the application of such proceeds.

(c)      It is understood and agreed that the handling of this credit facility on a joint borrowing basis as set forth in this Agreement is solely as an accommodation to the Borrower and at their request. Accordingly, the Administrative Agent and the Lenders are entitled to rely, and shall be exonerated from any liability for relying upon, any Borrowing Request, Interest Election Request, or any other request or communication made by a purported officer of any Borrower without the need for any consent or other authorization of any other Borrower and upon any information or certificate provided on behalf of any Borrower by a purported officer of such Borrower, and any such request or other action shall be fully binding on each Borrower as if made by it.

ARTICLE II

The Loans

Section 2.01 [Intentionally Omitted].

Section 2.02 Commitments. Subject to the terms and conditions set forth herein, each Lender severally agrees to make Loans to the Borrower on the Effective Date as follows:

(a)      a term loan (the "Tranche A Loan") to finance the acquisition of the Mortgaged Properties on the Effective Date in an aggregate principal amount not to exceed the lesser of (i) $231,400,000 and (ii) 65% of the lesser of (x) the allocated acquisition cost of the Mortgaged Properties as approved by the Administrative Agent and (y) the aggregate "as is" Appraised Value of the Mortgaged Properties; and

(b)      a term loan (the "Tranche B Loan") in an aggregate principal amount of $324,875,000 to finance a portion of the acquisition cost of the Portfolio Properties that is not financed by the Tranche A Loan or the Senior Loan;

Each Loan shall be made in immediately available funds in accordance with instructions provided by the Borrower. The aggregate amount of the Loan shall not exceed the aggregate amount of the Commitments. Once repaid, no portion of the Loans may be reborrowed. Notwithstanding anything herein to the contrary, the Commitments shall terminate upon the making of the Loans described in this Section 2.02 on the Effective Date.

Section 2.03 <u>Loans and Borrowings</u>.

(a)      Each Loan shall be made as part of a Borrowing consisting of Loans made by the Lenders ratably in accordance with their respective Commitments.  The failure of any Lender to make any Loan required to be made by it shall not relieve any other Lender of its obligations hereunder; provided that the Commitments of the Lenders are several and no Lender shall be responsible for any other Lender's failure to make Loans as required.

(b)      Subject to <u>Section 2.13</u>, each Borrowing shall be comprised of ABR Loans, Daily LIBOR Loans, and/or Eurodollar Loans as the Borrower may request in accordance herewith. Each Lender at its option may make any Eurodollar Loan by causing any domestic or foreign branch or Affiliate of such Lender to make such Loan; provided that any exercise of such option shall not affect the obligation of the Borrower to repay such Loan in accordance with the terms of this Agreement.

(c)      Each Eurodollar Loan shall be in an aggregate amount that is an integral multiple of $100,000 and not less than $1,000,000.  Borrowings of more than one Type may be outstanding at the same time; <u>provided</u> that there shall not at any time be more than a total of six (6) Eurodollar Borrowings outstanding.

(d)      Notwithstanding any other provision of this Agreement, the Borrower shall not be entitled to request, or to elect to convert or continue, any Borrowing if the Interest Period requested with respect thereto would end after the Maturity Date.

Section 2.04 [Intentionally Omitted].

Section 2.05 [Intentionally Omitted].

Section 2.06 [Intentionally Omitted].

Section 2.07 [Intentionally Omitted].

Section 2.08 <u>Interest Elections</u>.

(a)      Each Borrowing initially shall be of the Type specified in the applicable Borrowing Request and, in the case of a Eurodollar Borrowing, shall have an initial Interest Period as specified in such Borrowing Request.  Thereafter, the Borrower may elect to convert such Borrowing to a different Type or to continue such Borrowing and, in the case of a Eurodollar Borrowing, may elect Interest Periods therefor, all as provided in this Section.  The Borrower may elect different options with respect to different portions of the affected Borrowing, in which case each such portion shall be allocated ratably among the Lenders holding the Loans comprising such Borrowing, and the Loans comprising each such portion shall be considered a separate Borrowing.

(b)      To make an election pursuant to this Section, the Borrower shall notify the Administrative Agent of such election by telephone by the time that a Borrowing Request would be required under <u>Section 2.03</u> if the Borrower were requesting a Borrowing of the Type

resulting from such election to be made on the effective date of such election. Each such telephonic Interest Election Request shall be irrevocable and shall be confirmed promptly by hand delivery or telecopy to the Administrative Agent of a written Interest Election Request in the form of a Borrowing Request (with proper election made for an interest rate election only) and signed by the Lead Borrower.

(c)     Each telephonic and written Interest Election Request shall specify the following information in compliance with Section 2.03:

(i)     the Borrowing to which such Interest Election Request applies and, if different options are being elected with respect to different portions thereof, the portions thereof to be allocated to each resulting Borrowing (in which case the information to be specified pursuant to clauses (iii) and (iv) below shall be specified for each resulting Borrowing;

(ii)     the effective date of the election made pursuant to such Interest Election Request, which shall be a Business Day;

(iii)     whether the resulting Borrowing is to be an ABR Borrowing, a Daily LIBOR Borrowing, or a Eurodollar Borrowing; and

(iv)     if the resulting Borrowing is a Eurodollar Borrowing, the Interest Period to be applicable thereto after giving effect to such election, which shall be a period contemplated by the definition of the term "Interest Period".

If any such Interest Election Request requests a Eurodollar Loan but does not specify an Interest Period, then the Borrower shall be deemed to have selected an Interest Period of one month's duration.

(d)     Promptly following receipt of an Interest Election Request, the Administrative Agent shall advise each Lender of the details thereof and of such Lender's portion of each resulting Borrowing.

(e)     If the Borrower fails to deliver a timely Interest Election Request with respect to a Eurodollar Borrowing prior to the end of the Interest Period applicable thereto, then, unless such Eurodollar Borrowing is repaid as provided herein, at the end of such Interest Period such Borrowing shall be converted to an ABR Borrowing. Notwithstanding any contrary provision hereof, if an Event of Default has occurred and is continuing and the Administrative Agent, at the request of the Required Lenders, so notifies the Borrower, then, so long as an Event of Default is continuing (i) no outstanding Borrowing may be converted to or continued as a Eurodollar Borrowing and (ii) unless repaid, each Eurodollar Borrowing shall be converted to an ABR Borrowing at the end of the Interest Period applicable thereto.

Section 2.09 Reserved.

Section 2.10 <u>Repayment of Loans; Evidence of Debt.</u>

(a)      The Borrower hereby unconditionally promises to pay to the Administrative Agent for the account of each Lender the then unpaid principal amount of (i) the Tranche A Loans on the Tranche A Maturity Date and (i) the Tranche B Loans on the Tranche B Maturity Date.

(b)      At the request of each Lender, the Loans made by such Lender shall be evidenced by a Note payable to such Lender in the amount of such Lender's Commitment.

(c)      Each Lender shall maintain in accordance with its usual practice an account or accounts evidencing the indebtedness of the Borrower to such Lender resulting from each Loan made by such Lender, including the amounts of principal and interest payable and paid to such Lender from time to time hereunder.

(d)      The Administrative Agent shall maintain accounts in which it shall record (i) the amount of each Loan made hereunder, the Type thereof and the Interest Period applicable thereto, (ii) the amount of any principal or interest due and payable or to become due and payable from the Borrower to each Lender hereunder and (iii) the amount of any sum received by the Administrative Agent hereunder for the account of the Lenders and each Lender's share thereof.

(e)      The entries made in the accounts maintained pursuant to <u>paragraph (b)</u> or <u>(c)</u> of this Section shall be <u>prima facie</u> evidence of the existence and amounts of the obligations recorded therein; <u>provided</u> that the failure of any Lender or the Administrative Agent to maintain such accounts or any error therein shall not in any manner affect the obligation of the Borrower to repay the Loans in accordance with the terms of this Agreement.

Section 2.11 <u>Prepayment of Loans.</u>

(a)      The Borrower shall have the right at any time and from time to time to prepay, without penalty, any Borrowing in whole or in part, subject to prior notice in accordance with paragraph (b) of this Section, and subject to <u>Section 2.15</u>, if applicable.

(b)      The Borrower shall notify the Administrative Agent by telephone (confirmed by telecopy) of any prepayment hereunder (i) in the case of prepayment of a Eurodollar Borrowing, not later than 11:00 a.m., Boston, Massachusetts time, three (3) Business Days before the date of prepayment, or (ii) in the case of prepayment of an ABR Borrowing or a Daily LIBOR Borrowing, not later than 11:00 a.m., Boston, Massachusetts time, one Business Day before the date of prepayment. Each such notice shall be irrevocable and shall specify the prepayment date and the principal amount of each Borrowing or portion thereof to be prepaid. Promptly following receipt of any such notice relating to a Borrowing, the Administrative Agent shall advise the Lenders of the contents thereof. Each partial prepayment of any Borrowing shall be in an amount that is an integral multiple of $100,000 and not less than $200,000. Each prepayment of a Borrowing shall be applied ratably to the Loans included in the prepaid Borrowing. Prepayments shall be accompanied by accrued interest to the extent required by <u>Section 2.12</u>.

(c)      In connection with the prepayment of any portion of the Loan prior to the expiration of the Interest Period applicable thereto, the Borrower shall also pay any applicable expenses pursuant to <u>Section 2.15</u>.

(d)      The Borrower shall prepay the Loans (a "<u>Mandatory Prepayment</u>") in an amount equal to with respect to any sale, finance, refinance or other recapitalization of (i) the Mortgaged Properties, the greater of (x) $381,000,000 and (y) one hundred percent (100%) of the net proceeds payable to Borrowers or any Subsidiary (after payment of usual and customary closing costs and expenses) from the sale, finance, refinance or other recapitalization of the Mortgaged Properties; it being understood that prepayments required under this clause (d)(i) are in addition to any prepayments under clause (f) below and prepayments required under clause (f) below shall not diminish the required prepayment amounts under this clause (d)(i), and (ii) any other Real Property, one hundred percent (100%) of the net proceeds payable to Borrower or any Subsidiary (after payment of usual and customary closing costs and expenses and repayment of any Indebtedness secured by such Real Property and including, with respect to any partial recapitalization of a Portfolio Property through a joint venture or similar structure whereby the Borrower will, directly or indirectly, retain an Equity Interest in such Portfolio Property (other than any DST structure whereby Borrower will retain an approximately 1% Equity Interest in such Portfolio Property), an amount equal to the value of the Equity Interest in such Portfolio Property that the Borrower will retain) generated by the sale, finance, refinance or other recapitalization of any such Real Property owned directly or indirectly by Borrower, including, without limitation, any net proceeds thereof to be redeployed into the acquisition of one or more real properties to complete a 1031 exchange transaction, and all payments under the BH Loan. All Mandatory Prepayments shall be applied, first, to the prepayment of the Tranche A Loans until the Tranche A Loans have been repaid in full.  Thereafter all Mandatory Prepayments shall be applied to the Tranche B Loans.

(e)      Without limiting the foregoing, the Borrower shall make prepayments of the Loans from time to time in the amounts necessary such that after giving effect to any such prepayments, the aggregate outstanding amount of the Loans on each of the dates listed below shall not be more than the "Maximum Principal Amount" set forth across from such date on the table below:

| Date | Maximum Principal Amount |
|---|---|
| March 26, 2019 | $150,000,000 |
| June 26, 2019 | $100,000,000 |
| September 26, 2019 | $50,000,000 |
| December 26, 2019 | $15,000,000 |

<u>provided</u> that, if the Tranche A Initial Maturity Date is extended pursuant to <u>Section 2.21</u>, the "Maximum Principal Amount" set forth in the table above for each applicable date during the term of such extension of the Tranche A Initial Maturity Date, shall be

increased by an amount equal to the aggregate outstanding principal amount of Loans that were funded to purchase the Mortgaged Properties.

(f)     In addition to any other payment or prepayment required by any of the foregoing, on or prior to October 26, 2018, the Borrowers shall make payments to the Administrative Agent for application to the outstanding principal balance of the Loans from proceeds of additional equity contributions received by the Borrowers (other than the Property Owner Borrowers) after the Effective Date in an aggregate amount not less than $150,000,000.

(g)     Amounts to be applied to the prepayment of the Loans pursuant to any of the preceding subsections of this Section shall be applied, first, to reduce outstanding ABR Loans, next, to the extent of any remaining balance, to reduce outstanding Daily LIBOR Loans, and next, to the extent of any remaining balance, to reduce outstanding Eurodollar Loans.  Any amounts repaid under this Section 2.11 may not be reborrowed.

Section 2.12 Fees.

(a)     In addition to all fees specified herein, the Borrower agrees to pay to KeyBank and the Arranger, for their own account, certain fees for services rendered or to be rendered in connection with the Loans as provided pursuant to the Fee Letter.

(b)     All fees payable hereunder shall be paid on the dates due in immediately available funds.  Fees paid shall not be refundable under any circumstances.

Section 2.13 Interest.

(a)     The ABR Loans shall bear interest at the lesser of (x) the Alternate Base Rate plus the Applicable Rate, or (y) the Maximum Rate.

(b)     The Loans comprising each Eurodollar Borrowing shall bear interest at the lesser of (x) the Adjusted LIBO Rate for the Interest Period in effect for such Eurodollar Loan plus the Applicable Rate, or (y) the Maximum Rate.

(c)     The Loans comprising each Daily LIBOR Borrowing shall bear interest at the lesser of (x) the Daily LIBOR plus the Applicable Rate, or (y) the Maximum Rate

(d)     Notwithstanding the foregoing, (A) if any principal of or interest on the Loans or any portion thereof or any other amount payable by the Borrower hereunder is not paid when due, whether at stated maturity, upon acceleration or otherwise, such overdue amount shall bear interest, after as well as before judgment, at a rate per annum equal to (i) in the case of overdue principal of the Loans, the lesser of (x) 4% plus the rate otherwise applicable to the Loans as provided in the preceding paragraphs of this Section, or (y) the Maximum Rate, or (ii) in the case of any other amount, the lesser of (x) 4% plus the rate applicable to ABR Loans as provided in paragraph (a) of this Section, or (y) the Maximum Rate; and (B) after the occurrence of any Event of Default, at the option of the Administrative Agent, or if the Administrative Agent is directed in writing by the Required Lenders to do so, the Loans shall bear interest at a rate per

annum equal to the lesser of (x) 4% plus the rate otherwise applicable to the Loans as provided in the preceding paragraphs of this Section, or (y) the Maximum Rate.

(e)     Accrued interest on each Loan shall be payable in arrears on each Interest Payment Date; provided that (i) interest accrued pursuant to paragraph (c) of this Section shall be payable on demand, (ii) in the event of any repayment or prepayment of any Loan, accrued interest on the principal amount repaid or prepaid shall be payable on the date of such repayment or prepayment and (iii) in the event of any conversion of any Eurodollar Loan prior to the end of the current Interest Period therefor, accrued interest on such Eurodollar Loan shall be payable on the effective date of such conversion.

(f)     All computations of interest on the Loans and of other fees to the extent applicable shall be based on a 360-day year and paid for the actual number of days elapsed.  The applicable Alternate Base Rate, Adjusted LIBO Rate, LIBO Rate, or Daily LIBOR Rate shall be determined by the Administrative Agent, and such determination shall be conclusive absent manifest error.

Section 2.14 Alternate Rate of Interest.

(a)     If prior to the commencement of any Interest Period for a Eurodollar Borrowing or Daily LIBOR Borrowing:

(i)     the Administrative Agent determines (which determination shall be conclusive absent manifest error) that adequate and reasonable means do not exist for ascertaining the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period; or

(ii)     the Administrative Agent is advised by any Lender that the Adjusted LIBO Rate or the LIBO Rate, as applicable, for such Interest Period will not adequately and fairly reflect the cost to such Lenders (or Lender) of making or maintaining their Eurodollar Loan for such Interest Period;

then the Administrative Agent shall give notice thereof to the Borrower and the Lenders by telephone or telecopy as promptly as practicable thereafter and, until the Administrative Agent notifies the Borrower and the Lenders that the circumstances giving rise to such notice no longer exist, any Interest Election Request that requests the conversion of any Borrowing to, or continuation of any Borrowing as, a Eurodollar Borrowing shall be ineffective; provided that if the circumstances giving rise to such notice affect only one Type of Borrowings, then the other Type of Borrowings shall be permitted.

(b)     If at any time the Administrative Agent determines (which determination shall be conclusive absent manifest error) that either (i) the circumstances set forth in clause (a) of this Section 2.14 have arisen and such circumstances are unlikely to be temporary or (ii) the circumstances set forth in clause (a) of this Section 2.14 have not arisen but the supervisor for the administrator of LIBO Rate or a Governmental Authority having jurisdiction over the Administrative Agent has made a public statement identifying a specific date after which LIBO Rate shall no longer be used for determining interest rates for loans (in the case of either such

clause (i) or (ii), an "Alternative Interest Rate Election Event"), the Administrative Agent and
the Borrowers shall endeavor to establish an alternate rate of interest to LIBO Rate, which rate
may include adjustment (to be determined from time to time by Administrative Agent in its sole
discretion) to effect an aggregate interest rate comparable to the LIBO Rate on a historical basis
prior to such determination, and that gives due consideration to the then prevailing market
convention for determining a rate of interest for similar dollar-denominated credit facilities in the
United States at such time, and shall enter into an amendment to this Agreement to reflect such
alternate rate of interest and such other related changes to this Agreement as may be applicable.
Such amendment shall become effective without any further action or consent of any other party
to this Agreement.  To the extent an alternate rate of interest is adopted as contemplated hereby,
the approved rate shall be applied in a manner consistent with prevailing market convention;
provided that, to the extent such prevailing market convention is not administratively feasible for
the Administrative Agent, such approved rate shall be applied in a manner as otherwise
reasonably determined by the Administrative Agent and the Borrowers. From such time as an
Alternative Interest Rate Election Event has occurred and continuing until an alternate rate of
interest has been determined in accordance with the terms and conditions of this paragraph, any
Interest Election Request that requests the conversion of any Loan to, or continuation of any
Loan as, an Eurodollar Loan shall be ineffective; provided that (subject to clause (a) of this
Section 2.14) LIBO Rate for such Interest Period is not available or published at such time on a
current basis; provided, further, that, if such alternate rate of interest shall be less than zero, such
rate shall be deemed to be zero for the purposes of this Agreement.

   Section 2.15 Increased Costs.

  (a)  If any Change in Law shall:

    (i)  subject any Recipient to any Taxes or withholding of any nature
with respect to this Agreement, the other Loan Documents, such Lender's
Commitment or the Loans (other than for Indemnified Taxes, Taxes described in
clauses (b) through (d) of the definition of Excluded Taxes, and Connection
Income Taxes), or

    (ii)  materially change the basis of taxation (except for changes in taxes
on gross receipts, income or profits or its franchise tax) of payments to any
Recipient of the principal of or the interest on any Loans or any other amounts
payable to any Lender under this Agreement or the other Loan Documents, or

    (iii)  impose or increase or render applicable any special deposit,
reserve, assessment, liquidity, capital adequacy or other similar requirements
(whether or not having the force of law and which are not already reflected in any
amounts payable by Borrowers hereunder) against assets held by, or deposits in or
for the account of, or loans by, or commitments of an office of any Lender, or

    (iv)  impose on any Recipient any other conditions or requirements with
respect to this Agreement, the other Loan Documents, the Loans, such Lender's
Commitment, or any class of loans or commitments of which any of the Loans or
such Lender's Commitment forms a part;

and the result of any of the foregoing shall be to increase the cost to such Lender of making or maintaining any Eurodollar Loan (or of maintaining its obligation to make any such Loan) or to reduce the amount of any sum received or receivable by such Lender hereunder (whether of principal, interest or otherwise), then the Borrower will pay to such Lender such additional amount or amounts as will compensate such Lender for such additional costs incurred or reduction suffered.

(b)     If any Lender determines that any Change in Law regarding capital requirements has or would have the effect of reducing the rate of return on such Lender's capital or liquidity or on the capital or liquidity of such Lender's holding company, if any, as a consequence of this Agreement or the Loans made by such Lender, to a level below that which such Lender or such Lender's holding company would have achieved but for such Change in Law (taking into consideration such Lender's policies and the policies of such Lender's holding company with respect to capital adequacy), then from time to time the Borrower will pay to such Lender, as the case may be, such additional amount or amounts as will compensate such Lender or such Lender's holding company for any such reduction suffered.

(c)     A certificate of a Lender setting forth the amount or amounts necessary to compensate such Lender or its holding company, as the case may be, as specified in paragraph (a) or (b) of this Section shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay such Lender, the amount shown as due on any such certificate within 10 days after receipt thereof.

(d)     Failure or delay on the part of any Lender to demand compensation pursuant to this Section shall not constitute a waiver of such Lender's right to demand such compensation; provided that the Borrower shall not be required to compensate a Lender pursuant to this Section for any increased costs or reductions incurred more than 270 days prior to the date that such Lender notifies the Borrower of the Change in Law giving rise to such increased costs or reductions and of such Lender's intention to claim compensation therefor; provided further that, if the Change in Law giving rise to such increased costs or reductions is retroactive, then the 270-day period referred to above shall be extended to include the period of retroactive effect thereof.

Section 2.16 Break Funding Payments.  In the event of (a) the payment of any principal of any Eurodollar Loan other than on the last day of an Interest Period applicable thereto (including as a result of an Event of Default), (b) the conversion of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto, (c) the failure to borrow, convert, continue or prepay any Loan on the date specified in any notice delivered pursuant hereto (regardless of whether such notice may be revoked under Section 2.10(b)), or (d) the assignment of any Eurodollar Loan other than on the last day of the Interest Period applicable thereto as a result of a request by the Borrower pursuant to Section 2.18, then, in any such event, the Borrower shall compensate each Lender for the loss, cost and expense attributable to such event.  In the case of a Eurodollar Loan, such loss, cost or expense to any Lender shall be deemed to include an amount determined by such Lender to be the excess, if any, of (i) the amount of interest which would have accrued on the principal amount of such Loan had such event not occurred, at the Adjusted LIBO Rate that would have been applicable to such Loan, for the

period from the date of such event to the last day of the then current Interest Period therefor (or, in the case of a failure to borrow, convert or continue, for the period that would have been the Interest Period for such Loan), over (ii) the amount of interest which would accrue on such principal amount for such period at the interest rate which such Lender would bid were it to bid, at the commencement of such period, for dollar deposits of a comparable amount and period from other banks in the Eurodollar market. A certificate of any Lender setting forth any amount or amounts that such Lender is entitled to receive pursuant to this Section shall be delivered to the Borrower and shall be conclusive absent manifest error. The Borrower shall pay such Lender the amount shown as due on any such certificate within thirty (30) days after receipt thereof.

Section 2.17 <u>Taxes</u>.

(a)     All payments by the Borrower hereunder and under any of the other Loan Documents shall be made without setoff or counterclaim, and free and clear of and without deduction or withholding for any Taxes, except as required by Legal Requirements. If any Legal Requirement (as determined in the good faith discretion of an applicable Withholding Agent) requires the deduction or withholding of any Tax from any such payment by a Withholding Agent, then the applicable Withholding Agent shall be entitled to make such deduction or withholding and shall timely pay the full amount deducted or withheld to the relevant Governmental Authority in accordance with Legal Requirements and, if such Tax is an Indemnified Tax, then the sum payable by the Borrowers shall be increased as necessary so that after such deduction or withholding has been made (including such deductions and withholdings applicable to additional sums payable under this <u>Section 2.17</u>) the applicable Recipient receives an amount equal to the sum it would have received had no such deduction or withholding been made.

(b)     The Borrower shall timely pay to the relevant Governmental Authority in accordance with Legal Requirements, or at the option of the Agent timely reimburse it for the payment of, any Other Taxes.

(c)     The Borrower shall indemnify each Recipient, within ten (10) days after demand therefor, for the full amount of any Indemnified Taxes (including Indemnified Taxes imposed or asserted on or attributable to amounts payable under this <u>Section 2.17</u>) payable or paid by such Recipient or required to be withheld or deducted from a payment to such Recipient and any reasonable expenses arising therefrom or with respect thereto, whether or not such Indemnified Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to the Borrower by a Lender (with a copy to the Agent), or by the Agent on its own behalf or on behalf of a Lender, shall be conclusive absent manifest error; provided that the determinations in such statement are made on a reasonable basis and in good faith.

(d)     Each Lender shall severally indemnify the Agent, within ten (10) days after demand therefor, for (i) any Indemnified Taxes attributable to such Lender (but only to the extent that a Borrower has not already indemnified the Agent for such Indemnified Taxes and without limiting the obligation of the Borrowers to do so), (ii) any Taxes attributable to such Lender's failure to comply with the provisions of <u>Section 9.04(c)</u> relating to the maintenance of a Participant Register and (iii) any Excluded Taxes attributable to such Lender, in each case, that

are payable or paid by the Agent in connection with any Loan Document, and any reasonable expenses arising therefrom or with respect thereto, whether or not such Taxes were correctly or legally imposed or asserted by the relevant Governmental Authority. A certificate as to the amount of such payment or liability delivered to any Lender by the Agent shall be conclusive absent manifest error. Each Lender hereby authorizes the Agent to set off and apply any and all amounts at any time owing to such Lender under any Loan Document or otherwise payable by the Agent to the Lender from any other source against any amount due to the Agent under this subsection.

(e)     As soon as practicable after any payment of Taxes by the Borrower to a Governmental Authority pursuant to this Section 2.17, the Borrower shall deliver to the Administrative Agent the original or a certified copy of a receipt issued by such Governmental Authority evidencing such payment, a copy of the return reporting such payment or other evidence of such payment reasonably satisfactory to the Agent.

(f)     (i) Any Lender that is entitled to an exemption from or reduction of withholding Tax with respect to payments made under any Loan Document shall deliver to the Borrower and the Agent, at the time or times reasonably requested by the Borrower or the Agent, such properly completed and executed documentation reasonably requested by the Borrower or the Agent as will permit such payments to be made without withholding or at a reduced rate of withholding. In addition, any Lender, if reasonably requested by the Borrower or the Agent, shall deliver such other documentation prescribed by Legal Requirements or reasonably requested by the Borrower or the Agent as will enable the Borrower or the Agent to determine whether or not such Lender is subject to backup withholding or information reporting requirements. Notwithstanding anything to the contrary in the preceding two sentences, the completion, execution and submission of such documentation (other than such documentation set forth in the immediately following clauses (ii)(2)(A), (ii)(2)(B) and (ii)(2)(D)) shall not be required if in the Lender's reasonable judgment such completion, execution or submission would subject such Lender to any material unreimbursed cost or expense or would materially prejudice the legal or commercial position of such Lender.

(i)     Without limiting the generality of the foregoing, in the event that a Borrower is a U.S. Person:

(A)     any Lender that is a U.S. Person shall deliver to the Borrower and the Agent on or prior to the date on which such Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), an electronic copy (or an original if requested by the Borrower or the Agent) of an executed IRS Form W-9 (or any successor form) certifying that such Lender is exempt from U.S. federal backup withholding tax;

(B)     any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which such Foreign Lender becomes a Lender under this Agreement (and from

time to time thereafter upon the reasonable request of the Borrower or the Agent), whichever of the following is applicable:

(A)      in the case of a Foreign Lender claiming the benefits of an income tax treaty to which the United States is a party (x) with respect to payments of interest under any Loan Document, an electronic copy (or an original if requested by the Borrower or the Agent) of an executed IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "interest" article of such tax treaty and (y) with respect to any other applicable payments under any Loan Document, IRS Form W-8BEN or W-8BEN-E establishing an exemption from, or reduction of, U.S. federal withholding Tax pursuant to the "business profits" or "other income" article of such tax treaty;

(B)      an electronic copy (or an original if requested by the Borrower or the Agent) of an executed IRS Form W-8ECI;

(C)      in the case of a Foreign Lender claiming the benefits of the exemption for portfolio interest under Section 881(c) of the Code, (x) a certificate substantially in the form of Exhibit F-1 to the effect that such Foreign Lender is not a "bank" within the meaning of Section 881(c)(3)(A) of the Code, a "10 percent shareholder" of a Borrower within the meaning of Section 881(c)(3)(B) of the Code, or a "controlled foreign corporation" described in Section 881(c)(3)(C) of the Code (a "U.S. Tax Compliance Certificate") and (y) executed copies of IRS Form W-8BEN or W-8BEN-E; or

(D)      to the extent a Foreign Lender is not the beneficial owner, an electronic copy (or an original if requested by the Borrower or the Agent) of an executed IRS Form W-8IMY, accompanied by IRS Form W-8ECI, IRS Form W-8BEN or W-8BEN-E, a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-2 or Exhibit F-3, IRS Form W-9, and/or other certification documents from each beneficial owner, as applicable; provided that if the Foreign Lender is a partnership and one or more direct or indirect partners of such Foreign Lender are claiming the portfolio interest exemption, such Foreign Lender may provide a U.S. Tax Compliance Certificate substantially in the form of Exhibit F-4 on behalf of each such direct and indirect partner;

(C)      any Foreign Lender shall, to the extent it is legally entitled to do so, deliver to the Borrower and the Agent (in such number of copies as shall be requested by the recipient) on or prior to the date on which

such Foreign Lender becomes a Lender under this Agreement (and from time to time thereafter upon the reasonable request of the Borrower or the Agent), an electronic copy (or an original if requested by a Borrower or the Agent) of any other form prescribed by Legal Requirements as a basis for claiming exemption from or a reduction in U.S. federal withholding Tax, duly completed, together with such supplementary documentation as may be prescribed by Legal Requirements to permit the Borrower or the Agent to determine the withholding or deduction required to be made; and

(D)     if a payment made to a Lender under any Loan Document would be subject to U.S. federal withholding Tax imposed by FATCA if such Lender were to fail to comply with the applicable reporting requirements of FATCA (including those contained in Section 1471(b) or 1472(b) of the Code, as applicable), such Lender shall deliver to the Borrower and the Agent at the time or times prescribed by Legal Requirements and at such time or times reasonably requested by the Borrower or the Agent such documentation prescribed by Legal Requirements (including as prescribed by Section 1471(b)(3)(C)(i) of the Code) and such additional documentation reasonably requested by the Borrower or the Agent as may be necessary for the Borrower and the Agent to comply with their obligations under FATCA and to determine that such Lender has complied with such Lender's obligations under FATCA or to determine the amount to deduct and withhold from such payment. Solely for purposes of this clause (D), "FATCA" shall include any amendments made to FATCA after the date of this Agreement.

Each Lender agrees that if any form or certification it previously delivered expires or becomes obsolete or inaccurate in any respect, it shall update such form or certification or promptly notify the Borrower and the Agent in writing of its legal inability to do so.

(g)     If any party determines, in its sole discretion exercised in good faith, that it has received a refund of any Taxes as to which it has been indemnified pursuant to this Section 2.17 (including by the payment of additional amounts pursuant to this Section 2.17), it shall pay to the indemnifying party an amount equal to such refund (but only to the extent of indemnity payments made under this Section 2.17 with respect to the Taxes giving rise to such refund), net of all reasonable third party out-of-pocket expenses (including Taxes) of such indemnified party actually incurred and without interest (other than any interest paid by the relevant Governmental Authority with respect to such refund). Such indemnifying party, upon the request of such indemnified party, shall repay to such indemnified party the amount paid over pursuant to this subsection (plus any penalties, interest or other charges imposed by the relevant Governmental Authority) in the event that such indemnified party is required to repay such refund to such Governmental Authority.  Notwithstanding anything to the contrary in this subsection, in no event will the indemnified party be required to pay any amount to an indemnifying party pursuant to this subsection the payment of which would place the indemnified party in a less favorable net after-Tax position than the indemnified party would have been in if the Tax subject to indemnification and giving rise to such refund has not been deducted, withheld or otherwise

imposed and the indemnification payments or additional amounts with respect to such Tax had never been paid. This subsection shall not be construed to require any indemnified party to make available its Tax returns (or any other information relating to its Taxes that it reasonably deems confidential) to the indemnifying party or any other Person.

(h)     Each party's obligations under this <u>Section 2.17</u> shall survive the resignation or replacement of the Agent or any assignment of rights by, or the replacement of, a Lender, the termination of the Commitments and the repayment, satisfaction or discharge of all obligations under any Loan Document.

Section 2.18 <u>Payments Generally; Pro Rata Treatment; Sharing of Set-offs</u>.

(a)     The Borrower shall make each payment required to be made by it hereunder (whether of principal, interest, fees or of amounts payable under <u>Section 2.15</u>, <u>Section 2.16</u> or <u>2.17</u>, or otherwise) prior to 1:00 p.m., Boston, Massachusetts time, on the date when due, in immediately available funds, without set-off or counterclaim.  Any amounts received after such time on any date may, in the reasonable discretion of the Administrative Agent, be deemed to have been received on the next succeeding Business Day for purposes of calculating interest thereon.  All such payments shall be made to the Administrative Agent at its main offices in Cleveland, Ohio, except that payments pursuant to <u>Sections 2.15</u>, <u>2.16</u>, <u>2.17</u> and <u>9.03</u> shall be made directly to the Persons entitled thereto.  If the Administrative Agent receives a payment for the account of a Lender prior to 1:00 p.m., Boston, Massachusetts time, such payment must be delivered to the Lender on the same day and if it is not so delivered due to the fault of the Administrative Agent, the Administrative Agent shall pay to the Lender entitled to the payment interest thereon for each day after payment should have been received by the Lender pursuant hereto until the Lender receives payment, at the Federal Funds Effective Rate.  If any payment hereunder shall be due on a day that is not a Business Day, the date for payment shall be extended to the next succeeding Business Day and, in the case of any payment accruing interest, interest thereon shall be payable for the period of such extension.  All payments hereunder shall be made in Dollars.

(b)     If at any time insufficient funds are received by and available to the Administrative Agent to pay fully all amounts of principal, interest and fees then due hereunder, such funds shall be applied (i) first, towards payment of interest and fees then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of interest and fees then due to such parties, and (ii) second, towards payment of principal then due hereunder, ratably among the parties entitled thereto in accordance with the amounts of principal then due to such parties.

(c)     If any Lender shall, by exercising any right of set-off or counterclaim or otherwise, obtain payment in respect of any principal of or interest on any of its Loans resulting in such Lender receiving payment of a greater proportion of the aggregate amount of its Loans and accrued interest thereon than the proportion received by any other Lender, then the Lender receiving such greater proportion shall purchase (for cash at face value) participations in the Loans of other Lenders to the extent necessary so that the benefit of all such payments shall be shared by the Lenders ratably in accordance with the aggregate amount of principal of and accrued interest on their respective Loans; <u>provided</u> that (i) if any such participations are

purchased and all or any portion of the payment giving rise thereto is recovered, such participations shall be rescinded and the purchase price restored to the extent of such recovery, without interest, and (ii) the provisions of this paragraph shall not be construed to apply to any payment made by the Borrower pursuant to and in accordance with the express terms of this Agreement or any payment obtained by a Lender as consideration for the assignment of or sale of a participation in any of its Loans, other than to the Borrower or any Subsidiary or Affiliate thereof (as to which the provisions of this paragraph shall apply).  The Borrower consents to the foregoing and agrees, to the extent it may effectively do so under applicable law, that any Lender acquiring a participation pursuant to the foregoing arrangements may exercise against the Borrower rights of set-off and counterclaim with respect to such participation as fully as if such Lender were a direct creditor of the Borrower in the amount of such participation.

