# EXHIBIT 4

Page 1

1

2         IN THE UNITED STATES BANKRUPTCY COURT
          FOR THE NORTHERN DISTRICT OF TEXAS
3              DALLAS DIVISION

4
  IN RE:
5                         CHAPTER 11
  HIGHLAND CAPITAL
6  MANAGEMENT, L.P.,          CASE NO. 19-34054-SGI11
        Debtor.
7
  ----------------------------x
8
  HIGHLAND CAPITAL
9  MANAGEMENT, L.P.,
        Plaintiff,          ADVERSARY PROCEEDING
10
    vs.                 NO: 21-03000-SGI
11
  HIGHLAND CAPITAL
12  MANAGEMENT FUND ADVISORS,
  L.P.; NEXPOINT ADVISORS,
13  L.P.; HIGHLAND INCOME
  FUND; NEXPOINT STRATEGIC
14  OPPORTUNITIES FUND;
  NEXPOINT CAPITAL, INC.;
15  AND CLO HOLDCO, LTD.,
        Defendants.
16  ----------------------------/

17

18         DEPOSITION OF ROB WILLS, ESQ.

19         VIA REMOTE VIDEOCONFERENCE

20              August 11, 2021

21              9:30 a.m., Central

22

23  Reported by:

24  Anne E. Vosburgh, CSR-6804, RPR, CRR

25  Job No. 197673

Page 2

1
2 REMOTE APPEARANCES:
3
4 On behalf of the Debtor:
5    PACHULSKI STANG ZIEHL & JONES
6    150 California Street
7    San Francisco, California 94111
8    BY: KENNETH BROWN, ESQ.
9 - and -
10    PACHULSKI STANG ZIEHL & JONES
11    780 Third Avenue
12    New York, New York 10017
13    BY: HAYLEY WINOGRAD, ESQ.
14
15
16 On behalf of Unsecured Creditors Committee:
17    SIDLEY AUSTIN
18    2021 McKinney Avenue
19    Dallas, Texas 75201
20    BY: CHANDLER ROGNES, ESQ.
21
22
23
24
25

Page 3

1
2 REMOTE APPEARANCES (Continued):
3
4 On behalf of HCRE Partners, LLC (n/k/a NexPoint Real
5 Estate Partners, LLC):
6    WICK PHILLIPS
7    100 Throckmorton Street
8    Fort Worth, Texas 76102
9    BY: BRANT MARTIN, ESQ.
10     LAUREN DRAWHORN, ESQ.
11
12 On behalf of the Senior Employees and CPCM, LLC:
13    BAKER MCKENZIE
14    1900 North Pearl Street
15    Dallas, Texas 75201
16    BY: DEBRA DANDENEAU, ESQ.
17
18 ALSO PRESENT:
19    LA ASIA CANTY, Paralegal from Pachulski Stang
20
21
22
23
24
25

Page 4

1
2        I N D E X
3
4 ---------- EXAMINATIONS ----------
5 WITNESS: ROB WILLS, ESQ.
6 Examination by Mr. Brown      6
7 Examination by Mr. Martin     113
8 Re-Examination by Mr. Brown    124
9
10
11
12
13 ---------- MARKED EXHIBITS ----------
14 NUMBER     DESCRIPTION     PAGE
15 Exhibit A    Amended Notice of 30(b)(6)   11
16     Deposition
17 Exhibit B    SE Multifamily Holdings LLC,   14
18     Limited Liability Company
19     Agreement, August 23, 2018
20 Exhibit C    Bridge Loan Agreement,   20
21     September 26, 2018
22 Exhibit D    Email chain, "RE: Project   72
23     Unicorn - Final Org Charts,"
24     with attachments
25

Page 5

1
2 EXHIBITS (Continued):
3 Exhibit E    Email chain, "RE: Unicorn -   90
4     DSTs"
5 Exhibit F    SE Multifamily Holdings LLC   98
6     First Amended and Restated
7     Limited Liability Company
8     Agreement
9 Exhibit H    Email chain, "FW: Draft LLC   101
10     Agreement"
11 Exhibit I    Email chain "RE: SE   122
12     Multi-Family Holdings LLC:
13     Amended and Restated,"
14     beginning Bates
15     Highland136853
16
17
18
19
20
21
22
23
24
25

1    Wick Phillips 30(b)(6) - R. Wills
2    Remote Videoconference Deposition
3    August 11, 2021, 9:30 a.m., Central
4    --------------
5          PROCEEDINGS
6    --------------
7          ROB WILLS, ESQ.,
8    (Having been called to appear via
9    remote videoconference, declared his
10   testimony to be truthful under penalty
11   of perjury.)
12          —
13          EXAMINATION
14   BY MR. BROWN:
15   Q.   Would you state your full name for
16   the record.
17   A.   Sure.  James Robert Wills, IV.
18   Q.   Mr. Wills, I'm counsel for Highland
19   Capital Management L.P.  I think I'll be
20   referring to that entity, the Debtor,
21   throughout the deposition as Highland.
22          Will you understand what I mean
23   when I refer to Highland as the Debtor?
24   A.   Yes, sir.
25   Q.   And your last name is pronounced

1    Wick Phillips 30(b)(6) - R. Wills
2    Willis?
3    A.   Wills.
4    Q.   Mr. Wills, you're an attorney; is
5    that correct?
6    A.   Yes, sir.
7    Q.   Okay.  Can you tell me what your
8    current role is and position with
9    Wick Phillips?
10   A.   Sure.  I'm an equity partner here.
11   I'm one of two partners that run the real
12   estate group.
13   Q.   Okay.  Have you ever had your
14   deposition taken before?
15   A.   No, sir.
16   Q.   Have you ever taken a deposition
17   before?
18   A.   I have.
19   Q.   Okay.  So can we all assume that
20   you understand the rules, and I can
21   reasonably dispense with explaining to you
22   the protocol and procedures for a deposition?
23   A.   Yes.  That's fine with me.
24   Q.   Just very basically, you understand
25   you're under oath?

1    Wick Phillips 30(b)(6) - R. Wills
2    A.   Yes, sir.
3    Q.   And that what you say here is like
4    what you say in a court of law?
5    A.   Yes, sir.
6    Q.   It's important for you to
7    understand my question.  Wait until I'm
8    finished before you answer.
9          We don't want to be talking at the
10   same time because that makes for an unclear
11   record for the court reporter.
12   A.   Not a problem.
13   Q.   You understand all that?
14   A.   Yes, sir.
15   Q.   You also understand that you'll
16   have an opportunity to review the transcript
17   of this deposition and make corrections?
18   A.   Yes, sir.
19   Q.   Okay.  And that I'll be able to
20   comment on those corrections at the time of
21   the hearing on this?
22   A.   Yes, sir.
23   Q.   Okay.  Do you understand that
24   you've been designated as the witness for
25   Wick Phillips pursuant to Federal Rule of

1    Wick Phillips 30(b)(6) - R. Wills
2    Civil Procedure 30(b)(6), made applicable in
3    this proceeding by Bankruptcy Rule 9011?
4    A.   Yes, sir.
5    Q.   And you're aware that you're
6    required to provide complete and
7    knowledgeable answers on behalf of
8    Wick Phillips with respect to the topics that
9    have been designated in the Wick Phillips
10   Rule 30(b)(6) deposition notice?
11   A.   Yes, sir.
12   Q.   And you understand that your
13   responses will be binding on Wick Phillips in
14   this matter?
15   A.   Yes, sir.
16   Q.   And when I refer to "this matter,"
17   again, at the risk of stating the obvious,
18   this deposition is being taken today in
19   connection with the Debtor's motion to
20   disqualify Wick Phillips from representing an
21   adverse party in connection with their proof
22   of claim against the Debtor in the Debtor's
23   bankruptcy case.
24          Is that your understanding?
25   A.   Yes, sir.

Page 10

1     Wick Phillips 30(b)(6) - R. Wills
2     Q.  And you understand that what you
3  say today in your testimony represents the
4  testimony of the law firm of Wick Phillips
5  rather than your personal testimony?
6     A.  Yes, sir, I do.
7     Q.  Okay.  Do you know how you were
8  selected as Wick Phillips' designated witness
9  in connection with the disqualification
10  motion?
11     MR. MARTIN:  I'm going to object
12     and instruct the witness not to answer
13     based on the question of privilege.
14     That's the law firm's privilege and
15     we're not going to waive it.
16  BY MR. BROWN:
17     Q.  Well, do you -- can you answer that
18  question without disclosing the privilege?
19     A.  I'm one of two partners in the real
20  estate section of the firm.  This is a real
21  estate matter that we handled.
22     Q.  Okay.  What have you done to become
23  prepared to provide complete, knowledgeable,
24  and binding answers to the questions relating
25  to the topics in the deposition notice?

Page 11

1     Wick Phillips 30(b)(6) - R. Wills
2     A.  I reviewed the Motion to Disqualify
3  and the Brief in Support, my firm's
4  Opposition in that brief; as well as talking
5  with D.C. Sauter, a former partner of mine;
6  Rachel Sam, a current partner of mine; and
7  reviewing the exhibits and declarations
8  attached to all the briefs, as well as our
9  internal files and -- in relation.
10     Q.  Okay.  How much time did you spend
11  preparing for this deposition?
12     A.  It was over a couple of days.  I
13  would say several hours.
14     Q.  About five?
15     A.  I would say right about there.
16     MR. BROWN:  Could the court
17     reporter mark Exhibit A?
18     THE REPORTER:  As Exhibit A?
19     MR. BROWN:  Sure.  Mark Exhibit A
20     as Exhibit A.
21     (Amended Notice of 30(b)(6)
22     Deposition, marked as Exhibit A.)
23  BY MR. BROWN:
24     Q.  And housekeeping matter.  I don't
25  know --

Page 12

1     Wick Phillips 30(b)(6) - R. Wills
2     (Brief interruption.)
3  BY MR. BROWN:
4     Q.  So Mr. Wills, do you have this in
5  front of you or are you just looking at it on
6  the screen?
7     A.  No.  I've got the exhibits in front
8  of me.  It's also on the screen.
9     Q.  Okay.  So have you seen this?  It's
10  called Debtor's Amended Notice of 30(b)(6)
11  Deposition to Wick Phillips Gould & Martin
12  LLP.
13     Have you seen this before?
14     A.  Yes, sir.
15     Q.  And have you reviewed it?
16     A.  Yes, sir.
17     Q.  And if you scroll down to page 4,
18  that sets forth the topics that you have been
19  designated as the witness for Wick Phillips
20  on.
21     Have you reviewed those topics?
22     A.  Yes, sir.
23     Q.  And are you prepared to testify as
24  Wick Phillips' designated witness on those
25  topics today?

Page 13

1     Wick Phillips 30(b)(6) - R. Wills
2     A.  Yes, sir.
3     Q.  Okay.  Very good.
4     During the deposition today, you
5  are required to answer the questions
6  truthfully.  If you don't know the answer to
7  a question, that is a legitimate response if
8  it's a truthful response, and I'm sure you
9  know that.
10     But I want to make sure you
11  understand that if you say "I don't know" as
12  an answer to one of the questions about the
13  topics that have been designated, that I can
14  consider that and advance the argument at the
15  hearing that that is an admission by
16  Wick Phillips that Wick Phillips doesn't have
17  any knowledge or position with respect to the
18  question that you answer "I don't know" on,
19  and that I can argue that Wick Phillips can
20  be precluded -- should be precluded from
21  offering documents, evidence, or testimony at
22  the hearing on that matter.
23     Do you understand that?
24     A.  I do.
25     Q.  In this deposition, I may get a

Page 14

1    Wick Phillips 30(b)(6) - R. Wills
2    little sloppy and use the term "you" rather
3    than "Wick Phillips."  But because of the
4    nature of this deposition, when I do use the
5    term "you," I'm going to be referring to
6    Wick Phillips unless I specifically say I
7    want your knowledge rather than
8    Wick Phillips'.
9        Do you understand that?
10   A.  Yes, sir.
11       MR. BROWN:  Ms. Vosburgh, can you
12   please mark Exhibit B as Exhibit B.
13       (SE Multifamily Holdings LLC,
14       Limited Liability Company
15       Agreement, August 23, 2018, marked
16       as Exhibit B.)
17   BY MR. BROWN:
18   Q.  Mr. Wills, what has been marked as
19   Exhibit B is a copy of the SE Multifamily
20   Holdings LLC, Limited Liability Company
21   Agreement, dated August 23, 2018.
22       Have you seen this document before?
23   A.  Yes, sir.
24   Q.  And in what context did you see it?
25   A.  In connection with this motion.

Page 15

1    Wick Phillips 30(b)(6) - R. Wills
2    Q.  So is it accurate to say that
3    before you started preparing to be the Rule
4    30(b)(6) witness of Wick Phillips, you had
5    not seen this document before?
6    A.  That's correct.
7    Q.  So you personally, as opposed to
8    Wick Phillips, have had no role in connection
9    with this document, the preparation or
10   negotiation of this document, correct?
11   A.  Yes, sir.
12   Q.  Okay.  Do you understand what
13   Wick Phillips' role, if any, was in
14   connection with this document?
15   A.  Yes, sir.
16   Q.  Okay.  Could you tell me what
17   Wick Phillips' role was in connection with
18   the SE Multifamily Holdings Limited Liability
19   Company Agreement, which is Exhibit B.
20   A.  Yes.  Our -- Wick Phillips' role
21   was using this LLC Agreement in connection
22   with the financing of the Project Unicorn
23   transaction.
24   Q.  Okay.  Do you know what the purpose
25   of the SE Family Holdings -- let me make this

Page 16

1    Wick Phillips 30(b)(6) - R. Wills
2    simpler.
3        For this deposition, I would like
4    to refer to the SE Multifamily Holdings LLC
5    Limited Liability Company Agreement as the
6    LLC Agreement.
7        Is that acceptable to you, and will
8    we be talking about the same thing when we
9    talk about the LLC Agreement?
10   A.  Sure.  That works great.
11   Q.  What was the purpose of the
12   LLC Agreement?
13   A.  The purpose of the LLC Agreement
14   was, again, to use in connection with the
15   Project Unicorn structuring for the financing
16   of those acquisitions.
17   Q.  Do you know who the parties were to
18   the LLC Agreement?
19   A.  I know who the parties are from
20   reading the agreement, but I can't list them.
21   Q.  Okay.  So I think that Highland was
22   one of the parties.  And the other party was
23   an entity known as HCRE Partners LLC.
24       Is that your understanding?
25   A.  Yes, sir.

Page 17

1    Wick Phillips 30(b)(6) - R. Wills
2    Q.  Okay.  So -- and I'm going to refer
3    to HCRE Partners, LLC throughout this
4    deposition as "HCRE."
5        Will you understand what I'm
6    talking about and will we be talking about
7    the same thing when I refer to HCRE?
8    A.  Yes.
9    Q.  It's just the counterparty to
10   Highland in the LLC Agreement, or the other
11   party to the LLC Agreement.
12       Did Wick Phillips have any role in
13   connection with the negotiation and drafting
14   of the LLC Agreement?
15   A.  No, sir.
16   Q.  Okay.  It didn't represent any
17   party?
18   A.  Not at -- no, sir.
19   Q.  Okay.  So it didn't represent
20   either Highland or HCRE, correct?
21   A.  Correct.
22   Q.  Do you know if Wick Phillips had
23   any communications with either of the parties
24   to the LLC Agreement while the agreement was
25   being negotiated and drafted?

Page 18

1     Wick Phillips 30(b)(6) - R. Wills
2     A.  I'm not sure.  I don't know.
3     Q.  Okay.  Did Wick Phillips have
4  occasion to at any time need to become aware
5  of the ownership percentages as between the
6  Debtor, Highland, and HCRE, that were
7  allocated in the LLC Agreement?
8     A.  My suspicion would be in connection
9  with the financing, the Loan Agreement with
10  KeyBank and with Freddie, Freddie Mac,
11  obviously, the organizational structure is
12  important to those lenders and, to a certain
13  extent, attached to those loan agreements.
14        And so as it relates to that, yes,
15  sir.
16     Q.  And do you know what the
17  ownership -- does Wick Phillips know what the
18  ownership percentages were in connection with
19  the LLC Agreement?
20     A.  I know what the LLC Agreement says,
21  yes, sir.
22     Q.  And what does the LLC Agreement
23  say?
24     A.  It says --
25     Q.  I think if we flip to page 18,

Page 19

1     Wick Phillips 30(b)(6) - R. Wills
2  scroll to page 18 of the LLC Agreement...
3     A.  Yes, sir.  Yes, sir.
4        Do you want me to read that?
5     Q.  Yeah, sure.
6     A.  It says that HCRE Partners, LLC has
7  a percentage interest of 51 percent, and
8  Highland Capital Management L.P. has a
9  percentage interest of 49 percent.
10     Q.  Okay.  And do you have any
11  understanding if those percentages were
12  correct or incorrect at the time the Limited
13  Partnership Agreement was executed?
14     A.  I assume they were correct at the
15  time, yes, sir.
16     Q.  Did Wick Phillips have any
17  communications with HCRE concerning the
18  capital contributions required by the
19  LLC Agreement?
20     A.  No, sir.
21     Q.  Did Wick Phillips have any
22  communications with HCRE concerning the
23  ownership interests set forth in the
24  LLC Agreement?
25     A.  Only in connection with -- as a

Page 20

1     Wick Phillips 30(b)(6) - R. Wills
2  conduit to KeyBank or Freddie Mac in terms of
3  who owns what.
4     Q.  Okay.  We'll talk about that later,
5  then, when we talk about the KeyBank
6  Loan Agreement.
7     A.  Okay.
8     Q.  But no communications --
9  Wick Phillips had no communications with the
10  parties with respect to the ownership
11  interests limited -- if we limit that to the
12  context of just the LLC Agreement, its
13  drafting, negotiation, formation; is that
14  correct?
15     A.  That's correct.
16     Q.  And the same answer if, instead of
17  asking about ownership percentages, I asked
18  about contributions?
19     A.  Yes, sir.  Same answer.
20        MR. BROWN:  Okay.  Ms. Vosburgh,
21  can we mark Exhibit C as Exhibit C.
22        (Bridge Loan Agreement, September
23        26, 2018, marked as Exhibit C.)
24  BY MR. BROWN:
25     Q.  Okay.  So Mr. Wills, up on the

Page 21

1     Wick Phillips 30(b)(6) - R. Wills
2  screen -- and I think you have a binder of
3  exhibits, I assume?
4     A.  Yes, sir.
5     Q.  So up on the screen marked as
6  Exhibit C, and hopefully in your binder also
7  as Exhibit C, is a document called the Bridge
8  Loan Agreement dated as of September 26,
9  2018, among a group of entities set forth on
10  the agreement that I won't repeat, who are
11  the borrowers, and also the lender, KeyBank
12  National Association, as agent, and KeyBanc
13  Capital Markets as the sole lead arranger and
14  bookrunner.
15        Is that the document you have as
16  Exhibit C?
17     A.  Yes, sir.
18     Q.  Okay.  Have you ever seen this
19  document before?
20     A.  Yes, sir.
21     Q.  Okay.  Are you familiar with it?
22     A.  Yes, sir.
23     Q.  Is it a true copy of -- let's --
24  this Exhibit C, for the rest of the
25  deposition, I'm going to refer to it as the

Page 22

1      Wick Phillips 30(b)(6) - R. Wills
2  Loan Agreement.
3      And will you understand and be
4  comfortable referring to Exhibit C as the
5  Loan Agreement?
6      A.  Yes, sir.
7      Q.  Is this a true copy of the
8  Loan Agreement?
9      A.  Yes, sir.  I believe so.
10     Q.  Okay.  Did Wick Phillips have any
11  role in connection with the Loan Agreement?
12     A.  Yes, sir.
13     Q.  Can you describe the role that
14  Wick Phillips played in connection with the
15  Loan Agreement?
16     A.  Sure.  We helped the property-level
17  borrowers here in connection with the
18  Project Unicorn acquisition.
19     This -- the Loan Agreement that
20  we're looking at was for a bucket of
21  properties that could not get agency
22  financing through Freddie Mac.  So we needed
23  KeyBank to come in and provide sort of some
24  additional financing in connection with the
25  Project Unicorn closing.

