# EXHIBIT A



**Highland Capital Management LLP** & **HCMLP Investments, LLC**
100 Crescent Court,
Suite 1850.
Dallas, Texas
75201

**D: +44 1484 752272**
**E: Alex.Horsbrugh-Porter@ogier.com**

Ref: AHP/TIC/MGM/JDI/182801.00002
Your ref:
TC//1066695/0005/G13448784v1

**CC: Carey Olsen (Guernsey) LLP**
PO Box 98
Carey House
Les Banques
St Peter Port
Guernsey GY1 4BZ

BY EMAIL AND COURIER

Email: Alex.Adam@teneo.com

Notices@highlandcapital.com
and info@highlandcapital.com

CC: tim.corfield@careyolsen.com;
elliot.aron@careyolsen.com;
christopher.anderson@careyolsen.com

**Attention: Alex Adam (of Teneo Financial Advisory Limited in his capacity as representative of trustee)**

[x] August 2022

Dear Mr Adam,

**CLO HoldCo Ltd ("Applicant"), Highland CLO Funding Ltd (HCLOF) ("the Company"), Highland Capital Management L.P. ("HCM") & HCMLP Investments, LLC ("HCMLP Investments")**

We act on behalf of CLO Holdco, Ltd, a minority shareholder in the Company. We refer to the annual general meeting held on 19 May 2022 which you attended as representative of HCM and HCMLP (the **HCM Shareholders**). Thank you for agreeing to receive correspondence on behalf of the HCM Shareholders.

Our client has instructed us in relation to historic and continuing prejudice which is being caused to it as a result of the manner in which the affairs of the Company have been conducted, to seek relief against the Company in the Royal Court of Guernsey (the "**Court**") through the Application attached hereto (including the First Affidavit, and all Exhibits thereto, collectively the "**Application**"). Our client's concerns are set out broadly in Application, which include without limitation the letter before

**Formatted:** Font: Not Bold, English (United States)

**Deleted:** 106-25457868-1

**Ogier (Guernsey) LLP**
Redwood House
St Julian's Avenue
St Peter Port
Guernsey GY1 1WA

T +44 1481 721672
F +44 1481 721575
**ogier.com**

**Partners**
Martyn Baudains
Paul Chanter
Tim Clipstone
Craig Cordle
Simon Davies
Bryan de Verneuil-Smith
Gavin Ferguson
Matthew Guthrie

Alex Horsbrugh-Porter
Christopher Jones
Marcus Leese
Sandie Lyne
Catherine Moore
Mathew Newman
Bryon Rees

action sent from our offices to the Company's Guernsey advocates, Carey Olsen (Guernsey) LLP (**Carey Olsen**), dated 30 March 2022 and the Company's response from Carey Olsen, dated 14 April 2022.

The Application sets out both the grounds upon which the Applicant is proceeding and the relief sought from the Court, therefore we do not propose repeating those in this letter.

**Notification of Proposed Unfair Prejudice Proceedings**

We hereby notify the HCM Shareholder of our intention to file the Application. The Company has been notified of our intention to file the Application and will be notified of both the filing and of the date, time and place of the hearing of the Application in accordance with section 349(4) of the Companies Law. The HCM Shareholders and other Shareholders will also be formally notified of the filing of the Application, and will be notified of the date, time and place of the hearing of the Application, so that you can seek to be added as parties.

**Conclusion**

Our client continues to be open to meaningful engagement with the Company and as applicable the HCM Shareholders, and we invite the HCM Shareholders and the Company and/ or their representatives to attend a meeting with us at a convenient time and place with a view to reaching an amicable solution. However, given the time that has run to date and the apparent unwillingness of the Company to address the Applicant's concerns in a fair and meaningful fashion, our intention is to file the Application and if such a meeting can be agreed to thereafter perhaps progress could be made. But we hereby notify you that the filing of the Application will be without further notice, though, as stated, you will receive formal notification upon the filing. A copy of this letter will also be delivered to Carey Olsen.

All our client's rights are reserved.

Yours faithfully

**Alex Horsbrugh-Porter**
**for and on behalf of**
**Ogier (Guernsey) LLP**

*Encs*

(CC: Carey Olsen)

2

106-25457868-1

**Ogier (Guernsey) LLP**
**Advocate Alex Horsbrugh-Porter**
[Insert date]

## IN THE ROYAL COURT OF GUERNSEY

### (ORDINARY DIVISION)

**BETWEEN:**

### CLO HOLDCO, LTD

Applicant

### -and-

### HIGHLAND CLO FUNDING, LTD

Respondent

---

### APPLICATION

---

CLO HoldCo, Ltd of [Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands] and whose address for service is at Ogier (Guernsey) LLP, Redwood House, St Julian's Avenue, St Peter Port, Guernsey, GY1 1WA

### APPLIES TO THE COURT

**PURSUANT TO** Sections 349 and 350 of the Companies (Guernsey) Law 2008 (the **Companies Law**)

**AND IN THE CIRCUMSTANCES** more particularly described in the First Affidavit of Paul Richard Murphy sworn [date] 2022 **AND AS FOLLOWS:**

1       The Applicant is a limited company incorporated under the laws of the Cayman Islands with registration number 249232, its registered office being situated at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.   This application is brought by the Applicant in its capacity as a shareholder in the Respondent.

2       The Respondent is a limited company incorporated under the laws of Guernsey with registration number 60120, its registered office being situated at 1st Floor, Royal Chambers St. Julian's Avenue St. Peter Port Guernsey GY1 3JX.

3      Respondent has issued 153,139,231 ordinary shares. As shown, Applicant owns 49.015% of shares outstanding at the date of this Application. At the date of this Application the 153,139,231 shares in issue are fully paid up.

4      The current shareholding of the Respondent is as follows:-

(a)      The Applicant is the holder of 49.015% of the issued share capital in the Company (70,314,387.44 shares); and

(b)      HCMLP Investments, LLC is the holder of 49.985% of the issued share capital in the Company;

(c)      Highland Capital Management, L.P. (**HCM**) is the holder of 0.627% of the issued share capital in the Company;

(d)      The remaining shareholding in the Company of 0.373% is held by four individuals, namely Lee Blackwell Parker III, Hunter Covitz, Jon Poglitsch, and Neil Desai

(the **Shareholders**).

5      HCM and its affiliate, HCMLP Investments, LLC (**HCMLP Investments**), are the collective majority shareholders of the Company (the **HCM Shareholders**).

6      HCM is a limited partnership incorporated under the laws of Delaware with registration number 2770270, its registered office being situated at 100 Crescent Court, Suite 1850, Dallas, Texas, United States 75201. HCMLP Investments is a limited liability company incorporated under the laws of Delaware with registration number 5749764, its registered office being situated at 100 Crescent Court, Suite 1850, Dallas, Texas, United States 75201..

7      On or about October 16, 2019, HCM filed for bankruptcy pursuant to Chapter 11 of the U.S. Bankruptcy Code in the Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court (the **Bankruptcy Court**). Within the bankruptcy proceedings certain orders were issued by the Bankruptcy Court, including certain gatekeeper orders requiring motion before the Bankruptcy Court before taking certain actions against HCM and/or other parties (**Protected Parties**). The Company is not a Protected Party, and in fact it is not only HCLOF that is excluded from the definition of Protected Parties. The HCM Plan provides: "*for the avoidance of doubt, none of… Highland CLO Funding, Ltd. (**and any of its subsidiaries, <u>members</u>, and managed entities**), … is included in the term 'Protected Party.*'" (Emphasis added). Because they are "members" (i.e. shareholders) of HCLOF, the specific exclusion excludes HCM and HCMLP Investments from the definition of Protected Party in this capacity (as shareholders of HCLOF). In any event, no relief is being sought directly against the HCM Shareholders in the Application. However, out of an abundance of caution (given that the Plan Injunction in the HCM bankruptcy plan), the Applicant has presented the Application, along with this Affidavit and all exhibits to each, and also the notice to be sent to the HCM Shareholders as described above to the Bankruptcy Court.

8      The Respondent has been formally notified of the filing of this Application and will be notified of the date, time and place of the hearing of the Application in accordance with section

106-25128839-6

349(4) of the Companies Law. The HCM Shareholders and other Shareholders have been notified of the filing of this Application and will be notified of the date, time and place of the hearing of the Application, so that they can seek to be added as parties under Rule 37(1)(b)(ii) of the The Royal Court Civil Rules, 2007, if so advised.

9        The Application arises out of the management of the Respondent in a manner which has caused ongoing unfair prejudice to the Applicant in its capacity as minority shareholder in the Respondent. The unfair prejudice complained of by the Applicant as set out in the affidavit in support of this Application is mainly predicated upon the Respondent's conduct in aligning its interests with the wider commercial interests of the HCM Shareholders (as the majority shareholder) to the detriment of the Applicant.

10       The purpose of the Application is to mitigate any further harm being caused to the Applicant's interests as shareholder by securing for the Applicant a direct interest in the underlying assets of the Respondent in proportion to its shareholding (through the Applicant Exit Proposals as defined and contained within the First Affidavit). The Applicant has considered various options to achieve a mutual separation between it and the Respondent, and the relief sought in the Application is the most equitable solution to the unfair prejudice complained of.

11       Alternatively, as section 350(2)(b) of the Companies (Guernsey) Law, 2008 provides the Royal Court to "*require the company – . . . . . (ii) to do any act which the applicant has complained it has omitted to do,*" if the Court is not disposed to approve the Applicants Exit Proposals, the Applicant seeks as alternative relief provided for in Section 350(2)(c) - that the Court "*authorise civil proceedings to be brought in the name and on behalf of the company by such persons and on such terms as the Court may direct*" such that Applicant can bring an action against US Bank for recovery of the "Redemption Proceeds" as defined in the First Affidavit. As an additional alternative relief (if the Court does not approve the Applicant's Exit Proposals), the Applicant seeks relief under Section 350(2)(b)(ii), that the Court "*require the company (ii) to do any act which the applicant has complained it has omitted to do*" by ordering the Company to make full distributions to shareholders of unencumbered cash in an amount reflective of the Company's wind down status and absence of investment activities.

**THE APPLICANTS THEREFORE PRAY AS FOLLOWS:**

1.   That the Court make an order that:

   a.   The Respondent be ordered to undertake a transaction pursuant to section 350(2)(d) of the Companies Law pursuant to which:

      i.   the Applicant transfers to the Respondent its current shareholding held in the Respondent, in accordance with the Applicant Exit Proposals;

      ii.   as consideration for such shareholding, the Respondent transfers to the Applicant the full legal and beneficial title of all of the assets held by the Respondent in proportion to the Applicant's pro rata 49.015% equity share in the Respondent; and/ or

106-25128839-6

b. Such order as the Court thinks fit for giving relief in respect of the matters complained of, including without limitation the alternative relief set forth above.

This [date]th day of [date] 2022

……………………………………………….

**A Horsbrugh-Porter**
**Advocate for the Applicant**

106-25128839-6

Sworn by: PR Murphy
For: Applicant
Number: First
Exhibit: PRM1
Date sworn:            2022

**Ogier (Guernsey) LLP**
**Advocate Alex Horsbrugh-Porter**
**2022**

### IN THE ROYAL COURT OF GUERNSEY

### (ORDINARY DIVISION)

**IN THE MATTER OF PART XIX OF THE COMPANIES (GUERNSEY) LAW, 2008**

**BETWEEN:**

**CLO HOLDCO, LTD**

**Applicant**

**and**

**HIGHLAND CLO FUNDING, LTD**

**Respondent**

---

### FIRST AFFIDAVIT OF PAUL RICHARD MURPHY IN SUPPORT OF UNFAIR PREJUDICE APPLICATION

---

I, Paul Richard Murphy, of 67 Fort Street, George Town, Grand Cayman, Cayman Islands ky1-1007, having been duly sworn, being over 18 years of age, having personal knowledge of the facts sworn herein and being competent to testify as a witness, hereby say as follows:

**Introduction**

1    The Applicant, CLO HoldCo, Ltd, is a limited company incorporated under the laws of the Cayman Islands with registration number 249232 its registered office being situated at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands.  This application is brought by the Applicant in its capacity as a shareholder in the Respondent.

2    I hold the position of Director in the Applicant and I am duly authorised by the Applicant to swear to this affidavit in support of an application by the Applicant pursuant to sections 349

106-25478799-4

and 350 of the Companies (Guernsey) Law 2008 (as amended) (the **Companies Law**) (the **Application**).

3       The Respondent, Highland CLO Funding, Ltd (the **Company**) is a limited company incorporated under the laws of Guernsey with registration number 60120, its registered office being situated at 1st Floor, Royal Chambers St. Julian's Avenue St. Peter Port Guernsey GY1 3JX. The Company's stated investment objective is to provide its shareholders with stable and growing income returns and to grow the capital value of the investment portfolio through opportunistic exposure to senior secured loans and collateralized loan obligations (**CLOs**) on both a direct and indirect basis. The Company is beyond its investment period and currently in wind down, involving the process of liquidating its investment portfolio with a view to a complete return of capital to shareholders.

4       Highland Capital Management, L.P. (**HCM**) is a limited partnership incorporated under the laws of Delaware with registration number [insert], its registered office being situated at 100 Crescent Court, Suite 1850, Dallas, Texas, United States 75201, and holds 0.627% of the issued share capital in the Company.

5       HCMLP Investments, LLC (**HCMLP Investments**) is a limited liability company incorporated under the laws of Delaware with registration number [insert], its registered office being situated at 100 Crescent Court, Suite 1850, Dallas, Texas, United States 75201. HCMLP Investments is a solely owned subsidiary of HCM, having been created to hold 49.985% of the issued share capital in the Company. HCM and HCMLP Investments are hereinafter defined as the HCM Shareholders. The Application is brought against the Company, though the HCM Shareholders have been given notice of the filing of this Application and of their right to seek to be parties to the Application, or alternatively to advise if they wish to present evidence and be heard in the hearings on and concerning the Application, and/or in accordance with Rule 37 (1)(b)(ii) of the The Royal Court Civil Rules, 2007.

6       On or about October 16, 2019, HCM filed for bankruptcy pursuant to Chapter 11 of the U.S. Bankruptcy Code in the Delaware Bankruptcy Court, which was later transferred to the Northern District of Texas Bankruptcy Court (the **Bankruptcy Court**). Within the bankruptcy proceedings certain orders were issued by the Bankruptcy Court, including certain gatekeeper orders requiring motion before the Bankruptcy Court before taking certain actions against HCM and/or other parties (**Protected Parties**). The Company is not a Protected Party and no relief is being sought against any other party, including the HCM Shareholders, but out of an abundance of caution the Applicant intends to present the Application, along with this Affidavit and all exhibits to each, and also the notice to be sent to the HCM Shareholders, as described above.

7       I make this affidavit from facts and matters which I believe to be true and where matters are not within my knowledge, I have set out the source of that information. There is now produced and shown to me marked "**PRM1**", a paginated bundle of true copy documents to which I shall refer in this affidavit. References to page numbers are to page numbers of that exhibit.

8       The Application arises out of the management of the Company by its directors (the **Directors**) which has caused unfair prejudice to the Applicant in its capacity as a minority

shareholder in the Company. The unfair prejudice complained of by the Applicant is mainly predicated upon: (i) the inexplicable conduct of the affairs of the Company by the Directors regarding the failure of the Company to take action on behalf of the Company that would benefit all shareholders with respect to funds currently held by U.S. Bank; (ii) the refusal of the Company to make dividends/distributions that are warranted given the Company's wind down status, (iii) the action of the Company in making an indefensible share buy-back offer to Applicant that was comprised in great part of the Company seeking to obtain a 15% reduction in the cash amount attributable to the Applicant's interest, for the benefit of its majority shareholder (and which implied the threat of the Company's continuing refusal to maximize cash due the Company and provide fair dividends/distributions to Applicant of its share of Company cash if the "offer" was not accepted; (iv) the refusal of the Directors to cause the Company to respond sufficiently to information requests from Applicant as minority shareholder, (v) the failure of the Company to respond properly to Applicant's rejection of the aforementioned share buy-back proposal (only, "The various allegations made in that letter are wrong."), (vi) the Company's transparently self-serving dividend notice of only some 56% of unencumbered cash (despite the Company's purported willingness to use in excess of 85-90% of the Company's cash for the irrationally below market buy-back offer that required a 15% discount on cash), and (vii) the Company's rejection without legitimate basis of the Applicant Exit Proposals as defined below.

9       All of the foregoing, taken together with the inaction of the Company and the below described conduct of the Company and its representatives, is not defensible, but is clearly reflective of the Company's intention to continue with its unfair focus upon failing in its duties to Applicant as a minority shareholder.

**Purpose of Application**

10      The purpose of the Application is to mitigate further harm being caused to the Applicant and its shareholding in the Company.

11      As shown herein, the Applicant has made good faith proposals to rectify the unfair prejudice by making proposals to effect a distribution of the Company's assets to Applicant in an amount reflective of its ownership interest in the Company (the **Applicant Exit Proposals**). The Applicant has demanded the Company take action against US Bank to obtain withheld funds that should be paid to the Company by US Bank (the **US Bank Redemption Proceeds Claim**) for distribution to shareholders of the Company. Finally, the recent actions of the Company in limiting dividends that should be payable to shareholders given the Company wind down status is another form of relief to which the Applicant is entitled. Currently, the Applicant is not seeking the right to bring a derivative action against the Directors, though all rights are reserved.

12      The Applicant seeks the relief set forth in the Application, and is entitled to such relief. The Company seeks approval by the Court of the Applicant Exit Proposals, which would provide the Applicant with its full share of assets attributable to its interest, including the right to pursue an action for its own account against US Bank, for recovery of funds wrongfully held by US Bank allocated to the interest of the Applicant. The Company has declared that US Bank is wrongfully withholding such funds of the Company, but has taken no action and will not disclose to the Applicant any plans for taking any action to recover Company funds that should be distributed to shareholders. Therefore approval of the Applicant Exit Proposals

106-25478799-4

would allow the Company to maintain its current no-action policy, with respect to its remaining assets and shareholders, while providing the Applicant with an independent right to pursue US Bank for its own account.

13 Alternatively, as section 350(2)(b) of the Companies (Guernsey) Law, 2008 provides the Royal Court to "*require the company – . . . . . (ii) to do any act which the applicant has complained it has omitted to do,*" if the Court is not disposed to approve the Applicant Exit Proposals, the Applicant seeks as alternative relief provided for in Section 350(2)(c) - that the Court "a*uthorise civil proceedings to be brought in the name and on behalf of the company by such persons and on such terms as the Court may direct*" such that the Applicant can bring an action against US Bank for recovery of the "Redemption Proceeds" as defined below. As additional alternative relief (if the Court does not approve the Applicant Exit Proposals), the Applicant seeks relief under Section 350(2)(b)(ii), that the Court "*require the company (ii) to do any act which the applicant has complained it has omitted to do*" by ordering the Company to make full distributions to shareholders of unencumbered cash in an amount reflective of the Company's wind down status and absence of investment activities.

**Adverse Interests of Certain Parties to Applicant**

14 Acis Capital Management, L.P. (**Acis**), is the portfolio manager in respect of certain of the CLOs in which the Company has an investment and Highland HCF Advisor, Ltd is the Company's appointed general portfolio manager (the **Portfolio Manager**). HCM, Acis, the Portfolio Manager and the Company are a part of the same structure of entities and HCM and Acis both have a close relationship with each other and with the Company for the following reasons:

14.1 The HCM Shareholders are collectively the majority shareholder in the Company;

14.2 HCM is the sole shareholder of the Portfolio Manager;

14.3 HCM is the sub-advisor to the Portfolio Manager;

14.4 HCM and Acis previously had common ownership, as Joshua N. Terry (**Terry**), who is now the President and the sole limited partner of Acis, is a former limited partner of HCM; and

14.5 HCM and Acis have a close commercial relationship as Acis was founded as a subsidiary of HCM and managed HCM's portfolio of CLOs; and

14.6 Acis is a creditor in HCM's current bankruptcy proceedings in the Bankruptcy Court.

15 Acis also filed a bankruptcy case in the Bankruptcy Court, and within proceedings therein has brought a complaint in the Bankruptcy Court against Applicant, seeking judgment for several hundreds of thousands of dollars.

16 HCM, within its bankruptcy proceedings is adverse to Applicant regarding an amended proof of claim filed by Applicant against the bankruptcy estate of HCM.

17    Further, the alleged successor to HCM with respect to certain alleged claims held by HCM as of the bankruptcy petition date (a litigation sub-trust), has filed a complaint in the Bankruptcy Court against Applicant seeking judgment for approximately US $100 Million, which Applicant has in part sought dismissal as a matter of failure to state a claim, but the bankruptcy estate of HCM would be the ultimate beneficiary (along with the sub-trust trustee and its counsel) of any recovery.

18    In effect, therefore, both HCM and Acis have made litigation claims against Applicant within two bankruptcy cases.

19    As will be more fully set out below, the relationships between HCM, the Company and Acis have become improperly close and certain decisions and actions taken by the Company have clearly been made to promote the interests of the HCM Shareholders as the collective majority shareholder and Acis (in some cases the Company even effectively acting as the agent of HCM and/or Acis). This conduct has been to the detriment of the Applicant as minority shareholder and has caused unfair prejudice to the Applicant. The incidents of unfair prejudice which are explained more fully in this affidavit are summarised below.

19.1    The Company is beyond its investment period and is not being actively managed. As such, the Company serves as an unnecessary layer of complexity within the structure and does not have any objective purpose or commercial rationale that would interfere with the relief requested within the Application;

19.2    Due to the lack of need for active management, and as well because the Company has provided no explanation for its actions or information by which Applicant can determine that it is being fairly treated, Applicant has to draw its own conclusions, which include that the Company is being maintained and operated in such a way and for no reason other than to prefer other interests of its majority HCM Shareholders, with respect to claims of HCM that have been asserted against Applicant within the HCM bankruptcy process, and as well to favour Acis, which has also asserted claims against Applicant related to its own bankruptcy process;

19.3    The Company has mismanaged its assets by failing to take any steps to resolve the unlawful withholding of funds by US Bank, the indentured trustee, which are due to be distributed to the Company;

19.4    The Company has invalidly sought to appoint a voting member to the advisory board of the Company to represent the HCM Shareholders' interests as collective majority shareholder; and

19.5    The Company has provided limited and insufficient responses to repeated information requests by the Applicant on important and pressing issues, thereby breaching the Applicant's shareholder rights to information.

20    Confirming that the Company is operating in a manner that appears intentionally prejudicing the interests of Applicant as minority shareholder, the Company, rather than take appropriate action against US Bank or issue fair and warranted dividends, has issued a buy-out proposal that severely undervalues the interests of Applicant, to such an extent that the Company seeks to obtain a 15% discount on cash that should be immediately

106-25478799-4

distributed to Applicant. The threat implied by the buy-out proposal is that the Company will continue to withhold distributions to Applicant unless Applicant submits to an undervalued buy-out amount. This is irrefutable evidence of unfair prejudice and unwillingness of the Company to act in the best interest of Applicant as a minority shareholder.

21     Because the Company has refused to distribute available cash, for which it has no investment purpose and which is losing value every day due to inflation, the Applicant Exit Proposals would provide Applicant with immediate right to all available cash attributable to its interest in the Company, and as well immediate right to negotiate directly with US Bank for its share of the Redemption Proceeds and commence proceedings if necessary. Alternatively, it is necessary, for Applicant to be allowed to act on behalf of the Company to take action against US Bank for payment of Company funds that US Bank is unlawfully withholding. It would be unconscionable for the Court to direct the Company to take such action as it has consistently refused (without explanation) to engage US Bank for the Company's funds, and Applicant has good reason for its believe and conclusion that the Company would unfairly draw out any sort of proceedings, and as well maintain its stance of refusing to provide Applicant with information as to its engagement with USD Bank. Applicant as well seeks alternatively to have the Court compel fair distributions to all shareholders of available cash. I will now set out the background facts in relation to the Company, including the business, assets, shareholders, directors of the Company and the management of the Company's assets.

**Background**

*Shareholding of the Company*

22     The current shareholding of the Company is as follows:-

22.1     The Applicant is the holder of 49.015% of the issued share capital in the Company (70,314,387.44 shares); and

22.2     HCMLP Investments is the holder of 49.985% of the issued share capital in the Company;

22.3     HCM is the holder of 0.627% of the issued share capital in the Company;

22.4     The remaining shareholding in the Company of 0.373% is held by four individuals, namely Lee Blackwell Parker III, Hunter Covitz, Jon Poglitsch, and Neil Desai

(the **Shareholders**).

23     During 2015, the Applicant initially subscribed for an interest of 100% shareholding (143,454,001.00 ordinary shares) in the capital of the Company based upon the advice from HCM which was given to the Applicant's parent entity, Charitable DAF Fund L.P (**Charitable DAF**) initially, and then from Charitable DAF to Applicant.

24     The Applicant remained the sole shareholder of the Company up until 15 November 2017. Pursuant to a Subscription and Transfer Agreement dated 15 November 2017 (the **Subscription and Transfer Agreement**), the Applicant transferred and sold a total of

50.8% of its shareholding (73,139,613.56 ordinary shares) to several new shareholders, including 0.63% of its shareholding which was transferred to HCM. Following such transfer, the Applicant's shareholding in the Company was further reduced to its current shareholding of 49.015% (70,314,387.44 ordinary s/hares). A copy of the Subscription and Transfer Agreement is at pages **29 to 60**.

25    As of 15 November 2017, HCM held 0.63% of the issued share capital of the Company, and it then subsequently acquired an additional 49.98% (the **HarbourVest Shares**) of the issued share capital of the Company from HarbourVest Dover Street IX Investment L.P. (**Dover IX**), HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HV International VIII Secondary L.P. and HarbourVest Skew Base AIF L.P. (collectively, **HarbourVest**) (the **HarbourVest Share Purchase**).

26    As a result of the HarbourVest Share Purchase, HCM obtained a majority shareholding of 50.612% of the equity in the Company. On 14 January 2021 HCMLP Investments purchased 49.985% of the Company's ordinary shares.

27    HCM and HCMLP together hold the majority shareholding in the Company. By virtue of their affiliation, these entities act in concert as one and are treated as collective majority shareholders (the **HCM Shareholders**). The Company itself has confirmed in the Memorandum of Law dated 24 November 2021 at pages **60 to 81** filed in support of the Company's Motion to Intervene in certain proceedings (see page **69**) that HCM is "*directly and indirectly [the Company's largest shareholder…"* and therefore HCM is treated as a collective majority shareholder based on its affiliation with HCMLP. The Company's Guernsey advocates have also confirmed that HCM and HCMLP are treated as a collectively majority shareholder in a letter dated 14 April 2022 at pages **82 to 88** which states that "…*HCM and its affiliate, HCMLP Investments, LLC (collectively, the "HCM Shareholders") collectively own more than 50% of the Company's shares*..." (see page **88**).

*Business of the Company*

28    The Company (formerly known as Acis Loan Funding, Ltd) was incorporated in Guernsey on 30 March 2015 as a closed-ended registered collective investment scheme pursuant to The Protection of Investors (Bailiwick of Guernsey) Law, 1987 (the **POI Law**). The Company commenced operations on 10 August 2015 and changed its name from Acis Loan Funding, Ltd. to Highland CLO Funding, Ltd. on October 27, 2017. A copy of the Articles of Incorporation of the Company adopted by special resolution and passed on 15 November 2017 (the **Articles**) is at pages **89 to 126**.

29    The Members' Agreement relating to the Company dated 15 November 2017 (the **Members' Agreement**), regulates the relationship between the Shareholders and between the Shareholders and the Company itself, as well as the operation and management of the Company. A copy of the Members' Agreement is at pages **127 to 154**.

30    Pursuant to clause 1 read together with Recital (B) of the Members' Agreement at page **129**, the Company's business is providing its investors with exposure to senior secured loans and CLOs, on both a direct and indirect basis, through the use of the investments described in the Company's Investment Policy (the **Business**). Generally, the relevant

loans are high yield and are deposited into a trust which issues notes that are sold to investors.

31  Clause 2.1 read together with clause 2.2 of the Members' Agreement at page **132** provides that the Shareholders and Company shall, so far as they are able (including without limitation by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company):-

    31.1  procure that the Company's principal activities shall be the pursuit of carrying on the Business, conducted in accordance with the provisions of:

    (a)  the Members' Agreement (referred to above);

    (b)  the Offering Memorandum in relation to the Company, dated 15 November 2017, at pages **155 to 276** (the **Offering Memorandum**);

    (c)  the Subscription and Transfer Agreement (referred to above) ; and

    (d)  the Articles (referred to above); and

    31.2  not take any action inconsistent with the provisions of the Offering Memorandum, including, without limitation the investment strategy set forth therein (the **Investment Policy**) at pages **211 to 212**.

32  The Offering Memorandum provides at page **211** that the Company's stated investment objective is to provide its shareholders with stable and growing income returns and to grow the capital value of the Company's investment portfolio through opportunistic exposure to CLO notes and other assets.

33  The most recent audited financial statements of the Company for the year ended 31 December 2021 (the **2021 Accounts**) at pages **277 to 308** reflect that the investment period of the Company ended on 30 April 2020 and that the term of the Company is due to end on 15 November 2027, after which the Company will be wound up and dissolved (see page **294**).

*Directors of the Company*

34  The current directors of the Company are Mr Richard Michael Boléat (**Mr Boléat**) and Mr Richard Mark Burwood (**Mr Burwood**) (together the **Directors**). The Directors, who are both independent non-executive directors, were elected and appointed on 7 July 2020.

35  The former directors of the Company are William Scott and Heather Bestwick, who resigned as directors on 7 July 2020.

36  The Offering Memorandum provides at pages **224 to 225** that the Directors are committed to maintaining high standards of corporate governance and that the Company complies with and will continue to comply with the Guernsey Financial Services Commission's Code of Corporate Governance issued on 30 September 2011 (the **Code**).

106-25478799-4

*Management of the Company assets and inter-relations between entities*

37   The Company's assets as at 31 December 2021 are listed and described more fully at pages **289** and **299 to 302** in the 2021 Accounts. The total net asset value of the Company as at 31 December 2021 was US$ 76,100,545. Of that amount the Company asserts that at least $38,000,000 is cash on hand.

38   Amongst the Company's investments are significant interests in the following CLOs which were all historically and are currently managed by Acis:

   38.1   ACIS CLO 2014-4 Ltd.;

   38.2   ACIS CLO 2014-5 Ltd.; and

   38.3   ACIS CLO 2014-6 Ltd.

   (the **ACIS CLOs**).

39   Charitable DAF was the original holder of the ACIS CLOs which were subsequently transferred to the Company as consideration for the Applicant's shareholding in the Company.

40   The Company has appointed and retained the current Portfolio Manager pursuant to a portfolio management agreement dated 15 November 2017 (the **PMA**), a copy of which is at pages **318 to 343**. Pursuant to clause 2 of the PMA at pages **318 to 319**, the Portfolio Manager acts as investment manager to the Company and manages the investment and reinvestment of the cash, subject to and in accordance with the investment policy as set forth in the Offering Memorandum. The Portfolio Manager and/ or its affiliates have very wide authority in respect of engaging in transactions on behalf the Company, including the investment and reinvestment of the cash, financial instruments, and other properties comprising the assets and liabilities of the Company, pursuant to clause 5 of the PMA (see pages **319 to 324** for the full description of such authority). The Portfolio Manager has broad discretion to select and manage the Company's portfolio of investments, including the ability to instruct the Company's custodian with respect to any acquisition, disposition or sale of investments and to provide certain support and assistance, personnel and credit and market research and analysis in connection with the investment and ongoing management of the Company's portfolio.

41   Pursuant to the terms of the PMA, the Portfolio Manager may act (either itself or through an affiliate) as the Portfolio Manager to the CLOs and is responsible for rendering discretionary investment advice to the Company and for ensuring the Company has the required personnel and credit research available to it to make necessary business decisions and carry on the day-to-day management of the Company's business and to implement its investment objective and policy. In addition, the Portfolio Manager (or one of its affiliates) may also manage the Company's CLOs pursuant to management agreements to be entered into from time to time (see page **283** for reference to the role of the Portfolio Manager in the 2021 Accounts).

42   In addition to being a collective majority shareholder in the Company (together with HCMLP), upon information and belief, HCM is also the sub-advisor to the Company (see

2021 Accounts at page **279**), and is sole shareholder of the Portfolio Manager (see page **309** of a certain agreement at pages **309 to 317** concluded between HCM and other parties where it is confirmed that the Portfolio Manager is a subsidiary of HCM at page **309**). Therefore, HCM is in a position to control the Portfolio Manager through its ability to exercise its majority voting power in the Portfolio Manager and its role as sub-advisor and General Manager. Both the Portfolio Manager (directly pursuant to the PMA) and HCM (directly or indirectly by virtue of its control of the Portfolio Manager) provide advisory and management services to the Company and therefore have a close relationship with the Company. In fact, the Company has confirmed in the Motion to Intervene Submissions that that HCM "*through another entity, acts as [the Company's] portfolio manager*". Therefore effectively and for all intents and purposes, HCM is the Company's ultimate portfolio manager, and is now (for the first time in the Company's structural history) is both (along with HCMLP Investments) the majority shareholder while simultaneously suing Applicant.

43      The Company, Acis, HCM and the Portfolio Manager are all part of the same structure and have a close commercial relationship and economic ties with one another. The Company and HCM (through the Portfolio Manager) each hold an interest in a company known as Highland CLO Management, LLC (**Highland CLO Management**) (see Offering Memorandum at page **164**). The Company also has an investment amounting to 80.85% interest in ACIS CLO Management Holdings, L.P. (**ACMH**), an affiliated entity controlled by the Portfolio Manager (and therefore indirectly controlled by HCM) (see the 2021 Accounts at pages **289, 295, 299 to 300 and 303**). Therefore the Company and HCM both have a financial interest in more than one of the same entities. The Company and Acis also each hold an interest in a company known as Acis CLO Management, LLC (**Acis CLO Management**). HCM controls the major economic decisions of Highland CLO Management and ACMH (through the Portfolio Manager) and Acis controls the major economic decisions of Acis CLO Management.

44      A structure diagram setting out some of the relevant entities is at page **316**. While the structure diagram is not necessarily materially different from that from inception, or contrary to the Membership Agreement, the absence of ongoing advisory purpose, together with the fact that that now while HCM holds the power of Portfolio Manager along with majority shareholder (with HCMLP Investments), Applicant is adverse to both HCM and Acis within the Bankruptcy Court, highlights the unfair prejudice caused by the ongoing "operations" of the Company, which include refusal to distribute Applicant's share of material cash assets (of some $38 Million), refusal to take action against US Bank to obtain additional cash assets (approximately $33-35 Million), and finally, manifesting the intention to continue its unfair prejudice by making the buy-out offer which in primary part seeks to impose upon Applicant a 15% discount on cash.

45      Having outlined the background of the Company, its shareholders and asset managers, I now turn to the complaints and concerns in relation to unfair prejudice which the Applicant has in relation to the management of the Company, that underlie the request(s) made in the Application.

**Bankruptcy of Financial Advisors and conflict of interest**

46      As mentioned above, on 16 October 2019, HCM filed for Chapter 11 bankruptcy in the Delaware Bankruptcy Court, which was later transferred to the Bankruptcy Court of the

Northern District of Texas (see the court order dated 4 December 2019 evidencing the HCM bankruptcy proceedings at pages **345 to 346**). Prior to that, Acis had also filed for Chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Texas. A copy of the Court Order confirming the Trustee's Plan in respect of the bankruptcy proceedings of Acis dated 31 January 2019 (the **Acis Bankruptcy Order**) is at pages **347 to 353**.

47      Pursuant to clause 9(a) of the PMA at page **326**, the Portfolio Manager and HCM (as an affiliate of the Portfolio Manager) receive, in consideration for its services, a fee equivalent to all expenses incurred by the Portfolio Manager in the performance of its obligations related to the services set out in the PMA (defined as all Operating Expenses in the PMA). This is confirmed at page **297** in the 2021 Accounts and pages **225 to 226** in the Offering Memorandum.

48      Pursuant to clause 9(c) of the PMA at page **327**, the Portfolio Manager will also receive certain distributions as set forth in the Distribution Policy defined in the terms of the Offering Memorandum at pages **178 to 179**. In this regard, the Offering Memorandum provides that:

"*Following the Investment Period, after satisfaction of all expenses, debts, liabilities and obligations of the Company, any interest, proceeds from the realization of portfolio investments or other cash generated by the portfolio will be distributed by the Company to the Shareholders as a dividend on each Quarterly Dividend Date in accordance with the distribution priority as follows (the "Distribution Priority"):*

*First, 100% to the Shareholders pro rata based on the number of Shares held until each Shareholder has received (i) pursuant to this clause (i), aggregate distributions from the Company equal to all capital contributions made by such Shareholder plus (ii) an amount necessary for such Shareholder to receive a cumulative rate of return of 8.0% per annum, compounded annually, on such Shareholder's aggregate capital contributions;*

*Second, 100% to the Portfolio Manager until the Portfolio Manager has received aggregate distributions from the Company equal to 20% of the sum of all distributions made in excess of aggregate capital contributions made by Shareholders;*

*Third, 80% to the Shareholders pro rata based on the number of Shares held and 20% to the Portfolio Manager until each Shareholder has received aggregate distributions from the Company equal to all capital contributions made by such Shareholder plus an amount necessary for such Shareholder to receive a cumulative rate of return of 16% per annum, compounded annually, on such Shareholder's aggregate capital contributions; and*

*Thereafter, 70% to the Shareholders pro rata based on the number of Shares held and 30% to the Portfolio Manager.*"

49      The Portfolio Manager and HCM as affiliate and Sub-Adviser to the Portfolio Manager could argue that they are entitled to substantial compensation from the Company for their services, and HCM also could assert that it is entitled to maintain the indirect benefit of the Portfolio Manager's compensation demploue to it being the sole shareholder in the Portfolio Manager. Given the absence of continuing purpose, this described compensation structure unduly benefits HCM and Acis, to the prejudice of Applicant, and Applicant cannot assume

that the Company will not dilute the Company assets further by making future payment of this compensation.

50    Most concerning to the Applicant is that this apparent conflict of interest (possibility of continuing compensation without corporate purpose), which because of the inappropriately close relationship the Company has with HCM, favours the interests of HCM and the HCM Shareholders as collective majority shareholder over the other shareholders in the Company. While it may be that HCMLP Investments does not benefit directly, its ownership objectively appears designed to provide HCM with the argument that the vast majority of the HCM Shareholders' interests receives no benefit so as to thwart an unfair prejudice action, when in fact it is the majority status collectively that maintains the ability of the Company to suggest that the maintenance of the HCM compensation structure is appropriate.

**Unlawful Redemption Withholding**

51    The indentured trustee of the ACIS CLOs is U.S. Bank N.A. (**U.S. Bank**). On or around 12 May 2021, the Company submitted a redemption request to U.S Bank in relation to each of the ACIS CLOs (see Company's Interim Audited Financial Accounts dated 30 June 2021 at pages **354 to 377** (the **2021 Interim Accounts**) confirming this at page **357**). On 14 May 2021, NexPoint Diversified Real Estate Trust (formerly known as NexPoint Strategic Opportunities Fund) (**NexPoint**) filed a complaint in the United States District Court for the Southern District of New York against Acis (in its capacity as the then portfolio manager of the Company), U.S. Bank (in its capacity as trustee of the Company), Terry (in his capacity as Acis' principal) and Brigade Capital Management, L.P. (in its capacity as sub-adviser to Acis) (the **NexPoint Litigation**). The NexPoint Litigation was brought on the basis of inter alia the alleged breach of fiduciary duty in the management of certain CLOs in which NexPoint invested, resulting in a loss to NexPoint. A copy of the complaint filed by NexPoint in the NexPoint Litigation is at pages **378 to 427**.

52    On or around 23 June 2021, the Company's request for a redemption was satisfied and Acis and U.S. Bank liquidated nearly all of the ACIS CLOs and redeemed the secured notes, leaving only certain subordinated notes outstanding (the **Redemption**). As a result, the ACIS CLOs were largely redeemed and the liquidation of the CLOs generated sufficient proceeds to make significant payments to the holders of subordinated notes (the **Redemption Proceeds**).

53    The Redemption Proceeds were supposed to be distributed to the various noteholders, including, principally, the Company in accordance with the rights of those noteholders. (See pages **65 to 66** and **71 to 72** from the Motion to Intervene Submissions). However, U.S. Bank, has  reserved the entire Redemption Proceeds to pay for their legal expenses and any potential liability in connection with the NexPoint Litigation (see pages **71 to 72** of the Motion to Intervene Submissions). The value of the cash holdings retained by U.S. Bank as of 21 March 2021 amounted to approximately US$39 million (as reflected in the 2021 Accounts at page **280**).

54    US Bank's contention is that its retention of the Redemption Proceeds is authorised by the relevant CLO indentures on the basis that it is required in order to protect US Bank (and perhaps Acis; Applicant has insufficient information to make an allegation here) from the

effects of the NexPoint Litigation as well as its asserted concern over the perceived threat of litigation against the Company by the Applicant. In this regard, see page **280** in the 2021 Accounts, page **483** in the letter from the Company to the Applicant dated 23 July 2021, and page **462 to 464** in the letter dated 26 October 2021 from Carey Olsen (Guernsey) LLP, the advocates for the Company (**Carey Olsen**), to Ogier (Guernsey) LLP, the advocates for the Applicant (**Ogier**) (the **October 2021 Letter**).

55  In the October 2021 Letter it states at pages **462 to 463** that "*US Bank's stated justification for retaining the CLO redemption proceeds at issue is premised on certain threatened litigation from CLO Holdco and certain other presently-filed litigation by Nexpoint Strategic Opportunities Fund…including litigation in which the Company is cited as a nominal defendant.*"

56  The Company has declared in pleadings that U.S. Bank has no legal right to withhold the Redemption Proceeds, and therefore has acknowledged that the supposed "perceived threat" of litigation grants U.S. Bank no basis to withhold. Despite this, the Company has taken no action to force payment by U.S. Bank of the Redemption Proceeds.

57  CLOs are structured products with rated debt tranches, and therefore they are intended to operate automatically in accordance with cash waterfall provisions. There is no discretion by U.S Bank to withhold the Redemption Proceeds for any reason, including to fund any litigation such as a hypothetical potential future claim based on a purported indemnity (which the Company agrees does give rise to a right on behalf of U.S. Bank to withhold the Redemption Proceeds). The withholding by U.S. Bank of the Redemption Proceeds is therefore unlawful (the **Unlawful Redemption Withholding**). The Company agrees, despite its attempt to shirk duties by placing blame on Applicant, and its continuing refusal to take action to recover the Redemption Proceeds.

58  As mentioned, the Company has in fact recorded its disagreement with U.S. Bank's treatment of the Redemption Proceeds several times. In the Motion to Intervene Submissions at pages **74 to 75** it states "*There is no basis in the Indenture or the law to reserve funds for Defendants' potential liability*" and in the 2021 Interim Accounts it states at page **357** that "*The Directors' view, on advice, is that the retention of cash by the indenture trustee is unlawful and is inconsistent with the terms of the relevant CLO indentures. Accordingly, the Directors are taking urgent and proportionate steps to secure unrestricted control over this cash and any as yet unliquidated securities. I will communicate further with all shareholders as this matter progresses.*" This is reiterated in the 2021 Accounts at page **280** where it provides that it is the Directors' opinion that there is no proper basis in law for the withholding of the Company's assets by U.S. Bank.

59  In the October 2021 Letter at page **463** it also states that "*US Bank has explained its position on this matter openly and consistently. The Company disagrees with that position and has communicated that disagreement to US Bank.*"

60  Due to the Unlawful Redemption Withholding, significant payments that the Company would otherwise receive from the liquidation of the ACIS CLOs have been delayed on an unlawful basis and the funds that make up a portion of the Applicant's shareholding in the Company continue to be depleted. The Company has filed a motion seeking to intervene in the NexPoint Litigation purportedly in order to support the opposition to NexPoint's claim and

therefore seek to minimise the funds used by U.S. Bank for its defence to the NexPoint Litigation (see email from Company dated 3 December 2021 at pages **465 to 466**). However the Company has not taken any steps to compel U.S. Bank to release the Redemption Proceeds and thereby remedy the Unlawful Redemption Withholding, that the Company itself has claimed to be unlawful.

61    Despite several requests by the Applicant (described further below), the Company has also refused to provide the Applicant with any information relating to the Company's attempts to procure the release of these funds.

62    The Company's intervention in the NexPoint Litigation will inevitably result in the Company incurring litigation costs, which the Company in seeking the intervention has acknowledged should be spent. But the objective of the intervention is purportedly to accelerate the payment from U.S. Bank, by ending the litigation by NexPoint. Notwithstanding its willingness to expend costs in litigating against NexPoint, the Company remains unwilling to expend necessary costs to obtain payment of the withheld Redemption Proceeds, which would be simply litigation upon the Indenture documents against U.S. Bank, solely, and should have been explored as an action that could have been taken within the NexPoint litigation or otherwise (see below).

63    On 3 December 2021, the Company, acting through Mr Boléat, sent an email to the Applicant suggesting that, the easiest approach to receiving funds would be if the Applicant were able to "*procure a release from its affiliate NexPoint*". A copy of this email is at pages **465 to 466**).

64    This communication evidences the prejudice being caused to Applicant. Applicant is not an affiliate of NexPoint under any proper definition of the term, but the Company has assumed affiliate status and the power of Applicant to cause conduct on the part of NexPoint. In fact, it is the case that HCM has within bankruptcy proceedings routinely (without evidence) asserted that Applicant is an affiliate of numerous parties with which it is not affiliated, so we assume that the Company representatives did not simply make up the suggestion, but that the "assumption" of affiliate status is coming from HCM. This acceptance of assertions from HCM (without communication with Applicant) is the definition of prejudice. The Company has already stated in its own intervention submissions that U.S. Bank has no right to retain the proceeds related to Acis 6, despite the NexPoint litigation; so it cannot be heard to say that it should not commence action against U.S. Bank when in fact the only litigation regarding the other CLO's has been instituted by U.S. Bank, seeking an improper declaratory action that Applicant should not be able to sue U.S. Bank. It simply is improper for the Company to place any undue condition on the distribution of the Redemption Proceeds or withhold action to compel U.S. Bank to distribute the Redemption Proceeds, under an incorrect assumption that Applicant can resolve litigation by a third party. The Company is entitled to the Redemption Proceeds. The Company should also, within the Intervention submissions, proposed that upon intervention it would act as plaintiff in counterclaim with a direct Claim against U.S. Bank for immediate distribution of the Acis 6 proceeds (together with any and all fees, costs, and damages to which the Company is entitled -- as opposed to attaching only a motion to dismiss the NexPoint complaint. Clearly the Company has exhibited an unwillingness to bring action against US Bank, as it withheld such action from inclusion in its Intervention Submissions, despite such an approach being proper, even if in the alternative.

65      The Company is clearly not committed to resolving the Unlawful Redemption Withholding and are even willing to use inappropriate suggestions to take advantage of the circumstances in order to secure a release from the NexPoint Litigation, for some inexplicable purpose, upon a groundless assertion of affiliate status; while at the same time the Company, though making clear that it has a viable claim against U.S. Bank for distribution of the Unlawful Redemption Withholding, refuses to take action to obtain that result.  Therefore it is clear that while the Company has no concern for spending litigation expenses pursuing a release or withdrawal by NexPoint in respect of the NexPoint Litigation that is purely for the benefit of Acis, it simultaneously withholds the prospect of any direct action against U.S. Bank on its own proclaimed right to obtain from U.S. Bank the Redemption Proceeds.

66      As bad, by failing to take any steps to resolve the Unlawful Redemption Withholding, the Company has chosen to implicitly support U.S. Bank's unlawful position to the detriment of the Applicant and has preferred the interests of Acis (in relation to its position in the NexPoint Litigation) over the interests and rights of shareholders, and in particular, Applicant as minority shareholder.  This again raises a conflict of interest and instance of the Applicant being unfairly prejudiced by the conduct of the Company.  The Company's failure to take any steps to remedy the Unlawful Redemption Withholding as well as the apparent conflict of interest in relation to Acis, has caused and continues to cause loss and resultant unfair prejudice to the Applicant.

**Trading status of Company**

67      As mentioned above, the investment period of the Company ended on 30 April 2020 and the Company is currently in wind down mode, which is the process of dissolving a business by liquidating stock, paying off creditors, and distributing any remaining shareholder assets.  In the case of the Company, the Acis CLOs are in runoff, meaning there is a decline in fixed-term investments due to the fact that the bulk of the Company's assets have been redeemed and the proceeds of such redemption are being held in cash by the Company US Bank in its capacity as indentured trustee (while such cash is declining in value by aggressive inflation).  The Company is in the process of liquidating its investment portfolio with a view to a complete return of capital to shareholders.  The Applicant Exit Proposals are simply an acceleration of the liquidation process with respect to Applicant, and the Company can thereafter take whatever actions upon which it and its remaining shareholders agree.

68      The "Business" of the Company as defined in the Members Agreement and the investment policy set out in the Offering Memorandum is to provide its shareholders with stable and growing income returns and to grow the capital value of the investment portfolio through opportunistic exposure to senior secured loans.  Due to the current trading status of the Company, it is not actively fulfilling the purpose for which it was intended and is no longer operating in accordance with the Business of the Company.

69      The Articles and the Members' Agreement clearly do not anticipate the current investment status of the Company where there are no more investable assets and the only remaining assets (the Acis CLOs) are in wind down mode.  The shareholders of the Company are not benefitting from an investment in the underlying CLO assets as they had anticipated when entering the structure, and the fact that the proceeds from the Redemption are apparently

being unlawfully withheld by US Bank and that the Company has failed to take proper steps to remedy the position further supports the argument that the business of the Company is no longer operating in accordance with its stated investment objective.

70      Further, the Company may even be in breach of clause 2.1 read together with clause 2.2 of the Members' Agreement provides that the Shareholders and Company shall, so far as they are able procure that the Company's principal activities shall be the pursuit of carrying on the Business, which is currently not being carried out.

71      In these circumstances, the Applicant has a legitimate expectation that the remaining assets of the Company will be distributed to the shareholders and it is being unfairly prejudiced on an ongoing basis as long as these funds are not distributed.

**Invalid Appointment of Voting Member to Advisory Board**

72      Pursuant to clause 4.1 of the Members' Agreement at page **133**, the Company is required to establish an advisory board composed of two individuals, one of whom must be a representative of the Applicant (the **Advisory Board**).  On 2 November 2021, and pursuant to the Applicant's rights under clause 4.1 of the Members' Agreement, the Applicant appointed me (being one of its directors) as its representative on the Advisory Board. Notice of my appointment was provided to the Company and its shareholders and the Company acknowledged such appointment by letter to me dated 6 January 2022.  Copies of the notice of my appointment to the Advisory Board is at pages **472 to 473**. Pursuant to my appointment, I am the sole voting member of the Advisory Board.

73      Pursuant to clause 4.3 of the Members' Agreement at page **133,** the main function of the Advisory Board is to provide general advice to the Portfolio Manager or the Company with regard to Company activities and operations and other matters, and the Portfolio Manager may not act contrary to the advice of the Advisory Board.

74      Pursuant to clause 13 of the PMA at pages **138 to 139** the Advisory Board has the unilateral right to terminate the PMA and remove the Portfolio Manager from its position independently of the Directors and the Company for cause, including where the Portfolio Manager breaches any terms of the PMA or the Offering Memorandum.  Pursuant to clause 4(a)(xiv), the Portfolio Manager also may not cause the Company to engage in transactions, directly or indirectly, with the Portfolio Manager or its principals or affiliates without the consent of the Advisory Board of the Company.  The functions and duties of the Advisory Board therefore include the review of the performance and decisions of the Portfolio Manager to ensure it complies with its duties, and to maintain checks and balances on transactions between the Company and the Portfolio manager/ its affiliates/ principals, including HCM as an affiliate of the Portfolio Manager.

75      The Applicant understands that HCM has appointed Mr Richard Katz (**Mr Katz**) to the Advisory Board as a second member by virtue of HCM's right as the successor in title to the interest in the Company previously held by Dover IX.  Pursuant to clause 4.1 of the Members' Agreement at page **133**, no voting member of the Advisory Board shall be a controlled Affiliate of the Portfolio Manager. "Affiliate" is defined in the Members' Agreement at page **130** as "*(i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director,*

*officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above."*

76  Furthermore, pursuant to clause 4.4 of the Members' Agreement at page **134**, a member of the Advisory Board shall be deemed removed from the Advisory Board if *"…such member is no longer an officer, director, manager, trustee, employee, consultant or other representative of CLO Holdco or Dover IX [or their successors in title], as applicable, or their respective Affiliates and shall be replaced as soon as practicable with a representative of CLO Holdco or Dover IX, or their respective Affiliates, as applicable…"*.

77  HCM is in control of the Portfolio Manager as its wholly-owned subsidiary, and by virtue of clause 4.4, Mr Katz, as the appointed representative of HCM on the Advisory Board, may only be appointed to the Advisory Board for so long as he is an Affiliate of HCM. Therefore it is clear that, although Mr Katz may be appointed to the Advisory Board, any attempt by Mr Katz to assert a right to vote on the matters to be considered by the Advisory Board will be a breach of the Members' Agreement.

78  Further at page **133** of the Members' Agreement it provides that the quorum for a meeting of the Advisory Board shall be "*…all of its members **entitled to vote…**"* and that all actions of the Advisory Board shall be "*… (i) by a unanimous vote of all of the members of the Advisory Board in attendance in a meeting at which a quorum is present and **entitled to vote** and not abstaining from voting or (ii) by a written consent in lieu of a meeting signed by all of the members of the Advisory Board entitled to consent and not abstaining from consenting."* Therefore, despite any assertions by the Directors on behalf of the Company that the Advisory Board could not be quorate or act if Mr Katz were a non-voting member, it is clear that I, acting by myself and as the sole voting member appointed to the Advisory Board, will constitute the quorum for the Advisory Board and will be able to approve all actions of the Advisory Board.

79  As a result, the Applicant asserts that, although it is willing to recognise the appointment of Mr Katz as a non-voting member of the Advisory Board, any action, vote or exercise of power by Mr Katz as a member of the Advisory Board shall be deemed invalid and will be challenged on the basis that it constitutes a breach to the Shareholders' Agreement and unfairly prejudices the Applicant's interests.

80  The Company refusing to take action to establish the status of Mr Katz as a non-voting member of the Advisory Board is yet further evidence of unfair prejudice against Applicant as a minority shareholder.

**Insufficient responses to Information Requests**

81  For the reasons outlined above, the Applicant has become increasingly concerned with regards to the value of its shareholding in the Company over time due to, *inter alia*: (i) the refusal of the Company to distribute cash on hand and to take action against U.S. Bank: (ii) the apparent conflicts of interest of the Company with respect to Acis and the HCM Shareholders, made plain by (a) the Intervention Submissions (by which while the Company seeks to take action against NexPoint, it refuses to seek direct relief against U.S. Bank), and (b) the Buy-Back Proposal (defined and discussed more fully below), which sought to prefer the HCM Shareholders by the implicit threat to maintain a refusal to distribute cash

106-25478799-4

assets unless Applicant would submit to a 15% discount on cash, which would inure to the benefit of the HCM Shareholders in an unwarranted amount approaching $6 Million (counting the Applicant's share of the Redemption Proceeds, which the Company would doubtless receive immediately upon Applicant agreeing to the Buy-Back Proposal);  and (iii) the Company's refusal to abide by the above described corporate documents regarding the non-advisory role of Mr. Katz.

82    As a result of the failure to take action against U.S. Bank, and as well the status of Mr. Katz (and for other reasons previously mentioned in other correspondence), the Applicant and I sent various requests for information to the Company (both directly and through Ogier (Guernsey) LLP (**Ogier**) as the Applicant's advocates) in order for the Applicant and I to make an accurate evaluation of the impact of the investment and management decisions of the Company (and their advisors) on (i) the Company and (ii) the value of the Applicant's investment in the Company.

83    This is by virtue of both the implied information rights attaching to the Advisory Board, which are required to allow the members of the Advisory Board to make informed decisions, and the express rights provided by the further assurance provisions of the Members' Agreement as set out in clause 16.1 of that agreement at page **140**.

84    On the basis of the rights and powers afforded to the Applicant in its capacity as shareholder and me in my capacity as member of the Advisory Board, during the period 21 July 2021 to 20 January 2022, the Applicant and I made a number of requests for further information to the Directors in respect of the Company and its activities, including:

84.1    what advice the Company received to support their view that the withholding of the Redemption Proceeds by U.S. Bank is illegal;

84.2    what action the Company has taken to secure the release of the Redemption Proceeds by U.S. Bank;

84.3    which entities and/ or individuals are currently acting as advisor to the Company, if any; and

84.4    what action the Company intends taking to preserve the value of the Company and of the Applicant's interest therein.

(the **Information Requests**).

85    I will now set out a summary of the relevant inter parties correspondence exchanged in respect of the Applicant's various concerns in relation to the conduct of the affairs of the Company as set out above in this affidavit and the Information Requests:

85.1    On 22 July 2021, the Applicant sent a letter to the Company raising its concerns in relation to the Unlawful Redemption Withholding.  The Applicant requested information from the Company on what actions were being taken by it to release the Redemption Proceeds and requested the Company to take certain steps to resolve this issue (see pages **481 to 482**.

106-25478799-4

85.2 On 23 July 2021, the Company responded on a very limited basis to the Applicant's letter of 22 July 2021 providing that US Bank is holding reserves on account of pending and threatened litigation, including litigation filed by NexPoint and threatened litigation from the Applicant and Charitable DAF, and that it is "*currently consulting with legal advisor and the Fund's portfolio manager to determine the Fund's response to these events*" (see page **483**). Certain of the Company's legal advisors are counsel to HCM within adversarial action against Applicant in the HCM bankruptcy case (with respect to objection to the Applicant's proof of claim).

85.3 On 27 July 2021, the Applicant sent a letter to the Company confirming that it has neither commenced litigation against any entity in connection with the Acis CLOs or threatened litigation against any entity in connection with the Acis CLOs, and that lumping the Applicant with any other unrelated litigation is improper and no basis for US Bank to withhold substantial distributions owed to the Company. The Applicant added that even if such litigation was threatened (which it is not), this is still not basis for the Unlawful Redemption Withholding and also requested further details of the steps being taken by the Company to release the Unlawful Redemption Proceeds (see pages **484 to 485**). Again, we note that the Company has taken the position, within the Nexpoint litigation, that such litigation is not grounds for withholding Redemption Proceeds.

85.4 On 20 October 2021, Ogier, acting for the Applicant, sent an email to the Company making a further formal request for the information required by the Applicant for it to make an effective assessment as to how certain matters raised in the redemption reports for each of Acis CLO 2014-4, Ltd., Acis CLO 2014-5, Ltd. and Acis CLO 2014-6, Ltd. and 2021 Interim Accounts impacts its interest in the Company, and in particular, Ogier directed several detailed questions to the Company on the issue of the Unlawful Redemption Withholding (see pages **486 to 488**).

85.5 On 26 October 2021, Carey Olsen, acting for the Company, sent the October 2021 Letter referred to above (see pages **462 to 464**), providing inter alia that US Bank's stated justification for retaining the Redemption Proceeds is premised on certain threatened litigation from the Applicant and presently filed litigation by NexPoint as an apparent affiliate of the Applicant. This is despite the fact that the Applicant had already confirmed in its letter of 27 July 2021 that it has not commenced litigation against any entity in connection with the Acis CLOs or threatened litigation against any entity in connection with the Acis CLOs. In the October 2021 letter Carey Olsen purported to provide responses to the questions posed by Ogier in its email of 20 October 2021, however it is clear that the responses provided were superficial, meaningless and evasive.

85.6 On 2 November 2021, the Applicant sent a letter to the Company and its other shareholders providing formal notice of my appointment as a voting member of the Advisory Board representing the Applicant pursuant to clause 4 of the Members' Agreement (see pages **472 to 473**).

85.7 Between 8 November 2021 and 3 December 2021, I on behalf of the Applicant made further concerted efforts to engage with the Directors of the Company and discuss the

various issues, most importantly, the proposals in respect of the Applicant's exit from the Company. The full chain of emails at pages **465 to 471**) reflects inter alia that:

(a) On 9 November 2021 Mr Boléat responded to me on behalf of the Company providing that the Directors "*have nothing to add to the letter sent to Ogier on 26th October 2021*".

(b) On 10 November 2021, I sent an email to Mr Boléat requesting information and again confirming that I was not aware of the Applicant having threatened litigation which could have a bearing on the Unlawful Redemption Withholding. I also proposed an in specie distribution from the underlying assets of the Company to the Applicant in exchange for the Applicant's shareholding as a means to achieve the exit of the Applicant from the Company (defined below as the Redemption Proposal).

(c) Mr Boléat responded on 3 December 2021 indicating that the proposal for an in specie distribution was rejected. The Applicant does not consider that any of the reasons advanced by the Company (dealt with below in the next section in respect of the Applicant's exit proposals) are sufficient to justify rejecting the in specie distribution.

85.8 On 11 January 2022 at 05.14pm, I sent an email to the Company, both in his capacity as a voting member of the Advisory Board and on behalf of the Company, requesting information and documents from the Company in relation to the matters set out above, namely the invalid appointment of Richard Katz to the Advisory Board, the intervention by the Company in the NexPoint Litigation, and the Acis Settlement Agreement with no commercial rationale, among other things. I also put forward the proposal for either a redemption and in specie distribution of the Applicant's interests in the Acis CLOs, or alternatively an arm's length liquidation of the Acis CLOs, in order to extricate the Applicant from the Company (see pages **493 to 495**).

85.9 On 20 January 2022 the Company responded to my email of 11 January 2022 again with limited and insufficient responses (see the full chain of emails at pages **489 to 495**).

86 Despite the repeated Information Requests, to date the Applicant and I have received limited and insufficient information from the Company through its Directors. Pursuant to clause 16 of the Members' Agreement at page **140**, the Company will exercise all powers that it is able to procure that the provisions of the Members' Agreement are properly and promptly observed and given full force and effect according to the spirit and intention of the agreement. In breach of clause 16 of the Members' Agreement, the Company has refused to provide the necessary information to me and the Applicant in spite of my position as the sole voting member of the Advisory Board and the Applicant's rights as shareholder.

87 Therefore I cannot effectively fulfil my role on the Advisory Board as representative of the Applicant as shareholder and the Applicant is unable to make informed investment decisions relating to its shareholding in the Company. In this way, the Company, acting through its Directors, has displayed both a lack of regard for the Applicant's rights and interests in the Company as shareholder as well as my role on the Advisory Board, which

106-25478799-4

is a mandatory and important part of the checks and balances required for proper governance under the Articles.

88 Principle 8 of the Code indicates that the Directors should *"…ensure that satisfactory communication takes place with shareholders and is based on a mutual understanding of needs, objectives and concerns"* and that the Directors *"…should ensure the provision to shareholders of adequate information on which they may base informed decisions"*. Although the Directors have committed to complying with the Code, the actions of the Directors in failing to provide the Applicant with the information it seeks results in the Directors failing to comply with the Members' Agreement, and failing to meet the standards required by Principle 8 of the Code in relation to shareholder engagement.

89 It is especially unfair to the Applicant that the Company refuses to provide the Applicant with information in circumstances where that information has likely been made available to HCM due to its close relationship with the Company. HCM is able to make informed investment decisions regarding its investment in the Company while the Applicant is unfairly not afforded the same rights.

**The Company's Share Buy Back Proposal Establishes Unfair Prejudice**

90 On June 28, 2022, HCLOF, through Chairman Boleat, sent a share buyback proposal (**Share Buyback Proposal**) (see pages **496 to 545**) to the shareholders. In the Share Buyback Proposal, HCLOF referred to its policy for the previous two quarter-ends (December 2021 and March 2022) of returning excess cash from investment proceeds to shareholders by way of dividend. During the second quarter of 2022, HCLOF monetarized its interests in MGM Studios equity, resulting in $38,274,397.88 of unencumbered cash. Citing to this cash, HCLOF stated that its board was able to offer shareholders the opportunity to sell their shareholdings back to HCLOF. While the cash was insufficient to buy back all outstanding shares, the HCM Shareholders had previously indicated to HCLOF that they would not enter into a buyback transaction.

91 Therefore, HCLOF offered to buy back all of CLO HoldCo's outstanding shares (on an all or nothing basis). HCLOF clarified that any offer would reflect the advantages conferred upon shareholders, the loss of use of funds by HCLOF, and removal of risk. To reflect this, the Share Buyback Proposal offered to buy all of CLO HoldCo's outstanding shares at 85% of the May 2022 NAV (55.53 cents per share), being 47.20 cents per share.

92 In response to the Share Buyback Proposal, on 7 July 2022, CLO HoldCo, through counsel, sent a Response to the Share Buyback Proposal (**Response**) (see pages **546 - 547**). In the Response, first, CLO HoldCo noted that the Share Buyback Proposal was discounting 15% on cash, and therefore, there was no material risks or uncertainties justifying discounts. Second, CLO HoldCo also cited the impropriety of holding such significant cash reserves where HCLOF is in wind down and not actively trading. Further, CLO HoldCo stated that it was clear from the Share Buyback Proposal that HCLOF had previously discussed the details of a proposed buyback with the HCM Shareholders in advance of making the Share Buyback Proposal to CLO HoldCo, which again evidences HCLOF's preference for the interests of HCM Shareholders over CLO HoldCo. Finally, in making the Share Buyback Proposal without consulting with CLO HoldCo, HCLOF improperly incurred administrative expenses.

93     As such, given HCLOF's improper holding of significant cash and seeking to impose the unwarranted and prejudicial 15% discount (on some $78 Million in cash either on hand or in the form of Redemption Proceeds); taking no action and refusing to disclose what action it has taken against US Bank; and having an inappropriately close relationship with the HCM Shareholders as evidenced by the assertions herein, and the culminating prejudicial Company Share Buy-Back Proposal, CLO HoldCo rejected the Share Buyback Proposal.

94     On 15 July 2022, Carey Olsen sent a letter to Ogier on behalf of the Respondent, responding to Ogier's letter of 7 July 2022, a copy of which is at page **548**. The Company's response was essentially non-responsive (as it had no real response to the mathematical certainly of the undervaluation of the Share Buy-Back Proposal). Unable to refute the rejection letter, the Company resorted only to a single sentence -- "*The various allegations made in that letter are wrong.*" The Company also relied on a logical fallacy by accusing the Applicant of inconsistency by expressing willingness to discuss reasonable proposals while simultaneously having no real alternative but institution of Unfair Prejudice proceedings. Of course, as established here the Company has been unwilling to even consider, much less discuss reasonable proposals. It has only been willing to engage in refusal to provide information, refusal to take proper action to recover Company funds, refusal to make fair distributions; and it has been willing to traffic in the undervalued Share Buy-Back Proposal, requiring under threat of further unfair prejudice, a discount of 15% on cash for the benefit of the HCM Shareholders.

**Applicant's Alternative Exit Proposals**

95     Applicant has made alternative proposals, the Redemption Proposal and the Alternative Share Buy-Back Proposal (collectively the **Applicant Exit Proposals**), an outline of which, along with explanatory positions is attached at pages **570 to 574**.

96     The Redemption Proposal was previously advanced by the Applicant to the Company by written correspondence on 10 November 2021 (at pages **468 to 469,** on 3 December 2021 (at page **466** and again on 11 January 2022 (at pages **493 to 493** and was rejected each time by the Company for the following reasons:

(a)     The in specie distribution would result in the Company's position in respect of its intervention in the NexPoint Litigation being compromised;

(b)     It is not clear that the in specie distribution would be feasible as the CLO indentures would need to be reviewed to determine whether in-kind distributions to the relevant transferees are compatible with all relevant terms, and the Company would also need to ensure that each of the Company's shareholders are able both to receive and then hold the CLOs in question (either from a tax/regulatory perspective or based on the terms of the CLOs themselves);

(c)     The Company's structure has a history of hostile litigation that has had a serious impact on the Company's interests over the years, and the Company has concerns that any changes to the status quo might prompt further contentious activity, potentially involving the Company, that would be damaging and costly for all parties.

97      In response to the first reason, in the interests of resolving the ongoing disputes the Applicant would be amenable to agree to vote in conjunction with the Company in respect of the voting rights attaching to those CLOs represented in the assets distributed to the Applicant pursuant to the Redemption Proposal.

98      The Applicant does not agree that the Redemption or the Share Buyback would not be feasible as the transaction would be compatible with all relevant terms of the CLO Indentures.  In fact, the Applicant is willing upon direction of the Court to obtain an independent opinion from an established expert in the field of CLO structure management and operations that indicates that the Redemption Proposal would be administratively simple and would also not impact the value of the CLO positions of the Company as a whole or prejudice the remaining Shareholders.

99      On 30 March 2022, the Applicant's advocates, Ogier, sent a letter to the Company at pages **549 to 560** setting out the Applicant's concerns (in line with what is in this affidavit above) and proposing either of the Applicant Exit Proposals as a means to secure a mutual separation between the Applicant, HCM and the Company.  In sending the Applicant Exit Proposals, the Applicant aimed to encourage negotiations between the parties and the fact that the Applicant put forward more than one exit proposal in the Applicant Exit Proposals reflects that it sought to be reasonable and flexible in its approach.  The Applicant is of the position that either of the Applicant Exit Proposals would be effective in resolving the disputes between the parties as both are fair, practical and reasonable and will not prejudice any party.

100     On 14 April 2022 the Company's advocates, Carey Olsen, sent a letter responding to the letter from Ogier dated 30 March 2022, a copy of which is at pages **561 to 567** (the **Response to the Applicant Exit Proposals**).  The Company has responded to each of the Applicant Exit Proposals as follows:

"*A redemption of shares in the manner proposed in your letter is not possible pursuant to the Company's articles of incorporation (the "Articles"). The Articles only permit a redemption pursuant to article 9 thereof, which permits the board to compulsorily redeem shares in accordance with the Members' Agreement (as defined therein). The Members' Agreement only permits redemption in accordance with clause 5.5 which permits the Portfolio Manager, on behalf of the Company, to elect, upon notice to a Defaulting Member to redeem the Defaulting Member's shares in an amount equal to 50% of the outstanding amount existing as of the date of the default at a price of $0.0001 per Share (all capitalised terms as defined in the members' Agreement).*

*Pursuant to clause 3.2.3 of the Members' Agreement, any redemption other than pursuant to clause 5.5 requires the affirmative vote or prior written consent, as applicable, of the Members totalling in the aggregate more than seventy five percent (75%) of the Company. It would also require an amendment to the Articles, which requires special resolution approval.*

*With respect to a buyback, which requires ordinary resolution approval of the terms of the relevant buyback contract, pursuant to section 314(5) of the Companies (Guernsey) Law, 2008 (as amended), your client is precluded from voting its shares.*

…

*In principle, the Directors would be willing to engage U.S. and Guernsey counsel to review those matters, provided that HCM and its affiliate, HCMLP Investments, LLC (collectively, the "HCM Shareholders"), who collectively own more than 50% of the Company's shares, are agreeable to voting for, or to considering voting for, either of your proposals. As you will appreciate, if the HCM Shareholders are not agreeable to supporting one of those proposals, neither is viable – and time and costs incurred in considering these matters further would be wasted. The Directors, having approached the HCM Shareholders to consider these options, can confirm that they are not agreeable to giving their support, or to giving further consideration to the same…."* [emphasis added]

101    The Company has not provided any proper or specific legal or technical basis for its refusal of either of the Applicant Exit Proposals.  There is also no indication that the Company has properly canvassed either of the Applicant Exit Proposals internally or with the HCM Shareholders, which would necessitate circulating a shareholders resolution to the HCM Shareholders with a formal request for approval of either of the Applicant Exit Proposals. This would be easy, inexpensive and not time-consuming.  The Company does, however, make clear with the Share Buy-Back Proposal, its intention to further effect unfair prejudice upon Applicant.

102    It is apparent that the Directors of the Company have held discussions with the HCM Shareholders (without the Applicant's input) in respect of the Applicant Exit Proposals, and as well the Share Buy-Back Proposal (designed to promote the interests of the HCM Shareholders to the detriment of Applicant as minority shareholder).  The interests of the HCM Shareholders as a collective majority shareholder are blatantly being preferred by the Company over the interests of the Applicant as minority shareholder (there is simply no conceivable justification for an offer requiring a 15% discount for cash).

103    As no counter proposal has been offered by the Company pursuant to its discussions with the HCM Shareholder, whether in the form of a proposed amendment to the terms of the Applicant Exit Proposals or otherwise, except for the unwarranted and unfairly prejudicial Share Buy-Back Proposal, it is clear that neither the Company nor the HCM Shareholders have bona fide intentions of trying to resolve the disputes and secure a solution for the Applicant's request to exit from the Company.

104    The Response to the Applicant Exit Proposals is the latest in a substantial amount of correspondence which the Applicant has directed to the Company in order to raise its concerns and seek to agree an amicable resolution through various proposed solutions. The Company has refused to engage in any constructive discussions regarding the exit of the Applicant from the Company despite the various proposals made to resolve the issues and therefore the Applicant, and therefore Applicant has been left with no option other than to approach the Royal Guernsey Court for the necessary relief.

105    In an attempt to appear reasonable, the Company on 15 July 2022 sent a letter advising that the Share Buy-Back Proposal had not been approved by the requisite percentage of shareholders (which was self-evident, as Applicant rejected it), and as well a notice of intention to issue a dividend to shareholders.  Copies of these correspondences are attached at pages **568 to 569**.

106-25478799-4

106    The proposed dividend is $14.73 per share, despite the Company being willing to use in excess of $47.20 per Applicant share to pay the Share Buy-Out Proposal amount. This indicates an unfair retention of cash, as the Company was willing to part with close to 90% of its unencumbered cash for the Share Buy-Out Proposal, but now needs to retain in excess of 40% of unencumbered cash, for no discernible reason.

107    Applicant advised the Company of its intention to proceed with the Application in the Royal Guernsey Court for relief including that mentioned above at Sections 12 and 13, and otherwise described within the Application.

108    Applicant reserves all rights to amend, to seek additional relief to which it might be entitled, as could bring to resolution the continuing unfair prejudice being imposed upon Applicant as a minority shareholder.

**Conclusion**

109    For the reasons set out above, the actions of the Company are such that the Applicant's rights as shareholder are being ignored and the Applicant continues to be unfairly prejudiced as minority shareholder. The manner in which the Company is currently being managed is not in the interests of all shareholders and in fact that the Company has engaged in conduct that is pointedly prejudicial to the interests of Applicant as minority shareholder. Applicant's shareholding in the Company has become untenable. This is unfairly prejudicial and necessitates court intervention in the form of the Application.

110    The Applicant has provided the Company with several opportunities to justify the various actions they have taken which are the subject of the Applicant's concerns, in order for it to better understand the Company's position and rationale. However the Company has largely refused to answer the requests for information and where information has been provided, it has been very limited and insufficient.

**Notice**

111    Required proceedings, if necessary, have been undertaken in the Bankruptcy Court.

112    The Company has been notified of the filing of the Application and will be notified of the date, time and place of the hearing of the Application in accordance with section 349(4) of the Companies Law. The HCM Shareholders and other Shareholders have been notified of the filing of the Application and will be notified of the date, time and place of the hearing of the Application, so that they can seek to be added as parties under Rule 37(1)(b)(ii) of the The Royal Court Civil Rules, 2007 if so advised.

**Directions and Orders Sought**

113    I humbly request that the Court makes the directions and orders sought in the Application.

106-25478799-4

**SWORN** by the said
**PAUL RICHARD MURPHY**
At
on                    2022

Before me,

……………………………………………………….

**Solicitor/Notary Public**

Sworn by: PR Murphy
For: Applicant
Number: First
Exhibit: PRM1

**Ogier (Guernsey) LLP**
**Advocate Alex Horsbrugh-Porter**
**2022**

## IN THE ROYAL COURT OF GUERNSEY

## (ORDINARY DIVISION)

**IN THE MATTER OF PART XIX OF THE COMPANIES (GUERNSEY) LAW, 2008**

**BETWEEN:**

**CLO HOLDCO, LTD**

**Applicant**

**and**

**HIGHLAND CLO FUNDING, LTD**

**Respondent**

---

## EXHIBIT PRM1

---

This is the Exhibit PRM1 to the First Affidavit of Paul Richard Murphy sworn on      consisting of 574 pages including this page

Before me,

……………………………………………………

**Solicitor/Notary Public/Advocate of more than 5 years' call**

106-25478799-4

**PAGE LEFT INTENTIONALLY BLANK**

EXECUTION VERSION

## SUBSCRIPTION AND TRANSFER AGREEMENT

## FOR ORDINARY SHARES

## HIGHLAND CLO FUNDING, LTD.
### (the "Fund")

This Subscription and Transfer Agreement, dated as of November 15, 2017 (this "**Subscription and Transfer Agreement**"), is entered into by and among Highland CLO Funding, Ltd. (the "**Fund**"), Highland HCF Advisor, Ltd. (the "**Portfolio Manager**"), CLO Holdco, Ltd. (the "**Existing Shareholder**") and each of HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., Highland Capital Management, L.P., Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker, III, Acct. # 3058311, Quest IRA, Inc., fbo Hunter Covitz, Acct. # 1469811,Quest IRA, Inc., fbo Jon Poglitsch, Acct. # 1470612, Quest IRA, Inc., fbo Neil Desai, Acct. # 3059211 (collectively, the "**New Shareholders**" and each a "**New Shareholder**" and together with the Existing Shareholder, the "**Shareholders**")).

Reference is made to the Offering Memorandum, dated November 15, 2017 (the "**Offering Memorandum**") relating to the Fund in connection with the issue of Placing Shares in the Fund. Capitalised terms not specifically defined in this Subscription and Transfer Agreement have the meanings set out in the section of the Offering Memorandum.

## A.      TRANSFER OF EXISTING SHARES

The Existing Shareholder hereby transfers and sells currently existing Shares to the New Shareholders, and the New Shareholders hereby accept and buy Shares at $1.02535 per Share, which is based on the NAV of the Fund as of September 30, 2017, adjusted with respect to a dividend of $9,000,000 on October 10, 2017, and a buyback of the Shares from Acis Capital Management, L.P. for an aggregate purchase price of $991,180.13 on October 24, 2017 (the "**Adjusted NAV**"), such that the New Shareholders and Existing Shareholder will hold currently existing Shares on a *pro rata* basis as set forth below (the percent of Shares with respect to each Shareholder, its "**Share Percentage**").

| Name | Immediately prior to the Placing | | Immediately following the Placing | |
|---|---|---|---|---|
| | Number of Shares | Share Percentage | Number of Shares | Share Percentage |
| CLO Holdco, Ltd. | 143,454,001.00 | 100.00% | 70,314,387.44 | 49.02% |
| HarbourVest Dover Street IX Investment L.P. | 0.00 | 0.00% | 50,917,791.20 | 35.49% |
| HarbourVest 2017 Global Fund, L.P. | 0.00 | 0.00% | 3,478,649.09 | 2.42% |
| HarbourVest 2017 Global AIF L.P. | 0.00 | 0.00% | 6,957,226.48 | 4.85% |
| HV International VIII Secondary L.P. | 0.00 | 0.00% | 9,317,699.94 | 6.50% |
| HarbourVest Skew Base AIF L.P. | 0.00 | 0.00% | 1,034,136.77 | 0.72% |
| Highland Capital Management, L.P. | 0.00 | 0.00% | 898,708.98 | 0.63% |
| Lee Blackwell Parker, III | 0.00 | 0.00% | 94,173.23 | 0.07% |
| Quest IRA, Inc., fbo Lee B. Parker, III, Acct. # 3058311 | 0.00 | 0.00% | 58,798.51 | 0.04% |
| Quest IRA, Inc., fbo Hunter Covitz, Acct. # 1469811 | 0.00 | 0.00% | 239,018.34 | 0.17% |
| Quest IRA, Inc., fbo Jon Poglitsch, Acct. # 1470612 | 0.00 | 0.00% | 95,607.34 | 0.07% |
| Quest IRA, Inc., fbo Neil Desai, Acct. # 3059211 | 0.00 | 0.00% | 47,803.67 | 0.03% |

| Name | Immediately prior to the Placing | | Immediately following the Placing | |
|---|---|---|---|---|
| | Number of Shares | Share Percentage | Number of Shares | Share Percentage |
| TOTAL: | 143,454,001.00 | 100.00% | 143,454,001.00 | 100.00% |

The transfer of the Shares as referred to herein shall be effective as of the date hereof. Payment will take place by wire transfer to the bank account designated by the Existing Shareholder in writing to New Shareholders.

The Existing Shareholder hereby agrees to indemnify the New Shareholders and their affiliates and their respective officers, directors, partners, members, employees, agents, successors and assigns, from and against any and all losses, damages, claims, suits, proceedings, liabilities, fees, costs and expenses (including settlement costs, interest, penalties, reasonable attorneys' fees and any reasonable legal or other expenses for investigation or defense of any actions or threatened actions) (collectively, the "**Losses**") which may be imposed, sustained, incurred or suffered or asserted as a result of, relating to or arising out of (i) any inaccuracy in or breach of any representation or warranty of Existing Shareholder made by it under any documents or agreements in connection with the Shares, (ii) any actions, suits, litigations, arbitrations, proceedings, investigations or claims against the New Shareholders or the Company which arise, accrue or relate to the period prior to the date hereof, (iii) any tax, fee or other governmental charge attributable to the ownership by Existing Shareholder of the Shares prior to the date hereof or the sale by Existing Shareholder of the Shares pursuant to this Subscription and Transfer Agreement and (iv) any and all actions, suits, litigations, arbitrations, proceedings, investigations, claims or liabilities of whatever nature arising out of any of the foregoing. Notwithstanding anything herein to the contrary, the term "Losses" shall not include any indirect, special, consequential or punitive damages or any lost profits or diminution in value.

## B.    SUBSCRIPTION FOR PLACED SHARES

<u>Application and Subscription for Ordinary Shares</u>

The Shareholders hereby irrevocably commit to purchase $153,000,000.00 of Ordinary Shares from the Fund, *pro rata* alongside the Existing Shareholder based upon its Share Percentage as set forth below, at a price per Ordinary Share determined in reference to the most recent quarterly determined net asset value of the Fund, to be settled from time to time during the Investment Period.

| Name | Subscription Commitment | |
|---|---|---|
| | Commitment Amount | Share Percentage |
| CLO Holdco, Ltd. | $74,993,386.07 | 49.02% |
| HarbourVest Dover Street IX Investment L.P. | $54,306,063.26 | 35.49% |
| HarbourVest 2017 Global Fund L.P. | $3,710,132.22 | 2.42% |
| HarbourVest 2017 Global AIF L.P. | $7,420,187.96 | 4.85% |
| HV International VIII Secondary L.P. | $9,937,736.71 | 6.50% |
| HarbourVest Skew Base AIF L.P. | $1,102,952.34 | 0.72% |
| Highland Capital Management, L.P. | $958,512.64 | 0.63% |
| Lee Blackwell Parker, III | $100,439.89 | 0.07% |
| Quest IRA, Inc., fbo Lee B. Parker III, Acct. # 3058311 | $62,711.20 | 0.04% |

| Name | Subscription Commitment | |
| | Commitment Amount | Share Percentage |
| --- | --- | --- |
| Quest IRA, Inc., fbo Hunter Covitz, Acct. # 1469811 | $254,923.57 | 0.17% |
| Quest IRA, Inc., fbo Jon Poglitsch, Acct. # 1470612 | $101,969.43 | 0.07% |
| Quest IRA, Inc., fbo Neil Desai, Acct. # 3059211 | $50,984.71 | 0.03% |
| **TOTAL:** | $153,000,000.00 | 100.00% |

The Portfolio Manager may call such Shares for settlement from time to time on a *pro rata* basis (based on the Shareholder's respective Share Percentages) upon 10 Business Days' written notice to the Shareholders (the "**Settlement Notice**") to the Shareholders setting forth:

(i)     the aggregate amount of Shares to be settled by each Shareholder based upon its Share Percentage;

(ii)     the price per Share determined in reference to the most recent quarterly determined net asset value of the Fund and the aggregate purchase price for each Shareholder;

(iii)     the date by which such settlement must be made (the "**Settlement Date**"), which shall be at least ten (10) Business Days following the Settlement Notice by a Shareholder, unless agreed otherwise by each Shareholder;

(iv)     the bank account or collateral account, as applicable, to which such the purchase price for the Shares settled is to be paid.

Each Shareholder shall pay to the Fund, by wire transfer of immediately available funds, in each case in U.S. Dollars, to such account or accounts as shall be designated in the Settlement Notice for such settlement on or prior to the Settlement Date as specified in such Settlement Notice, the U.S. Dollar amount specified for such Shareholder in such Settlement Notice.

Upon the expiration of the Investment Period, all Shareholders will be released from any further obligation with respect to purchase Shares under this Agreement, except to the extent necessary to:

(i) complete, no later than 180 days after the expiration of the Investment Period, the purchase of Shares pursuant to written commitments, letters of intent or similar contractual commitments that were in process as of the end of the Investment Period; and

(ii) fund any indebtedness of the Fund permitted hereunder incurred prior to the end of the Investment Period (including to repay outstanding indebtedness under any Warehouse Loan Facilities).

C.     **Shareholder Subscription Supplement**

Each Shareholder has had an adequate opportunity to review the Offering Memorandum, and the Shareholder will have received, and will have had an adequate opportunity to review the contents of, the Offering Memorandum prior to the purchase of Shares on the Closing Date and settlement of their respective commitments, and such purchase and/or funding by such Shareholder shall be deemed to be confirmation by such Shareholder that it has received, reviewed and approved of the Offering Memorandum.

Each Shareholder hereby makes the representations and warranties to each of the Fund and the Registrar set forth under "*Placing Arrangements—Purchase and Transfer Restrictions—Subscriber and Shareholder warranties*" in the Offering Memorandum.

All information which the Shareholder has provided to the Fund, the Registrar, the Portfolio Manager or any other Person in connection with the transactions contemplated by this Agreement, including the information in the Shareholder's representation supplement in the form attached hereto as Exhibit A (the "**Shareholder Subscription Supplement**"), is correct and complete as of the date hereof, and the Shareholder agrees to notify the Fund, the Registrar, the Portfolio Manager immediately if any representation, warranty or information contained in this Agreement, including its Shareholder Subscription Supplement, becomes untrue. The Shareholder agrees to provide such information and execute and deliver such documents as the Fund, the Portfolio Manager may reasonably request from time to time to verify the accuracy of the Shareholder's representations and warranties herein or to comply with any law or regulation to which the Fund, the Portfolio Manager may be subject.

### D.    Representations of the Existing Shareholder

The Existing Shareholder hereby makes to each of the New Shareholders the representations and warranties in Exhibit B hereto.

### E.    Representations of the Fund

The Fund hereby makes to each of the New Shareholders the representations and warranties in Exhibit C hereto.

### F.    Several Liability of the New Shareholders

The representations, warranties, covenants, agreements and obligations of the New Shareholders under this Subscription and Transfer Agreement shall be several and not joint. Nothing contained in this Subscription and Transfer Agreement shall be construed to create as among the New Shareholders an association, trust, partnership, joint venture, association taxable as a corporation or other entity for the conduct of any business for profit, or impose a trust or partnership duty, obligation or liability on, or with regard to any New Shareholder, nor shall any New Shareholder have the right or authority to assume, create or incur any liability or obligation, express or implied, against, in the name of, or on behalf of any such other New Shareholder without the prior written consent of such other New Shareholder.

[Remainder of Page Intentionally Left Blank]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered as of the date first written above.

**CLO HOLDCO, LTD.**

By: _____

Name: Grant Scott

Title: Director

**HARBOURVEST DOVER STREET IX INVESTMENT L.P.**

By: HarbourVest Partners (Europe) Limited,
    its Alternative Investment Fund Manger

By: _____
    Name:    Michael J. Pugatch
    Title:    Authorised Person

**HARBOURVEST 2017 GLOBAL AIF L.P.**

By:    HarbourVest Partners (Europe) Limited,
       its Alternative Investment Fund Manger

By: _____
    Name:    Michael J. Pugatch
    Title:    Authorised Person

**HARBOURVEST 2017 GLOBAL FUND L.P.**

By: HarbourVest 2017 Global Associates L.P.,
    its General Partner

By: HarbourVest GP LLC,
    its General Partner

By: HarbourVest Partners, LLC,
    its Managing Member

By: _____
    Name:    Michael J. Pugatch
    Title:    Managing Director

SIGNATURE PAGE TO SUBSCRIPTION AND TRANSFER AGREEMENT

**HV INTERNATIONAL VIII SECONDARY L.P.**

By: HIPEP VIII Associates L.P.
Its General Partner

By: HarbourVest GP LLC
Its General Partner

By: HarbourVest Partners, LLC
Its Managing Member

By: _____
Name: Michael J. Pugatch
Title: Managing Director

**HARBOURVEST SKEW BASE AIF L.P.**

By: HarbourVest Partners (Europe) Limited,
its Alternative Investment Fund Manager

By: _____
Name: Michael J. Pugatch
Title: Authorised Person

**LEE BLACKWELL PARKER, III**,

SIGNATURE PAGE TO SUBSCRIPTION AND TRANSFER AGREEMENT

**QUEST IRA, Inc.**
**fbo Lee B. Parker III, Acct. # 3058311**

Read and approved

By: _____
Name: _Emmanuel Masel_
Title: _Manufacturing Supervisor_

**QUEST IRA, Inc.**
**fbo Hunter Covitz, Acct. # 1469811**

By: _____
Name: _____
Title: _____

**QUEST IRA, Inc.**
**fbo Jon Poglitsch, Acct. # 1470612**

By: _____
Name: _____
Title: _____

**QUEST IRA, Inc.**
**fbo Neil Desai, Acct. # 3059211**

By: _____
Name: _____
Title: _____

SIGNATURE PAGE TO SUBSCRIPTION AND TRANSFER AGREEMENT

**QUEST IRA, Inc.**
  **fbo Lee B. Parker III, Acct. # 3058311**

By: _____
Name: _____
Title: _____

**QUEST IRA, Inc.**
  **fbo Hunter Covitz, Acct. # 1469811**

By: _____
Name: _Emmanuel Maceil_
Title: _transacsero overview_

Read & Approved

**QUEST IRA, Inc.**
  **fbo Jon Poglitsch, Acct. # 1470612**

By: _____
Name: _____
Title: _____

**QUEST IRA, Inc.**
  **fbo Neil Desai, Acct. # 3059211**

By: _____
Name: _____
Title: _____

SIGNATURE PAGE TO SUBSCRIPTION AND TRANSFER AGREEMENT

**QUEST IRA, Inc.**
  **fbo Lee B. Parker III, Acct. # 3058311**

By: _____
Name: _____
Title: _____

**QUEST IRA, Inc.**
  **fbo Hunter Covitz, Acct. # 1469811**

By: _____
Name: _____
Title: _____

**QUEST IRA, Inc.**
  **fbo Jon Poglitsch, Acct. # 1470612**

Read and Approved:

_____ 11/7/17

By: _____
Name: Emmanuel Magiel
Title: Transactions Supervisor

**QUEST IRA, Inc.**
  **fbo Neil Desai, Acct. # 3059211**

By: _____
Name: _____
Title: _____

QUEST IRA, Inc.
fbo Lee B. Parker III, Acct. # 3058311


By: _____
Name: _____
Title: _____


QUEST IRA, Inc.
fbo Hunter Covitz, Acct. # 1469811


By: _____
Name: _____
Title: _____


QUEST IRA, Inc.
fbo Jon Poglitsch, Acct. # 1470612


By: _____
Name: _____
Title: _____


QUEST IRA, Inc.
fbo Neil Desai, Acct. # 3059211


*Read and approved*

By: _____
Name: Emmanuel Muset
Title: Transactions Supervisor

SIGNATURE PAGE TO SUBSCRIPTION AND TRANSFER AGREEMENT

**HIGHLAND CAPITAL MANAGEMENT, L.P.,**

By: Stand Advisors, Inc.,
    its general partner

By: _____
    Name:    James Dondero
    Title:    President

ACKNOWLEDGED AND AGREED:

**HIGHLAND CLO FUNDING, LTD.,**
as the Fund

By: _____
Name: William Scott
Title: Director

**HIGHLAND HCF ADVISOR, LTD.,**
as the Portfolio Manager

By: _____
Name: James Dondero
Title: President

ACKNOWLEDGED AND AGREED:

**HIGHLAND CLO FUNDING, LTD.,**
  the Fund

By: _____
  Name:
  Title:    Director

**HIGHLAND HCF ADVISOR, LTD.,**
  the Portfolio Manager

By: _____
  Name:    James Dondero
  Title:    President

**EXHIBIT A**

SHAREHOLDER SUBSCRIPTION SUPPLEMENT

Each Shareholder, individually and separately for itself, hereby makes the following declarations to, and covenants and agreements with the Fund:

A.    <u>General Declarations</u>

1.    I/We hereby acknowledge that the Fund has the right to reject any application for Ordinary Shares. I/We hereby acknowledge that I/we have received and read the current Offering Memorandum (including the risk warnings contained therein) relating to the Fund and that this application is made subject to the terms of the Offering Memorandum and to the Memorandum and Articles of Incorporation of the Fund.

2.    I/We hereby declare that the Ordinary Shares are not being acquired and will not be held in violation of any applicable laws.

3.    I/We agree not to duplicate or to furnish particulars of the Offering Memorandum, or to divulge any of its contents, to any person other than our investment, legal or tax advisers (who may use the information contained in the Offering Memorandum solely for purposes relating to our investment in the Fund).

4.    I/We hereby confirm that I/we shall be deemed to make, on a continuing basis, each of the statements contained herein unless I/we notify you to the contrary in relation to any Ordinary Shares I/we may hold or obtain at any time.

5.    I/We hereby agree to indemnify and hold harmless the Fund, the Directors, the Portfolio Manager and the Administrator against any loss, liability, cost or expense (including without limitation legal fees, taxes and penalties) which may result directly or indirectly, from any misrepresentation or breach of any warranty, condition, covenant or agreement contained herein or in any other document delivered by the undersigned to the Fund.

6.    [Reserved.]

7.    I/We consent to our shareholding being disclosed to the Portfolio Manager or any other companies within the Portfolio Manager's group of affiliated companies.

8.    I/We hereby authorise the Fund and the Administrator to retain all documentation provided by us in relation to our investment in the Fund for such period of time as may be required by Guernsey law, but not for less than six (6) years after the period of investment has ended.

C.    <u>Additional Declarations</u>

9.    I/We hereby confirm that I/we have the full right and power to make this application and invest in Ordinary Shares and all necessary corporate action has been taken to authorise this application and such investment.

D.    <u>Data Protection</u>

10.    I/We consent to personal information obtained in relation to us being handled by the Administrator, the Fund, or the Portfolio Manager and their delegates, agents or affiliates in accordance with the Data Protection (Bailiwick of Guernsey) Law 2001, as amended. Information in relation to us will be held, used, disclosed and processed for the purposes of

(a) managing and administering our holdings of Ordinary Shares in the Fund and any related account on an ongoing basis; (b) for any other specific purposes where the Shareholder has given specific consent to do so; (c) to carry out statistical analysis and market research; (d) to comply with any applicable legal or regulatory obligations including legal obligations under company law and anti-money laundering legislation; (e) for disclosure and transfer whether in Guernsey or elsewhere (including companies situated in countries outside of the European Economic Area which may not have the same data protection laws as in Guernsey) to third parties including our financial adviser (where appropriate), regulatory bodies, auditors, technology providers or to the Fund and its delegates and its or their duly appointed agents and any of their respective related, associated or affiliated companies for the purposes specified above; and/or (f) for other legitimate business interests of the Fund. I/We hereby acknowledge our right of access to and the right to amend and rectify our personal data, as provided herein. I/We understand that the Administrator is a data controller and will hold any personal information provided by us in confidence and in accordance with the Data Protection (Bailiwick of Guernsey) Law 2001, as amended. I/We consent to the recording of telephone calls that I/we make to and receive from the Administrator, the Fund or the Portfolio Manager and their delegates or duly appointed agents and any of their respective related, associated or affiliated companies for record keeping, security and/or training purposes. I/We consent to the Fund or the Portfolio Manager sending information about other investment services to us by letter, telephone or other reasonable means of communication. I/We understand that I/we have a right not to receive such information.

E. **United States Securities Act Compliance**

11. **You must check the box below and confirm your compliance with Regulation S or Rule 144A of the US Securities Act of 1933.**

The Purchaser represents, warrants and undertakes that it is either (i) a U.S. Person who is reasonably believed to be (x) a Qualified Institutional Buyer and a Qualified Purchaser, (y) an Accredited Investor and a Qualified Purchaser or (z) an Accredited Investor and a Knowledgeable Employee with respect to the Company and to whom the Company is privately placing a certain number of the Placing Shares in reliance on exemptions from registration under the U.S. Securities Act and the U.S. Investment Company Act or (ii) not a U.S. Person, it is acquiring the Shares in an offshore transaction meeting the requirements of Regulation S and it is not acquiring the Shares for the account or benefit of a U.S. Person.

The Purchaser represents, warrants and undertakes that neither it, its affiliates (as defined in Regulation 501 under the Securities Act), nor any persons acting on its or their behalf has engaged or will engage in any directed selling efforts (as defined in Regulation S) with respect to the Ordinary Shares.

The Purchaser acknowledges that the Ordinary Shares have not been and will not be registered under the Securities Act, and may not be offered or sold within the United States except in accordance with Regulation S or pursuant to an exemption from the registration requirements of the Securities Act. The Purchaser represents, warrants and undertakes that it has not offered or sold, and will not offer and sell any Ordinary Shares constituting part of its or their allotment within the United States except in accordance with Regulation S. Terms used in this paragraph have the meanings given to them by Regulation S.

A-2

F.  Anti-Money Laundering Declarations

12.  I/We acknowledge that measures aimed at the prevention of money laundering may require verification of our identity, address and source of the assets. I/We acknowledge that Ordinary Shares will not be issued until such time as the Administrator has received and is satisfied with all the information and documentation requested to verify our identity, address and source of the Assets. I/We acknowledge that the Administrator shall be held harmless and indemnified against any loss arising as a result of a failure to process our application for Ordinary Shares if such information and documentation as has been requested by the Administrator has not been provided by us or has been provided in incomplete form.

I/We acknowledge that the Fund or the Administrator on its behalf also reserves the right to refuse to make any distribution to an Ordinary Shareholder if any of the Directors of the Fund or the Administrator suspects or is advised that the payment of any distribution monies to such Ordinary Shareholder might result in a breach or violation of any applicable anti-money laundering or other laws or regulations by any person in any relevant jurisdiction, or such refusal is considered necessary or appropriate to ensure the compliance by the Fund, its Directors or the Administrator with any such laws or regulations in any relevant jurisdiction.

I/We understand and agree that the Fund prohibits the investment of funds by any persons or entities that are acting, directly or indirectly, (i) in contravention of any applicable laws and regulations, including anti-money laundering regulations or conventions, (ii) on behalf of terrorists or terrorist organisations, including those persons or entities that are included on the List of Specially Designated Nationals and Blocked Persons maintained by the US Treasury Department's Office of Foreign Assets Control ("**OFAC**"), as such list may be amended from time to time, (iii) for a senior foreign political figure, any member of a senior foreign political figure's immediate family or any close associate of a senior foreign political figure, unless the Fund, after being specifically notified by us in writing that I/we are such a person, conducts further due diligence, and determines that such investment shall be permitted, or (iv) for a foreign shell bank (such persons or entities in (i) - (iv) are collectively referred to as "**Prohibited Persons**").

I/We represent, warrant and covenant that: (i) I/we are not, nor is any person or entity controlling, controlled by or under common control with us, a Prohibited Person, and (ii) to the extent I/we have any beneficial owners, (a) I/we have carried out thorough due diligence to establish the identities of such beneficial owners, (b) based on such due diligence, I/we reasonably believe that no such beneficial owners are Prohibited Persons, and (c) I/we hold the evidence of such identities and status and will maintain all such evidence for the earlier of at least five years from the date of our complete exit from or termination of the Fund.

If any of the foregoing representations, warranties or covenants ceases to be true or if the Fund no longer reasonably believes that it has satisfactory evidence as to their truth, notwithstanding any other agreement to the contrary, the Fund may be obligated to freeze our investment, either by prohibiting additional investments, suspending any dividends and/or segregating the assets constituting the investment in accordance with applicable regulations, or our investment may immediately be redeemed by the Fund, and the Fund may also be required to report such action and to disclose our identity to OFAC or other authority. In the event that the Fund is required to take any of the foregoing actions, I/we understand and agree that I/we shall have no claim against the Fund, the Portfolio Manager, the Administrator, and their respective affiliates, directors, shareholders, officers, employees and agents for any form of damages as a result of any of the aforementioned actions.

A-3

I/We understand and agree that any dividends paid to us will be paid to the same account from which our investment in the Fund was originally remitted, unless the Fund, in its sole discretion, agrees otherwise.

I/We agree to indemnify and hold harmless the Fund, the Portfolio Manager, the Administrator, and their respective affiliates, directors, shareholders, officers, employees and agents from and against any and all losses, liabilities, damages, penalties, costs, fees and expenses (including legal fees and disbursements) which may result, directly or indirectly, from any inaccuracy in or breach of any representation, warranty, covenant or agreement contained herein or in any other document delivered by the undersigned to the Fund.

*Please complete the following:*

Anti-Money Laundering verification requirements in accordance with The Criminal Justice (Proceeds of Crime) (Financial Services Businesses) (Bailiwick of Guernsey) Regulations, 2007.

13. Measures aimed at the prevention of money laundering will, subject as set out below, require a subscriber to verify its identity and/or the source of the Assets to the Administrator. Depending on the circumstances of each application, the Administrator may accept as partial or complete verification of identity or of the source of the Assets evidence that the application is made either through a regulated financial intermediary or by a regulated financial institution, provided that in each case such intermediary/institution is domiciled in a country which has been prescribed by the Guernsey Financial Services Commission as having anti-money laundering regulations in place equivalent to those in force in Guernsey.

14. Please tick the following box, if appropriate:

   We are a bank/provider of financial services or a nominee company/nominee account which is part of/used by a bank/provider of financial services authorised and regulated in Austria, Australia, Belgium, Bulgaria, Canada, Cayman Islands, Cyprus, Denmark, Estonia, Finland, France, Germany, Gibraltar, Greece, Hong Kong, Iceland, Ireland, Isle of Man, Italy, Japan, Jersey, Latvia, Liechtenstein, Lithuania, Luxembourg, Malta, Netherlands, New Zealand, Norway, Portugal, Singapore, South Africa, Spain, Sweden, Switzerland, United Kingdom, United States.

   YES ☐

   If answer is Yes, please supply the name of regulated entity and also the name of your regulator:_____

   Note: the Fund or the Administrator may require further documentation to be provided upon written request.

15. **In the case of joint account holders, please supply the relevant documentation in respect of all holders.**

Before submitting your application, please ensure that you have satisfied the following requirements.

**(A) Verification from private individuals:**

A-4

| | A fully completed Shareholder Subscription Supplement. If any information is not provided, we reserve the right to reject or delay the application until all information is complete. |
|---|---|
| | A certified* copy of the passport or national identity card of each applicant (bearing a photo), together with a recent original or certified* copy of a utility bill or other as proof of the residential address. |
| | The initial and any subsequent investments must be received from an account held in the applicant's own name. |
| | A telephone number for the first named applicant. |

**(B) Verification from Financial Fund, Bank, Nominee that has completed paragraph 20:**

| | A fully completed Shreholder Subscription Supplement. If any information is not provided, we reserve the right to reject or delay the application until all information is complete. |
|---|---|
| | *Certified authorised signatory list. |
| | The initial and any subsequent investments must be received from an account held in the applicant's own name. |
| | If you are acting on behalf of a third party, please contact the Administrator regarding further documentation requirements. |

**(C) Verification from trustees:**

| | A fully completed Subscription and Transfer Agreement Supplement. If any information is not provided, we reserve the right to reject or delay the application until all information is complete. |
|---|---|
| | List of names, date of birth, occupation and permanent addresses of all trustees/settlors and protectors. |
| | *Certified copies of the above trustees'/settlors and protectors full identification as detailed per parts 1 for an individual and part 3 for a company. |
| | A recent original or certified* copy of the Trust Deed, or extracts showing the name of the trust, the date of the settlement, the governing law, the name of the settlor, the name of the protector and the schedule of named beneficiaries. |
| | *Certified authorised signatory list. |
| | The initial and any subsequent investments must be received from an account held in the trustee's own name. |

**(D) Verification from corporations:**

A-5

| | Public |
|---|---|
| | A fully completed Shareholder Subscription Supplement. If any information is not provided, we reserve the right to reject or delay the application until all information is complete. |
| | *Certified authorised signatory list. |
| | If the company is a subsidiary of a listed parent, a structure diagram or other evidence of the relationship to the listed parent is to be provided. |
| | The initial and any subsequent investments must be received from an account held in the company's own name. |
| | **Private** |
| | A fully completed Shareholder Subscription Supplement. If any information is not provided, we reserve the right to reject or delay the application until all information is complete. |
| | A certified* copy of the company's certificate of incorporation, the memorandum & articles of association, or equivalent constitutive documents. |
| | List of all directors' names, occupations, residential and business addresses and dates of birth. |
| | Register of shareholders. |
| | Identification as per individual investor (see part 1 above) for at least 2 directors and all shareholders holding a beneficial interest in the Fund of more than 25%. |
| | Organisation Structure Diagram. |
| | The initial and any subsequent investments must be received from an account held in the company's own name. |
| | A certified* copy of the passport or national identity card of each company employee authorised to deal on this account. |
| | *Certified authorised signatory list. |

**(E) Verification for partnerships:**

| | A fully completed Shareholder Subscription Supplement. If any information is not provided, we reserve the right to reject or delay the application until all information is complete. |
|---|---|
| | A certified* copy of the partnership deed or agreement, or equivalent constitutive documents. |

A-6

| | |
|---|---|
| | List of names, date of birth, occupation and permanent addresses of all partners. |
| | *Certified copies of the above partners' identification as detailed per part (A) for an individual and part (D) for a company. |
| | The initial and any subsequent investments must be received from an account held in the partnership's own name. |
| | *Certified copy of the authorised signatory list. |

**\* All documents must be originals or certified as true copies.**

Copies of the requested documentation must be supplied in the form of a "certified true and exact copy". Certification of copies of documentation may be made by the following types of person (although this list is not exhaustive):- Solicitor/Notary Public/ Accountant/ Banker/Local Police Station or other professional persons. Documentation cannot be certified by the applicant whether that is an individual, trust, company or partnership. The person certifying the copy document must sign, date and officially stamp all the documentation, detailing in what capacity they are acting.

**Entities not classified by 15(A) to 15(E) above, should contact the Administrator for documentation requirements.**

G.     Savings Directive Declarations

16.     I/We acknowledge that details of my/our shareholding, including information provided by me/us for the purposes of my/our application for Ordinary Shares, may be required by law to be disclosed. Without prejudice to the generality of the foregoing, I/we consent to disclosure of my/our identity, shareholding and details of my/our income derived from that shareholding by the Administrator, the Portfolio Manager or any person deemed to be a "paying agent" for the purposes of the EC Council Directive 2003/48/EC of 3 June 2003 (the "**Savings Directive**") to any relevant tax authority.

I/We agree to provide such information as may be required (whether in this Shareholder Subscription Supplement or otherwise), and I/we consent to the disclosure of such information to such person or persons as may be deemed to be a "paying agent" for the purposes of the Savings Directive in order to permit them to comply with their obligations under that Directive. I/We undertake to ensure that such information as I/we provide is kept up-to-date and to notify the Administrator any change to such information which may be relevant for the purposes of the Savings Directive as soon as reasonably practicable (including without limitation any change in my/our name, permanent residential address or registered office and/or the State in which I/we are resident for tax purposes).

I/We hereby agree to indemnify and hold harmless such person or persons as may be treated as a "paying agent" for the purposes of the Savings Directive against any loss, liability, cost or expense (including without limitation legal fees, taxes and penalties) which may result directly or indirectly from any failure by me/us to provide information or from any

A-7

information which I/we provide being incorrect or ceasing to be correct in accordance with this Shareholder Subscription Supplement.

I/We acknowledge that Ordinary Shares will not be issued until such time as the Administrator has received and is satisfied with all the information and documentation requested in order to comply with the terms of the Savings Directive. I/We acknowledge that the Company or the Administrator on its behalf also reserves the right to refuse to make any distribution to an Ordinary Shareholder where the Fund or the Administrator is not satisfied with the information and documentation that has been provided.

*(Individuals only)* **Please supply the following (to the extent not already provided pursuant to section 15(A) above):**

(A)     A certified** copy of your passport (or national identity card) showing the photograph and your date and place of birth and (if available) the Taxpayer Identification Number (**"TIN"**) allocated to you by the State in which you are resident for tax purposes;

(B)     Proof of your permanent residential address: for example an original or certified** copy of a recent utility bill (not more than 3 months' old); and

(C)     If your passport (or national identity card) does not show your TIN, other documentary proof of identity showing your TIN (if available), such as a certificate of residence for tax purposes from the tax authorities of the state in which you are resident for tax purposes.

**All certified copies should be certified by a Notary Public, Solicitor, Company Registrar or any other person appropriately authorised under the laws of your country or domicile and should be certified or otherwise authenticated in such manner as would make them admissible in evidence in proceedings before a court.

*(Non-natural persons only)* **We declare as follows:**

(D)     We are a legal person not being an individual (and are not acting in a representative capacity on behalf of an individual*) and are not any of the following types of legal person:

(E)     Our profits are taxed under general arrangements for business taxation (corporation tax or similar).

Yes / No **

(F)     We are (a) an undertaking for collective investment in transferable securities eligible for recognition in accordance with EC Council Directive 85/611/EEC of 20 December 1985 or (b) have elected to be so treated for the purposes of the Savings Directive and enclose an original certificate from the State in which I/we are resident for tax purposes to that effect.

Yes / No **

Applicants who are unable to make this declaration should contact the Administrator.

** Please delete as appropriate.

A-8

23959286.12.BUSINESS

G.    <u>Governing Law</u>

This agreement and any dispute or claim arising out of or in connection with it or its subject matter or formation (including non-contractual disputes or claims) shall be governed by and construed in accordance with the laws of Guernsey.   The parties hereto hereby agree to submit to the non-exclusive jurisdiction of the Guernsey courts in connection herewith and further waive the right to object to an action brought in the Guernsey courts on the basis of an action brought in an inconvenient forum.

**If you are unable to complete any part of this agreement please contact the Administrator on +44 (0) 1481 704543.**

A-9

23959286.12.BUSINESS

**PLEASE COMPLETE THE FOLLOWING SECTION AND SIGN ON PAGE 13.**

17.    Details of applicant(s)

| | |
|---|---|
| Name(s) of applicant(s) | …………………………………………………………………. |
| Correspondence Address | …………………………………………………………………. |
| | …………………………………………………………………. |
| | …………………………………………………………………. |
| Contact Details | …………………………………………………………………. |
| Telephone | ………………………….. Fax    ………………………… |
| Email | …………………………………………………………………. |

### 1. Registration details

*Individual Shareholders*

*Shares may be registered in a single name or in up to four names, but only one address*

Mr/Mrs/Ms/Title …………………………….

Surname …………………………………….

First
Name(s) …………………………………..

Address ………………………………….

………………………………………………

………………………………………………

Tel…………………..
Fax ……………………

Email………………………………………….

### 2. Registration details

*Individual Shareholders*

*Shares may be registered in a single name or in up to four names, but only one address*

Mr/Mrs/Ms/Title ………………………….

Surname ……………………………...…

First
Name(s) …………………………………

Tel…..…………..

Fax ……………………

Email……………………………………

### 3. Registration details

*Individual Shareholders*

*Shares may be registered in a single name or in up to four names, but only one address*

Mr/Mrs/Ms/Title …………………………….

Surname …………………………………….

First
Name(s) …………………………………..

Tel…………………..
Fax ……………………

Email………………………………………….

### 4. Registration details

*Individual Shareholders*

*Shares may be registered in a single name or in up to four names, but only one address*

Mr/Mrs/Ms/Title ………………………….

Surname ……………………………...…

First
Name(s) …………………………………

Tel…..…………..

Fax ……………………

Email……………………………………

A-10

*Corporate Shareholders*

Full title of body corporate
……………………………………………

Address ……………………………………

……………………………………………

……………………………………………

Tel…………………..
Fax ……………………

Email………………………………………

**Authorised Signatories**

The Fund and Administrator are authorised to act on the written instructions of any person listed below until further notice.

| | Name | Signature |
|---|---|---|
| 1. | ………………………………. | ……………………………………………. |
| 2. | …...………………………….. | ……………………………………………. |
| 3. | ………………………………  | ……………………………………………. |
| 4. | ………………………………. | ……………………………………………. |

**Bank Details for Payments to Shareholders**

Until further notice, funds may be wired to the Shareholder as follows:

Bank Name:        ……………………………………………

Bank Address:     ……………………………………………

                  ……………………………………………

                  ……………………………………………

ABA or CHIPS no:  ……………………………………………

A-11

23959286.12.BUSINESS

Account Name: …………………………….…………………………

Account Number: …………………………….…………………………

IBAN Number: …………………………….…………………………

For further credit: …………………………….…………………………

**PLEASE NOTE THAT NO THIRD PARTY PAYMENTS WILL BE UNDERTAKEN**

To be valid, the Subscription and Transfer Agreement and Shareholder Subscription Supplement must be signed by each applicant.  In the case of a partnership/firm application should be signed by all the partners/proprietors.  In the case of a corporation, applications under the Subscription and Transfer Agreement should be executed under seal or signed by a duly authorised signatory provided that a certified copy of the authority authorising the signatory and an authenticated list of signatories accompanies the application.  If this application is signed under power of attorney, such power of attorney or a duly certified copy thereof must accompanying the Subscription and Transfer Agreement and this Shareholder Subscription Supplement.

**PLEASE SIGN BELOW**

> **DECLARATION - We declare that the information contained in this form and the attached documentation, if any, is true and accurate to the best of our knowledge and belief.**

Signature of all duly authorised signatories

1. ………….…………………….    Name ………………………    Date …………………………..

2. ………….…………………….    Name ………………………    Date …………………………..

3. ………….…………………….    Name ………………………    Date …………………………..

4. ………….…………………….    Name ………………………    Date …………………………..

A-12

**Notes**

- Terms defined in the Offering Memorandum have the same meaning in the Subscription and Transfer Agreement and this Shareholder Subscription Supplement.

- The Shareholder Subscription Supplement may be returned to the Administrator by facsimile provided that the original must be received by the Administrator within twenty (20) calendar days after 15 November 2017.

- No Ordinary Shares will, unless the Directors otherwise determine, be issued unless and until the Assets have been received by or on behalf of the Fund. Once the Assets are received, the Directors may issue the shares.

- The relevant Bank Instruction Letter must be completed for the purposes of transferring cash funds, as applicable. Your bank should also be instructed to fax the Administrator with details of the transfer it is making.

- An acknowledgement will be sent to the applicant on acceptance of the application no later than two Business Days after 15 November 2017.

- Once completed applications have been received by the Administrator, they are irrevocable.

- All the Ordinary Shares will be registered shares and will only be issued in bookstock form, meaning that a Shareholder's entitlement will be evidenced by an entry in the Fund's register of Shareholders, as maintained by the Administrator, and not by a share certificate.

- Signatories may be required to produce evidence of authority.

- The Administrator reserves the right to retain the Subscription and Transfer Agreement and Shareholder Subscription Supplements and any surplus application monies as well as the right to reject an application or to treat as valid any applications which do not fully comply with the terms and conditions of the application. If any application is not accepted, the amount paid with regard to that application will be returned to the applicant, without interest (if any), by telegraphic transfer to the bank account from which such amounts were originally remitted at the applicant's risk. Any interest on any amount held, pending acceptance of an application, accrues for the account of the Fund.

A-13

**BANK INSTRUCTION LETTER**

**USE THIS LETTER IN CONJUNCTION WITH APPLICATIONS FOR**

**ORDINARY SHARES**

To:     The Manager

Name of Financial Institution...........................…………………..................................................

Address.....................................................................................……………….................

.........................................................................................................………………..........

Branch Number/Sort Code......................................................................………………......

Dear Sir,

To the debit of our account number [  ] with you, please remit by direct transfer the total sum of $[  ] net of bank charges for value not later than 5:00 p.m. (Guernsey time) on [  ] November 2017.

> State Street (Guernsey) Limited
> Swift Code: [●]
> IBAN: [●]
>
> A/C Number: [●] ($ Account Number)
> A/C Name: Highland CLO Funding, Ltd.

Please also fax the Administrator, State Street (Guernsey) Limited (attention: Shareholder Services) with the details of the transfer (fax number +44 (0) 1481 704543).

Entity name...........................................…........
(typed or in block capitals)

Account name..........................................

Date ....................................................…......

Signature(s)..........................................…..

A-14

**EXHIBIT B**

REPRESENTATIONS AND WARRANTIES OF THE EXISTING SHAREHOLDER

The Existing Shareholder hereby makes the following representations and warranties to each of the New Shareholders:

(a)    <u>Authorization</u>. Existing Shareholder is an entity duly organized and validly existing in good standing under the laws of its jurisdiction of organization. Existing Shareholder has the requisite power and authority to enter into, execute and deliver this Subscription and Transfer Agreement and to perform all of the obligations to be performed by it hereunder. This Subscription and Transfer Agreement and the transactions contemplated hereby have been duly authorized, executed and delivered by it, and this Subscription and Transfer Agreement constitutes its legal, valid and binding obligation, enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally.

(b)    <u>Title to Interest</u>. Existing Shareholder owns all right, title and interests (legal and beneficial) in and to the Shares being sold to the New Shareholders, as of the date hereof free and clear of all liens other than restrictions under federal and state securities laws. Upon delivery of the Shares to the New Shareholders and payment to Existing Shareholder of the purchase price, the New Shareholders will acquire good and marketable title to the Shares free and clear of all liens other than restrictions under federal and state securities laws. Existing Shareholder was the original purchaser of the Shares from the Fund and has been the legal and beneficial owner of the Shares since that date.

(c)    <u>No Conflicts</u>. Neither the execution and delivery of this Subscription and Transfer Agreement nor the performance or consummation of the transactions contemplated hereby or thereby by Existing Shareholder will conflict with, result in the breach of, constitute a default under or violation of, or accelerate the performance required by the terms of (i) any law, rule or regulation of any government or governmental or regulatory agency; (ii) any judgment, order, writ, decree, permit or license of any court or governmental or regulatory agency to which Existing Shareholder may be subject; (iii) any contract, agreement, commitment or instrument to which Existing Shareholder is a party or by which it or any of its assets is bound or (iv) Existing Shareholder's constituent documents or other governing instruments or constitute an event which, with the passage of time or action by a third party, would result in any of the foregoing. The execution and delivery of this Subscription and Transfer Agreement and the performance and consummation of the transactions contemplated hereby and thereby do not and will not require any registration, filing, qualification, consent or approval under any such law, rule, regulation, judgment, order, writ, decree, permit or license to which the Existing Shareholder may be subject or from or with any creditor of the Existing Shareholder, any court or other governmental authority having jurisdiction over it or its property or any third party. Neither the execution and delivery of this Subscription and Transfer Agreement nor the performance or consummation of the transactions contemplated hereby by Existing Shareholder will result in the creation of any lien upon any of the Shares.

# EXHIBIT C

## REPRESENTATIONS AND WARRANTIES OF THE FUND

The Fund hereby makes the following representations and warranties to each of the New Shareholders:

(d)     <u>Authorization</u>. The Fund is an entity duly organized and validly existing in good standing under the laws of its jurisdiction of organization. The Fund has the requisite power and authority to enter into, execute and deliver this Subscription and Transfer Agreement and to perform all of the obligations to be performed by it hereunder. This Subscription and Transfer Agreement and the transactions contemplated hereby have been duly authorized, executed and delivered by it, and this Subscription and Transfer Agreement constitutes its legal, valid and binding obligation, enforceable against it in accordance with its respective terms, subject to applicable bankruptcy, insolvency, reorganization and moratorium laws and other laws of general application affecting enforcement of creditors' rights generally.

(e)     <u>No Conflicts</u>. Neither the execution and delivery of this Subscription and Transfer Agreement nor the performance or consummation of the transactions contemplated hereby or thereby by the Fund will conflict with, result in the breach of, constitute a default under or violation of, or accelerate the performance required by the terms of (i) any law, rule or regulation of any government or governmental or regulatory agency; (ii) any judgment, order, writ, decree, permit or license of any court or governmental or regulatory agency to which the Fund may be subject; (iii) any contract, agreement, commitment or instrument to which the Fund is a party or by which it or any of its assets is bound or (iv) the Fund's constituent documents or other governing instruments or constitute an event which, with the passage of time or action by a third party, would result in any of the foregoing. The execution and delivery of this Subscription and Transfer Agreement and the performance and consummation of the transactions contemplated hereby and thereby do not and will not require any registration, filing, qualification, consent or approval under any such law, rule, regulation, judgment, order, writ, decree, permit or license to which the Existing Shareholder may be subject or from or with any creditor of the Existing Shareholder, any court or other governmental authority having jurisdiction over it or its property or any third party. Neither the execution and delivery of this Subscription and Transfer Agreement nor the performance or consummation of the transactions contemplated hereby by the Fund will result in the creation of any lien upon any of the Shares.

(f)     <u>Litigation</u>. As of the date hereof (i) there are no actions, proceedings or investigations threatened or pending before any court or governmental authority, including without limitation the U.S. Securities and Exchange Commission or any state securities regulatory authority, against the Company or the Portfolio Manager that, if adversely determined, could have a material adverse effect on the Company or its investments and (ii) none of the Company or the Portfolio Manager has been found liable for any such violation in any such action, proceeding or investigation.

23959286.12.BUSINESS

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

NEXPOINT STRATEGIC OPPORTUNITIES FUND,

        Plaintiff,

    -against-

ACIS CAPITAL MANAGEMENT, L.P., U.S.
BANK, N.A., JOSHUA N. TERRY, AND
BRIGADE CAPITAL MANAGEMENT, L.P.,

        Defendants,

    -and-

HIGHLAND CLO FUNDING LTD.

        Proposed Intervenor-Defendant.

---

Case No. 21-cv-04384

 

**MEMORANDUM OF LAW IN SUPPORT OF**
**HIGHLAND CLO FUNDING LTD.'s MOTION TO INTERVENE**

 

KASOWITZ BENSON TORRES LLP
1633 Broadway
New York, New York 10019
Tel.: (212) 506-1700
Fax: (212) 506-1800

*Attorneys for Proposed Intervenor Highland*
*CLO Funding, Ltd.*

## TABLE OF CONTENTS

<div align="right"><u>**Page**</u></div>

**TABLE OF AUTHORITIES** .................................................................................................. ii

**PRELIMINARY STATEMENT** ......................................................................................... 1

**RELEVANT FACTS** ........................................................................................................... 3

    I.    The Acis Bankruptcy and Reorganization ................................................... 3

    II.    The HCMLP Bankruptcy and HCLOF ........................................................ 4

    III.    The ACIS-6 CLO and HCLOF'S Interests ................................................. 5

    IV.    The Applicable Contract Provisions ........................................................... 6

    V.    NSOF's Suit Is Holding Up The ACIS-6 Distributions.............................. 7

**ARGUMENT** ....................................................................................................................... 8

    I.    HCLOF IS ENTITLED TO INTERVENE AS OF RIGHT ......................... 8

          A.    HCLOF Has A Material Interest In The Subject Matter Of This Case ................. 9

          B.    HCLOF's Interests Are Not Adequately Represented By Any Other Party......... 10

          C.    This Motion Is Timely And Intervention Will Not
               Result In Prejudice To Any Existing Party .......................................... 11

    II.    ALTERNATIVELY, THE COURT SHOULD
          PERMIT HCLOF TO INTERVENE ........................................................... 12

    III.    HCLOF'S PROPOSED MOTION TO DISMISS ........................................ 13

          A.    NSOF's Failure To Comply With The No-Action Clause
               Is Fatal To Its Claims Against Acis, Brigade, And Terry.................................. 14

          B.    NSOF's Claims Against The Trustee Also Fail................................................. 15

**CONCLUSION** ................................................................................................................... 17

<div align="center">i</div>

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Ace Sec. Corp. v. DB Structured Prod., Inc.*,
    52 Misc. 3d 343 (Sup. Ct. N.Y. Cty.), *aff'd sub nom. U.S. Bank Nat'l Ass'n v.*
    *UBS Real Est. Sec., Inc.*, 177 A.D.3d 493 (1st Dep't 2019), *leave to appeal*
    *dismissed*, 35 N.Y.3d 1063 (2020)...........................................................................................15

*In re Acis Capital Mgmt., L.P.*,
    584 B.R. 115 (Bankr. N.D. Tex. 2018)....................................................................................4

*In re Acis Capital Mgmt., L.P.*,
    Case No. 18-30264-sgj, 2019 WL 417149 (Bankr. N.D. Tex. Jan. 31, 2019)......................3, 4

*AG Capital Funding Partners, L.P. v. State Street Bank & Tr. Co.*,
    11 N.Y.3d 146 (N.Y. 2008) ..................................................................................................16

*AG Oncon, LLC v. Ligand Pharmaceuticals Inc.*,
    C.A. No. 2018-0556, 2019 WL 2245976 (Del. Ch. May 24, 2019), *aff'd*, 224
    A.3d 963 (Del. 2020) ............................................................................................................16

*Barry's Cut Rate Stores Inc. v. Visa Inc.*,
    No. 05-MD-1720 (MKB), 2021 WL 2646349 (E.D.N.Y. June 28, 2021) ............................13

*Beckman Indus., Inc. v. Int'l Ins. Co.*,
    966 F.2d 470 (9th Cir. 1992) ...............................................................................................13

*Bridgeport Guardians, Inc. v. Delmonte*,
    602 F.3d 469 (2d Cir. 2010)...................................................................................................9

*Building & Realty Inst. v. State of New York*,
    No. 19-cv-11285, 2020 WL 5658703 (S.D.N.Y. Sept. 23, 2020) ..........................................11

*City of Syracuse v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*,
    No. 20-cv-06885, 2021 WL 1051625 (S.D.N.Y. Mar. 19, 2021)............................................9

*Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Tr.*,
    No. 17-cv-1323, 2018 WL 5095666 (D. Del. Oct. 19, 2018)..........................................10, 11

*Delaware Tr. Co. v. Wilmington Tr., N.A.*,
    534 B.R. 500 (S.D.N.Y. 2015)..............................................................................................10

*Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*,
    837 F. Supp. 2d 162 (S.D.N.Y. 2011)..................................................................................9, 14

ii

*Elliot Assocs. v. J Henry Schroeder Bank & Trust Co.*,
838 F.2d 66 (2d Cir. 1988)..................................................................16, 17

*Exp.-Imp. Bank of the Republic of China v. Grenada*,
No. 13 CIV. 1450 HB, 2013 WL 4414875 (S.D.N.Y. Aug. 19, 2013)...................10

*Glancy v. Taubman Ctrs., Inc.*,
373 F.3d 656 (6th Cir. 2004) ......................................................................11

*Goldstein v. SEC*,
451 F.3d 873 (D.C. Cir. 2006) .....................................................................14

*Hartford Fire Ins. Co. v. Mitlof*,
193 F.R.D. 154 (S.D.N.Y. 2000) ..................................................................11

*In re Highland Cap. Mgmt., L.P.*,
No. 19-34054-SGJ11, 2021 WL 3418657 (Bankr. N.D. Tex. Aug. 4, 2021)............1

*Mortg. Lenders Network, Inc. v. Rosenblum*,
218 F.R.D. 381 (E.D.N.Y. 2003) ..................................................................12

*Olin Corp. v. Lamorak Ins. Co.*,
325 F.R.D. 85 (S.D.N.Y. 2018) ....................................................................12

*Pacific Life Ins. Co. v. Bank of N.Y. Mellon*,
No. 17 Civ. 1388 (KPF), 2018 WL 1382105 (S.D.N.Y. Mar. 16, 2018) ...............16

*Peak Partners, LP v. Republic Bank*,
191 F. App'x 118 (3d Cir. 2006) ..................................................................14

*Peterson v. Islamic Republic of Iran*,
290 F.R.D. 54 (S.D.N.Y. 2013) ...................................................................12

*Quadrant Structured Prods. Co., Ltd. v. Vertin*,
23 N.Y.3d 549 (N.Y. 2014) ..........................................................................9

*Republic of the Philippines v. Abaya*,
312 F.R.D. 119 (S.D.N.Y 2015) ..................................................................12

*RJ Cap., SA v. Lexington Cap. Funding III, Ltd.*,
No. 10 Civ. 25, 2011 WL 3251554 (S.D.N.Y. July 28, 2011) .................................14

*Scaminaci v. Jaffrey*,
No. 21-cv-321, 2021 WL 230203 (S.D.N.Y. Jan. 22, 2021) ..................................13

*SEC v. Northshore Asset Mgmt.*,
No. 05 Civ. 2192 (WHP), 2008 WL 1968299 (S.D.N.Y. May 5, 2008) .................14

iii

*SEC v. Trabulse*,
    526 F. Supp. 2d 1008 (N.D. Cal. 2007) .................................................................................14

*Tachiona ex rel. Tachiona v. Mugabe*,
    186 F. Supp. 2d 383 (S.D.N.Y. 2002).....................................................................................13

*Tennenbaum Living Tr. v. TGLT S.A.*,
    20 Civ. 6938, 2021 WL 3863117 (S.D.N.Y. Aug. 30, 2021) .................................................16

*Transamerica Mtg. Advisors, Inc. v. Lewis*,
    444 U.S. 11 (1979).................................................................................................................14

**Statutes**

15 U.S.C. § 77ddd(b) ....................................................................................................................16

**Other Authorities**

Fed. R. Civ. P. 24.................................................................................................. *passim*

Case 19-34054-sgj11 Doc 3507-1 Filed 09/09/22    Entered 09/09/22 16:32:09    Page 72 of
448
Case 1:21-cv-04384-GHW    Document 44    Filed 11/24/21    Page 6 of 22

Proposed Intervenor Highland CLO Funding, Ltd. ("HCLOF") respectfully submits this

memorandum of law, along with the declaration of Uri A. Itkin ("Itkin Decl.") and the exhibits

annexed thereto, in support of its motion to intervene in this action, pursuant to Rule 24 of the

Federal Rules of Civil Procedure ("FRCP").

## PRELIMINARY STATEMENT

This case arises from a bitter, long-running dispute between James Dondero and

defendant Joshua Terry.  Until January 2020, Mr. Dondero was the CEO of Highland Capital

Management, L.P. ("HCMLP").  Defendant Acis Capital Management, L.P. ("Acis") was

founded as a subsidiary of HCMLP, and managed HCMLP's portfolio of collateralized loan

obligations (CLOs), including the ACIS 2015-6 CLO at issue in this case ("ACIS-6").  Mr. Terry

was employed by Acis and HCMLP until 2016, when Mr. Dondero terminated him.  Ultimately,

Mr. Terry filed an involuntary bankruptcy petition against Acis, which led to Mr. Terry taking

control of Acis and its CLO management business away from Mr. Dondero.  The Acis

bankruptcy was marked by extreme acrimony between Mr. Dondero, directly and through

proxies, and Mr. Terry.  The claims filed in this case by plaintiff NexPoint Strategic

Opportunities Fund ("NSOF"), another of Mr. Dondero's proxies,[1] are yet another iteration of

Mr. Dondero's ongoing feud with Mr. Terry.  HCLOF, which holds 87% of the outstanding

notes in ACIS-6, is now caught in the middle of this feud.

HCLOF's interest in this case is significant, and it is impaired each day that this case is

not dismissed.  HCLOF owns the vast majority of the remaining interest in ACIS-6.  In early

May 2021, it directed the redemption of notes issued by ACIS-6.  The $18 million balance

---

[1]  NSOF is managed and controlled by NexPoint Advisors, L.P. ("NexPoint"), which in turn is
owned and controlled by Mr. Dondero.  *See In re Highland Cap. Mgmt., L.P.*, No. 19-34054-
SGJ11, 2021 WL 3418657, at *9 (Bankr. N.D. Tex. Aug. 4, 2021).

1

remaining after the redemption was supposed to be distributed to the rest of the ACIS-6 noteholders, including, principally, HCLOF. But that did not happen due to this case. The distributions did not take place because defendants Acis and U.S. Bank, National Association ("US Bank") — the portfolio manager and the trustee of ACIS-6, respectively — reserved the entire $18 million to defend themselves against NSOF's meritless claims in this case. The distributions now hang in limbo and will not be made so long as NSOF's meritless claims in this case remain outstanding. As a result, HCLOF is compelled to intervene to be heard in opposition to NSOF's meritless claims, which are precisely the sort of wasteful minority action that the ACIS-6 indenture was designed to prevent.

HCLOF's intervention should be granted as of right. This motion is timely: this case had been stayed until NSOF filed the amended complaint on November 22, 2021 (and NSOF just filed its second amended complaint on November 23, 2021). HCLOF's interest in this case is beyond dispute: it holds 87% of the outstanding notes and is thus by far the largest stakeholder in ACIS-6. And HCLOF's interest is being impaired each day this case continues: NSOF's claims are meritless and usurp contractual rights that can only be exercised by HCLOF, as the majority noteholder. Worse, the mere filing of NSOF's claims is directly harming HCLOF, as Defendants have held up the ACIS-6 distributions and are using the funds to defend themselves against NSOF instead of distributing them to HCLOF.

Defendants do not adequately represent HCLOF's interests. While Defendants may be nominally aligned with HCLOF with respect to NSOF's complaint, their interests diverge sharply with respect to the ACIS-6 funds being held up by NSOF's suit. In simple terms, Defendants have reserved the ACIS-6 funds, whereas HCLOF believes the reserves are improper

2

and wants the reserved funds to be released immediately. These circumstances compel granting HCLOF's intervention as of right.

Moreover, the Court has broad discretion to permit HCLOF to intervene. The Court should exercise its discretion to grant HCLOF's motion because HCLOF has a direct interest in this suit and its intervention will neither prejudice nor delay the resolution of NSOF's claims. To the contrary, HCLOF's participation will aid the Court's adjudication of this case because the Court should hear from the other 87% of the ACIS-6 noteholders (*i.e.*, HCLOF) and understand that they oppose and are continuously harmed by NSOF's claims.

Accordingly, HCLOF respectfully requests that the Court grant its motion to intervene.

## RELEVANT FACTS

I.     THE ACIS BANKRUPTCY AND REORGANIZATION

HCMLP was founded in 1993 by Mr. Dondero and his partner. Because of a series of well-publicized and contentious lawsuits involving HCMLP, it sought to re-brand its CLO management business and chartered Acis to manage its CLOs. Mr. Terry, Acis's current owner, was a key employee of Acis and HCMLP. *See In re Acis Capital Mgmt., L.P.*, Case No. 18-30264-sgj, 2019 WL 417149, at *4 (Bankr. N.D. Tex. Jan. 31, 2019). However, Mr. Terry and Mr. Dondero had a falling out in 2016, which resulted in Mr. Terry's termination. *See id.*

Mr. Terry subsequently sought arbitration and received an approximately $8 million arbitration award against Acis. *See id.* Instead of satisfying that award, Mr. Dondero, through his proxies, "orchestrated a systemic transfer of value away from" Acis. *Id.* at *8, *12. To stop that from happening, Mr. Terry filed an involuntary bankruptcy petition in the U.S. Bankruptcy Court for the Northern District of Texas, Dallas Division. *In re Acis Capital Management, L.P., et al.*, Case No. 18-30265-sgj11 (Bankr. N.D. Tex.) (the "Acis Bankruptcy").

3

The involuntary petition in the Acis Bankruptcy was granted, but because of concerns about Mr. Dondero's ability to function as a fiduciary of Acis's bankruptcy estate and his prior efforts to strip Acis of assets, a chapter 11 trustee was appointed. *See In re Acis Capital Mgmt., L.P.*, 584 B.R. 115, 132, 149-50 (Bankr. N.D. Tex. 2018) ("[T]he court is wholly convinced . . . that conflicts of interest among [HCMLP] and [Acis] abound, and no one is looking out for the interests of [Acis] as a fiduciary should."). In the words of the presiding judge, the Acis Bankruptcy was "astonishingly contentious." *In re Acis Capital Mgmt., L.P.*, 2019 WL 417149, at *2.[2] Mr. Dondero caused his controlled proxies, including, at that time, HCMLP, to litigate and appeal nearly every issue raised in the Acis Bankruptcy in a coordinated effort to exact revenge for Mr. Terry's perceived disloyalty. *See id.* at *2.

In January 2019, a plan of reorganization was confirmed in the Acis Bankruptcy. *See id.* at *1. The Acis Bankruptcy plan provided for the transfer of ownership of Acis from HCMLP to Mr. Terry and included an injunction engineered to allow Acis sufficient breathing room to successfully reorganize. *See id.* at *9-10. On May 7, 2021, Acis filed a notice disclosing that the injunction had expired,[3] and almost immediately thereafter, Mr. Dondero, through NSOF, commenced this lawsuit.

## II.     THE HCMLP BANKRUPTCY AND HCLOF

Mr. Dondero's litigiousness ultimately resulted in HCMLP filing for bankruptcy as well. *See In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11 (Bankr. N.D. Tex.) (the

---

[2]  HCMLP, then still under the control of Mr. Dondero, tried to pursue Mr. Terry in many ways, including by trying to take his and his wife's retirement accounts. *See generally Joshua and Jennifer Terry v. Highland Capital Management, L. P., et al*, Case No. DC-16-11396 (162nd District Court of Dallas County, Texas).

[3]  *Notice Regarding Expiration of Temporary Plan Injunction, In re Acis Capital Management, L.P.*, Case No. 18-30264-sgj11, Docket No. 1217 (Bankr. N.D. Tex. May 7, 2021).

4

Case 19-34054-sgj11 Doc 3507-1 Filed 09/09/22   Entered 09/09/22 16:32:09   Page 76 of
448
Case 1:21-cv-04384-GHW   Document 44   Filed 11/24/21   Page 10 of 22

"HCMLP Bankruptcy").  To avoid the appointment of a chapter 11 trustee, Mr. Dondero agreed

to surrender control of HCMLP in favor of an independent board selected by the Official

Committee of Unsecured Creditors.  After it became clear that Mr. Dondero would not get his

way in the HCMLP Bankruptcy, he, like with the Acis Bankruptcy, launched a coordinated

litigation crusade, directly and through his proxies, including NSOF, against HCMLP and its

court-appointed management.  Mr. Dondero's litigiousness resulted in the court overseeing

HCMLP's bankruptcy finding that Mr. Dondero was using litigation to "harass" HCMLP to

prevent a successful reorganization and ultimately to "burn down the place."  *See Order (i)*

*Confirming the Fifth Amended Plan of Reorganization of Highland Capital Management, L.P.*

*(as Modified) and (ii) Granting Related Relief* at 55-57, ECF No. 1943, *In re Highland Capital*

*Management, L.P.*, Case No. 19-34054-sgj11 (Bankr. N.D. Tex. Feb. 22, 2021).

       HCMLP is directly and indirectly HCLOF's largest shareholder and, through another

entity, acts as its portfolio manager and adviser.

### III.     THE ACIS-6 CLO AND HCLOF'S INTERESTS

       The ACIS-6 CLO at issue in this case was created in 2015 to invest in high yield

corporate loans.  The loans were deposited into a New York common law trust, and the trust

issued notes (the "Notes") that were sold to investors.  The trust and the Notes were administered

by US Bank as trustee, and the loan collateral was managed by Acis, as the portfolio manager.

       The rights and obligations of the trustee and the Noteholders are set forth in the indenture

(the "Indenture").  A copy of the Indenture is attached to the Itkin Declaration as Exhibit A.

Acis's obligations as the portfolio manager are set forth in the Portfolio Management Agreement

("PMA").  A copy of the PMA is attached as Exhibit B to the Itkin Declaration.

Currently, there is only one class of ACIS-6 Notes outstanding. That is the Subordinated Notes. *See* Itkin Decl. ¶ 6; Ex. C. As noted, HCLOF holds 87% of the Subordinated Notes. Itkin Decl. ¶ 2. NSOF claims to hold 13% of the Subordinated Notes. *See* Second Amended Complaint, ECF No. 42 ("SAC"), ¶ 38.[4]

## IV. THE APPLICABLE CONTRACT PROVISIONS

The Indenture contains a customary no-action clause. *See* Indenture § 5.8. In simple terms, the no-action clause bars any action filed by holders of less than 25% of the Subordinated Notes. Since HCLOF holds 87% of the Subordinated Notes, it is the only party that can comply with the no-action clause.[5]

Specifically, the no-action clause prohibits lawsuits by investors who hold less than 25% of the Notes of the "Controlling Class:"

> No Holder of any Note shall have any right to institute any Proceedings, judicial or otherwise, with respect to this Indenture . . . or for any other remedy hereunder, unless: (a) such Holder has previously given to the Trustee written notice of an Event of Default; (b) the Holders of not less than 25% of the then Aggregate Outstanding Amount of the Notes of the Controlling Class shall have made written request to the Trustee to institute Proceedings . . . (c) the Trustee for 30 days after its receipt of such notice . . . has failed to institute any such Proceeding; and (d) no direction inconsistent with such written request has been given to the Trustee during such 30 day period by a Majority of the Controlling Class.

And, as the only tranche of the Notes still outstanding, the Subordinated Notes are the Controlling Class under the Indenture:

> Controlling Class: [means] the Subordinated Notes, if there are no Class A Notes, Class B Notes, Class C Notes, Class D Notes or Class E Notes Outstanding.

---

[4] NexPoint allegedly holds $7.5 million of the Subordinated Class of Notes issued by ACIS-6. SAC ¶ 38. The Indenture provides that approximately $59.9 million of Subordinated Notes were issued in connection with the deal. *See* Indenture § 2.3.

[5] In addition to being the only holder that can direct the trustee to institute proceedings, HCLOF, as the majority Noteholder, also is the only holder that has sufficient voting rights to declare an Event of Default under the Indenture. *See* Indenture § 5.1(d).

6

Indenture § 1.1 at p. 17 (Definition of Controlling Class). This reflects the no-action clause's

purpose to protect majority Noteholder(s) from wasteful actions by the minority. This also

reflects the fact that NSOF cannot comply with the no-action clause.

NSOF also cannot sue under, or in connection with, the PMA. The PMA was entered

between Acis, as portfolio manager, and ACIS-6, the CLO. ACIS-6 then expressly assigned and

pledged the PMA to US Bank, the trustee, as part of the trust estate. *See* Indenture at p. 9

(Granting Clause); *see also id.* § 15.1. Reflecting this assignment, the PMA expressly provides

that it can be enforced by US Bank, as trustee, and none of the Noteholders are third party

beneficiaries:

> Other than as provided below, no party, including any Holder of Notes, is a third
> party beneficiary of this Agreement. The parties hereby acknowledge[] and
> agree[] that the Trustee will be a third-party beneficiary of this Agreement.

PMA § 31. In sum total, Noteholders only can sue Acis in place of the trustee if they comply

with the no-action clause (which NSOF is unable to do as a 13% holder).

**V.     NSOF'S SUIT IS HOLDING UP THE ACIS-6 DISTRIBUTIONS**

On May 12, 2021, HCLOF, as the majority holder of the Controlling Class, directed an

optional redemption of the Notes. *See* Itkin Decl. Ex. D. Acis and US Bank then sold nearly all

of the ACIS-6 assets and redeemed all of the senior ACIS-6 Notes. As noted, the Subordinated

Notes are the only Notes left.

NSOF filed this action on May 14, 2021 asserting claims against Acis and US Bank, in

their capacity as the portfolio manager and trustee, respectively; as well as Mr. Terry and

Brigade Capital Management ("Brigade"), who are Acis's principal and sub-adviser,

respectively. SAC ¶¶ 2-5, 47-49.

After this action was filed, Acis and US Bank reserved $18 million to pay for their legal

expenses and any potential liability in connection with this suit. *See* Itkin Decl. ¶ 6; Exs. C, E.

7

Case 19-34054-sgj11 Doc 3507-1 Filed 09/09/22 Entered 09/09/22 16:32:09 Page 79 of
448
Case 1:21-cv-04384-GHW Document 44 Filed 11/24/21 Page 13 of 22

These funds comprise virtually all of the ACIS-6 assets. *See* Itkin Decl. Ex. C.

The Subordinated Notes were supposed to receive a distribution of the remaining funds. But as a result of NSOF's suit, these funds are being needlessly held up by — and spent on — Defendants' defense. In other words, as a result of NSOF's meritless suit, HCLOF is being needlessly and unfairly deprived of nearly $18 million of distributions due on the Subordinated Notes. This is why HCLOF is seeking to intervene here.

## ARGUMENT

As explained above, HCLOF seeks to intervene in this case to stop the ongoing and increasing harm that NSOF's suit has caused and continues to cause it. To summarize: as the holder of 87% of the outstanding Notes issued by ACIS-6, HCLOF is the largest stakeholder in ACIS-6, and thus has a direct property interest at stake in this case. And NSOF's meritless claims are impairing HCLOF's interest. As a result of NSOF's suit, Defendants have reserved $18 million of ACIS-6 proceeds that should have been distributed to the Subordinated Noteholders, including HCLOF, and are instead using those proceeds to fund their defense. HCLOF cannot sit idly by while NSOF tries to assert the rights that can only be exercised by HCLOF under the no-action clause, and thereby depletes investor funds for a suit that HCLOF does not support. This is exactly the sort of harm that the no-action clause was designed to prevent. In sum, HCLOF is entitled to intervene in this case to protect its contractual and economic interests as of right, as well as by permission of the Court.

## I. HCLOF IS ENTITLED TO INTERVENE AS OF RIGHT

Under FRCP Rule 24(a)(2), the Court "must grant an applicant's motion to intervene . . . if (1) the motion is timely; (2) the applicant asserts an interest relating to the property or transaction that is the subject of the action; (3) the applicant is so situated that without intervention, disposition of the action may, as a practical matter, impair or impede the applicant's

Case 19-34054-sgj11 Doc 3507-1 Filed 09/09/22 Entered 09/09/22 16:32:09 Page 80 of
448
Case 1:21-cv-04384-GHW Document 44 Filed 11/24/21 Page 14 of 22

ability to protect its interest; and (4) the applicant's interest is not adequately represented by the other parties." *City of Syracuse v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, No. 20-cv-06885, 2021 WL 1051625, at *4 (S.D.N.Y. Mar. 19, 2021) (quoting *Laroe Ests., Inc. v. Town of Chester*, 828 F.3d 60, 66 (2d Cir. 2016)); *see also* FRCP 24(a)(2).

HCLOF meets each of these requirements, as (1) this motion is timely; (2) HCLOF holds the overwhelming majority interest of the ACIS-6 Notes at issue; (3) its interest is being impaired by NSOF's claims; and (4) the Defendants have withheld and are using ACIS-6 funds to pay for their defense against NSOF's claims, whereas HCLOF wants those funds immediately released.

### A.    HCLOF Has A Material Interest In The Subject Matter Of This Case

In order to intervene as of right, the intervenor must have a "direct, substantial, and legally protectable" interest in the proceeding. *Bridgeport Guardians, Inc. v. Delmonte*, 602 F.3d 469, 473 (2d Cir. 2010) (citation omitted). HCLOF plainly satisfies this requirement.

Put simply, NSOF's suit is causing Defendants to hold up and spend money that effectively belongs to HCLOF to defend a suit that the Indenture prohibits. As noted, HCLOF holds 87% of the outstanding ACIS-6 Subordinated Notes, which is the Controlling Class under the Indenture. By dint of HCLOF's majority position, the no-action clause in the Indenture explicitly gives HCLOF the contractual right to be free from unwanted nuisance suits by other Noteholders. *See Quadrant Structured Prods. Co., Ltd. v. Vertin*, 23 N.Y.3d 549, 565-66 (N.Y. 2014) ("Indeed, a no-action clause makes it more difficult for individual bondholders to bring suits that are unpopular with their fellow bondholders") (internal citations and alterations omitted); *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 184 (S.D.N.Y. 2011) (a no-action clause protects against the "expense of litigating an action brought

9

by a small group of certificateholders that most investors would consider not to be in their collective economic interest").

In other words, as the majority holder of 87% of the Notes, only HCLOF has the right to institute litigation against other CLO parties. *See* Indenture § 5.8. By the same token, HCLOF has the right to be free from nuisance suits from minority holders, like NSOF. NSOF's suit directly infringes on HCLOF's rights. Moreover, the harms of NSOF's infringement are real and concrete, as NSOF's suit is holding up (and using up) $18 million of distributions, which would otherwise be principally distributed to HCLOF.

These facts state a sufficient interest for purposes of intervention as of right under Rule 24(a)(2). *See Delaware Tr. Co. v. Wilmington Tr., N.A.*, 534 B.R. 500, 510 (S.D.N.Y. 2015) (permitting debt holders to intervene in a case concerning allocation of payments to debtor, which could affect payments on the intervenor's notes); *Exp.-Imp. Bank of the Republic of China v. Grenada,* No. 13 CIV. 1450 HB, 2013 WL 4414875, at *5 (S.D.N.Y. Aug. 19, 2013) (granting intervention to bondholders whose payments could be jeopardized by a judgment in the plaintiff's favor); *see also Consumer Fin. Prot. Bureau v. Nat'l Collegiate Master Student Tr.*, No. 17-cv-1323, 2018 WL 5095666, at *5 (D. Del. Oct. 19, 2018) (permitting noteholders to intervene where the litigation concerned their control rights).

### B. HCLOF's Interests Are Not Adequately Represented By Any Other Party

While the Defendants may raise similar arguments in support of dismissing NSOF's claims, there is still a significant wedge between the Defendants' interests and those of HCLOF. For one, Defendants are holding up funds that, in HCLOF's view, must be immediately distributed to Noteholders, including HCLOF. Furthermore, Defendants believe that they are entitled to reserve funds from the CLO not only for the purpose of reimbursement of their attorneys' fees, but also for any potential liability. HCLOF disagrees. There is no basis in the

10

Indenture or the law to reserve funds for Defendants' potential liability. Even if NSOF's claims were not utterly meritless (and they are), the claims concern conduct that is not indemnifiable under the Indenture. Indenture § 6.7(a)(iii).[6]

Courts have found that a similar divergence of interest between parties and proposed intervenors is sufficient to satisfy this element of Rule 24(a)(2). *See Consumer Fin. Prot. Bureau*, 2018 WL 5095666, at *5 (permitting noteholders to intervene alongside trustee because of potential claims faced by the trustee in its capacity as the special servicer); *Glancy v. Taubman Ctrs., Inc.*, 373 F.3d 656, 675 (6th Cir. 2004) ("Courts have held that asymmetry in the intensity of the interest can prevent a named party from representing the interests of the absentee.").

### C. This Motion Is Timely And Intervention Will Not Result In Prejudice To Any Existing Party

HCLOF's intervention is also timely and otherwise procedurally sound. "It is firmly established that the most significant criterion in determining timeliness is whether the delay in moving for intervention has prejudiced any of the existing parties." *Hartford Fire Ins. Co. v. Mitlof*, 193 F.R.D. 154, 160 (S.D.N.Y. 2000). The Court had stayed this case until NSOF filed its amended complaint, which NSOF did on November 22, 2021, just two days prior to the filing of this motion (and it filed a second amended complaint on November 23, 2021). Thus, there can be no dispute that this motion is timely, as HCLOF seeks to intervene before any meaningful progress in this case and before Defendants have moved to dismiss. *See, e.g.*, *Building & Realty Inst. v. State of New York*, No. 19-cv-11285, 2020 WL 5658703, at *7 (S.D.N.Y. Sept. 23, 2020) (motion to intervene three months after case was filed was timely, especially since it was made

---

[6] In the unlikely event that NSOF's claims are not dismissed in their entirety, HCLOF intends to ask the Court to order the immediate release of the ACIS-6 funds.

"prior to any significant substantive motions") (quoting *Schaghticoke Tribal Nation v. Norton*,

No. 06-CV-81, 2006 WL 1752384, at *8 (D. Conn. June 14, 2006)); *Republic of the Philippines*

*v. Abaya*, 312 F.R.D. 119, 123 (S.D.N.Y 2015) (motion to intervene "nearly a year" after action

commenced was timely); *Peterson v. Islamic Republic of Iran*, 290 F.R.D. 54, 58 (S.D.N.Y.

2013) (motion to intervene was timely when it was filed six months after the plaintiffs became

aware of their claims); *Mortg. Lenders Network, Inc. v. Rosenblum*, 218 F.R.D. 381, 383-84

(E.D.N.Y. 2003) (granting motion to intervene when filed more than six months after the

proposed intervenors knew or should have known of their interest in the litigation). In other

words, HCLOF's intervention will cause no prejudice to any party.

By contrast, absent intervention, only HCLOF will suffer prejudice. If intervention were

denied, HCLOF would be forced to idly sit by as NSOF attempts to exercise litigation rights that

belong exclusively to HCLOF under the no-action clause. Absent intervention, HCLOF would

be forced to idly sit by as nearly $18 million of distributions due to HCLOF are needlessly held

up. And, absent intervention, HCLOF would be forced to idly sit by as NSOF's suit needlessly

depletes that $18 million instead of being used for the required distributions to HCLOF.

The Court should not permit HCLOF to be prejudiced in this manner, and should grant

HCLOF's motion to intervene as of right pursuant to Rule 24(a)(2).

## II. ALTERNATIVELY, THE COURT SHOULD PERMIT HCLOF TO INTERVENE

FRCP Rule 24(b) gives the Court broad discretion to permit HCLOF to intervene even if

the Court finds that HCLOF is not entitled to intervene as of right. The Court should do so for

all of the reasons discussed above to avoid the manifest injustice that NSOF's meritless claims

would effect on HCLOF's contractual and economic interests in ACIS-6. *See Olin Corp. v.*

*Lamorak Ins. Co.*, 325 F.R.D. 85, 89 (S.D.N.Y. 2018) (granting permissive intervention and

12

Case 19-34054-sgj11 Doc 3507-1 Filed 09/09/22 Entered 09/09/22 16:32:09 Page 84 of
448
Case 1:21-cv-04384-GHW Document 44 Filed 11/24/21 Page 18 of 22

noting that despite seeking the "same ultimate objective" as parties already in the case, the

proposed intervenor would more "zealously" make arguments to that end).[7]

## III.     HCLOF'S PROPOSED MOTION TO DISMISS

FRCP Rule 24(c) provides that a motion to intervene must "be accompanied by a

pleading that sets out the claim or defense for which intervention is sought." Fed. R. Civ. P.

24(c). Courts in this Circuit and elsewhere have deemed this requirement met "when the

proposed intervenors position is 'clearly articulated' in its motion papers." *Barry's Cut Rate*

*Stores Inc. v. Visa Inc.*, No. 05-MD-1720 (MKB), 2021 WL 2646349, at *13-14 (E.D.N.Y. June

28, 2021) (collecting cases and waiving the pleading requirement); *see also Tachiona ex rel.*

*Tachiona v. Mugabe*, 186 F. Supp. 2d 383, 393 n.8 (S.D.N.Y. 2002) (approving intervention

based on letter briefs setting forth intervenor's position, without a pleading, recognizing "Rule

24(c) permits a degree of flexibility with technical requirements"); *Beckman Indus., Inc. v. Int'l*

*Ins. Co.*, 966 F.2d 470, 474 (9th Cir. 1992) ("Courts, including this one, have approved

intervention motions without a pleading where the court was otherwise apprised of the grounds

for the motion.").

HCLOF's intended arguments in support of dismissing NSOF's claims are described

above, but HCLOF explains them in more detail below to ensure that they are "clearly

articulated" for purposes of Rule 24(c). In light of this description, and for the sake of

efficiency, HCLOF also respectfully requests that the Court dispense with requiring HCLOF to

file a pre-motion letter in anticipation of HCLOF's motion.

---

[7] As a last resort, if the Court refuses to permit HCLOF to intervene, HCLOF seeks leave to file
an *amicus curiae* brief setting out its views as a majority ACIS-6 Noteholder. *See Scaminaci v.*
*Jaffrey*, No. 21-cv-321, 2021 WL 230203, at *1 (S.D.N.Y. Jan. 22, 2021) (accepting the
proposed intervenor's opposition as an amicus brief).

**A.    NSOF's Failure To Comply With The No-Action Clause Is Fatal To Its Claims Against Acis, Brigade, And Terry**

None of NSOF's claims against Acis, Brigade, or Terry satisfy the no-action clause.

NSOF's claims against these Defendants consist of violation of the Investment Advisors Act of 1940 (Count One), breach of fiduciary duty (Count Two), breach of the PMA and Indenture (Count Three), negligence (Count Six), and conversion (Count Seven).[8]  To assert each of these claims, NSOF was required to comply with the Indenture's no-action clause, and its failure and inability to do so is fatal.  *See RJ Cap., SA v. Lexington Cap. Funding III, Ltd.*, No. 10 Civ. 25, 2011 WL 3251554, at *6-7 (S.D.N.Y. July 28, 2011) (dismissing claims against collateral manager for failure to comply with no action clause); *Ellington Credit Fund, Ltd. v. Select Portfolio Servicing, Inc.*, 837 F. Supp. 2d 162, 185 (S.D.N.Y. 2011) (tort and contract claims against servicer and affiliates barred by a no action clause); *see also Peak Partners, LP v. Republic Bank*, 191 F. App'x 118, 126-27 (3d Cir. 2006) (applying New York law and holding that "any claim that can be enforced by the trustee on behalf of all bonds . . . is subject to the terms of a no action clause," including negligence claims against a servicer).

NSOF's failure to comply with the no-action clause is beyond dispute.  NSOF does not hold the requisite 25% of the Controlling Class — it holds only 13% — and no Event of Default

---

[8]  Even if NSOF's claims were not barred by NSOF's failure to comply with the no-action clause, its claims fail as a matter of law.  Acis has no duties to NSOF as an individual investor in ACIS-6 under the Investment Advisors Act of 1940 because an advisor owes no fiduciary or other duty to an individual investor in a fund, just to the fund itself.  *See Goldstein v. SEC*, 451 F.3d 873, 879 (D.C. Cir. 2006); *see also, e.g., SEC v. Northshore Asset Mgmt.*, No. 05 Civ. 2192 (WHP), 2008 WL 1968299, at *6 (S.D.N.Y. May 5, 2008) (dismissing a claim that an investment adviser owed a duty to a fund's investors rather than just the fund); *SEC v. Trabulse*, 526 F. Supp. 2d 1008, 1016 (N.D. Cal. 2007) (same).  And, even if Acis did owe a fiduciary duty to NSOF (which is not true because Acis owes duties to the entire CLO, rather than any individual Noteholder), U.S. Supreme Court precedent is clear that there is no private right of action for a breach of fiduciary duty under the Investment Advisors Act of 1940.  *See, e.g., Transamerica Mtg. Advisors, Inc. v. Lewis*, 444 U.S. 11 (1979).

14

has been declared (nor could it be, as that would require a majority of the Controlling Class, *i.e.*, far more than NSOF holds). *See* Indenture §§ 5.1, 5.8(a). Nor has NSOF satisfied — or attempted to satisfy — any of the other no-action clause requirements, including providing US Bank the requisite direction and adequate indemnity to sue Acis. *Id.* § 5.8(b)-(c).

That NSOF's claims include tort claims does not change this calculus. Not only are all of NSOF's tort claims duplicative of its claim for breach of the PMA, its tort claims could only be asserted by US Bank, as trustee (or a Noteholder complying with the no-action clause). Indeed, it is the PMA that gives rise to Acis's duties as portfolio manager, and it is US Bank, as trustee, who explicitly and unambiguously has the right to enforce those duties. PMA § 31; Indenture at p. 9 (Granting Clause), § 15.1. *See Ace Sec. Corp. v. DB Structured Prod., Inc.*, 52 Misc. 3d 343, 349 (Sup. Ct. N.Y. Cty.) (finding that a residential mortgage-backed securities trustee had the right to enforce breaches of a related agreement assigned to the trustee for the benefit of the noteholders), *aff'd sub nom. U.S. Bank Nat'l Ass'n v. UBS Real Est. Sec., Inc.*, 177 A.D.3d 493 (1st Dep't 2019), *leave to appeal dismissed*, 35 N.Y.3d 1063 (2020). Since the only way for Noteholders to sue in place of the trustee — as NSOF is trying to do here — is by satisfying the no-action clause, NSOF's failure to comply with the no-action clause is equally fatal to its tort claims.

Accordingly, NSOF's claims against Acis, Terry, and Brigade should be dismissed.

### B.     NSOF's Claims Against The Trustee Also Fail

While NSOF's claims against the trustee may not, arguably, be barred by the no-action clause, they are still subject to dismissal as a matter of law. NSOF asserts three claims against the trustee: breach of the Trust Indenture Act (Count Four), breach of fiduciary duty (Count Five), and negligence (Count Six).

Case 19-34054-sgj11 Doc 3507-1 Filed 09/09/22 Entered 09/09/22 16:32:09 Page 87 of
448
Case 1:21-cv-04384-GHW Document 44 Filed 11/24/21 Page 21 of 22

The Trust Indenture Act claim is baseless. NSOF fails to explain how it can assert a breach of the Trust Indenture Act when the Act does not apply to ACIS-6. ACIS-6 was a private debt offering under Rule 144A and Regulation S, whereas the Trust Indenture Act applies only to publicly-issued debt instruments. *See* 15 U.S.C. § 77ddd(b); *Tennenbaum Living Tr. v. TGLT S.A.*, 20 Civ. 6938, 2021 WL 3863117, at *4-5 (S.D.N.Y. Aug. 30, 2021) (dismissing claim for violating Trust Indenture Act on the grounds that the statute did not apply to private debt offering); *AG Oncon, LLC v. Ligand Pharmaceuticals Inc.*, C.A. No. 2018-0556, 2019 WL 2245976, at *9-10 (Del. Ch. May 24, 2019), *aff'd*, 224 A.3d 963 (Del. 2020) (same).

The fiduciary duty claim is also baseless. In the absence of an Event of Default, the ACIS-6 Indenture only requires the trustee (i) to avoid conflicts of interest; and (ii) to perform all basic, non-discretionary tasks with due care. *Elliot Assocs. v. J Henry Schroeder Bank & Trust Co.*, 838 F.2d 66, 71 (2d Cir. 1988). As noted above, NSOF has not alleged an Event of Default has occurred (and NSOF has no right to declare an Event of Default, as that requires a majority of the Controlling Class). Because the trustee owes no pre-Event of Default fiduciary duties under the Indenture, and there has been no Event of Default declared (by HCLOF or otherwise), this claim fails. *See, e.g.*, *Pacific Life Ins. Co. v. Bank of N.Y. Mellon*, No. 17 Civ. 1388 (KPF), 2018 WL 1382105, at *12 (S.D.N.Y. Mar. 16, 2018); *AG Capital Funding Partners, L.P. v. State Street Bank & Tr. Co.*, 11 N.Y.3d 146, 156-57 (N.Y. 2008).

The negligence claim fails for largely the same reasons. This claim seeks to hold the trustee liable for failing to manage the ACIS-6 assets. *See* SAC ¶¶ 221-23. But managing the ACIS-6 assets is a substantive responsibility that the Indenture assigns exclusively to Acis as the portfolio manager. *See* Indenture § 6.3(o). It is not a "ministerial" duty owed by the trustee.

16

Nor is there any provision holding the trustee liable for Acis's acts or omissions. The negligence claim is therefore also without basis. [9]

According, none of NSOF's claims against U.S. Bank have merit as a matter of law.

## CONCLUSION

For all these reasons, the Court should grant HCLOF's motion for intervention as of right or by permission to enable HCLOF to protect its financial and contractual interests in the ACIS-6 CLO at issue in this case.

Dated: New York, New York
        November 24, 2021

Respectfully submitted,

KASOWITZ BENSON TORRES LLP

By:    */s/ Uri A. Itkin*         
      Uri A. Itkin
      Jill L. Forster
      Andrew W. Breland

1633 Broadway
New York, New York 10019
Telephone: (212) 506-1700

*Attorneys for Proposed Intervenor Highland CLO Funding, Ltd.*

---

[9] NSOF's complaint includes one conclusory allegation that U.S. Bank failed to avoid conflicts of interest by failing to oversee the conduct of the Portfolio Manager. *See* SAC ¶¶ 206-11. These kinds of "bald assertions of conflict" absent further facts are insufficient to show a conflict of interest. *Elliot Assocs.*, 838 F.2d at 70.

# CAREY OLSEN

Carey Olsen (Guernsey) LLP
PO Box 98
Carey House
Les Banques
St Peter Port
Guernsey GY1 4BZ
Channel Islands

T +44 (0)1481 727272
F +44 (0)1481 711052
E guernsey@careyolsen.com

| Our ref | TC/EA/1066695/0005/G13984230v1 |
| Your ref | AHP/TIC/MGM/JDI/182801.0001 |

Advocate A. Horsbrugh-Porter                                      14 April 2022
Partner
Ogier (Guernsey) LLP
Redwood House
St. Julian's Avenue
St. Peter Port
Guernsey
GY1 1WA

**By Email Only: alex.horsbrugh-porter@ogier.com**

Dear Sir

**Highland CLO Funding, Ltd.**

As you know, this firm is Guernsey legal counsel to Highland CLO Funding, Ltd. ("**HCLOF**" or the "**Company**"). Where the context permits, this letter adopts the defined terms appearing in your firm's letter of 30 March 2022. Where necessary, it also adopts the substance of this firm's letter of 26 October 2021 in response to your Advocate Clipstone's email timed at 13.43hrs on Wednesday 20 October 2021 to, *inter alios*, the directors of the Company. We note that you "*act on behalf of*" CLO Holdco, Ltd., which holds 49.015% of the issued share capital in the Company (hereafter as the context permits "**CLO Holdco**" or the "**Shareholder**").

**(A) Introduction**

It is clear that your client is labouring under significant factual and legal misapprehensions. We address many of these below, but your assertion that the present Directors were "*selected and appointed by ordinary resolution passed solely by HCM…without consultation with the remaining minority shareholders*" is wrong and particularly telling. The current Directors were appointed by the former directors by way of filling the casual vacancies arising upon their resignations. HCM had no involvement in that process. More specifically, we make (and indeed repeat) the following prefatory observations.

First, your firm's letter of 30 March 2022 states in material part that it is "*specifically directed to the directors of the Company (the **Directors**) in their capacity as officers and agents of the Company*". This contextually inapposite (and confusing) language mirrors that which was used in your Advocate Clipstone's email timed at 13.43hrs on Wednesday 20 October 2021 ("*We … write to you, in your capacity as directors of the Company …*"). Your Ms. Malherbe sought – but failed – to clarify the position in her email to our Advocate Corfield timed at 15.53hrs on Wednesday 30 March 2022. We repeat that your client's limited, statutory rights and entitlements *viz.* the Company are as against the Company, and not as against the Directors in that capacity. This is fundamental and immutable company law and particularly relevant to the context where your letter is prefaced with inferences of mismanagement or misconduct ("*… of particular concern to our client is*

**PARTNERS:** A Alexander C Anderson A Boyce T Carey R Clark T Corfield D Crosland M Dunster K Friedlaender E Gray
D Jones N Kapp T Lane K Le Cras D Le Marquand B Morgan J Morgan **CONSULTANTS:** N Carey M Eades J Greenfield G Hall

The Guernsey limited liability partnership known as Carey Olsen (Guernsey) LLP is a limited liability partnership incorporated in Guernsey on 1 March 2018 with its registered office at Carey House, Les Banques, St Peter Port GY1 4BZ and registration number 95.

**BERMUDA BRITISH VIRGIN ISLANDS CAYMAN ISLANDS GUERNSEY JERSEY**
**CAPE TOWN HONG KONG LONDON SINGAPORE**                                   careyolsen.com

*the conduct of the Directors ...*"), which for the avoidance of doubt are denied. Lest there be any confusion, we confirm that the directors of HCLOF do not accept any personal obligation or assumption of responsibility to CLO Holdco or any special factual relationship that would invoke personal liability to your client.

Second, in addressing your letter, the Company does not waive legal professional privilege or the Company's attorney client privilege, including applicable privileges shared with its portfolio manager and its legal counsel in whatever jurisdiction.

Third, and as previously summarised, US Bank's stated justification for retaining the CLO redemption proceeds at issue is premised on certain threatened (but seemingly meritless) litigation from CLO Holdco and certain other presently-filed litigation by NexPoint Strategic Opportunities Fund, an apparent affiliate of your client which is represented by US counsel who also represents CLO Holdco in separate litigation in the United States, including litigation in which the Company was cited as a nominal defendant. In short, the position in which your client (and the Company) has found itself on the facts is one which is of your client's own making and *ergo* one which is within your client's gift to resolve satisfactorily.

Fourth, we are satisfied that the Directors have at all material times acted in good faith in what they believe to be the best interests of the Company, without conflict of interest or partisanship. HCLOF's present strategy is aimed at maximising a return of capital to *all* shareholders at the least possible expense to the Company (*i.e.* not to prospectively damage return of capital by becoming unnecessarily embroiled in the proliferation of litigation which has plagued this structure, and the profligacy with which parties have acted in those disputes). The suggestion that the Directors have knowingly and deliberately "*... align[ed] the Company's interests with the wider commercial interests of the majority shareholder in* [HCLOF]", namely HCM, is simply wrong. Neither the Company nor its Directors are in a position to know with certainty what HCM's (and its principals') subjective intentions are *viz.* its commercial interests, and to the extent that HCM is not pursuing meritless activism against HCLOF and its Directors is indicative only of alignment in circumstance, not improper preference. You allege that HCM has "*... gain[ed] significant influence and indirect control over the management decisions* [of HCLOF and/or its Directors]". This is wrong. The Directors have exercised independent judgment at all times. To the extent that HCM has the requisite control of the majority of voting shares which would enable it to preclude certain matters reserved to shareholders is a simple fact and not evidence of conflict or influence. Given the long history of this matter and your client's intimate knowledge of it, you do your client a grave disservice in seeking to contrive allegations that are wholly illusory and inconsistent with the history and the facts of this matter. The Company urges your client to work with it, rather than against it, in seeking to resolve these matters.

Finally, and allied to our fourth point above, you unequivocally aver that certain acts or omissions (of the Directors) constitute: (i) unfair prejudice to your client; and (ii) breaches of fiduciary duty owed to the Company. These allegations are denied, and you have in any event failed to provide the necessary levels of particularity to warrant anything other than a denial for all purposes. The suggestion that the position in which the Company has found itself (through no act or omission on its part) means that it has no "*objective purpose / commercial rationale other than to unfairly promote the wider commercial interests of HCM and Acis*" is casuistic.

You demand a response to your lengthy letter within 14 days. That is not only unreasonable, but unnecessarily hawkish given that your client is unable to compel a response to an arbitrary timeline. Again, our client urges yours to collaborate with it (in the final analysis, their interests are aligned) and not litigate. Our client's rights are reserved in the event that your client precipitates legal action. We provide a summary response to your letter in the interests of engaging with your client *qua* Shareholder. Where this letter does not address any allegation, inference, assumption or (mis)statement in your letter of 30 March, such should not be considered by your client to be an acceptance of, or agreement or acquiescence to, them.

**(B)  Transfer of Shares at Undervalue**

This matter relates to the 2021 HarbourVest Settlement Agreement, specifically the transfer of Company shares held by HarbourVest to a subsidiary of HCM.  We note that the Company viewed favorably the fact that HCM reached a settlement with HarbourVest, as that ongoing dispute – between one of the Company's largest shareholders and HCM (who as you know was both the sponsor of the Company at its inception and the submanager of the Company's portfolio manager) – was expected to cause ongoing disruption, complication and cost to the Company, and was likely to impair the Company's ability to defend or resolve pending claims brought against the Company by Acis, who was making claims against the Company and its former directors based on allegations similar to those raised by HarbourVest. Resolving the complications with HarbourVest was thus viewed by the Directors as a positive outcome for the Company.

The legality of the settlement with HarbourVest was considered by the Company and due diligence performed through legal counsel.  In particular, the Company considered with legal counsel the Shareholders' Agreement, and what you call the "*right of refusal*" provisions (essentially pre-emption rights) referenced in your letter, and concluded that the transfer of shares under the HarbourVest Settlement Agreement did not invoke the "*right of refusal*" provisions. We note that CLO Holdco objected at the time to the HarbourVest settlement on the basis of the Shareholders' Agreement and the "*right of refusal*" provisions, but withdrew that objection at the settlement hearing based on its review of HCM's response to its objection and the Company's governing documents. The U.S. Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**") concluded specifically that no right of refusal applied with respect to the transfer contemplated by the settlement, and recently dismissed with prejudice the lawsuit brought by your client against HCM, among others, seeking to re-litigate that issue. It should also be noted that your client's suit against the Company regarding this issue was voluntarily dismissed with prejudice.

The Company's unequivocal position – noting that it had no direct involvement in the negotiation of the HarbourVest settlement, and thus it can only assess these matters from an extraneous perspective – is that it has no reason to consider that the settlement was anything other than entirely proper and legal; and so far as the Directors are aware, the interested parties were given a full and fair opportunity to object, and those objections were either withdrawn and/or overruled.

The other allegation raised in your letter on this issue is that the sale price of the HarbourVest shares was inadequate and was the result of alleged collusion and insider trading activities.  Again, the Company had no direct involvement in the settlement negotiations or the setting of the settlement consideration, and can therefore only speak to the best of its knowledge from its extraneous perspective. As to that, at the time of the HarbourVest Settlement, and continuing to today, the Company had, and has, no reason to believe that the settlement consideration agreed between HCM and HarbourVest was the product of anything other than an arms-length, good faith negotiation. Given that HarbourVest was not only transferring its shares, but was also compromising and settling large claims against HCM, it is reasonable to assume that HarbourVest was motivated to negotiate fair terms for itself. Further, your letter offers no evidence, explanation or other basis for the bare allegations your client makes as to collusion and insider trading. We note for completeness that the Company obtained a release from HarbourVest in connection with the settlement.

For these (non-exhaustive) reasons, the Company rejects any assertion that the aspects of the HarbourVest Settlement to the extent that they relate to the Company's interests in isolation, was prejudicial at all, much less unfairly prejudicial, to any shareholder of the Company.

**(C)  Bankruptcy of Company Advisors**

You assert that the bankruptcy of HCM has rendered both HCM and the Portfolio Manager unable to service the necessary portfolio management functions on behalf of the Company.  The Company considered the impact of HCM's bankruptcy on the Company, including whether it was necessary or advantageous to attempt to terminate the arrangements with Portfolio Manager. The Company, independent of input from HCM or the Portfolio Manager, reached the conclusion that it was more advantageous to the Company to retain the

Portfolio Manager and the services of HCM. The Company reached this decision for multiple reasons, including, among others, that replacing the Portfolio Manager would be difficult and costly – a circumstance that was previewed for all shareholders in the Company's November 2017 Offering Memorandum. In addition, though the HCM personnel who regularly provided services to the Company are no longer employed by HCM, HCM retains legacy personnel (and has employed consultants as required) and all the Company records and data that were historically maintained by the Portfolio Manager. The Directors of the Company met with HCM personnel, including Mr. James P. Seery, Jr., and concluded that these individuals could provide helpful assistance to the Company - particularly given the nature of the anticipated go-forward operations and activities of the Company, which principally involve the monetisation of existing holdings rather than the making of new investments or the deployment of additional capital. In summary, the Directors concluded that the costs, complications and drawbacks of seeking to replace the Portfolio Manager were clear and substantial, while the benefits of doing so were unclear, uncertain and otherwise outweighed.

We note specifically that HCM's indirect majority stake in the Company is, in the Company's view, neither inappropriate or disadvantageous. To the Company's understanding, HCM desires to maximize the value of its shares in the Company while minimizing the cost and delay of distributing that value to the Company's shareholders. In this regard, HCM's interests are aligned with the Company and CLO Holdco. Nonetheless, the Directors of the Company have and will continue to exercise their independent judgment in service of the best interests of the Company as a whole.

For these (non-exhaustive) reasons, the Company rejects any assertion that the continued services of the Portfolio Manager and HCM are prejudicial at all, much less unfairly prejudicial, to any shareholder of the Company.

**(D) Unlawful Redemption Withholding**

This item concerns the withholding, by US Bank (with, we believe, the support of Acis), of the proceeds of the redemption of the Acis CLOs. As your letter notes, the Company agrees, and has and continues to state affirmatively its belief that the withholding of the redemption proceeds by US Bank is unlawful under the respective CLO indentures. As reported to you previously, the Company and its counsel have engaged with US Bank and Acis on this issue. US Bank and Acis disagree with the Company. Direct legal action against US Bank and Acis remains an available option, and one that may ultimately need to be pursued. At present, however, the Company is pursuing courses of action that it and its counsel believe are designed to result in the disbursement of the redemption proceeds in a manner that is more timely, more certain and less costly than other available alternatives (including litigation against US Bank and/or Acis – although the Company's rights to pursue litigation have been preserved). For the avoidance of doubt, the Company (and its Directors) shares your client's desire to obtain, and ultimately distribute to its shareholders, the maximum value of net redemption proceeds as soon and as efficiently as possible. It appears the Company merely disagrees with your client on the best strategy to accomplish that common goal. It is the Directors' responsibility to determine and execute that strategy, not your client.

In response to your allegation concerning what you describe as a misguided and/or improper reference to procuring a release of the NexPoint litigation, the Company disagrees. The Company understands that the NexPoint Litigation is the primary obstacle to US Bank's distribution of the redemption proceeds related to Acis 6 (and the other Acis CLOs). Consistent with the above-noted goal (presumed common with all Company shareholders) to achieve the release and distribution of redemption proceeds as quickly and efficiently as possible, it is entirely appropriate and reasonable for the Company to note this circumstance to one of its shareholders who it believes is affiliated with the obstructionist. Regarding the affiliation between NexPoint and CLO Holdco, the Company understands that both entities are controlled by Mr. James Dondero. This affiliation has been recognised by a number of orders of the Bankruptcy Court, and NexPoint has made affirmative representations regarding Mr. James Dondero's control in its filings with the U.S. Securities and Exchange Commission.

For these non-exhaustive reasons, the Company rejects any assertion that the Company is not committed to resolving the Unlawful Redemption Withholding, or that any of its actions in this regard have been prejudicial at all, much less unfairly prejudicial, to any shareholder of the Company.

**(E)  Appointment of Richard Katz to the Advisory Board**

We note your observations as a matter of contractual interpretation of the requisite provisions of the Shareholders' Agreement. It is unclear from your letter what allegations are being made against the Company itself. As your letter identifies, the Company is required to establish an Advisory Board. The Advisory Board is, of course, in existence.

The remainder of your assertions do not appear to contain any suggestion of an improper act or omission by the Company itself. Rather, your letter advances certain propositions with respect to the composition and operation of the Advisory Board, and threatens a challenge in the event that an event which has not yet come to pass – namely, Mr. Katz seeking to act or vote as a voting member of the Advisory Board – were to occur in the future. It is denied (given the limited role that the Company has in respect of the composition and operation of the Advisory Board) that the Company is responsible for any unfairly prejudicial conduct as inferred from the terms of your letter; and, indeed, that is a particularly fanciful suggestion where the allegedly unfairly prejudicial conduct in question has not yet even arisen.

As to Mr. Katz's eligibility to vote on Advisory Board matters, the Company notes as follows. Under clause 4.1 of the Shareholders' Agreement, no voting member shall be a "*controlled Affiliate of the Portfolio Manager*". It is, of course, a question of fact whether Mr. Katz constitutes a "controlled Affiliate" of the Portfolio Manager; but in principle the Company does not see any reason why Mr. Katz cannot be a "*consultant or other representative*" of HCM (such that clause 4.4 of the Shareholders' Agreement is not engaged), whilst not being a "*controlled Affiliate*" of the Portfolio Manager (for the purposes of clause 4.1 of the Shareholders' Agreement), contrary to the suggestion in your letter. The Company's understanding of the provisions of the Shareholders' Agreement, based on the advice it has received (privilege in which is not waived) is that they do not recognise the appointment of non-voting members of the Advisory Board. In circumstances where the Advisory Board is constituted of two individuals, the constitutional provisions of the operation of the Advisory Board are rendered otiose by the inference that one member may be 'non-voting', i.e. the Advisory Board would never be quorate, and would never be able to act (action requiring unanimity) or fulfil its functions.

That said, insofar as there is a disagreement in connection with Mr. Katz's role with respect to the Advisory Board, that is primarily a matter for your client to take up with HCM as the appointor of Mr. Katz as its representative. The Company has no power (under the Shareholders' Agreement or otherwise) to regulate HCM's appointment to the Advisory Board. Whilst it is accepted given the contents of your letter that, in the future, a dispute may materialise between your client and HCM if Mr. Katz were to seek to exercise his powers as a voting member of the Advisory Board, it is noted that under clause 4.2 of the Shareholders' Agreement, "*the Advisory Board shall meet with the Portfolio Manager at such times as requested by the Portfolio Manager from time to time*". Further, the consent of the Advisory Board is only required to approve the limited actions set out in clause 4.3 of the Shareholders' Agreement, none of which are expected to be of relevance to the Company going forward. Accordingly, your client's complaint is highly likely to be a theoretical one only (as demonstrated by the fact that there is no past or present business of the Advisory Board currently in dispute). It follows that the matters addressed in your letter do not give rise to any legitimate unfair prejudice complaint or action for breach of the Shareholders' Agreement.

**(F)  The Acis Settlement Agreement**

You allege that the value of the Acis Settlement Agreement is "*outweighed by the disproportionate prejudice caused to the Company due to the Directors' conduct*".  The Company disagrees.

The settlement with Acis resolved multiple claims against the Company and its former directors, claims based almost entirely on actions alleged to have been directed or orchestrated by and for the benefit of Mr. James

Dondero, who we, again, understand to be in control of both your client and NexPoint. These claims, if permitted to continue, would have caused continued expense and complication for the Company and would likely have been litigated in a court that has been highly unsympathetic to the interests and asserted defenses of the Company.

More importantly, the settlement permitted the lifting of the Bankruptcy Court injunction (an injunction that had been sustained on appeal to the United States District Court) that prevented the Company from redeeming the Acis CLOs. The value of the Acis CLOs has fluctuated over time and at points in time during the twelve months preceding the Acis settlement the CLOs had lost a large percentage of their worth. Further, the continued prohibition against redemption of the CLOs risked continued and systematic loss of value based upon the age of the CLOs and the costs of funding the CLOs' secured notes. Accordingly, and having taken specialist commercial advice, when the value available to the Company from the Acis CLOs improved, the Directors determined that it was in the Company's best interests to secure the ability to redeem the Acis CLOs and not risk subsequent deterioration in value. Acis was unwilling to agree to a settlement providing these benefits, and would oppose any effort to lift the pending injunction, without the releases contained in the Acis Settlement Agreement. The Company determined, with advice of counsel, that any value of the released claims was, at best, questionable and speculative, and otherwise outweighed by the benefits of a consensual lifting of the injunction and a release of claims and the dismissal of the pending litigation by Acis against the Company.

**(G) Your Client's Information Requests**

With respect to your client's information requests, these were addressed in our letter of letter of 26 October 2021. In particular, it was noted that the information requests had no bearing on the Request Rationale (as defined). The Company (and the Directors) are prepared to assist your client with valid requests for information pertaining to its investment and, as you intimate, value-based determinations; it is not, however, a proper request for your client to seek, in effect, pre-action discovery of legal advice for the purposes of shoring up woefully particularised allegations of unfair prejudice and breach of fiduciary duty. That was the concern which was addressed in our letter of 26 October, a concern which has seemingly been vindicated by the terms of your recent letter.

If your client has further requests for information, it should make those requests and we shall review them with our client.

**(H) CLO Holdco Exit Proposals**

A redemption of shares in the manner proposed in your letter is not possible pursuant to the Company's articles of incorporation (the "Articles"). The Articles only permit a redemption pursuant to article 9 thereof, which permits the board to compulsorily redeem shares in accordance with the Members' Agreement (as defined therein). The Members' Agreement only permits redemption in accordance with clause 5.5 which permits the Portfolio Manager, on behalf of the Company, to elect, upon notice to a Defaulting Member to redeem the Defaulting Member's shares in an amount equal to 50% of the outstanding amount existing as of the date of the default at a price of $0.0001 per Share (all capitalised terms as defined in the members' Agreement).

Pursuant to clause 3.2.3 of the Members' Agreement, any redemption other than pursuant to clause 5.5 requires the affirmative vote or prior written consent, as applicable, of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company. It would also require an amendment to the Articles, which requires special resolution approval.

With respect to a buyback, which requires ordinary resolution approval of the terms of the relevant buyback contract, pursuant to section 314(5) of the Companies (Guernsey) Law, 2008 (as amended), your client is precluded from voting its shares.

Your letter already accepts that certain issues would arise and require a suitable solution (*e.g.*, changing the custodian of the relevant assets) if a redemption or share buy-back in consideration for the legal and beneficial title to 49.015% of the Company's underlying assets were to proceed. There are other legal and practical considerations that arise in connection with your proposals. In principle, the Directors would be willing to engage U.S. and Guernsey counsel to review those matters, provided that HCM and its affiliate, HCMLP Investments, LLC (collectively, the "HCM Shareholders"), who collectively own more than 50% of the Company's shares, are agreeable to voting for, or to considering voting for, either of your proposals. As you will appreciate, if the HCM Shareholders are not agreeable to supporting one of those proposals, neither is viable – and time and costs incurred in considering these matters further would be wasted. The Directors, having approached the HCM Shareholders to consider these options, can confirm that they are not agreeable to giving their support, or to giving further consideration to the same. For completeness, we note that CLO Holdco is, of course, able to requisition a shareholders' meeting and propose the relevant resolutions to the shareholders if it so wishes.

Whilst the Company considers it patently clear that any allegations of unfair prejudice are unsustainable, that should not be taken as an unwillingness on the part of our client to consider suitable commercial proposals that would result in the exit from the structure that CLO Holdco seeks. Accordingly, should your client have further options or variations on the existing options to canvass (or, indeed, if there is any disagreement as to our analysis of the Exit Proposals already advanced), the Directors confirm they will consider the same and liaise with the other shareholders as appropriate.

Yours faithfully

*Carey Olsen (Guernsey) LLP*

**CAREY OLSEN (GUERNSEY) LLP**

**Highland CLO Funding, Ltd. (the Company)**

**Registration number 60120**

**Written resolution of the shareholders of the Company passed in accordance with section 175(2)(b) of the Companies (Guernsey) Law, 2008 (the Law)**

**PLEASE READ THE NOTES AT THE END OF THIS DOCUMENT BEFORE SIGNING YOUR APPROVAL OF THE RESOLUTION SET OUT BELOW.**

Pursuant to section 182 of the Law, the directors of the Company propose that the resolution set out below be passed as a **special resolution** of the Company and, accordingly, we resolve that:

1. in accordance with section 42 of the Law, the draft articles of incorporation appended to these resolutions be, and are hereby, approved and adopted as the new articles of incorporation of the Company in substitution for, and to the exclusion of, the existing articles of incorporation of the Company and each of the directors and the Company secretary be and is hereby authorised and instructed to do all such acts, and do all such things, as are necessary or expedient to make such change effective.

The following definitions apply in, and form part of, the above resolution.

**Circulation Date** means the date on which copies of this written resolution is sent to shareholders (or, if copies are sent to shareholders on different days, the first of those days).

8032669/71426991/3

1

We are the sole shareholder of the Company on the Circulation Date.

**Signature**

...................................................................................

For and on behalf of
**CLO HoldCo, Ltd.**
Shares voted in favour: ALL

Date: ........15 November 2017.................................

Location: ...Raleigh, NC..........................................

8032669/71426991/3

**THE COMPANIES (GUERNSEY) LAW, 2008**
**as amended**

**COMPANY LIMITED BY SHARES**

**ARTICLES OF INCORPORATION**

**of**

**HIGHLAND CLO FUNDING, LTD.**

**Registered on 30 March 2015**

(Adopted by special resolution passed on 15 November 2017)

| | | |
|---|---|---|
| 1 | STANDARD ARTICLES | 1 |
| 2 | INTERPRETATION | 1 |
| 3 | AMENDMENTS | 5 |
| 4 | BUSINESS | 5 |
| 5 | SHARE CAPITAL | 5 |
| 6 | ISSUE OF SHARES | 6 |
| 7 | OFFERS TO SHAREHOLDERS TO BE ON A PRE-EMPTIVE BASIS | 6 |
| 8 | REPURCHASE OF SHARES | 8 |
| 9 | COMPULSORY REDEMPTIONS OF SHARES BY THE COMPANY | 8 |
| 10 | VARIATION OF CLASS RIGHTS | 8 |
| 11 | CLASS MEETINGS | 9 |
| 12 | TRUSTS | 9 |
| 13 | CERTIFICATES | 9 |
| 14 | LIEN | 9 |
| 15 | CALLS ON SHARES | 10 |
| 16 | FORFEITURE AND SURRENDER OF SHARES | 10 |
| 17 | REGISTER OF MEMBERS | 11 |
| 18 | TRANSFER AND TRANSMISSION OF SHARES | 11 |
| 19 | GENERAL MEETINGS | 14 |
| 20 | NOTICE OF GENERAL MEETINGS | 15 |
| 21 | PROCEEDINGS AT GENERAL MEETINGS | 16 |
| 22 | VOTES OF MEMBERS | 18 |
| 23 | PROXIES | 18 |
| 24 | WRITTEN RESOLUTIONS | 19 |
| 25 | NUMBER, APPOINTMENT AND QUALIFICATION OF DIRECTORS | 20 |
| 26 | REMUNERATION OF DIRECTORS | 20 |
| 27 | INDEMNITIES | 20 |
| 28 | REGISTERS OF DIRECTORS | 21 |
| 29 | ALTERNATE DIRECTORS | 22 |
| 30 | BORROWING POWERS OF THE BOARD | 22 |
| 31 | OTHER POWERS AND DUTIES OF THE BOARD | 22 |
| 32 | CONFLICTS OF INTEREST | 24 |
| 33 | DISQUALIFICATION OF DIRECTORS | 26 |
| 34 | PROCEEDINGS OF DIRECTORS | 26 |
| 35 | EXECUTIVE DIRECTORS | 27 |
| 36 | SECRETARY | 28 |
| 37 | THE SEAL | 28 |
| 38 | COMMON SIGNATURE | 28 |
| 39 | AUTHENTICATION OF DOCUMENTS | 28 |
| 40 | DIVIDENDS | 28 |
| 41 | RESERVES | 29 |
| 42 | CAPITALISATION OF PROFITS | 30 |
| 43 | ACCOUNTS AND REPORTS | 30 |

8017957/62469122/5

| 44 | AUDIT | 30 |
| 45 | NOTICES | 31 |
| 46 | WINDING UP | 31 |
| 47 | DISCLOSURE OF THIRD PARTY INTERESTS IN SHARES | 31 |
| 48 | SUSPENSION OF THE CALCULATION OF THE NET ASSET VALUE | 34 |

8017957/62469122/5

THE COMPANIES (GUERNSEY) LAW, 2008

COMPANY LIMITED BY SHARES

ARTICLES OF INCORPORATION

of

HIGHLAND CLO FUNDING, LTD.

(Adopted by special resolution passed on 15 November 2017)

1    **STANDARD ARTICLES**

The standard articles prescribed pursuant to Section 16(2) of the Law shall be excluded in their entirety.

2    **INTERPRETATION**

In these Articles the following words shall bear the following meanings if not inconsistent with the subject or context:-

| Words | Meanings |
|---|---|
| **accounts** | either individual accounts prepared in accordance with Section 243 of the Law or consolidated accounts prepared in accordance with Section 244 of the Law. |
| **Advisory Board** | has the meaning given to it in the Subscription and Transfer Agreement. |
| **Affiliate** | with respect to a person, (i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director, officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above.  For the purposes of this definition, control of a person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such persons or (ii) to direct or cause the direction of the management and policies of such person whether by contract or otherwise.   For purposes of this definition, the management of an account by one person for the benefit of any other person shall not constitute "control" of such other person and no entity shall be deemed an "Affiliate" of the Company solely because the administrator or its Affiliates serve as administrator or share trustee for such entity. |
| **Articles** | these articles of incorporation as now framed and at any time altered. |

| | |
|---|---|
| **at any time** | at any time or times and includes for the time being and from time to time. |
| **Auditors** | the auditors, if any, engaged in accordance with the Law and these Articles. |
| **Board** | the Directors at any time or the Directors present at a duly convened meeting at which a quorum is present. |
| **Calendar Year** | the period from 1 January to 31 December of a particular year. |
| **clear days** | in relation to the period of notice, that period excluding the day when notice is given or deemed to be given and the day for which it is given or on which it is to take effect. |

**Connected Person**

(a) a spouse, child (under the age of eighteen) or step child (under the age of eighteen) of a Member; or

(b) an associated body corporate which is a company in which a Member alone, or with Connected Persons, is directly or indirectly beneficially interested in 20 per cent. or more of the nominal value of the equity share capital or is entitled (alone or with Connected Persons) to exercise or control the exercise of more than 20 per cent. of the voting power at general meetings; or

(c) a trustee (acting in that capacity) of any trust, the beneficiaries of which include the Member or persons falling within paragraphs (a) or (b) above excluding trustees of an employees' share scheme or pension scheme; or

(d) a partner (acting in that capacity) of the Member or persons in categories (a) to (c) above.

| | |
|---|---|
| **Director** | a director of the Company and includes an alternate Director. |
| **dividend** | has the meaning given in the Law. |
| **ERISA** | United States Employee Retirement Income Security Act of 1974 as amended. |
| **Exchange Act** | the US Securities Exchange Act of 1934, as amended. |
| **executors** | includes administrators. |

**financial year**

(a) firstly, the period beginning on the date on which the Company was incorporated and ending within eighteen months of that date; and

(b) thereafter, the period beginning on the day after its previous financial year ended and ending within eighteen (18) months of that date;

as determined from time to time by the Board.

**incapable or of unsound mind** a Member in respect of whom an order has been made by any court or official having jurisdiction (whether in Guernsey or elsewhere) that he is or may be suffering

|  |  |
|---|---|
|  | from mental disorder or is otherwise incapable of running his affairs. |
| **Investment Company Act** | the US Investment Company Act of 1940, as amended. |
| **Liquidator** | includes joint liquidators. |
| **Member** | a registered holder of a share in the capital of the Company. |
| **Memorandum** | the memorandum of incorporation of the Company. |
| **Month** | calendar month. |
| **Net Asset Value** | the value of the assets of the Company or a class of shares of the Company, as the case may be, less its liabilities (including accrued but unpaid fees), determined by the Directors in their absolute discretion in accordance with the accounting principles adopted by the Directors. |
| **Net Asset Value per Share** | the Net Asset Value divided by the number of shares or Ordinary Shares (as appropriate) in issue at the relevant time. |
| **Offering Memorandum** | the offering memorandum issued by the Company from time to time for the purpose of issuing shares. |
| **Office** | the registered office at any time of the Company, which shall always be located in the Island of Guernsey. |
| **Ordinary resolution** | a resolution passed by a simple majority in accordance with Section 176 of the Law. |
| **Ordinary Shares** | Unclassified Shares of no par value in the capital of the Company issued and designated as ordinary shares and having the rights described in these Articles. |
| **Plan** | has the meaning given to it in Article 18.7. |
| **Portfolio Manager** | Highland HCF Advisor, Ltd. or such other portfolio manager engaged by the Company from time to time. |
| **Prohibited US Person** | has the meaning given to it in Article 18.7. |
| **Proxy** | includes attorney. |
| **Register** | the register of members kept pursuant to the Law. |
| **Regulation S** | the rules and regulations under Regulation S, as promulgated by the US Securities and Exchange Commission under the Securities Act. |
| **Seal** | the common seal of the Company. |
| **Secretary** | any person designated by the Board as such. |
| **Securities Act** | the US Securities Act of 1933, as amended. |
| **share** | a share of any class in the Company, as well as any fraction of a share. |

| | |
|---|---|
| **Members' Agreement** | the Shareholders' Agreement relating to the Company, dated as of 15 November 2017, entered into by and among CLO HoldCo, Ltd., HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., Highland Capital Management, L.P., Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker, III, Acct., Quest IRA, Inc., fbo Hunter Covitz, Acct., Quest IRA, Inc., fbo Jon Poglitsch, Acct., Quest IRA, Inc., fbo Neil Desai, Acct., the Company and the Portfolio Manager. |
| **Special resolution** | a resolution passed by a majority of not less than 75 per cent. in accordance with Section 178 of the Law. |
| **Subscription and Transfer Agreement** | the Subscription and Transfer Agreement, dated as of 15 November 2017, entered into by and among the Company, the Portfolio Manager, CLO HoldCo, Ltd., HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., Highland Capital Management, L.P., Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker, III, Acct., Quest IRA, Inc., fbo Hunter Covitz, Acct., Quest IRA, Inc., fbo Jon Poglitsch, Acct. and Quest IRA, Inc., fbo Neil Desai, Acct. |
| **the Law** | The Companies (Guernsey) Law, 2008 as amended, extended or replaced and any Ordinance, statutory instrument or regulation made thereunder and references to sections thereof shall refer to such sections as amended or renumbered from time to time. |
| **Triggering Event** | a finding by any court or governmental body of competent jurisdiction in a final, non-appealable judgment that the commission by such person of an action, or the omission by such person to take an action, constitutes bad faith, gross negligence or wilful misconduct. |
| **Unclassified Share** | an unclassified share of no par value in the authorised capital of the Company (and, where the context permits, fractions of such unclassified shares) available for issue and designated as an Ordinary Share or otherwise and issued on such terms and conditions as the Directors may determine from time to time. |
| **United States or US** | the United States of America, its territories and possessions, any state of the United States and the District of Colombia. |
| **US dollars** | the lawful currency of the United States. |
| **US Internal Revenue Code** | the US Internal Revenue Code of 1986, as amended. |
| **US Person** | a person who is either (a) a "US person" within the meaning of Regulation S, or (b) not a "Non-United States person" within the meaning of the United States Commodity Futures Trading Commission Rule 4.7(a)(I)(iv). |

8017957/62469122/15                                                                                                4

| | |
|---|---|
| **US Plan Assets Regulations** | the regulations promulgated by the U.S. Department of Labor at 29 CFR 2510.3-101, as modified by section 3(42) of ERISA. |
| **unanimous resolution** | a resolution agreed to by every Member of the Company in accordance with Section 180 of the Law. |
| **waiver resolution** | a resolution passed by a majority of not less than 90 per cent. in accordance with Section 179 of the Law. |
| **Working Day** | a day which is not a Saturday, a Sunday, Christmas Day or Good Friday or a day appointed as a public holiday by Ordinance of the States of Guernsey. |

Any reference to a **share** of the Company shall, where the Board has resolved to allot and issue fractions of shares, include such fractions.

The singular includes the plural and vice versa.

The masculine includes the feminine.

Words importing persons include corporations.

Expressions referring to writing include any legible mode of representing or reproducing words.

Subject to the above, any words defined in the Law shall, if not inconsistent with the subject or context, bear the same meaning in these Articles.

In the event of any conflict between these Articles and the mandatory provisions of the Law, the latter shall prevail.

Where a Section of the Law is referred to and that Section is amended or renumbered or supplemented, then the reference shall be deemed to refer to the same Section as amended, renumbered or supplemented.

Where an ordinary resolution is expressed to be required for any purpose, a special resolution is also effective for that purpose.

3    **AMENDMENTS**

The Company's Memorandum and Articles of Incorporation may be amended in accordance with Part IV of the Law.

4    **BUSINESS**

Subject to compliance with the Offering Memorandum, any branch or kind of business which, by the Memorandum or by these Articles, is, either expressly or impliedly, authorised to be undertaken may be undertaken or suspended at any time by the Board.

5    **SHARE CAPITAL**

5.1    The Company may issue an unlimited number of shares, including Unclassified Shares which may be designated and issued as Ordinary Shares or otherwise as the Directors may from time to time determine.

**Ordinary Shares**

5.1.1    The rights attaching to the Ordinary Shares shall be as follows:-

(a)    As to income – subject to the rights of any Ordinary Shares which may be issued with special rights or privileges, the Ordinary Shares of each class carry the right to receive all income of the Company

8017957/62469122/15                                                                                   5

attributable to the Ordinary Shares, and to participate in any distribution of such income by the Company, pro rata to the relative Net Asset Values of each of the classes of Ordinary Shares and, within each such class, income shall be divided pari passu amongst the holders of Ordinary Shares of that class in proportion to the number of Ordinary Shares of such class held by them.

(b) As to capital – on a winding up of the Company or other return of capital (other than by way of a repurchase or redemption of Ordinary Shares in accordance with the provision of these Articles and the Law), the surplus assets of the Company attributable to the Ordinary Shares remaining after payment of all creditors shall, subject to the rights of any Ordinary Shares that may be issued with special rights or privileges, be divided amongst the holders of Ordinary Shares of each class pro rata to the relative Net Asset Values of each of the classes of the Ordinary Shares and, within each such class, such assets shall be divided pari passu amongst the holders of Ordinary Shares of that class in proportion to the number of Ordinary Shares of that class held by them.

(c) As to voting – the holders of the Ordinary Shares shall be entitled to receive notice of and to attend, speak and vote (in accordance with Article 22) at general meetings of the Company.

**General**

5.2 Without prejudice to any special rights previously conferred on the holders of any existing shares or class of shares, any share (or option, warrant or other right in respect of a share) in the Company may be issued with such preferred, deferred or other special rights or restrictions, whether as to dividend, voting, return of capital or otherwise, as the Board may determine.

6 **ISSUE OF SHARES**

6.1 Subject to Article 7, the unissued shares shall be at the disposal of the Board which is authorised to allot, grant options, warrants or other rights over or otherwise dispose of them to such persons on such terms and conditions and at such times as the Board determines but so that no share shall be issued at a discount except in accordance with the Law and so that the amount payable on application on each share shall be fixed by the Board.

6.2 Subject to the provisions of the Law and these Articles:-

6.2.1 any shares may with the sanction of the Board be issued on terms that they are, or at the option of the Company or the holder are, liable to be redeemed on such terms and in such manner as the Board may determine;

6.2.2 the Company and any of its subsidiary companies may, at the discretion of the Board, give financial assistance directly or indirectly for the purpose of or in connection with the acquisition of shares in the Company or in connection with reducing or discharging any liability incurred in connection with the purchase of shares in the Company;

6.2.3 fractions of shares may be issued or purchased by the Company; and

6.2.4 the Company may issue shares of no par value or shares with a par value or a combination of both.

7 **OFFERS TO SHAREHOLDERS TO BE ON A PRE-EMPTIVE BASIS**

7.1 In this Article 7:

8017957/62469122/15

6

      7.1.1      **equity shares** means shares in the Company excluding shares which, neither as respects dividends nor as respects capital, carries any right to participate beyond a specified amount in a distribution;

      7.1.2      **equity securities** means (i) equity securities; or (ii) rights to subscribe for, or to convert securities into, equity securities;

      7.1.3      references to the allotment of equity securities includes; (i) the grant of a right to subscribe for, or to convert any securities into, equity shares (but excludes the allotment of equity shares pursuant to the exercise of such a right); and (ii) the sale of equity shares in the Company that immediately before the sale are held by the Company as treasury shares.

7.2      The Company shall not allot equity securities to a person on any terms unless:

      7.2.1      it has made an offer to each person who holds equity securities of the same class in the Company to allot to him on the same or more favourable terms a proportion of those securities that is as nearly as practicable equal to the proportion in number held by him of the share capital of the Company; and

      7.2.2      the period during which any such offer may be accepted has expired or the Company has received notice of the acceptance or refusal of every offer so made.

7.3      Securities that the Company has offered to allot to a holder of equity securities in accordance with Article 7.2 may be allotted to him, or anyone in whose favour he has renounced his right to their allotment, without contravening Article 7.2.

7.4      Shares held by the Company as treasury shares shall be disregarded for the purposes of Article 7.2, so that the Company is not treated as a person who holds equity shares; and the treasury shares are not treated as forming part of the equity share capital of the Company.

7.5      Any offer required to be made by the Company pursuant to Article 7.2 should be made by a notice (given in accordance with Article 45) and such offer must state a period during which such offer may be accepted and such offer shall not be withdrawn before the end of that period. Such period must be a period of at least 21 days beginning on the date on which such offer is deemed to be delivered or received (as the case may be) pursuant to Article 45.

7.6      Article 7.2 shall not apply in relation to the allotment of bonus shares, nor to a particular allotment of equity securities if these are, or are to be, wholly or partly paid otherwise than in cash.

7.7      The Company may by special resolution resolve that Article 7.2 shall be excluded or that such Article shall apply with such modifications as may be specified in the resolution:

      7.7.1      generally in relation to the allotment by the Company of equity securities;

      7.7.2      in relation to allotments of a particular description; or

      7.7.3      in relation to a specified allotment of equity securities;

and any such resolution must: (i) state the maximum number of equity securities in respect of which Article 7.2 is excluded or modified (which may, for the avoidance of doubt, be an unlimited number); and (ii) specify the date on which such exclusion or modifications will expire, which must be not more than five years from the date on which the resolution is passed.

7.8      Any resolution passed pursuant to Article 7.7 may:

7.8.1      be renewed or further renewed by special resolution of the Company for a further period not exceeding five years; and

7.8.2      be revoked or varied at any time by special resolution of the Company.

7.9      Notwithstanding that any such resolution referred to in Article 7.7 or 7.8 has expired, the directors may allot equity securities in pursuance of an offer or agreement previously made by the Company if the resolution enabled the Company to make an offer or agreement that would or might require equity securities to be allotted after it expired.

7.10      In this Article 7, in relation to an offer to allot securities a reference (however expressed) to the holder of shares of any description is to whoever was the holder of shares of that description at the close of business on a date to be specified in the offer and the specified date must fall within the period of 28 days immediately before the date of the offer.

## 8      REPURCHASE OF SHARES

8.1      The Company may, at the discretion of the Board, purchase any of its own shares, whether or not they are redeemable, and may pay the purchase price in respect of such purchase to the fullest extent permitted by the Law.

8.2      Shares repurchased by the Company may be held as treasury shares and dealt with by the Directors to the fullest extent permitted by the Law.

## 9      COMPULSORY REDEMPTIONS OF SHARES BY THE COMPANY

9.1      The Company may redeem all or any of the shares at any time subject to and in accordance with the provisions of the Members' Agreement and this Article 9.

9.2      A Director is authorised to do all such acts and things as shall be necessary or expedient and to execute any documents deemed necessary or desirable in each case to complete any redemption of shares subject to and in accordance with the Members' Agreement and these Articles.

9.3      The redemption of shares under these Articles shall be deemed to be effective from the close of business on the relevant redemption date at which time any shares which are so redeemed shall forthwith be cancelled and the name of the relevant Member(s) be removed from the Register. Upon the redemption of a share being effected pursuant to the Members' Agreement and these Articles, a Member shall cease to be entitled to any rights in respect thereof save for payment of the redemption proceeds.

## 10      VARIATION OF CLASS RIGHTS

10.1      If at any time the share capital is divided into different classes of shares, the rights attached to any class (unless otherwise provided by the terms of issue) may, whether or not the Company is being wound up, be varied with the consent in writing of the holders of three-fourths of the issued shares of that class or with the sanction of a special resolution of the holders of the shares of that class.

10.2      The quorum for a variation of class rights meeting is:-

10.2.1      for a meeting other than an adjourned meeting, two (2) persons present holding at least one third of the voting rights of the class in question;

10.2.2      for an adjourned meeting, one (1) person holding shares of the class in question; or

10.2.3      where the class has only one Member, that Member.

10.3      For the purposes of Article 10.2 above, where a person is present by proxy or proxies, he is treated as holding only the shares in respect of which the proxies are authorised to exercise voting rights.

8017957/62469122/15      8

10.4    At a variation of class rights meeting, any holder of shares of the class in question present may demand a poll.

10.5    For the purposes of this Article:-

    10.5.1    any alteration of a provision contained in these Articles for the variation of rights attached to a class of shares, or the insertion of any such provision into the Articles, is itself to be treated as a variation of those rights; and

    10.5.2    references to the variation of rights attached to a class of shares include references to their abrogation.

10.6    The rights conferred upon the holders of the shares of any class issued with preferred or other rights shall not (unless otherwise expressly provided by the terms of issue of the shares of that class) be deemed to be varied by the creation or issue of further shares ranking pari passu therewith.

## 11    CLASS MEETINGS

Subject as aforesaid in the case of a variation of class rights, when the share capital is divided into different classes of shares, Articles 19 through and including 24 shall apply mutatis mutandis to any class meeting and to the voting on any matter by the Members of any such class.

## 12    TRUSTS

12.1    Without prejudice to Part XXIX of the Law, except as ordered by a court of competent jurisdiction or as required by law, the Company shall not be affected or bound by or be compelled in any way to recognise (even when having notice) any equitable, contingent, future or partial interest in any share or fraction or (except only as by these Articles or by law otherwise provided) or any other rights in respect of any share except an absolute right to the entirety thereof in the registered holder and whether or not such share shall be entered in the Register as held in trust, nor shall the Company be bound to see to the execution of any trust to which any share may be subject.

## 13    CERTIFICATES

13.1    The Directors shall be under no obligation to issue share certificates unless a Member shall so request.

13.2    If a share certificate is issued and is defaced, worn out, lost or destroyed it may be renewed on such terms (if any) as to evidence and indemnity and payment of the expenses reasonably incurred by the Company as the Directors may determine, and (in the case of defacement or wearing out) upon delivery up of the old certificate.

13.3    All forms of certificate for shares or debentures or representing any other form of security (other than letters of allotment, scrip certificates and other like documents) shall be issued and may, if determined by the Board, be issued under the Seal of the Company and shall be signed autographically unless there shall be in force a resolution of the Board adopting some method of mechanical signature in which event the signatures (if authorised by such resolution) may be effected by the method so adopted.

13.4    In respect of a share held jointly, the Company shall not be bound to issue more than one certificate and delivery of a certificate for a share to one of several joint holders shall be sufficient delivery to all such holders.

## 14    LIEN

14.1    The Company shall have a first and paramount lien (extending to all dividends payable) on all shares (not being fully paid) for all monies, whether presently payable or not, called or payable at a fixed time in respect of those shares and for all the debts and liabilities of the holder to the Company and that whether the same shall have been incurred before or after

notice to the Company of any equitable or other interest of any person (other than such holder) and whether the time for payment or discharge shall have arrived or not and notwithstanding that the same are joint debts or liabilities of such holder and any other person (whether a Member of the Company or not).

14.2 The Company may sell as the Board thinks fit any shares on which the Company has a lien but no sale shall be made unless a sum in respect of which the lien exists is presently payable nor until after a notice in writing demanding payment has been given to the holder of the shares.

14.3 To give effect to any sale, the Board may authorise some person to transfer the shares sold to the purchaser who shall be registered as the holder of the shares comprised in any such transfer and who shall not be bound to see to the application of the purchase money nor shall his title to the shares be affected by any irregularity or invalidity in the proceedings.

## 15 CALLS ON SHARES

15.1 The Board may at any time make on at least fourteen (14) clear days' notice calls upon the Members in respect of any monies unpaid on their shares (whether on account of the nominal value or by way of premium and not by the conditions of allotment made payable at fixed times) and each Member shall pay to the Company at the time and place appointed the amount called. A call may be revoked or postponed.

15.2 Joint holders shall be jointly and severally liable to pay calls.

15.3 If a sum called in respect of a share is not paid before or on the day appointed, the person from whom the sum is due shall pay interest from the day appointed to the time of actual payment at such rate as the Board may determine.

15.4 Any sum which by the terms of issue of a share becomes payable on allotment or at any fixed date shall, for the purposes of these Articles, be deemed to be a call duly made and payable on the date on which by the terms of issue the same becomes payable and, in the case of non-payment, all the relevant provisions of these Articles as to payment of interest and expenses forfeiture or otherwise shall apply as if such sum had become payable by virtue of a call duly made and notified.

15.5 The Board may on an issue of shares differentiate between holders as to amount of calls and times of payment.

## 16 FORFEITURE AND SURRENDER OF SHARES

16.1 If a Member fails to pay any call or instalment on the day appointed, the Board may, at any time during such period as any part remains unpaid, serve notice requiring payment of so much of the call or instalment as is unpaid together with any interest which may have accrued and any expenses which may have been incurred by the Company by reason of non-payment.

16.2 The notice shall state a further day at least fourteen (14) clear days after the date of the notice on or before which the payment required by the notice is to be made and the place where the payment is to be made and that in the event of non-payment the shares in respect of which the call was made or instalment is payable will be liable to be forfeited. If the requirements of any such notice are not complied with, any share in respect of which the notice has been given may, at any time before payment has been made, be forfeited by a resolution of the Board to that effect. Such forfeiture shall include all dividends declared in respect of the forfeited share and not actually paid before the forfeiture.

16.3 Notice of forfeiture shall forthwith be given to the former holder and an entry of such notice and forfeiture shall forthwith be made and dated in the Register opposite the entry of the share; but no forfeiture shall be in any manner invalidated by any omission or neglect to give notice or to make entry.

8017957/62469122/15

16.4 A forfeited share shall be deemed to be the property of the Company and may be sold, re-allotted or otherwise disposed of on such terms as the Board shall think fit, with or without all or any part of the amount previously paid on the share being credited as paid, and, at any time before a sale or disposition, the forfeiture may be cancelled.

16.5 A person whose shares have been forfeited shall cease to be a Member in respect of those shares but shall remain liable to pay to the Company all monies which, at the date of forfeiture, were payable in respect of the shares with interest at such rate as the Board may determine. The Board may enforce payment without any allowance for the value of the shares at the time of forfeiture.

16.6 The forfeiture of a share shall extinguish all interest in and all claims and demands against the Company in respect of the share and all other rights and liabilities incidental to the share as between the holder and the Company.

16.7 The Board may accept from any Member on such terms as shall be agreed a surrender of any shares in respect of which there is a liability for calls. Any surrendered share may be disposed of in the same manner as a forfeited share.

16.8 A declaration in writing by a Director or the Secretary that a share has been duly forfeited or surrendered on the date stated in the declaration shall be conclusive evidence of the facts therein as against all persons claiming to be entitled to the shares.

16.9 The Company may receive the consideration given for any share on any sale or disposition and may execute a transfer of the share in favour of the person to whom the same is sold or disposed of and he shall thereupon be registered as the holder and shall not be bound to see to the application of the purchase money nor shall his title be affected by any irregularity or invalidity in forfeiture sale re-allotment or disposal.

16.10 A forfeited share will be deemed to be the property of the Company and may be sold, re-allotted or otherwise disposed of on such terms as the Board thinks fit, including (if applicable) with or without all or any part of the amount previously paid on the share being credited as paid. At any time before such a sale or disposition the forfeiture process may be cancelled. No proceeds of any forfeiture will be paid to any person whose shares have been forfeited.

16.11 The Board may, save only as may be necessary to comply with the provisions of the Law, vary or amend the terms of any calls made, to include waiving or forgiving any amounts due under a call or extending the period by which a call must be satisfied in each case on such terms or conditions as the Board may determine.

17 **REGISTER OF MEMBERS**

17.1 The Company shall keep the Register and index of Members in accordance with Sections 123-128 of the Law and allow inspection in accordance with Sections 127-128 of the Law. The Company may delegate the maintenance of its Register and index of Members upon such terms as the Board may think fit. In the absence of manifest error, the Register shall be conclusive evidence as to the persons entitled to the shares entered therein.

17.2 Each Member shall inform the Company by means of a notice addressed to the Office of any change in his address and immediately after receipt of that notice the entry of the address of that Member in the Register shall be altered in conformity with the notice given.

17.3 The Register may be closed during such periods as the Board thinks fit not exceeding in all thirty (30) days in any year.

18 **TRANSFER AND TRANSMISSION OF SHARES**

18.1 No Member shall sell, pledge, charge, mortgage, assign, assign by way of security, transfer, convey, exchange or otherwise dispose of its shares or its commitment to settle purchases of shares under the Subscription and Transfer Agreement (each a **Transfer**), other than to an Affiliate of an initial Member party hereto, without the prior written consent of the Portfolio

8017957/62469122/15                                                                                          11

Manager, which consent shall be in the sole discretion of the Portfolio Manager; provided that no such Transfer shall be made unless in the opinion of counsel reasonably satisfactory to the Portfolio Manager (who may be counsel for the Company, and which requirement for an opinion may be waived, in whole or in part, in the sole discretion of the Portfolio Manager) that:

18.1.1     such Transfer would not require registration under the Securities Act or any state securities or "Blue Sky" laws or other laws applicable to the Shares to be assigned or transferred and is conducted in conformance with the restrictions set forth in the Offering Memorandum;

18.1.2     such Transfer would not be reasonably likely to cause the Company to be subject to tax in any jurisdiction other than of its incorporation on a net income basis, not be reasonably likely to cause the Company to become subject to registration as an investment company under the Investment Company Act of 1940, as amended;

18.1.3     such Transfer would not cause the Company to considered to be an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" in such entity pursuant to the US Plan Assets Regulations; and

18.1.4     such sale, assignment, disposition or transfer would not to cause all or any portion of the assets of the Company to constitute "plan assets" under ERISA or the US Internal Revenue Code.

18.2     Prior to making any Transfer of shares (other than Transfers to Affiliates of an initial Member or, in the case of CLO Holdco or a Highland Principal (as defined in the Members' Agreement), to Highland (as defined in the Offering Memorandum), its Affiliates or another Highland Principal) a Member must first offer to the other Members a right to purchase the shares, on a pro rata basis with respect to their current shares, at the same price (which must be cash) as such shares are proposed to be purchased by the prospective third party purchaser pursuant to an irrevocable offer letter. The other Members will have 30 days following receipt of the letter to determine whether to purchase their entire pro rata portion of the shares proposed to be Transferred. If the other Members do not accept the offer, the Member may (subject to complying with the other Transfer restrictions in these Articles) Transfer the applicable shares that such Members have not elected to purchase to a third party at a price equal to or greater than the price described in the offer letter, provided that if the Member has not (a) entered into a definitive agreement to effect such sale within 90 days after the expiration of the period that the other Members have to accept the offer in the offer letter or (b) consummated the sale within 120 day after the entry into the definitive agreement to consummate the sale, it must comply with these right of first refusal procedures again. Any Member (other than the Member proposing to Transfer its shares) may assign its right to purchase its pro rata portion of the shares to any other Member (subject to complying with the other Transfer restrictions in these Articles), any initial Member (other than the Member proposing to Transfer its shares) may assign its right to purchase its pro rata portion of the shares to an Affiliate (subject to complying with the other Transfer restrictions in these Articles), and CLO Holdco or the Highland Principals (unless such Member is the Member proposing the Transfer its shares) may assign its right to purchase its pro rata portion of the shares to Highland, an Affiliate of Highland or other Highland Principals (subject to complying with the other Transfer restrictions in these Articles).

18.3     Subject to Articles 18.1 and 18.2, and such of the restrictions of these Articles as may be applicable:

18.3.1     any Member may transfer all or any of his certificated shares by an instrument of transfer in any usual or common form or in any other form which the Board may approve; and

18.3.2     an instrument of transfer of a certificated share shall be signed by or on behalf of the transferor and, unless the share is fully paid, by or on behalf of the transferee. An instrument of transfer of a certificated share need not be under seal.

18.4 Every instrument of transfer of a certificated share shall be left at the Office or such other place as the Board may prescribe with the certificate of every share to be transferred and such other evidence as the Board may reasonably require to prove the title of the transferor or his right to transfer the shares, and the transfer and certificate (if any) shall remain in the custody of the Board but shall be at all reasonable times produced at the request and expense of the transferor or transferee or their respective representatives. A new certificate shall be delivered free of charge to the transferee after the transfer is completed and registered on his application and when necessary a balance certificate shall be delivered if required by him in writing.

18.5 The Board may, in its absolute discretion and without giving a reason, decline to transfer, convert or register any transfer of any share in certificated form which is not fully paid or on which the Company has a lien. In addition, the directors may refuse to register a transfer of shares unless:

18.5.1 it is in respect of only one class of shares;

18.5.2 it is in favour of a single transferee or not more than four joint transferees; and

18.5.3 in the case of a share in certificated form, having been delivered for registration to the Office or such other place as the Board may decide, it is accompanied by the certificate(s) for the shares to which it relates and such other evidence as the Board may reasonably require to prove title of the transferor and the due execution by him of the transfer or, if the transfer is executed by some other person on his behalf, the authority of that person to do so.

18.6 The Board may, in its absolute discretion, decline to register a transfer of any shares to any person whose ownership may result in a person holding shares in violation of the transfer restrictions put forth in any prospectus published by the Company, from time to time.

18.7 The Directors may, in their absolute discretion, refuse to register a transfer of any shares to a person that they have reason to believe is (i) an **employee benefit plan** (within the meaning of Section 3(3) of ERISA) that is subject to Part 4 of Title 1 of ERISA, (ii) a plan, individual retirement account or other arrangement that is subject to Section 4975 of the US Internal Revenue Code or any other state, local laws or regulations that would have the same effect as regulations promulgated under ERISA by the US Department of Labor and codified at 29 C.F.R. Section 2510.3-101 to cause the underlying assets of the Company to be treated as assets of that investing entity by virtue of its investment (or any beneficial interest) in the Company and thereby subject the Company and the Portfolio Manager (or other persons responsible for the investment and operation of the Company's assets) to laws or regulations that are similar to the fiduciary responsibility or prohibited transaction provisions contained in Title I of ERISA or Section 4975 of the US Internal Revenue Code, or (iii) an entity whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each of (i), (ii) and (iii), a **Plan**) or (iv) any person in circumstances where the holding of shares by such person would (a) give rise to an obligation on the Company to register as an "investment company" under the Investment Company Act (including because the holder of the shares is not a "qualified purchaser" as defined in the Investment Company Act); (b) preclude the Company from relying on the exception to the definition of **investment company** contained in Section 3(c)(7) of the Investment Company Act; (c) give rise to an obligation on the Company to register under the Exchange Act, the Securities Act or any similar legislation; (d) result in the Company not being considered a **Foreign Private Issuer** as that term is defined by Rule 3b-4(c) promulgated under the Exchange Act; (e) give rise to an obligation on the Portfolio Manager to register as a commodity pool operator or commodity trading advisor under the US Commodity Exchange Act of 1974, as amended; (f) cause the Company to be a "controlled foreign corporation" for the purposes of the US Tax Code, or cause the Company to suffer any pecuniary disadvantage (including any excise tax, penalties or liabilities under ERISA or the US Tax Code); or (g) give rise to the Company or the Portfolio Manager becoming subject to any US law or regulation determined to be detrimental to it (each such person in this Article 18.7, a **Prohibited US Person**). Each person acquiring shares shall by virtue of such

8017957/62469122/15

13

acquisition be deemed to have represented to the Company that they are not a Prohibited US Person.

18.8    If any shares are owned directly or beneficially by a person believed by the Board to be a Prohibited US Person, the Board may give notice to such person requiring them either (i) to provide the Board within 30 days of receipt of such notice with sufficient satisfactory documentary evidence to satisfy the Board that such person is not a Prohibited US Person or (ii) to sell or transfer their shares to a person qualified to own the same within 30 days and within such 30 days to provide the Board with satisfactory evidence of such sale or transfer. Where condition (i) or (ii) is not satisfied within 30 days after the serving of the notice, the person will be deemed, upon the expiration of such 30 days, to have forfeited their shares.

18.9    If the Board refuses to register the transfer of a share it shall, within two months after the date on which the transfer was lodged with the Company, send notice of the refusal to the transferee.

18.10   The registration of transfers may be suspended at such times and for such periods (not exceeding 30 days in the aggregate in any one Calendar Year) as the Board may decide on giving notice in La Gazette Officielle and either generally or in respect of a particular class of share.

18.11   No fee shall be payable to the Company in respect of the registration of any transfer, probate, letters of administration, certificate of marriage or death, power of attorney, instruction or other document relating to or affecting the title to any shares.

18.12   On the death of a Member, the survivors where the deceased was a joint holder and the executor or administrator of the deceased where he was a sole holder shall be the only persons recognised by the Company as having any title to or interest in his shares; but nothing herein shall release the estate of a deceased joint holder from any liability in respect of any share jointly held.

18.13   A person so becoming entitled to a share in consequence of the death, bankruptcy or incapacity or otherwise by operation of law (subject as hereinafter provided), upon supplying to the Company such evidence as the Board may reasonably require to show his title to the share, of a Member shall have the right to receive and may give a discharge for all dividends and other money payable or other advantages due on or in respect of the share, but he shall not be entitled to receive notice of or to attend or vote at meetings of the Company, or save as aforesaid, to any of the rights or privileges of a Member unless and until he shall be registered as a Member in respect of the share **PROVIDED ALWAYS THAT** the Board may at any time give notice requiring any such person to elect either to be registered himself or to transfer the share and if the notice is not complied with within ninety (90) days the Board may thereafter withhold all dividends or other monies payable or other advantages due in respect of the share until the requirements of the notice have been complied with.

18.14   Nothing in these Articles shall preclude the Board from recognising the renunciation of the allotment of any share by the allottee in favour of some other person.

19    **GENERAL MEETINGS**

19.1    The first general meeting of the Company shall be held within eighteen (18) months of the date of incorporation as required by the Law and thereafter general meetings shall be held once at least in each subsequent Calendar Year in accordance with Section 199 of the Law but so that not more than fifteen (15) months may elapse between one annual general meeting and the next. At each such annual general meeting shall be laid copies of the Company's most recent accounts, Directors' report and, if applicable, the auditor's report in accordance with Section 252 of the Law.  The requirement for an annual general meeting may be waived by the Members in accordance with Section 201 of the Law.  Other meetings of the Company shall be called extraordinary general meetings.

19.2    All general meetings shall be held in Guernsey.

19.3    A Member participating by video link or telephone conference call or other electronic or telephonic means of communication in a meeting at which a quorum is present shall be treated as having attended that meeting provided that the Members present at the meeting can hear and speak to the participating Member.

19.4    A video link or telephone conference call or other electronic or telephonic means of communication in which a quorum of Members participates and all participants can hear and speak to each other shall be a valid meeting which shall be deemed to take place where the Chairman is present unless the Members resolve otherwise.

19.5    Any general meeting convened by the Board, unless its time shall have been fixed by the Company in general meeting or unless convened in pursuance of a requisition, may be postponed by the Board by notice in writing and the meeting shall, subject to any further postponement or adjournment, be held at the postponed date for the purpose of transacting the business covered by the original notice.

19.6    The Board may, whenever it thinks fit, and shall on the requisition of Members who hold more than ten percent (10%) of such of the capital of the Company as carries the right to vote at general meetings (excluding any capital held as treasury shares) in accordance with Sections 203 and 204 of the Law proceed to convene a general meeting.

20    **NOTICE OF GENERAL MEETINGS**

20.1    A general meeting of the Company (other than an adjourned meeting) must be called by notice of at least fourteen (14) clear days.

20.2    A general meeting may be called by shorter notice than otherwise required if all the Members entitled to attend and vote so agree.

20.3    Notices and other documents may be sent in electronic form or published on a website in accordance with Section 208 of the Law.

20.4    Notice of a general meeting of the Company must be sent to:-

        20.4.1        every Member entitled to attend and vote thereat;

        20.4.2        every Director; and

        20.4.3        every Alternate Director registered as such.

20.5    In Article 20.4, the reference to Members includes only persons registered as a Member.

20.6    Notice of a general meeting of a company must:-

        20.6.1        state the time and date of the meeting;

        20.6.2        state the place of the meeting;

        20.6.3        specify any special business to be put to the meeting (as defined in Article 21.1);

        20.6.4        contain the information required under Section 178(6)(a) of the Law in respect of a resolution which is to be proposed as a special resolution at the meeting;

        20.6.5        contain the information required under Section 179(6)(a) of the Law in respect of a resolution which is to be proposed as a waiver resolution at the meeting; and

20.6.6         contain the information required under Section 180(3)(a) of the Law in respect of a resolution which is to be proposed as a unanimous resolution at the meeting.

20.7    Notice of a general meeting must state the general nature of the business to be dealt with at the meeting.

20.8    Where, by any provision of the Law, special notice is required of a resolution, the resolution is not effective unless notice of the intention to move it has been given to the Company at least twenty-eight (28) clear days before the date of the meeting at which it is moved.

20.9    The Company must, where practicable, give its Members entitled to vote thereon notice of any such resolution in the same manner and at the same time as it gives notice of the meeting.

20.10    Where that is not practicable, the Company must give its Members entitled to vote thereon notice at least fourteen (14) clear days before the meeting:-

20.10.1       by notice in La Gazette Officielle, or

20.10.2       in any other manner deemed appropriate by the Board.

20.11    If, after notice of the intention to move such a resolution has been given to the Company, a meeting is called for a date twenty-eight (28) clear days or less after the notice has been given, the notice is deemed to have been properly given, though not given within the time required.

20.12    In every notice calling a meeting of the Company there must appear a statement informing the Member of:-

20.12.1       his rights to appoint a proxy under these Articles and Section 222 of the Law; and

20.12.2       the right to appoint more than one proxy.

20.13    The accidental omission to give notice of any meeting to or the non-receipt of such notice by any Member shall not invalidate any resolution or any proposed resolution otherwise duly approved.

## 21    PROCEEDINGS AT GENERAL MEETINGS

21.1    The ordinary business of a general meeting shall be to receive and consider the profit and loss account and the balance sheet of the Company and the reports (if required) of the Directors and the Auditors, if any, to elect or re-elect Directors and appoint Auditors in the place of those retiring, to fix the remuneration of the Directors and Auditors, to sanction or declare dividends (if required by these Articles) and to transact any other ordinary business which ought to be transacted at such meeting. All other business shall be deemed special and shall be subject to notice as hereinbefore provided.

21.2    The quorum for a general meeting shall be one or more Members present in person or by proxy and holding 75% or more of the voting rights of the outstanding shares of the Company.

21.3    If, within half an hour after the time appointed for the meeting, a quorum is not present, the meeting, if convened by or upon a requisition, shall be dissolved. If otherwise convened, it shall stand adjourned for fourteen (14) clear days at the same time and place (or if that day is not a business day in the location of the meeting, to the next business day) or to such other day, time or place as the Board may determine and (subject to Article 21.8) no notice of adjournment need be given. The quorum at any such adjourned meeting shall be such Member or Members who shall attend in person or by proxy.

21.4    The chairman of any general meeting shall be either:-

8017957/62469122/15                                                        16

21.4.1     the chairman of the Board;

21.4.2     in the absence of the chairman of the Board, or if the Board has no chairman, then the Board shall nominate one of their number to preside as chairman;

21.4.3     if neither the chairman of the Board nor the nominated Director is present at the meeting, then the Directors present at the meeting shall elect one of their number to be the chairman,

21.4.4     if only one Director is present at the meeting, then he shall be chairman of the general meeting; or

21.4.5     if no Directors are present at the meeting, then the Members present shall elect a chairman of the meeting by an ordinary resolution.

21.5     The chairman of the general meeting shall conduct the meeting in such a manner as, subject to the Law, he thinks fit and may adjourn the meeting from time to time and limit the time for Members to speak.

21.6     The Board may determine in respect of any general meeting or meetings or generally that a list of the names and addresses of the Members shall not be made available for inspection.

21.7     A Director of the Company shall be entitled to attend and speak at any general meeting and at any separate meeting of the holders of any class of shares in the Company regardless of whether that Director is a Member of the Company or a holder of the relevant class of shares.

21.8     The chairman may, with the consent of any meeting at which a quorum is present, and shall if so directed by the meeting, adjourn the meeting to any time and to any place. When a meeting is adjourned for more than fourteen (14) clear days or where business other than the business left unfinished at the meeting from which the adjournment took place is to be put to the adjourned meeting, notice of the adjourned meeting shall be given as in the case of an original meeting. Save as aforesaid it shall not be necessary to give any notice of an adjournment or of the business to be transacted at an adjourned meeting.

21.9     At any meeting, a resolution put to the vote shall be decided by a show of hands or by a poll at the option of the chairman. Nevertheless before or on the declaration of the result a poll may be demanded:-

21.9.1     by the chairman; or

21.9.2     by not less than five (5) Members having the right to vote on the resolution; or

21.9.3     by a Member or Members representing not less than ten (10) per cent. of the total voting rights of all Members having the right to vote on the resolution.

21.10     The demand for a poll may be withdrawn.

21.11     Unless a poll is demanded, a declaration by the chairman that a resolution has on a show of hands been carried or carried unanimously or by a particular majority or lost and an entry to that effect in the minute book, shall be conclusive evidence of the fact without proof of the number or proportion of the votes recorded.

21.12     A poll, if demanded, shall be taken at the meeting at which the same is demanded or at such other time and place as the chairman shall direct and the result shall be deemed the resolution of the meeting.

21.13     The demand for a poll shall not prevent the continuance of a meeting for the transaction of any business other than the question on which a poll has been demanded.

21.14  If a poll shall be duly demanded on the election of a chairman or on any question of adjournment, it shall be taken at once.

21.15  In case of an equality of votes on a poll, the chairman shall have a second or casting vote.

22  **VOTES OF MEMBERS**

22.1  On a show of hands, every Member present in person or by proxy shall have one vote subject to any special voting powers or restrictions.

22.2  On a poll, every Member present in person or by proxy shall have one vote for each share held by him subject to any special voting powers or restrictions.

22.3  Where there are joint registered holders of any shares, such persons shall not have the right of voting individually in respect of such share but shall elect one of their number to represent them and to vote whether in person or by proxy in their name. In default of such election the person whose name stands first on the Register shall alone be entitled to vote.

22.4  Any Member, being incapable or of unsound mind, may vote by his curator or other legal guardian. Any of such persons may vote either personally or by proxy.

22.5  On a poll, votes may be given either personally or by proxy and a Member entitled to more than one vote need not use all his votes or cast all the votes he uses in the same way. A proxy need not be a Member. An instrument of proxy may be valid for one or more meetings.

22.6  No Member shall be entitled to be present or take part in any proceedings or vote, either personally or by proxy, at any meeting unless all calls due from him have been paid.

22.7  No Member shall be entitled to vote in respect of any shares that he has acquired unless he has been registered in the Register as their holder.

22.8  No objection shall be raised to the qualification of any voter except at the meeting or adjourned meeting at which the vote objected to is given or tendered and every vote not disallowed shall be valid for all purposes. Any objection made in due time shall be referred to the chairman whose decision shall be final and binding.

23  **PROXIES**

23.1  A Member is entitled to appoint another person as his proxy to exercise all or any of his rights to attend and to speak and vote at a meeting of the Company. A Member may appoint more than one proxy in relation to a meeting, provided that each proxy is appointed to exercise the rights attached to a different share or shares held by him.

23.2  The instrument appointing a proxy shall be in writing under the hand of the appointor or of his attorney duly authorised in writing or if the appointor is a corporation under the hand of an officer or attorney duly authorised.

23.3  The Directors must send proxy forms by post (which may be at the expense of the Company and with or without provisions for their return pre-paid) or, to the extent that a Member has consented to the use of electronic communications and notified an address for that purpose and if the Directors so decide, using electronic communications to all persons entitled to notice of, and to attend and vote at, any general meeting or at any separate meeting of the holders of any class of shares in the Company.

23.4  The instrument appointing a proxy and the power of attorney or other authority (if any) under which it is signed or a notarially certified copy of that power or authority shall be deposited at the Office or such other venue as the Board may specify. Any such instrument appointing a proxy shall not be treated as valid unless the document is received:

23.4.1  in the case of a meeting or adjourned meeting, 48 hours before the time for holding the meeting or adjourned meeting;

8017957/62469122/15

18

23.4.2    in the case of a poll taken more than 48 hours after it was demanded, 24 hours before the time appointed for taking the poll;

23.4.3    in the case of a poll taken not more than 48 hours after it was demanded, the time at which it was demanded; or

23.4.4    such later time as the Board may specify up to and including the time of the relevant meeting or the taking of the poll, as the case may be.

In calculating the periods mentioned above, no account shall be taken of any part of a day that is not a Working Day.

23.5    The instrument appointing a proxy may be in any form which the Board may approve and may include an instruction by the appointor to the proxy either to vote for or against any resolution to be put to the meeting.

23.6    The instrument appointing a proxy shall be deemed to confer authority to demand or join in demanding a poll and shall be as valid for any adjournment as for the meeting to which it relates.

23.7    Without prejudice to Section 226 of the Law, a vote given in accordance with the terms of an instrument of proxy shall be valid notwithstanding the previous death or disability of the principal or revocation of the proxy or of the authority under which the proxy was executed provided that no intimation in writing of such death, disability or revocation shall have been received by the Company at the Office before the commencement of the meeting or adjournment or the taking of the poll at which the proxy is used.

23.8    Any corporation which is a Member may, by resolution of its directors or other governing body, authorise such person as it thinks fit to act as its representative at any meeting of the Company or of any class of Members of the Company or to approve any resolution submitted in writing and the person so authorised shall be entitled to exercise on behalf of the corporation which he represents the same powers (other than to appoint a proxy) as that corporation could exercise if it were an individual Member of the Company.

## 24    WRITTEN RESOLUTIONS

24.1    Resolutions of the Members may be approved in writing if so determined by the Directors or the Members in accordance with Part XIII of the Law and every Member voting thereon shall have one vote for each share subject to any special voting powers or restrictions.

24.2    Notice specifying the proposed resolution in writing may be sent by the Company to Members by post or by facsimile or such other telephonic or electronic means of written communications as the Board may, subject to the Law, determine at any time.

24.3    Notices of proposed written resolutions forwarded by post shall be sent to the address of such Members entered in the Register.  Notices forwarded by any telephonic or electronic means of written communication shall be forwarded to such destination as the Member in question may at any time designate in writing signed by him.

24.4    Notices of proposed written resolutions shall incorporate or be accompanied by an instrument to be signed by or on behalf of the Member to who it is addressed for the purpose of approving the same.

24.5    Any notice of a proposed written resolution shall specify a date and time (whether greater or lesser than any period for the time being prescribed by the Law) at which the instrument or instruments signed by or on behalf of the Members voting in favour thereof shall be counted and at which the resolution if approved by the requisite majority shall become effective. No instrument received or signature appended thereto after such time shall be counted.

24.6    Notwithstanding anything else contained herein (and in particular the method of sending the notice of and instrument for approving the written resolution to Members) all such

instruments containing such approval shall be in writing and signed by the Member or Members in question. The signature of a Member shall be acceptable for such purposes if received by facsimile telephonic transmission or in any other way specified in the notice.

24.7 The accidental omission to give notice of any proposed written resolution to or the non receipt of such notice by any Member shall not invalidate any resolution or any proposed resolution otherwise duly approved.

## 25 NUMBER, APPOINTMENT AND QUALIFICATION OF DIRECTORS

25.1 The first Directors of the Company shall be specified in the application for incorporation prepared in accordance with Section 17 of the Law. Unless a sole Director is specified in the application for incorporation and until otherwise determined by the Board, the number of Directors shall be not less than two (2). At no time shall a majority of Directors, including any duly appointed alternates, be resident in the United Kingdom, and a person shall not be appointed a Director if as a result of such appointment the Board would cease to consist of a majority of Directors resident outside the United Kingdom.

25.2 The Board shall have power at any time to appoint any person eligible in accordance with Section 137 of the Law to be a Director to fill a casual vacancy (but not as an addition to the existing Directors) but so that the total number of Directors shall not at any time exceed the number, if any, fixed pursuant to these Articles. Any Director so appointed shall hold office only until the next following annual general meeting and shall then be eligible for re-election.

25.3 No person other than a Director retiring at a general meeting shall, unless recommended by the Directors, be eligible for election by the Company to the office of Director unless, not less than fourteen (14) clear days before the date appointed for the meeting there shall have been left at the Office notice in writing signed by a Member duly qualified to attend and vote at the meeting for which such notice is given of his intention to propose such person for election together with notice in writing signed by that person of his willingness to be elected.

25.4 Without prejudice to the powers of the Board, the Company in general meeting may appoint any person to be a Director either to fill a casual vacancy or as an additional Director.

25.5 A share qualification for a Director may be fixed by the Company in general meeting and unless and until so fixed no qualification shall be required.

## 26 REMUNERATION OF DIRECTORS

26.1 The ordinary remuneration of the Directors who do not hold executive office for their services (excluding amounts payable under any other sub-paragraph of these Articles) shall not exceed in aggregate £150,000 per annum or such higher amount as the Company may from time to time by ordinary resolution determine. Such remuneration shall be deemed to accrue from day to day.

26.2 The Directors shall also be paid all reasonable out-of-pocket travelling, hotel and other expenses properly incurred by them in attending and returning from meetings of the Directors or any committee of the Directors or general meetings of the Company or in connection with the business of the Company.

26.3 In addition, the Board may award additional remuneration to any Director engaged in exceptional work at the request of the Board on a time spent basis.

## 27 INDEMNITIES

27.1 The Directors, Secretary and officers of the Company and their respective heirs and executors shall, to the extent permitted by Section 157 of the Law, be fully indemnified out of the assets and profits of the Company from and against all actions expenses and liabilities which they or their respective heirs or executors may incur by reason of any contract entered into or any act in or about the execution of their respective offices or trusts except such (if any) as they shall incur by or through their own negligence, default, breach of duty or breach of trust respectively and none of them shall be answerable for the acts, receipts, neglects or

8017957/62469122/15                                                                                             20

defaults of the others of them or for joining in any receipt for the sake of conformity or for any bankers or other person with whom any monies or assets of the Company may be lodged or deposited for safe custody or for any bankers or other persons into whose hands any money or assets of the Company may come or for any defects of title of the Company to any property purchased or for insufficiency or deficiency of or defect in title of the Company to any security upon which any monies of the Company shall be placed out or invested or for any loss misfortune or damage resulting from any such cause as aforesaid or which may happen in or about the execution of their respective offices or trusts except if the same shall happen by or through their own negligence, default, breach of duty or breach of trust.

27.2    To the fullest extent permitted by applicable law (including the Law) and subject to compliance with the Offering Memorandum, the Portfolio Manager, its Affiliates, any officer, director, secretary, manager, employee or any direct or indirect partner, member, stockholder, agent or legal representative (including executors, guardians and trustees) of the Portfolio Manager and its Affiliates, including persons formerly serving in such capacities, any person who serves at the request of the Portfolio Manager or the Board pursuant to these Articles, on behalf of the Company as an officer, director, secretary, manager, partner, member, employee, stockholder, agent or legal representative of any other person serving at the request of the Portfolio Manager or the Board pursuant to these Articles on behalf of the Company in such capacity as listed above, each member of the Advisory Board and each member of any subcommittee thereof and any assignees or successors of the foregoing (each, an **Indemnified Person**) shall be fully indemnified against all losses, liabilities, damages, expenses or costs (including any claim, judgment, award, settlement, reasonable legal and other professional fees and disbursements and other costs or expenses incurred in connection with the defence of any proceeding, whether or not matured or unmatured or whether or not asserted or brought due to contractual or other restrictions, joint or several) other than those arising from suits, disputes or actions by Highland, its Affiliates or principals, Other Accounts (as defined in the Offering Memorandum) or CLO HoldCo, Ltd. (collectively, the **Indemnified Losses**) to which an Indemnified Person may become subject by reason of any acts or omissions or any alleged acts or omissions arising out of such Indemnified Person's or any other person's activities in connection with the conduct of the business or affairs of the Company and/or an investment, unless such Indemnified Losses result from any action or omission which constitutes, with respect to such person, a Triggering Event; provided, that notwithstanding the foregoing, the members of the Advisory Board or members of any subcommittee thereof shall be subject only to a duty of good faith (it being understood that, to the fullest extent permitted by applicable law, any such member, in determining to take or refrain from taking any action, shall be permitted to take into consideration only the interests of the Shareholder and/or other person represented by such member and, in so doing, shall, to the fullest extent permitted by applicable law, be considered to have acted in good faith). Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

27.3    The Directors may agree to such contractual indemnities for the benefit of the Secretary, officers, employees and other agents and contracting parties as they may from time to time, deem fit.

27.4    Notwithstanding Article 27.1, the Board may purchase and maintain, at the expense of the Company, insurance for the benefit of the Directors, Secretary, officers, employees and other agents and/or to cover corporate reimbursement of such Directors, Secretary, officers, employees and other agents.

27.5    For the avoidance of doubt, this Article shall apply to both current and former Directors, Secretary, officers, employees and other agents.

28    **REGISTERS OF DIRECTORS**

The Directors or Secretary shall cause to be maintained a register of Directors in accordance with Sections 143 and 147 of the Law.

29 **ALTERNATE DIRECTORS**

29.1 Any Director may, by notice in writing under his hand served upon the Company, appoint any person (whether a Member of the Company or not) as an alternate Director to attend and vote in his place at any meeting of the Directors at which he is not personally present or to undertake and perform such duties and functions and to exercise such rights as he could personally and such appointment may be made generally or specifically or for any period or for any particular meeting and with and subject to any particular restrictions provided that a Director who is not resident in the United Kingdom may not appoint as his alternate any person who is United Kingdom resident. Subject thereto, every such appointment shall be effective and the following provisions shall apply:-

29.2 Every alternate Director while he holds office as such shall be entitled:-

29.2.1 to notice of meetings of the Directors; and

29.2.2 to attend and to exercise (subject to any restrictions) all the rights and privileges of his appointor at all such meetings at which his appointor is not personally present.

29.3 Every alternate Director shall ipso facto vacate office if and when his appointment expires by effluxion of time or his appointor vacates office as a Director or removes the alternate Director from office as such by notice in writing under his hand served upon the Company

29.4 No alternate Director shall be entitled as such to receive any remuneration from the Company but every alternate Director shall be entitled to be paid all reasonable expenses incurred in exercise of his duties.

29.5 A Director may act as alternate Director for another Director and shall be entitled to vote for such other Director as well as on his own account but no Director shall at any meeting be entitled to act as alternate Director for more than one other Director.

30 **BORROWING POWERS OF THE BOARD**

Subject to the restrictions set forth in the Offering Memorandum, the Board may exercise all the powers of the Company to borrow money (in whatever currency the Board determines from time to time) and to mortgage, hypothecate, pledge or charge all or part of its undertaking property and uncalled capital and to issue debentures and other securities, whether outright or as collateral security for any liability or obligation of the Company or of any third party, subject to any limits on borrowings adopted by the Board from time to time. The Board may exercise all the powers of the Company to engage in currency or interest rate hedging in the interests of efficient portfolio management.

31 **OTHER POWERS AND DUTIES OF THE BOARD**

31.1 The business of the Company shall be managed by the Board who may exercise all such powers of the Company as are not required to be exercised by the Company in general meeting subject nevertheless to these Articles and to the Law and to such regulations as may be prescribed by the Company in general meeting but no regulation so made shall invalidate any prior act of the Board. The general powers given by this Article shall not be limited or restricted by any special authority or power given to the Board by any other Article.

31.2 The Board may arrange that any branch of the business carried on by the Company or any other business in which the Company may be interested shall be carried on by or through one or more subsidiary companies and the Board may on behalf of the Company make such arrangements as it thinks advisable for taking the profits or bearing the losses of any branch or business so carried on or for financing, assisting or subsidising any such subsidiary company or guaranteeing its contracts, obligations or liabilities.

31.3 The Board may establish any local boards or committees (provided that any such local board or committee shall be composed of all or a majority of persons who are resident outside of the United Kingdom and such local board or committee shall in any case meet in Guernsey)

for managing any of the affairs of the Company and may appoint any one or more of its number or any other persons to be members of such local boards or committees and may fix their remuneration and may delegate to any local board or committee any of the powers, authorities and discretions vested in the Board, with power to sub-delegate, and may authorise the members of any local board or committee to fill any vacancies and to act notwithstanding vacancies and any such appointment or delegation may be made upon such terms and subject to such conditions as the Board may think fit and the Board may remove any person so appointed and may annul or vary any such delegation but no person dealing in good faith and without notice of any such annulment or variation shall be affected thereby. The provisions of Article 37 shall apply to meetings of such local boards and committees mutatis mutandis save as varied by the Board.

31.4    The Board may:-

31.4.1    at any time, by power of attorney given under the hand of such person or persons duly authorised by the Board in that behalf, appoint any person or any fluctuating body of persons (not resident in the United Kingdom), whether nominated directly or indirectly by the Board, to be the attorney of the Company for such purposes and with such powers and discretions and for such periods and subject to such conditions as the Board may think fit and any such power of attorney may contain such provisions for the protection and convenience of persons dealing with any attorney as the Board may think fit and may also authorise any attorney to sub-delegate all or any of his powers and discretions; or

31.4.2    appoint such other agents, managers and contractors with such powers to sub-delegate as it may deem fit from time to time.

31.5    All cheques, promissory notes, drafts, bills of exchange and other negotiable instruments and all receipts for monies paid to the Company shall be signed, drawn, accepted, endorsed or otherwise executed in such manner as the Board shall, at any time, determine.

31.6    The Board shall cause minutes to be made and maintained at the Office or at such other place in Guernsey as the Board may think fit in books provided for the purpose of all resolutions and proceedings at meetings of the Board and of Board Committees in accordance with Section 154 of the Law.

31.7    The Board shall cause minutes and records of other corporate resolutions to be made and maintained at the Office or in such other place in Guernsey as the Board may think fit in accordance with Sections 228 and 230 of the Law of all proceedings at general meetings or otherwise and all decisions of a sole Member.

31.8    The Board may pay a gratuity, pension or allowance on death or retirement to, and may establish and maintain or procure the establishment and maintenance of any contributory or non-contributory pension or superannuation or life assurance funds or schemes, for the benefit of any persons:-

31.8.1    who are or were at any time in the employment or service of the Company or of any company which is or was a holding or subsidiary company of the Company or of any predecessor in business of any of them; or

31.8.2    who are or were at any time directors or officers of the Company or of any such other company or predecessor in business and holding any salaried employment or executive office in the Company or such other company or predecessor in business;  and the wives, widows, children, dependants or relations of any such persons. The receipt of any such gratuity pension or allowance shall not disqualify any person from being a Director of the Company.

31.9    The Board may also establish and subsidise or subscribe to any institutions, associations, clubs or funds calculated to be for the benefit of or to advance the interests and well-being

of the Company or of any such other company as aforesaid or of any such persons as aforesaid and make payments for or towards the insurance of any such persons.

31.10 The Board may do any of the matters aforesaid either alone or in conjunction with any such other company.

## 32 CONFLICTS OF INTEREST

32.1 A Director must, immediately after becoming aware of the fact that he is interested in a transaction or proposed transaction with the Company, disclose to the Board in accordance with Section 162 of the Law, the nature and extent of that interest.

32.2 Article 32.1 does not apply if:-

32.2.1 the transaction or proposed transaction is between the Director and the Company; and

32.2.2 the transaction or proposed transaction is or is to be entered into in the ordinary course of the Company's business and on usual terms and conditions.

32.3 A general disclosure to the Board to the effect that a Director has an interest (as director, officer, employee, member or otherwise) in a party and is to be regarded as interested in any transaction which may after the date of the disclosure be entered into with that party is sufficient disclosure of interest in relation to that transaction.

32.4 Nothing in Articles 32.1, 32.2 or 32.3 applies in relation to:-

32.4.1 remuneration or other benefit given to a Director;

32.4.2 insurance purchased or maintained for a Director in accordance with Section 158 of the Law; or

32.4.3 qualifying third party indemnity provision provided for a Director in accordance with Section 159 of the Law.

32.5 Subject to Article 32.6, a Director is interested in a transaction to which the Company is a party if the Director:-

32.5.1 is a party to, or may derive a material benefit from, the transaction;

32.5.2 has a material financial interest in another party to the transaction;

32.5.3 is a director, officer, employee or member of another party (other than a party which is an associated company) who may derive a material financial benefit from the transaction;

32.5.4 is the parent, child or spouse of another party who may derive a material financial benefit from the transaction; or

32.5.5 is otherwise directly or indirectly materially interested in the transaction.

32.6 A Director is not interested in a transaction to which the Company is a party if the transaction comprises only the giving by the Company of security to a third party which has no connection with the Director, at the request of the third party, in respect of a debt or obligation of the Company for which the Director or another person has personally assumed responsibility in whole or in part under a guarantee, indemnity or security.

32.7 Save as provided in these Articles, a Director shall not vote in respect of any contract or arrangement or any other proposal whatsoever in which he has any material interest otherwise than by virtue of his interest in shares or debentures or other securities of or

otherwise through the Company. A Director may be counted in the quorum at a meeting in relation to any resolution on which he is debarred from voting.

32.8 A Director shall (in the absence of some other material interest than is indicated below) be entitled to vote (and be counted in the quorum) in respect of any resolution concerning any of the following matters namely:-

32.8.1 the giving of any guarantee, security or indemnity to him in respect of money lent or obligations incurred by him at the request of or for the benefit of the Company or any of its subsidiaries;

32.8.2 the giving of any guarantee, security or indemnity to a third party in respect of a debt or obligation of the Company or any of its subsidiaries for which he himself has assumed responsibility in whole or in part under a guarantee or indemnity or by the giving of security;

32.8.3 any proposal concerning an offer of shares or debentures or other securities of or by the Company or any of its subsidiaries for subscription or purchase in which offer he is or is to be interested as a participant in the underwriting or sub-underwriting thereof;

32.8.4 any proposal concerning any other company in which he is interested, directly or indirectly and whether as an officer or shareholder or otherwise howsoever, provided that he is not the holder of or beneficially interested in one per cent. (1%) or more of the issued shares of such company (or of any third company through which his interest is derived) or of the voting rights available to members of the relevant company (any such interest being deemed for the purpose of this Article to be a material interest in all circumstances).

32.9 Where proposals are under consideration concerning the appointment (including fixing or varying the terms of appointment) of two or more Directors to offices or employment with the Company or any company in which the Company is interested the Directors may be counted in the quorum for the consideration of such proposals and such proposals may be divided and considered in relation to each Director separately and in such case each of the Directors concerned (if not debarred from voting under the provisions of Article 32.7 above) shall be entitled to vote (and be counted in the quorum) in respect of each resolution except that concerning his own appointment.

32.10 If any question shall arise at any meeting as to the materiality of a Director's interest or as to the entitlement of any Director to vote and such question is not resolved by his voluntarily agreeing to abstain from voting, such question shall be referred to the chairman of the meeting and his ruling in relation to any other Director shall be final and conclusive except in a case where the nature or extent of the interests of the director concerned have not been fairly disclosed.

32.11 The Company may by ordinary resolution suspend or relax the provisions of Articles 32.7 and 32.8 above to any extent or ratify any transaction not duly authorised by reason of a contravention of any of the said Articles.

32.12 Subject to Article 32.7 above the Directors may exercise the voting power conferred by the share in any other company held or owned by the Company or exercisable by them as directors of such other company in such manner in all respects as they think fit (including the exercise thereof in favour of any resolution appointing themselves or any of them director, managing director, managers or other officer of such company or voting or providing for the payment or remuneration to the directors, managing director, manager or other officer of such company).

32.13 A Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with his office of Director on such terms as to tenure of office or otherwise as the Directors may determine.

32.14 Subject to due disclosure in accordance with Article 32, no Director or intending Director shall be disqualified by his office from contracting with the Company as vendor, purchaser or otherwise nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested render the Director liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relationship thereby established.

32.15 Any Director may act by himself or his firm in a professional capacity for the Company and he or his firm shall be entitled to remuneration for professional services as if he were not a Director **PROVIDED THAT** nothing herein contained shall authorise a Director or his firm to act as Auditor to the Company.

32.16 Any Director may continue to be or become a director, managing director, manager or other officer or member of any company in which the Company may be interested and (unless otherwise agreed) no such Director shall be accountable for any remuneration or other benefits received by him as a director, managing director, manager or other officer or member of any such other company.

## 33  DISQUALIFICATION OF DIRECTORS

33.1 A Director shall cease to hold office:-

33.1.1 if he (not being a person holding for a fixed term an executive office subject to termination if he ceases for any reason to be a Director) resigns his office by written notice signed by him sent to or deposited at the Office;

33.1.2 if he shall have absented himself (such absence not being absence with leave or by arrangement with the Board on the affairs of the Company) from meetings of the Board for a consecutive period of twelve months and the Board resolves that his office shall be vacated;

33.1.3 if he dies or becomes of unsound mind or incapable;

33.1.4 if he becomes insolvent suspends payment or compounds with his creditors;

33.1.5 if he is requested to resign by written notice signed by all his co-Directors;

33.1.6 if the Company in general meeting shall declare that he shall cease to be a Director;

33.1.7 if he becomes resident in the United Kingdom and, as a result thereof, a majority of the Directors are resident in the United Kingdom;

33.1.8 if he becomes ineligible to be a Director in accordance with Section 137 of the Law; or

33.1.9 he becomes prohibited from being a Director by reason of any order made under any provisions of any law or enactment.

33.2 If the Company in general meeting removes any Director before the expiration of his period of office, it may appoint another person to be a Director in his stead who shall retain his office so long only as the Director in whose stead he is appointed would have held the same if he had not been removed. Such removal shall be without prejudice to any claims such Director may have for damages for breach of any contract of service between him and the Company.

## 34  PROCEEDINGS OF DIRECTORS

34.1 The Board may meet for the dispatch of business adjourn and otherwise regulate its meetings as it thinks fit. Questions arising at any meeting shall be decided by a majority of votes. In case of an equality of votes the chairman at the meeting shall have a second or casting vote, provided that he is not resident in the United Kingdom. All meetings of Directors

shall take place outside of the United Kingdom and any decision reached or resolution passed by the Directors at any meeting held in the United Kingdom or at which a majority of Directors resident in the United Kingdom is present shall be invalid and of no effect.

34.2 A Director in communication with one or more other Directors so that each Director participating in the communication can hear or read what is said or communicated by each of the others, is deemed to be present at a meeting with the other Directors so participating and, where a quorum is present, such meeting shall be treated as a validly held meeting of the Board and shall be deemed to have been held in the place where the chairman is present, provided that no directors physically present in the United Kingdom at the time of any such meeting may participate in a meeting by means of video link, telephone conference call or other electronic or telephonic means of communication.

34.3 The Board shall also determine the notice necessary for its meetings and the persons to whom such notice shall be given.

34.4 A meeting of the Board at which a quorum is present shall be competent to exercise all powers and discretions exercisable by the Board.

34.5 The continuing Directors may act notwithstanding any vacancy but, if and so long as their number is reduced below the minimum number fixed pursuant to these Articles, the continuing Directors may act for the purpose of increasing the number of Directors to that number or of summoning a general meeting but for no other purpose. If there be no Directors able or willing to act, then any Member may summon a general meeting for the purpose of appointing Directors.

34.6 The Board may elect a chairman of their meetings and determine the period for which he is to hold office. If no such chairman be elected or if at any meeting the chairman be not present within fifteen (15) minutes after the time appointed for holding the same, the Directors present may choose one of their number to be chairman of the meeting.

34.7 The Board may delegate any of their powers to committees consisting of such one or more Directors as they think fit provided that all or a majority of members of such committees are resident other than in the United Kingdom. Such committees shall meet only outside of the United Kingdom. No director physically present in the United Kingdom at the time of any such meeting may participate in a meeting by means of a video link, telephone conference call or other electronic or telephone means of communication. Any committee so formed shall in the exercise of the powers so delegated conform to any regulations that may be imposed on it by the Board. Subject thereto, this Article 37 shall apply mutatis mutandis to the proceedings of such committees.

34.8 The quorum necessary for the transaction of the business of the Board may be fixed by the Board and unless so fixed shall be two (2) except that where the minimum number of Directors has been fixed at one a sole Director shall be deemed to form a quorum and provided that if a majority of Directors present are not resident other than in the United Kingdom, the Directors present, irrespective of number, shall not constitute a quorum. For the purposes of this Article an alternate appointed by a Director shall be counted in a quorum at a meeting at which the Director appointing him is not present.

34.9 A resolution in writing signed by each Director (or his alternate) entitled to receive notice of a meeting of the Board or by all the members of a committee shall be as valid and effectual as a resolution passed at a meeting of the Board or committee. Such resolution may be contained in one document or in several documents in like form each signed by one or more of the Directors or members of the committee and may be transmitted to the Company by e-mail or facsimile. No such resolution shall be valid if a majority of the Directors sign the resolution in the United Kingdom.

35 **EXECUTIVE DIRECTORS**

35.1 The Board may at any time appoint one or more of their body (other than a Director resident in the United Kingdom) to be holder of any executive office including the office of managing director on such terms and for such periods as they may determine.

35.2 The appointment of any Director to any executive office shall be subject to termination if he ceases from any cause to be a Director but without prejudice to any claim for damages for breach of any contract of service between him and the Company.

35.3 The Board may entrust to and confer upon a Director holding any executive office any of the powers exercisable by the Board upon such terms and conditions and with such restrictions as it thinks fit either collaterally with or to the exclusion of their own powers and may at any time revoke withdraw alter or vary all or any of such powers.

## 36 SECRETARY

36.1 A Secretary may be appointed by the Board for such term at such remuneration and upon such conditions as the Board may think fit; and any Secretary may be removed by the Board but without prejudice to any claim which he may have for damages for breach of any contract of service between him and the Company.

36.2 A Secretary shall have such duties as may be agreed by the Board and the Secretary and, in the absence of such agreement, those duties shall include the duties set out in section 171 of the Law.

36.3 Any provision of the Law or these Articles requiring or authorising a thing to be done by a Director and the Secretary shall be satisfied by its being done by the same person acting both as Director and as or in the place of the Secretary.

## 37 THE SEAL

If the Board determines to maintain a Seal, it shall provide for the safe custody of the Seal which shall only be used by authority of the Board or of a committee and every instrument to which the Seal shall be affixed shall be signed by any such persons as are authorised by the Board in that behalf. The Board may authorise the use of a duplicate or facsimile Seal for use outside Guernsey in such manner as the Board may at its discretion determine.

## 38 COMMON SIGNATURE

The common signature of the Company may be either:-

38.1 the name of the Company with the addition of the signature(s) of one or more of the Directors or officers of the Company authorised generally or specifically by the Board for such purpose, or such other person or persons as the Board may from time to time appoint; or

38.2 if the Board resolves that the Company shall have a Seal, it shall be affixed in such manner as these Articles or the Board may from time to time provide.

## 39 AUTHENTICATION OF DOCUMENTS

Any Director or the Secretary or any person appointed by the Board for the purpose shall have power to authenticate any documents affecting the Company (including the Memorandum and these Articles) and any resolutions passed by the Company or the Board and any books records documents and accounts relating to the business of the Company and to certify copies or extracts as true copies or extracts provided that such authentication shall only take place outside the United Kingdom; and where any books records documents or accounts are elsewhere than at the Office the local manager or other Officer of the Company having their custody shall be deemed to be a person appointed by the Board as aforesaid.

## 40 DIVIDENDS

40.1 Subject to compliance with Section 304 of the Law and to compliance with the Offering Memorandum, the Board may at any time declare and pay such dividends as appear to be justified by the position of the Company. The Board may also declare and pay any fixed dividend which is payable on any shares of the Company half-yearly or otherwise on fixed dates whenever the position in the opinion of the Board so justifies. Dividend payments

8017957/62469122/15                                                                                          28

may be suspended by the Directors in their absolute discretion, including, without limitation, in the event of adverse, or perceived adverse, market conditions.

40.2    The method of payment of dividends shall be at the discretion of the Board.

40.3    No dividend shall be paid in excess of the amounts permitted by the Law or approved by the Board.

40.4    Unless and to the extent that the rights attached to any shares or the terms of issue thereof otherwise provide, all dividends shall be declared and paid pro rata according to the number of shares held by each Member. For the avoidance of doubt, where there is more than one class of share in issue, dividends declared in respect of any class of share shall be declared and paid pro rata according to the number of shares of the relevant class held by each Member.

40.5    The Board may deduct from any dividend payable to any Member on or in respect of a share all sums of money (if any) presently payable by him to the Company on account of calls or otherwise.

40.6    The Board may retain any dividend or other monies payable on or in respect of a share on which the Company has a lien and may apply the same in or towards satisfaction of the liabilities or obligations in respect of which the lien exists.

40.7    The Board may retain dividends payable upon shares in respect of which any person is entitled to become a Member until such person has become a Member.

40.8    With the sanction of the Company in general meeting by way of a special resolution, any dividend may be paid wholly or in part by the distribution of specific assets. Where any difficulty arises in regard to such distribution the Board may settle the same as it thinks expedient and in particular may fix the value for distribution of such specific assets and may determine that cash payments shall be made to any Members upon the basis of the value so fixed in order to adjust the rights of Members and may vest any such specific assets in trustees for the Members entitled as may seem expedient to the Board.

40.9    Any dividend interest or other monies payable in cash in respect of shares may be paid by cheque or warrant sent through the post to the registered address of the holder or, in the case of joint holders, to the registered address of that one of the joint holders who is first named on the Register. In addition, any such dividend or other sum may be paid by any bank or other funds transfer system or such other means and to or through such person as the holder or joint holders (as the case may be) may in writing direct, and the Company shall have no responsibility for any sums lost or delayed in the course of any such transfer or where it has acted on any such directions. Any one of two or more joint holders may give effectual receipts for any dividends interest bonuses or other monies payable in respect of their joint holdings.

40.10   No dividend or other monies payable on or in respect of a share shall bear interest against the Company.

40.11   All unclaimed dividends may be invested or otherwise made use of by the Board for the benefit of the Company until claimed and the Company shall not be constituted a trustee in respect thereof. All dividends unclaimed for a period of six (6) years after having been declared shall be forfeited and shall revert to the Company.

41      **RESERVES**

The Board may, before recommending any dividend, set aside such sums (out of profits or otherwise) as it thinks proper as reserves which shall, at the discretion of the Board, be applicable for any purpose to which such sums may be properly applied and, pending such application, may either be employed in the business of the Company or be invested in such investments as the Board may at any time think fit. The Board may also, without placing the same to reserve, carry forward any profits or other sums which it may think prudent not to distribute.

## 42 CAPITALISATION OF PROFITS

42.1 The Company in general meeting may, upon the recommendation of the Board, resolve that it is desirable to capitalise any part of the amount for the time being standing to the credit of any of the Company's reserve accounts or to the credit of the profit and loss account or otherwise available for distribution and accordingly that such sums be set free for distribution amongst the Members who would have been entitled thereto if distributed and in the same proportions on condition that the same be not paid in cash but be applied either in or towards paying up any amounts for the time being unpaid on any shares held by such Members respectively or paying up in full unissued shares of the Company to be allotted and distributed credited as fully paid to and amongst such Members.

42.2 Whenever such resolution shall have been passed, the Board shall make all appropriations and applications of the reserves or profits resolved to be capitalised and all allotments and issues of fully-paid shares and generally shall do all things required to give effect thereto with full power to the Board to make such provision by payment in cash or otherwise as it thinks fit for the case of shares becoming distributable in fractions and also to authorise any person to enter on behalf of all Members entitled thereto into an agreement with the Company providing for the allotment to them respectively credited as fully paid of any further shares to which they may be entitled upon such capitalisation or (as the case may require) for the payment up by the Company on their behalf by the application thereof of their respective proportions of the amounts resolved to be capitalised of the amounts or any part of the amounts remaining unpaid on their existing shares and any agreement made under such authority shall be effective and binding on all such Members.

## 43 ACCOUNTS AND REPORTS

43.1 The Board shall maintain accounting records and issue reports in accordance with Part XV of the Law.

## 44 AUDIT

44.1 Auditors shall be engaged in accordance with Part XVI of the Law.

44.2 A Director shall not be capable of being appointed as an Auditor.

44.3 A person other than a retiring Auditor shall not be capable of being appointed Auditor at an ordinary general meeting unless notice of intention to nominate that person as Auditor has been given by a Member to the Company not less than fourteen days before the meeting and the Board shall send a copy of any such notice to the retiring Auditor and shall give notice to the Members not less than seven days before the meeting provided that if after notice of the intention to nominate an Auditor has been so given a meeting is called for a date fourteen days or less after such notice has been given the requirements of this provision as to time in respect of such notice shall be deemed to have been satisfied and the notice to be sent or given by the Company may instead of being sent or given within the time required by this Article be sent or given at the same time as the notice of the meeting.

44.4 The first Auditors shall be appointed by the Board before the first general meeting and they shall hold office until the first general meeting unless previously removed in which case the Members at such meeting may appoint the Auditors.

44.5 The Board may fill any casual vacancy in the office of Auditor but while any such vacancy continues the surviving or continuing Auditors (if any) may act.

44.6 The remuneration of the Auditors shall be fixed by the Company in general meeting or in such manner as the Company may determine except that the remuneration of any Auditors appointed by the Directors shall be fixed by the Directors, if the Members by ordinary resolution so resolve.

44.7 Every Auditor shall have a right of access at all times to the books accounts and documents of the Company and as regards books accounts and documents of which the originals are not readily available shall be entitled to rely upon copies or extracts certified by an officer of the Company and shall be entitled to require from the Board such information and

explanations as may be necessary for the performance of their duties and the Auditors shall make a report to the Members on the accounts examined by them and the report shall state whether in their opinion the accounts give a true and fair view of the state of the Company's affairs and whether they have been prepared in accordance with the Law.

44.8 Any Auditor shall be eligible for re-election.

## 45 NOTICES

45.1 A notice or other communication may be given by the Company to any Member by any means as set out in section 523 of the Law.

45.2 Any notice or other document, if served by post (including registered post, recorded delivery service or ordinary letter post), shall be deemed to have been served 48 hours after the time when the letter containing the same is posted and in providing such service it shall be sufficient to prove that the letter containing the notice or document was properly posted.

45.3 Any notice or other document that may be sent by the Company by courier will be deemed to be received 24 hours after the time at which it was despatched.

45.4 A notice may be given by the Company to the joint holders of a share by giving the notice to the joint holder first named in the Register in respect of the share.

45.5 Any notice or other communication sent to the address of any Member shall, notwithstanding the death, disability or insolvency of such Member and whether the Company has notice thereof, be deemed to have been duly served in respect of any share registered in the name of such Member as sole or joint holder and such service shall, for all purposes, be deemed a sufficient service of such notice or document on all persons interested (whether jointly with or as claiming through or under him) in any such share.

45.6 All Members shall be deemed to have agreed to accept communication from the Company by electronic means in accordance with Sections 524 and 526 and Schedule 3 of the Law unless a Member notifies the Company otherwise. Notice under this Article must be in writing and signed by the Member and delivered to the Company's Office or such other place as the Board directs. A Member shall be entitled to require the Company to send him a version of a document or information in hard copy form.

45.7 Every person who becomes entitled to a share shall be bound by any notice in respect of that share which, before his name is entered in the register of members, has been duly given to a person from which he derives his title.

## 46 WINDING UP

46.1 The Company shall have an indefinite life.

46.2 If the Company is wound up whether voluntarily or otherwise the Liquidator may with the sanction of a special resolution divide among the Members in specie any part of the assets of the Company and may with the like sanction vest any part of the assets of the Company in trustees upon such trusts for the benefit of the Members as the Liquidator with the like sanction shall think fit.

46.3 If any of the securities or other assets to be divided as aforesaid involve a liability to calls or otherwise any person entitled under such division to any of the said assets may within fourteen (14) clear days after the passing of the special resolution, by notice in writing, direct the Liquidator to sell his proportion and pay him the net proceeds and the Liquidator shall, if practicable, act accordingly.

## 47 DISCLOSURE OF THIRD PARTY INTERESTS IN SHARES

47.1 The Directors shall have power, if required for any regulatory purposes, by notice in writing to require any Member to disclose to the Company the identity of any person other than the

8017957/62469122/15                                                                                              31

Member (an interested party) who has any interest in the shares held by the Member and the nature of such interest.

47.2 Any such notice shall require any information in response to such notice to be given in writing within the prescribed period which shall be twenty-eight (28) days after the service of the notice, or fourteen (14) days if the shares concerned represent 0.25 per cent. or more in value of the issued shares of the relevant class, or such other reasonable time period as the Directors may determine.

47.3 The Company shall maintain a register of interested parties and whenever in pursuance of a requirement imposed on a shareholder as aforesaid the Company is informed of an interested party the identity of the interested party and the nature of the interest shall be promptly inscribed therein together with the date of the request.

47.4 The Directors may be required to exercise their powers under Article 47.1 on the requisition of Members (excluding the holders of treasury shares) of the Company holding at the date of the deposit of the requisition not less than one-tenth of such of the paid up capital of the Company as carries at that date the right of voting at general meetings of the Company.

47.5 The requisition must:-

47.5.1 state that the requisitionists are requiring the Company to exercise its powers under this Article;

47.5.2 specify the manner in which they require those powers to be exercised; and

47.5.3 give reasonable grounds for requiring the Company to exercise those powers in the manner specified,

and must be signed by the requisitionists and deposited at the Office.

47.6 The requisition may consist of several documents in like form each signed by one or more requisitionists.

47.7 On the deposit of a requisition complying with this Article 47 it is the Directors' duty to exercise their powers under Article 47.1 in the manner specified in the requisition.

47.8 If any Member has been duly served with a notice given by the Directors in accordance with Article 47.1 and is in default for the prescribed period in supplying to the Company the information thereby required the Directors may in their absolute discretion at any time thereafter serve a notice (a **direction notice**) upon such Member as follows:-

47.8.1 a direction notice may direct that, in respect of:-

(a) the shares comprising the shareholder account in the Register which comprises or includes the shares in relation to which the default occurred (all or the relevant number as appropriate of such shares being the **default shares**); and

(b) any other shares held by the Member;

the Member shall not be entitled to attend or vote (either personally or by representative or by proxy) at any General Meeting or meeting of the holders of any class of shares of the Company or to exercise any other right conferred by membership in relation to any such meetings; and

47.8.2 where the default shares represent at least 0.25 per cent. of the class of shares concerned, then the direction notice may additionally direct that:-

(a) in respect of the default shares, any dividend or part thereof which would otherwise be payable on such shares shall be retained by the Company without any liability to pay interest thereon when such money is finally paid to the Member;

8017957/62469122/15 32

(b)     no transfer other than an approved transfer (as set out in Article 47.11.3) of any of the shares held by such Member shall be registered unless:-

         (i)     the Member is not himself in default as regards supplying the information requested; and

         (ii)     the transfer is of part only of the Member's holding and when presented for registration is accompanied by a certificate by the Member in a form satisfactory to the Directors to the effect that after due and careful enquiry the Member is satisfied that no person in default as regards supplying such information is interested in any of the shares the subject of the transfer.

The Company shall send to each other person appearing to be interested in the shares the subject of any direction notice a copy of the notice, but failure or omission by the Company to do so shall not invalidate such notice.

47.9     If shares are issued to a Member as a result of that Member holding other shares in the Company and if the shares in respect of which the new shares are issued are default shares in respect of which the Member is for the time being subject to particular restrictions, the new shares shall on issue become subject to the same restrictions whilst held by that Member as such default shares. For this purpose, shares which the Company procures to be offered to Members pro rata (or pro rata ignoring fractional entitlements and shares not offered to certain Members by reason of legal or practical problems associated with offering shares outside the United Kingdom or Guernsey) shall be treated as shares issued as a result of a Member holding other shares in the Company.

47.10     Any direction notice shall have effect in accordance with its terms for as long as the default, in respect of which the direction notice was issued, continues but shall cease to have effect in relation to any shares which are transferred by such Member by means of an approved transfer as set out in Article 47.11.3. As soon as practical after the direction notice has ceased to have effect (and in any event within seven days thereafter) the Directors shall procure that the restrictions imposed by Article 47.8 and 47.9 above shall be removed and that dividends and other monies withheld pursuant to Article 47.8.2(a) above are paid to the relevant Member.

47.11     For the purpose of this Article:-

47.11.1     a person shall be treated as appearing to be interested in any shares if the Member holding such shares has given to the Company a notification which either (a) names such person as being so interested or (b) fails to establish the identities of those interested in the shares and (after taking into account the said notification and any other relevant notification) the Company knows or has reasonable cause to believe that the person in question is or may be interested in the shares;

47.11.2     the prescribed period in respect of any particular Member is twenty-eight (28) days from the date of service of the said notice in accordance with Article 47.1 except where the default shares represent at least 0.25 per cent. of the class of shares concerned in which case such period shall be 14 days;

47.11.3     a transfer of shares is an approved transfer if but only if:-

         (a)     it is a transfer of shares to an offeror by way or in pursuance of acceptance of a public offer made to acquire all the issued shares in the capital of the Company not already owned by the offeror or Connected Person of the offeror in respect of the Company; or

         (b)     the Directors are satisfied that the transfer is made pursuant to a sale of the whole of the beneficial ownership of the shares to a party

8017957/62469122/15                                                          33

       unconnected with the Member and with other persons appearing to be interested in such shares; or

(c)    the transfer results from a sale made through a recognised investment exchange (as defined in the Financial Services and Markets Act 2000 of the United Kingdom) or any stock exchange outside the United Kingdom on which the Company's shares are listed or normally traded.

For the purposes of this sub-paragraph, any person who is a Connected Person shall be included amongst the persons who are connected with the Member or any person appearing to be interested in such shares.

47.12    Any shareholder who has given notice of an interested party in accordance with Article 47.2 who subsequently ceases to have any party interested in his shares or has any other person interested in his shares shall notify the Company in writing of the cessation or change in such interest and the Directors shall promptly amend the register of interested parties accordingly.

48    **SUSPENSION OF THE CALCULATION OF THE NET ASSET VALUE**

48.1    The Board may at any time, but cannot be obliged to, temporarily suspend the calculation of the Net Asset Value and Net Asset Value per Share during any period if it determines in good faith that such a suspension is warranted by extraordinary circumstances, including:

48.1.1    during any period when any market on which the Company's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended;

48.1.2    during the existence of any state of affairs, including as a result of political, economic, military or monetary events or any circumstances outside the control of the Portfolio Manager or the Company, as a result of which, in the reasonable opinion of the Portfolio Manager, the determination of the value of the assets of the Company, would not be reasonably practicable or would be seriously prejudicial to the Members taken as a whole;

48.1.3    during any breakdown in the means of communication normally employed in determining the price or value of the Company's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Company cannot reasonably be accurately ascertained within a reasonable time frame;

48.1.4    during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Portfolio Manager, be effected at normal rates of exchange;

48.1.5    automatically upon liquidation of the Company.

48.2    The Company may elect to treat the next business day on which the calculation can be made the next Net Asset Value calculation date.

48.3    Where any such suspension is likely to continue for a period exceeding ten business days, such suspension shall be notified by the Company by Regulatory Information Service announcement. All reasonable steps will be taken to bring the period of suspension to an end as soon as possible.

EXECUTION VERSION

Between

CLO HOLDCO, LTD.

And

HARBOURVEST DOVER STREET IX INVESTMENT L.P.

And

HARBOURVEST 2017 GLOBAL AIF L.P.

And

HARBOURVEST 2017 GLOBAL FUND L.P.

And

HV INTERNATIONAL VIII SECONDARY L.P.

And

HARBOURVEST SKEW BASE AIF L.P.

And

HIGHLAND CAPITAL MANAGEMENT, L.P.

And

LEE BLACKWELL PARKER, III

And

QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311

And

QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811

And

QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612

And

QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211

And

HIGHLAND CLO FUNDING, LTD.

And

HIGHLAND HCF ADVISOR, LTD.

---

MEMBERS AGREEMENT RELATING TO THE COMPANY

23981765.11.BUSINESS

TABLE OF CONTENTS

1.    INTERPRETATION ............................................................................ 2

2.    THE BUSINESS OF THE COMPANY ...................................................... 4

3.    VOTING RIGHTS .............................................................................. 4

4.    ADVISORY BOARD ........................................................................... 4

5.    DEFAULTING MEMBERS ..................................................................... 4

6.    TRANSFERS OR DISPOSALS OF SHARES .............................................. 4

7.    CONFIDENTIALITY ........................................................................... 4

8.    DIVIDENDS .................................................................................... 9

9.    TERM OF THE COMPANY ................................................................... 9

10.   ERISA MATTERS ............................................................................. 9

11.   TAX MATTERS ................................................................................ 9

12.   AMENDMENTS TO CERTAIN AGREEMENTS ............................................ 9

13.   FINANCIAL REPORTS ....................................................................... 9

14.   TERMINATION AND LIQUIDATION ....................................................... 9

15.   WHOLE AGREEMENT ...................................................................... 12

16.   STATUS OF AGREEMENT .................................................................. 12

17.   ASSIGNMENTS .............................................................................. 12

18.   VARIATION AND WAIVER .................................................................. 12

19.   SERVICE OF NOTICE ...................................................................... 12

20.   GENERAL .................................................................................... 13

21.   GOVERNING LAW AND JURISDICTION ................................................. 14

SCHEDULE ........................................................................................ 18
Adherence Agreement .......................................................................... 18

23981765.11.BUSINESS

128

THIS AGREEMENT is made the 15th day of November 2017

BETWEEN

(1)     CLO HOLDCO, LTD. whose registered office address is at Intertrust Corporate Services (Cayman) Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9005, Cayman Islands;

(2)     HARBOURVEST DOVER IX INVESTMENT L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(3)     HARBOURVEST 2017 GLOBAL AIF L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(4)     HARBOURVEST 2017 GLOBAL FUND L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(5)     HV INTERNATIONAL VIII SECONDARY L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(6)     HARBOURVEST SKEW BASE AIF L.P. of c/o HarbourVest Partners, LLC, One Financial Center, 44th Floor, Boston, MA 02111, USA

(7)     HIGHLAND CAPITAL MANAGEMENT, L.P. of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(8)     LEE BLACKWELL PARKER, III of 300 Crescent Court, Suite 700, Dallas, Texas 75201, USA

(9)     QUEST IRA, INC., FBO LEE B. PARKER III, ACCT. # 3058311 of 17171 Park Row #100, Houston, Texas 77084, USA

(10)    QUEST IRA, INC., FBO HUNTER COVITZ, ACCT. # 1469811 of 17171 Park Row #100, Houston, Texas 77084, USA

(11)    QUEST IRA, INC., FBO JON POGLITSCH, ACCT. # 1470612 of 17171 Park Row #100, Houston, Texas 77084, USA

(12)    QUEST IRA, INC., FBO NEIL DESAI, ACCT. # 3059211 of 17171 Park Row #100, Houston, Texas 77084, USA

(together the "Members") and

(13)    HIGHLAND CLO FUNDING, LTD., with registration number 60120 whose registered office is at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the "Company") and

(14)    HIGHLAND HCF ADVISOR, LTD., whose registered address is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "Portfolio Manager").

WHEREAS:

(A)     The Company is a limited company incorporated under the laws of the Island of Guernsey on 30 March 2015.

(B)     The Company has been established to provide its investors with exposure to CLO Notes on both a direct basis and indirect basis and senior secured loans on an indirect basis, through the use of the investments described in its investment policy as set forth in the Offering Memorandum dated 15 November 2017, the (the "Offering Memorandum"), subject to the restrictions set forth therein.

23981765.11. BUSINESS                    1

(C) The Members are the owners of the entire issued capital of the Company.

(D) The Parties are entering into this Agreement to regulate the relationship between them and the operation and management of the Company.

OPERATIVE PROVISIONS

1. INTERPRETATION

In this Agreement, including the Schedule:

1.1 the following words and expressions shall have the following meanings, unless they are inconsistent with the context:

"Adherence Agreement" means the agreement under which a person agrees to be bound by the terms of this Agreement in the form substantially similar as set out in the Schedule;

"Advisers Act" shall mean the U.S. Investment Advisers Act of 1940, as amended from time to time, and the rules and regulations of the U.S. Securities and Exchange Commission promulgated thereunder;

"Affiliate" means, with respect to a person, (i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director, officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above. For the purposes of this definition, control of a person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such persons or (ii) to direct or cause the direction of the management and policies of such person whether by contract or otherwise. For purposes of this definition, the management of an account by one person for the benefit of any other person shall not constitute "control" of such other person and no entity shall be deemed an "Affiliate" of the Company solely because the administrator or its Affiliates serve as administrator or share trustee for such entity;

"Agreement" means this agreement together with the Schedule;

"Articles" means the articles of incorporation of the Company as amended from time to time;

"Business" means the business of the Company as described in Recital (B);

"Business Day" means a day (other than a Saturday or Sunday) on which banks are open for ordinary banking business in Guernsey;

"Directors" means the directors of the Company from time to time;

"CLO Holdco" means CLO Holdco, Ltd. (or any permitted successor to the business of CLO Holdco, Ltd. or interest in the Company);

"Code" shall mean the U.S. Internal Revenue Code of 1986, as amended from time to time.

"Directors" means the directors of the Company from time to time;

"Dover IX" means HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or any interest in the Company);

"DOL" shall mean the U.S. Department of Labor, or any governmental agency that succeeds to the powers and functions thereof.

"DOL Regulations" shall mean the regulations of the DOL included within 29 C.F.R. section 2510.3-101.

23981765.11. BUSINESS                     2

"Dover IX" shall mean HarbourVest Dover Street IX Investment L.P. (or any permitted successor to the business of HarbourVest Dover Street IX Investment L.P. or interest in the Company);

"ERISA" shall mean the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time;

"ERISA Member" shall mean a Member that (a) is a "benefit plan investor" (as such term is defined in the DOL Regulations as modified by section 3(42) of ERISA) subject to the fiduciary responsibility provisions of part 4 of title I of ERISA or is a "plan" (as such term is defined in section 4975(e) of the Code) subject to section 4975 of the Code or (b) is designated as an ERISA Member by the General Partner in writing on or before the date at which such ERISA Member is admitted to the Company;

"HarbourVest Entities" means: Dover IX; HarbourVest 2017 Global AIF L.P.; HarbourVest 2017 Global Fund L.P.; HV International VIII Secondary L.P.; and HarbourVest Skew Base AIF L.P. (or any of their respective permitted successors to their businesses or interests in the Company);

"Highland Principals" means: Highland Capital Management, L.P.; Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker III Acct. # 3058311; Quest IRA, Inc., fbo Hunter Covitz Acct. # 1469811; Quest IRA, Inc., fbo Jon Poglitsch Acct. # 1470612; Quest IRA, Inc., fbo Neil Desai Acct. # 3059211 (or any of their respective permitted successors to their businesses or interests in the Company);

"Law" means the Companies (Guernsey) Law, 2008, as amended;

"Member" means a person whose name is from time to time entered in the register of members of the Company as the holder of shares in the Company;

"Parties" means the parties to this Agreement and any other person who agrees to be bound by the terms of this Agreement under an Adherence Agreement;

"Shares" means ordinary shares in the Company;

"Subsidiary" shall have the meaning ascribed to it in the Law;

"Subscription and Transfer Agreement" means the Subscription and Transfer Agreement, dated as of 15 November 2017, entered into by and among CLO HoldCo, Ltd. and each of the Members and acknowledged and agreed by the Company and the Portfolio Manager.

Any capitalized terms used herein without definition have the meanings specified in the Offering Memorandum.

1.2 any reference to the Parties being obliged to procure shall so far as they are able includes, without limitation, procuring by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company;

1.3 any reference to a person includes, where appropriate, that person's heirs, personal representatives and successors;

1.4 any reference to a person includes any individual, body corporate, corporation, firm, unincorporated association, organisation, trust or partnership;

1.5 any reference to time shall be to Guernsey time;

1.6 except where the context otherwise requires words denoting the singular include the plural and vice versa and words denoting any one gender include all genders;

23981765.11. BUSINESS          3

1.7     unless otherwise stated, a reference to a Clause or a Schedule is a reference to a Clause or a Schedule to this Agreement; and

1.8     Clause headings are for ease of reference only and do not affect the construction of any provision.

2.     THE BUSINESS OF THE COMPANY

2.1     The Parties hereby agree that the objects and purpose of the Company shall be to carry on the Business.

2.2     The Parties shall so far as they are able (including without limitation by the exercise of votes which they directly or indirectly control at meetings of the Directors or general meetings of the Company) procure that (i) the Company's principal activities shall be the pursuit of the objects and purposes described in Clause 2.1 conducted in accordance with the provisions hereof and with the Offering Memorandum, the Subscription and Transfer Agreement and Articles of the Company and (ii) the Parties shall not take any action inconsistent with the provisions of the Offering Memorandum, including, without limitation the investment strategy set forth in the "Summary" and the applicable restrictions during and after the Investment Period and the suspension or termination of the Investment Period following a Key Person Event.

2.3     The Members shall (so long as they hold shares in the capital of the Company) use all reasonable endeavours to promote and develop the Business of the Company.

3.     VOTING RIGHTS

3.1     The Parties agree that the following provisions of this Clause 3 shall apply during such period or periods as the Members parties hereto as the Members.

3.2     The Parties shall procure that the Company shall not take any action at any meeting requiring the sanction of an ordinary or special resolution or by written resolution, in each case of the Directors or of the Members, without the affirmative vote or prior written consent, as applicable, of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company, including, but not limited to, the following actions:

     3.2.1     any issuance of new shares of the Company or a new class of shares of the Company or payment of any dividend by issuance of new shares of the Company, other than issuances of Shares pursuant to the Offering Memorandum and the Subscription and Transfer Agreement;

     3.2.2     any alteration or cancellation of any rights of any Shares or of the Share capital of the Company,

     3.2.3     any conversion or redemption of Shares, except pursuant to Clause 5.5,

     3.2.4     any payment of commission in consideration for subscribing or agreeing to subscribe for any shares in the Company,

     3.2.5     the creation of any lien on any Shares, except pursuant to the remedies in Clause 5.3. or

     3.2.6     the suspension of the calculation of the NAV: other than a temporary suspension of the calculation of the NAV and NAV per Share by the Board of Directors during any period if it determines in good faith that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any market on which the Company's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended: (ii) during the existence of any state of affairs, including as a result of political, economic, military or monetary events or any circumstances outside the control of the Portfolio Manager or the Company, as a result of which,

23981765.11. BUSINESS      4

in the reasonable opinion of the Portfolio Manager, the determination of the value of the assets of the Company, would not be reasonably practicable or would be seriously prejudicial to the Members taken as a whole; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Company's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Company cannot reasonably be accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Portfolio Manager, be effected at normal rates of exchange; or (v) automatically upon liquidation of the Company.

4.     ADVISORY BOARD.

4.1    <u>Composition of Advisory Board</u>.  The Company shall establish an advisory board (the "Advisory Board") composed of two individuals, one of whom shall be a representative of CLO Holdco and one of whom shall be a representative of Dover IX (or, in each case, or any permitted successor to the interest in the Company of such Member).  No voting member of the Advisory Board shall be a controlled Affiliate of the Portfolio Manager (including, for the avoidance of doubt, following a permitted transfer of CLO Holdco's interest to an Affiliate of the Portfolio Manager, if applicable), it being understood that for the purposes of this sentence none of CLO Holdco, its wholly-owned subsidiaries nor any of their respective directors or trustees shall be deemed to be a controlled Affiliate of the Portfolio Manager due to their pre-existing non-discretionary advisory relationship with the Portfolio Manager.  None of the members of the Advisory Board shall receive any compensation (other than reimbursement for reasonable and documented out-of-pocket expenses) in connection with their position on the Advisory Board.  The Company shall bear any fees, costs and expenses related to the Advisory Board.

4.2    <u>Meetings of Advisory Board; Written Consents</u>.  The Advisory Board shall meet with the Portfolio Manager at such times as requested by the Portfolio Manager from time to time.  The quorum for a meeting of the Advisory Board shall be all of its members entitled to vote.  All actions taken by the Advisory Board shall be (i) by a unanimous vote of all of the members of the Advisory Board in attendance in a meeting at which a quorum is present and entitled to vote and not abstaining from voting or (ii) by a written consent in lieu of a meeting signed by all of the members of the Advisory Board entitled to consent and not abstaining from consenting. Meetings of the Advisory Board may be held in person, by telephone or by other electronic device.

4.3    <u>Functions of Advisory Board</u>.  The Advisory Board shall provide (or determine not to provide) any consents or approvals expressly contemplated by this Agreement and the Offering Memorandum to be provided by the Advisory Board and, at the request of the Portfolio Manager in its sole discretion, provide general advice (which, for the avoidance of doubt, shall be non-binding) to the Portfolio Manager or the Company with regard to Company activities and operations and other matters.  For the avoidance of doubt, no consent or approval of the Advisory Board shall be required for any action or determination expressly permitted or contemplated hereunder or in the Offering Memorandum and not conditioned on such a consent or approval.  The Portfolio Manager shall not act contrary to the advice of the Advisory Board with respect to any action or determination expressly conditioned herein or in the Offering Memorandum on the consent or approval of the Advisory Board.  Without limiting the foregoing, the Advisory Board shall be authorized to give any approval or consent required or deemed necessary or advisable under the Advisers Act on behalf of the Company and the Members, including under Section 206(3) of the Advisers Act.  The Portfolio Manager may from time to time in its discretion request the Advisory Board to review and ratify certain Company matters. The consent of the Advisory Board shall be required to approve the following actions: (i) any extension of the Investment Period; (ii) any extension of the Term (other than an automatic extension following an extension of the Investment Period that has been approved by the Advisory Board); (iii) any allotment of additional equity securities by the Company; and (iv) any investment in a Related Obligation or any other transaction between the Company or any entity in which the Company holds a direct or indirect interest, on the one hand, and Highland or any of its Affiliates, on the other hand and (v) other matters as set forth in the Offering

Memorandum. Notwithstanding the foregoing or anything to the contrary set forth herein, no transaction that is specifically authorized in the governing documents of the Company shall require approval of the Advisory Board, including, without limitation, sales or securitizations of all or a portion of the Company's loan portfolio into new Qualifying CLOs (i.e. the transfer of warehoused assets into new Qualifying CLOs), investments in CLO Notes issued by CLOs managed by Highland Affiliates, and the NexBank Credit Facility and any Permitted NexBank Credit Facility Amendments, in each case as described in the Offering Memorandum. Any such approval, consent or ratification given by the Advisory Board shall be binding on the Company and the Members. Neither the Advisory Board nor any member thereof shall have the power to bind or act for or on behalf of the Company in any manner, and no shareholder who appoints a member of the Advisory Board shall be deemed to be an Affiliate of the Company or Highland solely by reason of such appointment.

4.4    <u>Term of Members of Advisory Board</u>.   A member of the Advisory Board shall be deemed removed from the Advisory Board (i) if such member is no longer an officer, director, manager, trustee, employee, consultant or other representative of CLO Holdco or Dover IX, as applicable, or their respective Affiliates and shall be replaced as soon as practicable with a representative of CLO Holdco or Dover IX, or their respective Affiliates, as applicable, or (ii) if the Member represented by such member either becomes a Defaulting Member or such member ceases to be eligible to represent such Member pursuant to Clause 4.1.

4.5    <u>No Duties to Other Members</u>.  No Advisory Board member who is the representative of any Member shall, to the extent permitted by law, owe a fiduciary duty to the Company or any other Member (other than the duty to act in good faith), and may, to the fullest extent permitted by law, in all instances act in such member's own interest and in the interest of the Member that appointed such member.

5.    DEFAULTING MEMBERS

5.1    In the event any Member defaults in its obligation to pay the full amount of the purchase price of Shares called for settlement under the Subscription and Transfer Agreement on the applicable Settlement Date (such unpaid amount, an "Outstanding Settlement Amount"), the Portfolio Manager, on behalf of the Company, shall provide written or telephonic notice of such default to such Member. If such default is not cured within 5 business days after written (or if applicable telephonic or email) notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member, such Outstanding Settlement Amount shall automatically accrue interest on a retroactive basis from the date such Outstanding Settlement Amount was due at 12% (the "Default Interest Rate") (which interest, once paid, shall not be applied to the purchase of the unsettled Shares of such Member, but which will upon receipt be distributed pro rata to those Members who have funded any such Outstanding Settlement Amounts pursuant to this Clause 5). No such Shares which have failed to be settled will be issued to any Member until settlement of the full amount of the purchase price has been made.  In addition, if such default is not cured within 10 business days after written or telephonic notice thereof given by the Portfolio Manager, on behalf of the Company, has been received by such Member (a "Defaulting Member"), the following provisions shall apply:

5.2    Whenever the vote or consent of the Defaulting Member would otherwise be required or permitted hereunder or under the Articles, the Defaulting Member shall not be entitled to participate in such vote or consent in respect of his existing shareholding and with respect to any representative of such Defaulting Member on the Advisory Board, and such vote or consent shall be calculated as if such Defaulting Member were not a Member and, as applicable, any representative of such Defaulting Member on the Advisory Board were not a member of the Advisory Board.

5.3    The Portfolio Manager, on behalf of the Company, may pursue and enforce all rights and remedies available, including the commencement of legal proceedings against the Defaulting Member to collect the Outstanding Settlement Amounts, together with interest thereon for the account of the Company from the date due at the Default Interest Rate, plus the costs and expenses of collection (including attorneys' fees and expenses).

5.4    The Portfolio Manager, on behalf of the Company, may (at the sole cost of the Defaulting Member) borrow funds from any person (other than the Defaulting Member or its Affiliates) to cover such shortfall and/or advance all or a portion of the Defaulting Member's Outstanding Settlement Amount to the Company on behalf of the Defaulting Member, and such advance shall be repaid by the Defaulting Member to the Portfolio Manager, on behalf of the Company, with interest for the account of the Portfolio Manager, on behalf of the Company, on the amount outstanding from time to time commencing on the date of the advance at the Default Interest Rate. To the extent the Portfolio Manager, on behalf of the Company, advances funds to the Company on behalf of a Defaulting Member, all distributions from the Company that would otherwise be made to the Defaulting Member shall be paid to the Portfolio Manager, on behalf of the Company, (with any such amounts being applied first against accrued but unpaid interest and then against principal), until all amounts payable by the Defaulting Member to the Portfolio Manager, on behalf of the Company, under this Clause 5.4 (including interest) have been paid in full.

5.5    The Portfolio Manager, on behalf of the Company, may elect, upon notice to the Defaulting Member, to redeem the Defaulting Member's shares in an amount equal to 50% of the outstanding amount existing as of the date of the default at a price of $0.0001 per Share. Thereupon, the commitment of the Defaulting Member under the Subscription and Transfer Agreement shall be zero, the Defaulting Member shall not be obligated to make any further settlements, the voting capital of such Defaulting Member and of each other Member shall be re-determined as of the date of such default to reflect the new commitment of the Defaulting Member, and the Portfolio Manager shall revise the books and records of the Company to reflect the reduction of the commitment of the Defaulting Member. The Members agree (x) that the damages suffered by the Company as the result of a failure by a Member to settle a commitment to purchase Shares that is required by this Agreement cannot be estimated with reasonable accuracy and (y) that the foregoing provisions of this Clause 5.5 shall act as liquidated damages for the default by the Defaulting Member (which each Member hereby agrees are reasonable).

5.6    The Board may offer to the non-Defaulting Members (pro rata in accordance with their respective Commitments) the option of purchasing the Defaulting Member's unsettled Shares on the terms set forth in the applicable Settlement Notice (as defined in the Subscription and Transfer Agreement).

5.7    At the election of the Board, distributions of dividends otherwise payable to the Defaulting Member under the Articles shall not be paid to the Defaulting Member, but instead shall be applied against the amount of the Outstanding Settlement Amount (plus interest at the Default Interest Rate and related costs); provided that any amounts so applied shall be deemed to have been distributed to the Defaulting Member under the Articles.

5.8    The Portfolio Manager may send an amended or new Settlement Notice to the Members other than the Defaulting Member in an amount equal to the Defaulting Member's Outstanding Settlement Amount and otherwise in accordance with the Subscription and Transfer Agreement.

5.9    Each Defaulting Member further appoints the Portfolio Manager as agent and attorney-in-fact for the Defaulting Member and hereby grants to the Portfolio Manager an irrevocable power of attorney to take all actions necessary on its behalf to sell, assign, or transfer the commitment to purchase unsettled Shares of such Defaulting Member pursuant to Clause 5.6 or as necessary on its behalf to effect the other remedies or rights set forth in this Clause 5; provided that the Portfolio Manager shall not bind any Defaulting Member to an indemnification or other similar obligation which guarantees the financial performance of the Company or which exceeds the ability of the Defaulting Member to provide indemnification under applicable law.

6.    TRANSFERS OR DISPOSALS OF SHARES

6.1    No Member shall sell, pledge, charge, mortgage, assign, assign by way of security, transfer, convey, exchange or otherwise dispose of its Shares or its commitment to settle purchases of Shares under the Subscription and Transfer Agreement (each a "Transfer"), other than to an Affiliate of an initial Member party hereto, without the prior written consent of the Portfolio

Manager, which consent shall be in the sole discretion of the Portfolio Manager; provided that no such Transfer shall be made unless in the opinion of counsel reasonably satisfactory to the Portfolio Manager (who may be counsel for the Company, and which requirement for an opinion may be waived, in whole or in part, in the sole discretion of the Portfolio Manager) that:

6.1.1   such Transfer would not require registration under the Securities Act or any state securities or "Blue Sky" laws or other laws applicable to the Shares to be assigned or transferred and is conducted in conformance with the restrictions set forth in the Offering Memorandum;

6.1.2   such Transfer would not be reasonably likely to cause the Company to be subject to tax in any jurisdiction other than of its incorporation on a net income basis, not be reasonably likely to cause the Company to become subject to registration as an investment company under the Investment Company Act of 1940, as amended;

6.1.3   such Transfer would not cause the Company to considered to be an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" in such entity pursuant to the U.S. Plan Assets Regulations; and

6.1.4   such sale, assignment, disposition or transfer would not to cause all or any portion of the assets of the Company to constitute "plan assets" under ERISA or the Code.

6.2   Prior to making any Transfer of Shares (other than Transfers to Affiliates of an initial Member or, in the case of CLO Holdco or a Highland Principal, to Highland, its Affiliates or another Highland Principal) a Member must first offer to the other Members a right to purchase the Shares, on a pro rata basis with respect to their current Shares, at the same price (which must be cash) as such Shares are proposed to be purchased by the prospective third party purchaser pursuant to an irrevocable offer letter. The other Members will have 30 days following receipt of the letter to determine whether to purchase their entire pro rata portion of the Shares proposed to be Transferred. If the other Members do not accept the offer, the Member may (subject to complying with the other Transfer restrictions in this Agreement) Transfer the applicable Shares that such Members have not elected to purchase to a third party at a price equal to or greater than the price described in the offer letter, provided that if the Member has not (a) entered into a definitive agreement to effect such sale within 90 days after the expiration of the period that the other Members have to accept the offer in the offer letter or (b) consummated the sale within 120 day after the entry into the definitive agreement to consummate the sale, it must comply with these right of first refusal procedures again. Any Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to any other Member (subject to complying with the other Transfer restrictions in this Agreement), any initial Member (other than the Member proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to an Affiliate (subject to complying with the other Transfer restrictions in this Agreement), and CLO Holdco and the Highland Principals (unless such Member is the Member proposing the Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to Highland, an Affiliate of Highland or other Highland Principals (subject to complying with the other Transfer restrictions in this Agreement).

6.3   No Highland Principal may transfer his or its interests in the Company other than (i) to a trust or other tax or estate planning vehicle or (ii) to the Portfolio Manager, its Affiliates or another Highland Principal upon the termination of such Highland Principal's (or the beneficial owner of such Highland Principal, if applicable) employment by Highland Capital Management, L.P.

6.4   Any transferor of any Share shall remain bound by the terms of this Agreement applicable to it prior to such transfer and that nothing in this Agreement shall constitute a waiver of any rights a Party to this Agreement may have by reason of a breach of this Agreement by a transferor prior to transfer.  The transferor and/or the transferee shall bear all costs of any Transfer.

6.5   The Parties agree not to Transfer their Shares to any person unless such transferee agrees to be bound by the terms of this Agreement.

6.6   All Adherence Agreements executed pursuant to this Clause shall be executed by the transferee or allottee and each Party.

7.    CONFIDENTIALITY

7.1    Each Party agrees to keep any information received by it pursuant to this Agreement or relating to the Business as confidential and not (save with the relevant Party's consent or as may be required by Law or the rules of any regulatory authority or any stock exchange) disclose to any person such information.

7.2    Notwithstanding the foregoing, the Parties agree that the HarbourVest Entities may disclose to their limited partners and prospective limited partners (including any agents of such limited partners or prospective limited partners), clients and applicable governmental agencies (a) the name and address of the Company, (b) the capital commitment and the remaining capital commitment, (c) the net asset value of such HarbourVest Entity's interest in the Company, (d) the amount of distributions that have been made to such HarbourVest Entity by the Company and the amount of contributions that have been made by such HarbourVest Entity to the Company, (e) such ratios and performance information calculated by such HarbourVest Entity using the information in clauses (a) through (d) above, including the ratio of net asset value plus distributions to contributions (i.e., the "multiple") and such HarbourVest Entity's internal rate of return with respect to its investment in the Company, and (f) tax information with respect to the Company.

8.    DIVIDENDS

8.1    The Company agrees that it shall not, and the Portfolio Manager agrees it shall not cause the Company to, make any dividends except pursuant to the section titled "Summary—Dividend Policy" of the Offering Memorandum.

9.    TERM OF THE COMPANY

9.1    Each Party agrees to cause the winding up and dissolution of the Company after the ten year anniversary of the date hereof (the "Term"); provided that the Portfolio Manager, in its reasonable discretion, may postpone dissolution of the Company for up to 180 days in order to facilitate orderly liquidation of the investments; provided, further, that the Term shall be automatically extended for any amount of time for which the Investment Period may be extended.

9.2    Notwithstanding the foregoing, the Term may be extended with the consent of the Portfolio Manager and the Advisory Board for up to two successive periods of one year each.

10.    ERISA MATTERS

10.1    The Portfolio Manager, the Company and each Member shall use their reasonable best efforts to conduct the affairs and operations of the Company so as to limit investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to less than the U.S. Plan Threshold. In the event the U.S. Plan Threshold is met or exceeded, the Portfolio Manager, on behalf of the Company, may require any Non-Qualified Holder that is a U.S. Plan Investor to sell or transfer their Shares to a person qualified to own the same that is not a U.S. Plan Investor within 30 days and within such 30 days and to provide the Company with satisfactory evidence of such sale or transfer such that such sale or transfer, together with other sale or transfers pursuant to this Clause, would result in the investment in the Company by "benefit plan investors" (within the meaning of the DOL Regulations as modified by section 3(42) of ERISA) to be less than the U.S. Plan Threshold. Where the conditions above are not satisfied within 30 days after the serving of the notice to transfer, such Non-Qualified Holder will be deemed, upon the expiration of such 30 days, to have forfeited their Shares.

11.    TAX MATTERS

11.1    PFIC. For each fiscal year of the Company, the Company will no later than 120 days after the end of such fiscal year, commencing with the first fiscal year for which the Company is determined to be a PFIC (a "passive foreign investment company"), furnish to each of the

HarbourVest Entities (x) all information necessary to permit such HarbourVest Entity or any of its partners to complete United States Internal Revenue Service Form 8621 with respect to their interests in the Company and (y) a PFIC Annual Information Statement under section 1295(b) of the Code with respect to the Company: provided that if the Company is unable to furnish such final information and Statement within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information and Statement on or before the 120th day after the end of such fiscal year.

11.2 CFC. The Company shall furnish to each of the HarbourVest Entities within 120 days after the end of each fiscal year of the Company, a United States Internal Revenue Service Form 5471 for such fiscal year, completed for all information concerning the Company required to be filed by such HarbourVest Entity or any of its partners (i.e., all portions applicable to the relevant category of filer other than page 1 items A-D and page 2 Schedule B), to the extent such Form 5471 is required to be filed by such HarbourVest Entity or any of its partners: provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year.

11.3 Other Tax Information. The Company shall furnish to each of the HarbourVest Entities (a) within 120 days after the end of each fiscal year of the Company such other information reasonably requested by the HarbourVest Entities that any HarbourVest Entity may require in order for it or any of its partners to comply with its U.S. federal income tax reporting obligations with respect to its interest in the Company: provided that if the Company is unable to furnish such final information within such 120 days, then the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of such fiscal year and (b) promptly upon request such other information reasonably requested by such HarbourVest Entity in order to withhold tax or to file tax returns and reports or to furnish tax information to any of its partners with respect to the Company.

11.4 Withholding and Other Taxes. The Company will use reasonable best efforts to acquire investments that will not result in withholding or other taxes being imposed directly or indirectly on the Company by any jurisdiction with respect to income or distributions from such investments.

12. AMENDMENTS TO CERTAIN AGREEMENTS

12.1 The Portfolio Manager and the Company shall not amend or terminate, or agree to amend or terminate, the Memorandum or Articles of Incorporation of the Company or that certain Portfolio Management Agreement between the Portfolio Manager and the Company dated as of the date hereof (the "Management Agreement") without the consent of the Parties.

12.2 The Portfolio Manager agrees that it shall not assign its rights, duties and obligations under the Management Agreement without the consent of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company. Notwithstanding the foregoing, the Portfolio Manager may, without the consent of the Members, assign any of its rights or obligations under the Management Agreement to an Affiliate: provided that such Affiliate (A) has demonstrated ability, whether as an entity or by its personnel, to professionally and competently perform duties similar to those imposed upon the Portfolio Manager pursuant to the Management Agreement, (B) has the legal right and capacity to act as Portfolio Manager thereunder and (C) shall not cause the Company or the pool of collateral to become required to register under the provisions of the Investment Company Act and such action does not cause the company to be subject to tax in any jurisdiction outside of its jurisdiction of incorporation.

12.3 The Company agrees that it shall not hire any portfolio manager without the consent of the Parties and such new portfolio manager shall be required to join and abide by this Agreement.

13. FINANCIAL REPORTS

13.1 The books and records of account of the Company shall be audited as of the end of each fiscal year of the Company by a nationally recognized independent public accounting firm selected by

23981765.11. BUSINESS           10

the Portfolio Manager that is registered with, and subject to regular inspection as of the commencement of the professional engagement period, and as of each calendar year-end, by, the Public Company Accounting Oversight Board in accordance with its rules. During the Term, the Portfolio Manager or the Company shall prepare and mail, deliver by fax, email or other electronic means or otherwise make available a financial report (audited in the case of a report sent as of the end of a fiscal year and unaudited in the case of a report sent as of the end of a quarter) to each Member on or before the 120th day after the end of each fiscal year and the 45th day after the end of each of the first three quarters of each fiscal year, setting forth for such fiscal year or quarter (a) the assets and liabilities of the Company as of the end of such fiscal year or quarter; (b) the net profit or net loss of the Company for such fiscal year or quarter; and (c) such Member's closing capital account balance as of the end of such fiscal year or quarter; provided that if the Portfolio Manager or the Company is unable to furnish final information with respect to any of the above, then the Portfolio Manager or the Company shall use its reasonable best efforts to furnish estimates of such information on or before the 120th day after the end of each fiscal year and the 45th day after the end of the first three quarters of each fiscal year. On or before the 60th day after the end of each fiscal year, the Portfolio Manager or the Company shall provide to each Member an unaudited draft of the financial report for such fiscal year.

13.2 After the end of each fiscal year or quarter, the Portfolio Manager or the Company shall cause to be delivered to the Advisory Board a reasonably detailed summary of the expenses incurred by the Company during such period.

14. TERMINATION AND LIQUIDATION

14.1 Save as provided for in Clause 13.2, this Agreement shall terminate:

14.1.1 when one Party holds all the Shares;

14.1.2 when a resolution is passed by the Company's Members or creditors, or an order made by a court or other competent body or person instituting a process that shall lead to the Company being wound up and its assets being distributed among the Company's creditors, Members or other contributors; or

14.1.3 with the written consent of all the Parties.

14.2 The following provisions of this Agreement remain in full force after termination: Clause 1 (Interpretation), Clause 7 (Confidentiality), this Clause, Clause 14 (Whole Agreement), Clause 16 (Assignments), Clause 17 (Variation and Waiver), Clause 18 (Service of Notice), Clause 19 (General) and Clause 21 (Governing Law and Jurisdiction).

14.3 Termination of this Agreement shall not affect any rights or liabilities that the Parties may have accrued under it.

14.4 Where the Company is to be wound up and its assets distributed, the Parties shall agree a suitable basis for dealing with the interests and assets of the Company and shall endeavour to ensure that:

14.4.1 all existing contracts of the Company are performed to the extent that there are sufficient resources;

14.4.2 the Company shall not enter into any new contractual obligations;

14.4.3 the Company is dissolved and its assets are distributed as soon as practical; and

14.4.4 any other proprietary information belonging to or originating from a Party shall be returned to it by the other Parties.

23981765.11. BUSINESS 11

15.   WHOLE AGREEMENT

15.1   This Agreement, and any documents referred to in it, constitute the whole agreement between the Parties and supersede any arrangements, understanding or previous agreement between them relating to the subject matter they cover.

15.2   Each Party acknowledges that in entering into this Agreement, and any documents referred to in it, it does not rely on, and shall have no remedy in respect of, any statement, representation, assurance or warranty of any person other than as expressly set out in this Agreement or those documents.

15.3   Nothing in this Clause 14 operates to limit or exclude any liability for fraud.

16.   STATUS OF AGREEMENT

16.1   Each Party shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure that the provisions of this Agreement are properly and promptly observed and given full force and effect according to the spirit and intention of the Agreement.

16.2   If any provision in the memorandum of incorporation of the Company or the Articles conflicts with any provision of this Agreement, the provisions of this Agreement shall prevail as between the Parties. Each of the Parties shall, to the extent that it is able to do so, exercise its voting rights and other powers in relation to the Company to procure the modification of the memorandum of association of the Company or the Articles (as the case may be) in order to eliminate the conflict, but this Agreement shall not itself constitute a modification of the memorandum of association of the Company or the Articles.

17.   ASSIGNMENTS

Save as expressly permitted by this Agreement, no person may assign, or grant any security interest over, any of its rights under this Agreement or any document referred to in it without the prior written consent of the Parties.

18.   VARIATION AND WAIVER

18.1   A variation of this Agreement shall be in writing and signed by or on behalf of the Parties.

18.2   A waiver of any right under this Agreement is only effective if it is in writing and it applies only to the person to which the waiver is addressed and the circumstances for which it is given.

18.3   A person that waives a right in relation to one person, or takes or fails to take any action against that person, does not affect its rights against any other person.

19.   SERVICE OF NOTICE

19.1   Any notice required to be given by any of the Parties may be sent by post or facsimile to the address and facsimile number of the addressee as set out in this Agreement, in either case marked for the attention of the relevant person named below, or to such other address and/or facsimile number and/or marked for the attention of such other person as the addressee may from time to time have notified for the purposes of this Clause.

   19.1.1   to the Company:
            Address:
            First Floor, Dorey Court, Admiral Park
            St Peter Port, Guernsey GY1 6HJ
            Channel Islands

   19.1.2   to CLO Holdco:

23981765.11. BUSINESS                    12

140

Address:
c/o Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, TX 75201
Attn: General Counsel
Tel: +1 (972) 628-4100
Email: Notices@highlandcapital.com

19.1.3 to any HarbourVest Entity:
Address:
c/o HarbourVest Partners, LLC
One Financial Center, 44th Floor
Boston, MA 02111
USA
Attn: Michael Pugatch
Tel: +1 (617) 348-3712
F
Email: mpugatch@harbourvest.com

19.1.4 to any other Party: by post or hand delivery only to the address specified in the register of members of the Company.

19.2 Communications sent by post shall be deemed to have been received 24 hours after posting. Communications sent by facsimile transmission shall be deemed to have been received at the time the transmission has been received by the addressee PROVIDED THAT if the facsimile transmission, where permitted, is received after 5.00pm or on a day which is not a Business Day, it shall be deemed to have been received 11.00am the Business Day following thereafter.

19.3 In proving service by post it shall only be necessary to prove that the notice was contained in an envelope which was duly addressed and posted in accordance with this Clause and in the case of facsimile transmission it shall be necessary to prove that the facsimile was duly transmitted to the correct number.

20. GENERAL

20.1 Each of the Parties hereby agree not to enter into or abide by any agreement whether written or oral with any one or more of the other Parties in respect of the voting of Shares or the submission of Member resolutions to any Members for voting by them, or otherwise to direct or influence, or attempt to direct or influence, the day-to-day management of the Company, either directly or indirectly, other than in order to comply with the other terms of this Agreement or the Articles. In this regard, each of the Parties agrees to not to direct or influence or to attempt to direct or influence any of the Directors through any employment relationship that the Directors may have outside of the Company other than in order to comply with the other terms of this Agreement or the Articles. Each of the Parties hereby agree that this provision shall continue to apply to them whether or not they are or remain a Member.

20.2 Unless otherwise provided, all costs in connection with the negotiation, preparation, execution and performance of this Agreement, shall be borne by the Party that incurred the costs.

20.3 The Parties are not in partnership with each other and there is no relationship of principal and agent between them.

20.4 All transactions entered into between any Party and the Company shall be conducted in good faith and on the basis set out or referred to in this Agreement or, if not provided for in this Agreement, as may be agreed by the Parties and, in the absence of such agreement, on an arm's length basis.

20.5 Each Party shall at all times act in good faith towards the other Parties and shall use all reasonable endeavours to ensure that this Agreement is observed.

23981765.11. BUSINESS                    13

20.6 Each Party shall promptly execute and deliver all such documents, and do all such things, as the other Parties may from time to time reasonably require for the purpose of giving full effect to the provisions of this Agreement.

20.7 This Agreement may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each Party had signed the same document. This Agreement may not be amended except with the consent of each Party.

21. STATUS OF AGREEMENT

21.1 The Parties shall, when necessary, exercise their powers of voting and any other rights and powers they have to amend, waive or suspend a conflicting provision in the Articles to the extent necessary to permit the Company and its Business to be administered as provided in this Agreement.

21.2 If there is an inconsistency between any of the provisions of this agreement and the provisions of the Articles, the provisions of this agreement shall prevail as between the Parties.

22. GOVERNING LAW AND JURISDICTION

This Agreement shall be governed by and construed in accordance with the laws of the Island of Guernsey and each of the Parties submits to the non-exclusive jurisdiction of the Royal Courts of the Island of Guernsey.

[Signature Page Follows.]

23981765.11. BUSINESS                    14

**IN WITNESS WHEREOF** the Parties hereto have caused this Agreement to be executed the day and year first before written

**SIGNED** for and on behalf of **CLO HOLDCO, LTD.**

**By**:………………………………………………………………
**Name:** Grant Scott
**Title:** Director

SIGNATURE PAGE TO MEMBERS'AGREEMENT

**SIGNED** for and on behalf of
**HARBOURVEST DOVER STREET IX INVESTMENT L.P.**

By:    HarbourVest Partners (Europe) Limited,
        its Alternative Investment Fund Manager

**By:** .............................................................
**Name:** Michael J. Pugatch
**Title:** Authorized Person


**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL AIF L.P.**

By:    HarbourVest Partners (Europe) Limited,
        its Alternative Investment Fund Manager

**By:** .............................................................
**Name:** Michael J. Pugatch
**Title:** Authorized Person


**SIGNED** for and on behalf of
**HARBOURVEST 2017 GLOBAL FUND L.P.**

By:    HarbourVest 2017 Global Associates L.P.,
        its General Partner

By:    HarbourVest GP LLC,
        its General Partner

By:    HarbourVest Partners, LLC,
        its Managing Member

**By:** .............................................................
**Name:** Michael J. Pugatch
**Title:** Managing Director


SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**HV INTERNATIONAL VIII SECONDARY L.P.**

By:    HIPEP VIII Associates L.P.
        Its General Partner
By:    HarbourVest GP LLC
        Its General Partner
By:    HarbourVest Partners, LLC
        Its Managing Member

**By:** .................................................
**Name:**  Michael J. Pugatch
**Title:**  Managing Director


**SIGNED** for and on behalf of
**HARBOURVEST SKEW BASE AIF L.P.**

By:    HarbourVest Partners (Europe) Limited,
        its Alternative Investment Fund Manager

**By:** .................................................
**Name:**  Michael J. Pugatch
**Title:**  Authorized Person

SIGNATURE PAGE TO MEMBERS' AGREEMENT

145

**SIGNED**

Lee Blackwell Parker, III

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

Read and approved

By:..................................................
Name: *Emmanuel Mao-el*
Title: *transactions superior*

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:..................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:..................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:..................................................
Name:
Title:

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

By:......................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:......................................................................
Name: Emmanuel Maciel
Title: Transaction Superior

Read & Approved

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:......................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:......................................................................
Name:
Title:

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

**By:**........................................................
**Name:**
**Title:**

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

**By:**........................................................
**Name:**
**Title:**

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

**By:**........................................................
**Name:** *Emmanuel Magey*
**Title:** *Transactions Supervisor*

*Read and Approved:*

*11/7/17*

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

**By:**........................................................
**Name:**
**Title:**

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO LEE B. PARKER III, ACCT. # 3058311**

By:.................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO HUNTER COVITZ, ACCT. # 1469811**

By:.................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO JON POGLITSCH, ACCT. # 1470612**

By:.................................................................
Name:
Title:

**SIGNED** for and on behalf of
**QUEST IRA, INC.**
**FBO NEIL DESAI, ACCT. # 3059211**

By:.................................................................
Name: Emmanuel Maoel
Title: Transaction Supervisor

Read and approved

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:    Strand Advisors, Inc.,
       its General Partner

**By**:................................................................
**Name:** James Dondero
**Title:** President

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**HIGHLAND HCF ADVISOR, LTD.**

**By**:...............................................................
**Name:** James Dondero
**Title:**   President

SIGNATURE PAGE TO MEMBERS' AGREEMENT

**SIGNED** for and on behalf of
**HIGHLAND CLO FUNDING, LTD.**

**By**:................................................................................

**Name:** William Scott
**Title:** Director

SCHEDULE

Adherence Agreement

THIS ADHERENCE AGREEMENT is made on [ ] 200[ ]

BETWEEN:

(1)     [ ] of [ ] (the "Covenantor");

(2)     CLO HOLDCO, LTD. of [                         ] (a "Member");

(3)     [ ] of [                         ] (a "Member");

(4)     [ ] of [                         ] (a "Member");

(5)     HIGHLAND CLO FUNDING, LTD., with registration number 60120 whose registered office is at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (the "Company")

(6)     HIGHLAND HCF ADVISOR, LTD., registered address is at Maples Corporate Services Limited, PO Box 309, Ugland House, Grand Cayman, KY1-1104, Cayman Islands (the "Portfolio Manager").

RECITAL

This Agreement is supplemental to the members agreement made on November 15 2017 between the Members, the Portfolio Manager and the Company (the "Members Agreement").

IT IS HEREBY AGREED as follows:

1.      The Covenantor hereby confirms that he has been supplied with a copy of the Members Agreement and hereby covenants with each of the parties thereto to observe, perform and be bound by all the terms of the Members Agreement as if it were a party thereto.

2.      Each of the other parties to the Members Agreement hereby covenants with the Covenantor that the Covenantor shall be entitled to the benefit of the terms of the Members Agreement as if he were a party thereto.

3.      This Agreement shall be governed by and construed in accordance with Guernsey law.

IN WITNESS of which this Agreement has been executed by the Covenantor and each of the parties to the Members Agreement on the date shown above.

**THIS DOCUMENT IS IMPORTANT AND REQUIRES YOUR IMMEDIATE ATTENTION. If you are in any doubt as to the action you should take or the contents of this document, you are recommended to seek your own independent financial advice immediately from your stockbroker, bank, solicitor, accountant, or other appropriate independent financial adviser, who is authorised under the Financial Services and Markets Act 2000, as amended ("FSMA") if you are in the United Kingdom, or from another appropriately authorised independent financial adviser if you are in a territory outside the United Kingdom.**

**A copy of this document, which comprises an offering memorandum (the "Offering Memorandum") relating to Highland CLO Funding, Ltd. (the "Company") in connection with the issue of Placing Shares in the Company, is available at the Company's registered office upon request.**

**The Placing Shares are only suitable for investors: (i) who understand the potential risk of capital loss and that there may be limited liquidity in the underlying investments of the Company; (ii) for whom an investment in the Placing Shares is part of a diversified investment programme; and (iii) who fully understand and are willing to assume the risks involved in such an investment programme. It should be remembered that the price of the Placing Shares and the income from them can go down as well as up and that investors may not receive, on the sale or cancellation of the Placing Shares, the amount that they invested.**

The Company and its directors (whose names appear in the section of this Offering Memorandum entitled "*Company Directors and Administration*") (the "**Directors**") accept responsibility for the information contained in this Offering Memorandum. To the best of the knowledge of the Company and the Directors (who have taken all reasonable care to ensure that such is the case), the information contained in the Offering Memorandum is in accordance with the facts and contains no omission likely to affect its import. The Directors have taken all reasonable care to ensure that the facts stated in the Offering Memorandum are true and accurate in all material respects, and that there are no other facts the omission of which would make misleading any statement in this Offering Memorandum, whether of facts or of opinion. All the Directors accept responsibility accordingly.

**Potential investors should read the whole of this Offering Memorandum when considering an investment in the Placing Shares and, in particular, attention is drawn to the section of this Offering Memorandum entitled "*Risk Factors*" on pages 18 to 47 of this Offering Memorandum.**

---

### HIGHLAND CLO FUNDING, LTD.
*(a closed-ended investment company limited by shares incorporated under the laws of Guernsey with registered number 60120)*

### Placing for a target issue of U.S. $153,000,000 of Placing Shares

---

This Offering Memorandum does not constitute or form part of any offer or invitation to sell, or the solicitation of an offer to acquire or subscribe for, any securities other than the securities to which it relates or any offer or invitation to sell or issue, or any solicitation of any offer to purchase or subscribe for such securities by any person in any circumstances in which such offer or solicitation is unlawful.

The Placing Shares have not been and will not be registered under the U.S. Securities Act of 1933 (the "**U.S. Securities Act**") or under the securities laws of any state or other jurisdiction of the United States. The Placing Shares may not be offered, sold, exercised, resold, transferred or delivered, directly or indirectly, within the United States or to, or for the account or benefit of, U.S. Persons, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and in compliance with any applicable securities laws of any state or other jurisdiction in the United States.

The Company has not been and will not be registered under the U.S. Investment Company Act of 1940, as amended (the "**U.S. Investment Company Act**") and investors will not be entitled to the benefits of the U.S. Investment Company Act. There will be no public offer of the Placing Shares in the United States.

**Neither the U.S. Securities and Exchange Commission (the "SEC") nor any state securities commission has approved or disapproved of the Placing Shares or passed upon or endorsed the merits of the offering of the Placing Shares or the adequacy or accuracy of this Offering Memorandum. Any representation to the contrary is a criminal offence in the United States.**

Except with the express written consent of the Company given in respect of an investment in the Company, the Placing Shares may not be acquired by: (i) investors using assets of: (A) an "employee benefit plan" as defined in Section 3(3)

of the United States Employee Retirement Income Security Act of 1974, as amended ("**ERISA**") that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the United States Internal Revenue Code of 1986, as amended (the "**U.S. Tax Code**"), including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Tax Code; or (C) an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" described in preceding clause (A) or (B) in such entity pursuant to the U.S. Plan Assets Regulations; or (ii) a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Tax Code, unless its purchase, holding, and disposition of the Placing Shares will not constitute or result in a non-exempt violation of any such substantially similar law.

The distribution of this Offering Memorandum and the offer of the Placing Shares in certain jurisdictions may be restricted by law. No action has been or will be taken to permit the possession, issue or distribution of this Offering Memorandum (or any other offering or publicity material relating to the Placing Shares) in any jurisdiction where action for that purpose may be required or doing so is restricted by law. Accordingly, neither this Offering Memorandum, nor any advertisement, nor any other offering material may be distributed or published in any jurisdiction except under circumstances that will result in compliance with any applicable laws and regulations. Persons into whose possession this Offering Memorandum comes should inform themselves about and observe any such restrictions. None of the Company or any of its affiliates or advisors accepts any legal responsibility for any breach by any person, whether or not a prospective investor, of any such restrictions.

**In addition, the Placing Shares are subject to restrictions on transferability and resale in certain jurisdictions and may not be transferred or resold except as permitted under applicable securities laws and regulations. Investors may be required to bear the financial risks of their investment in the Placing Shares for an indefinite period of time. Any failure to comply with these restrictions may constitute a violation of the securities laws of any such jurisdictions. For further information on restrictions on offers, sales and transfers of the Placing Shares, please refer to the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*".**

In making an investment decision, each investor must rely on their own examination, analysis and enquiry of the Company and the terms of the Placing including the merits and risks involved. The investors also acknowledge that they have relied only on the information contained in this document. No person has been authorised to give any information or make any representations other than those contained in this Offering Memorandum and, if given or made, such information or representations must not be relied on as having been so authorised. Neither the delivery of this Offering Memorandum nor any subscription or sale made under it shall, under any circumstances, create any implication that there has been no change in the affairs of the Company since the date of this document or that the information in it is correct as of any subsequent time.

None of the Company or any of its representatives is making any representation to any prospective investor in respect of the Placing Shares regarding the legality of an investment in the Placing Shares by such prospective investor under the laws applicable to such prospective investor.

The contents of this Offering Memorandum should not be construed as legal, financial or tax advice. Each prospective investor should consult his, her or its own legal, financial or tax adviser for legal, financial or tax advice.

The Company is a registered closed-ended collective investment scheme pursuant to The Protection of Investors (Bailiwick of Guernsey) Law, 1987, as amended and the Registered Collective Investment Schemes Rules 2015 issued by the Guernsey Financial Services Commission. Neither the Guernsey Financial Services Commission nor the States of Guernsey take any responsibility for the soundness of the Company or for the correctness of any statements made or opinions expressed with regard to it.

If you are in any doubt about the contents of this Offering Memorandum you should consult your accountant, legal or professional adviser or financial adviser.

This Offering Memorandum has not been reviewed by the Guernsey Financial Services Commission and, in granting registration, the Guernsey Financial Services Commission has relied upon specific warranties provided by State Street (Guernsey) Limited, the Company's designated administrator.

It should be remembered that the price of securities and the income from them can go down as well as up.

**You are wholly responsible for ensuring that all aspects of the Company are acceptable to you. Investment in the Company may involve special risks that could lead to a loss of all or a substantial portion of such investment.**

**Unless you fully understand and accept the nature of the Company and the potential risks inherent in this Company you should not invest in the Company.**

This Offering Memorandum is dated November 15, 2017.

## IMPORTANT NOTICES

**Investors should rely only on the information contained in this Offering Memorandum. No person has been authorised to give any information or to make any representations in connection with the Placing other than those contained in this Offering Memorandum and, if given or made, such information or representations must not be relied upon as having been authorised by or on behalf of the Company. Neither the delivery of this Offering Memorandum nor any subscription or sale made under this Offering Memorandum shall, under any circumstances, create any implication that there has been no change in the business or affairs of the Company since the date of this Offering Memorandum or that the information contained in this Offering Memorandum is correct as of any time subsequent to its date.**

The contents of this Offering Memorandum are not to be construed as legal, financial, business, investment or tax advice. Each prospective investor should consult his or her own legal adviser, financial adviser or tax adviser for legal, financial or tax advice in relation to any purchase or proposed purchase of Placing Shares.

An investment in the Placing Shares is suitable only for institutional, professional and high net worth investors, private client fund managers and brokers and other investors who are capable of evaluating the merits and risks of such an investment and/or who have received advice from their fund manager or broker regarding such an investment and who have sufficient resources to be able to bear losses (which may equal the whole amount invested) that may result from such an investment. An investment in the Placing Shares should constitute part of a diversified investment portfolio. Accordingly, typical investors in the Company are expected to be institutional, professional and high net worth investors, private client fund managers and brokers and other investors who understand the risks involved in investing in the Company and/or who have received advice from their fund manager or broker regarding investment in the Company.

In making an investment decision, each investor must rely on their own examination, analysis and enquiry of the Company and the terms of the Placing including the merits and risks involved. Investors who purchase Placing Shares will be deemed to have acknowledged that no person has been authorised to give any information or make any representations other than those contained in this Offering Memorandum and, if given or made, such information or representations must not be relied on as having been authorised by the Company.

**General**

Prospective investors should not treat the contents of this Offering Memorandum as advice relating to legal, taxation, investment or any other matters. Prospective investors should inform themselves as to: (a) the legal requirements within their own countries for the purchase, holding, transfer, redemption or other disposal of Placing Shares; (b) any foreign exchange restrictions applicable to the purchase, holding, transfer, redemption or other disposal of Placing Shares which they might encounter; and (c) the income and other tax consequences which may apply in their own countries as a result of the purchase, holding, transfer, redemption or other disposal of Placing Shares. Prospective investors must rely on their own representatives, including their own legal advisers, financial advisers and accountants, as to legal, tax, investment or any other related matters concerning the Company and an investment therein.

Statements made in this Offering Memorandum are based on the law and practice currently in force and are subject to changes therein. This Offering Memorandum should be read in its entirety before making any application for Placing Shares.

Application will be made to the appropriate securities exchange for the Placing Shares to be admitted when deemed appropriate by the Company.

All times and dates referred to in this Offering Memorandum are, unless otherwise stated, references to Guernsey times and dates and are subject to change without further notice.

- i -

**Capitalised terms contained in this Offering Memorandum shall have the meanings set out in the Offering memorandum and/or in the section of this Offering Memorandum entitled "*Definitions*", save where the context indicates otherwise.**

**Restrictions on distribution and sale**

The distribution of this Offering Memorandum and the offering and sale of securities offered hereby in certain jurisdictions may be restricted by law. Persons in possession of this Offering Memorandum are required to inform themselves about and observe any such restrictions. This Offering Memorandum may not be used for, or in connection with, and does not constitute, any offer to sell, or solicitation to purchase, any such securities in any jurisdiction in which solicitation would be unlawful.

**For a description of restrictions on offers, sales and transfers of Shares, please refer to the sections of this Offering Memorandum entitled "*Selling restrictions*" below and "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*". Save as set out in these sections, there are no restrictions on the transfer of Shares under the Articles.**

**Forward-looking statements**

This Offering Memorandum includes statements that are, or may be deemed to be, "forward-looking statements". These forward-looking statements can be identified by the use of forward-looking terminology, including the terms "believes", "estimates", "anticipates", "expects", "intends", "plans", "projects", "targets", "aims", "may", "will" or "should" or, in each case, their negative or other variations or comparable terminology. These forward-looking statements include all matters that are not historical facts. They appear in a number of places throughout this Offering Memorandum and include statements regarding the intentions, beliefs or current expectations of the Company concerning, amongst other things, the investment objective and investment policy, investment strategy, financing strategies, investment performance, results of operations, financial condition, prospects, and dividend/distribution policy of the Company, and the markets in which the Company, and their respective portfolios of investments, invest and/or operate. By their nature, forward-looking statements involve risks (including those set out in the section of this Offering Memorandum entitled "*Risk Factors*") and uncertainties because they relate to events and depend on circumstances that may or may not occur in the future. Forward-looking statements are not guarantees of future performance. The Company's actual investment performance, results of operations, financial condition, dividend policy and the development of its investment strategy financing strategies may differ materially from the impression created by the forward-looking statements contained in this Offering Memorandum. In addition, even if the investment performance, results of operations, financial condition of the Company, and the development of its financing strategies, are consistent with the forward-looking statements contained in this Offering Memorandum, those results or developments may not be indicative of results or developments in subsequent periods. Important factors that could cause these differences include, but are not limited to:

- changes in economic conditions generally and the Company's ability to achieve its investment objective and target returns and target dividends for investors;

- the ability of the Company to invest the cash on its balance sheet and the proceeds of the Placing on a timely basis within the investment objective and investment policy;

- foreign exchange mismatches with respect to exposed assets;

- changes in the interest rates and/or credit spreads, as well as the success of the Company's investment strategy in relation to such changes and the management of the un-invested proceeds of the Placing;

- impairments in the value of the investments;

- the availability and cost of capital for future investments;

- the departure of key personnel employed by the Portfolio Manager;

- ii -

- changes in laws or regulations, including tax laws, or new interpretations or applications of laws and regulations, that are applicable to the Company; and

- general economic trends and other external factors, including those resulting from war, incidents of terrorism or responses to such events.

Given these uncertainties, prospective investors are cautioned not to place any undue reliance on such forward-looking statements. Prospective investors should carefully review the "*Risk Factors*" section of this Offering Memorandum before making an investment decision. Forward-looking statements speak only as at the date of this Offering Memorandum. Although the Company undertakes no obligation to revise or update any forward-looking statements contained herein (save where required by the Offering Memorandum Rules), whether as a result of new information, future events, conditions or circumstances, any change in the Company's expectations with regard thereto or otherwise, prospective investors are advised to consult any communications made directly to them by the Company and/or any additional disclosures through announcements that the Company may make through a website to be created or through the Administrator.

**Selling Restrictions**

**This Offering Memorandum does not constitute, and may not be used for the purposes of, an offer or an invitation to apply for any Placing Shares by any person: (i) in any jurisdiction in which such offer or invitation is not authorised; or (ii) in any jurisdiction in which the person making such offer or invitation is not qualified to do so; or (iii) to any person to whom it is unlawful to make such offer or invitation. The distribution of this Offering Memorandum and the offering of Placing Shares in certain jurisdictions may be restricted. Accordingly, persons into whose possession this Offering Memorandum comes are required to inform themselves about and observe any restrictions as to the offer or sale of Placing Shares and the distribution of this Offering Memorandum under the laws and regulations of any jurisdiction in connection with any applications for Placing Shares, including obtaining any requisite governmental or other consent and observing any other formality prescribed in such jurisdiction.**

*Bailiwick of Guernsey*

The Company has been established in Guernsey as a registered collective investment scheme under the RCIS Rules.

Further information in relation to the regulatory treatment of registered closed-ended investment funds domiciled in Guernsey may be found on the website of the Guernsey Financial Services Commission at www.gfsc.gg.

This Offering Memorandum is prepared, and a copy of it has been sent to the Guernsey Financial Services Commission, in accordance with the RCIS Rules.

The Commission takes no responsibility for the financial soundness of the Company or for the correctness of any statements made or opinions expressed with regard to it.

The applicant is strongly recommended to read and consider this Offering Memorandum before completing an application.

This Offering Memorandum has not been approved by the GFSC and neither the GFSC nor the States of Guernsey Policy Council takes any responsibility for the financial soundness of the Company or for the correctness of any of the statements made or opinions expressed with regard to it.

*European Economic Area*

In relation to each member state of the European Economic Area which has implemented the Prospectus Directive (each, a "**Relevant Member State**"), no Placing Shares have been offered or will be offered pursuant to the Placing to the public in that Relevant Member State prior to the publication of a prospectus in relation to the Placing Shares which has been approved by the competent authority in that Relevant Member State, or, where appropriate, approved in another Relevant Member State and notified to the competent authority in that Relevant Member State, all in accordance with the Prospectus Directive, except that offers of Placing Shares to the public may be made at any time

- iii -

under the following exemptions under the Prospectus Directive, if they are implemented in that Relevant Member State:

(a)    to any legal entity which is a qualified investor as defined in the Prospectus Directive;

(b)    to fewer than 150 natural or legal persons (other than qualified investors as defined in the Prospectus Directive) in such Relevant Member State; or

(c)    in any other circumstances falling within Article 3(2) of the Prospectus Directive,

**provided that** no such offer of Placing Shares shall result in a requirement for the publication of a prospectus pursuant to Article 3 of the Prospectus Directive or a supplemental prospectus pursuant to Article 16 of the Prospectus Directive or any measure implementing the Prospectus Directive in a Relevant Member State and each person who initially acquires any Placing Shares or to whom any offer is made under the Placing will be deemed to have represented, acknowledged and agreed that it is a "qualified investor" within the meaning of Article 2(1)(e) of the Prospectus Directive.

For the purposes of this provision, the expression an "**offer to the public**" in relation to any offer of Placing Shares in any Relevant Member State means a communication in any form and by any means presenting sufficient information on the terms of the offer and any Placing Shares to be offered so as to enable an investor to decide to purchase or subscribe for the Placing Shares, as the same may be varied in that Relevant Member State by any measure implementing the Prospectus Directive in that Relevant Member State and the expression "**Prospectus Directive**" means Directive 2003/71/EC (and the amendments thereto, including 2010 PD Amending Directive, to the extent implemented in the Relevant Member State) and includes any relevant implementing measure in each Relevant Member State and the expression "**2010 PD Amending Directive**" means Directive 2010/73/EU.

The distribution of this Offering Memorandum in other jurisdictions may be restricted by law and therefore persons into whose possession this Offering Memorandum comes should inform themselves about and observe any such restrictions.

The Company is an alternative investment fund for the purpose of the AIFMD. The Placing Shares may only be marketed to prospective investors which are domiciled or have a registered office in a member state of the European Economic Area ("**EEA Persons**") in which marketing has been registered or authorised (as applicable) under the relevant national implementation of Article 42 of AIFMD and in such cases only to EEA Persons which are Professional Investors or any other category of person to which such marketing is permitted under the national laws of such member state.

This Offering Memorandum is not intended for, should not be relied on by and should not be construed as an offer (or any other form of marketing) to any other EEA Person.

A "Professional Investor" is an investor who is considered to be a professional client or who may, on request, be treated as a professional client within the relevant national implementation of Annex II of Directive 2004/39/EC (Markets in Financial Instruments Directive) and the AIFMD.

Each EEA Person who initially acquires Placing Shares or to whom any offer is made will be deemed to have represented, warranted to and agreed with the entity placing such shares and the Company that (a) it is a "qualified investor" within the meaning of the law in that relevant member state implementing Article 2.1(e) of the Prospectus Directive and (b) , that it is a Professional Investor or other person to whom Placing Shares in the Company may lawfully be marketed under the AIFMD or under the national laws of that relevant member state.

The distribution of this Offering Memorandum in other jurisdictions may be restricted by law and therefore persons into whose possession this Offering Memorandum comes should inform themselves about and observe any such restrictions

### *Switzerland*

This Offering Memorandum may only be freely circulated and Shares in the Company may only be freely offered, distributed or sold to regulated financial intermediaries such as banks, securities dealers, fund management companies,

- iv -

asset managers of collective investment schemes and central banks as well as to regulated insurance companies. Circulating this Offering Memorandum and offering, distributing or selling Shares in the Company to other persons or entities including qualified investors as defined in the Federal Act on Collective Investment Schemes ("**CISA**") and its implementing Ordinance ("**CISO**") may trigger, in particular, (i) licensing/prudential supervision requirements for the distributor, (ii) a requirement to appoint a representative and paying agent in Switzerland and (iii) the necessity of a written distribution agreement between the representative in Switzerland and the distributor. Accordingly, legal advice should be sought before providing this Offering Memorandum to and offering, distributing, selling or on-selling Shares of the Company to any other persons or entities. This Offering Memorandum does not constitute an issuance prospectus pursuant to Articles 652a or 1156 of the Swiss Code of Obligations and may not comply with the information standards required thereunder. The Shares will not be listed on the SIX Swiss Exchange, and consequently, the information presented in this document does not necessarily comply with the information standards set out in the relevant listing rules. The documentation of the Company has not been and will not be approved, and may not be able to be approved, by the Swiss Financial Market Supervisory Authority ("**FINMA**") under the CISA. Therefore, investors do not benefit from protection under the CISA or supervision by the FINMA. This Offering Memorandum does not constitute investment advice. It may only be used by those persons to whom it has been handed out in connection with the Shares and may neither be copied or directly/indirectly distributed or made available to other persons.

### *United States*

The Placing Shares have not been and will not be registered under the U.S. Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States and the Placing Shares may not be offered, sold, exercised, resold, transferred or delivered, directly or indirectly, within the United States or to, or for the account or benefit of, U.S. Persons, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and in compliance with any applicable securities laws of any state or other jurisdiction in the United States. There will be no public offer of the Placing Shares in the United States.

Subject to certain exceptions as described herein, the Placing is only being made outside the United States to non-U.S. Persons in reliance on Regulation S under the U.S. Securities Act.

In addition, prospective investors should note that, except with the express written consent of the Company given in respect of an investment in the Company, the Placing Shares may not be acquired by: (i) investors using assets of: (A) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the U.S. Tax Code, including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Tax Code; or (C) an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" described in preceding clause (A) or (B) in such entity pursuant to the U.S. Plan Assets Regulations; or (ii) a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Tax Code, unless its purchase, holding, and disposition of the Placing Shares will not constitute or result in a non-exempt violation of any such substantially similar law.

If 25 per cent or more of any class of equity in the Company is owned, directly or indirectly, by U.S. Plan Investors that are subject to Title I of ERISA or Section 4975 of the U.S. Tax Code, the assets of the Company will be deemed to be "plan assets", subject to the constraints of ERISA and Section 4975 of the U.S. Tax Code. This would result, among other things, in: (i) the application of the prudence and fiduciary responsibilities standards of ERISA to investments made by the Company, and (ii) the possibility that certain transactions that the Company and its subsidiaries might enter into, or may have entered into in the ordinary course of business, might constitute or result in non-exempt prohibited transactions under Section 406 of ERISA and/or Section 4975 of the U.S. Tax Code and might have to be rescinded. A non-exempt prohibited transaction may also result in the imposition of an excise tax under the U.S. Tax Code upon a "party in interest" (as defined in ERISA) or "disqualified person" (as defined in the U.S. Tax Code), with whom a plan engages in the transaction. The Company will use commercially reasonable efforts to restrict ownership by U.S. Plan Investors of equity in the Company. However, no assurance can be given that investment by U.S. Plan Investors will not exceed 25 per cent or more of any class of equity in the Company.

For a description of restrictions on offers, sales and transfers of Placing Shares, please refer to the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*".

**TABLE OF CONTENTS**

Page

IMPORTANT NOTICES. ..................................................................................................................................i

SUMMARY. ...................................................................................................................................................1

RISK FACTORS. ..........................................................................................................................................19

COMPANY, ITS INVESTMENT OBJECTIVE, POLICY AND STRATEGY ......................................................48

THE CURRENT CLO PORTFOLIO. ..............................................................................................................55

MARKET OPPORTUNITY.............................................................................................................................56

INVESTMENT PROCESS .............................................................................................................................57

COMPANY DIRECTORS AND ADMINISTRATION. ......................................................................................61

PLACING ARRANGEMENTS. ......................................................................................................................65

TAXATION. ..................................................................................................................................................70

SHAREHOLDERS OF THE COMPANY. .......................................................................................................75

ADDITIONAL INFORMATION ON THE COMPANY. .....................................................................................76

TERMS AND CONDITIONS OF THE PLACING. ..........................................................................................100

PLACING STATISTICS.................................................................................................................................105

DEFINITIONS. .............................................................................................................................................106

DIRECTORS, ADVISERS AND SERVICE PROVIDERS. ...............................................................................113

# SUMMARY

The following is an overview of the transaction structure and is qualified in its entirety by, and should be read in conjunction with, the more detailed information appearing elsewhere in this Offering Memorandum and related documents referred to herein. Capitalised terms not specifically defined in this Offering Memorandum have the meanings set out in the section of this Offering Memorandum entitled "*Definitions*" below. For a discussion of certain risk factors to be considered in connection with an investment in the Shares, see "*Risk Factors*".

| | |
|---|---|
| **The Company:** | Highland CLO Funding, Ltd. (formerly known as Acis Loan Funding, Ltd.) (the "**Company**") is a closed-ended investment company limited by shares incorporated on 30 March 2015 under the laws of Guernsey with registered number 60120. The Company changed its name from Acis Loan Funding, Ltd. to Highland CLO Funding, Ltd. on October 27, 2017. |
| | The Company holds a partial, indirect ownership in Highland CLO Management, LLC ("**Highland CLO Management**"), a Delaware series limited liability company established to manage Highland CLOs, act as a "majority-owned affiliate" for purposes of the U.S. Risk Retention Rules and as an "originator" for purposes of EU Retention Requirements and to hold with respect to Highland CLOs the required risk retention interests required under, and in accordance with, the U.S. Retention Rules and/or the EU Retention Requirements, as applicable (such interests with respect to any CLO, the applicable "**Retention Interest**"). Highland CLO Management is also partly held (on an indirect basis through Highland HCF Advisor) by Highland Capital Management, L.P. ("**Highland**"), a Delaware limited partnership, which controls the major economic decisions of Highland CLO Management. |
| | The Company holds a partial, indirect ownership in ACIS CLO Management, LLC ("**Acis CLO Management**" and together with Highland CLO Management, the "**Management Companies**" and each, a "**Management Company**"), a Delaware series limited liability company established to manage Acis CLO 2017-7, Ltd. ("**Acis CLO 7**"), act as a "majority-owned affiliate" for purposes of the U.S. Risk Retention Rules and to hold the Retention Interests with respect to Acis CLO 7 required under, and in accordance with, the U.S. Retention Rules. Acis CLO Management is also partly held (on an indirect basis) by Acis Capital Management, L.P. ("**Acis**"), a Delaware limited partnership, which controls the major economic decisions of Acis CLO Management. |
| | Each of Highland or Acis, as applicable, may hold their respective indirect ownership interests in the applicable Management Companies through, or transfer such interests to, affiliates that are intended to be, directly or indirectly, majority controlled, are majority controlled by or are under common majority control with, Highland or Acis, as applicable, with the intention that the Management Companies will remain their respective "majority-owned affiliates" for purposes of the U.S. Risk Retention Rules. |
| **Investment Objective:** | The Company's investment objective is to provide Shareholders with stable and growing income returns, and to grow the capital value of the investment portfolio through opportunistic exposure to CLO Notes, investments in new issue CLOs sponsored by Highland and Acis CLO 7 through its interests in the Management Companies and CLO Income Notes, respectively, and senior secured loans primarily for the purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements, on both a direct basis and indirect basis, through the use of the investments described in its investment policy and through use of leverage, |

- 1 -

including, any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps or repurchase agreements, in addition to secured loan facilities. With respect to the Company's investments, except with respect to Designated CLO Resets or Designated CLO Refinancings, if applicable, it is expected that the Portfolio Manager intends to seek monetization of such investments in the ordinary course in its discretion; provided that at the end of the Term, the Portfolio Manager, in its reasonable discretion may postpone dissolution of the Company for up to 180 days to facilitate the orderly liquidation of the investments.

**Investment policy:** The Company's investment policy is to focus on synergistic investments in the following areas.

*Loan Investments*

The Company will invest on an indirect basis in a diverse portfolio of predominantly floating rate senior secured loans (or on a direct basis for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements), all of which will have at least one rating, which may be public or private, from **Moody's** Investor Services, Inc. ("**Moody's**"), Standard & Poor's Financial Services LLC ("**S&P**") or Fitch Group, Inc. ("**Fitch**"). Initially, the Company's loan investments will be focused in the U.S., but depending on market conditions the Company may also invest in similar types of loans in Europe. Accordingly, there is no limit on the maximum U.S. or European exposure. Investments in U.S. or European loans may be made through a U.S or European originator subsidiary of the Company. The Company intends to invest directly only in those senior secured loans to obligors with total potential indebtedness under all applicable loan agreements, indentures and other underlying instruments at least $250,000,000 that would generally satisfy the eligibility criteria for Highland CLOs and (without limiting the foregoing):

- Such loan is not currently deferring the payment of any accrued and unpaid interest that otherwise would have been due and continues to remain unpaid;

- Such loan provides for a fixed amount of principal payable in cash on scheduled payment dates and/or at maturity and does not by its terms provide for earlier amortization or prepayment at a price less than par;

- Such loan is not an obligation issued by Highland, any of its controlled affiliates that are investment funds or any other investment fund whose investments are primarily managed by Highland or any affiliate or company that is controlled by Highland, an affiliate thereof, or an account, fund, client or portfolio established and controlled by Highland or an affiliate thereof (a "**Related Obligation**");

- Such loan is neither an equity security nor by its terms is convertible into or exchangeable for an equity security and does not include an attached warrant to purchase equity securities;

- Such loan is not a bridge loan; and

- Such loan is not a zero coupon loan.

*Financing of Loan Portfolios / Securitization*

It is intended that the Company will periodically seek to sell or securitise all or a portion of its loan portfolio, held directly or indirectly, into new Highland CLOs where Highland CLO Management acts as CLO Manager. In doing so, Highland CLO Management may seek to adopt the "originator" model to address the Origination Requirements (as defined below) applicable to such Highland CLOs to the extent such Highland CLOs sought to comply with EU Retention Requirements. As a result, Highland CLO Management will be required to commit to: (a) establishing the relevant CLO and (b) selling certain loan investments to the relevant CLO which it has purchased for its own account initially. In addition, under current guidance, prior to closing date of the relevant CLO, Highland CLO Management expects to sell investments to the relevant CLO such that the required percentage of the total securitised exposures held by the CLO issuer will have come from Highland CLO Management (collectively, the "**Origination Requirements**").

*CLO Notes*

The Company will from time to time invest directly or indirectly (through affiliates and subsidiaries, including the Management Companies, as more fully described below) in CLO Notes issued by Acis CLO 7, Highland CLOs, CLOs where Acis is the CLO Manager, ("**Acis Legacy CLOs**"), CLOs where Highland is the CLO Manager, ("**Highland Legacy CLOs**" and together with the Highland CLOs, Acis CLO 7 and the Acis Legacy CLOs, the "**Managed CLOs**") or CLOs managed by other asset managers.

With respect to each such investment, Highland CLO Management, and Acis CLO Management with respect to Acis CLO 7, will acquire the percentages and tranches of CLO Notes necessary to enable the related CLO to meet the U.S. Risk Retention Rules and, if applicable, the EU Retention Requirements.

With respect to any such investments in Highland CLOs where Highland CLO Management acts as CLO Manager, it is expected that Highland CLO Management will be a "relying adviser" of Highland. With respect to Acis CLO 7, Acis CLO Management is a "relying adviser" of Acis. It is further expected that Highland or Acis, as applicable, will act as a "sponsor" of such Managed CLOs for purposes of the U.S. Risk Retention Rules and will treat the applicable Management Company as its "majority-owned affiliate" under the U.S. Risk Retention Rules. All management and incentive fees received from such Managed CLO will be paid to the applicable Management Company pursuant to the relevant portfolio management agreement, which will then pay the majority of such fees to Highland or Acis, as applicable, in its roles as Staff and Services Provider and as Sub-Advisor. The applicable Management Company may also seek to act as "originator" for purposes of the EU Retention Requirements with respect to such Managed CLOs as described above.

Each CLO in which the Company directly or indirectly holds CLO Notes will have its own eligibility criteria and portfolio limits. These limits are designed to ensure the portfolio of loans within the CLO meets a prescribed level of diversity and quality as set by the relevant rating agencies rating securities issued by such CLO. The applicable CLO Manager, including Highland CLO Management with respect to new Highland CLOs or Acis CLO Management with respect to Acis CLO 7, intends to identify and actively manage loans

- 3 -

which meet those criteria and limits within each CLO. The eligibility criteria and portfolio limits within a CLO will typically include the following required criteria and may include some or all of the following expected criteria:

- a limit on the weighted average life of the portfolio;

- a limit on the weighted average rating of the portfolio;

- a limit on the maximum amount of portfolio assets with a rating lower than B-/B3/B-; and

- a limit on the minimum diversity of the portfolio.

- a limit on the minimum weighted average of the prescribed rating agency recovery rate;

- a limit on the minimum amount of senior secured assets;

- a limit on the maximum aggregate exposure to second lien loans, high yield bonds, mezzanine loans and unsecured loans;

- a limit on the maximum portfolio exposure to covenant-lite loans;

- an exclusion of project finance loans;

- an exclusion of structured finance securities;

- an exclusion on investing in the debt of companies domiciled in countries with a local currency sub investment grade rating; and

- an exclusion of leases.

The above are not intended to be an exhaustive list of the eligibility criteria and portfolio limits within a typical CLO and the inclusion or exclusion of such limits and their absolute levels are subject to change depending on market conditions.

### Act as Risk Retention Provider

The Company may also invest in, provide loans to, or purchase performance-linked notes from, asset management subsidiaries, affiliated with the Company, the Portfolio Manager, Highland, Acis or the Management Companies and which may act as the asset manager of certain U.S. or European CLOs in order to satisfy the U.S. Risk Retention Rules or EU Retention Requirements.

### Allocation of Investment Opportunities

Highland CLO Management will serve as CLO Manager to each newly-issued Highland CLO during the Investment Period.

During the Investment Period, the Company shall receive priority allocations with respect to all CLO Income Note investment opportunities with respect to new issue Highland CLOs, over the account of the Portfolio Manager, its affiliates and other clients, including other investment funds and client accounts, including those which follow an investment program substantially similar to that of the Business (such other clients, funds and accounts, collectively, the "**Other Accounts**"). For the avoidance of doubt, the Portfolio

- 4 -

Manager shall otherwise allocate investment opportunities among the Company and Highland and its affiliates and Other Accounts in accordance with its allocation policy which requires allocations among clients to be fair and equitable over time. *See "Risk Factors—Risks Relating to Conflicts of Interest—The Company will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates".*

**Investment Restrictions:**

During the Investment Period, the Company may invest up to $250,000,000 in CLO Income Notes for new Highland CLOs as follows: (a) up to $150,000,000 in the aggregate from new capital contributions; and (b) up to $100,000,000 in the aggregate from proceeds received from existing seed portfolio investments and investments in new Highland CLOs, net of dividends paid, and amortization and interest payments on Company borrowings from committed credit facilities.

The Company may not, without the consent of the Advisory Board, invest in any CLO Notes or CLO Income Notes of new Highland CLOs that are not Qualifying CLOs. A "**Qualifying CLO**" is a Highland CLO (a) pursuant to which Highland, the Portfolio Manager, Highland CLO Management or any of its affiliates does not charge subordinate management fees in excess of 0.00%, senior management fees in excess of 0.15% or incentive management fees in excess of 0.00% and (b) which does not have a reinvestment period longer than 5 years; *provided* that, if the Portfolio Manager has provided reasonable evidence to the Advisory Board that a substantial portion of new issue CLOs have reinvestment periods longer than 5 years (the "**RP Condition**"), the consent of the Advisory Board to invest in any Highland CLO that meets clause (a) of the definition of Qualifying CLOs only shall not be unreasonably withheld, conditioned or delayed.

During the Investment Period, the Company shall be permitted to invest in a refinancing or "reset" with respect to the following CLOs (which may extend the re-investment period and/or term of such CLOs, subject to the proviso below) managed by Highland affiliates (the "**Designated CLO Resets**"):

Acis CLO 2013-1, Ltd.
Acis CLO 2014-3, Ltd.
Acis CLO 2014-4, Ltd.
Acis CLO 2014-5, Ltd.
Acis CLO 2015-6, Ltd.

provided that, with respect to Acis CLO 2014-3, Ltd., Acis CLO 2014-4, Ltd. and Acis CLO 2014-5, Ltd., any such Designated CLO Reset may not extend the re-investment period beyond 2.25 years of the date of such Designated CLO Reset.

During the Investment Period, the Company shall be permitted to invest in a refinancing with respect to Acis CLO 7 (which may not extend the re-investment period or term of such CLO) (the "**Designated CLO Refinancing**").

For the avoidance of doubt, following the expiration of the Investment Period, the Company shall not consummate an investment in any "reset" with respect to CLO Income Notes held by the Company. In addition, the Company shall not permit a reset with respect to any CLO Income Notes of Managed CLOs

- 5 -

that it holds, unless such CLO Income Notes of Managed CLOs are fully redeemed.

The Company shall not invest in the CLO Income Notes of a new issue Highland CLO unless it is the 100% owner of the CLO Income Notes not forming part of the Retention Interest acquired by Highland CLO Management.

### Indirect Actions

Neither the Portfolio Manager nor the Company may take any action indirectly through controlled subsidiaries that either the Portfolio Manager or the Company is not permitted to undertake directly as set forth herein.

**Borrowing:**

It is expected that the Company will have access to one or more committed credit facilities and will use advances under such facilities, together with the proceeds of the Shares, to purchase future senior secured loans (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) or other assets. Such facilities may take the form of any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps or repurchase agreements, in addition to secured loan facilities. In addition to such facilities, the Company will be permitted to borrow money for day to day administration and cash management purposes.

### Borrowing Limits

Notwithstanding the foregoing or anything to the contrary set forth herein, as of the time any such debt is incurred, the Company's maximum gross leverage exposure (excluding the Warehouse Loan Facilities) pursuant to (a) committed secured loan facilities and any other borrowing (other than described in clause (b)) shall not exceed (i) during the Investment Period, the greater of (x) 15% of the Company's gross asset value and (y) $50,000,000 and (ii) after the Investment Period, 15% of the Company's gross asset value, and (b) repurchase agreements shall not exceed 75% of the Company's gross asset value.

For purposes of the limits regarding repurchase agreements set forth in clause (b) above, the "gross asset value" of the Company shall exclude financing for CLO Notes held by a Management Company as part of a "vertical" Retention Interest (including for the Designated CLO Resets), the NexBank Credit Facility, any Warehouse Loan Facilities and cash equivalents.

### Warehouse Loan Facilities

One or more multi-currency warehouse lending facilities may be entered into from time to time between (i) the Company and (ii) a warehouse provider (the "**Warehouse Loan Facilities**"), pursuant to which the Company is able to draw multi-currency loans from time to time in order to purchase assets for its portfolio. The Warehouse Loan Facilities will be entered into on market standard terms, as negotiated between the Company and the relevant warehouse provider in each case and will include a senior security package in favour of the warehouse provider.

### Hedging and Derivatives

Without the consent of the Advisory Board, the Company may only use hedging or derivatives to hedge investments consistent with the Company's investment objectives, and not for speculative purposes.

*Repurchase Agreements*

The Company may not use repurchase agreements to finance the purchase of CLO Income Notes, however, the Company may pledge any already owned CLO Income Notes as additional collateral under repurchase agreements.

*Revolving Credit Facility*

The Company may enter into a secured revolving credit facility with a committed amount of $50,000,000 for working capital purposes (a "**Revolving Credit Facility**")

*NexBank Credit Facility*

The Company currently has a secured term credit facility provided by NexBank SSB, a Texas savings bank, with a principal amount of $22,158,337, as of September 30, 2017 (the "**NexBank Credit Facility**"). The Company may, from time to time, increase its borrowing under the NexBank Credit Facility up to a maximum principal amount of $30,000,000 at any time without the consent of the Advisory Board, but subject to the limitations set forth above in "*—Borrowing Limits*". The terms of the NexBank Credit Facility, and of any increase in the principal amount thereto, shall be at or better than market standard terms and shall be promptly disclosed to the Advisory Board (any such amended terms, the "**Permitted NexBank Credit Facility Amendments**").

| | |
|---|---|
| **Advisory Board:** | The Company shall form and assemble an advisory board (the "**Advisory Board**") composed of individuals who shall be representatives of certain Shareholders selected by the Portfolio Manager in its sole discretion in order to (a) provide advice to the Portfolio Manager with respect to certain issues involving conflicts of interest in any transaction or relationship between the Company and the Portfolio Manager or any of its employees or affiliates that are presented to the Advisory Board by the Portfolio Manager, and (b) be required to approve the following actions: |

- Any extension of the Investment Period;

- Any extension of the Term (other than an automatic extension following an extension of the Investment Period that has been approved by the Advisory Board);

- Any allotment of additional equity securities by the Company; and

- Any investment in a Related Obligation or any other transaction between the Company or any entity in which the Company holds a direct or indirect interest, on the one hand, and Highland or any of its affiliates, on the other hand.

Notwithstanding the foregoing or anything to the contrary set forth herein, no transaction that is specifically authorized in the governing documents of the Company shall require approval of the Advisory Board, including, without limitation, sales or securitizations of all or a portion of the Company's loan portfolio into new Qualifying CLOs (i.e. the transfer of warehoused assets into

new Qualifying CLOs), investments in CLO Notes issued by CLOs managed by Highland affiliates, and the NexBank Credit Facility and any Permitted NexBank Credit Facility Amendments.

No voting member of the Advisory Board shall be a controlled affiliate of Highland, it being understood that none of CLO Holdco, Ltd., its wholly-owned subsidiaries or any of their respective directors or trustees shall be deemed to be a controlled affiliate of Highland due to their pre-existing non-discretionary advisory relationship with Highland.

Each member of the Advisory Board shall owe no fiduciary or other duties to the Company or the shareholders and may act solely in the interest of the shareholder that it represents.

Neither the Advisory Board nor any member thereof shall have the power to bind or act for or on behalf of the Company in any manner, and no shareholder who appoints a member of the Advisory Board shall be deemed to be an affiliate of the Company, the Portfolio Manager or Highland solely by reason of such appointment.

**Investment Period:**

The Company's assets may be invested and, subject to the terms and conditions set forth in the "*Dividend Policy*" section below, reinvested for a period commencing on the Closing Date of the Placing and ending on April 30, 2020 (the "**Investment Period**"), subject to two additional one-year extensions with the consent of the Advisory Board (as hereinafter defined) and the Portfolio Manager; provided that the Term will automatically be extended by an identical length of time in the event of an extension of the Investment Period.

*Termination of Investment Period following Key Person Event*

The Portfolio Manager will promptly provide each Shareholder with written notice in the event that any two of James Dondero, Mark Okada, Trey Parker or Hunter Covitz (collectively, the "**Key Persons**") cease to devote such time to the affairs of the Company as is sufficient to effectively manage the operations of the Company (a "**Key Person Event**"), as determined by the Portfolio Manager in its reasonable discretion, taking into account such factors as it shall deem relevant in its reasonable discretion. The Portfolio Manager will promptly provide each Shareholder with written notice in the event of the termination of employment of any Key Person.

The Investment Period will be terminated immediately upon a Key Person Event. The Investment Period shall resume in the event that (i) the Portfolio Manager obtains or receives notice of the written election or vote of the Advisory Board to reinstate the Investment Period, or (ii) one or more Qualified Replacements (as defined below) are appointed in place of (or in addition to) the then existing Key Persons to cure the Key Person Event, in which event the Investment Period will continue until its termination as otherwise described herein without further regard to such Key Person Event.

For purposes of this Offering Memorandum, a "**Qualified Replacement**" means a person nominated by the Portfolio Manager and approved by the Advisory Board, such approval not to be unreasonably withheld, conditioned or delayed, as a replacement for any existing Key Person or as an additional Key Person; provided that the Advisory Board will provide notice of its

- 8 -

approval or disapproval of any person nominated to be a Qualified Replacement within 10 business days of such nomination.

For the avoidance of doubt, during any cessation of the Investment Period following a Key Person Event, (i) the Portfolio Manager may continue to require Placees to purchase Shares pursuant to the subscription and transfer agreement to fund (a) any indebtedness of the Company permitted hereunder incurred prior to the end of the Investment Period (including to repay outstanding indebtedness under any Warehouse Loan Facilities) or (b) the completion, no later than 180 days after the expiration of the Investment Period, new issue Highland CLOs that were in process at the time of such Key Person Event and (ii) the Company shall not receive priority allocations with respect to all CLO Income Note investment opportunities with respect to new issue Highland CLOs until the Investment Period resumes.

**Term:**

The term of the Company will end (and the Company thereafter will be wound up and dissolved) on the ten-year anniversary of the date of the Placing (the "**Term**"), subject to (a) automatic extension in the event of an extension of the Investment Period and (b) two additional one-year extension with the consent of the Portfolio Manager and the Advisory Board, or such earlier date after the end of the Investment Period on which the Portfolio Manager determines to terminate and wind up the Company following the receipt by the Company of all amounts reasonably expected by the Portfolio Manager to be received with respect to the Company's assets or the sale thereof during the term and in a manner that will not cause the Company, the Portfolio Manager, Highland, Acis, the Management Companies or any subsidiary thereof to violate any applicable law or contract.

The Company has been established as a closed-ended vehicle. Accordingly, there is no right or entitlement attaching to Shares that allows them to be redeemed or repurchased by the Company at the option of the Shareholder.

**Placing Arrangements – Investment Period Subscription Commitment:**

The Company is seeking aggregate subscriptions to purchase Placing Shares in an aggregate amount of up to approximately U.S. $153 million.

Placees will commit under a subscription and transfer agreement to purchase Shares to be settled from time to time during the Investment Period. The Portfolio Manager may call such Shares for settlement from time to time on a pro rata basis upon 10 Business Days' notice to the Placees in such amounts as may be specified by the Portfolio Manager.

Upon the expiration of the Investment Period, all Placees will be released from any further obligation with respect to purchase Shares under their subscriptions, except to the extent necessary to:

(i) complete, no later than 180 days after the expiration of the Investment Period, the purchase of Shares pursuant to written commitments, letters of intent or similar contractual commitments that were in process as of the end of the Investment Period; and

(ii) fund any indebtedness of the Company permitted hereunder incurred prior to the end of the Investment Period (including to repay outstanding indebtedness under any Warehouse Loan Facilities).

Shares will be issued at a price per Share based on the most recent quarterly determined NAV of the Company.

- 9 -

The maximum number of Shares to be issued by the Company is an amount of Shares equal to U.S. $153 million and there is no minimum number of Shares.  Fractions of Placing Shares will be issued.

On the Closing Date, Placees will acquire Shares of existing Shareholders at a price per Share based on the NAV of the Company as of September 30, 2017, adjusted with respect to a dividend of $9,000,000 on October 10, 2017, and a buyback of the Shares of Acis Capital Management, L.P. on October 24, 2017 (the "**Adjusted NAV**") such that Placees and existing Shareholders will hold currently existing Shares on a *pro rata* basis and existing Shareholders will commit, as Placees under a subscription and transfer agreement, to purchase Shares such that new and existing Shareholders will hold both existing Shares and commitments on *pro rata* basis.

The Board may deduct from any dividend payable to any Shareholder on or in respect of a Share all sums of money (if any) presently payable by him to the Company on account of calls with respect to existing Shares, or calls of commitments to purchase Shares pursuant to the subscription and transfer agreement or otherwise.

A Shareholder that defaults in respect of its obligation to purchase Shares pursuant to the terms of the subscription and transfer agreement will be subject to customary default provisions.

The Board may retain any dividend or other monies payable on or in respect of a Share on which the Company has a lien and may apply the same in or towards satisfaction of the liabilities or obligations in respect of which the lien exists.

*Highland Principal Commitment*

Certain principals of Highland will subscribe, directly or indirectly, for $3,000,000 of Shares in the aggregate.

| | |
|---|---|
| **Regulatory status:** | The Company is a registered closed-ended investment company incorporated in Guernsey with limited liability on 30 March 2015 under the provisions of the Companies Law, with registered number 60120.  The Company is regulated by the GFSC, and is not regulated by any regulator other than the GFSC. |
| **Typical investors:** | Investment in the Company is only suitable for Professional Investors as defined in the AIFMD and any other person to whom the Placing Shares may be lawfully offered. |
| **Applicant's service providers:** | *Portfolio Manager* |

Highland HCF Advisor, Ltd. ("**Highland HCF Advisor**") has been appointed as the Portfolio Manager to the Company pursuant to the Portfolio Management Agreement.  In that capacity, the Portfolio Manager will select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support and assistance (including back and middle office functions), personnel and credit and market research and analysis in connection with the origination and ongoing management of the portfolio by the Company.  Under the Portfolio Management Agreement, the Company shall pay to the Portfolio Manager an amount equivalent to all reasonable third party costs and expenses incurred by

the Portfolio Manager in the performance of its obligations thereunder, together with any irrecoverable VAT arising on such costs and expenses.

The Portfolio Manager has entered into a Master Sub-Advisory Agreement (the "**HCF Sub-Advisory Agreement**") and a Staff and Services Agreement (the "**HCF Staff and Services Agreement**", together with the Sub-Advisory Agreement, the "**HCF Services Agreements**") with Highland Capital Management, L.P. under which Highland Capital Management, L.P. provides investment research and recommendations and operational support to the Portfolio Manager, including services that may be used in connection with the Portfolio Manager's recommendations regarding the composition, nature and timing of changes to the Company's portfolio, the due diligence of actual or potential investments, the execution of investment transactions, and certain loan services and administrative services.

Highland CLO Management has a Master Sub-Advisory Agreement (the "**HCLOM Sub-Advisory Agreement**") and a Staff and Services Agreement (the "**HCLOM Staff and Services Agreement**", together with the HCLOM Sub-Advisory Agreement, the "**HCLOM Services Agreements**") in place with Highland, pursuant to which Highland provides credit research and operational support to Highland CLO Management, including services in connection with determining the composition, nature and timing of changes to portfolios of Highland CLOs for which Highland CLO Management acts as CLO Manager, the due diligence of actual or potential investments, the execution of investment transactions approved by the Highland CLO Management, and certain loan services and administrative services.

Acis (an affiliate of Highland) has entered into a Master Sub-Advisory Agreement (the "**ACM Sub-Advisory Agreement**") and a Staff and Services Agreement (the "**ACM Staff and Services Agreement**", together with the ACM Sub-Advisory Agreement, the "**ACM Services Agreements**") with Highland under which Highland provides investment research and recommendations and operational support to Acis, including services in connection with determining the composition, nature and timing of changes to portfolios of Acis CLOs for which Acis acts as CLO Manager, the due diligence of actual or potential investments, the execution of investment transactions approved by Acis, and certain loan services and administrative services.

Acis CLO Management has entered into a Master Sub-Advisory Agreement (the "**ACLOM Sub-Advisory Agreement**", and together with the HCF Sub-Advisory Agreement, the HCLOM Sub-Advisory Agreement and the ACM Sub-Advisory Agreement, the "**Sub-Advisory Agreements**") and a Staff and Services Agreement (the "**ACLOM Staff and Services Agreement**", and the ACLOM Staff and Services Agreement together with the HCF Staff and Services Agreement, the HCLOM Staff and Services Agreement and the ACM Staff and Services Agreement, the "**Staff and Services Agreements**", and the ACLOM Staff and Services Agreement together with the ACLOM Sub-Advisory Agreement, the "**ACLOM Services Agreements**" and the ACLOM Services Agreements with the HCF Services Agreements, the HCLOM Services Agreements and the ACM Services Agreements, the "**Services Agreements**") in place with Acis, pursuant to which Acis provides credit research and operational support to Acis CLO Management, including services in connection with determining the composition, nature and timing of changes to portfolios of Acis CLO 7 for which Acis CLO Management acts as CLO Manager, the due diligence of actual or potential investments, the

- 11 -

execution of investment transactions approved by Acis CLO Management, and certain loan services and administrative services.

No management fees will be payable by the Company pursuant to any Services Agreement; it being understood that each of the Management Companies will pay (i) eleven-fifteenths (11/15ths) of the total 0.15% senior management fee received from Acis CLO 7 and the Highland CLOs to affiliates of Highland pursuant to the applicable Services Agreements, and (ii) following any Designated CLO Reset, a portion of the management fees received from any CLO subject to such Designated CLO Reset to affiliates of Highland pursuant to the applicable Services Agreements, other than an amount equivalent to a senior management fee of 0.04%.

*Administrator*

State Street (Guernsey) Limited has been appointed as administrator to the Company pursuant to the Administration Agreement. In such capacity, the Administrator is responsible for the day-to-day administration of the Company. Under the terms of the Administration Agreement, the Administrator is entitled to an annual administration fee of up to 7 bps per annum of the Net Asset Value of the Company calculated and payable monthly in arrears, and other miscellaneous fees and expenses reimbursed, in each case, as determined in the Administration Agreement.

**Operating Expenses:**

Except as provided below, the Portfolio Manager will pay all of its own Overhead without reimbursement by the Company.

Subject to the following paragraph, the Company shall pay or reimburse the Portfolio Manager and its affiliates for all Operating Expenses. See "Company Directors and Administration—The Portfolio Manager—Highland Fees".

**Exculpation:**

The Portfolio Manager will assume no responsibility under the Portfolio Management Agreement other than to render the services called for thereunder and affecting the duties and functions that have been delegated to it thereunder in good faith and, subject to the standard of conduct described in the next succeeding sentence. The Portfolio Manager will not be responsible for any action or inaction of the Company in declining to follow any advice, recommendation or direction of the Portfolio Manager.

The Portfolio Manager, its affiliates, any officer, director, secretary, manager, employee or any direct or indirect partner, member, stockholder, agent or legal representative (e.g., executors, guardians and trustees) of the Portfolio Manager and its affiliates, including persons formerly serving in such capacities, any person who serves at the request of the Portfolio Manager or the Board pursuant to the Articles, on behalf of the Company as an officer, director, secretary, manager, partner, member, employee, stockholder, agent or legal representative of any other person serving at the request of the Portfolio Manager or the Board pursuant to the Articles on behalf of the Company in such capacity as listed above, each member of the Advisory Board and each member of any subcommittee thereof and any assignees or successors of the foregoing (each, an "**Indemnified Person**") will incur no liability to the Company or any Shareholder in the absence of a finding by any court or governmental body of competent jurisdiction in a final, non-appealable judgment that the commission by such person of an action, or the omission by such person to take an action, constitutes bad faith, gross

- 12 -

negligence or wilful misconduct (a "**Triggering Event**"), except as otherwise required by applicable law (including the Companies Law).  Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

**Indemnification:**  To the fullest extent permitted by applicable law, the Company will be required to indemnify each Indemnified Person against all losses, liabilities, damages, expenses or costs (including any claim, judgment, award, settlement, reasonable legal and other professional fees and disbursements and other costs or expenses incurred in connection with the defence of any proceeding, whether or not matured or unmatured or whether or not asserted or brought due to contractual or other restrictions, joint or several) other than those arising from suits, disputes or actions by Highland, its affiliates or principals, Other Accounts or CLO HoldCo, Ltd. (collectively, the "**Indemnified Losses**") incurred by such Indemnified Person or to which such Indemnified Person may be subject by reason of its activities in connection with the conduct of the business or affairs of the Company, unless such losses result from an Indemnified Person's Triggering Event.

The Indemnified Persons shall be entitled to advancement of expenses as they are incurred in connection with the investigation, defence or resolution of any claim that may be subject to indemnification, subject to providing an undertaking to repay any amounts ultimately determined not to be subject to indemnification due to a Triggering Event.

Each member of the Advisory Board and each member of any subcommittee thereof and, solely in connection with matters relating to the Advisory Board or such subcommittee, the Shareholder and/or other person or entity on whose behalf such Advisory Board member or subcommittee member serves, will have the benefit of similar exculpation and indemnification rights unless it has not acted in good faith.

Notwithstanding the foregoing or anything to the contrary set forth herein, the Company will not provide for the exculpation or indemnification of any Indemnified Person for any liability (including liability under U.S. federal securities laws which, under certain circumstances, impose liability even on persons that act in good faith), to the extent that such liability may not be waived, modified or limited under applicable law.

Under the Companies Law, any indemnity provided (directly or indirectly) by the Company to a Director, or an associated company, or a body corporate which is an overseas company and a subsidiary of the company, against any liability attaching to him in connection with any negligence, default, breach of duty or breach of trust in relation to the Company is void, except in certain circumstances.

**Regulatory status of Portfolio Manager:**  Highland HCF Advisor is a relying adviser of Highland Capital Management, L.P., an investment adviser registered under the Investment Advisers Act of 1940, as amended (the "**Investment Advisers Act**") and, as such, is subject to the provisions of the Investment Advisers Act.

**Regulatory status of Custodian:**  The Custodian of the Company is State Street Custodial Services (Ireland) Limited, which is authorised as an Investment Business Firm under Section

- 13 -

|  | 10 of the Irish Investment Intermediaries Act, 1995 (as amended), will provide custody and banking services. |
|---|---|
| **Calculation of Net Asset Value:** | The Company intends to publish the Net Asset Value per Share on a quarterly basis, within 15 Business Days following the relevant quarter-end. Notice will be provided by the Administrator by e-mail. |
| **Portfolio:** | The Company is currently invested in CLO Income Notes in the following Managed CLOs in the following amounts: |

| **Acis CLOs:** | **Aggregate Outstanding Amount (U.S.$)** |
|---|---|
| ACIS CLO 2013-1 Ltd. | $18,558,000.00 |
| ACIS CLO 2014-3 Ltd. | $39,750,000.00 |
| ACIS CLO 2014-4 Ltd. | $50,750,000.00 |
| ACIS CLO 2014-5 Ltd. | $53,000,000.00 |
| ACIS CLO 2015-6, Ltd. | $51,850,000.00 |

| **Highland Legacy CLOs:** | **Aggregate Outstanding Amount (U.S.$)** |
|---|---|
| Rockwall CDO, Ltd. | $14,000,000.00 |
| Brentwood CLO, Ltd. | $12,000,000.00 |
| Grayson CLO, Ltd. | $5,900,000.00 |
| Liberty CLO, Ltd. | $17,000,000.00 |
| HP CDO, Ltd. | $1,621,542.70 |
| Greenbriar CLO, Ltd. | $18,000,000.00 |
| Gleneagles CLO, Ltd. | $1,250,000.00 |

| **ACIS CLO Management** | **Aggregate Outstanding Amount (U.S.$)** |
|---|---|
| Acis CLO 7 | $17,850,000.00 |

| **Net Asset Value:** | As of September 30, 2017, the unaudited net asset value per share of the Net Asset Value was US $157,081,118.91. A special dividend in the aggregate amount of US $9,000,000 was paid on October 10, 2017, and a buyback of Shares from Acis Capital Management, L.P. was made on October 24, 2017, for an aggregate purchase price of $991,180.13. |
|---|---|
| **Type and class of securities:** | The Shares being offered under the Placing are ordinary shares of no par value in the capital of the Company. |
| **Currency of the securities issue:** | U.S. Dollar |
| **Number of securities in issue:** | The issued share capital of the Company (all of which shares have been fully paid) as of the date of this Offering Memorandum consists of 143,454,001 million Shares.<br><br>There are no non-paid up Shares in issue. |
| **Description of the rights attaching to the securities:** | The holders of the Shares shall be entitled to receive, and to participate in, any dividends declared in relation to the Shares that they hold.<br><br>On a winding-up or a return of capital by the Company, the net assets of the Company attributable to the Shares shall be divided pro rata among the holders of the Shares. |

The Shares shall carry the right to receive notice of, attend and vote at general meetings of the Company.

Unless otherwise authorised by a special resolution, the Company shall not allot equity securities on any terms unless the Company has first made an offer to each person who holds Shares to allot to him, on the same or more favourable terms, such proportion of those equity securities that is as nearly as practicable (fractions being disregarded) equal to the proportion held by the relevant person of the Shares.

**Restrictions on the free transferability of the securities:**

The Company has elected to impose certain restrictions (pursuant to its Articles) on the Placing and on the future trading of the Shares so that the Company will not be required to register the offer and sale of the Shares under the U.S. Securities Act, so that the Company will not have an obligation to register as an investment company under the U.S. Investment Company Act and related rules and to address certain ERISA, U.S. Tax Code and other considerations. These transfer restrictions, which will remain in effect until the Company determines in its sole discretion to remove them, may adversely affect the ability of Shareholders to trade the Shares. Due to the restrictions described below, potential investors in the United States and U.S. Persons (including persons acting for the account or benefit of any U.S. Person) are advised to consult legal counsel prior to making any offer, resale, exercise, pledge or other transfer of the Shares.

Subject to certain exceptions, the Placing is only being made outside the United States to non-U.S. Persons in reliance on Regulation S under the U.S. Securities Act.

**Dividend policy:**

Whilst not forming part of the investment objective or policy of the Company, dividends will be payable in respect of each calendar quarter, payable in the month following the end of such quarter. During the Investment Period, any interest, proceeds from the realization of portfolio investments or other cash generated by the portfolio in excess of the dividends paid to Shareholders as provided below will be reinvested by the Company with the objective of growing the NAV.

During the Investment Period, on the 15th of February, May, August and November of each calendar year, beginning May 15, 2018 (each a "**Quarterly Dividend Date**"), after satisfaction of all expenses, debts, liabilities and obligations of the Company, the Company will pay a dividend to each Shareholder at a rate of at least 8% per annum, based on such Shareholder's aggregate capital contributions as of the prior Quarterly Dividend Date (the "**Target Dividend**").

Following the Investment Period, after satisfaction of all expenses, debts, liabilities and obligations of the Company, any interest, proceeds from the realization of portfolio investments or other cash generated by the portfolio will be distributed by the Company to the Shareholders as a dividend on each Quarterly Dividend Date in accordance with the distribution priority as follows (the "**Distribution Priority**"):

*First*, 100% to the Shareholders *pro rata* based on the number of Shares held until each Shareholder has received (i) pursuant to this clause (i), aggregate distributions from the Company equal to all capital contributions made by such Shareholder plus (ii) an amount necessary for such Shareholder to

- 15 -

receive a cumulative rate of return of 8.0% per annum, compounded annually, on such Shareholder's aggregate capital contributions;

*Second*, 100% to the Portfolio Manager until the Portfolio Manager has received aggregate distributions from the Company equal to 20% of the sum of all distributions made in excess of aggregate capital contributions made by Shareholders;

*Third*, 80% to the Shareholders *pro rata* based on the number of Shares held and 20% to the Portfolio Manager until each Shareholder has received aggregate distributions from the Company equal to all capital contributions made by such Shareholder plus an amount necessary for such Shareholder to receive a cumulative rate of return of 16% per annum, compounded annually, on such Shareholder's aggregate capital contributions; and

*Thereafter*, 70% to the Shareholders *pro rata* based on the number of Shares held and 30% to the Portfolio Manager.

For purposes of this section, references herein to a "Shareholder" shall include Highland HCF Advisor in its capacity as a shareholder of the Company, if applicable, and references to "aggregate distributions" received by the "Portfolio Manager" shall not include any distributions received by Highland HCF Advisor in its capacity as a Shareholder.

| | |
|---|---|
| **The total net proceeds and an estimate of the total expenses of the issue/offer, including estimated expenses charged to the investor by the issuer or the offeror:** | The Net Placing Proceeds are expected to be approximately U.S. $153 million.<br><br>The initial expenses of the Company are those which are necessary for the Placing, and shall not exceed U.S. $750,000. These expenses will be paid on or around the Placing and will include, without limitation: the cost of settlement and escrow arrangements; printing, advertising and distribution costs; legal fees; and any other applicable expenses. |
| **Reasons for the offer and use of proceeds:** | The Company is making the offer in order to raise the Net Placing Proceeds which will be invested in accordance with the Company's investment objective and policy, including its indirect investment in the Management Companies. |
| **Expenses related to the Placing:** | All costs associated with the Placing will be borne by the Company after the Placing and therefore the Net Placing Proceeds will be lower than the Gross Placing Proceeds immediately following the Placing. |
| **Ongoing annual expenses:** | The Company currently estimates that its total annual expenses for 2017 will be approximately $525,000 per annum, and will provide the Advisory Board with updated estimates and reasonable detail from time to time upon request. For the avoidance of doubt, except as expressly set forth in the section titled "*Company Directors and Administration—Portfolio Manager—Highland Fees*", the Portfolio Manager will pay all of its own operating, overhead and administrative expenses, including all costs and expenses on account on employee compensation, employee benefits and rent without reimbursement by the Company<br><br>These expenses will include the following:<br><br>*The Portfolio Manager, Highland, Acis and the Management Companies* |

- 16 -

Please see below in section titled "*Company Directors and Administration—Portfolio Manager—Highland Fees*".

*Administrator*

Under the terms of the Administration Agreement, the Administrator is entitled to an annual administration fee of up to 7 bps of the Net Asset Value of the Company per annum, payable monthly in arrears, and other miscellaneous fees and expenses reimbursed, in each case, as determined in the agreement.

*Custodian*

Under the terms of the Custody Agreement, the Custodian is entitled to receive transaction charges and sub custodian charges will be recovered by the Custodian from the Company as they are incurred by the relevant sub custodian. All such charges shall be charged at normal commercial rates.

*Directors*

The Directors are remunerated for their services at a fee of £35,000 per annum (£40,000 for the Chairman). For more information in relation to the remuneration of the Directors, please refer to the section of this Offering Memorandum entitled "Memorandum and Articles" in "Additional Information on the Company".

*Operating Expenses*

All Operating Expenses shall be borne by the Company. All reasonably and properly incurred out-of-pocket expenses of the Administrator, the Custodian, and the Directors relating to the Company are borne by the Company.

The amount of charges and expenses which are borne by an investor may vary from year to year.

For more information on expenses charged during the most recent financial year, prospective investors should review the Company's annual audited financial statements (if any) for the prior financial year.

**Terms and conditions of the offer:**

An amount of Shares equal to U.S. $153 million are being marketed and are available for subscription of commitments under the Placing until the Closing Date.

Shares will be issued under the Placing at a price per Share based on the most recent quarterly determined NAV of the Company. The maximum number of Shares to be issued by the Company is an amount of Shares equal to U.S. $153 million and there is no minimum number of Shares.

Placees may acquire Shares pursuant to a combination of issuance and transfer from existing Shareholders.

Placees may also enter into commitments to acquire Shares pursuant to a combination of issuance and transfer from existing Shareholders.

The Placing is not being underwritten.

**Press Releases:**

Neither the Portfolio Manager, the Company nor any Shareholder shall issue or approve any press release or other announcement referring to the identity

- 17 -

of a Shareholder without the prior written consent of the applicable Shareholder.

- 18 -

## RISK FACTORS

**Investment in the Company should be regarded as long term in nature and involving a high degree of risk. Accordingly, prospective investors should consider carefully all of the information set out in this Offering Memorandum and the risks relating to the Company and the Shares including, in particular, the risks described below which are not presented in any order of priority and may not be an exhaustive list or explanation of all the risks which investors may face when making an investment in the Shares and should be used as guidance only.**

**Only those risks which are believed to be material and currently known to the Company in relation to itself and its industry as at the date of this Offering Memorandum have been disclosed. Additional risks and uncertainties not currently known, or deemed immaterial at the date of this Offering Memorandum, may also have an adverse effect on the business, results of operations, financial conditions and prospects of the Company and its net asset value. Potential investors should review this Offering Memorandum carefully and in its entirety and consult with their professional advisers before making an application to invest in the Shares.**

**Prospective investors should note that the risks relating to the Company and the Shares summarised in the section of this document headed "Summary" are the risks that the Directors believe to be the most essential to an assessment by a prospective investor of whether to consider an investment in the Shares. However, as the risks which the Company faces relate to events and depend on circumstances that may or may not occur in the future, prospective investors should consider not only the information on the key risks summarised in the section of this document headed "*Summary*" but also, among other things, the risks and uncertainties described below.**

## RISKS RELATING TO THE COMPANY

### *The Company is a recently incorporated company incorporated under the laws of Guernsey with limited history*

The Company was incorporated under the laws of Guernsey on 30 March 2015. It commenced operations after the initial Placing in August 2015. As the Company has a limited operating history, investors have limited information on which to evaluate the Company's ability to achieve its investment objective or implement its investment strategy and provide a satisfactory investment return. An investment in the Company is therefore subject to all the risks and uncertainties associated with a recently formed business, including the risk that the Company will not achieve its investment objective and that the value of an investment in the Company could decline substantially as a consequence. Any failure by the Company to do so may adversely affect its business, financial condition, results of operations and/or its NAV.

The Company's returns and operating cash flows depend on many factors, including the price and performance of the investments, the availability and liquidity of investment opportunities falling within the Company's investment objective and policy, the level and volatility of interest rates, readily accessible short-term borrowings, the conditions in the financial markets and economy, the financial performance of obligors under the investments and the Company's ability successfully to operate its business and execute its investment strategy. There can be no assurance that the Company's investment strategy will be successful.

### *The Company's target return and target dividend yield are based on estimates and assumptions that are inherently subject to significant business and economic uncertainties and contingencies, and the actual return and dividend yield may be materially lower than the target return and target dividend yield and could be negative*

The Company's target return and target dividend yield set forth in this Offering Memorandum are targets only and are based on estimates and assumptions concerning the performance of its investment portfolio which will be subject to a variety of factors including, without limitation, the availability of investment opportunities, asset mix, value, volatility, holding periods, performance of underlying portfolio debt issuers, investment liquidity, borrower default, changes in current market conditions, interest rates, government regulations or other policies, the worldwide economic environment, changes in law and taxation, natural disasters, terrorism, social unrest and civil disturbances or the occurrence of risks described elsewhere in this Offering Memorandum, which are inherently subject to significant business, economic and market uncertainties and contingencies, all of which are beyond the control of the Company and which may adversely affect the Company's ability to achieve its target return and target dividend yield. Such

- 19 -

targets are based on market conditions and the economic environment at the time of assessing the proposed targets and the assumption that the Company will be able to implement its investment policy and strategy successfully, and are therefore subject to change. There is no guarantee or assurance that the target return and/or target dividend yield can be achieved at or near the levels set forth in this Offering Memorandum. Accordingly, the Company's actual rate of return and actual dividend yield achieved may be materially lower than the targets, or may result in a loss. A failure to achieve the target return and/or target dividend yield set forth in this Offering Memorandum may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

An investment in the Company will be a speculative investment of a long-term nature and involving a high degree of risk. Shareholders could lose all or a substantial portion of their investment in the Company. Shareholders must have the financial ability, sophistication, experience and willingness to bear the risks of an investment in the Company.

***Material changes affecting global debt and equity capital markets may have a negative effect on the Company's business, financial condition, results of operations, and/or its NAV***

The global financial markets have experienced extreme volatility and disruption in recent years, as evidenced by a lack of liquidity in the equity and debt capital markets, significant write-offs in the financial services sector, the repricing of credit risk in the credit market and the failure of major financial institutions. Despite actions of governmental authorities, these events contributed to general economic conditions that have materially and adversely affected the broader financial and credit markets and reduced, and in certain circumstances, significantly reduced, the availability of debt and equity capital.

Further, within the banking sector, the default of any institution could lead to defaults by other institutions. Concerns about, or default by, one institution could lead to significant liquidity problems, losses or defaults by other institutions, because the commercial soundness of many financial institutions may be closely related as a result of their credit, trading, clearing or other relationships. This risk is sometimes referred to as "systemic risk" and may adversely affect other third parties with whom the Company deals. The Company may therefore be exposed to systemic risk when the Company deals with various third parties whose creditworthiness may be exposed to such systemic risk.

Recurring market deterioration may materially adversely affect the ability of an issuer whose debt obligations form part of the Company's portfolio, or an issuer whose debt obligations form part of a CLO in which the Company holds CLO Notes, to service its debts or refinance its outstanding debt. Further, such financial market disruptions may have a negative effect on the valuations of the investments (and, by extension, on the Company's NAV), and on the potential for liquidity events involving such investments. In the future, non-performing assets in the Company's portfolio may cause the value of that portfolio to decrease (and, by extension and/or its the NAV to decrease). Adverse economic conditions may also decrease the value of any security obtained in relation to any of the investments.

Conversely, in the event of sustained market improvement, the Company may have access to a reduced number of attractive potential investment opportunities, which also may result in limited returns to Shareholders.

***The Company's NAV is subject to valuation risk and the Company can provide no assurance that the NAVs it records from time to time will ultimately be realised***

The Company's NAV will be calculated by third parties and will be subject to valuation risk (see the risk factor entitled "*The investments may be difficult to value accurately and, as a result, the Company may be subject to valuation risk*"). If a valuation estimate provided to the Company by a third party subsequently proves to be incorrect, no adjustment to any previously calculated NAV will be made. Any acquisitions or disposals of Shares based on previous erroneous NAVs may result in losses for shareholders.

The investments held by the Company will be valued quarterly and the Company's Net Asset Value will be calculated based on these values. Therefore, the actual value of the investments at any given time may be different from the value based on which the Company's latest Net Asset Value has been calculated.

Investors should note that where a loan becomes subject to a Forward Purchase Agreement (described further in the section of this Offering Memorandum entitled "*Additional Information on the Company*") the Company will (subject to certain conditions as set out in the section of this Offering Memorandum entitled "*Additional Information on the*

- 20 -

*Company*") neither receive the gain nor bear the loss that occurs between the date when the loan is added to the Forward Purchase Agreement and the date when the transfer occurs.

***Each of the Company, the Portfolio Manager, Acis and the Management Companies is reliant on Highland (acting in its different capacities), asset management subsidiaries and other third party service providers to carry on their businesses and a failure by one or more service providers may materially disrupt the business of the Company and or the Management Companies***

The Company has no employees and its directors have all been appointed on a non-executive basis. Highland HCF Advisor will, as part of the services to be provided under the terms of the Portfolio Management Agreement, be responsible for selecting the portfolio of investments and the acquisition, disposition or sale of investments and providing the Company with the necessary personnel, credit research and other resources to perform the functions necessary to the business of the Company. In addition, Highland or its affiliates, including the Portfolio Manager, Acis or the Management Companies, may also act as CLO Manager in respect of the Managed CLOs from time to time. The Company may also invest in, provide debt financing to, or purchase performance-linked notes from, asset management subsidiaries, affiliated with the Company, the Portfolio Manager, Highland or Acis, including the Management Companies, and which may act as the asset manager of certain U.S. or European CLOs in order to satisfy certain U.S. or European risk retention requirements. Therefore, the Company is reliant upon the performance of Highland and/or its affiliates, asset management subsidiaries of the Company and other third party service providers for the performance of certain functions.

Highland CLO Management relies on Highland for access to its employees (which are shared with Highland). Acis CLO Management relies on Acis for access to its employees (which are shared with Acis). Highland and Acis, as applicable, will, as part of the services to be provided under the terms of the Staff and Services Agreements, be responsible for providing the Company with the necessary credit research, back office and other resources to perform the functions necessary to the business of each of the Management Companies, including its management of CLOs. Therefore, each of the Management Companies is reliant upon the performance of Highland and Acis, as applicable, for the performance of essential functions, and may be unable to properly manage CLOs without the support of Highland or Acis, as applicable.

Failure by any service provider to carry out its obligations to the Company or the applicable Management Company in accordance with the applicable duty of care and skill, or at all, or termination of any such appointment may adversely affect the Company's or the applicable Management Company's, as applicable, business, financial condition, results of operations and/or its NAV.

In the event that it is necessary for the Company or the applicable Management Company to replace any third party service provider, it may be that the transition process takes time, increases costs and may adversely affect the Company's or the applicable Management Company's, as applicable, business, financial condition, results of operations and/or its NAV.

***The Shares will be subordinated to the rights of any secured Warehouse Loan Facility Provider or holder of any other future indebtedness or preference shares of the Company.***

The Company is permitted to issue preference shares and incur indebtedness, including secured debt in the form of one or more Warehouse Loan Facilities or other lending facilities. Such preference shares and indebtedness will rank ahead of the Shares in respect of any distributions or payments by the Company to Shareholders. In an enforcement scenario under any Warehouse Loan Facility, the provider(s) of such facilities will have the ability to enforce their security over the assets of the Company and to dispose of or liquidate (on their own behalf or through a security trustee or receiver) the assets of the Company in a manner which is beyond the control of the Company. In such an enforcement scenario, there is no guarantee that there will be sufficient proceeds from the disposal or liquidation of the Company assets to repay any amounts due and payable on the Shares and this may adversely affect the performance of the Company's business, financial condition, results of operations and/or its NAV.

*Exculpation and Indemnification*

The Articles contain provisions that, subject to applicable law, reduce or modify the duties that the Indemnified Persons would otherwise owe to the Company and the Shareholders. The Portfolio Manager will assume no

responsibility under the Portfolio Management Agreement other than to render the services called for thereunder and affecting the duties and functions that have been delegated to it thereunder in good faith and, subject to the standard of conduct described in the next succeeding sentence. The Portfolio Manager will not be responsible for any action or inaction of the Company in declining to follow any advice, recommendation or direction of the Portfolio Manager. Further, Indemnified Persons will incur no liability to the Company or any Shareholder in the absence of a Triggering Event, except as otherwise required by applicable law (including the Companies Law). Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

Under the Articles, the Company, to the fullest extent permitted by applicable law (including the Companies Law), will indemnify each Indemnified Person against all Indemnified Losses to which an Indemnified Person may become subject by reason of any acts or omissions or any alleged acts or omissions arising out of such Indemnified Person's or any other person's activities in connection with the conduct of the business or affairs of the Company and/or an investment, unless such Indemnified Losses result from any action or omission which constitutes, with respect to such person, a Triggering Event; provided, that notwithstanding the foregoing, the members of the Advisory Board or members of any subcommittee thereof shall be subject only to a duty of good faith (it being understood that, to the fullest extent permitted by applicable law, any such member, in determining to take or refrain from taking any action, shall be permitted to take into consideration only the interests of the Shareholder and/or other person represented by such member and, in so doing, shall, to the fullest extent permitted by applicable law, be considered to have acted in good faith). Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

The fees, costs and expenses (whether or not advanced) and other liabilities resulting from the Company's indemnification obligations are generally operating expenses and will be paid by or otherwise satisfied out of the assets of the Company. The application of the foregoing standards may result in Shareholders having a more limited right of action in certain cases than they would in the absence of such standards. In particular, a "gross negligence" standard of care has been held in some jurisdictions to involve conduct that is closer to wilful misconduct. Even though such provisions in the Articles will not act as a waiver on the part of any Shareholder of any of its rights under applicable U.S. securities laws or other laws, the applicability of which is not permitted to be waived, the Company may bear significant financial losses even where such losses were caused by the negligence (even if heightened) of such Indemnified Persons.

## RISKS RELATING TO THE INVESTMENT STRATEGY

### *General Background relating to the United States and European Risk Retention Requirements*

Effective for CLOs on December 24, 2016, the so-called "risk retention" rules promulgated by U.S. federal regulators under the Dodd-Frank Wall Street Reform and Consumer Protection Act (the "**Dodd-Frank Act**") require a "securitizer" or "sponsor" (which in the case of a CLO is considered the collateral manager) to retain directly or through a "majority-owned affiliate" at least 5% of the credit risk of the securitized assets. Highland CLO Management is being formed with intention of acting as a "majority-owned affiliate" of Highland as a "sponsor" for purposes of holding the applicable Retention Interest under U.S. Risk Retention Rules with respect to Managed CLOs and to provide a vehicle whereby the Company can invest in Managed CLOs. Acis CLO Management is intended to act as a "majority-owned affiliate" of Acis as a "sponsor" for purposes of holding the applicable Retention Interest under U.S. Risk Retention Rules with respect to Acis CLO 7 and to provide a vehicle whereby the Company can invest in Acis CLO 7.

The CLOs in which the Company invests may be structured with the intent to be compliant with the European risk retention requirements for securitisation transactions, meaning, collectively, (i) Articles 404-410 of Regulation (EU) No 575/2013 on prudential requirements for credit institutions and investment firms and amending Regulation (EU) No. 648/2012 (the "**CRR**") as supplemented by Commission Delegated Regulation (EU) No. 625/2014 (the "**CRR Retention Requirements**") (ii) Articles 51-54 of the Commission Delegated Regulation (EU) No 231/2013 (the "**AIFMD Level 2 Regulation**") implementing Article 17 of Directive 2011/61/EU on Alternative Investment Fund Managers (the "**AIFMD**"), and (iii) Article 254-257 of the Commission Delegated Regulation (EU) 2015/35 implementing Article 135(2) of Directive 2009/138/EC on the taking-up and pursuit of the business of Insurance and Reinsurance, as amended by Directive 201/51/EU (and as supplemented by Articles 254-257 of Commission

- 22 -

Delegated Regulation (EU) 2015/35) (the "**Solvency II Level 2 Regulation**"), each together with any applicable guidance, technical standards and related documents published by any European regulator in relation thereto and any implementing laws or regulations in force in any Member State of the European Union (together with the CRR Retention Requirements and the AIFMD Level 2 Regulation, the "**EU Retention Requirements**" and, together with the risk retention requirements under the U.S. Risk Retention Rules, the "**Retention Requirements**"). Any such Company investments in CLOs intended to be compliant with the EU Retention Requirements will continue to be subject to the EU Retention Requirements. However, it is expected that, going forward, the Company's investments in CLOs will be done primarily on an indirect basis through its indirect interest in the Management Companies. As used herein, any reference to the Company's investments in CLOs or CLO Retention Notes shall be deemed to refer primarily to (i) prior to the formation of the Management Companies, the CLO securities the Company acquired directly and (ii) following the formation of the Management Companies, the indirect interests in CLOs it intends to hold through the applicable Management Company. Furthermore, any reference to Managed CLOs or CLOs managed by Highland, Acis, the Portfolio Manager and the Management Companies shall be deemed to refer primarily to (i) for CLOs formed prior to the formation of Acis, CLOs managed by Highland (ii) for CLOs formed after the formation of Acis and prior to the formation of Acis CLO Management, CLOs managed by Acis, (iii) for CLOs formed following the formation of Acis CLO Management and prior to the formation of Highland CLO Management, CLOs managed by Acis CLO Management and (iv) for CLOs formed following the formation of Highland CLO Management, CLOs managed by Highland CLO Management.

Although the Company, the Portfolio Manager, Highland, Acis and the Management Companies intend to comply with the Retention Requirements, there has been no explicit guidance regarding how entities may be structured for this purpose and therefore the regulatory environment in which the CLOs intend to operate is highly uncertain. There can be no assurance that applicable governmental authorities will agree that any of the transactions, structures or arrangements entered into by the Company, Highland, Acis or the applicable Management Company, and the manner in which it expects to hold retention interests, will satisfy the Retention Requirements, including any transactions pursuant to which Highland or Acis, as applicable, may hold their respective indirect ownership interests in the applicable Management Companies through, or transfer such interests to, affiliates that are intended to be, directly or indirectly, majority controlled, are majority controlled by or are under common majority control with, Highland or Acis, as applicable, with the intention that the Management Companies will remain their respective "majority-owned affiliates" for purposes of the U.S. Risk Retention Rules. If such transactions, structures or arrangements are determined not to comply with the Retention Requirements, Highland, Acis, the applicable Management Company or the Company (as applicable) could become subject to regulatory action which could in turn materially and adversely affect the Company and/or the potential return to shareholders. The impact of the Retention Requirements on the securitization market is also unclear and such rules may negatively impact the value of the CLOs and their underlying assets.

*The investments may be difficult to value accurately and, as a result, the Company may be subject to valuation risk*

The Company's portfolio may at any given time include, directly and indirectly, securities or other financial instruments or obligations which are very thinly traded, for which no market exists or which are restricted as to their transferability under applicable securities laws. These investments may be extremely difficult to value accurately. Further, because of overall size or concentration in particular markets of positions held by the Company, the value of its investments which can be liquidated may differ, sometimes significantly, from their valuations. Third party pricing information may not be available for certain positions held by the Company. Investments to be held by the Company may trade with significant bid-ask spreads. The Company is entitled to rely, without independent investigation, upon pricing information and valuations furnished by third parties, including pricing services and valuation sources. In the absence of fraud, gross negligence (under New York law), bad faith or manifest error, valuation determinations in accordance with the Company's valuation policy will be conclusive and binding.

*Market factors may result in the failure of the investment strategy*

Strategy risk is associated with the failure or deterioration of an investment strategy such that most or all investment managers employing that strategy suffer losses. Strategy-specific losses may result from excessive concentration by multiple market participants in the same investment or general economic or other events that adversely affect particular strategies (for example the disruption of historical pricing relationships). Furthermore, an imbalance of supply and demand favouring borrowers could result in yield compression, higher leverage and less favourable terms to the detriment of all investors in the relevant asset class. The investment strategy employed by the Company is speculative

- 23 -

and involves substantial risk of loss in the event of a failure or deterioration in the financial markets, although the Company has certain investment limits which define to a degree how it invests. As a result, the Company's investment strategy may fail, and it may be difficult for the Company to amend its investment strategy quickly or at all should certain market factors appear, which may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

***The investment strategy of the Company includes investing predominantly in CLO Notes, and, under certain circumstances, asset management subsidiaries, all of which are subject to a risk of loss of principal***

The investment strategy of the Company consists of investing predominantly in CLO Notes, directly and indirectly through its investment in the Management Companies, and, under certain circumstances, asset management subsidiaries. The company may also invest in senior secured loans (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements). Such investments may be considered to be subject to a level of risk in the case of deterioration of general economic conditions, which might increase the risk of loss of principal or investment. This could result in losses to the Company which could have a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV.

***In the event of a default in relation to an investment, the Company or the CLO in which the Company holds CLO Notes will bear a risk of loss of principal, and accrued interest***

Performance and investor yield on the Company's investments (including both direct investments by the Company in senior secured loans (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) and investments in senior secured loans held by CLOs in which the Company holds CLO Notes) may be affected by the default or perceived credit impairment of such investments and by general or sector specific credit spread widening. Credit risks associated with the investments include (among others): (i) the possibility that earnings of an obligor may be insufficient to meet its debt service obligations; (ii) an obligor's assets declining in value; and (iii) the declining creditworthiness, default and potential for insolvency of an obligor during periods of rising interest rates and economic downturn. An economic downturn and/or rising interest rates could severely disrupt the market for the investments and adversely affect the value of the investments and the ability of the obligors thereof or the CLO to repay principal and interest. In turn, this may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

In the event of a default in relation to an investment held by the Company or a CLO in which the Company holds CLO Notes, the Company will bear a risk of loss of principal and accrued interest on that investment. Any such investment may become defaulted for a variety of reasons, including non-payment of principal or interest, as well as breaches of contractual covenants. A defaulted investment may become subject to workout negotiations or may be restructured by, for example, reducing the interest rate, a write-down of the principal, and/or changes to its terms and conditions. Any such process may be extensive and protracted over time, and therefore may result in substantial uncertainty with respect to the ultimate recovery on the defaulted investment. In addition, significant costs might be imposed on the lender, further affecting the value of the investment. The liquidity in such defaulted investments may also be limited and, where a defaulted investment is sold, it is unlikely that the proceeds from such sale will be equal to the amount of unpaid principal and interest owed on that investment. This would adversely affect the value of the Company's investment portfolio and, by extension, its business, financial condition, results of operations and/or its NAV.

In the case of secured loans, restructuring can be an expensive and lengthy process which could have a material negative effect on the Company's anticipated return on the restructured loan. By way of example, it would not be unusual for any costs of enforcement to be paid out in full before the repayment of interest and principal. This would substantially reduce the Company's anticipated return on the restructured loan.

***The illiquidity of investments may have an adverse impact on their price and the Company's ability to trade in them or require significant time for capital gains to materialise***

Credit markets may from time to time become less liquid, leading to valuation losses on the investments making it difficult to acquire or dispose of them at prices the Company considers their fair value. Accordingly, this may impair the Company's ability to respond to market movements and the Company may experience adverse price movements upon liquidation of such investments. Liquidation of portions of the portfolio under these circumstances could produce realised losses. The size of the Company's positions may magnify the effect of a decrease in market liquidity for such

- 24 -

instruments. Settlement of transactions may be subject to delay and uncertainty. Such illiquidity may result from various factors, such as the nature of the instrument being traded, or the nature and/or maturity of the market in which it is being traded, the size of the position being traded, or lack of an established market for the relevant securities. Even where there is an established market, the price and/or liquidity of instruments in that market may be materially affected by certain factors.

The investment objective of the Company is to provide investors with stable income returns and capital appreciation from exposure on an indirect basis to a portfolio of predominantly floating rate senior secured loans, CLO Notes and, under certain circumstances, asset management subsidiaries. Investments which are in the form of loans are not as easily purchased or sold as publicly traded securities due to the unique and more customised nature of the debt agreement and the private syndication process. As a result, there may be a significant period between the date that the Company makes an investment and the date that any capital gain or loss on such investment is realised. Moreover, the sale of restricted and illiquid securities may result in higher brokerage charges or dealer discounts and other selling expenses than the sale of securities eligible for trading on national securities exchanges or in the over-the-counter markets. Further, the Company may not be able readily to dispose of such illiquid investments and, in some cases, may be contractually prohibited from disposing of such investments for a specified period of time, which could materially and adversely affect the Company's business, financial condition, results of operations and/or its NAV. See further the risk factor titled "*The Company will be unable to liquidate, sell, hedge or otherwise mitigate its credit risk under or associated with the CLO Retention Notes until such time as the securities of the relevant CLO have been redeemed in full (whether at final maturity or early redemption)*" below.

### *The Company may hold a relatively concentrated portfolio*

The Company may hold a relatively concentrated portfolio. There is a risk that the Company could be subject to significant losses if any obligor, especially one with whom the Company had a concentration of investments, were to default or suffer some other material adverse change. The level of defaults in the portfolio and the losses suffered on such defaults may increase in the event of adverse financial or credit market conditions. Any of these factors could adversely affect the value of the Company's investment portfolio and, by extension, its business, financial condition, results of operations and/or its NAV.

A significant portion of the Company's investment portfolio is expected to comprise directly or indirectly of Managed CLOs advised by Highland, Acis, the Portfolio Manager or a Management Company, as the CLO Manager. The performance of the Company's portfolio depends heavily on the skills of Highland, Acis, the Portfolio Manager and the Management Companies, as applicable, in analyzing, selecting and managing the relevant CLOs. See further the sections titled "*Risks Relating to Highland and Acis*" and "*Conflicts of Interest*" below.

### *The Company may be exposed to foreign exchange risk, which may have an adverse impact on the value of its assets and on its results of operations*

The base currency of the Company is the U.S. Dollar. Certain of the Company's assets may be invested in securities and other investments which are denominated in other currencies. Accordingly, the Company will necessarily be subject to foreign exchange risks and the value of its assets may be affected unfavourably by fluctuations in currency rates. Although the Company may utilise financial instruments to hedge against declines in the value of such assets as a result of changes in currency exchange rates, it is not obliged to do so and may terminate any hedge contract at any time. Moreover, it may not be possible for the Company to hedge against a particular change or event at an acceptable price or at all. In addition, there can be no assurance that any attempt to hedge against a particular change or event would be successful, and any such hedging failure could materially and adversely affect the Company's business, financial condition, results of operations and/or its NAV.

### *The hedging arrangements of the Company may not be successful*

The Company's economic risks cannot be effectively hedged. However, in connection with the financing of certain investments, the Company may employ hedging techniques designed to reduce the risks of adverse movements in interest rates, securities' prices and/or currency exchange rates. However, some residual risk may remain as a result of imperfections and inconsistencies in the market and/or in the hedging contract. While such hedging transactions may reduce certain risks, they create others. The Company directly or indirectly (through affiliates and subsidiaries) will not be permitted to enter into hedging with respect to the CLO Retention Notes.

The Company may utilise certain derivative instruments (including, without limitation, single-name credit default swaps, credit default swap and loan credit default swap indexes, equity futures and equity indexes) for hedging purposes. However, even if used primarily for hedging purposes, the prices of derivative instruments are highly volatile, and acquiring or selling such instruments involves certain leveraged risks. There may be an imperfect correlation between the instrument acquired for hedging purposes and the investments or market sectors being hedged, in which case, a speculative element is added to the highly leveraged position acquired through a derivative instrument primarily for hedging purposes. In particular, the investments which are in the form of loans may, in certain circumstances, be repaid at any time on short notice at no cost, and accordingly the hedging of interest rate or currency risk in such circumstances may be less precise than is the case with investments in the public securities market.

Furthermore, default by any hedging counterparty in the performance of its obligations could subject the investments to unwanted credit and market risks. Accordingly, although the Company may benefit from the use of hedging strategies, failure to properly hedge the market risk in the investments and/or default of a counterparty in the performance of its obligations under a hedging contract may have a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV, and such material adverse effects may exceed those which may have resulted had no hedging strategy been employed.

***Under certain hedging contracts that the Company may enter into, the Company may be required to grant security interests over some of its assets to the relevant counterparty as collateral***

In connection with certain hedging contracts, the Company may be required to grant security interests over some of its assets to the relevant counterparty to such hedging contract as collateral. Such hedging contracts typically will give the counterparty the right to terminate the agreement upon the occurrence of certain events. Such termination events may include, among others, a failure by the Company to pay amounts owed when due, a failure to provide required reports or financial statements, a decline in the value of the investments secured as collateral, a failure to maintain sufficient collateral coverage, a failure by the Company to comply with its investment policy and any investment restrictions, key changes in the Company's management, a significant reduction in the Company's Net Asset Value, and material violations of the terms, representations, warranties or covenants contained in the hedging contract, as well as other events determined by the counterparty. If a termination event were to occur, there may be a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV.

***The use of leverage by the Company may increase the volatility of returns and providers of leverage would rank ahead of investors in the Company in the event of insolvency***

The Company may employ leverage in order to increase investment exposure with a view to achieving its target return, in the form of one or more committed credit facilities. Leverage may come in the form of CLO securitizations.

While leverage presents opportunities for increasing total returns, it can also have the effect of increasing the volatility of the Shares, including the risk of total loss of the amount invested. If income and capital appreciation on investments made with borrowed funds are less than the costs of the leverage, the Net Asset Value will decrease. The effect of the use of leverage is to increase the investment exposure, the result of which is that, in a market that moves adversely, the possible resulting loss to investors' capital would be greater than if leverage were not used. As a result of leverage, small changes in the value of the underlying assets may cause a relatively large change in the value of the Company. Many financial instruments used to employ leverage are subject to variation or other interim margin requirements, which may force premature liquidation of investments. Investors should be aware that the use of leverage by the Company can be considered to multiply the leverage effect on their investment returns in the Company. As described above, while this effect may be beneficial when markets' movements are favourable, it may result in a substantial loss of capital when markets' movements are unfavourable.

In addition, such leverage may involve granting of security or the outright transfer of specific investments in the portfolio. Since there is no security created in respect of the Shares, any insolvency of the Shareholders could rank behind the Company's financing and hedging counterparties, whose claims will be considered as indebtedness of the Company and may be secured. Leverage does create opportunities for greater total returns on the investments but simultaneously may create special risk considerations by magnifying changes in the total value of the Net Asset Value and in the yield on the investments held by the Company.

- 26 -

In addition, to the extent leverage is employed, the Company may be required to refinance transactions from time to time. On each refinancing, the applicable counterparty may choose to re-negotiate the terms of each transaction or indeed not to refinance the transaction at all. To the extent refinancing facilities are not available in the market at economic rates or at all, the Company may be required to sell assets at disadvantageous prices. Any such deleveraging may result in losses on investments which could be severe and accordingly could have a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV.

### *Interest rate fluctuations could expose the Company to additional costs and losses*

The prices of the investments that may be held by the Company tend to be sensitive to interest rate fluctuations and unexpected fluctuations in interest rates could cause the corresponding prices of a position to move in directions which were not initially anticipated. In addition, interest rate increases generally will increase the interest carrying costs of borrowed securities and leveraged investments. Further, the Company may invest in both floating and fixed rate securities and interest rate movements will affect those respective securities differently. In particular, when interest rates rise significantly the value of fixed interest rate securities often fall. Furthermore, to the extent that interest rate assumptions underlie the hedging of a particular position, fluctuations in interest rates could invalidate those underlying assumptions and expose the Company to additional costs and losses. Any of the above factors could materially and adversely affect the Company's business, financial condition, results of operations and/or its NAV.

### *Additional Information about LIBOR*

In a speech on 27 July 2017, Andrew Bailey, the Chief Executive of the Financial Conduct Authority ("**FCA**"), announced the FCA's intention to cease sustaining LIBOR from the end of 2021.

The FCA has statutory powers to compel panel banks to contribute to LIBOR where necessary. The FCA has decided not to ask, or to require, that panel banks continue to submit contributions to LIBOR beyond the end of 2021. The FCA has indicated that the current panel banks will voluntarily sustain LIBOR until the end of 2021. The FCA does not intend to sustain LIBOR through using its influence or legal powers beyond that date. The FCA's intention is that after 2021, it will no longer be necessary for the FCA to persuade, or to compel, banks to submit to LIBOR due to the development of alternative benchmark rates, which the FCA suggested should be based on transactions and not on reference rates that do not have active underlying markets to support them. As of the date of this Offering Memorandum, no specific alternative rates have been generally agreed in the CLO market.

It is possible that the LIBOR administrator, ICE Benchmark Administration, and the panel banks could continue to produce LIBOR on the current basis after 2021, if they are willing and able to do so. However, the survival of LIBOR in its current form, or at all, is not guaranteed after 2021 and, if LIBOR in its current form does not survive, it could cause a disruption in the credit markets generally, which could negatively impact the market value and/or transferability of the Notes.

It is currently unclear how LIBOR would be determined pursuant to existing underlying CLO indentures if LIBOR ceased to exist. If an alternative or a successor benchmark rate were determined, it may increase the risk of a mismatch between the interest rate applicable to the underlying loan assets and the interest rate applicable to the underlying collateral obligations of the CLOs held by the Company. Such mismatch could have a material adverse effect on the value and liquidity of the CLO Notes held by the Company.

Investors should be aware that: (a) any of these changes or any other changes to LIBOR could affect the level of the published rate, including to cause it to be lower and/or more volatile than it would otherwise be; (b) if the applicable rate of interest on any collateral obligation held by the Company is calculated with reference to a currency or tenor which is discontinued, such rate of interest will then be determined by the provisions of the affected collateral obligation, which may include determination by the relevant calculation agent in its discretion; (c) the administrator of LIBOR will not have any involvement in the collateral obligations or notes linked to those obligations and may take any actions in respect of LIBOR without regard to the effect of such actions on the collateral obligations or the notes; and (d) any uncertainty in the value of LIBOR or the admissions made by financial institutions that LIBOR has been manipulated or any uncertainty in the prominence of LIBOR as a benchmark interest rate due to the recent regulatory reforms may adversely affect liquidity of the collateral obligations or the notes in the secondary market and their market value. Any of the above or any other significant change to the setting of LIBOR could materially and adversely affect the Company's business, financial condition, results of operations and/or its NAV.

*In the event of the insolvency of an obligor in respect of an investment, or of an underlying obligor in respect of an investment, the return on such investment to the Company may be adversely impacted by the insolvency regime or insolvency regimes which may apply to that obligor or underlying obligor and any of their respective assets*

In the event of the insolvency of an obligor in respect of an investment (and in the case of the CLO Notes, the obligors of the assets within the relevant CLO's portfolio), the Company's (or the CLO issuer's, in the case of CLO Notes) recovery of amounts outstanding in insolvency proceedings may be impacted by the insolvency regimes in force in the jurisdiction of incorporation of such obligor or in the jurisdiction in which such obligor mainly conducts its business (if different from the jurisdiction of incorporation), and/or in the jurisdiction in which the assets of such obligor are located. Such insolvency regimes impose rules for the protection of creditors and may adversely affect the ability to recover such amounts as are outstanding from the insolvent obligor under the investment, which may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

Similarly, the ability of obligors to recover amounts owing to them from insolvent underlying obligors may be adversely impacted by any such insolvency regimes applicable to those underlying obligors, which in turn may adversely affect the abilities of those obligors to make payments due under the investment to the Company on a full or timely basis.

In particular, it should be noted that the United States and a number of European jurisdictions operate unpredictable insolvency regimes which may cause delays to the recovery of amounts owed by insolvent obligors or underlying obligors subject to those regimes. The different insolvency regimes applicable in the different jurisdictions result in a corresponding variability of recovery rates for senior secured loans, entered into or issued in such jurisdictions, any of which may have a material adverse effect on the performance of a CLO and, by extension, the Company's business, financial condition, results of operations and/or its NAV.

*A CLO issuer may be subject to losses on investments as a result of insolvency or clawback legislation and/or fraudulent conveyance findings by courts*

Various laws enacted for the protection of creditors and stakeholders may apply to certain investments that are debt obligations, although the existence and applicability of such laws will vary between jurisdictions. For example, if a court were to find that an obligor did not receive fair consideration or reasonably equivalent value for incurring indebtedness evidenced by an investment and the grant of any security interest securing such investment, and, after giving effect to such indebtedness, the obligor: (i) was insolvent; (ii) was engaged in a business for which the assets remaining in such obligor constituted unreasonably small capital; or (iii) intended to incur, or believed that it would incur, debts beyond its ability to pay such debts as they mature, such court may: (a) invalidate such indebtedness and such security interest as a fraudulent conveyance; (b) subordinate such indebtedness to existing or future creditors of the obligor; or (c) recover amounts previously paid by the obligor (including to a CLO issuer) in satisfaction of such indebtedness or proceeds of such security interest previously applied in satisfaction of such indebtedness. In addition, if an obligor in whose debt a CLO issuer has an investment becomes insolvent, any payment made on such investment may be subject to avoidance, cancellation and/or clawback as a "preference" if made within a certain period of time (which for example under some current laws may be as long as two years) before insolvency.

In general, if payments on an investment are voidable, whether as fraudulent conveyances, extortionate transactions or preferences, such payments may be recaptured either from the initial recipient or from subsequent transferees of such payments. To the extent that any such payments are recaptured from a CLO issuer, there will be an adverse effect on the performance of the CLO issuer and, by extension, on the Company's business, financial condition, results of operations and/or its NAV.

*The due diligence process that the Company plans to undertake in evaluating specific investment opportunities may not reveal all facts that may be relevant in connection with such investment opportunities and any corporate mismanagement, fraud or accounting irregularities may materially affect the integrity of the Company's due diligence on investment opportunities*

When conducting due diligence and making an assessment regarding an investment, the Company will be required to rely on resources available to it, including internal sources of information as well as information provided by existing and potential obligors, any equity sponsor(s), lenders and other independent sources. The due diligence process may at times be required to rely on limited or incomplete information.

- 28 -

The Portfolio Manager will select investments on the Company's behalf in part on the basis of information and data relating to potential investments filed with various government regulators and publicly available or made directly available to the Portfolio Manager by the entities filing such information or third parties. Although the Portfolio Manager will evaluate all such information and data and seek independent corroboration when it considers it appropriate and reasonably available, the Portfolio Manager will not be in a position to confirm the completeness, genuineness or accuracy of such information and data. The Portfolio Manager is dependent upon the integrity of the management of the entities filing such information and of such third parties as well as the financial reporting process in general.

The value of an investment made by the Portfolio Manager on the Company's behalf may be affected by fraud, misrepresentation or omission on the part of an obligor, underlying obligor, any related parties to such obligor or underlying obligor, or by other parties to the investment (or any related collateral and security arrangements). Such fraud, misrepresentation or omission may adversely affect the value of the investment and/or the value of the collateral underlying the investment in question and may adversely affect the ability of the Portfolio Manager's on the Company's behalf to enforce its contractual rights relating to that investment or the relevant obligor's ability to repay the principal or interest on the investment.

Investment analysis and decisions by the Portfolio Manager may be undertaken on an expedited basis in order to make it possible for the Portfolio Manager to take advantage of short-lived investment opportunities. In such cases, the available information at the time of an investment decision may be limited, inaccurate and/or incomplete. Furthermore, the Portfolio Manager may not have sufficient time to evaluate fully such information even if it is available.

Accordingly, the Portfolio Manager cannot guarantee that the due diligence investigation it carries out with respect to any investment opportunity will reveal or highlight all relevant facts that may be necessary or helpful in evaluating such investment opportunity. Any failure by the Portfolio Manager to identify relevant facts through the due diligence process may cause it to make inappropriate investment decisions, which may have a material adverse effect on the Company's business, financial condition, results of operations and/or its NAV.

***The collateral and security arrangements attached to an investment may not have been properly created or perfected, or may be subject to other legal or regulatory restrictions***

The collateral and security arrangements in relation to secured obligations in which the Company may invest (and the security arrangements relating to the underlying assets of CLOs) will be subject to such security or collateral having been correctly created and perfected and any applicable legal or regulatory requirements which may restrict the giving of collateral or security by an obligor, such as, for example, thin capitalisation, over-indebtedness, financial assistance and corporate benefit requirements. If the investments do not benefit from the expected collateral or security arrangements, this may adversely affect the value of, or in the event of a default, the recovery of principal or interest from, such investments. Accordingly, any such failure to create or perfect collateral and security interests attaching to the investments may adversely affect the performance of the CLO issuer and/or the Company and, by extension, the Company's business, financial condition, results of operations and/or its NAV.

***The investments will be based in part on valuations of collateral which are subject to assumptions and factors that may be incomplete, inherently uncertain or subject to change***

A component of the Company's analysis of the desirability of making a given investment relates to the estimated residual or recovery value of such investments in the event of the insolvency of the obligor (and in the case of the CLO Notes, the obligors of the assets within the relevant CLO's portfolio). This residual or recovery value will be driven primarily by the value of the anticipated future cash flows of the obligor's business and by the value of any underlying assets constituting the collateral for such investment. The anticipated future cash flows of the obligor's business and the value of collateral can, however, be extremely difficult to predict as in certain circumstances market quotations and third party pricing information may not be available. If the recovery value of the collateral associated with the investments in which the Company or a CLO issuer invests decreases or is materially worse than expected by the Company or a CLO issuer (as applicable), such a decrease or deficiency may affect the value of the investments made by the Company or a CLO issuer. Accordingly, there will be an adverse effect on the performance of the CLO issuer and/or the Company and, by extension, on the Company's business, financial condition, results of operations and/or its NAV.

- 29 -

***CLO Income Notes are volatile and interest and principal payments payable on the CLO Income Notes are not fixed***

CLO Income Notes are the most subordinated tranche of a CLO and all payments of principal and interest on such CLO Income Notes are fully subordinated. Interest and principal payments are not fixed but are based on residual amounts available to make such payments. As a result, payments on such CLO Income Notes will be made by the CLO issuer to the extent of available funds, and no payments thereon will be made until amongst other things (a) the payment of certain costs, fees and expenses have been made and (b) interest and principal (respectively) has been paid on the more senior notes of the CLO. Non-payment of interest or principal on such CLO Income Notes will be unlikely to cause an event of default in relation to the CLO issuer.

CLO Income Notes represent a highly leveraged investment in the underlying assets of the CLO issuer. Accordingly, it is expected that changes in the market value of such CLO Income Notes will be greater than changes in the market value of the underlying assets of the CLO issuer, which themselves are subject to credit, liquidity, interest rate and other risks. Utilisation of leverage is a speculative investment technique and involves certain risks to investors and will generally magnify the CLO Income Notes investors' opportunities for gain and risk of loss. In certain scenarios, the CLO Income Notes may be subject to a partial or a 100 per cent loss of invested capital. CLO Income Notes represent the most junior securities in a leveraged capital structure. As a result, any deterioration in performance of the asset portfolio of a CLO issuer, including defaults and losses, a reduction of realised yield or other factors, will be borne first by holders of such CLO Income Notes prior to the rest of the capital structure.

***CLO Income Notes are a limited recourse obligation of the CLO issuer***

CLO Income Notes are a limited recourse obligation of a CLO issuer and amounts payable on CLO Income Notes are payable solely from amounts received in respect of the collateral of the CLO issuer. Payments on CLO Income Notes prior to and following enforcement of the security over the collateral of a CLO issuer are subordinated to the prior payment of certain costs, fees and expenses of, or payable by, the CLO issuer and to payment of principal and interest on more senior notes of the CLO issuer. The holders of CLO Income Notes must rely solely on distributions on the collateral of the CLO for payment of principal and interest, if any, on the CLO Income Notes. There can be no assurance that the distributions on the collateral of a CLO will be sufficient to make payments on the CLO Income Notes. If distributions are insufficient to make payments on the CLO Income Notes, no other assets of the CLO issuer will be available for payment of the deficiency and following realisation of the collateral and the application of the proceeds thereof, the obligations of the CLO issuer to pay such deficiency shall be extinguished. Such shortfall will be borne in the first instance by the CLO Income Notes.

In addition, at any time whilst the CLO Income Notes are outstanding in a CLO, no CLO Income Notes holder shall be entitled to institute against the related CLO issuer, or join in any institution against such CLO issuer of, any bankruptcy, reorganization, arrangement, insolvency, examinership, winding up or liquidation proceedings under any applicable bankruptcy or similar law in connection with any obligations of the CLO issuer relating to the CLO Income Notes or otherwise owed to the CLO Income Notes holder, save for lodging a claim in the liquidation of the CLO issuer which is initiated by another party or taking proceedings to obtain a declaration as to the obligations of the CLO issuer, nor shall it have a claim arising in respect of the share capital of the CLO issuer.

Furthermore, following the establishment of the Management Companies, CLO Income Notes may not be held directly by the Company. As such the Company's interest in the CLO Income Notes may be indirect, and the Management Company, not the Company, will be entitled to exercise voting rights associated with the CLO Income Notes.

***CLO Notes have limited liquidity***

In addition to the restrictions mentioned in the section titled "*The Company will be unable to liquidate, sell, hedge or otherwise mitigate its credit risk under or associated with the CLO Retention Notes until such time as the securities of the relevant CLO have been redeemed in full (whether at final maturity or early redemption)*", there will usually be a limited market for notes representing collateralised loan obligations (including the CLO Notes). There is no guarantee that any party to a CLO transaction will make a secondary market in relation to the CLO Notes. There can be no assurance that a secondary market for any CLO Notes will develop or, if a secondary market does develop, that it will provide the holders of CLO Notes with liquidity of investment or that it will continue for the life of such notes. As a result, the Company may have to hold the CLO Notes for an indefinite period of time or until their early

- 30 -

redemption date or maturity date.  Where a market does exist, to the extent that an investor wants to sell the CLO Notes, the price may, or may not, be at a discount from the outstanding principal amount.  There may be additional restrictions on divestment in the terms and conditions of CLO Notes.

***Investments in asset management subsidiaries may subject the Company to increased regulatory scrutiny or disputes related to CLOs or other investments managed by such asset management subsidiaries***

As part of its business, the Portfolio Manager may advise the Company to invest in asset management subsidiaries, affiliated with the Company, Highland, Acis, the Portfolio Manager or the Management Companies and which may act as the asset manager of certain U.S. or European CLOs in order to satisfy certain U.S. or European risk retention requirements.  Asset managers of U.S. or European CLOs operate in a highly regulated environment, and are subject to a comprehensive statutory and regulatory regime as well as oversight by governmental agencies.  In light of the current conditions in the global financial markets and economy, regulators have increased their focus on the regulation of asset managers in the U.S. and Europe.  New or modified regulations and related regulatory guidance, including under Basel III and the Dodd-Frank Act, may have unforeseen or unintended adverse effects on asset managers of CLOs.  These international regulations could limit an asset management subsidiary from pursuing certain business opportunities and/or impose additional costs, and otherwise indirectly materially adversely affect the Company's business operations and have other negative consequences.

***Investors will not have control over the CLO management activities of the Portfolio Manager, Highland, Acis or the Management Companies in CLOs***

The Portfolio Manager, Highland, Acis and/or the Management Companies, in the capacity of CLO Manager of a CLO, will have the discretion to make collateral management decisions for such CLO, including with respect to asset selection, disposition and amendments of the underlying loans.  In exercising such discretion, the Portfolio Manager, Highland, Acis and/or the applicable Management Company will be responsible to act solely in the best interests of the applicable CLO issuer, not the Company or any Investor.  Any amendment, waiver or modification of an investment could postpone the receipt of payments in respect of such investment and/or reduce distributions to Investors.  The shareholders will have no right to compel the Portfolio Manager, Highland, Acis or the Management Companies, in their roles as CLO Manager to take or refrain from taking any actions or decisions, and the actions or decisions taken by the Portfolio Manager, Highland, Acis or the Management Companies as CLO Manager may expose the Investors to losses on their investment.

***United States retention requirements may affect future actions of the Company and negatively impact the leveraged loan market***

As part of its business, the Company may invest in asset management subsidiaries, affiliated with the Company, the Portfolio Manager, Highland, Acis or the Management Companies and which may act as the asset manager of certain CLOs in order to satisfy the U.S. Risk Retention Rules.

On October 21, 2014, the U.S. Risk Retention Rules were issued and became effective on December 24, 2016 with respect to asset-backed securities collateralized by assets other than residential mortgages.  The statements contained herein regarding how compliance with the U.S. Risk Retention Rules may be achieved by a CLO are solely based on publicly available information as of the date hereof.  Except with respect to asset-backed securities transactions that satisfy certain exemptions, the U.S. Risk Retention Rules generally require one of the sponsors of asset-backed securities or a "majority-owned affiliate" thereof to retain not less than 5% of the credit risk of the assets collateralizing asset-backed securities.  The preamble to the rule text in the U.S. Risk Retention Rules indicates that a party that organizes and initiates a securitization would be the "sponsor."  In the case of many collateralized loan obligation transactions, the entity acting as collateral manager typically organizes and initiates a transaction and, therefore, would be considered the "sponsor" for U.S. Risk Retention Rules purposes, as further discussed in the preamble.  The U.S. Risk Retention Rules provide that if there is more than one "sponsor" of a securitization transaction, each "sponsor" is to ensure that at least one "sponsor" (or its "majority-owned affiliate") retains the requisite U.S. Retention Interest.

It is expected that Highland or Acis, as applicable, will agree to act as "sponsor" for purposes of Managed CLOs in which the Company invests, but there can be no assurance, and no representation, made that any Governmental Authority will agree that such is the case.  Each of Highland and Acis intends to treat the applicable Management Company as its "majority-owned affiliate" due to holding by it (or by affiliates that are intended to be, directly or

- 31 -

indirectly, majority controlled, are majority controlled by or are under common majority control with Highland or Acis, as applicable) of a controlling financial interest in such Management Company as determined under GAAP, although there can be no assurance that such Management Companies will maintain treatment as a "majority-owned affiliates" of Highland or Acis as "sponsors" given the lack of guidance in the U.S. Risk Retention Rules with respect to such affiliated situations. Moreover, there can be no guarantee that Highland or Acis will be able to maintain the treatment of such Management Company as a "majority-owned affiliate," particularly if GAAP regulations or interpretations change over time.

Each of Highland or Acis, as applicable, may also hold their respective indirect ownership interests in the applicable Management Companies through, or transfer such interests to, affiliates that are intended to be, directly or indirectly, majority controlled, are majority controlled by or are under common majority control with, Highland or Acis, as applicable, with the intention that the Management Companies will remain their respective "majority-owned affiliates" for purposes of the U.S. Risk Retention Rules. There can be no assurance that following any such transfer any Governmental entity will agree that the applicable Management Company will remain a "majority-owned affiliate" of Highland or Acis, as applicable.

At this time, each potential investor should understand that there is uncertainty with respect to what is required to comply with the U.S. Risk Retention Rules in certain circumstances, and therefore there can be no assurance that, with respect to any Managed CLO or other CLO in which the Company invests, the applicable credit risk retention and disclosures with respect to such CLO will enable the applicable CLO Manager or U.S. retention holder to comply with the U.S. Risk Retention Rules.

In addition, there are a number of future uncertainties surrounding, U.S. Risk Retention Rules for CLO Managers, including: (i) the ultimate results of litigation currently in process brought by the Loan Syndications and Trading Association (LSTA), a major industry trade association, challenging, among other things, the regulators' application of U.S. Risk Retention Rules to collateral managers of typical so-called open market CLOs, (ii) proposed legislation designed to exclude from U.S. Risk Retention Rules, collateral managers of certain defined "QCLOs" (qualified CLOs) and (iii) future directives and interpretations by Governmental Authorities with respect to the U.S. Risk Retention Rules. If such publicly available information is altered as a result of the foregoing (or anything else), there can be no assurance that, with respect to any Managed CLO or other CLO in which the Company invests, the applicable credit risk retention and disclosures would be viewed by any Governmental Authority as sufficient to meet the requirements under the U.S. Risk Retention Rules. The failure to satisfy the requirements of the U.S. Risk Retention Rules may have a material and adverse effect on the market value and/or liquidity of the applicable CLO Notes and on Highland, Acis and the Management Companies and the Company's investments therein.

***The failure by the Portfolio Manager, Highland, Acis and/or the Management Companies to comply with the U.S. Risk Retention Rules may have a material and adverse effect on the Company and/or the Portfolio Manager***

The failure by the Portfolio Manager, Highland, Acis and/or the applicable Management Company to comply with the U.S. Risk Retention Rules with respect to any Managed CLO may result in regulatory actions and other proceedings being brought against the Portfolio Manager, Highland, Acis and/or the applicable Management Company, which could result in such person being required, among other things, to pay damages, transfer interests and/or acquire additional CLO Notes (which may or may not be available at such time for acquisition) or be subject to cease and desist orders or other regulatory action. In addition, a failure to remedy non-compliance with the U.S. Risk Retention Rules may also trigger a "cause" event under the applicable CLO Management Agreement and/or subject the Portfolio Manager, Highland, Acis and/or the applicable Management Company to adverse publicity and reputational risk resulting from such non-compliance. In addition, given the lack of clarity under the U.S. Risk Retention Rules with respect to the identity of the party responsible for holding U.S. risk retention interests upon a resignation or removal of a CLO Manager or an if the Portfolio Manager, Highland, Acis and/or the applicable Management Company resigns or the applicable holders of CLO Notes desire to remove the Portfolio Manager in connection with any such "cause" event, there may be no successor CLO Manager willing to accept appointment as such, in which case the Portfolio Manager, Highland, Acis and/or the applicable Management Company will be required to continue to act as CLO Manager under the applicable CLO Management Agreement. Further, given such lack of clarity under the U.S. Risk Retention Rules with respect to the identity of the party responsible for holding U.S. risk retention interests, there can be no assurance that Highland or Acis, as applicable, will be able to maintain compliance with the U.S. Risk Retention Rules following any transfer of ownership interests in an entity holding Retention Interests by Highland or Acis to their respective affiliates that are, directly or indirectly, majority controlled,

- 32 -

are majority controlled by or are under common majority control with, Highland or Acis, as applicable, particularly in situations involving CLOs which have already been issued when the related transfer occurs. As a result of any of the foregoing, the failure of the Portfolio Manager, Highland, Acis and/or the applicable Management Company to comply with the U.S. Risk Retention Rules may have a material and adverse effect on the market value and/or liquidity of the Company's investment in the applicable CLO Notes as well as on the business, condition (financial or otherwise), assets, operations or prospects of the Portfolio Manager, Highland, Acis and/or the applicable Management Company and the Company.

***The Company will be unable to liquidate, sell, hedge or otherwise mitigate its credit risk under or associated with the CLO Retention Notes until such time as the securities of the relevant CLO have been redeemed in full (whether at final maturity or early redemption)***

In connection with the intention to comply with the Retention Requirements, each Management Company will need to, amongst other things, (a) on the closing date of a Managed CLO, commit to purchase and retain CLO Notes held in the form and at least the minimum required under the applicable Retention Requirements, as applicable, for the relevant CLO (the "**CLO Retention Notes**") and (b) undertake that, for so long as any securities of the CLO remain outstanding (including the CLO Retention Notes), it will retain its interest in the CLO Retention Notes and will not (except to the extent permitted by the EU Retention Requirements, the accompanying regulatory technical standards or any other related guidance published by the European Securities and Markets Authority) sell, hedge or otherwise mitigate its credit risk under or associated with such CLO Retention Notes. The Company or the applicable Management Company, as applicable, may make certain representations and/or give certain undertakings in favour of Managed CLOs (and/or certain other transaction parties) in respect of its ongoing retention of the CLO Retention Notes and regarding its agreement to sell certain assets to such Managed CLOs from time to time. There are currently transactions in the market which are similar to the Managed CLOs, however if an applicable regulatory authority supervising investors in a Managed CLO were to conclude that the applicable Management Company was not holding the CLO Retention Notes in accordance with the CRR, it is possible, but far from certain, that this may negatively impact the investors in such Managed CLO. If such investors decided to take action against the Company or the applicable Management Company as a result of any negative impact, this may have an adverse effect on the Company's financial performance and prospects.

In addition, with the intention of achieving classification as an "originator" (as defined in the CRR) and complying with the CRR Retention Requirements if applicable to the relevant CLO, the applicable Management Company would be required to meet the Origination Requirements.

As a result of the above commitments, the applicable Management Company will be unable to liquidate, sell, hedge or otherwise mitigate its credit risk under or associated with the CLO Retention Notes until such time as the securities of the relevant CLO have been redeemed in full (whether at final maturity or early redemption). Consequently, if any shares were to become due and repayable in connection with any resolution for their redemption, the Company, the applicable Management Company will not be obliged to immediately sell, transfer or liquidate the CLO Retention Notes and the proceeds of such CLO Retention Notes (if any) will not be available until the final maturity or early redemption in full of the securities of the relevant CLO. In addition, cash held by the Company will not be able to be used to repay any shares to the extent that such repayment could leave the Company unable to continue to originate and sell assets to the CLO issuers in order to ensure that during the relevant CLO's reinvestment period the Company, the applicable Management Company has met the Origination Requirements.

The Company or the applicable Management Company directly or indirectly, may hold a controlling equity stake in the Managed CLOs; accordingly, upon exercise by the Company or the applicable Management Company an early redemption option will result in a full redemption of the applicable CLO securities. Neither the Company nor the applicable Management Company will generally be able to exercise any early redemption options during a "non-call period" (generally lasting two years) after the closing date of the CLO. As a result of this feature and the EU Retention Requirements, the relevant CLO Retention Notes will not be permitted to be sold, transferred or liquidated during this time. In addition, even after an early redemption option is permitted to be exercised, such an option usually contains a number of conditions to its exercise including, but not limited to, a threshold that the liquidation value of the CLO collateral exceed an amount which would pay (a) all expenses of the CLO and (b) principal and accrued interest on the CLO Notes senior to the CLO Income Notes. If the liquidation value of the portfolio will not achieve this threshold at the time the Company intends to exercise its early redemption option, the CLO will not be able to be optionally redeemed by the Company at such time. In such circumstances, the Company or the applicable Management Company

- 33 -

may not redeem the CLO Retention Notes until their final stated maturity (which may be in excess of 12 years), therefore producing no proceeds to pay to Shareholders until this point.

### *Potential non-compliance with or changes to the United States and European risk retention requirements*

The purchase and retention of the CLO Retention Notes in a CLO will be undertaken by the Company or the applicable Management Company with the intention of achieving compliance with the U.S. Risk Retention Rules and/or the EU Retention Requirements by the relevant CLO.

The U.S. Risk Retention Rules and/or EU Retention Requirements may be amended, supplemented or revoked from time to time. There is no guarantee that existing CLOs or future CLOs will be grandfathered into the regime which results from such amendments, supplements or revocations and, as such, the CLOs in which the applicable Management Company is retaining the CLO Retention Notes, may become non-compliant with the U.S. Risk Retention Rules and/or EU Retention Requirements.

### *Liability for breach of a risk retention letter*

The arranger of a CLO and certain other parties of a CLO in which a Management Company agrees to hold the CLO Retention Notes (in such capacity, the "**Retention Holder**") will require the applicable Management Company to execute a risk retention letter. Under a risk retention letter the applicable Retention Holder will typically be required to, amongst other things, make certain representations, warranties and undertakings: (a) in relation to its acquisition and retention of the CLO Retention Notes for the life of the CLO; and (b) regarding its agreement to sell assets to the relevant CLO from time to time. If the applicable Retention Holder sells or is forced to sell the CLO Retention Notes prior to the maturity of the relevant CLO, or the applicable Retention Holder holds insufficient cash or investments to continually sell the assets to the CLO as described above or for any other reason the applicable Retention Holder is not considered to be an "originator" (as such term is defined in the CRR), the Company may be in breach of the terms of the related risk retention letter. In such circumstances the arranger of the relevant CLO and the other parties to the related risk retention letter would have recourse to the applicable Retention Holder for losses incurred as a result of such breach. Such claims may reduce, or entirely diminish any cash or assets of the Company which may have been available to make payments on the Shares.

## RISKS RELATING TO HIGHLAND AND ACIS

### *Past Performance Not Indicative of Future Results*

The past performance of Highland and Acis and their principals and affiliates in other portfolios or investment vehicles, including, without limitation their outstanding CLO transactions, may not be indicative of the results that the Company may be able to achieve. Similarly, the past performance of Highland, Acis and their principals and affiliates over a particular period may not necessarily be indicative of the results that may be expected in future periods. Furthermore, the nature of, and risks associated with, the Company's investments may differ substantially from those investments and strategies undertaken historically by Highland, Acis and their principals and affiliates. There can be no assurance that Highland's or Acis' investment recommendations will perform as well as past investments of Highland or Acis or their principals and affiliates, that the Company will be able to avoid losses or that the Company will be able to make investments similar to the past investments of Highland, Acis and their principals and affiliates. In addition, such past investments may have been made utilizing a leveraged capital structure, an asset mix and fee arrangements that are different from the anticipated capital structure, asset mix and fee arrangements of the Company. Moreover, because the investment criteria that govern investments in the Company's portfolio do not govern the investments and investment strategies of Highland, Acis and their principals and affiliates generally, such investments conducted in accordance with such criteria, and the results they yield, are not directly comparable with, and may differ substantially from other investments undertaken by Highland, Acis and their principals and affiliates.

### *Acis, as CLO Manager, Relies on Highland to Perform Certain Services*

Acis currently relies on Highland, a U.S. SEC-registered investment adviser under common control with Acis, pursuant to the ACM Services Agreements, to provide investment research and recommendations and operational support to Acis, including services in connection with credit research, due diligence of actual or potential investments,

the execution of investment transactions, and certain loan services and administrative services. If Highland does not continue to provide such services to Acis, or there is a departure or inability of certain Highland personnel to provide such services to Acis, there can be no assurances that Acis would be able to find a substitute service provider with the same experience as, or on the same terms as its ACM Services Agreements with, Highland. The inability of Acis to perform its duties under the applicable CLO Management Agreements or the ACLOM Services Agreements in accordance with the standard of care specified therein due to the termination of the Services Agreements could result in removal of Acis or Acis CLO Management, as applicable, under the applicable CLO Management Agreements for the Acis CLOs and Acis CLO 7.

*Litigation Involving Highland and Acis*

Highland and Acis currently are and have been previously subject to various legal proceedings, many of which have been due to the nature of operating in the distressed loan business in the U.S. The legal process is often the route of last resort to recover amounts due from delinquent borrowers. Shareholders have had an opportunity to discuss with Highland to their satisfaction all litigation matters against Highland and its affiliates unrelated to its distressed business. We currently do not anticipate these proceedings will have a material negative impact to the Company.

*Failure to Comply with Investment Advisers Act May Have an Adverse Effect on the Portfolio Manager's Performance*

Highland HCF Advisor and Highland CLO Management are relying advisers of Highland, and Highland is a registered investment adviser registered under the Investment Advisers Act and, as such, is subject to the provisions of the Investment Advisers Act. Acis CLO Management is a relying adviser of Acis, and Acis is a registered investment adviser registered under the Investment Advisers Act and, as such, is subject to the provisions of the Investment Advisers Act. Failure to comply with the requirements imposed on the Portfolio Manager, Highland, Acis and/or the Management Companies under the Investment Advisers Act may have a significant adverse effect on the Portfolio Manager, Highland, Acis and/or the applicable Management Company. The Portfolio Manager, Highland's, Acis' and/or the applicable Management Company's ability to act as CLO Manager for Managed CLOs in which the Company holds CLO Notes may also be adversely affected by negative publicity arising from any regulatory compliance failures or other inappropriate behavior attributed to or any other negative publicity related to the Portfolio Manager, Highland, Acis and/or the applicable Management Company, any affiliate thereof or any of their respective investment professionals.

*SEC enforcement actions*

There can be no assurance that the Portfolio Manager, Highland, Acis and/or the Management Companies or their affiliates will avoid regulatory examination and possibly enforcement actions. Recent SEC enforcement actions and settlements involving U.S.-based private fund advisers have involved a number of issues, including the undisclosed allocation of the fees, costs and expenses related to unconsummated co-investment transactions (i.e., the allocation of broken deal expenses), undisclosed legal fee arrangements affording the applicable adviser with greater discounts than those afforded to funds advised by such adviser. Although each of the Portfolio Manager, Highland, Acis and the Management Companies believe the foregoing practices to have been common historically amongst private fund advisers within the U.S. private funds industry, if the SEC or any other governmental authority, regulatory agency or similar body may take issue with, or in the case of insufficient disclosure regarding acceleration of certain special fees as described below, may continue to take issue with, past or future practices of the Portfolio Manager, Highland, Acis or the Management Companies or any of their affiliates as they pertain to any of the foregoing. In such instances, the Portfolio Manager, Highland, Acis or the Management Companies and/or such affiliates may be at risk for regulatory sanction. Even if an investigation or proceeding did not result in a sanction or the sanction imposed against the Portfolio Manager, Highland, Acis or the Management Companies was small in monetary amount, the Portfolio Manager, Highland, Acis and/or the applicable Management Company or their respective affiliates may be subject to adverse publicity relating to the investigation, proceeding or imposition of any such sanction.

*Potential litigation and regulatory actions may materially and adversely affect the Portfolio Manager, Highland, Acis and/or the Management Companies*

- 35 -

There can be no assurance that the Portfolio Manager, Highland, Acis and/or the Management Companies or their affiliates will avoid potential third party or other litigation or regulatory actions under existing laws (including the U.S. Risk Retention Requirements) or laws enacted in the future. Recent SEC enforcement actions and settlements involving U.S.-based private fund advisers have involved a number of issues, including undisclosed legal fee arrangements affording the applicable adviser with greater discounts than those afforded to funds advised by such adviser and the undisclosed acceleration of certain special fees. In addition, the failure by the Portfolio Manager, Highland, Acis and/or the Management Companies to comply with the U.S. Risk Retention Rules may result in regulatory actions and other proceedings being brought against the Portfolio Manager, Highland, Acis and/or the Management Companies. If the SEC or any other Governmental Authority takes issue with the practices of the Portfolio Manager, Highland, Acis and/or the Management Companies or any of their affiliates as they pertain to any of the foregoing, the Portfolio Manager, Highland, Acis and/or the Management Companies and/or any such affiliates will be at risk for regulatory sanction. Even if an investigation or proceeding did not result in a sanction or the sanction imposed against the Portfolio Manager, Highland, Acis and/or the Management Companies and/or such affiliates was small in monetary amount, the adverse publicity relating to the investigation, proceeding or imposition of these sanctions could harm the Company, the Portfolio Manager, Highland, Acis and/or the Management Companies and/or their respective affiliates' reputations which may adversely affect the market value and/or liquidity of the Debt. There is also a material risk that Governmental Authorities in the United States and beyond will continue to adopt new laws or regulations (including tax laws or regulations), or change existing laws or regulations, or enhance the interpretation or enforcement of existing laws and regulations including the U.S. Risk Retention Rules. Any such events or changes could occur during the term of the Debt and may materially and adversely affect the Portfolio Manager, Highland, Acis and/or the Management Companies and its ability to operate and/or pursue its management strategies on behalf of the Issuer. Such risks are often difficult or impossible to predict, avoid or mitigate in advance.

### Dependence on Highland, Acis and other collateral managers of CLOs

A significant portion of the Company's investment portfolio will comprise of its investment in the Management Companies and in Managed CLOs. The Company's investment portfolio may also include CLOs managed by other asset managers. The performance of the Company's portfolio depends heavily on the skills of the Portfolio Manager, Highland, Acis, the Management Companies or such other asset managers in analyzing, selecting and managing the relevant CLOs. As a result, the Company and the CLOs will be highly dependent on the financial and managerial experience of certain investment professionals associated with the Portfolio Manager, Highland, Acis, the Management Companies and the other asset managers, none of whom is under any contractual obligation to the Company or such CLOs to continue to be associated with the Portfolio Manager, Highland, Acis, the applicable Management Company or such other collateral manager for the term of the Company or any particular CLO. The loss of one or more of these individuals could have a material adverse effect on the performance of the Company and the relevant CLO.

Furthermore, the Portfolio Manager has informed the Company that these investment professionals are also actively involved in other investment activities and will not be able to devote all of their time to the Company's business and affairs. In addition, individuals not currently associated with the Portfolio Manager may become associated with the Portfolio Manager and the performance of the Company and the Managed CLOs may also depend on the financial and managerial experience of such individuals. Moreover, the Portfolio Management Agreement may be terminated under certain circumstances.

### The Company generally may not terminate the Portfolio Management Agreement, even in the event of the Portfolio Manager's poor performance

The Portfolio Management Agreement was negotiated between related parties and its terms may not be as favorable as if it had been negotiated with unaffiliated third parties. The Company may choose not to enforce, or to enforce less vigorously, certain of its rights under the Portfolio Management Agreement in an effort to maintain its ongoing relationship with the Portfolio Manager or Highland Capital Management, L.P., as the case may be.

Termination of the Portfolio Management Agreement is difficult and costly. In order to terminate the Portfolio Management Agreement without cause, the Company must (i) be required to register as an investment company under the provisions of the Investment Company Act of 1940 and it must notify the Portfolio Manager of such

- 36 -

requirement, (ii) the portfolio must be liquidated in full and its financing arrangements must have been terminated or redeemed in full, or (iii) it must reach a mutual agreement with the Portfolio Manager to terminate the agreement. The initial term of the Portfolio Management Agreement is three years, with automatic renewals of three years thereafter. The Company may not choose to not renew the Portfolio Management Agreement.

The Company's ability to terminate the Portfolio Management Agreement for "cause" is limited, including grounds of wilful violation of the Portfolio Management Agreement by the Portfolio Manager and fraud or criminal activity. However, poor performance by the Portfolio Manager is not grounds for termination for cause under the Portfolio Management Agreement.  See "*Material Contracts*"

## RISKS RELATING TO CONFLICTS OF INTEREST

### *Various Potential and Actual Conflicts of Interest*

Various potential and actual conflicts of interest may arise from the overall investment activity of the Portfolio Manager, Highland, its clients and its affiliates.  The following briefly summarizes some of these conflicts, but is not intended to be an exhaustive list of all such conflicts.

### *The Company will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates*

The following briefly summarizes certain potential and actual conflicts of interest which may arise from the overall investment activity of the Portfolio Manager, Highland, its clients and its affiliates, but is not intended to be an exhaustive list of all such conflicts.  The scope of the activities of the Portfolio Manager, Highland, its affiliates, and the funds and clients managed or advised by Highland or any of its affiliates may give rise to conflicts of interest or other restrictions and/or limitations imposed on the Company in the future that cannot be foreseen or mitigated at this time.

As part of their regular business, the Portfolio Manager, Highland, its affiliates and their respective officers, directors, trustees, shareholders, members, partners, personnel and employees and their respective funds and investment accounts (collectively, the "**Related Parties**") hold, purchase, sell, trade or take other related actions both for their respective accounts and for the accounts of their respective clients, on a principal or agency basis, with respect to loans, securities and other investments and financial instruments of all types.  The Portfolio Manager, its affiliates and their respective officers, directors, shareholders, members, partners, personnel and employees also provide investment advisory services, among other services, and engage in private equity, real estate and capital markets-oriented investment activities.  The Related Parties will not be restricted in their performance of any such services or in the types of debt or equity investments which they may make.  The Related Parties may have economic interests in or other relationships with obligors or issuers in whose obligations or securities or credit exposures the Company and/or the Managed CLOs may invest.  In particular, the Related Parties may make and/or hold an investment in an obligor's or issuer's securities that may be *pari passu*, senior or junior in ranking to an investment in such obligor's or issuer's securities made and/or held by the Company and/or the Managed CLOs, or in which partners, security holders, members, officers, directors, agents, personnel or employees of such Related Parties serve on boards of directors or otherwise have ongoing relationships.  Each of such ownership and other relationships may result in securities laws restrictions on transactions in such securities by the Company and/or the Managed CLOs and otherwise create conflicts of interest for the Company and/or the Managed CLOs.  In such instances, the Related Parties may in their discretion make investment recommendations and decisions that may be the same as or different from those made with respect to the Company's and/or the Managed CLOs' investments. In connection with any such activities described above, the Related Parties may hold, purchase, sell, trade or take other related actions in securities or investments of a type that may be suitable to be included as investments by the Company and/or Managed CLOs.  Other than with respect to new issue Highland CLOs as described below, the Related Parties will not be required to offer such securities or investments to the Company or Managed CLOs or provide notice of such activities to the Company or Managed CLOs.  In addition, in providing services under the Portfolio Management Agreement and the CLO Management Agreements, the Portfolio Manager may take into account its relationship or the relationships of its affiliates with obligors and their respective affiliates, which may create conflicts of interest.  Furthermore, in connection with actions taken in the ordinary course of business of the Portfolio Manager in accordance with its fiduciary duties to its other clients, the Portfolio Manager may take, or be required to take, actions which adversely affect the interests of the Company and/or Managed CLOs.  Except as otherwise set forth herein, including with respect to Qualifying CLOs, Designated CLO Resets, Designated CLO

- 37 -

Refinancings and the NexBank Facility and any Permitted NexBank Credit Facility Amendments, the consent of the Advisory Board will be required with respect to transactions with any Related Party.

The Related Parties invested and may continue to make investments that would also be appropriate for the Company, the Portfolio Manager, the Management Companies and/or the Managed CLOs. Such investments may be different from those recommended to the Company or made on behalf of the Managed CLOs or the Management Companies. Neither the Portfolio Manager nor any Related Entity has any duty, in making or maintaining such investments, to act in a way that is favorable to the Company, the Management Companies and/or the Managed CLOs or to offer any such opportunity to the Company, other than with respect to new issue Highland CLOs as described below, or the Managed CLOs. The investment policies, fee arrangements and other circumstances applicable to such other parties may vary from those applicable to the Company, the Portfolio Manager, Highland, Acis, the Management Companies and the Managed CLOs. The Portfolio Manager and/or any Related Entity may also provide advisory or other services for a customary fee to issuers or obligors whose debt obligations or other securities are held by the Company, the Portfolio Manager, Highland, Acis, the Management Companies and/or the Managed CLOs, and neither the Shareholders nor the Company shall have any right to such fees. The Portfolio Manager, Highland, Acis, the Management Companies and/or any Related Entity may also have ongoing relationships with, render services to or engage in transactions with other clients, including other issuers of collateralized loan obligations and collateralized debt obligations, who invest in assets of a similar nature to those of the Company, the Portfolio Manager, Highland, Acis, the Management Companies and/or the Managed CLOs, and with companies whose securities or loans are acquired by the Company, the Portfolio Manager, Highland, Acis, the Management Companies and/or the Managed CLOs, and may own equity or debt securities issued by obligors of debt held by the Company, the Portfolio Manager, Highland, Acis, the Management Companies and/or the Managed CLOs. In connection with the foregoing activities, the Portfolio Manager, Highland, Acis, the Management Companies and/or any Related Entity may from time to time come into possession of material nonpublic information that limits the ability of the Portfolio Manager to advise the Company or the Management Companies or effect a transaction for Managed CLOs, and the Company's, the Management Companies' and/or the Managed CLOs' investments may be constrained as a consequence of Highland's or Acis' inability to use such information for advisory purposes or otherwise to effect transactions that otherwise may have been initiated on behalf of its clients, including the Company, the Management Companies and/or the Managed CLOs. In addition, officers or affiliates of the Portfolio Manager, Highland, Acis and/or Related Parties may possess information relating to obligors of debt held by the Company, the Management Companies and/or the Managed CLOs that is not known to the individuals at the Portfolio Manager responsible for monitoring such investments and performing the other obligations under the Portfolio Management Agreement or CLO Management Agreements.

During the Investment Period, the Company shall receive priority allocations with respect to all CLO Income Note investment opportunities with respect to new issue Highland CLOs, over the account of the Portfolio Manager, its affiliates and Other Accounts. For the avoidance of doubt, the Portfolio Manager shall otherwise allocate investment opportunities among the Company and Highland and its affiliates and Other Accounts in accordance with its allocation policy which requires allocations among clients to be fair and equitable over time as described below. The Portfolio Manager, Highland, Acis and their affiliates may, from time to time, be presented with investment opportunities, other than with respect to new issue Highland CLOs during the Investment Period, that fall within the investment objectives of the Company, the Management Companies and/or the Managed CLOs and other clients, funds or other investment accounts managed by Highland, Acis or their affiliates, and in such circumstances, the Portfolio Manager, Highland, Acis and their affiliates expect to allocate such opportunities among the Company, the Management Companies and/or the Managed CLOs and such other clients, funds or other investment accounts on a basis that the Portfolio Manager, Highland, Acis and their affiliates determine in good faith is appropriate taking into consideration such factors as the fiduciary duties owed to the Company, the Management Companies, the Managed CLOs and such other clients, funds or other investment accounts, the primary mandates of the Company, the Management Companies, the Managed CLOs and such other clients, funds or other investment accounts, the capital available to the Company, the Management Companies, the Managed CLOs and such other clients, funds or other investment accounts, any restrictions on investment, the sourcing of the transaction, the size of the transaction, the amount of potential follow-on investing that may be required for such investment and the other investments of the Company, the Management Companies, the Managed CLOs and such other clients, funds or other investment accounts, the relation of such opportunity to the investment strategy of the Company, the Management Companies and/or the Managed CLOs and such other clients, funds or other investment accounts, reasons of portfolio balance and any other consideration deemed relevant by the Portfolio Manager, Highland, Acis

- 38 -

and their affiliates in good faith. Subject to the Company's priority allocation with respect to new issue Highland CLOs, the Portfolio Manager, will allocate investment opportunities across the entities for which such opportunities are appropriate, consistent with (1) its internal conflict of interest and allocation policies and (2) the requirements of the Investment Advisers Act. The Portfolio Manager, will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy. However, there is no assurance that such investment opportunities will be allocated to the Company, the Management Companies and/or the Managed CLOs fairly or equitably in the short term or over time and there can be no assurance that the Company, the Management Companies and/or any of the Managed CLOs will be able to participate in all such investment opportunities that are suitable for it.

Although the professional staff of the Portfolio Manager will devote as much time to the Company as the Portfolio Manager deems appropriate to perform its duties in accordance with the Portfolio Management Agreement and in accordance with reasonable commercial standards, the staff may have conflicts in allocating its time and services among the Company and the Portfolio Manager's other accounts.

The directors, officers, personnel, employees and agents of the Portfolio Manager and its Related Parties may, subject to applicable law, serve as directors (whether supervisory or managing), officers, personnel, employees, partners, agents, nominees or signatories, and receive arm's length fees in connection with such service, for the Company or entities that operate in the same or a related line of business as the Company or the Management Companies, or of other clients managed by the Portfolio Manager or its affiliates, or for any obligor or issuer in respect of the debt, equity securities or other investments held by the Company, the Management Companies and/or Managed CLOs, or any affiliate thereof, to the extent permitted by their governing instruments, or by any resolutions duly adopted by the Company, such other entities, or any obligor or issuer (or any affiliate thereof) in respect of any of the debt, equity securities or other investments held by the Company, the Management Companies and/or Managed CLOs pursuant to their respective governing instruments, and neither the Company, The applicable Management Company nor the Managed CLOs shall have the right to any such fees.

As further described below, the Portfolio Manager and its Related Parties may effect client cross-transactions where the Portfolio Manager advises the Company or a Management Company, or causes a Managed CLO, to effect a transaction between the Company, the applicable Management Company or such Managed CLO, as applicable, and another client advised by the Portfolio Manager or any of its affiliates. The Portfolio Manager, may engage in a client cross-transaction involving the Company, the Management Companies and/or Managed CLOs any time that the Portfolio Manager believes such transaction to be fair to the Company, the applicable Management Company and/or the Managed CLOs, as applicable, and such other client. By purchasing Shares of the Company, a Shareholder is deemed to have consented to such client cross-transactions between the Company, the applicable Management Company and another client of the Portfolio Manager or one of its Related Parties.

As further described below, the Portfolio Manager may effect principal transactions where Highland advises the Company, or causes a Managed CLO, to make and/or hold an investment, including an investment in securities, in which the Portfolio Manager and/or its affiliates have a debt, equity or participation interest, in each case in accordance with applicable law, which may include the Portfolio Manager obtaining the consent and approval of the Advisory Board of the Company prior to engaging in any such principal transaction between the Company and the Portfolio Manager or its affiliates. By purchasing Shares of the Company, a Shareholder is deemed to have consented to such procedures relating to principal transactions between the Company and the Portfolio Manager or its Related Entities, subject to consent of the Advisory Board. In addition, in the event a Managed CLO engages in a principal trade, consent of the client may consist of consent of the board of directors of such Managed CLO (or certain professionals contracted by the board of directors, to the extent relevant), and none of the Company or its Shareholders will have any additional consent rights with respect to such transaction.

The Portfolio Manager may advise the Company, or direct the Managed CLOs, to acquire or dispose of investments in cross trades between the Company or the Managed CLOs, as applicable, and other clients of the Portfolio Manager or its affiliates in accordance with applicable legal and regulatory requirements. In addition, the Company and/or the Managed CLOs may invest in securities of obligors or issuers in which the Portfolio Manager and/or its affiliates have a debt, equity or participation interest, and the holding and sale of such investments by the Company and/or Managed CLOs may enhance the profitability of the Portfolio Manager's own investments in such companies. Moreover, the Company and Managed CLOs may invest in assets originated by the Portfolio Manager or its affiliates. In each such case, the Portfolio Manager and such affiliates may have a potentially conflicting division

- 39 -

of loyalties and responsibilities regarding the Company or the Managed CLOs, as applicable, and the other parties to such trade. Under certain circumstances, the Portfolio Manager and its affiliates may determine that it is appropriate to mitigate such conflicts by selling an investment at a fair value that has been calculated pursuant to the Portfolio Manager's valuation procedures to another client managed or advised by the Portfolio Manager or such affiliates. In addition, the Portfolio Manager may enter into agency cross-transactions where it or any of its affiliates acts as broker for the Company or a Managed CLO, as applicable, and for the other party to the transaction, to the extent permitted under applicable law. The Portfolio Manager may obtain the Company's written consent as provided herein if any such transaction requires the consent of the Company under Section 206(3) of the Investment Advisers Act.

The Portfolio Manager and/or its Related Parties may participate in creditor committees or other committees with respect to the bankruptcy, restructuring or workout of obligors or issuers of debt obligations or securities held by the Company and/or the Managed CLOs. In such circumstances, the Portfolio Manager may take positions on behalf of itself or Related Parties that are adverse to the interests of the Company or the Managed CLOs in the relevant investment.

The Portfolio Manager and/or its Related Parties may act as an underwriter, arranger or placement or administrative agent, or otherwise participate in the origination, structuring, negotiation, syndication, administration or offering of CLOs or any senior secured loans purchased by the Company. Such transactions are on an arm's-length basis and may be subject to arm's-length fees. There is no expectation for preferential access to transactions involving CLOs or senior secured loans that are underwritten, originated, arranged or placed by the Portfolio Manager and/or its affiliates and the Company shall not have any right to any such fees.

There is no limitation or restriction on the Portfolio Manager or any of its Related Parties with regard to acting as investment adviser or collateral manager (or in a similar role) to other parties or persons. This and other future activities of the Portfolio Manager and/or its Related Parties may give rise to additional conflicts of interest. Such conflicts may relate to obligations that the Portfolio Manager's investment committee, the Portfolio Manager or its affiliates have to other clients.

The members of the Portfolio Manager's investment committee serve or may serve as personnel, officers, directors or principals of entities that operate in the same or a related line of business as the Company, or of other clients managed by the Portfolio Manager or its affiliates. In serving in these multiple capacities, they may have obligations to such other clients or investors in those entities, the fulfillment of which may not be in the best interests of the Company. The Company may compete with other entities managed by the Portfolio Manager and its affiliates for capital and investment opportunities.

There are generally no ethical screens or information barriers among the Portfolio Manager and certain of its affiliates of the type that many firms implement to separate persons who make investment decisions from others who might possess material, non-public information that could influence such decisions. If the Portfolio Manager, any of its personnel or its affiliates were to receive material non-public information about a particular obligor, issuer or CLO, or have an interest in causing the Company or a Managed CLO to acquire a particular CLO security, the Portfolio Manager may be prevented from causing the Company or Managed CLO to purchase or sell such asset due to internal restrictions imposed on the Portfolio Manager. Notwithstanding the maintenance of certain internal controls relating to the management of material non-public information, it is possible that such controls could fail and result in the Portfolio Manager, or one of its investment professionals, buying or selling an asset while, at least constructively, in possession of material non-public information. Inadvertent trading on material non-public information could have adverse effects on the Portfolio Manager's reputation, result in the imposition of regulatory or financial sanctions, and as a consequence, negatively impact the Portfolio Manager's ability to perform its portfolio management services to the Company and the Managed CLOs. In addition, while the Portfolio Manager and certain of its affiliates currently operate without information barriers on an integrated basis, such entities could be required by certain regulations, or decide that it is advisable, to establish information barriers. In such event, the Portfolio Manager's ability to operate as an integrated platform could also be impaired, which would limit the Portfolio Manager's access to personnel of its affiliates and potentially impair its ability to advise the Company and manage the Managed CLOs' investments.

## RISKS RELATING TO AN INVESTMENT IN THE SHARES

***Shareholders have no right to have their Shares redeemed or repurchased by the Company***

The Company has been established as a closed-ended vehicle. Accordingly, there is no right or entitlement attaching to the Shares that allows them to be redeemed or repurchased by the Company at the option of the Shareholder.

***There is no public market for the Shares, and a market for the Shares may never develop, which could result in Shareholders being unable to monetize their investment.***

The Shares have not been registered under any securities exchange, and, unless so registered, may not be offered or sold except pursuant to an exemption from the applicable securities exchange regulator. It is not expected that the Shares will be listed on any securities exchange in the future. The Shares are newly issued securities for which there is no established trading market. In the absence of an active trading market, Shareholders may be unable to resell the Shares at the time and for the price desired or at all. The Company can provide no assurances that the Shares will not subsequently trade below the price at which they are purchased pursuant to this Offering Memorandum.

In connection with the Company filing any registration for any securities exchange, the Company will agree to use commercially reasonable efforts to satisfy the criteria for listing and list and thereafter maintain the listing on such exchange or market so long as it is in the best interests of the Company. Each market or exchange has initial listing criteria, including criteria related to minimum bid price, public float, market makers, minimum number of round lot holders and board independence requirements that the Company can give no assurance that it will meet. The Company's inability to list or include the Shares on a securities exchange could affect the ability of Shareholders to sell their Shares subsequent to the declaration of the effectiveness of any registration statement, and consequently adversely affect the value of such Shares. In such case, Shareholders would find it more difficult to dispose of, or to obtain accurate quotations as to the market value of, the Shares. In addition, the Company would have more difficulty attracting the attention of market analysts to cover it in their research. If the Shares are approved for listing or inclusion on a securities exchange, the Company will have no prior reporting history, and thus there is no way to determine the prices or volumes at which the Shares will trade. The Company can give no assurances as to the development or liquidity of any trading market for the Shares. Shareholders may not be able to resell their Shares at or near their original acquisition price, or at any price.

***In the event a market for the Shares does develop, the Shares may trade at a discount to the Net Asset Value per Share and Shareholders may be unable to realise their Shares at the Net Asset Value per Share or at any other price***

The Shares may trade at a discount to the Net Asset Value per Share for a variety of reasons, including due to market or economic conditions or to the extent investors undervalue the Company.

Subject to the Companies Law, under its Articles, the Company may issue additional securities, including Shares, for any purpose. Any additional issuances by the Company, or the possibility of such issue, may cause the price of the Shares to decline.

***The existence of a liquid market in the Shares cannot be guaranteed***

The Shares may be admitted to a securities exchange at some point in the future, however there can be no guarantee that a liquid market in the Shares will develop or be sustained or that the Shares will trade at prices close to the Net Asset Value per Share. The number of Shares to be issued pursuant to the Placing is not yet known, and there may be a limited number of holders of Shares. Limited numbers and/or holders of Shares may mean that there is limited liquidity in such Shares which may affect: (i) a Shareholder's ability to realise some or all of their investment; (ii) the price at which such Shareholder can effect such realisation; and/or (iii) the price at which Shares trade in the secondary market. Accordingly, Shareholders may be unable to realise their investment at Net Asset Value per Share or at all.

- 41 -

***The Shares will be subject to purchase and transfer restrictions in the Placing and in secondary transactions in the future***

The Company intends to restrict the ownership and holding of its Shares so that none of its assets will constitute "plan assets" under the U.S. Plan Assets Regulations. The Company intends to impose such restrictions based on deemed representations in the case of a subscription of Shares. If the Company's assets were deemed to be "plan assets" of any plan subject to Title I of ERISA or Section 4975 of the U.S. Tax Code ("**U.S. Plan**"), pursuant to Section 3(42) of ERISA and U.S. Department of Labor regulations promulgated under ERISA by the U.S. Department of Labor and codified at 29 C.F.R. Section 2510.3-101 as amended by Section 3(42) of ERISA (collectively, the "**U.S. Plan Asset Regulations**") then: (i) the prudence and other fiduciary responsibility standards of ERISA would apply to investments made by the Company; and (ii) certain transactions that the Company or a subsidiary of the Company may enter into, or may have entered into, in the ordinary course of business might constitute or result in non-exempt prohibited transactions under Section 406 of ERISA or Section 4975 of the U.S. Tax Code and might have to be rescinded. Governmental plans and certain church plans, while not subject to Title I of ERISA or Section 4975 of the U.S. Tax Code, may nevertheless be subject to other State, local or other laws or regulations that would have the same effect as the U.S. Plan Asset Regulations so as to cause the underlying assets of the Company to be treated as assets of an investing entity by virtue of its investment (or any beneficial interest) in the Company and thereby subject the Company (or other persons responsible for the investment and operation of the Company assets) to laws or regulations that are similar to the fiduciary responsibility or prohibited transaction provisions contained in Title I of ERISA or Section 4975 of the U.S. Tax Code.

Each purchaser and subsequent transferee of the Shares will be deemed to represent and warrant that no portion of the assets used to acquire or hold its interest in the Shares constitutes or will constitute the assets of any U.S. Plan. The Articles of the Company provide that the Board of Directors may refuse to register a transfer of Shares to any person they believe to be a Non-Qualified Holder or a U.S. Plan investor. If any Shares are owned directly or beneficially by a person believed by the Board of Directors to be a Non-Qualified Holder or a U.S. Plan investor, the Board of Directors may give notice to such person requiring him either (i) to provide the Board of Directors within 30 days of receipt of such notice with sufficient satisfactory documentary evidence to satisfy the Board of Directors that such person is not a Non-Qualified Holder or a U.S. Plan investor, or (ii) to sell or transfer their Shares to a person qualified to own the same within 30 days and within such 30 days to provide the Board of Directors with satisfactory evidence of such sale or transfer. Where condition (i) or (ii) is not satisfied within 30 days after the serving of the notice, the person will be deemed, upon the expiration of such 30 days, to have forfeited their Shares.

In addition, the Placing Shares may not be offered, sold, exercised, resold, transferred or delivered, directly or indirectly, within the United States or to, or for the account or benefit of, U.S. Persons, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and in compliance with any applicable securities laws of any state or other jurisdiction in the United States. For more information, refer to "Risks relating to regulation and taxation - The Company is not, and does not intend to become, registered in the United States as an investment company under the U.S. Investment Company Act and related rules" in this section of this Offering Memorandum.

For more information on purchase and transfer restrictions, prospective investors should refer to the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*".

## RISKS RELATING TO REGULATION AND TAXATION

***Changes in law or regulations, or a failure to comply with any laws or regulations, may adversely affect the respective businesses, investments and performance of the Company***

The Company is subject to laws and regulations enacted by national and local governments.

On June 23, 2016, in a public referendum, the United Kingdom voted to leave the European Union. On March 29, 2017, the United Kingdom triggered Article 50 of the Treaty on European Union ("**Article 50**") by formally notifying the European Council of the United Kingdom's intention to withdraw from the European Union. In accordance with Article 50, the European Union shall negotiate and conclude a withdrawal agreement with the United Kingdom within 2 years of the United Kingdom triggering Article 50, although the European Council in agreement with the United Kingdom may decide to extend this period. The United Kingdom's decision to leave the European Union has caused,

- 42 -

and is anticipated to continue to cause, significant new uncertainties and instability in both domestic and global financial markets. These uncertainties could have a material adverse effect on the various obligors' ability to make payments due under the assets within the CLO portfolios, which in turn could have a material adverse effect on the Company's financial condition, results of operations and/or its NAV.

The Company is subject to, and is required to comply with, certain regulatory requirements that are applicable to registered investment schemes which are domiciled in Guernsey.

The laws and regulations affecting the Company are evolving and any changes in such laws and regulations may have an adverse effect on the ability of the Company to carry on its business. Any such changes may also have an adverse effect on the ability of the Company to pursue the investment policies, and may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

***Certain income of the Company may be subject to U.S. withholding tax, and changes in tax law may adversely affect the Company***

The Company intends to make loan investments in the United States that will qualify for the "portfolio interest exemption" from U.S. withholding on interest. However, if the Company is not eligible for the portfolio interest exemption with respect to a loan paying U.S.-source interest, interest payments to the Company could be subject to a 30% withholding tax. In addition, there can be no assurance that, as a result of any change in any applicable law, rule or regulation or interpretation thereof, U.S.-source interest or other payments on the loans that were not subject to withholding tax when purchased will not in the future become subject to U.S. or other withholding tax or that the amount or rate of withholding tax to which a payment on a loan is subject might not increase.

In addition, if the Company acquires equity interests in U.S. entities, either as a result of a direct purchase or as a result of loans previously purchased by the Company being converted into equity interests, the Company could be subject to 30% U.S. withholding tax on any U.S.-source dividends. If the Company is deemed to be engaged in a trade or business in the United States as a result of its ownership of an equity interest in an entity treated as fiscally transparent in the United States or certain other investments, the Company could be subject to a tax on net income with respect to income from such equity interest or other investments, as well as a "branch profits" tax, with a combined U.S. tax rate with respect to such equity interest or other investments of approximately 54%.

If the Company is subject to U.S. withholding tax on payments from investments or is subject to U.S. net income tax, such tax would reduce the amounts available to make payments on the Placing Shares. The extent to which other source country withholding taxes may apply to the Issuer's income will depend on the actual composition of its assets.

***The European Directive on Alternative Investment Fund Managers may impair marketing of the Shares to EU investors***

The AIFMD was transposed into the national legislation of a number of EEA member states on 22 July 2013. The Company will be considered an Alternative Investment Fund ("**AIF**") for the purposes of AIFMD. AIFMD will allow the continued marketing of AIFs, such as the Company, under national private placement regimes where EEA member states choose to implement AIFMD national private placement regimes. In relation to the Company, such marketing will be subject to registration under the AIFMD in those EU member states where there will be marketing of the Shares to investors. To permit marketing, appropriate cooperation agreements must be in place between the supervisory authorities of the relevant EEA member states in which the Shares are being marketed and the jurisdiction of both the Company and the Portfolio Manager, as the AIFM of the Company.

Accordingly, the ability of the Portfolio Manager to market the Shares in the EEA will depend on the relevant EEA state permitting the marketing of non-EEA managed funds, the continuing status of Guernsey and the USA in relation to AIFMD and the Portfolio Manager's willingness to comply with the relevant provisions of AIFMD and the other requirements of the national private placement regimes of individual EEA states, the requirements of which may restrict the Company's ability to raise additional capital from the issue of new Shares in one or more EEA state.

Additionally, it should be noted that what is and what is not "marketing" under AIFMD can vary between EEA member states, in some cases covering most promotional activity in respect of a fund and in some cases covering only material that is sufficiently specific or precise in respect of information relating to the terms of the fund that it could

- 43 -

alone form the basis of a decision to invest in the fund. This in turn means that the type of promotional activity that will require registration under AIFMD can also vary between EEA member states.

However, what is and what is not "marketing" under AIFMD remains a developing area and regulatory guidance in many EEA member states is limited. It is possible that European Securities and Markets Authority ("**ESMA**") or an EEA national regulator may change its policy approach in the future or that ESMA, the European Commission or another European entity, regulatory or legislative body may have a different interpretation at a later date of what constitutes marketing under AIFMD.

If it was held that certain promotional material in respect of the fund constitutes marketing under AIFMD and was provided to investors in an EEA member state without the Company having been registered in that EEA member state for marketing under AIFMD by the Portfolio Manager, the Portfolio Manager may face regulatory sanctions as a result of non-compliance with AIFMD, and the enforceability of agreements with Shareholders may be affected.

ESMA has also consulted on the possible extension of the passport for marketing and managing under AIFMD to non-EEA based managers (the marketing and managing passports are currently only available to EEA based AIFMs) and delivered advice to the European Commission on 18 July 2016 on whether, amongst other things, the passporting regime should be extended to the management and/or marketing of AIFs by non-EEA based managers.

This advice regarding extending the passport to US domiciled AIFMs was qualified, meaning it is currently not clear if the passporting regime will be extended to the Portfolio Manager as an AIFM, nor is it clear that the European Commission consider that this advice contains a positive assessment of a sufficient number of non-EEA countries to extend the passport to these countries. If the European Commission were to consider there were sufficient grounds to extend the passport and adopted the requisite delegated act extending the passport, the national private placement regimes which are currently applicable to non-EEA AIFMs and non-EEA AIFs in EEA member states will temporarily continue to co-exist with this new non-EEA passport (the "**Third Country Passport**").

However, three years after the adoption of this delegated act, ESMA is required to issue an opinion on the functioning of the Third Country Passport and advise on the potential termination of the current national private placement regimes. If the national private placement regimes were then abolished, an AIF could not be marketed into Europe by a non-EEA AIFM except by way of the Third Country Passport, meaning in this scenario the Portfolio Manager would not be able to market the Shares in the Company in the EEA.

Any regulatory changes arising from implementation of the AIFMD (or otherwise) that limit the Company's ability to carry on its business or to market future issues of its Shares may materially adversely affect the Company's ability to carry out its investment policy successfully and to achieve its investment objective, which in turn may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

***Final regulations implementing the "Volcker Rule" in the United States of America were issued in December 2013 and became effective by operation of law on 1 April 2014, subject to a conformance period. The final Volcker Rule regulations revised the November 2011 proposed regulations and include certain changes to the treatment of foreign funds and non-U.S. bank investors. If the Volcker Rule applies to an investor's ownership of Shares, the investor may be forced to sell its shares, or the continued ownership of such shares may be subject to certain restrictions.***

On 21 July 2010, U.S. President Barack Obama signed into law the Dodd-Frank Wall Street Reform and Consumer Protection Act and certain provisions therein known as the "Volcker Rule." On 10 December 2013, the final Volcker Rule regulations (the "**Final Regulations**") were issued by U.S. regulators. The Final Regulations are effective from 1 April 2014, subject to a conformance period ending on 21 July 2015 (which may be extended). The Volcker Rule generally restricts certain non-U.S. banks and affiliated financial firms, collectively identified as "banking entities," from investing in and sponsoring "covered funds." In the event that a non-U.S. bank is deemed to be a "banking entity" and the Company is deemed to be a "covered fund" for purposes of the Volcker Rule, the non-U.S. bank's ownership of the Shares may be subject to investment restrictions. If so, the non-U.S. bank may be required to divest the Shares by the end of the conformance period. Depending on market conditions and other factors, if an investor is required to liquidate its investment in the Shares during the conformance period, it may suffer a loss from the price at which it purchased the Shares.

***If the Company becomes subject to tax on a net income basis in any tax jurisdiction, including Guernsey or the United Kingdom, the Company's financial condition and prospects could be materially and adversely affected***

The Company intends to conduct its affairs so that it will not be treated as UK resident for taxation purposes, or as having a permanent establishment or otherwise being engaged in a trade or business, in the UK. The Company intends that it will not be subject to tax on a net income basis in any country. There can be no assurance, however, that the net income of the Company will not become subject to income tax in one or more countries, including Guernsey and the United Kingdom, as a result of unanticipated activities performed by the Company, adverse developments or changes in law, contrary conclusions by the relevant tax authorities, changes in the Directors' personal circumstances or management errors, or other causes. The imposition of any such unanticipated net income taxes could materially reduce the post-tax returns available for distributions on the Shares, and consequently may adversely affect the Company's business, financial condition, results of operations and/or its NAV.

***Changes in taxation legislation, or the rate of taxation, may adversely affect the Company***

Any change in the tax status of the Company, or in taxation legislation or practice in Guernsey, the United Kingdom or elsewhere could affect the value of the investments held by the Company or the Company's ability to achieve its investment objectives or alter the post-tax returns to Shareholders. Statements in this Offering Memorandum concerning the taxation of Shareholders and/or the Company are based upon current Guernsey and United Kingdom law and published practice as at the date of this Offering Memorandum, which law and practice is, in principle, subject to change (potentially with retrospective effect) that could adversely affect the ability of the Company to meet its investment objective and which could adversely affect the taxation of Shareholders and/or the Company.

Potential investors are urged to consult their tax advisers with respect to their particular tax situations and the tax effect of an investment in the Company.

***Possible Financial Transaction Tax***

On 14 February 2013, the European Commission issued proposals, including a draft Directive (the "Commission's Proposal") for a financial transaction tax ("**FTT**") to be adopted in certain participating EU member states (including Belgium, Germany, Estonia, Greece, Spain, France, Italy, Austria, Portugal, Slovenia and Slovakia (the "Participating Member States"), although Estonia has since stated that it will not participate). If the Commission's Proposal was adopted in its current form, the FTT would be a tax primarily on "financial institutions" in relation to "financial transactions" (which would include the conclusion or modification of derivative contracts and the purchase and sale of financial instruments).

Under the Commission's Proposal, the FTT could apply in certain circumstances to persons both within and outside of the Participating Member States. Generally, it would apply where at least one party is a financial institution, and at least one party is established in a Participating Member State. A financial institution may be, or be deemed to be, "established" in a Participating Member State in a broad range of circumstances, including (a) by transacting with a person established in a Participating Member State or (b) where the financial instrument which is subject to the financial transaction is issued in a Participating Member State.

The FTT proposal remains subject to negotiation between the Participating Member States. It may therefore be altered prior to implementation, the timing of which remains unclear. Additional EU member states may decide to participate.

In addition to the FTT, certain countries (such as France and Italy) have unilaterally introduced or announced their own financial transaction tax, and other countries may follow suit. There is therefore a risk that a financial transaction tax may be incurred on certain transactions entered into by the Company. Any such financial transaction tax may adversely affect the cost of investment or hedging strategies pursued by the Company as well as the value and liquidity of certain assets within the Company, such as securities, derivatives and structured finance securities.

***Different regulatory, tax or other treatment of the Company or the Shares in different jurisdictions, or changes to such treatment in different jurisdictions, may adversely impact shareholders in certain jurisdictions***

For regulatory, tax and other purposes, the Company and the Shares may be treated in different ways in different jurisdictions. For instance, in certain jurisdictions and for certain purposes, the Shares may be treated as more akin to

- 45 -

holding units in a collective investment scheme. Furthermore, in certain jurisdictions, the treatment of the Company and/or the Shares may be uncertain or subject to change, or it may differ depending on the availability of certain information or disclosure by the Company of that information. The Company may be subject, therefore, to financially and logistically onerous requirements to disclose any or all of such information or to prepare or disclose such information in a form or manner which satisfies the regulatory, tax or other authorities in certain jurisdictions. The Company may elect not to disclose such information or prepare such information in a form which satisfies such authorities. Therefore Shareholders in such jurisdictions may be unable to satisfy the regulatory requirements to which they are subject.

***The Company is not, and does not intend to become, registered in the United States as an investment company under the U.S. Investment Company Act and related rules***

The Company has not, does not intend to, and may be unable to, become registered in the United States as an investment company under the U.S. Investment Company Act. The U.S. Investment Company Act provides certain protections to U.S. investors and imposes certain restrictions on companies that are registered as investment companies. As the Company is not so registered, and does not intend to so register, none of these protections or restrictions is or will be applicable to the Company. In addition, to avoid being required to register as an investment company under the U.S. Investment Company Act and to avoid violating the U.S. Investment Company Act, the Company has implemented restrictions on the purchase of the Shares by persons who are located in the United States or are U.S. Persons (or are acting for the account or benefit of any U.S. Person). For more information, prospective investors should refer to the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in in "*Placing Arrangements*".

***Certain payments by the Company will in the future be subject to 30 per cent withholding tax unless the Company agrees to certain reporting and withholding requirements and certain Shareholders will be required to provide the Company with required information so that the Company may comply with its obligations under FATCA***

Under Sections 1471 through 1474 of the U.S. Internal Revenue Code (commonly referred to as "**FATCA**"), Financial Institutions are required to use enhanced due diligence procedures to identify U.S. persons who have invested in either non-U.S. financial accounts or non-U.S. entities. Pursuant to FATCA, certain payments of (or attributable to) U.S.-source income, and the proceeds of sales of property that give rise to U.S.-source payments, will be subject to 30 per cent withholding tax with effect from 1 July 2014 unless the Company agrees to certain reporting and withholding requirements.

The United States and Guernsey have entered into an Intergovernmental Agreement ("**US IGA**") to implement FATCA. Under the terms of the US IGA, the Company may be obliged to comply with the provisions of FATCA as enacted by the Guernsey legislation implementing the US IGA (the "**Guernsey IGA Legislation**"), rather than directly complying with the U.S. Treasury Regulations implementing FATCA. Under the terms of the US IGA, Guernsey resident entities that comply with the requirements of the Guernsey IGA Legislation will be treated as compliant with FATCA and, as a result, will not be subject to withholding tax under FATCA ("**FATCA Withholding**") on payments they receive and will not be required to withhold under FATCA on payments they make.

The Company expects that it will be considered to be a Guernsey resident financial institution and therefore will be required to comply with the requirements of the Guernsey IGA Legislation.

Under the Guernsey IGA Legislation, the Company will be required to register with the United States Internal Revenue Service ("**IRS**") and report to the Guernsey President of the Policy & Resources Committee certain holdings by and payments made to certain U.S. investors in the Company, as well as to non-U.S. financial institutions that do not comply with the terms of the Guernsey IGA Legislation. Under the terms of the US IGA, such information will be onward reported by the Guernsey President of the Policy & Resources Committee to the United States under the general information exchange provisions of the United States-Guernsey Agreement for the Exchange of Information Relating to Taxes.

Further, even if the Company is not characterised under FATCA as a Financial Institution, it nevertheless may become subject to such 30 per cent withholding tax on certain U.S.-source payments to it unless it either provides information to withholding agents with respect to its U.S. Controlling Persons or certifies that it has no such U.S. Controlling Persons.

- 46 -

As a result, Shareholders may be required to provide any information that the Company determines necessary in order to allow the Company to satisfy its obligations under FATCA.

Additional intergovernmental agreements similar to the US IGA have been entered into or are under discussion by other jurisdictions with the United States. Different rules than those described above may apply depending on whether a payee is resident in a jurisdiction that has entered into an intergovernmental agreement to implement FATCA.

In addition to the US IGA, Guernsey and the United Kingdom have entered into an inter-governmental agreement ("**UK IGA**") for the implementation of information exchange arrangements, based on FATCA, whereby relevant financial information held in Guernsey in respect of a person or entity who is resident in the UK for tax purposes will be reported to the Guernsey President of the Policy & Resources Committee for onward reporting to the UK's HM Revenue and Customs. Under the UK IGA, the Company may be required to provide information to the Guernsey authorities about investors and their interests in the Company in order to fully discharge its reporting obligations and, in the event of any failure or inability to comply with the proposed arrangements, may suffer a financial penalty or other sanction under Guernsey law.

The scope and application of FATCA Withholding and information reporting pursuant to the terms of FATCA and the IGAs are subject to review by the United States, the United Kingdom, Guernsey and other IGA governments, and the rules may change. Although the UK IGA and US IGA have been ratified by Guernsey's parliament, guidance published to date has been in draft format only and therefore, while the Company intends to comply with applicable law, it cannot be predicted at this time what the full impact on the Company and the Company's reporting responsibilities pursuant to the UK IGA and US IGA will be. Shareholders should consult with their own tax advisors regarding the application of FATCA to their particular circumstances.

### *OECD's Base Erosion Profit Shifting ("BEPS") Action Points*

In 2013, the OECD published its report on Addressing Base Erosion and Profit Shifting ("**BEPS**") and its Action Plan on BEPS. The aim of the report and Action Plan was to address and reduce aggressive international tax planning. BEPS remains an ongoing project. On 5 October 2015, the OECD published its final reports, analyses and sets of recommendations (deliverables) with a view to implementing internationally agreed and binding rules which could result in material changes to relevant tax legislation of participating OECD countries. The final package of deliverables was subsequently approved by the G20 Finance Ministers on 8 October 2015. On 24 November 2016, the OECD announced that more than 100 jurisdictions concluded negotiations on a multilateral instrument that will amend their respective tax treaties (more than 2,000 tax treaties worldwide) in order to implement the tax treaty-related BEPS recommendations, although the effective date of such multilateral instrument remains uncertain. A first high level signing ceremony took place on 7 June 2017 where 68 countries signed the multilateral instrument. It is currently anticipated that the multilateral instrument will enter into force after five countries have ratified it. The multilateral instrument will then enter into effect for a specific tax treaty after all parties to that treaty have ratified the multilateral instrument. The final actions to be implemented in the tax legislation of the countries in which the Company will have investments, in the countries where the Company is domiciled or resident, or changes in tax treaties negotiated by these countries, could adversely affect the returns from the Company to its investors.

## COMPANY, ITS INVESTMENT OBJECTIVE, POLICY AND STRATEGY

### COMPANY

Highland CLO Funding, Ltd. (formerly known as Acis Loan Funding, Ltd.) (the "**Company**") was incorporated on 30 March 2015 and registered under the laws of Guernsey (registration number 60120) pursuant to the Companies Law. The Company changed its name on October 27, 2017. The Company is an investment company established to provide its investors with exposure to CLO Notes on both a direct basis and indirect basis and senior secured loans on an indirect basis, through the use of the investments described in its investment policy, including through the Management Companies.

The Company is seeking to raise U.S. $153 million through the Placing to invest in accordance with its investment objective and policy. Applications to an appropriate securities exchange may be made when deemed appropriate by the Company.

Investment in the Company is only suitable for institutional, professional and high net worth investors, private client fund managers and brokers and other investors who understand the risks involved in investing in the Company and/or who have received advice from their fund manager or broker regarding investment in the Company.

### INVESTMENT OBJECTIVE

The Company's investment objective is to provide Shareholders with stable and growing income returns, and to grow the capital value of the investment portfolio through opportunistic exposure to CLO Notes, investments in new issue CLOs sponsored by Highland and Acis CLO 7 through its interests in the Management Companies and CLO Income Notes, respectively, and senior secured loans primarily for the purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements, on both a direct basis and indirect basis, through the use of the investments described in its investment policy and through use of leverage, any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps or repurchase agreements, in addition to secured loan facilities. With respect to the Company's investments, except with respect to Designated CLO Resets or Designated CLO Refinancings, if applicable, it is expected that the Portfolio Manager intends to seek monetization of such investments in the ordinary course in its discretion; provided that at the end of the Term, the Portfolio Manager, in its reasonable discretion may postpone dissolution of the Company for up to 180 days to facilitate the orderly liquidation of the investments.

Highland HCF Advisor, in its capacity as the Portfolio Manager under the Portfolio Management Agreement, will manage the Company's investments. In addition, the Portfolio Manager, Highland, Highland CLO Management, or another affiliate of Highland, in the capacity of the CLO Manager, may also manage Highland CLOs and the Portfolio Manager Highland, Acis, Acis CLO Management, or another affiliate of Acis, in the capacity of the CLO Manager, may also manage Managed CLOs, in each case, pursuant to CLO Management Agreements to be entered into from time to time.

### INVESTMENT POLICY

#### Overview

The Company's investment policy is to focus on synergistic investments in the following areas.

#### Loan Investments

The Company will invest on an indirect basis in a diverse portfolio of predominantly floating rate senior secured loans (or on a direct basis for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements), all of which will have at least one rating, which may be public or private, from Moody's, S&P or Fitch. Initially, the Company's loan investments will be focused in the U.S., but depending on market conditions the Company may also invest in similar types of loans in Europe. Accordingly, there is no limit on the maximum U.S. or European exposure. Investments in U.S. or European loans may be made through a U.S. or European originator subsidiary of the Company. The Company intends to invest directly only in those senior secured loans to obligors with total potential indebtedness under all applicable loan agreements, indentures and other

underlying instruments at least $250,000,000 that would generally satisfy the eligibility criteria for Highland CLOs and set forth in "*Summary—Investment Policy—Loan Investments*".

### *Financing of Loan Portfolios / Securitization*

It is intended that the Company will periodically seek to sell or securitise all or a portion of its loan portfolio, held directly or indirectly, into new Highland CLOs where Highland CLO Management acts as CLO Manager. In doing so, Highland CLO Management may seek to adopt the "originator" model to address the Origination Requirements (as defined below) applicable to such Highland CLOs to the extent such Highland CLOs sought to comply with EU Retention Requirements. As a result, Highland CLO Management, will be required to commit to: (a) establishing the relevant CLO and (b) selling certain loan investments to the relevant CLO which it has purchased for its own account initially. In addition, under current guidance, prior to closing date of the relevant CLO, Highland CLO Management expects to sell investments to the relevant CLO to satisfy the Origination Requirements.

### *CLO Notes*

The Company will from time to time invest directly or indirectly (through affiliates and subsidiaries, including the Management Companies, as more fully described below) in CLO Notes issued by Managed CLOs or CLOs managed by other asset managers as set forth in "*Summary—Investment Policy—CLO Notes*".

The Company is currently invested in CLO Income Notes issued by Managed CLOs managed by Highland, Acis and Acis CLO Management. Following the Placing, the Company will invest indirectly through the Management Companies in CLO Notes.

### *Act as Risk Retention Provider*

The Company may also invest in, provide loans to, or purchase performance-linked notes from asset management subsidiaries, affiliated with the Company, the Portfolio Manager, Highland or Acis and which may act as the asset manager of certain U.S. or European CLOs in order to satisfy certain U.S. Risk Retention Rules or EU Retention Requirements.

### **Allocation of Investment Opportunities**

Highland CLO Management will serve as CLO Manager to each newly-issued Highland CLO during the Investment Period.

During the Investment Period, the Company shall receive priority allocations with respect to all CLO Income Note investment opportunities with respect to new issue Highland CLOs, over the account of the Portfolio Manager, its affiliates and Other Accounts as set forth in "*Summary—Investment Policy—Allocation of Investment Opportunities*".

### **INVESTMENT RESTRICTIONS**

The Company will, at all times, invest and manage its assets in a way which is consistent with its object of spreading investment risk and in accordance with the investment policy set out in "*—Investment Policy*".

In the event of any breach of the Company's investment policy or of the investment restrictions applicable to the Company, Shareholders will be informed of the actions to be taken by the Company (at the time of such a breach) by an announcement issued by the Administrator.

During the Investment Period, the Company may invest up to $250,000,000 in CLO Income Notes for new Highland CLOs as follows: (a) up to $150,000,000 in the aggregate from new capital contributions; and (b) up to $100,000,000 in the aggregate from proceeds received from existing seed portfolio investments and investments in new Highland CLOs, net of dividends paid, and amortization and interest payments on Company borrowings from committed credit facilities.

The Company may not, without the consent of the Advisory Board, invest in any CLO Notes or CLO Income Notes of new Highland CLOs that are not Qualifying CLOs as set forth in "*Summary—Investment Restrictions*"; provided that, if the Portfolio Manager has satisfied the RP Condition, the consent of the Advisory Board to invest in any

- 49 -

Highland CLO that meets clause (a) of the definition of Qualifying CLOs only shall not be unreasonably withheld, conditioned or delayed.

During the Investment Period, the Company shall be permitted to invest in "resets" with respect to the Designated CLO Resets and refinancings with respect to the Designated CLO Refinancings, each as set forth in "*Summary—Investment Restrictions*".

The Company shall not invest in the CLO Income Notes of a new-issue Highland CLO unless it is the 100% owner of the CLO Income Notes not forming part of the Retention Interest acquired by Highland CLO Management.

## BORROWING

Subject to the limitations set forth in "*Summary-Borrowing*", it is expected that the Company will have access to one or more committed credit facilities. Such facilities may take the form of any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps or repurchase agreements, in addition to secured loan facilities. It is expected that the Company will use advances under such facilities, together with the proceeds of the Shares, to purchase future senior secured loans (acquired for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) and other assets. In addition to such facilities, the Company will be permitted to borrow money for day to day administration and cash management purposes.

## CHANGES TO INVESTMENT OBJECTIVE AND POLICY

Any material change to the investment objective and policy of the Company would be made only with the approval of Shareholders.

## INVESTMENT STRATEGY

Whether the senior secured loans or other assets are held directly by the Company (with respect to senior secured loans for the purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) or indirectly via CLO Notes or its investment in the applicable Management Company it is the Company's intention that, in any case, the portfolios will be actively managed (by the Portfolio Manager, Highland, Acis, the applicable Management Company, an asset manager subsidiary or the applicable CLO Manager, as the case may be) to minimise default risk and potential loss through comprehensive credit analysis performed by the Portfolio Manager, Highland, Acis, the applicable Management Company or the applicable CLO Manager (as applicable).

Whilst the intention is to pursue an active, non-benchmark total return strategy, Highland HCF Advisor as the Company's Portfolio Manager will be cognisant of the positioning of the loan portfolios against relevant indices. Accordingly, Highland HCF Advisor will track the returns and volatility of such indices, while seeking to outperform them on a consistent basis. In-depth, fundamental credit research dictates name selection and sector over-weights/under-weights relative to the benchmark, backstopped by constant portfolio monitoring and risk oversight. The Portfolio Manager will typically look to diversify the Company's portfolios to avoid the risk that any one obligor or industry will adversely impact overall returns. The investment strategy also places an emphasis on loan portfolio liquidity to ensure that if the Company's credit outlook changes, it is free to respond quickly and effectively to reduce or mitigate risk in its portfolio. The Portfolio Manager believes this investment strategy will be successful in the future as a result of its emphasis on risk management, capital preservation and fundamental credit research. The Portfolio Manager believes the best way to control and mitigate risk is by remaining disciplined in market cycles, by making careful credit decisions and maintaining adequate diversification.

### *Leverage and Expected Returns*

It is anticipated that any borrowing for the purpose of investing directly in senior secured loans (acquired for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) will be in the form of a term Warehouse Loan Facility, however the Company has entered into the NexBank Credit Facility and may enter into any Revolving Credit Facility, Warehouse Loan Facilities, total return swaps, repurchase agreements or other facilities to facilitate the acquisition or financing of loans. Loans purchased using such borrowings will typically be held for no more than 12 months before being sold to a Highland

- 50 -

CLO.  Except in relation to the CLO Retention Notes it holds, the Company may enter into hedging and derivatives transactions pursuant to its investment activities, for the purposes of efficient portfolio management.

The Company does not currently grant any guarantee under any leveraging arrangement.  The grant of any such guarantee would be disclosed to investors in accordance with the AIFMD Rules.

Any proposed changes to the Company's investment objective and policy will be subject to the process described in the section titled "*Changes to Investment Objective and Policy*" above in this section of the Offering Memorandum.

*Collateral and Asset Re-use Arrangements*

Any collateral and asset re-use arrangements of the Company will vary according to the brokers and/or trading counterparties which it may use (each a "**Trading Counterparty**").

The Company may be required to deliver collateral from time to time to its Trading Counterparties, under the terms of the relevant trading agreements, by posting initial margin and/or variation margin and on a mark-to-market basis. The Company may also deposit collateral as security with a Trading Counterparty.  The treatment of such collateral varies according to the type of transaction and where it is traded. Under such arrangements, the cash, securities and other assets deposited as collateral will generally become the absolute property of the Trading Counterparty, the Trading Counterparty will have the right to use such collateral.

Where collateral is reused by a Trading Counterparty, the Company will have an unsecured right to the return of equivalent assets and such collateral will be at risk in the event of the insolvency of a Trading Counterparty.

Any changes to the right of re-use of collateral will be disclosed to investors in accordance with the AIFMD Rules.

### Current Investments of the Company

In order to facilitate a timely investment of the proceeds of the Placing and to take advantage of existing opportunities, the Company is currently invested in CLO Income Notes issued by Managed CLOs managed by the Portfolio Manager, Highland, Acis and Acis CLO Management.  The details of such CLOs are set out in "*The Current CLO Portfolio*".

Following the Placing, the Company will acquire further assets and fund origination by Highland CLO Management of new Highland CLOs and it is expected that the Net Placing Proceeds will be substantially invested in CLO Notes upon closing.  The Company may also, from time to time: (i) hold assets within its portfolio to maturity; (ii) sell assets within its portfolio to the market; or (iii) sell assets within its portfolio to another CLO which is not Managed CLO.

## TARGET RETURN AND DIVIDEND POLICY

### Target Total Return

Whilst not forming part of the investment objective or policy of the Company, on the basis of current market conditions as at the date of this Offering Memorandum, the Company is targeting an annualised mid-teen total return over the medium-term, once the Net Placing Proceeds are substantially invested (through the Company) in CLO Notes (the "**Target Total Return**").  The Company intends to seek to deliver this return through a combination of dividend payments and capital appreciation.

### Target Dividend Yield and Policy

Whilst not forming part of the investment objective or policy of the Company, dividends will be payable in respect of each calendar quarter, payable in the month following the end of such quarter.

During the Investment Period, on each Quarterly Dividend Date, beginning May 15, 2018, the Company will target the Target Dividend.  During the Investment Period, excess cash or interest from the portfolio will be reinvested by the Company with the objective of growing the NAV.

Following the Investment Period, excess cash, interest and proceeds from the realization of portfolio investments after satisfaction of all expenses, debts, liabilities and obligations of the Company will be distributed by the Company to the Shareholders as a dividend on the Quarterly Dividend Date in accordance with the Distribution Priority as set forth in "*Summary-Dividend Policy*".

To the extent the Company does not have available funds on hand to meet the Target Dividend with respect to any Quarterly Payment Date, the Board of Directors may suspend dividends if, in consultation with the Portfolio Manager, it determines that a sale of assets to produce proceeds to meet the Target Dividend would not be in the best interests of the Company and/or would not produce a sale price reflective of the value of the assets.

The Board may deduct from any dividend payable to any Shareholder on or in respect of a Share all sums of money (if any) presently payable by him to the Company on account of calls with respect to existing Shares, or calls of commitments to purchase Shares pursuant to the subscription and transfer agreement or otherwise.

The actual dividend generated by the Company in pursuing its investment objective will, however, depend on a wide range of factors including, but not limited to, general economic and market conditions, fluctuations in currency exchange rates, prevailing interest rates and credit spreads, the terms of the investments made by the Company and the risks highlighted in the "*Risk Factors*" section of this Offering Memorandum. Dividend payments may be suspended by Board of Directors in its absolute discretion, including, without limitation, in the event of adverse, or perceived adverse, market conditions.

The Target Total Return and the Target Dividend should not be taken as an indication of the Company's expected future performance or results. The Target Total Return and the Target Dividend are targets only and there is no guarantee that they can or will be achieved and should not be seen as an indication of the Company's expected or actual return. Target returns are hypothetical and are neither guarantees nor predictions or projections of future performance. Actual events and conditions may differ materially from the assumptions used to establish the Target Total Return and Target Dividend. Accordingly, investors should not place any reliance on the Target Total Return or the Target Dividend in deciding whether to invest in Shares.

Furthermore, the future performance of the Company may be materially adversely affected by the risks discussed in the section of this Offering Memorandum entitled "*Risk Factors*".

**FURTHER ISSUES OF SHARES**

The Directors will have authority to allot further Shares in the share capital of the Company following the Placing subject to the subscription and transfer agreement. Further issues of Shares beyond the issuances contemplated in the subscription and transfer agreement would only be made subject to consent of the Advisory Board, as described in "*Summary—Advisory Board*" if the Directors determine such issues to be necessary to protect the Company, consistent with the Board's duties to the Company, and in the best interests of Shareholders and the Company as a whole. Relevant factors in making such determination include net asset performance, share price rating and perceived investor demand. In the case of further issues of Shares (or sales of Shares from treasury), except as permitted by the Shareholders, such Shares will only be issued at prices which are not less than the then prevailing Net Asset Value per Share (as estimated by the Directors).

There are no provisions of Guernsey law which confer rights of pre-emption in respect of the allotment of Shares. The Articles, however, contain pre-emption rights in relation to allotments of Shares for cash.

## VALUATION

### *Net Asset Value*

As of September 30, 2017, the unaudited net asset value per share of the Net Asset Value was US $157,081,118.91. A special dividend in the aggregate amount of US $9,000,000 was paid on October 10, 2017, and a buyback of Shares from Acis Capital Management, L.P. was made on October 24, 2017, for an aggregate purchase price of $991,180.13.

### *Publication of Net Asset Value*

The Company intends to publish the Net Asset Value per Share as calculated in accordance with the process described below, on a quarterly basis (within 15 Business Days following the relevant month-end). Notice will be provided either by a website to be created or investors may elect to be contacted by the Administrator by e-mail. The Net Asset Value will be calculated by the Administrator on the basis of the valuation policy established by the Directors from time to time. The Company's initial valuation policy is described below.

### *Valuation of the portfolio*

It is intended that, in accordance with its investment objective and policy set out above, the Company will invest in: (a) senior secured loans and other debt securities on both a direct basis (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements) and indirect basis, including through the use of leverage via repurchase facilities and Warehouse Loan Facilities, and for the purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements; (b) CLO Notes, and any other assets held by management subsidiaries; and (c) interests in the Management Companies, and will value such instruments in accordance with the valuation policy established by the Portfolio Manager from time to time.

The Company (meaning for the purposes of the valuation of assets described herein, the Company itself, the Portfolio Manager or the Administrator under the ultimate supervision of the Board) will generally compute the value of the instruments and other assets of the Company as of the close of business on the last day of each fiscal period and on any other date selected by the Board in its sole discretion. In addition, the Company must compute the value of the instruments that are being distributed in-kind as of their date of distribution in accordance with the Company's Memorandum and Articles of Association. In determining the value of the assets of the Company, no value is placed on the goodwill or name of the Company, or the office records, files, statistical data or any similar intangible assets of the Company not normally reflected in the Company's accounting records, but there must be taken into consideration any related items of income earned but not received, expenses incurred but not yet paid, liabilities fixed or contingent, prepaid expenses to the extent not otherwise reflected in the books of account, and the value of options or commitments to purchase or sell instruments pursuant to agreements entered into on or prior to such valuation date.

A copy of the Company's valuation policy is available upon request.

The value of each instrument and other asset of the Company and the net worth of the Company as a whole determined pursuant the Company's Memorandum and Articles of Association are conclusive and binding on all of the members of the Company and all persons claiming through or under them.

### *Suspension of the calculation of Net Asset Value*

The Directors may at any time, but are not obliged to, temporarily suspend the calculation of the NAV and NAV per Share during any period if it determines that such a suspension is warranted by extraordinary circumstances, including: (i) during any period when any market on which the Company's investments are quoted, traded or dealt in is closed, other than for ordinary holidays and weekends, or during periods in which dealings are restricted or suspended; (ii) during the existence of any state of affairs, including as a result of political, economic, military or monetary events or any circumstances outside the control, as a result of which, in the reasonable opinion of the Portfolio Manager, the determination of the value of the assets of the Company, would not be reasonably practicable or would be seriously prejudicial to the shareholders; (iii) during any breakdown in the means of communication normally employed in determining the price or value of the Company's assets or liabilities, or of current prices in any market as aforesaid, or when for any other reason the prices or values of any assets or liabilities of the Company cannot reasonably be

accurately ascertained within a reasonable time frame; (iv) during any period when the transfer of funds involved in the realization or acquisition of any investments cannot, in the reasonable opinion of the Portfolio Manager, be effected at normal rates of exchange; or (v) automatically upon liquidation of the Company.

Shareholders will be informed by e-mail from the Administrator in the event that the calculation of the NAV per Share is suspended as described above.

## REPORTS AND ACCOUNTS

The accounting period of the Company ends on 31 December, in each year, and the audited annual accounts will be provided to Shareholders within four months of the year end to which they relate. The Company shall report its results of operations and financial position in U.S. Dollars. The Company's first accounts were prepared for the period ending 31 December 2015.

The audited annual accounts will also be available at the registered office of the Administrator and the Company.

The financial statements of the Company will be prepared in accordance with GAAP, and the annual accounts will be audited. The Company's financial statements, which will be the responsibility of its Board, will consist of a statement of comprehensive income, statement of financial position, statement of cash flows, statement of changes in equity, related notes and any additional information that the Board deems appropriate or that is required by applicable law.

It is expected that the CLOs and any Warehouse Loan Facilities established will not be consolidated in the Company's GAAP financial statements, although such assessment will depend on the facts and circumstances.

Any disclosures required to be made to Shareholders pursuant to the AIFMD will be contained either in the Company's periodic reports or communicated to Shareholders in written form.

### THE CURRENT CLO PORTFOLIO

The Company is currently invested in CLO Income Notes in the following Managed CLOs in the following amounts (the "**Current CLO Portfolio**"):

| CLOs: | Aggregate Outstanding Amount (U.S.$) |
|---|---|
| ACIS CLO 2013-1 Ltd. | $18,558,000.00 |
| ACIS CLO 2014-3 Ltd. | $39,750,000.00 |
| ACIS CLO 2014-4 Ltd. | $50,750,000.00 |
| ACIS CLO 2014-5 Ltd. | $53,000,000.00 |
| ACIS CLO 2015-6, Ltd. | $51,850,000.00 |
| Acis CLO 2017-7, Ltd. | $17,850,000.00 |
| Rockwall CDO, Ltd. | $14,000,000.00 |
| Brentwood CLO, Ltd. | $12,000,000.00 |
| Grayson CLO, Ltd. | $5,900,000.00 |
| Liberty CLO, Ltd. | $17,000,000.00 |
| HP CDO, Ltd. | $1,621,542.70 |
| Greenbriar CLO, Ltd. | $18,000,000.00 |
| Gleneagles CLO, Ltd. | $1,250,000.00 |

**Valuation of the Current Portfolio**

Information regarding the Current Portfolio and its valuation as of 30 September 2017 has been made available to all Placees free of charge.

Information on the historic performance of the Company is available upon request from the Portfolio Manager. Such information will be updated periodically in accordance with the AIFMD Rules.

# MARKET OPPORTUNITY

## INVESTMENT OPPORTUNITY

The Company intends to invest in CLO Notes of CLOs which are compliant with the U.S. Risk Retention Rules and which may be compliant with the EU Retention Requirements (as defined above) and in senior secured loans (for the primary purpose of enabling Highland CLO Management to qualify as an "originator" for purposes of the EU Retention Requirements). In pursuance of this intention, the Company will invest in each of the Management Companies which will, pursuant to the EU Retention Requirements, need to, amongst other things: (a) on the closing date of a CLO it establishes, commit to purchase "material net economic interest" equal to at least five per cent of the maximum portfolio principal amount of the assets in the CLO and (b) undertake that, for so long as any securities of the CLO remain outstanding (including any CLO Retention Notes), it will retain its interest in the CLO and will not (except to the extent permitted by the EU Retention Requirements) sell, hedge or otherwise mitigate its credit risk under or associated with such CLO. This five per cent material net economic interest in the CLO can, amongst other methods, be retained through the holding of a vertical strip of all issued tranches (AAA-rated notes to equity) or a retention holding in the first loss tranche or a combination thereof. The EU Retention Requirements prohibit many significant European investors from investing in any securitisation which does not comply with them.

In addition, with the intention of achieving classification as an "originator" (as defined in the CRR) and complying with the CRR Retention Requirements with respect to Highland CLOs, Highland CLO Management will be required to meet the Origination Requirements.

Highland CLO Management may seek to adopt the "originator" model to address the EU Retention Requirements for its CLOs and intends to be treated as a "majority-owned affiliated" of Highland in order to comply with the U.S. Risk Retention Rules.

In addition to its current holdings, the Company may buy floating rate senior secured loans from the primary and secondary market before selling the assets to one or more CLOs which it establishes and for which Highland CLO Management will act as a retention provider, thereby offering investors wholesale access to senior secured loans acquired by the Company and retained CLO Income Notes.

The Portfolio Manager will be responsible for selecting and monitoring the performance of the investments. The Company's purchase and sale decisions (with certain exceptions) will be taken by Highland HCF Advisors as Portfolio Manager pursuant to the Portfolio Management Agreement. Further details on the investment process are set out in the section of this Offering Memorandum entitled "*Investment Process*".

## INVESTMENT PROCESS

### *Highland HCF Advisor as Portfolio Manager and CLO Manager*

The Company has entered into a Portfolio Management Agreement with Highland HCF Advisor as the Portfolio Manager. Pursuant to the Portfolio Management Agreement, Highland HCF Advisor will, at its discretion, select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support services to the Company. The performance of the Company's portfolio will depend heavily on the skills of Highland HCF Advisor in analyzing, selecting and managing the investments. The Portfolio Manager has entered into Services Agreements with Highland Capital Management, L.P. under which the Portfolio Manager has agreed to make its investment research and recommendations and back-office support services available to Highland HCF Advisor. Further details are set out in the section of this offering memorandum entitled "Investment Process" and "Additional Information on the Company".

Based in Dallas, Texas, Highland is an SEC Registered Investment Adviser founded in 1993 that specializes in senior secured bank loans, high yield bonds, structured products and equities. Highland issued its first CLO in 1996, and Highland and its affiliates have since issued and managed over U.S. $28 billion of CLOs and CDOs consisting of 40 separate vehicles. As of August 31, 2017, Highland and its affiliates, managed or serviced approximately U.S. $13.4 billion in senior secured bank loans, high yield bonds, structured products and other assets for banks, insurance companies, pension plans, foundations and high net worth individuals.

The Portfolio Manager, Highland, Acis and/or the Management Companies, may act as CLO Manager(s) in relation to the Managed CLOs pursuant to CLO Management Agreements. The Portfolio Manager, Highland, Acis and/or the applicable Management Company as CLO Manager is responsible for purchasing and selling of collateral obligations and performing certain other advisory and administrative tasks for and on behalf of the Managed CLOs in each case subject to the provisions of the applicable CLO Management Agreement and any applicable provisions of the indenture.

Highland HCF Advisor is a relying adviser of Highland. Highland is an SEC Registered Investment Adviser and currently manages CLOs and other managed accounts and investment funds. Highland CLO Management is a relying adviser of Highland and will manage Highland CLOs. Highland CLO Management has the HCLOM Services Agreements in place with Highland, pursuant to which Highland provides credit research and operational support to Highland CLO Management, including services in connection with determining the composition, nature and timing of changes to the Highland CLO Management portfolio, the due diligence of actual or potential investments, the execution of investment transactions approved by Highland CLO Management, and certain loan services and administrative services.

Acis is an SEC Registered Investment Adviser and currently manages CLOs and other managed accounts and investment funds. Acis CLO Management is a relying adviser of Acis and currently manages ACIS CLO 2017-7. Acis is an affiliate of Highland and is 100% owned by Highland senior management, and was established by James Dondero and Mark Okada to focus on managing traditional CLOs that invest in liquid, broadly syndicated bank loans and secondary CLO investments. Acis has the ACM Services Agreements in place with Highland, pursuant to which Highland provides investment research and recommendations and operational support to Acis, including services in connection with the Portfolio Manager's recommendations with respect to the composition, nature and timing of changes to the Company's portfolio, the due diligence of actual or potential investments, the execution of investment transactions, and certain loan services and administrative services. Acis CLO Management has the ACLOM Services Agreements in place with Acis, pursuant to which Acis provides credit research and operational support to Acis CLO Management, including services in connection with determining the composition, nature and timing of changes to the ACIS CLO Management portfolio, the due diligence of actual or potential investments, the execution of investment transactions approved by ACIS CLO Management, and certain loan services and administrative services. All final credit decisions are made by the Highland individuals referenced below.

### Investment Philosophy

Highland's investment philosophy centers on being investors first. The firm has 25 years of experience investing in alternative strategies through multiple cycles. Highland is a recognized pioneer in bank loan asset management and

CLO issuance. The firm invests a meaningful amount of capital in the portfolios they manage, with market value in excess of $250 million invested alongside our clients, as of September 30, 2017.

Highland's investment philosophy is rooted in a value-driven approach that combines rigorous bottom-up credit underwriting with top-down risk analysis to optimize risk-adjusted performance of portfolios. The firm integrates risk management throughout its investment process and maintains a culture of a high level of compliance. Highland focuses on attractive risk/return arbitrage opportunities where the firm can add value. Highland seeks to generate alpha by implementing checks and balances that allow the firm to identify risks, mitigate volatility, and quickly ascertain and sell losers.

While participating in the larger, liquid bank loan asset class, Highland continues to capture market inefficiencies in this over the counter (OTC) market through mispricings that it identifies via robust fundamental analysis, proactive diligence and monitoring, and nimble trading capabilities. Given the scale of the firm's investment resources, Highland is able to follow and manage investment portfolio names more closely. Highland credit research analysts manage 20-30 credits per analyst versus most peers, who manage 40-50 credits per analyst. In addition, the firm's dedicated trading desk and active dialogue with the Street enable Highland to identify technical dislocations and opportunities. The firm's high conviction investment philosophy and active portfolio management style versus peers have been key drivers of creating alpha for clients over time.

**Investment Monitoring and Risk Management**

Risk management is integrated into all levels of the investment process, from research, to portfolio construction and management, to ongoing monitoring. Highland conducts extensive position and portfolio monitoring activities on a daily basis. Portfolio risk is reviewed using internally generated daily, weekly, and monthly reports which measure transaction compliance including investor-mandated metrics such as portfolio concentrations or required test scores, as well as compliance with evolving internal positioning targets. Individual position risk is monitored in a number of ways, including Highland's extensive proprietary intranet system (Highland Online Management Engine or "**HOME**"), which pulls together data from their various data providers (Wall Street Office, LPC, Moody's, S&P, MarkIt, S&P LCD, CSFB Index) to provide a comprehensive portfolio/risk management system. The system allows the CLO team to monitor metrics at any level of aggregation (instrument, issuer, portfolio, fund and across the platform). Additionally, the system is designed to be scalable and with flexibility to enable future data inputs and reporting requirements.

For both Managed CLOs and for the underlying loans, the HOME intranet system allows Highland to monitor portfolios on a real-time, ongoing basis by receiving alerts showing positions with the largest daily/weekly/monthly mark change, as well as alerts on downgrades/upgrades, and when their credit analyst has changed his opinion on a broadly syndicated loan.

**Allocation Policy**

Highland and its affiliates may, from time to time, be presented with investment opportunities that fall within the investment objectives of the Company and the Managed CLOs and other clients, funds or other investment accounts managed by Highland or its affiliates, and in such circumstances, subject to the Company's priority allocation with respect to CLO Income Notes of new issue Highland CLOs Highland and its affiliates expect to allocate such opportunities among the Company, the Managed CLOs and such other clients, funds or other investment accounts on a basis that Highland and its affiliates determine in good faith is appropriate taking into consideration such factors as the fiduciary duties owed to the Company, the Managed CLOs and such other clients, funds or other investment accounts, the primary mandates of the Company, the Managed CLOs and such other clients, funds or other investment accounts, the capital available to the Company, the Managed CLOs and such other clients, funds or other investment accounts, any restrictions on investment, the sourcing of the transaction, the size of the transaction, the amount of potential follow-on investing that may be required for such investment and the other collateral obligations of the Company, the Managed CLOs and such other clients, funds or other investment accounts, the relation of such opportunity to the investment strategy of the Company, the Managed CLOs and such other clients, funds or other investment accounts, reasons of portfolio balance and any other consideration deemed relevant by Highland and its affiliates in good faith. Subject to the Company's priority allocation with respect to CLO Income Notes of new issue Highland CLOs, Highland will allocate investment opportunities across the entities for which such opportunities are

appropriate, consistent with (1) its internal conflict of interest and allocation policies and (2) the requirements of the Investment Advisers Act. Highland will seek to allocate investment opportunities among such entities in a manner that is fair and equitable over time and consistent with its allocation policy. However, there is no assurance that such investment opportunities will be allocated to the Company and the Managed CLOs fairly or equitably in the short term or over time and there can be no assurance that the Company and the Managed CLOs will be able to participate in all such investment opportunities that are suitable for it.

### Biographies of the Highland Key Personnel

The Portfolio Manager will use the services of the key personnel set forth below, although it may not necessarily continue to use their services during the entire term of the Portfolio Management Agreement. Of these, Trey Parker and Hunter Covitz (and such other personnel as may be determined from time to time) will be made available by the Portfolio Manager to the Company pursuant to the Portfolio Management Agreement.

Although the persons described above are currently employed by Highland and are engaged in the activities of the Portfolio Manager, such persons may not necessarily continue to be employed by the Portfolio Manager during the entire term of the Portfolio Management Agreement and, if so employed, may not remain engaged in the activities of the Portfolio Manager.

### James Dondero, CFA, CMA

### Co-Founder, President

Mr. Dondero is President of Highland CLO Management and Acis CLO Management, LLC and Co-Founder and President of Highland Capital Management, L.P. (an alternative asset manager specializing in high-yield fixed income investments) and Acis Capital Management, L.P. Mr. Dondero has over 30 years of experience in the credit and equity markets, focused largely on high-yield and distressed investing. Under Mr. Dondero's leadership, Highland and Acis have been a pioneer in both developing the collateralized loan obligation (CLO) market and advancing credit-oriented solutions for institutional and retail investors worldwide, including product offerings such as institutional separate accounts, CLOs, hedge funds, private equity funds, mutual funds, REITs, and ETFs. Mr. Dondero is the Chairman and President of NexPoint Residential Trust, Inc. (NYSE:NXRT), is Chairman of NexBank Capital, Inc., Cornerstone Healthcare Group Holding, Inc., and CCS Medical, Inc., and a board member of Jernigan Capital, Inc. (NYSE:JCAP), and MGM Holdings, Inc. He also serves on the Southern Methodist University Cox School of Business Executive Board. A dedicated philanthropist, Mr. Dondero actively supports initiatives in education, veterans affairs, and public policy. Prior to founding Highland in 1993, Mr. Dondero was involved in creating the GIC subsidiary of Protective Life, where as Chief Investment Officer he helped take the company from inception to over $2 billion between 1989 and 1993. Between 1985 and 1989, Mr. Dondero was a corporate bond analyst and then portfolio manager at American Express. Mr. Dondero began his career in 1984 as an analyst in the JP Morgan training program. Mr. Dondero graduated from the University of Virginia where he earned highest honors (Beta Gamma Sigma, Beta Alpha Psi) from the McIntire School of Commerce with dual majors in accounting and finance. He has received certification as Certified Public Accountant (CPA) and Certified Managerial Accountant (CMA) and has earned the right to use the Chartered Financial Analyst (CFA) designation.

### Mark Okada, CFA

### Co-Founder, Co-Chief Investment Officer

Mr. Okada is Co-Founder of Highland CLO Management and Acis CLO Management, LLC and Co-Founder and Co-Chief Investment Officer of Highland Capital Management, L.P. and Acis Capital Management, L.P. Responsible for overseeing investment activities for various strategies within Highland and Acis, Mr. Okada is a pioneer in the development of the bank loan market and has over 30 years of credit experience. He is responsible for structuring one of the industry's first arbitrage CLOs and was actively involved in the development of Highland's bank loan separate account and mutual fund platforms. Mr. Okada received a BA in Economics and a BA in Psychology, cum laude, from the University of California, Los Angeles. He has earned the right to use the Chartered Financial Analyst designation. Mr. Okada is a Director of NexBank, Chairman of the Board of Directors of Common Grace Ministries, Inc., is on the Board of Directors for Education is Freedom, and also serves on the GrowSouth Fund advisory board.

**Trey Parker**

**Partner, Portfolio Manager and Co-Chief Investment Officer**

Mr. Parker is Partner, Portfolio Manager and Co-Chief Investment Officer at Highland Capital Management, L.P., and serves on the Investment Manager's Investment Committee. Prior to his current role, Mr. Parker was Head of Credit and covered a number of the industrial verticals, as well as parts of tech, media and telecom for the Investment Manager and worked on the Distressed & Special Situations investment team at Highland. Prior to joining Highland in March 2007, Mr. Parker was a Senior Associate at Hunt Special Situations Group, L.P., a Private Equity group focused on distressed and special situation investing. Mr. Parker was responsible for sourcing, executing and monitoring control Private Equity investments across a variety of industries. Prior to joining Hunt, Mr. Parker was an analyst at BMO Merchant Banking, a Private Equity group affiliated with the Bank of Montreal. While at BMO, Mr. Parker completed a number of LBO and mezzanine investment transactions. Prior to joining BMO, Mr. Parker worked in sales and trading for First Union Securities and Morgan Stanley. Mr. Parker received an MBA with concentrations in Finance, Strategy and Entrepreneurship from the University of Chicago Booth School of Business and a BA in Economics and Business from the Virginia Military Institute. Mr. Parker serves on the Board of Directors of Omnimax Holdings, Inc., TerreStar Corporation, JHT Holdings, Inc., and a non-profit organization, the Juvenile Diabetes Research Foundation (Dallas chapter).

**Hunter Covitz, CPA**

**Managing Director, Structured Products**

Mr. Covitz is a Managing Director and Portfolio Manager at Highland Capital Management, L.P. He is responsible for all CLOs, separate accounts, and hedge funds managed by Acis Capital Management, L.P., as well as all CLOs managed by Highland. Mr. Covitz serves on Highland's investment committee and leads the structured products investment team. Since joining Highland in 2003, Mr. Covitz has been instrumental in the structuring, warehousing, ramping, and ongoing portfolio management of over 30 Highland and Acis-originated CLOs. Prior to joining Highland, Mr. Covitz served as a tax consultant at Deloitte & Touche and KBA Group LLP, where he focused on high-net worth individuals and middle-market companies. He received both his MS and BBA in Accounting from the University of Oklahoma. Mr. Covitz is a licensed Certified Public Accountant.

**Neil Desai**

**Portfolio Manager, Structured Products**

Mr. Desai is a Portfolio Manager of Structured Products at Highland Capital Management, L.P. He is focused on sourcing and trading structured products for Highland's CLOs, hedge funds, mutual funds and separate accounts in the primary and secondary markets. Prior to joining Highland in August 2015, Mr. Desai was a Director in Pfizer Inc.'s Treasury organization where he built and ran Pfizer's structured products business. Prior to Pfizer, Mr. Desai spent several years structuring and trading various structured products at Barclays Capital and its spin-off hedge fund, C12 capital. Mr. Desai received both a Bachelor's and Master's degree in Computer Science & Electrical Engineering from MIT.

## COMPANY DIRECTORS AND ADMINISTRATION

### DIRECTORS

The Directors are responsible for managing the business affairs of the Company in accordance with the Articles and have overall responsibility for the Company's activities including the appointment of the service providers. The Directors may delegate certain functions to other parties such as the Administrator. The Directors have appointed Highland HCF Advisor as Portfolio Manager and delegated the investment management and risk management of the Company's investments to the Portfolio Manager pursuant to the Portfolio Management Agreement.

The Board comprises two Directors, both of whom are independent of Highland and Acis.

The address of the Directors, all of whom are non-executive, is the registered office of the Company. The Directors of the Company are as follows:

### William Scott (Chairman)

William Scott, a Guernsey resident, acts as an independent non-executive Director of the Company. Mr. Scott also currently serves as independent non-executive director of a number of investment companies and funds. From 2003 to 2004, Mr. Scott worked as Senior Vice President with FRM Investment Management Limited. Previously, Mr. Scott was a director at Rea Brothers (which became part of the Close Brothers group in 1999 and where he was a director of Close Bank Guernsey Limited) (1989-2002) and Assistant Investment Manager with the London Residuary Body Superannuation Scheme (1987-1989). Mr. Scott graduated from the University of Edinburgh in 1982 and is a Chartered Accountant having qualified with Arthur Young (now E&Y) in 1987. Mr. Scott also holds the Securities Institute Diploma and is a Chartered Fellow of the Chartered Institute for Securities & Investment. He is also a Chartered Wealth Manager.

### Heather Bestwick

Heather Bestwick, a Jersey resident, acts as an independent non-executive Director of the Company. She qualified as an English solicitor with Norton Rose, and worked in their London and Athens offices for eight years. In 1999 she joined Walkers in the Cayman Islands, qualifying as a Cayman Islands attorney and Notary Public, and became a partner in 2003. Her practice encompassed hedge funds, private equity, structured finance, secured lending and yacht registration and finance. Ms. Bestwick moved to Jersey in 2007 to become Managing Partner of the Walkers Jersey office. She joined Jersey Finance in 2010 as Technical Director and Deputy Chief Executive, leading the development of finance industry legislation on behalf of industry and liaising with the regulator and government. Ms. Bestwick is a member of the Channel Islands committee of the Association of Investment Companies.

### Management functions of the Board of Directors

As there are no employees of the Company, the Board performs certain management functions, which include the overseeing of the Company's investment policy and investment strategy and the supervision of any delegated responsibilities to third-party service providers, and has the ultimate responsibility for the management and operations of the Company.

The Company has appointed Highland HCF Advisor as Portfolio Manager and delegated the investment management and risk management of the Company's investments to the Portfolio Manager pursuant to the Portfolio Management Agreement.

### CORPORATE GOVERNANCE

The Directors are committed to maintaining high standards of corporate governance. Insofar as the Directors believe it to be appropriate and relevant to the Company, it is their intention that the Company should comply with best practice standards for the business carried on by the Company.

On 1 January 2012, the GFSC's Finance Sector Code of Corporate Governance (the "**GFSC Code**") came into effect. The GFSC has stated in the GFSC Code that companies which report against the UK Corporate Governance Code are

- 61 -

deemed to meet the requirements of the GFSC Code, and need take no further action. Other than as set out below, the Company currently complies with, and will comply with, the GFSC Code.

The Company does not have a senior independent director because all of its Directors are non-executive and the Company has a Chairman. There are no other instances of non-compliance with the UK Corporate Governance Code by the Company as at the date of this Offering Memorandum.

### Audit Committee

The Company has established an Audit Committee, which comprises all the Directors. The Company's Audit Committee meets formally at least twice a year for the purpose, amongst other things, of considering the appointment, independence and remuneration of the Auditor and to review the Company's annual financial reports. Where audit-related and/or non-audit services are to be provided by the Auditors, full consideration of the financial and other implications on the independence of the Auditors arising from any such engagement will be considered before proceeding. Heather Bestwick acts as chairman of the Audit Committee. The responsibilities of the Audit Committee includes monitoring the integrity of the Company's results and financial statements, reviewing reports received from the Administrator on the adequacy and the effectiveness of the Company's internal controls and risk management systems, considering annually whether there is a need for an effectiveness of the Company's internal audit function and assessing the ongoing suitability of the Auditors and ensuring their co-ordination with any internal audit function.

The chairmanship of the Audit Committee and each Director's performance is reviewed annually by the Chairman and the performance of the Chairman is assessed by the other Directors.

### Advisory Board

The Company has established an Advisory Board, which composed of individuals who shall be representatives of certain Shareholders. See "*Summary—Advisory Board*".

## PORTFOLIO MANAGER

Highland HCF Advisor will act as Portfolio Manager to the Company (pursuant to the Portfolio Management Agreement) and may act (either itself or through an affiliate) as the CLO Manager to Managed CLOs.

Pursuant to the Portfolio Management Agreement, the Portfolio Manager will select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and be responsible for the business decisions and carry on the day-to-day management of the Company's business and implementation of its investment objective and policy.

### *Highland Fees*

Highland HCF Advisor will receive, in consideration for its services pursuant to the Portfolio Management Agreement, an amount equivalent to all Operating Expenses incurred by the Portfolio Manager in the performance of its obligations thereunder as described below, together with any irrecoverable VAT arising on such costs and expenses. Except as provided below, the Portfolio Manager will pay all of its own operating, overhead and administrative expenses, including all costs and expenses on account on employee compensation, employee benefits and rent ("**Overhead**") without reimbursement by the Company.

The Company shall pay or reimburse the Portfolio Manager and its affiliates for only for reasonable third party costs and expenses related to the services hereunder, including, but not limited to investment-related expenses, brokerage commissions and other transaction costs, expenses related to clearing and settlement charges, actual out-of-pocket professional fees relating to, trustee, administration, tax, accounting, legal, auditing or valuation services, any governmental, regulatory, licensing, filing or registration fees incurred in connection with the Company's compliance with the rules of any self-regulatory organization or any federal, state or local laws, research-related expenses (including, without limitation, news and quotation equipment and services, investment and trading-related software, including, without limitation, trade order management software (i.e., software used to route trade orders)), accounting (including accounting software), tax preparation expenses, costs and expenses associated with reporting and providing information to the Company, any taxes imposed upon the Company (including, but not limited to, any

irrecoverable VAT arising on such costs and expenses), fees relating to valuing the financial instruments, extraordinary expenses and the Company's indemnification obligations (including those incurred in connection with indemnifying indemnified persons, including advancing such amounts) (collectively, the "**Operating Expenses**"). In the event any fees or expenses are for services used by, or attributable to, other persons advised by Highland HCF Advisor or its affiliates, including, but not limited to, any fees or expenses for software or subscription-based services, the Company shall only reimburse the Portfolio Manager for its pro rata share of such expenses, as determined by the Portfolio Manager in good faith.

For the avoidance of doubt, (i) the cost of all third party expenses incurred by the Portfolio Manager in connection with the Portfolio Management Agreement shall not exceed standard market rates (which may include standard soft dollar arrangements) and (ii) to the extent any of the foregoing expenses were incurred on behalf of, or benefit of a number of Portfolio Manager's advised accounts, such expenses shall be allocated pro rata among such accounts.

To the extent that expenses to be borne by the Company are paid by the Portfolio Manager or by any services provider, the Company shall reimburse the Portfolio Manager (or the relevant services provider, as applicable) for such expenses so long as such expenses are determined on an arm's length basis.

The Portfolio Manager will also receive distributions pursuant to the Distribution Priority following the Investment Period, after satisfaction of all expenses, debts, liabilities and obligations of the Company and the Shareholders have receive a cumulative rate of return of 8.0% per annum, compounded annually. See "*Summary—Dividend Policy*".

Further details regarding the Portfolio Manager and Highland are set out in the section of this Offering Memorandum entitled "*Investment Process*". Further details regarding the Portfolio Management Agreement are set out in the section of this Offering Memorandum entitled "*Additional Information on the Company*".

## CLO MANAGER

In addition, the Portfolio Manager, Highland, Acis and/or the Management Companies (or one of their affiliates), as CLO Manager, may also manage Managed CLOs pursuant to management agreements ("**CLO Management Agreements**") to be entered into from time to time. The applicable CLO Manager will receive customary fees, in consideration for its services as the CLO Manager, from each of the Managed CLOs it manages.

## ADMINISTRATOR

State Street (Guernsey) Limited has been appointed as Administrator of the Company pursuant to the Administration Agreement (further details of which are set out in the section of this Offering Memorandum entitled "*Material Contracts*" in "*Additional Information on the Company*"). In such capacity, the Administrator is responsible for the day-to-day administration of the Company (including but not limited to the calculation and publication of the estimated quarterly NAV) and general secretarial functions required by the Companies Law (including but not limited to the maintenance of the Company's accounting and statutory records). Prospective investors should note that it is not possible for the Administrator to provide any investment advice to investors.

The Administrator is a private limited company, created under the laws of Guernsey on 17 March 2000 whose registered office is situated at First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands. The Administrator is licensed under the POI Law, with the GFSC to carry out controlled investment business. The Administrator's principal business activity is providing securities services.

## CUSTODIAN

State Street Custodial Services (Ireland) Limited has been appointed as Custodian of the Company pursuant to the Custody Agreement (further details of which are set out in the section of this Offering Memorandum entitled "*Material Contracts*" in "*Additional Information on the Company*"). In acting as custodian of the Company's investments, the Custodian shall provide for the safekeeping of certificates of deposit, shares, notes and in general any instrument evidencing the ownership of securities and may take custody of cash and other assets. Assets will be held in a custody account and registered in the name of the Company or the Custodian, its delegate or a nominee.

The Custodian, which is authorised as an Investment Business Firm under Section 10 of the Irish Investment Intermediaries Act, 1995 (as amended), will provide custody and banking services.

**FEES AND EXPENSES**

The expenses of the Company related to the Placing are described in "*Summary—Expenses related to the Placing*".

The Company's ongoing expenses are described in "*Summary—Ongoing annual expenses*".

For more information on expenses charged during the most recent financial year, prospective investors should review the Company's annual audited financial statements (if any) for the prior financial year.

**MEETINGS AND REPORTS TO SHAREHOLDERS**

All general meetings of the Company shall be held in Guernsey.

The Company's audited annual report and accounts will be prepared to 31 December, each year, and it is expected that copies will be sent to Shareholders at the end of April each year. Shareholders will also receive an unaudited interim report each year covering the six months from 1 January to 30 June, expected to be despatched at the end of August each year.

The Company's accounts are drawn up in U.S. Dollars and in compliance with GAAP.

The following information will be disclosed to investors at the same time as the annual financial statements and may be provided at other times by way of a report and/or letter sent to investors by the Portfolio Manager or the Administrator:

(a)     the percentage of the assets of the Company that are subject to special arrangements arising from their illiquid nature;

(b)     any new arrangements for managing the liquidity of the Company;

(c)     the current risk profile of the Company and the risk management systems employed by the Portfolio Manager to manage those risks; and

(d)     the total amount of leverage employed by the Company.

Any changes to the following information will be provided by the Portfolio Manager or the Administrator to investors without undue delay and may be provided by email:

(a)     the maximum level of leverage which the Portfolio Manager may employ on behalf of the Company;

(b)     the right of re-use of collateral or any changes to any guarantee granted under any leveraging arrangement; and

(c)     activation of liquidity management tools.

## PLACING ARRANGEMENTS

**THE PLACING**

The target number of Placing Shares to be issued pursuant to the Placing is an amount of Shares equal to U.S. $153 million. As at the date of this Offering Memorandum, the actual number of Placing Shares to be issued under the Placing is not known.

The results of the Placing will be released by the Company, including details of the number of Placing Shares allotted (or such other date as may be notified by the Company). The Directors are under no obligation to issue share certificates unless requested to do so by a Shareholder. No temporary documents of title will be issued.

The Company is seeking aggregate subscriptions to purchase Placing Shares in an aggregate amount of US $153 million.

Placees will commit under the subscription and transfer agreement to purchase Shares to be settled from time to time during the Investment Period. The Portfolio Manager may call such Shares for settlement from time to time on a pro rata basis upon 10 Business Days' notice to the Placees in such amounts as may be specified by the Portfolio Manager.

Upon the expiration of the Investment Period, all Placees will be released from any further obligation with respect to purchase Shares under their subscriptions, except to the extent necessary to:

(i) complete, no later than 180 days after the expiration of the Investment Period, the purchase of Shares pursuant to written commitments, letters of intent or similar contractual commitments that were in process as of the end of the Investment Period; and

(ii) fund any indebtedness of the Company permitted hereunder incurred prior to the end of the Investment Period (including to repay outstanding indebtedness under any Warehouse Loan Facilities).

Shares will be issued at a price per Share based on the most recent quarterly determined NAV of the Company.

The maximum number of Shares to be issued by the Company is an amount of Shares equal to U.S. $153 million and there is no minimum number of Shares. Fractions of Placing Shares will be issued.

On the Closing Date, Placees will acquire Shares of existing Shareholders at a price per Share based on the Adjusted NAV such that Placees and existing Shareholders will hold currently existing Shares on a *pro rata* basis and existing Shareholders will commit, as Placees under a subscription and transfer agreement, to purchase Shares such that new and existing Shareholders will hold both existing Shares and commitments on pro rata basis.

The Board may deduct from any dividend payable to any Shareholder on or in respect of a Share all sums of money (if any) presently payable by him to the Company on account of calls with respect to existing Shares, or calls of commitments to purchase Shares pursuant to the subscription and transfer agreement or otherwise.

A Shareholder that defaults in respect of its obligation to purchase Shares pursuant to the terms of the subscription and transfer agreement will be subject to customary default provisions.

The Board may retain any dividend or other monies payable on or in respect of a Share on which the Company has a lien and may apply the same in or towards satisfaction of the liabilities or obligations in respect of which the lien exists.

*Highland Principal Commitment*

Certain principals of Highland will subscribe, directly or indirectly, for $3,000,000 of Shares in the aggregate.

**TIME AND DATE OF THE OPENING AND CLOSING OF THE OFFER**

This subscription is open for a fixed offer period only. This period runs from November 15, 2017, the offer opening date, until 17:00 in Guernsey on the Closing Date. Only fully completed applications received by this date with cleared funds in the Company's nominated account will be acceptable for investment.

## USE OF PROCEEDS

The Net Placing Proceeds will depend on the number of Placing Shares issued pursuant to the Placing. The Portfolio Manager intends to invest the Net Placing Proceeds in accordance with the Company's investment policy (further details of the Company's investment process and strategy are set out in the section of this Offering Memorandum entitled "*Company, its Investment Objective, Policy and Strategy*").

## DEALINGS

The Company does not guarantee that at any particular time any market maker(s) will be willing to make a market in the Placing Shares, nor does it guarantee the price at which a market will be made in the Placing Shares. Accordingly, the dealing price of the Placing Shares may not necessarily reflect changes in the Net Asset Value per Share. Furthermore, the level of the liquidity in the Placing Shares can vary significantly.

## SCALING BACK AND ALLOCATION

If aggregate applications for Placing Shares exceed 325 million Shares, being the maximum number of Shares to be issued pursuant to the Placing, it will be necessary to scale back applications under the Placing. The Company reserves the right to decline in whole or in part any application for Placing Shares pursuant to the Placing.

## GENERAL

Pursuant to anti-money laundering laws and regulations with which the Company must comply in the UK and Guernsey, the Company (and its agents) may require evidence in connection with any application for Placing Shares, including further identification of the applicant(s), before any Placing Shares are issued.

In the event that there are any significant changes affecting any of the matters described in this Offering Memorandum or where any significant new matters have arisen after the publication of this Offering Memorandum, the Company will publish a notice to investors. Such notice will give details of the significant change(s) or the significant new matter(s). In the event that the Company is required to publish any notice, applicants who have applied for Placing Shares shall have at least two clear business days following the publication of the relevant notice within which to withdraw their offer to subscribe for Placing Shares in its entirety. The right to withdraw an application to subscribe for Placing Shares in these circumstances will be available to all investors in the Placing. If the application is not withdrawn within the time limits set out in the relevant notice, any application for Placing Shares will remain valid and binding.

The Directors may, in their absolute discretion, waive the minimum application amounts in respect of any particular application for Placing Shares under the Placing.

Should the Placing be aborted or fail to complete for any reason, monies received will be returned without interest at the risk of the applicant to the bank account from which the money was received forthwith following such abort or failure, as the case may be.

## CLEARING AND SETTLEMENT

Payment for the Placing Shares should be made in accordance with settlement instructions to be provided to Placees by or on behalf of the Company. To the extent that any application for Placing Shares is rejected in whole or in part (whether by scaling back or otherwise), monies received will be returned without interest at the risk of the applicant.

## PURCHASE AND TRANSFER RESTRICTIONS

This Offering Memorandum does not constitute an offer to sell, or the solicitation of an offer to acquire or subscribe for, Placing Shares in any jurisdiction where such an offer or solicitation is unlawful or would impose any unfulfilled registration, qualification, publication or approval requirements on the Company.

The Company has elected to impose the restrictions described below on the Placing and on the future trading of the Placing Shares so that the Company will not be required to register the offer and sale of the Placing Shares under the U.S. Securities Act, so that the Company will not have an obligation to register as an investment company under the U.S. Investment Company Act and related rules and to address certain ERISA, U.S. Tax Code and other considerations. The Company and its agents will not be obligated to recognise any resale or other transfer of the Placing Shares made other than in compliance with the restrictions described below.

### *Restrictions due to lack of registration under the U.S. Securities Act and U.S. Investment Company Act*

The Placing Shares have not been and will not be registered under the U.S. Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States and the Placing Shares may not be offered, sold, exercised, resold, transferred or delivered, directly or indirectly, within the United States or to, or for the account or benefit of, U.S. Persons, except pursuant to an exemption from, or in a transaction not subject to, the registration requirements of the U.S. Securities Act and in compliance with any applicable securities laws of any state or other jurisdiction in the United States. There will be no public offer of the Placing Shares in the United States.

Subject to certain exceptions as described herein, the Placing is only being made outside the United States to non-U.S. Persons in reliance on Regulation S under the U.S. Securities Act.

In addition, except with the express written consent of the Company given in respect of an investment in the Company, the Placing Shares may not be acquired by (i) investors using assets of (A) an "employee benefit plan" as defined in section 3(3) of ERISA that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the U.S. Code, including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Code; or (C) an entity which is deemed to hold the assets of any of the foregoing types of plans, accounts or arrangements that is subject to Title I of ERISA or Section 4975 of the U.S. Code; or (ii) a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Code, unless its purchase, holding, and disposition of the Placing Shares will not constitute or result in a non-exempt violation of any such substantially similar law.

### *Subscriber and Shareholder warranties*

By participating in the Placing, each subscriber acknowledges and agrees that it will (for itself and any person(s) procured by it to subscribe for Shares and any nominee(s) for any such person(s)) be further deemed to represent and warrant to the Company that:

(a)     if it is located outside the United States, it is not a U.S. Person, it is acquiring the Shares in an offshore transaction meeting the requirements of Regulation S and it is not acquiring the Shares for the account or benefit of a U.S. Person;

(b)     if it is located inside the United States or is a U.S. Person, it is an Eligible U.S. Investor and has received, read, understood and, prior to its receipt of any Shares pursuant to the Placing, returned an executed a U.S. Investor Letter to the Company;

(c)     it acknowledges that the Shares have not been and will not be registered under the U.S. Securities Act or with any securities regulatory authority of any state or other jurisdiction of the United States and may not be offered or sold in the United States or to, or for the account or benefit of, U.S. Persons absent registration or an exemption from registration under the U.S. Securities Act;

(d)     it acknowledges that the Company has not registered under the U.S. Investment Company Act and that the Company has put in place restrictions for transactions not involving any public offering in the United States, and to ensure that the Company is not and will not be required to register under the U.S. Investment Company Act;

(e)     unless the Company expressly consents in writing otherwise, no portion of the assets used to purchase, and no portion of the assets used to hold, the Shares or any beneficial interest therein constitutes or will constitute the assets of (i) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to Title I of ERISA; (ii) a "plan" as defined in Section 4975 of the U.S. Code, including an individual retirement account

or other arrangement that is subject to Section 4975 of the U.S. Code; or (iii) an entity which is deemed to hold the assets of any of the foregoing types of plans, accounts or arrangements that is subject to Title I of ERISA or Section 4975 of the U.S. Code. In addition, if an investor is a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Code, its purchase, holding, and disposition of the Shares must not constitute or result in a non-exempt violation of any such substantially similar law;

(f)     that if any Shares offered and sold are issued in certificated form, then such certificates evidencing ownership will contain a legend substantially to the following effect unless otherwise determined by the Company in accordance with applicable law:

"THE COMPANY HAS NOT BEEN REGISTERED UNDER THE UNITED STATES INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "INVESTMENT COMPANY ACT") AND THE SECURITY EVIDENCED HEREBY HAS NOT BEEN REGISTERED UNDER THE UNITED STATES SECURITIES ACT OF 1933, AS AMENDED (THE "SECURITIES ACT"), AND MAY NOT BE OFFERED, SOLD, PLEDGED OR OTHERWISE TRANSFERRED EXCEPT (A) OUTSIDE THE UNITED STATES TO A NON-US PERSON (AS DEFINED IN RULE 902 OF REGULATION S, "US PERSON") THAT IS NOT A US RESIDENT FOR THE PURPOSES OF THE INVESTMENT COMPANY ACT (A "US RESIDENT") IN ACCORDANCE WITH RULE 903 OR 904 OF REGULATION S UNDER THE SECURITIES ACT (AND NOT IN A PRE- ARRANGED TRANSACTION RESULTING IN THE RESALE OF SUCH SECURITY INTO THE UNITED STATES) OR (B) PURSUANT TO AN EXEMPTION FROM REGISTRATION UNDER THE SECURITIES ACT AND UNDER CIRCUMSTANCES WHICH WILL NOT REQUIRE THE COMPANY TO REGISTER UNDER THE INVESTMENT COMPANY ACT (PROVIDED THAT, IF SUCH TRANSFER PURSUANT TO THIS CLAUSE (B) IS TO A US PERSON OR A US RESIDENT, THE PURCHASER IS A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT) AND, IN EACH CASE IN ACCORDANCE WITH ANY APPLICABLE SECURITIES LAWS OF THE STATES OF THE UNITED STATES AND OTHER JURISDICTIONS. THE HOLDER OF THIS SECURITY AGREES THAT IT WILL COMPLY WITH THE FOREGOING RESTRICTIONS. NO REPRESENTATION CAN BE MADE AS TO THE AVAILABILITY OF ANY EXEMPTION UNDER THE SECURITIES ACT FOR RESALES OF THE SECURITY.

THE HOLDER ACKNOWLEDGES THAT THE COMPANY RESERVES THE RIGHT PRIOR TO ANY SALE OR OTHER TRANSFER TO REQUIRE THE DELIVERY OF SUCH CERTIFICATIONS, LEGAL OPINIONS AND OTHER INFORMATION AS THE COMPANY MAY REASONABLY REQUIRE TO CONFIRM THAT THE PROPOSED SALE OR OTHER TRANSFER COMPLIES WITH THE FOREGOING RESTRICTIONS.

IF A BENEFICIAL OWNER OF THIS SECURITY WHO IS REQUIRED TO BE A QUALIFIED PURCHASER WITHIN THE MEANING OF SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT IS AT ANY TIME NOT SUCH A QUALIFIED PURCHASER, THE COMPANY MAY (A) REQUIRE SUCH BENEFICIAL OWNER TO SELL THIS SECURITY TO A PERSON WHO IS NOT A US PERSON OR A US RESIDENT OR WHO IS A US PERSON WHO IS ALSO A QUALIFIED PURCHASER AND WHO IS OTHERWISE QUALIFIED TO PURCHASE SUCH SECURITY IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT OR (B) SELL THIS SECURITY ON BEHALF OF THE BENEFICIAL OWNER AT THE BEST PRICE REASONABLY OBTAINABLE TO A PERSON WHO IS NOT A US PERSON OR WHO IS A US PERSON OR A US RESIDENT WHO IS ALSO A QUALIFIED PURCHASER AND WHO IS OTHERWISE QUALIFIED TO PURCHASE SUCH SECURITY IN A TRANSACTION EXEMPT FROM REGISTRATION UNDER THE SECURITIES ACT.

THE HOLDER OF THIS SECURITY IS DEEMED TO HAVE ACKNOWLEDGED THAT THIS LEGEND WILL NOT BE REMOVED FROM THIS SECURITY FOR AS LONG AS THE COMPANY RELIES ON SECTION 3(c)(7) OF THE INVESTMENT COMPANY ACT";

(g)      if in the future the investor decides to offer, sell, transfer, assign or otherwise dispose of the Shares, it will do so only in compliance with an exemption from the registration requirements of the U.S. Securities Act and under circumstances which will not require the Company to register under the U.S. Investment Company Act.  It acknowledges that any sale, transfer, assignment, pledge or other disposal made other than in compliance with such laws and the above stated restrictions will be subject to the compulsory transfer provisions as provided in the Articles;

(h)      if in the future it decides to offer, resell, pledge or otherwise transfer any of the Shares, such Shares may be offered, resold, pledged or otherwise transferred only (A) outside the United States to persons not known to be U.S. Persons in an offshore transaction in accordance with Rule 904 of Regulation S under the U.S. Securities Act, (B) in a transaction that does not require registration under the U.S. Securities Act or any applicable United States securities laws and regulations or require the Company to register under the U.S. Investment Company Act, subject to, if requested by the Company, delivery of an opinion of counsel of recognised standing in form and substance reasonably satisfactory to the Company, or (C) to the Company;

(i)      it is purchasing the Shares for its own account or for one or more investment accounts for which it is acting as a fiduciary or agent, in each case for investment only, and not with a view to or for sale or other transfer in connection with any distribution of the Shares in any manner that would violate the U.S. Securities Act, the U.S. Investment Company Act or any other applicable securities laws;

(j)      it acknowledges that the Company reserves the right to make inquiries of any holder of the Shares or interests therein at any time as to such person's status under the U.S. federal securities laws and to require any such person that has not satisfied the Company that holding by such person will not violate or require registration under the U.S. securities laws to transfer such Shares or interests in accordance with the Articles;

(k)      it acknowledges and understands that the Company is required to comply with FATCA and that the Company will follow FATCA's extensive reporting and withholding requirements.  The subscriber agrees to furnish any information and documents the Company may from time to time request, including but not limited to information required under FATCA;

(l)      it is entitled to acquire the Shares under the laws of all relevant jurisdictions which apply to it, it has fully observed all such laws and obtained all governmental and other consents which may be required thereunder and complied with all necessary formalities and it has paid all issue, transfer or other taxes due in connection with its acceptance in any jurisdiction of the Shares and that it has not taken any action, or omitted to take any action, which may result in the Company or its directors, officers, agents, employees and advisers being in breach of the laws of any jurisdiction in connection with the Placing or its acceptance of participation in the Placing;

(m)      it has received, carefully read and understands this Offering Memorandum, and has not, directly or indirectly, distributed, forwarded, transferred or otherwise transmitted this Offering Memorandum or any other presentation or offering materials concerning the Shares to within the United States or to any U.S. Persons, nor will it do any of the foregoing; and

(n)      if it is acquiring any Shares as a fiduciary or agent for one or more accounts, the investor has sole investment discretion with respect to each such account and full power and authority to make such foregoing representations, warranties, acknowledgements and agreements on behalf of each such account.

The Company and its directors, officers, agents, employees, advisers and others will rely upon the truth and accuracy of the foregoing representations, warranties, acknowledgments and agreements.

If any of the representations, warranties, acknowledgments or agreements made by the investor are no longer accurate or have not been complied with, the investor will immediately notify the Company.

# TAXATION

## GENERAL

The information below, which relates only to Guernsey and UK taxation, summarises the advice received by the Board and is applicable to the Company (except insofar as express reference is made to the treatment of other persons) to persons who are resident or ordinarily resident in Guernsey or the United Kingdom for taxation purposes and who hold Placing Shares as an investment. It is based on current Guernsey and UK tax law and published practice, respectively, which law or practice is, in principle, subject to any subsequent changes therein (potentially with retrospective effect). Certain Shareholders, such as dealers in securities, collective investment schemes, insurance companies and persons acquiring their Placing Shares in connection with their employment may be taxed differently and are not considered. The tax consequences for each Shareholder of investing in the Company may depend upon the Shareholder's own tax position and upon the relevant laws of any jurisdiction to which the Shareholder is subject.

**If you are in any doubt about your tax position, you should consult your professional adviser.**

## GUERNSEY

The Directors intend to conduct the Company's affairs such that, based on current law and practice of the relevant tax authorities, the Company will not become resident for tax purposes in any other territory other than Guernsey.

### The Company

The Company has been granted tax exempt status by the Director of Income Tax in Guernsey pursuant to the Income Tax (Exempt Bodies) (Guernsey) Ordinance, 1989. The Company will need to reapply annually for exempt status, an application that currently incurs a fee of £1,200 per annum. It is expected that the Company will continue to apply for exempt status annually.

Once exempt status has been granted, the Company is not considered resident in Guernsey for Guernsey income tax purposes and will be exempt from tax in Guernsey on both bank deposit interest and any income that does not have its source in Guernsey. It is not anticipated that any income other than bank deposit interest will arise in Guernsey and therefore the Company is not expected to incur any additional liability to Guernsey tax.

### Shareholders

Non-Guernsey resident Shareholders will not be subject to any income tax in Guernsey in respect of or in connection with the acquisition, holding or disposal of any shares owned by them. Such Shareholders will receive dividends without deduction of Guernsey income tax.

Any Shareholders who are resident in Guernsey will be subject to Guernsey income tax on any dividends paid to such persons but will not suffer any deduction of tax by the Company from any such dividends payable where the Company is granted tax exempt status. The Company is however required to provide the Director of Income Tax the names, addresses and gross amount of any income paid to Guernsey resident shareholders during the previous year when renewing the Company's exempt tax status each year.

At present Guernsey does not levy taxes upon capital gains, capital transfer, wealth, sales or turnover (unless the varying of investments and turning of such investments to account is a business or part of a business), nor are there any estate duties save for registration fees and an ad valorem duty for a Guernsey grant of representation where the deceased dies leaving assets in Guernsey which require presentation of such a grant. No stamp duty is chargeable in Guernsey on the issue, transfer, switching or redemption of Shares in the Company.

### FATCA

The US Hiring Incentives to Restore Employment Act resulted in the introduction of legislation in the US known as the Foreign Account Tax Compliance Act (**FATCA**) which has the effect that a 30 per cent withholding tax may be imposed on payments of US source income and certain payments of proceeds from the sale of property that could give rise to US source income unless there is compliance with requirements for the Company to report on an annual basis the identity of, and certain other information about, direct and indirect US investors in the Company to the relevant

- 70 -

Guernsey authority for onward transmission to the US Internal Revenue Service (**IRS**). An investor that fails to provide the required information to the Company may be subject to the 30 per cent withholding tax with respect to its share of any such payments directly or indirectly attributable to US investments of the Company, and the Company might be required to terminate such investor's investment in the Company.

On 13 December 2013 an intergovernmental agreement was entered into between Guernsey and the US in respect of FATCA (the **IGA**), which agreement was enacted into Guernsey law as of 30 June 2014 by the Income Tax (Approved International Agreements) (Implementation) (United Kingdom and United States of America) Regulations, 2014. Guidance notes currently in draft form have been issued by the relevant Guernsey authority to provide practical assistance on the reporting obligations of affected businesses under the IGA.

Although the Company will attempt to satisfy any obligations imposed on it to avoid the imposition of such withholding tax, no assurance can be given that the Company will be able to satisfy these obligations. If the Company becomes subject to a withholding tax as a result of FATCA, the return of all Shareholders may be materially affected.

**This summary of Guernsey taxation issues can only provide a general overview of this area and it is not a description of all the tax considerations that may be relevant to a decision to invest in the Company. The summary of certain Guernsey tax issues is based on the laws and regulations in force as of the date of this document and may be subject to any changes in Guernsey law occurring after such date. Legal advice should be taken with regard to individual circumstances. Any person who is in any doubt as to his tax position or where he is resident, or otherwise subject to taxation, in a jurisdiction other than Guernsey, should consult his professional adviser.**

## UNITED KINGDOM

The following statements are intended as a general guide to certain UK tax considerations relating to an investment in Shares and do not purport to be a complete analysis of all potential UK tax consequences of holding Shares. They are based on current UK legislation and current published practice of HMRC, which may change, possibly with retroactive effect. Except insofar as express reference is made to the treatment of non-UK tax residents and non-UK domiciled individuals, they apply only to Shareholders who are resident and domiciled (in the case of individuals) or resident (in the case of companies) for tax purposes in (and only in) the UK, who hold their Shares as an investment (other than under an individual savings account) and who are the absolute beneficial owners of both the Shares and any dividends paid on them. The statements are not addressed to Shareholders who hold Shares in connection with a trade, profession or vocation carried on in the UK through a branch or agency (or, in the case of a corporate Shareholder, in connection with a trade in the UK carried on through a permanent establishment or otherwise). The tax position of certain categories of Shareholders who are subject to special rules (such as persons acquiring their Shares in connection with employment, dealers in securities, insurance companies and collective investment schemes) is not considered.

### *Taxation of the Company*

As the Company is an alternative investment fund for the purpose of the Alternative Investment Fund Managers Regulations 2013, it should not be considered to be UK resident for UK tax purposes. Accordingly, and provided that the Company does not carry on a trade in the UK through a permanent establishment situated therein for UK corporation tax purposes or through a branch or agency situated in the UK which would bring it within the charge to income tax, the Company will not be subject to UK corporation tax or income tax on income and capital gains arising to it save as noted below in relation to possible withholding tax on certain UK source income. The Directors intend that the affairs of the Company are conducted so that no such permanent establishment, branch or agency will arise insofar as this is within their control, but it cannot be guaranteed that the conditions necessary to prevent any such permanent establishment, branch or agency coming into being will at all times be satisfied.

Interest and other income received by the Company which has a UK source may be subject to withholding taxes in the UK.

### Disposals of Shares

Each class of Shares will constitute a relevant interest in an "offshore fund" for the purposes of UK taxation. Under the UK's offshore fund legislation, any gain arising on the sale, redemption or other disposal of shares in an offshore

fund (which may include an in specie redemption by the Company) held by persons who are resident in the UK for tax purposes will be taxed at the time of such sale, disposal or redemption as income and not as a capital gain. This does not apply, however, where the relevant offshore fund is accepted by HMRC as a "reporting fund" throughout the period during which the relevant interests were held.

It is not currently intended that the Company will apply for reporting fund status under the offshore funds regime in respect of any Shares. Accordingly, Shareholders who are resident in the UK for taxation purposes may be liable to UK income taxation in respect of gains arising from the sale, redemption or other disposal of their Shares. Such gains may remain taxable notwithstanding any general or specific UK capital gains tax exemption or allowance available to a Shareholder and may result in certain Shareholders incurring a proportionately greater UK taxation charge. Any losses arising on the disposal of Shares by Shareholders who are resident in the UK will be eligible for capital gains loss relief. The Directors may launch one or more classes of Shares in future certified by HMRC as reporting funds for the purposes of UK taxation.

### Dividends

Any dividends received by UK resident individual Shareholders (or deemed to be received in the case of any future class of Shares with reporting fund status) will generally be subject to UK income tax whether or not such distributions are reinvested.

Dividends received by a UK resident Shareholder (or deemed to be received in the case of any future class of Shares with reporting fund status) within the charge to corporation tax should be exempt from tax in respect of dividends paid by the Company, although it should be noted that this exemption is subject to certain exclusions and specific anti-avoidance rules (particularly in the case of "small companies", as defined in section 931S of the Corporation Tax Act 2009 ("CTA 2009")).

### Other UK taxation considerations

The attention of non-corporate Shareholders who are resident in the UK is drawn to the provisions of Chapter 2 of Part 13 of the UK Income Tax Act 2007. These provisions are aimed at preventing the avoidance of income tax by individuals through transactions resulting in the transfer of assets or income to persons (including companies) resident or domiciled abroad and may render them liable for income tax in respect of undistributed income and profits of the Company. This legislation will, however, not apply if such a Shareholder can satisfy HMRC that either:

(i)     it would not be reasonable to draw the conclusion from all the circumstances of the case, that the purpose of avoiding liability to taxation was the purpose, or one of the purposes, for which the relevant transactions or any of them were effected;

(ii)    all the relevant transactions are genuine commercial transactions and it would not be reasonable to draw the conclusion, from all the circumstances of the case, that any one or more of the transactions was more than incidentally designed for the purpose of avoiding liability to taxation; or

(iii)   all the relevant transactions were genuine, arm's length transactions and if the Shareholder were liable to tax under Chapter 2 of Part 13 in respect of such transactions such liability would constitute an unjustified and disproportionate restriction on a freedom protected by Title II or IV of Part Three of the Treaty on the Functioning of the European Union or Part II or III of the EEA Agreement.

Chapter 3 of Part 6 of the CTA 2009 provides that, if at any time in an accounting period a corporate Shareholder within the charge to UK corporation tax holds an interest in an offshore fund and there is a time in that period when that fund fails to satisfy the "non-qualifying investments test", the interest held by such a corporate Shareholder will be treated for the accounting period as if it were rights under a creditor relationship for the purposes of the rules relating to the taxation of most corporate debt contained in the CTA 2009 (the "Corporate Debt Regime"). Shares will (as explained above) constitute interests in an offshore fund and, on the basis of the current investment policies of the Company, it is likely that the "non-qualifying investments test" will not be met. In circumstances where the test is not so satisfied (for example where the Company invests in cash, securities or debt instruments or open-ended companies that themselves do not satisfy the "non-qualifying investments test" and the market value of such investments exceeds

- 72 -

60 per cent. of the market value of all its investments at any time), the Shares in the relevant class will be treated for corporation tax purposes as within the Corporate Debt Regime. As a consequence, all returns on the Shares in respect of each corporate Shareholder's accounting period during which the test is not met (including gains, profits and deficits and exchange gains and losses) will be taxed or relieved as an income receipt or expense on a fair value accounting basis. Accordingly, a corporate Shareholder in the Company may, depending on its own circumstances, incur a charge to corporation tax on an unrealised increase in the value of its holding of Shares (and, likewise, obtain relief against corporation tax for an unrealised reduction in the value of its holding of Shares). The provisions relating to non-reporting funds (outlined above) would not then apply to such corporate shareholders and the effect of the provisions relating to holdings in controlled foreign companies (outlined below) would then be substantially mitigated.

Part 9A of TIOPA 2010 subjects UK resident companies to tax on the profits of companies not so resident (such as the Company) in which they have an interest. The provisions, broadly, affect UK resident companies which hold, alone or together with certain other associated persons, shares which confer a right to at least 25 per cent. of the profits of a non-resident company (a "25% Interest") where that non-resident company is controlled by persons who are resident in the UK and is subject to a lower level of taxation in its territory of residence. The legislation is not directed towards the taxation of capital gains. In addition, these provisions will not apply if the shareholder reasonably believes that it does not hold a 25% Interest in the Company throughout the relevant accounting period.

The attention of persons resident in the UK for taxation purposes is drawn to the provisions of section 13 of the Taxation of Chargeable Gains Act 1992 ("section 13"). Section 13 applies to a "participator" for UK taxation purposes (which term includes a shareholder) if at any time when any gain accrues to the Company which constitutes a chargeable gain for those purposes, at the same time, the Company is itself controlled by a sufficiently small number of persons so as to render the Company a body corporate that would, were it to have been resident in the UK for taxation purposes, be a "close" company for those purposes. The provisions of section 13 could, if applied, result in any such person who is a "participator" in the Company being treated for the purposes of UK taxation of chargeable gains as if a part of any chargeable gain accruing to the Company had accrued to that person directly, that part being equal to the proportion of the gain that corresponds on a just and reasonable basis to that person's proportionate interest in the Company as a "participator". No liability under section 13 could be incurred by such a person however, where such proportion does not exceed one quarter of the gain. In addition, exemptions may also apply where none of the acquisition, holding or disposal of the assets had a tax avoidance main purpose or where the relevant gains arise on the disposal of assets used only for the purposes of genuine, economically significant business activities carried on outside the UK.

In the case of UK resident individuals domiciled outside the UK, section 13 applies only to gains relating to UK situate assets of the Company and gains relating to non-UK situate assets if such gains are remitted to the UK.

### *Stamp duty and stamp duty reserve tax*

No UK stamp duty or stamp duty reserve tax will be payable on an issue of Shares. UK stamp duty at the rate of 0.5% of the value of the consideration for the transfer of any Shares (rounded up where necessary to the nearest £5) may become payable on any instrument of transfer of the Shares which is executed within the UK, or which relates to any property situated, or to any matter or thing done or to be done, in the UK. Provided, as is the intention, that the Shares are not registered in any register kept in the UK by or on behalf of the Company and are not paired with shares issued by a body corporate incorporated in the UK, any agreement to transfer the Shares will not be subject to stamp duty reserve tax.

### *Inheritance tax*

A liability to UK inheritance tax on Shares may arise in the event of the death of or on the making of certain categories of lifetime transfers by an individual Shareholder domiciled or deemed to be domiciled in the UK for inheritance tax purposes.

### *The Common Reporting Standard*

Drawing extensively on the intergovernmental approach to implementing US FATCA, the OECD developed the Common Reporting Standard ("CRS") to address the issue of offshore tax evasion on a global basis. Aimed at maximizing efficiency and reducing cost for financial institutions, the CRS provides a common standard for due

- 73 -

diligence, reporting and exchange of financial account information. Pursuant to the CRS, tax authorities in participating CRS jurisdictions will obtain from reporting financial institutions, and automatically exchange with other participating tax authorities in which the Shareholders of the reporting financial institution are resident on an annual basis, financial account and personal information with respect to all reportable accounts identified by financial institutions on the basis of common due diligence and reporting procedures. The first information exchanges are expected to begin in September 2017. Guernsey has legislated to implement the CRS. As a result, the Company will be required to comply with the CRS due diligence and reporting requirements, as adopted by Guernsey. Shareholders may be required to provide additional information to the Company to enable the Company to satisfy its obligations under the CRS. Failure to provide requested information may subject a Shareholder to liability for any resulting penalties or other charges and/or mandatory termination of its interest in the Company.

If you are in any doubt as to your tax position, you should consult your professional adviser.

### SHAREHOLDERS OF THE COMPANY

So far as the Company is aware, as at November 15 2017 (being the latest practicable date prior to publication of this document) CLO Holdco, Ltd. is the sole Shareholder and holds directly or indirectly 5% or more of the Company's voting rights.

Immediately following the Placing the following persons will hold directly or indirectly the following percentages of the Company's voting rights:

| Name | Immediately prior to the Placing | | Immediately following the Placing | |
|------|---------------------|----------------------------------|------------------|-------------------------------|
| | Number of Shares | % of voting rights in respect of the issued share capital | Number of Shares | % of voting rights in respect of the issued share capital |
| CLO Holdco, Ltd. | 143,454,001.00 | 100.00% | 70,314,387.44 | 49.02% |
| HarbourVest Dover Street IX Investment L.P. | 0.00 | 0.00% | 50,917,791.20 | 35.49% |
| HarbourVest 2017 Global Fund L.P. | 0.00 | 0.00% | 3,478,649.09 | 2.42% |
| HarbourVest 2017 Global AIF L.P. | 0.00 | 0.00% | 6,957,226.48 | 4.85% |
| HV International VIII Secondary L.P. | 0.00 | 0.00% | 9,317,699.94 | 6.50% |
| HarbourVest Skew Base AIF L.P. | 0.00 | 0.00% | 1,034,136.77 | 0.72% |
| Highland Capital Management, L.P. | 0.00 | 0.00% | 898,708.98 | 0.63% |
| Lee Blackwell Parker, III | 0.00 | 0.00% | 94,173.23 | 0.07% |
| Quest IRA, Inc., fbo Lee B. Parker III, Acct. # 3058311 | 0.00 | 0.00% | 58,798.51 | 0.04% |
| Quest IRA, Inc., fbo Hunter Covitz, Acct. # 1469811 | 0.00 | 0.00% | 239,018.34 | 0.17% |
| Quest IRA, Inc., fbo Jon Poglitsch, Acct. # 1470612 | 0.00 | 0.00% | 95,607.34 | 0.07% |
| Quest IRA, Inc., fbo Neil Desai, Acct. # 3059211 | 0.00 | 0.00% | 47,803.67 | 0.03% |

———————————

Save as set out above in this section of this Offering Memorandum, the Company is not aware of any person who holds, or who will immediately following the Placing hold, as shareholder directly or indirectly, 5% or more of the voting rights of the Company.

None of the Shareholders referred to in the table set forth in above has voting rights which differ from those of any other Shareholder in respect of any Shares held by them.

Save as set out in this above in this section of this Offering Memorandum, the Company is not aware of any person who immediately following the Placing directly or indirectly, jointly or severally, will own sufficient shares to exercise control over the Company.

## ADDITIONAL INFORMATION ON THE COMPANY

### INCORPORATION AND ADMINISTRATION

The Company is a registered closed-ended investment company incorporated in Guernsey with limited liability on 30 March 2015 under the provisions of the Companies Law, with registered number 60120. The Company continues to be registered and domiciled in Guernsey. The registered office and principal place of business of the Company is First Floor, Dorey Court, Admiral Park, St Peter Port, Guernsey GY1 6HJ, Channel Islands (telephone number 01481 715601). The statutory records of the Company are kept at this address. The Company operates and issues shares in accordance with the Companies Law and ordinances and regulations made thereunder and has no employees. The Company shall have an unlimited life.

The Company is regulated by the GFSC and is not regulated by any regulator other than the GFSC.

The Company's accounting period will end on 31 December, of each year, with the first year end on 31 December 2015.

PricewaterhouseCoopers CI LLP of Royal Bank Place, 1 Glategny Esplanade, St Peter Port, Guernsey GY1 4ND has been the only Auditors of the Company since incorporation. PricewaterhouseCoopers CI LLP is a member of the Institute of Chartered Accountants of England & Wales. The Shareholders have the power, under the Companies Law, to appoint the auditor at each AGM or remove the auditor by ordinary resolution.

The annual report and accounts will be prepared according to GAAP.

Save for its entry into the material contracts summarised in "—*Material Contracts*" of this section of this Offering Memorandum and certain non-material contracts, since its incorporation the Company has not incurred borrowings, issued any debt securities, incurred any contingent liabilities or made any guarantees, nor granted any charges or mortgages.

Save as set out in "*Share Capital*" below, there have been no changes to the issued share capital of the Company since incorporation.

### SHARE CAPITAL

On incorporation, the share capital of the Company consisted of one ordinary share of no par value. The Placing Shares will be issued in the form of participating ordinary shares having the rights set out in the Articles. Shareholders have no right to have their Shares redeemed.

As at the date of this Offering Memorandum, the Company's issued and fully paid up share capital is 143,454,001 shares of no par value.

None of the Shareholders has voting rights attaching to Shares that they hold which are different to the voting rights attached to any other Shares of the same class in the Company.

As at the date of this Offering Memorandum, the memorandum of incorporation provides that there is no limit on the number of shares of any class which the Company is authorised to issue.

The Directors have absolute authority under the Articles to allot the Shares to be issued pursuant to the Placing and are expected to do so shortly prior to the Placing.

No share or loan capital of the Company is under option or has been agreed, conditionally or unconditionally, to be put under option.

### DIRECTORS' AND OTHER INTERESTS

As at the date of this Offering Memorandum, none of the Directors or any person connected with any of the Directors has a Shareholding or any other interest in the share capital of the Company. The Directors and their connected persons may, however, subscribe for Shares pursuant to the Placing.

- 76 -

The Directors are not aware of any person or persons who, following the Placing, will or could, directly or indirectly, jointly or severally, exercise control over the Company and there are no arrangements known to the Directors the operation of which may subsequently result in change of control of the Company, other than as disclosed above in "Shareholders of the Company" on page 75 of this Offering Memorandum.

There are no outstanding loans from the Company to any of the Directors or any outstanding guarantees provided by the Company in respect of any obligation of any of the Directors.

The aggregate remuneration and benefits in kind of the Directors in respect of the Company's accounting period ending on 31 December 2017, which will be payable out of the assets of the Company, is not expected to exceed £150,000. No amount has been set aside or accrued by the Company to provide pension, retirement or other similar benefits.

No Director has a service contract with the Company, nor are any such contracts proposed. The Directors have been appointed through letters of appointment which can be terminated in accordance with the Articles and without compensation. The notice period specified in the Articles for the removal of Directors is one month. The Articles provide that the office of Director shall be terminated by, among other things: (i) written resignation; (ii) unauthorised absences from board meetings for 12 months or more; (iii) written request of the other Directors; and (iv) an ordinary resolution.

None of the Directors has, or has had, an interest in any transaction which is or was unusual in its nature or conditions or significant to the business of the Company and which has been effected by the Company since its incorporation.

In addition to their directorships of the Company, the Directors hold or have held the directorships and are or were members of the partnerships, as listed in the table below, over or within the past five years.

| Name | Current directorships/partnerships | Past directorships/partnerships |
|---|---|---|
| **William Scott** | Aberdeen Global Infrastructure GP Limited (name changed from Lloyds Bank Global Infrastructure GP Limited 15 May 2014) | BMS Specialist Debt Fund Limited (applied for voluntary strike-off 29 September 2014) |
| | Aberdeen Global Infrastructure GP II Limited | Cinven Capital Management (G3) Limited |
| | Aberdeen Infrastructure Finance GP Limited (name changed from Uberior Infrastructure Finance GP Limited 7 August 2014) | FCA Catalyst Fund SPC (formerly FCM Catalyst Fund SPC) |
| | Aberdeen Infrastructure Spain Co-Invest II GP Limited | FCA Catalyst Master Fund SPC (formerly FCM Catalyst Master Fund SPC) |
| | Absolute Alpha Fund PCC Limited | FCA Trading SPC (formerly FCM Trading SPC) |
| | AcenciA Debt Strategies Limited | Financial Risk Management Diversified Fund Limited |
| | AHL Strategies PCC Limited | Financial Risk Management Matrio Fund Limited |
| | Axiom European Financial Debt Fund Limited | Financial Ventures Limited |
| | Cinven Capital Management (V) General Partner Limited | FRM Access II Fund SPC |
| | Cinven Capital Management (VI) General Partner Limited | FRM Customised Diversified Fund Limited |
| | Cinven Capital Management (G4) Limited | FRM Diversified II Fund SPC |
| | Cinven Limited | FRM Diversified II Master Fund Limited |
| | Class N AHL 2.5XL Trading Limited | FRM Diversified III Fund PCC Limited |
| | Class P Global Futures EUR Trading Limited | FRM Diversified III Master Fund Limited |
| | Hanseatic Asset Management LBG | FRM Equity Alpha Limited |

- 77 -

| | |
|---|---|
| Highland CLO Funding, Ltd. | FRM Credit Strategies Fund PCC Limited |
| KCSB Properties Limited | FRM Credit Strategies Master Fund PCC Limited |
| MAN AHL Diversified PCC Limited | FRM Global Diversified Fund |
| Pershing Square Holdings Limited | FRM Phoenix Fund Limited (name changed from FRM Financials Limited 10 June 2008) |
| Sandbourne Asset Management Limited (name changed from Sandbourne Asset Management Guernsey Limited 26 June 2015) | FRM Sigma Fund Limited |
| Sandbourne PCC Limited | FRM Strategic Fund PCC Limited |
| Savile AD4 Limited | FRM Strategic Master Fund Limited |
| Savile AD7 Limited | FRM Tail Hedge Limited |
| Savile AD8 Limited | FRM Thames Fund General Partner 1 Limited |
| Savile AD9 Limited | Invista European Real Estate Trust SICAF |
| SPL Guernsey ICC Limited (formerly Arch Guernsey ICC Limited) | Land Race Limited |
| The Flight and Partners Recovery Fund Limited | OldCo Limited ( name changed from Axiom European Financial Debt Limited 25 September 2015) |
| 30 St. Mary Axe Management Limited Partnership Incorporated | Principia TR-S 40 Ltd |
| | Property Income & Growth Fund Limited |
| | PSource Structured Debt Fund Limited |
| | PSource Structured Debt SPV II Inc |
| | Sandbourne Fund |
| | Savile AD2 Limited |
| | Savile ANG1 Limited |
| | Savile APG1 Limited |
| | Savile APG3 Limited |
| | Savile Durham 1 Limited |
| | Savile Exeter 1 Limited |
| | Savile ML1 Limited |
| | Secured Real Estate Finance Limited (dormant after unsatisfactory fundraising) |
| | TBH Guernsey Limited |
| | Threadneedle Asset Backed Income Limited (dormant after unsatisfactory fundraising) |
| | UCAP Investment Management Fund PCC Limited (name changed from Uttrup Investment Management Fund PCC Limited 7 February 14) |
| | UCAP Investment Management Limited (name changed from Uttrup Investment Management Limited 7 February 14) |
| | WyeTree RMBS Opportunities Fund Limited (name changed from WyeTree Opportunities |

- 78 -

241

Fund Limited 29 May 2014)

| Name | Current directorships/partnerships | Past directorships/partnerships |
| --- | --- | --- |
| **Heather Bestwick** | Andium Homes Limited | Jersey Finance Limited |
| | Deutsche International Corporate Services Limited | Walkers Limited |
| | Equiom (Jersey) Limited | Walkers Capital Markets Limited |
| | Highland CLO Funding, Ltd. | Walkers Pension Services (Jersey) Limited |
| | Equiom (Guernsey) Limited | Walkers Property Services (Jersey) Limited |
| | Sole Shipping SO II GP Limited | Homelink (Jersey) Limited |
| | Sole Shipping SO Adviser Limited | Altamas Resources Limited |
| | EPE Special Opportunities plc | BSREP Marina Village (Jersey) Limited |
| | | Altair Partners Limited |
| | | Cyan Blue Topco Limited |
| | | Century Limited |
| | | Fundamental Global Corporate Secured Loan Fund Limited |
| | | AEP 2003 Limited |
| | | AEP 2008 Limited |
| | | AEP 2012 Limited |
| | | Invision Capital Partners IV Limited |
| | | Invision IV Co-invest General Partner Limited |
| | | Invision Capital Partners V Limited |
| | | Triton Advisers Limited |
| | | GCP Infrastructure OEIC Limited |
| | | Equiom Trust Company (CI) Limited |
| | | Rokos Capital Management (GP) Limited |
| | | Rokos Intermediate (Jersey) Limited |

As at the date of this Offering Memorandum, there are no potential conflicts of interest between any duties to the Company of any of the Directors and their private interests and/or other duties. There are no lock up provisions regarding the disposal by any of the Directors of any Shares.

Save as set out in immediately following paragraph below, as at the date of this Offering Memorandum:

(a) none of the Directors has had any convictions in relation to fraudulent offences for at least the previous five years;

(b) save as detailed above, none of the Directors was a director of a company, a member of an administrative, management or supervisory body or a senior manager of a company within the previous five years which has entered into any bankruptcy, receivership or liquidation proceedings;

(c) none of the Directors has been subject to any official public incrimination and/or sanctions by statutory or regulatory authorities (including designated professional bodies) or has been

- 79 -

disqualified by a court from acting as a member of the administrative, management or supervisory bodies of an issuer or from acting in the management or conduct of the affairs of any issuer for at least the previous five years; and

(d)     none of the Directors are aware of any contract or arrangement subsisting in which they are materially interested and which is significant to the business of the Company which is not otherwise disclosed in this Offering Memorandum.

In respect of the declaration in the immediately preceding paragraph above, certain of the Directors have been directors of entities which have been dissolved. To the best of each Director's knowledge, no such entity, upon its dissolution, was insolvent or owed any amounts to creditors.

The Company maintains directors' and officers' liability insurance on behalf of the Directors at the expense of the Company.

No employees of the Administrator have any service contracts with the Company.

## MATERIAL CONTRACTS

The following are all of the contracts, not being contracts entered into in the ordinary course of business, that have been entered into by the Company since its incorporation and are, or may be, material or that contain any provision under which the Company has any obligation or entitlement which is or may be material to it as at the date of this Offering Memorandum.

### *Administration Agreement*

An administration agreement dated 10 August 2015 between (i) the Company and (ii) the Administrator, whereby the Administrator was appointed to act as administrator of the Company and provide related administrative, compliance and treasury services (the "**Administration Agreement**").

Under the terms of the Administration Agreement, the Administrator is entitled to an annual administration fee of up to 7 bps per annum of the Net Asset Value of the Company per annum, payable monthly in arrears, and other miscellaneous fees and expenses reimbursed, in each case, as determined in the Administration Agreement.

The Administration Agreement may be terminated by either party on not less than three months written notice (or such shorter notice as the parties may agree). The Administration Agreement may be terminated immediately by either party: (i) in the event that either party shall go into liquidation or receivership or an examiner shall be appointed to the Company (except for a voluntary liquidation for the purposes of reconstruction or amalgamation upon terms previously approved in writing by the notifying party, such approval not to be unreasonably withheld or delayed) or be unable to pay its debts as they fall due or commits any act of bankruptcy under the laws of an applicable jurisdiction; or (ii) if the other party commits any material breach of the provisions of the Administration Agreement and, if such breach is capable of remedy shall not have remedied that within 30 days after the service of written notice requiring it to be remedied; (iii) if it shall become illegal or impossible without breach of any applicable laws and for reasons reasonably outside the control of the relevant party for any party to fulfil its obligations hereunder; or (iv) if any changes to the Administration Agreement are required as a consequence of any financial services regulation which may in the future bind any of the parties thereto and which cannot be agreed between the parties. The appointment of the Administrator shall also automatically terminate forthwith if the Administrator shall become or be deemed to become resident for tax purposes in the United Kingdom or in any other place or places outside Guernsey in circumstances which cause the Company to become liable to pay any taxes which it would not otherwise be liable to pay.

The Company has given certain market standard indemnities in favour of the Administrator in respect of the Administrator's potential losses in carrying out its responsibilities under the Administration Agreement.

The Administration Agreement is governed by the laws of Guernsey.

*Portfolio Management Agreement*

A Portfolio Management Agreement dated November 15, 2017 between (i) the Company and (ii) the Portfolio Manager (the "**Portfolio Management Agreement**"), pursuant to which the Company appointed the Portfolio Manager to select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support and assistance (including back and middle office functions), personnel and credit and market research and analysis in connection with the investment and ongoing management of the portfolio.

The Portfolio Management Agreement may be terminated in the event of (A) the Company determining in good faith that the Company or the portfolio has become required to register as an investment company under the provisions of the Investment Company Act (where there is no available exemption), and the Company has given prior notice to the Portfolio Manager of such requirement, (B) the date on which the portfolio has been liquidated in full and the Company's financing arrangements have been terminated or redeemed in full and (C) such other date as agreed between the Company and the Portfolio Manager.

In addition, the Portfolio Management Agreement may be terminated, and the Portfolio Manager removed for "Cause" by the Advisory Board or by the Board of Directors upon 30 business days' prior written notice to the Portfolio Manager.

As defined in the Portfolio Management Agreement, "Cause" means any one of the following events: (a) the Portfolio Manager wilfully violates, or takes any action that it knows breaches any material provision of the Portfolio Management Agreement or the Offering Memorandum applicable to it in bad faith (not including a wilful and intentional breach that results from a good faith dispute regarding reasonable alternative courses of action or interpretation of instructions); (b) the Portfolio Manager breaches in any respect any provision of the Portfolio Management Agreement or any terms of the Offering Memorandum applicable to it (other than as covered by clause (a) and except for any such violations or breaches that have not had, or could not, either individually or in the aggregate, reasonably be expected to have, a material adverse effect on the Company) and fails to cure such breach within 30 days of the Portfolio Manager receiving notice of such breach, unless, if such breach is remediable, the Portfolio Manager has taken action that the Portfolio Manager believes in good faith will remedy such breach, and such action does remedy such breach, within sixty (60) days after the Portfolio Manager receives notice thereof; (c) the Portfolio Manager is wound up or dissolved or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer; or the Portfolio Manager (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of, or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Portfolio Manager or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Portfolio Manager and continue undismissed for sixty (60) days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Portfolio Manager without such authorization, application or consent and are approved as properly instituted and remain undismissed for sixty (60) days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for sixty (60) days; (d) the occurrence of an act by the Portfolio Manager that constitutes fraud or criminal activity in the performance of its obligations under the Portfolio Management Agreement (as determined pursuant to a final adjudication by a court of competent jurisdiction), or the Portfolio Manager being indicted for a criminal offense materially related to its business of providing asset management services; or (e) any Key Person of the Portfolio Manager (in the performance of his or her investment management duties) is convicted for a criminal offense materially related to the business of the Portfolio Manager providing asset management services and continues to have responsibility for the performance by the Portfolio Manager hereunder for a period of ten (10) days after such conviction.

The Portfolio Management Agreement provides that if any of the events specified in the definition of "Cause" occurs, the Portfolio Manager will give prompt written notice thereof to the Company upon the Portfolio Manager's becoming aware of the occurrence of such event. The Advisory Board and/or the Board of Directors may waive any event

- 81 -

described in (a), (b), (d), or (e) above as a basis for termination of the Portfolio Management Agreement and removal of the Portfolio Manager under the terms of the Portfolio Management Agreement.

Any resignation or removal of the Portfolio Manager will only be effective on the satisfaction of certain conditions set out in the Portfolio Management Agreement.

Under the Portfolio Management Agreement, the Portfolio Manager agrees to perform its obligations thereunder, with reasonable care (a) using a degree of skill and attention no less than that which the Portfolio Manager exercises with respect to comparable assets that it manages for itself and others having similar investment objectives and restrictions, and (b) to the extent not inconsistent with the foregoing, in a manner consistent with the Portfolio Manager's customary standards, policies and procedures in performing its duties under the Portfolio Management Agreement (the "**Standard of Care**"); provided that the Portfolio Manager will not be liable for any loss or damages resulting from any failure to satisfy the Standard of Care except to the extent any act or omission of the Portfolio Manager constitutes a Portfolio Manager Breach (as defined below). The Standard of Care may change from time to time to reflect changes by the Portfolio Manager to its customary standards, policies and procedures provided that such customary standards, policies and procedures are at least as rigorous as the foregoing.

The Portfolio Manager will not be liable (whether directly or indirectly, in contract or in tort or otherwise) to the Company under the Portfolio Management Agreement for liabilities incurred by the Company as a result of or arising out of or in connection with the performance by the Portfolio Manager under the Portfolio Management Agreement, or for any losses or damages resulting from any failure to satisfy the Standard of Care except to the extent such liabilities were incurred by reason of acts or omissions constituting bad faith, fraud, wilful misconduct or due to the gross negligence (with such term given its meaning under New York law) or reckless disregard of the duties and obligations of the Portfolio Manager (a "**Portfolio Manager Breach**").

Under the Portfolio Management Agreement, the Company will be required to indemnify the Portfolio Manager and its affiliates, managers, directors, officers, secretaries, partners, agents and employees, from and against all liabilities incurred in connection with the Portfolio Management Agreement (except to the extent such liabilities are incurred as a result of any acts or omissions of the Portfolio Manager which constitute a Portfolio Manager Breach).

The Portfolio Manager is able to resign its role under the Portfolio Management Agreement upon 90 days' written notice to the Company. Whilst the resignation will not be effective until the date as of which a successor adviser has been appointed, it may be difficult to locate an alternative adviser as a successor. In addition, the Portfolio Manager may immediately resign by providing written notice to the Company upon the occurrence of certain events relating to the Company such as, amongst others, the failure of the Company to comply in any material respect with any investment policy or investment objective to which it is bound to comply, a wilful breach or knowing violation by the Company of a material provision of the Portfolio Management Agreement or the occurrence of insolvency proceedings in respect of the Company.

Under the Portfolio Management Agreement, the Portfolio Manager agrees to the provision of certain human resources as may be necessary to enable the Company to conduct any matters related to its portfolio of assets.

Under the Portfolio Management Agreement, the Company shall pay to the Portfolio Manager an amount equivalent to all reasonable third party costs and expenses incurred by the Portfolio Manager in the performance of its obligations thereunder, together with any irrecoverable VAT arising on such costs and expenses.

The Portfolio Management Agreement is governed by the laws of the State of Texas.

### *Predecessor and Interim Portfolio Management Agreements and Terminations*

Prior to the current Portfolio Management Agreement, the Company held a Portfolio Management Agreement dated 22 December 2016 (the "**Predecessor Portfolio Management Agreement**") between (i) the Company and (ii) Acis as the predecessor portfolio manager (the "**Predecessor Portfolio Manager**"), pursuant to which the Company appointed Acis as the Predecessor Portfolio Manager to select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support and assistance (including back and middle office functions), personnel and credit and market research and analysis in connection with the investment and ongoing management of the portfolio.

- 82 -

245

The terms of the Predecessor Portfolio Management Agreement were substantially similar to the terms of the Portfolio Management Agreement.

The Predecessor Portfolio Management Agreement was governed by the laws of the State of Texas.

The Predecessor Portfolio Management Agreement was terminated pursuant to a Portfolio Management Agreement dated October 27, 2017 (the "**Interim Portfolio Management Agreement**") between (i) the Company and (ii) the Portfolio Manager and agreed and acknowledged by the Predecessor Portfolio Manager, pursuant to which the Company appointed Highland HCF as the Portfolio Manager to select the portfolio of investments and instruct the Custodian with respect to any acquisition, disposition or sale of investments and provide certain support and assistance (including back and middle office functions), personnel and credit and market research and analysis in connection with the investment and ongoing management of the portfolio. Pursuant to the Interim Portfolio Management Agreement, (x) the Predecessor Portfolio Management Agreement was cancelled and terminated in its entirety, (y) each party thereto released the other party from all claims, suits or causes of action arising out of or relating to the Predecessor Portfolio Management Agreement and (z) each party ratified prior transactions effected in accordance with the Predecessor Portfolio Management Agreement.

The terms of the Interim Portfolio Management Agreement were substantially similar to the terms of the Portfolio Management Agreement.

The Interim Portfolio Management Agreement was terminated pursuant to the Portfolio Management Agreement. Pursuant to the Interim Portfolio Management Agreement, (x) the Predecessor Portfolio Management Agreement was cancelled and terminated in its entirety and (y) each party ratified prior transactions effected in accordance with the Interim Portfolio Management Agreement.

The Interim Portfolio Management Agreement was governed by the laws of the State of Texas.

### Subscription and Transfer Agreement

A Subscription and Transfer Agreement dated November 15, 2017 (the "**Subscription and Transfer Agreement**") entered into by and among the Company, the Portfolio Manager, CLO Holdco, Ltd., HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., Highland Capital Management, L.P., Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker, III, Acct., Quest IRA, Inc., fbo Hunter Covitz, Acct., Quest IRA, Inc., fbo Jon Poglitsch, Acct. and Quest IRA, Inc., fbo Neil Desai, Acct., pursuant to which CLO Holdco, Ltd., as the existing Shareholder, agrees to transfer a portion of its shares to the new Shareholders listed above.

Under the Subscription and Transfer Agreement, CLO Holdco, Ltd. agreed to provide an indemnity to the new Shareholders relating to certain liabilities arising prior to the date of the transfer of Shares.

Further, each of the Shareholders subscribed to purchase Shares on a pro rata basis pursuant to commitments under the Subscription and Transfer Agreement, to be called for settlement by the Portfolio Manager from time to time during the Investment Period and at such time issued (including in the form of fractional shares).

The Subscription and Transfer Agreement may be terminated by mutual agreement of the parties.

The Subscription and Transfer Agreement is governed by the laws of Guernsey.

### Members' *Agreement*

A Shareholders' Agreement relating to the Company dated November 15, 2017 (the "**Shareholder's Agreement**"), among CLO HoldCo, Ltd., HarbourVest Dover Street IX Investment L.P., HarbourVest 2017 Global AIF L.P., HarbourVest 2017 Global Fund L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., Highland Capital Management, L.P., Lee Blackwell Parker, III, Quest IRA, Inc., fbo Lee B. Parker, III, Acct., Quest IRA, Inc., fbo Hunter Covitz, Acct., Quest IRA, Inc., fbo Jon Poglitsch, Acct., Quest IRA, Inc., fbo Neil Desai, Acct., the Company and the Portfolio Manager, which contemplates certain agreements of commercial terms among the Shareholders with respect to the formation of an Advisory Board, voting matters and the Shareholders' commitments to settle subscriptions for the Placing Shares.

Pursuant to the Shareholders' Agreement, the Shareholders set forth their rights in respect of the Company with respect to their voting rights, the composition and function of the Advisory Board, provisions with respect to Shareholders defaulting on commitments to settle Shares, indemnification and restrictions on the transfers or disposals of Shares.

The Shareholders' Agreement will be terminated when one party holds all the Shares, when a resolution is passed by the Shareholders or creditors of the Company or with the written consent of the parties.

The Shareholders' Agreement is governed by the laws of Guernsey.

### NexBank Credit Facility

The Company currently has the NexBank Credit Facility with a principal amount of $22,158,337, as of September 30, 2017. The NexBank Credit Facility is governed by an Amended and Restated Loan Agreement dated as of 17 January 2017 that provides for quarterly payments of principal and interest at 5.00% *per annum* and a maturity on November 23, 2021.

### Warehouse Loan Facilities

One or more multi-currency Warehouse Loan Facilities may be entered into from time to time between (i) the Company and (ii) a warehouse provider as described in "*Summary-Borrowing-Warehouse Loan Facilities*".

### Forward Purchase Agreements

Forward Purchase Agreements may be entered into from time to time, between (i) the Company and (ii) a CLO (each, a "**Forward Purchase Agreement**"), pursuant to which the Company may from time to time enter into sale and purchase contracts with a CLO with respect to the assets of the Company ("**Forward Sales**"). Such Forward Sales are with a view to effectively managing its access to wholesale funding and exposure to undesireable market price volatilities of its portfolio. Such Forward Purchase Agreements may be entered into at the same time or shortly after the origination or acquisition of the relevant asset by the Company, at a later date, or not at all. Where a loan becomes subject to a Forward Purchase Agreement, the Company will (subject to the conditions set out below) neither receive the gain nor bear the loss that occurs between the date when the loan is added to the Forward Purchase Agreement and the date when the transfer occurs.

Each Forward Sale will be conditional upon:

- the occurrence of the closing date of the relevant CLO; and

- the assets that are the subject of such Forward Sale satisfying a set of eligibility criteria on the closing date of the relevant CLO as agreed between the Company and the relevant CLO.

The Forward Purchase Agreements will contain standard limited recourse and non-petition provisions with respect to the Company and with respect to the relevant CLO.

The governing law of the Forward Purchase Agreements will be English or New York law.

### Custody Agreement

A custody agreement dated 10 August 2015 between (i) the Company and (ii) the Custodian (the "**Custody Agreement**"), whereby the Custodian was appointed to act as custodian of the Company's investments, cash and other assets.

The Custodian provides custody services in respect of such of the property of the Company which is delivered to and accepted by the Custodian as and when such custody services may be required. Securities are held by the Custodian in one or more accounts registered in the name of the Company or of the Custodian, its delegate or a nominee. The securities are separately designated in the books of the Custodian as belonging to the Company.

Under the terms of the Custody Agreement, the Custodian is entitled to receive transaction charges and sub-custodian charges will be recovered by the Custodian from the Company as they are incurred by the relevant sub-custodian. All such charges shall be charged at normal commercial rates.

The Custody Agreement shall continue for an initial period of six months and thereafter may be terminated by either of the parties hereto on giving ninety (90) days' prior written notice to the other party hereto, provided that the appointment of the Custodian shall not terminate before the appointment of a replacement Custodian provided always if a replacement custodian is not appointed within six months from the date of the relevant termination notice, the Custody Agreement shall terminate in any event. It may be terminated without notice in certain specified circumstances including the insolvency of either party.

The Custodian has a market standard indemnity from the Company in relation to liabilities incurred other than as a result of its negligence, fraud, bad faith, wilful default or recklessness in carrying out its responsibilities under the Custody Agreement.

The Custody Agreement is governed by the laws of Ireland.

## MEMORANDUM AND ARTICLES

### Memorandum of Incorporation

The Memorandum of Incorporation provides that the Company's objects are unrestricted and it shall therefore have the full power and authority to carry out any object not prohibited by the Companies Law, or any other law of Guernsey.

### Articles of Incorporation

The Articles of Incorporation of the Company contain provisions, *inter alia*, to the following effect.

### *Share Capital*

The Company may issue an unlimited number of Shares of no par value each, including Unclassified Shares which may be designated and issued as Ordinary Shares or otherwise as the Directors may from time to time determine.

#### *Ordinary Shares*

The rights attaching to the Ordinary Shares shall be as follows:

(a)    As to income – subject to the rights of any Ordinary Shares which may be issued with special rights or privileges, the Ordinary Shares of each class carry the right to receive all income of the Company attributable to the Ordinary Shares, and to participate in any distribution of such income by the Company, pro rata to the relative Net Asset Values of each of the classes of Ordinary Shares and, within each such class, income shall be divided *pari passu* amongst the holders of Ordinary Shares of that class in proportion to the number of Ordinary Shares of such class held by them.

(b)    As to capital – on a winding up of the Company or other return of capital (other than by way of a repurchase or redemption of Ordinary Shares in accordance with the provision of the Articles and the Companies Law), the surplus assets of the Company attributable to the Ordinary Shares remaining after payment of all creditors shall, subject to the rights of any Ordinary Shares that may be issued with special rights or privileges, be divided amongst the holders of Ordinary Shares of each class pro rata to the relative Net Asset Values of each of the classes of the Ordinary Shares and, within each such class, such assets shall be divided *pari passu* amongst the holders of Ordinary Shares of that class in proportion to the number of Ordinary Shares of that class held by them.

(c)    As to voting – the holders of the Ordinary Shares shall be entitled to receive notice of and to attend, speak  and vote at general meetings of the Company.

- 85 -

*General*

Without prejudice to any special rights previously conferred on the holders of any existing Shares or class of Shares, any Share (or option, warrant or other right in respect of a Share) in the Company may be issued with such preferred, deferred or other special rights or restrictions, whether as to dividend, voting, return of capital or otherwise, as the Board may determine.

**Offers to Shareholders to be on a pre-emptive basis**

(a) The Company shall not allot equity securities to a person on any terms unless:

    (i) it has made an offer to each person who holds equity securities of the same class in the Company to allot to him on the same or more favourable terms a proportion of those securities that is as nearly as practicable equal to the proportion in number held by him of the share capital of the Company; and

    (ii) the period during which any such offer may be accepted has expired or the Company has received notice of the acceptance or refusal of every offer so made.

(b) Securities that the Company has offered to allot to a holder of equity securities in accordance with the preceding may be allotted to him, or anyone in whose favour he has renounced his right to their allotment, without contravening the restriction referred to in above.

(c) Shares held by the Company as treasury shares shall be disregarded for the purposes of the restriction referred to in the second preceding paragraph, so that the Company is not treated as a person who holds equity shares; and the treasury shares are not treated as forming part of the equity share capital of the Company.

(d) Any offer required to be made by the Company pursuant to the restriction referred to above should be made by a notice (given in accordance with "—*Notices*" below) and such offer must state a period during which such offer may be accepted and such offer shall not be withdrawn before the end of that period. Such period must be a period of at least 21 days beginning on the date on which such offer is deemed to be delivered or received (as the case may be), pursuant to "—*Notices*" below.

(e) The restriction referred to above shall not apply in relation to the allotment of bonus shares, nor to a particular allotment of equity securities if these are, or are to be, wholly or partly paid otherwise than in cash.

(f) The Company may by special resolution resolve that the restriction referred to above shall be excluded or that the restriction referred to in above shall apply with such modifications as may be specified in the resolution:

    (i) generally in relation to the allotment by the Company of equity securities;

    (ii) in relation to allotments of a particular description; or

    (iii) in relation to a specified allotment of equity securities;

and any such resolution must: (A) state the maximum number of equity securities in respect of which the restriction referred to above is excluded or modified; and (B) specify the date on which such exclusion or modifications will expire, which must be not more than five years from the date on which the resolution is passed.

(g) Any resolution passed pursuant to the provisions referred to in the preceding paragraph may:

    (i) be renewed or further renewed by special resolution of the Company for a further period not exceeding five years; and

- 86 -

(ii)      be revoked or varied at any time by special resolution of the Company.

(h)      Notwithstanding that any such resolution referred to in the two preceding paragraphs has expired, the Directors may allot equity securities in pursuance of an offer or agreement previously made by the Company if the resolution enabled the Company to make an offer or agreement that would or might require equity securities to be allotted after it expired.

(i)      In relation to an offer to allot securities, a reference (however expressed) to the holder of shares of any description is to whoever was the holder of shares of that description at the close of business on a date to be specified in the offer and the specified date must fall within the period of 28 days immediately before the date of the offer.

### Issue of Shares

Subject to "—*Offers to Shareholders to be on a pre-emptive basis*", the unissued Shares shall be at the disposal of the Board, which is authorised to allot or grant options, warrants or other rights over or otherwise dispose of them to such persons on such terms and conditions and at such times as the Board determines but so that no Share shall be issued at a discount except in accordance with the Companies Law and so that the amount payable on application on each Share shall be fixed by the Board.

### Variation of class rights

If at any time the share capital is divided into different classes of Shares, the rights attached to any class (unless otherwise provided by the terms of issue) may, whether or not the Company is being wound up, be varied with the consent in writing of the holders of three-fourths of the issued Shares of that class or with the sanction of a special resolution of the holders of the Shares of that class.

### Winding up

The term of the Placing will commence on the date of the Placing and will end (and the Company thereafter will be wound up and dissolved) at the end of the Term, subject to extension as described in "*Summary-Term*".

If the Company is wound up whether voluntarily or otherwise the liquidator may with the sanction of a special resolution divide among the Shareholders in specie any part of the assets of the Company and may with the like sanction vest any part of the assets of the Company in trustees upon such trusts for the benefit of the Shareholders as the liquidator with the like sanction shall think fit.

If any of the securities or other assets to be divided as aforesaid involve a liability to calls or otherwise any person entitled under such division to any of the said assets may within fourteen (14) clear days after the passing of the special resolution, by notice in writing, direct the liquidator to sell his proportion and pay him the net proceeds and the liquidator shall, if practicable, act accordingly.

### Disclosure of Third Party Interests in Shares

The Directors shall have power, if required for any regulatory purposes, by notice in writing to require any Shareholder to disclose to the Company the identity of any person (other than the Shareholder) who has an interest in the Shares held by the Shareholder and the nature of such interest.  Any such notice shall require any information in response to such notice to be given in writing within the prescribed period which is 28 days after service of the notice or 14 days if the Shares concerned represent 0.25 per cent or more in value of the issued Shares of the relevant class or such other reasonable period as the Directors may determine.  If any Shareholder has been duly served with such a notice and is in default for the prescribed period in supplying to the Company the information required by such notice, the Directors may serve a direction notice upon such Shareholder. The direction notice may direct that in respect of the Shares in respect of which the default has occurred (the "default Shares") and any other Shares held by the Shareholder, the Shareholder shall not be entitled to vote (either personally or by representative or by proxy) in general meetings or class meetings.  Where the default Shares represent at least 0.25 per cent of the class of Shares concerned, the direction notice may additionally direct that dividends on such shares will be retained by the Company (without interest) and

- 87 -

that no transfer of the Shares (other than a transfer approved under the Articles) shall be registered until the default is rectified.

### *Dividends*

Subject to compliance with Section 304 of the Companies Law and the Distribution Priority, the Board may at any time declare and pay such dividends as appear to be justified by the position of the Company. The Board may also declare and pay any fixed dividend which is payable on any Shares half-yearly or otherwise on fixed dates whenever the position, in the opinion of the Board, so justifies. Dividend payments may be suspended by the Directors in their absolute discretion, including, without limitation, in the event of adverse, or perceived adverse, market conditions.

The method of payment of dividends shall be at the discretion of the Board and the Portfolio Manager.

No dividend shall be paid in excess of the amounts permitted by the Companies Law or approved by the Board.

Unless and to the extent that the rights attached to any Shares or the terms of issue thereof otherwise provide, all dividends shall be declared and paid pro rata according to the number of Shares held by each Shareholder. For the avoidance of doubt, where there is more than one class of Shares in issue, dividends declared in respect of any class of Share shall be declared and paid pro rata according to the number of Shares of the relevant class held by each Shareholder.

With the sanction of the Company in general meeting by way of a special resolution, any dividend may be paid wholly or in part by the distribution of specific assets and, in particular, of paid-up Shares of the Company. Where any difficulty arises in regard to such distribution, the Board may settle the same as it thinks expedient and in particular may issue fractional Shares and fix the value for distribution of such specific assets and may determine that cash payments shall be made to any Shareholders upon the basis of the value so fixed in order to adjust the rights of Shareholders and may vest any such specific assets in trustees for the Shareholders entitled as may seem expedient to the Board.

Any dividend interest or other monies payable in cash in respect of Shares may be paid by cheque or warrant sent through the post to the registered address of the holder or, in the case of joint holders, to the registered address of that one of the joint holders who is first named on the register. Any one of two or more joint holders may give effectual receipts for any dividends, interest or other monies payable in respect of their joint holdings. In addition, any such dividend or other sum may be paid by any bank or other funds transfer system or such other means and to or through such person as the holder or joint holders (as the case may be) may in writing direct, and the Company shall have no responsibility for any sums lost or delayed in the course of any such transfer or where it has acted on any such directions. Any one of two or more joint holders may give effectual receipts for any dividends, interest, bonuses or other monies payable in respect of their joint holdings.

No dividend or other monies payable on or in respect of a Share shall bear interest against the Company.

All unclaimed dividends may be invested or otherwise made use of by the Board for the benefit of the Company until claimed and the Company shall not be constituted a trustee in respect thereof. All dividends unclaimed for a period of six years after having been declared shall be forfeited and shall revert to the Company.

### *Transfer of Shares*

No Shareholder shall sell, pledge, charge, mortgage, assign, assign by way of security, transfer, convey, exchange or otherwise dispose of its Shares or its commitment to settle purchases of Shares under the Subscription and Transfer Agreement (each a "**Transfer**", other than to an Affiliate of an initial Shareholder party hereto, without the prior written consent of the Portfolio Manager, which consent shall be in the sole discretion of the Portfolio Manager; provided that no such Transfer shall be made unless in the opinion of counsel reasonably satisfactory to the Portfolio Manager (who may be counsel for the Company, and which requirement for an opinion may be waived, in whole or in part, in the sole discretion of the Portfolio Manager) that:

- 88 -

(a) such Transfer would not require registration under the Securities Act or any state securities or "Blue Sky" laws or other laws applicable to the Shares to be assigned or transferred and is conducted in conformance with the restrictions set forth in this Offering Memorandum;

(b) such Transfer would not be reasonably likely to cause the Company to be subject to tax in any jurisdiction other than of its incorporation on a net income basis, not be reasonably likely to cause the Company to become subject to registration as an investment company under the U.S. Investment Company Act;

(c) such Transfer would not cause the Company to considered to be an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" in such entity pursuant to the U.S. Plan Assets Regulations; and

(d) such sale, assignment, disposition or transfer would not to cause all or any portion of the assets of the Company to constitute "plan assets" under ERISA or the U.S. Tax Code.

Prior to making any Transfer of Shares (other than Transfers to Affiliates of an initial Shareholder or, in the case of CLO Holdco or a Highland Principal (as defined in the Members' Agreement), to Highland, its Affiliates or another Highland Principal) a Shareholder must first offer to the other Shareholders a right to purchase the Shares, on a pro rata basis with respect to their current Shares, at the same price (which must be cash) as such Shares are proposed to be purchased by the prospective third party purchaser pursuant to an irrevocable offer letter. The other Shareholders will have 30 days following receipt of the letter to determine whether to purchase their entire pro rata portion of the Shares proposed to be Transferred. If the other Shareholders do not accept the offer, the Shareholder may (subject to complying with the other Transfer restrictions in the Articles) Transfer the applicable Shares that such Shareholders have not elected to purchase to a third party at a price equal to or greater than the price described in the offer letter, provided that if the Shareholder has not (a) entered into a definitive agreement to effect such sale within 90 days after the expiration of the period that the other Shareholders have to accept the offer in the offer letter or (b) consummated the sale within 120 day after the entry into the definitive agreement to consummate the sale, it must comply with these right of first refusal procedures again. Any Shareholder (other than the Shareholder proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to any other Shareholder (subject to complying with the other Transfer restrictions in the Articles), any initial Shareholder (other than the Shareholder proposing to Transfer its Shares) may assign its right to purchase its pro rata portion of the Shares to an Affiliate (subject to complying with the other Transfer restrictions in the Articles), and CLO Holdco or the Highland Principals (unless such Shareholder is the Shareholder proposing the Transfer its shares) may assign its right to purchase its pro rata portion of the Shares to Highland, an Affiliate of Highland or other Highland Principals (subject to complying with the other Transfer restrictions in the Articles).

Subject to the Articles and such of the restrictions of the Articles as may be applicable, any Shareholder may transfer all or any of his certificated Shares by an instrument of transfer in any usual or common form or in any other form which the Board may approve. The instrument of transfer of a certificated Share shall be signed by or on behalf of the transferor and, unless the Share is fully paid, by or on behalf of the transferee. An instrument of transfer of a certificated Share need not be under seal.

The Board may, in its absolute discretion and without giving a reason, decline to transfer, convert or register any transfer of any Share in certificated form which is not fully paid or on which the Company has a lien. The Directors may also refuse to register a transfer of Shares unless it is in respect of only one class of Shares, it is in favour of a single transferee or not more than four joint transferees; and in the case of a Share in certificated form, having been delivered for registration to the Office or such other place as the Board may decide, it is accompanied by the certificate(s) for the Shares to which it relates and such other evidence as the Board may reasonably require to prove the right of the transferor to make the transfer.

The Board may, in its absolute discretion, decline to register a transfer of any Shares to any person whose ownership may result in a person holding Shares in violation of the transfer restrictions published by the Company, from time to time.

The Directors may, in their absolute discretion, refuse to register a transfer of any Shares to a person that they have reason to believe is (i) an "employee benefit plan" (within the meaning of Section 3(3) of ERISA) that is subject to Part 4 of Title 1 of ERISA, (ii) a plan, individual retirement account or other arrangement that is subject to Section

4975 of the U.S. Internal Revenue Code of 1986, as amended (the "**U.S. Tax Code**") or any other state, local laws or regulations that would have the same effect as regulations promulgated under ERISA by the U.S. Department of Labor and codified at 29 C.F.R. Section 2510.3-101 to cause the underlying assets of the Company to be treated as assets of that investing entity by virtue of its investment (or any beneficial interest) in the Company and thereby subject the Company and the Portfolio Manager (or other persons responsible for the investment and operation of the Company's assets) to laws or regulations that are similar to the fiduciary responsibility or prohibited transaction provisions contained in Title I of ERISA or Section 4975 of the U.S. Tax Code, (iii) an entity whose underlying assets are considered to include "plan assets" of any such plan, account or arrangement (each of (i), (ii) and (iii) in this paragraph a "**Plan**") or (iv) any person in circumstances where the holding of Shares by such person would (a) give rise to an obligation on the Company to register as an "investment company" under the Investment Company Act (as defined in the Articles) (including because the holder of the Shares is not a "qualified purchaser" as defined in the Investment Company Act), (b) preclude the Company from relying on the exception to the definition of "investment company" contained in Section 3(c)(7) of the Investment Company Act, (c) give rise to an obligation on the Company to register its Shares under the Exchange Act, the Securities Act or any similar legislation (each as defined in the Articles), (d) result in the Company not being considered a "Foreign Private Issuer" as that term is defined by Rule 3b-4(c) promulgated under the Exchange Act, (e) give rise to an obligation on the Portfolio Manager to register as a commodity pool operator or commodity trading advisor under the U.S. Commodity Exchange Act of 1974, as amended, (f) cause the Company to be a "controlled foreign corporation" for the purposes of the U.S. Tax Code, or cause the Company to suffer any pecuniary disadvantage (including any excise tax, penalties or liabilities under ERISA or the U.S. Tax Code), or (g) give rise to the Company or the Portfolio Manager becoming subject to any U.S. law or regulation determined to be detrimental to it (each such person in this paragraph a "**Prohibited U.S. Person**"). Each person acquiring Shares shall by virtue of such acquisition be deemed to have represented to the Company that they are not a Prohibited U.S. Person.

If the Board refuses to register the transfer of a Share it shall, within two months after the date on which the transfer was lodged with the Company, send notice of the refusal to the transferee.

The registration of transfers may be suspended at such times and for such periods (not exceeding 30 days in the aggregate in any one calendar year) as the Board may decide on giving notice in *La Gazette Officielle* and either generally or in respect of a particular class of Share.

### Compulsory redemptions of Shares by the Company

The Company may redeem all or any of the Shares at any time subject to and in accordance with the provisions of the Members' Agreement and the Articles.

A Director is authorised to do all such acts and things as shall be necessary or expedient and to execute any documents deemed necessary or desirable in each case to complete any redemption of Shares subject to and in accordance with the Members' Agreement and the Articles.

The redemption of Shares under the Articles shall be deemed to be effective from the close of business on the relevant redemption date at which time any Shares which are so redeemed shall forthwith be cancelled and the name of the relevant Shareholder(s) be removed from the Register. Upon the redemption of a Share being effected pursuant to the Members' Agreement and the Articles, a Shareholder shall cease to be entitled to any rights in respect thereof save for payment of the redemption proceeds.

### Purchase of Shares

The Company may, at the discretion of the Board, purchase any of its own Shares, whether or not they are redeemable, and may pay the purchase price in respect of such purchase to the fullest extent permitted by the Companies Law.

### Notices

A notice or other communication may be given by the Company to any Shareholder by any means as set out in Section 523 of the Companies Law.

Any notice or other document, if served by post (including registered post, recorded delivery service or ordinary letter post), shall be deemed to have been served 48 hours after the time when the letter containing the same is posted and in proving such service it shall be sufficient to prove that the letter containing the notice or document was properly posted.

Any notice or other document that may be sent by the Company by courier will be deemed to be received 24 hours after the time at which it was despatched.

A notice may be given by the Company to the joint holders of a Share by giving the notice to the joint holder first named in the register in respect of the Share.

Any notice or other communication sent to the address of any Shareholder shall, notwithstanding the death, disability or insolvency of such Shareholder and whether the Company has notice thereof, be deemed to have been duly served in respect of any Share registered in the name of such Shareholder as sole or joint holder and such service shall, for all purposes, be deemed a sufficient service of such notice or document on all persons interested (whether jointly with or as claiming through or under him) in any such Share.

All Shareholders shall be deemed to have agreed to accept communication from the Company by electronic means in accordance with sections 524 and 526 and schedule 3 of the Companies Law unless a Shareholder notifies the Company otherwise. Such notification must be in writing and signed by the Shareholder and delivered to the Company's registered office or such other place as the Board directs. A Shareholder shall be entitled to require the Company to send him a version of a document or information in hard copy form.

Every person who becomes entitled to a Share shall be bound by any notice in respect of that Share which, before his name is entered in the register of members, has been duly given to a person from which he derives his title.

### General meetings

General meetings shall be held once at least in each calendar year in accordance with Section 199 of the Companies Law but so that not more than fifteen (15) months may elapse between one annual general meeting and the next. At each such annual general meeting shall be laid copies of the Company's most recent accounts, Directors' report and, if applicable, the auditor's report in accordance with Section 252 of the Companies Law. The requirement for an annual general meeting may be waived by the shareholders in accordance with Section 201 of the Companies Law. Other meetings of the Company shall be called extraordinary general meetings.

All general meetings shall be held in Guernsey.

A shareholder participating by video link or telephone conference call or other electronic or telephonic means of communication in a meeting at which a quorum is present shall be treated as having attended that meeting, provided that the shareholders present at the meeting can hear and speak to the participating shareholder.

A video link or telephone conference call or other electronic or telephonic means of communication in which a quorum of shareholders participates and all participants can hear and speak to each other shall be a valid meeting which shall be deemed to take place where the Chairman is present unless the shareholders resolve otherwise.

Any general meeting convened by the Board, unless its time shall have been fixed by the Company in a general meeting or unless convened in pursuance of a requisition, may be postponed by the Board by notice in writing and the meeting shall, subject to any further postponement or adjournment, be held at the postponed date for the purpose of transacting the business covered by the original notice.

The Board may, whenever it thinks fit, and shall on the requisition of shareholders who hold more than ten per cent (10%) of such of the capital of the Company as carries the right to vote at general meetings (excluding any capital held as treasury shares) in accordance with Sections 203 and 204 of the Companies Law, proceed to convene a general meeting.

*Notice of general meetings*

A general meeting of the Company (other than an adjourned meeting) must be called by notice of at least 14 clear days.

A general meeting may be called by shorter notice than otherwise required if all the Shareholders entitled to attend and vote so agree.

Notices and other documents may be sent in electronic form or published on a website in accordance with Section 208 of the Companies Law.

Notice of a general meeting of the Company must be sent to every Shareholder (being only persons registered as a Shareholder), every Director and every alternate Director registered as such.

Notice of a general meeting of the Company must state the time and date of the meeting, state the place of the meeting, specify any special business to be put to the meeting (as defined in the Articles), contain the information required under Section 178(6)(a) of the Companies Law in respect of a resolution which is to be proposed as a special resolution at the meeting, contain the information required under Section 179(6)(a) of the Companies Law in respect of a resolution which is to be proposed as a waiver resolution at the meeting, and contain the information required under Section 180(3)(a) of the Companies Law in respect of a resolution which is to be proposed as a unanimous resolution at the meeting.

Notice of a general meeting must state the general nature of the business to be dealt with at the meeting.

The accidental omission to give notice of any meeting to or the non-receipt of such notice by any Shareholder shall not invalidate any resolution or any proposed resolution otherwise duly approved.

*Conflicts of interest*

A Director must, immediately after becoming aware of the fact that he is interested in a transaction or proposed transaction with the Company, disclose to the Board in accordance with section 162 of the Companies Law the nature and extent of that interest.

The obligation referred to above does not apply if:

> (a)     the transaction or proposed transaction is between the Director and the Company; and

> (b)     the transaction or proposed transaction is or is to be entered into in the ordinary course of the Company's business and on usual terms and conditions.

A general disclosure to the Board to the effect that a Director has an interest (as director, officer, employee, member or otherwise) in a party and is to be regarded as interested in any transaction which may after the date of the disclosure be entered into with that party is sufficient disclosure of interest in relation to that transaction.

Nothing referred to above in this section applies in relation to:

> (a)     remuneration or other benefit given to a Director;

> (b)     insurance purchased or maintained for a Director in accordance with Section 158 of the Companies Law; or

> (c)     a qualifying third party indemnification provision provided for a Director in accordance with Section 159 of the Companies Law.

Subject to the paragraph below, a Director is interested in a transaction to which the Company is a party if such Director:

> (a)     is a party to, or may derive a material benefit from, the transaction;

- 92 -

(b)     has a material financial interest in another party to the transaction;

(c)     is a director, officer, employee or member of another party (other than a party which is an associated company) who may derive a material financial benefit from the transaction;

(d)     is the parent, child or spouse of another party who may derive a material financial benefit from the transaction; or

(e)     is otherwise directly or indirectly materially interested in the transaction.

A Director is not interested in a transaction to which the Company is a party if the transaction comprises only the giving by the Company of security to a third party which has no connection with the Director, at the request of the third party, in respect of a debt or obligation of the Company for which the Director or another person has personally assumed responsibility in whole or in part under a guarantee, indemnity or security.

Save as provided in the Articles, a Director shall not vote in respect of any contract or arrangement or any other proposal whatsoever in which he has any material interest otherwise than by virtue of his interest in Shares or debentures or other securities of or otherwise through the Company.  A Director may be counted in the quorum at a meeting in relation to any resolution on which he is debarred from voting.

A Director shall (in the absence of some other material interest than is indicated below) be entitled to vote (and be counted in the quorum) in respect of any resolution concerning any of the following matters, namely:

(a)     the giving of any guarantee, security or indemnity to him in respect of money lent or obligations incurred by him at the request of or for the benefit of the Company or any of its subsidiaries;

(b)     the giving of any guarantee, security or indemnity to a third party in respect of a debt or obligation of the Company or any of its subsidiaries for which he himself has assumed responsibility in whole or in part under a guarantee or indemnity or by the giving of security;

(c)     any proposal concerning an offer of Shares or debentures or other securities of or by the Company or any of its subsidiaries for subscription or purchase in which offer he is or is to be interested as a participant in the underwriting or sub-underwriting thereof; or

(d)     any proposal concerning any other company in which he is interested, directly or indirectly and whether as an officer or shareholder or otherwise howsoever, provided that he is not the holder of or beneficially interested in one per cent  or more of the issued shares of such company (or of any third company through which his interest is derived) or of the voting rights available to shareholders of the relevant company (any such interest being deemed for these purposes to be a material interest in all circumstances).

Where proposals are under consideration concerning the appointment (including fixing or varying the terms of appointment) of two or more Directors to offices or employment with the Company or any company in which the Company is interested, the Directors may be counted in the quorum for the consideration of such proposals and such proposals may be divided and considered in relation to each Director separately and in such case each of the Directors concerned (if not debarred from voting under the provisions referred to above) shall be entitled to vote (and be counted in the quorum) in respect of each resolution except that concerning his own appointment.

If any question shall arise at any meeting as to the materiality of a Director's interest or as to the entitlement of any Director to vote and such question is not resolved by his voluntarily agreeing to abstain from voting, such question shall be referred to the chairman of the meeting and his ruling in relation to any other Director shall be final and conclusive except in a case where the nature or extent of the interests of the Director concerned have not been fairly disclosed.

The Company may by ordinary resolution suspend or relax the provisions referred to above to any extent or ratify any transaction not duly authorised by reason of a contravention of any of the paragraphs above.

Subject to the provisions referred to above the Directors may exercise the voting power conferred by the shares in any other company held or owned by the Company or exercisable by them as directors of such other company in such manner in all respects as they think fit (including the exercise thereof in favour of any resolution appointing themselves or any of them director, managing director, managers or other officer of such company or voting or providing for the payment or remuneration to the directors, managing director, manager or other officer of such company).

A Director may hold any other office or place of profit under the Company (other than the office of Auditor) in conjunction with his office of Director on such terms as to tenure of office or otherwise as the Directors may determine.

Subject to due disclosure in accordance with the provisions referred to in this section, no Director or intending Director shall be disqualified by his office from contracting with the Company as vendor, purchaser or otherwise, nor shall any such contract or arrangement entered into by or on behalf of the Company in which any Director is in any way interested render the Director liable to account to the Company for any profit realised by any such contract or arrangement by reason of such Director holding that office or of the fiduciary relationship thereby established.

Any Director may act by himself or his firm in a professional capacity for the Company and he or his firm shall be entitled to remuneration for professional services as if he were not a Director, provided that nothing herein contained shall authorise a Director or his firm to act as Auditor to the Company.

Any Director may continue to be or become a director, managing director, manager or other officer or member of any company in which the Company may be interested and (unless otherwise agreed) no such Director shall be accountable for any remuneration or other benefits received by him as a director, managing director, manager or other officer or member of any such other company.

### Remuneration and appointment of Directors

The ordinary remuneration of the Directors who do not hold executive office for their services (excluding amounts payable under any other sub-paragraph of the Articles) shall not exceed in aggregate £150,000 per annum or such higher amount as the Company may from time to time by ordinary resolution determine. Such remuneration shall be deemed to accrue from day to day. The Directors shall also be paid all reasonable out-of-pocket travelling, hotel and other expenses properly incurred by them in attending and returning from meetings of the Directors or any committee of the Directors or general meetings of the Company or in connection with the business of the Company. In addition, the Board may award additional remuneration to any Director engaged in exceptional work at the request of the Board on a time spent basis.

The Board shall have power at any time to appoint any person eligible in accordance with Section 137 of the Companies Law to be a Director either to fill a casual vacancy or as an addition to the existing Directors but so that the total number of Directors shall not at any time exceed the number, if any, fixed pursuant to the Articles. Any Director so appointed shall hold office only until the next following annual general meeting and shall then be eligible for re-election. Without prejudice to the powers of the Board, the Company in general meeting may appoint any person to be a Director either to fill a casual vacancy or as an additional Director.

The Directors may at any time appoint one or more of their body (other than a Director resident in the United Kingdom) to the office of managing director for such term and at such remuneration and upon such terms as they determine.

### Disqualification of Directors

No person other than a Director retiring at a general meeting shall, unless recommended by the Directors, be eligible for election by the Company to the office of Director unless, not less than 14 clear days before the date appointed for the meeting there shall have been left at the Company's registered office notice in writing signed by a Shareholder duly qualified to attend and vote at the meeting for which such notice is given of his intention to propose such person for election together with notice in writing signed by that person of his willingness to be elected.

A Director shall cease to hold office: (i) if the Director (not being a person holding for a fixed term an executive office subject to termination if he ceases for any reason to be a Director) resigns his office by written notice signed by him sent to or deposited at the registered office of the Company, (ii) if he shall have absented himself from meetings of the Board for a consecutive period of 12 months and the Board resolves that his office shall be vacated, (iii) if he

- 94 -

dies or becomes of unsound mind or incapable, (iv) if he becomes insolvent, suspends payment or compounds with his creditors, (v) if he is requested to resign by written notice signed by all his co-Directors, (vi) if the Company in general meeting shall declare that he shall cease to be a Director, (vii) if he becomes resident in the United Kingdom and, as a result thereof, a majority of the Directors are resident in the United Kingdom, (viii) if he becomes ineligible to be a Director in accordance with section 137 of the Companies Law or (ix) if he becomes prohibited from being a Director by reason of any order made under any provisions or any law or enactment.

### Indemnities

The Directors, company secretary and officers of the Company and their respective heirs and executors shall, to the extent permitted by Section 157 of the Companies Law, be fully indemnified out of the assets and profits of the Company from and against all actions expenses and liabilities which they or their respective heirs or executors may incur by reason of any contract entered into or any act in or about the execution of their respective offices or trusts except such (if any) as they shall incur by or through their own negligence, default, breach of duty or breach of trust respectively and none of them shall be answerable for the acts, receipts, neglects or defaults of the others of them or for joining in any receipt for the sake of conformity or for any bankers or other person with whom any monies or assets of the Company may be lodged or deposited for safe custody or for any bankers or other persons into whose hands any money or assets of the Company may come or for any defects of title of the Company to any property purchased or for insufficiency or deficiency of or defect in title of the Company to any security upon which any monies of the Company shall be placed out or invested or for any loss misfortune or damage resulting from any such cause as aforesaid or which may happen in or about the execution of their respective offices or trusts, except if the same shall happen by or through their own negligence, default, breach of duty or breach of trust.

To the fullest extent permitted by applicable law (including the Companies Law) and subject to compliance with this Offering Memorandum, the Portfolio Manager, its affiliates, any officer, director, secretary, manager, employee or any direct or indirect partner, member, stockholder, agent or legal representative (including executors, guardians and trustees) of the Portfolio Manager and its affiliates, including persons formerly serving in such capacities, any person who serves at the request of the Portfolio Manager or the Board pursuant to the Articles, on behalf of the Company as an officer, director, secretary, manager, partner, member, employee, stockholder, agent or legal representative of any other person serving at the request of the Portfolio Manager or the Board pursuant to the Articles on behalf of the Company in such capacity as listed above, each member of the Advisory Board and each member of any subcommittee thereof and any assignees or successors of the foregoing (each, an "**Indemnified Person**") shall be fully indemnified against all losses, liabilities, damages, expenses or costs (including any claim, judgment, award, settlement, reasonable legal and other professional fees and disbursements and other costs or expenses incurred in connection with the defence of any proceeding, whether or not matured or unmatured or whether or not asserted or brought due to contractual or other restrictions, joint or several) other than those arising from suits, disputes or actions by Highland, its affiliates or principals, Other Accounts or CLO HoldCo, Ltd. (collectively, the "**Indemnified Losses**") to which an Indemnified Person may become subject by reason of any acts or omissions or any alleged acts or omissions arising out of such Indemnified Person's or any other person's activities in connection with the conduct of the business or affairs of the Company and/or an investment, unless such Indemnified Losses result from any action or omission which constitutes, with respect to such person, a Triggering Event; provided, that notwithstanding the foregoing, the members of the Advisory Board or members of any subcommittee thereof shall be subject only to a duty of good faith (it being understood that, to the fullest extent permitted by applicable law, any such member, in determining to take or refrain from taking any action, shall be permitted to take into consideration only the interests of the Shareholder and/or other person represented by such member and, in so doing, shall, to the fullest extent permitted by applicable law, be considered to have acted in good faith). Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

### Borrowing powers

Subject to the restrictions set forth in this Offering Memorandum, the Board may exercise all the powers of the Company to borrow money (in whatever currency the Board determines from time to time) and to mortgage, hypothecate, pledge or charge all or part of its undertaking property and uncalled capital and to issue debentures and other securities, whether outright or as collateral security for any liability or obligation of the Company or of any third party, subject to any limits on borrowings adopted by the Board from time to time. The Board may exercise all the

powers of the Company to engage in currency or interest rate hedging in the interests of efficient portfolio management.

***Forfeiture and surrender of Shares***

Any Share in respect of which a notice requiring payment of an unpaid call or instalment, together with any interest which may have accrued and any expenses which may have been incurred, has been served may, at any time before payment has been made, be forfeited by a resolution of the Directors to that effect. Such forfeiture shall include all dividends declared in respect of the forfeited Share and not actually paid before the forfeiture.

The Board may accept from any Shareholder on such terms as agreed a surrender of any Shares in respect of which there is a liability for calls. Any surrendered Share may be disposed of in the same manner as a forfeited share.

If any Shares are owned directly or beneficially by a person believed by the Directors to be a Prohibited U.S. Person, the Directors may give notice to such person requiring them either (i) to provide the Directors within 30 days of receipt of such notice with sufficient satisfactory documentary evidence to satisfy the Directors that such person is not a Prohibited U.S. Person or (ii) to sell or transfer their Shares to a person qualified to own the same within 30 days and within such 30 days to provide the Directors with satisfactory evidence of such sale or transfer. Where condition (i) or (ii) is not satisfied within 30 days after the serving of the notice, the person will be deemed, upon the expiration of such 30 days, to have forfeited their Shares.

## LITIGATION

There are no, and have not been in the last 12 months, any governmental, legal or arbitration proceedings, nor, so far as the Company is aware, are any such proceedings pending or threatened, which may have, or have in the recent past had, a significant effect on the Company's financial position or profitability.

## RELATED PARTY TRANSACTIONS

Other than as set out in the section of this Offering Memorandum entitled "*—Material Contracts*" (including the NexBank Credit Facility), "*Investment Policy—Company Borrowing*" and cross-transactions as described in "*Risk Factors—Risks Relating to Conflicts of Interest—The Company will be subject to various conflicts of interest involving the Portfolio Manager and its affiliates*" the Company has not entered into any related party transactions. The consent of the Advisory Board will be required with respect to transactions with any Related Party.

## GENERAL

Highland may be regarded as the promoter of the Company. Save as disclosed in this section of this Offering Memorandum, no amount or benefit has been paid, or given, to the promoter or any of its subsidiaries since the incorporation of the Company and none is intended to be paid, or given. Highland is a limited partnership, established under the laws of the State of Delaware in the U.S. with its registered office at 1209 Orange Street, in the City of Wilmington, County of New Castle, Delaware 19801.

The Net Placing Proceeds available for investment by the Company following the Placing will be approximately U.S. $153 million (less any amounts retained for working capital purposes) and these proceeds will be invested in accordance with the Company's investment policy described in the section of this Offering Memorandum entitled "*The Company*". Since incorporation, the Company has not commenced operations, and therefore has not generated earnings. As the Shares do not have a par value, the Placing Price consists solely of share premium.

None of the Shares available under the Placing are being underwritten.

Application will be made to the appropriate securities exchange for the Placing Shares to be admitted when deemed appropriate by the Company.

The Company does not own any premises and does not lease any premises.

**THIRD PARTY SOURCES**

Where third party information has been referenced in this Offering Memorandum, the source of that third party information has been disclosed.  Where information contained in this Offering Memorandum has been so sourced, the Company confirms that such information has been accurately reproduced and, as far as the Company is aware and able to ascertain from information published by such third parties, no facts have been omitted which would render the reproduced information inaccurate or misleading.

Highland has given and not withdrawn its written consent to the issue of this Offering Memorandum with references to its name in the form and context in which such references appear.  Highland accepts responsibility for information attributed to it in this Offering Memorandum and declares that, having taken all reasonable care to ensure that such is the case, the information attributed to it in this Offering Memorandum is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

Each of the Management Companies has given and, as at the date of this Offering Memorandum, has not withdrawn its written consent to the issue of this Offering Memorandum with references to its name in the form and context in which such references appear.  Each of the Management Companies accepts responsibility for information attributed to it in this Offering Memorandum and declares that, having taken all reasonable care to ensure that such is the case, the information attributed to it in this Offering Memorandum is, to the best of its knowledge, in accordance with the facts and contains no omission likely to affect its import.

**WORKING CAPITAL**

The Company is of the opinion that the working capital available to the Group is sufficient for the present requirements of the Company, that is, for at least the next 12 months from the date of this Offering Memorandum.

**CAPITALISATION AND INDEBTEDNESS**

As at the date of this Offering Memorandum, the Company:

    (a)    does not have any secured, unsecured or unguaranteed indebtedness, including indirect and contingent, other than the NexBank Credit Facility;

    (b)    has not granted any mortgage or charge over any of its assets, other than that granted under the NexBank Credit Facility; and

    (c)    does not have any contingent liabilities or guarantees.

As at the date of this Offering Memorandum, the Company's issued and fully paid up share capital consisted of 143,454,001 Shares of no par value.

**DOCUMENTS AVAILABLE FOR INSPECTION**

Copies of the Articles, the constitutional documents of the Company, the material contracts referred to in "—*Material Contracts*" above and this Offering Memorandum will be available for inspection at the registered office of the Company during normal business hours on any weekday (Saturdays and public holidays excepted) up to and including the date of the Placing.

Copies of this Offering Memorandum may be obtained, free of charge during normal business hours on any weekday (bank and public holidays excepted) at the Company's registered office up to and including the date of the Placing.

**RELATIONSHIP BETWEEN SHAREHOLDERS, THE COMPANY AND SERVICE PROVIDERS**

The Company is a registered closed-ended investment company incorporated in Guernsey with limited liability on 30 March 2015.  While prospective investors will acquire an interest in the Company on subscribing for Placing Shares, the Company is the sole legal and/or beneficial owner of its investments.  Consequently, Shareholders have no direct legal or beneficial interest in those investments.  The liability of Shareholders for the debts and other obligations of the Company is limited to the amount unpaid, if any, on the Placing Shares held by them.

- 97 -

Shareholders' rights in respect of their investment in the Company are governed by the Articles, the Companies Law and the investment terms set out in this Offering Memorandum.

**RIGHTS AGAINST THIRD PARTIES, INCLUDING THIRD PARTY SERVICE PROVIDERS**

As the Company has no employees and the Directors have all been appointed on a non-executive basis, the Company is reliant on the performance of service providers listed in this Offering Memorandum (the "**Service Providers**").

Without prejudice to any potential right of action in tort that a Shareholder may have to bring a claim against a Service Provider, each Shareholder's contractual relationship in respect of its investment in Shares is with the Company only. Therefore, no Shareholder will have any contractual claim against any Service Provider with respect to such Service Provider's default.

**JURISDICTION AND APPLICABLE LAW**

As noted above, Shareholders' rights are governed by the Articles, the Companies Law and the terms set out in this Offering Memorandum. By subscribing for Placing Shares, investors agree to be bound by the Articles, the Companies Law and the terms set out in this Offering Memorandum.

Information on the existence or not of any legal instruments providing for the recognition and enforcement of judgments in the territory where the Company is established is as follows. A final and conclusive judgement under which a sum of money is payable (not being a sum payable in respect of taxes or other charges of a like nature or in respect of a fine or penalty) obtained in the superior courts in the reciprocating countries set out in the Judgments (Reciprocal Enforcement) (Guernsey) Law 1957 (the ''**1957 Law**'') (which includes the Supreme Court and the Senior Courts of England and Wales, excluding the Crown Court), after a hearing on the merits would be recognised as a valid judgement by the Guernsey courts and would be enforceable in accordance with and subject to the provisions of the 1957 Law.

The Guernsey courts would also recognise, without reconsideration of the merits and assuming proper service of process and assumption of jurisdiction in accordance with the laws of the relevant jurisdiction, any final and conclusive judgement under which affixed or ascertainable sum of money is payable (not being a sum payable in respect of taxes or other charges or a like nature or in respect of a fine or other penalty) obtained in a court not recognised by the 1957 Law provided that the judgment was not obtained by fraud or in a manner opposed to the principles of natural justice and recognition of the judgment is not contrary to public policy as applied by the Guernsey courts.

**FAIR TREATMENT AND PREFERENTIAL TREATMENT OF INVESTORS**

The Directors owe certain fiduciary duties to the Company which require them, among other things, to act in good faith and in what they consider to be the best interests of the Company. In doing so, the Directors will act in a manner that ensures the fair treatment of investors.

Under the AIFMD Rules, the Portfolio Manager as AIFM must treat all investors fairly. The Portfolio Manager ensures the fair treatment of investors through its decision-making procedures and organisational structure which (1) identify any preferential treatment, or the right thereto, accorded to investors and (2) ensure that any such preferential treatment does not result in an overall disadvantage to other investors.

In addition, the Portfolio Manager monitors the terms of side arrangements entered into with investors in relation to their investment in the Company to seek to ensure the fair treatment of investors. In so doing, the Portfolio Manager takes into consideration whether such side arrangements are in accordance with side arrangements previously entered into.

The Portfolio Manager may enter into side letters in relation to the Company and its investments with certain individual investors covering, inter alia, *capacity, provision of additional information, fees, most favoured investor commitments, individual investor approval requirements, transfer rights and confirmations of how expenses will be borne*. Such information may provide the recipient greater insights into the Company activities than is included in standard reports to investors. In entering into any side letters, the Company will act in the best interests of the investors as a whole.

Information on such side letters will be disclosed to investors in accordance with the AIFMD.

## TERMS AND CONDITIONS OF THE PLACING

**INTRODUCTION**

Each Placee which confirms its agreement (whether orally or in writing) to subscribe for Placing Shares under the Placing will be bound by these terms and conditions and will be deemed to have accepted them.

The Company may require any Placee to agree to such further terms and/or conditions and/or give such additional warranties and/or representations as it (in its absolute discretion) sees fit and/or may require any such Placee to execute a separate placing letter (a "**Placing Letter**").

**AGREEMENT TO SUBSCRIBE FOR PLACING SHARES**

Any Placee agrees to become a member of the Company and agrees to subscribe for those Placing Shares allocated to it at the Placing Price in respect of the Placing Shares allocated to the Placee.  To the fullest extent permitted by law, each Placee acknowledges and agrees that it will not be entitled to exercise any remedy of rescission at any time.  This does not affect any other rights the Placee may have.

**PAYMENT FOR PLACING SHARES**

Each Placee must pay the Placing Price for the Placing Shares issued to the Placee in the manner and by the time directed by the Company.  If any Placee fails to pay as so directed and/or by the time required, the relevant Placee's application for Placing Shares shall be rejected.

**REPRESENTATIONS AND WARRANTIES**

By agreeing to subscribe for Placing Shares, each Placee which will enter into a commitment to subscribe for Placing Shares will (for itself and any person(s) procured by it to subscribe for Placing Shares and any nominee(s) for any such person(s)) agree, represent and warrant to the Company that:

(a)     in agreeing to subscribe for Placing Shares under the Placing, it is relying solely on this Offering Memorandum and any subsequent notice published by the Company subsequent to the date of this Offering Memorandum and not on any other information given, or representation or statement made at any time, by any person concerning the Company or the Placing.  It agrees that none of the Company nor any of its respective officers, agents or employees, will have any liability for any other information or representation.  It irrevocably and unconditionally waives any rights it may have in respect of any other information or representation;

(b)     if the laws of any territory or jurisdiction outside the United Kingdom are applicable to its agreement to subscribe for Placing Shares under the Placing, it warrants that it has complied with all such laws, obtained all governmental and other consents which may be required, complied with all requisite formalities and paid any issue, transfer or other taxes due in connection with its placing commitment in any territory and that it has not taken any action or omitted to take any action which will result in the Company or any of its respective officers, agents, affiliates or employees acting in breach of the regulatory or legal requirements, directly or indirectly, of any territory or jurisdiction outside the United Kingdom in connection with the Placing;

(c)     it does not have a registered address in, and is not a citizen, resident or national of, any jurisdiction in which it is unlawful to make or accept an offer of the Placing Shares and it is not acting on a non-discretionary basis for any such person;

(d)     it agrees that, having had the opportunity to read this Offering Memorandum, it shall be deemed to have had notice of all information and representations contained in this Offering Memorandum, that it is acquiring Placing Shares solely on the basis of this Offering Memorandum and any subsequent notice published by the Company subsequent to the date of this Offering Memorandum and no other information and that in accepting a participation in the Placing it has had access to all information it believes necessary or appropriate in connection with its decision to subscribe for Placing Shares;

- 100 -

(e)     it acknowledges that no person is authorised in connection with the Placing to give any information or make any representation other than as contained in this Offering Memorandum and any subsequent notice published by the Company subsequent to the date of this Offering Memorandum and, if given or made, any information or representation must not be relied upon as having been authorised by the Company;

(f)     it is not applying as, nor is it applying as nominee or agent for, a person who is or may be liable to notify and account for tax under the Stamp Duty Reserve Tax Regulations 1986 at any of the increased rates referred to in section 67, 70, 93 or 96 (depository receipts and clearance services) of the Finance Act 1986;

(g)     it accepts that none of the Placing Shares have been or will be registered under the laws of any Restricted Territory.  Accordingly, the Placing Shares may not be offered, sold, issued or delivered, directly or indirectly, within any Restricted Territory unless an exemption from any registration requirement is available;

(h)     if it is receiving the offer in circumstances under which the laws or regulations of a jurisdiction other than the United Kingdom would apply, that it is a person to whom the Placing Shares may be lawfully offered under that other jurisdiction's laws and regulations;

(i)     if it is a resident in the EEA (other than the United Kingdom), it is a "Qualified Investor" within the meaning of the law in the Relevant Member State implementing Article 2(1)(e)(i), (ii) or (iii) of the Prospectus Directive;

(j)     if it is outside the United Kingdom, neither this Offering Memorandum nor any other offering, marketing or other material in connection with the Placing constitutes an invitation, offer or promotion to, or arrangement with, it or any person whom it is procuring to subscribe for Placing Shares pursuant to the Placing unless, in the relevant territory, such offer, invitation or other course of conduct could lawfully be made to it or such person and such documents or materials could lawfully be provided to it or such person and Placing Shares could lawfully be distributed to and subscribed and held by it or such person without compliance with any unfulfilled approval, registration or other regulatory or legal requirements;

(k)     it acknowledges the representations, warranties and agreements set out in this Offering Memorandum, including those set out in the section of this Offering Memorandum entitled "*Purchase and Transfer Restrictions*" in "*Placing Arrangements*", and further acknowledges that it is not a U.S. Person, it is not located within the United States, it is subscribing for Placing Shares in an "offshore transaction" as defined in Regulation S and it is not acquiring the Placing Shares for the account or benefit of a U.S. Person, and where it is subscribing for Placing Shares for one or more managed, discretionary or advisory accounts, it is authorised in writing for each such account:  (i) to subscribe for the Placing Shares for each such account; (ii) to make on each such account's behalf the representations, warranties and agreements set out in this Offering Memorandum or in any Placing Letter, where relevant; and (iii) to receive on behalf of each such account any documentation relating to the Placing in the form provided by the Company.  It agrees that the provision of this paragraph shall survive any resale of the Placing Shares by or on behalf of any such account;

(l)     it is acting as principal only in respect of the Placing, or, if it is acting for any other person (i) it is and will remain liable to the Company for the performance of all its obligations as a placee in respect of the Placing (regardless of the fact that it is acting for another person), (ii) it is both an "authorised person" for the purposes of FSMA and a "qualified investor" as defined at Article 2.1(e)(i) of Directive 2003/71/EC (known as Prospectus Directive) acting as agent for such person, and (iii) such person is either (1) a FSMA Qualified Investor or (2) its "client" (as defined in section 86(2) of FSMA) that has engaged it to act as his agent on terms which enable it to make decisions concerning the Placing or any other offers of transferable securities on his behalf without reference to him;

(m)     it has not and will not offer or sell any Placing Shares to persons in the United Kingdom, except to persons whose ordinary activities involve them in acquiring, holding, managing or disposing of investments (as principal or agent) for the purposes of their business or otherwise in circumstances which

have not resulted and which will not result in an offer to the public in the United Kingdom within the meaning of section 102B of the FSMA;

(n)     it is an "eligible counterparty" within the meaning of Chapter 3 of the FCA's Conduct of Business Sourcebook and it is subscribing for or purchasing the Shares for investment only and not for resale or distribution;

(o)     it irrevocably appoints any Director of the Company to be its agent and on its behalf (without any obligation or duty to do so), to sign, execute and deliver any documents and do all acts, matters and things as may be necessary for, or incidental to, its subscription for all or any of the Placing Shares for which it has given a commitment under the Placing, in the event of its own failure to do so;

(p)     it accepts that if the Placing does not proceed or such Placing Shares are not admitted to a securities exchange for any reason whatsoever, then none of the Company or any of its affiliates, nor persons controlling, controlled by or under common control with any of them nor any of their respective employees, agents, officers, members, stockholders, partners or representatives, shall have any liability whatsoever to it or any other person;

(q)     it has not taken any action or omitted to take any action which will or may result in the Company or any of its directors, officers, agents, affiliates, employees or advisers being in breach of the legal or regulatory requirements of any territory in connection with the Placing or its subscription of Placing Shares pursuant to the Placing;

(r)     in connection with its participation in the Placing it has observed all relevant legislation and regulations, in particular (but without limitation) those relating to money laundering and countering terrorist financing and that its placing commitment is only made on the basis that it accepts full responsibility for any requirement to identify and verify the identity of its clients and other persons in respect of whom it has applied.  In addition, it warrants that it is a person: (i) subject to the Money Laundering Regulations 2007 in force in the United Kingdom; or (ii) subject to the Money Laundering Directive (2005/60/EC of the European Parliament and of the EC Council of 26 October 2005 on the prevention of the use of the financial system for the purpose of money laundering and terrorist financing); or (iii) subject to the Guernsey AML Requirements; or (iv) acting in the course of a business in relation to which an overseas regulatory authority exercises regulatory functions and is based or incorporated in, or formed under the law of, a country in which there are in force provisions at least equivalent to those required by the Money Laundering Directive;

(s)     due to anti-money laundering and the countering of terrorist financing requirements, the Company may require proof of identity of the Placee and related parties and verification of the source of the payment before the placing commitment can be processed and that, in the event of delay or failure by the Placee to produce any information required for verification purposes, the Company may refuse to accept the placing commitment and the subscription moneys relating thereto.  It holds harmless and will indemnify the Company against any liability, loss or cost ensuing due to the failure to process the placing commitment, if such information as has been required has not been provided by it or has not been provided timeously;

(t)     any person in Guernsey involved in the business of the Company who knows or suspects or has reasonable grounds for knowing or suspecting that any other person (including the Company or any person subscribing for Placing Shares) is involved in money laundering activities, is under an obligation to report such suspicion to the relevant authorities pursuant to the Guernsey AML Requirements.  Similar disclosures may be required under other legislation;

(u)     it and each person or body (including, without limitation, any local authority or the managers of any pension fund) on whose behalf it accepts Placing Shares pursuant to the Placing or to whom it allocates such Placing Shares have the capacity and authority to enter into and to perform their obligations as a Placee of the Placing Shares and will honour those obligations;

- 102 -

(v)     it confirms that it is not acquiring the Placing Shares using the assets of: (i)(A) an "employee benefit plan" as defined in Section 3(3) of ERISA that is subject to Title I of ERISA; (B) a "plan" as defined in Section 4975 of the U.S. Tax Code, including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Tax Code; or (C) an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" described in preceding clause (A) or (B) in such entity pursuant to the U.S. Plan Assets Regulations; or (ii) a governmental, church, non-U.S. or other employee benefit plan that is subject to any federal, state, local or non-U.S. law that is substantially similar to the provisions of Title I of ERISA or Section 4975 of the U.S. Tax Code, unless its purchase, holding, and disposition of the Placing Shares will not constitute or result in a non-exempt violation of any such substantially similar law;

(w)     the representations, undertakings and warranties contained in this Offering Memorandum or in any Placing Letter, where relevant, are irrevocable. It acknowledges that the Company and its affiliates will rely upon the truth and accuracy of such representations and warranties and it agrees that if any of the representations or warranties made or deemed to have been made by its subscription of the Shares are no longer accurate, it shall promptly notify the Company;

(x)     nothing has been done or will be done by it in relation to the Placing that has resulted or could result in any person being required to publish a prospectus in relation to the Company or to any ordinary shares in accordance with FSMA or the Prospectus Rules or in accordance with any other laws applicable in any part of the European Union or the European Economic Area;

(y)     it accepts that the allocation of Placing Shares shall be determined by the Company in its absolute discretion and that such persons may scale down any placing commitments for this purpose on such basis as they may determine; and

(z)     time shall be of the essence as regards its obligations to settle payment for the Placing Shares and to comply with its other obligations under the Placing; and

(aa)    it has been provided an opportunity to ask questions of, and have received satisfactory answers thereto from, the Company, the Portfolio Manager, Highland, Acis and/or their respective affiliates, as applicable, regarding the Company's assets and the terms and conditions of the offering of the Placing Shares, and it and its representatives have obtained all additional information requested of the Company, the Portfolio Manager, Highland, Acis and/or their respective affiliates, as applicable and to the extent such information is in their possession or reasonably obtainable thereby without undue expense or burden, in order to respond to any inquiries it has made regarding the offering of the Placing Shares. In connection with the offering of the Shares, it is not relying upon any statements other than those statements contained in the Offering Memorandum. It are not relying on the Company, the Portfolio Manager, Highland, Acis and/or their respective any of its respective affiliates or any of its partners, members, managers, shareholders, officers, employees, shared personnel, representatives, consultants, advisors, attorneys or agents for legal, investment or tax advice. It has sought independent legal, investment and tax advice to the extent that it has deemed necessary or appropriate in connection with its decision to subscribe for the Placing Shares.

## SUPPLY AND DISCLOSURE OF INFORMATION

If the Administrator or the Company or any of their agents request any information in connection with a Placee's agreement to subscribe for Placing Shares under the Placing or to comply with any relevant legislation, such Placee must promptly disclose it to them.

## DATA PROTECTION

Pursuant to the Data Protection (Bailiwick of Guernsey) Law, 2001, as amended (the "**DP Law**") and any successor legislation, the Company and/or the Administrator may hold personal data (as defined in the DP Law) relating to past and present Shareholders.

- 103 -

Such personal data held is used by those parties in relation to the Placing and to maintain a register of the Shareholders and mailing lists and this may include sharing such data with third parties in one or more of the countries mentioned below when (a) effecting the payment of dividends and redemption proceeds to Shareholders (in each case, where applicable) and, if applicable, the payment of commissions to third parties; and (b) filing returns of Shareholders and their respective transactions in shares with statutory bodies and regulatory authorities. Personal data may be retained on record for a period exceeding six years after it is no longer used.

The countries referred to above include, but need not be limited to, those in the European Economic Area or the European Union and any of their respective dependent territories overseas, Andorra, Argentina, Canada, State of Israel, New Zealand, Switzerland and the Eastern Republic of Uruguay.

By becoming registered as a holder of Placing Shares in the Company a person becomes a data subject (as defined in the DP Law) and is deemed to have consented to the processing by the Company and the Administrator of any personal data relating to them in the manner described above.

The Company will be the "data controller" in respect of the personal data, but has appointed the Administrator as a "data processor" of such data (each as defined in the DP Law). Details of the registration of the Company as data controller can be found on the website of the Guernsey Data Protection Commissioner: www.dpr.gov.gg.

**MISCELLANEOUS**

The rights and remedies of the Company and the Administrator under these terms and conditions are in addition to any rights and remedies which would otherwise be available to each of them and the exercise or partial exercise of one will not prevent the exercise of others.

On the acceptance of their placing commitment, if a Placee is a discretionary fund manager, that Placee may be asked to disclose in writing or orally the jurisdiction in which its funds are managed or owned. All documents provided in connection with the Placing will be sent at the Placee's risk. They may be returned by post to such Placee at the address notified by such Placee.

Each Placee agrees to be bound by the Articles (as amended from time to time) once the Placing Shares, which the Placee has agreed to subscribe for pursuant to the Placing, have been acquired by the Placee. The contract to subscribe for Placing Shares under the Placing and the appointments and authorities mentioned in this Offering Memorandum will be governed by, and construed in accordance with, the laws of England. For the exclusive benefit of the Company and the Administrator, each Placee irrevocably submits to the jurisdiction of the courts of England and Wales and waives any objection to proceedings in any such court on the ground of venue or on the ground that proceedings have been brought in an inconvenient forum. This does not prevent an action being taken against a Placee in any other jurisdiction.

In the case of a joint agreement to subscribe for Placing Shares under the Placing, references to a "Placee" in these terms and conditions are to each of the Placees who are a party to that joint agreement and their liability is joint and several.

The Company expressly reserves the right to modify the Placing (including, without limitation, its timetable and settlement) at any time prior to the date of the Placing.

- 104 -

**PLACING STATISTICS**

| | |
|---|---|
| Target Gross Placing Proceeds[*] | U.S. $153 million |
| Minimum expected initial Net Asset Value per Share[**] | U.S. $1.02535 |

_____

[*]   The target size of the Placing is U.S. $153 million.  The number of Placing Shares to be issued, and therefore the Gross Placing Proceeds, is not known as at the date of this Offering Memorandum.

[**]  NAV per Share immediately following Placing based on the NAV of the Company as at September 30, 2017, as adjusted with respect to a dividend of US $ 9 million on October 10, 2017, and a buyback of Shares from Acis Capital Management, L.P. for an aggregate purchase price of $991,180.13 on October 24, 2017.

# DEFINITIONS

The following definitions apply in this Offering Memorandum unless the context otherwise requires:

**"2010 PD Amending Directive"**  Directive 2010/73/EU of the European Parliament and of the Council of 24 November 2010 amending Directives 2003/71/EC on the prospectus to be published when securities are offered to the public or admitted to trading and 2004/109/EC on the harmonisation of transparency requirements in relation to information about issuers whose securities are admitted to trading on a regulated market

**"Accredited Investor"**  an as "accredited investor" as defined in Rule 501(a) of Regulation D under the Securities Act

**"Acis"**  Acis Capital Management, L.P.

**"Acis CLO Management"**  Acis CLO Management, LLC

**"Acis Legacy CLO"**  a CLO in which Acis is the CLO manager

**"Administration Agreement"**  the agreement dated 10 August 2015 between the Company and the Administrator, a summary of which is set out in the section of this Offering Memorandum entitled "*Additional Information on the Company*"

**"Administrator"**  State Street (Guernsey) Limited, or such other person or persons from time to time appointed by the Company

**"affiliate" or "affiliated"**  with respect to a person, (i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director, officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above. For the purposes of this definition, control of a person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such persons or (ii) to direct or cause the direction of the management and policies of such person whether by contract or otherwise. For purposes of this definition, the management of an account by one person for the benefit of any other person shall not constitute "control" of such other person and no entity shall be deemed an "affiliate" of the Company solely because the Administrator or its affiliates serve as administrator or share trustee for such entity

**"AIF"**  an alternative investment fund, as defined in the AIFMD

**"AIFM"**  an alternative investment fund manager, as defined in the AIFMD

**"AIFMD"**  Directive 2011/61/EU of the European Parliament and of the Council of 8 June 2011 on Alternative Investment Fund Managers and amending Directive 2003/41/EC and 2009/65/EC and Regulations (EC) No 1060/2009 and (EU) No 1095/2010

- 106 -

| | |
|---|---|
| "**AIFMD Rules**" | any implementing legislation and regulations under AIFMD including, without limitation, Commission Delegated Regulation (EU) No 231/2013 supplementing the AIFMD with regard to exemptions, general operating conditions, depositaries, leverage, transparency, supervision and other applicable regulations implementing the AIFMD, in each case as may be altered, amended, added to or cancelled from time to time |
| "**Application Form**" | the application form for Shares, which is available upon request; |
| "**Approved Pricing Source**" | in relation to loans, Markit Partners or any other entity appointed from time to time and in relation to CLO Notes, Thomson Reuters or any other entity appointed from time to time |
| "**Articles**" | the articles of incorporation of the Company |
| "**Audit Committee**" | the audit committee of the Company, as more fully described in the section of this Offering Memorandum entitled "*Audit Committee*" in "*Company Directors and Administration*" |
| "**Auditor**" | PricewaterhouseCoopers CI LLP, or such other person or persons from time to time appointed by the Company |
| "**bps**" | basis point |
| "**Business Day**" | a day on which the banks in Guernsey and the United Kingdom are normally open for business |
| "**certificated**" or "**certificated form**" | not in uncertificated form |
| "**Chairman**" | the chairman of the Board |
| "**CLO**" | a special purpose vehicle which issues notes backed by a pool of collateral consisting primarily of loans |
| "**CLO Income Notes**" | the most subordinated tranche of debt issued by a CLO (which may be represented by a debt or equity security) |
| "**CLO Manager**" | the entity acting as manager in a CLO pursuant to the relevant CLO Management Agreement |
| "**CLO Notes**" | notes representing tranches of debt issued by a CLO, including CLO Income Notes (which may be represented by a debt or equity security) |
| "**Closing Date**" | November 15, 2017 |
| "**Companies Law**" | the Companies (Guernsey) Law 2008, as amended, extended or replaced and any ordinance, statutory instrument or regulation made thereunder |
| "**Company**" | Highland CLO Funding, Ltd., a closed-ended investment company incorporated in Guernsey under the Companies Law on 30 March 2015 with registration number 60120 |
| "**CRR**" | Regulation 575/2013 of the European Parliament and of the Council on prudential requirements for credit institutions and investment firms |

| | |
|---|---|
| "**CRR Retention Requirements**" | the retention requirements contained in the CRR as amended from time to time and including any guidance or any technical standards published in relation thereto |
| "**Custodian**" | State Street Custodial Services (Ireland) Limited |
| "**Custody Agreement**" | the agreement dated 10 August 2015 between the Company and the Custodian, further details of which are set out in the section of this Offering Memorandum entitled "*Additional Information on the Company*" |
| "**Directors**" or "**Board**" or "**Board of Directors**" | the directors of the Company |
| "**DP Law**" | The Data Protection (Bailiwick of Guernsey) Law, 2001, as amended |
| "**EEA**" | the European Economic Area being the countries included as such in the Agreement on European Economic Area, dated 1 January 1994, among Iceland, Liechtenstein, Norway, the European Community and the EU Member States, as may be modified, supplemented or replaced |
| "**Eligible U.S. Investor**" | a U.S. Person who is reasonably believed to be (x) a Qualified Institutional Buyer and a Qualified Purchaser (y) an Accredited Investor and a Qualified Purchaser or (z) an Accredited Investor and a Knowledgeable Employee with respect to the Company and to whom the Company is privately placing a certain number of the Placing Shares in reliance on exemptions from registration under the U.S. Securities Act and the U.S. Investment Company Act |
| "**ERISA**" | the U.S. Employee Retirement Income Security Act of 1974, as amended from time to time, and the applicable regulations thereunder |
| "**EU**" | the European Union |
| "**EU Member State**" | a member country of the EU |
| "**EU Retention Requirements**" | has the meaning given to it in the section of this Offering Memorandum entitled "*Risk Factors*" |
| "**EU Savings Tax Directive**" | Council Directive 2003/48/EC of 3 June 2003 on taxation of savings income in the form of interest payments |
| "**EURIBOR**" | Euro interbank offered rate, a benchmark interest rate |
| "**Euro**" or "**€**" | the lawful currency of the EU |
| "**FATCA**" | the U.S. Foreign Account Tax Compliance Act 2010 |
| "**FATCA Withholding**" | has the meaning given to it in the section of this Offering Memorandum entitled "*Risk Factors*" |
| "**Financial Conduct Authority**" or "**FCA**" | the UK Financial Conduct Authority and any successor regulatory authority |

- 108 -

271

| | |
|---|---|
| "**Forward Purchase Agreement**" | agreements which may be entered into from time to time between the Company and a CLO pursuant to which the Company may, from time to time, enter into sale and purchase contracts with a CLO with respect to certain assets of the Company |
| "**FSMA**" | the Financial Services and Markets Act 2000 of the United Kingdom, as amended |
| "**FTT**" | the European Commission's proposal for a Directive for a common financial transaction tax in certain EU Member States |
| "**GFSC**" or "**Commission**" | the Guernsey Financial Services Commission |
| "**GFSC Code**" | the Finance Sector Code of Corporate Governance published by the Commission |
| "**Gross Placing Proceeds**" | the aggregate value of the Placing Shares |
| "**Guernsey AML Requirements**" | The Criminal Justice (Proceeds of Crime) (Bailiwick of Guernsey) Law, 1999, the Criminal Justice (Proceeds of Crime) (Financial Services Businesses) (Bailiwick of Guernsey) Regulations 2007 and the Handbook of Financial Services Business (in each case as amended) and any other regulations relating to prevention of use of the financial system for the purpose of money laundering and made pursuant thereto |
| "**Guernsey IGA Legislation**" | Guernsey legislation implementing the IGA |
| "**Highland**" | Highland Capital Management, L.P. |
| "**Highland CLO**" | a CLO in which Highland or Highland CLO Management (or their affiliate) or a wholly owned subsidiary of the Company advised by Highland is the collateral manager |
| "**Highland CLO Management**" | Highland CLO Management, LLC |
| "**Highland HCF Advisor**" | Highland HCF Advisor, Ltd. |
| "**Highland Legacy CLO**" | a CLO in which Highland is the CLO manager |
| "**HMRC**" | Her Majesty's Revenue and Customs |
| "**IRR**" | internal rate of return |
| "**IRS**" | U.S. Internal Revenue Service |
| "Knowledgeable Employee" | a "knowledgeable employee" as defined in Rule 3c-5 promulgated under the Investment Company Act |
| "**LIBOR**" | London interbank offered rate, a benchmark interest rate |
| "**Managed CLO**" | any Acis Legacy CLO, Acis CLO 7, any Highland CLO or any Highland Legacy CLO |
| "**Market Abuse Directive**" | Directive 2003/6/EC of the European Parliament and of the Council on insider dealing and market manipulation (market abuse) |
| "**Memorandum**" | the memorandum of incorporation of the Company |

| | |
|---|---|
| "**Money Laundering Directive**" | 2005/60/EC of the European Parliament and of the EC Council of 26 October 2005 on the prevention of the use of the financial system for the purpose of money laundering and terrorist financing |
| "**Net Asset Value**" or "**NAV**" | gross assets less liabilities (including accrued but unpaid fees) determined in accordance with the section of this Offering Memorandum entitled "*Net Asset Value*" in "*The Company*" |
| "**Net Asset Value per Share**" or "**NAV per Share**" | the Net Asset Value divided by the number of Shares in issue at the relevant time |
| "**Net Placing Proceeds**" | the Gross Placing Proceeds less any offering expenses and any amounts retained for working capital purposes |
| "**Non-Qualified Holder**" | any person whose ownership of Shares (i) may result in the U.S. Plan Threshold being exceeded causing the Company's assets to be deemed "plan assets" for the purpose of ERISA or the U.S. Tax Code; (ii) may cause the Company to be required to register as an "investment company" under the U.S. Investment Company Act (including because the holder of the shares is not a "qualified purchaser" as defined in the U.S. Investment Company Act) or to lose an exemption or a status thereunder to which it might be entitled; (iii) may cause the Company to have to register under the U.S. Exchange Act or any similar legislation; (iv) may cause the Company not to be considered a "Foreign Private Issuer" as such term is defined in rule 3b-4(c) under the U.S. Exchange Act; (v) may result in a person holding shares in violation of the transfer restrictions published by the Company, from time to time; and (vi) may cause the Company to be a "controlled foreign corporation" for the purposes of the U.S. Tax Code |
| "**Offering Memorandum**" | this offering memorandum |
| "**Ordinary Shares**" | ordinary shares of no par value each in the capital of the Company |
| "**Placee**" | a person subscribing for Shares under the Placing |
| "**Placing**" | the placing of Placing Shares at the Placing Price to one or more investors |
| "**Placing Price**" | As of a given date, the price per Ordinary Share determined in reference to the most recent quarterly determined NAV |
| "**Placing Shares**" | Shares to be issued by the Company pursuant to the Placing |
| "**POI Law**" | The Protection of Investors (Bailiwick of Guernsey) Law, 1987, as amended |
| "**Portfolio Management Agreement**" | the agreement dated 22 December 2016 between the Company and the Portfolio Manager pursuant to which the Portfolio Manager will provide certain support and personnel to the Company |
| "**Portfolio Manager**" | Highland HCF Advisor acting as Portfolio Manager to the Company pursuant to the Portfolio Management Agreement |
| "**Prospectus Directive**" | Directive 2003/71/EC of the European Parliament and of the Council on the prospectus to be published when securities are offered to the public or admitted to trading |
| "**Provider**" | the provider of any Warehouse Loan to the Company |

| | |
|---|---|
| "**Qualified Institutional Buyers**" | has the meaning given in Regulation 144A of the U.S. Securities Act |
| "**Qualified Purchasers**" | has the meaning given in the U.S. Investment Company Act |
| "**RCIS Rules**" | the Registered Collective Investment Schemes Rules 2015 |
| "**Register**" | the register of Shareholders |
| "**Regulation S**" | Regulation S promulgated under the U.S. Securities Act |
| "**Relevant Member State**" | each member state of the European Economic Area which has implemented the Prospectus Directive |
| "**Restricted Shareholders**" | Shareholders who are resident in, or citizens of, a Restricted Territory |
| "**Restricted Territory**" | the United States and any other jurisdiction where the extension or availability of the Placing would breach any applicable law |
| "**RTS**" | the Regulatory Technical Standards, published by the European Commission |
| "**SDRT**" | UK Stamp Duty Reserve Tax |
| "**SEC**" | the U.S. Securities and Exchange Commission |
| "**Services Agreements**" | the Staff and Services Agreement and the Sub-Advisory Agreement |
| "**Share**" | a share in the capital of the Company (of whatever class) and having such rights and being subject to such restrictions as are contained in the Articles |
| "**Shareholder**" | a holder of Shares |
| "**Shareholding**" | a holding of Shares |
| "**UK**" or "**United Kingdom**" | the United Kingdom of Great Britain and Northern Ireland |
| "**UK Corporate Governance Code**" | the UK Corporate Governance Code as published by the Financial Reporting Council |
| "**United States**" or "**U.S.**" | the United States of America, its territories and possessions, any state of the United States of America and the District of Columbia |
| "**U.S. Dollar**" or "**U.S.$**" | the lawful currency of the United States |
| "**U.S. Exchange Act**" | the U.S. Securities Exchange Act of 1934, as amended |
| "**U.S. Investment Company Act**" | the U.S. Investment Company Act of 1940, as amended |
| "**U.S. Person**" | has the meaning given in Regulation S under the U.S. Securities Act |
| "**U.S. Plan**" | any plan subject to Title 1 of ERISA or section 4975 of the U.S. Tax Code |
| "**U.S. Plan Assets Regulations**" | the regulations promulgated by the U.S. Department of Labor at 29 CFR 2510.3-101, as modified by section 3(42) of ERISA |
| "**U.S. Plan Investor**" | (i) an "employee benefit plan" as defined in section 3(3) of ERISA that is subject to Title I of ERISA; (ii) a "plan" as defined in Section 4975 of the U.S. Tax Code, including an individual retirement account or other arrangement that is subject to Section 4975 of the U.S. Tax Code; or |

|  |  |
|---|---|
|  | (iii) an entity whose underlying assets are considered to include "plan assets" by reason of investment by an "employee benefit plan" or "plan" described in the preceding clause (i) or (ii) in such entity pursuant to the U.S. Plan Assets Regulations |
| "**U.S. Plan Threshold**" | ownership by benefit plan investors, as defined under section 3(42) of ERISA, in the aggregate of 25 per cent or more of the value of any class of equity in the Company (calculated by excluding the value of any equity interest held by any person (other than a benefit plan investor, as defined under section 3(42) of ERISA) that has discretionary authority or control with respect to the assets of the Company or that provides investment advice for a fee (direct or indirect) with respect to such assets, or any affiliate of such a person); the term shall be amended to reflect such new ownership threshold that may be established by a change in the U.S. Plan Asset Regulations or other applicable law |
| "**U.S. Risk Retention Rules**" | the United States federal interagency credit risk retention rules, codified at 17 C.F.R. Part 246. |
| "**U.S. Securities Act**" | the U.S. Securities Act of 1933, as amended |
| "**U.S. Tax Code**" | the U.S. Internal Revenue Code of 1986, as amended |
| "**VAT**" | value added tax or a similar consumption tax |

## DIRECTORS, ADVISERS AND SERVICE PROVIDERS

**Directors**
Heather Bestwick
William Scott

*All c/o the Company's registered office*

**Registered Office**
First Floor, Dorey Court
Admiral Park
St Peter Port
Guernsey
GY1 6HJ
Channel Islands

**Portfolio Manager and Adviser**
Highland HCF Advisor, Ltd.
c/o Maples Corporate Services Limited
PO Box 309, Ugland House
Grand Cayman, KY1-1104
Cayman Islands

**Legal Advisers to the Company (as to Guernsey law)**
Mourant Ozannes
PO Box 186
1 Le Marchant Street
St Peter Port
Guernsey GY1 4HP
Channel Islands

**Legal Advisers to the Company**
(as to English law)
Dechert LLP
160 Queen Victoria Street
London
EC4V 4QQ
United Kingdom

**Administrator/Company Secretary**
State Street (Guernsey) Limited
First Floor, Dorey Court
Admiral Park
St Peter Port, Guernsey GY1 6HJ
Channel Islands

**Custodian & Principal Bankers**
State Street Custodial Services (Ireland) Limited
No. 78
Sir John Rogerson's Quay
Dublin
Ireland

**Corporate Services Provider**
State Street Guernsey (Limited)
First Floor, Dorey Court
Admiral Park,
St Peter Port, Guernsey GY1 6HJ
Channel Islands

**Auditors**
PricewaterhouseCoopers CI LLP
Royal Bank Place
1 Glategny Esplanade
St Peter Port
Guernsey
GY1 4ND
Channel Islands

# Highland CLO Funding, Ltd.

## ANNUAL REPORT AND AUDITED FINANCIAL STATEMENTS
FOR THE FINANCIAL YEAR ENDED 31 December 2021

Registration No. 60120

**Highland CLO Funding, Ltd.**

| **Contents** | **Page** |
|---|---|
| Management and Administration | 2 |
| Letter from the Chairman | 3 |
| Directors' Report | 4 |
| Independent Auditor's Report | 8 |
| Statement of Assets and Liabilities | 11 |
| Condensed Schedule of Investments | 12 |
| Statement of Operations | 13 |
| Statement of Changes in Net Assets | 14 |
| Statement of Cash Flows | 15 |
| Financial Highlights | 16 |
| Notes to the Financial Statements | 17 |
| Notice of Annual General Meeting | 29 |
| Form of Proxy | 30 |

Highland CLO Funding, Ltd.    1

**Highland CLO Funding, Ltd.**
**Management and Administration**

**Directors**
Richard Boleat (Chairman)
Richard Burwood

*Both Directors are independent non-executive directors.*

**Registered Office**
1st Floor, Royal Chambers
St Julian's Avenue
St Peter Port
Guernsey, GY1 3JX
Channel Islands

**Portfolio Manager**
Highland HCF Advisor Ltd.
100 Crescent Court
Suite 1850
Dallas
Texas 75201
United States

*Portfolio Manager's registered office*:
PO Box 10008, Willow House, Cricket Square,
Grand Cayman KY1-1001, Cayman Islands

**Auditor**
Grant Thornton Limited
PO Box 313
Lefebvre House
Lefebvre Street
St Peter Port
Guernsey
GY1 3TF

**Sub-Adviser**
Highland Capital Management, L.P.
100 Crescent Court
Suite 1850
Dallas
Texas 75201
United States

**Administrator & Company Secretary**
Elysium Fund Management Limited
PO Box 650
1st Floor, Royal Chambers
St Julian's Avenue
St Peter Port
Guernsey, GY1 3JX
Channel Islands

**Legal Advisers to the Company**
*(as to US Law)*
King & Spalding LLP
PO Box 116133
Atlanta
GA, 30368-6133
United States

*(as to Guernsey Law)*
Carey Olsen (Guernsey) LLP
PO Box 98
Carey House
Les Banques
Guernsey, GY1 4BZ
Channel Islands

**Custodian**
Liberum Wealth Limited
PO Box 650
1st Floor, Royal Chambers
St Julian's Avenue
St Peter Port
Guernsey, GY1 3JX
Channel Islands

Highland CLO Funding, Ltd.    2

**Highland CLO Funding, Ltd.**
**Letter from the Chairman**

Guernsey, 19 April 2022

Dear Shareholder,

I am pleased to provide this covering letter to the Company's audited financial statements for the year ended 31 December 2021. During the year, the following events have occurred:

- Increase in net asset value per share (grossed up for distributions) from US$0.3295 to US$0.6005 (US$0.4969 net of distributions)
- Commencement of quarterly dividend payments of surplus liquidity
- Significant monetisation of underlying securities holdings
- Resolution of outstanding disputes
- Proactive steps taken towards a release of the Company's trapped liquidity held by US Bank

The majority of the foregoing points are referred to in detail elsewhere in the audited financial statements, but the Company's ongoing dispute resolution program requires special mention.

The disputes in which the Company are presently involved centre around a retention by US Bank as indenture trustee of a substantial portion of the proceeds of liquidation of ACIS CLO 2014-4, Ltd. ("ACIS 4"), ACIS CLO 2014-5, Ltd. ("ACIS 5"), and ACIS CLO 2015-6, Ltd. ("ACIS 6"), which took place in Q2/2021. The value of the Company's cash holdings retained by US Bank as of 21 March 2022 amounted to approximately US$39 million[1]. US Bank's contention is that such retention is authorised by the relevant CLO indentures on the basis that it is required in order to protect US Bank and ACIS Capital Management LP from the effects of current and prospective litigation from, amongst others, Nexpoint Diversified Real Estate Trust (formerly known as NexPoint Strategic Opportunities Fund) and CLO Holdco, Ltd, parties indirectly or directly controlled by Mr James Dondero ("the Dondero Parties"). It is the Directors' opinion, on advice, that there is no credible basis for the litigation being pursued by the Dondero Parties, nor is there a proper basis in law for the withholding of the Company's assets by US Bank. The Company's choice is straightforward, in either seeking to have the litigation initiated by the Dondero Parties terminated, and future litigation prevented, so as to remove the stated basis of US Bank's withholding, or to litigate with US Bank to force a release of the Company's funds, or both. The Company's present strategy is aimed at maximising a return of capital to all shareholders as soon as practically possible at the least possible expense to the Company. The Directors have formulated and continue to formulate the Company's dispute resolution approach in a manner which is aligned with that strategy. The Company will report material progress in the execution of its strategy as appropriate.

My co-director and I would like to take this opportunity to thank the Company's service providers and advisors for their assistance and support during the year under review.

Yours faithfully

Richard Boleat
Chairman

---

[1] Represents approximately 87% of cash holdings of ACIS 6 and 100% of cash holdings of both ACIS 4, and ACIS 5.

Highland CLO Funding, Ltd.     3

**Highland CLO Funding, Ltd.**
**Directors' Report**

The Directors present their Annual Report and the audited financial statements of Highland CLO Funding, Ltd. (the "Company") for the financial year ended 31 December 2021.

**General information**
The Company was incorporated in Guernsey on 30 March 2015 under The Companies (Guernsey) Law, 2008 (the "Companies Law") with registration number 60120, and is registered as a closed-ended investment scheme, regulated under The Protection of Investors (Bailiwick of Guernsey) Law, 2020 (the "POI Law"). The Company commenced operations on 10 August 2015.

**Principal activities**
The Company's stated investment objective is to provide Participating Shareholders with stable and growing income returns and to grow the capital value of the investment portfolio through opportunistic exposure to senior secured loans and CLO Notes, on both a direct and indirect basis. The Company is currently in the process of liquidating its investment portfolio with a view to a complete return of capital to shareholders.

**Results and dividends**
The results for the financial year are set out in the Statement of Operations. The Company declared, and paid, a dividend of $15,865,224 (10.36 cents per Ordinary Share) during 2021 (2020: nil).

**Significant events during the financial year**
See the Letter from the Chairman and Note 10 of the audited financial statements for details of significant events affecting the Company's financial statements during the year.

**Significant events since the financial year end**
See Note 12 of the audited financial statements for details of significant events affecting the Company since the year end.

**Going Concern**
The Directors believe it is appropriate to adopt the going concern basis in preparing the financial statements as, after due consideration, the Directors consider that the Company has adequate resources to continue in operational existence for at least 12 months from the date of signing these financial statements (see Note 13).

**Directors and Directors' Interests**
The Directors of the Company, who held office during the financial year and at the date of signing these financial statements, were:
- Richard Boleat
- Richard Burwood

The Directors and their families had no beneficial interests in the share capital of the Company at 31 December 2021. The Company has no employees and its Directors have been appointed on a non-executive basis.

**Issued Share Capital**
See Note 5 for details of the issued Ordinary Shares.

As at 31 December 2021, the Company had one class of shares in issue.

**Directors' and Officers' Liability Insurance**
The Company maintains insurance in respect of Directors' and officers' liability in relation to their acts on behalf of the Company.

Highland CLO Funding, Ltd.    4

**Highland CLO Funding, Ltd.**
**Directors' Report** *(continued)*

**Directors' responsibilities**

As there are no employees of the Company, the Board performs certain management functions, which include the overseeing of the Company's investment policy and investment strategy, the supervision of any delegated responsibilities to third-party service providers and any necessary investment management functions, and will have the ultimate responsibility for the management and operations of the Company.

The Directors are responsible for preparing the Annual Report and the financial statements for each financial year which give a true and fair view, in accordance with Guernsey Law and Accounting Principles Generally Accepted in the United States of America ("U.S. GAAP"), of the state of affairs of the Company and of the profit or loss of the Company for that year. In preparing those financial statements the Directors are required to:

- Select suitable accounting policies and then apply them consistently;
- Make judgments and estimates that are reasonable and prudent;
- State whether applicable accounting standards have been followed; and
- Prepare the financial statements on the going concern basis unless it is inappropriate to presume that the Company will continue in business.

The Directors confirm that they have complied with the above requirements in preparing the financial statements.

The Directors are responsible for keeping proper accounting records which disclose with reasonable accuracy at any time the financial position of the Company and which enable them to ensure that the financial statements comply with the Companies Law. They are also responsible for safeguarding the assets of the Company and hence for taking reasonable steps for the prevention and detection of fraud and other irregularities.

**Disclosure of information to Auditor**

So far as each of the Directors is aware, there is no relevant audit information of which the Company's Auditor is unaware, and each Director has taken all the steps they ought to have taken as a Director to make themselves aware of any relevant audit information and to establish that the Company's Auditor is aware of that information.

**Corporate Governance**

The Directors are committed to maintaining high standards of corporate governance. Insofar as the Directors believe it to be appropriate and relevant to the Company, it is their intention that the Company should comply with best practice standards for the business carried on by the Company.

The Guernsey Financial Services Commission ("GFSC") Finance Sector Code of Corporate Governance (the "Code") provides a framework that applies to all entities licensed by the GFSC or which are registered or authorised as a collective investment scheme. The Company currently complies with, and will continue to comply with, the GFSC Code.

As an investment company, all the Directors are non-executive and the Company has no employees.

**Audit Committee**

The Company has established an Audit Committee, which comprises both Directors. The Company's Audit Committee meets formally at least once a year for the purpose, amongst other things, of considering the appointment, independence and remuneration of the Auditor and to review the Company's annual financial reports. Where audit-related and/or non-audit services are to be provided by the Auditor, full consideration of the financial and other implications on the independence of the Auditor arising from any such engagement will be considered before proceeding. Richard Burwood acts as chairman of the Audit Committee.

**Highland CLO Funding, Ltd.**
**Directors' Report** *(continued)*

### Audit Committee *(continued)*
The responsibilities of the Audit Committee include monitoring the integrity of the Company's results and financial statements, reviewing reports received from the Administrator on the adequacy and the effectiveness of the Company's internal controls and risk management systems and assessing the ongoing suitability of the Auditor and ensuring their coordination with any internal audit function.

The chairmanship of the Audit Committee and each Director's performance is reviewed annually by the Chairman and the performance of the Chairman is assessed by the other Director.

### Remuneration and Nomination Committee
Given the size of the Board, the Directors have deemed that such a committee is unnecessary and the full Board will fulfil this role.

### Directors' Remuneration
Each of the Directors has signed a letter of appointment with the Company setting out the terms of their appointment, which are available for inspection at the Company's registered office. The level of Directors' fees payable in respect of 2021 is set out in Note 8 to these financial statements.

### Portfolio Manager
Highland HCF Advisor Ltd. ("HCF") acts as Portfolio Manager to the Company (pursuant to the Portfolio Management Agreement) and may act (either itself or through an affiliate) as the CLO Manager to HCF CLOs. Pursuant to the Portfolio Management Agreement, the Portfolio Manager is responsible for rendering discretionary investment advice to the Company and for ensuring the Company has the required personnel and credit research available to it to make necessary business decisions and carry on the day-to-day management of the Company's business and to implement its investment objective and policy.

In addition, HCF (or one of its affiliates) may also manage HCF CLOs pursuant to management agreements to be entered into from time to time.

### Administrator
Elysium Fund Management Limited ("Elysium" or the "Administrator") acts as Administrator and Company Secretary of the Company (pursuant to the Administration Agreement). In such capacity, the Administrator is responsible for the day-to-day administration of the Company (including but not limited to the calculation and publication of the estimated monthly Net Asset Value ("NAV")) and general secretarial functions required by the Companies Law (including but not limited to the maintenance of the Company's accounting and statutory records).

The Administrator is licensed under the POI Law with the GFSC to carry out controlled investment business.

Elysium, as Administrator, is responsible for maintaining the Company's share register.

### Custodian
Liberum Wealth Limited acts as Custodian to the Company (pursuant to the Custody Agreement). In acting as Custodian of the Company's investments, the Custodian provides for the safekeeping of certificates of deposits, shares, notes and in general any instruments evidencing the ownership of securities and may take custody of cash and other assets. Assets are held in a custody account and registered in the name of the Company or the Custodian, its delegate or a nominee.

### Litigation
During the course of 2021, the Company continued to be involved in litigation. Further details are provided in Note 10 and the Letter from the Chairman.

**Highland CLO Funding, Ltd.**
**Directors' Report** *(continued)*

**Annual General Meeting**
Details of the resolutions to be proposed at the Annual General Meeting ("AGM"), together with explanations, will appear in the Notice of Meeting to be distributed to shareholders together with a copy of this Annual Report.

Members of the Board will be in attendance at the AGM and will be available to answer shareholder questions.

**Independent Auditor**
Grant Thornton Limited ("Grant Thornton") has expressed its willingness to continue in office as the Company's auditor and a resolution to re-appoint Grant Thornton as Auditor will be proposed at the forthcoming AGM.

On behalf of the Board:

Richard Boleat                                        Richard Burwood
Director                                                   Director
19 April 2022                                          19 April 2022

**Independent Auditor's Report**
**To the Shareholders of Highland CLO Funding, Ltd.**

**Opinion**

We have audited the financial statements of Highland CLO Funding, Ltd. (the 'Company') for the year ended 31 December 2021 which comprise the Statement of Assets and Liabilities, the Condensed Schedule of Investments, the Statement of Operations, the Statement of Changes in Net Assets, the Statement of Cash Flows and notes to the financial statements, including a summary of significant accounting policies. The financial reporting framework that has been applied in their preparation is applicable law and accounting principles generally accepted in the United States of America ("US GAAP").

In our opinion, the financial statements:

- give a true and fair view of the state of the Company's affairs as at 31 December 2021 and of its gain for the year then ended;
- have been properly prepared in accordance with US GAAP; and
- comply with the requirements of The Companies (Guernsey) Law, 2008.

**Basis for opinion**

We conducted our audit in accordance with International Standards on Auditing (ISAs) and applicable law. Our responsibilities under those standards are further described in the 'Auditor's responsibilities for the audit of the financial statements' section of our report. We are independent of the Company in accordance with the International Ethics Standards Board for Accountants' International Code of Ethics for Professional Accountants (including International Independence Standards) (IESBA Code), together with the ethical requirements that are relevant to our audit of the financial statements in Guernsey, and we have fulfilled our other ethical responsibilities in accordance with these requirements and the IESBA Code. We believe that the audit evidence we have obtained is sufficient and appropriate to provide a basis for our opinion.

**Emphasis of matter**

We draw attention to Note 10 to the financial statements which describes the status and uncertainty related to the outcome of the litigation matters involving the Company and its related parties. Our opinion is not qualified in respect of this matter.

**Other information**

The directors are responsible for the other information. The other information comprises the information included in the annual report, other than the financial statements and our auditor's report thereon. Our opinion on the financial statements does not cover the other information and, except to the extent otherwise explicitly stated in our report, we do not express any form of assurance conclusion thereon. In connection with our audit of the financial statements, our responsibility is to read the other information and, in doing so, consider whether the other information is materially inconsistent with the financial statements or our knowledge obtained in the audit or otherwise appears to be materially misstated. If we identify such material inconsistencies or apparent material misstatements, we are required to determine whether there is a material misstatement in the financial statements or a material misstatement of the other information. If, based on the work we have performed, we conclude that there is a material misstatement of this other information, we are required to report that fact. We have nothing to report in this regard.

**Matters on which we are required to report by exception**

We have nothing to report in respect of the following matters in relation to which the Companies (Guernsey) Law, 2008 requires us to report to you if, in our opinion:

- proper accounting records have not been kept by the Company; or
- the Company's financial statements are not in agreement with the accounting records; or
- we have not obtained all the information and explanations, which to the best of our knowledge and belief, are necessary for the purposes of our audit.

**Independent Auditor's Report**
**To the Shareholders of Highland CLO Funding, Ltd. *(continued)***

**Responsibilities of directors for the financial statements**

As explained more fully in the directors' responsibilities statement set out on page 5, the directors are responsible for the preparation of the financial statements which give a true and fair view in accordance with US GAAP, and for such internal control as the directors determine is necessary to enable the preparation of financial statements that are free from material misstatement, whether due to fraud or error.

In preparing the financial statements, the directors are responsible for assessing the Company's ability to continue as a going concern, disclosing, as applicable, matters related to going concern and using the going concern basis of accounting unless the directors either intend to liquidate the Company or to cease operations, or have no realistic alternative but to do so.

**Auditor's responsibilities for the audit of the financial statements**

Our objectives are to obtain reasonable assurance about whether the financial statements as a whole are free from material misstatement, whether due to fraud or error, and to issue an auditor's report that includes our opinion. Reasonable assurance is a high level of assurance, but is not a guarantee that an audit conducted in accordance with ISAs will always detect a material misstatement when it exists. Misstatements can arise from fraud or error and are considered material if, individually or in the aggregate, they could reasonably be expected to influence the economic decisions of users taken on the basis of these financial statements.

As part of an audit in accordance with ISAs, we exercise professional judgment and maintain professional scepticism throughout the audit. We also:

- Identify and assess the risks of material misstatement of the financial statements, whether due to fraud or error, design and perform audit procedures responsive to those risks, and obtain audit evidence that is sufficient and appropriate to provide a basis for our opinion. The risk of not detecting a material misstatement resulting from fraud is higher than for one resulting from error, as fraud may involve collusion, forgery, intentional omissions, misrepresentations, or the override of internal control.

- Obtain an understanding of internal control relevant to the audit in order to design audit procedures that are appropriate in the circumstances, but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control.

- Evaluate the appropriateness of accounting policies used and the reasonableness of accounting estimates and related disclosures made by management.

- Conclude on the appropriateness of management's use of the going concern basis of accounting and, based on the audit evidence obtained, whether a material uncertainty exists related to events or conditions that may cast significant doubt on the Company's ability to continue as a going concern. If we conclude that a material uncertainty exists, we are required to draw attention in our auditor's report to the related disclosures in the financial statements or, if such disclosures are inadequate, to modify our opinion. Our conclusions are based on the audit evidence obtained up to the date of our auditor's report. However, future events or conditions may cause the Company to cease to continue as a going concern.

- Evaluate the overall presentation, structure and content of the financial statements, including the disclosures, and whether the financial statements represent the underlying transactions and events in a manner that achieves fair presentation.

We communicate with those charged with governance regarding, among other matters, the planned scope and timing of the audit and significant audit findings, including any significant deficiencies in internal control that we identify during our audit.

We also provide those charged with governance with a statement that we have complied with relevant ethical requirements regarding independence, and to communicate with them all relationships and other matters that may reasonably be thought to bear on our independence, and where applicable, related safeguards.

Highland CLO Funding, Ltd.     9

**Independent Auditor's Report**
**To the Shareholders of Highland CLO Funding, Ltd.** *(continued)*

**Use of our report**
This report is made solely to the Company's shareholders, as a body, in accordance with section 262 of the Companies (Guernsey) Law, 2008. Our audit work has been undertaken so that we might state to the Company's shareholders those matters we are required to state to them in an auditor's report and for no other purpose. To the fullest extent permitted by law, we do not accept or assume responsibility to anyone other than the Company and the Company's shareholders as a body, for our audit work, for this report, or for the opinions we have formed.

Grant Thornton Limited
Chartered Accountants
St Peter Port, Guernsey
19 April 2022

**Highland CLO Funding, Ltd.**
**Statement of Assets and Liabilities**
**as at 31 December 2021**

| | Notes | As at 31 December 2021 US$ |
|---|---|---|
| **Assets** | | |
| Investments in securities at fair value (cost $166,657,862) | 4 | 61,233,500 |
| Cash and cash equivalents | | 15,097,923 |
| Other assets | | 274,098 |
| | | ------------------ |
| **Total assets** | | **76,605,521** |
| | | ------------------ |
| **Liabilities** | | |
| Other payables and accrued expenses | | (504,976) |
| | | ------------------ |
| **Total liabilities** | | **(504,976)** |
| | | ------------------ |
| **Net assets** | | **76,100,545** |
| | | ------------------ |
| **Net assets** | | |
| Share capital | | 146,609,566 |
| Retained earnings | | (70,509,021) |
| | | ------------------ |
| **Total net assets** | | **76,100,545** |
| | | ------------------ |

The notes on pages 17 to 28 form an integral part of these financial statements.

The financial statements on pages 11 to 28 were approved by the Board of Directors on 19 April 2022 and signed by

Richard Boleat                                      Richard Burwood
Director                                                 Director
19 April 2022                                        19 April 2022

Highland CLO Funding, Ltd.    11

**Highland CLO Funding, Ltd.**
**Condensed Schedule of Investments**
**as at 31 December 2021**

| Description | Nominal holdings | Cost US$ | Fair value US$ | % of net assets |
|---|---|---|---|---|
| **Investments in CLOs** | | | | |
| **Cayman Islands** | | | | |
| **Industry: Financial** | | | | |
| ACIS CLO 2015-6 Ltd | 51,850,000 | 33,261,875 | 12,755,100 | 16.76 |
| ACIS CLO 2014-5 Ltd | 53,000,000 | 41,517,732 | 11,077,000 | 14.56 |
| ACIS CLO 2014-4 Ltd | 50,750,000 | 39,585,000 | 9,541,000 | 12.54 |
| Greenbriar CLO Ltd | 18,000 | 2,502,690 | 8,100,000 | 10.64 |
| Brentwood CLO Ltd | 12,000 | 2,147,594 | 6,000,000 | 7.88 |
| Rockwall CDO Ltd | 14,000,000 | 830,486 | 5,600,000 | 7.36 |
| Liberty CLO Ltd | 17,000 | 3,405,832 | 5,115,300 | 6.72 |
| Grayson CLO Ltd | 5,900 | 462,591 | 2,399,530 | 3.15 |
| Gleneagles CLO Ltd | 1,250 | 293,767 | 357,125 | 0.47 |
| Hewett's Island CDO Ltd | 1,096,200 | 27,000 | 112,032 | 0.15 |
| ACIS CLO 2014-3 Ltd | 39,750,000 | 28,620,000 | - | - |
| ACIS CLO 2013-1 Ltd | 18,558,000 | 10,916,137 | - | - |
| **Total Cayman Islands and total investments in CLOs** | | 163,570,704 | 61,057,087 | 80.23 |
| **Investments in LLC interests** | | | | |
| **United States** | | | | |
| **Industry: Energy – Oil and Gas** | | | | |
| Fieldwood Energy LLC | 118,614 | 2,767,265 | - | - |
| **Total United States and total investments in LLC Interests** | | 2,767,265 | - | - |
| **Investments in Limited Partnerships** | | | | |
| **Cayman Islands** | | | | |
| **Industry: Financial** | | | | |
| ACIS CLO Management Holdings, LP | 80.85% | 319,893 | 176,413 | 0.23 |
| **Total Cayman Islands and total investments in Limited Partnerships** | | 319,893 | 176,413 | 0.23 |
| **Total investments in securities** | | 166,657,862 | 61,233,500 | 80.46 |

The notes on pages 17 to 28 for an integral part of these financial statements.

**Highland CLO Funding, Ltd.**
**Statement of Operations**
**for the financial year ended 31 December 2021**

| | Notes | For the year ended 31 December 2021 US$ |
|---|---|---|
| **Investment income and expenses** | | |
| | | |
| **Income** | | |
| Dividends | | 14,453,587 |
| Other income | | 46,504 |
| | | ------------------ |
| **Total investment income** | | **14,500,091** |
| | | ------------------ |
| | | |
| **Expenses** | | |
| Legal and professional fees | | (1,169,607) |
| Directors' fees | 8 | (315,606) |
| Administration fees | 6 | (239,684) |
| Interest expense | | (183,957) |
| Audit fees | | (143,755) |
| Other | | (70,690) |
| | | ------------------ |
| **Total expenses** | | **(2,123,299)** |
| | | ------------------ |
| | | |
| **Net investment profit** | | **12,376,792** |
| | | ------------------ |
| | | |
| **Net realised and unrealised gain on investments** | | |
| Net realised loss on investments | 4 | (1,958,708) |
| Net change in unrealised loss on investments | 4 | 31,094,511 |
| | | ------------------ |
| **Net realised and unrealised gain on investments** | | **29,135,803** |
| | | ------------------ |
| | | |
| **Net foreign exchange loss** | | **(2,081)** |
| | | ------------------ |
| | | |
| **Net increase in net assets resulting from operations** | | **41,510,514** |
| | | ------------------ |

The above results are derived from continuing operations.

The notes on pages 17 to 28 form an integral part of these financial statements.

Highland CLO Funding, Ltd.    13

**Highland CLO Funding, Ltd.**
**Statement of Changes in Net Assets**
**for the financial year ended 31 December 2021**

| | Note | Share capital US$ | Retained earnings US$ | Total net assets US$ |
|---|---|---|---|---|
| Net assets at 31 December 2020 | | 146,609,566 | (96,154,311) | 50,455,255 |
| | | | | |
| **Operating transactions** | | | | |
| Net increase in net assets resulting from operations | | - | 41,510,514 | 41,510,514 |
| Dividends paid | 9 | - | (15,865,224) | (15,865,224) |
| | | ---------------- | ---------------- | ---------------- |
| **Net assets at 31 December 2021** | | **146,609,566** | **(70,509,021)** | **76,100,545** |
| | | ---------------- | ---------------- | ---------------- |

The notes on pages 17 to 28 form an integral part of these financial statements.

**Highland CLO Funding, Ltd.**
**Statement of Cash Flows**
**for the financial year ended 31 December 2021**

|  | Notes | For the year ended 31 December 2021 US$ |
|---|---|---|
| **Cash flows from operating activities** |  |  |
| Net increase in net assets resulting from operations |  | 41,510,514 |
|  |  |  |
| ***Adjustments to reconcile net decrease in net assets from operations to net cash used in operating activities*** |  |  |
| Proceeds from disposal of securities | 4 | 23,249,041 |
| Net realised loss on investments | 4 | 1,958,708 |
| Net change in unrealised loss on investments | 4 | (31,094,511) |
|  |  |  |
| ***Net changes in operating assets and liabilities*** |  |  |
| Change in other assets |  | 905,343 |
| Change in accrued expenses |  | (818,311) |
|  |  | ------------------ |
| **Net cash from operating activities** |  | **35,710,784** |
|  |  | ------------------ |
| **Cash flows from financing activities** |  |  |
| Loan payments |  | (11,449,923) |
| Dividend paid | 9 | (15,865,224) |
|  |  | ------------------ |
| **Net cash used in financing activities** |  | **(27,315,147)** |
|  |  | ------------------ |
|  |  |  |
| **Net change in cash and cash equivalents** |  | **8,395,637** |
|  |  |  |
| Cash and cash equivalents at beginning of year |  | 6,702,286 |
|  |  | ------------------ |
| **Cash and cash equivalents at end of year** |  | **15,097,923** |
|  |  | ------------------ |
|  |  |  |
| **Supplemental disclosure of cash flow information** |  |  |
| Interest paid |  | 232,447 |

The notes on pages 17 to 28 form an integral part of these financial statements.

Highland CLO Funding, Ltd.   15

**Highland CLO Funding, Ltd.**
**Financial highlights**

Financial highlights for the financial year ended 31 December 2021 for Highland CLO Funding, Ltd. are as follows:

|  | Ordinary shares 31 December 2021 | Ordinary shares 31 December 2020 |
|---|---|---|
| **Internal rate of return (cumulative)** [1] | (4.7)% | (15.5)% |
| **Ratio to average shareholder capital** [2] |  |  |
| Investment income | 22.9% | 4.2% |
| Operating expenses | (3.3)% | (5.2)% |
| **Net investment income/(expenses)** | 19.6% | (1.0)% |
| **Ratio of contributed capital to committed capital** [3] | 6.5% | 6.5% |

[1] The Internal Rate of Return ("IRR") is based on the date on which actual cash inflows (capital contributions) and outflows (cash distributions) occur, and the residual net assets of the Company as of the applicable measurement date. The IRR is reflected after all investment related and operating expenses, including Carried Interest when applicable. As discussed in Note 2, current accounting guidance requires, for purposes of financial statement presentation, a reallocation of shareholders' Carried Interest which is calculated as the amount that would be distributed in accordance with the Offering Memorandum to the Portfolio Manager calculated as if the assets of the Company were liquidated at fair value and distributed as of 31 December 2021. As of 31 December 2021, no allocations of Carried Interest have been made to the Portfolio Manager, based on this hypothetical liquidation. No Carried Interest has been paid as of 31 December 2021.

[2] The ratios of expenses and net investment income to average net assets reflect the expenses and net investment income, as reported in the Statement of Operations, as a percentage of the Company's weighted average net assets for the financial year ended 31 December 2021. The net investment income ratio does not include the effect of Carried Interest. The computation of such ratios based on the amount of expenses and Carried Interest assessed to an individual shareholder may vary from these ratios based on different Carried Interest arrangements.

[3] The ratio of contributed capital to committed capital relates to the US$10,000,000 contribution of the total US$153,000,000 committed by shareholders under the 15 November 2017 subscription and transfer agreement (see Note 5). The original share capital issued prior to 15 November 2017 has not been included in the contributed capital in this calculation.

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements**
**for the year ended 31 December 2021**

## 1. Organisation

Highland CLO Funding, Ltd. (the "Company"), formerly Acis Loan Funding, Ltd., was incorporated in Guernsey on 30 March 2015 under The Companies (Guernsey) Law, 2008, as amended (the "Companies Law") with registration number 60120, and is registered as a closed-ended investment scheme, regulated under the Protection of Investors (Bailiwick of Guernsey) Law, 2020, as amended (the "POI Law").

The Company's investment objective is to provide Participating Shareholders with stable and growing income returns and to grow the capital value of the investment portfolio through opportunistic exposure to senior secured loans and CLO Notes, on both a direct and indirect basis. The Company is currently in the process of liquidating its investment portfolio with a view to a complete return of capital to shareholders.

Any terms not defined in these notes shall have the meaning used in the Offering Memorandum of the Company.

**Investment Period**
The Investment Period ended on 30 April 2020.

**Term**
The term of the Company will end (and the Company thereafter will be wound up and dissolved) on 15 November 2027 (the ten-year anniversary of the closing date).

## 2. Significant Accounting Policies

The following is a summary of the significant accounting policies followed by the Company in the preparation of these financial statements.

**a) Basis of Accounting**
The Company's financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP") and are stated in United States Dollars, which is the functional and presentation currency. Assets and liabilities denominated in foreign currencies are translated into the functional currency using closing rates of exchange at the reporting date while revenues and expenses are translated at the daily spot rates of exchange.

The accounting policies applied in preparing these financial statements are consistent with those applied in the annual audited financial statements for the year ended 31 December 2020. The Company is an investment company in conformity with U.S. GAAP and follows the accounting and reporting guidance in Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic 946. Therefore, the Company follows the accounting and reporting guidelines for investment companies.

**b) New standards, amendments and interpretations issued and effective for annual reporting periods beginning 1 January 2021 and not early adopted**
There were no new accounting pronouncements required to be adopted by the Company during the year.

**c) Use of Estimates**
The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. The Company's significant estimates include the fair value of its investments. Actual results could differ from those estimates.

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2021**

### 2. Significant Accounting Policies *(continued)*
**d) Investment Transactions and Related Investment Income**

Investment transactions are recorded on a trade-date basis. Realised gains and losses on the investment transactions are determined based on the first-in, first-out method. The Company uses prices and inputs that are current as of the measurement dates. The Company also considers the counterparty's non-performance risk when measuring the fair value of its investments. Investments are valued at market or fair value at the date of the financial statements with the resulting net unrealised gain or loss reflected in the Statement of Operations. See Note 4 for a presentation of fair value hierarchy disclosures.

Investments in limited partnerships ("L.P.s") are valued using the net asset values provided by the underlying L.P.s as a practical expedient. The Company applies the practical expedient to its investments in private investment companies on an investment-by-investment basis, and consistently with the Company's entire position in a particular investment, unless it is probable that the Company will sell a portion of an investment at an amount different from the net asset value of the investment. The Company is precluded from consolidating entities that are not investment companies when it is required to measure those entities at fair value in accordance with Topic 946.

**e) Cayman Limited Partnerships**

The Portfolio Manager provides to the Administrator full supporting documentation to support the value of the interest the Company has in a Cayman registered L.P., ACIS CLO Management Holdings L.P.

**f) Investment Valuation - Collateralised Loan Obligations ("CLOs")**

CLOs are valued according to a number of key data points including, but not limited to, market trading levels, bid auctions, financial institution data, offering levels from counterparties/dealers and other sources, such as an independent pricing service.

In cases where no third party price is available, or where the Company determines that the provided price is not an accurate representation of the fair value of the investment, the Company determines the valuation based on the Company's fair valuation policy. The overall criterion for fair value is a price at which a CLO would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell and both having the same knowledge of the relevant facts.

Consistent with the above criterion, the following criteria will be considered when applicable:

- valuation of other securities by a similar CLO for which market quotations are available;
- value of the underlying cash and investment collateral of the CLO, itself;
- reasons for the absence of market quotations;
- recent sales prices and/or bid and ask quotations for a similar CLO;
- the soundness of the CLO's loan portfolio, its weighted average spread, weighted average life, the portfolio legal maturity profile, the credit standing and market prices of the loans and the structure of the CLO; and
- the CLO cash flows generated using Intex CLO modelling based on prevailing market assumptions including, inter alia, defaults, recoveries, prepayment rates, loan reinvestment prices and spreads, forward interest rates and loan prepayment rates.

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2021**

### 2. Significant Accounting Policies *(continued)*

#### g) Equity Investments

Publicly traded equities are valued at the closing price at the date of the financial statements. The fair value of equity securities that are not traded on national exchanges or through real-time quotation services are derived from methodologies that provide appropriate fair value estimates. Equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. The Company holds a limited number of private equity investments which resulted from the restructuring of other instruments. These assets are valued using market data obtained from a third-party pricing service and/or quotes from other parties dealing in the specific assets. In the event both a reliable market quote and third-party pricing service data are not available for such assets or such quotes are determined to be unreliable, the Company fair values the assets using various methodologies, as appropriate for individual investments, including comparable transaction multiples, comparable trading multiples, and/or discounted cash flow analysis. When utilising comparable trading multiples, the Portfolio determines comparable public companies (peers) based on industry, size, developmental stage, strategy, etc., and then calculates a trading multiple for each comparable company identified by using either a price to book ratio based on publicly available information about the underlying comparable company or by dividing the enterprise value of the comparable company by its earnings before interest, taxes, depreciation and amortisation (EBITDA) or similar metrics. In certain instances, the inputs used in the calculation of the trading multiples may vary based on the industry or development stage of the company. A multiple determined by the Portfolio Manager to be within a reasonable range, as calculated amongst its peers, is then applied to the underlying company's price to book ratio or EBITDA (which may be normalised to adjust for certain non-recurring events) to calculate the fair value of the underlying company. The fair value may be further adjusted for entity specific facts and circumstances.

#### h) Credit Facilities

With effect from 23 November 2015, the Company was a party to a committed loan agreement with a Texas savings bank, NexBank SSB (the "Lender"), a then-affiliate of the Portfolio Manager, a majority of the equity of which was owned directly or indirectly by then-principals of the Portfolio Manager or its affiliates. As security for its obligations under the loan agreement, the Company had provided collateral in the form of certain shares of the ACIS CLOs.

On 15 April 2021, the Directors notified NexBank SSB of their intention to fully repay the facility and, on 29 April 2021, the loan was repaid in full. Therefore, at 31 December 2021 there was no outstanding balance and no accrued but unpaid interest.

Interest expense is recognised in the Statement of Operations on an accrual basis.

#### i) Dividend Income

Dividend income is recognised in the Statement of Operations within dividend income when the Company's right to receive payments is established. This will generally be the ex-dividend date or, for certain securities, when notified. Dividend income is recognised gross of withholding tax, if any.

#### j) Income and Expense Recognition

Interest on currently paying debt instruments is accrued as earned. In certain instances where the asset has defaulted or some amount of the interest payment is deemed uncollectable, interest is recognised when received. Such accretion/amortisation is calculated on an effective-yield basis. Amendment fees are recognised when received. Dividend income is recorded on the ex-dividend date. Interest income on cash and cash equivalent balances and securities held is accrued when earned. Operating expenses are recorded on the accrual basis as incurred.

#### k) Cash and Cash Equivalents

Cash and cash equivalents consist of cash held at the Principal Bankers and deposits with original maturities of less than 90 days.

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2021**

## 2. Significant Accounting Policies *(continued)*

### l) Foreign Currency

Investment securities and other assets and liabilities denominated in foreign currencies are translated into U.S. Dollar amounts at the date of valuation. Purchases and sales of investment securities and income and expense items denominated in foreign currencies are translated into U.S. Dollar amounts on the respective dates of such transactions in the Statement of Operations.

The Company does not isolate that portion of the results of operations resulting from changes in foreign exchange rates on investments from the fluctuations arising from changes in market prices of securities held.

### m) Distributions

The Directors monitor the Company's profitability and cash flow regularly with a view to paying dividends, or capital distributions, on an ad hoc basis, if and when the Board consider it appropriate.

### n) Management Fees

No management fees will be payable by the Company pursuant to any Services Agreement.

The Company shall pay or reimburse the Portfolio Manager and its affiliates all expenses related to the services as set out in the Portfolio Management Agreement. Highland HCF Advisor receives, in consideration for its services pursuant to the Portfolio Management Agreement, an amount equivalent to all Operating Expenses incurred by the Portfolio Manager in the performance of its obligations thereunder, together with any irrecoverable Valued Added Tax ("VAT") arising on such costs and expenses.

## 3. Financial Instruments with Concentration of Credit Risk and Other Risks

### Limited Diversification

Highland HCF Advisor Ltd., as the Portfolio Manager, had attempted to diversify the Company's investments. However, the Company's portfolio has become significantly concentrated due to the ongoing realisation of its underlying portfolio assets, and such concentration of risk increases the risk of volatility in the Company's net asset value. This limited diversity exposes the Company to the risk of losses that are disproportionate to market movements as a whole.

### Market Risk

Market risk represents the potential loss that may be incurred by the Company due to a change in the market value of its investments. The Company's exposure to market risk is affected by a number of macroeconomic factors, such as interest rates, availability of credit, inflation rates, economic uncertainty and changes in laws and regulations. These factors may affect the level and volatility of security prices and the liquidity of the Company's investments. Volatility or illiquidity could impair the Company's performance or result in losses. The Company may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets.

### Custody Risk

The clearing operations for the Company investments are provided by brokerage firms. The Company is subject to credit risk to the extent that a broker is unable to deliver cash balances or securities, or clear securities transactions on the Company's behalf. In addition, all of the Company's cash and investments are held with banks or brokerage firms. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Company may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations.

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2021**

**3. Financial Instruments with Concentration of Credit Risk and Other Risks** *(continued)*
**Liquidity Risk**
The Company's Ordinary Shares outstanding owned by its investors have not been registered under the Securities Act or any other applicable securities laws. There is no public market for such interests and the Portfolio Manager and the Company do not expect such a market to develop. In addition, the Company's shares are not transferable except with the consent of the Portfolio Manager, which it generally may withhold in its sole discretion in accordance with the terms and conditions of the articles of incorporation.

**Concentration of Credit Risk and Other Risks**
At 31 December 2021, the Company's investments were predominantly concentrated in the Cayman Islands. Industry concentrations are provided in the Condensed Schedule of Investments. Five of the CLO investments held by the Company, representing 43.86% of the Company's net asset value as at 31 December 2021, were in CLOs managed by Acis Capital Management LP ("Acis"), the Company's former Portfolio Manager. These assets were largely redeemed by Acis on or around 23 June 2021 and the substantial proportion of the net asset value of such instruments are now held by US Bank as indenture trustee in the form of cash.

**Litigation**
The Company continues to be party to litigation, resulting in ongoing legal and professional fees. There is a risk that a liability may arise due to future litigation but no provision for adverse costs has been provided for in these financial statements as the Directors believe that, based on the information available at the time of signing these financial statements, it is unlikely that such costs will arise. Further information is provided in the Letter from the Chairman contained on page 3. Additionally, during the year, the Company settled its ongoing disputes with Acis thus enabling the redemption of the Company's CLOs managed by that party.

**Debt Obligations**
The Company's investment portfolio consists of CLOs that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. Because of the inherent uncertainty of the marketability of these investments, the Portfolio Manager's best estimates may differ significantly from values that would have been used had a broader market for the investments existed.

**4. Fair Value Hierarchy of Financial Instruments**
In accordance with the authoritative guidance on fair value measurements and disclosures under U.S. GAAP, the Company discloses the fair value of its investments in a hierarchy that prioritises the inputs to valuation techniques used to measure the fair value. The hierarchy gives the highest priority to valuations based upon unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurements) and the lowest priority to valuations based upon unobservable inputs that are significant to the valuation (Level 3 measurements). The guidance establishes three levels of the fair value hierarchy as follows:

Level 1 – Valuations based on quoted prices in active markets for identical assets and liabilities that the Company has the ability to access as of the measurement date. Valuations utilising Level 1 inputs do not require any degree of judgment.

Level 2 – Valuations based on: (a) quoted prices for similar instruments in active markets; (b) quoted prices for which identical or similar instruments in markets that are not active that are reflective of recent market transactions; or (c) models in which all significant inputs are observable, either directly or indirectly.

Level 3 – Valuations based on indicative quotes that do not reflect recent market transactions and models or other valuation techniques in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2021**

4. **Fair Value Hierarchy of Financial Instruments** *(continued)*

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction. When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs. For certain instruments, the inputs used to measure fair value may fall into different levels of the hierarchy discussed above. In those cases, the instruments are categorised for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

The Company uses prices and inputs that are current as of the measurement dates. The Company also considers the counterparty's non-performance risk when measuring the fair value of its investments.

During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being reclassified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates. Whenever possible, the Company uses actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities. In cases where observable inputs are not available, the Company develops methodologies that provide appropriate fair value estimates. Management reviews these methodologies on a continuous basis to account for changing market conditions.

The Portfolio Manager has established policies, as described above, processes and procedures to ensure that valuation methodologies for investments and financial instruments that are categorised within all levels of the fair value hierarchy are fair and consistent. A Pricing Committee has been established to provide oversight of the valuation policies, processes and procedures, comprising various personnel from the Portfolio Manager.

The Pricing Committee meets monthly to review the proposed valuations for investments and financial instruments. The Pricing Committee is responsible for establishing the valuation policies and evaluating the overall fairness and consistent application of those policies.

As of 31 December 2021, the Company's investments consisted primarily of CLOs, LLC Interests and Limited Partnership Interests.

Loans and bonds that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

The Company categorised investments recorded at fair value in accordance with the hierarchy established.

The following table provides a summary of the investments recorded at fair value on a recurring basis by level within the hierarchy as of 31 December 2021:

| Assets | Level 1 US$ | Level 2 US$ | Level 3 US$ | Total US$ |
|---|---|---|---|---|
| Investments in CLOs | - | - | 61,057,087 | 61,057,087 |
| Limited Partnership Interests | - | - | 176,413 | 176,413 |
| Investments in LLC Interests | - | - | - | - |
| **Total** | **-** | **-** | **61,233,500** | **61,233,500** |

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2021**

### 4. Fair Value Hierarchy of Financial Instruments *(continued)*

The following is a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorised within Level 3 of the fair value hierarchy:

| Category | Fair value at 31/12/21 US$ | Valuation technique | Unobservable inputs | Input value(s) |
|---|---|---|---|---|
| Investments in CLOs | 33,373,100 | Discounted cash flow | WACC | 3.0% |
| | | | Time to monetization | 1.79 years |
| Investments in CLOs | 25,284,457 | Indicative broker quotes | n/a | n/a |
| Investments in CLOs | 2,399,530 | Net asset value | Marketability discount | 19.5% |
| Limited Partnership Interest | 176,413 | Net asset value | n/a | n/a |
| **Total** | **61,233,500** | | | |

The significant unobservable inputs used in the fair value measurements of Level 3 CLO convertible preferred equity positions are weighted average cost of capital ("WACC"), time to monetization and marketability discount. Increases in the WACC in isolation would result in a lower fair value for the security, and vice versa. Increases in the time to monetization and marketability discount would result in a lower fair value of the security, and vice versa.

The following table provides a summary of changes in the amounts for the financial year ended 31 December 2021 for financial instruments classified within Level 3. The classification of a financial instrument within Level 3 is based on the significance of the unobservable inputs to the overall fair value measurement.

| | Fair value at 31/12/20 US$ | Transfers in/(out) of level 3 US$ | Purchases US$ | Sales and maturities US$ | Net realised loss US$ | Net change in unrealised loss US$ | Fair value at 31/12/21 US$ |
|---|---|---|---|---|---|---|---|
| Investments in CLOs | 45,755,325 | - | - | (10,327,643) | - | 25,629,405 | 61,057,087 |
| Investments in LLC Interests | - | - | - | - | - | - | - |
| Limited Partnership Interest | 9,591,413 | - | - | (12,921,398) | (1,958,708) | 5,465,106 | 176,413 |
| | 55,346,738 | - | - | (23,249,041) | (1,958,708) | 31,094,511 | 61,233,500 |

All of the net changes in unrealised losses, which are presented in the table above, are related to investments held as at 31 December 2021.

Transfers into and out of Level 3 would be recognised at the beginning of the financial year, but there were no transfers between levels during the year.

### 5. Share Capital

The shares of the Company are classified as equity based on the substance of the contractual arrangements and in accordance with the definition of equity instruments under ASC 480 "Distinguishing from Equities".

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2021**

**5. Share Capital** *(continued)*
**Ordinary Shares**
The rights attaching to the Ordinary Shares are as follows:

a) As to income - the Ordinary Shares carry the right to receive all income of the Company and to participate in any distribution of such income by the Company.

b) As to capital - on a winding up of the Company or other return of capital (other than by way of a repurchase or redemption of Ordinary Shares in accordance with the provision of the Articles of Incorporation and the Law), the surplus assets of the Company attributable to the Ordinary Shares remaining after payment of all creditors shall be divided amongst the holders of Ordinary Shares.

c) As to voting - the holders of the Ordinary Shares shall be entitled to receive notice of and to attend, speak and vote (in accordance with Article 22 of the Articles of Incorporation) at general meetings of the Company.

The following table represents the movement in Ordinary Shares issued by the Company for the financial year ended 31 December 2021:

|  | 31 December 2021 Quantity |
|---|---|
| Opening balance | 153,139,231 |
| Issued/(repurchased) | - |
| **Closing balance** | **153,139,231** |

**Net Asset Value**
The net asset value per share at 31 December 2021 is determined by dividing the value of the net assets by the total number of Ordinary Shares in issue at the financial year end.

|  | 31 December 2021 |
|---|---|
| Total net assets | US$76,100,545 |
| Number of Ordinary Shares in issue | 153,139,231 |
| Net asset value per Ordinary Share | US$0.50 |

**Capital Management**
The Company is closed-ended and has no externally imposed capital requirements.

**Committed Capital**
On 15 November 2017, the then shareholders entered into a subscription and transfer agreement (the "Subscription Agreement") with the Company. Collectively, the shareholders committed to purchase $153,000,000 of Ordinary Shares from the Company, pro rata, at a price per Ordinary Share determined in reference to the most recent quarterly determined net asset value of the Company.

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2021**

### 5. Share Capital *(continued)*
**Committed Capital** *(continued)*

The Portfolio Manager was able to call capital from the shareholders to purchase additional shares from time to time, on a pro rata basis, upon 10 business days' written notice to the shareholders. Upon the expiration of the Investment Period, all shareholders will be released from any further obligation to purchase shares under the Subscription Agreement, except to the extent necessary to:

(i) Complete, no later than 180 days after the expiration of the Investment Period, the purchase of shares pursuant to written commitments, letters of intent or similar contractual commitments that were in process as of the end of the Investment Period; and

(ii) Fund any indebtedness of the Company permitted hereunder incurred prior to the end of the Investment Period (including to repay outstanding indebtedness under any warehouse loan facilities).

At 31 December 2021 and the date of signing these financial statements, the commitments pursuant to (i) and (ii) above were zero. The Company's Investment Period ended on 30 April 2020.

### 6. Administration

Elysium Fund Management Limited (the "Administrator" or "Elysium") is the Company's administrator, and receives a fee of US$155,000 per annum. During the year, administration fees totalled US$239,684, which includes US$84,684 of fees payable to Elysium for additional work undertaken in the year relating to non-standard work outside the scope of the terms of the agreement between the Company and Elysium.

### 7. Income Taxes

The Company is an exempted company organised in Guernsey. Under the current laws of Guernsey, there are no income, estate, transfer, sale or other taxes payable by the Company.

For U.S. income tax purposes, the Company is treated as a pass-through entity, which means it is not subject to federal taxes under current Internal Revenue Service guidelines. However, each investor may be individually liable for income taxes, if any, on its share of the Company's net taxable income.

The Company invests in CLOs for its own account and, as such, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below). The Portfolio Manager intends to conduct the Company's business in such a manner that it does not constitute a U.S. trade or business, nor does it create a taxable presence in any of the jurisdictions in which the Portfolio Manager has offices.

Dividends as well as certain interest and other income received by the Company from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realised by the Company from non-U.S. sources and capital gains realised on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

The Company applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions which requires management to determine whether a tax position of the Company is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognised in the financial statements is the largest benefit that has a greater than fifty percent likelihood of being realised upon ultimate settlement with the relevant taxing authority. Management have determined that there was no effect on the financial statements from the Company's adoption of this authoritative guidance, and they do not expect a significant change in uncertain tax positions during the twelve months subsequent to 31 December 2021.

Highland CLO Funding, Ltd.    25

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2021**

**7. Income Taxes** *(continued)*
The Company files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Company is subject to examination by federal and foreign jurisdictions, where applicable. As of 31 December 2021, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the commencement of operations forward.

**8. Related Party Transactions**
**Directors' Fees**
The Directors' fees incurred during the year amounted to US$315,606 and are presented in the Statement of Operations. As at 31 December 2021, US$18,198 relating to fees for additional duties was still outstanding and is included within accrued expenses presented in the Statement of Assets and Liabilities. The total fees incurred consisted of base fees of US$115,379 (GBP85,000 equivalent) and US$200,227 related to additional duties arising out of the litigation process referred to in the Directors' Report on page 6 and further described in Note 10 below.

**Affiliates of the Portfolio Manager**
The Company committed US$18,487,500 to purchase limited partnership interests in ACIS CLO Management Holdings, L.P., an affiliated entity controlled by the Portfolio Manager. Of the US$18,487,500 committed, US$17,850,000 was contributed to ACIS CLO Management Holdings, L.P. on 18 September 2017, US$2,650,000 was redeemed on 26 November 2019, US$8,717,198 was redeemed on 17 March 2021, US$4,204,200 was redeemed on 9 November 2021 and US$637,500 remains unfunded as at 31 December 2021. The Company has no obligation to provide further funding to ACIS CLO Management Holdings, L.P.

Certain investments are issued and managed by affiliates of the Portfolio Manager. These investments are subject to the same valuation policies and procedures as similar investments within the same level of the fair value hierarchy. As of 31 December 2021, the Company held the following investments that were issued and managed by affiliates of the Portfolio Manager:

| Issuer | Type of Security | 31 December 2021 Fair Value US$ |
|---|---|---:|
| Greenbriar CLO Ltd | Asset-backed equity tranche | 8,100,000 |
| Brentwood CLO Ltd | Asset-backed equity tranche | 6,000,000 |
| Rockwall CDO Ltd | Asset-backed equity tranche | 5,600,000 |
| Liberty CLO Ltd | Asset-backed equity tranche | 5,115,300 |
| Grayson CLO Ltd | Asset-backed equity tranche | 2,399,530 |
| Gleneagles CLO Ltd | Asset-backed equity tranche | 357,125 |
| ACIS CLO Management Holdings, LP | Limited Partnership | 176,413 |
| | | 27,748,368 |

All related party transactions were made at arm's length on normal commercial terms and conditions. There have been no other transactions between the Company and its related parties during the reporting period.

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2021**

**9. Dividends paid**
The Company declared, and paid, a dividend of $15,865,224 (10.36 cents per Ordinary Share) during 2021. A further dividend of $2,675,342 (1.747 cents per Ordinary Share) was declared in March 2022 and paid on or around 30 March 2022.

**10. Litigation and other significant events during the financial year**
The Letter from the Chairman contained on page 3 summarises the significant events during the year. Additionally, during the year, the Company settled its ongoing disputes with Acis thus enabling the redemption of the Company's CLOs managed by that party.

**11. Commitments and Contingencies**
In the normal course of business, the Company may enter into contracts that provide general indemnifications and contain a variety of representations and warranties that may expose the Company to some risk of loss. The amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant, therefore no contingent liabilities have been raised at the year end.

**12. Subsequent Events**
Russian Invasion of Ukraine
Russia's invasion of Ukraine is a new emerging risk to the global economy. The invasion itself and resulting international sanctions on Russia have already caused substantial economic damage, and is expected to have a severe impact on the global economy. The crisis has spurred further rises in already elevated oil, gas and food prices that will continue to drive inflation. The full effects will take time to flow through fully and manifest themselves in the balance sheets of banks. In this context, we can only express reservations on the near-term outlook for the banking sector and the values of securities may be more volatile as a result. The Company has no direct exposure to assets or businesses domiciled or operating in Russia, the Ukraine or Belarus.

The Company declared a dividend of $2,675,342 (1.747 cents per Ordinary Share) in March 2022 that was paid on or around 30 March 2022.

There were no other significant events affecting the Company since the year end date that require amendment to or disclosure in the Financial Statements.

**13. Going concern**
The COVID-19 pandemic continues to be a risk to the global economy, and, although the impact of COVID-19 continues to be seen across the world, the implications for financial markets has begun to reduce, with rates and equity volatilities improving. Although impeded by the discovery of the new Omicron variant in the fourth quarter of 2021, overall indices were in a better position than at the start of 2021.

Like the majority of companies, COVID-19 has had an impact on the Company's operations but, at the height of the lockdowns in Guernsey and the United States, the Administrator and Portfolio Manager showed that they were able to work remotely without any significant negative impact on the Company's operations.

While the ongoing implications of COVID-19 are still unknown, the positive movements in the market are encouraging but, should another new variant lead to further lockdowns this could change again. However, in part due to the successful vaccine roll-out, there is light at the end of the COVID-19 pandemic tunnel, and it is expected that the risk to the Company from it will continue to decrease throughout 2022.

Although the COVID-19 pandemic could have a negative impact on investment valuations and on the volatility of investment valuations, it does not impact the ability of the Company to continue as a going concern. The impact of the COVID-19 pandemic is changing but the Directors consider that the Company is well placed to deal with challenges arising from the COVID-19 pandemic.

**Highland CLO Funding, Ltd.**
**Notes to the Financial Statements** *(continued)*
**for the year ended 31 December 2021**

**13. Going concern** *(continued)*
Russia's invasion of Ukraine is a new emerging risk to the global economy (see note 12 for further details).

In determining that it is appropriate to adopt the going concern basis in preparing these financial statements, the Directors have taken into consideration:

- The ongoing litigation affecting the Company (see Note 10).

- The possible quantum and timing of cashflows from the redemption of the Company's CLOs currently held in escrow by US Bank and otherwise.

- The possible quantum and timing of cashflows to 30 April 2023, including legal costs based on a number of different scenarios, the increased uncertainty of the income from and valuation of the Company's investments as a result of the COVID-19 pandemic's impact on financial markets, and the recovery via insurance of certain of those legal costs.

After careful consideration of the above, the Board is satisfied that the Company will have adequate liquidity to continue to operate for at least the next 12 months from the date of signing these financial statements and that the going concern basis of preparation of the financial statements for the year ended 31 December 2021 is appropriate.

**Highland CLO Funding, Ltd.**
**Incorporated in Guernsey**
**Registered Number: 60120**
**(the "Company")**


**Notice of Annual General Meeting**


Notice is hereby given that the Annual General Meeting of the Members of the Company will be held at 1st Floor, Royal Chambers, St. Julian's Avenue, St Peter Port, Guernsey, GY1 3JX on 19 May 2022 at 2pm (BST) for the purpose of considering the following:

The Board anticipates that at the time of the Annual General Meeting, shareholders will be able to attend the meeting in person, subject to any COVID-19 restrictions that might be imposed by the States of Guernsey. However, the Board recommends that, due to continuing uncertainty, shareholders appoint the Chairman as proxy and provide voting instructions in advance of the AGM. Should it be required, arrangements will be made by the Company to ensure that the minimum number of shareholders required to form a quorum will attend the AGM so that it may proceed. The completion of the form of proxy will not preclude a member from attending and voting in person at the meeting if it is so allowed.


**AGENDA**

1. To receive and consider the Annual Report and Audited Financial Statements of the Company for the year ended 31 December 2021.

2. To approve the re-appointment of Grant Thornton Limited as Auditor to the Company until the conclusion of the next annual general meeting.

3. To authorise the Directors to determine the Auditor's remuneration for the ensuing year.


19 April 2022

**By Order of the Board**
Elysium Fund Management Limited
Company Secretary


**Registered Office:**
1st Floor
Royal Chambers
St. Julian's Avenue
St Peter Port
Guernsey
GY1 3JX

**Highland CLO Funding, Ltd.**
**Incorporated in Guernsey**
**Registered Number: 60120**
**(the "Company")**

**FORM OF PROXY**

We/I,

………………………………………………………………………………………………………………………………………………………………………,

being a Member of the above named Company hereby appoint

…………………………………………………………………………………………………………………………………………………. (full name)

of

…………………………………………………………………………………………………………………………………………… (address) or
failing him/her the Chairman or the Company Secretary as my/our Proxy to vote for me/us on my/our behalf at
the General Meeting of the Company to be held on 19 May 2022 at 2pm, and at any adjournment thereof.
My/Our Proxy is to vote as indicated by an "X" in the appropriate column. Unless otherwise indicated, my/our
Proxy will vote or abstain as he/she thinks fit.

| *Ordinary Resolutions* | *For* | *Against* | *Abstain* |
|---|---|---|---|
| 1. *To receive and adopt the Annual Report and Audited Financial Statements of the Company for the year ended 31 December 2021.* | | | |
| 2. *To approve the re-appointment of Grant Thornton Limited as Auditor to the Company until the conclusion of the next annual general meeting.* | | | |
| 3. *To authorise the Directors to determine the Auditor's remuneration.* | | | |

…………………………………………………………………………
Authorised Signatory or Print name if an individual

Date: …………………………………

**The proxy must be lodged with the Company Secretary, Elysium Fund Management Limited, 1st Floor, Royal Chambers, St. Julian's Avenue, St Peter Port, Guernsey, GY1 3JX, or be returned by email to elysium@elysiumfundman.com, as soon as possible but to arrive no later than 2pm on 17 May 2022.**

**Highland CLO Funding, Ltd.**
**Incorporated in Guernsey**
**Registered Number: 60120**
**(the "Company")**

**Notes:**

(i)  In accordance with Section 252 of the Companies (Guernsey), Law, 2008 (the "**Law**") the Company is required to lay copies of its most recent Accounts, Directors' Report and Auditor's Report before the Annual General Meeting.

(ii)  In accordance with section 222 of the Law, each shareholder is entitled to appoint another person as his proxy to exercise all or any of his rights to attend and to speak and vote at a meeting of the Company. A proxy need not be a member of the Company.

(iii)  This instrument, if given by a company, should be executed under the common seal of that company or under the hand of an officer or attorney duly authorised to do so.

(iv)  This instrument and the power of attorney or other authority (if any) under which it is signed, or a notarised certified copy of that power or authority, must be delivered to the Registered Office of the Company so as to arrive no later than 2pm on 17 May 2022.

(v)  In the case of joint holders of a Share, the vote of the senior who tenders a vote whether in person or by proxy shall be accepted to the exclusion of the votes of the other joint holders, and for this purpose seniority shall be determined by the order in which the names stand in the Register in respect of the relevant Share.

(vi)  Only shareholders registered in the register of members of the Company at the close of business on 18 May 2022 shall be entitled to vote at the aforesaid meeting in respect of the number of shares registered in their name at the time, or in the event that the meeting is adjourned in accordance with the provisions before the time of any adjourned meeting. Changes to entries in the Register of members after such time or, in the event that the meeting is adjourned, to entries in the register of members after close of business before the time of the adjourned meeting, shall be disregarded in determining the rights of any person to attend or vote at the meeting.

(vii)  To change your proxy instructions, simply submit a new proxy appointment using the method set out above. If you submit more than one valid proxy appointment, the appointment received before the latest time for the receipt of proxies will take precedence. Please note that the cut-off time for receipt of proxy appointments also applies in relation to amended instructions; any amended proxy appointment received after the relevant cut-off time will be disregarded.

(viii)  To appoint more than one proxy you may photocopy the form of proxy. Please indicate the proxy holder's name and the number of shares in relation to which they are authorised to act as your proxy (which, in aggregate should not exceed the number of shares held by you). Please also indicate if the proxy instruction is one of multiple instructions being given. All forms must be signed and should be returned together in the same envelope.

**EXECUTION VERSION**

## SETTLEMENT AGREEMENT

This Settlement Agreement (the "<u>Agreement</u>") is entered into as of December 23, 2020, between Highland Capital Management, L.P. (the "<u>Debtor</u>"), on the one hand, and HarbourVest 2017 Global Fund L.P., HarbourVest 2017 Global AIF L.P., HarbourVest Dover Street IX Investment L.P., HV International VIII Secondary L.P., HarbourVest Skew Base AIF L.P., and HarbourVest Partners L.P. (each, a "<u>HarbourVest Party</u>," and collectively, "<u>HarbourVest</u>"), on the other hand. Each of the foregoing are sometimes referred to herein collectively as the "<u>Parties</u>" and individually as a "<u>Party</u>."

## R E C I T A L S

**WHEREAS,** on October 16, 2019 (the "<u>Petition Date</u>"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code (the "<u>Bankruptcy Case</u>") in the Bankruptcy Court for the District of Delaware, Case No. 19-12239 (CSS) (the "<u>Delaware Bankruptcy Court</u>");

**WHEREAS**, on December 4, 2019, the Delaware Bankruptcy Court entered an order transferring venue of the Debtor's case to the Bankruptcy Court for the Northern District of Texas, Dallas Division, Case No. 19-34054-sgj (the "<u>Bankruptcy Court</u>");

**WHEREAS,** prior to the Petition Date, HarbourVest invested in Highland CLO Funding, Ltd. f/k/a Acis Loan Funding, Ltd. ("<u>HCLOF</u>") and acquired an a 49.98% ownership interest in HCLOF (the "<u>HarbourVest Interests</u>");

**WHEREAS**, the portfolio manager for HCLOF is Highland HCF Advisor, Ltd., a subsidiary of the Debtor;

**WHEREAS,** on April 8, 2020, HarbourVest filed proofs of claim in the Bankruptcy Case, which are listed on the Debtor's claims register as claim numbers 143, 147, 149, 150, 153, and 154 (the "<u>HarbourVest Claims</u>"), asserting claims against the Debtor relating to its investment in HCLOF;

**WHEREAS,** on July 30, 2020, the Debtor filed the *Debtor's First Omnibus Objection to Certain (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 906], in which the Debtor objected to the HarbourVest Claims;

**WHEREAS,** on September 11, 2020, HarbourVest filed the *HarbourVest Response to Debtor's First Omnibus Objection to Creation (a) Duplicate Claims; (b) Overstated Claims; (c) Late-Filed Claims; (d) Satisfied Claims; (e) No Liability Claims; and (f) Insufficient-Documentation Claims* [Docket No. 1057] (the "<u>HarbourVest Response</u>");

**WHEREAS**, on October 18, 2020, HarbourVest filed the *Motion of HarbourVest Pursuant to Rule 3018(a) of the Federal Rules of Bankruptcy Procedure for Temporary Allowance of Claims for Purposes of Voting to Accept or Reject the Plan* [Docket No. 1207] (the "<u>3018 Motion</u>" and together with the HarbourVest Response, the "<u>HarbourVest Pleadings</u>");

1

US-DOCS\115534291.12

**EXECUTION VERSION**

**WHEREAS**, in the HarbourVest Pleadings, HarbourVest asserted, among other things, that the HarbourVest Claims included claims against the Debtor arising from fraudulent inducement, fraudulent concealment, fraudulent misrepresentation, breach of fiduciary duty, breach of securities laws, and misuse of assets and sought damages in excess of $300,000,000;

**WHEREAS**, the Debtor disputes the HarbourVest Claims;

**WHEREAS**, on November 24, 2020, the Debtor filed the *Fifth Amended Plan of Reorganization for Highland Capital Management, L.P.* [Docket No. 1472] (as amended, the "Plan").[1]

**WHEREAS**, the Parties desire to enter into this Agreement which incorporates, formalizes, and finalizes the full and final resolution of the HarbourVest Claims and HarbourVest Pleadings; and

**WHEREAS**, this Agreement will be presented to the Bankruptcy Court for approval pursuant to Federal Rule of Bankruptcy Procedure 9019 ("Rule 9019").

**NOW THEREFORE**, in consideration of the above recitals, the covenants, conditions, and promises made herein, and other good and valuable consideration, the receipt of which is hereby acknowledged, the Parties agree as follows:

1. **Settlement of Claims.**

(a) In full and complete satisfaction of the HarbourVest Claims, HarbourVest will receive:

(i) an allowed, nonpriority general unsecured claim in the aggregate amount of $45,000,000 (the "Allowed GUC Claim"); and

(ii) an allowed subordinated claim in the aggregate amount of $35,000,000 (the "Allowed Subordinated Claim" and together with the Allowed GUC Claim, the "Allowed Claims").

(b) On the Effective Date, HarbourVest will transfer all of its rights, title, and interest in the HarbourVest Interests to the Debtor or its nominee pursuant to the terms of the *Transfer Agreement for Ordinary Shares of Highland CLO Funding, Ltd.*, attached hereto as Exhibit A (the "Transfer Agreements") and the Debtor or its nominee will become a shareholder of HCLOF with respect to the HarbourVest Interests. The terms of the Transfer Agreements are incorporated into this Agreement by reference.

2. **Releases.**

(a) Upon the Effective Date, and to the maximum extent permitted by law, each HarbourVest Party on behalf of itself and each of its current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents,

---

[1] All capitalized terms used but not defined herein shall have the meanings given to them in the Plan.

2

**EXECUTION VERSION**

participants, subsidiaries, parents, successors, designees, and assigns hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue, the Debtor, HCLOF, HCLOF's current and former directors, and the Debtor's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns, except as expressly set forth below (the "Debtor Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, including, without limitation, those which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "HarbourVest Released Claims").

(b)     Upon the Effective Date, and to the maximum extent permitted by law, the Debtor hereby forever, finally, fully, unconditionally, and completely releases, relieves, acquits, remises, and exonerates, and covenants never to sue (i) each HarbourVest Party and (ii)  each HarbourVest Party's current and former advisors, trustees, directors, officers, managers, members, partners, employees, beneficiaries, shareholders, agents, participants, subsidiaries, parents, affiliates, successors, designees, and assigns (the "HarbourVest Released Parties"), for and from any and all claims, debts, liabilities, demands, obligations, promises, acts, agreements, liens, losses, costs and expenses (including, without limitation, attorney's fees and related costs), damages, injuries, suits, actions, and causes of action of whatever kind or nature, whether known or unknown, suspected or unsuspected, matured or unmatured, liquidated or unliquidated, contingent or fixed, at law or in equity, statutory or otherwise, including, without limitation, any claims, defenses, and affirmative defenses, whether known or unknown, which were or could have been asserted in, in connection with, or with respect to the Bankruptcy Case (collectively, the "Debtor Released Claims"); *provided, however,* that notwithstanding anything herein to the contrary, the release contained in this Section 2(b) will apply to the HarbourVest Released Parties set forth in subsection (b)(ii) only with respect to Debtor Released Claims arising from or relating to HarbourVest's ownership of the HarbourVest Interests.

(c)     Notwithstanding anything in this Agreement to the contrary, the releases set forth herein will not apply with respect to (i) the Allowed Claims, (ii) the claims of Charlotte Investor IV, L.P., or (iii) the duties, rights, or obligations of any Party under this Agreement or the Transfer Agreements.

3.     **Agreement Subject to Bankruptcy Court Approval.**  The effectiveness of this Agreement and the Parties' obligations hereunder are conditioned in all respects on the approval of this Agreement by the Bankruptcy Court.  The Parties agree to cooperate and use reasonable efforts to have this Agreement approved by the Bankruptcy Court.  The "Effective Date" will be the date of an order entered by the Bankruptcy Court approving this Agreement pursuant to a motion filed under Rule 9019.

<div align="center">3</div>

US-DOCS\115534291.12

**EXECUTION VERSION**

4. **Representations and Warranties**. Subject in all respects to Section 3 hereof:

(a) each HarbourVest Party represents and warrants that (i) it has full authority to enter into this Agreement and to release the HarbourVest Released Claims and has not sold, transferred, or assigned any HarbourVest Released Claim to any other person or entity, (ii) no person or entity other than such HarbourVest Party has been, is, or will be authorized to bring, pursue, or enforce any HarbourVest Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of such HarbourVest Party; and (iii) HarbourVest owns all of the HCLOF Interests free and clear of any claims or interests; and

(b) the Debtor represents and warrants to HarbourVest that (i) it has full authority to enter into this Agreement and to release the Debtor Released Claims and (ii) no person or entity other than the Debtor has been, is, or will be authorized to bring, pursue, or enforce any Debtor Released Claim on behalf of, for the benefit of, or in the name of (whether directly or derivatively) of the Debtor Party.

5. **Plan Support.**

(a) Each HarbourVest Party hereby agrees that it will (a) vote all HarbourVest Claims held by such HarbourVest Party to accept the Plan, by delivering its duly executed and completed ballots accepting the Plan on a timely basis; and (b) not (i) change, withdraw, or revoke such vote (or cause or direct such vote to be changed withdrawn or revoked); (ii) exercise any right or remedy for the enforcement, collection, or recovery of any claim against the Debtor except in a manner consistent with this Agreement or the Plan, (iii) object to, impede, or take any action other action to interfere with, delay or postpone acceptance or confirmation of the Plan; (iv) directly or indirectly solicit, propose, file, support, participate in the formulation of or vote for, any restructuring, sale of assets (including pursuant to 11 U.S.C. § 363), merger, workout, or plan of reorganization of the Debtor other than the Plan; or (v) otherwise take any action that would in any material respect interfere with, delay, or postpone the consummation of the Plan; provided, however, that such vote may be revoked (and, upon such revocation, deemed void ab initio) by such HarbourVest Party at any time following the termination of this agreement or the occurrence of a Support Termination Event (it being understood that any termination of this agreement shall entitle each HarbourVest Party to change its vote in accordance with section 1127(d) of the Bankruptcy Code), notwithstanding any voting deadline established by the Bankruptcy Court including without limitation the January 5, 2021, 5:00 p.m. (prevailing Central Time) deadline established by the *Order Approving Form of Ballots, Voting Deadline and Solicitation Procedures* [Docket No. 1476].

(b) In full resolution of the 3018 Motion, HarbourVest will have a general unsecured claim for voting purposes only in the amount of $45,000,000.

(c) The obligations of the HarbourVest Parties under this Section 5 shall automatically terminate upon the occurrence of any of the following (each a "Support Termination Event"): (i) the effective date of the Plan, (ii) the withdrawal of the Plan, (iii) the entry of an order by the Bankruptcy Court (A) converting the Bankruptcy Case to a case under chapter 7 of the Bankruptcy Code or (B) appointing an examiner with expanded powers beyond those set forth in sections 1106(a)(3) and (4) of the Bankruptcy Code or a trustee in Bankruptcy

4

**EXECUTION VERSION**

Case, or (iv) the failure of the Court to enter an order approving the terms of this Agreement and the settlement described herein pursuant to Rule 9019 prior to confirmation of the Plan.

6.    **No Admission of Liability**.  The Parties acknowledge that there is a bona fide dispute with respect to the HarbourVest Claims.  Nothing in this Agreement will imply, an admission of liability, fault or wrongdoing by the Debtor, HarbourVest, or any other person, and the execution of this Agreement does not constitute an admission of liability, fault, or wrongdoing on the part of the Debtor, HarbourVest, or any other person.

7.    **Successors-in-Interest.**  This Agreement shall be binding upon and shall inure to the benefit of each of the Parties and their successors, and assigns.

8.    **Notice**.  Each notice and other communication hereunder will be in writing and will be sent by email and delivered or mailed by registered mail, receipt requested, and will be deemed to have been given on the date of its delivery, if delivered, and on the fifth full business day following the date of the mailing, if mailed to each of the Parties thereto at the following respective addresses or such other address as may be specified in any notice delivered or mailed as set forth below:

**HARBOURVEST**

HarbourVest Partners L.P.
Attention: Michael J. Pugatch
One Financial Center
Boston, MA 02111
Telephone No. 617-348-3712
E-mail: mpugatch@harbourvest.com

with a copy (which shall not constitute notice) to:

Debevoise & Plimpton LLP
Attention: M. Natasha Labovitz, Esq.
919 Third Avenue
New York, NY 10022
Telephone No. 212-909-6649
E-mail: nlabovitz@debevoise.com

**THE DEBTOR**

Highland Capital Management, L.P.
300 Crescent Court, Suite 700
Dallas, Texas 75201
Attention: James P. Seery, Jr.
Telephone No.: 972-628-4100
Facsimile No.: 972-628-4147
E-mail: jpseeryjr@gmail.com

5

EXECUTION VERSION

with a copy (which shall not constitute notice) to:

Pachulski Stang Ziehl & Jones LLP
Attention: Jeffrey Pomerantz, Esq.
10100 Santa Monica Blvd., 13th Floor
Los Angeles, CA 90067
Telephone No.: 310-277-6910
Facsimile No.: 310-201-0760
E-mail: jpomerantz@pszjlaw.com

9.     **Advice of Counsel**.  Each Party represents that it has: (a) been adequately represented by independent legal counsel of its own choice, throughout all of the negotiations that preceded the execution of this Agreement; (b) executed this Agreement upon the advice of such counsel; (c) read this Agreement, and understands and assents to all the terms and conditions contained herein without any reservations; and (d) had the opportunity to have this Agreement and all the terms and conditions contained herein explained by independent counsel, who has answered any and all questions asked of such counsel, or which could have been asked of such counsel, including, but not limited to, with regard to the meaning and effect of any of the provisions of this Agreement.

10.     **Entire Agreement**.  This Agreement and the Transfer Agreement contain the entire agreement and understanding concerning the subject matter of this Agreement, and supersede and replace all prior negotiations and agreements, written or oral and executed or unexecuted, concerning such subject matter.  Each of the Parties acknowledges that no other Party, nor any agent of or attorney for any such Party, has made any promise, representation or warranty, express or implied, written or oral, not otherwise contained in this Agreement to induce any Party to execute this Agreement.  The Parties further acknowledge that they are not executing this Agreement in reliance on any promise, representation or warranty not contained in this Agreement, and that any such reliance would be unreasonable.  This Agreement will not be waived or modified except by an agreement in writing signed by each Party or duly authorized representative of each Party.

11.     **No Party Deemed Drafter**.  The Parties acknowledge that the terms of this Agreement are contractual and are the result of arms'-length negotiations between the Parties and their chosen counsel. Each Party and its counsel cooperated in the drafting and preparation of this Agreement.  In any construction to be made of this Agreement, the Agreement will not be construed against any Party.

12.     **Future Cooperation**.  The Parties agree to cooperate and execute such further documentation as is reasonably necessary to effectuate the intent of this Agreement.

13.     **Counterparts**.  This Agreement may be executed in counterparts with the same force and effect as if executed in one complete document. Each Party's signature hereto will signify acceptance of, and agreement to, the terms and provisions contained in this Agreement. Photographic, electronic, and facsimile copies of signed counterparts may be used in lieu of the originals of this Agreement for any purpose.

6

**EXECUTION VERSION**

      14.     <u>**Governing Law; Venue; Attorneys' Fees and Costs**</u>.  The Parties agree that this Agreement will be governed by and will be construed according to the laws of the State of Texas without regard to conflict-of-law principles.  Each of the Parties hereby submits to the exclusive jurisdiction of the Bankruptcy Court during the pendency of the Bankruptcy Case and thereafter to the exclusive jurisdiction of the state and federal courts located in the Northern District of Texas, Dallas Division, with respect to any disputes arising from or out of this Agreement.  In any action to enforce this Agreement, the prevailing party shall be entitled to recover its reasonable and necessary attorneys' fees and costs (including experts).

*[Remainder of Page Intentionally Blank]*

7

US-DOCS\115534291.12

**EXECUTION VERSION**

**IT IS HEREBY AGREED.**

**HIGHLAND CAPITAL MANAGEMENT, L.P.**

By:     /s/ James P. Seery, Jr.
Name: James P. Seery, Jr.
Its:    CEO/CRO

**HarbourVest 2017 Global Fund L.P., by HarbourVest 2017 Global Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

**HarbourVest 2017 Global AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

**HarbourVest Dover Street IX Investment L.P., by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

**HarbourVest Partners L.P., on behalf of funds and accounts under management, by HarbourVest Partners, LLC, its General Partner**

By:     /s/ Michael Pugatch
Name: Michael Pugatch
Its:    Managing Director

8

**EXECUTION VERSION**

**HarbourVest Skew Base AIF L.P., by HarbourVest Partners (Ireland) Limited, its Alternative Investment Fund Manager, by HarbourVest Partners L.P., its Duly Appointed Investment Manager, by HarbourVest Partners, LLC, its General Partner**

By:   /s/ Michael Pugatch
Name: Michael Pugatch
Its:   Managing Director

**HV International VIII Secondary L.P., by HIPEP VIII Associates L.P., its General Partner, by HarbourVest GP LLC, its General Partner, by HarbourVest Partners, LLC, its Managing Member**

By:   /s/ Michael Pugatch
Name: Michael Pugatch
Its:   Managing Director

9

## PORTFOLIO MANAGEMENT AGREEMENT

THIS PORTFOLIO MANAGEMENT AGREEMENT (this "**Agreement**"), dated to be effective from November 15, 2017 (the "**Effective Date**") is entered into by and between Highland CLO Funding, Ltd (formerly known as Acis Loan Funding, Ltd.), a closed-ended investment company limited by shares incorporated under the laws of Guernsey with registered number 60120, (the "**Company**") and Highland HCF Advisor, Ltd., an exempted company incorporated in the Cayman Islands with limited liability (the "**Portfolio Manager**").

## RECITALS

WHEREAS, the Company and the Portfolio Manager entered into that certain Portfolio Management Agreement, dated to be effective from October 27, 2017 (the "**Predecessor Portfolio Management Agreement**"); and

WHEREAS, the Company and the Portfolio Manager desire to supersede and replace the Predecessor Portfolio Management Agreement in its entirety with this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants herein contained and for other good and valuable consideration, the receipt of which is hereby acknowledged, the parties hereto agree as follows:

1.    Termination of the Predecessor Portfolio Management Agreement.  Effective as of the Effective Date, (x) the Predecessor Portfolio Management Agreement is hereby cancelled and terminated in its entirety and (y) each party ratifies prior transactions effected in accordance with the Predecessor Portfolio Management Agreement.

2.    Appointment of the Portfolio Manager.  The Portfolio Manager shall act as the investment manager to the Company and shall manage the investment and reinvestment of the cash, Financial Instruments (as defined in Section 5 below) and other properties comprising the assets and liabilities of the Company, in each case, subject to and in accordance with the investment

23959288.8. BUSINESS

policy of the Company as set forth in the Company's Offering Memorandum dated November 15, 2017 (as amended, modified or supplemented from time to time, the "**Offering Memorandum**"), subject to the restrictions set forth therein (the "**Investment Policy**").

3.     Additional Portfolio Services.    The Portfolio Manager shall discuss with the directors of the Company (the "**Directors**") the investment objectives of the Company and assist the Directors to develop, monitor and update the Company's Investment Policy; shall identify and present information to the Directors with respect to potential investments available to the Company in furtherance of the Investment Policy, including (without limitation) credit and market research and analysis in connection with the origination or acquisition of such investments; shall provide such assistance with respect to the administration and valuation of the Company's investment portfolio as the Directors shall reasonably require; and shall make available to the Company such personnel and resources as are necessary in connection with the foregoing services.

4.     Custody.    The Financial Instruments (as defined in Section 5 below) shall be held in the custody of State Street Custodial Services (Ireland) Limited or one or more banks selected by the Company (each such bank, a "**Custodian**").    The Company will notify the Portfolio Manager promptly of the proposed selection of any other Custodians.    The Custodian shall at all times be responsible for the physical custody of the Financial Instruments; for the collection of interest, dividends, and other income attributable to the Financial Instruments; and for the exercise of rights and tenders on the Financial Instruments after consultation with and as then directed by the Company.    At no time shall the Portfolio Manager have possession of or maintain custody over any of the Financial Instruments.    The Portfolio Manager shall not be responsible for any loss incurred by reason of any act or omission of the Custodian.

5.     Authority of the Portfolio Manager.

(a)     Subject at all times to (i) provisions of applicable law, (ii) the Investment Policy, (iii) that certain Shareholders Agreement by and among the Manager, the Company and shareholders of the Company, dated as of the date hereof, and (iv) the Memorandum and Articles of Incorporation of the Company, the Portfolio Manager shall have the authority for and in the name of the Company to:

(i)     invest, directly or indirectly, on margin or otherwise, in all types of securities and other financial instruments of United States and non-U.S. entities, including, without limitation, capital stock; all manner of equity securities (whether registered or unregistered, traded or privately offered, American Depository Receipts, common or preferred); physical commodities; shares of beneficial interest; partnership interests, limited liability company interests and similar financial instruments; secured and unsecured debt (both corporate and sovereign, bank debt, vendor claims and/or other contractual claims); bonds, notes and debentures (whether subordinated, convertible or otherwise); currencies; interest rate, currency, equity and other derivative products, including, without limitation, (i) senior secured loans, (ii) notes representing tranches of debt ("**CLO Notes**") issued by a special purpose vehicle which issues notes backed by a pool of collateral consisting primarily of loans (which may be represented by a debt or equity security) (a "**CLO**"), (iii) preference shares, income notes or other equity instruments issued by CLO issuers, (iv) equity interests or loans in asset management companies, (v) future contracts (and options thereon) relating to stock indices, currencies, United States Government securities, securities of non-U.S. governments, other financial instruments and all other commodities, (vi) swaps and contracts for difference, options, swaptions, rights, warrants, when- issued securities, caps, collars, floors, forward rate agreements, and repurchase and reverse repurchase agreements and other cash equivalents, (vii) spot and forward currency transactions and (viii) agreements

23959288.8. BUSINESS                      3

relating to or securing such transactions; leases, including, without limitation, equipment lease certificates; equipment trust certificates; mortgage-backed securities and other similar instruments (including, without limitation, fixed-rate, pass-throughs, adjustable rate mortgages, collateralized mortgage obligations, stripped mortgage-backed securities and REMICs); loans; credit paper; accounts and notes receivable and payable held by trade or other creditors; trade acceptances and claims; contract and other claims; executory contracts; participations; mutual funds, exchange traded funds and similar financial instruments; money market funds and instruments; obligations of the United States, any state thereof, non-U.S. governments and instrumentalities of any of them; commercial paper; certificates of deposit; bankers' acceptances; trust receipts; letters of credit; choses in action; puts; calls; other obligations and instruments or evidences of indebtedness of whatever kind or nature; and real estate and any kind of interests in real estate; in each case, of any person, corporation, government or other entity whatsoever, whether or not publicly traded or readily marketable (each of such items, "**Financial Instruments**"), and the sale of Financial Instruments short and covering such sales; provided that the Portfolio Manager shall not cause the Company to invest, directly or indirectly, in derivatives for speculative purposes and only for the purpose of hedging investments consistent with the investment objectives of the Company;

(ii)     engage in such other lawful Financial Instruments transactions as the Portfolio Manager may from time to time determine;

(iii)     provide credit and market research and analysis in connection with the investments and ongoing management of the Company and direct the formulation of investment policies and strategies for the Company;

(iv)     purchase Financial Instruments and hold them for investment;

(v) enter into contracts for or in connection with investments in Financial Instruments;

(vi) invest in other pooled investment vehicles, which investments shall be subject in each case to the terms and conditions of the respective governing document for each such vehicle;

(vii) possess, transfer, mortgage, pledge or otherwise deal in, and exercise all rights, powers, privileges and other incidents of ownership or possession with respect to Financial Instruments and other property and funds held or owned by the Company and/or its subsidiaries;

(viii) lend, either with or without security, any Financial Instruments, funds or other properties of the Company, including by entering into reverse repurchase agreements, and, from time to time, undertaking leverage on behalf of the Company;

(ix) open, maintain and close accounts, including margin and custodial accounts, with brokers and dealers, including brokers and dealers located outside the United States;

(x) open, maintain and close accounts, including custodial accounts, with banks, including banks located outside the United States, and drawing checks or other orders for the payment of monies;

(xi) combine purchase or sale orders on behalf of the Company with orders for other accounts to which the Portfolio Manager or any of its affiliates provides investment services ("**Other Accounts**") and allocate the Financial Instruments or other assets so purchased or sold, on an average-price basis or in any other manner deemed fair and equitable to the Portfolio Manager in good faith, among such accounts;

(xii)    enter into arrangements with brokers to open "average price" accounts wherein orders placed during a trading day are placed on behalf of the Company and Other Accounts and are allocated among such accounts using an average price;

(xiii)    organize one or more corporations and other entities formed to hold record title, as nominee for the Company (whether alone or together with the Other Accounts), to Financial Instruments or funds of the Company;

(xiv)    cause the Company to engage in cross transactions with Other Accounts, in each case, to the extent permitted by applicable laws; provided that the Portfolio Manager may not cause the Company to engage in transactions, directly or indirectly, with the Portfolio Manager or its principals or affiliates without the consent of the Advisory Board of the Company; provided further that no transaction that is specifically authorized in the Offering Memorandum shall require approval of the Advisory Board, including, without limitation, sales or securitizations of all or a portion of the Company's loan portfolio into new Qualifying CLOs (i.e. the transfer of warehoused assets into new Qualifying CLOs), investments in CLO Notes issued by CLOs managed by Highland affiliates, and the NexBank Credit Facility and any Permitted NexBank Credit Facility Amendments, in each case as described in and subject to the terms set forth in the Offering Memorandum;

(xv)    engage and/or provide personnel, whether part-time or full- time, and attorneys, independent accountants or such other persons (including, without limitation, finders, consultants, investment bankers and any human resources as may be necessary for the Company to conduct any matters related to its portfolio of assets on behalf of or for the Company);

(xvi)    provide certain support and assistance (including back office and middle office functions) to the Company; and

(xvii) vote Financial Instruments, participate in arrangements with creditors, the institution and settlement or compromise of suits and administrative proceedings and other like or similar matters.

(b) Notwithstanding anything to the contrary in this Agreement, the Portfolio Manager shall not have the authority to engage in any action, or cause the Company to engage in any action, that requires the consent of the Advisory Board of the Company, as described in the Offering Memorandum, unless such consent has been obtained.

For purposes of this Agreement, "affiliate" or "affiliated" means, with respect to a person, (i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director, officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above. For the purposes of this definition, control of a person shall mean the power, direct or indirect, (i) to vote more than 50% of the securities having ordinary voting power for the election of directors of such persons or (ii) to direct or cause the direction of the management and policies of such person whether by contract or otherwise. For purposes of this definition, the management of an account by one person for the benefit of any other person shall not constitute "control" of such other person and no entity shall be deemed an "affiliate" of the Company solely because the Administrator or its affiliates serve as administrator or share trustee for such entity.

6. <u>Policies of the Company</u>. The activities engaged in by the Portfolio Manager shall be subject to the policies and control of the Company, including (without limitation) the Investment Policy.

23959288.8. BUSINESS 7

The Portfolio Manager shall submit such periodic reports, recommendations, research and analytic material to the Company regarding the Investment Policy, the Company's investment portfolio and the Portfolio Manager's activities hereunder as the Company may reasonably request and a representative of the Portfolio Manager shall be available to meet with the Company (whether in person or by telephone) as reasonably requested by the Company.

In furtherance of the foregoing, the Company hereby appoints the Portfolio Manager as the Company's attorney-in-fact, with full power of authority to act in the Company's name and on its behalf with respect to the matters set forth in Section 5 above.

The Portfolio Manager represents and warrants that, as of the date hereof, it is not, and hereafter shall not become, in violation of any applicable statute or any applicable rule, regulation or order of any court, government agency or body having jurisdiction over the Portfolio Manager or its properties, the breach or violation of which or default under which would have a material adverse effect on the Company, the validity or enforceability of this Agreement or the provisions of the Offering Memorandum applicable to the Portfolio Manager, or the performance by the Portfolio Manager of its duties hereunder or thereunder.

7.    <u>Status of the Portfolio Manager</u>.  The Portfolio Manager shall, for all purposes, be an independent contractor and not an employee of the Company, and nothing herein shall be construed as making the Company a partner, member or co-venturer with the Portfolio Manager or any of its affiliates or clients.  The Portfolio Manager shall have no authority to act for, represent, bind or obligate the Company except as specifically provided herein.

8.    <u>Reimbursement by the Company</u>.  The Portfolio Manager may retain, in connection with its responsibilities hereunder, the services of others to assist in the investment advice to be given to the Company with respect to the Company and/or its subsidiaries (any such appointee, a

"**Sub-Services Provider**"), including, but not limited to, any affiliate of the Portfolio Manager, but payment for any such services shall be assumed by the Portfolio Manager, and the Company shall not have any liability therefor; provided, however, that the Portfolio Manager, in its sole discretion, may retain the services of independent third party professionals, including, without limitation, attorneys, accountants and consultants, to advise and assist it in connection with the performance of its activities on behalf of the Company, and the Company shall bear full responsibility therefor and the expense of any fees and disbursements arising therefrom, including any irrecoverable VAT arising on such costs and expenses.

      9.     <u>Expenses; Compensation</u>.

      (a)     Except as provided below, the Portfolio Manager will pay all of its own operating, overhead and administrative expenses, including all costs and expenses on account on employee compensation, employee benefits and rent ("**Overhead**") without reimbursement by the Company. The Company shall pay or reimburse the Portfolio Manager and its affiliates for all expenses related to the services hereunder, including, but not limited to, reasonable third party costs and expenses, investment-related expenses, brokerage commissions and other transaction costs, expenses related to clearing and settlement charges, actual out-of-pocket professional fees relating to legal, auditing or valuation services, any governmental, regulatory, licensing, filing or registration fees incurred in connection with the Company's compliance with the rules of any self-regulatory organization or any federal, state or local laws, research-related expenses (including, without limitation, news and quotation equipment and services, investment and trading-related software, including, without limitation, trade order management software (i.e., software used to route trade orders)), accounting (including accounting software), tax preparation expenses, costs and expenses associated with reporting and providing information to the Company, any taxes

imposed upon the Company (including, but not limited to, any irrecoverable VAT arising on such costs and expenses), fees relating to valuing the Financial Instruments, extraordinary expenses and the Company's indemnification obligations (including those incurred in connection with indemnifying indemnified persons, including advancing such amounts) (collectively, the "**Operating Expenses**").  In the event any fees or expenses are for services used by, or attributable to, other persons advised by the Portfolio Manager or its affiliates, including, but not limited to, any fees or expenses for software or subscription-based services, the Company shall only reimburse the Portfolio Manager for its pro rata share of such expenses, as determined by the Portfolio Manager in good faith.  For the avoidance of doubt, (i) the cost of all third party expenses incurred by the Portfolio Manager in connection with this Agreement shall not exceed standard market rates (which may include standard soft dollar arrangements) and (ii) to the extent any of the foregoing expenses were incurred on behalf of, or benefit of a number of Portfolio Manager's advised accounts, such expenses shall be allocated pro rata among such accounts.

(b)　　To the extent that expenses to be borne by the Company are paid by the Portfolio Manager or by any Sub-Services Provider, the Company shall reimburse the Portfolio Manager (or the relevant Sub-Services Provider, as applicable) for such expenses so long as such expenses are determined on an arm's length basis.

(c)　　The Portfolio Manager will also receive distributions as set forth in the terms of the Offering Memorandum in the Section "*Summary-Dividend Policy*" pursuant to the Distribution Priority following the Investment Period (in each case, as set forth and defined in the Offering Memorandum), after satisfaction of all expenses, debts, liabilities and obligations of the Company and the Shareholders have received a cumulative rate of return of 8.0% per annum, compounded annually.

23959288.8. BUSINESS

10

10.    <u>Exculpation; Indemnification</u>.

(a)    The Portfolio Manager assumes no responsibility under this Agreement other than to render the services called for hereunder and affecting the duties and functions that have been delegated to it thereunder in good faith and, subject to the standard of conduct described in the next succeeding sentence. The Portfolio Manager shall not be responsible for any action or inaction of the Company in declining to follow any advice, recommendation or direction of the Portfolio Manager.

(b)    Whether or not herein expressly so provided, every provision of this Agreement relating to the conduct or affecting the liability of or affording protection to the Portfolio Manager, its affiliates, any officer, director, secretary, manager, employee or any direct or indirect partner, member, stockholder, agent or legal representative (e.g., executors, guardians and trustees) of the Portfolio Manager and its affiliates, including persons formerly serving in such capacities, any person who serves at the request of the Portfolio Manager or the Board of Directors of the Company, on behalf of the Company as an officer, director, secretary, manager, partner, member, employee, stockholder, agent or legal representative of any other person serving at the request of the Portfolio Manager or the Board of Directors of the Company on behalf of the Company in such capacity as listed above and any assignees or successors of the foregoing (each, a "**Indemnified Person**" and collectively, "**Indemnified Persons**") shall be subject to the provisions of this Section.

(c)    To the fullest extent permitted by law, no Indemnified Person shall incur liability to the Company or any Shareholder in the absence of a finding by any court or governmental body of competent jurisdiction in a final, non-appealable judgment that the commission by such person of an action, or the omission by such person to take an action,

11

constitutes bad faith, gross negligence or wilful misconduct (a "**Triggering Event**"), except as otherwise required by applicable law (including the Companies Law). Any claims arising from a Triggering Event shall be limited to actual out-of-pocket damages incurred as a direct consequence of the Triggering Event, and shall not include punitive, consequential or other damages or lost profits.

(d)      Indemnified Persons may consult with legal counsel or accountants selected by such Indemnified Person and any act or omission by such Indemnified Person on behalf of the Company or in furtherance of the business of the Company in good faith in reliance on and in accordance with the advice of such counsel or accountants shall be full justification for the act or omission, and such Indemnified Person shall be fully protected in so acting or omitting to act if the counsel or accountants were selected with reasonable care.

(e)      To the fullest extent permitted by law, the Company shall indemnify and hold harmless Indemnified Persons, from and against all losses, liabilities, damages, expenses or costs (including any claim, judgment, award, settlement, reasonable legal and other professional fees and disbursements and other costs or expenses incurred in connection with the defence of any proceeding, whether or not matured or unmatured or whether or not asserted or brought due to contractual or other restrictions, joint or several) other than those arising from suits, disputes or actions by the Portfolio Manager, its affiliates or principals, Other Accounts or CLO HoldCo, Ltd. (collectively, "**Indemnified Losses**"), including amounts paid in satisfaction of judgments, in compromises and settlements, as fines and penalties and legal or other costs and expenses of investigating or defending against any claim or alleged claim, of any nature whatsoever, known or unknown, liquidated or unliquidated, that are incurred by any Indemnified Person or to which such Indemnified Person may be subject by reason of its activities in connection with the conduct of the

business or affairs of the Company, unless such losses result from an Indemnified Person's Triggering Event. The termination of any proceeding by settlement, judgment, order or upon a plea of nolo contendere or its equivalent shall not, of itself, create a presumption that the Indemnified Person's conduct constituted a Triggering Event.

(f) Expenses incurred by an Indemnified Person in defense or settlement of any claim that shall be subject to a right of indemnification hereunder, shall be advanced by the Company prior to the final disposition thereof upon receipt of an undertaking by or on behalf of the Indemnified Person to repay the amount advanced to the extent that it shall be determined ultimately that the Indemnified Person is not entitled to be indemnified hereunder due to a Triggering Event.

(g) The right of any Indemnified Person to the indemnification provided herein shall be cumulative of, and in addition to, any and all rights to which the Indemnified Person may otherwise be entitled by contract or as a matter of law or equity and shall be extended to the Indemnified Person's successors, assigns and legal representatives.

(h) The provisions of this Section are expressly intended to confer benefits upon Indemnified Persons and such provisions shall remain operative and in full force and effect regardless of the expiration or any termination of this Agreement.

(i) In no event shall any Indemnified Person be liable for special, exemplary, punitive, indirect, or consequential loss, or damage of any kind whatsoever, including without limitation lost profits.

(j) No Indemnified Person shall be liable hereunder for any settlement of any action or claim effected without its written consent thereto.

23959288.8. BUSINESS                                   13

(k)     Pursuant to the exculpation and indemnification provisions described above, the Portfolio Manager and each Indemnified Person will generally not be liable to the Company for any act or omission (or alleged act or omission), absent a Triggering Event, and the Company will generally be required to indemnify such persons against any Indemnified Losses they may incur by reason of any act or omission (or alleged act or omission) related to the Company, absent a Triggering Event.  As a result of these provisions, the Company (not the Portfolio Manager or any other Indemnified Person) will be responsible for any Indemnified Losses resulting from trading errors and similar human errors, absent a Triggering Event or the inability to waive or limit such Indemnified Losses under applicable law.  Trading errors might include, for example, keystroke errors that occur when entering trades into an electronic trading system or typographical or drafting errors related to derivatives contracts or similar agreements. Given the volume of transactions executed by the Portfolio Manager and its affiliates on behalf of the Company, the Company acknowledges that trading errors (and similar errors) will occur and that the Company will be responsible for any resulting Indemnified Losses, even if such Indemnified Losses result from the negligence (but not gross negligence) of the Portfolio Manager or its affiliates. The Portfolio Manager shall report to the Advisory Board of the Company the amount and a description of any trading error with respect to the Company's investment portfolio promptly after a responsible officer of the Portfolio Manager has knowledge or notice thereof.

11.     <u>Activities of the Portfolio Manager and Others</u>.  The Portfolio Manager, and its affiliates may engage, simultaneously with their portfolio servicing and management activities on behalf of the Company, in other businesses, and may render services similar to those described in this Agreement to other individuals, companies, trusts or persons, and shall not by reason of such engaging in other businesses or rendering of services for others be deemed to be acting in conflict

with the interests of the Company.  Notwithstanding the foregoing, the Portfolio Manager and its affiliates shall devote as much time and resources to the performance of its obligations hereunder as the Portfolio Manager deems necessary and appropriate.  In addition, the Portfolio Manager or any of its affiliates, in their individual capacities, may engage in securities transactions which may be different than, and contrary to, any guidance provided by the Portfolio Manager to the Company.  The Portfolio Manager may give advice and recommend securities to, or buy securities for, accounts and other clients, which advice or securities may differ from guidance given to, or securities recommended for, the Company, even though their investment objectives may be the same or similar.  The Portfolio Manager may recommend transactions in securities and other assets in which the Portfolio Manager has an interest, including securities or other assets issued by affiliates of the Portfolio Manager.  The Portfolio Manager is a relying advisor of Highland Capital Management, L.P. ("**Highland**"), a registered investment adviser under the Investment Company Act.  The Company acknowledges that it has received a copy of Part 2 of Highland's Form ADV, which further describes conflicts of interest, including the Portfolio Manager, its affiliates and their respective advised accounts.

      12.   <u>Term; Termination</u>.

      (a)   This Agreement shall remain in effect for ten (10) years, provided, however, this Agreement may be terminated in the event of: (A) the Company determining in good faith that the Company or the portfolio has become required to register as an investment company under the provisions of the Investment Company Act of 1940, as amended (the "**Investment Company Act**") (where there is no available exemption), and the Company has given prior notice to the Portfolio Manager of such requirement, (B) the date on which the portfolio has been liquidated in full and the Company's financing arrangements have been terminated or redeemed in full, (C) such

other date as agreed between the Company and the Portfolio Manager and (D) under subsection (b) of this Section 12 or Section 13 of this Agreement.

(b)　　Notwithstanding any other provision hereof to the contrary but subject to the provisions of clause (d) below, this Agreement may be terminated without cause by the Portfolio Manager, and the Portfolio Manager may resign, upon at least ninety (90) days' (or such shorter notice as is acceptable to the Company) written notice to the Company. The resignation shall not be effective until the date as of which a successor adviser has been appointed. The Portfolio Manager may immediately resign by providing written notice to the Company upon the failure of the Company to comply in any material respect with any investment policy or investment objective to which it is bound to comply, a willful breach or knowing violation by the Company of a material provision of this Agreement or the occurrence of insolvency proceedings in respect of the Company.

(c)　　Notwithstanding the provisions of clause (b) above, no resignation or removal of the Portfolio Manager or termination of this Agreement pursuant to such clause shall be effective until the date as of which a successor Portfolio Manager shall have been appointed and approved in accordance with Section 12(d) and has accepted all of the Portfolio Manager's duties and obligations pursuant to this Agreement in writing and has assumed such duties and obligations.

(d)　　Any termination, removal or resignation of the Portfolio Manager shall be effective only upon (a) the appointment by the Company of a successor Portfolio Manager that is an established institution which (i) has demonstrated an ability to professionally and competently perform duties reasonably comparable to those imposed upon the Portfolio Manager hereunder, (ii) is legally qualified and has the capacity to act as successor to the Portfolio Manager under this

Agreement in the assumption of all of the responsibilities, duties and obligations of the Portfolio Manager hereunder and under the terms of the Offering Memorandum applicable to the Portfolio Manager, (iii) shall not cause the Company to become required to register under the provisions of the Investment Company Act and (iv) shall not result in the imposition of any entity-level or withholding tax on the Company or cause any other material adverse tax consequences to the Company and (b) written acceptance of appointment by such successor Portfolio Manager. The Company shall use its commercially reasonable efforts to appoint a successor Portfolio Manager to assume the duties and obligations of the removed or resigning Portfolio Manager. The Company, the Custodians and the successor Portfolio Manager shall take such action (or cause the outgoing Portfolio Manager to take such action) consistent with this Agreement and the terms of the Offering Memorandum applicable to the Portfolio Manager, as shall be necessary to effectuate any such succession. In the event that a successor has not been appointed or has not assumed the duties of the Portfolio Manager in writing within a 60-day period, the Portfolio Manager or the Company may petition a court of competent jurisdiction for the appointment of a successor Portfolio Manager, which appointment will not require the consent of, or be subject to the approval or disapproval of, the Company (so long as such court appointed successor meets the requirements of clauses (a)(i) through (iv) above).

(e)      In the event of removal of the Portfolio Manager pursuant to this Agreement, the Company shall have all of the rights and remedies available with respect thereto at law or equity, and, without limiting the foregoing, the Company may by notice in writing to the Portfolio Manager as provided under this Agreement terminate all the rights and obligations of the Portfolio Manager under this Agreement (except those that survive termination pursuant to Section 12(d) above). Upon resignation or removal of the Portfolio Manager in accordance with this

Section 12 or Section 13 of this Agreement, as applicable, and upon acceptance by a successor Portfolio Manager of appointment, all authority and power of the Portfolio Manager under this Agreement and the Offering Memorandum, shall automatically and without further action pass to and be vested in the successor Portfolio Manager.

(f)     For so long as Highland HCF Advisor, Ltd. or an affiliate of Highland HCF Advisor, Ltd. is the Portfolio Manager, the Company shall be permitted to use the "Highland" name; provided that, if the Portfolio Manager ceases to be Highland HCF Advisor, Ltd. or an affiliate of Highland HCF Advisor, Ltd., the Company shall use commercially reasonable efforts to change its name to remove all reference to the name "Highland" therefrom. In addition, the Portfolio Manager, without the consent of the Company, may change the name of the Portfolio Manager.

13.     <u>Termination by the Company for Cause</u>. This Agreement may be terminated, and the Portfolio Manager may be removed for Cause (as defined below) by the Advisory Board of the Company or the Board of Directors of the Company upon thirty (30) days' prior written notice to the Portfolio Manager. No such termination or removal shall be effective until the date as of which a successor Portfolio Manager shall have agreed in writing to assume all of the Portfolio Manager's duties and obligations pursuant to this Agreement and as specified in the Offering Memorandum. "Cause" shall mean any one of the following events:

(a)     the Portfolio Manager wilfully violates, or takes any action that it knows breaches any material provision of this Agreement or the Offering Memorandum applicable to it in bad faith (not including a willful and intentional breach that results from a good faith dispute regarding reasonable alternative courses of action or interpretation of instructions);

(b)      the Portfolio Manager breaches in any respect any provision of this Agreement or any terms of the Offering Memorandum applicable to it (other than as covered by clause (a) and except for any such violations or breaches that have not had, or could not, either individually or in the aggregate, reasonably be expected to have, a material adverse effect on the Company) and fails to cure such breach within 30 days of the Company receiving notice of such breach, unless, if such breach is remediable, the Portfolio Manager has taken action that the Portfolio Manager believes in good faith will remedy such breach, and such action does remedy such breach, within sixty (60) days after the Company receives notice thereof;

(c)      the Portfolio Manager is wound up or dissolved or there is appointed over it or a substantial portion of its assets a receiver, administrator, administrative receiver, trustee or similar officer; or the Portfolio Manager (i) ceases to be able to, or admits in writing its inability to, pay its debts as they become due and payable, or makes a general assignment for the benefit of, or enters into any composition or arrangement with, its creditors generally; (ii) applies for or consents (by admission of material allegations of a petition or otherwise) to the appointment of a receiver, trustee, assignee, custodian, liquidator or sequestrator (or other similar official) of the Portfolio Manager or of any substantial part of its properties or assets, or authorizes such an application or consent, or proceedings seeking such appointment are commenced without such authorization, consent or application against the Portfolio Manager and continue undismissed for sixty (60) days; (iii) authorizes or files a voluntary petition in bankruptcy, or applies for or consents (by admission of material allegations of a petition or otherwise) to the application of any bankruptcy, reorganization, arrangement, readjustment of debt, insolvency or dissolution, or authorizes such application or consent, or proceedings to such end are instituted against the Portfolio Manager without such authorization, application or consent and are approved as properly

instituted and remain undismissed for sixty (60) days or result in adjudication of bankruptcy or insolvency; or (iv) permits or suffers all or any substantial part of its properties or assets to be sequestered or attached by court order and the order remains undismissed for sixty (60) days;

(d)    the occurrence of an act by the Portfolio Manager that constitutes fraud or criminal activity in the performance of its obligations under this Agreement (as determined pursuant to a final adjudication by a court of competent jurisdiction), or the Portfolio Manager being indicted for a criminal offense materially related to its business of providing asset management services; or

(e)    any Key Person (as defined in the Offering Memorandum) of the Portfolio Manager (in the performance of his or her investment management duties) is convicted for a criminal offense materially related to the business of the Portfolio Manager providing asset management services and continues to have responsibility for the performance by the Portfolio Manager hereunder for a period of ten (10) days after such conviction.

If any of the events specified in the definition of "Cause" in this Section 13 shall occur, the Portfolio Manager shall give prompt written notice thereof to the Company upon the Portfolio Manager's becoming aware of the occurrence of such event.  The Advisory Board of the Company may waive any event described in (a), (b), (d), or (e) above as a basis for termination of this Agreement and removal of the Portfolio Manager under this Section 13.

14.    <u>Miscellaneous</u>.

(a)    <u>Notices</u>.  Any notice, consent or other communication made or given in connection with this Agreement shall be in writing and shall be deemed to have been duly given when delivered by hand or facsimile or five days after mailed by certified mail, return receipt requested, as follows:

23959288.8. BUSINESS                    20

If to the Portfolio Manager, to:

Highland HCF Advisor, Ltd.
c/o Maples Corporate Services Limited
PO Box 309, Ugland House
Grand Cayman, KY1-1104, Cayman Islands
Telephone Number: 1 345 949 8066
Facsimile Number: 1 345 949 8080

If to the Company, to:

Highland CLO Funding, Ltd.
1st Floor
Dorey Court Admiral Park St Peter Port
Channel Islands
Guernsey
GY1 3BG
Attention: Sharon Wrench
Telephone Number: +44 (0) 1481 704543
Facsimile Number: +44 (0) 1481 715602

(b)     <u>Entire Agreement</u>.  This Agreement contains all of the terms agreed upon or made by the parties relating to the subject matter of this Agreement, and supersedes all prior and contemporaneous agreements, negotiations, correspondence, undertakings and communications of the parties, oral or written, respecting such subject matter.

(c)     <u>Amendments and Waivers</u>.  No provision of this Agreement maybe amended, modified, waived or discharged except as agreed to in writing by the parties and with the consent of the Advisory Board of the Company.  No amendment to this Agreement may be made without first obtaining the required approval from the Company.  The failure of a party to insist upon strict adherence to any term of this Agreement on any occasion shall not be considered a waiver thereof or deprive that party of the right thereafter to insist upon strict adherence to that term or any other term of this Agreement.

(d)     <u>Binding Effect; Assignment</u>.  This Agreement shall be binding upon and inure to the benefit of the Company, the Portfolio Manager, each Indemnified Person and their

respective successors and permitted assigns. Any person that is not a signatory to this Agreement but is nevertheless conferred any rights or benefits hereunder (e.g., officers, partners and personnel of the Portfolio Manager and others who are entitled to indemnification hereunder) shall be entitled to such rights and benefits as if such person were a signatory hereto, and the rights and benefits of such person hereunder may not be impaired without such person's express written consent. No party to this Agreement may assign (as such term is defined under the U.S. Investment Advisers Act of 1940, as amended) all or any portion of its rights, obligations or liabilities under this Agreement without the prior written consent of the Advisory Board of the Company.

(e)     Governing Law; Jurisdiction; Waiver of Jury Trial.

(i)     This Agreement and all matters arising out of or relating to this Agreement are governed by, and construed in accordance with, the laws of the State of Texas, United States of America, without giving effect to the conflict of laws provisions thereof to the extent such principles or rules would require or permit the application of the laws of any jurisdiction other than those of the State of Texas.

(ii)     The parties hereby agree that any action, claim, litigation, or proceeding of any kind whatsoever against any other party in any way arising from or relating to this Agreement and all contemplated transactions (a "**Dispute**") shall be submitted exclusively to the United States District Court for the Northern District of Texas or, if such court does not have subject matter jurisdiction, the courts of the State of Texas sitting in Dallas County, and any appellate court thereof ("**Enforcement Court**"). Each party irrevocably and unconditionally submits to the exclusive personal and subject matter jurisdiction of the Enforcement Court for any Dispute and agrees to bring any Dispute only in the Enforcement Court. Each party further agrees it shall not commence any Dispute in any forum, including, but not limited to, administrative,

arbitration, or litigation, other than the Enforcement Court. Each party agrees that a final judgement in any such action, litigation, or proceeding is conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

(iii) EACH PARTY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY LEGAL ACTION, PROCEEDING, CAUSE OF ACTION OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT, INCLUDING ANY EXHIBITS, SCHEDULES, AND APPENDICES ATTACHED TO THIS AGREEMENT, OR THE TRANSACTIONS CONTEMPLATED HEREBY.

(f) <u>Headings</u>. The headings contained in this Agreement are intended solely for convenience and shall not affect the rights of the parties to this Agreement.

(g) <u>Counterparts</u>. This Agreement may be signed in any number of counterparts with the same effect as if the signatures to each counterpart were upon a single instrument, and all such counterparts together shall be deemed an original of this Agreement.

(h) <u>Survival</u>. The provisions of Sections 8, 9, 10 and 15 hereof shall survive the termination of this Agreement.

(i) <u>Pronouns</u>. All pronouns shall be deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons' firm or company may require in the context thereof.

(j) <u>Arm's-Length Agreement</u>. The Company has approved this Agreement and reviewed the activities described in Section 11 and in Highland's Form ADV and the risks related thereto.

23959288.8. BUSINESS

23

[*Signature Page to Follow*]

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

HIGHLAND CLO FUNDING, LTD.

By: _____

   Name: William Scott
   Title: Director

HIGHLAND HCF ADVISOR, LTD.,
as Portfolio Manager

By: _____

   Name: James Dondero
   Title: President

SIGNATURE PAGE TO PORTFOLIO MANAGEMENT AGREEMENT

IN WITNESS WHEREOF the parties hereto have caused this Agreement to be executed to be effective from the date first written above.

**HIGHLAND CLO FUNDING, LTD.**

By: _____
    Name:
    Title:    Director

**HIGHLAND HCF ADVISOR, LTD.,**
    as Portfolio Manager

By: _____
    Name:    James Dondero
    Title:    President



Charitable DAF GP, LLC (Delaware)
Limited Partners
general partner
Charitable DAF Fund, L.P. (Cayman Islands)
Strand Management (?)
employed
general partner
Joshua N. Terry
James P. Seery
former president and limited partner
CEO
Highland Capital Management, L.P. (Texas)
CLO Holdco Ltd. (Cayman Islands)
authorised representative
Skyview Group Inc. (Texas)
Acis Capital Management GP, LLC (Delaware)
50.6% (49.98% acquired under Harbourview Settlement)
49.02%
0.38%
Other Investors
Lee Blackwell Parker, III
Quest IRA Inc., fbo Lee B. Parker, III
Quest IRA Inc., fbo Hunter Covitz
Quest IRA Inc., fbo Jon Poglitsch
Quest IRA Inc., fbo Neil Desai
general manager
general partner
ACIS Capital Management L.P. (Delaware)
Highland HCF Advisor Ltd (Cayman Islands)
portfolio manager
Highland CLO Funding Ltd. (Guernsey)

Docket #0184 Date Filed: 12/04/2019

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re: | ) Chapter 11 |
| | ) |
| HIGHLAND CAPITAL MANAGEMENT, L.P.,[1] | ) Case No. 19-12239 (CSS) |
| | ) |
| Debtor. | ) **Ref. Docket No.: 86** |
| | ) |

### ORDER TRANSFERRING VENUE OF THIS CASE TO THE UNITED STATES
### BANKRUPTCY COURT FOR THE NORTHERN DISTRICT OF TEXAS

Upon the motion (the "<u>Motion</u>")[2] of the Committee requesting entry of an order (this

"<u>Order</u>") transferring the venue of the above-captioned chapter 11 case to the United States

Bankruptcy Court for the Northern District of Texas; and this Court having jurisdiction over this

matter pursuant to 28 U.S.C. § 1334 and the *Amended Standing Order of Reference* from the

United States District Court for the District of Delaware, dated February 29, 2012; and this

matter being a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and venue of this Motion

being proper pursuant to 28 U.S.C. §§ 1408 and 1409; and adequate notice of, and the

---

[1]  The Debtor's last four digits of its taxpayer identification number are (6725). The headquarters and service address for the above-captioned Debtor is 300 Crescent Court, Suite 700, Dallas, TX 75201.

[2]  Capitalized terms not otherwise defined herein shall have the meaning ascribed to them in the Motion.

25658315.1



1912239191204000000000001

opportunity for a hearing on, the Motion having been given; and for the reasons stated on the

record, it is HEREBY ORDERED THAT:

1.      Effective as of the date of this Order, the above-captioned chapter 11 case shall be

transferred to the Dallas Bankruptcy Court pursuant to 28 U.S.C. § 1412.

2

25658315.1      **Dated: December 4th, 2019**
                **Wilmington, Delaware**          CHRISTOPHER S. SONTCHI
                                                  UNITED STATES BANKRUPTCY JUDGE



CLERK, U.S. BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS

**ENTERED**

THE DATE OF ENTRY IS ON
THE COURT'S DOCKET

The following constitutes the ruling of the court and has the force and effect therein described.



Signed January 31, 2019

United States Bankruptcy Judge

## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT, L.P., | § | CASE NO. 18-30264-SGJ-11 |
| | § | (Chapter 11) |
| Debtor. | § | |

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| ACIS CAPITAL MANAGEMENT GP, | § | CASE NO. 18-30265-SGJ-11 |
| L.L.C., | § | (Chapter 11) |
| | § | |
| Debtor. | § | |

## BENCH RULING AND MEMORANDUM OF LAW IN SUPPORT OF:
## (A) FINAL APPROVAL OF DISCLOSURE STATEMENT; AND (B)
## CONFIRMATION OF CHAPTER 11 TRUSTEE'S THIRD AMENDED JOINT PLAN

Before this court is a request by the Chapter 11 Trustee (herein so called) for final

approval of the adequacy of a disclosure statement and for confirmation of his Third Amended

1

just that—a passive investor—that did not have the ability to "start calling the shots" and dictate the terms of any reset transactions.[128] When asked if the Passive Investor was concerned about the Terry Arbitration Award, Mr. Pugatch replied: "The award itself, no. I think the only thing we were concerned about or focused on was that vis-à-vis our equity investment in Highland CLO Funding Limited and, in turn, the equity that that vehicle held in the various CLOs was appropriately, you know, ring-fenced or not exposed to any potential damages or economic loss in value as a result of that arbitration award."[129]

The Passive Investor further testified that Brigade has "a fine reputation in the market" but that it had no interaction with them historically.[130] The Passive Investor also testified that it was concerned about the cash buildups that had happened recently due to actions while Highland had still been the sub-advisor on the Acis CLOs.[131]

### 3. The Seemingly Rehearsed Testimony of the Two HCLOF Guernsey Witnesses.

The court was presented with video depositions of HCLOF Guernsey's two non-executive directors (*i.e.,* its only directors): Mr. William Scott[132] and Ms. Heather Bestwick.[133] It was very apparent to the court that HCLOF Guernsey is controlled by Highland in every way. Putting things in the kindest way possible, Mr. Scott and Ms. Bestwick appear to be nominal figureheads who are paid to act like they are in charge, while they are not. They are both

---

[128] *Id.* at p. 32 (lines 16-17); pp. 33-35.

[129] *Id.* at p. 43 (lines 3-9); p. 89.

[130] *Id.* at p. 68 (lines 11-13).

[131] *Id.* at p. 82, lines 9-24.

[132] *See* Exh. 721.

[133] *See* Exh. 719.

42

basically professional directors-for-hire, for companies that choose to form/organize in the nation of Guernsey.

Ms. Bestwick testified that she is a nonexecutive director for six companies in Guernsey (none of the others are in the CLO business).[134] She testified that she earned £35,000 per year to serve as a director of HCLOF Guernsey.[135] She testified that she was selected by Highland[136] and that Highland also made the decision to hire HCLOF Guernsey's law firm in the Bankruptcy Cases.[137] Ms. Bestwick, when questioned as to why the Equity/ALF PMA it had with the Debtor-Acis was terminated shortly after the Terry Arbitration Award was issued, testified that she was told it was "a condition precedent to the new Passive Investor" coming in and that she was told this by Highland.[138] She also testified that she had never talked to the Passive Investor (who, of course, is a 49% owner of HCLOF Guernsey)[139] or Grant Scott (the trustee of the charitable organization that owns 49% of HCLOF Guernsey).[140] She reiterated that she only talks to Highland employees. She also was under the impression that terminating the Equity ALF PMA would improve marketability of the CLOs going forward but that it was the same people and "business as usual for us."[141] She testified that she learned of the Terry

---

[134] *Id.* at pp. 7-8; p. 21 (line 5) through p. 22 (line 20); p. 26 (lines 10-12).

[135] *Id.* at p. 43 (lines 18-19).

[136] *Id.* at p. 42 (lines 17-25).

[137] *Id.* at p. 53 (lines 7-20).

[138] *Id.* at p. 16 (line 13) through p. 17 (line 23); p. 58 (line 21) through p. 60 (line 17).

[139] *Id.* at p. 188 (lines 12-15).

[140] *Id.* at p. 188 (line 19) through p. 189 (line 9).

[141] *Id.* at p. 189 (lines 12-15); p. 200 (line 22).

43

Arbitration Award in mid-April 2018 (some six months after the fact)[142] and "[y]ou'd have to ask Highland"[143] why it did not inform her sooner. Her testimony was clear that she defers to Highland on everything, stating that as directors they were "heavily reliant on our service providers, and that means Highland."[144]  With regard to a lawsuit that HCLOF Guernsey filed against Mr. Terry in Guernsey during the Bankruptcy Cases, she testified that it was neither her nor the other director, William Scott's, idea.

Mr. Scott, the other HCLOF Guernsey director, is a "professional director" for 10-15 Guernsey companies[145]—all of which are "paying assignments."[146]  He became rather incensed when testifying, at the suggestion that he and Ms. Bestwick were not in control of HCLOF Guernsey, stating that board minutes and other documents would show that they took a great level of interest in running the company.[147]  He testified that he earned £40,000 per year to serve as a director of HCLOF Guernsey and that, due to the extra work of the Bankruptcy Cases, he also was charging another £350 per hour, after the first 35 hours[148] (the court notes, anecdotally, that it required participation in court hearings by a director of HCLOF Guernsey each time that HCLOF Guernsey took a position in court).  Mr. Scott confirmed that he was not aware of the litigation with Mr. Terry nor the Acis Bankruptcy Cases until April 2018.[149]  He also testified

---

[142] *Id.* at p. 61 (lines 3-19); p. 130 (line 14) through p. 136 (line 2).

[143] *Id.* at p. 137 (line 21).

[144] *Id.* at p. 152 (lines 18-19).

[145] *See* Exh. 721 at p 8 (line 9) through p. 9 (line 5); p. 79 (lines 20-25).

[146] *Id.* at p. 80 (lines 3-5).

[147] *Id.* at p. 13 (lines 1-12); p. 22 (line 23) through p. 23 (line 12).

[148] *Id.* at p. 80 (lines 6-18).

[149] *Id.* at p. 132 (line 20) through p. 135 (line 10).

44

that Highland had proposed the legal counsel HCLOF Guernsey used in the Bankruptcy Cases
and that he had never disagreed with Highland's advice.[150] He confirmed that all investment
decisions were made by Highland and that he and Ms. Bestwick's role was to "police" service
providers.[151] Like Ms. Bestwick, Mr. Scott testified that they were told that the Passive Investor
had made it a condition precedent to their investment in HCLOF Guernsey that "Acis depart."[152]
But he had not talked to the Passive Investor.[153] As if all this deference to Highland were not
enough, HCLOF Guernsey's lender is NexBank (an affiliate of Highland—which is based in
Dallas, not Guernsey) and HCLOF Guernsey has given its actual equity notes to NexBank as
security for its loans from NexBank.[154] Also, interestingly, when asked about the adversary
proceeding that HCLOF Guernsey filed against the Chapter 11 Trustee a few months ago in the
Bankruptcy Cases (*i.e.,* the Highland Entities Adversary Proceeding—it was originally
commenced by Highland and HCLOF Guernsey as Plaintiffs), Mr. Scott testified that "we
haven't sued the trustee, he has sued us" but later acknowledged his mistake when corrected by
counsel.

This court is not naïve—it realizes that so-called "fiduciary services firms" are apparently
a typical thing in the world of off-shore jurisdictions that are large financial centers.[155] Maybe

---

[150] *See generally id.* at pp. 277-280.

[151] *Id.* at p. 106 (lines 1-7).

[152] *Id.* at p. 254 (line 20) through p. 260.

[153] *Id.* at p. 155 (lines 2-25).

[154] *See* Exh. 719 at p. 213 (line 2-22); Exh. 721 at p. 129 (line 10) through p. 130 (line 13).

[155] During the testimony of both Ms. Bestwick and Mr. Scott, the court was reminded of an old TV
commercial in which an actor states, "I am not a doctor, but I play one on TV." The court could not help
but conclude that these were not real directors but were playing them (when legally necessary).

45

the system works, for the most part and in many business contexts. But not when trying to convince a bankruptcy court of the bona fides of transactions that look like attempts to denude another party of value and/or to thwart creditors. And not when accusations are made that you are the alter ego of the party (Highland) who orchestrated the company's creation. The evidence was overwhelming that: (a) the HCLOF Guernsey Directors do whatever they are told to do by Highland; (b) they do not talk to anyone else but Highland; (c) they have never challenged Highland; (d) they let Highland pick and consult with their lawyers; and (e) they were not made aware by Highland of the Terry Arbitration Award, the Terry Judgment, the involuntary bankruptcy petitions, or pleadings that lawyers filed in the Bankruptcy Cases on HCLOF Guernsey's behalf.

In summary, the testimony of these two HCLOF Guernsey Directors was of little or no value in convincing the court that the Objector, HCLOF Guernsey, has valid concerns of its own (separate from Highland's) with regard to the bona fides of the Plan.

## VII. Conclusion.

This Bench Ruling and Memorandum Opinion is intended to address some of the most pertinent facts and issues raised in connection with confirmation of the Plan. Among other things, the court believed it was necessary to stress, in a separate ruling: (a) *the unique status of the Objectors* (they are "insiders" as defined in the Bankruptcy Code whose prepetition actions suggest unclean hands—this seems highly relevant to consider, when there are no non-insider creditors or other relevant parties objecting to the Plan); (b) *the appropriateness and legality of the proposed Plan Injunction* that would temporarily prevent nonconsensual redemptions/liquidations (it is in all ways justified given the allegations in the Highland Entities Adversary Proceeding and under the traditional four-prong test for preliminary injunctions); and

46

(c) *the feasibility of the Plan* (Mr. Terry and Brigade are well qualified to perform their contemplated roles).

The court will separately sign the Findings of Fact, Conclusions of Law and Order Confirming Plan submitted by the Chapter 11 Trustee to address all other relevant issues.

#### #### End of Bench Ruling and Memorandum Opinion ####

47

# Highland CLO Funding, Ltd.

## INTERIM REPORT AND UNAUDITED CONDENSED FINANCIAL STATEMENTS

FOR THE FINANCIAL PERIOD FROM 1 JANUARY 2021 TO 30 JUNE 2021

Registration No. 60120

**Highland CLO Funding, Ltd.**

| Contents | Page |
|---|---|
| Management and Administration | 2 |
| Letter from the Chairman | 3 |
| Statement of Assets and Liabilities | 5 |
| Condensed Schedule of Investments | 6 |
| Statement of Operations | 7 |
| Statement of Changes in Net Assets | 8 |
| Statement of Cash Flows | 9 |
| Financial Highlights | 10 |
| Notes to the Financial Statements | 11 |

Highland CLO Funding, Ltd.    1

**Highland CLO Funding, Ltd.**
**Management and Administration**

**Directors**
Richard Boleat (Chairman)
Richard Burwood

*Both Directors are independent non-executive directors.*

**Registered Office**
1st Floor
Royal Chambers
St Julian's Avenue
St Peter Port
Guernsey, GY1 3JX
Channel Islands

**Portfolio Manager**
Highland HCF Advisor Ltd.
300 Crescent Court
Suite 700
Dallas
Texas 75201
United States

*Portfolio Manager' registered office*:
PO Box 10008, Willow House, Cricket Square,
Grand Cayman KY1-1001, Cayman Islands

**Auditor**
Grant Thornton Limited
PO Box 313
Lefebvre House
Lefebvre Street
St Peter Port
Guernsey
GY1 3TF

**Sub-Adviser**
Highland Capital Management, L.P.
300 Crescent Court
Suite 700
Dallas
Texas 75201
United States

**Administrator & Company Secretary**
Elysium Fund Management Limited
PO Box 650, 1st Floor
Royal Chambers
St Julian's Avenue
St Peter Port
Guernsey, GY1 3JX
Channel Islands

**Legal Advisers to the Company**
*(as to US Law)*
King & Spalding LLP
PO Box 116133
Atlanta
GA, 30368-6133
United States

**Custodian**
Liberum Wealth Limited
PO Box 650, 1st Floor
Royal Chambers
St Julian's Avenue
St Peter Port
Guernsey, GY1 3JX
Channel Islands

*(as to Guernsey Law)*
Carey Olsen (Guernsey) LLP
PO Box 98
Carey House
Les Banques
Guernsey, GY1 4BZ
Channel Islands

Highland CLO Funding, Ltd.    2

**Highland CLO Funding, Ltd.**
**Letter from the Chairman**

31 August 2021

Dear Shareholders,

I am pleased to provide you with an update as to the Company's performance for the 6 month period ended on 30 June 2021 and its current circumstances.

As you will note from the Company's balance sheet, the net asset value of the Company increased markedly from the prior period end due to a very significant rally in the market value of and market demand for underlying credit assets, very low levels of market-wide defaults and continuing low US interest rates. In addition, the realisation of a number of underlying positions in CLOs which have been in runoff for a number of years at attractive prices gave rise to idiosyncratic uplifts in the values of a number of such instruments. The Directors perceive that, in the absence of unanticipated macro or geopolitical events, the outlook for credit assets remains robust through the balance of 2021. The Directors have taken advantage of these market conditions to seek to monetise the Company's holdings in anticipation of returns of capital to shareholders over the coming quarters. To that end, notices of redemption have been served in respect of the following securities:

ACIS CLO 2014-5 Ltd
ACIS CLO 2015-6 Ltd
ACIS CLO 2014-4 Ltd
ACIS CLO 2014-3 Ltd
ACIS CLO 2013-1 Ltd (redemption occurred in 2019)
ACIS CLO Management Holdings, LP (underlying CLO)

As a result of these notices of redemption, the following position existed at 31 July 2021:

|  | USD'000 |
|---|---|
| Net Asset Value of redeemed securities | 44,953 |
| Comprised of: |  |
| The Company's pro rata portion of the market value of loans remaining to be liquidated[1] | 16,990 |
| The Company's pro rata portion of cash held by indenture trustee for ACIS 2014-3 through ACIS 2015-6[2] | 23,601 |
| The Company's pro rata portion of Net Asset Value of Acis CLO Management Holdings, LP | 4,362 |

The Directors' view, on advice, is that the retention of cash by the indenture trustee is unlawful and is inconsistent with the terms of the relevant CLO indentures. Accordingly, the Directors are taking urgent and proportionate steps to secure unrestricted control over this cash and any as yet unliquidated securities. I will communicate further with all shareholders as this matter progresses.

---

[1] The Company's pro rata portion of the market value of loans has been adjusted to account for: 1) the time value of money (assuming cash distributions occur in the future); and 2) the market value of the underlying loans (for example, the remaining loans may not be sold at par value). The cumulative effect of these adjustments is a reduction of approximately US$2.4 million. Further, based on representations of the Portfolio Manager of Acis 2014-4, Ltd., Acis 2014-5, Ltd., and Acis 2015-6, Ltd., subsequent to 31 July 2021, a material remaining loan position was sold at or near par value. The Company's ratable share of the aggregate par value of this holding was US$16.4 million.

[2] The Company's pro rata portion of cash held by the indenture trustee has been adjusted to account for: 1) the time value of money (assuming cash distributions occur in the future); and 2) reserves for cash expenditures which would reduce available cash distributions. The cumulative effect of these adjustments is a reduction of approximately US$7.4 million.

Highland CLO Funding, Ltd.    3

**Highland CLO Funding, Ltd.**
**Letter from the Chairman** *(continued)*

Shareholders will recall from previous reports that the Company has been a party to a number of protracted disputes with commercial counterparties, which have given rise to a significant net asset value drawdown. Since taking office in mid-2020, the current Directors have sought to negotiate exits from such disputes where the prospects of success were, on advice, poor and/or sufficiently protracted and uncertain as to not be in the interests of the Company to pursue. As a consequence, the Company remains a party only to litigation initiated by Charitable DAF Fund L.P. and CLO Holdco, Ltd. on 12 April 2021, whereby those parties seek judgement against defendants Highland Capital Management L.P. ("HCM") and Highland HCF Advisor, Ltd. for alleged misbehaviour in relation to HCM's settlement of claims with certain of the Company's prior shareholders and HCM's resulting purchase of the Company's shares from those shareholders. The Company is a "nominal" defendant in such action and as such is currently incurring minimal costs.

It is the Directors' intention to commence a process of return of capital to shareholders over the coming twelve months, whilst ensuing that the Company has sufficient unrestricted liquidity to be able to take whatever steps are deemed appropriate and justified to hold contractual counterparties and fiduciaries that owe duties to the Company to account. This means that the Company will likely retain significant cash resources beyond that necessary to cover normal operating costs until such time as the Company has secured unfettered control of its assets and has converted substantially all of its securities portfolio to cash.

I look forward to reporting to you further as circumstances require.

Yours faithfully

Richard Boleat
Chairman
31 August 2021

Highland CLO Funding, Ltd.   4

**Highland CLO Funding, Ltd.**
**Unaudited Condensed Statement of Assets and Liabilities**
**as at 30 June 2021**

| | Notes | As at 30 June 2021 (unaudited) US$ | As at 31 December 2020 (audited) US$ |
|---|---|---|---|
| **Assets** | | | |
| Investments in securities at fair value | 4 | 66,807,887 | 55,346,738 |
| (cost US$180,307,436, 2020: US$191,865,611) | | | |
| Cash and cash equivalents | 2k | 5,588,509 | 5,249,171 |
| Cash collateral deposit | 2h | - | 1,453,115 |
| Other assets | | 314,424 | 1,179,441 |
| | | ------------------ | ------------------ |
| **Total assets** | | **72,710,820** | **63,228,465** |
| | | ------------------ | ------------------ |
| **Liabilities** | | | |
| Loans and credit facilities | 2h | - | (11,449,923) |
| Other payables and accrued expenses | | (723,005) | (1,323,287) |
| | | ------------------ | ------------------ |
| **Total liabilities** | | **(723,005)** | **(12,773,210)** |
| | | ------------------ | ------------------ |
| **Net assets** | | **71,987,815** | **50,455,255** |
| | | ------------------ | ------------------ |
| **Net assets** | | | |
| Share capital | 5 | 146,609,566 | 146,609,566 |
| Retained earnings | | (74,621,751) | (96,154,311) |
| | | ------------------ | ------------------ |
| **Total net assets** | | **71,987,815** | **50,455,255** |
| | | ------------------ | ------------------ |

The notes on pages 11 to 23 form an integral part of these unaudited condensed interim financial statements.

The unaudited condensed interim financial statements were approved by the Board of Directors on 31 August 2021 and signed by

Richard Burwood                                     Richard Boleat
Director                                                   Director
31 August 2021                                        31 August 2021

**Highland CLO Funding, Ltd.**
**Unaudited Condensed Schedule of Investments**
**as at 30 June 2021**

| Description | Nominal holdings | Cost US$ | Fair value US$ | % of net assets |
|---|---|---|---|---|
| **Investments in CLOs** | | | | |
| **Cayman Islands** | | | | |
| **Industry: Financial** | | | | |
| ACIS CLO 2014-5 Ltd | 53,000,000 | 41,517,732 | 13,250,000 | 18.41 |
| Greenbriar CLO Ltd | 18,000 | 8,100,000 | 11,700,000 | 16.25 |
| ACIS CLO 2015-6 Ltd | 51,850,000 | 33,261,875 | 9,333,000 | 12.96 |
| Brentwood CLO Ltd | 12,000 | 4,500,000 | 6,240,000 | 8.67 |
| ACIS CLO 2014-4 Ltd | 50,750,000 | 39,585,000 | 5,920,850 | 8.22 |
| Rockwall CDO Ltd | 14,000,000 | 830,486 | 5,600,000 | 7.78 |
| Liberty CLO Ltd | 17,000 | 3,405,832 | 5,355,000 | 7.44 |
| Grayson CLO Ltd | 5,900 | 1,958,250 | 4,366,000 | 6.06 |
| Gleneagles CLO Ltd | 1,250 | 293,767 | 425,000 | 0.59 |
| ACIS CLO 2014-3 Ltd | 39,750,000 | 28,620,000 | 133,838 | 0.19 |
| Other | 1,096,200 | 26,999 | 126,502 | 0.18 |
| ACIS CLO 2013-1 Ltd | 18,558,000 | 10,916,137 | - | - |
| **Total Cayman Islands investments in CLOs** | | 173,016,078 | 62,450,190 | 86.75 |
| **Total investments in CLOs** | | 173,016,078 | 62,450,190 | 86.75 |
| **Investments in LLC interests** | | | | |
| **United States** | | | | |
| **Industry: Energy – Oil and Gas** | | | | |
| Fieldwood Energy LLC | 118,614 | 2,767,265 | - | - |
| **Total United States investments in LLC Interests** | | 2,767,265 | - | - |
| **Total investments in LLC Interests** | | 2,767,265 | - | - |
| **Investments in Limited Partnerships** | | | | |
| **Cayman Islands** | | | | |
| **Industry: Financial** | | | | |
| ACIS CLO Management Holdings, LP | 4,524,093 | 4,524,093 | 4,357,697 | 6.05 |
| **Total Cayman Islands investments in Limited Partnerships** | | 4,524,093 | 4,357,697 | 6.05 |
| **Total investments in Limited Partnerships** | | 4,524,093 | 4,357,697 | 6.05 |
| **Total investments in securities** | | 180,307,436 | 66,807,887 | 92.80 |

The notes on pages 11 to 23 form an integral part of these unaudited condensed interim financial statements.

Highland CLO Funding, Ltd.    6

**Highland CLO Funding, Ltd.**
**Unaudited Condensed Statement of Operations**
**for the financial period ended 30 June 2021**

| | Notes | For the period ended 30 June 2021 (unaudited) US$ | For the period ended 30 June 2020 (unaudited) US$ |
|---|---|---|---|
| **Investment income and expenses** | | | |
| | | | |
| **Income** | | | |
| Dividends | | 1,805,153 | 381,522 |
| Bank interest | | - | 55 |
| | | ----------------- | ----------------- |
| **Total investment income** | | **1,805,153** | **381,577** |
| | | ----------------- | ----------------- |
| | | | |
| **Expenses** | | | |
| Legal and professional fees | | (728,093) | (1,467,060) |
| Interest expense | 2h | (183,957) | (375,050) |
| Directors' fees | 8 | (171,466) | (140,987) |
| Administration fees | 6 | (137,866) | (126,636) |
| Audit fees | | (95,771) | (36,871) |
| Other | | (15,233) | (18,919) |
| | | ----------------- | ----------------- |
| **Total expenses** | | **(1,332,386)** | **(2,165,523)** |
| | | ----------------- | ----------------- |
| | | | |
| **Net investment profit/(loss)** | | **472,767** | **(1,783,946)** |
| | | ----------------- | ----------------- |
| | | | |
| **Net realised and unrealised gain/(loss) on investments** | | | |
| Net realised (loss)/gain on investments | | (1,958,709) | 45,593 |
| Net unrealised gain/(loss) on investments for the period | | 23,019,324 | (39,518,088) |
| | | ----------------- | ----------------- |
| **Net realised and unrealised loss on investments** | | **21,060,615** | **(39,472,495)** |
| | | ----------------- | ----------------- |
| | | | |
| **Net foreign exchange loss** | | **(822)** | **(1,876)** |
| | | ----------------- | ----------------- |
| | | | |
| **Net increase/(decrease) in net assets resulting from operations** | | **21,532,560** | **(41,258,317)** |
| | | ----------------- | ----------------- |

The above results are derived from continuing operations.

The notes on pages 11 to 23 form an integral part of these unaudited condensed interim financial statements.

Highland CLO Funding, Ltd.    7

**Highland CLO Funding, Ltd.**
**Unaudited Condensed Statement of Changes in Net Assets**
**for the financial period ended 30 June 2021**

| | Share capital (unaudited) US$ | Retained earnings (unaudited) US$ | Total net assets (unaudited) US$ |
|---|---|---|---|
| Net assets at 31 December 2020 | 146,609,566 | (96,154,311) | 50,455,255 |
| **Operating transactions** | | | |
| Net increase in net assets resulting from operations | - | 21,532,560 | 21,532,560 |
| | ---------------- | ---------------- | ---------------- |
| **Net assets at 30 June 2021** | **146,609,566** | **(74,621,751)** | **71,987,815** |
| | ---------------- | ---------------- | ---------------- |

| | Share capital (unaudited) US$ | Retained earnings (unaudited) US$ | Total net assets (unaudited) US$ |
|---|---|---|---|
| Net assets at 31 December 2019 | 146,609,566 | (60,873,410) | 85,736,156 |
| **Operating transactions** | | | |
| Net decrease in net assets resulting from operations | - | (41,258,317) | (41,258,317) |
| | ---------------- | ---------------- | ---------------- |
| **Net assets at 30 June 2020** | **146,609,566** | **(102,131,727)** | **44,477,839** |
| | ---------------- | ---------------- | ---------------- |

The notes on pages 11 to 23 form an integral part of these unaudited condensed interim financial statements.

**Highland CLO Funding, Ltd.**
**Unaudited Condensed Statement of Cash Flows**
**for the financial period ended 30 June 2021**

| | Notes | For the period ended 30 June 2021 (unaudited) US$ | For the period ended 30 June 2020 (unaudited) US$ |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| Net increase/(decrease) in net assets resulting from operations | | 21,532,560 | (41,258,317) |
| | | | |
| ***Adjustments to reconcile net increase/(decrease) in net assets from operations to net cash used in operating activities*** | | | |
| Proceeds from disposal of securities | | 9,599,466 | 303,951 |
| Net realised loss/(gain) on investments | | 1,958,709 | (45,593) |
| Net unrealised (gain)/loss on investments for the period | | (23,019,324) | 39,518,088 |
| | | | |
| ***Net changes in operating assets and liabilities*** | | | |
| Change in other assets | | 865,017 | (44,325) |
| Change in accrued expenses | | (600,282) | 23,143 |
| | | ----------------- | ----------------- |
| **Net cash from/used in operating activities** | | **10,336,146** | **(1,503,053)** |
| | | ----------------- | ----------------- |
| **Cash flows from financing activities** | | | |
| Loan payments | 2h | (11,449,923) | (3,711,710) |
| | | ----------------- | ----------------- |
| **Net cash used in financing activities** | | **(11,449,923)** | **(3,711,710)** |
| | | ----------------- | ----------------- |
| **Net change in cash and cash equivalents** | | **(1,113,777)** | **(5,214,763)** |
| | | | |
| Cash and cash equivalents at beginning of the period | | 6,702,286 | 11,877,135 |
| | | ----------------- | ----------------- |
| **Cash and cash equivalents at end of the period** | 2k | **5,588,509** | **6,662,372** |
| | | ----------------- | ----------------- |
| | | | |
| **Supplemental disclosure of cash flow information** | | | |
| Interest paid | | 232,259 | 382,359 |

The notes on pages 11 to 23 form an integral part of these unaudited condensed interim financial statements.

Highland CLO Funding, Ltd.     9

**Highland CLO Funding, Ltd.**
**Unaudited Interim Financial highlights**

Financial highlights for the interim financial period ended 30 June 2021 for Highland CLO Funding, Ltd. are as follows:

|  | Ordinary shares 30 June 2021 (unaudited) | Ordinary shares 30 June 2020 (unaudited) |
|---|---|---|
| **Internal rate of return (cumulative)** [1] | (9.0)% | (18.9)% |
| **Ratio to average shareholder capital** [2] |  |  |
| Investment income | 2.9% | 0.6% |
| Operating expenses | (2.2)% | (3.3)% |
| **Net investment income/(expenses)** | 0.8% | (2.7)% |
| **Ratio of contributed capital to committed capital** [3] | 6.5% | 6.5% |

[1] The Internal Rate of Return ("IRR") is based on the date on which actual cash inflows (capital contributions) and outflows (cash distributions) occur, and the residual net assets of the Company as of the applicable measurement date. The IRR is reflected after all investment related and operating expenses, including Carried Interest when applicable. As discussed in Note 2, current accounting guidance requires, for purposes of financial statement presentation, a reallocation of shareholders' Carried Interest which is calculated as the amount that would be distributed in accordance with the Offering Memorandum to the Portfolio Manager calculated as if the assets of the Company were liquidated at fair value and distributed as of 30 June 2021. As of 30 June 2021, no allocations of Carried Interest have been made to the Portfolio Manager, based on this hypothetical liquidation. No Carried Interest has been paid as of 30 June 2021.

[2] The ratios of expenses and net investment income to average net assets reflect the expenses and net investment income, as reported in the Statement of Operations, as a percentage of the Company's weighted average net assets for the financial period ended 30 June 2021. The net investment income ratio does not include the effect of Carried Interest. The computation of such ratios based on the amount of expenses and Carried Interest assessed to an individual shareholder may vary from these ratios based on different Carried Interest arrangements.

[3] The ratio of contributed capital to committed capital relates to the US$10,000,000 contribution of the total US$153,000,000 committed by shareholders under the 15 November 2017 subscription and transfer agreement (see Note 5). The original share capital issued prior to 15 November 2017 has not been included in the contributed capital in this calculation.

**Highland CLO Funding, Ltd.**
**Notes to the Unaudited Condensed Interim Financial Statements**
**for the period ended 30 June 2021**

**1. Organisation**

Highland CLO Funding, Ltd. (the "Company"), formerly Acis Loan Funding, Ltd., was incorporated in Guernsey on 30 March 2015 under The Companies (Guernsey) Law, 2008, as amended (the "Companies Law") with registration number 60120, and is registered as a closed-ended investment scheme, regulated under the Protection of Investors (Bailiwick of Guernsey) Law, 1987, as amended (the "POI Law").

The Company's stated investment objective is to provide Participating Shareholders with stable and growing income returns and to grow the capital value of the investment portfolio through opportunistic exposure to senior secured loans and CLO Notes, on both a direct and indirect basis. The Company is currently in the process of liquidating its investment portfolio with a view to a complete return of capital to shareholders.

Any terms not defined in these notes shall have the meaning used in the Offering Memorandum of the Company.

**Investment Period**

The Investment Period ended on 30 April 2020.

**Term**

The term of the Company will end (and the Company thereafter will be wound up and dissolved) on 15 November 2027 (the ten-year anniversary of the closing date).

**2. Significant Accounting Policies**

The following is a summary of the significant accounting policies followed by the Company in the preparation of these unaudited condensed interim financial statements.

**a) Basis of Accounting**

The Company's unaudited condensed interim financial statements have been prepared in accordance with accounting principles generally accepted in the United States ("U.S. GAAP") and are stated in United States dollars, which is the functional and presentation currency. Assets and liabilities denominated in foreign currencies are translated into the functional currency using closing rates of exchange at the reporting date while revenues and expenses are translated at the daily spot rates of exchange.

The accounting policies applied in preparing these unaudited condensed interim financial statements are consistent with those applied in the annual audited financial statements for the year ended 31 December 2020. The Company is an investment company in conformity with U.S. GAAP and follows the accounting and reporting guidance in Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic 946. Therefore, the Company follows the accounting and reporting guidelines for investment companies.

**b) New standards, amendments and interpretations issued and effective for annual reporting periods beginning 1 January 2021 and not early adopted**

ASU 2016-13, Measurement of Credit Losses on Financial Instruments, introduces a new model for recognising credit losses on financial instruments based on an estimate of current expected credit losses. The new guidance is effective for public business entities that are SEC filers for fiscal years beginning after 15 December 2019 (including interim periods). For all other public business entities, ASU 2016-13 is effective for fiscal years beginning after 15 December 2020, including interim periods. For all other reporting entities, ASU 2016-13 is effective for fiscal years beginning after 15 December 2020, and interim periods within fiscal years beginning after 15 December 2021.

The effective dates and transition requirements of ASU 2018-19 - Codification Improvements to Topic 326, Financial Instruments—Credit Losses, and ASU 2019-04 - Codification Improvements to Topic 326, Financial Instruments—Credit Losses, are the same as for ASU 2016-13 above.

**Highland CLO Funding, Ltd.**
**Notes to the Unaudited Condensed Interim Financial Statements** *(continued)*
**for the year ended 30 June 2021**

**2. Significant Accounting Policies** *(continued)*
**b) New standards, amendments and interpretations issued and effective for annual reporting periods beginning 1 January 2021 and not early adopted** *(continued)*
The new standards have not had any impact on the Company's Statement of Assets and Liabilities, Statement of Operations or disclosures in its financial statements as there are no current expected credit losses the Company must recognise.

**c) Use of Estimates**
The preparation of financial statements in conformity with U.S. GAAP requires management to make estimates and assumptions that affect the amounts reported in the financial statements and accompanying notes. The Company's significant estimates include the fair value of its investments. Actual results could differ from those estimates.

**d) Investment Transactions and Related Investment Income**
Investment transactions are recorded on a trade-date basis. Realised gains and losses on the investment transactions are determined based on the first-in, first-out method. The Company uses prices and inputs that are current as of the measurement dates. The Company also considers the counterparty's non-performance risk when measuring the fair value of its investments. Investments are valued at market or fair value at the date of the financial statements with the resulting net unrealised gain or loss reflected in the Statement of Operations. See Note 4 for a presentation of fair value hierarchy disclosures.

Investments in limited partnerships ("L.P.s") are valued using the net asset values provided by the underlying L.P.s as a practical expedient. The Company applies the practical expedient to its investments in private investment companies on an investment-by-investment basis, and consistently with the Company's entire position in a particular investment, unless it is probable that the Company will sell a portion of an investment at an amount different from the net asset value of the investment. The Company is precluded from consolidating entities that are not investment companies when it is required to measure those entities at fair value in accordance with Topic 946.

**e) Cayman Limited Partnerships**
The Portfolio Manager provides to the Administrator full supporting documentation to support the value of the interest the Company has in a Cayman registered L.P., ACIS CLO Management Holdings L.P.

**f) Investment Valuation - Collateralised Loan Obligations ("CLOs")**
CLOs are valued according to a number of key data points including, but not limited to, market trading levels, bid auctions, financial institution data, offering levels from counterparties/dealers and other sources, such as an independent pricing service.

In cases where no third party price is available, or where the Company determines that the provided price is not an accurate representation of the fair value of the investment, the Company determines the valuation based on the Company's fair valuation policy. The overall criterion for fair value is a price at which a CLO would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell and both having the same knowledge of the relevant facts.

Highland CLO Funding, Ltd.    12

**Highland CLO Funding, Ltd.**
**Notes to the Unaudited Condensed Interim Financial Statements** *(continued)*
**for the year ended 30 June 2021**

**2. Significant Accounting Policies** *(continued)*
**f) Investment Valuation - Collateralised Loan Obligations ("CLOs")** *(continued)*
Consistent with the above criterion, the following criteria are considered when applicable:

- valuation of other securities by a similar CLO for which market quotations are available;
- reasons for the absence of market quotations;
- recent sales prices and/or bid and ask quotations for a similar CLO;
- the soundness of the CLO's loan portfolio, its weighted average spread, weighted average life, the portfolio legal maturity profile, the credit standing and market prices of the loans and the structure of the CLO; and
- the CLO cash flows generated using Intex CLO modelling based on prevailing market assumptions including, inter alia, defaults, recoveries, prepayment rates, loan reinvestment prices and spreads, forward interest rates and loan prepayment rates.

**g) Equity Investments**
Publicly traded equities are valued at the closing price at the date of the financial statements. The fair value of equity securities that are not traded on national exchanges or through real-time quotation services are derived from methodologies that provide appropriate fair value estimates. Equity investments with quotes that are based on actual trades with a sufficient level of activity on or near the valuation date are classified as Level 2 assets. The Company holds a limited number of private equity investments that resulted from the restructuring of other instruments. These assets are valued using market data obtained from a third-party pricing service and/or quotes from other parties dealing in the specific assets. In the event both a reliable market quote and third-party pricing service data are not available for such assets or such quotes are determined to be unreliable, the Company fair values the assets using various methodologies, as appropriate for individual investments, including comparable transaction multiples, comparable trading multiples, and/or discounted cash flow analysis. When utilising comparable trading multiples, the Portfolio determines comparable public companies (peers) based on industry, size, developmental stage, strategy, etc., and then calculates a trading multiple for each comparable company identified by using either a price to book ratio based on publicly available information about the underlying comparable company or by dividing the enterprise value of the comparable company by its earnings before interest, taxes, depreciation and amortisation (EBITDA) or similar metrics. In certain instances, the inputs used in the calculation of the trading multiples may vary based on the industry or development stage of the company. A multiple determined by the Portfolio Manager to be within a reasonable range, as calculated amongst its peers, is then applied to the underlying company's price to book ratio or EBITDA (which may be normalised to adjust for certain non-recurring events) to calculate the fair value of the underlying company. The fair value may be further adjusted for entity specific facts and circumstances.

**h) Credit Facilities**
With effect from 23 November 2015, the Company was a party to a committed loan agreement with a Texas savings bank, NexBank SSB (the "Lender"), a then-affiliate of the Portfolio Manager, a majority of the equity of which was owned directly or indirectly by principals of the Portfolio Manager or its affiliates. As of 31 December 2020, the Lender was no longer an affiliate of the Portfolio Manager. As security for its obligations under the loan agreement, the Company had provided collateral in the form of certain shares of the ACIS CLOs as detailed in the Investment Portfolio.

On 15 April 2021, the Directors notified NexBank SSB of their intention to fully repay the facility and, on 29 April 2021, the loan was repaid in full. Therefore, at 30 June 2021 there was no outstanding balance (31 December 2020: US$11,449,923) and no accrued but unpaid interest (31 December 2020: US$48,490).

**Highland CLO Funding, Ltd.**
**Notes to the Unaudited Condensed Interim Financial Statements** *(continued)*
**for the year ended 30 June 2021**

2. **Significant Accounting Policies** *(continued)*

**i) Dividend Income**

Dividend income is recognised in the Statement of Operations within dividend income when the Company's right to receive payments is established. This will generally be the ex-dividend date or, for certain securities, when notified. Dividend income is recognised gross of withholding tax, if any.

**j) Income and Expense Recognition**

Interest on currently paying debt instruments is accrued as earned. In certain instances where the asset has defaulted or some amount of the interest payment is deemed uncollectable, interest is recognised when received. Such accretion/amortisation is calculated on an effective-yield basis. Amendment fees are recognised when received. Dividend income is recorded on the ex-dividend date. Interest income on cash and cash equivalent balances and securities held is accrued when earned. Operating expenses are recorded on the accrual basis as incurred.

**k) Cash and Cash Equivalents**

Cash and cash equivalents consist of cash held at the Principal Bankers and deposits with original maturities of less than 90 days.

**l) Foreign Currency**

Investment securities and other assets and liabilities denominated in foreign currencies are translated into U.S. dollar amounts at the date of valuation. Purchases and sales of investment securities and income and expense items denominated in foreign currencies are translated into U.S. dollar amounts on the respective dates of such transactions in the Statement of Operations.

The Company does not isolate that portion of the results of operations resulting from changes in foreign exchange rates on investments from the fluctuations arising from changes in market prices of securities held.

**m) Distributions**

During 2019, the Company suspended the payment of dividends for an indefinite period. The Directors monitor the Company's profitability and cash flow regularly with a view to re-instating the payment of dividends, if and when the Board consider it appropriate.

**n) Management Fees**

No management fees are payable by the Company pursuant to any Services Agreement.

The Company shall pay or reimburse the Portfolio Manager and its affiliates all expenses related to the services as set out in the Portfolio Management Agreement. Highland HCF Advisor receives, in consideration for its services pursuant to the Portfolio Management Agreement, an amount equivalent to all Operating Expenses incurred by the Portfolio Manager in the performance of its obligations thereunder, together with any irrecoverable Value Added Tax ("VAT") arising on such costs and expenses.

Highland CLO Funding, Ltd.     14

**Highland CLO Funding, Ltd.**
**Notes to the Unaudited Condensed Interim Financial Statements** *(continued)*
**for the year ended 30 June 2021**

### 3. Financial Instruments with Concentration of Credit Risk and Other Risks

**Limited Diversification**

Highland HCF Advisor Ltd., as the Portfolio Manager, has attempted to diversify the Company's investments. However, the Company's portfolio has become significantly concentrated due to the ongoing realisation of its underlying portfolio assets, and such concentration of risk increases the risk of volatility in the Company's net asset value. This limited diversity exposes the Company to the risk of losses that are disproportionate to market movements as a whole.

**Market Risk**

Market risk represents the potential loss that may be incurred by the Company due to a change in the market value of its investments. The Company's exposure to market risk is affected by a number of macroeconomic factors, such as interest rates, availability of credit, inflation rates, economic uncertainty and changes in laws and regulations. These factors may affect the level and volatility of security prices and the liquidity of the Company's investments. Volatility or illiquidity could impair the Company's performance or result in losses. The Company may maintain substantial trading positions that can be adversely affected by the level of volatility in the financial markets.

**Custody Risk**

The clearing operations for the Company investments are provided by brokerage firms. The Company is subject to credit risk to the extent that a broker is unable to deliver cash balances or securities, or clear securities transactions on the Company's behalf. In addition, all of the Company's cash and investments are held with banks or brokerage firms. While both the U.S. Bankruptcy Code and the Securities Investor Protection Act of 1970 seek to protect customer property in the event of a broker-dealer's failure, insolvency or liquidation, the Company may lose all or a portion of the assets held by these banks or brokerage firms if they become insolvent or fail to perform pursuant to the terms of their obligations.

**Liquidity Risk**

The Company's ordinary shares outstanding owned by its investors have not been registered under the Securities Act or any other applicable securities laws. There is no public market for such interests and the Portfolio Manager and the Company do not expect such a market to develop. In addition, the Company's shares are not transferable except with the consent of the Portfolio Manager, which it generally may withhold in its sole discretion in accordance with the terms and conditions of the articles of incorporation.

**Concentration of Credit Risk and Other Risks**

At 30 June 2021, the Company's investments were predominantly concentrated in the Cayman Islands. Industry concentrations are provided in the Condensed Schedule of Investments. Five (31 December 2020: five) of the CLO investments held by the Company, representing 39.78% of the Company's net asset value as at 30 June 2021 (31 December 2020: 48.15%), were in CLOs managed by Acis Capital Management LP ("Acis"), the Company's former Portfolio Manager. These assets were largely redeemed by Acis on or around 23 June 2021 and the substantial proportion of the net asset value of such instruments as now held by US Bank as indenture trustee in the form of cash, as more fully described elsewhere.

**Highland CLO Funding, Ltd.**
**Notes to the Unaudited Condensed Interim Financial Statements** *(continued)*
**for the year ended 30 June 2021**

3. **Financial Instruments with Concentration of Credit Risk and Other Risks (***continued***)**
**Reverse Repurchase Agreements**
Securities purchased under agreements to resell (Reverse Repurchase Agreements) are reported as reverse repurchase agreements and carried in the Statement of Assets and Liabilities as a financial liability at amortised cost. Interest incurred on reverse repurchase agreements is recognised as interest expense over the life of the agreement. As at 30 June 2021, no assets were subject to reverse repurchase agreements.

**Debt Obligations**
The Company's investment portfolio consists of CLOs that are not listed on a national securities exchange. These investments trade in a limited market and it may not be possible to immediately liquidate them if needed. Because of the inherent uncertainty of the marketability of these investments, the Portfolio Manager's best estimates may differ significantly from values that would have been used had a broader market for the investments existed.

4. **Fair Value Hierarchy of Financial Instruments**
In accordance with the authoritative guidance on fair value measurements and disclosures under U.S. GAAP, the Company discloses the fair value of its investments in a hierarchy that prioritises the inputs to valuation techniques used to measure the fair value. The hierarchy gives the highest priority to valuations based upon unadjusted quoted prices in active markets for identical assets or liabilities (Level 1 measurements) and the lowest priority to valuations based upon unobservable inputs that are significant to the valuation (Level 3 measurements). The guidance establishes three levels of the fair value hierarchy as follows:

Level 1 – Valuations based on quoted prices in active markets for identical assets and liabilities that the Company has the ability to access as of the measurement date. Valuations utilising Level 1 inputs do not require any degree of judgment.

Level 2 – Valuations based on: (a) quoted prices for similar instruments in active markets; (b) quoted prices for which identical or similar instruments in markets that are not active that are reflective of recent market transactions; or (c) models in which all significant inputs are observable, either directly or indirectly.

Level 3 – Valuations based on indicative quotes that do not reflect recent market transactions and models or other valuation techniques in which the inputs are unobservable and significant to the fair value measurement, which includes situations where there is little, if any, market activity for the asset or liability.

The availability of observable inputs varies among financial instruments and is affected by numerous factors, including the type of instruments, the period of time in which the instrument has been established in the marketplace, market liquidity for an asset class and other characteristics particular to a transaction. When the inputs used in a valuation model are unobservable, management is required to exercise a greater degree of judgment to determine fair value than it would for observable inputs. For certain instruments, the inputs used to measure fair value may fall into different levels of the hierarchy discussed above. In those cases, the instruments are categorised for disclosure purposes based on the lowest level of inputs that are significant to their fair value measurements.

**Highland CLO Funding, Ltd.**
**Notes to the Unaudited Condensed Interim Financial Statements** *(continued)*
**for the year ended 30 June 2021**

### 4. Fair Value Hierarchy of Financial Instruments *(continued)*

The Company uses prices and inputs that are current as of the measurement dates. The Company also considers the counterparty's non-performance risk when measuring the fair value of its investments.

During periods of market dislocation, the ability to observe prices and inputs for certain instruments may change. These circumstances may result in the instruments being reclassified to different levels within the hierarchy over time. They also create an inherent risk in the estimation of fair value that could cause actual amounts to differ from management's estimates. Whenever possible, the Company uses actual market prices or relevant observable inputs to establish the fair value of its assets and liabilities. In cases where observable inputs are not available, the Company develops methodologies that provide appropriate fair value estimates. Management reviews these methodologies on a continuous basis to account for changing market conditions.

The Portfolio Manager has established policies, as described above, processes and procedures to ensure that valuation methodologies for investments and financial instruments that are categorised within all levels of the fair value hierarchy are fair and consistent. A Pricing Committee has been established to provide oversight of the valuation policies, processes and procedures, comprising various personnel from the Portfolio Manager.

The Pricing Committee meets monthly to review the proposed valuations for investments and financial instruments. The Pricing Committee is responsible for establishing the valuation policies and evaluating the overall fairness and consistent application of those policies.

As of 30 June 2021, the Company's investments consisted primarily of CLOs, LLC Interests and Limited Partnership Interests.

Loans and bonds that are priced using quotes derived from implied values, bid/ask prices for trades that were never consummated, or a limited amount of actual trades are classified as Level 3 assets because the inputs used by the brokers and pricing services to derive the values are not readily observable.

The Company categorised investments recorded at fair value in accordance with the hierarchy established.

The following table provides a summary of the investments recorded at fair value on a recurring basis by level within the hierarchy as of 30 June 2021:

| Assets | Level 1 *(unaudited)* US$ | Level 2 *(unaudited)* US$ | Level 3 *(unaudited)* US$ | Total *(unaudited)* US$ |
|---|---|---|---|---|
| Investments in CLOs | - | - | 62,450,190 | 62,450,190 |
| Limited Partnership Interests | - | - | 4,357,697 | 4,357,697 |
| Investments in LLC Interests | - | - | - | - |
| **Total** | **-** | **-** | **66,807,887** | **66,807,887** |

The following is a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorised within Level 3 of the fair value hierarchy:

**Highland CLO Funding, Ltd.**
**Notes to the Unaudited Condensed Interim Financial Statements** *(continued)*
**for the year ended 30 June 2021**

### 4. Fair Value Hierarchy of Financial Instruments *(continued)*

| Category | Fair value at 30 June 2021 *(unaudited)* US$ | Valuation technique *(unaudited)* | Unobservable inputs *(unaudited)* | Input value(s) *(unaudited)* |
|---|---|---|---|---|
| Investments in CLOs | 62,450,190 | Indicative broker quotes | n/a | n/a |
| Limited Partnership Interest | 4,357,697 | Net asset value | n/a | n/a |
| **Total** | **66,807,887** | | | |

The following table provides a summary of the investments recorded at fair value on a recurring basis by level within the hierarchy as of 31 December 2020:

| Assets | Level 1 *(audited)* US$ | Level 2 *(audited)* US$ | Level 3 *(audited)* US$ | Total *(audited)* US$ |
|---|---|---|---|---|
| Investments in CLOs | - | - | 45,755,325 | 45,755,325 |
| Limited Partnership Interests | - | - | 9,591,413 | 9,591,413 |
| Investments in LLC Interests | - | - | - | - |
| **Total** | **-** | **-** | **55,346,738** | **55,346,738** |

The following is a summary of significant unobservable inputs used in the fair valuations of assets and liabilities categorised within Level 3 of the fair value hierarchy:

| Category | Fair value at 31/12/20 US$ | Valuation technique *(audited)* | Unobservable inputs *(audited)* | Input value(s) *(audited)* |
|---|---|---|---|---|
| Investments in CLOs | 45,755,325 | Indicative broker quotes | n/a | n/a |
| Limited Partnership Interest | 9,591,413 | Net asset value | n/a | n/a |
| **Total** | **55,346,738** | | | |

The following table provides a summary of changes in the amounts for the financial period ended 30 June 2021 for financial instruments classified within Level 3. The classification of a financial instrument within Level 3 is based on the significance of the unobservable inputs to the overall fair value measurement.

| | Fair value at 31 December 2020 US$ | Transfers in/(out) of level 3 US$ | Purchases US$ | Sales and maturities US$ | Net realised loss US$ | Net change in unrealised loss US$ | Fair value at 30 June 2021 US$ |
|---|---|---|---|---|---|---|---|
| Investments in CLOs | 45,755,325 | - | - | (882,268) | - | 17,577,133 | 62,450,190 |
| Investments in LLC Interests | - | - | - | | | - | - |
| Limited Partnership Interest | 9,591,413 | - | - | (8,717,198) | (1,958,709) | 5,442,191 | 4,357,697 |
| | 55,346,738 | - | - | (9,599,466) | (1,958,709) | 23,019,324 | 66,807,887 |

**Highland CLO Funding, Ltd.**
**Notes to the Unaudited Condensed Interim Financial Statements** *(continued)*
**for the year ended 30 June 2021**

### 4. Fair Value Hierarchy of Financial Instruments *(continued)*

| | Fair value at 31 December 2019 US$ | Transfers in/(out) of level 3 US$ | Purchases US$ | Sales and maturities US$ | Net realised gain/(loss) US$ | Net change in unrealised gain/(loss) US$ | Fair value at 30 June 2020 US$ |
|---|---|---|---|---|---|---|---|
| Investments in CLOs | - | 77,537,647 | - | (303,951) | 45,593 | (32,449,831) | 44,829,458 |
| Investments in LLC Interests | - | 2,392,089 | - | - | - | (2,380,228) | 11,861 |
| Limited Partnership Interest | 10,310,160 | - | - | - | - | (4,688,029) | 5,622,131 |
| | 10,310,160 | 79,929,736 | - | (303,951) | 45,593 | (39,518,088) | 50,463,450 |

Transfers into and out of Level 3 are recognised at the beginning of the financial year. All of the net changes in unrealised, which are presented in the table above, are related to investments held as at 30 June 2021.

There were no transfers between levels during the period (30 June 2020: Except for transfers from Level 2 into Level 3 in the table above, there were no other transfers in the period).

### 5. Share Capital

The shares of the Company are classified as equity based on the substance of the contractual arrangements and in accordance with the definition of equity instruments under ASC 480 "Distinguishing from Equities".

**Ordinary Shares**

The rights attaching to the Ordinary Shares shall be as follows:

a) As to income - subject to the rights of any Ordinary Shares which may be issued with special rights or privileges, the Ordinary Shares of each class carry the right to receive all income of the Company attributable to the Ordinary Shares, and to participate in any distribution of such income by the Company, pro rata to the relative Net Asset Values of each of the classes of Ordinary Shares and within each such class, income shall be divided pari passu amongst the holders of Ordinary Shares of that class in proportion to the number of Ordinary Shares of such class held by them.

b) As to capital - on a winding up of the Company or other return of capital (other than by way of a repurchase or redemption of Ordinary Shares in accordance with the provision of the Articles of Incorporation and the Law), the surplus assets of the Company attributable to the Ordinary Shares remaining after payment of all creditors shall, subject to the rights of any Ordinary Shares that may be issued with special rights or privileges, be divided amongst the holders of Ordinary Shares of each class pro rata to the relative Net Asset Values of each of the classes of the Ordinary Shares and, within each such class, such assets shall be divided pari passu amongst the holders of Ordinary Shares of that class in proportion to the number of Ordinary shares of that class held by them.

c) As to voting - the holders of the Ordinary Shares shall be entitled to receive notice of and to attend, speak and vote (in accordance with Article 22 of the Articles of Incorporation) at general meetings of the Company.

Throughout the period, there was only one class of Ordinary Shares in issue.

**Highland CLO Funding, Ltd.**
**Notes to the Unaudited Condensed Interim Financial Statements** *(continued)*
**for the year ended 30 June 2021**

**5. Share Capital** *(continued)*

The following table represents the movement in ordinary shares issued by the Company for the financial period ended 30 June 2021:

|  | 30 June 2021 (unaudited) Quantity | 30 June 2020 (unaudited) Quantity |
|---|---|---|
| Opening balance | 153,139,231 | 153,139,231 |
| Issued/(repurchased) | - | - |
| **Closing balance** | **153,139,231** | **153,139,231** |

During the financial period, no shares were issued or repurchased.

**Net Asset Value**

The net asset value per share at 30 June 2021 is determined by dividing the value of the net assets by the total number of ordinary shares in issue at the financial period end.

|  | 30 June 2021 (unaudited) | 31 December 2020 (audited) |
|---|---|---|
| Total net assets | US$71,987,815 | US$50,455,255 |
| Number of ordinary shares in issue | 153,139,231 | 153,139,231 |
| Net asset value per ordinary share | US$0.47 | US$0.33 |

**Capital Management**

The Company is closed-ended and has no externally imposed capital requirements.

**Committed Capital**

On 15 November 2017, the existing shareholders entered into a subscription and transfer agreement (the "Subscription Agreement") with the Company. Collectively, the shareholders committed to purchase US$153,000,000 of ordinary shares from the Company, pro rata, at a price per ordinary share determined in reference to the most recent quarterly determined net asset value of the Company.

The Portfolio Manager may call capital from the shareholders to purchase additional shares from time to time, on a pro rata basis, upon 10 business days' written notice to the shareholders. Upon the expiration of the Investment Period, all shareholders will be released from any further obligation to purchase shares under the Subscription Agreement, except to the extent necessary to:

(i) Complete, no later than 180 days after the expiration of the Investment Period, the purchase of shares pursuant to written commitments, letters of intent or similar contractual commitments that were in process as of the end of the Investment Period; and

(ii) Fund any indebtedness of the Company permitted hereunder incurred prior to the end of the Investment Period (including to repay outstanding indebtedness under any warehouse loan facilities).

At the date of signing these unaudited condensed interim financial statements, the Portfolio Manager is still able to call capital from shareholders to repay outstanding indebtedness.

**Highland CLO Funding, Ltd.**
**Notes to the Unaudited Condensed Interim Financial Statements** *(continued)*
**for the year ended 30 June 2021**

### 6. Administration

Elysium Fund Management Limited (the "Administrator" or "Elysium") is the Company's administrator, effective from 8 November 2019, and receives a fee of US$155,000 per annum. During the period, administration fees totalled US$137,866, which includes US$60,366 of fees payable to Elysium for additional work undertaken in the period (30 June 2020: US$126,636, which includes US$49,136 of fees payable to Elysium for additional work undertaken in the period).

### 7. Income Taxes

The Company is an exempted company organised in Guernsey. Under the current laws of Guernsey, there are no income, estate, transfer, sale or other taxes payable by the Company.

For U.S. income tax purposes, the Company is treated as a pass-through entity, which means it is not subject to federal taxes under current Internal Revenue Service guidelines. However, each investor may be individually liable for income taxes, if any, on its share of the Company's net taxable income.

The Company invests in CLOs for its own account and, as such, non-U.S. Investment Vehicle investors are generally not subject to U.S. tax on such earnings (other than certain withholding taxes indicated below). The Portfolio Manager intends to conduct the Company's business in such a manner that it does not constitute a U.S. trade or business, nor does it create a taxable presence in any of the jurisdictions in which the Portfolio Manager has offices.

Dividends as well as certain interest and other income received by the Company from sources within the United States may be subject to, and reflected net of, United States withholding tax at a rate of 30% for non-U.S. Investment Vehicles. Interest, dividend and other income realised by the Company from non-U.S. sources and capital gains realised on the sale of securities of non-U.S. issuers may be subject to withholding and other taxes levied by the jurisdiction in which the income is sourced.

The Company applies the authoritative guidance on accounting for and disclosure of uncertainty in tax positions which requires management to determine whether a tax position of the Company is more likely than not to be sustained upon examination, including resolution of any related appeals or litigation processes, based on the technical merits of the position. For tax positions meeting the more likely than not threshold, the tax amount recognised in the **unaudited condensed interim** financial statements is the largest benefit that has a greater than fifty percent likelihood of being realised upon ultimate settlement with the relevant taxing authority. Management have determined that there was no effect on the **unaudited condensed interim** financial statements from the Company's adoption of this authoritative guidance, and they do not expect a significant change in uncertain tax positions during the six months subsequent to 30 June 2021.

The Company files tax returns as prescribed by the tax laws of the jurisdictions in which it operates. In the normal course of business, the Company is subject to examination by federal and foreign jurisdictions, where applicable. As of 30 June 2021, the tax years that remain subject to examination by the major tax jurisdictions under the statute of limitations is from the commencement of operations forward.

### 8. Related Party Transactions
**Directors' Fees**

The Directors' fees incurred during the period amounted to US$171,466 (30 June 2020: US$140,987) and are presented in the Statement of Operations. As at 30 June 2021, US$5,084 (31 December 2020: US$36,612) relating to fees for additional duties was still outstanding and is included within accrued expenses and US$58,164 (31 December 2020: nil) relating to the base fee for the year was prepaid and is included within other assets, both presented in the Statement of Assets and Liabilities. The total fees incurred consisted of base fees of US$57,216 (GBP42,158 equivalent) and US$114,250 related to additional duties arising out of the litigation process described in Note 9 below.

**Highland CLO Funding, Ltd.**
**Notes to the Unaudited Condensed Interim Financial Statements** *(continued)*
**for the year ended 30 June 2021**

**8. Related Party Transactions** *(continued)*
**Affiliates of the Portfolio Manager**
The Company committed US$18,487,500 to purchase limited partnership interests in ACIS CLO Management Holdings, L.P., an affiliated entity controlled by the Portfolio Manager. Of the US$18,487,500 committed, US$17,850,000 was contributed to ACIS CLO Management Holdings, L.P. on 18 September 2017, US$2,650,000 was redeemed on 26 November 2019, US$8,717,198 was redeemed on 17 March 2021 and US$12,004,698 remains unfunded as at 30 June 2021 (31 December 2020: US$3,287,500).

Certain investments are issued and managed by affiliates of the Portfolio Manager. These investments are subject to the same valuation policies and procedures as similar investments within the same level of the fair value hierarchy. As of 30 June 2021, the Company held the following investments that were issued and managed by affiliates of the Portfolio Manager:

| Issuer | Type of Security | 30 June 2021 Fair Value (unaudited) US$ | 31 December 2020 Fair Value (audited) US$ |
|---|---|---|---|
| Greenbriar CLO Ltd | Asset-backed equity tranche | 11,700,000 | 7,349,940 |
| Brentwood CLO Ltd | Asset-backed equity tranche | 6,240,000 | 6,000,000 |
| Rockwall CDO Ltd | Asset-backed equity tranche | 5,600,000 | 1,607,900 |
| Liberty CLO Ltd | Asset-backed equity tranche | 5,355,000 | 3,922,750 |
| Grayson CLO Ltd | Asset-backed equity tranche | 4,366,000 | 2,109,250 |
| ACIS CLO Management Holdings, LP | Limited Partnership | 4,357,697 | 9,591,413 |
| Gleneagles CLO Ltd | Asset-backed equity tranche | 425,000 | 348,625 |
| | | 38,043,697 | 30,929,878 |

All related party transactions were made at arm's length on normal commercial terms and conditions. There have been no other transactions between the Company and its related parties during the reporting period.

**9. Litigation and other significant events during the financial period**
The statement from the Chairman contained on pages 3 and 4 summarises the significant events during the period. Additionally, during the period, the Company settled its ongoing disputes with Acis thus enabling the redemption of the Company's CLOs managed by that party.

**10. Commitments and Contingencies**
In the normal course of business, the Company may enter into contracts that provide general indemnifications and contain a variety of representations and warranties that may expose the Company to some risk of loss. The amount of future losses arising from such undertakings, while not quantifiable, is not expected to be significant with the possible exception of indemnities to employees of the Portfolio Manager under the terms of the Portfolio Management Agreement ("PMA") arising out of the litigation described in Note 9 above. The Company is unable to determine and reliably estimate the future costs associated with these indemnity claims and therefore no contingent liabilities have been raised at the period end.

**Highland CLO Funding, Ltd.**
**Notes to the Unaudited Condensed Interim Financial Statements** *(continued)*
**for the year ended 30 June 2021**

**11. Subsequent Events**

On or around 12 May 2021, the Company issued notices to Acis seeking redemption of all CLOs under its management. Since the period end, the proceeds from such redemptions were received by and are currently held in cash by US Bank as indenture trustee, as more fully described elsewhere.

At the Annual General Meeting of the Company held on 10 May 2021 (adjourned and reconvened on 24 May 2021), although all votes received were in favour of the resolutions proposed, votes were received in respect of only 50.6% of the issued share capital. It is a requirement under the Members' Agreement governing certain aspects of the Company's operations that a positive vote of at least 75% of the ordinary shares then in issue is required for certain actions to be progressed. A consequence of this circumstance was that the resolution reappointing the Company's auditors was not passed, placing the Company in potential breach of both its constitutional documents and the regulatory framework to which it is subject. As a result, on 13 August 2021, the Directors reappointed Grant Thornton Limited as auditor to the Company in accordance with the powers granted to them in the Company's Articles of Association.

There were no other significant events affecting the Company since the period end date that require amendment to or disclosure in the unaudited condensed interim financial statements.

**12. Going concern**

The COVID-19 pandemic is a risk to the global economy, and, like the majority of companies, has had an impact on the Company's operations. At the height of the lockdowns in Guernsey and the United States, the Administrator and Portfolio Manager showed that they were able to work remotely without any significant negative impact on the Company's operations. The impact of the various vaccines has yet to be seen, but there is light at the end of the COVID-19 pandemic tunnel, and it is expected that (as vaccine programmes are rolled out globally) the risk to the Company from the pandemic will continue to decrease throughout 2021.

The COVID-19 pandemic could have a negative impact on investment valuations and on the volatility of investment valuations, but it does not impact the ability of the Company to continue as a going concern. The impact of the COVID-19 pandemic is changing but the Directors will continue to monitor the situation closely, and they consider that the Company is well placed to deal with challenges arising from the COVID-19 pandemic.

In determining that it is appropriate to adopt the going concern basis in preparing these unaudited condensed interim financial statements, the Directors have taken into consideration:

- The litigation in the United States of America arising out of an employment dispute between the former Portfolio Manager and a former employee/partner thereof (see Note 9).

- The possible quantum and timing of cashflows to 31 December 2022, including legal costs based on a number of different scenarios, the increased uncertainty of the income from and valuation of the Company's investments as a result of the COVID-19 pandemic's impact on financial markets, and the recovery via insurance of certain of those legal costs.

After careful consideration of the above, the Board is satisfied that the Company will have adequate liquidity to continue to operate for at least the next 12 months from the date of signing these unaudited condensed interim financial statements and that the going concern basis of preparation of the unaudited condensed interim financial statements for the period ended 30 June 2021 is appropriate.

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **NEXPOINT STRATEGIC** | § | |
| **OPPORTUNITIES FUND,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Cause No.** _____ |
| | § | |
| **ACIS CAPITAL MANAGEMENT, L.P.,** | § | |
| **U.S. BANK, N.A., JOSHUA N. TERRY,** | § | |
| **BRIGADE CAPITAL MANAGEMENT,** | § | |
| **L.P.,** | § | |
| | § | |
| *Defendants.* | § | |

**ORIGINAL COMPLAINT**

**I.**

**INTRODUCTION**

Plaintiff NexPoint Strategic Opportunities Fund ("NexPoint" or "Plaintiff") respectfully

files this action to recover damages caused by the gross malfeasance of Defendants U.S. Bank

National Association ("U.S. Bank"), as a trustee, and Acis Capital Management, L.P. ("Acis"

or "Acis"), Brigade Capital Management, LP ("Brigade"), and Joshua N. Terry ("Terry"), as

registered investment advisors ("RIAs", together with U.S. Bank, "Defendants" and each a

"Defendant"). The Defendants are jointly and severally liable for mismanaging certain

collateralized loan obligations that NexPoint invested in. The acts and omissions which have

recently come to light reveal breaches of fiduciary duty, a pattern of violations of the Investment

Advisers Act of 1940 and the Trust Indenture Act of 1939, and conversion, among others, which

have caused and/or likely will continue to cause Plaintiff damages.

At all relevant times, the Defendants have managed and advised ACIS CLO-2014-2, Ltd.,

("ACIS 2"), ACIS CLO-2014-3 Ltd. ("ACIS 3"), ACIS CLO-2014-4 Ltd. ("ACIS 4"), ACIS

---

**PLAINTIFF'S ORIGINAL COMPLAINT**                                                    **Page 1**

CLO-2014-5 Ltd. ("ACIS 5"), and ACIS CLO-2015-6, Ltd. ("ACIS 6") (any two or more, the "CLOs"). In a classic "let's rob Peter to pay Paul" scheme, the RIAs have—and the Trustee has allowed the RIAs (for their own sole benefit):

- Knowingly charge the CLOs exorbitant amounts of "expenses" without accountability or justification;

- Knowingly cause the CLOs to purchase loans that fail to meet credit quality tests and average life test, and caused the entire portfolio to fail the applicable collateral quality tests;

- Knowingly cause the CLOs to sell valuable assets cheaply; and

- Knowingly breach industry standards for best execution when buying and selling.

Furthermore, U.S. Bank knowingly breached the provisions of the CLOs' indentures by failing to object to and by not allowing the noteholders to vote on the entry of Plan D as part of the Chapter 11 Trustee's Joint Plan in the Acis Bankruptcy,[1] which contains provisions that adversely affect the noteholders and equity of the CLOs and their ability to make optional redemptions from the CLOs.

To put it simply, since February 16, 2019, forward, through the combined effect of the above malfeasance, Defendants have wiped out more than $50 million in value from the CLOs and have hamstrung NexPoint from recouping its investments in the CLOs.

The impact on NexPoint is substantial. It owns $5 million of ACIS 3's Class-F debt tranche, and approximately $7.5 million of the equity of ACIS 6. Defendants have caused the net asset value of the equity of ACIS 3 to be completely wiped out, which losses have now crept up into the Class-F Tranche of ACIS 3. That debt is worth 40 cents on the dollar. Defendants

---

[1] On January 31, 2019, in a consolidated adversary proceeding involving the Acis CLOs, the United States Bankruptcy Court for the Northern District of Texas entered a Third Amended Joint Plan for Acis Capital Management, L.P. and Acis Capital Management GP, LLC ("Plan D"). *See* Case No. 18-30264-SGJ-11 and Case No. 18-30265-SGJ-1, Jointly Administered Under Case No. 18-30264-SGJ-11), referred to herein as the Adversary Proceeding.

---

**PLAINTIFF'S ORIGINAL COMPLAINT**      Page 2

have also caused the net asset value of the ACIS 6 equity to be worth a mere 30 cents on the dollar. Defendants have thus caused Plaintiff to suffer over $8 million in losses.

These are not just ephemeral numbers. Plaintiff represents the interests of thousands of investors who rely on the promised security of these types of investments to provide cash flow and to fund things like retirements and college tuitions. Plaintiff invested in the CLOs because, if managed in the way provided for in the indentures and portfolio management agreements ("PMAs"), they are secure and relatively safe, diversified investments.

The economic purpose is obliterated where, as here, the RIAs manage the CLOs for their own ends, extending the life of the existing portfolio so as to maximize fees and prohibiting the noteholders from making redemptions. Meanwhile, the trustee, U.S. Bank, looks the other way (whether intentionally or negligently) while the value of the CLOs is decimated. The Defendants are legally obligated fiduciaries who have to look out for the best interests of the advised funds, i.e., the CLOs and their investors.

## II.

## THE PARTIES

1.     Plaintiff NexPoint Strategic Opportunities Fund ("NexPoint"), a Delaware statutory trust, is a closed-end retail fund managed by NexPoint Advisors, L.P. Its principal place of business is in Dallas, Texas. Interests in NexPoint trade on the New York Stock Exchange (NYSE: NexPoint).

2.     Joshua N. Terry is an individual resident of Texas located at 3509 Princeton Avenue, Dallas, Texas, 75205, who may be personally served wherever he may be found. Terry is the owner and President of Acis.

3.     Defendant Acis Capital Management, L.P. ("Acis") is a Delaware limited

partnership. Acis may be served through its registered agent Capitol Services, Inc., located at 1675 S. State Street, Suite B, Dover, Delaware 19901, or wherever it may be found. Acis is a registered investment advisor.

4.      Defendant Brigade Capital Management, LP is a Delaware limited partnership that is registered to do business in New York, with its principal place of business in the state of New York. Brigade may be served through Donald E. Morgan III, 399 Park Avenue, 16th Floor, New York, New York, 10022, or wherever it may be found. Brigade is a registered investment advisor.

5.      Defendant U.S. Bank, N.A. ("U.S. Bank", also, the "Indenture Trustee" or "Trustee") is a national banking association that is Trustee of the Acis Indentures, as defined further herein. Defendant U.S. Bank may be served at its corporate office located at 190 South LaSalle Street, 8th Floor, Chicago, IL 60603, or wherever it may be found.

### III.

### JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because one or more claims "arises under" federal law—namely, the Investment Advisers Act of 1940 and the Indenture Trust Act of 1939 (as amended). This Court also has original jurisdiction over all claims alleging violations of the Advisers Act or its regulations or commission rules, and venue is proper herein for same under 15 U.S.C. § 80b-14. All such other claims are properly before this Court under its supplemental jurisdiction supplied by 28 U.S.C. § 1367.

7.      Personal jurisdiction and venue over Acis and U.S. Bank are proper because the governing documents—the indentures and portfolio management agreements—to which they are bound, required them to agree to submit to the jurisdiction of New York and to waive any

Case 19-34054-sgj11 Doc 3507-1 Filed 09/09/22   Entered 09/09/22 16:32:09   Page 389 of
448
Case 1:21-cv-04384   Document 18   Filed 05/14/21   Page 5 of 50

objection to New York as a forum and venue. Both Defendants are authorized to and do regularly conduct business in the state of New York and are accused of torts directed at the state of New York, at least in part. Furthermore, the acts and/or omissions giving rise to the causes of action herein occurred in whole or in part in this District and affect property situated in this District.

8.      Jurisdiction and venue over Brigade are proper in this district because Brigade is registered to do business in New York, and the transactions and occurrences that are the subject of NexPoint's claims against Brigade, including certain advice, communications, and trading activity with brokers or dealers, took place in whole or in part in this District.

9.      Jurisdiction and venue over Terry are proper in this District because Terry is bound by the indenture clauses cited above, and he committed torts that are the subject of NexPoint's claims against him that occurred within or were directed to New York, including through certain trading activity with brokers or dealers within New York or to New York.

## IV.

## FACTUAL BACKGROUND

### A.  A BRIEF PRIMER OF THE ACIS CLOS

10.      In order for one unversed in the business to appreciate the issues raised in this lawsuit, Plaintiff introduces the relevant players, relationships, and terms in the business of "collateralized loan obligations" or "CLOs" as they pertain to the Acis CLOs.

11.      The CLOs were intended as investment vehicles whereby a special purpose issuer entity raises equity funds from one or more equity investors, and then raises additional cash in the form of debt, usually from the public markets by issuing notes to third-party investors (collectively, the "CLO Notes").

12.      The debt, as it often is, was arranged in tranches, whereby the most senior debt

Case 19-34054-sgj11 Doc 3507-1 Filed 09/09/22   Entered 09/09/22 16:32:09   Page 390 of
448
Case 1:21-cv-04384   Document 1   Filed 05/14/21   Page 6 of 50

bears the lowest coupon rate (i.e., *interest*) but is paid back first, and so is the least risky; and the
most junior debt is paid the highest coupon but is paid next-to-last (before the equity), and so it
is the riskiest of the debt tranches. Last to be paid (behind all the debt)—and taking on defaults
first--is the equity. The character of incoming funds cascading down the tranches to pay the debt
in descending seniority order, and then the equity last, is frequently referred to as the "payment
waterfall."

13.     The pool of cash raised from the issuance of the debt and equity was then used to
purchase a mixture of publicly available, floating rate, senior-secured debt instruments issued by
corporations (altogether, "CLO Assets").

14.     The CLO Assets become the source of the cash flow to pay the CLO's expenses,
then the CLO's noteholders' principal and interest payments due on the CLO Notes. And
typically, the rest was paid to the equity holders on a quarterly basis.

15.     Thus, the equity holders took on the most risk but were the beneficiaries of the
spread between the incoming cash flows from the CLO Assets, minus the operating expenses and
the interest on the CLO Notes, due to the respective debt tranches.

16.     The key parties to this transaction's success or failure are the portfolio manager,
the adviser, and the indenture trustee.

17.     The document that binds the parties – the issuer, the noteholders, the equity, the
portfolio manager, and the indenture trustee—is a contract referred to as an "indenture."

18.     The portfolio manager's role is two-fold: The first is to identify and purchase the
CLO Assets, and to do so in a manner that creates the requisite cash flow to meet the CLOs debt
service requirements (i.e., that it meets the payout, diversification, credit quality and average life
requirements), while not exposing the CLO to non-market risks. The second is to monitor the

CLO Assets to ensure that over time, the individual CLO Assets continue to meet various collateral quality tests designed to ensure that the CLO can meet its debt service requirements and still produce income for the CLO's equity holders. This usually requires the portfolio manager to monitor each of the assets in order to ensure that the CLO has a mix of assets in different industries or markets, with differing maturity dates within acceptable risk profiles, and within a variety of credit ratings. This often means selling assets that are deteriorating and buying assets that are superior to assets in the portfolio. Otherwise, investing too much of the portfolio in any one of these categories exposes the CLO to too much risk and to losses.

19.     The portfolio manager is typically subject to an agreement separate from the indenture called the portfolio management agreement, or "PMA." The portfolio manager also often serves as the investment advisor (or hires an advisor), who may also outsource or delegate certain functions to a sub-advisor. Advisors are required to be "Registered Investment Advisors" under federal law, which imposes a strong fiduciary duty on them as discussed below. One of those duties is to maintain the best interest of the investors and to make decisions on investment that is suitable to the investors' assumption of risk.

20.     The indenture is governed by federal law—namely, the Trust Indenture Act of 1939, and the Trust Indenture Reform Act of 1990, as well as their enacting regulations.

21.     Pursuant to these laws, the indenture trustees are required by federal law to safeguard the interests of the investors (debt and equity), as a watchdog of sorts to ensure the portfolio manager's compliance with the indenture, and with good and sound collateral management practices.

22.     The law imposes a fiduciary duty and a "prudent person" standard on indenture trustees, which governs their performance of their duties under the indenture.

23.     The role of the indenture trustee is critical because the portfolio manager is paid as a percentage of "assets under management," or "AUM," which is determined by the face value, or par, of the debt instruments owed.

24.     Because the asset management and advisory fees are a percentage of the par value of the CLO Assts, if left unchecked, the portfolio manager is incentivized to purchase instruments with the highest par value irrespective of their quality. That way, the portfolio manager can achieve the largest par value in aggregate as possible and, thus, the largest fees. Because lower-credit-quality instruments are cheaper than higher credit instruments, a -portfolio manager could spend the cash pool on lower-quality, younger instruments because it could buy more of them and therefore manipulate its fee structure. Despite exposing the CLO to greater risk due to longer maturities and lower credit ratings, the portfolio manager would actually earn more fees this way and for a longer period of time.

25.     The indenture trustee's job is, in part, to prevent that from happening by monitoring changes in the CLO Assets and in the portfolio's credit quality and maturity.

26.     To that end, it has tools for ensuring the security and soundness of the CLO Asset pool, such as the metrics called the "WARF" and the "WAL".

27.     The "WARF" or the "weighted average rating factor" determines what the credit quality of the entire portfolio is. The credit quality of the pool of assets can be adjudged by taking the ratings of each debt issuance held by the CLO, relative to the amount of that bond issuance as a percentage of the total portfolio and aggregating those to a factor of the total notional balance of the portfolio. The better the WARF, the lower the risk to the CLO's investors.

28.     The WAL or the "weighted average life" test is another metric that judges the riskiness of the entire portfolio with respect to the time until the principal is repaid.

Case 19-34054-sgj11 Doc 3507-1 Filed 09/09/22 Entered 09/09/22 16:32:09 Page 393 of
448
Case 1:21-cv-04384 Document 1 Filed 05/14/21 Page 9 of 50

29.     The WAL is the average number of years for which each dollar of unpaid principal on an investment remains outstanding. Generally, investors want to be paid back sooner rather than later.

30.     And because no one can see that far into the future, longer payouts typically mean exposure to greater risk because of unforeseen circumstances such as inflation, default risk, or the issuer calling the notes. Thus, the better the WAL (i.e., the shorter maturity dates,) the lower the risk to the CLOs investors.

31.     Together, the WARF and the WAL serve as a shorthand way to judge whether the pool of CLO Assets is getting too risky.

32.     Thus, the indenture trustee has several metrics that it can and should use to monitor the activity of the portfolio manager in order to protect the CLO investors, debt and equity alike (generally, by protecting the equity, the trustee as a matter of course will protect the noteholders who get paid before equity).

**B.  NexPoint Invests in THE ACIS CLOs**

33.     The Acis CLOs are issuers under the above rubric. Acis is the Portfolio Manager. Terry is President of Acis, an entity which he also owns and for which he serves as the primary advisor. and Brigade is the sub-advisor to Terry and Acis.

34.     Between 2014 and 2016, NexPoint became a secured noteholder and beneficiary under the indenture for Acis CLO 2014-3 Ltd., as issuer, and Acis CLO 2014-3 LLC, as co-issuer (together "ACIS-3"). The value of the Series-F notes purchased was approximately $5,000,000.

35.     During that time period, NexPoint also became an equity holder under the indenture dated April 16, 2015, among Acis CLO 2015-6 Ltd., as issuer, and Acis CLO 2015-6 LLC as co-issuer (together "ACIS-6"). The value of the equity was approximately $7,500,000.

36.     U.S. Bank agreed to serve as the Trustee for these ACIS indentures, with Acis as the portfolio manager, and Highland Capital Management L.P. as the sub-adviser.

37.     NexPoint made these investments as part of its mission and as a relatively secure and safe investment on behalf of *its* investors.

38.     NexPoint is a party to the indentures for ACIS-3 and ACIS-6 (the "Acis Indentures").

39.     The Acis Indentures impose a number of obligations on Acis as Portfolio Manager and on U.S. Bank in connection with its role as Trustee.

40.     Separately, the Portfolio Management Agreements (the "PMAs") between the Acis CLOs and Acis impose obligations on Acis in connection with its role as Portfolio Manager and also impose a liability on the Trustee as a third-party beneficiary to the PMAs. In general, the PMAs provide that, subject to the terms of the Acis Indentures, Acis is obligated to "supervise and direct the investment and reinvestment of the Assets" and to "monitor the Assets."

41.     As of August 2018, when Terry took over Acis, Acis continued to serve as PM to the Acis CLOs, but had Terry as the advisor.

42.     Acis, as a result of it having no apparent employees nor wherewithal to manage the Acis CLOs itself, retained Brigade to assist it and its principal Terry in providing these portfolio management services as a sub-advisor.

43.     Acis, Brigade, and Terry are registered investment advisors, all subject to the Investment Advisors Act of 1940 (the "Advisors Act") (Acis, Brigade, and Terry, the "RIA Defendants").

44.     As part of the Acis bankruptcy proceeding under Case No. 18-30264-SGJ-11 (the "Acis Bankruptcy"), in which Terry became 100% owner of Acis (as well as its President and

---

**PLAINTIFF'S ORIGINAL COMPLAINT**                                          **Page 10**

owner of its general partner),[2] the United States Bankruptcy Court for the Northern District of Texas formally approved Acis's appointment of Brigade as sub-advisor and shared services provider to Acis in connection with Acis's management of the Acis CLOs.

45.     Brigade has provided these services at all pertinent times through the present.

46.     As a sub-advisor, Brigade is the agent of Acis and, therefore, of the Acis CLOs. Upon information and belief, Terry needed help managing the Acis CLOs, and he retained Brigade to provide advisory services, as well as back-and middle-office functions, including, but not limited to, accounting, payments, operations, technology, and finance, among other things, in connection with Acis's obligations under the PMAs.

47.     Terry also employed Brigade to provide assistance relating to the negotiation and execution of any documents necessary to acquire or dispose of an asset under the PMAs.

48.     Further, Terry delegated certain tasks related to the Acis CLOs to Brigade, including, but not limited to, research services, strategy, identifying potential assets, buyers and sellers of same, modeling of ratings, default, and price scenarios as needed. In providing these critical portfolio management services for the Acis CLOs, Brigade works directly with and for Terry. Terry testified in the Acis bankruptcy proceedings that this was the intention.

49.     Given Brigade's extensive level of involvement of the portfolio management of the CLOs, Brigade's conduct, and by extension Acis's conduct through Terry's direction and control, severely and adversely impacts the collateral portfolios in which NexPoint is a noteholder and equity holder under the Acis CLOs.

50.     As of February 20, 2019 (and also prior to Acis's emergence from bankruptcy), Brigade had charged Acis fifteen basis points on total Acis CLO assets under management for

---

[2] The two case numbers in the consolidated Bankruptcy Proceeding include Case Nos. 18-30264-SGJ-11 and 18-30265-SGJ-11.

Case 19-34054-sgj11 Doc 3507-1 Filed 09/09/22 Entered 09/09/22 16:32:09 Page 396 of
448
Case 1:21-cv-04384 Document 148 Filed 05/14/21 Page 12 of 50

these portfolio management services, a fee which Brigade represented it negotiated in good faith with Acis. In short, it is paid like another portfolio manager or advisor.

51.     Of note, although Terry effectively approves all trading activity for the Acis CLOs, Terry and Acis have no executive level employees aside from Terry, and upon information and belief, they do not have the wherewithal to effectively manage the investment vehicles. As President and owner of Acis, Terry exercises complete dominion over Acis. With no chain of command besides himself at Acis, Terry answers to no one but himself and his greed.

52.     Prior to the Acis Bankruptcy (and for a period of time up until August 2, 2018), the Acis CLOs were managed by Highland Capital Management L.P. ("Highland"), which served as sub-advisor to Acis.

53.     One of the original investment vehicles, Acis CLO-7, continued to be managed by Highland after the RIA Defendants took over control of the Acis CLOs.

54.     Effective February 15, 2019, the Bankruptcy Court issued an order that purported to release any claims against Acis or Terry that had accrued prior to that date and enjoined any lawsuit being filed by any entity or person against Acis or Terry to recover for any claims that accrued prior to that effective date (the "BK Order").[3]

55.     The BK Order, through Plan D, imposes several provisions that directly affects the noteholders of the CLOs. Among other restrictions, Plan D impedes the ability of the equity and noteholders to make optional redemptions and therein prohibits beneficial trading that would serve to protect the noteholders' interest. Put differently, the noteholders are stuck with Acis against their will, and Acis has captured the CLOs for the time being.

---

[3] That release is the subject of an appeal, and if overturned, may cause certain released claims to be added later.

56.     Since February 15, 2019, and moving forward, the Acis CLOs have been managed and advised by Acis, Terry and Brigade subject to the PMAs and indentures.

57.     Under the indentures and PMAs, the RIA Defendants must "comply with all [applicable] terms  and conditions of the [Acis Indentures]" and "perform [their] obligations . . . in good faith and with  reasonable  care".

58.     The applicable "terms and conditions" of the Acis Indentures include an obligation to ensure compliance with the collateral quality tests described above.

59.     Furthermore, the PMAs at Section 8 prohibit the portfolio manager from "taking any action that would intentionally or with reckless disregard… which would knowingly and willfully and adversely affect the interest of the Holders in the Assets in any material respect,"[4] unless approved in writing by the Board of Directors of the Issuer and a majority of both the controlling class and the subordinate noteholders.

60.     The PMAs hold Acis liable for its acts or omissions, including, but not limited to, acting in bad faith, willful misconduct, gross negligence, or reckless disregard in the performance of its obligations under the Acis indentures.

61.     Critically, Section 11(a)(i) of the PMAs expressly holds Acis liable for any decrease in the value of the CLOs that was accomplished by bad faith, willful misconduct, gross negligence or reckless disregard in the performance of its obligations.

62.     As Portfolio Manager, Acis, through Terry and sub-advisor Brigade, were  aware that Acis, Terry and Brigade performed services for the Acis CLOs for a particular purpose.

---

[4] *See* Portfolio Management Agreement between Acis CLO 2015-6 and Acis Capital Management, L.P. Section 8, page 15.

63.     Likewise, the Portfolio Manager had further awareness that secured noteholders and the equity holders under the Acis CLOs, like NexPoint, relied on Acis and Brigade to perform services in furtherance of their particular purpose of managing the portfolio of the Acis CLOs.

64.     The RIA Defendants understood that noteholders and equity interest holders under the Acis CLOs, including Plaintiff, relied on them to perform services in furtherance of their particular purpose of managing the portfolio of the Acis CLOs.

65.     Despite the extra-contractual duties that the RIA Defendants owe to Plaintiff as of, and in furtherance of clear and impermissible conflicts of interest, from February 16, 2019 to the present, the RIA Defendants caused the Acis CLOs to incur astronomically unprecedented expenses well outside historical expense patterns in the Acis CLOs and very clearly outside market and industry norms, as discussed in more detail below.

**C. HOW DID THE RIAS DECIMATE THE ACIS CLOS' VALUE?**

66.     Since February 15, 2019, and moving forward, few payouts have been made to equity holders despite a history of consistent distributions during the years Highland managed them, and the equity holders, by means of Plan D, have been prevented from forcing redemptions in the funds.

67.     Since February 15, 2019, under Acis's and Brigade's "management" of the Acis CLOs, the WARF of the portfolios has become one of the dirtiest pools in the market. Specifically, as of October 2019 and through December 2020, the WARF of each such indenture has dramatically worsened, as follows:

| |
|---|
| ACIS 3: 2522---> 2678 |
| ACIS 6: 2627 ---> 3055 |

Counterintuitively, the higher the number, the worse the "WARF."

Case 19-34054-sgj11 Doc 3507-1 Filed 09/09/22   Entered 09/09/22 16:32:09   Page 399 of
448
Case 1:21-cv-04384   Document 1   Filed 05/14/21   Page 15 of 50

68.     This should not have happened given that, normally over time, the CLO
noteholders (the senior debt) are paid off. As that happens and there is less debt to unencumber
the equity, the equity becomes *less* risky, and thus, more valuable. The benefit would be realized
at the junior tranches, and equity holders would receive less-levered, lower interest payments
but those investors' residual principal value would have more certainty.  The opposite happened
here.

69.     Furthermore, as shown below, Acis replaced shorter term debt with longer terms,
extending the WAL of the entire portfolio.

70.     By keeping the average life extended and avoiding prepayments, (1) risk increased,
(2) residual principal value fell, and (3) interest accrued for an artificially longer period.

71.     Thus, the Acis CLOs' values have been decimated due to these tactics, as explained
more fully below. Yet, meanwhile, at the same time, the revenues and profits to Acis and Terry
have become inflated due to increased fees, the exorbitant-but-unexplained and unaccounted for
expenses foisted on the Acis CLOs, and the protected, extended life of the CLOs.

72.     The value of the CLOs is referred through a net-asset-value assessment, or "NAV"
of the equity. Because the equity is junior to all debt, healthy equity signifies healthy debt.
Unhealthy equity, or worse, equity that has been wiped out, signals potential default to at least the
junior debt tranches.

73.     The Acis CLOs' NAV over time (counting the distributions made to equity) can
be seen via the following graphic illustration:



74.     Accordingly, the NAV of the ACIS-3 equity has been completely wiped out.  The Series-F tranche of debt owned by NexPoint has been reduced to 40 cents on the dollar.

75.     As shown in the illustration, the NAV of ACIS-6 equity is approximately 30 cents on the dollar (as of April 1, 2021).

76.     It is no wonder that national rankings of CLOs have every Terry-managed CLO at the bottom of their list as the worst performing.

77.     Yet, despite having similar profiles and investment goals as the other Acis CLOs at its inception, the Highland-managed ACIS-7 did remarkably well, returning almost 100 cents on the dollar. While Acis is likely to blame COVID for the downfall of its performance, the relative performance of ACIS-7 should debunk that excuse fairly readily.

78.     Plaintiff has been able to discern four primary ways that the RIAs have decimated the value of the Acis CLOs.

1. **Mis-Accruing and Mis-Allocating Expenses**

79. Prior to Terry and Brigade advising the Acis CLOs, the Acis CLOs paid out millions of distributions to the equity holders, and expenses, as a percentage of those distributions, were remarkably low.

80. The expenses saddled on the Acis CLOs since February 15, 2019, have been nothing short of impressive. They literally inverted the relative cost-to-distributions ratio that had been in place for years prior.

81. The following graphic depicts that inexplicable inversion:

| Expenses Paid before Highland was removed | | | | | |
|---|---|---|---|---|---|
| Date | A3 | A4 | A5 | A6 | Total |
| 11/1/2017 | 53,366 | 74,533 | 75,099 | 97,077 | 300,075 |
| 2/1/2018 | 45,996 | 79,541 | 97,729 | 149,641 | 372,907 |
| 5/1/2018 | 32,194 | 15,635 | 11,723 | - | 59,552 |
| 8/1/2018 | - | 27,653 | 39,900 | 33,217 | 100,771 |
| **Total** | **131,557** | **197,363** | **224,450** | **279,935** | **833,305** |

| Equity Distirbutions Paid before Highland was removed | | | | | |
|---|---|---|---|---|---|
| Date | A3 | A4 | A5 | A6 | Total |
| 11/1/2017 | 1,068,208 | 1,434,935 | 1,220,175 | 1,499,862 | 5,223,179 |
| 2/1/2018 | 471,645 | 898,027 | 640,095 | 870,666 | 2,880,433 |
| 5/1/2018 | 229,888 | 1,231,081 | 1,096,471 | 1,313,207 | 3,870,646 |
| 8/1/2018 | - | - | 166,472 | 651,402 | 817,874 |
| **Total** | **1,769,741** | **3,564,043** | **3,123,213** | **4,335,136** | **12,792,132** |

82. The below chart further illustrates the expenses and distributions paid before Terry and Brigade took over advising and managing the Acis CLOs:



The ratio was approximately $13 million in equity distributions to shareholders versus less than

$900,000 in expenses, or 14.4 to 1 distributions to expenses.

83.  The expenses paid after Highland's removal are reflected here:

| Expenses Paid to Date since Highland was removed | | | | | |
|---|---|---|---|---|---|
| Date | A3 | A4 | A5 | A6 | Total |
| 11/1/2018 | - | - | 121,235 | 469,662 | 590,897 |
| 2/1/2019 | - | 70,977 | 159,488 | 270,667 | 501,132 |
| 5/1/2019 | - | 93,000 | 27,135 | 56,452 | 176,586 |
| 8/1/2019 | 649,832 | 822,224 | 609,974 | 1,046,612 | 3,128,643 |
| 11/1/2019 | 614,335 | 1,025,723 | 437,613 | 1,074,214 | 3,151,885 |
| 2/1/2020 | - | 867,277 | 822,864 | 699,384 | 2,389,524 |
| 5/1/2020 | - | - | - | - | - |
| 8/1/2020 | - | - | - | 94,611 | 94,611 |
| 11/1/2020 | - | 101,043 | 239,750 | - | 340,793 |
| 2/1/2021 | - | 25,585 | 186,834 | 32,549 | 244,968 |
| Total | 1,264,167 | 3,005,828 | 2,604,893 | 3,744,152 | 10,619,040 |

84. The equity distributions since Highland was removed are here:

**Equity Distirbutions Paid to Date since Highland was removed**

| Date | A3 | A4 | A5 | A6 | Total |
|---|---|---|---|---|---|
| 11/1/2018 | - | - | - | - | - |
| 2/1/2019 | - | - | - | 256,518 | 256,518 |
| 5/1/2019 | - | - | - | 791,696 | 791,696 |
| 8/1/2019 | - | - | - | - | - |
| 11/1/2019 | (0) | (0) | 0 | 102,378 | 102,378 |
| 2/1/2020 | - | - | (0) | 170,447 | 170,447 |
| 5/1/2020 | - | - | - | - | - |
| 8/1/2020 | - | - | - | 48,966 | 48,966 |
| 11/1/2020 | - | 376,910 | - | 732,260 | 1,109,169 |
| 2/1/2021 | - | 158,415 | - | 94,863 | 253,278 |
| **Total** | **(0)** | **535,325** | **0** | **2,197,129** | **2,479,175** |

85. Since the RIA Defendants have taken over managing the Acis CLOs, the distributions-to-expense ratio has thus fallen from what it used to be, 14–1, to what it is now, an anemic 0.25–1.

86. Because of the way these CLOs have been managed, the expenses were distributed proportionately amongst the Acis CLOs, thereby impacting ACIS-3 and ACIS-6, *pro rata*.

87. Assuming that remains true, and given the amount of revenue that Acis is supposed to have earned, which was about $12 million, Acis has taken well over $24 million in revenue through its manipulation of the portfolio and expenses.

88.     Relevant to this case, from May 2019 through May 2020, the Acis CLOs (Acis 3

through 6) accrued over $22 million in revenue:

| | | | | ACTUAL | | | | |
|---|---|---|---|---|---|---|---|---|
| DATE | TOTAL AUM | ACTUAL REV | ACTUAL EXP | LEG/ADM | ACTUAL NET | UNSEC DIST | CASH BEG | CASH END |
| 2/1/2019 | 1,890,604,000 | 2,172,029 | 959,039 | | 1,212,990 | | 3,824,839 | 5,037,827 |
| 5/1/2019 | 1,885,797,000 | 2,532,027 | 960,950 | 1,022,062 | 549,015 | | 5,037,827 | 5,586,841 |
| 8/1/2019 | 1,861,154,000 | 4,251,742 | 745,071 | 327,111 | 3,179,560 | 21,260 | 5,586,841 | 8,745,140 |
| 11/1/2019 | 1,738,471,000 | 4,718,571 | 1,043,539 | 4,629,967 | (954,935) | 2,479,244 | 8,745,140 | 5,310,961 |
| 2/1/2020 | 1,600,692,519 | 3,925,389 | 1,076,914 | - | 2,848,475 | 40,494 | 5,310,961 | 8,118,942 |
| 5/1/2020 | 1,372,412,410 | 1,057,251 | 649,671 | - | 407,580 | | 8,118,942 | 8,526,522 |
| 8/1/2020 | 1,143,864,482 | 3,305,967 | 936,538 | - | 2,369,429 | 1,500,000 | 7,809,535 | 8,678,963 |
| 11/1/2020 | 1,015,929,000 | 2,321,662 | 1,778,177 | - | 543,485 | | 8,678,963 | 9,222,448 |
| 2/1/2021 | 814,796,995 | | | | - | | 9,222,448 | 9,222,448 |
| | | 24,284,638 | 8,149,900 | 5,979,140 | 10,155,598 | 4,040,998 | | |

89.     The Acis CLOs had never incurred such profoundly high expenses and fees to

Acis. This includes roughly $2.3 million in extra profits to Acis, as well as substantial legal fees

incurred by Acis itself (not by the CLOs, and not for the benefit of the CLOs). For it to all come

at the expense of the investors in Acis CLOs 3 through 6 is gobsmacking.

90.     Meanwhile, the Indenture Trustee has done nothing about it, despite having been

warned several times.

91.     That they were incurred by the RIAs, who are defendants in this case, only after

they had secured through the Acis Bankruptcy certain protections for themselves against

redemptions, gives rise to a strong inference that they are not properly allocated as Acis CLO

expenses. Rather, they are something else.

92.     That Acis has represented these expenses as having been charged on behalf of, or

for the benefit of, the managed Acis CLOs, and then unilaterally collected those expenses under

the same pretense, gives rise to a strong inference that the RIA Defendants (as defined herein)

knowingly misrepresented the nature and proper allocation of these expenses.

93.     That the RIA Defendants have complete control over this information and have not disclosed it, while misrepresenting the nature of the fees and expenses, is a bad-faith manipulation of their duties and rights under the Acis Indentures and the PMAs.

**2.  The Scheme to Manipulate Advisory Fees**

94.     Because of the life cycle of a CLO, the Acis CLOs are currently outside the period of reinvestment. Therefore, the CLOs are stuck with the collateral they have.

95.     The problem is that prior to the close of the reinvestment period, Defendants have caused the CLOs to buy and hold collateral that would not have qualified for the risk parameters delineated in the PMAs and indentures.

96.     Certain loans have maturity dates further out than what is necessary or appropriate. Certain loans simply lacked the creditworthiness on their own to qualify. The purchase of these loans violated the PMAs, as well as the course of performance, and good industry practices.

97.     Equally important, the purchase of these loans violated the requirements in the indentures and the PMAs that any trading should maintain or improve the credit quality of the portfolio.

98.     This has caused the Acis CLOs to suffer substantial losses. Several examples are shown here.

99.     Chief Power. Throughout the relevant time period, Defendants held the Chief Power loan which bore a very dismal Caa1/B- rating when it initially purchased in 2019. Critically, it had a December 2020 maturity date. The lack of creditworthiness of the loan is evidenced not only by its low credit rating, but also by the fact that it was not refinanced when it could have been in 2018-2019. The loan was then downgraded to Caa2/CCC in late 2019. It was only then that Defendants went on to sell this loan at 51 cents on the dollar within a year, locking in $4.7mm of realized losses to the Acis CLOs. The manager had purchased this loan with a Dec 2020 (1+ year)

maturity date on the same day it bought multiple loans with 2025 (6+ year) and 2024 (5+ year) maturities. This is important because the 2025 and 2024 loans <u>do not</u> maintain or improve failing WAL Tests in existence at the time of purchase. However, the addition of Chief Power was plainly to generate the appearance of a *<u>blended</u>* WAL that did maintain or improve the failing WAL Test. This type of chicanery is not allowed nor is it in the spirit of the CLOs' indentures, and ended up directly leading to almost $5 million in losses to the Acis CLOs. There was no pro-investor justification for how Defendants managed this investment.

100.     <u>Glass Mountain Pipeline.</u> Defendants purchased $2 million of this loan in April 2019 on a single day (April 30, 2019). It had B3/B ratings at the time of purchase, indicating heightened credit risk, and also had a December 2024 maturity date, which was 5.5+ years from when it was purchased. The WAL Tests for the CLOs that bought this were failing at this time, meaning a loan purchased needed to main or improve the failing WAL Tests, which were all standing at 4.0 years or shorter. This was a purchase that in addition to heightened credit risk and increasing the average maturity date of the portfolios, also violated the CLOs' indentures' credit quality requirements. Similar to other situations, Defendants bought nineteen loans on a single day, likely in a scheme to circumvent the WAL test restrictions. The loan is currently still held in the portfolios and is quoted in the low 20s due to a continuing and apparently uncurable default, which is a $1.5 million in losses to the Acis CLOs. Defendants should have known and foreseen this risk because of the low credit ratings. Had Defendants abided by the indenture and PMA requirements, as well as prudent investing standards, these losses to the Acis CLOs would have been avoided. There was no pro-investor justification for how Defendants managed this investment.

Case 19-34054-sgj11 Doc 3507-1 Filed 09/09/22 Entered 09/09/22 16:32:09 Page 407 of
148
Case 1:21-cv-04384 Document 48 Filed 05/14/21 Page 23 of 50

101. <u>KCA Deutag.</u> Defendant purchased this loan with a Caa1/CCC+ rating at the time of its purchase in April through May 2019. There was no justification to purchase loans with a Caa1/CCC rating as the implied credit quality is far too risky for a levered CLO structure. The purchase price averaged 85 cents on the dollar (i.e., of the face value of the loan), which also implies significant credit risk. Defendants ended up selling this loan six months later, on November 18, 2019, at 65 cents on the dollar, locking in $1.8 million in losses to the Acis CLOs. The low credit rating and the fact that the loan had a long maturity date would have warned the Defendants that the loan lacked the credit quality and would not maintain or improve the credit quality of the portfolio; in fact, it would have certainly dragged the credit quality down. There was no pro-investor justification for how Defendants managed this investment.

102. <u>Libbey Glass.</u> This loan was being held by Acis for no apparent reason. Its credit was weak, B2/B, which is why it had not refinanced/extended already during a very strong 2018-2019 market. Defendants inexplicably held on to the loan which was downgraded to B3 in November 2019 and again to Caa2/CCC in March 2020. The issuer corporation filed for bankruptcy, and the loan was restructured into reorganized equity, essentially wiping out all the value from the lenders. Defendants' decision to hold the loan throughout the entire downward process locked in $12.7 million of tangible losses to the Acis CLOs. There was no pro-investor justification for how Defendants managed this investment.

103. <u>Carestream Health.</u> This loan had B3/B- ratings. The credit was very weak, which was reflected by the ratings, and is why it had not refinanced/extended already during a very strong 2018-2019 market. Following an S&P downgrade from B- to CCC+ in February 2020 (plus it remained on Creditwatch Negative), Defendants sold this loan across all portfolios on the same day (3/3/2020) at 75 cents on the dollar, locking in $4.8mm of realized losses to the Acis CLOs.

104.   <u>Envision Healthcare.</u> This loan had B2/B+ ratings at the time of purchase in April 2019, because the loan had been recently issued in October 2018 with a standard seven-year maturity date of October 2025.  The WAL of this loan was 6.5 years. The WAL Tests for the CLOs that bought this loan were failing at this time, meaning a loan purchased needed to main or improve the failing WAL Tests, which were all standing at less than 4.0 years or shorter. This was a purchase that clearly violated the CLOs' indentures. The loan would go on to be downgraded to its current Caa2/CCC ratings. The loan is currently still held in the Acis CLO portfolios at a $1.5mm loss thus far.

105.   <u>Doncasters.</u> This loan bore B3/B- ratings which means it was unlikely to be paid off or refinanced. While Defendants continued to hold the loan (which they should never have bought), Caa1/CCC-, and the manager sold the loan around July 1, 2020 at an average price of 80.51, locking in $1.2mm of realized losses to the Acis CLOs in less than a year.

106.   <u>Lumileds (Bright Bidco).</u> This loan is being held in violation of the CLOs' indentures. As of February 16, 2019, the loan had just recently been issued, and carried B1/B ratings and has a June 2024 maturity date, which was nearly six years from when it was bought in September 2018. The WAL Tests for the CLOs that bought this loan were failing at this time, meaning it failed to maintain or improve the failing WAL Tests, which were all standing at four years or shorter. In September 2019, the loan was downgraded to B3/CCC+, and in November 2019, the loan's ratings were downgraded again to Caa1/CCC+. The manager has not sold any of this loan to date. Today, the loan trades at 76-77, which is currently $2.2 million in losses to the Acis CLOs.

107.   <u>McGraw-Hill.</u> This loan had B2/B ratings on February 16, 2019, and was downgraded by Moody's to B3 in May 2019 and then again to Caa2 in August 2020. S&P

downgraded the rating to B- in May 2020 and to CCC+ in September 2020. This was a loan with

a very weak credit profile, but seemingly one that the manager believed in, as this was one of the

largest positions put on by the manager. However, after purchasing over $36mm across four CLOs

from a period between August 2018 and December 2019, the manager decided to sell all of it on a

single day – September 30, 2020 – at a price of 82.75, foregoing any chance of a par recovery.

This loan was then fully paid off at 100 cents on the dollar <u>roughly three months</u> later in January

2021. The sale at 82.75 cost the four CLOs a total of $5.9mm compared to the full paydown the

CLOs would have received in January 2021 had the loans not been sold.

108.    <u>GIP III Stetson.</u> The GIP Stetson loan bore low credit ratings of Ba3/B+, and more

critically, was a loan that carried a 6+ year maturity (July 2025) that made purchasing it violate

the indentures. The WAL of this loan did not maintain or improve the failing WAL Tests. By

purchasing this loan—in addition to all the others herein—the manager was engaging in a scheme

or artifice to deceive by manipulating the metrics of the indenture in bad faith. The manager was

buying risky loans that never should have been included in the collateral pool. The loan was

subsequently downgraded to B1/B-, and the manager sold this loan at 66 cents on the dollar

between May 2020 and August 2020, locking in $1.5 million in damages to the Acis CLOs. It is

also curious as to why the manager would then sell this loan down 34 points; not long after the

loan was sold, the trading levels moved up materially, and is now trading at 96 cents on the dollar.

109.    <u>Boardriders.</u>  Purchased in March 2019, the loan had B3/B- ratings at the time of

purchase, indicating heightened credit risk, and also had an April 2024 maturity date, which was

5+ years from when it was purchased. The WAL Tests for the CLOs that bought this were failing

at this time, meaning a loan purchased needed to main or improve the failing WAL Tests, which

were all standing at 4.0 years or shorter. This was a purchase that in addition to heightened credit

risk, also violated the CLOs' indentures. The loan is currently still held in the portfolios, has been downgraded to B3/CCC, and trades in the low-mid 90s, several points lower than where it was purchased, and reflects a loss of $442,193.

110. <u>Premiere Brands (Nine West)</u>. This loan had B3/B- ratings at the time of purchase, including a Caa1 tranche rating on the loan, indicating heightened credit risk, and also had a March 2024 maturity date, which is almost five years from when it was bought in April 2019. The WAL Tests for Acis 6, the CLO that bought this loan was failing at this time, meaning a loan purchased needed to main or improve the failing WAL Tests, and stood at 4.15 years. This was a purchase that in addition to heightened credit risk, also violated the CLOs' indentures. Similar to other situations, the manager bought sixteen items on a single day which is a violation of the indenture and of best execution conventions. The loan has subsequently been downgraded to Caa2/CCC, is currently still held in the portfolios, and is quoted in the mid-high 60s, which is more than a $600,000 unrealized loss.

111. This summarizes much of the losses:

| Issuer | Commitment Bought | Loss on Investment |
|---|---|---|
| Libbey Glass | 12,750,000 | $ (12,660,000) |
| Chief Power | 10,894,048 | (4,724,806) |
| Lumileds Holding | 9,732,632 | (2,181,083) |
| KCA Deutag UK Finance PL | 8,992,443 | (1,781,329) |
| Glass Mountain Pipeline | 1,994,949 | (1,548,280) |
| Envision Healthcare | 13,994,987 | (1,470,094) |
| Doncasters | 9,730,000 | (1,190,979) |
| Premiere Brands | 2,000,000 | (635,000) |
| Boardriders | 6,569,202 | (448,763) |
| **Total** | **76,658,262** | **$(26,640,333)** |

112. Another problem with these purchases is that they were often executed on the same day (purchasing in a single day tends to make an asset more expensive to buy) and were executed at a time when the market was flying high.

113. This violated the best execution duties of the Defendants.

114. Additionally, many of the purchased "bad" assets were some of the cheapest assets on the market—but they were actually still overpriced. The market at the time was a seller's market—loans were scarce. The most prudent course would have been to remain in cash or find far more secure short-term investments.

115. Defendants have furthermore caused the CLOs to sell certain collateral cheaply and prematurely. In other words, the RIA Defendants took over advising and managing the Acis CLOs with several credit-worthy assets, or they themselves luckily bought several credit-worthy assets.

116. The problem is that they then sold those assets, inexplicably, at a time when they knew they could not replace them with equal or improved assets.

117. Given that the Defendants had no intention of redeeming the CLOs (allowing investors to take their money out) or resetting them (raising new debt and opening a new investment period), the investors of the CLOs would have been best served had these "good" assets been allowed to simply mature.

118. These are illustrated here:

| Issuer | Commitment Sold | Lost Value |
|---|---|---|
| McGraw-Hill Global Education | 34,288,241 | ($5,914,722) |
| Carestream Health | 20,644,508 | (4,799,848) |
| Advantage Sales & Marketing 1L | 27,038,364 | (3,622,316) |
| Advantage Sales & Marketing 2L | 10,688,828 | (2,820,378) |
| Mohegan Tribal Gaming | 12,153,419 | (1,830,609) |
| GIP III STETSON I | 5,169,653 | (1,518,878) |
| Advantage Sales & Marketing 1L | 6,510,157 | (890,963) |
| Party City | 8,826,376 | (822,638) |
| **Total** | 125,319,547 | ($22,220,350) |

119.   A more cynical person would be left to wonder who the purchasers of these assets were, and whether they were entities or persons related to Terry, or in which he had a hidden or surreptitious or beneficial interest.

120.   These assets were sold well after the start of COVID—in late 2020. And so they were sold *after* they had hit their "COVID lows"—but the market had already shown it was roaring back in the last quarter of 2020.

121.   The above assets were also sold on or about the same day, again, a breach of best execution practices.

122.   The mix of assets, because of these knowingly errant purchases and sales, falls well below the acceptable, reasonable WARF, and pushed maturity of the portfolio out past any acceptable, reasonable WAL.

123.   Both the indentures and the PMAs require Acis to seek best execution for all Acis assets.[5]

## C. The Indenture Trustee Is Nowhere to be Found

124.   In light of the foregoing, where was the adult in the room?

125.   The Acis Indentures provide that U.S. Bank shall hold in trust, for the "benefit and security" of the noteholders, all "Collateral Obligations" that secure the co-issuers' financial obligations to the noteholders.

126.   In connection therewith, the Acis Indentures also provide that, for future purchases and sales of collateral obligations, the Portfolio Manager and the Trustee shall only consummate these transactions where certain investment criteria are satisfied.

---

[5] PMA Section 4(a); Indentures Section 12.2.

127.    One such criterion in the indenture is that, in order for trades to be combined under the WAL test, they cannot be more than +/- 2 years difference in the maturity dates. Here, that requirement was violated in almost all, if not all, of the bundled trades that the Defendants made or allowed to occur.

128.    Another criterion is that, for all purchases, either (A) each requirement or test, as the case may be, of the Concentration Limitations and the Collateral Quality Test will be satisfied, or (B) if any such requirement or test was not satisfied immediately prior to such reinvestment, such requirement or test will be maintained or improved after giving effect to the reinvestment. *See, e.g.*, Indenture 5 § 12.2(a)(iv). The Acis Indentures define "Collateral Quality Test" as:

> A test satisfied if, as of any date of determination . . . in the aggregate, the Collateral Obligations owned (or, for purposes of *pro forma* calculations in relation to a proposed purchase of a Collateral Obligation, proposed to be owned) by the Issuer satisfy . . . the Maximum Moody's Rating Factor Test . . . [and the] Weighted Average Life Test.

129.    These tests are defined, in turn, as follows:

> "Maximum Moody's Rating Factor Test": The test that will be satisfied on any date of determination if the Weighted Average Adjusted Moody's Rating Factor[6] of the Collateral Obligations is less than or equal to the lesser of (i) the sum of (A) the number set forth in the column entitled "Maximum Weighted Average Moody's Rating Factor" in the

---

[6] "Weighted Average Adjusted Moody's Rating Factor" means "[a]s of any date of determination, a number equal to the Weighted Average Moody's Rating Factor determined in the following manner: for purposes of this definition, the last paragraph of the definition of "Moody's Default Probability Rating," the second to last paragraph of the definition of "Moody's Rating" and the last paragraph of the definition of "Moody's Derived Rating" will be disregarded, and instead each applicable rating on credit watch by Moody's that is on (a) positive watch will be treated as having been upgraded by one rating subcategory, (b) negative watch will be treated as having been downgraded by two rating subcategories and (c) negative outlook will be treated as having been downgraded by one rating subcategory. *See, e.g.*, Indenture 5 at 64-65.

"Weighted Average Moody's Rating Factor" means "[t]he number (rounded up to the nearest whole number) equal to: (i) the sum of the products of (a) the Principal Balance of each Collateral Obligation (excluding Equity Securities) multiplied by (b) the Moody's Rating Factor of such Collateral Obligation, divided by (ii) the Aggregate Principal Balance of all such Collateral Obligations." *Id*.

Case 19-34054-sgj11 Doc 3507-1 Filed 09/09/22   Entered 09/09/22 16:32:09   Page 414 of
148
Case 1:21-cv-04384   Document 1   Filed 05/14/21   Page 30 of 50

> Moody's Asset Quality Matrix, based upon the applicable "row/column combination" chosen by the Portfolio Manager with notice to the Collateral Administrator . . . plus the Excess Recovery Adjustment Amount.
>
> "<u>Weighted Average Life Test</u>": A test that is satisfied if the Aggregate Weighted Average Life[7] on such date of determination is not later than November 18, 2022.

Indenture 6 at 37-38, 64.

130. These provisions seek to maintain the integrity and performance of the portfolio of collateral securing the co-issuers' obligations by requiring certain parties, including the Portfolio Managers and the Trustee, to ensure that any purchase or sale of such collateral complies with detailed, industry-recognized, and bargained-for tests – the exact investor protections that Plaintiff relied on when it invested in the Acis CLOs.

131. The Acis Indentures also provide that, in performing its duties as Indenture Trustee, U.S. Bank may not "authorize or consent to or vote for or accept or adopt on behalf of any Secured Noteholders, any plan of reorganization, arrangement, adjustment or composition affecting the Secured Notes or any Holder thereof".[8]

132. Similar to the provisions concerning collateral quality, these provisions also seek to ensure that the Trustee does not prejudice the rights of any noteholder under the ACIS Indentures, such as Plaintiff.

---

[7] "Aggregate Weighted Average Life" means "[w]ith respect to all Collateral Obligations as of any date of determination is a date equal to (A) the actual number of years (…) following such date obtained by (i) *summing* the products obtained by *multiplying* the Weighted Average Life at such time of each Collateral Obligation *by* the Principal Balance at such time of such Collateral Obligation and (ii) *dividing* such sum *by* the Aggregate Principal Balance at such time of all Collateral Obligations *plus* (B) such date of determination. *Id*. at 6.

[8] *er*Acis Indenture Section 5.3.

---

Case 19-34054-sgj11 Doc 3507-1 Filed 09/09/22 Entered 09/09/22 16:32:09 Page 415 of
148
Case 1:21-cv-04384 Document 48 Filed 05/14/21 Page 31 of 50

133. In addition to requiring that U.S. Bank observe certain safeguards, the ACIS Indentures also grant U.S. Bank the broad power to "execute any of the trusts or powers hereunder or perform any duties hereunder either directly or by or through agents, nominees, custodians, or attorneys."

134. As set forth above, U.S. Bank and the Portfolio Manager must ensure that every purchase made under the Acis Indentures satisfies the Collateral Quality Tests, including the Weighted Average Life Test ("WAL Test") and the Minimum Weighted Average Moody's Recovery Rate Test ("WAM Test"), or maintains or improves any failing collateral quality tests. They failed to satisfy these obligations.

135. For one thing, U.S. Bank and the Portfolio Manager effectuated or facilitated certain transactions that did not satisfy the WAL test or maintain or improve such failing WAL test.

136. Specifically, they made multiple same-day trades and consolidated the weighted average maturity date for these trades. In so doing, they created the false appearance of a maintained or improved WAL test.

137. Absent this consolidation, the same-day purchases could not have maintained or improved the failing WAL tests on individual bases.

138. Furthermore, U.S. Bank is obligated to seek best execution on trades reasonably available to the Acis CLOs.

139. By allowing multiple same day trades, U.S. Bank disregarded the Acis Indenture obligation which requires the maintenance or improvement of the Collateral Quality Test for each individual trade made in each respective Acis CLO.

140. Also, U.S. Bank allowed, and continues to allow, a circumvention of these collateral quality requirements by allowing the consolidation of the weighted average maturity date of such same-day trades, and in so doing, created the false appearance of a maintained or improved WAL test. But, absent consolidation, the same-day purchases allowed by U.S. Bank cannot maintain or improve the WAL test on an individual basis.

141. U.S. Bank cannot perform its duties by allowing such Acis CLOs to act as a market *taker*, nor by engaging in a practice of buying long collateral that is improper under the Acis Indentures.

142. In short, U.S. Bank, as Indenture Trustee, should never have allowed the "bad" loans to have been bought at all—much less on the same day or bundled with other loans.

143. And it should not have allowed the quality loans that were prematurely sold to have been sold—especially such that they were dumped in a short period of time.

144. U.S. Bank was required to reserve and protect the CLO investors' rights impacted by the Acis Bankruptcy.

145. It failed to protect the noteholders and the equity from certain rulings promoted by Terry and Brigade which have handicapped Plaintiff and those in its classes.

146. It failed to mount any challenge or fight liability and expense that might be incurred as a result of Plan D.

147. It failed to exercise any care in connection with the payment of expenses; collecting and distributing the interest and dividends due on the portfolio securities; and providing CLO noteholders with periodic reports concerning the interest received, amounts distributed and securities in the portfolio.

148.    Notably, no provisions of the Acis Indentures "shall be construed to relieve the
Trustee from liability for its own negligent action, its own negligent failure to act, or its own
willful misconduct."

## V.

## CAUSES OF ACTION

### COUNT ONE
**Violations of the Advisors Act**
**Against the RIA Defendants**

149.    Plaintiff incorporates the foregoing factual averments as if set fully set forth
herein.

150.    As registered investment advisors, the RIA Defendants are subject to the Advisers
Act, 15 U.S.C. § 80b-1 *et seq.*

151.    The Advisers Act establishes an unwaivable federal fiduciary duty for investment
advisers.[9]

152.    The RIA Defendants' fiduciary duties are broad and apply to the entire advisory
relationship. The core of the fiduciary duty is to follow the indenture and the PMA, and to do so
in a manner that always is in the best interest of their investors—the advisor must put the ends of
the client before its own ends or the ends of a third party.

---

[9] *See, e.g., SEC v. Capital Gains Research Bureau, Inc.,* 375 U.S. 180, 194 (1963); *Transamerica Mortg. Advisors (tama) v. Lewis,* 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers."); *Santa Fe Indus, v. Green,* 430 U.S. 462, 471, n.11 (1977) (in discussing *SEC v. Capital Gains,* stating that the Supreme Court's reference to fraud in the "equitable" sense of the term was "premised on its recognition that Congress intended the Investment Advisers Act to establish federal fiduciary standards for investment advisers"). *See also* Investment Advisers Act Release No. 3060 (July 28, 2010) ("Under the Advisers Act, an adviser is a fiduciary whose duty is to serve the best interests of its clients, which includes an obligation not to subrogate clients' interests to its own") (*citing Proxy Voting by Investment Advisers,* Investment Advisers Act Release No. IA-2106 (Jan. 31, 2003)).

---

153. This is manifested in a duty of loyalty and a duty of utmost care, which include a duty of transparency. It also means that the RIA has to follow the terms of the agreements and the regulations that apply to the investment vehicle.

154. The fiduciary duty that the RIA Defendants owed to Plaintiff is one that is predicated on trust and confidence. Section 204A of the Advisers Act requires investment advisors (whether SEC-registered or not) to establish, maintain, and enforce written policies and procedures reasonably designed to reflect the RIA's fiduciary duties and to prevent the RIA from violating disclosure rules. *See* 17 C.F.R. § 275.206(4)-7. That also entails the RIA's duty to disclose all facets surrounding potential conflicts of interest and to report their own malfeasance to investors.

155. Specifically, for all conflicts of interest, the RIAs must disclose those conflicts to the clients verbally, in writing, on Form ADV or a combination of the foregoing, [10] and obtain the client's consent. [11]

156. Where an RIA trades on its own behalf or places its interests above the advisee or its investors, the Advisers Act holds such RIA liable to the advisee and its investors for breach of fiduciary duty.

---

[10] General Instruction 3 to Part 2 of Form ADV (stating that an adviser's disclosure obligation "requires that [the adviser] provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest [the adviser has] and the business practices in which [the adviser] engage[s], and can give informed consent to such conflicts or practices or reject them")

[11] Investment Advisers Act Release 3060, *supra*; General Instruction 3 to Part 2 of Form ADV ("Under federal and state law, you are a fiduciary and must make full disclosure to your *clients* of all material facts relating to the advisory relationship. As a fiduciary, you also must seek to avoid conflicts of interest with your clients, and, at a minimum, make full disclosure of all material conflicts of interest between you and your *clients* that could affect the advisory relationship. This obligation requires that you provide the client with sufficiently specific facts so that the client is able to understand the conflicts of interest you have and the business practices in which you engage, and can give informed consent to such conflicts or practices or reject them."). *See also Robare Group, Ltd., et al. v. SEC*, 922 F.3d 468, 472 (D.C. Cir. 2019) ("[R]egardless of what Form ADV requires, [investment advisers have] a fiduciary duty to fully and fairly reveal conflicts of interest to their clients.").

---

157.    The Advisers Act's regulations and provisions require full transparency and accountability to an advisers' investors and clients.

158.    This duty is embodied in Section 206 of the Advisers Act, 15 U.S.C. § 80b-6, which prohibits registered investment advisors from using any instrumentality of interstate commerce, directly or indirectly, as a means or in support of "any device, scheme, or artifice to defraud any client or prospective client," "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client," or to "engage in any act, practice, or course of business which is fraudulent, deceptive, or manipulative."

159.    Section 206 of the Adviser's Act focuses on the use of the unlawful means or artifice —it does not require that the activity be in connection with an offer or sale of any security, or in connection with a purchase or sale to or from the advisee. It requires neither evidence of reliance or materiality.

160.    The RIA Defendants utilized the interstate wires and mails, including but not limited to utilizing telephones and email communications, and trading on national exchanges in order to effectuate one or more of the transactions referred to in this Complaint, all while engaged in a scheme to manipulate their fees earned by inflating the par value of the portfolio in aggregate.

161.    There is no plausible pro-investor reason for doing that.

162.    The RIA Defendants utilized interstate wires and mails as part of their business and transactions both in effectuating the inflated expenses, passing them on to the ACIS-3 and 6 accounts, withdrawing and manipulating the funds required to pay said expenses and fees, communications regarding same, and executing the purchases and sales of collateral that have decimated the value of ACIS-3 and ACIS 6.

163.    There is no plausible pro-investor reason for doing that.

164.    The RIA Defendants have engaged in a practice or course of business consisting of passing off expenses, without disclosure or accountability, that were incurred by Acis (the Advisor), as if they were expenses of the CLOs—the *advisees.* By doing so, the RIA Defendants affirmatively misrepresented the character and nature of those expenses and directly assessed their managed entities their pro rata share.

165.    There is no plausible pro-investor reason for doing that.

166.    The RIA Defendants have engaged in transactions as part of a course of business to manipulate, and which operates as a fraud or a deceit on the CLO investors. Its acts and omissions include purchasing non-creditworthy assets identified above at unfavorable prices and in an unfavorable market, in violation of their fiduciary duties and agreements (the indenture and the PMA). These include but are not limited to employing a scheme or artifice to charge millions in expenses that it incurred, to the advised funds; trading in securities as a naked means of maximizing the notional value of the CLO Assets which directly translates into higher fees, and at the same time purchasing loans with maturity dates far into the future, as a means of maximizing the time it can earn those fees. By doing so, the RIA Defendants have engaged in transactions that operate as a deceit or fraud upon their ultimate clients such as Plaintiff.

167.    There is no plausible pro-investor reason for doing that.

168.    The RIA Defendants have engaged in transactions such as selling qualified assets prematurely without being able to replace them, all to the detriment of the investors including the Plaintiff. The bona fide purpose of these acts and omissions, which doubtfully exists, has been concealed and not disclosed. However, the obvious reason for doing so is to increase the amount and duration that the RIA Defendants can continue to collect their fees.

169.    There is no plausible pro-investor reason for doing that.

170. The RIA Defendants have engaged in a deceptive and manipulative course of conduct by purchasing bundled loans or loans on the same day as a means of making them appear to be creditworthy and have proper maturity dates and have misrepresented whether such transactions were compliant with the indenture and with the RIAs' fiduciary duties to the Plaintiff and to the Indenture Trustee. The obvious reasons for doing so was plainly to escape detection of their wrongful conduct.

171. These trades not only violate the various fiduciary duties of the Advisers Act, but also violate the indentures' requirements not to bundle trades unless the maturity dates among the loans purchased and bundled are within +/- 2 years, and are part of a pre-approved trading plan. The RIA Defendants violated both of these planks, and such trades should not have been pre-approved even if they were presented prior to the trades.

172. The RIA Defendants have engaged in a deceptive, manipulative course of conduct and continue to do so in violation of the Advisers Act and its regulations and rules thereunder.

173. If it is discovered that the RIA Defendants have mislead or otherwise compromised the Indenture Trustee's ability or willingness to police their malfeasance by submitting misleading reports or documentation to the Trustee, or have otherwise manipulated the Trustee by submitting false reports or justifications, then those actions will be added as a basis for damages under this Count.

174. Based upon the foregoing, Plaintiff has been injured and suffered damages due to the violations.

175. The Adviser's Act declares any contract void that is made in violation of any of the Advisers Act's provisions, rules or regulations, or where the performance of the contract involves the violation of, or the continuance of any relationship or practice in violation of the

Advisers Act, or any rule, regulation, or order issued thereunder. *See* 15 U.S.C. § 80b-15. Thus, the agreements between Acis and any third party in any transaction in violation of the Advisers Act as alleged herein for ACIS-3 and/or ACIS-6, are void or voidable at the option of the aggrieved party, and the RIA Defendants are liable to Plaintiff to account for their share of the losses. Moreover, the RIA Defendants' rights under the indenture and PMAs are void due to the breaches of the Advisers Act committed in violation thereof, and thus the RIA Defendants are liable in restitution and disgorgement to Plaintiff for its pro rata share of the losses.

176.    Plaintiff thus seeks all legal and equitable remedies to which it is entitled.

## COUNT TWO
### Breach of Fiduciary Duty
### Against the RIA Defendants

177.    Plaintiff incorporates all foregoing factual averments and the factual and legal averments in Count One as if set fully set forth herein.

178.    As registered investment advisors, the RIA Defendants are subject to the Advisers Act. The Advisers Act establishes an unwaivable federal fiduciary duty for investment advisers.

179.    The RIA Defendants' fiduciary duties are broad and apply to the entire advisory relationship. The core of the fiduciary duty is to always act in the best interest of their investors— the advisor must put the ends of the client before its own ends or the ends of a third party.

180.    This is manifested in a duty of loyalty and a duty of utmost care. It also means that the RIA has to follow the terms of the agreements and the regulations that apply to the investment vehicle. The fiduciary duty that the RIA Defendants owed to Plaintiff is predicated on trust and confidence and to not commit corporate waste.

Case 19-34054-sgj11 Doc 3507-1 Filed 09/09/22   Entered 09/09/22 16:32:09   Page 423 of
448
Case 1:21-cv-04384   Document 8   Filed 05/14/21   Page 39 of 50

181.    The Advisers Act's regulations and provisions require full transparency and accountability to an advisers' investors and clients and does not require a showing of reliance or materiality.

182.    These duties are extra-contractual and cannot be waived.

183.    The RIA Defendants have breached their fiduciary duties of transparency by failing to fulsomely justify and document their activities with investors. This is a breach of the duty of loyalty because it is plainly a means to concealing the true extent of the malfeasance and damage done.

184.    The RIA Defendants have breached their fiduciary duties by committing corporate waste in two forms: by incurring unnecessary expenses or improperly imposing expenses on the Acis CLOs that should not have been, and by prematurely selling quality assets for discounts without proper basis. The RIA Defendants should have known that the market was rising, and should not have sold the assets in such a short time span because doing so violated best execution rules. Those rules are in place to avoid precisely what happened here.

185.    The RIA Defendants have breached their fiduciary duties by recklessly and knowingly purchasing assets that were below the requisite creditworthiness and allowing the WARF and the WAL to expose Plaintiff to unjustified risk. As set forth in more detail above, Acis breached its duty by mismanaging the portfolios of the ACIS 3 and 6, and by failing to ensure that new trades complied with the collateral quality tests as set forth above.

186.    Key to these duties is the duty to preserve the equity interests NexPoint holds and to refrain from self-dealing. Among other things, the RIA Defendants assumed obligations that affected NexPoint's rights, and NexPoint detrimentally relied on Acis's continued performance of such obligations. However, the RIA Defendants plainly concocted a scheme to enrich themselves

at the expense of NexPoint, which is an independent breach of fiduciary duty.

187.    The RIA Defendants have further aided and abetted the breaches by U.S. Bank, as described in Count Three (the acts of which are incorporated by reference herein).

188.    The RIA Defendants are thus liable for damages, punitive damages, and all other such relief to which Plaintiff is justly entitled.

### <u>COUNT THREE</u>
### Breach of Contract
### Against Acis

189.    Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

190.    Section 11(a)(i) of the PMAs expressly holds Acis liable for any decrease in the value of the CLOs that was accomplished by bad faith, willful misconduct, gross negligence or reckless disregard in the performance of its obligations.

191.    The PMAs further give Acis the discretion to allocate and manage the CLO assets, and to incur expenses on behalf of the CLOs for services for the benefit of the CLOs.

192.    The indentures to which Acis is a party further require Acis to manage the CLO Assets in a manner so as to maintain or improve the credit quality of the portfolio, subject to the Collateral Quality Tests as defined above.

193.    The PMAs and indentures at issue here select New York law, and under New York law, every contract contains an implied duty of good faith and fair dealing.

194.    Acis has breached these agreements and caused the CLOs to incur expenses that, upon information and belief, go well beyond what is contractually permissible to allocate to the CLOs.

195.    Acis has breached these agreements and manipulated the CLO Assets in a way that prolongs itself and maximizes fees at the expense of the CLO investors such as NexPoint.

Case 19-34054-sgj11 Doc 3507-1 Filed 09/09/22 Entered 09/09/22 16:32:09 Page 425 of
448
Case 1:21-cv-04384 Document 48 Filed 05/14/21 Page 41 of 50

196.     These breaches of contract has caused damage to the CLOs and, therefore, to NexPoint.

197.     NexPoint alleges and avers that it may bring this breach of contract claim directly to the extent it and Acis are parties to the indentures, and to the extent the indentures incorporate the PMAs and the duties therein. If NexPoint is required to bring this claim derivatively, it hereby does so and avers that any pre-suit demand would have been futile because asking ACIS-3 or ACIS-6 to bring suit where they are controlled by the Defendants would have been futile.

198.     NexPoint thus seeks its damages, attorneys' fees, restitution, disgorgement, and any and all other remedies to which it is justly entitled.

## <u>COUNT FOUR</u>
### Breach of Trust Indenture Act
### Against US Bank

199.     Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

200.     US Bank's role as trustee is governed in part by the Trust Indenture Act of 1939, as amended by the Trust Indenture Reform Act of 1990.

201.     The Trust Indenture Act of 1939 (the "<u>Act</u>"), codified at 15 U.S.C. §§ 77aaa et seq., is designed to protect bond investors.

202.     The Act, as amended, codifies under federal law an Indenture Trustee's fiduciary duty to the bondholders and holders of investors in debt securities.

203.     It also requires an issuer like ACIS-3 or ACIS-6 to provide periodic reports to the Indenture Trustee.

204.     An indenture trustee's core duty is to monitor and ensure that the issuer has not defaulted under the indenture or other transaction documents. It must report any such default that it recognizes.

Case 19-34054-sgj11 Doc 3507-1 Filed 09/09/22 Entered 09/09/22 16:32:09 Page 426 of
148
Case 1:21-cv-04384 Document 48 Filed 05/14/21 Page 42 of 50

205.    Prior to a default, an indenture trustee's primary duty is to follow the indenture.

206.    After a default, an indenture trustee's duty is to report the default within 90 days, and take all actions necessary and proper to protect the investors. Pursuant to Section 315 of the Trust Indenture Act, in the case of a default, the trustee must use the same degree of care and skills in the exercise of its rights and powers as a "prudent man would exercise or use under the circumstances in the conduct of his own affairs." Adequate notice must be provided to all security holders in accordance with Section 313 of the Trust Indenture Act so that they may also exercise their rights.

207.    Section 317 of the Trust Indenture Act provides the trustee with special powers, in the case of a default, to: recover judgment, in the trustee's own name and as trustee of an express trust, against the obligor for the whole amount of such principal and interest remaining unpaid, and file such proofs of claim and other papers or documents as may be necessary or advisable in order to have the claims of the trustee and of the security holders allowed in any judicial proceedings.

208.    An Indenture Trustee may not have conflicts of interest.

209.    US Bank had a conflict of interest when it became a creditor of the Acis CLOs in the Acis Bankruptcy and sought to claim its exorbitant attorneys' fees—fees incurred for actions that in no way protected the interests of the investors in the Acis CLOs.

210.    None of these duties are waivable in any way. *See* 15 U.S.C.S. § 77aaaa ("Any condition, stipulation, or provision binding any person to waive compliance with any provision of this subchapter[Trust Indenture Act, as modified, 15 USCS §§ 77aaa et seq.] or with any rule, regulation, or order thereunder shall be void.").

211.    Here, US Bank as the Indenture Trustee had the obligation to submit the approvals

for Plan D, and to object to the effects of Plan D, on behalf of the noteholders, such as NexPoint.

212.    US Bank failed to do so.

213.    US Bank further failed to ensure that the RIA Defendants were managing the CLO Assets in a manner that "maintained or improved" the credit quality of the portfolio. Instead, it appears that US Bank assisted, or capitulated.

214.    US Bank has not reported, nor taken action against the RIA Defendants despite the obvious defaults committed by them as reported herein.

215.    US Bank has thus violated the Act in numerous ways and can and should be held liable for the losses suffered by Plaintiff.

216.    U.S. Bank's breaches, set forth herein, have damaged Plaintiff in not less than $8,000,000.00.

## COUNT FIVE
**Breach of Fiduciary Duty**
**Against US Bank**

217.    Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

218.    U.S. Bank has an extra-contractual duty to perform all basic, non-discretionary, ministerial tasks under the Acis indentures with due care.

219.    This duty subjects U.S. Bank to tort liability.

220.    U.S. Bank breached this duty in at least two ways.

221.    First, U.S. Bank breached this duty by permitting the Acis Indentures to incur exorbitant expenses, which have diminished the equity that Plaintiff owns indirectly pursuant to the Acis Indentures.

222.    Second, U.S. Bank breached its duty by negligently failing to act, and by accepting the entry of "Plan D" in the Bankruptcy Proceeding, which directly affects the secured

noteholders. Among other things, Plan D adversely impacts the rights of Plaintiff by imposing an injunction that prohibits beneficial trading activity and impeding the ability of noteholders to make optional redemptions.

223.    U.S. Bank's omission to act was not in good faith. In 2018, U.S. Bank filed multiple pleadings in the Bankruptcy Proceeding, including, but not limited to, a Reservation of Rights, and Limited Objections to the entry of the predecessor plans to Plan D. U.S. Bank failed to take any action whatsoever in regard to Plan D.

224.    These breaches were the proximate cause of damages to Plaintiff.

225.    Based on investigation to date, such damages include, but are not limited to, Plaintiff's inability to make certain trades or redemptions, which restriction has decreased the value of Plaintiff's investment across the capital stack of each contract.  They also include the diminished value of the collateral securing the issuer and co-issuer's financial obligations to Plaintiff. U.S. Bank's failure to reserve or otherwise protect Plaintiff's rights impacted by the Bankruptcy Proceeding has caused it to suffer damages.

226.    U.S. Bank has an extra-contractual duty to avoid conflicts of interest.

227.    This duty subjects U.S. Bank to tort liability.

228.    U.S. Bank is prohibited from advancing its own interests at the expense of Plaintiff, its investor.

229.    U.S. Bank breached this duty by, among other things, facilitating extensive portfolio mismanagement and failing to ensure compliance with the collateral quality tests in order to artificially maximize management fees. Such facilitation of noncompliant trades gives rise to an inference of bad faith.

230.     U.S. Bank also breached this duty by allowing the Acis indentures to incur exorbitant fees which have diminished the equity that Plaintiff owns indirectly pursuant to the Acis Indentures.

231.     U.S. Bank's breaches were the proximate cause of damages to Plaintiff.

232.     Based on investigation to date, such damages include, but are not limited to, the diminished value of the collateral securing the issuer and co-issuer's financial obligations to Plaintiff.

233.     U.S. Banks conduct was knowing and willful, and done in disregard of known and established safeguards which are implemented and created in the industry in order to avoid well known, foreseeable risks.

234.     Defendant's acts and omissions were taken in reckless disregard of these known risks. U.S. Bank's breaches, set forth herein, have damaged Plaintiff in not less than $8,000,000.00. U.S Bank is thus liable for damages, punitive damages, attorneys' fees, and costs, as well as restitution and disgorgement.

235.     Furthermore, US Bank knew, or should have known, that the RIA Defendants were violating the various regulations of the Advisers Act and the indenture. The Advisers Act thus declares US Bank's rights under the indenture void, and US Bank is liable for the return of all funds paid to it under the indenture.

**COUNT SIX**
**Negligence**
**Against All Defendants**

236.     Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

237.     To the extent any Defendant would be liable for any of the foregoing causes of action before their lack of sufficient intent or willful actions, Plaintiff pleads in the alternative that

such Defendant's acts or omissions were negligent.

238. The Defendants owed Plaintiff a duty of care in managing the investments of the CLOs and in discharging their duties under the Investment Advisors Act, and under the indentures and PMAs.

239. The Defendants acts and omissions in violation of the duties outlined herein have resulted in substantial losses to the Plaintiff, totaling $8,000,000 or more.

240. The Defendants conduct was knowing and willful, and done in disregard of known and established safeguards which are implemented and created in the industry in order to avoid well known, foreseeable risks.

241. Defendants' acts and omissions were taken in reckless disregard of these known risks.

242. Defendants are thus liable for negligence, and gross negligence.

243. Plaintiff is thus entitled to damages, punitive damages, attorneys fees, and costs as the law provides and to which it is justly entitled.

## COUNT SEVEN
### Conversion
### Against Acis and Terry

244. Plaintiff incorporates the foregoing factual averments as if set fully set forth herein.

245. The Acis CLOs are obligated to pay specific and identifiable Administrative Expenses and other costs and expenses. The payment of these expenses is pulled from a reserve of specific and identifiable equity which includes funds belonging to NexPoint, to the extent it is an equity holder under the Acis CLOs.

246.     As a noteholder and equity holder, NexPoint had ownership and a right to the property used to pay the Acis CLOs' administrative expenses and costs before the property's conversion.

247.     In allowing the payment of uncharacteristically high expenses upwards near twenty times their historical amount—Terry, upon information and belief, wrongfully and improperly reimbursed Acis, and potentially himself, using Plaintiff's property designated for the payment of the Acis CLOs' Administrative Expenses and costs.

248.     Upon information and belief, Terry wrongfully and improperly reimbursed Acis and potentially himself, by using Plaintiff's property designated for the payment of the Acis CLOs' administrative expenses and costs, and by allowing the payment of uncharacteristically high expenses upwards nearly 20 times their historical amount

249.     An action for the conversion of using Plaintiff's property designated for the payment of the Acis CLOs' administrative expenses and costs lies based on this conduct. The property at issue is a specific, identifiable fund that has an obligation to be returned or otherwise treated in a particular manner.

**VI.**

**REQUEST TO PIERCE ACIS CAPITAL MANAGEMENT'S CORPORATE VEIL**

250.     Plaintiff hereby alleges and incorporates the preceding allegations as if fully set forth herein.

251.     Terry has exercised complete domination over Acis.

252.     As described herein, Terry used such domination to commit a fraud or wrong that injured Plaintiff. Terry abused the privilege of doing business as Acis to amass the unprecedented

expenses of the Acis CLOs, which was up to twenty times their historical expense rate, among other wrongs.

253.    These expenses and Acis's refusal to provide the accounting requested by certain noteholders under the Acis Indentures, creates an inference of impropriety. Further, the foregoing conduct raises an inference that expenses under the Acis CLOs are being improperly reimbursed.

254.    The circumstances described herein warrant the disregard of Acis's corporate form, in particular, because Courts in this District will disregard the corporate form when necessary to prevent fraud or to achieve equity.

255.    Plaintiff respectfully requests that the Court pierce the corporate veil of Acis such that Acis and Terry are jointly and severally liable for the wrongful conduct described herein, to the extent such conduct would otherwise only be attributable to Acis alone.

## VII.

## CONDITIONS PRECEDENT

256.    Pursuant to Federal Rule of Civil Procedure 9(c), Plaintiff hereby pleads that all conditions precedent have occurred or been performed.  Although the Acis Indentures contain "no-action" clauses that require certain noteholders to make written request to U.S. Bank to institute any judicial proceedings in its own name, the Second Circuit has held that noncompliance with a no-action provision is excused in a suit against the indenture trustee. *See Cruden v. Bank of N.Y.*, 957 F.2d 961, 968 (2d Cir. 1992) ("The district court held that the 'no action' clause applied only to the debenture holder suits against [the issuer], not the Indenture Trustees . . . This construction of [the limitation on suits provision] obviously is correct, as it would be absurd to require the debenture holders to ask the Trustee to sue itself.").

257. To the extent any claim herein is more properly characterized as a derivative claim, Plaintiff submits that any condition precedent to such claim has been satisfied, and that any pre-suit demand would have been futile because the defendants control both ACIS-3 and ACIS-6, and the Trustee who is empowered to bring suit failed to do so despite numerous written requests.

## VIII.

## **DEMAND FOR ATTORNEYS' FEES**

258. Pursuant to Section 5.15 of the Acis indentures, Plaintiff hereby makes a demand for the attorneys' fees and court costs it has sustained in bringing this action.

259. Plaintiff further seeks attorneys fees to the extent they are authorized by contract, law, regulation, or common law.

## IX.

## **PRAYER FOR RELIEF**

260. All causes of action and requested relief are hereby expressly intended to be predicated solely on the alleged acts and omission occurring after the effective date of the Bankruptcy Order dated February 15, 2019.

261. Plaintiff respectfully request that judgment be entered in its favor and against Defendants U.S. Bank, Acis, Terry, and Brigade as follows:

    **A.** Damages in an amount to be determined at trial;

    **B.** Punitive damages in an amount to be determined at trial;

    **C.** Disgorgement of wrongfully paid fees and expenses and restitution thereof, in an amount to be determined at trial;

    **D.** Disgorgement of any and all ill-gotten gains in an amount to be determined at trial;

    **E.** Attorneys' fees and costs;

    **F.** Constructive trust;

    **G.** All other legal and equitable relief to which Plaintiff is justly entitled.

Dated: May 14, 2021                          Respectfully submitted,

                                               **SBAITI & COMPANY PLLC**

                                               */s/ Mazin A. Sbaiti*
                                               **Mazin A. Sbaiti**
                                               NY Bar No. 275089
                                               J.P. MORGAN CHASE TOWER
                                               2200 Ross Avenue
                                               Suite 4900W
                                               Dallas, TX 75201
                                               T: (214) 432-2899
                                               F: (214) 853-4367
                                               E: mas@sbaitilaw.com

                                               ***COUNSEL FOR PLAINTIFF***

---



**ACIS CLO 2014-4, Ltd.**

Redemption Report

As of June 23, 2021

Global Corporate Trust
*www.usbank.com/cdo*



# ACIS CLO 2014-4, Ltd.

## Table of Contents

As of Date: 06/23/2021
Payment Date: 06/24/2021



| Report Name | Page |
|---|---|
| Distribution Summary | 3 |
| Distribution Detail | 4 |
| Proceeds Account Summary | 7 |

| Report Name | Page |
|---|---|
| Current Asset Characteristics - Part I | 8 |
| Equity Securities | 9 |
| Disclaimer | 10 |

# ACIS CLO 2014-4, Ltd.

## Distribution Summary

As of Date: 06/23/2021
Payment Date: 06/24/2021

Current Libor: 0.175630%

| Note CUSIP | Original Face Value Per $1000 | Opening Balance % of Orig Bal Per $1000 | Principal Payment Per $1000 | Principal Adj. or Loss Per $1000 | Closing Balance % of Orig Bal Per $1000 | Accrued Interest Due Per $1000 | Repayment of Deferred Interest Per $1000 | Total Interest Payment Per $1000 | Interest Rate Curr/Next |
|---|---|---|---|---|---|---|---|---|---|
| **Class X** 00100VAA8 / USG00749AA22 / G00749AA2 | 4,000,000.00 | - - % | - | - | - - % | - | - | - | 1.175630000000% |
| **Class A** 00100VAC4 / USG00749AB05 / G00749AB0 | 296,000,000.00 | - - % | - | - | - - % | - | - | - | 1.595630000000% |
| **Class B** 00100VAE0 / USG00749AC87 / G00749AC8 | 68,000,000.00 | 9,062,656.77 133.274384277 13.33% | 9,062,656.77 133.274384277 | - | - - % | 25,469.28 0.374548235 | - | 25,469.28 0.374548235 | 1.945630000000% |
| **Class C** 00100VAG5 / USG00749AD60 / G00749AD6 | 33,000,000.00 | 33,000,000.00 1000.000000000 100.00% | 33,000,000.00 1000.000000000 | - | - - % | 129,921.70 3.937021212 | - | 129,921.70 3.937021212 | 2.725630000000% |
| **Class D** 00100VAJ9 / USG00749AE44 / G00749AE4 | 28,500,000.00 | 28,500,000.00 1000.000000000 100.0% | 28,500,000.00 1000.000000000 | - | - - % | 134,846.77 4.731465614 | - | 134,846.77 4.731465614 | 3.275630000000% |
| **Class E** 00100VAA9 / USG00747AA65 / G00747AA6 | 20,500,000.00 | 20,500,000.00 1000.000000000 100.0% | 20,500,000.00 1000.000000000 | - | - - % | 147,333.93 7.187020976 | - | 147,333.93 7.187020976 | 4.975630000000% |
| **Class F** 00100VHAC5 / USG00747AB49 / G00747AB4 | 4,000,000.00 | 4,000,000.00 1000.000000000 100.0% | 4,000,000.00 1000.000000000 | - | - - % | 30,770.31 7.692577500 | - | 30,770.31 7.692577500 | 5.325630000000% |
| **Sub Notes** 00100VHAE1 / USG00747AC22 / G00747AC2 | 50,750,000.00 | 50,750,000.00 1000.000000000 100.00% | - | - | 50,750,000.00 1000.000000000 100.00% | - | - | - | % |
| **COMBO Notes** 00100VAL4 / USG00749AF19 / G00749AF1 | 2,000,000.00 | 49,794.24 24.897120000 2.49% | 49,794.24 24.897120000 | - | - - % | 139.94 0.069970000 | - | 139.94 0.069970000 | 1.945630000000% |
| **Totals:** | 506,750,000.00 | 145,862,451.01 | 95,112,451.01 | 0.00 | 50,750,000.00 | 468,481.93 | 0.00 | 468,481.93 | |

430



# ACIS CLO 2014-4, Ltd.

## Distribution Detail

As of Date: 06/23/2021
Payment Date: 06/24/2021

| Priority | Payable to: | Amount | Priority | Payable to: | Amount |
|---|---|---|---|---|---|
| | **Available Interest Proceeds:** | 517,263.75 | | **Available Redemption Monies:** | 95,242,833.01 |
| (A) | Taxes, governmental fees and registered office fees owing by the Issuer or Co-Issuer: | - | (A)(A) | Taxes, governmental fees and registered office fees owing by the Issuer or Co-Issuer: | - |
| (B) | Accrued and Unpaid Administrative Expenses up to the Administrative Expense Cap: | - | (A)(B) | Accrued and Unpaid Administrative Expenses up to the Administrative Expense Cap: | - |
| (B)(1)(i) | Fees, indemnities and expenses payable to the Trustee (pro rata): | 3,165.69 | (A)(B)(1)(i) | Fees, indemnities and expenses payable to the Trustee (pro rata): | - |
| (B)(1)(ii) | Fees, indemnities and expenses payable to the Bank (pro rata): | - | (A)(B)(1)(ii) | Fees, indemnities and expenses payable to the Bank (pro rata): | - |
| (B)(1)(iii) | Fees, indemnities and expenses payable to the Collateral Administrator (pro rata): | - | (A)(B)(1)(iii) | Fees, indemnities and expenses payable to the Collateral Administrator (pro rata): | - |
| (B)(2)(i) | Fees and expenses payable to the Independent accountants, agents and counsel of the Issuer and any ETB Subsidiary (pro rata): | - | (A)(B)(2)(i) | Fees and expenses payable to the Independent accountants, agents and counsel of the Issuer and any ETB Subsidiary (pro rata): | - |
| (B)(2)(ii) | Fees and expenses payable to the Rating Agencies (pro rata): | - | (A)(B)(2)(ii) | Fees and expenses payable to the Rating Agencies (pro rata): | - |
| (B)(2)(iii) | Fees and expenses payable to any Person in respect of Petition Expenses (pro rata): | - | (A)(B)(2)(iii) | Fees and expenses payable to any Person in respect of Petition Expenses (pro rata): | - |
| (B)(2)(iv) | Fees and expenses payable to the Portfolio Manager (pro rata): | - | (A)(B)(2)(iv) | Fees and expenses payable to the Portfolio Manager (pro rata): | - |
| (B)(2)(v) | Fees and expenses payable to the Administrator (pro rata): | - | (A)(B)(2)(v) | Fees and expenses payable to the Administrator (pro rata): | - |
| (B)(2)(vi) | Fees and expenses permitted to any other Person (pro rata): | 65,406.67 | (A)(B)(2)(vi) | Fees and expenses permitted to any other Person (pro rata): | - |
| (C) | Senior Management Fee: | 30,445.49 | (A)(C) | Senior Management Fee: | - |
| (D) | Amounts due to any Hedge Counterparty, excluding amounts due from termination (or partial termination): | - | (A)(D) | Amounts due to any Hedge Counterparty, excluding amounts due from termination (or partial termination): | - |
| (E)(1) | Accrued and unpaid interest on the Class X Notes (pro rata): | - | (A)(E)(1) | Accrued and unpaid interest on the Class X Notes (pro rata): | - |
| (E)(2) | Class X Note Payment Amount (pro rata): | - | (A)(E)(2) | Class X Note Payment Amount (pro rata): | - |
| (E)(3) | Accrued and unpaid interest on the Class A Notes (pro rata): | - | (A)(E)(3) | Accrued and unpaid interest on the Class A Notes (pro rata): | - |
| (F) | Accrued and unpaid interest on the Class B Notes: | 25,469.28 | (A)(F) | Accrued and unpaid interest on the Class B Notes: | - |
| (G) | Amounts due to any Hedge Counterparty pursuant to an early termination (or partial termination): | - | (A)(G) | Amounts due to any Hedge Counterparty pursuant to an early termination (or partial termination): | - |
| (H) | If either of the Class A/B Coverage Tests is not satisfied: | - | (A)(H) | If either of the Class A/B Coverage Tests is not satisfied: | - |
| (H)(i) | to the payment of principal of the Class X Notes (pro rata): | - | (A)(H)(i) | to the payment of principal of the Class X Notes (pro rata): | - |
| (H)(ii) | to the payment of principal of the Class A Notes (pro rata): | - | (A)(H)(ii) | to the payment of principal of the Class A Notes (pro rata): | - |
| (H)(iii) | to the payment of principal of the Class B Notes: | - | (A)(H)(iii) | to the payment of principal of the Class B Notes: | - |
| (I) | Accrued and unpaid interest on the Class C Notes: | 129,921.70 | (B)(I) | Accrued and unpaid interest on the Class C Notes: | - |
| (J) | Class C Deferred Interest | - | (B)(J) | Class C Deferred Interest | - |
| (K) | If either of the Class C Coverage Tests is not satisfied: | - | (B)(K) | If either of the Class C Coverage Tests is not satisfied: | - |
| (K)(i) | to the payment of principal of the Class X Notes (pro rata): | - | (B)(K)(i) | to the payment of principal of the Class X Notes (pro rata): | - |
| (K)(ii) | to the payment of principal of the Class A Notes (pro rata): | - | (B)(K)(ii) | to the payment of principal of the Class A Notes (pro rata): | - |
| (K)(iii) | to the payment of principal of the Class B Notes: | - | (B)(K)(iii) | to the payment of principal of the Class B Notes: | - |
| (K)(iv) | to the payment of principal of the Class C Notes: | - | (B)(K)(iv) | to the payment of principal of the Class C Notes: | - |

*The available Principal Proceeds excludes amounts held in reserve

## ACIS CLO 2014-4, Ltd.

### Distribution Detail

As of Date: 06/23/2021
Payment Date: 06/24/2021

| | | Amount |
|---|---|---|
| (L) | Accrued and unpaid interest on the Class D Notes: | 134,846.77 |
| (M) | Class D Deferred Interest | - |
| (N) | If either of the Class D Coverage Tests is not satisfied: | - |
| (N)(i) | to the payment of principal of the Class X Notes (pro rata): | - |
| (N)(ii) | to the payment of principal of the Class A Notes (pro rata): | - |
| (N)(iii) | to the payment of principal of the Class B Notes: | - |
| (N)(iv) | to the payment of principal of the Class C Notes: | - |
| (N)(v) | to the payment of principal of the Class D Notes: | - |
| (O) | Accrued and unpaid interest on the Class E Notes: | 128,008.15 |
| (P) | Class E Deferred Interest | - |
| (Q) | If either of the Class E Coverage Tests is not satisfied: | - |
| (Q)(i) | to the payment of principal of the Class X Notes (pro rata): | - |
| (Q)(ii) | to the payment of principal of the Class A Notes (pro rata): | - |
| (Q)(iii) | to the payment of principal of the Class B Notes: | - |
| (Q)(iv) | to the payment of principal of the Class C Notes: | - |
| (Q)(v) | to the payment of principal of the Class D Notes: | - |
| (Q)(vi) | to the payment of principal of the Class E Notes: | - |
| (R) | Accrued and unpaid interest on the Class F Notes: | - |
| (S) | Class F Deferred Interest | - |
| (T) | If Effective Date Ratings Confirmation has not been obtained: | - |
| (T)(x)(i) | to the payment of principal of the Class X Notes (pro rata): | - |
| (T)(x)(ii) | to the payment of principal of the Class A Notes (pro rata): | - |
| (T)(x)(iii) | to the payment of principal of the Class B Notes: | - |
| (T)(x)(iv) | to the payment of principal of the Class C Notes: | - |
| (T)(x)(v) | to the payment of principal of the Class D Notes: | - |
| (T)(x)(vi) | to the payment of principal of the Class E Notes: | - |
| (T)(x)(vii) | to the payment of principal of the Class F Notes: | - |
| (T)(y) | to purchase Collateral Obligations: | - |
| (U) | During the Reinvestment Period, if the Interest Reinvestment Test is not satisfied, the lesser of: | - |
| (U)(i) | 50% of the remaining Interest Proceeds: | - |
| (U)(ii) | amount that would satisfy test to the Collection Acct. as Prin Proceeds to purchase add'l Collateral: | - |
| (V) | At PM discretion, with consent of a Majority of the Subordinated Notes, to the payment of principal of the Class X Notes: | - |
| (W)(1) | Accrued and unpaid Subordinated Management Fee: | - |
| (W)(2) | Unpaid Administrative Expenses from clause (B): | - |

| | | Amount |
|---|---|---|
| (B)(L) | Accrued and unpaid interest on the Class D Notes: | - |
| (B)(M) | Class D Deferred Interest | - |
| (B)(N) | If either of the Class D Coverage Tests is not satisfied: | - |
| (B)(N)(i) | to the payment of principal of the Class X Notes (pro rata): | - |
| (B)(N)(ii) | to the payment of principal of the Class A Notes (pro rata): | - |
| (B)(N)(iii) | to the payment of principal of the Class B Notes: | - |
| (B)(N)(iv) | to the payment of principal of the Class C Notes: | - |
| (B)(N)(v) | to the payment of principal of the Class D Notes: | - |
| (B)(O) | Accrued and unpaid interest on the Class E Notes: | - |
| (B)(P) | Class E Deferred Interest | - |
| (B)(Q) | If either of the Class E Coverage Tests is not satisfied: | - |
| (B)(Q)(i) | to the payment of principal of the Class X Notes (pro rata): | - |
| (B)(Q)(ii) | to the payment of principal of the Class A Notes (pro rata): | - |
| (B)(Q)(iii) | to the payment of principal of the Class B Notes: | - |
| (B)(Q)(iv) | to the payment of principal of the Class C Notes: | - |
| (B)(Q)(v) | to the payment of principal of the Class D Notes: | - |
| (B)(Q)(vi) | to the payment of principal of the Class E Notes: | - |
| (B)(R) | Accrued and unpaid interest on the Class F Notes: | - |
| (B)(S) | Class F Deferred Interest | - |
| (C) | On a Special Redemption Date, payments in accordance with the Note Payment Sequence: | - |
| (C)(i) | to the payment of principal of the Class X Notes (pro rata): | - |
| (C)(ii) | to the payment of principal of the Class A Notes (pro rata): | - |
| (C)(iii) | to the payment of principal of the Class B Notes: | - |
| (C)(iv) | to the payment of principal of the Class C Notes: | - |
| (C)(v) | to the payment of principal of the Class D Notes: | - |
| (C)(vi) | to the payment of principal of the Class E Notes: | - |
| (C)(vii) | to the payment of principal of the Class F Notes: | - |
| (D)(1) | On a Redemption Date, payments in accordance with the Note Payment Sequence: | - |
| (D)(1)(i) | the Redemption Price of the Class X Notes (pro rata): | - |
| (D)(1)(ii) | the Redemption Price of the Class A Notes (pro rata): | - |
| (D)(1)(iii) | the Redemption Price of the Class B Notes: | 9,062,656.77 |
| (D)(1)(iv) | the Redemption Price of the Class C Notes: | 33,000,000.00 |
| (D)(1)(v) | the Redemption Price of the Class D Notes: | 28,500,000.00 |
| (D)(1)(vi) | the Redemption Price of the Class E Notes: | 20,519,325.78 |

*The available Principal Proceeds excludes amounts held in reserve

# ACIS CLO 2014-4, Ltd.

## Distribution Detail

As of Date: 06/23/2021
Payment Date: 06/24/2021

| Code | Description | Amount |
|---|---|---|
| (W)(2)(1)(i) | Fees, indemnities and expenses payable to the Trustee (pro rata): | - |
| (W)(2)(1)(ii) | Fees, indemnities and expenses payable to the Bank (pro rata): | - |
| (W)(2)(1)(iii) | Fees, indemnities and expenses payable to the Collateral Administrator (pro rata): | - |
| (W)(2)(2)(i) | Fees and expenses payable to the Independent accountants, agents and counsel of the Issuer and any ETB Subsidiary (pro rata): | - |
| (W)(2)(2)(ii) | Fees and expenses payable to the Rating Agencies (pro rata): | - |
| (W)(2)(2)(iii) | Fees and expenses payable to any Person in respect of Petition Expenses (pro rata): | - |
| (W)(2)(2)(iv) | Fees and expenses payable to the Portfolio Manager (pro rata): | - |
| (W)(2)(2)(v) | Fees and expenses payable to the Administrator (pro rata): | - |
| (W)(2)(2)(vi) | Fees and expenses permitted to any other Person (pro rata): | - |
| (W)(3) | to the payment of any expenses incurred in connection with a Refinancing: | |
| (X) | Unpaid amounts due to any Hedge Counterparty pursuant to an early termination (or partial termination) from Clause (G): | |
| (Y)(1) | Unless Effective Date Conditions has been satisfied, all Interest Proceeds to the Interest Collection Subaccount for next payment date: | |
| (Y)(2) | To the Holders of the Subordinated Notes in an amount necessary to satisfy a 10% IRR: | |
| (Z)(i) | 15% of any remaining Interest Proceeds to the PM as part of the Incentive Management Fee: | |
| (Z)(ii) | 85% of any remaining Interest Proceeds to the Holders of the Subordinated Notes: | |
| | **Total:** | **517,263.75** |
| | Balance in the Interest Account after the Payment Date | 0.00 |

| Code | Description | Amount |
|---|---|---|
| (D)(1)(vii) | the Redemption Price of the Class F Notes: | 4,030,770.31 |
| (D)(2) | On a Redemption Date, payments under clauses (W) and (X) of Section 11.1(a)(i): | 130,080.15 |
| (E) | During the Reinvestment Period, to invest in Eligible Investments and/or add'l Collateral Obligations: | - |
| (F) | After the Reinvestment Period, payments in accordance with the Note Payment Sequence: | |
| (F)(i) | the Redemption Price of the Class X Notes (pro rata): | |
| (F)(ii) | the Redemption Price of the Class A Notes (pro rata): | |
| (F)(iii) | the Redemption Price of the Class B Notes: | |
| (F)(iv) | the Redemption Price of the Class C Notes: | |
| (F)(v) | the Redemption Price of the Class D Notes: | |
| (F)(vi) | the Redemption Price of the Class E Notes: | |
| (F)(vii) | the Redemption Price of the Class F Notes: | |
| (G)(1) | Accrued and unpaid Subordinated Management Fee: | |
| (G)(2) | Unpaid Administrative Expenses: | |
| (G)(2)(1)(i) | Fees, indemnities and expenses payable to the Trustee (pro rata): | |
| (G)(2)(1)(ii) | Fees, indemnities and expenses payable to the Bank (pro rata): | |
| (G)(2)(1)(iii) | Fees, indemnities and expenses payable to the Collateral Administrator (pro rata): | |
| (G)(2)(2)(i) | Fees and expenses payable to the Independent accountants, agents and counsel of the Issuer and any ETB Subsidiary (pro rata): | |
| (G)(2)(2)(ii) | Fees and expenses payable to the Rating Agencies (pro rata): | |
| (G)(2)(2)(iii) | Fees and expenses payable to any Person in respect of Petition Expenses (pro rata): | |
| (G)(2)(2)(iv) | Fees and expenses payable to the Portfolio Manager (pro rata): | |
| (G)(2)(2)(v) | Fees and expenses payable to the Administrator (pro rata): | |
| (G)(2)(2)(vi) | Fees and expenses permitted to any other Person (pro rata): | |
| (H) | Unpaid amounts due to any Hedge Counterparty pursuant to an early termination (or partial termination): | |
| (I) | To the Holders of the Subordinated Notes in an amount necessary to satisfy a 10% IRR: | |
| (J)(i) | 15% of any remaining Interest Proceeds to the PM as part of the Incentive Management Fee: | |
| (J)(ii) | 85% of any remaining Interest Proceeds to the Holders of the Subordinated Notes: | |
| | **Total:** | **95,242,833.01** |
| | Balance in the Principal Account after the Payment Date | 0.00 |

*The available Principal Proceeds excludes amounts held in reserve



# ACIS CLO 2014-4, Ltd.

## Proceeds Account Summary

As of Date: 06/23/2021
Payment Date: 06/24/2021

### Accounts Summary

| Account | Beginning Balance | Deposits | Withdrawals | Ending Balance |
|---|---|---|---|---|
| Collection Account - Interest | 351,171.66 | 180,012.67 | 13,920.58 | 517,263.75 |
| Collection Account - Principal | 7,631,156.34 | 92,417,289.12 | 4,660.10 | 100,043,785.36 |
| Custodial Account | 0.00 | 0.00 | 0.00 | 0.00 |
| Expense Reserve Account | 0.00 | 0.00 | 0.00 | 0.00 |
| Hedge Account | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Reserve Account | 0.00 | 0.00 | 0.00 | 0.00 |
| Letter of Credit Reserve Account | 0.00 | 0.00 | 0.00 | 0.00 |
| Payment Account | 0.00 | 0.00 | 0.00 | 0.00 |
| Ramp-Up Account | 0.00 | 0.00 | 0.00 | 0.00 |
| Revolver Funding Account | 0.00 | 0.00 | 0.00 | 0.00 |
| **Totals:** | **7,982,328.00** | **92,597,301.79** | **18,580.68** | **100,561,049.11** |

### Asset Summary

| | |
|---|---|
| Balance of Collection Account: | 100,561,049.12 |
| Balance of Custodial Account: | 0.00 |
| Balance of Expense Reserve Account: | 0.00 |
| Balance of Hedge Account: | 0.00 |
| Balance of Interest Reserve Account: | 0.00 |
| Balance of Letter of Credit Reserve Account: | 0.00 |
| Balance of Payment Account: | 0.00 |
| Balance of Ramp-Up Account: | 0.00 |
| Balance of Revolver Funding Account: | 0.00 |
| **Total:** | **100,561,049.12** |

Account Summary: Based on Settlement Date
Asset Summary: Based on Trade Date

# ACIS CLO 2014-4, Ltd.

## Current Asset Characteristics - Part I

As of Date: 06/23/2021
Payment Date: 06/24/2021

| Security I.D. | Security Description | Issuer / Obligor | Stated Maturity | Current Coupon | Funded Balance | Unfunded Balance | Total Commitment | % of Collateral Principal Amount |
|---|---|---|---|---|---|---|---|---|
| LX158094 | Sinclair Television T/L B2 | Sinclair Television Group, Inc. | 03-Jan-24 | 2.35000% | 697,451.37 | - | 697,451.37 | 0.65% |
| LX171276 | Syniverse Holdings T/L (01/18) | Syniverse Holdings, Inc. | 09-Mar-23 | 6.00000% | 6,457,781.83 | - | 6,457,781.83 | 6.02% |
| **Totals:** | **2** | | | | **7,155,233.20** | **-** | **7,155,233.20** | |



# ACIS CLO 2014-4, Ltd.

## Equity Securities

As of Date: 06/23/2021
Payment Date: 06/24/2021

| CUSIP | Security Description | Asset Description | # of Units/Shares |
|---|---|---|---|
| 8AMCSCZX4 | Sabine Oil & Gas C/S | Equity | 10 |
| 8AMCSF0Z0 | Wayne Services Legacy - C/S | Equity | 617 |

**Totals:** 2



## ACIS CLO 2014-4, Ltd.

**Disclaimer**

As of Date: 06/23/2021
Payment Date: 06/24/2021

The information contained in this report is for general information only and has been obtained primarily from third party providers. The information is believed to be reliable, but is not guaranteed as to accuracy or completeness. U.S. Bank is not responsible for and does not guarantee the products, services or performance of its affiliates or third party providers. This information is not intended to serve as a recommendation or solicitation for the purchase or sale of any particular product or service. It is not intended to be a forecast of future events or guarantee of future results and should not be used as a primary basis of investment decisions.



**ACIS CLO 2014-5, Ltd.**

Redemption Report

As of June 23, 2021

Global Corporate Trust
*www.usbank.com/cdo*



# ACIS CLO 2014-5, LLC

## Table of Contents

As of Date: 06/23/2021
Payment Date: 06/24/2021

| Report Name | Page |
|---|---|
| Distribution Summary | 3 |
| Distribution Detail | 4 |
| Proceeds Account Summary | 8 |

| Report Name | Page |
|---|---|
| Current Asset Characteristics - Part I | 9 |
| Equity Securities | 10 |
| Disclaimer | 11 |



# ACIS CLO 2014-5, LLC

## Distribution Summary

As of Date: 06/23/2021
Payment Date: 06/24/2021

Current Libor: 0.175630%



| Note / CUSIP | Original Face Value Per $1000 | Opening Balance / % of Orig Bal Per $1000 | Principal Payment Per $1000 | Principal Adj. or Loss Per $1000 | Closing Balance / % of Orig Bal Per $1000 | Accrued Interest Due Per $1000 | Repayment of Deferred Interest Per $1000 | Total Interest Payment Per $1000 | Interest Rate Curr/Next |
|---|---|---|---|---|---|---|---|---|---|
| Class A-1 00102DAA6 / USG00073XAA03 / G0073XAA0 | 280,750,000.00 | - / -% | - | - | - / -% | - | - | - | 1.685630000% |
| Class A-2 00102DAC2 / USG00073XAB85 / G0073XAB8 | 30,000,000.00 | - / -% | - | - | - / -% | - | - | - | 3.534600000% |
| Class B 00102DAE8 / USG00073XAC68 / G0073XAC6 | 68,000,000.00 | 58,471,950.57 / 859.881628029 85.99% | 58,471,950.57 / 859.881628029 | - | - / -% | 212,468.81 / 3.124541324 | - | 212,468.81 / 3.124541324 | 2.515630000% |
| Class C-1 00102DAG3 / USG00073XAD42 / G0073XAD4 | 25,000,000.00 | 25,000,000.00 / 1000.000000000 100.00% | 25,000,000.00 / 1000.000000000 | - | - / -% | 129,119.97 / 5.164798800 | - | 129,119.97 / 5.164798800 | 3.575630000% |
| Class C-2 00102DAL2 / USG00073XAF99 / G0073XAF9 | 7,000,000.00 | 7,000,000.00 / 1000.000000000 100.00% | 7,000,000.00 / 1000.000000000 | - | - / -% | 60,045.32 / 8.577902857 | - | 60,045.32 / 8.577902857 | 5.826500000% |
| Class D 00102DAJ7 / USG00073XAE25 / G0073XAE2 | 26,000,000.00 | 26,000,000.00 / 1000.000000000 100.00% | 26,000,000.00 / 1000.000000000 | - | - / -% | 169,586.99 / 6.522576538 | - | 169,586.99 / 6.522576538 | 4.515630000% |
| Class E-1 00101WAA5 / USG00738XAA58 / G00738AA5 | 10,500,000.00 | 10,500,000.00 / 1000.000000000 100.00% | 10,500,000.00 / 1000.000000000 | - | - / -% | 101,550.39 / 9.671465714 | - | 101,550.39 / 9.671465714 | 6.695630000% |
| Class E-2 00101WAE7 / USG00738XAC15 / G00738AC1 | 10,500,000.00 | 10,500,000.00 / 1000.000000000 100.00% | 10,500,000.00 / 1000.000000000 | - | - / -% | 83,047.06 / 7.909243810 | - | 83,047.06 / 7.909243810 | 5.475630000% |
| Subordinated 00101WAC1 / USG00738AB32 / G00738AB3 | 53,000,000.00 | 53,000,000.00 / 1000.000000000 100.00% | - | - | 53,000,000.00 / 1000.000000000 100.00% | - | - | 882,267.70 / 16.646560372 | - |
| **Totals:** | 510,750,000.00 | 190,471,950.57 | 137,471,950.57 | 0.00 | 53,000,000.00 | 755,818.54 | 0.00 | 1,638,086.24 | |

U.S. Bank Global Corporate Trust
www.usbank.com/cdo

Distribution Summary

Page 3 of 11

# ACIS CLO 2014-5, LLC

## Distribution Detail

As of Date: 06/23/2021
Payment Date: 06/24/2021



### Available Interest Proceeds

| Priority | Payable to: | Amount |
|---|---|---|
| | **Available Interest Proceeds:** | **847,327.84** |
| (A) | Taxes, governmental fees and registered office fees owing by the Issuer or Co-Issuer: | - |
| (B) | Accrued and Unpaid Administrative Expenses up to the Administrative Expense Cap: | - |
| (B)(1)(i) | Fees, indemnities and expenses payable to the Trustee (pro rata): | 4,583.97 |
| (B)(1)(ii) | Fees, indemnities and expenses payable to the Bank (pro rata): | - |
| (B)(1)(iii) | Fees, indemnities and expenses payable to the Collateral Administrator (pro rata): | - |
| (B)(2)(i) | Fees and expenses payable to the Independent accountants, agents and counsel of the Issuer and any ETB Subsidiary (pro rata): | - |
| (B)(2)(ii) | Fees and expenses payable to the Rating Agencies (pro rata): | - |
| (B)(2)(iii) | Fees and expenses payable to any Person in respect of Petition Expenses (pro rata): | - |
| (B)(2)(iv) | Fees and expenses payable to the Portfolio Manager (pro rata): | - |
| (B)(2)(v) | Fees and expenses payable to the Administrator (pro rata): | - |
| (B)(2)(vi) | Fees and expenses permitted to any other Person (pro rata): | 35,381.72 |
| (C) | Senior Management Fee: | 42,953.47 |
| (D) | Amounts due to any Hedge Counterparty, excluding amounts due from termination (or partial termination): | - |
| (E)(1) | Accrued and unpaid interest on the Class A1 Notes (pro rata): | - |
| (E)(2) | Accrued and unpaid interest on the Class A2 Notes (pro rata): | - |
| (F) | Accrued and unpaid interest on the Class B Notes: | 212,468.81 |
| (G) | Amounts due to any Hedge Counterparty pursuant to an early termination (or partial termination): | - |
| (H) | If either of the Class A/B Coverage Tests is not satisfied: | - |
| (H)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (H)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (H)(iii) | to the payment of principal of the Class B Notes: | - |
| (I)(i) | Accrued and unpaid interest on the Class C1 Notes (pro rata): | 129,119.97 |
| (I)(ii) | Accrued and unpaid interest on the Class C2 Notes (pro rata): | 60,045.32 |
| (J)(i) | Class C1 Deferred Interest (pro rata): | - |
| (J)(ii) | Class C2 Deferred Interest (pro rata): | - |
| (K) | If either of the Class C Coverage Tests is not satisfied: | - |
| (K)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (K)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (K)(iii) | to the payment of principal of the Class B Notes | - |

### Available Redemption Monies

| Priority | Payable to: | Amount |
|---|---|---|
| | **Available Redemption Monies:** | **138,890,383.46** |
| (A)(A) | Taxes, governmental fees and registered office fees owing by the Issuer or Co-Issuer: | - |
| (A)(B) | Accrued and Unpaid Administrative Expenses up to the Administrative Expense Cap: | - |
| (A)(B)(1)(i) | Fees, indemnities and expenses payable to the Trustee (pro rata): | - |
| (A)(B)(1)(ii) | Fees, indemnities and expenses payable to the Bank (pro rata): | - |
| (A)(B)(1)(iii) | Fees, indemnities and expenses payable to the Collateral Administrator (pro rata): | - |
| (A)(B)(2)(i) | Fees and expenses payable to the Independent accountants, agents and counsel of the Issuer and any ETB Subsidiary (pro rata): | - |
| (A)(B)(2)(ii) | Fees and expenses payable to the Rating Agencies (pro rata): | - |
| (A)(B)(2)(iii) | Fees and expenses payable to any Person in respect of Petition Expenses (pro rata): | - |
| (A)(B)(2)(iv) | Fees and expenses payable to the Portfolio Manager (pro rata): | - |
| (A)(B)(2)(v) | Fees and expenses payable to the Administrator (pro rata): | - |
| (A)(B)(2)(vi) | Fees and expenses permitted to any other Person (pro rata): | - |
| (A)(C) | Senior Management Fee: | - |
| (A)(D) | Amounts due to any Hedge Counterparty, excluding amounts due from termination (or partial termination): | - |
| (A)(E)(1) | Accrued and unpaid interest on the Class A1 Notes (pro rata): | - |
| (A)(E)(2) | Accrued and unpaid interest on the Class A2 Notes (pro rata): | - |
| (A)(F) | Accrued and unpaid interest on the Class B Notes: | - |
| (A)(G) | Amounts due to any Hedge Counterparty pursuant to an early termination (or partial termination): | - |
| (A)(H) | If either of the Class A/B Coverage Tests is not satisfied: | - |
| (A)(H)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (A)(H)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (A)(H)(iii) | to the payment of principal of the Class B Notes: | - |
| (B)(I)(i) | Accrued and unpaid interest on the Class C1 Notes (pro rata): | - |
| (B)(I)(ii) | Accrued and unpaid interest on the Class C2 Notes (pro rata): | - |
| (B)(J)(i) | Class C1 Deferred Interest (pro rata): | - |
| (B)(J)(ii) | Class C2 Deferred Interest (pro rata): | - |
| (B)(K) | If either of the Class C Coverage Tests is not satisfied: | - |
| (B)(K)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (B)(K)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (B)(K)(iii) | to the payment of principal of the Class B Notes: | - |

*The available Principal Proceeds excludes amounts held in reserve