## ACIS CLO 2014-5, LLC

### Distribution Detail

As of Date: 06/23/2021
Payment Date: 06/24/2021



| Ref | Description | Amount |
|---|---|---|
| (K)(iv) | to the payment of principal of the Class C1 Notes (pro rata): | - |
| (K)(v) | to the payment of principal of the Class C2 Notes (pro rata): | - |
| (L) | Accrued and unpaid interest on the Class D Notes: | 169,586.99 |
| (M) | Class D Deferred Interest | - |
| (N) | If either of the Class D Coverage Tests is not satisfied: | - |
| (N)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (N)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (N)(iii) | to the payment of principal of the Class B Notes: | - |
| (N)(iv) | to the payment of principal of the Class C1 Notes (pro rata): | - |
| (N)(v) | to the payment of principal of the Class C2 Notes (pro rata): | - |
| (N)(vi) | to the payment of principal of the Class D Notes: | - |
| (O)(i) | Accrued and unpaid interest on the Class E1 Notes (pro rata): | 101,550.39 |
| (O)(ii) | Accrued and unpaid interest on the Class E2 Notes (pro rata): | 83,047.06 |
| (P)(i) | Class E1 Deferred Interest (pro rata): | - |
| (P)(ii) | Class E2 Deferred Interest (pro rata): | - |
| (Q) | If either of the Class E Coverage Tests is not satisfied: | - |
| (Q)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (Q)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (Q)(iii) | to the payment of principal of the Class B Notes: | - |
| (Q)(iv) | to the payment of principal of the Class C1 Notes (pro rata): | - |
| (Q)(v) | to the payment of principal of the Class C2 Notes (pro rata): | - |
| (Q)(vi) | to the payment of principal of the Class D Notes: | - |
| (Q)(vii) | to the payment of principal of the Class E1 Notes (pro rata): | - |
| (Q)(viii) | to the payment of principal of the Class E2 Notes (pro rata): | - |
| (R) | If Effective Date Ratings Confirmation has not been obtained: | - |
| (R)(x)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (R)(x)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (R)(x)(iii) | to the payment of principal of the Class B Notes: | - |
| (R)(x)(iv) | to the payment of principal of the Class C1 Notes (pro rata): | - |
| (R)(x)(v) | to the payment of principal of the Class C2 Notes (pro rata): | - |
| (R)(x)(vi) | to the payment of principal of the Class D Notes: | - |
| (R)(x)(vii) | to the payment of principal of the Class E1 Notes (pro rata): | - |
| (R)(x)(viii) | to the payment of principal of the Class E2 Notes (pro rata): | - |
| (S) | During the Reinvestment Period, if the Interest Reinvestment Test is not satisfied, the lesser of: | - |
| | 50% of the remaining Interest Proceeds: | - |
| (S)(i) | | - |

| Ref | Description | Amount |
|---|---|---|
| (B)(K)(iv) | to the payment of principal of the Class C1 Notes (pro rata): | - |
| (B)(K)(v) | to the payment of principal of the Class C2 Notes (pro rata): | - |
| (B)(L) | Accrued and unpaid interest on the Class D Notes: | - |
| (B)(M) | Class D Deferred Interest | - |
| (B)(N) | If either of the Class D Coverage Tests is not satisfied: | - |
| (B)(N)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (B)(N)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (B)(N)(iii) | to the payment of principal of the Class B Notes: | - |
| (B)(N)(iv) | to the payment of principal of the Class C1 Notes (pro rata): | - |
| (B)(N)(v) | to the payment of principal of the Class C2 Notes (pro rata): | - |
| (B)(N)(vi) | to the payment of principal of the Class D Notes: | - |
| (B)(O)(i) | Accrued and unpaid interest on the Class E1 Notes (pro rata): | - |
| (B)(O)(ii) | Accrued and unpaid interest on the Class E2 Notes (pro rata): | - |
| (B)(P)(i) | Class E1 Deferred Interest (pro rata): | - |
| (B)(P)(ii) | Class E2 Deferred Interest (pro rata): | - |
| (B)(O) | If either of the Class E Coverage Tests is not satisfied: | - |
| (B)(Q)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (B)(Q)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (B)(Q)(iii) | to the payment of principal of the Class B Notes: | - |
| (B)(Q)(iv) | to the payment of principal of the Class C1 Notes (pro rata): | - |
| (B)(Q)(v) | to the payment of principal of the Class C2 Notes (pro rata): | - |
| (B)(Q)(vi) | to the payment of principal of the Class D Notes: | - |
| (B)(Q)(vii) | to the payment of principal of the Class E1 Notes (pro rata): | - |
| (B)(O)(viii) | to the payment of principal of the Class E2 Notes (pro rata): | - |
| (C) | On a Special Redemption Date, payments in accordance with the Note Payment Sequence: | - |
| (C)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (C)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (C)(iii) | to the payment of principal of the Class B Notes: | - |
| (C)(iv) | to the payment of principal of the Class C1 Notes (pro rata): | - |
| (C)(v) | to the payment of principal of the Class C2 Notes (pro rata): | - |
| (C)(vi) | to the payment of principal of the Class D Notes: | - |
| (C)(vii) | to the payment of principal of the Class E1 Notes (pro rata): | - |
| (C)(viii) | to the payment of principal of the Class E2 Notes (pro rata): | - |
| (D)(1) | On a Redemption Date, payments in accordance with the Note Payment Sequence: | - |

*The available Principal Proceeds excludes amounts held in reserve

## ACIS CLO 2014-5, LLC

### Distribution Detail

As of Date: 06/23/2021
Payment Date: 06/24/2021

| Ref | Description | Amount |
|---|---|---|
| (S)(ii)(1) | Discretion of PM, amount that would satisfy to the Collection Acct, as Prin Proceeds to purchase add'l Collateral; or, to the payment of principal on the Secured Notes: | - |
| (S)(ii)(2)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (S)(ii)(2)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (S)(ii)(2)(iii) | to the payment of principal of the Class B Notes: | - |
| (S)(ii)(2)(iv) | to the payment of principal of the Class C1 Notes (pro rata): | - |
| (S)(ii)(2)(v) | to the payment of principal of the Class C2 Notes (pro rata): | - |
| (S)(ii)(2)(vi) | to the payment of principal of the Class D Notes: | - |
| (S)(ii)(2)(vii) | to the payment of principal of the Class E1 Notes (pro rata): | - |
| (S)(ii)(2)(viii) | to the payment of principal of the Class E2 Notes (pro rata): | - |
| (T)(1) | Accrued and unpaid Subordinated Management Fee: | 8,590.14 |
| (T)(2) | Unpaid Administrative Expenses from clause (B): | - |
| (T)(2)(1)(i) | Fees, indemnities and expenses payable to the Trustee (pro rata): | - |
| (T)(2)(1)(ii) | Fees, indemnities and expenses payable to the Bank (pro rata): | - |
| (T)(2)(1)(iii) | Fees, indemnities and expenses payable to the Collateral Administrator (pro rata): | - |
| (T)(2)(2)(i) | Fees and expenses payable to the Independent accountants, agents and counsel of the Issuer and any ETB Subsidiary (pro rata): | - |
| (T)(2)(2)(ii) | Fees and expenses payable to the Rating Agencies (pro rata): | - |
| (T)(2)(2)(iii) | Fees and expenses payable to any Person in respect of Petition Expenses (pro rata): | - |
| (T)(2)(2)(iv) | Fees and expenses payable to the Portfolio Manager (pro rata): | - |
| (T)(2)(2)(v) | Fees and expenses payable to the Administrator (pro rata): | - |
| (T)(2)(2)(vi) | Fees and expenses permitted to any other Person (pro rata): | - |
| (T)(3) | to the payment of any expenses incurred in connection with a Refinancing: | - |
| (U) | Unpaid amounts due to any Hedge Counterparty pursuant to an early termination (or partial termination) from Clause (G): | - |
| (V) | for deposit into the Supplemental Reserve Account: | - |
| (W) | To the Holders of the Subordinated Notes in an amount necessary to satisfy a 10% IRR: | - |
| (X)(i) | 15% of any remaining Interest Proceeds to the PM as part of the Incentive Management Fee: | - |
| (X)(ii) | 85% of any remaining Interest Proceeds to the Holders of the Subordinated Notes: | - |

| Ref | Description | Amount |
|---|---|---|
| (D)(1)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (D)(1)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (D)(1)(iii) | to the payment of principal of the Class B Notes: | 58,471,950.57 |
| (D)(1)(iv) | to the payment of principal of the Class C1 Notes (pro rata): | 25,000,000.00 |
| (D)(1)(v) | to the payment of principal of the Class C2 Notes (pro rata): | 7,000,000.00 |
| (D)(1)(vi) | to the payment of principal of the Class D Notes: | 26,000,000.00 |
| (D)(1)(vii) | to the payment of principal of the Class E1 Notes (pro rata): | 10,500,000.00 |
| (D)(1)(viii) | to the payment of principal of the Class E2 Notes (pro rata): | 10,500,000.00 |
| (D)(2) | On a Redemption Date, payments under clauses (T) and (U) of Section 11,1(a)(i): | - |
| (D)(2)(T)(1) | Accrued and unpaid Subordinated Management Fee: | 62,998.98 |
| (D)(2)(T)(2) | Unpaid Administrative Expenses from clause (B): | - |
| (D)(2)(T)(2)(1)(i) | Fees, indemnities and expenses payable to the Trustee (pro rata): | - |
| (D)(2)(T)(2)(1)(ii) | Fees, indemnities and expenses payable to the Bank (pro rata): | - |
| (D)(2)(T)(2)(1)(iii) | Fees, indemnities and expenses payable to the Collateral Administrator (pro rata): | - |
| (D)(2)(T)(2)(2)(i) | Fees and expenses payable to the Independent accountants, agents and counsel of the Issuer and any ETB Subsidiary (pro rata): | - |
| (D)(2)(T)(2)(2)(ii) | Fees and expenses payable to the Rating Agencies (pro rata): | - |
| (D)(2)(T)(2)(2)(iii) | Fees and expenses payable to any Person in respect of Petition Expenses (pro rata): | - |
| (D)(2)(T)(2)(2)(iv) | Fees and expenses payable to the Portfolio Manager (pro rata): | - |
| (D)(2)(T)(2)(2)(v) | Fees and expenses payable to the Administrator (pro rata): | - |
| (D)(2)(T)(2)(2)(vi) | Fees and expenses permitted to any other Person (pro rata): | 473,166.21 |
| (D)(2)(T)(3) | to the payment of any expenses incurred in connection with a Refinancing: | - |
| (D)(2)(U) | Unpaid amounts due to any Hedge Counterparty pursuant to an early termination (or partial termination) from Clause (G): | - |
| (E) | During the Reinvestment Period, to invest in Eligible Investments and/or add'l Collateral Obligations: | - |
| (F) | After the Reinvestment Period, payments in accordance with the Note Payment Sequence: | - |
| (F)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (F)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (F)(iii) | to the payment of principal of the Class B Notes: | - |
| (F)(iv) | to the payment of principal of the Class C1 Notes (pro rata): | - |
| (F)(v) | to the payment of principal of the Class C2 Notes (pro rata): | - |
| (F)(vi) | to the payment of principal of the Class D Notes: | - |

*The available Principal Proceeds excludes amounts held in reserve

# ACIS CLO 2014-5, LLC

## Distribution Detail

As of Date: 06/23/2021
Payment Date: 06/24/2021

| Code | Description | Amount |
|---|---|---|
| (F)(vii) | to the payment of principal of the Class E1 Notes (pro rata); | - |
| (F)(viii) | to the payment of principal of the Class E2 Notes (pro rata); | - |
| (G)(1) | Accrued and unpaid Subordinated Management Fee: | - |
| (G)(2) | Unpaid Administrative Expenses: | - |
| (G)(2)(1)(i) | Fees, indemnities and expenses payable to the Trustee (pro rata); | - |
| (G)(2)(1)(ii) | Fees, indemnities and expenses payable to the Bank (pro rata); | - |
| (G)(2)(1)(iii) | Fees, indemnities and expenses payable to the Collateral Administrator (pro rata); | - |
| (G)(2)(2)(i) | Fees and expenses payable to the Independent accountants, agents and counsel of the Issuer and any ETB Subsidiary (pro rata); | - |
| (G)(2)(2)(ii) | Fees and expenses payable to the Rating Agencies (pro rata); | - |
| (G)(2)(2)(iii) | Fees and expenses payable to any Person in respect of Petition Expenses (pro rata); | - |
| (G)(2)(2)(iv) | Fees and expenses payable to the Portfolio Manager (pro rata); | - |
| (G)(2)(2)(v) | Fees and expenses payable to the Administrator (pro rata); | - |
| (G)(2)(2)(vi) | Fees and expenses permitted to any other Person (pro rata); | - |
| (H) | Unpaid amounts due to any Hedge Counterparty pursuant to an early termination (or partial termination); | - |
| (I) | To the Holders of the Subordinated Notes in an amount necessary to satisfy a 10% IRR : | 882,267.70 |
| (J)(i) | 15% of any remaining Interest Proceeds to the PM as part of the Incentive Management Fee: | - |
| (J)(ii) | 85% of any remaining Interest Proceeds to the Holders of the Subordinated Notes: | - |

**Total: 138,890,383.46**

Balance in the Principal Account after the Payment Date    0.00

---

**Total: 847,327.84**

Balance in the Interest Account after the Payment Date    0.00

*The available Principal Proceeds excludes amounts held in reserve



# ACIS CLO 2014-5, LLC

## Proceeds Account Summary

As of Date: 06/23/2021
Payment Date: 06/24/2021

### Accounts Summary

| Account | Beginning Balance | Deposits | Withdrawals | Ending Balance |
|---|---|---|---|---|
| Collection - Interest | 537,681.99 | 340,157.12 | 30,511.27 | 847,327.84 |
| Collection - Principal | 6,486,059.81 | 143,908,371.93 | 4,048.28 | 150,390,383.46 |
| Custodial | 0.00 | 0.00 | 0.00 | 0.00 |
| Expense Reserve | 0.00 | 0.00 | 0.00 | 0.00 |
| Hedge | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Reserve | 0.00 | 0.00 | 0.00 | 0.00 |
| Payment | 0.00 | 0.00 | 0.00 | 0.00 |
| Ramp-Up | 0.00 | 0.00 | 0.00 | 0.00 |
| Revolver Funding | 0.00 | 0.00 | 0.00 | 0.00 |
| Supplemental Reserve | 0.00 | 0.00 | 0.00 | 0.00 |
| **Totals:** | **7,023,741.80** | **144,248,529.05** | **34,559.55** | **151,237,711.30** |

### Asset Summary

| | |
|---|---|
| Balance of Collection: | 151,237,711.28 |
| Balance of Custodial: | 0.00 |
| Balance of Expense Reserve: | 0.00 |
| Balance of Hedge: | 0.00 |
| Balance of Interest Reserve: | 0.00 |
| Balance of Payment: | 0.00 |
| Balance of Ramp-Up: | 0.00 |
| Balance of Revolver Funding: | 0.00 |
| Balance of Supplemental Reserve: | 0.00 |
| **Total of All Proceeds:** | **151,237,711.28** |

Account Summary: Based on Settlement Date
Asset Summary: Based on Trade Date



## ACIS CLO 2014-5, LLC

### Current Asset Characteristics - Part I

As of Date: 06/23/2021
Payment Date: 06/24/2021

| Security I.D. | Security Description | Issuer / Obligor | Stated Maturity | Current Coupon | Funded Balance | Unfunded Balance | Total Commitment | % of Collateral Principal Amount |
|---|---|---|---|---|---|---|---|---|
| LX153860 | Revlon Consumer Products T/L B (Initial) | Revlon Consumer Products Corporation | 07-Sep-23 | 4.25000% | 2,756,812.33 | - | 2,756,812.33 | 1.72% |
| LX158094 | Sinclair Television T/L B2 | Sinclair Television Group, Inc. | 03-Jan-24 | 2.35000% | 753,195.84 | - | 753,195.84 | 0.47% |
| LX171276 | Syniverse Holdings T/L (01/18) | Syniverse Holdings, Inc. | 09-Mar-23 | 6.00000% | 6,653,247.81 | - | 6,653,247.81 | 4.14% |
| **Totals:** | **3** | | | | **10,163,255.98** | **-** | **10,163,255.98** | |

# ACIS CLO 2014-5, LLC

## Equity Securities

As of Date: 06/23/2021
Payment Date: 06/24/2021

| Security ID | Security Description | Asset Description | # of Units/Shares |
|---|---|---|---|
| 8AMCSCZX4 | Sabine Oil & Gas C/S | Equity | 5.00 |
| 8AMCSF0Z0 | Wayne Services Legacy - C/S | Equity | 635.89 |

**Totals:** 2



## ACIS CLO 2014-5, LLC

**Disclaimer**

As of Date: 06/23/2021
Payment Date: 06/24/2021

The information contained in this report is for general information only and has been obtained primarily from third party providers. The information is believed to be reliable, but is not guaranteed as to accuracy or completeness. U.S. Bank is not responsible for and does not guarantee the products, services or performance of its affiliates or third party providers. This information is not intended to serve as a recommendation or solicitation for the purchase or sale of any particular product or service. It is not intended to be a forecast of future events or guarantee of future results and should not be used as a primary basis of investment decisions.





**ACIS CLO 2015-6 Ltd.**

Redemption Report
As of June 23, 2021



Global Corporate Trust
*www.usbank.com/cdo*



# ACIS CLO 2015-6, Ltd.

## Table of Contents

As of Date: 06/23/2021
Payment Date: 06/24/2021

| Report Name | Page |
|---|---|
| Distribution Summary | 3 |
| Distribution Detail | 4 |
| Assets: Sold | 8 |
| Proceeds Account Summary | 9 |

| Report Name | Page |
|---|---|
| Current Asset Characteristics - Part I | 10 |
| Equity Securities | 11 |
| Disclaimer | 12 |



450



# ACIS CLO 2015-6, Ltd.

## Distribution Summary

As of Date: 06/23/2021
Payment Date: 06/24/2021

Current Libor: 0.175630%

| Note / CUSIP | Original Face Value Per $1000 | Opening Balance % of Orig Bal Per $1000 | Principal Payment Per $1000 | Principal Adj. or Loss Per $1000 | Closing Balance % of Orig Bal Per $1000 | Accrued Interest Due Per $1000 | Repayment of Deferred Interest Per $1000 | Total Interest Payment Per $1000 | Interest Rate Curr/Next |
|---|---|---|---|---|---|---|---|---|---|
| Class A-1 00452PAA5 / US00074WAA11 / G0074WAA1 | 300,000,000.00 | - - % | - | - | - - % | - | - | - | 1.765630000% |
| Class A-2 00452PAD9 / US00074WAB93 / G0074WAB9 | 47,000,000.00 | - - % | - | - | - - % | - | - | - | 3.367000000% |
| Class B-1 00452PAG2 / US00074WAC76 / G0074WAC7 | 75,000,000.00 | 58,343,288.95 777.910519326 77.79% | 58,343,288.95 777.910519326 | - | - - % | 223,799.61 2.983994800 | - | 223,799.61 2.983994800 | 2.655630000% |
| Class B-2 00452PAK3 / US00074WAD59 / G0074WAD5 | 14,000,000.00 | 10,890,747.27 777.910519326 77.79% | 10,890,747.27 777.910519326 | - | - - % | 70,948.68 5.067762857 | - | 70,948.68 5.067762857 | 4.425000000% |
| Class C 00452PAN7 / US00074WAE33 / G0074WAE3 | 31,500,000.00 | 31,500,000.00 1000.000000000 100.00% | 31,500,000.00 1000.000000000 | - | - - % | 161,326.17 5.121465714 | - | 161,326.17 5.121465714 | 3.545630000% |
| Class D 00452PAR8 / US00074WAF08 / G0074WAF0 | 25,000,000.00 | 25,000,000.00 1000.000000000 100.00% | 25,000,000.00 1000.000000000 | - | - - % | 142,481.08 5.699243200 | - | 142,481.08 5.699243200 | 3.945630000% |
| Class E 00452AA2 / US00746AA82 / G00746AA8 | 26,000,000.00 | 26,000,000.00 1000.000000000 100.00% | 26,000,000.00 1000.000000000 | - | - - % | 212,775.88 8.183687692 | - | 212,775.88 8.183687692 | 5.665630000% |
| Subordinated 00452AD6 / US00746AB65 / G00746AB6 | 59,850,000.00 | 59,850,000.00 1000.000000000 100.00% | 59,850,000.00 1000.000000000 | - | 59,850,000.00 1000.000000000 100.00% | - | - | - | % |
| **Totals:** | 578,350,000.00 | 211,584,036.22 | 151,734,036.22 | 0.00 | 59,850,000.00 | 811,331.42 | 0.00 | 811,331.42 | |



## ACIS CLO 2015-6, Ltd.

### Distribution Detail

As of Date: 06/23/2021
Payment Date: 06/24/2021



| Priority | Payable to: | Amount | Priority | Payable to: | Amount |
|---|---|---|---|---|---|
| | **Available Interest Proceeds:** | **812,798.37** | | **Available Redemption Monies:** | **152,084,496.92** |
| (A) | Taxes, governmental fees and registered office fees owing by the Issuer or Co-Issuer: | - | (A)(A) | Taxes, governmental fees and registered office fees owing by the Issuer or Co-Issuer: | - |
| (B) | Accrued and Unpaid Administrative Expenses up to the Administrative Expense Cap: | - | (A)(B) | Accrued and Unpaid Administrative Expenses up to the Administrative Expense Cap: | - |
| (B)(1)(i) | Fees, indemnities and expenses payable to the Trustee (pro rata): | 5,067.49 | (A)(B)(1)(i) | Fees, indemnities and expenses payable to the Trustee (pro rata): | - |
| (B)(1)(ii) | Fees, indemnities and expenses payable to the Bank (pro rata): | - | (A)(B)(1)(ii) | Fees, indemnities and expenses payable to the Bank (pro rata): | - |
| (B)(1)(iii) | Fees, indemnities and expenses payable to the Collateral Administrator (pro rata): | - | (A)(B)(1)(iii) | Fees, indemnities and expenses payable to the Collateral Administrator (pro rata): | - |
| (B)(2)(i) | Fees and expenses payable to the Independent accountants, agents and counsel of the Issuer and any ETB Subsidiary (pro rata): | - | (A)(B)(2)(i) | Fees and expenses payable to the Independent accountants, agents and counsel of the Issuer and any ETB Subsidiary (pro rata): | - |
| (B)(2)(ii) | Fees and expenses payable to the Rating Agencies (pro rata): | - | (A)(B)(2)(ii) | Fees and expenses payable to the Rating Agencies (pro rata): | - |
| (B)(2)(iii) | Fees and expenses payable to any Person in respect of Petition Expenses (pro rata): | - | (A)(B)(2)(iii) | Fees and expenses payable to any Person in respect of Petition Expenses (pro rata): | - |
| (B)(2)(iv) | Fees and expenses payable to the Portfolio Manager (pro rata): | - | (A)(B)(2)(iv) | Fees and expenses payable to the Portfolio Manager (pro rata): | - |
| (B)(2)(v) | Fees and expenses payable to the Administrator (pro rata): | - | (A)(B)(2)(v) | Fees and expenses payable to the Administrator (pro rata): | - |
| (B)(2)(vi) | Fees and expenses permitted to any other Person (pro rata): | - | (A)(B)(2)(vi) | Fees and expenses permitted to any other Person (pro rata): | - |
| (C) | Senior Management Fee: | 36,856.31 | (A)(C) | Senior Management Fee: | - |
| (D) | Amounts due to any Hedge Counterparty, excluding amounts due from termination (or partial termination): | 48,803.52 | (A)(D) | Amounts due to any Hedge Counterparty, excluding amounts due from termination (or partial termination): | - |
| (E)(1) | Accrued and unpaid interest on the Class A1 Notes (pro rata): | - | (A)(E)(1) | Accrued and unpaid interest on the Class A1 Notes (pro rata): | - |
| (E)(2) | Accrued and unpaid interest on the Class A2 Notes (pro rata): | - | (A)(E)(2) | Accrued and unpaid interest on the Class A2 Notes (pro rata): | - |
| (F)(1) | Accrued and unpaid interest on the Class B1 Notes (pro rata): | 223,799.61 | (A)(F)(1) | Accrued and unpaid interest on the Class B1 Notes (pro rata): | - |
| (F)(2) | Accrued and unpaid interest on the Class B2 Notes (pro rata): | 70,948.68 | (A)(F)(2) | Accrued and unpaid interest on the Class B2 Notes (pro rata): | - |
| (G) | Amounts due to any Hedge Counterparty pursuant to an early termination (or partial termination): | - | (A)(G) | Amounts due to any Hedge Counterparty pursuant to an early termination (or partial termination): | - |
| (H) | If either of the Class A/B Coverage Tests is not satisfied: | - | (A)(H) | If either of the Class A/B Coverage Tests is not satisfied: | - |
| (H)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - | (A)(H)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (H)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - | (A)(H)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (H)(iii) | to the payment of principal of the Class B1 Notes (pro rata): | - | (A)(H)(iii) | to the payment of principal of the Class B1 Notes (pro rata): | - |
| (H)(iv) | to the payment of principal of the Class B2 Notes (pro rata): | - | (A)(H)(iv) | to the payment of principal of the Class B2 Notes (pro rata): | - |
| (I)(i) | Accrued and unpaid interest on the Class C Notes: | 161,326.17 | (B)(I)(i) | Accrued and unpaid interest on the Class C Notes: | - |
| (J)(i) | Class C Deferred Interest: | - | (B)(J)(i) | Class C Deferred Interest: | - |
| (K) | If either of the Class C Coverage Tests is not satisfied: | - | (B)(K) | If either of the Class C Coverage Tests is not satisfied: | - |
| (K)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - | (B)(K)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (K)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - | (B)(K)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (K)(iii) | to the payment of principal of the Class B1 Notes (pro rata): | - | (B)(K)(iii) | to the payment of principal of the Class B1 Notes (pro rata): | - |