(d)  Unless the Administrative Agent shall have received notice from the Borrower prior to the date on which any payment is due to the Administrative Agent for the account of the Lenders hereunder that the Borrower will not make such payment, the Administrative Agent may assume that the Borrower has made such payment on such date in accordance herewith and may, in reliance upon such assumption, distribute to the Lenders the amount due.  In such event, if the Borrower has not in fact made such payment, then each of the Lenders severally agrees to repay to the Administrative Agent forthwith on demand the amount so distributed to such Lender with interest thereon, for each day from and including the date such amount is distributed to it to but excluding the date of payment to the Administrative Agent, at the Federal Funds Effective Rate.

(e)  If any Lender shall fail to make any payment required to be made by it pursuant to Section 2.18(d), then the Administrative Agent may, in its reasonable discretion (notwithstanding any contrary provision hereof), apply any amounts thereafter received by the Administrative Agent for the account of such Lender to satisfy such Lender's obligations under such Sections until all such unsatisfied obligations are fully paid.

Section 2.19  Mitigation Obligations; Replacement of Lenders.

(a)  Each Lender will notify the Borrower of any event occurring after the date of this Agreement which will entitle such Person to compensation pursuant to Sections 2.13 and 2.15 as promptly as practicable after it obtains knowledge thereof and determines to request such compensation, provided that such Person shall not be liable for any costs, fees, expenses, or additional interest due to the failure to provide such notice.  If any Lender requests compensation under Section 2.13, or if the Borrower is required to pay any additional amount to any such Person or any Governmental Authority for the account of any Lender pursuant to Section 2.15, then such Lender shall use reasonable efforts to avoid or minimize the amounts payable, including, without limitation, the designation of a different lending office for funding or booking its Loans hereunder or the assignment of its rights and obligations hereunder to another of its offices, branches or affiliates, if, in the judgment of such Lender, such designation or assignment (i) would eliminate or reduce amounts payable pursuant to Section 2.13 or 2.15, as the case may be, in the future and (ii) would not subject such Lender to any unreimbursed cost or expense and would not otherwise be disadvantageous to such Lender.  The Borrower hereby agrees to pay all reasonable and documented costs and expenses incurred by any Lender in connection with any such designation or assignment.

(b)      If any Lender requests compensation under Section 2.13, or if the Borrower is required to pay any additional amount to any Lender or any Governmental Authority for the account of any Lender pursuant to Section 2.15, or if any Lender defaults in its obligation to fund Loans hereunder, then the Borrower may, at its sole expense and effort (excluding any costs or expense incurred by such Defaulting Lender), upon notice to such Lender and the Administrative Agent, require such Lender to assign and delegate, without recourse (in accordance with and subject to the restrictions contained in Section 9.04), all its interests, rights and obligations under this Agreement to an assignee that shall assume such obligations (which assignee may be another Lender, if a Lender accepts such assignment); provided that (i) the Borrower shall have received the prior written consent of the Administrative Agent, which consent shall not unreasonably be withheld, (ii) such Lender shall have received payment of an amount equal to the outstanding principal of its Loans, accrued interest thereon, accrued fees and all other amounts payable to it hereunder, from the assignee (to the extent of such outstanding principal and accrued interest and fees) or the Borrower (in the case of all other amounts), and (iii) in the case of any such assignment resulting from a claim for compensation under Section 2.13 or payments required to be made pursuant to Section 2.15, such assignment will result in a reduction in such compensation or payments.  A Lender shall not be required to make any such assignment and delegation if, prior thereto, as a result of a waiver by such Lender or otherwise, the circumstances entitling the Borrower to require such assignment and delegation cease to apply.

Section 2.20 Defaulting Lenders.

(a)      Adjustments.  Notwithstanding anything to the contrary contained in this Credit Agreement, if any Lender becomes a Defaulting Lender, then, until such time as that Lender is no longer a Defaulting Lender, to the extent permitted by applicable Law:

(i)      Waivers and Amendments.  That Defaulting Lender's right to approve or disapprove any amendment, waiver or consent with respect to this Credit Agreement shall be restricted as set forth in Section 9.02.

(ii)      Reallocation of Payments.  Any payment of principal, interest, fees or other amounts received by Administrative Agent for the account of a Defaulting Lender (whether voluntary or mandatory, at maturity, pursuant to ARTICLE VII or otherwise, and including any amounts made available to Administrative Agent by that Defaulting Lender pursuant to Section 9.08), shall be applied at such time or times as may be determined by Administrative Agent as follows: first, to the payment of any amounts owing by that Defaulting Lender to Administrative Agent hereunder; second, if so determined by Administrative Agent, to be held as cash collateral for future funding obligations of such Defaulting Lender; third, to the payment of any amounts owing to the non-Defaulting Lenders as a result of any judgment of a court of competent jurisdiction obtained by any Lender against such Defaulting Lender as a result of that Defaulting Lender's breach of its obligations under this Credit Agreement; fourth, so long as no Default or Event of Default exists, to the payment of any amounts owing to the applicable Borrower as a result of any judgment of a court

of competent jurisdiction obtained by Borrower against such Defaulting Lender as a result of such Defaulting Lender's breach of its obligations under this Credit Agreement; and fifth, to such Defaulting Lender or as otherwise directed by a court of competent jurisdiction. Any payments, prepayments or other amounts paid or payable to a Defaulting Lender that are applied (or held) to pay amounts owed by a Defaulting Lender or to post cash collateral pursuant to this <u>Section 2.20(a)(ii)</u> shall be deemed paid to and redirected by such Defaulting Lender, and each Lender irrevocably consents hereto.

(b)     <u>Defaulting Lender Cure</u>. If the Borrower and Administrative Agent agree in writing in their reasonable discretion that a Defaulting Lender has taken such action that it should no longer be deemed to be a Defaulting Lender, Administrative Agent will so notify the parties hereto, whereupon as of the effective date specified in such notice and subject to any conditions set forth therein (which may include arrangements with respect to any cash collateral), such Defaulting Lender will, to the extent applicable, purchase that portion of outstanding Loans of the other Lenders or take such other actions as Administrative Agent may determine to be necessary to cause the Loans to be held on a pro rata basis by the Lenders in accordance with their Applicable Percentages, whereupon such Defaulting Lender will cease to be a Defaulting Lender; provided that no adjustments will be made retroactively with respect to fees accrued or payments made by or on behalf of the Borrower while such Lender was a Defaulting Lender; and provided, further, that except to the extent otherwise expressly agreed by the affected parties, no cessation in status as Defaulting Lender will constitute a waiver or release of any claim of any party hereunder arising during the period that such Lender was a Defaulting Lender.

Section 2.21 <u>Extension of Tranche A Maturity Date</u>. The Borrower shall have the right and option to extend the Tranche A Maturity Date on no more than two occasions and for a term of 90 days on each occasion, first to June 26, 2019 and then to September 26, 2019, in each case, upon satisfaction of the following conditions precedent, which must be satisfied prior to the effectiveness of any extension of the Tranche A Initial Maturity Date:

(a)     <u>Extension Request</u>. The Borrower shall deliver written notice of such request (the "<u>Extension Request</u>") to the Agent not later than the date which is thirty (30) days prior to the Tranche A Initial Maturity Date.

(b)     <u>Payment of Extension Fee</u>. The Borrower shall pay to the Agent for the <u>pro rata</u> accounts of the Lenders in accordance with their respective Commitments an extension fee in an amount equal to 0.10% of the outstanding principal amount of the Tranche A Loans on the date of each extension of the Tranche A Initial Maturity Date, which fee shall, when paid, be fully earned and non-refundable under any circumstances.

(c)     <u>No Default</u>. On the date the Extension Request is given and the effective date of such extension there shall exist no Default or Event of Default.

(d)     <u>Purchase and Sale</u>. Borrower shall have, prior to the effective date of each such extension, entered in a legally binding purchase and sale agreement (or similar) with respect to the Mortgaged Properties, with the sale of the Mortgaged Properties pursuant to such agreement

being scheduled to occur prior to the latest date to which the Tranche A Initial Maturity Date could be extended in accordance with the provisions of this Section 2.21.

Section 2.22 Extension of Tranche B Maturity Date. The Borrower shall have the right and option to extend the Tranche B Maturity Date on a single occasion to March 26, 2020, upon satisfaction of the following conditions precedent, which must be satisfied prior to the effectiveness of such extension of the Tranche B Initial Maturity Date:

(a)     Extension Request. The Borrower shall deliver an Extension Request to the Agent not later than the date which is thirty (30) days prior to the Tranche B Initial Maturity Date.

(b)     Payment of Extension Fee. The Borrower shall pay to the Agent for the pro rata accounts of the Lenders in accordance with their respective Commitments an extension fee in an amount equal to 0.40% of the outstanding principal amount of the Tranche B Loans on the Tranche B Initial Maturity Date, which fee shall, when paid, be fully earned and non-refundable under any circumstances.

(c)     No Default. On the date the Extension Request is given and the effective date of such extension there shall exist no Default or Event of Default.

(d)     Principal Reduction. On the date of such extension, the Tranche A Loans shall have been paid in full and the aggregate principal amount of the Tranche B Loans shall not exceed $50,000,000.

## ARTICLE III

### Representations and Warranties

The Borrower represents and warrants to the Lenders and the Administrative Agent that:

Section 3.01 Organization; Powers. Each Borrower and each of its Subsidiaries is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, has all requisite power and authority to carry on its business as now conducted and, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect, is qualified to do business in, and is in good standing in, every jurisdiction where such qualification is required.

Section 3.02 Authorization; Enforceability. The Transactions are within the corporate, partnership or limited liability company powers (as applicable) of the respective Borrowers and their Subsidiaries and have been duly authorized by all necessary corporate, partnership or limited liability company action. This Agreement and the Loan Documents have been duly executed and delivered by each Borrower which is a party thereto and constitute the legal, valid and binding obligation of each such Person, enforceable in accordance with its terms, subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law.

Section 3.03 <u>Governmental Approvals; No Conflicts</u>.  The Transactions (a) do not require any consent or approval of, registration or filing with, or any other action by, any Governmental Authority, except such as have been obtained or made and are in full force and effect or which shall be completed at the appropriate time for such filings under applicable securities laws, (b) will not violate any applicable law or regulation or the charter, by-laws or other organizational documents of any Borrower or any Collateral Subsidiary or any order of any Governmental Authority, (c) will not violate or result in a default under any indenture, agreement or other instrument binding upon any Borrower or any Collateral Subsidiary or its assets, or give rise to a right thereunder to require any payment to be made by any Borrower or any of the Borrower's Subsidiaries, and (d) will not result in the creation or imposition of any Lien on any asset of any Borrower or any Collateral Subsidiary, except pursuant to the Pledge Agreement, the Equity Proceeds Pledge, the Economic Interest Pledge, and the Senior Loan.

Section 3.04 <u>Financial Condition; No Material Adverse Change</u>.

(a)      The Borrower has heretofore furnished to the Lenders audited financial statements for Highland Capital and management-prepared financial statements for all other Borrowers (other than the Property Owner Borrowers) as of and for the annual fiscal period ended December 31, 2017 and management-prepared financial statements as of and for the quarterly fiscal period ended June 30, 2018.  Such financial statements present fairly, in all material respects, the financial position and results of operations and cash flows of the Borrower and its consolidated Subsidiaries as of such dates and for such periods in accordance with sound accounting principles, consistently applied, subject to year-end audit adjustments.

(b)      To Borrower's actual knowledge, since December 31, 2017, no event has occurred which would reasonably be expected to have a Material Adverse Effect.

Section 3.05 <u>Properties</u>.

(a)      Each of the Borrower and its Subsidiaries has title to, or valid leasehold interests in, all its real and personal property material to its business, except for minor defects in title that do not interfere with its ability to conduct its business as currently conducted or to utilize such properties for their intended purposes, or Liens permitted under <u>Section 6.01</u>.

(b)      To each Borrower's actual knowledge, all franchises, licenses, authorizations, rights of use, governmental approvals and permits (including all certificates of occupancy and building permits) required to have been issued by Governmental Authority to enable all Real Property owned or leased by Borrower or any of its Subsidiaries to be operated as then being operated have been lawfully issued and are in full force and effect, other than those which the failure to obtain in the aggregate would not be reasonably expected to have a Material Adverse Effect.  To each Borrower's actual knowledge, no Borrower or any Subsidiary thereof is in violation of the terms or conditions of any such franchises, licenses, authorizations, rights of use, governmental approvals and permits, which violation would reasonably be expected to have a Material Adverse Effect.

(c)      None of the Borrowers has received any notice or has any actual knowledge of any pending, threatened or contemplated condemnation proceeding affecting any of the Real

Properties or any part thereof, or any proposed termination or impairment of any parking (except as contemplated in any approved expansion approved by Administrative Agent) at the Real Properties or of any sale or other disposition of the Real Properties or any part thereof in lieu of condemnation, which in the aggregate, are reasonably likely to have a Material Adverse Effect.

(d)　　　Subject to the property conditions reports obtained by the Borrower at the time of acquisition with respect to the Mortgaged Property, to Borrower's actual knowledge, all components of all improvements included within the Mortgaged Property owned or leased, as lessee, by any Borrower, including, without limitation, the roofs and structural elements thereof and the heating, ventilation, air conditioning, plumbing, electrical, mechanical, sewer, waste water, storm water, paving and parking equipment, systems and facilities included therein, are in good working order and repair, subject to such exceptions which are not reasonably likely to have, in the aggregate, a Material Adverse Effect. To Borrower's actual knowledge, all water, gas, electrical, steam, compressed air, telecommunication, sanitary and storm sewage lines and systems and other similar systems serving the Mortgaged Property owned or leased by Borrower are installed and operating and are sufficient to enable the Mortgaged Property to continue to be used and operated in the manner currently being used and operated, and no Borrower has any knowledge of any factor or condition that reasonably would be expected to result in the termination or material impairment of the furnishing thereof, subject to such exceptions which are not likely to have, in the aggregate, a Material Adverse Effect. To Borrower's actual knowledge, no improvement or portion thereof, or any other part of any Mortgaged Property, is dependent for its access, operation or utility on any land, building or other improvement not included in such Mortgaged Property, other than for access provided pursuant to a recorded easement or other right of way establishing the right of such access subject to such exceptions which are not likely to have, in the aggregate, a Material Adverse Effect.

(e)　　　Except for events or conditions not reasonably likely to, in the aggregate, materially impair the value or operation of the Mortgaged Property, to Borrower's actual knowledge (i) no portion of the Mortgaged Property has suffered any material damage by fire or other casualty loss which has not heretofore been completely repaired and restored to its condition prior to such casualty, and (ii) no portion of the Mortgage Property is located in a special flood hazard area as designated by any federal Government Authorities unless the Administrative Agent shall have received evidence that such Mortgaged Property is insured by special flood insurance under the National Flood Insurance Program in an amount equal to the full replacement cost (subject to sublimits and exclusions approved by the Administrative Agent) or the maximum amount then available under the National Flood Insurance Program.

(f)　　　There are no Persons operating or managing the Mortgaged Property other than the Borrower and the Management Company pursuant to (i) the management agreements delivered to Administrative Agent as of the Effective Date, and (ii) such other management agreements in form and substance reasonably satisfactory to the Administrative Agent.

Section 3.06 <u>Intellectual Property</u>. To the actual knowledge of each Borrower, such Borrower and its Subsidiaries owns, or is licensed to use, all patents and other intellectual property material to its business, and the use thereof by such Borrower or such Subsidiary does not infringe upon the rights of any other Person, except for any such infringements that,

individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. To the actual knowledge of each Borrower, there are no material slogans or other advertising devices, projects, processes, methods, substances, parts or components, or other material now employed, or now contemplated to be employed, by any Borrower or any Subsidiary of any Borrower, with respect to the operation of any Real Property, and no claim or litigation regarding any slogan or advertising device, project, process, method, substance, part or component or other material employed, or now contemplated to be employed by any Borrower or any Subsidiary of any Borrower, is pending or threatened, the outcome of which could reasonably be expected to have a Material Adverse Effect.

Section 3.07 <u>Litigation and Environmental Matters</u>.

(a)     To the actual knowledge of the Borrower, except as set forth in <u>Schedule 3.07</u> attached hereto, there are no actions, suits or proceedings by or before any arbitrator or Governmental Authority pending against or, threatened against or affecting any Borrower or any of the Borrower's Subsidiaries (i) as to which there is a reasonable possibility of an adverse determination and that, if adversely determined, would reasonably be expected, individually or in the aggregate, to result in a Material Adverse Effect or (ii) that involve this Agreement or the Transactions.

(b)     Except as disclosed in the environmental reports obtained by the Borrower at the time of acquisition with respect to the Portfolio Property and with respect to any matters that, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect:

(i)     to the actual knowledge of the Borrowers, all Real Property leased or owned by Borrower or any of its Subsidiaries is free from contamination by any Hazardous Material, except to the extent such contamination would not reasonably be expected to cause a Material Adverse Effect;

(ii)     to the actual knowledge of the Borrower, the operations of Borrower and its Subsidiaries, and the operations at the Real Property leased or owned by Borrower or any of its Subsidiaries are in compliance with all applicable Environmental Laws, except to the extent such noncompliance would not reasonably be expected to cause a Material Adverse Effect;

(iii)     neither the Borrower nor any of its Subsidiaries have known liabilities with respect to Hazardous Materials and, to the knowledge of each Borrower, no facts or circumstances exist which would reasonably be expected to give rise to liabilities with respect to Hazardous Materials, in either case, except to the extent such liabilities would not reasonably be expected to have a Material Adverse Effect;

(iv)     to Borrower's actual knowledge, (A) the Borrower and its Subsidiaries and all Real Property owned or leased by Borrower or its Subsidiaries have all Environmental Permits necessary for the operations at such Real Property and are in compliance with such Environmental Permits; (B) there

are no legal proceedings pending nor, to the knowledge of any Borrower, threatened to revoke, or alleging the violation of, such Environmental Permits; and (C) none of the Borrowers have received any notice from any source to the effect that there is lacking any Environmental Permit required in connection with the current use or operation of any such properties, in each case, except to the extent the nonobtainment or loss of an Environmental Permit would not reasonably be expected to have a Material Adverse Effect;

(v)  neither the Real Property currently leased or owned by Borrower nor, to the actual knowledge of any Borrower, are subject to any outstanding written order or contract, including Environmental Liens, with any Governmental Authority or other Person, or to any federal, state, local, foreign or territorial investigation of which a Credit Party has been given notice respecting (A) Environmental Laws, (B) Remedial Action, (C) any Environmental Claim; or (D) the Release or threatened Release of any Hazardous Material, in each case, except to the extent such written order, contract or investigation would not reasonably be expected to have a Material Adverse Effect;

(vi)  to the actual knowledge of each Borrower, none of the Borrowers are subject to any pending legal proceeding alleging the violation of any Environmental Law nor are any such proceedings threatened, in either case, except to the extent any such proceedings would not reasonably be expected to have a Material Adverse Effect;

(vii)  Borrower has not filed any notice under federal, state or local, territorial or foreign law indicating past or present treatment, storage, or disposal of or reporting a Release of Hazardous Material into the environment with respect to the Mortgaged Property, in each case, except to the extent such Release of Hazardous Material would not reasonably be expected to have a Material Adverse Effect;

(viii)  to the actual knowledge of each Borrower, none of the operations of the Borrower or any of its Subsidiaries or, of any owner of premises currently leased by Borrower or any of its Subsidiaries or of any tenant of premises currently leased from Borrower or any of its Subsidiaries, involve the generation, transportation, treatment, storage or disposal of hazardous waste, as defined under 40 C.F.R. Part 261.3 (in effect as of the date of this Agreement) or any state, local, territorial or foreign equivalent, in violation of Environmental Laws; and

(ix)  to the knowledge of the Borrower, there is not now (except, in all cases, to the extent the existence thereof would not reasonably be expected to have a Material Adverse Effect), on, in or under any Real Property leased or owned by Borrower or any of its Subsidiaries (A) any underground storage tanks or surface tanks, dikes or impoundments (other than for surface water); (B) any friable asbestos-containing materials; (C) any polychlorinated biphenyls; or (D) any radioactive substances other than naturally occurring radioactive material.

Section 3.08 <u>Compliance with Laws and Agreements</u>. Each of the Borrower and its Subsidiaries is in material compliance with all Legal Requirements (including all Environmental Laws) applicable to it or its property and all indentures, agreements and other instruments binding upon it or to its knowledge, its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect. No Default has occurred and is continuing.

Section 3.09 <u>Investment and Holding Company Status</u>. Neither any of the Borrowers nor any of the Borrower's Subsidiaries is (a) an "investment company" as defined in, or subject to regulation under, the Investment Company Act of 1940 or (b) a "holding company" as defined in, or subject to regulation under, the Public Utility Holding Company Act of 1935.

Section 3.10 <u>Taxes</u>. To Borrower's actual knowledge, each Borrower and each of the Borrower's Subsidiaries has timely filed or caused to be filed all Tax returns and reports required to have been filed and has paid or caused to be paid all Taxes required to have been paid by it, except (a) Taxes that are being contested in good faith by appropriate proceedings and for which such Person has set aside on its books adequate reserves or (b) to the extent that the failure to do so would not reasonably be expected to result in a Material Adverse Effect.

Section 3.11 <u>ERISA</u>. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, would reasonably be expected to result in a Material Adverse Effect. Neither the Borrower nor any of its Subsidiaries have any Plans as of the date hereof. As to any future Plan the present value of all accumulated benefit obligations under each Plan (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) will not exceed the fair market value of the assets of such Plan, and the present value of all accumulated benefit obligations of all underfunded Plans (based on the assumptions used for purposes of Statement of Financial Accounting Standards No. 87) will not exceed the fair market value of the assets of all such underfunded Plans.

Section 3.12 <u>Disclosure</u>. To the actual knowledge of the Borrower, the Borrower has disclosed or made available to the Lenders all agreements, instruments and corporate or other restrictions to which it, any other Borrower, or any of its Subsidiaries is subject, and all other matters known to it, that, in the aggregate, would reasonably be expected to result in a Material Adverse Effect. None of the reports, financial statements, certificates or other information furnished by or on behalf of the Borrower to the Administrative Agent or any Lender in connection with the negotiation of this Agreement or delivered hereunder (as modified or supplemented by other information so furnished) contains any material misstatement of fact or omits to state any material fact necessary to make the statements therein, in the light of the circumstances under which they were made, not misleading; provided that, with respect to projected financial information, the Borrower represents only that such information was prepared in good faith based upon assumptions believed to be reasonable at the time.

Section 3.13 <u>Solvency</u>. As of the Effective Date and after giving effect to the transactions contemplated by this Agreement and the other Loan Documents (including any contribution rights under the Guaranty), including all Loans made or to be made hereunder, the Borrower is not insolvent on a balance sheet basis such that the sum of such Person's assets

exceeds the sum of such Person's liabilities, the Borrower is able to pay its debts as they become due, and the Borrower has sufficient capital to carry on its business.

Section 3.14 <u>Margin Regulations</u>. Neither the Borrower nor any Subsidiary of Borrower is engaged in the business of extending credit for the purpose of purchasing or carrying margin stock (within the meaning of Regulation U issued by the Board), and no proceeds of the Loans will be used to purchase or carry any margin stock.

Section 3.15 <u>Subsidiaries</u>. As of the Effective Date, no Person owns any Equity Interests in the Portfolio Properties, Summers Landing Property, or HCRE Properties except as set forth on <u>Schedule 3.15</u> attached hereto.

Section 3.16 <u>OFAC; Anti-Money Laundering.</u> None of the Borrower, any of the other Subsidiaries, or any other Affiliate thereof is (or will be) (i) a Sanctioned Person, (ii) located, organized or resident in a Designated Jurisdiction, (iii) to the best of Borrower's knowledge, without any independent inquiry, is or has been (within the previous five (5) years) engaged in any transaction with any Sanctioned Person or any Person who is located, organized or resident in any Designated Jurisdiction to the extent that such transactions would violate Sanctions, or (iv) has violated any Anti-Money Laundering Law in any material respect. Each Borrower and its Subsidiaries, and to the knowledge of the Borrower, each director, officer, employee, agent and Affiliate of the Borrower and each such Subsidiary, is in compliance with the Anti-Corruption Laws in all material respects. The Borrowers have implemented and maintain in effect policies and procedures designed to promote and achieve compliance with the Anti-Corruption Laws and applicable Sanctions.

Section 3.17 <u>EEA Financial Institution</u>. No Borrower is an EEA Financial Institution.

Section 3.18 <u>Single Asset Entity; Compliance With Laws</u>. Each Property Owner Borrower hereby represents and warrants to, and covenants with, Agent that as of the date hereof and until such time as the Loan shall be paid in full, that such Property Owner Borrower has not at any time, does not presently, and shall not:

(a) own any asset or property other than (i) the Mortgaged Property owned by it as of the date hereof, and (ii) incidental personal property necessary for the ownership or operation of such Mortgaged Property;

(b) engage in any business other than the ownership, management and operation of such Mortgaged Property;

(c) enter into any contract or agreement with any Affiliate of Property Owner, any constituent party of such Property Owner Borrower or any Affiliate of any constituent party, except upon terms and conditions that are substantially similar to those that would be available on an arms-length basis with third parties other than any such party;

(d) incur any Indebtedness other than (i) the Loan, (ii) unsecured trade payables in the ordinary course of business not evidenced by a note, (iii) indebtedness incurred in the financing of equipment and other personal property used on the Property, and (iv) obligations to

tenants under Approved Leases; provided that any indebtedness incurred pursuant to subclauses (ii) and (iii) shall (x) be paid within ninety (90) days of the date incurred (or, in the case of equipment leases, such longer period as may be permitted by such leases), and (y) be incurred in the ordinary course of business.

(e)     make any loans or advances to any third party (including any Affiliate or constituent party), or acquire obligations or securities of its Affiliates;

(f)     fail to remain solvent or fail to pay its debts and liabilities (including, as applicable, shared personnel and overhead expenses) from its assets as the same shall become due; for the avoidance of doubt, nothing herein shall require any member of Property Owner Borrower to make additional capital contributions to such Property Owner Borrower;

(g)     fail to do all things necessary to observe organizational formalities and preserve its existence, and such Property Owner Borrower shall not, nor shall such Property Owner Borrower permit any constituent party to, amend, modify or otherwise change the partnership certificate, partnership agreement, articles of incorporation and bylaws, operating agreement, trust or other organizational documents of such Property Owner Borrower or such constituent party without the prior consent of Lender in any manner that (i) violates the covenants set forth in this Section 3.17, or (ii) amends, modifies or otherwise changes any provision thereof that by its terms cannot be modified at any time when the Loan is outstanding or by its terms cannot be modified without Administrative Agent's consent;

(h)     fail to maintain all of its books, records, financial statements and bank accounts separate from those of its Affiliates and any constituent party.  Such Property Owner Borrower's assets will not be listed as assets on the financial statement of any other Person, provided, however, that such Property Owner Borrower's assets may be included in a consolidated financial statement of its Affiliates provided that (i)  appropriate notation shall be made on such consolidated financial statements to indicate the separateness of such Property Owner Borrower and such Affiliates and to indicate that such Property Owner Borrower's assets and credit are not available to satisfy the debts and other obligations of such Affiliates or any other Person and (ii) such assets shall be listed on such Property Owner Borrower's own separate balance sheet.  Such Property Owner Borrower shall maintain its books, records, resolutions and agreements as official records;

(i)     fail to be, or fail to hold itself out to the public as, a legal entity separate and distinct from any other entity (including any Affiliate of such Property Owner Borrower or any constituent party of such Property Owner Borrower), fail to correct any known misunderstanding regarding its status as a separate entity, fail to conduct business in its own name, or fail to maintain and utilize separate stationery, invoices and checks bearing its own name, and such Property Owner Borrower shall not identify itself or any of its Affiliates as a division or part of the other;

(j)     fail to maintain adequate capital for the normal obligations reasonably foreseeable in a business of its size and character and in light of its contemplated business operations; for the avoidance of doubt, nothing herein shall require any member of such Property Owner Borrower to make additional capital contributions to such Property Owner Borrower;

(k)     seek or effect the liquidation, dissolution, winding up, consolidation or merger, in whole or in part, of such Property Owner Borrower nor permit any constituent party of such Property Owner Borrower to do any of the foregoing; for the avoidance of doubt, nothing herein shall require any member of Property Owner to make additional capital contributions to such Property Owner Borrower;

(l)     commingle the funds and other assets of such Property Owner Borrower with those of any Affiliate or constituent party or any other Person, and shall hold all of its assets in its own name;

(m)     fail to maintain its assets in such a manner that it will not be costly or difficult to segregate, ascertain or identify its individual assets from those of any Affiliate or constituent party or any other Person;

(n)     except with respect to the Obligations, guarantee or become obligated for the debts of any other Person or hold itself out to be responsible for or have its credit available to satisfy the debts or obligations of any other Person;

(o)     permit any Affiliate independent access to its bank accounts; or

(p)     fail to compensate each of its consultants and agents from its funds for services provided to it and pay from its own assets all obligations of any kind incurred; for the avoidance of doubt, nothing herein shall require any member of Property Owner to make additional capital contributions to such Property Owner Borrower.

## ARTICLE IV

### Conditions

Section 4.01 <u>Effective Date</u>.  The obligations of the Lenders to make the Loans hereunder shall not become effective until the date on which each of the following conditions is satisfied (or waived in accordance with <u>Section 9.02</u>):

(a)     The Administrative Agent (or its counsel) shall have received from each Borrower either (i) a counterpart of this Agreement and all other Loan Documents to which it is party signed on behalf of such party or (ii) written evidence satisfactory to the Administrative Agent (which may include telecopy transmission of a signed signature page of each such Loan Document other than the Notes) that such party has signed a counterpart of the Loan Documents, together with copies of all Loan Documents.

(b)     The Administrative Agent shall have received a favorable written opinion (addressed to the Administrative Agent and the Lenders and dated the Effective Date) of Wick Phillips Gould & Martin, LLP, counsel for the Borrower, and such other counsel as the Administrative Agent may approve, covering such matters relating to the Borrower, the Loan Documents or the Transactions as the Administrative Agent shall reasonably request.  The Borrower hereby requests such counsel to deliver such opinion.

(c)     The Administrative Agent shall have received such documents and certificates as the Administrative Agent or its counsel may reasonably request relating to the organization, existence and good standing of the Borrower, the authorization of the Transactions and any other legal matters relating to the Borrower, this Agreement (including each Borrower's compliance with Section 9.14 and other customary "know your customer" requirements) or the Transactions, all in form and substance satisfactory to the Administrative Agent and its counsel.

(d)     The Administrative Agent shall have received a Compliance Certificate, dated the date of this Agreement and signed by Borrowers or Lead Borrower, in form and substance satisfactory to the Administrative Agent.

(e)     The Administrative Agent shall have received searches of Uniform Commercial Code ("UCC") filings (or their equivalent) together with such other customary lien, litigation and bankruptcy searches as the Administrative Agent may require.

(f)     The Administrative Agent shall have received all fees and other amounts due and payable on or prior to the Effective Date, including, to the extent invoiced, reimbursement or payment of all out-of-pocket expenses required to be reimbursed or paid by the Borrower hereunder.

(g)     The Administrative Agent shall have received an Appraisal of each Mortgaged Property being included as Collateral in form and substance satisfactory to the Administrative Agent and the Lenders;

(h)     The Administrative Agent shall have received executed copies of all other Loan Documents, the Environmental Assessment, the Title Insurance Policy and the Current Survey (in each instance as delivered in connection with the original closing of the Loan, with the Administrative Agent receiving an acceptable endorsement to each Title Insurance Policy), property condition assessments, insurance certificates, and such other due diligence information as the Administrative Agent may require for each Mortgaged Property.

(f)     The representations and warranties of each Borrower set forth in this Agreement or in any other Loan Document shall be true and correct on and as of the Effective Date.

(g)     At the time of and immediately after giving effect to the making of the Loans, no Default shall have occurred and be continuing.

(h)     The Administrative Agent shall have received and approved executed copies of the Senior Loan Documents and sufficient evidence that the Senior Loan has closed and funded and that the proceeds thereof, together with the proceeds of the Loans hereunder, shall be sufficient to consummate the acquisition of the Portfolio Properties and the Summers Landing Property.

(i)     Upon the reasonable request of any Lender made at least ten (10) days prior to the Effective Date, each Borrower shall have provided to such Lender the documentation and other information so requested in connection with applicable "know your customer" and anti-money-

laundering rules and regulations, including the Patriot Act, in each case at least five (5) days prior to the Effective Date.

(j)      At least five (5) days prior to the Effective Date, any Borrower that qualifies as a "legal entity customer" under the Beneficial Ownership Regulation shall deliver a Beneficial Ownership Certification in relation to such Borrower to each requesting Lender.

Section 4.02 <u>Each Borrowing</u>.  The obligation of each Lender (as applicable) to make a Loan on the occasion of any Borrowing is subject to the satisfaction of the following conditions:

(a)      The representations and warranties of each Borrower set forth in this Agreement or in any other Loan Document shall be true and correct on and as of the date of such Borrowing.

(b)      At the time of and immediately after giving effect to such Borrowing, no Default shall have occurred and be continuing.

(c)      With respect to any requested Borrowings, the Borrower shall have complied with <u>Section 2.03</u>.

(d)      Each Borrowing shall be deemed to constitute a representation and warranty by the Borrower on the date thereof as to the matters specified in this Section.

ARTICLE V

Affirmative Covenants

Until the principal of and interest on the Loans and all fees payable hereunder shall have been paid in full, the Borrower covenants and agrees with the Lenders that:

Section 5.01 <u>Financial Statements; Ratings Change and Other Information</u>.  The Borrower will furnish to the Administrative Agent and each Lender:

(a)      within 120 days after the end of each fiscal year of the Borrower, the consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of and for such year, together with all notes thereto, setting forth in each case in comparative form the figures for the previous fiscal year, which shall be (i) with respect to Highland Capital, reported on by Deloitte or other independent public accountants of recognized national standing (without a "going concern" or like qualification or exception and without any qualification or exception as to the scope of such audit), and (ii) with respect to each other Borrower other than the Property Owner Borrowers, certified by each such Borrower, in each case, to the effect that such consolidated financial statements present fairly in all material respects the financial condition and results of operations of the applicable Borrower and its consolidated Subsidiaries on a consolidated basis in accordance with sound accounting principles, consistently applied;

(b)      within 60 days after the end of each fiscal quarter of each fiscal year of the Borrower, each Borrower's (other than the Property Owner Borrowers) consolidated balance sheet and related statements of operations, stockholders' equity and cash flows as of the end of

and for such fiscal quarter and the then elapsed portion of the fiscal year, setting forth in each case in comparative form the figures for the corresponding period or periods of (or, in the case of the balance sheet, as of the end of) the previous fiscal year and including supporting notes and schedules, all certified by each such Borrower as presenting fairly in all material respects the financial condition and results of operations of the applicable Borrower on a consolidated basis in accordance with sound accounting principles, consistently applied, subject to normal year-end audit adjustments and the absence of footnotes;

(c)    concurrently with any delivery of financial statements under clause (a) or (b) above, a compliance certificate of the Borrowers (the "Compliance Certificate") in the form of Exhibit B attached hereto;

(d)    concurrently with any delivery of quarterly financial statements under clause (b) above, operating statements, rent roll and accounts receivable aging for each Mortgaged Property; and

(e)    promptly following any request therefor, such other information regarding the operations, business affairs and financial condition of any Borrower or any Subsidiary of the Borrower, or compliance with the terms of the Loan Documents, as the Administrative Agent or any Lender may reasonably request.