Page 23

1      Wick Phillips 30(b)(6) - R. Wills
2      Q.  Okay.  Did Wick Phillips represent
3  Highland in connection with the KeyBank -- in
4  connection with the Loan Agreement?
5      A.  Highland is a co-borrower, but not
6  separately, no, sir.
7      Q.  Okay.  So is the answer to the
8  question did Wick Phillips represent Highland
9  in connection with the Loan Agreement yes or
10  no?
11     A.  No.  No, sir.
12     Q.  It had no representation of
13  Highland?
14     A.  That's correct.
15     Q.  Can you turn to -- let's flip to
16  page 3 of the Loan Agreement.
17     Okay.  So I want to focus you on
18  the term "Borrower" under the Loan Agreement.
19     A.  Okay.
20     Q.  Do you see where the term
21  "Borrower" is defined to include
22  Highland Capital?
23     A.  Yes, sir.
24     Q.  And Highland Capital has been
25  defined earlier in the Loan Agreement, has it

Page 24

1      Wick Phillips 30(b)(6) - R. Wills
2  not, as Highland Capital Management, L.P.?
3      A.  Correct.
4      Q.  So Highland, the Debtor, was a
5  borrower under the Loan Agreement, correct?
6      A.  Yes, sir.
7      Q.  Did Wick Phillips represent the
8  borrowers under the Loan Agreement?
9      A.  Wick Phillips represented some of
10  the borrowers.
11     Q.  Okay.  And which borrowers did it
12  not represent?
13     A.  We did not represent what we've
14  been calling Highland.
15     Q.  Where does it say in the
16  Loan Agreement that you didn't represent
17  Highland?
18     A.  I don't know that the
19  Loan Agreement would say that.
20     Q.  Okay.
21     MR. MARTIN:  I don't think he
22  finished his answer, Counsel.
23     MR. BROWN:  I'm sorry.
24     MR. MARTIN:  The question on the
25  table was which borrowers did

Page 25

1      Wick Phillips 30(b)(6) - R. Wills
2  Wick Phillips not represent, and he was
3  in the middle of providing his answer.
4      MR. BROWN:  I apologize.  I didn't
5  mean to interrupt.
6      MR. MARTIN:  That's okay.
7  BY MR. BROWN:
8      Q.  Can you please provide a complete
9  answer to the question?
10     A.  Sure.
11     Initially we represented the
12  NexPoint entities and the property-level
13  entities all as co-borrowers.  And KeyBank
14  needed more credit from the borrower side
15  since this was such a large transaction, and
16  that's when Highland Capital was added as an
17  additional borrower to the loan.
18     Q.  Okay.  Can we scroll to page 51.
19     Can you please focus on
20  Section 4.01(b).
21     A.  Okay.
22     Q.  This is -- this discusses certain
23  conditions to the Loan Agreement.  And (b)
24  says:
25     "The Administrative Agent shall

Page 26

1       Wick Phillips 30(b)(6) - R. Wills
2    have received" -- as a condition -- "a
3    favorable written opinion (addressed
4    to the Administrative Agent and the
5    Lenders and dated the Effective Date)
6    of Wick Phillips Gould & Martin, LLP,
7    counsel for the Borrower."
8       Is that statement referring to
9    Wick Phillips as "counsel for the borrower"
10   and referencing back to the borrower as
11   several entities, including Highland, is that
12   statement in the Loan Agreement incorrect?
13      A.   I mean, that's what it says, yes,
14   sir.
15      Q.   Is it incorrect?
16      A.   It is incorrect as to who
17   Wick Phillips represented.   It is correct in
18   terms of providing a legal opinion.   You
19   wouldn't have multiple legal opinions from
20   different firms for the same borrower,
21   typically, or collection of borrowers.
22      Q.   So the Loan Agreement -- your
23   testimony today on behalf of Wick Phillips is
24   that this Loan Agreement, to the extent it
25   refers to Wick Phillips' representation of

Page 27

1    the borrower, is inaccurate to the extent the
2    borrower includes Highland; is that correct?
3       MR. MARTIN:   Objection, form.
4       A.   Yes, sir.   That's what we're
5    saying.
6    BY MR. BROWN:
7       Q.   Did Wick Phillips say anything,
8    ever raise the issue of the lack of accuracy
9    of these representations in the
10   Loan Agreement to anybody at any time?
11      MR. MARTIN:   Objection to form.
12      A.   Not to my knowledge.
13   BY MR. BROWN:
14      Q.   Okay.   Can we also scroll forward
15   to page 76.   This is Article IX of the
16   Loan Agreement.   Section 9.01 discusses
17   Notices.
18      And do you see at Section 9.01(a)
19   where it says, in the case of notices, "if to
20   the Borrower, in care of Highland Capital
21   Management," with copies to Wick Phillips?
22      A.   Yes, sir.   I see that.
23      Q.   Okay.   So I'm just trying to
24   ascertain Wick Phillips' position here.   Is

Page 28

1       Wick Phillips 30(b)(6) - R. Wills
2    it that Section 9.01(a) is inaccurate to the
3    extent it reflects that Wick Phillips
4    represented Highland Capital Management in
5    connection with the Loan Agreement?
6       A.   My suspicion is this was the same
7    notice provision as had been there in
8    previous loans that we had worked on -- we,
9    Wick Phillips, had worked on with KeyBank.
10      And once Highland was added as a
11   co-borrower, which had not been the case
12   previously, it was not changed.
13      Q.   Okay.   So was Wick Phillips
14   receiving notices on behalf of
15   Highland Capital Management relating to the
16   Loan Agreement or not?
17      A.   Not that I'm aware of.
18      Q.   Okay.   So did Wick Phillips ever
19   raise the issue with any of the parties to
20   the Loan Agreement that this Section 9.01(a)
21   of the Loan Agreement did not accurately
22   reflect the position of Wick Phillips with
23   respect to its representation of
24   Highland Capital Management?
25      MR. MARTIN:   Objection, form.

Page 29

1       Wick Phillips 30(b)(6) - R. Wills
2       A.   Well, I think we would want the
3    notices, with the borrower being a collection
4    of borrowers, of which we did represent some.
5    BY MR. BROWN:
6       Q.   And why wouldn't the notices be in
7    care of the entities that you represented as
8    opposed to an entity that you didn't
9    represent?
10      A.   I don't know.
11      Q.   Give me a moment, please.
12      Do you have a copy of
13   Wick Phillips' Brief in Opposition to the
14   Debtor's Motion to Disqualify in front of
15   you?
16      A.   Not in front of me, no, sir.
17      Q.   I'm looking at it right now, and I
18   know that you have read it before.
19      And at page 4 of that Opposition,
20   Wick Phillips says:
21      "As a borrower under the bridge
22      loan, Wick Phillips was counsel to
23      HCM L.P."
24      So Wick Phillips' statement in a
25   document filed with the Court on May 6th,

Page 30

1      Wick Phillips 30(b)(6) - R. Wills
2  2021, is inconsistent with your testimony
3  today, is it not?
4      MR. MARTIN:  Objection, form.
5      A.  I'm sorry.  Did you say HC L.P.
6  or --
7  BY MR. BROWN:
8      Q.  HCM L.P., which is Highland Capital
9  Management, L.P., the Debtor, Highland.
10     A.  Right.
11     Q.  We're calling it Highland.
12        So in Wick Phillips' brief filed on
13 May 6th, 2021, in opposition to the Motion to
14 Disqualify, Wick Phillips said:
15        "As a borrower under the bridge
16     loan" -- which is what we're referring
17     to as the Loan Agreement --
18     "Wick Phillips was counsel to HCM
19     L.P."
20        So that is, by my lights,
21 inconsistent with your testimony today.
22        Can you explain why you are
23 testifying in a manner that is not consistent
24 with an admission Wick Phillips has already
25 made in pleadings filed with the bankruptcy

Page 31

1      Wick Phillips 30(b)(6) - R. Wills
2  court?
3      MR. MARTIN:  Objection, form.
4      A.  Yes.  I believe what I said was
5  that -- I guess what we're calling here
6  Highland is a co-borrower under this
7  Loan Agreement that was added later on.
8         And, yes, we did represent the
9  co-borrowers in connection with this
10 Loan Agreement.
11 BY MR. BROWN:
12     Q.  Okay.  So you agree, then, with the
13 statement made in Wick Phillips' May 6th
14 filing in opposition to the disqualification
15 motion that Wick Phillips did represent the
16 borrower, Highland, under the bridge loan; is
17 that correct?
18     A.  We represented all of the borrowers
19 as co-borrowers in this -- with this loan.
20     Q.  Okay.  Other than the borrowers --
21 other than the co-borrowers, did
22 Wick Phillips represent any other entities in
23 connection with the Loan Agreement?
24     A.  No, sir.
25     Q.  Okay.  Does Wick Phillips have a

Page 32

1      Wick Phillips 30(b)(6) - R. Wills
2  retention agreement in connection with the
3  work it did for the borrowers under the --
4  relating to the Loan Agreement?
5      A.  No, sir.
6      Q.  Why not?
7      A.  I don't know the answer to that
8  question.
9      Q.  Does Wick Phillips normally require
10 retention agreements when it undertakes a
11 client representation?
12     A.  In an ideal world, we do, yes, sir,
13 but it's not a requirement.
14     Q.  Can you tell me what Wick Phillips'
15 custom and practice is with respect to
16 obtaining retention agreements when it
17 undertakes the representation of a client?
18     A.  A similar answer.  We ideally would
19 have an engagement letter or retention
20 letter, as you mentioned.  But it is not
21 required for us to open a matter, or a new
22 client matter.
23     Q.  Okay.  Do you personally get
24 retention agreements from your clients when
25 you undertake a representation?

Page 33

1      Wick Phillips 30(b)(6) - R. Wills
2      A.  I certainly try to.
3      Q.  Do you always do it?
4      A.  I do not.
5      Q.  Did Wick Phillips obtain a conflict
6  waiver from the borrowers, or any of them,
7  concerning its joint representation of them
8  in connection with the Loan Agreement?
9      A.  I don't believe so.
10     Q.  Have you ever seen a conflict
11 waiver?
12     A.  Yes, sir.
13     Q.  I'm sorry.  I didn't mean it that
14 way.  That's the problem with lawyers.
15 They're too literal.
16        Have you ever seen a conflict
17 waiver in connection with the Loan Agreement?
18     A.  No, sir.
19     Q.  Okay.  Did you have -- in your
20 preparation for this deposition and to be the
21 designated witness of Wick Phillips, was
22 there any discussion or reference to a
23 conflict waiver among Wick Phillips' joint
24 clients relating to the Loan Agreement?
25     A.  Not that I'm aware of.

Page 34

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2      Q.  Do you know whether Wick Phillips
 3   considered whether a conflict waiver was
 4   necessary because of the joint representation
 5   of clients under the Loan Agreement?
 6      A.  I do not.
 7      Q.  Do you know if Wick Phillips
 8   undertook any analysis to determine if the
 9   joint representation of the borrowers
10   presented a conflict or a potential conflict
11   for which a conflict waiver was required?
12      A.  I do not.
13      Q.  You don't know if it was done?
14      A.  I don't know.
15      Q.  Okay.  Were there any discussions
16   of the issue of the advisability or necessity
17   of a conflict waiver in connection with the
18   Loan Agreement that Wick Phillips had?
19      A.  I don't believe so.
20      Q.  Do you -- is Wick Phillips familiar
21   with the Texas Rules of Professional Conduct,
22   Section 1.07?
23      A.  Yes, sir.
24      Q.  And do you know if it's familiar
25   with Section 1.07(a) that requires written
```

Page 35

```
 1   consent for common representations?
 2        MR. MARTIN:  Objection, form.
 3      A.  Yes, sir.
 4   BY MR. BROWN:
 5      Q.  And do you know why Wick Phillips
 6   did not obtain a written conflict waiver in
 7   conformity and compliance with
 8   Section 1.07 --
 9        MR. MARTIN:  Objection, form.
10   BY MR. BROWN:
11      Q.  -- in connection with the joint
12   representation of clients under the
13   Loan Agreement?
14        MR. MARTIN:  Same objection.
15      A.  I do not know.
16   BY MR. BROWN:
17      Q.  Do you know if Wick Phillips had
18   any discussions with any of the borrowers --
19   as that term is defined under the
20   Loan Agreement -- about actual or potential
21   conflicts that could arise from
22   Wick Phillips' joint representation of them
23   under the Loan Agreement?
24      A.  I don't.
25
```

Page 36

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2      Q.  Did Wick Phillips undertake any
 3   analysis of its responsibilities in
 4   connection with the joint representation and
 5   whether the representation could be
 6   undertaken without an improper impact on its
 7   responsibilities?
 8        MR. MARTIN:  Objection, form.
 9      A.  I'm not aware of that.
10   BY MR. BROWN:
11      Q.  Did Wick Phillips consult with any
12   of the borrowers concerning the implications
13   of the joint representation, for example, on
14   the attorney-client privilege?
15      A.  I don't know.
16      Q.  Do you know if Wick Phillips
17   consulted with any of the borrowers
18   concerning the advantages and risks to them
19   individually of having Wick Phillips jointly
20   represent them in connection with the Loan
21   Agreement?
22        MR. MARTIN:  Objection, form.
23      A.  I don't know.
24   BY MR. BROWN:
25      Q.  Do you have any understanding of
```