*The available Principal Proceeds excludes amounts held in reserve

# ACIS CLO 2015-6, Ltd.

## Distribution Detail

As of Date: 06/23/2021
Payment Date: 06/24/2021

| Code | Description | Amount |
|---|---|---|
| (K)(iv) | to the payment of principal of the Class B2 Notes (pro rata): | - |
| (K)(v) | to the payment of principal of the Class C Notes: | - |
| (L) | Accrued and unpaid interest on the Class D Notes: | 142,481.08 |
| (M) | Class D Deferred Interest | - |
| (N) | If either of the Class D Coverage Tests is not satisfied: | |
| (N)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (N)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (N)(iii) | to the payment of principal of the Class B1 Notes (pro rata): | - |
| (N)(iv) | to the payment of principal of the Class B2 Notes (pro rata): | - |
| (N)(v) | to the payment of principal of the Class C Notes: | - |
| (N)(vi) | to the payment of principal of the Class D Notes: | - |
| (O)(i) | Accrued and unpaid interest on the Class E Notes: | 123,515.51 |
| (P)(i) | Class E Deferred Interest: | - |
| (Q) | If either of the Class E Coverage Tests is not satisfied: | |
| (Q)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (Q)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (Q)(iii) | to the payment of principal of the Class B1 Notes (pro rata): | - |
| (Q)(iv) | to the payment of principal of the Class B2 Notes (pro rata): | - |
| (Q)(v) | to the payment of principal of the Class C Notes: | - |
| (Q)(vi) | to the payment of principal of the Class D Notes: | - |
| (Q)(vii) | to the payment of principal of the Class E Notes: | - |
| (R) | If Effective Date Ratings Confirmation has not been obtained: | |
| (R)(x)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (R)(x)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (R)(x)(iii) | to the payment of principal of the Class B1 Notes (pro rata): | - |
| (R)(x)(iv) | to the payment of principal of the Class B2 Notes (pro rata): | - |
| (R)(x)(v) | to the payment of principal of the Class C Notes: | - |
| (R)(x)(vi) | to the payment of principal of the Class D Notes: | - |
| (R)(x)(vii) | to the payment of principal of the Class E Notes: | - |
| (S) | During the Reinvestment Period, if the Interest Reinvestment Test is not satisfied, the lesser of: | |
| (S)(i) | 50% of the remaining Interest Proceeds: | - |
| (S)(ii)(1) | Discretion of PM, amount that would satisfy test to the Collection Acct. as Prin Proceeds to purchase add'l Collateral: | - |
| (S)(ii)(2) | or, to the payment of principal on the Secured Notes: | - |
| (S)(ii)(2)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |

| Code | Description | Amount |
|---|---|---|
| (B)(K)(iv) | to the payment of principal of the Class B2 Notes (pro rata): | - |
| (B)(K)(v) | to the payment of principal of the Class C Notes: | - |
| (B)(L) | Accrued and unpaid interest on the Class D Notes: | - |
| (B)(M) | Class D Deferred Interest | - |
| (B)(N) | If either of the Class D Coverage Tests is not satisfied: | |
| (B)(N)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (B)(N)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (B)(N)(iii) | to the payment of principal of the Class B1 Notes (pro rata): | - |
| (B)(N)(iv) | to the payment of principal of the Class B2 Notes (pro rata): | - |
| (B)(N)(v) | to the payment of principal of the Class C Notes: | - |
| (B)(N)(vi) | to the payment of principal of the Class D Notes: | - |
| (B)(O)(i) | Accrued and unpaid interest on the Class E Notes: | - |
| (B)(P)(i) | Class E Deferred Interest: | - |
| (B)(Q) | If either of the Class E Coverage Tests is not satisfied: | |
| (B)(Q)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (B)(Q)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (B)(Q)(iii) | to the payment of principal of the Class B1 Notes (pro rata): | - |
| (B)(Q)(iv) | to the payment of principal of the Class B2 Notes (pro rata): | - |
| (B)(Q)(v) | to the payment of principal of the Class C Notes: | - |
| (B)(Q)(vi) | to the payment of principal of the Class D Notes: | - |
| (B)(Q)(vii) | to the payment of principal of the Class E Notes: | - |
| (C) | On a Special Redemption Date, payments in accordance with the Note Payment Sequence: | |
| (C)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (C)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (C)(iii) | to the payment of principal of the Class B1 Notes (pro rata): | - |
| (C)(iv) | to the payment of principal of the Class B2 Notes (pro rata): | - |
| (C)(v) | to the payment of principal of the Class C Notes: | - |
| (C)(vi) | to the payment of principal of the Class D Notes: | - |
| (C)(vii) | to the payment of principal of the Class E Notes: | - |
| (D)(1) | On a Redemption Date, payments in accordance with the Note Payment Sequence: | |
| (D)(1)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (D)(1)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (D)(1)(iii) | to the payment of principal of the Class B1 Notes (pro rata): | 58,343,288.95 |
| (D)(1)(iv) | to the payment of principal of the Class B2 Notes (pro rata): | 10,890,747.27 |

*The available Principal Proceeds excludes amounts held in reserve

# ACIS CLO 2015-6, Ltd.

## Distribution Detail

As of Date: 06/23/2021
Payment Date: 06/24/2021

| Code | Description | Amount | Code | Description | Amount |
|---|---|---|---|---|---|
| (S)(ii)(2)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - | (D)(1)(v) | to the payment of principal of the Class C Notes: | 31,500,000.00 |
| (S)(ii)(2)(iii) | to the payment of principal of the Class B1 Notes (pro rata): | - | (D)(1)(vi) | to the payment of principal of the Class D Notes: | 25,000,000.00 |
| (S)(ii)(2)(iv) | to the payment of principal of the Class B2 Notes (pro rata): | - | (D)(1)(vii) | to the payment of principal of the Class E Notes: | 26,089,260.37 |
| (S)(ii)(2)(v) | to the payment of principal of the Class C Notes: | - | (D)(2) | On a Redemption Date, payments under clauses (T) and (U) of Section 11.1(a)(i): | - |
| (S)(ii)(2)(vi) | to the payment of principal of the Class D Notes: | - | (D)(2)(T)(1) | Accrued and unpaid Subordinated Management Fee: | 81,339.20 |
| (S)(ii)(2)(vii) | to the payment of principal of the Class E Notes: | - | (D)(2)(T)(2) | Unpaid Administrative Expenses from clause (B): | - |
| (T)(1) | Accrued and unpaid Subordinated Management Fee: | - | (D)(2)(T)(2)(1)(i) | Fees, indemnities and expenses payable to the Trustee (pro rata): | - |
| (T)(2) | Unpaid Administrative Expenses from clause (B): | - | (D)(2)(T)(2)(1)(ii) | Fees, indemnities and expenses payable to the Bank (pro rata): | - |
| (T)(2)(1)(i) | Fees, indemnities and expenses payable to the Trustee (pro rata): | - | (D)(2)(T)(2)(1)(iii) | Fees, indemnities and expenses payable to the Collateral Administrator (pro rata): | - |
| (T)(2)(1)(ii) | Fees, indemnities and expenses payable to the Bank (pro rata): | - | (D)(2)(T)(2)(2)(i) | Fees and expenses payable to the Independent accountants, agents and counsel of the Issuer and any ETB Subsidiary (pro rata): | - |
| (T)(2)(1)(iii) | Fees, indemnities and expenses payable to the Collateral Administrator (pro rata): | - | (D)(2)(T)(2)(2)(ii) | Fees and expenses payable to the Rating Agencies (pro rata): | - |
| (T)(2)(2)(i) | Fees and expenses payable to the Independent accountants, agents and counsel of the Issuer and any ETB Subsidiary (pro rata): | - | (D)(2)(T)(2)(2)(iii) | Fees and expenses payable to any Person in respect of Petition Expenses (pro rata): | - |
| (T)(2)(2)(ii) | Fees and expenses payable to the Rating Agencies (pro rata): | - | (D)(2)(T)(2)(2)(iv) | Fees and expenses payable to the Portfolio Manager (pro rata): | - |
| (T)(2)(2)(iii) | Fees and expenses payable to any Person in respect of Petition Expenses (pro rata): | - | (D)(2)(T)(2)(2)(v) | Fees and expenses payable to the Administrator (pro rata): | - |
| (T)(2)(2)(iv) | Fees and expenses payable to the Portfolio Manager (pro rata): | - | (D)(2)(T)(2)(2)(vi) | Fees and expenses permitted to any other Person (pro rata): | 179,861.13 |
| (T)(2)(2)(v) | Fees and expenses payable to the Administrator (pro rata): | - | (D)(2)(T)(3) | to the payment of any expenses incurred in connection with a Refinancing: | - |
| (T)(2)(2)(vi) | Fees and expenses permitted to any other Person (pro rata): | - | (D)(2)(U) | Unpaid amounts due to any Hedge Counterparty pursuant to an early termination (or partial termination) from Clause (G) : | - |
| (T)(3) | to the payment of any expenses incurred in connection with a Refinancing: | - | (E)(1) | During the Reinvestment Period, to invest in Eligible Investments and/or add'l Collateral Obligations: | - |
| (U) | Unpaid amounts due to any Hedge Counterparty pursuant to an early termination (or partial termination) from Clause (G) : | - | (E)(2) | After the Reinvestment Period, to invest in Eligible Investments and/or add'l Collateral Obligations: | - |
| (V) | for deposit into the Supplemental Reserve Account: | - | (F) | After the Reinvestment Period, payments in accordance with the Note Payment Sequence: | - |
| (W) | To the Holders of the Subordinated Notes in an amount necessary to satisfy a 10% IRR : | - | (F)(i) | to the payment of principal of the Class A1 Notes (pro rata): | - |
| (X)(i) | 15% of any remaining Interest Proceeds to the PM as part of the Incentive Management Fee: | - | (F)(ii) | to the payment of principal of the Class A2 Notes (pro rata): | - |
| (X)(ii) | 85% of any remaining Interest Proceeds to the Holders of the Subordinated Notes: | - | (F)(iii) | to the payment of principal of the Class B1 Notes (pro rata): | - |
| | | | (F)(iv) | to the payment of principal of the Class B2 Notes (pro rata): | - |
| | | | (F)(v) | to the payment of principal of the Class C Notes: | - |
| | | | (F)(vi) | to the payment of principal of the Class D Notes: | - |
| | | | (F)(vii) | to the payment of principal of the Class E Notes: | - |
| | | | (G)(1) | Accrued and unpaid Subordinated Management Fee: | - |
| | | | (G)(2) | Unpaid Administrative Expenses: | - |
| | | | (G)(2)(1)(i) | Fees, indemnities and expenses payable to the Trustee (pro rata): | - |

*The available Principal Proceeds excludes amounts held in reserve

## ACIS CLO 2015-6, Ltd.

### Distribution Detail

As of Date: 06/23/2021
Payment Date: 06/24/2021

| Ref | Description | Amount |
|---|---|---|
| (G)(2)(1)(ii) | Fees, indemnities and expenses payable to the Bank (pro rata); | - |
| (G)(2)(1)(iii) | Fees, indemnities and expenses payable to the Collateral Administrator (pro rata); | - |
| (G)(2)(2)(i) | Fees and expenses payable to the Independent accountants, agents and counsel of the Issuer and any ETB Subsidiary (pro rata); | - |
| (G)(2)(2)(ii) | Fees and expenses payable to the Rating Agencies (pro rata); | - |
| (G)(2)(2)(iii) | Fees and expenses payable to any Person in respect of Petition Expenses (pro rata); | - |
| (G)(2)(2)(iv) | Fees and expenses payable to the Portfolio Manager (pro rata); | - |
| (G)(2)(2)(v) | Fees and expenses payable to the Administrator (pro rata); | - |
| (G)(2)(2)(vi) | Fees and expenses permitted to any other Person (pro rata); | - |
| (H) | Unpaid amounts due to any Hedge Counterparty pursuant to an early termination (or partial termination); | - |
| (I) | To the Holders of the Subordinated Notes in an amount necessary to satisfy a 10% IRR ; | - |
| (J)(i) | 15% of any remaining Interest Proceeds to the PM as part of the Incentive Management Fee; | - |
| (J)(ii) | 85% of any remaining Interest Proceeds to the Holders of the Subordinated Notes; | - |

**Total:** 152,084,496.92

Balance in the Principal Account after the Payment Date 0.00

**Total:** 812,798.37

Balance in the Interest Account after the Payment Date 0.00

*The available Principal Proceeds excludes amounts held in reserve




# ACIS CLO 2015-6, Ltd.

## Assets: Sold

As of Date: 06/23/2021
Payment Date: 06/24/2021

| Security I.D. | Security Description | Primary Asset Type | Par Amount | Sale Price | Cost | Reason For Sale | Trade Date |
|---|---|---|---|---|---|---|---|
| LX179151 | Premier Brands T/L (3/19) (Nine West Holdings) | Term Loan | 945,135.75 | 68.0000 | 642,692.31 | Credit Risk | 16-Jun-21 |
| **Total:** | **1** | | **945,135.75** | | **642,692.31** | | |

**Assets: Sold**

**U.S. Bank Global Corporate Trust**
**www.usbank.com/cdo**

Page 8 of 12



# ACIS CLO 2015-6, Ltd.

## Proceeds Account Summary

As of Date: 06/23/2021
Payment Date: 06/24/2021

### Accounts Summary

| Account | Beginning Balance | Deposits | Withdrawals | Ending Balance |
|---|---|---|---|---|
| Collection - Interest | 544,878.60 | 313,722.42 | 45,802.65 | 812,798.37 |
| Collection - Principal | 13,465,472.69 | 149,333,314.34 | 18,653.70 | 162,780,133.33 |
| Custodial | 0.00 | 0.00 | 0.00 | 0.00 |
| Expense Reserve | 0.00 | 0.00 | 0.00 | 0.00 |
| Hedge | 0.00 | 0.00 | 0.00 | 0.00 |
| Interest Reserve | 0.00 | 0.00 | 0.00 | 0.00 |
| Payment | 0.00 | 0.00 | 0.00 | 0.00 |
| Ramp-Up | 0.00 | 0.00 | 0.00 | 0.00 |
| Revolver Funding | 0.00 | 0.00 | 0.00 | 0.00 |
| **Totals:** | **14,010,351.29** | **149,647,036.76** | **64,456.35** | **163,592,931.70** |

### Asset Summary

| | |
|---|---|
| Balance of Collection: | 167,087,388.25 |
| Balance of Custodial: | 0.00 |
| Balance of Expense Reserve: | 0.00 |
| Balance of Hedge: | 0.00 |
| Balance of Interest Reserve: | 0.00 |
| Balance of Payment: | 0.00 |
| Balance of Ramp-Up: | 0.00 |
| Balance of Revolver Funding: | 0.00 |
| **Total of All Proceeds:** | **167,087,388.25** |

Account Summary: Based on Settlement Date
Asset Summary: Based on Trade Date



# ACIS CLO 2015-6, Ltd.

## Current Asset Characteristics - Part I

As of Date: 06/23/2021
Payment Date: 06/24/2021

| Security I.D. | Issuer / Obligor | Security Description | Stated Maturity | Current Coupon | Funded Balance | Unfunded Balance | Total Commitment | % of Collateral Principal Amount |
|---|---|---|---|---|---|---|---|---|
| LX158094 | Sinclair Television Group, Inc. | Sinclair Television T/L B2 | 03-Jan-24 | 2.35000% | 901,571.47 | - | 901,571.47 | 0.53% |
| LX171276 | Syniverse Holdings, Inc. | Syniverse Holdings T/L (01/18) | 09-Mar-23 | 6.00000% | 4,104,785.86 | - | 4,104,785.86 | 2.40% |
| **Totals:** | **2** | | | | **5,006,357.33** | **-** | **5,006,357.33** | |

## ACIS CLO 2015-6, Ltd.

### Equity Securities

As of Date: 06/23/2021
Payment Date: 06/24/2021

| LoanX ID | Security Description | Asset Description | # of Units/Shares |
|---|---|---|---|
| 45174J608 | IHeartCommunications - Class B C/S | Equity | 85.00 |
| 8AMCSF0Z0 | Wayne Services Legacy - C/S | Equity | 718.52 |

| Totals: | 2 |
|---|---|



# ACIS CLO 2015-6, Ltd.

**Disclaimer**

As of Date: 06/23/2021
Payment Date: 06/24/2021

The information contained in this report is for general information only and has been obtained primarily from third party providers. The information is believed to be reliable, but is not guaranteed as to accuracy or completeness. U.S. Bank is not responsible for and does not guarantee the products, services or performance of its affiliates or third party providers. This information is not intended to serve as a recommendation or solicitation for the purchase or sale of any particular product or service. It is not intended to be a forecast of future events or guarantee of future results and should not be used as a primary basis of investment decisions.

**Highland CLO Funding, Ltd.**
**(registered in Guernsey with registration number 60120)**
**Registered Office: PO Box 650, 1ˢᵗ Floor, Royal Chambers, St. Julian's Avenue,**
**St. Peter Port, Guernsey GY1 3JX**
**T: +44 1481 810 100   E: HighlandCLO@elysiumfundman.com**

Mr. Mark Patrick
Director
CLO Holdco, Ltd.
3839 McKinney Avenue
Suite 155, PMB 2484
Dallas, Texas 75204

23 July 2021

Re: Acis CLOs 2014-4, 2014-5, 2014-6 (the "Acis-CLOs")

Dear Mr. Patrick

On behalf of Highland CLO Funding, Ltd. (the "Fund"), we write to you in your capacity as Director of CLO Holdco, Ltd. with regard to your letter of yesterday, July 22, 2021.

The Fund is aware of the circumstances referred to in your letter regarding the referenced Acis-CLOs, and we have communicated with counsel for US Bank National Association ("US Bank"), as indenture trustee for each of the Acis-CLOs.  US Bank's counsel has advised that, in addition to what it described as a normal administrative reserves for expenses, US Bank is also holding reserves on each of the referenced Acis-CLOs on account of pending and threatened litigation, including litigation filed by NexPoint Strategic Opportunities Fund, and threatened litigation from CLO Holdco and the Charitable Donor Advisory Fund, L.P. We are currently consulting with legal advisors and the Fund's portfolio manager to determine the Fund's response to these events.

We intend to provide updates to all of the Fund's shareholders as we deal with the matter, as and when appropriate and as circumstances dictate.

Yours sincerely

Joanna Duquemin Nicolle
Director of Elysium Fund Management Limited
Corporate Secretary to
Highland CLO Funding, Ltd

**Regulated by the Guernsey Financial Services Commission, reference number 2265836**

# CAREY OLSEN

Carey Olsen (Guernsey) LLP
PO Box 98
Carey House
Les Banques
St Peter Port
Guernsey  GY1 4BZ
Channel Islands

T  +44 (0)1481 727272
F  +44 (0)1481 711052
E  guernsey@careyolsen.com

| Our ref | TC//1066695/0005/G13448784v1 |
| Your ref | Advocate Tim Clipstone |

Advocate Tim Clipstone                                           26 October 2021
Partner
Ogier (Guernsey) LLP
Redwood House
St. Julian's Avenue
St. Peter Port
Guernsey
GY1 1WA

**By Email Only:** tim.clipstone@ogier.com

Dear Sir

**Highland CLO Funding, Ltd.**

This firm is Guernsey legal counsel to Highland CLO Funding, Ltd. (the "**Company**"). This letter adopts the defined terms appearing in your Advocate Clipstone's email timed at 13.43hrs on Wednesday 20 October 2021 to, *inter alios*, the directors of the Company, receipt of which is hereby acknowledged. We note that you "*act as*" Guernsey legal counsel to CLO Holdco, Ltd., which holds 49.02% of the issued share capital in the Company (hereafter as the context permits "**CLO Holdco**" or the "**Shareholder**").

We make the following prefatory observations.

First, your email is addressed to the directors of the Company and makes demands of them *qua* director ("*we … write to you, in your capacity as directors of the Company, to make a further formal request for the information …*"). Your client's limited, statutory entitlements to information from the Company are as against the Company, and not as against the directors in that capacity. The directors do not accept any personal obligation or assumption of responsibility to CLO Holdco.

Second, in providing the following information to you, the Company does not waive legal professional privilege or the Company's attorney client privilege, including applicable privileges shared with its portfolio manager and its legal counsel in whatever jurisdiction. As such, the Company does not propose to provide details of legal advice, strategies and anticipated courses of action regarding the matters referenced below.

Third, US Bank's stated justification for retaining the CLO redemption proceeds at issue is premised on certain threatened litigation from CLO Holdco and certain other presently-filed litigation by Nexpoint Strategic Opportunities Fund, an apparent affiliate of your client which is represented by US counsel who also represents CLO Holdco in separate litigation in the United States, including litigation in which the Company is

**PARTNERS:** A Alexander  C Anderson  A Boyce  T Carey  R Clark  T Corfield  D Crosland  M Dunster  K Friedlaender  E Gray
D Jones  N Kapp  T Lane  K Le Cras  D Le Marquand  B Morgan  J Morgan  **CONSULTANTS:** N Carey  M Eades  J Greenfield  G Hall

The Guernsey limited liability partnership known as Carey Olsen (Guernsey) LLP is a limited liability partnership incorporated in Guernsey on 1 March 2018 with its registered office at Carey House, Les Banques, St Peter Port GY1 4BZ and registration number 95.

**BERMUDA  BRITISH VIRGIN ISLANDS  CAYMAN ISLANDS  GUERNSEY  JERSEY**
CAPE TOWN  HONG KONG  LONDON  SINGAPORE                                careyolsen.com

cited as a nominal defendant.  These facts clearly have a bearing on the appropriate level of detail that can be shared with your client.

Notwithstanding these issues, the Company provides the following responses, adopting the numbering of each of your requests by way of reply. In this respect, it is noted that the supposed basis for the information requests your client has made is to enable it to, "*make an effective assessment as to how certain matters raised in the redemption reports for each of Acis CLO 2014-4, Ltd., Acis CLO 2014-5, Ltd. and Acis CLO 2014-6, Ltd. and* [the Financial Statements] *impacts its interest in the Company*" (hereafter the "**Request Rationale**").

1.    In the United States, King & Spalding LLP is advising the Company on this matter. The Company is also consulting with its portfolio manager and its portfolio manager's legal counsel, Pachulski, Stang Ziehl & Jones ("**Pachulski**"). Pachulski has also been retained directly by the Company on certain issues relevant to this matter. The Company is evaluating the benefit of retaining additional U.S. counsel. The Company has retained this firm to advise it on matters of Guernsey law in connection with this matter.

2.    Yes.

3.    US Bank has explained its position on this matter openly and consistently. The Company disagrees with that position and has communicated that disagreement to US Bank.  The Company continues to consider and explore means to resolve this matter efficiently and inexpensively.

4.    Pachulski communicated with US Bank counsel on 21 October 2021 and counsel are expected to speak again on 27 October.

5.    The Company has taken advice from counsel and its portfolio manager on the legal and financial issues and other challenges presented by this matter. The Company continues to consider and explore means to resolve this matter efficiently and inexpensively.

6.    In addition to the prior written communications with CLO Holdco, the Company has communicated with, and taken advice from, its portfolio manager who is an affiliate of the holders of more than fifty percent of the Company's issued share capital.

7.    The Company, with advice from its counsel and its portfolio manager, continues to consider and explore means to resolve this matter efficiently and inexpensively.

8.    Legal remedies are among the options under active consideration by the Company.

9.    The Company has received legal and other advice from its counsel regarding the merits (to the Company, and by extension its shareholders) of various courses of action and has discussed these issues with the portfolio manager under a common interest.

10.   The Company has received legal advice from current counsel and has received additional views from prospective counsel. The Company continues to consider and explore means to resolve this matter efficiently and inexpensively.

11.   As noted, the Company, with advice from its counsel and in discussion with its portfolio manager, has identified multiple courses of action.  The selection of the most suitable course of action is subject to certain near-term future events and actions and responses of third parties. The Company is actively engaged and monitoring the developments relevant to this matter.

12.   See the response at 11 above.

13.   See the response at 11 above.

We question the propriety of these requests. It is unclear how these information requests advance or have any bearing on the Request Rationale.

Yours faithfully

**CAREY OLSEN (GUERNSEY) LLP**

**From:** Richard Boleat <richard.boleat@governancepartners.je>
**Sent:** Friday, December 3, 2021 12:37 PM
**To:** Paul Murphy <paul@gkmanagement.com.ky>
**Cc:** Richard Burwood <rmburwood@gmail.com>
**Subject:** Re: Possible call with PM - placeholder

Hi Paul, sorry it's taken a while.

Dicky and I have discussed your suggestion of an in-kind distribution from the underlying assets. As directors we are required to act in the company's best interests, which is separate to the best interests of one or more of the shareholders. With that in mind, we are unable at present to support an in-kind distribution for several reasons.

Firstly, dividing the ownership of the underlying CLOs into several smaller holdings would be detrimental to HCLOF in terms of losing powers or influence associated with its current majority holdings. For example, it is a matter of public record that HCLOF has filed an intervention motion in litigation pending in the United States District Court for the Southern District of New York predicated on HCLOF holding a supermajority of the Acis 6 notes. That intervention, which seeks to remove certain material impediments to HCLOF receiving cash distributions from the CLOs, would be compromised by a distribution in specie diluting HCLOF's holding of the notes. Even if an in specie distribution was not contrary to HCLOF's interests, it is not clear such a distribution would be feasible. The CLO indentures would need to be reviewed to determine whether in-kind distributions to the relevant transferees are compatible with all relevant terms, and we would also need to ensure that each of HCLOF's shareholders are able both to receive and then hold the CLOs in question (either from a tax/regulatory perspective or based on the terms of the CLOs themselves). These are not straightforward questions and it may be fatal if not all shareholders could readily accept an in specie distribution, or could only do so with some material prejudice.

In addition, this structure unfortunately has a history of hostile litigation that has had a serious impact on HCLOF's interests over the years, as we've discussed. Many of those issues have now been resolved, and it is one of our key

1

priorities to avoid or at least minimize further complications as far as practical. We do therefore have concerns that any changes to the status quo might prompt further contentious activity, potentially involving HCLOF, that would be damaging and costly for all parties.

If your query was in fact directed more generally to how distributions from HCLOF can be facilitated (whether by cash or otherwise), the most straightforward solution would be for all parties connected with the structure to agree to suitable mutual releases, which would remove the existing obstacle to a cash distribution in respect of the Acis 4 and 5 notes. To the extent that CLO Holdco would be able to procure a release from its affiliate NexPoint, that should unlock the situation with the Acis 6 notes. If CLO Holdco is willing to consider a solution in these terms, we would be happy to discuss further with you.

Best

Richard

**Richard Boléat**
**Partner**
**Governance Partners, L.P.**
e:   richard.boleat@governancepartners.je
m:  44 (0)7797 743000
t:   44 (0)1534 625522
a:   First Floor, 7 Bond Street, St Helier, Jersey JE2 3NP

Personally regulated by the Jersey Financial Services Commission. This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender as soon as possible and delete this message from your system.

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Date:** Friday, 3 December 2021 at 13:10
**To:** Richard Boleat <richard.boleat@governancepartners.je>, Richard Burwood <rmburwood@gmail.com>
**Subject:** Re: Possible call with PM - placeholder

Hi Richard,

Just checking on the status of the update.

Hope all is well,

Paul.

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Wednesday, December 1, 2021 8:07 AM
**To:** Richard Boleat <richard.boleat@governancepartners.je>; Richard Burwood <rmburwood@gmail.com>
**Subject:** Re: Possible call with PM - placeholder

 Hi Richard,

Thanks for the update and look forward to the response.

Paul.

**From:** Richard Boleat <richard.boleat@governancepartners.je>
**Sent:** Wednesday, December 1, 2021 1:33 AM
**To:** Paul Murphy <paul@gkmanagement.com.ky>; Richard Burwood <rmburwood@gmail.com>
**Subject:** Re: Possible call with PM - placeholder

2

Hello Paul, we have been doing our background work on this topic, which has involved a review of documents as well as examining legal considerations in the US. A response will be coming to you by close of business tomorrow.

Best wishes

Richard

Get Outlook for iOS

---

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Sunday, November 28, 2021 3:58:35 PM
**To:** Richard Boleat <richard.boleat@governancepartners.je>; Richard Burwood <rmburwood@gmail.com>
**Subject:** Re: Possible call with PM - placeholder

Hi Richard,

Apologies for the email on a Sunday but sometime tomorrow I wondered if you could let me know how things are progressing on the in-kind distribution.

Thanks and hope all is well,

Paul.