Section 5.02 Financial Tests.  The Borrower shall have and maintain at all times, on a consolidated basis in accordance with sound accounting principles, consistently applied, tested as of the close of each calendar quarter:

(a)    A Total Leverage Ratio not to exceed sixty-five percent (65%);

(b)    A minimum Fixed Charge Coverage Ratio of not less than 1.30:1.00;

(c)    Tangible Net Worth at all times of not less than $750,000,000; and

(d)    A minimum Liquidity at all times in an amount not less than $75,000,000; provided that, at any time when the aggregate outstanding principal amount of the Loans is $150,000,000 or less, Borrower shall maintain minimum Liquidity in an amount not less than the lesser of (i) $75,000,000 and (ii) 25% of the aggregate outstanding principal amount of the Loans.

Section 5.03 Notices of Material Events.  The Borrower will furnish to the Administrative Agent and each Lender written notice of the following promptly after it becomes aware of same (unless specific time is set forth below):

(a)    the occurrence of any Default under this Agreement or any default or event of default under a Senior Loan Document;

(b)    within fifteen (15) Business Days after the filing or commencement of any action, suit or proceeding by or before any arbitrator or Governmental Authority against or affecting any

Borrower or any Affiliate thereof that, if adversely determined, would reasonably be expected to result in a Material Adverse Effect;

(c)     within fifteen (15) Business Days after the occurrence of any ERISA Event that, alone or together with any other ERISA Events that have occurred, would reasonably be expected to result in liability of the Borrower and its Subsidiaries in an aggregate amount exceeding $10,000,000.00; and

(d)     any other development that results in, or would reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section shall be accompanied by a statement of such Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

At the Administrative Agent's option, after the happening of any of the events listed in clauses (a), (b) or (d) above which would reasonably be expected to result in a Material Adverse Effect on any of the Mortgaged Properties, the Administrative Agent may obtain, or cause the Borrower to obtain, an updated Appraisal for the Mortgaged Properties giving rise to such events, all at the Borrower's expense.

Section 5.04 Existence; Conduct of Business. The Borrower will, and will cause each of its Subsidiaries to, do or cause to be done all things necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits, privileges and franchises material to the conduct of its business; provided that the foregoing shall not prohibit any merger, consolidation, liquidation or dissolution permitted under this Agreement. The Borrower may not be organized under the laws of a jurisdiction other than the United States of America, any State thereof or the District of Columbia. As an express inducement to Lenders to make and maintain the Loan, each Property Owner Borrower agrees at all times prior to payment and satisfaction of all Obligations to be and remain a single purpose entity in accordance with Section 3.18 above.

Section 5.05 Payment of Obligations. The Borrower will, and will cause each of its Subsidiaries to, pay its obligations, including Tax liabilities, that, if not paid, would result in a Material Adverse Effect before the same shall become delinquent or in default, except where (a) the validity or amount thereof is being contested in good faith by appropriate proceedings, (b) the Borrower or such Subsidiary has set aside on its books adequate reserves with respect thereto in accordance with sound accounting principles, consistently applied, and (c) the failure to make payment pending such contest would not reasonably be expected to result in a Material Adverse Effect. The Borrower will, and will cause each of its Subsidiaries to, comply with all of its obligations and liabilities (as applicable) under the Senior Loan Documents.

Section 5.06 Maintenance of Properties; Insurance.

(a)     The Borrower will, and will cause each of its Subsidiaries to, (i) keep and maintain all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted, and (ii) maintain, with financially sound and reputable insurance companies, insurance in such amounts and against such risks as are reasonable and

customary for similarly situated Properties.  Without limitation to the foregoing, the Borrower will, with respect to each Mortgaged Property, maintain, with financially sound and reputable insurance companies, insurance against such risks as are set forth below and in such amounts as are reasonably required by Administrative Agent from time to time, with Administrative Agent named as loss payee and a beneficiary of such insurance on substantially similar policies and programs as are acceptable to Administrative Agent.

(b)     The Borrower shall maintain the following insurance coverages for the Mortgaged Property:

(i)     An all-risk policy of permanent property insurance insuring the Mortgaged Property against all risks that are commonly covered under real property insurance except those permitted by the Administrative Agent in writing to be excluded from coverage thereunder.

(ii)     A boiler and machinery insurance policy covering loss or damage to all portions of the Mortgaged Property comprised of air-conditioning and heating systems, other pressure vessels, machinery, boilers or high pressure piping.

(iii)     An all-risk policy of insurance covering loss of earnings and/or rents from the Mortgaged Property in the event that the Mortgaged Property is not available for use or occupancy due to casualty, damage or destruction required to be covered by the policies of insurance described in (i) and (ii) above.

(iv)     Commercial general liability, auto liability, umbrella or excess liability and worker's compensation insurance against claims for bodily injury, death or property damage occurring on, in or about the Mortgaged Property in an amount and containing terms reasonably acceptable to the Administrative Agent.

(v)     Such other insurance against other insurable hazards, risks or casualties which at the time are commonly insured against in the case of owners and premises similarly situated, due regard being given to the financial condition of the Borrower, the height and type of the Mortgaged Property, its construction, location, use and occupancy.

(vi)     All required insurance with respect to the Mortgaged Property will be written on forms acceptable to the Administrative Agent and by companies having a Best's Insurance Guide Rating of not less than A or A+ and which are otherwise acceptable to the Administrative Agent, and such insurance (other than third party liability insurance) shall be written or endorsed so that all losses are payable to the Administrative Agent, as Administrative Agent for the Lenders. The original policies evidencing such insurance shall be delivered by the Borrower to the Administrative Agent and held by the Administrative Agent, unless Administrative Agent expressly consents to accept insurance certificates instead.  Each such policy shall expressly prohibit cancellation of insurance without thirty (30) days' written notice to the Administrative Agent.  The

Borrower agrees to furnish due proof of payment of the premiums for all such insurance to Administrative Agent promptly after each such payment is made and in any case at least fifteen (15) days before payment becomes delinquent.

(c)     The Borrower will pay and discharge, or cause to be paid and discharged, all taxes, assessments, maintenance charges, permit fees, impact fees, development fees, capital repair charges, utility reservations and standby fees and all other similar impositions of every kind and character charged, levied, assessed or imposed against any interest in any of the Mortgaged Property owned by it or any of its Subsidiaries, as they become payable and before they become delinquent.  The Borrower shall furnish receipts evidencing proof of such payment to the Administrative Agent promptly after payment and before delinquency.

(d)     All proceeds of insurance with respect to any Mortgaged Property shall be paid to Administrative Agent and, at Administrative Agent's option, be applied to Borrower's Obligations or released, in whole or in part, to pay for the actual cost of repair, restoration, rebuilding or replacement (collectively, "Cost To Repair").  If the Cost To Repair does not exceed thirty-five percent (35%) of the Appraised Value of the subject Mortgaged Property, provided no Event of Default is then in existence, Administrative Agent shall release so much of the insurance proceeds as may be required to pay for the actual Cost to Repair in accordance with and subject to the provisions of Section 5.06(e) below.

(e)     If Administrative Agent elects or is required to release insurance proceeds, Administrative Agent may impose, reasonable conditions on such release which shall include, but not be limited to, the following:

(i)     prior written approval by Administrative Agent, which approval shall not be unreasonably withheld or delayed of plans, specifications, cost estimates, contracts and bonds for the restoration or repair of the loss or damage;

(ii)     waivers of lien, architect's certificates, contractor's sworn statements and other evidence of costs, payments and completion as Agent may reasonably require;

(iii)     if the Cost To Repair does not exceed $500,000.00, the funds to pay therefor shall be released to Borrower. Otherwise, funds shall be released upon final completion of the repair work, unless Borrower requests earlier funding, in which event partial monthly disbursements equal to 90% of the value of the work completed shall be made prior to final completion of the repair, restoration or replacement and the balance of the disbursements shall be made upon full completion and the receipt by Administrative Agent of satisfactory evidence of payment and release of all liens;

(iv)     determination by Administrative Agent that the undisbursed balance of such proceeds on deposit with Administrative Agent, together with additional funds deposited for the purpose, shall be at least sufficient to pay for the remaining Cost To Repair, free and clear of all liens and claims for lien;

(v)     all work to comply with the standards, quality of construction and Legal Requirements applicable to the original construction of the Mortgaged Property; and

(vi)     in Administrative Agent's good faith judgment the repair work is likely to be completed at least three (3) months prior to the Maturity Date.

(f)     If there is any condemnation for public use of a Mortgaged Property, the awards on account thereof shall be paid to Administrative Agent and shall be applied to Borrower's obligations, or at Administrative Agent's discretion released to Borrower.  If, in the case of a partial taking or a temporary taking, in the sole judgment of Administrative Agent the effect of such taking is such that there has not been a material and adverse impairment of the viability of the Mortgaged Property or the value of such Collateral, so long as no Default exists Administrative Agent shall release awards on account of such taking to Borrower if such awards are sufficient (or amounts sufficient are otherwise made available) to repair or restore the Mortgaged Property to a condition reasonably satisfactory to Administrative Agent subject to the requirements of Section 5.06(e).

Section 5.07 Books and Records; Inspection Rights.

(a)     The Borrower will, and will cause each of its Subsidiaries to, keep proper books of record and account in which full, true and correct entries are made of all dealings and transactions in relation to its business and activities.

(b)     The Borrower will, and will cause each of its Subsidiaries to, permit any representatives designated by the Administrative Agent or any Lender, upon reasonable prior notice and subject to rights of tenants, to visit and inspect its properties, to examine and make extracts from its books and records, and to discuss its affairs, finances and condition with its officers and independent accountants, all at such reasonable times and as often as reasonably requested.

Section 5.08 Compliance with Laws.  The Borrower will, and will cause each of its Subsidiaries to, comply with all laws, rules, regulations and orders of any Governmental Authority applicable to it or its property, except where the failure to do so, individually or in the aggregate, would not reasonably be expected to result in a Material Adverse Effect.

Section 5.09 Use of Proceeds.  The proceeds of the Loans will be used solely to fund a portion of the cost to consummate the acquisition of the Portfolio Properties, including to make a loan to the BH Pledgor to fund such Person's acquisition of the Summers Landing Property.  No part of the proceeds of the Loans will be used, whether directly or indirectly, for financing, funding or completing the hostile acquisition of publicly traded Persons or for any purpose that entails a violation of any of the Regulations of the Board, including Regulations U and X.

Section 5.10 Fiscal Year.  Borrower shall maintain as its fiscal year the twelve (12) month period ending on December 31 of each year.

Section 5.11 Environmental Matters.

(a)     Borrower shall comply and shall cause each of its Subsidiaries and each Real Property owned or leased by such parties to comply in all material respects with all applicable Environmental Laws currently or hereafter in effect, except to the extent noncompliance would not reasonably be expected to have a Material Adverse Effect.

(b)     If the Administrative Agent or the Required Lenders at any time have a reasonable basis to believe that there may be a material violation of any Environmental Law related to the Mortgaged Property, or Real Property adjacent to such Mortgaged Property, which would reasonably be expected to have a Material Adverse Effect, then Borrower agrees, upon request from the Administrative Agent (which request may be delivered at the option of Administrative Agent or at the direction of Required Lenders), to provide the Administrative Agent, at the Borrower's expense, with such reports, certificates, engineering studies or other written material or data as the Administrative Agent or the Required Lenders may reasonably require so as to reasonably satisfy the Administrative Agent and the Required Lenders that any Credit Party or Real Property owned or leased by them is in material compliance with all applicable Environmental Laws.

(c)     Borrower shall take such Remedial Action or other action as required by Environmental Law or any Governmental Authority except to the extent the failure to do so, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect.

(d)     If the Borrower fails to timely take, or to diligently and expeditiously proceed to complete in a timely fashion, any action described in this Section, the Administrative Agent may, after notice to the Borrower, with the consent of the Required Lenders, make advances or payments toward the performance or satisfaction of the same, but shall in no event be under any obligation to do so.  All sums so advanced or paid by the Administrative Agent (including reasonable counsel and consultant and investigation and laboratory fees and expenses, and fines or other penalty payments) and all sums advanced or paid in connection with any judicial or administrative investigation or proceeding relating thereto, will become due and payable from the Borrower ten (10) Business Days after demand, and shall bear interest at the Default Rate from the date any such sums are so advanced or paid by the Administrative Agent until the date any such sums are repaid by the Borrower.  Promptly upon request, the Borrower will execute and deliver such instruments as the Administrative Agent may deem reasonably necessary to permit the Administrative Agent to take any such action, and as the Administrative Agent may require to secure all sums so advanced or paid by the Administrative Agent.  If a Lien is filed against the Mortgaged Property by any Governmental Authority resulting from the need to expend or the actual expending of monies arising from an action or omission, whether intentional or unintentional, of the Borrower or for which the Borrower is responsible, resulting in the Releasing of any Hazardous Material into the waters or onto land located within or without the state where the Mortgaged Property is located, then the Borrower will, within thirty (30) days from the date that the Borrower is first given notice that such Lien has been placed against the Mortgaged Property (or within such shorter period of time as may be specified by the Administrative Agent if such Governmental Authority has commenced steps to cause the Mortgaged Property to be sold pursuant to such Lien), either (i) pay the claim and remove the Lien, or (ii) furnish a cash deposit, bond or such other security with respect thereto as is

satisfactory in all respects to the Administrative Agent and is sufficient to effect a complete discharge of such Lien on the Mortgaged Property.

Section 5.12 <u>Collateral Requirement.</u>

(a)   <u>General Requirement</u>.  The Obligations and the Hedging Obligations, if any, shall be secured by a perfected first priority lien and security interest to be held by the Administrative Agent for the benefit of the Lenders, pursuant to the terms of the Security Documents, in

(i)   each Mortgaged Property;

(ii)   the Equity Interests of each Property Owner Borrower, fifty percent (50%) of the Equity Interests in each Collateral Subsidiary other than the Property Owner Borrowers, and the Equity Interests held by HCRE Partners and its Subsidiaries in the HCRE Properties; <u>provided</u> that the Borrower shall not, pursuant to this subclause (i), be required to pledge any portion of the Equity Interests of any Collateral Subsidiary that is not a Property Owner Borrower or in any owner of an HCRE Property to the extent (and only to the extent) that such a grant of a security interest is prohibited by, or under the terms thereof, may give rise to a default, breach, right of recoupment, buyout, repurchase, purchase option, right of first refusal or similar rights (whether effective with the pledge or any related exercise of rights thereunder), claim, defense or remedy, or directly or indirectly results in the termination of or requires any consent not obtained under, the Senior Loans or Indebtedness secured by the HCRE Properties; <u>provided</u> further that, to the extent such pledge of any portion of such Equity Interests is restricted as set forth in the previous proviso, the Borrower shall, to the extent permitted under any such debt instruments, pledge to the Administrative Agent, pursuant to documentation reasonably acceptable to the Administrative Agent, all of the economic interests and rights to receive dividends or distributions in respect of the Equity Interests of such Collateral Subsidiary or owner of an HCRE Property;

(iii)   to the extent not included in clause (ii) above, all of the economic interests and rights to receive dividends or distributions in respect of the Equity Interests of each Collateral Subsidiary and each owner of a HCRE Property to the extent owned by HCRE;

(iv)   all of the Borrower's rights with respect to the pledge by the BH Pledgor and its Subsidiaries of their interests in the Summers Landing Property;

(v)   the proceeds of all Equity Offerings with respect to the Stonebridge DST on a pari passu basis with the Stonebridge Term Loan subject to the terms of this Agreement;

(vi)   the common shares in NexPoint Residential Trust Inc. or partnership units in NexPoint Residential Operating Partnership, LP that are

identified on Schedule 5.12 hereto, 1,000,000 of which shall be pledged on a pari passu basis with the Stonebridge Term Loan;

(vii)   the economic interests in NexPoint Advisors, L.P. subject to the terms of the Economic Interests Pledge; and

(viii)   all of the common shares in NexBank Capital, Inc. owned by The SLHC Trust.

Upon the occurrence and during the continuance of an Event of Default, if the Administrative Agent determines to exercise rights and remedies with respect to the Collateral in accordance with the terms of the Loan Documents, the Administrative Agent shall first exercise rights and remedies with respect to any Equity Interests in NexPoint Residential Trust Inc. before exercising rights and remedies against any other Collateral.

(b)   <u>Release of Certain Collateral</u>.  Provided no Default or Event of Default shall have occurred hereunder and be continuing (or would exist immediately after giving effect to the transactions contemplated by this <u>Section 5.12(b)</u>, including any paydown of the Loans in connection with the transactions contemplated by this <u>Section 5.12(b)</u>), the Administrative Agent shall release the Collateral related to a Portfolio Property from the lien or security title of the Security Documents encumbering the same upon the request of Borrower in connection with a sale, refinancing, or recapitalization of such Portfolio Property, subject to and upon the following terms and conditions:

(i)   The Borrower shall have provided the Administrative Agent with written notice of its intention to remove any specified Collateral at least five (5) Business Days (or such shorter period as the Administrative Agent may agree) prior to the requested release (which notice may be revoked by Borrower at any time);

(ii)   Borrower shall submit to the Administrative Agent with such request an executed Compliance Certificate adjusted in the best good faith estimate of Borrower solely to give effect to the proposed release and demonstrating that no Default or Event of Default with respect to the covenants referred to therein shall exist after giving effect to such release and if the Borrower would not be in compliance, then any reduction in the outstanding amount of the Loans in connection with such release;

(iii)   The Administrative Agent shall have determined in its reasonable discretion, and received such evidence acceptable to it as it shall reasonably request, that the proceeds from expected sale, refinancing, or recapitalization transactions with respect to the Portfolio Properties (or the Equity Interests therein) remaining as Collateral for the Obligations after giving effect to the requested release, shall be sufficient to repay the Obligations in full;

(iv)   Borrower shall make all Mandatory Prepayments required under <u>Section 2.11(d)</u> in connection with such sale, refinancing, or recapitalization;

(v)     Borrower shall pay all reasonable costs and expenses of the Administrative Agent in connection with such release, including without limitation, reasonable attorney's fees; and

(vi)     without limiting or affecting any other provision hereof, any release of a Collateral will not cause the Borrower to be in violation of the covenants set forth in Section 5.02.

(c)     Release of Collateral.  Upon the refinancing or repayment of the Obligations and Hedging Obligations in full, then the Administrative Agent shall release the Collateral from the lien and security interest of the Security Documents.

(d)     Release of Certain HCRE Properties.  Provided no Default or Event of Default shall have occurred hereunder and be continuing (or would exist immediately after giving effect to the transactions contemplated by this Section 5.12(b), including any paydown of the Loans in connection with the transactions contemplated by this Section 5.12(b)), the Administrative Agent shall release the Collateral related to a HCRE Property from the lien or security title of the Security Documents encumbering the same upon the request of Borrower in connection with a Transfer of 100% of the indirect interest in any Borrower in conjunction with the formation of a publicly traded real estate investment trust (the "**Transferee REIT**"), which Transferee REIT shall be under common Control with NexPoint Advisors, L.P. pursuant to a written management or advisory agreement; provided, such applicable Borrower shall pledge its Equity Interests in such Transferee REIT as Collateral for the Obligations pursuant to documentation reasonably acceptable to the Agent.

Section 5.13 Further Assurances.  At any time upon the request of the Administrative Agent, Borrower will, promptly and at its expense, execute, acknowledge and deliver such further documents and perform such other acts and things as the Administrative Agent may reasonably request to evidence the Loans made hereunder and interest thereon in accordance with the terms of this Agreement.

Section 5.14 [Intentionally Omitted].

Section 5.15 [Intentionally Omitted].

Section 5.16 Approved Leases.  Borrower shall not enter into any tenant lease of space in the Portfolio Properties unless approved by Administrative Agent or deemed approved pursuant to the provisions of this Section 5.16 (each such lease, an "Approved Lease"); provided, however, for the avoidance of doubt, certain master leases and residential leases entered into by Portfolio One DST, Portfolio Two DST, Portfolio Three DST, and Stonebridge DST or their subsidiaries for the purposes of a Specified DSTs' Equity Offering shall not require approval for the purposes of this Section 5.16.  Borrower's standard form of residential tenant lease, and any material revisions thereto, must have the prior written approval of Administrative Agent; it being understood that Borrower's standard form of residential tenant lease as of the Effective Date is approved.  Administrative Agent shall be "deemed" to have approved any tenant lease that (a) is on the standard form lease approved by Administrative Agent, with no material deviations except as approved by Administrative Agent; (b) is entered into in the ordinary course of

business with a bona fide unrelated third party tenant, and Borrower, acting in good faith and exercising due diligence, has determined that the tenant is financially capable of performing its obligations under the lease or is leased to an employee of the applicable property manager pursuant to the terms of the written property management agreement applicable to such Portfolio Property; (c) is received by Administrative Agent (together with each guarantee thereof (if any) and financial information regarding the tenant and each guarantor (if any) received by Borrower) within fifteen (15) days after Administrative Agent's request; (d) reflects an arms-length transaction at then current market rate for comparable space (except for a lease to an employee of the applicable property manager pursuant to the terms of the written property management agreement applicable to such Portfolio Property); and (e) contains no right to purchase the Real Property, or any present or future interest therein. Borrower shall provide to Administrative Agent a correct and complete copy of each tenant lease, including any exhibits, and each guarantee thereof (if any), prior to execution unless the lease in question meets the foregoing requirements for "deemed" approval by Administrative Agent. If requested by Administrative Agent, Borrower shall provide to Administrative Agent a fully executed copy of each tenant lease within fifteen (15) days of such request. Borrower shall, throughout the term of this Agreement, pay all reasonable costs incurred by Administrative Agent in connection with Administrative Agent's review and approval of tenant leases and each guarantee thereof (if any), including reasonable attorneys' fees and costs.

Section 5.17 <u>Permanent Financing</u>. Borrower agrees, on behalf of itself and its Affiliates, that it shall utilize KeyBank to place permanent debt (e.g. CMBS, Fannie/Freddie, life company placements) with respect to the Portfolio Properties and all other Real Property acquired with proceeds from the Loans.

Section 5.18 <u>Keepwell</u>. Each Borrower that is a Qualified ECP Party at the time that the Agreement becomes effective with respect to any Hedging Obligation, hereby jointly and severally, absolutely, unconditionally and irrevocably undertakes to provide such funds or other support as may be needed from time to time by each other Borrower that is not then an "eligible contract participant" under the Commodity Exchange Act (a "<u>Specified Party</u>") to honor all of its obligations under the Agreement in respect of Hedging Obligations (but, in each case, only up to the maximum amount of such liability that can be hereby incurred without rendering such Qualified ECP Party's obligations and undertakings under this <u>Section 5.16</u> voidable under applicable law relating to fraudulent conveyance or fraudulent transfer, and not for any greater amount). The obligations and undertakings of each Qualified ECP Party under this <u>Section 5.16</u> shall remain in full force and effect until the Loans have been repaid in full. Each Qualified ECP Party intends this <u>Section 5.16</u> to constitute, and this Section shall be deemed to constitute, a guarantee of the obligations of, and a "keepwell, support, or other agreement" for the benefit of, each Specified Party for all purposes of the Commodity Exchange Act.

Section 5.19 <u>DST Offerings.</u>

(a)     <u>Marketing</u>. Borrower will cause each DST Depositor to use commercially reasonable efforts to market and sell its respective Trust Interests so as to achieve a DST Permitted Sale that will maximize the proceeds which can reasonably be expected to be obtained from a sale of such Trust Interests.

(b)    Periodic Investor Reports.  Borrower shall provide to the Agent a report, to be submitted for each two-calendar week period on or before each Friday of the succeeding calendar week after such two week period, identifying the amount paid by any investor in a Specified DST (but not the identity of such investor) and each such investor's and each other Borrower's percentage interest in each Specified DST, in form and substance reasonably satisfactory to Lender.

(c)    Monthly Distributions. During the existence of any Event of Default, Borrower shall, to the extent permitted by each applicable Trust Agreement, cause the applicable Specified DST to distribute all available cash under its Trust Agreement on a monthly basis to the holders of its Trust Interests in accordance with their percentage of ownership, and thereafter any Affiliate of Borrower directly or indirectly holding such Trust Interests shall cause such cash to be distributed to Borrower and, in the case of a DST Depositor, to its other members in accordance with the terms of such DST Depositor's organizational documents. All such distributions payable to Borrower during the existence of an Event of Default shall be paid directly to the Agent for application to the Obligations. The Borrower shall not permit any Indebtedness of any Specified DST (or its Subsidiaries) to prohibit such monthly distributions in the absence of a default or event of default thereunder; provided that the foregoing shall not apply to any Senior Loan in respect of the Portfolio Property owned directly or indirect by any Specified as of the Effective Date.

Section 5.20 BH Loan.

(a)    The Borrower shall require the BH Pledgor to comply with all material terms of the BH Loan Documents and shall enforce its rights as a lender thereunder in its reasonable discretion, unless otherwise agreed by the Administrative Agent.

(b)    The Borrower shall not permit any amendment or waiver of any material term of the BH Loan Documents without the prior consent of the Administrative Agent.

Section 5.21 Post-Closing Covenant.

(a)    The Borrowers shall use commercially reasonable efforts to, no later than fifteen (15) Business Days after the Effective Date (or such later date as the Administrative Agent may agree in its sole discretion), deliver an estoppel certificate with respect to that certain Declaration of Reciprocal Easements dated September 22, 2000 and recorded among the Land Records of Prince George's County in Liber 14127, folio 340 and that certain Declaration of Reciprocal Easements dated September 22, 2000 and recorded among the Land Records of Prince George's County in Liber 14127, folio 324, in each case, in accordance with the provisions of such Declaration of Reciprocal Easements.

(b)    No later than ten (10) Business Days after the Effective Date, the Borrowers shall deliver to the Administrative Agent (i) a control agreement, duly executed by the applicable Borrower and the applicable custodian, securities intermediary, or other person holding any of the Equity Interests in NexPoint Residential Trust Inc., NexPoint Residential Operating Partnership, LP, or NexBank Capital Inc. that are required to be pledged to the Administrative Agent under the Loan Documents, in form and substance reasonably satisfactory to the

Administrative Agent, and (ii) such notices, stock powers, transfer documents and other documentation and take such action as may be reasonably required by the Administrative Agent in order to maintain a perfected, first priority Lien and security interest in such Equity Interests.

(c)     No later than two (2) Business Days after the Effective Date, the Borrowers shall execute such documents and take such further action as the Administrative Agent may request in order to pledge to the Administrative Agent, for the benefit of the Lenders, common shares owned by the Borrowers or their Affiliates in NexPoint Residential Trust, Inc. and NexPoint Strategic Opportunities Fund with an aggregate market value of no less than $10,000,000.

(d)     Notwithstanding anything herein to the contrary, the Borrowers acknowledge and agree that any breach of this Section 5.21 shall constitute an immediate Event of Default (subject only to notice from the Administrative Agent).

Section 5.22 Sufficiency of Funds.  Each Borrower hereby represents, warrants, and covenants that:

(a)     In connection with the required prepayment under Section 2.11(f) hereof, the Borrowers and their Affiliates will recommend to the appropriate investment committees of funds managed by any Borrower or such Affiliates to make investments in the Portfolio Properties in an aggregate amount as may be required for the Borrowers to make such prepayments in full when required hereunder;

(b)     such funds are permitted under their respective organizational documents to make investments, in the form of debt or equity, in assets similar to the Portfolio Properties; and

(c)     the Borrowers and their affiliates will promptly undertake such action to obtain the necessary funding from such related funds and Affiliates in order to make the prepayment under Section 2.11(f) when required hereunder.

## ARTICLE VI

## Negative Covenants

Until the principal of and interest on the Loans and all other amounts due and  payable hereunder have been paid in full, the Borrower covenants and agrees with the Lenders that:

Section 6.01 Liens.  No Borrower will create, incur, assume or permit to exist any Lien on the Collateral or the Portfolio Properties, or assign or sell any income or revenues (including accounts receivable) or rights in respect of any thereof, except solely with respect to the Portfolio Properties and the pledged Equity Interests in the Stonebridge DST and NexPoint Residential Trust Inc., Permitted Encumbrances.  The Dugaboy Investment Trust shall not, prior to the date when the Obligations shall have been reduced to no more than $150,000,000, create, incur, assume or permit to exist any Lien on any marketable securities owned by it, whether now owned or hereafter acquired, except the Lien in favor of the Administrative Agent to secure the Obligations.

Section 6.02 <u>Fundamental Changes</u>.  The Borrower will not, and will not permit any Collateral Subsidiary to:

(a)        merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, transfer, lease or otherwise dispose of (in one transaction or in a series of transactions) all or substantially all of the assets of the Borrower or all or substantially all of the stock of its Subsidiaries (in each case, whether now owned or hereafter acquired), or liquidate or dissolve;

(b)        sell, transfer, lease or otherwise dispose of any of its assets to the extent such transaction would result in a breach of <u>Section 5.02</u>; or

(c)        engage to any material extent in any business other than the ownership of interest in entities that own, develop, operate and manage the Properties and businesses reasonably related thereto, except as allowed by <u>Section 6.03</u>.

Section 6.03 <u>Investments, Loans, Advances and Acquisitions</u>.  The Borrower will not purchase, hold or acquire (including pursuant to any merger with any Person that was not a wholly owned Subsidiary prior to such merger) any capital stock, evidences of indebtedness (subject to <u>Section 6.09</u> below) or other securities (including any option, warrant or other right to acquire any of the foregoing) of, make or permit to exist any loans or advances to, or make or permit to exist any investment or any other interest in, any other Person, or purchase or otherwise acquire (in one transaction or a series of transactions) any assets of any other Person constituting a business unit, except Permitted Investments.

Section 6.04 <u>Hedging Agreements</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, enter into any Hedging Agreement, other than Hedging Agreements entered into in the ordinary course of business to hedge or mitigate risks to which any Subsidiary of the Borrower is exposed in the conduct of its business or the management of its liabilities.

Section 6.05 <u>Restricted Payments</u>.  The Borrower will not declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment while any Default or Event of Default shall be in existence.

Section 6.06 <u>Transactions with Affiliates</u>.  The Borrower will not, and will not permit any of its Subsidiaries to, sell, lease or otherwise transfer any property or assets to, or purchase, lease or otherwise acquire any property or assets from, or otherwise engage in any other transactions with, any of its Affiliates, except (a) in the ordinary course of business at prices and on terms and conditions not less favorable to the Borrower or such Subsidiary than would be obtained on an arm's-length basis from unrelated third parties, (b) transactions between or among the Borrower and its wholly owned Subsidiaries not involving any other Affiliate, (c) transactions related to the closing of and ongoing  activities necessary to implement the loan obligations and requirements of this Agreement,  and (d) any Restricted Payment permitted by <u>Section 6.05</u>.

Section 6.07 [<u>Intentionally Omitted</u>].

Section 6.08 <u>Restrictive Agreements</u>.  No Borrower will, and will not permit any of its Subsidiaries to, directly or indirectly, enter into, incur or permit to exist any agreement or other arrangement that prohibits, restricts or imposes any condition upon (a) the ability of the Borrower or any Subsidiary to create, incur or permit to exist any Lien upon any of its property or assets, or (b) the ability of any Subsidiary to pay dividends or other distributions with respect to any shares of its capital stock or to make or repay loans or advances to the Borrower or any other Subsidiary or to Guarantee Indebtedness of the Borrower or any other Subsidiary; provided that the restrictions contained in this <u>Section 6.08</u> shall not apply to (i) restrictions and conditions imposed by law or by this Agreement or as otherwise approved by the Administrative Agent, (ii) customary restrictions and conditions contained in agreements relating to the sale of a Subsidiary pending such sale, provided such restrictions and conditions apply only to the Subsidiary that is to be sold and such sale is permitted hereunder, (iii) clause (a) of the foregoing shall not apply to restrictions or conditions imposed by any agreement relating to secured Indebtedness or Liens permitted by this Agreement if such restrictions or conditions apply only to the property or assets securing such Indebtedness, or ownership interests in the obligors with respect to such Indebtedness, and (iv) solely with respect to clause (a), provisions in leases restricting the assignment thereof.

Section 6.09 <u>Indebtedness</u>.  Neither any Borrower nor any Collateral Subsidiary shall, without the prior written consent of the Required Lenders, create, incur, assume, guarantee or be or remain liable, contingently or otherwise with respect to any Indebtedness on a recourse basis, except:

(a)	Indebtedness under this Agreement;

(b)	Indebtedness of a Collateral Subsidiary (other than any Property Owner Borrower) under the Senior Loan Documents;

(c)	Indebtedness under any Hedging Obligations;

(d)	Indebtedness of NexPoint Real Estate Advisors IV, L.P. and The Dugaboy Investment Trust under the Stonebridge Term Loan;

(e)	Recourse Indebtedness of the The Dugaboy Investment Trust and Highland Capital in an amount not to exceed the aggregate principal amount of such Borrower's Indebtedness outstanding on the date hereof and set forth in <u>Schedule 6.09</u>; provided that, from an after the date that the aggregate outstanding principal amount of the Obligations shall be reduced to $150,000,000 or less, The Dugaboy Investment Trust and Highland Capital may incur additional recourse Indebtedness on a recourse basis, subject to compliance with the covenants in <u>Section 5.02</u>;

(f)	Customary non-recourse, carveout guarantees and environmental indemnitees entered into in connection with property-level secured Indebtedness of such Borrower's Subsidiaries; and

(g)	Indebtedness for trade payables and operating expenses incurred in the ordinary course of business.

Section 6.10 <u>Subordination of Claims</u>.