Page 37

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2   whether the representation -- well, as you
 3   sit here today on behalf of Wick Phillips, do
 4   you have an opinion on whether or not the
 5   joint representation of the multiple
 6   borrowers under the Loan Agreement gave rise
 7   to any actual or potential conflicts?
 8        MR. MARTIN:  Objection, form.
 9      A.  I don't have an opinion.
10   BY MR. BROWN:
11      Q.  Do you understand that HCRE was
12   designated as the lead borrower under the
13   Loan Agreement?
14      A.  Yes, sir.
15      Q.  It was, to your understanding,
16   designated as the lead borrower?
17      A.  Yes, sir.
18      Q.  Can we -- let's see.
19        MS. CANTY:  Ken, if you tell me the
20   section, I can probably jump to it
21   quickly.
22        MR. BROWN:  Yeah.  It's
23   Section 1.05, page 14.
24        MS. CANTY:  Sorry.  I have it as
25   page 25.
```

Wick Phillips 30(b)(6) - R. Wills
1     Wick Phillips 30(b)(6) - R. Wills
2     MR. BROWN:  No, I'm sorry.  That –
3 let's first –
4     Okay.  That's fine.  That's fine.
5 BY MR. BROWN:
6     Q.  So if you -- could you review this
7 Section 1.05, Mr. Wills.
8     A.  Sure.  (Reviewing document.)
9     Okay.
10    Q.  Okay.  Did you have a chance to
11 look at both (a) and (b) of Section 1.05?
12    A.  Yes, sir.
13    Q.  Okay.  So the lead borrower under
14 the Loan Agreement is HCRE, correct?
15    A.  Correct.
16    Q.  And this Section 1.05 talks about
17 the appointment of the lead borrower and some
18 of the rights and obligations of the lead
19 borrower, correct?
20    A.  Yes, sir.
21    Q.  And Section (b) says:
22     "The proceeds of each loan and
23 advance provided under the Loans which
24 is requested by the Lead Borrower
25 shall be advanced as and when

1     Wick Phillips 30(b)(6) - R. Wills
2 otherwise provided herein or as
3 otherwise indicated by the Lead
4 Borrower."
5     Correct?
6    A.  Correct.
7    Q.  And that "The Lead Borrower shall
8 cause the transfer of the proceeds to the
9 other borrowers on whose behalf such loan and
10 advance was obtained."
11    So is it your understanding that
12 under this Loan Agreement, the lead borrower
13 had the ability to both determine when the
14 advances were made and to direct where the
15 transfers went?
16    A.  Yes, sir, according to this
17 provision.
18    Q.  Okay.  And do you also have an
19 understanding that the other borrowers,
20 including Highland, were on the hook jointly
21 and severally for all amounts that were
22 borrowed under the Loan Agreement?
23    A.  Yes, sir.
24    Q.  So, in your mind, does the fact
25 that HCRE could determine when advances were

1     Wick Phillips 30(b)(6) - R. Wills
2 made and direct how those advances were
3 applied, while Highland was jointly and
4 severally liable for those advances, does
5 that give rise to a conflict or potential
6 conflict between Highland and HCRE?
7    MR. MARTIN:  Objection, form.
8    A.  No, sir, not in my opinion.
9 BY MR. BROWN:
10    Q.  Okay.  Why not?
11    A.  Well, my understanding is the
12 Highland entity is more – was added as a
13 borrower more in a guarantee/guarantor
14 context.  And so the HCRE, or the lead
15 borrower, would just be directing the funds
16 to the property-level borrowers in connection
17 with each of the various acquisitions.
18    Q.  Do you know that's what occurred?
19    A.  That's the setup of the
20 Loan Agreement.
21    Q.  Do you have any knowledge on
22 whether HCRE used moneys that it obtained
23 under the Loan Agreement to make a capital
24 contribution to the Limited Partnership?
25    A.  I don't have that knowledge, no,

1     Wick Phillips 30(b)(6) - R. Wills
2 sir.
3    Q.  You don't know one way or the
4 other?
5    A.  No, sir.
6    Q.  Do you know if Wick Phillips ever
7 explained to any of the borrowers the
8 operation of the Loan Agreement to the extent
9 that it permitted HCRE to direct the
10 advances, but that all of the other borrowers
11 were liable under the Loan Agreement,
12 irrespective of how the advances were
13 directed?
14    MR. MARTIN:  Objection, form.
15    A.  I don't know.
16 BY MR. BROWN:
17    Q.  Did Wick Phillips ever advise
18 Highland that it was liable for all amounts
19 due under the Loan Agreement whether or not
20 it received the proceeds or received the
21 benefit of the proceeds?
22    A.  I don't know.
23    Q.  Do you know whether or not Highland
24 received the benefit of the proceeds advanced
25 under the Loan Agreement?

Page 42

| | |
|---|---|
| 1 | Wick Phillips 30(b)(6) - R. Wills |
| 1 | A. I don't. |
| 2 | |

1       Wick Phillips 30(b)(6) - R. Wills
2     A. I don't.
3     Q. Who was Wick Phillips' client
4 contact at HCRE in connection with the
5 Loan Agreement?
6     A. I believe there were several that
7 we typically deal with, Matt Goetz,
8 Matt McGraner. Freddy Chang was at one point
9 some form of in-house counsel there.
10     Q. So Matt Goetz. Do you know if
11 Matt Goetz was an employee of Highland?
12     A. I don't know.
13     Q. Do you know who he was employed by?
14     A. I don't.
15     Q. What about Mr. McGraner; do you
16 know if he was an employee of Highland?
17     A. I don't.
18     Q. Do you know if he was an employee
19 of HCRE?
20     A. I do not.
21     Q. What about Freddy Chang; do you
22 know if he was an employee of Highland?
23     A. I don't.
24     Q. Do you know if he was an employee
25 of HCRE?

Page 43

1       Wick Phillips 30(b)(6) - R. Wills
2     A. I do not.
3     Q. You understand you're testifying on
4 behalf of Wick Phillips right now, correct?
5     A. Yes, sir.
6     Q. Who was Wick Phillips' client
7 contact at Highland in connection with the
8 Loan Agreement?
9     A. I don't believe we have a client
10 contact for Highland.
11     Q. And why was that?
12     A. We -- I mean, our silo is the real
13 estate silo for NexPoint that handles loan
14 agreements like we're looking at right now.
15 Highland is a separate part of that company.
16     Q. But Wick Phillips has already
17 acknowledged in its Opposition that it
18 represented Highland in connection with the
19 Loan Agreement. And I'm just trying to
20 establish whether, in connection with that
21 acknowledged representation, Wick Phillips
22 had a client contact at Highland.
23       And so the question is did
24 Wick Phillips have a client contact and, if
25 so, who?

Page 44

1       Wick Phillips 30(b)(6) - R. Wills
2     A. Not to my knowledge.
3     Q. No client contact. Okay.
4       Did Wick Phillips have contact with
5 James Dondero in connection with the
6 Loan Agreement?
7     A. Not to my knowledge.
8     Q. Okay. With respect to Mr. Geotz,
9 who you did indicate was a client contact for
10 HCRE --
11       MR. MARTIN: Objection, form.
12 BY MR. BROWN:
13     Q. -- how did Wick Phillips determine
14 what hat, if you will, Mr. Geotz was wearing
15 and what entity he was speaking on behalf of,
16 communicating on behalf of?
17       MR. MARTIN: Objection, form.
18     A. My assumption is wearing a NexPoint
19 hat, as typically is the case.
20 BY MR. BROWN:
21     Q. And what is that assumption based
22 on?
23     A. Our prior representations and
24 dealings.
25     Q. But is it true that in connection

Page 45

1       Wick Phillips 30(b)(6) - R. Wills
2 with this representation, Wick Phillips'
3 representation of the borrowers under the
4 Loan Agreement, you don't know how
5 Wick Phillips made a determination of what
6 hat the individuals it spoke to were wearing,
7 do you?
8       MR. MARTIN: Objection, form.
9     A. I don't know if a determination was
10 made at all, no, sir.
11 BY MR. BROWN:
12     Q. And do you know whether
13 Wick Phillips made any distinction in terms
14 of people that -- the client contacts it
15 communicated with in connection with the
16 Loan Agreement, whether it made any
17 distinction whether those individuals were
18 communicating with it on behalf of Highland
19 or HCRE?
20       MR. MARTIN: Objection, form.
21     A. I don't know.
22       MR. MARTIN: Is now a good time to
23 take a break?
24       (Recess taken.)
25

Page 46

1  Wick Phillips 30(b)(6) - R. Wills
2  BY MR. BROWN:
3  Q. Mr. Wills, do you know what the
4  purpose of the Loan Agreement was?
5  A. To provide financing in connection
6  with the Project Unicorn property
7  acquisitions.
8  Q. Which was going to be done by the
9  LLC? The acquisitions were going to be by
10  the LLC?
11  A. By some subsidiaries, but yes, sir.
12  Q. And do you know what HCRE's role
13  was in connection with the Loan Agreement?
14  A. They were the lead borrower.
15  Q. Okay. And we've already talked
16  about to some extent what that involved.
17  Do you know what Highland's role
18  was in connection with the Loan Agreement?
19  A. It's a little bit like I've already
20  mentioned, but primarily to provide more
21  credit to the borrowing base, to the
22  collective definition of "borrower."
23  Q. Do you know whether the ownership
24  structure of the Limited Partnership was an
25  issue that was addressed in the

Page 47

1  Wick Phillips 30(b)(6) - R. Wills
2  Loan Agreement?
3  A. The Highland Limited Partnership?
4  Q. I'm sorry. Do you know -- let me
5  rephrase the question. I misstated it.
6  Do you know whether or not the
7  ownership interests between -- as and between
8  Highland and HCRE in the LLC was an issue
9  that was part of the Loan Agreement?
10  A. I'm not sure I understand your
11  question. I apologize.
12  Q. Okay. Did the ownership interest
13  in the LLC between Highland and HCRE -- was
14  that a component of the Loan Agreement?
15  A. Yes, sir.
16  Q. Okay. And in what way?
17  A. Just as far as which party was
18  51 percent and which was 49 percent.
19  Q. I'd like to scroll to Schedule 3.15
20  of the Loan Agreement.
21  MS. CANTY: Do you know which page
22  that's on, Ken?
23  Never mind. I see it.
24  MR. BROWN: Yeah.
25

Page 48

1  Wick Phillips 30(b)(6) - R. Wills
2  BY MR. BROWN:
3  Q. Okay. Let's go back to the prior
4  page, the caption page, Schedule 3.15.
5  Okay. Mr. Wills, are you familiar
6  with Schedule 3.15?
7  A. Yes, sir.
8  Q. What role did Wick Phillips have in
9  connection with Schedule 3.15 of the
10  Loan Agreement?
11  A. We provided these -- the
12  attachments to KeyBank to attach here as the
13  schedule.
14  Q. Okay. Let's look at the
15  attachments.
16  MR. BROWN: Flip -- if we could
17  flip to the very next page.
18  Okay. Is there any way we could
19  change the view on that so it's upright?
20  Okay.
21  BY MR. BROWN:
22  Q. Is this one of the attachments?
23  A. Yes, sir.
24  Q. And Wick Phillips prepared this
25  attachment in connection with the

Page 49

1  Wick Phillips 30(b)(6) - R. Wills
2  Loan Agreement?
3  MR. MARTIN: Objection, form.
4  A. No, sir. We provided these
5  schedules to KeyBank.
6  BY MR. BROWN:
7  Q. Okay. You provided the schedules
8  to KeyBank. Did Wick Phillips prepare the
9  schedules?
10  A. No, sir.
11  Q. Did it have any -- did it have any
12  role in connection with the preparation of
13  the schedules?
14  A. Just as sort of the conduit between
15  the business folks and the lender.
16  Q. The business folks at the borrower?
17  A. Correct.
18  Q. So did Wick Phillips make any
19  changes to these schedule -- to the schedules
20  attached as schedule -- to Schedule 3.15, did
21  it make any changes to them after it received
22  them from the borrowers?
23  A. Did it review -- did it review
24  Q. Did it review -- did it review
25  these attachments?

1    Wick Phillips 30(b)(6) - R. Wills

2    A.  Yes, sir.

3    Q.  And did it make any determination

4 as to their accuracy?

5    A.  I would assume so, yes, sir.

6    Q.  And, for example, this first

7 schedule reflects the ownership interests of

8 Highland and HCRE in the LLC; is that

9 correct?

10    A.  Yes, sir.

11    Q.  And it reflects the ownership

12 interest as 49 percent for Highland and

13 51 percent for HCRE; is that correct?

14    A.  Yes, sir.

15    Q.  And you don't have -- is it your

16 understanding that that ownership allocation

17 was correct at the time these schedules were

18 prepared?

19    A.  Yes, sir.

20    Q.  And let's scroll down to the next

21 attachment in the schedule.

22        This is the second attachment.  At

23 the bottom it says it's for Gulfstream Isles.

24        Do you see that?

25    A.  Yes, sir.

1    Wick Phillips 30(b)(6) - R. Wills

2    Q.  And that would be a reference to

3 the underlying property that was being

4 acquired; is that correct?

5    A.  Yes, sir.

6    Q.  Okay.  And, again, the ownership

7 percentages for HCRE and Highland in the LLC

8 are reflected as the same, 51 for HCRE and

9 49 percent for Highland.  Correct?

10    A.  Yes, sir.

11    Q.  And based on your prior review of

12 these attachments as Schedule 3.15, your

13 recollection is that they all -- I think

14 there's 22 of them, and they all reflect the

15 same ownership percentage in the LLC; is that

16 correct?

17    A.  I think so, yes, sir.  We can flip

18 through them, but I assume so.

19    Q.  Yeah.  Why don't we just briefly

20 flip through them.  If we go to the next one.

21        Again, this is for Victoria Park.

22        Same ownership percentage reflected

23 there, correct?

24    A.  Yes, sir.

25    Q.  And the next one, this is for the

1    Wick Phillips 30(b)(6) - R. Wills

2 Reserve at River Walk.

3        Same ownership percentage reflected

4 there, correct?

5    A.  Yes, sir.

6    Q.  The next one, Heights at

7 Olde Towne.

8        Same ownership percentage reflected

9 there, correct?

10    A.  Yes, sir.

11    Q.  Okay.  I don't think we have to

12 flip further after these.  They say what they

13 say.

14    A.  Okay.

15    MR. MARTIN:  Mr. Brown, I don't

16 pretend to know as much about these

17 transactions as you certainly do, but I

18 do believe that starting with some of

19 the properties towards the back, there

20 are -- while some of the ownership

21 percentages may be the same, you may

22 want to go over them.  Governors Green,

23 Stoney Ridge, Oak Mill --

24    MR. BROWN:  Okay.

25    MR. MARTIN:  The structures do

1    Wick Phillips 30(b)(6) - R. Wills

2 change a little bit.

3 BY MR. BROWN:

4    Q.  Okay.  We can do that.  Let's look

5 through each one of them.  Let's just do a

6 page flip.

7        Again, this is Governors Green.

8        With respect to the interests that

9 are reflected in the LLC, they're the same,

10 correct, for Highland and HCRE, as the

11 others, 49 percent and 51 percent

12 respectively?

13    A.  Yes, sir.

14    Q.  Okay.  Let's go down to the next

15 one, Stoney Ridge.

16        Again, focusing just on the

17 ownership interest in the LLC, it's reflected

18 as 49 percent Highland and 51 percent HCRE,

19 correct?

20    A.  Yes, sir.

21    Q.  And the next one, Oak Mill.

22        Again, focusing just on the LLC,

23 the ownership interest is reflected at

24 49 percent for Highland and 51 percent for

25 HCRE.  Correct?

Wick Phillips 30(b)(6) - R. Wills

1
2  A.  Yes, sir.
3  Q.  And the next one, which is
4  Battleground Park, and focusing again on the
5  LLC, the ownership interests are reflected as
6  49 percent Highland, 51 percent HCRE.
7  Correct?
8  A.  Yes, sir.
9  Q.  And for Lakes at Renaissance Park,
10  again focusing on the LLC, the ownership
11  percentage is reflected as 49 percent
12  Highland and 51 percent HCRE, correct?
13  A.  Yes, sir.
14  Q.  And for Brandywine -- huh.  Unless
15  I'm missing something, this doesn't even
16  address the LLC interests.
17      MR. MARTIN:  That's one of the
18  reasons I was asking.
19      MR. BROWN:  Pardon me?
20      MR. MARTIN:  That's one of the
21  reasons I was asking.
22      MR. BROWN:  Yeah.  Yeah.
23      MR. MARTIN:  I know you're trying
24  to make your record and I'm not trying
25  to interrupt you.

1      MR. BROWN:  Thank you.  I
2  appreciate it.
3  BY MR. BROWN:
4  Q.  So Brandywine just doesn't -- in
5  this chart, the LLC is not even shown,
6  correct?
7  A.  Correct.
8  Q.  Scroll to the next one, please.
9      This one, which is
10  Glenview Reserve, with respect to the LLC, it
11  reflects the same ownership percentage,
12  49 percent in Highland and 51 percent in
13  HCRE, correct?
14  A.  Yes, sir.
15  Q.  Scroll down, please.
16      And, again, this is for Andros
17  Isles.
18      And with respect to the LLC, it is
19  again reflecting and repeating the same
20  ownership percentage of 49 percent in
21  Highland and 51 percent in HCRE.  Correct?
22  A.  Yes, sir.
23  Q.  Again, this is Arborwalk.
24      And with respect to the LLC, the
25

Wick Phillips 30(b)(6) - R. Wills

1
2  same ownership percentages are reflected for
3  Highland and HCRE as on the prior charts,
4  correct?
5  A.  Yes, sir.
6  Q.  For Walker Ranch, which is the next
7  page, the same ownership percentages are
8  reflected for the LLC as on the prior charts,
9  correct?
10  A.  Yes, sir.
11  Q.  And with respect to Towne Crossing,
12  the next page, the same ownership percentages
13  are reflected in the LLC, correct?
14  A.  Yes, sir.
15  Q.  And with respect to the next page,
16  West Place, the same LLC percentages are
17  reflected for Highland and HCRE, correct?
18  A.  Yes, sir.
19  Q.  And the next page, Vista Ridge, the
20  same LLC percentages -- the same ownership
21  percentages are reflected for Highland as
22  HCRE as on the prior charts, correct?
23  A.  Yes, sir.
24  Q.  Next page, which is Hidden Lake.
25      With respect to the LLC, the same

Wick Phillips 30(b)(6) - R. Wills

1
2  ownership percentages are reflected for HCRE
3  and Highland as on the prior charts, correct?
4  A.  Yes, sir.
5  Q.  The next page, Arbolita.
6      With respect to the LLC, the same
7  ownership percentages are reflected, correct?
8  A.  Yes, sir.
9  Q.  Next page, Fairways.
10      With respect to the LLC, the same
11  ownership percentages are reflected, correct?
12  A.  Yes, sir.
13  Q.  The next page, with respect to
14  Grand Oasis, it's the same ownership
15  percentages as on the prior charts, correct?
16  A.  Yes, sir.
17  Q.  And with respect to
18  Summers Landing, there is no indication
19  here -- no reflection of the LLC in the
20  chart; is that correct?
21  A.  Yes, sir.  That's correct.
22  Q.  Okay.  I think that takes us
23  through it.  And I apologize for dragging
24  everybody through that, but your counsel is
25  correct that they're not all -- they did not

Wick Phillips 30(b)(6) - R. Wills

1 all reflect the ownership interests in the
2 all reflect the ownership interests in the
3 LLC.
4 But is it correct to say that, with
5 respect to Schedule 3.15 of the
6 Loan Agreement, and the charts reflecting the
7 ownership interests of the subsidiaries that
8 do address the ownership interest in the LLC,
9 they all identically reflect that the
10 ownership interest is 41 percent --
11 49 percent in Highland and 51 percent in
12 HCRE?
13 A. Yes, sir.
14 Q. And that's consistent with the
15 ownership interest that is set forth in the
16 LLC Agreement, correct?
17 A. Correct.
18 Q. Did you become familiar with the --
19 with Schedule 3.15 of the Loan Agreement
20 before or after your designation as the -- as
21 Wick Phillips' Rule 30(b)(6) witness?
22 A. After.
23 Q. Did Wick Phillips have any
24 communications with HCRE concerning the
25 charts we just went through that comprise

Wick Phillips 30(b)(6) - R. Wills

2 Schedule 3.15 of the Loan Agreement?
3 MR. MARTIN: Objection, form.
4 A. Yes, sir.
5 BY MR. BROWN:
6 Q. And with whom did Wick Phillips
7 have those communications?
8 A. I don't recall specific names, but
9 different people within both NexPoint and
10 from the in-house team at Highland.
11 Q. And how do you -- what is the
12 distinction between NexPoint and Highland in
13 Wick Phillips' mind?
14 A. The NexPoint distinction would be
15 we've always been hired in the real estate
16 silo, only operating on sort of what I would
17 call the property level.
18 And then, sort of like when we're
19 looking at the structure charts in 3.15, once
20 you get up to really the 49/51 percent
21 distinction, Mr. Brown, that you were talking
22 about, that structuring is beyond the scope
23 of our representation and typically goes to
24 in-house or a different law firm handling
25 that side of things for that portion of the

Wick Phillips 30(b)(6) - R. Wills

2 company.
3 Q. Did Highland have separate counsel
4 in connection with the Loan Agreement?
5 A. I don't know.
6 Q. So you, testifying here on behalf
7 of Wick Phillips, you don't know any of the
8 names of the individuals with whom
9 Wick Phillips communicated relating to the
10 HCRE representation; is that correct?
11 MR. MARTIN: Objection, form.
12 A. No. That's -- I don't think that's
13 exactly what I said. We've already gone over
14 a few of the Wick Phillips contacts at
15 NexPoint, Matt McGraner and Matt Goetz.
16 BY MR. BROWN:
17 Q. Yes.
18 A. In reviewing some of the
19 correspondence in preparation for this
20 deposition, yes, sir, there are some other
21 names that I'm not familiar with. My partner
22 at the time would have been having those
23 communications within the context of this
24 transaction.
25 So there's a Paul Broaddus and a

Wick Phillips 30(b)(6) - R. Wills

2 handful of other names that I believe had a
3 role in creating some of these charts and
4 passing them along to us, but I don't recall
5 their specific names.
6 Q. Okay. So, again, we'll get to
7 those emails and so we can follow up on that.
8 But other than Mr. Geotz,
9 Mr. McGraner, Mr. Chang, and Mr. Broaddus,
10 did Wick Phillips have communications with
11 any other individuals that were
12 representatives of HCRE in connection with
13 the Loan Agreement?
14 MR. MARTIN: Objection, form.
15 A. Not that I'm aware of.
16 BY MR. BROWN:
17 Q. Okay. Did Wick Phillips have
18 communications with any individuals that were
19 representatives of Highland in connection
20 with the Loan Agreement other than Mr. Goetz,
21 Mr. -- well, strike that.
22 Did Wick Phillips have any
23 communications with representatives of
24 Highland in connection with the
25 Loan Agreement?

Wick Phillips 30(b)(6) - R. Wills

1
2      MR. MARTIN:  Objection, form.
3    A.  I think with Mr. Broaddus and
4  probably a handful of other folks in
5  connection with some of these charts and
6  structuring.
7  BY MR. BROWN:
8    Q.  When it spoke to, for example,
9  Mr. Broaddus, who was communicating on behalf
10  of Highland, was there another counsel
11  involved for Highland in the communications
12  that Wick Phillips had for Mr. Broaddus?
13    A.  I believe in connection with some
14  of the structuring, yes, sir.
15    Q.  And who would that have been?
16    A.  I believe it was Hunton & Williams.
17    Q.  So you believe that
18  Hunton & Williams was involved in the
19  representation of Highland in connection with
20  the Loan Agreement?
21      MR. MARTIN:  Objection, form.
22    A.  In connection with the
23  organizational structure, yes, sir.
24  BY MR. BROWN:
25    Q.  Are you sure you're not conflating

Wick Phillips 30(b)(6) - R. Wills

1
2  that with the representation of Highland in
3  connection with the LLC?
4    A.  No, sir.  I mean -- no, I guess, is
5  the short answer.
6    Q.  And are you aware of any writings
7  that reflect that the Hunton firm represented
8  Highland in connection with the
9  Loan Agreement?
10    A.  I'm not aware of those.
11    Q.  And what do you base your
12  conclusion on that the Hunton firm
13  represented Highland in connection with the
14  Loan Agreement?
15    A.  Because Hunton is typically the
16  Highland tax counsel that provides the
17  organizational charts that are attached to
18  the Loan Agreement.
19    Q.  And do you have independent -- do
20  you have knowledge -- did the organizational
21  charts that comprise Schedule 3.15 of the
22  Loan Agreement, did they come from Hunton?
23      MR. MARTIN:  Objection, form.
24    A.  They came from Highland.  So beyond
25  that, I'm not sure.

Wick Phillips 30(b)(6) - R. Wills

1
2  BY MR. BROWN:
3    Q.  Okay.  So are you aware of any
4  communications that Wick Phillips had with
5  Hunton directly in connection with the
6  Loan Agreement?
7    A.  No, sir.
8    Q.  So you have no independent
9  knowledge -- you have no knowledge, do you,
10  that Hunton represented Highland in
11  connection with the Loan Agreement, do you?
12      MR. MARTIN:  Objection, form.
13    A.  I don't know.  Section 3.15 is part
14  of the Loan Agreement.  So that's where I'm
15  getting a little hung up, I suppose.
16  BY MR. BROWN:
17    Q.  Okay.  And what part of Section --
18  of Schedule 3.15 leads you to believe that
19  Hunton represented Highland in connection
20  with the Loan Agreement?
21      MR. MARTIN:  Objection, form.
22    A.  I guess it's just a little bit of
23  deduction because Wick Phillips did not.  So
24  it's either Highland in-house or their
25  typical tax counsel, which is Hunton, or DST

Wick Phillips 30(b)(6) - R. Wills

1
2  counsel or REIT counsel.
3    So I can't say for certain that
4  it's Hunton, but I can say for certain that
5  it's not Wick Phillips.
6  BY MR. BROWN:
7    Q.  So you can say -- I'm sorry.  You
8  can say for certain that what is not
9  Wick Phillips?
10    A.  That we did not -- we had no role
11  in these org charts, which you're saying did
12  Hunton represent Highland in connection with
13  the Loan Agreement.
14    And I'm saying, it looks like it
15  because these org charts were not prepared by
16  Wick Phillips, so somebody represented
17  Highland in connection with the
18  Loan Agreement, to answer that question.
19    Q.  But you're speculating that it was
20  Hunton, correct?
21    A.  That -- I just said I don't know
22  for certain that it was Hunton.
23    Q.  You actually -- as you sit here
24  today, you have no idea whether it was Hunton
25  or whether any firm was involved in preparing

Wick Phillips 30(b)(6) - R. Wills

1     Wick Phillips 30(b)(6) - R. Wills
2 those charts, do you?
3     A.  That's correct.
4     Q.  Okay.  Can you describe the
5 conversations that Wick Phillips had with
6 HCRE concerning the organization charts that
7 are attached to -- as Schedule 3.15 to the
8 Loan Agreement?
9     A.  Generally, yes.  To get an
10 understanding of what the structure was for
11 each of the properties so that we could
12 accurately communicate that to the lender.
13     Q.  Okay.  Can you give me any more
14 detail as to what those communications were
15 beyond what you just testified to?
16     A.  You know, it would -- sort of like
17 we had just talked about, it would be whether
18 it was going to be part of the restructure, a
19 DST structure, you know, for purposes of
20 communicating which buckets those would fall
21 in, whether it's KeyBank or Freddie.
22     Q.  Are you aware that the
23 Loan Agreement contained representations and
24 warranties?
25     A.  Yes, sir.

1     Wick Phillips 30(b)(6) - R. Wills
2     Q.  And are you aware that those
3 representations and warranties on multiple
4 occasions included reps and warranties by the
5 borrowers relating to the subsidiaries?
6     A.  Yes, sir.
7     Q.  Did Wick Phillips perform any
8 diligence on behalf of any of its clients in
9 connection with the Loan Agreement to
10 determine if the representations and
11 warranties in the Loan Agreement that related
12 to the subsidiaries were true and accurate?
13     A.  Diligence as far as asking the
14 client if their org chart is accurate?  Yes.
15     Q.  And what did it do to diligence the
16 reps and warranties and, in particular, the
17 reps and warranties relating to the
18 subsidiaries as they're reflected on
19 Schedule 3.15?
20     A.  Confirm with the people that
21 prepared the org charts.
22     Q.  So what were those communications?
23 What was the substance of those
24 communications?
25     A.  I don't know.

1     Wick Phillips 30(b)(6) - R. Wills
2     Q.  Okay.  Do you know who
3 Wick Phillips had these discussions relating
4 to diligencing the reps and warranties
5 relating to the subsidiaries?
6     A.  Yes.  At the time it would have
7 been primarily D.C. Sauter.  And then --
8     Q.  Could you spell that?
9     A.  Sure.  It's just the initials D,
10 like dog, C, like Charles.
11     Q.  Yep.
12     A.  Sauter, S-a-u-t-e-r.
13     Q.  And who was D.C. Sauter a
14 representative of, what entity?
15     A.  He was a partner at Wick Phillips.
16     Q.  Oh, okay.  So he was the
17 Wick Phillips lawyer that would have
18 diligenced -- done the underlying work to
19 diligence the reps and warranties relating to
20 the subsidiaries, correct?
21     A.  Yes, sir.
22     Q.  Did you speak to him in connection
23 with your preparation for your testimony as
24 the designated witness of Wick Phillips?
25     A.  Yes, sir.  We spoke yesterday.

1     Wick Phillips 30(b)(6) - R. Wills
2     Q.  Okay.  And so on behalf of
3 Wick Phillips, who did Wick Phillips speak to
4 in connection with diligencing the reps and
5 warranties in the Loan Agreement relating to
6 the subsidiaries?
7     MR. MARTIN:  Objection, form.
8     It would have been the laundry list
9 of folks we've been over, whether it was
10 Paul Broaddus, Freddy Chang, Matt McGraner,
11 someone within the NexPoint or Highland team
12 that had created those charts and could tell
13 us that they were accurate.
14 BY MR. BROWN:
15     Q.  Okay.  It's your understanding that