---

**From:** Richard Boleat <richard.boleat@governancepartners.je>
**Sent:** Thursday, November 18, 2021 8:21 AM
**To:** Paul Murphy <paul@gkmanagement.com.ky>; Richard Burwood <rmburwood@gmail.com>
**Subject:** Re: Possible call with PM - placeholder

Of course.

Richard Boleat
+44 7797 743000

---

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Thursday, November 18, 2021 1:19:05 PM
**To:** Richard Boleat <richard.boleat@governancepartners.je>; Richard Burwood <rmburwood@gmail.com>
**Subject:** Re: Possible call with PM - placeholder

Thanks Richard,

Let me know if you need anything from my end.

Paul

---

**From:** Richard Boleat <richard.boleat@governancepartners.je>
**Sent:** Thursday, November 18, 2021 8:16 AM
**To:** Paul Murphy <paul@gkmanagement.com.ky>; Richard Burwood <rmburwood@gmail.com>
**Subject:** Re: Possible call with PM - placeholder

Hello Paul - we're discussing this and having a chat about the mechanics with counsel. I wouldn't expect us to be in a position to have a meaningful discussion until into next week.

R

3

Richard Boleat
+44 7797 743000

---

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Thursday, November 18, 2021 1:13:51 PM
**To:** Richard Boleat <richard.boleat@governancepartners.je>; Richard Burwood <rmburwood@gmail.com>
**Subject:** Re: Possible call with PM - placeholder

Hi Richard,

hope all is well. Any thoughts on the in-kind distribution?

Thanks,

Paul.

---

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Friday, November 12, 2021 8:56 AM
**To:** Richard Boleat <richard.boleat@governancepartners.je>; Richard Burwood <rmburwood@gmail.com>
**Subject:** Re: Possible call with PM - placeholder

Thanks Richard, have a good weekend and let me know your thoughts next week.

Paul.

---

**From:** Richard Boleat <richard.boleat@governancepartners.je>
**Sent:** Friday, November 12, 2021 6:00 AM
**To:** Paul Murphy <paul@gkmanagement.com.ky>; Richard Burwood <rmburwood@gmail.com>
**Subject:** Re: Possible call with PM - placeholder

Hi Paul,

Dicky and I will be catching up over the weekend and we'll get back to you. Re your comments below, I'd refer you back to the recent correspondence between respective Guernsey counsels.

Best

Richard

**Richard Boléat**
**Partner**
**Governance Partners, L.P.**
e:  richard.boleat@governancepartners.je
m:  44 (0)7797 743000
t:  44 (0)1534 625522
a:  First Floor, 7 Bond Street, St Helier, Jersey JE2 3NP

Personally regulated by the Jersey Financial Services Commission. This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender as soon as possible and delete this message from your system.

---

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Date:** Wednesday, 10 November 2021 at 19:04
**To:** Richard Boleat <richard.boleat@governancepartners.je>, Richard Burwood <rmburwood@gmail.com>
**Subject:** Re: Possible call with PM - placeholder

4

Hi both,

Most importantly - Dicky, I hope you had a great birthday yesterday.

On to the other stuff, thanks for your time on the call yesterday. I've done some digging round with the folks from my end and the only action I could find that involved US Bank was the Newpoint Strategic Opportunities Fund action against ACIS and US Bank. Is this the only litigation you mentioned or is there another one I've missed?

Also, I couldn't see where the CLO HoldCo had threatened litigation. Again, perfectly possible that I've missed something or asked the wrong questions but was there anything specific you were thinking of.

Once I've cleared these things it will allow me to see what we can do from our side.

Separately, would an in-kind distribution from the underlying assets be on the cards?

Thanks,

Paul.


**From:** Richard Boleat <richard.boleat@governancepartners.je>
**Sent:** Tuesday, November 9, 2021 8:59 AM
**To:** Paul Murphy <paul@gkmanagement.com.ky>; Richard Burwood <rmburwood@gmail.com>
**Subject:** Re: Possible call with PM - placeholder

Understood.

Richard Boleat
+44 7797 743000

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Tuesday, November 9, 2021 1:56:38 PM
**To:** Richard Boleat <richard.boleat@governancepartners.je>; Richard Burwood <rmburwood@gmail.com>
**Subject:** Re: Possible call with PM - placeholder

Thanks Richard and not looking to do that.

My primary purpose is to introduce myself and let you know what my general thoughts are in relation to the fund and outline a few ideas I've had since coming on board. There's a lot of acrimony in this situation that HCLOF is caught in the middle of so, even if we have to hand this over to lawyers and engage in a contentious situation down the line, I'd much prefer to do it having spoken to you and at least explored whether we can build a rapport.

Speak soon,

Paul.

**From:** Richard Boleat <richard.boleat@governancepartners.je>
**Sent:** Tuesday, November 9, 2021 2:23 AM

5

**To:** Paul Murphy <paul@gkmanagement.com.ky>; Richard Burwood <rmburwood@gmail.com>
**Subject:** Re: Possible call with PM - placeholder

Hi Paul, I've sent an invite for 1730uk today. I hope that works.

You will be aware of the exchange of letters between Ogier, being Guernsey counsel for CLO Holdco and Carey Olsen, being Guernsey counsel for HCLOF, which took place recently. Just to manage your expectations for today's call, we do not have anything to add to the letter sent to Ogier on 26th October 2021 in response to CLO Holdco's enquiries as set out in Ogier's email of 20th October 2021, so it would not seem to be a good use of time today to revisit those matters.

Best wishes

Richard

**Richard Boléat**
**Partner**
**Governance Partners, L.P.**
e:   richard.boleat@governancepartners.je
m:  44 (0)7797 743000
t:   44 (0)1534 625522
a:   First Floor, 7 Bond Street, St Helier, Jersey JE2 3NP

Personally regulated by the Jersey Financial Services Commission. This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender as soon as possible and delete this message from your system.

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Date:** Monday, 8 November 2021 at 22:30
**To:** Richard Boleat <richard.boleat@governancepartners.je>, Richard Burwood <rmburwood@gmail.com>
**Subject:** Re: Possible call with PM - placeholder

Hi both,

I'm flexible tomorrow. Anytime from 1pm UK and I'll be in the office. Just let me know.

Paul.

**From:** Richard Boleat <richard.boleat@governancepartners.je>
**Sent:** Monday, November 8, 2021 5:39 AM
**To:** Richard Burwood <rmburwood@gmail.com>
**Cc:** Paul Murphy <paul@gkmanagement.com.ky>
**Subject:** Re: Possible call with PM - placeholder

1730uk?

**Richard Boléat**
**Partner**
**Governance Partners, L.P.**
e:   richard.boleat@governancepartners.je
m:  44 (0)7797 743000
t:   44 (0)1534 625522
a:   First Floor, 7 Bond Street, St Helier, Jersey JE2 3NP

Personally regulated by the Jersey Financial Services Commission. This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender as soon as possible and delete this message from your system.

**From:** Richard Burwood <rmburwood@gmail.com>
**Date:** Monday, 8 November 2021 at 10:37
**To:** Richard Boleat <richard.boleat@governancepartners.je>
**Cc:** Paul Murphy <paul@gkmanagement.com.ky>
**Subject:** Re: Possible call with PM - placeholder

Hi Richard,

Sorry, should have said, I can't do tomorrow evening I'm afraid - I have a dinner engagement.

Can you do anything earlier that day?

Dicky.

On 8 Nov 2021, at 10:35, Richard Boleat <richard.boleat@governancepartners.je> wrote:

_____

# Microsoft Teams meeting

**Join on your computer or mobile app**
Click here to join the meeting

**Or call in (audio only)**
+44 20 3855 5862,,958419969#  United Kingdom, London

Phone Conference ID: 958 419 969#
Find a local number | Reset PIN

Learn more | Meeting options

_____

<Mail Attachment.ics>

7

# CLO Holdco, Ltd.

300 Crescent Court, Suite 700, Dallas, Texas, 75201

**Highland CLO Funding, Ltd.**
1st Floor
Royal Chambers
St. Julian's Avenue
St. Peter Port
Guernsey
GY1 3JX

**D: +1 214 435 7943**
**E: mpatricktax1040@gmail.com**

**Highland Capital Management, L.P.**
300 Crescent Court, Suite 700
Dallas
Texas, 75201, USA

**Lee Blackwell Parker, III**
300 Crescent Court, Suite 700
Dallas
Texas, 75201, USA

**Quest IRA, Inc., FBO Lee B. Parker III, Acct. #3058311**
**Quest IRA, Inc., FBO Hunter Covitz, Acct. #1469811**
**Quest IRA, Inc., FBO Jon Poglitsh, Acct. #1470612**
**Quest IRA, Inc., FBO Neil Desai, Acct. #3059211**
17171 Park Row #100
Houston
Texas, 77084, USA

2 November 2021

Dear Sirs

**Appointment of a CLO Holdco Limited representative as a voting member of the Advisory Board of Highland CLO Funding, Ltd.**

We write to Highland CLO Funding, Ltd. (the **Company**), Highland Capital Management, L.P., both in its capacity as Portfolio Manager of the Company and as shareholder of the Company, and each of the Company's remaining shareholders in connection with the appointment of a representative of CLO Holdco Limited (**Holdco**) as a voting member of the Advisory Board of the Company pursuant to clause 4 of the members' agreement relating to the Company dated 15 November 2017 (the **Members' Agreement**).

Clause 4.1 of the Members' Agreement states that the Advisory Board shall be composed of two individuals, one of whom shall be a representative of Holdco. None of the Members' Agreement, the articles of incorporation of the Company, the prospectus of the Company nor any other agreement or document relating to the Company detail the procedure to be followed in connection with the appointment of a representative to the Advisory Board.

In the absence of any specific procedure for the appointment of a member to the Advisory Board, this notification shall constitute formal appointment of Paul Murphy as Holdco's representative on the Advisory Board with effect from the date hereof.

Full particulars of Holdco's representative on the Advisory Board are as follows:

| | |
|---|---|
| **Name** | Paul Murphy |
| **Email** | paul@gkmanagement.com.ky |
| **Telephone** | +1 345 749 7196 |
| **Contact address** | Charitable DAF Fund, L.P.<br>c/o Intertrust Corporate Services (Cayman) Limited<br>One Nexus Way<br>Camana Bay, George Town<br>Grand Cayman, KY1-9005<br>Cayman Islands |

We hereby instruct the directors of the Company to update the Company's books to reflect the appointment of Paul Murphy as a member of the Advisory Board and to direct all notices, correspondence, documents and any other matter relevant to the Advisory Board to Paul Murphy as Holdco's representative on the Advisory Board.

Yours faithfully

**for and on behalf of
CLO Holdco, Ltd.**

2                                                              BLAW-24909791-2

473

## COURIER

**DATE:** 03/11/2021

**FROM/FEE EARNER:** James Dickinson

**MATTER REFERENCE:** 182 801. 00001

**CONTACT/ADDRESS:** Lee Blackwell Parker, III
300 Crescent Court, Suite 700, Dallas, Texas, 75201, USA

**CONTACT TELEPHONE:** +1 (877) 665-1287

**CONTACT EMAIL ADDRESS:** info@highlandcapital.com

**CONTACT PERSON:** Lee Blackwell Parker, III

Thanks

[GST NAME]

35-49
Tracker 30614323465

Jo

1                                                 GUERNSEY-20923057-1

474

## COURIER

Sent 4/11/21

**DATE:** 03/11/2021

**FROM/FEE EARNER:** JAMES DICKINSON

**MATTER REFERENCE:** 182801.00001

**CONTACT/ADDRESS:** Highland CLO Funding, Ctd., Royal Chambers, St. Julian's Avenue, St. Peter Port, Guernsey GY1 3JX

**CONTACT TELEPHONE:** 01481 810100

**CONTACT EMAIL ADDRESS:** ~~Highland~~ HighlandCLO @ elysiumfundman. Com

**CONTACT PERSON:** Richard Boleat / Andrew Duquemin

Thanks

[GST NAME]

Waybill/tracking number 523 219 00 36

cost £734

1

## COURIER

**DATE:** 03/11/2021    Sent 4/11/21

**FROM/FEE EARNER:** James Dickinson

**MATTER REFERENCE:** 182801.00001

**CONTACT/ADDRESS:** Highland Capital Management L.P.
300 Crescent Court, Suite 700, Dallas, Texas, 75201, USA

**CONTACT TELEPHONE:** +1 (877) 665-1287

**CONTACT EMAIL ADDRESS:** info @highlandcapital.com

**CONTACT PERSON:**

Thanks

[GST NAME]

Waybill/tracking number   52321 46345

Cost £35.49.

1                                                    GUERNSEY-20923057-1

# COURIER

**DATE:** 03/11/2021

**FROM/FEE EARNER:** Jane Dickinson

**MATTER REFERENCE:** 182 801.0001

**CONTACT/ADDRESS:** Quest IRA Inc., FBO Neil Desai, Acct. # 305 9211
17171 Park Row # 100, Houston, Texas, 77084, USA

**CONTACT TELEPHONE:** +1 (855) 386 - 4727

**CONTACT EMAIL ADDRESS:** info @ QuestTrust. com

**CONTACT PERSON:**

Thanks

[GST NAME]

77084 . 4927
zip code already in. for Houston on form        DHL.

Waybill / Tracking No 5231980821
cost £35.49

1

GUERNSEY-20923057-1

477

## COURIER

**DATE:** 03/11/2021

**FROM/FEE EARNER:** James Dickinson

**MATTER REFERENCE:** 182801.00001

**CONTACT/ADDRESS:** Quest IRA Inc., FBO Jon Poglitsh, Acct. #1470612

**CONTACT TELEPHONE:** +1 (855) 386-4727

**CONTACT EMAIL ADDRESS:** info@Quest Trust.com

**CONTACT PERSON:**

Thanks

[GST NAME]

Waybill Tracking number  9509934092

Cost £35.49

1

## COURIER

**DATE:** 03/11/2021

**FROM/FEE EARNER:** James Dickinson

**MATTER REFERENCE:** 182801.00001

**CONTACT/ADDRESS:** Quest IRA Inc., FBO Hunter Covitz, Acct. #1469811 17171 Park Row #100, Houston, Texas, 77084, USA

**CONTACT TELEPHONE:** +1 (855) 386-4727

**CONTACT EMAIL ADDRESS:** info @ QuestTrust.com

**CONTACT PERSON:**

Thanks

[GST NAME]

523203 99 23
832

waybill /tracking number

cost £35.49

## COURIER

**DATE:** 03 / 11 / 2021

**FROM/FEE EARNER:** James Dickinson

**MATTER REFERENCE:** 182 801. 00001

**CONTACT/ADDRESS:** Quest IRA Inc., FBo Lee B. Parker III, Acc#: #3058311
17171 Park Row #100, Houston, Texas, 77084, USA

**CONTACT TELEPHONE:** +1 (855) 386-4727

**CONTACT EMAIL ADDRESS:** info @ Quest Trust. com

**CONTACT PERSON:**

Thanks

[GST NAME]

Waybill/tracking number 980 9992 2085

Cost £35.49.

1

**CLO Holdco, Ltd.**
**3839 McKinney Avenue**
**Suite 155, PMB 2484**
**Dallas, Texas 75204**

July 22, 2021

Via Email: rmburwood@gmail.com & richard.boleat@governancepartners.je

Highland CLO Funding, Ltd.
Attn: Richard Burwood, Director
Attn: Richard Boleat, Director
First Floor, Dorey Court, Admiral Park
St. Peter Port, Guernsey GY1 6HJ
Channel Islands

Re:     Withheld Distributions From Acis CLO's 2014-4, 2014-5 and 2014-6

Dear Directors:

Reference is made to (a) Acis CLO 2014-4, Ltd. ("**Acis 4**"), (b) Acis CLO 2014-5, Ltd. ("**Acis 5**"), and (c) Acis CLO 2014-6, Ltd. ("**Acis 6**"). Acis 4, Acis 5 and Acis 6 are collectively referred to herein as the "**Acis CLOs**". Highland CLO Funding, Ltd. ("**HCLOF**") owns 100% of the subordinated notes ("**Subordinated Notes**") of Acis 4 and Acis 5, and approximately 86.6% of the Subordinated Notes of Acis 6. CLO Holdco, Ltd. ("**CLO Holdco**") owns approximately 49% of HCLOF.

According to the applicable redemption report for each Acis CLO prepared by US Bank National Association ("**US Bank**"), the trustee for each Acis CLO, certain amounts of cash are not being distributed by US Bank to the Subordinated Note holders of each Acis CLO. Specifically, the redemption reports state that "[t]he available Principal Proceeds excludes amounts held in reserve." The redemption reports do not set forth the reason why these amounts are being held in reserve. In fact, there is no basis under the Indenture of each respective Acis CLO for the trustee to withhold these amounts to the Subordinated Note holders. Rather, such amounts are required to be distributed to the Subordinated Note holders pursuant to the payment waterfall set forth in Section 11.1(a)(ii) of the Indenture.

Based on our calculations, the amount of cash being withheld from HCLOF from each Acis CLO is as follows: (i) $4,800,952 from Acis 4, (ii) $11,500,000 from Acis 5, and (iii) $14,190,093 from Acis 6.[1] CLO Holdco's share of these amounts is approximately $14 million. In addition, the redemption reports detail certain assets that have yet to be sold by the applicable Acis CLO.

---

[1] These figures are calculated based on each redemption report as HCLOF's share of the difference between (a) the amount in the Principal Collection Account, and (b) the "Available Redemption Monies."

Again, no reason is given for why these assets have yet to be sold. CLO Holdco believes these assets could be sold for proceeds of approximately $21,500,000, all of which would be distributable to the Subordinated Note holders. Of this approximate $21.5 million, approximately $10,500,000 would be distributable to CLO Holdco.

As the appointed independent Directors of HCLOF, CLO Holdco wants to know what actions are being taken on behalf of HCLOF to obtain the withheld funds from US Bank. Unless the following actions have already been undertaken on behalf of HCLOF, CLO Holdco respectively requests that you contact US Bank to (a) demand that US Bank release the funds it is holding in "reserve" from the Acis CLOs, and (b) ask it to provide an explanation for why it has not sold certain assets as set forth in the redemption reports. Such actions are within your powers, responsibilities, and duties as independent Directors of HCLOF.

Thank you for your attention to this matter. Please acknowledge receipt of the letter by email correspondence. On behalf of CLO Holdco, I will follow up by phone after each of you has had the opportunity to review this letter and the concerns raised by CLO Holdco.

Sincerely,

CLO HOLDCO, LTD.

By:_____

Mark Patrick
Director

cc: Elysium Fund Management Limited, Administrator

**Highland CLO Funding, Ltd.**
**(registered in Guernsey with registration number 60120)**
**Registered Office: PO Box 650, 1st Floor, Royal Chambers, St. Julian's Avenue,**
**St. Peter Port, Guernsey GY1 3JX**
**T: +44 1481 810 100  E: HighlandCLO@elysiumfundman.com**

Mr. Mark Patrick
Director
CLO Holdco, Ltd.
3839 McKinney Avenue
Suite 155, PMB 2484
Dallas, Texas 75204

23 July 2021

Re: Acis CLOs 2014-4, 2014-5, 2014-6 (the "Acis-CLOs")

Dear Mr. Patrick

On behalf of Highland CLO Funding, Ltd. (the "Fund"), we write to you in your capacity as Director of CLO Holdco, Ltd. with regard to your letter of yesterday, July 22, 2021.

The Fund is aware of the circumstances referred to in your letter regarding the referenced Acis-CLOs, and we have communicated with counsel for US Bank National Association ("US Bank"), as indenture trustee for each of the Acis-CLOs.  US Bank's counsel has advised that, in addition to what it described as a normal administrative reserves for expenses, US Bank is also holding reserves on each of the referenced Acis-CLOs on account of pending and threatened litigation, including litigation filed by NexPoint Strategic Opportunities Fund, and threatened litigation from CLO Holdco and the Charitable Donor Advisory Fund, L.P. We are currently consulting with legal advisors and the Fund's portfolio manager to determine the Fund's response to these events.

We intend to provide updates to all of the Fund's shareholders as we deal with the matter, as and when appropriate and as circumstances dictate.

Yours sincerely

Joanna Duquemin Nicolle
Director of Elysium Fund Management Limited
Corporate Secretary to
Highland CLO Funding, Ltd

**Regulated by the Guernsey Financial Services Commission, reference number 2265836**

**CLO Holdco, Ltd.**
**3839 McKinney Avenue**
**Suite 155, PMB 2484**
**Dallas, Texas 75204**

July 27, 2021

Via Email: rmburwood@gmail.com & richard.boleat@governancepartners.je

Highland CLO Funding, Ltd.
Attn: Richard Burwood, Director
Attn: Richard Boleat, Director
First Floor, Dorey Court, Admiral Park
St. Peter Port, Guernsey GY1 6HJ
Channel Islands

Re:    Withheld Distributions From Acis CLO's 2014-4, 2014-5 and 2015-6

Dear Directors:

CLO Holdco, Ltd. ("**CLO Holdco**"), is in receipt of the letter dated July 23, 2021, from Elysium Fund Management Limited, on behalf of Highland CLO Funding, Ltd. ("**HCLOF**"). Thank you for the prompt response. Capitalized terms used herein and not defined shall have the meaning given them in the correspondence from CLO Holdco, dated July 22, 2021.

CLO Holdco wants to make a few points in response to the letter. First, HCLOF has neither (i) commenced litigation against any entity in connection with Acis CLOs, or (ii) threatened litigation against any entity in connection with the Acis CLOs. Accordingly, lumping HCLOF in with other Subordinated Note holders who may have commenced litigation against any entity in connection with the Acis CLOs is improper and no basis to withhold substantial distributions owed to HCLOF.

Second, even if CLO Holdco or Charitable DAF Fund, LP, has threatened litigation against any entity in connection with the Acis CLOs, this is not a valid basis for the portfolio manager or US Bank to withhold proceeds from HCLOF as a holder of Subordinated Notes. The actions of a direct or indirect investor in HCLOF should have no impact on the distribution of proceeds to HCLOF itself.

Finally, it is telling that the correspondence from Ms. Nicolle does not detail the portfolio manager or U.S. Bank referencing any provision in the Indenture for each Acis CLO that would allow them to withhold distributions due to pending or threatened litigation. That is because Section 11.1(a)(ii) of each Indenture does not allow for the withholding of distributable proceeds due to "pending" or "threatened" litigation.

As an investor in HCLOF, CLO Holdco was pleased to hear that the Directors are pursuing immediate steps to respond to these unprecedented actions.  CLO Holdco looks forward to receiving details next week on the steps the Directors will take to obtain the proceeds distributable to HCLOF.

Sincerely,

CLO HOLDCO, LTD.


By:_____

           Mark Patrick
           Director


cc: Elysium Fund Management Limited, Administrator

**Georgie Le Tocq**

| | |
|---|---|
| **From:** | Tim Clipstone <Tim.Clipstone@ogier.com> |
| **Sent:** | 20 October 2021 15:05 |
| **To:** | Richard Boleat; HighlandCLO@elysiumfundman.com; rmburwood@gmail.com |
| **Cc:** | James Dickinson; Alex Horsbrugh-Porter; Margeaux Malherbe |
| **Subject:** | RE: Highland CLO Funding Limited [OGIER-GSYLAW.FID2301833] |

Many thanks Richard

**Tim Clipstone**

D: +44 1481 752265 | T: +44 1481 721672 | M:+44 7797 712814

British Virgin Islands | Cayman Islands | **Guernsey** | Hong Kong | Jersey | London | Luxembourg | Shanghai | Singapore | Tokyo

**From:** Richard Boleat <richard.boleat@governancepartners.je>
**Sent:** 20 October 2021 13:51
**To:** Tim Clipstone <Tim.Clipstone@ogier.com>; HighlandCLO@elysiumfundman.com; rmburwood@gmail.com
**Cc:** James Dickinson <James.Dickinson@ogier.com>; Alex Horsbrugh-Porter <Alex.Horsbrugh-Porter@ogier.com>; Margeaux Malherbe <Margeaux.Malherbe@ogier.com>
**Subject:** Re: Highland CLO Funding Limited [OGIER-GSYLAW.FID2301833]

**This email originated from outside Ogier**

Hello Tim, I can confirm receipt of your email.

Regards

Richard

**Richard Boléat**
**Partner**
**Governance Partners, L.P.**
e:   richard.boleat@governancepartners.je
m:  44 (0)7797 743000
t:    44 (0)1534 625522
a:   First Floor, 7 Bond Street, St Helier, Jersey JE2 3NP

Personally regulated by the Jersey Financial Services Commission. This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender as soon as possible and delete this message from your system.

**From:** Tim Clipstone <Tim.Clipstone@ogier.com>
**Date:** Wednesday, 20 October 2021 at 13:43
**To:** "HighlandCLO@elysiumfundman.com" <HighlandCLO@elysiumfundman.com>, Richard Burwood <rmburwood@gmail.com>, Richard Boleat <richard.boleat@governancepartners.je>
**Cc:** James Dickinson <James.Dickinson@ogier.com>, Alex Horsbrugh-Porter <Alex.Horsbrugh-Porter@ogier.com>, Margeaux Malherbe <Margeaux.Malherbe@ogier.com>
**Subject:** Highland CLO Funding Limited [OGIER-GSYLAW.FID2301833]

Dear Sirs

1

We understand you are the directors of Highland CLO Funding Limited (the **Company**). We act as Guernsey counsel for CLO Holdco Limited, the holder of 49.02% of the issued share capital of the Company.

Further to correspondence sent to you by CLO Holdco Limited dated 22 July 2021 and 27 July 2021, and the response received from Elysium Fund Management Limited dated 23 July 2021, we have been instructed to write to you, in your capacity as directors of the Company, to make a further formal request for the information required by CLO Holdco Limited to make an effective assessment as to how certain matters raised in the redemption reports for each of Acis CLO 2014-4, Ltd., Acis CLO 2014-5, Ltd. and Acis CLO 2014-6, Ltd. and the most recent interim financial statements of the Company covering the period from 1 January 2021 to 30 June 2021 (the **Financial Statements**) impacts its interest in the Company.

Of particular concern, the Financial Statements state that it is the view of the directors of the Company, on advice, that the retention of certain cash by US Bank is unlawful and inconsistent with the terms of the relevant CLO indentures. It is further stated that the directors of the Company are taking urgent and proportionate steps to secure unrestricted control over this cash and any as yet unliquidated securities.

Given that the aforementioned position presents a substantial risk to CLO Holdco Limited's interest in the Company, we write on behalf of CLO Holdco Limited to require you to provide responses to the following questions:

1. who have been appointed as legal counsel to advise the Company on this matter;

2. has the Company's legal counsel been in contact with US Bank or US Bank's legal counsel in regard to this matter;

3. is US Bank being open and co-operative with the Company in connection with this matter;

4. when did the Company or Elysium Fund Management Limited last communicate with US Bank in connection with this matter;

5. has the Company conducted a detailed risk analysis regarding the potential recovery of the distributable cash and assets from the US Bank;

6. has the Company received representations from its remaining shareholders in connection with this matter;

7. have the Company and the Company's legal counsel identified a proposed course of action that provides the best chance of recovering the relevant distributable cash and assets from US Bank;

8. is the Company currently, or currently preparing to, pursue any formal legal action or form of alternative dispute resolution against US Bank to recover the relevant distributable cash and assets;

9. has the Company received legal advice regarding the potential prejudice against its shareholders that may result from failure to take appropriate action in relation to this matter;

10. what advice has the Company received to indicate that the retention of the relevant cash by US Bank is unlawful and inconsistent with the terms of the relevant CLO indentures;

11. what action have the directors of the Company, and the Company itself, taken to date in response to this advice;

12. what advice has the Company received as to the most appropriate action to take in relation to this matter going forward; and

13. what action do the directors propose or intend to take in relation to this matter going forward.