(a)  Prior to repayment in full of the Obligations, no Borrower or any Subsidiary may pay any advisory, asset management, property, acquisition, financing, and other fees and amounts due and payable to the Advisor in connection with the Portfolio Properties; <u>provided</u> that, so long as no Event of Default exists or would result therefrom, (i) the Advisor may receive asset management fees with respect to the Portfolio Properties (but not any acquisition, financing or similar fees with respect to the Specified DSTs) and (ii) from and after the date that the market value of the common shares of NexPoint Residential Trust Inc. are equal to an amount no less than 110% of the then aggregate outstanding balance of the Loans and the Stonebridge Term Loan has been repaid in full, the Borrower may pay acquisition, financing or similar fees with respect to a sellout of any DST offering occurring after such date.[1]

(b)  Each Borrower hereby expressly covenants and agrees for the benefit of the Administrative Agent and the Lenders that all obligations and liabilities of any Borrower or its Subsidiaries or Affiliates to such Borrower or its Subsidiaries or Affiliates of whatever description, including without limitation, all intercompany receivables of such Borrower from another Borrower or its Subsidiaries or Affiliates (collectively, the "<u>Junior Claims</u>") shall be subordinate and junior in right of payment to all Obligations; provided, however, that payment thereof may be made so long as no Event of Default shall have occurred and be continuing. If an Event of Default shall have occurred and be continuing, then no Borrower or its Subsidiaries or Affiliates shall accept any direct or indirect payment (in cash, property, securities by setoff or otherwise) from another Borrower or its Subsidiaries or Affiliates on account of or in any manner in respect of any Junior Claim until all of the Obligations have been indefeasibly paid in full.  <u>Schedule 6.10</u> is, as of the Effective Date, a complete and correct listing of all Junior Claims, and if such Indebtedness is secured by any Lien, a description of the property subject to such Lien. Except as set forth in <u>Schedule 6.10</u> no default exists under any Junior Claims as of the Effective Date.

(c)  All such parties shall execute subordination agreements in form and substance acceptable to the Administrative Agent with respect to such fees and Junior Claims.

Section 6.11 <u>Amendment to Organizational Documents</u>.  Without the prior written consent of Administrative Agent, which consent shall not be unreasonably withheld, conditioned or delayed, no Borrower will, nor will it permit any Collateral Subsidiary to, amend, modify or waive any rights under its certificate of incorporation, bylaws or other organizational documents in any manner, except: (a) modifications necessary to clarify existing provisions of such organizational documents; (b) modifications which would not have a Material Adverse Effect, and (c) modifications in connection with mergers, consolidations, investments and other transactions not otherwise prohibited by the other provisions of this Agreement.

Section 6.12 <u>Sanctions</u>.  No Borrower shall permit the proceeds of any Loan:  (a) to be lent, contributed or otherwise made available to fund any activity or business in any Designated Jurisdiction; (b) to fund any activity or business of any Sanctioned Person or any Person located,

---

[1] NTD: Key's understanding is that the fees would accrue but would not be paid until the 110% condition above is satisfied.

organized, formed, incorporated or residing in any Designated Jurisdiction or who is the subject of any Sanctions; (c) in any other manner that will result in any material violation by any Person (including any Lender or Administrative Agent) of any Sanctions; or (d) to be used in furtherance of an offer, payment, promise to pay, or authorization of the payment or giving of money, or anything else of value, to any Person in violation of any Anti-Corruption Laws.

Section 6.13 <u>Specified DSTs.</u>

(a)     <u>Sale of Trust Interests.</u>  Notwithstanding anything to the contrary contained in this Agreement or in any other Loan Documents, no DST Depositor may sell (or redeem the Trust Interests owned by such DST Depositor) or otherwise dispose of its Trust Interests or any portion thereof or interest (beneficial or otherwise) in any Trust Interests or Specified DST, or enter into a contract to sell or dispose of such Trust Interests or Specified DST, or any portion thereof or interest therein (collectively referred to as a "<u>DST Sale</u>"), unless:

> (i)     the DST Sale is being made pursuant to the applicable Offering Documents;

> (ii)     the DST Sale is not to an Affiliate (other than the redemption of Trust Interests held by the applicable DST Depositor in connection with a DST Permitted Sale to third party investors) unless the terms of the sale are no more favorable to the buyer than the terms upon which third party investors are acquiring the Trust Interests; and

> (iii)     the DST Sale is for all cash and all proceeds are deposited into the applicable Pledged DST Account.

A DST Sale satisfying these conditions shall be defined as a "<u>DST Permitted Sale</u>".

(b)     <u>Terms of DST Sales.</u>  The Offering Documents shall set forth the terms of the possible sale of Trust Interests owned by the applicable DST Depositor or sold for purposes of redeeming a separate class of Trust Interests held by such DST Depositor. No other beneficial interests in any property owned by a Specified DST shall be sold by the applicable Specified DST or its Affiliates other than Trust Interests pursuant to the terms of this Agreement or other than resales of Trust Interests owned by Investors other than a DST Depositor or its Affiliates. Prior to commencing the marketing of Trust Interests of any Specified DST, Borrower shall deliver to Lender a proposed budget in a form reasonably approved by Lender for each Specified DST showing anticipated proceeds from any issuance of Trust Interests, anticipated equity contributions by Borrower and its Affiliates (other than to DST Depositor as the initial holder of unsold Class 2 Trust Interests in such Specified DST), the amount of any "presold" Trust Interests, and the amount of any property level Indebtedness of such Specified DST or its Subsidiaries.   There shall be no change in the purchase price or any other material terms of a DST Sale (other than the reduction of commissions and/or expenses) without the prior written consent of the Agent. Notwithstanding anything set forth in this Agreement to the contrary, the original issuance of Trust Interests to its respective DST Depositor shall not be prohibited by this Agreement.

(c)     No Changes to DST.  No Specified DST shall change its corporate form from a Delaware statutory trust, or transfer or permit its subsidiaries to transfer any of its interests in any Portfolio Property; provided however, that any Specified DST may consummate any Transfer Distribution (as the term is defined in the Trust Agreement) so long as the Agent shall have received notice of such Specified DST no more than ten (10) days following the occurrence thereof, the Borrower or an Affiliate thereof remains as the manager of any limited liability company resulting from such Transfer Distribution, and such resulting limited liability company shall have executed such additional documents as the Administrative Agent may reasonably require to preserve its rights under the Loan Documents.

(d)     Pledged DST Accounts.  No later than the date that is thirty days after the Effective Date (or, with respect to a Specified DST formed hereafter, the date such Specified DST is form, or, in each case, such later date that the Agent may agree), the Borrowers shall cause each DST Depositor to establish with KeyBank a deposit account into which all proceeds of the sale of Trust Interests owned by such DST Depositor shall be deposited (with respect to each DST Depositor, it's "Pledged DST Account"), which shall be pledged to the Agent and subject to the sole control of the Agent pursuant to documentation reasonably acceptable to the Agent.

(e)     Partial Release.  Notwithstanding any other term or provision of this Agreement, the parties agree that upon the sale of 100% of the Trust Interests in a Specified DST pursuant to a DST Permitted Sale, so long as no Event of Default has occurred and is continuing (such conditions, the "Release Provisions"), the Specified DST Depositor with respect to such Specified DST shall be automatically released from the Loan Documents, and such Person shall no longer be obligated to comply with any of the representations, warranties or covenants applicable to such Person under the Loan Documents, provided, however, that the release contained in this Section 6.13(e) shall not apply to the extent any such representations, warranties or covenants apply to Subsidiaries of the Borrower for as long as any such Person constitutes a Subsidiary thereof. Further, from and after satisfaction of the Release Provisions for any Specified DST Depositor and its respective properties, any proceeds received with respect to the properties of such Specified DST shall no longer constitute Collateral under the Loan Documents or remain subject to the rights of the Agent under the Loan Documents.

## ARTICLE VII

## Events of Default

If any of the following events ("Events of Default") shall occur:

(a)     the Borrower shall fail to pay any principal of the Loans when and as the same shall become due and payable, whether at the due date thereof or at a date fixed for prepayment thereof or otherwise, and such failure (other than the payment due on the Maturity Date, for which there shall be no grace period) shall continue unremedied for a period of over three (3) Business Days;

(b)     the Borrower shall fail to pay any interest on the Loans or any fee or any other amount (other than an amount referred to in clause (a) of this Article) payable under any Loan

Documents, when and as the same shall become due and payable, and such failure shall continue unremedied for a period of over three (3) Business Days (such three Business Day period commencing after written notice from the Administrative Agent as to any such failure);

(c)      any representation or warranty made or deemed made by or on behalf of any Borrower in or in connection with any Loan Document or any amendment or modification thereof or waiver thereunder, or in any report, certificate, financial statement or other document furnished pursuant to or in connection with this Agreement or any amendment or modification hereof or waiver hereunder, shall prove to have been incorrect in any material respect when made or deemed made;

(d)      the Borrower shall fail to observe or perform any covenant, condition or agreement contained in <u>Article V</u> or <u>VI</u> other than <u>Sections 5.04</u>, 5.<u>05</u>, <u>5.06</u>, <u>5.07(a)</u>, <u>5.08</u>, and <u>5.11</u>;

(e)      any Borrower shall fail to observe or perform any covenant, condition or agreement contained in any Loan Document (other than those specified in <u>clause (a), (b)</u> or <u>(d)</u> of this Article), and such failure shall continue unremedied for a period of over 30 days after notice thereof from the Administrative Agent to the Borrower (which notice will be given at the request of any Lender) and if such default is not curable within thirty (30) days and the Borrower is diligently pursuing cure of same, the cure period may be extended for thirty (30) days (for a total of 60 days after the original notice from the Administrative Agent) upon written request from the Borrower to the Administrative Agent;

(f)      an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking (i) liquidation, reorganization or other relief in respect of any Borrower or any Collateral Subsidiary or its debts, or of a substantial part of its assets, under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect or (ii) the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for any Borrower or any Collateral Subsidiary or for a substantial part of its assets, and, in any such case, such proceeding or petition shall continue undismissed for 60 days or an order or decree approving or ordering any of the foregoing shall be entered;

(g)      any Borrower or any Collateral Subsidiary shall (i) voluntarily commence any proceeding or file any petition seeking liquidation, reorganization or other relief under any Federal, state or foreign bankruptcy, insolvency, receivership or similar law now or hereafter in effect, (ii) consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause (h) of this Article, (iii) apply for or consent to the appointment of a receiver, trustee, custodian, sequestrator, conservator or similar official for such Person or for a substantial part of its assets, (iv) file an answer admitting the material allegations of a petition filed against it in any such proceeding, (v) make a general assignment for the benefit of creditors or (vi) take any action for the purpose of effecting any of the foregoing;

(h)      any Borrower or any Collateral Subsidiary shall become unable, admit in writing its inability or fail generally to pay its debts as they become due;

(i)     one or more judgments for the payment of money in an aggregate amount in excess of $10,000,000 shall be rendered against any Borrower, any Subsidiary of the Borrower or any combination thereof and the same shall remain undischarged for a period of sixty (60) consecutive days during which execution shall not be effectively stayed, or any action shall be legally taken by a judgment creditor to attach or levy upon any assets of such Person to enforce any such judgment;

(j)     an ERISA Event shall have occurred that, in the opinion of the Required Lenders, when taken together with all other ERISA Events that have occurred, would reasonably be expected to result in liability of the Borrower and its Subsidiaries in an aggregate amount exceeding $10,000,000;

(k)     [Intentionally Omitted];

(l)     any Borrower shall default under any agreement and such default would reasonably be expected to result in a Material Adverse Effect;

(m)     any Borrower shall (or shall attempt to) disavow, revoke or terminate any Loan Document to which it is a party or shall otherwise challenge or contest in any action, suit or proceeding in any court or before any Governmental Authority the validity or enforceability of any Loan Document;

(k)     any provision of any Loan Document with respect to the Collateral shall for any reason cease to be valid and binding on, enforceable against, any Borrower resulting in a Material Adverse Effect, or any lien created under any Loan Document ceases to be a valid and perfected first priority lien in any of the Collateral purported to be covered thereby;

(n)     a Change in Control shall occur;

(o)     (i) Any Borrower defaults under any recourse Indebtedness, or (ii) any Subsidiaries of a Borrower defaults under any non-recourse Indebtedness in an aggregate amount equal to or greater than $75,000,000 at any time (such $75,000,000 calculated based on the Equity Percentage of Indebtedness for the Borrower's Unconsolidated Affiliates); or

(p)     An "event of default" occurs under any of the Senior Loan Documents or any other debt secured by the Portfolio Properties (excluding the Summers Landing Property);

then, and in every such event (other than an event described in clause (f) or (g) of this Article), and at any time thereafter during the continuance of such event, the Administrative Agent may, and at the request of the Required Lenders shall, by notice to the Borrower, take some or all of the following actions, at the same or different times:  (i) declare the Loans then outstanding to be due and payable in whole (or in part, in which case any principal not so declared to be due and payable may thereafter be declared to be due and payable), and thereupon the principal of the Loans so declared to be due and payable, together with accrued interest thereon and all reasonable fees and other obligations of the Borrower accrued hereunder, shall become due and payable immediately, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower, and (ii) exercise any other rights or remedies

provided under this Agreement or any other Loan Document, or any other right or remedy available by law or equity; and in case of any event described in clause (f) or (g) of this Article, the principal of the Loans then outstanding, together with accrued interest thereon and all reasonable fees and other obligations of the Borrower accrued hereunder, shall automatically become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Borrower.

## ARTICLE VIII

### The Administrative Agent

Each of the Lenders hereby irrevocably appoints the Administrative Agent as its agent and authorizes the Administrative Agent to take such actions on its behalf and to exercise such powers as are delegated to the Administrative Agent by the terms hereof, together with such actions and powers as are reasonably incidental thereto. In the event of conflicting instructions or notices given to the Borrower by the Administrative Agent and any Lender, the Borrower is hereby directed and shall rely conclusively on the instruction or notice given by the Administrative Agent.

The bank serving as the Administrative Agent hereunder shall have the same rights and powers in its capacity as a Lender as any other Lender and may exercise the same as though it were not the Administrative Agent, and such bank and its Affiliates may accept deposits from, lend money to and generally engage in any kind of business with the Borrower or any Subsidiary or other Affiliate thereof as if it were not the Administrative Agent hereunder.

The Administrative Agent shall not have any duties or obligations except those expressly set forth herein. Without limiting the generality of the foregoing, (a) the Administrative Agent shall not be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (b) the Administrative Agent shall not have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby that the Administrative Agent is required to exercise in writing by the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02), and (c) except as expressly set forth herein, the Administrative Agent shall not have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to any Borrower that is communicated to or obtained by the bank serving as Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be liable for any action taken or not taken by it with the consent or at the request of the Required Lenders (or such other number or percentage of the Lenders as shall be necessary under the circumstances as provided in Section 9.02) or in the absence of its own gross negligence or willful misconduct. The Administrative Agent shall be deemed not to have knowledge of any Default unless and until written notice thereof is given to the Administrative Agent by the Borrower or a Lender, and the Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement, (ii) the contents of any certificate, report or other document delivered hereunder or in connection herewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein,

(iv) the validity, enforceability, effectiveness or genuineness of this Agreement or any other agreement, instrument or document, or (v) the satisfaction of any condition set forth in Article IV or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent. The Administrative Agent agrees that, in fulfilling its duties hereunder, it will use the same standard of care it utilizes in servicing loans for its own account.

The Administrative Agent shall be entitled to rely upon, and shall not incur any liability for relying upon, any notice, request, certificate, consent, statement, instrument, document or other writing believed by it to be genuine and to have been signed or sent by the proper Person. The Administrative Agent also may rely upon any statement made to it orally or by telephone and believed by it to be made by the proper Person, and shall not incur any liability for relying thereon. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall not be liable for any action taken or not taken by it in good faith in accordance with the advice of any such counsel, accountants or experts.

The Administrative Agent may perform any and all its duties and exercise its rights and powers by or through any one or more sub-agents appointed by the Administrative Agent. The Administrative Agent and any such sub-agent may perform any and all its duties and exercise its rights and powers through their respective Related Parties. The exculpatory provisions of the preceding paragraphs shall apply to any such sub-agent and to the Related Parties of the Administrative Agent and any such sub-agent, and shall apply to their respective activities in connection with the syndication of the credit facilities provided for herein as well as activities as Administrative Agent.

Subject to the appointment and acceptance of a successor Administrative Agent as provided in this paragraph, the Administrative Agent may resign at any time by notifying the Lenders and the Borrower, and may be removed by the Required Lenders in the event of the Administrative Agent's gross negligence or willful misconduct. Upon any such resignation or removal, the Required Lenders shall have the right, with the approval of Borrower (provided no Default has occurred and is continuing), which approval shall not be unreasonably withheld, to appoint a successor. If no successor shall have been so appointed by the Required Lenders and shall have accepted such appointment within 30 days after the retiring Administrative Agent gives notice of its resignation or is removed, then the retiring Administrative Agent may, on behalf of the Lenders, appoint a successor Administrative Agent which shall be a Lender, or a bank with an office in New York, New York, or an Affiliate of any such bank. Upon the acceptance of its appointment as Administrative Agent hereunder by a successor, such successor shall succeed to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent, and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder. The fees payable by the Borrower to a successor Administrative Agent for its own behalf shall be the same as those payable to its predecessor unless otherwise agreed between the Borrower and such successor. After the Administrative Agent's resignation hereunder, the provisions of this Article and Section 9.03 shall continue in effect for the benefit of such retiring Administrative Agent, its sub-agents and their respective Related Parties in respect of any actions taken or omitted to be taken by any of them while it was

acting as Administrative Agent.  The Administrative Agent shall cooperate with any successor Administrative Agent in fulfilling its duties hereunder.

Each Lender acknowledges that it has, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it has deemed appropriate, made its own credit analysis and decision to enter into this Agreement. Each Lender also acknowledges that it will, independently and without reliance upon the Administrative Agent or any other Lender and based on such documents and information as it shall from time to time deem appropriate, continue to make its own decisions in taking or not taking action under or based upon this Agreement, any related agreement or any document furnished hereunder or thereunder.  Administrative Agent agrees to provide the Lenders with copies of all material documents and certificates received by the Administrative Agent from Borrower in connection with the Loans.

The Titled Agents shall not have any additional rights or obligations under the Loan Documents, except for those rights, if any, as a Lender.

Any material to be delivered pursuant to <u>Section 5.01</u> and <u>Section 5.03</u> (collectively, "<u>Information Materials</u>") may be delivered electronically directly to the Administrative Agent or made available to Administrative Agent pursuant to an accessible website and the Lenders provided that such material is in a format reasonably acceptable to Administrative Agent, and such material shall be deemed to have been delivered to Administrative Agent and the Lenders upon Administrative Agent's receipt thereof or access to the website containing such material. The Administrative Agent shall distribute any such information to the other Lenders after receipt thereof, and may do so by electronic form in the same manner as provided in this <u>Article VIII</u>. Upon the request of Administrative Agent, Borrower shall deliver paper copies thereof to Administrative Agent and the Lenders.  Borrower authorizes Administrative Agent and Arranger to disseminate any such materials through the use of Intralinks, SyndTrak or any other electronic information dissemination system provided that system is secure and access thereto is protected by a password that is only disclosed to the Lenders (an "<u>Electronic System</u>").  Any such Electronic System is provided "as is" and "as available."  The Administrative Agent and the Arranger do not warrant the adequacy of any Electronic System and expressly disclaim liability for errors or omissions in any notice, demand, communication, information or other material provided by or on behalf of Borrower that is distributed over or by any such Electronic System ("<u>Communications</u>").  No warranty of any kind, express, implied or statutory, including, without limitation, any warranty of merchantability, fitness for a particular purpose, non-infringement of third-party rights or freedom from viruses or other code defects, is made by the Administrative Agent or the Arranger in connection with the Communications or the Electronic System.  In no event shall the Administrative Agent, Arranger or any of their directors, officers, employees, agents or attorneys have any liability to the Borrower, any Lender or any other Person for damages of any kind, including, without limitation, direct or indirect, special, incidental or consequential damages, losses or expenses (whether in tort, contract or otherwise) arising out of any Borrower's, the Administrative Agent's or Arranger's transmission of Communications through the Electronic System, and the Borrowers release Administrative Agent, the Arrangers and the Lenders from any liability in connection therewith.  Certain of the Lenders (each, a "<u>Public Lender</u>") may have personnel who do not wish to receive material non-public

information with respect to the Borrowers, their Subsidiaries or its Affiliates, or the respective securities of any of the foregoing, and who may be engaged in investment and other market related activities with respect to such Persons' securities.  The Borrower hereby agrees that it will identify that portion of the Information Materials that may be distributed to the Public Lenders and that (i) all such Information Materials shall be clearly and conspicuously marked "PUBLIC" which, at a minimum, shall mean that the word "PUBLIC" shall appear prominently on the first page thereof; (ii) by marking Information Materials "PUBLIC," the Borrower shall be deemed to have authorized the Administrative Agent, the Lenders and the Arranger to treat such Information Materials as not containing any material non-public information with respect to the Borrowers, their Subsidiaries, their Affiliates or their respective securities for purposes of United States Federal and state securities laws (provided, however, that to the extent such Information Materials constitute confidential information, they shall be treated as provided in Section 9.12); (iii) all Information Materials marked "PUBLIC" are permitted to be made available through a portion of any electronic dissemination system designated "Public Investor" or a similar designation; and (iv) the Administrative Agent and the Arranger shall be entitled to treat any Information Materials that are not marked "PUBLIC" as being suitable only for posting on a portion of any electronic dissemination system not designated "Public Investor" or a similar designation.

ARTICLE IX

Miscellaneous

Section 9.01 Notices.  Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service, mailed by certified or registered mail or sent by telecopy, as follows:

(a)       if to the Borrower, in care of Highland Capital Management, L.P., at 300 Crescent Court, Suite 700, Dallas, Texas  75201, Attention:  Matt McGraner (Telephone No. (972) 419-6229 and Email:  mmcgraner@highlandcapital.com); copies to:  Wick Phillips Gould & Martin, LLP, 3131 McKinney, Suite 100, Dallas, Texas  75204, Attention:  Chris Fuller (Telephone No. (214) 740-4023 and Email: cfuller@wickphillips.com);

(b)       if to the Administrative Agent, to KeyBank, National Association, 225 Franklin Street, 16th Floor, Boston, Massachusetts 02110, Attention:  Christopher T. Neil, (Telephone No. (617) 385-6202 and Email: christopher_t_neil@keybank.com; and

(c)       if to any other Lender, to it at its address (or telecopy number) set forth on the signature pages of this Agreement, or as provided to Borrower in writing by the Administrative Agent or the Lender.

Any party hereto may change its address or telecopy number for notices and other communications hereunder by notice to the other parties hereto.  All notices and other communications given to any party hereto in accordance with the provisions of this Agreement shall be deemed to have been given (i) if given by telecopy, when such telecopy is transmitted to the telecopy number specified in this Section and the appropriate confirmation is received (or if

such day is not a Business Day, on the next Business Day); (ii) if given by mail (return receipt requested), on the earlier of receipt or three (3) Business Days after such communication is deposited in the mail with first class postage prepaid, addressed as aforesaid; or (iii) if given by any other means, when delivered at the address specified in this Section; provided that notices to the Administrative Agent under Article II shall not be effective until received.

Section 9.02 Waivers; Amendments.

(a)     No failure or delay by the Administrative Agent or any Lender in exercising any right or power hereunder or under any other Loan Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lenders hereunder and under any other Loan Document are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of this Agreement or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by paragraph (b) of this Section, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of a Loan shall not be construed as a waiver of any Default, regardless of whether the Administrative Agent or any Lender may have had notice or knowledge of such Default at the time.

(b)     Neither this Agreement nor any provision hereof nor any provision of any Loan Document may be waived, amended or modified except pursuant to an agreement or agreements in writing entered into by the Borrower and the Required Lenders or by the Borrower and the Administrative Agent with the consent of the Required Lenders; provided that no such agreement shall (i) increase the Commitment of any Lender without the written consent of such Lender, (ii) reduce the principal amount of any Loan or reduce the rate of interest thereon, or reduce any fees payable hereunder, without the written consent of each Lender affected thereby, (iii) postpone the scheduled date of payment of the principal amount of any Loan, or any interest thereon, or any fees payable hereunder, or reduce the amount of, waive or excuse any such payment, or postpone the scheduled date of expiration of any Commitment, without the written consent of each Lender affected thereby, (iv) change Section 2.17(b) or (c) in a manner that would alter the pro rata sharing of payments required thereby, without the written consent of each Lender, (v) change any of the provisions of this Section or the definition of "Required Lenders" or any other provision hereof specifying the number or percentage of Lenders required to waive, amend or modify any rights hereunder or make any determination or grant any consent hereunder, without the written consent of each Lender, (vi) release any Borrower from its obligations under the Loan Documents or release any Collateral, except as specifically provided for herein, without the written consent of each Lender, (vii) subordinate the Loans or any Collateral without the written consent of each Lender, (viii) waive or modify any conditions of extending the Loan set forth in Section 2.21 or Section 2.22 without the written consent of each Lender affected thereby, or (ix) consent to the Collateral securing any other Indebtedness without the written consent of each Lender; provided further that no such agreement shall

- 77 -

amend, modify or otherwise affect the rights or duties of the Administrative Agent hereunder without the prior written consent of the Administrative Agent.

(c)     There shall be no amendment, modification or waiver of ARTICLE VIII or any other provision in the Loan Documents that affects the rights or duties of the Administrative Agent under this Agreement or any of the other Loan Documents without the written consent of the Administrative Agent.

(d)     Notwithstanding anything to the contrary herein, no Defaulting Lender shall have any right to approve or disapprove any amendment, waiver or consent hereunder (and any amendment, waiver or consent which by its terms requires the consent of all Lenders or each affected Lender may be effected with the consent of the applicable Lenders other than Defaulting Lenders), except that (x) the Commitment of any Defaulting Lender may not be increased or extended without the consent of such Lender; and (y) any waiver, amendment or modification requiring the consent of all Lenders or each affected Lender that by its terms affects any Defaulting Lender more adversely than other affected Lenders shall require the consent of such Defaulting Lender.

Section 9.03  Expenses; Indemnity; Damage Waiver.

(a)     The Borrower shall pay (i) all reasonable out-of-pocket expenses incurred by the Administrative Agent, the Arranger, and its Affiliates, including the reasonable fees, charges and disbursements of counsel for the Administrative Agent, in connection with the closing of the credit facilities provided for herein, the syndication of the credit facilities provided for herein, the preparation and administration of this Agreement or any amendments, modifications or waivers of the provisions hereof (whether or not the transactions contemplated hereby or thereby shall be consummated), (ii) all mortgage taxes and other charges incurred or required to be paid by the Administrative Agent in connection with the Loan Documents, and (iii) all reasonable out-of-pocket expenses incurred by the Administrative Agent or any Lender, including the reasonable fees, charges and disbursements of any counsel for the Administrative Agent or any Lender, in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section, or in connection with the Loans made hereunder, including all such out-of-pocket expenses incurred (including any Appraisal costs) during any waivers, workout, restructuring or negotiations in respect of the Loans.

(b)     The Borrower shall indemnify the Administrative Agent, the Arranger, and each Lender, and each Related Party of any of the foregoing Persons (each such Person being called an "Indemnitee") against, and hold each Indemnitee harmless from, any and all losses, claims, damages, liabilities and related expenses, including the reasonable fees, charges and disbursements of any counsel for any Indemnitee, incurred by or asserted against any Indemnitee arising out of, in connection with, or as a result of (i) the execution or delivery of this Agreement or any agreement or instrument contemplated hereby, the performance by the parties hereto of their respective obligations hereunder or the consummation of the Transactions or any other transactions contemplated hereby, (ii) the Loans or the use of the proceeds therefrom, (iii) any actual or alleged presence or release of Hazardous Materials on or from any property owned or operated by the Borrower or any of its Subsidiaries, or any Environmental Liability related in any way to the Borrower or any of its Subsidiaries, or (iv) any actual or prospective claim,

litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory and regardless of whether any Indemnitee is a party thereto; provided that such indemnity shall not, as to any Indemnitee, be available to the extent that such losses, claims, damages, liabilities or related expenses resulted from the gross negligence or willful misconduct of such Indemnitee as determined by a court of law in a final non-appealable judgment, or the failure of the Indemnitee to make Loans pursuant to its Commitment in breach of its obligations hereunder.

(c)     To the extent that the Borrower fails to pay any amount required to be paid by it to the Administrative Agent under paragraph (a) or (b) of this Section, each Lender severally agrees to pay to the Administrative Agent such Lender's Applicable Percentage (determined as of the time that the applicable unreimbursed expense or indemnity payment is sought) of such unpaid amount; provided that the unreimbursed expense or indemnified loss, claim, damage, liability or related expense, as the case may be, was incurred by or asserted against the Administrative Agent in its capacity as such.

(d)     To the extent permitted by applicable law, the Borrower shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to direct or actual damages) arising out of, in connection with, or as a result of, this Agreement or any agreement or instrument contemplated hereby, the Transactions, the Loans or the use of the proceeds thereof.

(e)     All amounts due under this Section shall be payable not later than ten days after written demand therefor.

Section 9.04 Successors and Assigns.

(a)     The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of each Lender (and any attempted assignment or transfer by the Borrower without such consent shall be null and void).  Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby and, to the extent expressly contemplated hereby, the Related Parties of each of the Administrative Agent and the Lenders) any legal or equitable right, remedy or claim under or by reason of this Agreement.

(b)     (i)  Subject to the conditions set forth in paragraph (b)(ii) below, any Lender may assign to one or more assignees all or a portion of its rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans at the time owing to it) with the prior written consent (such consent not to be unreasonably withheld) of:

(A)     the Borrower, provided that no consent of the Borrower shall be required for an assignment to a Lender, an Affiliate of a Lender, an Approved Fund or, if a Default has occurred and is continuing, any other assignee; and (ii) such consent shall be deemed granted unless the

Lead Borrower objects within five (5) Business Days of a receipt of written notice of the proposed assignment;

(B)     the Administrative Agent, provided that no consent of the Administrative Agent shall be required for an assignment to a Lender, an Affiliate of a Lender or an Approved Fund.

Provided, no consent of the Borrower or Administrative Agent shall be required in connection with any assignment to an entity acquiring, or merging with, a Lender.

(ii)     Assignments shall be subject to the following additional conditions:

(A)     except in the case of an assignment to a Lender or an Affiliate of a Lender or an assignment of the entire remaining amount of the assigning Lender's Commitment or Loans, the amount of the Commitment or Loans of the assigning Lender subject to each such assignment (determined as of the date the Assignment and Assumption with respect to such assignment is delivered to the Administrative Agent) shall not be less than $5,000,000.00 unless each of the Borrower and the Administrative Agent otherwise consent, provided that no such consent of the Borrower shall be required if a Default has occurred and is continuing and such consent shall not be unreasonably withheld;

(B)     each partial assignment shall be made as an assignment of a proportionate part of all the assigning Lender's rights and obligations under this Agreement with respect to the Loans or the Commitment assigned;

(C)     the parties to each assignment shall execute and deliver to the Administrative Agent an Assignment and Assumption, together with a processing and recordation fee of $3,500.00; and

(D)     the assignee, if it shall not be a Lender, shall deliver to the Administrative Agent an Administrative Questionnaire.

For the purposes of this Section 9.04(b), the term "Approved Fund" has the following meaning:

"Approved Fund" means any Person (other than a natural person) that is engaged in making, purchasing, holding or investing in bank loans and similar extensions of credit in the ordinary course of its business and that is administered or managed by (a) a Lender, (b) an Affiliate of a Lender or (c) an entity or an Affiliate of an entity that administers or manages a Lender.

(iii)  Subject to acceptance and recording thereof pursuant to paragraph (b)(iv) of this Section, from and after the effective date specified in each Assignment and

Assumption the assignee thereunder shall be a party hereto and, to the extent of the interest assigned by such Assignment and Assumption, have the rights and obligations of a Lender under this Agreement, and the assigning Lender thereunder shall, to the extent of the interest assigned by such Assignment and Assumption, be released from its obligations under this Agreement (and, in the case of an Assignment and Assumption covering all of the assigning Lender's rights and obligations under this Agreement, such Lender shall cease to be a party hereto but shall continue to be entitled to the benefits of Sections 2.15, 2.16, 2.17 and 9.03).  Any assignment or transfer by a Lender of rights or obligations under this Agreement that does not comply with this Section 9.04 shall be treated for purposes of this Agreement as a sale by such Lender of a participation in such rights and obligations in accordance with paragraph (c) of this Section.

(iv)  The Administrative Agent, acting for this purpose as an agent of the Borrower, shall maintain at one of its offices a copy of each Assignment and Assumption delivered to it and a register for the recordation of the names and addresses of the Lenders, and the Commitment of the principal amount of the Loans owing to, each Lender pursuant to the terms hereof from time to time (the "Register").  The entries in the Register shall be conclusive, and the Borrower, the Administrative Agent and the Lenders may treat each Person whose name is recorded in the Register pursuant to the terms hereof as a Lender hereunder for all purposes of this Agreement, notwithstanding notice to the contrary.  The Register shall be available for inspection by the Borrower and any Lender, at any reasonable time and from time to time upon reasonable prior notice.

(v)  Upon its receipt of a duly completed Assignment and Assumption executed by an assigning Lender and an assignee, the assignee's completed Administrative Questionnaire (unless the assignee shall already be a Lender hereunder), the processing and recordation fee referred to in paragraph (b) of this Section and any written consent to such assignment required by paragraph (b) of this Section, the Administrative Agent shall accept such Assignment and Assumption and record the information contained therein in the Register.  No assignment shall be effective for purposes of this Agreement unless it has been recorded in the Register as provided in this paragraph.

(c)  Any Lender may, without the consent of the Borrower or the Administrative Agent, sell participations to one or more banks or other entities (a "Participant") in all or a portion of such Lender's rights and obligations under this Agreement (including all or a portion of its Commitment and the Loans owing to it); provided that (i) such Lender's obligations under this Agreement shall remain unchanged, (ii) such Lender shall remain solely responsible to the other parties hereto for the performance of such obligations, (iii) the Borrower, the Administrative Agent and the other Lenders shall continue to deal solely and directly with such Lender in connection with such Lender's rights and obligations under this Agreement and (iv) Borrower's obligations hereunder shall not be increased.  Any agreement or instrument pursuant to which a Lender sells such a participation shall provide that such Lender shall retain the sole right to enforce this Agreement and to approve any amendment, modification or waiver of any provision of this Agreement; provided that such agreement or instrument may provide that such Lender will not, without the consent of the Participant, agree to any amendment, modification or waiver described in the first proviso to Section 9.02(b) that affects such Participant.  Subject to

paragraph (d) of this Section, the Borrower agrees that each Participant shall be entitled to the benefits of Sections 2.15, 2.16 and 2.17 to the same extent as if it were a Lender and had acquired its interest by assignment pursuant to paragraph (b) of this Section.  To the extent permitted by law, each Participant also shall be entitled to the benefits of Section 9.08 as though it were a Lender, provided such Participant agrees to be subject to Section 2.18(c) as though it were a Lender.  Each Lender that sells a participation shall, acting solely for this purpose as a non-fiduciary agent of the Borrower, maintain a register on which it enters the name and address of each Participant and the principal amounts (and stated interest) of each Participant's interest in the Loans or other obligations under the Loan Documents (the "Participant Register"); provided that, except in the case of a Participant asserting any right of set-off pursuant to Section 9.08, no Lender shall have any obligation to disclose all or any portion of the Participant Register (including the identity of any Participant or any information relating to a Participant's interest in any commitments, loans, letters of credit or its other obligations under any Loan Document) to any Person except to the extent that such disclosure is necessary to establish that such commitment, loan, or other obligation is in registered form under Section 5f.103-1(c) of the United States Treasury Regulations. The entries in the Participant Register shall be conclusive absent manifest error, and such Lender shall treat each Person whose name is recorded in the Participant Register as the owner of such participation for all purposes of this Agreement notwithstanding any notice to the contrary.  For the avoidance of doubt, the Administrative Agent (in its capacity as Administrative Agent) shall have no responsibility for maintaining a Participant Register.