16 Wick Phillips made a determination that the
17 charts that comprise Schedule 3.15 and the
18 reps and warranties in the Loan Agreement
19 relating to those charts were true and
20 accurate, correct?
21     A.  Yes, sir.
22     Q.  And do you know if Wick Phillips
23 had an understanding when it did this due
24 diligence and spoke to that group of people
25 you had identified earlier, Goetz, McGraner,

1    Wick Phillips 30(b)(6) - R. Wills
2 Chang, and Broaddus, I believe were the
3 universe; is that correct?
4    MR. MARTIN: Objection, form.
5    A. Yes, sir.
6 BY MR. BROWN:
7    Q. Okay. So of those four people,
8 did -- how did Wick Phillips determine what
9 hat those individuals were wearing when it
10 spoke to them, i.e., were they speaking on
11 behalf of HCRE or were they speaking on
12 behalf of Highland or were they speaking on
13 behalf of some other borrower?
14    MR. MARTIN: Objection, form.
15 BY MR. BROWN:
16    Q. Do you understand the question,
17 Mr. Wills?
18    A. Yes. I can answer the question.
19    The Matt McGraner, Matt Goetz part
20 of things is NexPoint. So they should
21 communicate to us from the borrower level --
22 I'm sorry, the SE Multifamily Holdings LLC
23 level down, as we got down to the property
24 level.
25    And then Paul Broaddus, on that

1    Wick Phillips 30(b)(6) - R. Wills
2 side of things on the Highland level, is what
3 handles the chain up, or the chart up. And
4 so we would rely on their understanding of
5 the chart and the accuracy of that chart.
6    Q. Okay. You said McGraner was
7 speaking on behalf of NexPoint; is that
8 correct?
9    A. Yes, sir.
10    Q. And who else did you say was
11 speaking on behalf of NexPoint?
12    A. Matt Goetz.
13    Q. Okay. Do you know whether McGraner
14 was also a representative of Highland or had
15 any affiliation with Highland?
16    A. I don't.
17    Q. What about Geotz? Do you know if
18 he had any affiliation with Highland?
19    A. I don't know.
20    Q. And Wick Phillips understood, did
21 it not, that the lender under the
22 Loan Agreement would be relying on the reps
23 and warranties made by the borrower, correct?
24    A. Yes, sir.
25    Q. And Wick Phillips understood that

1    Wick Phillips 30(b)(6) - R. Wills
2 an incorrect or false representation or
3 warranty was an event of default under the
4 Loan Agreement, correct?
5    A. Yes, sir.
6    Q. And the event of default could lead
7 to acceleration of the amounts due, correct?
8    A. Yes, sir.
9    MR. BROWN: Can we attach -- or can
10 we mark Exhibit D.
11    (Email chain, "RE: Project Unicorn
12    - Final Org Charts," with
13    attachments, marked as Exhibit D.)
14    MR. BROWN: Okay. So can we scroll
15 down to the first email in the chain?
16 Okay. That's the one I want to focus on
17 for right now.
18 BY MR. BROWN:
19    Q. Okay. So Mr. Wills, focusing on
20 the email that's on the screen, it's the
21 Monday, September 17, 2018, email that is
22 sent by Rachel Sam at 4:21 p.m.
23    A. Uh-huh.
24    MR. MARTIN: You need to say "yes"
25 or "no."

1    Wick Phillips 30(b)(6) - R. Wills
2    THE WITNESS: Yes.
3 BY MR. BROWN:
4    Q. Okay. Have you seen that email
5 before?
6    A. Yes.
7    Q. Who is Rachel Sam?
8    A. She is an attorney at
9 Wick Phillips.
10    Q. Okay. This email was sent by
11 Rachel Sam?
12    A. Yes, sir.
13    Q. And you have seen it before?
14    A. Yes, sir.
15    Q. Before or after your designation?
16    A. After.
17    Q. Okay. And did you review this
18 email as part of your preparation to testify
19 today?
20    A. Yes, sir.
21    Q. So this email, the caption is
22 "Final Org Charts."
23    And if we scroll down further to
24 the attachments, they are either -- and I
25 can't tell, but they are either -- this is

Wick Phillips 30(b)(6) - R. Wills

1 this first email, says -- I'm sorry, the
2 first attachment refers to Governors Green.
3 And this is either one of the
4 charts attached to Schedule 3.15 in the
5 Loan Agreement or some prior and very similar
6 version to it.
7 Would you say that's accurate?
8 MR. MARTIN: Objection, form.
9 BY MR. BROWN:
10 Q. And, again, on the org chart, as
11 with all of the org charts attached as
12 Schedule 3.15 that contain a reference to the
13 LLC, this org chart provides that the
14 ownership interests are 51 percent HCRE and
15 49 percent Highland, correct?
16 A. Yes, sir.
17 Q. And if we could scroll down to the
18 next org chart.
19 Again, this one is Stoney Ridge.
20 And would you agree that this is
21 either the same chart that's attached to --
22 as Schedule 3.15 or a virtually identical
23 version and certainly identical with respect


Wick Phillips 30(b)(6) - R. Wills

1 this first email, says -- I'm sorry, the
2 first attachment refers to Governors Green.
3 And this is either one of the
4 charts attached to Schedule 3.15 in the
5 Loan Agreement or some prior and very similar
6 version to it.
7 Would you say that's accurate?
8 MR. MARTIN: Objection, form.
9 BY MR. BROWN:
10 Q. And, again, on the org chart, as
11 with all of the org charts attached as
12 Schedule 3.15 that contain a reference to the
13 LLC, this org chart provides that the
14 ownership interests are 51 percent HCRE and
15 49 percent Highland, correct?
16 A. Yes, sir.
17 Q. And if we could scroll down to the
18 next org chart.
19 Again, this one is Stoney Ridge.
20 And would you agree that this is
21 either the same chart that's attached to --
22 as Schedule 3.15 or a virtually identical
23 version and certainly identical with respect

Wick Phillips 30(b)(6) - R. Wills

1 to the ownership interests in the LLC?
2 A. Yes, sir.
3 Q. Scroll down one more chart, please.
4 With respect to the attachment to
5 Rachel Sam's email regarding Oak Mill
6 Apartments, again, would you agree that this
7 is either identical to the schedule attached
8 as -- to the chart attached for -- to
9 Schedule 3.15 or a virtually identical
10 version, and certainly identical with respect
11 to the reflection of the ownership interests
12 in the LLC?
13 A. Yes, sir.
14 MR. BROWN: Okay. Scroll down
15 again. I think that's the end. Yeah.
16 Okay.
17 Let's go back to the email, the
18 September 17 email.
19 BY MR. BROWN:
20 Q. Okay. So in her email, Ms. Sam is
21 writing or emailing to, if you look up to the
22 "To" line, Matt McGraner, who you've
23 referenced before. There are two -- there's
24 an entry for him showing a Highland Capital

Wick Phillips 30(b)(6) - R. Wills

1 email address, correct?
2 A. Yes, sir.
3 Q. And you had previously testified
4 that you believed he was a representative of
5 NexPoint, correct?
6 A. Yes, sir.
7 Q. Does this refresh your recollection
8 or change your conclusions as to whether or
9 not he was also a representative of Highland?
10 MR. MARTIN: Objection, form.
11 A. No, sir.
12 BY MR. BROWN:
13 Q. Okay. Do you have any idea why
14 Mr. McGraner has a Highland Capital email
15 address?
16 A. No, sir.
17 Q. And, again, it's also to Mr. Geotz,
18 who you also, I believe, testified that
19 Wick Phillips was communicating with on
20 behalf of NexPoint.
21 He also has a Highland Capital
22 email address, correct?
23 A. Yes, sir.
24 Q. And does that change your

Wick Phillips 30(b)(6) - R. Wills

1 conclusion or refresh your recollection as to
2 whether or not Mr. Goetz was also a
3 representative of Highland Capital or
4 Highland?
5 A. No, sir. No, sir.
6 Q. I want to make sure the record is
7 correct. I meant to just say Highland
8 because we've defined the Debtor as Highland.
9 Does this refresh your recollection
10 or change your conclusion as to whether
11 Mr. Goetz was a representative of Highland?
12 A. No, sir.
13 Q. Okay. And do you know who
14 Bonner McDermett is?
15 A. Yes, sir. I believe he is an
16 analyst with Mr. Goetz and Mr. McGraner.
17 Q. And do you know whether or not he
18 is a representative of Highland or some other
19 entity?
20 A. I do not know.
21 Q. You also had referred to
22 Mr. Broaddus, who is another recipient of
23 this email, also with a Highland Capital
24 email address?

Wick Phillips 30(b)(6) - R. Wills

1  Wick Phillips 30(b)(6) - R. Wills
2  A. Yes, sir.
3  Q. Do you know whether Mr. Broaddus is
4  a representative of Highland?
5  A. I believe that's correct.
6  Q. Okay. And also Freddy Chang, who I
7  believe you also referenced, with a
8  Highland Capital email address.
9  Do you know who Freddy Chang is a
10  representative of?
11  A. I believe he's NexPoint, some sort
12  of in-house counsel role.
13  Q. Okay. And do you know why he has a
14  Highland Capital email address?
15  A. No, sir.
16  Q. Okay. And the cc is to D.C. Sauter
17  of Wick Phillips, correct?
18  A. Yes, sir.
19  Q. And other than D.C. Sauter, there
20  are no other outside lawyers that are on –
21  that are recipients of this email, correct?
22  A. That's correct.
23  Q. So this email by Rachel Sam, the
24  Wick Phillips lawyer says:
25  "I made a couple of clean up

1  changes to the DST org charts and am
2  waiting for signoff from
3  Baker McKenzie. Once I hear back from
4  Baker, I will circulate those updated
5  org charts."
6  So you, I believe, testified
7  earlier that Wick Phillips didn't make any
8  changes to the org charts. Does this refresh
9  your recollection as to whether or not
10  Wick Phillips made changes to the org charts?
11  A. Yeah. It looks like Rachel may
12  have cleaned up some typos that she got from
13  DST counsel.
14  Q. Does this refer to typos?
15  A. "Clean up" is what I would
16  interpret as typo.
17  Q. You're assuming that clean up means
18  typo?
19  A. Yes, sir.
20  Q. But you don't know, do you?
21  A. I do not.
22  Q. So, for example, you don't know
23  whether the changes related to substance, do
24  you?

1  Wick Phillips 30(b)(6) - R. Wills
2  MR. MARTIN: Objection, form.
3  A. Well, I do because we are not DST
4  counsel. So we would not be making material
5  changes to the DST org chart.
6  BY MR. BROWN:
7  Q. Whether DST -- Delaware Statutory
8  Trust is what DST means, correct?
9  A. Yes, sir.
10  Q. And the reason you say you know
11  that the changes were, quote, "typos" is
12  because – tell me again?
13  A. Well, they're attached and we just
14  went through and said they're substantially
15  similar to what's in the Loan Agreement.
16  And quite frankly, we don't have
17  DST counsel here. We don't have that
18  capability. So we wouldn't – we wouldn't be
19  making those changes.
20  Q. Okay. But again, you're
21  speculating, correct? You don't know.
22  MR. MARTIN: Objection, form.
23  BY MR. BROWN:
24  Q. You don't know what changes Rachel
25  made, do you?

1  A. No, sir.
2  MR. BROWN: Okay. Can we scroll up
3  to the next email.
4  BY MR. BROWN:
5  Q. Again, this is a – appears to be
6  the next email on the chain. It's just under
7  an hour later, at 5:16 p.m., to the same
8  group with a copy to D.C. Sauter, and it's
9  Rachel again here saying:
10  "Just wanted to follow up on the
11  org charts. Let us know if you have
12  any comments or if these are okay to
13  submit to Freddie."
14  Does that – have you seen that
15  email before?
16  A. Yes, sir.
17  Q. And is that an email that
18  Rachel Sam of Wick Phillips sent to all the
19  people reflected on the "To" and "cc" line?
20  A. Yes, sir.
21  Q. Okay. Let's scroll up to the next
22  email. And this is – have you seen this
23  email before?
24  It's the September 18, 2018, email

<table>
<tr><td colspan="2" align="right">Page 82</td></tr>
</table>

Page 82

1    Wick Phillips 30(b)(6) - R. Wills
2  from Freddy Chang with a Highland Capital
3  email address, to Rachel Sam, again,
4  regarding the final org charts.  And it's
5  Freddy Chang asking, "Are the DST org charts
6  ready to go?"  Asking Rachel.
7       Have you seen this before?
8    A.  Yes, sir.
9    Q.  And is this an email that was
10 received by Wick Phillips?
11   A.  Yes, sir.
12   Q.  Okay.  Next email.
13      This appears to be Rachel Sam's
14 response to Freddy Chang's prior email at
15 7:45.  It's like seven minutes later, at
16 7:52, from Rachel Sam to Freddy Chang,
17 copying D.C. Sauter.
18      Have you seen this email before?
19   A.  Yes, sir.
20   Q.  And was this email sent by
21 Wick Phillips?
22   A.  Yes, sir.
23   Q.  And in response to Mr. Chang's
24 inquiry to Rachel Sam if the DST org charts
25 were ready to go, Rachel says:

Page 83

1    Wick Phillips 30(b)(6) - R. Wills
2    "The only remaining question is
3  whether we will be converting or
4  merging the borrower-level DST owner
5  entities.  The org charts currently
6  reflect that the owner entities 'may
7  be converted.'"
8    Is that a -- is that a substantive
9  question regarding the structure of the
10 subsidiaries, in your opinion?
11   A.  A substantive question from --
12   Q.  Yeah.  I mean, you said all that
13 was done was typos and passing on, you know,
14 information that other people provided.  You
15 said that that was all Wick Phillips did.
16      But here, this email seems to ask a
17 substantive question regarding converting or
18 merging borrower-level DST owner entities.
19      MR. MARTIN:  Objection, form.
20   A.  Yes, sir.  Again, we're at this
21 point a conduit between Baker McKenzie, DST
22 counsel, REIT counsel, and -- Rachel is
23 simply reiterating the outstanding item for
24 Baker McKenzie to complete on the org chart
25 so we can accurately deliver that to Freddie

Page 84

1    Wick Phillips 30(b)(6) - R. Wills
2  Mac.
3  BY MR. BROWN:
4    Q.  Is Baker McKenzie on any of these
5  emails?
6    A.  Yes, sir.  The first one we looked
7  at.
8    Q.  The initiating email by Rachel Sam
9  of September 17, 2018?
10   A.  Yes, sir.
11      MR. BROWN:  Okay.  Let's scroll --
12      I must be missing something.  Let's
13      scroll to the bottom.  There.  That
14      email.
15 BY MR. BROWN:
16   Q.  Can you point to the Baker McKenzie
17 recipient for me?
18   A.  No.  I'm sorry.  I may have been
19 speaking past you.  I'm referencing the
20 substance of the email.
21   Q.  Oh, I see.  Okay.  "I'm waiting for
22 signoff from Baker McKenzie."
23      Okay.  I got it.
24      And who did Baker McKenzie
25 represent?

Page 85

1    Wick Phillips 30(b)(6) - R. Wills
2    A.  I'm not certain.  I just know
3  they're DST counsel on the Highland side.
4    Q.  Delaware Statutory Trust counsel;
5  it's your understanding that that's who they
6  represented?
7    A.  Yes, sir.
8    (Telephonic interruption.)
9    Q.  Okay.  Let's go back to where we
10 were, the September 18 email, "The only
11 remaining question."
12      Okay.  Scroll up one email.  Okay.
13 And this is a September 18 email, again, one
14 minute after Rachel's email at 7:52, from
15 Freddie Chang to Rachel Sam copied to
16 D.C. Sauter.  And it's Rachel Sam saying:
17      "Thanks.  Are you working on the
18      REIT share acquisition org charts?"
19      And the only question I have for
20 you on that, Mr. Wills, is did Wick Phillips
21 receive that email?
22   A.  Yes, sir.
23   Q.  Okay.  And scroll up to
24 Rachel Sam's response.
25      Rachel Sam responds four minutes

1     Wick Phillips 30(b)(6) - R. Wills
2    later, at 7:57, to the inquiry by
3    Freddie Chang:
4        "Yes, the current versions of
5    those" -- being the REIT share
6    acquisition charts -- "are attached.
7    Paul has previously reviewed and
8    approved these, but let us know if you
9    have any comments."
10        So did Wick Phillips receive this
11   email?
12   A.  Yes.
13   Q.  Do you know who Paul is?
14   A.  I believe Paul Broaddus.
15     MR. BROWN:  Okay.  So it's now
16   about an hour from the last time we took
17   a break, and I would like to take a
18   five-minute break, if that's okay with
19   everybody.
20     MR. MARTIN:  It's your deposition.
21   Sure.
22     MR. BROWN:  All right.  Let's
23   reconvene in about five minutes.
24     MR. MARTIN:  Okay.  Thank you.
25     (Recess taken.)

1     Wick Phillips 30(b)(6) - R. Wills
2     MR. BROWN:  So let's get Exhibit D
3   back on the screen.  And let's go to the
4   bottom of the initiating email.
5   BY MR. BROWN:
6   Q.  So, again, Mr. Wills, I just want
7   to focus on these emails in particular, as
8   opposed to more generally, which I have
9   discussed in more general terms.
10       But Rachel Sam is communicating
11   here with the people on the "To" line:
12   Matt McGraner with the Highland Capital email
13   address, Matt Goetz with the Highland Capital
14   email address, Bonner McDermett with the
15   Highland Capital email address, Paul Broaddus
16   with the Highland Capital email address, and
17   Freddy Chang with the Highland Capital email
18   address.
19       Does Wick Phillips have knowledge
20   of the capacity that it was communicating
21   with these individuals in?
22       In other words, who were these
23   individuals representing -- who were these
24   individuals representing in these
25   communications, which entities?

1     Wick Phillips 30(b)(6) - R. Wills
2       And I'm interested in Wick
3   Phillips' knowledge and not your speculation.
4   A.  Sure.  So from our knowledge,
5   Matt McGraner, Geotz, Bonner McDermett, and
6   Freddy Chang are NexPoint.  Paul Broaddus is
7   Highland.  And there's a shared services
8   agreement between the two companies, and so
9   they're operating somewhat together.
10   Q.  In other words, Highland and
11   NexPoint are operating together; is that what
12   you mean?
13   A.  Yes, sir.
14   Q.  And are any of these individuals
15   that Rachel Sam was communicating with in
16   these emails, are they representatives of
17   HCRE, the lead borrower?
18   A.  I don't know.
19   Q.  Would Wick Phillips have been
20   communicating with the lead borrower in
21   connection with its communications relating
22   to the Loan Agreement?
23   A.  I would assume so.
24   Q.  Do you know who Mark Patrick was or
25   is?

1     Wick Phillips 30(b)(6) - R. Wills
2   A.  I believe he's an attorney with
3   Highland.
4   Q.  Do you know why he wasn't included
5   on these emails?
6   A.  No, sir.
7   Q.  And this email string, which is
8   Exhibit D, this relates to Wick Phillips'
9   work on the Loan Agreement, correct?
10   A.  Yes, sir.
11   Q.  And did these emails reflect some
12   of the work that Wick Phillips did in
13   connection with the Loan Agreement?
14   A.  Yes, sir.
15   Q.  Other than what's reflected in
16   these emails, do you know what other work
17   Wick Phillips did relating to the org charts
18   that constitute Schedule 3.15 of the
19   Loan Agreement?
20     MR. MARTIN:  Objection, form.
21   A.  Yes.  I mean, just as part of the
22   legal diligence in connection with, you know,
23   a loan checklist, making sure that the org
24   charts that we receive and are delivering
25   back to the lender are approved by the

1    Wick Phillips 30(b)(6) - R. Wills
2  business parties, and then, therefore, we can
3  get them to Freddie or KeyBank or whomever
4  needs to have those and then have them
5  checked off of the diligence portion of the
6  checklist.
7  BY MR. BROWN:
8    Q.  In connection with the org charts
9  that show up as Schedule 3.15 of the
10  Loan Agreement, who was Wick Phillips taking
11  instructions from on behalf of the borrowers?
12    A.  I think primarily the parties you
13  see here, both from The NexPoint side and
14  Mr. Broaddus.
15    Q.  On the Highland side?
16    A.  Yes, sir.
17    Q.  Other than this email, are you
18  aware of other -- I'm sorry.  Other than this
19  email string, are you aware of other
20  communications between Wick Phillips and any
21  of the borrowers concerning the org charts?
22    A.  No, sir.
23    MR. BROWN:  Can we put Exhibit E up
24  on the screen, please.
25    (Email chain, "RE: Unicorn - DSTs",

1    Wick Phillips 30(b)(6) - R. Wills
2    marked as Exhibit E.)
3  BY MR. BROWN:
4    Q.  Okay.  Exhibit E appears to be an
5  August 18, 2018 [sic] email from
6  Paul Broaddus; is that correct?
7    A.  Yes, sir.
8    Q.  And have you seen this email
9  before?
10    A.  Yes, sir.
11    Q.  Before or after your designation?
12    A.  After.
13    Q.  Did you review it in connection
14  with your preparation for your testimony
15  today?
16    A.  Yes, sir.
17    Q.  And it appears that there are a
18  number of recipients to this.  One of them is
19  D.C. Sauter; is that right?
20    A.  Yes, sir.
21    Q.  So Wick Phillips did receive this
22  email from Paul Broaddus, correct?
23    A.  Yes, sir.
24    Q.  And Paul Broaddus is -- as you have
25  previously testified, was a representative of

1    Wick Phillips 30(b)(6) - R. Wills
2  Highland in connection with Wick Phillips'
3  role representing the borrowers in the
4  Loan Agreement, correct?
5    A.  Yes, sir.
6    Q.  And the initiating email of
7  July 27, the first email in the string, which
8  is the second email on Exhibit E,
9  indicates -- it says:
10    "Hi.  Please see attached as
11  discussed for the basic DST charts.
12  Please note the open items.
13    "Should we have a call next week?
14    "Want to specifically discuss the
15  items that will need to be closed
16  out sooner rather than later.
17    "Thanks.  Paul."
18    So, again, did Wick Phillips
19  receive this email?
20    A.  Yes, sir.  It looks that way.
21    Q.  As well as the attachments,
22  correct?
23    And maybe we should look at the
24  attachments too.  So if we could scroll
25  further.

1    Wick Phillips 30(b)(6) - R. Wills
2    Okay.  So let's -- the first page
3  of the attachment says "Open items:
4  Economics/ownership of JV LLC."
5    Do you know what that refers to?
6    A.  Not specifically, no.
7    Q.  Could we scroll to the next
8  page of the attachment to Paul Broaddus'
9  email.  No.  We can --
10    Have you seen the attachments
11  before, Mr. Wills?
12    A.  Yes, sir.
13    Q.  Okay.  Let's scroll to the next
14  page.
15    Okay.  This attachment reverts to
16  the ownership interests of a JV -- of the JV
17  LLC, which was referred to in the first
18  document as being -- to be determined, but
19  approximately 51 percent for Partner 1 and
20  49 percent for Partner 2.
21    Do you know whether this is
22  referring to the LLC, which is the subject of
23  the, I think, Exhibit D in our case here?
24  It's the SE Multifamily LLC Agreement.
25    Is that what this refers to?

Wick Phillips 30(b)(6) - R. Wills

1     Wick Phillips 30(b)(6) - R. Wills
2     A.  That's what it looks like.  Yes,
3 sir.
4     Q.  Yeah.  And just to go back and
5 trace the history, the SE Multifamily
6 Holdings LLC Agreement was dated August 23.
7 The email that this was attached to is dated
8 August 1.  So this would have been -- this
9 email would have been sent prior to the
10 original LLC Agreement.
11     And this would have been the
12 discussions about the formation of it,
13 correct?
14     A.  Yes, sir.
15     Q.  Okay.  Can we scroll to the next
16 page.
17     And, again, this chart called DST
18 Properties LLC reflects ownership interest of
19 Partner 1 at 51 percent and Partner 2 at
20 49 percent for the LLC to be formed, correct,
21 which subsequently we learned was the SE
22 Multifamily Holdings LLC Agreement, correct?
23     A.  Yes, sir.
24     Q.  Okay.  Can we scroll forward again?
25     Again, this is another chart that

1     Wick Phillips 30(b)(6) - R. Wills
2 refers to the ownership interests of the
3 to-be-formed LLC Agreement, ultimately which
4 became SE Multifamily Holdings LLC, correct?
5     A.  Yes, sir.
6     Q.  And it reflects the same ownership
7 interests as we saw in Schedule 3.15 to the
8 Loan Agreement and in the LLC Agreement,
9 correct?
10     A.  Yes, sir.
11     Q.  Okay.  Next chart.
12     That's not sufficiently legible to
13 me.  Let's see.  Yeah.  I think we can pass
14 on this.
15     Do you have any idea what these
16 represent?
17     MR. MARTIN:  Objection, form.
18     A.  It's tough to make it out, but -- I
19 don't know if this is the structure that
20 Starwood had, who was the owner of the
21 portfolio, and they're just reflecting that,
22 or if this is a proposed structure for the
23 acquisition itself.
24 BY MR. BROWN:
25     Q.  And this is Highland263748,

1     Wick Phillips 30(b)(6) - R. Wills
2 correct?
3     A.  Yes, sir.
4     Q.  Of Exhibit E.
5     A.  Correct.
6     Q.  Okay.  Next chart, please.
7     And, again, this would be
8 Highland263749.
9     Do you know what this is?
10     A.  Similarly, it's tough to tell, but
11 more of the same if that was the existing
12 structure of the asset at the time of the
13 acquisition.
14     Q.  Next chart, please.  This is
15 263750.
16     Again, do you know what this is?
17     A.  Same thing, existing structure.
18     Q.  Next chart.  Same answer for
19 263751?
20     A.  Yes, sir.  It just looks like the
21 underlying property or asset changes.  But,
22 yes, sir.
23     Q.  Okay.  Next chart.
24     Go to the next chart after this.
25 And the next chart.  Next chart.  Keep going.

1     Wick Phillips 30(b)(6) - R. Wills
2 Keep going.  Keep going.
3     Okay.  One more -- okay.  One more.
4     This is a different format.  Do you
5 know how this is different from the
6 other charts?
7     A.  I don't know why.  It just looks
8 like a different structure.
9     Q.  Okay.  Let's go back to the
10 original email.
11     Hold on a second.  It says
12 K&E Draft on all of these charts.
13     What does that mean?
14     A.  I believe Kirkland & Ellis.
15     Q.  Okay.  And were these generated by,
16 do you know, the seller -- the potential
17 seller of the assets to the limited -- to the
18 LLC?
19     A.  Yes, sir.  I believe this was the
20 existing structure in place.
21     Q.  I see.
22     A.  At the time.
23     Q.  Okay.  Let's go back to the
24 original email.
25     Okay.  On both these emails from

Wick Phillips 30(b)(6) - R. Wills

1  Paul Broaddus, the July 27 email and the
2  August 1 email that constitute Exhibit E,
3  they were sent and received by D.C. Sauter of
4  Wick Phillips, correct?  They were sent to
5  and received by D.C. Sauter?
6     A.   Yes, sir.
7     Q.   And do you know if Wick Phillips
8  ever responded to these emails in any way?
9     A.   I don't believe so.
10    Q.   Okay.  Did Wick Phillips have any
11 communications with Paul Broaddus relating to
12 the charts attached on these emails?
13    A.   Not other than what we previously
14 discussed.
15    Q.   Okay.  Let's move on to Exhibit F.
16         (SE Multifamily Holdings LLC First
17         Amended and Restated Limited
18         Liability Company Agreement, marked
19         as Exhibit F.)
20 BY MR. BROWN:
21    Q.   So Exhibit F is the SE Multifamily
22 Holdings LLC First Amended and Restated
23 Limited Liability Company Agreement, dated as
24 of March 15, 2019, to be effective August 23,

Wick Phillips 30(b)(6) - R. Wills

1  2018, correct?
2     A.   Yes, sir.
3     Q.   And is this a true copy of that,
4  this Agreement?
5     A.   It looks to be so, yes, sir.
6         MR. BROWN:  Let me just digress for
7  a moment.
8         Lauren, we had agreed by emails
9  that the documents attached to both
10 declarations, the Morris declaration and
11 the McGraner declaration, that we could
12 stipulate to their authenticity.
13        MS. DRAWHORN:  Yes.
14        MR. BROWN:  So with respect to
15 Exhibit B to this deposition, the
16 original LLC Agreement, the
17 Loan Agreement, I believe, which is
18 Exhibit C, and this Loan Agreement,
19 Exhibit F, the Amended and Restated
20 Limited Liability Agreement, we're
21 agreeing that they're authentic.
22        We're reserving whatever other
23 objections, but nobody -- we're agreeing
24 as to authenticity.  So I'm not going to

Wick Phillips 30(b)(6) - R. Wills

1  worry about dealing with that in this
2  deposition.
3         Is that agreed, they're authentic?
4         MS. DRAWHORN:  Yes.  That's agreed.
5  BY MR. BROWN:
6     Q.   Okay.  So tell me what this
7  document is, Mr. Wills.
8     A.   Sure.  It's the Amended and
9  Restated LLC Agreement for SE Multifamily
10 Holdings.  My understanding in talking to
11 D.C. Sauter was that KeyBank retraded us at
12 the last minute and pulled back some of the
13 previously committed funds, and so we were
14 short about 20 million, which is why we
15 needed to bring in additional equity.
16        There was a previous relationship
17 with BH on some prior multifamily deals, and
18 so BH came in as the bridge equity, for lack
19 of a better term.  So the contributions
20 changed and it's memorialized here.
21    Q.   Do you know where they're
22 memorialized in the Agreement?  And I can
23 tell you if we flip to Schedule A.
24    A.   Yes, sir.  That's where I was going

Wick Phillips 30(b)(6) - R. Wills

1  as well.
2         (Email chain, "FW: Draft LLC
3         Agreement," marked as Exhibit H.)
4  BY MR. BROWN:
5     Q.   Okay.  So you had referred to BH in
6  your testimony you just gave.
7         And if you look at Schedule A to
8  the Amended LLC Agreement, it provides the
9  capital contributions and percentage
10 interest, correct?
11    A.   Correct.
12    Q.   And is this Schedule A, the chart
13 on Schedule A reflecting current -- the
14 percentage interest, is that what you were
15 referring to in terms of changing the
16 ownership interest?
17    A.   Yes, sir.
18    Q.   And is that an accurate statement
19 regarding the ownership interest of the
20 parties?
21    A.   I believe it accurately shows the
22 BH portion, and on the remainder, I'm not
23 positive.
24    Q.   Okay.  Let me -- let's back up a