We would be grateful if you could confirm receipt of this email and provide the above requested information as soon as possible and in any event within five business days of the date hereof.

We are not aware of whether the Company has engaged Guernsey counsel in respect of the matters addressed in our client's correspondence and this email. Please also arrange for a copy of this email to be forwarded to the Company's Guernsey legal counsel and confirm the identity of such counsel, if instructed.

Yours faithfully

**Tim Clipstone**
Partner
**Ogier (Guernsey) LLP**

D: +44 1481 752265 | T: +44 1481 721672 | M:+44 7797 712814

Admitted in:
- England and Wales (non-practising)
- British Virgin Islands
- Cayman Islands
- Bailiwick of Guernsey

British Virgin Islands | Cayman Islands | **Guernsey** | Hong Kong | Jersey | London | Luxembourg | Shanghai | Singapore | Tokyo

**Offshore Law Firm of the Year** - The Legal 500 Awards 2020

ogier.com

Ogier (Guernsey) LLP is registered as a limited liability partnership in Guernsey. Registered number 94.

-------------------------------------------------------------------------------------------------------------
This e-mail is confidential and may also be privileged.
If you are not the intended recipient, please notify the sender immediately.
You should not copy it or disclose its contents to any other person.

Internet communications cannot be guaranteed to be secure or error free as information could be intercepted, corrupted, lost, arrive late or contain viruses.
The sender does not accept liability for any errors or omissions in the context of this message which arise as a result of internet transmission.
If we receive a request from you via e-mail we will treat that as authority to reply by e-mail.
Please note from time to time, our firewall will eliminate legitimate e-mails that it believes represents 'spam' emails.
If your e-mail contains important instructions, please either confirm by separate means we have received them or ask us to acknowledge receipt.

Information on the Ogier Group, its law practices and companies including their registered offices and details of their local regulatory status can be accessed via the Ogier Group website:-

www.ogier.com/legal-notice

3

Begin forwarded message:

**From:** Richard Boleat <richard.boleat@governancepartners.je>
**Date:** 20 January 2022 at 10:34:38 AM GMT-8
**To:** Paul Murphy <paul@gkmanagement.com.ky>
**Cc:** rmburwood@gmail.com, HighlandCLO@elysiumfundman.com
**Subject: Re: HCLOF - Various Requests**

Hi Paul

I'm sorry its taken a little while to get back to you on your enquiries of last week. Before addressing your questions, we feel it would be helpful to make some prefatory observations.

First, we understand that you have written to us in distinct capacities, namely as "a member of the Advisory Board and a Director of CLO HoldCo". To the extent that you believe those differing capacities or offices provide you or CLO HoldCo with distinct entitlements, we have borne in mind the provisions of domestic law and the terms of, amongst other things, the Members Agreement Relating to HCLOF dated 15 November 2017 (the "Members Agreement").

Second, you demand that we respond to some of your requests within a timetable that is simply unreasonable. We shall always endeavour to provide expeditious responses to reasonable and lawful enquiries, but respectfully invite you to be realistic in making such requests and cognisant of the fact that HCLOF will not be held ransom to arbitrary deadlines. If you have a request that requires urgent attention (and that we believe HCLOF can assist with), then it will be helpful in future for you to explain what forthcoming – rather than historic – deadlines you are working to and why (e.g. it is not understood how your capacity as a member of the Advisory Board of HCLOF would impact on the extancy of the so-called ACIS Action).

Third, you demand that your email be treated as confidential. With respect, no party can unilaterally impose an obligation of confidentiality on another. Some of your enquiries require HCLOF to engage with its legal counsel and some beg exploration of the matters with HCLOF's portfolio manager. In those circumstances, you are at liberty to withdraw your email and its requests and we shall respect your decision to do so. However, whilst HCLOF has no desire to share your message with any party, it will not be held responsible for the need for appropriate disclosures to be made should they be necessary, e.g. to legal counsel, to the portfolio manager and where necessary as a matter of law or procedure. The fact that you have chosen to enforce your demand (to confidentiality) with a threat (the fact that CLO HoldCo will treat seriously the eventuality that your message "found its way into the possession of the ACIS Parties", viz. CLO HoldCo's pursuit of future claims) is replete with irony,

1

489

unattractive and an unsound basis upon which to engage with the board of HCLOF. We respectfully invite you to be cognisant of the need for proportionality.

We turn to each of your requests.

### Appointment of Richard Katz to Advisory Board

The urgency of your request appears prefaced by the explanation as to the commencement of the ACIS Action in December last year. It is unclear to us how Mr. Katz's appointment to the Advisory Board has a bearing (directly or indirectly) on the extancy of the ACIS Action.

Notwithstanding that, your understanding of Mr. Katz's position (i.e. that he is a "non-voting member" of the Advisory Board) is not understood by HCLOF. The provisions of the Members Agreement do not per se recognise the appointment of non-voting members of the Advisory Board. Whilst your confusion may arise from the provisions of clause 4.1 of the Members Agreement, we note that in circumstances where the Advisory Board is constituted of two individuals, the constitutional provisions of operation of the Advisory Board are rendered otiose by the inference that one member may be 'non-voting', i.e. the Advisory Board would never be quorate, and would never be able to act (action requiring unanimity) or fulfil its admittedly limited functions.

### Advisory Board Terms of Reference

We note your surprise to receive the Terms of Reference for the Advisory Board. We also note that you do not consider HCLOF to have "the authority to prepare and distribute" the Terms of Reference. Clause 4.1 of the Members Agreement expressly recognises that HCLOF "shall establish an advisory board", and we in good faith tendered the Terms of Reference to assist with this establishment. Your determination that CLO HoldCo's "rights in this regard are entirely reserved" is not understood (it is unclear what rights you maintain have been infringed or interfered with).

Absent the Terms of Reference, the relatively limited functions of the Advisory Board are in any event clear and agreed (see clause 4.3 of the Members Agreement).

### ACIS Action

As to the so-called NexPoint Action, this is a matter upon which HCLOF continues to seek legal advice. Such advice is subject to legal advice and litigation privilege / client-attorney privilege.

### Intervention in NexPoint Action

Your requests trespass on matters upon which HCLOF is taking legal advice and which are subject to legal advice and litigation privilege / client-attorney privilege. Such privilege is not waived, and nothing in this response constitutes a waiver of privilege and nor should it be considered an acquiescence to waiver of privilege. Further still, HCLOF (and its directors) do not assume any responsibility to you (in whatever capacity) or to CLO HoldCo. Nevertheless, and adopting your numbering, please note the following.

1.     Please see the correspondence from Carey Olsen to Ogier dated 26th October 2021.
2.     This is privileged information – we continue to consider multiple courses of action.
3.     We have communicated and engaged with Acis and US Bank on this matter and have made HCLOF's position on this clear.
4.     This is privileged information – you may draw inferences drawn from the contents of the publicly available pleadings in that case.
5.     This is privileged information – the course(s) of action undertaken have been taken in what is considered to be the best interests of HCLOF and its stakeholders.
6.     This is privileged information – all courses of action remain under consideration.

2

7.        This is privileged information – you may draw inferences drawn from the contents of the publicly available pleadings in that case.

**Settlement of Claims against ACIS**

Your requests trespass on matters upon which HCLOF is taking legal advice and which are subject to legal advice and litigation privilege / client-attorney privilege. Such privilege is not waived, and nothing in this response constitutes a waiver of privilege and nor should it be considered an acquiescence to waiver of privilege. Further still, HCLOF (and its directors) do not assume any responsibility to you (in whatever capacity) or to CLO HoldCo. Nevertheless, and adopting your numbering, please note the following.

1.        HCLOF has reviewed the complaint filed in the Acis Action and we note that the settlement agreement with Acis is attached as Exhibit J.  We assume you or your counsel has a copy.
2.        The release in the settlement agreement is a general release.  HCLOF considered the merits of potential claims subject to the release but these details are privileged.
3.        The directors of HCLOF, in the exercise of their business judgment, determined that settlement was in the best interests of HCLOF.

**Investment Advisor**

Adopting your numbering, please note the following.

1.        Without waiver of the attorney client privilege or other applicable protections, the directors of HCLOF receive advice from time to time from legal and other professional and business advisors.
2.        Without waiver of the attorney client privilege or other applicable protections, HCLOF received advice from legal and business advisors.
3.        Without waiver of the attorney client privilege or other applicable protections, the directors of HCLOF do not believe that termination of the Investment Advisor Agreement is in the best interests of HCLOF.  In further response, HCLOF refers you to pages 36-37 of the Offering Memorandum, dated 15 November 2017.
4.        HCLOF does not pay a fee to HCM or to Highland HCF Advisor Ltd under the Investment Advisor Agreement or any other agreement.
5.        No.

**Redemption**

In response to your proposal for a redemption of CLO Holdco's shares in HCLOF, we refer you to our email of 3 December 2021 on this subject.   HCLOF maintains that position regarding your proposal for in specie distributions.

I hope this deals with your queries. If you'd like to have a follow up call with Dicky and I, please do let us know.

Best wishes

Richard

Get Outlook for iOS

---

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Monday, January 17, 2022 6:06 pm
**To:** Richard Boleat
**Cc:** rmburwood@gmail.com
**Subject:** Re: HCLOF - Various Requests

3

Hi Richard,

Any thoughts on when you'll be able to get to me?

Thanks,

Paul

Sent from my iPhone

> On 13 Jan 2022, at 3:31 AM, Richard Boleat <richard.boleat@governancepartners.je> wrote:
>
> Hi Paul, thanks – I don't have anything to add to my response to your previous email, at this point.
>
> Best
>
> Richard
>
> **Richard Boléat**
> **Partner**
> **Governance Partners, L.P.**
> e:   richard.boleat@governancepartners.je
> m:  44 (0)7797 743000
> t:   44 (0)1534 625522
> a:   First Floor, 7 Bond Street, St Helier, Jersey JE2 3NP
>
> Personally regulated by the Jersey Financial Services Commission. This communication is confidential, may be privileged and is meant only for the intended recipient. If you are not the intended recipient, please notify the sender as soon as possible and delete this message from your system.
>
> **From:** Paul Murphy <paul@gkmanagement.com.ky>
> **Date:** Tuesday, 11 January 2022 at 22:15
> **To:** Richard Boleat <richard.boleat@governancepartners.je>, Richard Burwood <rmburwood@gmail.com>
> **Subject:** Re: HCLOF - Various Requests
>
> Thanks Richard,
>
> Just to explain our position, the action in the US, which we think is entirely unnecessary and unwarranted, has forced us to fill information gaps in a very short amount of time.
>
> I appreciate the requested timelines are tight but assume that, given you're caught in the middle, you'll have already thought about (i) Katz's appointment to the Advisory Board, and (ii) HCLOF's position in the ACIS litigation (especially given HCLOF's intervention in the NexPoint litigation). In addition, confirming whether HCM is still advisor should be straightforward.

4

Regardless of who's right or wrong, there's a real chance that any unnecessary delay has the potential to cause us significant loss.

As always, if you feel a call would be helpful I can make myself available.

Kind regards,

Paul.

---

**From:** Richard Boleat <richard.boleat@governancepartners.je>
**Sent:** Tuesday, January 11, 2022 2:07 PM
**To:** Paul Murphy <paul@gkmanagement.com.ky>; rmburwood@gmail.com <rmburwood@gmail.com>
**Subject:** Re: HCLOF - Various Requests

Hi Paul, thanks for the email. We'll work through each of the points listed in a businesslike manner and respond as we deem appropriate. I am sure you know that the timelines that you have sought for our responses are unrealistic and inappropriate.

Regards

Richard

Richard Boleat
+44 7797 743000

---

**From:** Paul Murphy <paul@gkmanagement.com.ky>
**Sent:** Tuesday, January 11, 2022 17:14
**To:** Richard Boleat; rmburwood@gmail.com
**Subject:** HCLOF - Various Requests

Dear Richard and Dicky,

I'm writing in my capacity as a member of the Advisory Board and a Director of CLO HoldCo. Please can you respond to my various requests for information and documents (underlined for convenience) within the timeframes I've requested.

These matters are time sensitive because of the action that was filed on 24 Dec 2021 by ACIS, US Bank and Josh Terry (**"ACIS Parties"**) in the NY Southern District for declaratory relief to prohibit CLO HoldCo from bringing various actions against them (**"ACIS Action"**). You are undoubtedly aware of this action but please let us know if you need us to provide you with a copy of the complaint.

Finally, before turning to my substantive requests and representations, this email should be treated as confidential. Our preliminary view of the ACIS Action is that it is weak, not least because of the glaring deficiency in the ACIS Parties' case that the NexPoint Action (defined below) somehow suggests that CLO HoldCo will now seek to pursue claims against them. We would take it very seriously if a copy of this email found its way into the possession of the ACIS Parties (or any other party for that matter) and was somehow used to bolster their claim that CLO HoldCo will seek to pursue claims against them in the future.

**Appointment of Richard Katz to Advisory Board**

5

It is our position that Richard Katz, although appointed to the Advisory Board, is a non-voting member. Please confirm this is your understanding by tomorrow.

**Advisory Board Terms of Reference**

We were surprised to receive the Terms of Reference which we do not consider you have the authority to prepare and distribute. Our rights in this regard are entirely reserved.

**ACIS Action**

HCLOF recently intervened in an action being brought by NexPoint against the ACIS Parties (**"NexPoint Action"**) which contains materially similar allegations to the complaints which the ACIS Parties are seeking to restrain CLO HoldCo from bringing.

Is it HCLOF's intention to intervene in this action as well? Please confirm by tomorrow.

**Intervention in NexPoint Action**

Having decided in mid-2021 that the withholding of $18m by ACIS and US Bank was unlawful, please provide details of:
1. Why you determined the withholding was unlawful.
2. What other potential avenues of recovery you considered.
3. Whether you took steps to make claims against ACIS and US Bank directly.
4. Why you chose to intervene in the NexPoint litigation.
5. Why you consider it is more expeditious and efficient that intervention in the Nexpoint litigation will secure release of these funds when the obvious remedy would seem to be taking action against the "unlawful" parties directly.
6. Whether any action will be brought against US Bank and ACIS for their "unlawful" withholding.
7. Why it was even felt necessary to intervene and incur costs by intervening when HCLOF could just await the outcome of the NexPoint litigation.

Please provide a response within 7 days.

**Settlement of claims against ACIS**

Please provide:
1. The settlement agreement between HCLOF and any ACIS parties.
2. Details of the claims HCLOF settled.
3. Why the settlement agreement was entered into.

Please provide a response a response within 7 days.

**Investment Advisor**

It's our understanding that Highland Capital Management (in bankruptcy) is still advisor to HCLOF and it has no qualified investment advisors (or indeed, any staff). Please confirm this and/or provide any corrections by tomorrow.

In addition, please provide details of:
1. Who else is advising the directors of HCLOF (if anyone).
2. Who advised the directors on the ACIS settlement.
3. Why HCLOF hasn't terminated the Investment Advisor Agreement.

6

    4. <u>Is HCM receiving any money from HCLOF. If so, what amounts have been</u>
       <u>paid since Jan 2020. If not, when did payments to it stop.</u>
    5. <u>Is HCLOF receiving advice from ACIS.</u>

Please respond to these questions within 7 days.

**<u>Redemption</u>**

We have previously sought to extricate ourselves from HCLOF by proposing that HCLOF undertake a redemption of the shares in the company held by CLO Holdco Limited, the consideration for which would be the transfer to CLO Holdco Limited of the title to the CLOs in ACIS 5 and ACIS 6 to which it is entitled.

We have discussed the matter further with experts in CLO structures, and, in their opinion, such an arrangement would be administratively simple and would require changing the custodian of 49% of the holdings in ACIS 5 and 6. In addition, this would not impact the value of the positions.

We reiterate our proposal to undertake a redemption of CLO Holdco Limited's shares on the terms noted above. HCLOF is a zombie fund that, from our perspective, is eroding value by taking unnecessary positions in wider acrimonious disputes in the US. Whatever the merits of the various positions in the US, we suggest that it would be far better to let these matters play out in the US without the unnecessary intervention of HCLOF.

However, as an alternative to a redemption, we may be willing to consider a liquidation of the ACIS positions as long as it takes the form of an arm's length auction that we are able to oversee and approve certain matters.

<u>Please let us know, within 7 days, if either of these proposals are worth exploring.</u>

Many thanks,

Paul.

7

HIGHLAND CLO FUNDING, LTD**.**
PO Box 650, 1st Floor,
Royal Chambers,
St. Julian's Avenue,
St. Peter Port,
Guernsey GY1 3JX

To: the shareholders of Highland CLO Funding, Ltd.

28 June 2022

Dear Sir/Madam

**Offer to buy back Shares in Highland CLO Funding, Ltd. (the "Company")**

The Company currently has significant cash reserves and following consultation with its advisors the Board believes that the most efficient use of those cash reserves would be to fund a repurchase ("**Buyback**") of shares in the capital of the Company. Therefore, the Company is offering to repurchase shares on the terms set out in the Share Buyback Agreement, enclosed at Schedule 3, as summarised below.

In this letter:

"**Participating Shareholders**" mean each shareholder in the Company who accepts the Offer.

"**Offer**" means the offer by the Company to repurchase Shares as described herein.

"**Shares**" means, in respect of each Participating Shareholder, all Shares in the Company held by that Participating Shareholder.

The terms of the Offer are as follows.

- The Offer is conditional upon the passing of the written resolutions described below.

- the consideration payable in respect of the repurchase will be USD 0.472 per Share (the "**Consideration**");

- the Company agrees to repurchase all of the Shares held by each Participating Shareholder. The Company will not repurchase some (but not all) of the Shares held by a Participating Shareholder.

1

- each repurchase is conditional upon execution by the Participating Shareholder of a waiver letter in the form attached at Schedule 4.

The Offer is open to all shareholders in the Company, although Highland Capital Management, L.P. and HCMLP Investments, LLC, who together own 50.61% of the voting Shares of the Company, have indicated that they will not accept the Offer or participate in the Buyback as they have no need for immediate liquidity and believe the Consideration is less than the long-term value of the Shares.

Highland HCF Advisors Ltd., the Company's portfolio manager, takes no position and offers no advice on whether the Company's shareholders should participate in the Buyback.

Forms of the following documents in relation to the Buyback are enclosed as schedules to this letter:

1. written consent ("**Consent**") of shareholders approving circulation of the written resolution described at 2 below.  To be effective this resolution must be approved by shareholders holding in excess of 75% of all of the Shares in issue in the capital of the Company.  All shareholders are eligible to vote on this consent;

2. written resolution ("**Resolution**") of shareholders approving the terms of the repurchase.  To be effective this resolution must be approved by eligible shareholders holding a simple majority of all of the Shares held by eligible shareholders.  Only shareholders who do **not** accept the Offer may vote on this resolution;

3. the form of share buyback agreement to be entered into by each Participating Shareholder and the Company in connection with the Buyback (the "**Share Buyback Agreement**");

4. the form of waiver letter to be entered into by each Participating Shareholder in connection with the Buyback (the "**Waiver Letter**"); and

5. the form of stock transfer form to be completed by each Participating Shareholder (the "**STF**", and together with the Share Buyback Agreement and the Waiver Letter, the "**Transfer Documents**").

If you wish to accept the Offer, please complete, sign and return:

- the acknowledgement to this letter;
- the Consent;
- the Share Buyback Agreement;

2

1066695/0006/G14185564v1

- the Waiver Letter; and
- the STF.

If you do **not** wish to accept the Offer please complete, sign and return:

- the Consent; and
- the Resolution;

indicating, in each case, whether you approve or disapprove the proposed resolution. The offer remains open until Monday 11 July 2022. The Company reserves the right to reject any documentation returned after that day.

By accepting the Offer you:

(a) warrant that you are the sole legal and beneficial owner of, and have good title to, the entire legal and beneficial title of the Shares;

(b) have full capacity to sell the Shares;

(c) are selling the Shares free from any encumbrances (including but not limited to any mortgage, charge, pledge, lien, option, restriction, right of first refusal, right of pre-emption, claim, right or interest of a third party, impairment or security interest of any kind, or any other obligations to make any payment having similar effect);

(d) agree to transfer the Shares in accordance with the Transfer Documents;

(e) acknowledge and agree that you have had access to all information you deem necessary and appropriate in connection with your assessment of the value of the Shares, the Buyback, the Offer, and decision to enter participate in the Buyback;

(f) acknowledge and agree that the Company's net asset value of the Shares is subject to material uncertainty in relation to realisable value of the remaining assets underlying the portfolio and the future costs of realising and unencumbering certain assets of the Company and that, accordingly, you have made an independent determination as to the value of the Shares;

(g) understand the Consideration for the Shares in the Offer and Buyback reflects a discount to the Company's current calculation of the net asset value of the Shares, and you have independently determined that the Consideration represents fair value for immediate liquidity for the Shares in light of the absence of a market therefor;

3

1066695/0006/G14185564v1

(h) you have reviewed the documents attached hereto in detail, including the Share Buyback Agreement and the Waiver Letter, and acknowledge you have had to opportunity to review such documents and this letter with independent counsel of your own choosing  and further agree that such documents are reasonable in connection with the consummation of the transactions contemplated hereunder; and

(i) acknowledge and agree that (x) none of the Company, Highland HCF Advisor Ltd, or any of their respective board members, officers, directors, members, employees, attorneys, agents or affiliates have recommended or induced you to enter into the Buyback; (y) no representations and/or warranties have been made by any of the foregoing parties with respect to the Buyback and Offer; and (z) you are not relying on any statements whatsoever, oral and or written, made in connection with the Buyback, the Offer, or the transactions contemplated hereby other than those expressly set forth herein.

**SHAREHOLDERS ARE URGED TO REVIEW THE ENCLOSED DOCUMENTS CAREFULLY, INCLUDING, WITHOUT LIMITATION, THE PURCHASE PRICE AND WAIVERS CONTAINED THEREIN, PRIOR TO MAKING ANY ELECTION AS TO WHETHER OR NOT TO PARTICIPATE IN THE OFFER.  TO THE EXTENT SHAREHOLDERS ELECT TO PARTICIPATE IN THE OFFER, DULY COMPLETED AND EXECUTED TRANSFER DOCUMENTS MUST BE RECEIVED BY THE COMPANY NO LATER THAN 5:00 PM GUERNSEY TIME ON 11 JULY 2022.  THE COMPANY RESERVES THE RIGHT TO TERMINATE THIS OFFER AT ANY TIME IN ITS SOLE AND ABSOLUTE DISCRETION PRIOR TO ITS ACCEPTANCE OF ANY SHARES TENDERED HEREUNDER.  TO THE EXTENT SHAREHOLDERS HAVE ANY QUESTIONS REGARDING THIS OFFER OR ANY OF THE DOCUMENTS RELATED THERETO PLEASE CONTACT RICHARD BOLEAT  AT RICHARD.BOLEAT@GOVERNANCEPARTNERS.JE, RICHARD BURWOOD AT RMBURWOOD@GMAIL.COM  AND HIGHLANDCLO@ELYSIUMFUNDMAN.COM.**

Yours faithfully


*Richard Boleat (Jun 28, 2022 14:07 GMT+1)*

**HIGHLAND CLO FUNDING, LTD.**
**Director**

1066695/0006/G14185564v1

**Acknowledgement and acceptance**

I hereby acknowledge receipt of the above, accept the Offer contained therein and instruct the Company to make payment of the consideration for the Share repurchase to the following bank account:

Account Name:

Account Number:

Sort Code:

IBAN:

BIC:

…………………………………………………………………
**CLO Holdco, Ltd.**

Date:

5

**Schedule 1**
**Consent of shareholders**

6

1066695/0006/G14185564v1

**Schedule 2**
**Written resolutions of the Eligible Shareholder(s)**

7

1066695/0006/G14185564v1

**Schedule 3**
**Share Buyback Agreement**

8

**Schedule 4**
**Waiver Letter**

9

**Schedule 5**

**Transfer of Shares or Stock**

| | |
|---|---|
| Full name of Undertaking | **Highland CLO Funding, Ltd.** |
| Full description of Security | Ordinary Shares |

| | Words | Figures |
|---|---|---|
| Number or amount of Shares or other security and, in figures column only, number and denomination of units, if any | Seventy five million sixty one thousand six hundred and thirty and fifty five hundredths | 75,061,630.55 |

| | |
|---|---|
| Name(s) of registered holder(s) should be given in full; the address should be given where there is only one holder. If the transfer is not made by the registered holder(s) insert also the name(s) and capacity (e.g. Executor(s)) of the person(s) making the transfer. | In the name(s) of<br><br>CLO Holdco, Ltd.<br><br>300 Crescent Court, Suite 700<br>Dallas<br>Texas 75201<br>USA |
| I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below. | Signature(s) of transferor(s)<br><br>……………………………………………………<br>CLO Holdco, Ltd. |
| Full name(s) and full postal address(es) (including County or, if applicable, Postal District number) of the person(s) to whom the security is transferred.<br><br>Please state title, if any, or whether Mr., Mrs., or Miss. | HIGHLAND CLO FUNDING, LTD.<br><br>PO Box 650, 1st Floor, Royal Chambers,<br>St. Julian's Avenue,<br>St. Peter Port,<br>Guernsey GY1 3JX |

I/We request that such entries be made by the Registrar as are necessary to give effect to this transfer

10

11

1066695/0006/G14185564v1

HIGHLAND CLO FUNDING, LTD**.**
PO Box 650, 1st Floor,
Royal Chambers,
St. Julian's Avenue,
St. Peter Port,
Guernsey GY1 3JX

To: the shareholders of Highland CLO Funding, Ltd.

28 June 2022

Dear Sir/Madam

**Offer to buy back Shares in Highland CLO Funding, Ltd. (the "Company")**

The Company currently has significant cash reserves and following consultation with its advisors the Board believes that the most efficient use of those cash reserves would be to fund a repurchase ("**Buyback**") of shares in the capital of the Company. Therefore, the Company is offering to repurchase shares on the terms set out in the Share Buyback Agreement, enclosed at Schedule 3, as summarised below.

In this letter:

"**Participating Shareholders**" mean each shareholder in the Company who accepts the Offer.

"**Offer**" means the offer by the Company to repurchase Shares as described herein.

"**Shares**" means, in respect of each Participating Shareholder, all Shares in the Company held by that Participating Shareholder.

The terms of the Offer are as follows.

- The Offer is conditional upon the passing of the written resolutions described below.

- the consideration payable in respect of the repurchase will be USD 0.472 per Share (the "**Consideration**");

- the Company agrees to repurchase all of the Shares held by each Participating Shareholder. The Company will not repurchase some (but not all) of the Shares held by a Participating Shareholder.

1

- each repurchase is conditional upon execution by the Participating Shareholder of a waiver letter in the form attached at Schedule 4.

The Offer is open to all shareholders in the Company, although Highland Capital Management, L.P. and HCMLP Investments, LLC, who together own 50.61% of the voting Shares of the Company, have indicated that they will not accept the Offer or participate in the Buyback as they have no need for immediate liquidity and believe the Consideration is less than the long-term value of the Shares.