(d)     A Participant shall not be entitled to receive any greater payment under Section 2.15 or 2.17 than the applicable Lender would have been entitled to receive with respect to the participation sold to such Participant, unless the sale of the participation to such Participant is made with the Borrower's prior written consent.  A Participant that would be a Foreign Lender if it were a Lender shall not be entitled to the benefits of Section 2.17 unless the Borrower is notified of the participation sold to such Participant and such Participant agrees, for the benefit of the Borrower, to comply with Section 2.17(e) as though it were a Lender.

(e)     Any Lender may at any time pledge or assign a security interest in all or any portion of its rights under this Agreement to secure obligations of such Lender, including any pledge or assignment to secure obligations to a Federal Reserve Bank, and this Section shall not apply to any such pledge or assignment of a security interest; provided that no such pledge or assignment of a security interest shall release a Lender from any of its obligations hereunder or substitute any such pledgee or assignee for such Lender as a party hereto.

Section 9.05 Survival.  All covenants, agreements, representations and warranties made by the Borrower herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by the other parties hereto and shall survive the execution and delivery of this Agreement and the making of the Loans, regardless of any investigation made by any such other party or on its behalf and notwithstanding that the Administrative Agent or any Lender may have had notice or knowledge of any Default or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on the Loans or any fee or any other amount payable under this Agreement is

outstanding and unpaid.  The provisions of <u>Sections 2.15</u>, <u>2.16</u>, <u>2.17</u> and <u>9.03</u> and <u>Article VIII</u> shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loans or the termination of this Agreement or any provision hereof.

Section 9.06 <u>Counterparts; Integration; Effectiveness</u>.

(a)     This Agreement may be executed in counterparts (and by different parties hereto on different counterparts), each of which shall constitute an original, but all of which when taken together shall constitute a single contract.

(b)     This Agreement and any separate letter agreements with respect to fees payable to the Administrative Agent constitute the entire contract among the parties relating to the subject matter hereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof.

(c)     Except as provided in <u>Section 4.01</u>, this Agreement shall become effective when it shall have been executed by the Administrative Agent and when the Administrative Agent shall have received counterparts hereof which, when taken together, bear the signatures of each of the other parties hereto, and thereafter shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns.  Delivery of an executed counterpart of a signature page of this Agreement by telecopy shall be effective as delivery of a manually executed counterpart of this Agreement.

Section 9.07 <u>Severability</u>.  Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.08 <u>Right of Setoff</u>.  If an Event of Default shall have occurred and be continuing, each Lender and each of its Affiliates is hereby authorized at any time and from time to time, to the fullest extent permitted by law, to set off and apply any and all deposits of a Borrower (general or special, time or demand, provisional or final, but excluding any funds held by the Borrower on behalf of tenants or other third parties) at any time held and other obligations at any time owing by such Lender or Affiliate to or for the credit or the account of a Borrower against any of and all the obligations of the Borrower now or hereafter existing under this Agreement held by such Lender, irrespective of whether or not such Lender shall have made any demand under this Agreement and although such obligations may be unmatured.  Each Lender agrees promptly to notify the Borrower after any such setoff and application made by such Lender, provided that the failure to give such notice shall not affect the validity of such setoff and application.  The rights of each Lender under this Section are in addition to other rights and remedies (including other rights of setoff) which such Lender may have.  In the event that any Defaulting Lender shall exercise any such right of setoff, (a) all amounts so set off shall be paid over immediately to the Administrative Agent for further application in accordance with the provisions of this Agreement and, pending such payment, shall be segregated by such Defaulting Lender from its other funds and deemed held in trust for the benefit of the Administrative Agent

and the Lenders, and (b) the Defaulting Lender shall provide promptly to the Administrative Agent a statement describing in reasonable detail the Obligations owing to such Defaulting Lender as to which it exercised such right of setoff.

Section 9.09 <u>Governing Law; Jurisdiction; Consent to Service of Process</u>.

(a)     This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

(b)     The Borrower hereby irrevocably and unconditionally submits, for itself and its property, to the nonexclusive jurisdiction of the state and federal courts in Boston, Massachusetts and in New York, New York, and any appellate court from any thereof, in any action or proceeding arising out of or relating to this Agreement or any other Loan Document, or for recognition or enforcement of any judgment, and each of the parties hereto hereby irrevocably and unconditionally agrees that all claims in respect of any such action or proceeding may be heard and determined in such State or, to the extent permitted by law, in such Federal court. Each of the parties hereto agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.  Nothing in this Agreement shall affect any right that the Administrative Agent or any Lender may otherwise have to bring any action or proceeding relating to this Agreement or any other Loan Document against the Borrower or its properties in the courts of any jurisdiction.

Notwithstanding the foregoing choice of law:

(i)     matters relating to the creation, perfection, priority and enforcement of the liens on and security interests in a Mortgaged Property or other assets situated in another jurisdiction(s), including by way of illustration, but not in limitation, actions for foreclosure, for injunctive relief, or for the appointment of a receiver, shall be governed by the laws of such state;

(ii)     Administrative Agent shall comply with applicable law in such state to the extent required by the law of such jurisdiction(s) in connection with the foreclosure of the security interests and liens created under the Mortgages or exercising any rights with respect to the Mortgaged Property directly, and the other Loan Documents with respect to the Mortgaged Property or other assets situated in another jurisdiction; and

(iii)     provisions of Federal law and the law of such other jurisdiction(s) shall apply in defining the terms Hazardous Materials, Environmental Laws and Legal Requirements applicable to the Mortgaged Property as such terms are used in this Agreement, the Environmental Indemnity and the other Loan Documents

(c)     The Borrower hereby irrevocably and unconditionally waives, to the fullest extent it may legally and effectively do so, any objection which it may now or hereafter have to the laying of venue of any suit, action or proceeding arising out of or relating to this Agreement or any other Loan Document in any court referred to in paragraph (b) of this Section.  Each of the

parties hereto hereby irrevocably waives, to the fullest extent permitted by law, the defense of an inconvenient forum to the maintenance of such action or proceeding in any such court.

(d)     Each party to this Agreement irrevocably consents to service of process in the manner provided for notices in <u>Section 9.01</u>. Nothing in this Agreement will affect the right of any party to this Agreement to serve process in any other manner permitted by law.

Section 9.10 <u>WAIVER OF JURY TRIAL</u>.  EACH PARTY HERETO HEREBY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL PROCEEDING DIRECTLY OR INDIRECTLY ARISING OUT OF OR RELATING TO THIS AGREEMENT, ANY OTHER LOAN DOCUMENT OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY (WHETHER BASED ON CONTRACT, TORT OR ANY OTHER THEORY). EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.

Section 9.11 <u>Headings</u>.  Article and Section headings and the Table of Contents used herein are for convenience of reference only, are not part of this Agreement and shall not affect the construction of, or be taken into consideration in interpreting, this Agreement.

Section 9.12 <u>Confidentiality</u>.  Each of the Administrative Agent and the Lenders agrees to maintain the confidentiality of the Information (as defined below), except that Information may be disclosed (a) to its and its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors (it being understood that the Persons to whom such disclosure is made will be informed of the confidential nature of such Information and instructed to keep such Information confidential), (b) to the extent requested by any regulatory authority, (c) to the extent  required by applicable laws or regulations or by any subpoena or similar legal process, (d) to any other party to this Agreement, (e) in connection with the exercise of any remedies hereunder or any suit, action or proceeding relating to this Agreement or the enforcement of rights hereunder, (f) subject to an agreement containing provisions substantially the same as those of this Section, to any assignee of or Participant in, or any prospective assignee of or Participant in, any of its rights or obligations under this Agreement, (g) with the consent of the Borrower or (h) to any Person in connection with any Hedging Agreement to the (i) extent such Information (i) becomes publicly available other than as a result of a breach of this Section or (ii) becomes available to the Administrative Agent or any Lender on a nonconfidential basis from a source other than a Borrower, and (j) to the National Association of Insurance Commissioners or any other similar organization or any nationally recognized rating agency that requires access to information about a Lender's or its Affiliates' investment portfolio in connection with ratings issued with respect to such Lender or its Affiliates  For the purposes of this Section, "Information" means all information received from any Borrower relating to the Borrower or its business, other than any such information that is available to the Administrative

Agent or any Lender on a nonconfidential basis prior to disclosure by any Borrower; provided that, in the case of information received from any Borrower after the date hereof, such information is clearly identified at the time of delivery as confidential. Any Person required to maintain the confidentiality of Information as provided in this Section shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Information as such Person would accord to its own confidential information.

Section 9.13 <u>Interest Rate Limitation</u>. If at any time there exists a maximum rate of interest which may be contracted for, charged, taken, received or reserved by the Lenders in accordance with applicable law (the "<u>Maximum Rate</u>"), then notwithstanding anything herein to the contrary, at any time the interest applicable to the Loans, together with all fees, charges and other amounts which are treated as interest on the Loans under applicable law (collectively, the "<u>Charges</u>"), shall exceed such Maximum Rate, the rate of interest payable in respect of the Loans hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been paid in respect of the Loans but were not payable as result of the operation of this Section shall be cumulated and the interest and Charges payable to the Lenders in respect of other Loans or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with interest thereon at the Federal Funds Effective Rate to the date of repayment, shall have been received by the Lenders. If, for any reason whatsoever, the Charges paid or received on the Loans produces a rate which exceeds the Maximum Rate, the Lenders shall credit against the principal of the Loans (or, if such indebtedness shall have been paid in full, shall refund to the payor of such Charges) such portion of said Charges as shall be necessary to cause the interest paid on the Loans to produce a rate equal to the Maximum Rate. All sums paid or agreed to be paid to the holders of the Loans for the use, forbearance or detention of the Loans shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread in equal parts throughout the full term of this Agreement, so that the interest rate is uniform throughout the full term of this Agreement. The provisions of this Section shall control all agreements, whether now or hereafter existing and whether written or oral, between the parties hereto. Without notice to the Borrower or any other person or entity, the Maximum Rate, if any, shall automatically fluctuate upward and downward as and in the amount by which such maximum nonusurious rate of interest permitted by applicable law fluctuates.

Section 9.14 <u>USA PATRIOT Act</u>. . Each Lender that is subject to the Patriot Act (as hereinafter defined) and Administrative Agent (for itself and not on behalf of any Lender) hereby notifies each Borrower that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "Patriot Act"), it is required to obtain, verify and record information that identifies such Borrower, which information includes the name and address of such Borrower and other information that will allow such Lender or Administrative Agent, as applicable, to identify such Borrower in accordance with the Patriot Act. Borrower shall, promptly following a request by Administrative Agent or any Lender, provide all documentation and other information that Administrative Agent or such Lender requests in order to comply with its ongoing obligations under applicable "know your customer" and Anti-Money Laundering Laws, rules and regulations, including the Patriot Act.

Section 9.15 <u>Fiduciary Duty/No Conflicts.</u>

The Administrative Agent, each Lender and their Affiliates (collectively, solely for purposes of this paragraph, the "Lenders"), may have economic interests that conflict with those of the Borrower, their stockholders and/or their affiliates. Each Borrower agrees that nothing in the Loan Documents or otherwise will be deemed to create an advisory, fiduciary or agency relationship or fiduciary or other implied duty between any Lender, on the one hand, and such Borrower, its stockholders or its affiliates, on the other. The Borrower acknowledges and agrees that (i) the transactions contemplated by the Loan Documents (including the exercise of rights and remedies hereunder and thereunder) are arm's-length commercial transactions between the Lenders, on the one hand, and the Borrowers, on the other, and (ii) in connection therewith and with the process leading thereto, (x) no Lender has assumed an advisory or fiduciary responsibility in favor of any Borrower, its stockholders or its affiliates with respect to the transactions contemplated hereby (or the exercise of rights or remedies with respect thereto) or the process leading thereto (irrespective of whether any Lender has advised, is currently advising or will advise any Borrower, its stockholders or its Affiliates on other matters) or any other obligation to any Borrower except the obligations expressly set forth in the Credit Documents and (y) each Lender is acting hereunder solely as principal and not as the agent or fiduciary of any Borrower, its management, stockholders, creditors or any other Person. Each Borrower acknowledges and agrees that it has consulted its own legal and financial advisors to the extent it deemed appropriate and that it is responsible for making its own independent judgment with respect to such transactions and the process leading thereto. Each Borrower agrees that it will not claim that any Lender has rendered advisory services of any nature or respect, or owes a fiduciary or similar duty to such Borrower, in connection with such transaction or the process leading thereto in its capacity as a Lender.

Section 9.16 <u>Acknowledgement and Consent to Bail-In of EEA Financial Institutions</u>. Notwithstanding anything to the contrary in any Loan Document or in any other agreement, arrangement or understanding among any such parties, each party hereto acknowledges that any liability of any EEA Financial Institution arising under any Loan Document, to the extent such liability is unsecured, may be subject to the Write-Down and Conversion Powers of an EEA Resolution Authority and agrees and consents to, and acknowledges and agrees to be bound by:

(a) the application of any Write-Down and Conversion Powers by an EEA Resolution Authority to any such liabilities arising hereunder which may be payable to it by any party hereto that is an EEA Financial Institution; and

(b) the effects of any Bail-in Action on any such liability, including, if applicable:

(i) a reduction in full or in part or cancellation of any such liability;

(ii) a conversion of all, or a portion of, such liability into shares or other instruments of ownership in such EEA Financial Institution, its parent entity, or a bridge institution that may be issued to it or otherwise conferred on it, and that such shares or other instruments of ownership will be accepted by it in lieu of any rights with respect to any such liability under this Agreement or any other Loan Document; or

(iii)     the variation of the terms of such liability in connection with the exercise of the Write-Down and Conversion Powers of any EEA Resolution Authority.

Section 9.17 <u>Multiple Borrowers; Joint and Several Liability.</u>

(a)     With respect to the definition of the "Borrower" hereunder or in any other Loan Document, except where the context otherwise provides, (a) any representations contained herein or in any other Loan Documents of Borrower shall be applicable to each Borrower, (b) any affirmative covenants contained herein or in any other Loan Documents shall be deemed to be covenants of each Borrower and shall require performance by all Borrowers, (c) any negative covenants contained herein or in any other Loan Documents shall be deemed to be covenants of each Borrower, and shall be breached if any Borrower fails to comply therewith, (d) the occurrence of any Event of Default with respect to any Borrower shall be deemed to be an Event of Default hereunder or thereunder, and (e) any Obligations of Borrowers, including, without limitation, under the Note (i) shall be deemed to be Obligations of all of the Borrowers, and (ii) shall be joint and several.  Each Borrower recognizes that credit available to it under the Loan is in excess of and on better terms than it otherwise could obtain on and for its own account and that one of the reasons therefor is its joining in the credit facility contemplated herein with all other Borrowers.  Consequently, each Borrower, jointly and severally, hereby assumes and agrees fully, faithfully and punctually to discharge all Obligations of all of the Borrowers.

(b)     To the fullest extent permitted by Law, the obligations of each Borrower shall not be affected by (i) the failure of Administrative Agent to assert any claim or demand or to enforce or exercise any right or remedy against any other Borrower under the provisions of this Agreement, any other Loan Document or otherwise, (ii) any rescission, waiver, amendment or modification of, or any release from any of the terms or provisions of, this Agreement or any other Loan Document, (iii) the failure to perfect any security interest in, or the release of, any of the collateral or other security held by or on behalf of Administrative Agent, or (iv) any default, failure or delay, willful or otherwise, in the performance of any of the Obligations, or by any other act or omission that may or might in any manner or to any extent vary the risk of any Borrower or that would otherwise operate as a discharge of any Borrower as a matter of law or equity (other than the indefeasible payment in full in cash of all the Obligations, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted).  The obligations of each Borrower shall not be subject to any reduction, limitation, impairment or termination for any reason (other than the indefeasible payment in full in cash of the Obligations, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted), including any claim of waiver, release, surrender, alteration or compromise of any of the Obligations, and shall not be subject to any defense or setoff, counterclaim, recoupment or termination whatsoever by reason of the invalidity, illegality or unenforceability of any of the Obligations or otherwise.

(c)     To the fullest extent permitted by Law, each Borrower waives any defense based on or arising out of any defense of any other Borrower or the unenforceability of the Obligations or any part thereof from any cause, or the cessation from any cause of the liability of any other

Borrower, other than the indefeasible payment in full in cash of all the Obligations, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted. Administrative Agent may, at its election, foreclose on any security held by one or more of them by one or more judicial or non-judicial sales, accept an assignment of any such security in lieu of foreclosure, compromise or adjust any part of the Obligations, make any other accommodation with any other Borrower, or exercise any other right or remedy available to them against any other Borrower, without affecting or impairing in any way the liability of any Borrower hereunder except to the extent that all of the Obligations have been indefeasibly paid in full in cash, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted. Each Borrower waives any defense arising out of any such election even though such election operates, pursuant to Law, to impair or to extinguish any right of reimbursement or subrogation or other right or remedy of such Borrower against any other Borrower.

(d)     Notwithstanding the foregoing, it is the intent of each Borrower and the Lenders that in any proceeding under any Debtor Relief Laws, such Borrower's maximum obligation hereunder shall equal, but not exceed, the maximum amount which would not otherwise cause the obligations of such Borrower hereunder (or any other obligations of such Borrower to the Lenders under the Loan Documents) to be avoidable or unenforceable against such Borrower in such proceeding as a result of any Legal Requirements, including, without limitation, (i) Section 548 of the Bankruptcy Code of the United States and (ii) any state fraudulent transfer or fraudulent conveyance act or statute applied in such proceeding, whether by virtue of Section 544 of the Bankruptcy Code of the United States or otherwise. The Legal Requirements under which the possible avoidance or unenforceability of the obligations of such Borrower hereunder (or any other obligations of such Borrower to the Lender under the Loan Documents) shall be determined in any such proceeding are referred to herein as "Avoidance Provisions". Accordingly, to the extent that the obligations of a Borrower hereunder would otherwise be subject to avoidance under the Avoidance Provisions, the maximum Obligations for which such Borrower shall be liable hereunder shall be reduced to the greater of (A) the amount which, as of the time any of the obligations of such Borrower are deemed to have been incurred by such Borrower under the Avoidance Provisions, would not cause the obligations of such Borrower hereunder (or any other obligations of such Borrower to the Lender under the Loan Documents), to be subject to avoidance under the Avoidance Provisions or (B) the amount which, as of the time demand is made hereunder upon such Borrower for payment on account of the Obligations, would not cause the obligations of such Borrower hereunder (or any other obligations of such Borrower to the Lender under the Loan Documents), to be subject to avoidance under the Avoidance Provisions. The provisions under this Section are intended solely to preserve the rights of the Lenders hereunder to the maximum extent that would not cause the obligations of any Borrower hereunder to be subject to avoidance under the Avoidance Provisions, and no Borrower or any other Person shall have any right or claim under this Section as against the Administrative Agent or any Lender that would not otherwise be available to such Person under the Avoidance Provisions.

(e)     Upon payment by any Borrower of any Obligations, all rights of such Borrower against any other Borrower arising as a result thereof by way of right of subrogation, contribution, reimbursement, indemnity or otherwise shall in all respects be subordinate and

junior in right of payment to the prior indefeasible payment in full in cash of all of the Obligations, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted. In addition, any indebtedness of any Borrower now or hereafter held by any other Borrower is hereby subordinated in right of payment to the prior indefeasible payment in full of the Obligations, excluding, however, any contingent indemnification obligations which are not then due and payable or for which a claim has not then been asserted and no Borrower will demand, sue for or otherwise attempt to collect any such indebtedness. If any amount shall erroneously be paid to any Borrower on account of (i) such subrogation, contribution, reimbursement, indemnity or similar right or (ii) any such indebtedness of any Borrower, such amount shall be held in trust for the benefit of Administrative Agent and shall forthwith be paid to Administrative Agent to be credited against the payment of the Obligations, whether matured or unmatured, in accordance with the terms of this Agreement and the other Loan Documents. Subject to the foregoing, to the extent that any Borrower shall, under this Agreement as a joint and several obligor, repay any of the Obligations constituting Loans made to another Borrower hereunder or other Obligations incurred directly and primarily by any other Borrower (an "Accommodation Payment"), then the Borrower making such Accommodation Payment shall be entitled to contribution and indemnification from, and be reimbursed by, each of the other Borrowers in an amount, for each of such other Borrowers, equal to a fraction of such Accommodation Payment, the numerator of which fraction is such other Borrower's Allocable Amount and the denominator of which is the sum of the Allocable Amounts of all of the Borrowers. As of any date of determination, the "Allocable Amount" of each Borrower shall be equal to the maximum amount of liability for Accommodation Payments which could be asserted against such Borrower hereunder without (a) rendering such Borrower "insolvent" within the meaning of Section 101 (32) of the Bankruptcy Code, Section 2 of the Uniform Fraudulent Transfer Act ("UFTA") or Section 2 of the Uniform Fraudulent Conveyance Act ("UFCA"), (b) leaving such Borrower with unreasonably small capital or assets, within the meaning of Section 548 of the Bankruptcy Code, Section 4 of the UFTA, or Section 5 of the UFCA, or (c) leaving such Borrower unable to pay its debts as they become due within the meaning of Section 548 of the Bankruptcy Code or Section 4 of the UFTA, or Section 5 of the UFCA.

(f)     Each Borrower agrees that it shall never be entitled to be subrogated to any of the Administrative Agent's or any Lender's rights against any Borrower or other Person or any collateral or offset rights held by the Administrative Agent or the Lenders for payment of the Loans until the full and final payment of the Loans and all other obligations incurred under the Loan Documents and final termination of the Lenders' obligations, if any, to make further advances under this Agreement or to provide any other financial accommodations to any Borrower. The value of the consideration received and to be received by each Borrower is reasonably worth at least as much as the liability and obligation of each Borrower incurred or arising under the Loan Documents. Each Borrower has determined that such liability and obligation may reasonably be expected to substantially benefit each Borrower directly or indirectly. Each Borrower has had full and complete access to the underlying papers relating to the Loans and all of the Loan Documents, has reviewed them and is fully aware of the meaning and effect of their contents. Each Borrower is fully informed of all circumstances which bear upon the risks of executing the Loan Documents and which a diligent inquiry would reveal. Each Borrower has adequate means to obtain from each other Borrower on a continuing basis

information concerning such other Borrower's financial condition, and is not depending on the Administrative Agent or the Lenders to provide such information, now or in the future.  Each Borrower agrees that neither the Administrative Agent nor any of the Lenders shall have any obligation to advise or notify any Borrower or to provide any Borrower with any data or information regarding any other Borrower.

[Signature Pages Follow]

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered as of the day and year first above written.

<b><u>BORROWERS</u></b>:

HCRE PARTNERS, LLC,
a Delaware limited liability company

By: _____
Name: Matt McGraner
Title:   Authorized Signatory

SE MULTIFAMILY REIT HOLDINGS, LLC, a Delaware limited liability company

By: _____
Name: Matt McGraner
Title:   Authorized Signatory

NEXPOINT ADVISORS, L.P., a Delaware limited partnership

By:     NexPoint Advisors GP, LLC, a Delaware limited liability company its general partner

By:   _____

Name: Matt McGraner

Title:  Authorized Signatory

NEXPOINT REAL ESTATE ADVISORS IV, L.P., a Delaware limited partnership

By:     NexPoint Real Estate Advisors GP, LLC, a Delaware limited liability company, its general partner

By:   _____

Name: Matt McGraner

Title:  Authorized Signatory

HIGHLAND CAPITAL MANAGEMENT, L.P., a
Delaware limited partnership

By:      Strand Advisors, Inc., its general partner

By:_____
Name: James Dondero
Title:   President

THE DUGABOY INVESTMENT TRUST,
under trust agreement dated November 15, 2010

By: _Nancy Dondero_

Name: Nancy Dondero
Title: Family Trustee

THE SLHC TRUST,
under trust agreement dated December 27, 2016

By:_____
Name: Grant James Scott
Title: Trustee

RIVERVIEW PARTNERS SC, LLC
HAMPTON RIDGE PARTNERS, LLC
LAT BATTLEGROUND PARK, LLC
LANDMARK AT BATTLEGROUND PARK II, LLC
MAR QUAIL LANDING, LLC
G&E APARTMENT REIT THE MYRTLES AT OLDE
TOWNE, LLC
G&E APARTMENT REIT THE HEIGHTS AT OLDE
TOWNE, LLC
SE OAK MILL I OWNER, LLC
SE OAK MILL II OWNER, LLC
SE STONEY RIDGE, LLC
SE GOVERNORS GREEN, LLC
each a Delaware limited liability company

By:_____
Name: Matt McGraner
Title:   Authorized Signatory

[Signatures Continue on the Following Page]

*[Signature Page to Bridge Loan Agreement]*

**SCHEDULE 1.01**
**PROPERTY OWNER BORROWERS**

1. RIVERVIEW PARTNERS SC, LLC, a Delaware limited liability company
2. HAMPTON RIDGE PARTNERS, LLC, a Delaware limited liability company
3. LAT BATTLEGROUND PARK, LLC, a Delaware limited liability company
4. LANDMARK AT BATTLEGROUND PARK II, LLC, a Delaware limited liability company
5. MAR QUAIL LANDING, LLC, a Delaware limited liability company
6. G&E APARTMENT REIT THE MYRTLES AT OLDE TOWNE, LLC, a Delaware limited liability company
7. G&E APARTMENT REIT THE HEIGHTS AT OLDE TOWNE, LLC, a Delaware limited liability company
8. SE OAK MILL I OWNER, LLC , a Delaware limited liability company
9. SE OAK MILL II OWNER, LLC, a Delaware limited liability company
10. SE STONEY RIDGE, LLC, a Delaware limited liability company
11. SE GOVERNORS GREEN, LLC, a Delaware limited liability company

*[Signature Page to Bridge Loan Agreement]*

**SCHEDULE 1.01(A)**
**HCRE PROPERTIES**

| | **Property Owner** | **HCRE Property** |
|---|---|---|
| 1. | HCRE Plano, LLC | Homewood Suites – Plano [2601 E President George Bush Hwy, Plano, TX 75074][ 4705 Old Shepard Pl, Plano, TX 75093] |
| 2. | HCRE Addison, LLC | Homewood Suites – Addison 4451 Belt Line Rd, Addison, TX 75001 |
| 3. | HCRE Las Colinas, LLC | Homewood Suites – Las Colinas 4300 Wingren Dr, Irving, TX 75039 |
| 4. | HCBH Buffalo Pointe, LLC, HCBH Buffalo Pointe II, LLC, HCBH Buffalo Pointe III, LLC | Connection at Buffalo Pointe, 10201 Buffalo Speedway, Houston, TX 77054 |
| 5. | Camelback Residential Partners, LLC | The Angela, 2727 E Camelback Road, Phoenix, AZ 85016 |
| 6. | | [McKinney Land] [Dallas Land] [Florida Land] |
| 7. | | |

**SCHEDULE 2.01**

| LENDER | COMMITMENT (Percentage) |
|---|---|
| KeyBank, National Association | $556,275,000 (100%) |
| TOTAL: | $556,275,000 (100%) |

**SCHEDULE 3.05**
**PORTFOLIO PROPERTIES AND MORTGAGED PROPERTIES**

| | Property Owner | Portfolio Property | Mortgaged Properties (Y/N) | Senior Credit Agreement |
|---|---|---|---|---|
| 1. | Riverview Partners SC, LLC | Reserve at River Walk - 4501 Bentley Drive Columbia, South Carolina 29210 | Yes | N/A |
| 2. | Hampton Ridge Partners, LLC | Victoria Park - 4616 Stoney Trace Drive Charlotte, North Carolina 28227 | Yes | N/A |
| 3. | LAT Battleground Park and Landmark AT Battleground Park II, LLC | Landmark at Battleground Park - 3520 Drawbridge Parkway Greensboro, North Carolina 27410 | Yes | N/A |
| 4. | MAR Quail Landing, LLC | Quail Landing - 14200 North May Avenue Oklahoma City, Oklahoma 73134 | Yes | N/A |
| 5. | G&E Apartment REIT The Myrtles at Olde Towne, LLC | The Myrtles at Olde Towne - 850 Crawford Parkway Portsmouth, Virginia 23704 | Yes | N/A |
| 6. | G&E Apartment REIT The Heights at Olde Towne, LLC | The Heights at Olde Towne - 303 Effingham Street and 301 Green Street Portsmouth, Virginia 23704 | Yes | N/A |
| 7. | SE Oak Mill I, LLC and SE Oak Mill II, LLC | Oak Mill - 20010 Frederick Road Germantown, Maryland 20876 | Yes | N/A |
| 8. | SE Stoney Ridge LLC | Stoney Ridge - 14397 Westminster Lane Woodbridge, Virginia 22193 | Yes | N/A |
| 9. | SE Governors Green, LLC | Governor's Green - 16501 Governor Bridge Road Bowie, Maryland 20716 | Yes | N/A |

| 10. | SOF-X GSOwner, L.P. | Gulfstream Isles - 1601 Red Cedar Drive<br>Fort Meyers, Florida 33901 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
|---|---|---|---|---|
| 11. | Lakes at Renaissance Park Apartments Investors, L.P. | Lakes at Renaissance Park - 1400 Renaissance Court<br>Austin, Texas 78728 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 12. | LATBriley Parkway, LLC | Glenview Reserve - 100 Arbor Creek Boulevard<br>Nashville, Tennessee 37217 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 13. | NREA SE1Andros Isles, DST<br>May be converted from DK Gateway Andros, LLC | Andros Isles - 100 Acklins Circle<br>Daytona Beach, Florida 32119 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 14. | NREA SE1Arborwalk, DST<br>May be converted from MAR Arborwalk, LLC | Arborwalk - 1318 SW Manor Lake Drive<br>Lee's Summit, Missouri 64082 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 15. | NREA SE1Walker Ranch, DST<br>May be converted from SOFWalker Ranch Owner, L.P. | Walker Ranch - 14500 Blanco Road<br>San Antonio, Texas 78216 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 16. | NREA SE1Towne Crossing, DST<br>May be converted from Apartment REIT Towne Crossing, L.P. | Towne Crossing - 1601 Town Crossing Boulevard<br>Mansfield, Texas 76063 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 17. | NREA SE2West Place, DST<br>May be converted from Landmark at West Place, LLC | West Place - 753 Sherwood Terrace Drive<br>Orlando, Florida 32818 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 18. | NREA SE2Vista Ridge, DST<br>May be converted from | Vista Ridge - 160 Vista Ridge Mall Drive<br>Lewisville, Texas 75067 | No | Loan Agreement dated as of the Effective Date between the Property Owner set |

| | | | | |
|---|---|---|---|---|
| | MAR Vista Ridge, L.P. | | | forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 19. | NREA SE2Hidden Lake, DST May be converted from SOFHidden Lake SA Owner, L.P. | Hidden Lake - 8910 North Loop 1604 West San Antonio, Texas 78249 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 20. | NREA SE3Arboleda, DST May be converted from G&EApartment REIT Arboleda, LLC | Arboleda - 900 Discovery Boulevard Cedar Park, Texas 78613 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 21. | NREA SE3Fairways, DST May be converted from MAR Fairways, LLC | Fairways - 16501 Stonemason Drive Huntersville, North Carolina 28078 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |
| 22. | NREA SE3Grand Oasis, DST May be converted from Landmark at Grand Oasis, L.P. | Grand Oasis - 400 McGinnis Ferry Road Suwanee, Georgia 30024 | No | Loan Agreement dated as of the Effective Date between the Property Owner set forth on this row and the Federal Home Loan Mortgage Corporation, as lender |

**SCHEDULE 3.07**
**LITIGATION**

See attached.



| | | |
|---|---|---|
| Date: | 08/15/2018 | |
| Reference: | 5470.06/JTB | |
| Copies Requested: | Docket Sheet and Judgment | |
| Copy Cost Limit: | $50.00 | |

| | |
|---|---|
| **Searched Through:** | 08/08/2018 |
| **Subject:** | RIVERVIEW PARTNERS SC, LLC |
| **Jurisdiction:** | Richland County, Circuit Court, SC |
| **Index Searched:** | Open & Closed Litigation by Defendant |

| FILE DATE | CASE # | STYLE OF ACTION |
|---|---|---|
| 03/09/2016 | 2016CP4001549 | Roy Paul Hendrix Sr vs Riverview Partners SC LLC , defendant, et al |

THIS REPORT MAY INCLUDE RECORDS THAT ARE SIMILAR TO THE SPECIFIC NAME REQUESTED. THE SIMILAR NAMES PROVIDED MAY BE LIMITED IN SO MUCH AS THERE IS NO WAY TO DETECT ERRORS MADE BY GOVERNMENT PERSONNEL, PRIVATE COMPANIES, OR PROVIDERS OF ONLINE PUBLIC RECORD RESEARCH DATABASES. IN ADDITION, COURT RECORDS MAY BE INDEXED BY STYLING OF CASE, FIRST NAMED DEFENDANT ONLY, OR WITH EXCESSIVE ABBREVIATIONS. CONSEQUENTLY, SOME CASES ARE DIFFICULT TO LOCATE IN A GENERAL INDEX SEARCH AND WOULD BE FOUND ONLY WITH ADDITIONAL INFORMATION SUCH AS THE SPECIFIC CASE NUMBER.