```
1      Wick Phillips 30(b)(6) - R. Wills
2   little bit.
3        Did -- what was Wick Phillips' role
4   in connection with the Amended and Restated
5   Limited Liability Company Agreement that's
6   Exhibit E?
7        Let's just -- I'm going to try to
8   make it simple.
9        Like we referred to the original
10  Agreement in this deposition as the
11  LLC Agreement, can we refer to this as -- if
12  I refer to this as the Amended LLC Agreement,
13  you'll understand I'm referring to Exhibit F,
14  correct?
15     A.  Yes, sir.
16     Q.  Okay.  So what was Wick Phillips'
17  role in connection with the Amended
18  LLC Agreement?
19     A.  We did not have one, other than
20  delivering, you know, and communicating with
21  KeyBank on the modified structure.
22     Q.  Okay.  So I don't believe I have
23  seen any -- well, let me back up.
24        How were the communications with
25  KeyBank on the modified structure?  What form
```

```
1      Wick Phillips 30(b)(6) - R. Wills
2   did those communications take?
3      A.  I would assume telephonic or email.
4        MR. BROWN:  Hayley, are you on the
5      call?
6        MS. WINOGRAD:  Yes.  I'm here.
7        MR. BROWN:  I have not seen and I
8      don't know if -- I don't think we've
9      received any communications between
10     Wick Phillips and KeyBank relating to
11     the Amended LLC Agreement, have we?
12       MS. WINOGRAD:  I haven't seen any,
13     no.
14  BY MR. BROWN:
15     Q.  So I guess, Mr. Wills, it raises
16  the question, we've asked for documents --
17  and maybe, Lauren, this is better addressed
18  to you --
19       MR. MARTIN:  Yeah.  Mr. Brown, I'll
20     represent to you, we haven't found any
21     of those communications.  I think
22     Mr. Wills is mistaken on that.
23       MR. BROWN:  Okay.
24       MR. MARTIN:  We're not withholding
25     anything, and if we were withholding
```

```
1      Wick Phillips 30(b)(6) - R. Wills
2      something, we would have produced a
3      privilege log or some other grounds for
4      withholding.  I'm never in the business
5      of withholding anything that you're
6      otherwise entitled to.
7        MR. BROWN:  And I'm not accusing.
8      I was just confused because --
9        MR. MARTIN:  I appreciate that.
10       MR. BROWN:  -- I'm familiar with
11     the documents that were produced and
12     I've looked at them fairly closely in
13     this deposition and I never saw any
14     communications between Wick Phillips and
15     KeyBank.
16       MR. MARTIN:  Yeah.  I think if you
17     ran the tape back, you would probably
18     see both Ms. Drawhorn and I raise our
19     eyebrows when Mr. Wills said that.  I
20     think he was simply mistaken.
21  BY MR. BROWN:
22     Q.  Mr. Wills, in light of that
23  discussion, let's talk about, again, what
24  your understanding is of Wick Phillips' role
25  in connection with the Amended LLC Agreement.
```

```
1      Wick Phillips 30(b)(6) - R. Wills
2      A.  We did not have one.
3      Q.  You don't -- let me ask you this:
4   You indicated in your prior testimony that
5   you believed there were communications with
6   KeyBank regarding the Amended LLC Agreement.
7        Why did you think that?
8      A.  Well, that has been the siloed role
9   that we've maintained throughout the
10  Project Unicorn transaction as sort of the
11  conduit in between the lender and the various
12  borrowers.
13     Q.  Okay.  So I think your counsel has
14  represented that there were no emails between
15  Wick Phillips and KeyBank concerning the
16  Amended LLC Agreement.
17       Are you aware of whether there were
18  emails that took place in form -- I'm sorry,
19  whether there were communications that took
20  place in a form other than an email
21  communication?
22     A.  I'm not aware.
23     Q.  So is it true that Wick Phillips
24  did not represent any party to the Amended
25  LLC Agreement?
```

1    Wick Phillips 30(b)(6) - R. Wills
2    A.   Correct.  We did not prepare it or
3  have anything to do with that agreement.
4    Q.   And is there any retention
5  agreement with respect to the LLC Agreement?
6    A.   No, sir.
7    Q.   Do you know if Wick Phillips had
8  any communications with James Dondero in
9  connection with the Amended LLC Agreement?
10    A.   I do not.
11    Q.   So let's focus again -- I think
12  that before we established that
13  Wick Phillips -- your testimony that
14  Wick-Phillips had no role in connection with
15  the Amended LLC Agreement.  We didn't
16  complete the questions with respect to your
17  knowledge of the percentage interest set
18  forth in the Amended LLC Agreement.
19    So what is your understanding
20  concerning the accuracy of the percentage
21  interest set forth in Schedule A to the
22  Amended LLC Agreement?
23    A.   In speaking with D.C., I believe
24  they modified this with the intent of
25  updating it prior to any distribution.  But

1    Wick Phillips 30(b)(6) - R. Wills
2  other than that, I'm not aware of the
3  accuracy one way or the other.
4    Q.   I'm not sure I understand what that
5  means.  Can you help me understand?  When you
6  say, "they modified this with the intent of
7  updating it prior to the distribution."
8    Can you unpack that for me?
9  Because I don't understand what that means.
10  Modified what?
11    A.   Well, they added in the BH portion
12  and then, obviously, the HCRE contributions
13  and percentages and the Highland
14  contributions and percentages are different
15  from the original LLC Agreement.
16    Q.   Okay.  And they're -- I mean, the
17  math, I'm sure if you did it on a calculator,
18  it would reflect that these percentages are
19  modified from the original percentages, 49
20  and 51, based on a proportional pro rata
21  reduction for the 6 percent given to
22  BH Management, correct?
23    A.   Yes.
24    Q.   Does Wick Phillips have any
25  knowledge concerning whether or not the

1    Wick Phillips 30(b)(6) - R. Wills
2  percentages reflected in this Schedule A do
3  not accurately reflect what the parties
4  intended?
5    MR. MARTIN:  Objection, form.
6    A.   I don't know.
7    MR. BROWN:  Okay.  I'd like to take
8  a brief recess.
9    And, Hayley, I'd like to talk on
10  the phone with you, so can we have a
11  separate phone call?
12    MS. WINOGRAD:  Sure.
13    MR. BROWN:  I'm going to put myself
14  on mute and stop the video.
15    And, Hayley, can you call me on my
16  cell?
17    MS. WINOGRAD:  Yeah.  I'll do that
18  right now.
19    (Recess taken.)
20  BY MR. BROWN:
21    Q.   Do you know who represented HCRE
22  and Highland in connection with the Amended
23  LLC Agreement?
24    A.   I believe it was Hunton & Williams.
25    Q.   And what do you base that

1    Wick Phillips 30(b)(6) - R. Wills
2  understanding on?
3    A.   Review of some material in
4  connection with the deposition.
5    Q.   What material?
6    A.   Some of these exhibits.
7    (Technical interruption, 1:29 p.m.
8    to 1:34 p.m.)
9  BY MR. BROWN:
10    Q.   So Mr. Wills, we've covered
11  Wick Phillips' involvement in the
12  representation of the parties in connection
13  with the Loan Agreement, correct?
14    A.   Yes, sir.
15    Q.   And Wick Phillips represented the
16  borrowers in connection with the
17  Loan Agreement, correct?
18    A.   Yes, sir.
19    Q.   And Wick Phillips communicated with
20  both -- with Highland, I think you've
21  acknowledged through Paul Broaddus, with
22  respect to the ownership interests in the LLC
23  in connection with the Loan Agreement,
24  correct?
25    MR. MARTIN:  Objection, form.

Page 110

Wick Phillips 30(b)(6) - R. Wills

1    A.  I don't think that's accurate.  We

2  had -- we communicated with Mr. Broaddus as

3  it related to finalizing and forwarding the

4  org charts that are part of Schedule 3.15 to

5  the Loan Agreement.

6  BY MR. BROWN:

7    Q.  And those org charts contain a

8  reflection of the ownership interest as they

9  appear on the LLC Agreement, correct?

10    A.  Yes, sir.  That's what they said.

11    Q.  And those org charts that were

12  transmitted by Wick Phillips to

13  Paul Broaddus, among others, reflect an

14  ownership interest of 51 percent in HCRE and

15  49 percent in Highland, correct?

16    A.  Yes, sir.

17    Q.  And the percentage interests that

18  appear in Schedule A of the Amended

19  LLC Agreement reflect those same ownership

20  interests adjusted for the addition of

21  BH Management as a 6 percent owner, correct?

22    MR. MARTIN:  Objection, form.

23    I'm going to instruct the witness

24  to not answer the question as being

Page 111

Wick Phillips 30(b)(6) - R. Wills

1  outside the scope of the 30(b)(6)

2  notice.

3    And the record should probably

4  reflect, Mr. Brown, I think you would

5  agree with me, the court reporter lost

6  about five minutes' worth of testimony.

7    So I appreciate the fact that

8  you're trying to go back through it

9  methodically.  I certainly don't want to

10  get in the way with that.  But we got

11  into a scrap while she was offline about

12  this and about what the scope of the

13  30(b)(6) deposition notice is.

14    So we perhaps have to have that

15  discussion over again.

16    MR. BROWN:  Okay.  Well, if you're

17  instructing him not to answer --

18  BY MR. BROWN:

19    Q.  Are you going to follow your

20  counsel's instruction, Mr. Wills?

21    A.  Yes, sir.

22    MR. BROWN:  Okay.

23    All right.  I don't have any

24  further questions.

Page 112

Wick Phillips 30(b)(6) - R. Wills

1    MR. MARTIN:  Okay.  I've got a few

2  questions.

3    Are you passing the witness,

4  Mr. Brown?

5    MR. BROWN:  I'll pass the witness

6  and reserve my right to reexamine.

7    MR. MARTIN:  Okay.  Well, I guess I

8  should make it clear that we're going to

9  ask you to petition the Court for a

10  reexamination because we presented

11  Mr. Wills here and are giving you ample

12  opportunity to ask questions.

13    MR. BROWN:  Well, I may need to

14  clarify questions that you ask.

15    MR. MARTIN:  After the read and

16  sign, that would be standard procedure,

17  and I would not disagree with that.

18    MR. BROWN:  Well, you're going to

19  ask him some questions.

20    MR. MARTIN:  Oh, I'm sorry.  Yeah,

21  yeah.  I'm sorry.

22    After me?  Sure.

23    MR. BROWN:  That's what I mean.

24    MR. MARTIN:  I apologize.  I didn't

Page 113

Wick Phillips 30(b)(6) - R. Wills

1  understand what you were saying.  I

2  thought you were saying we'd get back

3  together at some point in the future.

4    MR. BROWN:  No.  I want the

5  opportunity to, essentially, redirect

6  after you --

7    MR. MARTIN:  Recross after my

8  direct?  Sure.

9    Does anybody else have any

10  questions before I go?  Ms. Dandeneau?

11    MS. DANDENEAU:  No, I do not.

12    MR. MARTIN:  Okay.  And I apologize

13  if I tortured your name.

14    MS. DANDENEAU:  You actually said

15  it perfectly -- well, pretty perfectly.

16      --

17      EXAMINATION

18  BY MR. MARTIN:

19    Q.  Okay.  Mr. Wills, most of my

20  questions are going to be just follow-up to

21  what Mr. Brown asked you.

22    Who is it your understanding that

23  Wick Phillips represented in connection with

24  the Loan Agreement?

Page 114

1    Wick Phillips 30(b)(6) - R. Wills
2    A.   The borrowers.
3    Q.   And of those, was there any
4    representation -- Mr. Brown asked you a lot
5    of questions about Highland being the lead
6    borrower.
7        Do you remember that?
8        MR. BROWN:  That's an incorrect --
9    by the way, you're mischaracterizing.
10   It was HCRE, not Highland.
11       MR. MARTIN:  Okay.  HCRE.
12   BY MR. MARTIN:
13   Q.   Did HCRE have its own counsel
14   in-house or outside counsel?
15   A.   No.
16   Q.   Now, at Wick Phillips, at the time
17   of these transactions, who would have
18   consulted with the client about possible
19   conflicts or waiver of conflicts that
20   Mr. Brown was asking you about?
21   A.   D.C. Sauter.
22   Q.   Okay.  And at the time, Mr. Sauter
23   was a partner at Wick Phillips, correct?
24   A.   Yes, sir.
25   Q.   Is Mr. Sauter still a partner at

Page 115

1    Wick Phillips 30(b)(6) - R. Wills
2    Wick Phillips?
3    A.   No, sir.
4    Q.   And who would have consulted with
5    the client regarding Mr. Brown's questions
6    about the mechanics of the loan, who directed
7    what, where the money was going, what the
8    role of the lead borrower was compared to the
9    other borrowers, etc.?
10   A.   D.C. Sauter.
11   Q.   Now, to your knowledge -- and I'm
12   just going to try to make all of this crystal
13   clear.  Because I think this is where the
14   fight with Mr. Brown is going to come in.
15       To your knowledge, did
16   Wick Phillips have anything to do with the
17   formation of the LLC Agreement or the
18   negotiation of the LLC Agreement?
19   A.   No, sir.
20   Q.   Can you explain in
21   non-real-estate-lawyer terms what the scope
22   of the representation was of Wick Phillips in
23   the matter at issue?
24   A.   Yes.  Our -- the scope of our
25   representation was at specifically the real

Page 116

1    Wick Phillips 30(b)(6) - R. Wills
2    estate/property level, working with
3    essentially going through the
4    lender required --
5        MR. BROWN:  Can I just interpose
6    an -- ask for clarification?
7        You asked for Wick Phillips' role
8    in the matter at issue.
9        Could you clarify, please, what the
10   matter at issue is that you're referring
11   to?
12   BY MR. MARTIN:
13   Q.   Mr. Wills, who has Wick Phillips
14   represented while you're here today?
15   A.   NexPoint.
16       MR. BROWN:  Again, I'm going to
17   object.  It's vague and ambiguous.
18       Do you mean with respect to the
19   claim --
20       MR. MARTIN:  Make an objection.
21       MR. BROWN:  Do you mean with
22   respect to the Loan Agreement?  Do you
23   mean with respect to the LLC Agreement?
24       There's several -- Wick Phillips
25   has more than one representation.  I'm

Page 117

1    Wick Phillips 30(b)(6) - R. Wills
2    just trying to get the record clear on
3    what you're asking him.
4        MR. MARTIN:  Are you finished?
5        MR. BROWN:  Yes.
6        MR. MARTIN:  I would ask you to
7    keep your objections to the "objection,
8    form" called for by the Federal Rules of
9    Civil Procedure.  If I ask you for the
10   basis, then you can make a speaking
11   objection.
12       You are still trying to conflate
13   all of these issues.  I'm trying to
14   separate them out to make them clear.  I
15   get to ask my questions, and if you want
16   to come back and ask other questions,
17   you can.
18       MR. BROWN:  Thank you for the
19   lecture and for the instructions on how
20   to practice law.
21       MR. MARTIN:  Well, you started it.
22   BY MR. MARTIN:
23   Q.   Are you aware that NexPoint had a
24   shared services agreement with one of the
25   Highland entities, which is why their email

Page 118

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2    addresses have Highland Capital in them?
 3        A.  Yes.
 4        Q.  Did Wick Phillips form the LLC that
 5    Mr. Brown asked you about today?
 6        A.  No.
 7        Q.  Did Wick Phillips draft or
 8    negotiate the Amended LLC Agreement that
 9    Mr. Brown asked you about today?
10        A.  No.
11        Q.  If, in fact, another law firm
12    drafted the LLC Agreement, would that be
13    consistent with your understanding of how the
14    LLC was formed?
15        A.  Yes.
16        Q.  Regardless of who formed the LLC,
17    as a real estate lawyer, since Wick Phillips
18    was representing NexPoint and the borrowers,
19    would Wick Phillips had to have known the
20    ownership structure of the LLC in order to
21    work on Project Unicorn?
22        A.  Yes.
23        Q.  Why?
24        A.  So that we could accurately
25    communicate that to KeyBank, and because
```

Page 119

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2    those same -- the structure charts are
 3    attached as an exhibit to the Loan Agreement.
 4        Q.  I'm going to direct your attention
 5    to the exhibits that Mr. Brown provided prior
 6    to this deposition and ask you to look at
 7    Exhibit H.
 8        And you were in the room when we
 9    became aware that the court reporter was
10    offline for a little bit, correct?
11        A.  Yes, sir.
12        Q.  And if my memory of this is
13    correct, I think she was offline when
14    Mr. Brown asked you a couple of questions
15    about Exhibit H.
16        Do you remember that?
17        A.  Yes, sir.
18        Q.  Can you please look at Exhibit H
19    and tell me, on the -- that's an email string
20    starting on July 27, 2018, correct?
21        A.  Yes, sir.
22        Q.  And who is the author of the first
23    email in that chain?
24        A.  Alexander McGeoch.
25        Q.  And Mr. McGeoch's email signature
```

Page 120

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2    indicates he's a partner at Hunton Andrews
 3    Kurth, correct?
 4        A.  Yes, sir.
 5        Q.  In Dallas, Texas, right?
 6        A.  Correct.
 7        Q.  Who is the email addressed to?
 8        A.  Mark Patrick.
 9        Q.  And Mark Patrick you previously
10    identified as being one of the in-house
11    people at Highland, correct?
12        A.  Yes, sir.
13        Q.  And is there a Wick Phillips
14    attorney on the email from Mr. McGeoch to
15    Mr. Patrick?
16        A.  No, sir.
17        Q.  And then the top email on Exhibit H
18    is from Mr. Patrick to Tim Cournoyer,
19    correct?
20        A.  Yes, sir.
21        Q.  And it's my understanding
22    Tim Cournoyer is a Highland person as well,
23    correct?
24        A.  Yes, sir.
25        Q.  And he doesn't work at
```

Page 121

```
 1        Wick Phillips 30(b)(6) - R. Wills
 2    Wick Phillips, does he?
 3        A.  He does not.
 4        Q.  And there's no Wick Phillips
 5    attorney on either of these emails, correct?
 6        A.  Correct.
 7        Q.  Could you read Mr. McGeoch's email
 8    beginning with the word "Mark"?
 9        A.  (Reading.)
10        "Mark, a draft of the Unicorn LLC
11        agreement is attached.  We need to
12        select another name because Unicorn
13        is taken in Delaware.  It would be
14        helpful to schedule a call with you
15        to walk through our thoughts on the
16        allocation and distribution drafting
17        approach we took.  Please let me
18        know if you have time for a call
19        with Mark and me this morning.
20        "Thanks, Alex."
21        Q.  So does that indicate to you that
22    Hunton Andrews Kurth actually was involved in
23    the allocation and distribution drafting of
24    the LLC Agreement?
25        A.  Yes.
```

```
 1     Wick Phillips 30(b)(6) - R. Wills
 2     Q.  When Mr. Brown asked you questions
 3  about Mr. Wick Phillips' role in drafting the
 4  LLC Agreement, he didn't ask you about Hunton
 5  Andrews Kurth, did he?
 6     A.  No, sir.
 7     (Email chain "RE: SE Multi-Family
 8        Holdings LLC: Amended and
 9        Restated," beginning Bates
10        Highland136853, marked as Exhibit
11        I.)
12  BY MR. MARTIN:
13     Q.  If you would, please, look at
14  Exhibit I.
15     A.  Okay.
16     Q.  This is an email chain, several
17  pages long.  And if we're going by the Bates
18  numbers, from -- starting on Highland136853
19  through Highland136856.
20        Do you see that?
21     A.  Yes.
22     Q.  Will you page through any of those
23  emails and identify any email addresses from
24  Wick Phillips that are included in that
25  chain?
```

```
 1     Wick Phillips 30(b)(6) - R. Wills
 2     A.  There are no Wick Phillips' emails.
 3     MR. MARTIN:  Okay.  I'll pass the
 4  witness.
 5     MR. BROWN:  Ms. Vosburgh, could you
 6  go back to the first question that
 7  Counsel asked on his set of questions of
 8  Mr. Wills, to the first question, and
 9  read it back to me.
10     THE REPORTER:  (Reading back.)
11     "Question:  Okay.  Mr. Wills, most
12  of my questions are going to be
13  follow-up questions to what
14  Mr. Brown asked you.
15     "Who is it your understanding that
16  Wick Phillips represented in
17  connection with the Loan Agreement?"
18  "Answer:  The borrowers."
19     MR. BROWN:  Okay.  There's a
20  question regarding the matter at hand.
21  That's the one I want read back.
22     THE REPORTER:  (Reading back.)
23     "Question:  Can you explain in
24  non-real-estate-lawyer terms what
25  the scope of the representation was
```

```
 1     Wick Phillips 30(b)(6) - R. Wills
 2  of Wick Phillips in the matter at
 3  issue?"
 4     THE REPORTER:  Is that the one?
 5     MR. BROWN:  Yes.
 6     THE REPORTER:  (Reading back.)
 7     "Answer:  Yes.  Our -- the scope
 8  of our representation was at
 9  specifically the real
10  estate/property level working with
11  especially going through the lender
12  required --"
13     And then there was an interjection.
14        --
15        RE-EXAMINATION
16  BY MR. BROWN:
17     Q.  Okay.  Mr. Wills, I want to
18  understand what your understanding was when
19  you were asked about the scope of the
20  representation of the matter at issue.
21     What matter at issue did you
22  understand was being referred to?
23     A.  Wick Phillips' role with
24  Project Unicorn.
25     Q.  Okay.  So you were not answering
```

```
 1     Wick Phillips 30(b)(6) - R. Wills
 2  the question in connection with
 3  Wick Phillips' role in connection with the
 4  Loan Agreement then, were you?
 5     A.  Well, to me, Project Unicorn
 6  incorporates really all of the topics on the
 7  depo notice, the Loan Agreement,
 8  LLC Agreements.  It's all sort of the same
 9  global project.
10     Q.  But you've already testified, have
11  you not, and Wick Phillips has already
12  acknowledged in its papers that it filed in
13  the bankruptcy court that it represented the
14  borrowers in connection with the
15  Loan Agreement, correct?
16     A.  Correct.
17     MR. BROWN:  I don't have any other
18  questions.
19     MR. MARTIN:  We'll reserve.  Thank
20  you.
21     (The deposition was concluded at
22     1:51 p.m.)
23
24
25
```