Highland HCF Advisors Ltd., the Company's portfolio manager, takes no position and offers no advice on whether the Company's shareholders should participate in the Buyback.

Forms of the following documents in relation to the Buyback are enclosed as schedules to this letter:

1. written consent ("**Consent**") of shareholders approving circulation of the written resolution described at 2 below. To be effective this resolution must be approved by shareholders holding in excess of 75% of all of the Shares in issue in the capital of the Company. All shareholders are eligible to vote on this consent;

2. written resolution ("**Resolution**") of shareholders approving the terms of the repurchase. To be effective this resolution must be approved by eligible shareholders holding a simple majority of all of the Shares held by eligible shareholders. Only shareholders who do **not** accept the Offer may vote on this resolution;

3. the form of share buyback agreement to be entered into by each Participating Shareholder and the Company in connection with the Buyback (the "**Share Buyback Agreement**");

4. the form of waiver letter to be entered into by each Participating Shareholder in connection with the Buyback (the "**Waiver Letter**"); and

5. the form of stock transfer form to be completed by each Participating Shareholder (the "**STF**", and together with the Share Buyback Agreement and the Waiver Letter, the "**Transfer Documents**").

If you wish to accept the Offer, please complete, sign and return:

- the acknowledgement to this letter;
- the Consent;
- the Share Buyback Agreement;

2

1066695/0006/G14185564v1

- the Waiver Letter; and
- the STF.

If you do **not** wish to accept the Offer please complete, sign and return:

- the Consent; and
- the Resolution;

indicating, in each case, whether you approve or disapprove the proposed resolution. The offer remains open until Monday 11 July 2022. The Company reserves the right to reject any documentation returned after that day.

By accepting the Offer you:

(a) warrant that you are the sole legal and beneficial owner of, and have good title to, the entire legal and beneficial title of the Shares;

(b) have full capacity to sell the Shares;

(c) are selling the Shares free from any encumbrances (including but not limited to any mortgage, charge, pledge, lien, option, restriction, right of first refusal, right of pre-emption, claim, right or interest of a third party, impairment or security interest of any kind, or any other obligations to make any payment having similar effect);

(d) agree to transfer the Shares in accordance with the Transfer Documents;

(e) acknowledge and agree that you have had access to all information you deem necessary and appropriate in connection with your assessment of the value of the Shares, the Buyback, the Offer, and decision to enter participate in the Buyback;

(f) acknowledge and agree that the Company's net asset value of the Shares is subject to material uncertainty in relation to realisable value of the remaining assets underlying the portfolio and the future costs of realising and unencumbering certain assets of the Company and that, accordingly, you have made an independent determination as to the value of the Shares;

(g) understand the Consideration for the Shares in the Offer and Buyback reflects a discount to the Company's current calculation of the net asset value of the Shares, and you have independently determined that the Consideration represents fair value for immediate liquidity for the Shares in light of the absence of a market therefor;

3

1066695/0006/G14185564v1

(h) you have reviewed the documents attached hereto in detail, including the Share Buyback Agreement and the Waiver Letter, and acknowledge you have had to opportunity to review such documents and this letter with independent counsel of your own choosing  and further agree that such documents are reasonable in connection with the consummation of the transactions contemplated hereunder; and

(i) acknowledge and agree that (x) none of the Company, Highland HCF Advisor Ltd, or any of their respective board members, officers, directors, members, employees, attorneys, agents or affiliates have recommended or induced you to enter into the Buyback; (y) no representations and/or warranties have been made by any of the foregoing parties with respect to the Buyback and Offer; and (z) you are not relying on any statements whatsoever, oral and or written, made in connection with the Buyback, the Offer, or the transactions contemplated hereby other than those expressly set forth herein.

**SHAREHOLDERS ARE URGED TO REVIEW THE ENCLOSED DOCUMENTS CAREFULLY, INCLUDING, WITHOUT LIMITATION, THE PURCHASE PRICE AND WAIVERS CONTAINED THEREIN, PRIOR TO MAKING ANY ELECTION AS TO WHETHER OR NOT TO PARTICIPATE IN THE OFFER.  TO THE EXTENT SHAREHOLDERS ELECT TO PARTICIPATE IN THE OFFER, DULY COMPLETED AND EXECUTED TRANSFER DOCUMENTS MUST BE RECEIVED BY THE COMPANY NO LATER THAN 5:00 PM GUERNSEY TIME ON 11 JULY 2022.  THE COMPANY RESERVES THE RIGHT TO TERMINATE THIS OFFER AT ANY TIME IN ITS SOLE AND ABSOLUTE DISCRETION PRIOR TO ITS ACCEPTANCE OF ANY SHARES TENDERED HEREUNDER.  TO THE EXTENT SHAREHOLDERS HAVE ANY QUESTIONS REGARDING THIS OFFER OR ANY OF THE DOCUMENTS RELATED THERETO PLEASE CONTACT RICHARD BOLEAT AT RICHARD.BOLEAT@GOVERNANCEPARTNERS.JE, RICHARD BURWOOD AT RMBURWOOD@GMAIL.COM AND HIGHLANDCLO@ELYSIUMFUNDMAN.COM.**

Yours faithfully

Richard Boleat (Jun 28, 2022 14:07 GMT+1)

**HIGHLAND CLO FUNDING, LTD.**
**Director**

4

1066695/0006/G14185564v1

**Acknowledgement and acceptance**

I hereby acknowledge receipt of the above, accept the Offer contained therein and instruct the Company to make payment of the consideration for the Share repurchase to the following bank account:

Account Name:

Account Number:

Sort Code:

IBAN:

BIC:

…………………………………………………………
**CLO Holdco, Ltd.**

Date:

5

**Schedule 1**
**Consent of shareholders**

6

**Schedule 2**
**Written resolutions of the Eligible Shareholder(s)**

7

**Schedule 3**
**Share Buyback Agreement**

8

1066695/0006/G14185564v1

**Schedule 4**
**Waiver Letter**

9

**Schedule 5**

**Transfer of Shares or Stock**

| Full name of Undertaking | **Highland CLO Funding, Ltd.** |
| --- | --- |

| Full description of Security | Ordinary Shares |
| --- | --- |

| | Words | Figures |
| --- | --- | --- |
| Number or amount of Shares or other security and, in figures column only, number and denomination of units, if any | Seventy five million sixty one thousand six hundred and thirty and fifty five hundredths | 75,061,630.55 |

| Name(s) of registered holder(s) should be given in full; the address should be given where there is only one holder. If the transfer is not made by the registered holder(s) insert also the name(s) and capacity (e.g. Executor(s)) of the person(s) making the transfer. | In the name(s) of<br><br>CLO Holdco, Ltd.<br><br>300 Crescent Court, Suite 700<br>Dallas<br>Texas 75201<br>USA |
| --- | --- |

| I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below. | Signature(s) of transferor(s)<br><br>…………………………………………………<br>CLO Holdco, Ltd. |
| --- | --- |

| Full name(s) and full postal address(es) (including County or, if applicable, Postal District number) of the person(s) to whom the security is transferred.<br><br>Please state title, if any, or whether Mr., Mrs., or Miss. | HIGHLAND CLO FUNDING, LTD.<br><br>PO Box 650, 1st Floor, Royal Chambers,<br>St. Julian's Avenue,<br>St. Peter Port,<br>Guernsey GY1 3JX |
| --- | --- |

I/We request that such entries be made by the Registrar as are necessary to give effect to this transfer

10

11

1066695/0006/G14185564v1

**DATE OF CIRCULATION: 28 JUNE 2022**

**(the "Circulation Date")**

**HIGHLAND CLO FUNDING, LTD.**

**Guernsey registration number 60120**

**(the "Company")**

**MEMBERS' CONSENT – SECTION 3.2 OF THE MEMBERS AGREEMENT**

We, the undersigned, being the members of the Company who, at the Circulation Date were entitled to vote on the following resolution as if the same was proposed at a general meeting of the Company (the "**Eligible Members**") **HEREBY CONSENT TO** the circulation of the Offer, a copy of which is attached hereto.

| CONSENT | FOR | AGAINST |
|---|---|---|
| Circulation of the Resolution approving the Offer | | |

**SIGNATURES**

…………………………………
Director/Authorised Signatory
**CLO Holdco, Ltd**

…………………………………
Director/Authorised Signatory
**Highland Capital Management, L.P.**

…………………………………
Director/Authorised Signatory
**Lee Blackwell Parker, III**

…………………………………
Director/Authorised Signatory
**QUEST Trust Company, FBO Lee B. Parker III, ACCT #3058311**

………………………………
Director/Authorised Signatory
**QUEST Trust Company, FBO Hunter Covitz, ACCT #1469811**

………………………………
Director/Authorised Signatory
**QUEST Trust Company, FBO Jon Poglitsch, ACCT #1470612**

………………………………
Director/Authorised Signatory
**QUEST Trust Company, FBO Neil Desai, ACCT #3059211**

………………………………
Director/Authorised Signatory
**HCMLP Investments, LLC**

**Notes:**

1.  Please signify your agreement to the resolution proposed herein by casting your vote in the table above and signing and dating your copy (on the date of signing) and returning a pdf or fax copy to the Company as soon as possible, with the original signed copy returned to the Company immediately to be kept with the Company books.

2.  The resolution set out herein will lapse if not passed within 16 days of the date of circulation of the resolution.

3.  Pursuant to the terms of the members' agreement relating to the Company dated 15 November 2017, as amended from time to time, the affirmative vote or prior written consent of members holding in the aggregate more than seventy-five percent of the shares in issue in the capital of the Company is required in order to take any action in respect of any alteration or cancellation of any rights of any shares or of the share capital of the Company.

4.  To be effective, the Consent must be approved by members holding in the aggregate more than 75% of all of the shares issued in the capital of the Company.

5.  All members are eligible to vote on this Consent.

DATE OF CIRCULATION: _____ 2022

(the "Circulation Date")

**HIGHLAND CLO FUNDING, LTD.**

**Guernsey registration number 60120**

**(the "Company")**

We, the undersigned, being the members of the Company who, at the Circulation Date were entitled to vote on the following resolution as if the same was proposed at a general meeting of the Company (the "**Eligible Members**") **HEREBY RESOLVE** that the following resolutions be and are hereby approved as ordinary resolutions of the Company, such resolutions being deemed to be passed when the Eligible Members have signified their agreement to it by signing, dating and returning the instrument to the Company in accordance with instructions in Note 1 below:

**ORDINARY RESOLUTION**

**THAT** the terms of the proposed share buyback agreement (the "**Share Buyback Agreement**") for the acquisition by the Company of up to 153,139,231 ordinary shares in its issued share capital (the "**Shares**") (the "**Buyback**"), a copy of which is attached hereto, are hereby approved and authorised pursuant to section 314(2) of the Companies (Guernsey) Law, 2008 as amended and that the Company be authorised to enter into the Share Buyback Agreement.

| CONSENT | FOR | AGAINST |
|---|---|---|
| Terms of the Share Buyback Agreement are approved and authorised | | |

**SIGNATURES**

…………………………………

Director/Authorised Signatory
**CLO Holdco, Ltd**

…………………………………

Director/Authorised Signatory
**Highland Capital Management, L.P.**

…………………………………

Director/Authorised Signatory
**Lee Blackwell Parker, III**

…………………………………

Director/Authorised Signatory
**QUEST Trust Company, FBO Lee B. Parker, ACCT #3058311**

1066695/0006/G14141545v4       2

…………………………………
Director/Authorised Signatory
**QUEST Trust Company, FBO Hunter Covitz, ACCT #1469811**

…………………………………
Director/Authorised Signatory
**QUEST Trust Company, FBO Jon Poglitsch, ACCT #1470612**

…………………………………
Director/Authorised Signatory
**QUEST Trust Company, FBO Neil Desai, ACCT #3059211**

…………………………………
Director/Authorised Signatory
**HCMLP Investments, LLC**

**Notes:**

1. Please signify your agreement to the resolution proposed herein by casting your vote in the table above and signing and dating your copy (on the date of signing) and returning a pdf or fax copy to the Company as soon as possible, with the original signed copy returned to the Company immediately to be kept with the Company books.

2. The resolution set out herein will lapse if not passed within 16 days of the date of circulation of the resolution.

3. The authority to enter into the Share Buyback Agreement pursuant to this resolution shall expire on 31 December 2022 however, the expiration of such authority shall not prevent the Company from purchasing Shares after the expiration of the authority in accordance with the terms of the Share Buy Back Agreement made and agreed prior to the expiration of the authority.

**DATED:** **2022**

**HIGHLAND CLO FUNDING LTD.**

**AND**

**CLO HOLDCO, LTD.**

---

**SHARE BUYBACK AGREEMENT**

---

1066695/0006/G14140427v5

**CAREY OLSEN**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 1 |
| 2. | REPURCHASE OF SHARES | 2 |
| 3. | CLOSING | 2 |
| 4. | FURTHER ASSURANCE | 3 |
| 5. | GOVERNING LAW AND JURISDICTION | 3 |
| 6. | ENTIRE AGREEMENT | 3 |
| 7. | AGREEMENT SURVIVES COMPLETION | 3 |
| 8. | COUNTERPARTS | 3 |

i

**THIS AGREEMENT** is made on                    2022

**BETWEEN:**

(1)    **HIGHLAND CLO FUNDING, LTD.**, a non-cellular company limited by shares registered in the Island of Guernsey with registration number 60120, with its registered office at PO Box 650, 1st Floor, Royal Chambers, St. Julian's Avenue, St. Peter Port, Guernsey GY1 3JX (the "**Company**"); and

(2)    **CLO HOLDCO, LTD.,** of 300 Crescent Court, Suite 700, Dallas, Texas, 75201, USA (the "**Shareholder**").

**WHEREAS:**

(A)    The Shareholder holds 75,061,630.55 ordinary shares in the Company (the "**Shares**"):

(B)    Conditional upon execution of a waiver, the Company proposes to repurchase the Shares on the terms of this agreement.

(C)    The eligible shareholders of the Company have approved the terms of this Agreement by way of written ordinary resolution in accordance with the Law.

**IT IS HEREBY AGREED** as follows:

1.      **DEFINITIONS AND INTERPRETATION**

1.1     In this Agreement where the context so admits the words standing in the first column of the table next hereinafter contained shall bear the meanings set opposite to them in the second column hereof:

| | |
|---|---|
| **Agreement** | means this agreement, including any schedules or appendices hereto, as amended from time to time; |
| **Articles** | means the memorandum and articles of incorporation of the Company, as amended, supplemented, or otherwise modified from time to time; |
| **Closing** | means the completion of the sale and purchase of the Shares pursuant to this Agreement; |
| **Law** | means the Companies (Guernsey) Law, 2008 (as amended); |
| **Resolutions** | means the written resolution of members of the Company approving the terms of the repurchase and the written consent of members approving the circulation of the resolution approving the terms of the repurchase; |

1

| | |
|---|---|
| **Shares** | has the meaning given in Recital (A) of this Agreement; and |
| **Stock transfer form** | means the stock transfer form attached at schedule 2 hereto. |
| **Waiver Letter** | means the waiver letter attached at schedule 1 hereto. |

Unless the context otherwise requires and except as varied or otherwise specified in this Agreement, words and expressions contained in this Agreement shall bear the same meaning as in the Articles.

2.    **REPURCHASE OF SHARES**

2.1    Subject to the below, the Shareholder agrees to sell and the Company agrees to buy the Shares in consideration for payment of USD 0.472 per Share in cash (the "**Consideration**") and otherwise on the terms of this Agreement.

2.2    The sale and purchase described above shall be conditional upon:

2.2.1    execution of the Waiver Letter by the Shareholder; and

2.2.2    the passing of the Resolutions by the requisite majority of members of the Company.

2.3    In the event that both of the conditions described above have not been satisfied in full by 11 July 2022, unless the Parties otherwise agree this Agreement shall automatically terminate and no party shall have any claim of any nature whatsoever against any other party under this Agreement.

2.4    The Shareholder warrant that there are no liens, charges, or other encumbrances over or in respect of the Shares as at the date of this Agreement and undertakes to take all action within their power to ensure that such warranty shall be true with respect to the Shares as at the date of the Share Buyback in accordance with this Agreement.

3.    **CLOSING**

3.1    Closing shall take place as soon as practicable following execution and delivery to the Company of this Agreement, the Stock transfer form and the Waiver letter.

3.2    At Closing:

2

3.2.1     the Company shall procure payment of the Consideration in cash to the Shareholder's nominated bank account as notified to the Company or such other method of payment as shall be agreed between the Parties;

3.2.2     the Shareholder shall cease to be the holder of the Shares and shall have no further rights with respect to the Shares and the Shares shall be cancelled; and

3.2.3     the Company shall instruct its secretary to update the register of members accordingly.

4. **FURTHER ASSURANCE**

The Shareholder agrees that, on being requested in writing by the Company to do so, they shall, at their own expense, immediately execute and sign all such instruments and documents and do all such things as may be reasonably necessary in order to give effect to the terms of this Agreement.

5. **GOVERNING LAW AND JURISDICTION**

This Agreement shall be governed by and construed in accordance with the laws of the Island of Guernsey and the parties to this Agreement irrevocably submit to the exclusive jurisdiction of the courts of the Island of Guernsey in respect of any claim, dispute or difference arising out of or in connection with this Agreement.

6. **ENTIRE AGREEMENT**

This Agreement constitutes the entire and only legally binding agreement between the Parties relating to its subject matter and no variation of this Agreement shall be effective unless made in writing and signed by or on behalf of the Parties and expressed to be such a variation.

7. **AGREEMENT SURVIVES COMPLETION**

This Agreement shall remain in effect despite its completion.

8. **COUNTERPARTS**

This Agreement may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each party had signed the same document.

3

**IN WITNESS WHEREOF** the parties have executed this Agreement the day and year first above written.

**SIGNED** for and on behalf of

**HIGHLAND CLO FUNDING, LTD.**

acting by:

Richard Boleat (Jun 28, 2022 14:26 GMT+1)
...........................................

(Director)

**SIGNED** for and on behalf of

**CLO HOLDCO LTD.**

acting by:

...........................................

(Director)

4

**SCHEDULE 1**

**WAIVER LETTER**

5

**SCHEDULE 2**

**STOCK TRANSFER FORM**

6

**DATED:** _____ **2022**


**HIGHLAND CLO FUNDING LTD.**

**CLO HOLDCO, LTD.**

**THE CHARITABLE DONOR ADVISED FUND, L.P.**

---

**CLAIMS WAIVER AGREEMENT**

---

**CAREY OLSEN**

**TABLE OF CONTENTS**

| | | |
|---|---|---|
| 1. | DEFINITIONS AND INTERPRETATION | 2 |
| 2. | EFFECT OF THIS AGREEMENT | 4 |
| 3. | RELEASE | 4 |
| 4. | AGREEMENT NOT TO SUE; DISMISSAL OF PROCEEDINGS | 6 |
| 5. | COSTS | 6 |
| 6. | WARRANTIES AND AUTHORITIES | 6 |
| 7. | INDEMNITIES | 7 |
| 8. | NO ADMISSION | 7 |
| 9. | SEVERABILITY | 7 |
| 10. | ENTIRE AGREEMENT | 7 |
| 11. | GOVERNING LAW AND JURISDICTION | 7 |
| 12. | ENFORCEABILITY | 8 |
| 13. | VARIATION | 8 |
| 14. | CO-OPERATION | 8 |
| 15. | COUNTERPARTS | 8 |

i

**THIS AGREEMENT** is made on               2022

**BETWEEN:**

(1)     **HIGHLAND CLO FUNDING, LTD.**, a non-cellular company limited by shares registered in the Island of Guernsey with registration number 60120, with its registered office at PO Box 650, 1st Floor, Royal Chambers, St. Julian's Avenue, St. Peter Port, Guernsey GY1 3JX (the "**Company**");

(2)     **CLO HOLDCO, LTD.** of 300 Crescent Court, Suite 700, Dallas, Texas, 75201, USA ("**CLO Holdco**"); and

(3)     **The Charitable Donor Advised Fund, L.P.**, whose registered office address is at [*address*] ("**DAF**"),

(collectively, the **"Parties"**).

**WHEREAS:**

(A)     The "**Participating Shareholders**" are shareholders in the Company who are electing to participate in the Buyback (as defined below).

(B)     Around the same time as this Agreement, the Company is proposing to buy back shares held in the Company (the "**Buyback**"), subject to the terms of that certain Share Buyback Agreement, to which this agreement is attached as Schedule 1.

(C)     Certain of the parties connected to the Company have been, or continue to be, or have indicated they may in the future become, involved in various disputes arising directly or indirectly in relation to, or connection with the Company, the Company's business, and the Company's decisions, activities, management of its investments and all other actions and inactions of the Company since its incorporation, in whatever jurisdiction and howsoever arising (the "**Disputes**"). Without limiting the general and broad definition of Disputes, the Disputes include, but are not limited to, the following allegations:

       a.    that, as alleged, among other places, in the HarbourVest Actions, HCMLPI's acquisition of shares in the Company from HarbourVest Dover Street IX Investment L.P. (Dover IX), HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HV International VIII Secondary L.P. and HarbourVest Skew Base AIF L.P. (collectively, "**HarbourVest**") and/or the settlement agreement concluded between HarbourVest and HCMLP and approved by the Bankruptcy Court in HCMLP's Bankruptcy Case on 14 January 2021 were improper, the result of fraud and breach of fiduciary duty, violated the Governing Documents, and had a negative impact on the value of the Company and/or unfairly prejudiced CLO Holdco or DAF;

       b.    that the Company has improperly failed to terminate its relationship with HCFA, in its capacity as the Company's portfolio manager;

1

c.  that the Company, HCMLP, HCMLPI, and/or HCFA have failed to act properly in connection with certain redemption proceeds currently retained by the Acis CLOs for the benefit of the Acis Entities following the redemption of the senior notes issued by the Acis CLOs;

d.  that the Company, HCMLP, HCMLPI, and/or HCFA have acted improperly in connection with the Declaratory Judgment Action and NSOF Action;

e.  that the Company, HCFA, HCMLP, and/or HCMLPI have acted improperly in connection with the Advisory Board;

f.  that the Company acted inappropriately by entering into a settlement agreement with Acis and Terry on 28 April 2021;

g.  that the Company has failed to provide adequate or timely provide information regarding the Company's activities, including with respect to the Declaratory Judgment Action and the NSOF Action, to CLO Holdco; and

h.  that the Company, HCFA, HCMLP, or HCMLPI have otherwise acted in an unfairly prejudicial manner to CLO Holdco and/or the Company's other shareholders.

(D)  In consideration of participating in the Buyback, each of the Parties agree to fully and finally settle any and all Disputes between them and their Related Parties on the following terms. For the avoidance of doubt, none of the Parties accept any fault or liability with respect to the Disputes or any other matters connected to the Company.

**IT IS HEREBY AGREED** as follows:-

1.  **DEFINITIONS AND INTERPRETATION**

1.1  In this Agreement where the context so admits the words standing in the first column of the table next hereinafter contained shall bear the meanings set opposite to them in the second column hereof:

| | |
|---|---|
| **Acis** | means collectively Acis Capital Management, L.P., and Acis Capital Management GP LLC; |
| **Acis CLOs** | means collectively (i) Acis CLO 2014-4 Ltd. And Acis CLO 2014-4 LLC, (ii) Acis CLO 2014-5 Ltd. and Acis CLO 2014-4 LLC, and (iii) and Acis CLO 2015-6 Ltd. and Acis CLO 2015-6; |
| **Acis 2015-6** | means Acis CLO 2015-6 Ltd. and Acis CLO 2015-6; |
| **Acis Entities** | means collectively Acis, Terry, Brigade, USBank; |

2

| | |
|---|---|
| **Advisory Board** | means the advisory board established pursuant to clause 4 of the members' agreement relating to the Company dated 15 November 2017; |
| **Agreement** | means this agreement, including any schedules or appendices hereto, as amended from time to time; |
| **Bankruptcy Case** | means the case of *In re Highland Capital Management, L.P.*, Case No. 19-34054-sgj11, pending in the Bankruptcy Court; |
| **Bankruptcy Court** | means the United States Bankruptcy Court for the Northern District of Texas, Dallas Division; |
| **Brigade** | means Brigade Capital Management, L.P.; |
| **CLO Holdco** | means CLO Holdco, Ltd.; |
| **Declaratory Judgment Action** | means *U.S. Bank, National Association, et al v. The Charitable Donor Advised Fund, L.P., et al,* , Case No. 21-cv-11059, pending in the U.S. District Court for the Southern District of New York; |
| **Governing Documents** | means the offering memorandum, members' agreement, and articles of incorporation of the Company, as amended, supplemented or otherwise modified from time to time; |
| **HarbourVest Actions** | means collectively (i) *Charitable DAF Fund, L.P., et al v. Highland Capital Management, L.P., et al*, Case No. 21-cv-00842-B, filed in the U.S. District Court for the Northern District of Texas, (ii) *Charitable DAF Fund, L.P., et al v. Highland Capital Management, L.P., et al*, Case No. 21-03061-sgj, pending in the Bankruptcy Court, and (iii) any appeals from any orders or judgments entered therein; |
| **HCFA** | means Highland HCF Advisors Ltd.; |
| **HCMLP** | means Highland Capital Management, L.P.; |
| **HCMLPI** | means HCMLP Investments, LLC; |
| **Highland Entities** | means HCFA, HCMLP, HCMLPI, the Highland Claimant Trust, and the Highland Litigation Sub-Trust; |
| **NSOF Action** | means *NexPoint Strategic Opportunities Fund v. Acis Capital Management, L.P., et al.*, Case No. 21-cv-04384, pending in |

3

|  | the U.S. District Court for the Southern District of New York. |
|---|---|
| **Related Parties** | means a Party's parent, shareholders, subsidiaries, assigns, transferees, representatives, principals, trustees, members, limited partners, agents, employees, officers or directors, advisors and attorneys, each in their capacities as such. With respect to the Company, its Related Parties shall not include for the purposes of this Agreement: (i) the Highland Entities; (ii) any of the Participating Shareholders; or (iii) any of its other shareholders (if any) who have elected not to participate in the Buyback. With respect to CLO Holdco, its Related Parties shall include without limitation for the purposes of this Agreement (i) DAF and (ii) Mr. James Dondero; |
| **Terry** | means Mr. Joshua N. Terry; and |
| **USBank** | means U.S. Bank, National Association. |

Unless the context otherwise requires and except as varied or otherwise specified in this Agreement, words and expressions contained in this Agreement shall bear the same meaning as in the Governing Documents.

2. **EFFECT OF THIS AGREEMENT**

2.1 The Parties agree that this Agreement shall immediately be fully and effectively binding upon them.

3. **RELEASE**

3.1 The Parties acknowledge that they are entering into this Agreement in consideration of participating in the Buyback (as the case may be), the sufficiency of which is agreed to hereby.