*Capitol Services, Inc. and its affiliates make no express or implied representation or warranty regarding search reports. All liability shall be limited to the amount of the fee paid for the report.*

**Capitol Services, Inc.** ★ PO Box 1831 ★ Austin, TX 78767 ★ (800)345-4647

**\*9-10984022S\***
9-10984022S



# Richland County
# Fifth Judicial Circuit
# Public Index



## Roy Paul Hendrix Sr vs Riverview Partners SC LLC , defendant, et al

| | | | | | |
|---|---|---|---|---|---|
| Case Number: | 2016CP4001549 | Court Agency: | Richland County Common Pleas | Filed Date: | 03/09/2016 |
| Case Type: | Common Pleas | Case Sub Type: | Personal Injury 350 | File Type: | Jury |
| Status: | Dismissed | Assigned Judge: | Clerk Of Court C P, G S, And Family Court | | |
| Disposition: | Dismissed per Rule 43(k) | Disposition Date: | 10/25/2017 | Disposition Judge: | Manning, L. Casey |
| Original Source Doc: | | Original Case #: | | | |
| Judgment Number: | | Court Roster: | | | |

## Case Parties

Click the ☑ icon to show associated parties.

| Name | Address | Race | Sex | Year Of Birth | Party Type | Party Status | Last Updated |
|---|---|---|---|---|---|---|---|
| ☑Bradshaw, James Andrew | One Liberty Square 55 Beattie Place, Suite 1200 Greenville SC 29601 | | | | Defendant Attorney | | 02/15/2017 |
| ☑Hendrix, Jonathan R. | Hendrix & Steigner PO Box 6398 Cayce SC 29171 | | | | Plaintiff Attorney | | 02/15/2017 |
| ☑Hendrix, Roy Paul Sr | | | | | Plaintiff | | 10/25/2017 |
| ☑Jones, Roger | | | | | Defendant | | 03/10/2016 |
| ☑Landmark Apartment Trust Inc | | | | | Defendant | | 03/10/2016 |
| ☑Landmark Apartment Trust of America Inc | | | | | Defendant | | 03/10/2016 |
| Melton, Lawrence Caldwell(Inactive) | 747 Albion Rd. Columbia SC 292021913 | | | | Mediator | | 12/28/2016 |
| ☑Milestone Apartments Reit | | | | | Defendant | | 03/10/2016 |
| ☑Riverview Partners SC LLC | | | | | Defendant | | 03/10/2016 |
| ☑Stallings, Daryl | | | | | Defendant | | 03/10/2016 |
| ☑Starwood Capital Corp | | | | | Defendant | | 03/10/2016 |
| ☑Starwood Capital Group Global I LLC | | | | | Defendant | | 03/10/2016 |
| Williams, Daryl L. (Inactive) | PO Box 456 Columbia SC 29202 | | | | Alternate Mediator | | 12/28/2016 |

## Actions

| Name | Description | Type | Motion Roster | Begin Date | Completion Date | Documents |
|---|---|---|---|---|---|---|
| Hendrix, Roy Paul Sr | Form 4 Order this Case has been Fully Settled at Mediation ( | Order | | 10/25/2017-08:42 | | 📄 |
| | | Filing | | | | 📄 |

| | | | | | | |
|---|---|---|---|---|---|---|
| Hendrix, Roy Paul Sr | ADR/Mediation Results Report/Filing - case fully settled | | | 10/23/2017-08:32 | 10/25/2017-08:32 | |
| Hendrix, Jonathan R. | 11/6/2017_J1_Roster/Notice of Case Roster Publication Sent | Action | | 10/03/2017-12:37 | 10/25/2017-12:37 | |
| Bradshaw, James Andrew | 11/6/2017_J1_Roster/Notice of Case Roster Publication Sent | Action | | 10/03/2017-12:37 | 10/25/2017-12:37 | |
| Hendrix, Roy Paul Sr | Consent Scheduling Order trial not before October 1, 2017 | Order | | 02/27/2017-10:51 | 10/25/2017-10:51 | ▤ |
| Hendrix, Roy Paul Sr | Order/Order Filing Fee | Filing | | 02/23/2017-11:38 | 10/25/2017-11:38 | |
| Hendrix, Jonathan R. | Roster/Notice of Case Roster Publication Sent | Action | | 02/15/2017-11:28 | 10/25/2017-11:28 | |
| Bradshaw, James Andrew | Roster/Notice of Case Roster Publication Sent | Action | | 02/15/2017-11:28 | 10/25/2017-11:28 | |
| Hendrix, Roy Paul Sr | ADR/Notice of ADR | Filing | | 12/28/2016-00:00 | 10/23/2017-00:00 | |
| Hendrix, Roy Paul Sr | ADR/Alternative Dispute Resolution (Workflow) | Action | | 10/05/2016-14:33 | 12/28/2016-14:33 | |
| Riverview Partners SC LLC | Answer of Riverviwe Partners SC LLC, Landmark Apartment Trus | Filing | | 05/19/2016-16:38 | 10/25/2017-16:38 | ▤ |
| Starwood Capital Corp | Answer of Starwood Capital Group and Milestone Apartments Re | Filing | | 05/19/2016-16:22 | 10/25/2017-16:22 | ▤ |
| Hendrix, Roy Paul Sr | Certificate Of Service Certified Mail LANDMARK APARTMENT TRU | Filing | | 03/31/2016-15:38 | 10/25/2017-15:38 | ▤ |
| Hendrix, Roy Paul Sr | Certificate Of Service Certified Mail LANDMARK APT TRUST I NC | Filing | | 03/25/2016-10:05 | 10/25/2017-10:05 | ▤ |
| Hendrix, Roy Paul Sr | Certificate Of Service Certified Mail LANDMARK APARTMENT TRU | Filing | | 03/25/2016-10:04 | 10/25/2017-10:04 | ▤ |
| Hendrix, Roy Paul Sr | Certificate Of Service Certified Mail STARWOOD CAPITAL GROUP | Filing | | 03/25/2016-10:03 | 10/25/2017-10:03 | ▤ |
| Hendrix, Roy Paul Sr | Affidavit Of Service DARYL STALLINGS | Filing | | 03/25/2016-10:01 | 10/25/2017-10:01 | ▤ |
| Hendrix, Roy Paul Sr | Affidavit Of Service ROGER RAY JONES | Filing | | 03/25/2016-10:00 | 10/25/2017-10:00 | ▤ |
| Hendrix, Roy Paul Sr | Certificate Of Service Certified Mail MI LESTONE MANAGEMENT L | Filing | | 03/16/2016-11:21 | 10/25/2017-11:21 | ▤ |
| Hendrix, Roy Paul Sr | Verification/Verified | Filing | | 03/11/2016-08:37 | 10/25/2017-08:37 | |
| Hendrix, Roy Paul Sr | Amended Summons And Complaint | Filing | | 03/10/2016-14:24 | 10/25/2017-14:24 | ▤ |
| Hendrix, Roy Paul Sr | Summons & Complaint | Filing | | 03/09/2016-14:27 | 10/25/2017-14:27 | ▤ |

## Financials

| Summary | | | | | |
|---|---|---|---|---|---|
| Fine/Costs: | $175.00 | Total Paid for fine/costs: | $175.00 | Balance Due: | $0.00 |

| Costs | | | | |
|---|---|---|---|---|
| Description | Cost Code | Amount | Charge Action | Disbursed Amount |
| Motion/Order Filing Fee $25 | MOTION | $25.00 | | $25.00 |
| SCJD Filing Fee Proviso $50 / $25 | SCJDPV | $50.00 | | $50.00 |

| | | | | |
|---|---|---|---|---|
| Civil Filing Fee State 56% | CVFFST | $56.00 | | $56.00 |
| Civil Filing Fee County 44%/100% | CVFFCN | $44.00 | | $44.00 |

| Payments | | | | |
|---|---|---|---|---|
| Payment Date | Receipt Number | Entered By | Transaction Type Code | Payment Amount |
| 02/23/2017 | 219457 | C40BMETTS | PY | $25.00 |
| 03/09/2016 | 205131 | C40JMCMILL | PY | $150.00 |

# CAPITOL
## SERVICES

| | |
|---|---|
| **Date:** | 08/15/2018 |
| **Reference:** | 5470.06/JTB |
| **Copies Requested:** | Docket Sheet and Judgment |
| **Copy Cost Limit:** | $50.00 |

| | |
|---|---|
| **Searched Through:** | 08/08/2018 |
| **Subject:** | G&E APARTMENT REIT THE HEIGHTS AT OLDE TOWNE, LLC |
| **Jurisdiction:** | Portsmouth City, Circuit Court, VA |
| **Index Searched:** | Open & Closed Litigation by Plaintiff |

| FILE DATE | CASE # | STYLE OF ACTION |
|---|---|---|
| 02/28/2011 | CL11000769-00 | G&E APARTMENT REIT v. CITY OF PORTSMOUTH |

THIS REPORT MAY INCLUDE RECORDS THAT ARE SIMILAR TO THE SPECIFIC NAME REQUESTED. THE SIMILAR NAMES PROVIDED MAY BE LIMITED IN SO MUCH AS THERE IS NO WAY TO DETECT ERRORS MADE BY GOVERNMENT PERSONNEL, PRIVATE COMPANIES, OR PROVIDERS OF ONLINE PUBLIC RECORD RESEARCH DATABASES. IN ADDITION, COURT RECORDS MAY BE INDEXED BY STYLING OF CASE, FIRST NAMED DEFENDANT ONLY, OR WITH EXCESSIVE ABBREVIATIONS. CONSEQUENTLY, SOME CASES ARE DIFFICULT TO LOCATE IN A GENERAL INDEX SEARCH AND WOULD BE FOUND ONLY WITH ADDITIONAL INFORMATION SUCH AS THE SPECIFIC CASE NUMBER.

*Capitol Services, Inc. and its affiliates make no express or implied representation or warranty regarding search reports. All liability shall be limited to the amount of the fee paid for the report.*

**Capitol Services, Inc.** ★ PO Box 1831 ★ Austin, TX 78767 ★ (800)345-4647

**\*84-109838988\***
84-109838988

Portsmouth Circuit - Civil Division
**Case Details**

| Case Number:<br>CL11000769-00 | Filed:<br>02/28/11 |
|---|---|
| Filing Type:<br>Complaint - Catch-All | Filing Fee Paid |
| Number of  Plaintiffs:<br>0003 | Number of Defendants:<br>0001 |
| Commenced By:<br>Initial Filing | |
| Bond: | Complex  Case: |

**Plaintiffs**

Plaintiff 1: **G&E APARTMENT REIT**
Trading as:
Attorney:     SMITH, SHANE L

Plaintiff 2: **THE MYRTLES OLE TOWNE LLC**
Trading as:
Attorney:     SMITH, SHANE L

Plaintiff 3: **THE HEIGHTS AT OLDE TOWNE LLC**
Trading as:
Attorney:     SMITH, SHANE L

**Defendants**

Defendant: **CITY OF PORTSMOUTH**
Trading as:
Attorney:

**Hearings**

| # | Date | Time | Type | Room | Duration | Jury | Result |
|---|------|------|------|------|----------|------|--------|
| 1 | 01/27/12 | 9:59AM | Motion - Other-Pretrial | 3 | | | Granted |

**Date Ordered To Mediation:**

**Final Disposition**

- **Judgment:**          Other
- **Final Order Date:**  01/27/12
- **Appealed Date:**
- **Concluded By:**      Other

Portsmouth Circuit - Civil Division
**Pleadings/Orders Detail**

**Case Number:** CL11000769-00

| Filed | Type | Party | Judge | Book | Page | Remarks |
|-------|------|-------|-------|------|------|---------|
| 08/24/11 | Motion | | | GDH | SCAN | FOR LEAVE TO FILE AMNDD CO |
| 09/08/11 | Order | | KRM | GDH | SCAN | AGREED ODR FOR LEAVE TO FI |
| 10/20/11 | Scheduling Order | | JAC | GDH | SCAN | SCH ORDER |
| 10/24/11 | Demurrer | DEF | | NCT | SCAN | DEMURRER |
| 10/28/11 | Motion | | | JMW | SCAN | FILE SECOND COMPLAINT |
| 11/16/11 | Order | | KRM | GDH | SCAN | AGREED ORDER FOR LEAVE |
| 11/23/11 | Answer | DEF | | GDH | SCAN | CITY OF PORTSMOUTH |
| 11/29/11 | Other | | | GDH | SCAN | CC LTR |
| 12/27/11 | Other | | | GDH | SCAN | ATTORNY LTR |
| 01/04/12 | Notice Of Depositions | | | NCT | SCAN | NOTICE TAKE DEPOSITIONS |
| 01/25/12 | Notice Of Hearing | | | DLM | SCAN | HEARING 1/27/12 @10AM |
| 01/27/12 | Order | | DWS | DLM | SCAN | CONSENT ORDER |

# CAPITOL SERVICES

| | |
|---|---|
| Date: | 08/15/2018 |
| Reference: | 5470.06/JTB |
| Copies Requested: | Docket Sheet and Judgment |
| Copy Cost Limit: | $50.00 |

| | |
|---|---|
| Searched Through: | 08/08/2018 |
| Subject: | G&E APARTMENT REIT THE HEIGHTS AT OLDE TOWNE, LLC |
| Jurisdiction: | Portsmouth City, General District Court, VA |
| Index Searched: | Open & Closed Litigation by Defendant & Plaintiff |

| FILE DATE | CASE # | STYLE OF ACTION |
|---|---|---|

See Attached Listing.

Includes results for both G&E APARTMENT REIT THE HEIGHTS AT OLDE TOWNE, LLC and G&E APARTMENT REIT THE MYRTLES AT OLDE TOWNE, LLC. The cases are only indexed under G&E APARTMENT REIT. This specific index classifies THE HEIGHTS AT OLDE TOWNE and THE MYRTLES AT OLDE TOWNE as DBAs and does not include them on the index.

THIS REPORT MAY INCLUDE RECORDS THAT ARE SIMILAR TO THE SPECIFIC NAME REQUESTED. THE SIMILAR NAMES PROVIDED MAY BE LIMITED IN SO MUCH AS THERE IS NO WAY TO DETECT ERRORS MADE BY GOVERNMENT PERSONNEL, PRIVATE COMPANIES, OR PROVIDERS OF ONLINE PUBLIC RECORD RESEARCH DATABASES. IN ADDITION, COURT RECORDS MAY BE INDEXED BY STYLING OF CASE, FIRST NAMED DEFENDANT ONLY, OR WITH EXCESSIVE ABBREVIATIONS. CONSEQUENTLY, SOME CASES ARE DIFFICULT TO LOCATE IN A GENERAL INDEX SEARCH AND WOULD BE FOUND ONLY WITH ADDITIONAL INFORMATION SUCH AS THE SPECIFIC CASE NUMBER.

*Capitol Services, Inc. and its affiliates make no express or implied representation or warranty regarding search reports. All liability shall be limited to the amount of the fee paid for the report.*