Page 126

```
 1     Wick Phillips 30(b)(6) - R. Wills
 2          C E R T I F I C A T E
 3
 4        I, ANNE E. VOSBURGH, Certified Shorthand
 5     Reporter, Registered Professional Reporter,
 6     Certified Realtime Reporter, and Closed
 7     Captioner, hereby certify:
 8        That ROB WILLS, via remote
 9     videoconference, solemnly affirmed and agreed to
10     testify to the truth, the whole truth and
11     nothing but the truth; that all counsel
12     stipulated to this process, notwithstanding the
13     location of reporter or witness at time of
14     deposition; and that this transcript is a true
15     and correct record of testimony given.
16        I further certify that I am not related
17     to any of the parties to this action and that I
18     am in no way interested in the outcome of this
19     matter. Dated: August 11th, 2021.
20
21     _____
22          ANNE E. VOSBURGH
23     Certified Shorthand Reporter No. 6804
24     Registered Professional Reporter
25     Certified Realtime Reporter
```

Page 127

```
 1              ERRATA SHEET
 2   Case Name:
 3   Deposition Date:
 4   Deponent:
 5   Pg.  No. Now Reads   Should Read  Reason
 6   ___  ___ _____   _____   _____
 7   ___  ___ _____   _____   _____
 8   ___  ___ _____   _____   _____
 9   ___  ___ _____   _____   _____
10   ___  ___ _____   _____   _____
11   ___  ___ _____   _____   _____
12   ___  ___ _____   _____   _____
13   ___  ___ _____   _____   _____
14   ___  ___ _____   _____   _____
15   ___  ___ _____   _____   _____
16   ___  ___ _____   _____   _____
17   ___  ___ _____   _____   _____
18   ___  ___ _____   _____   _____
19   ___  ___ _____   _____   _____
20
                  _____
21              Signature of Deponent
22   SUBSCRIBED AND SWORN BEFORE ME
23   THIS _____ DAY OF _____, 2021.
24   _____
25   (Notary Public)  MY COMMISSION EXPIRES:_____
```

**(**

**(a)** 38:11

**(b)** 25:23 38:11,21

---

**1**

**1** 93:19 94:8,19 98:3

**1.05** 37:23 38:7,11,16

**1.07** 34:22 35:9

**1.07(a)** 34:25

**11** 6:3

**14** 37:23

**15** 98:25

**17** 72:21 75:19 84:9

**18** 18:25 19:2 81:25 85:10,13 91:5

**1:29** 109:7

**1:34** 109:8

---

**2**

**2** 93:20 94:19

**20** 100:15

**2018** 14:15,21 20:23 21:9 72:21 81:25 84:9 91:5 99:2 119:20

**2019** 98:25

**2021** 6:3 30:2,13

**22** 51:14

**23** 14:15,21 94:6 98:25

**25** 37:25

**26** 20:23 21:8

**263750** 96:15

**263751** 96:19

**27** 92:7 98:2 119:20

---

**3**

**3** 23:16

**3.15** 47:19 48:4,6,9 49:20 51:12 58:5,19 59:2,19 63:21 64:13, 18 66:7 67:19 69:17 74:5,14,24 75:10 89:18 90:9 95:7 110:5

**30(b)(6)** 6:1 7:1 8:1 9:1,2,10 10:1 11:1,21 12:1,10 13:1 14:1 15:1,4 16:1 17:1 18:1 19:1 20:1 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1 47:1 48:1 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1, 21 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1 71:1 72:1 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1 86:1 87:1 88:1 89:1 90:1 91:1 92:1 93:1 94:1 95:1 96:1 97:1 98:1 99:1 100:1 101:1 102:1 103:1 104:1 105:1 106:1 107:1 108:1 109:1 110:1 111:1,2,14 112:1 113:1 114:1 115:1 116:1 117:1 118:1 119:1 120:1 121:1 122:1 123:1 124:1

---

**4**

**4** 12:17 29:19

**4.01(b)** 25:20

**41** 58:10

**49** 19:9 47:18 50:12

**51:9** 53:11,18,24 54:6,11 55:13,21 58:11 74:17 93:20 94:20 107:19 110:16

**49/51** 59:20

**4:21** 72:22

---

**5**

**51** 19:7 25:18 47:18 50:13 51:8 53:11,18, 24 54:6,12 55:13,22 58:11 74:16 93:19 94:19 107:20 110:15

**5:16** 81:8

---

**6**

**6** 107:21 110:22

**6th** 29:25 30:13 31:13

---

**7**

**76** 27:16

**7:45** 82:15

**7:52** 82:16 85:14

**7:57** 86:2

---

**9**

**9.01** 27:17

**9.01(a)** 27:19 28:2,20

**9011** 9:3

**9:30** 6:3

---

**A**

**a.m.** 6:3

**ability** 39:13

**acceleration** 72:7

**acceptable** 16:7

**accuracy** 27:9 50:4 71:5 106:20 107:3

**accurate** 15:2 67:12,

14 69:13,20 74:8 101:19 110:2

**accurately** 28:21 66:12 83:25 101:22 103:3 118:24

**accusing** 104:7

**acknowledged** 43:17,21 109:21

**acquired** 51:4

**acquisition** 22:18 85:18 86:6 95:23 96:13

**acquisitions** 16:16 40:17 46:7,9

**actual** 35:21 37:7

**added** 25:16 28:10 31:7 40:12 107:11

**addition** 110:21

**additional** 22:24 25:17 100:16

**address** 54:16 58:8 76:2,16,23 77:25 78:8,14 82:3 87:13, 14,15,16,18

**addressed** 26:3 46:25 103:17 120:7

**addresses** 118:2 122:23

**adjusted** 110:21

**Administrative** 25:25 26:4

**admission** 13:15 30:24

**advance** 13:14 38:23 39:10

**advanced** 38:25 41:24

**advances** 39:14,25 40:2,4 41:10,12

**advantages** 36:18

**adverse** 9:21

**advisability** 34:16

**advise** 41:17

**affiliation** 71:15,18

**agency** 22:21

**agent** 21:12 25:25 26:4

**agree** 31:12 74:22 75:7 111:6

**agreed** 99:9 100:4,5

**agreeing** 99:22,24

**agreement** 14:15,21 15:19,21 16:5,6,9,12, 13,18,20 17:10,11, 14,24 18:7,9,19,20, 22 19:2,13,19,24 20:6,12,22 21:8,10 22:2,5,8,11,15,19 23:4,9,16,18,25 24:5, 8,16,19 25:23 26:12, 22,24 27:11,17 28:5, 16,20,21 30:17 31:7, 10,23 32:2,4 33:8,17, 24 34:5,18 35:14,21, 24 36:21 37:6,13 38:14 39:12,22 40:20,23 41:8,11,19, 25 42:5 43:8,19 44:6 45:4,16 46:4,13,18 47:2,9,14,20 48:10 49:2 58:6,16,19 59:2 60:4 61:13,20,25 62:20 63:9,14,18,22 64:6,11,14,20 65:13, 18 66:8,23 67:9,11 69:5,18 71:22 72:4 74:6 80:15 88:8,22 89:9,13,19 90:10 92:4 93:24 94:6,10, 22 95:3,8 98:19,24 99:5,17,18,19,21 100:10,23 101:4,9 102:5,10,11,12,18 103:11 104:25 105:6, 16,25 106:3,5,9,15, 18,22 107:15 108:23 109:13,17,23 110:6, 10,20 113:25 115:17, 18 116:22,23 117:24 118:8,12 119:3 121:11,24 122:4 123:17

**agreements** 18:13 32:10,16,24 43:14

**Alex** 121:20

**Alexander** 119:24

**allocated** 18:7

**allocation** 50:16
121:16,23

**ambiguous** 116:17

**amended** 11:21
12:10 98:18,23 99:20
100:9 101:9 102:4,
12,17 103:11 104:25
105:6,16,24 106:9,
15,18,22 108:22
110:19 118:8 122:8

**amounts** 39:21
41:18 72:7

**ample** 112:12

**analysis** 34:8 36:3

**analyst** 77:17

**Andrews** 120:2
121:22 122:5

**Andros** 55:17

**answering** 124:25

**answers** 9:7 10:24

**Apartments** 75:7

**apologize** 25:4
47:11 57:23 112:25
113:13

**appears** 81:6 82:13
91:4,17

**applicable** 9:2

**applied** 40:3

**appointment** 38:17

**approach** 121:17

**approved** 86:8 89:25

**approximately**
93:19

**Arbolita** 57:5

**Arborwalk** 55:24

**argue** 13:19

**argument** 13:14

**arise** 35:22

**arranger** 21:13

**Article** 27:16

**ascertain** 27:25

**asset** 96:12,21

**assets** 97:17

**Association** 21:12

**assume** 7:19 19:14
21:3 50:5 51:18
88:23 103:3

**assuming** 79:18

**assumption** 44:18,
21

**attach** 48:12 72:9

**attached** 11:8 18:13
49:20 63:17 66:7
74:5,13,23 75:8,9
80:13 86:6 92:10
94:7 98:13 99:10
119:3 121:11

**attachment** 48:25
50:21,22 74:3 75:5
93:3,8,15

**attachments** 48:12,
15,22 49:25 51:12
72:13 73:24 92:21,24
93:10

**attention** 119:4

**attorney** 7:4 73:8
89:2 120:14 121:5

**attorney-client**
36:14

**August** 6:3 14:15,21
91:5 94:6,8 98:3,25

**authentic** 99:22
100:4

**authenticity** 99:13,
25

**author** 119:22

**aware** 9:5 18:4 28:17
33:25 36:9 61:15
63:6,10 64:3 66:22
67:2 90:18,19
105:17,22 107:2
117:23 119:9

**B**

**back** 26:10 48:3
52:19 75:18 79:4
85:9 87:3 89:25 94:4
97:9,23 100:13
101:25 102:23
104:17 111:9 113:3
117:16 123:6,9,10,
21,22 124:6

**Baker** 79:4,5 83:21,
24 84:4,16,22,24

**bankruptcy** 9:3,23
30:25

**base** 46:21 63:11
108:25

**based** 10:13 44:21
51:11 107:20

**basic** 92:11

**basically** 7:24

**basis** 117:10

**Bates** 122:9,17

**Battleground** 54:4

**beginning** 121:8
122:9

**behalf** 9:7 26:23
28:14 37:3 39:9 43:4
44:15,16 45:18 60:6
62:9 67:8 69:2 70:11,
12,13 71:7,11 76:21
90:11

**believed** 76:5 105:5

**benefit** 41:21,24

**BH** 100:18,19 101:6,
23 107:11,22 110:22

**binder** 21:2,6

**binding** 9:13 10:24

**bit** 46:19 53:2 64:22
102:2 119:10

**Bonner** 77:15 87:14
88:5

**bookrunner** 21:14

**borrowed** 39:22

**borrower** 23:18,21
24:5 25:14,17 26:7,9,
10,20 27:2,3,21 29:3,
21 30:15 31:16
37:12,16 38:13,17,
19,24 39:4,7,12
40:13,15 46:14,22
49:16 70:13,21 71:23
88:17,20 114:6 115:8

**borrower-level**
83:4,18

**borrowers** 21:11
22:17 24:8,10,11,25
26:21 29:4 31:18,20
32:3 33:6 34:9 35:19
36:12,17 37:6 39:9,
19 40:16 41:7,10
45:3 49:22 67:5
90:11,21 92:3 105:12
109:16 114:2 115:9
118:18 123:18

**borrowing** 46:21

**bottom** 50:23 84:13
87:4

**Brandywine** 54:14
55:5

**break** 45:23 86:17,18

**bridge** 20:22 21:7
29:21 30:15 31:16
100:19

**briefly** 51:19

**briefs** 11:8

**bring** 100:16

**Broaddus** 60:25
61:9 62:3,9,12 69:10
70:2,25 77:23 78:3
86:14 87:15 88:6
90:14 91:6,22,24
98:2,12 109:21
110:3,14

**Broaddus'** 93:8

**Brown** 6:14 10:16
11:16,19,23 12:3
14:11,17 20:20,24
24:23 25:4,7 27:7,14
29:5 30:7 31:11 35:5,
11,17 36:10,24
37:10,22 38:2,5 40:9
41:16 44:12,20 45:11

46:2 47:24 48:2,16,
21 49:6 52:15,24
53:3 54:19,22 55:2,4
59:5,21 60:16 61:16
62:7,24 64:2,16 65:6
69:14 70:6,15 72:9,
14,18 73:3 74:11
75:15,20 76:13 80:6,
23 81:3,5 84:3,11,15
86:15,22 87:2,5 90:7,
23 91:3 95:24 98:21
99:7,15 100:6 101:5
103:4,7,14,19,23
104:7,10,21 108:7,
13,20 109:9 110:7
111:5,17,19,23
112:5,6,14,19,24
113:5,22 114:4,8,20
115:14 116:5,16,21
117:5,18 118:5,9
119:5,14 122:2
123:5,14,19 124:5,16

**Brown's** 115:5

**bucket** 22:20

**buckets** 66:20

**business** 49:15,16
90:2 104:4

**C**

**calculator** 107:17

**call** 59:17 92:13
103:5 108:11,15
121:14,18

**called** 6:8 12:10 21:7
94:17 117:8

**calling** 24:14 30:11
31:5

**CANTY** 37:19,24
47:21

**capability** 80:18

**capacity** 87:20

**capital** 6:19 19:8,18
21:13 23:22,24 24:2
25:16 27:21 28:4,15,
24 30:8 40:23 75:25
76:15,22 77:4,24
78:8,14 82:2 87:12,
13,15,16,17 101:10

118:2

caption 48:4 73:21

care 27:21 29:7

case 9:23 27:20
28:11 44:19 93:23

cell 108:16

Central 6:3

chain 71:3 72:11,15
81:7 90:25 101:3
119:23 122:7,16,25

chance 38:10

Chang 42:8,21 61:9
69:10 70:2 78:6,9
82:2,5,16 85:15 86:3
87:17 88:6

Chang's 82:14,23

change 48:19 53:2
76:9,25 77:11

changed 28:12
100:21

changing 101:16

Charles 68:10

chart 55:6 57:20
67:14 71:3,5 74:12,
15,20,23 75:4,9 80:5
83:24 94:17,25 95:11
96:6,14,18,23,24,25
101:13

charts 56:3,8,22
57:3,15 58:6,25
59:19 61:3 62:5
63:17,21 65:11,15
66:2,6 67:21 69:12,
17,19 72:12 73:22
74:5,13 79:2,6,9,11
81:12 82:4,5,24 83:5
85:18 86:6 89:17,24
90:8,21 92:11 97:6,
12 98:13 110:5,8,12
119:2

checked 90:5

checklist 89:23 90:6

circulate 79:5

Civil 9:2 117:9

claim 9:22 116:19

clarification 116:6

clarify 112:15 116:9

clean 78:25 79:16,18

cleaned 79:13

clear 112:9 115:13
117:2,14

client 32:11,17,22
42:3 43:6,9,22,24
44:3,9 45:14 67:14
114:18 115:5

clients 32:24 33:24
34:5 35:13 67:8

closed 92:15

closely 104:12

closing 22:25

co-borrower 23:5
28:11 31:6

co-borrowers 25:13
31:9,19,21

collection 26:21
29:3

collective 46:22

comfortable 22:4

comment 8:20

comments 81:13
86:9

committed 100:14

common 35:2

communicate 66:12
70:21 118:25

communicated
45:15 60:9 109:19
110:3

communicating
44:16 45:18 62:9
66:20 76:20 87:10,20
88:15,20 102:20

communication
105:21

communications
17:23 19:17,22 20:8,
9 58:24 59:7 60:23
61:10,18,23 62:11
64:4 66:14 67:22,24

87:25 88:21 90:20
98:12 102:24 103:2,
9,21 104:14 105:5,19
106:8

companies 88:8

company 14:14,20
15:19 16:5 43:15
60:2 98:19,24 102:5

compared 115:8

complete 9:6 10:23
25:8 83:24 106:16

compliance 35:8

component 47:14

comprise 58:25
63:21 69:17

conclusion 63:12
77:2,11

conclusions 76:9

condition 26:2

conditions 25:23

Conduct 34:21

conduit 20:2 49:14
83:21 105:11

Confirm 67:20

conflate 117:12

conflating 62:25

conflict 33:5,10,16,
23 34:3,10,11,17
35:7 40:5,6

conflicts 35:22 37:7
114:19

conformity 35:8

confused 104:8

connection 9:19,21
10:9 14:25 15:8,14,
17,21 16:14 17:13
18:8,18 19:25 22:11,
14,17,24 23:3,4,9
28:5 31:9,23 32:2
33:8,17 34:17 35:12
36:4,20 40:16 42:4
43:7,18,20 44:5,25
45:15 46:5,13,18
48:9,25 49:12 60:4
61:12,19,24 62:5,13,

19,22 63:3,8,13 64:5,
11,19 65:12,17 67:9
68:22 69:4 88:21
89:13,22 90:8 91:13
92:2 102:4,17 104:25
106:9,14 108:22
109:4,12,16,23
113:24 123:17

consent 35:2

considered 34:3

consistent 30:23
58:14 118:13

constitute 89:18
98:3

consult 36:11

consulted 36:17
114:18 115:4

contact 42:4 43:7,10,
22,24 44:3,4,9

contacts 45:14
60:14

contained 66:23

context 14:24 20:12
40:14 60:23

contribution 40:24

contributions 19:18
20:18 100:20 101:10
107:12,14

conversations 66:5

converted.' 83:7

converting 83:3,17

copied 85:15

copies 27:22

copy 14:19 21:23
22:7 29:12 81:9 99:4

copying 82:17

correct 7:5 15:6,10
17:20,21 19:12,14
20:14,15 23:14 24:3,
5 26:17 27:3 31:17
38:14,15,19 39:5,6
43:4 49:17 50:9,13,
17 51:4,9,16,23 52:4,
9 53:10,19,25 54:7,
12 55:7,8,14,22 56:4,
9,13,17,22 57:3,7,11,

19,22 63:3,8,13 64:5,
15,20,21,25 58:4,16,
17 60:10 65:20 66:3
68:20 69:20 70:3
71:8,23 72:4,7 74:17
76:2,6,23 77:8 78:5,
17,21,22 80:8,21
89:9 91:6,22 92:4,22
94:13,20,22 95:4,9
96:2,5 98:5 99:2
101:11,12 102:14
106:2 107:22 109:13,
17,24 110:10,16,22
114:23 119:10,13,20
120:3,6,11,19,23
121:5,6

corrections 8:17,20

correspondence
60:19

counsel 6:18 24:22
26:7,9 29:22 30:18
4:9 57:24 60:3
62:10 63:16 64:25
65:2 78:12 79:14
80:4,17 83:22 85:3,4
105:13 114:13,14
123:7

counsel's 111:21

counterparty 17:9

couple 11:12 78:25
119:14

Cournoyer 120:18,
22

court 8:4,11 11:16
29:25 31:2 111:6
112:10 119:9

covered 109:10

created 69:12

creating 61:3

credit 25:14 46:21

Crossing 56:11

crystal 115:12

current 7:8 11:6 86:4
101:14

custom 32:15

**D**

**D.C.** 11:5 68:7,13 78:16,19 81:9 82:17 85:16 91:19 98:4,6 100:12 106:23 114:21 115:10

**Dallas** 120:5

**Dandeneau** 113:11, 12,15

**Date** 26:5

**dated** 14:21 21:8 26:5 94:6,7 98:24

**days** 11:12

**deal** 42:7

**dealing** 100:2

**dealings** 44:24

**deals** 100:18

**Debtor** 6:20,23 9:22 18:6 24:4 30:9 77:9

**Debtor's** 9:19,22 12:10 29:14

**declaration** 99:11, 12

**declarations** 11:7 99:11

**declared** 6:9

**deduction** 64:23

**default** 72:3,6

**defined** 23:21,25 35:20 77:9

**definition** 46:22

**Delaware** 80:7 85:4 121:13

**deliver** 83:25

**delivering** 89:24 102:20

**deposition** 6:2,21 7:14,16,22 8:17 9:10, 18 10:25 11:11,22 12:11 13:4,25 14:4 16:3 17:4 21:25 33:20 60:20 86:20

99:16 100:3 102:10 104:13 109:4 111:14 119:6

**describe** 22:13 66:4

**designated** 8:24 9:9 10:8 12:19,24 13:13 33:21 37:12,16 68:24

**designation** 58:20 73:15 91:11

**detail** 66:14

**determination** 45:5, 9 50:3 69:16

**determine** 34:8 39:13,25 44:13 67:10 70:8

**determined** 93:18

**digress** 99:7

**diligence** 67:8,13,15 68:19 69:24 89:22 90:5

**diligenced** 68:18

**diligencing** 68:4 69:4

**direct** 39:14 40:2 41:9 113:9 119:4

**directed** 41:13 115:6

**directing** 40:15

**directly** 64:5

**disagree** 112:18

**disclosing** 10:18

**discuss** 92:14

**discussed** 87:9 92:11 98:15

**discusses** 25:22 27:17

**discussion** 33:22 104:23 111:16

**discussions** 34:15 35:19 68:3 94:12

**dispense** 7:21

**disqualification** 10:9 31:14

**disqualify** 9:20 11:2 29:14 30:14

**distinction** 45:13,17 59:12,14,21

**distribution** 106:25 107:7 121:16,23

**document** 14:22 15:5,9,10,14 21:7,15, 19 29:25 38:8 93:18 100:8

**documents** 13:21 99:10 103:16 104:11

**dog** 68:10

**Dondero** 44:5 106:8

**draft** 97:12 101:3 118:7 121:10

**drafted** 17:25 118:12

**drafting** 17:13 20:13 121:16,23 122:3

**dragging** 57:23

**Drawhorn** 99:14 100:5 104:18

**DST** 64:25 66:19 79:2,14 80:3,5,7,8,17 82:5,24 83:4,18,21 85:3 92:11 94:17

**DSTS** 90:25

**due** 41:19 69:23 72:7

**E**

**earlier** 23:25 69:25 79:8

**Economics/ownership** 93:4

**effective** 26:5 98:25

**Ellis** 97:14

**email** 72:11,15,20,21 73:4,10,18,21 74:2 75:6,18,19,21 76:2, 15,23 77:24,25 78:8, 14,21,23 81:4,7,16, 18,23,24,25 82:3,9, 12,14,18,20 83:16 84:8,14,20 85:10,12, 13,14,21 86:11 87:4,