4

3.2     This Agreement is in full, final, and fully enforceable settlement of, and each Party hereby releases and forever discharges, all and/or any actions, claims (including without limitation crossclaims, counterclaims and recoupment), rights, suits, debts, demands and set-offs, or other claims of whatsoever nature, whether asserted in this jurisdiction or any other, including, without limitation, in the United States of America (the "**USA**") and/or any State within the USA, whether or not presently known to the Parties or to the law, including any and all claims that are "unknown," as that term is defined in California Civil Code Section 1542 or any similar law of any other jurisdiction, and whether in law or equity or otherwise, be they contractual, tort, statutory or otherwise, that each Party, its Related Parties or any of them ever had, may have or hereafter can, shall or may have against the other Parties or any of their Related Parties, the Highland Entities or any of their Related Parties, or the Acis Entities or any of their Related Parties arising out of, in relation to, or connected with:

3.2.1     the Disputes;

3.2.2     the underlying facts or allegations of the Disputes;

3.2.3     the HarbourVest Actions, the Declaratory Judgment Action, and the NSOF Action;

3.2.4     the Acis CLOs;

3.2.5     any agreements between, or acts by, the Parties or their Related Parties (in their capacities as Related Parties) or any of them; and

3.2.6     any other matter arising out of, in relation to, or connected with the relationships between the Parties or the underlying facts or allegations of the Disputes,

collectively, the "**Released Claims**".

3.3     Each Party and its Related Parties hereby acknowledges that it has been advised by its attorneys concerning, and is familiar with, California Civil Code Section 1542 and expressly waives any and all provisions, rights, and benefits conferred by California Civil Code Section 1542 or any law of any state or territory of the United States, or principle of common law, which is similar, comparable, or equivalent to the provisions of the California Civil Code Section 1542, including that provision itself, which reads as follows:

"A GENERAL RELEASE DOES NOT EXTEND TO CLAIMS THAT THE CREDITOR OR RELEASING PARTY DOES NOT KNOW OR SUSPECT TO EXIST IN HIS OR HER FAVOR AT THE TIME OF EXECUTING THE RELEASE, AND THAT, IF KNOWN BY HIM OR HER WOULD HAVE MATERIALLY AFFECTED HIS OR HER SETTLEMENT WITH THE DEBTOR OR RELEASED PARTY."

5

The Parties and their Related Parties acknowledge that inclusion of the provisions of this section 3.3 of this Agreement was a material and separately bargained-for element of this Agreement. The Parties further acknowledge that the releases granted herein are specific releases, not general releases.

4.  **AGREEMENT NOT TO SUE; DISMISSAL OF PROCEEDINGS**

4.1 Each Party forever agrees, on behalf of itself and on behalf of its Related Parties, not to sue, commence, voluntarily aid in any way, prosecute, cause to be commenced or prosecuted against (i) any other Party or its Related Parties, (ii) the Highland Entities and their Related Parties, and (iii) the Acis Entities and their Related Parties, any action, suit or other proceeding (or to continue the prosecution of any action, suit, or other proceedings) concerning the Released Claims, in this jurisdiction or any other.

4.2 Each of DAF and CLO Holdco agree to dismiss the HarbourVest Actions with prejudice within five business days of the date hereof.

4.3 DAF, and CLO Holdco agree to consent to an order in the Declaratory Judgment Action finding that neither DAF or CLO Holdco have any claims or causes of action against the Acis CLOs, the Acis Entities, or any of their Related Parties.

4.4 Clauses 3 and 4.1 of this Agreement shall not apply to, and the Released Claims shall not include, any claims in respect of any breach of this Agreement.

5.  **COSTS**

The Parties shall each bear their own legal costs in relation to the negotiation, execution and performance of this Agreement.

6.  **WARRANTIES AND AUTHORITIES**

6.1 Each Party warrants and represents that it has not sold, transferred, assigned or otherwise disposed of its interest in any of the Released Claims.

6.2 Each Party warrants and represents that it has not sold, transferred, hypothecated, pledged, or otherwise encumbered its shares in the Company and that it holds such shares free and clear of any and all claims and interests.

6.3 Each Party warrants and represents to the others with respect to itself that it has the full right, power and authority to execute, deliver and perform this Agreement.

6.4 Each Party warrants and represents that it has been represented by, or had the opportunity to be represented by, independent legal counsel of its own choosing in connection with the negotiation and execution of this Agreement.

6

7. **INDEMNITIES**

If any Party or its Related Parties bring any of the Released Claims against any other Party or its Related Parties, then such Party agrees to indemnify, hereby indemnifies, and shall keep indemnified, each of the other Parties and their Related Parties against all costs and damages (including the entire legal expenses) incurred in all future actions, claims and proceedings in respect of such Released Claims, including all costs and damages (including the entire legal expenses) of enforcing the terms of this Agreement against such Party or its Related Parties or any of them.

8. **NO ADMISSION**

This Agreement is entered into in connection with the compromise of disputed matters and in the light of other considerations. It is not, and shall not be represented or construed by the Parties as, an admission of liability or wrongdoing on the part of any Party to this agreement or any other person or entity.

9. **SEVERABILITY**

If any provision or part-provision of this Agreement is or becomes invalid, illegal or unenforceable, it shall be deemed modified to the minimum extent necessary to make it valid, legal and enforceable. If such modification is not possible, the relevant provision or part-provision shall be deemed deleted. Any modification to or deletion of a provision or part-provision under this clause shall not affect the validity and enforceability of the rest of this Agreement.

10. **ENTIRE AGREEMENT**

10.1 This Agreement constitutes the entire agreement between the Parties and supersedes and extinguishes all previous agreements, promises, assurances, warranties, representations and understandings between them, whether written or oral, relating to its subject matter.

10.2 Each Party agrees that it shall have no remedies in respect of any statement, representation, assurance or warranty (whether made innocently or negligently) that is not set out in this Agreement. Each Party agrees that it shall have no claim for innocent or negligent misrepresentation or negligent misstatement based on any statement in this Agreement.

11. **GOVERNING LAW AND JURISDICTION**

11.1 This Agreement shall be governed by and construed in accordance with the laws of the Island of Guernsey.

7

11.2 Each Party irrevocably agrees that the courts of the Island of Guernsey shall have exclusive jurisdiction to settle any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with this Agreement or its subject matter or formation.

12. **ENFORCEABILITY**

This Agreement may be pled in any jurisdiction, including without limitation in the USA and any State within the USA, as a full and complete defense to, and may be used as a basis for an injunction against, any action, suit or other proceeding that may be prosecuted, instituted or attempted by any Party or its Related Parties in connection with the Released Claims. Each Party agrees that in the event an action or proceeding is instituted by any Party or its Related Parties to enforce the terms or provisions of this Agreement, the Party or its Related Parties successfully enforcing this Agreement, as applicable, shall be entitled to an award of costs and legal expenses incurred in connection with enforcing this Agreement.

13. **VARIATION**

No variation of this Agreement shall be effective unless made in writing and signed by or on behalf of the Parties and expressed to be such a variation.

14. **CO-OPERATION**

The Parties shall deliver or cause to be delivered such instruments and other documents at such times and places as are reasonably necessary or desirable, and shall take any other action reasonably requested by the other Parties for the purpose of putting this Agreement into effect.

15. **COUNTERPARTS**

This Agreement may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each Party had signed the same document.

*[REMAINDER OF PAGE INTENTIONALLY BLANK]*

8

**IN WITNESS WHEREOF** the parties have executed this Agreement the day and year first above written.

**SIGNED** for and on behalf of
**HIGHLAND CLO FUNDING, LTD.**
acting by:

Richard Boleat (Jun 28, 2022 15:03 GMT+1)
....................................................
(Director)

**SIGNED** for and on behalf of
**CLO HOLDCO LTD.**
acting by:

....................................................
(Director)

**SIGNED** for and on behalf of
**THE CHARITABLE DONOR ADVISED FUND, L.P.**
acting by:

....................................................
(Director)

9

**Transfer of Shares or Stock**

| | |
|---|---|
| Full name of Undertaking | **Highland CLO Funding, Ltd.** |
| Full description of Security | Ordinary Shares |

| | Words | Figures |
|---|---|---|
| Number or amount of Shares or other security and, in figures column only, number and denomination of units, if any | Seventy five million sixty one thousand six hundred and thirty and fifty five hundredths | 75,061,630.55 |

| | |
|---|---|
| Name(s) of registered holder(s) should be given in full; the address should be given where there is only one holder. If the transfer is not made by the registered holder(s) insert also the name(s) and capacity (e.g. Executor(s)) of the person(s) making the transfer. | In the name(s) of<br><br>CLO Holdco, Ltd.<br><br>300 Crescent Court, Suite 700<br>Dallas<br>Texas 75201<br>USA |
| I/We hereby transfer the above security out of the name(s) aforesaid to the person(s) named below. | Signature(s) of transferor(s)<br><br>…………………………………………………<br>CLO Holdco, Ltd. |
| Full name(s) and full postal address(es) (including County or, if applicable, Postal District number) of the person(s) to whom the security is transferred.<br><br>Please state title, if any, or whether Mr., Mrs., or Miss. | HIGHLAND CLO FUNDING, LTD.<br><br>PO Box 650, 1st Floor, Royal Chambers,<br>St. Julian's Avenue,<br>St. Peter Port,<br>Guernsey GY1 3JX |

I/We request that such entries be made by the Registrar as are necessary to give effect to this transfer



**Carey Olsen (Guernsey) LLP**
PO Box 98
Carey House
Les Banques St. Peter Port
Guernsey GY1 4BZ

**D: +44 1484 752272**

**E: Alex.Horsbrugh-Porter@ogier.com**

Ref: AHP/TIC/MGM/JDI/182801.00001
Your ref: TC//1066695/0005/G13448784v1

BY EMAIL ONLY
Email: tim.corfield@careyolsen.com

**Attention: Advocate Tim C. Corfield**

7 July 2022

Dear Sirs,

**Highland CLO Funding Ltd (the "Company")**

We refer to your client's letter dated 28 June 2022 and annexures (the **Offer**). Where applicable the defined terms used in previous correspondence will be adopted in this letter.

The Offer is rejected on the following grounds and we make the following additional points:

1. The Consideration defined at clause 2.1 of the draft Share Buyback Agreement amounts to 85% of the Company's alleged net asset value (**"NAV"**) as of 31st May 2022. Given the Company's assets are primarily comprised of cash, your client's offer effectively amounts to an unjustifiable 15% discount on cash.

2. The Company's NAV has historically factored up to a 70% discount on the book value of its CLO investments because the CLO investments are valued on a mark to market basis. However, when the Company's CLO investments have been liquidated or realised, they often achieve close to, if not, full value. There are no material risks or uncertainties around the existing CLO investments and so the baseline NAV upon which your client's offer must be judged is additionally discounted.

3. The cumulative effect of the points raised in paragraphs 1 and 2 is that, if our client accepts your client's offer:

   a. the HCM Shareholders would receive an immediate benefit from the 15% discount our client would be taking on what is primarily cash; and

   b. the HCM Shareholders would receive an additional benefit of the CLO positions being held to maturity and realised at their full value as opposed to our client accepting an offer based on discounted mark to market valuations of the remaining CLO positions.

**Ogier (Guernsey) LLP**
Redwood House
St Julian's Avenue
St Peter Port
Guernsey GY1 1WA

T +44 1481 721672
F +44 1481 721575
**ogier.com**

**Partners**
Martyn Baudains
Paul Chanter
Tim Clipstone
Craig Cordle
Simon Davies
Bryan de Verneuil-Smith
Gavin Ferguson
Matthew Guthrie

Alex Horsbrugh-Porter
Christopher Jones
Marcus Leese
Sandie Lyne
Catherine Moore
Mathew Newman
Bryon Rees

106-25393027-3

4.  Your client holds substantial cash reserves pursuant to a recent transaction which it has not distributed. There is no rationale for the Company to withhold cash reserves in circumstances where the Company is in a state of wind down and is not actively trading. This position is exacerbated given that inflation is destroying the value of the cash deposits your client holds.

5.  It is clear from your correspondence that your client has discussed the terms of the proposed Share Buyback transaction with the HCM Shareholders in advance of making the Offer. The Company continues to prioritise the interests of the HCM Shareholders over those of our client. Its conduct in this regard is not only unacceptable but clear and egregious evidence of the inappropriately close relationship between the Company and the HCM Shareholders.

6.  Without canvassing our client's views on the proposed Offer, your client has improperly incurred expense instructing attorneys to prepare transactional documents which is a highly inefficient use of the Company's resources.

There are other issues with the terms of the Offer which are unacceptable to our client, and regarding those, all rights are reserved. As the Offer is rejected we do not propose setting those out here in addition to those above. However, we reserve the right to set these out further in any claim against your client.

Even though the Offer demonstrates another instance of your client unfairly prejudicing our client's interests, in addition to those set out in our letter of 30 March 2022, our client remains willing to discuss any sensible proposals which would allow it to exit the Company on terms which are not punitive and treat all shareholders fairly.

However, given the Company (i) is improperly holding significant cash deposits whose value is being eroded through inflation, (ii) has taken no action, or refused to disclose what action it has taken, against US Bank and Acis who continue to unlawfully withhold significant cash deposits, and (iii) has an inappropriately close relationship with the HCM Shareholders, our client is left with no option but to commence proceedings in the appropriate forum.

Please confirm that you are instructed to accept service on behalf of your client.

Yours faithfully

*Alex Horsbrugh-Porter*

**Alex Horsbrugh-Porter**
**for and on behalf of**
**Ogier (Guernsey) LLP**

2

# CAREY OLSEN

Carey Olsen (Guernsey) LLP
PO Box 98
Carey House
Les Banques
St Peter Port
Guernsey GY1 4BZ
Channel Islands

T +44 (0)1481 727272
F +44 (0)1481 711052
E guernsey@careyolsen.com

Our ref       TC/EA/1066695/0005/G14246226v1
Your ref      AHP/TIC/MGM/JDI/182801.0001

Advocate A. Horsbrugh-Porter                     15 July 2022
Partner
Ogier (Guernsey) LLP
Redwood House
St. Julian's Avenue
St. Peter Port
Guernsey
GY1 1WA

**By Email Only: alex.horsbrugh-porter@ogier.com**

Dear Sir

**Highland CLO Funding, Ltd.**

We refer to your letter dated 7 July 2022.

The various allegations made in that letter are wrong. Moreover, the concluding two paragraphs appear contradictory. You maintain that your client "*remains willing to discuss any sensible proposals which would allow it to exit the Company on terms which are not punitive and treat all shareholders equally*" (our client is also willing to engage with yours to bring about the desired exit), yet you maintain (incorrectly) that your client "*is left with no option but to commence proceedings*" (it being denied that your client is without optionality as to its conduct).

We are instructed to accept service of proceedings.

As your client is not in the jurisdiction, we shall require information from you *viz.* security for costs if your client pursues its misconceived claim for unfair prejudice.

Yours faithfully

*Carey Olsen (Guernsey) LLP*

**CAREY OLSEN (GUERNSEY) LLP**

**PARTNERS:** A Alexander C Anderson A Boyce T Carey R Clark T Corfield D Crosland M Dunster K Friedlaender E Gray D Jones N Kapp T Lane K Le Cras D Le Marquand B Morgan J Morgan **CONSULTANTS:** N Carey M Eades J Greenfield G Hall

The Guernsey limited liability partnership known as Carey Olsen (Guernsey) LLP is a limited liability partnership incorporated in Guernsey on 1 March 2018 with its registered office at Carey House, Les Banques, St Peter Port GY1 4BZ and registration number 95.

**BERMUDA BRITISH VIRGIN ISLANDS CAYMAN ISLANDS GUERNSEY JERSEY**
CAPE TOWN HONG KONG LONDON SINGAPORE                 careyolsen.com



**Carey Olsen (Guernsey) LLP**
PO Box 98
Carey House
Les Banques St. Peter Port
Guernsey GY1 4BZ

**D:  +44 1484 752272**
**E: Alex.Horsbrugh-Porter@ogier.com**

Ref:  AHP/TIC/MGM/JDI/182801.00001
Your                                                    ref:
TC//1066695/0005/G13448784v1

BY EMAIL ONLY
Email: tim.corfield@careyolsen.com

**Attention: Advocate Tim C. Corfield**

30 March 2022

Dear Sirs,

**Highland CLO Funding Ltd**

We act on behalf of CLO Holdco, Ltd. in its capacity as a minority shareholder in Highland CLO Funding, Ltd (the **Company**).  Our client has instructed us in relation to historic and continuing concerns regarding the management of the Company which has resulted in substantial harm to the value of the Company's assets and unfair prejudice to our client's interests as shareholder.  We refer to your letter of 26 October 2021 in which you confirmed you act on behalf of the Company. This letter is specifically directed to the directors of the Company (the **Directors**) in their capacity as officers and agents of the Company.

As set out more fully below, of particular concern to our client is the conduct of the Directors in aligning the Company's interests with the wider commercial interests of the majority shareholder in the Company, Highland Capital Management L.P. (**HCM**).  HCM has a close relationship with the Company as well as with third parties related to the Company.  HCM is sole shareholder of and sub-advisor to Highland HCF Advisor, Ltd., which is the Company's portfolio manager (the **Portfolio Manager**).  Acis Capital Management, L.P. (**Acis**), has also managed and (our client understands) continues to provide significant management services in respect of the underlying assets of the Company.  HCM and Acis have had and continue to have a close commercial relationship and historical ties, such as the provision of back-office services by HCM to Acis as well as prior common ownership, including that Joshua N. Terry (**Terry**) is a former limited partner of HCM and is now the President and sole limited partner of Acis.  Acis is also a creditor in HCM's current bankruptcy proceedings in the U.S.

HCM's relationship with the Company, HFCA and Acis, has resulted in HCM gaining significant influence and indirect control over the management decisions made in respect of the Company's assets, and a close relationship with the Company.

Our client has provided the Directors with several opportunities to justify the various actions they have taken which are the subject of our client's concerns, including information requests by our client in order for our client to better understand their position and rationale.  However the Directors

**Ogier (Guernsey) LLP**
Redwood House
St Julian's Avenue
St Peter Port
Guernsey GY1 1WA

T +44 1481 721672
F +44 1481 721575
**ogier.com**

**Partners**
Martyn Baudains
Paul Chanter
Tim Clipstone
Craig Cordle
Simon Davies
Bryan de Verneuil-Smith
Gavin Ferguson
Matthew Guthrie

Alex Horsbrugh-Porter
Christopher Jones
Marcus Leese
Sandie Lyne
Catherine Moore
Mathew Newman
Bryon Rees

LITI-25141022-10

have largely refused to answer those requests and where information has been provided, it has been very limited and insufficient.

In this letter we set out the background and the historical decisions taken by the Directors which have had a harmful impact on the assets of the Company, resulting in (i) unfair prejudice to our client as minority shareholder, and (ii) breaches of the Directors' duties owed to the Company. The conduct of the Directors has cumulatively resulted in the compromised position in which our client now finds itself.

Our client has expressed to your client a number of times that it wishes to extricate itself from its shareholding in the Company in order to protect its interests. The Applicant has previously proposed a redemption of its shareholding in exchange for a proportionate share of the Company's interests in its the underlying assets. Despite such proposal being reasonable, fair and viable, your client has rejected them on unfounded grounds.

In this letter our client again makes this same proposal for the redemption of its shares, as it persists with its position that your client should not have any objections to it, however as an alternative, our client also proposes a second option to achieve the mutual separation of our client from your client, in the form of a share buy-back (more fully described below). Our client's proposals in this regard are collectively defined below as the "CLO HoldCo Exit Proposals". Our client requests your client to consider these proposals on the basis *inter alia* that:

1. The decisions and actions taken by the Directors are clearly made to promote the interests of HCM and Acis to the detriment of our client and, in circumstances where the Company is effectively acting as the agent of HCM and/or Acis;

2. The Company is not being actively managed and is being wound down. As such, the Company serves as an unnecessary layer of complexity within the structure and does not have any objective purpose/commercial rationale other than to unfairly promote the wider commercial interests of HCM and Acis; and

3. Our client merely seeks to protect its rights as shareholder in the Company by securing a direct interest in the underlying assets of the Company, and the CLO HoldCo Exit Proposals are the only practical, fair and reasonable means to do so without having to pursue unnecessary costly and protracted litigation.

**Background**

*Business of the Company*

The Company is a closed-ended registered collective investment scheme registered with the Guernsey Financial Services Commission under The Protection of Investors (Bailiwick of Guernsey) Law, 2020. The Company's stated investment objective is to provide shareholders with stable and growing income returns and to grow the capital value of the Company's investment portfolio through opportunistic exposure to senior secured loans and collateralized loan obligation (**CLO**) notes, on both a direct and indirect basis.

Amongst the Company's investments are significant interests in the following CLOs:

1       ACIS CLO 2014-4 Ltd.;

2       ACIS CLO 2014-5 Ltd.; and

3       ACIS CLO 2014-6 Ltd. (**ACIS 6**)

       (the **ACIS CLOs**).

*Shareholders of the Company*

Our client is the owner of 49.015% of the issued share capital in the Company by virtue of its subscription for 143,454,001.00 ordinary shares in the capital of the Company. Following the transfer of 73,139,613.56 ordinary shares, our client's shareholding in the Company was reduced to 70,314,387.44 ordinary shares pursuant to the terms of the subscription and transfer agreement dated 15 November 2017. The majority shareholder in the Company is HCM (directly and indirectly through a wholly-owned subsidiary), which owns 50.612% of the issued share capital of the Company. The remaining shareholding of 0.373% is held by four individuals, namely Lee Blackwell Parker III, Hunter Covitz, Jon Poglitsch, and Neil Desai.

We are instructed that our client subscribed for its interest in the Company based upon advice from HCM which was given to our client's parent entity, Charitable DAF Fund L.P (**Charitable DAF**). Charitable DAF was the original holder of the ACIS CLOs which it transferred to HCLOF as consideration for our client's shareholding in HCLOF.

*Directors*

The Directors were selected and appointed by ordinary resolution passed solely by HCM, as majority shareholder, without consultation with the remaining minority shareholders.

The annual accounts of the Company for the financial year ended 31 December 2020 (the **Accounts**) provide that the Directors are committed to maintaining high standards of corporate governance. The Accounts further provide that the Directors are committed to ensuring that the Company complies, and continues to comply, with the Guernsey Financial Services Commission's Code of Corporate Governance (the **Code**).

*Management of ACIS CLOs*

As mentioned above, the ACIS CLOs have historically been managed by Acis and whilst under its management, the ACIS CLOs were subject to a significant diminishment of value due to the underperformance of Acis. In fact, JP Morgan's analysis of 1200 CLOs identified the ACIS CLOs as being the worst performing of all those reviewed. The underperformance of the ACIS CLOs in turn led to a significant diminishment of the value of the Company. Despite this, the Directors failed to take any remedial steps such as terminating Acis' management services at the relevant stage in order to mitigate against further loss to the value of the Company's assets.

The Company has appointed and retained the Portfolio Manager pursuant to a portfolio management agreement dated 15 November 2017 (the **Portfolio Management Agreement**). Pursuant to clause 2 of the Portfolio Management Agreement, the Portfolio Manager acts as the investment manager to the Company and manages the investment and reinvestment of the cash, financial instruments, and other properties comprising the assets and liabilities of the Company. Therefore, the Portfolio Manager has broad discretion to select and manage the Company's portfolio of investments, including the ability to instruct the Company's custodian with respect to any acquisition, disposition or sale of investments and to provide certain support and assistance, personnel and credit and market research and analysis in connection with the investment and ongoing management of the Company's portfolio.

Pursuant to clause 2 of the Portfolio Management Agreement, the Portfolio Manager must carry out its role subject to and in accordance with the investment policy of the Company as set out in the Offering Memorandum (the **Investment Policy**), and pursuant to clause 5 of the Portfolio Management Agreement, the Portfolio Manager is subject at all times to *inter alia* the Investment Policy and the Shareholders Agreement.

As mentioned above, HCM, in addition to being the majority shareholder of the Company, is also the sole shareholder and sub-advisor to the Portfolio Manager and therefore has the ability to

3

control the Portfolio Manager through its ability to exercise its majority voting power in the Portfolio Manager and its position as sub-advisor. Both the Portfolio Manager (directly pursuant to the Portfolio Management Agreement) and HCM (directly or indirectly by virtue of its control of the Portfolio Manager) provide advisory and management services to the Company and therefore have a close relationship with the Company.

Having outlined the background of the Company, its shareholders and managers, we now turn to the complaints and concerns our client has in relation to the management of the Company:

## 1. Transfer of shares at undervalue

As of 15 November 2017, HCM held 0.63% of the issued share capital of the Company, and it then subsequently acquired an additional 49.98% (the **HarbourVest Shares**) of the issued share capital of the Company from HarbourVest Dover Street IX Investment L.P. (**Dover IX**), HarbourVest 2017 Global Fund, L.P., HarbourVest 2017 Global AIF L.P., HV International VIII Secondary L.P. and HarbourVest Skew Base AIF L.P. (collectively, **HarbourVest**).

This acquisition was made pursuant to a settlement agreement concluded between HarbourVest and HCM and approved by the Bankruptcy Court of the Northern District of Texas on 14 January 2021 (the **HarbourVest Settlement Agreement**). The litigation that led to the HarbourVest Settlement Agreement was in connection with a claim brought by HarbourVest against HCM alleging certain failures by HCM to make appropriate disclosures that resulted in HarbourVest making an investment in the Company in circumstances that it otherwise would not have done.

It is our client's position that HCM's acquisition of the HarbourVest Shares pursuant to the HarbourVest Settlement Agreement had a negative impact on the value of the Company and/or unfairly prejudiced our client for the following reasons:

i) Pursuant to clause 6.2 of the Shareholders' Agreement, to which the Company is a party, when a member intends to sell its interest in the Company to a third party, the other members have the first right of refusal to purchase those interests pro rata for the same price that the member has agreed to sell, unless such sale is to an affiliate of the selling member.

Our client was not offered or even made aware of the opportunity to purchase any portion of the HarbourVest Shares, and therefore the Board of the Company should not have allowed the transfer of the HarbourVest Shares to HCM.

The Company, together with HCM and the Portfolio Manager, have breached the Shareholders' Agreement and caused it a loss of opportunity that it would have benefitted from had it been given the option to purchase its entitlement of the HarbourVest Shares at a highly favourable price.

In addition, transferring the HarbourVest Shares to HCM allowed HCM to take a majority interest in the Company and exert undue influence and control over the Company to our client's detriment.

ii) The sale price of the HarbourVest Shares was significantly below the net asset value which should have been ascribed to the HarbourVest Shares. It is our client's position that HCM acquired the HarbourVest Shares as result of collusion and inside trading activities. In particular, that HCM was in possession of non-public information indicating that HarbourVest were prepared to sell at a price well below the fair market value.

The abovementioned conduct has exposed the Company to potential liability in the United States for serious breaches of local anti-corruption, securities, advisory and compliance laws, fraud, misfeasance, breaches of fiduciary duties, as well as tortious interference, which may negatively

4

affect the value of our client's investment. As a result, on 12 April 2021, our client together with the sole shareholder of our client, Charitable DAF, filed a complaint in the United States District Court for the Northern District of Texas against HCM, the Portfolio Manager and the Company (the **CLO HoldCo Litigation**). The CLO HoldCo Litigation was brought on the basis of *inter alia* the alleged breach of fiduciary duty and statutory breaches of anti-fraud provisions, resulting in a loss to our client and Charitable DAF.

Most concerning to our client is that this conduct of the Company demonstrates that it has a conflict of interest due to its inappropriately close relationship with HCM and clearly favours the interests of HCM, as the parent company of the Portfolio Manager, over the other shareholders in the Company. The Company has not been managed in a fair and independent manner and this continues to be the case.