**Capitol Services, Inc.** ★ PO Box 1831 ★ Austin, TX 78767 ★ (800)345-4647

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV12003325-00 | G&E APARTMENT | BENNETT, SHANEIKA | 04/05/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13005198-00 | G&E APARTMENT | HARRIS, GERALD | 05/09/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13005199-00 | G&E APARTMENT | ROBINSON, KENNETH | 05/09/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001047-00 | G&E APARTMENT H | ADAMS, ANTOINE | 02/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001048-00 | G&E APARTMENT H | MARSHALL, TERRANCE | 02/09/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006764-00 | G&E APARTMENT REIT | COWAN, JOSEPH L | 05/08/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08006765-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006766-00 | G&E APARTMENT REIT | REYNOLDS, TIFFANY | 08/07/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08006767-00 | G&E APARTMENT REIT | SALAZAR-MOORE, JOSEPHINA | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006768-00 | G&E APARTMENT REIT | TURNER, DANIEL | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006769-00 | G&E APARTMENT REIT | WILLIAMS, DANIEL | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08010779-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 08/07/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012417-00 | G&E APARTMENT REIT | ASHLEY, ROMAINE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012418-00 | G&E APARTMENT REIT | DICKSON, JEFFERY | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012419-00 | G&E APARTMENT REIT | YOUNG, MICHELLE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012420-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012421-00 | G&E APARTMENT REIT | DEGERAFF, GEORGE | 09/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08012422-00 | G&E APARTMENT REIT | JOLIFF, ALEXANDER | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012423-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012424-00 | G&E APARTMENT REIT | MARSHALL, MICHELLE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV08012425-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012426-00 | G&E APARTMENT REIT | SMITH, DAVID | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08013665-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 01/15/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08013666-00 | G&E APARTMENT REIT | SMITH, DAVID | 10/09/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08014898-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 11/06/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016790-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 03/12/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018427-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018428-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018429-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018430-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018431-00 | G&E APARTMENT REIT | PARKER, JUSTIN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018433-00 | G&E APARTMENT REIT | SMITH, CAROLYN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018434-00 | G&E APARTMENT REIT | TAYLOR, SATASHA | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018435-00 | G&E APARTMENT REIT | VINES, YOLANDA | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000853-00 | G&E APARTMENT REIT | DOSWELL, JENNIFER | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000854-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000855-00 | G&E APARTMENT REIT | SCOTT, DANA | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000856-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000857-00 | G&E APARTMENT REIT | CUFFEE, ANTONIO | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000858-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09000859-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000860-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000861-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000862-00 | G&E APARTMENT REIT | TAYLOR, LEROY | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002167-00 | G&E APARTMENT REIT | DOSWELL, JENNIFER | 03/12/2009 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV09002168-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09002185-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 03/12/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002186-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09002187-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002188-00 | G&E APARTMENT REIT | RATLEY, JOE | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002189-00 | G&E APARTMENT REIT | SANHUEZADES, DIEGO | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002190-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006266-00 | G&E APARTMENT REIT | ALTHOUSE, JOSEPH | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006267-00 | G&E APARTMENT REIT | DICKSON, JEFFERY | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006268-00 | G&E APARTMENT REIT | RIUSECH, EDUARDO | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006269-00 | G&E APARTMENT REIT | SNYDER, HOWARD | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006270-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006271-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006272-00 | G&E APARTMENT REIT | LACERTE, CHANDLER | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006273-00 | G&E APARTMENT REIT | MCGUIRE-MCMANAWAY, BRITTANY | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09006274-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006275-00 | G&E APARTMENT REIT | SMITH, DAVID | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006276-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006277-00 | G&E APARTMENT REIT | YOUNG, DUSTIN | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007115-00 | G&E APARTMENT REIT | KARIKA, SARAH | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007116-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007249-00 | G&E APARTMENT REIT | MCCASLAND, AMANDA | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007250-00 | G&E APARTMENT REIT | MOORE, TONY | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007251-00 | G&E APARTMENT REIT | SCOTT, ASHLEY | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007252-00 | G&E APARTMENT REIT | SMITH, DAVID | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007253-00 | G&E APARTMENT REIT | TERRY, MONIQUE | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007254-00 | G&E APARTMENT REIT | YOUNG, DUSTIN | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008958-00 | G&E APARTMENT REIT | SCOTT, DANA | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010895-00 | G&E APARTMENT REIT | HARGROW, MICHAEL | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010896-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010898-00 | G&E APARTMENT REIT | SMITH, DAVID | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010899-00 | G&E APARTMENT REIT | TERRY, MONIQUE | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010900-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010933-00 | G&E APARTMENT REIT | HENDERSON, CARL ADAM | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010936-00 | G&E APARTMENT REIT | SANDERS, ANDRIA | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09010937-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010938-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09012907-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 10/08/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09012908-00 | G&E APARTMENT REIT | SMITH, DAVID | 10/08/2009 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV09012909-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 10/08/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09012911-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09012912-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014634-00 | G&E APARTMENT REIT | CUFFEE, ANTONIO | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014635-00 | G&E APARTMENT REIT | DEMARIO, EMILY | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014636-00 | G&E APARTMENT REIT | DORSEY, STUART | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014637-00 | G&E APARTMENT REIT | KORILSON, OMENTUS | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014638-00 | G&E APARTMENT REIT | MCKENZIE, JAMES | 11/05/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09014639-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014640-00 | G&E APARTMENT REIT | TAYLOR, LEROY | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014641-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014642-00 | G&E APARTMENT REIT | HENDERSON, CARL ADAM | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014643-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014644-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10003666-00 | G&E APARTMENT REIT | GRAYSMITH CONSTRUCTION | 04/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10003667-00 | G&E APARTMENT REIT | HENDERSON, JAMESHA | 04/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV10003668-00 | G&E APARTMENT REIT | HOLDEN, CHRISTOPHER | 07/08/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10003669-00 | G&E APARTMENT REIT | POLK, WILLIE | 04/08/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005152-00 | G&E APARTMENT REIT | FRAZIER, SAM | 05/06/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10005153-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 05/06/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005154-00 | G&E APARTMENT REIT | JEFFERSON, ILLITHIA | 05/06/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005155-00 | G&E APARTMENT REIT | SAUCIER, JEREMY | 05/06/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10005156-00 | G&E APARTMENT REIT | GRAYSMITH CONSTRUCTION | 05/06/2010 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV10008030-00 | G&E APARTMENT REIT | GRANT, MARVIN | 07/08/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10008031-00 | G&E APARTMENT REIT | HUTTMAN, STEVEN | 07/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10008032-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 07/08/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10008033-00 | G&E APARTMENT REIT | VASQUEZ, MARIA | 07/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10009129-00 | G&E APARTMENT REIT | SAUCIER, JEREMY | 08/05/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10012971-00 | G&E APARTMENT REIT | ARTIS, JEROME | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10012972-00 | G&E APARTMENT REIT | EDWARDS, FLORA | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10012973-00 | G&E APARTMENT REIT | GIL, JONATHAN | 11/04/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10012974-00 | G&E APARTMENT REIT | SPELLER, DONALD | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016232-00 | G&E APARTMENT REIT | ARTIS, JEROME | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016232-01 | G&E APARTMENT REIT | ARTIS, JEROME | 11/15/2012 | 02:00 PM | Closed | Garnishment |
| ☐ | GV10016233-00 | G&E APARTMENT REIT | PORTER, SHANICA | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016234-00 | G&E APARTMENT REIT | SIMMONS, LARRY | 01/13/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV10016235-00 | G&E APARTMENT REIT | LAFFERTY, SEAN | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11002482-00 | G&E APARTMENT REIT | MCCONNELL, JOHN | 03/10/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11002483-00 | G&E APARTMENT REIT | JORDAN, DEMETRIOUS | 03/10/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11003463-00 | G&E APARTMENT REIT | ACOSTA, ENRIQUE | 04/07/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11003464-00 | G&E APARTMENT REIT | PAGE, JASON | 04/07/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11004501-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 05/05/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11004502-00 | G&E APARTMENT REIT | MCCONNELL, BRENT | 05/05/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11007700-00 | G&E APARTMENT REIT | GRIMES, CLAYTON | 07/07/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11007710-00 | G&E APARTMENT REIT | ODUOR, FELIX | 07/07/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009350-00 | G&E APARTMENT REIT | BULLOCK, TEAIRA | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009351-00 | G&E APARTMENT REIT | DIAZEGUIGURE, KENNY | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009352-00 | G&E APARTMENT REIT | HUSKEY, FREDERICK | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009353-00 | G&E APARTMENT REIT | MCKEOUGH, DUNCAN | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009354-00 | G&E APARTMENT REIT | WASHINGTON, DARLEEN | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009355-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009356-00 | G&E APARTMENT REIT | MONTELLANOS, JESUS | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009357-00 | G&E APARTMENT REIT | JACKSON, KATHERINE | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009358-00 | G&E APARTMENT REIT | SIMMONS, LARRY | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11010581-00 | G&E APARTMENT REIT | MOORE, PORSCHA | 09/08/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11010582-00 | G&E APARTMENT REIT | WASHINGTON, DARLENE | 09/08/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV12003325-00 | G&E APARTMENT | BENNETT, SHANEIKA | 04/05/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13005198-00 | G&E APARTMENT | HARRIS, GERALD | 05/09/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13005199-00 | G&E APARTMENT | ROBINSON, KENNETH | 05/09/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001047-00 | G&E APARTMENT H | ADAMS, ANTOINE | 02/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001048-00 | G&E APARTMENT H | MARSHALL, TERRANCE | 02/09/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006764-00 | G&E APARTMENT REIT | COWAN, JOSEPH L | 05/08/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08006765-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006766-00 | G&E APARTMENT REIT | REYNOLDS, TIFFANY | 08/07/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08006767-00 | G&E APARTMENT REIT | SALAZAR-MOORE, JOSEPHINA | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006768-00 | G&E APARTMENT REIT | TURNER, DANIEL | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08006769-00 | G&E APARTMENT REIT | WILLIAMS, DANIEL | 05/08/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08010779-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 08/07/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012417-00 | G&E APARTMENT REIT | ASHLEY, ROMAINE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012418-00 | G&E APARTMENT REIT | DICKSON, JEFFERY | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012419-00 | G&E APARTMENT REIT | YOUNG, MICHELLE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012420-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012421-00 | G&E APARTMENT REIT | DEGERAFF, GEORGE | 09/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08012422-00 | G&E APARTMENT REIT | JOLIFF, ALEXANDER | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012423-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012424-00 | G&E APARTMENT REIT | MARSHALL, MICHELLE | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV08012425-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08012426-00 | G&E APARTMENT REIT | SMITH, DAVID | 09/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08013665-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 01/15/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08013666-00 | G&E APARTMENT REIT | SMITH, DAVID | 10/09/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08014898-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 11/06/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016790-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 03/12/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018427-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018428-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018429-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018430-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018431-00 | G&E APARTMENT REIT | PARKER, JUSTIN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018433-00 | G&E APARTMENT REIT | SMITH, CAROLYN | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018434-00 | G&E APARTMENT REIT | TAYLOR, SATASHA | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018435-00 | G&E APARTMENT REIT | VINES, YOLANDA | 01/15/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000853-00 | G&E APARTMENT REIT | DOSWELL, JENNIFER | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000854-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000855-00 | G&E APARTMENT REIT | SCOTT, DANA | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000856-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000857-00 | G&E APARTMENT REIT | CUFFEE, ANTONIO | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09000858-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09000859-00 | G&E APARTMENT REIT | JORDAN, JOYCE | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000860-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 02/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000861-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09000862-00 | G&E APARTMENT REIT | TAYLOR, LEROY | 02/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002167-00 | G&E APARTMENT REIT | DOSWELL, JENNIFER | 03/12/2009 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV09002168-00 | G&E APARTMENT REIT | JAZWINSKI, BRUCE | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09002185-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 03/12/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002186-00 | G&E APARTMENT REIT | FLORES, MATTHEW | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09002187-00 | G&E APARTMENT REIT | JORDAN, SHAWN | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002188-00 | G&E APARTMENT REIT | RATLEY, JOE | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002189-00 | G&E APARTMENT REIT | SANHUEZADES, DIEGO | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09002190-00 | G&E APARTMENT REIT | SHELDON, KENNETH | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006266-00 | G&E APARTMENT REIT | ALTHOUSE, JOSEPH | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006267-00 | G&E APARTMENT REIT | DICKSON, JEFFERY | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006268-00 | G&E APARTMENT REIT | RIUSECH, EDUARDO | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006269-00 | G&E APARTMENT REIT | SNYDER, HOWARD | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006270-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006271-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006272-00 | G&E APARTMENT REIT | LACERTE, CHANDLER | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006273-00 | G&E APARTMENT REIT | MCGUIRE-MCMANAWAY, BRITTANY | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09006274-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006275-00 | G&E APARTMENT REIT | SMITH, DAVID | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09006276-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 06/11/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09006277-00 | G&E APARTMENT REIT | YOUNG, DUSTIN | 06/11/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007115-00 | G&E APARTMENT REIT | KARIKA, SARAH | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007116-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007249-00 | G&E APARTMENT REIT | MCCASLAND, AMANDA | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007250-00 | G&E APARTMENT REIT | MOORE, TONY | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007251-00 | G&E APARTMENT REIT | SCOTT, ASHLEY | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007252-00 | G&E APARTMENT REIT | SMITH, DAVID | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09007253-00 | G&E APARTMENT REIT | TERRY, MONIQUE | 07/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09007254-00 | G&E APARTMENT REIT | YOUNG, DUSTIN | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008958-00 | G&E APARTMENT REIT | SCOTT, DANA | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010895-00 | G&E APARTMENT REIT | HARGROW, MICHAEL | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010896-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010898-00 | G&E APARTMENT REIT | SMITH, DAVID | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010899-00 | G&E APARTMENT REIT | TERRY, MONIQUE | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010900-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010933-00 | G&E APARTMENT REIT | HENDERSON, CARL ADAM | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010936-00 | G&E APARTMENT REIT | SANDERS, ANDRIA | 09/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09010937-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010938-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09012907-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 10/08/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09012908-00 | G&E APARTMENT REIT | SMITH, DAVID | 10/08/2009 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV09012909-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 10/08/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09012911-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09012912-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014634-00 | G&E APARTMENT REIT | CUFFEE, ANTONIO | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014635-00 | G&E APARTMENT REIT | DEMARIO, EMILY | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014636-00 | G&E APARTMENT REIT | DORSEY, STUART | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014637-00 | G&E APARTMENT REIT | KORILSON, OMENTUS | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014638-00 | G&E APARTMENT REIT | MCKENZIE, JAMES | 11/05/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09014639-00 | G&E APARTMENT REIT | MURRAY, BARBARA | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014640-00 | G&E APARTMENT REIT | TAYLOR, LEROY | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014641-00 | G&E APARTMENT REIT | WILLIAMSON, ROY | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014642-00 | G&E APARTMENT REIT | HENDERSON, CARL ADAM | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09014643-00 | G&E APARTMENT REIT | THOMPSON, SHEILAH | 11/05/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09014644-00 | G&E APARTMENT REIT | WILLIAMS-WEBB, SONIA | 11/05/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10003666-00 | G&E APARTMENT REIT | GRAYSMITH CONSTRUCTION | 04/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10003667-00 | G&E APARTMENT REIT | HENDERSON, JAMESHA | 04/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV10003668-00 | G&E APARTMENT REIT | HOLDEN, CHRISTOPHER | 07/08/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10003669-00 | G&E APARTMENT REIT | POLK, WILLIE | 04/08/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005152-00 | G&E APARTMENT REIT | FRAZIER, SAM | 05/06/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10005153-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 05/06/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005154-00 | G&E APARTMENT REIT | JEFFERSON, ILLITHIA | 05/06/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10005155-00 | G&E APARTMENT REIT | SAUCIER, JEREMY | 05/06/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10005156-00 | G&E APARTMENT REIT | GRAYSMITH CONSTRUCTION | 05/06/2010 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV10008030-00 | G&E APARTMENT REIT | GRANT, MARVIN | 07/08/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10008031-00 | G&E APARTMENT REIT | HUTTMAN, STEVEN | 07/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10008032-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 07/08/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10008033-00 | G&E APARTMENT REIT | VASQUEZ, MARIA | 07/08/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10009129-00 | G&E APARTMENT REIT | SAUCIER, JEREMY | 08/05/2010 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV10012971-00 | G&E APARTMENT REIT | ARTIS, JEROME | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10012972-00 | G&E APARTMENT REIT | EDWARDS, FLORA | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10012973-00 | G&E APARTMENT REIT | GIL, JONATHAN | 11/04/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10012974-00 | G&E APARTMENT REIT | SPELLER, DONALD | 11/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016232-00 | G&E APARTMENT REIT | ARTIS, JEROME | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016232-01 | G&E APARTMENT REIT | ARTIS, JEROME | 11/15/2012 | 02:00 PM | Closed | Garnishment |
| ☐ | GV10016233-00 | G&E APARTMENT REIT | PORTER, SHANICA | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10016234-00 | G&E APARTMENT REIT | SIMMONS, LARRY | 01/13/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV10016235-00 | G&E APARTMENT REIT | LAFFERTY, SEAN | 01/13/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11002482-00 | G&E APARTMENT REIT | MCCONNELL, JOHN | 03/10/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11002483-00 | G&E APARTMENT REIT | JORDAN, DEMETRIOUS | 03/10/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11003463-00 | G&E APARTMENT REIT | ACOSTA, ENRIQUE | 04/07/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11003464-00 | G&E APARTMENT REIT | PAGE, JASON | 04/07/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11004501-00 | G&E APARTMENT REIT | BARNETTE, ERIN | 05/05/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11004502-00 | G&E APARTMENT REIT | MCCONNELL, BRENT | 05/05/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11007700-00 | G&E APARTMENT REIT | GRIMES, CLAYTON | 07/07/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11007710-00 | G&E APARTMENT REIT | ODUOR, FELIX | 07/07/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009350-00 | G&E APARTMENT REIT | BULLOCK, TEAIRA | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009351-00 | G&E APARTMENT REIT | DIAZEGUIGURE, KENNY | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009352-00 | G&E APARTMENT REIT | HUSKEY, FREDERICK | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009353-00 | G&E APARTMENT REIT | MCKEOUGH, DUNCAN | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009354-00 | G&E APARTMENT REIT | WASHINGTON, DARLEEN | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009355-00 | G&E APARTMENT REIT | MCCOY, JONATHAN | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009356-00 | G&E APARTMENT REIT | MONTELLANOS, JESUS | 08/18/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11009357-00 | G&E APARTMENT REIT | JACKSON, KATHERINE | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11009358-00 | G&E APARTMENT REIT | SIMMONS, LARRY | 08/18/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11010581-00 | G&E APARTMENT REIT | MOORE, PORSCHA | 09/08/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11010582-00 | G&E APARTMENT REIT | WASHINGTON, DARLEEN | 09/08/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV11011695-00 | G&E APARTMENT REIT | DIAZEGUIGURE, KENNY | 10/06/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11011696-00 | G&E APARTMENT REIT | MOORE, PORSCHA | 10/06/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11013085-00 | G&E APARTMENT REIT | HUGHES, ERIKA | 11/10/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11013086-00 | G&E APARTMENT REIT | ROBINSON, YOLANDA | 11/10/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11014139-00 | G&E APARTMENT REIT | BURTON, KIMBERLY | 12/08/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11014140-00 | G&E APARTMENT REIT | CONNOR, MICHAEL | 12/08/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12002245-00 | G&E APARTMENT REIT | BASKIN, THOMAS | 03/08/2012 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV12002246-00 | G&E APARTMENT REIT | BROWN, JUSTIN | 03/08/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12002247-00 | G&E APARTMENT REIT | MARSHALL, TERRENCE | 03/08/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12003326-00 | G&E APARTMENT REIT | ROUSE, WINSTON | 04/05/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12004722-00 | G&E APARTMENT REIT | FULGHAM, CURTIS | 05/10/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12004723-00 | G&E APARTMENT REIT | ROBERTSON, JAIME | 05/10/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12004724-00 | G&E APARTMENT REIT | HADDOCK, MICHELLE | 05/10/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12006011-00 | G&E APARTMENT REIT | HADDOCK, MICHELLE | 06/07/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12006012-00 | G&E APARTMENT REIT | MORTON, MICHAEL | 06/07/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12007582-00 | G&E APARTMENT REIT | BROWN, WILLIAM | 07/12/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12007583-00 | G&E APARTMENT REIT | ROBERTSON, JAIME | 07/12/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12008660-00 | G&E APARTMENT REIT | BENNETT, SHANEIKIA | 08/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12008661-00 | G&E APARTMENT REIT | HOLDEN, CHRISTOPHER | 08/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12011434-00 | G&E APARTMENT REIT | GOUGH, JOSEPH | 10/11/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV12011435-00 | G&E APARTMENT REIT | JENKINS, REINA | 10/11/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12011436-00 | G&E APARTMENT REIT | PORTER, RYAN | 10/11/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12011437-00 | G&E APARTMENT REIT | WEBB, JAMES | 10/11/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12012479-00 | G&E APARTMENT REIT | FULGHAM, CURTIS | 11/29/2012 | 09:00 AM | Plaintiff | Warrant In Debt |
| ☐ | GV12012479-01 | G&E APARTMENT REIT | FULGHAM, CURTIS | 12/12/2013 | 02:00 PM | Closed | Garnishment |
| ☐ | GV12012479-02 | G&E APARTMENT REIT | FULGHAM, CURTIS | 03/12/2015 | 02:00 PM | Closed | Garnishment |
| ☐ | GV12012811-00 | G&E APARTMENT REIT | MCCONNELL, BRENT | 11/29/2012 | 09:00 AM | Plaintiff | Warrant In Debt |
| ☐ | GV12012811-01 | G&E APARTMENT REIT | MCCONNELL, BRENT | 12/12/2013 | 02:00 PM | Closed | Garnishment |
| ☐ | GV12012811-02 | G&E APARTMENT REIT | MCCONNELL, BRENT | 07/09/2015 | 02:00 PM | Closed | Garnishment |
| ☐ | GV12013780-00 | G&E APARTMENT REIT | ADAMS, ANTOINE | 12/13/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12013781-00 | G&E APARTMENT REIT | BOONE, ALESHA | 12/13/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12013782-00 | G&E APARTMENT REIT | PORTER, RYAN | 12/13/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12013783-00 | G&E APARTMENT REIT | WEST, CASEY | 12/13/2012 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12013784-00 | G&E APARTMENT REIT | HORTON, AMELIA | 12/13/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12013785-00 | G&E APARTMENT REIT | WEBB, JAMES | 12/13/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12014732-00 | G&E APARTMENT REIT | BOONE, ALESHA | 01/10/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12014733-00 | G&E APARTMENT REIT | HAND, MARCUS | 01/10/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12014734-00 | G&E APARTMENT REIT | HARDY, CHARLETTE | 01/10/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12014735-00 | G&E APARTMENT REIT | HORTON, AMELIA | 01/10/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13000775-00 | G&E APARTMENT REIT | ADAMS, ANTOINE | 02/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV13000776-00 | G&E APARTMENT REIT | GREEN, TIFFANY | 02/07/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13000777-00 | G&E APARTMENT REIT | LUCAS, EARLIE | 02/07/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13000778-00 | G&E APARTMENT REIT | DAVIS, CYNTHIA | 02/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13002968-00 | G&E APARTMENT REIT | GREEN, TIFFANY | 03/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13002969-00 | G&E APARTMENT REIT | NATION, DEBORAH | 03/07/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13002970-00 | G&E APARTMENT REIT | ROMINIYI, MICHAEL | 03/07/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13003803-00 | G&E APARTMENT REIT | DONOHOE, ERYN | 04/04/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13003804-00 | G&E APARTMENT REIT | EDWARD, TONYA | 04/04/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13003805-00 | G&E APARTMENT REIT | GREEN, TIFFANY | 04/04/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13003806-00 | G&E APARTMENT REIT | HARRIS, GERALD | 04/04/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13003807-00 | G&E APARTMENT REIT | PORTER, RYAN | 04/04/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13003808-00 | G&E APARTMENT REIT | ROBINSON, KENNETH | 04/04/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13003809-00 | G&E APARTMENT REIT | DANIELS, HEATHER | 04/04/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13003810-00 | G&E APARTMENT REIT | RODGERS, PHILLIP | 04/04/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13005200-00 | G&E APARTMENT REIT | BROWN, KEVIN | 05/09/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13005201-00 | G&E APARTMENT REIT | HALEY, BENJAMIN | 05/09/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13005202-00 | G&E APARTMENT REIT | WEBB, JAMES | 05/09/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13006359-00 | G&E APARTMENT REIT | ALVAREZ, BRYANT | 06/06/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13006360-00 | G&E APARTMENT REIT | HAND, MARCUS | 06/06/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13006361-00 | G&E APARTMENT REIT | PORTER, RYAN | 06/06/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV13007830-00 | G&E APARTMENT REIT | BOONE, ALESHA | 07/11/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13009056-00 | G&E APARTMENT REIT | BOONE, ALESHA | 08/08/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13009057-00 | G&E APARTMENT REIT | CAMPBELL, BENJAMIN | 08/08/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13009058-00 | G&E APARTMENT REIT | CARVEY, JACLYN | 08/08/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13009059-00 | G&E APARTMENT REIT | NATION, DEBORAH | 08/08/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13009060-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 08/08/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13009061-00 | G&E APARTMENT REIT | REED, CASSIE | 08/08/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13009062-00 | G&E APARTMENT REIT | WANG, LEI | 08/08/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13010008-00 | G&E APARTMENT REIT | BOONE, ALESHA | 09/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13010009-00 | G&E APARTMENT REIT | CAMPBELL, BENJAMIN | 09/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13010010-00 | G&E APARTMENT REIT | NATION, DEBORAH | 09/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13010011-00 | G&E APARTMENT REIT | REED, CASSIE | 09/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13010012-00 | G&E APARTMENT REIT | SUMMERS, ELLIOTT | 09/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13011382-00 | G&E APARTMENT REIT | SUMMERS, ELLIOTT | 10/10/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13011383-00 | G&E APARTMENT REIT | GOUGH, JOSEPH | 10/10/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13013265-00 | G&E APARTMENT REIT | LUCAS, EARLIE | 11/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13013266-00 | G&E APARTMENT REIT | GOUGH, JOSEPH | 11/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13013267-00 | G&E APARTMENT REIT | HUNTER, LONNIE | 11/07/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13013972-00 | G&E APARTMENT REIT | FUTRELL, JARRON | 12/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13013973-00 | G&E APARTMENT REIT | GOUGH, JOSEPH | 12/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV13014023-00 | G&E APARTMENT REIT | BENNET, SHANEIKIA | 12/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13014024-00 | G&E APARTMENT REIT | JENKINS, REINA | 12/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13014025-00 | G&E APARTMENT REIT | LUCAS, EARLIE | 12/05/2013 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV13014026-00 | G&E APARTMENT REIT | MATHIS, ANTONIO | 12/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13014027-00 | G&E APARTMENT REIT | MCGHEE, TRAVONDA | 12/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13014028-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 12/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13014029-00 | G&E APARTMENT REIT | SOTO, EDGAR | 12/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13015168-00 | G&E APARTMENT REIT | HOLLAND, RAYSHAWN | 01/16/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13015169-00 | G&E APARTMENT REIT | PETTIS, RICHARD | 01/16/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13015170-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 01/16/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13015171-00 | G&E APARTMENT REIT | DAVIS, CYNTHIA | 01/16/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13015172-00 | G&E APARTMENT REIT | NELSON, INGRID | 01/16/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13015173-00 | G&E APARTMENT REIT | SMITH, MARVIN | 01/16/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14000605-00 | G&E APARTMENT REIT | MATHIS, ANTONIO | 02/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14000606-00 | G&E APARTMENT REIT | TAYLOR, DEREK | 02/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14000626-00 | G&E APARTMENT REIT | BRYANT, AXL | 02/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14000627-00 | G&E APARTMENT REIT | DAVIS, CYNTHIA | 02/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14001590-00 | G&E APARTMENT REIT | CARVEY, JACLYN | 03/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14001591-00 | G&E APARTMENT REIT | MCGHEE, TAVONDA | 03/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14001592-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 03/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV14001593-00 | G&E APARTMENT REIT | TAYLOR, DEREK | 03/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14001594-00 | G&E APARTMENT REIT | BRYANT, AXL | 03/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14001595-00 | G&E APARTMENT REIT | COUNTRYMAN, YAHCKEL | 03/06/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14001596-00 | G&E APARTMENT REIT | DAVIS, CYNTHIA | 03/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14001597-00 | G&E APARTMENT REIT | SMITH, MARVIN | 03/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14002092-00 | G&E APARTMENT REIT | LANE, JASON | 03/27/2014 | 09:00 AM | Plaintiff | Warrant In Debt |
| ☐ | GV14002092-01 | G&E APARTMENT REIT | LANE, JASON | 03/10/2016 | 02:00 PM | Closed | Garnishment |
| ☐ | GV14002728-00 | G&E APARTMENT REIT | HOLLAND, RAYSHAWN | 04/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14002729-00 | G&E APARTMENT REIT | MCGHEE, TAVONDA | 04/10/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14002730-00 | G&E APARTMENT REIT | PETTIS, RICHARD | 04/10/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14002742-00 | G&E APARTMENT REIT | GILES, KARL | 04/10/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14002743-00 | G&E APARTMENT REIT | HARDEE, BAILY | 04/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14002744-00 | G&E APARTMENT REIT | SMITH, MARVIN | 07/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14003665-00 | G&E APARTMENT REIT | KOCH, LINDSAY | 05/08/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14003666-00 | G&E APARTMENT REIT | FERNANDEZ, JOSE | 05/08/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14003667-00 | G&E APARTMENT REIT | GREENE, JOSHUA | 05/08/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14006009-00 | G&E APARTMENT REIT | FAULK, MELVIN | 07/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14006010-00 | G&E APARTMENT REIT | MATHIS, ANTONIO | 07/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14006011-00 | G&E APARTMENT REIT | EDMONDS, MARQUIS; JR | 07/10/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14006904-00 | G&E APARTMENT REIT | CRUMBY, DON | 08/07/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV14006905-00 | G&E APARTMENT REIT | GOUGH, JOSEPH | 08/07/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14010173-00 | G&E APARTMENT REIT | BARBER, VICTORIA | 10/09/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14010174-00 | G&E APARTMENT REIT | DUNN, KEEGAN | 10/09/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14010175-00 | G&E APARTMENT REIT | HEDGES, BRUCE | 10/09/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14010176-00 | G&E APARTMENT REIT | SHEETLEWORTH, ALEXANDRA | 10/09/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14010177-00 | G&E APARTMENT REIT | WALKER, KYNDRA | 10/09/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14013741-00 | G&E APARTMENT REIT | COOPER, SOROYA | 12/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14013742-00 | G&E APARTMENT REIT | BERRY, ZACH | 12/11/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14013743-00 | G&E APARTMENT REIT | ADERHOLT, MICHAEL | 12/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14013744-00 | G&E APARTMENT REIT | DUNN, KEEGAN | 12/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14013745-00 | G&E APARTMENT REIT | HITE, DANIEL | 12/11/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15000919-00 | G&E APARTMENT REIT | WHITEHEAD, CIARA | 02/12/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15002885-00 | G&E APARTMENT REIT | LOPEZ, PETER | 04/09/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15002886-00 | G&E APARTMENT REIT | PETERSON, MARTHA | 04/09/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15002921-00 | G&E APARTMENT REIT | DORFE, HARRY | 04/09/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15003962-00 | G&E APARTMENT REIT | MATHIS, ANTONIO | 05/07/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15004875-00 | G&E APARTMENT REIT | BACCHUS, RYAN | 06/04/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15004876-00 | G&E APARTMENT REIT | HADSELL, RICHARD | 06/04/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15004877-00 | G&E APARTMENT REIT | NOLAND, BENJAMIN | 06/04/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15004878-00 | G&E APARTMENT REIT | OWENS, BRIANNA | 06/04/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV15004879-00 | G&E APARTMENT REIT | REED, WILLIAM | 06/04/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15004880-00 | G&E APARTMENT REIT | SCULLY, ANDREW | 06/04/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15006215-00 | G&E APARTMENT REIT | BRISCO, SHABREYA | 07/09/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15006216-00 | G&E APARTMENT REIT | BURTON, WILLIAM | 07/09/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15006217-00 | G&E APARTMENT REIT | JONES, DAVID | 07/09/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15006218-00 | G&E APARTMENT REIT | FIGUROA, RAFAEL NIEVES | 07/09/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15006219-00 | G&E APARTMENT REIT | RAMUSSEN, CHARLES | 07/09/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15007898-00 | G&E APARTMENT REIT | BLEVINS, PHILLIP | 08/20/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15009578-00 | G&E APARTMENT REIT | WHITEHEAD, CIARA | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15009579-00 | G&E APARTMENT REIT | WILEY, STEFAN | 10/08/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15009586-00 | G&E APARTMENT REIT | BLEVINS, PHILLIP | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15009587-00 | G&E APARTMENT REIT | MCCOY, ARMESHA | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15009588-00 | G&E APARTMENT REIT | BACCHUS, RYAN | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15009589-00 | G&E APARTMENT REIT | SHEPPHERD, TIFFANY | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15009590-00 | G&E APARTMENT REIT | WILLIAMS, GARY | 10/08/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15012360-00 | G&E APARTMENT REIT | DORFE, HARRY | 11/05/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15012361-00 | G&E APARTMENT REIT | WILEY, STEFAN | 11/05/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15012362-00 | G&E APARTMENT REIT | LOPEZ, PETER | 11/05/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15014985-00 | G&E APARTMENT REIT | NOLAND, BENJAMIN | 01/28/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15014986-00 | G&E APARTMENT REIT | ROWLES, VALERIE | 01/28/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV15014987-00 | G&E APARTMENT REIT | WELLS, KARISHA | 01/28/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15014988-00 | G&E APARTMENT REIT | WHITEHEAD, LEVI | 02/11/2016 | 11:00 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16000710-00 | G&E APARTMENT REIT | HOYAT, BLACK | 02/11/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16000711-00 | G&E APARTMENT REIT | LOPEZ, PETER | 02/11/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16000712-00 | G&E APARTMENT REIT | SMITH, VALERIE | 02/11/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16000713-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 02/11/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16003560-00 | G&E APARTMENT REIT | MONDESIR, BECHIR | 03/31/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16003561-00 | G&E APARTMENT REIT | OTEY, KESHARA | 03/31/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16003562-00 | G&E APARTMENT REIT | SMITH, VALERIE | 03/31/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004830-00 | G&E APARTMENT REIT | BETHEL, ANDREW | 05/05/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16004831-00 | G&E APARTMENT REIT | COOPER, TIARIK | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004832-00 | G&E APARTMENT REIT | EDWARDS, CRYSTAL | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004833-00 | G&E APARTMENT REIT | HEATH, JAMES | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004834-00 | G&E APARTMENT REIT | MITCHELL, ANGELA | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004835-00 | G&E APARTMENT REIT | FIGUEROA, RAFAEL NIEVES | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004836-00 | G&E APARTMENT REIT | POULOS, JARON | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004837-00 | G&E APARTMENT REIT | WILEY, STEPHANIE | 05/05/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16006568-00 | G&E APARTMENT REIT | FIGUEROA, RAFAEL NIEVES | 06/30/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16006569-00 | G&E APARTMENT REIT | PACE, DERRICK | 06/30/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16006570-00 | G&E APARTMENT REIT | SIMMONS, STEVEN | 06/30/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV16007396-00 | G&E APARTMENT REIT | MCCOY, ARMESHA | 07/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16007397-00 | G&E APARTMENT REIT | MITCHELL, ANGELA | 07/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16007398-00 | G&E APARTMENT REIT | PACE, DERRICK | 07/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16007399-00 | G&E APARTMENT REIT | PARKER, WEBSTER | 07/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16007400-00 | G&E APARTMENT REIT | SOUTHALL, TARA | 07/28/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16007401-00 | G&E APARTMENT REIT | WILEY, STEPHANIE | 07/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16008059-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 08/04/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16008060-00 | G&E APARTMENT REIT | HEATH, JAMES | 08/04/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16008061-00 | G&E APARTMENT REIT | PARKER, WEBSTER | 08/04/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16008062-00 | G&E APARTMENT REIT | ROWLES, VALERIE | 08/04/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010077-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010078-00 | G&E APARTMENT REIT | EDWARDS, CRYSTAL | 10/20/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16010079-00 | G&E APARTMENT REIT | GREEN, JADA | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010080-00 | G&E APARTMENT REIT | HEATH, JAMES | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010081-00 | G&E APARTMENT REIT | JONES, JASON | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010082-00 | G&E APARTMENT REIT | PARKER, WEBSTER | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010083-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010084-00 | G&E APARTMENT REIT | SIGMON, ROBERT | 10/20/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16010085-00 | G&E APARTMENT REIT | THOMASON, CLIFTON | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16010086-00 | G&E APARTMENT REIT | TOSTENSON, HANNAH | 10/20/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV16012387-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012388-00 | G&E APARTMENT REIT | BUSACCO, SARAH | 12/15/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012389-00 | G&E APARTMENT REIT | EDWARDS, CRYSTAL | 12/08/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16012390-00 | G&E APARTMENT REIT | GARRETT, JEFFERY | 12/08/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16012391-00 | G&E APARTMENT REIT | GREEN, JADA | 12/08/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16012392-00 | G&E APARTMENT REIT | HEATH, JAMES | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012393-00 | G&E APARTMENT REIT | JONES, JASON | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012394-00 | G&E APARTMENT REIT | MARTIN, GIDEON | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012395-00 | G&E APARTMENT REIT | PENN, PAMELA | 12/08/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16012396-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012397-00 | G&E APARTMENT REIT | ROWLES, VALERIE | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012398-00 | G&E APARTMENT REIT | THOMASON, CLIFTON | 12/08/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16012399-00 | G&E APARTMENT REIT | TREADWAY, GREG | 12/08/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013427-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013428-00 | G&E APARTMENT REIT | ASSIAMAH, KWAKU | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013429-00 | G&E APARTMENT REIT | BROWN, ANTIONE | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013430-00 | G&E APARTMENT REIT | ELGAMAL, ROSE | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013431-00 | G&E APARTMENT REIT | GREEN, JADA | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013432-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013433-00 | G&E APARTMENT REIT | HINES, AARON | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV16013434-00 | G&E APARTMENT REIT | JONES, JASON | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013435-00 | G&E APARTMENT REIT | MARTIN, GIDEON | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013436-00 | G&E APARTMENT REIT | PAULA, JAVIER | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013437-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16013438-00 | G&E APARTMENT REIT | SOUTHALL, TARA | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013439-00 | G&E APARTMENT REIT | TAYLOR, LISA | 01/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16013440-00 | G&E APARTMENT REIT | THOMASON, CLIFTON | 01/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000636-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000637-00 | G&E APARTMENT REIT | BROWN, ANTIONE | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000638-00 | G&E APARTMENT REIT | GREEN, JADA | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000639-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000640-00 | G&E APARTMENT REIT | JOHNSON, MANCY | 02/23/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000641-00 | G&E APARTMENT REIT | JONES, JASON | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000642-00 | G&E APARTMENT REIT | MARTIN, GIDEON | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000643-00 | G&E APARTMENT REIT | PARKS, FRANCISCO | 02/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17000644-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000645-00 | G&E APARTMENT REIT | SCHLOSSER, KEITH | 02/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17000646-00 | G&E APARTMENT REIT | SUTTON, WANDA | 02/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17000647-00 | G&E APARTMENT REIT | TREADWAY, GREG | 02/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17002755-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV17002756-00 | G&E APARTMENT REIT | GREEN, JADA | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002757-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002758-00 | G&E APARTMENT REIT | JONES, JASON | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002759-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002760-00 | G&E APARTMENT REIT | MACKLIN, KAREN | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002761-00 | G&E APARTMENT REIT | MARTIN, GIDEON | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002762-00 | G&E APARTMENT REIT | REID, RONNA | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002763-00 | G&E APARTMENT REIT | SIMMONS, EDGAR | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17002764-00 | G&E APARTMENT REIT | SUTTON, WANDA | 03/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003602-00 | G&E APARTMENT REIT | ASSIAMAH, KWAKU | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003603-00 | G&E APARTMENT REIT | BROWN, ANTIONE | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003604-00 | G&E APARTMENT REIT | GREEN, JADA | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003605-00 | G&E APARTMENT REIT | MARTIN, GIDEON | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003606-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003607-00 | G&E APARTMENT REIT | PLUMMER, ASHLEY | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003608-00 | G&E APARTMENT REIT | SIMMONS, EDGAR | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003609-00 | G&E APARTMENT REIT | SOUTHALL, TARA | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17003610-00 | G&E APARTMENT REIT | SUTTON, WANDA | 04/06/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17004895-00 | G&E APARTMENT REIT | ANDERSON, DELITA | 05/11/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17004896-00 | G&E APARTMENT REIT | ASSIAMAH, KWAKU | 05/11/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV17008915-00 | G&E APARTMENT REIT | BROWN, ANTOINE | 09/07/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17008916-00 | G&E APARTMENT REIT | DESINCE, VANITY | 09/07/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17008917-00 | G&E APARTMENT REIT | SOUTHALL, TARA | 09/07/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17008918-00 | G&E APARTMENT REIT | SUTTON, WANDA | 09/07/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011350-00 | G&E APARTMENT REIT | BROWN, ANTOINE | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011351-00 | G&E APARTMENT REIT | DESINCE, VANITY | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011352-00 | G&E APARTMENT REIT | FIELDS, CHERI | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17011353-00 | G&E APARTMENT REIT | FRITZINGER, KELLY | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17011354-00 | G&E APARTMENT REIT | GBENOU, MESSAN | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011355-00 | G&E APARTMENT REIT | HESS, CHRISTOPHER | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17011356-00 | G&E APARTMENT REIT | LIEDKE, CHRISTINE | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17011357-00 | G&E APARTMENT REIT | MACKLIN, KAREN | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011358-00 | G&E APARTMENT REIT | REID, RONNA | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011359-00 | G&E APARTMENT REIT | SIGMON, ROBERT | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17011360-00 | G&E APARTMENT REIT | SUTTON, WANDA | 10/12/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17011361-00 | G&E APARTMENT REIT | WEBB, CHRISTIAN | 10/12/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012212-00 | G&E APARTMENT REIT | BROWN, ANTOINE | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17012213-00 | G&E APARTMENT REIT | BURTON, WILLIAM | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17012214-00 | G&E APARTMENT REIT | CULLUMBER, SARAH | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012215-00 | G&E APARTMENT REIT | DESINCE, VANITY | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV17012216-00 | G&E APARTMENT REIT | EDWARDS, TAMEKA | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17012217-00 | G&E APARTMENT REIT | GBENOU, MESSAN | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012218-00 | G&E APARTMENT REIT | HUBBLE, GARY | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012219-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012220-00 | G&E APARTMENT REIT | MACKLIN, KAREN | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17012221-00 | G&E APARTMENT REIT | MCKINLAY, AIDAN | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012222-00 | G&E APARTMENT REIT | PURDIE, ANDREA | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17012223-00 | G&E APARTMENT REIT | REED, SEAN | 11/09/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17012224-00 | G&E APARTMENT REIT | SMITH, JIA | 11/09/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013612-00 | G&E APARTMENT REIT | ALLEN, KAMREE | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013613-00 | G&E APARTMENT REIT | ALSTON, TRAVIS | 12/14/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17013614-00 | G&E APARTMENT REIT | DESINCE, VANITY | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013615-00 | G&E APARTMENT REIT | DODSON, BRYAN | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013616-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013617-00 | G&E APARTMENT REIT | JONES, JASON | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013618-00 | G&E APARTMENT REIT | JORDAN, MALIK | 12/14/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17013619-00 | G&E APARTMENT REIT | MANLEY-LEE, ISIAH | 12/14/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17013620-00 | G&E APARTMENT REIT | PHELAN, ERIN | 12/14/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17013621-00 | G&E APARTMENT REIT | PURDIE, ANDREA | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013622-00 | G&E APARTMENT REIT | RIDDICK, DEREK | 12/14/2017 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV17013623-00 | G&E APARTMENT REIT | SMITH, JIA | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013624-00 | G&E APARTMENT REIT | SUTTON, WANDA | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013625-00 | G&E APARTMENT REIT | WILLIAMS, CARLA | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17013626-00 | G&E APARTMENT REIT | WILLIAMS, TONY | 12/14/2017 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014481-00 | G&E APARTMENT REIT | HEARN, KAMREE ALLEN | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014482-00 | G&E APARTMENT REIT | ANDERSON, VIRGINIA | 01/11/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17014483-00 | G&E APARTMENT REIT | DESINCE, VANITA | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014484-00 | G&E APARTMENT REIT | DIAZ, LUIS | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014485-00 | G&E APARTMENT REIT | DODSON, BRYAN | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014486-00 | G&E APARTMENT REIT | ERNEST, LACEY | 01/11/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17014487-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014488-00 | G&E APARTMENT REIT | JOHNSON, CHERYLE | 01/11/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17014489-00 | G&E APARTMENT REIT | JONES, JASON | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014490-00 | G&E APARTMENT REIT | MALONE-FREEMAN, SHANITA | 01/11/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV17014491-00 | G&E APARTMENT REIT | SMITH, JIA | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014492-00 | G&E APARTMENT REIT | THOMPSON, JAMAL | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014493-00 | G&E APARTMENT REIT | WILLIAMS, CASEY | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV17014494-00 | G&E APARTMENT REIT | WILLIAMS, TONY | 01/11/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18000813-00 | G&E APARTMENT REIT | ALLEN, KAMREE | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18000814-00 | G&E APARTMENT REIT | DESINCE, VANITY | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV18000815-00 | G&E APARTMENT REIT | DODSON, BRYAN | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18000816-00 | G&E APARTMENT REIT | EBBA, LEONARD | 02/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18000817-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18000818-00 | G&E APARTMENT REIT | MANLEY-LEE, ISIAH | 02/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18000819-00 | G&E APARTMENT REIT | THOMPSON, JAMAL | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18000820-00 | G&E APARTMENT REIT | WEBB, CHRISTIAN | 02/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002735-00 | G&E APARTMENT REIT | CLARK, LAURA | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002736-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002737-00 | G&E APARTMENT REIT | HOLLOMAN, SHAMONA | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002738-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002739-00 | G&E APARTMENT REIT | JONES, JASON | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002740-00 | G&E APARTMENT REIT | JORDAN, MALIK | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002741-00 | G&E APARTMENT REIT | MANLEY-LEE, ISIAH | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18002742-00 | G&E APARTMENT REIT | MOODY, JULIANA | 04/05/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004062-00 | G&E APARTMENT REIT | CLARK, LAURA | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004063-00 | G&E APARTMENT REIT | EDMONDS, MARQUIS | 05/10/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18004064-00 | G&E APARTMENT REIT | HARDIN, ANGIE | 05/10/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18004065-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004066-00 | G&E APARTMENT REIT | JONES, DIAMOND | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004067-00 | G&E APARTMENT REIT | MACKLIBN, KAREN | 05/10/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV18004068-00 | G&E APARTMENT REIT | LIEDKE, CHRISTINE | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004069-00 | G&E APARTMENT REIT | MANLEY-LEE, ISAIAH | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18004070-00 | G&E APARTMENT REIT | MOODY, JULIANA | 05/10/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005037-00 | G&E APARTMENT REIT | BLACK, HOYAT | 06/07/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18005038-00 | G&E APARTMENT REIT | CLARK, LAURA | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005039-00 | G&E APARTMENT REIT | HUGHES, CHARLOTTE | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005040-00 | G&E APARTMENT REIT | JENNINGS, TANIA | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005041-00 | G&E APARTMENT REIT | JONES, JASON | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005042-00 | G&E APARTMENT REIT | RUSSELL, KEYANTE | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005043-00 | G&E APARTMENT REIT | SELLERS-BROWN, SHAMIR | 06/07/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18005044-00 | G&E APARTMENT REIT | WELLS, NICHOLAS | 06/14/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18005074-00 | G&E APARTMENT REIT | GAMBOA, ELIZABETH | 06/07/2018 | 10:13 AM | Other | Unlawful Detainer |
| ☐ | GV08018432-00 | G&E APARTMENT REIT 1 | SHELDON, KENNETH | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09003334-00 | G&E APARTMENT REIT 1 | DURIO, ADRIAN | 04/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09003335-00 | G&E APARTMENT REIT 1 | FLORES, MATTHEW | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09003336-00 | G&E APARTMENT REIT 1 | HALLEY, HOLLY | 04/09/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09003337-00 | G&E APARTMENT REIT 1 | MCGUIRE-MCMANAWAY, BRITTANY | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09003338-00 | G&E APARTMENT REIT 1 | RATLEY, JOE | 04/09/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09003339-00 | G&E APARTMENT REIT 1 | SHELDON, KENNETH | 10/08/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08018436-00 | G&E APARTMENT REIT 2 | JAZWINSKI, BRUCE | 04/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV08018437-00 | G&E APARTMENT REIT 2 | LOCK, TERRELL | 04/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09003340-00 | G&E APARTMENT REIT 2 | JAZWINSKI, BRUCE | 07/09/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10014903-00 | G&E APARTMENT REIT 2 | DEMARIO, EMILY | 01/13/2011 | 11:00 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10014904-00 | G&E APARTMENT REIT 2 | MOSLEY, ALYSSIA | 12/09/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10014905-00 | G&E APARTMENT REIT 2 | PAGE, JASON | 12/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09004682-00 | G&E APARTMENT REIT 1 | MCGUIRE-MCMANAWAY, BRITTANY | 09/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008951-00 | G&E APARTMENT REIT 1 | BARNETTE, ERIN | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09008952-00 | G&E APARTMENT REIT 1 | KORLISON, OMENTUS | 08/06/2009 | 10:13 AM | Non-suit | Unlawful Detainer |
| ☐ | GV09008953-00 | G&E APARTMENT REIT 1 | SMITH, DAVID | 08/06/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008954-00 | G&E APARTMENT REIT 1 | TERRY, MONIQUE | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09010897-00 | G&E APARTMENT REIT 1 | RATLEY, JOE | 12/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09012910-00 | G&E APARTMENT REIT 1 | JAZWINSKI, BRUCE | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09015719-00 | G&E APARTMENT REIT 1 | CUFFEE, ANTONIO | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09015720-00 | G&E APARTMENT REIT 1 | DORSEY, STUART | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09015721-00 | G&E APARTMENT REIT 1 | MURRAY, BARBARA | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09015722-00 | G&E APARTMENT REIT 1 | WILLIAMSON, ROY | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017160-00 | G&E APARTMENT REIT 1 | BEAULIEU, KENNETH | 01/14/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09017161-00 | G&E APARTMENT REIT 1 | CUFFEE, ANTONIO | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017162-00 | G&E APARTMENT REIT 1 | DORSEY, STUART | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017163-00 | G&E APARTMENT REIT 1 | VASQUEZ, MARIA | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV10000692-00 | G&E APARTMENT REIT 1 | CUFFEE, ANTONIO | 02/04/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10000693-00 | G&E APARTMENT REIT 1 | POLK, WILLIE | 02/04/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002058-00 | G&E APARTMENT REIT 1 | CHAMPION, BOBBY | 03/11/2010 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV10014902-00 | G&E APARTMENT REIT 1 | BULLOCK, TEAIRA | 12/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11000756-00 | G&E APARTMENT REIT 1 | ACOSTA, ENRIQUE | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11000757-00 | G&E APARTMENT REIT 1 | JACKSON, KATHERINE | 02/03/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11000758-00 | G&E APARTMENT REIT 1 | KING-SMITH, RIQUITA | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11000759-00 | G&E APARTMENT REIT 1 | MCCONNELL, BRENT | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11000760-00 | G&E APARTMENT REIT 1 | PAGE, JASON | 02/03/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11000761-00 | G&E APARTMENT REIT 1 | ROSKOWSKI, TARA | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV13010013-00 | G&E APARTMENT REIT 1 | HUNTER, LONNIE | 09/05/2013 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV13010014-00 | G&E APARTMENT REIT 1 | ROLLINS, TYRONEE | 09/05/2013 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14008455-00 | G&E APARTMENT REIT 1 | NEATHERY, DIANE | 09/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09004680-00 | G&E APARTMENT REIT 2 | JAZWINSKI, BRUCE | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09004681-00 | G&E APARTMENT REIT 2 | FLORES, MATTHEW | 05/07/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09004683-00 | G&E APARTMENT REIT 2 | MURRAY, BARBARA | 05/07/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09008955-00 | G&E APARTMENT REIT 2 | EDWARDS, DOUGLAS | 08/06/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008956-00 | G&E APARTMENT REIT 2 | KARIKA, SARAH | 08/06/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09008957-00 | G&E APARTMENT REIT 2 | ROGERS, ALVALON | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09008959-00 | G&E APARTMENT REIT 2 | WILLIAMS-WEBB, SONIA | 08/06/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV09010934-00 | G&E APARTMENT REIT 2 | JAZWINSKI, BRUCE | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09010935-00 | G&E APARTMENT REIT 2 | RIUSECH, EDUARDO | 12/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09015723-00 | G&E APARTMENT REIT 2 | GRIFFIN, MICHAEL | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09015724-00 | G&E APARTMENT REIT 2 | LONG, KRISTIN | 12/10/2009 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09015725-00 | G&E APARTMENT REIT 2 | WILLIAMS-WEBB, SONIA | 12/10/2009 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017164-00 | G&E APARTMENT REIT 2 | GRIFFIN, MICHAEL | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017165-00 | G&E APARTMENT REIT 2 | PATTERSON, MICAH | 01/14/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV09017166-00 | G&E APARTMENT REIT 2 | PRUITT, DUSTIN | 01/14/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV09017167-00 | G&E APARTMENT REIT 2 | SAUCIER, JEREMY | 01/14/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10000694-00 | G&E APARTMENT REIT 2 | GRIFFINM, MICHAEL | 02/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10000695-00 | G&E APARTMENT REIT 2 | HENDERSON, JAMESHA | 02/04/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10000696-00 | G&E APARTMENT REIT 2 | LONG, KRISTIN | 02/04/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002051-00 | G&E APARTMENT REIT 2 | BULLOCK, DARREN | 03/11/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002052-00 | G&E APARTMENT REIT 2 | FOX, CHRISTIE | 03/11/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002053-00 | G&E APARTMENT REIT 2 | GRAYSMITH CONSTRUCTION | 03/11/2010 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV10002054-00 | G&E APARTMENT REIT 2 | HOLAS-SHORTER, ABIGAIL | 03/11/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002055-00 | G&E APARTMENT REIT 2 | LAFFERTY, SEAN | 03/11/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10002056-00 | G&E APARTMENT REIT 2 | NUNES, SCOTT | 03/11/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10002057-00 | G&E APARTMENT REIT 2 | PATTERSON, MICAH | 03/11/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11000807-00 | G&E APARTMENT REIT 2 | BULLOCK, TEAIRA | 02/03/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV11000808-00 | G&E APARTMENT REIT 2 | JAMES, SABRINA | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV11000809-00 | G&E APARTMENT REIT 2 | LAFFERTY, SEAN | 02/03/2011 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV11000810-00 | G&E APARTMENT REIT 2 | MCCONNELL, JOHN | 02/03/2011 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14003668-00 | G&E APARTMENT REIT 2 | SMITH, MARVIN | 09/11/2014 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV14008456-00 | G&E APARTMENT REIT 2 | BRYANT, AXI | 09/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14008457-00 | G&E APARTMENT REIT 2 | DUNN, KEEGAN | 09/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14008458-00 | G&E APARTMENT REIT 2 | GOUGH, JOSEPH | 09/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14008459-00 | G&E APARTMENT REIT 2 | PIERCE, JOSHUA | 09/11/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10002059-00 | G&E APARTMENT REIT H | POLK, WILLIE | 06/10/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10006847-00 | G&E APARTMENT REIT H | HUTTMAN, STEVEN | 06/10/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10006848-00 | G&E APARTMENT REIT H | JEFFERSON, LLLITHIA | 09/09/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10006849-00 | G&E APARTMENT REIT H | JONATHAN, MCCOY | 06/10/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10006850-00 | G&E APARTMENT REIT M | HOLAS-SHORTER, ABIGAIL | 06/10/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10006851-00 | G&E APARTMENT REIT M | PHELPS, LIN HERMAN | 06/10/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10006852-00 | G&E APARTMENT REIT M | SAUCIER, JEREMY | 06/10/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08008522-00 | G&E APARTMENT REIT THE | LAMONDUE, CARL | 06/17/2008 | 11:00 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08008523-00 | G&E APARTMENT REIT THE | MAGEE, KENNETH | 06/05/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08014899-00 | G&E APARTMENT REIT THE | LAMONDUE, CARL | 12/18/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08016783-00 | G&E APARTMENT REIT THE | BARNETTE, ERIN | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016784-00 | G&E APARTMENT REIT THE | DEGERAFF, GEORGE | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV08016785-00 | G&E APARTMENT REIT THE | FLORES, MATTHEW | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016786-00 | G&E APARTMENT REIT THE | HECKER, ALISON | 12/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08016787-00 | G&E APARTMENT REIT THE | HUBBARD, DERIKISHA | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016788-00 | G&E APARTMENT REIT THE | JORDAN, SHAWN | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016789-00 | G&E APARTMENT REIT THE | PARKER, JUSTIN | 12/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08016791-00 | G&E APARTMENT REIT THE | SMITH, DAVID | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016792-00 | G&E APARTMENT REIT THE | TAYLOR, LEROY | 12/11/2008 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV08016793-00 | G&E APARTMENT REIT THE | TAYLOR, SATASHA | 12/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV08016794-00 | G&E APARTMENT REIT THE | VINES, YOLANDA | 12/11/2008 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10010613-00 | G&E APARTMENT REIT THE | HEFFLEFINGER, LARRY | 09/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10010614-00 | G&E APARTMENT REIT THE | HELMS, ERIC | 09/09/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10010615-00 | G&E APARTMENT REIT THE | PORTER, SHANICA | 09/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10010617-00 | G&E APARTMENT REIT THE | HOLAS-SHORTER, ABIGAIL | 09/09/2010 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV10010618-00 | G&E APARTMENT REIT THE | MORTON, MICHAEL | 09/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10010619-00 | G&E APARTMENT REIT THE | PARKS, KELLY | 09/09/2010 | 10:13 AM | Not Found/Unserved | Unlawful Detainer |
| ☐ | GV10010620-00 | G&E APARTMENT REIT THE | SAUCIER, JEREMY | 09/09/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10011724-00 | G&E APARTMENT REIT THE | BALLIAT, TYLER | 10/07/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10011725-00 | G&E APARTMENT REIT THE | FRANKLIN, MAURICE | 10/07/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10011726-00 | G&E APARTMENT REIT THE | JACKSON, KATHERINE | 10/07/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV10011727-00 | G&E APARTMENT REIT THE | SIMMONS, LARRY | 10/07/2010 | 10:13 AM | Case Dismissed | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV15001850-00 | G&E APARTMENT REITENTS LP | MATHIS, ANTONIO | 03/12/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV12001049-00 | G&E APARTMENTS M | BASKIN, THOMAS | 03/08/2012 | 11:00 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001050-00 | G&E APARTMENTS M | CONNOR, MICHAEL | 02/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV12001051-00 | G&E APARTMENTS M | ROBINSON, YOLANDA | 02/09/2012 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV14011316-00 | G&E APARTMENTS REIT | HEDGES, BRUCE | 11/06/2014 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15008752-00 | G&E APARTMENTS REIT | GAGE, ALEXIS | 09/10/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15008774-00 | G&E APARTMENTS REIT | PLUMMER, ASHLEY | 09/10/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15008775-00 | G&E APARTMENTS REIT | SCULLY, ANDREW | 09/10/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15013384-00 | G&E APARTMENTS REIT | WILEY, STEFAN | 12/10/2015 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV15013385-00 | G&E APARTMENTS REIT | BLACK, HOYAT | 12/10/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15013386-00 | G&E APARTMENTS REIT | CLOSE, RACHEL | 12/10/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV15013387-00 | G&E APARTMENTS REIT | NOLAND, BENJAMIN | 12/10/2015 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV16004586-00 | G&E APARTMENTS REIT | MONDESIR, BECHIR | 04/28/2016 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV16004587-00 | G&E APARTMENTS REIT | PAGEL, JAMES | 04/28/2016 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001984-00 | G&E APARTMENTS REIT | CULLUMBER, SARAH | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001985-00 | G&E APARTMENTS REIT | DESINCE, VANITY | 03/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18001986-00 | G&E APARTMENTS REIT | JENNINGS, TANIA | 03/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18001987-00 | G&E APARTMENTS REIT | JONES, ERICA | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001988-00 | G&E APARTMENTS REIT | JONES, JASON | 03/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |
| ☐ | GV18001989-00 | G&E APARTMENTS REIT | JORDAN, MALIK | 03/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |

| | Case # | Plaintiff | Defendant | Hearing Date | Hearing Time | Case Judgment | Case Type |
|---|---|---|---|---|---|---|---|
| ☐ | GV18001990-00 | G&E APARTMENTS REIT | LIEDKE, CHRISTINE | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001991-00 | G&E APARTMENTS REIT | MACKLIN, KAREN | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001992-00 | G&E APARTMENTS REIT | WEBB, CHRISTIAN | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001993-00 | G&E APARTMENTS REIT | WELLS, KARISHA | 03/08/2018 | 10:13 AM | Case Dismissed | Unlawful Detainer |
| ☐ | GV18001994-00 | G&E APARTMENTS REIT | WHITE, HELEN | 03/08/2018 | 10:13 AM | Plaintiff | Unlawful Detainer |

**SCHEDULE 3.15**
**LIST OF SUBSIDIARIES**

See attached.

Project Unicorn
Quail Landing



Project Unicorn
Gulfstream Isles



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Victoria Park



Project Unicorn
Reserve at River Walk



**Reserve at River Walk**
4501 Bentley Drive
Columbia, South Carolina 29210

Project Unicorn
Heights at Olde Towne



**Heights at Olde Towne**
303 Effingham Street and 301 Green Street
Portsmouth, Virginia 23704

Project Unicorn
Myrtles at Olde Towne



**Myrtles at Olde Towne**
850 Crawford Parkway
Portsmouth, Virginia 23704







Project Unicorn –
Oak Mill

Project Unicorn
Battleground Park



**Battleground Park**
3520 Drawbridge Parkway
Greensboro, North Carolina 27410

Project Unicorn
Lakes at Renaissance Park



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)    person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)   person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

**Lakes at Renaissance Park**
1400 Renaissance Court
Austin, Texas 78728

Project Unicorn
Brandywine



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Glenview Reserve



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

**Glenview Reserve**
100 Arbor Creek Boulevard
Nashville, Tennessee 37217

Project Unicorn
Andros Isles



James Dondero
Beneficiary

The Dugaboy Investment Trust (DE) (Guarantor)

Highland Capital Management Real Estate Holdings I, LLC (NV)

Highland Capital Management Real Estate Holdings II, LLC (NV)

70%    25%    5%

Highland Capital Management, L.P. (DE)

HCRE Partners, LLC (DE)

49%    51%

SE Multifamily Holdings, LLC (DE)

100%

NREA SE Multifamily, LLC (DE)

NREA SE1 Andros Isles Leaseco, LLC (DE) Master Tenant

NREA SE1 Andros Isles Manager, LLC (DE) Manager

100%

NREA SE MF Holdings, LLC (DE)

100%

NREA SE MF Investment Co, LLC (DE) Class 2 Interest Holder

Class 1 Investors

0%    100%

NREA Southeast Portfolio One, DST (DE)

100%

NREA SE1 Andros Isles, DST (DE) May be converted from DK Gateway Andros, LLC (DE)

Andros Isles
100 Acklins Circle
Daytona Beach, Florida 32119

Other than persons or entities specifically identified on this organizational chart, there is no:
(i)     person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)    person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Arborwalk



James Dondero
(Beneficiary)

The Dugaboy Investment Trust (DE) (Guarantor)

Highland Capital Management Real Estate Holdings I, LLC (NV)

Highland Capital Management Real Estate Holdings II, LLC (NV)

70%    25%    5%

Highland Capital Management, L.P. (DE)

HCRE Partners, LLC (DE)

49%    51%

SE Multifamily Holdings, LLC (DE)

100%

NREA SE Multifamily, LLC (DE)

NREA SE1 Arborwalk Leaseco, LLC (DE) Master Tenant

NREA SE1 Arborwalk Manager, LLC (DE) Manager

100%

NREA SE MF Holdings, LLC (DE)

100%

NREA SE MF Investment Co, LLC (DE) Class 2 Interest Holder

Class 1 Investors

0%    100%

NREA Southeast Portfolio One, DST (DE)

100%

NREA SE1 Arborwalk, DST (DE) May be converted from MAR Arborwalk, LLC (DE)

**Arborwalk**
1318 SW Manor Lake Drive
Lee's Summit, Missouri 64082

Other than persons or entities specifically identified on this organizational chart, there is no:
(i)    person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)    person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/1718

Project Unicorn
Walker Ranch



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)     person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)    person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Towne Crossing



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

**Towne Crossing**
1601 Town Crossing Boulevard
Mansfield, Texas 76063

Project Unicorn
West Place



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)     person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)    person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Project Unicorn
Vista Ridge



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

Vista Ridge
160 Vista Ridge Mall Drive
Lewisville, Texas 75067

Project Unicorn
Hidden Lake



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

**Hidden Lake**
8910 North Loop 1604
West San Antonio, Texas 78249

Project Unicorn
Arboleda



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 9/17/18

Project Unicorn
Fairways



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

**Fairways**
16501 Stonemason Drive
Huntersville, North Carolina 28078

Project Unicorn
Grand Oasis



Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 09/17/18

**Project Unicorn**
**Summers Landing Apartments**
**(AT CLOSING)**



Harry Bookey

85%
Managing
Member

BH EQUITIES, L.L.C.
(IA) ← Other individuals owning 15% in the aggregate and not more than 5% individually

100%

BHSL Holdings, LLC
(IA)

100%      100%

BH Summers Landing GP, LLC      BH Summers Landing, LLC
(DE)                              (IA)

Sole LP

Sole GP

Summers Landing Apartments
Investors, L.P.
(DE)

**Summers Landing Apartments**

Other than persons or entities specifically identified on this organizational chart, there is no:
(i)      person or entity with a collective equity interest (whether direct or indirect)
of 25% or more in Borrower; or
(ii)     person or entity with a collective equity interest (whether direct or indirect)
of 10% or more in Borrower, and which is either (a) an individual who is
not a citizen of the United States, or (b) an entity formed outside the United States.

Updated 9/21/18

**SCHEDULE 5.12**
**PLEDGED NXRT SHARES**

1,300,000 common shares of NexPoint Residential Trust, Inc. (NXRT)

**SCHEDULE 6.09**
**EXISTING INDEBTEDNESS**


**[BORROWER TO UPDATE]**

**SCHEDULE 6.10**
**JUNIOR CLAIMS**

**[BORROWER TO UPDATE]**

**BRIDGE LOAN AGREEMENT**

<u>EXHIBIT A</u>

ASSIGNMENT AND ASSUMPTION

This Assignment and Assumption (the "<u>Assignment and Assumption</u>") is dated as of the Effective Date set forth below and is entered into by and between [*Insert name of Assignor*] (the "<u>Assignor</u>") and [*Insert name of Assignee*] (the "<u>Assignee</u>"). Capitalized terms used but not defined herein shall have the meanings given to them in the Bridge Loan Agreement identified below  (as amended, the "<u>Credit Agreement</u>"), receipt of a copy of which is hereby acknowledged by the Assignee. The Standard Terms and Conditions set forth in Annex 1 attached hereto are hereby agreed to and incorporated herein by reference and made a part of this Assignment and Assumption as if set forth herein in full.

For an agreed consideration, the Assignor hereby irrevocably sells and assigns to the Assignee, and the Assignee hereby irrevocably purchases and assumes from the Assignor, subject to and in accordance with the Standard Terms and Conditions and the Credit Agreement, as of the Effective Date inserted by the Administrative Agent as contemplated below (i) all of the Assignor's rights and obligations in its capacity as a Lender under the Credit Agreement and any other documents or instruments delivered pursuant thereto to the extent related to the amount and percentage interest identified below of all its Commitment and outstanding Loans and a corresponding interest in and to all other rights and obligations of the Assignor under the respective facilities identified below (including any guarantees included in such facilities) and (ii) to the extent permitted to be assigned under applicable law, all claims, suits, causes of action and any other right of the Assignor (in its capacity as a Lender) against any Person, whether known or unknown, arising under or in connection with the Credit Agreement, any other documents or instruments delivered pursuant thereto or the loan transactions governed thereby or in any way based on or related to any of the foregoing, including contract claims, tort claims, malpractice claims, statutory claims and all other claims at law or in equity related to the rights and obligations sold and assigned pursuant to clause (i) above (the rights and obligations sold and assigned pursuant to clauses (i) and (ii) above being referred to herein collectively as the "<u>Assigned Interest</u>"). Such sale and assignment is without recourse to the Assignor and, except as expressly provided in this Assignment and Assumption, without representation or warranty by the Assignor.

Assignee, subject to the terms and conditions hereof, hereby assumes all obligations of Assignor with respect to the Assigned Interests from and after the Effective Date as if Assignee were an original Lender under and signatory to the Credit Agreement, which obligations shall include, but shall not be limited to, the obligation to make Loans to the Borrowers with respect to the Assigned Interest and to indemnify the Administrative Agent as provided therein (such obligations, together with all other obligations set forth in the Credit Agreement and the other Loan Documents are hereinafter collectively referred to as the "<u>Assigned Obligations</u>"). Assignor shall have no further duties or obligations with respect to, and shall have no further interest in, the Assigned Obligations or the Assigned Interests.

1.     Assignor:        _____

2.     Assignee:        _____
                          [and is an Affiliate/Approved Fund of [*identify Lender*][1]]

3.     Borrower:        [___]

4.     Administrative Agent:     KeyBank, National Association, as the administrative agent under the Credit Agreement

5.     Credit Agreement:     The Bridge Loan Agreement dated as of September 25, 2018, among the Borrower, the Lenders parties thereto, and KeyBank, National Association, as Administrative Agent

6.     Assigned Interest:

| Aggregate Amount of Tranche A Loan for all Lenders | Amount of Tranche A Loan Assigned | Percentage Assigned of Tranche A Loans[2] |
|---|---|---|
| $\_\_\_\_\_ | $\_\_\_\_\_ | \_\_\_\_% |
| $\_\_\_\_\_ | $\_\_\_\_\_ | \_\_\_\_% |
| $\_\_\_\_\_ | $\_\_\_\_\_ | \_\_\_\_% |

| Aggregate Amount of Tranche B Loan for all Lenders | Amount of Tranche B Loan Assigned | Percentage Assigned of Tranche B Loans[3] |
|---|---|---|
| $\_\_\_\_\_ | $\_\_\_\_\_ | \_\_\_\_% |
| $\_\_\_\_\_ | $\_\_\_\_\_ | \_\_\_\_% |
| $\_\_\_\_\_ | $\_\_\_\_\_ | \_\_\_\_% |

In consideration of the assignment made pursuant to this Assignment and Assumption, Assignee agrees to pay to Assignor on the Effective Date, an amount equal to the "Amount of Outstanding Loans Assigned" set forth in the table above.

Effective Date:     _____, 20\_\_\_\_ [TO BE INSERTED BY ADMINISTRATIVE AGENT AND WHICH SHALL BE THE EFFECTIVE DATE OF RECORDATION OF TRANSFER IN THE REGISTER THEREFOR.]

The terms set forth in this Assignment and Assumption are hereby agreed to:

---

[1] Select as applicable.
[2] Set forth, to at least 9 decimals, as a percentage of the Tranche A Loans of all Lenders thereunder.
[3] Set forth, to at least 9 decimals, as a percentage of the Tranche B Loans of all Lenders thereunder.

ASSIGNOR

[NAME OF ASSIGNOR]


By:_____

  Title:_____

ASSIGNEE

[NAME OF ASSIGNEE]


By:_____

  Title:_____

[Consented to and][4] Accepted:

[KeyBank, National Association], as
  Administrative Agent


By:_____

  Title:_____


[Consented to:][5]

[NAME OF LEAD BORROWER]


By:_____

  Title:_____

_____

[4] To be added only if the consent of the Administrative Agent is required by the terms of the Credit
Agreement.
[5] To be added only if the consent of the Borrower and/or other parties is required by the terms of the
Credit Agreement.

ANNEX 1

STANDARD TERMS AND CONDITIONS FOR
ASSIGNMENT AND ASSUMPTION

1. <u>Representations and Warranties</u>.

1.1 <u>Assignor</u>. The Assignor (a) represents and warrants that (i) it is the legal and beneficial owner of the Assigned Interest, (ii) the Assigned Interest is free and clear of any lien, encumbrance or other adverse claim and (iii) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby; and (b) assumes no responsibility with respect to (i) any statements, warranties or representations made in or in connection with the Credit Agreement or any other Loan Document, (ii) the execution, legality, validity, enforceability, genuineness, sufficiency or value of the Loan Documents or any collateral thereunder, (iii) the financial condition of the Borrower, any of its Subsidiaries or Affiliates or any other Person obligated in respect of any Loan Document or (iv) the performance or observance by the Borrower, any of its Subsidiaries or Affiliates or any other Person of any of their respective obligations under any Loan Document.

1.2. <u>Assignee</u>. The Assignee (a) represents and warrants that (i) it has full power and authority, and has taken all action necessary, to execute and deliver this Assignment and Assumption and to consummate the transactions contemplated hereby and to become a Lender under the Credit Agreement, (ii) it satisfies the requirements, if any, specified in the Credit Agreement that are required to be satisfied by it in order to acquire the Assigned Interest and become a Lender, (iii) from and after the Effective Date, it shall be bound by the provisions of the Credit Agreement as a Lender thereunder and, to the extent of the Assigned Interest, shall have the obligations of a Lender thereunder, (iv) it has received a copy of the Credit Agreement, together with copies of the most recent financial statements delivered pursuant to Section 5.01 thereof, as applicable, and such other documents and information as it has deemed appropriate to make its own credit analysis and decision to enter into this Assignment and Assumption and to purchase the Assigned Interest on the basis of which it has made such analysis and decision independently and without reliance on the Administrative Agent or any other Lender, and (v) if it is a Foreign Lender, attached to the Assignment and Assumption is any documentation required to be delivered by it pursuant to the terms of the Credit Agreement, duly completed and executed by the Assignee; (b) appoints and authorizes the Administrative Agent to take such action as agent on its behalf and to exercise such powers as are reasonably incidental thereto pursuant to the terms of the Loan Documents; and (c) agrees that (i) it will, independently and without reliance on the Administrative Agent, the Assignor or any other Lender, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit decisions in taking or not taking action under the Loan Documents, and (ii) it will perform in accordance with their terms all of the obligations which by the terms of the Loan Documents are required to be performed by it as a Lender.

2. <u>Payments</u>. From and after the Effective Date, the Administrative Agent shall make all payments in respect of the Assigned Interest (including payments of principal, interest, fees and other amounts) to the Assignor for amounts which have accrued to but excluding the

Effective Date and to the Assignee for amounts which have accrued from and after the Effective Date. All payments to Assignee under the Credit Agreement shall be made as provided in the Credit Agreement in accordance with the separate instructions delivered to Administrative Agent.

      3.  <u>General Provisions</u>. This Assignment and Assumption shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns. This Assignment and Assumption may be executed in any number of counterparts, which together shall constitute one instrument. Delivery of an executed counterpart of a signature page of this Assignment and Assumption by telecopy shall be effective as delivery of a manually executed counterpart of this Assignment and Assumption. This Assignment and Assumption shall be governed by, and construed in accordance with, the law of the State of New York.

**BRIDGE LOAN AGREEMENT**

EXHIBIT B

FORM OF COMPLIANCE CERTIFICATE

Key Bank, National
Association
as Administrative Agent
225 Franklin Street
Boston, MA  02110

Attn:  Mr. Christopher Neil

RE HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE
DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P.,
NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER
BORROWERS Compliance Certificate
for _____ through _____

Dear Ladies and Gentlemen:

This Compliance Certificate is made with reference to that certain Bridge Loan
Agreement dated as of September 25, 2018 (as amended, supplemented or otherwise
modified from time to time, the "Credit Agreement"), among HIGHLAND CAPITAL
MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT
TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE
ADVISORS IV, L.P., AND THE PROPERTY OWNER BORROWERS (collectively, the
"Borrower"), the financial institutions party thereto, as lenders, and KeyBank, National
Association, as Administrative Agent.  All capitalized terms used in this Compliance
Certificate (including any attachments hereto) and not otherwise defined in this Compliance
Certificate shall have the meanings set forth for such terms in the Credit Agreement.  All
Section references herein shall refer to the Credit Agreement.

I hereby certify that I am the [_____] of [LEAD BORROWER], and that I
make this Certificate on behalf of the Borrower.  I further represent and certify on behalf of
the Borrower as follows as of the date of this Compliance Certificate:

I have reviewed the terms of the Loan Documents and have made, or have caused to be
made under my supervision, a review in reasonable detail of the transactions and
consolidated and consolidating financial condition of the Borrower and its Subsidiaries,
during the accounting period (the "Reporting Period") covered by the financial reports
delivered simultaneous herewith pursuant to Section 5.01[(a)][(b)], and that such review
has not disclosed the existence during or at the end of such Reporting Period (and that I do
not have knowledge of the existence as at the date hereof) of any condition or event which
constitutes a Default or Event of Default.

(a)  Total Leverage Ratio
   1.  Indebtedness of Borrower and its Subsidiaries  $_____
   2.  Total Asset Value:
     (A)  Value of all real property
     (B)  other assets
         TOTAL     $_____
   3.  Ratio: 1 divided by 2  _____
   4.  Required Ratio:  not greater than 65%

(b)  Fixed Charge Coverage Ratio
   1.  Adjusted EBITDA  $_____
   2.  Fixed Charges:
     (A)  Current Principal
     (B)  Interest Expense
     (C)  Cash Dividends on Preferred Stock
         TOTAL     $_____
   3.  Ratio: 1 divided by 2  _____
   4.  Required Ratio:  not less than 1.6 to 1.0

(c)  Tangible Net Worth $_____
   1.  Actual _____
   2.  Required $750,000,000

(d)  Minimum Liquidity $_____
   1.  Cash and Cash Equivalents (excluding reserve amounts)  $_____
   2.  market value of shares in NXRT and units in the OP  $_____
   3.  market value of all other unencumbered securities  $_____
   4.  market value of all other encumbered securities (net of any outstanding
     debt related thereto)     $_____
   5.  Required Amount: $75,000,000 (or if  Loans are less than $150,000,000,
lesser of (i) $75,000,000 and (ii) 25% of outstanding Loan balance):  $_____

(e)  Recourse Debt        $_____
Currently Defaulted Other Debt:
(i) Aggregate Defaulted Recourse Debt of the Borrower $_____
(ii) Aggregate Defaulted Recourse Debt of Borrower $_____
(iii) Aggregate Defaulted Non-recourse Debt of the Subsidiaries of Borrower or Borrower
(of $75,000,000 or greater in the aggregate)  $_____

    This Compliance Certificate has been executed and delivered as of the date set
    forth above.

      [Signature Page Follows]

LEAD BORROWER:

[__]

By:_____
Name:
Title:

**BRIDGE LOAN AGREEMENT**

<u>EXHIBIT C</u>

<u>[INTENTIONALLY OMITTED]</u>

**BRIDGE LOAN AGREEMENT**

**EXHIBIT D**

FORM OF NOTE

$_____                                        _____, 2016

      **FOR VALUE RECEIVED, [___]** (the "Maker") jointly and severally promise to pay without offset or counterclaim to the order of [insert name of Lender], ("Payee"), the principal amount equal to the lesser of (x) _____ ($_____) or (y) the outstanding amount advanced by Payee as a Loan under the Credit Agreement (as hereinafter defined), payable in accordance with the terms of the Credit Agreement.

      Maker also promises to pay interest on the unpaid principal amount of this Note (this "Note") at the rates and at the times which shall be determined in accordance with the provisions of that certain Bridge Loan Agreement dated of September 25, 2018, among Maker, the Lenders named therein, and KeyBank, National Association, as Administrative Agent for itself and the Lenders (as hereafter amended, supplemented or otherwise modified from time to time, the "Credit Agreement"). Capitalized terms used herein without definition shall have the meanings set forth in the Credit Agreement.

      The Loans are not revolving loans. Amounts paid and prepaid may not be reborrowed.

      Payments hereunder shall be made to the Administrative Agent for the Payee at 127 Public Square, Cleveland, Ohio 44114-1306, or at such other address as Administrative Agent may designate from time to time, or made by wire transfer in accordance with wiring instructions provided by the Administrative Agent.

      This Note is subject to (a) mandatory prepayment and (b) prepayment at the option of the Maker, as provided in the Credit Agreement.

      This Note is issued pursuant to the Credit Agreement and is entitled to the benefits of the Credit Agreement, reference to which is hereby made for a more complete statement of the terms and conditions under which the Loan evidenced hereby is made and is to be repaid.

      THIS NOTE SHALL BE GOVERNED BY, AND CONSTRUED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK. MAKER AGREES THAT JURISDICTION AND VENUE FOR ANY ACTION REGARDING THIS NOTE SHALL BE AS SET FORTH IN THE CREDIT AGREEMENT.

      Upon the occurrence of an Event of Default, the unpaid balance of the principal amount of this Note may become, or may be declared to be, due and payable in the manner, upon the conditions and with the effect provided in the Credit Agreement.

Maker promises to pay all reasonable fees, costs and expenses incurred in the collection and enforcement of this Note in accordance with the terms of the Credit Agreement. Maker and any endorser of this Note hereby consents to renewals and extensions of time at or after the maturity hereof, without notice, and hereby waive diligence, presentment, protest, demand and notice of every kind (except such notices as may be expressly required under the Credit Agreement or the other Loan Documents) and, to the full extent permitted by law, the right to plead any statute of limitations as a defense to any demand hereunder.

Whenever possible, each provision of this Note shall be interpreted in such manner as to be effective and valid under applicable law, but if any provision of this Note shall be prohibited by or invalid under applicable law, such provision shall be ineffective to the extent of such prohibition or invalidity, without invalidating the remainder of such provision or the remaining provisions of this Note.

IN WITNESS WHEREOF, Maker has caused this Note to be executed and delivered by its duly authorized officer, as of the day and year first written above.

**BORROWERS**:

HCRE PARTNERS, LLC,
a Delaware limited liability company


By: _____
Name:
Title:

THE DUGABOY INVESTMENT TRUST,
under trust agreement dated November 15, 2010


By:_____
Nancy Dondero, Family Trustee


HIGHLAND CAPITAL MANAGEMENT, LP, a
Delaware limited partnership


By: [___], its general partner

    By: _____
    Name:
    Title:

THE SLHC TRUST,
under trust agreement dated [___]

By:_____
Name:
Title:


NEXPOINT ADVISORS, L.P., a Delaware limited partnership


By:      [___], its general partner

     By:  _____
     Name:
     Title:

NEXPOINT REAL ESTATE ADVISORS IV, L.P., a Delaware limited partnership


By:      [___], its general partner

     By:  _____
     Name:
     Title:

[**PROPERTY OWNER BORROWERS**]

**BRIDGE LOAN AGREEMENT**

EXHIBIT E

[FORM OF] BORROWING REQUEST

[Date]

KeyBank, National Association
as Administrative Agent
225 Franklin Street, 16th floor
Boston, Massachusetts 02110

Attn:  Mr. Christopher Neil

Re:     HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE
DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P.,
NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER
BORROWERS

Dear Ladies and Gentlemen:

        This Interest Election Request is made with reference to that certain Bridge Loan
Agreement dated as of September 25, 2018 (as amended, supplemented or otherwise modified
from time to time, the "Credit Agreement"), among HIGHLAND CAPITAL MANAGEMENT,
LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST,
NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE
PROPERTY OWNER BORROWERS (collectively, the "Borrower"), the financial institutions
party thereto, as lenders, and KeyBank, National Association, as Administrative Agent.  All
capitalized terms used in this Interest Election Request (including any attachments hereto) and
not otherwise defined in this Interest Election Request shall have the meanings set forth for such
terms in the Credit Agreement.  All Section references herein shall refer to the Credit
Agreement.

        The undersigned Lead Borrower hereby requests [check as applicable]

        ☐ a conversion of an existing Loan as provided below and/or

        ☐ a Borrowing under the Credit Agreement in the amount of $_____ [minimum
of $1,000,000.00 and in multiples of $100,000.00].

        The advance or conversion is to be made as follows:

        A.     ABR Loan.

                1.      Amount of ABR Loan:                                    $_____

                2.      Amount of conversion of existing

|  |  | Loan to ABR Loan | $_____ |
| --- | --- | --- | --- |
|  | 3. | Date of ABR Loan conversion: | _____ |

B.  Eurodollar Loan:

|  | 1. | Amount of Eurodollar Loan: | $_____ |
| --- | --- | --- | --- |
|  | 2. | Amount of conversion of existing Loan to Eurodollar Loan: | $_____ |
|  | 3. | Number of Eurodollar Loans(s) now in effect: [cannot exceed six (6)] | _____ |
|  | 4. | Date of Eurodollar Loan conversion: | _____ |
|  | 5. | Interest Period: | _____ |
|  | 6. | Expiration date of current Interest Period as to this conversion: | _____ |

C.  Daily LIBOR Loan.

|  | 1. | Amount of Daily LIBOR Loan: | $_____ |
| --- | --- | --- | --- |
|  | 2. | Amount of conversion of existing Loan to Daily LIBOR Loan | $_____ |
|  | 3. | Date of Daily LIBOR Loan conversion: | $_____ |

The Borrower hereby represents and warrants that the amounts set forth above are true and correct, that the representations and warranties contained in the Credit Agreement are true and correct as if made as of this date (except to the extent relating to a specific date), and that the Borrower has kept, observed, performed and fulfilled each and every one of its obligations under the Credit Agreement as of the date hereof [except as follows: _____]

Very truly yours,

[LEAD BORROWER]

By:_____
Name:
Title:

## **EXHIBIT F-1**

### [FORM OF] U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Bridge Loan Agreement dated as of September 25, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***, among HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER BORROWERS (collectively, the "Borrower"), the financial institutions party thereto, as lenders, and KeyBank National Association, as administrative agent for the lenders, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.17 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E (or successor form).  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By:

   Name:

   Title:

Date: _____ __, 20[  ]

## EXHIBIT F-2

### [FORM OF] U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Participants That Are Not Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Bridge Loan Agreement dated as of September 25, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "*Credit Agreement*, among HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER BORROWERS (collectively, the "Borrower"), the financial institutions party thereto, as lenders, and KeyBank National Association, as administrative agent for the lenders, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.17 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record and beneficial owner of the participation in respect of which it is providing this certificate, (ii) it is not a bank within the meaning of Section 881(c)(3)(A) of the Code, (iii) it is not a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code, and (iv) it is not a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with a certificate of its non-U.S. Person status on IRS Form W-8BEN or W-8BEN-E (or successor form).  By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender in writing, and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By:

    Name:

    Title:

Date: _____ __, 20[  ]

<u>**EXHIBIT F-3**</u>

<u>[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE</u>

(For Foreign Participants That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Bridge Loan Agreement dated as of September 25, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "***Credit Agreement***, among HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER BORROWERS (collectively, the "Borrower"), the financial institutions party thereto, as lenders, and KeyBank National Association, as administrative agent for the lenders, and each lender from time to time party thereto.

Pursuant to the provisions of <u>Section 2.17</u> of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the participation in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such participation, (iii) with respect such participation, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished its participating Lender with IRS Form W-8IMY (or successor form) accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E (or successor form) or (ii) an IRS Form W-8IMY (or successor form) accompanied by an IRS Form W-8BEN or W-8BEN-E (or successor form) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform such Lender and (2) the undersigned shall have at all times furnished such Lender with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF PARTICIPANT]

By:

    Name:

    Title:

Date: _____ __, 20[  ]

**EXHIBIT F-4**

[FORM OF] U.S. TAX COMPLIANCE CERTIFICATE

(For Foreign Lenders That Are Partnerships For U.S. Federal Income Tax Purposes)

Reference is hereby made to the Bridge Loan Agreement dated as of September 25, 2018 (as amended, restated, supplemented or otherwise modified from time to time, the "**Credit Agreement**, among HIGHLAND CAPITAL MANAGEMENT, LP, HCRE PARTNERS, LLC, THE DUGABOY INVESTMENT TRUST, THE SLHC TRUST, NEXPOINT ADVISORS, L.P., NEXPOINT REAL ESTATE ADVISORS IV, L.P., AND THE PROPERTY OWNER BORROWERS (collectively, the "Borrower"), the financial institutions party thereto, as lenders, and KeyBank National Association, as administrative agent for the lenders, and each lender from time to time party thereto.

Pursuant to the provisions of Section 2.17 of the Credit Agreement, the undersigned hereby certifies that (i) it is the sole record owner of the Loan(s) (as well as any Note(s) evidencing such Loan(s)) in respect of which it is providing this certificate, (ii) its direct or indirect partners/members are the sole beneficial owners of such Loan(s) (as well as any Note(s) evidencing such Loan(s)), (iii) with respect to the extension of credit pursuant to this Credit Agreement or any other Loan Document, neither the undersigned nor any of its direct or indirect partners/members is a bank extending credit pursuant to a loan agreement entered into in the ordinary course of its trade or business within the meaning of Section 881(c)(3)(A) of the Code, (iv) none of its direct or indirect partners/members is a ten percent shareholder of Borrower within the meaning of Section 871(h)(3)(B) of the Code and (v) none of its direct or indirect partners/members is a controlled foreign corporation related to the Borrower as described in Section 881(c)(3)(C) of the Code.

The undersigned has furnished the Administrative Agent and the Borrower with IRS Form W-8IMY (or successor form) accompanied by one of the following forms from each of its partners/members that is claiming the portfolio interest exemption: (i) an IRS Form W-8BEN or W-8BEN-E (or successor form) or (ii) an IRS Form W-8IMY (or successor form) accompanied by an IRS Form W-8BEN or W-8BEN-E (or successor form) from each of such partner's/member's beneficial owners that is claiming the portfolio interest exemption. By executing this certificate, the undersigned agrees that (1) if the information provided on this certificate changes, the undersigned shall promptly so inform the Borrower and the Administrative Agent, and (2) the undersigned shall have at all times furnished the Borrower and the Administrative Agent with a properly completed and currently effective certificate in either the calendar year in which each payment is to be made to the undersigned, or in either of the two calendar years preceding such payments.

Unless otherwise defined herein, terms defined in the Credit Agreement and used herein shall have the meanings given to them in the Credit Agreement.

[NAME OF LENDER]

By:

    Name:

    Title:

    Date: _____ __, 20[  ]

2371788.5