12,14,15,16,17 89:7 90:17,19,25 91:5,8, 22 92:6,7,8,19 93:9 94:7,9 97:10,24 98:2, 3 101:3 103:3 105:20 117:25 119:19,23,25 120:7,14,17 121:7 122:7,16,23

**emailing** 75:22

**emails** 61:7 84:5 87:7 88:16 89:5,11, 16 97:25 98:9,13 99:9 105:14,18 121:5 122:23 123:2

**employed** 42:13

**employee** 42:11,16, 18,22,24

**end** 75:16

**engagement** 32:19

**entities** 21:9 25:12, 13 26:11 29:7 31:22 83:5,6,18 87:25 117:25

**entitled** 104:6

**entity** 6:20 16:23 29:8 40:12 44:15 68:14 77:20

**entry** 75:25

**equity** 7:10 100:16, 19

**ESQ** 6:7

**essentially** 113:6 116:3

**establish** 43:20

**established** 106:12

**estate** 7:12 10:20,21 43:13 59:15 118:17

**estate/property** 116:2 124:10

**event** 72:3,6

**evidence** 13:21

**EXAMINATION** 6:13 113:18

**executed** 19:13

12,14,15,16,17 89:7 90:17,19,25 91:5,8, 22 92:6,7,8,19 93:9 94:7,9 97:10,24 98:2, 3 101:3 103:3 105:20 117:25 119:19,23,25 120:7,14,17 121:7 122:7,16,23

**exhibit** 11:17,18,19, 20,22 14:12,16,19 15:19 20:21,23 21:6, 7,16,24 22:4 72:10, 13 87:2 89:8 90:23 91:2,4 92:8 93:23 96:4 98:3,16,20,22 99:16,19,20 101:4 102:6,13 119:3,7,15, 18 120:17 122:10,14

**exhibits** 11:7 12:7 21:3 109:6 119:5

**existing** 96:11,17 97:20

**explain** 30:22 115:20 123:23

**explained** 41:7

**explaining** 7:21

**extent** 18:13 26:24 27:2 28:3 41:8 46:16

**eyebrows** 104:19

**F**

**fact** 39:24 111:8 118:11

**fairly** 104:12

**Fairways** 57:9

**fall** 66:20

**false** 72:2

**familiar** 21:21 34:20, 24 48:5 58:18 60:21 104:10

**Family** 15:25

**favorable** 26:3

**Federal** 8:25 117:8

**fight** 115:14

**filed** 29:25 30:12,25

**files** 11:9

**filing** 31:14

**final** 72:12 73:22 82:4

**finalizing** 110:4

**financing** 15:22 16:15 18:9 22:22,24

46:5

**fine** 7:23 38:4

**finished** 8:8 24:22 117:4

**firm** 10:4,20 59:24 63:7,12 65:25 118:11

**firm's** 10:14 11:3

**firms** 26:20

**five-minute** 86:18

**flip** 18:25 23:15 48:16,17 51:17,20 52:12 53:6 100:24

**focus** 23:17 25:19 72:16 87:7 106:11

**focusing** 53:16,22 54:4,10 72:19

**folks** 49:15,16 62:4 69:9

**follow** 61:7 81:11 111:20

**follow-up** 113:21 123:13

**form** 27:4,12 28:25 30:4 31:3 35:3,10 36:8,22 37:8 40:7 41:14 42:9 44:11,17 45:8,20 49:3 59:3 60:11 61:14 62:2,21 63:23 64:12,21 69:7 70:4,14 74:9 76:11 80:2,22 83:19 89:20 95:17 102:25 105:18, 20 108:5 109:25 110:23 117:8 118:4

**format** 97:4

**formation** 20:13 94:12 115:17

**formed** 94:20 118:14,16

**forward** 27:15 94:24

**forwarding** 110:4

**found** 103:20

**frankly** 80:16

**Freddie** 18:10 20:2 22:22 66:21 81:14

83:25 85:15 86:3 90:3

**Freddy** 42:8,21 69:10 78:6,9 82:2,5, 14,16 87:17 88:6

**front** 12:5,7 29:14,16

**full** 6:15

**funds** 40:15 100:14

**future** 113:4

**FW** 101:3

**G**

**gave** 37:6 101:7

**general** 87:9

**generally** 66:9 87:8

**generated** 97:15

**Geotz** 44:8,14 61:8 71:17 76:18 88:5

**give** 29:11 40:5 66:13

**giving** 112:12

**Glenview** 55:11

**Goetz** 42:7,10,11 60:15 61:20 69:25 70:19 71:12 77:3,12, 17 87:13

**good** 13:3 45:22

**Gould** 12:11 26:6

**Governors** 52:22 53:7 74:3

**Grand** 57:14

**great** 16:10

**Green** 52:22 53:7 74:3

**grounds** 104:3

**group** 7:12 21:9 69:24 81:9

**guarantee/ guarantor** 40:13

**guess** 31:5 63:4 64:22 103:15 112:8

**Gulfstream** 50:23

**H**

**hand** 123:20

**handful** 61:2 62:4

**handled** 10:21

**handles** 43:13 71:3

**handling** 59:24

**hat** 44:14,19 45:6 70:9

**Hayley** 103:4 108:9, 15

**HC** 30:5

**HCM** 29:23 30:8,18

**HCRE** 16:23 17:3,4, 7,20 18:6 19:6,17,22 37:11 38:14 39:25 40:6,14,22 41:9 42:4, 19,25 44:10 45:19 47:8,13 50:8,13 51:7, 8 53:10,18,25 54:6, 12 55:14,22 56:3,17, 22 57:2 58:12,24 60:10 61:12 66:6 70:11 74:16 88:17 107:12 108:21 110:15 114:10,11,13

**HCRE's** 46:12

**hear** 79:4

**hearing** 8:21 13:15, 22

**Heights** 52:6

**helped** 22:16

**helpful** 121:14

**Hidden** 56:24

**Highland** 6:18,21,23 16:21 17:10,20 18:6 19:8 23:3,5,8,13,22, 24 24:2,4,14,17 25:16 26:11 27:3,21 28:4,10,15,24 30:8,9, 11 31:6,16 39:20 40:3,6,12 41:18,23 42:11,16,22 43:7,10, 15,18,22 45:18 47:3, 8,13 50:8,12 51:7,9 53:10,18,24 54:6,12

55:13,22 56:3,17,21 57:3 58:11 59:10,12 60:3 61:19,24 62:10, 11,19 63:2,8,13,16, 24 64:10,19,24 65:12,17 69:11 70:12 71:2,14,15,18 74:17 75:25 76:10,15,22 77:4,5,8,9,12,19,24 78:4,8,14 82:2 85:3 87:12,13,15,16,17 88:7,10 89:3 90:15 92:2 107:13 108:22 109:20 110:16 114:5, 10 117:25 118:2 120:11,22

**Highland's** 46:17

**Highland136853** 122:10,18

**Highland136856** 122:19

**Highland263748** 95:25

**Highland263749** 96:8

**hired** 59:15

**history** 94:5

**Hold** 97:11

**Holdings** 14:13,20 15:18,25 16:4 70:22 94:6,22 95:4 98:17, 23 100:11 122:8

**hook** 39:20

**hour** 81:8 86:16

**hours** 11:13

**housekeeping** 11:24

**hung** 64:15

**Hunton** 62:16,18 63:7,12,15,22 64:5, 10,19,25 65:4,12,20, 22,24 108:24 120:2 121:22 122:4

**I**

**i.e.** 70:10

**idea** 65:24 76:14 95:15

**ideal** 32:12

**ideally** 32:18

**identical** 74:24,25 75:8,10,11

**identically** 58:9

**identified** 69:25 120:10

**identify** 122:23

**impact** 36:6

**implications** 36:12

**important** 8:6 18:12

**improper** 36:6

**in-house** 42:9 59:10, 24 64:24 78:12 114:14 120:10

**inaccurate** 27:2 28:2

**include** 23:21

**included** 67:4 89:4 122:24

**includes** 27:3

**including** 26:11 39:20

**inconsistent** 30:2, 21

**incorrect** 19:12 26:12,15,16 72:2 114:8

**independent** 63:19 64:8

**indication** 57:18

**individually** 36:19

**individuals** 45:6,17 60:8 61:11,18 70:9 87:21,23,24 88:14

**information** 83:14

**Initially** 25:11

**initials** 68:9

**initiating** 84:8 87:4 92:6

**inquiry** 82:24 86:2

**instruct** 10:12 110:24

**instructing** 111:18

**instruction** 111:21

**instructions** 90:11 117:19

**intended** 108:4

**intent** 106:24 107:6

**interest** 19:7,9 47:12 50:12 53:17,23 58:8, 10,15 94:18 101:11, 15,17,20 106:17,21 110:9,15

**interested** 88:2

**interests** 19:23 20:11 47:7 50:7 53:8 54:5,16 58:2,7 74:16 75:2,12 93:16 95:2,7 109:22 110:18,21

**interjection** 124:13

**internal** 11:9

**interpose** 116:5

**interpret** 79:17

**interrupt** 25:5 54:25

**interruption** 12:2 85:8 109:7

**involved** 46:16 62:11,18 65:25 121:22

**involvement** 109:11

**irrespective** 41:12

**Isles** 50:23 55:18

**issue** 27:9 28:19 34:16 46:25 47:8 115:23 116:8,10 124:3,20,21

**issues** 117:13

**item** 83:23

**items** 92:12,15 93:3

**IV** 6:17

**IX** 27:16

### J

**James** 6:17 44:5 106:8

**joint** 33:7,23 34:4,9 35:12,23 36:4,13 37:5

**jointly** 36:19 39:20 40:3

**July** 92:7 98:2 119:20

**jump** 37:20

**JV** 93:4,16

### K

**K&e** 97:12

**Ken** 37:19 47:22

**Keybanc** 21:12

**Keybank** 18:10 20:2, 5 21:11 22:23 23:3 25:13 28:9 48:12 49:5,8 66:21 90:3 100:12 102:21,25 103:10 104:15 105:6, 15 118:25

**Kirkland** 97:14

**knowledge** 13:17 14:7 27:13 40:21,25 44:2,7 63:20 64:9 87:19 88:3,4 106:17 107:25 115:11,15

**knowledgeable** 9:7 10:23

**Kurth** 120:3 121:22 122:5

### L

**L.P.** 6:19 19:8 24:2 29:23 30:5,8,9,19

**lack** 27:9 100:19

**Lake** 56:24

**Lakes** 54:9

**Landing** 57:18

**large** 25:15

**laundry** 69:8

**Lauren** 99:9 103:17

**law** 8:4 10:4,14 59:24 117:20 118:11

**lawyer** 68:17 78:24 118:17

**lawyers** 33:14 78:20

**lead** 21:13 37:12,16 38:13,17,18,24 39:3, 7,12 40:14 46:14 72:6 88:17,20 114:5 115:8

**leads** 64:18

**learned** 94:21

**lecture** 117:19

**legal** 26:18,19 89:22

**legible** 95:12

**legitimate** 13:7

**lender** 21:11 49:15 66:12 71:21 89:25 105:11 116:4 124:11

**lenders** 18:12 26:5

**letter** 32:19,20

**level** 59:17 70:21,23, 24 71:2 116:2 124:10

**Liability** 14:14,20 15:18 16:5 98:19,24 99:21 102:5

**liable** 40:4 41:11,18

**light** 104:22

**lights** 30:20

**limit** 20:11

**limited** 14:14,20 15:18 16:5 19:12 20:11 40:24 46:24 47:3 97:17 98:18,24 99:21 102:5

**list** 16:20 69:8

**literal** 33:15

**LLC** 14:13,20 15:21 16:4,6,9,12,13,18,23 17:3,10,11,14,24

18:7,19,20,22 19:2,6, 19,24 20:12 46:9,10 47:8,13 50:8 51:7,15 53:9,17,22 54:5,10, 16 55:6,11,19,25 56:8,13,16,20,25 57:6,10,19 58:3,8,16 63:3 70:22 74:15 75:2,13 93:4,17,22, 24 94:6,10,18,20,22 95:3,4,8 97:18 98:17, 23 99:17 100:10 101:3,9 102:11,12,18 103:11 104:25 105:6, 16,25 106:5,9,15,18, 22 107:15 108:23 109:22 110:10,20 115:17,18 116:23 118:4,8,12,14,16,20 121:10,24 122:4,8

**LLP** 12:12 26:6

**loan** 18:9,13 20:6,22 21:8 22:2,5,8,11,15, 19 23:4,9,16,18,25 24:5,8,16,19 25:17, 23 26:12,22,24 27:11,17 28:5,16,20, 21 29:22 30:16,17 31:7,10,16,19,23 32:4 33:8,17,24 34:5, 18 35:14,21,24 36:20 37:6,13 38:14,22 39:9,12,22 40:20,23 41:8,11,19,25 42:5 43:8,13,19 44:6 45:4, 16 46:4,13,18 47:2,9, 14,20 48:10 49:2 58:6,19 59:2 60:4 61:13,20,25 62:20 63:9,14,18,22 64:6, 11,14,20 65:13,18 66:8,23 67:9,11 69:5, 18 71:22 72:4 74:6 80:15 88:22 89:9,13, 19,23 90:10 92:4 95:8 99:18,19 109:13,17,23 110:6 113:25 115:6 116:22 119:3 123:17

**loans** 28:8 38:23

**log** 104:3

**long** 122:17

### M

**Mac** 18:10 20:2 22:22 84:2

**made** 9:2 30:25 31:13 39:14 40:2 45:5,10,13,16 69:16 71:23 78:25 79:11 80:25

**maintained** 105:9

**make** 8:17 13:10 15:25 40:23 49:18,21 50:3 54:24 77:7 79:8 95:18 102:8 112:9 115:12 116:20 117:10,14

**makes** 8:10

**making** 80:4,19 89:23

**Management** 6:19 19:8 24:2 27:22 28:4, 15,24 30:9 107:22 110:22

**manner** 30:23

**March** 98:25

**mark** 11:17,19 14:12 20:21 72:10 88:24 120:8,9 121:8,10,19

**marked** 11:22 14:15, 18 20:23 21:5 72:13 91:2 98:19 101:4 122:10

**Markets** 21:13

**Martin** 10:11 12:11 24:21,24 25:6 26:6 27:4,12 28:25 30:4 31:3 35:3,10,15 36:8, 22 37:8 40:7 41:14 44:11,17 45:8,20,22 49:3 52:15,25 54:17, 20,23 59:3 60:11 61:14 62:2,21 63:23 64:12,21 69:7 70:4, 14 72:24 74:9 76:11

80:2,22 83:19 86:20, 24 89:20 95:17 103:19,24 104:9,16 108:5 109:25 110:23 112:2,8,16,21,25 113:8,13,19 114:11, 12 116:12,20 117:4, 6,21,22 122:12 123:3

**material** 80:4 109:3, 5

**math** 107:17

**Matt** 42:7,8,10,11 60:15 69:10 70:19 71:12 75:23 87:12,13 88:5

**matter** 9:14,16 10:21 11:24 13:22 32:21,22 115:23 116:8,10 123:20 124:2,20,21

**Mcdermett** 77:15 87:14 88:5

**Mcgeoch** 119:24 120:14

**Mcgeoch's** 119:25 121:7

**Mcgraner** 42:8,15 60:15 61:9 60:10,25 70:19 71:6,13 75:23 76:15 77:17 87:12 88:5 99:12

**Mckenzie** 79:4 83:21,24 84:4,16,22, 24

**means** 79:18 80:8 107:5,9

**meant** 77:8

**mechanics** 115:6

**memorialized** 100:21,23

**memory** 119:12

**mentioned** 32:20 46:20

**merging** 83:4,18

**methodically** 111:10

**middle** 25:3

**Mill** 52:23 53:21 75:6

**million** 100:15

**mind** 39:24 47:23 59:13

**mine** 11:5,6

**minute** 85:14 100:13

**minutes** 82:15 85:25 86:23

**minutes'** 111:7

**mischaracterizing** 114:9

**missing** 54:15 84:12

**misstated** 47:5

**mistaken** 103:22 104:20

**modified** 102:21,25 106:24 107:6,10,19

**moment** 29:11 99:8

**Monday** 72:21

**money** 115:7

**moneys** 40:22

**morning** 121:19

**Morris** 99:11

**motion** 9:19 10:10 11:2 14:25 29:14 30:13 31:15

**move** 98:16

**Multi-family** 122:7

**multifamily** 14:13,19 15:18 16:4 70:22 93:24 94:5,22 95:4 98:17,22 100:10,18

**multiple** 26:19 37:5 67:3

**mute** 108:14

**N**

**names** 59:8 60:8,21 61:2,5

**National** 21:12

**nature** 14:4

**necessity** 34:16

**needed** 22:22 25:14 100:16

**negotiate** 118:8

**negotiated** 17:25

**negotiation** 15:10 17:13 20:13 115:18

**Nexpoint** 25:12 43:13 44:18 59:9,12, 14 60:15 69:11 70:20 71:7,11 76:6,21 78:11 88:6,11 90:13 116:15 117:23 118:18

**non-real-estate-lawyer** 115:21 123:24

**note** 92:12

**notice** 9:10 10:25 11:21 12:10 28:7 111:3,14

**notices** 27:18,20 28:14 29:3,6

**number** 91:18

**numbers** 122:18

**O**

**Oak** 52:23 53:21 75:6

**Oasis** 57:14

**oath** 7:25

**object** 10:11 116:17

**objection** 27:4,12 28:25 30:4 31:3 35:3, 10,15 36:8,22 37:8 40:7 41:14 44:11,17 45:8,20 49:3 59:3 60:11 61:14 62:2,21 63:23 64:12,21 69:7 70:4,14 74:9 76:11 80:2,22 83:19 89:20 95:17 108:5 109:25 110:23 116:20 117:7, 11

**objections** 99:24 117:7

**obligations** 38:18

**obtain** 33:5 35:7

**obtained** 39:10 40:22

**obtaining** 32:16

**obvious** 9:17

**occasion** 18:4

**occasions** 67:4

**occurred** 40:18

**offering** 13:21

**offline** 111:12 119:10,13

**Olde** 52:7

**open** 32:21 92:12 93:3

**operating** 59:16 88:9,11

**operation** 41:8

**opinion** 26:3,18 37:4,9 40:8 83:10

**opinions** 26:19

**opportunity** 8:16 112:13 113:6

**opposed** 15:7 29:8 87:8

**opposition** 11:4 29:13,19 30:13 31:14 43:17

**order** 118:20

**org** 65:11,15 67:14, 21 72:12 73:22 74:12,13,15,20 79:2, 6,9,11 80:5 81:12 82:4,5,24 83:5,24 85:18 89:17,23 90:8, 21 110:5,8,12

**organization** 66:6

**organizational** 18:11 62:23 63:17,20

**original** 94:10 97:10, 24 99:17 102:9 107:15,19

**outstanding** 83:23

**owner** 83:4,6,18 95:20 110:22

**ownership** 18:5,17, 18 19:23 20:10,17 46:23 47:7,12 50:7, 11,16 51:6,15,22 52:3,8,20 53:17,23 54:5,10 55:12,21 56:2,7,12,20 57:2,7, 11,14 58:2,7,8,10,15 74:16 75:2,12 93:16 94:18 95:2,6 101:17, 20 109:22 110:9,15, 20 118:20

**owns** 20:3

**P**

**p.m.** 72:22 81:8 109:7,8

**pages** 122:17

**Pardon** 54:19

**Park** 51:21 54:4,9

**part** 43:15 47:9 64:13,17 66:18 70:19 73:18 89:21 110:5

**parties** 16:17,19,22 17:23 20:10 28:19 90:2,12 101:21 108:3 109:12

**partner** 7:10 11:5,6 60:21 68:15 93:19,20 94:19 114:23,25 120:2

**partners** 7:11 10:19 16:23 17:3 19:6

**Partnership** 19:13 40:24 46:24 47:3

**party** 9:21 16:22 17:11,17 47:17 105:24

**pass** 95:13 112:6 123:3

**passing** 61:4 83:13 112:4

**past** 84:19

**Patrick** 88:24 120:8,

9,15,18

**Paul** 60:25 69:10 70:25 86:7,13,14 87:15 88:6 91:6,22, 24 92:17 93:8 98:2, 12 109:21 110:14

**penalty** 6:10

**people** 45:14 59:9 67:20 69:24 70:7 81:20 83:14 87:11 120:11

**percent** 19:7,9 47:18 50:12,13 51:9 53:11, 18,24 54:6,11,12 55:13,21,22 58:10,11 59:20 74:16,17 93:19,20 94:19,20 107:21 110:15,16,22

**percentage** 19:7,9 51:15,22 52:3,8 54:11 55:12,21 101:10,15 106:17,20 110:18

**percentages** 18:5, 18 19:11 20:17 51:7 52:21 56:2,7,12,16, 20,21 57:2,7,11,15 107:13,14,18,19 108:2

**perfectly** 113:16

**perform** 67:7

**perjury** 6:11

**permitted** 41:9

**person** 120:22

**personal** 10:5

**personally** 15:7 32:23

**petition** 112:10

**Phillips** 6:1 7:1,9 8:1, 25 9:1,8,9,13,20 10:1,4 11:1 12:1,11, 19 13:1,16,19 14:1,3, 6 15:1,4,8 16:1 17:1, 12,22 18:1,3,17 19:1, 16,21 20:1,9 21:1 22:1,10,14 23:1,2,8 24:1,7,9 25:1,2 26:1, 6,9,17,23 27:1,8,22