## 2. Bankruptcy of Company advisors

On 16 October 2019, HCM filed for Chapter 11 bankruptcy in the Delaware Bankruptcy Court, which was later transferred to the Bankruptcy Court of the Northern District of Texas. Prior to that, Acis had also filed for Chapter 11 bankruptcy in the Bankruptcy Court for the Northern District of Texas. Subsequently, HCM has terminated substantially all its employees, including all employees with CLO management experience, and it no longer has the necessary staffing to be a fully functioning registered investment advisor in line with the laws of the United States.

As a result, neither HCM as advisor to the Company, nor the Portfolio Manager (which is wholly owned and managed by HCM) nor Acis have the necessary resources to employ staff with the appropriate skills and qualifications to properly manage and advise the Company on the effective management of its investments, including the ACIS CLOs. This has understandably caused significant concern to our client due to the resultant risk to the value of its interest in the Company.

## 3. Unlawful Redemption Withholding

The indentured trustee of the ACIS CLOs is U.S. Bank N.A. (**U.S. Bank**). On or around 12 May 2021, the Company submitted a redemption request to U.S Bank in relation to each of the ACIS CLOs and such request was satisfied on or around 23 June 2021 when the CLOs liquidated their assets and redeemed their secured notes, leaving only the subordinated notes outstanding. The liquidation of the CLOs generated sufficient proceeds to make significant payments to the holders of subordinated notes, and the value of the redemptions is currently approximately US$23,601,000 (the **Redemption Proceeds**) (as indicated by reports from U.S. Bank and the interim financial statements of the Company for the period from 1 January 2021 to 30 June 2021 (the **Interim Accounts**).

Of this sum, approximately US$18,000,000 consists of funds to be paid in relation to the redemption of ACIS 6. Further to the advice of HCM, the Redemption Proceeds were received by, and are currently being held by, U.S. Bank in its capacity as indentured trustee.

Our client understands that U.S. Bank is currently refusing to distribute the Redemption Proceeds to the Company due to a perceived and unfounded threat of litigation by our client and/ or Charitable DAF against it which will purportedly trigger a potential future obligation by the CLOs to indemnify U.S. Bank in connection with such threatened litigation. CLOs are structured products with rated debt tranches, and therefore they are intended to operate automatically in accordance with cash waterfall provisions. There is no discretion by U.S Bank to withhold the Redemption Proceeds for any reason, including to fund any litigation such as a hypothetical potential future claim based on a purported indemnity.

The Directors have confirmed in the Interim Accounts that the withholding of the Redemption Proceeds by U.S. Bank is unlawful and inconsistent with the terms of the relevant CLO indentures (the **Unlawful Redemption Withholding**). Due to the Unlawful Redemption Withholding,

5

significant payments that CLO HoldCo and other subordinated noteholders would otherwise receive from the liquidation of the ACIS CLOs have been delayed on an unlawful basis. Our client also has reason to believe that that the funds being withheld by U.S Bank are currently or have been utilised by U.S Bank, Acis and/ or Terry, to fund certain litigation in the United States. Our client's position is that such litigation is a wasteful, unjustified and improper expenditure of Company funds and is brought contrary to the interests of our client as shareholder. Despite the Directors' express statement that the conduct of U.S Bank in withholding the Redemption Proceeds is unlawful, our client is not aware of any steps taken by the Directors in order to remedy the position, including taking action to compel U.S. Bank to release these funds or issuing any other legal proceedings in the US or elsewhere. Despite several requests by our client, the Directors have also refused to provide our client with any information relating to the Company's attempts to procure the release of these funds.

On 14 May 2021, NexPoint Strategic Opportunities Fund (**NexPoint**) filed a complaint in the United States District Court for the Southern District of New York against Acis, U.S. Bank, Terry and Brigade Capital Management, L.P. (the **NexPoint Litigation**). The NexPoint Litigation was brought on the basis of *inter alia* the alleged breach of fiduciary duty in the management of certain CLOs in which NexPoint invested, resulting in a loss to NexPoint. Our client has instructed us that the Company has intervened in the NexPoint Litigation, however our client has not been provided with the reasons for this decision by the Directors, given that such intervention will inevitably result in the Company incurring unnecessary costs.

On 3 December 2021, one of the Directors sent email correspondence to our client suggesting that, in relation to the NexPoint Litigation, if our client were able to "*procure a release from its affiliate NexPoint*" then the Directors would be willing to discuss the distribution by U.S Bank of the Redemption Proceeds in relation to ACIS 6. Such a request is not only misguided – as our client is not an affiliate of NexPoint under any proper definition of the term and is not in a position to procure NexPoint to take or not take any steps, including in relation to the NexPoint Litigation – but it is also improper for the Directors to place any undue condition on the distribution of the Redemption Proceeds or hold such distribution for ransom, given that our client is entitled to receive such proceeds outright by virtue of its shareholding in the Company.

The Directors are clearly not committed to resolving the Unlawful Redemption Withholding and are even willing to use inappropriate means to take advantage of the circumstances in order to secure a release from the NexPoint Litigation, seemingly for the benefit of Acis (who are a party to that litigation). The Directors have chosen to implicitly support U.S. Bank's unlawful position to the detriment of our client and have preferred the interests of Acis over our client's interests as shareholder, raising another conflict of interest and instance of our client being unfairly prejudiced by the conduct of the Directors. The Directors' failure to take any steps to remedy the Unlawful Redemption Withholding as well as the apparent conflict of interest in relation to Acis, has caused and continues to cause loss and resultant unfair prejudice to our client.

## 4. Appointment of Richard Katz to Advisory Board

Pursuant to clause 4.1 of the shareholders agreement relating to the Company dated 15 November 2017 (the **Shareholders' Agreement**), the Company is required to establish an advisory board composed of two individuals, one of whom must be a representative of our client. On 2 November 2021, and pursuant to our client's rights under clause 4.1 of the Shareholders Agreement, our client appointed one of its directors, namely Paul Murphy (**Mr Murphy**), as its representative on the advisory board of the Company (the **Advisory Board**). Notice of Mr Murphy's appointment was provided to the Company and its shareholders and the Company acknowledged such appointment by letter to Mr Murphy dated 6 January 2022. Our client's position is that Mr Murphy is the sole voting member of the Advisory Board. The main function of the Advisory Board in line with clause 4.3 of the Shareholders Agreement is to provide general advice to the Portfolio Manager or the Company with regard to Company activities and operations and other matters. Furthermore, clause

6

4.3 of the Shareholders Agreement provides that the Portfolio Manager may not act contrary to the advice of the Advisory Board.

Pursuant to clause 13 of the Portfolio Management Agreement, the Advisory Board has the unilateral right to terminate the Portfolio Management Agreement and remove the Portfolio Manager from its position independently of the Directors and the Company for cause, including where the Portfolio Manager breaches any terms of the Portfolio Management Agreement or the offering memorandum of the Company dated 15 November 2017. The functions and duties of the Advisory Board therefore include the review of the performance and decisions of the Portfolio Manager to ensure it complies with its duties.

Our client understands that HCM has appointed Mr Richard Katz (**Mr Katz**) to the Advisory Board as the second member by virtue of its right as the successor in title to the interest in the Company previously held by Dover IX. Pursuant to clause 4.1 of the Shareholders Agreement, no voting member of the Advisory Board shall be a controlled Affiliate of the Portfolio Manager. "Affiliate" is defined in the Shareholders Agreement as "*(i) any other person who, directly or indirectly, is in control of, or controlled by, or is under common control with, such person or (ii) any other person who is a director, officer or employee (a) of such person, (b) of any subsidiary or parent company of such person or (c) of any person described in clause (i) above.*"

Furthermore, pursuant to clause 4.4 of the Shareholders Agreement, a member of the Advisory Board shall be deemed removed from the Advisory Board if "*…such member is no longer an officer, director, manager, trustee, employee, consultant or other representative of CLO Holdco or Dover IX [or their successors in title], as applicable, or their respective Affiliates and shall be replaced as soon as practicable with a representative of CLO Holdco or Dover IX, or their respective Affiliates, as applicable…*".

HCM is in control of the Portfolio Manager as its wholly-owned subsidiary, and by virtue of clause 4.4, Mr Katz, as the appointed representative of HCM on the Advisory Board, may only be appointed to the Advisory Board for so long as he is an Affiliate of HCM. Therefore it is clear that, although Mr Katz may be appointed to the Advisory Board, any attempt by Mr Katz to assert a right to vote on the matters to be considered by the Advisory Board will be a breach of the Shareholders Agreement.

It is further noted that, the quorum for a meeting of the Advisory Board shall be "*…all of its members entitled to vote…*" and that all actions of the Advisory Board shall be "*… (i) by a unanimous vote of all of the members of the Advisory Board in attendance in a meeting at which a quorum is present and entitled to vote and not abstaining from voting or (ii) by a written consent in lieu of a meeting signed by all of the members of the Advisory Board entitled to consent and not abstaining from consenting.*". Therefore, despite Richard Boléat's assertions that the Advisory Board could not be quorate or act if Mr Katz were a non-voting member, it is clear that Mr Murphy, acting by himself and as the sole voting member appointed to the Advisory Board, will constitute the quorum for the Advisory Board and will be able to approve all actions of the Advisory Board.

As a result, our client asserts that, although it is willing to recognise the appointment of Mr Katz as a non-voting member of the Advisory Board, any action, vote or exercise of power by Mr Katz as a member of the Advisory Board shall be deemed invalid and will be challenged on the basis that it constitutes a breach to the Shareholders' Agreement and unfairly prejudices our client's interests.

## 5.      The Acis Settlement Agreement

We understand that the directors of the Company caused it to enter into a settlement agreement between the Company, Acis, Acis Capital Management GP, LLC and Terry on 28 April 2021 (the **Acis Settlement Agreement**). The Acis Settlement Agreement (which is subject to the law of Texas) purports to release all claims and causes of action that the Company has or may have, against the parties to the Acis Settlement Agreement as well as other third parties. As a result, the

7

Acis Settlement Agreement has compromised the Company's ability to pursue litigation both in Guernsey and the US that might return value to the Company and ultimately its shareholders. Although the Company may have received a very limited corporate benefit as a result of entering into the Acis Settlement Agreement, this is outweighed by the disproportionate prejudice caused to the Company due to the Directors' conduct. We would welcome an explanation as to the commercial rationale of the Company for entering into the Acis Settlement Agreement and what benefit has been returned to the Company as a result.

**6.      Our client's information requests**

For the reasons outlined above, our client has become increasingly concerned with regards to the value of its shareholding in the Company over time due to, *inter alia*, the diminishment of the value of the ACIS CLOs, the Unlawful Redemption Withholding, the effect and reasons for the Company's intervention in the NexPoint Litigation, the deficiencies in the commercial rationale for the Acis Settlement Agreement, the apparent lack of independence and conflict raised by the relationship between the Company and both HCM and Acis, and the improper management of the Company (especially considering the bankrupt status of Acis, HCM and the influence of HCM's bankruptcy on the Portfolio Manager which it owns).

Mr Murphy and our client require information from the Company in order to make an accurate evaluation of the impact of the investment and management decisions of the Directors and their advisors, including the Portfolio Manager, on the Company and the value of the shareholders' investment in the Company.

As set out above, the functions and duties of the Advisory Board include the review of the performance and decisions of the Portfolio Manager to ensure it complies with its duties. In order for Mr Murphy to properly discharge his duties as the sole voting member of the Advisory Board and to exercise the powers attached to his appointment, he requires access to sufficient relevant information from the Company, particularly in respect of its investment activities which encompasses a broad category of information. This is by virtue of both the implied information rights attaching to the Advisory Board, which are required to allow the members of the Advisory Board to make informed decisions, and the express rights provided by the further assurance provisions of the Shareholders Agreement as set out in clause 16.1 of that agreement.

On the basis of the rights and powers afforded to our client in its capacity as shareholder and Mr Murphy in his capacity as member of the Advisory Board, during the period 22 July 2021 to 11 January 2022, our client and Mr Murphy made a number of requests for further information to the Directors in respect of the Company and its activities, including:

1      what advice the Company received to support their view that the withholding of the Redemption Proceeds by U.S. Bank is illegal;

2      what action the Company has taken to secure the release of the Redemption Proceeds by U.S. Bank;

3      what the commercial rationale was for the Company to enter into the Acis Settlement Agreement;

4      what advice the Company has received, and what action the Company has taken, in light of the Bankruptcy of HCM and Acis and the corresponding impact on the ability of the Portfolio Manager and Acis to provide portfolio management services to the Company under the Portfolio Management Agreement;

5      the reasons for the Directors' decision that the Company would intervene in the NexPoint Litigation, given that such intervention will result in the Company incurring unnecessary costs and does not seem to have a proper rationale;

8

6       which entities and/ or individuals are currently acting as advisor to the Company, if any; and

7       what action the Company intends taking to preserve the value of the Company and of our client's interest therein.

Despite repeated requests, to date our client and Mr Murphy have received limited and insufficient information from the Directors. Pursuant to clause 16 of the Shareholders Agreement, the Company will exercise all powers that it is able to procure that the provisions of the Shareholders Agreement are properly and promptly observed and given full force and effect according to the spirit and intention of the agreement. In breach of clause 16 of the Shareholders Agreement, the Directors have refused to provide the necessary information to Mr Murphy and our client in spite of Mr Murphy's position as the sole voting member of the Advisory Board and our client's rights as shareholder. Therefore Mr Murphy cannot effectively fulfil his role on the Advisory Board and our client is unable to make informed investment decisions.

The purported justification given by the Directors for the refusal of such requests for information is that our client, as a shareholder, has limited rights to information available to it under the Companies (Guernsey) Law, 2008, as amended (the **Companies Law**). However, the Directors' duties to provide our client with information go beyond its statutory rights as shareholder and extend to their duty in equity to give shareholders sufficient information for them to make informed decisions. The essence of this duty is based on reasonableness and fairness in the circumstances and the duty includes a duty not to mislead or conceal material information and to advise shareholders in clear and comprehensible terms.

Furthermore, the Directors have stated that they are committed to complying with the principles of the Code set forth by the GFSC, and in particular, Principle 8 of the Code indicates that the Directors should *"…ensure that satisfactory communication takes place with shareholders and is based on a mutual understanding of needs, objectives and concerns"* and that the Directors *"…should ensure the provision to shareholders of adequate information on which they may base informed decisions"*. The actions of the Directors in failing to provide our client with the information it seeks results in the Directors failing to comply with the Shareholders' Agreement, breaching their duty in equity to provide the shareholders with sufficient information, and also do not meet the standards required by Principle 8 of the Code in relation to shareholder engagement.

It is especially unfair and alarming to our client that the Directors refuse to provide our client with information in circumstances where that information is available to HCM as the majority shareholder. HCM is able to make informed investment decisions regarding its investment in the Company while our client is unfairly not afforded the same rights.

In the most recent correspondence received from the Directors on 20 January 2022, the Directors have again stonewalled our client and Mr Murphy by failing to provide adequate responses to any of the queries raised by Mr Murphy. In so doing they have displayed both a lack of regard for our client's rights and interests in the Company and Mr Murphy's role on the Advisory Board.

## 7.    CLO Holdco Exit Proposals

*(i) Redemption Proposal*

Due to our client's various concerns in relation to the management of the Company as set out above and its impact on our client's shareholding, our client is of the view that its continued membership of the Company has become untenable.  As a result, our client has previously made a number of proposals to the Company in relation to exit strategies so that it may be extricated from the Company.  Foremost among these proposals was the proposal made by our client to the Directors that the Directors undertake a redemption of the shares in the Company held by our client. By way of an overview, our client proposed that:

1. the Directors undertake a redemption of the shares held by our client in accordance with article 9 of the articles of incorporation of the Company (the **Articles**) and section 311 of the Companies Law; and

2. the consideration payable by the Company for the redemption of our client's shares would be the transfer of the legal and beneficial title to a 49.015% equity share in all assets held by the Company, including the ACIS CLO's, to which our client is entitled in proportion to its shareholding (the **Transfer Assets**),

    (the **Redemption Proposal**).

*(ii) Share Buyback Proposal*

Our client stands by its position that the Redemption Proposal is the simplest, most efficient and most flexible procedure for achieving a resolution to our client's concerns set out in this letter. However, in the interests of reasonableness and advancing negotiations, our client is willing to consider an alternative option for the mutual separation of our respective clients by means of the Company undertaking an off-market acquisition of the shares held by our client in the Company pursuant to article 8 of the Articles and sections 313 and 314 of the Companies Law, which utilises a well-defined statutory share buyback procedure. This would involve the following steps being taken:

1   The Directors will work with our client to conclude an agreement as contemplated by section 314(1) of the Companies Law for the acquisition by the Company of our client's entire shareholding in the Company, pursuant to which the consideration for the acquisition of the relevant shares would be the transfer of the legal and beneficial title to the Transfer Assets to our client (the **Buyback Agreement**);

2   Upon the Buyback Agreement being concluded, the Directors will hold a board meeting at which they will approve the Buyback Agreement and circulate proposed shareholder resolutions to the shareholders of the Company (the **Shareholders**) in which they:

    (a)   recommend that the Shareholders approve the Share Buyback Proposal and the Company's entry into the Buyback Agreement;

    (b)   request the Shareholders' approval to the terms of the Buyback Agreement; and

    (c)   request that the Shareholders grant the Directors the requisite authority to implement the Share Buyback Proposal; and

3   upon receipt of the requisite Shareholder approval, the Directors will take the necessary steps to implement the Share Buyback Proposal on the terms agreed with our client and pursuant to the provisions of sections 313 and 314 of the Companies Law, the Articles and the members' agreement relating to the Company dated 15 November 2017.

Either of the CLO HoldCo Exit Proposals would be the most effective means of resolving the concerns raised in this letter, as well as being in the best interests of the Company and each of the Shareholders, for the following reasons:

1   The Directors have previously rejected the Redemption Proposal on the purported basis that not all the Shareholders may be able to accept an in specie distribution. Neither of the CLO HoldCo Exit Proposals involve the distribution of a dividend for purposes of the Companies Law and therefore would not be subject to the constraints placed on the Company by section 304(4) of the Companies Law (if the Transfer Assets were transferred to our client in the form of a dividend distribution). Therefore, by undertaking either of the CLO HoldCo Exit Proposals, the Directors would be permitted to transfer the Transfer

10

Assets to only our client and would not be obliged to transfer other proportions of the Company assets to any of the other Shareholders;

2      Our client has confirmed that it is able to receive the Transfer Assets and there are no legal, tax, regulatory, commercial, or other reasons that our client will not be able to hold the legal and beneficial title to its proportionate share of the Company's assets directly;

3      Neither of the CLO HoldCo Exit Proposals would result in the Company being unable to satisfy the solvency test as detailed at section 527 of the Companies Law immediately following their execution. The Transfer Assets represent less than half of the Company's total assets and the transfer of the beneficial and legal title of such assets will result in a corresponding transfer of both the benefits and the liabilities and obligations attaching to the Transfer Assets to our client;

4      Both the CLO HoldCo Exit Proposals would result in a straightforward exit of our client from the Company's ownership structure and accordingly would result in an immediate mitigation of the concerns that our client currently has in respect of the management of the Company, a diffusion of any connected shareholder tensions and avoid resultant potential litigation. This be in the best interests of all relevant parties, especially given the limited secondary market for shares in the Company and the fact that other potential courses of action would see our client remain as a Shareholder;

5      Our client has obtained an independent opinion from an established expert in the field of CLO structure management and operations (the **Expert**) that indicates that the CLO HoldCo Exit Proposals would both be administratively simple and that they would at most require merely changing the custodian of 49.015% of the holdings in the Transfer Assets. Considering that the ACIS CLOs were originally held by our client's holding company, Charitable DAF, the transfer of the Transfer Assets to our client as part of either of the CLO HoldCo Exit Proposals should therefore be a simple way of the Company distributing such equity to our client;

6      It is also the Expert's opinion that the transfer of the Transfer Assets to our client as part of either of the CLO HoldCo Exit Proposals would not impact the value of the CLO positions as a whole and therefore would not prejudice the remaining Shareholders;

7      The Directors have also previously rejected the Redemption Proposal on the purported basis that it would compromise the Company's supra-majority in relation to the CLOs in certain litigation proceedings in New York. In the interests of resolving the ongoing disputes between our respective clients, our client would be amenable to agree to vote in conjunction with the Company in respect of the voting rights attaching to those CLOs represented in the Transfer, provided that the exercise of any such voting rights would result in an increase to the chances of making a good return from the CLOs. The details of such an agreement may be refined at a later stage once your client has agreed in principle to the terms of either of the CLO HoldCo Exit Proposals.

**Conclusion**

For the reasons set out above, our client is of the view that the actions of the Directors (who have been appointed by and clearly act in the best interests of HCM as the majority shareholder in the Company) are such that the Directors have breached various duties owed to the Company and have conducted the Company's affairs in a manner which is unfairly prejudicial to our client's rights as a minority shareholder. This is based on a pattern of conduct including but not limited to:- the lack of transparency, mismanagement of Company assets, breaches of the Shareholders Agreement, the lack of independence and conflicts of interest, the failure to observe our client's shareholder rights pursuant to the Shareholders Agreement and the failure to recognise and give

11

effect to the rights of Mr Murphy as the sole voting member of the Advisory Board as afforded by the Shareholders Agreement and Portfolio Management Agreement.

Our client is of the view that the most fair and practical resolution to the current state of affairs is for the parties to agree to either of the CLO HoldCo Exit Proposals, which will allow our client to secure a direct interest in the CLOs so that the value of its investment in the Company is protected, whilst also securing the exit of our client from the Company. This removes the potential for unnecessary, protracted and costly shareholder action. The CLO HoldCo Exit Proposals are reasonable, simple and will clearly not cause prejudice to the Company.

Absent an agreement to either of the CLO HoldCo Exit Proposals, our client is effectively hamstrung as it will be limited to either selling or retaining its shareholding in the Company. However, the Company is restricting even those options as our client cannot form a view as to the value of its investment and whether or not is should sell its interest if it is not provided with the information necessary to make such a decision. It is also unlikely that that our client will be able to find a purchaser for its interest in the Company at fair value given the behaviour and attitude of the Directors, the Company and HCM to date.

Our client restates its willingness to reach an amicable solution and encourages the Directors to meaningfully consider the CLO HoldCo Exit Proposals and engage constructively with our client. In the absence of an agreement between the Company and our client as to an appropriate resolution to our client's concerns set out above within 14 days of the date of this letter, our client reserves its rights to seek appropriate relief from the Royal Court in order to protect its rights. A copy of this letter will be brought to the attention of the Royal Court in any such proceedings.

All our client's rights are reserved.

Yours faithfully

*Alex Horsbrugh-Porter*

**Alex Horsbrugh-Porter**
**for and on behalf of**
**Ogier (Guernsey) LLP**

12

**CAREY OLSEN**

Carey Olsen (Guernsey) LLP
PO Box 98
Carey House
Les Banques
St Peter Port
Guernsey GY1 4BZ
Channel Islands

T +44 (0)1481 727272
F +44 (0)1481 711052
E guernsey@careyolsen.com

Our ref          TC/EA/1066695/0005/G13984230v1
Your ref         AHP/TIC/MGM/JDI/182801.0001

Advocate A. Horsbrugh-Porter                                        14 April 2022
Partner
Ogier (Guernsey) LLP
Redwood House
St. Julian's Avenue
St. Peter Port
Guernsey
GY1 1WA

**By Email Only: alex.horsbrugh-porter@ogier.com**

Dear Sir

**Highland CLO Funding, Ltd.**

As you know, this firm is Guernsey legal counsel to Highland CLO Funding, Ltd. ("**HCLOF**" or the "**Company**"). Where the context permits, this letter adopts the defined terms appearing in your firm's letter of 30 March 2022. Where necessary, it also adopts the substance of this firm's letter of 26 October 2021 in response to your Advocate Clipstone's email timed at 13.43hrs on Wednesday 20 October 2021 to, *inter alios*, the directors of the Company. We note that you "*act on behalf of*" CLO Holdco, Ltd., which holds 49.015% of the issued share capital in the Company (hereafter as the context permits "**CLO Holdco**" or the "**Shareholder**").

**(A) Introduction**

It is clear that your client is labouring under significant factual and legal misapprehensions. We address many of these below, but your assertion that the present Directors were "*selected and appointed by ordinary resolution passed solely by HCM…without consultation with the remaining minority shareholders*" is wrong and particularly telling. The current Directors were appointed by the former directors by way of filling the casual vacancies arising upon their resignations. HCM had no involvement in that process. More specifically, we make (and indeed repeat) the following prefatory observations.

First, your firm's letter of 30 March 2022 states in material part that it is "*specifically directed to the directors of the Company (the **Directors**) in their capacity as officers and agents of the Company*". This contextually inapposite (and confusing) language mirrors that which was used in your Advocate Clipstone's email timed at 13.43hrs on Wednesday 20 October 2021 ("*We … write to you, in your capacity as directors of the Company …*"). Your Ms. Malherbe sought – but failed – to clarify the position in her email to our Advocate Corfield timed at 15.53hrs on Wednesday 30 March 2022. We repeat here that your client's limited, statutory rights and entitlements *viz.* the Company are as against the Company, and not as against the Directors in that capacity. This is fundamental and immutable company law and particularly relevant to the context where your letter is prefaced with inferences of mismanagement or misconduct ("*… of particular concern to our client is*

**PARTNERS:** A Alexander  C Anderson  A Boyce  T Carey  R Clark  T Corfield  D Crosland  M Dunster  K Friedlaender  E Gray
D Jones  N Kapp  T Lane  K Le Cras  D Le Marquand  B Morgan  J Morgan  **CONSULTANTS:** N Carey  M Eades  J Greenfield  G Hall

The Guernsey limited liability partnership known as Carey Olsen (Guernsey) LLP is a limited liability partnership incorporated in Guernsey on 1 March 2018 with its registered office at Carey House, Les Banques, St Peter Port GY1 4BZ and registration number 95.

**BERMUDA  BRITISH VIRGIN ISLANDS  CAYMAN ISLANDS  GUERNSEY  JERSEY**
**CAPE TOWN  HONG KONG  LONDON  SINGAPORE**                                    careyolsen.com

the conduct of the Directors …"), which for the avoidance of doubt are denied. Lest there be any confusion, we confirm that the directors of HCLOF do not accept any personal obligation or assumption of responsibility to CLO Holdco or any special factual relationship that would invoke personal liability to your client.

Second, in addressing your letter, the Company does not waive legal professional privilege or the Company's attorney client privilege, including applicable privileges shared with its portfolio manager and its legal counsel in whatever jurisdiction.

Third, and as previously summarised, US Bank's stated justification for retaining the CLO redemption proceeds at issue is premised on certain threatened (but seemingly meritless) litigation from CLO Holdco and certain other presently-filed litigation by NexPoint Strategic Opportunities Fund, an apparent affiliate of your client which is represented by US counsel who also represents CLO Holdco in separate litigation in the United States, including litigation in which the Company was cited as a nominal defendant. In short, the position in which your client (and the Company) has found itself on the facts is one which is of your client's own making and *ergo* one which is within your client's gift to resolve satisfactorily.