28:1,3,9,13,18,22 29:1,20,22 30:1,14, 18,24 31:1,15,22,25 32:1,9 33:1,5,21 34:1,2,7,18,20 35:1, 6,18 36:1,2,11,16,19 37:1,3 38:1 39:1 40:1 41:1,6,17 42:1 43:1, 4,16,21,24 44:1,4,13 45:1,5,13 46:1 47:1 48:1,8,24 49:1,8,18 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1,23 59:1,6 60:1, 7,9,14 61:1,10,17,22 62:1,12 63:1 64:1,4, 23 65:1,5,9,16 66:1,5 67:1,7 68:1,3,15,17, 24 69:1,3,16,22 70:1, 8 71:1,20,25 72:1 73:1,9 74:1 75:1 76:1,20 77:1 78:1,17, 24 79:1,8,11 80:1 81:1,19 82:1,10,21 83:1,15 84:1 85:1,20 86:1,10 87:1,19 88:1, 19 89:1,12,17 90:1, 10,20 91:1,21 92:1, 18 93:1 94:1 95:1 96:1 97:1 98:1,5,8,11 99:1 100:1 101:1 102:1 103:1,10 104:1,14 105:1,15,23 106:1,7,13 107:1,24 108:1 109:1,15,19 110:1,13 111:1 112:1 113:1,24 114:1,16,23 115:1,2,16,22 116:1, 13,24 117:1 118:1,4, 7,17,19 119:1 120:1, 13 121:1,2,4 122:1, 24 123:1,16 124:1,2

**Phillips'** 10:8 12:24 14:8 15:13,17,20 26:25 27:25 29:13,24 30:12 31:13 32:14 33:23 35:23 42:3 43:6 45:2 58:21 59:13 88:3 89:8 92:2 102:3,16 104:24 109:11 116:7 122:3 123:2 124:23

**phone** 108:10,11

**place** 56:16 97:20

105:18,20

**played** 22:14

**pleadings** 30:25

**point** 42:8 83:21 84:16 113:4

**portfolio** 95:21

**portion** 59:25 90:5 101:23 107:11

**position** 7:8 13:17 27:25 28:22

**positive** 101:24

**potential** 34:10 35:21 37:7 40:5 97:16

**practice** 32:15 117:20

**precluded** 13:20

**preparation** 15:9 33:20 49:12 60:19 68:23 73:18 91:14

**prepare** 49:8 106:2

**prepared** 10:23 12:23 48:24 50:18 65:15 67:21

**preparing** 11:11 15:3 65:25

**presented** 34:10 112:11

**pretend** 52:16

**pretty** 113:16

**previous** 28:8 100:17

**previously** 28:12 76:4 86:7 91:25 98:14 100:14 120:9

**primarily** 46:20 68:7 90:12

**prior** 44:23 48:3 51:11 56:3,8,22 57:3, 15 74:6 82:14 94:9 100:18 105:4 106:25 107:7 119:5

**privilege** 10:13,14, 18 36:14 104:3

**pro** 107:20

**problem** 8:12 33:14

**procedure** 9:2 112:17 117:9

**procedures** 7:22

**proceeding** 9:3

**PROCEEDINGS** 6:5

**proceeds** 38:22 39:8 41:20,21,24

**produced** 104:2,11

**Professional** 34:21

**Project** 15:22 16:15 22:18,25 46:6 72:11 105:10 118:21 124:24

**pronounced** 6:25

**proof** 9:21

**properties** 22:21 52:19 66:11 94:18

**property** 46:6 51:3 59:17 70:23 96:21

**property-level** 22:16 25:12 40:16

**proportional** 107:20

**proposed** 95:22

**protocol** 7:22

**provide** 9:6 10:23 22:23 25:8 46:5,20

**provided** 38:23 39:2 48:11 49:4,7 83:14 119:5

**providing** 25:3 26:18

**provision** 28:7 39:17

**pulled** 100:13

**purpose** 15:24 16:11,13 46:4

**purposes** 66:19

**pursuant** 8:25

**put** 90:23 108:13

**Q**

**question** 8:7 10:13, 18 13:7,18 23:8 24:24 25:9 32:8 43:23 47:5,11 65:18 70:16,18 83:2,9,11, 17 85:11,19 103:16 110:25 123:6,8,11, 20,23

**questions** 10:24 13:5,12 106:16 111:25 112:3,13,15, 20 113:11,21 114:5 115:5 117:15,16 119:14 122:2 123:7, 12,13

**quickly** 37:21

**quote** 80:11

**R**

**Rachel** 11:6 72:22 73:7,11 75:6 78:23 79:12 80:24 81:10,19 82:3,6,13,16,24,25 83:22 84:8 85:15,16, 24,25 87:10 88:15

**Rachel's** 85:14

**raise** 27:9 28:19 104:18

**raises** 103:15

**ran** 104:17

**Ranch** 56:6

**rata** 107:20

**RE-EXAMINATION** 124:15

**read** 19:4 29:18 112:16 121:7 123:9, 21

**reading** 16:20 121:9 123:10,22 124:6

**ready** 82:6,25

**real** 7:11 10:19,20 43:12 59:15 115:25 118:17 124:9

**reason** 80:10

**reasons** 54:18,21

**recall** 59:8 61:4

**receive** 85:21 86:10 89:24 91:21 92:19

**received** 26:2 41:20, 24 49:21 82:10 98:4, 6 103:9

**receiving** 28:14

**recess** 45:24 86:25 108:8,19

**recipient** 77:23 84:17

**recipients** 78:21 91:18

**recollection** 51:13 76:8 77:2,10 79:10

**reconvene** 86:23

**record** 6:16 8:11 54:24 77:7 111:4 117:2

**Recross** 113:8

**redirect** 113:6

**reduction** 107:21

**reexamination** 112:11

**reexamine** 112:7

**refer** 6:23 9:16 16:4 17:2,7 21:25 79:15 102:11,12

**reference** 33:22 51:2 74:14

**referenced** 75:24 78:7

**referencing** 26:10 84:19

**referred** 77:22 93:17 101:6 102:9 124:22

**referring** 6:20 14:5 22:4 26:8 30:16 93:22 101:16 102:13 116:10

**refers** 26:25 74:3 93:5,25 95:2

**reflect** 28:22 51:14 58:2,9 63:7 83:6 89:11 107:18 108:3 110:14,20 111:5

**reflected** 51:8,22 52:3,8 53:9,17,23 54:5,11 56:2,8,13,17, 21 57:2,7,11 67:18 81:20 89:15 108:2

**reflecting** 55:20 58:6 95:21 101:14

**reflection** 57:19 75:12 110:9

**reflects** 28:3 50:7,11 55:12 94:18 95:6

**refresh** 76:8 77:2,10 79:9

**REIT** 65:2 83:22 85:18 86:5

**reiterating** 83:23

**related** 67:11 79:24 110:4

**relates** 18:14 89:8

**relating** 10:24 28:15 32:4 33:24 60:9 67:5, 17 68:3,5,19 69:5,19 88:21 89:17 98:12 103:10

**relation** 11:9

**relationship** 100:17

**rely** 71:4

**relying** 71:22

**remainder** 101:23

**remaining** 83:2 85:11

**remember** 114:7 119:16

**remote** 6:2,9

**Renaissance** 54:9

**repeat** 21:10

**repeating** 55:20

**rephrase** 47:5

**reporter** 8:11 11:17, 18 111:6 119:9

123:10,22 124:4,6

**represent** 17:16,19 23:2,8 24:7,12,13,16 25:2 29:4,9 31:8,15, 22 36:20 65:12 84:25 95:16 103:20 105:24

**representation** 23:12 26:25 28:23 32:11,17,25 33:7 34:4,9 35:13,23 36:4, 5,13 37:2,5 43:21 45:2,3 59:23 60:10 62:19 63:2 72:2 109:12 114:4 115:22, 25 116:25 123:25 124:8,20

**representations** 27:10 35:2 44:23 66:23 67:3,10

**representative** 68:14 71:14 76:5,10 77:4,12,19 78:4,10 91:25

**representatives** 61:12,19,23 88:16

**represented** 24:9 25:11 26:17 28:4 29:7 31:18 43:18 63:7,13 64:10,19 65:16 85:6 105:14 108:21 109:15 113:24 116:14 123:16

**representing** 9:20 87:23,24 92:3 118:18

**represents** 10:3

**reps** 67:4,16,17 68:4, 19 69:4,18 71:22

**requested** 38:24

**require** 32:9

**required** 9:6 13:5 19:18 32:21 34:11 116:4 124:12

**requirement** 32:13

**requires** 34:25

**reserve** 52:2 55:11 112:7

**reserving** 99:23

**respect** 9:8 13:17 20:10 28:23 32:15 44:8 53:8 55:11,19, 25 56:11,15,25 57:6, 10,13,17 58:5 74:25 75:5,11 99:15 106:5, 16 109:22 116:18,22, 23

**responded** 98:9

**responds** 85:25

**response** 13:7,8 82:14,23 85:24

**responses** 9:13

**responsibilities** 36:3,7

**rest** 21:24

**Restated** 98:18,23 99:20 100:10 102:4 122:9

**restructure** 66:18

**retention** 32:2,10,16, 19,24 106:4

**retraded** 100:12

**reverts** 93:15

**review** 8:16 38:6 49:24 51:11 73:17 91:13 109:3

**reviewed** 11:2 12:15, 21 86:7

**reviewing** 11:7 38:8 60:18

**Ridge** 52:23 53:15 56:19 74:21

**rights** 38:18

**rise** 37:6 40:5

**risk** 9:17

**risks** 36:18

**River** 52:2

**ROB** 6:7

**Robert** 6:17

**role** 7:8 15:8,13,17, 20 17:12 22:11,13

46:12,17 48:8 49:12 61:3 65:10 78:12 92:3 102:3,17 104:24 105:8 106:14 115:8 116:7 122:3 124:23

**room** 119:8

**Rule** 8:25 9:3,10 15:3 58:21

**rules** 7:20 34:21 117:8

**run** 7:11

---

**S**

**S-A-U-T-E-R** 68:12

**Sam** 11:6 72:22 73:7, 11 75:21 78:23 81:19 82:3,16,24 84:8 85:15,16,25 87:10 88:15

**Sam's** 75:6 82:13 85:24

**Sauter** 11:5 68:7,12, 13 78:16,19 81:9 82:17 85:16 91:19 98:4,6 100:12 114:21,22,25 115:10

**schedule** 47:19 48:4,6,9,13 49:19,20 50:7,21 51:12 58:5, 19 59:2 63:21 64:18 66:7 67:19 69:17 74:5,14,24 75:8,10 89:18 90:9 95:7 100:24 101:8,13,14 106:21 108:2 110:5, 19 121:14

**schedules** 49:5,7,9, 13,19 50:17

**scope** 59:22 111:2, 13 115:21,24 123:25 124:7,19

**scrap** 111:12

**screen** 12:6,8 21:2,5 72:20 87:3 90:24

**scroll** 12:17 19:2 25:18 27:15 47:19 50:20 55:9,16 72:14

73:23 74:19 75:4,15
81:3,22 84:11,13
85:12,23 92:24 93:7,
13 94:15,24

**section** 10:20 25:20
27:17,19 28:2,20
34:22,25 35:9 37:20,
23 38:7,11,16,21
64:13,17

**select** 121:12

**selected** 10:8

**seller** 97:16,17

**separate** 43:15 60:3
108:11 117:14

**separately** 23:6

**September** 20:22
21:8 72:21 75:19
81:25 84:9 85:10,13

**services** 88:7 117:24

**set** 19:23 21:9 58:15
106:17,21 123:7

**sets** 12:18

**setup** 40:19

**severally** 39:21 40:4

**share** 85:18 86:5

**shared** 88:7 117:24

**short** 63:5 100:15

**show** 90:9

**showing** 75:25

**shown** 55:6

**shows** 101:22

**sic** 91:5

**side** 25:14 59:25 71:2
85:3 90:13,15

**sign** 112:17

**signature** 119:25

**signoff** 79:3 84:22

**silo** 43:12,13 59:16

**siloed** 105:8

**similar** 32:18 74:6
80:15

**Similarly** 96:10

**simple** 102:8

**simpler** 16:2

**simply** 83:23 104:20

**sir** 6:24 7:6,15 8:2,5,
14,18,22 9:4,11,15,
25 10:6 12:14,16,22
13:2 14:10,23 15:11,
15 16:25 17:15,18
18:15,21 19:3,15,20
20:19 21:4,17,20,22
22:6,9,12 23:6,11,23
24:6 26:14 27:5,23
29:16 31:24 32:5,12
33:12,18 34:23 35:4
37:14,17 38:12,20
39:16,23 40:8 41:2,5
43:5 45:10 46:11
47:15 48:7,23 49:4,
10,23 50:2,5,10,14,
19,25 51:5,10,17,24
52:5,10 53:13,20
54:2,8,13 55:15,23
56:5,10,14,18,23
57:4,8,12,16,21
58:13 59:4 60:20
62:14,23 63:4 64:7
66:25 67:6 68:21,25
69:21 70:5 71:9,24
72:5,8 73:12,14,20
74:10,18 75:3,14
76:3,7,12,17,24 77:6,
13,16 78:2,15,18
79:20 80:9 81:2,17,
21 82:8,11,19,22
83:20 84:6,10 85:7,
22 88:13 89:6,10,14
90:16,22 91:7,10,16,
20,23 92:5,20 93:12
94:3,14,23 95:5,10
96:3,20,22 97:19
98:7 99:3,6 100:25
101:18 102:15 106:6
109:14,18 110:11,17
111:22 114:24 115:3,
19 119:11,17,21
120:4,12,16,20,24
122:6

**sit** 37:3 65:23

**sloppy** 14:2

**sole** 21:13

**sooner** 92:16

**sort** 22:23 49:14
59:16,18 66:16 78:11
105:10

**speak** 68:22 69:3

**speaking** 44:15
70:10,11,12 71:7,11
84:19 106:23 117:10

**specific** 59:8 61:5

**specifically** 14:6
92:14 93:6 115:25
124:9

**speculating** 65:19
80:21

**speculation** 88:3

**spell** 68:8

**spend** 11:10

**spoke** 45:6 62:8
68:25 69:24 70:10

**standard** 112:17

**started** 15:3 117:21

**starting** 52:18
119:20 122:18

**Starwood** 95:20

**state** 6:15

**statement** 26:8,12
29:24 31:13 101:19

**stating** 9:17

**Statutory** 80:7 85:4

**stipulate** 99:13

**Stoney** 52:23 53:15
74:21

**stop** 108:14

**strike** 61:21

**string** 89:7 90:19
92:7 119:19

**structure** 18:11
46:24 59:19 62:23
66:10,19 83:9 95:19,
22 96:12,17 97:8,20
102:21,25 118:20
119:2

**structures** 52:25

**structuring** 16:15
59:22 62:6,14

**subject** 93:22

**submit** 81:14

**subsequently** 94:21

**subsidiaries** 46:11
58:7 67:5,12,18 68:5,
20 69:6 83:10

**substance** 67:23
79:24 84:20

**substantially** 80:14

**substantive** 83:8,11,
17

**sufficiently** 95:12

**Summers** 57:18

**Support** 11:3

**suppose** 64:15

**suspicion** 18:8 28:6

---

**T**

**table** 24:25

**takes** 57:22

**taking** 90:10

**talk** 16:9 20:4,5
104:23 108:9

**talked** 46:15 66:17

**talking** 8:9 11:4 16:8
17:6 59:21 100:11

**talks** 38:16

**tape** 104:17

**tax** 63:16 64:25

**team** 59:10 69:11

**technical** 109:7

**telephonic** 85:8
103:3

**term** 14:2,5 23:18,20
35:20 100:20

**terms** 20:2 26:18
45:13 87:9 101:16
115:21 123:24

**testified** 66:15 76:4,
19 79:7 91:25

**testify** 12:23 73:18

**testifying** 30:23 43:3
60:6

**testimony** 6:10 10:3,
4,5 13:21 26:23 30:2,
21 68:23 91:14 101:7
105:4 106:13 111:7

**Texas** 34:21 120:5

**thing** 16:8 17:7 96:17

**things** 59:25 70:20
71:2

**thought** 113:3

**thoughts** 121:15

**Tim** 120:18,22

**time** 8:10,20 11:10
18:4 19:12,15 27:11
45:22 50:17 60:22
68:6 86:16 96:12
97:22 114:16,22
121:18

**to-be-formed** 95:3

**today** 9:18 10:3
12:25 13:4 26:23
30:3,21 37:3 65:24
73:19 91:15 116:14
118:5,9

**top** 120:17

**topics** 9:8 10:25
12:18,21,25 13:13

**tortured** 113:14

**tough** 95:18 96:10

**Towne** 52:7 56:11

**trace** 94:5

**transaction** 15:23
25:15 60:24 105:10

**transactions** 52:17
114:17

**transcript** 8:16

**transfer** 39:8

**transfers** 39:15

**transmitted** 110:13

**true** 21:23 22:7 44:25 67:12 69:19 99:4 105:23

**Trust** 80:8 85:4

**truthful** 6:10 13:8

**truthfully** 13:6

**turn** 23:15

**typical** 64:25

**typically** 26:21 42:7 44:19 59:23 63:15

**typo** 79:17,19

**typos** 79:13,15 80:11 83:13

**U**

**Uh-huh** 72:23

**ultimately** 95:3

**unclear** 8:10

**underlying** 51:3 68:18 96:21

**understand** 6:22 7:20,24 8:7,13,15,23 9:12 10:2 13:11,23 14:9 15:12 17:5 22:3 37:11 43:3 47:10 70:16 102:13 107:4, 5,9 113:2 124:18,22

**understanding** 9:24 16:24 19:11 36:25 37:15 39:11,19 40:11 50:16 66:10 69:15,23 71:4 85:5 100:11 104:24 106:19 109:2 113:23 118:13 120:21 123:15 124:18

**understood** 71:20, 25

**undertake** 32:25 36:2

**undertaken** 36:6

**undertakes** 32:10, 17

**undertook** 34:8

**Unicorn** 15:22 16:15 22:18,25 46:6 72:11 90:25 105:10 118:21 121:10,12 124:24

**universe** 70:3

**unpack** 107:8

**updated** 79:5

**updating** 106:25 107:7

**upright** 48:19

**V**

**vague** 116:17

**version** 74:7,25 75:11

**versions** 86:4

**Victoria** 51:21

**video** 108:14

**videoconference** 6:2,9

**view** 48:19

**virtually** 74:24 75:10

**Vista** 56:19

**Vosburgh** 14:11 20:20 123:5

**W**

**Wait** 8:7

**waiting** 79:3 84:21

**waive** 10:15

**waiver** 33:6,11,17,23 34:3,11,17 35:7 114:19

**walk** 52:2 121:15

**Walker** 56:6

**wanted** 81:11

**warranties** 66:24 67:3,4,11,16,17 68:4, 19 69:5,18 71:23

**warranty** 72:3

**wearing** 44:14,18 45:6 70:9

**week** 92:13

**West** 56:16

**whomever** 90:3

**Wick** 6:1 7:1,9 8:1,25 9:1,8,9,13,20 10:1,4, 8 11:1 12:1,11,19,24 13:1,16,19 14:1,3,6,8 15:1,4,8,13,17,20 16:1 17:1,12,22 18:1, 3,17 19:1,16,21 20:1, 9 21:1 22:1,10,14 23:1,2,8 24:1,7,9 25:1,2 26:1,6,9,17, 23,25 27:1,8,22,25 28:1,3,9,13,18,22 29:1,13,20,22,24 30:1,12,14,18,24 31:1,13,15,22,25 32:1,9,14 33:1,5,21, 23 34:1,2,7,18,20 35:1,6,18,23 36:1,2, 11,16,19 37:1,3 38:1 39:1 40:1 41:1,6,17 42:1,3 43:1,4,6,16, 21,24 44:1,4,13 45:1, 2,5,13 46:1 47:1 48:1,8,24 49:1,8,18 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1,21,23 59:1,6,13 60:1,7,9,14 61:1,10, 17,22 62:1,12 63:1 64:1,4,23 65:1,5,9,16 66:1,5 67:1,7 68:1,3, 15,17,24 69:1,3,16, 22 70:1,8 71:1,20,25 72:1 73:1,9 74:1 75:1 76:1,20 77:1 78:1,17, 24 79:1,8,11 80:1 81:1,19 82:1,10,21 83:1,15 84:1 85:1,20 86:1,10 87:1,19 88:1, 2,19 89:1,8,12,17 90:1,10,20 91:1,21 92:1,2,18 93:1 94:1 95:1 96:1 97:1 98:1, 5,8,11,19 99:1 100:1 101:1 102:1,3,16 105:1,15,23 106:1,7, 13 107:1,24 108:1 109:1,11,15,19

**Wick-phillips** 106:14

**Williams** 62:16,18 108:24

**Willis** 7:2

**Wills** 6:1,7,17,18 7:1, 3,4 8:1 9:1 10:1 11:1 12:1,4 13:1 14:1,18 15:1 16:1 17:1 18:1 19:1 20:1,25 21:1 22:1 23:1 24:1 25:1 26:1 27:1 28:1 29:1 30:1 31:1 32:1 33:1 34:1 35:1 36:1 37:1 38:1,7 39:1 40:1 41:1 42:1 43:1 44:1 45:1 46:1,3 47:1 48:1,5 49:1 50:1 51:1 52:1 53:1 54:1 55:1 56:1 57:1 58:1 59:1 60:1 61:1 62:1 63:1 64:1 65:1 66:1 67:1 68:1 69:1 70:1,17 71:1 72:1,19 73:1 74:1 75:1 76:1 77:1 78:1 79:1 80:1 81:1 82:1 83:1 84:1 85:1,20 86:1 87:1,6 88:1 89:1 90:1 91:1 92:1 93:1, 11 94:1 95:1 96:1 97:1 98:1 99:1 100:1, 8 101:1 102:1 103:1, 15,22 104:1,19,22 105:1 106:1 107:1 108:1 109:1,10 110:1 111:1,21 112:1,12 113:1,20 114:1 115:1 116:1,13 117:1 118:1 119:1 120:1 121:1 122:1 123:1,8,11 124:1,17

**WINOGRAD** 103:6, 12 108:12,17

**withholding** 103:24, 25 104:4,5

110:1,13 111:1 112:1 113:1,24 114:1,16,23 115:1,2,16,22 116:1, 7,13,24 117:1 118:1, 4,7,17,19 119:1 120:1,13 121:1,2,4 122:1,3,24 123:1,2, 16 124:1,2,23

**word** 121:8

**words** 87:22 88:10

**work** 32:3 68:18 89:9,12,16 118:21 120:25

**worked** 28:8,9

**working** 85:17 116:2 124:10

**works** 16:10

**world** 32:12

**worry** 100:2

**worth** 111:7

**writing** 75:22

**writings** 63:6

**written** 26:3 34:25 35:7

**Y**

**yesterday** 68:25