Fourth, we are satisfied that the Directors have at all material times acted in good faith in what they believe to be the best interests of the Company, without conflict of interest or partisanship. HCLOF's present strategy is aimed at maximising a return of capital to *all* shareholders at the least possible expense to the Company (*i.e.* not to prospectively damage return of capital by becoming unnecessarily embroiled in the proliferation of litigation which has plagued this structure, and the profligacy with which parties have acted in those disputes). The suggestion that the Directors have knowingly and deliberately "… *align[ed] the Company's interests with the wider commercial interests of the majority shareholder in* [HCLOF]", namely HCM, is simply wrong. Neither the Company nor its Directors are in a position to know with certainty what HCM's (and its principals') subjective intentions are *viz.* its commercial interests, and to the extent that HCM is not pursuing meritless activism against HCLOF and its Directors is indicative only of alignment in circumstance, not improper preference. You allege that HCM has "… *gain[ed] significant influence and indirect control over the management decisions* [of HCLOF and/or its Directors]". This is wrong. The Directors have exercised independent judgment at all times. To the extent that HCM has the requisite control of the majority of voting shares which would enable it to preclude certain matters reserved to shareholders is a simple fact and not evidence of conflict or influence. Given the long history of this matter and your client's intimate knowledge of it, you do your client a grave disservice in seeking to contrive allegations that are wholly illusory and inconsistent with the history and the facts of this matter. The Company urges your client to work with it, rather than against it, in seeking to resolve these matters.

Finally, and allied to our fourth point above, you unequivocally aver that certain acts or omissions (of the Directors) constitute: (i) unfair prejudice to your client; and (ii) breaches of fiduciary duty owed to the Company. These allegations are denied, and you have in any event failed to provide the necessary levels of particularity to warrant anything other than a denial for all purposes. The suggestion that the position in which the Company has found itself (through no act or omission on its part) means that it has no "*objective purpose / commercial rationale other than to unfairly promote the wider commercial interests of HCM and Acis*" is casuistic.

You demand a response to your lengthy letter within 14 days. That is not only unreasonable, but unnecessarily hawkish given that your client is unable to compel a response to an arbitrary timeline. Again, our client urges yours to collaborate with it (in the final analysis, their interests are aligned) and not litigate. Our client's rights are reserved in the event that your client precipitates legal action. We provide a summary response to your letter in the interests of engaging with your client *qua* Shareholder. Where this letter does not address any allegation, inference, assumption or (mis)statement in your letter of 30 March, such should not be considered by your client to be an acceptance of, or agreement or acquiescence to, them.

**(B) Transfer of Shares at Undervalue**

This matter relates to the 2021 HarbourVest Settlement Agreement, specifically the transfer of Company shares held by HarbourVest to a subsidiary of HCM. We note that the Company viewed favorably the fact that HCM reached a settlement with HarbourVest, as that ongoing dispute – between one of the Company's largest shareholders and HCM (who as you know was both the sponsor of the Company at its inception and the submanager of the Company's portfolio manager) – was expected to cause ongoing disruption, complication and cost to the Company, and was likely to impair the Company's ability to defend or resolve pending claims brought against the Company by Acis, who was making claims against the Company and its former directors based on allegations similar to those raised by HarbourVest. Resolving the complications with HarbourVest was thus viewed by the Directors as a positive outcome for the Company.

The legality of the settlement with HarbourVest was considered by the Company and due diligence performed through legal counsel. In particular, the Company considered with legal counsel the Shareholders' Agreement, and what you call the "*right of refusal*" provisions (essentially pre-emption rights) referenced in your letter, and concluded that the transfer of shares under the HarbourVest Settlement Agreement did not invoke the "*right of refusal*" provisions. We note that CLO Holdco objected at the time to the HarbourVest settlement on the basis of the Shareholders' Agreement and the "*right of refusal*" provisions, but withdrew that objection at the settlement hearing based on its review of HCM's response to its objection and the Company's governing documents. The U.S. Bankruptcy Court for the Northern District of Texas (the "**Bankruptcy Court**") concluded specifically that no right of refusal applied with respect to the transfer contemplated by the settlement, and recently dismissed with prejudice the lawsuit brought by your client against HCM, among others, seeking to re-litigate that issue. It should also be noted that your client's suit against the Company regarding this issue was voluntarily dismissed with prejudice.

The Company's unequivocal position – noting that it had no direct involvement in the negotiation of the HarbourVest settlement, and thus it can only assess these matters from an extraneous perspective – is that it has no reason to consider that the settlement was anything other than entirely proper and legal; and so far as the Directors are aware, the interested parties were given a full and fair opportunity to object, and those objections were either withdrawn and/or overruled.

The other allegation raised in your letter on this issue is that the sale price of the HarbourVest shares was inadequate and was the result of alleged collusion and insider trading activities. Again, the Company had no direct involvement in the settlement negotiations or the setting of the settlement consideration, and can therefore only speak to the best of its knowledge from its extraneous perspective. As to that, at the time of the HarbourVest Settlement, and continuing to today, the Company had, and has, no reason to believe that the settlement consideration agreed between HCM and HarbourVest was the product of anything other than an arms-length, good faith negotiation. Given that HarbourVest was not only transferring its shares, but was also compromising and settling large claims against HCM, it is reasonable to assume that HarbourVest was motivated to negotiate fair terms for itself. Further, your letter offers no evidence, explanation or other basis for the bare allegations your client makes as to collusion and insider trading. We note for completeness that the Company obtained a release from HarbourVest in connection with the settlement.

For these (non-exhaustive) reasons, the Company rejects any assertion that the aspects of the HarbourVest Settlement to the extent that they relate to the Company's interests in isolation, was prejudicial at all, much less unfairly prejudicial, to any shareholder of the Company.

**(C) Bankruptcy of Company Advisors**

You assert that the bankruptcy of HCM has rendered both HCM and the Portfolio Manager unable to service the necessary portfolio management functions on behalf of the Company. The Company considered the impact of HCM's bankruptcy on the Company, including whether it was necessary or advantageous to attempt to terminate the arrangements with Portfolio Manager. The Company, independent of input from HCM or the Portfolio Manager, reached the conclusion that it was more advantageous to the Company to retain the

Portfolio Manager and the services of HCM. The Company reached this decision for multiple reasons, including, among others, that replacing the Portfolio Manager would be difficult and costly – a circumstance that was previewed for all shareholders in the Company's November 2017 Offering Memorandum. In addition, though the HCM personnel who regularly provided services to the Company are no longer employed by HCM, HCM retains legacy personnel (and has employed consultants as required) and all the Company records and data that were historically maintained by the Portfolio Manager. The Directors of the Company met with HCM personnel, including Mr. James P. Seery, Jr., and concluded that these individuals could provide helpful assistance to the Company - particularly given the nature of the anticipated go-forward operations and activities of the Company, which principally involve the monetisation of existing holdings rather than the making of new investments or the deployment of additional capital. In summary, the Directors concluded that the costs, complications and drawbacks of seeking to replace the Portfolio Manager were clear and substantial, while the benefits of doing so were unclear, uncertain and otherwise outweighed.

We note specifically that HCM's indirect majority stake in the Company is, in the Company's view, neither inappropriate or disadvantageous. To the Company's understanding, HCM desires to maximize the value of its shares in the Company while minimizing the cost and delay of distributing that value to the Company's shareholders. In this regard, HCM's interests are aligned with the Company and CLO Holdco. Nonetheless, the Directors of the Company have and will continue to exercise their independent judgment in service of the best interests of the Company as a whole.

For these (non-exhaustive) reasons, the Company rejects any assertion that the continued services of the Portfolio Manager and HCM are prejudicial at all, much less unfairly prejudicial, to any shareholder of the Company.

**(D) Unlawful Redemption Withholding**

This item concerns the withholding, by US Bank (with, we believe, the support of Acis), of the proceeds of the redemption of the Acis CLOs. As your letter notes, the Company agrees, and has and continues to state affirmatively its belief that the withholding of the redemption proceeds by US Bank is unlawful under the respective CLO indentures. As reported to you previously, the Company and its counsel have engaged with US Bank and Acis on this issue. US Bank and Acis disagree with the Company. Direct legal action against US Bank and Acis remains an available option, and one that may ultimately need to be pursued. At present, however, the Company is pursuing courses of action that it and its counsel believe are designed to result in the disbursement of the redemption proceeds in a manner that is more timely, more certain and less costly than other available alternatives (including litigation against US Bank and/or Acis – although the Company's rights to pursue litigation have been preserved). For the avoidance of doubt, the Company (and its Directors) shares your client's desire to obtain, and ultimately distribute to its shareholders, the maximum value of net redemption proceeds as soon and as efficiently as possible. It appears the Company merely disagrees with your client on the best strategy to accomplish that common goal. It is the Directors' responsibility to determine and execute that strategy, not your client.

In response to your allegation concerning what you describe as a misguided and/or improper reference to procuring a release of the NexPoint litigation, the Company disagrees. The Company understands that the NexPoint Litigation is the primary obstacle to US Bank's distribution of the redemption proceeds related to Acis 6 (and the other Acis CLOs). Consistent with the above-noted goal (presumed common with all Company shareholders) to achieve the release and distribution of redemption proceeds as quickly and efficiently as possible, it is entirely appropriate and reasonable for the Company to note this circumstance to one of its shareholders who it believes is affiliated with the obstructionist. Regarding the affiliation between NexPoint and CLO Holdco, the Company understands that both entities are controlled by Mr. James Dondero. This affiliation has been recognised by a number of orders of the Bankruptcy Court, and NexPoint has made affirmative representations regarding Mr. James Dondero's control in its filings with the U.S. Securities and Exchange Commission.

For these non-exhaustive reasons, the Company rejects any assertion that the Company is not committed to resolving the Unlawful Redemption Withholding, or that any of its actions in this regard have been prejudicial at all, much less unfairly prejudicial, to any shareholder of the Company.

**(E) Appointment of Richard Katz to the Advisory Board**

We note your observations as a matter of contractual interpretation of the requisite provisions of the Shareholders' Agreement. It is unclear from your letter what allegations are being made against the Company itself. As your letter identifies, the Company is required to establish an Advisory Board. The Advisory Board is, of course, in existence.

The remainder of your assertions do not appear to contain any suggestion of an improper act or omission by the Company itself. Rather, your letter advances certain propositions with respect to the composition and operation of the Advisory Board, and threatens a challenge in the event that an event which has not yet come to pass – namely, Mr. Katz seeking to act or vote as a voting member of the Advisory Board – were to occur in the future. It is denied (given the limited role that the Company has in respect of the composition and operation of the Advisory Board) that the Company is responsible for any unfairly prejudicial conduct as inferred from the terms of your letter; and, indeed, that is a particularly fanciful suggestion where the allegedly unfairly prejudicial conduct in question has not yet even arisen.

As to Mr. Katz's eligibility to vote on Advisory Board matters, the Company notes as follows. Under clause 4.1 of the Shareholders' Agreement, no voting member shall be a "*controlled Affiliate of the Portfolio Manager*". It is, of course, a question of fact whether Mr. Katz constitutes a "controlled Affiliate" of the Portfolio Manager; but in principle the Company does not see any reason why Mr. Katz cannot be a "*consultant or other representative*" of HCM (such that clause 4.4 of the Shareholders' Agreement is not engaged), whilst not being a "*controlled Affiliate*" of the Portfolio Manager (for the purposes of clause 4.1 of the Shareholders' Agreement), contrary to the suggestion in your letter. The Company's understanding of the provisions of the Shareholders' Agreement, based on the advice it has received (privilege in which is not waived) is that they do not recognise the appointment of non-voting members of the Advisory Board. In circumstances where the Advisory Board is constituted of two individuals, the constitutional provisions of the operation of the Advisory Board are rendered otiose by the inference that one member may be 'non-voting', i.e. the Advisory Board would never be quorate, and would never be able to act (action requiring unanimity) or fulfil its functions.

That said, insofar as there is a disagreement in connection with Mr. Katz's role with respect to the Advisory Board, that is primarily a matter for your client to take up with HCM as the appointor of Mr. Katz as its representative. The Company has no power (under the Shareholders' Agreement or otherwise) to regulate HCM's appointment to the Advisory Board. Whilst it is accepted given the contents of your letter that, in the future, a dispute may materialise between your client and HCM if Mr. Katz were to seek to exercise his powers as a voting member of the Advisory Board, it is noted that under clause 4.2 of the Shareholders' Agreement, "*the Advisory Board shall meet with the Portfolio Manager at such times as requested by the Portfolio Manager from time to time*". Further, the consent of the Advisory Board is only required to approve the limited actions set out in clause 4.3 of the Shareholders' Agreement, none of which are expected to be of relevance to the Company going forward. Accordingly, your client's complaint is highly likely to be a theoretical one only (as demonstrated by the fact that there is no past or present business of the Advisory Board currently in dispute). It follows that the matters addressed in your letter do not give rise to any legitimate unfair prejudice complaint or action for breach of the Shareholders' Agreement.

**(F) The Acis Settlement Agreement**

You allege that the value of the Acis Settlement Agreement is "*outweighed by the disproportionate prejudice caused to the Company due to the Directors' conduct*". The Company disagrees.

The settlement with Acis resolved multiple claims against the Company and its former directors, claims based almost entirely on actions alleged to have been directed or orchestrated by and for the benefit of Mr. James

Dondero, who we, again, understand to be in control of both your client and NexPoint. These claims, if permitted to continue, would have caused continued expense and complication for the Company and would likely have been litigated in a court that has been highly unsympathetic to the interests and asserted defenses of the Company.

More importantly, the settlement permitted the lifting of the Bankruptcy Court injunction (an injunction that had been sustained on appeal to the United States District Court) that prevented the Company from redeeming the Acis CLOs. The value of the Acis CLOs has fluctuated over time and at points in time during the twelve months preceding the Acis settlement the CLOs had lost a large percentage of their worth. Further, the continued prohibition against redemption of the CLOs risked continued and systematic loss of value based upon the age of the CLOs and the costs of funding the CLOs' secured notes. Accordingly, and having taken specialist commercial advice, when the value available to the Company from the Acis CLOs improved, the Directors determined that it was in the Company's best interests to secure the ability to redeem the Acis CLOs and not risk subsequent deterioration in value. Acis was unwilling to agree to a settlement providing these benefits, and would oppose any effort to lift the pending injunction, without the releases contained in the Acis Settlement Agreement. The Company determined, with advice of counsel, that any value of the released claims was, at best, questionable and speculative, and otherwise outweighed by the benefits of a consensual lifting of the injunction and a release of claims and the dismissal of the pending litigation by Acis against the Company.

**(G) Your Client's Information Requests**

With respect to your client's information requests, these were addressed in our letter of letter of 26 October 2021. In particular, it was noted that the information requests had no bearing on the Request Rationale (as defined). The Company (and the Directors) are prepared to assist your client with valid requests for information pertaining to its investment and, as you intimate, value-based determinations; it is not, however, a proper request for your client to seek, in effect, pre-action discovery of legal advice for the purposes of shoring up woefully particularised allegations of unfair prejudice and breach of fiduciary duty. That was the concern which was addressed in our letter of 26 October, a concern which has seemingly been vindicated by the terms of your recent letter.

If your client has further requests for information, it should make those requests and we shall review them with our client.

**(H) CLO Holdco Exit Proposals**

A redemption of shares in the manner proposed in your letter is not possible pursuant to the Company's articles of incorporation (the "Articles"). The Articles only permit a redemption pursuant to article 9 thereof, which permits the board to compulsorily redeem shares in accordance with the Members' Agreement (as defined therein). The Members' Agreement only permits redemption in accordance with clause 5.5 which permits the Portfolio Manager, on behalf of the Company, to elect, upon notice to a Defaulting Member to redeem the Defaulting Member's shares in an amount equal to 50% of the outstanding amount existing as of the date of the default at a price of $0.0001 per Share (all capitalised terms as defined in the members' Agreement).

Pursuant to clause 3.2.3 of the Members' Agreement, any redemption other than pursuant to clause 5.5 requires the affirmative vote or prior written consent, as applicable, of the Members totalling in the aggregate more than seventy-five percent (75%) of the Company. It would also require an amendment to the Articles, which requires special resolution approval.

With respect to a buyback, which requires ordinary resolution approval of the terms of the relevant buyback contract, pursuant to section 314(5) of the Companies (Guernsey) Law, 2008 (as amended), your client is precluded from voting its shares.

Your letter already accepts that certain issues would arise and require a suitable solution (*e.g.*, changing the custodian of the relevant assets) if a redemption or share buy-back in consideration for the legal and beneficial title to 49.015% of the Company's underlying assets were to proceed. There are other legal and practical considerations that arise in connection with your proposals. In principle, the Directors would be willing to engage U.S. and Guernsey counsel to review those matters, provided that HCM and its affiliate, HCMLP Investments, LLC (collectively, the "HCM Shareholders"), who collectively own more than 50% of the Company's shares, are agreeable to voting for, or to considering voting for, either of your proposals. As you will appreciate, if the HCM Shareholders are not agreeable to supporting one of those proposals, neither is viable – and time and costs incurred in considering these matters further would be wasted. The Directors, having approached the HCM Shareholders to consider these options, can confirm that they are not agreeable to giving their support, or to giving further consideration to the same. For completeness, we note that CLO Holdco is, of course, able to requisition a shareholders' meeting and propose the relevant resolutions to the shareholders if it so wishes.

Whilst the Company considers it patently clear that any allegations of unfair prejudice are unsustainable, that should not be taken as an unwillingness on the part of our client to consider suitable commercial proposals that would result in the exit from the structure that CLO Holdco seeks. Accordingly, should your client have further options or variations on the existing options to canvass (or, indeed, if there is any disagreement as to our analysis of the Exit Proposals already advanced), the Directors confirm they will consider the same and liaise with the other shareholders as appropriate.

Yours faithfully

*Carey Olsen (Guernsey) LLP*

**CAREY OLSEN (GUERNSEY) LLP**

DocuSign Envelope ID: C46957CA-AAT5-44FE-8734-8FE059A50345

## Highland CLO Funding, Ltd.

(registered in Guernsey with registration number 60120)
Registered Office: PO Box 650, 1st Floor, Royal Chambers, St. Julian's Avenue, St. Peter Port,
Guernsey GY1 3JX
T: +44 1481 810 100   E: HighlandCLO@elysiumfundman.com

15th July 2022

Dear Shareholder,

I refer to my letter of 28 June 2022 in relation to the proposed offer to buy-back the shares in the Company using the Company's current liquidity (the "**Offer Letter**"), and to the pack of documentation circulated to the shareholders with the Offer Letter (the "**Offer Documents**").

As noted in the Offer Documents, the proposed buy-back of shares required the consent of shareholders holding in excess of 75% of all shares in issue in the capital of the Company to be received by 11 July 2022 in order to proceed.

I regret to inform you that the requisite consent was not obtained and therefore the offer lapsed on 11 July 2022.

The directors have determined that it would be appropriate to pay a dividend to shareholders, in line with the approach adopted for the previous two quarter-ends (December 2021 and March 2022). The intention is to return excess cash from the proceeds of the Company's investments to you as shareholders, while retaining sufficient funds to cover the Company's current and future outgoings, including assessed possible liabilities and required reserves.

It is anticipated that the dividend will be paid to your usual nominated account by 22 July 2022.

Yours sincerely,

Richard M. Boleat
Chairman
Highland CLO Funding Ltd.

**Highland CLO Funding, Ltd.**

(registered in Guernsey with registration number 60120)

Registered Office: PO Box 650, 1st Floor, Royal Chambers, St. Julian's Avenue,

St. Peter Port, Guernsey, GY1 3JX

T: +44 1481 810 100   E: HighlandCLO@elysiumfundman.com

18 July 2022

CLO Holdco Limited
300 Crescent Court
Suite 700
Dallas
TX 75201
USA
Email CRice@skyviewgroup.com

**Dividend Notice: Highland CLO Funding, Ltd.**

Dear Investor:

We are pleased to report that Highland CLO Funding, Ltd. (the "Company") has available cash for distribution to investors and has declared a cash dividend equal to $14.93 cents per share payable to all shareholders of the Company. The dividend is comprised of cash received from various of the Company's investment holdings received in the year to date.

**This dividend will be paid on or around 22 July 2022 to the account details previously provided:**

> Bank Name:    NexBank SSB
> ABA Routing No: 311973208
> Swift Code:      n/a
> Account Name: CLO Holdco LTD
> Account Number: 1612639

Please contact the Company's administrator, Elysium Fund Management Limited, by email or telephone as soon as possible to advise if your account details have changed:

> email:   highlandclo@elysiumfundman.com
> tel:     +44 (0) 1481 810100

You are receiving this dividend pursuant to Article 40 of the Articles of Incorporation of the Company and section 304 of the Companies (Guernsey) Law, 2008, as amended.  Please consult your tax advisor regarding the implications of your investment in the shares of the Company.

As always, please contact Elysium Fund Management Limited at the contact details above regarding any administrative matters or queries you may have in relation to this notice.

Yours faithfully,

Highland CLO Funding, Ltd

## Applicant's Exit Proposals

### A.    Redemption Proposal

1.    Due to the Applicant's various concerns in relation to the management of the Company as set out above and otherwise and its impact on the Applicant's shareholding, the Applicant is of the view that its continued membership of the Company is causing unfair prejudice to it and has become untenable.   As a result, the Applicant has previously made a number of proposals to the Company in relation to exit strategies so that it may be extricated from the Company.   In making such proposals to exit from the Company, the Applicant has taken the following aims into consideration:

- the transfer of ownership of the assets of the Company to the Applicant pro rata to its interest in the Company; and

- the mutual separation and exit of the Applicant from the Company structure to avoid any further prejudice to the Applicant and further disputes with HCM and/ or the Company.

- First among these proposals was that the Company undertakes an in specie distribution in the form of a redemption of the shares in the Company held by the Applicant, as follows:

- the Company would undertake a redemption of the shares held by the Applicant in accordance with article 9 of the Articles and section 311 of the Companies Law; and

- the consideration payable by the Company for the redemption of the Applicant's shares would be the transfer of the legal and beneficial title to a 49.015% equity share in all assets held by the Company, including the ACIS CLOs, to which the Applicant is entitled in proportion to its shareholding (the **Transfer Assets**).

2.    As set out above, the Redemption Proposal was previously advanced by the Applicant to the Company by written correspondence on 10 November 2021, on 3 December 2021 and again on 11 January 202 and was rejected each time by the Company for the following reasons:

- The in specie distribution would result in the Company's position in respect of its intervention in the NexPoint Litigation being compromised;

- It is not clear that the in specie distribution would be feasible as the CLO indentures would need to be reviewed to determine whether in-kind distributions to the relevant transferees are compatible with all relevant terms, and the Company would also need to ensure that each of the Company's shareholders are able both to receive and then hold the CLOs in question (either from a tax/regulatory perspective or based on the terms of the CLOs themselves);

- The Company's structure has a history of hostile litigation that has had a serious impact on the Company's interests over the years, and the Company has concerns that any changes to the status quo might prompt further contentious activity, potentially involving the Company, that would be damaging and costly for all parties.

3. In response to the first reason, in the interests of resolving the ongoing disputes the Applicant would be amenable to agree to vote in conjunction with the Company in respect of the voting rights attaching to those CLOs represented in the assets distributed to the Applicant pursuant to the Redemption Proposal.

4. The Applicant does not agree that the Redemption or the Share Buyback would not be feasible as the transaction would be compatible with all relevant terms of the CLO Indentures. In fact, the Applicant is willing to obtain an independent opinion from an established expert in the field of CLO structure management and operations that indicates that the Redemption Proposal would be administratively simple and would also not impact the value of the CLO positions of the Company as a whole or prejudice the remaining Shareholders.

## B. Applicant's Alternative Share Buyback Proposal

1. Notwithstanding that the Applicant considers that the Company's responses to the Redemption Proposal are unfounded, in the spirit of reaching an agreement with the Company, the Applicant later also proposed an alternative option to the Company in the form of a share buyback, in terms

of which the Company would undertake an off-market acquisition of the shares held by the Applicant in the Company pursuant to article 8 of the Articles and sections 313 and 314 of the Companies Law, which utilises a well-defined statutory share buyback procedure (the **Share Buyback Proposal**).

2.      Both the Redemption Proposal and Share Buyback Proposal (collectively the **CLO HoldCo Exit Proposals**) would ultimately achieve the same end which is the acquisition by the Company of the shares held by the Applicant, thus achieving an exit for the Applicant whilst allowing the ownership of Transfer Assets to be transferred to the Applicant without also requiring any portion of the assets of the Company to be transferred to the remaining Shareholders.  This is because, although section 302(1)(b) and section 318 of the Companies Law make it clear that both a redemption and a share buyback constitute a distribution and therefore need to comply with the relevant provisions of the Companies Law in that regard, they do not constitute a dividend and thus do not need to be undertaken equally in relation to all shareholders of the same class.

3.      The Articles provide for the ability of the Company to undertake both a redemption and an acquisition of its own shares (i.e. a share buyback) and therefore both the CLO HoldCo Exit Proposals are available to the Company to achieve the stated objectives.  However, the Share Buyback Proposal offers greater procedural certainty which would avoid the risk that the Company may seek to evade or delay the transfer of the relevant title in the Transfer Assets to the Applicant.

4.      In addition, the Share Buyback Proposal is viable, fair and reasonable for the following reasons:

- The Company has previously rejected the Redemption Proposal on the purported basis that not all the Shareholders may be able to accept an in specie distribution.  The Share Buyback Proposal will not involve the distribution of a dividend for purposes of the Companies Law and therefore would not be subject to the constraints placed on the Company by section 304(4) of the Companies Law (if the Transfer

Assets were transferred to the Applicant in the form of a dividend distribution). Therefore, the Company would be permitted to transfer the Transfer Assets to only the Applicant and would not be obliged to transfer other proportions of the Company assets to any of the other Shareholders;

- The Applicant has confirmed that it is able to receive the Transfer Assets and there are no legal, tax, regulatory, commercial, or other reasons that the Applicant will not be able to hold the legal and beneficial title to its proportionate share of the Company's assets directly;

- The Share Buyback Proposal should not leave the Company in an insolvent position as it will only see the transfer of ownership of 49.015% of the assets held by the Company, leaving the Company with just over half of its substantial assets. The transfer of ownership pursuant to a share buyback will also transfer any liabilities attaching to the Transferred Assets to the Applicant and a corresponding reduction in the liability attaching to the Company. This would assist the Company in satisfying itself that the it would continue to satisfy the solvency test following the completion of the share buyback;

- The Share Buyback Proposal would result in a straightforward exit of the Applicant from the Company's ownership structure and accordingly would result in an immediate mitigation of the concerns that the Applicant currently has in respect of the management of the Company and a diffusion of any connected shareholder tensions. This be in the best interests of all relevant parties, especially given the limited secondary market for shares in the Company and the fact that other potential courses of action would see the Applicant remain as a Shareholder;

- Considering that the ACIS CLOs were originally held by the Applicant's holding company, Charitable DAF, the transfer of the Transfer Assets to the Applicant as part of the Share Buyback Proposal should be a simple way of the Company distributing such equity to the Applicant.

5.      As is the case in respect of the Redemption Proposal, the Applicant is also willing to confirm the viability and legality of the Share Buyback Proposal through expert evidence.

6.      The Companies Law provides for a share buyback to take place either by means of a market acquisition (section 315) or off-market acquisition (section 314).  The share buyback must also be effected in accordance with the terms set out in the Articles and the terms of issue of the shares as per section 313(1) of the Companies Law.  As the shares of the Company are not listed, the off-market acquisition procedure is applicable.